**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:  Oil Spill by the Oil Rig** "**Deepwater** | * | **MDL NO. 2179** |
| | * | |
| **Horizon**" **in the Gulf of Mexico, on April** | * | **SECTION J** |
| **20, 2010** | * | |
| | * | |
| **This document relates to:** | * | **HONORABLE CARL J.** |
| **All Cases and No. 12-970** | * | **BARBIER** |
| | * | |
| | * | **MAGISTRATE JUDGE** |
| | * | **SHUSHAN** |
| | * | |

---

## <u>DECLARATION OF MARK HOLSTEIN</u>

I, Mark Holstein, do hereby declare that the following statements made by me are true and accurate to the best of my knowledge and belief:

### Introduction

**1.**      I am Managing Counsel for BP America, and one of the in-house legal representatives overseeing implementation of the Economic Loss and Property Damages Settlement ("Settlement Agreement"), as amended on May 2, 2012.  I make this Declaration based upon my own personal knowledge.

### Appointment of Patrick Juneau as Claims Administrator

**2.**      The Economic and Property Damages Settlement was negotiated over many months in 2011-12.   While the parties had discussed candidates a few weeks prior to the date of the announcement of the Agreement in Principle, we were unable to agree. Serious consideration of who would serve as Claims Administrator in the new claims

facility took place in the days just before the agreement was announced on March 2, 2012.

**3.** The Plaintiffs' Steering Committee proposed Patrick Juneau as a candidate for Claims Administrator. On February 26, 2012, after being contacted by counsel for BP and the PSC, Mr. Juneau traveled to New Orleans to meet with two outside attorneys for BP, Keith Moskowitz of the SNR Denton firm and Dan Cantor of Arnold & Porter LLP.

**4.** After the preliminary conversation with outside counsel, I interviewed Mr. Juneau for the first time on the evening of February 27, 2012. John Lynch, U.S. General Counsel BP America, Inc. and James Neath, Associate General Counsel for U.S. Litigation, were also present on behalf of BP as was Keith Moskowitz. Members of the Plaintiffs' Steering Committee were also present. Mr. Juneau said that he had been at his fishing camp when he was called "out of the blue" by Keith Moskowitz on BP's behalf. We discussed the prospect of Mr. Juneau serving as Claims Administrator and any issues it might present. Mr. Juneau said that he had been a neutral in large, complex civil disputes for many years, and had practiced for decades in Louisiana. As a result, he knew many members of the Plaintiffs' Steering Committee. He also had served as a neutral in matters in which PSC members had been counsel and had positive working relationships with them. However, he noted that no one could serve as a neutral in major cases over a long period of time without forming such relationships. He also noted that he had a reputation for fairness and that he had been a defense lawyer in private practice and had acted as counsel for both plaintiffs and defendants over a long career.

**5.** Either in this meeting, or one shortly after his appointment, Mr. Juneau further said he was still performing work in connection with the Toyota litigation, where he was

serving as a neutral, but that he expected such work to conclude by the end of the year. He said that if he were selected as Claims Administrator in this matter, other than that matter, he would devote his full-time energies to it.

**6.**     I asked him if he felt that he could faithfully comply with the terms of a settlement agreement as written, and he responded that he would.

**7.**     I have no recollection of Mr. Juneau saying at this meeting that he had represented the State of Louisiana as a lawyer in matters related to the Deepwater Horizon oil spill, or that he had done so for the purpose of advocating to the Gulf Coast Claims Facility as to how Louisiana resident claimants should be compensated. Nor do I recall him saying that at any time. Nor do I recall him saying he had previously considered the issue of how Deepwater Horizon oil spill claimants should be compensated (much less the specific details of that issue), what documentation claimants should have to provide to recover for claims, or the GCCF release.

**8.**     In July 2013, I was interviewed by the Freeh Group as part of the mandate given it by this Court to investigate misconduct in the CSSP. At that time, there was much public interest as to allegations of misconduct at the CSSP and whether senior staff had conflicts, apparent conflicts, or potential conflicts. I discussed with the Freeh Group some conflicts that alarmed BP. I did not discuss Mr. Juneau's prior representation of Louisiana and believe that I would have if I were aware of what I know today.

### Recent Developments

**9.**     At the end of July 2014, I became aware of a contract between Louisiana and Mr. Juneau's firm originally executed in July 2010 and several amendments thereto. (Exs. 3, 4, and 12 of BP's Motion to Remove the Claims Administrator).

**10.**     I asked in August 2014 that BP's files be reviewed for purposes of locating any waiver related to that issue or any communication from Mr. Juneau in February 2012 disclosing the representation or its scope.

**11.**     BP has not as of this date located any waiver of a conflict of interests or any written disclosure from Mr. Juneau regarding the issue.

**12.**     Over the next few weeks, BP located items in its files that appear to relate to Mr. Juneau's Louisiana representation, though none came from Mr. Juneau.  First, BP located copies of three news articles in 2010 which describe Mr. Juneau as a "liaison" from Louisiana to the GCCF.  (Exs. A to C).[1]  Second, the State of Louisiana made a production to BP on a "thumb drive" on December 20, 2011, and February 24, 2012 to advance its claim for damages.  This production included the contract and related amendments between Mr. Juneau and Louisiana and documents that appear to record some payments under the contract.  (Ex. D).  The State provided these as part of its claim for damages in connection with the spill, and, to my knowledge, these documents were not and have never been considered in connection with Mr. Juneau's appointment and service as Claims Administrator before the past several weeks.  These documents are among tens of millions of pages of documents that have been produced for litigation and claims purposes in oil spill matters.  Third, BP has located in its files three documents from November 2010 that contain references to Mr. Juneau and the Gulf Coast Claims Facility.  The first two are letters between Louisiana Attorney General Buddy Caldwell

---

[1]     These are an October 23, 2010 New York Times article entitled "Should the Money Go Where the Oil Didn't?," a November 14, 2010 Business Insurance article entitled "Far-flung Claimants Complicate BP Oil Spill Fund; Claims Asserting Loss Far Away from Gulf Tougher to Assess," and a Metrolic.com article entitled "Proximity Claims in BP Lawsuit."

and Ken Feinberg, then-head of the GCCF, which refer to Mr. Juneau. *See* (Exs. E & F). The third document, a November 30, 2010 email from Mary Anna Tabol of Mr. Feinberg's law firm, forwarded to BP counsel an exchange between Mr. Feinberg and Mr. Juneau. (Ex. G). To my knowledge, these documents—which were found in files predating by more than a year the February and March 2012 process of selecting the Claims Administrator—were not and have never been considered in connection with Mr. Juneau's appointment and service as Claims Administrator before the past several weeks.

**13.** Dentons, the successor to SNR Denton, located in its files an undated handwritten note of Keith Moskowitz under the heading "Pat Jenueu," (sic) which appears to read: "Consulted with La. (State) about the whole Feinberg process." (Ex. 18 of BP's Motion to Remove the Claims Administrator).

**14.** On August 14, 2014, I became aware of documents that reflect communications between Mr. Juneau and Ken Feinberg (or people working for him) related to the Gulf Coast Claims Facility's compensation protocols and other detailed communications and advocacy about how Louisiana claimants should be compensated. The documents of which I am aware are (Ex. H). These documents contain two pages previously located in BP's files, (Ex. G), but they also contain 49 pages of additional emails between Mr. Feinberg and Mr. Juneau that have not been found in BP's files, including attachments in which Mr. Juneau proposed to the GCCF compensation methodologies for claimants with "no or little documentation." (E.g., Ex. H, at 4). Given the language in some of the emails, it appears that there are several other communications between Mr. Juneau and representatives of the GCCF in which Mr. Juneau advocated on behalf of Louisiana businesses and residents and adverse to BP.

**15.**     BP is filing this motion now because of the new information that it learned in recent weeks regarding Mr. Juneau's past advocacy of the interests of individual and business claimants seeking compensation from BP for spill-related injuries.  It has never made any decision to defer raising this issue with the Court.  Nor did it make any decision to await developments in the CSSP before raising the issue with the Court.

<strong>Modification of Documentation Requirements</strong>

**16.**     On August 16, 2012, I received an email from Claims Administrator Juneau containing a report, prepared by Orran Brown of BrownGreer, which recommended substantial modifications to the documentation requirements mandated by the Settlement Agreement.  The recommendations included, among other things, eliminating the requirements imposed under the Settlement Agreement that BEL and IEL claimants provide copies of their business licenses.  Mr. Juneau stated that his "initial view" was that the report's recommendations were "solid and if implemented, they would speed the process while still maintaining the intent of the agreement."  (Ex. I).

**17.**     On August 21, 2012, BP counsel Wendy Bloom provided BP's comments on these recommendations.  Ms. Bloom noted that the CSSP was proposing "to disregard mandatory document and sworn statement requirements," which were "fundamental elements" of the compensation frameworks.  For example, BP specifically stated that business licenses were a "mandatory" requirement under Exhibit 4A "that was negotiated and agreed to by the Parties," and that the requirement "cannot be disregarded."  BP stated that the CSSP did not have the authority to disregard the requirements, and that BP would not agree to waive them.  (Ex. J).

**18.**     On August 28, 2012, I represented BP, along with Keith Moskowitz, at a meeting with Mr. Juneau and Class Counsel.  Orran Brown of BrownGreer also attended the meeting.  Mr. Juneau advocated that BP waive the requirements because BrownGreer believed they were not necessary to make eligibility and claim payment determinations.

**19.**     Mr. Juneau stated that, unless BP agreed to do so, the CSSP would be forced to issue a substantial number of deficiency notices, which would damage the public image of the CSSP and could impact the number of opt-outs to the Settlement Agreement.  Mr. Juneau characterized the upcoming sixty days as a crucial time for the CSSP, and suggested that BP's decision on this issue potentially could affect the Court's decision to grant final approval to the Settlement Agreement.  Mr. Juneau stated that it was in the interest of all the Parties to remove these requirements.

**20.**     However, when questioned at that meeting, Mr. Brown admitted that the CSSP had not contacted claimants found to have document deficiencies and had not worked with claimants to attempt to cure those deficiencies—for instance, by asking for a business license from a claimant who failed to provide one.  I reiterated BP's position that the contested documentation requirements were specifically negotiated by the Parties, and that there was no justification for removing those requirements.

**21.**     On September 4, 2012, I attended another meeting with Mr. Juneau regarding the document requirement issue.

**22.**     BP attempted to work with the CSSP to develop a more efficient way for the claims vendors to either assist claimants in obtaining their own licenses or for the vendors to determine themselves whether claimants had professional licenses.  To this end, on September 13, 2012, BP counsel Wendy Bloom sent Claims Administrator Juneau (as

well as Magistrate Judge Shushan) several spreadsheets listing the relevant licensing agencies for each state. BP representatives had contacted those licensing agencies and verified that the clear majority of them retained historical records of licenses, which would allow either the CSSP or claimants to obtain verification of past licenses.

23.     Notwithstanding these efforts to assist claimants in providing the documents required under the Settlement Agreement, Claims Administrator Juneau and the CSSP adhered to their position that BP should waive the documentation requirements.

24.     Class Counsel submitted a memorandum to Claims Administrator Juneau on September 16, 2012. Class Counsel argued that the documentation requirements, particularly the license requirements for business and individual economic loss claimants, were permissive rather than mandatory.

25.     BP responded on September 17, 2012. BP maintained that "the license requirements in the Settlement Agreement are mandatory and must be met in order for a . . . claimant to be eligible for a settlement payment." BP also noted that the CSSP had "sought prematurely to seek exceptions from the Settlement Agreement's document requirements before undertaking its obligations under the Settlement Agreement to provide claimants with an opportunity to cure document deficiencies." Notwithstanding those observations, BP acquiesced to the Claims Administrator's insistence, but only because the Claims Administrator personally and others at the CSSP were emphasizing its importance:

> [G]iven *the importance the CSSP places* on eliminating the license requirement for Business Economic Loss and Individual Economic Loss claims, *and in a good faith effort* to facilitate the shared goal of efficiently processing claims under the terms of the Settlement Agreement with appropriate speed and diligence, BP agrees to modify the document requirements for [BEL] and [IEL] claims, including, but not limited to, license requirements for Seafood Compensation Program claims.

BP is agreeing to this modification based on representations by the CSSP that not requiring licenses will allow the CSSP to significantly increase the pace of claims processing and the payment of eligible claims.  (Ex. K) (Emphases added)

**26.**     In addition, and again based on the Claims Administrator's insistence, BP also agreed to a number of other modifications to the documentation requirements mandated by the Settlement Agreement.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

Dated:  September 2, 2014

_____
Mark Holstein



**Exhibit A**

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

SUBSCRIBE NOW | Log In | Register Now | Help

**The New York Times**

# Business Day

Search All NYTimes.com



WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

Search | Global | DealBook | Markets | Economy | Energy | Media | Personal Tech | Small Business | Your Money


Banfield PET HOSPITAL — Together for the life of your pet

GET A FREE PET EXAM*
at Banfield Pet Hospital
*New clients only, restrictions apply.
Download Coupon

# Should BP's Money Go Where the Oil Didn't?



Michael C. Weimar for The New York Times

The TradeWinds Resort in St. Pete Beach, Fla., was not hit by the oil spill that began in April, but it may be among the collateral damage: occupancy rates sank, and the hotel cut prices.

By DAVID SEGAL
Published: October 23, 2010

## ST. PETE BEACH, Fla.

**Multimedia**



Graphic

**BP Claims Pile Up, Often Far From Oiled Shores**



Multimedia Feature

**Gulf of Mexico Oil Spill Multimedia Collection**

IN late April, a week after the BP oil spill began, Keith Overton had an alarming encounter with one of his employees here at the TradeWinds Resort. The guy — an engineer who had worked at the hotel for a dozen years — had just spoken with his mother, who lives in Bosnia, and the conversation went like this:

"Are you going to be fired?" she asked.

"Fired?" the son replied. "Why would I get fired?"

"Because your beach is covered with oil," she said.

Actually, there wasn't a drop of oil anywhere in sight. Not then, not in the months that followed and not now. This barrier-island city and snowbird haven is hundreds of miles from the nearest land befouled by the collapse of the

TWITTER

LINKEDIN

COMMENTS (116)

PRINT

REPRINTS

SHARE

FROM THE AUTHOR OF
**MYSTIC RIVER**

**Most Popular - Business Day**

EMAILED | VIEWED

1. Retiring: Increasingly, Retirees Dump Their Possessions and Hit the Road
2. New Novartis Drug Effective in Treating Heart Failure
3. Your Money: For Some, 'Tis a Gift to Be Simple
4. Using Gambling to Entice Low-Income Families to Save
5. Hey, Chef: Next Time, Skip the Fennel
6. Prototype: No Canvas, No Leather: A Reboot for the Sneaker
7. Corner Office: Lindsey Ueberroth of Preferred Hotels: When Running a Meeting, Speak Last
8. Common Sense: With $38 Million Ferrari, Classic Car Market Revs Up
9. Divisions Grow as a Downturn Rocks Europe
10. Hal Finney, Cryptographer and Bitcoin Pioneer, Dies at 58

Go to Complete List »

ELSEWHERE ON NYTIMES.COM



**Sick immigrant sees ghosts of former country**
- In "Voices of Swords," aging parents are at issue
- Theater listings for Aug. 29-Sept. 4



Ads by Google    what's this?

**Spill Control**
Emergency Spill Response Kits
High quality sorbents & pads
www.awarehousefull.com/spill-kits/

**Related**

Times Topic: Gulf of Mexico Oil Spill (2010)

**Add to Portfolio**

BP Plc

Go to your Portfolio »

Enlarge This Image



Michael C. Weimar for The New York Times

People like Keith Overton, head of a resort in St. Pete Beach, argue that they are eligible for compensation from BP. Oil never touched most Florida beaches, but tourists were scared off anyway.

Enlarge This Image



John Raoux/Associated Press

Kenneth Feinberg, center, is deciding whom BP must compensate. Keith Overton and Carol Dover represent Florida businesses.

Enlarge This Image



Gary Mccracken/Pensacola News Journal, via Associated Press

Lines outside the Pensacola, Fla., office of the Gulf Coast Claims Facility in August. Most of Florida's coastline was untouched by oil, but the spill affected many local businesses indirectly.

**Readers' Comments**

Readers shared their thoughts on this article.

Read All Comments (116) »

Deepwater Horizon platform and the epic gusher it left behind.

"That was the moment I realized how big the problem had become," recalls Mr. Overton, who runs the resort. "At first we thought, 'Well, people will know there's a spill in the Gulf of Mexico, and they won't think that St. Pete has been affected.' "

Not so. After the explosion on April 20, there were some cancellations, but what really wrecked the summer for TradeWinds was the countless number of people who feared that oil was about to hit St. Pete and never called in the first place. By Mr. Overton's calculations, his profits from April to late October sank by slightly more than $1 million, compared with his average earnings during the same period for the last three years.

Of course, anyone who bothered to look at a map would have known that St. Pete Beach — and hundreds of other vacation spots throughout the Sunshine State — would have pristine beachfronts through the summer, even under the worst of the worst-case scenarios.

But Mr. Overton and others don't blame tourists or the news media for failing to grasp basic geography and ocean currents. They blame BP, and they think the company should compensate them for money they would have earned but for the onset of black-crude hysteria.

Are they right? Should companies like TradeWinds collect damages from an oil spill even if their beaches were never sullied? Put another way, should BP have to pay for economic hardship caused by the public's reaction to the oil, even if that reaction was utterly irrational?

The answers involve a sum of money that can safely be described as staggering. The aftermath and legal wranglings of the BP fiasco have focused so far on commercial interests — like fishing, shrimping and food processing — that relied directly on the gulf for their livelihoods. For the most part, these are people in Louisiana, Mississippi and Alabama.

What has scarcely been noted, however, is that virtually oil-free Florida just might hoover up the bulk of BP's settlement money. The company has set aside $20 billion for a fund intended to make whole both private enterprises (for lost earnings) and the states and the federal government (for cleanup costs), with a promise to throw additional money in the pot if more is needed to cover

legitimate claims.

But what if every business in Florida's $60 billion-a-year tourist trade stands up and demands compensation for what it would have earned this summer had the spill not happened?

And what if hotels, restaurants, gas stations, miniature-golf courses, amusement parks, grocery stores, retailers, movie theaters and others want more than just those losses? What if they demand future lost revenue, too — money that would have come to Florida next year, and the year after, but won't because people who spent their summer vacations in, say, South Carolina decided that they liked it enough to go back?

None of this should be very hard to imagine — because it's happening. According to the estimates of plaintiffs' lawyers, more than 100,000 entities in Florida will make what are known as proximity claims, which are based on arguments of indirect harm.

Already, the sheer number of Florida claims is outpacing those of Louisiana, among claimants who have provided addresses of where they suffered damages to the Gulf Coast Claims Facility, which is administering the BP fund: 35,500 versus just over 31,000, as of last week. Even businesses in Miami and Key West are lawyering up.

"The entire tourism industry in this state has been impacted by people's fear that oil was going to hit Florida, whether those fears were reasonable or not," says Brian Barr, a Florida lawyer and a member of the plaintiffs' executive committee in the BP case. "People don't come to Florida to sit in a hotel. They come to enjoy the natural resources of this state, and they were worried that the oil would affect that resource."

Proximity claims, it turns out, fall into an area that has been debated for decades in law schools and in court opinions. Until early October, Kenneth Feinberg, the longtime mediator and the lawyer in charge of administering the spill fund, said publicly that he wouldn't consider such claims, in part because he thought they would open a door that thousands of businesses across the country would try to walk through.

The theoretical possibilities are endless. A restaurant owner in Boston: "I had a Gulf shrimp scampi special that was off the menu for months. Pay me." A T-shirt maker in Tennessee: "I'm stuck with 10,000 'I Love Pensacola' shirts. Pay me." These examples are just conjecture, but real ones are piling up. Thousands of claims from all 50 states have already been filed.

There is another reason that Mr. Feinberg initially balked at proximity claims: it's far from clear how they'd fare if they ever landed in court.

But he was "clobbered," as he later put it, by Floridians, including some high-profile critics like the state attorney general. In a little-noticed reversal, Mr. Feinberg announced on Oct. 4 that he and his team would consider, though not necessarily pay out, proximity claims.

Now, plaintiffs' lawyers in Florida are already worrying aloud that BP hasn't set aside the kind of money that would constitute real compensation.

"They're worried that $60 billion won't be enough, and they might be right," Mr. Feinberg said in a recent interview. "Especially if every single restaurant and hotel in Florida can simply stand up and say: 'Before the spill. After the spill. Pay me the difference.' "

Mr. Feinberg then shrugs like a man trying to wrap his arms around a number that is simply too large to fathom.

A DECISION about proximity claims is coming in the next few weeks, with the approach of the Nov. 23 application deadline for emergency payouts related to the spill. For now, all eyes are on Mr. Feinberg as he determines the rules and decides who will be dealt a hand in a game of Texas Hold 'Em with some of the highest stakes in legal history.

His job is to keep everyone at the table. For him, success means presenting terms to all sides that sound more appealing than ditching the claims process and opting for an expensive, protracted swarm of lawsuits.

As Mr. Feinberg would be the first to acknowledge, this won't be easy. Florida plaintiffs might assume that juries will be sympathetic if these cases actually get to court. Then again, if plaintiffs overreach, BP might decide that it has no choice but to try its luck in the judicial system, betting that judges might toss out cases before they get to trial, or that big verdicts could be scaled back or even tossed out on appeal.

The trick for Mr. Feinberg is to sort through a jumble of legal minutiae, state politics and pitched emotion to find a solution that feels Solomonic to everyone, or at least better than the alternatives.

"The decision to at least consider proximity claims is the correct one," he says, enunciating carefully in his Massachusetts accent and speaking, as he always does, loud enough for the hard of hearing.

"Everybody stays in the fund and, hopefully, decides not to sue. But the big issue remains — how do I assess the damages?"

For a guy on the verge of such a weighty decision, Mr. Feinberg seems at ease. Sitting one recent morning in his spacious office at his Washington law firm, Feinberg Rozen, he sips San Pellegrino Limonata as an opera plays faintly from a stereo system near his desk. His interior decoration of choice appears to be adulatory newspaper articles about Ken Feinberg. One is a recent [Boston Globe](#) editorial headlined "[Can Ken Feinberg Be Cloned?](#)" This would seem a little egomaniacal if the guy didn't project so much decency and personal warmth.

The Globe article, and many others, praise Mr. Feinberg for earlier performances distributing money in catastrophes. He was acclaimed for processing the 9/11 victims fund established by the federal government. He resolved 97 percent of those cases on his own. A mere 94 went to court.

It's a success rate that he does not anticipate in the BP matter. Part of the problem is no one is sure how BP will handle the Florida cases. The company didn't respond to interview requests.

The other issue confronting Mr. Feinberg is one of sheer volume.

"If proximity isn't a bar to claims, who knows how many there will be," he says.

Big numbers present complications. Almost from the start, there have been accusations leveled at Mr. Feinberg and his 25 assistants that claims for those hit hardest and most directly in the gulf aren't being processed fast enough; in late September, the Justice Department described the pace of his work as "unacceptable." Adding tens of thousands of claims from Florida, and the rest of the country, won't help.

Then there is the matter of resource allocation. To the extent that there is a limit to what BP will pay, this is a zero-sum game, and in Louisiana, there is growing anxiety that proximity claims will siphon money from those suffering the most.

"There is a huge concern here about depletion of the BP fund," says Patrick Juneau, who

is working as a liaison to Mr. Feinberg on behalf of the attorney general of Louisiana. "Obviously, we're at ground zero here in Louisiana, and the farther away someone is from the oil, the more questions are raised by the claim — like whether the losses were really the result of the spill."

ON a late September afternoon, the temperature at the TradeWinds is just warm enough for sunbathing and the sky is cloudless, but the white-sand beach abutting the hotel is nearly empty.

"We run at about 30 percent occupancy in September," says Mr. Overton, a square-jawed 43-year-old in a Hawaiian shirt who manages to look both stern and laid back at the same time — picture [Jimmy Buffett](#)'s bodyguard. "We make all our money in six months, and our best months are March to July."

He is giving a tour of the premises — 800 hotel rooms and condo rentals and 13 bars and restaurants — and explaining why the spill could hardly have been timed worse. He has a spreadsheet detailing his losses and the story behind those figures.

The tale is more complicated than just "People stopped booking rooms here." What happened is that occupancy rates sank, which led Mr. Overton to drop prices. That pushed up occupancy rates, which left him with what he calls "the double whammy" — a large-ish number of visitors, with all the overhead costs they incur, but a smaller revenue stream to cover those expenses.

Details like this get to the challenge of proximity claims: figuring out what, if anything, they're worth.

How much of the TradeWinds' duress can be blamed on its strategy, which led to the dire-sounding "double whammy"? Is BP liable for both whammies? If another hotel experienced a triple whammy, should BP pay for all three? And how much of the TradeWinds' troubles this summer stemmed from the lousy economy, as opposed to oil-phobia?

Once the resort asks for money for future losses, which it plans to do, there are more imponderables. Mr. Overton couldn't maintain the level of staffing that he desired, and, as a result, service suffered.

"You arrive at the hotel and it takes you an extra couple minutes to get your stuff unloaded," he says. "It takes longer at the front desk, and you get up to your room and you think: 'I'm not going to come back to this place. It just isn't up to my standards.' How do you value that?"

How indeed? And once you figure that out, how do you decide what part, if any, of the shortfall should be covered by BP?

It's the kind of conundrum that scholars have been puzzling over for a very long time.

ON the morning of Aug. 24, 1924, a 43-year-old homemaker named Helen Palsgraf stood on the Jamaica Station platform of the [Long Island Rail Road](#) in Queens, waiting for a train. When it arrived, a man struggling to climb aboard was given an assisting push by a railroad employee on the platform and a pull by another employee on the train. That caused the man to drop the package he was carrying, a newspaper wrapped around some fireworks.

What happened in the next few seconds was described the next day in The New York Times as a "short-lived pyrotechnics display," though it sounds more like a scene from a Looney Tunes reel. The fireworks exploded, and the shock reportedly toppled a scale on the platform some distance away, which fell on Ms. Palsgraf.

She sued the railroad over her injuries and won $6,000, roughly $75,000 in today's dollars. But her victory didn't last. It was reversed by the New York Court of Appeals, and the majority opinion in the 4-to-3 decision was written by the future Supreme Court justice Benjamin N. Cardozo.

To win a tort claim, as every law student knows, a plaintiff needs to prove that a defendant was negligent and the plaintiff a duty — in Ms. Palsgraf's case, a duty not to be harmed. Chief Judge Cardozo was skeptical that railroad employees had acted negligently, because the package carried by the passenger didn't outwardly appear to be dangerous. But, more important, he dismissed Ms. Palsgraf's claim because she was "outside the zone of foreseeable danger" and therefore was not owed a duty.

The key finding was this: The further away a plaintiff is from the defendant — physically, or as part of a causal chain — the harder it is to win a lawsuit.

This opinion, in Palsgraf v. Long Island Railroad Co., became a central touchstone of American tort law, one with such abiding force in legal culture that a re-enactment of the 1924 accident, performed with Legos, is now posted on YouTube.

As narrow as the law is when it comes to indirect physical harm, it is narrower when the harm is indirect and economic.

"The classic law school case example is a guy who negligently rams his boat into a bridge and the bridge collapses," says David Logan, dean of the Roger Williams University School of Law in Bristol, R.I. "Business on that island is shut down for as long as it takes to rebuild the bridge. But generally, the law says that unless the boat physically harmed your property, you can't collect."

At root, the law is concerned that people would be reluctant to operate a boat, or drill for oil, if liability for an accident extended to its innumerable ripple effects. In the case of the Exxon Valdez, a tanker that devastated the Alaskan shore with oil in 1989, none of the plaintiffs making proximity claims — hunting lodges, fishing lodges, cruise ships and so on — were given a dime.

"We were operating under federal maritime law," says David Oesting, an Anchorage lawyer who handled litigation for the plaintiffs, "which basically says 'no touch, no foul.' It was and is terrible."

Mr. Oesting speaks of the Valdez litigation in the present tense because it isn't over. On the day of this phone interview, an assistant in a nearby office was preparing the last round of checks — about $130 million — to be sent to plaintiffs, 21 years after the accident.

ALL of this history explains why, in legal circles, Mr. Feinberg's original decision to bar proximity claims was considered utterly mainstream. But the BP oil spill was unlike any that came before it — larger, and beamed live on television for months. And the legal patchwork of laws under which plaintiffs can make claims now includes the Oil Pollution Act, which provides for "damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction or loss of real property, personal property or natural resources."

Does that include a hotel on a beach, 450 miles from the nearest oil? How about one 50 miles inland from the same beach?

Working outside of the court system, Mr. Feinberg isn't necessarily constrained by the act, or state or federal tort law. But to figure out what, if anything, these claimants should be paid, he needs a sense of what would become of them if they slogged through

the dockets.

So Mr. Feinberg has quietly hired one of the country's foremost scholars on torts — he declined to provide a name — to write a memorandum about the validity and value of proximity claims.

The memo is due soon, and Mr. Feinberg has no idea what it will say. But it won't serve as a blueprint, he says. It will serve as leverage. If the memo states, for instance, that certain proximity claims are stinkers, Mr. Feinberg could say to claimants, "You'll get nothing in court, but I'll give you 20 cents or 30 cents on the dollar."

Or the memo could say that some claims might well succeed, but only after clearing a very high standard of proof of damages. Then Mr. Feinberg could offer a slightly lower standard.

Those are just two of many possibilities. Regardless of what is in the memo, Mr. Feinberg won't start writing checks willy-nilly, no matter how many plaintiffs line up, no matter how many people yell at him, and no matter how many people are eager to see BP punished, legal niceties be damned.

This guy is versatile, but Santa Claus is one role he will not play.

Mr. Overton and other business people in Florida think this is no time for stinginess. He likens the BP oil spill to hurricanes that struck the state years ago, and he worries that the impact will be the same.

"We haven't had a hurricane since '04, but still today, we can't get close to achieving the occupancy level we had in August and September, pre-'04," he says. "People know a hurricane is possible and they don't want risk it."

The analogy between storms that actually destroyed property and a spill that did not is hardly perfect. But this may be the only difference that matters: you can't sue Mother Nature.

A version of this article appeared in print on October 24, 2010, on page BU1 of the New York edition.




SAVE 50% FOR 26 WEEKS
• ENDS SEPT. 3 •  CLICK HERE >



COMMENTS
(116)

PRINT

REPRINTS

**Get Free E-mail Alerts on These Topics**

- Oil (Petroleum) and Gasoline
- Offshore Drilling and Exploration
- Accidents and Safety
- Gulf of Mexico



Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Autos | Back to Top

Copyright 2010 The New York Times Company | Privacy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Advertise | Site Map



**Exhibit B**

# BUSINESS INSURANCE.

# Far-flung claimants complicate BP oil spill fund

## Claims asserting loss far away from Gulf tougher to assess

Posted On: Nov. 14, 2010 6:00 AM CST

### Michael Bradford

ADVERTISEMENT

**WHEN YOU'RE RESILIENT, YOU'RE IN BUSINESS.**

FM Global

Learn how we can make your company more resilient.

Worries are mounting that the volume of claims from the Deepwater Horizon oil spill, some of which allege damages hundreds of miles from the Gulf Coast beaches where oil washed ashore, will bog down the facility created to administer payments on behalf of BP P.L.C.

The Gulf Coast Claims Facility will have enough money to pay legitimate losses, but there is a danger that the volume of claims could create logjams that will slow payments, according to Kenneth Feinberg, the facility's administrator.



THE TIMES-PICAYUNE/LANDOV

Oil seeps out of a tar patty on a beach in Louisiana in September.

"There is great concern that there will be so many claims that it will be difficult to efficiently process the claims," Mr. Feinberg said. "But BP has made it clear that there will be adequate funding to pay claims."

Meanwhile, while the fund has limited the insurance claims stemming from the spill, insurers may see claims if some are rejected by the GCCF, experts said. Whether rejected claimants will be able to recover losses from insurers will depend on circumstances around their losses and the type of coverage they have in place, sources said.

The GCCF was created in August to take over claims administration after BP had paid around $399 million on 127,000 claims. As of Nov. 5, the BP-funded facility had paid $3.42 billion on an unstated number of claims.

BP said this month that its latest estimate was around $40 billion for the cost of cleanup and claims payments related to the spill.

A Nov. 23 deadline is looming for claimants to file for emergency advance payments from the fund. Beyond that

date, claims will be handled under a new protocol that is expected to be released soon.

The GCCF is charged not only with sorting out legitimate claims from the tens of thousands that are filed from Gulf Coast residents and businesses that were directly impacted by the spill, but also those that are lodged by claimants who are far from the beaches where oil washed ashore after the April 20 explosion on the Deepwater Horizon rig.

The facility has received, for example, claims from restaurants and fishing equipment companies located hundreds of miles from the coastal area where the oil washed up. Such claimants are saying they suffered losses because of the impact of the spill on their businesses, regardless of the distance of those operations from the region where the accident occurred.

Those claims have to be held to a high standard of proof so there is no danger that they could deplete the funds available for "unquestionable" claims, said Patrick A. Juneau, an attorney with the Lafayette, La., law firm of Juneau David A.P.L.C. Mr. Juneau serves as the liaison between the state of Louisiana and the GCCF on matters related to processing Louisiana claims.

"In Louisiana, we believe proximity should be a factor," Mr. Juneau said, and claims that come from distant claimants, while they should not be automatically denied, should have to show "without question that there is a causal connection with the accident."

Sources say insurance coverage could come into play if the GCCF decides not to pay some claims.

Policyholders with pollution insurance that have suffered property damage as a result of the spill will have "the potential for coverage," depending on the nature of coverage and circumstances around the claim, said Chris Smy, Atlanta-based global environmental practice leader with Marsh Inc. "There is the potential for business interruption as well, but it would have to be the result of pollution damage," under such coverage, he said.

An attorney with experience in business interruption claims said there could be the potential for recovery from insurers for those losses if the facility rejects such claims.

The GCCF protocol will spell out what sorts of claims will be accepted, the attorney pointed out. If, for whatever reason, it decides some claims will be rejected, rejected claimants might well be able to turn to their insurers, he said.

"I'm sure they have put their insurers on notice," he said of commercial operations waiting to see how their claims will be handled by the GCCF.

Mr. Smy said he is aware of some pollution claims having been filed with insurers, but the volume of such claims is not expected to be substantial.

Claimants in Louisiana and other parts of the coast where the oil directly affected businesses do not have a lot of difficulty in proving their losses to the GCCF, Mr. Juneau said. "The proof is in the pudding" for claimants along the shores where oil washed up, he said.

Mr. Juneau added, though, that faraway claimants should have to "come forward with a true connection; it has to be a very indisputable, provable claim."

Gulf Coast claimants "don't have any difficulty with that test," he said. "Our concern is that we don't deplete the funds that are used for unquestionable claims."

Mr. Feinberg said claims filed by distant claimants will be considered by the facility and will get close scrutiny. "It's one thing to say a claimant far from the beach is able to file," he said, but that doesn't mean the legitimacy of such claims won't be carefully considered before payments are granted.

The burden of proof for claims outside the region is too much trouble for some attorneys.

"I have thousands of clients, and I don't take anything that's more than 2,000 feet from the beach," said Daniel E. Becnel Jr., a plaintiffs attorney with The Law Offices of Daniel E. Becnel Jr. in Reserve, La. "I'm not saying that those claims aren't viable," he said. "It's just that they're harder to prove."

Mr. Becnel said he has found the GCCF to be cooperative in handling emergency advance payments. The facility paid a $4 million claim he filed on behalf of a Florida resort. "I don't find them being unreasonable," he said of the GCCF.

Ervin Gonzalez, an attorney with Colson, Hicks, Eidson in Coral Gables, Fla., said it's clear that some claims filed by businesses outside the Gulf Coast region are entitled to damages from the GCCF.

A fishing equipment manufacturer client of his has filed a claim for losses because the manufacturer can't sell his goods to buyers who previously purchased them, Mr. Gonzalez said. "If a manufacturer of fishing equipment used in the Gulf is not selling to his customers" who can't fish in those waters because of the spill, "that's a legitimate claim," he said.

The spill provides an interesting lesson as to how policyholders might consider protecting themselves from such losses in the future, said Mr. Smy.

"Most don't buy pollution cover," Mr. Smy said. The spill "may cause them to rethink that strategy," he said.



**Exhibit C**



About    Meet our team    Contact

Home | World News | U.S. News | Business | Technology | Entertainment | Lifestyle | Science | Environment | Health | Sports | Arts | Editorials

# Proximity Claims in BP Lawsuit



Written by Sergiu Vidican
Posted in: Science

no comments

Do you like this story?

The BP incident started in April and after two months of ordeal, the cap was finally sealed. The entire area was affected by the spill, and people had to suffer because of it. They could no longer fish in the area, and the tourism was heavily affected by the spill as well.



BP Logo

President Obama declared months after the incident that it is OK to swim in those waters, and in order to prove it, he went with his family there and took a bath there. The reality is that despite his attempts of proving that the waters are clean, people still have doubts about it. We are almost at the end of October, and people are still afraid that they might become ill because of the spill, or that the oil might be hazardous for their health. Because of this fear, some of the people's businesses have to suffer. Such is the case of the people who live in St. Pete Beach. There are people who have seen a decline in profit of more than $1 million, in comparison to the previous year.

The reality is that St. Pete Beach is nowhere near the zone of the spill, and as a result the chances for it to be affected by the spill are next to zero. The people, who suffer because of it, do not blame the tourists, but they blame the company whose well exploded: British Petroleum. They want the company to pay because people no longer visit the areas because of them. There are some who say that this should not happen, meaning that BP should not pay for something which they did not commit. Sure, the spill was their fault, but since St. Pete Beach and many other beaches have 0 percent chances of being affected by the spill, they should not pay. People chose not to go there because of irrational fears.



There are some people who have sued the company, and who consider that they deserve to be compensated. These are the people from Alabama, Mississippi, and Louisiana, regions where the fauna and flora have been heavily affected by the spill. They could not fish for a very long time, and their businesses suffered because of it. It has been discovered that Florida might be the luckiest state of them all, because it might receive the largest sum of money, even if it has not been affected directly by the spill. It has been said that BP might have to pay Florida more than $20 billion as compensations for the profits lost by the companies from that state. The situation is extremely



## Today's Most Popular

**Abu Dhabi, The Richest City In The World**

**Susan Boyle's Autobiography: The Woman I Was Born To Be**

**Top Alien Encounter Stories**

**Romanians Are On The Verge Of Finding The Cure For Cancer**

**New Planet Earth Found?**

## Find us on Facebook

## Recent Comments

Bogdan: My friend, I would avoid considering some theories as bei

cours de cuisine Strasbourg: Its like you learn my mind! You appear to grasp a lot about

NIDHIN A S: ENJOY THE LAST TIMES OF YOURS BY A HUMAN BEING WHO LOVES THE

Barnes: Satan (Allah) will call Jesus loud in the end.

Muthusi: Why do those aliens show themselves only on whitelands, why h

9637567952: a

Nancy: I am reading the Dulce book, and it made me think of some of

Dr. Sanathdeva Murutenge: Now I am really getting tired of reading junk science of Ste

Faithful: I see the math is ounce and ton but china is using Metro ton

garba ali: helo very body i love this country is very nice an

## Keep In Touch

 subscribe to RSS

 follow us on Twitter

complicated, as it is very likely that the other states will not allow such a thing to happen.

There is also the possibility that the people from Florida might ask for more; for example they might ask compensations for the future years as well. It seems that this will happen, as it has been estimated that more than 100,000 will file lawsuits against the companies for indirect harm. It seems that there are many businesses from Florida which are waiting for the big buck. Brian Barr, a Florida lawyer and a member of the plaintiffs' executive committee in the BP case stated that there were many people from Florida who are still afraid of the fact that the oil might be harmful. He stated that the people who come to Florida do not come there to sit in hotels, but to sight see and to enjoy the natural beauty of the state. These proximity claims, as they are officially called, fall into an area that has been debated for decades in law schools and in court opinions.



Kenneth Feinberg, who is a longtime mediator and the lawyer in charge of administering the spill fund, stated that he wound not allow these trials because they might set a new trend. If all these people receive their money, then it is very likely that tens of thousands of lawsuits will be filed in the years to come for various reasons. The possibilities for such a thing to happen are without limit. For example a restaurant owner might claim money because he did not receive a certain type of fish which he has in the menu. Another person might want money because he has T-shirts which he can no longer sell. The thing is that people from all over the country have filed a lawsuit against the company, and many believe that that is wrong. The situation is complicated, because under normal circumstances those people should not receive the money they have claimed since they might be in the opposite corner of the country. However, since they have proof that their businesses have been affected by the spill, they might receive the money after all.

The chances are that they will never make it to court, because either they will receive some minor compensation, or their claims will be rejected. Mr. Feinberg is curious about what would happen if all these claims would be allowed into court. There are many lawyers who are worried about the fact that BP will not have the demanded amount of money. They have put aside $60 billion, but the people are afraid that it might not be enough. Mr. Feinberg stated that the people are right, because even of the sum sounds very big, it really isn't especially if tens of thousands of people will receive money. Each hotel or any other business might present the profits prior and after the spill, and then demand to receive the difference. That might be tens of millions of dollars for a single company or business.

become a fan on **Facebook**



Smartphone Powered

Did you know that **Metrolic** can be viewed from popular touch-based smartphones like iPhone™, iPod touch™, Android™, Palm™ Pre/Pixi, and BlackBerry Storm™?

A decision about all these claims will be made in the weeks to come, and for the moment everyone is waiting for Mr. Feinberg to make a decision regarding the people who will receive money as compensation. His main task is to make sure that every person will receive some money, even if that would mean that everyone would receive a smaller amount of it. He is convinced that the task will not be easy because everything depends on the sum of money which they ask. If they ask for too much, then BP might decide that it has no choice but to try its luck in the judicial system, hoping that the judges will reject numerous cases before they reach the trial. He has to find the answer which would make everyone happy, meaning that he will need to ask just the right amount of money.

The problem is that he has no idea on how to asses the sues, because people might claim way more than they actually deserve. Despite of all this pressure, it seems that he is very calm and that he is optimistic and confident that he will make the right choice. This is not the first time when he is involved in very famous cases. He obtained money for people who were victims of the 9/11 attacks, and he managed to solve 97 percent of the cases on his own, without having to go to court. However, he believes that he will not have the same success rate in this case because it is unknown how BP will handle the Florida case.

It is also possible that there might be thousands of other similar cases, with people demanding money for all sorts of reasons. There is a limit to the amount of money BP will pay, and the people from Louisiana are worried that they will not receive their money. Patrick Juneau, who is working as a liaison to Mr. Feinberg on behalf of the attorney general of Louisiana stated that there is the risk that the people from that state will not receive any money because they are the farthest away from the spill. There will be lots of questions regarding the validity of the claims especially in those areas. It will most likely be believed that the people invented things, and as a result they will not receive the money they truly deserve.

In many areas of the states affected by the spill, the beaches are almost empty, even when the weather is perfect for swimming or for sun tanning. Because of the lack of customers the ones who own hotels have to decrease the prices, and as a result they get more costumers. However, they receive less money from the customers even if they have to pay the same amounts of money in order to please them. There are some who say that BP is not responsible for this, as the managers acted in a faulty manner. If the managers would have not dropped the prices

so much, then they would have been able to cover the costs of the clients.

Of course, then there is the issue of the staff, as in most of the cases the hotel managers had to let some people go. Because of that, the services of the hotels often drop. That leads to a chain reaction and in the end the hotels end up losing money. One of the problems is the fact that it is unknown how one can asses those damages. There have been numerous such proximity cases over the course of history, one more absurd than the other. For example in the 20s, two railroad employees helped a man get on the train. He dropped his package which contained fireworks, they accidentally were set on fire, and they hit a scale on the platform some distance away, which fell on his wife. She sued the company and won $6,000, which is about $80,000 nowadays.

The New York Court of Appeals decided to reverse the decision, and as a result a law was introduced in the Supreme Court. The new law stated that the farther is a person from the place of the accident; the least likely is that he will be compensated for his claims. In the case previously mentioned, the employees did not have a fault because they simply tried to help a man in need, and they did it with lots of care. The law is even narrower when it comes to indirect economical harm than to indirect physical harm. The law clearly states that if a certain business was not harmed by direct factors, then one can not ask for monetary compensations. For example if a boat hits a bridge, and the bridge collapses, the people who are isolated can not ask for money from the boat driver for the fact that they were isolated. They could ask for money if the boat would have hit all their homes and destroyed them.

There are many contradictions when it comes to this, as it is also written that in case of an event such as the BP spill, the people who have suffered because of it can receive money as well. Many people suffered because of the spill, even if indirectly. The situation is much tensed and everyone would like to see how the events will unfold. People want money, and they would do anything to get it.11

---

**Did you like it? Share it!**

 

  You and 2 others like this. 2 people like this. Sign Up to see what your friends like.

---

**Related Articles**

Florida beaches closed On June 24, 2010 the British company BP resumed the task of reattaching the cap on the well which was broken approximately one month ago in the Gulf of Mexico. However the short hiatus did was not without consequences, as the beaches […]

BP resumes collecting the oil spill After a brief hiatus, BP Plc resumed to collect the oil spill from its well located in the Gulf of Mexico. This happened on Thursday, 24th of June, approximately one month after the incident. An interesting twist of this situation is the […]

The Oil in the Gulf Does Not Impose a Risk The U.S government will release a statement on Wednesday, stating that the oil which was spilled by the Deepwater Horizon rig, property of British Petroleum, does not impose a threat for the environment. The ones in charge with solving […]

The Future of the BP Well BP plans to abandon the well which has been responsible for causing so much damage in the Gulf of Mexico. They want to leave a plug on top of the well, and that's about it. However, they might consider exploiting the reservoir of gas […]

Though Times For BP The British oil giant BP at risk of further costs in the billions for the environmental disaster off the Gulf of Mexico. The U.S. government has unexpectedly

filed a complaint that BP could be costly.<-200x200 Small [...]

**Oil Spill Money Problem** The scientists at Tulane University asked Harriet M. Perry, the director of the fisheries program at the Gulf Coast Research Laboratory in May to investigate some droplets found on the blue crab larvae. The initial tests indicated that [...]

**Split Opinions Regarding BP'S Situation** The company British Petroleum caused the biggest ecological disaster in history and soon after the problem was solved, they declared that they will continue the activity of offshore drilling, which displeased many.<-200x200 Small [...]

**Gulf Of Mexico Spill Containment Operation Sees Progress, Leak In Sights** Oil company BP Plc announced the operation to stop the oil spill in the Gulf of Mexico, using a relief well, is well under way, and the blown-out well is currently being targeted. However, the ecological disaster caused by the oil rig [...]

« previous post

next post »

© 2010 Metrolic. All rights reserved | Meet our team | Contact us | Archive | About

# Exhibit D

| VENDOR NAME | PAYMENT AMOUNT | GRAND TOTAL |
|---|---|---|
| The Juneau Firm | $$ 2,189.48 | |
| | | $$ 2,189.48 |
| | | |

ACTION: R SCREEN: OPVL USERID: Z418A47          09/02/11  07:53:37 AM

                    O P E N   P V   L I N E   I N Q U I R Y

          VENDOR= ▮▮▮▮▮▮▮ 00 VOUCHER NO= 419 P1000032890
VENDOR INVOICE= 22011          LINE NO= 01
    DESCRIPTION: #001200 00203


     FUND: 419      AGENCY: 419    ORG/SUB-ORG: ERPC      APPR UNIT: 100
 ACTIVITY: RIG1     FUNCTION:      OBJ/SUB-OBJ: 3740 SS     REV SRC:
  SUB-REV:       BS ACCOUNT:       REPT-CATEGORY: 4715      JOB NO:
 PROJECT:                        FED AID NUMBER:
                                          FREIGHT AMOUNT:           0.00
     QUANTITY:        0.000           VOUCHER LINE AMOUNT:       2,189.48
 DISCOUNT TYPE:                          DISCOUNT AMOUNT:           0.00
                                    WITHHELD LINE AMOUNT:           0.00
                                      LIEN/LEVY AMOUNT:            0.00
                                       DISBURSED AMOUNT:       2,189.48
                                          CLOSED AMOUNT:       2,189.48
    LAST CHECK/MW NO: AD00004032356    DATE: 09 02 11  NO OF CHECKS WRITTEN:  1
 REFERENCE TRANS ID:                   LINE:    COMM LINE:    DATE:
    REFERENCE VI ID: VI 22011                   COMM LINE:    DATE:

VENDOR PAYMENT VOUCHER INPUT FORM

PV DATE: 09 01 11 ACCT PD: 02 12 BFY: 12 ACT: E SINGLE CHECK: N TC:    FA:
EFT IND/TYPE: N / 99 CHECK CAT: 99 OFF LIAB ACCT:          SCHED PAY DATE: 09 01 11
VENDOR:              ACT DEL DATE: 06 30 11  DOC TOTAL:        2,189.48
  NAME: THE JUNEAU FIRM                      USE TAX:             0.00
  ADDR: PO DRAWER 51268          CALC DOC TOTAL:               2,189.48
     :                              FREIGHT IND:
     : LAFAYETTE        LA 70503   FREIGHT TOT:                    I/D:
TOT AMT:              I/D:  CAL AMT:
TOT QTY:              I/D:  CAL QTY:
LN    REFERENCE         COM VENDOR      INV
NO CD NUMBER        LN LN  INVOICE      LN  FUND AGCY ORG/SUB APPR UNIT ACTV
-- -- --------------- -- --- ----------- -- ---- ---- ------- -------- ---
FUNC OBJ/SUB RSRC/SUB JOB/PROJ RCAT BACC DT   DESCRIPTION      QUANTITY   I/D
---- ------- -------- -------- ---- ---- --  --------------- ------------ ---
TAX CD FREIGHT AMOUNT I/D    AMOUNT    I/D  TAX AMOUNT    TOTAL AMOUNT  P/F
------ -------------- - -------------- - --------------- -------------- -
01                        22011          419  419  ERPC    100        RIG1
    3740 SS                4715          #001200 00203
                          2,189.48  I                        2,189.48
H--*S401-READY FOR APPROVAL 1      01-HFL6W-FAIT ENTRY MISSING

# STATE OF LOUISIANA

# CONTRACT FOR PROFESSIONAL LEGAL SERVICES

**BE IT KNOWN THAT** this agreement is entered into by and between the Department of Public Safety, Public Safety Services/Louisiana Oil Spill Coordinator's Office (LOSCO) hereinafter sometimes referred to as ("State") and Juneau David, APLC hereinafter sometimes referred to as ("Counsel").

1.

Counsel hereby agrees to furnish the following services:

*advice and **counsel to the State through the Department of Public Safety, Public Safety Services/LOSCO related to the claims process and allocation protocols utilized and developed by the Responsible Parties associated with and/or arising from the Deepwater Horizon Oil Spill, Mississippi Canyon***

The scope of this contract does not include litigation, unless requested by or consented to by the Attorney General, or proceedings arising out of or involving tort or worker's compensation.

These legal services are to be provided under the immediate supervision of Elizabeth Murrill, Deputy Executive Counsel to Governor Bobby Jindal, subject to secondary review by the Department of Justice, Office of the Attorney General.

2.

In consideration of services described hereinabove, State hereby agrees to pay the Counsel as follows:

See Attached Rate Schedule

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $175,000.00.

Counsel is authorized to associate with local counsel in other states as required by local court rules, subject to approval by the Attorney General and the Commissioner of Administration of such associated counsel and of rates to be paid. After such approval, Counsel is authorized to incorporate the billings of associated counsel with invoices submitted to the Attorney General.

Counsel will submit, at the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the quarter of an hour, with specific reference to the nature of the work performed (e.g., drafting of pleadings, research, review of files, etc.). Invoices for services shall be submitted by counsel to State for review and approval. All billings by Counsel for services rendered shall be submitted in compliance with LSA-R.S. 39:1521.1. Any invoices submitted to Counsel by associated counsel shall also comply with the invoicing terms required of Counsel.

Counsel shall be reimbursed for out-of-pocket expenses in accordance with the regulations issued by the Division of Administration. Travel time, at the direction and for the convenience of the State, is billable as services. Counsel agrees to comply with the instructions on Attachment #1 when submitting invoices.

Counsel hereby agrees that the responsibility for payment of taxes from the funds thus received under this agreement and/or legislative appropriation shall be said counsel's obligation and identified under Federal tax identification number █████████

Counsel agrees to submit monthly statements. It is understood that should Counsel fail to submit statements within thirty (30) days following the end of each month, State shall not be responsible for payment thereof under this contract or in quantum meruit.

3.

The Legislative Auditor of the State of Louisiana and/or Division of Administration auditors may audit all records of Counsel which relate to this contract. Counsel shall maintain said records for a period of three years after the date of final payment under this contract.

4.

This contract is in effect for the period commencing July 2, 2010, and ending on June 30, 2013. Notwithstanding the foregoing, in no event shall this contract be valid until it has been approved in writing by the Director of the Office of Contractual Review and the Attorney General.

5.

The continuation of this contract is contingent upon the appropriation of funds to fulfill the requirements of the contract by the legislature. If the legislature fails to appropriate sufficient monies to provide for the continuation of the contract, or if such appropriation is reduced by the veto of the Governor or by any means provided in the appropriations act to prevent the total appropriation for the year from exceeding revenues for that year, or for any other lawful purpose, and the effect of such reduction is to provide insufficient monies for the continuation of the contract, the contract shall

terminate on the date of the beginning of the first fiscal year for which funds are not appropriated.

6.

Counsel shall not assign any interest in this contract and shall not transfer any interest in same (whether by assignment or novation), without prior written consent of the State, provided however, that claims for money due or to become due to the Counsel from the State under this contract may be assigned to a bank, trust company, or other financial institution without such prior written consent. Notice of any such assignment or transfer shall be furnished promptly to the State and the Director of the Office of Contractual Review.

7.

Either party shall have the right to cancel this contract, with or without cause, by giving the other party (30) days written notice forwarded to their respective address by certified mail. State has the right to cancel this contract upon less than thirty (30) days due to budgetary reductions and changes in funding priorities by the State.

Notice shall be sent Certified Mail, return receipt requested, to the following addresses:

If to State:   Louisiana Oil Spill Coordinator's Office
       Louisiana Department of Public Safety & Corrections
       Public Safety Services
       P. O. Box 66614
       Baton Rouge, LA 70896

If to Counsel:   Patrick A. Juneau
       Juneau, David, APLC
       P.O. Box 51268
       Lafayette, LA 70505-1268

8.

All records, reports, documents and other material delivered or transmitted to Counsel by State shall remain the property of State, and shall be returned by Counsel to State, at Counsel's expense, at termination or expiration of this contract. All records, reports, documents, pleadings, exhibits or other material related to this contract and/or obtained or prepared by Counsel in connection with the performance of the services contracted for herein shall become the property of State, and shall, upon request, be returned by Counsel to State, at Counsel's expense, at termination or expiration of this contract.

9.

The State and Counsel acknowledge and agree that the Department of Justice has the right to review all records, reports, worksheets or any other material of either party related to this contract. The State and Counsel further agree that they or either of them will furnish to the Department of Justice, upon request, copies of any and all records, reports, worksheets, bills, statements or any other material of Counsel or State related to this contract.

10.

Counsel agrees to abide by the requirements of the following as applicable: Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, Federal Executive Order 11246 as amended, the Rehabilitation Act of 1973, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, the Fair Housing Act of 1968 as amended,

and contractor agrees to abide by the requirements of the Americans with Disabilities Act of 1990.

Counsel agrees not to discriminate in its employment practices, and will render services under this contract without regard to race, color, religion, sex, sexual orientation, national origin, veteran status, political affiliation, or disabilities.

Any act of discrimination committed by counsel, or failure to comply with these statutory obligations when applicable shall be grounds for termination of this contract.

11.

This contract is not effective until approved by the Director of the Office of Contractual Review in accordance with La. R.S. 39:1502. It is the responsibility of the contractor to advise the State in advance if contract funds or contract terms may be insufficient to complete contract objectives.

12.

Any claim or controversy arising out of the contract shall be resolved by the provisions of LSA-R.S. 39:1524 - 1526.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of this day of July 2, 2010.

WITNESSES SIGNATURES:

_Danielle Lahni_
DANIelle Lahni

_Stacy Oxley_
Stacy Oxley

LOUISIANA OIL SPILL COORDINATOR

BY: _[signature]_
JILL P. BOUDREAUX
DRS UNDERSECRETARY

Telephone: 225-925-6032

_Karen Blanchard_
Karen Blanchard

_Felicia Guidry_
Felicia Guidry

COUNSEL

BY: _[signature]_
PATRICK A. JUNEAU, PARTNER
JUNEAU DAVID, APLC

Tax I.D. #: ███████

Telephone: 337-269-0052

APPROVED AS PER LETTER OF _7/12/10_
JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL

BY: _Rell McSme_
RICHARD L. McGIMSEY
ASSISTANT ATTORNEY GENERAL

CONCURRED BY:

_[signature]_ _7/12/10_
J.S. THOMPSON, JR.          DATE
STATE RISK DIRECTOR

APPROVED
Office of the Governor
Office of Contractual Review

JUL 15 2010

_Sandra G. Gillen_
CR

**ATTACHMENT #1**

**INSTRUCTIONS FOR SUBMITTING INVOICES**

At the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the quarter of an hour with specific reference to the nature of the work performed *(e.g. drafting of expert reports, research, review of files, etc.)* should be invoiced to the Louisiana Department of Public Safety and Corrections/LOSCO.

Reimbursement for all expenses must have receipts or documentation attached to the invoices or reimbursement will not be made. Some examples of the receipts or documentation that will be accepted are given below:

1.      Telephone expenses - a copy of the telephone bill indicating the telephone calls made in reference to the contract. A listing of telephone billings on the invoice with the original kept by counsel for review by the State.

2.      Express Mail - a copy of the invoice from the vendor.

3.      Travel expenses - purpose of the trip, miles traveled or airline ticket receipt, parking receipts, taxi receipts, hotel receipts (credit card receipt will not be accepted).

4.      Photocopying - number of copies and the amount per copy; or if outside photocopying is utilized a receipt must be included.

When invoices are submitted at the end of each calendar month, you must indicate the amount of your contract, the amount billed to date and the remaining balance.

If your invoices are billed by each individual case that you have worked on please include a summary sheet for that month for that invoice. Do not include any previous balances owed on the summary sheet.

LSA - R.S. 39:1521.1 calls for invoices to be submitted in the form of an affidavit.

CFMS # 694588
OCR #419-100365
Amendment # 01

**Amendment to Agreement between**

Louisiana Department of Public Safety & Corrections
Public Safety Services, Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Juneau David, APLC
P.O. Box 51268
Lafayette, LA 70505-1268

**Amendment Provisions**

**Change Agreement From:**

**Counsel hereby agrees to furnish the following services:**

These legal services are to be provided under the immediate supervision of Elizabeth Murrill, Deputy Executive Counsel to Governor Bobby Jindal, subject to secondary review by the Department of Justice, Office of the Attorney General.

**Add or Change To:**

**Counsel hereby agrees to furnish the following services:**

These legal services are to be provided under the immediate supervision of Mark Brady, Deputy Commissioner, Division of Administration, subject to secondary review by the Department of Justice, Office of the Attorney General.

Amendment becomes effective: <u>August 26, 2010</u>

This amendment is necessary to change the supervision requirement in current contract and contains or has attached hereto all revised terms and conditions agreed upon by contracting parties.

IN WITNESS THEREOF, this amendment is signed and entered into on the date indicated above.

**Contractor:**

Patrick A. Juneau, Partner
Juneau David, APLC

**Public Safety Services:**

Jill P. Boudreaux, Undersecretary

**Witnesses:**

Felicia Guidry

SEP 2 8 2010

CFMS # 694588
OCR #419-100365
Amendment # 02

## Amendment to Agreement between

Louisiana Department of Public Safety & Corrections
Public Safety Services, Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Juneau David, APLC
P.O. Box 51268
Lafayette, LA 70505-1268

### Amendment Provisions

**Change Agreement From:**

2. In consideration of services described hereinabove, State hereby agrees to pay the Counsel as follows:

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $175,000.00.

**Add or Change To:**

2. In consideration of services described hereinabove, State hereby agrees to pay the Counsel as follows:

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $275,000.00.

Amendment becomes effective: March 3, 2011

This amendment is necessary to increase the number of hours required to provide legal services as described in the original scope of services and contains or has attached hereto all revised terms and conditions agreed upon by contracting parties.

IN WITNESS THEREOF, this amendment is signed and entered into on the date indicated above.

**Contractor:**

Patrick A. Juneau, Partner
Juneau David, APLC

**Public Safety Services:**

Jill R. Boudreaux, Undersecretary

**Witnesses:**

Felicia Guidry

APR 05 2011

RECEIVED
APR 15 2011

APPROVED AS PER LETTER OF
JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL

BY: _____
RICHARD L. McGIMSEY
ASSISTANT ATTORNEY GENERAL

CFMS # 694588
OCR #419-100365
Amendment # 03

## Amendment to Agreement between

Louisiana Department of Public Safety & Corrections
Public Safety Services, Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Juneau David, APLC
P.O. Box 51268
Lafayette, LA 70505-1268

## Amendment Provisions

**Change Agreement From:**

4. This contract is in effect for the period commending July 2, 2010 and ending on June 30, 2013.

**Add or Change To:**

4. This contract is in effect for the period commending July 2, 2010 and ending on July 21, 2011.

Amendment becomes effective:  July 21, 2011

This amendment is necessary to cancel contract as requested by Contractor. All tasks have been performed in accordance with deliverables as originally listed.

IN WITNESS THEREOF, this amendment is signed and entered into on the date indicated above.

**Contractor:**

Patrick A. Juneau, Partner
Juneau David, APLC

**Witnesses:**

Felicia Guidry

**Public Safety Services:**

Jill P. Boudreaux, Undersecretary

AUG 16 2011

| VENDOR NAME | PAYMENT AMOUNT | GRAND TOTAL |
|---|---|---|
| Plauche & Stock | $ 106.00 | |
| | $ 1,710.00 | |
| | | $ 1,816.00 |
| | | |

ENTER FUNCTION:                          TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER          DATE: 06/10/11
                                                         TIME: 07:53:28
                                                         TERM: $D1V
CONTRACT NUMBER.: 694657     : PLAUCHE & STOCK, LLP
VEND INVOICE NO.: 1900
INVOICE COMMENTS: ACCT 19.000                  CONTRACT REVIEW #: 419-000366
CONTRACT TYPE...: PRO : PROFESSIONAL CONTRACT -CFMS      AGCY CONT #:
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING    CFMS INV #: AAT
VENDOR NUMBER...: ▮▮▮▮▮▮▮▮ NAME: PLAUCHE & STOCK LLP     CHG DATE: 06/09/11
ADDRESS 1 AND 2.: 811 FIRST AVE STE 320
CITY............: SEATTLE              STATE: WA ZIP: 98104
INV AMT:        106.00 INV DTE: 05/01/11 INV RCVD: 05/31/11 INV APRV: 05/31/11
DATE GOODS/SERV RCVD/ACPTD: 04/05/11 CONTACT PERSON:
DEFERRED COMP VENDOR:                  :
PYMT TYPE.: RP : REGULAR PAYMENT
BFY: 11      ACCT PERIOD: 1211   EFFCTVE BILLING FROM:    P/F: P SNGL CHK:  CHK CAT:
PAYMENT AMOUNT.:        106.00   SCHD PAY DATE: 06/09/11              TO:
RETAINAGE AMT..:           .00   DATE APRVD.: 06/09/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:           .00   LST BTCH#: 905488 PV#  6858902  DC PV#
DEFRD COMP AMT.:           .00   CHECK NUMBER: 00000583544 DATE PAID: 06/10/11
NET TO VEND AMT:        106.00   USER LST CHG: BK26Y      DTE LST CHG: 06/09/11

```
H-                      AGENCY JOURNAL VOUCHER INPUT FORM
    J6 DATE: 09 02 11  ACCT PRD: 02 12  BUDGET FY: 12
    ACTION: E                         COMMENTS: CFMS #694657
          DEBIT DOC TOTAL:     14,310.00   CREDIT DOC TOTAL:      14,310.00
          CALC DEBIT TOTAL:    14,310.00   CALC CREDIT TOTAL:     14,310.00
    AC            SUB                 FUNC OBJ SUB
    TP FUND AGCY ORG  ORG APPR UNIT ACTV TION REV O/R REPT CATG JOB NO
    -- ---- ---- -------- --------- ---- ---- ------- --------- --------
    DESCRIPTION                  DEBIT AMOUNT   CREDIT AMOUNT
    -------------------------- -------------- ---------------
          VENDOR/PROVIDER
    CODE        NAME
    --------------------------------
 01- 22 419  419  ELGT     100     RIG1    3740 LG   4715
    INV 2227 MOVE GN TO LG         12,600.00

 02- 22 419  419  ERPC     100     RIG1    3740 SS   4715
    INV 2227 MOVE GN TO SS          1,710.00

 H--*S401-READY FOR APPROVAL 1      01-HFL6W-FAIT ENTRY MISSING
 02-HFL6W-FAIT ENTRY MISSING
```

# STATE OF LOUISIANA

# CONTRACT FOR PROFESSIONAL LEGAL SERVICES

**BE IT KNOWN THAT** this agreement is entered into by and between the

Louisiana Oil Spill Coordinator's Office and the Trustees hereinafter sometimes referred

to as ("Trustees") and Plauche, Stock hereinafter sometimes referred to as ("Counsel").

1.

Counsel hereby agrees to furnish the following services:

*advice and counsel to LOSCO and the Trustees related to the Natural Resource Damage Assessment process and associated claims and removal actions arising from the Deepwater Horizon Oil Spill, Mississippi Canyon*

The scope of this contract does not include litigation, unless requested by or

consented to by the Attorney General, or proceedings arising out of or involving tort or

worker's compensation.

These legal services are to be provided under the immediate supervision of the

staff of LOSCO, Trustee Garrett Graves, or his designee in the Coastal Protection &

Restoration Authority, subject to secondary review by the Department of Justice, Office of

the Attorney General.

2.

In consideration of services described hereinabove, State hereby agrees to pay

the Counsel as follows:

See Attached Rate Schedule

The total of all sums payable under this contract including fees and

Reimbursement of expenses shall not exceed $100,000.00.

Counsel is authorized to associate with local counsel in other states as required by local court rules, subject to approval by the Attorney General and the Commissioner of Administration of such associated counsel and of rates to be paid. After such approval, Counsel is authorized to incorporate the billings of associated counsel with invoices submitted to the Attorney General.

Counsel will submit, at the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the quarter of an hour, with specific reference to the nature of the work performed (e.g., drafting of pleadings, research, review of files, etc.). Invoices for services shall be submitted by counsel to State for review and approval. All billings by Counsel for services rendered shall be submitted in compliance with LSA-R.S. 39:1521.1. Any invoices submitted to Counsel by associated counsel shall also comply with the invoicing terms required of Counsel.

Counsel shall be reimbursed for out-of-pocket expenses in accordance with the regulations issued by the Division of Administration. Travel time, at the direction and for the convenience of the State, is billable as services. Counsel agrees to comply with the instructions on Attachment #1 when submitting invoices.

Counsel hereby agrees that the responsibility for payment of taxes from the funds thus received under this agreement and/or legislative appropriation shall be said counsel's obligation and identified under Federal tax identification number

Counsel agrees to submit monthly statements. It is understood that should Counsel fail to submit statements within thirty (30) days following the end of each

month, State shall not be responsible for payment thereof under this contract or in quantum meruit.

3.

The Legislative Auditor of the State of Louisiana and/or Division of Administration auditors may audit all records of Counsel which relate to this contract. Counsel shall maintain said records for a period of three years after the date of final payment under this contract.

4.

This contract is in effect for the period commencing May 1, 2010, and ending on April 30, 2013. Notwithstanding the foregoing, in no event shall this contract be valid until it has been approved in writing by the Director of the Office of Contractual Review and the Attorney General.

5.

The continuation of this contract is contingent upon the appropriation of funds to fulfill the requirements of the contract by the legislature. If the legislature fails to appropriate sufficient monies to provide for the continuation of the contract, or if such appropriation is reduced by the veto of the Governor or by any means provided in the appropriations act to prevent the total appropriation for the year from exceeding revenues for that year, or for any other lawful purpose, and the effect of such reduction is to provide insufficient monies for the continuation of the contract, the contract shall terminate on the date of the beginning of the first fiscal year for which funds are not appropriated.

6.

Counsel shall not assign any interest in this contract and shall not transfer any interest in same (whether by assignment or novation), without prior written consent of the State, provided however, that claims for money due or to become due to the Counsel from the State under this contract may be assigned to a bank, trust company, or other financial institution without such prior written consent. Notice of any such assignment or transfer shall be furnished promptly to the State and the Director of the Office of Contractual Review.

7.

Either party shall have the right to cancel this contract, with or without cause, by giving the other party (30) days written notice forwarded to their respective address by certified mail. State has the right to cancel this contract upon less than thirty (30) days due to budgetary reductions and changes in funding priorities by the State.

Notice shall be sent Certified Mail, return receipt requested, to the following addresses:

If to State:      Louisiana Oil Spill Coordinator's Office
Louisiana Department of Public Safety & Corrections
Public Safety Services
P. O. Box 66614
Baton Rouge, LA 70896

If to Counsel:      Samuel W. Plauché
Plauché & Stock LLP
811 First Avenue, Suite 320
Seattle, WA 98104

All records, reports, documents and other material delivered or transmitted to Counsel by State shall remain the property of State, and shall be returned by Counsel to State, at Counsel's expense, at termination or expiration of this contract. All records, reports, documents, pleadings, exhibits or other material related to this contract and/or obtained or prepared by Counsel in connection with the performance of the services contracted for herein shall become the property of State, and shall, upon request, be returned by Counsel to State, at Counsel's expense, at termination or expiration of this contract.

9.

The State and Counsel acknowledge and agree that the Department of Justice has the right to review all records, reports, worksheets or any other material of either party related to this contract. The State and Counsel further agree that they or either of them will furnish to the Department of Justice, upon request, copies of any and all records, reports, worksheets, bills, statements or any other material of Counsel or State related to this contract.

10.

Counsel agrees to abide by the requirements of the following as applicable: Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, Federal Executive Order 11246 as amended, the Rehabilitation Act of 1973, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, the Fair Housing Act of 1968 as amended,

and contractor agrees to abide by the requirements of the Americans with Disabilities Act of 1990.

Counsel agrees not to discriminate in its employment practices, and will render services under this contract without regard to race, color, religion, sex, sexual orientation, national origin, veteran status, political affiliation, or disabilities.

Any act of discrimination committed by counsel, or failure to comply with these statutory obligations when applicable shall be grounds for termination of this contract.

11.

This contract is not effective until approved by the Director of the Office of Contractual Review in accordance with La. R.S. 39:1502. It is the responsibility of the contractor to advise the State in advance if contract funds or contract terms may be insufficient to complete contract objectives.

12.

Any claim or controversy arising out of the contract shall be resolved by the provisions of LSA-R.S. 39:1524 - 1526.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of this

day of June 5, 2010.

WITNESSES SIGNATURES:

_____

_____

LOUISIANA OIL SPILL COORDINATOR

BY: _____
        JILL P. BOUDREAUX, UNDERSECRETARY
        225-925-6032

BY: _____
        GARRET GRAVES, TRUSTEE
        (Telephone Number)

COUNSEL

BY: _____
        SAMUEL W. PLAUCHE, PARTNER
        PLAUCHE & STOCK LLP

**Tax I.D. #:** ▮▮▮▮▮▮▮

**Telephone: 206-588-4188**

_____

_____

APPROVED AS PER LETTER OF 7/12/10
JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL

BY: _____
        RICHARD L. McGIMSEY
        ASSISTANT ATTORNEY GENERAL

CONCURRED BY:

_____ 7/12/10
J.S. THOMPSON, JR.          DATE
STATE RISK DIRECTOR

**A P P R O V E D**
Office of the Governor
Office of Contractual Review

JUL 20 2010

_____
DIRECTOR

## SCOPE OF SERVICES
## PLAUCHE & STOCK, LLP

**Goals and Objectives:**

To protect the legal interest of the State of Louisiana as it relates to the Deepwater Horizon Oil Spill, Mississippi Canyon.

**Deliverables:**

To provide advice and counsel to LOSCO and the Trustees related to the Natural Resource Damage Assessment process and associated claims and removal actions arising from the Deepwater Horizon Oil Spill, Mississippi Canyon.

**Methods used to measure and determine contact performance:**

Satisfactory completion of deliverables will determine contract performance.

**Monitoring Plan:**

Review invoices and their reasonableness associated with the contract deliverables.

**ATTACHMENT #1**

## INSTRUCTIONS FOR SUBMITTING INVOICES

At the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the quarter of an hour with specific reference to the nature of the work performed *(e.g. drafting of expert reports, research, review of files, etc.)* should be invoiced to the Louisiana Department of Public Safety and Corrections.

Reimbursement for all expenses must have receipts or documentation attached to the invoices or reimbursement will not be made. Some examples of the receipts or documentation that will be accepted are given below:

1.    Telephone expenses - a copy of the telephone bill indicating the telephone calls made in reference to the contract. A listing of telephone billings on the invoice with the original kept by counsel for review by the State.

2.    Express Mail - a copy of the invoice from the vendor.

3.    Travel expenses - purpose of the trip, miles traveled or airline ticket receipt, parking receipts, taxi receipts, hotel receipts (credit card receipt will not be accepted).

4.    Photocopying - number of copies and the amount per copy; or if outside photocopying is utilized a receipt must be included.

When invoices are submitted at the end of each calendar month, you must indicate the amount of your contract, the amount billed to date and the remaining balance.

If your invoices are billed by each individual case that you have worked on, please include a summary sheet for that month for that invoice. Do not include any previous balances owed on the summary sheet.

LSA - R.S. 39:1521.1 calls for invoices to be submitted in the form of an affidavit.

CFMS # 694657
OCR #419 - 000366
Amendment # 01

## Amendment to Agreement between

Louisiana Department of Public Safety & Corrections
Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Plauche & Stock, LLP
811 First Avenue
Seattle, WA 98104

## Amendment Provisions

**Change Agreement From:**

**In consideration of the services described hereinabove, State hereby agrees to pay Counsel as follows:**

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $100,000.00.

**Add or Change To:**

**In consideration of the services described hereinabove, State hereby agrees to pay Counsel as follows:**

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $500,000.00.

Amendment becomes effective: <u>August 1, 2010</u>

This amendment is necessary for additional funds to complete the scope of work contained in the original contract.

IN WITNESS THEREOF, this amendment is signed and entered into on the date indicated above.

**Contractor:**

Samuel W. Plauche, Partner
Plauche & Stock, LLP

**Witnesses:**

**RECEIVED**

JAN 0 5 2011

UNDERSECRETARY'S OFFICE

Louisiana Oil Spill Coordinator's Office (LOSCO):

Jill P. Boudreaux, Undersecretary
Public Safety Services

Garret Graves, Trustee
Coastal Protection & Restoration Authority

APPROVED
Office of the Governor
Office of Contractual Review

DEC 2 0 2010

Sandra G. Beller
DIRECTOR

APPROVED AS PER LETTER OF 12-3-10
JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL

BY: Rel M
RICHARD L. McGIMSEY
ASSISTANT ATTORNEY GENERAL

CFMS # 694657
OCR #419-000366
Amendment # 2

**Amendment to Agreement between**

Louisiana Department of Public Safety & Corrections
Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Plauche & Stock LLP
811 First Avenue, Suite 320
Seattle, WA 98104

**Amendment Provisions**

**Change Agreement From:**

**In consideration of the services described hereinabove, State hereby agrees to pay Counsel as follows:**

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $500,000.00.

**Add or Change To:**

**In consideration of the services described hereinabove, State hereby agrees to pay Counsel as follows:**

The total of all sums payable under this contract including fees and reimbursement of expenses shall not exceed $1,500,000.00.

Amendment becomes effective: March 1, 2011

This amendment is necessary for additional funds and to increase the number of hours to complete the scope of work under the original contract and contains or has attached hereto all revised terms and conditions agreed upon by contracting parties.

IN WITNESS THEREOF, this amendment is signed on the dates indicated below.

Contractor:                                           Witnesses:

_____   3/16/11   _____
Samuel W. Plauche, Partner      Date
Plauche & Stock, LLP

Louisiana Oil Spill Coordinator's Office (LOSCO):

_____   4/7/11   _____
Jill P. Boudreaux, Undersecretary   Date
Public Safety Services

_____   3/21/11   _____
Garret Graves, Trustee          Date
Coastal Protection & Restoration Authority

MAY 26 2011

APPROVED AS PER LETTER OF   4-27-11
JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL

BY: _____
RICHARD L. McGIMSEY
ASSISTANT ATTORNEY GENERAL

| VENDOR NAME | PAYMENT AMOUNT | GRAND TOTAL |
|---|---|---|
| Jackson, Gilmore & Dobbs | $ 35,940.00 | |
| | $ 26,715.00 | |
| | $ 37,780.00 | |
| | $ 35,240.00 | |
| | $ 37,440.00 | |
| | $ 25,925.00 | |
| | $ 40.00 | |
| | $ 9,037.50 | |
| | $ 37,655.00 | |
| | $ 35,920.00 | |
| | $ 44,697.50 | |
| | | $ 326,390.00 |
| | | |

```
ENTER FUNCTION:              TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                          DATE: 12/02/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER        TIME: 13:32:45
                                                        TERM: $DUT
CONTRACT NUMBER.: 698963    : JACKSON, GILMORE & DOBBS
VEND INVOICE NO.: 1209                 CONTRACT REVIEW #:
INVOICE COMMENTS: LA OIL SPILL         AGCY CONT #:
CONTRACT TYPE...: MIS : MISCELLANEOUS CONTRACT-CFMS    CFMS INV #: AAE
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING   CHG DATE: 06/14/11
VENDOR NUMBER...:            NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON       STATE: TX ZIP: 77027
INV AMT:     63557.50 INV DTE: 02/11/11 INV RCVD: 06/14/11 INV APRV: 06/14/11
DATE GOODS/SERV RCVD/ACPTD: 12/31/10 CONTACT PERSON:
DEFERRED COMP VENDOR:          :
PYMT TYPE.: RP : REGULAR PAYMENT           P/F: P SNGL CHK:  CHK CAT:
BFY: 11    ACCT PERIOD: 1211  EFFCTVE BILLING FROM:      TO:
PAYMENT AMOUNT.:     63557.50  SCHD PAY DATE: 06/14/11
RETAINAGE AMT..:         .00  DATE APRVD.: 06/14/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:         .00  LST BTCH#: 913075 PV#  6864691  DC PV#
DEFRD COMP AMT.:         .00  CHECK NUMBER: 00000584874 DATE PAID: 06/15/11
NET TO VEND AMT:     63557.50  USER LST CHG: BK26Y    DTE LST CHG: 06/14/11
```

$35,940.00 = SS

```
ENTER FUNCTION:           TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                    DATE: 12/02/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER  TIME: 13:32:56
                                                  TERM: $DUT
```

CONTRACT NUMBER.: 698963    : JACKSON, GILMORE & DOBBS
VEND INVOICE NO.: 1297                      CONTRACT REVIEW #:
INVOICE COMMENTS: LA OIL SPILL              AGCY CONT #:
CONTRACT TYPE...: MIS : MISCELLANEOUS CONTRACT-CFMS    CFMS INV #: AAF
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING    CHG DATE: 06/14/11
VENDOR NUMBER...: ███████████ NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON        STATE: TX ZIP: 77027
INV AMT:     59865.00 INV DTE: 03/07/11 INV RCVD: 06/14/11 INV APRV: 06/14/11
DATE GOODS/SERV RCVD/ACPTD: 01/31/11 CONTACT PERSON:
DEFERRED COMP VENDOR:          :
PYMT TYPE.: RP : REGULAR PAYMENT              P/F: P SNGL CHK:  CHK CAT:
BFY: 11     ACCT PERIOD: 1211  EFFCTVE BILLING FROM:      TO:
PAYMENT AMOUNT.:    59865.00  SCHD PAY DATE: 06/14/11
RETAINAGE AMT..:         .00  DATE APRVD.: 06/14/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:         .00  LST BTCH#: 913076 PV#  6864692  DC PV#
DEFRD COMP AMT.:         .00  CHECK NUMBER: 00000584874 DATE PAID: 06/15/11
NET TO VEND AMT:    59865.00  USER LST CHG: BK26Y    DTE LST CHG: 06/14/11

$26,715.00 = SS

```
ENTER FUNCTION:                TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                          DATE: 12/02/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER        TIME: 13:33:07
                                                        TERM: $DUT

CONTRACT NUMBER.: 698963    : JACKSON, GILMORE & DOBBS
VEND INVOICE NO.: 1340              CONTRACT REVIEW #:
INVOICE COMMENTS: LA OIL SPILL      AGCY CONT #:
CONTRACT TYPE...: MIS : MISCELLANEOUS CONTRACT-CFMS   CFMS INV #: AAG
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING   CHG DATE: 06/14/11
VENDOR NUMBER...:              NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON       STATE: TX ZIP: 77027
INV AMT:      92350.00 INV DTE: 04/01/11 INV RCVD: 06/14/11 INV APRV: 06/14/11
DATE GOODS/SERV RCVD/ACPTD: 02/28/11 CONTACT PERSON:
DEFERRED COMP VENDOR:          :
PYMT TYPE.: RP : REGULAR PAYMENT          P/F: P SNGL CHK:  CHK CAT:
BFY: 11     ACCT PERIOD: 1211  EFFCTVE BILLING FROM:      TO:
PAYMENT AMOUNT.:     92350.00  SCHD PAY DATE: 06/14/11
RETAINAGE AMT..:         .00   DATE APRVD.: 06/14/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:         .00   LST BTCH#: 913077 PV#  6864693  DC PV#
DEFRD COMP AMT.:         .00   CHECK NUMBER: 00000584874 DATE PAID: 06/15/11
NET TO VEND AMT:     92350.00  USER LST CHG: BK26Y    DTE LST CHG: 06/14/11
```

$37,780.00 = SS

CONTRACT INVOICE/PAYMENT TABLE
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER

DATE: 06/15/11
TIME: 08:07:12
TERM: $DN6

CONTRACT NUMBER.: 698963    : JACKSON, GILMORE & DOBBS
VEND INVOICE NO.: 1428                      CONTRACT REVIEW #:
INVOICE COMMENTS: LA OIL SPILL              AGCY CONT #:
CONTRACT TYPE...: MIS : MISCELLANEOUS CONTRACT-CFMS    CFMS INV #: AAH
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING    CHG DATE: 06/14/11
VENDOR NUMBER...:              NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY...........: HOUSTON        STATE: TX ZIP: 77027
INV AMT:      35240.00 INV DTE: 05/02/11 INV RCVD: 06/14/11 INV APRV: 06/14/11
DATE GOODS/SERV RCVD/ACPTD: 03/31/11 CONTACT PERSON:
DEFERRED COMP VENDOR:                :
PYMT TYPE.: RP : REGULAR PAYMENT                P/F: P SNGL CHK:  CHK CAT:
BFY: 11     ACCT PERIOD: 1211  EFFCTVE BILLING FROM:          TO:
PAYMENT AMOUNT.:       35240.00 SCHD PAY DATE: 06/14/11
RETAINAGE AMT..:           .00 DATE APRVD.: 06/14/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:           .00 LST BTCH#: 913079 PV#  6864695  DC PV#
DEFRD COMP AMT.:           .00 CHECK NUMBER: 00000584874 DATE PAID: 06/15/11
NET TO VEND AMT:       35240.00 USER LST CHG: BK26Y    DTE LST CHG: 06/14/11

```
ENTER FUNCTION:              TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                        DATE: 12/02/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER      TIME: 13:33:31
                                                      TERM: $DUT
CONTRACT NUMBER.: 698963      : JACKSON, GILMORE & DOBBS
VEND INVOICE NO.: 1529                    CONTRACT REVIEW #:
INVOICE COMMENTS: FILE 4060-002           AGCY CONT #:
CONTRACT TYPE...: MIS : MISCELLANEOUS CONTRACT-CFMS    CFMS INV #: AAK
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING   CHG DATE: 07/07/11
VENDOR NUMBER...: █████████ NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON          STATE: TX ZIP: 77027
INV AMT:     43080.00 INV DTE: 06/06/11 INV RCVD: 07/07/11 INV APRV: 07/07/11
DATE GOODS/SERV RCVD/ACPTD: 04/30/11 CONTACT PERSON:
DEFERRED COMP VENDOR:           :
PYMT TYPE.: RP : REGULAR PAYMENT           P/F: P SNGL CHK:  CHK CAT:
BFY: 11     ACCT PERIOD: 1311  EFFCTVE BILLING FROM:      TO:
PAYMENT AMOUNT.:     43080.00  SCHD PAY DATE: 07/07/11
RETAINAGE AMT..:          .00  DATE APRVD.: 07/07/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:          .00  LST BTCH#: 944323 PV#  6883525   DC PV#
DEFRD COMP AMT.:          .00  CHECK NUMBER: 00000589459 DATE PAID: 07/08/11
NET TO VEND AMT:     43080.00  USER LST CHG: BK26Y    DTE LST CHG: 07/07/11
```

$ 37,440.00 = 55

```
ENTER FUNCTION:              TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                    DATE: 12/02/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER  TIME: 13:33:40
                                                  TERM: $DUT
CONTRACT NUMBER.: 698963    : JACKSON, GILMORE & DOBBS
VEND INVOICE NO.: 1532           CONTRACT REVIEW #:
INVOICE COMMENTS: FILE 4060-002       AGCY CONT #:
CONTRACT TYPE...: MIS : MISCELLANEOUS CONTRACT-CFMS    CFMS INV #: AAM
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING   CHG DATE: 07/07/11
VENDOR NUMBER...: ███████████ NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON      STATE: TX ZIP: 77027
INV AMT:      71325.00 INV DTE: 06/13/11 INV RCVD: 07/07/11 INV APRV: 07/07/11
DATE GOODS/SERV RCVD/ACPTD: 05/31/11 CONTACT PERSON:
DEFERRED COMP VENDOR:          :
PYMT TYPE.: RP : REGULAR PAYMENT         P/F: P SNGL CHK:  CHK CAT:
BFY: 11    ACCT PERIOD: 1311  EFFCTVE BILLING FROM:    TO:
PAYMENT AMOUNT.:    71325.00  SCHD PAY DATE: 07/07/11
RETAINAGE AMT..:        .00   DATE APRVD.: 07/07/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:        .00   LST BTCH#: 944329 PV#  6883532  DC PV#
DEFRD COMP AMT.:        .00   CHECK NUMBER: 00000589459 DATE PAID: 07/08/11
NET TO VEND AMT:    71325.00  USER LST CHG: BK26Y    DTE LST CHG: 07/07/11
```

$25,925.00 = SS

                    AGENCY JOURNAL VOUCHER INPUT FORM
     J6 DATE: 08 10 11  ACCT PRD: 13 11  BUDGET FY: 11
      ACTION: E                      COMMENTS: CFMS #698963
         DEBIT DOC TOTAL:     173,790.00   CREDIT DOC TOTAL:    173,790.00
         CALC DEBIT TOTAL:    173,790.00   CALC CREDIT TOTAL:   173,790.00
      AC                SUB                  FUNC OBJ SUB
      TP FUND AGCY ORG  ORG APPR UNIT ACTV TION REV O/R REPT CATG JOB NO
      -- ---- ---- -------- --------- ---- ---- ------- --------- --------
      DESCRIPTION                    DEBIT AMOUNT   CREDIT AMOUNT
      -------------------------      -------------- ---------------
            VENDOR/PROVIDER
      CODE        NAME
      --------------------------------

01- 22 419  419  ERPC    100      RIG1     3740 GF   4715
    CFMS#698963 JACKSON GILMORE    114,645.00

02- 22 419  419  ERPC    100      RIG1     3740 SS   4715
    CFMS#698963 JACKSON GILMORE     40.00

H--*S401-READY FOR APPROVAL 1        01-HFL6W-FAIT ENTRY MISSING
02-HFL6W-FAIT ENTRY MISSING

K. Cook
8/10/11

H-                        AGENCY JOURNAL VOUCHER INPUT FORM
     J6 DATE: 08 10 11  ACCT PRD: 13 11  BUDGET FY: 11
       ACTION: E                      COMMENTS: CFMS #698963
           DEBIT DOC TOTAL:     173,790.00    CREDIT DOC TOTAL:     173,790.00
           CALC DEBIT TOTAL:    173,790.00    CALC CREDIT TOTAL:    173,790.00
       AC              SUB              FUNC OBJ SUB
    TP FUND AGCY ORG  ORG APPR UNIT ACTV TION REV O/R REPT CATG JOB NO
    -- ---- ---- -------- --------- ---- ---- ------- --------- --------
       DESCRIPTION                    DEBIT AMOUNT   CREDIT AMOUNT
    --------------------------- --------------- ---------------
            VENDOR/PROVIDER
       CODE       NAME
    -------------------------------
    01- 22 419  419  ERPC    100     RIG1     3740 GN   4715
        CFMS#698963 JACKSON GILMORE         480.00
    02- 22 419  419  ERPC    100     RIG1     3740 SS   4715
        CFMS#698963 JACKSON GILMORE       9,037.50

H--*S401-READY FOR APPROVAL 1        01-HFL6W-FAIT ENTRY MISSING
02-HFL6W-FAIT ENTRY MISSING

```
ENTER FUNCTION:                    TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                        DATE: 12/05/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER      TIME: 14:58:13
                                                      TERM: $DZ6
CONTRACT NUMBER.: 705391    : JACKSON, GILMOUR & DOBBS, PC & DPS
VEND INVOICE NO.: 1767                    CONTRACT REVIEW #: 419-200378
INVOICE COMMENTS: FILE #4060-002          AGCY CONT #:
CONTRACT TYPE...: PRO : PROFESSIONAL CONTRACT -CFMS    CFMS INV #: AAC
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING    CHG DATE: 11/07/11
VENDOR NUMBER...: ██████████ NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON        STATE: TX ZIP: 77027
INV AMT:      37655.00 INV DTE: 09/09/11 INV RCVD: 11/07/11 INV APRV: 11/07/11
DATE GOODS/SERV RCVD/ACPTD: 07/31/11 CONTACT PERSON:
DEFERRED COMP VENDOR:              :
PYMT TYPE.: RP : REGULAR PAYMENT            P/F: P SNGL CHK:   CHK CAT:
BFY: 12     ACCT PERIOD: 0512  EFFCTVE BILLING FROM:        TO:
PAYMENT AMOUNT.:    37655.00 SCHD PAY DATE: 11/07/11
RETAINAGE AMT..:        .00  DATE APRVD.: 11/07/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:        .00  LST BTCH#: 105914 PV#  6979742  DC PV#
DEFRD COMP AMT.:        .00  CHECK NUMBER: 00000617680 DATE PAID: 11/08/11
NET TO VEND AMT:    37655.00 USER LST CHG: BK26Y  DTE LST CHG: 11/07/11
```

```
ENTER FUNCTION:                    TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                          DATE: 12/05/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER        TIME: 15:01:38
                                                        TERM: $DZ6
CONTRACT NUMBER.: 705391    : JACKSON, GILMOUR & DOBBS, PC & DPS
VEND INVOICE NO.: 1851              CONTRACT REVIEW #: 419-200378
INVOICE COMMENTS: FILE #4060-002        AGCY CONT #:
CONTRACT TYPE...: PRO : PROFESSIONAL CONTRACT -CFMS    CFMS INV #: AAD
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING    CHG DATE: 11/07/11
VENDOR NUMBER...: ████████████ NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON      STATE: TX ZIP: 77027
INV AMT:     35920.00 INV DTE: 10/04/11 INV RCVD: 11/07/11 INV APRV: 11/07/11
DATE GOODS/SERV RCVD/ACPTD: 08/31/11 CONTACT PERSON:
DEFERRED COMP VENDOR:            :
PYMT TYPE.: RP : REGULAR PAYMENT         P/F: P SNGL CHK:  CHK CAT:
BFY: 12     ACCT PERIOD: 0512  EFFCTVE BILLING FROM:        TO:
PAYMENT AMOUNT.:    35920.00  SCHD PAY DATE: 11/07/11
RETAINAGE AMT..:         .00  DATE APRVD.: 11/07/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:         .00  LST BTCH#: 105915 PV#  6979743  DC PV#
DEFRD COMP AMT.:         .00  CHECK NUMBER: 00000617680 DATE PAID: 11/08/11
NET TO VEND AMT:    35920.00  USER LST CHG: BK26Y    DTE LST CHG: 11/07/11
```

```
ENTER FUNCTION:              TRANS: KINV
CONTRACT INVOICE/PAYMENT TABLE                        DATE: 12/05/11
KEY IS CONTRACT NUMBER AND VENDOR INVOICE NUMBER      TIME: 14:57:45
                                                      TERM: $DZ6
CONTRACT NUMBER.: 705391   : JACKSON, GILMOUR & DOBBS, PC & DPS
VEND INVOICE NO.: 1889                 CONTRACT REVIEW #: 419-200378
INVOICE COMMENTS: FILE #4060-002       AGCY CONT #:
CONTRACT TYPE...: PRO : PROFESSIONAL CONTRACT -CFMS   CFMS INV #: AAH
STATUS CODE.....: PYS : PAYMENT SUCCESSFUL IN ACCTING   CHG DATE: 11/28/11
VENDOR NUMBER...: ███████████ NAME: JACKSON GILMORE & DOBBS, PC
ADDRESS 1 AND 2.: 3900 ESSEX STE 700
CITY............: HOUSTON        STATE: TX ZIP: 77027
INV AMT:     44697.50 INV DTE: 10/13/11 INV RCVD: 11/23/11 INV APRV: 11/23/11
DATE GOODS/SERV RCVD/ACPTD: 09/29/11 CONTACT PERSON:
DEFERRED COMP VENDOR:               :
PYMT TYPE.: RP : REGULAR PAYMENT        P/F: P SNGL CHK:   CHK CAT:
BFY: 12    ACCT PERIOD: 0512  EFFCTVE BILLING FROM:       TO:
PAYMENT AMOUNT.:     44697.50  SCHD PAY DATE: 11/28/11
RETAINAGE AMT..:          .00  DATE APRVD.: 11/28/11 USERID APRVD: Z418A47
RECOUPMENT AMT.:          .00  LST BTCH#: 126089 PV#  6995072   DC PV#
DEFRD COMP AMT.:          .00  CHECK NUMBER: 00000622120 DATE PAID: 11/29/11
NET TO VEND AMT:     44697.50  USER LST CHG: BK26Y    DTE LST CHG: 11/28/11
```

CFMS # 705391
OCR #419 - 200378

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**
**CONTRACT**

BE IT KNOWN THAT on this 1st day of July, 2011, the Louisiana Department of Public Safety and Corrections (DPS)/Louisiana Oil Spill Coordinator's Office (hereinafter sometimes referred to as the "State" or "LOSCO") and the law firm of Jackson, Gilmour & Dobbs, PC, with offices to be located at the Chase South Tower, 451 Florida Street, Suite 720, Baton Rouge, Louisiana 70801 and its principal place of business located at 3900 Essex, Suite 700, Houston, TX 77027 ("Counsel", collectively hereinafter referred to as the "Parties"), do hereby enter into a contract under the following terms and conditions (the "Contract").

1.

Counsel hereby agrees to furnish the following services:

A. Advice and legal services to LOSCO, the Division of Administration (DOA), and the State trustees and agencies with which they are coordinating during all phases of the Natural Resources Damage Assessment (NRDA) process and during the assessment of economic impacts to the State, as well as to the Attorney General on any legal matter arising from the Deepwater Horizon Oil Spill.

B. The scope of this contract does not include litigation or proceedings arising out of tort or worker's compensation against the State.

C. Any claim or controversy arising out of the contract shall be resolved by the provisions of La. R.S. 39:1524-1526.

**Goals and Objectives:**

To protect the legal interest of the State of Louisiana as it relates to the Deepwater Horizon Oil Spill.

**Deliverables:**

To provide advice and legal services to LOSCO, the Division of Administration and the State trustees and agencies with which they are coordinating during all phases of the Natural Resource Damage Assessment (NRDA) process and during the assessment of economic impacts to the State, as well as to the Attorney General on any legal matter arising from the Deepwater Horizon Oil Spill.

**Methods used to measure and determine contact performance:**

Satisfactory completion of deliverables will determine contract performance.

**Monitoring Plan:**

Review invoices and their reasonableness associated with the contract deliverables.

2.

In consideration of the services described above, State hereby agrees to pay Counsel in accordance with the schedule attached and marked as Appendix "A". Unless otherwise provided in this Contract, Counsel has agreed that it will not be reimbursed for out-of-pocket expenses (i.e. copies, mailings, travel), however, Counsel may request reimbursement for extraordinary out-of-pocket expenses in accordance with the regulations issued by DOA and must receive prior written approval from the individual who is tasking Counsel for such expenses. Payment will be made only on approval of the individual who is tasking Counsel. The total of all sums payable under this Contract including fees and reimbursement of any expenses shall not exceed $1,000,000.00.

Counsel will submit, at the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the tenth of an hour, with specific reference to the nature of the work performed *(e.g., drafting of memoranda, research, review of files, etc.).* Counsel shall maintain three separate billing matters for: (a) NRDA and work tasked primarily by LOSCO (the "NRDA Matter"), (b) economic and damages work tasked primarily by DOA (the "Economic Damages Matter"), and (c) discovery, ESI and litigation-related work tasked by the State and/or the Attorney General (the "Litigation Matter"). Counsel hereby agrees not to bill the State for travel time or travel expenses, unless Counsel is otherwise performing work pursuant to this Contract while traveling, in which case the State will pay for the work performed while traveling by hours as outlined above.

Counsel agrees to submit monthly statements either in hard copy or in electronic format. It is understood that should Counsel fail to submit statements within thirty (30) days following the end of each month, State shall not be responsible for payment thereof under this Contract or in quantum merit.

LOSCO Counsel, Kathryn H. Bowman, or other counsel as designated by DPS/LOSCO, shall be the Counsel's principal point of contact on behalf of the State Trustees. Trey Phillips, First Assistant Attorney General, shall be the Counsel's principal point of contact on behalf of the Attorney General. Mark Brady shall be the Counsel's principal point of contact on behalf of DOA. The invoice for the NRDA Matter shall be directed to Mrs. Bowman, the invoice for the Economic Damages Matter shall be directed to Mr. Brady, and the invoice for the Litigation Matter shall be directed to Mr. Phillips. LOSCO, DOA and the Attorney General's Office may task Counsel separately

and without the prior consent of the other. The Attorney General, or his designee, will review invoices related to tasking requested by the Attorney General or his designee. DPS/LOSCO/State shall be responsible for payment of all of Counsel's work and expenses under this Contract regardless of the point of contact identified herein or which agency receives or reviews Counsel's invoices. All billings by Counsel for services rendered shall be submitted in compliance with Appendix B hereto and LSA-R.S. 39:1521.1. *JB* (*all*)

Counsel hereby agrees that the responsibility for payment of taxes by Counsel for its work under this agreement and/or legislative appropriation shall be said Counsel's obligation and identified under federal tax identification number ▓▓▓▓▓▓▓▓▓.

### 3.

It is anticipated that some or part of fees and expenses paid under this Contract to Counsel may be reimbursed by BP Production and Exploration Inc. and other parties pursuant to state and federal law for the Spill. The Parties agree that Counsel will separately invoice travel expenses, which will be submitted to the responsible parties for reimbursement to Counsel upon written authorization from LOSCO as to the timing of submittal to the responsible parties.

### 4.

The Legislative Auditor of the State of Louisiana and/or DOA auditors may audit all records of Counsel that relate to this Contract. Counsel shall maintain said records for a period of three years after the date of final payment under this Contract.

### 5.

This Contract is in effect for the period commencing July 1, 2011, and ending on June 30, 2013. Notwithstanding the foregoing, in no event shall this Contract be valid until it has been approved in writing by the Director of the Office of Contractual Review and the Attorney General.

### 6.

The continuation of this Contract is contingent upon the appropriation of funds to fulfill the requirements of the Contract by the legislature. If the legislature fails to appropriate sufficient monies to provide for the continuation of the Contract, or if such appropriation is reduced by the veto of the Governor or by any means provided in the appropriations act to prevent the total appropriation for the year from exceeding revenues for that year, or for any other lawful purpose, and the effect of such reduction is to provide insufficient monies for the continuation of the Contract, the Contract shall terminate on the date of the beginning of the first fiscal year for which funds are not appropriated.

7.

Counsel shall not assign any interest in this Contract and shall not transfer any interest in same (whether by assignment or novation), without prior written consent of the State, provided however, that claims for money due or to become due to the Counsel from the State under this Contract may be assigned to a bank, trust company, or other financial institution without such prior written consent. Notice of any such assignment or transfer shall be furnished promptly to the State and the Director of the Office of Contractual Review.

8.

Either party shall have the right to cancel this Contract, with or without cause, by giving the other party (30) days written notice forwarded to their respective address by certified mail. State has the right to cancel this Contract upon less than thirty (30) days due to budgetary reductions and changes in funding priorities by the State.

Notice shall be sent Certified Mail, return receipt requested, to the following addresses:

If to State:        Louisiana Oil Spill Coordinator's Office
                    Louisiana Department of Public Safety & Corrections
                    Public Safety Services
                    P. O. Box 66614
                    Baton Rouge, LA 70896
                    Attention: Jill P. Boudreaux, Undersecretary

If to Counsel:      Jackson, Gilmour & Dobbs, PC
                    3900 Essex, Suite 700
                    Houston, TX 77027
                    Attention: Bill Jackson

9.

All information which relates to the State's operations, and made available to Counsel in order to carry out this Contract, shall be protected by Counsel from unauthorized use and disclosure through the observance of the same or more effective procedural requirements as are applicable to the State. Counsel shall maintain and protect all privileged and confidential information of the State. Counsel has been provided with a copy of and understands the provisions of (1) the Joint Confidentiality Agreement Between the United States and the States of Alabama, Florida, Louisiana, Mississippi and Texas and (2) the Common Interest and Confidentiality Agreement executed by and between certain state agencies/departments of the State of Louisiana.

All records, reports, documents and other material delivered or transmitted to Counsel by the State shall remain the property of the State, and shall be returned by Counsel to the State, at Counsel's expense, at termination or expiration of this Contract. All records, reports, documents, pleadings, exhibits or other material related to this Contract and/or obtained or prepared by Counsel in connection with the performance of the services contracted for herein shall become the property of the State, and shall, upon request, be returned by Counsel to the State, at Counsel's expense, at termination or expiration of this Contract.

Counsel agrees to retain all books, records, and other documents relevant to this Contract and the funds expended hereunder until otherwise instructed by the State, or at a minimum, as required by applicable state and/or federal law.

The State and Counsel acknowledge and agree that the State Department of Justice has the right to review all records, reports, worksheets or any other material of either party related to this Contract. The State and Counsel further agree that they or either of them will furnish to the Department of Justice, upon request, copies of any and all records, reports, worksheets, bills, statements or any other material of Counsel or the State related to this Contract.

Counsel agrees to abide by the requirements of the following as applicable: Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, Federal Executive Order 11246 as amended, the Rehabilitation Act of 1973, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, the Fair Housing Act of 1968 as amended, and Counsel agrees to abide by the requirements of the Americans with Disabilities Act of 1990. Counsel agrees not to discriminate in its employment practices, and will render services under this contract without regard to race, color, religion, sex, sexual orientation, national origin, veteran status, political affiliation, or disabilities. Any act of discrimination committed by counsel, or failure to comply with these statutory obligations when applicable shall be grounds for termination of this Contract.

This Contract is not effective until approved by the Director of the Office of Contractual Review in accordance with La. R.S. 39:1502. It is the responsibility of Counsel to advise the State in advance if contract funds or contract terms may be insufficient to complete contract objectives.

IN WITNESS THEREOF, this Contract is signed on the dates indicated below.

**Counsel:**                                          **Witnesses:**
**Jackson, Gilmour & Dobbs, PC**

_____    __9/6/2011__
William J. Jackson                   Date
President

**Louisiana Oil Spill Coordinator's Office (LOSCO):**

_____    __7/7/11__
Jill P. Boudreaux, Undersecretary    Date
Public Safety Services

**Office of the Attorney General, State of Louisiana:**

_____    _____
James D. "Buddy" Caldwell            Date
Attorney General

**CONCURRED BY:**

_____    __7/22/11__
J.S. THOMPSON, JR                    DATE
STATE RISK DIRECTOR

APPROVED AS PER LETTER OF  __07-19-11__
JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL

BY: _____
RICHARD L. McGIMSEY
ASSISTANT ATTORNEY GENERAL

**A P P R O V E D**
Office of the Governor
Office of Contractual Review

AUG 0 8 2011

_____
DIRECTOR                             Page 6 of 8

## APPENDIX B
## INSTRUCTIONS FOR SUBMITTING INVOICES

At the end of each calendar month an itemization of all work performed, listing time by date for work performed by hours, down to the tenth of an hour with specific reference to the nature of the work performed *(e.g. drafting of expert reports, research, review of files, etc.)* should be invoiced according to the Contract provisions above.

If reimbursement is sought for expenses, receipts or documentation must be attached to the invoices or reimbursement will not be made. Some examples of the receipts or documentation that will be accepted are given below:

1. Telephone expenses - a copy of the telephone bill indicating the telephone calls made in reference to the contract. A listing of telephone billings on the invoice with the original kept by Counsel for review by the State.

2. Express Mail - a copy of the invoice from the vendor.

3. Travel expenses - purpose of the trip, miles traveled or airline ticket receipt, parking receipts, taxi receipts, hotel receipts (credit card receipt will not be accepted).

4. Photocopying - number of copies and the amount per copy or if outside photocopying is utilized a receipt must be included.

When invoices are submitted at the end of each calendar month, you must indicate the amount of your contract, the amount billed to date and the remaining balance.

If your invoices are billed by each individual case that you have worked on please include a summary sheet for that month for that invoice. Do not include any previous balances owed on the summary sheet.

LSA - R.S. 39:1521.1 calls for invoices to be submitted in the form of an affidavit.

**STATE OF LOUISIANA**

**CONTRACT**

Be it known, that on this 1ˢᵗ day of July 2010, the Louisiana Oil Spill Coordinator's Office (hereinafter sometimes referred to as "State" or "LOSCO") and the law firm of Jackson Gilmour & Dobbs, PC (hereinafter sometimes referred to as "Contractor") do hereby enter into contract under the following terms and conditions.

**Scope of Services**

Contractor hereby agrees to furnish the following services:

Advice and counsel to LOSCO during all phases of the Natural Resources Damage Assessment (NRDA) process (including but not limited to pre-assessment, assessment, quantification and recovery of natural resource damages, and related restoration planning and implementation) arising from the Deepwater Horizon oil spill. Advice and counsel to LOSCO regarding creation of agreements, protocols and work plans pertaining to the NRDA process and the assessment of injuries to the State's natural resources which have occurred and continue to occur as a result of the Deepwater Horizon oil spill in the Gulf of Mexico and all economic impacts to the State that have resulted therefrom. Review information and provide legal advice relative to compensation claims from the Responsible Party(ies) for response costs and recovery of released oil, restoration and recovery of natural resource and related economic damages. Activities shall include but not be limited to the provision of legal advice and counsel, conference calls and meetings, document preparation, document review and comment, memoranda on issues such as statutory and regulatory interpretation, preparation of regulations, advice as to drafting by LOSCO of the notice to conduct Restoration Planning, settlement strategy and other activities as required by the LOSCO or the Department of Public Safety & Corrections, Public Safety Services. Contractor will be under the direct supervision of the Assistant Secretary of Legal Affairs.

**The Scope of Services provided under this Contract specifically excludes and does not provide for Contractor to appear on behalf of LOSCO or the State of Louisiana in a formal capacity in any legal proceeding or in any court of law.**

Given the limited scope of this engagement, the State agrees that Contractor may contract with and/or provide legal services to other natural resource trustees or parties injured as a result of the Deepwater Horizon oil spill in the Gulf of Mexico provided that Contractor will not undertake any concurrent representation that is directly or materially adverse to the interests of LOSCO while this contract is in place. LOSCO has the right to review and consent to the proposed scope of work for any concurrent representation by Contractor under this section within one week of Contractor's presentment of such representation to LOSCO, and such consent shall not be unreasonably withheld.

## Payment Terms

In consideration of the services described above, State hereby agrees to pay the Contractor a maximum fee of $450.00 per hour, at the rates included in Attachment A, which is attached hereto and made a part of this Agreement. Payment will be made only on approval of Assistant Secretary of Legal Affairs Frank Blackburn.

The total of all sums payable under this contract including fees and reimbursement of any expenses shall not exceed $250,000.00.

Contractor will submit, at the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the quarter of an hour, with specific reference to the nature of the work performed *(e.g., drafting of memoranda, research, review of files, etc.).* Reasonable travel time, at the direction and for the convenience of the State, is billable as service time. Prior written approval of the Assistant Secretary either via email or fax is required for travel expenses prior to commencing such travel.

Contractor agrees to submit monthly statements either in hard copy or in electronic format. It is understood that should Contractor fail to submit statements within thirty (30) days following the end of each month, State shall not be responsible for payment thereof under this contract or in quantum meruit.

## Confidentiality

All information which relates to the State's operations, and made available to the Contractor in order to carry out this contract, shall be protected by the Contractor from unauthorized use and disclosure through the observance of the same or more effective procedural requirements as are applicable to the State. Contractor shall maintain and protect all confidential information of LOSCO and the State.

## Record Retention

Contractor agrees to retain all books, records, and other documents relevant to this contract and the funds expended hereunder for at least three years after final payment, or as required by applicable Federal law if Federal funds are used to fund this contract.

## Taxes

Contractor hereby agrees that the responsibility for payment of taxes from the funds thus received under this Contract and/or legislative appropriation shall be Contractor's obligation and identified under Federal tax identification number ▉▉▉▉▉▉.

## Termination for Cause

The State may terminate this Contract for cause based upon the failure of the

Contractor to comply with the terms and/or conditions of the Contract; provided that the State shall give the Contractor written notice specifying the Contractor's failure. If within thirty (30) days after receipt of such notice, the Contractor shall not have either corrected such failure or, in the case of failure which cannot be corrected in thirty (30) days, begun in good faith to correct said failure and thereafter proceeded diligently to complete such correction, then the State may, at its option, place the Contractor in default and the Contract shall terminate on the date specified in such notice. The Contractor may exercise any rights available to it under Louisiana law to terminate for cause upon the failure of the State to comply with the terms and conditions of this contract, provided that the Contractor shall give the State written notice specifying the State's failure and a reasonable opportunity for the State to cure the defect.

## Termination for Convenience

Either party may terminate the Contract at any time by giving thirty (30) days written notice to the other party. The Contractor shall be entitled to payment for deliverables in progress, to the extent work has been performed satisfactorily.

## Remedies for Default

Any claim or controversy arising out of this contract shall be resolved by the provisions of LSA - R.S. 39:1524 - 1526.

## Ownership

All records, reports, documents and other material delivered or transmitted to Contractor by State shall remain the property of State and shall be returned by Contractor to State, at Contractor's expense, at termination or expiration of this contract. All records, reports, documents, or other material related to this contract and/or obtained or prepared by Contractor in connection with the performance of the services contracted for herein shall become the property of State, and shall, upon request, be returned by Contractor to State, at Contractor's expense, at termination or expiration of this contract.

## Nonassignability

No contractor shall assign any interest in this contract by assignment, transfer, or novation, without prior written consent of the State. This provision shall not be construed to prohibit the Contractor from assigning his bank, trust company, or other financial institution any money due or to become due from approved contracts without such prior written consent. Notice of any such assignment or transfer shall be furnished promptly to the State.

## Auditors

It is hereby agreed that the Legislative Auditor of the State of Louisiana and/or the

Office of the Governor, Division of Administration auditors shall have the option of auditing all accounts of contractor which relate to this contract.

## Term of Contract

This contract shall begin on *July 1, 2010* and shall terminate on *August 31, 2010*.

## Fiscal Funding

The continuation of this contract is contingent upon the appropriation of funds to fulfill the requirements of the contract by the legislature. If the legislature fails to appropriate sufficient monies to provide for the continuation of the contract, or if such appropriation is reduced by the veto of the Governor or by any means provided in the appropriations act to prevent the total appropriation for the year from exceeding revenues for that year, or for any other lawful purpose, and the effect of such reduction is to provide insufficient monies for the continuation of the contract, the contract shall terminate on the date of the beginning of the first fiscal year for which funds are not appropriated.

## Discrimination Clause

The contractor agrees to abide by the requirements of the following as applicable: Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, Federal Executive Order 11246 as amended, the Rehabilitation Act of 1973, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, the Fair Housing Act of 1968 as amended, and contractor agrees to abide by the requirements of the Americans with Disabilities Act of 1990.

Contractor agrees not to discriminate in its employment practices and will render services under this contract without regard to race, color, religion, sex, sexual orientation, national origin, veteran status, political affiliation, or disabilities.

Any act of discrimination committed by Contractor, or failure to comply with these statutory obligations when applicable shall be grounds for termination of this contract.

## Conflicts of Interest

It is possible that while providing services to the State, Contractor may also provide services, including legal representation, to other natural resource trustees or persons or entities injured as a result of the Deepwater Horizon oil spill in the Gulf of Mexico, including other states along the Gulf of Mexico. In the event a potential or actual conflict of interest arises during such representation, Contractor will notify the State of the potential or actual conflict of interest and the State may agree to either: (1) waive the potential or actual conflict of interest and consent to continued services by Contractor; (2) determine that there is no conflict of interest or modify the representations so as to guard against a potential conflict; or (3) terminate this Contract. In the event that either

Party elects to terminate this Contract because of such a potential or actual conflict of interest, the State consents to and agrees that Contractor may proceed with the representation of other natural resource trustees or persons or entities injured as a result of the Deepwater Horizon oil spill in the Gulf of Mexico.

IN WITNESS WHEREOF, the parties have executed this Agreement as of this 1st day of July, 2010.

WITNESSES SIGNATURES:

_____

_____

_____

_____


STATE AGENCY SIGNATURE:

By: _____

Title: _____


WITNESSES SIGNATURES:

_____

_____

_____


CONTRACTOR SIGNATURE:

By: _____

Title:  President
        Jackson Gilmour & Dobbs, PC

CFMS #
698963

**STATE OF LOUISIANA**

**AMENDMENT TO July 1, 2010 CONTRACT**

Be it known, that on this ___ day of December 2010, the Louisiana Oil Spill Coordinator's Office (hereinafter sometimes referred to as "State" or "LOSCO") and the law firm of Jackson Gilmour & Dobbs, PC (hereinafter sometimes referred to as "Contractor" and collectively, the "Parties") do hereby agree to amend the July 1, 2010 contract between the Parties in appreciation of the scope of work created by the Deepwater Horizon oil spill (the "Spill") and in recognition of the State's responsibility to manage and use outside consultants and state resources judiciously, which agreement is subject to the following terms and conditions.

**Effective Date**

The Parties agree that all amendments contained herein apply retroactively to the effective date of the July 1, 2010 contract.

**Scope of Services**

Contractor hereby agrees to furnish the following services:

Advice and counsel to LOSCO and those State trustees and agencies with which it is coordinating during all phases of the Natural Resources Damage Assessment (NRDA) process (including but not limited to pre-assessment, assessment, quantification and recovery of natural resource damages, and related restoration planning and implementation) arising from the Deepwater Horizon oil spill. Advice and counsel to LOSCO and those State trustees and agencies with which it is coordinating regarding creation of agreements, protocols and work plans pertaining to the NRDA process and the assessment of injuries to the State's natural resources that have occurred and continue to occur as a result of the Deepwater Horizon oil spill in the Gulf of Mexico and all economic impacts to the State that have resulted therefrom. Review information and provide legal advice relative to compensation claims from the Responsible Party(ies) for response costs and recovery of released oil, restoration and recovery of natural resource and related economic damages. Activities shall include but not be limited to the provision of legal advice and counsel, conference calls and meetings, document preparation, document review and comment, memoranda on issues such as statutory and regulatory interpretation, preparation of regulations, advice as to drafting by LOSCO of the notice to conduct Restoration Planning, settlement strategy and other activities as required by LOSCO or the Department of Public Safety & Corrections, Public Safety Services. Contractor will be under the direct supervision of the Assistant Secretary of Legal Affairs and LOSCO in-house counsel.

**The Scope of Services provided under this Contract specifically excludes and does not provide for Contractor to appear on behalf of LOSCO or the State of Louisiana in a formal capacity in any legal proceeding or in any court of law.**

Given the limited scope of this engagement, the State agrees that Contractor may contract with and/or provide legal services to other natural resource trustees or parties injured as a result of the Deepwater Horizon oil spill in the Gulf of Mexico, provided that Contractor will not undertake

any concurrent representation that is directly or materially adverse to the interests of LOSCO while this contract is in place. LOSCO has the right to review and consent to the proposed scope of work for any concurrent representation by Contractor under this section within one week of Contractor's presentment of such representation to LOSCO, and such consent shall not be unreasonably withheld.

## Payment Terms

In consideration of the services described above, State hereby agrees to pay Contractor a maximum fee of $400 per hour. In order to assist the State in its efforts to judiciously manage and control the costs associated with the Spill response and assessment, Contractor hereby agrees to reduce the maximum fee of all of Contractor's employees to $400.00 per hour. In accordance with the Effective Date of this contract amendment, this fee reduction shall be implemented retroactively to the beginning of Contractor's services for LOSCO. All other services provided to LOSCO by Contractor will be at the rates included in Attachment A, which is attached hereto and made a part of this Agreement. Contractor will not generally be reimbursed for out-of-pocket expenses (i.e. copies, mailings, travel), however, Contractor may request reimbursement for extraordinary out-of-pocket expenses in accordance with the regulations issued by the Division of Administration and must receive prior written approval from the Assistant Secretary of Legal Affairs or his designee for such expenses. Payment will be made only on approval of Assistant Secretary of Legal Affairs.

The total of all sums payable under this contract including fees and reimbursement of any expenses shall not exceed $750,000.00.

Contractor will submit, at the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the tenth of an hour, with specific reference to the nature of the work performed *(e.g., drafting of memoranda, research, review of files, etc.)*. Contractor hereby agrees not to bill the State for travel time or travel expenses, unless Contractor is otherwise performing work pursuant to this Contract while traveling, in which case the State will pay for the work performed while traveling by hours as outlined above. In accordance with the Effective Date of this contract amendment, this revision shall be implemented retroactively to the beginning of Contractor's services for LOSCO. Notwithstanding the foregoing, Contractor's travel expenditures may be submitted to the responsible parties and, if reimbursed by the responsible parties, shall be reimbursed to Contractor as set forth in the section titled Anticipated Reimbursement.

Contractor agrees to submit monthly statements either in hard copy or in electronic format. It is understood that should Contractor fail to submit statements within thirty (30) days following the end of each month, State shall not be responsible for payment thereof under this contract or in quantum merit.

Contractor hereby agrees to reissue prior monthly invoices reflecting the decrease in Contractor's hourly rate to a maximum of $400 per hour and the exclusion of travel time and expenses.

## Confidentiality

All information which relates to the State's operations, and made available to the Contractor in order to carry out this contract, shall be protected by the Contractor from unauthorized use and disclosure through the observance of the same or more effective procedural requirements as

are applicable to the State. Contractor shall maintain and protect all confidential information of LOSCO and the State.

## Record Retention

Contractor agrees to retain all books, records, and other documents relevant to this contract and the funds expended hereunder for at least three years after final payment, or as required by applicable Federal law if Federal funds are used to fund this contract.

## Taxes

Contractor hereby agrees that the responsibility for payment of taxes from the funds thus received under this Contract and/or legislative appropriation shall be Contractor's obligation and identified under Federal tax identification number ▮▮▮▮▮▮▮▮.

## Termination for Cause

The State may terminate this Contract for cause based upon the failure of the Contractor to comply with the terms and/or conditions of the Contract; provided that the State shall give the Contractor written notice specifying the Contractor's failure. If within thirty (30) days after receipt of such notice, the Contractor shall not have either corrected such failure or, in the case of failure which cannot be corrected in thirty (30) days, begun in good faith to correct said failure and thereafter proceeded diligently to complete such correction, then the State may, at its option, place the Contractor in default and the Contract shall terminate on the date specified in such notice. The Contractor may exercise any rights available to it under Louisiana law to terminate for cause upon the failure of the State to comply with the terms and conditions of this contract, provided that the Contractor shall give the State written notice specifying the State's failure and a reasonable opportunity for the State to cure the defect.

## Termination for Convenience

Either party may terminate the Contract at any time by giving thirty (30) days written notice to the other party. The Contractor shall be entitled to payment for deliverables in progress, to the extent work has been performed satisfactorily.

## Remedies for Default

Any claim or controversy arising out of this contract shall be resolved by the provisions of LSA - R.S. 39:1524 - 1526.

## Ownership

All records, reports, documents and other material delivered or transmitted to Contractor by State shall remain the property of State and shall be returned by Contractor to State, at Contractor's expense, at termination or expiration of this contract. All records, reports, documents, or other material related to this contract and/or obtained or prepared by Contractor in connection with the performance of the services contracted for herein shall become the property of State, and shall, upon request, be returned by Contractor to State, at Contractor's expense, at termination or expiration of this contract.

## Nonassignability

No contractor shall assign any interest in this contract by assignment, transfer, or novation, without prior written consent of the State. This provision shall not be construed to prohibit the Contractor from assigning his bank, trust company, or other financial institution any money due or to become due from approved contracts without such prior written consent. Notice of any such assignment or transfer shall be furnished promptly to the State.

## Auditors

It is hereby agreed that the Legislative Auditor of the State of Louisiana and/or the Office of the Governor, Division of Administration auditors shall have the option of auditing all accounts of contractor which relate to this contract.

## Term of Contract

This contract shall begin on *September 1, 2010* and shall terminate on *June 30, 2011*.

## Fiscal Funding

The continuation of this contract is contingent upon the appropriation of funds to fulfill the requirements of the contract by the legislature. If the legislature fails to appropriate sufficient monies to provide for the continuation of the contract, or if such appropriation is reduced by the veto of the Governor or by any means provided in the appropriations act to prevent the total appropriation for the year from exceeding revenues for that year, or for any other lawful purpose, and the effect of such reduction is to provide insufficient monies for the continuation of the contract, the contract shall terminate on the date of the beginning of the first fiscal year for which funds are not appropriated.

## Anticipated Reimbursement

It is anticipated that the fees and expenses paid under this contract to Contractor will be reimbursed by BP Production and Exploration Inc. and any and all other responsible parties designated as such pursuant to state and federal law for the Deepwater Horizon oil spill. The Parties agree that Contractor will separately invoice its travel expenses, which will be submitted to the responsible parties for reimbursement to Contractor upon written authorization from LOSCO as to the timing of submittal to the responsible parties.

## Discrimination Clause

The contractor agrees to abide by the requirements of the following as applicable: Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, Federal Executive Order 11246 as amended, the Rehabilitation Act of 1973, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, the Fair Housing Act of 1968 as amended, and contractor agrees to abide by the requirements of the Americans with Disabilities Act of 1990.

Contractor agrees not to discriminate in its employment practices and will render services under this contract without regard to race, color, religion, sex, sexual orientation, national origin, veteran status, political affiliation, or disabilities.

Any act of discrimination committed by Contractor, or failure to comply with these statutory obligations when applicable shall be grounds for termination of this contract.

**Conflicts of Interest**

It is possible that while providing services to the State, Contractor may also provide services, including legal representation, to other natural resource trustees or persons or entities injured as a result of the Deepwater Horizon oil spill in the Gulf of Mexico, including other states along the Gulf of Mexico. In the event a potential or actual conflict of interest arises during such representation, Contractor will notify the State of the potential or actual conflict of interest and the State may agree to either: (1) waive the potential or actual conflict of interest and consent to continued services by Contractor; (2) determine that there is no conflict of interest or modify the representations so as to guard against a potential conflict; or (3) terminate this Contract. In the event that either Party elects to terminate this Contract because of such a potential or actual conflict of interest, the State consents to and agrees that Contractor may proceed with the representation of other natural resource trustees or persons or entities injured as a result of the Deepwater Horizon oil spill in the Gulf of Mexico.

IN WITNESS WHEREOF, the parties have executed this Agreement as of this ___ day of December, 2010.

WITNESSES SIGNATURES:

DEPARTMENT OF PUBLIC SAETY & CORRECTIONS, LOSCO:

By: _____

Jill P. Boudreaux

Title:     Undersecretary

WITNESSES SIGNATURES:

JACKSON, GILMOUR & DOBBS

By: _____

Bill Jackson

Title:     President

**Amendment to Agreement between**

Louisiana Department of Public Safety & Corrections
Public Safety Services, Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Jackson, Gilmour & Dobbs, PC
3900 Essex Suite 700
Houston, TX 77027

**Amendment Provisions**

## CHANGE AGREEMENT FROM:

**Payment Terms**

The total of all sums payable under this contract including fees and reimbursement of any expenses shall not exceed $750,000.00.

## ADD OR CHANGE TO:

**Payment Terms**

The total of all sums payable under this contract including fees and reimbursement of any expenses shall not exceed $1,200,000.00.

Amendment becomes effective:  April 1, 2011

This amendment is necessary to increase the number of hours required to provide services as described in the original scope of services and contains or has attached hereto all revised terms and conditions agreed upon by contracting parties.

IN WITNESS THEREOF, this amendment is signed and entered into on the date indicated above.

**Contractor:**

_____
Jackson, Gilmour & Dobbs, PC

**Public Safety Services:**

_____
Jill P. Boudreaux, Undersecretary

**Witnesses:**

_____

_____

### Amendment to Agreement between

Louisiana Department of Public Safety & Corrections
Louisiana Oil Spill Coordinator's Office (LOSCO)
AND
Jackson, Gilmour & Dobbs, PC
3900 Essex, Suite 700
Houston, TX 77027

BE IT KNOWN THAT that on this 7th day of April , 2011, the Louisiana Oil Spill Coordinator's Office (hereinafter sometimes referred to as the "State" or "LOSCO") and the law firm of Jackson, Gilmour & Dobbs, PC (hereinafter sometimes referred to as "Counsel", collectively hereinafter referred to as the "Parties"), do hereby agree to amend the July 1, 2010 contract between the parties, and the Amendment to that contract, dated December 14, 2010, in appreciation of the scope of work created by the Deepwater Horizon Oil Spill (the "Spill") and in recognition of the State's responsibility to manage and use outside counsel and the state's resources judiciously.

1.

The Parties agree that all provisions contained herein apply retroactively to the effective date of the July 1, 2010 contract. The Parties further agree that this amendment supersedes and replaces, in its entirety, the July 1, 2010 contract between the Parties, as well as the December 14, 2010 amendment thereto.

2.

Counsel hereby agrees to furnish the following services:

Advice and counsel to LOSCO, the Division of Administration (DOA), and those State trustees and agencies with which it is coordinating during all phases of the Natural Resources Damage Assessment (NRDA) process, including but not limited to pre-assessment, restoration planning, and restoration implementation. Advice and counsel to LOSCO, DOA and those State trustees and agencies with which it is coordinating regarding creation of agreements, protocols and work plans pertaining to the NRDA process and the assessment of injuries to the State's natural resources that have occurred and continue to occur as a result of the Spill, as well as all economic impacts to the State that have resulted from the Spill. Review information and provide legal advice relative to compensation claims submitted to the Responsible Party(ies) for response costs and recovery of released oil, restoration and recovery of natural resource and economic damages. Activities shall include but not be limited to the provision of legal advice and counsel, conference calls and meetings, document preparation, document review and comment, memoranda on issues such as statutory and regulatory interpretation, preparation of regulations, advice as to drafting by LOSCO of the Notice of Intent to Conduct Restoration Planning, settlement strategy and other activities as required by LOSCO, the Department of Public Safety & Corrections, Public Safety Services ("DPS"), or DOA. Counsel will be under the direct supervision of the Assistant Secretary of Legal Affairs for DPS, LOSCO in-house counsel, and Mark Brady, Deputy Commissioner of DOA. The Assistant Secretary of Legal Affairs for DPS, LOSCO in-house counsel, and Mark Brady, Deputy Commissioner of DOA may task Counsel separately and without the prior consent of the other.

The scope of services provided under this Contract does not include litigation, unless requested by or consented to by the Attorney General, or proceedings arising out of or involving tort or worker's compensation.

LOSCO Special Counsel, Stephanie C. Morris, shall be the Counsel's principal point of contact on behalf of the State. LOSCO may designate other points of contact on behalf of the State. Counsel shall copy and include LOSCO Special Counsel, Stephanie C. Morris, on any and all communications regarding the services, including specific task orders, performed pursuant to the Contract.

3.

In consideration of the services described above, State hereby agrees to pay Counsel a maximum fee of $400 per hour. In order to assist the State in its efforts to judiciously manage and control the costs associated with the Spill response and assessment, Counsel hereby agrees to reduce the maximum fee of all of Counsel's employees to $400.00 per hour. In accordance with the Effective Date of this contract amendment, this fee reduction shall be implemented retroactively to the beginning of Counsel's services for LOSCO. All services provided to LOSCO or DOA by Counsel will be at the rates included in Attachment A, which is attached hereto and made a part of this Agreement. Counsel will not generally be reimbursed for out-of-pocket expenses (i.e. copies, mailings, travel), however, Counsel may request reimbursement for extraordinary out-of-pocket expenses in accordance with the regulations issued by DOA and must receive prior written approval from the individual who is tasking Counsel for such expenses. Payment will be made only on approval of the individual who is tasking Counsel.

The total of all sums payable under this contract including fees and reimbursement of any expenses shall not exceed $1,500,000.00.

Counsel will submit, at the end of each calendar month, an itemization of all work performed, listing time by date for work performed by hours, down to the tenth of an hour, with specific reference to the nature of the work performed *(e.g., drafting of memoranda, research, review of files, etc.)*. Counsel hereby agrees not to bill the State for travel time or travel expenses, unless Counsel is otherwise performing work pursuant to this Contract while traveling, in which case the State will pay for the work performed while traveling by hours as outlined above. In accordance with the Effective Date of this contract amendment, this revision shall be implemented retroactively to the beginning of Counsel's services for LOSCO. Notwithstanding the foregoing, Counsel's travel expenditures may be submitted to the responsible parties and, if reimbursed by the responsible parties, shall be reimbursed to Counsel as set forth in Section 4 below.

Counsel agrees to submit monthly statements either in hard copy or in electronic format. It is understood that should Counsel fail to submit statements within thirty (30) days following the end of each month, State shall not be responsible for payment thereof under this contract or in quantum merit.

Invoices for services shall be submitted by counsel to LOSCO and DOA for review and approval by the individual who is tasking Counsel. All billings by Counsel for services rendered shall be submitted in compliance with LSA-R.S. 39:1521.1.

Counsel hereby agrees that the responsibility for payment of taxes from the funds thus received under this agreement and/or legislative appropriation shall be said Counsel's obligation and identified under federal tax identification number ▮▮▮▮▮▮

4.

It is anticipated that the fees and expenses paid under this contract to Counsel will be reimbursed by BP Production and Exploration Inc. and any and all other responsible parties designated as such pursuant to state and federal law for the Spill. The Parties agree that Counsel will separately invoice its travel expenses, which will be submitted to

the responsible parties for reimbursement to Counsel upon written authorization from LOSCO as to the timing of submittal to the responsible parties.

5.

The Legislative Auditor of the State of Louisiana and/or DOA auditors may audit all records of Counsel that relate to this contract. Counsel shall maintain said records for a period of three years after the date of final payment under this contract.

6.

This contract is in effect for the period commencing July 1, 2010, and ending on June 30, 2013. Notwithstanding the foregoing, in no event shall this contract be valid until it has been approved in writing by the Director of the Office of Contractual Review and the Attorney General.

7.

The continuation of this contract is contingent upon the appropriation of funds to fulfill the requirements of the contract by the legislature. If the legislature fails to appropriate sufficient monies to provide for the continuation of the contract, or if such appropriation is reduced by the veto of the Governor or by any means provided in the appropriations act to prevent the total appropriation for the year from exceeding revenues for that year, or for any other lawful purpose, and the effect of such reduction is to provide insufficient monies for the continuation of the contract, the contract shall terminate on the date of the beginning of the first fiscal year for which funds are not appropriated.

8.

Counsel shall not assign any interest in this contract and shall not transfer any interest in same (whether by assignment or novation), without prior written consent of the State, provided however, that claims for money due or to become due to the Counsel from the State under this contract may be assigned to a bank, trust company, or other financial institution without such prior written consent. Notice of any such assignment or transfer shall be furnished promptly to the State and the Director of the Office of Contractual Review.

9.

Either party shall have the right to cancel this contract, with or without cause, by giving the other party (30) days written notice forwarded to their respective address by certified mail. State has the right to cancel this contract upon less than thirty (30) days due to budgetary reductions and changes in funding priorities by the State.

Notice shall be sent Certified Mail, return receipt requested, to the following addresses:

If to State:       Louisiana Oil Spill Coordinator's Office
                   Louisiana Department of Public Safety & Corrections
                   Public Safety Services
                   P. O. Box 66614
                   Baton Rouge, LA 70896
                   Attention: Jill P. Boudreaux, Undersecretary

If to Counsel:     Jackson, Gilmour & Dobbs, PC
                   3900 Essex, Suite 700
                   Houston, TX 77027
                   Attention: Bill Jackson

, 10.

All information which relates to the State's operations, and made available to Counsel in order to carry out this contract, shall be protected by Counsel from unauthorized use and disclosure through the observance of the same or more effective procedural requirements as are applicable to the State. Counsel shall maintain and protect all privileged and confidential information of LOSCO, DOA and the State. Counsel has been provided with a copy of and understands the provisions of (1) the Joint Confidentiality Agreement Between the United States and the States of Alabama, Florida, Louisiana, Mississippi and Texas and (2) the Common Interest and Confidentiality Agreement executed by and between certain state agencies/departments of the State of Louisiana.

11.

All records, reports, documents and other material delivered or transmitted to Counsel by State shall remain the property of State, and shall be returned by Counsel to State, at Counsel's expense, at termination or expiration of this contract. All records, reports, documents, pleadings, exhibits or other material related to this contract and/or obtained or prepared by Counsel in connection with the performance of the services contracted for herein shall become the property of State, and shall, upon request, be returned by Counsel to State, at Counsel's expense, at termination or expiration of this contract.

12.

Counsel agrees to retain all books, records, and other documents relevant to this contract and the funds expended hereunder until otherwise instructed by the State, or at a minimum, as required by applicable state and/or federal law.

13.

The State and Counsel acknowledge and agree that the Department of Justice has the right to review all records, reports, worksheets or any other material of either party related to this contract. The State and Counsel further agree that they or either of them will furnish to the Department of Justice, upon request, copies of any and all records, reports, worksheets, bills, statements or any other material of Counsel or State related to this contract.

14.

Counsel agrees to abide by the requirements of the following as applicable: Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964, as amended the Equal Employment Opportunity Act of 1972, Federal Executive Order 11246 as amended, the Rehabilitation Act of 1973, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, the Fair Housing Act of 1968 as amended, and Counsel agrees to abide by the requirements of the Americans with Disabilities Act of 1990.

Counsel agrees not to discriminate in its employment practices, and will render services under this contract without regard to race, color, religion, sex, sexual orientation, national origin, veteran status, political affiliation, or disabilities.

Any act of discrimination committed by counsel, or failure to comply with these statutory obligations when applicable shall be grounds for termination of this contract.

15.

This contract is not effective until approved by the Director of the Office of Contractual Review in accordance with La. R.S. 39:1502. It is the responsibility of Counsel to advise the State in advance if contract funds or contract terms may be insufficient to complete contract objectives.

4

16.

Any claim or controversy arising out of the contract shall be resolved by the provisions of LSA-R.S. 39:1524 - 1526.

IN WITNESS THEREOF, this Amendment is signed on the dates indicated below.

Counsel:                                                          Witnesses:
Jackson, Gilmour & Dobbs, PC

_____  3/20/2011
William J. Jackson            Date
President

Louisiana Oil Spill Coordinator's Office (LOSCO):

_____  4/5/11
Jill P. Boudreaux, Undersecretary   Date
Public Safety Services



**Exhibit E**



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
POST OFFICE BOX 94005
BATON ROUGE 70804-9005

JAMES D. "BUDDY" CALDWELL
ATTORNEY GENERAL

November 17, 2010

Mr. Kenneth R. Feinberg, Esq.
Feinberg Rozen, LLP
The Willard Office Building
1455 Pennsylvania Avenue, NW, Suite 390
Washington, D.C., 20004-1008

Dear Mr. Feinberg:

We are in receipt of your November 1, 2010, email transmitting the Gulf Coast Claims Facility ("GCCF") Draft Protocol for Interim and Final Claims. We appreciate the opportunity to review this protocol and offer comments. As we have mentioned, the claims process is extremely important to the citizens who have been affected by this disaster, and it is pertinent that the GCCF incorporate best practices into the protocols in order to ensure that claimants are fully compensated for the losses they have suffered from this disaster.

I have reviewed the Draft Protocol and the Attached Release and Covenant Not To Sue and have outlined below a list of ongoing concerns:

Comments:

1. The referenced causation determination of OPA claims is not consistent between the GCCF evaluation and the release. Section F of the Draft Protocol states that "[t]he GCCF will only pay for harm or damage that is proximately caused by the Spill." However, the Release states that the claimant is discharging the Released Parties for any claim "arising from or relating in any way" to the incident. Claimants are not required to release the responsible parties from liability for claims that the GCCF will not pay.

2. Neither the Release nor the Draft Protocol contain a re-opener clause. In fact, the release specifically states that the claimant "releases and forever discharges...any losses, damages, costs, expenses, injuries, claims, causes of actions, liabilities, or other relief that Claimant has or may have, whether known or unknown, whether present or future, whether direct or indirect, whether legal or equitable..." arising from the Spill. Our continued investigation into this incident suggests that some of the damages claimants may suffer will not manifest or be determinable until some unknown future date. As such, I must insist that any release contain a re-opener clause allowing for the possibility for additional compensation in the event that new damages are discovered.

3. OPA does not support the concept that the GCCF can release BP and other responsible or liable parties and allow BP to subrogate itself to the claimant's rights against other "Released Parties" without limitation. All references to "Released Parties" should be removed.

4. Section 6 of the Release and Covenant Not To Sue should be amended as follows, "This Release is not intended to prevent ~~any of the Released Parties~~ any person from exercising their respective rights of contribution, subrogation, or indemnity under the Oil Pollution Act of 1990 ("OPA") or any other law. ~~As this Release is fully and completely resolving, together with all other Claims, Claimant's claim under OPA,~~ To the extent authorized by OPA, BP is hereby subrogated to any and all rights that Claimant has ~~arising from the Incident.~~ under any other law." This amendment is consistent with OPA, and specifically, the subrogation language of § 2715 of OPA.

5. The last bullet of Section IV (A) of the Draft Protocol states, "Any interim payment or Emergency Advance Payment made to a Claimant will be deducted from the final payment of the claim." The Draft Protocol should clarify that the deduction only applies to a final claim for the same loss, i.e. GCCF should not deduct an interim payment for property damage from a final payment for lost profits.

I would also like to incorporate by reference the comments submitted to you, via email, on November 8, 2010, by Patrick Juneau. Thank you for providing us with an opportunity to comment on this Protocol. We encourage you to make the changes suggested above so that we can support the claims process and recommend it to our citizens.

Sincerely,

James D. "Buddy" Caldwell,
Attorney General, State of Louisiana

cc: Attorney General Jim Hood
State of Mississippi

Attorney General Troy King
State of Alabama

Attorney General Bill McCollum
State of Florida

Kenneth R. Feinberg
November 17, 2010
Page Three

Attorney General Greg Abbott
State of Texas

Associate Attorney General Thomas Perrelli
United States Department of Justice

Mr. Jack Lynch
General Counsel, BP

Mr. Mark Holstein
Managing Attorney, BP



**Exhibit F**

November 22, 2010

The Honorable James D. "Buddy" Caldwell
Attorney General
State of Louisiana
Department of Justice
Post Office Box 94005
Baton, Rouge, LA  70804

Dear Attorney General Caldwell:

I want to thank you for your letter of November 17th urging that I make important changes and improvements to the enclosed Protocol for Interim and Final Claims ("the Final Protocol") of the Gulf Coast Claims Facility ("GCCF"). I have carefully reviewed the proposals made in your November 17 letter and have adopted certain of your suggestions. I do hope you will find the Final Protocol acceptable. I have done my best in considering proposed changes made by your office and others.

In particular, I refer to your suggestions in your November 17 letter:

1) I have made changes in both the Final Protocol and the Release in an attempt to narrow somewhat the differences.

2) I have dealt with your "re-opener" concerns by providing any claimant with the right to seek "interim payments" rather than a final payment; only the latter will require a release. Any claimant can continue to accept "interim payments" during the three-year life of the GCCF without being required to sign any release. As you have pointed out, at some point there is a benefit in "finality." Until each claimant makes his/her own decision about accepting a final payment, no release of any type will be required.

3) With all due respect, I disagree with your conclusion that it is not sound public policy to require a claimant – who accepts a final payment – to sign a comprehensive release ending the right of the claimant to litigate against BP and other potential defendants. I believe that OPA contemplates such a comprehensive release. Indeed, when the State of Louisiana, acting as a

defendant, settles a claim, I would be surprised if it did not seek a similar broad based release. You have convinced me over the past few months about the wisdom of promoting "finality" in ending future uncertainty surrounding the oil spill. My comprehensive Release language – designed with such finality in mind but, at the same time, purely voluntary – is focused on this objective.

4) With all due respect, I do not think your suggestion regarding the subrogation language in the Release is consistent with the subrogation language of OPA. Section 2715 of OPA refers to the subrogation rights of any person "who pays compensation" pursuant to this Act to any claimant. Other persons do not have subrogation rights under the Act. The current language of the Release is consistent with subrogation rights under OPA.

5) I agree with you that payments made for lost profits, wage loss, subsistence use, or property damage should not be deducted when a claimant receives an offer for a non-OPA claim of physical injury. In such a case there should be no such deduction. In all other cases, however, I believe that such a deduction is appropriate. I believe this issue is largely mute since a final payment must be made in an aggregate amount, after deductions, that will satisfy the claimant who chooses to accept the final payment and sign a Release.

Finally, I enclose for your information a Memorandum of Law prepared at my request by Professor John Goldberg of the Harvard Law School. The Memorandum focuses on the issue of proximity and "proximate cause" under OPA. I believe it reaches conclusions which both you and Mr. Juneau share about the limitations imposed by OPA on hotels, motels, restaurants, and other businesses far from Gulf beaches, which now claim injury due to the spill.

Attorney General Caldwell, I thank you for your constructive criticism and, especially, the assistance of Patrick Juneau over the past few months.

Sincerely,

Kenneth R. Feinberg
Administrator
Gulf Coast Claims Facility

KRF:shs

Enclosures: Protocol for Interim and Final Claims
            Professor John Goldberg – Memorandum of Law



**Exhibit G**



**From:** Mary Anna Tabol [mailto:MaryAnna@feinbergrozen.com] **On Behalf Of** Ken Feinberg
**Sent:** Tuesday, November 30, 2010 3:35 PM
**To:** Milch, Thomas
**Subject:** FW: GCCF Protocol & Release

Your thoughts in a consultative capacity?

Thanks,
Ken

**From:** Felicia A. Guidry [mailto:FGG@juneaudavid.com] **On Behalf Of** Patrick A. Juneau
**Sent:** Tuesday, November 30, 2010 2:38 PM
**To:** Ken Feinberg
**Subject:** RE: GCCF Protocol & Release

Ken:

      Thank you for the kind comments. One correction; I am not a great servant. I am trying to get it right and help the process.

      I really do believe that the evaluation templates will assist you in processing a lot of the Louisiana claims. If your staff needs further input from us on these templates, please advise and we will make the necessary people available.

      We do disagree on the release issue. Under the provisions of section 2715(b)(2) of OPA, a strong argument could be made that there are no subrogation rights granted on final payments. Beyond that argument, I do not see how your present release can pass muster with the provisions of Sections 2702 and 2715 of OPA. First, you state that section 2715 grants BP subrogation rights. Please note that in 2715(a) there are no subrogation rights granted to BP for the OPA payments. BP gets subrogation rights only to claims the claimant may have "under any other law." Additionally, under section 2702(d)(1)(B), BP would be entitled to subrogation only if the oil spill was caused solely by the act or omission of a third party. I do not believe that BP is making such a contention.

      Finally, if BP enters into a release with a claimant and the claims against BP are discharged, those claims against BP are gone and a third party cannot support a claim against BP by some third party or cross claim. Again, if there are any contractual agreements between BP and the third parties then, of course, those contractual obligations would apply.

11/30/2010

If your legal team disagrees with the above, please let me know the basis of their position. As always, we will consider all options.

**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email: paj@juneaudavid.com
         fgg@juneaudavid.com

---

**From:** Ken Feinberg [mailto:KFeinberg@feinbergrozen.com]
**Sent:** Sunday, November 28, 2010 7:55 AM
**To:** Patrick A. Juneau
**Subject:** RE: GCCF Protocol

Patrick – I thank you, sir, not only for sending me your comments below, but also for sending me your other email with the "compensation models" attached. Very, very helpful. I am including some of your changes in the final protocol and will send you a final version in the next week or so. Also, I have accepted an invitation from the Gulf AGs to meet with them in Fort Lauderdale this Wednesday at 12:15 p.m. If you are present, perhaps we can get together for a few minutes before the meeting. I must depart immediately thereafter. Patrick, I do appreciate your constructive criticisms and suggestions. As you know, I have accepted many of them. Where we seem to disagree most vehemently is on the question of the release. I do not understand your position on this, especially in light of the fact that I have adopted your suggestion for the option of interim payments without any release. What is the point of a release being limited to BP; the other defendants will simply cross claim and Judge Barbier will simply confront all of the litigation with the plaintiff in the courtroom against all defendants. The GCCF will not have achieved the goal of corralling the claims and eliminating litigation. In addition, if I am correct in my offers, the claimant (plaintiff) will be made whole and then some. So why permit additional litigation? My friend, you have great credibility with me and I may be missing something here; you, in your wisdom and experience, may correct me. But I don't understand your current position or that of the AG. Thanks again for everything. You are a great public and private servant.


Ken

**From:** Felicia A. Guidry [mailto:FGG@juneaudavid.com] **On Behalf Of** Patrick A. Juneau
**Sent:** Wednesday, November 24, 2010 3:08 PM
**To:** Ken Feinberg
**Cc:** Mark Brady; murrille@GOV.STATE.LA.US; Terrell, Megan K.
**Subject:** GCCF Protocol


Dear Ken:

Here are my comments on the November 22, 2010 protocol and release:

a)      In Section 1 A, it should state "Pursuant to a determination by the USCG, filing a claim for a sum certain to the GCCF constitutes presentment of a claim to BP, as the Responsible Party, under OPA, whether the claim is for emergency advance, interim or final payment." This Section

11/30/2010

should also include this sentence "Filing a claim under the GCCF for OPA damages is a required "conditioned precedent" to seeking payment from the Oil Spill Liability Trust Fund ("OSLTF"), administered by the USCG, or filing a lawsuit, in State or Federal Court. Failure of an individual or business to comply with the presentment requirement in OPA could result in a denial of a claimants OSLTF claim and/or dismissal of a claimant's OPA lawsuit;

b)      In both Sections II C and D the following sentence should be included "The reasonable costs incurred by the claimant in assessing the damages claim. This includes the reasonable costs of estimating the damages claim, but not attorneys fees or other administrative costs associated with preparation of the claim";

c)      Under Section II E, to delete the words "not otherwise compensated" in the sentence that now reads "records showing expenditures for medical care not otherwise compensated";

d)      The causation section II F should read: "The GCCF will only pay for harm, damage or removal costs that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA and the proximate cause doctrine. Determinations of non-OPA claims will be guided by applicable law. The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources." (This is the same definition that was contained in your protocol for Advanced Payments with the exception that I have inserted the words removal costs for reasons of clarity. There should be no difference or standard).

e)      Section IV it should provide "Interim claims may not be made more frequently than once per month and may be made quarterly." (Please note that interim payments cover only "past damages," this was not the case with the emergency payment). This Section should also include a statement that "income received performing oil removal or other oil related work for BP shall not be used to offset against any interim damages or loss of income claims submitted to the GCCF";

f)      In Section IV B a sentence should be added that states "income received for performing oil removal or other related work for BP shall not be used to offset against any final damages or loss of income claims submitted to the GCCF";

g)      In Section VI(B) there should be no limit set as a requirement for a claimant to appeal;

h)      Section V E should read "The amount of compensation shall be reduced by the amount of collateral compensation that is allowed by the applicable law. (To include the language that is now in the draft protocol would allow collateral source deductions that are not permitted in existing law).

i)      The present draft of the protocol requires the execution of the release for a final payment. The release as drafted includes a release of parties in addition to BP. The release also provides for a subrogation of the claimant's rights to BP. The State of Louisiana continues to have strong objection to theses provisions in the release and insists that these provisions be removed. Sections 1702 and 1715 of OPA do not support the insertion of the subrogation language that is in the release.

**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email:  paj@juneaudavid.com
        fgg@juneaudavid.com

11/30/2010

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

------------------------------------------------------------------
For more information about Arnold & Porter LLP, click here:
http://www.arnoldporter.com



**Exhibit H**

| | |
|---|---|
| **From:** | Felicia A. Guidry <FGG@juneaudavid.com> on behalf of Patrick A. Juneau <PAJ@juneaudavid.com> |
| **Sent:** | Wednesday, November 24, 2010 2:08 PM |
| **To:** | Ken Feinberg |
| **Cc:** | Mark Brady; murrille@GOV.STATE.LA.US; Terrell, Megan K. |
| **Subject:** | GCCF Protocol |

Dear Ken:

Here are my comments on the November 22, 2010 protocol and release:

a)     In Section 1 A, it should state "Pursuant to a determination by the USCG, filing a claim for a sum certain to the GCCF constitutes presentment of a claim to BP, as the Responsible Party, under OPA, whether the claim is for emergency advance, interim or final payment." This Section should also include this sentence "Filing a claim under the GCCF for OPA damages is a required "conditioned precedent" to seeking payment from the Oil Spill Liability Trust Fund ("OSLTF"), administered by the USCG, or filing a lawsuit, in State or Federal Court. Failure of an individual or business to comply with the presentment requirement in OPA could result in a denial of a claimants OSLTF claim and/or dismissal of a claimant's OPA lawsuit;

b)     In both Sections II C and D the following sentence should be included "The reasonable costs incurred by the claimant in assessing the damages claim. This includes the reasonable costs of estimating the damages claim, but not attorneys fees or other administrative costs associated with preparation of the claim";

c)     Under Section II E, to delete the words "not otherwise compensated" in the sentence that now reads "records showing expenditures for medical care not otherwise compensated";

d)     The causation section II F should read: "The GCCF will only pay for harm, damage or removal costs that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA and the proximate cause doctrine. Determinations of non-OPA claims will be guided by applicable law. The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources." (This is the same <u>definition</u> that was contained in your protocol for Advanced Payments with the exception that I have inserted the words removal costs for reasons of clarity. There should be <u>no</u> difference or standard).

e)     Section IV it should provide "Interim claims may not be made more frequently than once per month and may be made quarterly." (Please note that interim payments cover only "past damages," this was not the case with the emergency payment). This Section should also include a statement that "income received performing oil removal or other oil related work for BP shall not be used to offset against any interim damages or loss of income claims submitted to the GCCF";

f)     In Section IV B a sentence should be added that states "income received for performing oil removal or other related work for BP shall not be used to offset against any final damages or loss of income claims submitted to the GCCF";

g)     In Section VI(B) there should be no limit set as a requirement for a claimant to appeal;

h) Section V E should read "The amount of compensation shall be reduced by the amount of collateral compensation that is allowed by the applicable law. (To include the language that is now in the draft protocol would allow collateral source deductions that are not permitted in existing law).

i) The present draft of the protocol requires the execution of the release for a final payment. The release as drafted includes a release of parties in addition to BP. The release also provides for a subrogation of the claimant's rights to BP. The State of Louisiana continues to have strong objection to theses provisions in the release and insists that these provisions be removed. Sections 1702 and 1715 of OPA do not support the insertion of the subrogation language that is in the release.

**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email: paj@juneaudavid.com
     fgg@juneaudavid.com

| | |
|---|---|
| **From:** | Felicia A. Guidry <FGG@juneaudavid.com> on behalf of Patrick A. Juneau <PAJ@juneaudavid.com> |
| **Sent:** | Wednesday, November 24, 2010 2:25 PM |
| **To:** | Ken Feinberg |
| **Cc:** | Mark Brady; murrille@GOV.STATE.LA.US; Terrell, Megan K. |
| **Subject:** | Narratives for Valuation Templates |
| **Attachments:** | FINAL Narrative Summary Crab Deckhand  Captain.doc; FINAL Narrative Summary FinFish.doc; FINAL Narrative Summary Hotel.doc; FINAL Narrative Summary Restaurant.doc; FINAL Narrative Summary Shrimp Deckhand - Captain.doc |

Ken:

      As a follow-up to our email concerning the valuation templates, you will find attached narratives in support of those templates. We
would encourage you to use these templates in the evaluation of claims.

      Happy Thanksgiving!


PATRICK A. JUNEAU
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email:  paj@juneaudavid.com
        fgg@juneaudavid.com

## Crab Industry – Captain & Deckhand Baseline Compensation Models

The Crab Captain & Deckhand Compensation models was designed to assist with the calculations for payments of interim and final claims filed by claimants with little or no documentation. Nearly 1/3 of the domestic seafood consumed in the contiguous United States comes from Louisiana. Louisiana is the number one provider of crabs in the United States supporting and augmenting other regions catches which are in decline due to environmental and biologic conditions. Crabs are caught primarily by very small vessels and are either sold into picking houses or are shipped as a live product throughout the country, primarily to the eastern seaboard. Louisiana's crab industry is vital to not only the State's economy but the nation economy, providing revenue to local, parish and State governments across the country. The crab industry provides significant blue collar employment in Louisiana primarily to low and moderate hourly wage earners and to persons in the restaurant industry across the United States. The model is intended to be primarily used as a method to calculate lost income streams and revenues. If a claimant suffered a real or personal property loss, this formula would not compensate them for that loss.

The key component driving this model's creation was access to confidential Federal and State trip ticket data that is provided by crabbers individually per trip to the Louisiana Department of Wildlife & Fisheries. Summarized on a monthly basis for several years, this data contains information on vessel size and location of catch. This empirical data coupled with extensive field industry interviews with the crab industry has provided the means to properly reflect the financial baseline for the industry.

The process used for developing the baseline compensation models consisted of conducting individual field interviews with affected crabbers and crab related businesses to specifically identify and document broad impacts on this industry sector industry. In total over 150 field interviews were held.

After our models were completed, we field-tested each model with actual financial information from affected claimants and the end result demonstrated that our models closely paralleled the actual results from the data we examined. We met with several key individuals, businesses and Crab Task Force members.

Generally when determining a lost earnings and profits the first component in that process involves determining the amount of revenues you expect to generate for the affected period. Once that calculation is determined, a deduction must be applied for any revenues actually received. Saved expenses would then be subtracted and increased expenses added to arrive at the lost earnings and profits for the affected period.

In the case of captains and deckhands with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits.

## Base Line Compensation Models

Average value earned per landing was determined using accumulated revenue data from Louisiana Wildlife and Fisheries. We analyzed monthly trip landing information from January 2007 through June 2010. Furthermore, we extracted average dollar value earned per landing from all vessel trips broken down into three categories based on vessel size (1. Vessels 0ft. – 50ft. 2. Vessels 51ft. – 80ft. 3. Vessels 81ft. and up). These figures were used consistently throughout each model as the starting point for determining estimated monthly compensation. All other components used to compute the estimated monthly compensation vary by boat size and are addressed below.

### Small Boat (0ft. – 50ft.)
For a small boat (0ft. – 50ft.), the vessel owner is the captain. The compensation for captains of these vessels is the gross revenue less trip-related expenses.

The estimated trip-related expenses consist of fuel, bait, groceries, ice; in some instances, deckhand labor is applicable. Small boats typically burn approximately twenty-five (25) gallons of fuel per trip. The fuel is most often purchased from land-based gas stations and we have estimated the average per gallon price of this fuel at three dollars ($3.00) per gallon.

Bait is essential in the crab industry and thus a material expense. Most crabbers will bait an average of two hundred fifty (250) to three hundred (300) traps per day which requires approximately five (5) boxes of bait at a cost of seventeen dollars ($17.00) per box for a total daily expenditure of eighty-five dollars ($85.00).

Groceries are purchased daily for the captain and generally amount to no more than ten dollars ($10.00) per trip. Ice is also needed for daily operations and costs approximately fifteen dollars ($15.00) per trip.

Most crab fishermen do not utilize deckhands. However, some captains prefer to employ deckhands and most commonly structure their pay in the form of a flat daily rate. A deckhand on a crab boat will typically earn ninety dollars ($90.00) per trip.

We have determined through multiple field-industry interviews that a typical crab fisherman on a small boat will make approximately two hundred (200) trips per year. We analyzed the trip frequency by month for all crab landings reported to the Louisiana Department of Wildlife and Fisheries from January 2007 through June 2010. We then determined the percentage of trips taken for each month and multiplied that figure by the total number of annual trips to arrive at the estimated number of trips taken each month. The average baseline monthly compensation was determined by multiplying the net trip revenue by the number of trips taken each month.

### Medium Boat (51ft. – 80ft.)

The crab industry is almost exclusively fished by small vessels and the number of landings reported by the Louisiana Department of Wildlife and Fisheries for medium boats is negligible; they were not considered for this evaluation.

**Large Boat (81ft. and Up)**
The crab industry is almost exclusively fished by small vessels and the number of landings reported by the Louisiana Department of Wildlife and Fisheries for large boats is negligible; they were not considered for this evaluation.

## Restaurant Baseline Compensation Model

The Restaurant Compensation model was designed to assist GCCF and the State of Louisiana assist industry claimants with the calculation s for payments of interim and final claims, who have little or no documentation. Small family and sole proprietor restaurants are a vital component of rural Louisiana parish economies, providing local employment options in addition to meeting locations. If a claimant suffered a real or personal property loss, this formula would not compensate them for that loss.

The key component driving this model originated from accumulating established data obtained from audited financial statements and other pertinent financial information of Louisiana claimants. This empirical data provided the means to properly reflect the financial baseline for the restaurant industry.

After our models were completed, we field-tested each model with actual financial information from affected claimants and the end result demonstrated that our models closely paralleled the actual results from the data we examined. Key individuals and or businesses include the following:

1.  Family owned seafood restaurant less than 1 mile from Gulf of Mexico
2.  National restaurant chain
3.  Regional restaurant chain

Generally, when determining lost earnings and profits, the first component in that process involves determining the amount of revenues you expect to generate for the affected period. Once that calculation is determined, a deduction must be applied for any revenues actually received. Saved expenses would then be subtracted and increased expenses added to arrive at the lost earnings and profits for the affected period.

In the case of restaurants with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits.

### Restaurants
We analyzed multiple restaurant types ranging from small family-owned or single facility operations to the larger regional and national chains. In coastal Louisiana many of our restaurants are of the single sole nature and the sale of seafood products is a standard item. From an accounting perspective, our analysis found that most utilized similar chart of accounts and the expenses and that these entities were roughly the same when weighed against gross sales.

We created a model for restaurants using gross sales as the driver and presenting the respective expenses as a percentage of gross sales. The percentages within each expense category can vary slightly, but we have confirmed that a well-operated restaurant should experience a net profit of thirty percent (30%) (before income taxes and accelerated/bonus depreciation).

**Fin Fishing – Captain & Deckhand Baseline Compensation Models**

The Fin Fishing Captain & Deckhand Compensation models was designed to assist with the calculations for payments of interim and final claims filed by claimants with little or no documentation. Nearly 1/3 of the domestic seafood consumed in the contiguous United States comes from Louisiana. Louisiana is the second largest producer of fin fish in the nation. With a wide range of commercially viable fin fish species to harvest, resulting from our marsh and wetland areas acting as nursery habitats, Louisiana's fin fishers are not only a key economic driver but a part of the State's cultural identity and key contributor to our international culinary legacy. Fin fishers are vital to the State's economy providing revenue to local, parish and State governments and employment to low and moderate hourly wage earners. The model is intended to be primarily used as a method to calculate lost earnings and profits. If a claimant suffered a real or personal property loss, this formula would not compensate them for that loss.

The key component driving this models creation was access to confidential Federal and State trip ticket data that is provided by commercial fisherman individually per trip to the Louisiana Department of Wildlife & Fisheries. Summarized on a monthly basis for several years, this data contains information on vessel size and location of catch. This empirical data coupled with extensive field industry interviews with the commercial fishing industry has provided the means to properly reflect the financial baseline for this industry sector.

The process used for developing the baseline compensation models consisted of conducting individual field interviews with affected commercial fisherman and related businesses to specifically identify and document broad impacts on this industry sector industry.

The models were then developed and field tested with actual financial information and the end result demonstrated that our models closely paralleled the actual results from the data we examined.

Generally when determining a lost earnings and profits claim the first component in that process involves determining the amount of revenues you expect to generate for the affected period. Once that calculation is determined, a deduction must be applied for any revenues actually received. Saved expenses would then be subtracted and increased expenses added to arrive at the lost earnings and profits for the affected period.

In the case of captains and deckhands with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits.

### Base Line Compensation Models
Average value earned per landing was determined using accumulated revenue data from Louisiana Wildlife and Fisheries. We analyzed monthly trip landing information from January 2007 through June 2010. Furthermore, we extracted average dollar value earned per landing from all vessel trips broken down into

three categories based on vessel size (1. Vessels 0ft. – 50ft. 2. Vessels 51ft. – 80ft. 3. Vessels 81ft. and up). These figures were used consistently throughout each model as the starting point for determining estimated monthly compensation. All other components used to compute the estimated monthly compensation vary by boat size and are addressed below.

### Nearshore - Small Boat (0ft. – 50ft.)

For a small boat (0ft. – 50ft.), the vessel owner is the captain. The compensation for captains of these vessels is typically calculated as seventy percent (70%) of the net landing value. Hence, the captain's compensation per trip is seventy percent (70%) of the gross dollar value of the catch sold at the docks less the trip-related expenses.

The estimated trip-related expenses consist of fuel, bait, tackle, groceries, ice and deckhand labor. Small boats typically burn approximately thirty-five (35) gallons of fuel per trip. The fuel is most often purchased from land-based gas stations and we have estimated the average price of this fuel at three dollars ($3.00) per gallon.

Bait is essential in the fin fishing industry and thus a material expense. Fin fishermen are tasked with baiting multiple hooks on long-lines which usually amounts to approximately seventy-five dollars ($75.00) per trip for vessels of this size.

Tackle is a key component for fin fishermen and the per trip burden can be estimated at forty dollars ($40.00).

Groceries are purchased daily for the captain and crew and generally amount to no more than thirty dollars ($30.00) per trip. Ice is also needed for daily operations and costs approximately thirty dollars ($30.00) per trip.

There is usually only one deckhand on vessels of this size and they customarily receive thirty percent (30%) of the net landing value. Hence, the compensation per trip for a deckhand on a small vessel can be computed as thirty percent (30%) of the net landing value (gross dollar value of the catch sold at the docks less the trip-related expenses).

We have determined through multiple field-industry interviews that a nearshore typical fin fisherman on a small boat will make approximately one hundred eighty (180) trips per year. We analyzed the trip frequency by month for all nearshore fin fish landings reported to the Louisiana Department of Wildlife and Fisheries from January 2007 through June 2010. We then determined the percentage of trips taken for each month and multiplied that figure by the total number of annual trips to arrive at the estimated number of trips taken each month. The average baseline monthly compensation for captains and deckhands was determined by multiplying their respective percentages of the net trip revenue by the number of trips taken each month.

2

### Nearshore - Medium Boat (51ft. – 80ft.)

For a medium boat (51ft. – 80ft.), the vessel owner is usually the captain; although some owners use for-hire captains. The compensation for captains of these vessels is typically calculated as sixty percent (60%) of the net landing value. Hence, the captain's compensation per trip is sixty percent (60%) of the gross dollar value of the catch sold at the docks less the trip-related expenses.

The estimated trip-related expenses consist of fuel, bait, tackle, groceries, ice and deckhand labor. Medium boats typically burn approximately sixty (60) gallons of fuel per trip. The fuel is most often purchased from a marina and we have estimated the average price of dockside fuel at four dollars ($4.00) per gallon.

Bait is essential in the fin fishing industry and thus a material expense. Fin fishermen are tasked with baiting multiple hooks on long-lines which usually amounts to approximately one hundred twenty dollars ($120.00) per trip for vessels of this size.

Tackle is a key component for fin fishermen and the per trip burden can be estimated at one hundred dollars ($100.00).

Groceries are purchased daily for the captain and crew and generally amount to no more than forty-five dollars ($45.00) per trip. Ice is also needed for daily operations and costs approximately fifty dollars ($50.00) per trip.

There are usually two deckhands on vessels of this size and they customarily split forty percent (40%) of the net landing value. Hence, the compensation per trip for each deckhand on a medium vessel can be computed as twenty percent (20%) of the net landing value (gross dollar value of the catch sold at the docks less the trip-related expenses).

We have determined through multiple field-industry interviews that a typical nearshore fin fisherman on a medium boat will make approximately one hundred eighty (180) trips per year. We analyzed the trip frequency by month for all nearshore fin fish landings reported to the Louisiana Department of Wildlife and Fisheries from January 2007 through June 2010. We then determined the percentage of trips taken for each month and multiplied that figure by the total number of annual trips to arrive at the estimated number of trips taken each month. The average baseline monthly compensation for captains and deckhands was determined by multiplying their respective percentages of the net trip revenue by the number of trips taken each month.

### Nearshore - Large Boat (81ft. and Up)

The fin fishing industry is almost exclusively fished by small and medium vessels and the number of landings reported by the Louisiana Department of Wildlife and

Fisheries for large boats is negligible; they were not considered for this evaluation.

## Offshore - Small Boat (0ft. – 50ft.)

For a small boat (0ft. – 50ft.), the vessel owner is the captain. The compensation for captains of these vessels is typically calculated as seventy percent (70%) of the net landing value. Hence, the captain's compensation per trip is seventy percent (70%) of the gross dollar value of the catch sold at the docks less the trip-related expenses.

The estimated trip-related expenses consist of fuel, bait, tackle, groceries, ice and deckhand labor. Small boats typically burn approximately one hundred fifty (150) gallons of fuel per trip. The fuel is most often purchased from land-based gas stations and we have estimated the average price of this fuel at three dollars ($3.00) per gallon.

Bait is essential in the fin fishing industry and thus a material expense. Fin fishermen are tasked with baiting multiple hooks on long-lines which usually amounts to approximately two hundred dollars ($200.00) per trip for vessels of this size.

Tackle is a key component for fin fishermen and the per trip burden can be estimated at one hundred fifty dollars ($150.00).

Groceries are purchased daily for the captain and crew and generally amount to no more than one hundred dollars ($100.00) per trip. Ice is also needed for daily operations and costs approximately seventy-five dollars ($75.00) per trip.

There is usually only one deckhand on vessels of this size and they customarily receive thirty percent (30%) of the net landing value. Hence, the compensation per trip for a deckhand on a small vessel can be computed as thirty percent (30%) of the net landing value (gross dollar value of the catch sold at the docks less the trip-related expenses).

We have determined through multiple field-industry interviews that a typical offshore fin fisherman on a small boat will make approximately sixty (60) trips per year. We analyzed the trip frequency by month for all fin fish landings reported to the Louisiana Department of Wildlife and Fisheries from January 2007 through June 2010. We then determined the percentage of trips taken for each month and multiplied that figure by the total number of annual trips to arrive at the estimated number of trips taken each month. The average baseline monthly compensation for captains and deckhands was determined by multiplying their respective percentages of the net trip revenue by the number of trips taken each month.

## Offshore - Medium Boat (51ft. – 80ft.)

For a medium boat (51ft. – 80ft.), the vessel owner is usually the captain; although some owners use for-hire captains. The compensation for captains of these vessels is typically calculated as sixty percent (60%) of the net landing value. Hence, the captain's compensation per trip is sixty percent (60%) of the gross dollar value of the catch sold at the docks less the trip-related expenses.

The estimated trip-related expenses consist of fuel, bait, tackle, groceries, ice and deckhand labor. Medium boats typically burn approximately two hundred fifty (250) gallons of fuel per trip. The fuel is most often purchased from a marina and we have estimated the average price of dockside fuel at four dollars ($4.00) per gallon.

Bait is essential in the fin fishing industry and thus a material expense. Fin fishermen are tasked with baiting multiple hooks on long-lines which usually amounts to approximately five hundred dollars ($500.00) per trip for vessels of this size.

Tackle is a key component for fin fishermen and the per trip burden can be estimated at two hundred fifty dollars ($250.00).

Groceries are purchased daily for the captain and crew and generally amount to no more than two hundred dollars ($200.00) per trip. Ice is also needed for daily operations and costs approximately one hundred fifty dollars ($150.00) per trip.

There are usually two deckhands on vessels of this size and they customarily split forty percent (40%) of the net landing value. Hence, the compensation per trip for each deckhand on a medium vessel can be computed as twenty percent (20%) of the net landing value (gross dollar value of the catch sold at the docks less the trip-related expenses).

We have determined through multiple field-industry interviews that a typical offshore fin fisherman on a medium boat will make approximately forty-eight (48) trips per year. We analyzed the trip frequency by month for all fin fish landings reported to the Louisiana Department of Wildlife and Fisheries from January 2007 through June 2010. We then determined the percentage of trips taken for each month and multiplied that figure by the total number of annual trips to arrive at the estimated number of trips taken each month. The average baseline monthly compensation for captains and deckhands was determined by multiplying their respective percentages of the net trip revenue by the number of trips taken each month.

## Offshore - Large Boat (81ft. and Up)
The fin fishing industry is almost exclusively fished by small and medium vessels and the number of landings reported by the Louisiana Department of Wildlife and Fisheries for large boats is negligible; they were not considered for this evaluation.

**Shrimp Industry – Captain & Deckhand Baseline Compensation Models**

The Shrimp Captain & Deckhand Compensation models was designed to assist with the calculations for payments of interim and final claims filed by claimants with little or no documentation. Nearly 1/3 of the domestic seafood consumed in the contiguous United States comes from Louisiana. Louisiana is the largest producer of shrimp in the nation and this industry is a defining cultural identifier of our State and the Gulf of Mexico. Louisiana's shrimp industry is not only a multi-billion dollar economic driver to the State but a key contributor to our tourism and culinary industries as well. Shrimpers are vital to the State's economy providing millions of dollars in revenue to local, parish and State governments. The industry as a result of landings by captains and deckhands employs thousands of persons throughout the seafood distribution system. The model is intended to be primarily used as a method to calculate lost earnings and profits. If a claimant suffered a real or personal property loss, this formula would not compensate them for that loss

The key component driving this model's creation was access to confidential Federal and State trip ticket data that is provided by shrimpers individually as they land there catch. This landings data is reported to the Louisiana Department of Wildlife & Fisheries per trip. The model uses summarized monthly landings data based on several years and includes data from 2010. This data contains information on vessel size and location of catch. This empirical data coupled with extensive field industry interviews with the shrimp industry has provided the means to properly reflect the financial baseline for the industry.

The process used for developing the baseline compensation models consisted of conducting individual field interviews with affected shrimpers and related businesses from across the impacted areas so that we could correctly and specifically identify and document broad impacts on this industry sector industry as the industry has both an inshore and offshore fleet. In total over 150 field interviews were held.

After our models were completed, we field-tested each model with actual financial information from affected claimants and the end result demonstrated that our models closely paralleled the actual results from the data we examined. Key individuals and or businesses include the following:

1. Shrimp Associations
2. Shrimp Harvester Advisory Panel representatives
3. Shrimp Fishermen

Furthermore, our models were refined by working closely with the Technical Assistance Centers engaged by the State of Louisiana who are on the front lines in our parishes and in direct contact working with claimants who are experiencing challenges regarding the BP and GCCF oil spill claim process. The specific TAC units contacted to complete that task includes the following:

1. Coastal Community Consulting (CCC) – TAC Organization
2. Mary Queen of Vietnam CDC – TAC Organization
3. Volunteers of America (Acadiana) – TAC Organization
4. GNO Inc.

Generally when determining a business interruption loss the first component in that process involves determining the amount of revenues you expect to generate for the affected period. Once that calculation is determined, a deduction must be applied for any revenues actually received. Saved expenses would then be subtracted and increased expenses added to arrive at the net revenue lost for the affected period.

In the case of captains and deckhands with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits.

### Base Line Compensation Models
Average value earned per landing was determined using accumulated revenue data from Louisiana Wildlife and Fisheries. We analyzed monthly trip landing information from January 2007 through June 2010. Furthermore, we extracted average dollar value earned per landing from all vessel trips broken down into three categories based on vessel size (1. Vessels 0ft. -- 50ft. 2. Vessels 51ft. – 80ft. 3. Vessels 81ft. and up). These figures were used consistently throughout each model as the starting point for determining estimated monthly compensation. All other components used to compute the estimated monthly compensation vary by boat size and are addressed below.

### Small Boat (0ft. – 50ft.)
For a small boat (0ft. – 50ft.), the vessel owner is the captain. The compensation for captains of these vessels is typically calculated as sixty percent (60%) of the gross landing value. Hence, the captain's compensation per trip is the gross dollar value of the catch sold at the docks multiplied by sixty percent (60%).

The estimated trip-related expenses consist of fuel, ice, groceries, salt and deckhand labor. Fuel, ice, groceries and salt typically amount to approximately fifteen percent (15%) of the gross landing value for vessels of this size. Therefore, trip-related expenses can be computed by multiplying the gross dollar value of the catch sold at the docks by fifteen percent (15%).

There is usually only one deckhand on vessels of this size and they customarily receive twenty-five percent (25%) of the gross landing value. Hence, the compensation per trip for a deckhand on a small vessel can be computed by multiplying the gross dollar value of the catch sold at the docks by twenty-five percent (25%).

2

We have determined through multiple field-industry interviews that a typical trip for a small boat lasts approximately four to six days with most trips lasting closer to four days. Therefore, we have estimated the total number of trips a vessel of this size could fish for any given month would be four and a half. We have multiplied the earnings per trip for captains and deckhands by the average number of trips per month to arrive at the average baseline monthly compensation for each.

## Medium Boat (51ft. – 80ft.)

For a medium boat (51ft. – 80ft.), the vessel owner is usually the captain; although some owners use for-hire captains. The vessel owner will generally retain fifty percent (50%) of the gross landing value to provide the vessel and to finance all repairs and maintenance, equipment, insurance and other expenses that are not trip-related.

The compensation for captains of these vessels typically ranges from eleven percent (11%) to fifteen percent (15%) of the gross landing value depending on the number of deckhands working. If there are two deckhands, the captain will receive fifteen percent (15%) of the gross landing value and if there are three, they are generally paid closer to eleven percent (11%). Hence, a captain's compensation per trip on a medium vessel can be computed by multiplying the gross dollar value of the catch sold at the docks by either eleven percent (11%) or fifteen percent (15%), depending on the number of crew working each trip.

The estimated trip-related expenses consist of fuel, ice, groceries, salt and deckhand labor. Fuel, ice, groceries and salt typically amount to approximately fifteen percent (15%) of the gross landing value for vessels of this size. Therefore, trip-related expenses can be computed by multiplying the gross dollar value of the catch sold at the docks by fifteen percent (15%).

There are usually two or three deckhands on vessels of this size and they customarily receive eight percent (8%) to ten percent (10%) of the gross landing value depending on the number of deckhands working each trip. If there are two deckhands, each deckhand will receive ten percent (10%) of the gross landing value and if there are three, each deckhand will receive eight percent (8%). Hence, a deckhand's compensation per trip on a medium vessel can be computed by multiplying the gross dollar value of the catch sold at the docks by either eight percent (8%) or ten percent (10%), depending on the number of deckhands working.

We have determined through multiple field-industry interviews that a typical trip for a medium boat lasts approximately seven to twelve days. Therefore, we have estimated the total number of trips a vessel of this size could fish for any given month at three. We have multiplied the earnings per trip for captains and deckhands by the average number of trips per month to arrive at the average baseline monthly compensation for each.

3

### Large Boat (81ft. and Up) – Captain Owned
The ownership of large boats (81ft. and Up) vary with some captains owning the vessels and others utilizing for-hire captains. The compensation for captain-owners of these vessels is typically calculated as thirty percent (30%) of the gross landing value. Hence, the captain's compensation per trip is the gross dollar value of the catch sold at the docks multiplied by thirty percent (30%).

The estimated trip-related expenses consist of fuel, groceries, salt and deckhand labor. Fuel, groceries and salt typically amount to approximately fifty percent (50%) of the gross landing value for vessels of this size. These vessels have freezers on board so there are no expenditures for ice, however, these boats use significantly more fuel than their smaller counterparts. Therefore, trip-related expenses can be computed by multiplying the gross dollar value of the catch sold at the docks by fifty percent (50%).

There are usually four deckhands on vessels of this size and they customarily receive five percent (5%) of the gross landing value each. Hence, the compensation per trip for each deckhand on a large vessel owned by the captain can be computed by multiplying the gross dollar value of the catch sold at the docks by five percent (5%).

We have determined through multiple field-industry interviews that a typical trip for a large boat lasts approximately thirty to thirty-five days with the maximum number of annual trips totaling seven. Therefore, we have estimated the total number of trips a vessel of this size could fish for any given month would average slightly less than one per month. We have multiplied the earnings per trip for captains and deckhands by the average number of trips per month to arrive at the average baseline monthly compensation for each.

### Large Boat (81ft. and Up) – Non-Captain Owned
The ownership of large boats (81ft. and Up) vary with some captains owning the vessels and others utilizing for-hire captains. The vessel owner will generally retain fifty percent (50%) of the gross landing value to provide the vessel and to finance all repairs and maintenance, equipment, insurance and other expenses that are not trip-related.

The compensation of for-hire captains on these vessels is typically calculated as fourteen percent (14%) of the net landing value (gross landing value less trip-related expenses). Hence, the captain's compensation per trip is the net dollar value of the catch sold at the docks multiplied by fourteen percent (14%).

The estimated trip-related expenses consist of fuel, groceries, salt and deckhand labor. Fuel, groceries and salt typically amount to approximately fifty percent (50%) of the gross landing value for vessels of this size. These vessels have freezers on board so there are no expenditures for ice, however, these boats use

significantly more fuel than their smaller counterparts. Therefore, trip-related expenses can be computed by multiplying the gross dollar value of the catch sold at the docks by fifty percent (50%).

There are usually four deckhands on vessels of this size and they customarily receive four percent (4%) of the net landing value each (gross landing value less trip-related expenses). Hence, the compensation per trip for each deckhand, on a large vessel that is not owned by the captain, can be computed by multiplying the net dollar value of the catch sold at the docks by four percent (4%).

We have determined through multiple field-industry interviews that a typical trip for a large boat lasts approximately thirty to thirty-five days with the maximum number of annual trips totaling seven. Therefore, we have estimated the total number of trips a vessel of this size could fish for any given month would average slightly less than one per month. We have multiplied the earnings per trip for captains and deckhands by the average number of trips per month to arrive at the average baseline monthly compensation for each.

# Hotel Baseline Compensation Model

The Hotel Compensation model was designed to assist GCCF and the State of Louisiana assist industry claimants with the calculation s for payments of interim and final claims, who have little or no documentation. Hotel stays are critical component of Louisiana's economy, providing revenue to local, parish and State government and significant employment in the affected areas primarily to low and moderate hourly wage earners. The size, sophistication and type of hotels, motels and bread and breakfast stay vary dramatically in Louisiana based on the location. The model is intended to be primarily used as a method to calculate lost earnings and profits. If a claimant suffered a real or personal property loss, this formula would not compensate them for that loss.

The key components driving this model originated from accumulated established data obtained from multiple hotel financial statements and Smith Travel Research. This empirical data provided the means to properly reflect the financial baseline for the restaurant industry.

After our models were developed, we field-tested the model with actual financial information. The results demonstrated that this model closely paralleled the actual results from the data we examined. Key individuals and or businesses include the following:

1. Hotel developers
2. Hotel management firms
3. Louisiana Hotel & Lodging Association representatives
4. Regionally impacted Convention & Visitors Bureau representatives

Generally, when determining lost earnings and profits, the first component in that process involves determining the amount of revenues you expect to generate for the affected period. Once that calculation is determined, a deduction must be applied for any revenues actually received. Saved expenses would then be subtracted and increased expenses added to arrive at the lost earnings and profits for the affected period.

In the case of hotels with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits.

## Hotels
We gathered information from various industry leaders in the hotel and lodging industry and consulted with national and regional hotel owners, developers and operators to create a baseline compensation model.

We analyzed the financial results of operations for over forty (40) hotels. The data set evaluated ranged from hotels with around fifty (50) rooms to those with larger capacities of just over one hundred (100) rooms. Hotels researched ranged from large national brands to small individually owned and operated facilities. This cross section is representative of the hotels affected by the oil spill and were in use at the time of the event. While there was varying levels of sophistication with accounting systems,. we found most facilities utilized a similar chart of accounts and the expenses were roughly the same when weighed against gross sales.

We created a model for hotels using gross sales as the driver and presenting the respective expenses as a percentage of gross sales. The percentages within each expense category can vary slightly, but we have substantiated that a well-operated hotel should experience a net profit of approximately thirty-two percent (32%) (before income taxes and accelerated/bonus depreciation).

| From: | Felicia A. Guidry <FGG@juneaudavid.com> |
|---|---|
| Sent: | Wednesday, November 17, 2010 1:50 PM |
| To: | Krista@feinbergrozen.com |
| Cc: | Mark Brady; murrille@GOV.5TATE.LA.U5; Terrell, Megan K. |
| Subject: | RE: Valuation Templates for Claims Processing |

In my email dated November 8, 2010 I provided Mr. Feinberg with valuation templates that have been prepared by the State of Louisiana to assist in the claims process. Thereafter, there were extensive discussions between representatives of Louisiana and Mr. Feinberg's claims staff regarding these templates and the background information and data that is available. Finally, Mr. Feinberg himself stated recently, in New Orleans to several Louisiana representatives, that he thought that a meeting between his personnel and the Louisiana representatives regarding these templates should be held. In view thereof, I really don't know what you are asking us to produce. If the final protocol has already been prepared and you are not interested in what we have suggested, I request that you simply state same so that I can advise the Governor and the Attorney General of the State of Louisiana.


**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email: paj@juneaudavid.com
          fgg@juneaudavid.com


**From:** Krista Friedrich [mailto:Krista@feinbergrozen.com]
**Sent:** Wednesday, November 17, 2010 11:36 AM
**To:** Felicia A. Guidry
**Cc:** Bill Mulvey
**Subject:** Valuation Templates for Claims Processing
**Importance:** High

Mr. Juneau:

Bill Mulvey and I are attorneys working with Ken Feinberg's office on the claims administration process. We spoke to Louisiana representatives last Friday regarding the models that have been developed for various industries. Ken asked that we respond to the email you sent to him yesterday.

We have since discussed with the senior team here the suggestion of a meeting and would prefer at this time to review any representative materials you can send us rather than scheduling a formal meeting. We are in the midst of developing the final claims process and would be happy to have the opportunity to consider whether your materials would be useful to us in implementing that process.

Best,

Krista Friedrich
202-621-1793

1

krista@feinbergrozen.com

| | |
|---|---|
| **From:** | Felicia A. Guidry <FGG@juneaudavid.com> on behalf of Patrick A. Juneau <PAJ@juneaudavid.com> |
| **Sent:** | Tuesday, November 16, 2010 12:19 PM |
| **To:** | Ken Feinberg |
| **Cc:** | Mark Brady; murrille@GOV.STATE.LA.US; Terrell, Megan K. |
| **Subject:** | Valuation Templates for Claims Processing |
| | |
| **Importance:** | High |

Ken:

      I am advised that some of your claims personnel have had a lengthy discussion with Louisiana representatives regarding the valuation templates that I sent to you. Your personnel feel that the templates could be of great assistance to them in the processing of claims. If you are interested in utilizing these valuation templates, we would propose that you schedule a meeting between our staff personnel who are involved in the formulation of these templates and the staff from your claims operation who would be involved in the implementation. I would suggest that we hold the meeting in Baton Rouge, but if you want the meeting in Washington, we would be willing to send our staff personnel to Washington if your operation would pick up their travel costs.

      Since the clock is ticking on processing these claims, I would suggest that you let me know ASAP as to whether or not you are interested in implementation of the templates and the setting up of a meeting concerning same.

**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email: paj@juneaudavid.com
       fgg@juneaudavid.com

1

## Terrell, Megan K.

| | |
|---|---|
| **From:** | Felicia A. Guidry <FGG@juneaudavid.com> |
| **Sent:** | Wednesday, November 17, 2010 1:58 PM |
| **To:** | Krista@feinbergrozen.com |
| **Cc:** | Mark Brady; murrille@GOV.STATE.LA.US; Terrell, Megan K. |
| **Subject:** | Valuation Templates |
| **Attachments:** | BIACM 11510- Index.pdf; P01 - BIACM 11510.pdf; P02 - BIACM 11510.pdf; P03 - BIACM 11510.pdf; P04 - BIACM 11510.pdf; P05 - BIACM 11510.pdf; P06 - BIACM 11510.pdf; P07 - BIACM 11510.pdf; P08 - BIACM 11510.pdf; P09 - BIACM 11510.pdf; P10 - BIACM 11510.pdf; P11 - BIACM 11510.pdf; P12 - BIACM 11510.pdf; P13 - BIACM 11510.pdf; P14 - BIACM 11510.pdf; P15 - BIACM 11510.pdf; P16 - BIACM 11510.pdf |

Krista:

Below is a copy of the email, with attachments, that were sent to Mr. Feinberg on November 8, 2010.

Since you are in the process of developing the final claims process, it would be appreciated if you would advise as to whether or not the issues set forth in my email below have been addressed.

**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email: paj@juneaudavid.com
         fgg@juneaudavid.com

**From:** Felicia A. Guidry **On Behalf Of** Patrick A. Juneau
**Sent:** Monday, November 08, 2010 9:03 AM
**To:** 'Ken Feinberg'
**Subject:** Draft Final Protocol

Dear Ken:

Thank you very much for sending us your working draft of the Gulf Coast Facility Protocol for Interim and Final Claims dated November 1, 2010. The following are our comments as a result of our initial review of the working draft:

a)   In Section 1 A, it should state that GCCF is intended to replace BP's claims facility for individuals and businesses. In that same Section it should state "Pursuant to a determination by the USCG, filing a claim for a sum certain to the GCCF constitutes presentment of a claim to BP, as the Responsible Party, under OPA, whether the claim is for emergency advance, interim or final payment." This Section should also include this sentence "Filing a claim under the GCCF for OPA damages is a required "conditioned precedent" to seeking payment from the Oil Spill Liability Trust Fund ("OSLTF"), administered by the

1

USCG, or filing a lawsuit, in State or Federal Court. Failure of an individual or business to comply with the presentment requirement in OPA could result in a denial of a claimants OSLTF claim and/or dismissal of a claimant's OPA lawsuit;

b)  In both Sections II C and D the following sentence should be included "The reasonable costs incurred by the claimant in assessing the damages claim. This includes the reasonable costs of estimating the damages claim, but not attorneys fees or other administrative costs associated with preparation of the claim";

c)  Under Section II E, to delete the words "not otherwise compensated" in the sentence that now reads "records showing expenditures for medical care not otherwise compensated";

d)  The causation section II F should read: "The GCCF will only pay for harm, damage or removal costs that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA and the proximate cause doctrine. Determinations of non-OPA claims will be guided by applicable law. The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources." (This is the same definition that was contained in your protocol for Advanced Payments with the exception that I have inserted the words removal costs for reasons of clarity. There should be no difference or standard).

e)  Section IV it should provide "Interim claims may not be made more frequently than once per month and may be made quarterly." (Please note that interim payments cover only "past damages," this was not the case with the emergency payment). This Section should also include a statement that "income received performing oil removal or other oil related work for BP shall not be used to offset against any interim damages or loss of income claims submitted to the GCCF";

f)  In Section IV B a sentence should be added that states "income received for performing oil removal or other related work for BP shall not be used to offset against any final damages or loss of income claims submitted to the GCCF";

g)  Section V should state that the 90 days begins to run from the date a claim is submitted to the GCCF by the claimant;

h)  In Section V B the notification should state the reason for any denial, reduction or increase, to any claimed amount;

i)  An appeal process should definitely be provided. The suggestion is that a panel of three judges will be available in each of the five Gulf States to hear appeals of the administrator's decisions. A three-member GCCF appeals panel would be created for each of the five states. When the GCCF program was initially announced it was clearly stated that an appeal process would be provided;

j)  Section V E should read "The amount of compensation shall be reduced by the amount of collateral compensation that is allowed by the applicable law. (To include the language that is now in the draft protocol would allow collateral source deductions that are not permitted in existing law).

k)  Under Section VI it should be made clear that you will provide the information and reports that you previously agreed to provide. Please remember that there was still an outstanding issue about providing some information in certain zip codes. We addressed this issue, but we have not had a reply.

l)  The present draft of the protocol requires for the execution of the release for a final payment. The release as drafted includes a release of parties in addition to BP. The release also provides for a subrogation of the claimant's rights to BP. The State of Louisiana has strong objection to theses provisions in the release and insists that these provisions be removed.

On another matter, we have raised on several occasions the difficulty we and our claimants are having with understanding the evaluation process. In an effort to address this issue, the State has spent considerable time and expense

2

in developing valuation templates. I have taken the liberty to attach them and our people are prepared to explain them in depth with your people. Please let me know and I will make the appropriate contact for you.

Sincerely,
**PATRICK A. JUNEAU**
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268
Telephone: 337-269-0052
Facsimile: 337-269-0061
Email:  paj@juneaudavid.com
            fgg@juneaudavid.com

# Business Interruption Average Calculation Models

| | Part |
|---|---|
| Captains - Shrimp (Small Boat) | 1 |
| Captains - Shrimp (Medium Boat) | 2 |
| Captains - Shrimp (Large Boat - Captain Owned) | 3 |
| Captains - Shrimp (Large Boat - Non-Captain Owned) | 4 |
| Deckhands - Shrimp (Small Boat) | 5 |
| Deckhands - Shrimp (Medium Boat) | 6 |
| Deckhands - Shrimp (Large Boat - Captain Owned) | 7 |
| Deckhands - Shrimp (Large Boat - Non- Captain Owned) | 8 |
| Charter Boat Captain - (Inshore) | 9 |
| Charter Boat Captain - (Offshore > 3 Miles) | 10 |
| Charter Boat Captain - (Offshore < 3 Miles) | 11 |
| Charter Boat Fishing - Deckhand (Offshore > 3 Miles) | 12 |
| Charter Boat Fishing - Deckhand (Offshore < 3 Miles) | 13 |
| Crab | 14 |
| Crab Deckhand | 15 |
| Restaurant Model | 16 |

© Adjusters International, Inc.

**Shrimp - Deckhand**
Business Interruption Compensation Model for Emergency Payments
Large Boat (81ft. and Up) - Captain Owned

| | # of Deckhands | % of Gross | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing (Gross) | | | 44,449.07 | 48,405.05 | 36,804.29 | 28,226.16 | 50,710.65 | 70,166.50 | 72,626.38 | 77,594.61 | 74,037.47 | 59,017.21 | 66,227.91 | 50,319.28 | 56,548.72 | 1 |
| Est. Trip-Related Expenses | | 50% | 22,224.54 | 24,202.53 | 18,402.15 | 14,113.08 | 25,355.32 | 35,083.25 | 36,313.19 | 38,797.30 | 37,018.74 | 29,508.61 | 33,113.95 | 25,159.64 | | 2 |
| Est. Captain Earnings per Landing | | 30% | 13,334.72 | 14,521.52 | 11,041.29 | 8,467.85 | 15,213.19 | 21,049.95 | 21,787.92 | 23,278.38 | 22,211.24 | 17,705.16 | 19,868.37 | 15,095.78 | | 3 |
| Est. Total Deckhand Earnings per Landing | | 20% | 8,889.81 | 9,681.01 | 7,360.86 | 5,645.23 | 10,142.13 | 14,033.30 | 14,525.28 | 15,518.92 | 14,807.49 | 11,803.44 | 13,245.58 | 10,063.86 | | |
| Est. Deckhand Earnings per Landing (each) | 4 | 5% | 2,222.45 | 2,420.25 | 1,840.21 | 1,411.31 | 2,535.53 | 3,508.33 | 3,631.32 | 3,879.73 | 3,701.87 | 2,950.86 | 3,311.40 | 2,515.96 | | 4 |
| Est. Number of Landings per Month | | | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | | 5 |
| Est. Monthly Deckhand Compensation | | | 1,296.43 | 1,411.81 | 1,073.46 | 823.26 | 1,479.06 | 2,046.52 | 2,118.27 | 2,263.18 | 2,159.43 | 1,721.34 | 1,931.65 | 1,467.65 | 1,649.34 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Estimated trip-related expenses include (fuel, groceries and salt) and represent roughly 50 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 3: Captain earnings percentages were determined based on extensive one-on-one industry field interviews and represents
30 percent of gross landing value as the captain is also the owner of the vessel.

Note 4: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represents
5 percent of the gross landing value for each deckhand. There are typically 4 deckhands on these large vessels.

Note 5: Extensive one-on-one industry field interviews indicate large vessels are out for 30-35 days on average. Their season
typically yields a maximum of 7 trips.

# Crab
**Business Interruption Compensation Model for Emergency Payments**

| | January | February | March | April | May | June | July | August | September | October | November | December | Annual | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value per Landing | 493.90 | 471.79 | 423.61 | 428.20 | 411.51 | 434.31 | 369.43 | 343.34 | 456.13 | 358.07 | 374.78 | 484.73 | | 1 |
| Est. Trip-Related Expenses: | | | | | | | | | | | | | | 2 |
| Fuel | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | | |
| Deckhand | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| Bait | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | | |
| Groceries | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | | |
| Ice | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | | |
| Total Est. Trip-Related Expenses | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | 185.00 | | |
| Est. Net Trip Revenue | 308.90 | 286.79 | 238.61 | 243.20 | 226.51 | 249.31 | 184.43 | 158.34 | 271.13 | 173.07 | 189.78 | 299.73 | | |
| Est. Number of Trips per Month | 10.21 | 10.35 | 13.16 | 18.40 | 24.27 | 26.86 | 22.22 | 21.40 | 14.80 | 15.55 | 12.56 | 10.24 | 200 | 3 |
| Total Est. Net Trip Revenue | 3,153.94 | 2,968.56 | 3,140.56 | 4,474.47 | 5,497.49 | 6,695.54 | 4,097.25 | 3,387.76 | 4,011.74 | 2,690.91 | 2,383.28 | 3,068.52 | 45,570.03 | |

**Note 1:** Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries.
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

**Note 2:** The estimated trip-related expenses were obtained from field industry interviews and consist of fuel, bait, groceries and ice.
Most crabbers do not utilize deckhands.

**Note 3:** The estimated number of trips were obtained from field industry interviews, but will vary for each captain.

**Shrimp - Captain**
Business Interruption Compensation Model for Emergency Payments
Small Boat (0ft. - 50ft.) Captain Owned

| | % of Value | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing | | 1,805.31 | 2,305.16 | 1,634.37 | 1,648.88 | 1,494.11 | 1,844.91 | 1,157.17 | 1,669.50 | 1,877.45 | 1,600.29 | 1,756.12 | 1,692.74 | 1,707.17 | 1 |
| Est. Vessel Owner/Captain Earnings per Landing | 60% | 1,083.19 | 1,383.10 | 980.62 | 989.33 | 896.47 | 1,106.95 | 694.30 | 1,001.70 | 1,126.47 | 960.17 | 1,053.67 | 1,015.64 | | 2 |
| Est. Trip-Related Expenses | 15% | 270.80 | 345.77 | 245.16 | 247.33 | 224.12 | 276.74 | 173.58 | 250.43 | 281.62 | 240.04 | 263.42 | 253.91 | | 3 |
| Est. Deckhand Earnings per Landing | 25% | 451.33 | 576.29 | 408.59 | 412.22 | 373.53 | 461.23 | 289.29 | 417.38 | 469.36 | 400.07 | 439.03 | 423.18 | | 4 |
| Est. Number of Landings per Month | | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | | 5 |
| Est. Monthly Captain Compensation | | 4,874.34 | 6,223.93 | 4,412.80 | 4,451.99 | 4,034.10 | 4,981.26 | 3,124.37 | 4,507.66 | 5,069.11 | 4,320.78 | 4,741.51 | 4,570.39 | 4,609.35 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries.
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Vessel owner's/captain's earnings were determined based on extensive one-on-one industry field interviews and represents
60 percent of gross landing value. On these small boats, the vessel owner is the captain.

Note 3: Estimated trip-related expenses include (fuel, ice, groceries and salt) and represent roughly 15 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 4: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represent
25 percent of the gross landing value. Typically there is only one deckhand on these sized boats.

Note 5: Extensive one-on-one industry field interviews indicate small boats are out for 4-6 days on average.

Shrimp - Deckhand
Business Interruption Compensation Model for Emergency Payments
Large Boat (81ft. and Up) - Non-Captain Owned

| | # of Deckhands | % of Net | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing (Gross) | | | 44,449.07 | 48,405.05 | 36,804.29 | 28,226.16 | 50,710.65 | 70,166.50 | 72,626.38 | 77,594.61 | 74,037.47 | 59,017.21 | 66,227.91 | 50,319.28 | 56,548.72 | 1 |
| Est. Trip-Related Expenses (Net) | | 50% | 22,224.54 | 24,202.53 | 18,402.15 | 14,113.08 | 25,355.32 | 35,083.25 | 36,313.19 | 38,797.30 | 37,018.74 | 29,508.61 | 33,113.95 | 25,159.64 | | 2 |
| Est. Captain Earnings per Landing | | 14% | 3,111.43 | 3,388.35 | 2,576.30 | 1,975.83 | 3,549.75 | 4,911.66 | 5,083.85 | 5,431.62 | 5,182.62 | 4,131.20 | 4,635.95 | 3,522.35 | | 3 |
| Est. Total Deckhand Earnings per Landing | | 36% | 8,000.83 | 8,712.91 | 6,624.77 | 5,080.71 | 9,127.92 | 12,629.97 | 13,072.75 | 13,967.03 | 13,326.74 | 10,623.10 | 11,921.02 | 9,057.47 | | |
| Est. Deckhand Earnings per Landing (each) | 4 | 9% | 2,000.21 | 2,178.23 | 1,656.19 | 1,270.18 | 2,281.98 | 3,157.49 | 3,268.19 | 3,491.76 | 3,331.69 | 2,655.77 | 2,980.26 | 2,264.37 | | 4 |
| Est. Number of Landings per Month | | | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | | 5 |
| Est. Monthly Deckhand Compensation | | | 1,166.79 | 1,270.63 | 966.11 | 740.94 | 1,331.15 | 1,841.87 | 1,906.44 | 2,036.86 | 1,943.48 | 1,549.20 | 1,738.48 | 1,320.88 | 1,484.40 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Estimated trip-related expenses include (fuel, groceries and salt) and represent roughly 50 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 3: Captain earnings percentages were determined based on extensive one-on-one industry field interviews and represents
14 percent of the net landing value as the captain is not the owner of the vessel.

Note 4: Deckhand earnings percentages were determined based on industry field interviews and represents 9 percent
of the net landing value (gross less trip-related expenses). There are typically 4 deckhands on these large vessels.

Note 5: Extensive one-on-one industry field interviews indicate large vessels are out for 30-35 days on average. Their season
typically yields a maximum of 7 trips.

**Crab Deckhand**
Business Interruption Compensation Model for Emergency Payments

| | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Average | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est. Number of Trips per Month | 20 | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 20 | 20 | 20 | 20 | 21.67 | 1 |
| Est. Revenue per Trip | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | | 2 |
| Est. Expenses per Trip | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 3 |
| Est. Monthly Revenue | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,950.00 | |

Note 1:   The estimated number of trips for each year were obtained from field industry interviews

Note 2:   The estimated revenue per trip were obtained from field industry interviews with Louisiana commercial crabbers

Note 3:   Deckhands do not incur any expenses - all expenses are paid by captain and/or boat owner

**Shrimp - Captain**
Business Interruption Compensation Model for Emergency Payments
Medium Boat (51ft. - 80ft.) Captain Owned

| | % of Value | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing | | 10,772.59 | 10,930.51 | 11,454.63 | 8,261.56 | 7,926.15 | 12,464.99 | 10,961.00 | 8,717.35 | 9,760.96 | 9,155.53 | 9,936.55 | 10,660.69 | 10,083.54 | 1 |
| Est. Vessel Owner Earnings per Landing | 50% | 5,386.30 | 5,465.25 | 5,727.32 | 4,130.78 | 3,963.08 | 6,232.50 | 5,480.50 | 4,358.68 | 4,880.48 | 4,577.77 | 4,968.27 | 5,330.35 | | 2 |
| Est. Trip-Related Expenses | 15% | 1,615.89 | 1,639.58 | 1,718.19 | 1,239.25 | 1,188.92 | 1,869.75 | 1,644.15 | 1,307.60 | 1,464.14 | 1,373.33 | 1,490.48 | 1,599.10 | | 3 |
| Est. Captain Earnings per Landing | 11% | 1,184.99 | 1,202.36 | 1,260.01 | 908.77 | 871.88 | 1,371.15 | 1,205.71 | 958.91 | 1,073.71 | 1,007.11 | 1,093.02 | 1,172.68 | | 4 |
| Est. Total Deckhand Earnings per Landing | 24% | 2,585.42 | 2,623.32 | 2,749.11 | 1,982.77 | 1,902.28 | 2,991.60 | 2,630.64 | 2,092.16 | 2,342.63 | 2,197.33 | 2,384.77 | 2,558.57 | | 5 |
| Est. Number of Landings per Month | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 6 |
| Est. Monthly Captain Compensation | | 3,554.96 | 3,607.07 | 3,780.03 | 2,726.31 | 2,615.63 | 4,113.45 | 3,617.13 | 2,876.73 | 3,221.12 | 3,021.33 | 3,279.06 | 3,518.03 | 3,327.57 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Vessel owner's/captain's earnings were determined based on extensive one-on-one industry field interviews and represents
50 percent of gross landing value. The captain on vessels of this size may or may not be the owner

Note 3: Estimated trip-related expenses include (fuel, ice, groceries and salt) and represent roughly 15 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 4: Captain earnings percentages were determined based on extensive one-on-one industry field interviews and represents
11 to 15 percent of the gross landing value - the captain may or may not be the owner of the vessel. Captain's percentage
depends on whether there are 2 or 3 deckhands.

Note 5: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represents
8 to 10 percent of the gross landing value. The deckhands percentage depends on whether there are 2 or 3 deckhands.

Note 6: Extensive one-on-one industry field interviews indicate medium boats are out for 7-12 days on average.

**Charter Fishing Captain**
Business Interruption Compensation Model for Emergency Payments
Inshore

| | January | February | March | April | May | June | July | August | September | October | November | December | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est. Revenue per Trip | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 1 |
| | | | | | | | | | | | | | |
| Est. Trip-Related Expenses: | | | | | | | | | | | | | 2 |
| Fuel | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | 60.00 | |
| Deckhand | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Bait | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | |
| Tackle | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | |
| Ice | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | |
| Total Est. Trip-Related Expenses | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | |
| | | | | | | | | | | | | | |
| Est. Net Trip Revenue | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | |
| | | | | | | | | | | | | | |
| Est. Number of Trips per Month | 5.00 | 5.00 | 20.00 | 20.00 | 25.00 | 25.00 | 25.00 | 25.00 | 20.00 | 20.00 | 5.00 | 5.00 | 3 |
| | | | | | | | | | | | | | |
| Est. Monthly Income | 2,625.00 | 2,625.00 | 10,500.00 | 10,500.00 | 13,125.00 | 13,125.00 | 13,125.00 | 13,125.00 | 10,500.00 | 10,500.00 | 2,625.00 | 2,625.00 | |

Note 1:  The estimated revenues per trip were obtained from one-on-one field industry interviews with several
inshore charter boat captains and by consulting multiple Louisiana charter boat captain's rate schedules.
The inshore charter captains charge a set fee per trip inclusive of fuel.

Note 2:  The estimated trip-related expenses were obtained from one-on-one field industry interviews with several
inshore charter boat captains and consist of fuel, bait, tackle and ice.

Note 3:  The estimated number of trips were obtained from one-on-one field industry interviews with several
inshore charter boat captains. The number of trips are an average and will vary for each captain.

# BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL INDUSTRY

| NAME: | 0 | SCHEDULE |
|---|---|---|
| ADDRESS: | 0 | 1/0 - R1 |
| CLAIM NUMBER: | 0 | Page 1 of 2 |

Period Covered

## Historical Sales Data

### Revenue

| | 2009 | | 2008 | | 2007 |
|---|---|---|---|---|---|
| January | | | | | |
| February | | | | | |
| March | | | | | |
| April | | | | | |
| May | | | | | |
| June | | | | | |
| July | | | | | |
| August | | | | | |
| September | | | | | |
| October | | | | | |
| November | | | | | |
| December | | | | | |
| | | | | | |
| Total | 0 | | 0 | | 0 |

*Claimant can photocopy this recap page and attach to claims prepared for each period / month.

| NAME: | 0 | SCHEDULE |
|---|---|---|
| ADDRESS: | 0 | 1/0 - R1 |
| CLAIM NUMBER: | 0 | Page 2 of 2 |

Period Covered

Income Projection

| Projected Revenue | | Actual Revenue | | Net Revenue Lost |
|---|---|---|---|---|
| | **-** | | **=** | 0 |

How was Projected Revenue calculated:

Previous Years' Data:

| Month | Year | Total Revenue |
|---|---|---|
| | 2009 | |
| | 2008 | |
| | 2007 | |

*Show Revenue for only that time frame claimed above

BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL  INDUSTRY

| NAME: | 0 | SCHEDULE |
|-------|---|----------|
| ADDRESS: | 0 | 1/0  - R2 |
| CLAIM NUMBER: | 0 | Page 1 of 1 |

Period Covered

Historical Costs of Goods Sold

| | Total Costs of Goods Sold | | Total Gross Revenue | | Costs of Goods Sold Percentage |
|---|---|---|---|---|---|
| 2009 | | / | | = | |
| 2008 | | / | | = | |
| 2007 | | / | | = | |
| Total | 0 | / | 0 | = | |

Costs of Goods Sold Projection

| Net Revenue Lost | | Projected Costs of Goods Sold Percentage | | Projected Costs of Goods Sold |
|---|---|---|---|---|
| | X | | = | |

How was Projected Costs of Goods Sold calculated:

*Calculate Costs of Goods Sold Percentage using total costs of goods sold expenses to the years lis

# BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL INDUSTRY

| NAME: | 0 | SCHEDULE |
|-------|---|----------|
| ADDRESS: | 0 | 1/0 - R3 |
| CLAIM NUMBER: | 0 | **Page 1 of 4** |

Period Covered

Variable Historical Costs

| | 2009 | | 2008 | | 2007 |
|---|---|---|---|---|---|
| Total Gross Revenue | | Total Gross Revenue | | Total Gross Revenue | |

Expenses

| VARIABLE EXPENSES | Total Expense - 2009 | Percentage of Gross Revenue | Total Expense - 2008 | Percentage of Gross Revenue | Total Expense - 2007 | Percentage of Gross Revenue |
|---|---|---|---|---|---|---|
| Contract Labor | | | | | | |
| Supplies | | | | | | |
| Waste Removal | | | | | | |
| Linen Expense | | | | | | |
| Other - _____ | | | | | | |
| Other - _____ | | | | | | |
| Other - _____ | | | | | | |
| Other - _____ | | | | | | |
| Other - _____ | | | | | | |

*Claimant can photocopy this recap page and attach to claims prepared for each period / month.

# BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL INDUSTRY

| NAME: | 0 | SCHEDULE |
|---|---|---|
| ADDRESS: | 0 | 1/0  - R3 |
| CLAIM NUMBER: | 0 | Page 2 of 4 |

**Period Covered**

## Variable Costs Projection

| VARIABLE SAVED EXPENSES | Percentage of Gross Revenue | Net Revenue Lost | Total Variable Saved Expenses |
|---|---|---|---|
| Contract Labor | | 0 | 0 |
| Supplies | | 0 | 0 |
| Waste Removal | | 0 | 0 |
| Linen Expense | | 0 | 0 |
| Other - _____ | | 0 | 0 |
| Other - _____ | | 0 | 0 |
| Other - _____ | | 0 | 0 |
| Other - _____ | | 0 | 0 |
| Other - _____ | | 0 | 0 |

How were Variable Saved Expenses Calculated:

| TOTAL VARIABLE SAVED EXPENSES | 0 |
|---|---|

* Note only the costs that have been saved or reduced.
* Saved expenses are those expenses that have been reduced or eliminated as a result of the decline in revenue from the oil spill

BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL INDUSTRY

| NAME: | 0 | SCHEDULE |
|---|---|---|
| ADDRESS: | 0 | 1/0 - R3 |
| CLAIM NUMBER: | 0 | **Page 3 of 4** |

Period Covered

Historical Fixed Costs

| | Total Gross Revenue | **2009** | | Total Gross Revenue | **2008** | | Total Gross Revenue | **2007** |
|---|---|---|---|---|---|---|---|---|

| FIXED EXPENSES | Total Expense - 2009 | Monthly Average Expense | Total Expense - 2008 | Monthly Average Expense | Total Expense - 2007 | Monthly Average Expense |
|---|---|---|---|---|---|---|
| Advertising | | 0 | | 0 | | 0 |
| Car and Truck Expense | | 0 | | 0 | | 0 |
| Depreciation | | 0 | | 0 | | 0 |
| Employee Benefit Plan | | 0 | | 0 | | 0 |
| Insurance | | 0 | | 0 | | 0 |
| Mortgage Interest | | 0 | | 0 | | 0 |
| Other Interest | | 0 | | 0 | | 0 |
| Legal and Professional Services | | 0 | | 0 | | 0 |
| Office Expense | | 0 | | 0 | | 0 |
| Pension and Profit Sharing Plans | | 0 | | 0 | | 0 |
| Rent or Lease - Machinery | | 0 | | 0 | | 0 |
| Rent or Lease - Other | | 0 | | 0 | | 0 |
| Repairs and Maintenance | | 0 | | 0 | | 0 |
| Taxes and Licenses | | 0 | | 0 | | 0 |
| Travel | | 0 | | 0 | | 0 |
| Meals | | 0 | | 0 | | 0 |
| Entertainment | | 0 | | 0 | | 0 |
| Wages | | 0 | | 0 | | 0 |
| Utilities | | 0 | | 0 | | 0 |
| Other - _____ | | 0 | | 0 | | 0 |
| Other - _____ | | 0 | | 0 | | 0 |
| Other _____ | | 0 | | 0 | | 0 |
| Other - _____ | | 0 | | 0 | | 0 |
| Other - _____ | | 0 | | 0 | | 0 |
| TOTAL FIXED EXPENSES | 0 | 0 | 0 | 0 | 0 | 0 |

*Claimant can photocopy this recap page and attach to claims prepared for each period / month.

BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL INDUSTRY

| NAME: | 0 | SCHEDULE |
|---|---|---|
| ADDRESS: | 0 | 1/0 - R3 |
| CLAIM NUMBER: | 0 | **Page 4 of 4** |

Period Covered

Fixed Costs Projection

| FIXED SAVED EXPENSES | Projected Monthly Average Expense | Saved Expense | How were Fixed Saved Expenses Calculated: |
|---|---|---|---|
| Advertising | | | |
| Car and Truck Expense | | | |
| Depreciation | | | |
| Employee Benefit Plan | | | |
| Insurance | | | |
| Mortgage Interest | | | |
| Other Interest | | | |
| Legal and Professional Services | | | |
| Office Expense | | | |
| Pension and Profit Sharing Plans | | | |
| Rent or Lease - Machinery | | | |
| Rent or Lease - Other | | | |
| Repairs and Maintenance | | | |
| Taxes and Licenses | | | |
| Travel | | | |
| Meals | | | |
| Entertainment | | | |
| Wages | | | |
| Utilities | | | |
| Other - _____ | | | |
| Other - _____ | | | |
| Other - _____ | | | |
| Other - _____ | | | |
| Other - _____ | | | |

| TOTAL FIXED SAVED EXPENSES | | |
|---|---|---|

* Note only the costs that have been saved or reduced.
* Saved expenses are those expenses that have been reduced or eliminated as a result of the decline in revenue from the oil spill

# BUSINESS INCOME EVALUATION FOR RESTAURANT / RETAIL INDUSTRY

| NAME: | | SCHEDULE |
|---|---|---|
| ADDRESS: | | - R |
| CLAIM NUMBER: | | Page 1 of 1 |

Period Covered

|  |  |
|---|---|

|  | | Sub-Schedule |
|---|---|---|
| Projected Revenue | 0 | R1 |
| LESS: Actual Revenue | 0 | R1 |
| EQUALS: Net Revenue Lost | 0 | |
| LESS: Costs of Goods Sold | 0 | R2 |
| EQUALS: Gross Profit Lost | 0 | |
| LESS: Projected Variable Saved Expenses | 0 | R3 |
| LESS: Projected Fixed Saved Expenses | 0 | R3 |
| EQUALS: Claimed Business Income Lost | 0 | |

*Claimant should use a MONTH / YEAR format for the schedule number preceding each form found in the top, right-hand of each claim form.

| NAME: | |
|-------|---|
| ADDRESS: | |
| CLAIM NUMBER: | |

| Time Frame | Projected Revenue | LESS: Actual Revenue | EQUALS: Net Revenue Lost | LESS: Costs of Goods Sold | EQUALS: Gross Profit Lost | LESS: Projected Variable Saved Expenses | LESS: Projected Fixed Saved Expenses | EQUALS: Claimed Business Income Lost | Schedule Attached |
|---|---|---|---|---|---|---|---|---|---|
| __/__/__ to __/__/__ | | - | = 0 | - | = 0 | - | - | = 0 | |
| __/__/__ to __/__/__ | | - | = 0 | - | = 0 | - | - | = 0 | |
| __/__/__ to __/__/__ | | - | = 0 | - | = 0 | - | - | = 0 | |
| __/__/__ to __/__/__ | | - | = 0 | - | = 0 | - | - | = 0 | |
| __/__/__ to __/__/__ | | - | = 0 | - | = 0 | - | - | = 0 | |
| __/__/__ to __/__/__ | | - | = 0 | - | = 0 | - | - | = 0 | |
| TOTAL | 0 | - 0 | = 0 | - 0 | = 0 | - 0 | - 0 | = 0 | |

*Claimant should use a MONTH/YEAR format. I.E. May 2010 would be 05/2010, for each set of forms completed. That form designation is then used as a label in the last column of this recap schedule.

Shrimp - Captain
Business Interruption Compensation Model for Emergency Payments
Large Boat (81ft. and Up) - Captain Owned

| | % of Value | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing | | 44,449.07 | 48,405.05 | 36,804.29 | 28,226.16 | 50,710.65 | 70,166.50 | 72,626.38 | 77,594.61 | 74,037.47 | 59,017.21 | 66,227.91 | 50,319.28 | 56,548.72 | 1 |
| Est. Trip-Related Expenses | 50% | 22,224.54 | 24,202.53 | 18,402.15 | 14,113.08 | 25,355.32 | 35,083.25 | 36,313.19 | 38,797.30 | 37,018.74 | 29,508.61 | 33,113.95 | 25,159.64 | | 2 |
| Est. Captain Earnings per Landing | 30% | 13,334.72 | 14,521.52 | 11,041.29 | 8,467.85 | 15,213.19 | 21,049.95 | 21,787.92 | 23,278.38 | 22,211.24 | 17,705.16 | 19,868.37 | 15,095.78 | | 3 |
| Est. Total Deckhand Earnings per Landing | 20% | 8,889.81 | 9,681.01 | 7,360.86 | 5,645.23 | 10,142.13 | 14,033.30 | 14,525.28 | 15,518.92 | 14,807.49 | 11,803.44 | 13,245.58 | 10,063.86 | | 4 |
| Est. Number of Landings per Month | | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | | 5 |
| Est. Monthly Captain Compensation | | 7,778.59 | 8,470.88 | 6,440.75 | 4,939.58 | 8,874.36 | 12,279.14 | 12,709.62 | 13,579.06 | 12,956.56 | 10,328.01 | 11,589.88 | 8,805.87 | 9,896.03 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Estimated trip-related expenses include (fuel, groceries and salt) and represent roughly 50 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 3: Captain earnings percentages were determined based on extensive one-on-one industry field interviews and represents
30 percent of gross landing value as the captain is also the owner of the vessel.

Note 4: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represents
5 percent of the gross landing value for each deckhand. There are typically 4 deckhands on these large vessels.

Note 5: Extensive one-on-one industry field interviews indicate large vessels are out for 30-35 days an average. Their season
typically yields a maximum of 7 trips.

**Charter Fishing Captain**
Business Interruption Compensation Model for Emergency Payments
Offshore Greater than 3 Miles

| | January | February | March | April | May | June | July | August | September | October | November | December | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est. Revenue per Trip | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1 |
| Est. Trip-Related Expenses: | | | | | | | | | | | | | 2 |
| Fuel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Deckhand | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | |
| Bait | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | |
| Tackle | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | |
| Ice | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | |
| Total Est. Trip-Related Expenses | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | 310.00 | |
| Est. Net Trip Revenue | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | 890.00 | |
| Est. Number of Trips per Month | 5.00 | 5.00 | 20.00 | 20.00 | 25.00 | 25.00 | 25.00 | 25.00 | 20.00 | 20.00 | 5.00 | 5.00 | 3 |
| Est. Moothly Income | 4,450.00 | 4,450.00 | 17,800.00 | 17,800.00 | 22,250.00 | 22,250.00 | 22,250.00 | 22,250.00 | 17,800.00 | 17,800.00 | 4,450.00 | 4,450.00 | |

Note 1:  The estimated revenue per trip were obtained from field industry interviews and multiple Louisiana charter
boat captain's rate schedules. The offshore charter captains charge a set fee per trip plus the cost of fuel.

Note 2:  The estimated trip-related expenses were obtained from one-on-one field industry interviews with several
inshore charter boat captains and consist of deckhand, bait, tackle and ice.

Note 3:  The estimated number of trips were obtained from one-on-one field industry interviews with several
inshore charter boat captains. The number of trips are an average and will vary for each captain.

**Shrimp - Captain**
Business Interruption Compensation Model for Emergency Payments
Large Boat (81ft. and Up) - Non-Captain Owned

| | % of Net | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing (Gross) | | 44,449.07 | 48,405.05 | 36,804.29 | 28,226.16 | 50,710.65 | 70,166.50 | 72,626.38 | 77,594.61 | 74,037.47 | 59,017.21 | 66,227.91 | 50,319.28 | 56,548.72 | 1 |
| Est. Trip-Related Expenses (Net) | 50% | 22,224.54 | 24,202.53 | 18,402.15 | 14,113.08 | 25,355.32 | 35,083.25 | 36,313.19 | 38,797.30 | 37,018.74 | 29,508.61 | 33,113.95 | 25,159.64 | | 2 |
| Est. Captain Earnings per Landing | 14% | 3,111.43 | 3,388.35 | 2,576.30 | 1,975.83 | 3,549.75 | 4,911.66 | 5,083.85 | 5,431.62 | 5,182.62 | 4,131.20 | 4,635.95 | 3,522.35 | | 3 |
| Est. Total Deckhand Earnings per Landing | 36% | 8,000.83 | 8,712.91 | 6,624.77 | 5,080.71 | 9,127.92 | 12,629.97 | 13,072.75 | 13,967.03 | 13,326.74 | 10,623.10 | 11,921.02 | 9,057.47 | | 4 |
| Est. Number of Landings per Month | | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | | 5 |
| Est. Monthly Boat Owner Compensation | | 1,815.00 | 1,976.54 | 1,502.84 | 1,152.57 | 2,070.68 | 2,865.13 | 2,965.58 | 3,168.45 | 3,023.20 | 2,409.87 | 2,704.31 | 2,054.70 | 2,309.07 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Estimated trip-related expenses include (fuel, groceries and salt) and represent roughly 50 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 3: Captain earnings percentages were determined based on extensive one-on-one industry field interviews and represents
14 percent of the net landing value as the captain is not the owner of the vessel.

Note 4: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represents
36 percent of the net landing value. There are typically 4 deckhands on these large vessels.

Note 5: Extensive one-on-one industry field interviews indicate large vessels are out for 30-35 days on average. Their season
typically yields a maximum of 7 trips.

**Charter Fishing Captain**
Business Interruption Compensation Model for Emergency Payments
Offshore Less than 3 Miles

| | January | February | March | April | May | June | July | August | September | October | November | December | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est. Revenue per Trip | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1 |
| | | | | | | | | | | | | | |
| Est. Trip-Related Expenses: | | | | | | | | | | | | | 2 |
| Fuel | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | 225.00 | |
| Deckhand | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | |
| Bait | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | |
| Tackle | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | |
| Ice | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | 45.00 | |
| Total Est. Trip-Related Expenses | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | |
| | | | | | | | | | | | | | |
| Est. Net Trip Revenue | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | 525.00 | |
| | | | | | | | | | | | | | |
| Est. Number of Trips per Month | 5.00 | 5.00 | 20.00 | 20.00 | 25.00 | 25.00 | 25.00 | 25.00 | 20.00 | 20.00 | 5.00 | 5.00 | 3 |
| | | | | | | | | | | | | | |
| Est. Monthly Income | 2,625.00 | 2,625.00 | 10,500.00 | 10,500.00 | 13,125.00 | 13,125.00 | 13,125.00 | 13,125.00 | 10,500.00 | 10,500.00 | 2,625.00 | 2,625.00 | |

Note 1: The estimated revenues per trip were obtained from one-on-one field industry interviews with several charter
boat captains and consulting multiple Louisiana charter boat captain's rate schedules. The offshore charter
captains not venturing further than 3 miles from shore, include fuel in the cost of the trip.

Note 2: The estimated trip-related expenses were obtained from one-on-one field industry interviews with several
inshore charter boat captains and consist of fuel, deckhand, bait, tackle and ice.

Note 3: The estimated number of trips were obtained from one-on-one field industry interviews with several
inshore charter boat captains. The number of trips are an average and will vary for each captain.

**Shrimp - Deckhand**
Business Interruption Compensation Model for Emergency Payments
Small Boat (0ft. - 50ft.) Captain Owned

| | % of Gross | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing (Gross) | | 1,805.31 | 2,305.16 | 1,634.37 | 1,648.88 | 1,494.11 | 1,844.91 | 1,157.17 | 1,669.50 | 1,877.45 | 1,600.29 | 1,756.12 | 1,692.74 | 1,707.17 | 1 |
| Est. Vessel Owner/Capt. Earnings per Landing | 60% | 1,083.19 | 1,383.10 | 980.62 | 989.33 | 896.47 | 1,106.95 | 694.30 | 1,001.70 | 1,126.47 | 960.17 | 1,053.67 | 1,015.64 | | 2 |
| Est. Trip-Related Expenses | 15% | 270.80 | 345.77 | 245.16 | 247.33 | 224.12 | 276.74 | 173.58 | 250.43 | 281.62 | 240.04 | 263.42 | 253.91 | | 3 |
| Est. Deckhand Earnings per Landing | 25% | 451.33 | 576.29 | 408.59 | 412.22 | 373.53 | 461.23 | 289.29 | 417.38 | 469.36 | 400.07 | 439.03 | 423.18 | | 4 |
| Est. Number of Landings per Month | | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | | 5 |
| Est. Monthly Deckhand Compensation | | 2,030.97 | 2,593.30 | 1,838.66 | 1,854.99 | 1,680.87 | 2,075.53 | 1,301.82 | 1,878.19 | 2,112.13 | 1,800.32 | 1,975.63 | 1,904.33 | 1,920.56 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Vessel owner's/captain's earnings were determined based on extensive one-on-one industry field interviews and represents
60 percent of gross landing value. On these small boats, the vessel owner is the captain.

Note 3: Estimated trip-related expenses include (fuel, ice, groceries and salt) and represent roughly 15 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews, including interviews
with officers of the LA Shrimp Association.

Note 4: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represent
25 percent of the gross landing value. Typically there is only one deckhand on these sized boats.

Note 5: Extensive one-on-one industry field interviews indicate small boats are out for 4-6 days on average.

**Charter Fishing Deckhand**
Business Interruption Compensation Model for Emergency Payments
Offshore Greater than 3 Miles

| | January | February | March | April | May | June | July | August | September | October | November | December | Annual | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est. Number of Trips per Month | 5.00 | 5.00 | 20.00 | 20.00 | 25.00 | 25.00 | 25.00 | 25.00 | 20.00 | 20.00 | 5.00 | 5.00 | | 1 |
| Est. Revenue per Trip | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | | 2 |
| Est. Expenses per Trip | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 3 |
| Est. Monthly Revenue | 500.00 | 500.00 | 2,000.00 | 2,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,000.00 | 2,000.00 | 500.00 | 500.00 | 20,000.00 | |

Note 1: The estimated number of trips were obtained from one-on-one field industry interviews with several inshore charter boat captains. The number of trips are an average and will vary for each deckhand.

Note 2: The estimated revenue per trip was obtained from one-on-one field industry interviews with Louisiana charter fishing captains. In addition to compensation paid by the captain, a material portion of overall deckhand compensation comes from gratuities which will vary for each deckhand and not accounted for in this calculation.

Note 3: Deckhands do not incur any expenses - all expenses are paid by captain and/or boat owner

**Shrimp - Deckhand**
Business Interruption Compensation Model for Emergency Payments
Medium Boat (51ft. - 80ft.) Captain Owned

| | # of Deckhands | % of Gross | January | February | March | April | May | June | July | August | September | October | November | December | Yearly Avg. | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Value Earned per Landing (Gross) | | | 10,772.59 | 10,930.51 | 11,454.63 | 8,261.56 | 7,926.15 | 12,464.99 | 10,961.00 | 8,717.35 | 9,760.96 | 9,155.53 | 9,936.55 | 10,660.69 | 10,083.54 | 1 |
| Est. Vessel Owner Earnings per Landing | | 50% | 5,386.30 | 5,465.25 | 5,727.32 | 4,130.78 | 3,963.08 | 6,232.50 | 5,480.50 | 4,358.68 | 4,880.48 | 4,577.77 | 4,968.27 | 5,330.35 | | 2 |
| Est. Trip-Related Expenses | | 15% | 1,615.89 | 1,639.58 | 1,718.19 | 1,239.23 | 1,188.92 | 1,869.75 | 1,644.15 | 1,307.60 | 1,464.14 | 1,373.33 | 1,490.48 | 1,599.10 | | 3 |
| Est. Captain Earnings per Landing | | 11% | 1,184.99 | 1,202.36 | 1,260.01 | 908.77 | 871.88 | 1,371.15 | 1,205.71 | 958.91 | 1,073.71 | 1,007.11 | 1,093.02 | 1,172.68 | | 4 |
| Est. Total Deckhand Earnings per Landing | | 24% | 2,585.42 | 2,623.32 | 2,749.11 | 1,982.77 | 1,902.28 | 2,991.60 | 2,630.64 | 2,092.16 | 2,342.63 | 2,197.33 | 2,384.77 | 2,558.57 | | |
| Est. Deckhand Earnings per Landing (each) | 3 | 8% | 861.81 | 874.44 | 916.37 | 660.92 | 634.09 | 997.20 | 876.88 | 697.39 | 780.88 | 732.44 | 794.92 | 852.86 | | 5 |
| Est. Number of Landings per Month | | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 6 |
| Est. Monthly Deckhand Compensation | | | 2,585.42 | 2,623.32 | 2,749.11 | 1,982.77 | 1,902.28 | 2,991.60 | 2,630.64 | 2,092.16 | 2,342.63 | 2,197.33 | 2,384.77 | 2,558.57 | 2,420.05 | |

Note 1: Data on average value earned per landing was provided by LA Department of Wildlife and Fisheries
We compared the monthly averages from January 2007 - June 2010 and used the highest monthly average for each month.

Note 2: Vessel owner's/captain's earnings were determined based on extensive one-on-one industry field interviews and represents
50 percent of gross landing value. The captain on vessels of this size may or may not be the owner.

Note 3: Estimated trip-related expenses include (fuel, ice, groceries and salt) and represent roughly 15 percent of the
gross landing value. Percentage is based on extensive one-on-one industry field interviews; including interviews
with officers of the LA Shrimp Association.

Note 4: Captain earnings percentages were determined based on extensive one-on-one industry field interviews and represents
11 to 15 percent of the gross landing value - the captain may or may not be the owner of the vessel. Captain's percentage
depends on whether there are 2 or 3 deckhands.

Note 5: Deckhand earnings percentages were determined based on extensive one-on-one industry field interviews and represents
8 to 10 percent of the gross landing value. The deckhands percentage depends on whether there are 2 or 3 deckhands.

Note 6: Extensive one-on-one industry field interviews indicate medium boats are out for 7-12 days on average.

**Charter Fishing Deckhand**
**Business Interruption Compensation Model for Emergency Payments**
**Offshore Less than 3 Miles**

| | January | February | March | April | May | June | July | August | September | October | November | December | Annual | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est. Number of Trips per Month | 5.00 | 5.00 | 20.00 | 20.00 | 25.00 | 25.00 | 25.00 | 25.00 | 20.00 | 20.00 | 5.00 | 5.00 | | 1 |
| Est. Revenue per Trip | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | | 2 |
| Est. Expenses per Trip | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 3 |
| Est. Monthly Revenue | 500.00 | 500.00 | 2,000.00 | 2,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,000.00 | 2,000.00 | 500.00 | 500.00 | 20,000.00 | |

Note 1: The estimated number of trips were obtained from one-on-one field industry interviews with several inshore charter boat captains. The number of trips are an average and will vary for each deckhand.

Note 2: The estimated revenue per trip was obtained from one-on-one field industry interviews with Louisiana charter fishing captains. In addition to compensation paid by the captain, a material portion of overall deckhand compensation comes from gratuities which will vary for each deckhand and not accounted for in this calculation.

Note 3: Deckhands do not incur any expenses - all expenses are paid by captain and/or boat owner



**Exhibit I**

## Moskowitz, Keith

| | |
|---|---|
| **From:** | Tracy Steilberg <tsteilberg@dheclaims.com> on behalf of Patrick Juneau <pjuneau@dheclaims.com> |
| **Sent:** | Thursday, August 16, 2012 10:05 AM |
| **To:** | 'Stephen Herman (sherman@hhkc.com)'; 'James Roy (jimr@wrightroy.com)'; mark.holstein@bp.com; Moskowitz, Keith; Daniel Cantor (Daniel.Cantor@aporter.com); Orran L. Brown |
| **Subject:** | FW: Incomplete Claims and Suggested Workarounds |
| **Attachments:** | Incomplete Claims and Workarounds-Composite.pdf |

All:

      I asked Brown Greer to give me a report on what they saw as some deficiencies that were noted.  I also asked them to give me a recommendation as to what could be done with respect to their deficiencies.  There was considerable input from the accountants on these issues.

      Pursuant to my request Orran Brown sent me the attached report.  You need to carefully review this report and recommendations.  My initial view is that the recommendtions are solid and if implemented, they would speed the process while still maintaining the intent of the agreement.

      Please let me have any comments you want to make by 5:00 p.m. on Monday, August 20th.

Thanks,

Patrick A. Juneau
*Claims Administrator*



**DEEPWATER HORIZON CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

**504-934-4999**

**935 Gravier Street, Ste. 1905**
**New Orleans, LA  70112**
**pjuneau@dheclaims.com**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.



**Exhibit J**

| | |
|---|---|
| **From:** | Bloom, Wendy L. <wbloom@kirkland.com> |
| **Sent:** | Tuesday, August 21, 2012 11:58 PM |
| **To:** | Patrick Juneau |
| **Cc:** | tsteilberg@dheclaims.com; Christine Reitano; sherman@hhkc.com; Jim Roy; mark.Holstein@bp.com; Moskowitz, Keith; Daniel.Cantor@aporter.com; Orran L. Brown; Lynn Greer |
| **Subject:** | Incomplete/Deficient Claims |
| **Attachments:** | 8-18-12 BROWNGREER-#412614-v1-Missing_Documents_and_Possible_Solutions_Excel.XLSX |

Dear Mr. Juneau,

At your request, BP reviewed the Settlement Program memorandum regarding Incomplete Claims and Possible Workarounds attached to your email dated August 16, 2012. BP appreciates the Settlement Program's diligence in seeking to understand the population of deficient claims presenting to the Settlement Program. A number of proposals in the memorandum will facilitate prompt claims processing and payment of those claims meeting the framework requirements, consistent with the parties' intent in negotiating the Settlement Agreement. As noted in the attached excel file, BP supports those proposals.

However, as set forth in the attached excel, a good number of the Settlement Program recommendations regarding the BEL, IEL, IPV/FV, Seafood Compensation Program and Vessel Physical Damage frameworks propose to disregard mandatory document and sworn statement requirements of these frameworks. These mandatory requirements were negotiated and agreed to by the parties, and preliminarily approved by the Court. As to these mandatory requirements, BP does not agree that the Settlement Program has authority to disregard them, nor will BP agree to do so. These mandatory requirements, individually and cumulatively, are fundamental elements of the frameworks. They are important prerequisites to eligibility of claims for payment. Moreover, they are documents that should be in a claimant's possession, or, if not, are readily obtainable by claimants.

If claimants are failing to submit required documentation -- notwithstanding clear directions in the Settlement Frameworks, the claim forms and the claim instructions -- BP suggests that the Settlement Program notify the claimant promptly and provide an opportunity to cure the deficiency. To the extent the Settlement Program identifies frequently recurring deficiencies, BP agrees with the suggestion that the Settlement Program publish an alert or otherwise remind claimants of these requirements. Such alerts or reminders could include identification of relevant state or local governmental contact numbers or databases.

Several of the proposals suggest that Settlement Program staff be authorized to conduct internet searches in an attempt to identify required but missing documentation for claimants. To the extent the Settlement Program has identified common deficiencies that are readily remedied by reference to public databases, BP encourages the Facility to do so in the exercise of its discretion to facilitate expeditious claim processing. However, BP would not support devotion of significant resources by the Settlement Program to idiosyncratic or burdensome searches for these documents which should be in the claimant's possession, and, if not, are readily obtainable by claimants.

Regards,

Wendy Bloom
Counsel for BP

**Wendy Bloom | Kirkland & Ellis LLP**
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2343 **DIRECT** | (312) 862-2200 **FAX**
wendy.bloom@kirkland.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



**Exhibit K**

# SNR DENTON 

SNR Denton US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306 USA

Keith Moskowitz
Partner
keith.moskowitz@snrdenton.com
D  +1 312 876 8220
T  +1 312 876 8000
F  +1 312 876 7934
snrdenton.com

September 17, 2012

Patrick Juneau
Claims Administrator of the Deepwater Horizon
Court Supervised Settlement Program
935 Gravier Street, Suite 1905
New Orleans, LA 70112

Dear Mr. Juneau

On September 12, 2012 a meeting was held between the Parties, the Court Supervised Settlement Program (the "CSSP") and Magistrate Judge Shushan at the CSSP's offices. The purpose of this meeting was to discuss the interpretation of certain provisions of the Settlement Agreement and proposals to streamline the processing of claims by the CSSP. This Report provides BP's positions on certain key provisions highlighted by the CSSP. In addition, BP has clearly stated that it will not withhold any reasonably required resources that will allow the CSSP to achieve the shared goal of efficiently processing claims under the terms of the Settlement Agreement with appropriate speed and diligence. With those principles in mind, BP responds to the proposals presented at the September 12, 2012 meeting as follows:

**Business Economic Loss and Individual Economic Loss**

**I.      License Requirements**

Claimants making Business Economic Loss claims must provide a copy of any applicable federal, state, or local government license required to operate their business. See Settlement Agreement, Ex. 4A. Claimants making Individual Economic Loss claims whose employment requires a license must provide a copy of a government-issued license/permit, a copy of valid 2010 and 2011 licenses, if appropriate, or a print out from a public database providing the same information as would be provided by the original document. See Settlement Agreement, Ex. 8. The following interpretation of the Settlement Agreement was suggested by Judge Shushan in order to streamline the processing of Business Economic Loss and Individual Economic Loss claims:

1.      An applicable 2010 license <u>alone</u> may be used to satisfy the license requirements for a Business Economic Loss Claim or Individual Economic Loss Claim.

2.      In addition to the claimant providing the CSSP with an applicable license, the Settlement Program may itself obtain a copy, or verify the existence, of the claimant's license by accessing the license on-line, where available, or contacting the appropriate licensing body to verify that the claimant had an applicable 2010 license. The CSSP does not have to obtain a copy of the license, but, if it confirms the existence of a valid, applicable license, the CSSP will make a notation in the claimant's file reflecting the verification of the license and the source of

the verification (i.e., through on-line access or through contact with the appropriate licensing body).

3.     If a claimant holds, or is required to hold, more than one license from an appropriate licensing body or licenses from more then one level of government (e.g., a federal license and a state license) the claimant need only submit, or the Settlement Program need only verify, one applicable license for the claimant.

In its September 16, 2012 memorandum, the PSC contends that the license requirements in the Settlement Agreement are permissive and can be ignored by the CSSP.

The framework exhibits for Business Economic Loss and Individual Economic Loss claims (and other Exhibits) clearly state that claimants submitting Business Economic Loss and/or Individual Economic Loss claims must provide applicable licenses.  See Settlement Agreement, Exs. 4A and 8 ("In order to be eligible for compensation, a business claimant must provide the following…" (emphasis added.))  Furthermore, the CSSP has no authority to change the document requirements, a position the Claims Administrator has appropriately acknowledged.  See Settlement Agreement, Section 4.4.7. and Report By The Claims Administrator Of The Deepwater Horizon Economic And Property Damage Settlement Agreement On The Status Of Claims Review.  [Doc. 7282 at 10.]

**BP's Position:**  Contrary to the position taken by PSC in its September 16, 2012 memorandum, the license requirements in the Settlement Agreement are mandatory and must be met in order for a Business Economic Loss or Individual Economic Loss claimant to be eligible for a settlement payment.  BP agrees with Judge Shushan that her proposals are reasonable and practical interpretations of the Settlement Agreement.  Moreover, to facilitate and expedite compliance with the license requirement, BP has compiled and provided to both the CSSP and the PSC spreadsheets identifying relevant licensing authorities and their contact information and, where available, online databases.  BP also supports the Court entering an Order or Orders that the CSSP can use with appropriate licensing bodies to obtain applicable claimant licenses.  While the CSSP has indicated that it will attempt to implement the license requirements, including pursuant to Judge Shushan's proposal, the CSSP contests BP's contention that obtaining business and professional licenses can be done expeditiously and with little burden to claimants.  The CSSP continues to maintain that the license requirements are perhaps the most significant impediment to expediting the processing and payment of claims with document deficiencies.

BP has observed that, under any reasonable objective measure, the CSSP has done a good job in establishing and implementing the Settlement Program to date.   As more fully detailed in the September 9, 2012 Status Report from the Claims Administrator Patrick Juneau to the Court (Doc. 7282), the CSSP has opened 21 different offices throughout the Gulf Coast, recruited and trained hundreds of local residents to take on roles within the CSSP, developed and issued over 150,000 comprehensive claim forms, established a multi-lingual call center, programmed a robust website with over 165 Frequently Asked Questions and the CSSP has received, catalogued and scanned over 625,000 pages of forms and supporting information.  (*Id.* at 3 to 9)  This essential infrastructure is not only far more extensive and involved than what a claims administrator typically must accomplish in other settlements but was completed on a tight timetable that is not ordinarily seen in other far less significant claims programs.  Because

of these accomplishments, more than 55,000 claim forms have already been submitted to the CSSP. The results of this extensive work by the CSSP is beginning to manifest in the processing and payment of eligible claims. As of September 17, the CSSP has issued 11,412 claims determinations, including 5,201 eligibility determinations for a total of $205.8 million, in addition to more than $400 million in payments during the Transition Process. This includes more than $46 million in eligibility determinations during the last week. These facts refute assertions that the CSSP is not successfully implementing the Settlement Agreement.

However, BP has also made clear that the CSSP has sought prematurely to seek exceptions from the Settlement Agreement's document requirements before undertaking its obligations under the Settlement Agreement to provide claimants with an opportunity to cure document deficiencies. Simply put, because the CSSP has yet to do this particular work, neither the class, the parties nor the Court know whether, in fact, the license requirements are really an impediment to the efficient and expeditious processing and payment of eligible claims or if these requirements can be quickly satisfied with relative ease. The information BP has provided to the CSSP regarding how to obtain licenses coupled with the extensive infrastructure the CSSP has put in place to implement the Settlement Agreement strongly suggest that the license requirements do not impose the significant impediment that the CSSP maintains they do.

Notwithstanding, these observations, given the importance the CSSP places on eliminating the license requirement for Business Economic Loss and Individual Economic Loss claims, and in a good faith effort to facilitate the shared goal of efficiently processing claims under the terms of the Settlement Agreement with appropriate speed and diligence, BP agrees to modify the document requirements for Business Economic Loss and Individual Economic Loss claims and not require these licenses. This agreed modification does not apply to any other license requirements for claims other than Business Economic Loss and Individual Economic Loss claims, including, but not limited to, license requirements for Seafood Compensation Program claims.

BP is agreeing to this modification based on representations by the CSSP that not requiring licenses will allow the CSSP to significantly increase the pace of claims processing and the payment of eligible claims. BP expects that the CSSP will report regularly on the progress of its claims processing efforts and demonstrate that modifying the document requirements to excuse Business Economic Loss and Individual Economic Loss claimants from providing licenses does in fact advance the pace of claims processing and the payment of eligible claims. Such progress should be reflected in claims that are paid or denied, not claims that continue to suffer from other unrelated document deficiencies.

One of the key reasons why the parties negotiated for these license requirements was to prevent and detect fraud, which the parties clearly want to prevent in this Settlement Program. We expect that the CSSP and the Court share this important goal. Dropping the license requirements may increase the risk of fraud. The CSSP made clear to the parties and the Court that by considering a claimant's full documentation and after engaging in its own fraud prevention processes the CSSP will be able to appropriately address fraud without the license requirements. BP requests that the CSSP further explain what specific steps it will take to address fraud in the absence of the license requirements.

As explained above, there is simply no question that the license requirements are mandatory documentation requirements that the parties negotiated for in the Settlement Agreement. BP agrees to modify these requirements for the reasons stated above and not in any way because there is an argument (of any kind) that these requirements are permissive and not mandatory. BP rejects any assertion to the contrary. To the extent that the PSC's September 16, 2012 memorandum, or e-mails on related issues that the PSC has recently circulated, is intended to suggest that other unrelated document requirements are permissive and not mandatory, BP takes the same position: These express contract terms are clearly mandatory. The Settlement Agreement is clear on the mandatory nature of the document requirements and, by its terms, does not allow the CSSP to change these document requirements. If the CSSP has questions about how to interpret the Settlement Agreement's document requirements, BP expects that the CSSP will bring its questions to the parties through the process established by parties and the CSSP to address Settlement Administration issues and, if necessary, to the Claims Administration Panel. The CSSP cannot excuse or modify any document requirements without the express consent of the parties.

## II.    Annual Profit and Loss Statement

All claimants making a Business Economic Loss claim must provide an annual Profit and Loss ("P&L") statement. See Settlement Agreement, Ex. 4A (Item 4). To streamline the processing of Business Economic Loss claims it is proposed that a claimant can submit all twelve monthly P&L statements in lieu of an annual P&L statement.

**BP's Position:** BP agrees with Judge Shushan that this is a reasonable and practical interpretation of the Settlement Agreement.

## III.    Missing One Monthly P&L

All claimants making a Business Economic Loss claim must provide an annual P&L statement and all twelve individual monthly P&L statements for that annual period. See Settlement Agreement, Ex. 4A (Item 4). To streamline the processing of Business Economic Loss claims it is proposed that if a claimant submits an annual P&L statement and 11 of the 12 months of individual P&L statements, the CSSP can determine the missing monthly P&L statement from the submitted annual P&L and 11 individual monthly P&L statements.

**BP's Position:** BP agrees with Judge Shushan that this is a reasonable and practical interpretation of the Settlement Agreement.

## IV.    Proof of Age

A claimant submitting an Individual Economic Loss claim must prove that he or she is 16 years of age or older to make a claim under the Settlement Agreement. See Settlement Agreement, Section I.A.5.a.ii of Exhibit 8A. To streamline the processing of Individual Economic Loss claims it is proposed that the claim form which requires the claimant to attest to the fact that he or she is 16 years of age or older be deemed sufficient to satisfy the proof of age requirement under the Settlement Agreement.

**BP's Position**: BP agrees with Judge Shushan that this is a reasonable and practical interpretation of the Settlement Agreement. However, BP notes that this proposal still leaves open the risk of fraud presented by identity theft. BP requests that the CSSP present the parties with its anti-fraud procedures so that the parties can properly evaluate whether this risk of fraud will be appropriately addressed by the CSSP.

## V.    Proof of Employability

A claimant submitting an Individual Economic Loss claim must establish proof of employability, such as a Social Security card, to make a claim under the Settlement Agreement. See Settlement Agreement, Section I.A.5.a.ii of Exhibit 8A.   To streamline the processing of Individual Economic Loss claims it is proposed that the CSSP run claimant names through a proprietary database of Social Security numbers maintained by Lexis/Nexis.

**BP's Position**: BP agrees with Judge Shushan that this is a reasonable and practical interpretation of the Settlement Agreement. However, BP notes that the process for obtaining social security numbers maintained by Lexis/Nexis does not address the risk of fraud presented by identity theft. The Settlement Agreement requires the CSSP to implement anti-fraud procedures. BP requests that the CSSP present the parties with its anti-fraud procedures to that the parties can properly evaluate whether this risk of fraud will be appropriately addressed by the CSSP.

## VI.    Sworn Written Statement 9

A claimant making an Individual Economic Loss claim who does not submit all required tax return information must execute Sworn Written Statement 9 ("SWS-9"). To streamline the processing of Individual Economic Loss claims the CSSP is proposed that if the CSSP has enough documentation and information to determine that the Individual Economic Loss claim qualifies for a Settlement Payment, the CSSP can issue a determination letter notifying the claimant of the settlement award expressly conditioned upon the claimant first executing and returning SWS-9.

**BP's Position:** BP does not agree with this proposal. We were advised by the CSSP at the meeting that this proposal will not streamline the processing of claims. (The CSSP contended that its original proposal to simply eliminate SWS-9 would streamline the processing of claims, but that position was previously rejected as contravening a specifically bargained-for requirement of the Settlement Agreement and the CSSP is no longer advancing that position.) While the CSSP's proposal would not advance its stated objective of streamlining the processing of claims, it would encourage noncompliance with the express documentation requirements of the Individual Economic Loss framework and fraud. Being presented with a notification letter advising a claimant of a specific settlement award subject only to executing and returning SWS-9 might induce a claimant to file an unjustified SWS-9.

Requiring the SWS-9 prior to processing should not result in significant delay since the claimant has all relevant information in his possession; moreover, to the extent the claimant is unable to sign the SWS-9 because he in fact has and should submit tax information, requiring the SWS-9 at the outset may avoid wasted time and effort by the CSSP, which is in no party's interest. BP recommends that the CSSP issue a claimant-friendly communication to a claimant

who has not submitted all required tax information or an executed SWS-9. This letter could inform the claimant that he or she can obtain their tax returns at www.irs.gov or by calling a toll free IRS number. All years beginning with 2008 are available on-line. Business transcripts, as well as income and payroll tax returns, can be obtained by submitting a simple one-page form -- Form 4506-T. Copies of returns dating back 7 years can be obtained by submitting a simple one page form -- Form 4506 -- which can be obtained from the IRS through the mail or on-line at www.irs.gov. The communication can also provide the claimant with a form that authorizes the CSSP to obtain tax records on the claimant's behalf.

## VII.   Vessel Title

To make a Vessel Physical Damage claim a vessel owner must provide a copy of the vessel's title and registration. See Settlement Agreement, Appendix B to Ex. 14.    To streamline the processing of Vessel Physical Damage claims it is proposed that a claimant only has to submit a registration and not a title.

**BP's Position**: Judge Shushan's proposal was that a registration only would be required where the claimant built the vessel and, therefore, did not have a vessel title. In an effort to further streamline the processing of claims, BP has agreed to extend Judge Shushan's proposal as this expanded proposal is a reasonable and practical interpretation of the Settlement Agreement if the CSSP also implements an additional measure to address the risk of incorrect settlement payments described above. However, this proposal does not fully address the risk that a vessel registration may not reflect all vessel owners which, if it does not, could result in incorrect settlement payments. BP requests that to address this risk the CSSP develop an additional required Sworn Written Statement. Such a Sworn Written Statement would require the vessel owner to attest to the fact that he is the only owner and, if it turns out that there are other owners who make claims, the resolution of any disputes between the owners over the settlement payment shall be the sole responsibility of the owner who received the settlement payment and not the CSSP. If the CSSP is unwilling to implement this type of Sworn Written Statement, or some other equivalent mechanism to address the risk of incorrect settlement payments described above, BP will not accept this proposal.

## VIII.   2011 Tax Returns

For claimants making Business Economic Loss Claims and Individual Economic Loss Claims in Category I, a 2011 tax return is required. See Settlement Agreement, Exs. 4A and 8A. PSC contends that certain claimants have not yet filed 2011 tax returns (and are not late in doing so based on extensions, including a recent blanket extension issue in response to Hurricane Isaac) and that, under these circumstances these claimants should have their claims processed and, if eligible, paid without consideration of the 2011 tax return.

**BP's Position:** BP does not agree with this interpretation of the Settlement Agreement. A 2011 tax return is required documentation and excusing the submission of this tax return violates the terms of the Settlement Agreement. The CSSP needs the 2011 tax return for Start-Up Businesses claims because 2011 is a benchmark year for those claims. For other Business Economic Loss claims, a 2011 tax return is an important check on the other financial information submitted by a claimant in connection with the Business Economic Loss framework. The IRS has extended the deadline for filing returns in certain Louisiana parishes and Mississippi

counties until January 13, 2013 because of Hurricane Isaac. The extension for businesses in other parishes and counties expires on September 14, 2012 and the extension for individuals in other parishes and counties expires on October 15, 2012. However, the filing of a 2011 tax return is uniquely controlled by the claimant. If a claimant wants to expedite the completion of the claims process, the claimant simply needs to make the tax filing as soon as possible within whatever relatively short period of time remains in the applicable extension period. As a result, there is no justification for simply eliminating this important document requirement. The CSSP can contact the claimant and let them know that the 2011 tax filing is required to complete processing of the claim and then set aside that claim. When the claimant submits the 2011 tax return the CSSP should promptly determine whether the claim is eligible for payment.

## IX.     Wetlands and Coastal Claims

In separate discussions, BP, PSC and the CSSP have been discussing wetlands claims and whether it may be possible for the Settlement Program to directly obtain certain required documents directly if a claimant has not supplied them. BP has made some good progress on this front, and we will be prepared to report on this separately tomorrow.

## X.     Response to PSC's September 16, 2012 Memorandum Regarding Process To Address Settlement Administration Issues

In its September 16 memo, PSC argues that the Claims Administrator may simply make decisions regarding the Settlement Agreement without consulting the Parties. As an initial matter, the Claims Administrator is not authorized to make any changes to the terms of the Settlement Agreement, and particularly enforcement of its documentation requirements, without the consent of the parties. *See* Settlement Agreement Section 4.3.10 ("The Settlement Program, under the supervision and direction of the Claims Administrator, shall implement the terms of the Settlement Agreement.")

Moreover, a process where the Claims Administrator does not consult with the parties with regard to proposed decisions and actions would run counter to the purpose of the Claims Administration Panel process, an important governance feature of the Settlement Agreement. Section 4.3.4 of the Settlement Agreement provides: "A three-person Claims Administration Panel shall be established consisting of the Claims Administrator, one representative designated by Lead Class Counsel and one representative designated by BP. Upon the request of any member of the Claims Administration Panel, it shall address and attempt to resolve unanimously any issues or disagreements that arise regarding the Claims Administrator's oversight responsibilities, Settlement administration, or any other issue involving the Settlement Program. Issues or disagreements that cannot be unanimously resolved by the Claims Administration Panel will be referred to the Court for resolution." Transparent disclosure to the parties of any intended decisions by the CSSP is fundamental to the proper implementation of the Settlement Agreement and the ability of the parties to exercise their rights under Section 4.3.4 of the Settlement Agreement. The need for transparency and disclosure has been appropriately recognized by the CSSP. The CSSP has developed a formal process whereby proposed decisions and interpretations are disclosed to the parties, the parties have a short period to voice their opinions, and, in the event there is disagreement, the Claims

Administration Panel is convened. This process must be respected and maintained in order to effectuate the terms of the Settlement Agreement and their prompt and consistent implementation.

Sincerely,

Keith Moskowitz

cc:    The Honorable Sally Shushan
       James Roy
       Steven Herman
       Orran Brown
       Lynn Greer
       Mark Holstein
       Daniel Cantor
       Richard Godfrey