## PERRY, ATKINSON, BALHOFF, MENGIS, BURNS & ELLIS, L.L.C.
### ATTORNEYS AT LAW

John W. Perry, Jr.
Daniel R. Atkinson, Jr.
Daniel J. Balhoff
Joseph W. Mengis †
Robert J. Burns, Jr.
Randi S. Ellis
John W. Perry, III

†Board Certified in Estate Planning
 and Administration by the Louisiana
Board of Legal Specialization

2141 Quail Run Drive
Baton Rouge, Louisiana 70808
Telephone: 225-767-7730
Fax: 225-767-7967

Mailing Address:
P. O. Drawer 83260
Baton Rouge, LA 70884-3260

Daniel R. Atkinson, Sr.
Of Counsel

E-Mail Address:
balhoff@pabmb.com

September 19, 2014

Honorable Carl Barbier                        *Via: Email*
U.S. District Court, EDLA -- Div. J
500 Camp Street, Room C322
New Orleans, LA 70130

Re:     In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico
        on April 20, 2010
        MDL # 2179

Dear Judge Barbier:

On January 31, 2013, you appointed John Perry, Randi Ellis, and myself as Court-Designated Neutrals with the task of "presid[ing] over the settlement of the seafood program." This principally has involved investigating and proposing a fair distribution of the balance of the seafood settlement fund.

We have now concluded our investigation. I am enclosing with this letter a copy of a document entitled "Court-Designated Neutrals' Recommendations for Seafood Compensation Program Supplemental Distribution."

If there is anything further that we can do in this regard, please let us know.

Sincerely yours,

/s/ Daniel J. Balhoff

Daniel J. Balhoff

United States District Court
Eastern District of Louisiana

In Re: Oil Spill by the Oil Rig                    MDL No. 2179
"Deepwater Horizon" in the Gulf
Of Mexico, on April 20, 2010                     Section J

Applies to: *All Cases*                          Judge Barbier
                                                 Magistrate Judge Shushan

# Court-Designated Neutrals' Recommendations for Seafood Compensation Program Supplemental Distribution

*/s/ John W. Perry, Jr.*
*John W. Perry, Jr. (#10524)*


*/s/ Daniel J. Balhoff*
*Daniel J. Balhoff (#18776)*


*/s/ Randi S. Ellis*
*Randi S. Ellis (#25251)*

# Table of Contents

I.   The Neutrals recommend a proportionate distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   The *Deepwater Horizon* incident leads to litigation . . . . . . . . . . . . . . . . . . . . . 1

    B.   BP enters into a class settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    C.   The Seafood Compensation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.   The Round Two investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    E.   The Neutrals have considered various approaches to Round Two . . . . . . . . . . . 7

        1.   Round Two should not be used to correct perceived errors
            in the original SCP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.   Round Two should not be used to adjust payments to
            achieve a species-by-species allocation goal . . . . . . . . . . . . . . . . . . . . . . 8

        3.   Round Two should not adjust payments to more heavily
            compensate oyster leaseholders or harvesters of certain species . . . . . . . . 9

        4.   Round Two should not adjust payments to more heavily
            compensate claimants in certain geographic regions . . . . . . . . . . . . . . . . 9

    F.   The Neutrals recommend a partial distribution at this time . . . . . . . . . . . . . . . 10

II.   The Round Two formula . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.   The same formula will apply to all claimants . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   The Round Two formula is designed to fairly treat all claimants . . . . . . . . . . . 11

    C.   Examples demonstrate the formula's fair treatment of claimants . . . . . . . . . . . 12

III.   Implementation of Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.   Interested parties will have an opportunity to object . . . . . . . . . . . . . . . . . . . . . 15

    B.   Steps shall be taken to mitigate (and, if possible, correct) any
        errors or fraud previously occurring during the claims process . . . . . . . . . . . . . 15

    C.   The Claims Administrator shall apply appropriate values for the
        Round Two formula . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D.   There will be a right to object to individual awards ...................... 16

E.   Claimants will be required to sign releases ........................... 16

F.   The Neutrals shall make recommendations concerning the
     disposition of any remaining funds .................................. 16

G.   The Neutrals shall aid in the implementation of these Recommendations ..... 18

# Court-Designated Neutrals' Recommendations
# for Seafood Compensation Program Supplemental Distribution

## I.     The Neutrals recommend a proportionate distribution.

### A.     The *Deepwater Horizon* incident leads to litigation.

On April 20, 2010, a blowout, explosion, and fire occurred aboard the *Deepwater Horizon*, a semi-submersible offshore drilling rig, as it was engaged in drilling activities on the "Macondo Well" on the Outer Continental Shelf off the coast of Louisiana.  Thousands of individuals and businesses claimed that they were affected by these events. Litigation ensued.[1]  On August 10, 2010, the Judicial Panel on Multidistrict Litigation centralized all federal actions (excluding securities suits) before the Honorable Carl Barbier.[2]

Most of these suits named BP Exploration and Production, Inc. ("BP"), a lessor of the *Deepwater Horizon* rig, as a defendant.  BP began paying some claims immediately.  It initially established its own claims process and later funded a claims process administered by the Gulf Coast Claims Facility ("GCCF").[3]

### B.     BP enters into a class settlement.

On March 2, 2012, BP and the Plaintiffs' Steering Committee ("PSC") informed the District Court that they had reached an Agreement-in-Principle ("AIP") to settle several facets of the litigation.[4] The parties devoted the next two months to refining the settlement's details.  On May 2, 2012, the parties jointly moved for the District Court to approve an amended Settlement Agreement.[5]  The

---

[1]Rec. Doc. 8138 (Order and Reasons, p.1); *In re: Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d 891, 900 (E.D. La. 2012).

[2]Rec. Doc. 1 (Transfer Order); Rec. Doc. 8138 (Order and Reasons, p.1); *In re: Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d at 900.

[3]Rec. Doc. 12978, p.3; *In re Deepwater Horizon – Appeals of the Economic and Property Damage Class Action Settlement*, 739 F.3d 790, 796 (5th Cir. 2014).

[4]Rec. Doc. 5955 (Order); Rec. Doc. 8138 (Order and Reasons, p.3); *In re: Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d at 901.

[5]Rec. Doc. 6414 (Interim Class Counsel's and BP's Joint Supplemental Motion Related to the Economic and Property Damages Settlement).

Settlement Agreement[6] included a Seafood Compensation Program ("SCP"),[7] which will be discussed in greater detail below.

The District Court granted the parties' joint motion, preliminarily approved the Settlement Agreement, and preliminarily and conditionally certified the class for purposes of settlement only.[8] The Preliminary Approval Order also approved the Class Notice and Class Notice Plan proposed by the parties.[9]   The District Court later determined that potential claimants had an adequate amount of time to evaluate the proposed settlement before the objection (September 7, 2012) and opt-out (November 1, 2012) deadlines.[10]

On December 21, 2012, the District Court entered a judgment finally approving the settlement.[11]  In doing so, the Court determined that "the Settlement Agreement is clearly fair, reasonable, and adequate to putative class members."[12]  On January 10, 2014, a Fifth Circuit panel affirmed the District Court's judgment.[13]  On May 19, 2014, the same Fifth Circuit panel denied rehearing,[14] and the full Fifth Circuit denied rehearing *en banc*.[15]

--------

[6]Rec. Doc. 6430-1 (*Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012).

[7]Rec. Doc. 6430-22 (Seafood Compensation Program).

[8]Rec. Doc. 6418 (Preliminary Approval Order).

[9]*Id.*

[10]Rec. Doc. 8138 (Order and Reasons, p.4); *In re: Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d at 902.

[11]Rec. Doc. 8139 (Order and Judgment Granting Final Approval of Economic and Property Damages Settlement and Confirming Certification of the Economic and Property Damages Settlement Class); Rec. Doc. 8138 (Order and Reasons); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d 891.

[12]Rec. Doc. 8138 (Order and Reasons, p.55); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d at 930.

[13]Rec. Doc. 12978; *In re Deepwater Horizon – Appeals of the Economic and Property Damage Class Action Settlement*, 739 F.3d 790.

[14]Rec. Doc. 12926.

[15]Rec. Doc. 12927; *In re Deepwater Horizon – Appeals of the Economic and Property Damage Class Action Settlement*, 756 F.3d 320 (5th Cir. 2014).

Thus, the parties entered into a settlement, the District Court preliminarily approved it, potential claimants received notice, potential claimants had an opportunity to object or to opt out, the District Court finally approved the settlement, and the Fifth Circuit affirmed.[16]

## C.    The Seafood Compensation Program.

The settlement provided that BP would finance a $2.3 billion Seafood Compensation Program Settlement Fund for seafood harvesters and oyster leaseholders ("the Settlement Fund").[17] On March 8, 2012, the District Court appointed John W. Perry, Jr. "to preside over the proposed settlement of the seafood program."[18]

Over the next two months, Mr. Perry and/or his law partner Daniel J. Balhoff attended meetings in New Orleans and Baton Rouge on an almost daily basis, with additional substantial time spent in telephone conferences.  They met with lay persons (non-lawyers) representing and/or participating in the shrimp industry, the oyster industry, the finfish industry, and the crab industry, many of whom worked as harvesters, boat captains, oyster leaseholders, quota holders and/or vessel owners in their respective industries; lawyers for persons engaged in each of these segments of the above-named industries; members of the PSC; representatives of and lawyers for BP; and experts who had been retained by the parties to the settlement.  In addition to these meetings, Mr. Perry and Mr. Balhoff reviewed historical evidence concerning the performance of each sector of the seafood industry and the available data with respect to the impact of the spill, including: materials and data from Congressional proceedings and from federal government agencies; materials and data prepared by and/or for state government agencies; literature and studies concerning the fisheries in and around

---

[16]On August 1, 2014, BP asked the U.S. Supreme Court to review the class certification ruling.  As of the date of these Recommendations, the Court has not acted upon the request.  In any event, these Recommendations do not depend on the finality of the District Court's prior determinations.  The crucial point for the purposes of these Recommendations is that potential claimants were presented with a detailed SCP and, based on the information available at the time, some chose to participate in it and some chose to opt out.  As will be discussed *infra*, it would be unfair to change the SCP's formula unless new evidence were to support such a change.

[17]Rec. Doc. 8138 (Order and Reasons, p.7); *In re: Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d at 904.  The Seafood Compensation Program Settlement Fund is subject to a reduction by certain transition payments.  Rec. Doc. 6430-1 (*Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 § 4.2.7).

[18]Rec. Doc. 5998 (Order Appointing John W. Perry, Jr. as a Court-Designated Neutral).

the Gulf of Mexico; and materials and data relating to and/or developed by the GCCF.[19]  This effort culminated in the SCP, which was included in the class settlement as Exhibit 10.[20]

The SCP specified formulas designed to compensate commercial fishermen, seafood boat captains, seafood crew members, oyster leaseholders, and seafood vessel owners for their economic loss claims relating to seafood, including shrimp, oysters, finfish, blue crab, and other species.  These formulas were designed to guarantee individual participating claimants fair and adequate compensation.  The formulas were not designed to guarantee an aggregate share of the Settlement Fund to any group of potential claimants such as the harvesters of a particular species, some of whom may choose not to participate.  Mr. Perry and Mr. Balhoff stated their rationale behind this decision in their declarations which were filed before the class fairness hearing:

> Some objectors have expressed a concern that too much money will end up in the hands of (for instance) oyster leaseholders, and too little in the hands of others.  But [Mr. Perry and Mr. Balhoff] did not develop the Seafood Compensation Program from the top down.  In fact, [Mr. Perry and Mr. Balhoff] consciously rejected the suggestion that specified amounts of money be allotted to aggregate groups of Claimants by species or otherwise and developed the Program from the bottom up.  [Mr. Perry and Mr. Balhoff] rejected the top down approach because, among other reasons, [Mr. Perry and Mr. Balhoff] were aware that if [they] had allocated fixed dollar amounts by group, and a disproportionately high number of Claimants within one such group were to opt out or choose not to file claims, there would be a resulting windfall to the members of the group who filed claims.  [Mr. Perry and Mr. Balhoff] chose instead to develop a Program from the bottom up by first gaining an understanding of the class member population to be covered by the Program (Commercial Fisherman, Seafood Boat Captains, Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners) and the claims covered by the Program (all economic loss claims by such class members relating to Seafood).[21]

The SCP stated that it was estimated to result in claims payments "totaling more than $1.9 billion

---

[19]Rec. Doc. 7110-2 (Declaration of Daniel J. Balhoff); Rec. Doc. 7110-5 (Declaration of John W. Perry, Jr.).

[20]Rec. Doc. 6430-22 (Seafood Compensation Program).

[21]Rec. Doc. 7726-2 (Second Declaration of Daniel J. Balhoff); Rec. Doc. 7726-7 (Second Declaration of John W. Perry, Jr.).

representing approximately 83% of the $2.3 billion Seafood Compensation Program Amount."[22] This admittedly was a "conservative" estimate:[23] "[T]he Seafood Compensation Program may well pay less than $1.9 billion in the first distribution, which would result in a second distribution to be made under the Seafood Compensation Program in an amount in excess of $400 million."[24] However, the SCP never stated how much more than $400 million might be available for the second distribution; in fact, the SCP did not guarantee that even $400 million would be available. The amount available for the second distribution always has been a function of the aggregate payment of eligible claims in the first distribution (which was estimated but not guaranteed to be $1.9 billion).

The SCP stated that any balance available after the first distribution would be divided proportionately unless the Court-Appointed Neutral recommended a different formula:

> In the event there are Seafood Compensation Program Amount funds remaining, such funds will be distributed to claimants that received compensation from the Seafood Compensation Program. The balance will be distributed to each Claimant in proportion to the Claimant's gross compensation expressed as a share of the gross compensation paid by the Claims Administrator to all claimants under the Seafood Compensation Program. Gross compensation reflects compensation paid by the Claims Administrator prior to deduction for Seafood Spill-Related Payments. If, however, the Court-Appointed Neutral determines that a distribution other than purely proportional would be more appropriate in light of the information available at the time of the second distribution, he may recommend to the Court that the second distribution be reallocated in an alternative fashion. Any such reallocation will be subject to court approval.[25]

The SCP provided that Category II and Category III seafood crew members might be subject to Aggregate Compensation Amounts which could affect their recovery in the first distribution, depending upon how many claims were made by similarly situated crew members.[26] Nevertheless,

---

[22]Rec. Doc. 6430-22 (Seafood Compensation Program, p.3).

[23]Rec. Doc. 7110-2 (Declaration of Daniel J. Balhoff); Rec. Doc. 7110-5 (Declaration of John W. Perry, Jr.).

[24]*Id.*

[25]Rec. Doc. 6430-22 (Seafood Compensation Program, p.3).

[26]Rec. Doc. 6430-22 (Seafood Compensation Program, pp.66, 78, and 84). In fact, Category II and Category III claimants have been fully compensated under the SCP without triggering the Aggregate Compensation Amounts.

the SCP specifically provided that these Aggregate Compensation Amounts would not apply to the second distribution:

> All claimants who receive compensation under the Seafood Compensation Program are entitled to a share of the distribution of the balance whether or not their individual claims have been characterized as "lump sum" or a similar term, and whether or not they are members of Categories II and III of the Seafood Crew Compensation Plan (each of which provides for an Aggregate Compensation Amount, which shall not apply as a limitation to a Claimant's entitlement to a share of the balance to be distributed).[27]

### D.    The Round Two investigation.[28]

As stated previously, Mr. Perry and Mr. Balhoff anticipated that there would be a balance after the initial distribution.  In deciding how to allocate the balance, they promised the following:

- To reach out to SCP claimants and their attorneys and to review any relevant data released subsequent to finalization of the SCP.

- To ask for written evidence and submissions and conduct interviews.

- To conduct both a species-by-species analysis and analyses of geographic impacts of the spill (if appropriate).

- To distribute any balance from the Settlement Fund in a manner that takes into account information and data which may not have been available when the SCP was originally developed.[29]

On January 31, 2013, the Court appointed Mr. Perry and Mr. Balhoff as "joint Court-Designated Neutrals to preside over the settlement of the seafood program."[30]  The Court further appointed

---

[27]Rec. Doc. 6430-22 (Seafood Compensation Program, p.3 n.4).

[28]The discussion below will refer to the first distribution as "Round One" and the second distribution as "Round Two."

[29]Rec. Doc. 7726-2 (Second Declaration of Daniel J. Balhoff); Rec. Doc. 7726-7 (Second Declaration of John W. Perry, Jr.).

[30]Rec. Doc. 8426 (Order).

Randi S. Ellis (Mr. Perry's and Mr. Balhoff's law partner) as Deputy Court-Designated Neutral.[31]

Since their appointment, the Neutrals have conducted hundreds of conferences with attorneys, claimants, and experts. They have also reviewed additional data and reports from the National Oceanic and Atmospheric Administration ("NOAA"), along with similar governmental (both federal and state) and private entities and persons. In doing so, the Neutrals have completed an investigation which has been more extensive than what they promised in their 2012 declarations.

The Neutrals have considered trends in seafood harvesting by analyzing data that segregates landings both by weight and dollar value on a species-by species (brown shrimp, white shrimp, blue crabs, eastern oysters, various finfish, and other species harvested in the Gulf region), geographic (both state-by-state and, where available, more localized), and temporal (yearly, monthly, and/or weekly) basis. They have also considered potential confounding factors for these trends. Indeed, the Neutrals have given due consideration to all information, whether written or collected through the interview process, that they have gathered during the course of their investigation.

## E.     The Neutrals have considered various approaches to Round Two.

Most of the attorneys and claimants who have stated an opinion concerning Round Two have indicated that they favor a proportionate distribution similar to the one described in the SCP. Some have proposed a method other than a proportionate distribution. These proposals generally fall into four categories: (1) Round Two should correct perceived errors in the original SCP; (2) Round Two should adjust payments to achieve a species-by-species allocation goal because Round One allegedly did not achieve that goal; (3) Round Two should adjust payments to more heavily compensate oyster leaseholders or harvesters of certain species because those claimants were more acutely impacted than was anticipated when the SCP was drafted; and (4) Round Two should adjust payments to more heavily compensate claimants in certain geographic regions because those claimants were more acutely impacted than was anticipated when the SCP was drafted.

The Neutrals have carefully considered and rejected each of these four alternative methods of allocating Round Two:

### 1.     Round Two should not be used to correct perceived errors in the original SCP.

Several attorneys and claimants have contended that, in light of the information that was available at the time that the SCP was drafted, the SCP should have paid claims that it did not, or it should have paid more (or possibly less) money for certain claims. These attorneys and claimants contend

---

[31]*Id.*

that the Neutrals should use Round Two funds to correct these perceived errors.

The Neutrals disagree with this proposal. As noted above, the SCP was part of the class settlement that the parties proposed in May 2012. The District Court preliminarily approved the settlement, potential claimants received notice, potential claimants had an opportunity to object or to opt out, the District Court finally approved the settlement (stating that it was "clearly fair, reasonable, and adequate to putative class members"), and the Fifth Circuit affirmed.

Absent some new information, using Round Two to "correct" the SCP would alter the settlement that the claimants thought that they were accepting and that the courts have approved. The SCP stated: "If, however, the Court-Appointed Neutral determines that a distribution other than purely proportional would be more appropriate *in light of the information available at the time of the second distribution*, he may recommend to the Court that the second distribution be reallocated in an alternative fashion."[32] Likewise, the Neutrals stated: "Our principal goal will be, to the extent possible, to distribute any remaining Seafood Compensation Program funds in a manner that takes into account *information and data which may not have been available when the Seafood Compensation Program was originally developed*."[33] The Neutrals made this representation before potential claimants had to decide whether or not they would opt out.

If a potential claimant disagreed with the SCP as it was originally drafted, the claimant had an opportunity to opt out of the settlement. Claimants who gave up their rights to sue in exchange for participating in the SCP had every reason to believe that any balance would be allocated proportionately unless new information (i.e., information not available to the Neutrals at the time that the SCP was drafted) counseled against it. The Neutrals recommend that the Court proceed accordingly.

### 2.   Round Two should not be used to adjust payments to achieve a species-by-species allocation goal.

Several attorneys and claimants have contended that harvesters of certain species, in the aggregate, did not receive as much money in Round One as they anticipated. These attorneys and claimants have contended that Round Two funds should be allocated so that any perceived species-based distortion be corrected.

The Neutrals disagree with this proposal. This is a reincarnation of the "top down" approach (discussed above) that the Neutrals rejected in drafting the original SCP. As was stated previously, the Neutrals designed the SCP to fairly compensate individual *participating* claimants. The formulas

---

[32]Rec. Doc. 6430-22 (Seafood Compensation Program, p.3) (emphasis added).

[33]Rec. Doc. 7726-2 (Second Declaration of Daniel J. Balhoff) (emphasis added); Rec. Doc. 7726-7 (Second Declaration of John W. Perry, Jr.) (emphasis added).

were not designed to guarantee any group of *potential* claimants (such as the harvesters of a particular species, *some of whom may have chosen not to participate*) an aggregate share of the Settlement Fund.

Indeed, a species-by-species ("top down") approach could lead to absurd results. If the Neutrals were to determine that harvesters of one species would have been entitled to $500 million, and all but one of the harvesters of that species decided to opt out, a top-down approach would result in a single claimant receiving $500 million. Admittedly, this is an extreme hypothetical. But it demonstrates how any top-down implementation would result in a windfall for some claimants; the only question is how large the windfall would be.

### 3.   Round Two should not adjust payments to more heavily compensate oyster leaseholders or harvesters of certain species.

Several attorneys and claimants have contended that newly available information (i.e., information that was not available to the Neutrals when they drafted the SCP) supports compensating oyster leaseholders or harvesters of certain species more heavily than others.

The Neutrals disagree with this proposal. In drafting the original SCP, the Neutrals considered the biological differences among the various species, including but not limited to typical periods that could be expected for maturation and reproduction. Based upon these considerations, the Neutrals did not expect the effects on all species, if any, to become apparent at the same time. Neither did the Neutrals expect the effects on all species, if any, to run their course at the same rate.

The Neutrals have interviewed attorneys, claimants, and experts, and they have reviewed additional data and reports. The information available to the Neutrals does not significantly vary from what they anticipated when they drafted the SCP. The information supports a proportionate approach.

### 4.   Round Two should not adjust payments to more heavily compensate claimants in certain geographic regions.

Several attorneys and claimants have contended that newly available information (i.e., information that was not available to the Neutrals when they drafted the SCP) supports compensating claimants in certain geographic regions more heavily than others.

The Neutrals disagree with this proposal. In drafting the original SCP, the Neutrals took into account, where appropriate, the potentially differing impact of the *Deepwater Horizon* incident with respect to various geographic regions of the class area.

The Neutrals have interviewed attorneys, claimants, and experts, and they have reviewed additional data and reports. The information available to the Neutrals, taken as a whole, does not significantly

vary from what they anticipated when they drafted the SCP. The information supports a proportionate approach.

## F.    The Neutrals recommend a partial distribution at this time.

The vast majority of SCP claims have now been processed.[34] However, there are still some claims which have not been paid.[35] Some of these claims are awaiting policy determinations; some are under appeal; and some currently are being investigated. Furthermore, BP has filed a Rule 60(b)(3) motion which seeks a return of part of the Settlement Fund.[36] The balance which is available for distribution will not be determinable until these issues are finally resolved.

Because it is impossible to fully distribute the balance of the Settlement Fund at this time, the Neutrals recommend that the Court authorize a partial distribution. This will allow the claimants to receive a substantial amount of money in the near future.

The Neutrals recommend that the Court target a $500 million partial distribution in Round Two using the formula discussed below. This amount is substantially greater than the $400 million that the SCP estimated would be available for Round Two.[37]

In the event that more money is available for distribution after Round Two, the Neutrals recommend that they be authorized to implement additional distributions as provided below. The goal is to make distributions as soon as is feasibly possible with the understanding that some money may have to be reserved due to the uncertainties listed above.

---

[34]Rec. Doc. 13340 (Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review; Status Report No. 22, dated August 29, 2014).

[35]*Id.*

[36]Rec. Doc. 11994 (BP's Motion for Relief Pursuant to Rule 60(b)(3)). The District Court heard argument on BP's motion on February 26, 2014, but it deferred ruling on the motion at that time. Rec. Doc. 12426 (February 26, 2014 Minute Entry).

[37]Indeed, the benefit of a partial distribution to individual claimants is even greater than these numbers convey. Assuming the SCP's original estimates were correct, a claimant who was allocated $100,000.00 from the SCP in Round One should have expected to be allocated a *total* additional amount of (($100,000.00)($400,000,000.00/$1,900,000,000.00)=)$21,052.63. Instead, the claimant typically will be allocated an additional amount of $39,264.01 (almost twice the expected total additional payment) *in Round Two alone*, with the likely prospect that the claimant will be allocated more money in the future. See examples in Section II(C) *infra*.

## II.     The Round Two formula.

### A.     The same formula will apply to all claimants.

A claimant's Round Two payment shall be calculated as follows:

$$(g/G)(D + N) - n = d$$

> g = the gross amount that the SCP has allocated to the claimant in Round One before deducting Seafood Spill-Related Payments; Seafood Spill-Related Payments shall be given the same meaning as that term has been given in implementing the SCP
>
> G = the sum of g for all claimants; the value of G will be updated before Round Two is allocated
>
> D = $500,000,000.00; the amount that will be targeted for distribution in Round Two
>
> n = the amount of the claimant's negative balance before the Round Two disbursement is made; the claimant has a negative balance to the extent that the claimant's Seafood Spill-Related Payments exceed the claimant's g; if g equals or exceeds the claimant's Seafood Spill-Related Payments, then n = $0.00 (for further explanation, see the examples in Section II(C))
>
> N = the sum of n for all claimants who have negative balances; the value of N will be updated before Round Two is allocated
>
> d = the amount that will be paid to the claimant in Round Two; if d equals zero or a negative amount, the claimant will receive no award in Round Two

### B.     The Round Two formula is designed to fairly treat all claimants.

The formula derives from the premise that the SCP, which was approved by the Court and affirmed by the Fifth Circuit, provides fair, reasonable, and adequate compensation to each claimant.

The SCP determines a claimant's fair, reasonable, and adequate compensation through a two-step process.  First, the SCP calculates an amount designed to roughly represent the claimant's damages. Second, the SCP deducts the claimant's previous Seafood Spill-Related Payments from this amount. The reason for the second step is to fairly treat all claimants by avoiding double payment of those who previously received Seafood Spill-Related Payments.

The Round Two formula continues this principle of fair treatment.  If a claimant's Seafood Spill-Related Payments (such as from the GCCF) equaled or exceeded the amount that the SCP

would have allocated to the claimant before deducting Seafood Spill-Related Payments (g), the claimant would have received nothing in Round One. Nevertheless, the Round Two formula allows such a claimant to participate in Round Two, but only after the claimant no longer has a negative balance.

## C.    Examples demonstrate the formula's fair treatment of claimants.

Assuming G = $1,350,041,613.00 and  N = $30,081,668.00,[38] the formula becomes:

$$(g/\$1,350,041,613.00)(\$500,000,000.00 + \$30,081,668.00) - n = d$$

The following examples demonstrate how the Round Two formula works for five different claimants with similar damages:

- **Example 1:**

     If the DHECC evaluated a claimant's First Round SCP allocation (before deducting Seafood Spill-Related Payments) at $100,000.00, then g = $100,000.00. If the claimant previously received $110,000.00 from the GCCF, the DHECC would not have paid the claimant anything during Round One (since the claimant's Seafood Spill-Related Payments exceeded his pre-deduction Round One SCP allocation). The claimant would have a negative balance of $10,000.00 after Round One; therefore n = $10,000.00.

     For this claimant, g = $100,000.00 and n = $10,000.00. The formula becomes ($100,000.00/$1,350,041,613.00)($500,000,000.00 + $30,081,668.00) − $10,000.00 = d. Therefore, for this claimant, d = $29,264.01. The claimant would receive $29,264.01 in Round Two.

     The claimant's total take home (GCCF + Round One + Round Two) = $110,000.00 + $0.00 + $29,264.01 = $139,264.01. **The claimant would take home an aggregate of $139,264.01.**

- **Example 2:**

     Assume that the claimant was allocated $100,000.00 in Round One before deducting Seafood Spill-Related Payments, and the claimant had been paid $125,000.00 by the GCCF. Because

---

[38]These values are used simply to demonstrate how the formula works. As stated in Section II(A) *supra*, the values of G and N will be updated before Round Two is allocated.

the claimant had a negative balance, he would have received nothing in Round One.

For this claimant, g = $100,000.00 and n = $25,000.00.

($100,000.00/$1,350,041,613.00)($500,000,000.00 + $30,081,668.00) − $25,000.00 = d. For this claimant, d = $14,264.01. The claimant would receive $14,264.01 for Round Two.

The claimant's total take home (GCCF + Round One + Round Two) = $125,000.00 + $0.00 + $14,264.01 = $139,264.01. **The claimant would take home an aggregate of $139,264.01.**

- **Example 3:**

  Assume that the claimant was allocated $100,000.00 in Round One before deducting Seafood Spill-Related Payments, and the claimant had been paid $50,000.00 by the GCCF. The claimant would have received ($100,000.00 - $50,000.00 =) $50,000.00 in Round One.

  For this claimant, g = $100,000.00 and n = $0.00.

  ($100,000.00/$1,350,041,613.00)($500,000,000.00 + $30,081,668.00) − $0.00 = d. For this claimant, d = $39,264.01. The claimant would receive $39,264.01 for Round Two.

  The claimant's total take home (GCCF + Round One + Round Two) = $50,000.00 + $50,000.00 + $39,264.01 = $139,264.01. **The claimant would take home an aggregate of $139,264.01.**

- **Example 4:**

  Assume that the claimant was allocated $100,000.00 in Round One before deducting Seafood Spill-Related Payments, and the claimant had been paid $75,000.00 by the GCCF. The claimant would have received ($100,000.00 - $75,000.00 =) $25,000.00 in Round One.

  For this claimant, g = $100,000.00 and n = $0.00.

  ($100,000.00/$1,350,041,613.00)($500,000,000.00 + $30,081,668.00) − $0.00 = d. For this claimant, d = $39,264.01. The claimant would receive $39,264.01 for Round Two.

  The claimant's total take home (GCCF + Round One + Round Two) = $75,000.00 + $25,000.00 + $39,264.01 = $139,264.01. **The claimant would take home an aggregate of $139,264.01.**

- **Example 5:**

  Assume that the claimant was allocated $100,000.00 in Round One before deducting Seafood Spill-Related Payments, and the claimant had been paid $150,000.00 by the GCCF. Because the claimant had a negative balance, he would have received nothing in Round One. For this claimant, g = $100,000.00 and n = $50,000.00.

  ($100,000.00/$1,350,041,613.00)($500,000,000.00 + $30,081,668.00) − $50,000.00 = d. For this claimant, d = ($10,735.90). Because d is a negative number, the claimant still has a negative balance. The claimant will receive nothing in Round Two.

  The claimant's total take home (GCCF + Round One + Round Two) = $150,000.00 + $0.00 + $0.00 = $150,000.00. **The claimant would take home an aggregate of $150,000.00.**

The above examples are of five claimants who are identical in every way except one – they received differing amounts from the GCCF. A fair system would endeavor to ensure that each receives the same aggregate award. Four of the five claimants end up with the same aggregate award after Round Two. The fifth claimant does not, but this is because the GCCF paid him more than the SCP would have paid him. This is why the Neutrals recommend that claimants should not receive additional payments until they have erased their negative balances.

## III.   Implementation of Recommendations.

### A.   Interested parties will have an opportunity to object.

The Neutrals recommend that the Court afford interested parties at least 30 days to comment upon and/or object to these Recommendations, and that at the conclusion of the comment/objection process, the Court either adopt, modify, or reject these Recommendations.

### B.   Steps shall be taken to mitigate (and, if possible, correct) any errors or fraud previously occurring during the claims process.

The Neutrals recommend that no Round Two funds be disbursed until the Claims Administrator[39] has taken the following steps, which are designed to mitigate (and, if possible, correct) any errors or fraud previously occurring during the claims process.

The Neutrals recommend that the Claims Administrator determine the status of any investigations which have identified or are likely to identify claims or disbursements which have been affected by error or fraud.  In accord with the Claims Administrator's policies, an administrative hold should be placed on those distributions, and those funds shall remain in reserve until a determination is made. In the event of a determination by the Claims Administrator of fraud by any claimant, the Neutrals recommend that any Round Two distribution to which that claimant would otherwise have been entitled shall be forfeited, and distributed in accordance with Section III(F).  If the Claims Administrator identifies any Round One disbursement to a claimant based upon an erroneous calculation, the Claims Administrator should take that error into account before that claimant receives any Round Two distribution.[40]

### C.   The Claims Administrator shall apply appropriate values for the Round Two formula.

To the extent that additional information is available which indicates that a claimant's Round One award was in error, the Neutrals recommend that the Claims Administrator take such steps as he deems appropriate to ensure that the Round Two values of g and n reflect the corrected data for each

---

[39]When these Recommendations use the term "the Claims Administrator," it is intended to include not only the Claims Administrator himself, but also his designees.

[40]These Recommendations are not intended to impose a duty upon the Claims Administrator to review all Round One determinations.

claimant.[41]

### D.      There will be a right to object to individual awards.

The Neutrals recommend that if a claimant or BP disagrees with a claimant's award in Round Two or in any supplemental round, the challenge must be limited to whether the formulas described in Sections II(A) and III(F) were properly implemented with respect to the individual claim at issue. Subject to the approval of the Court, the Claims Administrator shall have the discretion and authority to promulgate procedural and evidentiary rules as well as limit and define appellate rights (including appellate rights to appeal panels, the Claims Administrator, the Magistrate Judge, the District Judge, and appellate courts) in conjunction with the implementation of this Section.[42]

### E.      Claimants will be required to sign releases.

In the event that some claimants have not yet signed releases, the Neutrals recommend that the Claims Administrator ensure that such claimants are identified and required to execute releases in exchange for their Round Two disbursements.

### F.      The Neutrals shall make recommendations concerning the disposition of any remaining funds.

In the event that a balance remains in the Settlement Fund after Round Two, the Neutrals recommend that they periodically consult with representatives of the Claims Administrator, the DHECC, Class Counsel, and BP (or their designated contractors, vendors, or experts) to determine whether and when to recommend to the Court that any supplemental disbursements (rounds) should be made to the claimants.

The Neutrals recommend that no supplemental round be disbursed until the Neutrals have

---

[41]If previous investigations have already identified errors or fraud, the Neutrals recommend that the Claims Administrator take such steps as he deems appropriate to mitigate (and, if possible, correct) such errors or fraud.

[42]This paragraph is not intended to (nor shall it) alter or supersede any policies or procedures promulgated by the Claims Administrator which address whether or how any party might contest a determination by the Claims Administrator with respect to fraud or error in connection with any claim or claimant.

ascertained the amount of the credit contemplated in Section 4.2.7 of the Settlement Agreement.[43] The Neutrals also recommend that they consult representatives of the Claims Administrator, the DHECC, Class Counsel, and BP to determine if there is any disagreement concerning the amount of the credit contemplated in Section 4.2.7. If there is a disagreement, the Neutrals would make a recommendation and would take necessary steps to seek a determination from the Court.

The Neutrals recommend that a claimant's entitlement to a disbursement in any round after Round Two be calculated as follows, with the values of the formula's variables being recalculated immediately before the disbursement of each round:

$$(g/G)(D + N) - n = d$$

> g = the gross amount that the SCP has allocated to the claimant (including in Round One and in subsequent rounds) before deducting Seafood Spill-Related Payments; Seafood Spill-Related Payments shall be given the same meaning as that term has been given in implementing the SCP

> G = the sum of g for all claimants

> D = the amount that will be targeted for distribution in the round in question

> n = the amount of the claimant's negative balance before the supplemental disbursement is made; the claimant has a negative balance to the extent that his Seafood Spill-Related Payments exceed the gross amount that the SCP has allocated to the claimant in all rounds (cumulatively) before the round in question; if g equals or exceeds the claimant's Seafood Spill-Related Payments, then n = $0.00

> N = the sum of n for all claimants who have negative balances

> d = the amount that will be disbursed to the claimant in the round in question; if d equals zero or a negative amount, the claimant will receive no award in the round in question

In the event that a supplemental round is disbursed, the principles and rules for disbursing Round Two would apply where appropriate.

In the event that the Neutrals determine that, after the disbursement of Round Two or any supplemental round, the Settlement Fund is so depleted that it is impractical to disburse another round, the Neutrals recommend that they consider and determine whether they should recommend an appropriate disposition of the balance under the circumstances, including but not limited to a *cy près* award. In making any such recommendation (including whether such an award should be made

---

[43]Rec. Doc. 6430-1 (*Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 § 4.2.7).

and to whom it should be made), the Neutrals would consult with representatives of the Claims Administrator, the DHECC, Class Counsel, and BP.

### G.    The Neutrals shall aid in the implementation of these Recommendations.

The Neutrals recommend that they coordinate with and consult representatives of the Claims Administrator and the DHECC (along with the appropriate contractors or vendors) to facilitate the implementation of these Recommendations. Subject to the approval of the Court, the Neutrals would have the authority to clarify these Recommendations to the extent necessary to carry out the spirit of these Recommendations.[44]

/s/ John W. Perry, Jr.
John W. Perry, Jr. (#10524)


/s/ Daniel J. Balhoff
Daniel J. Balhoff (#18776)


/s/ Randi S. Ellis
Randi S. Ellis (#25251)

---

[44]The Neutrals have conducted their investigation and have made the conclusions herein for the sole purpose of recommending an appropriate method for distributing the balance of the Settlement Fund.  No party shall cite or offer into evidence these Recommendations or any Court order relying on these Recommendations for any purpose in any proceeding (including but not limited to in support of or in opposition to any claim or defense pursuant to maritime, federal, state, local, statutory, regulatory, foreign, international, treaty, or common law) other than for purposes of distributing the balance of the Settlement Fund.