1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

       ****************************************************************

4

       IN RE:  OIL SPILL BY THE
5      OIL RIG *DEEPWATER HORIZON*
       IN THE GULF OF MEXICO ON
6      APRIL 20, 2010

7                             CIVIL ACTION NO. 10-MD-2179 "J"
                              NEW ORLEANS, LOUISIANA
8                             WEDNESDAY, SEPTEMBER 24, 2014, 9:00 A.M.

9

       THIS DOCUMENT RELATES TO
10     ALL ACTIONS

11

12     PLAISANCE, ET AL.

13

14     VERSUS                 CIVIL ACTION 12-968 "J"
                              NEW ORLEANS, LOUISIANA

15     BP EXPLORATION AND
       PRODUCTION, INCORPORATED, ET AL.

16

17

       BON SECOUR FISHERIES,
18     INCORPORATED, ET AL.

19

20     VERSUS                 CIVIL ACTION 12-970 "J"
                              NEW ORLEANS, LOUISIANA

21     BP EXPLORATION & PRODUCTION,
       INCORPORATED, ET AL

22

       ****************************************************************

23

24        TRANSCRIPT OF STATUS CONFERENCE AND HEARING PROCEEDINGS
              HEARD BEFORE THE HONORABLE CARL J. BARBIER
25                    UNITED STATES DISTRICT JUDGE

                         **OFFICIAL TRANSCRIPT**

09:03:28 (line 12)
09:03:28
09:03:28 (line 13)
09:03:24
09:03:26 (line 14)
09:03:26
09:03:29 (line 15)
09:03:30
09:03:31 (line 16)
09:03:31
09:03:31 (line 17)
09:03:36
09:03:39 (line 18)
09:03:39
09:03:39 (line 19)
09:03:33
09:03:33 (line 20)
09:03:33
09:03:40 (line 21)
09:03:42

```
1    APPEARANCES:

2


3    FOR THE PLAINTIFFS'
     LIAISON COUNSEL:        DOMENGEAUX WRIGHT ROY & EDWARDS
4                            BY:  JAMES P. ROY, ESQUIRE
                             P. O. BOX 3668
5                            556 JEFFERSON STREET
                             LAFAYETTE, LA  70502
6

7                            HERMAN HERMAN & KATZ
                             BY:  STEPHEN J. HERMAN, ESQUIRE
8                                 SOREN GISLESON, ESQUIRE
                             820 O'KEEFE AVENUE
9                            NEW ORLEANS, LA  70113

10

11   FOR THE PLAINTIFFS:    BREIT DRESCHER IMPREVENTO & WALKER
                            BY:  JEFFREY A. BREIT, ESQUIRE
12                          1000 DOMINION TOWER
                            999 WATERSIDE DRIVE
13                          NORFOLK, VA  23510

14

15                          LEVIN PAPANTONIO THOMAS MITCHELL
                            RAFFERTY & PROCTOR
16                          BY:  BRIAN H. BARR, ESQUIRE
                            316 SOUTH BAYLEN STREET, SUITE 600
17                          PENSACOLA, FL  32502

18

19                          CUNNINGHAM BOUNDS
                            BY:  ROBERT T. CUNNINGHAM, ESQUIRE
20                          1601 DAUPHIN STREET
                            MOBILE, AL  36604
21

22
                            LEWIS, KULLMAN, STERBCOW & ABRAMSON
23                          BY:  PAUL M. STERBCOW, ESQUIRE
                            PAN AMERICAN LIFE BUILDING
24                          601 POYDRAS STREET, SUITE 2615
                            NEW ORLEANS LA  70130
25
```

**OFFICIAL TRANSCRIPT**

```
1
                          LIEFF CABRASER HEIMANN & BERNSTEIN
2                         BY:  ELIZABETH J. CABRASER, ESQUIRE
                          275 BATTERY STREET, 29TH FLOOR
3                         SAN FRANCISCO, CA  94111

4

5                         WEITZ & LUXENBERG
                          BY:  ROBIN L. GREENWALD, ESQUIRE
6                         700 BROADWAY
                          NEW YORK CITY, NY  10003
7

8                         MARTÍNEZ, GONZALES, KALBAC & KANE
                          BY:  ERVIN A. GONZALEZ, ESQUIRE
9                         255 ALHAMBRA CIRCLE, PENTHOUSE
                          CORAL GABLES, FL  33134
10

11
                          DEGRAVELLES PALMINTIER HOLTHAUS & FRUGE
12                        BY:  MICHAEL C. PALMINTIER, ESQUIRE
                          618 MAIN STREET
13                        BATON ROUGE, LA  70801

14

15                        BEASLEY ALLEN CROW METHVIN
                          PORTIS & MILES
16                        BY:  RHON E. JONES, ESQUIRE
                          POST OFFICE BOX 4160
17                        MONTGOMERY, AL  36013

18

19                        FAYARD & HONEYCUTT
                          BY:  CALVIN C. FAYARD, JR., ESQUIRE
20                        519 FLORIDA AVENUE SW
                          DENHAM SPRINGS, LA 70726
21

22
                          LUNDY, LUNDY, SOILEAU & SOUTH
23                        BY:  MATTHEW E. LUNDY, ESQUIRE
                          501 BROAD STREET
24                        LAKE CHARLES, LA  70601

25


                          OFFICIAL TRANSCRIPT
```

```
 1   APPEARANCES CONTINUED:

 2

 3                            LEGER & SHAW
                             BY:  WALTER J. LEGER, JR., ESQUIRE
 4                           600 CARONDELET STREET, 9TH FLOOR
                             NEW ORLEANS, LA  70130
 5

 6                            MOTLEY RICE
 7                           BY:  JOSEPH D. RICE, ESQUIRE
                             28 BRIDGESIDE BLVD.
 8                           MOUNT PLEASANT, SC 29464

 9

10   FOR THE STATE OF
     LOUISIANA:                KANNER & WHITELEY
11                           BY:  ALLAN KANNER, ESQUIRE
                             701 CAMP STREET
12                           NEW ORLEANS, LA  70130

13

14   FOR THE FEDERAL
     GOVERNMENT INTERESTS: U.S. DEPARTMENT OF JUSTICE
15                           TORTS BRANCH, CIVIL DIVISION
                             BY:  R. MICHAEL UNDERHILL, ESQUIRE
16                           450 GOLDEN GATE AVENUE
                             7TH FLOOR, ROOM 5395
17                           SAN FRANCISCO, CA  94102

18

19   FOR THE UNITED STATES
     OF AMERICA:              ENVIRONMENTAL ENFORCEMENT SECTION
20                           U.S. DEPARTMENT OF JUSTICE
                             BY:  STEVEN O'ROURKE, ESQUIRE
21                           P.O. BOX 7611
                             WASHINGTON, DC  20044
22

23

24

25
```

**OFFICIAL TRANSCRIPT**

1    APPEARANCES CONTINUED:

2

3    FOR TRANSOCEAN HOLDINGS
     LLC, TRANSOCEAN
4    OFFSHORE DEEPWATER
     DRILLING INC., AND
5    TRANSOCEAN DEEPWATER
     INC.:                     FRILOT
6                              BY:  KERRY J. MILLER, ESQUIRE
                               ENERGY CENTRE, 36TH FLOOR
7                              1100 POYDRAS STREET
                               NEW ORLEANS, LA  70163
8

9
                               SUTHERLAND ASBILL & BRENNAN
10                             BY:  STEVEN L. ROBERTS, ESQUIRE
                               1001 FANNIN STREET, SUITE 3700
11                             HOUSTON, TX  77002

12

13                             MUNGER TOLLES & OLSON
                               BY:  MICHAEL R. DOYEN, ESQUIRE
14                             355 SOUTH GRAND AVENUE, 35TH FLOOR
                               LOS ANGELES, CA  90071
15

16
     FOR BP EXPLORATION
17   AND PRODUCTION, INC.,
     BP AMERICA PRODUCTION
18   COMPANY, BP P.L.C.
     NORTH AMERICA INC.:       LISKOW & LEWIS
19                             BY:  SHANNON S. HOLTZMAN, ESQUIRE
                               ONE SHELL SQUARE
20                             701 POYDRAS STREET
                               SUITE 5000
21                             NEW ORLEANS, LA  70139

22

23                             KIRKLAND & ELLIS
                               BY:  J. ANDREW LANGAN, ESQUIRE
24                             300 N. LASALLE
                               CHICAGO, IL  60654
25

                         **OFFICIAL TRANSCRIPT**

```
1    APPEARANCES CONTINUED:

2

3                          WILLIAMS & CONNOLLY
                           BY:  KEVIN M. DOWNEY, ESQUIRE
4                               KEVIN M. HODGES, ESQUIRE
                           725 12TH ST., N. W.
5                          WASHINGTON, DC 20005

6

7    FOR HALLIBURTON
     ENERGY SERVICES,
8    INC.:                 GODWIN RONQUILLO
                           BY:  DONALD E. GODWIN, ESQUIRE
9                               JENNY L. MARTINEZ, ESQUIRE
                           1201 ELM STREET, SUITE 1700
10                         DALLAS, TX  75270

11

12                         GODWIN RONQUILLO
                           BY:  R. ALAN YORK, ESQUIRE
13                         1331 LAMAR, SUITE 1665
                           HOUSTON, TX  77010
14

15

16   ALSO PRESENT:         THE HONORABLE SALLY SHUSHAN

17

18   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
19                               REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM HB406
20                               NEW ORLEANS, LA  70130
                                 (504) 589-7779
21                               Cathy_Pepper@laed.uscourts.gov

22   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
23

24

25
```

**OFFICIAL TRANSCRIPT**

1                              **I N D E X**

2

3      <u>ITEMS</u>                                        <u>PAGE</u>

4

5      TRANSOCEAN'S ALLEGED "ABOVE-SURFACE" DISCHARGE

6      LIABILITY UNDER OPA.................................    9

7      HALLIBURTON'S MOTION FOR SUMMARY JUDGMENT WITH

8      RESPECT TO CONTRIBUTION AND INDEMNITY PERTAINING TO

9      THE CIVIL FINES AND PENALTIES......................   12

10     MEDICAL SETTLEMENT ISSUE...........................   16

11     MOTION FOR RECONSIDERATION OF THE COURT'S ORDER......   37

12     BP'S MOTION FOR RESTITUTION AND INJUNCTIVE RELIEF....   58

13

14

15

16

17

18

19

20

21

22

23

24

25

                          **OFFICIAL TRANSCRIPT**

**P-R-O-C-E-E-D-I-N-G-S**

WEDNESDAY, SEPTEMBER 24, 2014

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning, everyone.

VOICES:  Good morning, Your Honor.

THE COURT:  Stephanie, did you do sign-in sheets this

morning?

THE DEPUTY CLERK:  Yes, sir.

THE COURT:  Since we did sign-in sheets, I'm not going

to have everyone stand and identify themselves; except, you

people who plan to argue this morning, I would like you to

identify yourselves.

We're going to take things up in the order that I

have it on the screen.  Transocean and Halliburton have each

raised matters that they would like to briefly discuss this

morning, so we'll take those two first.

Then we'll do the oral arguments, first on the

medical settlement issue, and then on the economic settlement

issue, okay?

All right.  So who is going to speak this

morning?

**OFFICIAL TRANSCRIPT**

09:03:07 1          THE DEPUTY CLERK:  Do you want me to call the case?

09:03:09 2          THE COURT:  Yes, go ahead and call the cases

09:03:12 3  officially.

09:03:12 4          THE DEPUTY CLERK:  MDL 10-2179, *In re:  Oil Spill by*

09:03:17 5  *the Oil Rig Deepwater Horizon in the Gulf of Mexico on*

09:03:21 6  *April 20, 2010;* Civil Action 12-968, *Plaisance, et al. versus*

09:03:29 7  *BP Exploration and Production, Incorporated, et al.;*

09:03:33 8  Civil Action 12-970, *Bon Secour Fisheries, Incorporated, et al.*

09:03:40 9  *versus BP Exploration & Production, Incorporated, et al.*

09:03:44 10         THE COURT:  All right.  We'll take up first

09:03:48 11 Transocean's letter request.

09:03:51 12         MR. MILLER:  Good morning, Your Honor.  Kerry Miller,

09:03:54 13 on behalf of Transocean.

09:03:55 14             Real brief, Your Honor, we know that in your

09:03:58 15 Phase 1 rulings, you had Footnote 272, which recognized that

09:04:01 16 the issue of Transocean's alleged "above-surface" discharge

09:04:07 17 liability under OPA had been deferred by agreement of the

09:04:10 18 parties.

09:04:10 19             That comes out of conversations, prior to the

09:04:14 20 Phase 1 and Phase 2 trial, that we had with Your Honor back in

09:04:16 21 chambers prior to a status conference, and with

09:04:21 22 Magistrate Shushan.

09:04:22 23             Judge, we just wanted to make sure that the

09:04:23 24 arguments, both factual and legal -- and I think in our letter

09:04:26 25 we set forth two legal arguments and one factual argument --

**OFFICIAL TRANSCRIPT**

09:04:29  1    are covered by the deference -- or the deferment, rather, that

09:04:34  2    you set forth in paragraph -- Footnote 272 of your ruling.

09:04:39  3            We had a minute to talk with Mr. O'Rourke from

09:04:42  4    the Government, and I think we all agree that the issue is

09:04:45  5    live.  They haven't been decided -- at least as to Transocean

09:04:49  6    and the U.S., they're live, they haven't been decided, but they

09:04:52  7    are not time sensitive.

09:04:54  8            We are very aware and respectful of the Court's

09:04:58  9    busy docket coming up, three large trials next year.  We just

09:05:03 10    wanted to make sure that it was on the radar screen, but we're

09:05:05 11    aren't seeking any immediate attention to the issues, Your

09:05:08 12    Honor.  Again, it's just making sure that your Footnote 272

09:05:10 13    covered both the factual and legal issues set forth in that

09:05:13 14    letter.

09:05:13 15            THE COURT:  All right.  Where is Mr. O'Rourke?  Is he

09:05:15 16    here?

09:05:19 17            MR. O'ROURKE:  Your Honor, this is Steve O'Rourke, for

09:05:21 18    the United States.

09:05:22 19            THE COURT:  Come up here, Mr. O'Rourke.

09:05:26 20            MR. O'ROURKE:  Mr. Miller is correct.  We agree that

09:05:30 21    those issues are live.  They need to be resolved someday.  They

09:05:34 22    are not highly significant issues, so they should be deferred.

09:05:39 23            THE COURT:  Does the Government intend to pursue this?

09:05:42 24            MR. O'ROURKE:  At least until after Phase 3, we

09:05:44 25    certainly don't.

09:05:45 1          THE COURT:  What do you intend to pursue there?  What

09:05:47 2     do you envision you would pursue?

09:05:50 3          MR. O'ROURKE:  With respect to our case, we had two

09:05:51 4     claims:  Clean Water Act, which we settled with Transocean;

09:05:56 5     Oil Pollution Act, declaration of liability only.  We went for

09:05:59 6     summary judgment on that and partially lost, so all we're

09:06:03 7     seeking is resolution of who is liable for what under the

09:06:06 8     Oil Pollution Act to the United States.

09:06:09 9               Now, you've already given us liability against

09:06:12 10    BP, and BP is indemnifying Transocean.  So it is a very minor

09:06:15 11    issue, as Mr. Miller and as I have said.

09:06:18 12         THE COURT:  Seems like "minor" is an exaggeration.  It

09:06:21 13    sounds like it's less than that.  I don't know what the word

09:06:23 14    would be, but it'd be much less than minor.  I can't believe

09:06:27 15    the Government doesn't have better things to spend its time and

09:06:29 16    money on, but that's up to you.

09:06:31 17         MR. O'ROURKE:  I'll certainly consider that,

09:06:32 18    Your Honor --

09:06:32 19         THE COURT:  Please do.

09:06:34 20         MR. O'ROURKE:  -- and if you would defer it until after

09:06:35 21    Phase 3.

09:06:36 22         THE COURT:  Thank you.

09:06:38 23              Anybody else want to speak on this?

09:06:39 24         MR. LANGAN:  Your Honor, it's Andy Langan, for BP.

09:06:42 25              I talked to Mr. O'Rourke about this, and we think

**OFFICIAL TRANSCRIPT**

09:06:44  1    the Government has got a point, that if they are going to

09:06:47  2    pursue this, probably later is the time to do it.

09:06:50  3           THE COURT:  I think everybody agrees it definitely was

09:06:52  4    not part of the trial that we had.

09:06:54  5           MR. LANGAN:  We agree.  Thank you.

09:06:55  6           THE COURT:  All right.  Thank you.

09:06:56  7               Okay.  Halliburton.

09:07:05  8           MR. GODWIN:  Good morning, Judge.  Don Godwin for

09:07:08  9    Halliburton.

09:07:08 10           THE COURT:  Good morning.

09:07:09 11           MR. GODWIN:  Judge, July 15, 2013, Halliburton filed

09:07:13 12    its Motion for Summary Judgment with respect to contribution

09:07:17 13    and indemnity pertaining to the civil fines and penalties, and

09:07:23 14    we just simply wanted to follow up with the Court to see if you

09:07:26 15    would permit further briefing by Halliburton to supplement what

09:07:29 16    we've already filed, insofar as we've considered your findings

09:07:33 17    and conclusions and may want to add to that.

09:07:35 18               If you were so inclined and would permit us an

09:07:39 19    opportunity to do so briefly, we would propose supplementing

09:07:42 20    our briefing, Judge, by October 8th.  We would suggest that if

09:07:45 21    you allow briefing by us, that you would give BP and Transocean

09:07:50 22    until October 22nd, as suggested dates, and then give us seven

09:07:56 23    days, calendar days, after that to reply, to the extent we deem

09:08:00 24    appropriate, if at all.

09:08:01 25           THE COURT:  Let me ask you this.

**OFFICIAL TRANSCRIPT**

09:08:03  1          MR. GODWIN:  Yes, Your Honor.

09:08:04  2          THE COURT:  I don't think this motion was ever fully

09:08:07  3  briefed, right?

09:08:07  4          MR. GODWIN:  I don't think it was, Judge.

09:08:09  5          THE COURT:  You filed it, and I think we stayed it,

09:08:10  6  effectively, right?

09:08:11  7          MR. GODWIN:  Yes, sir.  Yes, sir.

09:08:12  8          THE COURT:  So what you're asking is for us to put a

09:08:17  9  briefing schedule in place?

09:08:18 10          MR. GODWIN:  Yes, sir, that's all I'm asking for,

09:08:21 11  Judge.

09:08:21 12          THE COURT:  All right.  Let me hear from Mr. Langan.

09:08:25 13          MR. GODWIN:  Yes, Your Honor.

09:08:25 14          MR. LANGAN:  Andy Langan for BP.

09:08:28 15          Your Honor, we agree this remains a live issue.

09:08:31 16  We feel like it's not going to be ripe for decision until after

09:08:35 17  Your Honor decides the penalty, so we would -- our suggestion

09:08:38 18  would be we defer to see what happens with the penalty phase,

09:08:42 19  and then take it up after that.

09:08:44 20          I mean, it's really -- we have a lot to do, the

09:08:47 21  United States and we, and it just seems like the best use of

09:08:50 22  our time is to let the penalty phase come and go, and then deal

09:08:53 23  with Halliburton's motion thereafter.

09:08:56 24          THE COURT:  It's also related, isn't it, to the Clean

09:09:00 25  Water Act appeal that's up in the Fifth Circuit?

**OFFICIAL TRANSCRIPT**

09:09:01 1          MR. LANGAN:  It is in part, sure, yes.

09:09:03 2          THE COURT:  In part.  My recollection -- in fact, I

09:09:07 3     have the case here, the panel upheld this Court's ruling in

09:09:18 4     favor of the Government on that --

09:09:19 5          MR. LANGAN:  Yes, Your Honor.

09:09:20 6          THE COURT:  -- and BP has petitioned for rehearing,

09:09:24 7     right?

09:09:24 8          MR. LANGAN:  As has Anadarko, and that petition has not

09:09:28 9     yet been disposed of.

09:09:29 10         THE COURT:  Okay.  Mr. Godwin, would it make sense to

09:09:33 11    wait at least until that's done and let the dust settle a

09:09:37 12    little bit?

09:09:38 13         MR. GODWIN:  Of course, Judge, whatever you want to do

09:09:40 14    is what we're going to be fine with.

09:09:41 15              My thought was, is in as much as the penalty

09:09:45 16    phase case is going to go to trial in January, where

09:09:48 17    Halliburton will not be involved, with the contribution claim

09:09:51 18    pending there involving BP and Transocean, we'd like to have

09:09:55 19    that matter disposed of prior to that, where that claim against

09:09:58 20    us is pending where we will not be participating in any

09:10:03 21    respect.

09:10:03 22              But whatever you want to do, Judge, is going to

09:10:06 23    be fine with Halliburton.

09:10:07 24         THE COURT:  All right.  Let me give it a little

09:10:09 25    thought.  I think I'm inclined to agree with Mr. Langan on

**OFFICIAL TRANSCRIPT**

09:10:15 1  this, it may make sense to hold off a little bit longer on

09:10:19 2  this, but I'll take another look at it.

09:10:21 3          MR. GODWIN:  Thank you, Your Honor.

09:10:22 4          MR. LANGAN:  Thank you, Your Honor.

09:10:23 5          THE COURT:  Did you want to speak to this?  I'm sorry,

09:10:25 6  Mr. O'Rourke.

09:10:25 7          MR. O'ROURKE:  Yes, sir, Your Honor.  Steve O'Rourke

09:10:28 8  for the United States.

09:10:29 9          I just wanted to ask that if you do issue a

09:10:31 10 scheduling order, could we have permission to file a brief,

09:10:35 11 too?

09:10:35 12         You may remember on the other contractual

09:10:38 13 indemnity we weighed in, sort of as an amicus, just as a law

09:10:42 14 enforcement issue.  Thank you.

09:10:42 15         THE COURT:  All right.

09:10:43 16         MR. DOYEN:  Your Honor, Mike Doyen for Transocean.

09:10:44 17         We have no preference as to whether the Court

09:10:47 18 takes the matter up now or defers it, as BP suggests.  Either

09:10:51 19 way, when the Court does set it for briefing, we would almost

09:10:55 20 certainly file a similar motion with respect to BP and us.

09:10:59 21         So if the Court decides, after reflection, to go

09:11:02 22 ahead and schedule it now, that in some manner would need to be

09:11:05 23 worked into the schedule.

09:11:08 24         THE COURT:  All right.

09:11:08 25         MR. DOYEN:  Thank you.

                         **OFFICIAL TRANSCRIPT**

09:11:09  1         THE COURT:  Thank you very much.

09:11:11  2              Okay.  Let's take up the medical settlement

09:11:22  3    issue.

09:11:26  4         MR. HERMAN:  Good morning, Your Honor.

09:11:31  5         THE COURT:  You're going to argue for the plaintiffs --

09:11:35  6         MR. HERMAN:  Yes, Your Honor.

09:11:35  7         THE COURT:  -- or for the class?  Who is going to argue

09:11:36  8    this for --

09:11:40  9         MR. HODGES:  Kevin Hodges, Your Honor.

09:11:42 10         THE COURT:  Very well.

09:11:43 11         MR. HERMAN:  Your Honor, with the Court's permission, I

09:11:45 12    have two copies of each of these PowerPoints for opposing

09:11:48 13    counsel and two copies for the Court.

09:13:15 14         THE COURT:  All right.  We have got a technology

09:15:49 15    problem here, Kevin, trying to hook up this laptop to get it

09:15:53 16    working.

09:16:19 17              I'm going to step off the bench for a couple of

09:16:21 18    minutes.  As soon as it's ready, let me know.

09:16:23 19         THE DEPUTY CLERK:  All rise.

09:16:25 20         (WHEREUPON, at 9:16 a.m., the Court took a recess.)

09:22:06 21         THE DEPUTY CLERK:  All rise.

09:22:07 22         THE COURT:  Please be seated, everyone.

09:22:16 23              All right.  I think we have our little technical

09:22:20 24    problem solved.

09:22:21 25              Mr. Herman.

**OFFICIAL TRANSCRIPT**

09:22:22  1          MR. HERMAN:  Thank you, Your Honor.  I apologize.

09:22:25  2          What we've tried to do here is reflect what at

09:22:29  3  least class counsel negotiated and intended when we entered

09:22:33  4  into the Settlement Agreement in 2012.

09:22:34  5          On the left side, we have the existing cases,

09:22:39  6  that meaning the cases that existed as of the time of the

09:22:42  7  settlement.  They were, based on our intent and understanding,

09:22:47  8  intended to be settled, either as Acute Specified Physical

09:22:51  9  Conditions or as Chronic Specified Physical Conditions.

09:22:54 10          If a future claim were to develop as a

09:22:59 11  Later-Manifested Physical Condition, five years later, 10 years

09:23:01 12  later, 15 years later, that was included within the settlement;

09:23:06 13  but, effectively, it wasn't settled.  It was subject to being

09:23:10 14  litigated and quantified through this Back-End Litigation

09:23:14 15  Option.

09:23:14 16          Going back to the time of the settlement --

09:23:18 17          THE COURT:  It wasn't settled, but they were within the

09:23:20 18  class.

09:23:20 19          MR. HERMAN:  They were within the class.

09:23:22 20          THE COURT:  They were class members.

09:23:23 21          MR. HERMAN:  Right, they were class members.

09:23:26 22          BP, as I understood it -- or as we understood it,

09:23:29 23  wanted to ensure that there would be certain parameters, if

09:23:32 24  they were to get cancer or leukemia or something five or

09:23:36 25  10 years down the line, they wouldn't just be able to go back

09:23:39 1   into the tort system and have a free for all for punitive

09:23:43 2   damages, etcetera.

09:23:44 3          The class got some consideration, too, because

09:23:47 4   you didn't have to prove exposure, you didn't have to prove

09:23:50 5   liability, etcetera.

09:23:54 6          So, those were the confines of the Back-End

09:23:57 7   Litigation Option, they were part of the class and, to some

09:23:59 8   extent, part of the settlement, but the claims weren't

09:24:03 9   quantified to a sum certain.  That would be subject to either

09:24:06 10  mediation or, if mediation were unsuccessful, litigation.

09:24:10 11         At the time, August 13, 2012, what BP represented

09:24:15 12  to the Court and to everybody else:  "This settlement seeks to

09:24:18 13  resolve the vast majority of post-incident personal injury

09:24:23 14  claims based on alleged exposure to oil and/or dispersants."

09:24:27 15         If we go back to our little chart, that's

09:24:32 16  consistent with our understanding; existing cases would be

09:24:34 17  settled, if future claims arose later they would be subject to

09:24:37 18  the BELO.

09:24:38 19         BP brief in support of approval -- again, this is

09:24:41 20  back in 2012 -- "The medical settlement provides compensation

09:24:44 21  to qualifying class members who can demonstrate that they have

09:24:47 22  manifested during a specified timeframe a Specified Physical

09:24:53 23  Condition covered by the agreement."

09:24:54 24         The focus here of BP's brief is, if the condition

09:24:59 25  has already manifested, if it already exists, then the

**OFFICIAL TRANSCRIPT**

09:25:03  1    Specified Physical Condition will be covered.  It's not related

09:25:05  2    to a quote/unquote diagnosis.  It's just related to

09:25:12  3    manifestation.

09:25:12  4         Mr. Coffee -- or Professor Coffee, who is a joint

09:25:16  5    expert submitted by both BP and class counsel, says:  "This

09:25:20  6    class consists of small claims that would yield modest

09:25:23  7    compensation in individual litigation and, in most cases, would

09:25:28  8    not be attractive to a plaintiffs' attorney compensated on a

09:25:33  9    contingency fee basis."

09:25:33 10         This is, again, consistent with our

09:25:35 11    understanding.  You have either acute or chronic things like

09:25:39 12    respiratory conditions, dermal conditions, ocular conditions

09:25:42 13    that are, by some people's definition, relatively small, as

09:25:47 14    opposed to something like cancer or leukemia, which would be

09:25:49 15    more serious and might develop later.

09:25:54 16         This is, again, Professor Coffee:  "Class members

09:25:56 17    who later develop more serious injuries that they attribute to

09:25:59 18    the *Deepwater Horizon* incident are provided with the Back-End

09:26:03 19    Litigation Option for later-manifested physical conditions."

09:26:08 20         Dr. Herzstein, BP's medical expert, at that

09:26:14 21    time -- she's submitted other declarations more recently, but

09:26:16 22    at that time she repeatedly, in her declaration, refers to what

09:26:20 23    I'm calling -- or Professor Coffee is calling these more

09:26:23 24    serious injuries that are left to the Back-End Litigation

09:26:27 25    Option are latent diseases such as cancers, as distinguished

**OFFICIAL TRANSCRIPT**

09:26:32  1   from existing chronic ocular or respiratory or dermal

09:26:36  2   conditions.

09:26:37  3          The rationale is explained by Professor Coffee

09:26:41  4   here:  "The reason why we only compensated in the settlement

09:26:45  5   existing manifested physical conditions and left future claims

09:26:49  6   to the Back-End Litigation Option was to avoid what I'll

09:26:55  7   generically call the *Amchem* problem," explained here by

09:26:58  8   Professor Coffee, "there are no future claimants" --

09:27:01  9   essentially, they are going to be litigated under the BELO --

09:27:04 10   "versus exposed to a toxic substance who have not yet

09:27:06 11   manifested any injury, who will receive any compensation for

09:27:09 12   future injuries under the medical benefits Settlement

09:27:11 13   Agreement.  This was the category of class members that most

09:27:15 14   concerned the Supreme Court in *Amchem*, and their absence here

09:27:20 15   increases cohesion."

09:27:22 16          Then, finally, these are the joint proposed

09:27:25 17   findings that we submitted to the Court with BP.  In those

09:27:27 18   proposed findings -- I think they were probably submitted in

09:27:30 19   either October or November of 2012 -- BP presented evidence

09:27:34 20   that, "to the extent latent diseases could be caused by

09:27:38 21   exposure to oil and/or dispersants at sufficient doses, such

09:27:45 22   diseases would not be expected to manifest in class members for

09:27:48 23   years after exposure."

09:27:49 24          We cite BP's expert, Dr. Herzstein:

09:27:56 25   "Accordingly, to the extent that class members manifest a

**OFFICIAL TRANSCRIPT**

09:27:58  1    latent condition that they attribute to their exposure to oil

09:28:01  2    and/or dispersants, the Back-End Litigation Option, and not the

09:28:07  3    Matrix," that's the Specified Condition Matrix, Exhibit 8,

09:28:08  4    "provides an appropriate mechanism for class members to seek

09:28:10  5    compensation for such conditions."

09:28:12  6            So everything that we've seen here is consistent,

09:28:15  7    all these things that BP and BP's lawyers and BP's experts said

09:28:19  8    at the time was consistent with our understanding.  Now, let's

09:28:23  9    look very briefly at what we're trying to reflect, what we

09:28:28 10    understand BP now to be arguing.

09:28:30 11            On the left side, you have claims that are

09:28:33 12    settled.  That includes Acute Specified Physical Conditions,

09:28:39 13    but essentially everything in orange is now under the current

09:28:43 14    interpretation proffered by BP and accepted by the Claims

09:28:47 15    Administrator.  It splits these Chronic Specified Physical

09:28:51 16    Conditions in half, essentially.

09:28:52 17            If the Specified Physical Condition was confirmed

09:28:55 18    by a test before April of 2012, then it's settled under this

09:29:01 19    Matrix for 36 to $60,000; but, if, at the time of the

09:29:08 20    settlement, the claimant, who at that time was suffering from a

09:29:13 21    chronic physical condition, had not gone to the doctor to get

09:29:16 22    the specific tests that were required under the Settlement

09:29:19 23    Agreement, and didn't get those tests until after April 2012,

09:29:22 24    under the current interpretation, now that case is not settled,

09:29:26 25    even though it existed at the time of the settlement, and that

09:29:29  1   now needs to be litigated and quantified per the Back-End

09:29:35  2   Litigation Option.  Then, there will be other Later-Manifested

09:29:38  3   Physical Conditions, like cancers or something like that, that

09:29:40  4   might need to be litigated in the future.

09:29:42  5          This may not be relevant, but I think it might be

09:29:46  6   worth noting that this is BP's Memorandum of Support of Class

09:29:51  7   Settlement Approval.  I've highlighted Mr. Bloomer and

09:29:54  8   Ms. Reisman, from Kirkland & Ellis and Arnold & Porter, who,

09:30:01  9   from our team's recollection were the key negotiators on behalf

09:30:03 10   of BP.

09:30:04 11          Mr. Bloomer submitted a declaration of support of

09:30:09 12   the settlement in August of 2012:  "I personally participated

09:30:09 13   and was involved in the settlement discussions and

09:30:12 14   negotiations."

09:30:13 15          For whatever reason -- it may not be relevant,

09:30:16 16   but I think it's somewhat interesting -- in the motion -- I

09:30:18 17   mean, in the opposition that they just filed two weeks later,

09:30:23 18   neither Mr. Bloomer nor Ms. Reisman, nor Kirkland & Ellis, nor

09:30:29 19   Arnold & Porter are on the pleadings.

09:30:30 20          Maybe that was just an oversight, but I

09:30:32 21   understand Mr. Bloomer is here.  He could perhaps confirm for

09:30:36 22   the Court that this is, in fact, what BP was contemplating at

09:30:42 23   the time of the settlement.

09:30:42 24          It seems somewhat strange that BP would spend

09:30:46 25   eight months with us carefully negotiating this Matrix, which

**OFFICIAL TRANSCRIPT**

09:30:51 1    limits their exposure for these claims to a certain dollar

09:30:55 2    amount, and which requires all of these specific tests, but now

09:30:59 3    claims that their intent was for a significant portion of those

09:31:04 4    claimants -- I don't know what the percentage is, some people

09:31:07 5    may say 90 percent, some people may say 50 percent, but I think

09:31:12 6    BP would agree that for a significant portion of the claimants

09:31:13 7    who were suffering or alleged were suffering from chronic

09:31:16 8    physical conditions at the time of the settlement, all of those

09:31:19 9    tests that were negotiated on that Matrix, all of those medical

09:31:22 10   records that were required, are basically thrown out the

09:31:27 11   window, and it's left open to litigation; those plaintiffs can

09:31:31 12   go get the exact type of diagnosis that BP was concerned about,

09:31:34 13   for litigation purposes, and, if it's accepted by the judge or

09:31:38 14   jury, they can prevail, without all of the Exhibit 8

09:31:41 15   requirements; and, BP loses the protection of having exposure

09:31:46 16   limited to $60,000 for a cleanup worker because, in the

09:31:52 17   Back-End Litigation proceeding, presumably the judge or the

09:31:55 18   jury could find BP responsible for a lot more money for the

09:31:58 19   same ocular conditions, dermal conditions or respiratory

09:32:01 20   conditions that we spent eight months negotiating what they

09:32:04 21   were going to be worth.

09:32:04 22          So, I just find it hard that that's what BP

09:32:07 23   intended.  I mean --

09:32:08 24       THE COURT:  Let me ask you this:  You said you don't

09:32:10 25   know the exact percentage of claims that would be affected by

09:32:14  1    this policy.  Is there any data available from the Claims

09:32:20  2    Administrator yet on that, either raw numbers or percentages?

09:32:24  3            MR. HERMAN:  Well --

09:32:26  4            THE COURT:  What I'm looking for is how many claimants

09:32:30  5    who are claiming chronic conditions are being denied benefits

09:32:40  6    under the Matrix and told they have to resort to this Back-End

09:32:43  7    Litigation Option?

09:32:44  8            MR. HERMAN:  I think our best estimate -- and I'll

09:32:46  9    confer with Robin and maybe get you a better answer on

09:32:51 10    rebuttal -- but I think our best estimate is that you have

09:32:53 11    approximately around 20,000 people, at least, who at least

09:32:57 12    allege that they were suffering from a chronic condition at the

09:33:00 13    time of the settlement.

09:33:01 14            As of today -- I don't know what the report is --

09:33:05 15    there is a Status Report that Mr. Garretson filed, but I think

09:33:10 16    there are very few of these claims that have been filed.  To

09:33:13 17    date, I think four of them, under the current interpretation,

09:33:19 18    were treated as Later-Manifested Physical Conditions and

09:33:23 19    therefore were told to file Back-End Litigation Option claims

09:33:28 20    instead of chronic claims, and I understand that BP has refused

09:33:34 21    to mediate all four of those.

09:33:36 22            So we don't have a great sample.  I know that

09:33:39 23    there were various attorneys that filed their own briefs that

09:33:42 24    represented that they had thousands.

09:33:44 25            THE COURT:  Well, I saw numbers in briefs, but I

09:33:47  1    haven't seen any actual data or information on it.

09:33:54  2         MR. HERMAN:  I think where the 20,000 -- I'll check

09:33:55  3    with Robin while Mr. Hodges --

09:33:57  4         THE COURT:  I don't need an exact number right now.  I

09:34:00  5    was just trying to get some sense.

09:34:01  6         MR. HERMAN:  I think our 20,000 number comes from we

09:34:05  7    have approximately -- I think it's 180,000 cleanup workers, so

09:34:08  8    there is a certain percentage of that, around 10 percent or

09:34:12  9    more, that we'll expect to have chronic conditions.

09:34:15 10         THE COURT:  So, in other words, if I'm understanding

09:34:16 11    you right, the 180,000 number that you mentioned would be an

09:34:21 12    approximate?

09:34:21 13         MR. HERMAN:  Oh, I'm sorry.  I apologize.  It's 90,000.

09:34:24 14         THE COURT:  90,000 total class members?

09:34:27 15         MR. HERMAN:  Total cleanup workers.

09:34:29 16         THE COURT:  Total cleanup workers?

09:34:29 17         MR. HERMAN:  Cleanup workers.

09:34:29 18         THE COURT:  They would be class members, right?

09:34:30 19         MR. HERMAN:  Correct.  All cleanup workers --

09:34:33 20         THE COURT:  Unless they opted out.

09:34:35 21         MR. HERMAN:  -- unless they opted out, right.

09:34:37 22         200,000 total class members, because there are

09:34:39 23    residents that are included.  Out of those 200,000, about

09:34:43 24    90,000 are cleanups workers.

09:34:44 25         THE COURT:  Let's focus on the cleanup workers.  So

**OFFICIAL TRANSCRIPT**

09:34:47  1   about 90,000 cleanup workers are class members, if they have

09:34:56  2   not opted out?

09:34:56  3            MR. HERMAN:  Right.

09:34:57  4            THE COURT:  But they have to still make a claim, right?

09:35:00  5            MR. HERMAN:  Yes, Your Honor.

09:35:00  6            THE COURT:  They have to file a claim.

09:35:02  7            MR. HERMAN:  Yes, Your Honor.

09:35:04  8            THE COURT:  Are you telling me we don't know how

09:35:07  9   many -- maybe Mr. Garretson knows, I see him back there -- but

09:35:12 10   you don't know how many claims have actually been filed yet, or

09:35:15 11   do you?

09:35:16 12            MR. HERMAN:  I don't know off the top of my head the

09:35:17 13   number, but I think it's very few.

09:35:20 14            THE COURT:  Where does the 20,000 come from that you

09:35:23 15   mentioned?  What does that represent?

09:35:24 16            MR. HERMAN:  It's from adding up the numbers from all

09:35:28 17   the lawyers.

09:35:29 18            THE COURT:  So the plaintiff lawyers estimate that of

09:35:36 19   the 200,000 total class members, 90,000 of which are cleanup

09:35:43 20   workers -- and these are round numbers, obviously --

09:35:44 21   approximately 20,000 would be people who are alleging some type

09:35:47 22   of chronic physical condition?

09:35:49 23            MR. HERMAN:  Correct.  That's our best guess.

09:35:52 24            What I think the reality is, is a lot of these

09:35:58 25   workers, class members, have been waiting to file their claims

**OFFICIAL TRANSCRIPT**

09:36:02 1   because of an issue that I will get to next, because they are

09:36:06 2   worried about prejudicing their back-end rights by making

09:36:11 3   certain claims about when they manifested on the front end.  So

09:36:15 4   they are trying to get clear direction from the Court and/or BP

09:36:18 5   before the claims are filed.

09:36:19 6              THE COURT:  The claim deadline, again, remind me, it's

09:36:21 7   one year from the date the settlement became final?

09:36:24 8              MR. HERMAN:  Yes, Your Honor.

09:36:25 9              THE COURT:  Which was when, again?

09:36:26 10             MR. HERMAN:  February something of this year.  So it's

09:36:29 11  going to be February of 2015.

09:36:31 12             THE COURT:  So another five or six months?

09:36:34 13             MR. HERMAN:  Yes, Your Honor.

09:36:35 14             THE COURT:  All right.  Go ahead.

09:36:36 15             MR. HERMAN:  Well, this kind of brings us to our next

09:36:39 16  issue, which is there is kind of a release question which has

09:36:43 17  developed.

09:36:45 18             THE COURT:  Before you get to that --

09:36:45 19             MR. HERMAN:  Yes, Your Honor.

09:36:52 20             THE COURT:  Is that somebody's phone?  Please turn your

09:37:07 21  phones off, if you haven't already done it.

09:37:09 22                  So what BP is focusing on and the Claims

09:37:13 23  Administrator is focused on are the certain provisions in the

09:37:18 24  settlement agreement itself --

09:37:21 25             MR. HERMAN:  Yes, Your Honor.

**OFFICIAL TRANSCRIPT**

09:37:21  1        THE COURT:  -- which you haven't really talked about

09:37:23  2   yet.  I know it's in your briefs, but you haven't talked about

09:37:27  3   it here.  I don't know if you plan to.

09:37:30  4        MR. HERMAN:  Yes, Your Honor.

09:37:30  5        THE COURT:  You're planning to talk about that?

09:37:30  6        MR. HERMAN:  I do, but I can address that now.

09:37:33  7        THE COURT:  Because it seems like it all turns on what

09:37:35  8   to make of this -- we have a situation where under the Matrix

09:37:41  9   it describes certain requirements for proving up a claim,

09:37:45 10   right?

09:37:45 11        MR. HERMAN:  Yes, Your Honor.

09:37:46 12        THE COURT:  It doesn't mention any date by which you

09:37:49 13   have to be diagnosed?

09:37:50 14        MR. HERMAN:  Correct.

09:37:51 15        THE COURT:  It does say that you have to have

09:37:54 16   manifested symptoms within, I think it's 24 to 72 hours --

09:37:58 17        MR. HERMAN:  Yes.

09:37:59 18        THE COURT:  -- and certain other requirements.

09:38:01 19        MR. HERMAN:  Depending on the conditions.

09:38:02 20        THE COURT:  But then, when you get to this Back-End

09:38:06 21   Litigation Option -- well, when you get to the Later-Manifested

09:38:10 22   Physical Condition, that term is defined in the agreement.

09:38:19 23        MR. HERMAN:  Yes, Your Honor.

09:38:20 24        THE COURT:  If you just focus on that, Later-Manifested

09:38:25 25   Physical Condition, it sounds like just what it says.  It's

09:38:28  1    pretty plain English.  It's a physical condition that becomes

09:38:32  2    manifest, that you became aware of, the symptoms become

09:38:36  3    apparent at some later date?

09:38:39  4            MR. HERMAN:  Correct.

09:38:40  5            THE COURT:  At some later date, later than the

09:38:43  6    Settlement Agreement, presumably?

09:38:44  7            MR. HERMAN:  Yes.

09:38:45  8            THE COURT:  But there is a definition of that term in

09:38:49  9    the Settlement Agreement.

09:38:51 10            MR. HERMAN:  Yes, Your Honor.  It's based on the

09:38:55 11    diagnosis.

09:38:55 12            THE COURT:  Yes, it's in the Settlement Agreement

09:39:05 13    definition section at subpart VV, double V, on page 17, it

09:39:14 14    looks like, of the Settlement Agreement.

09:39:14 15            It says:  "Later-Manifested Physical Condition

09:39:18 16    shall mean a physical condition that is first diagnosed in a

09:39:24 17    medical benefits settlement class member after April 16, 2012,"

09:39:30 18    and then it goes on.

09:39:31 19            But BP represents to the Court, in its briefing

09:39:41 20    and, I think, some documentation, that that language was

09:39:46 21    changed from what it originally was when the various drafts

09:39:51 22    were being exchanged between the plaintiffs' counsel and

09:39:54 23    counsel for BP, that it originally read:  "Later-Manifested

09:39:59 24    Physical Condition shall mean a physical condition that first

09:40:02 25    manifests after April 16," but that at some point in March -- I

09:40:10  1    don't remember the exact date -- in March of 2012, they

09:40:13  2    received a revised draft from plaintiffs' negotiating team

09:40:20  3    which changed the word "manifests" to "diagnosed."

09:40:24  4              I guess my first question to you, is that correct

09:40:28  5    factually or historically?

09:40:30  6         MR. HERMAN:  I think the answer is we're not sure.  It

09:40:33  7    may be correct.  I would accept BP's representation on that, if

09:40:38  8    they've provided the documentation.  We really don't recall,

09:40:42  9    have independent recollection of intending -- certainly not

09:40:45 10    intending these effects.

09:40:46 11         THE COURT:  Do you recall that it was, in fact,

09:40:50 12    changed; that it originally said "manifested," and it was

09:40:53 13    changed to "diagnosed"?

09:40:55 14         MR. HERMAN:  Well, we don't recall that specifically,

09:40:58 15    but if the documentation shows that, then that's what it shows.

09:41:03 16         THE COURT:  Do you know why it would have been changed

09:41:04 17    from "manifested" to "diagnosed"?

09:41:08 18         MR. HERMAN:  I don't know.

09:41:17 19         THE COURT:  If you read that literally,

09:41:20 20    "Later-Manifested Physical Condition shall mean a physical

09:41:23 21    condition first diagnosed after April 16," it seems like what

09:41:26 22    it's saying is that if you have a condition that is first

09:41:32 23    diagnosed after April 16, it's a Later-Manifested Physical

09:41:38 24    Condition, right?  That's what it says.  Literally, that's what

09:41:40 25    it says.  That's what that section says.

                              **OFFICIAL TRANSCRIPT**

09:41:43 1        MR. HERMAN:  Literally, that's what that section says.

09:41:45 2        THE COURT:  Then there is another section in the

09:41:48 3    agreement which basically says that --

09:41:57 4        MR. HERMAN:  An election of remedies?

09:42:01 5        THE COURT:  -- it says if you come under the

09:42:09 6    Later-Manifested Physical Condition provision and have a right

09:42:11 7    to this Back-End Litigation Option, and you can't make a claim

09:42:18 8    on any other basis -- I'm paraphrasing --

09:42:22 9        MR. HERMAN:  Yes.

09:42:23 10        THE COURT:  -- but that's essentially what it says,

09:42:24 11    right?

09:42:24 12        MR. HERMAN:  Yes, Your Honor, that's the election of

09:42:26 13    remedies under the Back-End Litigation Option.

09:42:30 14        THE COURT:  Right.  I guess I'm asking you, what is

09:42:34 15    your response to that because that's primarily their argument,

09:42:38 16    those two provisions?

09:42:39 17        MR. HERMAN:  Yes.  I think -- obviously, this could

09:42:43 18    have been done a little bit clearer, but I think the disconnect

09:42:47 19    is that there was an intent, assumption and understanding on

09:42:51 20    our part, and I frankly think, for the reasons previously

09:42:55 21    addressed, BP's part, that we were talking -- there was an

09:42:59 22    assumption that the diagnosis after that date was modifying

09:43:04 23    Later-Manifested Physical Condition.

09:43:06 24            They were only talking about -- we were only

09:43:09 25    thinking of Later-Manifested Physical Conditions, those had to

09:43:12  1    be diagnosed.  That didn't apply in our minds -- and I would

09:43:18  2    argue it doesn't really make very much sense to apply that --

09:43:21  3    in the context of Chronic Specified Physical Conditions.

09:43:26  4          What you have now is an interpretation that all

09:43:29  5    hinges, as Your Honor points out, on when the diagnosis was.

09:43:33  6    In the negotiations of the settlement, BP was very careful that

09:43:38  7    they did not want to define Specified Physical Conditions in

09:43:43  8    terms of the diagnosis because they thought that was too

09:43:47  9    subjective and would allow people to go to doctors and get a

09:43:51 10    diagnosis of a condition.

09:43:52 11          So the word "diagnosis" is not used in any

09:43:55 12    context with Specified Physical Condition, it doesn't appear in

09:44:00 13    the definition of Specified Physical Condition, it doesn't

09:44:03 14    appear in the section that directs the Claims Administrator to

09:44:06 15    compensate Specified Physical Conditions, and it doesn't appear

09:44:10 16    anywhere in Exhibit 8, which is the Specified Condition Matrix.

09:44:14 17          Instead, what BP wanted to do to protect itself

09:44:17 18    from the same types of things it's now complaining about is,

09:44:23 19    we're not going to use just a quote/unquote diagnosis.  You

09:44:25 20    have to get these exact test results that are objective,

09:44:31 21    documented objective findings of damage to conjunctiva, cornea

09:44:37 22    and/or surrounding structures, that's for an ocular chronic

09:44:40 23    condition; objective evidence of a sinus muscle disease on a CT

09:44:43 24    imaging or endoscopic examination, that's for chronic

09:44:48 25    rhinosinusitis; and, then for what's call RADS, positive -- I

09:44:51 1  don't even know how to pronounce that -- methacholine challenge

09:44:54 2  test finding or equivalent test which signifies hyperactive

09:44:58 3  airways.

09:44:58 4          So BP was very careful, when talking about

09:45:02 5  chronic SPC's, we don't want to define those in terms of

09:45:05 6  diagnosis, either the date of diagnosis or any diagnosis, we

09:45:08 7  want to have more objective findings.

09:45:10 8          THE COURT:  Are those the same tests that are required

09:45:15 9  to prove the chronic condition under the later-manifested?

09:45:21 10         MR. HERMAN:  Well, that's the irony, and that's why I

09:45:23 11 would argue that BP's interpretation doesn't really make sense,

09:45:26 12 because they spent all this time with us negotiating what they

09:45:30 13 were going to pay for these chronic conditions under the SPC's,

09:45:33 14 but when you go to the Back-End Litigation Option, this is kind

09:45:37 15 of thrown out the window, and it just goes to litigation.  You

09:45:40 16 can use a diagnosis, and you hire an expert, and the doctor

09:45:44 17 says whatever he or she says.

09:45:46 18         So why would they negotiate all of these

09:45:49 19 protections, demanding these specific tests and limiting their

09:45:53 20 exposure to 60,000, and then now come back and say, oh, well,

09:45:55 21 for a significant portion of those claims, we intended to just

09:45:58 22 throw that into the Back-End Litigation Option, give up those

09:46:01 23 protections procedurally to those tests, and give up the

09:46:05 24 economic limitations.

09:46:06 25         THE COURT:  You had one other point you wanted to make,

**OFFICIAL TRANSCRIPT**

09:46:10  1    and I interrupted you.

09:46:11  2           MR. HERMAN:  Yes, Your Honor.  Thank you.

09:46:12  3           THE COURT:  We're running a little over time, but I'll

09:46:14  4    give you a few extra minutes.

09:46:17  5           MR. HERMAN:  Thank you, Your Honor.  This, I think, at

09:46:19  6    least attempts to address the heart of what Your Honor is

09:46:22  7    concerned with.

09:46:23  8           The term "diagnosis" only appears, we would

09:46:25  9    argue, in relation to a manifested physical condition, that is,

09:46:28 10    a latent future condition that had not manifested as of the

09:46:31 11    date of the settlement.  We have previously briefed a number of

09:46:36 12    representations from attorneys and experts that were made at

09:46:38 13    the time of the approval that we think support that.

09:46:40 14           The election of remedy provision, we would argue,

09:46:44 15    is limited to Later-Manifested Physical Conditions.  You don't

09:46:48 16    have an election of remedy provision that governs the entire

09:46:52 17    contract or chronic SPC's.  It's within the section of the

09:46:55 18    provision that talks about Later-Manifested Physical

09:46:59 19    Conditions, and chronic conditions that manifested within the

09:47:01 20    first 24 to 72 hours are not later manifested.

09:47:05 21           The purpose of the election of remedy restriction

09:47:08 22    was not to prevent class members from seeking compensation from

09:47:12 23    chronic SPC's.  That wasn't the purpose of it.  The purpose was

09:47:16 24    to prevent class members from suing BP for latent disease, like

09:47:22 25    cancers, that might develop five or 10 years down the line, in

09:47:26 1    tort.

09:47:26 2              THE COURT:  Also, to sue any other released party.

09:47:29 3              MR. HERMAN:  Exactly, because there are a number of

09:47:30 4    other released parties that are subject to the release.

09:47:33 5              If I have one minute.

09:47:35 6              THE COURT:  Go ahead.

09:47:35 7              MR. HERMAN:  Thank you, Your Honor.

09:47:37 8              This is something that came up that some of the

09:47:42 9    lawyers are struggling with.  This is what I call the release

09:47:44 10   issue.

09:47:45 11             Under BP's interpretation, you have a class

09:47:47 12   member with a condition that manifested in the first 24 to

09:47:50 13   72 hours, chronic condition developed later and persisted

09:47:54 14   through the date of the settlement, but the chronic condition

09:47:56 15   is not confirmed by these tests that we just looked at until

09:48:00 16   after April of 2012.

09:48:02 17             Right now, we believe, under this interpretation,

09:48:06 18   that person would have a claim right now for an Acute Specified

09:48:11 19   Physical Condition because of the original manifestation, and

09:48:13 20   he or she would also have a claim for that ocular, skin, or

09:48:19 21   respiratory chronic condition in the Back-End Litigation

09:48:24 22   Option.

09:48:24 23             BP says, we don't have to address that now.  It's

09:48:27 24   irrelevant.  It's a hypothetical issue.

09:48:29 25             We think it's relevant for two reasons.  For one,

**OFFICIAL TRANSCRIPT**

09:48:32  1    we think it's relevant to the current interpretation because it

09:48:35  2    just doesn't seem likely that BP would have intended to

09:48:39  3    compensate an ocular condition now as an acute condition, but

09:48:43  4    then still expose itself to litigation for a chronic ocular

09:48:48  5    condition on the back end.  We don't think that's what they

09:48:51  6    intended, and so that's the intent.

09:48:53  7              But the other issue, and perhaps more important

09:48:56  8    issue, is if the current interpretation stands, there are class

09:49:00  9    members who we would argue deserve the right to know now going

09:49:04 10    forward what the effect is of filing a claim.  If they make a

09:49:09 11    claim right now for Acute Specified Physical Condition, and

09:49:13 12    they get paid, are they going to be releasing --

09:49:15 13         THE COURT:  They are required to sign this release

09:49:17 14    before they get paid for the Acute Specified Physical

09:49:22 15    Condition, correct?

09:49:23 16         MR. HERMAN:  They are.  We believe, and I understand

09:49:27 17    Mr. Garretson believes, that they are ripe for the chronic

09:49:33 18    condition, which has now been, under the current

09:49:35 19    interpretation, deemed to be a Later-Manifested Physical

09:49:37 20    Condition, is preserved under the settlement.

09:49:38 21              BP has refused to say, we agree with that, you

09:49:41 22    will be able to do that.

09:49:43 23         THE COURT:  What they've said, as I appreciate it, is

09:49:47 24    we have not taken that position and do not take that position,

09:49:50 25    but they have not said, we will not take that position.

09:49:54  1          MR. HERMAN:  Correct, Your Honor.

09:49:56  2          THE COURT:  That's, I think, where they are, but we'll

09:49:58  3   find out in a minute when they get up here.

09:50:00  4          MR. HERMAN:  Thank you very much, Your Honor.

09:50:02  5          THE COURT:  Okay.  Thank you.

09:50:04  6          MR. HODGES:  Your Honor, we have to switch over.

09:50:09  7          THE COURT:  Go ahead.

09:50:33  8          MR. HODGES:  Your Honor, we have some PowerPoints as

09:50:35  9   well.  May I approach?

09:50:36 10          THE COURT:  Sure.

09:51:22 11          MR. HODGES:  Good morning, Your Honor.  Kevin Hodges on

09:51:25 12   behalf of BP.

09:51:26 13          THE COURT:  Good morning.

09:51:27 14          MR. HODGES:  Your Honor, we're here on a Motion for

09:51:28 15   Reconsideration of the Court's Order.

09:51:30 16          The legal standard for granting a motion for

09:51:34 17   reconsideration is extremely demanding.  This circuit has held

09:51:38 18   that reconsideration is an extraordinary remedy that should be

09:51:41 19   used sparingly.

09:51:43 20          Motions to reconsider or revise court orders

09:51:47 21   serve a narrow purpose, and that is to correct manifest errors

09:51:50 22   of law or fact or to present newly discovered evidence.

09:51:53 23          THE COURT:  Let me just suggest, I think I'm well aware

09:51:57 24   of what the law is on this type of motion.  You might better

09:52:01 25   spend your time talking about the substance of what we're

                              **OFFICIAL TRANSCRIPT**

09:52:06  1    talking about.

09:52:07  2            MR. HODGES:  I will, Your Honor.

09:52:08  3                  The merits, and the first point I would make, is

09:52:11  4    that the Court's Order was correct, that the language, the

09:52:16  5    definition of Later-Manifested Physical Condition is plain, it

09:52:21  6    is unambiguous, and it leaves no room for reinterpretation.

09:52:24  7                  According to the Settlement Agreement, a

09:52:27  8    Later-Manifested Physical Condition shall mean "a physical

09:52:29  9    condition that is first diagnosed in a medical benefits

09:52:34 10    settlement class member after April 16th of 2012."  That is

09:52:38 11    plain and unambiguous language that the Court correctly applied

09:52:44 12    in its July 23rd order.

09:52:46 13            THE COURT:  Tell me about the history of how that term

09:52:49 14    came to be in the Settlement Agreement.

09:52:51 15            MR. HODGES:  Certainly.  The Plaintiffs Steering

09:52:55 16    Committee requested it.  They requested it on March 9th of

09:52:57 17    2012, and that correction was made pursuant to their request.

09:53:03 18    That was roughly a month to six weeks before the final version

09:53:08 19    of the Settlement Agreement was submitted to the Court.

09:53:17 20            THE COURT:  Were you part of the negotiating team?

09:53:19 21            MR. HODGES:  I was not, Your Honor, but I have spoken

09:53:21 22    to those who were, and I have reviewed the documentation of the

09:53:24 23    negotiation history.

09:53:27 24                  You'll see on the slide that's currently up --

09:53:32 25            THE COURT:  What's the --

**OFFICIAL TRANSCRIPT**

09:53:33  1        MR. HODGES:  Slide Number 5, Your Honor.

09:53:35  2        THE COURT:  Yes, I'm looking at it right now.  Thank

09:53:37  3  you.

09:53:40  4            Is there any evidence or do you have any

09:53:49  5  information as to what the reason was, from either BP or class

09:53:55  6  counsels' standpoint, as to why that word was changed?

09:53:57  7        MR. HODGES:  From BP's perspective, they wanted some

09:54:01  8  limitation on the scope of Specified Physical Conditions and

09:54:04  9  how far out in time they could go.  This provided a line.

09:54:08 10            From class counsels' perspective, they were

09:54:11 11  afraid that someone who had a condition that manifested later

09:54:13 12  in time, that BP might take the position that there were signs

09:54:16 13  of that condition very early on.

09:54:18 14            So, for example, BP could get medical records and

09:54:21 15  say someone who was -- who was claiming a condition that

09:54:27 16  developed in 2016, really, the medical records show that there

09:54:31 17  was some sign of it back in 2011, and they would take the

09:54:35 18  position that the condition was preexisting, and therefore that

09:54:38 19  claimant would be barred from asserting a Later-Manifested

09:54:43 20  Physical Condition.

09:54:44 21            So from class counsels' perspective, this

09:54:47 22  protected them by saying if someone is not diagnosed until

09:54:50 23  after April 2012, that person can still proceed with a LMPC.

09:54:57 24  So it offered protection for a particular type of later

09:54:59 25  condition.  That is the reason.

09:55:02 1          THE COURT:  All right.

09:55:03 2          MR. HODGES:  Now, this was -- as we can see from the

09:55:07 3   slide, this was a draft.  This was BP's draft.  BP has crossed

09:55:13 4   it out, and you can see that this is a change that was made at

09:55:17 5   the behest of the Plaintiffs Steering Committee, and I don't

09:55:20 6   think there is any dispute about that.

09:55:22 7              What we do know is that when the plaintiffs came

09:55:30 8   forward to this Court and asked for approval of the settlement,

09:55:35 9   they never indicated to the Court that this plain definition

09:55:39 10  should be given anything other than this literal meaning.

09:55:42 11         THE COURT:  Well, that's probably true.  The problem

09:55:46 12  here is that -- and I don't know what to do about it, what can

09:55:51 13  be done about it -- but it's rather obvious to me that the

09:56:04 14  current interpretation of this agreement, of the provisions

09:56:10 15  we're talking about, was never discussed with the Court.  It

09:56:17 16  was never made clear in terms of the public hearings we had.

09:56:33 17             The discussion was always about describing this

09:56:36 18  Later-Manifested Physical Condition as being just what it

09:56:39 19  sounds like.  It was even described, and they used the

09:56:44 20  examples.  The most common would be somebody developing cancer

09:56:47 21  years later from some toxic substance, which, you know, there

09:56:50 22  is always a latency period in some of these chemicals for

09:56:53 23  years, as I appreciate it.  So those were the kinds of cases

09:56:56 24  that everybody was focused on, including the Court.  It seemed

09:57:01 25  like that was what the parties were focused on.

                        **OFFICIAL TRANSCRIPT**

09:57:04  1          The purpose of a fairness hearing is to advise

09:57:06  2     the class members, out in the universe of class members, as to,

09:57:12  3     you know, what does this settlement encompass, and how will it

09:57:17  4     compensate people.

09:57:18  5          It is rather strange -- I guess is a good word,

09:57:27  6     maybe there is a better word -- that the Court would approve a

09:57:32  7     settlement, a class settlement that really doesn't settle

09:57:38  8     thousands of claims and requires them to file another lawsuit.

09:57:43  9     I mean, it doesn't sound like much of a settlement.  Frankly,

09:57:46 10     I've never heard of a settlement which requires you to file

09:57:49 11     another lawsuit.

09:57:53 12          That's what's causing me problems, I guess, in

09:57:57 13     thinking through this.  It seems like it's going to result in

09:58:05 14     something that I don't believe either party intended, and that

09:58:08 15     is -- like I said, we don't know what the exact numbers are, we

09:58:13 16     may be able to get some better information from

09:58:16 17     Mr. Garretson -- but it seems like it's certainly going to be

09:58:21 18     thousands of claimants who apparently, on first blush, would

09:58:30 19     appear to be -- I'm sure believe they would qualify for a

09:58:34 20     later-manifested chronic physical condition because they would

09:58:37 21     meet the definition of chronic -- the problem is you have a

09:58:41 22     definition of what is a Specified Physical Condition, right?

09:58:46 23          MR. HODGES:  We do, Your Honor.

09:58:48 24          THE COURT:  That doesn't have this provision about have

09:58:52 25     to be diagnosed by a certain date or anything like that,

**OFFICIAL TRANSCRIPT**

09:58:54  1    correct?

09:58:54  2            MR. HODGES:  It does not.

09:58:55  3            THE COURT:  Okay.  So if someone focused on, well, I

09:58:59  4    have a condition that meets the definition, Specified Physical

09:59:05  5    Condition, it would seem like they would be covered, they would

09:59:11  6    be entitled to some type of claim under the Matrix; but, now

09:59:15  7    they are being told, apparently, under this policy, that no,

09:59:20  8    you really don't because you weren't formally diagnosed, you

09:59:23  9    didn't have all the exact tests that you need.  You could have

09:59:27 10    even had a diagnosis, I suppose, but some doctor could --

09:59:31 11    doctors make diagnoses sometimes on clinical findings and so

09:59:35 12    forth, histories, but if they didn't have all the right tests

09:59:40 13    at the right time before this date, they are removed from the

09:59:47 14    Matrix, and they are thrown into the Back-End Litigation

09:59:49 15    Option.

09:59:50 16            MR. HODGES:  May I speak to those points, Your Honor --

09:59:51 17            THE COURT:  Sure.

09:59:52 18            MR. HODGES:  -- because I think those are the important

09:59:54 19    points, the points that somehow the Court is going to receive

09:59:58 20    all of these Back-End Litigation Option lawsuits, and the fact

10:00:01 21    that this might not be fair to some claimants.

10:00:04 22            BP doesn't agree with that.  If you think about

10:00:07 23    this in terms of what is medically plausible, what legitimate

10:00:12 24    claims will look like, there should not be thousands of class

10:00:17 25    members who would have filed SPC claims, but now must file

10:00:20  1    through the BELO process because of the Court's Order, because

10:00:24  2    of the application of the plain language of the agreement.

10:00:27  3                Now, why do I say this?  There are several

10:00:29  4    reasons.  The first is the conditions that are described in the

10:00:32  5    SPC Matrix -- particularly the chronic conditions, there are

10:00:35  6    five of them -- are serious conditions.  These are severe

10:00:38  7    conditions that would require prompt medical attention.  These

10:00:43  8    are not nagging conditions.

10:00:46  9                For example, a chemical splash to the eye, or

10:00:49 10    Reactive Airways Dysfunction Syndrome, which is a severe form

10:00:54 11    of asthma that's brought about by exposure to certain

10:00:59 12    substances, these are the types of conditions for which someone

10:01:02 13    would go to the emergency room in many cases, in most cases.

10:01:02 14                Other conditions --

10:01:05 15         THE COURT:  But that, going to the emergency room and

10:01:08 16    having a record of that, doesn't qualify you for the Specified

10:01:14 17    Physical Conditions chronic?

10:01:15 18         MR. HODGES:  It does.

10:01:15 19         THE COURT:  Not as a chronic condition.  It would be

10:01:17 20    acute, wouldn't it?

10:01:19 21         MR. HODGES:  Well, that could be an acute condition,

10:01:23 22    you're correct; but, it if persists over time, it could be

10:01:26 23    chronic.

10:01:26 24                Now, remember, chronic conditions must manifest

10:01:28 25    within 24 to 72 hours, and then over time they must become

10:01:32 1    chronic.

10:01:32 2         THE COURT:  In other words, you must have an acute

10:01:34 3    condition which later becomes chronic.

10:01:36 4         MR. HODGES:  An acute condition turns into a chronic

10:01:39 5    condition, that's correct.

10:01:41 6              So these are serious conditions.  Even the other

10:01:42 7    conditions, even the dermal conditions, for example, are

10:01:46 8    persistent and are the type of conditions that will interfere

10:01:49 9    with your day-to-day life and will require you to seek medical

10:01:52 10   attention.

10:01:53 11             It's not plausible that someone would get

10:01:56 12   chemicals in their eyes or would get RADS, which is the asthma,

10:02:00 13   and wait years to go to a doctor.  It's just not plausible.

10:02:04 14             Why is that important?  Because if a class member

10:02:08 15   seeks medical attention that is relatively proximate in time to

10:02:12 16   when they manifested their conditions, then they should have

10:02:15 17   the medical documentation that they need to file a claim under

10:02:19 18   the SPC Matrix.

10:02:21 19             That is the intent of the parties, that people

10:02:23 20   who were injured, manifested symptoms, and went to seek

10:02:27 21   treatment would have the types of medical documentation that

10:02:30 22   they need to seek SPC compensation.

10:02:33 23        THE COURT:  But that would qualify them at a lower

10:02:36 24   level, right?  Acute conditions don't get paid at the same

10:02:40 25   level as a chronic condition, obviously, right?

**OFFICIAL TRANSCRIPT**

10:02:42 1    MR. HODGES:  But depending on the level of proof that

10:02:45 2  you have, that will determine your level of compensation.  So

10:02:49 3  for an acute condition, all you need is your own declaration.

10:02:53 4  For certain types of acute conditions, you need medical records

10:02:53 5  as well.

10:02:57 6    For chronic, you need three things:  You need

10:02:59 7  your declaration as to manifestation; you need some record

10:03:02 8  showing that you were treated for the condition, and that can

10:03:05 9  take various forms, including medical records; and, you need a

10:03:08 10  medical record showing ongoing treatment.  All of those things

10:03:11 11  can be obtained in time to submit a claim for an SPC condition.

10:03:17 12    THE COURT:  For a chronic condition?

10:03:19 13    MR. HODGES:  For a chronic condition, yes.

10:03:21 14    THE COURT:  So there is no requirement for the

10:03:23 15  diagnosis by a certain date?

10:03:24 16    MR. HODGES:  The diagnosis does not appear as an SPC

10:03:27 17  condition --

10:03:28 18    THE COURT:  So someone could qualify for a Chronic

10:03:32 19  Specified Physical Condition under the Matrix, even if they

10:03:36 20  were never diagnosed by a certain date?

10:03:42 21    MR. HODGES:  Well, anybody who goes to see a doctor and

10:03:45 22  is treated for a condition will, in effect, have a diagnosis.

10:03:49 23    THE COURT:  Well, you know, doctors treat symptoms a

10:03:56 24  lot of times.  They may or may not make a formal diagnosis -- a

10:04:00 25  diagnosis may not be the same as how it's defined in here.

**OFFICIAL TRANSCRIPT**

10:04:05  1   That's what I'm trying to understand.

10:04:07  2          MR. HODGES:  Well --

10:04:08  3          THE COURT:  Does it require any formal -- that's not a

10:04:14  4   medical term, but formal diagnosis with certain specified test

10:04:19  5   results to entitle you to a Chronic Specified Physical

10:04:26  6   Condition payment under this Matrix?

10:04:28  7          MR. HODGES:  Well, if we could look at the Matrix,

10:04:30  8   which is at our Slide 11, if you look at it, there are

10:04:36  9   different criteria for different types of conditions.

10:04:45 10          So if we start from the bottom and look at the

10:04:47 11   two dermal conditions, there is no particular type of test or

10:04:51 12   treatment that's required for a dermal chronic condition.  So

10:04:56 13   if you to go the doctor, and the doctor says, you have this,

10:04:59 14   you can submit a claim for a dermal chronic condition.

10:05:02 15          For ocular, which is at the top, now, there is a

10:05:08 16   specific finding that is necessary, but it's not a particular

10:05:13 17   type of test.  The doctor has to document an objective finding

10:05:18 18   of damage to the conjunctiva, cornea and/or surrounding

10:05:24 19   structures, but there is not some particular test that people

10:05:26 20   would have needed to be aware of.  The doctor basically needs

10:05:29 21   to look at you and say that you have the condition for which

10:05:31 22   you're submitting your claim.

10:05:32 23          Now, for the respiratory, there are particular

10:05:36 24   tests that are specified, but what's important about these

10:05:39 25   tests is these are the types of tests that would be used if you

**OFFICIAL TRANSCRIPT**

10:05:42  1    report to the doctor with these conditions.  These are not

10:05:45  2    specific tests that were made up; rather, the Matrix is

10:05:49  3    reflecting the standard of care for these conditions.

10:05:52  4            So if you have rhinosinusitis, chronic

10:05:58  5    rhinosinusitis, the standard course of treatment would be to

10:06:01  6    take a medical history to rule out other causes, and then to

10:06:05  7    get either CT imaging or an endoscopic examination.

10:06:10  8        THE COURT:  Another issue that's been pointed out by

10:06:13  9    the other side is that you're dealing with a population of

10:06:17 10    claimants here who -- speaking for south Louisiana, I know --

10:06:22 11    you're dealing with people who are probably at the lower end of

10:06:26 12    the socioeconomic scale.  Most of these people, I feel sure,

10:06:35 13    likely have no health insurance, and I don't know that I

10:06:44 14    necessarily would assume that anybody that has this condition

10:06:48 15    would be able to seek out private medical care and get all of

10:06:53 16    the CT scans and all this done.

10:06:56 17            I mean, that would be the optimum thing, if

10:06:59 18    everybody had insurance and could afford it, but what do we do

10:07:03 19    about people who have these conditions, maybe they've been to

10:07:07 20    the doctor a few times, maybe they've been -- well, we don't

10:07:13 21    really have Charity Hospital anymore, we used to have Charity

10:07:15 22    Hospital here -- but the last statistic I heard, I think about

10:07:20 23    one-third of people living in Louisiana have no health

10:07:24 24    insurance, so, you know, what is that, two million people, a

10:07:29 25    million and a half, something like that.

**OFFICIAL TRANSCRIPT**

10:07:31 1          So I don't know that you can just assume that

10:07:35 2     anybody that had any of these conditions had to have gone to a

10:07:38 3     doctor and gotten all these tests and a diagnosis beforehand.

10:07:42 4          Now, I don't know what we do about that, but

10:07:44 5     that's a concern.

10:07:46 6          MR. HODGES:  Your Honor, with respect to the cleanup

10:07:47 7     workers, they could have gone to the on-site clinics at the BP

10:07:52 8     facilities.  That is actually one of the acceptable forms of

10:07:56 9     proof towards proving a chronic condition.  So for 90,000 or so

10:08:00 10    cleanup workers, you actually have access to medical care.

10:08:04 11         THE COURT:  Are those places running CT scans and all

10:08:07 12    these fancy tests?

10:08:08 13         MR. HODGES:  No, but if someone came in with oil in

10:08:10 14    their eyes, or they came in and they couldn't breathe -- RADS

10:08:13 15    can be a life-threatening disease -- if people came in with

10:08:16 16    these types of things, they would have been referred to an

10:08:18 17    emergency room or to an emergency clinic.

10:08:21 18         I understand, I'm very sensitive to the issues of

10:08:27 19    the residents of the Gulf and the difficulties with healthcare,

10:08:30 20    but there are emergency facilities for serious injuries of the

10:08:33 21    nature that are being treated by the SPC Matrix.

10:08:36 22         The question becomes, is it plausible that

10:08:40 23    somebody who had one of these conditions, who had such a severe

10:08:43 24    asthma attack that they couldn't breathe, would wait four years

10:08:47 25    to go and get a diagnosis?  Is that for the purpose of

**OFFICIAL TRANSCRIPT**

10:08:50 1    treatment, or is that simply for the purpose of submitting a

10:08:53 2    claim so that they can seek compensation?

10:08:56 3           We believe that the Matrix provides people with

10:09:01 4    the opportunity to submit their claims if they have legitimate

10:09:07 5    claims.

10:09:08 6           Now, one other point I want to make here is that

10:09:12 7    there are a lot of class members who will claim to have

10:09:15 8    manifested prior to April of 2012, who will not be able to seek

10:09:21 9    SPC compensation, even without regard to the Court's Orders.

10:09:25 10           There are only five of these conditions, and they

10:09:28 11   are very specified chronic conditions, so there will be a lot

10:09:31 12   of people who are going to go into the BELO process anyway.

10:09:36 13   The Court's Order is not going to --

10:09:38 14           THE COURT:  Meaning that they are complaining of a

10:09:41 15   medical condition that's not one of the five listed specified

10:09:43 16   conditions?

10:09:44 17           MR. HODGES:  That's correct.  That's correct.

10:09:47 18           So those people, if they want to make a claim,

10:09:49 19   will go into the BELO, or they simply may have a

10:09:54 20   non-compensable claim under the SPC matrix.

10:09:56 21           The SPC sets up some stringent requirements.  You

10:10:01 22   must manifest within the right time frames, you must have the

10:10:04 23   right kind of condition, you must have the right kind of

10:10:08 24   medical records to receive compensation.

10:10:10 25           Now, the BELO process has its own features, but

**OFFICIAL TRANSCRIPT**

10:10:13 1   one feature it has, it is flexible.  It does not have those

10:10:18 2   same types of restrictions.  So you can imagine that there are

10:10:21 3   people in the class who are already going to invoke the BELO

10:10:24 4   process rather than the SPC process.  I'm not sure that we're

10:10:27 5   driving so many people into different categories.

10:10:30 6          We also know, Your Honor -- you had asked about

10:10:33 7   statistics earlier -- but we do know that from Mr. Garretson's

10:10:38 8   Status Report to the Court in August, that there are 10,600 SPC

10:10:43 9   claims that have been filed thus far.

10:10:45 10          THE COURT:  What's that number?

10:10:48 11          MR. HODGES:  10,600.  That's a lot of people.  So we

10:10:50 12   have a lot of people who have made use of the SPC process.

10:10:53 13          Now, I do not know, of those, how many are

10:10:57 14   chronic versus how many are acute.  I do know that the chronic

10:11:01 15   claims have not been paid yet, but I do know that most of those

10:11:06 16   claims are still pending.  So we don't know the answer to the

10:11:09 17   particular question that the Court asked earlier.

10:11:18 18          Your Honor, the language of this agreement is

10:11:20 19   clear, it's plain on its face, and it should be enforced

10:11:25 20   according to its terms.

10:11:26 21          This issue first came up in March.  It was

10:11:29 22   briefed.  The Claims Administrator, Mr. Garretson, weighed in

10:11:34 23   on the issue, at the Court's request.  What he found is that --

10:11:40 24   at slide 2, Jason -- what he found is that the MSA -- I'm

10:11:49 25   sorry, that's the wrong slide -- he found that the plain

10:11:56  1   language of the LMPC definition should be applied and should be

10:12:01  2   enforced.  He found that the Claims Administrator's bound to

10:12:06  3   follow the plain language in the MSA.

10:12:09  4          Pursuant to the plain language of the MSA, the

10:12:11  5   Claims Administrator will classify physical conditions that are

10:12:13  6   first diagnosed after April 16, 2012, as Later-Manifested

10:12:18  7   Physical Conditions, rather than Specified Physical Conditions.

10:12:23  8          Class counsel submitted objections to that.

10:12:25  9   There was further briefing.  This Court ordered briefing on a

10:12:28 10   particular issue, and then it issues its Order.

10:12:31 11          There is nothing new that has been presented on

10:12:34 12   this Motion for Reconsideration that should cause the Court to

10:12:38 13   either revisit its Order or to change the plain language of the

10:12:42 14   LMPC definition; and, to be clear, that is what class counsel

10:12:49 15   is asking.  If we have that slide.

10:12:52 16          This is the definition of LMPC.  It shall mean "a

10:12:58 17   physical condition that is first diagnosed after April 16th of

10:13:01 18   2012."  Class counsels' Motion for Reconsideration says the

10:13:07 19   phrase:  "LMPC, as used in the MSA, does not mean any condition

10:13:11 20   diagnosed after April 16, 2012."  They are asking the Court to

10:13:15 21   read it to mean the exact opposite of what it says.

10:13:17 22      THE COURT:  Let me ask you about the release issue.  I

10:13:23 23   think it is a significant issue that needs to be resolved now,

10:13:27 24   not later, for a lot of reasons.

10:13:35 25          I think class members are entitled to know what

**OFFICIAL TRANSCRIPT**

10:13:39 1  the legal ramifications are going to be if they make a claim

10:13:46 2  for a Specified Physical Condition.  They have to sign a

10:13:50 3  release before they are paid, as I appreciate it, and is that

10:13:57 4  going to later preclude them, if their condition becomes

10:14:05 5  chronic or is chronic?

10:14:07 6         They have an acute condition, they make a claim,

10:14:12 7  they get a very modest amount, as I appreciate it, under this

10:14:16 8  settlement.  They sign a release, and the release certainly

10:14:21 9  could be construed, it could be argued, releases all claims

10:14:25 10 against BP.  The concern is that if they later bring a Back-End

10:14:33 11 Litigation claim for a chronic condition, even if they jump

10:14:36 12 through all the hoops and meet the requirements, BP will assert

10:14:42 13 the release as a defense to that claim.

10:14:46 14        BP has told the Claims Administrator, as I

10:14:49 15 appreciate it, when that concern was raised by class counsel

10:14:54 16 recently, BP sent a letter, and it said, essentially -- I'm

10:14:59 17 paraphrasing, I don't have the letter right in front of me but

10:15:02 18 I've read the letter -- it says, we have not taken that

10:15:05 19 position, and we do not take that position.

10:15:12 20        Can BP now assure everyone that BP does not

10:15:18 21 presently and will not in the future, at any time in the

10:15:21 22 future, assert that these releases will bar a Back-End

10:15:29 23 Litigation claim?

10:15:30 24        MR. HODGES:  I could speak to that issue.

10:15:32 25        THE COURT:  Okay.

**OFFICIAL TRANSCRIPT**

10:15:32 1          MR. HODGES:  First, if I may address the release

10:15:34 2     itself, because it's not my understanding that the release is

10:15:39 3     signed when someone is paid.  The release actually is effective

10:15:45 4     upon approval of the class settlement.

10:15:48 5          So the preexisting claims are being released in

10:15:52 6     exchange for the rights under the agreement; whether that be

10:15:55 7     the SPC or the Back-End Litigation depends on the individual

10:15:58 8     class member.

10:15:59 9          Then when a class member submits a claim, he or

10:16:01 10    she signs the release as part of the claim form.  So they're

10:16:05 11    saying, I release my claims whether I'm paid or not.  The

10:16:08 12    Claims Administrator could say, you're not entitled to anything

10:16:11 13    but this release.

10:16:12 14         So with that clarification, BP's fundamental

10:16:15 15    position is that class members should receive what they are

10:16:17 16    entitled to receive under the settlement.  So in terms of the

10:16:21 17    question the Court asks, if a class member is paid, if a class

10:16:26 18    member submits a claim for an acute condition and is paid,

10:16:32 19    receives compensation for that condition, then they cannot go

10:16:35 20    on to later seek additional compensation for the exacerbation

10:16:39 21    or progression of that condition.

10:16:41 22         That would mean that someone who submits an acute

10:16:44 23    condition cannot later file a second claim for the same

10:16:48 24    condition as a chronic condition.  That's pursuant to the

10:16:55 25    release that's contained in the medical settlements --

10:16:57 1    THE COURT:  So if they have an acute condition which

10:16:59 2    later becomes chronic, but they haven't been diagnosed before

10:17:07 3    April 16, 2012, you're telling them on the one hand that they

10:17:17 4    are not eligible for -- if they are diagnosed after April 16,

10:17:24 5    2012, they have a Later-Manifested Physical Condition, right,

10:17:29 6    and they have to go into the BELO option, Back-End Litigation

10:17:33 7    Option.

10:17:33 8         But if at the same time, obviously, the condition

10:17:39 9    was acute at one point, and if they make a claim or have made a

10:17:43 10   claim for the acute condition and get paid a small amount of

10:17:46 11   money, they've waived or released their Back-End Litigation

10:17:52 12   Option?  That's what you just said.

10:17:53 13        MR. HODGES:  That all chronic --

10:17:56 14        THE COURT:  Is that what you just said?

10:17:56 15        MR. HODGES:  Yes, it is.  All chronic conditions --

10:17:59 16        THE COURT:  That's really troubling, I've got to tell

10:18:00 17   you.

10:18:01 18        MR. HODGES:  Well, let me explain, Your Honor.  All

10:18:03 19   chronic conditions begin as acute conditions.

10:18:05 20        THE COURT:  I know that.

10:18:06 21        MR. HODGES:  So, to otherwise, we would have double

10:18:09 22   recovery for every single chronic condition.  You could submit

10:18:12 23   it as an acute and then later seek compensation under the

10:18:17 24   Back-End Litigation Option.

10:18:19 25        THE COURT:  Well, there are other ways you could draft

**OFFICIAL TRANSCRIPT**

10:18:21 1     a release.  You could say that you reserve your right, and you

10:18:24 2     get credit for the acute payment or something -- there are a

10:18:27 3     lot of ways you can work that without double payment -- but it

10:18:30 4     seems inherently unfair.

10:18:31 5          Now, what are these people supposed to do?  They

10:18:35 6     are supposed to guess as to whether it's in their best interest

10:18:37 7     to make a claim for an acute payment and give up their right to

10:18:41 8     a Back-End Litigation claim, or do they waive their right to

10:18:45 9     the acute payment, and take a chance on a Back-End Litigation

10:18:50 10    claim, which could be several years away before they would know

10:18:53 11    if they could prevail on that claim or not?

10:18:55 12         That's quite a quandary you're putting them in

10:19:00 13    there.

10:19:00 14         MR. HODGES:  Well, Your Honor, but the same holds true

10:19:03 15    for those who are able to submit claims for chronic conditions

10:19:07 16    under the SPC Matrix.  They are not entitled to submit a claim

10:19:10 17    for an acute SPC and then later submit a claim for a chronic

10:19:15 18    SPC for that same condition.

10:19:17 19         So they are in that same position even if the

10:19:21 20    Back-End, Later-Manifested Condition issue doesn't apply to

10:19:25 21    them at all.  They are only going to get one compensation under

10:19:29 22    the settlement.

10:19:31 23         THE COURT:  Why did BP tell Mr. Garretson that, no, you

10:19:34 24    haven't taken that position, and you're not taking that

10:19:36 25    position, and now today you are taking that position?

10:19:38  1      MR. HODGES:  I don't believe that was exactly the

10:19:40  2  position that was --

10:19:41  3      THE COURT:  Well, that's what the letter said.  The

10:19:43  4  letter said, we have not taken that position, and we do not

10:19:46  5  take that position.  Now you're saying, we are taking that very

10:19:51  6  position.

10:19:51  7      MR. HODGES:  Your Honor, this issue came up in the

10:19:54  8  approval hearing.  It was specifically presented to the Court,

10:19:59  9  as a group of objectors asked for this exact result.

10:20:04 10          What happened at that time in the approval order

10:20:09 11  is the Court said -- well, first of all, another group of

10:20:12 12  objectors assert that exacerbation of a preexisting condition

10:20:17 13  diagnosed before April 16, 2012, should be included in the

10:20:20 14  Back-End Litigation Option, and the Court held that that can't

10:20:23 15  happen; to the extent an individual has already recovered under

10:20:26 16  the Matrix for such a condition, there is no unfairness in

10:20:31 17  excluding double recoveries.

10:20:35 18          We're talking only about the same condition now,

10:20:37 19  of course.  If a class member were to submit a claim --

10:20:41 20      THE COURT:  So what if they had an acute ocular

10:20:48 21  condition, and they filed a claim for a Specified Physical

10:20:54 22  Condition, acute -- or chronic, for that matter, but in this

10:20:59 23  Specified Physical Condition Matrix, and they were paid for

10:21:01 24  that, and later, you know, four or five years later, they

10:21:06 25  developed some type of cancer that they could show is related

10:21:08  1    to the exposure, their exposure, are you saying that release
10:21:14  2    would not release that claim?
10:21:15  3         MR. HODGES:  That is what I'm saying.  If it is a
10:21:18  4    different condition, they are entitled to seek compensation for
10:21:22  5    those different conditions, and that would not be released.  Of
10:21:25  6    course, they have to meet the proof requirements that may
10:21:28  7    apply, but that's correct.
10:21:33  8              If they submit an acute condition and they are
10:21:36  9    not compensated for the acute condition, for whatever reason --
10:21:39 10    well, other than the Claims Administrator saying, we find that
10:21:43 11    you don't have that condition, or you haven't documented that
10:21:46 12    condition, they can submit for the chronic condition.
10:21:50 13              I would suggest that the Claims Administrator
10:21:52 14    would be in a position, through the Claims Service Center, to
10:21:57 15    guide people to the correct procedure for them, depending on
10:22:00 16    date of diagnosis, date of manifestation, and that sort of
10:22:03 17    thing.
10:22:04 18              I mean, there are going to be some people who
10:22:06 19    call who aren't eligible for SPC compensation, period.
10:22:10 20    Hopefully, those people are directed to the right procedure for
10:22:12 21    them.
10:22:13 22              But the release specifically says that a party
10:22:19 23    releases claims for exacerbation or progression of conditions,
10:22:23 24    and that would mean a progression or exacerbation of a
10:22:26 25    condition from acute to chronic.

**OFFICIAL TRANSCRIPT**

10:22:30  1          THE COURT:  All right.  Thank you, Mr. Hodges.

10:22:33  2          MR. HODGES:  Thank you, Your Honor.

10:22:35  3          THE COURT:  All right.  We'll take this one under

10:22:39  4    advisement.

10:22:40  5          MR. HERMAN:  Okay, Your Honor.

10:22:41  6          THE COURT:  Thank you.

10:22:43  7              We went a little longer than I thought on that.

10:22:46  8    Let's move on to the other issue.

10:22:46  9          [Reporter's Note:  BP's Motion for Restitution and

10:22:56 10    Injunctive Relief]

10:22:56 11          MR. DOWNEY:  Your Honor, I have a set of slides for you

10:23:08 12    for this argument, as well, as well as the original documents.

10:23:12 13    So if I might, I'll just approach and pass those up.

10:23:17 14          THE COURT:  Sure.

10:23:38 15              All right, go ahead, Counsel.

10:23:40 16          MR. DOWNEY:  May it please the Court, Kevin Downey on

10:23:43 17    behalf of BP.

10:23:45 18              As the Court is well aware, the Settlement

10:23:48 19    Agreement instructs the Settlement Program how to calculate the

10:23:51 20    compensation under the Settlement Agreement.

10:23:52 21              For more than a year, the Settlement Program

10:23:56 22    pursued a policy which was inconsistent with the requirements

10:23:59 23    of the Settlement Agreement, as both the Fifth Circuit and this

10:24:02 24    Court have now held.

10:24:04 25              As a result, there were substantial overpayments

OFFICIAL TRANSCRIPT

10:24:07  1    in connection with a number of awards, and we're here today to

10:24:11  2    ask the Court to resolve the question of whether those awards

10:24:15  3    which have already been paid should result in those claimants

10:24:19  4    returning the overpayments, or whether those claimants should

10:24:23  5    be permitted to keep those overpayments.  To date, the Court

10:24:29  6    has not directed resolution of that question, and we ask by

10:24:34  7    this motion that the Court do so.

10:24:36  8             There are essentially two different reasons,

10:24:38  9    which are distinct but relate to each other, Judge, to do so.

10:24:42 10    One, principles of restitution demand that when there is a

10:24:48 11    situation where a party makes a substantial payment in response

10:24:51 12    to either a court order or a compelling contractual

10:24:56 13    circumstance, and the determination is later made by a court

10:24:59 14    that that was done in error, the party which is compelled to

10:25:04 15    pay is entitled to restitution of that amount.

10:25:06 16             As well, Your Honor, and I think this is

10:25:10 17    important because it really goes to the heart of class

10:25:13 18    counsels' arguments, when the agreement is considered as a

10:25:16 19    whole, contrary to, I think, what the essence of class

10:25:20 20    counsels' argument is, it's clear that the agreement here would

10:25:23 21    require restitution for overpayments in this particular context

10:25:27 22    as well.

10:25:29 23             So, before I get into that analysis of the

10:25:31 24    contract, let me just give the Court the basic statistics on

10:25:38 25    why this question matters so much.

**OFFICIAL TRANSCRIPT**

10:25:39  1                 When the matching policy, 495, was approved by

10:25:41  2      this Court, BP undertook an analysis of claims that had been

10:25:46  3      paid, but which had been appealed by BP on matching grounds.

10:25:53  4      At that time, it was able to identify about 793 claims for

10:25:58  5      which there was an overpayment.

10:26:01  6                 For a subset of those claims, it's about 208

10:26:04  7      claims, BP was able to identify to the point of being able to

10:26:10  8      estimate in a reasonable manner what the specific amount of

10:26:14  9      overpayment was.  That amount of overpayment is near

10:26:20 10      $185 million.

10:26:21 11                 So the question we're asking the Court to resolve

10:26:26 12      today relates at least to that amount.  Of course, there are

10:26:30 13      still another 600 or so calculations that would have to be

10:26:34 14      done.

10:26:34 15                 There are 50 or so claimants who, if there had

10:26:39 16      been a correct calculation of compensation under the agreement,

10:26:44 17      would have received no payment at all, and that's within the

10:26:46 18      population of the 208 that I gave the Court.

10:26:50 19                 There is really nothing in the record, even by

10:26:53 20      way of analysis, that disputes either the potential for

10:26:56 21      overpayment or the fact that any of these individual claims

10:27:00 22      have been overpaid.

10:27:02 23                 So we're asking the Court today for two things.

10:27:04 24      One is, we're asking the Court to interpret the Settlement

10:27:08 25      Agreement to give BP the right to obtain, in restitution,

10:27:13 1  overpayments made back from the claimants, through the same

10:27:18 2  mechanisms that the Court has used in connection with the *Thonn*

10:27:22 3  claim.

10:27:22 4       As well, we're asking that the Court -- while

10:27:25 5  those overpayments are calculated with precision, that the

10:27:30 6  Court direct, in certain situations, that there not be further

10:27:33 7  dissipation of those awards in an amount equal to the amount of

10:27:38 8  overpayment.  So those are really the two issues that are

10:27:40 9  before the Court.

10:27:41 10      I know that the Court, from some of the other

10:27:44 11 litigation, is well familiar with the equitable principles that

10:27:50 12 are relevant with respect to already awarded claims.  That's

10:27:54 13 happened with respect to the *Thonn* claim in response to the

10:27:59 14 motion by the Special Master.

10:28:00 15      But as I said -- and this is briefed extensively,

10:28:03 16 so I won't go into it unless the Court directs questions about

10:28:08 17 it -- the basic principle that is articulated in *The*

10:28:13 18 *Restatement (Third) of Restitution and Unjust Enrichment* is

10:28:16 19 that in a situation where a claimant has been overpaid or has

10:28:21 20 been paid at all as a result of an error in law that is later

10:28:26 21 corrected by another court, that amount should be repaid to the

10:28:33 22 payor in restitution.  That's Section 18 of *The Restatement*

10:28:38 23 *(Third)* on that subject.

10:28:39 24      That is true, Your Honor, regardless of fault on

10:28:45 25 the part of the claimant receiving the payment.  The analysis

that's contained in the notes to *Restatement* 18 makes clear

that the issue is just was the payment warranted, or was the

payment not.

So the situation we have here is well familiar to

the Court.  These are claims for which BP filed an appeal

within the Settlement Program, according to the procedures set

out in the Settlement Agreement and by the Settlement Program

for filing an appeal.  They were pursued throughout the

Settlement Program.  Discretionary review was sought from this

Court.  There were collateral proceedings at the same time to

challenge the policy under which the determinations were made.

There was litigation related to that in the form of a request

for an injunction against the Claims Administrator.  All of

those determinations were appealed.

So throughout, BP has been maintaining the

position that with regard to these awards, they were

erroneously calculated and should not be paid.

It's not until, really, this Court's adoption of

Policy 495 in May, but certainly not until this Court's ruling

on December 24th, that the prior matching order was errant,

that BP has been in a position to make the request.

So the basic principle of restitution to a party

that overpays applies here because the party has done

everything it can to preserve its rights.  Its procedural

posture in the case makes clear that it's contesting the

**OFFICIAL TRANSCRIPT**

10:30:28  1   validity of the awards up until it was -- its position was

10:30:32  2   ultimately adopted by this Court.

10:30:35  3          For that reason, there is no ambiguity that BP

10:30:38  4   has both given notice and has put itself in a position to make

10:30:43  5   a claim for restitution.

10:30:44  6          That's the restitutionary principle, Your Honor,

10:30:48  7   and that is certainly a basis on which to make the award that

10:30:53  8   we are asking for; but, there is a related issue, and that's

10:30:58  9   really what I want to devote the bulk of my comments to today

10:31:02 10   because I think it speaks, really, to the basis on which this

10:31:07 11   motion is being resisted.

10:31:08 12          That is, that even putting aside the issue of

10:31:11 13   restitution, the Settlement Agreement, as drafted, does not

10:31:17 14   permit compensation to a claimant until you have the

10:31:22 15   calculation through appropriate procedures of the proper

10:31:25 16   settlement payments.  So let me explain why that is.

10:31:29 17          As you know from class counsels' papers in this

10:31:32 18   matter, there is substantial focus on various provisions in the

10:31:36 19   agreement that relate to the release and that relate to

10:31:40 20   language about several possibilities, terms of the agreement

10:31:44 21   changing, the agreement not being finally approved, etcetera.

10:31:50 22          Before I answer any of those individual claims,

10:31:52 23   let me just start by explaining how the release is supposed to

10:31:56 24   work under the terms of the agreement, and what's effective and

10:31:59 25   what's not effective about the terms of that release.

**OFFICIAL TRANSCRIPT**

10:32:02 1          First of all, I'll tell the Court that, as a

10:32:06 2  matter of practice, releases are sent out by the Settlement

10:32:09 3  Program with an amount in them that often ends up not being the

10:32:14 4  final settlement payment amount.  That's because the practice

10:32:17 5  in the Settlement Program is to send a draft release with the

10:32:23 6  amount of the eligibility notice, often months before there is

10:32:27 7  actually a final award.

10:32:29 8          So the amounts within the releases are not

10:32:32 9  treated by the Settlement Program; if the claimant accepts the

10:32:35 10 award, not treated by the claimant; not treated by BP as having

10:32:39 11 any significance in terms of the amount specified within the

10:32:43 12 release.

10:32:44 13         Let me just show Your Honor that practice by

10:32:48 14 demonstrating a slide.

10:32:50 15         THE COURT:  But a release has to be signed before any

10:32:53 16 payment is made.

10:32:55 17         MR. DOWNEY:  That's right.  If you look at the

10:32:56 18 language --

10:32:56 19         THE COURT:  Throughout this, what has been very

10:33:03 20 different about this case is that, unlike the more typical

10:33:11 21 class settlement, usually there is a settlement, documents are

10:33:24 22 filed with the Court, the Court is asked to give preliminary

10:33:27 23 approval and then final approval at a fairness hearing.  There

10:33:32 24 may or may not be appeals.  It's only once there is final

10:33:37 25 approval and all appeals are final that a Claims Administrator

**OFFICIAL TRANSCRIPT**

10:33:42  1    is appointed, a claims office is set up, and claims begin to be

10:33:48  2    accepted and paid.

10:33:50  3              What's very different about this case is that

10:33:56  4    when the parties came to the Court sometime in March, I think,

10:34:05  5    in 2012, with this settlement, they did all of that, they had

10:34:13  6    all of those provisions, but they had more than that.  They had

10:34:19  7    motions asking me to immediately appointment a Claims

10:34:26  8    Administrator, which I did, and establish a transition process

10:34:33  9    to transition -- in other words, they immediately shut down --

10:34:37 10    the parties asked me to immediately shut down the Gulf Coast

10:34:42 11    Claims Facility and transition them into the Court-Supervised

10:34:44 12    Settlement Program.

10:34:46 13              Then, beyond that, that I think as of June 4th of

10:34:52 14    2012 -- I don't recall the exact date -- within two to three

10:34:55 15    months, that Claims Administration Office opened up, and they

10:35:01 16    started accepting claims and paying the claims.

10:35:08 17              It was provided that that would be done

10:35:10 18    regardless of what happened with the class settlement, in terms

10:35:14 19    of whether the settlement was finally approved or not finally

10:35:18 20    approved, or whether it was overturned on appeal or anything,

10:35:22 21    because the claims that would be paid in the interim, which is

10:35:25 22    still ongoing because of your appeals, would be paid in

10:35:33 23    exchange for an individual release.

10:35:35 24              So the release is important, very important,

10:35:39 25    because barring the class settlement being finally approved, in

10:35:47   1   the interim BP wanted that -- you negotiated for that release,

10:35:50   2   right?  You had to have that release, otherwise you wouldn't

10:35:53   3   have been paying claims in the interim, right?

10:35:56   4        MR. DOWNEY:  That's right.  A motive for having the

10:35:58   5   release was that there might be a couple of scenarios:  The

10:36:02   6   settlement might not be finally approved --

10:36:05   7        THE COURT:  Sure, a lot of scenarios could occur, but

10:36:06   8   you wouldn't be paying people without a release, not knowing if

10:36:11   9   they would be bound by a class-wide release or settlement.

10:36:14  10        So what we have is a situation where that's what

10:36:18  11   you all agreed to, you designed and drafted this release, and

10:36:28  12   in the Settlement Agreement and in the release, you tell the

10:36:32  13   person, the claimant who is getting paid, that if you sign this

10:36:35  14   release, that's it, it's over for you, you can't come back and

10:36:39  15   ask for more money, because later you can't file a suit against

10:36:44  16   us, you can't sue anybody else.  You've settled all of your

10:36:50  17   claims, and it doesn't matter if the settlement is ever

10:36:56  18   approved or reversed on appeal or not, it doesn't matter if the

10:37:00  19   law changes or not, if the interpretation of the Settlement

10:37:03  20   Agreement changes, for better or worse, because we could be

10:37:08  21   standing here now in a scenario where the reverse situation

10:37:13  22   happened, where the Claims Administrator and this Court had

10:37:17  23   interpreted the agreement one way, in your favor and against

10:37:21  24   the class, they could have gotten a reversal on appeal from the

10:37:26  25   Fifth Circuit, we could have come back and changed the

**OFFICIAL TRANSCRIPT**

10:37:32 1   interpretation of the agreement in accordance with the Court of

10:37:35 2   Appeal, and I doubt that you would be standing here and saying

10:37:41 3   anything but that those people who had settled and signed their

10:37:45 4   releases before would be bound by that settlement, they

10:37:49 5   couldn't come back and undo that settlement; am I right?

10:37:53 6        MR. DOWNEY:  It would depend on the context,

10:37:56 7   Your Honor.

10:37:56 8        THE COURT:  You wouldn't be here saying they could undo

10:37:59 9   those settlements, just like they can't undo the Gulf Coast

10:38:03 10   Claims Facility settlements.

10:38:04 11        MR. DOWNEY:  Your Honor, first of all, I substantially

10:38:06 12   agree with your -- I can't verify all the dates that Your Honor

10:38:08 13   gave, but, in terms of the procedural history, I think -- I

10:38:11 14   agree with that.

10:38:12 15        I don't agree with Your Honor on an important

10:38:14 16   point that Your Honor included in that summary, which is it is

10:38:18 17   not the case that this Settlement Agreement says, if the

10:38:22 18   interpretation of the Settlement Agreement is changed, that

10:38:27 19   that's an immaterial event in connection with the agreement.

10:38:31 20        The way this works is, as Your Honor said --

10:38:36 21        THE COURT:  Well, here is the language.  I know this

10:38:41 22   language is in the Settlement Agreement.  I guess it's

10:38:47 23   Exhibit 26.  The individual release has the same language.  It

10:38:59 24   says:  "If the Court does approve the proposed class

10:39:05 25   settlement, an appellate court could reverse the approval.  In

OFFICIAL TRANSCRIPT

10:39:10  1    addition, it is possible that the terms of the proposed

10:39:11  2    settlement may change in the future, for better or worse, as a

10:39:14  3    result of further legal proceeding.  However, if you sign this

10:39:17  4    individual release, none of those uncertain future events will

10:39:22  5    affect you.  By signing this individual release, you are

10:39:26  6    forever waiving and releasing all claims that you may have

10:39:29  7    against BP" -- there is a provision for expressly reserved

10:39:33  8    claims, which doesn't apply here -- "in exchange for

10:39:37  9    compensation being provided.  In fact, even if the Court does

10:39:39  10   not approve the proposed class settlement agreement or the

10:39:43  11   approval is reversed by the appellate court, you shall continue

10:39:47  12   to be bound by this individual release."

10:39:50  13          I don't know how you get around that, Mr. Downey.

10:39:55  14       MR. DOWNEY:  Well, the answer to that, Your Honor, is

10:39:57  15   this is not -- the scenario that's eventuated is not one about

10:40:03  16   changing the terms of the Settlement Agreement.

10:40:05  17       THE COURT:  Well, if you change the interpretation of

10:40:07  18   it, you've changed the terms.  It says things could be on

10:40:11  19   appeal through further litigation.  You seem to be splitting

10:40:15  20   hairs there if you're saying that's not changing the terms.

10:40:18  21       MR. DOWNEY:  No, Your Honor, what I'm saying is this,

10:40:21  22   I'm saying there basically are three kinds of future events

10:40:24  23   anticipated in the release that you just read and other

10:40:28  24   portions of the Settlement Agreement, one of which is some

10:40:30  25   future change in the terms of the agreement because it's

10:40:33 1    modified, for example, by --

10:40:35 2         THE COURT:  By a court ruling.

10:40:38 3         MR. DOWNEY:  -- in response to a request -- well, that

10:40:38 4    the terms of the Settlement Agreement changed.

10:40:40 5              The Settlement Agreement and its interpretation

10:40:43 6    are questions that aren't final until it's been finally

10:40:47 7    interpreted, and that's what happened.  The agreement is the

10:40:50 8    same agreement.  No terms to the agreement have changed.

10:40:53 9              So we don't have in place -- you know, we haven't

10:40:56 10   agreed and put to the Court a change in the terms of Exhibit 4C

10:41:03 11   to the agreement.  We have in front of the Court the same

10:41:06 12   Exhibit 4C, and the interpretation of it has now been

10:41:09 13   corrected.

10:41:10 14             The series of payments flowed from the incorrect

10:41:16 15   interpretation, and we're just asking that what the parties

10:41:17 16   have been found to have agreed to be enforced.

10:41:21 17        THE COURT:  So if it had gone the opposite way, as I

10:41:24 18   suggested could have happened, if it had gone in your favor

10:41:29 19   originally and been reinterpreted differently by the Court of

10:41:32 20   Appeal or whoever later and gone the other way, would you be

10:41:37 21   standing here now saying that these claimants who settled

10:41:42 22   before the different interpretation came into effect are not

10:41:46 23   bound by this settlement, by this release?

10:41:48 24        MR. HODGES:  In some circumstances, yes, and in some,

10:41:51 25   no.

                        **OFFICIAL TRANSCRIPT**

10:41:51  1          The circumstances we have here are each of the

10:41:53  2     awards that's at issue that has been appealed.  Each of

10:41:57  3     those -- the issues with regard to those awards was the subject

10:42:02  4     of that appeal.  BP took all the procedural steps available to

10:42:07  5     it to stop those payments.

10:42:08  6          The reinterpretation that was given to the

10:42:14  7     Settlement Agreement affects the question under the agreement

10:42:18  8     as to what the proper, quote, settlement payment, close quote,

10:42:23  9     is.

10:42:23 10          I think the disagreement that I'm having with

10:42:26 11     Your Honor's question is this.  The plain language of the

10:42:28 12     Settlement Agreement says that the release is a -- the delivery

10:42:33 13     of the individual release is a condition precedent for the

10:42:38 14     settlement payment.  So the question is -- and that's in

10:42:42 15     Section 10.9 of the agreement -- the question is, what is the

10:42:47 16     proper settlement payment, and has that been finally

10:42:50 17     determined?

10:42:51 18          Here, it was not finally determined until after

10:42:54 19     the determination that the policy was -- the policy meant

10:43:02 20     something along the lines of the position BP was asserting.

10:43:05 21          So the issue -- in that procedural context,

10:43:08 22     that's the right result.  If there is another situation where

10:43:11 23     that type of posture exists, then I would say to Your Honor,

10:43:17 24     yes, in that situation, despite the fact that we'd like the

10:43:21 25     benefit of the release, we may not get it; but, if there are

10:43:25  1    differences, I think the results would be varying, depending

10:43:29  2    upon the circumstances.

10:43:31  3                So the way we see the contract is, Your Honor, if

10:43:34  4    you look at, I think, what is the first slide in front of you,

10:43:38  5    that is the section of the Settlement Agreement that I refer

10:43:43  6    to, which is Section 10.9.  That provision provides, as I said,

10:43:47  7    that a condition -- it's a condition precedent to receiving a

10:43:53  8    settlement payment, that a claimant sign an individual release.

10:43:58  9        THE COURT:  Isn't that always required?  I've never

10:43:59 10    heard of a settlement where you didn't have to sign a release.

10:44:02 11        MR. DOWNEY:  Well, in a class settlement, you know, you

10:44:04 12    could avoid --

10:44:05 13        THE COURT:  Well, in a class settlement, but this gets

10:44:08 14    back to my earlier point, I think, that you all were

10:44:13 15    envisioning and trying to make sure that people who were paid

10:44:17 16    before there was a final class settlement signed an individual

10:44:21 17    release --

10:44:22 18        MR. DOWNEY:  That's correct.

10:44:23 19        THE COURT:  -- which would put it in the realm of, I'll

10:44:26 20    call it, an ordinary settlement, a nonclass individual

10:44:29 21    settlement.  They've signed this individual release.  That's

10:44:33 22    what this says.  I don't know how this provision means anything

10:44:39 23    more than that.

10:44:41 24        MR. DOWNEY:  Well, the question, Your Honor, is what is

10:44:43 25    the definition of settlement payment within the agreement?

**OFFICIAL TRANSCRIPT**

10:44:45  1   Settlement payment is not the amount that is entered at one

10:44:50  2   point in time on an eligibility notice, but that's how these

10:44:54  3   determinations are sent out, and that's the release that

10:44:57  4   claimants typically sign.

10:44:58  5          So the basic legal framework is in -- I believe

10:45:03  6   it's the second slide -- yes, the slide that's entitled,

10:45:08  7   "Definition of Settlement Payment."  That says that,

10:45:11  8   "Settlement Payment shall mean the total compensation amount to

10:45:14  9   be paid to a claimant for any claim made pursuant to the terms

10:45:17 10   of the agreement," including the frameworks in the exhibits.

10:45:20 11          As the Court well knows, Exhibit 4C contains the

10:45:26 12   relevant compensation framework here.  It's clear, again, that

10:45:29 13   the total compensation amount, which is ultimately what's

10:45:33 14   supposed to equal the settlement payment, also requires that it

10:45:37 15   be done in accord with the agreement and its frameworks.

10:45:40 16          So what happens as a practical matter -- because

10:45:43 17   I think the practical application of what the Court is saying

10:45:47 18   is not consistent with BP's understanding, not consistent with

10:45:51 19   the claimants' understanding, not consistent with the program's

10:45:54 20   understanding -- what happens is that at the time of the

10:45:58 21   eligibility notice, the release is sent out.

10:46:01 22          So let me show you an example of that, which this

10:46:05 23   example is in your notebook, but there is an eligibility notice

10:46:09 24   sent here on February 11th, 2013.  That proposes an award of a

10:46:17 25   little bit more than a million dollars.

10:46:19 1        At the time that that is sent, both parties still

10:46:22 2   have all their appeal rights.  If an appeal is taken, the

10:46:29 3   appeals panel has whatever time it takes to decide the matter.

10:46:32 4   There's a possibility that the CSSP would reconsider.  So there

10:46:36 5   is no sense in which we would call that amount a final amount,

10:46:41 6   but it is, I believe, more the rule than the exception that

10:46:44 7   that's when the release is sent out, and the amount contained

10:46:47 8   in the release is the amount reflected here.

10:46:50 9        So if you look on the example that I'm showing

10:46:52 10  you, the release that was sent out along with these documents

10:46:56 11  on February 11th had an amount of a little bit more than a

10:46:59 12  million dollars.  The claimant signed that on February 18th,

10:47:04 13  long before even the time had expired for either party to

10:47:09 14  appeal the award.  That went through the process, and the final

10:47:13 15  award here, as shown in the post-appeal eligibility notice, is

10:47:18 16  for $534,000.

10:47:20 17       So that's not -- the description of those

10:47:24 18  numbers, as it's done in practice, is not a description of the

10:47:28 19  payment that's actually been made and the parties agreed to in

10:47:32 20  exchange for the release.  What the practice is, is simply

10:47:38 21  what's done as a matter of facilitating the payment of the

10:47:41 22  claims within the judgment of the Settlement Program is the

10:47:44 23  best way to do it.

10:47:45 24       BP has consistently objected to that being done.

10:47:50 25  BP's view is that there shouldn't be any release sent until

10:47:54  1    there is a final settlement payment amount.  But, nevertheless,

10:47:57  2    that is the practice, but it doesn't describe either anything

10:48:00  3    which happens or anything that BP has agreed to because BP has

10:48:03  4    agreed the calculations are the correct settlement payment

10:48:06  5    amount.

10:48:07  6              So the --

10:48:08  7              THE COURT:  Well, you did agree to the language in the

10:48:11  8    settlement agreement and in the release.

10:48:13  9              MR. DOWNEY:  Well, that's right, but the release exists

10:48:16 10    as -- is created by the Settlement Agreement, and that's why

10:48:20 11    the language of Section 10.9 is important, and why the

10:48:24 12    surrounding language in Exhibit 26 is important.

10:48:27 13              So as we read the Settlement Agreement,

10:48:32 14    Your Honor, the requirement of the agreement is, once the

10:48:36 15    parties have exercised whatever their procedural rights are in

10:48:39 16    a particular situation, and those have expired, there's a final

10:48:44 17    settlement payment amount consistent with the terms of the

10:48:47 18    agreement.

10:48:47 19              When that's done, that's the amount for which

10:48:50 20    there has been an exchange of consideration between the

10:48:54 21    claimant and BP, and it is that amount that should be in the

10:48:59 22    release, and it's that amount that's the binding amount.

10:49:01 23              That didn't occur here until we had a new policy.

10:49:05 24    Indeed, if these are sent for reconsideration, that's what the

10:49:11 25    determination is that will be made, and that's what those

**OFFICIAL TRANSCRIPT**

10:49:15  1    releases should say, and that's what they should, frankly, say

10:49:17  2    in every instance, but they don't.

10:49:22  3            BP has never agreed to these individual amounts.

10:49:24  4    It doesn't even see these releases before they go out.  It

10:49:29  5    agreed to proper calculations under the Settlement Agreement.

10:49:31  6            The issue that has resulted in these adjustments

10:49:34  7    is not a change in terms, failure of approval, it is simply a

10:49:38  8    change in the interpretation.  Had the --

10:49:41  9        THE COURT:  If you write a contract, someone has to

10:49:46 10    interpret it.  If you write a law, someone has to interpret it.

10:49:52 11    That's usually the business of the courts, right?

10:49:54 12        MR. DOWNEY:  Right.

10:49:55 13        THE COURT:  Whether it's changed by agreement of the

10:50:00 14    parties, whether the parties amend the contract, or whether the

10:50:05 15    change is directed by a court in the way it interprets a law,

10:50:14 16    or a contract in this case, I don't know how there could be

10:50:17 17    anything other than a change in the terms of the contract, and

10:50:24 18    it's a change in how the terms are interpreted.

10:50:26 19            You're splitting hairs, it seems to me, to make

10:50:29 20    that argument that this was not contemplated by the Settlement

10:50:33 21    Agreement.  I think it was clearly contemplated that things

10:50:35 22    could change, a lot of things could change going forward in

10:50:39 23    this case.  The settlement could be approved, it might not be

10:50:44 24    approved, it might be approved in a different fashion, it could

10:50:49 25    be interpreted the way we think it should be interpreted.

**OFFICIAL TRANSCRIPT**

10:50:53 1          The parties, the claimant and you all may be

10:50:57 2  looking at the same document, as happened here, and have very

10:51:02 3  different interpretations of how that's going to be

10:51:05 4  interpreted, but that's the risk you take when you sign a

10:51:08 5  settlement and you sign a Settlement Agreement, and when the

10:51:11 6  claimant signs that document and it says, nothing that changes

10:51:15 7  can affect you.

10:51:17 8          I just don't see how you get around that, but I

10:51:22 9  understand your argument.

10:51:23 10     MR. DOWNEY:  Right.  The only thing I would say in

10:51:25 11  terms of Your Honor's formulation is I think those -- the

10:51:29 12  scenarios that the Court describes are specifically

10:51:32 13  contemplated in the agreement, and a change in interpretation

10:51:35 14  is not one of them.

10:51:38 15         So I understand Your Honor's point, but I think,

10:51:40 16  actually, when Your Honor correctly says a lot of things could

10:51:45 17  change, you could certainly have a change with regard to

10:51:48 18  approval status, the parties could renegotiate a term,

10:51:51 19  etcetera, but that's a different question from the same

10:51:54 20  contract being reinterpreted to apply the correct

10:51:58 21  interpretation.

10:51:59 22         I would also say, Your Honor, it's an important

10:52:02 23  fact that BP never agrees to these individual amounts in almost

10:52:09 24  any situation because they're interim.

10:52:12 25     THE COURT:  Did you appeal those individual amounts?

**OFFICIAL TRANSCRIPT**

10:52:16  1        MR. DOWNEY:  Within the BEL -- we sought discretionary

10:52:22  2   review with the Court, and they were sent to the -- they were

10:52:26  3   dealt with pursuant to Your Honor's April --

10:52:29  4        THE COURT:  Did you appeal beyond that on the

10:52:32  5   individual awards?

10:52:34  6        MR. DOWNEY:  I'm sorry?

10:52:34  7        THE COURT:  Did you appeal beyond that any of these 700

10:52:38  8   and something awards that you indicated?

10:52:39  9        MR. DOWNEY:  Well, in the context of seeking to enjoin

10:52:41 10   the payments, yes.

10:52:42 11        THE COURT:  That's not what I'm asking, I'm sorry.  Any

10:52:45 12   individual awards, did you appeal them beyond what you just

10:52:50 13   described?

10:52:51 14        MR. DOWNEY:  No, no, we didn't appeal the individual

10:52:53 15   awards, the 800 individual awards, to the Fifth Circuit in

10:52:57 16   terms of noting, here is the appeal number, and we're appealing

10:53:02 17   it; but, I think, in every form that we perceived to be

10:53:06 18   available to us at that time, we appealed it.

10:53:10 19             So I don't think --

10:53:10 20        THE COURT:  You guys haven't been bashful about

10:53:13 21   appealing.  You know where the Circuit is, I know.

10:53:16 22        MR. DOWNEY:  Well, I think the answer to your question

10:53:18 23   is, I think what was -- what was deemed to be procedurally

10:53:21 24   available, which was more than many thought at the time, we

10:53:25 25   exercised our procedural rights.

**OFFICIAL TRANSCRIPT**

10:53:27  1          THE COURT:  Okay.  Anything else, Mr. Downey?

10:53:30  2          MR. DOWNEY:  No, Your Honor, thank you.

10:53:32  3          THE COURT:  Thank you very much.

10:53:38  4              Do you want to respond?  I'd like you to respond

10:53:41  5      specifically to the points Mr. Downey raised about the way the

10:53:48  6      releases work, the settlement, the payments that went out and

10:53:50  7      so forth.

10:53:50  8          MR. HERMAN:  As a practical matter, I think he's

10:53:51  9      correct, but where he's wrong in several places is that, as

10:53:57 10      Your Honor pointed out, in each of these cases, whatever number

10:54:03 11      there is, they got to the end of the road, they got to the

10:54:07 12      final release or the final eligibility notice or the

10:54:11 13      post-appeal notice, and the case at that point was over.  The

10:54:15 14      release was signed, finalized, payment was made.

10:54:18 15              As Your Honor pointed out, none of those claims

10:54:21 16      were actually appealed beyond Your Honor to the Fifth Circuit.

10:54:27 17      There has been no reversal of any of those individual awards.

10:54:31 18      There has been no finding by either the Claims Administrator,

10:54:34 19      Your Honor, or the Fifth Circuit that any of those claims had

10:54:37 20      matching issues, or that there were overpayments, or that those

10:54:43 21      awards or releases or payments needed to be reversed or

10:54:47 22      restitution paid in any way.  So he's correct.

10:54:53 23              I think several class members have disagreed with

10:54:57 24      Your Honor, but Your Honor has basically, in the implementation

10:55:00 25      of 495 to live claims, has essentially agreed with BP that

**OFFICIAL TRANSCRIPT**

10:55:08 1  signing the release was subject to appellate rights and further

10:55:14 2  review, and Your Honor has now instructed the appeal

10:55:17 3  coordinator to send all those back down and reprocess them

10:55:21 4  under 495, despite the fact that releases were signed.  We

10:55:25 5  disagreed with that; Your Honor ruled BP.

10:55:27 6             This is a completely different situation, in my

10:55:29 7  opinion.

10:55:30 8        THE COURT:  Those are claims that, what, were still in

10:55:32 9  the appeal process?

10:55:33 10       MR. HERMAN:  That were still in the Settlement Program

10:55:36 11 appeal process or discretionary review was applied for, or, in

10:55:41 12 fact, I think in some cases, Your Honor even ordered, where the

10:55:46 13 discretionary appeal process was over but payment hadn't been

10:55:50 14 made, for those to be reprocessed.

10:55:53 15            I mean, what I suspect is that's because when the

10:55:58 16 Fifth Circuit entered its injunction or stay, whatever you want

10:56:02 17 to call it, in October of 2013, the Fifth Circuit indicated

10:56:05 18 that any claim not paid should be stayed or enjoined.  So it

10:56:12 19 didn't matter where it was in the release process or the appeal

10:56:16 20 process; if it hadn't been paid, it was enjoined and is now

10:56:19 21 subject to 495.

10:56:20 22            All of these claims, however, had gotten to the

10:56:23 23 end of the road, had been paid, were not subject to the

10:56:26 24 Fifth Circuit's stay or injunction, and are final.  BP now

10:56:35 25 says, we availed ourselves of all the procedures that we

**OFFICIAL TRANSCRIPT**

10:56:38  1    thought we had available to us.

10:56:40  2         Just to be clear, we've consistently taken the

10:56:44  3    position that there is no appellate court jurisdiction over an

10:56:47  4    individual claim, but, thus far, our motions for dismissal on

10:56:52  5    those grounds have been denied, and the Fifth Circuit is

10:56:54  6    preparing to hear, on October 6, oral argument on individual

10:56:59  7    nonprofit claims that were already paid and that were already

10:57:01  8    appealed, that were appealed to the Fifth Circuit by BP.  BP

10:57:06  9    did not do that timely with respect to these 700 or 800 or 200

10:57:11 10    or however many claims.

10:57:12 11         So one of those reasons, one of the reasons why I

10:57:16 12    think their motion should be denied is because they haven't

10:57:19 13    preserved it.

10:57:20 14         Your Honor is obviously familiar with this

10:57:22 15    language, what BP told every claimant.  The one thing I just

10:57:26 16    want to note real quickly is, what BP is saying now is, well,

10:57:28 17    this only applies if the terms change.

10:57:31 18         The only way the terms could change, the terms

10:57:35 19    themselves of the Settlement Agreement, is by amendment between

10:57:38 20    class counsel and BP, approved by the Court.

10:57:42 21         As class counsel, it's very hard to imagine that

10:57:46 22    we would have agreed -- I'm not sure if we ethically could have

10:57:50 23    agreed -- to change the terms of the Settlement Agreement,

10:57:53 24    after notice went out and after it was approved, to make things

10:57:57 25    worse for the class.

**OFFICIAL TRANSCRIPT**

10:57:59  1          Clearly, they are talking about as a result of

10:58:01  2  further legal proceeding, some type of adversarial dispute,

10:58:06  3  which is exactly what happened here.

10:58:07  4          What did BP tell this Court in March of 2013?

10:58:10  5  "BP cannot feasible sue the claimants who will receive payment

10:58:14  6  for fictitious losses."  What they called them, fictitious.

10:58:19  7  "Even if BP could recover from the class members, BP would need

10:58:22  8  to file a large number of actions."

10:58:24  9          Then BP told the Fifth Circuit:  "The egregiously

10:58:28 10  distorted awards to date will cost BP hundreds of millions of

10:58:32 11  dollars that it could never recover once paid.  Once an

10:58:35 12  improper award is paid, it is typically impossible for BP to

10:58:38 13  recover that amount.  Even if this Court ultimately determines

10:58:41 14  that it should never been paid, BP cannot feasibly sue each of

10:58:45 15  the thousands of claimants receiving awards."

10:58:47 16          THE COURT:  Well, I don't know if that helps you

10:58:49 17  because it seems to me they are just talking about practical

10:58:55 18  ability to recoup payments from people who were previously

10:59:02 19  paid, either because they can't find them, or they can't pay it

10:59:05 20  back, or for a variety of reasons, you know.

10:59:07 21          MR. HERMAN:  Yes, Your Honor.  I agree to some extent

10:59:11 22  substantively it might not help us that much.  Procedurally,

10:59:14 23  the reason why I believe that it helps us is because BP

10:59:17 24  repeatedly admitted and represented to various different courts

10:59:21 25  that the only way, if there is a way -- I'm not saying that

10:59:24 1   there is, but if there is a way to get this money back, we'd

10:59:28 2   have to file thousands of lawsuits, we'd have to serve people,

10:59:32 3   we'd have to give them notice, we'd have to give them an

10:59:32 4   opportunity to be heard.

10:59:33 5          Now, BP is taking the position that all I have to

10:59:35 6   do is provide notice to Mr. Roy and Mr. Herman, because they

10:59:38 7   are the people that are on notice under the Settlement

10:59:41 8   Agreement, and with one single motion, without filing a

10:59:44 9   lawsuit, without serving a lawsuit on anybody, without even

10:59:46 10  identifying many of the attorneys or claims processors or other

10:59:51 11  people they want to enjoin, that with a very easy motion and

10:59:55 12  one hearing today, that they could accomplish this.

10:59:58 13         They repeatedly told every level of the court

11:00:01 14  system before, if there even is a way for us to recover these

11:00:05 15  payments, it would require us to file and serve and pursue

11:00:09 16  thousands of lawsuits.  Now, they say, oh, we can just come in

11:00:14 17  with one motion and get restitution from any member of the

11:00:17 18  class that we deem to have made an overpayment.

11:00:20 19         So I think it's procedurally -- Your Honor may be

11:00:22 20  correct that substantively it doesn't help us, but I think this

11:00:26 21  motion is procedurally improper by BP's own admissions.

11:00:29 22         "There is no cause of action for restitution

11:00:31 23  because of voluntary payment."  This is the *Restatement*.  I

11:00:36 24  think Your Honor is probably familiar with it.  I'll just go

11:00:38 25  over this -- Your Honor is obviously familiar with the terms of

11:00:40 1    the settlement, but I just want to note one thing.

11:00:42 2                    Here is one provision.  This is in the release.

11:00:53 3    It says:  "This individual release shall remain effective

11:00:57 4    regardless of any appeals or court decisions relating in any

11:01:02 5    way to the liability of the released parties in any current or

11:01:07 6    future litigation."

11:01:08 7                    Now, what BP is saying now is, oh, that just

11:01:11 8    means like the Phase 1 ruling or the Phase 2 ruling or the

11:01:17 9    limitation action or our indemnity responsibilities; it doesn't

11:01:20 10   apply to this lawsuit or this liability for these claims.

11:01:23 11                   The language here is very broad.  It says, "in

11:01:25 12   any way to the liability of the released parties in any current

11:01:30 13   or future litigation."

11:01:32 14                   While we thought Bon Secour Fisheries was going

11:01:35 15   to be a settlement, unfortunately it's current and continuing

11:01:40 16   in future, unfortunately, litigation.  This is a provision

11:01:43 17   Your Honor pointed to before.

11:01:44 18                   There is no individual claim identified by BP

11:01:52 19   which reverses an overpayment.  Their whole theory is, if we

11:01:56 20   pay something pursuant to court order, and then that gets

11:01:58 21   reversed, then we should get our money back.  That hasn't

11:02:03 22   happened with respect to any of these 7 or 800 claims.

11:02:05 23                   As Your Honor noted, BP did not timely appeal on

11:02:09 24   any individual claim to the Fifth Circuit.  Neither the Claims

11:02:11 25   Administrator nor this Court nor the Fifth Circuit ever

OFFICIAL TRANSCRIPT

determined that there was a matching issue or an overpayment with respect to any of these 700 claims.

It was anticipated that BP or the claimant or both might object to an appeal or a determination.  Every day the claims program issues denials and determinations that claimants disagree with and object to and appeal, and BP disagrees with and objects to and appeals; but, BP voluntarily agreed to a process whereby you make the appeal, and if the appeal is rejected, despite a continuing objection, it's going to be paid.  BP has not identified a single claim that was not paid according to BP's voluntary agreement and direction under the trust agreement.

I have some sections cited, but BP said, we're going to set up a trust, we're going to have a trustee, when you get to the end of the road the trustee is directed to pay the claims.  That's the voluntary process that BP consented to, and that was followed in every one of these 7 or 800 cases, whatever they are.

In addition, there is a remedy, arguably, at law for which BP itself voluntary agreed to provide indemnity.  BP's argument -- and I'll say a little bit more about this, if I can, in a few minutes -- BP's argument is essentially that the Claims Administrator erroneously interpreted the agreement and erroneously made these determinations and paid it.

If that's true, then BP itself agreed to

11:03:42  1   indemnify the Claims Administrator for any errors that he might

11:03:44  2   have made in administering the contract.  They also agreed to

11:03:49  3   indemnify the Lead Paying Agent.

11:03:51  4        THE COURT:  I guess they'd have to sue me because I'm

11:03:54  5   the one that upheld this policy.

11:03:56  6        MR. HERMAN:  Well, the fact that they agreed to

11:03:58  7   indemnify for the losses, their own losses, doesn't mean that

11:04:02  8   there's not an available remedy.  Their voluntary agreement

11:04:05  9   extinguishes the remedy, but it doesn't create an equitable

11:04:08 10   remedy.

11:04:08 11        Then, even assuming, arguendo, that there's a

11:04:11 12   cause of action, the equities do not favor BP.  First, they

11:04:15 13   have to establish a right to restitution; but, even if they

11:04:18 14   establish some argument that they could be entitled to

11:04:21 15   restitution, it's still an equitable cause of action.

11:04:24 16        I don't want to belabor this, you know, too much,

11:04:26 17   but BP right now, in my opinion, is violating the agreement by

11:04:32 18   taking this appeal or cert position, whatever it is, to the

11:04:36 19   Supreme Court.  I think BP has repeatedly violated 9.1 of the

11:04:41 20   Settlement Agreement with its public statements.  BP has filed

11:04:44 21   baseless actions against the Claims Administrator.

11:04:48 22        I would just like to say, you know, when we first

11:04:51 23   wrote this, we were talking about the suit that was thrown out

11:04:54 24   last March; but, a couple of weeks ago, I got this pleading

11:04:59 25   that BP filed about the Claims Administrator, and I'm noticing

**OFFICIAL TRANSCRIPT**

11:05:05  1    they make some very serious accusations about something that

11:05:09  2    they say transpired.

11:05:11  3            I notice that they keep quoting Mr. Juneau out of

11:05:15  4    context, and I think, well, I wonder what the actual question

11:05:18  5    was that he was asked that he was responding to.  When you read

11:05:23  6    the transcript, Exhibit 5, of what was actually said during

11:05:29  7    that interview, and you compare it to BP's brief, the gap is

11:05:35  8    just, is just tremendous.

11:05:37  9            I just feel, since I'm here, I should say that I

11:05:44  10   just think that these continued unwarranted, unfair,

11:05:50  11   disingenuous attacks on the Claims Administrator for doing

11:05:56  12   exactly what BP told him to do and asked him to do are just a

11:05:59  13   little bit beyond the pale.

11:06:00  14           BP has also interfered with -- when they didn't

11:06:05  15   get what they wanted, when they kept trying to enjoin the

11:06:09  16   program, and they didn't get what they wanted, then they

11:06:11  17   essentially tried to get their own injunction by refusing to

11:06:14  18   fund the administrative payments, only did it when they were

11:06:18  19   ordered to do so.  They gained unauthorized access to the

11:06:20  20   confidential predetermined claims information.  They keep

11:06:22  21   trying to interfere with things.

11:06:24  22           They sought *en banc* and currently seek

11:06:26  23   U.S. Supreme Court review on the causation issue, after

11:06:29  24   expressly representing and conceding to the Court of Appeal

11:06:32  25   that the issue had not been raised on appeal and was not before

**OFFICIAL TRANSCRIPT**

11:06:35 1   the Court.  I don't need to read this.  This is Your Honor's

11:06:38 2   previous ruling.

11:06:39 3        THE COURT:  I don't think you need to go there.  Let's

11:06:41 4   get back to the substance of what we're talking about here.

11:06:45 5        MR. HERMAN:  Yes, Your Honor.

11:06:45 6             But here are the equities.  BP says, well, all

11:06:49 7   this stuff that you're bringing up about our alleged bad faith,

11:06:54 8   unclean hands, it's unrelated to these actual overpayments.

11:06:59 9             First of all, again, BP is bringing this motion

11:07:02 10  against the class as a whole.  They have, you know, said that

11:07:07 11  they can do this in essentially a class-wide proceeding, so I

11:07:11 12  think we should look at the unjust enrichment that BP is

11:07:17 13  getting with respect to the class as a whole.

11:07:20 14            But even with respect to these overpayments, BP

11:07:22 15  demands interest on the overpayments, despite the fact that no

11:07:26 16  interest is provided to the claimants in the Settlement

11:07:28 17  Agreement.  So if a claimant has to wait three years for their

11:07:32 18  payment, they don't get interest on that, but now BP says it

11:07:35 19  should get interest on the overpayment, so there is something

11:07:41 20  inequitable about that.

11:07:41 21            Now that Your Honor has directed the Appeal

11:07:43 22  Coordinator to do this remand situation on matching claims

11:07:45 23  under 495, there are hundreds of claims -- I think it's 200 and

11:07:48 24  something -- where BP has now, after its gotten the claim

11:07:53 25  stayed for a year, admitted that there were no matching issues

**OFFICIAL TRANSCRIPT**

11:07:56 1  in those claims that were on appeal.

11:07:58 2          So, it got the unjust enrichment of delaying

11:08:03 3  payment of those claims for a long time, even claims that they

11:08:07 4  now admit had no matching issue.  There are thousands of claims

11:08:10 5  that have been and will continue to be delayed and otherwise

11:08:14 6  burdened with requests for additional information, and the

11:08:17 7  Claims Administrator will ultimately find no matching issue,

11:08:19 8  and yet BP has an unjust enrichment from that.

11:08:24 9          There are claims that were stayed for almost a

11:08:27 10  year based on BP's causation argument, and, you know, business

11:08:30 11  owners have been attacked for fraud.

11:08:32 12          Finally, on the injunction, you know, BP says, we

11:08:36 13  need an injunction because some of these claimants and some of

11:08:38 14  these other third parties, who we don't even identify, might

11:08:43 15  dissipate assets.

11:08:44 16          The standard rule in litigation is that you don't

11:08:48 17  enjoin a defendant's assets just because they might be

11:08:53 18  dissipated over the course of litigation.  BP was just found a

11:08:56 19  few weeks ago to be liable for willful misconduct, reckless

11:09:01 20  conduct and gross negligence.  If the claimants and their

11:09:05 21  attorneys and other third parties should be enjoined because

11:09:06 22  they might dissipate assets, then I would make the argument

11:09:11 23  that BP should be enjoined from giving out dividends until

11:09:15 24  their liability is fully resolved.

11:09:17 25          I'd be happy to answer any questions that the

**OFFICIAL TRANSCRIPT**

11:09:19 1    Court might have.

11:09:20 2           THE COURT:  Thank you.

11:09:22 3               Mr. Downey.

11:09:23 4           MR. DOWNEY:  Your Honor, can I make one discrete

11:09:24 5    procedural point?

11:09:26 6           THE COURT:  Sure.

11:09:26 7           MR. DOWNEY:  On the question that Your Honor asked, and

11:09:28 8    then Mr. Herman echoed, about the subject of appealing the

11:09:32 9    individual orders, I want to remind the Court that the way the

11:09:36 10   matching appeals were dealt with under the Court's April 2012

11:09:42 11   order was that any appeal within the discretionary review

11:09:46 12   process that raised the issue of matching was deemed denied, so

11:09:53 13   there were at that time no individual orders being entered by

11:09:56 14   this Court with respect to those particular claims which would

11:10:01 15   provide a basis on which to appeal.

11:10:02 16          THE COURT:  All right.  Thank you.

11:10:04 17              Okay.  BP has moved for an order declaring it is

11:10:15 18   entitled to restitution plus interest from those claimants who

11:10:19 19   have been allegedly overpaid as a result of a failure to match

11:10:24 20   expenses with revenue, as is now required by Policy 495; and,

11:10:31 21   also, that any professionals, including lawyers, accountants

11:10:33 22   and others, who have been paid a proportional amount of any

11:10:36 23   overpayments, also make restitution.

11:10:39 24              In addition, BP has moved for a preliminary

11:10:44 25   injunction prohibiting certain claimants identified in an

**OFFICIAL TRANSCRIPT**

11:10:48  1    exhibit to their motion from dissipating the portions of the

11:10:52  2    awards that BP has identified as possible overpayments, pending

11:10:59  3    recalculation of their compensation amounts.

11:11:04  4         BP argues as follows.  They argue that the law is

11:11:08  5    clear, that the right to recover what one has lost by

11:11:11  6    enforcement of a judgment subsequently reversed is well

11:11:15  7    established.  They rely on Comment A to *The Restatement (Third)*

11:11:21  8    *of Restitution and Unjust Enrichment*, at Section 18, which

11:11:27  9    extends this principle beyond judgments, to any case of unjust

11:11:32 10    enrichment in the consequence of a judicial or administrative

11:11:36 11    order that is subsequently dissolved or withdrawn.

11:11:38 12         BP also relies on this Court's previous rulings

11:11:45 13    and orders in the case of *Casey Thonn*, where the Court ordered

11:11:53 14    that the awards for Mr. Thonn be clawed back, and that the

11:12:02 15    professionals who participated in assisting and filing that

11:12:05 16    claim also make restitution, even if they were not personally

11:12:09 17    at fault in participating in the fraud that Mr. Thonn was found

11:12:15 18    to have conducted.

11:12:18 19         BP relies largely on cases where a trial court

11:12:32 20    rendered judgment following a trial on the merits, which

11:12:35 21    judgment was then subsequently reversed on appeal.  In that

11:12:41 22    scenario, if there is not a suspensive appeal, and the judgment

11:12:45 23    is paid and later reversed on appeal, there is typically a

11:12:50 24    right to restitution of the amounts paid pursuant to the court

11:12:55 25    judgment which is later reversed.

**OFFICIAL TRANSCRIPT**

11:12:58  1           This dispute, however, arises in the context of a

11:13:02  2  settlement between BP and class counsel, whereby they agreed to

11:13:06  3  resolve disputes through a negotiated settlement scheme.

11:13:12  4           Pursuant to that Settlement Agreement, BP and

11:13:15  5  class counsel negotiated over and agreed to both a general

11:13:22  6  class-wide release and individual releases.  I'm not going to

11:13:26  7  repeat what I said earlier, but I described earlier the rather

11:13:32  8  unusual mechanisms set forth in this particular class

11:13:38  9  settlement, where the parties envisioned that there were a lot

11:13:44 10  of scenarios by which the class settlement could be undone,

11:13:50 11  which would vitiate any class-wide release that would benefit

11:13:58 12  BP and the other released parties, and other circumstances

11:14:02 13  which might occur.

11:14:04 14           So the parties negotiated this individual release

11:14:10 15  language, which is located in the Settlement Agreement itself,

11:14:12 16  particularly at Exhibit 26, the very first page of Exhibit 26,

11:14:25 17  where it informs class members of important information about

11:14:28 18  the attached Full and Final Release, Settlement and Covenant

11:14:33 19  Not to Sue.

11:14:35 20           I've already read some of this language, but in

11:14:43 21  the second to last paragraph it talks about the settlement:  "A

11:14:53 22  class action settlement has been proposed in the case, but the

11:14:56 23  Court has not yet given final approval of that proposed

11:14:58 24  settlement.  If the Court does approve the proposed class

11:15:00 25  action, the appellate court could reverse the approval.

**OFFICIAL TRANSCRIPT**

11:15:03  1              "In addition, it is possible that the terms of
11:15:05  2     the proposed settlement may change in the future, for better or
11:15:07  3     for worse, and as a result of further legal proceedings.
11:15:13  4     However, if you sign this individual release, none of those
11:15:18  5     uncertain future events will affect you.  By signing this
11:15:21  6     individual release, you are forever waiving and releasing all
11:15:26  7     claims that you may have against BP, except for expressly
11:15:29  8     reserved claims, in exchange for compensation being provided.
11:15:35  9     In fact, even if the Court does not approve the proposed class
11:15:39 10     action settlement agreement, or the approval is reversed by an
11:15:43 11     appellate court, you shall continue to be bound by this
11:15:47 12     individual release."
11:15:48 13              Later, at the back, the actual release itself has
11:15:56 14     that same language in it.
11:16:12 15              In the release, which is a pretty extensive
11:16:15 16     document, some 12 or 13 pages, in addition to that language, in
11:16:25 17     paragraph 16 of the release it talks about the continuing
11:16:32 18     effectiveness of the agreement:  "This individual release shall
11:16:35 19     remain effective regardless of any appeals or court decisions
11:16:39 20     relating in any way to the liability of the released parties in
11:16:44 21     any current or future litigation.  This individual release
11:16:48 22     shall also remain effective regardless of whether the
11:16:51 23     settlement agreement resolving the claims of the economic class
11:16:53 24     is approved."
11:16:54 25              So it appears to the Court clearly that the

**OFFICIAL TRANSCRIPT**

11:17:04  1   Settlement Agreement reflects that both BP and class counsel
11:17:08  2   anticipated that there could be disagreements over the
11:17:11  3   interpretation and in implementation of the settlement.  From
11:17:23  4   the quoted language that I just read from the individual
11:17:27  5   release and from the Settlement Agreement, the only conclusion
11:17:39  6   the Court can draw is that this language bars BP's attempt at
11:17:45  7   any restitution.
11:17:48  8           BP argues or suggests that the individual release
11:17:52  9   covers situations where the, quote, "terms of the settlement
11:17:55 10   have changed," but that no, quote, "terms have been changed in
11:17:59 11   this instance."  The Court finds this is classic hairsplitting.
11:18:04 12   There appears to be little difference, if any, in the change in
11:18:07 13   terms and the change in the interpretation of those terms, at
11:18:10 14   least in the present context.
11:18:12 15           Finally, the Court's decision to claw back the
11:18:15 16   funds from Casey Thonn and other professionals, the ruling upon
11:18:21 17   which BP relies in part, is readily distinguishable from this
11:18:26 18   matter.  The Court, in that case, found that Mr. Thonn had
11:18:35 19   committed fraud by filing fraudulent tax returns in support of
11:18:40 20   his claims.  As class counsel points out in its brief, fraud
11:18:44 21   goes to the validity of the Settlement Agreement itself and
11:18:47 22   vitiates the settlement and the associated release.
11:18:52 23           The claimants in the current situation, however,
11:18:55 24   did not commit fraud and are not even accused of committing or
11:18:59 25   suggested that they committed fraud.  They simply were paid

OFFICIAL TRANSCRIPT

11:19:02  1    under the settlement's terms as it was interpreted by the

11:19:05  2    Claims Administrator and the Court at that time.  The fact that

11:19:10  3    the decision and the interpretation were later reversed does

11:19:13  4    not equate to fraud or anything close to it by these claimants.

11:19:18  5        BP also relies on the fact that the Court ordered

11:19:21  6    restitution from Thonn's attorneys and others who helped

11:19:26  7    prepare his claims, even though they may have been innocent of

11:19:29  8    any wrongdoing.  BP points out that the Court stated that,

11:19:33  9    quote, "Restitution is often ordered where there is no fault."

11:19:36 10        Again, this situation is distinguishable.  Even

11:19:40 11    though Thonn's attorneys may have been innocent of wrongdoing,

11:19:45 12    the initial payment to Thonn was the result of Thonn's fraud.

11:19:50 13    Furthermore, the payment to Thonn's attorneys was made pursuant

11:19:55 14    to a contingency fee contract with Mr. Thonn.

11:19:58 15        The Court explained that because the claim

11:20:02 16    participants, that is, the attorneys and others who helped

11:20:04 17    prepare Thonn's claim, all received a portion of Mr. Thonn's

11:20:08 18    claim based on their contingency fee relationship, that

11:20:13 19    restitution was proper.  However, here again, BP's motion for

11:20:16 20    restitution is not based on fraud by anyone.

11:20:19 21        So for these reasons, the Court hereby denies

11:20:31 22    BP's Motion for Restitution, and as a consequence of that,

11:20:37 23    naturally, the other part of the motion to prohibit dissipation

11:20:47 24    of assets is also denied.

11:20:49 25        All right.  Court's adjourned.

**OFFICIAL TRANSCRIPT**

11:20:53   1           THE DEPUTY CLERK:  All rise.

2               (WHEREUPON, at 11:20 a.m., Court was adjourned.)

3                       *    *    *

4

5

6                   REPORTER'S CERTIFICATE

7

8           I, Cathy Pepper, Certified Realtime Reporter, Registered

9      Merit Reporter, Certified Court Reporter in and for the State

10     of Louisiana, Official Court Reporter for the United States

11     District Court, Eastern District of Louisiana, do hereby

12     certify that the foregoing is a true and correct transcript to

13     the best of my ability and understanding from the record of the

14     proceedings in the above-entitled and numbered matter.

15

16

17                         _s/Cathy Pepper_____

18                         Cathy Pepper, CRR, RMR, CCR
                           Certified Realtime Reporter
19                         Registered Merit Reporter
                           Official Court Reporter
20                         United States District Court
                           Cathy_Pepper@laed.uscourts.gov
21

22

23

24

25

                          **OFFICIAL TRANSCRIPT**

## $

**$185** [1] - 60:10
**$534,000** [1] - 73:16
**$60,000** [2] - 21:19, 23:16

## 1

**1** [3] - 9:15, 9:20, 83:8
**10** [4] - 17:11, 17:25, 25:8, 34:25
**10,600** [2] - 50:8, 50:11
**10-2179** [1] - 9:4
**10-MD-2179** [1] - 1:7
**10.9** [3] - 70:15, 71:6, 74:11
**1000** [1] - 2:12
**10003** [1] - 3:6
**1001** [1] - 5:10
**11** [1] - 46:8
**1100** [1] - 5:7
**11:20** [1] - 95:2
**11th** [2] - 72:24, 73:11
**12** [2] - 7:9, 92:16
**12-968** [2] - 1:13, 9:6
**12-970** [2] - 1:19, 9:8
**1201** [1] - 6:9
**12TH** [1] - 6:4
**13** [2] - 18:11, 92:16
**1331** [1] - 6:13
**15** [2] - 12:11, 17:12
**16** [11] - 7:10, 29:17, 29:25, 30:21, 30:23, 51:6, 51:20, 54:3, 54:4, 56:13, 92:17
**1601** [1] - 2:20
**1665** [1] - 6:13
**16th** [2] - 38:10, 51:17
**17** [1] - 29:13
**1700** [1] - 6:9
**18** [3] - 61:22, 62:1, 90:8
**180,000** [2] - 25:7, 25:11
**18th** [1] - 73:12

## 2

**2** [3] - 9:20, 50:24, 83:8
**20** [2] - 1:6, 9:6
**20,000** [5] - 24:11, 25:2, 25:6, 26:14, 26:21
**200** [2] - 80:9, 87:23

**200,000** [3] - 25:22, 25:23, 26:19
**20005** [1] - 6:5
**20044** [1] - 4:21
**2010** [2] - 1:6, 9:6
**2011** [1] - 39:17
**2012** [23] - 17:4, 18:11, 18:20, 20:19, 21:18, 21:23, 22:12, 29:17, 30:1, 35:16, 38:10, 38:17, 39:23, 49:8, 51:6, 51:18, 51:20, 54:3, 54:5, 56:13, 65:5, 65:14, 89:10
**2013** [4] - 12:11, 72:24, 79:17, 81:4
**2014** [2] - 1:8, 8:2
**2015** [1] - 27:11
**2016** [1] - 39:16
**208** [2] - 60:6, 60:18
**22nd** [1] - 12:22
**23510** [1] - 2:13
**23rd** [1] - 38:12
**24** [6] - 1:8, 8:2, 28:16, 34:20, 35:12, 43:25
**24th** [1] - 62:20
**255** [1] - 3:9
**26** [4] - 67:23, 74:12, 91:16
**2615** [1] - 2:24
**272** [3] - 9:15, 10:2, 10:12
**275** [1] - 3:2
**28** [1] - 4:7
**29464** [1] - 4:8
**29TH** [1] - 3:2

## 3

**3** [2] - 10:24, 11:21
**300** [1] - 5:24
**316** [1] - 2:16
**32502** [1] - 2:17
**33134** [1] - 3:9
**355** [1] - 5:14
**35TH** [1] - 5:14
**36** [1] - 21:19
**36013** [1] - 3:17
**36604** [1] - 2:20
**3668** [1] - 2:4
**36TH** [1] - 5:6
**37** [1] - 7:11
**3700** [1] - 5:10

## 4

**4160** [1] - 3:16

**450** [1] - 4:16
**495** [7] - 60:1, 62:19, 78:25, 79:4, 79:21, 87:23, 89:20
**4C** [3] - 69:10, 69:12, 72:11
**4th** [1] - 65:13

## 5

**5** [2] - 39:1, 86:6
**50** [2] - 23:5, 60:15
**500** [1] - 6:19
**5000** [1] - 5:20
**501** [1] - 3:23
**504** [1] - 6:20
**519** [1] - 3:20
**5395** [1] - 4:16
**556 JEFFERSON STREET** [1] - 2:5
**58** [1] - 7:12
**589-7779** [1] - 6:20

## 6

**6** [1] - 80:6
**60,000** [1] - 33:20
**600** [3] - 2:16, 4:4, 60:13
**601** [1] - 2:24
**60654** [1] - 5:24
**618** [1] - 3:12

## 7

**7** [2] - 83:22, 84:17
**700** [4] - 3:6, 77:7, 80:9, 84:2
**701** [2] - 4:11, 5:20
**70113** [1] - 2:9
**70130** [4] - 2:24, 4:4, 4:12, 6:20
**70139** [1] - 5:21
**70163** [1] - 5:7
**70502** [1] - 2:5
**70601** [1] - 3:24
**70726** [1] - 3:20
**70801** [1] - 3:13
**72** [4] - 28:16, 34:20, 35:13, 43:25
**725** [1] - 6:4
**75270** [1] - 6:10
**7611** [1] - 4:21
**77002** [1] - 5:11
**77010** [1] - 6:13
**793** [1] - 60:4
**7TH** [1] - 4:16

## 8

**8** [3] - 21:3, 23:14, 32:16
**800** [4] - 77:15, 80:9, 83:22, 84:17
**820** [1] - 2:8
**8th** [1] - 12:20

## 9

**9** [1] - 7:6
**9.1** [1] - 85:19
**90** [1] - 23:5
**90,000** [6] - 25:13, 25:14, 25:24, 26:1, 26:19, 48:9
**90071** [1] - 5:14
**94102** [1] - 4:17
**94111** [1] - 3:3
**999** [1] - 2:12
**9:00** [1] - 1:8
**9:16** [1] - 16:20
**9th** [1] - 38:16
**9TH** [1] - 4:4

## A

**a.m** [2] - 16:20, 95:2
**A.M** [1] - 1:8
**ability** [2] - 81:18, 95:13
**able** [9] - 17:25, 36:22, 41:16, 47:15, 49:8, 55:15, 60:4, 60:7
**ABOVE** [1] - 7:5
**above-entitled** [1] - 95:14
**above-surface** [1] - 9:16
**ABOVE-SURFACE** [1] - 7:5
**ABRAMSON** [1] - 2:22
**absence** [1] - 20:14
**accept** [1] - 30:7
**acceptable** [1] - 48:8
**accepted** [3] - 21:14, 23:13, 65:2
**accepting** [1] - 64:9
**accepts** [1] - 64:9
**access** [2] - 48:10, 86:19
**accomplish** [1] - 82:12
**accord** [1] - 72:15
**accordance** [1] - 67:1
**according** [4] - 38:7,

50:20, 62:6, 84:11
**accordingly** [1] - 20:25
**accountants** [1] - 89:21
**accusations** [1] - 86:1
**accused** [1] - 93:24
**Act** [4] - 11:4, 11:5, 13:18, 13:25
**ACTION** [3] - 1:7, 1:13, 1:19
**Action** [2] - 9:6, 9:8
**action** [7] - 82:22, 83:9, 85:12, 85:15, 91:22, 91:25, 92:10
**ACTIONS** [1] - 1:10
**actions** [2] - 81:8, 85:21
**actual** [4] - 25:1, 86:4, 87:8, 92:13
**Acute** [5] - 17:8, 21:12, 35:18, 36:11, 36:14
**acute** [27] - 19:11, 36:3, 43:20, 43:21, 44:2, 44:4, 44:24, 45:3, 45:4, 50:14, 52:6, 53:18, 53:22, 54:1, 54:9, 54:10, 54:19, 54:23, 55:2, 55:7, 55:9, 55:17, 56:20, 56:22, 57:8, 57:9, 57:25
**add** [1] - 12:17
**adding** [1] - 26:16
**addition** [5] - 68:1, 84:19, 89:24, 92:1, 92:16
**additional** [2] - 53:20, 88:6
**address** [4] - 28:6, 34:6, 35:23, 53:1
**addressed** [1] - 31:21
**adjourned** [2] - 94:25, 95:2
**adjustments** [1] - 75:6
**administering** [1] - 85:2
**Administration** [1] - 65:15
**administrative** [2] - 86:18, 90:10
**Administrator** [23] - 21:15, 24:2, 27:23, 32:14, 50:22, 51:5, 52:14, 53:12, 57:10, 57:13, 62:13, 64:25, 65:8, 66:22, 78:18, 83:25, 84:23, 85:1, 85:21, 85:25, 86:11,

88:7, 94:2

**Administrator's** [1] - 51:2

**admissions** [1] - 82:21

**admit** [1] - 88:4

**admitted** [2] - 81:24, 87:25

**adopted** [1] - 63:2

**adoption** [1] - 62:18

**adversarial** [1] - 81:2

**advise** [1] - 41:1

**advisement** [1] - 58:4

**affect** [3] - 68:5, 76:7, 92:5

**affected** [1] - 23:25

**affects** [1] - 70:7

**afford** [1] - 47:18

**afraid** [1] - 39:11

**Agent** [1] - 85:3

**ago** [2] - 85:24, 88:19

**agree** [13] - 10:4, 10:20, 12:5, 13:15, 14:25, 23:6, 36:21, 42:22, 67:12, 67:14, 67:15, 74:7, 81:21

**agreed** [18] - 66:11, 69:10, 69:16, 73:19, 74:3, 74:4, 75:3, 75:5, 78:25, 80:22, 80:23, 84:8, 84:20, 84:25, 85:2, 85:6, 91:2, 91:5

**agreement** [43] - 9:17, 18:23, 27:24, 28:22, 31:3, 40:14, 43:2, 50:18, 53:6, 59:18, 59:20, 60:16, 63:19, 63:20, 63:21, 63:24, 66:23, 67:1, 67:19, 68:10, 68:25, 69:7, 69:8, 69:11, 70:7, 70:15, 71:25, 72:10, 72:15, 74:8, 74:14, 74:18, 75:13, 76:13, 84:11, 84:12, 84:23, 85:8, 85:17, 92:10, 92:18, 92:23

**Agreement** [43] - 17:4, 20:13, 21:23, 29:6, 29:9, 29:12, 29:14, 38:7, 38:14, 38:19, 58:19, 58:20, 58:23, 60:25, 62:7, 63:13, 66:12, 66:20, 67:17, 67:18, 67:22, 68:16, 68:24, 69:4, 69:5, 70:7, 70:12, 71:5, 74:10, 74:13, 75:5, 75:21, 76:5, 80:19,

80:23, 82:8, 85:20, 87:17, 91:4, 91:15, 93:1, 93:5, 93:21

**agrees** [2] - 12:3, 76:23

**ahead** [6] - 9:2, 15:22, 27:14, 35:6, 37:7, 58:15

**Airways** [1] - 43:10

**airways** [1] - 33:3

**al** [4] - 9:6, 9:7, 9:8, 9:9

**AL** [6] - 1:12, 1:15, 1:18, 1:21, 2:20, 3:17

**ALAN** [1] - 6:12

**ALHAMBRA** [1] - 3:9

**ALL** [1] - 1:10

**ALLAN** [1] - 4:11

**allege** [1] - 24:12

**alleged** [4] - 9:16, 18:14, 23:7, 87:7

**ALLEGED** [1] - 7:5

**allegedly** [1] - 89:19

**alleging** [1] - 26:21

**ALLEN** [1] - 3:15

**allow** [2] - 12:21, 32:9

**almost** [3] - 15:19, 76:23, 88:9

**ALSO** [1] - 6:16

**ambiguity** [1] - 63:3

**Amchem** [2] - 20:7, 20:14

**amend** [1] - 75:14

**amendment** [1] - 80:19

**AMERICA** [3] - 4:19, 5:17, 5:18

**AMERICAN** [1] - 2:23

**amicus** [1] - 15:13

**amount** [31] - 23:2, 52:7, 54:10, 59:15, 60:8, 60:9, 60:12, 61:7, 61:21, 64:3, 64:4, 64:6, 64:11, 72:1, 72:8, 72:13, 73:5, 73:7, 73:8, 73:11, 74:1, 74:5, 74:17, 74:19, 74:21, 74:22, 81:13, 89:22

**amounts** [6] - 64:8, 75:3, 76:23, 76:25, 90:3, 90:24

**Anadarko** [1] - 14:8

**analysis** [4] - 59:23, 60:2, 60:20, 61:25

**AND** [7] - 1:15, 1:24, 5:4, 5:17, 7:8, 7:9, 7:12

**ANDREW** [1] - 5:23

**Andy** [2] - 11:24, 13:14

**ANGELES** [1] - 5:14

**answer** [7] - 24:9, 30:6, 50:16, 63:22, 68:14, 77:22, 88:25

**anticipated** [3] - 68:23, 84:3, 93:2

**anyway** [1] - 49:12

**apologize** [2] - 17:1, 25:13

**apparent** [1] - 29:3

**appeal** [37] - 13:25, 62:5, 62:8, 65:20, 66:18, 66:24, 68:19, 70:4, 73:2, 73:14, 73:15, 76:25, 77:4, 77:7, 77:12, 77:14, 77:16, 78:13, 79:2, 79:9, 79:11, 79:13, 79:19, 83:23, 84:4, 84:6, 84:8, 84:9, 85:18, 86:25, 88:1, 89:11, 89:15, 90:21, 90:22, 90:23

**Appeal** [4] - 67:2, 69:20, 86:24, 87:21

**appealed** [7] - 60:3, 62:14, 70:2, 77:18, 78:16, 80:8

**appealing** [3] - 77:16, 77:21, 89:8

**appeals** [8] - 64:24, 64:25, 65:22, 73:3, 83:4, 84:7, 89:10, 92:19

**appear** [5] - 32:12, 32:14, 32:15, 41:19, 45:16

**APPEARANCES** [4] - 2:1, 4:1, 5:1, 6:1

**appellate** [6] - 67:25, 68:11, 79:1, 80:3, 91:25, 92:11

**application** [2] - 43:2, 72:17

**applied** [3] - 38:11, 51:1, 79:11

**applies** [2] - 62:23, 80:17

**apply** [7] - 32:1, 32:2, 55:20, 57:7, 68:8, 76:20, 83:10

**appointed** [1] - 65:1

**appointment** [1] - 65:7

**appreciate** [5] - 36:23, 40:23, 52:3, 52:7, 52:15

**approach** [2] - 37:9,

58:13

**appropriate** [3] - 12:24, 21:4, 63:15

**approval** [16] - 18:19, 34:13, 40:8, 53:4, 56:8, 56:10, 64:23, 64:25, 67:25, 68:11, 75:7, 76:18, 91:23, 91:25, 92:10

**Approval** [1] - 22:7

**approve** [5] - 41:6, 67:24, 68:10, 91:24, 92:9

**approved** [13] - 60:1, 63:21, 65:19, 65:20, 65:25, 66:6, 66:18, 75:23, 75:24, 80:20, 80:24, 92:24

**approximate** [1] - 25:12

**April** [19] - 9:6, 21:18, 21:23, 29:17, 29:25, 30:21, 30:23, 35:16, 38:10, 39:23, 49:8, 51:6, 51:17, 51:20, 54:3, 54:4, 56:13, 77:3, 89:10

**APRIL** [1] - 1:6

**arguably** [1] - 84:19

**argue** [9] - 8:15, 16:5, 16:7, 32:2, 33:11, 34:9, 34:14, 36:9, 90:4

**argued** [1] - 52:9

**arguendo** [1] - 85:11

**argues** [2] - 90:4, 93:8

**arguing** [1] - 21:10

**argument** [12] - 9:25, 31:15, 58:12, 59:20, 75:20, 76:9, 80:6, 84:21, 84:22, 85:14, 88:10, 88:22

**arguments** [4] - 8:21, 9:24, 9:25, 59:18

**arises** [1] - 91:1

**Arnold** [2] - 22:8, 22:19

**arose** [1] - 18:17

**articulated** [1] - 61:17

**ASBILL** [1] - 5:9

**aside** [1] - 63:12

**assert** [3] - 52:12, 52:22, 56:12

**asserting** [2] - 39:19, 70:20

**assets** [4] - 88:15, 88:17, 88:22, 94:24

**assisting** [1] - 90:15

**associated** [1] - 93:22

**assume** [2] - 47:14,

48:1

**assuming** [1] - 85:11

**assumption** [2] - 31:19, 31:22

**assure** [1] - 52:20

**asthma** [3] - 43:11, 44:12, 48:24

**attached** [1] - 91:18

**attack** [1] - 48:24

**attacked** [1] - 88:11

**attacks** [1] - 86:11

**attempt** [1] - 93:6

**attempts** [1] - 34:6

**attention** [4] - 10:11, 43:7, 44:10, 44:15

**attorney** [1] - 19:8

**attorneys** [8] - 24:23, 34:12, 82:10, 88:21, 94:6, 94:11, 94:13, 94:16

**attractive** [1] - 19:8

**attribute** [2] - 19:17, 21:1

**August** [3] - 18:11, 22:12, 50:8

**available** [6] - 24:1, 70:4, 77:18, 77:24, 80:1, 85:8

**availed** [1] - 79:25

**AVENUE** [4] - 2:8, 3:20, 4:16, 5:14

**avoid** [2] - 20:6, 71:12

**award** [7] - 63:7, 64:7, 64:10, 72:24, 73:14, 73:15, 81:12

**awarded** [1] - 61:12

**awards** [18] - 59:1, 59:2, 61:7, 62:16, 63:1, 70:2, 70:3, 77:5, 77:8, 77:12, 77:15, 78:17, 78:21, 81:10, 81:15, 90:2, 90:14

**aware** [5] - 10:8, 29:2, 37:23, 46:20, 58:18

---

**B**

**Back-End** [28] - 17:14, 18:6, 19:18, 19:24, 20:6, 21:2, 22:1, 23:17, 24:6, 24:19, 28:20, 31:7, 31:13, 33:14, 33:22, 35:21, 42:14, 42:20, 52:10, 52:22, 53:7, 54:6, 54:11, 54:24, 55:8, 55:9, 55:20, 56:14

**back-end** [1] - 27:2

**bad** [1] - 87:7
**banc** [1] - 86:22
**bar** [1] - 52:22
**BARBIER** [1] - 1:24
**BARR** [1] - 2:16
**barred** [1] - 39:19
**barring** [1] - 65:25
**bars** [1] - 93:6
**based** [6] - 17:7,
18:14, 29:10, 88:10,
94:18, 94:20
**baseless** [1] - 85:21
**bashful** [1] - 77:20
**basic** [4] - 59:24,
61:17, 62:22, 72:5
**basis** [5] - 19:9, 31:8,
63:7, 63:10, 89:15
**BATON** [1] - 3:13
**BATTERY** [1] - 3:2
**BAYLEN** [1] - 2:16
**BEASLEY** [1] - 3:15
**became** [2] - 27:7,
29:2
**become** [2] - 29:2,
43:25
**becomes** [5] - 29:1,
44:3, 48:22, 52:4,
54:2
**BEFORE** [1] - 1:24
**beforehand** [1] - 48:3
**begin** [2] - 54:19, 65:1
**behalf** [4] - 9:13, 22:9,
37:12, 58:17
**behest** [1] - 40:5
**BEL** [1] - 77:1
**belabor** [1] - 85:16
**believes** [1] - 36:17
**BELO** [8] - 18:18,
20:9, 43:1, 49:12,
49:19, 49:25, 50:3,
54:6
**bench** [1] - 16:17
**benefit** [2] - 70:25,
91:11
**benefits** [4] - 20:12,
24:5, 29:17, 38:9
**BERNSTEIN** [1] - 3:1
**best** [7] - 13:21, 24:8,
24:10, 26:23, 55:6,
73:23, 95:13
**better** [8] - 11:15,
24:9, 37:24, 41:6,
41:16, 66:20, 68:2,
92:2
**between** [4] - 29:22,
74:20, 80:19, 91:2
**beyond** [7] - 65:13,
77:4, 77:7, 77:12,
78:16, 86:13, 90:9
**binding** [1] - 74:22

**bit** [7] - 14:12, 15:1,
31:18, 72:25, 73:11,
84:21, 86:13
**bloomer** [2] - 22:18,
22:21
**Bloomer** [2] - 22:7,
22:11
**blush** [1] - 41:18
**BLVD** [1] - 4:7
**BON** [1] - 1:17
**Bon** [2] - 9:8, 83:14
**bottom** [1] - 46:10
**bound** [6] - 51:2, 66:9,
67:4, 68:12, 69:23,
92:11
**BOUNDS** [1] - 2:19
**BOX** [3] - 2:4, 3:16,
4:21
**BP** [140] - 1:15, 1:21,
5:16, 5:17, 5:18, 9:7,
9:9, 11:10, 11:24,
12:21, 13:14, 14:6,
14:18, 15:18, 15:20,
17:22, 18:11, 18:19,
19:5, 20:17, 20:19,
21:7, 21:10, 21:14,
22:10, 22:22, 22:24,
23:6, 23:12, 23:15,
23:18, 23:22, 24:20,
27:4, 27:22, 29:19,
29:23, 32:6, 32:17,
33:4, 34:24, 35:23,
36:2, 36:21, 37:12,
39:5, 39:12, 39:14,
40:3, 42:22, 48:7,
52:10, 52:12, 52:14,
52:16, 52:20, 55:23,
58:17, 60:2, 60:3,
60:7, 60:25, 62:5,
62:15, 62:21, 63:3,
64:10, 66:1, 68:7,
70:4, 70:20, 73:24,
74:3, 74:21, 75:3,
76:23, 78:25, 79:5,
79:24, 80:8, 80:15,
80:16, 80:20, 81:4,
81:5, 81:7, 81:9,
81:10, 81:12, 81:14,
81:23, 82:5, 83:7,
83:18, 83:23, 84:3,
84:6, 84:7, 84:10,
84:13, 84:16, 84:20,
84:25, 85:12, 85:17,
85:19, 85:20, 85:25,
86:12, 86:14, 87:6,
87:9, 87:12, 87:14,
87:18, 87:24, 88:8,
88:12, 88:18, 88:23,
89:17, 89:24, 90:2,
90:4, 90:12, 90:19,

91:2, 91:4, 91:12,
92:7, 93:1, 93:8,
93:17, 94:5, 94:8
**BP'S** [1] - 7:12
**BP's** [25] - 18:24,
19:20, 20:24, 21:7,
22:6, 30:7, 31:21,
33:11, 35:11, 39:7,
40:3, 53:14, 58:9,
72:18, 73:25, 82:21,
84:11, 84:21, 84:22,
86:7, 88:10, 93:6,
94:19, 94:22
**BRANCH** [1] - 4:15
**breathe** [2] - 48:14,
48:24
**BREIT** [2] - 2:11, 2:11
**BRENNAN** [1] - 5:9
**BRIAN** [1] - 2:16
**BRIDGESIDE** [1] - 4:7
**brief** [6] - 9:14, 15:10,
18:19, 18:24, 86:7,
93:20
**briefed** [4] - 13:3,
34:11, 50:22, 61:15
**briefing** [8] - 12:15,
12:20, 12:21, 13:9,
15:19, 29:19, 51:9
**briefly** [3] - 8:19,
12:19, 21:9
**briefs** [3] - 24:23,
24:25, 28:2
**bring** [1] - 52:10
**bringing** [2] - 87:7,
87:9
**brings** [1] - 27:15
**broad** [1] - 83:11
**BROAD** [1] - 3:23
**BROADWAY** [1] - 3:6
**brought** [1] - 43:11
**BUILDING** [1] - 2:23
**bulk** [1] - 63:9
**burdened** [1] - 88:6
**business** [2] - 75:11,
88:10
**busy** [1] - 10:9
**BY** [29] - 1:4, 2:4, 2:7,
2:11, 2:16, 2:19,
2:23, 3:2, 3:5, 3:8,
3:12, 3:16, 3:19,
3:23, 4:3, 4:7, 4:11,
4:15, 4:20, 5:6, 5:10,
5:13, 5:19, 5:23, 6:3,
6:8, 6:12, 6:22, 6:22

3:2
**calculate** [1] - 58:19
**calculated** [2] - 61:5,
62:17
**calculation** [2] -
60:16, 63:15
**calculations** [3] -
60:13, 74:4, 75:5
**calendar** [1] - 12:23
**CALLED** [1] - 8:4
**CALVIN** [1] - 3:24
**CAMP** [1] - 4:11
**cancer** [4] - 17:24,
19:14, 40:20, 56:25
**cancers** [3] - 19:25,
22:3, 34:25
**cannot** [4] - 53:19,
53:23, 81:5, 81:14
**care** [3] - 47:3, 47:15,
48:10
**careful** [2] - 32:6, 33:4
**carefully** [1] - 22:25
**CARL** [1] - 1:24
**CARONDELET** [1] -
4:4
**case** [16] - 9:1, 11:3,
14:3, 14:16, 21:24,
62:25, 64:20, 65:3,
67:17, 75:16, 75:23,
78:13, 90:9, 90:13,
91:22, 93:18
**cases** [12] - 9:2, 17:5,
17:6, 18:16, 19:7,
40:23, 43:13, 78:10,
79:12, 84:17, 90:19
**Casey** [2] - 90:13,
93:16
**categories** [1] - 50:5
**category** [1] - 20:13
**Cathy** [2] - 95:8, 95:18
**CATHY** [1] - 6:18
**Cathy_Pepper@laed
.uscourts.gov** [1] -
95:20
**cathy_Pepper@laed.
uscourts.gov** [1] -
6:21
**causation** [2] - 86:23,
88:10
**caused** [1] - 20:20
**causes** [1] - 47:6
**causing** [1] - 41:12
**CCR** [2] - 6:18, 95:18
**Center** [1] - 57:14
**CENTRE** [1] - 5:6
**cert** [1] - 85:18
**certain** [16] - 17:23,
18:9, 23:1, 25:8,
27:3, 27:23, 28:9,
28:18, 41:25, 43:11,

45:4, 45:15, 45:20,
46:4, 61:6, 89:25
**certainly** [10] - 10:25,
11:17, 15:20, 30:9,
38:15, 41:17, 52:8,
62:19, 63:7, 76:17
**CERTIFICATE** [1] -
95:6
**CERTIFIED** [1] - 6:18
**Certified** [3] - 95:8,
95:9, 95:18
**certify** [1] - 95:12
**challenge** [2] - 33:1,
62:11
**chambers** [1] - 9:21
**chance** [1] - 55:9
**change** [22] - 40:4,
51:13, 68:2, 68:17,
68:25, 69:10, 75:7,
75:8, 75:15, 75:17,
75:18, 75:22, 76:13,
76:17, 80:17, 80:18,
80:23, 92:2, 93:12,
93:13
**changed** [14] - 29:21,
30:3, 30:12, 30:13,
30:16, 39:6, 66:25,
67:18, 68:18, 69:4,
69:8, 75:13, 93:10
**changes** [3] - 66:19,
66:20, 76:6
**changing** [2] - 63:21,
68:16, 68:20
**Charity** [2] - 47:21
**CHARLES** [1] - 3:24
**chart** [1] - 18:15
**check** [1] - 25:2
**chemical** [1] - 43:9
**chemicals** [2] - 40:22,
44:12
**CHICAGO** [1] - 5:24
**chronic** [57] - 19:11,
20:1, 21:21, 23:7,
24:5, 24:12, 24:20,
25:9, 26:22, 32:22,
32:24, 33:5, 33:9,
33:13, 34:17, 34:19,
34:23, 35:13, 35:14,
35:21, 36:4, 36:17,
41:20, 41:21, 43:5,
43:17, 43:19, 43:23,
43:24, 44:1, 44:3,
44:4, 44:25, 45:6,
45:12, 45:13, 46:12,
46:14, 47:4, 48:9,
49:11, 50:14, 52:5,
52:11, 53:24, 54:2,
54:13, 54:15, 54:19,
54:22, 55:15, 55:17,
56:22, 57:12, 57:25

**C**

**CA** [3] - 3:3, 4:17, 5:14
**CABRASER** [2] - 3:1,

**Chronic** [5] - 17:9, 21:15, 32:3, 45:18, 46:5
**CIRCLE** [1] - 3:9
**Circuit** [14] - 13:25, 58:23, 66:25, 77:15, 77:21, 78:16, 78:19, 79:16, 79:17, 80:5, 80:8, 81:9, 83:24, 83:25
**circuit** [1] - 37:17
**Circuit's** [1] - 79:24
**circumstance** [1] - 59:13
**circumstances** [4] - 69:24, 70:1, 71:2, 91:12
**cite** [1] - 20:24
**cited** [1] - 84:13
**CITY** [1] - 3:6
**CIVIL** [5] - 1:7, 1:13, 1:19, 4:15, 7:9
**civil** [1] - 12:13
**Civil** [2] - 9:6, 9:8
**claim** [55] - 14:17, 14:19, 17:10, 26:4, 26:6, 27:6, 28:9, 31:7, 35:18, 35:20, 36:10, 36:11, 42:6, 44:17, 45:11, 46:14, 46:22, 49:2, 49:7, 49:18, 49:20, 52:1, 52:6, 52:11, 52:13, 52:23, 53:9, 53:10, 54:10, 55:7, 55:8, 55:10, 55:11, 55:16, 55:17, 56:19, 56:21, 57:2, 61:3, 61:13, 63:5, 72:9, 79:18, 80:4, 83:18, 83:24, 84:10, 87:24, 90:16, 94:15, 94:17, 94:18
**claimant** [17] - 21:20, 39:19, 61:19, 61:25, 63:14, 64:9, 64:10, 66:13, 71:8, 72:9, 73:12, 74:21, 76:1, 76:6, 80:15, 84:3, 87:17
**claimants** [23] - 20:8, 23:4, 23:6, 24:4, 41:18, 42:21, 47:10, 59:3, 59:4, 60:15, 61:1, 69:21, 72:4, 81:5, 81:15, 84:6, 87:16, 88:13, 88:20, 89:18, 89:25, 93:23, 94:4
**claimants'** [1] - 72:19

**claiming** [2] - 24:5, 39:15
**claims** [76] - 11:4, 18:8, 18:14, 18:17, 19:6, 20:5, 21:11, 23:1, 23:3, 23:25, 24:16, 24:19, 24:20, 26:10, 26:25, 27:3, 27:5, 33:21, 41:8, 42:24, 42:25, 49:4, 49:5, 50:9, 50:15, 50:16, 52:9, 53:5, 53:11, 55:15, 57:23, 60:2, 60:4, 60:6, 60:7, 60:21, 61:12, 62:5, 63:22, 65:1, 65:16, 65:21, 66:3, 66:17, 68:6, 68:8, 73:22, 78:15, 78:19, 78:25, 79:8, 79:22, 80:7, 80:10, 82:10, 83:10, 83:22, 84:2, 84:5, 84:16, 86:20, 87:22, 87:23, 88:1, 88:3, 88:4, 88:9, 89:14, 92:7, 92:8, 92:23, 93:20, 94:7
**Claims** [28] - 21:14, 24:1, 27:22, 32:14, 50:22, 51:2, 51:5, 52:14, 53:12, 57:10, 57:13, 57:14, 62:13, 64:25, 65:7, 65:11, 65:15, 66:22, 67:10, 78:18, 83:24, 84:23, 85:1, 85:21, 85:25, 86:11, 88:7, 94:2
**clarification** [1] - 53:14
**class** [85] - 16:7, 17:3, 17:18, 17:19, 17:20, 17:21, 18:3, 18:7, 18:21, 19:5, 19:6, 19:16, 20:13, 20:22, 20:25, 21:4, 25:14, 25:18, 25:22, 26:1, 26:19, 26:25, 29:17, 34:22, 34:24, 35:11, 36:8, 38:10, 39:5, 39:10, 39:21, 41:2, 41:7, 42:24, 44:14, 49:7, 50:3, 51:8, 51:14, 51:18, 51:25, 52:15, 53:4, 53:8, 53:9, 53:15, 53:17, 56:19, 59:17, 59:19, 63:17, 64:21, 65:18, 65:25, 66:9, 66:24, 67:24, 68:10, 71:11, 71:13, 71:16, 78:23,

80:20, 80:21, 80:25, 81:7, 82:18, 87:10, 87:11, 87:13, 91:2, 91:5, 91:6, 91:8, 91:10, 91:11, 91:17, 91:22, 91:24, 92:9, 92:23, 93:1, 93:20
**Class** [1] - 22:6
**class-wide** [4] - 66:9, 87:11, 91:6, 91:11
**classic** [1] - 93:11
**classify** [1] - 51:5
**claw** [1] - 93:15
**clawed** [1] - 90:14
**Clean** [2] - 11:4, 13:24
**cleanup** [11] - 23:16, 25:7, 25:15, 25:16, 25:17, 25:19, 25:25, 26:1, 26:19, 48:6, 48:10
**cleanups** [1] - 25:24
**clear** [10] - 27:4, 40:16, 50:19, 51:14, 59:20, 62:1, 62:25, 72:12, 80:2, 90:5
**clearer** [1] - 31:18
**clearly** [3] - 75:21, 81:7, 91:25
**CLERK** [7] - 8:7, 8:12, 9:1, 9:4, 16:19, 16:21, 95:1
**clinic** [1] - 48:17
**clinical** [1] - 42:11
**clinics** [1] - 48:7
**close** [2] - 70:8, 94:4
**Coast** [2] - 65:10, 67:9
**coffee** [1] - 19:4
**Coffee** [5] - 19:4, 19:16, 19:23, 20:3, 20:8
**cohesion** [1] - 20:15
**collateral** [1] - 62:10
**coming** [1] - 10:9
**Comment** [1] - 90:7
**comments** [1] - 63:9
**commit** [1] - 93:24
**committed** [2] - 93:19, 93:25
**Committee** [2] - 38:16, 40:5
**committing** [1] - 93:24
**common** [1] - 40:20
**COMPANY** [1] - 5:18
**compare** [1] - 86:7
**compelled** [1] - 59:14
**compelling** [1] - 59:12
**compensable** [1] - 49:20
**compensate** [3] - 32:15, 36:3, 41:4

**compensated** [3] - 19:8, 20:4, 57:9
**compensation** [25] - 18:20, 19:7, 20:11, 21:5, 34:22, 44:22, 45:2, 49:2, 49:9, 49:24, 53:19, 53:20, 54:23, 55:21, 57:4, 57:19, 58:20, 60:16, 63:14, 68:9, 72:8, 72:12, 72:13, 90:3, 92:8
**complaining** [2] - 32:18, 49:14
**completely** [1] - 79:6
**COMPUTER** [1] - 6:22
**conceding** [1] - 86:24
**concern** [3] - 48:5, 52:10, 52:15
**concerned** [3] - 20:14, 23:12, 34:7
**conclusion** [1] - 93:5
**conclusions** [1] - 12:17
**condition** [81] - 18:24, 21:1, 21:21, 24:12, 26:22, 29:1, 29:16, 29:24, 30:21, 30:22, 32:10, 32:23, 33:9, 34:9, 34:10, 35:12, 35:13, 35:14, 35:21, 36:3, 36:5, 36:18, 38:9, 39:11, 39:13, 39:15, 39:18, 39:25, 41:20, 42:4, 43:19, 43:21, 44:3, 44:4, 44:5, 44:25, 45:3, 45:8, 45:11, 45:12, 45:13, 45:17, 45:22, 46:12, 46:14, 46:21, 47:14, 48:9, 49:15, 49:23, 51:17, 51:19, 52:4, 52:6, 52:11, 53:18, 53:19, 53:21, 53:23, 53:24, 54:1, 54:8, 54:10, 54:22, 55:18, 56:12, 56:16, 56:18, 56:21, 57:4, 57:8, 57:9, 57:11, 57:12, 57:25, 70:13, 71:7
**Condition** [33] - 17:11, 18:23, 19:1, 21:3, 21:17, 28:22, 28:25, 29:15, 29:24, 30:20, 30:24, 31:6, 31:23, 32:12, 32:13, 32:16, 35:19, 36:11, 36:15, 36:20, 38:5, 38:8, 39:20, 40:18, 41:22,

42:5, 45:19, 46:6, 52:2, 54:5, 55:20, 56:22, 56:23
**conditions** [48] - 19:12, 19:19, 20:2, 20:5, 21:5, 23:8, 23:19, 23:20, 24:5, 25:9, 28:19, 33:13, 34:19, 43:4, 43:5, 43:6, 43:7, 43:8, 43:12, 43:14, 43:24, 44:6, 44:7, 44:8, 44:16, 44:24, 45:4, 46:9, 46:11, 47:1, 47:3, 47:19, 48:2, 49:3, 49:10, 49:11, 49:16, 51:5, 54:15, 54:19, 55:15, 57:5, 57:23
**Conditions** [16] - 17:9, 21:12, 21:16, 22:3, 24:18, 31:25, 32:3, 32:7, 32:15, 34:15, 34:19, 39:8, 43:17, 51:7
**conduct** [1] - 88:20
**conducted** [1] - 90:18
**confer** [1] - 24:9
**CONFERENCE** [1] - 1:24
**conference** [1] - 9:21
**confidential** [1] - 86:20
**confines** [1] - 18:6
**confirm** [1] - 22:21
**confirmed** [2] - 21:17, 35:15
**conjunctiva** [2] - 32:21, 46:18
**connection** [3] - 59:1, 61:2, 67:19
**CONNOLLY** [1] - 6:3
**consented** [1] - 84:16
**consequence** [2] - 90:10, 94:22
**consider** [1] - 11:17
**consideration** [2] - 18:3, 74:20
**considered** [2] - 12:16, 59:18
**consistent** [8] - 18:16, 19:10, 21:6, 21:8, 72:18, 72:19, 74:17
**consistently** [2] - 73:24, 80:2
**consists** [1] - 19:6
**construed** [1] - 52:9
**contained** [3] - 53:25, 62:1, 73:7
**contains** [1] - 72:11

contemplated [3] - 75:20, 75:21, 76:13
contemplating [1] - 22:22
contesting [1] - 62:25
context [9] - 32:3, 32:12, 59:21, 67:6, 70:21, 77:9, 86:4, 91:1, 93:14
contingency [3] - 19:9, 94:14, 94:18
continue [3] - 68:11, 88:5, 92:11
CONTINUED [3] - 4:1, 5:1, 6:1
continued [1] - 86:10
continuing [3] - 83:15, 84:9, 92:17
contract [10] - 34:17, 59:24, 71:3, 75:9, 75:14, 75:16, 75:17, 76:20, 85:2, 94:14
contractual [2] - 15:12, 59:12
contrary [1] - 59:19
contribution [2] - 12:12, 14:17
CONTRIBUTION [1] - 7:8
conversations [1] - 9:19
coordinator [1] - 79:3
Coordinator [1] - 87:22
copies [2] - 16:12, 16:13
CORAL [1] - 3:9
cornea [1] - 32:21, 46:18
correct [26] - 10:20, 25:19, 26:23, 28:14, 29:4, 30:4, 30:7, 36:15, 37:1, 37:21, 38:4, 42:1, 43:22, 44:5, 49:17, 57:7, 57:15, 60:16, 71:18, 74:4, 76:20, 78:9, 78:22, 82:20, 95:12
corrected [2] - 61:21, 69:13
correction [1] - 38:17
correctly [2] - 38:11, 76:16
cost [1] - 81:10
Counsel [1] - 58:15
counsel [14] - 16:13, 17:3, 19:5, 29:22, 29:23, 51:8, 51:14, 52:15, 80:20, 80:21, 91:2, 91:5, 93:1,

93:20
COUNSEL [1] - 2:3
counsels' [7] - 39:6, 39:10, 39:21, 51:18, 59:18, 59:20, 63:17
couple [3] - 16:17, 66:5, 85:24
course [6] - 14:13, 47:5, 56:19, 57:6, 60:12, 88:18
Court [96] - 12:14, 15:17, 15:19, 15:21, 16:13, 16:20, 18:12, 20:14, 20:17, 22:22, 27:4, 29:19, 38:11, 38:19, 40:8, 40:9, 40:15, 40:24, 41:6, 42:19, 50:8, 50:17, 51:9, 51:12, 51:20, 53:17, 56:8, 56:11, 56:14, 58:16, 58:18, 58:24, 59:2, 59:5, 59:7, 59:24, 60:2, 60:11, 60:18, 60:23, 60:24, 61:2, 61:4, 61:6, 61:9, 61:10, 61:16, 62:5, 62:10, 63:2, 64:1, 64:22, 65:4, 65:11, 66:22, 67:1, 67:24, 68:9, 69:10, 69:11, 69:19, 72:11, 72:17, 76:12, 77:2, 80:20, 81:4, 81:13, 83:25, 85:19, 86:23, 86:24, 87:1, 89:1, 89:9, 89:14, 90:13, 91:23, 91:24, 92:9, 92:25, 93:6, 93:11, 93:18, 94:2, 94:5, 94:8, 94:15, 94:21, 95:2, 95:9, 95:10, 95:11, 95:19, 95:20
court [17] - 37:20, 59:12, 59:13, 61:21, 67:25, 68:11, 69:2, 75:15, 80:3, 82:13, 83:4, 83:20, 90:19, 90:24, 91:25, 92:11, 92:19
court's [1] - 94:25
COURT'S [1] - 7:11
Court-Supervised [1] - 65:11
courts [2] - 75:11, 81:24
Covenant [1] - 91:18
covered [5] - 10:1, 10:13, 18:23, 19:1, 42:5
covers [1] - 93:9
create [1] - 85:9

15:15, 15:24, 16:1, 16:5, 16:7, 16:10, 16:14, 16:22, 17:17, 17:20, 23:24, 24:4, 24:25, 25:4, 25:10, 25:14, 25:16, 25:18, 25:20, 25:25, 26:4, 26:6, 26:8, 26:14, 26:18, 27:6, 27:9, 27:12, 27:14, 27:18, 27:20, 28:1, 28:5, 28:7, 28:12, 28:15, 28:18, 28:20, 28:24, 29:5, 29:8, 29:12, 30:11, 30:16, 30:19, 31:2, 31:5, 31:10, 31:14, 33:8, 33:25, 34:3, 35:2, 35:6, 36:13, 36:23, 37:2, 37:5, 37:7, 37:10, 37:13, 37:23, 38:13, 38:20, 38:25, 39:2, 40:1, 40:11, 41:24, 42:3, 42:17, 43:15, 43:19, 44:2, 44:23, 45:12, 45:14, 45:18, 45:23, 46:3, 47:8, 48:11, 49:14, 50:10, 51:22, 52:25, 54:1, 54:14, 54:16, 54:20, 54:25, 55:23, 56:3, 56:20, 58:1, 58:3, 58:6, 58:14, 64:15, 64:19, 66:7, 67:8, 67:21, 68:17, 69:2, 69:17, 71:9, 71:13, 71:19, 74:7, 75:9, 75:13, 76:25, 77:4, 77:7, 77:11, 77:20, 78:1, 78:3, 79:8, 81:16, 85:4, 87:3, 89:2, 89:6, 89:16
Court's [14] - 10:8, 14:3, 16:11, 37:15, 38:4, 43:1, 49:9, 49:13, 50:23, 62:18, 62:19, 89:10, 90:12, 93:15

created [1] - 74:10
credit [1] - 55:2
criteria [1] - 46:9
crossed [1] - 40:3
CROW [1] - 3:15
CRR [2] - 6:18, 95:18
CSSP [1] - 73:4
CT [4] - 32:23, 47:7, 47:16, 48:11
CUNNINGHAM [2] - 2:19, 2:19
current [12] - 21:13, 21:24, 24:17, 36:1, 36:8, 36:18, 40:14, 83:5, 83:12, 83:15, 92:21, 93:23

## D

DALLAS [1] - 6:10
damage [2] - 32:21, 46:18
damages [1] - 18:2
data [2] - 24:1, 25:1
date [19] - 24:17, 27:7, 28:12, 29:3, 29:5, 30:1, 31:22, 33:6, 34:11, 35:14, 41:25, 42:13, 45:15, 45:20, 57:16, 59:5, 65:14, 81:10
dates [2] - 12:22, 67:12
DAUPHIN [1] - 2:20
day-to-day [1] - 44:9
days [2] - 12:23
DC [2] - 4:21, 6:5
deadline [1] - 27:6
deal [1] - 13:22
dealing [2] - 47:9, 47:11
dealt [2] - 77:3, 89:10
December [1] - 62:20
decide [1] - 73:3
decided [2] - 10:5, 10:6
decides [2] - 13:17, 15:21
decision [3] - 13:16, 93:15, 94:3
decisions [2] - 83:4, 92:19
declaration [5] - 11:5, 19:22, 22:11, 45:3, 45:7
declarations [1] - 19:21
declaring [1] - 89:17
deem [2] - 12:23,

82:18
deemed [3] - 36:19, 77:23, 89:12
Deepwater [2] - 9:5, 19:18
DEEPWATER [3] - 1:5, 5:4, 5:5
defendant's [1] - 88:17
defense [1] - 52:13
defer [2] - 11:20, 13:18
deference [1] - 10:1
deferment [1] - 10:1
deferred [2] - 9:17, 10:22
defers [1] - 15:18
define [2] - 32:7, 33:5
defined [2] - 28:22, 45:25
definitely [1] - 12:3
definition [13] - 19:13, 29:8, 29:13, 32:13, 38:5, 40:9, 41:21, 41:22, 42:4, 51:1, 51:14, 51:16, 71:25
Definition [1] - 72:7
DEGRAVELLES [1] - 3:11
delayed [1] - 88:5
delaying [1] - 88:2
delivery [1] - 70:12
demand [1] - 59:10
demanding [2] - 33:19, 37:17
demands [1] - 87:15
demonstrate [1] - 18:21
demonstrating [1] - 64:14
DENHAM [1] - 3:20
denials [1] - 84:5
denied [5] - 24:5, 80:5, 80:12, 89:12, 94:24
denies [1] - 94:21
DEPARTMENT [2] - 4:14, 4:20
DEPUTY [7] - 8:7, 8:12, 9:1, 9:4, 16:19, 16:21, 95:1
dermal [7] - 19:12, 20:1, 23:19, 44:7, 46:11, 46:12, 46:14
describe [1] - 74:2
described [4] - 40:19, 43:4, 77:13, 91:7
describes [2] - 28:9, 76:12
describing [1] - 40:17

description [2] - 73:17, 73:18
deserve [1] - 36:9
designed [1] - 66:11
despite [4] - 70:24, 79:4, 84:9, 87:15
determination [4] - 59:13, 70:19, 74:25, 84:4
determinations [5] - 62:11, 62:14, 72:3, 84:5, 84:24
determine [1] - 45:2
determined [3] - 70:17, 70:18, 84:1
determines [1] - 81:13
develop [4] - 17:10, 19:15, 19:17, 34:25
developed [4] - 27:17, 35:13, 39:16, 56:25
developing [1] - 40:20
devote [1] - 63:9
diagnosed [19] - 28:13, 29:16, 30:3, 30:13, 30:17, 30:21, 30:23, 32:1, 38:9, 39:22, 41:25, 42:8, 45:20, 51:6, 51:17, 51:20, 54:2, 54:4, 56:13
diagnoses [1] - 42:11
diagnosis [24] - 19:2, 23:12, 29:11, 31:22, 32:5, 32:8, 32:10, 32:11, 32:19, 33:6, 33:16, 34:8, 42:10, 45:15, 45:16, 45:22, 45:24, 45:25, 46:4, 48:3, 48:25, 57:16
difference [1] - 93:12
differences [1] - 71:1
different [14] - 46:9, 50:5, 57:4, 57:5, 59:8, 64:20, 65:3, 69:22, 75:24, 76:3, 76:19, 79:6, 81:24
differently [1] - 69:19
difficulties [1] - 48:19
direct [1] - 61:6
directed [5] - 57:20, 59:6, 75:15, 84:15, 87:21
direction [2] - 27:4, 84:11
directs [2] - 32:14, 61:16
disagree [1] - 84:6
disagreed [2] - 78:23, 79:5
disagreement [1] -

70:10
disagreements [1] - 93:2
disagrees [1] - 84:7
DISCHARGE [1] - 7:5
discharge [1] - 9:16
disconnect [1] - 31:18
discovered [1] - 37:22
discrete [1] - 89:4
discretionary [5] - 62:9, 77:1, 79:11, 79:13, 89:11
discuss [1] - 8:19
discussed [1] - 40:15
discussion [1] - 40:17
discussions [1] - 22:13
disease [1] - 32:23, 34:24, 48:15
diseases [3] - 19:25, 20:20, 20:22
disingenuous [1] - 86:11
dismissal [1] - 80:4
dispersants [3] - 18:14, 20:21, 21:2
disposed [2] - 14:9, 14:19
dispute [3] - 40:6, 81:2, 91:1
disputes [2] - 60:20, 91:3
dissipate [2] - 88:15, 88:22
dissipated [1] - 88:18
dissipating [1] - 90:1
dissipation [2] - 61:7, 94:23
dissolved [1] - 90:11
distinct [1] - 59:9
distinguishable [2] - 93:17, 94:10
distinguished [1] - 19:25
distorted [1] - 81:10
DISTRICT [3] - 1:1, 1:2, 1:25
District [3] - 95:11, 95:20
dividends [1] - 88:23
DIVISION [1] - 4:15
docket [1] - 10:9
doctor [12] - 21:21, 33:16, 42:10, 44:13, 45:21, 46:13, 46:17, 46:20, 47:1, 47:20, 48:3
doctors [3] - 32:9, 42:11, 45:23
document [4] - 46:17,

76:2, 76:6, 92:16
DOCUMENT [1] - 1:9
documentation [6] - 29:20, 30:8, 30:15, 38:22, 44:17, 44:21
documented [2] - 32:21, 57:11
documents [3] - 58:12, 64:21, 73:10
dollar [1] - 23:1
dollars [3] - 72:25, 73:12, 81:11
DOMENGEAUX [1] - 2:3
DOMINION [1] - 2:12
Don [1] - 12:8
DONALD [1] - 6:8
done [14] - 4:11, 27:21, 31:18, 40:13, 47:16, 59:14, 60:14, 62:23, 65:17, 72:15, 73:18, 73:21, 73:24, 74:19
doses [1] - 20:21
double [4] - 29:13, 54:21, 55:3, 56:17
doubt [1] - 67:2
down [5] - 17:25, 34:25, 65:9, 65:10, 79:3
Downey [5] - 58:16, 68:13, 78:1, 78:5, 89:3
DOWNEY [24] - 6:3, 58:11, 58:16, 64:17, 66:4, 67:6, 67:11, 68:14, 68:21, 69:3, 71:11, 71:18, 71:24, 74:9, 75:12, 76:10, 77:1, 77:6, 77:9, 77:14, 77:22, 78:2, 89:4, 89:7
DOYEN [3] - 5:13, 15:16, 15:25
Doyen [1] - 15:16
Dr [2] - 19:20, 20:24
draft [5] - 30:2, 40:3, 54:25, 64:5
drafted [2] - 63:13, 66:11
drafts [1] - 29:21
draw [1] - 93:6
DRESCHER [2] - 2:11
DRILLING [1] - 5:4
DRIVE [1] - 2:12
driving [1] - 50:5
during [2] - 18:22, 86:6
dust [1] - 14:11
Dysfunction [1] -

43:10

# E

early [1] - 39:13
Eastern [1] - 95:11
EASTERN [1] - 1:2
easy [1] - 82:11
echoed [1] - 89:8
economic [3] - 8:22, 33:24, 92:23
EDWARDS [1] - 2:3
effect [3] - 36:10, 45:22, 69:22
effective [6] - 53:3, 63:24, 63:25, 83:3, 92:19, 92:22
effectively [2] - 13:6, 17:13
effects [1] - 30:10
egregiously [1] - 81:9
eight [2] - 22:25, 23:20
either [17] - 15:18, 17:8, 18:9, 19:11, 20:19, 24:2, 33:6, 39:5, 41:14, 47:7, 51:13, 59:12, 60:20, 73:13, 74:2, 78:18, 81:19
election [5] - 31:4, 31:12, 34:14, 34:16, 34:21
eligibility [6] - 64:6, 72:2, 72:21, 72:23, 73:15, 78:12
eligible [2] - 54:4, 57:19
ELIZABETH [1] - 3:2
Ellis [2] - 22:8, 22:18
ELLIS [1] - 5:23
ELM [1] - 6:9
emergency [5] - 43:13, 43:15, 48:17, 48:20
en [1] - 86:22
encompass [1] - 41:3
end [7] - 27:2, 27:3, 36:5, 47:11, 78:11, 79:23, 84:15
End [28] - 17:14, 18:6, 19:18, 19:24, 20:6, 21:2, 22:1, 23:17, 24:6, 24:19, 28:20, 31:7, 31:13, 33:14, 33:22, 35:21, 42:14, 42:20, 52:10, 52:22,

53:7, 54:6, 54:11, 54:24, 55:8, 55:9, 55:20, 56:14
endoscopic [2] - 32:24, 47:7
ends [1] - 64:3
ENERGY [2] - 5:6, 6:7
enforced [3] - 50:19, 51:2, 69:16
enforcement [2] - 15:14, 90:6
ENFORCEMENT [1] - 4:19
English [1] - 29:1
enjoin [4] - 77:9, 82:11, 86:15, 88:17
enjoined [4] - 79:18, 79:20, 88:21, 88:23
Enrichment [2] - 61:18, 90:8
enrichment [4] - 87:12, 88:2, 88:8, 90:10
ensure [1] - 17:23
entered [4] - 17:3, 72:1, 79:16, 89:13
entire [1] - 34:16
entitle [1] - 46:5
entitled [11] - 42:6, 51:25, 53:12, 53:16, 55:16, 57:4, 59:15, 72:6, 85:14, 89:18, 95:14
ENVIRONMENTAL [1] - 4:19
envision [1] - 11:2
envisioned [1] - 91:9
envisioning [1] - 71:15
equal [2] - 61:7, 72:14
equate [1] - 94:4
equitable [3] - 61:11, 85:9, 85:15
equities [2] - 85:12, 87:6
equivalent [1] - 33:2
errant [1] - 62:20
erroneously [3] - 62:17, 84:23, 84:24
error [2] - 59:14, 61:20
errors [2] - 37:21, 85:1
ERVIN [1] - 3:8
ESQUIRE [29] - 2:4, 2:7, 2:8, 2:11, 2:16, 2:19, 2:23, 3:2, 3:5, 3:8, 3:12, 3:16, 3:19, 3:23, 4:3, 4:7, 4:11, 4:15, 4:20, 5:6, 5:10, 5:13, 5:19, 5:23, 6:3, 6:4, 6:8, 6:9, 6:12

**essence** [1] - 59:19
**essentially** [10] - 20:9, 21:13, 21:16, 31:10, 52:16, 59:8, 78:25, 84:22, 86:17, 87:11
**establish** [3] - 65:8, 85:13, 85:14
**established** [1] - 90:7
**estimate** [4] - 24:8, 24:10, 26:18, 60:8
**ET** [4] - 1:12, 1:15, 1:18, 1:21
**et** [4] - 9:6, 9:7, 9:8, 9:9
**etcetera** [4] - 18:2, 18:5, 63:21, 76:19
**ethically** [1] - 80:22
**event** [1] - 67:19
**events** [3] - 68:4, 68:22, 92:5
**eventuated** [1] - 68:15
**evidence** [4] - 20:19, 32:23, 37:22, 39:4
**exacerbation** [4] - 53:20, 56:12, 57:23, 57:24
**exact** [10] - 23:12, 23:25, 25:4, 30:1, 32:20, 41:15, 42:9, 51:21, 56:9, 65:14
**exactly** [4] - 35:3, 56:1, 81:3, 86:12
**exaggeration** [1] - 11:12
**examination** [2] - 32:24, 47:7
**example** [7] - 39:14, 43:9, 44:7, 69:1, 72:22, 72:23, 73:9
**examples** [1] - 40:20
**except** [2] - 8:14, 92:7
**exception** [1] - 73:6
**exchange** [6] - 53:6, 65:23, 68:8, 73:20, 74:20, 92:8
**exchanged** [1] - 29:22
**excluding** [1] - 56:17
**exercised** [2] - 74:15, 77:25
**exhibit** [1] - 90:1
**Exhibit** [11] - 21:3, 23:14, 32:16, 67:23, 69:10, 69:12, 72:11, 74:12, 86:6, 91:16
**exhibits** [1] - 72:10
**existed** [2] - 17:6, 21:25
**existing** [4] - 17:5, 18:16, 20:1, 20:5
**exists** [3] - 18:25,

70:23, 74:9
**expect** [1] - 25:9
**expected** [1] - 20:22
**expenses** [1] - 89:20
**expert** [4] - 19:5, 19:20, 20:24, 33:16
**experts** [2] - 21:7, 34:12
**expired** [2] - 73:13, 74:16
**explain** [2] - 54:18, 63:16
**explained** [2] - 20:3, 20:7, 94:15
**explaining** [1] - 63:23
**EXPLORATION** [3] - 1:15, 1:21, 5:16
**Exploration** [2] - 9:7, 9:9
**expose** [1] - 36:4
**exposed** [1] - 20:10
**exposure** [11] - 18:4, 18:14, 20:21, 20:23, 21:1, 23:1, 23:15, 33:20, 43:11, 57:1
**expressly** [1] - 68:7, 86:24, 92:7
**extends** [1] - 90:9
**extensive** [1] - 92:15
**extensively** [1] - 61:15
**extent** [6] - 12:23, 18:8, 20:20, 20:25, 56:15, 81:21
**extinguishes** [1] - 85:9
**extra** [1] - 34:4
**extraordinary** [1] - 37:18
**extremely** [1] - 37:17
**eye** [1] - 43:9
**eyes** [2] - 44:12, 48:14

## F

**face** [1] - 50:19
**facilitating** [1] - 73:21
**facilities** [2] - 48:8, 48:20
**Facility** [2] - 65:11, 67:10
**fact** [16] - 14:2, 22:22, 30:11, 37:22, 42:20, 60:21, 68:9, 70:24, 76:23, 79:4, 79:12, 85:6, 87:15, 92:9, 94:2, 94:5
**factual** [3] - 9:24, 9:25, 10:13
**factually** [1] - 30:5

**failure** [2] - 75:7, 89:19
**fair** [1] - 42:21
**fairness** [2] - 41:1, 64:23
**faith** [1] - 87:7
**familiar** [5] - 61:11, 62:4, 80:14, 82:24, 82:25
**fancy** [1] - 48:12
**FANNIN** [1] - 5:10
**far** [3] - 39:9, 50:9, 80:4
**fashion** [1] - 75:24
**fault** [3] - 61:24, 91:17, 94:9
**favor** [4] - 14:4, 66:23, 69:18, 85:12
**FAYARD** [2] - 3:19, 3:19
**feasible** [1] - 81:5
**feasibly** [1] - 81:14
**feature** [1] - 50:1
**features** [1] - 49:25
**February** [5] - 27:10, 27:11, 72:24, 73:11, 73:12
**FEDERAL** [1] - 4:14
**fee** [3] - 19:9, 94:14, 94:18
**few** [6] - 24:16, 26:13, 34:4, 47:20, 84:22, 88:19
**fictitious** [2] - 81:6
**Fifth** [14] - 13:25, 58:23, 66:25, 77:15, 78:16, 78:19, 79:16, 79:17, 79:24, 80:5, 80:8, 81:9, 83:24, 83:25
**file** [14] - 15:10, 15:20, 24:19, 26:6, 26:25, 41:8, 41:10, 42:25, 44:17, 53:23, 66:15, 81:8, 82:2, 82:15
**filed** [16] - 12:11, 12:16, 13:5, 22:17, 24:15, 24:16, 24:23, 26:10, 27:5, 42:25, 50:9, 56:21, 62:5, 64:22, 85:20, 85:25
**filing** [5] - 36:10, 62:8, 82:8, 90:15, 93:19
**Final** [1] - 91:18
**final** [17] - 27:7, 38:18, 64:4, 64:7, 64:22, 64:24, 64:25, 69:6, 71:16, 73:5, 73:14, 74:1, 74:16, 78:12, 79:24, 91:23

**finalized** [1] - 78:14
**finally** [11] - 20:16, 63:21, 65:19, 65:25, 66:6, 69:6, 70:16, 70:18, 88:12, 93:15
**findings** [6] - 12:16, 20:17, 20:18, 32:21, 33:7, 42:11
**fine** [2] - 14:14, 14:23
**FINES** [1] - 7:9
**fines** [1] - 12:13
**first** [26] - 8:20, 8:21, 9:10, 29:16, 29:24, 30:4, 30:21, 30:22, 34:20, 35:12, 38:3, 38:9, 41:18, 43:4, 50:21, 51:6, 51:17, 53:1, 56:11, 64:1, 67:11, 71:4, 85:12, 85:22, 87:9, 91:16
**Fisheries** [2] - 9:8, 83:14
**FISHERIES** [1] - 1:17
**five** [8] - 17:11, 17:24, 27:12, 34:25, 43:6, 49:10, 49:15, 56:24
**FL** [2] - 2:17, 3:9
**flexible** [1] - 50:1
**FLOOR** [5] - 3:2, 4:4, 4:16, 5:6, 5:14
**FLORIDA** [1] - 3:20
**flowed** [1] - 69:14
**focus** [4] - 18:24, 25:25, 28:24, 63:18
**focused** [4] - 27:23, 40:24, 40:25, 42:3
**focusing** [1] - 27:22
**follow** [2] - 12:14, 51:3
**followed** [1] - 84:17
**following** [1] - 90:20
**follows** [1] - 90:4
**Footnote** [3] - 9:15, 10:2, 10:12
**FOR** [11] - 2:3, 2:11, 4:10, 4:14, 4:19, 5:3, 5:16, 6:7, 7:7, 7:11, 7:12
**foregoing** [1] - 95:12
**forever** [2] - 68:6, 92:6
**form** [4] - 43:10, 53:10, 62:12, 77:17
**formal** [3] - 45:24, 46:3, 46:4
**formally** [1] - 42:8
**forms** [2] - 45:9, 48:8
**formulation** [1] - 76:11
**forth** [6] - 9:25, 10:2, 10:13, 42:12, 78:7, 91:8

**forward** [3] - 36:10, 40:8, 75:22
**four** [4] - 24:17, 24:21, 48:24, 56:24
**frames** [1] - 49:22
**framework** [2] - 72:5, 72:12
**frameworks** [2] - 72:10, 72:15
**FRANCISCO** [2] - 3:3, 4:17
**frankly** [1] - 31:20, 41:9, 75:1
**fraud** [9] - 88:11, 90:17, 93:19, 93:20, 93:24, 93:25, 94:4, 94:12, 94:20
**fraudulent** [1] - 93:19
**free** [1] - 18:1
**FRILOT** [1] - 5:5
**front** [4] - 27:3, 52:17, 69:11, 71:4
**FRUGE** [1] - 3:11
**Full** [1] - 91:18
**fully** [2] - 13:2, 88:24
**fund** [1] - 86:18
**fundamental** [1] - 53:14
**funds** [1] - 93:16
**furthermore** [1] - 94:13
**future** [19] - 17:10, 18:17, 20:5, 20:8, 20:12, 22:4, 34:10, 52:21, 52:22, 68:2, 68:4, 68:22, 68:25, 83:6, 83:13, 83:16, 92:2, 92:5, 92:21

## G

**GABLES** [1] - 3:9
**gained** [1] - 86:19
**gap** [1] - 86:7
**Garretson** [6] - 24:15, 26:9, 36:17, 41:17, 50:22, 55:23
**Garretson's** [1] - 50:7
**GATE** [1] - 4:16
**general** [1] - 91:5
**generically** [1] - 20:7
**GISLESON** [1] - 2:8
**given** [5] - 11:9, 40:10, 63:4, 70:6, 91:23
**Godwin** [2] - 12:8, 14:10
**GODWIN** [12] - 6:8, 6:8, 6:12, 12:8, 12:11, 13:1, 13:4,

13:7, 13:10, 13:13, 14:13, 15:3
**GOLDEN** [1] - 4:16
**GONZALES** [1] - 3:8
**GONZALEZ** [1] - 3:8
**Government** [5] - 10:4, 10:23, 11:15, 12:1, 14:4
**GOVERNMENT** [1] - 4:14
**governs** [1] - 34:16
**GRAND** [1] - 5:14
**granting** [1] - 37:16
**great** [1] - 24:22
**GREENWALD** [1] - 3:5
**gross** [1] - 88:20
**grounds** [2] - 60:3, 80:5
**group** [2] - 56:9, 56:11
**guess** [8] - 26:23, 30:4, 31:14, 41:5, 41:12, 55:6, 67:22, 85:4
**guide** [1] - 57:15
**GULF** [1] - 1:5
**Gulf** [4] - 9:5, 48:19, 65:10, 67:9
**guys** [1] - 77:20

## H

**hairs** [2] - 68:20, 75:19
**hairsplitting** [1] - 93:11
**half** [2] - 21:16, 47:25
**HALLIBURTON** [1] - 6:7
**Halliburton** [7] - 8:18, 12:7, 12:9, 12:11, 12:15, 14:17, 14:23
**Halliburton's** [1] - 13:23
**HALLIBURTON'S** [1] - 7:7
**hand** [1] - 54:3
**hands** [1] - 87:8
**happy** [1] - 88:25
**hard** [2] - 23:22, 80:21
**HB406** [1] - 6:19
**head** [1] - 26:12
**health** [2] - 47:13, 47:23
**healthcare** [1] - 48:19
**hear** [2] - 13:12, 80:6
**HEARD** [1] - 1:24
**heard** [4] - 41:10, 47:22, 71:10, 82:4
**HEARING** [1] - 1:24

hearing [4] - 41:1, 56:8, 64:23, 82:12
**hearings** [1] - 40:16
**heart** [2] - 34:6, 59:17
**HEIMANN** [1] - 3:1
**held** [3] - 37:17, 56:14, 58:24
**help** [2] - 81:22, 82:20
**helped** [2] - 94:6, 94:16
**helps** [2] - 81:16, 81:23
**hereby** [2] - 94:21, 95:11
**Herman** [3] - 16:25, 82:6, 89:8
**HERMAN** [62] - 2:7, 2:7, 16:4, 16:6, 16:11, 17:1, 17:19, 17:21, 24:3, 24:8, 25:2, 25:6, 25:13, 25:15, 25:17, 25:19, 25:21, 26:3, 26:5, 26:7, 26:12, 26:16, 26:23, 27:8, 27:10, 27:13, 27:15, 27:19, 27:25, 28:4, 28:6, 28:11, 28:14, 28:17, 28:19, 28:23, 29:4, 29:7, 29:10, 30:6, 30:14, 30:18, 31:1, 31:4, 31:9, 31:12, 31:17, 33:10, 34:2, 34:5, 35:3, 35:7, 36:16, 37:1, 37:4, 58:5, 78:8, 79:10, 81:21, 85:6, 87:5
**Herzstein** [2] - 19:20, 20:24
**highlighted** [1] - 22:7
**highly** [1] - 10:22
**hinges** [1] - 32:5
**hire** [1] - 33:16
**historically** [1] - 30:5
**histories** [1] - 42:12
**history** [4] - 38:13, 38:23, 47:6, 67:13
**HODGES** [41] - 6:4, 16:9, 37:6, 37:8, 37:11, 37:14, 38:2, 38:15, 38:21, 39:1, 39:7, 40:2, 41:23, 42:2, 42:16, 42:18, 43:18, 43:21, 44:4, 45:1, 45:13, 45:16, 45:21, 46:2, 46:7, 48:6, 48:13, 49:17, 50:11, 52:24, 53:1, 54:13, 54:15, 54:18, 54:21, 55:14, 56:1,

56:7, 57:3, 58:2, 69:24
**Hodges** [4] - 16:9, 25:3, 37:11, 58:1
**hold** [1] - 15:1
**HOLDINGS** [1] - 5:3
**holds** [1] - 55:14
**HOLTHAUS** [1] - 3:11
**HOLTZMAN** [1] - 5:19
**HONEYCUTT** [1] - 3:19
**Honor** [97] - 8:9, 9:12, 9:14, 9:20, 10:12, 10:17, 11:18, 11:24, 13:1, 13:13, 13:15, 13:17, 14:5, 15:3, 15:4, 15:7, 15:16, 16:4, 16:6, 16:9, 16:11, 17:1, 26:5, 26:7, 27:8, 27:13, 27:19, 27:25, 28:4, 28:11, 28:23, 29:10, 31:12, 32:5, 34:2, 34:5, 34:6, 35:7, 37:1, 37:4, 37:6, 37:8, 37:11, 37:14, 38:2, 38:21, 39:1, 41:23, 42:16, 48:6, 50:6, 50:18, 54:18, 55:14, 56:7, 58:2, 58:5, 58:11, 59:16, 61:24, 63:6, 64:13, 67:7, 67:11, 67:12, 67:15, 67:16, 67:20, 68:14, 68:21, 70:23, 71:3, 71:24, 74:14, 76:16, 76:22, 78:2, 78:10, 78:15, 78:16, 78:19, 78:24, 79:2, 79:5, 79:12, 80:14, 81:21, 82:19, 82:24, 82:25, 83:17, 83:23, 87:5, 87:21, 89:4, 89:7
**Honor's** [5] - 70:11, 76:11, 76:15, 77:3, 87:1
**HONORABLE** [2] - 1:24, 6:16
**hook** [1] - 16:15
**hoops** [1] - 52:12
**hopefully** [1] - 57:20
**HORIZON** [1] - 1:5
**Horizon** [2] - 9:5, 19:18
**Hospital** [2] - 47:21, 47:22
**hours** [4] - 28:16, 34:20, 35:13, 43:25
**HOUSTON** [2] - 5:11,

6:13
**hundreds** [2] - 81:10, 87:23
**hyperactive** [1] - 33:2
**hypothetical** [1] - 35:24

## I

**identified** [4] - 83:18, 84:10, 89:25, 90:2
**identify** [5] - 8:14, 8:16, 60:4, 60:7, 88:14
**identifying** [1] - 82:10
**IL** [1] - 5:24
**imagine** [2] - 50:2, 80:21
**imaging** [2] - 32:24, 47:7
**immaterial** [1] - 67:19
**immediate** [1] - 10:11
**immediately** [3] - 65:7, 65:9, 65:10
**implementation** [2] - 78:24, 93:3
**important** [12] - 36:7, 42:18, 44:14, 46:24, 59:17, 65:24, 67:15, 74:11, 74:12, 76:22, 91:17
**impossible** [1] - 81:12
**IMPREVENTO** [1] - 2:11
**improper** [2] - 81:12, 82:21
**IN** [2] - 1:4, 1:5
**INC** [5] - 5:4, 5:5, 5:17, 5:18, 6:8
**incident** [2] - 18:13, 19:18
**inclined** [2] - 12:18, 14:25
**included** [4] - 17:12, 25:23, 56:13, 67:16
**includes** [1] - 21:12
**including** [4] - 40:24, 45:9, 72:10, 89:21
**inconsistent** [1] - 58:22
**Incorporated** [3] - 9:7, 9:8, 9:9
**INCORPORATED** [3] - 1:15, 1:18, 1:21
**incorrect** [1] - 69:14
**increases** [1] - 20:15
**indeed** [1] - 74:24
**indemnify** [1] - 85:1, 85:3, 85:7

**indemnifying** [1] - 11:10
**INDEMNITY** [1] - 7:8
**indemnity** [4] - 12:13, 15:13, 83:9, 84:20
**independent** [1] - 30:9
**indicated** [3] - 40:9, 77:8, 79:17
**individual** [39] - 19:7, 53:7, 56:15, 60:21, 63:22, 65:23, 67:23, 68:4, 68:5, 68:12, 70:13, 71:8, 71:16, 71:20, 71:21, 75:3, 76:23, 76:25, 77:5, 77:12, 77:14, 77:15, 78:17, 80:4, 80:6, 83:3, 83:18, 83:24, 89:9, 89:13, 91:6, 91:14, 92:4, 92:6, 92:12, 92:18, 92:21, 93:4, 93:8
**inequitable** [1] - 87:20
**information** [6] - 25:1, 39:5, 41:16, 86:20, 88:6, 91:17
**informs** [1] - 91:17
**inherently** [1] - 55:4
**initial** [1] - 94:12
**injunction** [7] - 62:13, 79:16, 79:24, 86:17, 88:12, 88:13, 89:25
**Injunctive** [1] - 58:10
**INJUNCTIVE** [1] - 7:12
**injured** [1] - 44:20
**injuries** [4] - 19:17, 19:24, 20:12, 48:20
**injury** [2] - 18:13, 20:11
**innocent** [2] - 94:7, 94:11
**insofar** [1] - 12:16
**instance** [2] - 75:2, 93:11
**instead** [2] - 24:20, 32:17
**instructed** [1] - 79:2
**instructs** [1] - 58:19
**insurance** [3] - 47:13, 47:18, 47:24
**intend** [2] - 10:23, 11:1
**intended** [7] - 17:3, 17:8, 23:23, 33:21, 36:2, 36:6, 41:14
**intending** [2] - 30:9, 30:10
**intent** [5] - 17:7, 23:3, 31:19, 36:6, 44:19
**interest** [6] - 55:6,

87:15, 87:16, 87:18, 87:19, 89:18
**interesting** [1] - 22:16
**INTERESTS** [1] - 4:14
**interfere** [2] - 44:8, 86:21
**interfered** [1] - 86:14
**interim** [4] - 65:21, 66:1, 66:3, 76:24
**interpret** [3] - 60:24, 75:10
**interpretation** [25] - 21:14, 21:24, 24:17, 32:4, 33:11, 35:11, 35:17, 36:1, 36:8, 36:19, 40:14, 66:19, 67:1, 67:18, 68:17, 69:5, 69:12, 69:15, 69:22, 75:8, 76:13, 76:21, 93:3, 93:13, 94:3
**interpretations** [1] - 76:3
**interpreted** [8] - 66:23, 69:7, 75:18, 75:25, 76:4, 84:23, 94:1
**interprets** [1] - 75:15
**interrupted** [1] - 34:1
**interview** [1] - 86:7
**invoke** [1] - 50:3
**involved** [2] - 14:17, 22:13
**involving** [1] - 14:18
**irony** [1] - 33:10
**irrelevant** [1] - 35:24
**issue** [37] - 8:22, 8:23, 9:16, 10:4, 11:11, 13:15, 15:9, 15:14, 16:3, 27:1, 27:16, 35:10, 35:24, 36:7, 36:8, 47:8, 50:21, 50:23, 51:10, 51:22, 51:23, 52:24, 55:20, 56:7, 58:8, 62:2, 63:8, 63:12, 70:2, 70:21, 75:6, 84:1, 86:23, 86:25, 88:4, 88:7, 89:12
**ISSUE.......................
....** [1] - 7:10
**issues** [11] - 10:11, 10:13, 10:21, 10:22, 48:18, 51:10, 61:8, 70:3, 78:20, 84:5, 87:25
**it'd** [1] - 11:14
**ITEMS** [1] - 7:3
**itself** [10] - 27:24, 32:17, 36:4, 53:2,

63:4, 84:20, 84:25, 91:15, 92:13, 93:21

**J**

**JAMES** [1] - 2:4
**January** [1] - 14:16
**Jason** [1] - 50:24
**JEFFREY** [1] - 2:11
**JENNY** [1] - 6:9
**joint** [2] - 19:4, 20:16
**JONES** [1] - 3:16
**JOSEPH** [1] - 4:7
**JR** [2] - 3:19, 4:3
**JUDGE** [1] - 1:25
**judge** [4] - 9:23, 12:11, 23:13, 23:17
**Judge** [7] - 12:8, 12:20, 13:4, 13:11, 14:13, 14:22, 59:9
**JUDGMENT** [1] - 7:7
**judgment** [7] - 11:6, 73:22, 90:6, 90:20, 90:21, 90:22, 90:25
**Judgment** [1] - 12:12
**judgments** [1] - 90:9
**judicial** [1] - 90:10
**July** [2] - 12:11, 38:12
**jump** [1] - 52:11
**June** [1] - 65:13
**Juneau** [1] - 86:3
**jurisdiction** [1] - 80:3
**jury** [2] - 23:14, 23:18
**JUSTICE** [2] - 4:14, 4:20

**K**

**KALBAC** [1] - 3:8
**KANE** [1] - 3:8
**KANNER** [2] - 4:10, 4:11
**KATZ** [1] - 2:7
**keep** [3] - 59:5, 86:3, 86:20
**kept** [1] - 86:15
**Kerry** [1] - 9:12
**KERRY** [1] - 5:6
**Kevin** [4] - 16:9, 16:15, 37:11, 58:16
**KEVIN** [2] - 6:3, 6:4
**key** [1] - 22:9
**kind** [5] - 27:15, 27:16, 33:14, 49:23
**kinds** [2] - 40:23, 68:22
**KIRKLAND** [1] - 5:23
**Kirkland** [2] - 22:8,

22:18
**knowing** [1] - 66:8
**knows** [2] - 26:9, 72:11
**KULLMAN** [1] - 2:22

**L**

**LA** [11] - 2:5, 2:9, 2:24, 3:13, 3:20, 3:24, 4:4, 4:12, 5:7, 5:21, 6:20
**LAFAYETTE** [1] - 2:5
**LAKE** [1] - 3:24
**LAMAR** [1] - 6:13
**Langan** [4] - 11:24, 13:12, 13:14, 14:25
**LANGAN** [8] - 5:23, 11:24, 12:5, 13:14, 14:1, 14:5, 14:8, 15:4
**language** [26] - 29:20, 38:4, 38:11, 43:2, 50:18, 51:1, 51:3, 51:4, 51:13, 63:20, 64:18, 67:21, 67:22, 67:23, 70:11, 74:7, 74:11, 74:12, 80:15, 83:11, 91:15, 91:20, 92:14, 92:16, 93:4, 93:6
**laptop** [1] - 16:15
**large** [2] - 10:9, 81:8
**largely** [1] - 90:19
**LASALLE** [1] - 5:24
**last** [3] - 47:22, 85:24, 91:21
**latency** [1] - 40:22
**latent** [5] - 19:25, 20:20, 21:1, 34:10, 34:24
**Later-Manifested** [22] - 17:11, 22:2, 24:18, 28:21, 28:24, 29:15, 29:23, 30:20, 30:23, 31:6, 31:23, 31:25, 34:15, 34:18, 36:19, 38:5, 38:8, 39:19, 40:18, 51:6, 54:5, 55:20
**later-manifested** [3] - 19:19, 33:9, 41:20
**law** [9] - 15:13, 37:22, 37:24, 61:20, 66:19, 75:10, 75:15, 84:19, 90:4
**lawsuit** [5] - 41:8, 41:11, 82:9, 83:10
**lawsuits** [2] - 42:20, 82:2, 82:16

**lawyers** [5] - 21:7, 26:17, 26:18, 35:9, 89:21
**Lead** [1] - 85:3
**least** [9] - 10:5, 10:24, 14:11, 17:3, 24:11, 34:6, 60:12, 93:14
**leaves** [1] - 38:6
**left** [5] - 17:5, 19:24, 20:5, 21:11, 23:11
**legal** [9] - 9:24, 9:25, 10:13, 37:16, 52:1, 68:3, 72:5, 81:2, 92:3
**LEGER** [2] - 4:3, 4:3
**legitimate** [2] - 42:23, 49:4
**less** [2] - 11:13, 11:14
**letter** [8] - 9:11, 9:24, 10:14, 52:16, 52:17, 52:18, 56:3, 56:4
**leukemia** [2] - 17:24, 19:14
**level** [5] - 44:24, 44:25, 45:1, 45:2, 82:13
**LEVIN** [1] - 2:15
**LEWIS** [2] - 2:22, 5:18
**liability** [9] - 9:17, 11:5, 11:9, 18:5, 83:5, 83:10, 83:12, 88:24, 92:20
**LIABILITY** [1] - 7:6
**liable** [2] - 11:7, 88:19
**LIAISON** [1] - 2:3
**LIEFF** [1] - 3:1
**life** [2] - 44:9, 48:15
**LIFE** [1] - 2:23
**life-threatening** [1] - 48:15
**likely** [2] - 36:2, 47:13
**limitation** [2] - 39:8, 83:9
**limitations** [1] - 33:24
**limited** [2] - 23:16, 34:15
**limiting** [1] - 33:19
**limits** [1] - 23:1
**line** [3] - 17:25, 34:25, 39:9
**lines** [1] - 70:20
**LISKOW** [1] - 5:18
**listed** [1] - 49:15
**literal** [1] - 40:10
**literally** [3] - 30:19, 30:24, 31:1
**litigated** [4] - 17:14, 20:9, 22:1, 22:4
**Litigation** [27] - 17:14, 18:7, 19:19, 19:24,

20:6, 21:2, 22:2, 23:17, 24:7, 24:19, 28:21, 31:7, 31:13, 33:14, 33:22, 35:21, 42:14, 42:20, 52:11, 52:23, 53:7, 54:6, 54:11, 54:24, 55:8, 55:9, 56:14
**litigation** [15] - 18:10, 19:7, 23:11, 23:13, 33:15, 36:4, 61:11, 62:12, 68:19, 83:6, 83:13, 83:16, 88:16, 88:18, 92:21
**live** [5] - 10:5, 10:6, 10:21, 13:15, 78:25
**living** [1] - 47:23
**LLC** [1] - 5:3
**LMPC** [5] - 39:23, 51:1, 51:14, 51:16, 51:19
**located** [1] - 91:15
**look** [11] - 15:2, 21:9, 42:24, 46:7, 46:8, 46:10, 46:21, 64:17, 71:4, 73:9, 87:12
**looked** [1] - 35:15
**looking** [2] - 24:4, 39:2, 76:2
**looks** [1] - 29:14
**LOS** [1] - 5:14
**loses** [1] - 23:15
**losses** [3] - 81:6, 85:7
**lost** [2] - 11:6, 90:5
**LOUISIANA** [5] - 1:2, 1:7, 1:14, 1:20, 4:10
**Louisiana** [4] - 47:10, 47:23, 95:10, 95:11
**lower** [2] - 44:23, 47:11
**LUNDY** [3] - 3:22, 3:23
**LUXENBERG** [1] - 3:5

**M**

**Magistrate** [1] - 9:22
**MAIN** [1] - 3:12
**maintaining** [1] - 62:15
**majority** [1] - 18:13
**manifest** [6] - 20:22, 20:25, 29:2, 37:21, 43:24, 49:22
**manifestation** [4] - 19:3, 35:19, 45:7, 57:16
**Manifested** [22] - 17:11, 22:2, 24:18, 28:21, 28:24, 29:15,

29:23, 30:20, 30:23,
31:6, 31:23, 31:25,
34:15, 34:18, 36:19,
38:5, 38:8, 39:19,
40:18, 51:6, 54:5,
55:20
**manifested** [20] -
18:22, 18:25, 19:19,
20:5, 20:11, 27:3,
28:16, 30:12, 30:17,
33:9, 34:9, 34:10,
34:19, 34:20, 35:12,
39:11, 41:20, 44:16,
44:20, 49:8
**manifests** [2] - 29:25,
30:3
**manner** [2] - 15:22,
60:8
**March** [7] - 29:25,
30:1, 38:16, 50:21,
65:4, 81:4, 85:24
**MARTINEZ** [1] - 6:9
**MARTÍNEZ** [1] - 3:8
**Master** [1] - 61:14
**match** [1] - 89:19
**matching** [11] - 60:1,
60:3, 62:20, 78:20,
84:1, 87:22, 87:25,
88:4, 88:7, 89:10,
89:12
**matrix** [1] - 49:20
**Matrix** [21] - 21:3,
21:19, 22:25, 23:9,
24:6, 28:8, 32:16,
42:6, 42:14, 43:5,
44:18, 45:19, 46:6,
46:7, 47:2, 48:21,
49:3, 55:16, 56:16,
56:23
**matter** [14] - 14:19,
15:18, 56:22, 63:18,
64:2, 66:17, 66:18,
72:16, 73:3, 73:21,
78:8, 79:19, 93:18,
95:14
**matters** [2] - 8:19,
59:25
**MATTHEW** [1] - 3:23
**MDL** [1] - 9:4
**mean** [18] - 13:20,
22:17, 23:23, 29:16,
29:24, 30:20, 38:8,
41:9, 47:17, 51:16,
51:19, 51:21, 53:22,
57:18, 57:24, 72:8,
79:15, 85:7
**meaning** [3] - 17:6,
40:10, 49:14
**means** [2] - 71:22,
83:8

**meant** [1] - 70:19
**MECHANICAL** [1] -
6:22
**mechanism** [1] - 21:4
**mechanisms** [2] -
61:2, 91:8
**mediate** [1] - 24:21
**mediation** [1] - 18:10
**MEDICAL** [1] - 7:10
**medical** [25] - 8:22,
16:2, 18:20, 19:20,
20:12, 23:9, 29:17,
38:9, 39:14, 39:16,
43:7, 44:9, 44:15,
44:17, 44:21, 45:4,
45:9, 45:10, 46:4,
47:6, 47:15, 48:10,
49:15, 49:24, 53:25
**medically** [1] - 42:23
**meet** [3] - 41:21,
52:12, 57:6
**meets** [1] - 42:4
**member** [10] - 29:17,
35:12, 38:10, 44:14,
53:8, 53:9, 53:17,
53:18, 56:19, 82:17
**members** [26] - 17:20,
17:21, 18:21, 19:16,
20:13, 20:22, 20:25,
21:4, 25:14, 25:18,
25:22, 26:1, 26:19,
26:25, 34:22, 34:24,
36:9, 41:2, 42:25,
49:7, 51:25, 53:15,
78:23, 81:7, 91:17
**Memorandum** [1] -
22:6
**mention** [1] - 28:12
**mentioned** [2] - 25:11,
26:15
**Merit** [2] - 95:9, 95:19
**MERIT** [1] - 6:19
**merits** [2] - 38:3,
90:20
**methacholine** [1] -
33:1
**METHVIN** [1] - 3:15
**Mexico** [1] - 9:5
**MEXICO** [1] - 1:5
**MICHAEL** [3] - 3:12,
4:15, 5:13
**might** [20] - 19:15,
22:4, 22:5, 34:25,
37:24, 39:12, 42:21,
58:13, 66:5, 66:6,
75:23, 75:24, 81:22,
84:4, 85:1, 88:14,
88:17, 88:22, 89:1,
91:13
**Mike** [1] - 15:16

**MILES** [1] - 3:15
**MILLER** [2] - 5:6, 9:12
**Miller** [3] - 9:12, 10:20,
11:11
**million** [5] - 47:24,
47:25, 60:10, 72:25,
73:12
**millions** [1] - 81:10
**minds** [1] - 32:1
**minor** [3] - 11:10,
11:12, 11:14
**minute** [1] - 10:3,
35:5, 37:3
**minutes** [3] - 16:18,
34:4, 84:22
**misconduct** [1] -
88:19
**MITCHELL** [1] - 2:15
**MOBILE** [1] - 2:20
**modest** [2] - 19:6,
52:7
**modified** [1] - 69:1
**modifying** [1] - 31:22
**money** [6] - 11:16,
23:18, 54:11, 66:15,
82:1, 83:21
**MONTGOMERY** [1] -
3:17
**month** [1] - 38:18
**months** [5] - 22:25,
23:20, 27:12, 64:6,
65:15
**morning** [12] - 8:8,
8:9, 8:11, 8:15, 8:20,
8:25, 9:12, 12:8,
12:10, 16:4, 37:11,
37:13
**most** [6] - 19:7, 20:13,
40:20, 43:13, 47:12,
50:15
**motion** [18] - 13:2,
13:23, 15:20, 22:16,
37:16, 37:24, 59:7,
61:14, 63:11, 80:12,
82:8, 82:11, 82:17,
82:21, 87:9, 90:1,
94:19, 94:23
**MOTION** [3] - 7:7,
7:11, 7:12
**Motion** [6] - 12:12,
37:14, 51:12, 51:18,
58:9, 94:22
**motions** [3] - 37:20,
65:7, 80:4
**motive** [1] - 66:4
**MOTLEY** [1] - 4:6
**MOUNT** [1] - 4:8
**move** [1] - 58:8
**moved** [2] - 89:17,
89:24

**MR** [148] - 9:12, 10:17,
10:20, 10:24, 11:3,
11:17, 11:20, 11:24,
12:5, 12:8, 12:11,
13:1, 13:4, 13:7,
13:10, 13:13, 13:14,
14:1, 14:5, 14:8,
14:13, 15:3, 15:4,
15:7, 15:16, 15:25,
16:4, 16:6, 16:9,
16:11, 17:1, 17:19,
17:21, 24:3, 24:8,
25:2, 25:6, 25:13,
25:15, 25:17, 25:19,
25:21, 26:3, 26:5,
26:7, 26:12, 26:16,
26:23, 27:8, 27:10,
27:13, 27:15, 27:19,
27:25, 28:4, 28:6,
28:11, 28:14, 28:17,
28:19, 28:23, 29:4,
29:7, 29:10, 30:6,
30:14, 30:18, 31:1,
31:4, 31:9, 31:12,
31:17, 33:10, 34:2,
34:5, 35:3, 35:7,
36:16, 37:1, 37:4,
37:6, 37:8, 37:11,
37:14, 38:2, 38:15,
38:21, 39:1, 39:7,
40:2, 41:23, 42:2,
42:16, 42:18, 43:18,
43:21, 44:4, 45:1,
45:13, 45:16, 45:21,
46:2, 46:7, 48:6,
48:13, 49:17, 50:11,
52:24, 53:1, 54:13,
54:15, 54:18, 54:21,
55:14, 56:1, 56:7,
57:3, 58:2, 58:5,
58:11, 58:16, 64:17,
66:4, 67:6, 67:11,
68:14, 68:21, 69:3,
69:24, 71:11, 71:18,
71:24, 74:9, 75:12,
76:10, 77:1, 77:6,
77:9, 77:14, 77:22,
78:2, 78:8, 79:10,
81:21, 85:6, 87:5,
89:4, 89:7
**MSA** [4] - 50:24, 51:3,
51:4, 51:19
**MUNGER** [1] - 5:13
**muscle** [1] - 32:23
**must** [7] - 42:25,
43:24, 43:25, 44:2,
49:22, 49:23

## N

**nagging** [1] - 43:8
**narrow** [1] - 37:21
**naturally** [1] - 94:23
**nature** [1] - 48:21
**near** [1] - 60:9
**necessarily** [1] -
47:14
**necessary** [1] - 46:16
**need** [17] - 10:21,
15:22, 22:4, 25:4,
42:9, 44:17, 44:22,
45:3, 45:4, 45:6,
45:7, 45:9, 81:7,
87:1, 87:3, 88:13
**needed** [2] - 46:20,
78:21
**needs** [3] - 22:1,
46:20, 51:23
**negligence** [1] - 88:20
**negotiate** [1] - 33:18
**negotiated** [6] - 17:3,
23:9, 66:1, 91:3,
91:5, 91:14
**negotiating** [5] -
22:25, 23:20, 30:2,
33:12, 38:20
**negotiation** [1] - 38:23
**negotiations** [2] -
22:14, 32:6
**negotiators** [1] - 22:9
**never** [10] - 40:9,
40:15, 40:16, 41:10,
45:20, 71:9, 75:3,
76:23, 81:11, 81:14
**nevertheless** [1] -
74:1
**NEW** [11] - 1:7, 1:14,
1:20, 2:9, 2:24, 3:6,
4:4, 4:12, 5:7, 5:21,
6:20
**new** [2] - 51:11, 74:23
**newly** [1] - 37:22
**next** [3] - 10:9, 27:1,
27:15
**NO** [1] - 1:7
**non** [1] - 49:20
**non-compensable** [1]
- 49:20
**nonclass** [1] - 71:20
**none** [3] - 68:4, 78:15,
92:4
**nonprofit** [1] - 80:7
**NORFOLK** [1] - 2:13
**NORTH** [1] - 5:18
**note** [2] - 80:16, 83:1
**Note** [1] - 58:9
**notebook** [1] - 72:23

**noted** [1] - 83:23
**notes** [1] - 62:1
**nothing** [3] - 51:11, 60:19, 76:6
**notice** [13] - 63:4, 64:6, 72:2, 72:21, 72:23, 73:15, 78:12, 78:13, 80:24, 82:3, 82:6, 82:7, 86:3
**noticing** [1] - 85:25
**noting** [2] - 22:6, 77:16
**November** [1] - 20:19
**number** [11] - 25:4, 25:6, 25:11, 26:13, 34:11, 35:3, 50:10, 59:1, 77:16, 78:10, 81:8
**Number** [1] - 39:1
**numbered** [1] - 95:14
**numbers** [6] - 24:2, 24:25, 26:16, 26:20, 41:15, 73:18
**NY** [1] - 3:6

# O

**O'KEEFE** [1] - 2:8
**O'Rourke** [7] - 10:3, 10:15, 10:17, 10:19, 11:25, 15:6, 15:7
**O'ROURKE** [8] - 4:20, 10:17, 10:20, 10:24, 11:3, 11:17, 11:20, 15:7
**object** [2] - 84:4, 84:6
**objected** [1] - 73:24
**objection** [1] - 84:9
**objections** [1] - 51:8
**objective** [5] - 32:20, 32:21, 32:23, 33:7, 46:17
**objectors** [2] - 56:9, 56:12
**objects** [1] - 84:7
**obtain** [1] - 60:25
**obtained** [1] - 45:11
**obvious** [1] - 40:13
**obviously** [6] - 26:20, 31:17, 44:25, 54:8, 80:14, 82:25
**occur** [3] - 66:7, 74:23, 91:13
**October** [5] - 12:20, 12:22, 20:19, 79:17, 80:6
**ocular** [6] - 19:12, 20:1, 23:19, 32:22, 35:20, 36:3, 36:4,

46:15, 56:20
**OF** [8] - 1:2, 1:5, 1:24, 4:10, 4:14, 4:19, 4:20, 7:11
**offered** [1] - 39:24
**OFFICE** [1] - 3:16
**office** [1] - 65:1
**Office** [1] - 65:15
**Official** [2] - 95:10, 95:19
**OFFICIAL** [1] - 6:18
**officially** [1] - 9:3
**OFFSHORE** [1] - 5:4
**often** [3] - 64:3, 64:6, 94:9
**OIL** [2] - 1:4, 1:5
**oil** [5] - 9:4, 18:14, 20:21, 21:1, 48:13
**Oil** [3] - 9:5, 11:5, 11:8
**OLSON** [1] - 5:13
**ON** [1] - 1:5
**on-site** [1] - 48:7
**once** [4] - 64:24, 74:14, 81:11
**one** [34] - 9:25, 27:7, 33:25, 35:5, 35:25, 47:23, 48:8, 48:23, 49:6, 49:15, 50:1, 54:3, 54:9, 55:21, 58:3, 59:10, 60:24, 66:23, 68:15, 68:24, 72:1, 76:14, 80:11, 80:15, 82:8, 82:12, 82:17, 83:1, 83:2, 84:17, 85:5, 89:4, 90:5
**ONE** [1] - 5:19
**one-third** [1] - 47:23
**ongoing** [2] - 45:10, 65:22
**OPA** [1] - 9:17
**OPA............................
.....** [1] - 7:6
**open** [1] - 23:11
**opened** [1] - 65:15
**opinion** [2] - 79:7, 85:17
**opportunity** [3] - 12:19, 49:4, 82:4
**opposed** [1] - 19:14
**opposing** [1] - 16:12
**opposite** [2] - 51:21, 69:17
**opposition** [1] - 22:17
**opted** [3] - 25:20, 25:21, 26:2
**optimum** [1] - 47:17
**option** [1] - 54:6
**Option** [21] - 17:15, 18:7, 19:19, 19:25,

20:6, 21:2, 22:2, 24:7, 24:19, 28:21, 31:7, 31:13, 33:14, 33:22, 35:22, 42:15, 42:20, 54:7, 54:12, 54:24, 56:14
**oral** [2] - 8:21, 80:6
**orange** [1] - 21:13
**ORDER** [1] - 8:4
**Order** [6] - 37:15, 38:4, 43:1, 49:13, 51:10, 51:13
**order** [10] - 8:17, 15:10, 38:12, 56:10, 59:12, 62:20, 83:20, 89:11, 89:17, 90:11
**ORDER.....** [1] - 7:11
**ordered** [6] - 51:9, 79:12, 86:19, 90:13, 94:5, 94:9
**orders** [4] - 37:20, 89:9, 89:13, 90:13
**Orders** [1] - 49:9
**ordinary** [1] - 71:20
**original** [2] - 35:19, 58:12
**originally** [4] - 29:21, 29:23, 30:12, 69:19
**ORLEANS** [10] - 1:7, 1:14, 1:20, 2:9, 2:24, 4:4, 4:12, 5:7, 5:21, 6:20
**otherwise** [3] - 54:21, 66:2, 88:5
**ourselves** [1] - 79:25
**overpaid** [3] - 60:22, 61:19, 89:19
**overpayment** [9] - 60:5, 60:9, 60:21, 61:8, 82:18, 83:19, 84:1, 87:19
**overpayments** [12] - 58:25, 59:4, 59:5, 59:21, 61:1, 61:5, 78:20, 87:8, 87:14, 87:15, 89:23, 90:2
**overpays** [1] - 62:23
**oversight** [1] - 22:20
**overturned** [1] - 65:20
**own** [6] - 24:23, 45:3, 49:25, 82:21, 85:7, 86:17
**owners** [1] - 88:11

# P

**P.L.C** [1] - 5:18
**P.O** [1] - 4:21
**PAGE** [1] - 7:3

**page** [2] - 29:13, 91:16
**pages** [1] - 92:16
**paid** [37] - 36:12, 36:14, 44:24, 50:15, 52:3, 53:3, 53:11, 53:17, 53:18, 54:10, 56:23, 59:3, 60:3, 61:20, 62:17, 65:2, 65:21, 65:22, 66:13, 71:15, 72:9, 78:22, 79:18, 79:20, 79:23, 80:7, 81:11, 81:12, 81:14, 81:19, 84:10, 84:11, 84:24, 89:22, 90:23, 90:24, 93:25
**pale** [1] - 86:13
**PALMINTIER** [2] - 3:11, 3:12
**PAN** [1] - 2:23
**panel** [2] - 14:3, 73:3
**PAPANTONIO** [1] - 2:15
**papers** [1] - 63:17
**paragraph** [3] - 10:2, 91:21, 92:17
**parameters** [1] - 17:23
**paraphrasing** [2] - 31:8, 52:17
**part** [12] - 12:4, 14:1, 14:2, 18:7, 18:8, 31:20, 31:21, 38:20, 53:10, 61:25, 93:17, 94:23
**partially** [1] - 11:6
**participants** [1] - 94:16
**participated** [2] - 22:12, 90:15
**participating** [2] - 14:20, 90:17
**particular** [11] - 39:24, 46:11, 46:16, 46:19, 46:23, 50:17, 51:10, 59:21, 74:16, 89:14, 91:8
**particularly** [2] - 43:5, 91:16
**parties** [22] - 9:18, 35:4, 40:25, 44:19, 65:4, 65:10, 69:15, 73:1, 73:19, 74:15, 75:14, 76:1, 76:18, 83:5, 83:12, 88:14, 88:21, 91:9, 91:12, 91:14, 92:20
**party** [8] - 35:2, 41:14, 57:22, 59:11, 59:14, 62:22, 62:23, 73:13
**pass** [1] - 58:13
**PAUL** [1] - 2:23

**pay** [5] - 33:13, 59:15, 81:19, 83:20, 84:15
**paying** [3] - 65:16, 66:3, 66:8
**Paying** [1] - 85:3
**payment** [32] - 46:6, 55:2, 55:3, 55:7, 55:9, 59:11, 60:17, 61:25, 62:2, 62:3, 64:4, 64:16, 70:8, 70:14, 70:16, 71:8, 71:25, 72:1, 72:14, 73:19, 73:21, 74:1, 74:4, 74:17, 78:14, 79:13, 81:5, 82:23, 87:18, 88:3, 94:12, 94:13
**Payment** [2] - 72:7, 72:8
**payments** [9] - 63:16, 69:14, 70:5, 77:10, 78:6, 78:21, 81:18, 82:15, 86:18
**payor** [1] - 61:22
**penalties** [1] - 12:13
**PENALTIES...............
........** [1] - 7:9
**penalty** [4] - 13:17, 13:18, 13:22, 14:15
**pending** [4] - 14:18, 14:20, 50:16, 90:2
**PENSACOLA** [1] - 2:17
**PENTHOUSE** [1] - 3:9
**people** [33] - 8:15, 23:4, 23:5, 24:11, 26:21, 32:9, 41:4, 44:19, 46:19, 47:11, 47:12, 47:19, 47:23, 47:24, 48:15, 49:3, 49:12, 49:18, 50:3, 50:5, 50:11, 50:12, 55:5, 57:15, 57:18, 57:20, 66:8, 67:3, 71:15, 81:18, 82:2, 82:7, 82:11
**people's** [1] - 19:13
**Pepper** [3] - 95:8, 95:17, 95:18
**PEPPER** [1] - 6:18
**per** [1] - 22:1
**perceived** [1] - 77:17
**percent** [3] - 23:5, 25:8
**percentage** [3] - 23:4, 23:25, 25:8
**percentages** [1] - 24:2
**perhaps** [2] - 22:21, 36:7
**period** [2] - 40:22,

57:19
**permission** [2] - 15:10, 16:11
**permit** [3] - 12:15, 12:18, 63:14
**permitted** [1] - 59:5
**persisted** [1] - 35:13
**persistent** [1] - 44:8
**persists** [1] - 43:22
**person** [3] - 35:18, 39:23, 66:13
**personal** [1] - 18:13
**personally** [2] - 22:12, 90:16
**perspective** [3] - 39:7, 39:10, 39:21
**PERTAINING** [1] - 7:8
**pertaining** [1] - 12:13
**petition** [1] - 14:8
**petitioned** [1] - 14:6
**Phase** [7] - 9:15, 9:20, 10:24, 11:21, 83:8
**phase** [3] - 13:18, 13:22, 14:16
**phone** [1] - 27:20
**phones** [1] - 27:21
**phrase** [1] - 51:19
**Physical** [46] - 17:8, 17:9, 17:11, 18:22, 19:1, 21:12, 21:15, 21:17, 22:3, 24:18, 28:22, 28:25, 29:15, 29:24, 30:20, 30:23, 31:6, 31:23, 31:25, 32:3, 32:7, 32:12, 32:13, 32:15, 34:15, 34:18, 35:19, 36:11, 36:14, 36:19, 38:5, 38:8, 39:8, 39:20, 40:18, 41:22, 42:4, 43:17, 45:19, 46:5, 51:7, 52:2, 54:5, 56:21, 56:23
**physical** [14] - 19:19, 20:5, 21:21, 23:8, 26:22, 29:1, 29:16, 29:24, 30:20, 34:9, 38:8, 41:20, 51:5, 51:17
**place** [2] - 13:9, 69:9
**places** [2] - 48:11, 78:9
**plain** [11] - 29:1, 38:5, 38:11, 40:9, 43:2, 50:19, 50:25, 51:3, 51:4, 51:13, 70:11
**plaintiff** [1] - 26:18
**PLAINTIFFS** [1] - 2:11
**Plaintiffs** [2] - 38:15, 40:5

**plaintiffs** [3] - 16:5, 23:11, 40:7
**PLAINTIFFS'** [1] - 2:3
**plaintiffs'** [3] - 19:8, 29:22, 30:2
**PLAISANCE** [1] - 1:12
**Plaisance** [1] - 9:6
**plan** [2] - 8:15, 28:3
**planning** [1] - 28:5
**plausible** [4] - 42:23, 44:11, 44:13, 48:22
**pleading** [1] - 85:24
**pleadings** [1] - 22:19
**PLEASANT** [1] - 4:8
**plus** [1] - 89:18
**point** [13] - 12:1, 29:25, 33:25, 38:3, 49:6, 54:9, 60:7, 67:16, 71:14, 72:2, 76:15, 78:13, 89:5
**pointed** [4] - 47:8, 78:10, 78:15, 83:17
**points** [7] - 32:5, 42:16, 42:19, 78:5, 93:20, 94:8
**Policy** [2] - 62:19, 89:20
**policy** [9] - 24:1, 42:7, 58:22, 60:1, 62:11, 70:19, 74:23, 85:5
**Pollution** [2] - 11:5, 11:8
**population** [2] - 47:9, 60:18
**Porter** [2] - 22:8, 22:19
**portion** [4] - 23:3, 23:6, 33:21, 94:17
**portions** [2] - 68:24, 90:1
**PORTIS** [1] - 3:15
**position** [25] - 36:24, 36:25, 39:12, 39:18, 52:19, 53:15, 55:19, 55:24, 55:25, 56:2, 56:4, 56:5, 56:6, 57:14, 62:16, 62:21, 63:1, 63:4, 70:20, 80:3, 82:5, 85:18
**positive** [1] - 32:25
**possibilities** [1] - 63:20
**possibility** [1] - 73:4
**possible** [3] - 68:1, 90:2, 92:1
**POST** [1] - 3:16
**post** [3] - 18:13, 73:15, 78:13
**post-appeal** [2] - 73:15, 78:13

**post-incident** [1] - 18:13
**posture** [2] - 62:25, 70:23
**potential** [1] - 60:20
**PowerPoints** [2] - 16:12, 37:8
**POYDRAS** [4] - 2:24, 5:7, 5:20, 6:19
**practical** [4] - 72:16, 72:17, 78:8, 81:17
**practice** [6] - 64:2, 64:4, 64:13, 73:18, 73:20, 74:2
**precedent** [2] - 70:13, 71:7
**precision** [1] - 61:5
**preclude** [1] - 52:4
**predetermined** [1] - 86:20
**preexisting** [3] - 39:18, 53:5, 56:12
**preference** [1] - 15:17
**prejudicing** [1] - 27:2
**preliminary** [2] - 64:22, 89:24
**prepare** [2] - 94:7, 94:17
**preparing** [1] - 80:6
**PRESENT** [1] - 6:16
**present** [2] - 37:22, 93:14
**presented** [3] - 20:19, 51:11, 56:8
**presently** [1] - 52:21
**preserve** [1] - 62:24
**preserved** [2] - 36:20, 80:13
**presumably** [2] - 23:17, 29:6
**pretty** [2] - 29:1, 92:15
**prevail** [2] - 23:14, 55:11
**prevent** [2] - 34:22, 34:24
**previous** [2] - 87:2, 90:12
**previously** [3] - 31:20, 34:11, 81:18
**primarily** [1] - 31:15
**principle** [4] - 61:17, 62:22, 63:6, 90:9
**principles** [2] - 59:10, 61:11
**private** [1] - 47:15
**problem** [5] - 16:15, 16:24, 20:7, 40:11, 41:21
**problems** [1] - 41:12
**procedural** [7] -

62:24, 67:13, 70:4, 70:21, 74:15, 77:25, 89:5
**procedurally** [5] - 33:23, 77:23, 81:22, 82:19, 82:21
**procedure** [2] - 57:15, 57:20
**procedures** [3] - 62:6, 63:15, 79:25
**proceed** [1] - 39:23
**proceeding** [4] - 23:17, 68:3, 81:2, 87:11
**proceedings** [3] - 62:10, 92:3, 95:14
**PROCEEDINGS** [3] - 1:24, 6:22, 8:1
**process** [16] - 43:1, 49:12, 49:25, 50:4, 50:12, 65:8, 73:14, 79:9, 79:11, 79:13, 79:19, 79:20, 84:8, 84:16, 89:12
**processors** [1] - 82:10
**PROCTOR** [1] - 2:15
**PRODUCED** [1] - 6:22
**Production** [2] - 9:7, 9:9
**PRODUCTION** [4] - 1:15, 1:21, 5:17, 5:17
**professionals** [3] - 89:21, 90:15, 93:16
**Professor** [5] - 19:4, 19:16, 19:23, 20:3, 20:8
**proffered** [1] - 21:14
**Program** [11] - 58:19, 58:21, 62:6, 62:7, 62:9, 64:3, 64:5, 64:9, 65:12, 73:22, 79:10
**program** [2] - 84:5, 86:16
**program's** [1] - 72:19
**progression** [3] - 53:21, 57:23, 57:24
**prohibit** [1] - 94:23
**prohibiting** [1] - 89:25
**prompt** [1] - 43:7
**pronounce** [1] - 33:1
**proof** [3] - 45:1, 48:9, 57:6
**proper** [5] - 63:15, 70:8, 70:16, 75:5, 94:19
**proportional** [1] - 89:22
**propose** [1] - 12:19

**proposed** [10] - 20:16, 20:18, 67:24, 68:1, 68:10, 91:22, 91:23, 91:24, 92:2, 92:9
**proposes** [1] - 72:24
**protect** [1] - 32:17
**protected** [1] - 39:22
**protection** [2] - 23:15, 39:24
**protections** [2] - 33:19, 33:23
**prove** [3] - 18:4, 33:9
**provide** [3] - 82:6, 84:20, 89:15
**provided** [7] - 19:18, 30:8, 39:9, 65:17, 68:9, 87:16, 92:8
**provides** [4] - 18:20, 21:4, 49:3, 71:6
**proving** [2] - 28:9, 48:9
**provision** [10] - 31:6, 34:14, 34:16, 34:18, 41:24, 68:7, 71:6, 71:22, 83:2, 83:16
**provisions** [5] - 27:23, 31:16, 40:14, 63:18, 65:6
**proximate** [1] - 44:15
**public** [2] - 40:16, 85:20
**punitive** [1] - 18:1
**purpose** [7] - 34:21, 34:23, 37:21, 41:1, 48:25, 49:1
**purposes** [1] - 23:13
**pursuant** [9] - 38:17, 51:4, 53:24, 72:9, 77:3, 83:20, 90:24, 91:4, 94:13
**pursue** [5] - 10:23, 11:1, 11:2, 12:2, 82:15
**pursued** [2] - 58:22, 62:8
**put** [4] - 13:8, 63:4, 69:10, 71:19
**putting** [2] - 55:12, 63:12

## Q

**qualify** [4] - 41:19, 43:16, 44:23, 45:18
**qualifying** [1] - 18:21
**quandary** [1] - 55:12
**quantified** [3] - 17:14, 18:9, 22:1
**questions** [3] - 61:16,

69:6, 88:25
**quickly** [1] - 80:16
**quite** [1] - 55:12
**quote** [5] - 70:8, 93:9, 93:10, 94:9
**quote/unquote** [2] - 19:2, 32:19
**quoted** [1] - 93:4
**quoting** [1] - 86:3

## R

**radar** [1] - 10:10
**RADS** [3] - 32:25, 44:12, 48:14
**RAFFERTY** [1] - 2:15
**raised** [5] - 8:19, 52:15, 78:5, 86:25, 89:12
**ramifications** [1] - 52:1
**rather** [7] - 10:1, 40:13, 41:5, 47:2, 50:4, 51:7, 91:7
**rationale** [1] - 20:3
**raw** [1] - 24:2
**RE** [1] - 1:4
**re** [1] - 9:4
**Reactive** [1] - 43:10
**read** [10] - 29:23, 30:19, 51:21, 52:18, 68:23, 74:13, 86:5, 87:1, 91:20, 93:4
**readily** [1] - 93:17
**ready** [1] - 16:18
**real** [2] - 9:14, 80:16
**reality** [1] - 26:24
**really** [16] - 13:20, 28:1, 30:8, 32:2, 33:11, 39:16, 41:7, 42:8, 47:21, 54:16, 59:17, 60:19, 61:8, 62:18, 63:9, 63:10
**realm** [1] - 71:19
**REALTIME** [1] - 6:18
**Realtime** [2] - 95:8, 95:18
**reason** [7] - 20:4, 22:15, 39:5, 39:25, 57:9, 63:3, 81:23
**reasonable** [1] - 60:8
**reasons** [9] - 31:20, 35:25, 43:4, 51:24, 59:8, 80:11, 81:20, 94:21
**rebuttal** [1] - 24:10
**recalculation** [1] - 90:3
**receive** [6] - 20:11,

42:19, 49:24, 53:15, 53:16, 81:5
**received** [3] - 30:2, 60:17, 94:17
**receives** [1] - 53:19
**receiving** [3] - 61:25, 71:7, 81:15
**recently** [2] - 19:21, 52:16
**recess** [1] - 16:20
**reckless** [1] - 88:19
**recognized** [1] - 9:15
**recollection** [3] - 14:2, 22:9, 30:9
**reconsider** [2] - 37:20, 73:4
**RECONSIDERATION** [1] - 7:11
**Reconsideration** [3] - 37:15, 51:12, 51:18
**reconsideration** [3] - 37:17, 37:18, 74:24
**record** [15] - 4:16, 45:7, 45:10, 60:19, 95:13
**RECORDED** [1] - 6:22
**records** [6] - 23:10, 39:14, 39:16, 45:4, 45:9, 49:24
**recoup** [1] - 81:18
**recover** [5] - 81:7, 81:11, 81:13, 82:14, 90:5
**recovered** [1] - 56:15
**recoveries** [1] - 56:17
**recovery** [1] - 54:22
**refer** [1] - 71:5
**referred** [1] - 48:16
**refers** [1] - 19:22
**reflect** [2] - 17:2, 21:9
**reflected** [1] - 73:8
**reflecting** [1] - 47:3
**reflection** [1] - 15:21
**reflects** [1] - 93:1
**refused** [2] - 24:20, 36:21
**refusing** [1] - 86:17
**regard** [4] - 49:9, 62:16, 70:3, 76:17
**regardless** [5] - 61:24, 65:18, 83:4, 92:19, 92:22
**REGISTERED** [1] - 6:19
**Registered** [1] - 95:8
**registered** [1] - 95:19
**rehearing** [1] - 14:6
**reinterpretation** [2] - 38:6, 70:6
**reinterpreted** [2] -

69:19, 76:20
**Reisman** [2] - 22:8, 22:18
**rejected** [1] - 84:9
**relate** [3] - 59:9, 63:19
**related** [6] - 13:24, 19:1, 19:2, 56:25, 62:12, 63:8
**relates** [1] - 60:12
**RELATES** [1] - 1:9
**relating** [2] - 83:4, 92:20
**relation** [1] - 34:9
**relationship** [1] - 94:18
**relatively** [2] - 19:13, 44:15
**release** [79] - 27:16, 35:4, 35:9, 36:13, 51:22, 52:3, 52:8, 52:13, 53:1, 53:2, 53:3, 53:10, 53:11, 53:13, 53:25, 55:1, 57:1, 57:2, 57:22, 63:19, 63:23, 63:25, 64:5, 64:12, 64:15, 65:23, 65:24, 66:1, 66:2, 66:5, 66:8, 66:9, 66:11, 66:12, 66:14, 67:23, 68:4, 68:5, 68:12, 68:23, 69:23, 70:12, 70:13, 70:25, 71:8, 71:10, 71:17, 71:21, 72:3, 72:21, 73:7, 73:8, 73:10, 73:20, 73:25, 74:8, 74:9, 74:22, 78:12, 78:14, 79:1, 79:19, 83:2, 83:3, 91:6, 91:11, 91:14, 92:4, 92:6, 92:12, 92:13, 92:15, 92:17, 92:18, 92:21, 93:5, 93:8, 93:22
**Release** [1] - 91:18
**released** [9] - 35:2, 35:4, 53:5, 54:11, 57:5, 83:5, 83:12, 91:12, 92:20
**releases** [12] - 52:9, 52:22, 57:23, 64:2, 64:8, 67:4, 75:1, 75:4, 78:6, 78:21, 79:4, 91:6
**releasing** [3] - 36:12, 68:6, 92:6
**relevant** [6] - 22:5, 22:15, 35:25, 36:1, 61:12, 72:12
**Relief** [1] - 58:10

**RELIEF...** [1] - 7:12
**relies** [4] - 90:12, 90:19, 93:17, 94:5
**rely** [1] - 90:7
**remain** [3] - 83:3, 92:19, 92:22
**remains** [1] - 13:15
**remand** [1] - 87:22
**remedies** [2] - 31:4, 31:13
**remedy** [8] - 34:14, 34:16, 34:21, 37:18, 84:19, 85:8, 85:9, 85:10
**remember** [3] - 15:12, 30:1, 43:24
**remind** [2] - 27:6, 89:9
**removed** [1] - 42:13
**rendered** [1] - 90:20
**renegotiate** [1] - 76:18
**repaid** [1] - 61:21
**repeat** [1] - 91:7
**repeatedly** [4] - 19:22, 81:24, 82:13, 85:19
**reply** [1] - 12:23
**report** [2] - 24:14, 47:1
**Report** [2] - 24:15, 50:8
**REPORTER** [3] - 6:18, 6:18, 6:19
**Reporter** [7] - 95:8, 95:9, 95:10, 95:18, 95:19, 95:19
**Reporter's** [1] - 58:9
**REPORTER'S** [1] - 95:6
**represent** [1] - 26:15
**representation** [1] - 30:7
**representations** [1] - 34:12
**represented** [3] - 18:11, 24:24, 81:24
**representing** [1] - 86:24
**represents** [1] - 29:19
**reprocess** [1] - 79:3
**reprocessed** [1] - 79:14
**request** [6] - 9:11, 38:17, 50:23, 62:12, 62:21, 69:3
**requested** [2] - 38:16
**requests** [1] - 88:6
**require** [5] - 43:7, 44:9, 46:3, 59:21, 82:15
**required** [7] - 21:22, 23:10, 33:8, 36:13, 46:12, 71:9, 89:20

**requirement** [2] - 45:14, 74:14
**requirements** [7] - 23:15, 28:9, 28:18, 49:21, 52:12, 57:6, 58:22
**requires** [4] - 23:2, 41:8, 41:10, 72:14
**reserve** [1] - 55:1
**reserved** [2] - 68:7, 92:8
**residents** [2] - 25:23, 48:19
**resisted** [1] - 63:11
**resolution** [2] - 11:7, 59:6
**resolve** [4] - 18:13, 59:2, 60:11, 91:3
**resolved** [3] - 10:21, 51:23, 88:24
**resolving** [1] - 92:23
**resort** [1] - 24:6
**RESPECT** [1] - 7:8
**respect** [13] - 11:3, 12:12, 14:21, 15:20, 48:6, 61:12, 61:13, 80:9, 83:22, 84:2, 87:13, 87:14, 89:14
**respectful** [1] - 10:8
**respiratory** [5] - 19:12, 20:1, 23:19, 35:21, 46:23
**respond** [2] - 78:4
**responding** [1] - 86:5
**response** [4] - 31:15, 59:11, 61:13, 69:3
**responsibilities** [1] - 83:9
**responsible** [1] - 23:18
**Restatement** [5] - 61:18, 61:22, 62:1, 82:23, 90:7
**Restitution** [5] - 58:9, 61:18, 90:8, 94:9, 94:22
**RESTITUTION** [1] - 7:12
**restitution** [21] - 59:10, 59:15, 59:21, 60:25, 61:22, 62:22, 63:5, 63:13, 78:22, 82:17, 82:22, 85:13, 85:15, 89:18, 89:23, 90:16, 90:24, 93:7, 94:6, 94:19, 94:20
**restitutionary** [1] - 63:6
**restriction** [1] - 34:21
**restrictions** [1] - 50:2

**result** [11] - 41:13, 56:9, 58:25, 59:3, 61:20, 68:3, 70:22, 81:1, 89:19, 92:3, 94:12
**resulted** [1] - 75:6
**results** [3] - 32:20, 46:5, 71:1
**returning** [1] - 59:4
**returns** [1] - 93:19
**revenue** [1] - 89:20
**reversal** [2] - 66:24, 78:17
**reverse** [3] - 66:21, 67:25, 91:25
**reversed** [10] - 66:18, 68:11, 78:21, 83:21, 90:6, 90:21, 90:23, 90:25, 92:10, 94:3
**reverses** [1] - 83:19
**review** [6] - 62:9, 77:2, 79:2, 79:11, 86:23, 89:11
**reviewed** [1] - 38:22
**revise** [1] - 37:20
**revised** [1] - 30:2
**revisit** [1] - 51:13
**rhinosinusitis** [3] - 32:25, 47:4, 47:5
**RHON** [1] - 3:16
**RICE** [2] - 4:6, 4:7
**RIG** [1] - 1:5
**Rig** [1] - 9:3
**rights** [7] - 27:2, 53:6, 62:24, 73:2, 74:15, 77:25, 79:1
**ripe** [2] - 13:16, 36:17
**rise** [4] - 8:7, 16:19, 16:21, 95:1
**risk** [1] - 76:4
**RMR** [2] - 6:18, 95:18
**road** [3] - 78:11, 79:23, 84:15
**ROBERT** [1] - 2:19
**ROBERTS** [1] - 5:10
**Robin** [2] - 24:9, 25:3
**ROBIN** [1] - 3:5
**RONQUILLO** [2] - 6:8, 6:12
**room** [4] - 38:6, 43:13, 43:15, 48:17
**ROOM** [2] - 4:16, 6:19
**ROUGE** [1] - 3:13
**roughly** [1] - 38:18
**round** [1] - 26:20
**Roy** [1] - 82:6
**ROY** [2] - 2:3, 2:4
**rule** [3] - 47:6, 73:6, 88:16
**ruled** [1] - 79:5

**ruling** [8] - 10:2, 14:3, 62:19, 69:2, 83:8, 87:2, 93:16
**rulings** [2] - 9:15, 90:12
**running** [2] - 34:3, 48:11

# S

**s/Cathy** [1] - 95:17
**SALLY** [1] - 6:16
**sample** [1] - 24:22
**SAN** [2] - 3:3, 4:17
**saw** [1] - 24:25
**SC** [1] - 4:8
**scale** [1] - 47:12
**scans** [2] - 47:16, 48:11
**scenario** [3] - 66:21, 68:15, 90:22
**scenarios** [4] - 66:5, 66:7, 76:12, 91:10
**schedule** [3] - 13:9, 15:22, 15:23
**scheduling** [1] - 15:10
**scheme** [1] - 91:3
**scope** [1] - 39:8
**screen** [2] - 8:18, 10:10
**seated** [1] - 16:22
**second** [3] - 53:23, 72:6, 91:21
**Secour** [2] - 9:8, 83:14
**SECOUR** [1] - 1:17
**Section** [5] - 61:22, 70:15, 71:6, 74:11, 90:8
**section** [7] - 29:13, 30:25, 31:1, 31:2, 32:14, 34:17, 71:5
**SECTION** [1] - 4:19
**sections** [1] - 84:13
**see** [10] - 12:14, 13:18, 26:9, 38:24, 40:2, 40:4, 45:21, 71:3, 75:4, 76:10
**seek** [11] - 21:4, 44:9, 44:20, 44:22, 47:15, 49:2, 49:8, 53:20, 54:23, 57:4, 86:22
**seeking** [6] - 10:11, 11:7, 34:22, 77:9
**seeks** [2] - 18:12, 44:15
**seem** [3] - 36:2, 42:5, 68:19
**send** [2] - 64:5, 79:3
**sense** [6] - 14:10,

15:1, 25:5, 32:2, 33:11, 73:5
**sensitive** [2] - 10:7, 48:18
**sent** [11] - 52:16, 64:2, 72:3, 72:21, 72:24, 73:1, 73:7, 73:10, 73:25, 74:24, 77:2
**SEPTEMBER** [2] - 1:8, 8:2
**series** [1] - 69:14
**serious** [7] - 19:15, 19:17, 19:24, 43:6, 44:6, 48:20, 86:1
**serve** [3] - 37:21, 82:2, 82:15
**Service** [1] - 57:14
**SERVICES** [1] - 4:7
**serving** [1] - 82:9
**set** [9] - 9:25, 10:2, 10:13, 15:19, 58:11, 62:6, 65:1, 84:14, 91:8
**sets** [1] - 49:21
**settle** [2] - 14:11, 41:7
**settled** [11] - 11:4, 17:8, 17:13, 17:17, 18:17, 21:12, 21:18, 21:24, 66:16, 67:3, 69:21
**SETTLEMENT** [1] - 7:10
**Settlement** [58] - 17:4, 20:12, 21:22, 22:7, 29:6, 29:9, 29:12, 29:14, 38:7, 38:14, 38:19, 58:18, 58:19, 58:20, 58:21, 58:23, 60:24, 62:6, 62:7, 62:9, 63:13, 64:2, 64:5, 64:9, 65:12, 66:12, 66:19, 67:17, 67:18, 67:22, 68:16, 68:24, 69:4, 69:5, 70:7, 70:12, 71:5, 72:7, 72:8, 73:22, 74:10, 74:13, 75:5, 75:20, 76:5, 79:10, 80:19, 80:23, 82:7, 85:20, 87:16, 91:4, 91:15, 91:18, 93:1, 93:5, 93:21
**settlement** [87] - 8:22, 16:2, 17:7, 17:12, 17:16, 18:8, 18:12, 18:20, 20:4, 21:20, 21:25, 22:12, 22:13, 22:23, 23:8, 24:13, 27:7, 27:24, 29:17, 32:6, 34:11, 35:14,

36:20, 38:10, 40:8, 41:3, 41:7, 41:9, 41:10, 52:8, 53:4, 53:16, 55:22, 63:16, 64:4, 64:21, 65:5, 65:18, 65:19, 65:25, 66:6, 66:9, 66:17, 67:4, 67:5, 67:25, 68:2, 68:10, 69:23, 70:8, 70:14, 70:16, 71:8, 71:10, 71:11, 71:13, 71:16, 71:20, 72:1, 72:14, 74:1, 74:4, 74:8, 74:17, 75:23, 76:5, 78:6, 83:1, 83:15, 91:2, 91:3, 91:9, 91:10, 91:21, 91:22, 91:24, 92:2, 92:10, 92:23, 93:3, 93:9, 93:22
**settlement's** [1] - 94:1
**settlements** [3] - 53:25, 67:9, 67:10
**seven** [1] - 12:22
**several** [5] - 43:3, 55:10, 63:20, 78:9, 78:23
**severe** [3] - 43:6, 43:10, 48:23
**shall** [11] - 29:16, 29:24, 30:20, 38:8, 51:16, 68:11, 72:8, 83:3, 92:11, 92:18, 92:22
**SHANNON** [1] - 5:19
**SHAW** [1] - 4:3
**sheets** [2] - 8:10, 8:13
**SHELL** [1] - 5:19
**show** [4] - 39:16, 56:25, 64:13, 72:22
**showing** [3] - 45:8, 45:10, 73:9
**shown** [1] - 73:15
**shows** [2] - 30:15
**Shushan** [1] - 9:22
**SHUSHAN** [1] - 6:16
**shut** [2] - 65:9, 65:10
**side** [3] - 17:5, 21:11, 47:9
**sign** [14] - 8:10, 8:13, 36:13, 39:17, 52:2, 52:8, 66:13, 68:3, 71:8, 71:10, 72:4, 76:4, 76:5, 92:4
**sign-in** [2] - 8:10, 8:13
**signed** [8] - 53:3, 64:15, 67:3, 71:16, 71:21, 73:12, 78:14, 79:4

**significance** [1] - 64:11
**significant** [5] - 10:22, 23:3, 23:6, 33:21, 51:23
**signifies** [1] - 33:2
**signing** [3] - 68:5, 79:1, 92:5
**signs** [3] - 39:12, 53:10, 76:6
**similar** [1] - 15:20
**simply** [6] - 12:14, 49:1, 49:19, 73:20, 75:7, 93:25
**single** [3] - 54:22, 82:8, 84:10
**sinus** [1] - 32:23
**site** [1] - 32:23
**situation** [14] - 28:8, 59:11, 61:19, 62:4, 66:10, 66:21, 70:22, 70:24, 74:16, 76:24, 79:6, 87:22, 93:23, 94:10
**situations** [2] - 61:6, 93:9
**six** [2] - 27:12, 38:18
**skin** [1] - 35:20
**slide** [10] - 38:24, 39:1, 40:3, 50:24, 50:25, 51:15, 64:14, 71:4, 72:6
**Slide** [1] - 46:8
**slides** [1] - 58:11
**small** [3] - 19:6, 19:13, 54:10
**socioeconomic** [1] - 47:12
**SOILEAU** [1] - 3:22
**solved** [1] - 16:24
**someday** [1] - 10:21
**someone** [12] - 39:11, 39:15, 39:22, 42:3, 43:12, 44:11, 45:18, 48:13, 53:3, 53:22, 75:9, 75:10
**sometime** [1] - 65:4
**sometimes** [1] - 42:11
**somewhat** [2] - 22:16, 22:24
**soon** [1] - 16:18
**SOREN** [1] - 2:8
**sorry** [5] - 15:5, 25:13, 50:25, 77:6, 77:11
**sort** [2] - 15:13, 57:16
**sought** [3] - 62:9, 77:1, 86:22
**sound** [1] - 41:9
**sounds** [3] - 11:13, 28:25, 40:19

**SOUTH** [3] - 2:16, 3:22, 5:14
**south** [1] - 47:10
**sparingly** [1] - 37:19
**SPC** [18] - 42:25, 43:5, 44:18, 44:22, 45:11, 45:16, 48:21, 49:9, 49:20, 49:21, 50:4, 50:8, 50:12, 53:7, 55:16, 55:17, 55:18, 57:19
**SPC's** [4] - 33:5, 33:13, 34:17, 34:23
**speaking** [1] - 47:10
**speaks** [1] - 63:10
**Special** [1] - 61:14
**specific** [6] - 21:22, 23:2, 33:19, 46:16, 47:2, 60:8
**specifically** [5] - 30:14, 56:8, 57:22, 76:12, 78:5
**Specified** [27] - 17:8, 17:9, 18:22, 19:1, 21:3, 21:12, 21:15, 21:17, 32:3, 32:7, 32:12, 32:13, 32:15, 32:16, 35:18, 36:11, 36:14, 39:8, 41:22, 42:4, 43:16, 45:19, 46:5, 51:7, 52:2, 56:21, 56:23
**specified** [6] - 18:22, 46:4, 46:24, 49:11, 49:15, 64:11
**spend** [3] - 11:15, 22:24, 37:25
**spent** [2] - 23:20, 33:12
**SPILL** [1] - 1:4
**Spill** [1] - 9:4
**splash** [1] - 43:9
**splits** [1] - 21:15
**splitting** [2] - 68:19, 75:19
**spoken** [1] - 38:21
**SPRINGS** [1] - 3:20
**SQUARE** [1] - 5:19
**ST** [1] - 6:4
**stand** [1] - 8:14
**standard** [4] - 37:16, 47:3, 47:5, 88:16
**standing** [3] - 66:21, 67:2, 69:21
**standpoint** [1] - 39:6
**stands** [1] - 36:8
**start** [2] - 46:10, 63:23
**started** [1] - 65:16
**STATE** [1] - 4:10
**State** [1] - 95:9

**statements** [1] - 85:20
**STATES** [3] - 1:1, 1:25, 4:19
**States** [6] - 10:18, 11:8, 13:21, 15:8, 95:10, 95:20
**statistic** [1] - 47:22
**statistics** [2] - 50:7, 59:24
**status** [2] - 9:21, 76:18
**Status** [2] - 24:15, 50:8
**STATUS** [1] - 1:24
**stay** [2] - 79:16, 79:24
**stayed** [4] - 13:5, 79:18, 87:25, 88:9
**Steering** [2] - 38:15, 40:5
**STENOGRAPHY** [1] - 6:22
**step** [1] - 16:17
**Stephanie** [1] - 8:10
**STEPHEN** [1] - 2:7
**steps** [1] - 70:4
**STERBCOW** [2] - 2:22, 2:23
**Steve** [2] - 10:17, 15:7
**STEVEN** [2] - 4:20, 5:10
**still** [10] - 26:4, 36:4, 39:23, 50:16, 60:13, 65:22, 73:1, 79:8, 79:10, 85:15
**stop** [1] - 70:5
**strange** [2] - 22:24, 41:5
**STREET** [13] - 2:16, 2:20, 2:24, 3:2, 3:12, 3:23, 4:4, 4:11, 5:7, 5:10, 5:20, 6:9, 6:19
**stringent** [1] - 49:21
**structures** [2] - 32:22, 46:19
**struggling** [1] - 35:9
**stuff** [1] - 87:7
**subject** [10] - 17:13, 18:9, 18:17, 35:4, 61:23, 70:3, 79:1, 79:21, 79:23, 89:8
**subjective** [1] - 32:9
**submit** [10] - 45:11, 46:14, 49:4, 54:22, 55:15, 55:16, 55:17, 56:19, 57:8, 57:12
**submits** [3] - 53:9, 53:18, 53:22
**submitted** [7] - 19:5, 19:21, 20:17, 20:18, 22:11, 38:19, 51:8

**submitting** [2] - 46:22, 49:1
**subpart** [1] - 29:13
**subsequently** [3] - 90:6, 90:11, 90:21
**subset** [1] - 60:6
**substance** [4] - 20:10, 37:25, 40:21, 87:4
**substances** [1] - 43:12
**substantial** [3] - 58:25, 59:11, 63:18
**substantially** [1] - 67:11
**substantively** [2] - 81:22, 82:20
**Sue** [1] - 91:19
**sue** [5] - 35:2, 66:16, 81:5, 81:14, 85:4
**suffering** [4] - 21:20, 23:7, 24:12
**sufficient** [1] - 20:21
**suggest** [3] - 12:20, 37:23, 57:13
**suggested** [3] - 12:22, 69:18, 93:25
**suggestion** [1] - 13:17
**suggests** [2] - 15:18, 93:8
**suing** [1] - 34:24
**suit** [2] - 66:15, 85:23
**SUITE** [6] - 2:16, 2:24, 5:10, 5:20, 6:9, 6:13
**sum** [1] - 18:9
**summary** [2] - 11:6, 67:16
**Summary** [1] - 12:12
**SUMMARY** [1] - 7:7
**Supervised** [1] - 65:11
**supplement** [1] - 12:15
**supplementing** [1] - 12:19
**Support** [1] - 22:6
**support** [4] - 18:19, 22:11, 34:13, 93:19
**suppose** [1] - 42:10
**supposed** [4] - 55:5, 55:6, 63:23, 72:14
**Supreme** [3] - 20:14, 85:19, 86:23
**SURFACE** [1] - 7:5
**surface** [1] - 9:16
**surrounding** [3] - 32:22, 46:18, 74:12
**suspect** [1] - 79:15
**suspensive** [1] - 90:22
**SUTHERLAND** [1] - 5:9

**SW** [1] - 3:20
**switch** [1] - 37:6
**symptoms** [4] - 28:16, 29:2, 44:20, 45:23
**Syndrome** [1] - 43:10
**system** [2] - 18:1, 82:14

# T

**talks** [3] - 34:18, 91:21, 92:17
**tax** [1] - 93:19
**team** [2] - 30:2, 38:20
**team's** [1] - 22:9
**technical** [1] - 16:23
**technology** [1] - 16:14
**term** [6] - 28:22, 29:8, 34:8, 38:13, 46:4, 76:18
**terms** [38] - 32:8, 33:5, 40:16, 42:23, 50:20, 53:16, 63:20, 63:24, 63:25, 64:11, 65:18, 67:13, 68:1, 68:16, 68:18, 68:20, 68:25, 69:4, 69:8, 69:10, 72:9, 74:17, 75:7, 75:17, 75:18, 76:11, 77:16, 80:17, 80:18, 80:23, 82:25, 92:1, 93:9, 93:10, 93:13, 94:1
**test** [8] - 21:18, 32:20, 33:2, 46:4, 46:11, 46:17, 46:19
**tests** [16] - 21:22, 21:23, 23:2, 23:9, 33:8, 33:19, 33:23, 35:15, 42:9, 42:12, 46:24, 46:25, 47:2, 48:3, 48:12
**THE** [170] - 1:4, 1:5, 1:24, 2:3, 2:11, 4:10, 4:14, 4:19, 6:16, 7:9, 7:11, 8:7, 8:8, 8:10, 8:12, 8:13, 9:1, 9:2, 9:4, 9:10, 10:15, 10:19, 10:23, 11:1, 11:12, 11:19, 11:22, 12:3, 12:6, 12:10, 12:25, 13:2, 13:5, 13:8, 13:12, 13:24, 14:2, 14:6, 14:10, 14:24, 15:5, 15:15, 15:24, 16:1, 16:5, 16:7, 16:10, 16:14, 16:19, 16:21, 16:22, 17:17, 17:20, 23:24, 24:4, 24:25, 25:4,

25:10, 25:14, 25:16, 25:18, 25:20, 25:25, 26:4, 26:6, 26:8, 26:14, 26:18, 27:6, 27:9, 27:12, 27:14, 27:18, 27:20, 28:1, 28:5, 28:7, 28:12, 28:15, 28:18, 28:20, 28:24, 29:5, 29:8, 29:12, 30:11, 30:16, 30:19, 31:2, 31:5, 31:10, 31:14, 33:8, 33:25, 34:3, 35:2, 35:6, 36:13, 36:23, 37:2, 37:5, 37:7, 37:10, 37:13, 37:23, 38:13, 38:20, 38:25, 39:2, 40:1, 40:11, 41:24, 42:3, 42:17, 43:15, 43:19, 44:2, 44:23, 45:12, 45:14, 45:18, 45:23, 46:3, 47:8, 48:11, 49:14, 50:10, 51:22, 52:25, 54:1, 54:14, 54:16, 54:20, 54:25, 55:23, 56:3, 56:20, 58:1, 58:3, 58:6, 58:14, 64:15, 64:19, 66:7, 67:8, 67:21, 68:17, 69:2, 69:17, 71:9, 71:13, 71:19, 74:7, 75:9, 75:13, 76:25, 77:4, 77:7, 77:11, 77:20, 78:1, 78:3, 79:8, 81:16, 85:4, 87:3, 89:2, 89:6, 89:16, 95:1
**themselves** [2] - 8:14, 80:19
**theory** [1] - 83:19
**thereafter** [1] - 13:23
**therefore** [2] - 24:19, 39:18
**they've** [6] - 30:8, 36:23, 47:19, 47:20, 54:11, 71:21
**thinking** [2] - 31:25, 41:13
**third** [3] - 47:23, 88:14, 88:21
**Third** [3] - 61:18, 61:23, 90:7
**THIS** [1] - 1:9
**THOMAS** [1] - 2:15
**Thonn** [9] - 61:2, 61:13, 90:13, 90:14, 90:17, 93:16, 93:18, 94:12, 94:14
**Thonn's** [6] - 94:6,

94:11, 94:12, 94:13, 94:17
**thousands** [8] - 24:24, 41:8, 41:18, 42:24, 81:15, 82:2, 82:16, 88:4
**threatening** [1] - 48:15
**three** [5] - 10:9, 45:6, 65:14, 68:22, 87:17
**throughout** [3] - 62:8, 62:15, 64:19
**throw** [1] - 33:22
**thrown** [4] - 23:10, 33:15, 42:14, 85:23
**timeframe** [1] - 18:22
**timely** [2] - 80:9, 83:23
**TO** [4] - 1:9, 7:8, 8:4
**today** [7] - 24:14, 55:25, 59:1, 60:12, 60:23, 63:9, 82:12
**TOLLES** [1] - 5:13
**took** [2] - 16:20, 70:4
**top** [2] - 26:12, 46:15
**tort** [2] - 18:1, 35:1
**TORTS** [1] - 4:15
**total** [7] - 25:14, 25:15, 25:16, 25:22, 26:19, 72:8, 72:13
**towards** [1] - 48:9
**TOWER** [1] - 2:12
**toxic** [2] - 20:10, 40:21
**transcript** [2] - 86:6, 95:12
**TRANSCRIPT** [2] - 1:24, 6:22
**transition** [3] - 65:8, 65:9, 65:11
**TRANSOCEAN** [3] - 5:3, 5:3, 5:5
**Transocean** [8] - 8:18, 9:13, 10:5, 11:4, 11:10, 12:21, 14:18, 15:16
**Transocean's** [2] - 9:11, 9:16
**TRANSOCEAN'S** [1] - 7:5
**transpired** [1] - 86:2
**treat** [1] - 45:23
**treated** [7] - 24:18, 45:8, 45:22, 48:21, 64:9, 64:10
**treatment** [5] - 44:21, 45:10, 46:12, 47:5, 49:1
**tremendous** [1] - 86:8
**trial** [5] - 9:20, 12:4, 14:16, 90:19, 90:20
**trials** [1] - 10:9

**tried** [2] - 17:2, 86:17
**troubling** [1] - 54:16
**true** [5] - 40:11, 55:14, 61:24, 84:25, 95:12
**trust** [2] - 84:12, 84:14
**trustee** [2] - 84:14, 84:15
**trying** [8] - 16:15, 21:9, 25:5, 27:4, 46:1, 71:15, 86:15, 86:21
**turn** [1] - 27:20
**turns** [2] - 28:7, 44:4
**two** [14] - 8:20, 9:25, 11:3, 16:12, 16:13, 22:17, 31:16, 35:25, 46:11, 47:24, 59:8, 60:23, 61:8, 65:14
**TX** [3] - 5:11, 6:10, 6:13
**type** [11] - 23:12, 26:21, 37:24, 39:24, 42:6, 44:8, 46:11, 46:17, 56:25, 70:23, 81:2
**types** [8] - 32:18, 43:12, 44:21, 45:4, 46:9, 46:25, 48:16, 50:2
**typical** [1] - 64:20
**typically** [3] - 72:4, 81:12, 90:23

## U

**U.S** [4] - 4:14, 4:20, 10:6, 86:23
**ultimately** [4] - 63:2, 72:13, 81:13, 88:7
**unambiguous** [2] - 38:6, 38:11
**unauthorized** [1] - 86:19
**uncertain** [2] - 68:4, 92:5
**unclean** [1] - 87:8
**under** [45] - 9:17, 11:7, 20:9, 20:12, 21:13, 21:18, 21:22, 21:24, 24:6, 24:17, 28:8, 31:5, 31:13, 33:9, 33:13, 35:11, 35:17, 36:18, 36:20, 42:6, 42:7, 44:17, 45:19, 46:6, 49:20, 52:7, 53:6, 53:16, 54:23, 55:16, 55:21, 56:15, 58:3, 58:20, 60:16, 62:11, 63:24, 70:7,

75:5, 79:4, 82:7, 84:11, 87:23, 89:10, 94:1
**UNDER** [1] - 7:6
**UNDERHILL** [1] - 4:15
**understood** [2] - 17:22
**undertook** [1] - 60:2
**undo** [3] - 67:5, 67:8, 67:9
**undone** [1] - 91:10
**unfair** [2] - 55:4, 86:10
**unfairness** [1] - 56:16
**unfortunately** [2] - 83:15, 83:16
**United** [6] - 10:18, 11:8, 13:21, 15:8, 95:10, 95:20
**UNITED** [3] - 1:1, 1:25, 4:19
**universe** [1] - 41:2
**unjust** [4] - 87:12, 88:2, 88:8, 90:9
**Unjust** [2] - 61:18, 90:8
**unless** [3] - 25:20, 25:21, 61:16
**unlike** [1] - 64:20
**unrelated** [1] - 87:8
**unsuccessful** [1] - 18:10
**unusual** [1] - 91:8
**unwarranted** [1] - 86:10
**up** [30] - 8:17, 9:10, 10:9, 10:19, 11:16, 12:14, 13:19, 13:25, 15:18, 16:2, 16:15, 26:16, 28:9, 33:22, 33:23, 35:8, 37:3, 38:24, 47:2, 49:21, 50:21, 55:7, 56:7, 58:13, 63:1, 64:3, 65:1, 65:15, 84:14, 87:7
**upheld** [2] - 14:3, 85:5

## V

**VA** [1] - 2:13
**validity** [2] - 63:1, 93:21
**variety** [1] - 81:20
**various** [5] - 24:23, 29:21, 45:9, 63:18, 81:24
**varying** [1] - 71:1
**vast** [1] - 18:13
**verify** [1] - 67:12

**version** [1] - 38:18
**versus** [4] - 9:6, 9:9, 20:10, 50:14
**VERSUS** [2] - 1:13, 1:19
**view** [1] - 73:25
**violated** [1] - 85:19
**violating** [1] - 85:17
**vitiate** [1] - 91:11
**vitiates** [1] - 93:22
**VOICES** [1] - 8:9
**voluntarily** [1] - 84:7
**voluntary** [5] - 82:23, 84:11, 84:16, 84:20, 85:8
**VV** [1] - 29:13

## W

**wait** [4] - 14:11, 44:13, 48:24, 87:17
**waiting** [1] - 26:25
**waive** [1] - 55:8
**waived** [1] - 54:11
**waiving** [2] - 68:6, 92:6
**WALKER** [1] - 2:11
**WALTER** [1] - 4:3
**warranted** [1] - 62:2
**WASHINGTON** [2] - 4:21, 6:5
**Water** [2] - 11:4, 13:25
**WATERSIDE** [1] - 2:12
**ways** [2] - 54:25, 55:3
**WEDNESDAY** [2] - 1:8, 8:2
**weeks** [4] - 22:17, 38:18, 85:24, 88:19
**weighed** [2] - 15:13, 50:22
**WEITZ** [1] - 3:5
**whereby** [2] - 84:8, 91:2
**WHEREUPON** [2] - 16:20, 95:2
**WHITELEY** [1] - 4:10
**whole** [4] - 59:19, 83:19, 87:10, 87:13
**wide** [4] - 66:9, 87:11, 91:6, 91:11
**willful** [1] - 88:19
**WILLIAMS** [1] - 6:3
**window** [2] - 23:11, 33:15
**WITH** [1] - 7:7
**withdrawn** [1] - 90:11
**wonder** [1] - 86:4
**word** [6] - 11:13, 30:3, 32:11, 39:6, 41:5,

41:6
**words** [3] - 25:10, 44:2, 65:9
**worker** [1] - 23:16
**workers** [12] - 25:7, 25:15, 25:16, 25:17, 25:19, 25:24, 25:25, 26:1, 26:20, 26:25, 48:7, 48:10
**works** [1] - 67:20
**worried** [1] - 27:2
**worse** [4] - 66:20, 68:2, 80:25, 92:3
**worth** [2] - 22:6, 23:21
**WRIGHT** [1] - 2:3
**write** [2] - 75:9, 75:10
**wrongdoing** [2] - 94:8, 94:11
**wrote** [1] - 85:23

## Y

**year** [6] - 10:9, 27:7, 27:10, 58:21, 87:25, 88:10
**years** [13] - 17:11, 17:12, 17:25, 20:23, 34:25, 40:21, 40:23, 44:13, 48:24, 55:10, 56:24, 87:17
**yield** [1] - 19:6
**YORK** [2] - 3:6, 6:12
**yourselves** [1] - 8:16