UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG    *   MDL NO. 2179
"DEEPWATER HORIZON" IN THE GULF   *
OF MEXICO, ON APRIL 20, 2010       *   SECTION J
     *
This document relates to:          *
     *   HONORABLE CARL J. BARBIER
   Nos. 10-2771; 10-4536       *
     *   MAGISTRATE JUDGE SHUSHAN
     *

---

MEMORANDUM OF LAW BY BP EXPLORATION & PRODUCTION INC. AND
BP AMERICA PRODUCTION COMPANY IN SUPPORT OF THEIR MOTION
TO AMEND THE FINDINGS, ALTER OR AMEND THE JUDGMENT,
OR FOR A NEW TRIAL

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for BP Exploration &
Production Inc. and BP America
Production Company*

Pursuant to Federal Rules of Civil Procedure 52(b), 59(a), and 59(e), BP Exploration & Production Inc. ("BPXP") and BP America Production Company (together with BPXP, "BP") respectfully submit this memorandum in support of their motion to amend the findings entered by this Court on September 4, 2014, *see* Dkt. Entry 13355 (the "Order"), to alter or amend the judgment, or for a new trial.

## INTRODUCTION

In its Order, the Court concluded that "[i]mproper placement of the cement was the reason the production casing cement job failed to achieve zonal isolation, which led to the blowout." Order ¶ 232. The Order stated that, "when cement was pumped on April 19 and April 20, most of it exited the casing through a breach in the shoe track below the float collar, rather than through the reamer shoe." *Id.* ¶ 178. "Consequently," the Order concluded, "no cement was placed in the annulus below the breach point, and little or no cement was placed in the shoe track below the breach point." *Id.* Based on this casing-breach theory, the Order determined that, "[w]hen hydrocarbons later entered the casing on April 20, they flowed through the breach in the shoe track" and eventually caused the blowout. *Id.* Thus, the Order found that, even though the cement was unstable, its instability did not cause the incident. *Id.* ¶ 232.

In concluding that the cement was improperly placed due to a breach in the shoe track, the Order relied on testimony that had been appropriately excluded from evidence. The casing-breach theory depends critically on the assertion that, when it was run into the well, the production casing "experienced as much as 140,000 pounds of compressive force," Order ¶ 88 n.33; *see id.* ¶ 152, which supposedly would "buckle the daylights out of" the production casing and leave it in a weakened state, *id.* ¶ 152 n.60.

According to this theory, when the attempt was made to convert the float collar after the casing was run, the release of pressure during the float collar conversion attempt breached the purportedly weakened casing below the float collar.  Order ¶¶ 154-55.  The only attempt to establish this proposition at trial was by Halliburton's expert Dr. Gene Beck, who expressly admitted on the Court's own question that he had not addressed or analyzed in his expert report the possibility of a compressive force weakening the casing when it was run.  Accordingly, the Court properly barred Dr. Beck from testifying on this issue, and excluded his testimony from the record.  There is, moreover, no other evidence in the record to support this weakened-casing element, which is central to the casing-breach theory, and therefore that theory cannot stand.  Furthermore, the casing-breach theory is a necessary component of at least four of the eight supposedly negligent actions that form the basis for the Order's conclusion that BP engaged in gross negligence through a series of negligent actions.  *Id.* ¶¶ 518-19.  Given the removal of at least half of the alleged "multiple negligent acts" from the chain of causation, the Order's finding that this series of acts amounted to gross negligence and willful misconduct should be overturned.  For these reasons, this Court should amend its findings and judgment to eliminate the casing-breach theory, determine that BP did not engage in gross negligence through a series of negligent actions, and revisit the Order's allocation of fault accordingly.

Even if Dr. Beck's testimony had not been excluded from evidence on the ground that it was not included in his report, that testimony would have been inadmissible in any event under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702 because Dr. Beck's conclusions were not based on a

reliable—or, indeed, any—scientific methodology.  That testimony therefore cannot properly form the basis for the Order's findings, which should accordingly be amended. In the alternative, given BP's lack of incentive to explore the *Daubert* issue and demonstrate the absence of any scientific foundation for Dr. Beck's opinion that compressive force occurred when the casing was run and weakened the casing, in light of the Court's exclusion of that evidence, the Court should—at the very least—grant a new trial to permit BP to explore the basis (or lack thereof) for his opinion.

Finally, even if this Court were to reject the foregoing requests for relief, a new trial would be required in order to allow BP to present evidence rebutting the casing-breach-due-to-compressive-force theory.  BP did not introduce evidence to establish the utter impossibility of that "compressive force" theory at trial because Dr. Beck's testimony on the point had never appeared in his expert reports and was excluded from evidence at trial.  If BP had been provided with notice that the Order might rest on the casing-breach theory, it would have presented additional, compelling evidence that the casing-breach theory is irreconcilable with the factual record in this case.  As BP explains in detail below, this evidence would have foreclosed any findings that the production casing experienced 140,000 pounds of compressive force; that, even if such force existed, any buckling from the force could have weakened the casing to such a degree that it could then be ruptured during the attempted float collar conversion; or that the attempted float collar conversion could have generated sufficient pressure to rupture the casing, even if it was in the purported weakened condition.  Because BP had no reason to believe that this significant evidence was even relevant in light of the Court's evidentiary rulings at trial, and because the Order nonetheless relied on the casing-breach theory, BP should

be allowed to present rebuttal evidence to the Court if the Order is not amended as BP has requested.  Therefore, the Order's casing-breach theory should be set aside, or, at a minimum, a new trial ordered.

**STANDARD**

"Rule 52(b) provides that, '[o]n a party's motion . . . the court may amend its findings—or make additional findings—and may amend the judgment accordingly.'" *Bush v. Thoratec Corp.*, No. 11-1654, 2014 WL 2465305, at *3 (E.D. La. June 2, 2014) (citing Fed. R. Civ. P. 52(b)).  The primary purpose of motions to amend under Rule 52(b) "is to correct manifest errors of law or fact."  *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986).

Similarly, Federal Rule of Civil Procedure 59(e) permits a party to file a motion to alter or amend a judgment.  Fed. R. Civ. P. 59(e).  Like motions pursuant to Rule 52(b), motions to alter or amend a judgment under Rule 59(e) are appropriate to correct manifest errors of law or fact.  *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989); *In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2008 WL 4003023, at *2-3 (E.D. La. Aug. 26, 2008).  "It is within the district court's discretion whether to reopen a case under Fed. R. Civ. Pro. 59(e)."  *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 276 (5th Cir. 2000).

Finally, under Rule 59(a), "a new trial may be granted 'on all or part of the issues . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.'"  *McCuller v. Nautical Ventures, LLC*, No. 05-1195, 2011 WL 5878046, at *2 (E.D. La. Nov. 23, 2011) (citing Fed. R. Civ. P. 59(a)(1)(B)). "Although Rule 59 does not list specific grounds for a new trial, the United States Court of Appeal for the Fifth Circuit has held that a new trial may be granted if . . . 'the trial

4

was unfair, or prejudicial error was committed in its course.'" *Id.* (quoting *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985)).

## ARGUMENT

**I.    Because The Casing-Breach Theory Rests On Excluded Evidence, The Court Should Amend Its Findings, Eliminate The Order's Multiple-Acts Theory Of Gross Negligence, And Alter Its Allocation Of Fault.**

The Order expressly predicates its adoption of the casing-breach theory on Dr. Beck's testimony, repeatedly quoting and relying on his assertions that buckling supposedly produced by an alleged 140,000 pounds of compressive force caused the casing to be weakened, such that a breach occurred below the float collar after the casing was run and during the final attempt to convert the float collar.  Order ¶ 88 n.33, ¶ 152 & n.60.  Indeed, the Order concludes its discussion of this theory by stating that "[t]he Court agrees with Dr. Beck's opinion and finds that a breach or opening occurred in the shoe track during the ninth attempted conversion."  *Id.* ¶ 155.  Thus, it is beyond dispute that Dr. Beck's testimony was essential to the Order's adoption of the casing-breach theory.

By relying on Dr. Beck's testimony on compressive force, however, the Order is premised in crucial part on testimony that the Court properly excluded from evidence at trial.  There is accordingly no record evidence supporting the Order's finding that compressive force buckled the production casing and substantially weakened it, which is an essential and threshold element of the casing-breach theory.  That theory must therefore be overturned, and the Court should reject the Order's finding that BP engaged in gross negligence through a series of negligent acts (Order ¶¶ 518-19) and revise its fault allocation accordingly (*id.* ¶ 544).

### A.    The Order Relies On Evidence That The Court Properly Excluded From The Record.

During the phase one trial, the Court repeatedly and correctly granted BP's objections to Dr. Beck's testimony regarding his newly minted theory that compressive force led to a casing breach.  Indeed, Dr. Beck's new compressive-force explanation was excluded by the Court at least three separate times based on the "four corners" rule, which prevents experts from testifying to matters not addressed in their reports, *see, e.g.*, *Witt v. Chesapeake Exploration, L.L.C.*, No. 2:10-cv-22-TJW, 2011 WL 2790174, at *2 (E.D. Tex. July 14, 2011) (expert may not testify beyond the confines of his report); *see also* Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them"), and which the Court repeatedly enforced at trial, *see, e.g.*, Trial Transcript ("Tr.") 453-56 (sustaining objection to cross-examination on issues outside the four corners of an expert's report); *id.* at 4017-18 (reminding counsel to focus questions on four corners of report following BP objection to questioning); *id.* at 8387-90 (overruling Transocean's objection to BP expert after concluding that the expert's testimony was within the four corners of the report).

*First*, during Dr. Beck's direct examination, counsel for BP objected to a question regarding whether the casing had buckled, noting that Dr. Beck "has not done an analysis" and "has not done any independent modeling of the phenomenon."  Tr. 7137. The Court then directed Halliburton's counsel to "lay a foundation" for this evidence.  *Id.* Yet when Halliburton attempted to provide that foundation, Dr. Beck admitted that he had done no "analysis or calculation or testing" in support of his buckling theory, that he

instead based the theory on his interpretation of the Sperry data, and that he did not see

evidence of buckling when he first examined the data:

> THE COURT:  Is there some analysis or calculation or testing that you did or is this an hypothesis based on reading these reports?
>
> THE WITNESS:  Oh, no, sir.  I went back and early on I looked at the Sperry data. . . .  And I admit, the first time I looked at it in the context of this report, when I looked at the data, I didn't see that—I didn't see that I thought buckling was that big of an issue. . . .  So I went back and reviewed the Sperry data in detail, and I think that I have a very good explanation for a loading on the casing that occurred that has, up to now, been unknown.
>
> THE COURT:  Is this explanation stated in your report?
>
> THE WITNESS:  The explanation—no, sir, it's not.  All that my report states is that I feel like there was some type of failure in the shoe track, and at the time of the report, I hadn't figured out what that failure was yet.

*Id.* at 7141-42.[1]   After counsel for BP invoked the four corners rule, the Court

"sustain[ed] the objection" to Dr. Beck's testimony regarding an alleged loading on the

casing leading to a later casing breach.  *Id.* at 7142.

　　*Second*, shortly after the Court sustained BP's objection, Dr. Beck attempted to

explain his view that the production casing experienced as much as 140,000 pounds of

compressive force and thus buckled, stating that "I identify off the log 140,000 [pounds]

applied to the casing."  Tr. 7148.  BP again objected: "Just move to strike as not in his

report, your Honor.  I don't mean to be continuing objecting, but we really are getting

into something that was not disclosed."  *Id.*  In response, the Court again "sustain[ed] that

---

[1]  Dr. Beck also acknowledged in his deposition that he had done no analysis regarding the strength of the casing or the surge of pressure that he alleged to cause a casing breach.  *See* Beck Dep. 265:23-266:1 (attached as Exhibit A); *id.* at 266:24-267:4 *id.* at 268:11-268:15.

objection," explaining:  "I think we keep veering into stuff.  If it's not in his report, it's not fair to be talking about it here."  *Id.*

*Third*, on redirect examination, Dr. Beck again attempted to testify that he saw evidence of 140,000 pounds of compression placed on the casing and—in response to a hypothetical question divorced from the actual facts—that the compression would "buckle the daylights out of it."  Tr. 7380.  Once again, BP objected to Dr. Beck's testimony:  "I would have liked to see it at his deposition, and I'd like to see it in his report.  It wasn't in either one, and that's the problem."  *Id.* at 7381.  And, once again, the Court "maintain[ed] the objection."  *Id.*  Thus, the Court excluded from evidence the key compressive-force testimony on which the Order relies to justify its adoption of the casing-breach theory.

In addition to excluding Dr. Beck's testimony, the Court also excluded Halliburton demonstratives animating the very casing-breach theory ultimately adopted in the Order.  Counsel for BP objected to these demonstratives on the ground that they were not contained in Dr. Beck's report, that they were not mentioned in his deposition, and that they mischaracterized the evidence.  Tr. 7138-39.  This Court sustained BP's objections, *see id.* at 7142, and none of the three animations at issue during this exchange—D-8018-2, D-8018-3, and D-8018-4—were used or admitted at trial.  *See* Dkt. Entry 10254-2 (Phase One Trial Master Marshaling List).

The Order's determination that a casing breach prevented the cement job from achieving zonal isolation, however, rests on this excluded evidence.  In concluding that a breach in the shoe track caused improper cement placement, the Order employed a two-step theory.  *First*, the Order determined that "debris" from the "fragile wellbore"

8

"applied substantial compressive force to the production casing, causing it to buckle." Order ¶¶ 86-88.  In support of that conclusion, the Order cited only Dr. Beck's excluded testimony that "data shows the production casing actually experienced as much as 140,000 pounds of compressive force when it was landed on April 19." *Id.* ¶ 88 n.33; *see* Tr. 7148 (sustaining objection to this testimony).

*Second*, the Order determined that—due in large part to alleged weakness caused by supposed buckling—the shoe track breached during the attempted float collar conversion.  Order ¶ 155.  In reaching this conclusion, the Order again relied on Dr. Beck's excluded trial testimony, adopting Dr. Beck's testimony that the compression would "'buckle the daylights out of'" the production casing.  *Id.* ¶ 152 n.60 (citing Tr. 7380); *see* Tr. at 7381 ("I'll sustain the – maintain the objection.").

Based on Dr. Beck's testimony, the Order found "that a breach or opening occurred in the shoe track during the ninth attempted conversion."  Order ¶ 155. Accordingly, these crucial steps of the Order's casing-breach theory rely on Dr. Beck's excluded trial testimony that the production casing buckled after experiencing as much as 140,000 pounds of compressive force, and that the buckling magnified the stress on the casing, allowing it to breach during the attempted float collar conversion.[2]

---

[2]  Notably, although the Order concludes that Dr. Beck's theory is consistent with the testimony of Glen Benge and Bill Ambrose, *see* Order ¶¶ 148-49, both of those witnesses refused to express an opinion on whether the casing breached.  In response to questioning from his own attorneys, Benge freely admitted that he was not offering an opinion on the casing-breach theory.  *See* Tr. 2312-13.  The Court then sustained BP's objections to later attempts by Halliburton to ask Benge about a casing-breach-below-the-float-collar theory, because it was not in his report.  *See id.* at 2467. Similarly, Ambrose testified that there was no way to know whether "something opened up below the float collar," and the Court subsequently sustained BP's speculation objection when Ambrose was asked for a second time about the
*(Cont'd on next page)*

Because they rely on excluded testimony and are not supported by any evidence in the record, the Order's findings regarding the casing-breach theory cannot stand. The findings and judgment should thus be amended to reflect that the flow path for hydrocarbons was not created by a breach in the casing. Instead, the findings and judgment should reflect that the unstable foam cement designed, tested, and recommended by Halliburton for the production casing failed to serve as a hydrocarbon barrier and thus caused the blowout, as set forth in BP's proposed findings of fact. *See* Dkt. Entry 10467, at 248-310; Order ¶ 232 (acknowledging that the foamed cement was unstable).

### B. The Lack Of Evidentiary Support For The Casing-Breach Theory Is Fatal To The Order's Multiple-Acts Theory Of Gross Negligence And Also Warrants Revising The Order's Fault Allocation.

Given that the casing-breach theory is unsupported by the evidence admitted at trial and should be rejected, the Court should also amend the Order to eliminate the finding that BPXP "committed a series of negligent acts or omissions that resulted in the discharge of oil, which together amount to gross negligence and willful misconduct under the CWA," Order ¶ 518, a finding that is based in significant part on this excluded and unsupported theory. In addition, the Court should also revise the Order's allocation of

---

*(Cont'd from previous page)*

possibility of a casing breach. *See id.* at 6174-75. The testimony of Benge and Ambrose thus does not support the Order's casing-breach theory. Finally, the Court cites (Order ¶ 148) an attachment to Calvin Barnhill's expert report—a summary outline that has no analysis or elaboration, and which simply lists "possible damage to casing shoe track" without explanation alongside alternatives of "possible float valve issues" and "possible casing damage." These "possibilities" are neither represented as nor indicative of an opinion (reliable or otherwise) that the casing in fact breached due to a compressive load weakening the casing prior to float collar conversion.

fault by assigning a lesser degree of comparative fault to BP and a higher percentage to Halliburton to reflect these amended findings.

If the casing-breach theory is rejected, as it should be, then causation for the blowout, explosion, and oil spill would be absent as to at least four of the eight "multiple negligent acts" identified by the Order as the basis for its finding of gross negligence based on multiple acts.  *See* Order ¶ 519.  *First*, because the casing did not breach, there is no evidence that "drilling the final 100 feet of the well with little or no margin" caused the blowout.  According to the Order, "the decision to drill the last 100 feet of the well with little or no margin left the wellbore in an extremely fragile condition," which "resulted in the presence of a large amount of debris in the well when the production casing was set in the well a few days later."  *Id.* ¶ 71.  "[T]his debris," the Order reasoned, "compromised the production casing, which led to the incorrect placement of cement, which in turn permitted hydrocarbons to enter the well on April 20, 2010," eventually causing the blowout, explosion, and spill.  *Id.*  In the absence of a casing breach, however, there is no evidence that debris contributed to the blowout and thus no evidence that drilling the final 100 feet of the well was causal.

*Second*, the invalidity of the casing-breach theory warrants reversal of the Order's conclusion that "running the production casing with the float collar in unconverted mode *and* without a shoe filter" caused the blowout.  *See* Order ¶ 519.  The Order's reasoning with respect to the float collar and shoe filter is again based on the presence of debris in the well leading to buckling and weakening of the casing.  By running the casing with the float collar in unconverted mode, the Order concluded, BP "increased the risk that debris from the well would flow into and plug the reamer shoe, the float collar, or both."  *Id.*

¶ 107.   The Order further determined that, while "BP could have mitigated this risk by using a shoe filter, which is designed to filter cuttings and other debris that could possibly plug the float equipment," it "did not use any type of shoe filter."  *Id.*  Like the alleged debris resulting from the decision to drill the final 100 feet of the well, however, any debris resulting from the decision to run the production casing with the float collar in unconverted mode and without a shoe filter could not have caused the blowout if the casing-breach theory is rejected; the Order's chain of causation critically depends on the proposition that debris compromised the production casing sufficiently to cause the alleged casing breach, and fails without that link.  Thus, the Order's determination that running the production casing with the float collar in unconverted mode and without a shoe filter had a causal connection to the blowout should be overturned.

*Third*, the invalidity of the casing-breach theory also negates any conclusion that "failing to verify whether the float collar converted by reverse circulating the well" caused the blowout.  *See* Order ¶ 519.  The Order concludes that the float collar did not fully or properly convert, *id.* ¶ 144, and that BP did not attempt to verify whether the float collar converted by having the drill crew attempt to reverse circulate, *id.* ¶¶ 131-32.  According to the Order, "an unconverted float collar could result in the cement 'u-tubing' out of the annulus and back into the well casing."  *Id.* ¶ 191.  Once the casing-breach theory is overturned, however, there is no basis for concluding that any issues regarding the float collar conversion led to incorrect cement placement and thus contributed to the blowout.

*Fourth*, since the casing did not breach, there is no basis for concluding that "not conducting a CBL" caused the blowout.  Order ¶ 519.  The Order determined that, "[i]f

BP had performed the CBL, it would have shown that the top of the cement was not where it should have been, which would have given clear indication that the cement was placed improperly and extremely unlikely to provide a barrier to flow." *Id.* ¶ 196. "At that point," the Order reasoned, "BP could have attempted to remediate the cement job before proceeding any further with the temporary abandonment." *Id.* Accordingly, the Order concluded "that BP's decision to not run the CBL was a substantial cause of the blowout, explosion, and oil spill." *Id.* Absent the purported casing breach, however, and given the indications that the cement job was successful, with full returns (no lost circulation), lift pressure, plugs bumped on time, and floats held, *see* Dkt. Entry 10467, at 171-72, 182, there is no reason to believe that the top of cement was not at the intended location. A CBL thus would not have indicated that cement was "extremely unlikely to provide a barrier to flow." *Id.* Because a CBL would not have shown any problems with cement placement, there is no basis for finding that failing to conduct the CBL had any causal relationship to the blowout, explosion, and spill.

Thus, elimination of the casing-breach theory would mean that at least four of the eight alleged "multiple negligent acts" identified by the Order were not causal and, as a result, cannot support a finding of gross negligence: (1) drilling the final 100 feet of the well with little or no margin; (2) running the production casing with the float collar unconverted and without a shoe filter; (3) failing to verify whether the float collar converted by reverse circulating the well; and (4) not conducting a CBL. *See* Order ¶ 519; *see also id.* ¶ 547 ("As to causation, the negligence must be the 'legal cause' of the damage, which is something more than 'but for' causation—'the negligence must be a substantial factor in causing the injuries'" (citation omitted)); *id.* ¶ 558 ("[B]ecause the

Court ultimately finds that the unstable foamed cement was not the cause of the blowout, no legal fault is allocated to Halliburton for these failures.").  With at least half of the "multiple negligent acts" removed, the Order's determination that this series of acts amounted to gross negligence and willful misconduct should be reconsidered, and the Court should reject this theory of gross negligence.  Moreover, because the Order's allocation of fault is based both on the "multiple negligent acts" theory of gross negligence and on the finding that Halliburton's faulty cement was not a cause of the blowout, explosion, and spill, *see id.* ¶¶ 544, 558, the fault allocation should be amended to adjust downward BP's percentage of responsibility.

## II. Even If Dr. Beck's Testimony On The Casing-Breach Theory Had Not Been Excluded Under The Four Corners Rule, It Nonetheless Would Be Inadmissible Under *Daubert* And Federal Rule of Evidence 702.

Dr. Beck's casing-breach theory due to compressive loading when the casing was run into the well was appropriately excluded from evidence at trial under the four corners rule because it was not included in his expert report and because allowing him to testify to this newly minted theory would have been unfairly prejudicial to BP.  Even if that theory had not been excluded on this ground, however, it would have been inadmissible on the alternative ground that it is not based on a reliable scientific methodology, as required by *Daubert* and Federal Rule of Evidence 702.  For this reason, too, the Court should reject the casing-breach theory and instead adopt BP's proposed findings of fact and conclusions of law regarding the mechanism by which hydrocarbons entered the well.

Federal Rule of Evidence 702 requires an expert's testimony to be (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) reliably applied to the facts of the case.  Fed. R. Evid. 702.  Among other things, Rule 702

"imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

"[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  "This requires some objective, independent validation of the expert's methodology."  *Id.*; *see also Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (excluding an expert's affidavit because his testimony "has neither the sufficient facts nor the reliable methodology that would warrant its inclusion as evidence").  "The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient."  *Moore*, 151 F.3d at 276.

In this case, Dr. Beck's casing-breach theory is inadmissible under *Daubert* and its progeny because he did not employ a reliable—or, indeed, any—methodology in evaluating that theory.  As Dr. Beck acknowledged in response to questioning from the Court, his proposed testimony regarding the theory of compressive loading weakening the casing was not based on any "analysis or calculation or testing."  Tr. 7142-43.  But such analysis, calculation, and testing are exactly what Rule 702 and *Daubert* require.  In *Moore*, for instance, the Fifth Circuit affirmed the district court's exclusion of expert testimony on the ground that the expert "cited no scientific support for his theory," explaining that, "[u]nder the *Daubert* regime, trial courts are encouraged to exclude such speculative testimony as lacking any scientific validity."  151 F.3d at 279.  Likewise, in *Hathaway*, the court affirmed the exclusion of an expert's testimony because he relied on

"a host of unsupported conjectures that falls far short of a methodology."  507 F.3d at 318.

Instead of employing a reliable methodology, as required under the case law, Dr. Beck merely looked at the Sperry data, which he admitted did not initially lead him to the conclusion that buckling had occurred when he submitted his first expert report, and then offered the unsubstantiated *ipse dixit* that some later review of evidence led him to conclude that buckling had in fact occurred (which the Court promptly excluded).  Such testimony is speculative and conclusory, and falls well short of the reliable and testable methodology necessary for expert opinions to be admissible.  *See Kumho Tire*, 526 U.S. at 158; *see also Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("'A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.'" (citation omitted)); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").  Dr. Beck's testimony thus could not properly support the casing-breach theory even if it had not been excluded under the four corners rule, and—as noted above, *see supra* Section I—that theory lacks any other sufficient basis in the record and should accordingly be rejected.

Alternatively, if the Court declines at this point to amend its findings of fact and conclusions of law, a new trial would be necessary so that BP can explore the lack of foundation for Dr. Beck's casing-breach theory.  The theory that a casing breach occurred because compressive loading had weakened the casing was not included in Dr. Beck's

expert report and was excluded by the Court at trial.  Accordingly, BP had no incentive to explore the *Daubert* issue by addressing with the Court and the witness the absence of any methodology or scientific basis for Dr. Beck's opinion, beyond BP's objection that "he doesn't go into any analysis of what the strength or impact would be on this type of casing, given its compression, given its buckling capacities, so forth."  Tr. 7145.  At a minimum, therefore, even if the Court were belatedly to attempt to overturn its rulings excluding this improper testimony at trial (which would be inappropriate and impermissible), the Court would be obligated to remedy the prejudice to BP resulting from this unfair surprise by ordering a new trial to permit BP to explore the absence of any reliable basis for Dr. Beck's opinion.

## III.   The Court's Findings Regarding The Casing-Breach Theory Unfairly Prejudiced BP, Requiring A New Trial If They Are Not Set Aside.

If the Court does not amend its findings and judgment, BP would also be entitled to a new trial so that it can offer evidence rebutting the casing-breach theory.  If BP had been provided with notice that the Order might adopt the casing-breach theory notwithstanding the exclusion of Dr. Beck's testimony at trial, BP could and would have presented compelling evidence refuting that theory.  Thus, if the findings and judgment are not altered to reject the casing-breach theory outright, a new trial would be required so that BP can rebut the (inadmissible) evidence purportedly supporting that theory.

### A.   BP Had No Incentive To Refute The Casing-Breach Theory At Trial Because The Court Properly Excluded The Only Evidence Purportedly Supporting That Theory.

BP reasonably believed that the casing-breach theory was not a live issue at trial based on the Court's consistent exclusion of the testimony and demonstratives presented in support of that theory.  As explained above, Dr. Beck's compressive-force speculation

was not included in his expert report.  *See* Tr. 7142 ("THE COURT: Is this explanation stated in your report?  THE WITNESS: The explanation-- no, sir, it's not.").  Consistent with the four corners rule established for the trial, the Court repeatedly excluded the testimony and demonstratives regarding the casing-breach theory.  *See id.* at 7142, 7148, 7381.  Moreover, the Court explicitly excluded such evidence on the basis that it would be unfair to BP, stating that, "[i]f it's not in his report, it's not fair to be talking about it here."  *Id.* at 7148.  Given that Dr. Beck's theory was admittedly supported by no "analysis or calculation or testing," Tr. 7141-42, was not included in his expert report, *id.* at 7142, was excluded by the Court because allowing it at trial was "not fair," *id.* 7148, and was not addressed by any other expert at trial, BP had no incentive to offer evidence to refute the casing-breach theory and was understandably surprised that it formed a substantial basis for the Order's findings.

The case law is clear that such unfair surprise warrants a new trial.  "It is well settled that Rule 59 provides a means of relief in cases in which a party has been unfairly made the victim of surprise."  *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 109 (5th Cir. 1982) (holding that the district court did not abuse its discretion in granting a new trial on the basis that a party had "introduced a surprise expert witness"); *see also Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 287-88 (1st Cir. 1993) (remanding for a new trial because expert testimony introduced "a novel theory of liability," which constituted "unfair surprise" and which defendant was "precluded from effectively addressing" because it was "denied the opportunity to design an intelligent litigation strategy"); 11 Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2805 (3d ed. 2014).  As the Fifth Circuit held in *Conway*, a new trial is justified if the

surprise was "'inconsistent with substantial justice'" and "actually prejudiced" the moving party's case.  687 F.2d at 111-12.  This standard is satisfied, the Fifth Circuit held, where the moving party "had no . . . opportunity to prepare a response to this unexpected turn of events."  *Id.* at 112.

Because BP was "unfairly made the victim of surprise," *Conway*, 687 F.2d at 111-12, and was thus "denied the opportunity to design an intelligent litigation strategy," *Perez-Perez*, 993 F.2d at 287-88, a new trial would be required in these circumstances.  BP had no notice that the casing-breach theory would form the basis for the Order and no incentive to refute that theory at trial.  If the Court does not amend its findings to remove reliance on the casing-breach theory, failing to allow BP to rebut that theory now would accordingly be "'inconsistent with substantial justice.'"  *Conway*, 687 F.2d at 111.

> **B.     If BP Had Been Provided With Notice That The Order Might Adopt The Casing-Breach Theory, BP Could And Would Have Presented Compelling Evidence Refuting That Theory.**

BP was "actually prejudiced" (*Conway*, 687 F.2d at 112) by the fact that the Order endorsed the casing-breach theory even though the Court had excluded the only support for that theory—Beck's alleged observation of a compressive load leading to an alleged weakening of the casing.   BP could and would have provided overwhelming evidence disproving the casing-breach theory if it had known that the theory was still at issue.

At trial, BP offered the testimony of David Lewis, an expert in casing and tubular design and a member of numerous industry committees on casing and tubular design.  Mr. Lewis addressed a different casing issue that (unlike Dr. Beck's testimony) was part of the record and at issue in the case—namely, the use of long-string casing versus a liner casing.  But if BP had known that the Court was considering basing its findings upon

excluded testimony by Dr. Beck that the casing was weakened and ultimately breached because of an alleged compressive load, BP could have offered the testimony of Mr. Lewis in rebuttal, as he is qualified to refute that allegation using industry standard calculations and analysis that were not employed by Dr. Beck.

In particular, as explained in the attached declaration of Mr. Lewis, there are standardized formulas used in the industry to evaluate how a buckling force may reduce the strength of casing.  Using those standardized formulas, even with an assumed 140,000-pound buckling force, the reduction in strength of the casing in the shoe track would be 363 psi.  The ultimate limit state (that is, the point at which pressure causes a structure to burst or breach) for the casing is 19,227 psi.   Therefore, the reduction in strength from an alleged 140,000-pound load would be *less than 2% of the overall strength* of that casing.   A 2% reduction in strength would not be considered a meaningful reduction and would not raise concerns about casing integrity.  Indeed, given that there would have to have been a differential pressure in excess of 18,864 psi to burst the casing, even assuming it had weakened due to 140,000 pounds of buckling force, the differential pressure load of 3,142 psi at the time of the float collar conversion could not possibly have caused a casing breach.   Thus, as Mr. Lewis concludes, there is no scientific basis for Dr. Beck's assertion that a differential pressure caused a breach in the shoe track casing.

Additionally, Mr. Lewis explains that, after reviewing the Sperry data and the daily operations report from when the casing was run, he did not see any evidence of a 140,000-pound compressive load placed on the casing.  Mr. Lewis could not identify any

support for Dr. Beck's unsubstantiated statement that the casing may have experienced up to 140,000 pounds of compressive force.

## CONCLUSION

For the foregoing reasons, BP respectfully requests that the Court amend the Order's findings and judgment to reject the casing-breach theory and, as a result, alter the Order's conclusion that eight alleged "multiple negligent acts" caused the blowout, eliminate its theory that this series of acts amounted to gross negligence and willful misconduct, and modify its allocation of fault to adjust downward BP's percentage of responsibility.  In the alternative, BP would be entitled to a new trial in order to explore the absence of any reliable basis for Dr. Beck's opinion and for the casing-breach theory and to present evidence refuting that baseless theory.


Date: October 2, 2014                                    Respectfully submitted,


                                                         /s/ Don K. Haycraft
                                                         Don K. Haycraft (Bar #14361)
                                                         R. Keith Jarrett (Bar #16984)
                                                         Liskow & Lewis
                                                         701 Poydras Street, Suite 5000
                                                         New Orleans, Louisiana 70139-5099
                                                         Telephone: (504) 581-7979
                                                         Facsimile: (504) 556-4108

                                                         Richard C. Godfrey, P.C. J.
                                                         Andrew Langan, P.C.
                                                         Hariklia Karis, P.C
                                                         Matthew Regan, P.C.
                                                         Kirkland & Ellis LLP
                                                         300 North LaSalle Street
                                                         Chicago, IL 60654
                                                         Telephone: (312) 862-2000
                                                         Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for BP Exploration &*
*Production Inc. and BP America*
*Production Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 2nd day of October, 2014.


/s/ Don K. Haycraft
Don K. Haycraft