UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179  SECTION J |
| This document relates to:  Nos. 10-2771; 10-4536 | * * * * * | HONORABLE CARL J. BARBIER  MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF DAVID B. LEWIS

I, David B. Lewis, submit this declaration in support of the Motion by BP Exploration & Production Inc. and BP America Production Company To Amend the Findings, Alter or Amend the Judgment, or for a New Trial. This declaration is based upon my own personal experience, expertise, and analysis; and if called to testify I could testify to the opinions and analysis I set forth in this declaration. I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

## INTRODUCTION

1. I have over thirty years of domestic and international experience in oil & gas exploration and production. I have a management and a functional background in drilling, completions, and offshore structures and a strong engineering background with experience in deepwater, big bore (monobore) and High Pressure/High Temperature (HPHT) wells. I have specific expertise in technology management, deepwater drilling, reliability based design, tubulars, connections, marine drilling risers, conductors, pipelines, offshore structures, down-hole equipment, project management, training, and finite element analysis. I am currently the Chairman of the Board of Blade Energy Partners and was formerly the President and Chief Executive Officer.

2. I am a Registered Professional Engineer in the State of Texas, a member of the American Society of Civil Engineers (ASCE), a member of the Society of Petroleum Engineers (SPE), and I serve on numerous American Petroleum Institute (API) and International Organization for Standardization (ISO) committees, including as an API Executive Board Member of Committee 5 – Tubular Goods and Technical Member of API 5CT (Specifications for Casing and Tubing) and API TR 5C3 (Bulletin on Formulas and Calculations for Casing, Tubing, Drill Pipe and Line Properties).

3. I have designed dozens of deepwater wells in multiple areas around the world and have been involved with numerous failure analysis and post well reviews. I have authored or co-authored over 20 industry papers. My education includes a BS degree and MS degree in Civil Engineering from University of Missouri-Rolla, and postgraduate doctoral work in finite element methods, continuum mechanics, vibrations, and structural dynamics. I submitted an expert report in the Phase One litigation with respect to the Macondo production casing design, and I testified before the Court on Wednesday, April 10, 2013. My full resume and qualifications are set forth in my expert report (TREX 8098) and are summarized in my trial testimony (Trial Tr. 8308-8342).

4. I have been asked to review the Court's September 4, 2014 ruling with respect to a single issue: that is the Court's finding, based on the testimony of Dr. Gene Beck, that the production casing used at Macondo experienced some form of weakening caused by buckling that allegedly occurred from a compressive force when the casing was run in the well on April 18 and 19, 2010 and later burst during the float collar conversion. I was not aware of this compressive force theory at the time of my expert report, and did not see this theory or any

analysis to support it in either of Dr. Beck's expert reports, both of which I reviewed prior to my testimony at Trial in April 2013.

## ANALYSIS AND OPINIONS

### I. OVERVIEW OF OPINIONS

5. The production casing used in this well was 7 inch 32 foot per pound high collapse Q-125 (7" 32 lb/ft HC Q-125) (referred to as HC Q-125 in this declaration) casing and had a working burst rating of 14,160 psi and an ultimate limit state of 19,227 psi. As I explain below, that means that the casing is capable to withstand differential pressures in excess of 19,227 psi before bursting.

6. As I discuss below, it is unclear what basis Dr. Beck had for claiming to "see" 140,000 pounds of weight being taken by the casing when it was run and that the compressive load buckled and weakened the casing. Buckling can occur when running casing, but what is important is the stress caused by buckling, not the buckling itself. Most importantly, in this case, even if one were to assume that the casing in the shoe track experienced 140,000 pounds of compressive force – the highest compressive load hypothesized by Dr. Beck and cited by the Court – standard industry calculations demonstrate that such a force would only stress the production casing by 363 psi, or **less than 2% of that casing's 19,227 psi strength**. A 2% reduction in strength would not be considered a meaningful reduction and would not raise concerns about casing integrity.

7. I am aware that the Court's finding, in reliance upon Dr. Beck, is that the casing breach occurred during the float collar conversion where pressure was released from 3,142 psi when circulation was established, and that this pressure release both damaged the float collar and caused a breach in the casing. I also understand that this theory requires the casing to have

previously been weakened from buckling. In my professional judgment, there is no evidence of a differential pressure load in this wellbore sufficient to overcome the burst rating of the HC Q-125 casing. The 3,142 psi differential pressure during the final float collar conversion attempt is five to six times too small to burst the casing given its strength characteristics.

8. In summary, it is my professional judgment to a reasonable degree of engineering certainty that there is no scientific basis to conclude that the shoe-track casing in the wellbore was weakened to any material degree during the casing running, even if I assume 140,000 pounds of compressive load occurred. I am not aware of the basis for any such 140,000 pound load, and industry standard calculations show that such a load would only result in a less than 2% reduction in the strength of the casing. Further, it is my professional judgment to a reasonable degree of engineering certainty that there is no scientific basis to conclude that the shoe track was breached during the float collar conversion, as the differential pressures were five to six times lower than the burst strength of the shoe track casing under the scenario proposed by Dr. Beck.

## II. THERE IS NO EVIDENCE THAT THE CASING WAS WEAKENED SUFFICIENTLY TO BREACH.

### A. The 7" Production Casing Was 7" 32 lb/ft HC Q-125 Casing, Which Is Capable to Withstand More Than 19,227 psi of Differential Load

9. The shoe track of the production casing used at Macondo was 7 inch 32 pounds per foot high collapse Q-125 casing ("7" 32 lb/ft HC Q-125" or "HC Q-125"): "7 inch" is the outer diameter and "32 pounds per foot" is the weight per unit length of the casing; "Q-125" is an industry standard material designation that indicates 125,000 psi as the yield point; and, "HC" stands for high collapse, which means the casing is overall heavier and stronger than standard Q-125 casing. This additional HC strength comes from a higher material yield point and better dimensions.

10. As set forth in my Phase One expert report, casing is designed to withstand pressure from the outside of the casing inward ("collapse strength") and from the inside of the casing outward ("burst strength"). TREX 8098.9. For the issue I am addressing in this declaration, pressure from the float collar conversion would be inside out, which relates to the burst load placed on the casing.

11. In the industry, casing strength is typically reported using a rating known as "**working pressure**." Working pressure is a standard API calculation that sets forth the minimum burst value/load for the casing. The industry uses this working pressure in designing casing with a safety margin – knowing full well that the casing is actually significantly stronger than the working pressure. Casing is capable to withstand the working pressure value without bursting.

12. The industry also evaluates the pressure where the casing is likely to actually burst or breach. That is known as the "**limit state**" or ultimate limit state. The ultimate limit state is determined by using sophisticated but standard API calculations for casing – calculations that determine the point at which the casing will burst or breach. Ultimate limit state values are used in the industry in well control situations and other scenarios where knowing the ultimate pressure the casing can contain is necessary. If there is a situation where one must pressure the casing, the industry uses ultimate limit state data to understand the limit of pressure that can be placed on the casing. For that reason, when one is examining the actual load experienced by casing, including review of an actual casing failure after the fact, one uses ultimate limit state values rather than working pressure values.

13. I evaluated the (a) working pressure and (b) ultimate limit state of the shoe-track casing used at the Macondo well under two different strength calculations. To do this I used

industry standard equations found in API TR 5C3, titled "TECHNICAL REPORT ON EQUATIONS AND CALCULATIONS FOR CASING, TUBING, AND LINE PIPE USED AS CASING OR TUBING; AND PERFORMANCE PROPERTIES TABLES FOR CASING AND TUBING."[1]  I was on the API Committee that developed these equations and created this API Technical Report.  I am unaware of any such calculations being performed by Dr. Beck and no such calculations are set forth in the Court's September 4, 2014 ruling.

14.     In calculating the working pressure of the HC Q-125, I used industry standard equations found in API TR 5C3.  I first used equation #10.  The variables in API TR 5C3 equation #10 focus on the dimensions of the casing and material strengths.  This calculation relies on the minimum values and results in the lowest possible working pressure for the casing, a conservative measurement of the working pressure.  After running these calculations, I computed the working pressure for the HC Q-125 casing to be 14,156 psi.  In other words it would require a differential pressure load of 14,156 psi to exceed the working pressure of the casing.  However, even that pressure would still not breach the casing because the casing has a much higher "limit state."

15.     Again, using industry standard API TR 5C3, I calculated the ultimate limit stress using equation #B.6.  The variables in equation #B.6 are the same as those used in equation #10 discussed above.  I calculated the ultimate limit state of the casing under two different strength scenarios.  First, I calculated the ultimate limit state using minimum values for the variables.  Second, I calculated the ultimate limit state using nominal values for the variables. The reason I used minimum values is to be as conservative as possible, as it determines the lowest possible

---

[1]  Working pressure and limit state values are always calculated at room temperature conditions, as I did here. During design and analysis, we incorporate a deration in yield point due to temperature.  Because the deration for this casing based on a downhole temperature of 210 degrees would only be 4% of the limit state values, using derated values makes no difference to my conclusions here.

ultimate limit state for the casing. The use of nominal values gives a more accurate calculation of the ultimate limit state.

16. After performing these calculations, I concluded to a reasonable degree of engineering certainty that the ultimate limit state for the HC Q-125 casing using minimum variables is 15,814 psi. The ultimate limit state of the HC Q-125 casing using nominal values is 19,227 psi.

17. Based on these standard API calculations, it is my professional judgment to a reasonable degree of engineering certainty that one would need to see a differential pressure load **in excess of 19,277 psi** to breach the HC Q-125 casing in the shoe track at Macondo. I am not aware of any evidence of a differential pressure load approaching anything near this level of differential pressure at Macondo.

> **B. Even Assuming 140,000 Pounds Of Buckling Force On The Casing, The Reduction In Strength Is Less Than 2% For the Casing Used at Macondo.**

18. Buckling requires a compressive force acting on pipe that in turn results in a curvature of the casing in the wellbore and an additional state of stress. Buckling weakens the casing, but in standard wellbore configurations like Macondo, any weakening from such buckling is minor and not substantial. In addition, the degree of any such weakening from buckling can be calculated using industry standard formulas.

19. It is my understanding that Dr. Beck suggested at trial that up to 140,000 pounds of buckling force weakened the HC Q-125 casing. Again, I did not see any such analysis in Dr. Beck's reports and I am unaware of anything in the Sperry data to support his claim at trial. More importantly, as an engineering matter, even assuming that there was 140,000 pounds of buckling force, standard API calculations would show that the reduction in burst strength of the shoe track casing is **less than 2%.**

20.     There are standardized formulas used in the industry by casing engineers to evaluate how a buckling force may reduce the strength of casing. Using those formulas, I determined that, even with a 140,000-pound buckling force, the reduction in strength of the HC Q-125 casing would be 363 psi. With the ultimate limit state values of 19,227 psi, the reduction in strength is less than 2%.

21.     Given these results, even if 140,000 pounds of buckling force was applied at Macondo (which I have not seen evidence of), the differential pressure necessary after that point to then burst the HC Q-125 shoe track casing would be in excess of 18,864 psi. I am unaware of any evidence to suggest such differential pressures existed for the shoe track HC Q-125 casing at Macondo, and it is my professional judgment to a reasonable degree of engineering certainty that there is no scientific basis to conclude that a differential pressure caused a breach in the shoe track casing.

22.     The only differential pressure load placed on the casing below the shoe track that I am aware of was 3,142 psi during the final float collar conversion attempt. That pressure, 3,142 psi, is **five to six times lower** than the both the working pressure and ultimate limit state of the HC Q-125. It is my professional judgment to a reasonable degree of engineering certainty that there is no scientific basis to conclude that the 3,142 psi differential pressure was capable of breaching the HC Q-125 shoe track casing, even if one assumes an alleged 140,000 pounds of compressive load was placed on the casing when it was run.

23.     I am also aware that the Court cites to a Halliburton email from April 16, to suggest that that buckling could begin at 30,000 pounds of force. It is not a surprise that buckling could begin at 30,000 pounds of force because you can see buckling if compressive loads occur when casing is run in wells. Again, the issue is not when buckling starts, but rather

when and how that buckling results in the casing losing strength. In specific, with the HC Q-125 casing and a compressive force of 30,000 pound, standard API calculations show the reduction in strength would be 71 psi, or less than one half of one percent reduction in casing strength. That means a 30,000 pound compressive force on the HC Q-125 casing would reduce the ultimate limit state of the casing from 19,227 psi to 19,156 psi, an almost imperceptible amount.

### C.   There Is No Evidence Of 140,000 Pounds Of Force On The Casing At Any Time.

24.   It is my understanding that, at trial, Dr. Beck asserted that he could see a 140,000-pound load based upon his examination of the real time "Sperry" hookload data from when the casing was run. Dr. Beck did not elaborate further on where in the Sperry data the he identified the load.

25.   I was asked to review the Sperry-Sun hookload data (TREX 604) to evaluate whether I can identify any place where the hookload indicates the casing was subject to a compressive load of 140,000 pounds when it was run on April 18 and 19, 2010.[2] This data captures hookload weights from 0 to 1 million pounds. I have not identified any evidence of 140,000 pounds of compressive force placed on the casing while it was being run. I also have reviewed the daily operations reports and see no indication of a compressive force being placed on the casing beyond a "10,000 pound weight" noted in the report by the rig crew that ran the casing into the well. (TREX 41071) I would expect that the crew that noted 10,000 pounds when running the casing would also have also noted 140,000 pounds, if it had occurred.

---

[2]   With respect to hookload data and casing compressive loads, due to wellbore tortuosity and configuration, it is difficult to determine the exact compression load on the bottom of the casing with hookload. If the wellbore is perfectly smooth and the casing is hanging perfectly straight, hookload will reflect the full compressive load at the bottom. In the real world, hookload may overestimate the compressive load at the bottom of the casing, but it does provide notional values or maximum values of compressive load at the bottom of the casing.

## CONCLUSION

26. It is my professional judgment to a reasonable degree of engineering certainty that there is no scientific basis to conclude that the shoe track casing in the wellbore was materially weakened during the casing running, even if I assume that 140,000 pounds of compressive load occurred. I cannot see any such load, and industry-standard strength calculations show that such a load, if it occurred, would only result in a 2% reduction in strength of the casing. Further, it is my professional judgment to a reasonable degree of engineering certainty that there is no scientific basis to conclude that the shoe track breached during the final float collar conversion attempt, as the 3,142 psi differential pressure at that time was five to six times lower than the limit state for bursting the shoe track casing.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 2nd day of October, 2014 in Houston, Texas.

_David B. Lewis_
**DAVID B. LEWIS**