UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY  THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to: No. 10-4536 | * * * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

**BPXP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE THE EXPERT REPORTS OF WALTER H. CANTRELL AND RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO UNRELATED PRIOR INCIDENTS**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I.   The Cantrell Reports Revisit Phase 1 Issues The Court Has Already Determined And Will Necessarily Require The Parties To Rehash The Phase 1 Record. ........................................................................................................................ 4

   A.   The Cantrell Reports are an impermissible attempt by the U.S. to retry its Phase 1 process safety arguments. ....................................................... 5

   B.   To rebut Cantrell, BPXP will be entitled to cross-examine and re-introduce its own evidence from Phase 1 regarding causation, which Cantrell ignores. ................................................................................................. 9

II.  The Cantrell Reports Confirm That Permitting Evidence Of Unrelated Prior Violations Will Result In Unnecessary "Mini-Trials." ................................................. 10

III. Unrelated Incidents That Are Not Similar To The *Deepwater Horizon* Incident Should Not Be Considered. ................................................................................ 12

   A.   Under the Prior Violations factor, only similar incidents are relevant and may be considered. ............................................................................... 12

   B.   Only Section 311 violations committed by the violator should be considered. ................................................................................................. 13

   C.   Each of the four prior incidents discussed by Rear Admiral Cantrell is very different from the *Deepwater Horizon* incident. ...................................... 14

CONCLUSION ...................................................................................................................... 15

# INTRODUCTION

BP Exploration & Production Inc. ("BPXP") previously moved to exclude evidence of unrelated prior incidents during the Penalty Phase trial. Rec. Doc. 12513. BPXP's motion was discussed during the March 21, 2014 Status Conference, and the Court limited the United States to pre-trial discovery concerning four incidents the government had previously disclosed: Endicott Island, Alaska; Grangemouth, Scotland; Texas City, Texas; and Prudhoe Bay, Alaska. Rec. Doc. 12592 at 2. In allowing discovery to proceed, however, the Court stated that it was not deciding "whether any of those four specifically are admissible or not" and noted that BPXP could revisit the issue again later, including through a motion to strike the U.S.'s expert report(s). Ex. A, 3/21/2014 Hr'g Tr. at 25-26, 44 ("we'll have a chance to make the final decision before trial as to whether any or all of those are admissible or not").

Discovery relating to the four prior incidents has now been conducted and the U.S. has served expert reports from retired Rear Admiral Walter Cantrell attempting to compare the causes of the prior incidents to the causes of the *Deepwater Horizon* incident. Cantrell's initial Round 1 report is attached as Exhibit B and his Round 3 reply report is attached as Exhibit C. The Cantrell reports have confirmed the relevance and trial manageability issues which led the Court to exclude this evidence during the first two phases of this trial. Rec. Doc. 5634 at 4-5; Rec. Doc. 11367 at 2. Those concerns are even more applicable now.

*First*, even a quick review of Cantrell's reports reveals that his opinions are inextricably intertwined with Phase 1 issues that the Court has already determined, and thus consideration of the Cantrell reports will be cumulative and inescapably result in revisiting Phase 1 issues and evidence. Cantrell contends that BP failed to learn lessons from the prior incidents, and that all of the incidents—including the *Deepwater Horizon* incident—were caused by similar process

safety failings and a deficient process safety management system. But the Court has already found that BP's process safety management system was *not* a cause of the *Deepwater Horizon* incident and that "BP had a process safety management system in place on April 20, 2010." Findings of Fact and Conclusions of Law, Phase One Trial (Rec. Doc. 13355) at ¶ 469. The U.S. should not be permitted to relitigate that issue.

*Second*, as the Court previously observed before the Phase 1 trial, permitting evidence of prior incidents poses a real risk of creating mini-trials for each of the prior incidents. If the U.S. is permitted to introduce such evidence during the Penalty Phase, BP will be compelled to present substantial evidence, including two expert witnesses, to refute Cantrell's sweeping assertions relating to events that occurred over a 15-year period. A ruling on this issue now will avoid further unnecessary discovery, including expert depositions, and streamline the trial.

*Third*, none of the four prior incidents discussed in the Cantrell reports are remotely similar to the *Deepwater Horizon* incident. In order for the evidence of prior violations or incidents to be relevant and admissible, the incidents must, at minimum, be similar to the Clean Water Act (CWA) violation being penalized. The plain language and the statutory structure of Section 311 of the CWA also make clear that the Court should only consider CWA violations by the alleged violator, which here is BPXP.

BPXP is filing this renewed motion now, rather than waiting until the deadline for filing motions *in limine*, because expert reports have been filed and the issue is ripe. Resolution of this matter not only has the potential to avoid three expert depositions, but will have a substantial effect on the scope of trial. And adjudicating these issues now will allow the parties to plan accordingly for a trial limited to 90 hours and avoid unnecessary expenditure of significant time

and resources if this motion is granted. Accordingly, for the reasons explained below, the Court should strike the Cantrell reports and exclude all evidence relating to the four prior incidents.

## BACKGROUND

The U.S. seeks to introduce evidence relating to the following four prior incidents, none of which involved BPXP or deepwater drilling.

*Endicott Island*. Endicott Island consists of two man-made islands in the Beaufort Sea, off the northern shore of Alaska. In the 1990s, BP Exploration (Alaska) Inc. was the majority owner and operator of Endicott Island and employed one drilling rig that was provided and operated by a contractor, Doyon Drilling, Inc. During the mid-1990s, Doyon Drilling engaged in illegal waste disposal practices at Endicott Island. BP Exploration (Alaska) Inc. first received allegations of Doyon Drilling's conduct on August 31, 1995, and immediately began an investigation. Two weeks later, on September 13, 1995, BP Exploration (Alaska) Inc. notified government authorities. In 1999, BP Exploration (Alaska) Inc. pled guilty to one count of failing to immediately report the release, in violation of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA).

*Grangemouth*. In May and June 2000, the Grangemouth refinery and chemical plant in Scotland experienced a series of incidents over a two-week period: a power distribution failure and subsequent plant shutdown; a steam line leak; and a hydrocarbon fire from a vessel. The incidents resulted in no serious injury and only short-term environmental impact. BP Chemicals Ltd. and BP Oil Grangemouth Refinery Ltd. pled guilty to two charges relating to the steam main rupture and fire incidents and paid fines totaling £1 million to the UK government.

*Texas City*. On March 23, 2005, there was an explosion and fire at the Texas City refinery that resulted in 15 casualties and numerous injuries. The explosion and fire occurred

during the restart of an isomerization unit when hydrocarbons were released into the atmosphere and ignited. BP Products North America Inc. pled guilty to violations of the Clean Air Act.

*Prudhoe Bay*. The Prudhoe Bay incident took place in the Greater Prudhoe Bay exploration and production area in Alaska, which includes over 1,500 miles of pipeline, located 200 miles north of the Arctic Circle. In March 2006, pipeline corrosion caused a leak from an oil transit line, releasing approximately 5,000 barrels of crude oil. As a result of the release, BP Exploration (Alaska) Inc. pled guilty to one count of violating the CWA.

## ARGUMENT

The Cantrell reports and the four prior incidents they discuss should be excluded from evidence at the Penalty Phase trial because: (1) in opining as to the causes of the prior incidents and the alleged similarities between those causes to the causes of the *Deepwater Horizon* incident, the Cantrell reports repeat the evidence from Phase 1 and address issues on which this Court already has ruled; (2) permitting evidence of the four prior incidents, including Cantrell's opinions as to the causes of those incidents and BP's alleged failure to learn following each incident, will result in "mini-trials" relating to the facts and causes of each incident; and (3) the four prior incidents are vastly different from the *Deepwater Horizon* incident and are not relevant to the amount of the penalty to be paid by BPXP, which is the only defendant and alleged CWA violator in this proceeding.

**I.   THE CANTRELL REPORTS REVISIT PHASE 1 ISSUES THE COURT HAS ALREADY DETERMINED AND WILL NECESSARILY REQUIRE THE PARTIES TO REHASH THE PHASE 1 RECORD.**

Cantrell opines that the prior incidents were each caused by the same "common failures" and that BP failed to improve its process safety management system after those incidents:

> I then compared the common failures among the incidents with the evidence introduced in Phase I regarding the causes of the Macondo blowout. This comparison demonstrates that BP leadership did not learn key lessons necessary

4

> for responsible, safe and reliable operations, failed to create a safety culture, and failed to implement an effective process safety system.

Ex. B, Cantrell Rpt. at 4.  According to Cantrell, BP's "failure to learn" resulted in a deficient process safety management system that ultimately caused the *Deepwater Horizon* incident:  "BP leadership failed to create a safety culture and implement an effective process safety system which led to violations of other basic process safety principles discussed below and ultimately the blowout at Macondo."  *Id.* at 55.

Cantrell's central causation opinion runs counter to the Court's own finding—that BP's process safety management system was ***not*** a cause of the *Deepwater Horizon* incident.  Rec. Doc. 13355 at ¶¶ 467-469.  Having reviewed the extensive significant evidence and testimony regarding process safety that was presented during the Phase 1 trial, the Court found that "BP had a process safety management system in place on April 20, 2010 and that it applied to the Macondo well and the DEEPWATER HORIZON" and that "the evidence has not shown that it was defective or a cause of the blowout, explosion, and fire."  *Id.* at ¶ 469.

It is well within the Court's discretion to exclude such cumulative evidence, particularly where the Court has already ruled on the issue in dispute.  *Lirette v. Popich Bros. Water Transp., Inc.*, 660 F.2d 142, 145 (5th Cir. 1981) ("It is within the trial court's discretion to exclude cumulative evidence."); *see also United States v. Arledge*, 553 F.3d 881, 894 (5th Cir. 2008) ("The district court is permitted to exclude evidence that is cumulative of evidence already in the record."); *French v. Allstate Indem. Co.*, 637 F.3d 571, 578 (5th Cir. 2011) (affirming exclusion of testimony on the "same subject" as prior evidence as cumulative).

    **A.**    **The Cantrell Reports are an impermissible attempt by the U.S. to retry its Phase 1 process safety arguments.**

At their core, the Cantrell reports offer a causation opinion:  "The BP investigations for Grangemouth, Texas City, and Prudhoe Bay, as well as evidence related to the Macondo

incident, show that the four accidents resulted from similar process safety failings." Ex. B, Cantrell Rpt. at 15. As such, the reports necessarily rehash evidence relating to Phase 1, which addressed the parties' conduct and the causes of the spill. *See* Rec. Doc. 6592 (Second Am. Pretrial Order No. 41) at 2.

Process safety was not an issue that was glossed over in Phase 1, but was instead an issue upon which the Court heard "much evidence and testimony at trial . . . ." Rec. Doc. 13355 at ¶ 467. Cantrell acknowledges the cumulative nature of his opinions but attempts to side-step the issue by purporting to "summarize" the Phase 1 evidence. Cantrell's "summary" of the Phase 1 evidence addresses a wide variety of alleged failures, all of which relate to BP's conduct and were allegedly caused by BP's deficient process safety system. These include issues pertaining to cementing, spacer, drilling margin, and the BOP, to name just a few.

The following excerpt from Cantrell's initial report is illustrative of his focus on issues that were litigated extensively during Phase 1 and on which the Court has now ruled:

> Macondo was no different than these prior incidents. BP failed to comply with its DWOP, Engineering Technical Practices and industry best practices for critical operations.[155] Examples where BP did not adhere to practices include, but are not limited to:[xlviii]
>
> - Failing to ensure the "BOP [was] capable of shearing and sealing on the main strings of drill pipe"[156] and that limitations on shearing capacity must be risk assessed and addressed;[157]
>
> - Failing to ensure that the top of cement was determined by a "proven cement evaluation technique";[158]
>
> - Failing to prepare a well control bridging document;[159] and
>
> - Failing to perform a management of change[xlix] analysis prior to reducing the number of centralizers[160] or making changes to the temporary abandonment procedures.[161]

6

Ex. B, Cantrell Rpt. at 28.  Cantrell's reply report likewise discusses a litany of heavily litigated issues from Phase 1, including drilling margin, float collar conversion, running a cement bond log, performing a bottoms up, zonal isolation, simultaneous operations, the number of centralizers, and the negative pressure test.  Ex. C, Cantrell Reply Rpt. at 6-7.

The cumulative nature of Cantrell's reports is further underscored by his use of and reliance on documents and other evidence admitted during the Phase 1 trial.  Cantrell's initial report, including its Appendix 1, cites to 169 unique exhibits from Phase 1 (cited a total of 582 times) and the testimony of 96 witnesses from Phase 1 (cited a total of 244 times).  His 15-page reply report includes over 100 citations to the Court's Phase 1 Findings of Fact as well as numerous references to Phase 1 testimony, such as two pages of single-spaced quotations from Jonathan Sprague's Phase 1 deposition testimony relating to BP's Recommended Practice for Cement Design and Operations.  Ex. C, Cantrell Reply Rpt. at 12-13.

Far from a mere "summary" of the Phase 1 evidence, the Cantrell reports serve as a platform from which the U.S. seeks to rehash and relitigate its Phase 1 process safety arguments.  Cantrell's one-sided presentation of the Phase 1 evidence is a stark indication of this intent, but even more telling is Cantrell's adoption and restatement of the U.S.'s Phase 1 Proposed Findings of Fact and Conclusions of Law, sometimes verbatim.  Several such instances are noted in this table, comparing several of the Phase 1 opinions in Cantrell's initial report to the U.S.'s proposed Phase 1 findings:

| **Cantrell Report (Ex. B)** | **U.S. Phase 1 Proposed Findings of Fact (Rec. Doc. 10460)** |
|---|---|
| "These maintenance failures were serious breaches of safety that put the rig at risk." (p. 32) | "These maintenance failures were serious breaches of safety that put the rig at risk." (¶295) |

7

| | |
|---|---|
| "Within the two years preceding the Macondo Well blowout, BP twice reorganized the corporate structure it would use to lead and manage the construction of the Macondo Well (Drilling and Completions' Exploration and Appraisal group) – once in April 2008 and again in April 2010, just before the blowout. As part of the April 2010 reorganization, a number of BP managers and specialists responsible for the Macondo Well construction changed jobs or saw changes in their lines of reporting."  (p. 66) | "Within the two years preceding the Macondo Well blowout, BP twice reorganized the corporate structure it would use to lead and manage the construction of the Macondo Well (Drilling and Completions' Exploration and Appraisal group) – once in April 2008 and again in April 2010, just before the blowout. As part of the April 2010 reorganization, a number of BP managers and specialists responsible for the Macondo Well construction changed jobs or saw changes in their lines of reporting . . ." (¶21) |
| "Process safety differs from personal safety. Process safety relates to hazards that can cause or contribute to "major accidents," whereas personal safety focuses on preventing injuries to individuals from slips, trips, and falls and is more synonymous with occupational safety." (p. 10) | "Process safety also differs from personal safety. Whereas personal safety focuses on preventing injuries to individuals from slips, trips, and falls and is more synonymous with occupational safety, process safety relates to hazards that can cause or contribute to 'major accidents.'" (¶338) |
| "The impacts of process safety risks are different from, and do not include, operational impacts such as cost overruns or failure to deliver a well on schedule." (p. 10) | "Process safety impacts do not include operational impacts such as cost overruns or failure to deliver a well on schedule." (¶337) |
| "In the midst of drilling the Macondo Well, David Sims became Wells Team Leader, Guide's immediate supervisor, just weeks before the explosion and fire on the *Deepwater Horizon*."  (p. 66) | "…in the midst of drilling the Macondo Well, David Sims became Wells Team Leader Guide's immediate boss in early March 2010, just weeks before the explosion and fire on the *Deepwater Horizon*." (¶24) |

The Court spent significant time and resources deciding the Phase 1 causation issues.  As the Court is well aware, the Phase 1 trial lasted 29 trial days and included live testimony from 39 witnesses, video deposition testimony from 26 other witnesses, and 199 witnesses who testified via deposition bundle—a total of 264 witnesses.  The Phase 1 trial transcript was nearly 10,000 pages, and over 7,000 items were admitted into evidence.  As a result of these efforts, the Court has addressed issues relating to cement, drilling margin, the BOP, and other contested causation topics, and has specifically found that BP's process safety management system was not a cause

of the blowout, explosion and fire. Rec. Doc. 13355 at ¶¶ 467-69. There is no need, or reason, for the Court to permit the U.S. to have a second bite at that apple now.

### B. To rebut Cantrell, BPXP will be entitled to cross-examine and re-introduce its own evidence from Phase 1 regarding causation, which Cantrell ignores.

If the Court permits the U.S. to introduce the Cantrell reports, BPXP will be entitled to cross-examine Cantrell. While BPXP has no interest in revisiting the Phase 1 record on process safety, Cantrell's reports reflect a one-sided reliance on Phase 1 evidence and fail to consider any Phase 1 evidence that is contrary to his causation opinion. Accordingly, any cross-examination will necessarily require revisiting the Phase 1 record.

The Cantrell reports rely extensively on the Phase 1 expert reports of several parties other than BPXP, and the result is an unbalanced view with respect to process safety. This is particularly true with respect to Cantrell's reliance on the Phase 1 expert report of Dr. Bea, which Cantrell cites a total of 86 times. Likewise, Cantrell relies heavily on other expert reports from parties that were adverse to BPXP during Phase 1. For example, Cantrell cites to HESI's well design, monitoring and control expert, Gene Beck, a total of 49 times; to the U.S.'s cementing expert, Glen Benge, a total of 38 times; and to Transocean's well design, monitoring and control expert, Calvin Barnhill, a total of 20 times. Notably, in his purported "summary" of the Phase 1 evidence, Cantrell does not cite to or even acknowledge a single BP expert.

Unsurprisingly, Cantrell's failure to review the complete relevant record leads to patent mistakes within his report. For example, according to Cantrell, "Testimony indicates that within BP's GoM SPU, Hayward's Forward Agenda created 'tremendous' and 'incredible' cost reduction pressures (incentives) to cut hundreds of million dollars in annual costs. Indeed, during 2008-2009, GoM shed $250 to $300 million in costs." Ex. B, Cantrell Rpt. at 56 (citing Bea Report and other documents). While it is true that costs were reduced by approximately

9

$250 million between 2008 and 2009, had Cantrell reviewed and summarized the complete record, he would have acknowledged the undisputed evidence that these cost reductions were the result of completed repairs to the Thunder Horse platform and reduced corporate overhead expenses and deflation, and that the reductions had nothing to do with safety.[1] This is just one of many examples of Cantrell's blind and incorrect reliance on Phase 1 experts such as Dr. Bea.

Given the unbalanced, incomplete, and incorrect nature of Cantrell's reliance on Phase 1 causation issues, BPXP will need to present substantial evidence not only to correct Cantrell's mistakes, but also to provide context for the other experts' statements upon which Cantrell so heavily relies. For example, Cantrell cites to Dr. Bea over 80 times, but fails to acknowledge Dr. Bea's numerous trial admissions acknowledging BP's efforts to enhance its process safety management system in the years leading up to the *Deepwater Horizon* incident, including, for example, BP's development of a new Operating Management System (OMS) following the Texas City incident. *See* Phase 1 Trial Tr. at 373, 396 (Dr. Bea acknowledging that BP took positive steps between 2005 and 2010 to improve its process safety management system and that BP committed significant resources and personnel to improving its process safety regime).

If Cantrell's reports are not excluded, BPXP will be forced to reintroduce evidence and cross-examine Cantrell on all of these key points, utilizing all of the other experts' admissions, on issues that this Court has already decided.

## II. THE CANTRELL REPORTS CONFIRM THAT PERMITTING EVIDENCE OF UNRELATED PRIOR VIOLATIONS WILL RESULT IN UNNECESSARY "MINI-TRIALS."

In its Phase 1 ruling on BP's motion to exclude evidence of past incidents, the Court recognized that allowing such evidence posed "a real danger of creating a 'trial within a trial.'"

---

[1] Phase 1 Trial Tr. 8085-8087 (Shaw); TREX-005689.8.13.BP; Phase 1 Trial Tr. 489-91 (Bea); TREX-048250.36.1.BP; Suttles Dep. at 844.

Rec. Doc. 5634 at 5. While the Court's previous Order was focused on the Phase 1 trial, the concerns the Court identified remain present and are equally relevant in the context of the Penalty Phase. If the U.S. is permitted to introduce evidence concerning prior incidents that are entirely unrelated to the *Deepwater Horizon* incident, BPXP will be entitled to rebut the U.S.'s assertions and characterizations and present its own evidence concerning each of the incidents, resulting in the very "trials within a trial" this Court has sought to avoid.

Cantrell's sweeping claims about BP's failure to learn after these prior incidents are based almost exclusively on his review of one category of evidence: BP's post-incident investigation reports. Ex. B, Cantrell Rpt. at 4 ("In arriving at my opinions, I evaluated BP's investigations and reports on Grangemouth, Texas City, and Prudhoe Bay against basic process safety principles and identified fundamental common failures.") In response, BPXP will be compelled to present substantial evidence to refute the government's assertions relating to each of the four prior incidents—events that occurred over a 15-year period. BPXP will need to respond to Cantrell's description of each incident by introducing evidence regarding the circumstances of each incident, the efforts to learn and share lessons from each incident, the extensive improvements and follow-up to each incident, and the many specific post-incident initiatives, programs, and policies that the Cantrell reports fail to acknowledge.

At trial, in addition to cross-examining Rear Admiral Cantrell, BPXP will present this evidence through its own witnesses. Because the Cantrell reports address alleged deficiencies in BP's safety culture and in its process safety management system, often interchangeably,[2] BPXP has disclosed experts in each of those two fields: Dr. Kathleen Sutcliffe (safety culture) and Mr.

---

[2] *See,* for example, Ex. B, Cantrell Rpt. at 4: "This comparison demonstrates that BP leadership did not learn key lessons necessary for responsible, safe and reliable operations, failed to create a safety culture, and failed to implement an effective process safety system."

11

Morris Burch (process safety management). Dr. Sutcliffe and Mr. Burch have each served rebuttal reports and are scheduled to be deposed on October 17 and 30, respectively.

In addition, the Cantrell reports cite and rely on the annual reports and deposition testimony of L. Duane Wilson, the Independent Expert who monitored BP's implementation of the Baker Panel recommendations following the Texas City incident. As part of his comprehensive monitoring, Mr. Wilson submitted five annual reports, covering 2007 to 2011. In each of his reports, Mr. Wilson's overall conclusion was that BP was making considerable progress in its implementation of the Baker Panel recommendations. *See, e.g.*, TREX-045045 at 5 ("In the three years since the Report was published BP has made significant improvements in response to all ten Recommendations.") The Cantrell reports, however, completely ignore Wilson's numerous statements regarding BP's progress in implementing the Baker Panel's recommendations. Mr. Wilson has been deposed and is on BP's Rule 26(a) witness disclosures.

Cantrell's limited review of the evidence, compared to the complete record, confirms that allowing his report into evidence will result in mini-trials about each incident, additional trial witnesses, and the introduction of a substantial amount of evidence rebutting Cantrell's opinions.

### III. UNRELATED INCIDENTS THAT ARE NOT SIMILAR TO THE *DEEPWATER HORIZON* INCIDENT SHOULD NOT BE CONSIDERED.

#### A. Under the Prior Violations factor, only similar incidents are relevant and may be considered.

The CWA enumerates eight factors the Court shall consider in assessing civil penalties for violations of Section 311 of the Act, including "any history of prior violations." 33 U.S.C. § 1321(b)(8). Although the limited case law under Section 311 does not provide substantive guidance on the precise scope of the "history of prior violations" factor, cases interpreting an analogous "history of such violations" factor under Section 309 of the CWA demonstrate that, to be relevant, the prior violations or incidents must be similar to the violation being penalized. *See*

12

33 U.S.C. § 1319(d); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 864 (S.D. Miss. 1998) (considering whether defendants have committed similar violations in the past); *United States v. Scruggs*, 2009 WL 500608, at *5 (S.D. Tex. Feb. 26, 2009) (same); *United States v. Bedford*, 2009 WL 1491224, at *17 (E.D. Va. May 22, 2009) (same).

In ruling on BPXP's initial motion before the Phase 1 trial, the Court held that incidents such as Grangemouth, Prudhoe Bay, and Texas City were too unrelated and dissimilar to the *Deepwater Horizon* incident to be relevant. Rec. Doc. 5634 at 3-5 (noting that the parties seeking to introduce such evidence "failed to demonstrate any substantial similarity between the prior incidents and the Macondo casualty"). In examining the differences between the prior incidents and the *Deepwater Horizon* incident, the Court found that Grangemouth, Texas City, and Prudhoe Bay were "remote in time," "all land-based," and that "the circumstances of oil refinery disasters and a MODU exploratory drilling disaster are vastly different." *Id.* at 5. The lack of similarity and relevance of the prior incidents is equally applicable in the Penalty Phase.

## B. Only Section 311 violations committed by the violator should be considered.

In evaluating the "prior violations" factor, the plain text of the statute and the statutory context make clear that the Court should only consider Section 311 violations that were committed by BPXP. *First,* the term "violations" in "history of prior violations" can only mean violations of Section 311. This logical reading is supported by the statutory context surrounding every use of the term "violation" in Section 311, which makes clear that "violation" refers to a violation of Section 311 or regulations promulgated under Section 311, not some other provision or statute. *See* BPXP's initial Motion *In Limine*, Rec. Doc. 12347, at 11-14. The EPA's own penalty policy provides further support for this logical interpretation, outlining the type of violations the EPA should consider under the "history of prior violations" factor and discussing

only violations that relate to Section 311 spills.[3] *Id*. at 14. Contrary to the U.S.'s view, remote-in-time violations of unrelated statutes, at other facilities, involved in different operations, is not a logical interpretation of "violations" in light of the statutory context.

*Second,* Section 311(b)(8) demonstrates that only prior violations by the alleged violator should be considered by the Court in assessing a penalty. *See id.* at 14-15. While the "prior violations" factor does not expressly include the phrase "by the violator," such a reading is the only reasonable and most logical interpretation. In the context of Section 311(b)(8), the penalty assessed does not depend merely on the severity and effect of the spill, but on considerations specific to the particular CWA defendant, i.e. the particular party responsible for the discharge giving rise to the CWA violation. Here, the only named defendant is BPXP, and thus "prior violations" by other BP entities are not relevant.

### C. Each of the four prior incidents discussed by Rear Admiral Cantrell is very different from the *Deepwater Horizon* incident.

Even a cursory review of the four prior incidents discussed in Cantrell's reports reveals the numerous and significant differences between these incidents. The incidents are remote in time and involved different entities, different locations, different types of facilities and operations, and different types of violations. None of the four prior incidents in question involved BPXP or deepwater drilling, and only one of the four prior incidents (the pipeline leak in Prudhoe Bay) involved a CWA violation.

The Cantrell reports attempt to overcome these obvious dissimilarities by contending that similar process safety failures caused the prior incidents and the *Deepwater Horizon* incident. The Government made this same argument in Phase 1: "The PSC and the Government argue

---

[3] The EPA's penalty policy also recognizes the irrelevance of incidents that are remote in time, only considering "violations *within the past five years*." Office of Enforcement and Compliance Assurance, Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean Water Act (CWA) (1998) at 10 (emphasis added).

14

that the similarity between prior incidents and Macondo is that they are all large-scale, process-safety caused industrial accidents." Rec. Doc. 5634 at 5. The Court disagreed, finding the argument to be "an over-generalization." *Id.* (noting that "the specific process safety failures at a refinery are different from those on a MODU").

Indeed, Cantrell's opinion that the prior incidents resulted from similar "causes" is unremarkable at best. As Cantrell himself observes, for all major accidents, "'[t]he causes are remarkably similar….'" Ex. B, Cantrell Rpt. at 10 (citing TREX-006026). Even if Cantrell were right, the existence of certain generic similarities present in all major accidents does not mean that the causes of the four prior incidents are similar to each other or to the causes of the *Deepwater Horizon* incident, particularly in light of this Court's finding that BP's process safety management system was not a cause of the *Deepwater Horizon* incident.

In any event, as discussed above, Cantrell's opinions regarding the similarities between the causes of the prior incidents and the causes of the *Deepwater Horizon* incident necessarily rely on and therefore require revisiting disputed issues from Phase 1 which the Court has since decided, as well as requiring mini-trials on the causes of each of the four prior incidents.

## **CONCLUSION**

The Cantrell reports and their discussion of four unrelated incidents dating back to the mid-1990s are cumulative, contrary to the Court's ruling on the adequacy of BP's process safety management system, and legally irrelevant. Resolving this issue now will allow the parties to complete expert discovery and efficiently plan for a 90-hour trial, and save significant time and effort if this motion is granted. Accordingly, for the reasons discussed in this renewed motion and in BP's initial motion, the Court should strike the expert reports of Walter H. Cantrell and exclude all evidence relating to the prior incidents discussed in the reports.

15

Date: October 7, 2014                        Respectfully submitted,

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Scott W. Fowkes, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of October, 2014.

/s/ Don K. Haycraft
Don K. Haycraft