**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179** |
| This Document Relates to: | **SECTION: J** |
| No. 12-970 | **JUDGE BARBIER** |
| | **MAGISTRATE SHUSHAN** |

**CLASS COUNSEL'S RESPONSE TO**
**BP'S MOTION TO REMOVE THE CLAIMS ADMINISTRATOR**

Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class, through undersigned appointed Class Counsel and the duly appointed Class Representatives, respectfully submit the following response to BP's Motion to Remove the Claims Administrator [Doc 13347]:

**MAY IT PLEASE THE COURT:**

Class Counsel respectfully submit this Memorandum and the associated Exhibits in order to provide a more complete factual record to the Court.  For example, Class Counsel respectfully note that:

- The Program Vendors were nominated by BP and approved by the Court without any input, involvement or approval by the Claims Administrator.  BrownGreer, Garden City and PriceWaterhouse Coopers had all been providing services to BP for over 18 months in the administration of BP's Gulf Coast Claims Facility before the Settlement Agreement was executed. BP participated in the negotiations with these Program Vendors, and formally approved the final vendor contracts setting forth their terms and rates.  BP was also provided with all Program Vendor invoices prior to payment.

- It is Class Counsel's recollection that BP was aware of Mr. Juneau's prior consultation with the State of Louisiana at the time he was interviewed and nominated for appointment by BP.

- The State of Louisiana is not a party to the *Bon Secour* action, and is unambiguously excluded from the Economic & Property Damages Settlement Class.

- The State of Louisiana actually objected to approval of the Economic & Property Damages Settlement Class.

- It is Class Counsel's recollection that the Claims Administrator did not "deviate" from the terms of the Settlement in favor of Class Members.

- Indeed, with respect to the Business Economic Loss Documentation provisions contained within Exhibit 4A – as well as several other key interpretations – the Claims Administrator has sided with BP.

- With respect to Seafood Program Documentation, BP agreed in October of 2012 and again in May of 2013 that Claimants establishing Benchmark revenues with Tax Returns would be able to use Sworn Written Statements to allocate among multiple catch types and/or vessels, and that the Settlement Program would not attempt to obtain, enter or compute all available Trip Ticket data.

- The Claims Administrator, on his own initiative, obtained an operational audit of the Settlement Program, which concluded that Claims were being processed correctly, transparently and efficiently.

- Special Master Freeh concluded that the Claims Administrator set an ethical tone at the top, that there was no evidence that anyone within the Program had manipulated the valuation of any Claim, and that nothing contained within the Report should prevent the Program from continuing to fairly and efficiently process and pay legitimate claims.

- BP, along with the Freeh Group, have actively participated in the development, review and approval of the Administrative Budget and expenditures for over a year.  And:

- BP has consistently urged the Claims Administrator and the Special Master to engage in more exhaustive, intrusive, burdensome, time-consuming, and expensive analysis, review, investigation, and evaluation of Claims.

Preliminarily, however, it seems appropriate to address a fundamental and recurring mischaracterization of the Settlement and Trust Agreement by the BP Defendants:  Namely, that

BP is *not* a trust beneficiary.  BP is the settlor.  The members of the plaintiff class are the beneficiaries. *See* SETTLEMENT AGREEMENT, Section 4.3.1 ("The Claims Administrator shall … faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class").[1]   The Claims Administrator and Trustee owes BP no broad fiduciary duties, as are owed to Class Members.   Rather, the Trust Agreement expressly enumerates what is owed by the Claims Administrator and Trustee to BP:  **(i)** to generically "report" and "provide information" to the Court, BP and Lead Class Counsel, as may be requested "and/or as the Court directs";[2]  **(ii)** to ensure that BP has the right, under the Program Vendor contracts, to "receive invoices submitted by Claims Administration Vendors and subcontractors" with a reasonable amount of time to raise concerns or objections prior to payment;[3]  and **(iii)** to provide a monthly Administrative Expense Report "in such detail as the BP Parties may *reasonably* request and a reconciliation of such payments in comparison to the

---

[1] *See also, generally,* CLASS COUNSEL MASTER *AMICUS* TO THE SETTLEMENT PROGRAM APPEAL PANELISTS (July 16, 2014), pp.1-2 ("In the traditional litigation context, the rules are designed, and courts strive, to ensure that there is a level playing field, with plaintiffs and defendants provided with the same respective procedural and evidentiary opportunities.  This, however, is a settlement; not litigation.  BP, with the exception of very limited and specifically enumerated rights and reservations, has agreed to *settle* these claims.   Both substantively and procedurally, the Settlement Agreement is intentionally drawn and designed to place the Parties on decidedly *unequal* footing.  The playing field established by and under this Settlement Agreement was never intended to be 'even'"); *citing* SETTLEMENT AGREEMENT, Sections 4.3.1 (*supra*), 4.3.7 ("The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement"), SECTION 4.3.8 ("The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the *greatest* Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework") (emphasis supplied), and SECTION 6.1 ("Subject to and in accordance with Sections 4.3.7 and 4.3.8, Economic Class Members will have up to three opportunities, depending on the circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence and adherence by the Settlement Program to the terms of this Agreement").

[2] *See* SETTLEMENT AGREEMENT, Section 4.3.2.

[3] SETTLEMENT AGREEMENT, Section 5.12.1.4.

Administrative Budget."[4]   Indeed, with respect to the fulfillment of both sets of duties, the Claims Administrator is expressly indemnified by BP.[5]

Contrary to BP's suggestions that the inner workings of the Settlement Program were intended to be "transparent" to either the public generally or even BP, the over-arching intent and agreement was that both the Compensation Frameworks and the individual Claim Determinations be transparent *to the members of the Class*.[6]   Indeed, with respect to individual Claims Determinations, BP expressly agreed that individual Claim-specific information would be treated as "confidential"[7] and that:

> BP … shall *not* have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal.[8]

The intent and agreement of the Parties was to ensure that BP would *not* have "transparency" into the evaluation and processing of Claims, in order to protect and advance the independence of the Claims Administrator and Program Vendors in fulfilling their obligations to the class beneficiaries.[9]   Rather, BP's rights were limited to the post-determination appeal of certain Claims under Section 6.1.2.4 of the Settlement Agreement.

With that background, Class Counsel respectfully provide the following additional factual information in response to BP's Motion:

---

[4] SETTLEMENT AGREEMENT, Section 5.12.1.4 (emphasis supplied).

[5] SETTLEMENT AGREEMENT, Section 4.3.11; *see also* SECTION 5.12.1.7.3.

[6] *See generally* MEMO IN SUPPORT OF MOTION TO PROTECT AND PRESERVE CONFIDENTIALITY [Doc 12413-1] p.8;  HERMAN E-MAIL TO CANTOR (Nov. 11, 2013) [Doc 12413-10].

[7] ORDER REGARDING THE CONFIDENTIALITY OF CLAIMS INFORMATION (June 29, 2012) [Doc 6822] ¶¶ 2, 4, 6; ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573] ¶4.

[8] SETTLEMENT AGREEMENT, Section 4.4.14, *and* ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573] ¶9 (emphasis supplied); *see also* ORDER (March 25, 2014) [Doc 12591] (granting Class Counsel's Motion to Protect and Preserve Claimant Confidentiality).

[9] *See, e.g.,* SECTION 6.1 ("*Economic Class Members* will have up to three opportunities … to have their Claims reconsidered and reviewed to assure accuracy, *transparency, independence* and adherence by the Settlement Program to the terms of this Agreement") (emphasis supplied).

## <u>TABLE OF CONTENTS</u>

Introduction   .   .   .   .   .   .   .   .   .   .   1

Table of Contents   .   .   .   .   .   .   .   .   .   5

Selection and Appointment of Program Vendors   .   .   .   .   .   6

Selection and Appointment of Mr. Juneau   .   .   .   .   .   .   7

The State of Louisiana and its Relation to the Settlement   .   .   .   .   8

Implementation of the Business License and Permit Requirements   .   .   .   9

Seafood Program Documentation   .   .   .   .   .   .   .   10

Other Significant Settlement Interpretations and Policies   .   .   .   .   11

Operational Process Audit   .   .   .   .   .   .   .   .   14

Freeh Report   .   .   .   .   .   .   .   .   .   16

BP's Access to and Participation in Budgetary and Administrative Matters .   .   17

BP's Statements Regarding the Claims Administrator   .   .   .   .   19

BP's Insistence on Administrative Expenditures and Inefficiencies .   .   .   21

List of Exhibits   .   .   .   .   .   .   .   .   .   28

Conclusion   .   .   .   .   .   .   .   .   .   29

Certificate of Service .   .   .   .   .   .   .   .   .   31

**Selection and Appointment of Program Vendors**

BP, not the Claims Administrator, selected and nominated BrownGreer, Garden City, and PwC to process and evaluate Court-Supervised Settlement Program Claims.  At the time the Settlement Agreement was signed in April of 2012, these companies had been working with BP for 18 months in the administration, evaluation and processing of BP's Gulf Coast Claims Facility claims.  BP was presumably familiar with these companies' IT systems, competence, billing practices, and efficiencies, when BP strongly encouraged Class Counsel to agree to utilize them as Program Vendors.  Despite Class Counsel's concerns about utilizing companies that had worked for BP and the GCCF, BP made a strong case that, because of these companies' existing tools, claims files, and familiarity with BP Oil Spill claims generally, such vendors would be able to transition into and thereafter administer the Court-Supervised Settlement Program quickly and efficiently.  Based largely on these considerations, the Parties agreed to use BrownGreer, as well as Garden City, Postlewaite & Netterville, and PwC, before Mr. Juneau was selected to serve as Claims Administrator;  Mr. Juneau had no input, involvement or approval of their selection, appointment or service as Program Vendors.[10]

Moreover, it is Class Counsel's understanding that BP was actively involved in the negotiations with these companies with respect to the services they would provide, and the rates at which they would be paid.  BP formally approved the contracts between the Claims Administrator and the Claims Administration Vendors.  BP received, and either implicitly or explicitly approved, all Program Vendor invoices prior to payment.[11]

---

[10] *See* HERMAN DECLARATION (Oct. 15, 2014) ¶¶5-6; *see also* SETTLEMENT AGREEMENT, Sections 4.2.2 and 4.3.5; ORDER CREATING TRANSITION PROCESS (March 8, 2012) [Doc 5988] ¶8.

[11] *See generally* CLASS COUNSEL'S RESPONSE TO BP'S OPPOSITION TO THE 4TH QUARTER BUDGET SUBMITTED BY THE CLAIMS ADMINISTRATOR (Sept. 17, 2013) [Doc 11402].

**Selection and Appointment of Mr. Juneau**

Consistent with BP Counsel's contemporaneous notes,[12] and putting aside for a moment the fact that Mr. Feinberg was acting as BP's counsel and agent in connection with his administration of BP's Gulf Coast Claims Facility,[13] it is Class Counsel's recollection that BP was aware of Mr. Juneau's prior consultation with the State of Louisiana at the time he was interviewed and nominated for appointment by BP.[14]  It was also Class Counsel's understanding and distinct impression that BP had meticulously looked into Mr. Juneau's background and vetted him, initially as a potential Settlement Program Appeal Panelist,[15] and then as a candidate for Claims Administrator and Trustee.[16]  BP, jointly with Class Counsel, and enthusiastically, selected and proposed that Mr. Juneau be appointed by the Court, as the sole nominee.[17]

---

[12] BP EXHIBIT 18.

[13] *See* ORDER AND REASONS (Feb. 2, 2011) [Doc 1098].

[14] ROY DECLARATION (Oct. 10, 2014) ¶¶ 4-7; HERMAN DECLARATION (Oct. 15, 2014) ¶ 8; FAYARD DECLARATION (Oct. 13, 2014) ¶¶ 4-10; CABRASER DECLARATION (Oct. 13, 2014) ¶¶ 4-6.

[15] FAYARD DECLARATION, ¶ 5.

[16] ROY DECLARATION, ¶ 7; FAYARD DECLARATION, ¶¶ 4, 8, 10; CABRASER DECLARATION, ¶ 6.

[17] ROY DECLARATION, ¶ 5; HERMAN DECLARATION, ¶ 8; FAYARD DECLARATION, ¶ 8; *see also* TRANSCRIPT (July 19, 2013) pp.28-29 (The Court: "The scenario that unfolded, as I recall, is that you all were going to initially come to me and propose three names from which I would select one.  Instead, in the end when it was presented to the Court, the motion to establish the transition program from the GCCF and set up the new DEEPWATER HORIZON Court Supervised Settlement Program, counsel for BP, BP and you all as interim class counsel at the time, or PSC, whichever role you were occupying at the time, came to me and said we've agreed, we want you to appoint Pat Juneau as the Claims Administrator. And that's what I did, I accepted your recommendation and appointed him").

**The State of Louisiana and its Relation to the Settlement**

The State of Louisiana is not a party to the *Bon Secour* action. Indeed, the State of Louisiana is unambiguously excluded from potential membership in the Settlement Class.[18]

Far from advocating for the rights of Claimants in the Settlement Program, the State of Louisiana filed an objection to the Court's approval of the *Deepwater Horizon* Economic & Property Damages Settlement.[19]

Even accepting *arguendo* BP's contentions, the alleged "conflict" that BP raises is merely an alleged "conflict" with the Settlor; BP points to no alleged conflict between the State of Louisiana and the trust Beneficiaries. *See, e.g.,* RESTATEMENT (SECOND) OF TRUSTS §200 ("No one except a beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust or to enjoin and obtain redress for a breach of trust"); Lewis v. Hanson, 36 Del. Ch. 235, 260, 128 A.2d 819, 835 (1957), *aff'd sub nom.* Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (the Trustee's primary duties are to the Beneficiaries and, in furtherance of these duties, must protect the corpus even from the Settlor); *see also* Bishop v. McNeil, 1999 WL 743489 at **18-19 (Del. Ch. Sept. 14, 1999); *citing,* RESTATEMENT (SECOND) OF TRUSTS §4 cmt. a (1959) ("The intention of the settlor which determines the terms of the trust is his intention at the time of the creation of the trust and not his subsequent intention"); RESTATEMENT (SECOND) OF TRUSTS §164 cmt. B (1959) ("The duties or powers of the trustee cannot be enlarged or diminished by a direction of the settlor given subsequent to the creation of the trust").

---

[18] *See* SETTLEMENT AGREEMENT, Section 2.2.5 (excluding Government Organizations from the Class Definition); SECTION 38.63 (excluding Government Organizations from the definition of "Entity"); SECTION 38.75 (defining Government Organization as "any state or local government"; "any agency, branch, commission, department, or unit of the government of … any state"; or "any Affiliate of, or any business or organization of any type that is owned in whole or at least 51% in part by the government of … any state … or any of [its] agencies, branches, commissions, departments, or units").

[19] *See* REC. DOC. 7345.

**Implementation of the Business License and Permit Requirements**

During the summer of 2012, Class Counsel became concerned about the apparent lack of progress in the determination and payment of Settlement Program Claims, particularly Business Economic Loss (BEL) Claims.   When these concerns were addressed with the Claims Administrator, Class Counsel were informed that many of the Claims were considered "incomplete" because the claiming entity had not provided a license or permit that had been deemed to be "required" by the Program.[20]

In further discussions with the Mr. Juneau, Orran Brown, and BP Counsel, it became clear that BP took the position, and Mr. Juneau agreed, that a claiming entity was required to submit any and all licenses or permits that might arguably apply to that business or its property under any law, regulation, or ordinance, even if such licenses or permits were not in fact required by the governing legal authorities for the operation of the claiming entity's business;  or, in other words, the Program was requiring the submission of documentation that in many cases simply did not exist.[21]

Class Counsel do not recall, during that meeting, that Mr. Juneau "advocated that BP waive the requirements."[22]   Rather, it is Class Counsel's recollection that Mr. Juneau sided with BP in interpreting and applying the terms of the Settlement Agreement in what Class Counsel considered to be an unduly restrictive and unintended way.[23]

It is possible that, during a follow-up meeting, Mr. Juneau might have suggested that unless BP agreed to 'waive' these alleged 'requirements', the Program "would be forced to issue

---

[20] ROY DECLARATION (Oct. 10, 2014) ¶ 8; HERMAN DECLARATION (Oct. 15, 2014) ¶ 10.

[21] ROY DECLARATION, ¶ 10; HERMAN DECLARATION, ¶ 11.

[22] HOLSTEIN DECLARATION (Sept. 2, 2014) [Doc 13347-15], p.7, ¶18.

[23] ROY DECLARATION, ¶ 9; HERMAN DECLARATION, ¶ 12.

a substantial number of deficiency notices, which would damage the public image of the CSSP and could impact the number of opt-outs to the Settlement Agreement" and that "BP's decision on this issue potentially could affect the Court's decision to grant final approval to the Settlement Agreement."[24]   However, Class Counsel believe that it was primarily Class Counsel who suggested that the then-existing interpretation and application of the Agreement might place the Settlement in jeopardy.[25]

In any event, and irrespective of what Mr. Juneau might have suggested, he continued to interpret and apply the terms of the Settlement Agreement as proposed and urged by BP.[26]

Class Counsel provided a Memo to the Claims Administrator on September 16, 2012, attempting to more formally articulate Class Counsel's position, and encouraging Mr. Juneau to implement the Settlement Agreement as Class Counsel intended, even without BP's consent on the issue.  Yet Mr. Juneau continued to enforce the documentation provisions as urged by BP.[27]

It was only after BP decided to formally 'waive' some of these documentation 'requirements' that Mr. Juneau allowed the claims to go forward.[28]

**Seafood Program Documentation**

By Letter from Mark Holstein to the Claims Administrator dated October 11, 2012, and again by Memorandum to the Claims Administrator dated May 23, 2013, BP agreed with the Claims Administrator's adoption of the Sworn Written Statement to allocate income reflected on

---

[24] HOLSTEIN DECLARATION, ¶19.

[25] ROY DECLARATION, ¶ 11; HERMAN DECLARATION, ¶ 13.

[26] ROY DECLARATION, ¶ 11; HERMAN DECLARATION, ¶ 13.

[27] ROY DECLARATION, ¶ 12; HERMAN DECLARATION, ¶ 14.

[28] ROY DECLARATION, ¶ 13; HERMAN DECLARATION, ¶ 15.

tax returns between and among multiple vessels and/or catch types,[29] acknowledging and agreeing that the Settlement Program would not attempt to obtain, enter or compute all available Trip Ticket data, but simply survey the available information for "material" "conflicts" within the Claim.[30]

**Other Significant Settlement Interpretations and Policies**

The Claims Administrator has issued a number of Policies to assist both Claimants and Program Vendors in the submission and evaluation of Settlement Program Claims.  Some of these Policies are simply administrative in nature.  Many of the other Policies are relatively straight-forward and uncontroversial; and, indeed, in numerous cases, BP Counsel and Class Counsel have formally agreed.[31]  In some cases, however, these Policies have addressed very significant issues with respect to the interpretation and/or application of the terms of the Settlement Agreement, which were subject to extensive discussion and debate between the Parties.  Mr. Juneau, with respect to many of the more significant issues, has interpreted and/or applied the Settlement Agreement in a way that has favored BP, over Class Counsel's objection. For example:

- The Claims Administrator initially allowed BP to access Claim- and Claimant-specific pre-Determination data, files and other information.[32]

---

[29] *See* CLAIMS ADMINISTRATOR MEMO (Oct. 8, 2012) No. 12.

[30] HERMAN DECLARATION (Oct. 15, 2014) ¶ 17.  With respect to the general incompleteness and unreliability of available Trip Ticket data, *see generally* CLASS COUNSEL MASTER *AMICUS,* at pp.6-9.

[31] Notably, despite BP's current Petition for *Certiorari* to the U.S. Supreme Court involving the October 2012 Causation Policy, that Policy was not debated or disputed among the Parties.  BP expressly agreed with the Claims Administrator's Policy on Causation, and, to this day, has never formally objected to the Policy or sought resolution by the Administrative Panel and/or the Court under Section 4.3.4 of the Settlement Agreement. *See generally* In re Deepwater Horizon, 744 F.3d 370, 374 (5th Cir. 2014); ORDER AND REASONS (Nov. 22, 2013) [Doc 11890] pp.4-7 and 10-11.

[32] This Policy was overruled by the Court on March 25, 2014. *See* ORDER [Doc 12591].

- The Claims Administrator agreed with BP that, under the two-step BEL Compensation analysis, a negative Step One calculation should offset a positive Step Two calculation.[33]

- The Claims Administrator agreed with BP that the owner or officer of a BEL Claimant cannot make an Individual Economic Loss (IEL) Claim for his or her own losses as a W-2 employee.[34]

- The Claims Administrator agreed with BP (even before the Fifth Circuit BEL Opinion and adoption of the new Matching Policy) that, where a BEL Claimant, in the ordinary course of business, maintained quarterly, annual or semi-annual financial statements, but not monthly profit & loss statements, in creating Monthly Profit & Loss statements for submission and processing under Exhibit 4, the BEL Claimant could not average monthly costs and/or expenses from the annual, quarterly or semi-annual reports.[35]

- The Claims Administrator agreed with BP (even before the Fifth Circuit BEL Opinion and adoption of the new Matching Policy) that a BEL Claimant who had kept its financials under an accrual method in the ordinary course of business could not re-state its experience to cash basis Monthly P&Ls, even if it was more favorable under Section 4.3.8.[36]

- The Claims Administrator agreed with BP to eliminate revenues from intra-company sales and other related party transactions.[37]

- The Claims Administrator agreed with BP that a Claiming Entity could not file a Multi-Facility or other BEL Claim with respect to revenues or facilities wholly owned and/or operated by the Claiming Entity through one or more wholly-owned subsidiaries.[38]

- The Claims Administrator agreed with BP that accrual-based claims, as well as cash basis claims, would be subject to the new Matching Policy.[39]

- The Claims Administrator dictated that properly recorded revenues, as well as expenses, would be "smoothed" and/or otherwise re-allocated and/or moved

---

[33] Policy No. 372.

[34] Former Policy No. 363.  (*But see* CLASS MASTER *AMICUS,* at pp.12-18.)

[35] *See* Claims Administrator's October 8, 2012 Policy Announcement, and Policy Nos. 355 and 464.

[36] *See* Claims Administrator's October 8, 2012 Policy Announcement, and Policy Nos. 355 and 464.

[37] Policy No. 328.  (*But see* CLASS MASTER *AMICUS,* at pp.12-14.)

[38] Former Policy Nos. 354, 490 and 503.  (*But see* CLASS MASTER *AMICUS,* at pp.12-14.)

[39] Policy No. 495. (*But see* MEMO TO ALTER OR AMEND APPROVAL OF MATCHING POLICY [Doc 12941-1] at pp.3-5.)

under the new Matching Policy, particularly under the Construction, Agricultural, Educational and Professional Services Methodologies.[40]

- The Claims Administrator has required Claimants attempting to satisfy the Customer Mix Test to submit documents that, in many cases, simply do not exist.[41]

- The Claims Administrator agreed with BP that a vessel owner with a Transitional MVCA would not qualify for VoO Charter Compensation.[42]

- The Claims Administrator has included requirements or limitations generally favorable to BP in connection with various Wetlands and Subsistence Claim Policies.[43]

In addition:

- The Claims Administrator has (as more fully discussed *infra*) continued to invite BP representatives to Business Process, IT, Fraud Waste & Abuse, Budget, Stakeholders' and other "Workstream" Meetings.

- The Claims Administrator has, thus far, (and despite Class Counsel's repeated requests and objections), declined to provide Claimants accused or suspected of alleged or potential "fraud" with notice and an opportunity to respond.

While Class Counsel continue to respectfully disagree with these interpretive practices and Policies,[44] they would seem to refute the notion that Mr. Juneau has acted with bias or partiality in favor of either the State of Louisiana or the Class, or against BP.[45]

---

[40] Policy No. 495.  (*But see* MEMO TO ALTER OR AMEND APPROVAL OF MATCHING POLICY, pp.5-10; *see also* CLASS MASTER *AMICUS,* pp.18-20 (Panelists Should Reject, Out of Hand, any BP Appeal Based on What a Bel Claimant Allegedly "Would Have Been Expected to Earn" or Other Vague and Alleged Notions of "Economic Reality").)

[41] *See* Policy No. 345 v.3 (April 21, 2014) ("The Claims Administrator has observed that it is difficult or even impossible for some claimants with BEL or Start-Up BEL claims to satisfy this test because they do not have documentation to establish the addresses/locations of their customers. This is particularly problematic for businesses that deal primarily in cash, which often do not maintain the type records specified in the above-referenced section of the Settlement Agreement. However, the Claims Administrator interprets the Settlement Agreement's documentation requirements as mandatory").

[42] Policy No. 348.

[43] *See, e.g.,* Policy Nos. 253, 316, 317, 442, 443 and 484.

[44] *See generally* CLASS COUNSEL MASTER *AMICUS* TO THE SETTLEMENT PROGRAM APPEAL PANELISTS (July 16, 2014); MEMO IN SUPPORT OF CLASS COUNSEL'S MOT TO ALTER OR AMEND ORDER ADOPTING MATCHING POLICY [No. 495] (May 27, 2014) [Doc 12941-1]; CLASS COUNSEL MEMO TO CLAIMS ADMINISTRATOR AND SPECIAL MASTER RE ALLEGED / POTENTIAL "FRAUD" INVESTIGATIONS (Oct. 6, 2014).

[45] *See, e.g.,* ROY DECLARATION ¶16; HERMAN DECLARATION ¶19.

**Operational Process Audit**

Although not required by the Settlement and Trust Agreement, Mr. Juneau, on his own initiative, engaged CliftonLarsonAllen (CLA) to conduct a three-part Process Audit. After confirming the absence of any conflicts of interest with both Parties, the Claims Administrator circulated the proposed scope of the operational audit, which was approved by BP.

The auditors initially found that "Key Strengths" associated with the Settlement Program under Mr. Juneau included:

- **Claims Paid in Accordance with Settlement Agreement**: The auditors found that "claims as a whole appear to be paid in accordance with the Settlement Agreement," with an exception rate of less than 2%.

- **Open Communication between the DHECC, the Court, the PSC and BP**

- **Claims Processing with Transparency**

- **Claims Processing with Due Process**

- **Consistent Application of the Settlement Agreement**

- **Quality Control:** The Settlement Program "uses formal disciplines in accordance with the International Standards for the Professional Practice of Internal Auditing Standards to conduct their reviews" which "ensure a consistent application and allow for timely and accurate reporting" and "is viewed as a leading practice."

- **Claims Processing Volumes:** From December 31, 2012 to March 31, 2013, there was an increase from 11,492 claims per month to 21,657 claims per month, demonstrating increasing efficiency.[46]

Having failed to enjoin the Settlement Program or successfully withhold funding for the 2013 Fourth Quarter Administrative Budget, BP objected to the completion of the CLA Audit, and demanded a second operational / process audit by a different auditor.

---

[46] The CLA Audit Report (previously provided by the Claims Administrator to the Parties and the Court) was admitted into evidence as Exhibit 4 during the Show Cause Hearing before Judge Shushan on Sept. 4, 2013.

Notably, neither the Settlement Agreement, not the Vendor Contracts, nor general trust principles, give BP the right to conduct an operational or process audit of the Court-Supervised Settlement Program.  The Settlement Agreement provisions cited by BP generically provide that: **(i)** the Claims Administrator shall "report" and "provide information" to the Court, BP and Lead Class Counsel, as may be requested "and/or as the Court directs";[47]  **(ii)** BP will have the right, under the contracts with the vendors, to "receive invoices submitted by Claims Administration Vendors and subcontractors" with a reasonable amount of time to raise concerns or objections prior to payment;[48]  and **(iii)** the Claims Administrator will provide a monthly Administrative Expense Report "in such detail as the BP Parties may *reasonably* request and a reconciliation of such payments in comparison to the Administrative Budget."[49]  Nowhere does the Agreement discuss the right of BP to conduct an operational audit, nor does BP contend that the Claims Administrator has ever failed to provide BP with a monthly Administrative Expense Report or a copy of a Vendor Invoice in advance of the invoice being paid.

The Vendor Contract provision previously referenced by BP simply gives the *Claims Administrator* the right to audit the vendor at issue.[50]  BP's right to audit the vendor is clearly vendor-specific and subject to "the approval of the Claims Administrator."[51]

Again, BP fundamentally overstates its standing as the mere settlor to a carefully negotiated and detailed trust, to be administered independently for the benefit of a defined class of beneficiaries.   Both the Claims Administrator and the Settlement Program serve at the

---

[47] *See* SETTLEMENT AGREEMENT, Section 4.3.2.

[48] SETTLEMENT AGREEMENT, Section 5.12.1.4.

[49] SETTLEMENT AGREEMENT, Section 5.12.1.4 (emphasis supplied).

[50] *See, e.g.,* BrownGreer Vendor Contract, §10.1.

[51] *See* BrownGreer Vendor Contract, §10.1 ("*with the approval of the Claims Administrator,* BP and its agents, accountants, consultants and advisors, shall have the right to review and/or audit Vendor….") (emphasis supplied).

direction of the Court.[52]   Neither the Claims Administrator nor the Settlement Program are BP contractors, divisions, or instrumentalities.

Nevertheless, the Claims Administrator agreed to engage a new firm to conduct a second process audit, as requested by BP.

**<u>Freeh Report</u>**

Summarizing the Freeh Report, the Court noted that:

> [T]he Special Master has not found any evidence that the Claims Administrator, Patrick Juneau, engaged in any conflict of interest, or unethical or improper conduct. The Special Master also did not find any evidence that Claims Administrator Office officials or employees manipulated the valuation of claims, although a comprehensive examination of this issue was not part of the Special Master's mandate. While the conduct of certain Claims Administrator Office employees and vendors described in the Report is problematic, the Special Master finds that should not prevent the CSSP from continuing to fairly and efficiently process and pay legitimate claims in a timely manner.[53]

Special Master Freeh specifically found that Mr. Juneau established a "clear ethical 'tone at the top' and sound written policies."[54]

Special Master Freeh also opined that the concerns regarding BrownGreer "should not prevent the DHECC from fairly and efficiently processing and paying honest and legitimate claims in a timely manner."[55]

---

[52] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.3.1, 4.3.2, and 5.12.1.4.

[53] ORDER (Sept. 6, 2013) [Doc 11288], p.2.

[54] SPECIAL MASTER FREEH'S REPORT (Sept. 6, 2013) [Doc 11287], p.8; *see also* FREEH REPORT, p.42 n.229 ("Mr. Welker is the CAO's Fraud, Waste, and Abuse Director. He joined Patrick Juneau's staff after a 33-year career in law enforcement, including 25 years of service with the Federal Bureau of Investigation. He retired from the FBI as Special Agent in Charge of the New Orleans Field Office").

[55] FREEH REPORT, p.6.  *See also* FREEH REPORT, p.8 (confirming that "Patrick Juneau continued to utilize the services of BrownGreer ('BG'), PricewaterhouseCoopers LLP ('PwC'), and the Garden City Group ('GCG'), which had been administering claims for the GCCF").

**BP's Access to and Participation in Budgetary and Administrative Matters**

Even prior the issuance of the Freeh Report, the challenge to the fourth quarter Administrative Budget, and the Fifth Circuit's BEL Opinion (effectively staying the processing and payment of Claims) during the Fall of 2013, BP had been afforded significant access to both budgetary and claims information, and had routinely approved the Administrative Budgets submitted by the Claims Administrator, as well as the Program Vendor invoices.

Since July 2012, the Settlement Program had provided BP with a Sharepoint file of exhaustive materials, including 'Administrative Expense and Budget' and 'Weekly Claim Status' and 'Weekly Claims Paid Appeal Process' reports – on a monthly, weekly, and in some cases even daily basis. These reports contain exhaustive information related to the administrative budget, vendor payment, and claims information.

In January or February of 2013, the Settlement Program arranged to increase BP's access to information thru an FTP site, enabling the transfer of large amounts of data. In one report alone, BP was being provided, at its request, with the following fields of information for each and every Claim: (1) Claimant ID; (2) Claim ID; (3) claim origination; (4) claim registration start date; (5) claim registration submit date; (6) claim form start date; (7) claim form submit date; (8) claim type; (9) taxpayer ID type; (10) previous GCCF claimant; (11) GCCF claimant ID; (12) previous VoO claimant; (13) active/inactive duplicate; (14) claim status; (15) last event; (16) claimant's state; (17) claimant's city; (18) claimant's zip code; (19) county/parish; (20) bankruptcy status, if any; (21) law firm name; (22) docket number; (23) short form joinder number; (24) plaintiff profile number; (25) claim zone; (26) city of loss; (27) state of loss; (28) zip code of loss; (29) employer; (30) amount claimed; (31) business name; (32) NAICS code; (33) NAICS description; (34) seafood type; (35) seafood species; (36) vessel type; (37) vessel

size; (38) wetlands oil on property; (39) wetlands physical damage; (40) coastal oil on property; (41) costal damage; (42) RTP; (43) 2010 losses; (44) type of causation test performed; (45) causation test result; (46) prior payment offset; (47) gross value; (48) offset amount; (49) final compensation award; (50) incompleteness reasons; (51) denial reasons; (52) reconsideration; (53) appeal; (54) release generated; (55) release accepted; (56) amount paid; and (57) potential 40% value.[56]

On or around October 2, 2013, Class Counsel learned that BP was using an electronic robot (or "bot") to "crawl" through the Program's IT system in order to extract Claim-specific data on a nightly basis.  In addition, Class Counsel were advised that BP had provided a list of approximately 700 claims to the Program *via* the Freeh Group which BP contended deserved some type of heightened or additional scrutiny.  Finally, in January of 2014, Class Counsel learned that BP had been meeting *ex parte* with BrownGreer on a weekly basis since (at least) the Fall of 2012 to discuss various data-related issues.[57]  Class Counsel filed a motion to reverse Mr. Juneau's BP-favorable interpretation of the Settlement Agreement with respect to Claimant- and Claim-specific pre-Determination data, which was granted,[58] and appealed to the U.S. Fifth Circuit by BP.[59]

In the meantime, following the dispute over the 2013 4Q Administrative Budget, Judge Shushan suggested that the Parties work with the Claims Administrator's staff and the Freeh Group to attempt to address some of the questions raised by BP.  These Budget Meetings have occurred at least monthly, with additional exchanges of information between the Program and

---

[56] There are additional data fields, which are not listed herein.

[57] *See generally* MEMO IN SUPPORT OF MOTION TO PROTECT AND PRESERVE CONFIDENTIALITY [Doc 12413-1] pp.5-11.

[58] *See* ORDER (March 25, 2014) [Doc 12591].

[59] *See* U.S. Fifth Circuit Appeal No. 14-30823.

BP.  For over a year now, BP, along with the Freeh Group, have actively participated in the development, review and approval of the Administrative Budget and expenditures.

**BP's Statements Regarding the Claims Administrator**

Putting aside, for a moment, BP's current Petition for *Certiorari* to the U.S. Supreme Court,[60] a BP representative was quoted by the press as stating that the Settlement Agreement had been "willfully misinterpreted."[61]  While the BP official was, to Class Counsel's knowledge, not an attorney, to the extent that Mr. Juneau might be acting in the capacity of an 'adjudicatory officer' or 'public legal officer' within the meaning of Professional Rule 8.2(a),[62] such statement could arguably be sanctionable.[63]

---

[60] One wonders how a party can tell a U.S. Court of Appeals that it is not seeking review of a settled issue (*see* Rec. Doc. 11826-2), and then turn around and attempt to seek reversal on that same issue from the U.S. Supreme Court?  Or how an appellee can seek *certiorari* to reverse approval of a settlement, despite its express agreement and warranty that it would "take all necessary actions to obtain final approval" and "support the final approval and implementation of the Agreement and to defend it against objection [and] appeal"? (*see* SECTIONS 16.1 and 17.1)  Yet, with respect to the Claims Administrator in particular, BP falsely suggests that the Claims Administrator, and the District Court, somehow "modified" and "expanded" the Settlement Agreement's causation requirements through "subsequent" "interpretation and implementation". *See* BP PETITION FOR *CERTIORARI,* No.14-123 at pp.11-12. ***But see:*** In re Deepwater Horizon, 744 F.3d 370, 374 (5th Cir. 2014); ORDER AND REASONS (Nov. 22, 2013) [Doc 11890] pp.4-7 and 10-11; APPELLEES' OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION, No.13-30315 (Nov. 22, 2013) [Fifth Cir. Doc. 00512450441] pp.7-34.

[61] Rob Davies "BP suffers revolt as executive pay packages are rejected by 32pc of investors" *MailOnline* (April 10, 2014) (http://www.dailymail.co.uk/money/markets/article-2601955/BP-suffers-revolt-executive-pay-packages-rejected-32pc-investors.html) (last visited Oct. 14, 2014).

[62] Professional Rule 8.2(a) provides that: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer."

[63] Such statement, if made by an attorney, could also arguably be sanctionable under PROFESSIONAL RULE 8.4(d) (conduct prejudicial to the administration of justice).  (*See also* PROFESSIONAL RULE 3.6(a) ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter")).

At the same time, BP grossly mischaracterizes the exchange between Mr. Juneau and Special Master Freeh.[64]   As mere background to approximately 120 pages of questioning regarding the Sutton incident, Mr. Juneau was asked the following:

Q.   There came a time when you were appointed the-court Claims Administrator for what's been referred to as the *Horizon* or the *BP* matter?

A.   I vividly remember all of that, yes. Interesting story behind all that.

Q.   Approximately when were you appointed, sir?

A.   I think that was in March, March or April. I don't have the exact order here, but I vividly remember how all that came about. I don't know if that's your question, but, I mean

Q.   I didn't ask you that, but, certainly, you can explain that.

A.   What happened, I was in my office in Lafayette, and I got a call. I think there was a lawyer from the PSC on the phone, and I think it was a lawyer from BP on the phone. I wasn't in that room, but I was in Lafayette. I think this was on a Thursday or something like that. They asked me could I come to New Orleans. There was a meeting about the *Deepwater Horizon.* Anybody that lives in the Gulf South knows those words, obviously know about the whole spill. They asked me to come over here. Now, I knew, from reading the newspaper – I didn't have any involvement in anything in the spill. I didn't represent any claimants in the spill, wasn't representing any defendants in the spill, had really had no connection with the spill per se. They asked me to come because they were considering some matters that had to do with some considerations of appointment. That's all I really knew.[65]

Mr. Juneau was not being asked about any prior connections to the Spill.  The precise 'question' to which Mr. Juneau was responding is: "I didn't ask you that, but, certainly, you can explain that."  When Mr. Juneau volunteered, truthfully, that he wasn't involved in the litigation, he was clearly referring to the time at which he was approached by the Parties in February or March of 2012.  Nowhere in this 130-page interview concerning the conduct of Lionel Sutton

---

[64] *See* BP Memo in Support of Motion to Remove Claims Administrator [Doc 13347-5] at pp.2, 8 and 17-19.

[65] Sworn Statement of Patrick A. Juneau (Aug. 1, 2013) (BP Exhibit 5) [Doc 12182-16] pp.7-8.

does Special Master Freeh exhibit any question, interest or concern regarding Mr. Juneau's potential consultation with the State of Louisiana or any other potential plaintiff, or defendant, in connection with the *Deepwater Horizon* tragedy.   The suggestions in BP's pleadings to the contrary are difficult to accept or defend.

To be clear, Class Counsel do *not* seek sanctions at this time.

Indeed, one must wonder, under the circumstances, whether the imposition of sanctions might be something consciously desired by BP? [66]

### BP's Insistence on Administrative Expenditures and Inefficiencies

In addition to the Budgetary Meetings which commenced in the Fall of 2013, the Claims Administrator, along with the Freeh Group, began to conduct weekly and/or monthly "workstream" meetings (over Class Counsel's continuing objections) with BP representatives and representatives of Co-Lead Class Counsel to address administrative, efficiency and process issues, including IT, Business, Fraud Waste & Abuse, and Stakeholders' Meetings – as well as the Administrative Panel Meetings associated with various Policy interpretation issues, including the development and implementation of the new Matching Policy.

Throughout these meetings, and in written submissions to the Claims Administrator, the Special Master, and others, BP has consistently and repeatedly urged the Program to conduct more exhaustive, intrusive, burdensome, time-consuming and expensive analysis, review,

---

[66] Having accused Mr. Juneau (and/or the Court) of "willfully misinterpreting" the Settlement Agreement, BP then seeks to remove Mr. Juneau based on his observation that such comment was inappropriate. *See* BP MEMO, at p.20.   Then, when the Phase One Findings and Conclusions were issued by this Honorable Court, BP appears to call into question this Court's impartiality. *See* "Statement on Gulf of Mexico" (Sept. 4, 2014) ("BP believes that an impartial view of the record does not support the erroneous conclusion reached by the District Court") (http://www.bp.com/en/global/corporate/press/press-releases/statement-on-gulf-of-mexico.html) (last visited Oct. 14, 2014).   Certainly a question must arise as to whether such outrageous and unfounded accusations are a purposefully calculated attempt to provoke a response from the Court, which response would, in turn, form the basis of some further motion practice?   In any event, Class Counsel respectfully ask the Court to refrain from imposing sanctions at this time, despite the potential presence of questions under Rule 11 and/or Professional Rules of Conduct 3.1, 3.3, 3.6(a), 8.2(a) and/or 8.4(d).

investigation, and evaluation of Claims.  Just a smattering of the almost infinite examples include the following:

- BP has, at least since the BEL Opinion,[67] consistently and repeatedly taken the position that the Program Accountants must: (i) screen *all* BEL claims for failure to record monthly revenues and corresponding variable expenses "accurately", using a proper accrual framework; (ii) define revenues in terms of "those enhancements of an entity's net assets which derive from earnings activities constituting its principal and ongoing business operations";  (iii) attribute monthly revenues in a manner consistent with "economic reality" based on those business operations that generate earnings; (iv) define corresponding variable expenses as "those actual or expected reductions in net assets that have occurred or will occur as a result of the entity's principal and ongoing business operations and, for any given month, were incurred to generate the revenues properly attributed to that month"; (v) **take into account all factual information known and reasonably available to the Settlement Program regarding revenues and corresponding variable expenses, including subsequently corrected financial data, so as to achieve results consistent with "economic reality" in the calculation of lost profits**; and (vi) calculate BEL lost profits so as to reflect "actual economic loss" during the selected Compensation Period."[68]

- Further, and along these same lines, BP has consistently and repeatedly (at least since the BEL Opinion) taken the position that the Claims Administrator is "required" to call for additional documentation necessary "to understand the underlying earnings activities in the Benchmark and Compensation Periods…. If, subsequent to the creation of P&Ls and other documents submitted in support of a claim, additional information comes to light that gives a more

---

[67] *See* LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-68], referenced and quoted in Footnote 68, *infra.*

[68] *See, e.g.,* BP'S PROPOSAL FOR MATCHING (Nov. 21, 2013) [Doc 11886] pp.2-3 (emphasis supplied). BP's current position is inconsistent with what BP told the Claims Administrator on Sept. 28, 2012: "One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's **contemporaneously-maintained financial data** submitted in compliance with documentation requirements.  These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements.  Among other reasons, **these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent…. The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements….** The BEL framework expressly requires monthly profit and loss statements or alternate source documents establishing monthly revenues and expenses.  These documents are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on **the actual monthly financial experience of claimants…. [U]se of allocated proxy rather than actual data could severely distort the resulting outcomes,** especially (but not limited to) in the tourism industry, which experiences substantial seasonal and monthly fluctuations in revenues and expenses." REC. DOC. 8963-68 (emphasis supplied); *see also* MEMO TO ALTER OR AMEND APPROVAL OF MATCHING POLICY, pp.5-10; CLASS MASTER *AMICUS,* pp.18-20.

accurate and complete picture of the underlying economic activities, the Settlement Program should take this information into account. The Settlement Program" BP contends, "should not only scrutinize claims submissions for errors and irregularities, but also request and examine additional source documents from the claimant (as well as other available information) in order to apply rigorously the principles discussed above." The Program Accountants, according to BP, are responsible for "identifying the underlying economic activities, not simply tracking the flow of cash." Which, according to BP, "inherently involves identification of the timing of the transaction – *i.e.*, when did the business engage in the activities that earned revenue and when did it incur the expenses for the business operations that gave rise to that revenue?"[69]

- BP repeatedly and consistently urges the Program Accountants, even prior to application of the Policy 495 general AVM or one of the Specialized Methodologies, to attempt to correctly match revenues and expenses "as a preliminary step to help achieve a realistic measure of historical economic performance." BP asks the Program Accountants to investigate "spikes" or other "irregularities" in the benchmark and compensation periods, including review of irregularities in monthly revenues. BP asks the Program to "comprehensively identify such circumstances" and to "adjust and restate the inputs to achieve proper matching consistent with economic reality."[70]

- BP takes the position that each Entity with a separate Tax ID Number must file its own separate and distinct Claim. A Claiming Entity cannot, according to BP, file a single claim for the Facilities it owns or operates through wholly-owned subsidiaries. At the same time, however, BP also takes the position that "the Settlement Program must scrutinize such claims because these separate legal entities typically operate in a coordinated and often dependent way which may distort economic reality, and thus may be subject to the Settlement Program's policy regarding related parties."[71]

- On July 15, 2014, BP objected to a proposed new fraud audit policy as not going far enough, urging the Program to require authorizations from *all* past, present and future BEL, IEL and Seafood Claimants, and to use those authorizations to verify tax returns with the IRS.

- On May 6, 2014, BP objected to proposed wetlands policy, complaining that two affidavits – one from the Claimant and one from a person who is not the Claimant – are insufficient to establish ownership of a Wetlands Parcel

---

[69] BP'S MATCHING PROPOSAL, pp.7-8. (*But see* Footnotes 67 and 68, *supra*.)

[70] *See, e.g.,* BP RESPONSE TO FINAL MATCHING POLICY (March 19, 2014) pp.3-4, 7 [Doc 12589-15, at 23-24, 27]. (*But see* Footnotes 67 and 68, *supra*.)

[71] *See, e.g.,* CLASS MASTER *AMICUS,* at pp.12-14.

inherited in the absence of a formal succession.  BP argues that the second affidavit should be executed by someone who is not a claimant at all within the Program, and that the Program should investigate and verify that the deceased was in fact the owner of the Eligible Parcel, as well as the accuracy of the statements contained within the two affidavits.

- On June 11, 2014, BP objected to a proposed policy which only required an IEL Claimant to submit documentation relating to the Claiming Job for which the Claimant seeks IEL Compensation.  Rather, BP insists that the Program obtain and examine all documentation relating to any and *all* income during the Benchmark and/or Compensation Periods.

- BP has consistently argued that *all* Subsistence Claimants must be interviewed by the CADA, not just those with payable base amounts above $10,000.

- On April 14, 2014, BP objected to the Program's proposed use of City and Zip Code mapping geo-coder applications to apply the Customer Mix Test, suggesting that the mapping software be supplemented with specific Address information.

- In April 7, 2014, BP emphasized that "the Settlement Program must require retail and lodging claimants to submit the documentation identified in Section 5 of Exhibit 4A" and "test the reasonableness and accuracy of the revenue information submitted by the claimant…. The Settlement Program must act to investigate and obtain documentation required to ensure a claimant truly meets the exceptions."

- With respect to contact with third-parties to verify the information within a Claim, BP reiterated, on October 23, 2013, its previous objection and concern that "the Claims Administrator - by using the term 'verify' - might be interpreting too narrowly the requirement that the Settlement Program obtain all the information it needs to scrutinize a claim not only for full compliance with the Settlement Agreement's requirements, but also for accuracy and internal consistency."

- On October 13, 2014, BP objected to the proposed policy to deny all Claims submitted by a Claimant found to be guilty of fraud.  Among other things, BP argues that the word "knowingly" should be eliminated as a requirement. Further, "where there is any suspicion or indicia of fraud relating to a claim, the claim should be directed to the [Fraud Waste and Abuse team], and the FWA shall indefinitely suspend all claims by the Claimant until the FWA completes its investigation. If the claimant fails to cooperate with FWA or it is confirmed that a claim includes fraudulent information, then all the claims for that Claimant must be denied…. [T]he FWA must use all available information to actually detect and investigate fraudulent and erroneous payments — even if that means certain documents not required by a claims

> framework are used to test the sufficiency of documents or information submitted in another framework. Documents and information submitted for one claim can lead to the identification of false or fabricated documents and information in another claim.  Accordingly, it is essential that the Settlement Program obtain all the information it needs to accurately review and process claims."

*See generally* HERMAN DECLARATION ¶22; *see also, e.g.,* CLASS RESPONSE TO BP OBJECTIONS TO 4Q ADMINISTRATIVE BUDGET (Sept. 17, 2013) [Doc 11402] p.9 ("BP, in this way, says one thing in the Policy Room, and in the Budget Room cries great big 'Crocodile Tears' to the contrary").   Additionally, as of September 30, 2014, BP has filed 4,178 Settlement Program Appeals, as compared to only 1,391 filed by Claimants.[72]   As of the date of that report, 3,385 appeals had been resolved, with only 611 resulting in a lower Compensation Amount (including situations where Claimants compromised their Claim with BP or otherwise voluntarily agreed to lower the claim value).[73]   Just a sampling of BP's abuses of the Settlement Program Appeals process include: (i) "BP's utter failure to disclose this information is troubling when disclosure is undoubtedly required" APPEAL 2014-385; (ii) "BP suggests that switching to this alternative period would actually have decreased claimant's recovery. This is completely inaccurate and BP seems to be pulling numbers out of thin air" APPEAL 2014-472;  (iii) "In this Panelist's view, [BP's] arguments have nothing whatsoever to do with the substance of [the alleged error] and should be ignored as a violation of Appeal Panel Procedural Rule 8" APPEAL 2014-486; (iv) "This appears to be a case in which BP has drawn incorrect conclusions from selected parts of the record and presented them on appeal as fact" APPEAL 2014-447; (v) BP objected to the submission of "new documentation" by the Claimant,  and then later in the same appeal filed new documentation in opposition the Claim, (and regularly fills its Initial and/or Final Proposals

---

[72] Note that the universe of Claims that can be appealed by Claimants is much larger, as only Claimants would appeal Denials, and only Claimants can appeal Determinations of less than $25,000. (*Compare* SECTION 6.1.2.3 *with* 6.1.2.4.)

[73] *See* STATUS REPORT BY THE CLAIMS ADMINISTRATOR No. 25 (Sept. 30, 2014) [Doc 13452] pp.18-20.

with cites to webpages, screenshots, and other "new documentation"); (vi) BP filed an appeal regarding "'unanswered questions' regarding the data relied upon" but then did not address the issue in its Proposal, hence abandoning the issue; (vii) BP fought the Tourism designation of a New Orleans Travel Agency; (viii) BP appealed the Claim of a Downtown New Orleans Hotel on the basis that it "failed causation" despite the fact that it is a Tourism business located in Zone A; (xi) BP frequently proposes Zero compensation in an attempt to force a remand, when they clearly have ability to calculate the figure which BP asserts is correct; (xii) BP frequently challenges expense items as "variable" when Exhibit 4D unequivocally provides that they are to be treated as "fixed"; (xiii) BP continued to file Settlement Program Appeals on alleged "alternative causation" grounds even after formally agreeing to the policy, and continues to assert such causation appeals for "preservation" purposes; (xiv) BP sends (*ex parte*) communications to Program Staff (and perhaps the Special Master) asking for an unauthorized "re-review" or "reconsideration" of Claims (which are only available to the Claimant under the terms of the Settlement Agreement), while simultaneously seeking relief *via* Settlement Program Appeals, and/or in some cases even after BP's arguments on appeal have been rejected; (xv) BP urged the remand and re-processing of numerous BEL Claims under 495 despite never having raised or preserved a "matching" issue or objection in its initial Settlement Program Appeal; and (xvi) BP frequently sandbags the Claimant by raising new issues or submitting new purported "evidence" with its Initial or Final Proposal that had not been previously raised or submitted in the Initial Proposal or the original Notice of Appeal.  *See also, generally* OPPOSITION TO MOTION FOR RESTITUTION (Aug. 15, 2014) [Doc 13287] pp.15-16 (BP Has Unclean Hands); CLASS COUNSEL MEMO TO CLAIMS ADMINISTRATOR AND SPECIAL MASTER re ALLEGED / POTENTIAL "FRAUD" INVESTIGATIONS (Oct. 6, 2014) p.4 fn.1 ("having continuously and repeatedly pushed

for more and more frequent, widespread, cumbersome, intrusive and expansive investigation, examination, analysis and adjustment of Claims, BP has rendered the Program inefficient, burdensome and expensive, only to turn around and disingenuously attack the Claims Administrator with respect to expense and inefficiency").

## **Exhibits**

DECLARATION OF STEPHEN J. HERMAN (Oct. 15, 2014)

DECLARATION OF JAMES P. ROY (Oct. 10, 2014)

DECLARATION OF CALVIN C. FAYARD JR. (Oct. 13, 2014)

DECLARATION OF ELIZABETH J. CABRASER DECLARATION (Oct. 13, 2014)

CLASS COUNSEL MEMO TO CLAIMS ADMINISTRATOR AND SPECIAL MASTER FREEH
RE ALLEGED / POTENTIAL "FRAUD" INVESTIGATIONS (Oct. 6, 2014)

CLASS COUNSEL MASTER *AMICUS* TO THE SETTLEMENT PROGRAM
APPEAL PANELISTS (July 16, 2014)

## Conclusion

For the above and foregoing reasons, BP's Motion to Remove the Claims Administrator should be denied.

This 15<u>th</u> day of <u>October</u>, <u>2014</u>.


Respectfully submitted,


    /s/   Stephen J. Herman                    /s/ James Parkerson Roy

**Stephen J. Herman**, La. Bar No. 23129       **James Parkerson Roy**, La. Bar No.11511

**HERMAN HERMAN & KATZ LLC**           **DOMENGEAUX WRIGHT ROY & EDWARDS LLC**

820 O'Keefe Avenue                 556 Jefferson Street, Suite 500

New Orleans, Louisiana 70113          Lafayette, Louisiana 70501

Telephone: (504) 581-4892            Telephone: (337) 233-3033

Fax No. (504) 569-6024               Fax No. (337) 233-2796

E-Mail: sherman@hhkc.com           E-Mail: jimr@wrightroy.com

*Co-Lead Class Counsel*                 *Co-Lead Class Counsel*


## CLASS COUNSEL FOR THE
## ECONOMIC & PROPERTY DAMAGES SETTLEMENT CLASS

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH
501 Broad Street

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726

Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of October, 2014.

/s/  James Parkerson Roy and Stephen J. Herman