UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. James Parkerson Roy and I have been appointed by the Court to serve as Co-Liaison Counsel for Plaintiffs in MDL No. 2179 and Co-Lead Class Counsel for the Economic & Property Damages Settlement Class.

3. I have previously submitted a Declaration dated July 23, 2012 [Doc 7104-5], a Declaration dated April 1, 2013 [Doc 9087-3], a Declaration dated November 5, 2013 [Doc 11804-1], and a Declaration dated November 11, 2013 [Doc 11833-1], which are respectfully incorporated by reference herein.

4. This Declaration is submitted to provide the Court with additional facts regarding the subject of BP's Motion to Remove the Claims Administrator [Doc 13347].

**Selection and Appointment of the Program Claims Administration Vendors**

5. As it appeared, during the negotiation process, that a settlement might be likely, BP approached us regarding the issue of which accounting and other firms would assist the Claims Administrator in evaluating, processing, and paying Settlement Program Claims. BP wanted to continue to use BrownGreer, Garden City Group, and Price WaterhouseCoopers, who had been administering the BP Gulf Coast Claims Facility (GCCF). Class Counsel were reluctant to use these companies, given the complaints (whether founded or unfounded) regarding the GCCF and the likely perception that these firms would not behave independently of BP. However, BP made a strong case that, because of these companies' existing tools, claims files, and familiarity with BP Oil Spill claims, such vendors would be able to transition into and thereafter utilize the necessary and appropriate Settlement Program tools, programs and processes quickly and efficiently.

6. It is my recollection that the Parties agreed to use BrownGreer (as well as Garden City, Postlewaite & Netterville, and PwC) before Mr. Juneau was selected to serve as Claims Administrator, and that Mr. Juneau had no input, involvement or approval of their selection, appointment or service as Program Vendors.[1]

7. It was also my impression that BP initially proposed and strongly encouraged the Claims Administrator to hire Mr. Odom as his CEO.

**BP Awareness of Mr. Juneau's Prior Consultation for the State of Louisiana**

8. I did not personally attend the meetings at which Mr. Juneau was interviewed by Class Counsel and Counsel for BP, but I do recall asking either Mr. Roy or Mr. Fayard about the initial interview after it occurred. The indication was that the interview went well, and it is my recollection that either Mr. Roy or Mr. Fayard mentioned, during our conversation, that Mr. Juneau's prior consultation with the State of Louisiana came up,

---

[1] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.3.5. (*See also* SECTION 4.2.2 *and* ORDER CREATING TRANSITION PROCESS (March 8, 2012) [Doc 5988] ¶8.)

and it was his perception that BP did not seem too concerned about it, but was going to look into it further. I believe that BP Counsel interviewed Mr. Juneau at least one more time, before supporting him for the Claims Administrator's position.

9. I do not recall BP Counsel ever asking Class Counsel for additional information regarding Mr. Juneau, or expressing any objections, hesitations or concerns.

## Interpretation and Application of the Documentation Provisions

10. During the summer of 2012, Mr. Roy and I became concerned about the apparent lack of progress in the determination and payment of Settlement Program Claims, particularly Business Economic Loss (BEL) Claims. When we addressed these concerns with Mr. Juneau and other representatives of the Program, we were informed that many of the Claims were considered "incomplete" because the claiming entity had not provided a license or permit that had been deemed to be "required" by the Program.

11. In further discussions with Mr. Juneau, Mr. Brown, and Mr. Holstein, (and perhaps also Ms. Bloom and/or Mr. Moskowitz), it became clear that BP was taking the position, and Mr. Juneau agreed, that a Claiming Entity was required to submit any and all licenses or permits that might arguably apply to that business or its property under any law, regulation, or ordinance, even if such licenses or permits were not in fact required by the governing legal authorities for the operation of the claiming entity's business – and hence the "required" documentation therefore in many cases simply did not exist.

12. I do not recall, during that meeting, that Mr. Juneau "advocated that BP waive the requirements because BrownGreer believed they were not necessary to make eligibility and claim payment determinations."[2] Rather, it is my recollection that Mr. Juneau sided with BP in interpreting and applying the terms of the Settlement Agreement in what I considered to be an unduly restrictive and unintended way.

---

[2] Holstein Declaration (Sept. 2, 2014) [Doc 13347-15], p.7, ¶18.

13. There was at least one follow-up meeting, during which BP Counsel Wendy Bloom proposed what we considered to be a completely unworkable and unrealistic "solution". It is possible that Mr. Juneau might have suggested, during one or both of these meetings, that unless BP agreed to "waive" these documentation "requirements", the Program "would be forced to issue a substantial number of deficiency notices, which would damage the public image of the CSSP and could impact the number of opt-outs to the Settlement Agreement" and that "BP's decision on this issue potentially could affect the Court's decision to grant final approval to the Settlement Agreement."[3] However, I believe that it was primarily Class Counsel who suggested that the then-current interpretation and application of the Agreement might place the Settlement in jeopardy. In any event, and irrespective of what Mr. Juneau might have suggested, he continued to interpret and apply the terms of the Settlement Agreement as proposed and urged by BP.

14. Class Counsel provided a Memo to the Claims Administrator on September 16, 2012, attempting to more formally articulate Class Counsel's position, and encouraging Mr. Juneau to implement the Settlement Agreement as Class Counsel had intended, even without BP's consent on the issue.[4] Yet Mr. Juneau continued to enforce the documentation provisions as urged by BP.

15. It was only after BP decided to formally "waive" some of these documentation "requirements" that Mr. Juneau allowed the claims to go forward.

16. Similarly, and more recently, (and, in Class Counsel's view, erroneously), the Claims Administrator has required Claimants attempting to satisfy the Customer Mix Test to submit documents that simply do not exist.[5]

---

[3] Holstein Declaration (Sept. 2, 2014) [Doc 13347-15], p.7, ¶19.

[4] Class Counsel's September 16, 2012 Memorandum to the Claims Administrator is attached hereto.

[5] *See* Policy No. 345 v.3 (April 21, 2014) ("The Claims Administrator has observed that it is difficult or even impossible for some claimants with BEL or Start-Up BEL claims to satisfy this test because they do not have documentation to establish the addresses/locations of their customers. This is particularly problematic for businesses that deal primarily in cash, which often do not maintain the type records specified in the above-referenced section of the Settlement Agreement. However, the Claims Administrator interprets the Settlement Agreement's documentation requirements as mandatory").

17. With respect to Seafood Program Documentation, BP agreed, by Letter from Mark Holstein to the Claims Administrator dated October 11, 2012, and again by Memorandum to the Claims Administrator dated May 23, 2013, with the Claims Administrator's adoption of a Sworn Written Statement to allocate income reflected on tax returns between and among multiple vessels and/or catch types, and further agreed and acknowledged that the Settlement Program would not attempt to obtain, enter or compute all available trip ticket data, but simply survey the available information in the Claim.

### The Claims Administrator Has Sided with BP, and against the Class, with respect to Numerous Settlement Program Policies

18. The Claims Administrator has issued a number of Policies to assist both Claimants and Program Vendors in the submission and evaluation of Settlement Program Claims. Some of these Policies are simply administrative in nature. Many of the Policies are relatively straight-forward and uncontroversial; and, indeed, in numerous cases, BP Counsel and Class Counsel agreed.[6] In some cases, however, these Policies have addressed very significant issues with respect to the interpretation and/or application of the terms of the Settlement Agreement, which were subject to extensive discussion and debate between the Parties. Mr. Juneau, with respect to many of the more significant Policies, has interpreted and/or applied the Settlement Agreement (erroneously, in my view) in a way that has favored BP, over Class Counsel's objection. For example:

    - The Claims Administrator initially allowed BP to access Claim- and Claimant-specific pre-Determination data, files and other information.[7]

    - The Claims Administrator agreed with BP that, under the two-step BEL Compensation analysis, a negative Step One calculation should offset a positive Step Two calculation.[8]

---

[6] Notably, despite BP's repeated attacks on the Claims Administrator with respect to the October 2012 Causation Policy, that Policy was not debated or disputed among the Parties. BP expressly agreed with the Claims Administrator's Policy on Causation, and, to this day, has never formally objected to the Policy or sought resolution by the Administrative Panel and/or the Court under Section 4.3.4 of the Settlement Agreement. *See generally* In re Deepwater Horizon, 744 F.3d 370, 374 (5th Cir. 2014); ORDER AND REASONS (Nov. 22, 2013) [Doc 11890] pp.4-7 and 10-11.

[7] This Policy was overruled by the Court on March 25, 2014. *See* ORDER [Doc 12591].

[8] Policy No. 372.

- The Claims Administrator agreed with BP that the owner or officer of a BEL Claimant cannot make an Individual Economic Loss (IEL) Claim for his or her own losses as a W-2 employee.[9]

- The Claims Administrator agreed with BP (even before the Fifth Circuit BEL Opinion and adoption of the new Matching Policy) that, where a BEL Claimant, in the ordinary course of business, maintained quarterly, annual or semi-annual financial statements, but not monthly profit & loss statements, in creating Monthly Profit & Loss statements for submission and processing under Exhibit 4, the BEL Claimant could not average monthly costs and/or expenses from the annual, quarterly or semi-annual reports.[10]

- The Claims Administrator agreed with BP (even before the Fifth Circuit BEL Opinion and adoption of the new Matching Policy) that a BEL Claimant who had kept its financials under an accrual method in the ordinary course of business could not re-state its experience to cash basis Monthly P&Ls, even if it was more favorable under Section 4.3.8.[11]

- The Claims Administrator agreed with BP to eliminate revenues from intracompany sales and other related party transactions.[12]

- The Claims Administrator agreed with BP that a Claiming Entity could not file a Multi-Facility or other BEL Claim with respect to revenues or facilities wholly owned and/or operated by the Claiming Entity through one or more subsidiaries.[13]

- The Claims Administrator agreed with BP that accrual-based claims, as well as cash basis claims, would be subject to the new Matching Policy.[14]

- The Claims Administrator dictated that properly recorded revenues, as well as expenses, would be "smoothed" and/or otherwise re-allocated and/or moved under the new Matching Policy, particularly under the Construction, Agricultural, Educational and Professional Services Methodologies.[15]

- The Claims Administrator agreed with BP that a vessel owner with a Transitional MVCA would not qualify for VoO Charter Compensation.[16]

---

[9] Former Policy No. 363.

[10] *See* Claims Administrator's October 8, 2012 Policy Announcement and Policy Nos. 355 and 464.

[11] *See* Claims Administrator's October 8, 2012 Policy Announcement and Policy Nos. 355 and 464.

[12] Policy No. 328.

[13] Former Policy Nos. 354, 490 and 503.

[14] Policy No. 495.

[15] Policy No. 495.

[16] Policy No. 348.

- The Claims Administrator has included requirements or limitations generally favorable to BP in connection with various Wetlands and Subsistence Claim Policies.[17]

- The Claims Administrator has, thus far, (and despite Class Counsel's repeated requests and objections), declined to provide Claimants accused or suspected of alleged or potential "fraud" with notice and an opportunity to respond.

19. Despite my disagreement with Mr. Juneau with respect to these (and other) interpretations, practices, and policies, it was always my impression and belief that Mr. Juneau was faithfully and independently administering the terms of the Settlement and Trust Agreement as a conscientious claims administrator and trustee.

## BP's Participation in Budgetary Process and Insistence upon Policies that Require Administrative Expenditures and Inefficiencies

20. Following the dispute over the Fourth Quarter (4Q) 2013 Administrative Budget, Judge Shushan suggested that the Parties work with the Claims Administrator's staff and the Freeh Group to attempt to address some of the questions that had been raised by BP. These Budget Meetings have occurred at least monthly, with additional exchanges of information between the Program and BP. For over a year now, BP, along with the Freeh Group, have actively participated in the development, review and approval of the Administrative Budget and expenditures.

21. In addition to the Budgetary Meetings, the Claims Administrator, along with the Freeh Group, began to conduct weekly and/or monthly "workstream" meetings (over Class Counsel's continuing objections) with BP representatives and representatives of Co-Lead Class Counsel to address administrative, efficiency and process issues, including IT, Business Process, Fraud Waste & Abuse, and Stakeholders' Meetings – as well as the Administrative Panel Meetings associated with various Policy interpretation issues, including the development and implementation of the new Matching Policy.

---

[17] *See, e.g.,* Policy Nos. 253, 316, 317, 442, 443 and 484.

22. Throughout these meetings, and in written submissions to the Claims Administrator, the Special Master, and others, BP has consistently and repeatedly urged the Program to conduct more exhaustive, intrusive, burdensome, time-consuming and expensive analysis, review, investigation, and processing of Claims.  Just a smattering of the almost infinite examples include the following:

- BP has consistently and repeatedly taken the position, with respect to the interpretation of the BEL Decision and the implementation of the new Matching Policy (No. 495) that the Program Accountants must: (i) screen *all* BEL claims for failure to record monthly revenues and corresponding variable expenses "accurately", using a proper accrual framework; (ii) define revenues in terms of "those enhancements of an entity's net assets which derive from earnings activities constituting its principal and ongoing business operations"; (iii) attribute monthly revenues in a manner consistent with "economic reality" based on those business operations that generate earnings; (iv) define corresponding variable expenses as "those actual or expected reductions in net assets that have occurred or will occur as a result of the entity's principal and ongoing business operations and, for any given month, were incurred to generate the revenues properly attributed to that month"; (v) **take into account all factual information known and reasonably available to the Settlement Program regarding revenues and corresponding variable expenses, including subsequently corrected financial data, so as to achieve results consistent with "economic reality" in the calculation of lost profits**; (vi) calculate BEL lost profits so as to reflect "actual economic loss" during the selected Compensation Period."[18]

- Further, and along these same lines, BP has consistently and repeatedly taken the position that the Claims Administrator is "required" to call for additional documentation necessary "to understand the underlying earnings activities in the Benchmark and Compensation Periods…. If, subsequent to the creation of P&Ls and other documents submitted in support of a claim, additional information comes to light that gives a more accurate and complete picture of the underlying economic activities, the Settlement Program should take this information into account.  The Settlement Program" BP contends, "should not only scrutinize claims submissions for errors and irregularities, but also request and examine additional source documents from the claimant (as well as other available information) in order to apply rigorously the principles discussed above."  The Program Accountants, according to BP, are responsible for "identifying the underlying economic activities, not simply tracking the flow of cash."  Which, according to BP, "inherently involves identification of the timing of the transaction – *i.e.*, when did the business

---

[18] *See, e.g.,* BP'S PROPOSAL FOR MATCHING (Nov. 21, 2013) [Doc 11886] pp.2-3 (emphasis supplied).

engage in the activities that earned revenue and when did it incur the expenses for the business operations that gave rise to that revenue?"[19]

- BP repeatedly and consistently urges the Program Accountants, even prior to application of the general AVM or one of the Policy 495 Specialized Methodologies, to attempt to correctly match revenues and expenses "as a preliminary step to help achieve a realistic measure of historical economic performance." BP asks the Program Accountants to investigate "spikes" or other "irregularities" in the benchmark and compensation periods, including review of irregularities in monthly revenues. BP asks the Program to "comprehensively identify such circumstances" and to "adjust and restate the inputs to achieve proper matching consistent with economic reality."[20]

- BP takes the position that each Entity with a separate Tax ID Number must file its own separate and distinct Claim. A Claiming Entity cannot, according to BP, file a single claim for the Facilities it owns or operates through wholly-owned subsidiaries. At the same time, however, BP also takes the position that "the Settlement Program must scrutinize such claims because these separate legal entities typically operate in a coordinated and often dependent way which may distort economic reality, and thus may be subject to the Settlement Program's policy regarding related parties."

- On July 15, 2014, BP objected to proposed Policy No. 70 (version 2) as not going far enough, urging the Program to require authorizations from *all* past, present and future BEL, IEL and Seafood Claimants, and to use those authorizations to verify all allegedly "invalid" tax returns with the IRS.[21]

- On May 6, 2014, BP objected to proposed Policy 500, complaining that two affidavits – one from the Claimant and one from a person who is not the Claimant – are insufficient to establish ownership of a Wetlands Parcel inherited in the absence of a formal succession. BP argues that the second affidavit should be executed by someone who is not a claimant at all within the Program, and that the Program should investigate and verify that the deceased was the owner of the Eligible Parcel, and that the statements within the two affidavits are true.

- On June 11, 2014, BP objected to proposed Policy 213 (version 3) to the extent the Program was only requiring an IEL Claimant to submit

---

[19] BP'S MATCHING PROPOSAL, pp.7-8.

[20] *See, e.g.,* BP RESPONSE TO FINAL MATCHING POLICY (March 19, 2014) pp.3-4, 7 [Doc 12589-15, at 23-24, 27].

[21] BP contends that unsigned copies of tax returns are, for example, "invalid". In my own personal experience, I only sign the original tax returns, which are then provided to the IRS. (Or, more recently, I simply provide a signed authorization for the returns to be electronically filed by my accountant.) Neither my file copies of the actual returns, nor my CPA's copies, are signed. But that doesn't make them "fraudulent" or "suspicious" or "invalid".

documentation relating to the Claiming Job for which the Claimant seeks IEL Compensation. Rather, BP insists that the Program obtain and examine all documentation relating to any and *all* income during the Benchmark and/or Compensation Periods.

- BP has consistently argued that *all* Subsistence Claimants must be interviewed by the CADA, not just those with payable base amounts above $10,000.

- On April 14, 2014, BP objected to the Program's proposed use of City and Zip Code mapping geo-coder applications to apply the Customer Mix Test, suggesting that the mapping software be supplemented with specific Address information. (BP further argued that "the Customer Mix Test should not be allowed for claimants that do not have properly matched underlying source records, and these types of claims should be denied.")

- In April 7, 2014, BP emphasized that "the Settlement Program must require retail and lodging claimants to submit the documentation identified in Section 5 of Exhibit 4A" and is further required to "test the reasonableness and accuracy of the revenue information submitted by the claimant…. The Settlement Program must act to investigate and obtain documentation required to ensure a claimant truly meets the exceptions stated in Reissued Policy 458 v.2, and that it obtains the documentation required to accurately assess the claimant's revenue and corresponding variable expenses…. As stated by BP in its prior submission, the Settlement Program should require documentation objectively demonstrating the asserted exemption and non-filing."

- With respect to contact with third-parties to verify the information within a Claim, BP reiterated, on October 23, 2013, its previous objection and concern that "the Claims Administrator - by using the term 'verify' - might be interpreting too narrowly the requirement that the Settlement Program obtain all the information it needs to scrutinize a claim not only for full compliance with the Settlement Agreement's requirements, but also for accuracy and internal consistency."

- On July 30, 2014, and again on September 29, 2014, BP letters to Mr. Welker seeking an unauthorized "re-review" or "reconsideration" of already determined – and, in some cases, either simultaneous appealed or already resolved on appeal – Claims.

- On September 30, 2014, BP objected to a proposed policy prefaced by the recognition that "at times the Claims Administrator discovers that, despite the availability of multiple opportunities for claimants and BP to point out perceived errors through the Re-Review, Reconsideration and Appeal mechanisms, a review outcome or a final Eligibility or Denial Notice on a specific claim (a 'Notice') was incorrect," emphasizing that that "it is the duty of the Claims Administrator to implement policies and procedures to

avoid making errors, to conduct audits to identify errors and to fix the errors, and any policy involving the correction of errors should acknowledge these provisions of the Settlement Agreement."

- On October 13, 2014, BP objected to the proposed policy to deny all Claims submitted by a Claimant found to be guilty of fraud. Among other things, BP argues that the word "knowingly" should be eliminated as a requirement. Further, "where there is any suspicion or indicia of fraud relating to a claim, the claim should be directed to the FWA, and the FWA shall indefinitely suspend all claims by the Claimant until the FWA completes its investigation. If the claimant fails to cooperate with FWA or it is confirmed that a claim includes fraudulent information, then all the claims for that Claimant must be denied…. the FWA must use all available information to actually detect and investigate fraudulent and erroneous payments — even if that means certain documents not required by a claims framework are used to test the sufficiency of documents or information submitted in another framework. Documents and information submitted for one claim can lead to the identification of false or fabricated documents and information in another claim. Accordingly, it is essential that the Settlement Program obtain all the information it needs to accurately review and process claims…. BP is concerned that the Settlement Program has not drawn a hard enough line on what constitutes fraud, and how the Settlement Program handles potentially fraudulent claims."

## The State of Louisiana's Objection to the Economic & Property Damages Settlement

23. The State of Louisiana filed an objection to the Court's approval of the *Deepwater Horizon* Economic & Property Damages Class Settlement [Doc 7345].

## BP Did Not Confer with Class Counsel
## Prior to its Motion to Remove the Claims Administrator

24. To the best of my knowledge, recollection and belief, BP Counsel did not contact or confer with Class Counsel before filing its Motion to Remove the Claims Administrator, in accord with Section 18.2 of the Settlement Agreement.

Signed, under penalty of perjury, this 15th day of October, 2014, in New Orleans, Louisiana.

_____
Stephen J. Herman

## MEMORANDUM

**To:** Patrick A. Juneau, Esq.
       Claims Administrator

**From:** Class Counsel

**Matter:** In re: Deepwater Horizon
         MDL No. 2179

**Re:** Documentation Provisions
      (Licences and 2011/2012 Tax Returns)

**Date:** September 16, 2012

      It is important to recognize, from the outset, that the Documentation provisions within the Settlement Agreement and its Frameworks provide a means to an end, and are not substantive ends, in and of themselves.

      Neither the Class Definition [Section 1.2] nor the definition of an Entity [Section 38.63] includes the word "license" or "licensed" or in any way suggests (as was stated by BP last week) that the Class Settlement was intended to include or compensate only "fully licensed" individuals or business entities.

      Moreover, Class Counsel had specific discussions regarding Documentation requirements during the negotiations, and BP embraced the notion that the classmember should provide them "if they have them".

      BP never took the position during negotiations that: If an otherwise eligible class member did not have "required" documentation, he or she would have no substantive right to recover.

      Indeed, with respect to some classmembers, the level of recovery may be differentiated where the plaintiff does not formally substantiate his or her earnings with Tax Returns, but that classmember nevertheless retains the right to be compensated under the Agreement.

      BP's position, accepted by Class Counsel, was that claimants should provide these documents *to the extent they had them.*

      While, in some cases, some documents may be a necessary *means* to establishing the eligibility for and/or level of compensation under the Causation and/or Compensation Frameworks (and/or other relevant Settlement provisions), it was always intended that the *substantive right to recover* would be available to Class Members who could establish those Causation and/or other threshhold requirements.

      The Settlement was not designed to afford recoveries to people or businesses who just happened to be in possession of certain documents.

Accordingly, Class Counsel believe that the Documentation requirements can – and should – fairly and reasonably be interpreted to generally require the submission of such documents, where they exist, in the claimant's possession, to support or *confirm* his or her substantive right to recover.

As noted, some of the "required" documentation will be necessary for the Class Member to establish his or her eligibility and/or level of compensation under the substantive terms of the Agreement; if the Claimant cannot produce documents sufficient to establish that, presumably, as a practical matter, he or she will not be able to recover, or will be able to recover at a lower amount.

In some cases, similarly, the absence of a "required" document might trigger the Program to evaluate more closely a claim or certain aspect of a claim – (and work with the Claimant to obtain sufficient documentation per Section 4.3.7).

But, in most cases, these documents are being "required" – not to determine whether the person or business is an eligible Class Member entitled to a specific recovery, but – to dot the Is and cross the Ts in such a way that will lend confidence in and credibility of the Program's Determinations.

This is certainly what was intended and understood by Class Counsel.

**Implicit in the "Requirements" is that the Documents Actually Exist**

Looking, in particular, to the License provisions under Exhibit 4A Section 7 and the Tax Return requirements under Exhibit 4A Section 3 (and Exhibit 7 Section 4D), Class Counsel believe that a claimant who has provided the Program with all of the existing Licenses and/or Tax Returns has submitted "all" or "any" or "the" specified Licenses and/or Tax Returns, and complied with the terms of the Agreement.

Consistent with logic, reason, the intent and understanding of Class Counsel, and the intent of BP as expressed during negotiations, these documents do not go to the existence or even the level of a Class Member's substantive right to recover.  Rather, they are to be provided - *where the Class Member has them* - to lend confirmation and support for the existence and nature of the entity, and the general validity of the claim.

It is unreasonable, illogical, and inconsistent with the intent of the parties that a claimant be required to submit a document that he or she simply does not have.

**The Term "Any" in Exhibit 4A Section 7 Indicates that the Class Member only has to Submit a Copy of "Any" License that Might Exist**

Exhibit 4A Section 7 says "any".  Not "all".  Nor "every".  But "any".

  This term implies – *i.e.* expects – that such documents may or may not be available for submission.

  Indeed, the fact that the Agreement is asking for "a copy of" communicates an expectation that the Class Member will simply be making a copy of something already in his or her possession.

  If I, as a Class Member, have given the Program a copy of all of the licenses I have, then I have provided "a copy of any applicable federal, state or local governmental licence...."


**The Word "Applicable" Raises an Ambiguity which Should be Resolved by the Claims Administrator Consistent with the Overall Structure and Intent of the Agreement**

  What does "applicable" mean?

  Potentially "applicable" to any aspect of the business?  Or only "applicable" to the professional aspects of the business?  Or only "applicable" to the business' *claim* under the Settlement Agreement?

  It is not logical or reasonable to interpret this provision to mean that a business who failed to get, or has since lost, some potentially "applicable" "license" with no relevance to the nature of its claim cannot recover under the Agreement.


**The Phrase "Required" Raises an Ambiguity which Should be Resolved by the Claims Administrator Consistent with the Overall Structure and Intent of the Agreement**

  What does "required" mean?

  In simplest and most literal terms, a business that in fact operated without a license was not actually "required" by a State, Local or Federal Government to have a license.

  The inclusion of "*to operate its business*" is significant.

  It, at the very least, distinguishes licenses that are truly pre-conditions to engage in a business or profession from mere revenue-generating governmental measures.

  Not just any potentially applicable "license".  But only those licenses that are "required to operate its business."

  What is the consequence of not having the license?   Does the Government come and close your doors?  Or do you simply pay a penalty or a fine?

This provision should be strictly construed, particularly when read together withe the examples that are provided.

**The "Requirement" Should be Construed in Light of the Examples Provided**

While Class Counsel understand that the examples in Exhibit 4A Section 7 were not intended to be exhaustive, the ambiguities in the preceding language should be interpreted in light of the examples that are provided:
- Real Estate Sales Licenses
- Occupancy Licences
- Liquor Licenses
- Restaurant Licenses
- Taxi / Livery Licenses
- Service Licenses or Permits

These do not convey that a generic "business license" or "occupational license" or permit that theoretically applies to anyone conducting business within a given county or parish or municipality is "required".

**Where 2011 Tax Returns Do Not Yet Exist, an Otherwise Eligible Class Member Still Has the Substantive Right to Recover under the Agreement**

The IRS has extended the 2011 tax filing deadline to January 11, 2013 for Gulf Coast residents and businesses affected by Hurricane Isaac.[1]

If I, as a Class Member, have completed and filed 2007-2010 Tax Returns, but have not yet completed or filed my 2011 Tax Returns, and I have submitted to the Program the 2007-2010 Tax Returns which exist, then I have provided the Program with *any* and *all* federal tax returns.

Class Counsel agree that, where "required", a 2011 Tax Return should be provided to the Program where such documents in fact exist.

But, to interpret Exhibit 4A Section 3 (or Exhibit 7 Section 4D) to preclude an otherwise eligible Class Member's *substantive right* to recover where a 2011 Tax Return doesn't exist is unreasonable, illogical and inconsistent with the parties' intent.

**There is No "Requirement" for 2012 Tax Returns**

A Start-Up, under Exhibit 7 Section III, may use January - April 2012 financials in order to establish Causation.

---

[1] Postlethwaite & Netterville Tax Update, http://www.pncpa.com/wwd_tax_tax-updates.asp (Sept. 10, 2012).

However, there is <u>no</u> mention of 2012 Tax Returns in the Documentation provisions of either Exhibit 7 Section IV(D) or Exhibit 4A Section 3.

2012 Tax Returns are not required.

**The Claims Administrator Has the Power and the Responsibility to Interpret and Apply the Settlement Agreement**

Under Section 4.3.1, the Claims Administrator has the power and responsibility to "faithfully implement and administer the Settlement, according to its terms and procedures, *for the benefit of the Economic Class,* consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court."[2]

The Claims Administrator does not need the approval of BP.

If BP disagrees with the Claims Administrator's interpretation, BP has the right to invoke an Administrative Panel under Section 4.3.4.

---

[2] Emphasis supplied.