UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

### DECLARATION OF JAMES P. ROY

I, James Patterson Roy, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. Stephen J. Herman and I have been appointed by the Court to serve as Co-Liaison Counsel for Plaintiffs in MDL No. 2179 and Co-Lead Class Counsel for the Economic & Property Damages Settlement Class.

3. This Declaration is submitted to provide the Court with additional facts regarding the subject of BP's Motion to Remove the Claims Administrator [Doc 13347].

### BP Awareness of Mr. Juneau's Prior Consultation for the State of Louisiana

4. I personally attended one or more of the meetings at which Mr. Juneau was interviewed by PSC/Class Counsel and Counsel for BP prior to the Court's appointment of Mr. Juneau to the Administrator position.

5. During one or more of those meetings, Mr. Juneau's prior representation of the State of Louisiana was discussed, and it was my perception that BP did not seem in the least bit concerned about it. It is my understanding that BP Counsel interviewed Mr. Juneau several times, and ultimately enthusiastically supported him for the Claims Administrator's position.

6. I do not recall BP Counsel ever asking Class Counsel for additional information regarding Mr. Juneau, or expressing any objections, hesitations or concerns.

7. Prior to Mr. Juneau's appointment as Administrator, in one or more conversations with BP counsel after one or more interviews with Mr. Juneau, BP counsel clearly articulated that they were aware of a great deal of Mr. Juneau's background, had investigated and vetted him thoroughly, and acknowledged their awareness of his prior interfacing with Mr. Feinberg and the GCCF on behalf of the State of Louisiana.

### Interpretation and Application of the Documentation Provisions

8. During the summer of 2012, Mr. Herman and I became concerned about the apparent lack of progress in the determination and payment of Settlement Program Claims, particularly Business Economic Loss (BEL) Claims. We discussed these concerns with Mr. Juneau and other representatives of the Program and were informed that many of the Claims were considered "incomplete" because the claiming entity had not provided a license or permit that had been deemed to be "required" by the Program.

9. We conducted additional discussions with Mr. Juneau and Mr. Holstein, which included, I believe, Mr. Moskowitz and possibly other BP lawyers. In these discussions BP took

the position that a claiming entity was required to submit any and all licenses or permits that might arguably apply to that business or its property under any law, regulation, or ordinance, even if such licenses or permits were not in fact required by the governing legal authorities for the operation of the claiming entity's business. That meant that in many cases the "required" documentation simply did not exist. Mr. Juneau expressed his agreement with BP's position.

10. It is my recollection that during that meeting Mr. Juneau sided with BP in interpreting and applying the terms of the Settlement Agreement and that he did not "advocate that BP waive the requirements because BrownGreer believed they were not necessary to make eligibility and claim payment determinations." Mr. Herman and I considered this to be an unduly restrictive and unintended interpretation.

11. I recall at least one follow-up meeting on the matter. At that meeting, BP Counsel Wendy Bloom proposed what we considered to be a completely unworkable and unrealistic "solution". It is possible that Mr. Juneau might have suggested, during one or both of these meetings, that unless BP agreed to "waive" these documentation "requirements", the Program "would be forced to issue a substantial number of deficiency notices, which would damage the public image of the CSSP and could impact the number of opt-outs to the Settlement Agreement" and that "BP's decision on this issue potentially could affect the Court's decision to grant final approval to the Settlement Agreement."[1] It is my recollection that it was primarily Class Counsel who suggested that the issue might place the viability of the settlement in jeopardy. Irrespective of what Mr. Juneau might have suggested, he continued to interpret and apply the terms of the Settlement Agreement as proposed and urged by BP.

12. On September 16, 2012, Class Counsel provided a Memo to the Claims Administrator, to formally articulate Class Counsel's position, and to encourage Mr. Juneau to implement the Settlement Agreement consistent with Class Counsel's understanding of what was

---

[1] Holstein Declaration (Sept. 2, 2014) [Doc 13347-15], p.7, ¶19.

intended, even if BP disagreed.[2] Mr. Juneau continued to enforce the documentation provisions as urged by BP.

13. Subsequently, only after BP decided to formally "waive" some of the documentation "requirements" Mr. Juneau allowed the claims to proceed.

14. More recently the Claims Administrator has required Claimants attempting to satisfy the Customer Mix Test to submit documents that simply do not exist.[3] Class Counsel believes this is another incorrect interpretation of the agreement.

### The Claims Administrator Has Sided with BP, and against the Class, with respect to Numerous Settlement Program Policies

15. I join and concur with Mr. Herman's recitation on this matter in his affidavit, to wit, it is also my recollection that the Claims Administrator has issued a number of Policies to assist both Claimants and Program Vendors in the submission and evaluation of Settlement Program Claims. Some of these Policies are simply administrative. Many of the Policies are relatively straight-forward and uncontroversial; and, indeed, in numerous cases, BP Counsel and Class Counsel agreed.[4] In some cases, however, these Policies have addressed very significant issues with respect to the interpretation and/or application of the terms of the Settlement Agreement, which were subject to extensive discussion and debate between the Parties. Mr. Juneau, with respect to many of the more significant Policies, has interpreted and/or applied the Settlement Agreement (erroneously, in my view) in a way that has favored BP, over Class Counsel's objection. For example:

---

[2] Class Counsel's September 16, 2012 Memorandum to the Claims Administrator is attached hereto.

[3] *See* Policy No. 345 v.3 (April 21, 2014) ("The Claims Administrator has observed that it is difficult or even impossible for some claimants with BEL or Start-Up BEL claims to satisfy this test because they do not have documentation to establish the addresses/locations of their customers. This is particularly problematic for businesses that deal primarily in cash, which often do not maintain the type records specified in the above-referenced section of the Settlement Agreement. However, the Claims Administrator interprets the Settlement Agreement's documentation requirements as mandatory").

[4] Notably, despite BP's repeated attacks on the Claims Administrator with respect to the October 2012 Causation Policy, that Policy was not debated or disputed among the Parties. BP expressly agreed with the Claims Administrator's Policy on Causation, and, to this day, has never formally objected to the Policy or sought resolution by the Administrative Panel and/or the Court under Section 4.3.4 of the Settlement Agreement. *See generally* In re Deepwater Horizon, 74 F.3d 370, 374 (5th Cir. 2014); ORDER AND REASONS (Nov. 22, 2013) [Doc 11890] pp.4-7 and 10-11.

- The Claims Administrator initially allowed BP to access Claim- and Claimant-specific pre-Determination data, files and other information.[5]

- The Claims Administrator agreed with BP that, under the two-step BEL Compensation analysis, a negative Step One calculation should offset a positive Step Two calculation.[6]

- The Claims Administrator agreed with BP that the owner or officer of a BEL Claimant cannot make an Individual Economic Loss (IEL) Claim for his or her own losses as a W-2 employee.[7]

- The Claims Administrator agreed with BP (even before the Fifth Circuit BEL Opinion and adoption of the new Matching Policy) that, where a BEL Claimant, in the ordinary course of business, maintained quarterly, annual or semi-annual financial statements, but not monthly profit & loss statements, in creating Monthly Profit & Loss statements for submission and processing under Exhibit 4, the BEL Claimant could not average monthly costs and/or expenses from the annual, quarterly or semi-annual reports.[8]

- The Claims Administrator agreed with BP (even before the Fifth Circuit BEL Opinion and adoption of the new Matching Policy) that a BEL Claimant who had kept its financials under an accrual method in the ordinary course of business could not re-state its experience to cash basis Monthly P&Ls, even if it was more favorable under Section 4.3.8.[9]

- The Claims Administrator agreed with BP to eliminate revenues from intracompany sales and other related party transactions.[10]

- The Claims Administrator agreed with BP that a Claiming Entity could not file a Multi-Facility or other BEL Claim with respect to revenues or facilities wholly owned and/or operated by the Claiming Entity through one or more subsidiaries.[11]

- The Claims Administrator agreed with BP that accrual-based claims, as well as cash basis claims, would be subject to the new Matching Policy.[12]

---

[5] This Policy was overruled by the Court on March 25, 2014. *See* ORDER [Doc 12591].

[6] Policy No. 372.

[7] Former Policy No. 363.

[8] *See* Claims Administrator's October 8, 2012 Policy Announcement and Policy Nos. 355 and 464.

[9] *See* Claims Administrator's October 8, 2012 Policy Announcement and Policy Nos. 355 and 464.

[10] Policy No. 328.

[11] Former Policy Nos. 354, 490 and 503.

[12] Policy No. 495.

- The Claims Administrator dictated that properly recorded revenues, as well as expenses, would be "smoothed" and/or otherwise re-allocated and/or moved under the new Matching Policy, particularly under the Construction, Agricultural, Educational and Professional Services Methodologies.[13]

- The Claims Administrator agreed with BP that a vessel owner with a Transitional MVCA would not qualify for VoO Charter Compensation.[14]

- The Claims Administrator has included requirements or limitations generally favorable to BP in connection with various Wetlands and Subsistence Claim Policies.[15]

16. Notwithstanding the numerous interpretations and/or rulings of Mr. Juneau against the positions advocated by Class Counsel, whether or not appealing such Administrator decisions, Class Counsel have at all times believed Mr. Juneau was within his authority and mandate of the Court to make such decisions, whether or not we agreed, and that Mr. Juneau each and every time believed he was making the correct decision under the Settlement Agreement and orders of the Court.

### The State of Louisiana's Objection to the Economic & Property Damages Settlement

17. The State of Louisiana filed an objection to the Court's approval of the *Deepwater Horizon* Economic & Property Damages Class Settlement [Doc 7345].

### BP Did Not Confer with Class Counsel Prior to its Motion to Remove the Claims Administrator

18. To the best of my knowledge, recollection and belief, BP Counsel did not contact or confer with Class Counsel before filing its Motion to Remove the Claims Administrator, in accord with Section 18.2 of the Settlement Agreement.

Signed, under penalty of perjury, this 10th day of October, 2014, in New Orleans, Louisiana.

_____
James Parkerson Roy

---

[13] Policy No. 495.
[14] Policy No. 348.
[15] *See, e.g.,* Policy Nos. 253, 316, 317, 442, 443 and 484.

# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
     Claims Administrator

**From:** Class Counsel

**Matter:** <u>In re: Deepwater Horizon</u>
      MDL No. 2179

**Re:** Documentation Provisions
    (Licences and 2011/2012 Tax Returns)

**Date:** September 16, 2012

     It is important to recognize, from the outset, that the Documentation provisions within the Settlement Agreement and its Frameworks provide a means to an end, and are not substantive ends, in and of themselves.

     Neither the Class Definition [Section 1.2] nor the definition of an Entity [Section 38.63] includes the word "license" or "licensed" or in any way suggests (as was stated by BP last week) that the Class Settlement was intended to include or compensate only "fully licensed" individuals or business entities.

     Moreover, Class Counsel had specific discussions regarding Documentation requirements during the negotiations, and BP embraced the notion that the classmember should provide them "if they have them".

     BP never took the position during negotiations that: If an otherwise eligible class member did not have "required" documentation, he or she would have no substantive right to recover.

     Indeed, with respect to some classmembers, the level of recovery may be differentiated where the plaintiff does not formally substantiate his or her earnings with Tax Returns, but that classmember nevertheless retains the right to be compensated under the Agreement.

     BP's position, accepted by Class Counsel, was that claimants should provide these documents *to the extent they had them.*

     While, in some cases, some documents may be a necessary *means* to establishing the eligibility for and/or level of compensation under the Causation and/or Compensation Frameworks (and/or other relevant Settlement provisions), it was always intended that the *substantive right to recover* would be available to Class Members who could establish those Causation and/or other threshhold requirements.

     The Settlement was not designed to afford recoveries to people or businesses who just happened to be in possession of certain documents.

Accordingly, Class Counsel believe that the Documentation requirements can – and should – fairly and reasonably be interpreted to generally require the submission of such documents, where they exist, in the claimant's possession, to support or *confirm* his or her substantive right to recover.

As noted, some of the "required" documentation will be necessary for the Class Member to establish his or her eligibility and/or level of compensation under the substantive terms of the Agreement; if the Claimant cannot produce documents sufficient to establish that, presumably, as a practical matter, he or she will not be able to recover, or will be able to recover at a lower amount.

In some cases, similarly, the absence of a "required" document might trigger the Program to evaluate more closely a claim or certain aspect of a claim – (and work with the Claimant to obtain sufficient documentation per Section 4.3.7).

But, in most cases, these documents are being "required" – not to determine whether the person or business is an eligible Class Member entitled to a specific recovery, but – to dot the Is and cross the Ts in such a way that will lend confidence in and credibility of the Program's Determinations.

This is certainly what was intended and understood by Class Counsel.

**Implicit in the "Requirements" is that the Documents Actually Exist**

Looking, in particular, to the License provisions under Exhibit 4A Section 7 and the Tax Return requirements under Exhibit 4A Section 3 (and Exhibit 7 Section 4D), Class Counsel believe that a claimant who has provided the Program with all of the existing Licenses and/or Tax Returns has submitted "all" or "any" or "the" specified Licenses and/or Tax Returns, and complied with the terms of the Agreement.

Consistent with logic, reason, the intent and understanding of Class Counsel, and the intent of BP as expressed during negotiations, these documents do not go to the existence or even the level of a Class Member's substantive right to recover.  Rather, they are to be provided - *where the Class Member has them* - to lend confirmation and support for the existence and nature of the entity, and the general validity of the claim.

It is unreasonable, illogical, and inconsistent with the intent of the parties that a claimant be required to submit a document that he or she simply does not have.

**The Term "Any" in Exhibit 4A Section 7 Indicates that the Class Member only has to Submit a Copy of "Any" License that Might Exist**

Exhibit 4A Section 7 says "any".  Not "all".  Nor "every".  But "any".

This term implies – *i.e.* expects – that such documents may or may not be available for submission.

Indeed, the fact that the Agreement is asking for "a copy of" communicates an expectation that the Class Member will simply be making a copy of something already in his or her possession.

If I, as a Class Member, have given the Program a copy of all of the licenses I have, then I have provided "a copy of any applicable federal, state or local governmental licence...."

**The Word "Applicable" Raises an Ambiguity which Should be Resolved by the Claims Administrator Consistent with the Overall Structure and Intent of the Agreement**

What does "applicable" mean?

Potentially "applicable" to any aspect of the business?  Or only "applicable" to the professional aspects of the business?  Or only "applicable" to the business' *claim* under the Settlement Agreement?

It is not logical or reasonable to interpret this provision to mean that a business who failed to get, or has since lost, some potentially "applicable" "license" with no relevance to the nature of its claim cannot recover under the Agreement.

**The Phrase "Required" Raises an Ambiguity which Should be Resolved by the Claims Administrator Consistent with the Overall Structure and Intent of the Agreement**

What does "required" mean?

In simplest and most literal terms, a business that in fact operated without a license was not actually "required" by a State, Local or Federal Government to have a license.

The inclusion of "*to operate its business*" is significant.

It, at the very least, distinguishes licenses that are truly pre-conditions to engage in a business or profession from mere revenue-generating governmental measures.

Not just any potentially applicable "license".  But only those licenses that are "required to operate its business."

What is the consequence of not having the license?   Does the Government come and close your doors?  Or do you simply pay a penalty or a fine?

This provision should be strictly construed, particularly when read together withe the examples that are provided.

**The "Requirement" Should be Construed in Light of the Examples Provided**

While Class Counsel understand that the examples in Exhibit 4A Section 7 were not intended to be exhaustive, the ambiguities in the preceding language should be interpreted in light of the examples that are provided:
- Real Estate Sales Licenses
- Occupancy Licences
- Liquor Licenses
- Restaurant Licenses
- Taxi / Livery Licenses
- Service Licenses or Permits

These do not convey that a generic "business license" or "occupational license" or permit that theoretically applies to anyone conducting business within a given county or parish or municipality is "required".

**Where 2011 Tax Returns Do Not Yet Exist, an Otherwise Eligible Class Member Still Has the Substantive Right to Recover under the Agreement**

The IRS has extended the 2011 tax filing deadline to January 11, 2013 for Gulf Coast residents and businesses affected by Hurricane Isaac.[1]

If I, as a Class Member, have completed and filed 2007-2010 Tax Returns, but have not yet completed or filed my 2011 Tax Returns, and I have submitted to the Program the 2007-2010 Tax Returns which exist, then I have provided the Program with *any* and *all* federal tax returns.

Class Counsel agree that, where "required", a 2011 Tax Return should be provided to the Program where such documents in fact exist.

But, to interpret Exhibit 4A Section 3 (or Exhibit 7 Section 4D) to preclude an otherwise eligible Class Member's *substantive right* to recover where a 2011 Tax Return doesn't exist is unreasonable, illogical and inconsistent with the parties' intent.

**There is No "Requirement" for 2012 Tax Returns**

A Start-Up, under Exhibit 7 Section III, may use January - April 2012 financials in order to establish Causation.

---

[1] Postlethwaite & Netterville Tax Update, http://www.pncpa.com/wwd_tax_tax-updates.asp (Sept. 10, 2012).

However, there is <u>no</u> mention of 2012 Tax Returns in the Documentation provisions of either Exhibit 7 Section IV(D) or Exhibit 4A Section 3.

2012 Tax Returns are not required.

**The Claims Administrator Has the Power and the Responsibility to Interpret and Apply the Settlement Agreement**

Under Section 4.3.1, the Claims Administrator has the power and responsibility to "faithfully implement and administer the Settlement, according to its terms and procedures, *for the benefit of the Economic Class,* consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court."[2]

The Claims Administrator does not need the approval of BP.

If BP disagrees with the Claims Administrator's interpretation, BP has the right to invoke an Administrative Panel under Section 4.3.4.

---

[2]Emphasis supplied.