# CLASS COUNSEL'S *AMICUS* SUBMISSION
# IN CONNECTION WITH SETTLEMENT PROGRAM APPEALS

July 16, 2014

TO THE HONORABLE ECONOMIC & PROPERTY DAMAGES SETTLEMENT APPEAL PANELISTS:

Because BP – who has the opportunity to provide its positions and perspectives to the presiding Appeal Panelist or Panel in each and every Settlement Program Appeal – has objected to the Appeal Coordinator providing all of the Appeal Panelists with the *amicus* submissions of Class Counsel on significant, overarching and/or recurring issues;  has objected to the Appeal Coordinator providing the Appeal Panelists with copies of the *amicus* submissions of Class Counsel to the Court in support of or opposition to Requests for Discretionary Review on significant, overarching and/or recurring issues;  and has objected to the Appeal Coordinator's suggestion of a "CLE"-type program where representatives of both BP and Class Counsel could provide insights and perspectives directly to the Appeal Panelists and respond to some of the Appeal Panelists' potential questions on significant, overarching and/or recurring issues;  Class Counsel respectfully submit the following *Amicus* Brief with respect to each and every Settlement Program Appeal, in order to ensure that each and every Appeal Panelist has the benefit of Class Counsel's positions and perspectives on what we consider to be the significant, overarching and recurring issues.

Class Counsel understand and anticipate, of course, that some or all of the Appeal Panelists may disagree with Class Counsel regarding the interpretation or application of the Settlement Agreement as to some or all of the issues.  But we want to ensure that you at least have the benefit of what we consider to be the intent and purpose of the specific terms and provisions of the Settlement Agreement, as well as the overall nature and spirit of the Agreement, based on what we negotiated, agreed to, intended and understood.

Accordingly, Class Counsel respectfully address the following issues of significant, recurring, overarching and/or general class-wide application:

## What's Good for the Goose Is Not Necessarily Good for the Gander.

In the traditional litigation context, the rules are designed, and courts strive, to ensure that there is a level playing field, with plaintiffs and defendants provided with the same respective procedural and evidentiary opportunities.  This, however, is a settlement; not litigation.  BP, with the exception of very limited and specifically enumerated rights and reservations, has agreed to *settle* these claims. Both substantively and procedurally, the Settlement Agreement is intentionally drawn and designed to place the Parties on decidedly *unequal* footing.  The playing field established by and under this Settlement Agreement was never intended to be "even".

Substantively, everything is to be viewed in a light most favorable to the Claimant, and to provide the Claimant with the greatest opportunity to be deemed eligible for compensation, and to be awarded the *maximum* amount of compensation available under the terms and provisions of the Agreement. *See* SECTION 4.3.8.[1]

---

[1] Specifically, Section 4.3.8 requires that: "The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the *greatest* Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework" (emphasis supplied).

Procedurally, the Program is to provide the Claimants with multiple opportunities, notice, and assistance, to be deemed eligible and to receive the compensation to which they are entitled. *See, e.g.,* SECTIONS 4.3.7[2] and 6.1.[3]  There was no intent, nor agreement, nor are there analogous provisions that concern themselves with affording such opportunities or protections to BP.

This is a trust. BP is merely the settlor. Only the Classmembers are beneficiaries. *See, e.g.,* SECTION 4.3.1.[4]

**Claimants Must Be Provided With Reasonable Opportunities to Present Additional Evidence in Response to New Arguments by BP and/or Determinations by the Program / Appeal Panelists – Including, Where Necessary, Remand.**

Under the RULES GOVERNING THE APPEALS PROCESS, the Appeal Panel should remand a claim to the Settlement Program where "the information in the record is not sufficient to support either the Claimant or BP's Final Proposal."[5]

On a superficial level, Class Counsel and Claimants naturally tend to support remand as an alternative to the adoption of BP's Final Proposal, while opposing remand where the Appeal Panelists would otherwise be adopting the Final Proposal of the Claimant.  This is one of those circumstances, however, where what is good for the Claimant should not necessarily be the same for BP.

One of the cornerstones of the Settlement Agreement, in this regard, was that the Claimant would be provided with notice, information, assistance and opportunities to receive the greatest possible compensation to which he or she is entitled under the terms of the Settlement Agreement. *See, e.g.,* SECTIONS 4.3.7, 4.3.8, 6.1 and 6.1.2.1.1.[6]  Such concepts are expressly incorporated into the Section of the Agreement governing Appeals, which specifically provides that "Class Members will have up to three opportunities, depending on the circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence and adherence by the Settlement Program to the terms of this Agreement." SECTION 6.1;  *see also, e.g.,* SECTION 6.1.1.1 (where the Document Reviewer determines that there is insufficient documentation, such decision "shall be without prejudice to the Claimant's right at any time prior to the termination of the Settlement Agreement to resubmit the Claim").

---

[2] Section 4.3.7 requires that: "The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."

[3] Section 6.1 dictates that: "Subject to and in accordance with Sections 4.3.7 and 4.3.8, Economic Class Members will have up to three opportunities, depending on the circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence and adherence by the Settlement Program to the terms of this Agreement."

[4] Under Section 4.3.1, the Claims Administrator is appointed to faithfully implement and administer the Settlement Agreement, according to its terms and procedures, "*for the benefit of the Economic Class*".

[5] *See* RULE 17(d)(5).

[6] Under Section 6.1.2.1.1, "the Settlement Program shall provide access to the Claimant and the BP Parties of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination."

There was no corresponding intent, or agreement, nor is there any corresponding language, which ensures that such rights and opportunities be afforded to BP.

When, consistent with the "baseball" construct, the Claimant's Final Proposal is, in the eyes of the Appeal Panelist or Panel, a better, fairer and more appropriate result than BP's under the terms of the Settlement Agreement, the Claimant should be awarded his or her Final Proposal.

Similarly, *when the Claimant has had a full and fair opportunity to respond to the arguments advanced and/or any extrinsic evidence submitted by BP – and/or the ultimate determination by the Appeal Panelist or Panel* – and BP's Final Proposal is, in the eyes of the Appeal Panelist or Panel, a better, fairer and more appropriate result than the Claimant's, consistent with the "baseball" appeal construct, the Claimant should frequently be awarded BP's Final Proposal *(if any)*.

*However,* when BP has advanced some new argument, or submitted some new purported "evidence" – and/or the Appeal Panelist or Panel makes a new denial or determination – the Claimant must have some reasonable right and opportunity to respond.

In some cases, this opportunity may have been afforded within the appeal process itself. But, in the case of any doubt, the Claim should be remanded, to afford the Claimant an opportunity to supplement, explain further, or otherwise respond.

Particularly when the Settlement Program has deemed the evidence sufficient, and issued an Eligibility Determination; but then BP argues, and the Appeal Panelist or Panel is inclined to agree, that the evidence is not sufficient; yet that insufficiency could theoretically be cured; the Claimant must be afforded the opportunity to amend or supplement the Claim.

Several examples of this have occurred where an Individual Economic Loss Claimant was not entitled to a causation presumption, but had established causation satisfactorily by (a) demonstrating that his or her Claiming Job is with an "Eligible Employer" (*i.e.* an employer that has satisfied the causation requirements of the Settlement Agreement's Business Economic Loss Framework or received payment from the GCCF), or (b) providing an employer Sworn Written Statement attributing the Claimant's losses to the spill.[7] Many IEL Claimants are unable to establish that they worked for an Eligible Employer due to the fact that their Employer's BEL Claim is still under review by the Settlement Program, and thus are forced to submit an Employer SWS to satisfy the Settlement Agreement's causation requirements.

First of all, and as addressed more fully *infra,* substantial deference should be paid to the Employer's SWS. However, in the event that the Appeal Panelist or Panel accepts BP's argument that the SWS is (allegedly) "insufficient", the Claimant must be provided with the opportunity to submit an additional SWS, and/or wait until the Program has made a determination regarding the Employer's BEL Claim. Indeed, where an Appeal Panelist determines that a Claimant's Employer's SWS lacks sufficient detail to link the Claimant's losses to the Spill, there is an inherent lack of information supporting either an award to the Claimant or a complete and final Denial of the claim.[8] To select BP's default Final Proposal of

---

[7] *See* SETTLEMENT AGREEMENT, Exhibit 8A, Section I(B)(2)(b).

[8] If there were no Employer SWS, there might be no information in the record on this issue, which might well support BP's Final Proposal. But where there is an Employer SWS, it is simply "insufficient".

$0 denies the Claimant the ability to correct the "errors" of the Settlement Program itself, which had informed the Claimant (by issuing an Eligibility Notice) that the Employer SWS *sufficiently* established causation. The proper result, rather, is to remand to the Settlement Program so that additional evidence relating to causation can be entered into the record – and/or wait until the Program has made a determination regarding the Employer's BEL Claim.[9]

**BP's Right to Present Evidence Is, and Should Be, Limited.**

On June 14, 2014, the *En Banc* Panel issued its opinion in the context of related-entity activity "evidence" offered by BP in support of its arguments for exclusion of a Wetlands Claim on appeal, resulting in the issuance of Rule 7 of the Rules Governing the Appeals Process. Class Counsel understand, appreciate and respect the careful consideration that the Appeal Panelists have given to this matter.

We do, at the same time, have a couple of observations that we believe are important for the Panelists to keep in mind when considering other cases.

First, at least some of the Appeal Panelists appear to have accepted the Court's Order of March 14, 2014 as an unqualified approval of Rule 7 in all cases. Which may, of course, have been the Court's intent. However, Class Counsel had suggested in its submission to the Court that the rule should perhaps be different for a claim like the subject Wetlands Claim, where the documentation requirements are relatively limited and might not necessarily provide a reliable basis for the Claims Administrator and his Vendors to determine whether a Claiming Entity should be excluded, versus a BEL Claim, for example, on the other hand, where the extensive Exhibit 4A Documentation requirements should be more than sufficient for the Program to make a reliable Eligibility Determination, without extrinsic investigation and attack by BP at the appeal stage.[10] It was our reading of the Court's Order that Judge Barbier left this question open for another day, and limited his approval to the specific Wetlands Claim at issue in this particular case. *See* ORDER, at p.5 ("*In the particular circumstances of this appeal,* the Undersigned finds

---

[9] Section 4.3.8 further illustrates this concept by explaining that if a Claimant were to select a non-optimal compensation or benchmark period when presenting a claim, the Claims Center would apply the most beneficial compensation or benchmark period notwithstanding the Claimant's choice. This is highly analogous to the present scenario. Essentially, an IEL Claimant must "choose" between two alternative methods of establishing causation. Where the Claimant chooses to provide an Employer SWS prior to there being a determination as to whether their Employer qualifies as an "Eligible Employer," and is adjudged to have selected the wrong option (*i.e.* the Employer SWS is deemed insufficiently detailed), the Claimant should be afforded the chance to qualify for compensation under the alternative option.

[10] *See* CLASS COUNSEL REPLY BRIEF [Doc. 12283-1] pp.3-4 ("Any concern by the Panelists, or the Court, regarding Wetlands type Claims, (where the required documentation to establish Class membership is limited), *should not bleed over Into BEL or other claims*, with comprehensive documentation requirements. The decision of the Appeal Panelists' to allow BP to submit additional evidence regarding Class Membership in the Settlement Program Appeal process arises in the particular context of a Wetlands Claim, which, as noted, does not necessarily require (by and with agreement of BP) documents or other information from which the Claims Administrator will necessarily be able to determine Class Membership. In the context of a Business Economic Loss (BEL) Claim, by contrast, the Claimant will be required to submit documents reflecting the business structure and ownership; Federal Tax Returns; existing business or occupational licenses; and other documents under Exhibit 4A from which the Program can certainly make an independent and reliable determination of not only Class Membership, but also Causation and Compensation. Hence, even assuming *arguendo* that in the context of some Claims (such as Wetlands) the Appeal Panelists feel that it may be appropriate to allow BP to submit limited additional information or documents on appeal, (which is denied), this should certainly not bleed over into BEL or other claims, and "open the floodgates" to a "free-for-all" adversarial litigation, before Appeal Panelists, of settlement claims").

that Rule 7 is properly enacted to implement a logical and efficient appeal process") (emphasis supplied).

Secondly, it has been noted by at least some Appeal Panelists that *Claimants* have frequently attached new documents or exhibits to their memoranda and asked that they be accepted and considered in connection with their settlement program appeals. Again, it is important to recognize, in this respect, that the Settlement Agreement does not contemplate what would typically be found in a litigated matter, where the plaintiff and the defendant are on more or less equal substantive and procedural footing. Rather, as a substantive matter, Section 4.3.8 clearly and explicitly favors the Claimant, by directing the Settlement Program to award the maximum amount to which the Class Member may be entitled, while, as a procedural matter, Sections 4.3.7 and 6.1 (along with other provisions) were intentionally designed to guarantee that the Claimant would have multiple opportunities to have their Claims reconsidered and reviewed to be determined eligible for and receive the greatest amount to which he or she is entitled under the terms of the Settlement Agreement. Nowhere does the Settlement Agreement indicate that such procedural assurances – nor indeed any opportunities to submit documentation – would be afforded to BP. As noted *supra,* the Settlement Agreement was never intended or agreed to place the Parties on equal footing. BP agreed to settle these Claims, in a light most favorable to the Claimant.[11]

**The Claims Administrator's Interpretations of the Settlement Agreement Are Not Necessarily Binding on the Appeal Panelists.**

In almost all cases, the Parties have deferred to the Claims Administrator's interpretation, in the first instance, to process the Claim under the annunciated Policy. However, that does not mean that the Parties have formally agreed with the Claims Administrator's interpretation, and Class Counsel have specifically reserved for each Claimant, (and for the Class as a whole), the right to argue to the Appeal Panelists (and/or ultimately to the Court) either that the Claims Administrator's interpretation is incorrect, and/or that the Policy was not applied correctly to the specific facts and circumstances.

While Class Counsel, of course, believe that many of the Claims Administrator's Policies represent a fair and reasonable interpretation or application of the terms and provisions of the Settlement Agreement, and while we presume that the Appeal Panelists will often agree with the relevant Policy or Policies, in virtually all cases the Appeal Panelist is free to decide that the Policy is not a correct interpretation of the Settlement Agreement, and/or that it was misapplied to the particular facts and circumstances associated with the appealed Claim.[12]

---

[11] It should further be noted that Class Counsel continue to believe that Claimants are unfairly prejudiced to the extent that BP is permitted to submit new purported, untested, extrinsic "evidence" with BP's *Final* Proposal, and the Claimant has little, if any, opportunity to respond. As outlined in the previous section, such claims should – at the very least – be remanded, so that the Claimant has a full and fair opportunity to supplement, amend, and/or otherwise respond.

[12] *See, e.g.,* POLICY KEEPER PORTAL USER MANUAL (affirming that Claims Administrator Policy Decisions are "Used by the Claims Administrator and Program Vendors for all affected claims, unless the Parties formally agree to a different policy or it is overturned by the Court; *not binding on Appeal Panelists*") (emphasis supplied).

**Seafood Claimants Are Entitled to the *Greater* of Trip Tickets vs. Tax Returns**

The Settlement Agreement expressly instructs the Program to evaluate and process the information in the Claim Form and all supporting documentation to produce the greatest Compensation Amount that such information and supporting documentation allow under the terms of the Settlement Agreement. *See* SECTION 4.3.8.

Under the terms of the Settlement Agreement, a Seafood Program Claimant is entitled to establish benchmark revenue using either (a) available trip ticket data, or (b) federal income tax returns. *See* EXHIBIT 10, at pp.10-11.

The Claims Administrator has confirmed the ability of a Claimant to use Tax Return revenue, in POLICY NO. 236, which provides that:

> On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:
>
> (a) Single Catch/Single Vessel Claimants: If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:
>
> (1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.
>
> (2) The revenues shall be limited to those shown in the applicable tax returns.
>
> (3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.

Where there is a claim for only one vessel, and only one catch type, there is no allocation issue, and the Program should use the revenue that results in the *greatest* award to the Claimant. *See* SECTION 4.3.8.

Where there is a potential allocation issue, resulting from claims for multiple vessels, and/or multiple catch types, the Settlement Program is not even attempting to enter or compute all of the potentially available Trip Ticket information; but, in the event that some conflict is noted – (as to *allocation,* not total revenue) – the Program should, after appropriate due diligence, and working with the claimant, ultimately interpret the documentation in a way that produces the *greatest* award to the Claimant. *See* SECTION 4.3.8.

*Trip Ticket Data is Frequently Inaccurate and/or Incomplete*

The availability and reliability of trip ticket data, (which, incidentally, was not fully available to many Claimants or to the Program when many of the Seafood Claims were originally submitted during the Summer of 2012), has been frequently called into question.[13]

First, trip tickets are frequently under-inclusive and under-reported. There are no rules, regulations, training, or certification procedures on how to complete trip tickets. In 2007, 2008, and 2009, the majority of trip tickets were completed by hand often by low-level dock workers that may have ranged from mom-and-pop shops to high-tech operations. These are typically cash transactions. The hand-written trip tickets are commonly illegible and damaged by water and the elements as they are not stored properly. Moreover, the different States have used – and not used – trip tickets during the benchmark years, and do not share their data; hence, for some or all of the catch landed during certain time periods in certain States, trip ticket data would not even be available.

The wrong boat names are commonly identified on trip tickets in situations where one captain may own multiple vessels. Even when computers are used, the trip tickets will automatically assign a boat captain to a particular vessel in default mode, such that when the same captain uses a different vessel, it is not reflected in the trip tickets. The electronic and paper records of these docks commonly do not have up to date information on boat owners and captains.

Further, trip tickets are often attributed to the wrong commercial fishing license. In situations where the captain and owner of the vessel are two different people, one landing may generate trip tickets under the owner's commercial license and the next landing may generate trip tickets under the captain's commercial license. There are even instances when deckhands helping with the landing will have trip tickets generated under their own commercial license number. In all of these examples, the owner, the captain, or both will have under-reported trip tickets.

Similarly, trip tickets often identify the wrong catch type, catch volume and catch price. Many trip tickets are hand written using a numeral "species code" which identifies the catch type. These species codes can be illegible or have the incorrect code identified on the ticket. This can also occur with the catch volume and catch price. In some instances, trip tickets will have no species code, catch volume and/or catch price identified.

Trip tickets routinely do not make their way from the docks to the Department of Wildlife and Fisheries as they are often lost, misplaced, or simply not reported. In fact, the Times Picayune detailed pending charges on a Slidell Seafood Processing company who failed to

---

[13]The Seafood Neutral, for example, noted that: "In reporting this sales information, the dealer must identify by registration number the vessel that landed the catch. A number of claimants have indicated that the seafood dealers to whom they sold their catch entered the wrong registration number, and, therefore, reported the sale to the LDWF under the wrong vessel. This erroneous reporting creates a discrepancy in the Claims Administrator's reviews of the affected Louisiana-based commercial fishermen's claims in the Seafood Compensation Program." POLICY NO. 404 (Aug. 28, 2013); *see also, e.g.,* GO FISH PRELIMINARY OBJECTION [Doc 6353] p.9 (LDWF trip tickets are sometimes mis-identified because captains on some vessels work under the vessel owner's license and use that license to report catch at the docks, and trip ticket data often contains typographical errors); *see also, e.g.,* "Slidell Seafood Processor Arrested, Accused of Not Reporting Purchases from Commercial Fishers," *Times Picayune* (Oct. 30, 2012) (processor accused of failing to submit trip tickets for 178,215 pounds of blue crab, 104,489 pounds of shrimp, and over 2,000 pounds of finfish to the LDWF).

report almost 300,000 pounds of seafood trip tickets to the Louisiana Wildlife and Fisheries between January 2010 and July 2011.[14] Additionally, trip tickets may be entered in the Wildlife and Fisheries database incorrectly or not at all as they are prone to human error during data entry.

Cash sales from seafood do not generate trip tickets. Many claimants will report these cash sales on their schedule C tax return. These sales have no way of being reported on trip tickets.

Additionally, seafood landings in states outside Louisiana, for example Mississippi, do not historically generate trip tickets. Many of these states do not have a trip ticket database, do not require the generation of a trip ticket at a landing, and do not require trip tickets to be reported to the proper governmental agency. Even if a trip ticket is generated in Alabama or Florida, there is no duty or requirement for that state to send the trip ticket to the Louisiana Department of Wildlife and Fisheries. This accounts for a number of shrimpers and other commercial fishermen having under-reported trip tickets, when compared to the claimant's tax return.

Hence, in creating the Seafood Compensation Program, the Court-Appointed Neutral recognized that Claimants should have the option of establishing their income as reported on their tax returns, as even the Louisiana Department of Wildlife and Fisheries "trip ticket database" would be often inaccurate and incomplete, due to the fact that:

- Trip Tickets are lost;
- Trip Tickets are damaged;
- Trip Tickets are illegible;
- Trip Tickets may be improperly identified with the wrong Commercial Fishing License;
- Trip Tickets may be improperly identified with the wrong Vessel;
- The Trip Tickets would frequently not be generated for catch outside of the State;
- Even if Trip Tickets are generated, they would not be provided to the Home Port State;
- Trip Tickets do not reflect many cash sales, (which often may be reported on tax returns);
- Trip Ticket Summary Sheets often have incorrect data such as:
  a. Catch Type Data
  b. Catch Volume Data
  c. Price Data
- Trip Tickets Summary Sheets may not be forwarded to DWF (or other States' analogous bodies) by the landing docks.
- Trip Tickets may be entered incorrectly into the database.
- Trip Tickets may not have been entered into the database.

---

[14] "Slidell Seafood Processor Arrested, Accused of Not Reporting Purchases from Commercial Fishers," *Times Picayune* (Oct. 30, 2012).

- Other database issues.

Accordingly, the fact that there is a discrepancy between the Income Tax Returns and the available Trip Ticket Data should not, in and of itself, be a cause for alarm. And, in any event, and as provided under the Settlement Agreement, the Program (and Appeal Panelists) should provide the *maximum* award, based on the available documentation.

**Why Is BP Even Appealing Seafood Program Claims?**

BP agreed that the $2.3 Billion Seafood Fund would be guaranteed and non-reversionary. With projections of a full Seafood Compensation Plan pay-out to all Seafood Program Claimants of only around $1.3 Billion, there is absolutely no risk that the Fund will be exceeded – (even assuming *arguendo* that BP might possibly recover the *entire* $130 Million allocated for *all* Deckhand Claims under BP's frivolous motion for reversion, (which is, of course, strenuously opposed and rejected)). Accordingly, BP really has no interest or stake in the outcome of Seafood Program denials or determinations.

While it may well be that some Seafood Claims might have arguably been adjudicated incorrectly, and while Class Counsel certainly want the allocation of the Fund to be fair and appropriate and in accordance with the directives of the Seafood Neutral and the Claims Administrator, it is clear that there is more than adequate funding for all of the Commercial Fishermen to receive full compensation.

Again, Class Counsel believe that any and all errors should be faithfully corrected in accordance with Section 6 and Exhibit 25.

But the Appeals Panelists should at least ask themselves why BP is appealing the Claim. Is it really to "ensure the integrity of the Program"? Or could there be some other motivation? (*e.g.* to attack the Claims Administrator, the Program, or perhaps even the Court, for making or allowing allegedly "improper" payments or claims?)

**Application of the "Tourism" Definition in Exhibit 2**

*As set forth in Class Counsel's Memo to the Claims Administrator dated October 11, 2012:*

Toward the conclusion of the negotiations, there was a disagreement about how the "Tourism" Definition that had been negotiated over the previous eight months should be applied. Class Counsel took the position that the introductory definition was controlling, with all of the following NAICS Codes merely illustrative examples. BP, by contrast, took the position that the NAICS Codes listed on Exhibit 2 were exclusive, and that no other business or NAICS Code could be considered "Tourism".

The compromise, brokered by Judge Shushan, is reflected in the final version of Exhibit 2, which describes the following NAICS Codes as neither illustrative nor exclusive.

Significantly, what was retained in Exhibit 2 is not only the lists of specific types of businesses that are identified under the relevant NAICS Codes, but the Industry Definitions themselves.

So, for example, NAICS Code 447110 is not simply the enumerated examples:
- Convenience food with gasoline stations
- Gasoline stations with convenience stores

- Gasoline with convenience stores

But also includes an Industry Definition of:

> "...establishments engaged in retailing automotive fuels (*e.g.,* diesel fuel, gasohol, gasoline) in combination with convenience store or food mart items. These establishments can either be in a convenience store (*i.e.* food mart) setting or a gasoline station setting. These establishments may also provide automotive repair services."

With that background, Class Counsel respectfully submit that that the following general rules should apply in determining whether a Claimant or his Employer is treated as a "tourism" business under the Settlement Agreement:

*General Rules*

1. Where the Claimant (or Employer) is a business that is specifically identified on Exhibit 2, it should be treated as a "Tourism" business, irrespective of what NAICS Code the business may have used for various purposes in the ordinary course of its business.

2. When the Claimant (or Employer) actually used one of the NAICS Codes that is listed on Exhibit 2 on its tax returns, business licenses, or otherwise, for at least some purposes, in the ordinary course of its business, it should be presumed to be "Tourism" – and should be conclusively deemed to be "Tourism" where the business was actually engaged in activities reasonably described in the Industry Definition and/or examples listed.

3. When the Claimant (or Employer) is neither a business that is specifically identified on Exhibit 2 and did not use an NAICS Code that is listed on Exhibit 2 in the ordinary course of its business, then the Claims Administrator should fairly apply the entirety of Exhibit 2 – including the introductory definition of Tourism generally, the Industry Definitions that accompany each NAICS Code listed on Exhibit 2, and the examples that are specifically listed under each NAICS Code listed on Exhibit 2 – to determine whether the Claimant (or Employer) should fairly and reasonably be considered "Tourism".

4. The Program should be looking at whether the Entity (or Employer) is engaged in substantial business activity that falls within Exhibit 2, rather than attempting to shoehorn a multi-faceted business into a single NAICS Code / description.[15]

---

[15] Class Counsel note that these proposed General Rules differ slightly from the suggested use and application of NAICS Codes for the purpose of "flagging" potential businesses for a Moratoria loss evaluation under Exhibit 16.  However, these provisions were negotiated at different times, in different ways, for different purposes. The result of being "flagged" under Exhibit 16 (which was negotiated in a very short time period) may or may not affect the ultimate outcome under the Settlement Agreement; and, to the extent it does affect the Claimant's compensation under the Settlement Agreement, the remainder of his or her claim for "Moratoria Losses" is Expressly Reserved.  The application of the "Tourism" definition, by contrast, (which was negotiated over a period of many months), will conclusively and irrevocably affect the interests of the Class Member within the bounds of the Settlement Agreement.

The language and structure of the Settlement Agreement itself further supports such a distinction. Exhibit 17 states that "Business Entities within the NAICS code descriptions set forth below are excluded from the class"; Exhibit 18 states that "Business Entities within the NAICS code descriptions set forth are excluded from the class to the extent and manner set forth in the Excluded Industries Chart"; and Exhibit 19 explicitly states that the NAICS

So, taking the example of a Liquor Store located on Highway 98 in Destin, Florida, near the beach. Applying Rule 1, the words "liquor store" do not appear on Exhibit 2. Nevertheless, applying Rule 2, if the Liquor Store used an NAICS Code listed on Exhibit 2 in the ordinary course of its business, then it should be presumed to be "Tourism". In the alternative, applying Rule 3, this Liquor Store clearly "provides services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community." *See also, e.g.*, NAICS Code 452990 ("retail a general line of new merchandise, such as ... groceries, housewares"); NAICS Code 447110 ("convenience store or food mart"); NAICS Code 722211 ("establishments primarily engaged in providing food services ... where patrons generally select items and pay before eating. Food and drink may be consumed on premises, taken out, or delivered to the customer's location. Some establishments in this industry may provide these food services in combination with selling alcoholic beverages"); NAICS Code 722410 ("establishments ... primarily engaged in preparing and serving alcoholic beverages"). Particularly where the Liquor Store also, (as is typical), offers food items, (*e.g.* cheese, crackers, chips), or other retail goods, (*e.g.,* wine glasses, shot glasses, other household items, souvenirs[16]), the Program should consider the Liquor Store to fall within the definition of "Tourism" under the totality of the circumstances.

It is important, in applying these Rules, to recognize that a business will often be engaged in activities that crossover / encompass several different types of Industry Definitions, and the inquiry should therefore be focused on whether the Entity (or Employer) in question conducts substantial business activities within the Tourism Definition and the NAICS Codes within Exhibit 2. (*i.e.,* Rule 4)

*Scope of the Tourism Definition*

While it's likely fair to say that the *Codes* listed are "exhaustive", those Codes, as outlined above, both **(i)** include Industry Definitions which would encompass additional businesses that are not specifically listed, but which, in light of the general introductory Tourism definition, and the nature of the business, should be treated as falling under one or more of those Codes; and **(ii)** extend to the businesses that are specifically identified under the Codes, even if, for some reason, the Claimant (or Employer) did not use that specific Code (or Codes) in the ordinary course of its business.

A studio that takes pictures of vacationers or weddings on the beach should be placed in Tourism if it used one of the NAICS Codes identified on Exhibit 2 in the ordinary course of its business. Alternatively, the Program might consider such a business to fall within the definition of "Tourism" under a totality of the circumstances. As an initial matter, that business certainly falls within the general definition of Tourism ("provides services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places

---

codes and descriptions are determinative of Automatic Review for Potential Moratoria claims. Exhibit 2, by contrast, provides a specific definition of Tourism, which is separate and controlling over the NAICS Code descriptions that follow.

The bottom line is: Exhibits 16, 17 and 19 are used to exclude the Claimant and/or treat the Claimant less favorably; while Exhibit 2 is used to include the Claimant and treat the Claimant more favorably; so, when interpreted in light of Sections 4.3.1, 4.3.7 and 4.3.8, the "Tourism" definition should generally be interpreted and applied more liberally.

[16] NAICS Code 453220 ("Gift, Novelty and Souvenir Stores").

outside their home community"); *see also, e.g.,* NAICS 453220 ("souvenirs ... seasonal and holiday decorations"); NAICS 448190 ("bridal gowns"); NAICS 487110 ("scenic and sightseeing transportation"); NAICS 561520 ("tour operators"); NAICS 712190 ("nature parks"); NAICS 713990 ("ballrooms ... beaches ... picnic grounds ... tourist guide services").

Jewelry Stores are specifically identified on Exhibit 2:  *see* NAICS Code 448150.

*Assigning a NAICS Code*

Where a business is engaged in activities that crossover / encompass several different types of Industry Definitions, the inquiry should be focused on whether the Entity (or Employer) in question conducts substantial business activities within the Tourism Definition and the NAICS Codes within Exhibit 2 – not try to pigeonhole the business into one single NAICS Code. (*i.e.* Rule 4)[17]

Moreover, in close cases, where the Claimant (or Employer) can fairly and reasonably be classified as a "Tourism" business, Section 4.3.8 (and, to a lesser extent, Sections 4.3.1 and 4.3.7) should favor general application of the Tourism definition in a Claimant-favorable way.

**Entities, Facilities, and Other Claimants**

The Parties, the Claims Administrator, and the Appeal Panelists have struggled, with somewhat inconsistent and varying results, with how to define a BEL Claimant or other Claiming Entity, for Class Membership or Exclusion purposes, for Multi-Facility Framework purposes, and for other issues that involve either respect for or piercing of business distinctions and corporate formalities.

For example, the Claims Administrator's original policy regarding the scope and effect of GCCF Releases [No. 276], the current policy regarding Non-Revenue Items [No. 328], and the current policy regarding the Owner and Officer Exclusion [No. 363], all largely disregard corporate or other business distinctions and formalities.[18]  On the other hand, the proposed policy regarding Business Economic Loss Claimants [No. 503], the proposed policy regarding Changes in Ownership [No. 354 v.4], and the proposed policy regarding Multi-Facility Claims [No. 490], strictly enforce all corporate and other business distinctions and formalities.  Disappointingly, the common thread that seems to run through these policies is that they are *all* to the burden and/or detriment of the Claimant, while to the benefit of BP.[19]  Similarly, in the recent *En Banc* Appeal

---

[17] For example, a "marina" likely includes a "marine service station" (NAICS Code 447190), and/or a "fishing supply store" and/or "tackle shop" (NAICS Code 45110), and/or "boat rental" (NAICS Code 532292), and/or "excursion boat operations" or "sightseeing boat operations" and/or "harbor sightseeing tours" (NAICS Code 487210). A "fruit and vegetable market" may include a "restaurant" and/or a "bar" and/or a "deli" (NAICS Codes 722110, 722211, 722213 and/or 722410). A "jewelry store" (which is listed in NAICS Code 448150) could also be / include a "collectible gift shop" (NAICS Code 453220) because they sell "crystal, pewter, porcelain" *etc.*

[18] The policy regarding the exclusion of Real Estate Developers also potentially disregards corporate or other business distinctions and formalities, as Policy No. 468 Sections IIC(1) and C(3) look to the 2010 Tax Returns, which would typically include and reflect information about parents and/or subsidiaries if they were prepared and filed on a consolidated basis;  in addition, Policy No. 468 Section IIC(5) looks to websites and other promotional materials, which frequently summarize and project information about the business as a whole, without regard to corporate or other business distinctions or formalities.

[19] Proposed Policy No. 276 v.2 does appear to respect corporate and other business distinctions and formalities in the Claimant's favor.  As a practical matter, however, those effects will frequently be rendered moot by proposed Section II(A)(4) and the Owner / Officer Exclusion [No. 363].

Panel decision which resulted in the exclusion of a Wetlands Claimant, (which had been previously deemed eligible by the Program), was based, in part, on the nature and activities of a parent corporation, piercing to some extent the corporate distinctions, to the detriment of the Claimant, and in favor of BP.[20]

As a general matter, the result should be just the opposite: The Settlement Agreement should generally be interpreted and applied in a way that facilitates the efficient filing and processing of Claims, that provides Claimants with the best opportunity to be deemed eligible for compensation, and that produces for each Claimant the maximum available recovery. *See generally* SECTIONS 4.3.7 and 4.3.8.

Yet, at a more granular level, the appropriate result should frequently be guided, in the first instance, by **(i)** whether you are dealing with a Class Definition / Exclusion issue, versus whether you are dealing with the way that an eligible Class Member is treated under the terms of the Settlement, and **(ii)** whether the Claiming Entity is a parent versus a subsidiary of the other potentially related persons, businesses or entities.

When the Program, or the Appeal Panelist, is making a Class Definition or Exclusion determination, that determination should be made at the Entity level, according to the relevant corporate or other existing business structures and formalities.

When, on the other hand, the Claiming Entity is an eligible Class Member, then internal classifications, such as application of the "Tourism" definition under Exhibit 2, or the requirement (or not) of a "Moratoria Loss review" under Exhibits 16 and 19, can and should be made, in a Claimant-favorable way, on either a Facility-by-Facility or a Consolidated basis.

When the Claiming Entity (or a Natural Person filing a Schedule C in the case of some BEL Claimants) is the owner of an LLC, a corporation, or another wholly-owned subsidiary, the whole should generally be treated as the sum of its parts. The Claimant should be able to make a claim for, and the Program – and Appeal Panelists – should consider the nature, revenues and facilities of the wholly-owned subsidiaries, (as they are effectively owned by the Claimant).

When, on the other hand, the Claiming Entity has a separate and distinct parent corporation or other owner, the Program – and Appeal Panelists – should generally not consider the nature, revenues or facilities of the owner or parent company.

Notably, BP is fully protected in any event, as both the Class Release and the Individual Release expressly extinguish all claims, rights, interests, actions and demands of not only the Claimant, but also its "corporate parents" and "subsidiaries". *See* SETTLEMENT AGREEMENT, Section 10.1 and Exhibit 26, ¶2.

Indeed, the *quid pro quo* that was struck between Class Counsel and BP toward the end of the negotiations was that all parents and subsidiaries would be released in exchange for the optionality and flexibility of those businesses' being able to file either Consolidated or Facility-by-Facility Claims, under Exhibit 5, in the most efficient and/or optimal way.

In any event, BP should not be able to have it both ways:

If each and every Individual or Entity is to be treated as a separate and distinct person or entity, then allow each and every Entity, as well as each and every Owner and Officer, to make

---

[20] It may well be that this particular Claiming Entity was correctly excluded by the *En Banc* Panel, based solely on its own facts and circumstances. Class Counsel simply point to the fact that BP submitted, and the *En Banc* Panel cited, evidence regarding the nature of a distinct parent entity.

his, her or its own separate and distinct Settlement Program Claim. Don't disregard corporate formalities for Class Membership or Exclusionary purposes. Don't exclude revenue from Related-Party Transactions. And don't deprive a BEL Owner or Officer of the right to make his or her own IEL Claim.

### **An Owner, Part Owner or Officer of a BEL Claimant under the Settlement Agreement is an Eligible IEL Class Member and Claimant with Respect to His or Her Loss of Income as a W-2 Employee.**

Under the Class Definition, an Individual who lived in and/or worked in the Gulf Coast Area is a member of the Class, unless excluded. *See* SECTION 1.1. No one contends that Owners, Part Owners, or Officers of eligible BEL Claimants are excluded.

Rather, these Individual Class Members are directed to Exhibit 8A to determine how they are treated under the Class Settlement Agreement. Nowhere in the document is it stated that an owner, part owner or officer of a business is excluded from making an IEL Claim if he or she otherwise satisfies the Class Definition and qualifications. Indeed, it is specifically contemplated under the Settlement Agreement that an Entity's employees will make claims within the Settlement Program, based on the recognition of the Eligible Employer's Settlement Program Claim. *See* EXHIBIT 8A, Section I(B)(2)(b)(i). Nothing tells an investor in a business entity that he or she is excluded. Nothing provides notice to an Individual that if a Business Economic Loss is paid and he or she is an owner or part owner of the business, he or she is excluded from filing an IEL Claim. Nothing in Exhibit 26, the Individual Release that would be signed by the BEL Claimant, excludes or releases an employee's Individual Economic Loss Claim.

Nor is there an exclusion or offset of such owner/officer compensation in particular, nor what some might contend to be a "double payment" generally, in the Exhibit 8A Individual Economic Loss Framework, or anywhere in the Settlement Agreement.

While "Owner/Officer Compensation" is unambiguously excluded from the calculation of Payroll Expenses under the BEL Framework, (*see* Settlement Agreement, Exhibit 4C, Section I (definition of "Fixed and Variable Payroll Expenses")), the Agreement also unambiguously allows owners and officers who are Individuals under the Agreement to recover their lost W-2 employee earnings from BP.

Both Parties have consistently understood, and publically represented, that – with the exception of the Seafood Compensation Program – the Economic & Property Damages Class Settlement is "uncapped", and that compensation awarded or paid to any one Class Member will have no impact or affect on any other.

The entire notion of a "double payment" looks at the question from BP's point of view, rather than the Claimant's. BP could have, but did not, suggest, and Class Counsel did not agree, to include a set-off, exclusion, release, or other prohibition on "double payments" generally, nor with respect to these particular IEL Claimants within either the Class Definition or Exhibit 8 of the Settlement Agreement. Respectfully, the question is not what Claims BP should or should not have to pay under the Settlement Agreement, but rather, what compensation is promised and owed to each eligible Class Member?

Indeed, several Appeal Panelists have rejected application of Policy No. 363, particularly in cases where it was not clear that a "double payment" had, in fact, occurred. *See, e.g.,* CLAIM NO. 54208 (release by business should not preclude claim by owner/officer in capacity of W-2

employee); CLAIM NO. 84233 (IEL Claim should not have been denied where owner/officer's salary was not separated out in the financials and treated as a "fixed expense" in the BEL Claim); CLAIM NO. 114046 (IEL Claim remanded where it was unclear whether owner's W-2 salary was broken out and treated as a "fixed expense" in the BEL Claim); CLAIM NO. 211144 (IEL Claim of "Chief Financial Officer" recognized where the employer did not compensate him as an executive along with the partners).

The definition of "Individual Claimant" excludes the owners of sole proprietorships and self-employed individuals, (*see* SECTION 38.84), who must instead make BEL Claims, (*see* SECTION 38.15). Other owner and officer employees of business entities qualify as Individual Claimants, and are entitled to the benefit of the IEL claims process.

Where the BEL Claimant is a corporation or other formal business entity, it is considered a separate legal person from the owners and officers. There is no reason to presume, (particularly outside of a sole proprietorship or other closely-held situation), that the business would have passed along those lost profits to the owners and officers, or that such owner or officer actually did or will share in the business' GCCF or BEL recovery.

Further, the Agreement expressly mandates inclusion of "[a]ll bonuses and/or commissions" in the lost earnings calculation on a *pro rata* basis. *See* EXHIBIT 8A, at 16. It also expressly states which earnings may be deducted from the calculation.

The IEL Framework provides a detailed definition of these "Offsetting Earnings." *See* EXHIBIT 8A, at 6. The definition conspicuously omits Owner/Officer Compensation from the Claiming Job, as well as BEL compensation paid to the employer. Had the parties intended or agreed that such offsets to apply, they would have made an express provision for them, as they did with every other offset and exclusion in the Agreement.

BP effectively conceded this point in suggesting that the entity's BEL compensation (or part thereof) should be deducted as a "Spill-Related Payment". Though creative, this argument fails for three obvious reasons:

First, the definition of "Spill-Related Payments" under the IEL Framework is limited to compensation paid "for the Claiming Job." *See* EXHIBIT 8A, at 8. A BEL Claim is paid for the lost profits of the business, not for any Claiming Job. This narrow definition is specifically intended to protect Claimants who make claims under multiple frameworks. In the rare instance in which payments under one framework are meant to be offset against payments under another, the Agreement expressly sets forth the relevant offset, rather than treating it as a "Spill-Related Payment." *See* SECTION 38.164 (defining "VoO Earned Income Offset"); SECTION 38.166 (defining "VoO Settlement Payment Offset"); SECTION 5.5.2.1-5.5.3 (dictating which claims are subject to VoO offsets). Likewise, whenever a settlement payment must be allocated among multiple claimants, the Agreement dictates that the Claims Administrator make the allocation and pay each claimant directly. It does not leave claimants to squabble amongst themselves or pay one claimant at the expense of others. *See* EXHIBIT 11A, at 7 (allocation of Coastal Real Property Compensation Amount); EXHIBIT 12A, at 7 (allocation of Wetlands Real Property Compensation Amount); EXHIBIT 13A, at 4 (allocation of Real Property Sales Compensation Amount).

Second, and more importantly, the Agreement is not written, and was never understood, to allow economic loss compensation awarded to one claimant to be deducted from, or entirely bar, another claimant's award.

Third, BP's position would result in similarly situated claimants being treated quite differently. By definition, "Spill-Related Payments" include only those payments which have actually been made, not any that hypothetically might be. Accordingly, the fortuity of which claim was submitted and processed first – IEL or BEL – would dictate the compensation available to the individual. These results directly contradict the Agreement's stated goal of uniformity. *See, e.g.,* SECTION 4.4.7 (stating that the claims frameworks "shall apply equally to all claimants…").

Because the Agreement does not distinguish between owners, officers, and other W-2 employees, all are subject to the same documentation, causation, and compensation frameworks, and are eligible for the same types of awards.

Notably, there is an inconsistency between Policy No. 363 and Proposed Policies Nos. 490 and 503, which require strict respect for and enforcement of corporate and other business distinctions and formalities.

While Class Counsel believe that the IEL Claims of Owners and Officers should generally be recognized irrespective of whether there was, in fact, an actual "double payment" by BP, such claims should certainly not be prohibited across-the-board, as a matter of policy.

Class Counsel respectfully note the absurdity of the Policy's unfair effect on eligible Class Members outside of the sole proprietorship or other closely-held situation. What about, for example:

    a.    An Officer who is *not* an Owner?

    b.    A former Officer, who is no longer either an Officer nor an Owner?

    c.    An employee, or former employee, who has a very small minority Ownership interest?

    d.    An employee, or former employee, who had a very small minority Ownership interest at the time of the Spill, but has since sold it?

There is no justified presumption that a part-owner or officer of a corporation was paid a portion of the earnings from the corporation, and did not have separate W-2 earnings. Nor can it be presumed that the proceeds from any BEL recovery will be passed on to a part-owner, officer, or former owner or officer of the company.

Finally, where the employer's claim was a GCCF Business Claim, as opposed to a Settlement Program BEL Claim, there is no basis to apply this Policy, because the GCCF did not treat owner or officer compensation as a "fixed expense" under any type of concrete or objective framework analogous to Exhibit 4C.

**Exclusion of Claimants Based on a Prior GCCF Release**

The Settlement Class Definition excludes:

> Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF Release and Covenant Not to Sue.

The Exclusion, therefore: **(i)** distinguishes between Natural Persons "*or*" Entities; **(ii)** requires that the Natural Person *or* Entity made a claim to the GCCF; **(iii)** requires that the

Natural Person or Entity was "paid" by the GCCF; and **(iv)** requires that the Natural Person or Entity "executed" the GCCF Release.[21]

At the same time, the standard GCCF Release for a GCCF "Business" Claim provided:

Claimant also, on behalf of Claimant's spouse, heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, affiliates, partners, limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, and attorneys (collectively, "Affiliates"), hereby releases....

Significantly, the GCCF Release does *not* purport to release the claims of either "owners" or "officers" or "employees" of the business.

Indeed, and as noted *supra,* it is specifically contemplated under the Settlement Agreement that an Entity's employees will make claims within the Settlement Program based on the recognition of the Entity's GCCF Claim (which, in many cases, presumably included the execution of a GCCF Release).  *See* EXHIBIT 8A, Section I(B)(2)(b)(i).

Similarly, questions are raised about the extent of the release by other Affiliates under the GCCF Release – *e.g.,* Is a "shareholder" or a "member" or a "joint venturer" of a GCCF Business Claimant really releasing any and all BP Oil Spill Claims, or only claims *in the capacity* of a "shareholder" or a "member" or a "joint venturer" of the relevant Business entity?

Apparently the GCCF, and certainly the Settlement Program, treat some claims as "Business" or "Entity" claims, despite the absence of corporate (or LLC, or limited partnership, or other business) formalities.  In those cases, a release signed by the owner of the "business" or "entity" would presumably release such claims – but would not release the claims of any other formal business entity owned by him/her and/or his/her Spouse.

On the other hand, where there are corporate (or LLC, or limited partnership, or other business) formalities, the execution of a release for that entity would generally not bar the signatory's separate and independent individual claim, nor the claim of some other separate and distinct entity, and would certainly not bar his/her spouse's claims (if any).

So, in order to determine whether the Exclusion applies to a previous GCCF Release, you would have to know:  the nature of the entity or other "business" (or individual) that made the previous GCCF Claim (*i.e.,* who is the GCCF "Claimant"); the capacity in which the GCCF Release was executed on behalf of the business claimant and/or the individual claimant; and the relationship of the business and/or signatory to the potential Settlement Program Claimant.

(In addition, it may depend upon specific / individualized terms of a GCCF Release.  We understand, for example, that in at least one case the GCCF agreed to expressly limit the release to one Division of a multi-unit company, expressly reserving the claims of the other Divisions. In that case, the GCCF Release should not prohibit the Entity from making a Settlement Program claim on behalf of its other units or Divisions.)

*GCCF Claimant's Spouse's Independent Claim in Settlement Program*

Again, the evaluation of the claim of the Spouse of a GCCF Claimant will likely depend upon the nature of any relevant "businesses" and/or "entities", but generally:

---

[21] SECTION 2.2.6.

If the GCCF claim was an "Individual" GCCF claim, then the Spouse of that individual should be able to assert a Settlement Program BEL Claim on behalf of a separate formal Entity, or an IEL Claim for a Claiming Job, or a Seafood Vessel / Lease Claim that is separate from what was claimed by the GCCF claimant.

If the GCCF claim was a "Business" GCCF claim, then the Spouse cannot make a claim for the same Entity in the Settlement Program, but can make a claim for a different Entity or for his/her own separate Claiming Job, or Seafood Vessel / Lease Claim, that was not the subject of the GCCF claim.

**The Panelists Should Reject, Out of Hand, any BP Appeals Based on What a BEL Claimant Allegedly "Would Have Been Expected to Earn" and/or Other Vague and Alleged Notions of "Economic Reality"**

Based on the discussions regarding the implementation of the new Matching Policy [No. 495], Class Counsel expect BP to appeal numerous, if not all, new BEL Eligibility Determinations based on general, subjective contentions that the objective application of 495 by the Program Accountants, (as directed by the Court), either (in BP's view) exceeds what the BEL Claimant "would have expected to earn" absent the Spill, or is (allegedly) inconsistent with "economic reality".

Clearly, there was and is no indication or directive from the U.S. Fifth Circuit that either the Program Accountants, the Claims Administrator, or the Appeal Panelists, would tear up the Agreement, and, for each individual claim, attempt to subjectively "achieve a realistic measure of economic loss" for that claimant.

In using that language, the BEL Panel was simply weighing the two proffered interpretations of the term "corresponding" as used in Exhibit 4C, and concluded that, *as between* *the* *two,* BP's proffered interpretation was *more* in line with "economic reality".

Upon remand, Judge Barbier agreed that the word "corresponding" within the definition of "Variable Profit" should be interpreted to suggest the type of matching of expenses to revenue that one would typically find in accrual-based accounting profit & loss statements.

*However,* this does not in any way suggest or imply that the entire 4C Compensation Framework should be tossed out the window in favor of some new and unspecified standard of "realistic measure of economic loss" or other vague notions of "economic reality".

In the same vein, BP has suggested that the Exhibit 4B Causation Framework, the Exhibit 5 Multi-Facility Framework, and the Exhibit 4C Compensation Framework, including the Policy No. 495 Matching Methodologies, should all be tossed aside in favor of some unspecified and subjective inquiry into what (BP contends) the BEL Claimant "would have expected to earn" absent the Spill.  Of course, neither BP nor its proffered "expert" were able to articulate specific answers the following questions:

    a.    Where in Exhibit 4C or Exhibit 5 is the Claims Administrator or are the Program Vendors directed to modify, manipulate, overrule or disregard some or all of the Benchmark Compensation, or to otherwise subjectively determine what the Program might believe "reflect[s] what a 'claimant might have expected to earn' in the related compensation period to appropriately calculate an award consistent with a 'reasonable understanding of calculation of damages'"?

b.  Where in Exhibit 4C or Exhibit 5 (or anywhere else) does the Settlement Agreement direct or otherwise provide that "the benchmark period must reflect what a 'claimant might have expected to earn' in the related compensation period to appropriately calculate an award consistent with a 'reasonable understanding of calculation of damages'"?

c.  Where in Exhibit 4C or Exhibit 5 (or anywhere else) does the Settlement Agreement direct or otherwise provide that "[w]here the benchmark period results do not establish a reasonable expectation of 2010 results the CSSP should make appropriate and reasonable adjustments to provide an economically relevant benchmark of what a claimant might have 'expected to earn' in the absence of the spill"?

d.  Where in Exhibit 4C or Exhibit 5 is the Claims Administrator or are the Program Vendors directed to consider "a claimant's divestiture of a product line or location between the benchmark year and 2010"?

e.  Where in Exhibit 4C or Exhibit 5 (or anywhere else) does the Settlement Agreement direct or otherwise provide that the Claims Administrator and/or Program Vendors must adopt and apply some unstated, unspecified "analysis" of "economic reality" and to "consider[] the totality of information rather than a single standard"?

f.  What about additions to product lines and/or locations, and/or other changes during the Benchmark and/or Compensation Period that would indicate that the Claimant "might have expected to earn" *more* money during the Compensation Period than what is dictated by the stipulated Exhibit 4C methodology?

g.  Why shouldn't a Claimant simply be allowed to verify what he, she or it actually "expected to earn" during the Compensation Period, and award that BEL Claimant what the BEL Claimant "might have expected to earn in the absence of the Spill" irrespective of the Benchmark Compensation?[22]

As the BEL Panel concluded – rejecting BP's argument regarding the term "comparable":

> BP's primary concern seems to be the uneven cash flows of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed.[23]

---

[22] Class Counsel are confident that many BEL Claimants would *love* to be awarded what they subjectively expected to earn, prior to the Spill, in 2010.

[23] BEL OPINION, p.25 (In re Deepwater Horizon, 732 F.3d 326, 340 (5th Cir. 2013)); *see also* ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] pp.5-6.

The Fifth Circuit also said, in that same section of the BEL Decision:

> The agreement allows the claimant to pick as few as three months or as much as an average of nine months over three calendar years. This, along with the word "comparable," clearly indicate that the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months.* [24]

BP's continuing and bad faith attempts to re-write the Settlement Agreement, to blow up the Settlement Program, and/or to inject new, additional, unspecified, undefined and inherently subjective causation, compensation and/or other tests or notions should be summarily rejected.

**Substantial Deference Should Be Paid to Employer SWSs.**

When a Claimant's employer completes an SWS attributing the Claimant's losses to the spill, the information is required to be in the form of a *sworn statement,* (as opposed to a simple letter in support of the claim). The Claimant's Employer is under no compulsion to provide any information in support of the claim whatsoever; completion of the Employer SWS is completely voluntary. That the Claimant's Employer is willing to swear that the Claimant's losses were caused by the Spill should entitle the statement to a high degree of deference, even during the Appeal Panel's *de novo* review.

Furthermore, it is important to keep a reasonable perspective when evaluating the sufficiency of the information provided in the Employer SWS. The Settlement Agreement does require that the Employer SWS "articulate in detail" how the claimant's losses are attributable to the spill.[25] However, in all but the most unusual of cases, the Employer will not have retained experts to formally quantify or assess the manner in which the Employer's business and/or employees were impacted. The explanation provided in the Employer SWS will almost always be the statement of a business that has simply done its best to internally gauge how financially detrimental the Spill was to the business and/or to the Claimant. Section 4.3.8, in this regard, requires the Settlement Program to view such evidence in a light most favorable. Applying an overly stringent interpretation of the Settlement Agreement to conclude that the Employer did not sufficiently articulate how a Claimant was impacted by the spill is inconsistent with the nature, spirit, intent and terms of the Settlement Agreement.[26]

This 16th day of July, 2014.

Respectfully submitted,

STEPHEN J. HERMAN
JAMES PARKERSON ROY
*Co-Lead Class Counsel*

---

[24] BEL OPINION, p.25 (732 F.3d at 340) (emphasis supplied). *See also* BEL OPINION, p.20 (732 F.3d at 337) (The documents identified in Exhibit 4A "presumably would allow accountants *fairly, if at times imperfectly,* to 'match' revenues and expenses if such were required") (emphasis supplied).

25 SETTLEMENT AGREEMENT, Exhibit 8A, Section I(B)(2)(b)(ii).

[26] At the very least, and as noted above, particularly where the Settlement Program had previously deemed the SWS to be sufficient, the Claimant should be provided with the opportunity to supplement, amend, and/or otherwise respond.