# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to all actions. | * * | |
| | * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |
| | * * | |
| | * | |

## MEMORANDUM IN OPPOSITION TO BP'S MOTION TO REMOVE THE CLAIMS ADMINISTRATOR

Richard C. Stanley, 8487
Bryan C. Reuter, 23910
STANLEY, REUTER, ROSS
  THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana  70112
(504) 523-1580
rcs@stanleyreuter.com

Phillip A. Wittmann, 13625
John M. Landis, 7958
C. Lawrence Orlansky, 2039
Maggie A. Broussard, 33033
STONE, PIGMAN, WALTHER, WITTMANN, LLC
546 Carondelet Street
New Orleans, LA 70130
(504) 581-3200
pwittmann@stonepigman.com

*Attorneys for the Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust*

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II. THERE IS NO LEGAL OR FACTUAL BASIS FOR BP'S MOTION
    UNDER 28 U.S.C. § 455 ........................................................................................... 3

    A.  28 U.S.C. § 455 does not apply to the administrator of a settlement
        agreement ....................................................................................................... 5

    B.  BP's motion is untimely and is not completely candid with the Court ........... 7

    C.  Mr. Juneau also did not previously "serve as lawyer in the matter in
        controversy" ................................................................................................. 11

    D.  There are no reasonable grounds on which to question Mr. Juneau's
        impartiality .................................................................................................. 16

III. BP'S ARGUMENTS CONCERNING MR. JUNEAU'S STATEMENTS
     PROVIDE NO GROUNDS FOR REMOVAL ........................................................ 18

    A.  Mr. Juneau's statements to Mr. Freeh were neither false nor misleading .... 18

    B.  Mr. Juneau's public comments do not suggest that he is unable to
        impartially administer the CSSP ................................................................... 21

IV. THE MOTION'S REMAINING ALLEGATIONS SIMPLY REPEAT STALE
    ACCUSATIONS THAT HAVE BEEN ADDRESSED AND RESOLVED ............... 23

    A.  Mr. Juneau responded properly to allegations of staff misconduct .............. 24

    B.  Mr. Juneau did not improperly expedite claims ........................................... 25

    C.  Mr. Juneau committed no other "misconduct" ............................................. 26

    D.  Mr. Juneau's oversight has not been "wasteful" .......................................... 27

        1.  BP's criticisms of the Program's claims processing system ignore
            the unprecedented challenges it has faced ........................................ 27

        2.  Mr. Juneau's oversight of the Program vendors has been more
            than adequate ................................................................................... 30

        3.  The Program's costs are in line with its scope .................................. 32

    E.  The CAO is operating in accordance with the Settlement Agreement ......... 33

V.  CONCLUSION ....................................................................................................... 34

i

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429 (1993) ……………………………….......…….. 7

*Blue Cross & Blue Shield v. Delta Dental,* 248 F. Supp. 2d 39 (D.R.I. 2003) ………………… 11

*Boullion v. McClanahan,* 639 F.2d 213 (5th Cir. Unit A 1981) ………………………………… 7

*Briscoe v. LaHue,* 460 U.S. 325 (1983) ……………………………………………….......…….. 7

*Chitimacha Tribe of La. v. Harry L. Laws Co.,* 690 F.2d 1157 (5th Cir. 1982) ……………….. 17

*Davis v. Bayless,* 70 F.3d 367 (5th Cir. 1995) ………………………………………….......…… 7

*Guardian Pipeline, L.L.C. v. 950.80 Acres of Land,* 525 F.3d 554 (7th Cir. 2008) …………….. 5

*Imbler v. Pachtman,* 424 U.S. 409 (1976) …………………………………………………….. 7

*In re Castillo,* 297 F.3d 940 (9th Cir. 2002) …………………………………………………….. 7

*In re Kempthorne,* 449 F.3d 1265 (D.C. Cir. 2000) …………………………………………..….. 5

*In re Rodgers,* 537 F.2d 1196 (4th Cir. 1976) ……………………………………......……….. .16

*Little Rock Sch. Dist. v. Armstrong,* 359 F.3d 957 (8th Cir. 2004) ……………………………. 12

*Little Rock Sch. Dist. v. Pulaski County Special School District No. 1,*
839 F.2d 1296 (1988) ……………………………………………………………..………….. 12

*Patterson v. Masem,* 774 F.2d 251 (8th Cir. 1985) ………………………………….....……….. 12

*Preston v. United States,* 923 F.2d 731 (9th Cir. 1991) …………………………………..……… 16

*Renteria v. Schellpeper,* 936 F. Supp. 691 (D. Neb. 1996) …………………….......……………. .12

*Republic of Panama v. Am. Tobacco Co.,* 217 F.3d 343 (5th Cir. 2000) ……………..…………17

*Sao Paolo State of the Federation Republic of Brazil v. Am. Tobacco Co.,*
535 U.S. 229 (2002) ………………………………………………………………………….. 17

*Sensley v. Albritton,* 385 F.3d 591 (5th Cir. 2004) ……………………………………......…….. 8

*Travelers Ins. Co. v. Liljeberg Enters., Inc.,* 38 F.3d 1404 (5th Cir. 1994) ………………….…. 8

*United States v. Int'l Bhd. of Teamsters,* 814 F. Supp. 1165 (S.D.N.Y. 1993) ……………………6

*United States v. Sanford,* 157 F.3d 987 (5th Cir. 1998) ………………………...…………………. 8, 10

*United States v. Siegelman,* 640 F.3d 1159 (11th Cir. 2011) ……………………….…………. 10

*United States v. Werner,* 916 F.2d 175 (4th Cir. 1990) ………………………………………….. 5

*United States v. York,* 888 F.2d 1050 (5th Cir. 1989) ……………………………………….. 7, 11

## **STATUTES**

28 U.S.C. § 455 …………………………………………………………………....…… *passim*

33 U.S.C. § 2705 ………………………………………………………………….……… 13

La. R.S. 56:40.4 ……………………………………………………………….…….….. 12

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 53 ……………………………………………………………....……… 5, 6

Fed. R. Civ. P. 71.1 …………….....…………………………………………………….… 5, 6

## TABLE OF EXHIBITS

1.  Chronology of Facts

2.  Declaration of Patrick A. Juneau

3.  Declaration of Bruce A. Green

4.  Declaration of Kenneth R. Feinberg

5.  Declaration of Robert P. Levine

6.  Declaration of Lynn C. Greer

7.  Declaration of Orran L. Brown

8.  Declaration of David E. Smith

9.  Declaration of Neil L. Zola

10. Declaration of Bryan G. Pye

11. Patrick Juneau Press Conference Coverage, August 8, 2012

12. Supplemental Joint Declaration of Meade Monger, October 10, 2010

13. Letter from Patrick Juneau to the Court, July 1, 2013

14. Bob Dudley Comments, April 10, 2014

## I.    INTRODUCTION

Patrick Juneau, in his capacity as Claims Administrator of the Court Supervised Settlement Program (the "CSSP"), through his undersigned counsel, respectfully submits this memorandum in opposition to BP's Motion to Remove the Claims Administrator.  For the reasons stated herein, the motion should be denied.

BP and the PSC jointly proposed that Mr. Juneau be designated as Claims Administrator of the transition process.[1]  The Court appointed him to that position on March 8, 2012.[2]  Later, once it had granted preliminary approval of the Settlement Agreement establishing the CSSP, the Court appointed Mr. Juneau as Claims Administrator of the CSSP on May 2, 2012.  Mr. Juneau immediately began implementing the framework to receive and pay claims, with the objective of opening claims facilities in June 2012 and paying claims by the end of July 2012.[3]  All parties desired that a history of claims payment experience could be developed and filed into the record before the final fairness hearing on the class settlement.  With unprecedented effort and working under stringent time constraints, that objective was achieved.

On November 8, 2012, BP expressed its views on the settlement program and in particular on Mr. Juneau's performance for the prior 6 months:

> As Mr. Roy observed, this week we will reach a milestone. Even before this Court has had the opportunity to determine whether or not on a final basis the settlement is fair, reasonable and adequate, Mr. Juneau, by the end of this week or early next, will have approved the payment of over one billion dollars in claims made to his facility under the terms of this settlement.
>
> There is no precedence [sic] for this in our nation's jurisprudence. This is a good thing. It is a good thing not only for the claimants and for the communities of the

---

[1] *See* Tr. of November 8, 2012 Final Fairness Hearing, Rec. Doc. 7892 at 278.

[2] First Amended Order Creating Transition Process, Rec. Doc. 5995 at 1 (Mar. 8, 2012).

[3] Ex. 2, Declaration of Patrick A. Juneau, at ¶ 26.

Gulf Coast states, but it is good for our system of justice, for BP is committed to this principle.[4]

BP specifically remarked that Mr. Juneau was "doing a wonderful job"[5] and described his performance as "excellent."[6]

Nothing has changed about the quality or fairness of Mr. Juneau's work as Claims Administrator in the past 23 months. As the court-appointed and court-supervised Claims Administrator, Mr. Juneau remains committed to administering the CSSP according to the terms of the Settlement Agreement. The life of the CSSP, however, has not been easy. While acknowledged as one of the most complex and far-reaching settlement programs in the history of the federal courts, the CSSP also has endured extensive challenges in both the judicial system and the media. Mr. Juneau has continued his work with integrity, notwithstanding those challenges, improving the program whenever possible. For these efforts, for which there truly is "no preceden[t] . . . in our nation's jurisprudence," Mr. Juneau deserves to be commended—not removed.

Under the Settlement Agreement, Mr. Juneau serves always at the pleasure of the Court. In its Motion, BP offers five grounds for Mr. Juneau's removal as Claims Administrator. Specifically, BP cites: (1) Mr. Juneau's prior work for the State of Louisiana, (2) his comments to Special Master Freeh, (3) his public comments, (4) past misconduct by CSSP staff, and (5) Mr. Juneau's allegedly "wasteful" oversight of the CSSP. As will be shown, each of these grounds is utterly meritless as a basis for removal. After addressing these points in turn, Mr. Juneau requests simply that this Court deny the motion and permit him to continue to do his job of administering the settlement program in a fair and impartial manner.

---

[4] *See* Tr. of November 8, 2012 Final Fairness Hearing, Rec. Doc. 7892 at 50.

[5] *Id.* at 55.

[6] *Id.* at 64, 75.

## II.      THERE IS NO LEGAL OR FACTUAL BASIS FOR BP'S MOTION UNDER 28 U.S.C. § 455.

BP filed its motion on September 2, 2014, approximately 2 ½ years after Mr. Juneau's initial appointment by the Court.  In its motion, BP constructs a conflict of interest argument on the false premise that it only recently learned of, or only recently thought about, Mr. Juneau's prior and unrelated work for the State of Louisiana.  The truth is, however, that BP knew this fact no later than February 2012 for a very simple reason—**because Mr. Juneau expressly told them so**. Indeed, the fact that Mr. Juneau told BP about the very representation about which they now feign surprise is expressly documented in the notes of Mr. Juneau's interview by BP attorney Keith Moskowitz, leaving no doubt whatsoever that the message was not only conveyed by Mr. Juneau, but received and duly recorded by BP.[7]  Moreover, Mr. Juneau's straightforward statement to BP and the PSC in 2012 was in all likelihood completely unnecessary, since his work was widely and publicly known.

During his representation of the State of Louisiana which, as will be shown herein, related solely to acting in a non-litigation role to consult with Mr. Feinberg on the Gulf Coast Claims Facility (hereinafter "GCCF") protocols, Mr. Juneau worked closely and dealt frequently with Mr. Feinberg, who managed the GCCF on BP's behalf.[8]  Furthermore, in his role, Mr. Juneau personally met at least two BP executives, and participated in at least one conference call with BP

---

[7] Mr. Moskowitz's notes are attached to BP's Motion to Remove the Claims Administrator ("BP Motion") at Ex. 18. BP attorney Mark Holstein was not at the meeting, and treats his colleague's notes dismissively in his Declaration, though, indeed, those notes are fatal to the Motion.  *See* BP Motion, Ex. 10 (amended), Declaration of Mark Holstein, at ¶ 13.  It is also worthy of mention that Mr. Moskowitz took only 1 ½ pages of notes during the entire two-hour interview, obviously choosing to record only the important points of the meeting.  Those important points specifically included Mr. Juneau's statement about his prior representation of the State of Louisiana.

[8] "[T]he district court determined Mr. Feinberg acted as BP's 'agent' in administering the Gulf Coast Claims Facility." Brief *amicus curiae* of Kenneth R. Feinberg, Special Master of the Federal September 11th Victim Compensation Fund of 2001 and Administrator of the Gulf Coast Claims Facility at 1 n.1, No. 14-123, filed Sept. 4, 2014.

counsel.[9]  Indeed, in a letter from Attorney General Caldwell to Mr. Feinberg commenting on aspects of the GCCF, the Attorney General specifically references that Mr. Juneau also will be commenting on the State's behalf.[10]  A copy of that letter was sent to BP counsel Mark Holstein, who attaches it to his declaration without further comment on his receipt of the letter, saying only that it was one of several items recently located in BP's files.[11]  Indeed, Mr. Juneau's prior work for the State of Louisiana was even reported in the *New York Times*, a publication used frequently by BP as an advertising medium for its criticism of the CSSP.[12]

This factual record precludes the revisionist historical pose BP now attempts to present to the Court in its motion.  And, beyond that, the remainder of the argument has no greater merit.  As will be demonstrated, 28 U.S.C. § 455 cannot support BP's Motion, as it does not apply at all,[13] and would not require removal even if it did.  The State of Louisiana was never a claimant under the GCCF, and cannot be a party to the Settlement Agreement and thus can make no claim under it to the CSSP.  There is no conflict, which likely explains why BP had nothing at all to say about this despite its knowledge in 2012, when it jointly moved to have Mr. Juneau appointed, and

---

[9] Ex. 2, Juneau Declaration at ¶ 17.

[10] BP Motion, Ex. 10 (amended), Holstein Declaration, Exhibit E, Rec. Doc. 13370-44 at 10-12. The Attorneys General of the other Gulf States also were copied on this letter.

[11] *Id.* at ¶ 12.

[12] *Id.* at Exhibit A, Rec. Doc. 13370-42 at 11-17.

[13] Mr. Juneau's role as Claims Administrator exists only because it is a position created by a term of the Settlement Agreement, a contractual agreement between the Parties that serves as the basis for the class settlement.  According to that agreement, the Court alone has the power to replace Mr. Juneau at its discretion, and the Court is not bound to apply any identifiable statute or Code of Conduct in making that determination.  Rather, the Court is empowered by the Agreement to act in the best interest of the program.  *See* Settlement Agreement § 4.3.3, Rec. Doc. 6430-1 (May 3, 2012).  The standards of 28 U.S.C. § 455 are not incorporated into the Settlement Agreement in reference to the Claims Administrator's role, or in any other manner.  Accordingly, there is no legal basis for a disqualification motion of a Claims Administrator under § 455.

4

affirmatively supported and publicly lauded Mr. Juneau as an "excellent" Claims Administrator after nearly six months of CSSP operations.[14]

### A.    28 U.S.C. § 455 does not apply to the administrator of a settlement agreement.

First, and most importantly, Mr. Juneau is not a "justice, judge, or magistrate judge of the United States."  28 U.S.C. § 455(a).[15]  BP cites case law holding only that the restrictions of § 455 apply to special masters and land commissioners.[16]  This is certainly true (at least in large part) as to special masters, and arguably true as to land commissioners.  Federal Rule of Civil Procedure 53, which deals with court-appointed special masters, explicitly provides that "[a] master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses the potential ground for disqualification."  Fed. R. Civ. P. 53(a)(2).[17]  Furthermore, Rule 71.1 provides that a land commissioner is essentially equivalent to a Rule 53 special master.  *See* Fed. R. Civ. P. 71.1(h)(2)(D) ("A commission has the powers of a master under Rule 53(c).  Its action and report are determined by a majority.  Rule 53(d), (e), and (f) apply to its action and report.").[18]

---

[14] *See supra* notes 4-6.

[15] The statute provides, in relevant part, that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," or "[w]here in private practice he served as [a] lawyer in the matter in controversy."  28 U.S.C. § 455(a), (b)(2).

[16] *See* BP's Memorandum in Support of Motion to Remove the Claims Administrator ("BP Memorandum") at 11 n.45 (citing *In re Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2000); *United States v. Werner*, 916 F.2d 175, 178 (4th Cir. 1990)).

[17] The Advisory Committee Notes to the 2003 Amendments explain that "[b]ecause a master is not a public judicial officer, it may be appropriate to permit the parties to consent to the appointment of a particular person as master in circumstances that would require disqualification of a judge."  Thus, a Special Master sometimes can serve with the consent of the parties even in circumstances when a judge could not.

[18] Illustrating the reluctance of federal courts to expand the reach of § 455 beyond judges in the absence of clear authority, the Seventh Circuit has expressed doubt that its restrictions apply to Rule 71.1 land commissioners.  *See Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554, 556 (7th Cir. 2008).  The Seventh Circuit noted that

Mr. Juneau, however, is not a Rule 53 special master, and BP does not suggest that he is.[19] Rather, Mr. Juneau oversees a settlement and compensation program that was created by agreement of the parties.  Notwithstanding the Court's supervisory role over the program, BP itself has previously described Mr. Juneau as essentially "a private agent administering a private settlement contract pursuant to private undertaking and trust contracts."[20]  Neither BP nor its expert cites a single case applying § 455 to an administrator of a private settlement agreement, or indeed, to *any* court appointee other than a Rule 53 special master or a Rule 71.1 land commissioner.  One district court has convincingly explained why an "Independent Administrator" of a consent decree was not subject to § 455:

> [The administrator] is not a judge, justice, or magistrate.  Thus, Section 455 is not facially applicable to him.  In addition, even if Section 455 controls the disqualification of adjudicators such as special masters, [the administrator's] role is not equivalent to that of a special master.  A special master is largely under the direction of the court, *see* Fed. R. Civ. P. 53(a), while [the administrator] is **charged with an adjudicatory function pursuant to a private agreement between the Government and the IBT**.  Indeed, the Second Circuit has held that the Independent Administrator is not a state actor because he "act[s] pursuant to the IBT Constitution—a private agreement—and not pursuant to a 'right or privilege created by the State.'"  *United States v. IBT*, 941 F.2d 1292, 1296 (2d Cir.), *cert denied*, 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1991).

*United States v. Int'l Bhd. of Teamsters*, 814 F. Supp. 1165, 1171 (S.D.N.Y. 1993) (emphasis added).

Mr. Juneau has maintained (and still maintains) that he is entitled to quasi-judicial immunity "with respect to his discretionary acts in interpreting the [Business Economic Loss]

---

Rule 71.1 makes certain subsections of Rule 53 applicable to land commissioners, but does not include the subsection imposing the restrictions of § 455.  *Id.*

[19] In fact, BP thoroughly explained in an earlier memorandum the various reasons why Mr. Juneau is not a special master under Rule 53.  *See* Opposition to Motion to Dismiss, Rec. Doc. 9119 at 8-9 (Apr. 4, 2013).

[20] *Id.* at 7.

Framework as part of the Settlement Agreement and processing claims under that framework."[21] From this, BP argues that Mr. Juneau should therefore "be held to the ethical standards that govern judges," including § 455.[22]  This argument simply does not follow.  Courts frequently have granted quasi-judicial immunity to individuals and officials who plainly are not subject to § 455, such as grand jurors, prosecutors, witnesses, bankruptcy trustees, and court-appointed receivers.[23]  This is not surprising, as judicial immunity is a judge-created doctrine based on policy concerns that have little to do with whether one is literally a "justice, judge, or magistrate judge of the United States," as required by § 455.[24]

### B.      BP's motion is untimely and is not completely candid with the Court.

Even if Mr. Juneau could be subject to a motion to disqualify under 28 U.S.C. § 455, BP's motion is untimely.  The Fifth Circuit has made clear that a motion to disqualify under either § 455(a) or § 455(b) is barred if not timely asserted.  *See United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989).  This timeliness requirement "prohibits knowing concealment of an ethical issue for strategic purposes."  *Id.*  Moreover, although waiver under § 455(e) requires "full disclosure on the record of the basis for disqualification," timeliness looks only to the prior knowledge and awareness of the party seeking disqualification—not to the source of that

---

[21] Memorandum in Support of Motion to Dismiss, Doc. No. 9066-1 at 8 (Apr. 1, 2013).

[22] BP Memorandum at 11.

[23] *See Imbler v. Pachtman*, 424 U.S. 409, 422-24 & n.20 (1976) (grand jurors and prosecutors); *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983) (witnesses); *Davis v. Bayless*, 70 F.3d 367, 374 (5th Cir. 1995) (court-appointed receiver); *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. Unit A 1981) (bankruptcy trustee).

[24] *See, e.g., Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993) ("The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. . . . When judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, 'exercise a discretionary judgment' as a part of their function.") (quotation omitted); *In re Castillo*, 297 F.3d 940, 948 (9th Cir. 2002) ("The Supreme Court has recognized that individuals, when performing functions that are judicial in nature, or who have a sufficiently close nexus to the adjudicative process, are entitled to a grant of absolute quasi-judicial immunity.").

knowledge.[25]  Professor Bruce Green, the Director of the Louis Stein Center for Law and Ethics at

Fordham University School of Law and an expert in legal and judicial ethics, explains:

> A party must file its disqualification motion once it is in possession of the basic
> facts about the judge's relationships or prior employment on which its motion
> would be predicated; it cannot justify its delay on the ground that it had not yet
> acquired all the details that judicial disclosure might have afforded.[26]

Fifth Circuit precedent strongly favors denial of a motion for disqualification when the

underlying facts were known to the party now seeking disqualification.  *See Sanford*, 157 F.3d at

988 ("The general rule on timeliness requires that 'one seeking disqualification must do so at the

earliest moment after knowledge of the facts demonstrating the basis for such disqualification.'")

(quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)); *see also*

*id.* at 988-89 ("The most egregious delay—the closest thing to *per se* untimeliness—occurs when

a party already knows the facts purportedly showing an appearance of impropriety but waits until

after an adverse decision has been made by the judge before raising the issue of recusal.").  A strict

rule on untimeliness is necessary to preserve fairness to all parties and prevent one side from

concealing facts that could lead to disqualification to preserve a strategic advantage.  *Sensley v.*

*Albritton*, 385 F.3d 591, 598 (5th Cir. 2004) ("Courts should take special care in reviewing recusal

claims so as to prevent parties from 'abus[ing] § 455 for a dilatory and litigious purpose based on

little or no substantiated basis.'") (quoting *Travelers*, 38 F.3d at 1410).

---

[25] *See York*, 888 F.2d at 1056 ("[B]efore his trial began, York was aware generally of the circumstances upon which
he bases his motion for disqualification.  York allowed the court to conduct a full trial, all the while knowing that he
might seek to invalidate it.  Therefore, we find his motion for a new trial untimely."); *United States v. Sanford*, 157
F.3d 987, 988-89 (5th Cir. 1998) (finding motion untimely because of counsel's prior knowledge of grounds for
disqualification, without any suggestion that the district judge had disclosed these grounds on the record).

[26] Ex. 3, Declaration of Bruce A. Green, at ¶ 21.

BP's motion is untimely because Mr. Juneau's work on behalf of Louisiana was well known to BP, first and foremost, because Mr. Juneau expressly told them about his role in 2012.[27] That disclosure by Mr. Juneau likely confirmed what BP already knew, since Mr. Juneau's role was well and publicly known when he was interviewed for the position of Claims Administrator. Aside from Mr. Feinberg and the GCCF staff, no fewer than five BP representatives were expressly aware of Mr. Juneau's role as Louisiana's liaison to the GCCF in the year following the oil spill:

- On July 15, 2010, Mr. Juneau spent the day traveling across Louisiana by helicopter with GCCF personnel, state officials, and BP Vice-President Darryl Willis; the team attended town hall meetings in Harahan, Houma, Port Sulphur, and Lafitte throughout the day.  Mr. Juneau met Darryl Willis and remembers talking with him that day.[28]

- On August 13, 2010, Mr. Juneau attended a meeting of state and local officials at the Claiborne Building, where he also met BP's Geir Robinson.[29]

- On December 7, 2010, Mr. Juneau participated on behalf of Louisiana in a conference call hosted by BP's own Mark Holstein and Daniel Cantor of Arnold & Porter, wherein the two BP lawyers discussed the language of the GCCF release with the various Gulf States Attorneys General and their liaisons, including Mr. Juneau.[30]

- On November 17, 2010, Louisiana Attorney General Buddy Caldwell wrote to Kenneth Feinberg, with a copy to BP attorneys Mark Holstein and Jack Lynch, giving Louisiana's comments on the GCCF release and draft protocol. The letter specifically mentions Mr. Juneau's work on these issues and his communications with Mr.

---

[27] BP Motion, Ex. 18, Notes of Keith Moskowitz.

[28] Ex. 2, Juneau Declaration at ¶ 12.

[29] *Id.* at ¶ 13.

[30] *Id.* at ¶ 17.

Feinberg: "I would also like to incorporate by reference the comments submitted to you, via email, on November 8, 2010 by Patrick Juneau."[31]

- As explained more fully below, Mr. Juneau frequently communicated with Mr. Feinberg on behalf of Louisiana as Mr. Feinberg was developing the GCCF protocols. Mr. Feinberg "communicate[d] regularly with BP as [he] developed the GCCF Protocol and forwarded copies of email correspondence between Mr. Juneau and [himself] to BP's counsel." [32]

Accordingly, the "earliest moment after knowledge of the facts demonstrating the basis for [Mr. Juneau's] disqualification" would have been the moment his name was proposed as a candidate for the position of Claims Administrator. *See Sanford*, 157 F.3d at 988. BP's motion to disqualify Mr. Juneau, brought now after over ***two and one-half years*** of work as Claims Administrator based on facts it has known about for over ***four years***, is a paradigm of untimeliness.

Even if the Court were to indulge the assumption that these six BP executives and attorneys (Mr. Willis, Mr. Robinson, Mr. Moskowitz, Mr. Cantor, Mr. Holstein, and Mr. Lynch) did not remember meeting, talking to, or reading about Mr. Juneau, Mr. Juneau's role was still public knowledge and documented in publicly-available news sources. The *New York Times* article cited by BP as evidence of Mr. Juneau's representation of the State was available, no doubt, through a rudimentary internet search of Mr. Juneau's name at the time he was being considered for the position of Claims Administrator. [33] Also, among the many members of the public with personal knowledge of Mr. Juneau's representation were BP's GCCF administrator Kenneth Feinberg,

---

[31] BP Motion, Ex. 10 (amended), Holstein Declaration, Exhibit E, Rec. Doc. 13370-44 at 10-12.

[32] Ex. 4, Declaration of Kenneth R. Feinberg, Exhibit B at ¶ 6.

[33] *See, e.g.*, *United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) (recusal motion was untimely, in part because it was based upon information garnered from an internet search that was readily available to the plaintiff prior to trial).

Camille Biros and several other GCCF officials,[34] the Gulf States Attorneys General and their staff, and members of Louisiana Attorney General's office. Mr. Juneau's role was simply too widely known for BP to credibly claim that it was not aware of it when selecting him as Claims Administrator.

Because the standard for untimeliness looks only to the prior knowledge and awareness of the party seeking disqualification—not its source—BP cannot complain that the facts revealing Mr. Juneau's representation of Louisiana were never presented "on the record" when the facts were known to all parties.[35]  *See York*, 888 F.2d at 1056.  In light of Mr. Juneau's disclosure and BP's own prior knowledge of the representation, there can be no doubt that BP has long been aware of its alleged grounds for disqualification.

### C.  Mr. Juneau also did not previously "serve as lawyer in the matter in controversy."

Disqualification also would not be called for under § 455(b)(2) for another independent reason: Mr. Juneau never "served as [a] lawyer in the matter in controversy."  Although the case law reflects no clear consensus on the definition of "matter in controversy," courts often have defined the term quite narrowly.  *See, e.g.*, *Blue Cross & Blue Shield v. Delta Dental*, 248 F. Supp. 2d 39, 43 (D.R.I. 2003) ("[T]he term 'matter in controversy' as set forth in § 455(b)(2) should be given a restrictive reading; that is, it should be read as applying only to the case that is before the

---

[34] *See* BDO's Independent Evaluation of the Gulf Coast Claims Facility Department of Justice, Prepared at the request of the U.S. Department of Justice at 13, (June 5, 2012) available at http://www.justice.gov/iso/opa/resources/66520126611210351178.pdf ("The daily execution of Feinberg Rozen's involvement in the GCCF was overseen and supervised by Camille Biros.").  Ms. Biros was involved in several of Patrick Juneau's email exchanges with Kenneth Feinberg and the GCCF.  *See, e.g.*, Ex. 2, Juneau Declaration, Exhibit A.

[35] BP argues that Mr. Juneau did not disclose his representation "on the record" (as opposed to orally at the interview) at either the preliminary or final approval hearing on the class settlement, Memorandum at 21, apparently forgetting that these hearings took place in the context of a claims process that was already actively underway.  *See* Ex. 1, Chronology of Facts.  In fact, the Court's first question to Patrick Juneau at the Final Fairness Hearing was, "what is the acceptance rate that you're seeing on the determination letters?"  Rec. Doc. 7892 at 87.  The Claims Administrator's background and qualifications were never questioned by any party at either hearing.

Court as defined by the docket number attached to that case . . . ."); *Renteria v. Schellpeper*, 936 F. Supp. 691, 696-97 (D. Neb. 1996) ("The 'matter in controversy' means this case or one so nearly identical that the two are the same insofar as the parties and the claims are concerned.").  The Eighth Circuit has held that the "matter in controversy" may be "*less* extensive than a case" before the court.  *Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957, 960 (8th Cir. 2004) (emphasis added).

In *Little Rock School District v. Pulaski County Special School District No. 1*, 839 F.2d 1296 1301-02 (1988), the Eighth Circuit concluded that earlier litigation "form[ing] part of the historical background" of the dispute before the court was nevertheless not the same "matter in controversy" under 28 U.S.C. § 455(b)(2).  The court acknowledged earlier precedent holding that the "matter in controversy" does not extend beyond a particular case.  *Id.* (discussing *Patterson v. Masem*, 774 F.2d 251, 254 n.2 (8th Cir. 1985)).  The court went on to explain, however, that "[e]ven if we accept appellants' argument that different cases may constitute the same 'matter in controversy,' . . . the question of what kinds of cases are sufficiently related for the purposes of § 455(b)(2) would remain a question of judgment and degree."  *Id.* at 1302.  The court found it important that the earlier litigation had involved, "to a large extent, different issues and different remedies."  *Id.*

Despite BP's argument to the contrary, Mr. Juneau has never served as a lawyer adverse to BP in the MDL before the Court.  BP seeks to substitute a form of adversity by noting that Louisiana sued BP on April 19, 2011, [36] and "claimed damages based on purported injuries it has

---

[36] BP Memorandum at 13-14.  Based on BP's definition of "adverse" as asserting claims for damages in court, "adversity" may have commenced much earlier (and before Mr. Juneau's hiring) on May 17, 2010, when parish officials first filed suit against BP in the name of the State in the 32nd Judicial District, Terrebonne Parish, asserting claims for damages for destruction of wildlife and aquatic life throughout Louisiana.  *See* Order Denying Remand, Rec. Doc. 470 (Oct. 6, 2010).  La. R.S. 56:40.4 allows a Parish District Attorney to bring a civil suit "in the name of the state to recover civil penalties for the value of each fish, wild bird, wild quadruped, and other wildlife and aquatic life unlawfully killed, caught, taken, possessed, or injured."  This case was one of several such claims brought in the courts of the coastal parishes that BP eventually removed to the MDL 2179 proceedings.  *See* Order Denying Remand, Rec. Doc. 471 (Oct. 6, 2010).  "Adversity" to BP, therefore, predated Mr. Juneau's contract for consulting work

suffered through losses allegedly suffered by individual claimants and businesses."[37]   Although Louisiana certainly became adverse to BP upon filing its own action against BP, the law does not impute a client's adversity to a lawyer who is serving the client in a different matter.  Louisiana's legal claims against BP, whenever filed, are irrelevant as to Mr. Juneau because Mr. Juneau played no role in preparing, filing, or litigating those claims for relief.[38]  Mr. Juneau was hired to provide "advice and counsel to the State . . . related to the claims process and allocation protocols utilized and developed by the Responsible Parties associated with and/or arising from the Deepwater Horizon Oil Spill," and these services did "not include litigation."[39]

Furthermore, Mr. Juneau's role as Louisiana's liaison to the GCCF does not constitute "serv[ice] as [a] lawyer in the matter in controversy."  The GCCF was unilaterally created, funded, and ultimately controlled by BP.  BP, as a "responsible party" under the OPA, had a statutory duty to establish a functional system for paying interim damages claims.  *See* 33 U.S.C. § 2705.  The GCCF sought to go beyond the payment of claims required by the OPA, however, attempting to settle claims by individuals and businesses against BP relating to the oil spill—and thereby avoiding the prospect of protracted, expensive litigation.[40]  BP was fully aware that the success of

---

concerning the GCCF—which began on July 2, 2010—but did not stop BP and Mr. Feinberg from affirmatively reaching out to the State and Mr. Juneau for assistance with the GCCF.

[37] *See* Rec. Doc. 2031 (Apr. 19, 2011).

[38] *See* Ex. 2, Juneau Declaration at ¶ 9.  Though related to the GCCF, Louisiana's Notice of Joinder, Rec. Doc. 1091 (Feb. 1, 2011), and later Memorandum in Support of the PSC's motion requesting that the Court supervise the GCCF's communications with class members, Rec. Doc. 1308 (Feb. 7, 2011), are likewise irrelevant to any conflicts analysis. BP acknowledged in its previous memorandum to this Court that these filings in the MDL did not involve the assertion of any claims by the State of Louisiana on behalf of itself or its citizens.  *See* BP Memorandum Regarding the OPA and GCCF, Rec. Doc. 1330, at 17-18 (Feb. 18, 2011) ("Thus, Louisiana, Mississippi, and Florida have no claims seeking relief under OPA on behalf of their citizens . . . .  Instead, they remain nonparties . . . .").

[39] BP Motion, Ex. 3, Contract for Professional Legal Services.

[40] *See* Order and Reasons, Doc. No. 1098, at 10-11 (Feb. 2, 2011) ("The GCCF is settling claims against BP under OPA, but also attempting to settle claims that fall outside of OPA, such as personal injury and death claims.  In their releases of BP, the GCCF requires claimants to release and assign all rights or claims not only against BP, but against any other potentially liable party.  Whether or not seeking such broad releases is appropriate, the GCCF is clearly acting to benefit BP in doing so.") (citations omitted).  Indeed, BP also emphasized to this Court that the GCCF was established to fulfill BP's obligations under the OPA and that the "OPA's very purpose . . . is to provide an opportunity

13

the GCCF depended upon the public's trust and willingness to participate.  Moreover, BP's response through the GCCF helped to offset widespread negative publicity from the oil spill and problems in its earlier claims process by instituting protocols that would be perceived as fair and reasonable by the people of the Gulf States.

For these reasons, Mr. Feinberg aggressively sought input and support of the governors of the Gulf States and other public officials in drafting the protocols that would govern the GCCF.[41] Louisiana officials were aware of Mr. Juneau's extensive experience as a Special Master in complex cases, and therefore retained Mr. Juneau specifically for the purpose of acting as the State's liaison in providing this input to Mr. Feinberg.  The retainer agreement, as previously explained, makes clear that Mr. Juneau's work "does not include litigation."[42]  As the collaboration between Mr. Feinberg and the state liaisons continued, Mr. Feinberg repeatedly requested comments and assistance and emphasized the need for support from Louisiana's political leaders:

> I would appreciate your constructive criticism concerning the attached no later than the close of business on Monday, August 16.  I plan to release a final Emergency Protocol next week, well in advance of the August 23 start up date for the Gulf Coast Claims Facility.  I hope that all of you will find a way to support this effort at the prompt distribution of emergency funds to eligible claimants.[43]

> I am very grateful for all the input you provided me in drafting the [Final Emergency] Protocol and very much welcome as much support as possible from the Gulf Coast Governors (see, for example, the terrific publicity campaign supporting the Gulf Coast Claims Facility promoted this week by Governor Riley

---

to resolve claims without litigation."  BP Memorandum Regarding the OPA and GCCF, Rec. Doc. 1330, at 19 (Feb. 18, 2011).  Accordingly, the GCCF (by BP's own admission) cannot be considered the same "matter" as the later CSSP settlement program that was specifically designed to settle and resolve claims brought within the context of adversarial litigation.

[41] Importantly, Mr. Feinberg was under no obligation to accept *any* of the suggestions offered by Mr. Juneau or the Attorneys General.

[42] BP Motion, Ex. 3, Contract for Professional Legal Services.

[43] Ex. 2, Juneau Declaration, Exhibit A (August 13, 2010 email).

in Alabama).  I need al [sic] the assistance I can get from the Governors and hope that this Emergency Protocol will be supported by your principal.[44]

It is my hope that the various Gulf Coast AGs will be supportive of my emergency compensation efforts commencing next Monday, August 23.  Your credibility in supporting the Program is very important.  I also pledge to each of you my commitment to meet with you in the weeks and months ahead as we strive to fashion a Final Settlement Protocol (including important release language).[45]

Shortly after BP announced the creation of the GCCF, Mr. Feinberg held "town hall" meetings in Houma, Louisiana, and elsewhere, urging Louisiana citizens to participate in the GCCF.  Mr. Feinberg stressed that there was no need for anyone to hire a lawyer because he—as the administrator of the GCCF—was "not adversarial to the people."[46]  BP now argues, however, that by collaborating with Mr. Feinberg to develop the GCCF protocols and propose methodologies for determining compensation to the "people," Louisiana was "adverse to BP" because it sought to "maximize compensation for Louisiana claimants at BP's expense."[47]  But Mr. Feinberg did not view Louisiana's participation as adversarial; to the contrary, he described the valuation templates and narratives submitted by Mr. Juneau on behalf of Louisiana as "[v]ery, very helpful."[48]  More fundamentally, it strains the English language now to recharacterize Louisiana's involvement (by invitation) with a program *created, funded, and ultimately controlled by BP for its own benefit* as "adverse" to BP.

Louisiana was not, and could not have been, a claimant in the GCCF, which was open only to individuals and businesses.  Likewise, Louisiana is not, and cannot be, a claimant in the CSSP,

---

[44] Ex. 2, Juneau Declaration, Exhibit A (August 19, 2010 email).

[45] Ex. 2, Juneau Declaration, Exhibit A (August 19, 2010 email).

[46] Ex. 2, Juneau Declaration, Exhibit B at 16.

[47] BP Memorandum at 13-14, 16.

[48] BP Motion, Ex. 10 (amended), Holstein Declaration, Exhibit G, Rec. Doc. 13370-44 at 18; *see also id.* at Exhibit F (email from Kenneth Feinberg to Louisiana Attorney General Buddy Caldwell), Rec. Doc. 11370-44 at 14-15 ("I thank you for your constructive criticism and, especially, the assistance of Patrick Juneau over the past few months.").

which categorically excludes government entities.  Mr. Juneau never represented any claimant before the GCCF.  Mr. Juneau's current role as Claims Administrator involves overseeing a process to determine the eligibility of various individual and business claimants to compensation under the terms of a court-supervised settlement agreement that resolved adversarial litigation in federal court.  His prior work consulting on BP's collaborative, non-adversarial program was work involving "different issues and different remedies."  *Pulaski*, 839 F.2d at 1302.  As Professor Green explains:  "Although the two matters are loosely related, in the sense that they involve different processes for resolving claims arising from the Deepwater Horizon Oil Spill, they are not the *same* matters for purposes of Section 455(b)(2). . . .  [U]nder any reasonable interpretation, there is insufficient congruence between the prior and current matters."[49]  The fact that some Louisiana citizens who were beneficiaries of  the GCCF program may now appear as CSSP claimants does not give rise to a conflict under § 455(b)(2), and BP cites no authority suggesting that it would.[50]

### D.    There are no reasonable grounds on which to question Mr. Juneau's impartiality.

Under 28 U.S.C. § 455(a), a party seeking disqualification "must show that, if a reasonable man knew of all the circumstances, he would harbor doubts about the judge's impartiality."

---

[49] Ex. 3, Green Declaration at ¶¶ 22, 24.

[50] BP cites two cases in support of its expansive interpretation of "matter in controversy," but neither is remotely relevant to Mr. Juneau's situation.  *See* BP Memorandum at 13 n.58.  In *In re Rodgers*, 537 F.2d 1196, 1197-98 (4th Cir. 1976), a judge was disqualified from presiding over a criminal trial in which the defendants intended to introduce evidence of the specific advice and representation provided by the judge's former law firm during the time the judge was a partner in the firm.  The government conceded that this evidence was relevant to the defense.  *Id.* at 1197.  By contrast, the nature and scope of Mr. Juneau's prior work for Louisiana is entirely irrelevant to the compensation issues he must oversee as Claims Administrator.

In *Preston v. United States*, 923 F.2d 731, 732 (9th Cir. 1991), a judge was disqualified from presiding over a wrongful death claim against the United States under the Federal Tort Claims Act.  The judge's former law firm had, at the time the judge was still associated with it, spent nearly three years defending Hughes Aircraft in a state court action concerning the death of the same decedent.  *Id.* at 734.  Furthermore, although Hughes was not a named party in the actual case before the judge, the judge's former law firm had actually represented Hughes in *that* case in the context of depositions, subpoena objections, and other matters (once again, while the judge was still associated with the firm).  *Id.*  However, neither Mr. Juneau nor any member of his firm has ever litigated *any* claims against BP, in any context whatsoever.

16

*Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir. 1982); *see also Sao Paolo State of the Federative Republic of Brazil v. Am. Tobacco Co.*, 535 U.S. 229 (2002)[51].  The decision whether to disqualify "is committed to the sound discretion of the district judge," and is reviewed for abuse of discretion.  *Id.* at 1166.  For the same reasons explained above, a reasonable person with knowledge of all the circumstances surrounding Mr. Juneau's prior legal work for Louisiana would not harbor doubts about his ability to serve impartially as Claims Administrator.  Indeed, many reasonable people knew about Mr. Juneau's work for the State of Louisiana, including (1) Kenneth Feinberg, Camille Biros, and other GCCF officials, (2) at least six BP attorneys and representatives, (3) the Gulf States Attorneys General and their staff, and (4) a *New York Times* reporter, yet the issue of that service raising any potential concerns of partiality or bias in Mr. Juneau's new role as Claims Administrator was never broached or suggested until the filing of this motion.

BP argues that Mr. Juneau's conflict of interest is demonstrated by his "policy decisions that deviate from the Settlement Program in ways that parallel positions taken . . . when he represented Louisiana."[52]  BP contends that as Claims Administrator, Mr. Juneau "has pressed BP to waive documentation requirements explicitly required by the Settlement Agreement, saying that doing so would 'speed the process while still maintaining the intent of the agreement.'"[53]  BP refers

---

[51] BP cites *Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000), in support of its argument that Mr. Juneau's impartiality could reasonably be questioned.  BP Motion at 14 n. 61.  However, as the Court is well aware, that decision was overruled by the Supreme Court in *Sao Paolo*.  The Supreme Court explained that the Fifth Circuit "reached the conclusion that recusal was required because it considered what a reasonable person would believe *without* knowing (or giving due weight to the fact) that the judge's name was added mistakenly and without his knowledge to a *pro forma* motion to file an *amicus* brief in a separate controversy," and that "when [these facts] are taken into account . . . it is self-evident that a reasonable person would not believe he had any interest or bias." *Sao Paolo*, 535 U.S. at 233.  Likewise, when all of the pertinent facts surrounding Mr. Juneau's service on behalf of Louisiana and his role as Claims Administrator are taken into account, it is evident that a reasonable person would not believe he has any disqualifying interest or bias.

[52] BP Memorandum at 8.

[53] *Id.*

specifically to the business license documentation requirement that was resulting in a large number

of deficient claims in the summer of 2012.[54]  Recognizing that a large percentage of deficiencies

could adversely impact the chances of the settlement being approved at the upcoming fairness

hearing, Mr. Juneau agreed with the recommendation of BrownGreer that it would be in the best

interest of all parties to relax or waive this requirement.[55]  Nevertheless, Mr. Juneau sided with BP

(and against the position of Class Counsel) in concluding that the documentation requirements

were mandatory, and refused to modify them without BP's consent.[56]  BP ultimately agreed to

modify the requirement for Individual and Business Economic Loss claims only after meeting with

Magistrate Judge Shushan, who encouraged BP to consider the potential class certification

ramifications if a large percentage of claims were rejected as deficient.[57]  As this episode illustrates,

Mr. Juneau has, in fact, interpreted the Settlement Agreement faithfully and impartially.[58]

## III.   BP'S ARGUMENTS CONCERNING MR. JUNEAU'S STATEMENTS PROVIDE NO GROUNDS FOR REMOVAL.

### A.   Mr. Juneau's statements to Mr. Freeh were neither false nor misleading.

BP next argues that the Court should remove Mr. Juneau based on a statement he gave to

Special Master Louis Freeh.  BP centers much of its motion on one sound bite lifted from Mr.

---

[54] *See* BP Motion, Ex. 10, Holstein Declaration, Exhibits I, K, Rec. Doc. 13370-46 at 32, 37-39.

[55] Ex. 2, Juneau Declaration at ¶ 32*; see also* Ex. 7, Declaration of Orran L. Brown, at ¶¶ 13-14.

[56] Ex. 2, Juneau Declaration at ¶ 33.

[57] *Id.* at ¶ 34.

[58] *See* Ex. 7, Brown Declaration at ¶¶ 7-24.  As additional examples, BP argues that Mr. Juneau has allowed seafood and vessel damage claimants to recover without presenting required documentation.  BP Memorandum at 9-10.  BP's only "evidence" for this assertion is ten awards that have been reversed on appeal for insufficient or conflicting documentation.  *See* BP Ex. 13, Declaration of Daniel Cantor, at ¶¶ 14, 19.  BP does not identify any "policy decision" by Mr. Juneau that caused these erroneous awards, or otherwise explain how he might have influenced the outcomes. Likewise, although BP states that Mr. Juneau "now oversees the program that decides [the GCCF release's] effect on individual claims and policies related to it," it does not even attempt to explain how any of his decisions in this capacity "deviate from the Settlement Program."  BP Memorandum at 8, 10.

Juneau's 2013 interview with the Special Master.[59]   BP's allegations surrounding this quote completely ignore the context of the interview and distort Mr. Juneau's statements.

The Court appointed the Hon. Louis J. Freeh as Special Master on July 2, 2013 to investigate allegations of misconduct by two Claims Administrator Office ("CAO") staff members.[60]  During the Special Master's Independent Internal Investigation, Mr. Juneau provided an on-the-record interview about staff misconduct.  At the start of the interview, in answer to the Special Master's simple question, "Approximately when were you appointed, sir?",  Mr. Juneau responded with a lengthy narrative summary of how he was appointed.[61]  From pages 7-15 of the transcript, Mr. Juneau tells the story of his interview and appointment as Claims Administrator.[62]  During this explanation, he indicates that he didn't represent any claimants or a defendant in the spill when he was called in for the interview and "really had no connection with the spill per se" at that time.[63]   Contrary to BP's assertions, at no time in the August 1, 2013 interview did the Special Master ever inquire about Mr. Juneau's prior services for the State of Louisiana or any potential conflict involving him.[64]

A fuller excerpt, which sets the quotation in its context, reads:

Q. There came a time when you were appointed the Court Claims Administrator for what's been referred to as the *Horizon* or the *BP* matter?
A. I vividly remember all of that, yes. Interesting story behind all that.
**Q. Approximately when were you appointed, sir?**
A. I think that was in March, March or April. I don't have the exact order here, but **I vividly remember how all that came about.** I don't know if that's your question, but, I mean
Q. **I didn't ask you that, but, certainly, you can explain that.**

---

[59] *See, e.g.*, BP Memorandum at 2, 8, 15, 18.

[60] *See* Order Appointing Special Master, Rec. Doc. 10564 at 2 (July 2, 2013).

[61] BP Motion, Ex. 5, Tr. of Patrick Juneau's August 1, 2013 Sworn Statement, at 8.

[62] *Id.* at 7-15.

[63] *Id.* at 8.

[64] *See id.* at 7-15.

A. What happened, I was in my office in Lafayette, and I got a call. I think there was a lawyer from the PSC on the phone, and I think it was a lawyer from BP on the phone. I wasn't in that room, but I was in Lafayette.

**I think this was on a Thursday or something like that**. They asked me could I come to New Orleans. There was a meeting about the *Deepwater Horizon*. Anybody that lives in the Gulf South knows those words, obviously know [sic] about the whole spill. They asked me to come over here.

Now, I knew, from reading the newspaper – I didn't have any involvement in anything in the spill. I didn't represent any claimants in the spill, wasn't representing any defendants in the spill, had really had no connection with the spill per se.

**They asked me to come because they were considering some matters that had to do with some considerations of appointment. That's all I really knew.**

**I knew that settlement negotiations were underway because it was in the paper.** The trial was set. They bumped the trial for about ten days or something like that. So I came here. They told me to meet at the Ritz-Carlton hotel. I went to the Ritz-Carlton. They had a conference room set up. There were various people there. There were several BP people there, all the lawyers for BP….[65]

BP's Motion lifts one phrase from this much longer narrative within the three and a half hour interview to conclude that Mr. Juneau somehow denied his very public role as a liaison for Louisiana in the year following the spill.[66]  BP claims that Mr. Juneau said "he knew about the oil spill only from information that he had learned by reading the newspaper" when it is clear in context he was indicating he knew about "settlement negotiations" only from reading the newspaper.[67]  Mr. Juneau had not worked as a liaison for the State of Louisiana for seven months prior to the time of his interview for the position of Claims Administrator, and was describing events that took place in February 2012.  When he was called in for the interview, he indeed "had no connection with the spill per se" and did not represent any claimants or defendants.  Moreover, the response was part of the routine series of foundational questions and answers that began the

---

[65] *Id.* at 7-9.

[66] BP Memorandum at 18.  It is simply illogical and unfair for BP to draw this conclusion when faced with the fact that it was Mr. Juneau himself who told BP about the prior representation during the interview process that took place in February of 2012, and indeed, such arguments should have no place in this Court or any other.

[67] BP Memorandum at 19.

on-the-record interview.  Mr. Juneau was never "questioned about conflicts of interest by the Special Master,"[68] and certainly was never asked about his prior role or the disclosures he made about that role.

### B.   Mr. Juneau's public comments do not suggest that he is unable to impartially administer the CSSP.

BP argues in its Motion that Mr. Juneau should be bound by the Judicial Code of Conduct in his public statements, yet BP itself has provided a promotion fund to the CSSP of $285,331.20 and has encouraged Mr. Juneau's public comments when those comments were to its benefit.[69] For example, on August 8, 2012, Mr. Juneau appeared at a press conference about the Deepwater Horizon Claims Center encouraging the public to file claims with the new program, saying: "My message to everyone is 'When it doubt, file a claim.'  Doesn't cost you a nickel.  We want eligible people to get paid."[70]  BP fully supported these very public promotional efforts by Mr. Juneau, repeatedly praising his administration of the Settlement Program before the Court in November 2012.[71]  To support Mr. Juneau's service as a public spokesman for the Settlement Program as the program was being established and then argue two years later that he is bound by Codes of Conduct requiring his silence is disingenuous.

---

[68] *Id.* at 2.

[69] *See* Ex. 5, Declaration of Robert P. Levine, Exhibit B (Administrative Fund Costs March 8, 2012- July 31, 2014).

[70] *See* Ex. 11, George Talbot, "New BP claims boss is a stark contrast to Ken Feinberg," AL.com (August 8, 2012); *see also* Ex. 12, Supplemental Declaration of Meade Monger in Support of Confirmation of the Economic and Property Settlement Agreement, at ¶ 21 ("[T]he Claims Administrator, Mr. Patrick Juneau, has made himself personally available to the public.  Mr. Juneau has visited each Claims Assistance Center where he talked to Class Members, local politicians and officials, as well as the local media.  The effort to 'get the word out' on the Settlement allowed for a great deal of visibility for the Program and helped educate potential Class Members on their rights in the Settlement. . . . [T]his level of personal involvement and outreach by the Claims Administrator sends a very positive message to class members about the claims process and tends to encourage claimants to participate in the claims process.").

[71] *See supra* notes 4-6.

Choosing another sound bite, BP's motion again lifts a single word out of context to claim that Mr. Juneau himself may be asserting claims against BP and thus cannot be impartial.[72] Following BP's national media campaign impugning the settlement process and Mr. Juneau personally[73] and BP CEO Bob Dudley's comments on CNBC's *Mad Money* [74] that the Claims Administrator was "hijacking"[75] the settlement, in July 2014, the *Daily Advertiser* quoted Mr. Juneau as saying:

> BP's CEO Bob Dudley said I was willfully misinterpreting the settlement; that's a lie and, yes, it is actionable. BP agreed to the settlement and its terms and it had the advice of some of the best attorneys in the world. The federal courts have upheld the settlement process as valid — repeatedly. And I don't understand the vitriol in attacking me. I am not anti-oil. I grew up in Lafayette, and I represented oil companies in court.[76]

In context, this quote demonstrates that Mr. Juneau was in fact responding to an improper accusation and reaffirming his impartiality. Mr. Juneau maintained that, despite BP's public comments, he is not "anti-oil" and will remain impartial as a Claims Administrator.[77] Yet, BP focuses on one word, "actionable," to catapult to the conclusion that Mr. Juneau's comments "attack the credibility of BP and its CEO, and appear to threaten to sue them for libel."[78] BP makes this claim also knowing full well that the Claims Administrator promptly responded to the article in a

---

[72] BP Memorandum at 20.

[73] For a record of BP's extensive advertising efforts, see "The State of the Gulf: BP Sets the Record Straight," at https://www.thestateofthegulf.com.

[74] *See* CNBC's Mad Money hosted by Jim Cramer, "BP CEO: We're back on our feet," http://video.cnbc.com/gallery/?video=3000183882 (video) at 17 mins. (July 19, 2013); *see also* Ex. 14, Rob Davies, "BP suffers revolt as executive pay packages are rejected by 32pc of investors," This is Money.co.uk (Apr. 10, 2014) (quoting Bob Dudley as saying "the settlement wording was being wilfully misinterpreted").

[75] Although clearly hyperbole and poorly used as a metaphor, the description of Mr. Juneau's work as a "hijacking" was inflammatory and suggestive of intentional misconduct.

[76] BP Motion, Ex. 19, Lynda Edwards, "Lafayette lawyer takes heat handling oil spill claims," *The Advertiser* (July 5, 2014).

[77] *See id.*

[78] BP Memorandum at 3.

subsequent interview with the *Louisiana Record*, stating that he didn't remember using the word "actionable" and under no circumstances was he "talking about lawsuits."[79]  Mr. Juneau further clarified that BP's public comments would not alter his professional objectivity or "affect one iota" his performance in his role as Claims Administrator.[80]

Professor Green explains why the standards governing public comments by judges are inapplicable to a practicing lawyer selected to administer a settlement program:

> As a practicing lawyer, Mr. Juneau has a legitimate interest in protecting his professional reputation when publicly attacked, as he was in this case.  And as Claims Administrator, he has a legitimate interest in educating the public regarding his administrative work in order to promote understanding of, and confidence in, the claims process.  Because his work does not take place in a judicial setting in which he can speak from the bench or by issuing opinions, his only opportunity to educate the public is by speaking extra-judicially.[81]

As Mr. Juneau has repeatedly affirmed to this Court, he is committed to administering the settlement impartially, under the terms originally agreed to by the Parties and the directions of this Court. Moreover, BP cannot initiate public debate on Mr. Juneau's service as Claims Administrator, thrusting a private settlement agreement and its supervision by this Court into the public forum, and then argue that the very controversy it created now makes Mr. Juneau appear partial when he responds to it.

## IV. THE MOTION'S REMAINING ALLEGATIONS SIMPLY REPEAT STALE ACCUSATIONS THAT HAVE BEEN ADDRESSED AND RESOLVED.

BP's remaining allegations likewise do not supply any grounds for the Claims Administrator's removal.

---

[79] BP Motion, Ex. 20, Kyle Barnett, "Deepwater Horizon Claims Administrator Patrick Juneau defends negative statements," *Louisiana Record* (July 26, 2014).

[80] *See id.*

[81] Ex. 3, Green Declaration at ¶ 16.

### A.    Mr. Juneau responded properly to allegations of staff misconduct.

BP bases its argument that Mr. Juneau "has failed to prevent misconduct by senior CSSP personnel" on two reports issued by Special Master Freeh.[82]   The allegations upon which these reports are based came to light in May 2013, and BP gives no justification as to why they would *now* merit the Claim's Administrator's removal.[83]   Again, lifting selected passages from the reports citing past wrongdoing by certain former CSSP personnel,[84] it omits other portions of the reports that demonstrate that Mr. Juneau acted promptly and appropriately in each case.   Most importantly, the motion fails to mention that *both* of Mr. Freeh's reports expressly found that there was no evidence that any claim related to the alleged misconduct had actually been manipulated or improperly paid.  BP also dismisses Mr. Juneau's prompt actions to investigate the allegations against CSSP staff by claiming credit for his prompt attention to these matters.[85]   In fact, Mr. Juneau immediately undertook to investigate the allegations as soon as they came to light and promptly notified both BP and the Court.[86]   Thereafter, Mr. Juneau either terminated or accepted resignations from all of the affected personnel.

BP also argues that Mr. Juneau "did not apprise BP that he had a longstanding relationship with Mr. Sutton (according to Mr. Sutton) or that Mr. Sutton had worked at his law firm and been

---

[82] Rec. Doc. 11287 (Sep. 6, 2013); Rec. Doc. 12174 (Jan. 17, 2014).

[83] A hearing is set to address these issues in the Special Master's report for November 7, 2014.  *See* Order, Rec. Doc. 13440 (Sep. 26, 2014).

[84] The First Report accuses Lionel Sutton and Christine Reitano of having conflicts of interest and of expediting a particular claim.  The Second Report accuses David Duval of improperly disclosing an appeal result, and accuses Mr. Duval, David Odom and Kirk Fisher of inappropriately inviting CSSP subordinates to join them at a local bar that was a claimant in the CSSP.

[85] BP Memorandum at 23.

[86] *See* First Freeh Report, Rec. Doc. 11287 at 9 (Sep. 6, 2013) ("In May 2013, Mr. Patrick Juneau became aware of an alleged conflict of interest regarding Mr. Sutton and immediately initiated an investigation, led by Mr. Welker.  Mr. Patrick Juneau promptly reported this allegation to the Court, which became the basis for the Court's July 2, 2013 appointment of the Special Master.").

the beneficiary of case referrals from him."[87]   Even Mr. Sutton describes this "longstanding relationship" somewhat differently:  Mr. Sutton worked as an associate for Mr. Juneau's Lafayette law firm between approximately 1990 and 1993, immediately after finishing law school.[88]   Mr. Sutton then started his own practice in nearby New Iberia and "stayed in touch with [Mr. Juneau]," who "used to send [him] a few cases."[89]   In 1996, Mr. Sutton moved to New Orleans, and it is not clear from his statement whether he had any contact at all with Mr. Juneau after that time.[90]   BP does not attempt to explain why it would have found this information relevant in deciding whether to hire Mr. Sutton, or why Mr. Juneau would have wanted to hide it.  In any event, the note and resume Mr. Juneau sent to Keith Moskowitz recommending that Mr. Sutton be hired clearly disclosed his known outside business interests and his marriage to another staff member.[91]

### B.      Mr. Juneau did not improperly expedite claims.

According to BP, "reports allege"[92] that Mr. Juneau "directed improper expedited processing of claims filed by clients of the Plaintiffs' Steering Committee."[93]   As BP acknowledges, it was well aware of a legitimate program to expedite certain claims in advance of the final fairness hearing.[94]   In fact, BP was eager to have representative claims from each claim

---

[87] BP Memorandum at 22.

[88] BP Motion, Ex. 23, Lionel Sutton Interview (video).

[89] *Id.*

[90] *Id.*

[91] *See* BP Motion, Ex. 24, Note from Patrick Juneau to Keith Moskowitz.

[92] By which it means rumor and speculation on a single internet blog called "American Zombie."  *See* BP Motion, Ex. 26.

[93] BP Memorandum at 24.

[94] *See* BP Memorandum at 25.  BP notes that Mr. Sutton stated in his "American Zombie" interview that "he was unaware of the pre-fairness hearing 'sampling program' until he saw [Mr. Juneau's] response" to the accusations of improper expediting of claims.  *Id.*  The significance of this fact is not clear, given that BP does not deny that this program actually existed.  In any event, it is entirely irrelevant because this sampling program took place before Mr. Sutton was hired – as he acknowledged in his interview.

type processed before the hearing, as well as high-value claims that would drive up the total compensation amount.[95]  BP's allegation of impropriety appears to be that claimants represented by PSC members were "advantaged over *pro se* claimants or those represented by non-PSC lawyers."[96]  This allegation is mistaken.  BP's only evidence in support of its allegation is an email from a lawyer at a PSC firm to the CSSP, which states: "Per our meeting last week, [Mr. Juneau] mentioned for members of the PSC to send along claim numbers for claims that have been filed and are larger claims that perhaps could be looked at more quickly."[97]  Of course, the fact that Mr. Juneau invited PSC members to send certain types of claims for expedited processing does not suggest that he *did not* also invite non-PSC members to do the same.  Overall, less than 40% of the claims in the sampling program were represented by PSC members.[98]   Also, despite characterizing Mr. Sutton's credibility as "certainly questionable," BP relies on his statements in the "American Zombie" interview to allege that Mr. Juneau wrongfully expedited the claims of a friend's son.[99]  The CSSP and Mr. Juneau receive numerous calls from claimants who feel their claims are taking longer than they expected.  The program always has tried to respond to these inquiries, but not with the object of improperly expediting a claim.

### C.  Mr. Juneau committed no other "misconduct."

BP also relies on Mr. Sutton's "American Zombie" interview to vaguely accuse Mr. Juneau of other "misconduct."  Mr. Sutton's accusations appear to relate to a finding by the Special Master

---

[95] *See* Ex. 2, Juneau Declaration at ¶ 36; *see also* Tr. of November 8, 2012 Final Fairness Hearing (statement of BP Counsel Richard Godfrey), Rec. Doc. 7892 at 50 ("[T]his week we will reach a milestone.  Even before this Court has had the opportunity to determine whether or not on a final basis the settlement is fair, reasonable and adequate, Mr. Juneau, by the end of this week or early next, will have approved the payment of over one billion dollars in claims made to his facility under the terms of this settlement.").

[96] BP Memorandum at 25.

[97] BP Motion, Ex. 27, Email from Patrick Juneau to Christine Reitano.

[98] Ex. 2, Juneau Declaration at ¶ 42.

[99] BP Memorandum at 24, 26.

that "several claimants [in the Seafood Compensation Program] from AndryLerner and another law firm were submitting claims in which the claimants' tax returns were significantly more favorable than their trip tickets."[100]  Mr. Sutton stated that upon learning of this issue, Mr. Juneau "contacted the firm in question and told them that they had to stop doing it."[101]  He further stated that "as far as [he] know[s], [Mr.] Juneau did not bring that to the attention to [sic] the court."[102] He stated that he did not know whether any amounts that might have been improperly paid were retracted.[103]  As the Special Master's report makes clear, these discrepancies were discovered by BrownGreer and investigated by the CAO's quality control team—all of whom were under the supervision of Mr. Juneau.[104]  There was no "misconduct" in dealing with these issues.

### D.   Mr. Juneau's oversight has not been "wasteful."

#### 1.   BP's criticisms of the Program's claims processing system ignore the unprecedented challenges it has faced.

Relying on the opinions of its expert, Charles Cipione, BP criticizes the CSSP's claims processing systems, calling them "fundamentally flawed" due to the "underlying failure of the Claims Administrator."[105]  Although BP's complaints are varied, in essence they fault Mr. Juneau for failing to adhere to the "widely accepted industry standards" and "industry best practices" applicable to "a Fortune 1000 business performing claims processing" or "a large insurance claims

---

[100] First Freeh Report, Rec. Doc. 11287 at 60 (Sep. 6, 2013).

[101] BP Motion, Ex. 29, Lionel Sutton Interview (video).

[102] *Id.*

[103] *Id.* ("That I can't answer definitively; it's my understanding that they did not retract the ones that had already been paid.  That's my understanding, but I don't know that.").

[104] First Freeh Report, Rec. Doc. 11287 at 60 (Sep. 6, 2013).

[105] BP Memorandum at 29-30.  Notably, Mr. Cipione admits that he "did not have access to the IT System or to facility personnel," and that "[his] opinions are based primarily on the IBM report" commissioned by the CAO to identify any potential problems with the claims processing systems.  BP Motion, Ex. 30, Declaration of Charles Cipione, at ¶¶ 12, 39.  Indeed, Mr. Cipione disclaims any knowledge of or opinion concerning modifications to the claims system made after that report was issued on December 20, 2013.  *Id.* at ¶ 13

operation."[106]  Moreover, despite recognizing that the CSSP's systems are in fact in the process of being improved and upgraded, BP faults Mr. Juneau for not having created ideal systems from the start.[107]

BP's criticisms are entirely unfair and unrealistic.  There are simply no "industry standards" or "best practices" for administering a settlement agreement of such magnitude under such exacting time pressures.  As BrownGreer partner David Smith explains, it would have taken between nine and twelve months to build and launch an IT System using the "industry standard methods" discussed by Mr. Cipione.[108]  Such a delay, however, would have been unacceptable to all Parties.  In fact, although the final Settlement Agreement and exhibits were not provided until April 18, 2012, the claims processing system was expected to be—and in fact was—up and running by June 4, 2012.[109]

During the transition period, BP selected and recommended the same vendors that it had used for the GCCF—BrownGreer, PriceWaterhouseCoopers ("PwC") and Garden City Group ("GCG")—to serve as Court-appointed vendors for the CSSP.[110]  Upon their receipt of the Settlement Agreement on April 18, 2012, the CAO and the Vendors immediately began creating claims forms.[111]  Between May 17, 2012, and June 3, 2012, while still processing Transition

---

[106] BP Motion, Ex. 30, Cipione Declaration at ¶¶ 10, 24, 41; *see also id.* at ¶ 43 ("[I]f these conditions were present for a public company's financial systems, the auditors would likely not give a clean opinion.").

[107] *See* BP Memorandum at 29-30 (complaining that the claims processing functions "have required extensive overhaul at extraordinary expense"); *id.* at 30 ("Mr. Juneau also did not implement at the outset the necessary systems to prevent and detect the payment of fraudulent and potentially fraudulent claims.").

[108] Ex. 8, Declaration of David E. Smith, at ¶ 22.

[109] *Id.* at ¶¶ 4, 9-10; Ex. 8, Declaration of Lynn C. Greer, at ¶ 7.

[110] Postlethwaite & Netterville ("PN") was chosen as an additional vendor.  Collectively, BrownGreer, PwC, GCG, and PN are referred to as "the Vendors."

[111] The Parties, however, were unable to agree on many important aspects of the claim forms.  At Mr. Juneau's request, the Court convened a conference among the Parties, the CAO, and BrownGreer on May 16, 2012, to discuss the impasse.  The Court directed the Parties to resolve their differences by the end of the day and, except for the Subsistence Claim form, the Parties were able to do so.  Ex. 8, Smith Declaration at ¶ 9.

Claims, the CAO and the Vendors cooperated in an extraordinary effort to develop the new claims system such that it could begin receiving claims by the June 4th deadline.[112]  On June 4, 2012, the claims filing system was open and available on-line, 19 claims centers were open and staffed, and two call centers were open and ready to receive calls.[113]  This was followed in short order by a July 15, 2012 deadline for beginning to issue eligibility notices and a July 31, 2012 deadline to begin making payments.[114]  To meet these deadlines, the CAO and the Vendors were required to develop and implement the claims processing system before many of the underlying claims policies were available to them, due to disagreements between the Parties.  The alternative—to develop the policies first and then to create and implement the claims processing system—was simply not an option.

Throughout this start-up period, the Parties exerted pressure on the CAO and the Vendors to process and pay as many claims as possible before the November 1, 2012 opt-out deadline and the November 8, 2012 fairness hearing.[115]  By the time of the fairness hearing, the Parties extolled the CSSP's accomplishments, which included the issuance of over $1.3 billion in payment determinations and over $1 billion in actual payments.  BP's counsel, Rick Godfrey, told the Court Mr. Juneau had even outperformed the Vioxx settlement:

> [M]any people, particularly in this area of the country, hold the Vioxx settlements as a model.  Mr. Juneau's facility will pay over 30,000 claims before the Vioxx settlement ever made a single payment.  It's a stunning statistic.[116]

---

[112] *See* Ex. 8, Smith Declaration at ¶¶ 4-9 (describing the challenges of meeting the June 4th deadline while major disagreements and ambiguities remained).

[113] *See* Ex. 5, Levine Declaration at ¶¶ 7-9 (describing the tasks accomplished during the transition period); Ex. 6, Greer Declaration at ¶ 7.

[114] Ex. 8, Smith Declaration at ¶¶ 10, 20.

[115] *Id.* at ¶¶ 15-17.

[116] Tr. of November 8, 2012 Final Fairness Hearing, Rec. Doc. 7892 at 56-57.

As the Parties well knew, one of the consequences of achieving this result, in terms of both time and expense, would be that the claims processing system would have to be updated and adjusted continually as the Settlement Agreement policies were developed (and are still being developed).[117]

It is telling that the criticisms of BP's current experts are in stark contrast to the praises of another AlixPartners Managing Director, Meade Monger, which BP offered in support of final approval of the Settlement Agreement. In his expert opinion, Mr. Monger explained that he was "impressed with the overall process and sophistication of the operations as well as the results that have been achieved," including the "very high" pace of payment determinations; the "well-designed and impressive mechanisms in place to evaluate and process the information in the completed Claim Form and all supporting documentation"; the "speed and smoothness of the operations"; and the "thorough and multi-step review process."[118]  The facts have not changed since BP made these representations to the Court, but BP's motives apparently have.

> ### 2.    Mr. Juneau's oversight of the Program vendors has been more than adequate.

Citing the declarations of two of its current experts, BP argues that "Mr. Juneau has further failed to monitor CSSP vendors."[119]  BP's main complaint seems to be that the CAO has permitted the Vendors to overcharge for their services. The record is clear, however, that BP itself negotiated and approved the Vendors' hourly rates.[120]  And, again, BP ignores the CAO's continuing efforts to reduce the scale of the Vendors' facilities and work force in order to lower costs.[121]  BP's

---

[117] *See* Ex. 8, Smith Declaration at ¶ 18 ("Despite the 1,000+ page 'settlement' agreed to by the Parties in the spring of 2012, the interpretations and constant shifting of directives has never provided the Program with any stability.").

[118] Ex. 12, Supplemental Joint Declaration of Meade Monger, at ¶¶ 4, 6, 9, 12, 36.

[119] BP Memorandum at 31.  These same complaints were lodged by BP and responded to by the CAO over a year ago. *See* Ex. 13, Letter from Patrick Juneau to the Court (July 1, 2013).

[120] Ex. 9, Declaration of Neil L. Zola, at ¶ 6; Ex. 6, Greer Declaration at ¶ 11.

[121] *See* Ex. 13, Juneau Letter at 7; Ex. 5, Levine Declaration at ¶ 28; Ex. 9, Zola Declaration at ¶¶ 20-23, 30-31.

complaints similarly ignore that the CAO has continuously worked with BP, both before and since the August 8, 2013 budget hearing before Magistrate Judge Shushan,[122] to develop a budget process and format to satisfy BP's ever-changing requirements.[123]

Finally, BP's complaints regarding low productivity and accuracy are based on out-of-date data and skewed statistical analyses.  For example, the Interim File Review Report cited by Mr. Brents as evidence of unacceptable error rates is dated February 3, 2013, or about 19 months before BP filed its motion.[124]   Similarly, the CliftonLarsonAllen ("CLA") Process Audit Report upon which Mr. Brents relies is dated May 17, 2013, or about 16 months before BP filed its motion.[125] More importantly, Mr. Brents distorts CLA's findings and ignores the limited scope of the audit and the nature of the data entry errors found by CLA.[126]  Mr. Brents opines that the CLA report "identified unreasonably high errors [13.3%] in claims processing of BEL [Business Economic Loss] claims," despite the fact that these errors resulted in an overpayment of only $2,494 out of a total amount of $26,737,487 paid—less than one-thousandth of one percent.[127]   Similarly, Mr. Brents notes that "20.4% of the appealed BEL claims were ultimately reduced in amount," and opines that "the error rate for the appealed BEL claims is at least 20.4%."[128]  However, this statistic

---

[122] Tr. of Budget Hearing, Rec. Doc. 10975 (Aug. 7, 2013).

[123] *See* Ex. 13, Juneau Letter at 3-4 (July 1, 2013); Ex. 5, Levine Declaration at ¶¶ 20-26.

[124] BP Motion, Ex. 31, Declaration of Todd Brents, at ¶ 16 & Exhibit 5.

[125] *Id.* at ¶ 16 & Exhibit 6.

[126] *See* Ex. 10, Declaration of Brian G. Pye, at ¶ 4 ("The purpose of CLA's procedures and sample testing was not to identify, or determine, any form of a dollar value misstatement that may have occurred related to paid claims for the entire population.  Rather, the purpose was to evaluate the design of internal controls over claims processing – i.e., to evaluate if controls were in place and operating as intended for claim processing."); *id.* at ¶ 6 n.2 ("Paragraph 24 of the Brents Declaration wrongly assumes that CLA utilized a 'substantive testing' methodology.").

[127] BP Motion, Ex. 31, Brents Declaration at ¶ 24.

[128] *Id.* at ¶ 25.

is artificially inflated and essentially meaningless.[129]   In addition to appeals resolved by the appellate panel, Mr. Brents' calculation also includes appeals settled by the parties before decision.[130]  More importantly, it fails to account for the many appealable decisions that were never appealed; parties are, of course, more likely to appeal a decision that they perceive to be erroneous.[131]

### 3.      The Program's costs are in line with its scope.

BP also cites the CSSP's approximately $1 billion cost to date as evidence that the CAO has failed to control the Program's costs.  That argument fails for several reasons.  First, it ignores the scope and scale of the undertaking in establishing, developing, and operating the Program.  Second, it fails to take into account the substantial extra costs that have been and continue to be incurred because of the inability of the Parties to agree on how key provisions of the Settlement Agreement should be interpreted.[132]   Finally, as to the allegedly unsatisfactory ratio of administration expenses to claims paid, BP overlooks the effect of its own efforts over the past year to stop, or at least slow down, the processing and payment of claims.  When the cost of the Program is viewed in the context of these factors, it has not been excessive.  In any event, each budget prepared by the CAO is reviewed by BP before it is paid and any expenses are ultimately subject to the Court's oversight.

---

[129] *See* Ex. 6, Greer Declaration at ¶¶ 14-17 (explaining the nature of the appeals process and Mr. Brents' fallacies in relying on award reductions on appeal to demonstrate "error"); Ex. 6, Levine Declaration at ¶¶ 43-46 (same).

[130] *Id.* at ¶ 27 n.11.

[131] *See* Ex. 5, Levine Declaration at ¶¶ 43-45.  Mr. Brents' calculations were based on the CAO's May 30, 2014 Status Report.  *See* BP Motion, Ex. 31, Brents Declaration at ¶ 25.  The report notes that 18,862 claims had met or exceeded the threshold for appealability, but does not specify how many of these were Business Economic Loss claims.  *See id.*, Exhibit 7 at 18.

[132] *See* Ex. 5, Levine Declaration at ¶ 17; Ex. 8, Smith Declaration at ¶¶ 50-51; Ex. 13, Juneau Letter at 6.

In particular, comparisons between the cost of the GCCF and the CSSP are easily misunderstood, as the scopes of the two programs are entirely different—one involved voluntary payments by BP on its own terms and the other requires interpretation and implementation of a 1,200-page Settlement Agreement.[133]  If the Court were to make such a comparison, however, it would be interesting to note that, over a 20-month period, the GCCF spent an average of $47.9 million per month while the CSSP, over a 28-month period, has spent an average of $37.0 million per month.[134]  The CSSP's expenses also include the costs of processing payments of outstanding GCCF benefits totaling $47.6 million to 2,870 GCCF claimants, as well as the costs of the massive effort to respond over these many months to the litigation initiated by BP.[135]

### E.      The CAO is operating in accordance with the Settlement Agreement.

BP's closing argument—that the Claims Administrator has breached his contractual and fiduciary duties—reflects BP's apparent but unstated position that the CSSP should be viewed and treated as a subsidiary of BP rather than as an independent settlement program supervised by the Court.  The Claims Administrator is not an employee or officer of BP.  His function is to interpret and implement the terms of the Settlement Agreement as agreed to by the Parties and approved by the Court.  The Parties agreed in Section 4.3.1 of the Settlement Agreement that:

> The Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or approved by the Court.

---

[133] Ex. 5, Levine Declaration at ¶ 29.

[134] *Id.* at ¶ 30.

[135] *Id.* at ¶¶ 30-31.

While Mr. Juneau remains committed to working with the Parties in implementing the Settlement Agreement, his fiduciary obligations under the Agreement are to the Economic Class and to the Court.  Mr. Juneau has fulfilled and will continue faithfully to fulfill these duties.

## V.    CONCLUSION

In an unbridled effort to find some argument that might serve as a basis for its motion, BP overlooks perhaps the single, most-critical reason that Mr. Juneau ***should not*** be removed as Claims Administrator: his knowledge and experience in developing and managing the CSSP through the most difficult of circumstances.  Because Mr. Juneau has been involved with the CSSP from its inception, he has unparalleled institutional knowledge of how this 1,200-page settlement has been interpreted, implemented, and applied.  He has successfully resolved more than 200,000 claims (including denials of thousands of claims where appropriate) and issued 273 active, public policy interpretations, only three of which were appealed or reviewed by this Court.[136]

While Mr. Juneau did not draft the Settlement Agreement, he, more than any other person, has had the considerable task of bringing its terms to life such that (a) eligible claimants can be paid (after waiting more than four years since the Deepwater Horizon event) and (b) BP can enjoy the benefit of having claims resolved outside of litigation.  Mr. Godfrey was absolutely correct when he described the CSSP as unprecedented.  It is indeed—both in its scope and complexity. But Mr. Godfrey also was correct when he described Mr. Juneau as an "excellent" administrator, a description that is as apt today as it was in 2012.  Accordingly, we respectfully request that BP's motion be denied.

---

[136] *See* Claims Administrator's Status Report for September 30, 2014, Rec. Doc 13452 at 12, 22.  *See also*, Deepwater Horizon Claims Center Policy Keeper, available at https://www2.deepwaterhorizoneconomicsettlement.com/un-secure/pkpolicysearch.aspx.

Respectfully submitted,


_/s/  Richard C. Stanley_____
Richard C. Stanley, 8487
Bryan C. Reuter, 23910
  Of
STANLEY, REUTER, ROSS, THORNTON &
  ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana  70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069
rcs@stanleyreuter.com

Phillip A. Wittmann, 13625
John M. Landis, 7958
C. Lawrence Orlansky, 2039
Maggie A. Broussard, 33033
  Of
STONE, PIGMAN, WALTHER, WITTMANN, L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone: (504) 581-3200
Facsimile: (504) 581-3361
pwittmann@stonepigman.com


Attorneys for the Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this _____ day of October, 2014, I electronically filed the foregoing Memorandum in Opposition to BP's Motion to Remove the Claims Administrator with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/  Richard C. Stanley*_____
