**EXHIBIT  2**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL NO. 2179 |
| | * | SECTION J |
| This document relates to all actions. | * * | |
| | * | HONORABLE CARL J. |
| | * | BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| | * | |

**DECLARATION OF PATRICK A. JUNEAU, CLAIMS ADMINISTRATOR**
[Regarding BP's Motion to Remove]

**Introduction**

1.      I am a person of the full age of majority and, if called, am competent to testify to the facts set forth herein.

2.      I am the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"), and I serve as the Trustee of the Settlement Trust.

**Work on the GCCF for the State of Louisiana**

3.      On June 16, 2010, BP created the Gulf Coast Claims Facility (the "GCCF") to speed emergency claims processing related to the April 20, 2010 explosion of the *Deepwater Horizon*.

4.      Kenneth Feinberg was appointed to head the GCCF.

5.      As the GCCF claims process was being established, I was hired as Special Counsel by the Louisiana Attorney General to provide advice and counsel to the State in understanding GCCF claims processes and allocation protocols.  My contract, dated July 2, 2010, specifically noted that

it "[did] not include litigation." Rather, I was retained to provide advice and counsel on matters "related to the claims process and allocation protocols utilized and developed by the Responsible Parties associated with and/or arising from the Deepwater Horizon Oil Spill." The contract had a three-year term and was an hourly rate contract with a maximum cap amount of $175,000.

6.      My contract with the State was amended on March 3, 2011, to increase the maximum amount payable by $100,000.  The original scope of the engagement remained unchanged.

7.      During July and August of 2010, Kenneth Feinberg emailed the Attorneys General of the Gulf States and their respective liaison counsel (including myself) drafts of emergency claims processing protocols for the GCCF, soliciting comments and collaborating with us to establish guidelines for claims processing.

8.      My contract with the State did not include litigation.  I did not sign any pleadings filed by the State of Louisiana or appear as counsel on any filing made by the State of Louisiana.

9.      I had no role in consulting on or drafting any claims for damages by the State of Louisiana against BP.  To do so would have been outside the scope of my engagement.

10.     Roughly one year after the oil spill ended, on July 21, 2011, with the GCCF protocols well-established, I voluntarily terminated my contract for consulting services with the State of Louisiana.  My interview to become Claims Administrator would take place 7 months later, on February 26-27, 2012.  Of course, at the time of my resignation, there was no Settlement Agreement, no Court Supervised Settlement Program ("CSSP"), and no discussion whatsoever of my having any role with regard to any future settlement program.

**Meetings and Collaboration with BP and GCCF Officials**

11.     In addition to collaborating with Mr. Feinberg and his staff, including Camille Biros, I also met and dealt with BP officials during my role as Louisiana's liaison to the GCCF.

12.     As a liaison to the GCCF for Louisiana, I was part of a team of Louisiana officials and GCCF personnel who attended a series of town hall meetings in Harahan, Houma, Port Sulphur, and Lafitte, Louisiana held on July 15, 2010.  During the day, I met with Kenneth Feinberg for lunch and an "End of Day Wrap up" session.  Also part of the team attending these meetings was Darryl Willis, a Vice President of BP.  I specifically remember introducing myself to Mr. Willis during the day, as was my custom whenever I met officials from BP or the GCCF.

13.     I also remember personally introducing myself to Geir Robinson of BP on August 13, 2010, at a meeting of state and local officials held at the Claiborne Building in Baton Rouge, LA.

14.     Mr. Feinberg and I met again in person on August 18, 2010, following a town hall meeting in Kenner, LA, and we exchanged several emails with drafts and comments of the emergency protocols.  Mr. Feinberg's office specifically solicited comments and feedback from the Attorneys General of each of the Gulf States.

15.     The GCCF began accepting claims for Emergency Advance Payments on August 23, 2010. Mr. Feinberg and I continued working together as the Final Protocols were being developed and the release language was finalized, meeting in person again for a business dinner in Baton Rouge at Juban's Restaurant on September 13, 2010.   In the following months, Mr. Feinberg again solicited comments from myself and the other Gulf State Attorneys General and their representatives on the proposed release language and final protocols.

16.     On October 12, 2010, I received an email from *New York Times* reporter David Segal concerning a feature he was writing for the Sunday Business section about proximity claims in the BP oil spill.  Mr. Segal indicated that he got my name, number, and email from Mr. Feinberg.  On October 13, 2010, we discussed my views on the GCCF program for the article.  Mr. Segal's article was published on October 23, 2010, and describes my role as "**a liaison to Mr. Feinberg on behalf of the attorney general of Louisiana.**"

3

17.     On December 7, 2010, I participated as a representative of Louisiana on a conference call hosted by BP's legal team, including Mark Holstein of BP and Daniel Cantor of Arnold & Porter, to discuss the GCCF release language.

18.     I have produced copies of emails between myself and Kenneth Feinberg documenting our collaborative relationship (Exhibit A) as well as the itinerary for the day and what appears to be a transcript from one of the July 15, 2010 town hall meetings (Exhibit B).

**Interview, Appointment, and Service as Claims Administrator for the CSSP**

19.     Seven months after I terminated my consulting contract with the State of Louisiana, on February 26-27, 2012, BP and the PSC jointly interviewed me for the position of Claims Administrator.

20.     During that interview, I told all parties, including BP attorney Keith Moskowitz, of my prior role as a consultant in the GCCF process for the State of Louisiana.  I recall Mr. Moskowitz then expressing that he thought that was a good thing, because I would know what they had been dealing with.

21.     I also answered all questions that were addressed to me by the Parties during the two-day interview process.   In particular, there were no other questions or requests for further documentation regarding my work for the State of Louisiana with the GCCF program.

22.     The Economic and Property Damages Settlement Agreement in Principle was announced on March 2, 2012.

23.     The State of Louisiana was not then and is not now a party to the Settlement Agreement. The State of Louisiana, as a governmental entity, is specifically excluded from the settlement class.

24.     Judge Barbier asked BP and the PSC for a list of three names from which he would select a Claims Administrator, but the Parties jointly submitted only my name for consideration.

25.     I was appointed Claims Administrator of the transition process on March 8, 2012. During the transition process, I again met with Kenneth Feinberg to discuss the GCCF program and effectuate a smooth transition to the CSSP.

26.     The Court held a Preliminary Approval Hearing on May 1, 2012, and granted Preliminary Approval of the Settlement Agreement on May 2, 2012, appointing me as Claims Administrator of the CSSP.  The CSSP began processing claims on June 4, 2012, with the objective of paying claims by the end of July 2012.

27.     A final approval hearing was held on November 8, 2012, and the Court granted final approval of the Settlement Agreement on December 21, 2012.  BP did not raise any objection to my appointment or conduct as Claims Administrator or to my prior work history at the Preliminary or Final Approval Hearings.

28.     By the time of the Final Approval Hearing, I had served as Claims Administrator of the transition process and the CSSP for approximately eight months.  The CSSP had processed more than 79,000 claims, authorizing payments of more than $1.3 billion to claimants since the program's commencement on June 4, 2012.

29.     I fully cooperated with all investigations by the Freeh Group and truthfully answered all questions asked of me.

30.     When called to interview for the position of Claims Administrator, I did not represent any claimants or defendants in the present proceedings.  My services for the State of Louisiana had ended seven months earlier.  Moreover, the State has never been subject to the Settlement Agreement I am charged with administering.

**Holstein Declaration Response**

31.     In his declaration ¶¶ 16-26, BP's Mark Holstein alleges that BP only "acquiesced to the Claims Administrator's insistence" to modifying the requirements for business licenses and a number of other documentation requirements mandated by the Settlement Agreement.

32.     My recollection of the events surrounding the business license modification differs from Mr. Holstein's.  I recall acknowledging that unless BP waived the documentation requirement in this instance, the CSSP likely would be forced to issue a substantial number of deficiency notices. It was the goal of both parties to have the settlement approved, but these deficiency notices could have impacted the number of opt-outs to the Settlement Agreement and thus the Court's final approval.  I believed then—and still believe—that it was in the interest of all Parties to relax or waive these requirements.

33.     Nevertheless, I recommended that the Settlement Agreement terms be followed unless and until *both* parties agreed to the modification.  I refused to make the change even after receiving Class Counsel's memorandum on September 16, 2012, arguing that the license requirements were permissive rather than mandatory.

34.     As I recall, due to my refusal to allow the modification without BP's agreement, Magistrate Judge Shushan met with BP to discuss the impasse and also encouraged BP to consider the potential impact on class certification—after which point, BP made the decision to eliminate the license requirement for Business and Economic Loss claims.

35.     In this instance, and in other instances of disagreement among the Parties, it has been my position that the Settlement Agreement controls unless and until *both* parties agree to a modification and/or such modification is approved by the court.  My personal views on whether a

particular provision of the Settlement Agreement should or should not have been included do not factor in to my decision-making regarding enforcing the Agreement's provisions.

## Sutton Accusation Response

36.     In the fall of 2012, the DHECC Program was fast approaching the fairness hearing and the opt-out deadline.  To avoid confusion as to who should opt-out versus who should stay in the class, it was important for the class as a whole to have a representative sample of paid claims across all of the claim types in order for them to assess which was the better path forward for them.  This could not be accomplished in the time required using the first-in/first-out (FIFO) method outlined in the Settlement Agreement, which method had been used for the summer of 2012, because many of the claims were incomplete and therefore not ready for processing.

37.     After discussion with the Court, BP, and the PSC, it was determined that a larger number of claims should be examined before the fairness hearing so that the Court, the parties, objectors and claimants could see how the settlement program was working.

38.     As noted above, since the program had encountered problems with a lot of the claims not having complete documentation, it was difficult to come up with claims that could be analyzed and determined, so a sample of sufficiently documented claims was needed.

39.     With the knowledge and input of the PSC and BP, I asked the PSC to provide a listing of such cases and a sampling was taken of those cases for processing.  This action had nothing to do with trying to expedite a claim for any particular attorney or party.

40.     Pursuant to that request, claims were submitted, a sampling was taken, determinations were made, and those results were made available to the Court and the parties at the time of the fairness hearing.

41.     During this same time frame, some of the objectors were taking the position that in order to be able to determine whether to opt-out, they needed to see at the time of the fairness hearing a determination on the type of claims they were handling.  We therefore took samples of claims from the several of the objectors and made determinations which were also available at the time of the fairness hearing.

42.     Over 60% of the claims that were considered were not represented by the PSC.

43.     If someone calls and complains about something, I feel I have an obligation to see if it is valid or not valid, but that does not mean we improperly push any claims through the process.

## Conclusion

44.     Before filing its Motion to Remove, BP did not request a Panel Hearing as required by the Settlement Agreement § 4.3.4 ("Upon the request of any member of the Claims Administration Panel, it shall address and attempt to resolve unanimously any issues or disagreements that arise regarding the Claims Administrator's oversight responsibilities.").

45.     As Claims Administrator, under § 4.3.3 of the Settlement Agreement, I serve at the pleasure of the Court and under this Court's supervision.

46.     In my many years of experience as a Special Master and Claims Administrator, this is the first time that I have been subject to a Motion to Remove.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state
that the facts set forth herein are true to the best of my knowledge, belief, and information.

Dated: October __14__, 2014

Patrick A. Juneau, Claims Administrator

9

# EXHIBIT  2A

## Felicia A. Guidry

| | |
|---|---|
| **From:** | Ken Feinberg [KFeinberg@feinbergrozen.com] |
| **Sent:** | Friday, August 13, 2010 9:35 AM |
| **To:** | aharbin@ago.state.al.us; taylorc@ag.state.la.us; robert.allen@oag.state.tx.us; Trish Conners; MELANIE WEBB; Felicia A. Guidry; Patrick A. Juneau; Leslie Jacobs |
| **Subject:** | Attached Draft Emergency Protocol |
| **Attachments:** | AUGUST 13, 2010 WORKING DRAFT.DOCX |

To All:

I continue to make changes in the Draft Gulf Coast Claims Facility Protocol for Emergency Advanced Payments to reflect ongoing input from the AGs and Department of Justice. I would appreciate your constructive criticism concerning the attached no later than the close of business on Monday, August 16. I plan to release a final Emergency Protocol next week, well in advance of the August 23 start up date for the Gulf Coast Claims Facility. I hope that all of you will find a way to support this effort at the prompt distribution of emergency funds to eligible claimants. I will then turn my attention to drafting a Final Protocol and believe it would be beneficial for all of us to meet in person to discuss the most controversial features of the Final Protocol e.g. the subject of release language, etc. I propose that this meeting occur sometime in September. I thank you for your valuable and constructive input and look forward to working with you. .

Ken

Kenneth R. Feinberg
Feinberg Rozen, LLP
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC   20004-1008
Office: 202 962 9280
Email:  kfeinberg@feinbergrozen.com

8/13/2010

**Felicia A. Guidry**

| | |
|---|---|
| **From:** | Ken Feinberg [KFeinberg@feinbergrozen.com] |
| **Sent:** | Thursday, August 19, 2010 1:28 PM |
| **To:** | aharbin@ago.state.al.us; taylorc@ag.state.la.us; robert.allen@oag.state.tx.us; Trish Conners; MELANIE WEBB; Felicia A. Guidry; Patrick A. Juneau; Leslie Jacobs |
| **Subject:** | Attached - Final Emergency Protocol & Criteral |
| **Attachments:** | GCCF Protocol August 19.DOCX; NARRATIVE ELIGIBILITY 8.23.10.ken edits.doc |

To All:

I attach the final Emergency Protocol I plan to release tomorrow, along with a Summary Criteria Narrative Explanation suggested by Attorney General Hood. I thank you all for your constructive input and assistance. I have adopted many of your suggestions – particularly the "presentment" language urged by Attorney General McCollum.
It is my hope that the various Gulf Coast AGs will be supportive of my emergency compensation efforts commencing next Monday, August 23. Your credibility in supporting the Program is very important. I also pledge to each of you my commitment to meet with you in the weeks and months ahead as we strive to fashion a Final Settlement Protocol (including important release language).


Ken


Kenneth R. Feinberg
Feinberg Rozen, LLP
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC   20004-1008
Office: 202 962 9280
Email:  kfeinberg@feinbergrozen.com

**Felicia A. Guidry**

| | |
|---|---|
| **From:** | Ken Feinberg [KFeinberg@feinbergrozen.com] |
| **Sent:** | Thursday, August 19, 2010 1:29 PM |
| **To:** | Paul Hurst; Kristy Nichols; Moulton, Diane; Walker, Jim; shane.strum@eog.myflorida.com; Patrick A. Juneau |
| **Cc:** | Camille Biros |
| **Subject:** | Attached: Final Emergency Protocol and Criteria |
| **Attachments:** | NARRATIVE ELIGIBILITY 8.23.10.ken edits.doc; GCCF Protocol August 19.DOCX |

To All:

I attach my Final Emergency Protocol which will be distributed to the public and all interested parties tomorrow. I also attach a Summary Narrative describing the criteria being used to determine claimant eligibility. I am very grateful for all the input you provided me in the drafting of the Protocol and very much welcome as much support as possible from the Gulf Coast Governors (see, for example, the terrific publicity campaign supporting the Gulf Coast Claims Facility promoted this week by Governor Riley in Alabama). I need al the assistance I can get from the Governors and hope that this Emergency Protocol will be supported by your principals. I also pledge to you that I will work directly with you in the drafting of a Final Protocol in the weeks and months ahead. I thank you again for all of your help.


Ken


Kenneth R. Feinberg
Feinberg Rozen, LLP
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC  20004-1008
Office: 202 962 9280
Email:  kfeinberg@feinbergrozen.com

**EXHIBIT  2B**

**Felicia A. Guidry**

| | |
|---|---|
| **From:** | Trey Williams [Trey.Williams@LA.GOV] |
| **Sent:** | Wednesday, July 14, 2010 3:11 PM |
| **To:** | Patrick A. Juneau; 'Hannes, Kevin'; Kristy Nichols; Ruth Johnson (DSS); Elizabeth Murrill; 'Skip Brechtel'; Curt Eysink |
| **Subject:** | Final Itinerary for July 15 - as of 3:10 pm |
| **Importance:** | High |
| **Attachments:** | 71510_Kenneth Feinberg Visit_FINAL_310pm.pdf |

Attached is the final schedule for tomorrow.  The helicopters will depart Baton Rouge at 8 sharp, so please arrive 10-15 minutes early. Please note which Helicopter you are scheduled to fly in for the day.  If you have any questions, please feel free to contact me via cell at 225-436-9582.  Thanks.

Trey

Trey Williams | Director
Bureau of Communications and Governmental Affairs
Louisiana Department of Children and Family Services
225.342.6700 | trey.williams@la.gov
www.dcfs.louisiana.gov

7/14/2010

**Kenneth Feinberg Visit**
**Itinerary for July 15, 2010**

**Master Schedule**
8:45 a.m. –  Arrive and Meet with local elected officials from impacted parishes
11:30 a.m. – Town Hall meeting at Houma/Terrebonne Civic Center, 346 Civic Center Blvd., Houma, La 70360
2:30 p.m. –  Town Hall at St. Patrick Catholic Church, 28698 Hwy 23, Port Sulphur, La 70083
4:30 p.m. –  Town hall at Lafitte Civic Center, 4917 City Park Dr., Lafitte, LA

<u>**Mr. Feinberg's Itinerary**</u>
<u>**Helicopter #2**</u>

Manifest – Kenneth Feinberg, John Schwartz, Amy Weiss, Darryl Willis

| Arrive | Depart | Event Time | Mode | Location | Notes |
|--------|--------|------------|------|----------|-------|
| 8:15 am | | | Plane | Atlantic Aviation, 749 Lockheed Dr., Kenner, La 70062, 504-466-1700 | Will be arriving from Montgomery, Tail #N711EC. Trooper Chavez will meet plane to transport to next destination, Cell #225-454-0848 |
| | 8:25 am | | SUV | Atlantic Aviation | |
| 8:40 am | | | SUV | Jefferson Parish Council Chambers, 1221 Elmwood Park Blvd., Harahan | POC: Anita Freeman, Parish President Steve Theriot's Office, 504-736-6405, Afreeman@jeffparish.net |
| | | 8:45 – 10 am | | Meet with local elected officials | Invited list includes Parish Presidents, Mayors and legislators from impacted parishes. Event is open to the media. |
| | | 10-10:15 am | | Media Avail | |
| | 10:15 am | | SUV | Jefferson Parish Council | |
| 10:35 am | | | SUV | Atlantic Aviation | |
| | 10:45 am | | Plane | Atlantic Aviation | Wheels up for Houma/Terrebonne Airport |
| 11 am | | | Plane | Houma Jet Center, 3602 Thunderbird Rd., Houma, 985-868-7858 | Will be greeted by Trooper Eric Frazier, who will helicopter you to event, cell # 225-505-5590 |

| | | | | | |
|---|---|---|---|---|---|
| | 11:05 am | | Helicopter | Houma Jet Center | Takeoff for Houma Civic Center |
| 11:15 am | | | Helicopter | Houma Civic Center, 346 Civic Center Blvd, Houma | |
| | | 11:30-12:45 pm | | Town Hall Meeting | POC: Michel H. Claudet, Terrebonne Parish President, 985-873-6401, mhclaudet@tpcg.org |
| | | 12:45-1 pm | | Media Avail | |
| | | 1-1:30 pm | | Lunch and Meeting | Lunch will be provided at facility.  Meeting between Mr. Feinberg and Kristy Nichols, Ruth Johnson, Elizabeth Merrill and Pat Juneau. |
| | 1:30 pm | | SUV | Houma Civic Center | Depart for Houma Jet Center in SUV.  POC: Trooper Josh, cell # 504-460-0823 |
| 1:45 pm | | | SUV | Houma Jet Center | |
| | 1:55 pm | | Helicopter | Houma Jet Center | Depart for Plaquemines Parish |
| 2:25 pm | | | Helicopter | St. Patrick Catholic Church, 28698 Hwy 23, Port Sulphur, LA 70083 | Will land in field next to church |
| | | 2:30-3:45 pm | | Town Hall Meeting | POC: Therese Wooton, Plaquemines Parish Government, (504) 274-2464, twooton@plaqueminesparish.com |
| | | 3:45-4 pm | | Media Avail | |
| 4:05 pm | | | Helicopter | St. Patrick Church | Depart for Lafitte, La |
| | 4:25 pm | | | Lafitte Civic Center, 4917 City Park Dr., Lafitte | Will land in field 1 block from site and walk to site. |
| | | 4:30 – 5:45 pm | | Town Hall Meeting | POC: Krystal Christen, Mayor Charles Kerner, 504-689-7801, 504-307-2423 (cell) |
| | | 5:45 – 6 pm | | Media Avail | |
| | | 6-6:15 pm | | End of Day Wrap up | Mr. Feinberg to meet with Kristy Nichols, Ruth Johnson, Elizabeth Merrill and Pat Juneau to discuss days events. |
| | 6:20 pm | | Helicopter | Lafitte Civic Center | Depart for Atlantic Aviation in New Orleans |
| 6:30 pm | | | Helicopter | Atlantic Aviation | End of Mission |

7/14/2010, 3:10:01 PM

**Kristy Nichols' Itinerary**
**Helicopter 1**

Manifest:  Kristy Nichols, Ruth Johnson, Elizabeth Merrill, Curt Eysink

| Arrive | Depart | Event Time | Mode | Location | Notes |
|---|---|---|---|---|---|
| | 8:00 am | | Helicopter | State Police Headquarters, Independence Blvd., Baton Rouge | Landing Zone – Helipad to right of front gates Pilot: Keith Smith, 225-663-0714 and Jeff Cupples, 225-341-9684 |
| 8:30 am | | | Helicopter | Jefferson Parish Council Chambers, 1221 Elmwood Park Blvd., Harahan | POC: Anita Freeman, Parish President Steve Theriot's Office, 504-736-6405, Afreeman@jeffparish.net |
| | | 8:45 – 10 am | | Meet with local elected officials | Invited list includes Parish Presidents, Mayors and legislators from impacted parishes. Event is open to the media. |
| | | 10-10:15 am | | Feinberg Media Avail | |
| | 10:20 am | | Helicopter | Jefferson Parish Council | Takeoff for Houma Civic Center |
| 10:45 am | | | Helicopter | Houma Civic Center, 346 Civic Center Blvd, Houma | |
| | | 11:30-12:45 pm | | Town Hall Meeting | POC: Michel H. Claudet, Terrebonne Parish President, 985-873-6401, mhclaudet@tpcg.org |
| | | 12:45-1 pm | | Feinberg Media Avail | |
| | | 1-1:30 pm | | Lunch and Meeting | Lunch will be provided at facility.  Meeting between Mr. Feinberg and Kristy Nichols, Ruth Johnson, Elizabeth Merrill and Pat Juneau. |
| | 1:30 pm | | SUV | Houma Civic Center | Depart for Houma Jet Center in DCFS Durango. POC: Lindsey deBlieux, 225-454-2232 |
| 1:45 pm | | | SUV | Houma Jet Center | |
| | 1:50 pm | | Helicopter | Houma Jet Center | Depart for Plaquemines Parish |
| 2:20 pm | | | Helicopter | St. Patrick Catholic Church, 28698 Hwy 23, Port Sulphur, LA 70083 | Will land in field next to church |

| | | | | | |
|---|---|---|---|---|---|
| | | 2:30-3:45 pm | | Town Hall Meeting | POC: Therese Wooton, Plaquemines Parish Government, (504) 274-2464, twooton@plaqueminesparish.com |
| | | 3:45-4 pm | | Feinberg Media Avail | |
| 4:00 pm | | | Helicopter | St. Patrick Church | Depart for Lafitte, La |
| | 4:20 pm | | | Lafitte Civic Center, 4917 City Park Dr., Lafitte | Will land in field 1 block from site and walk to site. |
| | ، | 4:30 – 5:45 pm | | Town Hall Meeting | POC: Krystal Christen, Mayor Charles Kerner, 504-689-7801, 504-307-2423 (cell) |
| | | 5:45 – 6 pm | | Media Avail | |
| | | 6-6:15 pm | | End of Day Wrap up | Mr. Feinberg to meet with Kristy Nichols, Ruth Johnson, Elizabeth Merrill and Pat Juneau to discuss days events. |
| | 6:25 pm | | Helicopter | Lafitte Civic Center | Depart for Atlantic Aviation in New Orleans |
| 6:35 pm | | | Helicopter | Atlantic Aviation | Refuel |
| | 6:55 pm | | Helicopter | Atlantic Aviation | Depart for State HQ, Baton Rouge |
| 7:25 pm | | | Helicopter | State LSP HQ | End of Mission |

7/14/2010, 3:10:01 PM

4

### Helicopter #3 Itinerary

Manifest:  Pat Juneau, Skip Brectel, Kevin Hannes, Trey Williams

| Arrive | Depart | Event Time | Mode | Location | Notes |
|---|---|---|---|---|---|
| | 8:00 am | | Helicopter | State Police Headquarters, Independence Blvd., Baton Rouge | Landing Zone – Helipad to right of front gates Manifest – Pat Juneau, Kevin Hannes, Trey Williams Pilot: Keith Smith, 225-663-0714 and Jeff Cupples, 225-341-9684 |
| 8:30 am | | | Helicopter | Jefferson Parish Council Chambers, 1221 Elmwood Park Blvd., Harahan | POC: Anita Freeman, Parish President Steve Theriot's Office, 504-736-6405, Afreeman@jeffparish.net |
| | | 8:45 – 10 am | | Meet with local elected officials | Invited list includes Parish Presidents, Mayors and legislators from impacted parishes. Event is open to the media. |
| | | 10-10:15 am | | Feinberg Media Avail | |
| | 10:20 am | | Helicopter | Jefferson Parish Council | Takeoff for Houma Civic Center Manifest: Pat Juneau, Skip Brectel, Kevin Hannes, Trey Williams |
| 10:45 am | | | Helicopter | Houma Civic Center, 346 Civic Center Blvd, Houma | |
| | | 11:30-12:45 pm | | Town Hall Meeting | POC: Michel H. Claudet, Terrebonne Parish President, 985-873-6401, mhclaudet@tpcg.org |
| | | 12:45-1 pm | | Feinberg Media Avail | |
| | | 1-1:30 pm | | Lunch and Meeting | Lunch will be provided at facility.  Meeting between Mr. Feinberg and Kristy Nichols, Ruth Johnson, Elizabeth Merrill and Pat Juneau. |
| | 1:30 pm | | SUV | Houma Civic Center | Depart for Houma Jet Center in LSP car. McGovern will travel in Feinberg SUV. POC: Trooper Josh, cell # 504-460-0823 |

| | | | | | |
|---|---|---|---|---|---|
| 1:45 pm | | | SUV | Houma Jet Center | |
| | 1:50 pm | | Helicopter | Houma Jet Center | Depart for Plaquemines Parish |
| 2:20 pm | | | Helicopter | St. Patrick Catholic Church, 28698 Hwy 23, Port Sulphur, LA 70083 | Will land in field next to church |
| | | 2:30-3:45 pm | | Town Hall Meeting | POC: Therese Wooton, Plaquemines Parish Government, (504) 274-2464, twooton@plaqueminesparish.com |
| | | 3:45-4 pm | | Feinberg Media Avail | |
| 4:00 pm | | | Helicopter | St. Patrick Church | Depart for Lafitte, La |
| | 4:20 pm | | | Lafitte Civic Center, 4917 City Park Dr., Lafitte | Will land in field 1 block from site and walk to site. |
| | | 4:30 – 5:45 pm | | Town Hall Meeting | POC: Krystal Christen, Mayor Charles Kerner, 504-689-7801, 504-307-2423 (cell) |
| | | 5:45 – 6 pm | | Media Avail | |
| | | 6-6:15 pm | | End of Day Wrap up | Mr. Feinberg to meet with Kristy Nichols, Ruth Johnson, Elizabeth Merrill and Pat Juneau to discuss days events. |
| | 6:25 pm | | Helicopter | Lafitte Civic Center | Depart for Atlantic Aviation in New Orleans |
| 6:35 pm | | | Helicopter | Atlantic Aviation | Refuel – Skip Brectel to disembark |
| | 6:55 pm | | Helicopter | Atlantic Aviation | Depart for State HQ, Baton Rouge Manifest -- Pat Juneau, Kevin Hannes and Trey Williams |
| 7:25 pm | | | Helicopter | State LSP HQ | End of Mission |

7/14/2010, 3:10:01 PM

6

>>:   Now a town hall meeting on BP's $20 billion dollar oil spill fund.   The government appointed administrator of the fund Kenneth Feinberg talks to residents in Houma Louisiana about the claims process and answers questions.   This is a little over an hour.

>>:   Good morning.   Today we have -- my name is Michele Clodet.   I am really pleased to introduce the individual that I will be introducing.   This gentleman has had a long history of working with people to resolve certain problems.   He worked with agent orange people.   He has worked with the 9/11 people.   He has been a mediator and he is a very impressive individual.   I have heard him speak now twice.   The first time was when the senior senator from Louisiana, Senator Landrieu, brought him down, and we had the good fortune to meet at that time.   After that we begged him to please come to Houma because we have so many people who need claims, information, how they process claims, what's in the future.   It is my great pleasure to introduce the person known as the $20 billion man, the man selected to actually hand $20 billion fund, Mr. Kenneth Feinberg.

>>:   Applause.

>>:   Thank you very, very much.   That's a nice introduction. And I appreciate it.   I want to thank everybody for being here.

I particularly want to thank the Governor who I have been working with to try and get this program up and running.   The Governor helped arrange this entire day.   I am traveling throughout Louisiana today, Mississippi tomorrow, Alabama next week, Florida on the 29th.   I will be coming back here as often as is necessary to answer questions and to help you understand what this program is all about.   In the next few minutes, before I take questions, let me try and give all of you a thorough understanding of what is going on.   First, the program that I am administering is a private program.   I am not working for the government of the United States or the government of Louisiana.   I am working for the people of Louisiana.   An agreement was entered into between the Obama administration and BP to set aside $20 billion to pay any and all claims arising out of the spill.   If the $20 billion is not enough, BP has agreed that it will honor any and all of its financial obligations above $20 before.   So the money is there.   But I am not working for BP or the administration. They picked me to run an independent facility company, claims program.   If it works, I get the credit.   If it doesn't work, only I get the blame, nobody else.   This is not about politics.   This is about helping people in the Gulf.   That's what this is about.   I am working for you, not for BP.   Next, I believe that BP deserves some credit for the program it has already set up.

Darrell Willis is right here, the man behind BP on this.   They
have paid out about $150 million already in eligible claims.
That has ain't even come out of the 20 billion.   That's
separate.   So what BP has already done, I commend them.
But in about another 2 weeks, around August 6th, 8th, 10th,
BP is gone.   They're out of the claims business, and I will be
responsible for processing all claims from individuals and
businesses.   I do not have jurisdiction over two types of
claims.   I want you to understand.   Right now, I have no
authority to process government claims.   The county, the
parishes, the state, the feds.   That I do not have.
Government claims go to BP.   I also do not have jurisdiction
yet over moratorium claims.   Now, BP set aside $100 million;
not part of the 20 billion, an additional $100 million set aside
just for rig workers out of work because of the moratorium.
That 100 million is for rig workers only, not rig related
businesses, just for rig workers.   And unlike the 20 billion, it
will not be added to.   That's it on rig worker moratorium
claims.   Now, right now, that 100 million is not part of the 20
billion and is not even part of my program.   It's over here
somewhere.   BP is currently trying to decide how to distribute
that 100 million.   So keep in mind I am not here today to talk
about government claims.   I am not here today to distribute
100 million in moratorium claims.   I am here with a $20 billion

fund for individuals and businesses, private.   That's what I'm doing.   Now, keep in mind that this program, this 20 billion, is not just limited to my -- the government claims come out of the 20 billion even though it's not part of my watch.   The government claims do.   The moratorium claims are separate. Clean up costs come out of the 20 billion.   So I don't control this $20 billion.   I control whatever I need to process individual and business claims out of that fund.   If it's not enough, BP has stated it will pay additional claims as needed.   Now, I want to urge everybody to file a claim in this program.   I believe, and I have told all of the Louisiana government officials that will listen to me, that it is a mistake for people not to file a claim.   And here's why.   If you file a claim with me and the claim is eligible and it is corroborated, you will be paid forth with 24, 48 hours, immediately.   You will be paid emergency payments totaling what you need for 6 months. Now, BP to its credit has been paying emergency payments one month at a time.   You come in for a month, you get a check, you come back next month, you get a check.   You come back a third month, you get a check.   Forget it.   When the Gulf Coast claims facility is up and running in the next few weeks, come in, file a claim, 6 months advanced emergency payments.   You may not want 6 months.   You may like coming back every month.   That's all right.   But if you want 6

months up front, no obligation.   You don't wave any rights.   If you need an emergency payment and you're eligible and you corroborate the claim, you will get a check for 6 months without any requirement that you sign away any legal rights that you may have or what have you.   But if you don't file a claim, I can't pay you.   I've got to look at the claim, make sure it's backed up with facts.   6 months emergency pay.   Now, when the oil stops and you want more money, you can come in and I'll examine your claim for all of your loss now and in the future.   Mr. Feinberg, I think I won't be able to fish for 18 months.   It will take 18 months for me to be up and running again.   I'll examine that.   I'll look at the claim.   And I'll turn to you and say I agree with you or I don't agree with you.   But if I agree with you, here is a check for 18 months lost pay, lost income.   But then, think long and hard, because then in order to get that big check, lump sum, full payment, you got to release BP.   You got to sign a piece of paper that you won't sue BP.   In return, if you like the amount of that check, here.   Now, keep in mind this program is entirely 100 percent voluntary.   Nobody has to come into the program.   If you think this is a trick, if you think this is a trap, it isn't.   But if you think that, don't do it.   You can go file a law suit.   But my friends, I'm telling you that lawsuit you will litigate for years, you may not win, you got to pay a lawyer.   I suggest to you

that the program I am setting up here in Louisiana is absolutely, I am convinced, the way to go.   Now, let's walk through what happens if you file a claim.   Mr. Feinberg, I'm here, and I want emergency payments.   I want work.   Okay. Fill out the form.   By the way, in a couple of more weeks, if you want, fill out the form online.   You don't even have to go to an office.   We'll have right online on the internet, you can fill out the form electronically.   I don't care.   But we have got as you know 35 claims offices that Darrell and BP set up all over the Gulf.   You can go to one of those claims offices.   You can call a 1-800 number.   You can ask questions.   You can walk in.   You can make an appointment.   Or you can do it all in your living room on the internet.   I am out of work, the fishing boat dry docked, I can't work.   All right, fill out the form. Corroborate your claim, here is a check for 6 months.   And you don't have to sign anything.   Take the money.   If later on you don't want to participate any longer, don't.   You still keep the 6 months.   It's a gift.   Wait a minute Mr. Feinberg, it says that I got to corroborate the claim.   I have an all cash business.   Nothing illegal about an all cash business.   That's fine with me.   How are you going to show me that you are losing 8,000 a month or 6 thousand a month or 12,000 a month?   You got to show me something.   You can't just walk in and say give me the money.   Show me your tax return.

Well, I lost it.   All right.   You lost your tax return.   Show me a profit loss statement, a check book, a check stub, something. Well, I don't have -- I don't know.   Tell the captain of the boat or your priest or your sheriff or the Mayor, come on in, vouch for you, that's good enough.   I got to have something to avoid fraud.   I've got to have something that verifies your claim. But I'm not looking to get fancy here.   I want to get the money out to people who need it.   I am working for you.   So let's get creative as to what you offer in the way of corroboration.   I will bend over backwards to corroborate these emergency pavements.   But I got to have some corroboration.   So I'll know how much to give you per month for 6 months.   No obligation.   Well, Mr. Feinberg, I am losing 7,000 a month, but BP put me to work on a vessel skimming or whatever and that makes up 6 thousand so I am only out 1000.   All right.   I'll give you 1000.   You've mitigated.   You have reduced what you are out of work by having another job so I will reduce that amount, whatever you are getting.   Emergency payments. When the oil stops and we all have a better handle on where it is going and how it is spread, then you come in and say okay, now I want a lump sum payment.   I am a shrimper.   I am a shrimper.   And I think that shrimping, I am out of luck for 3 years.   Well, that's what you say.   I'm looking at this.   I am asking the experts down in the parish and everything.   You're

not going to be out of luck for 3 years.   You're out of luck for 2 years.   I will give you $143,000 if you release BP from any lawsuit.   You can go sue somebody else if you want.   But in return for $143,000, here is the check, you sign away you won't sue BP.   You decide.   Yes, give me the check.   You're gone.   Release, sign your name, or you are not treating me fairly, I think it's not enough, I don't know about the future, I don't want the money.   Don't take it.   Don't take it.   Go file a lawsuit.   Wait, come back, a year later.   This program's going to be up and running for, I think, 3 years.   No rush if you want to wait and see.   That's up to you.   That's how the program's going to work.   Now that's not how the moratorium's going to work.   The 100 million is different.   That's all together different.   That's not part of my program.   But you are going to ask questions about it.   And I want you to know what's going to happen.   With the 100 million moratorium rig workers, not moratorium businesses, this is wage loss only, because of the moratorium on the rigs.   What's going to happen is somebody is going to add up all the rig worker claims for lost wages and divide it up based on $100 million that's in the kitty. There are 1100 workers.   Here is a million dollars divided by whatever it is.   That's what you get, and that's all you get. There is no more money on the moratorium.   BP will not, will not add to that 100 million.   That is a one shot contribution.

Keep in mind, I cannot help anybody here if you don't file a claim.   I'm worried that there will be too many people that, for whatever their reason, whatever their motivation, won't file a claim.   And if you don't file a claim with the Gulf Coast claims facility, I can't help you.   Now, if you already filed a claim with BP, that's good enough.   You don't have to refile.   In other words, when I take over from Darrell, who thank goodness isn't going anywhere, when I take over from BP, you don't have to come in and start all over.   As I have explained over and over again in Louisiana, when I take over, we are not reinventing the wheel here.   It is already in place.   We have already got a BP program.   I want the program made better.   I think that the BP program isn't swift enough, especially with small businesses that are waiting.   It's not fast enough.   We have got to accelerate the process.   We have got to make it more efficient.   We have got to get the money out quicker.   I realize that.   But I am coming here to Louisiana with my Boston accent.   I am coming here to Louisiana urging the citizens of Louisiana to take advantage of this program.   Do I need a lawyer, Mr. Feinberg?   You don't need a lawyer to file.   We'll help you fill out the claims.   I am not adversarial to the people here.   You don't need a lawyer, well I want a lawyer -- bring your husband, I don't care.   Bring your accountant.   I don't care who you bring.   I don't care who helps you.   But I will

say this, you don't need a lawyer to fill out these forms.   And in fact I suspect in the next few weeks, just as with my 9/11 victim compensation fund, we'll have lawyers if you want one to help you for free.   For free if you think you need one.   So that's how the program's going to work.   Now, it's not just wages.   If you have a business and you are losing revenue, Mr. Feinberg, we can't shrimp, we can't oyster harvest, we can't fish, we can't sight see boats.   We used to take people out to sight see.   File a claim.   Lost profits from a business, compensable.   Compensable.   Well, I don't know if my business is eligible because there is no oil on the beach. There doesn't have to be oil on the beach.   You can't fish. You can't shrimp.   You can't process shrimp.   You are a food processor.   You are a wholesaler.   File a claim.   You will be eligible.   The amazing things to me are the number of people who so far haven't filed a claim even for emergency payments. Well, you are not giving up any rights whatsoever.   So the main reason I'm here today at the request of Governor Jindal and the local parish is to promote this program and to urge everybody to take advantage of the program.   If you are not eligible, so you are not eligible.   You still have all your other rights.   But my goal is to make sure that whatever you could get in court after years of litigation with lawyers, I am going to do better and I am going to do quicker.   So that is sort of the

overview of the program.   And I welcome the opportunity to respond to questions from this audience.   Yes, sir.

>>:   I am glad you came to Houma and I am glad you are working for me.   One of my questions is I got 20 vessels and I have been trying to get with BP, I got some contracts that say May 5th, and I still never had call to put my vessels to work.   I tried.   Almost everyday I called in.   I never talked to the same person.   That's one of my questions.   My other question is I am also an oyster fishermen and I got oyster leases.   Now, how do I collect from oysters that we can't fish and everything is shut down, we can't go out to fish.

>>:   Now, you asked two questions.   Let's make sure I understand the question.   I take it that the first question is you are not getting any response from BP to your questions.   Is that the problem?

>>:   Yes, sir.

>>:   All right.   Well, there is a guy right here, Darrell Willis, right there in the front row, you are about to get a response after we break.   He is going to chat with you.   An you are going to get responses to your questions, or he is going to take down your name and right back to you so you will get some responses.

>>:   I was in the last meeting when you came down to Raceland.

>>:   Speak into the mic.

>>:   Okay.   Whenever you came down to Raceland -- to lock part, I mean, I talked to Darrell Willis.   I gave him one of my cards.   I told him the problem that we had and I never had a response.

>>:   Two answers.   You are going to get a response.   And secondly, in about 2 weeks I am going to leave here today and y'all are going to give me whatever information you need. Believe me, you are going to get a response.   Now orchis occurs or shrimp or fishing, keep in mind, this is very important.   Are you going to be able to file a claim even though the oil hasn't reached your oysters?   Because they won't let you harvest the oysters or you can't sell the oysters? Yes, file a claim.   I am not going to require that the oysters actually be harmed by the oil.   That's not required.   If you can demonstrate that the market for oysters has dried up because of the oil, even though the oil's never reached your oysters, we'll take care of you.

>>:   Okay, Kenneth, one other thing, I work out of bayou Barry.   That's like northwest of grand isle.   At urban May they had oil that came into the bayou.   So we had oil on our leases.

>>:   I don't understand the question.

>>:   The oil came on the leases.

>>:   Oh, you mean the oil has harmed the beds?

>>:   Well, we couldn't go out and fish.

>>:   Valid claims, the resources, you can't get to the fish. The fish don't have to be swimming in the oil.   We'll take care of this.

>>:   That's my question, thank you.

>>:   As long as you file a claim.

>>:   Yes, so far we are talking about income and it affecting our revenue.   My question is should we be hit with a hurricane and our community be flooded and our homes and our properties be covered with oil, what happens then?   I know insurance is not going to cover, you oil, oil damage to our properties.

>>:   I will look at that problem.   But if you hurricane comes along and damages your home this summer with oil caused by the spill because of that natural disaster, you got a claim.

>>:   Good day sir.   My question is I was employed by an oilfield service company and I was laid off due to the business climate in the Gulf of Mexico because of the spill.   Am I entitled to file a claim and for lost wages?

>>:   You have been laid off as a direct result of the oil spill. And if it wasn't for the oil spill, you would still be working.   I will take a look at that.   These questions come up.   I mean, I think you are eligible.   I think you are.   You have been laid off

directly as a result of the spill.   You have a valid claim.

>>:   Sir, is your criteria going to be any different in your program as opposed to the BP program?

>>:   Our program will pick up where the BP program left off.   I am hoping, and I believe, that we will find more eligible than under the BP program.   We'll find more people and businesses eligible.   And we'll process the claims faster. Right now, thanks to Darrell and BP, BP's done a pretty good job of processing wage loss claims.   They haven't been as effective as they should be in processing business claims, lost business profits.   We have got do better on that.   So I think it's fair to say you don't have to refile.   We will pick up where BP left off, accelerate the processing not only of individual claims but business interruption and lost profit claims as well.

>>:   My husband owns part of a crab dock, but he is also a fisherman.   Originally they were compensating us for his wishing loss even though they haven't got around to dealing with our business claims, which is a common complaint.   Now they have stopped compensating us for his fishing losses since he owns part of a company, even though they're separate.   How is that going to be handled under your program?

>>:   File one claim.   The claim form will say A, lost fishing or wages, business.   B, crabs or whatever, oysters, shrimp.   In

one claim form, you will file both claims.   And we'll process them together.

>>:   Okay.   I own the biggest soft shell crab company in the state.   I just doubled 2 time and a half times my size.   Okay. I don't have a soft shell crab at all.   I want to know if I make soft shell crabs if BP and the government is going to come eat them crabs.

>>:   Now, I am not sure I understood the question.   You own a soft shell crab business.

>>:   I own the biggest one in the state.   Okay.   I got crabs going to Hawaii, the west coast -- BP's only got 10 or 15 percent of the oil floating.   The rest is on the bottom of the Gulf and in our bays.   Are y'all going to eat any of them crabs?   You got to eat the whole crab.

>>:   I don't know whether I am going to eat the whole crab or not.

>>:   Applause.

>>:   But when you file your claim, you're going to state in your claim that you want to be compensated for the entire loss of the crab, not part of the crab or -- in other words, your revenue that you are losing is because you can't ship that crab around the country.

>>:   BP put me out of business.   I ain't got crabs at all no more.   I won't sell crabs like that to the public.   Okay.   They

got more oil on the bottom of that Gulf of Mexico than what they got floating.   That's the thing.   How they going to get that oil off the bottom of the Gulf of Mexico?

>>:   I can help you with the claim.   I can't help you with the technical way that they're going to get rid of the oil in the bottom of the Gulf.   But let me ask you a question.   Let me ask you a question.   You're an expert.   How long do you think it will be before you will be able to harvest those crabs again in the bottom of the Gulf.

>>:   Over 30 years.

>>:   Well, then you've got a total loss.   What you are saying is you've got a total loss of your business.

>>:   I used to work in the oilfield for 36 years.   I was a pipe tester.   I am a Jack of all trades.   Okay.   BP and companies like BP, I used to do them deep water wells.   They call me to go test the pipe on them jobs as they go in the holes.   But I went to BP 3 days after they had the spill to show them a tool to stop the spill.   I couldn't even get an appointment.   My brother talked to slim Jay, Halliburton and BP, supposed to get me a meeting.   None of them ever gave me a meeting.   I talked to BP on the phone.   They said an engineer was going to call me.   Nobody ever called me.   I could have stopped that leak a long time ago.

>>:   Applause.

>>:   I am not here to stop the leak.   I'm here to urge you to try and get compensated for your loss.   That's what I'm here for.

>>:   I was trying to save my company.   It's destroyed now.

>>:   Mr. Feinberg, a couple questions.   In spite of BP's insurgence in their press releases that large claims are being paid on average of 9 days from claim made to claim paid, all of my large losses claims I filed on behalf of my clients, none have been paid and I think right now I am running at an average of 53 days for all the claims combined since the time they have been submitted.   The first question is will claims that have been sitting there for 53 days get any priority once you take over?

>>:   Yes, we will immediately prioritize claims that are already in the inventory.

>>:   Secondly, will there be put forth a standard set of data required?   We have been sending in PDF format, first we ask for 3 years of tax returned.   Then they come back and they want monthly P N Ls.   Then they come back, they want year before's P N Ls.   Now they want 3 years of checking account records.   It changes every single day and it's completely arbitrary.

>>:   I agree with you that the current de centralized system is the shambles.   I am agreeing with you.   In the next couple of weeks, not months, when we set up this centralized system

online, in these 35 claims offices, we will have systematically consistently what we want, you will know what we want. That's all we want.   And we are not going to change from claims office to claims office to claims office.

>>:   Next question, is the third party administrator going to remain the same?   By that I mean Isis or Whirly catastrophe. Are those same people going to -- adjustors going to be in place or are you bringing in new folks.

>>:   Whirly is staying.   They have done a fairly decent job, but they need more direction.   And they're a Hammond Louisiana company.   And I like that.   Isis is out.   We are going to set up a new infrastructure.   You must be a lawyer. We are going to set up an infrastructure that is going to systematically consistently make it easier to file, find out where your claim is and process that claim.

>>:   Lastly sir, almost lastly, are you going to make the computation process public?   We are dealing with -- we don't know.   Say one of my clients gets is check.   I ask them how did you come up with that amount?   I sent you with $100,000 worth of shrimp tickets.   They won't tell us.   Is that going to be transparent.

>>:   Transparent.   Let me tell you something about transparency.   The methodology that I am going to use to calculate the claims will be public.   You can challenge it if you

think it's wrong.   It will be made available to anybody who
wants it.   That's first.   Secondly, if Governor Jindal has
complained to me about anything it's the absence of reliable
data as to where the claims are, where they're going.
Homeland security in Washington, very, very concerned about
the lack of really transparent good data.   We're going to get
that data.   We are going to make that data available.   Not
personal information.   That's private.   But we are going to get
the type of data that everybody needs to see how the program
is working.   That we will do.

>>:   I appreciate that, sir.   Mr. Feinberg, I have been pulling
my hair out for the last 50 to 60 days dealing with this as an
attorney with a few skill sets.   So it's a complicated process
and all us attorneys aren't bad folks.   So I would appreciate if
you just take it a little easy on us unless you really do intend to
bring in an entire legion of free lawyers.   I hope that those
folks have my clients' interest at heart the way I do.   Thank
you.

>>:   Let me say, if they don't, they have every right -- and they
wouldn't be so bad off retaining you frankly.

>>:   Thank you sir.

>>:   Applause.

>>:   We are caught in the middle because we can't file a claim
with BP because we are in the moratorium.   And we don't fall

with y'all either.   There is thousands of us who are independent contractors.   Therefore we cannot file unemployment.   I am sure that no one is going to want those numbers.   I am not sure whereas businesses who is under the moratorium can go to the moratorium.   We get if from BP. We get no from you.   Next week at the Cajun Dome, there is 20 thousand attendees already registered.   This ought to tell you the scope of the people who were affected that have nowhere to go.   And I don't know where we fall as businesses because -- right now, we are at 85 percent loss in business. Most of the vendors that we service are at 85 and 90.   Some are moving out of the area and trying to send their people to Texas to divisions there.   It's greatly affecting.   I want to know where all of us can go.

>>:   Ma'am, you are exactly in no man's land.   Let me tell you, I want you to know, I want you to understand the dilemma here.   If your business has been adversely impacted by the moratorium, not the spill, the moratorium, I think it's fair to say you are not eligible for any of the 100 million dollar moratorium, you are not eligible under the program I am administering.   You are not.   You are only, right now, right now, your only home is a law suit.   I am into the advising that because I am not sure you can win it.   So all I can say is to you -- I mean, of all the questions I've heard here today, the

one that is the most distressing to me is yours because I can only do what I can do.   I can help fishermen and shrimpers and oyster harvesters and boats and people who are impacted by the spill, crabbers, that I can help.   And I can direct rig workers who are harmed by the moratorium to go to the $100 million fund.   Businesses impacted by the moratorium, I don't have a satisfactory answer to you, at least not now, I don't. I'm sorry, I don't.

>>:   Hi.   My husband is a charter captain but he is an inland charter captain.   And he works in Montana in the summer. He comes back usually in October and works the winter here. Well, he's got a claim, he's working on it.   I have been told not to turn it in yet.   And I have been told to go on and turn it in now and get him in the system.   All right.   My first question is when do I turn it in?

>>:   Turn it in now.

>>:   Now, okay.   My second question is do I say for this year and hopefully next year we won't need it because his customers will be able to come back and fish?   Or should we go for 2 years?

>>:   Right now, come in and get 6 months of emergency pay without waving any rights.   Later on, 6 months from now when the oil has stopped, we hope, then you will sit down and you will come in and you will seek what you believe you need to

make yourself whole next year, the year after or the year after,

depending on how long you think the spill will adversely impact

your husband's business.

>>:   Additional claim.

>>:   That's right, that's correct.

>>:   Mr. Feinberg, aim shrimp processor here from Houma,

Louisiana.   When the spill started in April, we had inventories.

We also chose to work when the season was open.   To make

a point, I think we are being penalized for that.   We worked

product, we sold product and we sold off inventory.

Consequently in the month of May, in the month of June, we

made a meager profit.   Well, BP is basing their claims off of

profit and loss.   So we talked to them and said let's take a

look at production figures which are way off compared to last

year and inventory figures which right now I am about 15

percent in inventory of what I had last year at this time.   An

hour before we came to this meeting, we got denied a claim.

Is your system going to take care of me that has no inventory

now and not a possibility of buying too much more?

>>:   First of all, I am surprised that you said an hour ago you

were actually denied a claim.   You actually got word from BP

claim denied?

>>:   Excuse me, excuse me, let me rephrase that.   It's not a

denied claim.   They said we were not eligible for any funds in

the month of May and June.   But maybe by August or
September when we start showing losses, then maybe we'll be
eligible.   But how do we survive until that point?

>>:   If you are out of inventory, you are already suffering
losses.   You have no inventory.

>>:   Correct.

>>:   Well, I don't understand.   You are already suffering
losses.   You have nothing to sell because there is nothing in
your warehouse.

>>:   You don't understand it.   You are a lot smarter man than
me.   I don't understand it.

>>:   I think you got a valid claim.   And I think that we ought to
talk before I leave here today.

>>:   I would love to.

>>:   I better make sure I have the right information from you,
how to contact you.

>>:   I would love to.   Thank you.

>>:   My name is Charles Heart.   We are in a joint venture
with BP and H20 clean filtration system and everybody's with
what the fishermen will do and how we will bring the oil up
from the depths of the bottom.   We are able with BP to bring
up 720 thousand gallons a minute, 2000 feet wide and 800
feet deep which is an issue that no one's addressing.   But with
all the local fishermen and captains with their boats they have

put down at least those at those volumes 7 days a week, 24 hours a day.

>>:  I will talk to you also after.   Thank you, sir.

>>:   My name is Emory.   I am an all life commercial fisherman.   During the storm, it will knock me out of business for a while.   Ready to start this year.   I have done this all my life.   It put me out of business for a while and get ready.   This year I am ready to start again.   I couldn't start.   Do I have a claim or not?

>>:   If I understand correctly, are you asking whether you have to refile for a claim or what?   You better give him the mic.

>>:   You filed a claim with BP.

>>:   Yeah.

>>:   Now you are asking if you should file another claim.

>>:   No, no, to see why I was denied.   I didn't get nothing.

>>:   Again, if you have filed a claim with BP and the claim has not been decided, you don't know what happened, it's sitting there, it hasn't been resolved, we will resolve those claims in the next few weeks.   Once I come in.   I can't do it now.   We are setting up the new system.   But you don't have to refile it. We'll resolve that claim in the next few weeks.

>>:   Okay.   Thank you.

>>:   My question is about cash.   Cash, people that have been

working for cash.    How are y'all going to handle that as far as the person being transparent.    A lot of people will probably be afraid to put a claim with BP because of course they have been working for cash and the IRS and taxes and all that other stuff in between.

>>:    Now, listen carefully about cash, you would be amazed how many times I get questions about cash.    There is nothing illegal in getting paid in cash.    It's not illegal.    There are plenty of people that get paid in cash.    And that's perfectly okay. Nobody says that's illegal.    Now, when you file your claim with me and you say that you are out of pocket, you have lost wages that you only received in cash, I need you to help me prove the amount.    I got to know the amount.    Now, there are various ways you can show me the amount.    You can show me a tax return.    You can show me a profit loss statement from your company.    You can show me checks or check Stubs.    You can even come to me and say Mr. Feinberg, here is my captain who I work for.    He'll vouch for me that it's $5,000 a month or whatever.    I don't care.    But I've got to corroborate it somehow.    Now listen carefully, let's say you're able to corroborate the cash.    I will give you 6 months worth of cash.    But you are going to get a 1099 from me.    You are going to get the IRS.    I got to send you a form from the internal revenue service.    I can't violate the law.    I got to send

you that 1099.   Then it's up to you.   But I'm not
looking -- ladies and gentlemen, I don't need a tax return to
corroborate your cash.   What I need is something.   I will be
as generous as I can.   But I cannot violate the law.   I can't
accept a claim from an undocumented worker.   It doesn't have
to be a citizen, got to have a green card.   Got to be a law full
worker.   I can't violate the immigration law or the IRS.   So I
will work with you guys.   I will work with you to try and make
this program work.   But understand there are legal limitations.
Now, one other thing, very important, very important.
Mr. Feinberg, if I come to you with a cash corroborated, I can
corroborate it, are you going to send my file to the
government?   Absolutely not.   This is a confidential
submission.   You are not going to send it to any government.
State, local, federal, IRS, immigration.   I want to know,
Mr. Feinberg, when you get this information, is it confidential
and is it sealed away?   And the answer is yes.   We'll provide
some important data to Governor Jindal and others to make
sure that they understand the overall program, how it's
working, general statistics.   We are not going to disclose to
anybody your private file.
>>:   I would like to know how long will it be before the rig
workers get paid.
>>:   How long before the moratorium rig workers get paid.

Well, not on my watch, at least not yet.   I will try and get an answer to that question.   I don't know the status yet of where that $100 million is.   As soon as I can find out, I mean, you are not the only person asking me that question.   Public officials right here in the parish are asking me that question. It's at the top of their agenda.   So I will try and get an answer for you as soon as I can.   But again, that's not part of my program yet.   I am hoping it will be.   And I will let you know as soon as I can.

>>:   Everybody from BP is saying that you the one that's responsible for this.   You going to get a word saying when you going to issue out the money to the rig workers.   The guys working for BP, once I put my claim in, they said they waiting on your final word to issue out the money to the rig workers.

>>:   That's what they told us.

>>:   The question is, this gentleman says when he tried to file a claim, BP said no, you got to wait until Ken Feinberg takes over.   No, that's not what you said?

>>:   They saying that they can't issue out any money until you give the final word.

>>:   Right.

>>:   Worse, just as bad.   You are able to file the claim with BP, but they say they won't pay that claim because they're waiting for Mr. Feinberg.   Well, let me just tell you, Darrell

Willis is right here from BP.   They have paid out already about $150 million worth of claims before I ever showed up.   So I think, A, you ought to talk to Darrell about getting that claim paid, processed.   B, if it's a tough case, if it's a problem area, I will take a look at it.   I am going to be up and running in the next 2 or 3 weeks, not months.   I will try to get to that claim as soon as I can.

>>:   Thank you.

>>:   My name is Thomas, I am principal chief of United Houma Nation.   The state of Louisiana is the largest recognized indigenous native American tribe.   We have over 17 thousand citizens in our tribe, most of whom live in the 6 parishes along the Louisiana coast which have been hit hardest by the oil spill.   Nearly 6 thousand of our tribal families have been directly impacted by the closure of the traditional fishing grounds as a result of the infiltration of the surface and sub surface oil and dispersants into the Terrebonne estuary system.   We are requesting that our tribe leadership and staff managers meet with you personally as soon as possible to explore the unique situation that the tribe is in currently. Commercial fishermen -- firing is the single largest industry of our tribe.   We have fished these waters since before New Orleans became a French colony, since before American history began, and since before there was an oil industry in

this country.   Our very existence is being threatened by this oil
spill.   I have the information for you to contact me and will
prefer a private meeting without the typical political type in
attendance such as Congressmen and senators or parish
commissioners.   We are a solid nation with our own
constitution.

>>:   If I understand this correctly, your concern on behalf of
Indian tribes is not simply loss of fishing rights or whatever.
It's the natural habitat, the whole area has been adversely
impacted by the spill.   And natural resources are threatened.
Absolutely, you have a claim.   You absolutely have a claim.
And the individual members who are each adversely impacted
by the oil ruining scenic land and fishing rights and swamp
land and marshes and the physical injury to the land is
absolutely compensable.   You should file a claim.

>>:   Not only just that also but our barrier grounds and Indian
mounds are being adversely affected by this oil also.   To the
lady earlier about being a lawyer and going through the
process, we filed for federal recognition 30 years ago which
was only supposed to be a 18 month process.   Here it is 30
years later.   So this lawyer, get ready, every time you get
close to the mark, it changes.

>>:   Well, I can't compensate for physical injury before the
spill years ago.   But to the extent that the spill has adversely

impacted your use of the land and the fishing rights and the marshes and whatever else, that is absolutely compensable. Now, I don't know if you filed a claim yet, but you should file a claim.   And we'll help you file that claim.   Because it is compensable.

>>:   That's what the meeting is for, Mr. Ken, is to meet with you and sit down and talk with you.   I have this for you.

>>:   Yes.

>>:   Mr. Feinberg, you mentioned that you will be in operation in 3 to 4 weeks.   Will you have a Houma office?   Do you anticipate the same offices as BP presently has?

>>:   Yes.   We will maintain the 35 offices that BP has set up around the Gulf.   We may add some.   I got a call from the Attorney General of Texas saying that Galveston needs an office.   We may supplement with additional offices and additional staff.   But we want to try and make it as convenient as possible, including electronic online files.   You don't even have to go to an office.   So we'll do what we can to make sure it's accessible.

>>:   Second question.   You manage the 9/11 disaster from start to finish.   Is that correct?   First of all, what period of time did it take to complete that management, and how do you envision this spill disaster with the width and breadth of affect of the area as compared to 9/11?

>>:   9/11 we resolved 7300 claims for death and physical injury in 33 months, less than 3 years.   This program that I am setting up will be in effect for 3 years.   Now, you imply an interesting question.   Mr. Feinberg, you're around for 3 years. But we are not sure how long the effects of this spill -- we might not be able to fish for 7 years, 6 years, 8 years, 30 years, the crabber.   30 years.   How are you going to deal with this problem?   Here is what we are going to do.   We are going to sit down with you or the crabber and we are going to say how long do you think it will take before your business will be restored?   He says never.   All right.   We will have experts from Houma, from around the country, from around the area. We think it probably will be 3 years.   Here is a check for 3 years.   Now, you don't need to take the check.   Because if you take the check for 3 years, you are releasing BP.   That's your choice.   But we think 3 years and here is the check if you want it.   Otherwise you don't have to take it.

>>:   My last question is, Mr. Feinberg, I assume you communicate with the president on a fairly regular basis. Since you are touring the entire Gulf Coast and he has also, I would ask and plead with you that you from time to time reflect your ability to understanding the tremendous impact to the people of the Gulf Coast and that the president would show some sympathy for the people here and realize some of the

actions that his administration has taken is tending to possibly exacerbate the economic disaster.   And I wish you would voice those opinions to him whenever you have a chance.

>>:   Let me just say a couple of things about that.   I do not speak to the president at all.   And that's because I am not working for the administration or BP.   I have an independent -- I am setting up an independent process.   It's not political.   I am working for you.   Fortunately, your message, there are people in this audience who do work for the administration.   So I am sure your words will get back to him.

>>:   Last year I made like 8,000 something dollars fishing. This year I probably lost 50,000 because I bought a different boat.   I am wondering like how am I going to determine my losses on my claim?   I had a lot of problems with the boat. So I only made like 8,000 something dollars.   This year I bought a mega boat, but I have lost like 50,000 in shrimping already.

>>:   Last year you owned a small boat and made $8,000. This year you had a bigger boat and would have made $50,000.   Show us that you would have made $50,000, explain it, corroborate it, we'll pay it.   If you can't corroborate it, it's $8,000 or something in between.

>>:   How would I go about that, showing that I could have

made that?

>>:   You have to sit down and explain to our people here is my plan, here is how I would have made $50,000.   If it's real, if it's not speculative, we pay it.   If it's too speculative, who knows what you would have made.   Maybe, maybe not.   The question is can you corroborate the 50.   You would sit with us and talk with us about your plan.

>>:   Okay.   And also on our claim, do we have -- the claim I filed already with BP and we get the 5,000 a month, is that still the same claim that you are saying or we have to refile a different claim?

>>:   If you filed with BP, you don't have to file again.   We will inherit that claim and process it as soon as we can.

>>:   All right.   Thank you.

>>:   2 more questions.

>>:   Once you take over in a couple of weeks and someone files a claim, how long afterwards before they can actually get a check in their hand?

>>:   If it's an emergency payment in the next 2 weeks when we take over, we hope to process that claim within 24 hours and pay within 2 or 3 days there after.

>>:   Also does the business have to be directly affected?   For instance, say you have a restaurant and you can show that your sales have decreased in the last 2 or 3 months.   Can

they go ahead and file a claim also?

>>:   They can file a claim.   Whether a restaurant will be compensated will depend on its eligible.   How close is it to the coast?   How dependent is it on the fishing?   I mean, we are going to have to make some judgment calls.   I can't pay a restaurant in Boston that says it can't get shrimp.   But I am certainly willing to pay a restaurant that's on the Gulf Coast, I will tell you that.

>>:   If someone is to go to work for BP, will that affect their emergency payments?

>>:   If somebody goes to work for BP, that will not affect their emergency payment except in one way.   We will deduct, obviously, the amount you are getting from BP as wages as a substitute for you being out of work.   So if you were going to get $5,000 unemployed a month, now you are getting $3,000 a month from BP, that's a $2000 swing.   That, you will get. You will not be ineligible.

>>:   Okay.   If you were able to trawl some during the season, will that affect your final payment?   If you were able to trawl for the season?

>>:   Will seasonal variations have an impact on your payment?

>>:   Yes.

>>:   Sure.   We would want to know what those seasonal

variations are and factor those into the overall calculation, yes.

>>:   Okay.   One more question.   We filed a claim on shrimp. Okay.   But the family which is like 10 brothers and sisters have oyster beds.   Do we have to refile another claim and does each individual have to be there on that claim?

>>:   If it's a business, you file one claim as a business.   If it's 10 different siblings that are all working and they have their own income and their own share or whatever it is, they file separately.   If you have got a business, you file as a business. If you are not, you file individually.   We'll process it either way.

>>:   Being we filed the shrimp claim, we filed the oyster on the shrimp claim also?

>>:   Yeah, sure.

>>:   Okay.   Thank you.

>>:   Let me just say this before I turn it back over to our leader here.   I will come back as often as is necessary.   My frustration is if people don't file a claim.   I want to try and help. I've got this money to distribute.   But I need -- I can only help if the claim is filed.   I am acting independently.   I am enormously grateful to Governor Jindal who helped set up this entire day of meetings.   I will do everything I can to help you folks.   And I wish you well.   I can't imagine what you are going through.   And I hope to be able to help you in some way.   Thank you very much.

>>:   Applause.

>>:   I think everybody agrees to thank Mr. Feinberg for being here.   We obviously want him down in the future.   We certainly want everyone to file a claim.   Mr. Feinberg will be meeting right here with the media so if you want to start accumulating right here, that will be fine.   In addition, we will have all the media right here.   I wanted to introduce some of our elected officials.   We have Senator Chabert, Representative Joe Harrison, our councilman Alvin Truman. We have a number of people on boards and agencies.   That was the elected officials I saw.   Anybody else?

>>:   Michele, one question I wanted to ask Mr. Feinberg.   But I want the public to ask questions first.   We have a number of people, because their claims have been so delayed, that we need a moratorium with the banks and the loan institutions to stop them from possibly foreclosing on businesses, homes and all the people's assets.   So we need a lot of help in that area to protect those people going through this situation right now.