# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to all actions. | * * | |
| | * * * | HONORABLE CARL J. BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

## DECLARATION OF ROBERT P. LEVINE
[Regarding BP's Motion to Remove the Claims Administrator]

### Introduction

1.      I am a person of the full age of majority and, if called, am competent to testify to the facts set forth herein.

2.      I am Chief Financial Officer ("CFO") for the Court Supervised Settlement Program ("CSSP"). I started my work at the CSSP on May 15, 2012. Prior to joining the CSSP, I had thirty-six years of financial management experience, including ten years as Chief Financial Officer for three privately-held corporations, two years as Senior Consultant for a CPA firm, and eight years based in Indonesia in financial management positions for a Fortune 500 company. I have held various other positions in operations analysis, strategic planning, treasury and general accounting. I received my Bachelors of Business Administration in accounting from Louisiana State University.

3.      I have set out below my comments regarding several issues raised by BP and its experts in BP's Motion to Remove the Claims Administrator. In particular I will address specific operational

factors that the program has faced since the transition from the Gulf Coast Claims Facility ("GCCF") to the CSSP.  Further, I have addressed the error rates cited by Todd Brents and his allegation that Mr. Juneau failed to take the appropriate steps to implement a system of internal controls around claims processing accuracy.  As described further below, the actual error rate is minimal, indicating that significant internal controls are in place to ensure that the CSSP is calculating the appropriate compensation amounts in accordance with the Settlement Agreement.

### CSSP Start-up Efforts and Costs

4.      The CSSP was created to administer the Settlement Agreement, which was created by BP and the Plaintiff Steering Committee, also referred to as the "Parties."  The CSSP replaced the GCCF.

5.      The District Court issued a Transition Order on March 8, 2012, which announced the Parties were working on a Settlement Agreement and named Mr. Juneau as the Claims Administrator of the CSSP.  Four vendors (BrownGreer ("BG"), Garden City Group ("GCG"), Postlethwaite & Netterville ("PN"), and PricewaterhouseCoopers ("PWC")), were named in the Settlement Agreement and each had gone through interviews and discussions with the Parties during the two months before the announcement. Three of the named vendors (BG, GCG, and PWC) were vendors in the GCCF, which had a 20-month existence.

6.      The CSSP started accepting claims forms electronically, through the postal system, and at nineteen Claimant Assistance Centers ("CAC") on June 4, 2012.

7.      The period between March 8, 2012, and June 4, 2012, is called the Transition Period, an interval of eighty-eight days.  During these eighty-eight days, the Claims Administrator, assisted by the four vendors named in the Settlement Agreement, performed the tasks of creating the

infrastructure of the CSSP program based on the Settlement Agreement. Many of the tasks performed were in collaboration with the Parties. Some of these tasks included:

- Identified available rental space, negotiated leases, renovated space where required, then outfitted each CSSP facility with the necessary infrastructure for functionality including furniture, equipment, computers and communications.
- Calculated staffing requirements, identified appropriate staff, including the required new hires specifically from the locality of each facility.
- Created job-function specific training programs for each CSSP claim type to trained staff to perform tasks in adherence to the Settlement Agreement.
- Designed, printed, and mailed claims forms to identified potential claimants eligible for the program per the geographic area established in the Settlement Agreement.
- Developed the claims processing procedures for each of the twelve claim types as required by the Settlement Agreement.
- Created a website for communicating program information and electronic claims filing.
- Started the development of a customized IT system to process each claim type based upon adherence to the Settlement Agreement.

8.      The CSSP opened 19 Claimant Assistance Centers in Alabama, Florida, Louisiana, Mississippi and Texas. Office renovations were made in the Exchange Center in New Orleans and in a facility in Hammond, Louisiana, to accommodate claims processing CSSP staff. *See* Exhibit A, CSSP Facilities and Work Locations.

9.      As stated above, the CSSP established the program in an expedited time frame, which included establishing channels for claimants to file claims and submit required documentation as well as establishing the infrastructure to calculate compensation awards under terms of the numerous unique programs outlined in the Settlement Agreement. The completion of these steps and the initial claim compensation awards issued by the CSSP were described as successful by all Parties during the Fairness Hearing in November of 2012.

**CSSP Costs as of July 31, 2014**

10.     Subsequent to the initial implementation, the Program has been faced with several external factors that have required it to be agile, but which have also led to interruptions and changes in program priorities beyond its control.  The 1,000-plus-page Settlement Agreement is complex and challenging to comply with, which has led to numerous disputes between the Parties that at times required Court intervention.  These factors, which are beyond the control of the CSSP, should be considered when understanding the CSSP Administration costs described below.

11.     The total costs of the CSSP Administration Fund are $1,036,176,431 from inception on March 8, 2012, through July 31, 2014.  This equates to an average monthly cost of $37,006,301, based on 28 months including the Transition Period.  *See* Exhibit B for a detailed breakout of these Administrative Fund costs.

12.     The Claims Administrator's Office ("CAO") costs through July 31, 2014, are $42,578,466.  There was an initial staff of 18 in the CAO at the end of June 2012.  The CAO staff numbered 126 as of July 31, 2014.

13.     Claims processing costs for the CSSP are $946,875,772 through July 31, 2014.  This includes the Appeals process costs.

14.     The Hon. Louis Freeh was appointed Special Master in July 2013.  Special Master Freeh recommended centralizing the Fraud, Waste and Abuse ("FWA") function into the CAO with CAO staff, which resulted in the CAO hiring 64 staff to assume this responsibility.   His recommendation was implemented through a transition process between April and August 2014, resulting in a reconfiguration of the FWA team skill set and a reduction of 53 staff at one vendor.

15.     The Settlement Agreement requires an annual financial audit.  In July 2012, I sent a request for proposal to three national CPA firms, each of which was pre-approved (without conflict) by the Parties. CliftonLarsenAllen ("CLA") was selected and appointed in September 2012 by the Claims Administrator.  The total cost of the financial audits for the years of 2012 and 2013 was $787,849.

16.     The Claims Administrator also requested proposals for a separate Independent Evaluation of the Internal Control Environment over processing claims (Process Audit), and CLA was selected.

17.     As I described previously, the CSSP was successfully established within a very aggressive time period, and therefore, in September 2012, certain claims processing policy decisions were being formalized while others were pending discussion and approval by the Parties.  For example, the Subsistence claim process was still in development and pending approval by the Parties, which would require future programming once finalized.  At this time the CSSP had only been in operation for three and a half months, and its primary objective and focus were on increasing claims-processing velocity and validating that claims were being processed according to the Settlement Agreement. Given the objective at the time, the Claims Administrator made a decision to divide the CLA process audit into three separate Project phases, where the initial phase was focused on validating that the CSSP had established a system of controls and was processing claims in accordance with the Settlement Agreement.

18.     The first CLA Process Audit Report was issued on May 17, 2013.  The CLA process audit cost for Phase 1 and part of Phase 2 was $190,396.  CLA's work on Phase 2 of their process audit was terminated at the request of BP in the first week of October 2013.

19.     The termination of CLA came after a meeting with the Parties, Freeh Group personnel, and the CAO.  During this meeting, BP requested the CAO hire McGladrey to perform another process audit.  Within a few days of this meeting, Mr. Odom, then CEO, gave me a new audit scope document to insert into the McGladrey contract.  I asked Mr. Odom where the scope document came from, and he responded that he got it from BP. The cost of the ongoing McGladrey process audit is $14,524,265 as of July 31, 2014.

### Budget Process

20.     The CSSP budget process is performed on a quarterly basis. In the beginning few quarters of the program (the 3rd and 4th quarters of 2012, and the 1st, 2nd, and 3rd quarters of 2013), budgets were prepared by requesting forecasts from each vendor and modeling these forecasts against historical costs, analyzing trends and headcount.   CAO management measured metrics on utilization of CAC facilities, call center volumes, and claims processing velocity on a daily basis.

21.     After consultation with vendors on utilization trends, budgets were agreed to, or adjusted by CAO management to meet the CSSP objectives.   The backlog of claims was measured in months and years, so maximum effort was needed.

22.     The Parties were presented a one page budget request with a one line per vendor budget, by month for the quarter being budgeted.  By prior agreement with BP, budget requests were made approximately ten days in advance of the Administration Fund requiring funding to meet cash expenditure requirements, which always occurred during the first month of the quarter being budgeted.

23.     After a dispute over BP approval on the budget detail and amount requested for the third quarter 2013 budget, the Court ordered future quarterly budget requests be prepared 60 days prior to the beginning of the quarter being budgeted.  The CSSP has been in compliance with that order.

24.     Beginning with the fourth quarter 2013 budget, the CSSP tasked existing CAO staff additional duties and hired additional staff for the budget process.  The Finance and Accounting staff grew from two people to six people.  Additional business process staff were hired to monitor, manage and coordinate with specific vendors.

25.     The fourth quarter 2014 budget request totaled approximately 90 pages of numbers and detailed documentation such as full time equivalent employees ("FTEs") by title, hours by title, labor expense by title, other direct costs ("ODC") expense by cost type, hours by scope, labor expense by scope, and production levels with tracked throughput, as well as historical data for trends analysis.  *See* Exhibit C, Fourth Quarter Budget [*Filed under seal*]

26.     In addition to the budget process, the CAO has been holding monthly work stream related meetings with the Parties to review actual monthly costs versus budgeted costs with detailed variance and narrative analysis. *See* Exhibit D, Monthly Budget Review August 13, 2014 [*Filed under seal*]


**Cost Reductions**


27.     The motion to remove Mr. Juneau cites his "failure to control costs."  To the contrary, as an example of the attention to detail that Mr. Juneau gives to this issue, he insists on approving every invoice and questions many, which has resulted in cost savings.

28.     As a further example of his attention to detail, Mr. Juneau initiated action to cut costs by reducing the off-duty police presence at each CAC from two officers to one during the initial

months of the program, resulting in an annual savings of $2.3 million.  Other examples of cost savings approved by Mr. Juneau include reducing staffing and/or facilities based on utilization factors at CAC's, call centers, and other CSSP functions, totaling a cost saving in excess of $100 million per year.  *See* Exhibit E, CAO Continuous Improvement.

### Cost Comparison GCCF versus CSSP

29.     The CSSP runs at a lower monthly cost than the GCCF did.  The CSSP must follow the 1,200-page Settlement Agreement and the approximately 500 policies that have been implemented. In addition, the program was under a Court Order preventing BEL payments for approximately eight months.  The GCCF was able to issue payments without having to adhere to the requirements of a complex Settlement Agreement and claims payments were never stayed during the program.

30.     Between August 2010 and March 2012, a 20-month period, the GCCF spent an average of $47.9 million per month, not including the BDO audit initiated by the Justice Department.  The CSSP spent an average of $37.0 million per month over a 28-month period, which includes all audit costs, the Freeh Group, and the massive effort and related costs that have been expended in responding over many months to the continuous litigation effort by BP.  *See* Exhibit F. [Filed under seal]

31.     It is important to note that part of the CSSP duties involved the processing of the outstanding GCCF offers made.  Through July 31, 2014, the CSSP paid 2,870 claims totaling $47.6 million under the GCCF program, and the cost of administering those claims is included in the average monthly costs of the CSSP.

### CliftonLarsonAllen ("CLA") Process Audit Report

32.     In Mr. Brents' declaration, he states that the CSSP was operating with inadequate internal controls over claim processing, resulting in unacceptably high error rates, most notably for the BEL program.  As support for this assertion he cites the CLA report, in which it reported errors contained within two of the 15 BEL claims selected during the audit.   While perhaps mathematically accurate, the basis adopted by Mr. Brents to determine this "error rate" is misleading.  Set forth below is the more appropriate method to calculate this error rate, which ultimately leads to the conclusion that internal controls implemented by the CSSP were operating effectively.

33.     In Exhibit 31 of BP's Motion, Mr. Brents states (¶ 21) that "one cannot observe these significant numbers of attribute or control errors without questioning whether the appropriate controls are in place."  He cites the CLA Process Audit Report as an indicator of the high error rates.

34.     Mr. Brents asserts (¶ 24) that the CLA Audit "findings cannot be conclusively relied upon," citing a letter sent by BP attorney Mark Holstein on June 21, 2013.  Despite determining that it "cannot be conclusively relied upon," Mr. Brents nevertheless utilizes its findings in highlighting an alleged 13.3% error rate for BEL claims.  This percentage figure is computed by virtue of two claims from a sample of 15 BEL claims found to have "claim payment variances."

35.     Mr. Brents' report ignores a more significant finding in the CLA Audit Report regarding the "claim payment variances."   The variances detected in the two claims resulted in an overpayment of $2,494 against a total payment amount of $26,737,487 for the sample of 15 BEL claims.  The CLA Audit Report extrapolated an error rate in terms of actual amounts paid, which

was an extremely low 0.008%.

36.    The errors identified in the CLA Audit Report related to either a) data entry errors (i.e., an amount was incorrectly entered into a field in the calculation template) or b) classification errors (i.e., an account was incorrectly classified as revenue, variable expense or fixed expense).  Based on the nature of these errors, it would be meaningful to compare the percentage of a) data entry errors relative to the total population of cells to be entered or b) the number of classification errors relative to the number of revenue/expense line items required to be classified.


Data Entry Errors

37.    As to Data Entry Errors, Initial Accounting Reviewers are trained to double-check the entry of claimant-provided information into the BEL calculation template.  Checking individual cell entries as well as 'sub-total' and 'total' lines from the model to the original data source is a standard task of the claim preparers.  Further, the accounting vendors have a secondary review/quality review function part of which is to validate the accuracy of data entry.

38.    Based on a review by the CAO staff under my direction, of the 15 BEL claims tested, the Accountant Reviewer was required to enter data into 58,472 cells, and 418 data entry errors were identified by CLA. When compared to the total population of entries, data entry errors occurred at the extremely low rate of 0.71%.

39.    Furthermore, the dollar amounts associated with the 418 identified data entry errors are insignificant.  Of the 418 errors, 315 related to differences of less than $1.00, representing rounding errors.  There were transposition errors between expense line items, the net impact of which resulted in no adjustments to the compensation amount by virtue of both expense line items being either fixed or variable in nature.  Additionally, any of the 418 differences that are included in

periods outside the optimum benchmark period (that would include January to April of the Benchmark years) would have no impact on the calculated compensation amount.  Data entry errors represent a manual error by a claim preparer and are specific to that individual claim.  They do not represent Settlement Agreement interpretation issues or systemic lapses in the Program's internal controls that might impact numerous claims or claim types.  To the contrary, this low error rate indicates that data was entered accurately 99.3% of the time, highlighting that existing internal controls were in place and functioning effectively, contrary to what is implied by Mr. Brents.

Account Classification Errors

40.     As to classification errors, Accounting Vendors classify revenue and expenses based upon the requirements set forth in Exhibit 4D of the Settlement Agreement.  Descriptions of revenue and expense items provided on profit and loss statements submitted by claimants do not, however, always align with those categories set forth in Exhibit 4D.

41.     When necessary, claimants are contacted to ascertain the nature of the expenses included in a given expense heading and, based on the given industry and the claim preparer's professional judgment, the expense will be classified as fixed or variable.  Similarly, the classification of revenue/income line items oftentimes requires similar claimant outreach and judgment, as appropriate.

42.     The CAO, working in conjunction with the Accounting Vendors, has implemented steps to address matters requiring judgment including account classifications.  These include:

- Weekly accounting meetings attended by the Accounting Vendors, BG, and CAO personnel, during which issues are raised for discussion and CAO resolution.

- Accounting Vendors conduct regular trainings that incorporate interpretations of the Settlement Agreement as it relates to account classifications.

- Accounting Vendor secondary/quality review procedures are in place to validate account classifications as well as ensure consistency in the treatment of pertinent issues.

Account classification errors differ from the data entry errors in that there is an element of judgment involved when it comes to the classification of revenue and expense line items in accordance with the tenets of Exhibit 4D. Often there is no bright line when exercising these judgments. Accordingly, the definition of what is, or is not, an account classification error is much less precise. The CAO staff, under my direction, analyzed the findings of CLA's testing and noted one of the 15 claims had an alleged account classification error, and within that claim only one expense category was incorrectly classified. In the sample of 15 claims, 1,454 revenue and/or expense line items were classified by Accountant Vendor personnel, and the one account misclassification equates to a 0.069% error rate. This indicates revenue and/or expenses were correctly classified 99.9% of the time, therefore highlighting that existing internal controls were in place and functioning effectively, contrary to what is implied by Mr. Brents.

### Mr. Brents' Error Rate Calculation Utilizing Appeal Results

43.     Mr. Brents states that results from the CSSP appeals process "indicate claims are erroneously deemed eligible for payment at a high rate." To imply that such 'statistics' indicate an error rate of 20.4% for BEL claims is inaccurate and misleading. First, almost 50% of claims were resolved through a negotiation between BP and the claimant. Such resolutions do not reflect a decision by a delegated authority (i.e., Appeals Panel) wherein there is any ruling from such authority as to the accurate interpretation of the Settlement Agreement or judgment with respect

to how the subject claim was processed. Negotiated settlements are just that – they are negotiations between the parties, the outcome of which is acceptable to both parties. The outcome does not necessarily mean that there is any "error" in the underlying claim calculation that is the subject of the negotiation. The motives for the claimant to accept a lower amount than the originally calculated amount could be based on any number of factors, regardless of whether they believe the claim had been accurately calculated in accordance with the Settlement Agreement.

44.     As it relates to appeals arbitrated by the Appeals Panel, there are, on occasions, various reasons for BP or a claimant to appeal awards calculated by the Program. During the appeal process, additional information may come to light that was not included in the claimant's file and thus not considered by the Program Vendors when initially adjudicating the claim. In addition, the appeals panelist may request a document that is not required per the Settlement Agreement, but the Claimant decides to produce. Under these circumstances, the Appeals Panelist is considering information that differs from what was originally considered by the Program Vendors. Adjustments arising from such situations could not be considered errors in the original calculation.

45.     While I disagree with Mr. Brents' assumption that an Appeals Panel Decision resulting in a reduced award represents an "error," the manner in which he presented his analysis is flawed. The decision of BP or the Claimant not to appeal a claim that meets appealable thresholds implies that neither party identified any errors in the award calculation. Accordingly, applying Mr. Brents' analysis, albeit flawed, the error rate would be more "accurately" computed by dividing the number of claims he deemed "errors" by the total number of claims that were appealable by either party (i.e., all eligibility notices greater than $25,000 pre-risk transfer premium)—not just the number ultimately appealed.

46.     Mr. Brents' statement at ¶ 26 of his declaration—that if BEL Matching appeals subsequently denied were considered the "error rates that would be higher"—ignores the fact that the Settlement Program's approach to the matching issue complied with the rulings of the District Court.  On receipt of the decision of the U.S. 5th Circuit Court of Appeals, and subsequent District Court opinions, the Settlement Program developed policies to match revenues with corresponding variable expenses.  The District Court subsequently approved the Program's policy as drafted and the Program implemented those policies.  Mr. Brents' suggestion that the error rate would be somewhat higher in advance of the aforementioned later Court rulings is misleading.  This is reinforced by the recent District Court ruling denying BP the right to retroactively recover amounts paid to claimants that may have had P&Ls that exhibited matching issues.

### Mr. Brents' "Low Productivity" Assertion

47.     Mr. Brents (¶ 53) criticizes the Program for what he calls "low productivity," stating that "[f]or BEL claims, productivity has historically averaged 1.6 resolved claims per accountant reviewer per week but dipped to 0.2 resolved claims per accountant reviewer per week during the BEL injunction period from October 2013 through May 2014."  It should be noted that during the injunction period the Program was under a Court's Order prohibiting final notice issuance.

48.     Mr. Brents also ignores, or is unaware, that during the injunction period, there was a considerable amount of work conducted:

- Over 26,000 Incompleteness Notices were issued, despite a decision during the injunction period to suspend temporarily the issuance of such notices on account of the uncertainty as it related to the anticipated need for additional documentation as Policy 495 was being

developed.  By comparison over 39,000 Incompleteness Notices were issued during the period between January and September 2013.

- Over 11,000 BEL claims were worked by Accountant Reviewers and 'stayed' on account of potential matching issues.  Such 'stayed' claims comprise the 'inventory' of claims that the accountants have been working on since the lifting of the injunction.

49.     While CSSP does not question the numbers presented in the footnoted referenced reports in Exhibit 22 of Mr. Brents' declaration (pg. 273 of the pdf), these figures do not reflect the entire 'effort' expended by accountants in reviewing BEL claims.

50.     Actual Notices issued for the pre- and post-injunction periods are over 30,000 and over 3,000, respectively.  The reports from which Mr. Brents derives his numbers reflect cumulative throughput, not overall effort: the reports count a claim only once, thereby not reflecting each time a separate review of that claim takes place as it cycles through the various review mechanisms (i.e., re-review, reconsideration, appeal, etc.) set forth in the Settlement Agreement.

51.     When conducting an analysis of throughput per Full Time Equivalent (FTE), it is more appropriate to consider the number of reviews per claim (as indicated by the number of submissions) as opposed to counting a claim only once.  For example, if a claim was previously issued an Eligibility Notice, then later an Eligibility Re-Review Notice, this would be counted only once under Mr. Brents' analysis, but in reality the claim was reviewed twice by an Accountant reviewer.

**Mr. Brents' "Reporting" Criticisms**

52.     Mr. Brents opines that an effective status report should convey important activities regarding claims status, financial matters, governance, and legal and other policy issues, as well

as substantial explanations of major operational changes such as the cost and implementation of new IT systems. Mr. Brents cites the Madoff Recovery Institute as an example of more extensive and transparent reporting. A review of the Eleventh Interim Report for the Madoff Recovery Institute disclosed that the Institute had consultant fees and expenses of approximately $308,000,000 and total administrative expenses of $972,000,000. The Report does not provide a breakdown of the consultant fees by vendor, nor does it contain any cost-per-claim analysis. In addition, the Report fails to provide any benchmark criteria to measure or assess the performance of the vendors retained on behalf of the Madoff Trustee. These observations are made not for the purpose of critiquing the reporting made by the Madoff Recovery Institute, but rather to question the basis for Mr. Brents' opinion that the Claims Administrator falls far short of the Madoff Recovery Institute's reporting "gold standard." Where similarities in the two claims programs exist, the Claims Administrator's status reporting compares quite favorably with the Madoff Recovery Institute reporting.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

Dated: October 15, 2014

Robert Levine, CFO

**EXHIBIT  5A**

**CSSP Facilities and Work Locations**

| Facility | Vendor | CSSP Functions | City | State | Open June 2012 | Open July 2014 |
|---|---|---|---|---|---|---|
| CSSP | BG | Claims Assistance Center | Apalachicola | Florida | Yes | No |
| CSSP | BG | Claims Assistance Center | Bay St. Louis | Mississippi | Yes | No |
| CSSP | BG | Claims Assistance Center | Bayou La Batre | Alabama | Yes | No |
| CSSP | BG | Claims Assistance Center | Biloxi | Mississippi | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Clearwater | Florida | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Cutoff | Louisiana | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Fort Meyers | Florida | No | Yes |
| CSSP | BG | Claims Assistance Center | Ft Walton Beach | Florida | Yes | No |
| CSSP | BG | Claims Assistance Center | Grand Isle | Louisiana | Yes | No |
| CSSP | BG | Claims Assistance Center | Gretna | Louisiana | Yes | No |
| CSSP | BG | Claims Assistance Center / now Subsistence Processing | Gulf Shores | Alabama | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Houma | Louisiana | Yes | No |
| CSSP | BG | Claims Assistance Center | Lafitte | Louisiana | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Lake Charles | Louisiana | No | Yes |
| CSSP | BG | Claims Assistance Center | Metairie | Louisiana | No | Yes |
| CSSP | BG | Claims Assistance Center | Mobile | Alabama | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Naples | Florida | Yes | No |
| CSSP | BG | Claims Assistance Center | New Orleans East | Louisiana | Yes | No |
| CSSP | BG | Claims Processing - Exchange Center | New Orleans | Louisiana | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Orange | Texas | Yes | No |
| CSSP | BG | Claims Assistance Center | Panama City Beach | Florida | Yes | Yes |
| CSSP | BG | Claims Assistance Center | Pensacola | Florida | Yes | Yes |
| CSSP | GCG | Intake Facility, Claims Processing, Outgoing Mail Center | Hammond | Louisiana | Yes | Yes |
| CSSP | PN | Claims Processing - Exchange Center | New Orleans | Louisiana | Yes | Yes |
| CSSP | PWC | Claims Processing - Exchange Center | New Orleans | Louisiana | Yes | Yes |
| CSSP | CAO | Claims Administrators Office ("CAO") | New Orleans | Louisiana | Yes | Yes |
| | | | | | | |
| Vendor | BG | Claims Processing, IT | Richmond | Virginia | Yes | Yes |
| Vendor | GCG | Claims Processing, Data Center, Payment Processing | Lake Success | New York | Yes | Yes |
| Vendor | GCG | Data Center, Call Center | Dayton | Ohio | Yes | Yes |
| Vendor | GCG | Claims Processing | Seattle | Washington | Yes | Yes |
| Vendor | GCG | Call Center | Sarasota | Florida | Yes | No |
| Vendor | PN | Claims Processing | Baton Rouge | Louisiana | Yes | Yes |
| Vendor | PWC | BEL claims processing | Atlanta | Georgia | No | Yes |
| Vendor | PWC | BEL claims processing | Boston | Massachusetts | No | Yes |
| Vendor | PWC | BEL claims processing | Chicago | Illinois | No | Yes |
| Vendor | PWC | BEL claims processing | Dallas | Texas | No | Yes |
| Vendor | PWC | BEL claims processing | Houston | Texas | No | Yes |
| Vendor | PWC | BEL claims processing | Los Angeles | California | No | Yes |
| Vendor | PWC | BEL claims processing | McLean | Virginia | No | Yes |
| Vendor | PWC | BEL claims processing | New York | New York | No | Yes |
| Vendor | PWC | BEL claims processing | Philadelphia | Pennsylvania | No | Yes |
| Vendor | PWC | BEL claims processing | Pittsburgh | Pennsylvania | No | Yes |
| Vendor | PWC | BEL claims processing | San Francisco | California | No | Yes |
| Vendor | PWC | BEL claims processing | Tampa | Florida | No | Yes |

# EXHIBIT  5B

**Court Supervised Settlement Program**
**Administrative Fund Costs**
**March 8, 2012 - July 31, 2014**

|  | | Amount | % |
|---|---|---:|---:|
| **Claims Administrator's Office Costs** | | | |
| CAO Staff - Fees | $ | 30,183,601.63 | 2.91% |
| Staff Support costs - Travel, Per Diems, other reimbursements | | 832,459.04 | 0.08% |
| Audit Committee Costs - Court Appointed | | 58,919.86 | 0.01% |
| Audits - CLA - Financial & Process | | 978,245.48 | 0.09% |
| Bank Charges | | 1,805,196.84 | 0.17% |
| Computer Consultants | | 63,925.04 | 0.01% |
| Computer Hardware & Software | | 458,356.82 | 0.04% |
| Consultants | | 306,871.43 | 0.03% |
| Court Reporter | | 1,596.50 | 0.00% |
| Dues & Subscriptions | | 3,386.90 | 0.00% |
| Facilities Cost | | 520,413.17 | 0.05% |
| Fraud Hotline | | 2,181.00 | 0.00% |
| Insurance - D&O, Auto, Property | | 2,968,420.75 | 0.29% |
| Legal Expense | | 3,306,485.67 | 0.32% |
| Legal Liason Cost | | 201,780.31 | 0.02% |
| Office Supplies | | 337,520.11 | 0.03% |
| Postage & Courier | | 3,585.30 | 0.00% |
| Printing | | 147,239.87 | 0.01% |
| Promotion Fund Direct Admin Cost | | 285,331.20 | 0.03% |
| Telephone | | 112,949.35 | 0.01% |
| | $ | 42,578,466.27 | 4.11% |
| | | | |
| **Program Costs** | | | |
| Brown Greer - Claims Processing | | 334,712,321.77 | 32.30% |
| Garden City Group - Claims Processing | | 237,819,599.65 | 22.95% |
| Postlethwaite & Netterville - Claims Processing | | 172,616,164.63 | 16.66% |
| Pricewaterhouse Coopers - Claims Processing | | 158,817,152.42 | 15.33% |
| Hub - Fraud Investigation Services | | 14,384,581.96 | 1.39% |
| New IT System | | 11,048,338.81 | 1.07% |
| Security - Claimant Assistance Centers | | 5,154,999.09 | 0.50% |
| Pro-bono Legal Support - Indigent Claimants | | 4,800,000.00 | 0.46% |
| Appeals Panel Costs | | 4,724,039.38 | 0.46% |
| Subsistence Claimant Verification | | 1,793,263.83 | 0.17% |
| Wetlands Title Research | | 1,005,310.79 | 0.10% |
| | $ | 946,875,772.33 | 91.38% |
| | | | |
| **Other Costs** | | 46,722,192.75 | 4.51% |
| | | | |
| **CSSP Administrative Fund Cost** | | $ 1,036,176,431.35 | 100.00% |

# EXHIBIT 5C
# Filed Under Seal

# EXHIBIT 5D
# Filed Under Seal

**EXHIBIT  5E**

# CAO Continuous Improvement

Program Inception to Date

| Measure | Timeline | Annual Cost Savings (Millions) | Other Measure |
|---|---|---|---|
| HUB Security Rightsizing (Guard reduction from 2 to 1) | July, 2012 | $2.30 | |
| HUB Fraud Detection Standby Billing and Cost Savings | September, 2012 | $2.32 | |
| Continuous Rightsizing of call center from 451 in 2Q 2012 individuals to < 20 in 4Q 2013 | Continuous | $46.80 | |
| Brown/Greer Second Shift Reduction | October, 2013 | $10.76 | |
| CAC Staffing Reduction & consolidation of CAC's | October, 2013 | $23.48 | |
| Proactively measured maximum workload for the accountant vendors during the stay of BEL claims stemming from the injunction and promoted opportunity for accountants to use PTO or acquire CPE credit to provide cost savings to the DHECC during the 4th Quarter 2013 and rightsize workload on a continous basis | December, 2013 | $9.42 | 4th Quarter Savings Only. Actual cost savings |
| Elimination of Saturday Call Center Shift | March, 2014 | $0.13 | |
| Rightsizing of GCG Hammond Facility | March, 2014 | $3.08 | |
| Contract with Willis Group to replace ACG | April, 2014 | $3.80 | |
| CAC Cost Savings Implementation | 2nd Quarter 2014 | $2.50 | Hours of operation, location consolidation, does not include security cost savings |
| TOTAL | | $104.59 | |

# EXHIBIT 5F
# Filed Under Seal