# EXHIBIT  6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  **Oil Spill by the Oil Rig**   **MDL NO. 2179**
　　　　**"Deepwater Horizon" in the Gulf**
　　　　**of Mexico, on April 20, 2012**   **SECTION J**

**Applies to:** *All Cases*   **JUDGE BARBIER**
　　　　　　　　　　　　　　　　　　 **MAGISTRATE JUDGE SHUSHAN**

### DECLARATION OF LYNN C. GREER

1.　　*Personal Information and Background.*  My name is Lynn C. Greer.  I am the

President and a founding partner of BrownGreer PLC ("BrownGreer"), located at 250

Rocketts Way, Richmond, Virginia.  I received my B.A from the University of North

Carolina at Chapel Hill and my J.D. from the University of Virginia.  I have been a

practicing lawyer for over 26 years and have dedicated my practice exclusively to all

aspects of multiple claims resolution for over 24 years, advising management, trustees,

claims administrators and companies on the successful implementation and administration of

resolution plans. In addition to this experience, I have directed and presided over the

management of national litigation and have developed processes and systems for receiving,

tracking, monitoring, consolidating, and streamlining the data and information generated in

such litigation. After first joining the Dalkon Shield Claimants Trust ("Trust") in 1990 to lead

its management of litigation filed against the Trust in forty states, I became Manager of the

Trust's legal department and ultimately rose to General Counsel and Executive Director. Since

the Trust's closure in 2000, I have dedicated my professional career on meeting the unique

needs of clients or Courts involved in or faced with multiple claims or lawsuits and co-founded

BrownGreer in 2002 to focus exclusively on providing different and innovative solutions for

managing such situations.  I have served as Court-appointed Special Master and Claims Administrator and have been involved in the administration and management of all of BrownGreer's engagements, which include more than 60 major programs involving nearly 2,000,000 claimants and the disposition of over $24 billion in payments to qualifying claimants.

2.      *Personal Knowledge.*  The matters set forth in this Declaration are based upon my personal knowledge, experience, and training, as well as facts related to me in my capacity as supervising partner for BrownGreer's work on the Court Supervised Settlement Program ("Program") for the Deepwater Horizon Economic and Property Damages Settlement Agreement.

3.      *BrownGreer's Role in the Deepwater Horizon Program.*  BrownGreer was appointed by the Court to assist Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("Program") with its implementation.   Among other services, BrownGreer has: assisted with the creation of the process for the review of claims received by the Program; procured and trained staff needed to process the claims; procured and trained the staff in the Claimant Assistance Centers ("CACs") used in the Program. BrownGreer also worked with the Claims Administrator's Office to develop and implement internal controls and fraud detection and prevention measures.

A. **BrownGreer's Involvement in the GCCF and Transition to the Program.**

4.      *Involvement in the GCCF.*  In June of 2010, BrownGreer was retained to assist Kenneth Feinberg with processing claims presented to the Gulf Coast Claims Facility ("GCCF").  We served the GCCF from our Richmond, VA headquarters from June 2010 and through the transition from the GCCF to the Program.

   **5.** *Preparation for the New Court Supervised Settlement Program.* In January of 2012, we met with BP and representatives of the Plaintiffs' Steering Committee ("PSC") ("the Parties") about assisting with a new Court Supervised Settlement Program. We understood at the time that the Parties were still negotiating and drafting the Settlement Agreement but that they wanted vendors in place to provide a seamless transition between the GCCF and the Program. Beginning on February 1, 2012, and continuing throughout the spring of 2012, BrownGreer met extensively and frequently with the Parties to discuss all aspects of administering the Program. At that time, the Parties anticipated that the new Program would commence within 60 days and demanded that we take immediate steps to hire a workforce to be ready to review claims as soon as the Program opened. They further explained that they wanted: (1) the hub of BrownGreer's claims review activity to be in New Orleans; and (2) BrownGreer to take over the Site Offices from the GCCF, which had been staffed by Worley Catastrophe Response, LLC ("Worley"). The new offices would be called the "Claimant Assistance Centers" (CACs) in the new Program. There were to be 19 CACs located throughout the Gulf. Although the Parties charged BrownGreer with running the CACs, they specifically prohibited us from hiring anyone from Worley to staff those offices or to play any role in the new Program, even though they had direct experience. The Parties understood that the 19 CACs, in addition to the 15th floor at the Exchange Center on Gravier Street in New Orleans, were all new offices for BrownGreer and would require us to hire those with whom we had never worked, given that our headquarters is in Richmond, VA. Although the exact opening date of the Program was uncertain, the Parties told us to begin hiring immediately, even if the employees did not have anything to do at first, and Dan Cantor on behalf of BP specifically instructed us to "fill every seat." We agreed to hire locally to

support the system, and between February 2, 2012, and June 4, 2012, we hired and trained 1,035 new individuals to work on the Program: 756 were hired locally in the Gulf and 279 were hired in Richmond to serve as additional support for the Program.  We dispatched experienced supervisors from Richmond to the Gulf to help with the training and oversight of the new workers and maintained a significant presence of experienced supervisory staff in the Gulf throughout 2012.  The Program had not yet opened in the spring of 2012 when we were onboarding significant personnel, and the review system for the new Program had not yet  been developed;  however, we developed training modules using blinded claims from the GCCF to test the new workers on basic skills necessary for claims review and to assess proficiency and accuracy so that when the Program opened, our workforce would be familiar with the types of documentation that accompanied the claims and would understand the level of detail and precision required for a successful review.  Workers who did not demonstrate proficiency and accuracy in their review of test claims were released, and new workers were hired to fill the seat vacated by the departing individual.

6.     *The Transition.*  On March 8, 2012, the Court entered a Transition Order, which announced that the Parties were working on a settlement program to assume the claims of the GCCF and to receive new claims associated with the Spill.  The Order named Patrick Juneau as the Claims Administrator of the new Program and the Transition Process and named me as the Transition Coordinator to oversee the continued processing of claims under the GCCF's rules until the new Program opened.  There was to be no gap between the GCCF and the new Program.  Instead, we were tasked with continuing to review claims, issue notices and handle all issues arising from GCCF claims, while at the same time building the infrastructure for and

planning the new Program. During the Transition Period, which ran from March 8, 2012, until the Program opened on June 4, 2012, the Transition Process paid $377,214,845.

7.    *Opening of Program*.  During the Transition Period, BrownGreer continued to work with the Parties on preparing for the opening of the Program.  Critical to the Program's ability to open was the need for the Parties to approve the Claim Forms that were to be used for the filing of each of the 12 claim types provided in the Settlement Agreement.  Because the new Program had entirely different requirements from the GCCF, it was necessary to start anew with coding and building the system to implement the terms of the Settlement Agreement.  We advised the Parties that we needed a minimum of 60 days to program, code, and test the Claim Forms.  Nevertheless, as of May 16, 2012, only 19 days before the Program's opening on June 4, 2012, the Parties had not reached an agreement.  On May 16, 2012, I attended a status conference with the Court, Mr. Juneau and other members of the Claims Administrator's Office ("CAO"), along with representatives from BP and Class Counsel. The Court ordered the Parties to agree on the Claim Forms by the end of the day, which they did. From May 17, 2012, through June 3, 2012, our programmers and all of our teams worked around the clock to build the infrastructure and database platform necessary to allow the Program to open on June 4, 2012, while continuing to process and pay claims in the GCCF.  At 7:00 a.m. CT on Monday, June 4, 2012, the new Program kicked off without a hitch, with the claims filing system available online, 19 CACs Centers open and staffed with BrownGreer employees, and two call centers ready to answer questions.  That morning, we also posted 21 webinars on the website we had prepared to walk lawyers and claimants through each screen in completing a Registration Form or Claim Form online and on how to use the DWH Portal interface for law firms and unrepresented claimants.

## B. BrownGreer's Use of Independent Contractors.

**8.**   ***BrownGreer's Hiring Practices.***  BrownGreer's standard and preferred hiring practice is to hire employees directly, and this has been our consistent preference since opening in 2002.  However, when faced with demands for a large workforce to be engaged quickly, we have used staffing agencies to assist us with screening and onboarding individuals.  The Program presented an acute situation and unprecedented demand for a large workforce that needed to be hired quickly.  Accordingly, we engaged the services of staffing agencies with a presence in the Gulf region to assist with our staffing efforts, searching for candidates with varying skillsets and including professionals with finance and accounting degrees, as well as JDs, MBAs and CPAs.

**9.**   ***BrownGreer's Contractor Conversion Process.***  Since 2002, whenever BrownGreer has retained the services of contractors to serve on a project, our consistent practice has been to convert contractors to employees as soon as those contractors have worked enough hours to convert without paying the agency a fee.  The number of hours a contractor must work before being able to convert without a fee varies and depends on the staffing agency and the level of employee.  This practice benefits the employees because they become eligible for certain benefits that contractors are not eligible to receive, and we have learned from those converted that there is a greater sense of security associated with being an employee, rather than a contractor.  These benefits, along with being immersed as a full employee into the culture of our firm, translates into increased morale in our workforce and an enhanced "ownership" of each task.

**10.** ***Conversion of Contractors to Employees in the Program.***  Consistent with our long-standing employment practice of converting contractors to employees as soon as possible, BrownGreer monitored hours of each contractor working on the Program and established a schedule for conversion.  Certain contractors were not eligible for conversion because their staffing agencies were the sponsors of their H1B visa applications.  Others who were able to be converted and met BrownGreer's job performance standards were converted on a rolling basis.

**11.** ***Establishment of BrownGreer's Billing Rates.***  BrownGreer provided services to the Program for over a year before we had a contract in place with the CAO.   On January 28, 2013, Orran Brown and I met with representatives of BP, along with David Odom, former Chief Executive Officer of the CAO, Kirk Fisher, former Chief Operations Officer of the CAO, and David Forsyth, counsel to the CAO, to negotiate and discuss our contract.  Following that meeting, and although BrownGreer's contract was with the Claims Administrator and not BP, the CAO instructed us to negotiate our billing rates directly with BP.   Accordingly, on February 8, 2013, I had a call with Maria Travis from BP and personally negotiated billing rates for positions who were working on the Program.  As a result of that conversation, BrownGreer lowered the rates for certain positions.  At no time during our contract negotiations with the CAO or BP, including my February 8, 2013 conversation with Ms. Travis, did the issue of independent contractors versus employees arise.  BrownGreer has consistently billed for positions in compliance with our contract, which incorporated the billing rates approved by BP.

**12.** ***Mr. Moskowitz's June 7, 2013 Letter.***   On June 10, 2013, we received from David Odom a copy of a letter dated June 7, 2013, which was written by BP's Counsel, Keith Moskowitz, regarding BrownGreer's and other vendors' use of independent contractors on the

Program.  The letter made assumptions based on what Mr. Moskowitz thought a staffing

agency would charge for an "average" contractor and then used those assumptions to guess

what BrownGreer's markup would be.  Mr. Moskowitz then multiplied that assumption by

1,320, which was the number of independent contractors he thought BrownGreer used on the

Program.  Along with the number of independent contractors used by other vendors, Mr.

Moskowitz concluded that, "the monthly markup of the vendors appears to approximate $14M

per month that is pure profit for the CSSP vendors."  Among other reasons why Mr.

Moskowitz's letter was severely flawed as it related specifically to BrownGreer were the

following:

(1) **Number of Contractors.**    Consistent with our long-standing employment practices, by the time of Mr. Moskowitz's letter, which was over year after BrownGreer had hired the bulk of its workers, we had converted all but 190 contractors to permanent employees.  These 190 contractors represented only 12% of BrownGreer's staff that was allocated to the Program.  Included among those 190 contractors were those with advanced skill sets, such 56 computer programmers and technology experts who could not be converted to a direct employee because the staffing agency was a sponsor of their H1B visa application.  The remaining 134 included varying skillsets and were more recent hires who were slated for conversion as soon as they became eligible.   Thus, when conducting his calculation for what he thought constituted the monthly markup figure for an "average contractor", Mr. Moskowitz's assumptions were misplaced and its use of 1,320 contractors was off by 1,130 individuals.

(2) **"Pure Profit."**  Mr. Moskowitz's conclusion that any markup was certainly "pure profit" was also fundamentally flawed, for it assumed that BrownGreer had no overhead related to our contractors.  In fact, BrownGreer has absorbed significant overhead in connection with our retention of contractors on this project, including but not limited to the following: (a) BrownGreer's Human Resources Department set and confirmed contractor candidate qualifications with each agency, and none of this administrative support was billed to BP; (b) BrownGreer's supervisors approved contractors' time and managed Human Resources issues, and none of this supervisory time was billed to BP; (c) BrownGreer's payroll department and a contractor's supervisor reconciled the contractor's time, and none of this administrative time was billed to BP; (d) of the 190 total contractors at the time of Mr. Moskowitz's letter, 132 were located in BrownGreer's Richmond offices, where BG covered all overhead; (e) when the need for overtime existed, BrownGreer paid its contractors 1.5

times the applicable rate to reviewer contractors for any time worked over 40 hours, and BrownGreer did not bill the overtime rate to BP.

**13.** ***Budget Meeting with BP on June 18, 2013.*** On June 18, 2013, I, Orran Brown and Roma Petkauskas attended a meeting at the CAO with representatives of BP, Class Counsel, the CAO's office, as well as Judge Shushan. It was my understanding that each vendor was participating in separate meetings to answer BP's questions in connection with the administrative budget for the Program. During that meeting, the issue of independent contractors arose, and we explained why the assumptions in Mr. Moskowitz's June 7, 2013 letter were flawed, including an explanation of our hiring and conversion practices, the number of contractors we currently had, and examples of overhead costs expended on our contractors. Despite our explanations, BP has continued to accuse BrownGreer falsely of enjoying pure profit associated with our contractors.

## C. Appeals Process and BEL Results.

**14.** ***BrownGreer's Involvement in Appeals Process.*** One of BrownGreer's functions in the Program is to assist the CAO with the processing of appeals. This assistance has included helping to draft the Rules Governing the Appeals Process, as well as developing and maintaining the database Portal through which BP and claimants appeal a claim, transmit Initial and Final Proposals, and through which the Appeals Panelist(s) render a decision. BrownGreer helps the Appeals Coordinator keep track of all deadlines and has assisted with the development and circulation of reports regarding the status and results of all appeals. Because of BrownGreer's involvement in the appeals process, we have first-hand knowledge of how it works and the background necessary to place results in context.

**15.** *Explanation of the "Baseball" Appeals Process.* Section 6.2 of the Settlement Agreement and Section 3.A of Exhibit 25 to the Settlement Agreement establish an appeals process known as the "baseball" process. Pursuant to this "baseball" process, 15 days after an appeal is filed, the Claimant and BP exchange, in writing, their respective Initial Proposals. Ten days later, if neither party has accepted the other's Initial Proposal, the Claimant and BP exchange their Final Proposals. During this period of exchanging Initial and Final Proposals, either party may elect to accept the other's Initial or Final Proposal and resolve the appeal without it reaching an Appeal Panelist for decision. Separately, during this same time period, the parties may choose to reach a mutually agreed upon compromise amount that is different from their Initial or Final Proposals. Thus, under the "baseball" appeals process, before an appeal is submitted to an Appeal Panelist to render a decision, the Rules encourage resolution by requiring the Claimant and BP to go through a two-step process for exchanging proposals.

If the Claimant and BP do not resolve the appeal during the Initial/Final Proposal stage, the claim advances to an Appeal Panelist for determination. The Settlement Agreement mandates that the Appeal Panelist choose *only* from among the two Final Proposal figures submitted by the parties and may choose no other amount.

During the Initial and Final Proposal portions of the "baseball" process, Claimants routinely submit settlement proposal amounts that are substantially similar, but slightly lower than the amount of the underlying Original Award amount in an effort to resolve the appeal in a negotiated manner to save the time and effort of a protracted appeal. If the Appeal Panelist determines to rule in favor of the claimant, the Panelist can only award the amount listed by the claimant on his or her Final Proposal. If the claimant's Final Proposal is the same as the

Program's Original Offer, then the Appeal Panelist will choose that one; however, in instances where the claimant, for whatever reason, submits a Final Proposal figure that lower than the Original Award amount, the Appeal Panelist must select that amount when finding in favor of the claimant.

16.    *BP's Use of Appeal Results to Argue Error Rates in the Claims Process.*  I have reviewed the Declaration of Todd Brents and am familiar with his assertion that there have been 2,268 BEL claim determinations that have been appealed "for which the appeals panel has reached an outcome."  I am also familiar with his conclusion that the Program made "errors" in 463 of these 2,268 BEL claim determinations simply because the amount after an appeal was lower than the amount of the Program's original offer. In the table in paragraph 27 of his Declaration, Mr. Brents labels a column "Error Rate (Reduction in Amount)," thereby equating a reduction after appeal as an error.  Although Mr. Brents glosses over in a footnote that his figures include claims "either decided by the appeals panel or resolved by the parties that resulted in a reduction to the award amount," he leaps to a conclusion that in all instances where there is a reduction, the Program made an "error,' which ignores the nature of the baseball process and its encouragement for the Parties to reach a resolution before the claim advances to an Appeal Panelist.

17.    *Mr. Brent's Mischaracterization of Appeal Results.*  To characterize the 2,268 BEL results as those decided by an Appeal Panelist and to equate a lower post-Appeal amount as being indicative of an "error" in the Program's amount is inaccurate and at odds with the nature and purpose of the "baseball" process.   We researched the 2,268 BEL claims Mr. Brents' refers to in his Declaration and looked specifically at the 463 he claims reflect "error"

by the Program because their post-appeal amount was lower than the Program's offer and found the following:

(1) The 2,268 resolved BEL claims have **not** all been resolved by way of an Appeal Panel decision. Instead, 2,268 is the sum of all the BEL appeal outcomes and includes not only those resolved by an Appeal Panelist's decision, but also those resolved by the Parties before the claim reached an Appeal Panelist.

(2) Out of the 463 claims Mr. Brents says were errors because the Appeals Panelist awarded a lower amount than the Program's final determination, only 236 actually progressed to the point of being decided by an Appeal Panelist. The remaining 227 were resolved by the parties and were not decided by an Appeal Panelist. The majority of these 227 claims were resolved for an agreed-upon award amount that was substantially similar to the Original Award amount. In fact, 182 out of the 227 BEL claims resolved by the parties were resolved for an award amount that was within 75% of the Original Award amount, and 116 of those were resolved for an award amount that was within 90% of the Original Award amount.

(3) Of the 236 claims that did progress to an Appeals Panelist decision, the overwhelming majority were decided by the Appeal Panelist using the Final Proposal figure provided by the Claimant. In only 27 instances did the Appeal Panelist select the Final Proposal figure that was asserted by BP. This represents only .01 % out of the total of the 2,268 resolved appealed BEL claims.

### D. Fraud Prevention and Internal Controls

**18.** *The Program's Fraud Detection Structure*. Since the beginning of the Program, the Program's fraud detection processes have been led by David Welker. Until the recent formation of the Fraud Waste & Abuse ("FWA") department within the CAO, Mr. Welker was supported by BrownGreer's Special Investigations Team (SIT), which was led by Roma Petkauskas, who is a Certified Fraud Examiner. In addition to Roma, members of SIT included lawyers, a Forensic Accountant, Financial Claims Reviewers and Non-Financial Claims Reviewers. SIT trained all BrownGreer claims reviewers working on the Program to spot questionable claims and also developed and shared with other Program Vendors and the Parties processes and systems for flagging claims and forwarding those to SIT for further review.

19.    The pre-FWA program involving Mr. Welker and BrownGreer's SIT department, accomplished the following:

(1)  SIT educated claims handlers to note fraud flags, developed systemic metrics to analyze suspect trends, and developed robust data analytics to detect multi-claimant schemes.  As a result of these efforts, SIT received potential fraud proposals for 31,889 claimants.  Of these, SIT labeled 13,476 claimants as participants in 802 different multi-claimant schemes.

(2)  SIT subjected 10,047 claims to Further Investigation after confirming that there were initial indicia of potential fraud, and SIT made preliminary determinations of potential fraud for 1,988 claimants.  Of these 1,988 preliminary determinations of fraud, SIT recommended and the CAO agreed to refer 1,504 claimants to the DOJ for possible additional investigations.  The referral and suspension of the claims of these 1,504 claimants resulted in potential savings of $136,340,829 to the Settlement Program based on the average calculated award amount for each Claim Type.

20.    ***BP's Knowledge of Program's Fraud Detection and Control Process***.  Long before the Program opened on June 4, 2012, BrownGreer, with Mr. Juneau's approval, met and participated in conference calls with representatives of BP to discuss controls, including change control processes.  Pursuant to those meetings, BrownGreer provided BP with documents BP requested about our procedures and practices.  For example, on April 26, 2012, BrownGreer Special Counsel Kristina Tyler transmitted BrownGreer's Change Control Processes and Procedures to Nick Lawson with BP and copied Mr. Juneau, John Baden and Dan Cantor (a copy of this email is attached as Ex. A). In an effort to be responsive to each request from BP regarding our controls and processes, we kept a log of all requests and the date we complied with each  (copy attached as Ex. B).

After the Program opened, Mr. Welker and Ms. Petkauskas met with representatives of BP and Class Counsel numerous times to explain the Program's fraud and control processes.  These meetings occurred on June 26, 2012, August 7, 2012, January 16, 2013, and June 18, 2013.  During those meetings, BP never raised concerns or questions about the fraud

processes being employed by the Program.  The only dissatisfaction raised by BP was that they could not get access to certain data, which was prohibited by the Confidentiality Order.  I am not aware of any other complaints or data requests purportedly made by BP.

21.    *Gibson Dunn & Crutcher's January 27, 2014 Letter on Error and Risk Detection and Mitigation.*  On February 6, 2014, Roma Petkauskas received a letter from David Welker dated February 3, 2014, which accompanied a letter with attachment from George H. Brown with Gibson Dunn, & Crutcher ("Gibson Dunn") dated January 27, 2014, on behalf of BP, regarding "Error and Risk Detection and Mitigation in the Deepwater Horizon Court Supervised Settlement Program."  Mr. Welker asked Roma to review the materials from Mr. Brown and to provide comment on the controls already in place, measures taken to tighten controls, and/or any additional observation she had regarding the content of either the letter or its attachment.   A copy of Mr. Welker's letter dated February 3, 2014, along with Mr. Brown's letter and attachment are attached to as Ex. C.

22.    *Response to Gibson Dunn's Letter*.  In response to this request, Roma sent a letter dated February 19, 2014, to Mr. Welker, which included a 33 page, single-spaced attachment describing: (1) the SIT's Fraud Detection and Prevention Process; (2) Business Economic Loss Framework Controls; and (3) a Description of BrownGreer's Internal Controls. A copy of the letter and materials Roma provided to Mr. Welker is attached as Ex. D**.**

23.    *BrownGreer's DWH Operations Manual.*  Roma's February 19, 2014 letter also referenced the BrownGreer DWH Operations Manual and Operations Manual Appendix as a source that provides a thorough review of all of the process and rules BrownGreer follows in performing claims review functions.  As early as May 7, 2012, Mr. Juneau had requested each Vendor to submit an Operations Manual to him to document fully all processes being

14

performed in the Program.  The BrownGreer DWH Operations Manual and Appendix total 2,312 pages and document fully every step and control we follow in the implementation of claims review pursuant to the Settlement Agreement.  BrownGreer wrote its manual over the course of several months and provided it to the CAO first on February 1, 2013.  Since then, we have updated and provided new versions to the CAO each quarter to reflect new policies or processes.  BrownGreer also made its DWH Operations Manual and Appendix available to BP on or around June 14, 2013, in response to BP's request for certain information prior to the June 18, 2013 budget meeting.

24. ***BEL Controls Proposed by Gibson Dunn***. In Mr. Brown's January 27, 2014 letter, he referenced a detailed list of proposed controls that he expected to share with the Program soon, which he explained were focused on entity level controls and BEL claims processing controls.  On February 21, 2014, Mr. Welker gave Roma Petkauskas a copy of the proposed controls he had received from BP, a copy of which is attached as Ex. E.  In this document, BP had identified 327 risks in the processing of BEL claims. Mr. Welker asked BrownGreer to analyze and, if possible, respond briefly to each risk/control listed.  We explained that many of the controls would be applicable to the Program's accounting firms (PwC and P&N), and Mr. Welker asked us to share the list with them as well, which we did.

25. ***Response to Gibson Dunn's BEL Controls Proposals.***  Because many of the statements and risks BP raised were directly explained and covered in our Operations Manual, it was apparent to us upon review of the list that either BP had never reviewed BrownGreer's Operations Manual that had been available to them on or around June 14, 2013, or they had reviewed it and chosen to ignore it. Nevertheless, from February 21, 2014 until March 13, 2014, BrownGreer researched and drafted responses to each of the risks or controls from BP's

list of 327 that were applicable to our processes or systems.  On March 13, 2014, we provided

Mr. Welker with our response to the controls from BP's list that pertained to BrownGreer.  A

copy of the document we sent to Mr. Welker in response is attached as Ex. F.

26.   ***Gibson Dunn's March 5, 2014 List of Proposed Entity Controls.*** That same day,

on March 13, 2014, Mr. Welker sent Roma Petkauskas another spreadsheet from Mr. Brown,

which Mr. Welker described as a second round of controls BP believes should be used in the

Program.  Mr. Brown had sent this list to the CAO on March 5, 2014.  Upon review, we

determined that, again, the vast majority of the items in the claim processing section were

addressed in BrownGreer's Operations Manual, which BP had been given on or about June 14,

2013.  We asked Mr. Welker for guidance on how to respond.

27.   ***CAO's Request for Information in Response to Gibson Dunn's March 5, 2014***

***List of Controls.*** We received further direction on June 2, 2014, when the CAO's Internal

Audit department contacted Roma Petkauskas to seek BrownGreer's input on 78 items from

BP's March 5, 2014 list of suggested entity controls.  For each item, the CAO's office asked us

to confirm whether:  (1) the control was currently in place; (2) if not, whether it should be

implemented; (3) whether the control was manual or automated; (4) the frequency of the

control; and (5) a description of the control in place.  The 78 items were those related to

BrownGreer's processes.

28.   ***BrownGreer's Response to Gibson Dunn's March 5, 2014 List of Controls.***

BrownGreer researched each of the 78 controls listed on BP's March 5, 2014 list and

confirmed that, not only were all 78 controls were in place, but also that BrownGreer's current

processes provided even broader and stricter controls than what BP had recommended in many

instances.  For example, one of the proposed mitigating internal controls recommended establishing quality assurance (QA) protocols using a risk based approach to focus QA efforts on the appropriate areas of the claims process.  In fact, BrownGreer employs sophisticated automated data metrics and daily analysis processes to identify claims for QA.  The metrics are identified in Appendix XXV.A of the Operations Manual.  Discrepancies found in QA Reviews are recorded in the system.  BrownGreer runs weekly reports that quantify user performance based on these reports and those reports are provided to supervisors.  Supervisors examine these reports and follow up with reviewers weekly.  Section  XXV.D of the Operations Manual describes the follow up process in detail.  On June 20, 2014, we provided the CAO with our analysis of whether the control was in place, whether it was automated, the frequency of it, and we described the control in place.  A copy of this analysis is attached as Ex. G.

**29.**   ***BP's Disregard of Existing Internal Controls and Processes.***  I have read the Declaration of Mark Hutchins and am familiar with his opinion that although BrownGreer was to assist the Claims Administrator in implementing controls for the claims process, there is "no indication that such controls were developed or implemented." (Hutchins, ¶ 38).    To render such an opinion, it is apparent that Mr. Hutchins is unfamiliar with the internal controls detailed in BrownGreer's:  (1)  February 19, 204 response to Gibson, Dunn's January 27, 2014 letter; (2) March 13, 2014 response to Gibson, Dunn's list of BEL Controls Proposal; (3) June 20, 2014 analysis of the 78 controls applicable to BrownGreer from Gibson, Dunn's March 5, 2014 list of entity controls; or (4) DWH Operations Manual and Appendices.  These documents reflect the comprehensive and robust system of controls that had been implemented in the Program, and in fact show that *all* of the controls contained in the March 5, 2014 list

from Gibson, Dunn as they related to BrownGreer were in place and had been for some time. BP had been privy to these controls, at a minimum through its access to the BrownGreer Operations Manual and the explanation of the Program's fraud detection and prevention processes in at least four in-person meetings.  Furthermore, BrownGreer's internal controls had been provided in detail in the Declaration of Orran L. Brown, filed with the CAO's response to BP's Renewed Motion For An Emergency Preliminary Injunction To Suspend Payments on August 26, 2013, a copy of which is attached as Ex. H.   Either Mr. Hutchins was personally unaware of all of these controls, or he chose to ignore them in favor of making a blanket assertion that they do not exist.

30.    *The Casey Thonn Claim.*  Mr. Hutchins again blames the alleged absence of controls in the system or processes in place within the Program for not detecting fraudulent activity by Casey Thonn and other Seafood Program claimants, although he does not explain specifically how the controls listed on BP's January 27, 2014 or March 5, 2014 list would have detected "fraudulent activity by Casey Thonn and other Seafood Claimants."  On May 2, 2012, before claims review began, BrownGreer, on behalf of the Claims Administrator, recommended to the Parties that the DWH Program obtain authorizations to verify tax forms from all claimants at the time they filed claims to give the Claims Administrator the ability to confirm that claimants who relied upon tax returns as proof of their income or losses actually submitted those returns to the IRS and to deter submissions from claimants who did not file such tax returns.  Class Counsel strongly opposed this, stating that the measure was too intrusive.  On June 15, 2012, BP ultimately agreed that the Program would not require authorization forms to verify tax forms from all claimants at the time they filed claims, and would only require them as the Claims Administrator judged necessary.  During the GCCF,

BrownGreer had referred the Casey Thonn claim to audit, and Guidepost (the investigative arm of the GCCF Program) had cleared the claim, finding "no evidence of fraud." In light of the prior investigation by Guidepost that cleared his claims, the Program would not have required authorization forms, and the claim was reviewed in accordance with the Seafood Protocols.

### E. Mr. Juneau's Exercise of Control.

**31.** *Use of Freeh Report by BP.* In Todd Brents' Declaration, he recites excerpts from Special Master Freeh's report regarding BrownGreer and concludes that a reasonable and prudent Claims Administrator would "not tolerate such 'brazen behavior' or disregard to his authority." BrownGreer and the Special Master resolved all issues from the September 6, 2013 Report relating to BrownGreer in filings with the Court dated November 12, 2013, and November 13, 2013, respectively. Notwithstanding that resolution and determination that the Program could continue with BrownGreer in its same role, BP has resurrected the report to attack Mr. Juneau and to suggest that it proves he had ineffective controls over his vendors. That is not what the Special Master's report said. In fact, an example given to Special Master Freeh by certain former members of the CAO of BrownGreer's alleged "resistance" to the "CAO's oversight efforts to control costs and to create efficiencies" ironically illustrates the ultimate control Mr. Juneau consistently displayed on issues relating to efficiencies and costs. On January 14, 2013, David Odom, notified BrownGreer that a decision had been made to transfer front-end data entry on BEL claims from BrownGreer to the accountants. Mr. Odom stated that he and Mr. Juneau had met with the accountants and had decided to transition BEL functions over to the accountants. He said that Kirk Fisher would set up a meeting to work out the details. That same day, I replied to Mr. Odom's email, thanking him for it, and sending him a memo outlining all tasks currently being performed by BrownGreer on BEL claims to

19

help inform the transition process from BrownGreer to the Accountants. (*See* email exchange attached as Ex. I.)  Over the course of the next week, we learned from one of the Accounting vendors that Mr. Odom had never met with them, had never asked them their opinion, that the current division of responsibilities between BrownGreer and the Accountants was working, and that the accountants did not want to absorb the front-end data entry work.  We also learned that the transition from Brown Greer to the Accountants would cost the Program $1.1 million more per month because BrownGreer's billing rates were lower than the rates of the Accountants.   Furthermore, at the time of this proposed transition, there was already a backlog of approximately 3,300 BEL claims awaiting Accountant review, and we were pushing new BEL claims to Accountant Review at a faster rate than the Accountant Reviewers could review them, because their review involved a comprehensive look at all aspects of the claim.  At the time, we were sending the Accountants an average of 243 claims a day, but because of their extensive review, they were completing an average of 137.5 claims each day.  Thus, at the time of the Odom-Fisher plan, the  front-end work done by BrownGreer was outpacing the Accountants by over 500 claims per week, adding at least 2,000 claims per month to the backlog of claims with the Accountants.  To keep up with the pace of claims being sent to the Accountants for review and for them to take on the new responsibility of the front-end data entry, new Accountants would need to be hired and trained, which would take time and risk slowing down the process and increasing the backlog. For all of these reasons, we discussed and asked questions about the transition but willingly would have made the transition if the CAO had decided ultimately to make the proposed change.  I attended a meeting on January 23, 2013, among David Odom, Kirk Fisher, Pat Juneau, Mike Juneau, and other members of the CAO on January 23, 2013, to discuss the transition.  It is my understanding and recollection

that the Accountants also met with the CAO that day.  After those meetings, Mr. Juneau

decided not to transfer the front-end data entry work from BrownGreer to the Accountants,

which saved the Program and thus, BP, $1.1 million per month.

32.   ***BrownGreer's Reporting Relationship to the CAO***.  Mr. Brents also comments

on David Odom's representation to Special Master Freeh that Orran Brown "made it clear to

him from the outset of Mr. Odom's tenure at the CAO that Mr. Brown reported only to Mr.

Patrick Juneau," which Mr. Brents characterizes as "brazen behavior that a reasonable and

prudent Claims Administrator would not tolerate."   Mr. Brents' characterization has no basis

in fact.  In his interview with Mr. Freeh, Mr. Odom was referring to a statement that arose

during BrownGreer's contract negotiations with BP, which occurred at Arnold & Porter's

offices in DC on January 28, 2013, eight months after Mr. Odom was named CEO.  That

meeting was attended by Orran Brown, me, representatives of BP, David Odom, Kirk Fisher,

and David Forsyth.  The subject of reporting arose in the context of a discussion about the

chain of command and how one of the murkiest parts of our engagement at the time was who

directed our work and to whom we reported, because we worked directly with Patrick Juneau,

Michael Juneau, the legal team at the CAO's office, David Odom, Kirk Fisher, Bob Levine,

and others in Mr. Juneau's office, and we had been getting directions and requests from all of

them. We discussed how the draft contract referred to the relationship between BrownGreer

and the "Claims Administrator," which was defined in the contract to have the same meaning

as provided in the Settlement Agreement.  The Settlement Agreement defined the "Claims

Administrator" as Patrick Juneau and not the "Claims Administrator's Office" or anyone else

in that Office, which was contributing to our uncertainty about who directed our work. We

were trying to obtain some clarity in our written contract on to whom we reported. It was

during this discussion that Mr. Brown made a statement that, according to the terms of the contract and the definitions in the then working draft, our relationship was with Mr. Juneau as Claims Administrator, and we ultimately took our direction from him.  The statement—which did nothing more than state our reading of the current version of the contract—is not evidence of intolerable "brazen behavior."

I, Lynn C. Greer, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 15th day of October, 2014.

_____
Lynn C. Greer

# EXHIBIT A

| | |
|---|---|
| **From:** | Kristina Tyler <ktyler@browngreer.com> |
| **Sent:** | Thursday, April 26, 2012 9:31 AM |
| **To:** | 'Nicholas.Lawson@bp.com' |
| **Cc:** | Roma Petkauskas; Bob Staneart; Orran L. Brown; Lynn Greer; 'jbaden@motleyrice.com'; 'Cantor, Daniel A.'; Patrick A. Juneau (paj@juneaulaw.com) |
| **Subject:** | Deepwater Horizon Economic Settlement |
| **Attachments:** | Change Control Prcoesses and Procedures.pdf |

Nick,

On 4/20/12 Bob Staneart discussed the Change Control process with you by telephone conference.

To date at your request we have sent you the following documents:

    (1)    Accountant Review Screens spreadsheet
    (2)    Accountant Data Capture Screens
    (3)    BDO Field Mapping Screens
    (4)    BCQ Source Field Screens
    (5)    BG Contact list
    (6)    Status of Screens spreadsheet
    (7)    Confidentiality Agreement for New Orleans office
    (8)    Court Supervised Training Program
    (9)    Metrics for Targeted QC and Enhancements after running metrics
    (10)    Fraud Detection Procedures
    (11)    GCCF Binder
    (12)    Individual Economic Loss Review – All Screens
    (13)    Oyster Lease Testing – User Example
    (14)    Position Requirements for New Orleans Office
    (15)    Review of Intake Screens
    (16)    Business Economic loss process flow
    (17)    Individual Economic loss process flow
    (18)    Breakdown of Information management group
    (19)    Re-review for Sweeping Determination Letters
    (20)    Process of Establishing a Claimant
    (21)    Staffing Models for the New Program
    (22)    Past monthly Staffing Levels for GCCF
    (23)    Reviewer Off-Boarding Documentation
    (24)    Confidentiality Agreement
    (25)    Reviewer Declaration that they will not File Claims
    (26)    Reviewer Fraud Training Materials
    (27)    Current Fraud Process Flow Chart and Fraud Team Org Chart for New Program

We are currently working on gathering these requested documents:

    (1)    New Program Org Chart

Attached to this email are the following documents:

(1) Change Control Processes and Procedures

Thank you,
Kristina


**Kristina Tyler**
Special Counsel
**BROWNGREER PLC**
115 S. 15th Street, Suite 400
Richmond, Virginia  23219-4209
Telephone:  (804) 521-7200
Facsimile:  (804) 521-7299
www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

BROWNGREER ‖ PLC                    *Privileged and Confidential Attorney Work Product*

---

**Change Control Processes and Procedures**
**(As of 4/24/12)**

---

The following items are involved in change control:
1) Business Rules
2) Database Objects (Stored Procedures, Functions, Views, Tables)
3) Database Reference Tables
4) Web Application Code (C#)

<u>**Business Rules**</u>
The business owners create a document describing the business rules for each screen. Every time there is a change, they update the document highlighting the changes. The developers then make the changes. These business rule documents are kept in BrownGreer's document management product -DM.

<u>**Database Objects (Stored Procedures, Functions, Views, Tables)**</u>
All of the database objects in the Development environment are scripted and stored in Microsoft's Visual Source Safe. The only exception to this is that the table structures.

All changes to database objects are scripted and placed in a specific folder on the network drive. Once scripted, these database objects are pushed to Production.

A database trigger has been added to the new BP Development database which tracks all changes to all database objects. It will copy any modified code and store it in a table for future reference. Also, a tool has been coded to allow comparisons of the database object versions.

<u>**Database Reference Tables (Control Tables)**</u>
Each business owners create a document containing the data that should be in each reference table. Every time there is a change, they update the document highlighting the changes. The developers then script the changes and place the scripts in a specific folder on the network drive. The reference table data is also tracked in Visual Source Safe. Then the scripts are run in Production. The documents are kept in DM.

In addition, the Database Administrator team maintains a data dictionary of each data element. The team will keep a data schematic for each table and the relational structure between those elements. This schematic is scheduled to run once a month to keep it updated.

**Web Application Code (C#)**

***Changes to Development environment***
1. The code changes are tracked in Visual Source Safe.
2. Will use the internal Task Manager Application for tracking changes once we make the first production build to track change requests.

***Steps to move changes from Development environment to the Training environment***
1. Backup existing Training Application from IIS Server.
2. Move the code changes (Complied Files) from Development Project to Training Project in Visual SourceSafe.
3. Move the code changes (Complied Files) to Training IIS Server.
4. Do Sanity testing to make sure the screens are working.
5. Notify Users and QA for testing.

***Steps to move changes from Training environment to Production environment***
1. Backup existing Production Application from IIS Server.
2. Move the code changes (Complied Files) from Training Project to Production Project in Visual SourceSafe.
3. Move the code changes (Complied Files) to Production IIS Server.
4. Do Sanity testing to make sure the screens are working.

4/24/2012

# EXHIBIT B

| Row | Documents Requested | BP Person Who Requests the Documents | Date Produced |
|-----|---------------------|--------------------------------------|---------------|
| 1. | Accountant Review Screens spreadsheet | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 2. | Accountant Data Capture Screens | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 3. | BDO Field Mapping Screens | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 4. | BCQ Source Field Screens | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 5. | BG Contact list | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 6. | Status of Screens spreadsheet | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 7. | Confidentiality Agreement for New Orleans office | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 8. | Court Supervised Training Program | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 9. | Metrics for Targeted QC and Enhancements after running met | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 10. | GCCF Binder | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 11. | Individual Economic Loss Review – All Screens | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 12. | Oyster Lease Testing – User Example | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 13. | Position Requirements for New Orleans Office | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 14. | Review of Intake Screens | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 15. | Business Economic loss process flow | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 16. | Individual Economic loss process flow | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 17. | Breakdown of Information management group | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 18. | Re-review for Sweeping Determination Letters | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 19. | Process of Establishing a Claimant | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 20. | Fraud Detection Methods Document | Nick Lawson, Blaire Baldridge | Sent as of 4/16/12 |
| 21. | Staffing Models for the New Program | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 22. | Past monthly Staffing Levels for GCCF | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 23. | Outline of the Training Plan for Reviewers | Nick Lawson, Blaire Baldridge | Sent as of 4/17/12 |
| 24. | Reviewer Off-Boarding Documentation | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 25. | Confidentiality Agreement | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 26. | Reviewer Declaration that they will not File Claims | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 28. | Reviewer Fraud Training Materials | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 29. | Current Fraud Process Flow Chart and Fraud Team Org Chart | Nick Lawson, Blaire Baldridge | 4/21/2012 |
| 30. | Change Control | Nick Lawson | 4/26/2012 |
| 31. | Overarching project plan for the implementation of the settlen | *unknown* | Sent as of 4/30/12 |

# EXHIBIT C



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

Ms. Roma Petkauskas
Brown Greer
935 Gravier Street
Suite 1520
New Orleans, La. 70112

February 3, 2014

Dear Ms. Petkauskas,

Please see attached letter from BP counsel with accompanying list of "proposed" controls suggested by BP. Please review the attached and provide comment to me regarding controls already in place, measures taken to tighten controls, and/or any additional observations you may have regarding the content or either the letter or it's attachment. Please provide your comments by COB February 13, 2014.

Thank you for your attention to this request.

Sincerely,

David W. Welker

David W. Welker

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel 650.849.5300
www.gibsondunn.com

George H. Brown
Direct: +1 650.849.5339
Fax: +1 650.849.5039
GBrown@gibsondunn.com

January 27, 2014

Mr. David Welker
CEO
Court Supervised Settlement Program
935 Gravier Street, Suite 1905
New Orleans, LA  70112

Re:   Error and Fraud Risk Detection and Mitigation in the Deepwater Horizon Court
        Supervised Settlement Program

Dear Mr. Welker:

   We have been told that the CSSP is now working to rebuild its internal control policies and procedures with respect to detecting and preventing fraud and abuse in the claims process – a process that is particularly important in light of the Fifth Circuit's recent decisions and the District Court's orders on matching revenue and variable expenses under the settlement agreement.  During our recent meeting with the CSSP Accounting Vendors, BP was asked for additional input on rebuilding internal control procedures relating to fraud.  Towards that end, BP has prepared an outline of the key principles that should be included in any redesigned overall error and fraud risk detection and mitigation program.  In addition, we have prepared a "preliminary risk assessment" relating to BEL claims which we think may be a useful starting point for the risk assessment activities that we expect the CSSP will undertake as it rebuilds its BEL claims processing procedures.  We assume that the Claims Administrator has considered and now put into place some aspects included in our summary of key principles – as ample time has passed to do so during the life of the CSSP and since the first Freeh report identified numerous weaknesses in the CSSP's controls – but the second Freeh report makes plain that an unacceptable number of weaknesses remain.   We have not tried to evaluate which of the principles the Claims Administrator may have attempted to partially or fully implement.  I am including certain important proposals along with this letter.

   Of course, the effectiveness of any set of policies and procedures depends heavily on the effectiveness of the organization's leadership.  Policies that protect against abuse of facility resources, conflicts of interest, and fraud will only be effective if senior leadership does not engage in such conduct – and will not be effective in an organization in which

GIBSON DUNN

Mr. David Welker
January 27, 2014
Page 2

senior leadership has failed to detect fraud and error and failed to respond to it aggressively and timely on its own.

That said, effective management of the risk of material errors or fraud occurring and remaining undetected should be based on a three-phased approach: prevention, detection, and response. Policies and procedures designed to prevent errors and irregularities in the administration of the CSSP should include a robust program of error and fraud awareness training at all levels of the CSSP, periodic formal error and fraud risk assessments by both the Claims Administrator and its outside auditors, implementation of appropriate controls and procedures to reduce the identified risks to an acceptable level, implementation of an effective internal audit program, creation of an effective information technology system, and implementation of a rigorous program of due diligence with respect to CSSP employees and vendors, including with respect to actual and potential conflicts of interest.

As you review the summary internal control framework we are providing with this letter, we assume you will recognize that it is consistent with the Committee of Sponsoring Organizations of the Treadway Commission's ("COSO") updated *Internal Control — Integrated Framework* and covers all areas of the claims administration process, including identification of and training for professionally qualified and technically competent personnel and vendors, and claims verification, documentation and review. In addition, the CSSP should use Service Organization Control ("SOC") reports in accordance with AICPA standards, as a method of vendor management.

The CSSP should ensure that there is an independent person or group responsible for oversight and management of fraud detection and mitigation procedures and to investigate or review potential fraud or corruption as soon as possible after it has been identified in the event that preventive processes and controls fail. As outlined in our summary of key principles, the CSSP's fraud detection protocols should include routine post-claim reviews based on identified risk criteria; clear internal and external reporting mechanisms for employees, vendors and others to report instances of fraud and abuse; establishing effective auditing and monitoring of the CSSP's internal controls program; and using proactive forensic data analysis tools to identify potential fraud and other misconduct. We recognize that the CSSP has only very recently adopted an internal fraud hotline, and, as noted, our summary outline of key principles does not attempt to identify which aspects of internal controls the Claims Administrator has attempted to implement or that he is in the process of attempting to implement.

In our view, the adoption and implementation of a robust error and fraud risk detection and mitigation program is essential to a properly functioning organization like the CSSP. Moreover, the Claims Administrator failed to conduct a robust fraud risk assessment

GIBSON DUNN

Mr. David Welker
January 27, 2014
Page 3

and failed to implement appropriate internal controls from the inception of the settlement program through today, and that has contributed to the failure to prevent or detect the many conflicts, corrupt activity, and ethical lapses that have been reported to date. Therefore, before the CSSP resumes the processing and payment of BEL claims in any significant volume, the CSSP should ensure that a program based on the key principles outlined in our attached summary is fully implemented. Please confirm that you intend to do so.

In addition to the attached, we have been working on a detailed list of proposed controls that we expect to share with the CSSP soon. Those proposed controls are focused on entity level controls and BEL claims processing controls and are intended to be helpful suggestions (i.e., not mandates or demands) as you continue to work towards the implementation of an appropriate control environment for the operation of the CSSP and processing of BEL claims.

BP requests that the Claims Administrator review the accompanying materials and respond by indicating which internal control features are being implemented and what the Claims Administrator intends to do about the features that have not yet been adopted. We will follow up with you in our upcoming regular meetings.

Sincerely,

George H. Brown

GHB/knb

**January 24, 2014**

# SUMMARY OF KEY PRINCIPLES FOR CSSP INTERNAL CONTROLS FRAMEWORK

# TABLE OF CONTENTS

Page

I.   ERROR AND FRAUD RISK DETECTION AND MITIGATION .................................. 1

   A.   Error And Fraud Prevention Protocols ......................................... 1

      1.   Error and Fraud Awareness Training ........................................ 1

      2.   Error and Fraud Risk Assessment ........................................... 2

      3.   Internal Audit Program ...................................................... 3

      4.   Vendor Oversight ........................................................... 4

      5.   Employment and Third Party Due Diligence ................................ 4

      6.   Conflicts of Interest ........................................................ 5

   B.   Fraud Detection Protocols ...................................................... 6

      1.   Post-transaction review ..................................................... 6

      2.   Hotline and Whistleblower Mechanisms .................................... 7

      3.   Auditing and Monitoring .................................................... 7

      4.   Proactive Forensic Data Analysis .......................................... 7

   C.   Fraud Response Protocols ...................................................... 8

      1.   Internal Investigations Protocol ........................................... 8

      2.   Reporting Requirement ..................................................... 9

      3.   Remedial Action Protocols .................................................. 9

         a)   Internal Control Review Following Discovery of Fraud .................... 10

         b)   Recovery of Proceeds of Fraudulent Conduct ........................... 10

II.  PRELIMINARY ERROR AND FRAUD RISK ASSESSMENT FOR CSSP BEL
     CLAIMS ...................................................................... 11

   A.   Financial Statement Fraud .................................................... 11

   B.   CSSP Risk Factors ........................................................... 12

   C.   Potential Claims Process Fraud Scenarios ..................................... 13

   D.   All Industry Error And Fraud ................................................. 14

   E.   Agriculture Error And Fraud .................................................. 16

   F.   Construction Error And Fraud ................................................. 16

   G.   Manufacturing Error And Fraud ............................................... 17

   H.   Professional Services Error And Fraud ........................................ 18

   I.   Real Estate Error And Fraud .................................................. 18

   J.   Retail Error And Fraud ....................................................... 18

# TABLE OF CONTENTS
## (continued)

Page

K.  Wholesale/Distribution Error And Fraud.................................................................. 19

L.  Healthcare Error And Fraud....................................................................................... 20

M.  Bar & Restaurant And Other Food Service Error And Fraud.............................. 20

N.  Tourism And Hospitality Error And Fraud............................................................ 20

O.  Transportation & Warehousing Error And Fraud ................................................. 21

III.  ERROR AND FRAUD DETECTION, MITIGATION, AND REMEDIATION
PROCEDURES AND POLICIES ..................................................................................... 22

A.  Internal Control Environment ................................................................................. 22

B.  Control Activities........................................................................................................ 22

C.  Internal Controls ......................................................................................................... 22

# I.    ERROR AND FRAUD RISK DETECTION AND MITIGATION

Among the risks faced by the CSSP are that material errors, irregularities or frauds will occur and remain undetected and thus will distort the claims determination process and lead to the payment of claims that are not based on actual economic loss, or losses traceable to the Deepwater Horizon accident.   The CSSP must be committed to minimizing such errors, irregularities and fraud through the development, implementation and regular review and enhancement of risk identification processes, and through well developed prevention, detection and response strategies.

The information below outlines the key principles that should be used for developing a program for achieving those goals.

Effective fraud risk management is based on a three-phased approach:

| Phase | Description |
|---|---|
| **Prevent** | Proactively implementing measures to prevent errors and fraud is the first component of an effective error and fraud risk management program.  Prevention measures include organization wide strategies such as regular external and internal communication of the anti-fraud program, fraud awareness training, pre-employment screening and business unit specific strategies such as fraud risk assessment. |
| **Detect** | Detection measures incorporate actions, programs, controls, and systems designed to discover circumstances indicative of errors or fraud and misconduct such as data mining.  Appropriate detection procedures are the second component in the management of fraud. |
| **Respond** | Response measures include controls designed to take corrective action to remedy the impact caused by fraud or misconduct. |

To achieve these goals, the following sections identify targeted and scalable error and fraud risk management procedures the CSSP should use to address potential error or fraud risk occurring in the BEL process.

## A.    Error And Fraud Prevention Protocols

## 1.    Error and Fraud Awareness Training

CSSP must raise the awareness of its directors, staff and third party vendors of error, fraud and corruption risks, including early warning signs and how to respond if fraud or corruption is suspected.  CSSP's commitment to fraud prevention and detection should be communicated both externally and internally on an ongoing, regular basis.

Below is a list of communication strategies and methods to raise awareness:

- **Written anti-fraud and corruption policies (Code of Conduct).** There exists a written anti-fraud and corruption policy and a code of conduct. The Claims Administrator should take steps to ensure that all CSSP employees acknowledge in writing that they are aware of the CSSP's written anti-fraud and corruption policies and code of conduct and agree to abide by them.

- **Regular formal awareness training.** Face to face training facilitates increased learning of core concepts and is generally supplemented by appropriate e-learning modules and assessments to ensure and test employee's knowledge of the policies. Training sessions should also be embedded at the orientation training.

- **Intranet communication/Instructional videos.** CSSP should publish fraud control related policies, news and bulletins, instructional videos and other information regarding promoting fraud awareness on the Intranet site or common platform.

- **Report investigations and take disciplinary action against perpetrators.** To maximize deterrent value, instances of uncovered fraud should be publicized, emphasizing that all offenders will face disciplinary and other appropriate action. This discourages employee involvement in fraud and, conversely, encourages employee efforts to assure the integrity of CSSP operations.

## 2.     Error and Fraud Risk Assessment

The Claims Administrator and outside auditors should periodically perform an Error and Fraud and Compliance Risk Assessment to understand the risks that are unique to the CSSP claims process, and identify gaps or weaknesses in CSSP's controls to mitigate those risks. The CSSP should also develop a practical plan for appropriately using sufficient resources to develop any additional policies, procedures and controls required to reduce the identified risks to an acceptable level. The assessment should be conducted across the entire organization, taking into consideration CSSP's significant claim processes and identified errors and irregularities that have occurred during the life of the organization.

The objectives of the CSSP fraud risk assessment process are to:

- **Identify and assess fraud risk factors through interviews and leveraging other pre-existing documentation.** Fraud risk factors include past frauds and allegations of fraud, unusual trends or relationships identified through the performance of analytical procedures, and consideration of the potential role IT controls could play in early detection or prevention of fraud.

- **Identify, to the extent possible, the specific fraud risks present in the current CSSP business practices, policies and claims processing and other procedures.** Key components of this step include comprehensive discussions with individual with

relevant knowledge and information, including CSSP management and staff, the CSSP Accounting Vendors, BP's counsel and experts, industry specialists and others as appropriate, considering past frauds within the organization, and identifying possible fraud schemes, without consideration of the existence or effectiveness of internal controls.  This process must include evaluation of the pervasiveness, likelihood and the significance of any potential impact of the fraud risks and scenarios identified.

- *Evaluate whether mitigating controls exist and are effective.*  Key components to this step include mapping existing controls to prioritized fraud risks, assessing the degree to which particular fraud risks are mitigated by existing controls, and identifying what potential remediating controls are necessary, if any.

- *Develop fraud mitigation strategies to address risks with an unacceptable residual risk rating.*

If the existing CSSP policies and internal control framework are sufficient to mitigate effectively, at least partially, the fraud risks identified, steps should be taken to ensure that these fraud risks remain adequately controlled.  Accordingly, the CSSP should continue to actively monitor those key control mechanisms reported as effective during the fraud risk assessment process.  The Claims Administrator should undertake a series of reviews and periodic follow-up to ensure that the selection of controls remain operational and effective.

Based on the results of the risk assessment, the Claims Administrator should propose mitigation strategies to address the remaining fraud risk discovered during the assessment process for which the existing policies and internal control framework appear insufficient.  The mitigation strategy should clearly define the fraud risk and the personnel involved with implementing the strategies.

The Claims Administrator should immediately identify a person within the CSSP who will be responsible for monitoring the implementation of the fraud risk mitigation strategies arising from the fraud risk assessment and reporting progress to the Claims Administrator to ensure that all timetabled strategies are implemented accordingly.

## 3.    Internal Audit Program

The Internal Audit Program ("IAP") is an independent assurance and consulting activity designed to evaluate and improve the effectiveness of risk management, control and governance arrangements within the claims administrative process.  The IAP should use a systematic and disciplined approach to assist in:

- developing and maintaining a culture of accountability and integrity;

- facilitating the integration of risk management into day to day business activities and processes;

- promoting a culture of cost consciousness, self-assessment and adherence to the highest ethical standards;

- evaluating the potential for the occurrence of fraud and how the agency manages fraud risk; and

- assisting management to investigate fraud, identify the risks of fraud and develop fraud prevention and monitoring strategies.

## 4.    Vendor Oversight

The Claims Administrator should obtain assurances that the significant vendors are working in an adequate control environment and the processes are functioning as designed.  An assessment of the service providers can be accomplished through the utilization of the industry recognized Service Organization Control ("SOC") reports.  SOC reports are an industry standard for all companies of any size that receive a financial statement audit and outsource a significant process or portion of their internal control environment to third parties.  These reports are used to evaluate the controls of third party services and vendor operations to ensure that the results provided are valid and reliable.

There are three basic forms of the SOC report: SOC 1, SOC 2, and SOC3.  Reports are further described below:

- A SOC 1 is prepared in accordance with Statement on Standards for Attestation Engagements ("SSAE") No. 16, Reporting on Controls at a Service Organization to evaluate the effect of the internal controls over financial statement assertions and financial reporting.

- A SOC 2 is a Trust Services Report for service organizations which addresses the controls related to security, availability, processing integrity, confidentiality, and/or privacy of a service organization's system.

- A SOC 3 report is just the assertion and an opinion from the longer SOC 2 report.

The SOC reporting framework was developed by the American Institute of Certified Public Accountants ("AICPA").  All three SOC reports must be performed by an independent auditor and should be obtained annually from the vendor.

## 5.    Employment and Third Party Due Diligence

The Claims Administrator and its outside auditor should periodically perform CSSP employee and CSSP Claims Administration vendor assessments.  This includes performing due diligence in the hiring, retention and promotion of employees, agents, vendors, and other third parties.  The scope and depth of the due diligence process will vary based on the organization's identified risks, and the individual's job function and/or level or authority.

Employee and third party due diligence is reduces an organization's potential exposure to internally based fraud and corruption.  Screening process reduces the risk of a potential security breach and helps assure the integrity, identity and credentials of personnel and third parties with whom the CSSP deals in the claims administration process.

Employment screening should be considered for all new employees joining the organization (including contractors) and all personnel being transferred to a senior executive position or to a position considered by the organization to be "high-risk" in terms of the potential exposure to fraud or corruption associated with those positions.

The employment screening process should include:

- verifying personal identity (using at least two forms of identity documentation such as passport, birth certificate or driver's license);

- verifying formal qualifications (sighting diplomas and contacting the relevant institution for confirmation);

- conducting a police criminal history search;

- conducting bankruptcy checks; and

- reviewing third party vendor business relationships and evaluating interests with related parties.

It is also important to consider and evaluate any gaps in the employment history of a potential candidate and the reasons for these gaps.

## 6.    Conflicts of Interest

A conflict of interest is a circumstance or situation that has, or may be perceived by a fully informed, reasonable observer to have an impact on the objective, unbiased performance of the CSSP or its personnel.  Proper due diligence procedures should be performed to deter the appearance of unfair or biased review by the CSSP.   Steps for deterrence include:

- conducting background checks of employees and third party vendors for pre-existing or ongoing business relationships with claimant attorneys or accounting professionals assisting claimants;

- implementing a policy to ensure all possible conflicts of interest are disclosed at the onset of employment or when a vendor is engaged, periodically confirming the absence of conflicts or potential conflicts, and terminating or dismissing those responsible for violations of the CSSP's conflicts policy; and

- ensuring claim processors and reviewers are randomly assigned claim files for which they are qualified to review.

## B.       Fraud Detection Protocols

The CSSP should identify an individual responsible for regular performance of fraud detection procedures to identify fraud and corruption to the extent it has occurred.

Fraud and corruption detection may be achieved through:

- enhancing fraud and corruption awareness and reporting responsibilities amongst employees working across all aspects of the claims processing;

- vigilance on the part of vendor management, who must be aware of their responsibility to identify and report any suspected or actual fraud or corruption activity;

- strategic use of the Internal Audit Program by building fraud detection procedures into the internal audit undertaken and to identify auditing priorities;

- development of automated Data Analytics routines, which should be run at regular intervals to identify unusual transactions, or other data anomalies indicative of potential fraud and corruption that should be investigated.  This can be done both as proactive and reactive measures;

- development of specific detection strategies for action by the CSSP and periodic management review as part of the day to day activities; and

- implementation of a hotline or other independent channel through which CSSP personnel, vendor personnel and others may report potential instances of fraud or other inappropriate conduct.

Responsibility for developing and maintaining systems and procedures to detect fraud and corruption (as specified above) rests with the Claims Administrator.  However, all employees and vendors must be alert to the potential for fraud and corruption and to take active steps to detect and report any suspected fraud and corruption.

## 1.       Post-transaction review

A targeted review of processed claims is an effective way to identify fraudulent or corrupt activity.  The population for review should be selected based upon risk criteria and selected in a systematic and documented manner.   Such a review may uncover instances of altered or missing documentation, falsified or altered authorization or inadequate documentary support.  In addition to the possibility of detecting fraudulent transactions, employing a post-transaction review process can also have a significant fraud prevention effect, as the threat of detection may be enough to deter some who would otherwise be tempted to engage in fraud.  The review may lead to the discovery of new methods or risk factors to be incorporated in future fraud detection procedures.

## 2.    Hotline and Whistleblower Mechanisms

A fraud and corruption control program should have clearly communicated internal and external reporting mechanisms for employees and others to report suspected fraud or corruption. Internal reporting channels may include reporting through line management or directly to a nominated individual who has responsibility for fraud and corruption control.  An effective fraud and corruption control program should also include an external anonymous reporting hotline.

"A Whistleblower Protection - Program for Entities" recommends the implementation of a whistleblower protection policy that encourages employees to report suspected fraud and corruption matters detected and provide for the protection of whistleblowers.  This policy should extend beyond staff to suppliers, contractors and clients.  It is important that the policy is well communicated and understood.   Organizations should consider providing external parties, including employees of vendors and claimants, with an avenue to report suspected fraud or corruption.   This can be achieved, for example, by extending the staff reporting hotline to external stakeholders.

## 3.    Auditing and Monitoring

Auditing and monitoring processes (separate from the Internal Audit Program) are effective in detecting transactions that are out of the ordinary.  Auditing and monitoring should be done by an employee who is independent of the employee processing the claims.  The continuous auditing and monitoring of the internal controls surrounding claims processing can be instrumental in detecting vulnerabilities in the existing policies and controls.  While audits are important for assessing internal controls, vendor audits are also necessary in preventing noncompliance or fraud by vendors.  In addition to the traditional tools of observation and monitoring, technology is becoming increasingly useful in this area with the potential to use software tools to quickly scan large quantities of disparate information for anomalous transactions and suspicious trends.  These types of processes can be integrated with or run alongside existing IT systems.

## 4.    Proactive Forensic Data Analysis

The Claims Administrator should perform proactive data analysis to help highlight potential fraud and misconduct by using sophisticated analytical tests, and non-obvious relationship identification.  Data resulting from the CSSP process is an important source of information to detect fraudulent and, to a lesser extent, corrupt conduct.  By using software applications and techniques early on in the CSSP intake process, suspect transactions can be identified and investigated to assist in the detection of anomalous transactions.  Transactions can be analyzed using repeatable monitoring routines which help identify potentially fraudulent transactions on an on-going basis, focusing on transactions or areas that pose particularly significant risk.

## C.    Fraud Response Protocols

An effective fraud response program should provide CSSP management with a comprehensive guideline of the steps to be undertaken should a fraud event be suspected to ensure that an appropriate set of procedures are consistently followed in order to limit the risk associated with the investigation of fraud.  The CSSP should adopt policies which establish the organization's internal investigation protocols, including requiring that an investigation or review be conducted whenever a potential significant impropriety is identified.  A well-designed investigative process typically includes the following types of elements:

- protocols for responding to initial allegations (*e.g.*, decisions on internal and external notifications, selecting an unbiased and qualified internal or external investigation team, etc.);

- standard investigative procedures exist for those conducting the investigation (*e.g.*, steps required to preserve attorney-client privilege, interviewing and other investigative techniques, documentation requirements, etc.); and

- protocols for reporting findings from the investigation.

## 1.    Internal Investigations Protocol

An investigation into actual or suspected fraud and corruption should be conducted by appropriately skilled and experienced personnel who are independent of the area in which the alleged fraudulent or corrupt conduct occurred.   To obtain reasonable assurance that investigations are properly performed and reported, experienced personnel who are sufficiently independent of the CSSP or the matter under investigation should conduct investigations.

Internal investigations into fraud or misconduct should be conducted based on the following internal control guidelines:

- When an allegation of fraud or misconduct is identified, a CSSP investigation team should be advised of the potentially fraudulent conduct immediately.

- Upon receipt of a suspected fraud incident report, the immediate concern of the investigative team should be the preservation of evidence and the containment of loss.

- The investigative team should conduct an internal investigation or coordinate the services of external consultants to assist in an investigation into the alleged fraudulent conduct.

- Parties to an investigation should be required to enter into a confidentiality agreement in relation to the information coming into their possession during the course of the investigation.

- Any investigation and resulting disciplinary proceedings should be conducted in an atmosphere of transparency, independence, fairness and objectivity at all times.

- An investigation should comply with all relevant legislation.

- Adequate records should be made and kept of all investigations, findings, and outcomes. The investigation team should keep a register of all frauds reported and maintain files of all reports and working papers relating to investigations of fraud.

An investigation should be subject to an appropriate level of supervision and review by an independent and responsible group or committee with regard to and in consideration of the seriousness of the matter under investigation.  When the initial investigation identifies a situation beyond the scope of the investigation team's capability, external expertise should be sought to assist in performing the investigation.  The decision to obtain such external expertise should be determined by CSSP management with notice to and input from the Court, BP, and Class Counsel.

## 2.      Reporting Requirement

The investigative team should submit a written report to CSSP management, BP, and Class Counsel detailing the circumstances and, when appropriate, recommending appropriate remedial or disciplinary action with respect to all investigations.  The investigative report should provide the following information:

- details and circumstances of the allegations of fraud or misconduct reported;

- observations and findings from the investigation scope and procedures performed;

- disciplinary actions or administrative remedies (*i.e.*, dismissal, demotion or reprimand) recommended or taken with respect to identified CSSP employees or CSSP Claims Administration Vendors  found culpable in the matter;

- recommendation concerning referral of investigative matters to authorities for further investigation and/or the results of any completed prosecuted action;

- any monies recovered, both by administrative action and the use of the judicial process; and

- recommendations concerning internal control modifications to enhance the system's ability to prevent or promptly detect similar fraud in the future.

## 3.      Remedial Action Protocols

Remediation protocols are designed to provide guidance on when and how to execute remediation steps in response to substantiated allegations of fraud or misconduct.  A well-designed remediation protocol should:

- include a written guideline for anti-fraud control or program remediation that has been approved by the appropriate levels of management at the CSSP;

SUMMARY OF  INTERNAL CONTROLS PRINCIPLES FOR CSSP CONSIDERATION

- identify the group or department at the CSSP that will have primary responsibility for monitoring remediation steps;

- include recommended remediation steps based upon the substantiated facts resulting from an internal or external investigation including among others (1) dollar impact, (2) the position and associated level of trust of the wrongdoer, or (3) compliance, legal, or reputation risk; and

- training and reinforcement protocols.

### a)      Internal Control Review Following Discovery of Fraud

In each instance in which fraud is detected, the adequacy of the internal control environment should be reassessed, particularly those controls directly impacting the fraudulent conduct. When improvements are required, these should be implemented as soon as practicable and additional testing to identify similar events should be conducted consistent with the enhanced risk profile relating to such events.

CSSP management is responsible for ensuring that the internal control environment is reassessed and the recommendations arising out of this assessment are implemented. Fraud control procedures must be subject to regular monitoring and revision to ensure such controls are being implemented effectively and achiving their intended outcomes. This will help to ensure internal controls weaknesses and gaps are addressed to prevent the fraud from reoccurring. A summary of recommendations or requirements for the modification of the internal control environment should be provided to CSSP management.

### b)      Recovery of Proceeds of Fraudulent Conduct

The CSSP should establish a policy requiring that recovery action be undertaken whenever: (1) evidence of fraud, corruption or material error is identified, and (2) the likely benefits of such recovery will exceed the funds and resources invested in the recovery action, including the consideration of the benefits of the deterrent effects of vigorous recovery efforts. The investigation team, in consultation with government authorities, including the Department of Justice (DOJ), should be responsible for recovering any funds as a result of court orders or negotiated settlements with organizations or persons found to have been involved in fraudulent or corrupt conduct. The investigation team should refer likely instances of fraud and corruption to the DOJ for further investigation or potential criminal prosecution. Prosecutions are important in deterring future instances of fraud and in educating the public generally about the seriousness of fraud.

Fraud investigation and response are key elements of the overall fraud control framework and provide reasonable assurance that fraudulent acts are identified, and appropriate remedies are consistently applied. The reporting of fraud control outcomes can provide a deterrent effect which will assist in minimising the impact of fraud on CSSP operations. The CSSP should adopt

fraud control protocols that are subject to regular monitoring and revision, to ensure fraud controls are implemented effectively and achieving their intended outcomes.

# II.   PRELIMINARY ERROR AND FRAUD RISK ASSESSMENT FOR CSSP BEL CLAIMS

An effective error and fraud prevention and detection program begins with a strong internal fraud risk assessment process.  When implemented properly, an error and fraud risk assessment will enable the CSSP to better understand and identify risk factors that are specific to the CSSP and BEL claims.  The knowledge gained by the CSSP in undertaking an error and fraud risk assessment should be utilized to evaluate existing processes and procedures and identify ways in which errors and fraud could occur within the BEL claims process.  The fraud risk assessment process should be conducted on a regular basis and provide the CSSP with insight as to how to strengthen its overall antifraud program through evaluation of the effectiveness of existing internal controls.

The following items represent risks of undetected errors and fraud occurring based on observations from BP's participation in the claims process as an external party.  In addition, the CSSP must engage in a comprehensive internal fraud risk assessment process to ensure that material risks have been identified and appropriate controls have been implemented.

## A.   Financial Statement Fraud

Financial statement fraud is the deliberate misrepresentation of the financial condition of an enterprise through the intentional misstatement or omission of amounts or disclosures in the financial statements to deceive financial statement users.[1]  Financial statement fraud can be as simple as double counting inventory or as complex as fabricating entire transactions, customers, or business operations.  Financial statement fraud typically begins with manipulating the timing of transactions.  It is common accounting practice to recognize revenue when it is earned (regardless of when cash is exchanged) and to recognize expenses when obligations occur.  Known as accrual accounting, this provides a good picture of the results of operations for a period by matching revenues earned with the expenses incurred to generate those revenues.  By intentionally manipulating the recorded timing of transactions, a company misrepresents its financial position or its results of operations.  Abnormal patterns may be an indication that improperly timed transactions have been recorded, for example, quarter-to-quarter revenue figures that do not appear consistent with economic events or industry averages.

Revenue is the most commonly relied-upon metric in evaluating a company's financial position, and therefore tends to be the most susceptible to manipulation.  Improper revenue recognition, either prematurely or fictitiously, is the most common form of financial statement fraud.  Another common area for financial statement fraud concerns expenses.  The simplest way to use expenses to manipulate profits is by understating or omitting expenses, specifically during

---

[1] *See, e.g.,* Association of Certified Fraud Examiners, Fraud Examiners Manual, §1.303, (2010).

the benchmark periods.  Deferring expenses has the same effect on profits as overstating revenues.  A common indicator that a company has concealed or deferred expenses is recurring negative cash flows from operations or an inability to generate cash flows from operations while reporting earnings.

## B.    CSSP Risk Factors

CSSP's attitudes and actions toward BEL claims, including disputes over application of accounting treatments (*e.g.*, whether accounting principles have been misapplied, important financial information not disclosed or records manipulated or falsified), are themselves a significant risk factor.

One of CSSP's apparent primary financial statement fraud deterrence/detection procedures appears to have been the reconciliation of book financial statements to tax returns. This has been insufficient and ineffective.  The difference in net income between monthly financial statements and tax returns is simply assessed as a percentage of revenue, often with no meaningful inquiry into differences evidenced.  Material differences between the monthly book financials and the tax returns have not been investigated by a professional accountant with sufficient training to understand the differences.

Claimants often provide insufficient explanations when inquiries related to sales differences are made.  For example, claimants often provide one-line "reconciliations" with the reconciling item described as "accrual to cash adjustments".  Variances identified in the data may not be further reviewed by a professional accountant with sufficient training to investigate and additional documentation is not requested as support.  Little to no verification of source documentation is performed in any meaningful fashion which would uncover or deter fraud, which is a reflection of CSSP's attitude toward data processing, accounting functions, and concern about the reliability of financial reporting.

Individuals hired specifically to perform claims review by PWC and Postlethwaite may not have received the same training as employees hired in the ordinary course of business.

Individuals hired specifically to perform claims review may not have gone through the same rigorous background checks, particularly with regards to prior actions or activities considered to be unacceptable to CSSP, as employees hired in the ordinary course of business.

Individuals hired specifically to perform claims review may not possess required technical competence or professional qualifications relative to the size of the CSSP, nature and complexity of activities and systems.

There is a lack of formal job descriptions or other means of defining tasks and responsibilities that comprise particular jobs.  Individuals may not be aware of their responsibilities and expectations of them.

## C.     Potential Claims Process Fraud Scenarios

Reviewer states that the book to tax reconciliation was performed when, in fact, it was not and, as a result, CSSP has paid for work that was never performed.  Based on the manner in which the reconciliation is performed and documented, a supervisor has no means to identify whether the work was performed, adequate inquiries were made and/or what, if any, responses were received.

Reviewer colludes with claimant to inflate a claim and mask the fraud by either not performing the limited "reconciliation" procedures or not investigating differences.

Reviewer inappropriately relies on claimant's consolidated financial statements, despite evidence indicating that the claimants maintain and operate out-of-zone facilities.  Thus, in certain instances claimants' financial statements have included operations throughout the United States, without excluding revenues generated from facilities located outside the compensable zones.

Reviewer incorrectly designates the compensable zones (*i.e.*, used Zone A location rather than relying on the claimant's headquarters in Zone D) and applies the incorrect RTP to increase the claim award.

Reviewer incorrectly and inconsistently includes expense reimbursements and non-recurring, non-operational income as revenue during the benchmark periods.

Reviewer incorrectly relies on multiple and inconsistent sets of P&Ls submitted by the claimant, all of which are inconsistent with the tax returns.  Without explanation, the reviewer uses the amounts listed in the set of P&Ls submitted by the claimant without resolving the discrepancies.

Claimant utilizes the book to tax reconciliation to mask an underlying financial statement fraud by submitting a spreadsheet reconciliation between accrual basis monthly financial statements and cash basis tax return with no source document such as bank statements to verify adjustments.

Claimant changes an expense account name from one falling into a variable category to one falling into a fixed category in the benchmark period, thereby overstating benchmark variable profit.

Claimant changes an expense account name from a fixed category to one falling into a variable category in the compensation period, thereby understating compensation period variable profit.

Claimant understates revenue by reclassifying the revenue as a loan in the compensation period, thereby understating compensation period variable profit.

Claimant submits fixed and variable costs in the benchmark period at a summary level categorized as fixed, thereby overstating benchmark variable profit.

Claimant submits fixed and variable costs in the compensation period at a summary level categorized as variable, thereby understating compensation period variable profit.

Claimant incorrectly and inappropriately breaks fixed expenses between fixed and variable during the compensation period, thereby reducing variable profit in the compensation period.

Claimant moves revenue out of compensation months in the Compensation Period into non-compensation months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant moves expenses into compensation months from non-compensation months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant moves revenue into benchmark months in the Benchmark Period from non-benchmark months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant moves expenses out of benchmark months from non-benchmark months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant submits a claim on the cash basis when books are kept on the accrual basis.

Sub-ledgers which differ from and are not reconciled to the general ledger or financial statements are never reconciled with the monthly financial statements.

Claimant submits unsigned tax returns and/or fails to provide periodic financial statements routinely prepared in the normal course of the claimant's business.

## D.      All Industry Error And Fraud

Illegitimate or false sales transactions have been recorded to overstate revenues during the benchmark periods.  For example, a claimant can create a fake customer, or use a legitimate customer and falsify invoices, without actually processing the invoices for product or service delivery.

Revenue recognition is delayed, specifically during the Compensation Period.  In such cases, a company may close the books early or not record current-period sales until the next period.

Expenses are understated or excluded during the Benchmark Periods by not paying or delaying the payment of invoices to future periods.

Fixed costs are categorized purely based on the description of the costs without considering the nature of the expenditure and substance of the transactions.

Due to the ambiguity of expenses incurred by certain industries claimant can change an expense from falling into a variable category to one falling into a fixed category, or vice versa, thereby impacting the Benchmark and Compensation Period variable profit.      Such

reclassifications that are made as a result of the claims submission process and not reflected in the contemporaneous records are indicia of potential errors or fraud.

Significant decrease in revenue results from discontinuation of business units / operations prior to or during the compensation period, but claimant falsely attributes the loss in revenue to the oil-spill.

Significant undisclosed related party (*i.e.*, controlled entity) transactions are executed to improperly inflate earnings by masking their economic substance or distorting reporting results.

Accounting estimates (approximations of financial statement elements, item or account) are manipulated.  Estimates are included in financial reports when particular amounts are uncertain as they are dependent upon the outcome of a future event or upon information related to events that have not yet occurred or cannot be gathered.  Common examples include obsolete inventory, warranty claims, and percentage of completion.  Claimant could take advantage of the uncertainties to create favorable financial results.

The financial data uses inconsistent accounting methods between the Benchmark Period and Compensation Period to achieve favorable financial results for the claimants.

Cumulative adjustments at year end to commissions that were earned throughout the year are recorded when made and are not tied to the months in which the commissions were earned, causing commissions to be overstated in the monthly financial statements throughout the year. Similarly, compensation expense is recorded in the period in which it is paid, not when it is earned.

Corrections of revenue from prior periods are recorded when the correction is made rather than matched with the period in which the revenue was earned, resulting in misstated records for two months.

Bad debt expense is recorded in the income statement when the accounts are written-off or deemed uncollectable, rather than when the related revenue was recorded.  Warranty expense is recorded in the income statement when warranty claims are received, rather than when the work was performed.

Sales tax is recorded in the income statement when sales tax is remitted, not when it was collected (*i.e.*, when the sale is made).  Similarly, payroll tax is recorded in the income statement when payroll tax is remitted, not when the corresponding payroll is earned.

Inventory cycle counts which differ from the monthly financial statements are not reconciled to the general ledger or financial statements.

Payroll tax payable is reconciled and corrections are made to payroll tax expense in the last segment of the period which leaves the Compensation and/or Benchmark Periods uncorrected.

Cash basis claimants' bank reconciliation does not agree to cash basis financial statements.

Deposits are recorded as revenue in the Benchmark Period thereby overstating Benchmark revenue.

## E.    Agriculture Error And Fraud

Agriculture claimant manipulates the timing of the revenue recognition.  For example, a rice farmer may record harvest revenue in different months between the Benchmark and Compensation Periods, which can result in fictional losses in the Compensation Period (*i.e.*, records the bulk of 2009 revenue in November and records the bulk of the 2010 revenue in December).

Agriculture claimant stores certain crop harvests and does not sell or receive payment for these harvests until months later, potentially in the following calendar year.  The claimant stores the harvests on site or at a third-party warehouse.  In this scenario, it appears that claimant has zero revenues in the months the harvests are stored on-site and incurs storage costs, resulting in fictional losses in the Compensation Period.

## F.    Construction Error And Fraud

The percentage of completion is based on the claimant's estimates.  Accounting estimates, in nature, are subjective and vulnerable to manipulation because uncertainties exist in the underlying assumptions, and construction claimants could take advantage of the uncertainties.  Construction claimants may artificially overstate revenue by increasing the costs incurred toward completion, underestimating the costs of completion or overestimating the percentage completed.

Construction claimant incorrectly and inappropriately adjusts percentage of completion accounting during the year in a way that cannot be substantiated to achieve favorable results.

Estimated contract revenue is overstated, *e.g.*, incentives which are unlikely to be achieved are included in estimated contract revenues, thereby overstating revenue and profit.

Construction claimant incorrectly and inappropriately treats unapproved change orders as earned revenue even though there is no basis to determine if the change order will be approved. The contract value is not allowed to increase until the change order is actually approved by the customer.  Furthermore, billings on unapproved change orders will result in unearned revenue.

Assets are typically held on the balance sheet until consumed, at which time they are transferred to the income statement as expenses.  When assets or costs are held on the balance sheet, they are known as capitalized costs.  When an expense is not moved to the income statement but is held in the balance sheet, it gives the appearance of stronger profits. Construction claimant expenses the cost of equipment when purchased rather than capitalizing it and subsequently allocating the expense to jobs according to its use.  Consequently, revenue

recognition is accelerated into non-compensation months and compensation month revenue is reduced.

Materials purchased by claimant in one period but put in place in a later period are expensed in the income statement in the period purchased rather than capitalized and expensed when put in place. Consequently, revenue recognition is accelerated into non-compensation months and compensation month revenue is reduced.

Construction claimant incurring certain operating costs that should have been recorded as current-period expenses holds them in capital accounts on the balance sheet, thereby deferring recognition of current-period expenses during the Benchmark Periods to future periods.

Construction claimant shift costs from an unprofitable job in the Compensation Period to a profitable job with completion falling outside the Compensation Period.

Liabilities are not recorded, *e.g.*, payables, project claims against the contractor, backcharges/warranty expense, contract penalties. Understating liabilities mirrors overstating income in that both artificially inflate earnings and/or the company's financial performance.

## G.  Manufacturing Error And Fraud

Long-term manufacturing claimant shifts costs from an unprofitable job in the Compensation Period to a profitable job with completion falling outside the Compensation Period.

Manufacturing claimant overstates revenues by manipulating consignment sales, which are sales contingent upon a third party that has a right to return the purchased merchandise. For example, a manufacturer may sell a product to a retailer who can return the product if it is unable to sell it. Revenue for the manufacturer typically is recognized when the item is ultimately sold by the retailer. These types of selling arrangements are legitimate, but are vulnerable to abuse since such arrangements are susceptible to undisclosed sales conditions. In this case, the manufacturer and retailer could negotiate the consignment sales with a side agreement that goes undocumented so that all deliveries to the retailer could be considered sales, but because of the undisclosed side agreement, the retailer can return any unsold items. This would disallow the manufacturer from recognizing revenue.

Manufacturing claimant enters into arrangements whereby a third party would display the claimant's products without actually purchasing them. Under this arrangement, the claimant ships products to dealers without releasing title and providing for no financial obligation unless the products are sold within 90 days. If the products were not sold, the dealers could return the products. However, as soon as the agreement was entered, the manufacturing claimant recognized revenue before the products were manufactured, shipped or sold.

Manufacturing claimant inflates revenues by recognizing 100 percent of the revenues on partial incomplete shipment of goods to customers or products that were not fully assembled or functional.

### H.      Professional Services Error And Fraud

Professional services firm often charges clients for external disbursements.  These costs are passed through to the client and do not constitute true expenses for the purposes of calculating variable profit.   The timing of disbursements may also differ from timing of repayment of the expenses by the client, affecting compensation calculation.

Professional services firm inappropriately classifies owner's compensation throughout the year as variable expense and then reclassifies it as fixed expense at year end, thereby understating variable profit throughout the year and artificially depressing the firm's performance.

Professional services firm (particularly law firms) records revenue from a contingent fee matter all in one month, when the matter has ended, rather than tying such revenue to the associated expenses incurred throughout the matter.

Professional services firm does not recognize certain types of fees (*e.g.*, contingent-fee matters, bankruptcy holdbacks, success fees) in the period the revenue is earned, instead delaying the recognition of revenue until the time payment is received.  This improper recognition of revenue impacts the proper calculation of Benchmark or Compensation Period Variable Profit.

Professional services firm claimant submits records recording revenue from services performed over a span of several months in one month, when the work has ended and payment has been received, rather than tying such revenue to the associated expenses incurred throughout the work period.

Professional services firm pays bonuses at year end to employees.  These bonuses are based on hours worked by the employees throughout the year, but the firm only records the expense in the month when the bonuses are paid, overstating expenses in one month and giving the appearance of low variable profit for that month and overinflated variable profit for the other months of the year.

### I.      Real Estate Error And Fraud

The principal source of revenue for real estate agents is commissions.  In some cases, real estate agents spend multiple months to complete the sale and commissions are paid upon sale of the property.   The agent incorrectly recognizes and records revenue in the period in which commission is received, not when it is earned.  In doing so, the agent recognizes no revenue in the periods prior to closing the sale, potentially resulting in fictional losses in the Compensation Period or inflated revenues in the Benchmark Period.

### J.      Retail Error And Fraud

A "bill-and-hold" transaction occurs where a company negotiates the sale of inventory but holds it at the company's facility or ships them to a different location such as a third party warehouse for storage until the customer is ready to accept shipment.  Revenue is typically

recognized once the risk of ownership is transferred to the buyer or upon shipment of goods. Under bill-and-hold transactions, a retailer can prematurely record revenues from invoiced purchases that would not be delivered until a future date.  In this case, sales made on bill-and-hold terms are included in revenue in a Benchmark Period when they should be recorded in a later period thereby overstating benchmark revenue.

Retailers delay the write-down of obsolete or slow-moving inventory, since a write-down would require a charge against earnings.  Retailer records obsolete or damaged inventory expense outside of a Benchmark Period at the time inventory is written-off, but the expense should have been recorded in a Benchmark Period when the inventory value was determined to be impaired due to reasons of obsolescence or damage.  Consequently, benchmark expense is understated and benchmark variable profit is overstated.

Retailers include vendor allowances in revenue when payment is received, not when the allowance is actually earned, thereby improperly shifting revenue recognition from a Benchmark Period to a later period outside of a benchmark.  Retailers receive allowances through a variety of different methods such as markdown allowances, advertising contributions, volume rebates, promotional discounts, and stocking and display allowances.  Allowances are earned over time when the specific activity associated with the allowance is performed, regardless of timing of receipts which can overlap across financial reporting periods.

Retailers issue coupons and rebates to promote customer sales.  Retailer improperly records coupons and rebates redeemed by customers as advertising expense, an expense line item accounted for below the variable profit line.  Coupons and rebates expense should be recorded in the financial statements as a direct reduction from top line revenue and recognized as an expense at the time of the sales transaction.  Recording coupons and rebates as advertising expense results in understating top line expenses and overstating variable profit.

## K.      Wholesale/Distribution Error And Fraud

Wholesale/Distribution claimant engages in pre-arranged sales transactions, often of the same product, to create an appearance of legitimate business activity and revenue.  For example, the company sells goods to another company with an undisclosed agreement to buy back the goods at a future time.  In essence, the transaction is without economic substance.

Wholesale/Distribution claimant pushes, often through its sales department, more products through its distribution channel than its customers have ordered or can sell during that period or in a reasonable time thereafter.  This behavior is conducted under the assumption that the customers will accept the goods in exchange for some future undisclosed benefit.  In some cases, there may be some collusion between the company selling the goods and the company purchasing the goods.

Wholesale/Distribution claimant fraudulently overstates inventory thereby understating expenses.  The claimant double counts the physical counts of the inventory on hand, or includes scrap, obsolete, damaged or even sold goods that are not yet shipped.

## L.       Healthcare Error And Fraud

Complex sales arrangement/contract typically provide opportunities for manipulating revenue.  The complexity of contracts between patients, employers who provide employment based health plans, insurance companies, health care providers and medical facilities present challenges in revenue recognition, thereby creating ample mechanisms to inflate or misrepresent revenues.   The most common methods healthcare providers use to falsely inflate revenues include: submitting claim forms to government healthcare plans and / or insurance companies for services and care that were not rendered; billing for non-covered services as a covered services; misrepresenting dates of service; misrepresenting the locations of services; misrepresenting the provider of service; waiving of deductibles and/or co-payments and then submitting another false claims to make up the dollar difference; billing and reporting false diagnoses or procedures performed; billing for services that are truly unnecessary; and issuing false or unnecessary prescription drugs.

Due to complexity of reimbursement arrangements and delays in reimbursement by insurers, there may be significant delays between the time services are rendered and cash is collected and thus revenues are incorrectly attributed to the months in which the service was provide and the efforts expended.

## M.       Bar & Restaurant And Other Food Service Error And Fraud

Bar and restaurant claimant shuts down one its restaurant locations prior to or during the compensation period, resulting in a significant decrease in revenue during 2010.  Nonetheless, claimant inappropriately attributes the reduction in revenue to the oil-spill in determining the variable profit in the compensation period, and fails to disclose such critical change in its business operations.

Bar and restaurant claimant's classification of fixed costs is based purely on the description of the costs without considering the fluctuating nature of the expenditure and the expenses unique to its industry.  For example, supplies such as straws, napkins, disposable utensils, cups and food containers are variable costs.  These expenses directly relate to the sales of restaurants, bars or other food service establishments.  Due to the ambiguity of certain expenses incurred in the bar and restaurant industry, claimant can reclassify an expense from a variable category to a fixed category, or vice versa, thereby misrepresenting the Benchmark and Compensation Period variable profit.

## N.       Tourism And Hospitality Error And Fraud

Tourism and hospitality claimant's classification of fixed costs is based purely on the description of the costs without considering the fluctuating nature of the expenditure.  For example, a hotel claimant incorrectly assigns housekeeping and laundry supplies and contract cleaning as fixed expense, thereby increasing the variable profit during the benchmark periods. Such supplies are considered variable as these expenses directly relate to occupancy level, which is the single most important revenue driver and source of revenue for hotel/lodging units.  Due to the ambiguity of certain expenses incurred in the lodging industry (*i.e.*, housekeeping and

laundry supplies, etc.), claimant can reclassify an expense from a variable category to a fixed category, or vice versa, thereby misrepresenting the Benchmark and Compensation Period variable profit.

Tourism and hospitality claimants typically accept reservations, often requiring a deposit (refundable) in advance from customers. As this refundable deposit has not yet been earned, the deposit should not be recognized as revenue until it is earned (*i.e.*, when the event has occurred). However, claimants in the tourism and hospitality industry record the deposits as revenues upon receipt of payment without recognizing the corresponding expenses during the Benchmark Period, thereby overstating the variable profit.

Tourism and hospitality claimants often have operations that span countries. The claimant includes operations throughout the country without excluding revenues generated from facilities located outside the compensable zones.

## O.    Transportation & Warehousing Error And Fraud

Transportation and warehousing claimant's classification of fixed costs is based purely on the description of the costs without considering the fluctuating nature of the expenditure and the expenses unique to its industry. For example, transportation and warehousing typically incur insurance costs specific to the goods in transit or stored in a warehouse. Such insurance costs are variable as these expenses increase as more goods are stored at the warehouse and transported to the customers. Due to the ambiguity of certain expenses incurred in the transportation and warehousing industry (*i.e.*, supplies, insurance, licenses, etc.), claimant changes an expense from falling into a variable category to one falling into a fixed category, or vice versa, thereby misrepresenting the Benchmark and Compensation Period variable profit.

Revenue from transportation services can be recognized based on the proportional performance method, which requires an estimate of the percentage complete when delivery is at the period end, factoring in transportation times and any specific costs of packaging, loading and unloading. Similar to the percentage-of-completion method used in the construction industry, proportional performance method is based on the claimant's estimates, which involves subjective judgments or uncertainties that can be difficult to corroborate which increase the likelihood of misstating or manipulating revenue.

The complexity of pricing in the transportation industry presents challenges in revenue recognition. The processes for pricing, contracting and billing freight movements can be complex due to a number of factors, including: high variability of prices in fuel surcharge; wide range of load types and volumes; range of different customers; variable duration, routes and distances; customer changes to original requirements before or during shipments; and shipments where the operator has to sub-contract with another operator to complete the delivery due to their own capacity or route constraints. As such, open bills can be amended a number of times prior to the finalization of the account with the customer. An estimate is made to adjust revenue for the expected final amount of open billings at the period end. Such an estimate involves subjective judgments or uncertainties that can be difficult to corroborate which increase the likelihood of misstating or manipulating revenue.

# III.   ERROR AND FRAUD DETECTION, MITIGATION, AND REMEDIATION PROCEDURES AND POLICIES

## A.   Internal Control Environment

The control environment is the foundation for all other components of internal control, providing discipline and structure for the "tone at the top." Control environment factors include the integrity, ethical values and competence of an organization's employees, management's philosophy and operating style, the way management assigns authority and responsibility and organizes and develops its people and the attention and direction provided by its governance body.[2]

The CSSP is expected to promote an internal control culture of integrity and ethical behavior through a process of:

- example setting by management for CSSP Claims Administration and CSSP Claims Administration Vendors;

- regular communication of the importance of ethical behavior and the adherence to internal controls to all CSSP employees and Claims Administration Vendors; and

- adherence to internal controls as part of performance development.

## B.   Control Activities

Control activities are the policies and procedures that help ensure management directives are carried out. They help ensure that necessary actions are taken to address risks to achieve the organization's objectives. Control activities occur throughout the organization, at all levels and in all functions. They include a range of activities as diverse as approvals, authorizations, verifications, reconciliations, reviews of operating performance, security of assets and segregation of duties.[3]

## C.   Internal Controls

Internal control is defined as a process, affected by those charged with governance and management designed to provide reasonable assurance about the achievement of the organization's mission, goals, and objectives with regard to:

- effectiveness and efficiency of operations;

- reliability of financial reporting; and

- compliance with applicable laws and regulations.

---

[2] Committee of Sponsoring Organizations of the Treadway Commission (COSO)

[3] *Id.*

Internal controls are the result of management planning, organizing and directing. They are an integrated collection of systems and processes used by all personnel designed to provide reasonable assurance that the organization's objectives are met, including:

- assets are safeguarded;

- resources are used efficiently and economically;

- the organization complies with all policies, procedures, laws, regulations and contracts;

- information is reliable and accurate; and

- organizational goals and objectives are successfully accomplished.

Internal controls are often the first line of defense against fraud. The CSSP should ensure the maintenance of a strong internal control system and the promotion and monitoring of a robust internal control culture to detect and mitigate error, fraud and corruption through implementation of an internal control policy framework.

To effectively and efficiently accomplish these objectives, the CSSP must develop policies, programs, systems, and controls that will balance providing appropriate relief with mitigating the risks of fraud, waste and abuse associated with the claims process. Fraud is only one aspect of these efforts. To have confidence in the program, similar attention must be paid to accurate reporting of claims statuses, reducing duplication of benefits and minimizing error rates, overpayments or underpayments.

The following are suggested areas for proposed internal control procedures, policies and practices which should be considered when designing and developing controls aimed at reducing the risk of possible material errors and or irregularities occurring in the BEL claims determination process and going undetected.

*Claims Administration.* For BEL claims, CSSP management personnel with primary responsibilities for administration and supervision of the CSSP should be professionally qualified and technically competent. Such personnel should have adequate training and credentials to make the judgments needed in connection with BEL claims. To mitigate the risk that CSSP personnel will not be qualified or competent to effectively perform their required duties, there should be internal controls in place to ensure that a thorough check into the background and qualifications of prospective candidates is conducted prior to any hiring decision being made. In addition, internal control procedures should be in place to ensure that assessment of employee performance is conducted through regular, periodic job performance evaluations.

*Claims Verification.* Claimants must be able to satisfy class member eligibility requirements based on their geographic Spill Zone location and the causal nexus requirement of the Settlement Agreement and to satisfy the causation proof requirements in Exhibit 4B to the Settlement Agreement. To mitigate the risk that claims verification has not been properly checked by the claims reviewer prior to the claim being submitted for evaluation and review,

there should be internal control procedures in place to ensure that claim eligibility has been properly assessed and determined in accordance with the Settlement Agreement.

*Claims Documentation.* Claimants must submit all required information and necessary supporting documentation to the CSSP for the purpose of claims evaluation and processing. A non-exhaustive list of required information and documentation is provided in Exhibit 4A to the Settlement Agreement. To mitigate the risk that a claimant will submit incomplete information or insufficient documentation, and the deficiency is not identified or followed up by the CSSP claims reviewer, there should be internal control procedures to ensure the reviewer follows-up with the claimant for any missing documentation or key additional information required to properly evaluate the BEL claim.

*Claims Review*. Claims reviewers should receive adequate training on CSSP BEL claim policies and procedures and claims review methodology to be properly educated and familiar with the methodology for reviewing and evaluating individual claims. The processing of BEL claims can be affected by a variety of factors, such as completeness and quality of the information and documents submitted by the claimant, complexity of the claim, effectiveness of communications by the CSSP with the claimants, and revenue attribution and expense determination to the relevant periods of the Benchmark and Compensation periods. Strong internal controls procedures should be in place to ensure BEL claims are effective and rigorously reviewed by claims reviews for compliance.

BP is working to complete a spreadsheet containing proposed internal control procedures relative to the BEL claims which are aimed at error and fraud risk management and control, and will share it with the CSSP soon. BP strongly recommends that these controls be implemented to reduce the possible risk that material errors and irregularities occurring in the BEL claims determination process go undetected.

//

//

# EXHIBIT D

**BROWNGREER**

Direct Dial:  (804) 521-7218
Office:  (804) 521-7200
Facsimile:  (804) 521-7299
rpetkauskas@browngreer.com

February 19, 2014

**_By Email_**

Mr. David Welker
CEO
Deepwater Horizon Claims Center
Economic and Property Damage Claims
935 Gravier Street, Suite 1905
New Orleans, Louisianna  70119

Re:     **January 27, 2014 Letter from Mr. George Brown**

Dear Mr. Welker:

I am in receipt of a letter with an attachment regarding "Error and Risk Detection and Mitigation in the Deepwater Horizon Court Supervised Settlement Program" from George H. Brown, dated January 27, 2014.  You asked that BrownGreer review these materials and respond to you regarding controls already in place, measures taken to tighten controls, and/or any additional observations I may have regarding the content of either the letter or its attachment.   This letter provides the requested response.

BrownGreer is a firm experienced in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicle. BrownGreer provides services to Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("CSSP") established under the Program.  Among other services, BrownGreer created the process for the review of claims received by the Program, procured and trained staff needed to process the claims, and procured and trained the staff in the 18 Claimant Assistance Centers ("CAC") used in the Program.  As part of this process, BrownGreer assisted the Claims Administrator and the Parties with interpretation of the Settlement Agreement and, when faced with the implementation question, raised it with the Claims Administrator/Parties, leading to adoption of Policies that govern the process.  The BrownGreer DWH Operations Manual and Operations Manual Appendix provide a thorough review of all the processes and rules BrownGreer follows in performing claims review functions.

Mr. Brown identifies material errors and irregularities or frauds as risks faced by the CSSP and suggests that the Program should undertake measures to effectively prevent, detect, and respond to such risks.  From the outset, the Program has implemented a wide range of controls,

Mr. David Welker
February 19, 2014
Page 2

each of which is carefully designed to protect the integrity of the process.  We are continually calibrating existing controls to maximize their effectiveness while evaluating whether to implement new measures.  Consequently, our controls evolve over time as we add metrics in response to new developments and deactivate measures that we have determined are no longer necessary.  To address fully the issues raised in Mr. Brown's letter, we provide the attached response, which discusses controls and processes to combat external (claimant) fraud, followed with the error and fraud prevention measures specific to the evaluation of Business Economic Loss Claims. We conclude the response with an outline of BrownGreer's internal controls.

We welcome an opportunity to discuss any of the control measures with you and/or the Parties in more detail.

Sincerely,

*Roma Petkauskas*

Roma Petkauskas

Enclosures

---

**I. SPECIAL INVESTIGATIONS TEAM'S FRAUD DETECTION AND PREVENTION PROCESS**

---

      **1.** *Introduction.* Settlement programs become the target of varying degrees of attempted fraud. While the appropriate level and type of anti-fraud measures necessarily vary from program to program, every settlement program establishes as a core objective detecting and preventing fraud. BrownGreer implements tailored anti-fraud measures commensurate with those demanded by the circumstances of each case and with guidance from the Court, the Settlement Agreement, and law enforcement and other government agencies. Typically, no two programs are identical. We start with a baseline developed from our experience administering other programs, and we assess initially what to deploy in addition to that baseline. We then continually reassess those needs throughout the maturation of the program in consultation, when appropriate, with the parties, the Court, government agencies, and occasionally private third-party investigative services firms. The BrownGreer DWH Operations Manual provides a thorough review of the Special Investigations Team and its processes. *See* BrownGreer DWH Operations Manual and Operations Manual Appendix.

      **2.** *The Gulf Coast Claims Facility.* Before this Program's launch, BrownGreer assisted Kenneth Feinberg in developing and implementing the fraud detection and prevention program for the Gulf Coast Claims Facility ("GCCF"). The GCCF successfully used anti-fraud measures appropriate for the tenor and time of that program. Of particular note, Mr. Feinberg decided to refer all claimants identified by BrownGreer as suspect to Guidepost Solutions, LLC ("Guidepost"), an investigative services firm, for investigation and determination of the presence of fraud. In other words, BrownGreer's Audit Team identified potentially fraudulent claims, and Guidepost investigated those claims to confirm whether they were fraudulent.

      **3.** *Comparison of the GCCF to the Program.* Since the beginning of the Transition Process from the GCCF to the Program, the Claims Administrator's Office ("CAO") coordinated with BrownGreer's GCCF Audit Team to develop a more robust, efficient, and otherwise improved Fraud Detection Program, tailored to the requirements of the Deepwater Horizon Settlement Program ("the Program"). BrownGreer and the Program use the experience of the same key personnel who directed the GCCF's fraud detection efforts to leverage the institutional knowledge developed over the course of the GCCF program. To oversee and coordinate the process, the CAO engaged David Welker, a former Special Agent in charge of the FBI's New Orleans Division, to serve as the Claims Administrator's Fraud, Waste, and Abuse Director. Roma Petkauskas, a Partner at BrownGreer, a Certified Fraud Examiner, and the director of the GCCF's Audit Team, continued to head the BrownGreer SIT team. The CAO replaced Guidepost with HUB Enterprises, Inc. ("HUB") as the Program's outside investigative firm. BrownGreer set up the Special Investigation Team ("SIT") comprised of lawyers, accountants, Case Managers ("CM"s), analysts, and reviewers located primarily in Richmond, VA, offices, that are managed by members of the former GCCF Audit Team. In addition, Mr. Welker and Roma Petkauskas have been meeting regularly with representatives from the National Center for Disaster Fraud ("NCDF") to: (1) review and coordinate the Program's Fraud Detection and Prevention Processes; and (2) receive updates from the NCDF on the status of investigations. We met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. We discussed that bringing the expertise

from the GCCF experience, the SIT helped develop a process that has not only resulted in significant cost savings when compared with the GCCF, but also has improved upon the GCCF's process in several ways.

(a) **Fraud Detection.**  The GCCF developed and implemented effective processes to detect and prevent fraud, but the processes were necessarily limited because the claims resolution protocols included far fewer documentation requirements to prove losses, thereby limiting the amount and type of data available for analysis. In the Program, the Settlement Agreement requires extensive and specific documents for each Claim Type, and these documents must be present and sufficient before a claim may qualify for compensation under the Settlement Agreement.   Consequently, during the claims review process, we are able to track significantly more information in the Program.  The SIT leverages the Program's Claims database and has improved precision of database queries and trends analyses, thereby enhancing efficiency in detecting fraud.  These queries permit the SIT to analyze and detect fraudulent patterns from, for example, (1) profit and loss statements and sales tax variances for BEL claims, (2) correlations between business claimants and individual claimants claiming losses from working for those businesses, and (3) correlations of Seafood crew claimants to a claimed vessel.  The SIT's reviewers and CMs have access to various reports, including reports that identify claimants sharing the same IP filing address, physical address, and email that they review both to identify suspect claimant groups as well as to identify overlaps with any suspect claims.  The SIT automatically identifies claimants with overlapping addresses with claimants previously found fraudulent and identifies them for SIT review if the same or another claimant living at that address files a claim in the Program.  Such queries were cumbersome or not available under the GCCF because data fields and metrics to track the activity were not available for analysis.

The SIT further improved upon the processes in the GCCF by developing specialized education of the SIT's staff and conducting enhanced periodic training for all Claims Handlers.   With the more standardized and structured documents requirements, the Claims Handlers develop expertise in recognizing documents applicable to particular Claim Types and identify the claim for SIT review if documents appears suspect.  The SIT also updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 442 businesses, employers, notaries, and tax preparers, all of whose involvement or preparation of claims is suspect.  These improved measures result in higher ratios of suspect claims referred to the SIT that ultimately lead to a finding of fraud.  As an example of this awareness, the CACs alert the SIT about unusual claim activities in their communities, such as increased Subsistence claim filings in the Mobile area and the suspect patterns of Claims Preparation groups.  Claims Reviewers identify for fraud review claims where business' location, existence, or submitted financial documents are questionable.  With the improved precision of fraud detection queries and improved Claim Handler referrals, the Program has reviewed, proportionally to overall claim filing, more claims for potential fraud than during the GCCF.

**(b) Multi-Claimant Pattern Management.**  Bringing the experience and knowledge from the GCCF, the SIT also programmatically identifies claims filed in the Program that were found to be potentially fraudulent in the GCCF as well as participants of any of the approximately 780 multi-claimant patterns we detected in the GCCF.  The SIT CMs actively monitor the multi-claimant patterns identified in the GCCF and have detected the same or new claimants establishing Claimant IDs from over 340 known GCCF multi-claimant activities.  For example, a SIT CM determined that a ringleader of a GCCF pattern the SIT identified on February 4, 2011 and who was known to assist claimants in filing economic loss claims with documents from non-existing businesses had started assisting claimants in filing Subsistence claims in the Program.

In addition to monitoring actively the resurgence of re-filings from the fraud detected in the GCCF, the SIT CMs also identify and develop approximately seven new potentially fraudulent multi-claimant patterns weekly, with a total of over 650 patterns having been detected, of which 286 are newly identified patterns in the Program, consisting of over 10,500 potential participants.  The SIT CMs routinely develop reports based on the unique characteristics of the multi-claimant pattern as they monitor its progression.  Frequently, the SIT CMs design reports to define the characteristics of the pattern and refine the reports as the pattern evolves.  Since the inception of the Program, the SIT CMs have run over 6,100 specially designed pattern reports to develop new patterns or find additional participants in the existing patterns.

**(c) Investigative Steps.**  The Program realized, and explained to BP in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013, that the GCCF incurred significant costs from its requirement that every potentially fraudulent claim be referred to Guidepost for a full external investigation.  Without compromising effectiveness, the SIT helped the Claims Administrator implement "in-house" investigative processes to review suspect claims to make findings of fraud at a substantially reduced cost and in less time when compared with the processes of the GCCF.  The SIT established direct access services with the IRS to verify tax and other financial documents, developed standardized authorization forms to obtain information from other third party sources, increased efforts in contacting employers and other witnesses, and retained a forensic accountant.  Over 8,300 claimants have been the subject of these "in-house" investigations, and the Program has handled approximately two-fifths of all fraud findings internally, which has significantly reduced the cost to the Program.  Even so, the in-house team has still referred close to 3,300 claimants to HUB for a full investigation in instances where an on-site interview, inspection, or search of public records are the most efficient and reliable methods of investigation.  These adjustments have resulted in a more effective and efficient fraud detection process.

The table below demonstrates effectiveness of the Program's fraud detection and findings, when compared to the GCCF:

| TABLE 1 | Comparison of DWH and GCCF Fraud Review Statistics | | | | |
|---|---|---|---|---|---|
| | **All Claimants** | **GCCF** | | **DWH**[1] | |
| | | **582,283** | **%** | **181,250** | **%** |
| **1.** | Fraud: Referred to DOJ | 4,083 | 0.70% | 1,142 | 0.63% |
| **2.** | Potential Fraud: No Referral to DOJ | 449 | 0.08% | 647 | 0.36% |
| **3.** | **Subtotal with Finding of Fraud** | **4,532**[2] | **0.78%** | **1,789** | **0.99%** |
| **4.** | Initial Review/Further Investigation Steps | N/A | N/A | 16,341 | 9.02% |
| **5.** | **Subtotal of All Claimants under Fraud Review + With a Finding of Fraud** | **4,532** | **0.78%** | **18,130** | **10.00%** |
| **6.** | SIT Reviewed - No Indication of Fraud | 36,438 | 6.26% | 5,154 | 2.84% |
| **7.** | HUB/Guidepost - No Indication of Fraud | 7,948 | 1.36% | 75 | 0.04% |
| **8.** | **Subtotal with Finding of No Indication of Fraud** | **44,386** | **7.62%** | **5,229** | **2.88%** |
| **9.** | **Claimant Address Overlaps with Claimant in Initial Review** | **N/A** | **N/A** | **15,200** | **8.39%** |
| **10.** | **Claimant on a Watch List - Claimant ID Established**[3] | **N/A** | **N/A** | **521** | **0.29%** |
| **11.** | **Claimant on SIT Hold -- Claimant ID Established But No Registration and/or Claim Form Filed To Date** | **N/A** | **N/A** | **2,740** | **1.51%** |
| **12.** | **DOJ Stand Downs/Active Investigation** | **2,670** | **0.46%** | **1,224** | **0.68%** |
| **13.** | **All Claimants Reviewed/To Be Reviewed for Potential Fraud** | **51,558** | **8.85%** | **43,044**[4] | **23.75%** |

---

[1] The Transition Program denied 2,999 for potential fraud indicators and retracted 967 investigations for BrownGreer's re-review and in-house investigations.

[2] These claimants were paid a total of $27,425,460 prior to being identified for fraud review.

[3] There are additional 121 tips that the SIT monitors where the claimant has not yet established a claimant ID.

[4] The Program continues to identify on average 75 claimants for SIT review every day.

**4.** *Tax Identification Number ("TIN") Verification and Duplicate Claimant/Claim Analysis*:

**(a) Tax Identification Number ("TIN") Verification.** The first and fundamental step in the SIT's processes is verifying each claimant's tax identification number. Although the Program will review the claimant's claim, the Program will not pay a claimant until the SIT has verified that the claimant's tax identification number is valid and belongs to the claimant. The Settlement Program asks every claimant to provide a Social Security number ("SSN"), Individual Taxpayer Identification Number ("ITIN"), or Employer Identification Number ("EIN") on the Registration Form. The SIT uses that number as a unique identifier to keep claimants separate in the Program. When the Program receives a Registration Form, the SIT verifies the accuracy of the SSN, ITIN, or EIN provided by the claimant, to make sure we have the right number and that the number exists and does not belong to anyone else. We perform this verification step for several reasons:

(1) The SSN, ITIN or EIN is the only way to give each claimant a unique identifier, which is necessary for tracking, processing and payment purposes.

(2) It enables the Program to link a Deepwater Horizon claimant to a previous GCCF claim, copy existing documents to the new claim and account for any previous offers or payments.

(3) Further, the Program needs accurate and genuine taxpayer numbers to prevent issuing payments to fictitious taxpayers or paying the same claim more than once.

In addition to verifying a TIN for the claimant, beginning on January 6, 2014, when a claimant submits a Subsistence claim stating that he or she provided food for family members from his or her seafood catch, the TIN Verification Team verifies the identities of the claimed family members.

The SIT verifies the claimant's Tax Payer Identification number by following these steps:

**(1) SSN Verification:** Specially trained SIT reviewers access a custom built database module that permits the SIT to identify and submit the claimant's SSN and name to be verified and matched through independent third party sources. If the SIT cannot verify the SSN or if the SSN and name cannot be matched to the claimant through these queries, SIT reviewers analyze the files and correct typographical errors in the name and/or number. If the SIT cannot confirm that the claimant's name and SSN match the independent sources, the SIT issues a Notice to the claimant, asking the claimant to identify potential typographical errors in the SSN number and/or name, as well as to identify any name changes. The claimant is

also given an option to verify the SSN with the Social Security Administration's ("SSA") Consent Based Social Security Verification Program by submitting a properly executed authorization.  If the claimant does not respond to the Notice or if the documents the claimant submits are not sufficient to verify the claimant's SSN, the SIT issues a Follow-Up Notice explaining the next steps to complete the verification.

(2) **EIN Verification:** Specially trained SIT reviewers access a custom built database module that allows the SIT to confirm that the claimant's EIN and the business name can be verified and matched through various independent third party sources.  If the SIT cannot verify the EIN or if the EIN and the business name cannot be matched to the claimant, and if there are no apparent typographical errors in the name and/or number, the SIT issues a Notice to the claimant, asking the claimant to identify potential typographical errors in the EIN number and/or the business name, as well as to identify changes to the business's name.  The Notice also explains the documents that the claimant can submit to help verify the EIN.  If the claimant does not respond to the Notice or if the documents the claimant submits are not sufficient to verify the claimant's EIN, the SIT issues a Follow-Up Notice explaining the next steps to complete the verification.

*Reviews and Results:* To date, the Claimant Identity Team has initiated verifications for 181,250 claimants. Of those, it matched the Taxpayer Identity Number (TIN) and the claimant's name to public records databases and verified identity for 96,669 (53%) claimants from the initial query through LexisNexis and/or Dun & Bradstreet. We have or are in the process of reviewing the remaining 84,581 (47%) claimants to determine if we can verify identity after searching for typographical errors and name changes or with official documentation from the Internal Revenue Service or Social Security Administration. Of the 84,581 claimants whose information did not match the public sources from the first data run, the Identity Team was able to verify 79,058 (44%), leaving 5,523 claimants still in play (3%) without identity verification.

Similarly, to date, the Identity Team has sent 43,511 Subsistence Claimant Family Members' names and TINs from 18,245 claims to LexisNexis for verification.  If LexisNexis does not verify a Family Member's identity, the Identity Team reviews the claim file to determine if it can verify the Family Member's identity.  To date, 28,577 of those Family Members from 6,953 claims have required further review.

(b) **Duplicate Claimant Reviews.**  The Duplicate Claimant Team, working closely with the Identity Verification Team, has developed a process to detect and prevent duplicate claimant identification numbers (claimant IDs) in the Program. Duplicate claimant IDs occur when a claimant establishes more than one claimant ID using the same TIN. We attempt to prevent duplicates by: (1)

not allowing law firms to establish a claimant ID if the TIN overlaps with an existing claimant; and (2) providing a prompt for *Pro Se* Portal users informing them they have entered a TIN already submitted by a previous claimant and asking to verify they have entered the TIN correctly. Despite our front-end efforts, duplicate claimant IDs still enter the Program if a user mistypes the TIN, the typo that is later detected and corrected by the Identity Verification Team, or if a *Pro Se* Portal user clicks through the prompts and continues to establish a duplicate claimant ID. The Duplicate Claimant Team identifies the duplicate claimant IDs, analyzes the documents and claims filed and selected the Claimant ID that will remain active. The Duplicate Claimant Team then programmatically marks the remaining duplicate(s) inactive and transfers any information, including separate claim types, associated with the duplicate claimant ID(s) to the active claimant ID. The result is that only one claimant ID associated with each TIN remains active.

*Reviews and Results:* In total, the Duplicate Claimant Team review efforts have resulted in the detection of 6,633 duplicate claimant IDs.  Of those, we identified 3,982 were duplicative and thus marked them inactive.

(c) **Duplicate Claim Reviews.** The Duplicate Claim Reviews are being performed for each claim type separately to determine whether the claim is proper or in fact should be closed as duplicate.  To date, the Program closed 3,399 claims as duplicate:

| TABLE 2 | Claims Found to be Duplicates and Closed (As of 2/10/14) | |
|---|---|---|
| Row | Claim Type | Claims |
| 1. | Business Economic Loss | 804 |
| 2. | Coastal Real Property | 709 |
| 3. | Failed Business Economic Loss | 112 |
| 4. | Individual Economic Loss | 461 |
| 5. | Individual Periodic Vendor or Festival Vendor Economic Loss | 10 |
| 6. | Real Property Sales | 50 |
| 7. | Seafood Compensation Program | 776 |
| 8. | Start-Up Business Economic Loss | 134 |
| 9. | Vessel Physical Damage | 59 |
| 10. | VoO Charter Payment | 84 |
| 11. | Wetlands Real Property | 200 |
| 12. | Grand Total | 3,399 |

**5.  *Sources of Claim Selection for SIT Review*.**  SIT reviewers analyze all claims that are identified for a SIT review.  Referrals to the SIT team come from a variety of sources:

(a) **Specific Claims Identified During Claim Intake and Review:**  The SIT has developed and periodically updates instructions and training materials for all Claims Handlers on certain problems or discrepancies that might indicate potential fraud, deception, or dishonesty.  Claims Handlers have the functionality to identify for SIT review any claim that might indicate a potential problem.  Alternatively, Claims Handlers can email the SIT by using a dedicated email box that is publicized in the trainings.  In general, the areas that the SIT highlights in trainings and asks the Claims Handlers to identify for SIT review include: (1) claims with suspicious or altered claim materials, including suspect tax returns; (2) claims where the claimant's date of birth, name, and/or TIN asserted on the Claim Form differ from the documents submitted in support of the claim; (3) claims that rely on suspect employment verification letters; and (4) claims involving non-arms-length transactions, such as claims where on the face of the documents it appears that there is a family or other personal relationship between the claimant and a person who authenticated or produced documents in support of the claim, and other sources cannot substantiate the information provided in those documents.  SIT also provides trainings and raises fraud awareness for specific tasks that Claims Handlers perform, such as processing hard copy documents, monitoring claim withdrawals, processing third party claims, updating the claimant address, which is only a a sample to indicate the various levels of task related fraud awareness that SIT continuously identifies and raises.  In addition, the SIT maintains and periodically updates and distributes to Claims Reviewers its BOLO lists of documents and entities that previous investigations and findings have determined to be suspect or fraudulent.  The Claims Reviewers identify for SIT review any claim that is supported by documentation appearing on that list.

(b) **Specific Claims Identified Through Database Queries:**  The SIT uses the Claims Database of all claimants to help spot and identify for SIT review specific claims that may be problematic.  The areas of focus and analysis include but are not limited to: (1) automated identification for SIT review of all claims filed by claimants that were found fraudulent in the GCCF; (2) detection of claimants with characteristics similar to claimants previously found fraudulent through address, and various other data matches; (3) automated identification for SIT review of all claimants with a date of death prior to the oil spill, indication that a claimant was a minor at the time of the spill, and any incarceration history, data indicators that SIT obtains for all claimants from third party sources.

(c) **Statistical Trends Analysis:**  The SIT analyzes data in the Claims Database to monitor and identify trends of potential fraud, deception, or dishonesty and identifies for SIT review claims from the suspect populations.  SIT currently

utilizes twenty-two reports that track various documents and information submitted by claimants to the Settlement Program to support their claims to monitor and analyze various trends that include but are not limited to: (1) analysis of claimants who appear to have reported the same income information in the same pay period as other claimants employed with the same company.  Reviewing claimants with such overlaps helps to identify claimants who have shared their income documents with other claimants to use in support of their own claims; (2) analysis of claimants that share the same or similar physical addresses, IP addresses, or email addresses to confirm that each claimant's documentation is unique and for a presence of a multi-claimant pattern; (3) analysis of outliers within the claimant populations that include, for example, correlations of employees to the businesses and Seafood crew to vessels; (4) analysis of trends in variance in income and revenue based on, for example, patterns in the profit & loss statements, sales and use taxes for business claimants with potentially manipulated income trends that could be used to pass causation tests, and patterns of an individual's earnings.

In addition, on November 19, 2013, SIT implemented nine additional programmatic metrics that relate specifically to Subsistence claims. These metrics automatically propose claimants for SIT review if they meet specific criteria. These metrics look for claimants that report non-indigenous species, apparently excessive catch amounts, claimants who report unusual equipment and species, non-Alabama residents who report fishing at Cedar Point Pier (a location where is fishing license is not required), and claimants who assert license exemptions for more than one state. SIT developed the criteria for these metrics in consultation with the CADA, David Welker, HUB, the Subsistence Team, and the Subsistence Field Visit Team. These metrics initially placed 2,428 claimants on hold for review by SIT.

(d) **Multi-Claimant Pattern Participants:**  The SIT classifies a pattern as a group of claims exhibiting indicia of fraud that are linked by common factors suggesting deliberate collusion or coordination.  Examples of patterns include: (1) the mass production and sale of falsified payroll documents; (2) the mass forging of employment verification letters; (3) routing payment for a large number of spurious claims to a single bank account; and (4) the systematic filing of documents for a series of similar fictitious businesses.  The SIT classifies patterns into two categories: general patterns and family/household fraud.  The SIT's dedicated group of CMs and reviewers manage already existing patterns and develop and detect new patterns.  CMs develop and analyze reports to define characteristics of a new potential pattern and refine criteria as they monitor the multi-claimant pattern development through analysis of overlapping or similar characteristics, including physical address, employer, type of documentation submitted, payment instructions, and any other assertions on the Claims Form(s) as claimants in any known multi-claimant patterns.  CMs run periodic reports based on the known characteristics and analyze trends for development of new characteristics to identify new participants in the existing patterns.

9

(e) **Alerts from the Department of Justice:**  The NCDF hotline (877-623-3423) receives calls from the public with alerts of potential fraud.  The Department of Justice provides to the Program a summary of the tips that it receives and to date has sent the Program over 876 individual tips.  The SIT reviews the tips and matches the information to claimants in the Program and identifies these claims for SIT review.  If the SIT review results in no indicia of fraud, the SIT releases the hold.  If the SIT determines indicia of fraud exist, it refers the claim to the Department of Justice for potential investigation.  The SIT produces claimant files to the NCDF for all tips that match a claimant in the Program or the GCCF databases.

(f) **Letters of Introduction and Stand Down Orders:**  The Department of Justice sends Letters of Introduction to inform the Program about claimants on which the Department of Justice has an ongoing investigation or has a strong interest in investigating.  The SIT reviews all the claimants identified based on these tips for indicia of fraud, deception, or dishonesty, but will stop any field investigative activity on claims if the Department of Justice issues a Stand Down Order requesting that the Program cease an investigation.

(g) **BP/Class Counsel:** If BP and/or Class Counsel believe that any indicia of deception, dishonesty, or fraud relating to any claim or to the Program exist in any way, BP or Class Counsel may refer such matter for SIT review.  On 7/15/13, BP launched a Gulf Claims Fraud hotline to receive calls from the public to report potential fraud, with a promise of a potential award to the reporter.  BP provides to the Program a summary of the information that it receives.  The SIT reviews the tips and matches the information to claimants in the Program and identifies these claims for SIT review.  Since the launch of the Hotline, SIT received tips regarding 274 claimants.  Of these, SIT resolved and released holds of the 150 claimants and found fraud and referred three claimants to DOJ.

(h) **Random Claim Selection.**  Twice a week, BrownGreer selects 3% - 5% of all claims ready for a Notice.  The selection is random, however, a small sample of each claim type would include claims with a high dollar amounts determination as well as sampling of reviewer approval rates for certain claim types.  The claimants are proposed for SIT Review and move through the Special Investigations Team's review and evaluation.

6.  ***SIT Review Process.***  The SIT performs review of the claimants as follows:

(a) **SIT Initial Review.**  The initial SIT reviewer analyzes all forms and documents submitted by the claimant to substantiate the reason why the claim was identified for SIT review and also to validate all the information by specifically focusing on varying information, alterations, redactions, or otherwise suspicious documents.  The reviewer assesses potential non-arms-

length transactions and verifies existence of businesses, properties and ownership as well as licenses through general records searches. The reviewer also assesses potential double payment and identity theft issues. Finally, the reviewer analyzes the claim for the presence of a multi-claimant pattern by analyzing various overlapping reports to determine if the claimant shares any characteristics with other claimants in the Program. The initial reviewer documents the review process and provides a summary comment of the review and makes one of the following findings: (1) select the claimant for review by a CM, by selecting one of the existing patterns or a new pattern; (2) select the claimant for Further Investigation ("FI") review; (3) select the claimant for Final Determination, meaning that the reviewer determined there is indicia of fraud; or (4) release the claimant from SIT review, if the reviewer finds no indicia of fraud.

**(b) Multi-Claimant Pattern Reviews.** If the initial reviewer selects the claimant for review by a CM, the CM evaluates the documents for already known pattern characteristics, analyzes claimant overlaps, and develops and reviews reports to determine if the claimant is a participant of an already existing pattern or for the development of a new pattern. At the end of his or her review, the CM: (1) confirms that the claimant is a participant of a pattern; (2) requests FI steps to confirm pattern association; or (3) does not find pattern association and either releases the claim or makes a finding for that particular claimant.

**(c) Further Investigation Reviews.** If the initial reviewer or a CM selects a claim for FI steps, he or she will have to specify which FI step is the most appropriate. To date, over 8,300 claimants have been selected for various FI reviews that are handled by specialized teams. At the end of each FI review, the FI reviewer makes a finding of fraud or no fraud, or sends the claimant to another of the following FI steps:

**(1) Third Party Contact.** Verify information through a call/fax to a third party, including but not limited to contacting a claimant's employer to verify employment and employer letters, contacting departments of Wildlife & Fisheries to verify vessel and fishing licenses, contacting churches and local governments to verify letters from officials, contacting local business licensing offices to verify the existence of a business, contacting neighboring businesses to verify the existence of a business, and contacting businesses to verify receipts/expenses submitted by a claimant. The SIT has performed over 1,800 verification calls to third parties to verify information submitted by claimants.

**(2) Verifications Pursuant to Authorizations.** Verify information by requesting that a claimant submit an authorization to (a) obtain records from the SSA for self-employed claimants who report income for social security purposes, but otherwise have no supporting financials or earnings

statements like W-2s or 1099s, (b) obtain the claimant's tax transcripts and/or wage and income transcripts directly from the IRS for claimants who have conflicting tax information, suspicious wage statements, or conflicting financial information, or (c) obtain educational records to confirm that a claimant incurred expenses from job-training class. The SIT has issued over 2,850 notices to claimants to request authorization to obtain financial, employment or education records from third parties to verify claimant documents.

(3) **Forensic Accountant Review.** Utilize a forensic accountant to review claims where it is appropriate to use normal accounting methods to solve an unresolved financial discrepancy in the claimant's submitted documentation. The SIT's forensic accountant has reviewed over 500 claimants to determine whether normal accounting methods can resolve potential discrepancies in the claimants' submitted financial documents.

(4) **Request for Information from the Claimant.** Request information from a claimant if the claimant is in the best position to explain discrepancies or to locate proof to substantiate his or her claim. The SIT has issued over 240 notices to claimants to request specific documents or corroborating information to support their claims.

(5) **Referrals to HUB.** Refer a claimant to HUB for on-site investigation when other methods of in-house investigation listed above are not sufficient to make a fraud determination or if on-site investigation appears to be the most appropriate method to resolve the potential fraud concern. To date, the Program has referred close to 3,300 claimants to HUB for the investigation.

7. ***SIT Review Results***: At the end of its review, the SIT makes one of the following determinations:

(a) **Clear Finding of Fraud**. In determining whether a clear indication of fraud exists, the Claims Administrator's Office ("CAO") evaluates materiality of the falsified records and considers any prior payments as compensation for losses related to the Deepwater Horizon Oil Spill. The SIT prepares recommendations to the CAO to refer the claimant to the Department of Justice ("DOJ") for appropriate review and relief. Upon notification to the Department of Justice of the potential deception, dishonesty, or fraud, all such claimants' claims submitted in the Program are suspended indefinitely. The CAO has referred over 873 claimants to the DOJ for investigation.

(b) **No Indication of Fraud**. If the SIT finds no indicia of fraud relating to the claim after the Special Investigation Review, the SIT releases the claim for payment. The SIT does not notify any party of this determination. To date, SIT reviewers have evaluated and found no indication of fraud for over 3,500 claimants that were identified for SIT review.

(c) **Inconclusive Finding of Fraud.**  The SIT or HUB may not have enough information to make a conclusive finding of fraud, typically due to lack of a claimant's cooperation.  The Program will suspend such claimant's claims and review claims on a claim-by-claim basis to determine if there is sufficient evidence of fraud to refer the claim to the Department of Justice.

8.  *Reporting*.  The SIT tracks all claims, outcomes, and issues relating to any SIT claim review and finding.  The SIT develops reports to implement fraud detection processes, team management reports, and provides reports showing review progress and status as determined necessary by SIT management and the CAO.

9.  *Special Investigation Holds on Claims Processing.*  The Program does not issue payments or Eligibility Notices to a claimant while the claim is the subject of a SIT review.  However, the SIT performs reviews for potential fraud claims on all claims, regardless of whether the claimant has already received a payment.

10. *Notifications on Claims Subject to Special Investigation Review*.  The SIT places internal hold codes to indicate that the claim is subject to Special Investigation Review in the Claims Database.  The SIT issues Notices to claimants under SIT review when the claimant is selected for Further Investigation steps or when there is a finding of fraud.  In addition, the SIT issues Notices to claimants to complete TIN verification steps.

11. *File Production and Trial Assistance*.  The SIT responds to file production requests from the NCDF and other Law Enforcement Agencies and to date has produced information in response to over 5,521 requests for claimant information.  The SIT also assists U.S. Attorneys in preparing for trials and, if determined necessary, provides witnesses.  The CAO has not requested that the SIT track court dockets to substantiate the precise numbers of prosecutions related.  Based on general internet search, SIT located over 132 news reports arrested, charged, and/or convicted of fraud relating to the DWH oil spill.  Of these, 109 had filed claims in the GCCF and at least 84 were identified with fraud indicators by the GCCF Audit/SIT Team, referred to Guidepost and investigated.  The GCCF formally referred to the DOJ 69 of these cases.

---

## II.  Business Economic Loss Framework Controls

---

In his letter, Mr. Brown references "a detailed list of proposed controls that we expect to share with the CSSP soon.  The proposed controls are focused on entity level controls and BEL claims processing controls…"  BrownGreer will be happy to respond to these proposed controls by indicating which are already in place and how it can implement the others when Mr. Brown provides them.

To ensure that Business Economic Loss ("BEL") reviewers continue to display competency and diligence, we regularly analyze the performance and productivity of each reviewer.  BrownGreer has implemented the measures below to specifically combat error and fraud in the evaluation of BEL Claims.

Deepwater Horizon Program Accountants ("Accountants") exercise their professional judgment regarding revenue shifting, matching and improper reconciliation and it would be appropriate for the Accountants to respond to the items regarding the Accountant review processes.  Where applicable, we have included examples of Accountant collaboration with BrownGreer in the error and fraud prevention processes.

### 1.  *Error Prevention and the Quality Assurance Process.*

The BrownGreer Quality Assurance ("QA") process addresses three fundamental needs of the Program:  (1) to ensure that all claims are reviewed in accordance with the policies of the Settlement Agreement by targeting anomalous claims results through data metrics analysis; (2) to provide a mechanism to monitor Reviewer performance and the necessary tools to efficiently and effectively provide feedback to Reviewers; and (3) to identify areas of review resulting in high error rates that require retraining or refined review procedures and data validations.  The QA process analyzes the documents accompanying a BEL claim to ensure that the reviewer accurately captures the claimant's information and to identity irregularities within a claimant's documentation. A QA Reviewer analyzes the claim based on these metrics to confirm that the information matches source documents.  If a reviewer questions the authenticity, veracity or considers the information suspect, the QA reviewer will propose the claim for SIT review.

**(a) QA Metrics, Algorithm and Data Checks**.  An algorithm identifies which claims meet certain data metrics triggering a QA Review. The algorithm runs nightly against all claims reviewed during the previous 24 hours. For BEL claims, the Program uses the data metrics listed in the table below to identify claims for QA Review.  Table 3 provides the metric ID, the reason for the metric and the instruction that the QA reviewer must follow when reviewing a claim that triggers one or more of the BEL metric(s).

| TABLE 3 | | | BUSINESS ECONOMIC LOSS CLAIMS |
|---|---|---|---|
| Row | METRIC ID | METRIC REASON | SPECIAL INSTRUCTIONS FOR QA REVIEWER |
| 1. | BEL-M-01 | Reviewer Competency | Provide detailed feedback comments for training purposes. |
| 2. | BEL-M-02 | Text Entered by QA Supervisor | The supervisor enters a comment regarding an error not covered by a metric.  The comment is sent to the reviewer for feedback purposes. |
| 3. | BEL-M-09 | Exclusion Denial | The Claim is excluded because the Reviewer indicated that the claimant submitted documents indicating the claimant is an Excluded Class Member.  Confirm the accuracy of the Data Capture, Employer/Location ID ("EID") selection and the answers to the Claimant Exclusion Questions.<br>If the claimant is Excluded as part of the Gaming Industry, Banking/Financial Industry, Insurance Industry or Funds & Trusts Industry, or as a BP-Branded Fuel Seller, Defense Contractor, Real Estate Developer, Government Organization or Menhaden Processor, confirm that the claimant is engaged in business activity related to the applicable Exclusion Category.<br>If the claimant is Excluded as Outside Eligibility Zone, confirm that the Operating Address associated with the EID is correct and that the claimant is not a member of the Economic and Property Damages Settlement Class pursuant to Section 1.2 of the Settlement Agreement. |
| 4. | BEL-M-18 | Denied Result | The claim review resulted in a Denial.  Ensure the accuracy of the Financial Data Capture, EID selection and responses to Causation questions.  Confirm the accuracy of the Economic Loss Zone and Industry Designation. |
| 5. | BEL-M-39 | Incomplete Result | The Reviewer selected or confirmed the automated selection of Incompleteness Reasons indicating that the claimant did not provide documentation showing the physical location of the business or the type of business in which the claimant was engaged at the time of the Spill.  Confirm that the selected Incompleteness Reasons apply.  If EID 38 (Unknown Employer/Location) was selected in Facility Identification, confirm that selection of this EID was correct. |

15

| TABLE 3 | | | BUSINESS ECONOMIC LOSS CLAIMS |
|---|---|---|---|
| ROW | METRIC ID | METRIC REASON | SPECIAL INSTRUCTIONS FOR QA REVIEWER |
| **6.** | **BEL-M-44** | Unknown Location of HQ | The previous reviewer indicated that he or she could not determine the location of the business' Headquarters. Review the claimant's documents to determine whether you can identify the location of the business' Headquarters.  If not, confirm that Incompleteness Reason BEL-I-14 is selected. |
| **7.** | **BEL-M-45** | Class Representative | This claim was filed by a Class Representative.  Hold the claim and contact a QA supervisor for further instructions. |
| **8.** | **BEL-M-46** | Incomplete Sworn Written Statement ("SWS") | The Reviewer indicated that the claim is Incomplete for a reason that can be cured with a SWS.  If the claimant has submitted the required SWS, make sure the Data Capture is complete.  If the SWS is complete, you must de-select the corresponding Incompleteness Reason on the Claim Summary screen. |
| **9.** | **BEL-M-47** | Duplicate Documents | One or more Documents have been classified as "Duplicate" during Document Categorization, but the claimant's documents do not include a non-Duplicate version of the same Document.  Confirm the Document Categorization and the "Duplicate" classification. |
| **10.** | **BEL-M-48** | Use of Incompleteness Reason BEL-I-49 (Free text Incompleteness reason) | The Reviewer marked the claim Incomplete for BEL-I-49.  If the BEL-I-49 comment is inaccurate or duplicative of the other Incompleteness Reasons, then remove BEL-I-49. |

Claims that trigger any automated metrics are automatically pushed to the QA Review Queue. The QA Team also analyzes all claims subject to a 48-hour cooling-off period, regardless of whether that claim triggered an automated metric.  During this cooling-off period, the QA Team examines the Data Capture of financial forms for all BEL claims with a review result of "Denied" or "Incomplete" to look for anomalous entries and other issues.  The QA Team performs the following data checks:

(1) **Irregular date ranges.** The QA Team identifies date entries greater than a month and/or inconsistent with other dates captured under the same EID.

(2) **Inconsistent accounting methods.**  The QA Team identifies entries where different accounting methods (Accrual, Cash and Unknown) have been selected for entries from the same Profit and Loss Statement ("P&L").

(3) **Inconsistent Indication of Expenses.**  The QA Team identifies entries where the reviewer inconsistently indicated the existence of Expenses for entries from the same P&L.

**(4) Inconsistent Responses Regarding Consolidated Profit & Loss Statements.** The QA Team identifies entries where the reviewer inconsistently indicated whether entries from the same P&L were Consolidated.

**(5) Zero dollar entries.** The QA Team identifies P&Ls, Rental Property Statements or State Sales and/or Use Records that contain zero dollar entries which do not follow a pattern.

**(6) Illegibly marked entries.** The QA Team identifies any P&Ls, Rental Property Statements or State Sales and/or Use Records with an entry that is marked "Illegible" in Data Capture yet has all required information entered.

**(7) Duplicate revenue amounts.** The QA Team identifies any claims where P&Ls, Rental Property Statements, State Sales and/or Use Records have identical revenue amounts for separate months which do not follow a pattern.

**(8) Outlier revenues.** The QA Team identifies revenues with the same EID that are significantly less or greater than other months.

**(9) Identical amounts entered in consecutive months.** The QA Team identifies identical revenues with the same EID entered in one or more months in the same year.

**(10) EIN Mis-match.** The QA Team identifies any claim with Data Capture entries where the claimant's Tax ID does not match the Tax ID associated with the EID selected for that financial document.

**(b) QA Warning Prompts.** BrownGreer has eight warning messages to alert BEL reviewers to potential typographical errors and other data entry mistakes during Data Capture. These warnings remind the reviewers to confirm that the financial information is correctly entered before completing the review of the claim. The DWH Database Application ("the Application") programmatically checks the values that reviewers enter during Data Capture for duplicate values, as well as values below or above the expected range, and provides warning messages to the reviewers if the Review System detects any anomalies. The Review System uses the following information to trigger the warning messages:

**(1) Taxpayer Identification Number (TIN) Discrepancy.** The Application triggers this warning when the Social Security Number (SSN) or Employer Identification Number (EIN) that the reviewer enters in the Data Capture form, or associated with the selected Employer Entity, does not match the TIN in the Application

**(2) Minimum and Maximum Expected Values.** The Application triggers this warning when the reviewer enters a value that is outside of the range of expected values for that Document Type. Table 4 lists the minimum and maximum expected values for specific documents that trigger this prompt

(3) **Duplicate Income.**  The Application triggers this warning when the reviewer enters identical financial, entity and date information that matches an existing entry.  This suggests the possibility of duplicate data entry.

(4) **Sworn Written Statement if Verified Boxes Not Checked.**  The Application triggers this warning when the reviewer enters a Sworn Written Statement but did not check any Verified Box.  Failure to check any Verified Box associated with a Sworn Written Statement may lead to false Incompleteness findings or a reduced payment to the claimant.

(5) **P&L Entries Less than 28 Days.**  The Application triggers this warning when the reviewer enters a Start Date and an End Date for a P&L, rental property statement, or sales and production report that are less than 28 days apart.  Incorrect entry of Start and End Dates may lead to false Incompleteness findings or incorrect Causation determinations.

(6) **P&L Entries More than 31 Days.**  The Application triggers this warning when the reviewer enters a Start Date and an End Date for a profit and loss statement, rental property statement, or sales and production report that are more than 31 days apart.  Incorrect entry of Start and End Dates may lead to false Incompleteness findings or incorrect Causation determinations.

(7) **P&L Entries with Spill-Related Payments.** The Application triggers this warning when the reviewer enters a P&L, rental property statement, or state sales and use record where the claimant has a prior spill-related payment but no One-Time Non-recurring Income ("OTNRI").  Failure to enter a spill-related payment may lead to false Incompleteness findings or incorrect Causation determinations.

(8) **P&Ls with Duplicate Revenue Amounts in Two or More Consecutive Months.** The Application triggers this warning when the reviewer enters a P&L, rental property statement, or state sales and use record with duplicate revenue amounts in two or more consecutive months.  Incorrect entry of revenue may lead to false Incompleteness findings or incorrect Causation determinations.

The table below provides information on the minimum and maximum expected values for the documents relevant to BEL Data Capture.

| TABLE 4 | | MINIMUM AND MAXIMUM EXPECTED VALUES | | |
|---------|---|------|------|------|
| ROW | FORM | QUESTION | MINIMUM VALUE | MAXIMUM VALUE |
| 1. | **1099 Form** | Rents | $500.00 | $99,999.99 |
| 2. | **1099 Form** | Other Income | $500.00 | $99,999.99 |
| 3. | **1099 Form** | Fishing boat proceeds | $500.00 | $99,999.99 |
| 4. | **1099 Form** | Nonemployee Compensation | $500.00 | $99,999.99 |

| TABLE 4 | | MINIMUM AND MAXIMUM EXPECTED VALUES | | |
|---|---|---|---|---|
| ROW | FORM | QUESTION | MINIMUM VALUE | MAXIMUM VALUE |
| 5. | **Commission Statements** | Gross Amount | $1,000.00 | $99,999.99 |
| 6. | **Correspondence from Employer/Business Owner** | 2008 Salary | $10,000.00 | $99,999.99 |
| 7. | **Correspondence from Employer/Business Owner** | 2009 Salary | $10,000.00 | $99,999.99 |
| 8. | **Correspondence from Employer/Business Owner** | Annualized Salary at Spill | $10,000.00 | $99,999.99 |
| 9. | **Federal Partnership Form 1065** | Balance of Gross Receipts/Sales less returns and allowances | $25,000.00 | $999,999,999.99 |
| 10. | **Federal Corporate Income Return Form 1120** | Balance of Gross Receipts/Sales less returns and allowances | $25,000.00 | $999,999,999.99 |
| 11. | **Federal Corporate Income Return Form 1120, Schedule E** | 3(d) Amount of Compensation | $1,000.00 | $99,999.99 |
| 12. | **Federal Corporate Income Return Form 1120S** | Balance of Gross Receipts/Sales less returns and allowances | $25,000.00 | $999,999,999.99 |
| 13. | **Federal Partnership Form 8825** | 6(b) Rental Real Estate Income | $5,000.00 | $999,999.99 |
| 14. | **Profit & Loss/Rental Property Statement/State Sales and Use Record/Sales & Production Report** | Gross Sales or Rents | $500.00 | $999,999.99 |

| TABLE 4 | | MINIMUM AND MAXIMUM EXPECTED VALUES | | |
| --- | --- | --- | --- | --- |
| ROW | FORM | QUESTION | MINIMUM VALUE | MAXIMUM VALUE |
| 15. | **Profit & Loss/Rental Property Statement/State Sales and Use Record/Sales & Production Report** | Expenses | N/A | $999,999.99 |
| 16. | **Employment – Pay Stub/Pay Check and Payroll Records** | Gross payment about for the above period | $100.00 | $9,999.99 |
| 17. | **Federal Income Return Form 1040, Schedule C (Profit or Loss from Business)** | Gross Receipts or Sales | $5,000.00 | $99,999.99 |
| 18. | **Return Form 1040, Schedule E (Supplemental Income and Loss)** | 4(b) Rents Received | $1,000.00 | $99,999.99 |
| 19. | **Return Form 1040, Schedule F (Profit or Loss from Farming)** | Sales of Livestock and Items for Resale | $1,000.00 | $99,999.99 |
| 20. | **W2** | Wages, tips, other compensation | $10,000.00 | $99,999.99 |
| 21. | **W2** | Medicare wages and tips | $10,000.00 | $99,999.99 |

(c) **Notice QC.** In addition to the processes described above, the BrownGreer BEL Team and Accountants perform a daily QA review for all BEL Eligibility and Denial Notices to identify potential errors within the review or on the Notice. The Accountants perform a final, high-level accounting QA Review of the work up and ensure that the information in the Eligibility Notice matches the data in the BEL compensation workbook. The Accountants request the pull of certain Eligibility Notices each day if during the QA Review the accountant reviewer determines that there was an error in the BEL compensation workbook. Similarly, a member of the BEL Team performs a QA Review of all BEL Denial Notices each day to identify potential errors within the review or on the Notice. The BEL Team Member performs a final, high-level QA Review of the BEL Review to ensure that the information in the Denial Notice is an accurate reflection of the BEL Review.

**2.  *BEL Fraud Identification and Prevention.***  BEL reviewers receive supplementary training on detecting fraud within a claimant's documents.  The SIT has provided guidelines for BEL reviewers and accountants on common characteristics of potentially fraudulent claims that reviewers should propose for SIT review.  These characteristics include:

(a)  **Conflicting revenue between Profit and Loss Statements ("P&Ls") and tax returns.**  Accountants use their professional judgment to reconcile a claimant's P&Ls against his/her tax returns to confirm consistent revenue.

(b)  **Professionally prepared tax returns for years leading up to the spill that switch to self-prepared in the years after the spill.**  BrownGreer reviewers must enter tax preparer information when they perform Data Capture of a tax return, which alerts them to potential fraud issues related to tax return preparation.  If a BEL Reviewer recognizes potential fraud in the tax return preparation, he/she must refer the claim to the SIT for further review.

(c)  **Professionally prepared tax returns that answered "May the IRS discuss this return with the preparer shown below" with No.**  BrownGreer reviewers must enter tax preparer information when they perform Data Capture of a tax return, which alerts them to potential fraud issues related to tax return preparation.  If a BEL Reviewer recognizes potential fraud in the tax return preparation, he/she must refer the claim to the SIT for further review.

(d)  **Altered tax returns and/or tax returns that contain crossed out data with handwritten new information.**  During Document Categorization, BrownGreer reviewers confirm whether a tax return contains altered information, including crossed out data with handwritten revenues.  If a BEL Reviewer recognizes potential fraud in the tax returns, he/she must refer the claim to the SIT for further review.  Generally, the reviewer considers various items listed on the tax return, including occupation listed on the return, types of income, evidence of pre-spill activity to corroborate income on tax returns, missing signatures by the claimant/tax preparer, repetitive/round income amounts.

(e)  **Multiple sets of tax returns that show different income amounts with no indication that the amended tax returns filed with the IRS or tax returns for Benchmark Years that were amended after the spill.**  During Document Categorization, BrownGreer reviewers must evaluate whether multiple tax returns for the same year are duplicates or represent amended returns actually filed with the IRS.  If the reviewer can confirm that the claimant submitted IRS-verified amended returns, he/she Data Captures the amended return.  If a BEL Reviewer recognizes potential fraud in the tax returns, he/she must refer the claim to the SIT for further review.

(f)  **P&Ls that shift revenue across various months to pass causation or maximize potential earnings.**  Accountants use their professional judgment to review a claimant's P&Ls consistent revenue.

(g) **P&Ls that show numerical patterns for each month, such as revenues that are in multiple of 3s or identical revenue every month.** BrownGreer reviewers receive a pop-up error message when they enter consecutive months of P&Ls with identical revenues. This pop-up assists reviewers in evaluating the numerical data trends in a claimant's P&Ls. If a BEL Reviewer recognizes potential fraud in the P&Ls, he/she must refer the claim to the SIT for further review.

(h) **Two P&L sets for the same time period that show significant differences in revenue without an explanation for the differences.** During Document Categorization, BrownGreer reviewers must categorize two P&L statements for the same period with the exact same revenue as duplicates. Reviewers must evaluate whether two P&Ls for the same period contain identical revenue or contain substantial variances. If a BEL Reviewer recognizes potential fraud in the P&Ls, he/she must refer the claim to the SIT for further review.

(i) **Tax returns with nonstandard fonts or colors.** BrownGreer reviewers perform Data Capture on pertinent information on tax returns, which requires them to evaluate the font and color used on a tax return. If a BEL Reviewer recognizes potential fraud in the tax returns, he/she must refer the claim to the SIT for further review.

(j) **Business records that show operating activities in months beyond the cessation date of the business.** BrownGreer reviewers must enter the date the business ceased operations during the review of a Failed BEL claim. Reviewers also perform Data Capture on a claimant's P&Ls, which alerts them to discrepancies between the cessation date and the financial documentation on file. If a BEL Reviewer recognizes potential fraud in the financial statements, he/she must refer the claim to the SIT for further review.

(k) **Documents from suspect entities on SIT's "Be on the Lookout" list.** The SIT has prepared a list of potentially fraudulent entities, including tax preparers and businesses, that is available to all BrownGreer reviewers. During Document Categorization and Data Capture, reviewers must evaluate a claimant's documents to determine whether they are from any of the entities on the "Be on the Lookout" list. If a BEL Reviewer recognizes a potentially fraudulent entity in the claimant's financial documents, he/she must refer the claim to the SIT for further review.

When a BEL reviewer or accountant refers a claim to SIT review, the SIT will perform additional analysis to confirm the validity of the claimant's documentation.

As part of SIT's ongoing efforts to identify suspect claims and  trends in BEL Claims, SIT also performs data mining and continuously develops new reports and analysis to identify suspect claims as well as patterns in the submissions from law firms, claims preparation groups, and accountants. In this inquiry, SIT examines the relevant financial documents, paying particular attention to any discrepancies and variances in the revenues and expenses between years and/or between months within each year that could indicate the financial statements have been altered to

enable the claimant to pass the causation tests of Exhibit 4B of the Settlement Agreement, or to maximize potential compensation under Exhibit 4C of the Settlement Agreement.

Specifically, the SIT accountant looks to all available documentation for the following indicators including but not limited to: (1) the claimant has shifted revenue between months so that the claimant will pass the V or Modified V-Shaped Revenue Pattern Test; (2) the claimant has shifted revenue into the Benchmark Period months and/or out of the Compensation Period months to maximize the Compensation Calculations; (3) the claimant overstates revenues in the Benchmark Year and 2011 P&Ls when compared to the tax returns for the same years; and (4) the claimant understates revenue in the 2010 P&Ls when compared to the tax returns for the year.

After SIT identifies a specific group of claims, such as law firm, claims preparation group, or accountant for further investigation, SIT runs a report of all claims associated with that group. This report highlights the BEL Claims that may exhibit suspicious trends using key terms SIT considers potential red flags and the SIT accountant will review the financial documentation submitted by these claimants to determine whether the pattern is indicative of a scheme.

The list below is a sample of data reports that SIT monitors to identify suspect claims and trends either relating directly to BEL claims or applicable to all claim types.  SIT also has a report in development that will include all BEL Claims with the monthly P&L data, tax return data, and state sales and use records, along with the claims preparation group, law firm, and accountant affiliated with the claimant. This report will allow for an even further refined statistical trend analysis to identify suspicious trends in the submissions from each group as compared to the entire population of BEL Claims as well as industry.

| TABLE 5 | DWH SIT Fraud Detection Reports | | |
|---|---|---|---|
| Row | Report Name | Summary | What We Do |
| 1. | **Duplicate Tax ID Report** | Provides a summation of Claimants with Duplicate Tax ID Numbers. | The analyst looks for claimants with identical Taxpayer Identification Numbers and determines which Claimant IDs should remain active.  These claimants are not proposed for SIT review but are merged so that a claimant only has one active Claimant ID in the database. |
| 2. | **Double Payment Report - Matching Employer ID** | Tracks Business Economic Loss Claims with the same Employer and Location IDs | The analyst reviews claimants with BEL claims with the same Employer and Location IDs to prevent business owners who file individual claims and multiple claimants filing for the same business.  These claimants are not proposed for SIT review, but if overlap is identified, the Program administratively closes the duplicate claims to prevent double payment to a claimant for the same losses. |

| TABLE 5 | | DWH SIT Fraud Detection Reports | |
|---|---|---|---|
| Row | Report Name | Summary | What We Do |
| 3. | **Overlapping IP Addresses** | Tracks overlapping claimants who electronically filed a Registration Form or Claim Form using the same IP Address | The analyst and SIT reviewers search this report for every Claimant ID that is reviewed in SIT to identify claimants with a overlapping email address who could be part of a potential scheme.  The analyst/reviewers propose for SIT review  claimants that share an overlapping IP address with a claimant currently under review by SIT and who submitted suspect documentation similar to the documentation submitted by the claimant currently under SIT review. |
| 4. | **Matching Address Report** | Tracks overlapping claimants that report the same address information for the Claim filings (mailing address, claims preparer, business address, etc.) | The analyst and SIT reviewers search this report for every Claimant ID that is reviewed in SIT to identify claimants with a matching address who could be part of a potential scheme.  The analyst/reviewers propose for SIT review any claimants that share an overlapping mailing address with a claimant currently under review by SIT and who submitted suspect documentation similar to the documentation submitted by the claimant currently under SIT review. |
| 5. | **Matching Email Addresses Report** | Tracks overlapping claimants that report the same email address for communications with the Settlement Program | The analyst and SIT reviewers search this report for every Claimant ID that is reviewed in SIT to identify claimants with a matching email address who could be part of a potential scheme.  The analyst/reviewers propose for SIT review any claimants that share an overlapping email address with a claimant currently under review by SIT and who submitted suspect documentation similar to the documentation submitted by the claimant currently under SIT review. |
| 6. | **Fraud Scheme Reports** | Ad-hoc requests to identify claimants involved in specific potentially fraudulent schemes using data points and other identifiers associated with the scheme and/or its participants. | SIT Case Managers and Case Workers review claimants based on searches for specific data points and identifiers including information listed on Registration and Claim Forms, Financial Data, Tax Preparers, and Employer/Location IDs. SIT Case Managers  propose for SIT review any claimant found to be a potential participant in the scheme being researched.  To date, SIT Case Managers had run over 6,155 scheme reports. |

| TABLE 5 | | DWH SIT Fraud Detection Reports | |
|---|---|---|---|
| Row | Report Name | Summary | What We Do |
| 7. | **First Time Filers from Zone A Report** | Identifies all claimants in Zone A who first file a claim in the Settlement Program instead of the GCCF. | The analyst reviews claimants with a Zone A classification who file a claim with the DWH Settlement Program for the first time. This means that they have not filed in GCCF, nor do they have a payment from prior to the GCCF.  The analyst proposes for SIT review any first time filer who appears to have submitted suspect documents to support his/her claims. |
| 8. | **Accountant Incompleteness Selection** | Provides Incompleteness details for claims for which the accountants' Incompleteness selections differ from the selections made by BG.  Allows SIT to locate claimants that the accountants identify as having inconsistent financial and tax documents. | The analyst reviews this report showing claimants processed and submitted by BG, but later flagged by accountants due to income discrepancies. The analyst reviews documents, conducts profit and loss statement analysis and conducts a financial review on these Claimant IDs.  The analyst proposes for SIT review any claimant that appears to have irreconcilable discrepancies between submitted P&L documents and tax documents and any claimant with P&L documents that appear to have unexplainable income variances. |
| 9. | **BEL Tracking Report** | Detail of all Economic Loss claims requiring Accountant Review. This report allows the accountants to track the progress of all Business Economic Loss, Failed Business, and Start-up claims as they are filed. Provides data for use in statistical trend analysis. | The analyst reviews claims that pass causation in Zones B, C, and D based on their compliance with the requisite revenue patterns to detect anomalous variances in monthly and yearly income. The analyst proposes for SIT review any claimant with P&L documents that appear to have unexplainable income variances. |
| 10. | **Tracking Report for Accountants** | Tracks claims in Accountant Review Queues. | The analyst conducts profit and loss statement analysis and financial document reviews based on Accountant notations indicating discrepancies in reported income. The analyst proposes for SIT review any claimant with P&L documents that appear to have unexplainable income variances. |

| TABLE 5 | | DWH SIT Fraud Detection Reports | |
|---|---|---|---|
| Row | Report Name | Summary | What We Do |
| 11. | **Accountant Allocation Report** | Used to identify abnormal P&L statements signifying potentially fabricated and manipulated P&L submissions; identifies P&L/tax discrepancies. | The analyst reviews claimants with claim statuses of Accountant Pending, Tax Discrepancy, or Awaiting Documentation to analyze documents and profit and loss statements to verify that financial documents were not manipulated for the purposes of filing a claim.  The analyst focuses on groups of claimants by the Industry, Zone, and claim prep/tax preparer/law firm to detect outliers and trends.  The analyst proposes for SIT review any claimant with P&L documents that appear to have unexplainable income variances. |
| 12. | **Address Change Request Tracking Report** | Tracks changes made to claimant mailing addresses pursuant to claimant/attorney requests. | The reviewer responsible for address changes and analyzes claimants with multiple address change requests, multiple claimants who request changes to the same address, and claimants who request changes from a physical address to a PO Box.  The reviewer ensures that these new addresses actually exist and that changes are not indicative of a potential identity theft scheme.  The reviewer proposes for SIT review overlapping claimants who request an address change to the same address, as well as claimants that request an address change to an address that does not appear to exist. |
| 13. | **Reversed Causation Denial for BEL Claims** | Tracks claimants with BEL claims that submit new documentation to prove causation after previously received a Denial Notice for lack of causation. | The analyst reviews claimants who submit new documents to establish causation after a previous causation denial.  The analyst proposes for SIT review any claimant whose newly submitted causation documentation appears to be, suspect, fabricated or inconsistent with previously submitted documents. |
| 14. | **Compensation Changed After Reconsideration/ Re-review** | Tracks claimants with a change in compensation amount after Reconsideration or Re-review. | The analyst reviews claimants with a substantial change in compensation amount after Reconsideration or Re-review. The analyst proposes for SIT review any claimant whose newly submitted documentation appears to be suspect, fabricated, or inconsistent with previously submitted documents. |

| TABLE 5 | DWH SIT Fraud Detection Reports | | |
|---|---|---|---|
| Row | Report Name | Summary | What We Do |
| 15. | **Business Location Report** | Tracks business claimants, and identifies the number of employees, and their location. | The analyst reviews the Employer/Location IDs to (1) research and verify potential links to an already known multi-claimant scheme by researching entity history, dbas, and corporate structures and verifying that research against the already known suspect scheme entities list; (2) confirm the existence of the business and (3) examine business types and earnings totals to verify businesses employ a reasonable number of employees. The analyst conducts general searches to determine the size of the employer and the numbers of employees that particular business or a business of that size could have and compares that with the number of associated claimants listed on the report. The analyst samples individual claimant files to observe variations in documentation, similarities/discrepancies between common source documents, i.e., payroll records and employer letters, as well as income outliers within the claimant population. The analyst marks the group as suspect if  he or she observes any anomalies with documents, such as a claimant that does not appear to be a verified business and the listed employees of that business as well as those businesses and employees with a higher than expected number of employees. |
| 16. | **Non-Matching Addresses Report** | Tracks claimants with a different address listed in LexisNexis batch results than in the DWH program. | The analyst reviews claimants with conflicting addresses, attempts to determine the reason for the discrepancy, and proposes claims for SIT Review that appear to be a part of a new or existing scheme, have a different address listed because of a suspect claims preparer, or if claimants who currently live in an area far from the Gulf region with no record of an address for them in the Gulf region. |

       **3.** *Specific Responses to "Potential Claims Process Fraud Scenarios."* The report attached to Mr. Brown's letter regarding "Error and Risk Detection and Mitigation in the Deepwater Horizon Court Supervised Settlement Program" contained "Potential Claims Process Fraud Scenarios." BrownGreer's responses to the items referencing BrownGreer BEL review processes are below:

    **(a) Potential Scenario 1:** Reviewer inappropriately relies on claimant's consolidated financial statements, despite evidence indicating that the claimants maintain and operate out-of-zone facilities. Thus, in certain instances claimants' financial statements have

included operations throughout the United States, without excluding revenues generated from facilities located outside the compensable zones.

> ***Response:*** BEL Reviewers are only permitted to mark a P&Ls, State Sales and Use Record, or Rental Property Statement as "consolidated" if the document contains revenues and expenses for all the claimant's Facilities in the Gulf Coast Areas, regardless of how many claims the claimant files. The document must not contain revenue and expenses from Facilities that are outside the GCA.

**(b) Potential Scenario 2**: Reviewer incorrectly designates the compensable zones (i.e., used Zone A location rather than relying on the claimant's headquarters in Zone D) and applies the incorrect RTP to increase the claim award.

> ***Response:*** The Program applies the Economic Loss Zone according to the claimant's Operating Address. The Operating Address is the street address of the physical facility owned or maintained by the employer or business entity at which the employment or business activity takes place. The Deepwater Horizon Settlement Mapping Tool uses the Operating Address to determine a claimant's Economic Loss Zone. Therefore, the Operating Address must correspond to the physical location of the business and not a P.O. Box address. Like the Economic Loss Zone, the RTP is tied to the Zone and is not manually determined by a reviewer.

**(c) Potential Scenario 3**: Reviewer incorrectly and inconsistently includes expense reimbursements and non-recurring, non-operational income as revenue during the benchmark periods.

> ***Response:*** BEL Reviewers enter the following items as One Time Non-Recurring Income ("OTNRI") during Data Capture: (1) BP Payments; (2) Capital Assessments; (3) GCCF Payments; (4) Grants for "For Profit" Entities; (5) Insurance Proceeds; (6) Inter-company Sales and Related Party Transactions; (7) Interest/Dividend Income; (8) Real Estate Payments; (9) Reimbursed Expenses; (10) Sale of Assets; and (11) VoO Payments. BEL Reviewers enter these items as OTNRI only if the item is specifically listed in the claimant's financial statement as one of the items above. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BEL Reviewers and a team of P&N Accountants so that BEL reviewers can email the accountants for guidance when a P&L contains a line item that appears to be a OTNRI, but it is not one of the categories listed on the P&L Data Capture Screen.

**(d) Potential Scenario 4:** Reviewer incorrectly relies on multiple and inconsistent sets of P&Ls submitted by the claimant, all of which are inconsistent with the tax returns. Without explanation, the reviewer uses the amounts

***Response:***  As described above, the Program has recently implemented a collaboration process between BEL Reviewers and a team of P&N Accountants.  When a claimant provides two or more distinct monthly P&L sets for the same Facility, BEL Reviewers must ask the accountants which P&L set to Data Capture.  This collaboration is meant to increase productivity and accuracy.  The Accountant Reviewers are permitted to use their professional judgment to exclude P&Ls that did not accurately reflect the claimant's revenue and identify suspect claims for SIT.

## III. DESCRIPTION OF BROWNGREER'S INTERNAL CONTROLS

1.    ***BrownGreer Employment.***    BrownGreer has expansive protocols in place to ensure that candidates for hire are qualified to work for the Claims Administrator, do not have a current claim in the Program, and do not have other conflicts that would disqualify them from employment with the Claims Administrator.

2.    ***Hiring Criteria.***    Each candidate for employment with BrownGreer must fill out an application and background questionnaire.  Candidates for employment as claims reviewers, managers of claims reviewers, or assistants in the CACs must meet certain established professional and educational criteria to be eligible for hire.

3.    ***Employee Background Checks***.    BrownGreer conducts background checks on candidates for employment through First Advantage to detect federal and state felony and misdemeanor convictions, education, former employment, present employment, and to verify Social Security Number information provided by candidates.  BrownGreer does not hire anyone who has been convicted of a felony in the past seven years or who provides false information on an application to work for BrownGreer on the Deepwater Horizon program.

4.    ***Required Disclosures of Personal Relationships and Business Interests***.    Since June 2012, the Claims Administrator's Office has required that vendor employees working on the Program disclose if they have a parent, spouse or child who has a claim with the Program.  Commencing that month, BrownGreer has required all of its employees and subcontractors to disclose any such family members with a claim in the Program.  Beginning on July 20, 2013, BrownGreer went further and required all BrownGreer employees and subcontractors to complete a Relationship Survey and provide the name, alias and address information for each of their following relationships: (a) spouses and ex-spouses; (b) children and stepchildren; (c) parents and stepparents; (d) brothers and stepbrothers; (e) sisters and stepsisters; (f) cohabitants (including other relatives, fiancés, partners, boyfriends and girlfriends); and (g) close personal friends who have filed a claim with the Program.  The survey also requires all BrownGreer employees and subcontractors to disclose: (1) any businesses in which they have an ownership or other financial interest; and (2) all co-owners or business partners in any such businesses.  BrownGreer does not hire anyone who discloses that he or she has a claim in the Program or a parent, spouse or child who has a claim in the Program.  BrownGreer also compares the relationships and business information solicited by the survey against the DWH database to identify claims that may present a potential conflict of interest for its employees and subcontractors that are not otherwise disclosed to BrownGreer.  If BrownGreer identifies a potential conflict of interest,  it conducts a preliminary investigation (including an interview of the employee or subcontractor by Human Resources), ensures that the employee/subcontractor does not have access to any claim giving rise to their potential conflict and, discloses the potential conflict to the Claims Administrator's Office, requesting instruction as to appropriate remedial steps.

**5.**     *New Hire Orientation.*   BrownGreer conducts a new hire orientation for every new worker.  Our new hire orientation includes an explanation of the confidential nature of claimant information, the Program's Code of Conduct Policy, ethics and honesty, and the requirement to be free of all actual or apparent conflicts of interest.  BrownGreer explains that the worker cannot have or file a claim in the Program and that employees must disclose any claim activity by a business partner, a close personal friend, a cohabitating individual, or members of their immediate family.  BrownGreer conducts this training before employees or contractors are given access to the Review System.

**6.**     *BrownGreer Employee Handbook.*   All BrownGreer employees or contractors working on the Program receive and are required to read and agree to the BrownGreer Employee Handbook.  The Employee Handbook covers Conflicts of Interest, Confidentiality, and Professional Conduct.  All new hires also complete these additional Compliance Documents:

> **(a) BrownGreer Confidentiality Agreement:**  All workers must complete a Confidentiality Agreement with BrownGreer acknowledging that they must maintain the confidentiality of all information related to their work at BrownGreer during their employment and after they leave BrownGreer.

> **(b) Declaration for DWH Settlement Program:**  All workers must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.

> **(c) DWH Order Regarding Confidentiality:**  All workers must review the Confidentiality Order issued by the Court for the protection of Claims Information submitted to the Program and must execute a Certification indicating that they have read and agree to abide by the terms of the Order.

> **(d) DHECC Security Policy Quick Reference:**  This document provides a summary of the full security policies implemented by the Claims Administrator for the protection of Program data.

> **(e) DHECC Data Protection Plan:**  This is the Claims Administrator's Policy on how to identify and protect personal data.

> **(f) Policy on Property and Information Use:**  This outlines the acceptable use of BrownGreer property and information.

**7.**   *Employee Training and BrownGreer Culture Building.*   Before any employee or contractor begins work on any project at BrownGreer, we conduct extensive training on (a) BrownGreer; (b) our expectations regarding performance, behavior, and confidentiality; and (c) the specific tasks the worker will perform.  We cultivate in each worker a sense of pride in our organization and the work we do.  We find that this introduction into our firm culture promotes greater loyalty and adherence to standards of ethics and honesty required to work at our firm.

**8.**   *Settlement Code of Conduct Training.*   Before any employee or contractor begins

work on the Program, we conduct extensive training on the Program and on expectations regarding the Program's Code of Conduct and conflicts of interest.  All BrownGreer workers assigned to the Program must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.  We perform refresher trainings to continue to raise awareness and post Employee Conflict rules on BrownGreer's intranet that workers access daily.

**9.  *Fraud Training.***  All BrownGreer reviewers working on the Program receive training on the Program's fraud processes and how to contact the Special Investigations Team ("SIT") to report fraud.  Every BrownGreer reviewer has the ability to identify a claim as potentially fraudulent, which automatically triggers a review of the claim by the SIT.  BrownGreer also provides workers with email addresses for the SIT to report instances of potential fraud and directs employees to contact their supervisors or BrownGreer Human Resources to report instances of potential fraud.  Fraud trainings and refresher trainings include both general awareness and training related to the specific risks for the tasks that employees handle.

**10. *BrownGreer Employee Declarations*.**  BrownGreer requires all workers to affirm in a Declaration that they are unaware of any conflicts and imposes on the declarant an on-going duty to notify the declarant's supervisor(s) if the declarant becomes aware of a conflict.  To keep the Declaration current with Program standards, BrownGreer periodically revises the Declaration and requires every BrownGreer employee or Program contractor to sign the revised version of the Declaration.  BrownGreer has revised the Declaration four times:

**(a) *April 19, 2012, Declaration.***  BrownGreer posted the initial version of the Declaration on its internal data collection site and instructed all employees and contractors on April 19, 2012, to sign this Declaration.  This version asked (1) if a declarant or declarant's "spouse and/or child" ever worked for BP; (2) if applicable, for their date of separation from BP; and (3) if applicable, for a description of the nature of their employment with BP.

**(b) *June 8, 2012, Declaration*.**  BrownGreer posted the First Revised Declaration on its internal data collection site and required employees in the New Orleans office to read and sign it.  BrownGreer instructed employees and contractors on June 8, 2012, to sign this Declaration.  This version asked the declarant "are you a spouse or child of a person or have a child who has filed a claim" and required the declarant to agree to immediately notify their supervisor if a parent, spouse, or child files a claim with the Program.

**(c) *July 13, 2012, Declaration*.**  BrownGreer posted the Second Revised Declaration on its internal data collection site and required all employees to read and sign it, including those who had signed the First Revised Declaration.  BrownGreer instructed employees on July 13, 2012, to sign this Declaration.  This version asked the declarant if a "parent, spouse, or child" filed a DWH claim and continued to require the declarant to agree to notify immediately their supervisor if a parent, spouse, or child files a claim with the Program.

(d) ***June 24, 2013, Declaration.***  BrownGreer posted the Revised Declaration for DWH Settlement Program on its internal data collection site and required all employees to read and sign it to comply with the provisions of the Program's Code of Conduct Policy.  This version required all employees and contractors to affirm that neither they nor any immediate family members have submitted any claim to the Program or taken other actions that would create a conflict of interest.  BrownGreer instructed employees and contractors on June 24, 2013, to sign this Declaration.

**11. *Declaration Renewal.***  Periodically during the course of the Program, BrownGreer requires employees and contractors to renew their Declarations confirming that they do not have a conflict of interest by reading and signing a new Declaration and disclosing any events that have changed since the prior Declaration by the worker.  BrownGreer also conducts frequent refresher trainings to reinforce the messages delivered during initial training.

**12. *BrownGreer Employee SSN Audits.***  Starting in July 2012, BrownGreer began checking the Social Security Numbers of our employees and contractors against the Social Security Numbers associated with DWH claims to ensure that no BrownGreer worker has filed a claim of his or her own.  Beginning on July 22, 2013, BrownGreer changed the frequency of this check so that it is performed on a daily basis.  We investigate all matches and take appropriate disciplinary measures.  BrownGreer reports all suspected Code of Conduct violations to the Claims Administrator.

**13. *BrownGreer Employee Address Audits.***  Starting in October 2012, BrownGreer began checking the addresses of our employees and contractors against the addresses associated with DWH claims to ensure that no person living with a BrownGreer worker has filed a claim of his or her own.  We investigate all matches and take appropriate disciplinary measures.  BrownGreer reports all suspected Code of Conduct violations to the Claims Administrator.

**14. *Investigations and Reporting.***  BrownGreer has a dedicated team comprised of members from the data analytics and reporting team, Human Resources, internal audit team, the Compliance Officer, with the oversight by a Partner, that investigates all potential violations.  BrownGreer reports all suspected Code of Conduct violations to the Claims Administrator.

**15. *Supervisor Responsibility.***  BrownGreer managers and supervisors, including CAC managers, observe their teams daily and watch for any unusual conversations, behavior, or associations with visitors.  The Quality Assurance Team ("QA Team") produces weekly reports by claim type, which provide reviewer performance statistics.  These statistics include the rates of errors, changes in claim results, and percentage of claims found payable by each reviewer.  The QA Team sends these reports to each team weekly.  Claim Review teams have standard productivity and reviewer accuracy monitoring ScoreCARDs for individual reviewers and for the team performance overall that supervisors use to monitor reviewer progress, measure performance, spot outliers, and implement Progressive Discipline remedial action steps.

**16. *CAC Oversight.***  BrownGreer managers make frequent visits to the CACs, both

announced and unannounced. These are led by members of the BrownGreer Gulf Oversight Team, CAC Executive Team, Human Resources, Facilities, and trainers. During the visits, members of the Gulf Oversight Team and CAC Executive Team ensure compliance with BrownGreer and Program policies, and interview managers and staff to gather any comments or concerns they have, including concerns about potential fraud. All potential concerns identified during these visits receive immediate corrective attention. The Gulf Oversight Team and CAC Executive team uses a checklist to ensure consistency in the evaluation of all the CAC locations. We use this checklist as a guideline to identify and document any issues or areas of concern that need to be addressed, adding any new issues to the checklist for future reference. The checklist covers the following high level areas: a) Details of the Visit (Location, Announced/Unannounced Visit, Purpose of Visit, Overall Professionalism, Overall Physical Site Appearance/Issues, and Policy Questions); b) Interior/Exterior Observations; c) CAC Staff Interviews; d) Manager Interviews; e) DWH System; f) Training, Policy Issues, or Work Aids; g) Facilities; h) Security; i) IT/Network Support; and j) Potential Conflicts of Interest/Fraud Awareness; Business and/or Family Disclosures. From June 4, 2012, through February 17, 2014, BrownGreer performed over 289 such oversight visits to the CACs.

**17. CAC IT Security Audits.** Representatives from the Claims Administrator's Office visit the CACs to conduct IT Security Audits. These audits include inquiries to managers and staff about common practices, including the use of IT assets. The audits check for removable media, personal devices connected to the network, and visibility of computer monitors from outside-secured areas. The auditors also check to ensure that all automated IT security protocols are operational. The IT Technicians in the CACs received additional security training from the Claims Administrator and, beginning in January, 2014, are also charged to perform routine Security Audits and report results directly to the CAO. From June 4, 2012, through February 17, 2014, the Claims Administrator's Office/Technicians in the CACs performed over 67 IT Security Audits.

**18. Passwords, User Roles, and Review System Security.** No individual can access the Review System unless that person is an authorized user with an approved user name and password. That password is issued only to that specific user. Separate from inherent tasks such as logging in, logging out, and changing passwords, we assign every user a defined role in the Review System tailored to permit that person to perform only the job assigned to the person and no other task. The user role defines the capabilities and functions that an individual user can perform or access within the Review System. To access a feature or function, an individual user must be assigned the specific governing role. For example, it is impossible for a reviewer assigned solely to the role of Initial Review to perform a Quality Assurance review. Currently, there are 156 roles in the Review System.

Each module of the Review System is assigned a Directly Responsible Individual ("DRI") who directs any activity or access in that module. A supervisor or DRI makes the request that will not be granted without explicit approval from the DRI of that module. No reviewer may request their own access. This system prevents any user from being able to add functionality to their portal without proper approval. A limited group of senior staff are the only persons who have the ability to grant roles. The DRI must approve the request but cannot grant the role. The DWH Access team can grant the role but not approve the request. All requests are

monitored by a Staffing and Assignments DRI who audits access roles to match them with the person's assignments.  This means no single user can create or alter their access.

In addition to passwords and user roles, we also employ system security procedures.  The Review System uses algorithms to restrict further access.  For example, a reviewer who performs an Initial Review cannot perform the QA review on the same claim.  Following the claim evaluation, we employ a detailed Notice QA process before we issue any Eligibility Notice.  On Subsistence claims, an experienced reviewer or supervisor evaluates the substance of every payable determination for accuracy before we issue the Eligibility Notice.

**19.** ***Portal Log-In Requirements***.  BrownGreer has a DWH Access Team that oversees the creation of user accounts and removal of system access for the areas of the Review System for which BrownGreer is responsible.  BrownGreer has established system protocols that monitor Portal user activity to assure that the user accounts are being actively used.  Each day, a system query checks user accounts for recent activity, and disables a user account if the user did not successfully log in to the account within the last 14 days.

**20.** ***Portal Time-Out***.  If a user does not actively use the Portal for four hours, the system generates a message informing the user that the session will time out because of inactivity.  If the user does not request to continue using the Portal within five minutes, the Portal session ends.  The user is then required to log in to the Portal again to start a new session**.**

**22.** ***Portal User Audits***.  The BrownGreer DWH Access Team, in coordination with each team and the Claims Administrator's Office, performs periodic audits of all user access.

**21.** ***Multiple Reviewer Requirement***.  The Review System prevents a QA reviewer from reviewing a claim that he or she previously reviewed in Initial Review.  This ensures that a different person reviews any claim flagged for QA.

**22.** ***Claim Review Access***.  Since August 5, 2013, BrownGreer reviewers have been unable to pull and review claims on demand from the Initial and QA queues.  Instead, the system selects the next available claim when prompted to do so by the Initial Reviewer, who has no knowledge of the claims in line for review.  Only a small group of supervisors may assign a claim to a reviewer outside that assigned queue order, and, in doing so, the supervisor places the claim directly into the reviewer's personal queue.  Consequently, no reviewer can simply pick a particular claim for review.

**23.** ***Claim Review Functions at the CACs***.  On October 14, 2013, BrownGreer at the direction and in coordination with the Claims Administrator, removed all claims review functions from its personnel in the CACs.  The staff at the CAC now only serves the claimants and performs outreach calls.  The only exception remains in the Gulf Shores office, where the remaining staff continues to review Subsistence claims.  However, the claimant assistance function in Gulf Shores is performed out of a separate space that is not shared with those performing reviews.

**24.** ***Pop-Up Warning and Agreement to Start Each Session***.  Each time a worker logs on

35

to the BrownGreer network, he receives the following warning:

> By logging into the BrownGreer network or using computers or resources connected to the network, I acknowledge my duty to preserve the confidentiality of BrownGreer data including claims related data. I will comply with BrownGreer's Policy on Computer Use and Internet Access and will use BrownGreer resources for approved business purposes only. I will not engage in unauthorized uses, such as connecting non-BrownGreer devices to the computer or network, listening to or viewing personal CDs and DVDs, engaging in any illegal activities under state or Federal law, or using any confidential claims-related information for non-authorized purpose or disclosure outside of BrownGreer. I acknowledge that my information and use of the BrownGreer network and this computer are logged and monitored.

**23. IP Address Security.**  On June 28, 2012, we implemented a process to limit access to the Review System only from pre-approved IP addresses.  Certain users are permitted to access the Review System from any computer, but access is limited.  As a result, most users cannot access the Review System to view, update or enter claims data from unapproved locations.

**24. Workstation Security.**  The workstations used by all BrownGreer workers automatically lock after 8 minutes of inactivity.  Workers may unlock the station only by using a valid username and password.  Antivirus software is installed on all workstations and remote laptops have full disk encryption enabled.

**25. Internet Security.**  BrownGreer blocks worker access to various external internet sites.  Exceptions to this rule are evaluated and reviewed by IT and by management, if required.  Examples of these exceptions include sites containing public records, court sites, government sites, and Google Maps (for researching location/address information), all of which we use in the processing of claims.

**26. Hardware Security.**  BrownGreer has disabled the functioning of the USB ports on each workstation, which prevents workers from placing information found in the Portal on a removable drive.  This restriction applies to all BrownGreer workstations in the New Orleans office, all CACs, and the Paragon Place office in Richmond, Virginia.

**27. Results Search Access.**  Results Search is a function that allows users to view only the status of a claim and its associated documents.  Users cannot perform system reviews, modify claimant profiles, or submit determinations into the Review System through Results Search.  On August 12, 2013, BrownGreer removed access to the Results Search function from reviewers who do not use the Results Search function to perform their primary job duties.  Reviewers who do not have access to the Results Search function are unable to look up claims in the system.

**28. Results Search Monitoring.**  On July 23, 2013, BrownGreer began analyzing data from Portal Users with higher than normal Results Search usage.  We periodically identify workers with over 50 claimant searches, evaluate the data associated with those claimant searches, and complete interviews with these workers to understand the circumstances that led to

36

these searches.  If, after reviewing the results of our internal investigation, we determine that a BrownGreer worker was conducting claimant searches for reasons outside the scope of a project assignment, we take appropriate disciplinary action.

     **29. *Safeguarding Hard Copy Materials*.**  BrownGreer provides reviewers with personal notebooks for keeping notes from trainings and as they perform reviews.  Reviewers are prohibited from removing notebooks from the premises and are instructed to keep the notebook secure while in the office.  Notebooks and other confidential materials that do not require retention are collected for shredding after they are no longer in use or if employee is separated.

     **30. *Random Post-Review Audits*.**  Twice a week, BrownGreer selects 3% - 5% of all claims ready for a Notice.  The selection is random, however, a small sample of each claim type includes claims with a high dollar amounts determination as well as sampling of claims based on reviewer approval rates for certain claim types.  The claimants are proposed for SIT Review and move through the Special Investigations Team's review and evaluation.

     **31. *Payment and Notice Review*.**  Each day, BrownGreer identifies all claims or claimants that are ready for a Notice or payment.  BrownGreer reviews each payable Notice and potential payment before issuance to confirm that the Notice or payment is appropriate and correct.  This payable Notice review confirms that there is no evidence of fraud related to the claims that will receive a Notice.  Additionally, before payment, we verify the claimant's identity and reaffirm that there is no evidence of fraud related to the claim that will be paid.

     **32. *BrownGreer E-Hotline*.**  Beginning on July 24, 2012, BrownGreer implemented an e-Hotline for use by workers in the New Orleans office and in the CACs to alert us of situations that are a potential cause for concern.  BrownGreer has also asked workers to reach out to our Human Resources department to report any concerns that a worker may have, including instances where a worker suspects a co-worker of misconduct.

     **33. *Call Center Comment Line*.**  On March 15, 2013, BrownGreer implemented a Call Center Comment Line for use by claimants or other individuals to report concerns about their experiences with the Program.  Callers may supply these comments anonymously if they wish to do so.  Since establishing this hotline, BrownGreer has not received any calls reporting potential fraud or suspicious behavior.

     **34. *CSSP Fraud Hotline*.**  We received notification about the new Hotline for the Deepwater Horizon Settlement Program from the Claims Administrator on January 21, 2014.  On January 23, 2014, we notified all BG workers to read and acknowledge the notice in BrownGreer's Data Collection site by the following day.  We immediately sent reminders to those who did not meet this deadline.  All employees have acknowledged the new notice with the exception of a three employees that are currently on leaves of absence.  We are requiring that these individuals read and acknowledge the notice upon return from their leave.

     **35. *Employee Awareness and Surveys*.**  To encourage exchange and flow of information, BrownGreer solicits feedback from its employees periodically through Comment Box, Employee Opinion Surveys, Supervisor and Operations Feedback Surveys, Evaluations Surveys, and Exit

Surveys that is taken when employee separates from BrownGreer.  BrownGreer also implemented the Best Practices Program that solicits ideas from employees to improve practices, efficiency, and communications.

   **36. *Special Investigations Team ("SIT").***  In addition to the internal controls over our workers' actions, the Program also maintains the Special Investigations Team, described in more detail in Section I, that works closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice.

   **37. *Safeguarding Expenses*.**  BrownGreer requires all employees or contractors traveling for the Program related matters to read and sign the Travel and Entertainment Policy.  BrownGreer set up corporate accounts with travel vendors to ensure that we receive discounted rates.  All Airfare, Hotel Accommodations, Rental Car and Per Diem calculations are done in compliance with the Travel and Entertainment Policy.  Every expense incurred for the Program requires approval and review of at least four individuals, and is subject to audit, to confirm business necessity, compliance, and approval before an expense is billed to the client.

   **38. *Internal and External Audits.***  Starting in November 2012, the Claims Administrator initiated an Internal Audit team to analyze claim reviews.  The Internal Audit team communicates its finding to BrownGreer.  We participate in weekly meetings with the Claims Administrator's staff to review findings and discuss results and provide written responses.  BrownGreer incorporates the Claims Administrator's finding in the reviewer evaluation, provides feedback to reviewers on all the findings, and formulates refresher trainings for all staff as deemed necessary.  BrownGreer fully and extensively cooperates with all external audits and initiatives, including claims review and review system evaluation, training, fraud prevention, IT and security controls, contract compliance, and financial audits conducted by (a) CliftonLarsonAllen, (b) the Freeh Group, (c) IBM, and (d) McGladrey LLP.

   **39. *Additional Protections.***  BrownGreer continually evaluates the need for additional internal controls.  We continually assess the installation of new protections and the effectiveness of current procedures.  We will continue to enact new measures whenever necessary over the remainder of the Program.

# EXHIBIT E

Proposed BEL Claim Process Level Internal Controls

| | | | | | |
|---|---|---|---|---|---|
| DEEPWATER HORIZON CSSP | | | | | |
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| **PROCESS CONTROLS** | | | | | |
| **P1 - CLAIMS ADMINISTRATION** | | | | | |
| P1.01 | Claims Error or Fraud | Non-Qualified Personnel | Personnel responsible for BEL claims review may not possess required technical accounting competence or professional qualifications. | Professional accountants should be responsible for accounting related judgments and analyses. A review of the technical competence of CSSP vendor personnel charged with making important judgments about accounting related issues should be conducted. Such personnel should have adequate training and credentials to make the necessary judgments in connection with BEL claims. Monitor final determinations to determine whether they significantly vary based upon which professional reviewed the claim and adjust and implement additional training accordingly. | |
| P1.02 | Claims Error or Fraud | Non-Qualified Personnel | Personnel responsible for BEL claims review may not possess required industry working knowledge or experience. | In addition to control P1.01, professional accountants assigned to review claims in specific industries should possess knowledge or experience unique to that particular industry. A review of the technical industry-specific qualifications must be conducted for each CSSP vendor employee. | |
| P1.03 | Claims Error or Fraud | Non-Qualified Personnel | CSSP Vendor personnel responsible for BEL claims review may not possess required technical competence or professional qualifications. | The causation determination required by Exhibit 4B requires a determination of revenue, which requires professional review of the claimant's books and records. Per control P1.01, this should be handled by accounting professionals with appropriate training. Institute a reporting system in which Vendors provide detailed information about the qualifications of the individual reviewers employed by Vendors. Retain the discretion to reject individual reviewers employed by Vendors. | |
| P1.04 | Claims Error or Fraud | Lack of Transparency | The CSSP may fail to establish and maintain adequate transparency in the claims process. | Ensure claims are processed with complete transparency to the claimant, the Court, Class Counsel and BP. Claim reviewers should be able to show how a claim was processed and the claim outcome, including how the compensation amount was determined and all documents submitted by the claimant. Any critical determinations and judgments made by the claim reviewer should be documented. It may be necessary to develop a written policy on transparency and conduct supervisory reviews to validate consistency with the policy. | . ● |
| P1.05 | Claims Error or Fraud | Lack of Transparency | The CSSP may fail to establish and maintain adequate transparency in the claims process. | Ensure that every step of the claim review process is clearly documented and a readily available audit trail exists for review. Review notes and documentation must correspond with the results of the claim review. Any critical determinations and judgments made by the claim reviewer should be clearly documented. | |
| P1.06 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | There should be a QC review team responsible for in-house quality control functions over the claims process. Such function would be responsible for quality control over claims processed, paid, and appealed. A quality control function should ensure that claims are reviewed and determined based on a consistently applied method. It should also ensure that any identified issues or exception are promptly investigated. | |
| P1.07 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | Per control P1.06, ensure that an in-house quality control group performs scheduled weekly recalculations on a random sampling of processed claims within weighted categories. The random sampling should consist of at least 5% of the weekly submitted claim population. This quality control function should ensure that claims are reviewed and determined based on a consistently applied method and any identified issues or exception are promptly investigated. | |
| P1.08 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | Use computer-assisted data analytics to incorporate an automated quality control function as part of the claims review process. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P1.09 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | Use computer-assisted data analytics to incorporate an automated quality control function as part of the claims review process to review for unusual fluctuations in addition to the seven Juneau matching criteria. For example, benchmark metrics should be generated for a given industry in order to compare specific offers with benchmark amounts. | |
| P1.10 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | Use computer-assisted data analytics to evaluate claims by comparing offer amounts to industry averages. Claims that are outside the range of tolerance should be flagged for further review. | |
| P1.11 | Claims Error or Fraud | Documentation is Not Properly Retained | Financial and other source documents submitted by claimant as well as supporting documents prepared by the CSSP are not properly retained and stored. | A records management policy should exist and outline procedures related to different records and the classification of such records, records retention schedule process, records retention schedule for each classification of records, and the process for amending a record retention schedule. Supervisory reviews should validate compliance with the policy. | |
| P1.12 | Claims Error or Fraud | Documentation is Not Properly Retained | Financial and other source documents submitted by claimant as well as supporting documents prepared by the CSSP are not properly retained and stored. | Ensure that both hard copy paper and electronic documentation are maintained in a secure manner or location consistent with court orders on respective document retention for that classification of records and can be readily accessible or recalled when needed. | |
| P1.13 | Claims Error or Fraud | Documentation is Not Properly Retained | Financial and other source documents submitted by claimant as well as supporting documents prepared by the CSSP are not properly retained and stored. | Ensure all personnel are adequately trained on the proper safeguarding policies and procedures for both physical and cyber storage of records. For example, records copied onto USB drives for transfer must be properly encrypted. Confidential documents must also be marked with appropriate confidentiality notices. | |
| P1.14 | Claims Error or Fraud | Lack of Segregation of Duties | Inappropriate segregation in the assignment of duties leading to control deficiencies resulting in errors, fraud or misstatements. | Ensure there are appropriate procedures in place to maintain proper segregation of duties between those who review claims and those who approve the claims determination. Approving the claim is another level of quality control and should not be performed by the same individual who reviewed the claim. Written policy should be developed and supervisory reviews conducted to validate consistency with the policy. | |
| P1.15 | Claims Error or Fraud | Additional Review | Additional review for claims flagged by matching screening criteria. | The claims reviewer must determine the proper monthly revenue and corresponding variable expenses to be attributed to each month in the Benchmark and Compensation Periods. In addition, all claims that trigger the matching screening criteria must be followed up for additional review. | |
| P1.16 | Claims Error or Fraud | Lack of Authorization | Authorization is not required for large claim payments. | As part of the in-house quality control function, create a tiered authorization system requiring claim award amounts above a certain threshold to receive additional senior management authorization before pay out. Award amounts above the set threshold must be approved and signed by a senior manager before payout of claim occurs. | |
| P1.17 | Claims Error or Fraud | Lack of Communication and Training | CSSP Vendor personnel responsible for BEL claims review may not be aware of policy and procedure updates. | All Vendor personnel must be properly informed of all changes in policies and procedures related to processing BEL claims as well as system updates that may impact the processing of claims. All policy and procedure updates should be delivered electronically directly to front-line Vendor personnel. Vendors will be required to verify that supervisors remind front-line personnel, on a real-time basis, to review all changes in policies and procedures. | |
| P1.18 | Claims Error or Fraud | Lack of Communication and Training | CSSP Vendor personnel responsible for BEL claims review may not be aware of policy and procedure updates. | All changes in policy must be applied to claims in process and yet to be reviewed claims. Additionally, all changes in policy must be reviewed for consideration of impact on closed claim files and applied as deemed necessary. | |

Proposed BEL Claim Process Level Internal Controls

| | | | | | |
|---|---|---|---|---|---|
| DEEPWATER HORIZON CSSP | | | | | |
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |

| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
|---|---|---|---|---|---|
| **P2 – CONTROL ENVIRONMENT** | | | | | |
| P2.01 | Bribery and Corruption | Conflict of Interest | Employees may have a personal or business interest in conflict with duties and responsibilities to the CSSP. | CSSP personnel may not make decisions in matters which they have a personal financial interest or where the outcome can be expected to result in monetary gain for themselves or persons close to them (e.g., related party). Ensure that personnel policies on conflicts of interest and code of ethics be in writing and given to all employees prior to hiring, with changes in policies communicated on a regular basis. Regular training on avoiding conflicts of interest should be provided. Employees will be required to certify on a regular basis (e.g., quarterly) that they understand the policy on conflicts of interest and have abided by it. | |
| P2.02 | Claims Error or Fraud | Fraudulent Claims Activity Not Investigated | Special investigations unit may not be established or properly maintained. | Establish and maintain a separate fraudulent claims unit focused on handling all fraudulent claims related activity. The fraudulent claims unit personnel should be independent of the CSSP and be given authority to interview CSSP personnel and access to claims documentation without unreasonable restriction or limitation from the CSSP. This fraudulent claims unit should directly report to Judge Barbier and BP. | |
| P2.03 | Claims Error or Fraud | Fraud Training Programs not Conducted | CSSP may not have fraud training programs in place. | Establish employee fraud training programs taught by competent professionals trained in claims fraud. All claims personnel should be required to attend fraud training programs to ensure they have received adequate training to recognize potential fraudulent claims activity. To enforce training requirements, maintain records indicating, on an employee by employee basis, that claims personnel have attended such training programs. | |
| P2.04 | Claims Error or Fraud | Management Override | Established protocols or procedures are circumvented. | In addition to the separate fraudulent claims unit, CSSP senior managers should be equipped to react and deal with acts of fraud, or suspected fraud, in a timely manner that sends a strong message to others that the override of controls and fraudulent activity will not be tolerated or quietly ignored. | |
| P2.05 | Claims Error or Fraud | Fraud/Reject Claims | Previously denied claimants may re-submit claim files. | Maintain an active list of rejected claimants to reference during the claims intake process of newly submitted claims. Claim processors must flag newly submitted claims previously rejected for careful review. | |
| P2.06 | Claims Error or Fraud | Fraud/Reject Claims | Claimants found to submit fraudulent claims may re-submit claim files. | Maintain an active list of claimants found to have submitted fraudulent claims. Claim processors must reference newly submitted claims against this fraud list for automatic rejection. | |
| P2.07 | Claims Error or Fraud | Fraud/Reject Claims | Third parties submitting claims on behalf of entities found to be guilty of submitting fraudulent claims. | Maintain an active list of third party entities, such as law firms or accounting firms, found to have submitted fraudulent claims. | |
| P2.08 | Claims Error or Fraud | Fraud/Reject Claims | Third parties submitting claims on behalf of entities found to be guilty of submitting fraudulent claims. | Maintain an active list of third party entities with an unusual relationship with the claims submitted. For example, third parties that submit a disproportional number of claims that meet the Juneau triggers. | |
| P2.09 | Information and Communication | Privacy | Breach of confidentiality. | Maintain an appropriate communication policy to ensure vendors and contractors safeguard confidentiality of claimant information consistent with the Settlement Agreement and all court orders addressing confidentiality. Ensure that all vendors and contractors are informed and provide signed acknowledgement of the communication policy. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| **Risk #** | **Risk Category** | **Subcategory** | **Risk / Scheme Description** | **Proposed Mitigating Internal Controls** | **Notes** |
| **P3 - CLAIM INTAKE PROCESS** | | | | | |
| P3.01 | Claims Error or Fraud | Incomplete Claim File | Incomplete or inaccurate data input into claim processing system. | There should be a controlled process for input of claimant data to ensure all information is complete and accurate in order to accurately determine BEL amount.  A quality control and quality assurance process should be documented and performed.  Any revisions to the data should be documented and supported by claimant requests or documentation.   All exceptions should be reported and reprocessed. | |
| P3.02 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should ensure that the claims form has been received and signed under penalty of perjury, and document said review. | |
| P3.03 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should utilize a checklist to verify all documents required by Exhibit 4A are included in claimant provided information.  The claims processing clerk should consider whether circumstances warrant requesting metadata or electronic versions of source documents. | |
| P3.04 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should ensure that the claimant tax returns for the relevant Benchmark and Compensation years are signed and dated consistent with normal filing schedules.  In the event of any variation from this standard, authorization should be obtained to obtain verification from relevant tax authorities of the filing and accuracy of the submitted return.  All such steps should be documented. | |
| P3.05 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should ensure that documents reflecting the business structure and ownership of the claimant have been received.  This may include but is not limited to articles of incorporation, shareholder list, and partnership or limited partnership agreements.  The clerk shall document said review. | |
| P3.06 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should ensure that the monthly and annual profit and loss statements have been received for the relevant Benchmark and Compensation years, and document said review.  If the date of preparation is available on the annual profit and loss statement, review date to determine whether documents were contemporaneously prepared.  See also control P4.12. | |
| P3.07 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should ensure that claimants who have received any VoO payments, payments from GCCF, or payments from BP as part of its OPA claims process, have provided documentation of the amount of payment received, and document said review.  To facilitate this review, the CSSP should maintain electronically-searchable lists of these prior payments independently compiled per controls P3.15, P3.16, P3.17. | |
| P3.08 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | The claims processing clerk performing the intake process should ensure that the form affirming that the individual filing the claim on behalf of the business is an authorized representative of the claimant has been received and reviewed. | |
| P3.09 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation. | Per Exhibit 4A of the Settlement Agreement, claims processing clerks should ensure that submitted documentation are properly dated.  If dates are missing, the claim should be returned to the claimant to provide missing information. | |
| P3.10 | Claims Error or Fraud | Missing Documentation | Claimant may have provided an invalid or suspicious mailing address. | Follow-up and perform a more in-depth inquiry of claimants who provide a P.O. box as the mailing address in their claim file and verify that the claimant is a legitimate business. | |

Proposed BEL Claim Process Level Internal Controls

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P3.11 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be created if supplemental information provided by claimant is mistaken as a new claim. | During the intake process, the claim processor should first verify that the claimant does not exist in CSSP system to avoid multiple claims IDs assigned to the same claimant.  In addition to preventing multiple payments to the same claimant, this should ensure that all information and supplemental information provided by the claimant is consolidated in the same claim file. | |
| P3.12 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be created if a claimant submits more than one claim. | Per control P3.11, perform a search for duplicate claims utilizing claimant name. | |
| P3.13 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be created if a claimant submits more than one claim. | Per control P3.11, perform a search for duplicate claims utilizing claimant address. | |
| P3.14 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be created if a claimant submits more than one claim. | During the intake process, the claim processor should independently cross-check the claimant's TIN with the TINs of other claimants in order to prevent multiple payments to the same claimant. | |
| P3.15 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants listed on fraud lists. | During the intake process, the claim processor should independently cross-check the claimant name, address, and TIN against reject and fraud lists published by the Gulf Coast Claims Facility (GCCF). | |
| P3.16 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants listed on fraud lists. | During the intake process, the claim processor should independently cross-check the claimant name, address, and TIN against reject and fraud lists published by the Vessels of Opportunity (VoO). | |
| P3.17 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants listed on fraud lists. | During the intake process, the claim processor should cross-check the claimant name, address, and TIN against the claimants who were rejected or deemed fraudulent during the BP-Oil Pollution Act (OPA) claims process. | |
| P3.18 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants listed on fraud lists. | During the intake process, the claim processor should cross-check the claimant name, address, and TIN against the internally maintained BEL list of rejected claims described in risk P2.05.  Claim reviewers should be aware and take extra care in review of claimants who have previously been denied. | |
| P3.19 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants listed on fraud lists. | During the intake process, the claim processor should cross-check the claimant name, address, and TIN against the internally maintained BEL list of fraudulent claims described in risk P2.06.  Claimants found to have submitted perpetrated fraudulent claims must be automatically rejected. | |
| P3.20 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants assisted by third parties found guilty of preparing fraudulent claims. | If a claim was prepared by a third party, such as a law firm or accounting firm, the claim processor should cross-check the third party entity against the internally maintained BEL list of third parties that previously handled fraudulent claims or have been investigated for fraud described in control P2.07.  Claim reviewers should take extra care when reviewing claims prepared by such third parties. | |
| P3.21 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be created if claimant submits a hard copy and electronic copy of their claim. | Hard copy forms should be compared to list of electronically submitted claims to ensure claimants are not submitting a hard copy and electronic copy, prior to scanning a hard copy. | |
| P3.22 | Claims Error or Fraud | Incomplete Claim Data | Scanned claims are not legible. | Hard copy forms are reviewed after they are scanned to ensure they are legible and that no information was cut-off. | |
| P3.23 | Claims Error or Fraud | Invalid Claim | Claimant does not meet the requirements for a BEL Claim. | During the intake process, the claim processor should ensure that the claimant is not seeking payment only for bodily injury. | |

Proposed BEL Claim Process Level Internal Controls

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P3.24 | Claims Error or Fraud | Claimant Number | Claimant does not utilize the proper Claimant Number. | During the intake process, the claim processor should ensure that claimants who have filed a claim with the GCCF are utilizing their GCCF Claimant Number as their Deepwater Horizon Settlement Program Claimant Number. | |
| P3.25 | Claims Error or Fraud | Claimant Number | Claimant does not utilize the proper Claimant Number. | During the intake process, the claim processor should ensure that claimants who have not filed a claim with the GCCF are utilizing the nine-digit Claimant Number they received from their initial Registration Form with the Deepwater Horizon Settlement Program. | |
| P3.26 | Claims Error or Fraud | Claimant Number | Claimant Number is not the proper length. | During the intake process, the claim processor should ensure that the Claimant Number for claimants who checked the box "GCCF Claimant Number" is seven digits. | |
| P3.27 | Claims Error or Fraud | Claimant Number | Claimant Number is not the proper length. | During the intake process, the claim processor should ensure that the Claimant Number for claimants who did not check the box "GCCF Claimant Number" is nine digits. | |
| P3.28 | Claims Error or Fraud | Social Security Number | Social security number is not in the proper length or format. | If a claimant files their business's taxes using a social security number, the claim processor should ensure that a nine digit number is submitted in this format: XXX-XX-XXXX. | |
| P3.29 | Claims Error or Fraud | Individual Taxpayer Identification Number | Individual taxpayer identification number is not in the proper length or format. | If a claimant files their business's taxes using an individual taxpayer identification number, the claim processor should ensure that a nine digit number is submitted in this format: XXX-XX-XXXX. | |
| P3.30 | Claims Error or Fraud | Employer Identification Number | Employer identification number is not in the proper length or format. | If a claimant files their business's taxes using an employer identification number, the claim processor should ensure that a nine digit number is submitted in this format: XX-XXXXXXX. | |
| P3.31 | Claims Error or Fraud | Supporting Documentation | Supporting documentation is not in the proper claim file. | For supporting documentation received subsequent to receipt of claim, the claims processing clerk should ensure that all supporting documentation is clearly labeled with the claimants name and TIN and matched to the proper claim file. | |
| P3.32 | Claims Error or Fraud | W-9 Form | W-9 Form is not submitted. | The claims processing clerk performing the intake process should ensure that the claimant's W-9 Form is received and verified. | |
| P3.33 | Claims Error or Fraud | Missing Documentation | Claimant has not provided the proper documentation for Multi-Facility Businesses. | If the claimant is a Multi-Facility Business, the claims processing clerk performing the intake process should ensure that claimant has provided the documentation required in accordance with Exhibit 5. | |
| P3.34 | Claims Error or Fraud | GCCF Release | Claimant did not disclose a release from GCCF. | Check if the claimant executed a release in the GCCF. Ensure to check under both the claimant's EIN and SSN. | |
| P3.35 | Claims Error or Fraud | Opt out | Claimant opted out of the claim. | Ensure the claimant did not opt out of the settlement.  If claimant did opt out, reject the claim. | |

Proposed BEL Claim Process Level Internal Controls

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| **P4 - CLAIMS VERIFICATION** | | | | | |
| P4.01 | Claims Error or Fraud | Class Member Requirements Not Met | Claimant is not an eligible class member or fail to meet the Exhibit 4B requirement. | Claim eligibility should be verified to check that the claimant is an eligible class member and has, in fact, incurred a loss due to the spill and there is valid and supportable basis for the loss. Available factual information should be evaluated to determine claimant eligibility due to a lack of nexus, in an excluded industry or failure to meet the proof requirements of Exhibit 4B. For example, other determinations of ineligibility include real estate development, other financial institutions, not selling products to a consumer, end-user, or another entity that does so. | |
| P4.02 | Claims Error or Fraud | Industry Misclassified | Claimant industry improperly classified or ineligible for BEL. | Ascertain the nature of the claimant's business and determine the appropriate earnings cycle and industry classification. The claim should be reviewed, so the specific revenue attributes and variable expenses can be applied to assist with the evaluation of the BEL claim. In addition, proper identification of the claimant's industry is essential for identifying excluded industries and in applying the correct Risk Transfer Premium (RTP) (e.g., tourism v. non-tourism). | |
| P4.03 | Claims Error or Fraud | Claim Type Misclassified | Failed Business loss claim improperly classified as a general BEL claim. | All Business Claims should be reviewed to identify businesses that have ceased operations and wound down, entered into bankruptcy, or other otherwise initiated or completed liquidation of substantially all assets. Claims identified as a failed business should be evaluated under the separate Failed Business framework to the Settlement Agreement. | |
| P4.04 | Claims Error or Fraud | Spill Zone Misidentified | Misidentification of spill zone by claimant may not be identified and corrected. | Review zone designation to determine whether it is properly classified per the provisions of the Settlement Agreement. Such determination should be based on objective and reliable information. | |
| P4.05 | Claims Error or Fraud | Residential Address Used | Claimant improperly uses residential addresses as business address to qualify for Zone requirements. | Claimant may improperly record owner or shareholder residential address as the main business address in order to falsely qualify into a certain Zone. According to the Settlement Program, "the physical location of the business" is the address that must be used for Business Economic Loss claimants, not where an owner of the business maintains his personal residence. The CSSP should investigate and obtain objective evidence to verify the business address provided by the Claimant. | |
| P4.06 | Claims Error or Fraud | Re-evaluation of Class Member Requirements | Claimant class member and Exhibit 4B requirements were met using financial data that does not reflect monthly revenues when earned and corresponding variable expenses consistent with proper matching using an accrual type framework. | Claimant may prepare and submit claim using financial information that does not properly reflect monthly revenues and corresponding variable expenses that achieves proper matching. Any time throughout the claims review process where proper allocation of monthly revenues and corresponding variable expenses differs from the original data submitted by claimant, or where restatement, adjustment or reallocation of revenue and/or expenses is necessary, re-evaluate the claimant for class member requirements to ensure the claimant still qualifies to submit a claim. | |
| P4.07 | Claims Error or Fraud | False Information | Information provided does not belong to the claimant. | Perform additional due diligence on the claimant. Compare information such as Tax ID and business name to information provided by publicly available business registration organizations such as the Better Business Bureau and internet database searches to verify information is not fraudulent. In addition, review the claimant's filings on their web site. | |
| P4.08 | Claims Error or Fraud | Unauthorized Changes to Claim | Claims may be changed without proper authorization. | Request for changes to claims in the form of additional documents or correction of previously submitted data error must be submitted in writing, authorized by the individual that submitted the original claim, and properly documented and retained according to record keeping policy outlined in control P1.12 so as to maintain transparency as required in control P1.05. | |

DEEPWATER HORIZON CSSP
Proposed BEL Claim Process Level Internal Controls
February 4, 2014

| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
|---|---|---|---|---|---|
| P4.09 | Claims Error or Fraud | Claim Exceptions | Exceptions are not identified. | Management reviews exception reports to ensure that all exceptions are identified and properly addressed. | |
| P4.10 | Claims Error or Fraud | Compensation Period | Claimant selected an improper compensation period. | The IT system should include an algorithm to compute optimal Compensation and Benchmark periods for claimants using accurate data consistent with the requirements of the Settlement Agreement, including Exhibit 4C. | |
| P4.11 | Claims Error or Fraud | North American Industry Classification System Code | Claimant selects an improper North American Industry Classification System Code, or is in an excluded industry. | Ensure that the North American Industry Classification System (NAICS) Code determined is in line with the nature of the claimant's business and revenue attributes. Evaluate whether claimant is in an excluded industry. If NAICS Code is inconsistent with the claimant's industry, perform additional research to properly identify Code. Proper identification of the claimant's NAICS Code is essential in applying the correct Risk Transfer Premium (RTP) (e.g., tourism v. non-tourism), and for ensuring eligibility. | |
| P4.12 | Claims Error or Fraud | Financial Statements | Non-contemporaneously prepared financial statements. | Procedures should be developed to apply appropriate review to non-contemporaneously prepared financial statements, as such statements create a heightened risk of error or fraud. | |
| P4.13 | Claims Error or Fraud | Financial Statements | Transactions are not carried out at arm's length. | Claimant submits multiple claims for related parties which include financial statements that reflect transactions not carried out at arm's length. Procedures should be developed to identify related party transactions. Perform inquiries of the claimants to understand the transaction and review accounting treatment to determine whether it is proper. | |
| P4.14 | Claims Error or Fraud | Financial Statements | Claimant submits financial statements that differ materially from financial statements submitted to the GCCF or BP Claims program. | Obtain the financial statements submitted to the GCCF or BP Claims program and determine if they differ materially from the financial statements submitted for the BEL claim. Material differences should be further investigated. | |
| P4.15 | Claims Error or Fraud | Claim Exceptions | A claim that should be subject to review for Moratoria Losses is not properly identified as such by claimant or the CSSP. | Procedures must accurately identify claims requiring Moratoria Loss review. Per Exhibit 16, the BEL framework does not apply for determinations of Moratoria Losses. Such claims may not be processed until guidance agreed upon by BP is developed to apply in making compensation determinations that adhere to the Moratoria Loss exclusion in the Settlement Agreement. Moratoria Losses are excluded from the Settlement and no claimant may recover for Moratoria Losses; claims that include such losses must be identified and such losses excluded. | |
| **P5 - CLAIMS DOCUMENTATION** | | | | | |
| P5.01 | Revenue / Expense Error or Fraud | Inadequate Documentation | BEL claims documentation may be insufficient, non-contemporaneous, or otherwise lacking. | Ensure that the contemporaneous underlying financial records support the BEL claims and the Profit & Loss statements for the relevant periods. The sufficiency of proof of the contemporaneous nature of the proffered records must be evaluated by a professional with sufficient training to evaluate the quality and sufficiency of the records provided. | |
| P5.02 | Revenue / Expense Error or Fraud | Inadequate Documentation | Minimum required BEL claims documentation may not be provided or followed-up with claimant. | Professional accountant claims reviewer must evaluate documentation submitted to determine whether it permits accurate identification of monthly revenues and corresponding variable expenses for the Benchmark Period year(s) and the Compensation Period. Where it does not, or it is unclear that it does, seek underlying source documentation consistent with Exhibit 4A Paragraph 4 sufficient to make such determinations. | |
| P5.03 | Revenue / Expense Error or Fraud | Inadequate Documentation | Minimum required BEL claims documentation may not be provided or followed-up with claimant. | Verify that annual tax returns submitted by the claimant are appropriately dated and signed, and the documents submitted were actually filed with the IRS. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P5.04 | Revenue / Expense Error or Fraud | Inadequate Documentation | Minimum required BEL claims documentation may not be provided or followed-up with claimant. | Verify that sales tax returns submitted by the claimant are appropriately dated and signed, and the documents submitted were actually filed with the state. | |
| P5.05 | Revenue / Expense Error or Fraud | Inadequate Documentation | Minimum required BEL claims documentation may not be provided or followed-up with claimant. | As an independent verification, for tax returns that do not appear contemporaneously prepared, signed or dated, the CSSP should verify claimant submitted information with the IRS to reconcile and verify accuracy. | |
| P5.06 | Revenue / Expense Error or Fraud | Lack of supplemental documentation | Supplemental information may contradict minimum required documentation submitted by BEL claimants. | Where necessary, request claimants to supplement their claim file with financial documents submitted to lenders or other third parties to resolve questions identified in claim data. | |
| P5.07 | Revenue / Expense Error or Fraud | Documentation does not reflect economic reality | BEL claims documentation may not accurately reflect monthly revenue and corresponding variable expense. | Claims may require additional documentation in order to properly determine the monthly revenue and corresponding variable expenses to reflect economic reality. | |
| P5.08 | Revenue / Expense Error or Fraud | Documentation Lacking Support/ Information Inconsistent | Inadequate documentation and inconsistent information supplied by claimant may not be identified and followed up. | To help prevent material errors and irregularities, compare the information submitted by the claimant with the information provided by the claim preparer for inconsistencies. Variances in the data provided need to be further reviewed by a professional accountant with sufficient training to investigate, and additional documentation should be requested as support. | |
| P5.09 | Revenue / Expense Error or Fraud | Claimant Interview Not Conducted | Missing documentation or key additional information required to properly evaluate BEL claim may not be followed-up with claimant. | Interview claimant and any person with principal responsibility for preparing the claim submission if there are additional follow-up questions necessary to understand the submitted claim file. Questions include topics related year-end or period-end adjustments, related party transactions, non-contemporaneously prepared documents, multiple versions of financial statements and multi-facility claims. | |
| P5.10 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Short Earnings Cycle - Traditional Manufacturing, Retail, Wholesale Distribution: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for short cycle claimants in traditional manufacturing, retail and wholesale distribution industries to supplement the required documents as set forth in Exhibit 4A. Examples of such for traditional manufacturing, retail, and wholesale distribution claimants may include sales journal, point of sale (POS) system information, inventory subsidiary ledger, monthly shipping log, and operating budgets and forecast reports. | |
| P5.11 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Short Earnings Cycle - Transportation Warehousing: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for short cycle claimants in the transportation warehousing industry to supplement the required documents as set forth in Exhibit 4A. Examples of such for transportation warehousing claimants may include monthly re-rating logs, Rail Inc. reports, contracts for transportation, warehouse receipts, and receiving reports. | |
| P5.12 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Short Earnings Cycle - Bar and Restaurants: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for short cycle claimants in the bar and restaurants industry to supplement the required documents as set forth in Exhibit 4A. Examples of such for bar and restaurant claimants may include payouts and receipts, payroll reports, and franchise agreements. | |
| P5.13 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Short Earnings Cycle - Healthcare: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for short cycle claimants in the healthcare industry to supplement the required documents as set forth in Exhibit 4A. Examples of such for healthcare claimants may include monthly patient AR ledgers, monthly patient census, and net patient service revenue reconciliations. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| **Risk #** | **Risk Category** | **Subcategory** | **Risk / Scheme Description** | **Proposed Mitigating Internal Controls** | **Notes** |
| P5.14 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Short Earnings Cycle - Tourism: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for short cycle claimants in the tourism industry to supplement the required documents as set forth in Exhibit 4A.  Examples of such for tourism claimants may include monthly occupancy percentage reports, bookings and cancellations logs, and monthly ticket sales reports. | |
| P5.15 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Time-Based Cycle - Agriculture: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for time-based claimants in the agriculture industry to supplement the required documents as set forth in Exhibit 4A.  Examples of such for agriculture claimants may include contract for sale of crops and inventory valuation documents. | |
| P5.16 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Effort-Based Cycle - Professional Services: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for effort-based claimants in the professional services industry to supplement the required documents as set forth in Exhibit 4A.  Examples of such for professional services claimants may include Work-In-Progress (WIP) reports, utilization reports, Statement of Work (SOW), rate schedules, and expense reports. | |
| P5.17 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Project-Based Cycle - Project-Based Manufacturing: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for project-based claimants in the project-based manufacturing industry to supplement the required documents as set forth in Exhibit 4A.  Examples of such for project-based manufacturing claimants may include job-cost ledgers, detailed transaction reports, bid and estimate documents, and payroll reports. | |
| P5.18 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Project-Based Cycle - Construction: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for project-based claimants in the construction industry to supplement the required documents as set forth in Exhibit 4A.  Examples of such for construction claimants may include job-cost ledgers, change orders log, labor distribution reports, and back charge reports. | |
| P5.19 | Revenue / Expense Error or Fraud | Insufficient Industry-Specific Documentation | Continued Market Presence Cycle - Real Estate: Additional documentation applicable to specific industries may not be requested or provided. | In order to ensure revenue and corresponding expenses are accurately identified, develop a list of additional documentation usual and customary for continued market presence claimants in the real estate industry to supplement the required documents as set forth in Exhibit 4A.  Examples of such for real estate claimants may include contract agreements, monthly commission payouts and receipts, and listing contracts. | |
| **P6 - CLAIMS REVIEW (RECONCILIATION)** | | | | | |
| P6.01 | Revenue / Expense Error or Fraud | Financial Data Not Reconciled | Financial information supporting BEL claims may not be reconciled to supporting documentation and discrepancies may not be resolved. | To help prevent material errors and irregularities, the CSSP must regularly compare the line items and totals in BEL claimant's proffered monthly P&L statements, which must be accurately dated, as confirmed by the CSSP, to other contemporaneous records such as annual financial statements. Material differences between the monthly P&L and the annual tax returns must be investigated by a professional accountant with sufficient training to understand the differences.  Determination of the proper treatment of such differences should be made based on appropriate contemporaneous objective evidence. | |
| P6.02 | Revenue / Expense Error or Fraud | Financial Data Not Reconciled | Financial information supporting BEL claims may not be reconciled to supporting documentation and discrepancies may not be resolved. | Compare the BEL claimant's proffered dated monthly P&L statements to other contemporaneous records such as annual tax returns filed under penalty of perjury.  Material differences between the two should be further reviewed by a professional accountant. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P6.03 | Revenue / Expense Error or Fraud | Financial Data Not Reconciled | Financial information supporting BEL claims may not be reconciled to supporting documentation and discrepancies may not be resolved. | Compare the BEL claimant's proffered dated monthly P&L statements to other contemporaneous records such as monthly or other sales tax returns filed under penalty of perjury. Material differences between the two should be further reviewed by a professional accountant. | |
| P6.04 | Revenue / Expense Error or Fraud | Unusual Variance or Discrepancies Not Reviewed | Large differences in variable profits between Benchmark and Compensation period may not be reviewed or evaluated. | Compare the 2010 calculations including but not limited to variable profit / profit margin with the variable profit variable / profit margin of prior periods (2009, 2008 or 2007). Perform data analytics to identify claims with large discrepancies between 2010 and historical and investigate the variance to understand the discrepancy. Determine whether additional documentation is required. | |
| P6.05 | Revenue / Expense Error or Fraud | Unusual Variances or Discrepancies Not Reviewed | Irregularities in revenue and expense financial information are not identified. | Apply computer assisted data analytic tools throughout the claim process to review for data irregularities and abnormal trends in the claim information. Further review variances and after remediation, if necessary, recalculate revenue / expenses. | |
| P6.06 | Revenue / Expense Error or Fraud | Unusual Variances or Discrepancies Not Reviewed | Irregularities in revenue and expense financial information may require adjustments that disqualifies claimant from causation. | If the claimant only qualified for the V revenue pattern for one period or narrowly meets the V revenue pattern for one or more periods further inquiry should be performed to ensure that monthly revenue and expenses are properly attributed. In addition, the CSSP should re-apply the V revenue pattern, modified V revenue pattern, or Down Only revenue pattern required in Exhibit 4B to determine whether the claimant still satisfies the causation proof requirements of Exhibit 4B using properly attributed monthly revenue. More rigorous inquiry should be performed to determine whether additional documentation should be obtained where appropriate. | |
| P6.07 | Revenue / Expense Error or Fraud | Unusual Variance or Discrepancies Not Reviewed | Large differences between budget and actual for the Benchmark and Compensation periods may not be evaluated. | If there are red flags indicating potential fraud, consider requesting that the claimant provide budget and forecast documentation in the submitted claim file. Large discrepancies in the actual P&L versus the budget for either the Benchmark Period or Compensation Period may indicate a potential fraud. Unexplained variances should be reviewed by a professional accountant with sufficient training to investigate, and additional documentation should be requested as support. | |
| P6.08 | Revenue / Expense Error or Fraud | Revenue Reported During Non-Operating Period | Claimant reports revenue during time period when it was not engaged in profit-making activities. | Claimants who did not engage in profit-making activities during periods chosen for Benchmark and Compensation did not suffer Business Economic Loss and therefore cannot qualify to submit a claim. Revenue reported during periods where a claimant did not engage in profit-making activities may incorrectly include non-revenue gained from non-operating activities. The CSSP should further investigate and request additional documentation to determine and support whether the Claimant is a legitimate class member. | |
| **P7 - CLAIMS REVIEW (ACCOUNTING METHOD)** | | | | | |
| P7.01 | Revenue / Expense Error or Fraud | Accounting Method Not Consistently Applied | Inconsistent application of accounting method by claimant in Benchmark vs. Compensation period may not be identified or reconciled. | Identify the accounting method used by the claimant during the benchmark period and compensation period. Determine whether the methods applied are consistent and that the financials can be properly compared. If different methods are identified, additional procedures should be performed to determine appropriate treatment. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| **P8 - CLAIMS REVIEW (REVENUE)** | | | | | |
| P8.01 | Revenue / Expense Error or Fraud | Revenue Attribution Misapplied | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | Claims submitted with monthly P&Ls should be reviewed and adjusted to ensure that revenue is attributed to each month as it was earned, not when cash was received. Claim reviewer should make a determination to ensure monthly revenue is attributed for each month in the Benchmark and Compensation period. | |
| P8.02 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that negative total revenue is recorded for any month included within the Benchmark Year, Compensation Year or 2011, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail, follow-up with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |
| P8.03 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that total revenue recorded in any month included in the Benchmark Year, Compensation Year of 2011 exceeds 20% of the claimant's annual revenue for the year which includes that month, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |
| P8.04 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that the claimant's business experienced a period of dormancy during the Benchmark Year, Compensation Year or 2011, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail, follow-up with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |
| P8.05 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that total variable expenses when summed up are negative for any month within the Benchmark Year or Compensation Year, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail, follow-up with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |
| P8.06 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that total variable expenses for any month within the Benchmark Year or Compensation Year exceed 25% of the claimant's annual variable expense for the year which includes that month, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail, follow-up with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |
| P8.07 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that variable margin percentages when compared between any two months included within the Benchmark Year and Compensation Year vary by more than 50% points, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail, follow-up with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P8.08 | Revenue / Expense Error or Fraud | Insufficient Revenue and Expense Matching | Monthly P&L statements are not sufficiently matched and therefore, claim determination can be distorted. | In accordance with the criteria set forth in the Declaration of Patrick Juneau, if the claimant submits monthly P&L statements showing that in any given month within the Benchmark Year or Compensation Year, the variance between that month's percentage of annual revenues as compared to that same month's percentage of annual variable expenses exceeds 8% points, revenue and corresponding variable expense may not have been sufficiently matched. The claim reviewer should review in detail, follow-up with any inquiries, and attribute monthly revenue and corresponding variable expense appropriately. | |
| P8.09 | Revenue / Expense Error or Fraud | Negative Revenue Not Reviewed | Claimant financial information reports a negative revenue figure for any months included in the Benchmark or Compensation periods. | Any time a claimant submits financial documentation that reports a negative line item revenue figure or a negative monthly revenue figure, particularly if that month falls within a Benchmark or Compensation period, conduct further investigation and inquiries to understand the nature of the negative revenue and determine if reallocation of revenue is necessary to be appropriately reflected during the month in which revenue was earned. | |
| P8.10 | Revenue / Expense Error or Fraud | Revenue is Misstated | General: Claimants misstate revenue. | For all claims, ensure that total monthly revenue per the supporting source documentation agrees to the respective company's P&L. | |
| P8.11 | Revenue / Expense Error or Fraud | Financial Information is Misstated | General: Claimants misstate financial information. | For all claims, per control P6.01, compare the claimant's monthly P&Ls in the aggregate to its federal tax returns, reconcile any differences, and investigate anomalies. | |
| P8.12 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Insurance Proceeds: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Insurance proceeds are compensation paid to a claimant under an insurance contract and do not represent payments arising from the earnings activity. Ensure that insurance proceeds are not included in monthly revenue figures for the calculation of Variable Profit. | |
| P8.13 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Interest and Investment Income: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Interest income reflects interest earned on investments such as cash held in savings accounts, certificates of deposits, dividends and other investment related activities not generated through the claimant's central business operations. Ensure that interest and investment income are not included in monthly revenue figures for the calculation of Variable Profit. | |
| P8.14 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Gains or Losses from Sales of Assets: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Gains or losses from sales of assets refer to transactions involving the sale of assets that are not part of the claimant's central business operations. Ensure that gains or losses from sales of assets are not included in monthly revenue figures for the calculation of Variable Profit. | |
| P8.15 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Reimbursed Expenses: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Reimbursed expenses are considered compensation for "passed-through" costs that a claimant incurs on behalf of its clients for convenience and practical business purposes (e.g. travel expenses, advances of customer obligations, permits and licenses). Funds that are reimbursement for expenses must not be included in monthly revenue figures for the calculation of Variable Profit. Similarly, reimbursable expenses are not to be included in monthly variable expense figures as covered in control P14.09. | |
| P8.16 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Capital Assessments: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Capital assessments are typically transactions in which members of an entity, such as a Homeowners Association, are required to provide additional capital. For claimants that make capital assessments on their owners or stakeholders, the resulting transaction reflects an investment in the business and is not the result of earnings activity. Ensure that capital assessments are not included in monthly revenue figures for the calculation of Variable Profit. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P8.17 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Intercompany Sales/Related Party Transactions: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Intercompany sales and related party transactions reflect the internal allocation of inventory or other assets among entities under a common ownership.  It cannot be presumed such transactions were carried out on an arm's length basis given the absence of a competitive, free-market environment. Related party transactions warrant additional scrutiny to determine whether they are arms length transactions. | |
| P8.18 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Consignment Sales: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Consignment sales are sales contingent upon a third party's ability to sell the purchased merchandise.  Revenue for the claimant in these arrangements should be attributed to the months that the items were ultimately sold by the third party.  Ensure that revenue from consignment sales equal the cash ultimately collected and are attributed to the appropriate months. | |
| P8.19 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Grants for "For-Profit" Entities: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Grants from governmental entities made to claimants are not the result of the claimant's central business operations; rather, they are typically subsidies of various types that are intended to implement government policies.  Ensure that grants from governmental entities are not included in monthly revenue figures for the calculation of Variable Profit.  (BP notes in this regard its pending appeals in the Fifth Circuit regarding inappropriate revenue attribution to not for profit claimants and preserves its position in this regard.) | |
| P8.20 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Capital Contributions: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Capital contributions are proceeds that result from a claimant's financing activities, including owners' contributions or sale of shareholder stock.  Capital contributions are considered cash flow from financing activities.  Ensure such sources of cash are not included in monthly revenue figures for the calculation of Variable Profit. | |
| P8.21 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Financing Arrangements: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | A claimant may engage in financing arrangements by borrowing money from financial institutions and issuing bonds to investors.  These are considered loan activities in which the claimant receives an upfront principle amount that must be later paid back in installments with interest.  Ensure such cash inflows are not included in monthly revenue figures for the calculation of Variable Profit. | |
| P8.22 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Credit Adjusting Journal Entries to Expense Accounts: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Credit adjustment journal entries to expense accounts that result in a negative expense account balance are typically adjustments to correct an expense entry made in the prior period.  Ensure that these adjusting journal entries are attributed to the proper period and not skew the monthly revenue figures used for the calculation of Variable Profit. | |
| P8.23 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Payment from Suppliers for Returns: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Payment from suppliers for returns are cash received by a claimant for returning previously purchased items.  Purchase returns should be treated as if the original purchase never occurred and should be treated not as revenue, but as decreasing adjustments in previously recorded expenses. | |
| P8.24 | Revenue / Expense Error or Fraud | Non-Operating Revenue/Income Included in BEL Claim | Litigation/Dispute Proceeds: Non-operating revenue improperly included in variable profit by the claimant may fail to be identified and excluded. | Litigation or dispute proceeds are compensation paid to a claimant upon successful outcome of a lawsuit.  These proceeds are typically payment to compensate an entity for wrongdoing acted upon them and usually should have a net zero impact on the operating revenue.  Unless circumstances warrant, ensure such payments are not included in monthly revenue figures for the calculation of Variable Profit. | |
| P8.25 | Revenue / Expense Error or Fraud | Bad Debt Recovery | Bad Debt Recoveries:  Bad debt recoveries are not properly recorded as revenue. | A bad debt recovery is a debt that is recovered in whole or in part after it has been written off or classified as a bad debt.  When a bad debt is recovered the claimant should reinstate the account that was written off by reversing the write-off entry.  Ensure that the claimant records amount collected after write-off as a recovery of bad debts (i.e. reduction of allowance for doubtful accounts) , not as other revenues, a contractual allowance adjustment or as a reduction to another expense account. | |

| DEEPWATER HORIZON CSSP | | | | | |
| --- | --- | --- | --- | --- | --- |
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P8.26 | Revenue / Expense Error or Fraud | Bad Debt Recovery | Bad Debt Recoveries:  Bad debt recoveries received at year end are not properly attributed to the correct period. | A bad debt recovery is a debt that is recovered in whole or in part after it has been written off or classified as a bad debt.  When a bad debt is recovered the claimant should reinstate the account that was written off by reversing the write-off entry. Ensure that bad debt recovered at the end of the year should be a revenue attributed to relevant months of economic activity.  The amount should pertain to a specific invoice or account tied to a particular period. | |
| P8.27 | Revenue / Expense Error or Fraud | Department of Defense Revenue | Claimant's Department of Defense revenues are improperly reported. | Procedures should be developed to obtain information from the claimant so the reviewer can evaluate a claimant's Department of Defense revenues as a contractor or subcontractor(s).  An audit trail should be developed and appropriate documentation should be maintained. | |
| P8.28 | Revenue / Expense Error or Fraud | Department of Defense Revenue | Claimant's Real Estate Development revenues are improperly reported. | Procedures should be developed to obtain information from the claimant so the reviewer can evaluate a claimant's Real Estate Development revenues.  An audit trail should be developed and appropriate documentation should be maintained. | |
| **P9 - CLAIMS REVIEW (REVENUE - SHORT CYCLE)** | | | | | |
| P9.01 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Traditional Manufacturing: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a traditional manufacturing industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as discounts and customer returns are treated consistently across all traditional manufacturing claimants. | |
| P9.02 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Retail: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a retail industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as gift cards and product returns are treated consistently across all retail claimants. | |
| P9.03 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Wholesale Distributors: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a wholesale distribution industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as discounts, and customer returns are treated consistently across all wholesale distribution claimants. | |
| P9.04 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Bar and Restaurants: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a bar, restaurant, and other food service industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as tips, franchise rebates, and gift cards are treated consistently across all bar and restaurant claimants. | |
| P9.05 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Transportation Warehousing: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a transportation warehousing industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as long-term contracts and shipments in transit are treated consistently across all transportation warehousing claimants. | |
| P9.06 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Healthcare: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a healthcare industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as risk sharing models and contractual allowances are treated consistently across all healthcare claimants. | |
| P9.07 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Tourism: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a tourism industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that notable industry exceptions such as upfront deposits are treated consistently across all tourism claimants. | |

| DEEPWATER HORIZON CSSP | | | | | |
| --- | --- | --- | --- | --- | --- |
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P9.08 | Revenue / Expense Error or Fraud | Unusual Variance in Monthly Profit Margin Not Reviewed | Short Cycle: Claimants in industries where profit margin should typically be steady from month to month report large differences in monthly profit margin in either/both Benchmark and Compensation periods, and the CSSP does not further evaluate/investigate. | The respective industry claim reviewer should have sufficient industry and expert knowledge regarding the industry to which they are assigned, including the typical profit margin patterns for businesses in that industry. Calculate monthly profit margin figures using provided documentation and further investigate claims with financial documents that report widely varying and fluctuating monthly profit margins but belong to industries where steady profit margins are customary. | |
| P9.09 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Healthcare Providers:  Claimants may misstate revenue. | Revenue for healthcare provider claimants typically has a direct relationship with services provided. The claims should be reviewed to ensure that inpatient revenue attributed from month to month increases or decreases in line with the services rendered. | |
| P9.10 | Revenue / Expense Error or Fraud | Improper revenue attribution | Healthcare Providers:  Claimants may misstate revenue. | The claims should be reviewed to ensure that the calculation of charity care and bad debt is mathematically accurate.  Perform a recalculation of allowances and testing of inputs and underlying data, including the roll forward of the allowance. | |
| P9.11 | Revenue / Expense Error or Fraud | Improper revenue attribution | Healthcare Providers:  Claimants may misstate revenue. | In order to calculate net patient service revenue, management must estimate the contractual adjustment to be deducted from the gross charges.  Obtain the claimant's calculation of contractual reserves to test the mathematical accuracy of the calculation and ensure that any retroactive corrections to contractual adjustment estimates to are captured. | |
| P9.12 | Revenue / Expense Error or Fraud | Improper revenue attribution | Healthcare Providers:  Claimants may misstate revenue. | In order to calculate net patient service revenue, management must estimate the contractual adjustment to be deducted from the gross charges.  Compare the reserve methodology utilized in current period versus prior period to determine that it is consistently applied. | |
| P9.13 | Revenue / Expense Error or Fraud | Improper revenue attribution | Healthcare Providers:  Claimants may misstate revenue. | Patient revenue and the related receivables are recorded at the time that services are performed. However, because of the complex billing and coding process, charges may not be complete or may be entered for procedures that have not been performed.  Review claims to ensure that patient revenue is attributed back to the month that services were performed. | |
| P9.14 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Tourism and Hospitality:  Accommodation and lodging claimants may incorrectly record deposits. | Fully refundable deposits should not be recognized as revenue until services have been performed. Ensure that revenue is attributed to the period in which services were rendered, not at point of sale, when reservation is booked, or when cash was received. | |
| P9.15 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Tourism and Hospitality:  Passenger travel and transportation claimants may incorrectly record ticket revenue. | Revenue generated for ticket sales related to travel or entertainment should be attributed to the period when services were rendered and not at the point of sale.  Ensure revenue is attributed to the appropriate period. | |
| P9.16 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Tourism and Hospitality:  Accommodation and lodging claimants may misstate revenue. | Verify accommodation and lodging revenue with occupancy rates to ensure that revenue is indeed attributed to the proper period.  This review must confirm that revenue from month to month increases or decreases in line with the occupancy rates. | |
| P9.17 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Transportation and Warehousing:  Freight and cargo transportation claimants may incorrectly define the time period of freight transportation contracts. | Revenue is typically recognized when the shipment is completed upon delivery of the freight or allocated to periods based on the relative transit time in each period.  Identify the appropriate time period to allocate revenue on a contract-by-contract basis in order to ensure revenue is appropriately attributed to the period in which it was earned according to contract agreements. | |
| P9.18 | Revenue / Expense Error or Fraud | Proportional Percentage Method Misapplied. | Transportation and Warehousing:  Claimants improperly apply proportional percentage method. | For claims submitted by transportation and warehousing industry claimants using the proportional percentage method as the basis for revenue recognition, the claim should be reviewed to ensure that revenues and expenses of applicable long-term contracts are recognized continuously as a percentage of a delivery completed during that period.  Revenue recognized should be attributed to relevant months based the percentage of the delivery completed in each period in relation to the total contract value.  Any year-end or adjusting entries made mid-year (e.g., change orders) should be reviewed and re-allocated as appropriate. | |

| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
|---|---|---|---|---|---|
| **DEEPWATER HORIZON CSSP** | | | | | |
| **Proposed BEL Claim Process Level Internal Controls** | | | | | |
| **February 4, 2014** | | | | | |
| P9.19 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Retail: Claimants improperly record revenue related to the sale of gift cards. | Sale of gift cards creates an obligation of a future product or service delivery. Revenue should only be recognized when that product or service obligation is met and until then the sale is held as deferred revenue. The claims should be reviewed to ensure that revenue related to the sale of gift cards attributed to the month the obligation is met and not during the month the gift card was originally sold. | |
| **P10 - CLAIMS REVIEW (REVENUE - LONG CYCLE: TIME BASED)** | | | | | |
| P10.01 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Agriculture: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop an agriculture industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims. This will ensure that notable industry exceptions such as timing of crop season and bulk inventory purchases are treated consistently across all agriculture claimants. | |
| P10.02 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Agriculture: Revenue is not properly attributed to the earnings cycle. | Claimants in the agriculture industry should attribute revenue to the period of revenue-generating activity, also known as the crop cycle. Claim reviewers must verify that all revenue received from the sale of the crop, which may be prior, during or after the crop cycle, is attributed evenly over the months of the growing season. | |
| P10.03 | Revenue / Expense Error or Fraud | Crop Year and Production Year are Not Consistent with Industry | Agriculture: Agriculture industry claimants crop year and production year are not consistent with the industry. | For claims submitted by agriculture industry claimants, the claim should be reviewed to ensure the crop year and production year in the compensation period agree to the industry crop year and production year.<br><br>Note: The crop year reflects the USDA-designated period in which a crop is marketed and sold, and differs from the production year, which reflects that period in which expenses are incurred for growing and harvesting the crop. | |
| P10.04 | Revenue / Expense Error or Fraud | Revenue is Misstated | Agriculture: Agriculture industry claimants misstate revenue. | Claims submitted by agriculture industry claimants should be particularly reviewed for asset enhancement. Because this exercise is done retroactively, all revenue received from the sale of crops is identifiable. Ensure they are comprehensively included in the even allocation of revenue over months in the growing season. | |
| P10.05 | Revenue / Expense Error or Fraud | Fictional Losses | Agriculture: Inconsistent or improper treatment of hedging / contract sales activities. | Review supporting documentation to ensure consistent and proper treatment of hedging / contract sales activities to ensure financial performance is not distorted and fictional losses are not reported in the Compensation Period. | |
| **P11 - CLAIMS REVIEW (REVENUE - LONG CYCLE: PROJECT BASED)** | | | | | |
| P11.01 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Construction: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a construction industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims. This will ensure that notable industry exceptions such as percentage-of-completion, subcontractors, and change orders are treated consistently across all construction claimants. | |
| P11.02 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Project-Based Manufacturing: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a project-based manufacturing industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims. This will ensure that notable industry exceptions such as input vs. output percentage-of-completion are treated consistently across all project-based manufacturing claimants. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P11.03 | Revenue / Expense Error or Fraud | Percentage of Completion Method Misapplied | Construction, Project-Based Manufacturing: Construction and project-based manufacturing industry claimants improperly apply percentage of completion method. | For claims submitted by construction industry claimants using the percentage of completion method as the basis for revenue recognition, the claim should be reviewed to ensure that revenues and expenses of long-term contracts are recognized continuously as a percentage of the work completed during that period. Revenue recognized should be attributed to relevant months based on the percentage of the work completed in each period in relation to the total contract value. Any year-end or adjusting entries made mid-year (e.g., change orders) should be reviewed and re-allocated as appropriate. | |
| P11.04 | Revenue / Expense Error or Fraud | Operating Incentives/Disincentives Not Allocated | Construction, Project-Based Manufacturing: Construction and project-based manufacturing industry claimants did not allocate incentives monthly. | For claims submitted by construction industry claimants, the claim should be reviewed for operating incentive or disincentive clauses (such as contract options, price redetermination, penalty clauses, and escalation clauses) or other terms to ensure that amounts are allocated to the appropriate months. Improper allocation or non-allocation of such amounts results in misstated monthly financial records. | |
| P11.05 | Revenue / Expense Error or Fraud | Customer Specific Contracts | Construction, Project-Based Manufacturing: Construction and project-based manufacturing industry claimants did not appropriately account for customer specific contracts. | Obtain and inspect major customer contracts and determine whether their accounting treatment is appropriate and consistent with each respective contract. Customer specific, rather than standard, sales contracts are used which contain provisions (i.e. bill and hold sales, rights to return, conditional payment, etc.). The number and extent of specific customer contracts increases the likelihood of misstatements in sales, the sales return provision, or accounts receivable. | |
| **P12 - CLAIMS REVIEW (REVENUE - LONG CYCLE: EFFORT BASED)** | | | | | |
| P12.01 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Professional Services: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a professional services industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims. This will ensure that notable industry exceptions such as passed-through expenses, contingent fees, and changes in scope of work are treated consistently across all professional services claimants. | |
| P12.02 | Revenue / Expense Error or Fraud | Revenue Attribution Misapplied | Claimant did not attribute revenue in the periods revenue is earned, resulting in inappropriate delayed revenue attribution. | Professional service firms may not have attributed certain types of fees (e.g., contingent-fee matters, bankruptcy holdbacks, success fees) in the period the revenue is earned, instead delaying the recognition of revenue until the time of a favorable outcome and payment is received. For professional service firms and other claimants with effort-based earnings cycle, effort is typically measured in hours incurred. Claim review is conducted retroactively and such revenue must be attributed to the proper months in which effort was expended, proportionally to the number of hours incurred. | |
| P12.03 | Revenue / Expense Error or Fraud | Revenue Attribution Misapplied | Claimant did not attribute revenue in the periods revenue is earned, resulting in inappropriate delayed revenue attribution. | If Work In Progress (WIP) reports or other documentation showing hours incurred is not available for professional service firms and other claimants in effort-based earnings cycles, revenue should be ratably attributed to the relevant months of respective contract length. | |
| P12.04 | Revenue / Expense Error or Fraud | Expenses are Misstated | Professional Services: Expenses reported are not in the proper period. | Claims submitted by professional services industry claimants should be reviewed to ensure that expenses claimed on the expense reports were indeed incurred during the reported month. | |
| P12.05 | Revenue / Expense Error or Fraud | Bonuses | Professional Services: Bonuses are not tied to the relevant revenue. | Often professional services firms will pay their employees bonuses based on hours or projects worked. To the extent that these payments are tied to an identifiable project, the claims should be reviewed to ensure that the bonus expenses are tied to the corresponding revenue. | |

| DEEPWATER HORIZON CSSP | | | | | | |
| Proposed BEL Claim Process Level Internal Controls | | | | | | |
| February 4, 2014 | | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | | Notes |
|---|---|---|---|---|---|---|
| P12.06 | Revenue / Expense Error or Fraud | Changes in Scope | Professional Services: Additional hours incurred due to change in scope of work not reflected in proper period. | Claims submitted by professional services industry claimants should be particularly reviewed for additional hours or expenses incurred due to sudden changes in scope or statement of work not originally included in a fixed contract price. If year-end adjustments were made to "catch up" or account for these changes, further investigate and ensure that the revenue is reallocated appropriately to the months in which it was earned and corresponding variable expenses are matched to the related revenue. | | |
| **P13 - CLAIMS REVIEW (REVENUE - LONG CYCLE: CONTINUED MARKET PRESENCE)** | | | | | | |
| P13.01 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Real Estate: Lack of industry-specific revenue attribution guidelines for consistent treatment and review. | Develop a real estate industry revenue attribution standard for claim reviewers to use as a guideline in their review of claims. This will ensure that notable industry exceptions such as commission split models are treated consistently across all real estate claimants. | | |
| P13.02 | Revenue / Expense Error or Fraud | Improper Revenue Attribution | Real Estate: Broker claimants may incorrectly record 100% of the commission prior to the percentage split. | Be mindful of commission revenue recognized by the broker that is split with the agent. The claim should be reviewed to ensure that these revenues are excluded from the broker's revenue and only included on the agent's claim. | | |
| P13.03 | Revenue / Expense Error or Fraud | Incorrect Commission Percentage Split | Real Estate: Claimants may incorrectly define the commission percentage split between the broker and the agent. | Identify the appropriate percentage split to recalculate broker commission expense and agent commission revenue on a contract by contract basis. The rate of commission varies according to the contract between the agent and broker. The percentage split is an amount agreed upon by the broker and agent, which determines the sharing of the gross commission between the broker and agent. | | |
| P13.04 | Revenue / Expense Error or Fraud | Reimbursable Costs | Real Estate: Claimants may not match costs incurred by the agent that are passed through to the brokerage firm to the reimbursement portion of receipts. | Be mindful of costs incurred by the agent that are passed through to the brokerage firm and reimbursed. The claim should be reviewed to ensure that if these costs are excluded from the broker's variable expense figure, the reimbursement portion of receipts must also be excluded from the agent's revenue figure. | | |
| P13.05 | Revenue / Expense Error or Fraud | Incorrect Market Presence Time Period | Real Estate: Claimants may incorrectly define the time period of market presence for respective commissions. | Ensure that for claimants in the market presence earnings cycle, such as real estate, the aggregate revenue generated from market presence maintaining activities must be ratably attributed over the period during which the entity maintained its presence in the market. | | |
| **P14 - CLAIMS REVIEW (EXPENSES)** | | | | | | |
| P14.01 | Revenue / Expense Error or Fraud | Improper Expense Classification | Expenses may not be properly classified as variable or fixed expenses. | Claimant's classification of variable and fixed expenses as reported in the financial documentation submitted should be reviewed to ensure classification of expenses is in accordance with Exhibit 4D to the Settlement Agreement. The review should consider not only the label applied by the claimant to the expense but the substance of the expense, which is the controlling criterion. Inappropriate classification of variable expenses to fixed expenses in a Benchmark period will result in overstating variable profit in that period. Similarly, inappropriate classification of fixed expenses to variable expenses in a Compensation period will result in understatement of variable profit in that period. | | |
| P14.02 | Revenue / Expense Error or Fraud | Improper Expense Classification | Expenses may not be properly classified as variable or fixed expenses. | If claimant provides expense information at a summary level insufficient to properly apply the Settlement Agreement, perform source documentation audit to ensure the expenses are properly classified. | | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P14.03 | Revenue / Expense Error or Fraud | Improper Expense Reclassification | Expenses may be improperly reclassified from variable to fixed expenses, or vice versa. | Reclassification of expenses from a variable category to a fixed category, or vice versa, can impact the proper calculation of Benchmark or Compensation Period Variable Profit. Such reclassifications that are made as a result of the claims submission process and not reflected in the contemporaneous records are indicia of potential errors or fraud. Consequently, an investigation of such reclassifications should be performed by a professional with appropriate training, and appropriate treatment should be determined based on contemporaneous objective evidence. | |
| P14.04 | Revenue / Expense Error or Fraud | Improper Expense Classification | Donations and Contributions: Expenses may not be properly classified as variable expenses. | Ensure that donations and contributions are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.05 | Revenue / Expense Error or Fraud | Improper Expense Classification | Drug Testing: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to drug testing are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement | |
| P14.06 | Revenue / Expense Error or Fraud | Improper Expense Classification | Repairs (Excluding Maintenance): Expenses may not be properly classified as variable expenses. | Ensure that expenses related to repairs, excluding maintenance, are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.07 | Revenue / Expense Error or Fraud | Improper Expense Classification | Training and Education: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to training and education are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.08 | Revenue / Expense Error or Fraud | Improper Expense Classification | Non-Reimbursable Travel and Entertainment: Expenses may not be properly classified as variable expenses. | Ensure that non-reimbursable travel and entertainment are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.09 | Revenue / Expense Error or Fraud | Improper Expense Classification | Reimbursable Travel and Entertainment: Expenses may not be improperly classified as variable expenses. | As reimbursable travel and entertainment costs are passed-through to the client and reimbursements for travel and entertainment are not to be included as revenue as covered in control P8.15, ensure that similarly, monthly variable expenses do not include passed-through reimbursable travel and entertainment expenses. | |
| P14.10 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Donations and Contributions: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent that the claimant can provide adequate supporting documentation showing a particular donation or contribution is related to a specific transaction, attribute that particular related donation and contribution expense to the months in which the original revenue was properly attributed. | |
| P14.11 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Donations and Contributions: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For claimants whose donations and contributions expense is unrelated to a specific transaction, the CSSP must allocate that expense ratably over the relevant months. | |
| P14.12 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Drug Testing: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent that the claimant can provide adequate supporting documentation showing a particular drug testing expenses is related to a specific transaction, attribute that particular drug testing expense to the months in which the original revenue was properly attributed. | |
| P14.13 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Drug Testing: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For claimants whose drug testing expense is unrelated to a specific transaction, the expense must be allocated ratably over the relevant months. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P14.14 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Repairs (Excluding Maintenance): P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent that the claimant can provide adequate supporting documentation showing a particular repair expense (excluding maintenance) is related to a specific historical transaction, attribute that particular repair expense to the months in which the revenue is properly attributed. | |
| P14.15 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Repairs (Excluding Maintenance): P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For claimants whose repair expense is unrelated to a specific transaction, allocate that expense ratably over the relevant months. | |
| P14.16 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Training and Education: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent that the claimant can provide adequate supporting documentation showing that a particular training and education expense is related to a specific transaction, attribute that particular related training and education expense to the months in which the original revenue was properly attributed. | |
| P14.17 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Training and Education: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For claimants whose training and education is unrelated to a specific purpose such as general compliance training and education, allocate that expense ratably over the relevant months. | |
| P14.18 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Non-Reimbursable Travel and Entertainment: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent that the claimant can provide adequate supporting documentation showing a particular travel and entertainment expense is related to a specific transaction, attribute that particular travel and entertainment expense to the months in which the original revenue was properly attributed. | |
| P14.19 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Non-Reimbursable Travel and Entertainment: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For claimants whose travel and entertainment expense is unrelated to a specific transaction, allocate that expense ratably over the relevant months. | |
| P14.20 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Bulk Inventory Purchases: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | Claimants may not adjust their monthly financial statements to properly reflect cost of goods sold as a result of bulk inventory purchases recorded in prior months. Re-allocate bulk inventory expenses to the appropriate months and re-calculate Cost of Goods Sold as necessary to determine true monthly variable expense figures for the calculation of Variable Profit. Claimants who make bulk inventory purchases in a single month that relate to goods sold over multiple months may overstate Cost of Goods Sold in the month the purchase was made and understate Cost of Goods Sold in the subsequent months where goods were sold. | |
| P14.21 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Inventory Adjustments: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | Claimants may not adjust their monthly financial statements to properly reflect cost of goods sold resulting in inventory adjustments recorded in later months. Re-allocate such inventory adjustments to the appropriate months and re-calculate Cost of Goods Sold as necessary to determine true monthly variable expense figures for the calculation of Variable Profit. | |
| P14.22 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Bad Debt Expense: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent a claimant can provide adequate supporting documentation showing a particular bad debt expense is related to a specific transaction, attribute that particular related bad debt expense to the months in which the original revenue was properly attributed. | |
| P14.23 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Bad Debt Expense: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For a claimant who records an estimate of its overall uncollectible accounts, allocate the bad debt expense proportionally over the period when the related receivables were generated and the original revenue was properly attributed. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P14.24 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Bonuses: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | To the extent a claimant can provide adequate supporting documentation showing a particular bonus expense is related to a specific transaction, attribute that particular related bonus expense to the months in which the original revenue was properly attributed.  Recalculate variable payroll expenses to ensure that the bonus allocations are included. | |
| P14.25 | Revenue / Expense Error or Fraud | Adjusting Entries Related to Multiple Periods Not Re-allocated | Bonuses: P&L account balances or adjusting entries requiring allocation to relevant monthly periods may not be conducted or reviewed. | For claimants who record an overall bonus expense, allocate the bonus expense proportionally over the period when the related original revenue was properly attributed. | |
| P14.26 | Revenue / Expense Error or Fraud | Variable Expenses Not Matched | Claimant did not match expenses to the revenue earned. | Monthly P&Ls should be reviewed and properly adjusted to ensure that variable expenses related to revenue earned are attributed to the corresponding relevant Benchmark and Compensation periods and offset against that revenue for purposes of determining variable profit.  Similarly, variable expenses that do not relate to revenue in a period should not be offset against revenue in that period for purposes of determining variable profit. | |
| P14.27 | Revenue / Expense Error or Fraud | Variable Expenses Not Matched | Claimant reports one-time expenses not matched to the revenue earned. | Monthly P&Ls should be reviewed for large or unusual one-time expenses and periods with reported negative profit.  Monthly periods with negative profit may be the result of large or unusual one-time expenses reported in that period but related to or incurred over the span of several months.  The nature of such expenses should be evaluated and properly attributed and matched to the period(s) in which the revenue was earned. | |
| P14.28 | Revenue / Expense Error or Fraud | Passed Through Disbursements Misclassified as Variable Expenses | Client pass through expenses are improperly included as business expenses. | Per control P14.09, claims submitted by claimants in the professional services industry must be reviewed to identify any external disbursements treated as "passed through" expenses to the end client.  Such disbursements do not constitute operating expenses for the purposes of calculating variable profit and should not be included as expenses in the calculation of variable profit. | |
| P14.29 | Revenue / Expense Error or Fraud | Cost of Goods Sold | Incorrect expense classification into Cost of Goods Sold. | For claims submitted by claimants involved with the sale of goods, extra care should be taken in reviewing the expenses included in Cost of Goods Sold. Analytical procedures comparing Gross Profit Percentages should be compared from Benchmark period to Compensation period and year end totals.  Large discrepancies should be investigated by a professional accountant with sufficient training to identify the source of discrepancies. | |
| P14.30 | Revenue / Expense Error or Fraud | Contract Labor Expenses | Contracted services and labor are misclassified as fixed expenses. | Operating expenses for outside labor and services often fluctuate greatly depending on sales. Expenses involving outside parties should be examined to identify whether they are directly related to revenue attribution and should be correctly classified as variable expenses. | |
| P14.31 | Revenue / Expense Error or Fraud | Negative Expense Not Reviewed | Claimant financial information reports a negative expense figure for any months included in the Benchmark or Compensation periods. | Any time a claimant submits financial documentation that reports a negative monthly expense figure, further investigation and inquiry is required to understand the nature of the negative expense and determine if reallocation of the expense is necessary to appropriately match corresponding expenses with the revenue to which it relates. | |
| P14.32 | Revenue / Expense Error or Fraud | Negative Expense Not Reviewed | Claimant financial information reports a negative expense figure for any months throughout the year. | If a claimant submits financial documentation that reports a negative monthly expense figure for a period outside either the Benchmark or the Compensation period, conduct further investigation and inquiries to is required to understand the nature of the negative expense and determine if reallocation of expense is necessary.  Expenses may be reallocated to months within either the Benchmark or Compensation period and would impact the calculation of Variable Profit. | |
| P14.33 | Revenue / Expense Error or Fraud | Expenses are Misstated | General:  Claimants misstate expenses. | For all claims, ensure that the claimant-submitted total monthly expenses per the supporting documentation agree to the respective company's P&L.  If adjustments and re-allocation of expenses are necessary in order to properly attribute expenses to the related revenue, there should be sufficient and verifiable supporting documentation. | |

| | | | | | |
|---|---|---|---|---|---|
| DEEPWATER HORIZON CSSP | | | | | |
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |

| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
|---|---|---|---|---|---|
| P14.34 | Revenue / Expense Error or Fraud | Repair Costs Are Overstated | Repairs (excluding Maintenance): Claimant does not separately identify maintenance and repair cost. | If claimant's financial statements, books and/or records do not separately identify maintenance costs and repair costs, claimant shall allocate costs associated with repairs and maintenance 50% to fixed costs and 50% to variable costs.  Recalculate repair expenses to ensure they are not overstated. | |
| P14.35 | Revenue / Expense Error or Fraud | Improper Expense Classification | Cost of Good Sold: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to cost of goods sold are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.36 | Revenue / Expense Error or Fraud | Improper Expense Classification | Bad Debt Expense: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to bad debt expense are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.37 | Revenue / Expense Error or Fraud | Improper Expense Classification | Consumable Goods: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to consumable goods are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.38 | Revenue / Expense Error or Fraud | Consumable Goods Not Matched to Revenue | Consumable Goods:  Consumable good are not matched to the corresponding revenue. | Consumable goods are inputs into the production process that "use up" the input.  Ensure that the cost of consumable goods is matched with the related revenue derived from the consumption of the input. | |
| P14.39 | Revenue / Expense Error or Fraud | Improper Expense Classification | Sales and Other Commissions: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to sales and other commissions are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.40 | Revenue / Expense Error or Fraud | Sales Commission and Other Compensation Not Matched to Revenue | Sales Commission and Other Compensation:  Sales commission and other compensation are not matched to the corresponding revenue. | Sales commissions and other compensation are the direct compensation paid to a person or entity in connection with a contractual arrangement to sell goods or services.  Ensure that the expense is matched with the related revenue derived from the sales for which the commission or other compensation is paid. | |
| P14.41 | Revenue / Expense Error or Fraud | Improper Expense Classification | Contract Labor: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to contract labor are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.42 | Revenue / Expense Error or Fraud | Contract Labor Not Matched to Revenue | Contract Labor:  Contract labor is not matched to the corresponding revenue. | Contract labor costs are payments to other firms for the contractual use of their employees.  These employees are supplied by other firms for a specific task and usually these employees are under the supervision of the purchasing firm.  Ensure that the contract labor variable expense is matched to the period of economic gain and attributed to the revenue generated from the output produced. | |
| P14.43 | Revenue / Expense Error or Fraud | Improper Expense Classification | Credit Card Fees: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to credit card fees are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.44 | Revenue / Expense Error or Fraud | Credit Card Fees Not Matched to Revenue | Credit Card Fees:  Credit card fees are not matched to the corresponding revenue. | Credit card fees are merchant processing fees charged to a business when customers use a credit card to pay for the purchase of goods or services.  Credit card fees are generally charged as a percentage of sales or assessed as a fee per transaction for the sales of goods or services rendered.  Ensure that the claimant's credit card fees are recorded in the period in which the related revenue is attributed. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P14.45 | Revenue / Expense Error or Fraud | Improper Expense Classification | Discounts and Rebates: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to discounts and rebates are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.46 | Revenue / Expense Error or Fraud | Discounts and Rebates Not Matched to Revenue | Discounts and Rebates:  Discounts and rebates are  not matched to corresponding revenue. | For all claims that include discounts and rebates, ensure that the discounts and rebates expenses are properly matched to the revenue gained from the sale of the discounted goods and services. | |
| P14.47 | Revenue / Expense Error or Fraud | Improper Expense Classification | Franchise Fees: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to franchise fees are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.48 | Revenue / Expense Error or Fraud | Franchise Fees Not Matched to Revenue | Franchise Fees:  Franchise fees are not matched to corresponding revenue. | Franchise fees are the costs associated with using the trade name, service marks, and the operational system of a larger brand.  Franchise fees that are calculated based on the total sales for the period are a variable expense.  Ensure that the variable portion of the franchise fees is attributed to the period in which the related revenue is attributed. | |
| P14.49 | Revenue / Expense Error or Fraud | Improper Expense Classification | Freight: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to freight are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.50 | Revenue / Expense Error or Fraud | Freight Not Matched to Revenue | Freight:  Freight is not matched to corresponding revenue. | Freight-in and freight-out costs typically are variable costs an organization incurs shipping costs when it receives materials or ships out products for sale. Ensure that freight expenses are matched to the period in which the revenue from the sale of related goods is attributed. | |
| P14.51 | Revenue / Expense Error or Fraud | Freight-In Costs | Freight-In:  Freight-In is misclassified. | Freight-in costs are generally included in the variable expenses of costs of goods sold.. ensure that freight-out costs are properly classified. | |
| P14.52 | Revenue / Expense Error or Fraud | Freight-Out Costs | Freight-Out:  Freight-Out is misclassified. | Freight-out costs are generally included as a variable selling expense, ensure that freight-out costs are properly classified. | |
| P14.53 | Revenue / Expense Error or Fraud | Improper Expense Classification | Fuel Expense: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to fuel expense are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.54 | Revenue / Expense Error or Fraud | Fuel Expense Not Matched to Revenue | Fuel Expense:  Fuel expense is not matched to corresponding revenue. | Fuel costs vary depending on the number of hours an engine is operated.  Fuel expenditures also depend on the amount of fuel consumed per hour and fuel price. Ensure that the cost of fuel is matched to the period in which the related revenue gained from the use of fuel is attributed. | |
| P14.55 | Revenue / Expense Error or Fraud | Improper Expense Classification | Inventory Adjustment: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to inventory adjustments are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.56 | Revenue / Expense Error or Fraud | Improper Expense Classification | Sales / Lodging Tax: Expenses may not be properly classified as variable expenses. | Ensure that expenses related to sales / lodging tax are accurately classified as variable expenses per Exhibit 4D of the Settlement Agreement. | |
| P14.57 | Revenue / Expense Error or Fraud | Sales Tax Not Matched to Revenue | Sales Tax:  Sales tax expense is not matched to corresponding revenue. | Most sales tax is broadly applied to a wide range of businesses and levied on the sale or lease of goods and services.  The amount of the sales tax will ultimately depend on the pricing and the applicable tax rate, which vary by jurisdiction.  Ensure that the expense is matched to the period in which the related revenue is attributed. | |

| DEEPWATER HORIZON CSSP | | | | | | |
|---|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | | |
| February 4, 2014 | | | | | | |
| **Risk #** | **Risk Category** | **Subcategory** | **Risk / Scheme Description** | **Proposed Mitigating Internal Controls** | | **Notes** |
| P14.58 | Revenue / Expense Error or Fraud | Lodging Tax Not Matched to Revenue | Lodging Tax: Lodging tax expense is not matched to corresponding revenue. | Lodging tax is a tax on paid overnight stays at a lodging property such as a hotel, motel, resort, inn, or bed and breakfast, etc. It is usually collected by the lodging operator from the overnight guest, and then passed on to the appropriate level of government. Ensure that the expense is deducted from the related room revenue during the period in which the lodging revenue is attributed. | | |
| P14.59 | Revenue / Expense Error or Fraud | Lodging Tax Not Accurately Calculated | Lodging Tax: Lodging tax expense is not properly calculated. | Lodging tax is usually a set percentage of the cost of the overnight stay or a flat fee per sleeping room (or rentable unit) on a daily or total stay. Recalculate the lodging tax to ensure it is mathematically accurate. | | |
| **P15 - CLAIMS REVIEW (EXPENSES- SHORT CYCLE)** | | | | | | |
| P15.01 | Revenue / Expense Error or Fraud | Improper Expense Classification | Traditional Manufacturing: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a traditional manufacturing industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as Cost of Goods Sold, freight costs, and packaging supplies are classified accurately and treated consistently across all traditional manufacturing claimants. | | |
| P15.02 | Revenue / Expense Error or Fraud | Improper Expense Classification | Retail: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a retail industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as Cost of Goods Sold, hourly labor cost, and selling expenses are classified accurately and treated consistently across all retail claimants. | | |
| P15.03 | Revenue / Expense Error or Fraud | Improper Expense Classification | Transportation Warehousing: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a transportation warehousing industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as labor cost, fuel expense, and non-routine repairs are classified accurately and treated consistently across all transportation warehousing claimants. | | |
| P15.04 | Revenue / Expense Error or Fraud | Improper Expense Classification | Wholesale Distribution: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a wholesale distribution industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as Cost of Goods Sold, outbound freight costs, and packaging supplies are classified accurately and treated consistently across all wholesale distribution claimants. | | |
| P15.05 | Revenue / Expense Error or Fraud | Improper Expense Classification | Healthcare: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a healthcare industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as medical supplies, consumable goods, and laboratory fees are classified accurately and treated consistently across all healthcare claimants. | | |
| P15.06 | Revenue / Expense Error or Fraud | Improper Expense Classification | Tourism: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a tourism industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as occupancy cost, sales commissions, fuel costs, and discounts are classified accurately and treated consistently across all tourism claimants. | | |
| P15.07 | Revenue / Expense Error or Fraud | Inventory Write-off | Retail, Manufacturing, Wholesale: Inventory write-offs conducted at year-end may not be properly reallocated to the month in which respective products were received. | Claimant may write-off inventory due to obsolescence or damages. For inventory identified as obsolete or damaged ensure that the related write-offs are applied to the period in which the product was deemed obsolete or damaged. Write-offs decrease ending inventory balances, which in turn affect the calculation of Cost of Goods Sold in each period. | | |
| P15.08 | Revenue / Expense Error or Fraud | Inventory Write-off | Retail, Manufacturing, Wholesale: Inventory write-offs conducted at year-end may not be properly reallocated to the month in which respective products were received. | If claimants are unable to provide sufficient documentation to indicate when damaged or lost inventory was originally received, ratably allocate the inventory write-off expense across the periods in which it might have been damaged or lost. | | |

| DEEPWATER HORIZON CSSP | | | | | | |
|---|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | | |
| February 4, 2014 | | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | | Notes |
| P15.09 | Revenue / Expense Error or Fraud | Contractual Allowance | Healthcare Providers: Contractual allowance estimates corrected at year-end may not be reallocated back to the respective period. | Based on negotiated contracts and historical experience, estimated contractual allowances are maintained for reimbursement amounts due from third-party payors during the period in which the services are performed. These estimates are then adjusted as payments are received and actual contractual allowances are recorded. Ensure that these year-end adjustments are appropriately allocated back to the month in which the service was performed. | | |
| P15.10 | Revenue / Expense Error or Fraud | Allowance for Returns | Manufacturing, Retail, Wholesale: Claimant must include an allowance for return of products. | Inquire of the claimant as to how the return allowance was estimated if claimants show Net Sales (gross sales less allowance for returns). Claim review is conducted retroactively and actual sales return figures are identifiable. Ensure that any overstated monthly allowances for returns are reversed and understated monthly allowances for returns are increased to appropriately reflect economic reality. | | |
| P15.11 | Revenue / Expense Error or Fraud | Allowance for Returns | Manufacturing, Retail, Wholesale: Claimant did not calculate the allowance for return of products accurately. | The calculation of the estimate of the provision for sales returns involves subjective judgments or uncertainties that can be difficult to corroborate. Test the calculation of the allowance for sales returns by ensuring the reasonableness of the computation. | | |
| P15.12 | Revenue / Expense Error or Fraud | Inflated Sales | Manufacturing, Retail, Wholesale: Claimant inflated sales. | A high volume of sales close to the period end, followed by a high volume of returns in the beginning of the following period may indicate that management relaxed the sales returns criteria in the lead up to the period end in order to inflate sales artificially. Review all claims to ensure that sales are not inflated. | | |
| **P16 - CLAIMS REVIEW (EXPENSES - LONG CYCLE)** | | | | | | |
| P16.01 | Revenue / Expense Error or Fraud | Improper Expense Classification | Agriculture: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop an agriculture industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as cost of production, labor cost, and truck, car, and equipment expense are classified accurately and treated consistently across all agriculture claimants. | | |
| P16.02 | Revenue / Expense Error or Fraud | Expenses Not Matched to Revenue | Agriculture: Agriculture industry claimants do not match variable expenses to the corresponding revenue generating activities. | For claims submitted by agriculture industry claimants, the matching concept requires variable expenses to be matched with time based asset enhancing activities. The claims should be reviewed to ensure that the variable expenses incurred during the production year are matched to the corresponding revenue resulting from the asset enhancement during the crop year.<br><br>Note: The crop year reflects the USDA-designated period in which a crop is marketed and sold, differs from the production year, which reflects that period in which expenses are incurred for growing and harvesting the crop. | | |
| P16.03 | Revenue / Expense Error or Fraud | Expenses Not Matched to Revenue | Agriculture: Agriculture industry claimants do not match variable expenses to the corresponding revenue generating activities. | Expenses of claimants in the agriculture industry must be carefully reviewed for irregular spikes in expense categories such as seed, fertilizer, pesticides, or tillage activities. Follow-up and make additional inquiries of the claimant to ensure that only expenses corresponding to the reported crop year are included and bulk expenses for future use are excluded from monthly expense figures for the calculation of Variable Profit. | | |
| P16.04 | Revenue / Expense Error or Fraud | Improper Expense Classification | Professional Services: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a professional services industry expense classification standard for claim reviewers to use as a guideline in their review of claims. This will ensure that standard industry corresponding variable expenses such as non-reimbursable travel and entertainment and bonuses are classified accurately and treated consistently across all professional services claimants. | | |

Proposed BEL Claim Process Level Internal Controls

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P16.05 | Revenue / Expense Error or Fraud | Improper Expense Classification | Construction: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a construction industry expense classification standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that standard industry corresponding variable expenses such as material cost, subcontractor cost, and building licenses and permit fees are classified accurately and treated consistently across all construction claimants. | |
| P16.06 | Revenue / Expense Error or Fraud | Improper Expense Classification | Project-Based Manufacturing: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a project-based manufacturing industry expense classification standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that standard industry corresponding variable expenses such as material costs, packaging supplies, and freight costs are classified accurately and treated consistently across all project-based manufacturing claimants. | |
| P16.07 | Revenue / Expense Error or Fraud | Improper Expense Classification | Real Estate: Lack of industry-specific expense classification guidelines for consistent treatment and review. | Develop a real estate industry expense classification standard for claim reviewers to use as a guideline in their review of claims.  This will ensure that standard industry corresponding variable expenses such as desk fees, referral fees, and franchise fees are classified accurately and treated consistently across all real estate claimants. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| **P17 - CLAIMS REVIEW (YEAR-END, ADJUSTING AND OTHER CORRECTING ENTRIES)** | | | | | |
| P17.01 | Revenue / Expense Error or Fraud | Adjusting Entries Not Reviewed | Adjusting or correcting entries reported in claimant financial information may not be evaluated or reviewed. | Adjusting entries must be evaluated. Adjusting entries are contemporaneous evidence made by the claimant that bear on the reported P&Ls. Those adjusting entries often reflect transactions and events that occurred during particular months but were not recorded until a later month. They are also admissions by the claimant of what the claimant believed at the time the adjusting entry was made. Such entries need to be reviewed by a professional accountant with appropriate training to determine how the adjusting entries should be reflected in the submitted P&L statements. | |
| P17.02 | Revenue / Expense Error or Fraud | Correcting Entries Not Reviewed | Correcting entries reported in claimant financial information may not be evaluated or reviewed. | Correcting entries must be:<br>(a) identified by the claimant or the claimant's representative; and<br>(b) reviewed by a professional accountant with appropriate training; and<br>(c) allocated to proper months based on objective contemporaneous evidence. | |
| P17.03 | Revenue / Expense Error or Fraud | Correcting Entries Not Reviewed | Correcting entries reported in claimant financial information may not be evaluated or reviewed. | Review of correcting entries should not be limited to entries the claimant has classified as a correcting entry, but additional review should be made to identify all correcting entries and are further reviewed. | |
| P17.04 | Revenue / Expense Error or Fraud | Year End Entries or Adjustments Not Reviewed | Large expense related entries reported at year end in claimant financial information may not be reviewed or evaluated. | Year end expenses such as bonus or commission payments and bad-debt expense should be reviewed by an experienced accountant, and the timing of the payment should be compared to historical financials. Review the contemporaneous documents to evaluate if the payment relates to activity performed in the year end period. If the payment is based on an annual activity performed throughout the year, then the amount should be properly and proportionally allocated to the corresponding periods. Review of contemporaneous should be accompanied by an inquiry of the claimant. | |
| **P18 - CLAIMS REVIEW (OTHER)** | | | | | |
| P18.01 | Claims Error or Fraud | Risk Transfer Premium (RTP) Misapplied | RTP is improperly applied to a claim not meeting the RTP requirements. | Claim should be evaluated to determine whether a claim meets the requirements for an RTP as set forth in the Settlement Agreement. To the extent that an RTP is applicable, it should be based on the type of claim and type of business, as certain businesses qualify for a higher RTP than others (e.g., tourism related entities have a higher RTP than non-tourism entities). | |
| P18.02 | Claims Error or Fraud | Prior Payments Improperly Excluded from Claim | Revenue received by a claimant from the Gulf Coast Claims Facility (GCCF), the Vessels of Opportunity (VoO) program, the Oil Pollution Act (OPA), or other related spill programs is not reported in BEL claim. | Cross reference claims to a master list of all spill related payments from the GCCF, VoO program, OPA, or other spill programs prior to award and payment of a claim. Prior payments received by claimants from the these programs should be reported as required by Exhibit 4C to the Settlement Agreement. Failure to consider prior payments received as revenue or to separately report costs unmatched to the revenue earned from these programs may result in understated revenues or overstated expenses in the Compensation period. | |
| **P19 - PAYMENT PROCESSING** | | | | | |
| P19.01 | Claims Error or Fraud | Inappropriate Payments | Claim payments are not properly calculated. | The final claim determination is reviewed and signed by a supervisor who did not initially review the claim. Any errors are sent back to the reviewer for resolution. | |
| P19.02 | Claims Error or Fraud | Unauthorized Payments | Claim payments are not properly authorized. | Claims processed in the IT system are validated to ensure that the claims have been accurately keyed-in, proper approvals have been obtained, and the correct G/L coding was used. This review is performed based on the actual claim payments processed in the IT system. | |
| P19.03 | Claims Error or Fraud | Unauthorized Payments | Claim payments are not properly authorized. | Checks for approved claims over a certain dollar threshold are verified and approved against supporting documentation by an authorized individual in accordance with treasury signatory policy. | |

| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
|---|---|---|---|---|---|
| DEEPWATER HORIZON CSSP | | | | | |
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| P19.04 | Claims Error or Fraud | Unauthorized Payments | Claim payments are not properly authorized. | Perform a reconciliation on a weekly basis between the IT system and the check register. The reconciliation and review is performed to validate the accuracy of the check run. Variances are investigated and adjusted on a timely basis. | |
| P19.05 | Claims Error or Fraud | Inaccurate Reporting | Accruals are not properly recorded. | On a monthly basis, the claims data is reviewed for claims processed not yet paid in the current month. All accruals booked must be reviewed and approved by a supervisor. | |
| P19.06 | Claims Error or Fraud | Inaccurate Payment | Claim are incorrectly paid. | Review and approve EFT or check payments before they are disbursed. They must also ensure that the total payment amount (per the IT system and source documentation) agrees to the actual payment (per EFT system). | |
| P19.07 | Claims Error or Fraud | Improper Payee | Claim payments are not sent to claimant's attorney. | Ensure that payments are properly made and addressed to a claimant's attorney, if the claimant checks the box for the Claims Administrator to make payments only to their attorney. | |
| P19.08 | Claims Error or Fraud | Improper Payee | Claim payments are not sent to both the claimant and the claimant's attorney. | Ensure that payments are properly made and addressed to the claimant and claimant's attorney, if the claimant does not check the box for the Claims Administrator to make payments only to their attorney. | |
| P19.09 | Claims Error or Fraud | Garnishments, Liens and Other Attachments | Garnishments, liens and other attachments are not properly deducted. | Ensure that garnishments, liens and other attachments are properly deducted from a claimant's payment. | |
| P19.10 | Claims Error or Fraud | Segregation of Duties | Payment process is not properly segregated. | Division of roles and responsibilities should exist between individuals setting up settlement payments and individuals authorized to trigger payments. | |
| P19.11 | Claims Error or Fraud | Safeguarding of Checks | Physical access to check stock is not appropriately restricted. | Ensure the physical security of checks from individuals to protect against theft by having proper safeguarding protocols in place. | |
| P19.12 | Claims Error or Fraud | Theft and Forgery | Settlement checks are not sequentially numbered. | Ensure that all settlement checks are sequentially numbered. Missing checks should be further reviewed. | |
| P19.13 | Claims Error or Fraud | Payment Address | Settlement checks not sent to physical address. | Review the delivery address of the settlement checks to verify that they are sent to a physical address belonging to the claimant and/or their attorney. Checks that are sent to a post office box should be further reviewed to ensure address is associated to the claimant/and or attorney. | |
| P19.14 | Claims Error or Fraud | Payment Address | Claimant's address is not confirmed prior to sending payment. | Once a claim has been completely reviewed and an award amount has been reached, confirm the contact information of the claimant receiving the award prior to sending the check payment. | |
| P20 - CLAIMS CLOSING | | | | | |
| P20.01 | Claims Error or Fraud | Untimely Closing of Claims | Settled claims are not recorded as closed in a timely manner. | Ensure that claims are appropriately closed when all payments are completed and appropriately reviewed. | |
| P20.02 | Claims Error or Fraud | Untimely Closing of Claims | Settled claims are not recorded as closed in a timely manner. | A supervisor should review a listing of open claims on a monthly basis to ensure all settled claims are closed in a timely manner. | |
| P20.03 | Claims Error or Fraud | Returned Checks | The liability for returned checks is not properly recorded. | A returned check from a claimant should not be routed to the same individual who issued the check to the claimant. When a returned check is received, contact the claimant to determine whether the check should be reissued. If so, request the updated contact information from the claimant. | |
| P20.04 | Claims Error or Fraud | Denied Claims | Claims are incorrectly denied. | A supervisor should review all denied claims and ensure that denials were properly determined and communicated to the claimant. | |
| P20.05 | Claims Error or Fraud | Changes to Closed Claims | Closed claims files are inappropriately changed. | Change all closed claims to read-only access to ensure no changes are made after claims are finalized and payments are processed. | |

Proposed BEL Claim Process Level Internal Controls

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P20.06 | Claims Error or Fraud | Payment Documentation | Copy of claims payment is not recorded. | Ensure that a copy of the EFT(s) or check(s) is included in the claimant's claim file prior to closing the file. | |
| **P21 - INFORMATION SYSTEMS** | | | | | |
| P21.01 | Information Security | System User Access Controls Not Maintained | User access level granted may not be up-to-date or regularly maintained. | User access is monitored and a routine assessment is performed to verify and update new, old, and terminated users from the system.  Ensure that the vendor employees have the proper access based on their specific roles. | |
| P21.02 | Information Security | System User Access Controls Not Appropriate | User access level granted may not be appropriate based on user role and responsibilities. | Users should not have the ability to review and approve a claim through payment.  Employees who transition into a new role should have prior access restricted. | |
| P21.03 | Information Security | System User Access Controls Not Monitored | Failure to reconcile accounts, resulting in a single user having multiple accounts. | User access is monitored and reconciled so each user should only have one account.  Multiple user accounts with different levels of access should not be allowed. | |
| P21.04 | Information Security | System Cyber Security Not Maintained | Employees do not take measures to ensure cyber security of their accounts. | Users should complete training regarding cyber security awareness and procedures that ensure the safekeeping of user accounts.  These measures should include secure log-ins and passwords, not sharing account information with colleagues, keeping all pertinent and sensitive documentation away from open areas, and securing all documentation when stepping away.  Training will be provided on a regular basis, and employees will certify that they have taken the minimum required training. | |
| P21.05 | Information Security | System Access | User access may not be monitored for irregular activity. | User access to the software should be tracked and reviewed for anomalous behavior (e.g., spending too much time on one claim file). | |
| P21.06 | Information Security | System Access | User access level granted may not be appropriate based on user role and responsibilities. | User access to claim files should be limited to only those claims assigned to that specific user.  Consequently, users should not be able to access or view claim files not assigned to them. | |
| P21.07 | Information Security | System Access | User access level granted may not be appropriate based on user role and responsibilities. | Remote access by users to the system should be limited or restricted to only users who receive prior authorization by direct supervisors.  Such authorization must be adequately documented. | |
| P21.08 | Information Security | System Access | Duplication of claims processing. | Create proper system and account controls to ensure that only one claim processor can write to a claimant file at a given time.  If multiple users are processing the same file, override issues may occur or duplication of information may arise. | |
| P21.09 | Information Security | System Access | Intentional or unintentional alteration of claim information. | The claims processing system should maintain an access log or control log for each claimant file to document the users accessing the file and changing the information, to prevent and monitor any unnecessary revision of claimant-provided information. | |
| P21.10 | Information Security | System backup and updates | Processing of duplicate claims. | The claims processing system should be updated in real time or close to real time to prevent any duplicate processing of claims.  If claimants' information is not refreshed on a frequent basis then there may be a lapse in control while verifying information.  If claimant has already been entered into system, but information is not updated until the next day, then the potential of creating another file for the same claimant could increase. | |
| P21.11 | Information Security | System backup and updates | Loss of claimant information. | Systems should be properly backed up on a frequent basis to prevent the loss of any processed information and to maintain accuracy of claim information. | |
| P21.12 | Information Security | System backup and updates | Physical Security. | Physical security of IT system and database from individuals and environmental risks should be maintained and monitored on a regular basis. | |
| P21.13 | Information Security | System Security | Logical security | Claim processing system should have the proper security to prevent outside third party from accessing and manipulating data information. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| P21.14 | Information Security | System Security | Software, databases, and other system components that perform business logic lack appropriately programmed automated controls | Automated controls to test system configuration and account mapping must occur regularly. | |
| P21.15 | Information Security | System Security | Software, databases, and other system components that perform business logic lack appropriately programmed automated controls | Automated controls that generate exception/edit reports must occur regularly and include the manual review of such reports. | |
| P21.16 | Information Security | System Security | Software, databases, and other system components that perform business logic lack appropriately programmed automated controls | Automated controls that provide system interface controls, interaction and information flow between multiple systems must occur regularly. | |
| P21.17 | Information Security | System Security | Software, databases, and other system components that perform business logic lack appropriately programmed automated controls | Automated controls that monitor and provide exception reports for system access, including enforcing segregation of duties must occur regularly. | |
| P21.18 | Information Security | System Security | Software, databases, and other system components that perform business logic lack appropriately programmed automated controls | Completeness checks are automated controls that ensure all data is properly submitted and complete before the system will further process the claim.  If claim information is insufficient or blank, then there should be completeness checks and other system controls to prevent further processing. | |
| P21.19 | Information Security | System Security | Software, databases, and other system components that perform business logic lack appropriately programmed automated controls | Validity checks should be implemented.  They are controls to verify and limit the type of data (characters v. numbers) that can be submitted and ensure only valid data is input or processed. | |
| P21.20 | Information Security | System Security | Lack of general IT Controls that ensure consistent system operation and integrity and security of information. | Appropriate policies and procedures that relate to IT applications must support the effective functioning of automated controls by helping ensure the operation of information systems. | |
| P21.21 | Information Security | System Security | Lack of general IT controls that ensure consistent system operation and integrity and security of information. | General IT controls surrounding the mainframes, client server systems, file servers, or combinations thereof must be monitored regularly. | |
| P21.22 | Information Security | System Security | Lack of general IT Controls that ensure consistent system operation and integrity and security of information. | Program change management must ensure systems changes are effective at addressing the CSSP's needs, properly authorized, and tested before implementation.  In addition, adequate document and record changes to the IT system must be readily available and accessible. | |
| P21.23 | Information Security | System Access | Database administration privileges are inappropriate. | Database administration privileges are limited to authorized individuals (DBAs). Administrator accounts are adequately authenticated with unique user names and passwords.  There should be no shared user names and/or passwords. The number of administrator users is limited and controlled. Direct access to the database is limited. | |
| P21.24 | Information Security | System Access | User accounts are not properly managed. | Management has established procedures to ensure timely action relating to requesting, establishing, issuing, suspending and closing of user accounts. A formal approval procedure outlining the data or system owner granting the access privileges is included. | |
| P21.25 | Information Security | Lack of change management | Changes to claims system are not properly recorded. | Changes to claims systems are properly recorded and tracked and are integrated with an overall configuration management system. | |
| P21.26 | Information Security | Management Review | Lack of general IT Controls that ensure consistent system operation and integrity and security of information. | Controls should guarantee that sufficient chronological information is being stored in logs to enable the reconstruction, review and examination of the time sequences of processing and the other activities surrounding or supporting processing of claims. | |
| P21.27 | Information Security | System Access | Inappropriate access to claims system. | Adequate firewalls are operative to protect against denial of services and any unauthorized access to the claims system. | |
| P21.28 | Information Security | System Access | Firewalls not operating as designed. | Firewall logs are reviewed by IT on a weekly basis. Questionable items are investigated and resolved. | |

DEEPWATER HORIZON CSSP
Proposed BEL Claim Process Level Internal Controls
February 4, 2014

| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
|--------|---------------|-------------|--------------------------|--------------------------------------|-------|
| P21.29 | Information Security | Segregation of Duties | System access is not properly segregated. | Division of roles and responsibilities excludes the possibility for a single individual to subvert a critical process. | |
| P21.30 | Information Security | Backup Access | Access to backups is not appropriate. | Access to request and obtain back-up files is based on an authorization list and is limited to personnel commensurate with job responsibilities. | |
| P21.31 | Information Security | Lack of change management | Change management procedures do not exist. | All requests for changes and system maintenance are standardized and are subject to formal change management procedures. Changes are categorized and prioritized. Change requestors are kept informed about the status of their request. | |
| P21.32 | Information Security | System backup and updates | Loss of claimant information. | The back-up restore process is tested monthly to ensure that data backups can be restored. | |
| P21.33 | Information Security | System backup and updates | Loss of claimant information. | Back-up procedures for information technology-related media include the proper storage of the data files, software and related documentation, both on-site and off-site. | |
| P21.34 | Information Security | Problem Management System | Problem management system does not exist. | IT management should define and implement a problem management system to ensure that all operational events which are not part of the standard operation (incidents, problems and errors) are recorded, analyzed and resolved in a timely manner. | |
| P21.35 | Information Security | System Security | System is not adequately safeguarded. | Appropriate physical security and access control measures should be established for IT facilities including off-site use of information devices in conformance with the general security policy. | |
| P21.36 | Information Security | System Access | Claimant file is inappropriately changed due to a lack of and/or inappropriate access controls. | Access controls ensures that only Claims Managers can modify critical data on the claimant file such as claim dates and claim location. Such data will only be changed with appropriate backup from the claimant. | |
| P21.37 | Information Security | System Security | Lack of general IT Controls that ensure consistent system operation and integrity and security of information. | Change Management: Monthly management review should ensure that the IT analyst performs system tests and that User Acceptance Tests are carried out by the end user. | |
| P21.38 | Information Security | System Security | Lack of general IT Controls that ensure consistent system operation and integrity and security of information. | Change Management: Application software change requests are standardized and subject to formal change management procedures. There must be a management review of the initial approval for a software change. | |
| P21.39 | Information Security | System Security | Breach of confidentiality. | Monitor external communication to ensure confidential information regarding the claimant and claim process is not shared with unrelated parties. | |
| **DATA ANALYSIS** | | | | | |
| **D1 - ERROR ASSESSMENT** | | | | | |
| D1.01 | Claims Error or Fraud | Class Member Requirements Manipulated | Claimant manipulated V-test requirements. | Claims that "nearly fail" the V-test requirements because they (a) pass on a small set of potential eligibility windows, or (b) exceed the relevant thresholds by small dollar amounts should be reviewed to ensure that small errors in reported revenue which trigger eligibility do not exist. Sufficient inquiry should be made of the claimant to understand when the financial statements were created and steps should be taken to assure that revenue is recorded properly in the monthly and annual financial statements. | |
| D1.02 | Claims Error or Fraud | Class Member Requirements Manipulated | Claimant manipulated Modified V-test requirements. | Claims that "nearly fail" the Modified V-test requirements because they (a) pass on a small set of potential eligibility windows, or (b) exceed the relevant thresholds by small dollar amounts should be reviewed to ensure that small errors in reported revenue which trigger eligibility do not exist. Sufficient inquiry should be made of the claimant to understand when the financial statements were created and steps should be taken to assure that revenue is recorded properly in the monthly and annual financial statements. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| D1.03 | Claims Error or Fraud | Class Member Requirements Manipulated | Claimant manipulated Down Only Test requirements. | Claims that "nearly fail" the Down Only V-test requirements because they (a) pass on a small set of potential eligibility windows, or (b) exceed the relevant thresholds by small dollar amounts should be reviewed to ensure that small errors in reported revenue which trigger eligibility do not exist. Sufficient inquiry should be made of the claimant to understand when the financial statements were created and steps should be taken to assure that revenue is recorded property in the monthly and annual financial statements. | |
| **D2 - DATA ANALYSIS** | | | | | |
| D2.01 | Claims Error or Fraud | Third Party Sponsored Claims | Claims sponsored by accounting firms are manipulated. | Require standardized reporting of accounting firms and accountant names utilized to report claims to enable comparison of claims from specific third parties. | |
| D2.02 | Claims Error or Fraud | Third Party Sponsored Claims | Improper relationships between the accountant(s) and/or accounting firm and sponsoring law firm. | Perform inquiries to identify the relationship of the accountant(s) and/or accounting firm with the sponsoring law firm.  Ensure no inappropriate relationships exist. | |
| D2.03 | Claims Error or Fraud | Third Party Sponsored Claims | Patterns exist within claim outcomes for claims submitted by law firms and accounting firms. | Perform systematic and regular analysis of claim outcome patterns by law firms and accounting firms. Metrics that can be applied include, for example: a. Claim approval rates by sponsoring law/accounting firms b. Identification of frequency of irregular award sizes (e.g., based on disproportionality metrics that compare Step 1 award to May-December loss metrics) c. Frequency of awards that "nearly fail" V-test d. Frequency of unsigned tax returns e. Frequency of claims with financial statements that do not reconcile with tax returns Ensure confidential follow-up forensic analysis interviews/analysis with firms/individuals associated with irregular claim metrics. | |
| D2.04 | Claims Error or Fraud | Claim Reviewer Activity | Patterns exist and/or irregularities within claim outcomes for claim reviewers. | Perform an overview and evaluation of claim reviewer activity: a. Systematic report of CSSP employees involved in review of given claims, including their role b.  Evaluation of outcome metrics (such as those described in D2.03 above) based on CSSP employee involved in review c. monitor on-going relationships between claims reviewers and firms. | |
| D2.05 | Claims Error or Fraud | Irregular Reporting | Irregular line item reporting. | Identification and evaluation of irregular line item reporting: a. Identify whether claimant did not to report line-item detail typical for claimant's size/industry b. Typical patterns based on reporting patterns for similarly situated claimants c. Test consistency of claimant's line item reporting across and within years | |
| D2.06 | Claims Error or Fraud | Irregular Reporting | Patterns and/or irregularities exist with geographic and time series analysis. | Perform geographic and time series analysis such as: a. Analyze historical and geographic patterns of claim emergence, claim eligibility (pass rate), and award size (relative to typical size/industry), industry composition b. Test for potential fraud "clustering" based on irregular results:    i. Irregularly high claim emergence from particular geographies in concentrated time periods    ii. Irregularly high pass rates among claims filed in particular geographies or filing periods    iii. Irregularly large awards relative to benchmarks from particular geographies or filing periods | |
| D2.07 | Claims Error or Fraud | Irregular Reporting | Patterns and/or irregularities exist for claim centers. | Perform comparison of outcomes cross claim centers for patterns and/or irregularities. | |

| DEEPWATER HORIZON CSSP | | | | | |
|---|---|---|---|---|---|
| Proposed BEL Claim Process Level Internal Controls | | | | | |
| February 4, 2014 | | | | | |
| | | | | | |
| Risk # | Risk Category | Subcategory | Risk / Scheme Description | Proposed Mitigating Internal Controls | Notes |
| **D3 - COMPUTER ASSISTED DATA ANALYTICS** | | | | | |
| D3.01 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | Perform applicable data analytics as outlined in "Data Analytics" document. | |
| | | | | | |

# EXHIBIT F

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| **Risk #** | **Responsible Party** | **Response** |
| P1.01 | Accountants | N/A |
| P1.02 | Accountants | N/A |
| P1.03 | Accountants | N/A |
| P1.04 | BG-BEL | Accountant and BrownGreer BEL Reviewers must enter comments in the review screen for each critical decision they make.  The Deepwater Horizon ("DWH") Database Application ("Application") stores all data related to each unique claim and claimant-level review.  Policy 378 grants the Parties access to a claimant's Global Notes, accountant workbooks, Claim Review Details for a particular claim only after the DWH Economic & Property Damages Settlement Program ("Program") has issued a Denial or Eligibility Notice for that claim.  The policy also indicates that before a Denial or Eligibility Notice, the Parties will have access to claim reports, claim files and the claims database only.  Policy 378 and the Confidentiality Agreement govern the information the Program is permitted to share with the Parties and the Program cannot deviate from these policies. |
| P1.05 | BG-BEL | Accountant and BrownGreer BEL Reviewers must enter comments in the review screen for each critical decision they make.  The Application stores all data related to each unique claim and claimant-level review. The Claims Administrator's office has access to the claimant and claim-level review history tables in the Application.  These tables allow them to verify and trace the results of each review. |
| P1.06 | BG-BEL | The Program has multiple quality control measures in place for each step of the claims review process. Section XXV of the BrownGreer DWH Operations Manual ("Operations Manual") outlines the BrownGreer Quality Assurance ("QA") Process for all claim types, including BEL claims.  BrownGreer runs daily automated QA Metrics against all claims reviewed in Initial and Incompleteness Response Review in the past 24 hours, as well as offline data analytics on BEL Financial Data entered for those claims to identify potential errors and move those claims through QA Review for correction, if needed.  In addition to the BrownGreer QA processes, every eligible claim must route to Accountant QA Review after the initial compensation calculation review to ensure the accuracy of the calculation.  After claim review is complete, the BrownGreer BEL Team and Accountants perform a daily QA review of all BEL Eligibility and Denial Notices to identify potential errors within the review or on the Notice.  The Accountants perform a final, high-level accounting QA Review of the calculations and ensure that the information in the Eligibility Notice matches the data in the BEL compensation workbook.  The Accountants request the pull of certain Eligibility Notices each day if during the QA Review the Accountant determines that there was an error in the BEL compensation workbook. |
| P1.07 | Accountants | N/A |
| P1.08 | BG-BEL | The Program performs a Data Metrics Analysis on all BEL claims submitted from BrownGreer Initial and Incompleteness Response Review.  This is an algorithm that identifies which claims meet certain data metrics triggering a QA Review.  The algorithm runs nightly against all claims reviewed during the previous 24 hours. Claims that meet any of these data metrics are identified for QA Review.  The automated data metrics that may trigger a QA Review are described in Exhibit XXV.A of the Operations Manual. Additionally, the BEL QA Team runs daily offline data analytics on all Financial Data entered for the population of claims described above.  These offline data analytics are described more fully in Section XXV.E of the Operations Manual. |
| P1.09 | Accountants | For data analytics peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| P1.10 | Accountants | For data analytics peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P1.11 | BG- Document Retention | BrownGreer ("BG") adheres to the Court Approved Procedure 3, the Court's Order Regarding Document Retention by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement (the "Order"), the Claims Administrator's Policy on Document and Data Retention, and any other Orders entered by the Court or policies promulgated by the Claims Administrator affecting the retention and preservation of documents and Settlement Program materials.  BG has implemented policies for its personnel consistent with these directives for all documents or electronically stored information relating to the Settlement Program and received or generated by the Settlement Program, including writings, notes, calendars, logs, forms, drawings, diagrams, graphs, schedules, charts, worksheets, computations, photographs, videos, sound recordings (excluding voicemails), images, emails to or from DHECC associated accounts or recipients, databases and other data or data compilations stored in any medium from which information can be obtained.  Each BG employee or contractor is expected to comply with all policies and procedures related to document retention.<br><br>For more information regarding the storage and retention of claimant documents submitted electronically or through the Settlement Program's facility in Hammond, LA, please consult GCG. |
| P1.12 | BG- Document Retention | BrownGreer ("BG") adheres to the Court Approved Procedure 3, the Court's Order Regarding Document Retention by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement (the "Order"), the Claims Administrator's Policy on Document and Data Retention, and any other Orders entered by the Court or policies promulgated by the Claims Administrator affecting the retention and preservation of documents and Settlement Program materials.  BG has implemented policies for its personnel consistent with these directives for all documents or electronically stored information relating to the Settlement Program and received or generated by the Settlement Program, including writings, notes, calendars, logs, forms, drawings, diagrams, graphs, schedules, charts, worksheets, computations, photographs, videos, sound recordings (excluding voicemails), images, emails to or from DHECC associated accounts or recipients, databases and other data or data compilations stored in any medium from which information can be obtained.  Each BG employee or contractor is expected to comply with all policies and procedures related to document retention.<br><br>For more information regarding the storage and retention of claimant documents submitted electronically or through the Settlement Program's facility in Hammond, LA, please consult GCG. |
| P1.13 | BG- Document Retention | All BG personnel have received instructions regarding expectations for their compliance with policies and procedures related to document retention and storage.  All training presentations presented to BG personnel contain instructions regarding the expectation of reviewers to maintain the confidentiality of claims information as required by the Court's Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement. These presentations remind reviewers that confidential claims information cannot be shared with any individuals other than the claimant and his/her authorized representatives.  They also reinforce that confidential information cannot be removed from BG's offices by any reviewer. |
| P1.14 | BG-BEL | The BrownGreer BEL Team and Accountant Reviewers perform a daily QA review for all BEL Eligibility and Denial Notices to identify potential errors within the review or on the Notice.  Going forward, the Accountants that perform the QA review for BEL Eligibility Notices will not examine the Notice for a claim that particular accountant reviewed at any point. A member of the BEL Team performs a QA Review of all BEL Denial Notices each day to identify potential errors within the review or on the Notice.  The BEL Team Member does not review claims and never examines a Notice for which she reviewed the claim. |
| P1.15 | Accountants | N/A |
| P1.16 | Accountants | N/A |
| P1.17 | BG-BEL | BrownGreer BEL Team Leads send an informational email to all BrownGreer BEL Reviewers each time the Claims Administrator finalizes a policy that affects the processing of claims through BrownGreer review. Regular refresher trainings reinforce applicable policies and procedures for BrownGreer BEL Reviewers. Accountant and BrownGreer BEL Reviewers have access to the public Policy Keeper on the Program's website. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls |
|---|---|---|
| Risk # | Responsible Party | Response |
| P1.18 | BG-BEL | BrownGreer BEL Team Leads send an informational email to all BrownGreer BEL Reviewers any time the Claims Administrator finalizes a policy that affects the processing of claims through BrownGreer review to ensure the reviewers apply the correct policy to claims reviews. Regular refresher trainings reinforce applicable policies and procedures for BrownGreer BEL Reviewers. When the Claims Administrator finalizes new policies, BEL Team Leads ensure that the policy is applied to all claims currently under review. The Program does not retroactively apply policy decisions to claims with a final determination Notice, but makes conscientious efforts to identify claims that may be affected by pending policy decisions by applying a claim-level Stop Processing Hold that prevents the issuance of a determinative Notice before the finalization of the policy. |
| P2.01 | BG-Compliance | BrownGreer implemented a wide range of meaningful internal controls to protect against potential conflicts of interest among employees and contractors working on the Program, including: (1) new-hire protocols to ensure that candidates have not filed a claim with the Program, are qualified to work on the Program and have no conflicts; (2) a Personal Relations Survey that every worker must complete, disclosing information about prescribed categories of relationships and business interests; (3) worker training regarding their obligations under the DWH Code of Conduct Policy and prohibitions against conflicts; (4) a Declaration for DWH Settlement Program that requires each worker to certify periodically that he or she has read and understands the DWH Code of Conduct Policy and will comply with its terms; (5) programmatic reports that compare information about workers and their personal relationships and business interests against the DWH Database to identify and monitor potential conflicts that may not have been reported or disclosed; and (6) a protocol for investigating potential conflicts and reporting them to the Claims Administrator's Office ("CAO"). These controls are being modified to accommodate the new Vendor Code of Conduct that has been adopted earlier this week. |
| P2.02 | BG-SIT | The Settlement Agreement grants the Claims Administrator the authority to verify Claim Form statements and documents submitted with such Claim Forms as is deemed necessary. The Claims Administrator has established a Special Investigations Team, whose purpose is to prevent, detect, investigate, and deter fraud in the claims review process under the Settlement Program. For more in detail discussion of fraud detection, prevention, and investigation processes, see Section XXXIV of DWH Operations Manual and related Appendices. The CSSP personnel met with BP in June, 2012, August, 2012, January, 2013, and June, 2013, to discuss in depth the framework and processes of the Program's Special Investigations Team (SIT). |
| P2.03 | BG-SIT | The SIT developed specialized education and training for SIT's staff and all Claims Handlers and also conducts follow-up training. With the more standardized and structured documents requirements, the Claims Handlers develop expertise in recognizing documents applicable to particular Claim Types and identify the claim for SIT review if documents appears suspect. The SIT also updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 442 businesses, employers, notaries, and tax preparers, all of whose involvement or preparation of claims is suspect. BG maintains records of trainings to ensure that Claims Handlers attend appropriate trainings. For more in detail discussion of fraud detection, prevention, and investigation processes, see Section XXXIV of DWH Operations Manual and related Appendices. |
| P2.04 | BG-SIT | BrownGreer follows its policies. |
| P2.05 | BG-Duplicate Claimants | The BrownGreer Duplicate Claimant Team identifies duplicate claims filed under separate Claimant Identification Numbers ("Claimant IDs") using the DWH 8349 Report, which identifies Claimant IDs with overlapping Tax Identification Numbers ("TINs"). A member of the Duplicate Claimant Team evaluates the report and if he or she finds duplicate claims filed under separate Claimant IDs, then he or she will mark the duplicate DWH Claimant ID inactive, thereby merging the duplicate claims under one Claimant ID. |
| P2.06 | BG-SIT | The SIT maintains records in the Application's SIT modules all claimants who were previously found to have submitted false documents to support their claims. Any claimant under investigation for potential fraud at the end of the GCCF, including claimants who were found to have submitted false documents during the GCCF and were referred to the DOJ for investigation, are automatically proposed for review by SIT if they file with the Settlement Program. Additionally, SIT runs data analytics reports to detect additional claims filed by individuals who were found to have submitted false documents and were referred to the DOJ by the Settlement Program; these additional claims are monitored and reviewed to determine if they are also supported by false documents. |

| Risk # | Responsible Party | Response |
|---|---|---|
| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
| P2.07 | BG-SIT | The SIT maintains and updates a "be on the look out" ("BOLO") list that currently contains 442 businesses, employers, notaries, tax preparers, and other entities, all of whose involvement or preparation of claims is suspect.  SIT actively monitors the database to locate claimants who may be associated with any of these suspect entities and regularly provides this BOLO list to reviewers so that they may also check claimant documents for these suspect entities during claims review. |
| P2.08 | BG-SIT | For data analytics currently peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| P2.09 | BG- Confidentiality | BG has appointed a Confidentiality Team to ensure that the firm and its employees adhere to rules, procedures, and Orders regarding confidentiality of communications and claims processing in the Settlement Program.  BG includes information and rules regarding the preservation of confidential claims information in all training presentations for BG reviewers.  BG also ensures that all BG reviewers execute the Certification required by the Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement before the reviewers are granted access to the information in the Settlement Program database.<br><br>For information regarding other vendors' compliance with the Order Regarding Confidentiality, please consult the other vendors. |
| P3.01 | BG-BEL | The Program has multiple quality control measures in place for each step of the claims review processes. Section XXV of the Operations Manual outlines the BrownGreer QA Process for all claim types, including BEL claims.  BrownGreer runs daily automated QA Metrics against all claims reviewed in Initial and Incompleteness Response Review in the past 24 hours, as well as consistent offline data analytics on BEL Financial Data entered for those claims to identify potential errors and move those claims through QA Review for correction, if needed.  The data metrics that may trigger a QA Review are described in Exhibit XXV.A of the Operations Manual and Section XXV.E outlines the offline data analytics process.  Finally, the QA Team uses the data from the QA Reviews to identify errors and follow-up with reviewers as needed. The Error Tracking and Reviewer Follow-Up Process is described in Section XXV.D of the Operations Manual. |
| P3.02 | GCG | N/A |
| P3.03 | GCG | N/A |
| P3.04 | GCG | N/A |
| P3.05 | GCG | N/A |
| P3.06 | GCG | N/A |
| P3.07 | GCG | N/A |
| P3.08 | GCG | N/A |
| P3.09 | GCG | N/A |
| P3.10 | BG-EVR | The BrownGreer Employer Verification Review ("EVR") Team determines the appropriate Economic Loss Zone for each Facility of a Business Entity, which is represented in the Application by a unique Employer/Location ID ("EID").  To achieve this, the EVR Team reviews business licenses, permits, websites, state databases and any other information necessary to determine the physical operating address of each Facility.  In the absence of an identifiable physical operating address, the EVR reviewer verifies the EID with an "Unknown" Zone determination.  The claimant will then receive an Incompleteness Notice requesting the physical operating address of the Facility.  P.O. Boxes and mailbox store rental units are not acceptable substitutions for physical operating addresses because they do not indicate the physical location of a Facility. |
| P3.11 | GCG | N/A |
| P3.12 | BG-Duplicate Claimants | The Special Investigation Team ("SIT") identifies claimants with the same or similar address, name and Social Security Number ("SSN") or Employer Identification Number ("EIN"). The SIT reviews all the claimants identified through these queries to confirm a claimant's identity and the veracity of the records submitted in support of the claim and to prevent duplicate claims. |
| P3.13 | BG-Duplicate Claimants | The SIT uses a matching address report to track overlapping claimants that report the same address information for Claim Filings (mailing address, claims preparer, business address).  The SIT reviews all claimants identified by this report to confirm a claimant's identity and the veracity of the records submitted in support of the claim and to prevent duplicate claims. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P3.14 | BG-ID Verification | BrownGreer performs a review to prevent claimants from creating multiple Claimant IDs in the Application. The BrownGreer Duplicate Claimant Team identifies duplicate claims filed under separate Claimant IDs using the DWH 8349 Report, which identifies Claimant IDs with overlapping TINs.  If a member of the Duplicate Claimant Team finds duplicate claims filed under separate Claimant IDs, then he or she will mark the duplicate DWH Claimant ID inactive, thereby merging the duplicate claims under one Claimant ID.  In addition, the Application links any BP claims process, Real Estate Fund or Gulf Coast Claims Facility ("GCCF") Payments associated with the GCCF Claimant ID or a Tax ID entered on a claimant's Registration Form to that claimant's DWH Claimant ID.  This ensures that all applicable prior payments are deducted from a future award to the Claimant, eliminating multiple payments to the same claimant for the same loss. |
| P3.15 | BG-SIT | Claimants who were found to have submitted false documents and referred to the DOJ during the GCCF and claimants who had any unresolved red flags at the end of the GCCF are automatically proposed for review by SIT if they file with the Settlement Program. |
| P3.16 | BG-SIT | When reviewing VoO claims, BrownGreer relies on databases provided by BP.  If there is a discrepancy that warrants suspicion, SIT conducts investigation. |
| P3.17 | BG-SIT | BrownGreer's SIT team has requested BP in the August, 2013 meeting to alert it of potential fraudulent activity observed by the OPA activity.  The Claims Administrator's office extended the reciprocal alert system, whereby the SIT team will alert the OPA facility of suspected activity that may affect it.  SIT also alerts the Medical Settlement of any suspect activity that could pertain to its processing of claims.  Since August, 2013, BrownGreer's SIT team received approximately 60 tips from OPA facility alerting of potential fraud.  BrownGreer's SIT team places any identified claims on hold, fully investigated them, and provided response to the OPA facility, within confines of the Confidentiality rules. |
| P3.18 | BG-Duplicate Claimants | The BrownGreer Duplicate Claimant Team identifies programmaticaly duplicate claims filed under separate Claimant IDs using the DWH 8349 Report, which identifies Claimant IDs with overlapping TINs.  If a member of the Duplicate Claimant Team finds duplicate claims filed under separate Claimant IDs, then he or she will mark the duplicate DWH Claimant ID inactive, thereby merging the duplicate claims under one Claimant ID.  The BG Duplicate Claimant Team ensures that all holds, including SIT holds, are applied to the DWH Claimant ID remaining active. |
| P3.19 | BG-SIT | The SIT maintains records and lists of claimants who were previously found to have submitted false documents to support their claims.  Claimants who were found to have submitted false documents during the GCCF and were referred to the DOJ for investigation are automatically proposed for review by SIT if they file with the Settlement Program.  Additionally, SIT monitors reports to locate any additional claims filed by individuals who were found to have submitted false documents and were referred to the DOJ by the Settlement Program; these additional claims are monitored and reviewed to determine if they are also supported by false documents.  Pursuant to the policy agreed to by the Parties in July, 2012, the Program does not automatically deny resubmitted claims that previously were found fraudulent; instead, the BrownGreer's SIT team re-reviews all these submissions to determine if any further investigation steps are warranted and if issues determined fraudulent in the GCCF are applicable to the CSSP filings. |
| P3.20 | BG-SIT | The SIT maintains and updates a "be on the look out" ("BOLO") list that currently contains 442 businesses, employers, notaries, tax preparers, and other entities, all of whose involvement or preparation of claims is suspect.  SIT issues an updated BOLO list to reviewers and instructs them to search all entities on the  list.  In addition, SIT periodically runs automated queries to locate claimants who may be associated with any of these suspect entities.  SIT queries note only these 442 entities, but also over 9100 other suspect data indicators accross the entire database, hitting approximately 326 data fields, to detect presence of additional participants with similar fraudulent characteristics. |
| P3.21 | GCG | N/A |
| P3.22 | GCG | N/A |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P3.23 | BG-Exclusions | BrownGreer BEL Reviewers examine the all of the claimant's documents, paying special attention to any medical records, doctor visits, or hospital stays that may be indicative of a medical injury.  If the reviewer discovers documentation demonstrating that the claimant is filing a claim for Bodily Injury only, the reviewer selects the check box for Question 2 in the Found an Exclusion button.  The Application will then exclude the claim. See Section IV.C.1 of the Operations Manual for details on the Found an Exclusion button. |
| P3.24 | GCG | N/A |
| P3.25 | GCG | N/A |
| P3.26 | GCG | N/A |
| P3.27 | GCG | N/A |
| P3.28 | GCG | N/A |
| P3.29 | GCG | N/A |
| P3.30 | GCG | N/A |
| P3.31 | GCG | N/A |
| P3.32 | GCG | N/A |
| P3.33 | GCG | N/A |
| P3.34 | BG-Exclusions | The Application programmatically identifies claimants with an accepted GCCF Release on file through the claimant's SSN or EIN.  The Application applies an Event 62, "Accepted GCCF Release on File," and a claimant level hold, "Claimant Excluded – Signed GCCF Release" ("GCCF Release Hold") to all claimants with a GCCF Release on file.  When the claimant has an Event 62 and a GCCF Release Hold, the Application triggers a GCCF Release Exclusion Review ("Review").  BrownGreer Exclusions Reviewers complete the Review and make the final determination as to whether the Entity or Individual is excluded. See Section IV.B.1 of the Operations Manual for details regarding the Review. |
| P3.35 | BG-Opt Outs | Garden City Group ("GCG") Reviewers assign Opt-Out identification numbers ("Opt-Out IDs") to individuals or businesses that have validly opted out of the Program.  GCG provides BrownGreer with a table of opted out claimants ("the Opt-Out table"), populated with some or all of the following identifiers: the Claimant's Name, DWH Claimant ID, GCCF Claimant ID, Tax Payer ID and Claimant's Address.  The Opt-Out table categorizes the Opt-Out IDs as valid, invalid or revoked. Using the identifiers provided, the Application programmatically assigns Opt-Out Holds to DWH claimants linked to valid Opt-Out IDs and removes Opt-Out Holds from DWH claimants linked to invalid or revoked Opt-Out IDs.  If a claimant with an Opt-Out Hold has submitted claims in the Program, the claimant will receive a notice stating that the Program will close the claimant's claims because the claimant opted out of the Program.  The claimant will receive the status "Claimant Opted Out of the Settlement, and the claimant's claims will receive the status "Claim Closed – Claimant Opted Out of Settlement." |

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P4.01 | BG-Exclusions | The Application assigns a Zone to each EID based on the Mapping Software and BrownGreer EVR Reviewers' verification.  If the Application identifies the EID as Outside the Eligibility Zone, then it requires the BrownGreer EVR reviewer to review the Found an Exclusion button questions.  The BrownGreer EVR Reviewer must then determine if the Entity linked to that EID meets the Class Membership requirements of Section 1.2 of the Settlement Agreement.  The Application flags these Entities and refers them to the Exclusions Team, which then determines whether the Entity is properly excluded.<br><br>With respect to excluded industries, BrownGreer EVR and BEL Reviewers identify Entities in potentially excluded industries (including Financial Institutions, Funds, Financial Trusts, and Other Financial Vehicles, Gaming, Insurance Entities, Oil and Gas Industry, Defense Contractors, Real Estate Developers, BP-branded fuel sellers and Governmental Organizations) during Initial Review and QA Review.  The BrownGreer EVR and BEL Reviewers refer these Entities to the Exclusions Team, allowing the Exclusions Team to determine whether the entity is properly excluded pursuant to  Sections 2.2.4-2.2.5 of the Settlement Agreement and, if so, to apply the exclusion through the EVR process.<br><br>Claimants must meet the Causation Requirements of Exhibit 4B to be eligible for compensation.  By meeting the Causation Requirements of Exhibit 4B, the claimant has established that his or her loss was due to or resulting from the DWH Spill. |
| P4.02 | BG-EVR | The BrownGreer EVR Team determines the appropriate NAICS Code and Industry Designation for each Business Entity.  To achieve this, the EVR Team reviews business licenses, permits, websites, state databases and any other information necessary to determine the primary nature of the claimant's business activity as a whole.  The BrownGreer EVR Reviewer then assigns the most appropriate 2007 U.S. NAICS Code by referencing the NAICS Code descriptions on the U.S. Census Bureau website.  In most cases, the Application programmatically determines the correct Industry Designation or Exclusion once the BrownGreer EVR Reviewer enters the NAICS Code.  However, in cases where the NAICS Code does not directly correspond to a particular Industry Designation or Exclusion, the Application programmatically guides the EVR reviewer through a more detailed analysis to determine the correct Industry Designation or Exclusion.  The EVR reviewer must perform an additional review step for all businesses with a NAICS Code that results in a Non-Tourism Industry Designation to determine if the claimant meets the subjective definition of Tourism. |
| P4.03 | BG-BEL | The BrownGreer BEL and the Accountant Reviewers review each claim to determine whether the claimant filed the claim in the correct framework.  If either a BrownGreer BEL Reviewer or Accountant determines that the business ceased operations and wound down, entered bankruptcy, or otherwise initiated or completed a liquidation of substantially all of the business' assets prior to December 31, 2011, and did not submit a Failed BEL claim form, then the reviewer will submit a request to have the claim Reclassified.  For additional information on the Reclassification process, see Section XXII of the Operations Manual.  In addition, the Program is currently reaching out to the Parties for clarification regarding certain aspects of a Failed Business.  Once the policy is finalized, BrownGreer BEL and Accountant Reviewers will receive additional instructions as to how to identify and evaluate Failed BEL claims. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P4.04 | BG-EVR | The BrownGreer EVR Team reviews claimant documents and performs external internet research to determine the physical operating address for each Facility of a Business Entity.  Once the EVR reviewer confirms the physical operating address for a Facility, the Application automatically designates the appropriate Economic Loss Zone using the DWH mapping software.  The EVR reviewer must then perform a visual inspection of the mapping software result to determine whether an Exhibit 1C provision applies to that Facility.  If an Exhibit 1C provision applies, the Facility receives a more preferential Zone and the EVR reviewer must manually update the Zone in the Application.  Every EID that receives a manual Zone update triggers an EVR QA metric so a different EVR reviewer can confirm that the Zone is correct.  In addition, there are other EVR QA metrics that relate to Zone assignment. |
| P4.05 | BG-EVR | The BrownGreer EVR Team consults DWH Policy 467 for guidance in determining what constitutes a Facility of a Business Entity.  The address listed on a federal tax return or Claim Form is not direct indicia of the physical operating address of a Facility.  The EVR Team performs an independent review of business licenses, permits, websites, state databases and all other supporting documentation to confirm the physical operating address for each Facility.  If the only business address provided is a residential address, we ensure that there is sufficient evidence showing that the claimant manages or performs business operations from that address.  In the absence of such evidence, the EVR reviewer either assigns the Zone corresponding to the Facility's physical operating address as determined by the reviewer or selects the "Unknown" Zone determination, rather than use the asserted residential address.  If EVR team questions the claimant's assertions, it will propose the claim for further SIT review. |
| P4.06 | Accountants | N/A |
| P4.07 | BG-ID Verification | A business claimant will be subjected to this mitigating control in two processes:  the Identity ("ID") Verification Process and the EVR Process.  BrownGreer's ID Verification Team sends business Tax IDs and Names to Dun & Bradstreet for verification.  If Dun & Bradstreet is not able to verify the business' identity, BrownGreer's ID Verification Reviewers perform a review of the business to attempt to verify the business' identity.  ID Verification Reviewers may use the claimant's documentation, state corporation commission websites and the Accurint database to verify the business' identity.  During each EVR review, the BrownGreer EVR Team reviews business licenses, permits, employer websites and state databases in addition to submitted claim documentation and tax returns.  In instances where external information does not correlate to the claimant's documentation, or when there is conflicting information, the BrownGreer EVR Reviewer proposes the claim for SIT review.  The BrownGreer EVR Team has access to the DWH Results Search Feature which enables them to refer a claim to the SIT when deemed appropriate. |
| P4.08 | BG-BEL | Accountant and BrownGreer BEL Reviewers must review all newly submitted documentation to ensure the documentation belongs to the claimant and the documentation is relevant to the claim. All documentation submitted, including documentation that is additional to the original filing or is a correction to the previous filing, are stored. Accountant and BrownGreer BEL Reviewers must enter comments in the review screen for each critical decision. These comments must include the document citation. |
| P4.09 | BG-BEL | BrownGreer BEL Team Leads review and provide timely responses to all exception reports from the CAO and external auditors.  As part of the exception process, BEL Team Leads track and address all errors with BrownGreer BEL Reviewers. |
| P4.10 | BG-BEL | The Application runs the Revenue-Pattern Causation Tests on all revenues that the claimant provides to evaluate the most beneficial Benchmark Period, regardless of the Benchmark Period that the claimant selects.  Similarly, the Accountant Reviewers calculate the Compensation amount for all Compensation Periods to maximize the claimant's recovery, regardless of the Compensation Period that the claimant selects.  The Accountant Reviewers perform offline Compensation Calculations in an Excel workbook.  The workbook contains a formula that calculates the most optimum Compensation Period. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P4.11 | BG-EVR | The BrownGreer EVR Team determines the appropriate NAICS Code and Industry Designation for each Business Entity. To achieve this, the EVR Team reviews business licenses, permits, websites, state databases and any other information necessary to determine the primary nature of the claimant's business activity as a whole. The EVR reviewer then assigns the most appropriate 2007 U.S. NAICS Code by referencing the NAICS Code descriptions on the U.S. Census Bureau website. In most cases, the Application programmatically determines the correct Industry Designation or Exclusion once the EVR reviewer enters the NAICS Code. However, in cases where the NAICS Code does not directly correspond to a particular Industry Designation or Exclusion, the Application programmatically guides the EVR reviewer through a more detailed analysis to determine the correct Industry Designation or Exclusion. The EVR reviewer must perform an additional review step for all businesses with a NAICS Code that results in a Non-Tourism Industry Designation to determine if the claimant meets the subjective definition of Tourism. |
| P4.12 | Accountants | N/A |
| P4.13 | Accountants | N/A |
| P4.14 | BG-BEL | BrownGreer BEL and Accountant Reviewers review all the documentation submitted by a claimant, including GCCF documentation. If the documentation differs materially, the BrownGreer BEL and Accountant Reviewers will refer the claim to SIT for a fraud evaluation. The BrownGreer BEL and Accountant Reviewers have access to this information because the Application automatically transfers a copy of the documents from the file of a GCCF Claimant ID, including any BP claims documents linked to that GCCF claimant, into the file of the newly established DWH Claimant ID when a claimant registers with the Program and provides his or her GCCF Claimant ID. In addition, BrownGreer is currently building a Utility that will allow a system user to link a DWH Claimant ID to a GCCF Claimant ID if the automated function in the Application did not provide a match due to a typo or incorrectly completed field. |
| P4.15 | BG-Moratoria | The Settlement Program has not finalized a comprehensive policy establishing how to identify Moratoria Losses Claims and how to process such claims once identified. However, as an initial step in implementing the Moratoria Losses Exclusion and ensuring that claims with potential Moratoria Losses are not compensated prior to finalization of this policy, the Claims Administrator established a dedicated Moratoria Team that is responsible for reviewing (1) all Entities to which the Claims Administrator assigns an NAICS Code enumerated in Exhibit 19 and (2) all other Entities with indicia of potential Moratoria Losses. Following this Entity-level review by the BrownGreer Moratoria Team, the BrownGreer Moratorium reviewer places a Moratorium Hold on each BEL, Failed BEL and Start-Up BEL claim that has a Claiming Facility that meets the express potential moratoria criteria of Exhibit 16 (*i.e.* (a) falls within a NAICS Code listed in Exhibit 19 Section I and engages in any business activity description marked with an "X" under such NAICS Code; or (b) falls within a NAICS Code listed in Exhibit 19 Section II, engages in any business activity description marked with an "X" under such NAICS Code, and affirms that it provided significant services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009). Similarly, pending finalization of the Moratoria Losses exclusion policy, including clarification of its scope, the BrownGreer Moratoria Team places a Moratorium Hold on each BEL, Failed BEL and Start-Up BEL claim that reflects other indicia of potential Moratoria Losses, including, but not limited to: an affirmation by the business that it provided significant services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico; a business name or company description indicating that it does business in or with customers in the offshore oil and gas industry in the Gulf of Mexico; a customer list, project list, contract, Master Service Agreement, purchase order, invoice, profit and loss statement, or other evidence indicating that the company does business in or with customers in the offshore oil and gas industry in the Gulf of Mexico; and/or documents in the DWH claim file indicating that all or part of the claimed losses were caused by or resulted from the Moratoria or from doing business in the offshore oil and gas industry in the Gulf of Mexico. |
| P5.01 | Accountants | N/A |
| P5.02 | Accountants | N/A |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P5.03 | BG-BEL | BrownGreer recognizes the benefits to reviewing signed tax returns and verifying their submission to the IRS, however it cannot impose additional requirements beyond what is required by the Settlement Agreement and agreed to by the Parties.  Exhibit 4A of the Settlement Agreement requires that BEL claimants submit "federal tax returns (including all schedules and attachments) for the years included in the claimant-selected Benchmark Period, 2010, and, if applicable, 2011," but it does not require the tax returns to be signed by the claimant nor does it provide BrownGreer with the authority to verify that the claimant in fact filed taxes with the IRS.  In May, 2012, BrownGreer proposed to the Parties a Policy to require every claimant filing a claim within a framework that requires submission of tax returns to also provide the Program with the authorization (in the form of 4506-T) to allow the Program to verify that the tax returns submitted to the Program were in fact filed with the IRS.  The Parties disputed this proposed Policy as too instrusive and after discussions and input, deferred to the Claims Administrator's Policy 70 that no longer required such authorization from all claimants.  The Program reposted Policy 70 again in January, 2013, and Parties deferred to this Policy again.<br><br>Accountant Reviewers verify that the tax returns reconcile with the claimant submitted P&L statements, and request clarification if the two do not reconcile.  Accountant and BrownGreer BEL Reviewers propose claims to SIT when they have concerns about the validity of a tax return in a claimant's file. |
| P5.04 | BG-BEL | BrownGreer recognizes the benefits to reviewing signed sales and use tax returns and verifying their submission to the state, however it cannot impose additional requirements beyond what is required by the Settlement Agreement.  Exhibit 4A of the Settlement Agreement requires that BEL claimants with a Retail business type must submit "monthly sales and use tax returns" for the years included in the Benchmark Period, 2010, and, if applicable, 2011, but it does not require the tax returns to be signed by the claimant nor does it provide BrownGreer with the authority to verify that the claimant in fact filed taxes with the state.  In May, 2012, BrownGreer proposed to the Parties a Policy to require every claimant filing a claim within a framework that requires submission of tax returns to also provide the Program with the authorization to allow the Program to verify that the tax returns submitted to the Program were in fact filed with the IRS.  The Parties disputed this proposed Policy as too instrusive and after discussions and input, deferred to the Claims Administrator's Policy 70 that no longer required such authorization from all claimants.  The Program reposted Policy 70 again in January, 2013, and Parties deferred to this Policy again.<br><br>The Accountant Reviewers verify that the state sale and use tax returns reconcile with the claimant submitted P&L statements, and request clarification if the two do not reconcile.  Accountant and BrownGreer BEL Reviewers propose claims to the SIT when they have concerns about the validity of a sales and use tax return in a claimant's file. |
| P5.05 | BG-BEL | BrownGreer recognizes the benefits to contemporaneously prepared tax returns, however it cannot impose additional requirements beyond what is required by the Settlement Agreement.  Exhibit 4A of the Settlement Agreement requires claimants to submit, but it does not require the tax returns to be signed by the claimant nor does it provide BrownGreer with the authority to verify that the claimant in fact file taxes with the state.  In May, 2012, BrownGreer proposed to the Parties a Policy to require every claimant filing a claim within a framework that requires submission of tax returns to also provide the Program with the authorization (in the form of 4506-T) to allow the Program to verify that the tax returns submitted to the Program were in fact filed with the IRS.  The Parties disputed this proposed Policy as too instrusive and after discussions and input, deferred to the Claims Administrator's Policy 70 that no longer required such authorization from all claimants.  The Program reposted Policy 70 again in January, 2013, and Parties deferred to this Policy again.<br><br>The Accountant Reviewers verify that the state sale and use tax returns reconcile with the claimant submitted P&L statements, and request clarification if the two do not reconcile.  Accountant and BrownGreer BEL Reviewers propose claims to SIT when they have concerns about the validity of a tax return in a claimant's file. |
| P5.06 | Accountants | N/A |
| P5.07 | Accountants | N/A |
| P5.08 | Accountants | N/A |
| P5.09 | Accountants | N/A |
| P5.10 | Accountants | N/A |
| P5.11 | Accountants | N/A |
| P5.12 | Accountants | N/A |

Confidential
DRAFT

| | BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P5.13 | Accountants | N/A |
| P5.14 | Accountants | N/A |
| P5.15 | Accountants | N/A |
| P5.16 | Accountants | N/A |
| P5.17 | Accountants | N/A |
| P5.18 | Accountants | N/A |
| P5.19 | Accountants | N/A |
| P6.01 | Accountants | N/A |
| P6.02 | Accountants | N/A |
| P6.03 | Accountants | N/A |
| P6.04 | BG-SIT | For data analytics peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| P6.05 | BG-SIT | For data analytics peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| P6.06 | BG-BEL | BrownGreer BEL Reviewers carefully review financial information for accuracy.  When a claimant submits conflicting financial information or multiple sets of P&Ls, the BrownGreer BEL Reviewers will seek assistance from the Accountants and, if deemed necessary, refer the claim to SIT for evaluation.  The Accountant Reviewers also review all financial information submitted and perform a reconciliation of the P&Ls and the tax documentation.  The Accountant Reviewers will request additional financial information as they deem necessary.  During their review, the Accountant Reviewers have the ability to re-run the Revenue Causation tests.  More recently, the Program, at the direction of the Courts, has developed a policy to analyze claimant's financial information for the issue of matching.  This will ensure that all revenues and expenses are properly attributed to the correct month. |
| P6.07 | BG-SIT | SIT has a forensic accountant team that reviews claims that may require normal accounting methods to solve an unresolved financial discrepancy in the claimant's submitted documentation.  If the forensic team is unable to resolve the potential discrepancies in the file, it can and will request that a claimant provide additional corroborating documents, such as source materials, bank records, or other operational documents, to attempt to resolve the identified discrepancies.  If the claimant fails to respond to these requests, then SIT suspends review of the claimant's claim(s) until the documents are provided. |
| P6.08 | Accountants | N/A |
| P7.01 | BG-BEL | BrownGreer BEL Reviewers identify the business' accounting method during Data Capture of P&L statements.  If the P&L statement does not explicitly indicate whether it uses the Cash or Accrual Accounting Method, the reviewer must select "Unknown."  The Application populates the Total Revenue table based on the information that the BrownGreer BEL Reviewers enter during Data Capture.  The Application uses a specific hierarchy of data to ensure that the Total Revenue Table does not populate using P&L data from different sets of P&Ls and that it does not use a combination of "Accrual" and "Cash" Profit & Loss Statements.  For more information on how the Application populates the Total Revenue Table, see Section XIII.F of the Operations Manual. |
| P8.01 | Accountants | N/A |
| P8.02 | Accountants | N/A |
| P8.03 | Accountants | N/A |
| P8.04 | Accountants | N/A |
| P8.05 | Accountants | N/A |
| P8.06 | Accountants | N/A |
| P8.07 | Accountants | N/A |
| P8.08 | Accountants | N/A |
| P8.09 | Accountants | N/A |
| P8.10 | Accountants | N/A |
| P8.11 | Accountants | N/A |
| P8.12 | BG-BEL | BrownGreer BEL Reviewers designate Insurance Proceeds as One Time Non-Recurring Income ("OTNRI") during Data Capture.  The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests.  The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P8.13 | BG-BEL | BrownGreer BEL Reviewers designate Interest and Investment income as OTNRI during Data Capture. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |
| P8.14 | BG-BEL | BrownGreer BEL Reviewers designate Gains or Losses from Sales of Assets as OTNRI during Data Capture. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |
| P8.15 | BG-BEL | BrownGreer BEL Reviewers designate Reimbursed Expenses as OTNRI during Data Capture. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |
| P8.16 | BG-BEL | BrownGreer BEL Reviewers designate Capital Assessments as OTNRI during Data Capture. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |
| P8.17 | BG-BEL | BrownGreer BEL Reviewers designate Intercompany Sales/Related Party Transactions as OTNRI during Data Capture. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |
| P8.18 | Accountants | N/A |
| P8.19 | BG-BEL | BrownGreer BEL Reviewers designate Grants for "For-Profit Entities" as OTNRI during Data Capture. The Application will exclude OTNRI from the revenue used to perform the Causation Revenue Pattern Tests. The Program has recently implemented a collaboration process between BrownGreer BEL Reviewers and a team of P&N Accountants so that the reviewers can request guidance regarding OTNRI and other Claims Review questions. |
| P8.20 | BG-BEL | BrownGreer BEL Reviewers defer to the P&N Accountants for guidance regarding Capital Contributions. A BrownGreer BEL Reviewer will not necessarily exclude Capital Contributions as OTNRI because the Accountants typically must perform additional research on this revenue line item to determine whether Capital Contributions is truly cash flow from financing activities or some other type of revenue. |
| P8.21 | Accountants | N/A |
| P8.22 | Accountants | N/A |
| P8.23 | Accountants | N/A |
| P8.24 | Accountants | N/A |
| P8.25 | Accountants | N/A |
| P8.26 | Accountants | N/A |
| P8.27 | Accountants | N/A |
| P8.28 | BG-EVR | A specialized team of BrownGreer EVR Reviewers reviews each potential Real Estate Developer to determine whether it is excluded under the terms of the Settlement Agreement. Revenue from real property sales reported by an Entity on its 2010 Tax Return as ordinary income (other than depreciation recapture), rather than as capital gains income, typically shall be considered to be revenue associated with Real Estate Development Activity. This includes, but is not limited to, the 2010 sale of any real property developed by the Entity, including individual condominium or vacation rental units, timeshare estates, timeshare interests, or vacation ownership interests. BrownGreer EVR Reviewers analyze submitted financial documentation along with publicly available information, including county property records, to identify whether an Entity derived revenue from real property sales. When the available information is insufficient to make a determination, the claimant receives a notice requesting additional documentation. BrownGreer also performs claimant outreach when the review requires a more targeted response. |
| P9.01 | Accountants | N/A |
| P9.02 | Accountants | N/A |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P9.03 | Accountants | N/A |
| P9.04 | Accountants | N/A |
| P9.05 | Accountants | N/A |
| P9.06 | Accountants | N/A |
| P9.07 | Accountants | N/A |
| P9.08 | Accountants | N/A |
| P9.09 | Accountants | N/A |
| P9.10 | Accountants | N/A |
| P9.11 | Accountants | N/A |
| P9.12 | Accountants | N/A |
| P9.13 | Accountants | N/A |
| P9.14 | Accountants | N/A |
| P9.15 | Accountants | N/A |
| P9.16 | Accountants | N/A |
| P9.17 | Accountants | N/A |
| P9.18 | Accountants | N/A |
| P9.19 | Accountants | N/A |
| P10.01 | Accountants | N/A |
| P10.02 | Accountants | N/A |
| P10.03 | Accountants | N/A |
| P10.04 | Accountants | N/A |
| P10.05 | Accountants | N/A |
| P11.01 | Accountants | N/A |
| P11.02 | Accountants | N/A |
| P11.03 | Accountants | N/A |
| P11.04 | Accountants | N/A |
| P11.05 | Accountants | N/A |
| P12.01 | Accountants | N/A |
| P12.02 | Accountants | N/A |
| P12.03 | Accountants | N/A |
| P12.04 | Accountants | N/A |
| P12.05 | Accountants | N/A |
| P12.06 | Accountants | N/A |
| P13.01 | Accountants | N/A |
| P13.02 | Accountants | N/A |
| P13.03 | Accountants | N/A |
| P13.04 | Accountants | N/A |
| P13.05 | Accountants | N/A |
| P14.01 | Accountants | N/A |
| P14.02 | Accountants | N/A |
| P14.03 | Accountants | N/A |
| P14.04 | Accountants | N/A |
| P14.05 | Accountants | N/A |
| P14.06 | Accountants | N/A |
| P14.07 | Accountants | N/A |
| P14.08 | Accountants | N/A |
| P14.09 | Accountants | N/A |
| P14.10 | Accountants | N/A |
| P14.11 | Accountants | N/A |
| P14.12 | Accountants | N/A |
| P14.13 | Accountants | N/A |
| P14.14 | Accountants | N/A |
| P14.15 | Accountants | N/A |
| P14.16 | Accountants | N/A |
| P14.17 | Accountants | N/A |
| P14.18 | Accountants | N/A |
| P14.19 | Accountants | N/A |
| P14.20 | Accountants | N/A |
| P14.21 | Accountants | N/A |

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| P14.22 | Accountants | N/A |
| P14.23 | Accountants | N/A |
| P14.24 | Accountants | N/A |
| P14.25 | Accountants | N/A |
| P14.26 | Accountants | N/A |
| P14.27 | Accountants | N/A |
| P14.28 | Accountants | N/A |
| P14.29 | Accountants | N/A |
| P14.30 | Accountants | N/A |
| P14.31 | Accountants | N/A |
| P14.32 | Accountants | N/A |
| P14.33 | Accountants | N/A |
| P14.34 | Accountants | N/A |
| P14.35 | Accountants | N/A |
| P14.36 | Accountants | N/A |
| P14.37 | Accountants | N/A |
| P14.38 | Accountants | N/A |
| P14.39 | Accountants | N/A |
| P14.40 | Accountants | N/A |
| P14.41 | Accountants | N/A |
| P14.42 | Accountants | N/A |
| P14.43 | Accountants | N/A |
| P14.44 | Accountants | N/A |
| P14.45 | Accountants | N/A |
| P14.46 | Accountants | N/A |
| P14.47 | Accountants | N/A |
| P14.48 | Accountants | N/A |
| P14.49 | Accountants | N/A |
| P14.50 | Accountants | N/A |
| P14.51 | Accountants | N/A |
| P14.52 | Accountants | N/A |
| P14.53 | Accountants | N/A |
| P14.54 | Accountants | N/A |
| P14.55 | Accountants | N/A |
| P14.56 | Accountants | N/A |
| P14.57 | Accountants | N/A |
| P14.58 | Accountants | N/A |
| P14.59 | Accountants | N/A |
| P15.01 | Accountants | N/A |
| P15.02 | Accountants | N/A |
| P15.03 | Accountants | N/A |
| P15.04 | Accountants | N/A |
| P15.05 | Accountants | N/A |
| P15.06 | Accountants | N/A |
| P15.07 | Accountants | N/A |
| P15.08 | Accountants | N/A |
| P15.09 | Accountants | N/A |
| P15.10 | Accountants | N/A |
| P15.11 | Accountants | N/A |
| P15.12 | Accountants | N/A |
| P16.01 | Accountants | N/A |
| P16.02 | Accountants | N/A |
| P16.03 | Accountants | N/A |
| P16.04 | Accountants | N/A |
| P16.05 | Accountants | N/A |
| P16.06 | Accountants | N/A |
| P16.07 | Accountants | N/A |
| P17.01 | Accountants | N/A |
| P17.02 | Accountants | N/A |

Confidential
DRAFT

| | BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | |
|---|---|---|
| **Risk #** | **Responsible Party** | **Response** |
| P17.03 | Accountants | N/A |
| P17.04 | Accountants | N/A |
| P18.01 | BG-EVR | The BrownGreer EVR Team assigns the appropriate Economic Loss Zone, NAICS Code and Industry Designation to each Facility of a Business Entity, which are represented in the Application by a unique EID. During the EVR process, all EIDs go through at least one level of review by a specially-trained BrownGreer EVR reviewer, and some EIDs are then subject to a QA review by a different BrownGreer EVR reviewer. Once the BrownGreer EVR Team verifies an EID, it is available for selection as the Claiming Facility for a BEL claim.  To complete the BEL compensation calculation, the Application programmatically applies the correct RTP based on the Zone and Industry Designation of the EID selected as the Claiming Facility. Exhibit 15 lists the appropriate RTP for each Zone/Industry Designation combination. |
| P18.02 | BG-PPO | The Application links any BP claims process, Real Estate Fund and/or GCCF Payments associated with the GCCF Claimant ID or a Tax ID entered on a claimant's Registration Form to that claimant's DWH Claimant ID.  An Eligibility Notice will not generate unless the Accountant Reviewers have linked all prior payments linked to that claimant.  BrownGreer BEL Reviewers link VoO Earned Income to a claim during the Initial Review after evaluating the claimant's documentation to determine if the claim relates to a non-Seafood-related business which directly involves the use of the vessel that performed the VoO services. |
| P19.01 | Accountants | N/A |
| P19.02 | GCG | N/A |
| P19.03 | GCG | N/A |
| P19.04 | GCG/CAO | N/A |
| P19.05 | GCG/CAO | N/A |
| P19.06 | GCG | N/A |
| P19.07 | BG-Payments | When writing claims to the Payment Table, BrownGreer implements logic that determines whether the claimant has authorized the Program to issue payments solely to his/her attorney.  If the claimant has checked this box on any of his/her claim forms, then the payment is made to the attorney "for benefit of" the claimant.  After sweeping in claims from the Payment Table, GCG also verifies the payee lines have been populated correctly. |
| P19.08 | BG-Payments | When writing claims to the Payment Table, BrownGreer implements logic that determines whether the claimant has authorized the Program to issue payments solely to his/her attorney.  If the claimant has not checked this box on any of his/her claim forms, then the payment is made to the attorney and the claimant. After sweeping in claims from the Payment Table, GCG also verifies the payee lines have been populated correctly. |
| P19.09 | BG-Payments | BrownGreer Lien Reviewers require claimant-identifying information from all Third Party Claimants in order to place a Possible Lien Hold on any claimant or future claimant subject to a Third Party Claim.  This hold does not stop the claims review process or the Application from issuing any notices on the claim, but does prevent final payment until lien processing is complete.  In order to issue payment for a claim subject to a lien, BrownGreer Lien Reviewers must review all documentation to ensure that it complies with the Claims Administrator's enforcement requirements, complete all lien processing and communication in accordance with Amended Court Approved Procedure Order Number 1, place Event 226 on the payable claim and approve payment with any lien amount withheld from the payable claim.  See Section XXXIX of the Operations Manual for additional information on enforcement requirements, lien processing, communication and payment procedures. |
| P19.10 | BG-Payments | BrownGreer determines which claims are ready for payment and places payee and demographic information for those claims on the Payment Table.  GCG then sweeps those claims in, performs additional audits, and then triggers payments when applicable. |
| P19.11 | GCG | N/A |
| P19.12 | GCG | N/A |
| P19.13 | GCG | N/A |
| P19.14 | GCG | N/A |
| P20.01 | BG-Payments | BrownGreer is not currently closing claims after the claimant receives his/her payment.  BrownGreer is tracking the 180 day deadline a claimant has to file additional claims after he/she receives his/her first payment.  Once that deadline is reached, BrownGreer implements logic that prevents the claimant from filing additional claims.  BrownGreer could implement daily logic that identifies claims that have "Payment Issued" and "Payment Received" events or a "$0 Payment Processed" event.  The logic would then place a "Claim Closed" event on the claims with these events. |

Confidential
DRAFT

| | | |
|---|---|---|
| **BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls** | | |
| **Risk #** | **Responsible Party** | **Response** |
| P20.02 | BG-Payments | A supervisor with BrownGreer's internal claim monitoring team could review all claims that have "Payment Issued" and "Payment Received" events or a "$0 Payment Processed" event to insure the claims are properly and timely closed. |
| P20.03 | GCG | N/A |
| P20.04 | BG-BEL | A member of the BEL Team performs a QA Review of all BEL Denial Notices each day to identify potential errors within the review or on the Notice.  The BEL Team Member performs a final, high-level QA Review of the BEL Review to ensure that the information in the Denial Notice is an accurate reflection of the BEL Review. |
| P20.05 | BG-BEL | After the Program closes a claim, BrownGreer BEL and Accountant Reviewers can no longer access that claim for review.  Application users with access to Results Search will have "read-only access," but they cannot change the review. |
| P20.06 | GCG | N/A |
| P21.01 | BG-Access | User access is monitored on a regular basis for internal BrownGreer users, based on project need and employee role. These portal accounts are disabled when the business need for access to that portal no longer exists.  Any user who does not actively use their account for a period of 14 days is automatically disabled.  Accounts are only restored with approval from direct supervisors.  Non-BrownGreer vendors must notify BrownGreer of any updates to their employees' access as related to their specific project roles. |
| P21.02 | BG-Access | A single user cannot review a claim and approve through payment.  After claim review is complete, the claim is prepared for a notice. Every eligibility notice goes through another round of QC by the BrownGreer Notice Team.  GCG must review the release and determine acceptance.  Then the payment algorithm must run to ensure all necessary data points are consistent and no issues exist that will prevent payment.  If the claim passes these tests, the claim is placed in a payment table that alerts GCG to being their separate set of algorithms to verify payment is ready and allowed.  If a claim passes these additional tests, GCG will then issue payment.  This means that the reviewer who first notes the eligibility is only the first step in a line of additional measures and that ultimately both BrownGreer and GCG must agree payment is allowed before any payment is issued.  Additionally, the Application is programmed to prevent an initial reviewer from performing the QA review on claims that he or she previously reviewed.  We provided the SQL code and screen shots to prove this to CLA during the February, 2012 audit. |
| P21.03 | BG-Access | User access is monitored on a regular basis.  Any user who does not actively user their account for a period of 14 days is automatically disabled.  In some cases, users are allowed to have multiple accounts, but are still restricted to only allow one account per portal type.  Wherever a single user is allowed access to more than one portal, all accounts are linked to a master account.  Portal accounts are disabled when the business need for access to that portal no longer exists. |
| P21.04 | BG-Access | To ensure security of user accounts all BrownGreer users are given a unique user account for BrownGreer network access and are requested to reset their password at first logon.  The password is required to change every 90 days and users are also restricted from using their previous 24 passwords.  BrownGreer User accounts are disabled immediately upon separation to ensure access is discontinued for former workers.  New BrownGreer workers are required to review and agree to several documents defining and outlining their responsibilities for security of passwords and information that they may obtain working on the Settlement Program.  These requirements are continuously refreshed in Policy Update reminder circulations: (1) DHECC Data Protection Plan - defines PII along with the end user requirements to protect PII (2) Policy on the Use of BrownGreer Computers and Internet Access – defines end user computing responsibilities and acceptable use (3) Confidentiality Agreement – reinforces the requirement to ensure confidentiality of business/claimant data |
| P21.05 | BG- SIT | BG analyzes data from Portal Users with higher than normal Results Search usage.  Internal Audit team periodically identify workers with over 50 claimant searches, evaluate the data associated with those claimant searches, and complete interviews with these workers to understand the circumstances that led to these searches.  If, after reviewing the results of our internal investigation, we determine that a BG worker was conducting claimant searches for reasons outside the scope of a project assignment, we take appropriate disciplinary action.  Quality Assurance team has programmatic metrics that track the time reviewer spent reviewing claims and such claims are routed for Quality Assurance review. |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| **Risk #** | **Responsible Party** | **Response** |
| P21.06 | BG- SIT/Access | Users are allowed to access the claim files for the claim they are currently reviewing.  If the job role (such as Claimant Assistant, Firm Contact or Call Center personnel) dictates the ability to assist multiple claimants, the reviewer is allowed to access the claim file of the claimant they are currently assisting. Senior staff are also allowed to access claim files in order to monitor the accuracy of reviews and perform research on policies and procedures.  User access is periodically audited. |
| P21.07 | BG- SIT/Access | BrownGreer limits employees who can work remotely by allowing access to the Application from pre-approved IP addresses. Remote Access is permitted only when necessary to perform assigned job duties/functions.  Users cannot access the www2.deepwaterhorizoneconomicsettlement.com site unless they are in an approved location (NOLA or Richmond or Hammond) or have a pre-approved IP address entered into the database. Default values for reviewer portals are set to restricted.  Unrestricted access requires approval from the direct supervisor for BG employees or the Vendor Directly Responsible Individual ("DRI"). |
| P21.08 | BG-Programmers | At a given time a claim can be in only one queue and reviewed by only one reviewer. This is done through the check-out and check-in process. Once a claim is checked out by a reviewer in a queue, it is not available in any other queues until that reviewer checks in the claim. |
| P21.09 | BG-Programmers | The review check-out and check-in data is tracked in the database table BG_tblReviewsCheckOut. When the reviewer submits (Check-in) the claim he or she reviewed, the Application creates a history record of that entire review. Each review table has a history table. |
| P21.10 | BG-Programmers | When a Claimant ID is established, the claimant or firm must provide the full TIN and name of the claimant.  If the TIN does not already exist in the Application, the Claimant ID is created and the claimant may continue to progress.  If the TIN has been previously submitted as an established claimant, the user submitted the duplicate Claimant information is warned about the duplication and requested to verify certain information.  If verified, the new Claimant ID is created (along with the other duplicate or original) but flagged with a reviewable status of Duplicate.  Only claimants with reviewable status of Active may progress in the Application.  A team reviews all duplicates to determine which are correct.  If found to be the same information, the claimant files are merged, with the resulting merged Claimant ID flagged with Reviewable status of Active and the duplicate updated to Inactive. |
| P21.11 | BG-Programmers/GCG | The Application is backed up in hourly snapshots. GCG should also address this topic as there is a strict separation of controls and duties for the DWH IT systems. |
| P21.12 | GCG | N/A |
| P21.13 | GCG | N/A |
| P21.14 | GCG | N/A |
| P21.15 | BG-Programmers | The Application maintains a robust system of SIT reports for over 500 SIT schemes, querrying over 9100 suspect data indicators, to find potentially fraudulent activity, 22 database query data sets that SIT monitors for anomalies and trends, 9 automated metrics for flags in Subsistence claims, and 210 automatic, programmed QA metrics to find anomalies during the data entry and claims review of all claim types. |
| P21.16 | BG-Programmers | The Application interacts with the GCR, Inc. mapping system regularly to get economic loss zone information and other non-economic loss claims information for the real property types (RPS, Wetlands and Coastal) and Subsistence claims. There are automated controls in place to track if the Application is not able to connect GCR, Inc.'s mapping system. |
| P21.17 | GCG | N/A |
| P21.18 | BG-Programmers | When BrownGreer went live with the Registration Form and Claims Form processes on 6/4/12, all of these forms and existing Sworn Written Statements had automated controls to ensure that the forms were complete and we were provided with all required information.  The plaintiffs expressed concern about having to provide this information and the Claims Administrator directed BrownGreer to strip out the data validations and controls the first week after launching the Program. |
| P21.19 | BG-Programmers | BrownGreer built several user controls in the Application. For example Date, SSN, Amount, etc. require a date format or numeric characters. BrownGreer uses Ajax toolkit controls to restrict numeric data entry where the field is a number field. On text fields BrownGreer restricts the number of characters to the number set in the database for that field. |
| P21.20 | CAO | N/A |
| P21.21 | GCG | N/A |
| P21.22 | CAO | N/A |

| Risk # | Responsible Party | Response |
|---|---|---|
| | BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | |
| P21.23 | GCG | N/A |
| P21.24 | BG-Access | BrownGreer Employees who begin work on the Program must complete all necessary paperwork, including certificates of confidentiality and code of conduct agreement, before they are authorized to have an account. After all agreements are completed, Human Resources ("HR") verifies authorization and sends a request directly to the Access team. BrownGreer accounts are not created outside this process. Once an account is created, the Application immediately and automatically notifies the user directly of the credentials so they remain secure. When HR is notified of any BrownGreer employees' leaves of absence, terminations or team changes, they notify the Access team for deactivation of the associated account. Automatic measures also exist to deactivate any account that goes unused for a period of 14 consecutive days. Non-BrownGreer Vendor DRIs provide authorization and request access accounts be created, removed or updated for employees of that vendor. Portal roles must be approved by the assigned DRI before they are added to an account. Supervisors and assigned DRIs monitor project roles and send requests to the Access team to update portal roles as project needs change. |
| P21.25 | BG-Programmers | Any changes to the Application must first be submitted to the Change Control Board ("CCB") for approval. Once coded, the updated code is submitted along with the approved CCB form and approval from the DRI that governs the associated module. A promotion plan is attached to each piece of code detailing how to implement the change and a communication plan as well as plans to recover if any updates are unsuccessful. |
| P21.26 | BG-Programmers | Every time a claim review is submitted, the resulting analysis is saved in the current table and a copy is saved in a separate history table. This allows full tracking of every review result and the data points that led to that determination. A review checkout table also records when claims entered and exited each review queue. Claimant and Claim Reviewer history is available in the Application as well as the associated data through the View Last Review process. This is the same mechanism that allows us to share the review result and data points to Firms, Claimants, BP and Class Counsel that is associated with each claim notice that is issued. |
| P21.27 | GCG | N/A |
| P21.28 | GCG | N/A |
| P21.29 | BG-Programmers | Application access is controlled by portal type and specific user roles. A reviewer is only assigned roles that directly relate to job function and only then after approval from the DRI in charge of that module. Checks and balances are built in to the process so that QC is performed by a different reviewer than the one performing the initial review. There are separate DRIs for review, notice, release and payment that preclude any one user from altering or updating any part of the Application by acting alone. |
| P21.30 | GCG | N/A |
| P21.31 | CAO | N/A |
| P21.32 | GCG | N/A |
| P21.33 | GCG | N/A |
| P21.34 | CAO | N/A |
| P21.35 | GCG | N/A |
| P21.36 | BG-Programmers | The Application only allows users to access portions of the Application for which they have a direct business need. A change to the claimant file date or location is only allowed to be requested by the DRI. Each request must be submitted to the CCB for approval before implementation. |
| P21.37 | CAO | N/A |
| P21.38 | CAO | N/A |
| P21.39 | BG-SIT | By default BrownGreer Reviewer accounts are setup to allow internal email only. In addition the default web browsing profile restricts personal email websites, social media websites and files sharing websites to ensure data cannot be sent via that method. Exceptions can be made to the default filtering for reviewers when approved by Senior Management. All email and web browsing is logged for audit and review in the event we need to examine an individual users activity further. For User Awareness Training, all BrownGreer Reviewers are required to complete confidentiality training and refresher courses in addition to reviewing and signing official certifications of confidentiality for the DWH settlement as well as BrownGreer's own confidentiality agreements. |
| D1.01 | Accountants | N/A |
| D1.02 | Accountants | N/A |
| D1.03 | Accountants | N/A |

Confidential
DRAFT

| BrownGreer's Response to Proposed BEL Claim Process Level Internal Controls | | |
|---|---|---|
| Risk # | Responsible Party | Response |
| D2.01 | BG-SIT | The Claims Administrator approved a monthly Profit and Loss (P&L) Template to assist the program in analyzing P&Ls for Business Economic Loss claimants and processing these claims in a more efficient manner. However, the template does not satisfy the requirement of contemporaneous P&Ls and use of the template is optional. Claimants are not required to submit this template to satisfy the documentation requirements of Exhibit 4A. |
| D2.02 | BG-SIT | BG Firm Contacts have been instructed to review correspondence received from firm and claims preparation group contacts to determine whether there appears to be an inappropriate relationship between the two entities, e.g. whether the firm is not actually representating the claimants but is acting only as a escrow agent for the claims preparation group in violation of the terms of the Settlement Agreement.  Such situations are elevated for appropriate action, up to and including termination of the firm's portal acess and removal of their representation status for the claimants' files. |
| D2.03 | BG-SIT | For data analytics currently peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| D2.04 | BG- SIT/Access | (a) BrownGreer maintains internal assignment documents showing all employees' current tasks within the Program.  In addition, BrownGreer maintains a list of all users and the rolls within the Application to which they have access through a report available on the Reporting Portal of the Application. BrownGreer supervisors regularly reconcile the reports to ensure BrownGreer employees have access only to appropriate system modules for their current roles. Non-BG Vendors review their own employees' access and must respond separately on their processes.<br>(b) SIT regularly reviews the work of reviewers who appear to have high approval rates within Claim Types. For these reviewers, SIT will randomly sample their work product to ensure that the reviewers are not overlooking suspect documents or are not incorrectly reviewing the files that have been assigned to them. |
| D2.05 | Accountants | N/A |
| D2.06 | BG-SIT | For data analytics currently peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| D2.07 | BG-SIT | For data analytics currently peformed by the BrownGreer's SIT team, refer to Appendix XXXIV of the DWH Operations Manual. |
| D3.01 | BG-BEL | The Program has multiple quality control measures in place for each step of the claims review process. Section XXV of the Operations Manual outlines the BrownGreer QA Process for all claim types, including BEL claims.  BrownGreer runs daily automated QA Metrics against all claims reviewed in Initial and Incompleteness Response Review in the past 24 hours, as well as consistent offline data analytics on BEL Financial Data entered for those claims to identify potential errors and move those claims through QA Review for correction, if needed.  The data metrics that may trigger a QA Review are described in Exhibit XXV.A of the Operations Manual, and Section XXV.E outlines the offline data analytics process.  Finally, the QA Team uses the data from the QA Reviews to identify errors and follow-up with reviewers as needed. The Error Tracking and Reviewer Follow-Up Process is described in Section XXV.D of the Operations Manual. |

# EXHIBIT G

**BROWNGREER**

Direct Dial:  (804) 521-7218
Office:  (804) 521-7200
Facsimile:  (804) 521-7299
rpetkauskas@browngreer.com

June 20, 2014

**_By Email_**

Mr. Randall Black
CEO
Deepwater Horizon Claims Center
Economic and Property Damage Claims
935 Gravier Street, Suite 1905
New Orleans, Louisianna  70119

Re:    **Entity Level Controls**

Dear Mr. Black:

On June 2, 2014, Jeff Englert, Manager of the DWH Internal Audit Team, informed me that the Claims Administrator's Office ("CAO")  is currently in the process of performing an entity-wide "Risk and Controls Assessment" to identify potential control gaps and areas for improvement. Mr. Englert stated that as a starting point the CAO is using the list of entity-level controls suggested by BP, and asked BrownGreer to review them and provide our responses.  This letter and attachments provide the requested response.

BrownGreer is a firm experienced in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims.  BrownGreer provides services to Patrick Juneau, the Claims Administrator of the DWH Program.  To get the DWH Program up and running before June 4, 2012, BrownGreer created the process for the review of all claims received by the Program, procured and trained staff needed to process the claims, and procured and trained staff for the 18 Claimant Assistance Centers used in the Program.  In addition to these start-up activities, BrownGreer assisted the Claims Administrator and the Parties with interpretation of the Settlement Agreement and many implementation questions that directly led to the adoption of 400+ Policies that govern the claims review process.  The BrownGreer DWH Operations Manual and Appendices provide a thorough review of all the processes and rules BrownGreer follows in performing claims review functions.

BrownGreer has extensive processes and protocols to identify, re-assess, and mitigate internal and external risks.  After reviewing the 78 risk categories and the proposed mitigating internal controls in the entity-wide list that Mr. Englert sent us, we determined that BrownGreer not only has processes to mitigate each of the noted risks, but

BrownGreer's current processes provide even broader and stricter controls than what BP recommends.  While responding to each of the items in the attached spreadsheet, we have provided cites to the BrownGreer DWH Operations Manual and Operations Manual Appendix, as well as to other relevant documents that describe all the controls that BrownGreer currently implements.  The CAO has access to the BrownGreer DWH Operations Manual on the Portal, but we are happy to provide a copy of it, as well as any other documents we cite to for support, at your request.

In its list, BP identifies a series of risks and proposes mitigating controls that the Program should undertake.  However, it is worth notingthat from the outset, the Program has implemented a wide range of controls, each of which is carefully designed to protect the integrity of the process.  Since the early months of 2012, before the Program even opened and as BrownGreer worked tirelessly to develop functions to make it operational, we participated in multiple meetings with BP and its consultants (KPMG, and Optimity Advisors)  to answer questions and provide them with documentation about BrownGreer's operations and controls.  We provided documents describing BrownGreer's hiring criteria, on-boarding and off-boarding processes, training plans, claim process flows, and conflict checks.  During the many meetings in Richmond and in New Orleans during that time, BP requested information that we openly and gladly provided, and always expressed that it was satisfied with BrownGreer's processes.

After the Program opened on June 4, 2012, we met with BP and the Parties continuously to address and resolve Settlement Agreement interpretation issues and discuss our processes.  For example, I personally met with BP and carefuly explained in detail the Program's fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013.  In all of these meetings, BP not once questioned or criticized any of the fraud detection and prevention steps or mechanisms.

As the Program matured, we have continually calibrated existing controls to maximize their effectiveness while evaluating whether to implement new measures.  Consequently, our controls evolved over time as we added metrics in response to new developments and deactivated measures that we have determined are no longer necessary.  When BP asked the CAO for a meeting with the Vendors to discuss certain budget questions on June 18, 2013, BrownGreer provided 74 documents totaling over 2,000 pages that described BrownGreer's processes about claims review system, training, quality assurance, and fraud processes.

More recently, on February 6, 2014, David Welker forwarded me a letter with an attachment regarding "Error and Risk Detection and Mitigation in the Deepwater Horizon Court Supervised Settlement Program" from George H. Brown, dated January 27, 2014.  On February 19, 2014, I provided BrownGreer's response.  I am attaching that response, because it details many overlapping issues that this letter addresses as well.

On February 21, 2014, David Welker handed me a hard copy of a document titled "Proposed BEL Claim Process Level Internal Controls."  It is my understanding that this document was a more detailed list of controls that was mentioned in Mr. Brown's letter dated January 27, 2014.  We contacted the Program accountants to separate items that we believed were more appropriate for the accounting vendors to answer.  BrownGreer prepared a response that I

2

provided to David Welker on March 13, 2014.  I also attach that response captioned "Entity level internal controls spreadsheet," because it overlaps with several of the same issues addressed in this letter.

It is our goal to fully address any questions that you and your staff may have about our efforts under the Program.  If there are ways to improving existing processes, we welcome an opportunity to discuss any of the control measures with you and/or the Parties in more detail.


Sincerely,

*Roma Petkauskas*

Roma Petkauskas



cc:     Jeff Englert
        *(By Electronic Mail)*

Enclosures

| | | | Provided by CAO | | | BG Response | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Line | Risk # | Risk Category | Subcategory | Risk / Scheme Description | Source of Risks | Proposed Mitigating Internal Controls | Is the Control currently in place? | If No, should the control be implemented? | Manual or Automated? | Frequency of Control | Control in Place |
| 8 | E1.01 | Employment Due Diligence | On-Boarding | The hiring process is not properly designed. | BP | The CSSP should establish a policy of hiring and job placement requiring specific experience and proficiency in relevant areas in order to increase hiring efficiency and accuracy. | Yes | | Manual | As Needed | To ensure hiring efficiency and accuracy, BrownGreer's practice is to hire high quality employees who clearly understand and are well suited for the position for which they are hired. We do so in a manner that is timely, fair, and consistent. Our pre-employment process and new hire orientation includes substantive testing for competency in relevant areas. The process is documented in BrownGreer's "Hiring the Best" documentation. |
| 9 | E1.02 | Error and Fraud Awareness | On-Boarding | Lack of compliance with relevant on-boarding requirements. | BP | Ensure a formal on-boarding process exists for all CAO employees, vendors and third parties. The process should include applicable trainings and user access setup. If relevant training requirements are not fulfilled there should be established disciplinary repercussions. Training and disciplinary structures must be monitored on a regular basis. | Yes | | Manual | As Needed | BrownGreer's onboarding process and new hire orientation that are delivered to every new hire during on-boarding include the company overview, training on policies and procedures, benefits orientation, and Code of Conduct training. Employees are required to sign through the BG Portal the standard confidentiality agreement, conflict disclosures, and declarations. They are granted access to the system after these acknowledgements have all be verified. During the substantive training and testing period of new hire orientation, employees must score an 80% or above in order to be retained on the program. |
| 10 | E1.03 | Employment Due Diligence | Conflict of Interest | Employees may have a personal or business interest in conflict with their duties and responsibilities to the CSSP. | BP | The CSSP should require employee to disclose, on an ongoing basis, any relationships leading to potential conflicts of interest. | Yes | | Manual | Daily | BrownGreer requires workers to disclose immediately to the firm any circumstance prohibited by or otherwise addressed within the BG Code of Conduct/DWH Code of Conduct. BG Workers can make such a disclosure to HR or a supervisor or report anonymously may print off a Code of Conduct Comment Form from the BG Portal and submit it to Human Resources either by hand or mail, or call the BG Hotline number. BG Compliance Team investigates all disclosures and reports appropriate findings to the CAO. |
| 11 | E1.04 | Employment Due Diligence | Conflict of Interest | Employees may have a personal or business interest in conflict with their duties and responsibilities to the CSSP. | BP | CSSP personnel may not make decisions in matters which they have a personal financial interest or where the outcome can be expected to result in monetary gain for themselves or those close to them (e.g., related party). Ensure that proper screening is performed during the hiring process and ongoing monitoring occurs. Personnel policies including the conflicts of interest and the code of ethics should be in writing and given to all employees and vendors prior to hiring, with changes in policies communicated on a regular basis. | Yes | | Manual | Daily | BrownGreer prohibits workers from having any financial interests that present an actual or potential conflict of interest . The BG Compliance Team requires the hiring managers to provide the following statement and asks the questions to potential applicants to eliminate potential conflicts prior to hiring:<br>Statement for Applicants: BrownGreer PLC is committed to conducting all operations in keeping with the highest standards of ethics, honor and integrity. As part of this commitment, we must take appropriate steps to ensure that all potential hires adhere to these principles and avoid even the appearance of a conflict of interest or loss of impartiality with respect to their duties at the firm. Please review the active client list here to familiarize yourself with our active clients. Accordingly, all applicants must complete the following compliance questionnaire . The information you provide will be kept strictly confidential and used solely for running conflicts checks against programs in which the firm is engaged, and for no other purpose.<br>Questions to Applicants:<br>1) Have you filed or do you intend to file any Claims with any active client?<br>2) Do you have a First Degree Family Member or Household Member with whom you have had any contact within the previous 365 days, who, in each case, has filed or intends to file a claim with any active client?<br>3) Do you have a Financial Interest with any active client?<br>BG Compliance Team monitors compliance with the Code of Conduct, investigates all potential violations, and reports to the CAO pursuant to the Code. |
| 12 | E1.05 | Employment Due Diligence | Conflict of Interest | Possible conflicts of interest are not disclosed when hired. | BP | Establish a policy requiring that all potential conflicts of interest, business and personal relationships be disclosed. Ensure all possible conflicts of interest are disclosed at the onset of employment or when a vendor is engaged, periodically confirming the absence of conflicts or potential conflicts and terminating or dismissing those responsible for violations of the CSSP's conflicts policy. | Yes | | Manual | Daily | BrownGreer prohibits any employment relationships that present an actual or potential conflict of interest. BG workers must disclose all known potential conflicts prior to starting on a specific process. The BG Compliance Team investigates each reported conflict to determine if a BG worker can remain on a specific assignment BrownGreer reserves the right to remove an employee from the project if the reported conflict violates BrownGreer or the DWH Vendor Code of Conduct policies and procedures.<br>BG Compliance Team monitors compliance with the Code of Conduct, investigates all potential violations, and reports to the CAO pursuant to the Code. |
| 12a | E1.05a | Employment Due Diligence | Conflict of Interest | Possible conflicts of interest are not disclosed on an ongoing basis. | CAO-IA | Establish a policy requiring that all potential conflicts of interest, business and personal relationships be disclosed. Ensure all possible conflicts of interest are disclosed at the onset of employment or when a vendor is engaged, periodically confirming the absence of conflicts or potential conflicts and terminating or dismissing those responsible for violations of the CSSP's conflicts policy. | Yes | | Manual | Daily | BrownGreer prohibits any employment relationships that present an actual or potential conflict of interest. BG workers must disclose all known potential conflicts prior to starting on a specific process. The BG Compliance Team investigates each reported conflict to determine if a BG worker can remain on a specific assignment BrownGreer reserves the right to remove an employee from the project if the reported conflict violates BrownGreer or the DWH Vendor Code of Conduct policies and procedures.<br>BG Compliance Team monitors compliance with the Code of Conduct, investigates all potential violations, and reports to the CAO pursuant to the Code. |
| 13 | E1.06 | Employment Due Diligence | Employee Screening | Employee screenings are not performed. | BP | Perform employee screenings for all new employees joining the organization (including contractors) and all personnel being transferred to a senior executive position or to a position considered by the organization to be "high-risk" in terms of the potential exposure to fraud or corruption associated with those positions. | Yes | | Manual | As Needed | BrownGreer's onboarding process for BG Workers includes industry standard background investigations including: National criminal database search, Seven-year criminal history search from all counties that the individual has lived in, Office of Foreign Assets Control (OFAC) check, SSN and address verification, employment verification, and education verification. |
| 14 | E1.07 | Employment Due Diligence | Employee Screening | Employee screenings are not performed. | BP | Establish appropriate employee screening procedures for new hires which include:<br>• verifying personal identity (using at least two forms of identity documentation such as passport, birth certificate or driver's license);<br>• verifying formal qualifications (sighting diplomas and contacting the relevant institution for confirmation);<br>• conducting a criminal history search; and<br>• conducting bankruptcy checks | Yes | | Manual | As Needed | BrownGreer's onboarding process for BG Workers includes industry standard background investigations including: National criminal database search, Seven-year criminal history search from all counties that the individual has lived in, Office of Foreign Assets Control (OFAC) check, SSN and address verification, employment verification, and education verification. |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | E1.08 | Employment Due Diligence | Employee Screening | Background checks of employees and third party vendors have not been conducted for pre-existing or ongoing business relationships with claimant attorneys or accounting professionals assisting claimants. | BP | Ensure that background checks are conducted for employees and third party vendors for pre-existing or ongoing business relationships with claimant attorneys or accounting professionals assisting claimants. Screening should include a conflicts of interest analysis. | Yes | | Manual | As Needed | BrownGreer prohibits any BG worker from having past or present employment relationships that present an actual or potential conflict of interest. We require each BG worker to complete a Conflicts of Interest Check for each settlement to determine if they have any potential conflicts. BG Compliance Team interviews each BG worker that reported a potential conflict immediately to determine if the disclosure will result in removal from the project. All conflicts are reported immediately to the Manager of Compliance and Internal Integrity for review. The following persons are prohibited from serving as a BG Worker in a Program, per Section II.3 in the BG Code of Conduct:<br><br>(1) A Person who is a Current employee or contractor of any Interested Party in a Program shall not serve as a BG Worker in that Program.<br>(2) A Person who served as a lawyer to any Claimant or Interested Party in a Program cannot serve as a BG Worker in that Program.<br><br>We require the following employment be disclosed immediately to the Human Resources Department and Compliance Team upon hire:<br><br>(1) Any Past employment or contractor relationship of the BG Worker.<br>(2) Any First Degree Family Member or Household Member who is a Current or Past employee or contractor of any Interested Party in a Program to which the BG Worker is assigned.<br><br>BG Compliance Team monitors compliance with the Code of Conduct, investigates all potential violations, and reports to the CAO pursuant to the Code. |
| 16 | E1.09 | Employment Due Diligence | Employee Screening | Employees with questionable prior conduct may increase the likelihood of internal fraud. | BP | The CSSP should consider and evaluate any gaps in the employment history of a potential candidate and the reasons for the gaps. | Yes | | Manual | As Needed | BG's interview process includes inquiry and analysis of any employment gaps. BG also runs background checks that identify gaps in employment. If there are unexplainable gaps or dishonesty is discovered, the employment or contract relationship is terminated. |
| 17 | E1.10 | Error and Fraud Awareness | Employee Competence | New hires may not possess required competence in the field of the position which they are hired for. | BP | New hires are appropriately assessed for competence in the field of the position for which they are hired. A competency review must be conducted for each new hire. Key personnel and senior management must possess the appropriate skills and technical knowledge to manage operations. | Yes | | Manual | As Needed | During new hire orientation, employees are trained and tested on material to ensure understanding. Employees must pass with a score of 80% or better. Failure to pass tests results in remedial training and testing and possible refresher training on substantive material periodically based on assessment of needs, which is determined by the QA reports. All management hires must possess management experience which is reflected on the resume and assessed during the job interview using behavioral interview questions. Managers receive training on all aspects of the program and on processing claims. In addition to supervisory responsibilities, managers also have substantive responsibilities related to the program. All management team members receive substantial leadership and supervisor training. Managers are typically promoted from within per the BG Career Path. All new managers must have demonstrated success in previous roles before being promoted to Analyst (Supervisor) or Senior Analyst (Manager). |
| 18 | E1.11 | Employment Due Diligence | Employee Competence | Personnel within the CSSP are staffed based upon means other than their qualifications, such as personal relationships. | BP | Establish policies and processes to ensure that competence, knowledge, experience and skills determines employees' placement in the CSSP. | Yes | | Manual | As Needed | During new hire orientation, BG Workers are trained and tested on material to ensure understanding. Employees must pass with a score of 80% or better. Employees that fail to pass tests undergo remedial training and testing and are evaluated for separation. |
| 19 | E1.12 | Employment Due Diligence | Employee Competence | Employees do not have the required competence to perform their job. | BP | The CSSP should assess the competence of all employees and provide ongoing and/or remedial training, as needed. | Yes | | Manual | As Needed | During new hire orientation, BG Workers are trained and tested on material to ensure understanding. Workers must pass with a score of 80% or better. Employees that fail to pass tests undergo remedial training and testing and are evaluated for separation. We also conduct refresher training on substantive material periodically based on assessment of needs as determined by the QA reports as well as changes to the program. |
| 20 | E1.13 | Employment Due Diligence | Employee Competence | Key managers and personnel are not properly trained. | BP | The CSSP should hire and train key managers and personnel to ensure they have the adequate knowledge and experience required to deliver their responsibilities. | Yes | | Manual | As Needed | BG requires all management hires to possess management experience which is reflected on the resume and assessed during the job interview using behavioral interview questions. Managers receive training on all aspects of the program and on processing claims. In addition to supervisory responsibilities, managers also have substantive responsibilities related to the program. All management team members receive substantial leadership and supervisor training. Managers are typically promoted from within per the BG Career Path. All new managers must have demonstrated success in previous roles before being promoted to Analyst (Supervisor) or Senior Analyst (Manager). |
| 21 | E1.14 | Employment Due Diligence | Employee Performance Evaluation | Employee performance evaluation techniques have not been implemented to identify incompetent or ineffective employees. | BP | The CSSP should establish unbiased, consistent evaluation techniques in order to evaluate and provide feedback to employees as well as identify incompetent or ineffective employees. | Yes | | Manual | Weekly | BrownGreer employs sophisticated data metrics and daily analysis processes to identify claims for QA. Errors found in QA Reviews are recorded in the system. BrownGreer runs weekly reports which quantify user performance based on these error reports and those reports are provided to supervisors. Supervisors examine these reports and follow up with reviewers weekly. Section XXV.D of the Operations Manual describes the follow up process in detail. |
| 22 | E1.15 | Employment Due Diligence | Employee Workload | Workload of departmental personnel does not permit them to be mindful of controlling the quality of their work. | BP | Ensure that the workload of departmental personnel appears to permit them to be mindful of controlling the quality of their work. Excessive workloads for departmental personnel is likely to have a negative impact on the quality of their work and provide pressures and incentives for employees to circumvent controls and regulatory requirements. Personnel should feel free to express concerns regarding workload to management without the threat of repercussions and the CSSP should reevaluate the expected workloads as reduced quality directly leads to processing errors and the increased likelihood that fraud will go unnoticed. | Yes | | Both | Daily | BrownGreer balances accuracy and productivity in setting reviewer expectations in an internal policy. BrownGreer recognizes that BG Worker's job performance includes two equally important goals: accuracy and productivity. The Quality Assurance (QA) Team has significant tools to control the quality and accuracy of the reviews. Each Claim Type Team leads developed productivity standards for all different teams and based on the reviewer assignments. Team leads, supervisors, the training team, Internal Audit Team, and HR collaborated in developing the procedure to define and standardize the process of job performance monitoring. BrownGreer provides refresher trainings and gives timely corrective feedback to improve competency of the reviewers. We also document our coaching efforts to add to the reviewer's file so that we can have that information available to make conversion and promotion decisions as well as identify any more poor performers quickly up or out of the company. BrownGreer's Procedure outlines for every reviewer QA Reports and productivity expectations and provides guidelines for all supervisors on what factors to consider for the Follow-Up Processes. The Procedure also provides guidelines for standardized reviewer feedback process. Reviewers have the opportunity to express concerns related to workload or Quality Assurance feedback through an error dispute resolution process. To set the expectations, the documented coaching process includes action plans setting specific goals for reviewer improvement. |
| 23 | E1.16 | Employment Due Diligence | Job Descriptions | Employee and claims processor job descriptions are not communicated to employees. | BP | Employee and claims processor job descriptions, including specific duties, reporting responsibilities and constraints, should be clearly established and effectively communicated to employees. | Yes | | Manual | As Needed | BrownGreer job descriptions include specific duties and responsibilities. This information is communicated to the Worker during the interview as well as throughout the orientation period. The substantive training and testing period includes communication specific to the duties and responsibilities of BG Workers. Supervisors continually communicate responsibilities to Workers throughout their tenure. |
| 24 | E1.17 | Employment Due Diligence | Job Descriptions | Employee job responsibilities are not clearly established and communicated to employees. | BP | The CSSP should establish and clearly communicate employees' job responsibilities, including specific duties, reporting relationships and constraints. | Yes | | Manual | As Needed | BrownGreer job descriptions include specific duties and responsibilities. This information is communicated to the Worker during the interview as well as throughout the orientation period. The reporting relationships are covered during the Company Overview portion of new hire orientation. The substantive training and testing period includes communication specific to the duties and responsibilities of BG Workers. Additionally, Workers receive an email from the Assignments team informing them of their supervisor. Supervisors continually communicate responsibilities to Workers throughout their tenure. Any changes to supervisor assignments are communicated by the Assignments team. |

| 25 | E1.18 | Employment Due Diligence | Job Descriptions | Claims processing personnel do not understand the duties and procedures applicable to their jobs. | BP | Require that an understanding of the required duties and procedures is provided at orientation and that ongoing and/or remedial training is provided, when needed. | Yes | | Both | As Needed | BrownGreer job descriptions include specific duties and responsibilities. This information is communicated to the Worker during the interview as well as throughout the orientation period. The reporting relationships are covered during the Company Overview portion of new hire orientation. The substantive training and testing period includes communication specific to the duties and responsibilities of BG Workers. Additionally, Workers receive an email from the Assignments team informing them of their supervisor. Supervisors continually communicate responsibilities to Workers throughout their tenure. Any changes to supervisor assignments are communicated by the Assignments team. |
| 26 | E1.19 | Employment Due Diligence | Employee Handbook | Employee handbook does not exist. | BP | Establish an employee handbook which includes sections that address:<br>• Non-Disclosure Agreements & Conflict of Interest Statements<br>• Anti-Discrimination & Harassment Policies<br>• Compensation & Work Schedule<br>• Standards of Conduct<br>• General Employment Information<br>• Safety & Emergency<br>• Communications & Technology<br>• Media Relations<br>• Employee Benefits<br>• Leave Policies | Yes | | Manual | As Needed | All BrownGreer Workers receive and are required to read and agree to the BrownGreer Employee Handbook. The Employee Handbook covers Conflicts of Interest, Confidentiality, and Professional Conduct. All new hires also complete these additional Compliance Documents through the BG Portal. Reviewers are not granted access to the Claims Information unless they have fully completed all compliance documents:<br><br>**(a) BrownGreer Confidentiality Agreement:** All workers must complete a Confidentiality Agreement with BrownGreer acknowledging that they must maintain the confidentiality of all information related to their work at BrownGreer during their employment and after they leave BrownGreer.<br><br>**(b) Declaration for DWH Settlement Program:** All workers must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.<br><br>**(c) DWH Order Regarding Confidentiality:** All workers must review the Confidentiality Order issued by the Court for the protection of Claims Information submitted to the Program and must execute a Certification indicating that they have read and agree to abide by the terms of the Order.<br><br>**(d) DHECC Security Policy Quick Reference:** This document provides a summary of the full security policies implemented by the Claims Administrator for the protection of Program data.<br><br>**(e) DHECC Data Protection Plan:** This is the Claims Administrator's Policy on how to identify and protect personal data.<br><br>**(f) Policy on Property and Information Use:** This outlines the acceptable use of BrownGreer property and information. |
| 27 | E1.20 | Employment Due Diligence | Personnel Turnover | The turnover of key personnel results in diminished performance of the CSSP. | BP | Current and former personnel should be interviewed to address the reasons for excessive turnover. Use feedback to adjust policies, compensation and/or leadership accordingly. | Yes | | Manual | As Needed | BrownGreer does not have excessive turnover, although turnover is expected with Reductions in Force at the direction of the CAO and as the Program winds down, valuable employees may seek more stable job opportunities. To encourage exchange and flow of information, BrownGreer solicits feedback from its employees periodically through Comment Box, Employee Opinion Surveys, Supervisor and Operations Feedback Surveys, Evaluations Surveys, and Exit Surveys, taken when employee separates from BrownGreer. BrownGreer also implemented the Best Practices Program that solicits ideas from employees to improve practices, efficiency, and communications. |
| 28 | E1.21 | Employment Due Diligence | Promotions | There is not clear criteria for hiring and promoting. | BP | The CSSP should make hiring criteria available publicly and outline promotion criteria to current and prospective personnel. | Yes | | Manual | As Needed | Job postings are distributed internally for inside advancement opportunities and externally through BG's website outline the hiring criteria for every position posted. The BG Career Path outlines promotion criteria and is available to employees. The career path is not posted externally. |
| 29 | E1.22 | Error and Fraud Awareness | Off-Boarding | Lack of compliance with relevant off-boarding requirements. | BP | Ensure a formal off-boarding process exists for all CAO employees, vendors and third parties. The process should include an exit interview, review of applicable non-disclosure and confidentiality agreements, return of all CSSP property and security passes, appropriate deletion of system access rights and logins and deactivation of accounts, and verification that no data related to the CSSP is being taken. | Yes | | Manual | As Needed | When a BG Worker submits a resignation, HR notifies the Executive Team. Depending on the level of sensitivity of the position, a decision is made as to whether or not the Worker can work out the notice. The Worker receives an email to complete an exit survey (electronic). HR reviews the exit survey to see if there are any concerns. If there are concerns, HR seeks clarity during the final in-person Exit Interview. Every separating employees undergoes an in person Exit Interview. During this final Exit Interview, HR reviews the Exit Letter with employees and reminds them of the confidentiality agreement they signed; that language is included in the letter. For contract workers, the assignment is ended with the agency and Workers are reminded of the confidentiality agreement. After completing the Exit Interview, HR initiates communication that starts the process to deactivate all system access and security badge access. To assure CSSP related data is secure, employees do not have printing or emailing capabilities and all USB ports are deactivated per the IT Policy. |
| 31 | E2.01 | Error and Fraud Awareness | Training | There may be insufficient error and fraud awareness training. | BP | An anti-fraud and corruption policy and a code of conduct must be in place, and the Claims Administrator should take steps to ensure that all CSSP employees acknowledge in writing that they are aware of the CSSP's written anti-fraud and corruption policies and code of conduct and agree to abide by them. | Yes | | Manual | Quarterly | Each BrownGreer worker reads and acknowledges the DHECC Vendor Code of Conduct that was revised on 2/24/14.<br><br>However, since the inception of the Program, BrownGreer has complied with the Claims Administrator's Office directive requiring that vendor employees working on the Program disclose if they have a parent, spouse or child who has a claim with the Program. BrownGreer has required all of its employees and subcontractors to disclose any such family members with a claim in the Program. In addition, BrownGreer verified compliance through several data queries, including employee SSN checks again the DWH and the GCCF systems.<br><br>Beginning on July 20, 2013, BrownGreer required all BrownGreer employees and subcontractors to complete a Relationship Survey and provide all the names, alias and address information for each of their following relationships: (a) spouses and ex-spouses; (b) children and stepchildren; (c) parents and stepparents; (d) brothers and stepbrothers; (e) sisters and stepsisters; (f) cohabitants (including other relatives, fiancés, partners, boyfriends and girlfriends); and (g) close personal friends who have filed a claim with the Program. The survey also requires all BrownGreer employees and subcontractors to disclose: (1) any businesses in which they have an ownership or other financial interest; and (2) all co-owners or business partners in any such businesses. BrownGreer also asks about anyone who discloses that he or she has a claim in the Program or a parent, spouse or child who has a claim in the Program. BrownGreer compares this relationships and business information solicited by the survey against the DWH database to identify claims that may present a potential conflict of interest for its employees and subcontractors that are not otherwise disclosed to BrownGreer.<br><br>If BrownGreer identifies a potential conflict of interest, it conducts a preliminary investigation (including an interview of the employee or subcontractor by Human Resources), ensures that the employee/subcontractor does not have access to any claim giving rise to their potential conflict, discloses the potential conflict to the Claims Administrator's Office, requesting instruction as to appropriate remedial steps. |
| 32 | E2.02 | Error and Fraud Awareness | Training | There may be insufficient error and fraud awareness training. | BP | Face-to-face training facilitates increase learning of core concepts and should be supplemented by appropriate e-learning modules and assessments to ensure and test employee's knowledge of the policies. Training sessions should also be embedded at the orientation training. | Yes | | Manual | As Needed | Substantive training is primarily conducted face-to-face in a classroom setting and includes testing for understanding; the only exception would be soft skills training. |
| 33 | E2.03 | Error and Fraud Awareness | Training | There may be insufficient error and fraud awareness training. | BP | Instances of uncovered fraud should be publicized to maximize deterrent value, emphasizing that all offenders will face disciplinary and other appropriate action. This discourages employee involvement in fraud and encourages employee efforts to assure the integrity of CSSP operations. | Yes | | Manual | As Needed | BrownGreer takes all reports of potential violations of this Code seriously and is committed to a thorough and fair investigation of all potential violations. No BG Worker should be disciplined for a violation of this Code without notice and an opportunity to be heard on the matter before any disciplinary decisions are made by BrownGreer. Any BG Worker who violates any provision of this Code, fails to adhere to any of its requirements, or fails timely to disclose information to BrownGreer as required by this Code, shall be subject to such consequences as determined by BrownGreer under the circumstances, including any or all of the following: (a) Removal from a Program; (b) Termination from BrownGreer or other adverse action; (c) Supplemental training; (d) Modification of the BG Worker's duties and level of supervision, including steps to restrict the BG Worker's duties so as to avoid a conflict of interest or the appearance of a conflict of interest; and/or (e) Referral to the appropriate law enforcement authorities for investigation or prosecution (Section I.11). |
| 34 | E2.04 | Error and Fraud Awareness | Training | The CSSP does not perform ongoing assessments to ensure and test employee's knowledge of the relevant policies. | BP | The CSSP should establish a policy requiring ongoing employee knowledge assessments to ensure and test employee's knowledge of the relevant policies. | Yes | | Manual | Weekly | BrownGreer employs sophisticated data mining and daily analysis processes to identify claims for QA. Errors found in QA Reviews are recorded in the system. BrownGreer runs weekly reports which quantify user performance based on these error reports and these reports are provided to supervisors. Supervisors examine these reports and follow up with reviewers weekly. Section XXV.D of the Operations Manual describes the follow up process in detail. |

| # | Ref | Category | Subcategory | Issue | Type | Recommendation | Response | | Method | Frequency | BrownGreer Response |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | E2.05 | Error and Fraud Awareness | Training | Lack of fraud training programs in place. | BP | Develop and implement an employee fraud training program. Ensure program is taught by competent professionals and all personnel should be required to attend fraud training programs to ensure they have received adequate training to recognize potential fraudulent activity. To enforce training requirements, maintain personnel records to monitor fraud training compliance. | Yes | | Both | Ongoing | To prevent and detect fraud, the SIT trains all claims handlers on potentially fraudulent issues.  SIT also periodically issues additional refresher trainings to supplement the fraud awareness. SIT also periodically updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 549 businesses, employers, attorneys, and tax preparers, all of whose involvement or preparation of claims is suspect. SIT also has developed Quick Reference Guides to all Claims Handlers instructing them to reference SIT's BOLO list when performing reviews.  SIT developed specialized fraud awareness trainings for different claims handlers, specifying the risks to be on the look out when performing specific tasks.<br><br>CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036.  SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013.  SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section  XXXIV of the Operations Manual describes the SIT process in detail. |
| 38 | E3.01 | Bribery and Corruption | Communication of Integrity and Ethical Values | CSSP (CAO) may not foster or effectively communicate strong ethics culture. | BP | Senior management should, on a monthly basis, provide reminders to employees highlighting ethical risks and the importance of following the CSSP code of ethics. | Yes | | Manual | Quarterly | BrownGreer is committed to fostering a climate that is conducive to open and honest communication. We demonstrate to all Workers the importance of communication during our onboarding process with the Human Resources Department, compliance certification emails from the Compliance Team, introductory and bi-weekly meetings with assigned project managers, and firm-wide communications from Founding Partners. All Workers are required to comply with the Code of Conduct. BG Compliance Team developed a thorough interactive Code of Conduct mandatory training for all Workers. BG has a dedicated page on our internal intranet of  "Employee Rules" that capture our expectations for all workers assigned to the DWH Settlement Program. BrownGreer is also committed to reinforcing the message of following the Code of Conduct and Confidentiality through each training we hold. Prior to any BG training commencing, we provide workers with an overview reminders of the Code of Conduct and confidentiality procedures for BG Workers.<br><br>Within our open communication climate, Workers are strongly encouraged to provide their input and ideas related to fostering an open and honest communication environment and share potential conflicts through the correct channels. Frequently, our senior management sends reminders to the workforce expressing the importance of keeping claimant information confidential. We advise our Workers cannot talk about or disclose to anyone outside of our firm claimant information, except to persons who are authorized to receive information about the project, such as law firms representing claimants or Claimant Assistance Center workers. |
| 38a | E3.01a | Bribery and Corruption | Communication of Integrity and Ethical Values | Vendors may not foster or effectively communicate strong ethics culture. | CAO-IA | Senior management should, on a monthly basis, provide reminders to employees highlighting ethical risks and the importance of following the CSSP code of ethics. | Yes | | Manual | Quarterly | See E3.01 |
| 39 | E3.02 | Integrity and Ethics Awareness | Communication of Integrity and Ethical Values | Insufficient emphasis is placed on the need for integrity and ethical values. | BP | The entity should develop a culture that emphasizes the importance of integrity and ethical behavior through oral communication and by management example--i.e., an appropriate tone at the top. | Yes | | Manual | Daily | See E3.01 |
| 40 | E3.03 | Integrity and Ethics Awareness | Communication of Integrity and Ethical Values | Management does not convey the message that integrity and ethical values cannot be compromised and/or employees do not receive or understand that message. | BP | The CSSP should develop a clearly articulated statement on integrity and ethical values that is available to all employees and understood at all levels of the organization. Management must convey the message that integrity and ethical values cannot be compromised and employees must receive and understand that message. Management must continually demonstrate, through words and actions, a commitment to high ethical standards. | Yes | | Manual | Daily | BrownGreer workers must conduct themselves professionally, ethically, competently and with dignity and honor at all times (Code of Conduct for BrownGreer Workers, Canon 8 - Section II.8). |
| 41 | E3.04 | Integrity and Ethics Awareness | Enforcement of Integrity and Ethical Values | Remedial actions are not taken in response to deviations from sound integrity and ethical values. | BP | Institute policies and procedures regarding remedial actions to be taken in response to deviations from sound integrity and ethical values or violations of the entity's code of conduct. | Yes | | Manual | As Needed | BrownGreer takes all reports of potential violations of this Code seriously and is committed to a thorough and fair investigation of all potential violations. No BG Worker shall be disciplined for a violation of this Code without notice and an opportunity to be heard on the matter before any disciplinary decisions are made by BrownGreer. Any BG Worker who violates any provision of this Code, fails to adhere to any of its requirements, or fails timely to disclose information to BrownGreer as required by this Code, shall be subject to such consequences as determined by BrownGreer under the circumstances, including any or all of the following: (a) Removal from a Program; (b) Termination from BrownGreer or other adverse action; (c) Supplemental training; (d) Modification of the BG Worker's duties and level of supervision, including steps to restrict the BG Worker's duties so as to avoid a conflict of interest or the appearance of a conflict of interest; and (e) Referral to the appropriate law enforcement authorities for investigation or prosecution (Section 1.11). |
| 44 | E3.07 | Information and Communication | Communication and Reporting | Communication does not flow across the organization. | BP | The CSSP should initiate policies and procedures to ensure that communication flows adequately across the organization. | Yes | | Manual | As Needed | The Communications Team uses approved scripts to address common questions and issues that arise during calls with claimants, attorneys, and authorized representatives. The Communications Center Director works with Damage Category Team Leads and the Claims Administrator's Office to review and update the scripts as necessary. The Communication Team Scripts are distributed to all CCC, Form Contacts, Claims Preparation Group Contacts, and Claimant Assistance Center representatives.<br><br>The communication scripts can be found in Section II.F.48 of the BrownGreer DWH Operations Manual. |
| 46 | E3.09 | Information and Communication | Duties and Responsibilities | Management does not communicate employees' duties and control responsibilities in an effective manner. | BP | Management should clearly communicate employees' duties and control responsibilities in an effective manner. | Yes | | Manual | As Needed | Claim Type Team Leads communicate assignment duties and control responsibilities of BG Workers. The Assignment Team controls system access to various queues by established restrictions to user profiles on the BG Portal. For example, Workers assigned to BEL do not have access to IEL reviews; only Workers approved to do QA reviews have access to the QA portal. |
| 47 | E3.10 | Information and Communication | Hotline and Whistleblower Mechanisms | Communication channels or hotlines are not established for people (internal and external) to report suspected improprieties. | BP | Establish communication channels or hotlines for people (internal and external) to report suspected improprieties. | Yes | | Manual | As Needed | BrownGreer is committed to ensuring the Program is run efficiently through the creation of fraud detection and prevention processes. The Special Investigations Team (SIT) is responsible for promptly evaluating claims to determine whether a SIT hold can be released or the claim should be investigated further and potentially referred to HUB for investigation. We have instructed all Claims Reviewers working on the Program to propose a claim for SIT review if they note suspicious or altered claims materials, documentation is conflicting, or if any submitted documentation is found on SIT's list of potentially fraudulent documentation.  BG provides training and refresher training to raise fraud awareness.   The propose for SIT review button is available on all Portal review screens.<br><br>Our firm  informed the BG Workers of responsibility to comply with the Code of Conduct.  BG encourages and performed trainings to all workers instructing how to elevate concerns and advised them to utilize the firm (1-877-391-3167) and DHECC (1-855-990-0014) anonymous hotlines or the lighthouse services website to report potential conflicts or fraudulent activity. |

| 48 | E3.11 | Claims Error or Fraud | Change Management | Inappropriate changes to program policies and processes. | BP | Establishment of change management committee to review program policy and process changes. | Yes | | | Manual | As Needed | **(A) Program Claim Processing Policies**: BrownGreer may initiate a need for a policy, but the CAO, with input from the Parties, promulgates new policies and policy changes.  BG built Poly Keeper application that permits all the parties and claims handlers access to policies and background materials for hundreds of policies that the Program has promulgated.<br><br>Policy Keeper sends automated emails notifying users when a policy has been adopted as a Final Policy.  Additionally, Policy Keeper identifies the policies that have been superseded and/or revised to prevent the use of stale policies during the claims review process. Beyond the internal controls of Policy Keeper, it is up to the team leads to digest, incorporate and disseminate the policies and adjust their reviews or training materials accordingly.<br><br>**(B) Program Vendor Policies**:  DWH policies and procedures that apply to the Program Vendors and its staff are communicated to all BG Workers.  BG Workers are required to acknowledge compliance with policies and procedures.  BG Compliance Team monitors BG worker compliance.<br><br>**(C) Communication Scripts**:  CAO reviews and updates the scripts as necessary. The Communication Team creates internal scripts to BG Workers after changes are announced. |
| 49 | E3.12 | Information and Communication | Privacy | Breach of confidentiality. | BP | Maintain an appropriate communication policy to ensure vendors and employees safeguard the confidentiality of claimant information consistent with the Settlement Agreement and all court orders addressing confidentiality. Vendors and employees are informed and provide signed acknowledgement of the communication policy. | Yes | | | Manual | As Needed | Communication scripts are distributed to all CCC, Firm Contacts, Claims Preparation Group Contacts, and Claimant Assistants. |
| 50 | E3.13 | Internal Communication | Internal Communication | The CSSP does not disseminate information to all employees. | BP | An intranet site or other communication tool is maintained for disseminating information, including information on internal controls. The entity's code of conduct and related content dealing with integrity and ethical values should also be contained on this website or tool. Additionally, broadcast e-mails, conference calls, or webcasts should be utilized to reinforce the entity's commitment to internal control, including updates on internal and external matters. | Yes | | | Manual | As Needed | BG  manages all compliance matters through the BG Portal, a web-based application that serves as the firm's compliance database.  This internal site is utilized to disseminate policies and procedures related to the firm and the DWH program. The BG Compliance Team developed an internal distribution list called BGComplianceTeam@browngreer.com that they use to send out daily, weekly, or quarterly reminders related to our compliance expectations. |
| 57 | E4.06 | Claims Error or Fraud | Management Override | Established protocols or procedures are circumvented. | BP | In addition to the separate fraudulent claims unit, CSSP senior managers should be equipped to react and deal with acts of fraud, or suspected fraud, in a timely manner that sends a strong message to others that the override of controls and fraudulent activity will not be tolerated or ignored. | Yes | | | Manual | As Needed | **(A) Internal Fraud Prevention: BG Compliance Team**.  BG Compliance Team, comprised of two BG partners and other senior management, monitors internal compliance matters and reports to all BG management on any internal investigations.  BG Compliance Team analyzes data and conducts investigations as necessary for complete compliance with the DWH Code of Conduct.  BG Compliance Team also develops periodic communications and trainings to all BG Workers<br><br>**(B) External Fraud Prevention: CSSP's Special Investigations Team (SIT).**  CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,030.  SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice.  SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013.<br><br>Section  XXXIV of the Operations Manual describes the SIT process in detail. |
| 60 | E4.09 | Claims Error or Fraud | Management's Integrity and Ethical Values | Management intervention in established controls is not appropriately documented and/or explained. | BP | To guard against management override of controls (interfering with controls for an illegitimate purpose), establish a policy that any and all interventions in established controls should be clearly documented and explained. The documentation should be signed by the management personnel performing the intervention. | Yes | | | Manual | As Needed | There is no way for BG to override controls or interfere with the claims review process. The only way to "manipulate" claims is to:  (1) review them through the DWH system, which keeps a detailed electronic record of every action who touched a claim, when, and for how long; or (2) submit a manual request for programmers to update/move/approve claims through the Change Control Board (CCB) process.  No one at BG has writable access to the database and all changes to any claimant or claims-related data must have a written CCB request approved by the CAO.  Once a CCB is approved, BrownGreer programmers must prepare the SQL code necessary to move or modify claimant/claim data and upload it through the Remedy software for the CAO to review and approve.  Garden City then executes the CCB promotion package to make the necessary changes. There is a clear written record of the CCB request in Remedy and the CCB request form is signed by the DRI or approved manager for any claim type or claims review process.  David Smith (partner) or Kevin Plasse (system architect) approve all CCB requests that emanate from DRIs and approved managers before being submitted for approval by the CAO. |
| 63 | E4.12 | Claims Error or Fraud | Management's Integrity and Ethical Values | Claim processors and reviewers are not assigned claim files for which they are qualified to review. | BP | The CSSP should establish a policy of randomly assigning claims review and processing to claims processors with particular experience and proficiency in relevant areas in order to increase review efficiency and accuracy. | Yes | | | Automated | Ongoing | Reviewers can pull only claims in the category/type for which they are trained and authorized to perform review.  Reviewers are blocked from pulling claims to themselves for review.  Instead, reviewers use the "Get Next" function in their designated review queues, which assigns reviewers the next claim in line for evaluation.  Using this method, reviewers pull claims for evaluation without knowing which claim the system will assign.  The system further prevents from a reviewer performing Quality Assurance review on a claim that he or she had reviewed initially.  Finally, any manual moves required to advance the claim are documented with the proper audit trail and can be requested only by designated Directly Responsible Individuals within each claim type.  Section L of the Operations Manual describes the User Access process in more detail. |
| 64 | E4.13 | Claims Error or Fraud | Management's Philosophy and Operating Style | Significant or unexpected changes in management recently occurred or are likely to occur during the next year. | BP | Interview current and former personnel to address the reasons for changes. Use feedback to adjust policies, compensation and/or leadership accordingly. | Yes | | | Manual | As Needed | To encourage exchange and flow of information, BrownGreer solicits feedback from its employees periodically through Comment Box, Employee Opinion Surveys, Supervisor and Operations Feedback Surveys, Evaluations Surveys, and Exit Surveys that is taken when employee separates from BrownGreer.  BrownGreer also implemented the Best Practices Program that solicits ideas from employees to improve practices, efficiency, and communications. |
| 65 | E4.14 | Claims Error or Fraud | Management's Philosophy and Operating Style | There has been excessive turnover of management and/or supervisory personnel. | BP | Interview current and former personnel to address the reasons for turnover. Use feedback to adjust policies, compensation and/or leadership accordingly. | Yes | | | Manual | As Needed | To encourage exchange and flow of information, BrownGreer solicits feedback from its employees periodically through Comment Box, Employee Opinion Surveys, Supervisor and Operations Feedback Surveys, Evaluations Surveys, and Exit Surveys that is taken when employee separates from BrownGreer.  BrownGreer also implemented the Best Practices Program that solicits ideas from employees to improve practices, efficiency, and communications. |
| 85 | E4.34 | Claims Error or Fraud | Policy Implementation | Lack of a controlled process for policy implementation. | BP | Establish a controlled process for the implementation of new and/or revised policies to ensure consistent application entity-wide. Ensure that the policies are properly tested before implementation and that the policies are monitored on an ongoing basis. | Yes | | | Manual | As Needed | BG built Poly Keeper application that permits all the parties and claims handlers access to policies and background materials for hundreds of policies that the Program has promulgated.<br><br>Policy Keeper sends automated emails notifying users when a policy has been adopted as a Final Policy.  Additionally, Policy Keeper identifies the policies that have been superseded and/or revised to prevent the use of stale policies during the claims review process. Beyond the internal controls of Policy Keeper, it is up to the team leads to digest, incorporate and disseminate the policies and adjust their reviews or training materials accordingly. |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 86 | E4.35 | Claims Error or Fraud | Policy Implementation | Lack of awareness of new policies. | BP | Establish increased awareness of policy promulgation through ongoing entity-wide communications. | Yes | | Manual | As Needed | **(A) Program Claim Processing Policies:** BG may initiate a need for a policy, but the CAO, with input from the Parties, promulgates new policies and policy changes. BG built Poly Keeper application that permits all the parties and claims handlers access to policies and background materials for hundreds of policies that the Program has promulgated.<br><br>Policy Keeper sends automated emails notifying users when a policy has been adopted as a Final Policy. Additionally, Policy Keeper identifies the policies that have been superseded and/or revised to prevent the use of stale policies during the claims review process. Beyond the internal controls of Policy Keeper, it is up to the team leads to digest, incorporate and disseminate the policies and adjust their reviews or training materials accordingly.<br><br>**(B) Program Vendor Policies:** DWH policies and procedures that apply to the Program Vendors and its staff are communicated to all BG Workers. BG Workers are required to acknowledge compliance with policies and procedures. BG Compliance Team monitors BG worker compliance.<br><br>**(C) Communication Scripts:** CAO reviews and updates the scripts as necessary. The Communication Team creates internal scripts to BG Workers after changes are announced. |
| 88 | E4.37 | Claims Error or Fraud | Policy Implementation | Lack of a quality assurance process for new policies. | BP | Develop, implement and document a quality assurance process for new policies. | Yes | | Manual | As Needed | BG may initiate a need for a policy, but the CAO, with input from the Parties, promulgates new policies and policy changes. BG built Poly Keeper application that permits all the parties and claims handlers access to policies and background materials for hundreds of policies the Program has promulgated. When a Policy is promulgated, the CAO announces whether the application will be retroactive. If it is, BG's team leads find affected claims and perform reviews as necessary to comply with the Policies. |
| 131 | E7.01 | Claims Error or Fraud | Claim Discrepancies | Procedures for deciding how to resolve discrepancies in data or documentation do not exist. | BP | The CSSP should establish policies for resolution of discrepancies in data or documentation. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section XXXIV of the Operations Manual describes the SIT process in detail. |
| 134 | E7.04 | Claims Error or Fraud | Claim Variances | The appropriate level of management does not adequately investigate claim variances and other issues. | BP | Establish and enforce a policy of appropriate level of review by management to adequately investigate claim variances and other issues. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section XXXIV of the Operations Manual describes the SIT process in detail. |
| 135 | E7.05 | Claims Error or Fraud | Corrective Actions | Corrective actions related to claim variances and other issues are not taken. | BP | The Claims Administrator should initiate and enforce a policy that establishes the appropriate level of management to take appropriate and timely corrective actions related to claim variances and other issues. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section XXXIV of the Operations Manual describes the SIT process in detail. |
| 136 | E7.06 | Claims Error or Fraud | Denied Claims | Procedures for deciding when to deny a claim based on "lack" of credible evidence do not exist. | BP | Establish and enforce procedures for the denial of claims based on "lack" of credible evidence. Particular attention should be paid to documenting the rationale for the denial of claims in anticipation of appeal. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section XXXIV of the Operations Manual describes the SIT process in detail. |
| 137 | E7.07 | Claims Error or Fraud | Denied Claims | Claims are incorrectly denied. | BP | A supervisor should review all denied claims and ensure that denials were properly determined and communicated to the claimant. | Yes | | Automated | Daily | BrownGreer has numerous automated data metrics that look for denied claims and send them to the QA Queue for a Quality Assurance Review. In addition, BrownGreer performs multiple daily analytic processes on completed claims in the "cooling off" period as described in Section XXV.E of the Operations Manual. For most claim types, the QA Team identifies claims that were submitted from the Initial or Incompleteness Response Review Queue with a Denied or Excluded result and sends those claims to the Exclusions Team for subject matter expert review to confirm the denial. |
| 138 | E7.08 | Claims Error or Fraud | Escalation of Claims | Procedures for deciding when to escalate of fraud issues to more senior managers does not exist. | BP | The CSSP should initiate and enforce procedures for deciding when fraud issues are escalated to more senior managers. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section XXXIV of the Operations Manual describes the SIT process in detail. |
| 158 | E7.28 | Claims Error or Fraud | Referral of Claims | Procedures for deciding when to require referral of a claim to the SIU do not exist. | BP | Establish procedures for deciding when to require the referral of claims to the Special Investigative Unit (SIU) or equivalent. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of $272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>Section XXXIV of the Operations Manual describes the SIT process in detail. |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 160 | E7.30 | Claims Error or Fraud | Training of Claims | A policy of assigning claims review and processing to claims processors with particular experience does not exist. | BP | The CSSP should establish a policy of assigning claims review and processing to claims processors with particular experience and proficiency in relevant areas in order to increase efficiency and accuracy. For example, all claims for a particular type of business are routed to the same reviewer(s), all complex claims are routed to the same (more experienced) reviewer(s). | Yes | | Both | Ongoing | Reviewers can pull only claims in the category/type for which they are trained and authorized to perform review. Reviewers are blocked from pulling claims to themselves for review. Instead, reviewers use the "Get Next" function in their designated review queues, which assigns reviewers the next claim in line for evaluation. Using this method, reviewers pull claims for evaluation without knowing which claim the system will assign. The system further prevents from a reviewer performing Quality Assurance review on a claim that he or she had reviewed initially. Finally, any manual moves required to advance the claim are documented with the proper audit trail and can be requested only by designated Directly Responsible Individuals within each claim type. Section L of the Operations Manual describes the User Access process in more detail. |
| 163 | E7.33 | Claims Error or Fraud | Safeguarding of Assets | Access to financial stationary is not restricted. | BP | Ensure that financial stationary is held securely and records kept of stock holdings, withdrawals and destruction of wasted stationary. | Yes | | Manual | Daily | BG implemented records management policies for intake of documents at the CACs and Document Retention. BG sends updates to BG Workers reminding of confidentiality and records retention policies. BG Workers acknowledge receipt of the DWH policies through BP Portal. BG Compliance verifies user acknowledgments. |
| 168 | E7.38 | Claims Error or Fraud | Documentation Retention | Financial and other source documents submitted by claimant as well as supporting documents prepared by the CSSP are not properly retained and stored. | BP | A records management policy should exist and outline procedures related to different records and the classification of such records, records retention schedule process, records retention schedule for each classification of records, and the process for amending a record retention schedule. Supervisory reviews should validate compliance with the policy. | Yes | | Manual | Daily | BG implemented records management policies for intake of documents at the CACs and Document Retention. BG sends updates to BG Workers reminding of confidentiality and records retention policies. BG Workers acknowledge receipt of the DWH policies through BP Portal. BG Compliance verifies user acknowledgments. |
| 169 | E7.39 | Claims Error or Fraud | Documentation Retention | Financial and other source documents submitted by claimant as well as supporting documents prepared by the CSSP are not properly retained and stored. | BP | Ensure that both hard copy paper and electronic documentation are maintained in a secure manner or location consistent with court orders on respective document retention for that classification of records and can be readily accessible or recalled when needed. | Yes | | Manual | Daily | BG implemented records management policies for intake of documents at the CACs and Document Retention. BG sends updates to BG Workers reminding of confidentiality and records retention policies. BG Workers acknowledge receipt of the DWH policies through BP Portal. BG Compliance verifies user acknowledgments. |
| 170 | E7.40 | Claims Error or Fraud | Documentation Retention | Financial and other source documents submitted by claimant as well as supporting documents prepared by the CSSP are not properly retained and stored. | BP | Ensure that all personnel are adequately trained on the proper safeguarding policies and procedures for both physical and cyber storage of records. For example, records copied onto USB drives for transfer must be properly encrypted. Confidential documents must also be marked with appropriate confidentiality notices. | Yes | | Manual | Daily | BG implemented records management policies for intake of documents at the CACs and Document Retention. BG sends updates to BG Workers reminding of confidentiality and records retention policies. BG Workers acknowledge receipt of the DWH policies through BP Portal. BrownGreer has disabled the functioning of the USB ports on each workstation, which prevents workers from placing information found in the Portal on a removable drive. This restriction applies to all BrownGreer workstations in the New Orleans office, all CACs, and the Paragon Place office in Richmond, Virginia. |
| 206 | E10.02 | Vendor Management | Proper Supervision | Lack of supervision may lead to improper processing of claims. | BP | Ensure each vendor has adequate supervision of the professional accountants and claim processors. | Yes | | Manual | As Needed | All BG Workers have supervisors who have been thoroughly trained in their specific damage category and have intimate knowledge of the claims process. |
| 219 | E11.01 | Monitoring Activities | Claims Processing Errors | Lack of automated monitoring system. | BP | Ensure programs with a significant volume of activity have automated monitoring systems designed to identify potentially suspicious or fraudulent activity and from the use of automated case management systems. Automated monitoring systems typically have a rules engine that can be programmed for rule sets with established thresholds or typical scenarios indicative of fraud. Transactions that violate the programmed rules or scenarios can then be "flagged" for follow up analysis and investigation. In addition, the monitoring system should be programmed to screen names against an internal "watch" list. | Yes | | Both | Ongoing | CSSP's fraud program, staffed by a dedicated team of BG employees and led from its inception by David Welker, has resulted in 5,354 claims being denied for potential fraud, resulting in a potential savings to BP of \$272,296,036. SIT has worked closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. SIT team leaders have met with BP and explained the fraud processes in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. SIT has developed processes for fraud detection and training for all claims handlers, implemented processes for multi-scheme management, and performs complex data analysis from various data sets for suspect trends.<br><br>The data analytics process has evolved and matured over time since the inception of the Program, and BG's SIT continuously improve it by identifying trends and metrics that are over inclusive and/or not indicative of fraud, or find additional ways to analyze the data. Descriptions of the data analytics processes that SIT performs is outlined in the BG DWH Operations Manual, Section XXXIV, at XXXIV-4 through XXXIV-8 and Exhibit XXXIV C. SIT currently monitors 24 different data sets for suspect trends and several of them affect BEL claims. |
| 222 | E11.04 | Monitoring Activities | Claims Program | Risks identified by internal and external auditors are not addressed. | BP | Ensure that all recommendations and deficiencies identified by the internal or external auditors are properly implemented. | Yes | | Manual | As Needed | BG implements controls or changes as directed by the CAO and/or the Audit Committee. |
| 335 | C1.06 | Claims Error or Fraud | Duplicate Claims | Duplicate claims may be paid to claimants assisted by third parties found guilty of preparing fraudulent claims. | BP | If a claim was prepared by a third party, such as a law firm or accounting firm, the claim processor should cross-check the third party entity against the internally maintained list of third parties that previously handled fraudulent claims or have been investigated for fraud. Claim reviewers should take extra care when reviewing claims prepared by such third parties. | Yes | | Both | Ongoing | The SIT also updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 549 businesses, employers, notaries, and tax preparers, all of whose involvement or preparation of claims is suspect. SIT provides training and Quick Reference Guides to all Claims Handlers instructing them to reference SIT's BOLO list when performing reviews. |
| 338 | C1.09 | Claims Error or Fraud | Incomplete Claim File | Incomplete or inaccurate data input into claim processing system. | BP | There should be a controlled process for input of claimant data to ensure all information is complete and accurate. A quality control and quality assurance process should be documented and performed. Any revisions to the data should be documented and supported by claimant requests or documentation. All exceptions should be reported and reprocessed. | Yes | | Automated | Daily | BrownGreer has numerous automated data metrics that look for anomalous data capture and warning messages which assist reviewers in avoiding data capture errors. In addition, BrownGreer performs multiple daily analytic processes on completed claims in the "cooling off" period as described in Section XXV.E of the Operations Manual. Critical answers in review screens require reference to documentation and the process of tying data capture to categorized forms provides an incontrovertible and unambiguous link the supporting documentation. A QA review system is available at the end of each QA review which provides a mechanism for recording errors in the prior review and those questions are presented on a topic-by-topic basis for each claim type which provides statistics on errors and error types by user and across Claim Types. |
| 343 | C2.01 | Claims Error or Fraud | Lack of Transparency | The CSSP may fail to establish and maintain adequate transparency in the claims process. | BP | Ensure claims are processed consistently with complete transparency to the claimant, the Court, Class Counsel and BP. Claim reviewers should be able to show how a claim was processed and the claim outcome, including how the compensation amount was determined and all documents submitted by the claimant. Any critical determinations and judgments made by the claim reviewer should be documented. It may be necessary to develop a written policy on transparency and conduct supervisory reviews to validate consistency with the policy. | Yes | | Both | Ongoing | Claim reviewers with a specific business need are allowed access to Results Search. These screens show the complete history of both claimant and claim level reviews, along with reports called VLRs (View Last Review) that display the details on every review response, comment, document ID selected during that review which led to the specific review result/outcome. When the review screens are modified, the VLR reports are also modified to ensure any response are readily available. The Contact Notes reports also show a collection of all Global Note entries for a claimant. Only supervisors, managers and call center agents/CAC representatives have Results Search. After the Froeb report last summer, we restricted Results Search access to only necessary personnel and not all Claims Reviewers.<br><br>Class Counsel, BP and the Claimant are only allowed to see the Review details after a notice is issued. They do not get notified of results except through an official notice. When viewing the notice, they are also provided with access to the VLR that led to that specific notice. In this way, they are provided with the critical decisions, documents used for proof, calculations and ultimate result of the review. |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 344 | C2.02 | Claims Error or Fraud | Lack of Transparency | The CSSP may fail to establish and maintain adequate transparency in the claims process. | BP | Ensure that every step of the claim review process is clearly documented and a readily available audit trail exists for review. Review notes and documentation must be traceable and correspond with the results of the claim review. Any critical determinations and judgments made by the claim reviewer should be clearly documented. | Yes | | Automated | Ongoing | Review notes are entered in the review screens as part of the review.  Because the notes for review are saved inside the actual review, the results of the claim review and the notes are saved together.  Each time a review is started, the notes and responses  from the prior reviewer are available for reference and update.  Furthermore, each time a review is submitted, a copy of all review data including comments and results are saved to a history table so they are preserved based on the moment of submission.  This allows a clear trail of the decisions made during each instance of review. <br><br> Documents are stored at the Claimant level as a single document might be applicable to multiple claims.  All documents submitted by claimant are available for reference in any review.  When key decisions during the review rely on documentation, the question requires both a response and a specific Document ID.  This allows us to know the precise document used a proof when providing the response. |
| 345 | C2.03 | Claims Error or Fraud | Lack of Segregation of Duties | Inappropriate segregation in the assignment of duties leading to control deficiencies resulting in errors, fraud or misstatements. | BP | Ensure there are appropriate procedures in place to maintain proper segregation of duties between those who review claims and those who approve the claims determination. Approving the claim is another level of quality control and should not be performed by the same individual who reviewed the claim. Written policy should be developed and supervisory reviews conducted to validate consistency with the policy. | Yes | | Automated | Ongoing | No individual can access the Review System unless that person is an authorized user with an approved user name and password.  That password is issued only to that specific user.  Separate from inherent tasks such as logging in, logging out, and changing passwords, we assign every user a defined role in the Review System tailored to permit that person to perform only the job assigned to the person and no other task.  The user role defines the capabilities and functions that an individual user can perform or access within the Review System. To access a feature or function, an individual user must be assigned the specific governing role.  For example, it is impossible for a reviewer assigned solely to the role of Initial Review to perform a Quality Assurance review.  Currently, there are 156 roles in the Review System. <br><br> Each module of the Review System is assigned a Directly Responsible Individual ("DRI") who directs any activity or access in that module.  A supervisor or DRI makes the request that will not be granted without explicit approval from the DRI of that module.  No reviewer may request their own access.  This system prevents any user from being able to add functionality to their portal without proper approval.  A limited group of senior staff are the only persons who have the ability to grant roles.  The DRI must approve the request but cannot grant the role.  The DWH Access team can grant the role but not approve the request.  All requests are monitored by a Staffing and Assignments DRI who audits access roles to match them with the person's assignments.  This means no single user can create or alter their access. <br><br> In addition to passwords and user roles, we also employ system security procedures.  The Review System uses algorithms to restrict further access.  For example, a reviewer who performs an Initial Review cannot perform the QA review on the same claim.  Following the claim evaluation, we employ a detailed Notice QA process before we issue any Eligibility Notice.  On Subsistence claims, an experienced reviewer or supervisor evaluates the substance of every payable determination for accuracy before we issue the Eligibility Notice. <br><br> After the claim is determined payable, it is reviewed by GCG to issue payment. |
| 346 | C2.04 | Claims Error or Fraud | Non-Qualified Personnel | Personnel responsible for claims review may not possess required technical accounting competence or professional  qualifications. | BP | Professional accountants should be responsible for accounting related judgments and analyses. A review of the technical competence of CSSP vendor personnel charged with making important judgments about accounting related issues should be conducted. Such personnel should have adequate training and credentials to make the necessary judgments in connection with claims. Monitor final determinations to determine whether they significantly vary based upon which professional reviewed the claim and adjust and implement additional training accordingly. | Yes | | Manual | Daily | BG hires competent reviewers to perform data capture and claim completeness determination that BG reviewers perform on BEL claims.  To ensure that Business Economic Loss ("BEL") reviewers continue to display competency and diligence, we regularly analyze the performance and productivity of each reviewer.  BrownGreer has implemented tailored measures to specifically combat error and fraud in the evaluation of BEL Claims. <br><br> Deepwater Horizon Program Accountants ("Accountants") exercise their professional judgment regarding revenue shifting, matching and improper reconciliation and it would be appropriate for the Accountants to respond to the items regarding the Accountant review processes.  Where applicable, BG collaborates with the Accountants in the error and fraud prevention processes. |
| 347 | C2.05 | Claims Error or Fraud | Non-Qualified Personnel | Personnel responsible for claims review may not possess required industry working knowledge or experience. | BP | Professional accountants assigned to review claims in specific industries should possess knowledge or experience unique to that particular industry. A review of the technical industry-specific qualifications should be conducted for each CSSP vendor employee. | Yes | | Manual | Daily | BG hires competent reviewers to perform data capture and claim completeness determination that BG reviewers perform on BEL claims.  To ensure that Business Economic Loss ("BEL") reviewers continue to display competency and diligence, we regularly analyze the performance and productivity of each reviewer.  BrownGreer has implemented tailored measures to specifically combat error and fraud in the evaluation of BEL Claims. <br><br> Deepwater Horizon Program Accountants ("Accountants") exercise their professional judgment regarding revenue shifting, matching and improper reconciliation and it would be appropriate for the Accountants to respond to the items regarding the Accountant review processes.  Where applicable, BG collaborates with the Accountants in the error and fraud prevention processes. |
| 350 | C2.08 | Claims Error or Fraud | Lack of Communication and Training | CSSP Vendor personnel responsible for claims review may not be aware of policy and procedure updates. | BP | All changes in policy must be applied to claims in process and yet to be reviewed claims. Additionally, all changes in policy must be reviewed for consideration of impact on closed claim files and applied as deemed necessary. | Yes | | Automated | | BG may initiate a need for a policy, but the CAO, with input from the Parties, promulgates new policies and policy changes.  BG built Poly Keeper application that permits all the parties and claims handlers access to policies and background materials for hundreds of policies that the Program has promulgated. <br><br> Policy Keeper sends automated emails notifying users when a policy has been adopted as a Final Policy.  Additionally, Policy Keeper identifies the policies that have been superseded and/or revised to prevent the use of stale policies during the claims review process. Beyond the internal controls of Policy Keeper, it is up to the team leads to digest, incorporate and disseminate the policies and adjust their reviews or training materials accordingly. |
| 352 | C2.10 | Claims Error or Fraud | Claims Processing | Claims are not handled consistently. | BP | Establish claims checklist for each claim type to ensure consistent treatment across claims. | Yes | | Automated | Ongoing | Each claim type review is recorded in the system and follows a set of questions that a reviewer must answer for the system to determine the applicable claim outcome. <br><br> To prevent and detect fraud, the SIT trains all claims handlers on potentially fraudulent issues.  SIT also periodically issues additional refresher trainings to supplement the fraud awareness.  SIT also periodically updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 549 businesses, employers, notaries, and tax preparers, all of whose involvement or preparation of claims is suspect. SIT has also developed Quick Reference Guides to all Claims Handlers instructing them to reference SIT's BOLO list when performing reviews. |
| 353 | C2.11 | Claims Error or Fraud | Lack of Quality Assurance | Review and determination of claims may not be  handled in a consistent manner and exceptions may not be followed up. | BP | Establish quality assurance (QA) protocols using a risk based approach to focus QA efforts on the appropriate areas of the claims process. | Yes | | Automated | Daily | BrownGreer employs sophisticated data metrics and daily analysis processes to identify claims for QA.  The metrics are identified in Appendix XXV.A of the Operations Manual.  Errors found in QA Reviews are recorded in the system.  BrownGreer runs weekly reports which quantify user performance based on these error reports and those reports are provided to supervisors.  Supervisors examine these reports and follow up with reviewers weekly.  Section  XXV.D of the Operations Manual describes the follow up process in detail. |
| 355 | C2.13 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be  handled in a consistent manner and exceptions may not be followed up. | BP | Use computer-assisted data analytics to incorporate an automated quality control function as part of the claims review process. | Yes | | Automated | Daily | BrownGreer employs sophisticated data metrics and daily analysis processes to identify claims for QA.  The metrics are identified in Appendix XXV.A of the Operations Manual.  Errors found in QA Reviews are recorded in the system.  BrownGreer runs weekly reports which quantify user performance based on these error reports and those reports are provided to supervisors.  Supervisors examine these reports and follow up with reviewers weekly.  Section  XXV.D of the Operations Manual describes the follow up process in detail. |

| # | ID | Name | Sub-category | Risk Description | | Control Description | | Yes | Type | Frequency | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 356 | C2.14 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | | Use computer-assisted data analytics to incorporate an automated quality control function as part of the claims review process to review for unusual fluctuations in addition to the seven Juneau matching criteria. For example, benchmark metrics should be generated for a given industry in order to compare offers with benchmark amounts. | | Yes | Both | Ongoing | The data analytics process has evolved and matured over time since the inception of the Program, and BG's SIT continuously improve it by identifying trends and metrics that are over inclusive and/or not indicative of fraud, or find additional ways to analyze the data. Descriptions of the data analytics process that SIT performs is outlined in the BG DWH Operations Manual, Section XXXIV, at XXXIV-4 through XXXIV-8 and Exhibit XXXIV.C. SIT currently monitors 24 different data sets for suspect trends and several of them affect BEL claims.<br><br>One of the data sets that we analyze, DWH 8865, is the compilation of all data captured in the system during the BG BEL review. SIT reviews to detect patterns and anomalies. In its analysis, SIT relies on the monthly revenues for all years and analyzes the data in combination with the federal tax return data, SSUR values, industry designations, causation results and claim status, to detect patterns within a Claims Preparation Group, law firm, or other unifying trend. SIT utilizes six main tests to identify populations with abnormal patterns that may be indicative of habitual or repeated alteration of prepared Profit and Loss Statements and/or Federal Tax Returns to maximize recovery under the terms of the Settlement Agreement or to pass causation. We also perform additional analyses for special groups of claims that may be otherwise suspect. Here are the **six standardized tests** that we perform to analyze this data:<br><br>**(A) The Causation Near Pass Test.** This test identifies claimants that pass the applicable Causation Revenue Pattern for their respective Economic Loss Zone but in only one or fewer three month period for all Benchmark Periods (2009 only, average 2008/2009, average 2007/2008/2009) for which data is available. These subservient tests identify claimants using methods of estimation to possibly pass causation.<br><br>**(B) The Federal Tax v. Profit and Loss Statement Revenue Variance Test.** This test identifies claimants with a suspect trend in the variance between the revenues per the Profit and Loss Statements compared to the federal tax returns in the Benchmark Years and 2011 when compared to 2010, which suggests revenue per Profit and Loss Statements may be artificially inflated in the Benchmark Years, 2011, depressed in 2010, or all three.<br><br>**(C) The Monthly Variance Duplicates Test.** This test identifies claims in which the Profit and Loss Statements display a formulaic method of creation rather than actual contemporaneous financial data.<br><br>**(D) The Front-Loading Test.** This test identifies claims that display an extreme departure from Benchmark Years in the revenues reported in the pre-Spill months of 2010, which could indicate manipulation of the monthly distribution of revenues reported to either inflate Benchmark Period revenues or depress Compensation Period revenues.<br><br>**(E) Benford's Test.** This test identifies Claims Preparation Group's (CPG's) and law firms (as opposed to individual claimants) with first digit revenue numbers not within the frequency distribution of digits in real life sources of data. The test does not have a trigger threshold; rather an analysis is conducted on each law firm or prep group by comparing the results to peers |
| 357 | C2.15 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | BP | Use computer-assisted data analytics to evaluate claims by comparing offer amounts to industry averages. Claims that are outside the range of tolerance should be flagged for further review. | | Yes | Both | Ongoing | See C2.14 |
| 358 | C2.16 | Error and Fraud Awareness | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be detected. | BP | Develop automated data analytics routines, which should be run at regular intervals to identify unusual transactions or other data anomalies indicative of potential fraud and corruption. The outliers should be investigated. | | Yes | Automated | Ongoing | SIT analyzes claims information and data to detect outliers in the claimant population. The data analytics process has evolved and matured over time since the inception of the Program, and BG's SIT continuously improve it by identifying trends and metrics that are over inclusive and/or not indicative of fraud, or find additional ways to analyze the data. Descriptions of the data analytics process that SIT performs is outlined in the BG DWH Operations Manual, Section XXXIV, at XXXIV-4 through XXXIV-8 and Exhibit XXXIV.C. SIT currently monitors 24 different data sets for suspect trends and several of them affect BEL claims.<br><br>SIT also has developed a randomized criteria it uses to detect outliers in claim approval and in claim determination to select for SIT review. |
| 375 | C4.01 | Claims Error or Fraud | Changes to Closed Claims | Closed claims files are inappropriately changed. | BP | Change all closed claims to read-only access to ensure no changes are made after claims are finalized and payments are processed. | | Yes | Automated | Ongoing | Closed Claims are distinct and separate from Paid Claims. The system is coded so that Closed Claims are not accessible in the review queues, Notices or Payments. As soon as a claim is designated as Closed, the restriction from review is immediate. Any claims that are requested to be manually moved are not permitted when the claim is closed. Automated code verifies the presence of the closure and instructs the requestor the request cannot be process.<br><br>In some cases, claims that have been paid also allow further review. Examples include reviewing a claim for CAS to prevent appeal as well as special circumstances like Lake Eugenie where portions of property ownership were in dispute. The CA authorized payment on the non-disputed property and as ownership was clearly settled, the claim was allowed further review to receive additional payments. The review aspect of these paid claims is considered read-only unless specific approval is given. |
| 387 | D0.07 | Claims Error or Fraud | Lack of Quality Control | Review and determination of claims may not be handled in a consistent manner and exceptions may not be followed up. | BP | Perform applicable data analytics as outlined in "Data Analytics" document. All requirements so far are focused on various trend, pattern, clustering and other related techniques. Custom queries should be created, as needed. | | Yes | Both | Ongoing | See C2.14 |

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**In re: Oil Spill by the Oil Rig**        **MDL NO. 2179**
**"Deepwater Horizon" in the Gulf**
**of Mexico, on April 20, 2012**        **SECTION J**

**Applies to:** *All Cases*            **JUDGE BARBIER**
                                     **MAGISTRATE JUDGE SHUSHAN**

## <u>DECLARATION OF ORRAN L. BROWN</u>

**1.**      *Personal Information.*   My name is Orran L. Brown. I am the Chairman and a founding partner of BrownGreer PLC ("BrownGreer"), located at 250 Rocketts Way, Richmond, Virginia.

**2.**      *Personal Knowledge.*   The matters set forth in this Declaration are based upon my personal knowledge, experience, and training, as well as facts related to me in my capacity as supervising partner for BrownGreer's work on the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Program").

**3.**      *General Description of BrownGreer.*   BrownGreer is a firm experienced in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicle.

**4.**      *Role in the Deepwater Horizon Program.*   BrownGreer provides services to Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("CSSP") established under the Program. Among other services, BrownGreer created the process for the review of claims received by the Program, procured and trained staff needed to process the claims, and procured and trained the staff in the 18 Claimant Assistance Centers ("CAC") used in the Program. Attached to this Declaration as Exhibit A is an overview of the claims processing system.

### A. <u>BP Hotline Caller's Accusation Against the Program's Employees</u>

**5.**      *BP's Hotline.*   According to BP's July 15, 2013, Press Release, *BP Launches Gulf Claims Fraud Hotline*, attached to this Declaration as Exhibit B, BP opened the "Gulf Claims Fraud Hotline" on July 15, 2013, encouraging people – in exchange for a potential monetary award – to report "any fraudulent or corrupt activity" regarding the Program.

**EXHIBIT II**

**6.**     ***Content of Informant's Allegations.***     On Thursday, July 18, 2013, I received a copy of a letter from Keith Moskowitz, an attorney who represents BP, which was written to David Welker, the Program's Director of Fraud, Waste, & Abuse.  Mr. Moskowitz's letter described and forwarded an accusation by a caller ("BP Hotline Informant") against a specific employee of the Program ("Employee A"), as well as the CAC in which Employee A worked, located in Mobile, Alabama ("Mobile CAC").  Specifically, Mr. Moskowitz indicated that, on July 15, 2013, BP received an allegation through its anti-fraud hotline that Employee A had "assist[ed] individuals in submitting fraudulent subsistence claims to the CSSP in exchange for payment of a portion of settlement awards that may be paid to these individual claimants."  Mr. Moskowitz indicated that the fraud hotline intake report "[wa]s the only record that BP possess[ed] related to the reported tip."  He also noted that "the person who reported the tip does not know the name of the CSSP employee" and that "BP cannot comment on the veracity of the information reported[.]"

Mr. Moskowitz's letter then attached the statement taken from the BP Hotline Informant.  In this statement, the informant stated that she worked with Employee A's mother and that, through the mother, she learned that Employee A (a) recruits people to file claims in exchange for a percentage of the claim's award and (b) had actually filed fraudulent claims for her mother, uncle, and other family members in which she advised her family on ways to maximize claim value while evading fraud detection.  The BP Hotline Informant also alleged that other employees in the Mobile CAC participated in similar activity.

**7.**     ***The Program's Claimant Assistance Centers.***     The "claims center" referred to by the BP Hotline Informant refers to one of the 18 CACs located across the Gulf.  The CACs are customer service centers, staffed with trained professionals who assist primarily unrepresented claimants interested in participating in the Program or who have questions about claims already filed with the Program.  The Program has CACs in Alabama, Florida, Louisiana, Mississippi, and Texas.  The specific CAC referenced in the BP Hotline Informant's statement is located in Mobile, Alabama.

**8.**     ***Roles of CACs and Their Personnel.***     The Program primarily charges a CAC employee with the responsibility of giving each claimant or potential claimant he encounters the tools and knowledge needed to make the most informed decisions possible for each claim he may file.  Necessarily, CAC employees – after verifying a claimant's identity and representation status – must initiate claims, search for claims, and speak to claimants about their claims.  The employees answer general Program questions and concerns, review documentation for completeness, explain notices, deadlines, and correspondence in an understandable and approachable way, and perform outreach to claimants with incomplete claims.  Most commonly, individuals visit CACs for assistance with:

(a)  Registering or Filing a Claim Form;

(b)  Checking the Status of a Claim; or

(c)  Submitting New Documents.

9.     **Response to Keith Moskowitz's Letter and BP Hotline Informant's Statement.** After BrownGreer received a copy of Mr. Moskowitz's letter, we participated in a conference call with Mr. Welker and other members of the Claims Administrator's Office. We learned that the independent third-party vendor retained by the Program to investigate allegations of fraud, HUB Enterprises, Inc. ("HUB"), would be conducting an investigation into the BP Hotline Informant's Statement. HUB also indicated that it planned to interview the specific target of the accusation, Employee A, as well as all members of the Mobile CAC the next day, Friday, July 19, 2013. We helped facilitate the investigation by deploying our head of Human Resources from New Orleans to the Mobile CAC on the morning of the interviews to be available to assist HUB in whatever manner necessary.

10.     **Actions Taken by BrownGreer on July 19, 2013, Following HUB's Interviews.** During HUB's interviews, questions arose about whether Employee A knew that her mother and brother had a claim with the Program. The Program's Code of Conduct Policy requires employees to disclose any family member with a claim. During HUB's interviews, questions arose about whether two other employees were in complete compliance with BrownGreer's Conflict of Interest Policy and Computer Use Policy. Because the investigation had just begun and out of an abundance of caution pending its outcome, BrownGreer suspended the employment of Employee A and the other two employees. These suspensions were not because we suspected them to have engaged in fraud; rather, as there was some question that they may have violated employment policies, we thought it was prudent to await the outcome of HUB's investigation before making a final determination about their employment.

11.     **Continued HUB Investigation.** On August 7, 2013, HUB again visited the Mobile CAC for follow-up interviews of certain employees and to interview employees who had been absent during the initial interviews on July 19, 2013. BrownGreer learned that HUB planned to interview Employee A's mother later that evening and Employee A's brother the next day, on August 8, 2013. Later, we learned that Employee A's mother did not keep her appointment with HUB.

12.     **Discussion with Employee A's Mother.** On August 8, 2013, Ron Nowicki at HUB informed Roma Petkauskas of BrownGreer that Employee A's mother wished to withdraw her Subsistence claim from the Program and did not want to talk with HUB about it. Ms. Petkauskas informed Mr. Nowicki that we intended to contact Employee A ourselves.

13.     **Content of Conversations with Employee A's Mother.** On August 8, 2013, I called Employee A's mother at the phone number she had listed in the Registration Form she had submitted in the Program, but did not receive an answer. When I tried the same number again later in the afternoon, I asked to speak with Employee A's mother and the person who had answered identified herself as the same. I gave her my name and informed her that I was with BrownGreer and worked for Claims Administrator Patrick Juneau in the Program. I then asked if we could discuss her claim. She readily agreed to do so. She informed me of the following:

    (a) She instructed me to mark her Subsistence claim as withdrawn by claimant and close it.

(b) She had decided to withdraw her claim because she "no longer wants to fool with it." It "just doesn't matter to me," she said. She does not know if it is a payable claim or not. She does know that she had to stop fishing because of the Spill and thought that meant she could file a claim. She is not afraid of getting in trouble or getting her daughter, Employee A, in trouble relating her claim. She knows of no reason she would be in trouble as a result of her claim.

(c) She filed her Subsistence claim online on her own, using a laptop. She did not talk with Employee A or anyone else before she did so. She filed it because the Spill prevented her from fishing. Neither Employee A nor anyone else told her what to put in her Claim Form. She did not tell Employee A that she had filed a claim. As far as she knew, Employee A did not know that she had filed a claim. It is "none of her business what I do," she said.

(d) She does not have a close relationship with Employee A because she went into debt trying to take care of Employee A. They "had a falling out" some time ago.

(e) She enjoys eating fish. She took up fishing in 2004, after another daughter and her mother both died. Her daughter died on April 9, 2004, and her mother died on June 29, 2004. She feels that she still has "not gotten over it."

(f) She fishes mostly with a cane pole, and she says she knows what bait to use. She named the types of fish she catches, which matched the types in her Subsistence Claim Form.

(g) She fishes mostly at Cedar Point Pier in Mobile or at the Mobile causeway. On some occasions, she goes to Gulf Shores or Pensacola with her son to fish.

(h) To derive the pounds she put in her Subsistence Claim Form, she just estimated. She used the size of her cooler and how much it holds, and what "things weigh in the store."

(i) She identified the family members she named in the Subsistence Claim Form, listed in this Declaration as Family Member 1, Family Member 2, and Family Member 3. Family Member 1 is her daughter, whom she adopted after her other daughter's death. Family Member 2 is her father, who has had several mini-strokes and is in poor health. Family Member 3 is her brother. All three persons live with her full time except Family Member 3, who lives with her "off and on, but more than off," meaning more with her than anywhere else. She cooked fish that she caught and fed it to these people.

(j) She never asked Employee A for help on her claim or to look it up and tell her where it was in the system. Employee A never talked with her about her claim or where it was in the system. She did not want Employee A to know she had filed a claim and sees it as "none of her business."

4

(k) She never talked with Employee A about sharing any proceeds of her claim.  If she
had been paid on it, she would not have shared any part of her claim with Employee
A.

I then concluded the call.  After reviewing my notes of the call, I called her back about an hour later, and she again answered the phone.  I asked her whether she had ever told anyone anywhere that her daughter, Employee A, was helping relatives file claims, or was getting money from other persons' claims, or that others in the office where her daughter Employee A worked knew how to game the system and were doing any of those things.  She said "absolutely not."  She said that she "would not do anything like that" and "would not be a part of anything like that" or talk about anything like that with anyone.  She said that, "I pretty much keep to myself."  I then concluded the call and have not talked with her since that call.

## B.  Employee A's Job Description and Performance

**14.**  ***Research into Employee A's Actions.***  Simultaneous with HUB's investigation, BrownGreer conducted research into Employee A's activities.  Members of my staff conducted this research by analyzing Employee A's activities in the DWH Claims Review System ("Review System"), the online mechanism through which claims evaluation occurs.  Every time an employee accesses the Review System to create a claim, review a claim, or look up information, we permanently record that action in the Review System.  We are able to see specifically what action an employee took and when, down to the hour, minute, and second.

**15.**  ***Employee A's Duties.***  On May 9, 2012, Employee A began working as a Claimant Assistant, assigned to assist claimants with filing claims, intake of documents and answering program related questions.  On September 20, 2012, she received training to perform Data Capture and Document Categorization reviews.  After passing her Document Categorization and Data Capture proficiency tests, Employee A began those functions on October 3, 2012.  On December 10, 2012, the Subsistence Team Leads from Orange Beach, Alabama, trained her to perform Subsistence reviews.  She began performing Initial Reviews on Subsistence claims on January 12, 2013.  On February 6, 2013, she progressed to performing Quality Assurance ("QA") reviews on Subsistence claims.  She was removed from QA on February 26, 2013, for retraining and to gain more experience, and she requalified to conduct QA Subsistence reviews on March 18, 2013.

**16.**  ***Initiation of Claims by Employee A.***  As a CAC employee, Employee A was charged with all of the responsibilities identified in Paragraph 8 above, so her job required her to initiate claims for claimants visiting the Mobile CAC.  Based on our research, we learned that Employee A had created 135 claims and 124 claimants in the system.  She did not create the Subsistence claims of her mother or her brother.  There is no claim in the Review System for her ex-husband or for her uncle.

**17.**  ***Employee A's Referral of Claims to the Special Investigations Team.***  Over the course of her employment, Employee A referred 32 claimants to the Program's Special Investigations Team ("SIT"), the unit charged with detecting and preventing fraud, honoring her commitment to the Program to flag any questionable or suspicious claim and escalate it for SIT

review.  Twenty-two of the claimants she referred to the SIT had filed claims in the Mobile CAC.

**C**.  **Subsistence Claims Filed by BP Hotline Informant, Employee A's Mother, and Employee A's Brother**

**18.**  ***Research into Subsistence Claims Filed by BP Hotline Informant, Employee A's Mother and Employee A's Brother.***  We researched the Subsistence claims filed by the BP Hotline Informant, Employee A's mother, and Employee A's brother.  The following table provides a comparison among these three claims.

| | Comparison of Subsistence Claims | | | |
|---|---|---|---|---|
| | **Claim Information** | **BP Hotline Informant** | **Employee A's Mother** | **Employee A's Brother** |
| 1. | Date Filed | 6/19/13 | 5/4/13 | 1/17/13 |
| 2. | How Filed? | In Mobile CAC | Online | Online |
| 3. | Fishing Locations | Cedar Point Pier | Cedar Point Pier; Pensacola Pier; Mobile Causeway | Cedar Point Pier; Pensacola Pier |
| 4. | Catch Type | | | |
| | (a) Mullet | 75 lbs | 200 lbs | 450 lbs |
| | (b) Flounder | 100 lbs | N/A | 450 lbs |
| | (c) Trout | 100 lbs | N/A | 250 lbs |
| | (d) Crab | 100 lbs | N/A | N/A |
| | (e) Sheepshead | 75 lbs | N/A | 450 lbs |
| | (f) Drum | 50 lbs | N/A | N/A |
| | (g) Croaker | 100 lbs | 200 lbs | 300 lbs |
| | (h) Catfish | N/A | 320 lbs | 200 lbs |
| | (i) Grouper | N/A | N/A | 300 lbs |
| | (j) Flounder | 100 lbs | N/A | 450 lbs |
| 5. | Consumption % | 100% | 100% | 100% |
| 6. | Diet % | 40% | 45% | 30% |
| 7. | Dependents | 0 | 3 | 5 |
| 8. | Value | $2,898.48 | $4,376.22 | $13,500.18 |

**19.**  ***No Payments to the BP Hotline Informant, Employee A's Mother, or Employee A's Brother.***  The Program has not paid the claims of the BP Hotline Informant, Employee A's mother, or Employee A's brother.

**D**.  **Analysis of Subsistence Claims Filed in the Mobile CAC and in the Mobile Area**

**20.**  ***Program Reporting.***  The Claims Administrator's Office directed BrownGreer to establish and maintain daily, public reports providing details about the operation of the Program, such as the report cited in BP's Renewed Motion for Preliminary Injunction filed on August 5, 2013 ("Motion").  Furthermore, at the inception of the Program, the Claims Administrator's

Office directed us to develop an online portal ("the Portal") through which representatives of Class Counsel and BP, including BP's general counsel, could access information about the Program. This Portal provides 23 reports to the Parties, the majority of which are updated daily.

21. **Weekly Data Feed.** In addition to the reports posted publically and those made available to BP through its Portal, members of my staff provide the Parties a weekly data feed with additional details, including information about the origin of all claims in the Review System. Each week, members of my staff participate in telephone conferences with representatives from BP to explain the data retained by the Program and answer any questions from the BP analysts charged with evaluating that data.

22. **Reports on Activity in Claimant Assistance Centers.** On June 14, 2012, the Program posted the first daily report showing statistics of claims filed at each CAC. That report showed that 16% of all claims filed through a CAC came from the Mobile CAC. At the time, fewer than two weeks after the start of the Program, this represented the second highest volume of claims submitted at any of the CACs. Since October 2012, BrownGreer has provided reports to BP through its Portal and the weekly data feed displaying the number of claims filed in each CAC location, the type of claim filed, and the number of claimants visiting each CAC on a daily and weekly basis. These reports have consistently identified the Mobile CAC as one of the busiest CACs in terms of both visitors and claims filed since the beginning of the Program in June 2012. Further, since January 2013, these reports have reflected an increase in the volume of traffic at the Mobile CAC, as well as an increase in the number of Subsistence claims submitted across the Mobile region.

23. **Activity in the Mobile Claimant Assistance Center.** The Mobile CAC experiences a higher volume of visitors than all other CACs. As of August 21, 2013, the Mobile CAC has had 19,361 visitors. The Mobile CAC has been the most visited CAC since the first week of the Program when 668 visitors went to the CAC, the most of any CAC during that week. The Mobile CAC has been the most visited for 46 out of the 64 weeks during the Program. Since November 19, 2012, the Mobile CAC has been the most visited CAC 39 out of 40 weeks. BP has had access to this information both through the reports referenced above and the weekly data feed.

24. **Filings in the Mobile Claimant Assistance Center.** Claimants have submitted 7,478 claims from the Mobile CAC, of which 4,462 are Subsistence claims. Additionally, claimants have filed approximately 1,667 IEL claims, 656 BEL claims, 610 Real Property claims, and fewer than 100 Seafood, VoO, and Vessel Physical Damage claims at the Mobile CAC. While the Mobile CAC has received the highest number of Subsistence claims of any CAC, the filing of other claim types in the Mobile CAC is consistent with that of other CACs.

25. **Filings of Subsistence Claims.** Of the 26,223 total Subsistence claims filed with the Program so far, 19,379 have been filed online or by hard copy mail and not in any CAC. This means that 17% of all Subsistence claims (4,462 out of 26,223) were filed in the Mobile CAC and 83% were not. A total of 7,309 claims, or 28% of all Subsistence claims, originated from the Mobile area, of which 4,462 were filed in the Mobile CAC. The other 2,847 claims were submitted online or by mail from claimants listing Mobile, Alabama, as the city of

residence of their Claim Form.  The prevalence of Subsistence claims from Mobile residents has caused the Mobile CAC to have the highest number of Subsistence claims filed in a CAC.

26.     ***Increase in Subsistence Filings in Mobile.***  In January 2013, BrownGreer identified an increase in claims filed at the Mobile CAC and an increase in the number of claims submitted by Mobile residents generally.  The majority of the claims submitted during this time were Subsistence claims.  Employees at the Mobile CAC were the first to recognize the increase in Subsistence claim filings from Mobile and immediately brought that information to the attention of the CAC management staff and the SIT.  Immediately following the spike in Subsistence claim filing and continuing until today, the Program has taken steps to identify potentially fraudulent claims related to that spike.  Attached to this Declaration as Exhibits C and D are an overview of the analysis of Subsistence claims in the Mobile area and the SIT's fraud detection and prevention procedures.

27.     ***Claims Preparation Firms.***  The Program's claim filing statistics, fraud prevention investigations, and anecdotal evidence provided by claimants visiting CACs indicate that multiple claims preparation firms solicited claimants in the Mobile area.  Statistical evidence indicates that these claims preparation firms encouraged claimants in Mobile to file Subsistence claims.  Attached to this Declaration as Exhibit E is a graph that shows a spike in Subsistence claim filings shortly after the Program first learned about the involvement of these firms.  Collectively, these claims preparation firms have generated more than 2,079 Subsistence claims from the Mobile area, accounting for approximately 28% of all Subsistence claims from the Mobile area.  Multiple claimants visiting the Mobile CAC have informed our staff that these claims preparation firms prompted them to file Subsistence claims in the Mobile CAC, online, or by mail, even if they declined to register with a claims preparation firm.  The 2,079 Subsistence claims from the Mobile area have been placed on hold while the SIT continues its investigations.

28.     ***Referral of Subsistence Claims from Mobile to the Special Investigations Team.***  Over the course of the Program, we have referred a higher number of Subsistence claims from the Mobile CAC and the overall Mobile area to the SIT than any other CAC.  We have referred for SIT review 46% of Subsistence claims filed at the Mobile CAC and 83% of claims filed by Mobile residents online or by mail.  In comparison, we have referred for SIT review 14% of Subsistence claims filed elsewhere.

29.     ***Attorney Representation.***  Law firms represent 67% of all Subsistence claims filed by claimants outside of Mobile.  However, attorneys represent only 6% of claims submitted by Mobile residents.

30.     ***BP and GCCF Claims from Mobile.***  Though not all were Subsistence claims, BP received and paid hundreds of claims from Mobile residents in the months before the Gulf Coast Claims Facility ("GCCF") was operational.  After the opening of the GCCF, Mobile residents continued to file and receive payment on thousands of Emergency Advanced Payment, Interim Payment, and Final Payment claims.

31.     ***Fishing License Requirement.***  Section C.5 of the Subsistence Framework in Exhibit 9 to the Settlement Agreement requires that Subsistence claimants submit a copy of their

fishing license but then states that, "Deckhands or others that are not required to possess a fishing license are excused from this requirement."

32.     ***Cedar Point Pier.***  The Cedar Point Pier, a major recreational fishing area in Mobile, does not require persons fishing there to have a fishing license.  Subsistence claimants who indicate in their Claim Form or supporting documents that they fish at the Cedar Point Pier are exempt from the fishing license requirement described in Paragraph 31.  This document exemption is known to the public.  Claimants who filed at the Mobile CAC more commonly referenced the Cedar Point Pier in their submissions than claimants who filed in any other CAC.  Claimants qualifying for this exemption are more likely to be payable.  Therefore, the data suggests that Subsistence claims filed in the Mobile CAC have a higher payment percentage than those filed in other CACs because of the presence of the Cedar Point Pier in Mobile.

33.     ***GCCF Releases from Claimants Filing Subsistence Claims at the Mobile CAC.***  To date, the Program has issued Notices for 1,673 Subsistence claims that were filed in the Mobile CAC, of which 26 (2%) were denied because the claimant had signed a GCCF Release.  The Program has issued Notices to an average of 52 Subsistence claims filed in other CACs and denied an average of 10, or 19%, of those claims because the claimant signed a GCCF Release.  Thus, a lower percentage of claimants who filed a Subsistence claim at the Mobile CAC have been excluded from participation in the Program because of a signed release, as compared to claimants who have filed at other CACs.  In its Motion, specifically the accompanying Declaration of Hal Sider, BP includes excluded claims in its calculation of payable claims rates at Mobile and other CACs.  The Program does not complete a substantive review of claims excluded from the Program and thus makes no decision on the merits of the claim to determine whether it is payable or not.  After confirming that the claimant is excluded, the Program issues a Denial Notice without further review.  Therefore, it is not appropriate to include such claims when comparing the payable rate between Mobile and other CACs because the other CACs have a significantly higher number of claimants who signed GCCF Releases and are excluded from this Program than do claimants filing at the Mobile CAC.  Including these numbers artificially increases the gap between the payable rates by increasing the population of non-Mobile CAC claims that, by definition, can never be found payable.

34.     ***Incomplete Claim Cure Rate.***  Of the Subsistence claims filed in the Mobile CAC, 63% are incomplete.  Of Subsistence claims filed in other CACs, 75% are incomplete.  Of the claims filed in the Mobile CAC that were initially determined to be incomplete for the license requirement, more claimants have cured this incompleteness reason by qualifying for an exemption than by satisfying the license requirement.  The data suggest that the exemption from the fishing license requirement for Cedar Point Pier in Mobile contributes to Subsistence claims filed in the Mobile CAC having a higher incompleteness cure rate (32%) than those filed in other CACs (17%).  In its Motion, BP does not include incomplete claims in its calculation of payable claims rates.  By not including these claims, BP lowers the base population of claims and thus increases the payable rate.

35.     ***Outcomes of Subsistence Claims Filed in the Mobile CAC.***  Though BP calculates a payable claims rate at the Mobile CAC of 86%, this figure excludes claims with incomplete outcomes and includes claims from claimants who are not eligible to participate in

the Program because of a signed GCCF Release. Considering these factors, of the Subsistence claims submitted in the Mobile CAC, 32% are payable, 3% have been denied, 63% are incomplete, and 2% have been withdrawn or closed. BP compares the Mobile CAC payable claims rate to the payable claims rate at all other CACs, which it calculates as 27%. These figures do not consider the 19,379 claims filed online or through the mail. Among all Subsistence claims filed, regardless of origin, 23% are payable, 3% have been denied, 69% are incomplete, and 4% have been withdrawn or closed. Payable claims are claims receiving an Eligibility Notice with an award offer greater than $0. Denied claims are claims that fail to meet the eligibility requirements set forth in the Settlement Agreement for Subsistence claims and claims that fail to provide the required documentation after a minimum of two Incompleteness Notices. Denied claims in these statistics do not count claimants excluded from the Program. Incomplete claims are claims that fail to provide the required documentation, but have not yet exhausted all opportunities to respond with additional documents.

36. ***Claim Approval Process.*** The Mobile CAC does not approve Subsistence claims for payment. No Subsistence claim is finally approved for payment by anyone in the Mobile CAC. Of the 527 Subsistence claims with Eligibility Notices thus far that were filed in the Mobile CAC, 159 (30%) were evaluated by an Initial or QA reviewer in the Mobile CAC. However, before generating any Notice on these claims, a team of evaluators – none of whom is in Mobile – checked all the claims and approved issuance of the Eligibility Notices.

## E. **Description of the Program's Internal Controls**

37. ***BP's Assertions About Lack of Program Controls.*** Having read its Motion, I am familiar with BP's contention that, "There is a systemic failure by the CSSP to supervise and monitor personnel to prevent misconduct." From the outset of our work on the Program, BrownGreer has implemented a wide range of meaningful internal controls, each of which is carefully designed to protect the integrity of the Program. BrownGreer is continually calibrating existing controls to maximize their effectiveness while evaluating whether to implement new measures. Consequently, our internal controls evolve over time as we add metrics in response to new developments and deactivate measures that we have determined are no longer necessary.

38. ***BrownGreer Employment.*** BrownGreer has expansive protocols in place to ensure that candidates for hire are qualified to work for the Claims Administrator, do not have a current claim in the Program, and do not have other conflicts that would disqualify them from employment with the Claims Administrator.

39. ***Hiring Criteria.*** Each candidate for employment with BrownGreer must fill out an application and background questionnaire. Candidates for employment as claims reviewers, managers of claims reviewers, or assistants in the CACs must meet certain established professional and educational criteria to be eligible for hire.

40. ***Employee Background Checks***. BrownGreer conducts background checks on candidates for employment through LexisNexis to detect federal and state felony and misdemeanor convictions, education, former employment, present employment, and to verify Social Security Number information provided by candidates. BrownGreer does not hire anyone

who has been convicted of a misdemeanor or felony in the past seven years or who provides false information on an application to work for BrownGreer.

**41.** ***Required Family Disclosures.*** Since July 2012, the Claims Administrator's Office has required that vendor employees working on the Program disclose if they have a parent, spouse, or child who has a claim with the Program. Consequently, BrownGreer asked our employees and contractors to provide the name, alias, and address information for each individual that BrownGreer defines as an immediate family member. Beginning on July 20, 2013, BrownGreer also asks about any other individual that cohabitates with the employee or contractor, such as another relative, a fiancé, a boyfriend, or a girlfriend. BrownGreer does not hire anyone who discloses that he or she has a claim in the Program or that a parent, spouse, or child has a claim in the Program. BrownGreer discloses to the Claims Administrator's Office all possible conflicts of interest that we identify and takes administrative action as necessary.

**42.** ***Required Business Disclosures.*** Beginning on July 20, 2013, BrownGreer also requested that our employees and contractors provide information about any business in which that worker has a financial interest or is an owner or part owner of as well as information about any business partners or co-owners that the worker has in such business. We use this information to perform additional searches of the Review System to locate any claims that may pose a potential conflict of interest for an employee or contractor. BrownGreer discloses to the Claims Administrator's Office all possible conflicts of interest that we identify and takes administrative action as necessary.

**43.** ***New Hire Orientation.*** BrownGreer conducts a new hire orientation for every new worker. Our new hire orientation includes an explanation of the confidential nature of claimant information, the Program's Code of Conduct Policy, ethics and honesty, and the requirement to be free of all actual or apparent conflicts of interest. BrownGreer explains that the worker cannot have or file a claim in the Program and that employees must disclose any claim activity by a business partner, a close personal friend, a cohabitating individual, or members of their immediate family. BrownGreer conducts this training before employees or contractors are given access to the Review System.

**44.** ***BrownGreer Employee Handbook.*** All BrownGreer employees or contractors working on the Program receive and are required to read and agree to the BrownGreer Employee Handbook. The Employee Handbook covers Conflicts of Interest, Confidentiality, and Professional Conduct. All new hires also complete these additional Compliance Documents:

(a) **BrownGreer Confidentiality Agreement:** All workers must complete a Confidentiality Agreement with BrownGreer acknowledging that they must maintain the confidentiality of all information related to their work at BrownGreer during their employment and after they leave BrownGreer.

(b) **Declaration for DWH Settlement Program:** All workers must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.

11

(c) **DWH Order Regarding Confidentiality:**   All workers must review the Confidentiality Order issued by the Court for the protection of Claims Information submitted to the Program and must execute a Certification indicating that they have read and agree to abide by the terms of the Order.

(d) **DHECC Security Policy Quick Reference:**  This document provides a summary of the full security policies implemented by the Claims Administrator for the protection of Program data.

(e) **DHECC Data Protection Plan:**  This is the Claims Administrator's Policy on how to identify and protect personal data.

(f) **Policy on Property and Information Use:**   This outlines the acceptable use of BrownGreer property and information.

45.     ***Employee Training and BrownGreer Culture Building.***  Before any employee or contractor begins work on any project at BrownGreer, we conduct extensive training on (a) BrownGreer; (b) our expectations regarding performance, behavior, and confidentiality; and (c) the specific tasks the worker will perform.  We cultivate in each worker a sense of pride in our organization and the work we do.  We find that this introduction into our firm culture promotes greater loyalty and adherence to standards of ethics and honesty required to work at our firm.

46.     ***Settlement Code of Conduct Training.***  Before any employee or contractor begins work on the Program, we conduct extensive training on the Program and on expectations regarding the Program's Code of Conduct and conflicts of interest.  All BrownGreer workers assigned to the Program must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.

47.     ***Fraud Training.***  All BrownGreer reviewers working on the Program receive training on the Program's fraud processes and how to contact the SIT to report fraud.  Every BrownGreer reviewer has the ability to identify a claim as potentially fraudulent, which automatically triggers a review of the claim by the SIT.  BrownGreer also provides workers with email addresses for the SIT to report instances of potential fraud and directs employees to contact their supervisors or BrownGreer Human Resources to report instances of potential fraud.  In addition, BrownGreer provides training specific to fraudulent claims to employees in CACs.

48.     ***BrownGreer Employee Declarations.***  BrownGreer requires all workers to affirm in a Declaration that they are unaware of any conflicts and imposes on the declarant an on-going duty to notify the declarant's supervisor(s) if the declarant becomes aware of a conflict.  To keep the Declaration current with Program standards, BrownGreer periodically revises the Declaration and requires every BrownGreer employee or Program contractor to sign the revised version of the Declaration.  BrownGreer has revised the Declaration four times:

(a) ***April 19, 2012, Declaration.***   BrownGreer posted the initial version of the Declaration on its internal data collection site and instructed all employees and contractors on April 19, 2012, to sign this Declaration.  This version asked (1) if a

declarant or declarant's "spouse and/or child" ever worked for BP; (2) if applicable, for their date of separation from BP; and (3) if applicable, for a description of the nature of their employment with BP.

(b) *June 8, 2012, Declaration*.  BrownGreer posted the First Revised Declaration on its internal data collection site and required employees in the New Orleans office to read and sign it.  BrownGreer instructed employees and contractors on June 8, 2012, to sign this Declaration.  This version asked the declarant "are you a spouse or child of a person or have a child who has filed a claim" and required the declarant to agree to immediately notify their supervisor if a parent, spouse, or child files a claim with the Program.

(c) *July 13, 2012, Declaration*.  BrownGreer posted the Second Revised Declaration on its internal data collection site and required all employees to read and sign it, including those who had signed the First Revised Declaration.  BrownGreer instructed employees on July 13, 2012, to sign this Declaration.  This version asked the declarant if a "parent, spouse, or child" filed a DWH claim and continued to require the declarant to agree to notify immediately their supervisor if a parent, spouse, or child files a claim with the Program.

(d) *June 24, 2013, Declaration.*  BrownGreer posted the Revised Declaration for DWH Settlement Program on its internal data collection site and required all employees to read and sign it to comply with the provisions of the Program's Code of Conduct Policy.  This version required all employees and contractors to affirm that neither they nor any immediate family members have submitted any claim to the Program or taken other actions that would create a conflict of interest.  BrownGreer instructed employees and contractors on June 24, 2013, to sign this Declaration.

49.  ***Declaration Renewal.***  Periodically during the course of the Program, BrownGreer requires employees and contractors to renew their Declarations confirming that they do not have a conflict of interest by reading and signing a new Declaration and disclosing any events that have changed since the prior Declaration by the worker.  BrownGreer also conducts frequent refresher trainings to reinforce the messages delivered during initial training.

50.  ***Supervisor Responsibility.***  BrownGreer managers and supervisors, including CAC managers, observe their teams daily and watch for any unusual conversations, behavior, or associations with visitors.  The Quality Assurance Team ("QA Team") produces weekly reports by claim type, which provide reviewer performance statistics.  These statistics include the rates of errors, changes in claim results, and percentage of claims found payable by each reviewer.  The QA Team sends these reports to supervisors, who analyze them for outliers in performance statistics and take remedial action when they detect an issue with reviewer performance.

51.  ***CAC Oversight.***  BrownGreer managers make frequent visits to the CACs, both announced and unannounced.  These are led by members of the BrownGreer Gulf Oversight Team, CAC Executive Team, Human Resources, Facilities, and Training Team.  The CACs also

undergo periodic IT audits from the Claims Administrator's Office. During the visits, members of the Gulf Oversight Team and CAC Executive Team ensure compliance with all BrownGreer and Program policies, and talk with managers and staff to gather any comments or concerns they have, which would include any concerns about internal fraud. All potential concerns identified during these visits receive immediate corrective attention.

52.     ***CAC IT Security Audits.***   Representatives from the Claims Administrator's Office visit the CACs to conduct IT Security Audits. These audits include inquiries to managers and staff about common practices, including the use of IT assets. The audits check for removable media, personal devices connected to the network, and visibility of computer monitors from outside-secured areas. The auditors also check to ensure that all automated IT security protocols are operational. From June 4, 2012, through August 8, 2013, the Claims Administrator's Office performed 37 IT Security Audits.

53.     ***Passwords, User Roles, and Review System Security.***   No individual can access the Review System unless that person is an authorized user with an approved user name and password. That password is issued only to that specific user. Separate from inherent tasks such as logging in, logging out, and changing passwords, we assign every user a defined role in the Review System tailored to permit that person to perform only the job assigned to the person and no other task. The user role defines the capabilities and functions that an individual user can perform or access within the Review System. To access a feature or function, an individual user must be assigned the specific governing role. For example, it is impossible for a reviewer assigned solely to the role of Initial Review to perform a Quality Assurance review. Currently, there are 151 roles in the Review System.

In addition to passwords and user roles, we also employ system security procedures. The Review System uses algorithms to restrict further access. For example, a reviewer who performs an Initial Review cannot perform the QA review on the same claim. Following the claim evaluation, we employ a detailed Notice QA process before we issue any Eligibility Notice. On Subsistence claims, an experienced reviewer or supervisor evaluates the substance of every payable determination for accuracy before we issue the Eligibility Notice. None of the individuals who perform this function works in the Mobile CAC. Therefore, it is not possible for anyone in the Mobile CAC to approve a payable notice.

54.     ***Portal Log-In Requirements.***   BrownGreer has a DWH Access Team that oversees the creation of user accounts and removal of system access for the areas of the Review System for which BrownGreer is responsible. BrownGreer has established system protocols that monitor Portal user activity to assure that the user accounts are being actively used. Each day, a system query checks user accounts for recent activity, and disables a user account if the user did not successfully log in to the account within the last 14 days.

55.     ***Portal Time-Out.***   If a user does not actively use the Portal for four hours, the system generates a message informing the user that the session will time out because of inactivity. If the user does not request to continue using the Portal within five minutes, the Portal session ends. The user is then required to log in to the Portal again to start a new session.

**56.     *Pop-Up Warning and Agreement to Start Each Session*.**  Each time a worker logs on to the BrownGreer network, he receives the following warning:

By using this computer:

• I acknowledge my duty to preserve the confidentiality of all claims-related information, to use the information solely for the purpose for which I have access to it, and to disclose the information only to those persons necessary to assist with the performance of my authorized purpose.

• I will comply with BrownGreer's Policy on Computer Use and Internet Access and represent that I will use the computer only for acceptable uses and that I will not engage in unauthorized uses such as connecting non-BrownGreer devices to the computer, listening to or viewing personal CD and DVDs, accessing any personal email accounts, engaging any illegal activities under state or Federal law or reproducing any confidential claims-related information for conveyance outside of BrownGreer.

**57.     *Portal User Audits*.**  The BrownGreer DWH Access Team, in coordination with each team and the Claims Administrator's Office, performs periodic audits of all user access.

**58.     *IP Address Security*.**  On June 28, 2012, we implemented a process to limit access to the Review System only from pre-approved IP addresses.  Certain users are permitted to access the Review System from any computer, but access is limited.  As a result, most users cannot access the Review System to view or manipulate claims data from unapproved locations.  At all times during the Subsistence review process, BrownGreer Subsistence reviewers could access the Review System only from pre-approved IP addresses.

**59.     *Workstation Security*.**  The workstations used by all BrownGreer workers automatically lock after 15 minutes of inactivity.  Workers may unlock the station only by using a valid username and password.

**60.     *Internet Security*.**  BrownGreer blocks worker access to various external internet sites.  Exceptions to this rule are evaluated and reviewed by IT and by CAC management, if required.  Examples of these exceptions include sites containing public records, court sites, government sites, and Google Maps (for researching location/address information), all of which we use in the processing of claims.

**61.     *Hardware Security*.**  BrownGreer has disabled the functioning of the USB ports on each workstation, which prevents workers from placing information found in the Portal on a removable drive.  This restriction applies to all BrownGreer workstations in the New Orleans office, all CACs, and the Paragon Place office in Richmond, Virginia.

**62.     *Multiple Reviewer Requirement*.**  The Review System prevents a QA reviewer from reviewing a claim that he or she previously reviewed in Initial Review.  This ensures that a different person reviews any claim flagged for QA.

63.     **Results Search Access.**  Results Search is a function that allows users to view only the status of a claim and its associated documents.  Users cannot perform system reviews, modify claimant profiles, or submit determinations into the Review System through Results Search.  On August 12, 2013, BrownGreer removed access to the Results Search function from reviewers who do not use the Results Search function to perform their primary job duties.  Reviewers who do not have access to the Results Search function are unable to look up claims in the system.

64.     **Results Search Monitoring.**  On July 23, 2013, BrownGreer began analyzing data from Portal Users with higher than normal Results Search usage.  We identified workers with outlier claimant searches, evaluated the data associated with those claimant searches, and completed interviews with these workers to understand the circumstances that led to these searches.  If, after reviewing the results of our ongoing internal investigation, we determine that a BrownGreer worker was conducting claimant searches for reasons outside the scope of a project assignment, we will take appropriate disciplinary action.

65.     **Claim Review Access.**  Since August 5, 2013, BrownGreer reviewers have been unable to pull and review claims on demand from the Initial and QA queues.  Instead, the system selects the next available claim when prompted to do so by the Initial Reviewer, who has no knowledge of the claims in line for review.  Only a small group of supervisors may assign a claim to a reviewer outside that assigned queue order, and, in doing so, the supervisor places the claim directly into the reviewer's personal queue.  Consequently, no reviewer can simply pick a particular claim for review.

66.     **Safeguarding Hard Copy Materials.**  BrownGreer provides reviewers with personal notebooks for keeping notes from trainings and as they perform reviews.  Reviewers are prohibited from removing notebooks from the premises and are instructed to keep the notebook secure while in the office.  Notebooks are collected for retention/shredding after they are no longer in use.

67.     **BrownGreer Employee SSN Audits.**  Starting in July 2012, BrownGreer began checking the Social Security Numbers of our employees and contractors against the Social Security Numbers associated with DWH claims to ensure that no BrownGreer worker has filed a claim of his or her own.  Beginning on July 22, 2013, BrownGreer changed the frequency of this check so that it is performed on a daily basis.

68.     **Quality Assurance Metrics.**  Each day, BrownGreer runs a total of 264 automated data metrics and analytic processes to detect anomalies in claims with all types of results.

69.     **Payment and Notice Review.**  Each day, BrownGreer identifies all claims or claimants that are ready for a Notice or payment.  BrownGreer reviews each payable Notice and potential payment before issuance to confirm that the Notice or payment is appropriate and correct.  This payable Notice review confirms that there is no evidence of fraud related to the claims that will receive a Notice.  Additionally, before payment, we verify the claimant's identity and reaffirm that there is no evidence of fraud related to the claim that will be paid.

70. **_BrownGreer E-Hotline_.** Beginning on July 24, 2012, BrownGreer implemented an e-Hotline for use by workers in the New Orleans office and in the CACs to alert us of situations that are a potential cause for concern. BrownGreer has also asked workers to reach out to our Human Resources department to report any concerns that a worker may have, including instances where a worker suspects a co-worker of misconduct.

71. **_Call Center Comment Line_.** On March 15, 2013, BrownGreer implemented a Call Center Comment Line for use by claimants or other individuals to report concerns about their experiences with the Program. Callers may supply these comments anonymously if they wish to do so. Since establishing this hotline, BrownGreer has not received any calls reporting potential fraud or suspicious behavior.

72. **_Special Investigations Team._** In addition to the internal controls over our workers' actions, the Program also maintains the Special Investigations Team, described above, that works closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice. Exhibit D to this Declaration contains details about this team.

73. **_Additional Protections._** BrownGreer continually evaluates the need for additional internal controls. For example, BrownGreer is implementing a system control in which reviewers at the CACs are not permitted to evaluate a claim that was filed in person at any CAC. We continually assess the installation of new protections and the effectiveness of current procedures. We will continue to enact new measures whenever necessary over the remainder of the Program.

I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 26th day of August, 2013.

_____
Orran L. Brown

17

---

**DEEPWATER HORIZON ECONOMIC SETTLEMENT PROGRAM CLAIMS REVIEW PROCESS**

---

     **1.**    *Claim Intake.*    The Deepwater Horizon Economic and Property Damages Settlement Program ("Program") has developed the Claim Intake process to address the needs of both *Pro Se* and represented claimants. To assist in the submission and tracking of claims, the Program has developed these processes:

    (a) Submitting a Claim. The Program allows *Pro Se* claimants to submit claims in one of two ways. First, claimants may submit claims by filling out a hardcopy Claim Form. Claimants can mail, fax, or email these Claim Forms to the Program. The Garden City Group processes these hardcopy claim forms and enters the claims in the Program's Review System. Additionally, claimants may submit claims through a secure online portal. Claimants can submit claims using the portal on their own or they may visit a Claimant Assistance Center ("CAC") to receive assistance from a CAC representative in submitting a claim.

    (b) Portals. The Program created secure web-based portals to allow claimants and attorneys to submit, access, and edit information needed to process claims for the Program. The portals allow claimants and attorneys the ability to exchange information with the Program instantly and provide one central location to track deadlines, review notices and view claim statuses.

     **2.**    *Pre-Review Processes.*    The Program performs several pre-review processes before a claim enters the substantive review process.

    (a) Exclusions. The Program conducts reviews of claims and claimants to determine if they should be excluded under the Settlement Agreement.

       (1) GCCF Release Review. The Program reviews claimants to confirm that claimants who are filing for claims other than Vessels of Opportunity ("VoO") or Vessel Physical Damage claims have not submitted a Gulf Coast Claims Facility ("GCCF") Release. Approximately 80% of the Exclusion Denials are GCCF Release Exclusions.

       (2) Self-Reported Exclusions on the Registration Form Review. The Program reviews claimants' Registration Forms to determine whether or not the claimants accurately self-reported Exclusions.

       (3) Exclusions based on Substantive Business Activity. The Program identifies Exclusions based on an Entity's NAICS Code or Substantive Business Activity through the Employer/Entity Verification Review ("EVR") Process described below.

**EXHIBIT II(A)**

(4) The Program reviews for all Exclusions listed in Sections 2 and 3 of the Settlement Agreement.

(b) Opt-Outs. An individual or business representative who submitted a personally signed letter, postmarked by November 1, 2012, stating that he/she/it chooses not to be a part of the Program has opted out of the Program. Such Opt-Out claimants cannot submit claims in the Program. The Program reviews all claimants to determine if the claimant opted out of the Program.

Opt-Out claimants could revoke the decision to opt out prior to December 15, 2012. Any revocations postmarked later than December 15, 2012, must receive permission from BP or the court for the revocation to be granted. The Program reviews all attempts to revoke an Opt-Out, if the revocation requests are postmarked before the deadline. The Program presents revocation requests submitted after the deadline to BP or the court for consideration.

(c) Moratoria Review. The Program analyzes each Entity that the EVR Team determines to have an Exhibit 19 NAICS code and determines whether the Entity fits the Exhibit 16 criteria requiring further scrutiny for potential Moratoria Losses. Moratoria Losses are any losses whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity – including shallow water and deepwater activity – that occurred after May, 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010, and July 12, 2010, and new or revised safety rules, regulations, inspections or permitting practices. Economic Loss Claims arising out of Entities that meet these criteria are automatically routed to Moratoria Losses Review. Economic Loss Claims arising out of Entities that do not meet these criteria generally proceed under normal processing pursuant to the Business Economic Loss ("BEL") Frameworks and the Individual Economic Loss ("IEL") Framework, without further analysis for Moratoria Losses. However, if the Program identifies indicia of potential Moratoria Losses, it will review the claim and related Entity and refer it to the Claims Administrator for approval before continuing to process the claim. The Claims Administrator analyzes these claims on a case-by-case basis, examining the particular circumstances of the Entity, to determine whether the claim requires further review for Moratoria Losses or should continue normal processing under the BEL Frameworks or IEL Framework. Because the Moratoria Losses Review framework has not been finalized, the Program is not currently reviewing claims identified as requiring Moratoria Losses Review. The Claims Administrator has met with BP and Class Counsel on numerous occasions to discuss the implementation of the Moratoria Losses exclusion and has requested that the Parties furnish the agreed-upon guidance and parameters that the Claims Administrator is to apply. While the Claims Administrator has received submissions from both BP and Class Counsel setting out their respective provisions, there is no agreement between the Parties on any of the essential aspects the Moratoria Losses exclusion.

(d) Identity Verification.  The Program conducts searches based on the claimant's Social Security Number ("SSN"), Individual Taxpayer Identification Number ("ITIN") or Employer Identification Number ("EIN") to ensure the legitimacy of the claim being submitted and to confirm that the SSN/ITIN/EIN belongs to the corresponding claimant.  This protects against payment of claims that are fraudulent and that may involve identity theft.  The Program verifies these taxpayer identification numbers using one or more of the following services:  LexisNexis, the Social Security Administration's Consent Based Social Security Verification process, Dun & Bradstreet, Accurint.com, or Florida Sunbiz.  If the Program cannot verify the taxpayer identification number through its research, it will issue an Identity Verification Notice requesting additional documentation from the claimant.

(e) Overlapping/Duplicate Claimants.  The Program performs this review to prevent claimants from filing with the Program more than once and to link Program claimants properly to GCCF claimants.  It is essential that the Program link claimants properly so that it can accurately: (1) offset prior GCCF payments; (2) identify claimants who signed a Release in the GCCF program; and (3) transfer documentation to the Program's Review System.

(f) Signature Review Process.  The Signature Review process addresses the need of the Program to ensure that the Registration Form, Claim Form(s) and Challenge Form(s) have valid signatures.  If the claimant is represented by an attorney, the claimant may sign the Form(s) personally or the attorney can sign the Form(s) for the claimant if there is a Power of Attorney agreement signed by the claimant that provides the attorney the ability to represent the claimant in the Program.  If the claimant is *Pro Se*, the Program requires that the Form(s) be signed personally unless the claimant is deceased, minor or incompetent.  If the claimant is deceased, minor or incompetent, the Program requires the signature of an authorized personal representative of the claimant.

(g) EVR.  For BEL, IEL, and Seafood Crew claims, the EVR process ensures that each Employer/Entity and its employees are treated uniformly for purposes of all designations that will affect the eligibility and value of a claim.  To accomplish this uniformity, the Program identifies each unique Employer/Entity associated with or making any claim and assigns attributes to the unique Employer/Entity that have a substantive effect on the outcome of claims.  The characteristics assigned to each unique Employer/Entity are:  NAICS Codes, Industry classification, and Eligibility Zones.  These attributes, when associated with a particular claim, determine exclusions based on the Employer/Entity's substantive business activities, documentation requirements, causation requirements and Risk Transfer Premiums ("RTP").

   **3.** **Document Categorization.**  This is the first step in the substantive claims review process.  During this part of the review, the Program identifies the type and location of each page of documentation in the claimant's file.  This step is the foundation for the rest of the claims review process because the Program will perform Data Capture of certain financial and

causation-related data based on the Document Types identified during this process. During this part of the review, the reviewer will identify all relevant financial documents from which data will need to be entered into the system for use in calculating the value of the Economic Loss claim.

**4.** ***Data Capture.*** The Program recognizes four categories of "Economic Loss" claims: (1) Business Economic Loss (including Failed Business Economic Loss and Start-Up Business Economic Loss); (2) Individual Economic Loss; (3) Seafood Compensation Program; and (4) Individual Periodic Vendor. Data Capture is the building block for the Economic Loss claims review. The Program performs Data Capture on financial documents and on certain other documents, such as Sworn Written Statements. The Program then uses the data to perform both causation analysis and compensation calculations for Economic Loss claims.

(a) For IEL claims, the most common documents entered during the Data Capture process are paychecks or payroll records. As part of Data Capture, the Program captures several data points from these records, including Start and End Dates, Gross Earnings, and Year-to-Date Earnings. Once this data is collected, the Program uses it to compare Benchmark and Compensation Period earnings.

(b) For BEL claims, the most common documents entered during the Data Capture process are profit and loss statements. As part of Data Capture, the Program captures several data points from these records, including Start and End Dates, Total Revenue, the presence of expenses and any one-time revenue that must be excluded from the claimant's monthly revenue. Once this data is corrected, the Program uses it to perform both the causation and compensation analysis.

(c) For Seafood Compensation Program ("SCP") claims, the three most common documents entered during the Data Capture process are trip tickets, vessel registration forms, and commercial fishing licenses. As part of Data Capture, the Program records several data points from these documents. For trip tickets, this includes the date of the trip ticket, the vessel listed on the trip ticket, the gross revenue associated with each catch type, and the landing location where the trip ticket was issued. For vessel registration forms, the Program captures the registration type, Federal or State, the vessel registration number, vessel owner, and the expiration date of the registration. For commercial fishing licenses, the Program captures the name of the license holder, the license expiration date, the issuing state, and the catch type covered by the license.

**5.** ***Economic Loss Claims Review.*** After the Document Categorization and Data Capture[1] steps, the Economic Loss Claim Types have similar review steps:

(a) Claim Identification. Each Economic Loss Claim Type requires the identification of the claim that the claimant is asserting.

---

[1] The Program does not perform Data Capture on IPV/FV claims.

    (1) BEL.  The Program must identify the Facility that represents the physical location of the business entity for which the claimant is asserting a claim.

    (2) IEL.  The Program must identify the job or jobs for which the IEL claimant is claiming losses as a result of the Spill.

    (3) SCP.  The Program must identify the claimant's specific employer(s) or vessel(s) associated with a particular claim. The Program records any applicable partial ownership interest in vessels, Oyster Leaseholds, or Individual Fishing Quotas ("IFQs") to allocate offers between multiple owners, if any, during the compensation calculations.

    (4) Individual Periodic Vendor or Festival Vendor ("IPV/FV").  The Program must identify the sales item(s) and location(s) for which the claimant is claiming losses as a result of the Spill.

(b) Document Requirements:

    (1) BEL.  The Program must confirm that a BEL claimant has submitted financial records, documents demonstrating ownership and business structure and documents proving the effect of the Spill on the claimant's business.  The Program may require additional documentation if the claimant is submitting a Multi-Facility, Failed or Start-Up BEL claim.

    (2) IEL.  The Program must confirm that an IEL claimant has submitted all required supporting documentation for the Program to calculate a claimant's Spill-related losses, such as financial documents, including tax and pay period documents and documents proving causation if the claimant does not have the benefit of a causation presumption or an Eligible Employer.  If a claimant is claiming additional losses for Reimbursable Job Search Costs, Reimbursable Training Costs, One Time Non-Recurring Losses, or Employer-Related Benefits Losses, the Program must determine if the claimant provided additional documentation to demonstrate the cause and the amount of those losses.

    (3) SCP.  Each claim type in the SCP has unique documentation requirements based on the specific compensation plan.  The Program must confirm that that claimant has provided the documents required for its compensation plan, such as licenses, financial records, proof of vessel ownership and proof oyster leaseholds.

    (4) IPV/FV.  The Program must confirm that an IPV/FV claimant has submitted documents sufficient for the Program to determine that the claimant made sales before 4/20/10, required sworn written statements for an IPV and/or FV that provide details on the items sold, the locations or Festivals where the claimant sold the items, and third-party verification of such sales, and total earned income documentation for IPV sales from May – December 2009 and 2010 and/or total earned income made at each eligible Festival in May - December 2009 and

2010.  The Program may require additional documentation if the claimant made sales in Zone C or employed another individual to help make the sales.

(c)  Eligibility/Causation:

    (1)  BEL.  The Program will determine if the claimant has satisfied a causation presumption as outlined in the Settlement Agreement.  If the claimant has not satisfied a causation presumption, the Program performs a causation analysis to determine if the claimant's financial performance satisfies the revenue pattern tests that the Settlement Agreement requires according to the claimant's Zone and Industry Designation.  If the claimant has submitted insufficient documentation to determine if the claim passes causation, the Program will seek additional documents from the claimant such as:  objective Third-Party documentation describing the reason that the claimant's revenue did not recover in 2011, proof of a cancelled contract or reservation and documents showing the addresses of the claimant's customers and dates of the sales to these customers.

    (2)  IEL.  The Settlement Agreement outlines two groups of IEL claimants who do not need to provide documentation to prove that their losses were caused by the Spill (1) Claimants whose employers received final payment in either the GCCF or the Program; and (2) claimants whose employers are presumed to have passed causation based on the requirements of the Settlement Agreement. The Program performs causation analysis on all other IEL claimants to determine if a claimant's losses were caused by the Spill.

    (3)  SCP.  The Program performs the causation analysis outlined in the Settlement Agreement on Seafood Crew Claims.  However, causation is presumed if the claimant satisfies the documentation requirements for each specific Crew Claim Type.  Causation Analysis is not required on any other claim type in the SCP.

    (4)  IPV/FV.  If the claimant made sales in Zones A or B, the Program presumes causation.  If the claimant made sales in Zone C, the Program must determine if the claimant submitted sufficient documents to verify that the claimant made the sales to non-local consumers and that the claimant experienced a 5% decline in sales for three or more months from 2009 to the same months in 2010 or the Festival was cancelled or experienced a loss of attendance.

(d)  Compensation Calculation.

    (1)  BEL.  The Program compares the actual profit of a business during a defined post-Spill period in 2010 to the profit that the business might have expected to earn in the comparable post-Spill period of 2010.  The compensation calculation is divided into two steps.  The Program determines Step 1 Net Compensation by calculating the difference in Variable Profit between the Optimum Step 1 Compensation Period and the Variable Profit over the comparable months of the Optimum Benchmark Period.  The Step 1 Compensation Period must include

three or more consecutive months between May and December 2010. The Program determines by multiplying the claimant's monthly revenues from the Optimum Benchmark Period by the sum of its Claimant-Specific Factor and the General Adjustment Factor to yield Incremental Revenue. The Program then multiplies the Incremental Revenue by a Variable Margin Percentage to determine Step 2 Variable Lost Profit. Total Compensation is calculated by adding Step 1 Compensation and Step 2 Compensation, applying the appropriate RTP based on the claimant's Industry Designation and Economic Loss Zone, and subtracting any applicable payments that it received from BP or the GCCF pursuant to BP's OPA claims process, as well as any VoO Settlement Payment Offset and VoO Earned Income Offset.

(2) IEL. The Program compares the income that the claimant was expected to earn in the Compensation Period to the income that the claimant actually earned during that period. The Program also applies an award multiplier based on the claimant's job industry and geographic location. In addition to the base calculation, the Program allows some IEL claimants to claim certain additional expenses caused by the Spill, such as Reimbursable Job Search Costs, Reimbursable Training Costs, One Time Non-Recurring Losses, or Employer-Related Benefits Losses.

(3) SCP. In the SCP, for Vessel Owner, Vessel Lessee, Boat Captain, and Seafood Crew claims the compensation calculations are based on eligible Benchmark Revenue.[2] The Program determines the Final Claimant Compensation by calculating Benchmark Revenue from data entered during Data Capture, or from Accountant Workbooks, and applying the specific formulas for each SCP claim type fixed by Exhibit 10. The compensation for IFQ claims is based on IFQ share percentages owned as of 4/20/10. Oyster Leaseholder compensation is based on leasehold acreage located in three Oyster Leasehold Compensation Zones.

(4) IPV/FV. The Program calculates compensation for IPV/FV claims by comparing earned income made in 2009 to earned income made in the same months or specific Festivals in 2010. The Total Compensation Amount is equal to that amount or $12,000, whichever is lower, and applying a RTP of one.

**6.    Non- Economic Loss Claims Review.** The Program recognizes four types of Non- Economic Loss claims:

(a) Wetlands Real Property. The Program conducts Wetlands reviews for individuals or businesses that prove ownership of a Parcel located in the Wetlands Real Property Claim Zone at any time between April 20, 2010, and April 18, 2012. The Program confirms the location of the claimed Parcel and determines whether the Parcel is located in the Wetlands Real Property Claim Zone according to the Wetlands Claims

---

[2] Aside from Seafood Crew Claims, the Benchmark Revenue is based on annual income earned during the Benchmark Period. The Benchmark Period, for Vessel Owner, Vessel Lessees and Boat Captains is 2007-2009, 2008-2009, or 2009, with two exceptions. For Oyster claims the Benchmark Period is fixed as 2007-2009 and for Seafood Crew Claims the Benchmark Period is April 20th through December 31st, for each of the Base Years.

Administrator's Database. If a Parcel is not located in the Wetlands Real Property Claim Zone, the claim is sent to the mapping experts to determine if the Parcel should be added to the Wetlands Real Property Claim Zone. If the Parcel is located in the Wetlands Real Property Claim Zone, or is added to the Wetlands Real Property Claim Zone after review by the Program's mapping experts, the Program determines whether the claimant has submitted an official copy of the deed or other documentation proving ownership of the Parcel or an official copy of the 2010 Property Tax Assessment. If there is a complex ownership issue, a Louisiana property attorney reviews the ownership documents and determines the claimant's ownership percentage. After the claimant's ownership has been confirmed, the Program assigns the Parcel a Compensation Amount based on the Parcel's Compensation Category. The Program also evaluates whether the claimant submitted sufficient documentation to recover repair or replacement costs for physical damage to real or personal property located on the Eligible Parcel for damage that occurred as a result of the Spill or Spill Response Clean-Up operations. If the claimant has proven physical damage, the claimant is compensated for reasonable repair or replacement costs in addition to the Parcel's Compensation Amount.

(b) Coastal Real Property. The Program reviews Coastal Real Property Parcels or Deeded Boat Slips ("Parcels") to determine whether a Parcel is in the Coastal Real Property Claim Zone and whether the claimant owned or leased all or part of the Parcel during the Eligibility Period, April 20, 2010, to December 31, 2010. If the Parcel is not in the Claim Zone, the Program sends the claim to the Program's mapping experts to review the deed and real property tax assessment to determine whether to add the Parcel to the Claim Zone. If a Parcel is located in the Claim Zone, or added by the mapping experts, the Program reviews the submitted Deed or Lease Agreement to determine the claimant's period and percentage of ownership or leasehold interest in the Parcel. If all necessary documentation is available for review, the Program confirms the claimant owned or leased the Parcel between April 20, 2010 and December 31, 2010, and the claimant's ownership or leasehold interest during the time period. The Program then values the claim by multiplying the 2010 Appraised Value of the Parcel by 1.18% and then by the Compensation Category percentage (40/45/30/35) of the Compensation Category of the Parcel to determine the Coastal Compensation Amount. The Program then multiples the Coastal Compensation Amount by the RTP and adds the two numbers together to reach the Total Compensation Amount. The Program then evaluates whether the claimant asserted, and is compensable for, physical damage to real or personal property on the Parcel as a result of the *Deepwater Horizon* ("DWH") Spill or Spill Response Clean-Up Operations. If the claimant provided all necessary documentation to prove physical damage, the claimant is compensated for the lesser of the reasonable repair or replacement costs in addition to the Coastal Compensation Amount.

(c) Real Property Sales. The Program conducts Real Property Sales reviews for individuals or businesses who sold an eligible parcel between April 21, 2010, and December 31, 2010. The Program first reviews the parcel's eligibility, to determine if it has a residential classification and is located in the Real Property Sales

Compensation Zone ("Zone").  If the parcel is not classified as residential or located outside the Zone the Program sends the claim to the Program's mapping experts to determine if it should be added to the Zone.  If the parcel is classified as residential and is located in the Compensation Zone, or the mapping experts add it to the Zone, the Program then reviews the supporting documentation to determine if the claim is eligible.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate: (1) that the claimant owned the Parcel as of April 20, 2010; (2) that the claimant sold the Parcel in the time period April 21, 2010, to December 31, 2010; (3) when the claimant executed a contract for the sale of the Parcel; (4) the final sale price of the Parcel; and (5) that the sale of the Parcel was not made as part of the foreclosure process.

(d) VoO Charter Payment.  The Program conducts VoO Charter Payment reviews for individuals or businesses who participated in BP's VoO program.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate: (1) that the claimant participated with the claimed vessel in the VoO program, as evidenced through a signed Master Vessel Charter Agreement ("MVCA") listing the claimed vessel; (2) that the claimant personally signed the MVCA; (3) the length of the claimed vessel; and (4) that the claimant performed work with the vessel or did not perform work, but attended the initial VoO training program.  The Program determines whether some or all of this information is available in the BP-provided VoO data and, if so, the Program does not require that the claimant re-submit that information to the Program.  If the claim is eligible, the Program determines the Compensation Amount based on the length of the vessel and whether the vessel performed work in the VoO program.

(e) Vessel Physical Damage.  The Program conducts Vessel Physical Damage reviews for individuals or businesses whose vessel sustained physical damage because of the DWH Spill or DWH Spill response cleanup operations, including the VoO program.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate:  (1) whether the claimant is the owner of the claimed vessel; (2) whether there is a signed Receipt and Release Letter Agreement in connection with the VoO program for the vessel, which would exclude the vessel from receiving compensation under the Program; (3) whether the physical damages sustained by the vessel was caused by the DWH Spill or DWH Spill response cleanup operations; and (4) the costs to repair or replace the vessel.

(f) Subsistence.  The Program conducts Subsistence reviews for individuals who fished or hunted to sustain personal or family dietary, shelter, tool or other basic needs.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate:  (1) that the claimant satisfies the Subsistence Claimant definition provided in the Settlement Agreement and, (2) the quantity of Seafood and Game the claimant could not harvest as a result of the Spill during the time period of April 20, 2010, to December 31, 2011.  The Program will issue Eligibility Notices on Subsistence claims that are payable for $10,000 or less before the application of the RTP.  The Program will conduct Field Visits for

Subsistence claims that are payable for more than $10,000 before application of the RTP in order for the Program to determine whether the claimant is eligible for payment.

**7.** *Quality Assurance Process and Metrics.* The Quality Assurance ("QA") process addresses three fundamental needs of the Program: (a) to ensure that all claims are reviewed in accordance with the policies of the Settlement Agreement by targeting anomalous claims results through data metrics analysis; (b) to provide a mechanism to monitor reviewer performance and the necessary tools efficiently and effectively to provide feedback to reviewers; and (c) to identify areas of review resulting in high error rates that require retraining or refined review procedures and data validations. To meet these needs, the Program runs a total of 264 automated data metrics and analytic processes to detect anomalies in claims reviewed in the previous 24 hours and moves identified claims to QA Review for review and, if necessary, correction. Examples of automated data metrics include: (a) for IEL claims, claims where more than 90% of the claimant's paychecks have hours entered, but some hours are missing; (b) for Seafood claims, claims where the claimant submitted financial documents from an entity that primarily fishes and/or processes Menhaden; and (c) for Coastal claims, claims where the reviewer did not identify a Deed in the document data entry screen, but there is a Deed in the document data list. Examples of analytic processes include the forwarding of Exclusions and possible Double Payment issues to experts in those areas for review, as well as analysis of financial data entered for IEL and BEL claims reviewed in the past 24 hours to identify data anomalies associated with potential errors.

Table 1 lists the number of data metrics and analytic processes the QA Team runs for each Claim Type.

| Table 1 | QUALITY ASSURANCE DATA METRICS AND PROCESSES | | | |
|---|---|---|---|---|
| | **Claim Type** | **Metrics** | **QA Processes** | **Total** |
| **1.** | Business Economic Loss | 6 | 12 | 18 |
| **2.** | Coastal Real Property | 32 | 6 | 38 |
| **3.** | Individual Economic Loss | 29 | 25 | 54 |
| **4.** | Real Property Sales | 11 | 3 | 14 |
| **5.** | Seafood Compensation | 44 | 14 | 58 |
| **6.** | Subsistence | 28 | 2 | 30 |
| **7.** | Vessels of Opportunity | 18 | 1 | 19 |
| **8.** | Vessel Physical Damage | 15 | 1 | 16 |
| **9.** | Wetlands Real Property | 14 | 3 | 17 |
| **10.** | **Total** | **197** | **67** | **264** |

If any of these automated metrics or analytic processes flag a claim, we move the claim to the QA Queue with a QA Metric that identifies the issue and instructs the QA Reviewer on what to look for in the review. The QA Reviewer completes the review, focusing on the identified issue and making any necessary corrections. The QA Reviewer also completes a series of QA Summary questions that describe any identified errors in the review. After the QA

Review is complete, the QA Team analyzes the results of QA Reviews completed the day before to identify errors that caused the review result to change from Initial Review to QA Review. The QA Team sends the results of that analysis to the Claim Type Team Leads and supervisors to follow up with reviewers who made errors and to address areas of review that may require re-training or improvement in the claims review process. The QA Team monitors the remedial actions and follows up with the Claim Type teams as necessary.

8. ***Incompleteness Process.*** A claim is incomplete if the claimant has not provided all documents required by the Settlement Agreement. The Program may issue an Incompleteness Notice, may call the claimant or the claimant's attorney, or both in order to notify a claimant that a claim lacks required documents. If the claimant fails to submit sufficient documents after receiving an Incompleteness Notice, the Program issues a Follow-Up Incompleteness Notice. The Program denies the claim for insufficient documents and issues an Incompleteness Denial Notice if the claimant does not provide required documents after receiving a Follow-Up Incompleteness Notice. The Incompleteness Denial Notice provides the claimant with 30 days to request Reconsideration, or the Program closes the claim. If the claimant requests Reconsideration and the claim still lacks sufficient documents, the Program issues a Post-Reconsideration Incompleteness Denial Notice. The Post-Reconsideration Incompleteness Denial Notice provides the claimant with 20 days to request an appeal of the denial for insufficient documents to the Documentation Reviewer ("Incompleteness Appeal"). The Program closes the claim if the claimant does nothing in response to the Post-Reconsideration Incompleteness Denial Notice. If the Documentation Reviewer overturns the denial, he sends the claim back to the Program for further review, and the Program issues a notice based on the result of the review. However, if Documentation Reviewer upholds the denial, the Program sends a Post-Appeal Incompleteness Denial Notice to inform the claimant that the Program will close the claim. The claimant may re-file the claim subject to Program deadlines if the Program closes the claim for this reason or because the claimant did not exercise the Reconsideration or appeal rights described above.

9. ***Re-Review and Reconsideration.*** Claimants who receive an Eligibility or Denial Notice and who do not wish to accept the result may submit a Request for Re-Review or Reconsideration. The Program determines whether the claimant submitted a request for Re-Review or Reconsideration within the deadline established by the Settlement Agreement (30 days after an eligibility or denial notice). After a claimant requests a Re-Review or Reconsideration, the Program performs a full review of the claim using any additional information submitted by the claimant. Once the review is complete and submitted, the Program generates a Post Re-Review or Post-Reconsideration Notice that informs the claimant of the result of the review. The Program monitors claimant response to the Notice to determine whether the claimant accepts the award, requests Reconsideration after a Re-Review, or submits an Appeal.

10. ***Double Payment.*** The Program prevents double recovery for compensation of owners or officers of business entities. Business owners and officers cannot recover for lost individual wages in an IEL claim when the business filed a separate BEL claim with the Program or signed a Release as part of the GCCF. The Program analyzes the Claim Form, correspondence from the claimant and employer, the tax records, and any other documentation in

11

the file to determine a possible double payment situation. A double payment reviewer determines whether the claimant is actually an owner or an officer of the business by verifying the information in the file and through available online resources. If the claimant is an owner or an officer of the business and the business signed a Release and received payment from the GCCF or the Program, the Program denies the owner/officer claim. In situations where the business has a BEL claim that has not progressed to payment, the Program processes the IEL claim and applies a Prior Payment Offset on the BEL claim to offset the losses compensated to the owner or officer.

**11.** ***Prior Payment Offsets.*** The Program deducts prior payments made by BP, the Real Estate Fund, or the Gulf Coast Claims Facility from the corresponding Program claim through the Prior Payment Offset review process. The Program performs this review to determine if prior payments have been made to a claimant. If prior payments have been made, the prior payment offset reviewer allocates the prior payments to be deducted from the appropriate claim type for any future payments to the claimant.

**12.** ***Claimant Accounting Support.*** The Program will reimburse a claimant for the cost of preparing IEL, BEL, or SCP claims, if the claimant submits documents proving the cost of the claims preparation. If a claimant has not submitted the proper documentation to receive the reimbursement, the claimant receives an Eligibility Notice with an explanation of what he/she must provide to receive reimbursement. He/she may then submit additional documents, and the Program will re-review the claim, in whole or in part. If the claimant has already used his/her Re-Review request, he/she may ask for Reconsideration of the entire claim or Reconsideration focused only on the Claimant Accounting Support.

**13.** ***Notice Process.*** The Program provides written communication in the form of Notices that are either posted to the Portal or mailed to the claimant. The Program will send a Notice in several situations, such as (1) when it determines an outcome for a specific claim; or (2) when it discovers a specific issue that it needs to address with the claimant in order to process his or her claim fully. The Program generates and sends Notices daily for all claimants that require a Notice. The Program also reviews the generated Notices each day to confirm that Notice populated with the correct information and language for the outcome calculated for that particular claimant.

**14.** ***Release.*** The Settlement Agreement requires each claimant to submit a "Full and Final Release, Settlement, and Covenant not to Sue" ("Release") to receive payment on a claim. The Program requires one Release per claimant and this Release will cover all of the claimant's claims in the Program. The Release Review process verifies that the claimant submitted a valid signed and original hard copy Release before the Program will issue payment on all eligible claim(s).

**15.** ***Payments.*** The Program runs programmatic checks to make sure a claim is ready for payment. The Program reviews all payable claims with an Eligibility Notice and confirms the following before processing a claim for payment:

(a) The claimant has a signed Release;

(b) The claimant has accepted the offer or has not requested Re-Review or Reconsideration. This means:

    (1) The claimant has accepted the Eligibility Notice;

    (2) The 30-day window has expired and the claimant has not requested Reconsideration/Re-Review; or,

    (3) If the claimant did request Reconsideration/Re-Review, the claimant has withdrawn that request.

(c) The Appeal Period has expired and neither party has requested an appeal (or the requesting party has withdrawn the appeal);

(d) There are no Holds that apply to the claim or claimant;

(e) The ID Team has verified the claimant's ID;

(f) The claimant or his/her attorney has properly signed the Registration and Claim Forms;

(g) The Garden City Group has accepted the claimant's Payment Documents (as well as the firm's, if the claim is represented); and

(h) The claim or claimant is not under review.

If a claim passes these checks, the claim is then sent to the Program's Paying Agent along with information necessary to facilitate the payment. This information includes wiring instructions and/or check payee names and addresses. As an additional level of security, the Paying Agent performs another round of internal audits to verify the claim is ready for payment and that the payment information is up to date. Once the Paying Agent confirms the claim is ready for payment, it issues the payment in the method selected by the claimant (and his attorney, if represented).

    **16.** *Liens.* The Program receives Third Party Claims and/or liens ("TPCs") from attorneys, state and federal agencies, claims preparation and accounting firms, creditors, and other third parties asserting a claim against payments to be made to Program claimants. The Program has established documentation requirements to ensure that it protect claimants from frivolous assertions while honoring documented obligations. The Lien Team reviews all documentation submitted by Third Party Claimants to determine if it satisfies these requirements, binds the specific claimant against whom the TPC was asserted, and that the Third Party Claimant provided us with a Program Claimant ID, GCCF ID, or Taxpayer ID to ensure that we are placing a lien hold against the correct claimant's Settlement Payment(s). We advise claimants of all Enforced (fully documented) and Valid (documented and payable, since one or more Program claims is payable) TPCs, provide copies of all enforcement documentation, and provide claimants with an opportunity to object. If the claimant notifies us of an objection

within the deadline provided and the TPC amount is fixed, we withhold the disputed TPC amount and issue payment to the claimant of any remaining Settlement Payment balance.  We advise all parties that they must resolve disputes by agreement, with the relevant agency, or through the Third Party Claims Dispute Resolution Process, if the dispute is over an eligible fee lien dispute.

   **17.**  ***Appeals.*** After a Post-Reconsideration Eligibility or Denial Notice, the claimant shall choose to accept the result or submit an Appeal to the Appeal Panel.  The Program allows claimants to file an appeal through the online portal or by submitting the Request for Appeal Form within 30 days after a Post-Reconsideration Notice.  BP has the option of filing an appeal through the online portal on Eligibility Notices and Post-Reconsideration Eligibility Notices with Compensation Amounts over $25,000.  The deadline for BP appeals varies depending on the Compensation Amount.  For claims less than or equal to $1,000,000, a single Panelist will review the claim. For claims greater than $1,000,000, three Panelists will review the claim. After the appeal is resolved, the Program issues a Post-Appeal Eligibility Notice or Denial Notice.  Appeals based on a Compensation Amount are processed using the "Baseball Process."  The "Baseball Process" involves the exchange of Initial and Final Proposals by the claimant and BP.  The claimant or BP may accept the other party's Initial or Final Proposal or reach an independent compromise, which will end the Appeal Process.  If the claimant and BP do not reach an agreement, the Appeal Panel will review the claim and select either one of the Final Proposals, but no other amount.  The decision of the Appeal Panel shall be final. Appeals of Denials are processed according to the "Non-Baseball Process."  The "Non-Baseball Process" involves the exchange of memoranda between BP and the claimant.  A single Appeal Panelist will review the claim and all memoranda submitted by the parties and then issue a decision as to whether the Panelist has upheld or overturned the Denial.  If the Denial is overturned, the claim will return to the claims review process for a determination of the appropriate Compensation Amount by the Program.



# BP Launches Gulf Claims Fraud Hotline

Release date: 15 July 2013

## Launch Comes as Allegations of Fraud and Corruption Continue to Surface; Court Supervised Settlement Program Spends Less for Fraud Detection than the GCCF

BP today launched the Gulf Claims Fraud Hotline to help protect the integrity of the claims processes relating to the Deepwater Horizon oil spill.

The Fraud Hotline is a reliable resource for people who want to do the right thing and report fraud or corruption. Reports should be made of any fraudulent or corrupt activity, no matter where in the claims process it occurs – whether in the solicitation of the claim by attorneys, accountants or other claims preparation services, the preparation of the financial records and claim application, or the processing of the claim – and no matter whether the claim was filed with BP, the Gulf Coast Claims Facility (GCCF), or the Court Supervised Settlement Program (CSSP).

The launch of the hotline comes as federal law enforcement officials are clamping down on cases of fraud and other abuses in the claims process. In recent months, U.S. attorneys in Florida, Alabama and Louisiana have secured guilty pleas and convictions against multiple individuals for attempting to defraud the claims process and take money to which they are not entitled under the law.

What's more, in the face of troubling allegations of unethical and potentially criminal corrupt behavior within the CSSP itself, the Court has appointed Louis Freeh, former federal judge and Director of the FBI, as Special Master. Judge Freeh is leading an independent investigation of the CSSP with wide latitude to look for "possible ethical violations or misconduct."

The launch of the Gulf Claims Fraud Hotline is particularly timely because the CSSP spends substantially less than the GCCF spent to combat fraud. This seems inappropriate given that the GCCF's fraud detection program enabled it to identify more than 7,000 claims as "multi-claimant scams or even efforts at criminal fraud." The GCCF referred more than half of these to the U.S. Department of Justice for criminal investigation.

Anyone with knowledge of fraud or corruption should report it by dialing, toll-free, 1-855-NO-2-FRAUD (1-855-662-3728). All reports can be made anonymously.

Tips received through the Hotline will be reviewed and referred for further evaluation, if warranted, to fraud investigators at the CSSP, the National Center for Disaster Fraud, or other law enforcement agencies. Tips that lead directly to an indictment, a recovery of money paid, or the denial of a claim because of fraud or corruption may entitle the reporter to a reward.

While BP continues to take steps to stamp out fraud and corruption and assure the integrity of the claims process, the company remains committed to the Gulf and to the payment of legitimate claims for real losses. So far, BP has spent $14 billion on response and cleanup to help restore the environment. The company has also paid more than 300,000 claims totaling over $11 billion to help restore the Gulf economy.

## Further Information:

Name: BP US Press Office
Phone: (281) 366-4463
Email: uspress@bp.com

**EXHIBIT II(B)**

BP Press Releases, "BP Launches Gulf Claims Fraud Hotline," (Aug. 13, 2013, 5:35 PM), http://www.bp.com/en/global/corporate/press/press-releases/bp-launches-gulf-claims-fraud-hotline.html

---

## OVERVIEW OF THE ANALYSIS OF SUBSISTENCE CLAIMS FROM THE MOBILE AREA

---

1. **1/12/13:**   The Deepwater Horizon Economic and Property Settlement Program ("the Program") began reviewing Subsistence claims.

2. **1/22/13:**   Tim Touchton, the Manager of the Claimant Assistance Center ("CAC") in Mobile, AL ("Mobile CAC"), alerted the CAC Executive Team to (a) a sudden increase in Subsistence claim filings in the Mobile CAC and (b) a claims preparation firm ("Claims Preparation A") that may be inappropriately coaching claimants in the filing of their Subsistence Claim Forms.  Claims Preparation A was allegedly soliciting claimants and guaranteeing payment to its patrons in exchange for 25% of any payment made on a claim.

    The CAC Executive Team notified BrownGreer's Special Investigations Team ("SIT").  In coordination with the Claims Administrator's office and the Claims Administrator's independent investigation group, HUB Enterprises, Inc. ("HUB"), the SIT began analyzing the claims as a potentially fraudulent multi-claimant pattern ("Claims Preparation A Pattern").  As of 8/13/13, the SIT has confirmed 2,559 participants in the Claims Preparation A Pattern.

3. **1/24/13:**   The Mobile CAC informed the SIT and the CAC Executive Team about a possible television commercial or ad by Claims Preparation A to solicit claimants.

4. **1/25/13:**   The SIT updated the list it maintains of suspect entities (the "Be On The Look Out" list) and notified all reviewers to propose for SIT review any claim that contains documents indicating that the claim was prepared by Claims Preparation A.

5. **1/30/13:**   The BrownGreer Subsistence Team had observed a high number of Subsistence claims filed from the Mobile, AL area in which claimants asserted claims related to subsistence fishing at Cedar Point Pier, where no fishing license is required. Claimants submitted these claims through a mix of online Portal submissions, paper mailed submissions, and Mobile CAC submissions.  The BrownGreer Subsistence Team Lead, Bethany Anderson, instructed the Court-Appointed Distribution Agent ("CADA") team and supervisors to propose any Subsistence claimant who alleged fishing at Cedar Point Pier for SIT review.

1

**EXHIBIT II(C)**

6.  **2/8/13:**      BrownGreer's Claims Preparation A Pattern SIT Case Manager ("CM") observed significant similarities between confirmed Claims Preparation A Pattern filings and other Mobile-area Subsistence filings that did not identify Claims Preparation A as the claims preparer.   The similarities included Mobile area residence, use of the Cedar Point Pier as a fishing location, and the submission of similar maps showing Cedar Point Pier as a fishing location.  Accordingly, the SIT identified Subsistence claims with these characteristics as potentially part of a multi-claimant fraudulent pattern ("Mobile, AL Resident Pattern").  The SIT instructed SIT reviewers to place claims with these characteristics on hold pending further investigation into their legitimacy.

7.  **2/12/13:**     The BrownGreer Subsistence Team notified the SIT that it had received a claim from an individual claiming to be exempt from licensing requirements because she fished off of the Dauphin Island Pier.  Dauphin Island Pier is landlocked and is, therefore, an unlikely Subsistence fishing location.  BrownGreer's SIT assigned a CM to determine if there were additional Subsistence claims that asserted losses from fishing at the Dauphin Island Pier and to analyze these claim submissions for potential fraud, based on the claimants' assertions that he or she fished at a landlocked pier.  In coordination with the Claims Administrator's office and HUB, the SIT started analyzing these claims as a potentially fraudulent multi-claimant pattern ("Dauphin Island Pier Pattern").  As of 8/13/13, the SIT confirmed 152 participants in the Dauphin Island Pier pattern.

8.  **2/13/13:**     Employee A, a Subsistence Claim Quality Assurance Reviewer in the Mobile CAC, sent an email to Ms. Anderson advising her to "be on the look out for [Claims Preparation B] … in Mobile, AL.  It is not certain, but they are operating similar to [Claims Preparation A].  They are electronically filing the Registration and submitting scan[ned] copies of the [C]laim [F]orm and Interview Form."   In coordination with the Claims Administrator's office and HUB, the SIT started analyzing the Claims Preparation B claims as a potentially fraudulent multi-claimant pattern ("Claims Preparation B Pattern").  As of 8/13/13, the SIT confirmed 173 participants in the Claims Preparation B Pattern.

9.  **2/21/13:**     The SIT provided SIT reviewers and CMs further instructions on how to treat and classify Subsistence claimants from the Mobile, AL area.  The instructions were:

(a) If the Claim Form or Registration Form, or any of the documentation lists [Claims Preparation A], select the claimant for pattern review under [Claims Preparation A].

(b) If the Claim Form or any of the documentation lists Dauphin Island Pier as a fishing location, select the claimant for pattern review under Dauphin Island Pier Subsistence Claims.

(c) If the Subsistence claim lists Cedar Point Fishing pier and/or lacks any substantive documentation or seems generally suspicious, and is located in or around Mobile, AL (but [Claims Preparation A] cannot be found), select the claimant for pattern review under Subsistence Claims – Mobile, AL.

(d) If the Subsistence claim overlaps with or conflicts with another similar, suspicious Subsistence claim from a family member or another individual, select the claimants for pattern review under New Pattern – Family/Household Fraud.

**10. 2/26/13:** HUB sent an undercover investigator into Claims Preparation A.  David Welker, the Program's Director of Fraud, Abuse, and Waste, had previously requested that HUB conduct an undercover investigation of the activities at Claims Preparation A.  HUB intended to determine whether Claims Preparation A was counseling claimants to provide false information in claims filed with the Program.  HUB was unable to confirm the allegations regarding Claims Preparation A's actions through its undercover visit to the business.

**11. 3/4/13:** Ms. Anderson emailed the CADA team and supervisors reminding them to propose any claimant listing Cedar Point Pier and/or Dauphin Island Pier as a fishing location for SIT review.

**12. 3/7/13:** The SIT referred 62 claimants identified as potential participants in the Mobile, AL Resident Pattern to HUB for verification.  The SIT asked HUB to verify the alleged Subsistence activities and the alleged Subsistence losses for each of the claimants.  During the course of its investigations of these claimants, HUB conducted interviews with the claimants to confirm their asserted Subsistence activities.

**13. 3/13/13:** As part of routine analysis of all known multi-claimant patterns, a BrownGreer SIT CM analyzed reports of the potential resurgence of a pattern originally identified on 2/4/11 during the operation of the Gulf Coast Claims Facility ("GCCF").  The pattern (the "T.W. Pattern") centered on an individual ("T.W.") who submitted suspect documents in support of her own purported businesses and prepared and notarized suspect documents for other claimants.  Guidepost Solutions, LLC ("Guidepost"), the GCCF's independent investigative firm, confirmed that the claimed businesses did not exist and that the documentation

3

was fabricated.  At the end of the GCCF, the T.W. Pattern involved 12 claimants, all of whom Guidepost formally identified as fraudulent.  Several of the participants confirmed that T.W. prepared their documents.  On 3/13/13, when reviewing new reports for the pattern, a SIT CM observed that T.W. had started assisting claimants in the Program with filing Subsistence claims.  The SIT, in coordination with the Claims Administrator's office and HUB, started analyzing other T.W.-prepared claims as a part of a potentially fraudulent multi-claimant pattern.  As of 8/13/13, the T.W. Pattern had seven confirmed participants, five of whom filed Subsistence claims.

**14. 3/25/13:**    The CADA, Christina Hendrick, informed the Subsistence Team Leads by email that the Program should continue to require licenses from those claimants who list Dauphin Island Pier as a fishing location and to propose such claimants for SIT review.  The SIT maintained holds on all Mobile area Subsistence claims that reviewers had previously proposed for SIT review while attempting to verify the legitimacy of these claims.

**15. 3/27/13:**    A SIT CM prepared a list of 22 Subsistence claims from the Mobile, AL area with the highest reported catch amounts, and asked the Subsistence Team for guidance regarding what catch amounts warrant suspicion.  The Subsistence Team Leads referred these claims to the CADA on 4/1/13 for analysis.  The CADA asked the Field Visit Team, the team appointed by the CADA to travel to claimants' homes, dock locations, and other applicable areas to interview claimants and evaluate their Subsistence claims, to also provide analysis on the claims.  On 5/29/13, the Field Visit Team returned their observations about the claimants' filings and allegations.  The Field Visit Team did not interview these Subsistence claimants but offered expert opinions about the legitimacy of the claim filings.  The Field Visit Team's findings were generally inconclusive.  After reviewing the reports, the SIT notified the CADA that these Field Visit Team reports were not sufficient to provide or formulate general guidelines for the SIT on how to identify potentially suspect Subsistence claims.  The SIT continued to maintain holds on generally all Mobile area Subsistence claims that were proposed for SIT review and exhibited potential fraud concerns, while attempting to identify other methods to verify legitimacy of these claims.

**16. 3/28/13**:

(a) The CADA instructed the Subsistence Team Leads to release SIT holds on claims from claimants that fished at the Cedar Point Pier, unless (1) they were implicated in the

Claims Preparation A Pattern, or (2) there were other indications of potential fraud beyond simply alleging fishing at the Cedar Point Pier.

(b) The SIT instructed a Mobile Pattern CM and SIT reviewers to analyze the 428 claimants held under the Mobile, AL Resident Pattern to determine if there were issues that would warrant a hold aside from the claimant's assertion that he or she fished at the Cedar Point Pier.

**17. 4/29/13:**   The SIT terminated review of the Mobile, AL Resident Pattern after completing thorough reviews of all 428 claimants on SIT hold. The SIT did not find indicia of fraud in 83 claimants' filings, but the SIT found that the remaining 345 claimants were potential participants in a new pattern or a previously identified pattern, or displayed other potential fraud concerns. The SIT released its holds on the 83 cleared claimants.

**18. 6/5/13:**   When analyzing a group of claimants associated with the Claims Preparation A Pattern, a SIT CM noted that a licensed CPA ("C.W."), who is herself a claimant in the Program, had submitted several SWS-38 Accountant Sworn Written Statements in support of other claimants' Subsistence claims. The CM also noticed that C.W.'s fee agreements limited the scope of her services to preparation of Subsistence claims only. The claims packages appeared to be template claims that asserted the same fishing locations, equipment, and species. The CM also determined that all of these claimants list Cedar Point Pier, Dauphin Island Pier, Bayou La Batre, Alabama Point Pier, and the Mobile Causeway as their fishing locations, followed by a statement indicating that they purchased a temporary pier permit to fish at all locations. Of all these locations, Cedar Point Pier is the only location that allows one to fish for a fee with no license. In coordination with the Claims Administrator's office and HUB, the SIT started analyzing these claims as a potentially fraudulent multi-claimant pattern ("C.W. Pattern"). As of 8/13/13, the SIT had confirmed 263 participants in the C.W. Pattern.

**19. 6/7/13:**   A SIT reviewer identified a new potentially fraudulent pattern involving Alabama and Louisiana Fishing Licenses during his review of a Subsistence claimant. A Subsistence Claim Reviewer in the Mobile CAC identified this claim for SIT review, indicating that the claimant's submitted fishing licenses had several anomalies in the font and formatting of the text of the license as compared to official, state-issued fishing licenses.

The SIT reviewer confirmed that the claimant's 2010 licenses contained incorrect information about the date that the license was supposedly issued.  When analyzing the data, the SIT reviewer discovered approximately 69 other claimants with suspect licenses, many of whom submitted similar, suspicious licenses.  The SIT reviewer escalated his findings to the SIT supervisors.  The SIT determined that the licenses were most likely fabricated.  Given these findings, and the numerous other claimants who submitted licenses with similar inconsistencies, the SIT assigned the issue to a CM for pattern review ("Alabama and Louisiana License Pattern").  As of 8/13/13, the SIT confirmed 79 participants in the Alabama and Louisiana License Pattern.

20. 7/8/13:     A Subsistence Claim Reviewer at the Pensacola, FL CAC proposed a Subsistence claimant for SIT review because she noted assertions of excessive catch.  A SIT reviewer analyzing the claimant identified a potential new pattern, in which several claimants had filed similarly suspect claims that were faxed from a number registered to the same individual ("N.P.").  The SIT reviewer noted that all claimants listed a fishing location at Dauphin Island Pier or Cedar Point Pier and that none of the claimants submitted fishing licenses.  In coordination with the Claims Administrator's office and HUB, the SIT began analyzing the claims as a potentially fraudulent multi-claimant pattern ("N.P. Pattern").  As of 8/13/13, the SIT had confirmed 18 participants in the N.P. Pattern.

21.  3/1/13 – 8/12/13:

In addition to the seven multi-claimant patterns discussed in the timeline with a total of 3,270 participants, the SIT has identified another 50 Family Household Fraud patterns with an additional 111 participants.  Finally, as of 8/13/13, there are an additional 347 individual Subsistence claims from the Mobile, AL area that are under SIT review for various other reasons.  The SIT continues to review and investigate these claimants and other Subsistence filings that present potential indicia of fraud.

---

**SPECIAL INVESTIGATIONS TEAM'S FRAUD DETECTION AND PREVENTION PROCESS**

---

1.      **Introduction.**  Settlement programs become the target of some degree of attempted fraud.  While the appropriate level and type of anti-fraud measures necessarily vary from program to program, every settlement program establishes as a core objective detecting and preventing fraud.  We implement tailored anti-fraud measures commensurate with those demanded by the circumstances of each case and with guidance from the Court, the Settlement Agreement, and law enforcement and other government agencies.  Typically, no two programs are identical.  We start with a baseline developed from our experience administering other programs, and we assess initially what to deploy in addition to that baseline.  We then continually reassess those needs throughout the maturation of the program in consultation, when appropriate, with the parties, the Court, government agencies, and occasionally private third-party investigative services firms.

2.      **The Gulf Coast Claims Facility.**  Before the Program's launch, BrownGreer assisted Kenneth Feinberg in developing and implementing the fraud detection and prevention program for the Gulf Coast Claims Facility ("GCCF").  The GCCF successfully used anti-fraud measures appropriate for the tenor and time of that program.  Of particular note, Mr. Feinberg decided to refer all claimants identified by BrownGreer as suspect to Guidepost Solutions, LLC ("Guidepost"), an investigative services firm, for investigation and determination of the presence of fraud.  In other words, BrownGreer's Audit Team identified, while Guidepost confirmed, that these claims were potentially fraudulent.

3.      **Comparison of the GCCF to the Program.**  Since the beginning of the Transition Process from the GCCF to the Program, the Claims Administrator's Office ("CAO") coordinated with BrownGreer's GCCF Audit Team to develop a more robust, efficient, and otherwise improved Fraud Detection Program, tailored to the requirements of the Deepwater Horizon Settlement Program ("the Program").  BrownGreer and the Program use the experience of the same key personnel who directed the GCCF's fraud detection efforts to leverage the institutional knowledge developed over the course of the GCCF program.  To help coordinate the process, the CAO engaged David Welker, a former Special Agent in charge of the FBI's New Orleans Division, to serve as the Claims Administrator's Fraud, Waste, and Abuse Director.  The CAO replaced Guidepost with HUB Enterprises, Inc. ("HUB") as the Program's outside investigative firm.  BrownGreer set up the Special Investigation Team ("SIT") comprised of lawyers, accountants, Case Managers ("CM"s), analysts, and reviewers located primarily in Richmond, VA, offices, that are managed by members of the former GCCF Audit Team.  In addition, Mr. Welker and Roma Petkauskas, the head of the BrownGreer SIT, have been meeting regularly with representatives from the National Center for Disaster Fraud ("NCDF") to: (1) review and coordinate the Program's Fraud Detection and Prevention Processes; and (2) receive updates from the NCDF on the status of investigations.  Bringing the expertise from the GCCF experience, the SIT helped develop a process that has not only resulted in significant cost savings when compared with the GCCF, but also has improved upon the GCCF's process in several ways.

**EXHIBIT II(D)**

**(a) Fraud Detection.** The GCCF developed and implemented effective processes to detect and prevent fraud, but the processes were necessarily limited because the claims resolution protocols included far fewer documentation requirements to prove losses, thereby limiting the amount and type of data available for analysis. In the Program, the Settlement Agreement requires extensive and specific documents for each Claim Type, and these documents must be present and sufficient before a claim may qualify for compensation under the Settlement Agreement. Consequently, during the claims review process, we are able to track significantly more information in the Program. The SIT leverages the Program's Claims database and has improved precision of database queries and trends analyses, thereby enhancing efficiency in detecting fraud. These queries permit the SIT to analyze and detect fraudulent patterns from, for example, (1) profit and loss statements and sales tax variances for BEL claims, (2) correlations between business claimants and individual claimants claiming losses from working for those businesses, and (3) correlations of Seafood crew claimants to a claimed vessel. The SIT's reviewers and CMs have access to various reports, including reports that identify claimants sharing the same IP filing address, physical address, and email that they review both to identify suspect claimant groups as well as to identify overlaps with any suspect claims. The SIT automatically identifies claimants with overlapping addresses with claimants previously found fraudulent and identifies them for SIT review if the same or another claimant living at that address files a claim in the Program. Such queries were cumbersome or not available under the GCCF because data fields and metrics to track the activity were not available for analysis.

The SIT further improved upon the processes in the GCCF by developing specialized education of the SIT's staff and conducting enhanced periodic training for Claims Reviewers, accountants reviewing claims, and intake and call center personnel (collectively referred to as "Claims Handlers"). The SIT also updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 442 businesses, employers, notaries, and tax preparers, all of whose involvement or preparation of claims is suspect. These improved measures result in higher ratios of suspect claims referred to the SIT that ultimately lead to a finding of fraud. As an example of this awareness, the CACs alert the SIT about unusual claim activities in their communities, such as increased Subsistence claim filings in the Mobile area and the suspect patterns of Claims Preparation A, a claims preparation group discussed in further detail in Exhibit C. With the improved precision of fraud detection queries and improved Claim Handler referrals, the Program has reviewed, proportionally to overall claim filing, more claims for potential fraud than during the GCCF.

**(b) Multi-Claimant Pattern Management.** Bringing the experience and knowledge from the GCCF, the SIT also programmatically identifies claims filed in the Program that were found to be potentially fraudulent in the GCCF as well as participants of any of the approximately 780 multi-claimant patterns we detected in the GCCF. The SIT CMs actively monitor the multi-claimant patterns identified in the GCCF and have detected the same or new claimants establishing Claimant IDs from over 300 known GCCF multi-claimant activities. For example, a SIT CM determined that a ringleader of a GCCF pattern the SIT identified on 2/4/11 and who was known to

assist claimants in filing economic loss claims with documents from non-existing businesses had started assisting claimants in filing Subsistence claims in the Program.

In addition to monitoring actively the resurgence of re-filings from the fraud detected in the GCCF, the SIT CMs also identify and develop approximately seven new potentially fraudulent multi-claimant patterns weekly, with a total of over 600 patterns having been detected in the Program consisting of over 5,100 potential participants. The SIT CMs routinely develop reports based on the unique characteristics of the multi-claimant pattern as they monitor its progression. Frequently, the SIT CMs design reports to define the characteristics of the pattern and refine the reports as the pattern evolves. Since the inception of the Program, the SIT CMs have run over 4,300 specially designed pattern reports to develop new patterns or find additional participants in the existing patterns.

(c) **Investigative Steps.** The Program realized, and explained to BP in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013, that the GCCF incurred significant costs from its requirement that every potentially fraudulent claim be referred to Guidepost for a full external investigation. Without compromising effectiveness, the SIT helped the Claims Administrator implement "in-house" investigative processes to review suspect claims to make findings of fraud at a substantially reduced cost and in less time when compared with the processes of the GCCF. The SIT established direct access services with the IRS to verify tax and other financial documents, developed standardized authorization forms to obtain information from other third party sources, increased efforts in contacting employers and other witnesses, and retained a forensic accountant. Over 4,100 claimants have been the subject of these "in-house" investigations, and the Program has handled approximately two-thirds of all fraud findings internally, which has significantly reduced the cost to the Program. Even so, the in-house team has still referred close to 800 claimants to HUB for a full investigation in instances where an on-site interview, inspection, or search of public records are the most efficient and reliable methods of investigation. These adjustments have resulted in a more effective and efficient fraud detection process.

4.      **Tax Identification Number ("TIN") Verification.** The first and fundamental step in the SIT's processes is verifying each claimant's tax identification number. Although the Program will review the claimant's claim, the Program will not pay a claimant until the SIT has verified that the claimant's tax identification number is valid and belongs to the claimant. The Settlement Program asks every claimant to provide a Social Security number ("SSN"), Individual Taxpayer Identification Number ("ITIN"), or Employer Identification Number ("EIN") on the Registration Form. The SIT uses that number as a unique identifier to keep claimants separate in the Program. When the Program receives a Registration Form, the SIT verifies the accuracy of the SSN, ITIN, or EIN provided by the claimant, to make sure we have the right number and that the number exists and does not belong to anyone else. We perform this verification step for several reasons:

(a) The SSN, ITIN or EIN is the only way to give each claimant a unique identifier, which is necessary for tracking, processing and payment purposes.

(b)  It enables the Program to link a Deepwater Horizon claimant to a previous GCCF claim, copy existing documents to the new claim and account for any previous offers or payments.

(c)  Further, the Program needs accurate and genuine taxpayer numbers to prevent issuing payments to fictitious taxpayers or paying the same claim more than once.

The SIT verifies the claimant's Tax Payer Identification number by following these steps:

(e)  **SSN Verification:** Specially trained SIT reviewers access a custom built database module that permits the SIT to identify and submit the claimant's SSN and name to be verified and matched through independent third party sources.  If the SIT cannot verify the SSN or if the SSN and name cannot be matched to the claimant through these queries, SIT reviewers analyze the files and correct typographical errors in the name and/or number.  If the SIT cannot confirm that the claimant's name and SSN match the independent sources, the SIT issues a Notice to the claimant, asking the claimant to identify potential typographical errors in the SSN number and/or name, as well as to identify any name changes.  The claimant is also given an option to verify the SSN with the Social Security Administration's ("SSA") Consent Based Social Security Verification Program by submitting a properly executed authorization.  If the claimant does not respond to the Notice or if the documents the claimant submits are not sufficient to verify the claimant's SSN, the SIT issues a Follow-Up Notice explaining the next steps to complete the verification.

(f)  **EIN Verification:** Specially trained SIT reviewers access a custom built database module that allows the SIT to confirm that the claimant's EIN and the business name can be verified and matched through various independent third party sources.  If the SIT cannot verify the EIN or if the EIN and the business name cannot be matched to the claimant, and if there are no apparent typographical errors in the name and/or number, the SIT issues a Notice to the claimant, asking the claimant to identify potential typographical errors in the EIN number and/or the business name, as well as to identify changes to the business's name.  The Notice also explains the documents that the claimant can submit to help verify the EIN.  If the claimant does not respond to the Notice or if the documents the claimant submits are not sufficient to verify the claimant's EIN, the SIT issues a Follow-Up Notice explaining the next steps to complete the verification.

To date, SIT has started the verification process for 146,970 claimants.  Of those, we matched the TIN and claimant's name to public records databases and verified tax identification numbers for 81,674 (56%) claimants from the initial queries through the independent third-party sources.  Initially, 65,296 (44%) claimants' information could not be matched to the public records databases and we reviewed these claims to determine if we can identify name changes or typographical errors and re-queried these claims through public searches to resolve 51,302 claimants' records.  After this initial review, 13,994 (9.5%) claimants' data still did not match independent third-party source

information and issued Notices to claimants asking for official documentation from the Internal Revenue Service ("IRS") or SSA that confirms the claimant's TIN. Of these, 11,875 claimants have submitted information/documents that helped confirm the claimants' information and verify their tax identification numbers. As of today, 2,119 (1.4%) claimants' tax identification numbers have not yet been verified. Claimant tax identification number verification and duplicate claimant review efforts also resulted in detection and merging of 5,745 claimant IDs such that 3,562 claimant IDs were found to be duplicative and marked inactive.

5.     **Sources of Claim Selection for SIT Review.**  SIT reviewers analyze all claims that are identified for a SIT review.  Referrals to the SIT team come from a variety of sources:

(a) **Specific Claims Identified During Claim Intake and Review:**  The SIT has developed and periodically updates instructions and training materials for all Claims Handlers on certain problems or discrepancies that might indicate potential fraud, deception, or dishonesty.  Claims Handlers have the functionality to identify for SIT review any claim that might indicate a potential problem.  Alternatively, Claims Handlers can email the SIT by using a dedicated email box that is publicized in the trainings.  In general, the areas that the SIT highlights in trainings and asks the Claims Handlers to identify for SIT review include: (1) claims with suspicious or altered claim materials; (2) claims where the claimant's date of birth, name, and/or TIN asserted on the Claim Form differ from the documents submitted in support of the claim; (3) claims that rely on suspect employment verification letters; and (4) claims involving non-arms-length transactions, such as claims where on the face of the documents it appears that there is a family or other personal relationship between the claimant and a person who authenticated or produced documents in support of the claim, and other sources cannot substantiate the information provided in those documents.  In addition, the SIT maintains and periodically updates lists of documents and entities that previous investigations and findings have determined to be suspect or fraudulent.  The Claims Handlers identify for SIT review any claim that is supported by documentation appearing on that list.

(b) **Specific Claims Identified Through Database Queries:**  The SIT uses the Claims Database of all claimants to help spot and identify for SIT review specific claims that may be problematic.  The areas of focus and analysis include but are not limited to: (1) detection of overlapping claims by the same claimant to prevent payments on duplicate claims through standardized reports; (2) automated identification for SIT review of all claims filed by claimants that were found fraudulent in the GCCF; (3) detection of claimants with characteristics similar to claimants previously found fraudulent through address, and various other data matches.

(c) **Change of Address Requests:** The Program instructs and requires claimants to inform the Claims Administrator if the claimant's address changes at any time during the administration of the Program.  To update an address, a claimant must submit a written request to the Program to change the address in the database. The SIT tracks all completed address change requests to monitor such requests for indications of

potential fraud, such as (1) changing an address to one associated with a known multi-claimant pattern; (2) suddenly changing an address immediately following the filing of a claim with the Program; (3) requesting a change of address from a physical address to a P.O. Box, especially soon after the filing of a claim; or (4) requesting a change of address to one that cannot be verified as being related to the claimant.

(d) **Statistical Trends Analysis:**  The SIT analyzes data in the Claims Database to monitor and identify trends of potential fraud, deception, or dishonesty and identifies for SIT review claims from the suspect populations.  The SIT monitors and analyzes various trends that include but are not limited to: (1) analysis of claimants that share the same or similar physical addresses, IP addresses, or email addresses to confirm that each claimant's documentation is unique and for a presence of a multi-claimant pattern; (2) analysis of outliers within the claimant populations that include, for example, correlations of employees to the businesses and Seafood crew to vessels; (3) analysis of trends in variance in income and revenue based on, for example, patterns in the profit & loss statements, sales and use taxes, and patterns of an individual's earnings.

(e) **Multi-Claimant Pattern Participants:**  The SIT classifies a pattern as a group of claims exhibiting indicia of fraud that are linked by common factors suggesting deliberate collusion or coordination.  Examples of patterns include: (1) the mass production and sale of falsified payroll documents; (2) the mass forging of employment verification letters; (3) routing payment for a large number of spurious claims to a single bank account; and (4) the systematic filing of documents for a series of similar fictitious businesses.  The SIT classifies patterns into two categories: general patterns and family/household fraud.  The SIT's dedicated group of CMs and reviewers manage already existing patterns and develop and detect new patterns.  CMs develop and analyze reports to define characteristics of a new potential pattern and refine criteria as they monitor the multi-claimant pattern development through analysis of overlapping or similar characteristics, including physical address, employer, type of documentation submitted, payment instructions, and any other assertions on the Claims Form(s) as claimants in any known multi-claimant patterns.  CMs run periodic reports based on the known characteristics and analyze trends for development of new characteristics to identify new participants in the existing patterns.  The SIT currently monitors over 600 active patterns of potentially fraudulent conduct, with over 5,100 potential participants.  The SIT identifies approximately seven new patterns weekly and weekly identifies additional participants in already known patterns.  The SIT's CMs have designed over 4,300 reports to identify new patterns or find additional participants in existing patterns.

(f) **Alerts from the Department of Justice:**  The NCDF hotline (877-623-3423) receives calls from the public with alerts of potential fraud.  The Department of Justice provides to the Program a summary of the tips that it receives and to date has sent the Program over 720 individual tips.  The SIT reviews the tips and matches the information to claimants in the Program and identifies these claims for SIT review.  If the SIT review results in no indicia of fraud, the SIT releases the hold.  If the SIT

determines indicia of fraud exist, it refers the claim to the Department of Justice for potential investigation.  The SIT produces claimant files to the NCDF for all tips that match a claimant in the Program or the GCCF databases.

**(g)  Letters of Introduction and Stand Down Orders:**  The Department of Justice sends Letters of Introduction to inform the Program about claimants on which the Department of Justice has an ongoing investigation or has a strong interest in investigating.  The SIT reviews all the claimants identified based on these tips for indicia of fraud, deception, or dishonesty, but will stop any field investigative activity on claims if the Department of Justice issues a Stand Down Order requesting that the Program cease an investigation.

**(h)  BP/Class Counsel:** If BP and/or Class Counsel believe that any indicia of deception, dishonesty, or fraud relating to any claim or to the Program exist in any way, BP or Class Counsel may refer such matter for SIT review.  On 7/15/13, BP launched a Gulf Claims Fraud hotline to receive calls from the public to report potential fraud, with a promise of a potential award to the reporter.  BP provides to the Program a summary of the information that it receives.  The SIT reviews the tips and matches the information to claimants in the Program and identifies these claims for SIT review.

**(i)  Random Claim Selection.**   The SIT team identifies pending claims for random selection for SIT review.

**6.**      **SIT Review Process.**  The SIT performs review of the claimants as follows:

**(a)  SIT Initial Review.**  The initial SIT reviewer analyzes all forms and documents submitted by the claimant to substantiate the reason why the claim was identified for SIT review and also to validate all the information by specifically focusing on varying information, alterations, redactions, or otherwise suspicious documents.  The reviewer assesses potential non-arms-length transactions and verifies existence of businesses, properties and ownership as well as licenses through general records searches.  The reviewer also assesses potential double payment and identity theft issues.  Finally, the reviewer analyzes the claim for the presence of a multi-claimant pattern by analyzing various overlapping reports to determine if the claimant shares any characteristics with other claimants in the Program.  The initial reviewer documents the review process and provides a summary comment of the review and makes one of the following findings: (1) select the claimant for review by a CM, by selecting one of the existing patterns or a new pattern; (2) select the claimant for Further Investigation ("FI") review; (3) select the claimant for Final Determination, meaning that the reviewer determined there is indicia of fraud; or (4) release the claimant from SIT review, if the reviewer finds no indicia of fraud.

**(b)  Multi-Claimant Pattern Reviews.**  If the initial reviewer selects the claimant for review by a CM, the CM evaluates the documents for already known pattern characteristics, analyzes claimant overlaps, and develops and reviews reports to determine if the claimant is a participant of an already existing pattern or for the

development of a new pattern.  At the end of his or her review, the CM: (1) confirms that the claimant is a participant of a pattern; (2) requests FI steps to confirm pattern association; or (3) does not find pattern association and either releases the claim or makes a finding for that particular claimant.

**(c) Further Investigation Reviews.**  If the initial reviewer or a CM selects a claim for FI steps, he or she will have to specify which FI step is the most appropriate.  To date, over 4,800 claimants have been selected for various FI reviews that are handled by specialized teams.  At the end of each FI review, the FI reviewer makes a finding of fraud or no fraud, or sends the claimant to another of the following FI steps:

**(1) Third Party Contact.**  Verify information through a call/fax to a third party, including but not limited to contacting a claimant's employer to verify employment and employer letters, contacting departments of Wildlife & Fisheries to verify vessel and fishing licenses, contacting churches and local governments to verify letters from officials, contacting local business licensing offices to verify the existence of a business, contacting neighboring businesses to verify the existence of a business, and contacting businesses to verify receipts/expenses submitted by a claimant. The SIT has performed over 1,200 verification calls to third parties to verify information submitted by claimants.

**(2) Verifications Pursuant to Authorizations.**  Verify information by requesting that a claimant submit an authorization to (a) obtain records from the SSA for self-employed claimants who report income for social security purposes, but otherwise have no supporting financials or earnings statements like W-2s or 1099s, (b) obtain the claimant's tax transcripts and/or wage and income transcripts directly from the IRS for claimants who have conflicting tax information, suspicious wage statements, or conflicting financial information, or (c) obtain educational records to confirm that a claimant incurred expenses from job-training class. The SIT has issued over 2,240 notices to claimants to request authorization to obtain financial, employment or education records from third parties to verify claimant documents.

**(3) Forensic Accountant Review.**  Utilize a forensic accountant to review claims where it is appropriate to use normal accounting methods to solve an unresolved financial discrepancy in the claimant's submitted documentation. The SIT's forensic accountant has reviewed over 275 claimants to determine whether normal accounting methods can resolve potential discrepancies in the claimants' submitted financial documents.

**(4) Request for Information from the Claimant.**  Request information from a claimant if the claimant is in the best position to explain discrepancies or to locate proof to substantiate his or her claim.  The SIT has issued over 175 notices to claimants to request specific documents or corroborating information to support their claims.

**(5) Referrals to HUB.** Refer a claimant to HUB for on-site investigation when other methods of in-house investigation listed above are not sufficient to make a fraud determination or if on-site investigation appears to be the most appropriate method to resolve the potential fraud concern. To date, the Program has referred close to 800 claimants to HUB for the investigation.

**7.      SIT Review Results:** At the end of its review, the SIT makes one of the following determinations:

**(a) Clear Finding of Fraud**. In determining whether a clear indication of fraud exists, the Claims Administrator's Office ("CAO") evaluates materiality of the falsified records and considers any prior payments as compensation for losses related to the Deepwater Horizon Oil Spill. The SIT prepares recommendations to the CAO to refer the claimant to the Department of Justice ("DOJ") for appropriate review and relief. Upon notification to the Department of Justice of the potential deception, dishonesty, or fraud, all such claimants' claims submitted in the Program are suspended indefinitely. The CAO has referred over 590 claimants to the DOJ for investigation.

**(b) No Indication of Fraud**. If the SIT finds no indicia of fraud relating to the claim after the Special Investigation Review, the SIT releases the claim for payment. The SIT does not notify any party of this determination. To date, SIT reviewers have evaluated and found no indication of fraud for over 3,500 claimants that were identified for SIT review.

**(c) Inconclusive Finding of Fraud.** The SIT or HUB may not have enough information to make a conclusive finding of fraud, typically due to lack of a claimant's cooperation. The Program will suspend such claimant's claims and review claims on a claim-by-claim basis to determine if there is sufficient evidence of fraud to refer the claim to the Department of Justice.

**8.      Reporting.** The SIT tracks all claims, outcomes, and issues relating to any SIT claim review and finding. The SIT develops reports to implement fraud detection processes, team management reports, and provides reports showing review progress and status as determined necessary by SIT management and the CAO.

**9.      Special Investigation Holds on Claims Processing.** The Program does not issue payments or Eligibility Notices to a claimant while the claim is the subject of a SIT review. However, the SIT performs reviews for potential fraud claims on all claims, regardless of whether the claimant has already received a payment.

**10.      Notifications on Claims Subject to Special Investigation Review**. The SIT places internal hold codes to indicate that the claim is subject to Special Investigation Review in the Claims Database. The SIT issues Notices to claimants under SIT review when the claimant is selected for FI steps or when there is a finding of fraud. In addition, the SIT issues Notices to claimants to complete TIN verification steps.

9

**11.     File Production and Trial Assistance.**  The SIT responds to file production requests from the NCDF and other Law Enforcement Agencies and to date has produced information in response to over 4,100 requests for claimant information.  The SIT also assists U.S. Attorneys in preparing for trials and, if determined necessary, provides witnesses.



**EXHIBIT II(E)**



# EXHIBIT I

| | |
|---|---|
| **From:** | Lynn Greer <LGreer@browngreer.com> |
| **Sent:** | Monday, January 14, 2013 6:18 PM |
| **To:** | dodom@dheclaims.com; Orran L. Brown |
| **Cc:** | pjuneau@dheclaims.com; creitano@dheclaims.com; kfisher@dheclaims.com; Bill Atkinson |
| **Subject:** | RE: Transition |
| **Attachments:** | BROWNGREER-#419010-v1-BEL_Reviews.pdf |

David:  Thanks for your email.  Please see the attached memo, which explains the tasks our reviewers perform relating to BEL claims.  These tasks go beyond the Data Capture and Document Categorization we discussed in our meeting last Thursday.

In addition to the tasks of our reviewers described in this memo, we also  have trained staff in the CACs, CCCs and law firm contacts/ claimant contacts, and team members who address questions about BEL claims, help with appeals of BEL claims, etc.  Each BEL Notice has the phone number of our CCC for claimants and lawyers to call for explanation and discussion of the next steps in the process.

Bill Atkinson, who is in charge of our BEL team, is in New Orleans until Wednesday and would like to attend the meeting in person, if it could be scheduled before then.

Thank you.

---

**From:** David Odom [mailto:dodom@dheclaims.com]
**Sent:** Monday, January 14, 2013 1:37 PM
**To:** Lynn Greer; Orran L. Brown
**Cc:** pjuneau@dheclaims.com; creitano@dheclaims.com; kfisher@dheclaims.com
**Subject:** Transition

Lynn and Orran,

Pat and I met with the accountants following our meeting last week and have decided to move forward with transitioning BEL functions over to the accountants.  Kirk is setting up a meeting to work out the details with BG and the accountants later this week and will contact you for available dates.

Thanks,

David

**David F. Odom**
*Chief Executive Officer*


**504-934-4999**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not

the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

| Business Economic Loss Reviews |
|---|

1. Document Categorization:  Document Categorization is the first step in the review process. During this step, each document in a claimant's file is assigned a Document Type and the page number(s) of that Document Type are identified.  This step is the foundation for the rest of the claims review process.  The reviewer identifies relevant financial documents for Data Capture in Document Categorization.

2. Data Capture:  After Document Categorization, certain documents will require Data Capture of the information provided by the claimant.  If a document requires Data Capture, the reviewer must enter all information required in the Data Capture Screen as it appears on the document.  This includes the capture of the business name and location, total revenues, total expenses, period start and end dates, and onetime non-recurring income for Profit & Loss Statements.  Some important documents that require Data Capture for Business Economic Loss claims are:

   (a) Financial – Income Statements / Profit & Loss
   (b) Federal Corporate Income Return 1120
   (c) Federal Corporate Income Return 1120S
   (d) Federal Income Return Form 1040
   (e) Rental – Statement from Property Management Company

3. EVR:  EVR determines the outcome of every Individual and Business Economic Loss Claim by ensuring that exactly one Employer/Location ID ("EID") exists for each location of a particular business.  EVR ensures consistent treatment of multiple claims across different Damage Categories by assigning a NAICS code, Industry Designation and Eligibility Zone to every Employer, Entity or Natural Person in the system.

   (a) The BEL reviewer either creates EIDs or selects existing EIDs during Data Capture based on the claimant's tax documents, profit and loss statements and other financial documents.  For each Data Capture entry, the reviewer must determine whether an appropriate EID for the particular business location already exists in the system or if he or she must create a new EID.

   (b) If the reviewer creates a new EID, he or she must enter various data points from these documents, including the Tax ID, Business Name, Operating Address and NAICS code.

   (c) After a reviewer creates a new EID, the EVR Team uses those data points, along with additional analysis, to assign an Industry Designation and Eligibility Zone to that business location.  The combination of Industry Designation and Eligibility Zone determines the claimant's Risk Transfer Premium and whether the claimant receives a Causation Presumption.

4. Exclusion Review:  The Found an Exclusion button is located on each screen for the BEL Claim Review.  The reviewer must select this button if he/she determines that the claimant or claim is subject to an Exclusion.

(a) The BEL reviewer must review the claimant's documentation to determine if:
    (1) The claimant opted out of the Settlement Agreement and has not revoked that Opt-Out;
    (2) The claim is for Medical Benefits or Bodily Injury that should be asserted to the Medical Benefits Settlement rather than the Economic and Property Damage Settlement;
    (3) The claimant is a BP Shareholder who is making the claim solely in the claimant's capacity as a BP Shareholder based on complaints about the value of BP stock;
    (4) The claim is against Transocean or Halliburton and not against BP;
    (5) The claimant is a Government Organization;
    (6) The claimant is a company in the Oil and Gas Industry; or
    (7) The claimant is a company that sells or markets BP fuel.

(b) Additionally, the BEL reviewer must answer the questions on the Found an Exclusion screen if EVR determines that the claimant is located outside the Eligibility Zone. The reviewer must examine the claimant's documentation to answer a series of questions that determine whether the claimant is a member of the Economic and Property Damages Settlement Class.

5. Multi-Facility Questions: If the claimant is a Multi-Facility business, then the reviewer must complete the Multi-Facility Questions Review before entering the claim review for each claiming Facility. The questions are:

(a) Question 1. This question will display the Yes or No claimant response to the question. There is no Reviewer Override for Question 1. This question is pre-populated from the claimant's response to Question 6 of the Claim Form.

(b) Question 2. This question will display the Yes or No. This question is pre-populated from the claimant's response to Question 5 of the Claim Form.

    (1) If the reviewer determines that the claimant's response is not accurate, then he or she can override the claimant's response. The reviewer must select the Yes or No radio button and leave a comment.

    (2) This question requires the reviewer to analyze and review each of the profit and loss statements submitted by the claimant to determine whether the business maintained separate profit and loss statements for each Claimant Facility. The reviewer must select the Yes or No radio button and leave a comment.

(c) Question 3. This question does not have a claimant response.

    (1) The reviewer must determine whether the claimant is a non-corporate structured Vacation Rental Property owner that would not have a Headquarters facility.

(2) This question requires the reviewer to analyze and review the claimant's federal tax documents to answer this question. The reviewer must select the Yes or No radio button and leave a comment.

(d) Question 4.  An accountant reviewer answers this question during the accountant review portion of the Business Economic Loss Review.

(e) Question 5.  The reviewer must identify the Headquarters of the Multi-Facility Business by selecting the Headquarters from the list of entities that are available in the Drop-down menu.

(1) To identify the Headquarters, the reviewer must examine Question 7 on the Claim Form.  If the claimant provides only one Claim Form for a consolidated claim, the reviewer must use the location provided for Question 7.  If the Claimant provided multiple Claim Forms for non-consolidated claims, the reviewer must use the location for which the claimant checked the "Headquarters" box in Question 7.

(2) The reviewer must verify the Headquarters identified by the claimant with documentation in the claimant's file and through an internet search of the claimant's Facilities.  If the claimant did not provide a Headquarters, the reviewer must look through the documentation provided and perform an internet search to verify the location of the Headquarters.

6.  Facility Identification:  The reviewer must answer two questions to identify the Claiming Facility.

(a) Select Business Entity or Rental Property.  The reviewer must select whether the business is a Business Entity or Rental Property.

(b) Select the Facility associated with this Claim. The reviewer must select the Facility that identifies the physical location of the business entity for which the claimant is asserting a claim. This list contains the entities that the reviewer entered during Data Capture.

7.  Causation Review

(a) General Business Causation Tests

(1) V Shaped Revenue Pattern Test:  The result of this test displays after the reviewer clicks on the "Run" button.  This test is performed programmatically by an algorithm using the calculations set forth in the Settlement Agreement.  The reviewer must click on the Review button next to the Revenue Pattern Test in order to review the results of the test.

(2) Modified V Shaped Revenue Pattern Test:  The result of this test displays after the reviewer clicks on the "Run" button.  This test is performed programmatically by an algorithm using the calculations set forth in the Settlement Agreement.  The reviewer

must click on the Review button next to the Revenue Pattern Test in order to review the results of the test.

(3) Decline-Only Revenue Pattern Test and Additional Analysis:  The result of this test displays after the reviewer clicks on the "Run" button.  This test is performed programmatically by an algorithm using the calculations set forth in the Settlement Agreement.  The reviewer must click on the Review button next to the Revenue Pattern Test in order to review the results of the test.  To pass the Additional Analysis prong of the Decline-Only Revenue Pattern test, the claimant must provide specific documentation identifying factors outside the control of the claimant the prevented the record of revenues in 2011.

    a.  The reviewer must answer the Additional Analysis question to complete the Decline-Only Revenue Pattern analysis.  If the reviewer determines that the claimant did not provide specific documentation identifying factors outside the control of the Claimant that prevented the recovery of revenues in 2011, then the reviewer must select No.  If the reviewer selects No, then the claimant will fail the Decline-Only Revenue Pattern.  If the reviewer determines that the claimant provided specific documentation identifying factors outside the control of the Claimant that prevented the recovery of revenues in 2011, then the reviewer must select Yes.  If the reviewer selects Yes, he or she must select the factor that prevented recovery of revenues from the Drop-down menu, and he or she must leave a comment by clicking on the Comments button next to Question 1.

    b.  The Comment must explain how the reviewer determined that the claimant provided specific documentation identifying factors outside the control of the claimant that prevented recovery of revenues and the reviewer must select the document on which he or she based his or her determination.  This question requires the reviewer to analyze and review documents such as third party letters, claimant correspondence, newspaper articles, photographs, legal documents, customer correspondence, maps and medical records.

(4) Proof of Spill Related Cancellations

    a.  Spill-Related Reservation Cancellations:  Business claimants located in Zones B, C, or D may establish causation by providing contemporaneous written evidence of Spill-Related Reservation Cancellations that the claimant was unable to rebook.

        1.  The reviewer must make an independent determination of whether there is Proof of Spill-Related Reservation Cancellations, regardless of the claimant's response on the Claim Form.

        2.  In Question 1(a), the reviewer must answer whether the claimant has submitted specific documentation of a cancelled reservation. If the answer to Question 1(a) is "No", all subparts of Question 1 will be disabled.  If the

answer is "Yes", the reviewer must provide a comment and indicate the type of specific documentation that the claimant provided. For each box that the reviewer checks, he or she must select from the adjacent drop-down menu the document in which such evidence on is located.

3. In Question 1(b), the reviewer must answer whether the reservation was in place as of April 20, 2010. If the reviewer selects "No" then subparts 1(c) and 1(d) will be disabled. If the reviewer selects "Yes", then he or she must enter a date for Questions 1(c) and (d).

4. In Question 1(e), the reviewer must answer whether the claimant established that he or she was unable to rebook the reservation on same or similar terms. If the reviewer selects "No", then the claimant will fail Proof of Spill Related reservation cancellations causation test. If the reviewer selects "Yes", then he or she must leave a comment.

5. These questions require the reviewer to analyze and review such documents as claimant correspondence, third party correspondence, customer correspondence, business records such as occupancy reports and reservation lists and Sworn Written Statements.

b. Spill-Related Contract Cancellations: Business claimants located in Zones B, C, or D may establish causation by providing contemporaneous written evidence of the cancellation of a contract as a direct result of the Spill that the claimant was not able to replace. In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation was Spill-Related.

1. The reviewer must make an independent determination of whether there is Proof of Spill-Related Contract Cancellations, regardless of the claimant's response on the Claim Form.

2. In Question 2(a), the reviewer must answer whether the claimant has submitted specific documentation of a cancelled contract. If the answer to Question 2(a) is "No", all subparts of Question 2 will be disabled. If the answer is "Yes", the reviewer must provide a comment and indicate the type of specific documentation that the claimant provided. For each box that the reviewer checks, he or she must select from the adjacent drop-down menu the document in which such evidence on is located.

3. In Question 2(b), the reviewer must answer whether the reservation was in place as of April 20, 2010. If the reviewer selects "No" then subparts 2(c) and 2(d) will be disabled. If the reviewer selects "Yes", then he or she must enter a date for Questions 2(c) and (d).

4. In Question 2(e), the reviewer must answer whether the claimant established that he or she was unable to replace the contract on same or similar terms between April 21, 2010 and the date that the claimant's claim was filed. If the reviewer selects "No", then the claimant will fail Proof of Spill-Related Contract Cancellations Causation Test.  If the reviewer selects "Yes", then he or she must leave a comment.

5. This question requires the reviewer to analyze and review such documents as legal contracts, claimant correspondence, third party correspondence, customer correspondence and Sworn Written Statements to determine the answers to the questions above.

(5) Causation Proxy and Causal Relationship Review  A non-rural business claimant on a property that is in close proximity (within 100 yards) to the property of a separate MDL 2179 business claimant that has established causation ("Causation Proxy Claimant") may rely on the documentation submitted by such Causation Proxy Claimant to satisfy the Causation Requirements for BEL Claims.  A "Rural Business" claimant located within one quarter-mile of the property of the Causation Proxy Claimant may rely on the documentation submitted by the Causation Proxy Claimant to satisfy these causation requirements only if the claimant provides information sufficient for the Claims Administrator to determine that a causal relationship exists between the claimant's financial performance and the financial performance of the Causation Proxy Claimant.  A Rural Business shall be defined as one that is located in an area outside an Urban Area or Urban Cluster, as defined by the US Census Bureau's classification.  Only business claimants with annual revenue of $75,000 or below are eligible to establish causation as under the Causation Proxy Analysis.

a. The system will automatically populate Questions 1 through 6 based on the data capture of the claimant's Profit and Loss statements and the Causation Proxy Sworn Written Statement.

b. The reviewer must click on the Calculate button for the system to determine the distance from the claimant to the Causation Proxy Claimant in Question 5.

c. If any of the answers for Questions 1 through 6 are "No", Question 7 will be disabled.  If the answers to Questions 1 through 6 are all "Yes", Question 7 will be enabled.  The reviewer must examine the claimant's documentation and indicate whether there is evidence of a causal relationship between the claimant's financial performance and the Causation Proxy Claimant's financial performance.  If the reviewer selects "Yes", then he or she must provide a comment.  If the reviewer selects "No", the claimant will not pass the Causation Proxy Analysis.

d. Question 7 requires the reviewer to analyze and review financial documents, customer lists, claimant correspondence and third party correspondence.

(6) Failed Business Causation Tests

    a. Failed Business Causation Test:  The result of this test displays after the reviewer clicks on the "Run" button.  This test is performed programmatically by an algorithm using the calculations set forth in the Settlement Agreement.  The reviewer must click on the Review button next to the Revenue Pattern Test in order to review the results of the test.

    b. Failed Business Additional Analysis Question:  The reviewer must determine if the claimant provided evidence through documentation and/or affidavits that provide a reasonable basis to conclude that the DWH Spill was a substantial cause of the business's revenue decline.  The reviewer must analyze and review such documents as claimant correspondence, third party correspondence, financial documents and cancelled contracts or reservations.

    c. Failed Start-Up Business Additional Analysis Question:  This analysis is the same as described above.

(7) Start-Up Business Causation Tests

    a. Upturn Revenue Pattern Plus Test:  The result of this test displays after the reviewer clicks on the "Run" button.  This test is performed programmatically by an algorithm using the calculations set forth in the Settlement Agreement.  The reviewer must click on the Review button next to the Revenue Pattern Test in order to review the results of the test.

    b. Proof of Spill Related Cancellations:  This analysis is the same as described above.

8. Incompleteness Review:  The Incompleteness Review represents an area where work done by reviewers in Document Categorization and Data Capture is leveraged to produce system-generated results.

(a) The system determines which required documents are missing, if any, based on the Document Categorization and Data Capture performed in earlier review steps.  The Claim Summary screen shows all of the Incompleteness Reasons with a corresponding checkbox.

(b) The reviewer notes which documents have been marked as Incomplete by the system, and then performs quality control on the Document Categorization and Data Capture to ensure that the documents are Incomplete.  The reviewer analyzes all submitted documentation in an attempt to locate the documents marked as Incomplete on the claim summary screen.

(c) If the Document Categorization for any of the documents was performed incorrectly, then the reviewer corrects the categorization of the document, and then performs Data Capture for the document.

(d) If a claimant submits a documents but the document does not contain all of the required information, the review will indicate during Data Capture that the document is incomplete.  In these situations, to maximize the clarity of the Incompleteness Notice sent to the claimant, the reviewer uses a comment box to explain to the claimant exactly why the document(s) that he/she provided was not complete. For example, if a claimant submits a Sworn Written Statement but forgets to sign the Statement, then the reviewer will leave a note specifying that the missing signature caused the document to be considered Incomplete.

9. Claim Summary Screen:  The Claim Summary Screen displays the outcome of the review of the claim.  If the outcome is Denied or Incomplete, the Claim Summary screen displays the applicable Denial Reason Code or Incompleteness Reason Code(s), together with a brief description of each.  If the claimant has submitted complete documentation and established causation, the Claim Summary screen displays a status of Sent to Accountant.

10. Final Comment:  The reviewer must enter a final comment before he clicks on the Submit button.  If the result of the review is Incomplete, this comment must explain why the Incompleteness Reasons are selected.  If the result of the review is Denied, this comment must explain the reason for the Denial.  If the claim is not Incomplete, the reviewer must explain that the claimant provided all necessary documentation.  The reviewer must also include any additional pertinent information that he thinks may be helpful to the Accountant Reviewer that will perform the Compensation calculation.

11. QA:  We have a nightly job programmed into the DWH Database Application that sweeps for BEL claims coming of the Initial Review that trip certain QA metrics.  The system redirects these claims to the QA Review Queue.  Currently, these metrics identify all claims with a Denied or "Fatally Incomplete" outcome.  Claims are considered "Fatally Incomplete" if we cannot determine the NAICS Code, Economic Loss Zone, or several other fundamental characteristics of the claim that factor into the Causation and Incompleteness review standards that the Settlement Agreement requires.  All claims in the QA Review Queue undergo the same review steps as set forth above for the Initial Reviews.  QA Reviewers check each step of the claims review to confirm that it was performed properly, and make adjustments as necessary.

12. Incompleteness Response:  When a claimant submits new documents in response to an Incompleteness Notice, the claim is routed back to the BEL Incompleteness Response Queue for evaluation of the claim given the presence of the newly submitted documentation.  All claims in the Incompleteness Response Queue undergo the same review steps as set forth above for the Initial Reviews, however the focus of the review is on whether the new documentation (or any previously-submitted documentation) cures the Incompleteness Reasons listed in the Incompleteness Notice.

13. Reconsideration:  When a claimant requests Reconsideration after the Program has issued an Eligibility Notice or Denial Notice, the claim is routed back to the BEL Reconsideration Queue for re-evaluation.  All claims in the Incompleteness Response Queue undergo the

same review steps as set forth above for the Initial Reviews, however the focus of the review is on the factors specified by the claimant or law firm in their request for Reconsideration.

14. Additional Reviewer Determinations:  There are other determinations that a reviewer must make during the course of a BEL review.

    (a)  Double Payments;
    (b)  SIT Review;
    (c)  Tax ID Verification;
    (d)  Changing Benchmark Period;
    (e)  Reclassification;
    (f)  Mis-linked Documents;
    (g)  Withdrawal claim requests; and
    (h)  Moratoria issues.