# EXHIBIT  7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig                    MDL NO. 2179
        "Deepwater Horizon" in the Gulf
        of Mexico, on April 20, 2012               SECTION J

Applies to: *All Cases*                            JUDGE BARBIER
                                                   MAGISTRATE JUDGE SHUSHAN

<u>DECLARATION OF ORRAN L. BROWN</u>

1.      ***Personal Information.***  My name is Orran L. Brown.  I am the Chairman and a founding partner of BrownGreer PLC ("BrownGreer"), located at 250 Rocketts Way, Richmond, Virginia.

2.      ***Personal Knowledge.***  The matters set forth in this Declaration are based upon my personal knowledge, experience, and training, as well as facts related to me in my capacity as supervising partner for BrownGreer's work on the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement").

3.      ***General Description of BrownGreer.***  BrownGreer is a firm experienced in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicle.

4.      ***Personal Information.***  I received my J.D. degree from Harvard Law School *cum laude* in 1981 and my B.A. from Hampden-Sydney College *summa cum laude* in 1978. After serving as the law clerk for the Hon. Robert R. Merhige, United States District Judge for the Eastern District of Virginia, from 1981 to 1982, I practiced litigation in Houston,

Texas, from 1982 until I returned to Richmond, Virginia, in 1986.  I then practiced litigation in the Richmond law firm Christian, Barton, Epps, Brent & Chappell, with an emphasis on products liability, MDL and class action matters.  I am a member of the State Bars of Texas and Virginia.  Starting in 1990, I served as outside counsel to the $3.0 billion Dalkon Shield Claimants Trust created under the bankruptcy plan of the A.H. Robins Co. to resolve administratively over 300,000 claims relating to the Dalkon Shield IUD and served in that capacity for that fund and two other trusts formed under the plan until we closed the last of the trusts un April 2000.  From 1999-2002, I was a partner in the firm of Bowman and Brooke, LLP, where I founded the firm's Mass Claims Resolution Group. Lynn Greer and I formed BrownGreer in September 2002 to specialize in the design and operation of facilities for the receipt, review and disposition of multiple claims arising from a product or injury event and aggregated for resolution through a class action judgment or settlement, voluntary settlement programs, or other means. From 1997 through 2004, I was an Adjunct Professor of Law at the University of Richmond School of Law, teaching courses on complex litigation and trial and appellate practice, and have taught in numerous legal education seminars on class actions and settlement programs.  I have served or currently serve on the Board of Directors or Board of Trustees of several non-profit organizations.

5.     ***Claims Administration Experience.***  I have worked in the mass claims area, including class actions, for over 25 years.  I have extensive experience as a lawyer handling class action proceedings, settlements and notices; as a claims administrator designing and implementing class action settlements and other claims programs; as a notice administrator; as a trustee or special master involved in multiple claim proceedings; and as an educator on class actions and other complex litigation.  As an example, in August 2007, I was appointed

by the United States District Court for the Middle District of Florida as the Special Master for case-specific discovery in *In re Seroquel Products Liability Litigation,* MDL No. 1769 (M.D. Fla.) and served in that role until the litigation concluded. Our firm has performed crucial administration or review roles in over 60 major programs involving around 2,000,000 claimants and the disposition of over $24 billion in payments to qualifying claimants.  A list of some of our major engagements is attached to this Declaration as Ex. A.

6.     ***Role in the Deepwater Horizon Program.***   BrownGreer provides services to Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("CSSP") established under the Settlement Agreement.   Among other services, BrownGreer created the process for the review of claims received by the CSSP, procured and trained staff needed to process the claims, and procured and trained the staff in the 18 Claimant Assistance Centers ("CACs") used in the CSSP.

## A. <u>THE BUSINESS LICENSE REQUIREMENT.</u>

7.     ***Holstein Declaration.***   I have reviewed the Declaration of Mr. Mark Holstein filed with BP's Motion to Remove and submit this Declaration to explain more fully the events regarding the ultimate relaxation of the requirement that claimants submit copies of business licenses or permits and to correct certain statements made by Mr. Holstein.

8.     ***Settlement Agreement Provision Regarding Business Licenses of BEL Claimants.***   Section 7 of the Documentation Requirements for Business Economic Loss Claims (Ex. 4A to the Settlement Agreement) provided:

> Claimant must provide a copy of any applicable federal, state, or local
> governmental license required to operate its business.  For example,
> claimants shall produce the following for the Benchmark Period, 2010 and, if
> applicable, 2011:

      a) Real estate sales licenses
      b) Occupancy licenses (lodging businesses, including hotels, motels, and vacation rental properties)
      c) Business or occupational licenses
         i. Restaurant licenses
         ii. Bars (liquor) licenses
         iii. Taxi/livery licenses
         iv. Service licenses or permits

**9.** ***Settlement Agreement Provision Regarding Licenses of IEL Claimants.*** Section I.A.5.b of the Framework for Individual Economic Loss Claims (Ex. 8A to the Settlement Agreement) stated, as to IEL claimants in Category I (those with contemporaneous tax documents for 2010 and Benchmark Period):

    a) **Licensing Documentation**: If claimant's employment requires a government-issued license/permit, a copy of valid 2010 and 2011 licenses, if appropriate, or a print out from a public database providing the same information as would be provided by the original document.  Licenses could include, but are not limited to:

        i. Taxi/livery licenses.
        ii. Real Estate Sales licenses.
        iii. Other licenses and permits related to income sources.

The Framework contained identical provisions for IEL claimants in Category II (those with pay period or other earnings documentation for 2010 and Benchmark Period; §II.A.4.b),  Category III (those with earnings documentation for 2010 but without comparable Benchmark Period Earnings; §III.A.5.b) and Category IV (those with no earnings documentation; §IV.A.3).  These provisions addressed licenses obtained by individual workers when their employment required them to have a license or permit to work in their position.

**10.** ***Website Information and Posted Claim Form Instructions.*** Beginning on May 7, 2012, the Claims Administrator posted the Settlement Agreement and its Exhibits containing these and other document requirements on his public website for the CSSP,

http://www.deepwaterhorizoneconomicsettlement.com.   Working with Class Counsel and BP counsel, we developed written Instruction manuals on how to complete each of the 12 Claim Types available under the Settlement Agreement, including an BEL or IEL claim, that clearly spelled out that the Settlement Agreement required submission of these license materials, that were available on the CSSP public website starting on May 22, 2012.  Class Counsel and BP's counsel agreed to the terms of these Instruction Manuals.  We also prepared and made available on that website recorded Webex seminars on how to submit a complete BEL or IEL Claim Form that reviewed this and other documents required by the Settlement Agreement.  These materials made it clear that BEL claimants were required by the Settlement Agreement to submit copies of business licenses for every year of their Benchmark Period (which could include 2007, 2008 and 2009), 2010, and in some instances 2011 as well, and that IEL claimants were to submit individual licenses or permits for 2010 and in some situations 2011.

11.     ***Claims Experience in the First Months of the CSSP.***  We began receiving Claim Form packages on all 12 Claim Types online through the system we created on the CSSP website, in hard copy by mail or delivery and in person in the 19 Claimant Assistant Centers, starting on June 4, 2012.  By August 13, 2012, we had received 9,243 BEL claims and 10,922 IEL claims and had begun reviewing them to determine whether the claimants had submitted the supporting documents required by the Settlement Agreement and to calculate award amounts to those who had done so and were eligible for benefits under the terms of the Settlement Agreement.  It quickly became apparent that the majority of BEL and IEL claimants and their counsel were failing to submit any business licenses or permits with their Claim Forms, rendering their claims incomplete under the terms of the Settlement Agreement, and requiring us to issue Notices of Incomplete Claim to alert claimants and their lawyers of what they were

missing.  For example, as of August 14, 2012, 76.8% of the BEL claims reviewed thus far lacked any business license.  As claimants and counsel were attempting to file claims, and as we began issuing Notices of Incomplete Claim to counsel and claimants asking them for business licenses, we began receiving in June and July, 2012, many complaints from counsel and claimants about the requirement to submit a license.  Counsel and claimants were uncertain as to which licenses were required and from what governmental levels.  They contended that the claimants operated in industries with no licensing requirements, that most businesses discarded copies of old licenses after obtaining a new one for the current year and even that they had been instructed to do so by the licensing authorities, that the licenses were for periods that did not match up with the annual yearly model contemplated by the Settlement Agreement, and that they were having trouble and incurring costs and delay attempting to obtain copies of former licenses from government offices.  We heard similar comments from members of Class Counsel.  We also received many questions as to why the CSSP was requiring submission of a business license, when the license did not seem pertinent to any of the damages calculations prescribed by the Settlement Agreement.  In all these situations, our contacts assigned to each firm representing claimants explained the provisions of the Settlement Agreement regarding this requirement and provided suggestions on where to go to try to obtain copies of licenses, but these helpful instructions, with the explanation that we did not determine what documents were required by the Settlement Agreement but instead those terms were in the agreement written and signed by Class Counsel and BP, did little to quell the unrest over this license requirement.  Of all the documents required by the Settlement Agreement, we received the most intense and bitter complaints from Class Counsel, Class Members and their lawyers regarding this one.

12.    ***Complaints from Class Counsel on the Issuance of Notices of Incomplete Claims and Demands from the Parties to Issue Awards.***    At the same time in July and August, 2012, Mr. Juneau and we were receiving harsh criticism from members of Class Counsel on the number of claims we were being forced by the terms of the Settlement Agreement to find incomplete.  Class Counsel were adamant that we should issue only notices of awards to eligible claimants and should stop issuing any notices of incomplete claims in an effort to get claimants and their counsel to complete their claim files.  They questioned why we were telling claimants that they must submit copies of licenses.  They contended that with the Opt Out Deadline of October 1, 2012, approaching, the issuance of notices of incomplete claims would prompt class members to opt out of the settlement, whereas notices of eligible awards would induce them to remain in the Class.  In addition, both BP and Class Counsel demanded that the CSSP issue substantial payments before the scheduled November 8, 2012 Fairness Hearing, to show the success of the CSSP and to support the request for District Court approval of the Settlement Agreement.  That goal, however, was not possible to attain unless we had complete claims on which we were permitted under the terms of the Settlement Agreement to issue awards and payments.

13.    ***The Early Analysis of the Causes of Incomplete Claims.***  With this brewing unrest about to boil over, on August 6, 2012, Mr. Juneau asked me for an analysis of the percentages of claims we were finding incomplete during our reviews, what was causing them to be incomplete, and whether there were any "workarounds" we could suggest to help make the claims complete and permit us to review them for eligibility and awards.  He asked me to assess whether the document requirements causing claims to be incomplete were really needed to perform a damages review, or instead were Settlement Agreement requirements that did not

affect the award calculation.  On August 14, 2012, I emailed Mr. Juneau a memorandum that surveyed the common deficiencies we were seeing in claims and that suggested possible alternatives to expedite claims processing and avoid having to issue Incomplete Notices on the claims. That same day, Mr. Juneau emailed this memo to Class Counsel (Mr. Herman and Mr. Roy) and BP's counsel (Mr. Holstein, Mr. Cantor and Mr. Moskowitz).[1]  The memo identified the document requirements yielding deficiencies in claims for BEL (five requirements), IEL (four requirements), Seafood (five requirements), Vessel Physical Damage (one requirement), VoO Charter Payment (two requirements), Individual Periodic or Festival Vendor (three requirements), Real Property Sales (one requirement), Coastal Real Property (one requirement) and Wetlands Real Property (two requirements).  The memo identified missing business licenses as the major obstacle to completing an BEL claim and suggested two possible workarounds for this problem:

   (a)  Not enforce the requirement of a business license;  or

   (b)  Require the license, but have our reviewers perform internet research to attempt to verify the existence of a claimant's license.

We also recommended that we issue even stronger Alerts in the CACs and on the CSSP website to stress the need to submit copies of licenses and remind claimants and lawyers of this Settlement Agreement requirement.  This first memo did not raise the issue of IEL claimants having to submit individual licenses or permits.

**14.**     ***Questions Regarding the Purpose of the Requirement of a Business License.***
While we could not determine why Class Counsel and BP had agreed in the Settlement Agreement to require BEL claimants to file copies of old and current business licenses or IEL

---

[1] Mr. Holstein attached Mr. Juneau's email as Ex. I to his Declaration, but did not supply the Court with the actual memorandum sent with the email.  The memo itself is attached to this Declaration as Ex. B.

claimants to furnish copies of individual licenses or permits, Mr. Juneau was clear that unless and until Class Counsel and BP agreed to alter the requirement, we were bound to continue to enforce it and render claims incomplete if those documents were missing from the claim files. The presence or absence of a license is immaterial to the assessment of causation, Class Member eligibility, or the calculation of damages under either the BEL Framework or the IEL Framework in the Settlement Agreement.   In fact, after BP and Class Counsel ultimately agreed on September 17, 2012, as explained below, not to enforce the license requirement, the CSSP has not paid any BEL or IEL claimant any larger payment than the claimant otherwise would have received, and has not paid any claimant who would not otherwise have been eligible for payment, but for the technical requirement of submitting copies of old and current licenses.   We surmised that perhaps Class Counsel and BP had felt when they wrote the Settlement Agreement that a license requirement would help prevent payment of claims to fictitious businesses or employees of companies that did not really exist.   If so, it was not necessary for us to have a copy of a business license or personal license to control that risk.   Instead, we had designed and from the outset were carefully applying steps to verify that each company submitting a BEL claim or appearing as an employer of an IEL claimant was an existing business by confirming the validity of the company's Employer Identification Number through data searches with Dun & Bradstreet, Accurint, and even directly with the Internal Revenue Service when necessary. We also confirmed that each IEL claimant's Social Security Number was a valid SSN and belonged to the claimant.   These steps eliminated the need for a license to control fraud, and in fact are far more effective than requiring the submission of copies of licenses, which are easily fabricated.[2]   We also guessed that perhaps the Parties had instituted the license requirement to

---

[2] While these anti-fraud procedures effectively eliminated the risk of paying a fake company or individual, they too were the subject of vehement criticism from Class Members, their lawyers and Class Counsel.  For example, on

avoid paying damages to companies that were operating businesses illegally or persons working unlawfully, without the required license or permits, but nothing in the Settlement Agreement otherwise suggested that the only persons or companies entitled to compensation for injuries from the Spill were those with all their licenses up to date in 2010 and all prior Benchmark Period years, and when we asked the Parties in later meetings they responded that there was no such intention behind the provision.   As a result, the license requirement erected a merely technical hurdle for BEL and IEL claimants to clear by submitting copies of licenses to allow us to qualify them for payment, even if we had no need to use them in the course of review of a claim.

15.   ***Complaints from Class Counsel.***   During the July-August 2012 period, members of Class Counsel relentlessly pressured Mr. Juneau and me to stop sending Incomplete Notices and instead to send Eligibility Notices and payments to class members.   We regularly responded to these complaints that we were merely following the terms of the Settlement Agreement, which mandated the submission of certain records, such as the business license, that were not used in the compensation frameworks established by the Settlement Agreement to calculate the amount of a claimant's award.   At a meeting on August 15, 2012, among Mr. Juneau, Phil Strunk of BrownGreer, and Class Counsel Steve Herman and Joe Rice, Mr. Rice stated his view that 15% of all claims submitted by each Claim Type needed to be paid by September 1, 2012, to convince Class Members to stay in the settlement and not opt out.   He requested that the CSSP not issue Incomplete Notices on claims missing required information, but instead issue "conditional" Eligibility Notices stating the dollars the claimant could be paid if the claimant were to cure all

---

September 13, 2012, I attended a meeting with Mr. Juneau and about 30 lawyers who were members of Class Counsel or the PSC.   At that meeting, Class Counsel Joe Rice argued that we had no right to request that claimants prove their identity and criticized us severely for "treating every claimant as if they were a fraud."

deficiencies in its claim. In an email to Mr. Juneau and BP (Mr. Holstein and Mr. Moskowitz) on August 17, 2012, Class Counsel Steve Herman endorsed all the suggested workarounds in my August 1, 2012 memo and also requested that the CSSP begin to issue conditional awards.[3]  I discussed that idea with Mr. Juneau on August 17, 2012.  I explained that we were already issuing Eligibility Notices where the claim file contained sufficient information to evaluate the claim, but that the majority of the BEL, IEL and Seafood claims we had received were lacking in so many documents that we did not have sufficient information to run the damages calculations required by the Settlement Agreement, and particularly not to determine the Compensation Period most advantageous to the claimant, as mandated by Section 4.3.8 of the Settlement Agreement.  It was highly likely that any potential dollar amount in a conditional award notice would not match the actual award calculated after a claimant supplied all the required information, which would have led to rampant confusion, defeated expectations and disappointment among Class Members and their lawyers.  I also explained that altering the review system to abandon the model on which it was built—which, like any efficient claims process should do, assessed claims for file completeness, issued notices asking claimants to furnish missing required information and then evaluated claims once complete and issued Eligibility Notices with awards—would have required significant changes to the training and review processes, causing additional delay and expense, none of which was acceptable, especially in light of the looming Opt Out Deadline and upcoming Fairness Hearing.  Mr. Juneau correctly determined that it was not in the best interests of the CSSP to attempt to issue conditional awards.

---

[3] In that email, Mr. Herman reported that the business license document requirement was designed "to ensure that the claimant is a real person or entity;  therefore, when you have documentation that sufficiently verifies that the claimant is real, like the EIN number or Tax Return, that is all that should be required."

16.     *Additional Suggested Enhancements to the Handling of Claims.*   Given the crisis in confidence of the Class in the viability of the Settlement as described by Class Counsel, Mr. Juneau again directed us to continue to analyze methods to expedite the processing of claims and solve the problem of high percentages of incomplete claims.  On August 19, 2012, I emailed Mr. Juneau and others in his office a second memorandum on incomplete claims (copy attached as Ex. C).  This memo reviewed nine additional issues we had encountered over five Claim Types.  I raised in this memo the recommendation that Class Counsel and BP be asked to agree to remove the requirement that IEL claimants submit copies of individual licenses and permits. Up to that point we had directed our reviewers to perform internet research to locate licenses for IEL claimants who were not submitting them, which was taking around 30 minutes of reviewer time to perform, and it was very difficult for us to determine which employment positions were required to have a license or permit under the state laws of Louisiana, Mississippi, Alabama, Texas and Florida, and all the county, city and parish laws of those states.  I felt that removing this requirement would save the CSSP significant review time and cost and eliminate all this confusion over which IEL claimants were legally required to have a license or permit for all the jobs they held, and many claimants held more than one job during the relevant periods.

17.     *Response by BP to These Efforts to Improve the CSSP.*   At 11:58 p.m. CT on August 21, 2012, BP counsel Wendy Bloom emailed Mr. Juneau, Class Counsel, me, and others opposing the majority of the workarounds Mr. Juneau had suggested to solve the problem of incomplete claims.  In the Excel worksheet[4] she sent with her email, Ms. Bloom responded to the BEL business license issue as follows:

---

[4] Mr. Holstein included Ms. Bloom's August 21, 2012 email, but not her Excel sheet, as Ex. J to his Declaration.

Item 7 of Ex. 4A is a mandatory requirement that was negotiated and agreed to by the Parties, and preliminarily approved by the Court.  It cannot be disregarded.  If not already in the possession of the Claimant, these licenses are readily obtainable.  In many cases, these licenses are required to be posted by a Claimant in order to do business.  To the extent the Settlement Program is observing that many Claimants are failing to comply with this requirement, we agree with the Settlement Program's recommendation to post a message regarding this requirement on its website.  In BP's view the priority should be processing fully completed claims.  If not overly burdensome and can be done efficiently, BP is amenable to having the Settlement Program run internet searches of state databases to find licenses.  To the extent that readily available databases have this information, we encourage the Settlement Program to include this information on the public website and to post for Claimants to help them complete their claims correctly.

18.    *Further Efforts by Mr. Juneau and BrownGreer to Solve the Incompletes Problem.*  On August 23, 2012, Mr. Juneau spoke with Lynn Greer of BrownGreer and directed us to examine each of the document requirements and workarounds we had thus far presented to him and ensure that altering the document requirement would not compromise the integrity of the claim or change the intent of the Settlement Agreement.  He also wanted our analysis on whether the Claims Administrator had the discretion under the Settlement Agreement to alter a document requirement in the absence of agreement by BP and Class Counsel.  Mr. Juneau was adamant that he did not want to press any suggested relaxation of a document requirement if it would lead to paying invalid claims or depart from the Settlement Agreement's goal of paying Class Members who otherwise would qualify for payment.  In response, I emailed Mr. Juneau a report on Saturday, August 25, 2012 (copy attached as Ex. D) listing all the missing documents and possible solutions and the status of each.  On the Business License issue, I summarized BP's Response as "License required, but approved us doing online research to try to find them."  This table did not address the issue of individual licenses from IEL claimants, as at the time that issue was not as critical as the BEL license issue.

19.    *August 28, 2012 Administrative Panel Session.*  Section 4.3.4 of the Settlement Agreement provides that any issues regarding the implementation of the Settlement Agreement that cannot be resolved are to be presented to an Administrative Panel consisting of Mr. Juneau, Class Counsel and BP, which then must act by unanimous vote.  Because the document requirements and workarounds issues remained unresolved, the Panel convened at BP's offices in Houston, Texas, on August 28, 2012.[5]  Mr. Juneau and I attended.  Mr. Holstein, Mr. Moskowitz and Mr. Cantor appeared for BP, while Mr. Roy represented Class Counsel. Throughout that session, BP opposed any changes to the document requirements in the Settlement Agreement, including the business license requirement.  Mr. Holstein said that the Settlement Agreement had been "carefully negotiated" in "trench warfare" and that altering the document requirements would "allow claimants to pass who would not pass now," which would cause more claimants to be paid than otherwise would be paid.  He stated that he could not "agree to any changes to the Settlement Agreement," which had been approved by BP's Board of Directors.  He reasoned that the "presumption of causation" in the Settlement Agreement was offset by "rigorous document requirements," that "claimants who cannot get over the line will not get paid" and that "the deal is the deal."  Contrary to Mr. Holstein's assertion in Paragraph 20 of his Declaration, I did not "admit" that we had not contacted claimants with document deficiencies or asked anyone to provide a business license.  Instead, I explained the percentages of claims that were incomplete for various reasons, including the business license issue. I described the notices we had issued to claimants missing a license or other documents, our efforts to help claimants locate licenses, the extremely negative responses we were receiving from Class Members and their lawyers describing their inability to obtain copies of their licenses

---

[5] By this time, in an Order entered on August 27, 2012 (Document 7176), the Court had extended the Opt Out Deadline from October 1, 2012, to November 1, 2012.

and questioning why a license was required when it has no bearing on the damages calculations under the Settlement Agreement, and the better practice of informing claimants of all the deficiencies in their claims in one communication, rather than sending multiple incomplete notices to the same claimant on multiple different issues.  I also explained the tremendous pressure from Class Counsel not to issue any Notices of Incomplete claims but instead to issue only award notices and payments. Mr. Moskowitz asked many questions regarding the numbers of claims we had found to be incomplete, for what reasons, and what notices we had already issued. He asked Mr. Juneau and me to provide him with reports on those statistics, which we agreed to do.  I did ask Mr. Holstein at the session to describe the purpose and intent of requiring claimants to produce copies of business licenses for several years.  He either could not or would not articulate any rationale for the provision, and instead reiterated that it was a negotiated term of the Settlement Agreement and that it should be enforced regardless of whether we felt that it served any purpose.  At the end of the session, Mr. Juneau mentioned his plan to file a report with the Court on the outcome of the Panel session.   Mr. Holstein stated that he did not want to "create a negative record" and asked to see any report before it was filed.

20.     ***Reports Sent to BP on August 31, 2012.***   On August 31, 2012, I emailed Mr. Moskowitz and Mr. Cantor three reports to address the information Mr. Moskowitz had requested at the August 28, 2012 Panel session:

> (a) A report on the numbers and percentages of claims that we had found
> incomplete after our initial reviews of them (copy attached as Ex. E).  This
> report showed that 84% of BEL claims and 99% of IEL claims reviewed were
> incomplete.  It also showed that we had issued Notices of Incomplete Claim
> on 132 BEL claims on issues involved in the workarounds discussion and had
> another 419 claims ready for such a Notice.  We had 276 IEL claims ready for
> an Incomplete Notice.

(b) A report on the Notices issued by the CSSP as of August 30, 2012 (copy attached as Ex. F), which showed that we had issued 3,188 Eligibility Notices across the 12 Claim Types, with award amounts totaling over $132,000,0000, and a total of 224 Notices of Incomplete Claim on BEL claims.

(c) A report requested by Mr. Moskowitz (copy attached as Ex. G) on the numbers of claims denied by the Gulf Coast Claims Facility as incomplete.

21.    ***Additional Efforts by Mr. Juneau to Solve the Problem.***   Class Counsel and claimants' attorneys continued to swamp the CSSP with complaints about the document requirements and the numbers of incomplete Notices they were receiving.   On September 4, 2012, Mr. Juneau instructed me to alter all the 214 reasons we were giving to claimants in their Notices of Incomplete Claim to include suggestions on where and how claimants could obtain the documents they were missing, and we then modified all the Notices to provide these suggestions.

22.    ***Subsequent Developments.***   From September 4, 2012, until BP agreed on September 17, 2012, to remove the license requirement, there were these developments:

(a) September 4, 2012:  Mr. Holstein, Mr. Moskowitz and Mr. Cantor called me and stated that the CSSP should help claimants find the records they needed to file.  Mr. Holstein reiterated that BP had "chosen not to pay certain claims" and that BP "will not pay claimants who do not provide these records."

(b) September 5, 2012:  Magistrate Judge Shushan called me and reported that she had met with Mr. Holstein on the documents issues and that I was to contact them for details.  I immediately emailed Mr. Holstein and Mr. Cantor and asked them for their position on each issue, but did not get a response.

(c) September 10, 2012:  BrownGreer sent an email to all counsel for claimants who had registered with us reminding them of the document requirements in the Settlement Agreement, including the business license requirement (copy attached as Ex. H).

(d) September 11, 2012:  Mr. Cantor called me and said that BP had undertaken a "huge effort" to research and compile spreadsheets that he would give to us on what copies of licenses are available in each state for businesses and individuals and in the seafood industry.  He repeated that BP would "not alter the Settlement Agreement."  That day, Mr. Cantor emailed me spreadsheets

16

on Alabama, Florida and Mississippi websites and links to obtain licenses.  In a meeting that I attended on September 12, 2012, among Judge Shushan, Class Counsel, Mr. Holstein and others for BP and Mr. Juneau, Lynn Greer and me, Mr. Holstein repeated his position that the CSSP should look up and find the licenses for claimants. At this meeting, Class Counsel Jim Roy said that there had been "an abject failure of the system" and that the CSSP received a grade of "F" on paying claims. He predicted a "flood gate of opt outs" that will "pull the plug on the program."

(e)  September 13, 2012:  Ms. Bloom emailed Judge Shushan, Mr. Juneau, me and others seven Excel sheets on licenses required and offices responsible for them in Louisiana, Texas, Mississippi, Florida, and Alabama, and sources of fishing related information.  In all of these discussions about the CSSP assuming the duty to find and obtain copies of licenses for claimants, I explained that while we were happy to undertake that work, doing so would increase the time needed to do a review and the numbers of reviewers required, all of whom would have to be trained in this new process, and all of which would be very time-consuming, unlikely to lead to obtaining copies of licenses for all years in all instances, increase the costs of administration drastically, and do nothing to achieve the goals of increasing the number of payable claims, notices of awards and payments before the October 1, 2012 Opt Out Deadline and the November 8, 2012 Fairness Hearing.  I also explained that all of this effort, cost and delay did not seem worthwhile to obtain copies of documents that are not used in the damages calculations under the Settlement Agreement.

(f)  September 16, 2012:  Class Counsel sent Mr. Juneau and BP counsel a memo contending that licenses were not required by the Settlement Agreement.

23.    ***Agreement by BP on September 17, 2012.***  On September 17, 2012, Mr. Moskowitz sent a letter to Mr. Juneau (copy attached to Mr. Holstein's Declaration as Ex. K) in which he announced BP's agreement to relax several of the document requirements in the Settlement Agreement, including that, as to licenses and permits, "BP agrees to modify the document requirements for Business Economic Loss and Individual Economic Loss claims and not require these licenses."  He noted that "BP is agreeing to this modification based on representations by the CSSP that not requiring licenses will allow the CSSP to significantly increase the pace of claims processing and the payment of eligible claims."  By this time the

November 1, 2012 Opt Out Deadline was only 44 days away and it was only 52 days until the November 8, 2012 Fairness Hearing.

24.     ***Events After September 17, 2012.***  Immediately upon receiving Mr. Moskowitz's September 17, 2012 letter, we implemented all the steps needed to carry out that decision, by alerting claimants and counsel that licenses were no longer required, eliminating this as a deficiency reason for claims, retracting Incomplete Notices already issued asking for licenses, and discontinuing issuing any additional Incomplete Notices for this reason.  This required considerable changes to the Frequently Asked Questions and Claim Form Instruction booklets we had previously used, our Incomplete Notices, and in the training and re-training for our reviewers, contacts for claimants and their lawyers and CAC assistants.  We also had to alter and re-test the software programing in our claims review application that had been erected with the approval of BP and Class Counsel to require these documents and not pay claims without them. These many changes did speed up claims review and enhance our ability to issue awards and payments. Removing the license requirement meant that we no longer had to issue Notices of Incomplete Claim asking claimants to submit copies of licenses, spend time reviewing the claims to see if the licenses had been submitted, or devote resources and time hunting for licenses from various licensing authorities or working with claimants who were confused about and unable to comply with the license requirement.  By the time of the Fairness Hearing on November 8, 2012, the CSSP had issued 1,576 Eligibility Notices for $180,844,952.53 on BEL claims, and had sent over $1.3 billion in payment determinations and had actually paid out almost $1 billion across Claim Types.  The CSSP had received only 2,588 potential Opt Outs by the Opt Out Deadline, and not a "floodgate" of exclusions.   At the Fairness Hearing, BP's Counsel Rick Godfrey applauded this progress on record in the Fairness Hearing when he said:

> Even before this Court has had the opportunity to determine whether or not on a final basis the settlement is fair, reasonable and adequate, Mr. Juneau, by the end of this week or early next, will have approved the payment of over one billion dollars in claims made to his facility under the terms of this settlement.  There is no precedence for this in our nation's jurisprudence.  This is a good thing.  It is a good thing not only for the claimants and for the communities of the Gulf Coast states, but it is good for our system of justice.  [Final Judicial Hearing Transcript, p. 50]

Mr. Godfrey continued:

> [M]any people, particularly in this area of the country, hold the Vioxx settlements as a model.  Mr. Juneau's facility will pay over 30,000 claims before the Vioxx settlement ever made a single payment.  It's a stunning statistic. [Final Judicial Hearing Transcript, p. 56-57]

25.    ***BP Again Agreed to the No License Policy in February 2013.***  Starting in May 2012, Mr. Juneau and we encountered hundreds of issues of interpretation and application of the Settlement Agreement that required the adoption of Claims Administration policies to cover areas where the Settlement Agreement was incomplete or unclear.  After presenting policy questions to the Parties and soliciting their feedback, the Claims Administrator would develop policies and procedures to govern gaps in the Settlement Agreement.  We cataloged all policies implemented over the course of the CSSP in a file called the Policy Compendium.  The Policy Compendium provided structure to the complex exchanges between the Parties and the Claims Administrator over all manner of settlement implementation questions.  The Policy Compendium created a record that included the substance of each policy, the date on which it was proposed and implemented, and the comments submitted by Class Counsel and BP in response to the Claims Administrator's request.  As the number of policies increased, the Claims Administrator wanted to disseminate the policies to the Parties and the public in a more efficient manner.  To this end, we began to catalogue all policies in a newly created application called Policy Keeper.  Before loading existing policies into the new Policy Keeper application, we circulated the Policy Compendium to the Parties on January 18, 2013.  We instructed them to review the

existing policies and provide comments as to why the policies should or should not be publicly disseminated.   Policy #109 in the Policy Compendium Excel stated that, for BEL claims: "Business License.   Business Economic Loss claimants are no longer required to submit a business or professional license or permit."   Mr. Moskowitz returned this Policy Compendium Excel to us by email on February 11, 2013.   As to this Policy #109, he indicated BP's position as "Agree."   Policy #227 in the list stated, for IEL claims: "Business License.   Individual Economic Loss claimants (including Individual Periodic Vendor/Festival Vendor claimants) are no longer required to submit a business or professional license or permit."   On this one, Mr. Moskowitz indicated "Already publicly announced."   Because this program presented hundreds of claims administration policy questions not answered by the express terms of the Settlement Agreement, and because Class Counsel and BP seldom agreed on the answers to those questions, in February and March, 2013, we developed and built an online software application called "Policy Keeper" to present policy questions to Class Counsel and BP, obtain their views on each, and then track the policies adopted by the Claims Administrator.   When we launched the Policy Keeper application, we back-filled all existing policies into the application and published them to BP and Class Counsel, indicating whether the policy had been agreed to by the Parties or instead whether it was one adopted by Claims Administrator without ever securing Party agreement.   We labeled the business license policies "Agreed to by the Parties" on March 28, 2013, and provided that to Class Counsel and BP.[6]   Also, under the Settlement Agreement, BP had the right to appeal to the Court on any of these policies, and did so in other instances, but never challenged the implementation of the business license policies for BEL and IEL claims.

---

[6] When these policies were entered into Policy Keeper, we assigned them new policy numbers in accordance with the new application.   The BEL business license policy previously referenced as 109 became number 231 in Policy Keeper.   The IEL business license policy formerly referenced as 227 became number 234 in Policy Keeper.

## B.  SEAFOOD PROGRAM CLAIMS.

26.     *The Cantor Declaration.*  I have reviewed the Declaration of Mr. Daniel Cantor filed with BP's Motion to Remove and submit this Declaration to explain more fully the events regarding three complaints he raises about Mr. Juneau's implementation of the Seafood Compensation Program and offer the facts that follow to explain these three areas:

> (a)  The policy regarding the use of Sworn Written Statement 1 (SWS-1) to identify shrimp harvesting revenues (Paragraphs 13-14 of the Cantor Declaration);
>
> (b)  The policy to apply the Settlement Agreement permitting the exclusion of one or more years of a claimant's Benchmark Period; and
>
> (c)  The policy regarding whether payments to seafood dealers and others under the Continued Dumping and Subsidy Offset Act ("CDSOA") constituted "revenue" under the Settlement Agreement.

BP's position towards Mr. Juneau's handling of the Seafood Compensation Program is curious on multiple levels.  First, the Seafood Compensation Fund is capped at $2.3 billion, with certain reductions to that figure negotiated by BP as part of the Settlement Agreement.[7]  Every dollar of the Seafood Compensation Fund will be distributed to eligible claimants.  As a result, no policy implemented by the Claims Administrator over Seafood claims could have a financial impact on BP.  Second, the Settlement Agreement contains provisions that are designed to make the administration process accommodating to claimants.  In his handling of the Seafood policies referenced by the Cantor declaration, Mr. Juneau sought to execute this express directive, while adhering strictly to the rules and requirements of the Settlement Agreement.[8]

---

[7] One of the reductions to the $2.3 billion for which BP negotiated is a credit for the number of Seafood claimants who declined to participate in the CSSP, known as the Opt-Out credit.  On 3/7/14, we learned that BP would waive the opt-out credit, a financial decision that is inconsistent with its current position regarding Mr. Juneau's administration of the Seafood Compensation Program (copy attached as Ex. I).

[8] Class Counsel submitted a memorandum to the Claims Administrator on 9/17/12 regarding the implementation of specific "claimant-friendly" provisions (copy attached as Ex. J).

## C. <u>SEAFOOD PROGRAM CLAIMS:  THE SWS-1 POLICY</u>.

27.     ***Settlement Agreement Provisions Pertinent to the SWS-1 Issue.***  Ex. 10 to the Agreement set forth the documentation required for Affected Claimants to prove their claims' eligibility and level of compensation under the Seafood Program.  (*See* Ex. 10 at 10-12, 14, 17-20, 31-32, 45-47, 56-58.)  Affected Claimants must support their Seafood Program claims with either (1) Trip Tickets or (2) federal or state tax returns *and* other financial information.  With respect to Vessel Owners and Commercial Fisherman Vessel Lessees without Trip Tickets, the Agreement required supporting documentation as follows:

> i.   If Claimant is an entity, federal tax returns or state tax returns, and sufficient documentation to identify components of gross revenue derived from commercial [catch type-specific] harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

> ii.  If Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms as well as sufficient documentation to identify those components of earnings derived from commercial [catch type-specific] harvesting by vessel for the Benchmark Period.

> iii. In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) the Claimant's revenue from [the specific catch type] as compared to other sources and (ii) Claimant's revenue from landings in the Gulf Coast Areas.

(Ex. 10 at 10-11, 17-20, 31-32, 45-46, 56-57).  Similarly, with respect to Boat Captains without Trip Tickets, the Agreement required supporting documentation as follows:

> b.   Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns and supporting documents for the Benchmark Period and sufficient documentation to identify those components of earnings derived from commercial [catch type-specific] harvesting for the Benchmark Period for the vessel(s) selected by the Claimant. In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from [catch type-specific]

landings in the Gulf Coast Areas for each vessel while the Claimant was Boat
Captain.

c.  Also, the Claimant must provide documentation sufficient to establish the vessel size
and type for the vessel(s) for which the Claimant seeks compensation.

d.  In addition, if available, it is requested that the Claimant also provide the following
documents, to assist the Claims Administrator:

(a)  Captain's log book
(b)  Vessel log book
(c)  Share sheets
(d)  Sales or other production reports maintained in the normal course of business.

(Ex. 10 at 11-12, 14, 20, 31, 46-47, 57-58.)  In short, Affected Claimants were required to

provide sufficient documentation of vessel-specific and catch type-specific revenue derived from

Seafood landed in the Gulf Coast Areas in the Benchmark Period, which can be (1) 2009, (2)

2008 and 2009, or (3) 2007, 2008 and 2009.  Without this information, the CSSP considered the

claim incomplete.

28.  *The Lack of Allocation Information.*  As of July 16, 2012, 3,644 claimants had

filed claims seeking compensation under the Seafood Program.  Of these claimants, 2,870 sought

compensation as a Vessel Owner, Commercial Fisherman Vessel Lessee, or Boat Captain.  Of

the 2,237 Affected Claimants indicating the type of proof of revenue they intended to submit on

a Claim Form, 49.7 percent, or 1,111, of these Affected Claimants submitted Trip Tickets in

support of their claims; the other 50.3 percent relied on tax and other financial information, as

Ex. 10 allowed.  Few of those claimants, however, had submitted documents showing the

breakdown of their Benchmark Revenue by vessel or catch type, which rendered all these claims

incomplete at the time when Class Counsel and BP were pressing the Claims Administrator

relentlessly to issue payable awards on claims before the original October 1, 2012 Opt Out

Deadline and the November 8, 2012 Fairness Hearing.

29.    *The Origins of the SWS-1 Policy.*   Nothing in the Settlement Agreement told us what documentation constituted "sufficient documentation to identify those components of earnings derived from commercial [catch type-specific] harvesting by vessel."   Neither BP nor Class Counsel had provided any guidance or assistance to us or Mr. Juneau on what documentation would be acceptable proof.   The Settlement Agreement allows the Claims Administrator to "explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, without changing Claims criteria."  (Agreement § 4.4.7, at 22.) Similarly, Ex. 10 to the Agreement provides expressly that, "[i]f necessary, the Claims Administrator may require supplemental information from the Claimant" in order to make determinations related to (1) the allocation of revenue from a certain catch type as compared to other sources and (2) the allocation of revenue for that catch type derived from landings in the Gulf Coast Areas.  (*See*, *e.g.*, Ex. 10 at 19.)  To try to solve this incompleteness problem, on July 17, 2012, we recommended to Mr. Juneau that he implement the use of a Sworn Written Statement in which Affected Claimants with deficient supporting documentation were required to allocate Benchmark Revenue to specific vessels and specific catch types for Seafood landed in the Gulf Coast Areas (memo attached as Ex. K).  This form entitled, "Sworn Written Statement for Sufficient Documentation of Benchmark Revenue," became SWS-1 (current version attached as Ex. L).  The proposed form, to be signed under oath and the penalty of perjury, captured allocations of revenue for Seafood landed both in the Gulf Coast Areas and outside the Gulf Coast Areas, which was to serve, for accuracy and fraud purposes, as a check on the total revenue figures the Affected Claimants reported.  Mr. Juneau approved our recommendation to use the SWS-1 as sufficient documentation to identify those components of earnings derived from commercial [catch type-specific] harvesting by vessel in what became Claims

Administrator Policy ID 212.  Claimants who submitted an SWS-1 were required to submit federal or state tax returns and schedules for the years that correspond to the Benchmark Revenue on the completed SWS-1 Form.  The SWS-1 form became available to Seafood claimants on the CSSP public website on July 31, 2012.  We also issued a formal Alert to all law firms registered with us as representing Class Members on the CSSP public website (copy attached as Ex. M).

30.    ***Response from Class Counsel and BP.***  The August 14, 2012 memo I sent to Mr. Juneau regarding the problem of rampant incomplete claims (described in Paragraph 13 of this Declaration and attached as Ex. B) and that Mr. Juneau emailed to Class Counsel and BP counsel on August 16, 2012, included a description of the need for and basis of the SWS-1 policy.  Class Counsel Steve Herman endorsed the use of the policy on August 17, 2012.  In her email on August 22, 2012, BP counsel Wendy Bloom objected to the use of SWS-1 as the documentation to allocate revenues by vessel and catch-type, and instead suggested that claimants should use trip tickets, "invoices reporting sales of seafood by species, vessel log books, and inventory records" to allocate tax return amounts.

31.    ***Subsequent Developments.***  Mr. Juneau instructed us to proceed with the use of SWS-1 as a means to allocate tax revenue.  Our reviewers compared tax return revenue with the amounts shown in a completed SWS-1.  If the file contained any trip tickets, we also examined the amounts shown in them to assess whether they reflected additional species or landing information not reported in the SWS-1.  On September 24, 2012, Mr. Juneau filed with this Court and served on Class Counsel and BP his Claims Administrator's Status Report 2, titled, "Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement: Status of Policy Changes Affecting Document Requirements"

(copy attached as Ex. N).  The Report described the SWS-1 as one method of allocating Benchmark Revenue in Seafood claims to avoid an incomplete outcome.  The exact terms of the SWS-1 policy evolved over time.  On September 25, 2012, Mr. Juneau adopted Claims Administrator Policy ID 257, which established a hierarchy of proof for documents to allocate revenue for purposes of Ex. 10:

>   (a)   If the claimant has submitted federal or state tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type, the Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, unless documents submitted by the claimant indicate that the revenues reported in the tax returns are not solely related to harvesting the catch type claimed.

>   (b)   If the claimant is not subject to (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns and has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation, the Claims Administrator will use the SWS-1 allocation and will not consider trip tickets or other documents for that purpose.

>   (c)   If the claimant is not subject to (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose.

>   (d)   If the Claimant is not subject to (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

Also on September 25, 2012, Ms. Bloom emailed Mr. Juneau stating that BP objected to the use of SWS-1 mentioned in the Court Report and suggested that the appointed Seafood Neutral, Mr. Dan Balhoff, be consulted as to the policy.  Ms. Bloom noted:

BP agrees it may be helpful to use an SWS in conjunction with tax document and additional supporting documents, but not as the sole source for allocating revenue.  We would like the opportunity to discuss this further with the Settlement Program seafood team.

**32.**     *October 1, 2012 Panel Session.*  On October 1, 2012, I attended a Panel meeting convened by Mr. Juneau with Class Counsel and BP to review several policy matters, including the use of SWS-1.  The Seafood Neutral, Mr. Balhoff, also attended.  At this session, Ms. Bloom, Mr. Holstein and Mr. Moskowitz  argued that the Claims Administrator should require claimants to use trip tickets to allocate revenue and that he had no authority to create a sworn statement for use in the claims process.  Class Counsel Joe Rice contended that Ex. 10 allowed claimants to choose between using trip tickets and tax returns, that if trip tickets were used, the claimant's revenue should not be limited to that shown in the claimant's tax returns, and that the SWS-1 was a reliable means to allocate tax return revenue.  Mr. Rice also argued that if a claimant had only one vessel, Mr. Juneau should allocate all tax return revenue to that vessel, without the need for any SWS-1.  Mr. Balhoff indicated that trip tickets are not always available to all claimants.  After this Panel meeting, on October 8, 2012, in a memo to Class Counsel and BP counsel, Mr. Juneau announced a re-stated SWS-1 policy as Issue 12 in the memo (ultimately issued as Claims Administrator Policy ID 262), which stated:

> The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:  On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:
>
> **(a) Single Catch/Single Vessel Claimants:**  If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information

available on the claim that the claimant is submitting a claim for only one vessel and one catch type:

The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following:

(1) The revenues shall be limited to those shown in the applicable tax returns.
(2) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.

**(b) SWS-1 Claimants:** If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:

(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:

    a)  The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.

    b) The revenues shall be limited to those shown in the applicable tax returns.

    c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.

(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:

    a)  The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation.  The Claims Administrator will base the resulting Eligibility Notice on the higher award.

       b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns.

**(c)** **Louisiana Trip Ticket Database:** If the claimant is not subject to Subsections (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose. The Claims Administrator will not consider tax return revenues on such claims.

**(d)** **Specific Trip Tickets or Equivalent:** If the Claimant is not subject to Subsections (a), (b), or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

33.     ***BP Response to the Restated SWS-1 Policy.*** On October 11, 2012, Mr. Holstein emailed Mr. Juneau a letter on several issues addressed by the Panel on October 1, 2012 (copy attached as Ex.O). Under a section entitled "Issues As To Which Parties Have Reached Agreement," Mr. Holstein listed the SWS-1 issue, which had been Issue 12 in the October 8, 2012 memo from Mr. Juneau, and said:

> Class Counsel and BP agree that the Claims Administrator's policy decision for Issue 12 as set forth in the Claims Administrator's memo of October 8 should be amended by adding the following underlined language to the first sentence of 12(a)(3) and 12(b)(1)(c): "The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim, including without limitation trip tickets, to note information that conflicts in a material manner with the allocation assertions in the Claim Form, sworn written statement, or other evidence submitted by the Claimant."

Mr. Juneau did not adopt these underlined changes to the wording of the policy, because the policy already said that the Claims Administrator would survey all claim information to detect conflicts, and on October 18, 2012, he adopted standards to define what constitutes a material conflict between the allocations in an SWS-1 form and other information in the claimant record.

BrownGreer trained its reviewers to apply these standards in the evaluation of Seafood Compensation Claims. The accountant reviewers from Postlethwaite & Netterville ("P&N") who worked on Seafood claims also adhered to these guidelines.

34.     ***Later Proceedings Concerning the SWS-1 Policy.***  Paragraph 25 above describes the Claims Administrator's development of the Policy Compendium and, later, the Policy Keeper application.   Before loading existing policies into the new Policy Keeper application, we circulated the Policy Compendium to the Parties on January 18, 2013.  We instructed them to review the existing policies and provide comments as to why the policies should or should not be publicly disseminated.  The SWS-1 policy was presented in the compendium as Policy 262.  BP did not respond to Policy 262 in that circulation.  On April 4, 2013, we re-circulated to the Parties the remaining policies on which BP and Class Counsel had not commented or agreed to post publically.  On April 13, 2013, Wendy Bloom from BP provided the following response to Policy 262, "Classify as CA Decision.  Column A should make clear this Policy pertains to Seafood Compensation Program."  This information was then back-filled into Policy Keeper.  Here again, BP had the right to appeal to the Court on any of these policies, but did not challenge the implementation of Policy 262 concerning the use of sworn statements to allocate revenue in the Seafood Compensation Program.

35.     ***Application of the SWS-1 Policy.***  In the review of Seafood claims, BrownGreer reviewers applied Mr. Juneau's SWS-1 policy carefully, looking for variances and discrepancies between the SWS-1 and tax returns or other documents and whether the claimant used more vessels than reported on the SWS-1 or caught species differing from those identified in the SWS-1.  We also compared SWS-1 data to information available to us in submitted trip tickets and the Trip Ticket Database later received from the State of Louisiana and looked for other oddities,

such as whether the same revenue was shown on the SWS-1 for different vessels, revenue shown for a single year when there was revenue in 2007-2009, and conflicting statements in correspondence in the file.  We detected such anomalies in claims.  When we did, we followed up with Mr. Juneau and his staff and with claimants to reach the correct outcome.

### D.  SEAFOOD PROGRAM CLAIMS:  BENCHMARK YEAR EXCLUSIONS

36.  ***Benchmark Period Exclusions in the Seafood Compensation Program.***  For most claim types in the Seafood Compensation Program, the Settlement Agreement allows a claimant to request that the Claims Administrator exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish "at the same level of effort . . . due to circumstances beyond the Claimant's control."  The Settlement Agreement provides three non-exclusive examples of what constitutes circumstances beyond a Claimant's control:  (1) illness, (2) disability, and (3) major mechanical failure.  The Settlement Agreement does not provide guidance on what illnesses, disabilities, or mechanical failures might justify an exclusion or what proof of those setbacks a claimant must submit.  Similarly, the Settlement Agreement does not speak to what circumstances other than illness, disability, or mechanical failure might qualify a claimant for an exclusion.  Instead, whether and how to grant an exclusion rests solely in the Claims Administrator's discretion.

37.  ***The Claims Administrator's Policy on Benchmark Period Exclusions.***  In September of 2012, the Claims Administrator participated in a telephone conference with attorneys from BrownGreer in which the issue of Benchmark Period Exclusions was discussed. During that call, attorneys from BrownGreer provided examples of the types of Benchmark

Period Exclusion Requests claimants had submitted to date.  In discussing whether to grant requests arising from the claimant's participation in the 2009 shrimper strike in Louisiana, Mr.Juneau decided, under the discretion afforded to him in the Settlement Agreement, that such requests should be granted.  The CSSP issued the first notice approving a Benchmark Period Exclusion Request arising from the 2009 shrimper strike on September 20, 2012.

38.     *Discussion of Benchmark Period Exclusion Requests at the October 1, 2012, Panel Hearing.*   The Parties and the Claims Administrator discussed the issue of Benchmark Period Exclusions at the October 1, 2012, Panel meeting.  BP's counsel, Class Counsel, and the Seafood Neutral provided input on the intended application of the exclusion language of Ex. 10 and ultimately agreed that the Claims Administrator should evaluate these requests on a case-by-case basis.  This decision was consistent with the manner in which the Claims Administrator had handled Benchmark Period Exclusion Requests in the preceding weeks.  In the October 8, 2012 policy memo to BP and Class Counsel, Mr. Juneau announced:

> In any instance in which Exhibit 10 permits a Seafood Program claimant to request that the Claims Administrator exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish 'at the same level of effort…due to circumstances beyond the claimant's control,' the Claims Administrator will consider each request on a case-by-case basis to determine: (1) whether the circumstances presented justified the claimant's absence from seafood harvesting exclusion for one or more years of  the Benchmark Period; and (2) the level of proof required to establish such justification.

(copy attached as Ex. P).

39.     *Processing Seafood Compensation Claims Seeking Benchmark Period Exclusions.*   The Claims Administrator instructed BrownGreer to identify Seafood claims where the claimant requested the exclusion of a Benchmark Period year from the calculation.  On a rolling basis, BrownGreer cataloged those claims, the reasons claimants articulated for

requesting the exclusion of a Benchmark year, and the types of proof claimants supplied to support their requests.  BrownGreer presented these fact patterns to the Claims Administrator in the form of memoranda beginning on November 1, 2012 (copy attached as Ex. Q).  The Claims Administrator evaluated each fact pattern on a case-by-case basis, decided whether the facts warranted granting the claimant's request for an exclusion, and instructed BrownGreer to apply that decision to other identical fact patterns encountered in future claims.  As part of this process, the Claims Administrator considered additional requests from Shrimp claimants who sought to exclude the 2009 season from their Benchmark Period because the claimant participated in the Louisiana shrimper strike.  Applying the discretion afforded by the Settlement Agreement, the Claims Administrator determined that such requests should be granted and instructed BrownGreer to implement that policy on all similar claims.  In every outcome described in Paragraph 15 of the Cantor Declaration, the Claims Administrator processed the claim in accordance with the requirements of the Settlement Agreement and the approved policies over Benchmark Period Exclusions, to which BP had direct input.

### E.  SEAFOOD PROGRAM CLAIMS:  CDSOA REVENUE

40.     ***Inquiries from Seafood Compensation Claimants about CDSOA Revenue.*** During the early part of 2013, BrownGreer received a handful of inquiries from claimants and attorneys who filed Shrimp Claims in the Seafood Compensation Program that were based in part on CDSOA revenues the claimant received.  On April 8, 2013, BrownGreer presented the CDSOA issue to the Claims Administrator's Office as part of a compilation of open policy and implementation questions (copy attached as Ex. R).  That compilation included a memorandum prepared by attorneys representing claimants asserting their CDSOA revenue should be included in the Benchmark Revenue Calculations.  The recommendation from BrownGreer was that

CDSOA revenue was not the same as Seafood harvesting revenue.  The recommendation stated, "We believe such subsidies fall outside of the Settlement Agreement and recommend considering only revenue connected to actual Seafood landings when calculating a claimant's Benchmark Period Revenue."  Because the Claims Administrator was aware that a similar issue was under consideration in the BEL program, Mr. Juneau decided to develop a policy for the Seafood Compensation Program consistent with BEL's treatment of government subsidies.  On July 31, 2013, Michael Juneau requested written recommendations on addressing CDSOA payments as revenue from each of the accounting firms (copy attached as Ex. S).

41.     ***Announcement of the Claims Administrator's Original CDSOA Policy.***   On August 13, 2013, Michael Juneau issued an email announcement to the Parties explaining the Claims Administrator's approach to CDSOA payments across the CSSP, stating:

> The question has arisen within the DwH Program as to how payments under the CDSOA program should be treated.  This has been the subject of much discussion within our Program.  The consensus within our Program is that CDSOA payments should typically be treated as revenue for purposes of the Settlement Agreement.  It should also be noted that the CDSOA program requires accrual accounting; thus, any claim than includes CDSOA payments will presumably be presented with accrual basis monthly financials.  The nature of the issue is such that the entire BEL team was in agreement that the Parties should be fully aware of how this issue is being accounted for in our Program.  One side or the other may disagree with this approach and hence may wish to contest specific award(s) that may be reached using this methodology.  But in any event, we wanted you to be fully aware of how we are dealing with this specific issue.

42.     ***Preparation of Policy ID 486 "Inclusion of CDSOA Payments in Determining Benchmark Revenue.***  Having determined that CDSOA payment should be treated as revenue for the purpose of calculating claimant awards, the Seafood Compensation Program sought to implement that policy in its claim reviews.  Attorneys from BrownGreer and accountants from P&N exchanged correspondence with the Claims Administrator's Office about the application of the rule to these Seafood Claims.  The P&N accountants noted that the majority of claimants in

the Seafood Compensation Program did not maintain accrual basis accounting records and wanted clarification on how to proceed under those circumstances. On September 11, 2013, Michael Juneau approved this language for an internal policy, consistent with the announcement he made by email on August 13, 2013:

> The Claims Administrator will consider CDSOA payments as part of a claimant's Benchmark Revenue under the terms of Shrimp Compensation Plan.  To include a CDSOA payment, the claimant must have reported the income on his or her tax return.  The claimant's tax return accounting method will determine the appropriate Benchmark Period year in which to allocate the CDSOA payments.  The Claims Administrator will limit the consideration of CDSOA payments solely to those claimants that receive a calculation based on their Tax Returns and will not consider CDSOA payments in conjunction with Trip Tickets.

On September 12, 2013, BrownGreer posted Policy ID 486, "Inclusion of CDSOA Payments in Determining Benchmark Revenue" as an internal Claims Administrator Decision in Policy Keeper.  BrownGreer and the P&N accountants used Policy 486 to process the few Seafood Compensation claims that presented questions involving CDSOA payments.

43. ***Announcement of Policy 504.*** In January of 2014, BP appealed to the Appeals Panel the Claims Administrator's determination as to one claim decided under Policy 486.  BP's appeal was consistent with the email announcement made by Michael Juneau on August 13, 2013, in which he notified the Parties of the Claims Administrator's decision involving CDSOA payments and invited them to contest specific awards where they disagreed with the application of the policy.  In an email dated February 14, 2014, a BrownGreer attorney requested guidance from Claims Administrator counsel David Forsyth and Jack Alltmont about whether Appeals Panelists would have access to internal Claims Administrator policies.  The discussion of that issue led the Claims Administrator's Office to consider posting Policy 486 to the Parties, recognizing that the Parties were already aware of the policy from the August 13, 2013 email announcement.  On April 24, 2014, the Claims Administrator's Office approved posting an

35

updated, external version of the CDSOA policy through Policy Keeper with substance identical

to that of Policy 486.  On May 13, 2014, BrownGreer released Claims Administrator's Policy

504, "Seafood Compensation Program: Inclusion of CDSOA Payments in Determining

Benchmark Revenue," to the Parties for comment as a proposed policy.  Class Counsel Deferred

to the Claims Administrator's Decision without comment, perhaps recognizing that Policy 504

was a continuation of the announcement in the Juneau email from August 13, 2013.  BP did not

agree to Policy 504.  Instead, BP proposed a modification with a four page memorandum arguing

that Policy 504 would lead to inconsistent treatment under the Seafood Compensation Program

because it:

> will limit the consideration of CDSOA payments solely to those claimants that receive a
> calculation based on their Tax Returns and will not consider CDSOA payments in
> conjunction with Trip Tickets…This proposal not only creates an incentive for Claimants
> to rely on tax returns instead of trip tickets; but as stated by BP in prior responses
> regarding the Seafood Compensation Program's documentation requirements, tax returns
> are not as reliable of an indicator of historical revenue (as compared to trip tickets)
> because tax returns often do not segregate fishing revenue from other sources of income,
> and often do not identify revenue by species.  Put simply, trip tickets provide the most
> consistently reliable source of a Claimant's revenue from each species…

(copy attached as Ex. T).

The comments from BP ignored the fact that Ex. 10 to the Settlement Agreement gives

equal weight to trip tickets and federal or state tax returns supported by sufficient documentation,

allowing claimants in the Seafood Compensation Program to support their claims with either

type of documentation.  The Claims Administrator is not afforded the discretion to ignore claims

supported by tax returns and sufficient documentation.

**44.**     ***Input from the Seafood Neutrals and Revisions to Proposed Policy 504.***

Because the Parties could not agree on the implementation of Policy 504, the Claims

Administrator sought input from the Seafood Neutral.  On June 10, 2014, BrownGreer sent an

email to Dan Balhoff asking for his view on the treatment of CDSOA payments in the context of Seafood Compensation Claims.  On June 19, 2014, Mr. Balhoff responded that he agreed with BP's position and that he did not think that the revenues associated with the CDSOA grants arise from activities that are comparable to seafood harvesting (email confirmation attached as Ex. U). Having received the views of the Seafood Neutral, the Claims Administrator reevaluated the policy on CDSOA payments as they relate to claims within the Seafood Compensation Program. The Claims Administrator's Office approved posting a revised version of the CDSOA through Policy Keeper.  As a result, on August 6, 2014, BrownGreer re-issued Policy 504, "Seafood Compensation Program: Inclusion of CDSOA Payments in Determining Benchmark Revenue," to the Parties for comment as a proposed public policy.  The re-issued Policy 504 stated that the "Claims Administrator will not consider CDSOA grant payments as part of a claimant's Benchmark Revenue under the terms of Seafood Compensation Program."  On August 10, 2014, Class Counsel requested a Panel Hearing on the re-issued Policy stating, "Has the Seafood Neutral weighed in on this?  What was his opinion/reasoning?  There is clearly more than enough money in the Seafood Compensation Fund to fully compensate all eligible Claimants. Not sure why BP even cares."  BP accepted the revised policy on August 19, 2014.

**45.**      *Current Posture of Seafood Compensation Claims Involving CDSOA Payments.* Since first evaluating the treatment of CDSOA payments and issuing the email announcement of August 13, 2013, the Claims Administrator has clearly communicated with the Parties about the controlling policy on CDSOA payments.  In every instance where the Claims Administrator applied the controlling policy, BP had the opportunity to appeal the decision, using the mechanism created by the Settlement Agreement to resolve such questions.  When necessary, the Claims Administrator opened the policy to comment from the Parties and sought input from the

Seafood Neutral.  The Claims Administrator deferred to the interpretation of the Seafood Neutral, after receiving his input on the issue.  Because the Parties are unable to agree on a policy for the treatment of CDSOA payments, Class Counsel has requested a Panel hearing to discuss the issue, the date of which has not been set.  As a result, there is presently no controlling policy for the administration of Seafood Compensation Claims based in part on revenues claimants earned under the CDSOA program.

I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 15th day of October, 2014.

_____
Orran L. Brown



# EXHIBIT A



# BROWNGREER

# RELEVANT EXPERIENCE

OCTOBER 9, 2014

BROWNGREER PLC
250 Rocketts Way
Richmond, VA 23231
www.browngreer.com



# RELEVANT EXPERIENCE

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| | **ECONOMIC LOSS SETTLEMENT PROGRAMS** | | | |
| 1. | ***Gulf Coast Claims Facility***. Voluntary claims program to resolve economic loss and physical injury claims arising from the April 20, 2010 oil spill in the Gulf of Mexico. | Claims Administrator; Transition Coordinator | 600,000 Claimants | $20 Billion cap; $6.5 Billion disbursed |
| 2. | ***In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010***, MDL Docket No. 2179 (E.D. La). Class action settlement to resolve economic loss and property damage claims arising from the April 20, 2010 oil spill in the Gulf of Mexico. | Claims Administrator | 220,000 Claimants | Uncapped Fund; $3.9 Billion disbursed |
| 3. | ***In re Black Farmer's Discrimination Litigation***, No. 08-mc-0511 PLF (D.D.C.). Class action settlement to resolve claims of discrimination against African-American farmers by the U.S. Department of Agriculture regarding farm loans and loan servicing for claimants who had missed deadlines in a prior settlement. | Claims Review and Evaluation | 40,000 Claimants | $1.25 Billion |
| 4. | ***United States Securities and Exchange Commission v. American International Group, Inc.***, No. 06-Civ. 100-LAP (S.D.N.Y.). Securities enforcement action settlement between the SEC and a multinational insurance corporation over allegations of accounting fraud and related shareholder litigation. | Audited the Claims Administrator | 260,000 Class Members | $843 Million |
| 5. | ***In re Genetically Modified Rice Litigation***, MDL Docket No. 1811 (E.D. Mo.). Voluntary claims program to resolve claims concerning genetically modified rice and crop values. | Claims Administrator | 12,000 Claimants | $750 Million |
| 6. | ***In re Chinese-Manufactured Drywall Products Liability Litigation***, MDL Docket No. 2047 (E.D. La.). Class action settlement for the remediation of homes containing defective drywall manufactured in China. | Claims Administrator; Lynn Greer, Special Master | 25,000 Claimants | Blend of Uncapped and Capped Funds; $395 Million disbursed |
| 7. | ***United States v. National Treasury Employees Union***, No. 93-1170 (D.C. App.). Class action settlement between a federal employees' union and the U.S. Government for back payment of wages. | Trustee of Settlement Trust | 212,000 Class Members | $173 Million |



| PERSONAL INJURY SETTLEMENT PROGRAMS | | | | |
|---|---|---|---|---|
| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
| 1. | *In re National Football League Players' Concussion Injury Litigation*, MDL Docket No. 2323 (E.D. Pa.). Preliminarily approved Class action settlement to resolve personal injury claims of retired professional football players allegedly caused by concussive impacts. | Claims Administrator | TBD | Fund Uncapped |
| 2. | *In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La.). Class action settlement to resolve claims arising from the use of prescription painkillers. | Claims Administrator | 60,000 Claimants | $4.85 Billion |
| 3. | *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203 (E.D. Pa.). Class action settlement to resolve claims arising from the "Fen-Phen" diet drugs. | Liaison for the Defendant to the Settlement Trust | 600,000 Claimants | $3.55 Billion |
| 4. | *In re A.H. Robins Company Inc., Debtor (In re Dalkon Shield Claimants Trust)*, MDL Docket No. 211 (Bankr. E.D. Va.).  Class action settlement created in the Chapter 11 bankruptcy proceeding of the A.H. Robins Company to resolve claims arising from the Dalkon Shield intrauterine device. | Counsel to the Settlement Trust | 400,000 Claimants | $3 Billion |
| 5. | *In re DePuy Orthopaedics, Inc., ASR Hip Implant Products*, MDL Docket No. 2197 (N.D. Ohio). Voluntary settlement program for claims relating metal-on-metal hip implant devices. | Claims Administrator | 7,500 Claimants | $2.475 Billion |
| 6. | *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203 (E.D. Pa.). Voluntary settlement program to resolve opt outs from the class action settlement of claims arising from the "Fen-Phen" diet drugs. | Claims Administrator | 66,000 Claimants | $2.63 Billion |
| 7. | Voluntary settlement of claims relating to a prescription medication. | Claims Administrator | 12,000 Claimants | Fund Uncapped; $1.4 Billion Disbursed |
| 8. | *In re Sulzer Orthopedics and Knee Prosthesis Products Liability Litigation*, MDL Docket No. 1401 (N.D. Ohio). Class action settlement of claims relating to hip and knee implants. | Claims Administrator | 27,000 Claimants | $1.15 Billion |



| | PERSONAL INJURY SETTLEMENT PROGRAMS | | | |
|---|---|---|---|---|
| | **PROGRAM DESCRIPTION** | **ROLE** | **PROGRAM SIZE** | **SETTLEMENT FUND** |
| **9.** | *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, **MDL Docket No. 2385 (S.D. Illinois)**. Class action settlement to resolve claims arising from the use of blood thinning medication. | Claims Administrator | 4,800 Claimants | $650 Million |
| **10.** | Voluntary settlement program of claims arising from use of a prescription medication. | Claims Administrator | 2,700 Claimants | Fund Uncapped; $279 Million Disbursed |
| **11.** | *In re Guidant Implantable Defibrillators Products Liability Litigation Settlement*, **MDL Docket No. 1708 (D. Minn.)**. Class action settlement to resolve claims related to a medical device company's cardiac resynchronization therapy devices, implantable cardiac defibrillators and pacemakers. | Advised Defendant and Defense Counsel | 26,000 Class Members | $240 Million |
| **12.** | *In re Nuvaring Products Liability Litigation*, **MDL Docket No. 1964 (W.D. Mo.)**. Class action settlement to resolve claims concerning a contraceptive device. | Claims Administrator | 3,800 Claimants | $100 Million |
| **13.** | *In re Phenylpropanolamine (PPA) Products Liability Litigation*, **MDL Docket No. 1407 (W.D. Wash.)**. Class action settlement trust established to resolve claims related to an over-the-counter weight loss product. | Claims Administrator | 500 Claimants | $60 Million |
| **14.** | *In re Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, **MDL Docket No. 2100 (S.D. Ill.)**. Class action settlement to resolve claims related to a prescription oral contraceptive. | Claims Administrator | 9,000 Claimants | $24 Million |
| **15.** | *In re OxyContin Litigation - All Cases*, **No. 2002-CP-18-1756 (Dorchester County S.C. Ct.)**. Class action settlement by a pharmaceutical company regarding a prescription pain killer. | Notice and Claims Administrator | 3,600 Class Members | $4.25 Million |
| **16.** | *In re Seroquel Products Liability Litigation*, **MDL Docket No. 1769 (M.D. Fla.)**. Multidistrict litigation proceedings involving the antipsychotic prescription drug Seroquel. | Special Master; Project Manager | Company Did Not Disclose | Company Did Not Disclose |

# EXHIBIT B

# BROWNGREER ‖ PLC

# MEMORANDUM

TO:  **Patrick A. Juneau, Claims Administrator**
   **Christine Reitano**

FROM: **Orran L. Brown**

DATE: **August 14, 2012**

RE:  **Incomplete Claims and Possible Workarounds**

---

   This memo addresses common deficiencies we are seeing in claims by claimants who have not submitted materials that the Settlement Agreement requires. We also suggest some alternatives to try to reduce the number of incomplete Notices we will have to send.

## A. <u>Business Economic Loss Claims</u>.

  1. <u>Missing Licenses</u>.

   Of the Business Economic Loss claims we have reviewed so far, 78.1% of them have an incomplete outcome. We will send these claimants incomplete Notices unless they submit the required documentation while the claims are in Accountant Review.

   The most frequent missing documents are business licenses. Item 7 in Exhibit 4A (Documentation Requirements for Business Economic Loss Claims) states that "Claimant must provide a copy of any applicable federal, state, or local governmental licenses required to operate its business." Of the BEL claims with an incomplete result after our review so far, 76.8% are missing a business license.

   The Settlement Agreement requires these licenses. To reduce the number of incomplete Notices related to the license requirement, we suggest:

   (a) We should disregard the license requirement in Exhibit 4A. We assume that the Settlement Agreement requires these licenses to prevent the risk of paying fictitious businesses that never actually operated, and maybe to avoid paying losses to some business that existed and operated but was never actually authorized to do business. We can control at least the first risk through our other processes. We take steps to verify that an EIN of a business is genuine, so we will not pay fake businesses that do not exist. The Settlement Agreement requires Business Claimants to provide Federal tax returns, which illustrate that their business has been in operation. We think that

1

the license requirement is unnecessary.  If a BG reviewer or Accountant Reviewer has doubts as to whether a business existed, that reviewer would still have the ability to select the incompleteness reason that corresponds to missing licenses. We would like to do away with the license requirement entirely.

(b) Alternatively, if we have to require a license, we can have our reviewers perform internet research to attempt to verify the existence of licenses that are not in the claimants' documentation.  This research would likely benefit claimants that are in industries that are regulated by a state.  For example, the Florida Department of Business & Professional Regulation maintains a site that compiles license information for businesses in regulated industries.  Other Gulf States have similar sites that provide industry-specific license information.  We could instruct reviewers to leave detailed comments about the results of their research, including the web address for any sites they used.  Although this type of research will not benefit every claimant, it will reduce the number of incomplete Notices related to the license requirement.

(c) Whatever we do on the requirement, we should issue an Alert to the CACs and add a message on the public website to let claimants know that the most common incompleteness reason for BEL claims is the failure to satisfy the license requirement and to remind claimants and their lawyers of this requirement and the need to submit a copy of a license.

## 2.  Lodging Tax Returns and Occupancy Reports for Lodging Businesses.

Item 5 in Exhibit 4A the Settlement Agreement requires Lodging Tax Returns and Occupancy Reports for Lodging Businesses.  PWC has pointed out that the Accountants do not actually use these documents in performing the Compensation calculation, but instead really need only complete monthly Profit and Loss statements ("P&Ls").  Eliminating these Lodging Tax Returns and Occupancy Reports document requirements would be another way to reduce the volume of potential incomplete Notices on BEL claims.  Of the BEL claims with an incomplete result after our review so far, 4.4% are missing Lodging Tax Returns and 3.5% are missing Occupancy Reports.

## 3.  State Sales and Use Tax Returns for Retail Businesses.

Item 5 in Exhibit 4A also requires State Sales and Use Tax Returns for Retail Businesses.  PWC has indicated that the Accountants only actually need these documents to perform the Compensation calculation if monthly income statements appear to be inconsistent with the Federal Tax Returns.  As such, we recommend eliminating this document requirement.  The Accountants would still have the ability to select this incompleteness Reason if they determine that State Sales and Use Tax Returns are necessary to performing the Compensation calculation.  Of the BEL claims with an incomplete result after our review so far, 13.3% are missing Sales and Use Tax Returns.

## 4.  Annual Profit and Loss Statements.

Item 4 in Exhibit 4A requires "monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents

412161

establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011." If a claimant has provided monthly financial statements that establish the monthly revenues and expenses, we and PWC believe that the claimant has satisfied the requirement to provide "alternate source documents." PWC has confirmed that annual P&Ls are not required to perform the Compensation calculation if the claimant has provided monthly P&Ls. For these reasons, we recommend that we not require annual Profit and Loss statements.

### 5. Missing One Monthly Profit and Loss Statement in a Given Year.

We have encountered situations where the claimant is missing one monthly P&L but has provided annual financials that appear consistent with the claimant's tax returns. In performing compensation calculations for claimants that fit this fact pattern, we and PWC recommend using the revenue from the annual financial statement minus the revenues on the eleven months of P&Ls to determine the revenue for the missing month. This recommended course of action would result in fewer incomplete Notices on BEL claims.

## B. Individual Economic Loss Claims.

### 1. The Most Frequent Incomplete Reasons.

We are just beginning to review claims in the system and do not have a definitive number of claims with an incomplete outcome. We have looked at some claims outside of the review system and are finding that approximately 75-80% will have an incomplete result, usually because they are missing one or more of the following:

(a) Proof of age: A Driver's License, Passport, Birth Certificate, or a print-out from a public database showing the claimant's date of birth (Ex. 8A, Section I. A. 5. a. ii);

(b) Proof of Employability: A Social Security card, Government-issued ID (*i.e.*, driver's license), temporary work visa, or a green card (Ex. 8A, Section I. A. 5. a. i);

(c) A Sworn Written Statement ("SWS-9") from the claimant attesting that the claimant was unable to obtain Tax Information or Pay Period Earnings Documentation (payroll records) (Ex. 8A, Section I and I.A.2); and/or

(d) For claims without a causation presumption, a sworn Written Statement ("SWS-12") from the employer relating the claimant's losses to the Spill (Ex. 8A, Section I.B.2.b.ii).

### 2. Proof of Age and Employability.

The Settlement Agreement clearly requires claimants to submit documents proving their age and employability, we assume to ensure that they were entitled to earn the wages they now say were lost because of the Spill. Many claimants are not submitting any of these documents. These are clear eligibility requirements of the Settlement Agreement. We do not yet have an alternative means of establishing age or employability without one of these documents. If people are working and paying taxes, it seems irrelevant whether they were legally entitled to do so, but we likely need approval by the Parties to overlook these provisions of the Settlement Agreement.

We thus do not have a recommendation on these two issues, but wanted to bring this to your attention as an area that we may want to address in the future.

3. **SWS-9 for Missing Tax Information and Pay Period Earnings Documentation.**

The Settlement Agreement requires SWS-9 when a claimant does not provide complete Tax Information and Pay Period Earnings Documentation for the Benchmark and Compensation Periods.  For claims that do not have both complete  Pay Period Earnings Documentation and Tax Information Documentation, we would like to review the claim based on the documents we have, issue a Notice telling the claimant what is missing and what the claimant can get paid based on what we have, and then see what the claimant wants to do.  We asked the Parties at both the Tutorial and on the spreadsheet if they wanted to require SWS-9 before we performed a calculation.  BP responded that claimants are required to provide tax information or pay period earnings documentation if they have it, and if they do not provide SWS-9. The PSC agreed with BP's position. We prefer to send out an Eligibility Notice if we have enough information to perform a calculation and the claim is payable instead of first send an incompleteness Notice requesting SWS-9 to document why Tax Information or Pay Period Documentation is not available.

4. **SWS-12 for Causation.**

Based on our review of claims so far, approximately 17% of the claimant's employers qualify for a causation presumption.  If an employer does not qualify for causation, it can be established if the employer is an Eligible Employer (an employer that established causation under the MDL 2179 process or received a compensation offer from the GCCF) or by submitting SWS-12 from the employer establishing that the claimant's losses are related to the Spill.  The Settlement Agreement clearly requires SWS-12 if the employer does not qualify for causation or is not an Eligible Employer, thus we do not have a recommendation on this issue but wanted to bring it to your attention as an area that we may want to address in the future.

5. **Employer Related Benefits Losses and Reimbursable Job Search and/or Job Training Costs.**

Our review of claims so far indicates that 98.9% of claims seeking Employer Related Benefits Losses and 91.8% of claims seeking Reimbursable Job Search and/or Job Training Costs do not contain any documentation supporting the claim.  We will prepare an FAQ and send/post an alert to all CACs, Attorney Portals, Pro Se Portals, and the public DWH website reminding claimants that the Instruction Booklet sets out the specific document requirements for these Add-On claims and to be sure that they submit them.

C. **Seafood Compensation Program Claims.**

Of the Seafood claims reviewed to date, 52% are incomplete.  The vast majority of these claims are incomplete because (1) the claimant submitted financial documentation that does not adequately allocate the claimed revenue to a particular vessel, landing location, and catch type or (2) the claimant did not submit a vessel registration or a valid commercial fishing license for the time of the spill.  We have already taken steps to address these two areas.  We have also

4

encountered two other common causes of incompleteness and have implemented workarounds for these problems.

### 1. **Inadequate Revenue Allocation.**

The Seafood Compensation Program requires vessel owner, vessel lessee, and boat captain claimants to establish, on a vessel-by-vessel basis, the amount of revenue derived from a specific catch type – shrimp, oyster, finfish, blue crab, or other Seafood – landed in the qualifying Gulf Coast Areas during the Benchmark years of 2007, 2008, and/or 2009. (*See*, *e.g.*, Ex. 10 at 10-11.) In response to claimants' repeated failures to allocate Benchmark Revenue to a specific vessel, landing location, and/or catch type, we created the Sworn Written Statement for Sufficient Documentation of Benchmark Revenue (SWS-1). SWS-1, which is now available on the public website, allows claimants with tax records to allocate annual revenues as needed. Though we will continue to issue incompleteness notices for inadequate revenue allocation, we have updated those notices to direct affected claimants to SWS-1 as a cure for their incompleteness. This Form, if completed correctly, will remedy a significant number of otherwise incomplete claims.

### 2. **Vessel Registration and Ownership.**

The Settlement Agreement requires most vessel owner, vessel lessee, and boat captain claimants to provide (1) the claimed vessel name and (2) any applicable federal and/or state vessel registration identification numbers. (*See*, *e.g.*, Ex. 10 at 4.) Under the express terms of the Agreement, only Expedited and Reduced Expedited Shrimp claimants must submit a copy of the actual vessel registration document itself to receive payment. (Ex. 10 at 9, 13.) Even though the Agreement does not require most owners, lessees, and captains to submit an actual registration document, all of those claimants must still submit "[p]roof of ownership of the vessel during the time period of April 20, 2010 to December 31, 2010." (*See*, *e.g.*, Ex. 10 at 4.) In the absence of a vessel title, we accept a vessel registration as proof of ownership. The registration document, therefore, typically satisfies at least three basic and essential requirements for Seafood claimants: (1) vessel name; (2) vessel registration number; and, most importantly, (3) vessel ownership.

Our reviews to date indicate that many claimants either have not submitted any registration documents or submitted 2011 or 2012 registration documents that fail to establish the requisite temporal component of vessel ownership during the April 20, 2010 to December 31, 2010 period. Understandably, a claimant's failure to submit a vessel registration for the appropriate years creates significant problems for the claim. Therefore, we have implemented flexible but reliable workarounds to allow certain other documents from a claimant's file to bridge gaps in registration information. Now, when we possess a valid registration document from an improper time period, we accept the following to establish registration and ownership during the proper time period:

    (a) Trip tickets or landing reports issued by Louisiana or Florida that show vessel registration information for the proper time period;

(b) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period;

(c) Information in Federal and/or State vessel registration databases where available for the proper time period;

(d) Saltwater products license showing vessel registration numbers for the proper time period;

(e) Vessel registration receipts for the proper time period; or

(f) Vessel title for the proper time period.

While these fixes do not cover every state or all claimants, they help reduce the number of incomplete claims.  To further relax our requirements would mean to stop requiring proof of ownership documents altogether, and that would depart from a clear requirement of the Settlement Agreement.

### 3. Commercial Fishing License.

Much like the proof of ownership requirement, the Settlement Agreement's commercial fishing license requirement includes a temporal component.  Vessel owner, vessel lessee, and boat captain claimants must submit proof that a government license that was valid as of April 20, 2010, authorized the claimed vessel to fish commercially for the 2009 or 2010 season.  (*See, e.g.*, Ex. 10 at 26.)  As with registration documents, our reviews to date indicate that many claimants either did not submit any commercial fishing license information or submitted license documents that fail to establish the requisite temporal component required under the Agreement.

We have implemented workarounds for this issue similar to those outlined above for the registration deficiencies.  Now, when we possess a valid fishing license from an improper time period, we accept the following to establish a valid license during the proper time period:

(a) Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and

(b) Commercial fishing license receipts for the proper time period.

Again, though these solutions cannot remedy all claims that are incomplete for deficiencies in license proof, they help reduce the number of incomplete claims without omitting payment eligibility requirements under the Settlement Agreement.

### 4. Prior Seafood Spill-Related Payments.

The Settlement Agreement requires each claimant to submit a Sworn Written Statement regarding Seafood Spill-Related Payments the claimant received from BP, the GCCF, the Transition Facility, or through the OPA Process, as well documents reflecting the timing, amount, and source of the payments received.  (See, *e.g.*, Ex. 10 at 43.)  Approximately four percent of Seafood claims reviewed are incomplete because the claimant failed to complete

6

Section J of the Claim Form, the portion that includes the Sworn Written Statement on Seafood Spill-Related Payments.

To address this deficiency, we created the Claim Form Sworn Written Statement (SWS-2) that is now available on the public website.  The fourth section of SWS-2 allows claimants to indicate whether they received Prior Seafood Spill-Related Payments, and, if so, the date, source, amount, and type of payment they received.

The Settlement Agreement clearly requires Seafood claimants to submit a sworn written statement on prior payments.  But we can use the data we already have from the BP and GCCF programs, we will always know whether a claimant, in fact, received a Prior Seafood Spill-Related payment, regardless of what the claimant indicated in their Claim Form or Sworn Written Statement.  We recommend that we find a claim incomplete Notice for failure to complete the Sworn Written Statement if we have BP/GCCF data that tells us the prior payment amounts.  This will avoid the bureaucratic step of requiring additional documentation from the claimant when we already possess the information we need to address the issue.

**5.  <u>Home Port and Landings</u>.**

The Settlement Agreement requires claimants to submit documentation to verify whether a claimed vessel (1) had a Home Port in the Gulf Coast Areas at any time between 4/20/10 and 4/16/12 or (2) landed a qualifying species in the Gulf Coast Areas at any time between 4/20/09 and 4/16/12.  (*See*, *e.g.*, Ex. 10 at 5.)  Approximately eight percent of claimants fail to provide home port or landing location information for their reported revenue.  Home port information can typically be found on a vessel registration, vessel license, or Federal Fisheries Permits.  Landings information is typically found on trip tickets.  In the absence of these documents, we will accept a correctly-completed SWS-1 as adequate proof of home port and/or landings to satisfy this eligibility requirement under the Agreement.

**D.  <u>Vessel Physical Damage Claims</u>.**

We have 95 Vessel Physical Damage claims with an incomplete result.  Of those, 89 are incomplete for lack of proof of ownership of the vessel.  The Settlement Agreement requires the claimant to submit both the vessel's title *and* federal or state registration to prove ownership.  The Vessel Physical Damage Instruction Booklet includes these requirements in its section listing all of the required documentation.  Appendix B to Exhibit 14 specifically requires the claimant to submit: (1) a copy of the title for the vessel; (2) a copy of the registration for the vessel; and (3) a completed Verification Statement.  Many claimants are not submitting a title for their vessel, which is causing the claim to be incomplete for lack of proof of ownership.  In the Verification Statement in the Claim Form, each claimant swears that "I owned the vessel(s) for which I am submitting the claim during the time period April 20, 2010, to December 31, 2011."

We recommend that we require only a vessel title *or* a vessel registration to prove ownership, rather than both.  Of the 89 claims, 67 of them have one or the other and thus would be complete under this rule.

7

**E.  VoO Charter Payment Claims.**

    **1.  The Most Frequent Incomplete Reasons.**

Of the VoO Charter Payment claims we have reviewed, 36% have an incomplete outcome.  The most common reasons are:

    (a)  Proof of Training:  The VoO Charter Payment definitions require that a claimant have attended the initial VoO training (Sections 38.96 and 38.170); and

    (b)  Proof of Working Status:  The VoO Charter Payment definitions require that we determine whether the claimant was a Working or Non-Working VoO participant (Sections 38.96 and 38.170).

    **2.  Proof of Training.**

The most common incompleteness reason has been lack of a document that shows the claimant attended the VoO training.  The Settlement Agreement requires that a VoO Charter Payment claimant have attended the initial VoO training.  We recommended and BP and the PCC agreed that if a claimant is proven to have been dispatched or placed on hire, that we may presume that the claimant attended training.  We are implementing this policy change in our system now and expect that the percentage of those found incomplete for this reason will decline.  We are also analyzing those claimants who already received incompleteness Notices for this reason to determine how many would no longer be incomplete under the new policy.

    **3.  Proof of Working Status.**

The second most common incompleteness reason has been lack of a document that shows the claimant was dispatched or placed on hire.  The Settlement Agreement requires that we determine whether the claimant was Working or Non-Working to calculate the appropriate payment.  If a claimant identifies on the Claim Form that he or she was non-working, we classify the claimant as Non-Working.

BP provided us with data from the VoO program, which included the Working Status of participants.  The data shows either a "Yes," which means BP verified the participant was dispatched or placed on hire with that vessel, or shows no data.  We interpreted the lack of data to mean that BP was not sure of the participant's Working Status, so we found those claimants incomplete.  We discussed the data with BP and were told that the lack of data means that the BP determined that the participant was Non-Working based on their payment records and dispatch logs.  We are implementing this change in the data to convert those records that we previously identified as "Cannot Determine" and led to an incompleteness result, to "Non-Working."  This will allow those claims to be eligible for payment under the Non-Working calculation instead of incomplete.  Claimants will still have the opportunity to overcome this presumption through documents proving that they were dispatched or placed on hire in the VoO program.

**F.  Individual Periodic Vendor or Festival Vendor Claims.**

  **1.  The Most Frequent Incomplete Reasons.**

Of the claims we have reviewed so far, 80% have had an incomplete outcome, usually because they are missing one or more of the following:

  (a)  License required by law to make the sales (Ex. 8D, Sections I. C. 2 and II. C. 2);

  (b)  Documents showing that the claimant sold the claimed good(s) or service(s) before 4/20/10, including all of the following: documents showing revenues and expenses; photographs reflecting the goods or services sold; and documentation such as news articles, sales flyers or advertisements reflecting the goods or services sold (Ex. 8D, Sections I. C. 1. a and I. C. 1. b); and/or

  (c)  Documents showing total earned income in 2009 and 2010 (Ex. 8D, Section I. C. 2. c).

  **2.  License.**

The Settlement Agreement clearly requires claimants to submit any licenses required by law to make the sales.  Many claimants are not submitting a license and some are self-identifying on the Claim Form that they did not hold a license.  Because the Settlement Agreement clearly requires a claimant to have a license to be eligible, this is not an issue of claimants failing to submit a copy of a license that they did hold.  We have no workaround for this issue, for ignoring the license requirement would expand eligibility beyond that prescribed by the Settlement Agreement.

  **3.  Documents Showing Sales before 4/20/10.**

The Settlement Agreement requires that claimants submit documents to prove that they old the good(s) or service(s) claimed and did so regularly before 4/20/10.  To prove this, IPV claimants must submit *all* of the following: documents showing all revenues and expenses, photographs containing dates and locations, and sales documents such as sales flyers or advertisements.  The photographs and sales documents must show the goods or services sold, the location of the sales, the prices charged and/or other product information, and any biographical or other background information on the claimant.

We recommend relaxing this requirement to allow IPV claimants to show that they were in the business of regularly making such sales prior to 4/20/10 through any, but not necessarily all, of these means.  We can reliably make a determination whether a claimant was in the business of regularly selling the goods or services without the claimant submitting all of the documents outlined above.

  **4.  Total Earned Income.**

The Settlement Agreement requires that IPV claimants submit documents showing Total Earned Income for 2009 and 2010.  We use this information to perform the payment calculation

and do not currently have an alternative method of doing so.  We thus do not have a recommendation on this issue.

## G.  Real Property Sales Claims.

Of the Real Property Sales claims we have reviewed so far, 54% of them are incomplete.  No one incompleteness reason accounts for a significant majority of these incomplete claims. The most common situation involves claimants who are missing documentation needed to support a Parcel Eligibility Challenge, which accounts for 18% of the incomplete claims.  Those claimants have submitted their Challenge Form, but no other documentation.

A Parcel Eligibility Challenge occurs when a Parcel is determined to be ineligible and the claimant submits a Real Property Sales Parcel Eligibility Challenge Form. A Parcel is ineligible if: 1) the mapping software determines that it is located outside the Real Property Sales Compensation Zone; or 2) it carries a Non-Residential Land Use Designation.  The claimant can challenge either one of the above ineligibility reasons.

Claimants who allege that his or her Parcel belongs in the Eligibility Zone make up the majority of the 18% of claimants who are incomplete for not submitting documentation in support of the challenge.  If a claimant is challenging a Parcel's omission from the Real Property Sales Compensation Zone, Section 1 (C) requires the claimant to submit official documentation from the county or parish Assessor or a Professional Land Survey showing: (a) the actual presence of a Parcel for which there are no Parcel lines on the Real Property Sales Compensation Zone Map; (b) the Parcel is located within the geography identified in the Real Property Sales Compensation Zone Map; and (c) the county where the Parcel is located has designated the Parcel as a Residential.

Settlement Agreement Exhibit 13A, Section 1(C) requires a claimant to submit such supporting documentation before the mapping software vendor can overturn an ineligible determination.  We recommend that we do our own online research of the public property records and try to find the tax assessment on the Parcel, make a PDF of it, and then upload it into their documentation.  Only a tax assessment will show all the elements needed (existence of Parcel, location and land use designation).

## H.  Coastal Real Property Claims.

Of the Coastal Real Property claims we have reviewed so far, 1,260 are incomplete.  Of them, 434 (34% of the incomplete claims) are missing 2010 Property Tax Assessments.  Claimants submit tax documentation similar to a Property Tax Assessment, such as Valuation Notices and Tax Bills.  Section 1.b, Appendix F to Exhibit 11A of the Settlement Agreement explicitly requires a 2010 Property Tax Assessment to prove ownership of the Parcel or Deeded Boat Slip and provide the appraised value of the parcel for the purposes of calculating valuation.

The database created by the mapping vendor provides us with all the information we need to calculate the damages for an eligible Parcel or Deeded Boat Slip.  We have structured the

10

Coastal review system so that the appraised value provided by the database populates in the review screens so that we no longer rely on the Claims Reviewer to enter the value.  We propose that if ownership can be established through other documentation such as a deed, but the claim is missing the 2010 Property Tax Assessment solely for the purposes of valuation, that we use the amount provided by the mapping database.  Any possible discrepancies between the appraised value provided by the Property Tax Assessment and the value in the mapping database could then be a point for reconsideration or appeal.  We raised this idea at the 5/8/12 tutorial session in New Orleans, but we were instructed that we continue to require the claimant to provide the documentation specified in the Coastal framework.

## I.  **Wetlands Real Property Claims.**

We are finding some claims incomplete because they are missing either the 2010 or 2011 Tax Assessment.  Exhibit 12A, Section 1.A of the Settlement Agreement requires that the claimant be an owner of an Eligible Parcel during the period from April 20, 2010, to April 18, 2012.  If the claimant owned the Eligible Parcel for the entire time period, the claimant must submit the deed and *both* 2010 and 2011 Tax Assessments to prove ownership.

To prove ownership, we propose that we require only a deed and either the 2010 *or* 2011 Tax Assessment.  Unlike Coastal claims, we do not need the Tax Assessment value to establish Wetlands damages.  If the claimant provides on the Claim Form the dates that he or she owned the Parcel, we can verify the ownership through the Deed and either the 2010 or 2011 Tax Assessment.

| MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION** |
| **1.** | **BUSINESS ECONOMIC LOSS** | 1. Business Licenses | (1) Not require a license; OR<br>(2) We do online research to find licenses as best we can; AND<br>(3) Issue a public Alert reminding the Class of this requirement. |
| | | 2. Lodging Tax Returns and Occupancy Reports for lodging business claimants | ▪ Not require them, use P & Ls instead. |
| | | 3. State Sales and Use Tax Returns for retail businesses | ▪ Not require them from all retail claimants; require only when the Accountants decide that the monthly P & Ls seem inconsistent with the income tax returns of the business. |
| | | 4. Annual Profit and Loss Statements | ▪ Not require them; use monthly P & Ls for the year instead. |
| | | 5. Missing One Monthly P & L | ▪ If missing only one month, determine that month from the annual financial statement or tax returns, rather than requiring a P & L for that missing month. |
| **2.** | **INDIVIDUAL ECONOMIC LOSS** | 1. Proof of Age:  Driver's License, Passport, Birth Certificate, or a print-out from a public database showing the claimant's date of birth | ▪ Would like to stop requiring this, but submission is mandatory under the Settlement Agreement and we have no functional equivalent unless we rely on the DOB given in the Registration Form. |
| | | 2. Proof of Employability:  Social Security card, Government-issued ID (*i.e.*, driver's license), temporary work visa, or a green card | ▪ Would like to stop requiring this, but submission is mandatory under the Settlement Agreement and we have no functional equivalent. |
| | | 3. Sworn Written Statement (SWS-9 ) from the claimant that Pay Period Documentation or Tax Documentation is not available | ▪ Use the Pay Period Documentation or Tax Documentation that we have and issue an Eligibility Notice, without requiring an SWS-9 on why the claimant cannot provide full Pay Period Documentation or Tax Documentation, but BP previously rejected this idea and Class Counsel went along with that rejection. |
| | | 4. Sworn Written Statement (SWS-12) from Employer on causation by the Spill, for claimants who must prove causation | ▪ Settlement Agreement requires this; no workaround recommended. |
| | | 5. Employer Related Benefits Losses and Reimbursable Job Search and/or Job Training Costs | ▪ Prepare an FAQ and send/post an alert to all CAC's, Attorney Portals, Pro Se Portals, and the DWH public website reminding claimants that the Instruction Booklet sets out the specific document requirements for these Add-On claims and to be sure that they submit them. |

| MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION** |
| **3.** | **SEAFOOD** | 1. Documents that allocate revenues by vessel, landing location and catch type | ▪ Created SWS-1 to allow a claimant to make and vouch for this allocation.  (ALREADY IMPLEMENTED) |
| | | 2. Vessel Registration and Ownership 4/20/10 to 12/31/10 | (1) Trip tickets or landing reports issued by Louisiana or Florida that show vessel registration information for the proper time period; <br><br>(2) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period; <br><br>(3) Information in Federal and/or State vessel registration databases where available for the proper time period; <br><br>(4) Saltwater products license showing vessel registration numbers for the proper time period; <br><br>(5) Vessel registration receipts for the proper time period; or <br><br>(6) Vessel title for the proper time period. <br><br>(ALL AREADY IMPLEMENTED) |
| | | 3. Commercial Fishing License valid 4/20/10 for 2009 or 2010 season | (1) Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and <br>(2) Commercial fishing license receipts for the proper time period. |
| | | 4. Prior Seafood Spill-Related Payments | (1) Allow use of SWS-2 Form; and <br>(2) Use GCCF and BP Payment data that we have. |
| | | 5. Home Port and Landings in the Gulf Coast Areas 4/20/10 to 4/16/12 shown in vessel registration, vessel license, Federal Fisheries Permits, or trip tickets | ▪ Allow use of the SWS-1 Form to establish home port and landings in the Gulf Coast Areas. |
| **4.** | **VESSEL PHYSICAL DAMAGE** | ▪ Proof of Ownership of Vessel | ▪ Accept copy of a vessel title or a vessel registration to prove ownership, rather than requiring both. |

| MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION** |
| **5.** | **VoO CHARTER PAYMENT CLAIMS** | 1. Proof of Training | ▪ Accept proof of dispatch or placed on hire as proof of training (ALREADY IMPLEMENTED) |
| | | 2. Proof of Working Status | (1) If claimant says Non-Working in Claim Form, treat as Non-Working. <br> (2) If claimant says Working in Claim Form, consult BP database and: <br> (a) BP Data says Yes → treat as Working <br> (b) BP Data says Non-Working → treat as Non-Working unless claimant submits proof of working (payment of two days or more) <br> (c) BP Data says Cannot Determine → do not treat as Incomplete, but instead treat as Non-Working <br> (ALL ALREADY IMPLEMENTED) |
| **6.** | **INDIVIDUAL PERIODIC VENDOR OR FESTIVAL VENDOR** | 1. License required by law to make the sales | ▪ Many claimants have not submitted these because they did not have licenses.  With this requirement, unlicensed vendors will not be eligible. We have not found a way to eliminate this requirement. Researching online databases will not help, because these claimants did not have licenses. |
| | | 2. Proof that the claimant sold the good(s) or service(s) claimed and did so regularly before 4/20/10, which requires submission of all of these documents:   photographs reflecting the goods or services sold, news articles, sales flyers or advertisements reflecting the goods or services sold, and documents showing revenues and expenses. | ▪ Require only one type of document to show this, rather than requiring them all. |
| | | 3. Documents showing total earned income in 2009 and 2010 | ▪ We have not found a way to eliminate this requirement. |

| | CLAIM TYPE | MISSING DOCUMENTS | POSSIBLE SOLUTION |
|---|---|---|---|
| | **MISSING DOCUMENTS AND POSSIBLE SOLUTIONS** | | |
| 7. | **REAL PROPERTY SALES** | ▪ Documents supporting a Parcel Eligibility Challenge for Parcels not showing as in the Compensation Zone in the Mapping Software. The claimant must submit official documentation from the county or parish Assessor or a Professional Land Survey showing: (a) the actual presence of a Parcel for which there are no Parcel lines on the Real Property Sales Compensation Zone Map; (b) the Parcel is located within the geography identified in the Real Property Sales Compensation Zone Map; and (c) the county where the Parcel is located has designated the Parcel as Residential. | ▪ We will do our own online research of the public property records and try to find the tax assessment, make a PDF of it, and then upload it into the claimant's claim file.  Only a tax assessment will show all the elements needed (existence of Parcel, location and land use designation). |
| 8. | **COASTAL REAL PROPERTY** | ▪ 2010 Property Tax Assessment to prove value of a Parcel | ▪ Do not require this document; instead, rely on the Mapping Software, which contains the 2010 appraised value of the property. |
| 9. | **WETLANDS REAL PROPERTY** | ▪ 2010 and 2011 Tax Assessments to prove ownership of a Parcel | ▪ Use either the 2010 or the 2011 Tax Assessment to prove ownership, rather than requiring both. |

# EXHIBIT C

# BROWNGREER ‖ PLC

# MEMORANDUM

TO:      **Patrick A. Juneau, Claims Administrator**
                  **Christine Reitano**

FROM:    **Orran L. Brown**

DATE:     **August 19, 2012**

RE:       **Additional Incomplete Claims Issues**

---

We continue to look for ways to reduce the number of deficiencies we are forced to find in claims. This memo addresses ideas in addition to those in our 8/14/12 memo.

## A.  Business Economic Loss Claims.

*Proof of Property Management*:  The Settlement Agreement (Ex. 4A, Section 5. (b) .iii) requires that business claimants that are classified as lodging business, including hotels, motels and vacation rental properties, provide documentation to identify how the rental property is managed, such as (i) a rental management contract from a third-party management company or (ii) a Sworn Written Statement from an owner that manages its own property.  We created Sworn Written Statement 22 for property owners to submit to meet this requirement.

While this requirement is not currently resulting in many Incompleteness Notices, eliminating it would reduce the number of Incompleteness Notices overall.  We recommend that we eliminate this requirement for hotels and motels, but keep it for vacation rental properties, as the Accountants have indicated that they do not need this type of documentation for hotels and motels.

## B.  Individual Economic Loss Claims.

*Proof of License*:  Currently, if a claimant worked in an occupation that requires a state-issued license but did not provide that license, we ask reviewers to conduct research through state government websites to determine if a claimant was actually licensed for a particular period of time.  An IEL reviewer indicated that he spent roughly thirty minutes in an attempt to verify that a claimant had a valid operating license in 2010.  While this requirement is not currently resulting in many Incompleteness Notices, eliminating the licensing requirement could save a significant amount of time over the course of the review process.

412586

## C.  VoO Charter Payment Claims.

*Proof of Training*:  We recently implemented two significant policy changes to reduce incompleteness results.  One of those changes is that a Working VoO Participant is no longer required to prove that he or she attended the initial VoO training.  We now presume that Working participants attended the training.  However, we currently require Non-Working VoO Participants to submit documents showing that the claimant or an agent of the claimant attended the initial VoO training, or that the person who attended the training is listed in the VoO Training Database.  We accept PEC cards and documents specifying that the training was for the VoO program.  We do not currently accept non-VoO specific oil spill training documents like Hazwoper training or OSHA training, though claimants frequently submit those documents to satisfy the requirement.  To reduce the number of claims that are incomplete for this reason, we recommend accepting Hazwoper and OSHA oil spill training documents to satisfy the proof of training requirement.

## D.  Individual Periodic Vendor or Festival Vendor Claims.

### 1.  Total Earned Income.

The Settlement Agreement requires that claimants submit Total Earned Income information for us to calculate a potential payment (Ex. 8D, Sections I. C. 1(c) and II. D. 1(d)).  Many IPV/FV claimants are not submitting this information.  To reduce this common incompleteness, we recommend expanding the Individual Periodic Vendor Sworn Written Statement (SWS-13) and Festival Vendor Sworn Written Statement (SWS-15) to include Total Earned Income.  Pursuant to the Settlement Agreement, we currently have a section in each SWS that is devoted to estimated revenues and expenses.  We would expand this section so that the claimant may enter Total Earned Income information for 2009 and 2010 by month for SWS-13, and by Festival for SWS-15.

### 2.  Licenses/Permits to Make Sales or Hold Festivals.

The Settlement Agreement requires that claimants submit any licenses required by law to make the claimed sales (Ex. 8D, Sections I. C. 2 and 2. C. 2) and any permits required by law to hold any claimed Festival (Ex. 8D, Section II. C. 5(e)).  To reduce this common incompleteness, we recommend eliminating these requirements.  Many claimants do not have the appropriate license to make the sales and identify this as such on the Claim Form.  Festival Vendor claimants do not have ready access to the required festival permit because the claimant did not purchase the permit.  Instead, a Festival Coordinator or other person would generally have access to that permit, thereby requiring the claimant to obtain a Festival Coordinator SWS for each Festival to obtain a copy of the permit to hold each festival in 2009 and 2010.  The Festival Coordinator SWS and Festival Vendor SWS should be enough for us to determine that the festival exists and to satisfy the requirement.

Eliminating this license requirement would reduce the time it takes for us to complete a review.  Now, we must find the state where the claimant sold the goods or services and then match up each good or service with the licensing requirement for that state.  Many state licensing requirements have exceptions that we must also apply to reach our final conclusion of whether

2

the claimant was required to have a license to sell the good or service.  Many claimants sell more than one thing and we must repeat the process for each one.

## E. __Real Property Sales Claims.__

For Real Property Sales, Exhibit 13A of the Settlement Agreement requires four basic documents for every claim.  The claimant must provide:

(a)  Documentation verifying ownership of the Parcel on 4/20/10;

(b)  Official copy of the deed recorded after the Parcel was sold to confirm the transfer of ownership;

(c)  Copy of the signed sales contract(s); and

(d)  Copy of the closing statement, to determine the final sales price.

As outlined in the 8/14/12 Incomplete Claims and Possible Workarounds Memo, the majority of our Incomplete claims involve our Parcel Eligibility Challenges.  We have additional suggestions to help reduce the occurrence of Incomplete Reasons with eligible Parcels:

(1)  Expand what we proposed in the 8/14/12 Memo, where we suggested that we do online research of the public property records to retrieve a copy of the tax assessment for the Parcel and upload it to the claimants documentation.  We have looked at the public records websites for each of the 14 eligible counties in the Compensation Zone.  Certain counties provide information in addition to the tax assessment.  For example, the websites for Harrison County, MS, and Baldwin County, AL, also provide copies of property deeds.  Rather than making a claimant incomplete because he or she has not provided a copy of the deed recorded after the Parcel was sold, we could use the county website to retrieve a copy of that deed.  All of the eligible counties located in Florida provide the final sales price of the Parcel and we could use this information in place of the required closing statement.  The additional information available varies by county, but these records are useful tools we can utilize to further reduce the number of Incomplete Notices.

(2)  The mapping vendor gave us an Excel spreadsheet containing 1,638 Parcels located in the Compensation Zone and that meet our eligibility requirements.  This spreadsheet lists the Parcel's owner as of 4/20/10, the sale date, and the sale price.  We could use this information to determine these required data points rather than requiring documents from the claimant on those points.

| | ADDITIONAL INCOMPLETE CLAIMS ISSUES | |
|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION** |

| | **CLAIM TYPE** | | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION** |
|---|---|---|---|---|
| **1.** | **BUSINESS ECONOMIC LOSS** | | ▪ Proof of Property Ownership | ▪ Eliminate this requirement for Lodging Businesses that are hotels and motels. |
| **2.** | **INDIVIDUAL ECONOMIC LOSS** | | ▪ Proof of License | ▪ Eliminate this requirement. |
| **3.** | **VoO CHARTER PAYMENT CLAIMS** | | ▪ Proof of Training | ▪ Accept Hazwoper and OSHA training certifications, even if they do not specify Vessels of Opportunity training. |
| **4.** | **INDIVIDUAL PERIODIC VENDOR OR FESTIVAL VENDOR** | 1. | Total Earned Income | ▪ Revise SWS-13 and SWS-15 to include areas where a claimant can fill in Total Earned Income information for 2009 and 2010 and by Festival for Festival Vendors. |
| | | 2. | Licenses/Permits to Make Sales or Hold Festivals | ▪ Eliminate this requirement. |
| **5.** | **REAL PROPERTY SALES** | 1. | Documents that verify ownership of the Parcel on 4/20/10 | (1) We will do our own online research of the public property records and try to find the ownership history from the tax assessment, or a copy of the deed from when the claimant obtained ownership of the Parcel. We will make a PDF of this record and then upload it to the claimant's claim file. <br> (2) We will use the data sent to us from the mapping vendor for eligible Parcels. This spreadsheet lists the Parcel's owner as of 4/20/10. |
| | | 2. | Deed recorded after the Parcel was sold | (1) We will do our own online research of the public property records and try to find the deed recorded after the Parcel sold. We will make a PDF of the deed and then upload it to the claimant's claim file. This will determine that the claimant was the owner at the time the Parcel sold, as well as the date that the property transferred ownership. <br> (2) We will use the data sent to us from the mapping vendor. This spreadsheet lists the date the Parcel sold. |

| ADDITIONAL INCOMPLETE CLAIMS ISSUES | | | | |
|---|---|---|---|---|
| | **CLAIM TYPE** | | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION** |
| | | 3. | Documents showing the claimants ownership interest in the Parcel | ▪ We will do our own online research of the public property records and try to find the deed recorded after the Parcel was sold. We will make a PDF of the deed and then upload it to the claimant's claim file. This will show who owned the Parcel when it was sold and may explain their ownership interest, if not already 100%. |
| | | 4. | Closing statement | (1) We will do our own online research of the public property records and try to find the final sale price of the Parcel from the tax assessment. We will make a PDF of this record and then upload them to the claimant's claim file. Although the closing statement itself may not be visible through the public records search, some counties will display this amount on the tax assessment history. (2) We will use the data sent to us from the mapping vendor. This spreadsheet lists the final sales price of the Parcel. |