

# EXHIBIT D

| | | MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | |
|---|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION/BP RESPONSE/ANALYSIS** |
| **1.** | **BUSINESS ECONOMIC LOSS** | 1. Business      Licenses | (1) Not require a license; OR<br>(2) We do online research to find licenses as best we can; AND<br>(3) Issue a public Alert reminding the Class of this requirement.<br>***BP Response:*** License required, but approved us doing online research to try to find them. |
| | | 2.      Lodging Tax Returns and Occupancy Reports for lodging business claimants | ▪ Not require them; use P & Ls instead.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |
| | | 3.      State Sales and Use Tax Returns for retail businesses | ▪ Not require them from all retail claimants; require only when the Accountants decide that the monthly P & Ls seem inconsistent with the income tax returns of the business.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |
| | | 4.      Annual Profit and Loss Statements | ▪ Not require them; use monthly P & Ls for the year instead.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |
| | | 5.      Missing One Monthly P & L | ▪ If missing only one month, determine that month from the annual financial statement or tax returns, rather than requiring a P & L for that missing month.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |

| | | | MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | |
|---|---|---|---|---|
| | **CLAIM TYPE** | | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION/BP RESPONSE/ANALYSIS** |
| **2.** | **INDIVIDUAL ECONOMIC LOSS** | 1. | Proof of Age:  Driver's License, Passport, Birth Certificate, or a print-out from a public database showing the claimant's date of birth | ▪ Would like to stop requiring this, but submission is mandatory under the Settlement Agreement and we have no functional equivalent unless we rely on the DOB given in the Registration Form.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |
| | | 2. | Proof of Employability:  Social Security card, Government-issued ID (*i.e.*, driver's license), temporary work visa, or a green card | ▪ Would like to stop requiring this, but submission is mandatory under the Settlement Agreement and we have no functional equivalent.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |
| | | 3. | Sworn Written Statement (SWS-9 ) from the claimant that Pay Period Documentation or Tax Documentation is not available | ▪ Use the Pay Period Documentation or Tax Documentation that we have and issue an Eligibility Notice, without requiring an SWS-9 on why the claimant cannot provide full Pay Period Documentation or Tax Documentation, but BP previously rejected this idea and Class Counsel went along with that rejection.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** Possibly<br>***CA Discretion Granted?*** No |
| | | 4. | Sworn Written Statement (SWS-12) from Employer on causation by the Spill, for claimants who must prove causation | ▪ Settlement Agreement requires this; no workaround recommended.<br>**No suggested workaround.** |
| | | 5. | Employer Related Benefits Losses and Reimbursable Job Search and/or Job Training Costs | ▪ Prepare an FAQ and send/post an alert to all CAC's, Attorney Portals, Pro Se Portals, and the DWH public website reminding claimants that the Instruction Booklet sets out the specific document requirements for these Add-On claims and to be sure that they submit them.<br>***BP Response:*** Approved |

| | | MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | |
|---|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION/BP RESPONSE/ANALYSIS** |
| **3.** | **SEAFOOD** | 1. Documents that allocate revenues by vessel, landing location and catch type | ▪ Created SWS-1 to allow a claimant to make and vouch for this allocation. (ALREADY IMPLEMENTED)<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** Yes |
| | | 2. Vessel Registration and Ownership 4/20/10 to 12/31/10 | (1) Trip tickets or landing reports issued by Louisiana or Florida that show vessel registration information for the proper time period;<br><br>(2) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period;<br><br>(3) Information in Federal and/or State vessel registration databases where available for the proper time period;<br><br>(4) Saltwater products license showing vessel registration numbers for the proper time period;<br><br>(5) Vessel registration receipts for the proper time period; or<br><br>(6) Vessel title for the proper time period.<br><br>(ALL AREADY IMPLEMENTED)<br>***BP Response:*** Approved |
| | | 3. Commercial Fishing License valid 4/20/10 for 2009 or 2010 season | (1) Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and<br>(2) Commercial fishing license receipts for the proper time period.<br>***BP Response:*** Approved |

| | CLAIM TYPE | | MISSING DOCUMENTS | POSSIBLE SOLUTION/BP RESPONSE/ANALYSIS |
|---|---|---|---|---|
| | | 4. | Prior Seafood Spill-Related Payments | (1) Allow use of SWS-2 Form; and<br>(2) Use GCCF and BP Payment data that we have.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** No |
| | | 5. | Home Port and Landings in the Gulf Coast Areas 4/20/10 to 4/16/12 shown in vessel registration, vessel license, Federal Fisheries Permits, or trip tickets | ▪ Allow use of the SWS-1 Form to establish home port and landings in the Gulf Coast Areas.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** No<br>***CA Discretion Granted?*** Yes |
| 4. | VESSEL PHYSICAL DAMAGE | | ▪ Proof of Ownership of Vessel | ▪ Accept copy of a vessel title or a vessel registration to prove ownership, rather than requiring both.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** Possibly<br>***CA Discretion Granted?*** No |

| MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION/BP RESPONSE/ANALYSIS** |
| **5.** | **VoO CHARTER PAYMENT CLAIMS** | 1. Proof of Training | ▪ Accept proof of dispatch or placed on hire as proof of training (ALREADY IMPLEMENTED)<br>***BP Response:*** Approved |
| | | 2. Proof of Working Status | (1) If claimant says Non-Working in Claim Form, treat as Non-Working.<br>(2) If claimant says Working in Claim Form, consult BP database and:<br>　(a) BP Data says Yes → treat as Working<br>　(b) BP Data says Non-Working → treat as Non-Working unless claimant submits proof of working (payment of two days or more)<br>　(c) BP Data says Cannot Determine → do not treat as Incomplete, but instead treat as Non-Working<br>　(ALL ALREADY IMPLEMENTED)<br>***BP Response:*** Approved |
| **6.** | **INDIVIDUAL PERIODIC VENDOR OR FESTIVAL VENDOR** | 1. License required by law to make the sales | ▪ Many claimants have not submitted these because they did not have licenses.  With this requirement, unlicensed vendors will not be eligible. We have not found a way to eliminate this requirement. Researching online databases will not help, because these claimants did not have licenses.<br>***BP Response:*** Opposed<br>***Increase Amount Paid?*** Yes<br>***CA Discretion Granted?*** No |
| | | 2. Proof that the claimant sold the good(s) or service(s) claimed and did so regularly before 4/20/10, which requires submission of all of these documents:   photographs reflecting the goods or services sold, news articles, sales flyers or advertisements reflecting the goods or services sold, and documents showing revenues and expenses. | ▪ Require only one type of document to show this, rather than requiring them all.<br>***BP Response:*** Approved |

| MISSING DOCUMENTS AND POSSIBLE SOLUTIONS | | |
|---|---|---|
| **CLAIM TYPE** | **MISSING DOCUMENTS** | **POSSIBLE SOLUTION/BP RESPONSE/ANALYSIS** |
| | 3. Documents showing total earned income in 2009 and 2010 | ▪ We have not found a way to eliminate this requirement.<br>**No suggested workaround.** |
| 7. **REAL PROPERTY SALES** | ▪ Documents supporting a Parcel Eligibility Challenge for Parcels not showing as in the Compensation Zone in the Mapping Software. The claimant must submit official documentation from the county or parish Assessor or a Professional Land Survey showing: (a) the actual presence of a Parcel for which there are no Parcel lines on the Real Property Sales Compensation Zone Map; (b) the Parcel is located within the geography identified in the Real Property Sales Compensation Zone Map; and (c) the county where the Parcel is located has designated the Parcel as Residential. | ▪ We will do our own online research of the public property records and try to find the tax assessment, make a PDF of it, and then upload it into the claimant's claim file.  Only a tax assessment will show all the elements needed (existence of Parcel, location and land use designation).<br>**BP Response:** Approved |
| 8. **COASTAL REAL PROPERTY** | ▪ 2010 Property Tax Assessment to prove value of a Parcel | ▪ Do not require this document; instead, rely on the Mapping Software, which contains the 2010 appraised value of the property.<br>**BP Response:** Approved |
| 9. **WETLANDS REAL PROPERTY** | ▪ 2010 and 2011 Tax Assessments to prove ownership of a Parcel | ▪ Use either the 2010 or the 2011 Tax Assessment to prove ownership, rather than requiring both.<br>**BP Response:** Opposed<br>**Increase Amount Paid?** No<br>**CA Discretion Granted?** Yes |

# EXHIBIT E

| Table 1: Incomplete Claims After Completed Review | | | | |
|---|---|---|---|---|
| **Row** | **Claim Type** | **# of Reviews[1]** | **Incomplete Results** | **% Incomplete** |
| **1.** | Seafood Compensation Program | 398 | 147 | 37% |
| **2.** | Individual Economic Loss | 280 | 276 | 99% |
| **3.** | Individual Periodic Vendor or Festival Vendor Economic Loss | 11 | 11 | 100% |
| **4.** | Business Economic Loss[2] | 656 | 551 | 84% |
| **5.** | Start-Up Business Economic Loss[2] | 24 | 21 | 88% |
| **6.** | Failed Business Economic Loss[2] | 21 | 12 | 57% |
| **7.** | Coastal Real Property | 2,423 | 1,195 | 49% |
| **8.** | Wetlands Real Property | 485 | 338 | 70% |
| **9.** | Real Property Sales | 235 | 98 | 42% |
| **10.** | Subsistence | 0 | 0 | N/A |
| **11.** | VoO Charter Payment | 3,434 | 453 | 13% |
| **12.** | Vessel Physical Damage | 167 | 160 | 96% |
| **13.** | **Totals** | **8,134** | **3,262** | **40%** |

[1] The number of reviews includes (1) all claims issued Eligibility and Incompleteness Notices; (2) claims issued Non-Exclusion Denial Notices; and (3) all claims with a completed BrownGreer review.  This analysis does not count claims issued Denial Notices for Exclusions because we are able to cull these claims from the top without putting them through the full review process used to identify incompleteness reasons.

[2] The number of Incomplete Results for the three BEL Claim Types includes claims currently pending with the accountants.  While some claimants may cure the BrownGreer identified Incompleteness reason before the accountants finish reviewing the claim, this will be a small percentage and the majority of these claims will result in an Incompleteness Notice.



| Row | Claim Type | Incomplete Results | Notices Issued | Claims Ready for Notice[1] |
|---|---|---|---|---|
| | **Table 2: Incompleteness Notice Analysis** | | | |
| 1. | Seafood Compensation Program | 147 | 111 | 36 |
| 2. | Individual Economic Loss | 276 | 0 | 276 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 11 | 11 | 0 |
| 4. | Business Economic Loss[1] | 551 | 132 | 419 |
| 5. | Start-Up Business Economic Loss[1] | 21 | 5 | 16 |
| 6. | Failed Business Economic Loss[1] | 12 | 2 | 10 |
| 7. | Coastal Real Property | 1,195 | 50 | 1,145 |
| 8. | Wetlands Real Property | 338 | 0 | 338 |
| 9. | Real Property Sales | 98 | 29 | 69 |
| 10. | Subsistence | 0 | 0 | 0 |
| 11. | VoO Charter Payment | 453 | 266 | 187 |
| 12. | Vessel Physical Damage | 160 | 2 | 158 |
| 13. | **Totals** | **3,262** | **608** | **2,654** |

[1] The number of Claims Ready for Notice for the three BEL Claim Types includes claims currently pending with the accountants.  While some claimants may cure the BrownGreer identified Incompleteness reason before the accountants finish reviewing the claim, this will be a small percentage and the majority of these claims will result in an Incompleteness Notice.



| | Table 3: Extent of Incompleteness Results | | | | |
|---|---|---|---|---|---|
| **Row** | **Claim Type** | **One Missing Item** | **Multiple Missing Items** | **Total Incomplete Results** | **% Missing Multiple Items** |
| **1.** | Seafood Compensation Program | 79 | 68 | 147 | 46% |
| **2.** | Individual Economic Loss | 193 | 83 | 276 | 30% |
| **3.** | Individual Periodic Vendor or Festival Vendor Economic Loss | 0 | 11 | 11 | 100% |
| **4.** | Business Economic Loss | 62 | 489 | 551 | 89% |
| **5.** | Start-Up Business Economic Loss | 3 | 18 | 21 | 86% |
| **6.** | Failed Business Economic Loss | 0 | 12 | 12 | 100% |
| **7.** | Coastal Real Property | 466 | 729 | 1,195 | 61% |
| **8.** | Wetlands Real Property | 22 | 316 | 338 | 93% |
| **9.** | Real Property Sales | 30 | 68 | 98 | 69% |
| **10.** | Subsistence | 0 | 0 | 0 | N/A |
| **11.** | VoO Charter Payment | 267 | 186 | 453 | 41% |
| **12.** | Vessel Physical Damage | 66 | 94 | 160 | 59% |
| **13.** | **Totals** | **1,188** | **2,074** | **3,262** | **64%** |

| Table 4: Incompleteness Results by Workaround | | | | | | |
|---|---|---|---|---|---|---|
| Row | Claim Type | Incomplete Results without Notice | # with One Proposed Workaround | # with Multiple Proposed Workarounds | # with Workaround and Other | # with Only Other |
| **1.** | **Seafood Compensation Program** | **36** | **26** | **4** | **4** | **2** |
| | Vessel Registration and Ownership 4/20/10 to 12/31/10 | | 3 | 0 | 4 | 0 |
| | Commercial Fishing License valid 4/20/10 for 2009 or 2010 season | | 1 | 3 | 4 | 0 |
| | Home Port and Landings in the Gulf Coast Areas 4/20/10 to 4/16/12 shown in vessel registration, vessel license, Federal Fisheries | | 0 | 1 | 3 | 0 |
| | Documents that allocate revenues by vessel, landing location and catch type | | 22 | 4 | 2 | 0 |
| | Prior Seafood Spill-Related Payments | | 0 | 0 | 2 | 0 |
| **2.** | **Individual Economic Loss** | **276** | **193** | **0** | **46** | **37** |
| | SWS-9 or PPED/TID | | 193 | 0 | 46 | 0 |
| **3.** | **Individual Periodic Vendor or Festival Vendor Economic Loss** | **0** | **0** | **0** | **0** | **0** |
| **4.** | **Business Economic Loss** | **445** | **22** | **115** | **258** | **50** |
| | Business Licenses | | 86 | 84 | 179 | 0 |
| | State Sales and Use Tax Returns | | 4 | 21 | 34 | 0 |
| | Lodging Tax Returns | | 2 | 8 | 22 | 0 |
| | Annual Profit and Loss Statements | | 0 | 77 | 115 | 0 |
| | Missing One Monthly P & L | | 2 | 83 | 119 | 0 |
| **5.** | **Coastal Real Property** | **1,145** | **300** | **0** | **416** | **429** |
| | 2010 Property Tax Assessment to prove value of a Parcel | | 300 | 0 | 416 | 0 |
| **6.** | **Wetlands Real Property** | **338** | **266** | **0** | **53** | **19** |
| | 2010 and 2011 Tax Assessments to prove ownership of a Parcel | | 266 | 0 | 53 | 0 |

| Table 4: Incompleteness Results by Workaround | | | | | | |
|---|---|---|---|---|---|---|
| Row | Claim Type | Incomplete Results without Notice | # with One Proposed Workaround | # with Multiple Proposed Workarounds | # with Workaround and Other | # with Only Other |
| 7. | **Real Property Sales** | **69** | **20** | **0** | **0** | **49** |
| | Documents supporting a Parcel Eligibility Challenge for Parcels not showing as in the Compensation Zone in the Mapping Software. The claimant must submit official documentation from the county or parish Assessor or a Professional Land Survey showing: (a) the actual presence of a Parcel for which there are no Parcel lines on the Real Property Sales Compensation Zone Map; (b) the Parcel is located within the geography identified in the Real Property Sales Compensation Zone Map; and (c) the county where the Parcel is located has designated the Parcel as Residential. | | 20 | 0 | 0 | 0 |
| 8. | **Subsistence** | **0** | **0** | **0** | **0** | **0** |
| 9. | **VoO Charter Payment** | **187** | **64** | **7** | **80** | **36** |
| | Proof of Working Status | | 25 | 7 | 53 | 0 |
| | Proof of Training | | 39 | 7 | 39 | 0 |
| 10. | **Vessel Physical Damage** | **158** | **62** | **0** | **94** | **2** |
| | Proof of Ownership of Vessel | | 62 | 0 | 94 | 0 |
| 11. | **Totals** | **2,654** | **953** | **126** | **951** | **624** |

| | Table 5: Breakdown of Incomplete Claims Into Represented and Prior GCCF Claimants | | | |
|---|---|---|---|---|
| **Row** | **Claim Type** | **Incomplete Results** | **Represented (%)** | **Prior GCCF Claimant (%)** |
| **1.** | Seafood Compensation Program | 147 | 71 (48%) | 116 (79%) |
| **2.** | Individual Economic Loss | 276 | N/A | N/A |
| **3.** | Individual Periodic Vendor or Festival Vendor Economic Loss | 11 | 1 (9%) | 8 (73%) |
| **4.** | Business Economic Loss | 551 | 400 (73%) | 456 (83%) |
| **5.** | Start-Up Business Economic Loss | 21 | 10 (48%) | 17 (81%) |
| **6.** | Failed Business Economic Loss | 12 | 7 (58%) | 11 (92%) |
| **7.** | Coastal Real Property | 1,195 | 285 (24%) | 329 (28%) |
| **8.** | Wetlands Real Property | 338 | 318 (94%) | 11 (3%) |
| **9.** | Real Property Sales | 98 | 14 (14%) | 39 (40%) |
| **10.** | Subsistence | 0 | N/A | N/A |
| **11.** | VoO Charter Payment | 453 | 343 (76%) | 324 (72%) |
| **12.** | Vessel Physical Damage | 160 | 90 (56%) | 126 (79%) |
| **13.** | **Totals** | **3,262** | **1,539 (52%)** | **1,437 (48%)** |

| Table 6: Analysis of Law Firms with 15 or More Incomplete Claims | | | | |
|---|---|---|---|---|
| Row | Firm Name | Complete Reviews | Incomplete Results | % Incomplete |
| 1. | | 286 | 285 | 100% |
| 2. | | 860 | 120 | 14% |
| 3. | | 267 | 81 | 30% |
| 4. | | 96 | 80 | 83% |
| 5. | | 84 | 63 | 75% |
| 6. | | 328 | 54 | 16% |
| 7. | | 50 | 35 | 70% |
| 8. | | 55 | 29 | 53% |
| 9. | | 46 | 28 | 61% |
| 10. | | 409 | 25 | 6% |
| 11. | | 112 | 25 | 22% |
| 12. | | 78 | 22 | 28% |
| 13. | | 201 | 22 | 11% |
| 14. | | 162 | 22 | 14% |
| 15. | | 21 | 21 | 100% |
| 16. | | 40 | 20 | 50% |
| 17. | | 36 | 19 | 53% |
| 18. | | 162 | 19 | 12% |
| 19. | | 19 | 18 | 95% |
| 20. | | 59 | 18 | 31% |
| 21. | | 75 | 18 | 24% |
| 22. | | 105 | 18 | 17% |
| 23. | | 17 | 16 | 94% |
| 24. | | 23 | 16 | 70% |
| 25. | | 25 | 15 | 60% |





# EXHIBIT F

### A. Notices Issued

| | Claim Type | Notice Type | | | | | | Representation Status | | Delivery Method | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Eligible - Payable | | Eligible- No Payment | Incomplete | Denial | Total Notices | Represented | Pro Se | Portal | Mail |
| | | Number | Amount | | | | | | | | |
| 1. | Seafood Compensation Program | 95 | $7,509,564.18 | 47 | 114 | 267 | **523** | 226 | 297 | 370 | 153 |
| 2. | Individual Economic Loss | 1 | $2,572.29 | 2 | 0 | 725 | **728** | 46 | 682 | 417 | 311 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | $0.00 | 0 | 11 | 5 | **16** | 3 | 13 | 15 | 1 |
| 4. | Business Economic Loss | 50 | $9,369,837.18 | 2 | 224 | 185 | **461** | 232 | 229 | 357 | 104 |
| 5. | Start-Up Business Economic Loss | 0 | $0.00 | 0 | 7 | 15 | **22** | 5 | 17 | 13 | 9 |
| 6. | Failed Business Economic Loss | 0 | $0.00 | 0 | 2 | 49 | **51** | 3 | 48 | 25 | 26 |
| 7. | Coastal Real Property Damage | 536 | $3,540,106.86 | 0 | 73 | 104 | **713** | 440 | 273 | 627 | 86 |
| 8. | Wetlands Real Property Damage | 9 | $141,750.00 | 0 | 0 | 7 | **16** | 9 | 7 | 13 | 3 |
| 9. | Real Property Sales Damage | 68 | $3,700,731.25 | 0 | 29 | 36 | **133** | 51 | 82 | 101 | 32 |
| 10. | Subsistence Damage | 0 | $0.00 | 0 | 0 | 98 | **98** | 62 | 36 | 76 | 22 |
| 11. | VoO Charter Damage | 2,428 | $108,098,130.95 | 0 | 341 | 44 | **2,813** | 2,392 | 421 | 2,582 | 231 |
| 12. | Vessel Physical Damage | 1 | $1,088.04 | 0 | 5 | 0 | **6** | 0 | 6 | 2 | 4 |
| 13. | **SUBTOTALS** | **3,188** | **$132,363,780.75** | **51** | **806** | **1,535** | **5,580** | **3,469** | **2,111** | **4,598** | **982** |
| | | **57%** | | **1%** | **14%** | **28%** | **100%** | **62%** | **38%** | **82%** | **18%** |
| 14. | **TOTAL NOTICES** | 5,580 | | | | | | 5,580 | | 5,580 | |

### B. Notices Issued by State of Residence

| | State of Residence | Notice Type | | | | | | Representation Status | | Delivery Method | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Eligible - Payable | | Eligible- No Payment | Incomplete | Denial | Total Notices | Represented | Pro Se | Portal | Mail |
| | | Number | Amount | | | | | | | | |
| 1. | Alabama | 902 | $34,344,400.76 | 1 | 129 | 146 | **1,178** | 869 | 309 | 1,043 | 135 |
| 2. | Florida | 501 | $20,485,362.03 | 7 | 253 | 439 | **1,200** | 573 | 627 | 975 | 225 |
| 3. | Louisiana | 1,035 | $46,099,272.75 | 39 | 278 | 554 | **1,906** | 1,211 | 695 | 1,493 | 413 |
| 4. | Mississippi | 608 | $27,390,387.47 | 3 | 109 | 177 | **897** | 688 | 209 | 797 | 100 |
| 5. | Texas | 22 | $1,712,563.12 | 0 | 18 | 149 | **189** | 36 | 153 | 126 | 63 |
| 6. | Others | 120 | $2,331,794.62 | 1 | 19 | 70 | **210** | 92 | 118 | 164 | 46 |
| 7. | **SUBTOTALS** | **3,188** | **$132,363,780.75** | **51** | **806** | **1,535** | **5,580** | **3,469** | **2,111** | **4,598** | **982** |
| | | **57%** | | **1%** | **14%** | **28%** | **100%** | **62%** | **38%** | **82%** | **18%** |
| 8. | **TOTAL NOTICES** | 5,580 | | | | | | 5,580 | | 5,580 | |

## C. Claimant Responses to Notices

| | Claim Type | Accepted Offers | | | Requests for Reconsideration | | | Sent Additional Documents After Incomplete | No Response | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Accepted Offer | Release Generated | Release Submitted | Eligible - Payble | Eligible - No Payment | Denial | | | |
| 1. | Seafood Compensation Program | 49 | 67 | 0 | 5 | 4 | 31 | 62 | 372 | 523 |
| 2. | Individual Economic Loss | 1 | 1 | 0 | 0 | 0 | 59 | 0 | 668 | 728 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0 | 0 | 0 | 0 | 2 | 5 | 9 | 16 |
| 4. | Business Economic Loss | 30 | 13 | 0 | 1 | 0 | 22 | 68 | 340 | 461 |
| 5. | Start-Up Business Economic Loss | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 19 | 22 |
| 6. | Failed Business Economic Loss | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 45 | 51 |
| 7. | Coastal Real Property Damage | 211 | 216 | 0 | 7 | 0 | 12 | 55 | 428 | 713 |
| 8. | Wetlands Real Property Damage | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 13 | 16 |
| 9. | Real Property Sales Damage | 51 | 40 | 0 | 0 | 0 | 4 | 21 | 57 | 133 |
| 10. | Subsistence Damage | 0 | 4 | 0 | 0 | 0 | 6 | 0 | 92 | 98 |
| 11. | VoO Charter Damage | 1,855 | 1,331 | 0 | 21 | 0 | 9 | 247 | 681 | 2,813 |
| 12. | Vessel Physical Damage | 1 | 1 | 0 | 0 | 0 | 0 | 2 | 3 | 6 |
| 13. | **SUBTOTALS** | **2,199** | **1,674** | **0** | **35** | **4** | **154** | **461** | **2,727** | **5,580** |
| | | 39% | | | 1% | <1% | 3% | 8% | 49% | 100% |
| 14. | **TOTALNOTICES** | | | | | 5,580 | | | | |

## D. Accepted Offers

| | Claim Type | Accepted Offers | | | Representation Status | | Appeal Rights | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Number | Amount | Average Offer | Represented | Pro Se | No BPAppeal Right: Offer<=$25,000 | BP Appeal Right | | |
| | | | | | | | | $25,001-$250,000 | $2,50,001-$500,000 | >$500,000 |
| 1. | Seafood Compensation Program | 49 | $5,218,595.35 | $106,501.00 | 47 | 2 | 32 | 7 | 7 | 3 |
| 2. | Individual Economic Loss | 1 | $734.94 | $734.00 | 1 | 0 | 1 | 0 | 0 | 0 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | $0.00 | $0.00 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. | Business Economic Loss | 30 | $2,632,468.47 | $87,748.00 | 24 | 6 | 7 | 20 | 3 | 0 |
| 5. | Start-Up Business Economic Loss | 0 | $0.00 | $0.00 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6. | Failed Business Economic Loss | 0 | $0.00 | $0.00 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7. | Coastal Real Property Damage | 211 | $432,024.97 | $2,047.00 | 131 | 80 | 211 | 0 | 0 | 0 |
| 8. | Wetlands Real Property Damage | 1 | $4,500.00 | $4,500.00 | 0 | 1 | 1 | 0 | 0 | 0 |
| 9. | Real Property Sales Damage | 51 | $2,834,006.25 | $55,568.00 | 30 | 21 | 11 | 39 | 1 | 0 |
| 10. | Subsistence Damage | 0 | $0.00 | $0.00 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11. | VoO Charter Damage | 1,855 | $84,722,000.00 | $45,672.00 | 1,679 | 176 | 147 | 1,708 | 0 | 0 |
| 12. | Vessel Physical Damage | 1 | $1,088.04 | $1,088.00 | 0 | 1 | 1 | 0 | 0 | 0 |
| 13. | **SUBTOTALS** | **2,199** | **$95,845,418.02** | **$43,585.91** | **1,912** | **287** | **411** | **1,774** | **11** | **3** |
| | | 100% | | | 87% | 13% | 19% | 81% | <1% | <1% |
| 14. | **TOTALNOTICES** | | 2,199 | | 2,199 | | 2,199 | | | |



# EXHIBIT G

| | GCCF CLAIMS SENT DEFICIENCY NOTICES AND DENIED AS DEFICIENT | | | | | |
|---|---|---|---|---|---|---|
| Row | Category | Individual | Business | Total | % of All Claims Filed | % of Deficiency Notices Sent |
| | **A. Deficiency Denials** | | | | | |
| **1.** | **EAP Claims Sent Deficiency Notices** | **70,511** | **21,451** | **91,962** | **19%** | |
| **2.** | **EAP Claims Denied as Deficient** | **77,877** | **19,488** | **97,365** | **20%** | **43%[1]** |
| **3.** | **Phase II Claims Sent Deficiency Notices** | **92,040** | **45,741** | **137,781** | **40%** | |
| | (a) IP Claims Sent Deficiency Notices | 35,563 | 20,740 | 56,303 | | |
| | (b) FP Claims Sent Deficiency Notices | 46,772 | 17,635 | 64,407 | | |
| | (c) Transition Claims Sent Deficiency Notices | 9,705 | 7,366 | 17,071 | | |
| **4.** | **Phase II Claims Denied as Deficient** | **49,362** | **15,311** | **64,673** | **19%** | **47%** |
| | (a) IP Claims Denied as Deficient | 19,086 | 6,933 | 26,019 | | 46% |
| | (b) FP Claims Denied as Deficient | 27,580 | 7,353 | 34,933 | | 54% |
| | (c) Transition Claims Denied as Deficient | 2,696 | 1,025 | 3,721 | | 22% |
| | **B. Payments** | | | | | |
| **1.** | **EAP Claims Paid** | **121,104** | **48,165** | **169,269** | **36%** | |
| **2.** | **Phase II Claims Paid** | **72,440** | **40,642** | **113,082** | **33%** | |
| | (a) IP Claims Paid | 22,833 | 14,118 | 36,951 | | |
| | (b) FP Claims Paid | 45,806 | 21,221 | 67,027 | | |
| | (c) Transition Claims Paid | 3,801 | 5,303 | 9,104 | | |

[1]The GCCF Denied 39,986 claims as Deficient after sending a prior Deficiency Letter.  The GCCF issued an additional 57,379 Deificiency Denial Letters without a prior Deficiency Letter, because the claims were processed at the end of the EAP Program without sufficient time for the claimant to respond with additional documentation.  This report only counts the 39,986 claims receiving both a Deficiency Notice and a Deficiency Denial in calculating the 43% of all Deficiency Notices.



# EXHIBIT H

**From:** noreply@one,dhecc,com [mailto:noreply@one,dhecc,com]
**Sent:** Monday, September 10, 2012 3:03 PM
**To:** Srikanth Regula
**Subject:** Update on DWH Settlement Program
**Importance:** High

The DWH Economic Settlement Program is well underway in its review of claims submitted to date.  In a report filed last week with the Court, the Claims Administrator announced that the Program had completed reviews and had issued 3,398 Notices of Eligibility, 831 Incompleteness Notices, and 1,544 Denial Notices.  The volume of claims being reviewed increases every day, as more and more reviewers are trained to evaluate and decide the claims under the Settlement Agreement.  To see a copy of the Court report, go to www.deepwaterhorizoneconomicsettlement.com,  click on the Reporting tab, and then click on the report labeled "Claims Administrator's Status Report No. 1 (September 5, 2012)."

As we review claims, we are finding that many of them are missing documents that the Settlement Agreement requires.  In an effort to make more claims eligible for payment, we explored with BP and Class Counsel relaxing some of the requirements.  As a result of that effort, we were able to relax some of the requirements; however, for the rest, we will have to abide by and implement the negotiated terms of the Settlement Agreement, as written.  For these, we will be issuing Incompleteness Notices to ask for the required information.

The Program is committed to assisting claimants and law firms through this process.  The Incompleteness Notice will contain helpful tips on how you may be able to obtain a missing document.  We are also working with each of the Gulf states to see whether they have licensing or other databases that we could access to obtain copies of certain missing documents for claimants.  Our law firm contacts and Claimant Assistance Centers are available to answer questions and to help.  Although we will continue our efforts, it will usually be faster for you to obtain and send in the documents because you will either already have them in your possession, or may be able to get them from a public source more readily than we can.

You may find the list of all required documents in the Instruction Booklets, which are available online.  To find these Instruction Booklets, go to www.deepwaterhorizoneconomicsettlement.com.  Click on the Claim Form tab, find the type of claim you wish to file, and then click on the link called "Instructions" for that claim type. The following documents are those that are missing most often, based on the reviews we have completed so far:

1.  **Seafood Compensation Program:**  Documents or the SWS-1 that allocate revenues by vessel, landing location and catch type.

2.  **Business Economic Loss Claims:**
    (a)  Business licenses;
    (b)  Annual profit and loss statements;

1

    (c)  Full monthly profit and loss statements with revenue and expenses; and
    (d)  2011 Federal Tax Returns.

**3.  Coastal Real Property:**
    (a)  2010 Tax Assessment;
    (b)  Copy of the Deed for the Parcel; and
    (c)  Clerk of Court report OR Registrar of Lands report OR Professional Land Survey.

**4.  Real Property Sales:**
    (a)  Copy of a signed Purchase Contract before April 21, 2010;
    (b)  Copy of a signed Purchase Contract after April 21, 2010, lowering the sales price;
    (c)  Proof of ownership on April 21, 2010; and
    (d)  Proof of ownership at the time of the sale.

**5.  VoO Charter Payment:**
    (a)  Proof that the claimant signed an MCVA;
    (b)  Proof of Working Status; and
    (c)  Proof of completion of initial VoO Training.

**6.  Vessel Physical Damage:**
    (a)  Vessel title and registration; and
    (b)  Proof of costs incurred to repair or replace the vessel.

This  list is not exhaustive, but it provides a sampling of the commonly missing documents.  You may want to review the claim or claims you have already submitted to make sure that you have provided these documents and any others required by the Settlement Agreement and explained in the Instruction Booklets.

At any time during this process, please let us know if you have any questions.  Thank you.

This communication (including any attachments) is intended for the use of the intended recipient(s) only and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.



# EXHIBIT I

**From:**       Dan Balhoff <balhoff@pabmb.com>
**Sent:**       Friday, March 07, 2014 6:35 PM
**To:**         pstrunk@browngreer.com
**Cc:**         Randi Ellis
**Subject:**    Opt out credits

Phil:

BP tells me it will waive the opt-out credits.

Dan Balhoff

Sent from my iPhone
###################################################################################
Attention:
The information contained in this message and or attachments is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any system and destroy any copies.

Thank You.
###################################################################################



# EXHIBIT J

# Memorandum

**To:** Patrick A. Juneau, Esq.
    Claims Administrator

**From:** Class Counsel

**Matter:** <u>In re: Deepwater Horizon</u>
    MDL No. 2179

**Re:** Implementation and Application of the "Claimant-Friendly" Provisions

**Date:** September 17, 2012


The cornerstone of this Settlement and its Program is to be claimant friendly.

This includes a substantive component, which is memorialized in Section 4.3.8.

But the perhaps more important component is the procedural component, which is memorialized in Section 4.3.7, and requires the Vendors to:

> work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes.

Further:

> The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

This is *not* merely aspirational.  The word used repeatedly is "shall".  It is clear and unambiguous, to be implemented faithfully by the Claims Administrator pursuant to Section 4.3.1 ("...for the benefit of the Economic Class...").

This obligation under Section 4.3.7 is *not* satisfied by the separate opportunity for a claimant to seek Reconsideration.

Indeed, these two provisions and procedures are completely separate and distinct.

Section 4.3.7 appears in Section 4, the Claims Processing Section.  Reconsideration, by contrast, appears in Section 6, the *Appeal* Section.

All of the Program's efforts to work with Economic Class Members to facilitate the assembly and submission of Claims Forms and all supporting documentation, and to provide claimants with assistance, information, opportunities and notice so that they have the best opportunity to be determined eligible for and receive the settlement payments to which they are entitled happens ***before*** there is a denial, determination and/or opportunity to seek Reconsideration and/or Appeal.

This is the way it was negotiated.

Sections 4.3.7 and 4.3.8 were negotiated first.

Then the general aspects of the Appeal process were negotiated.

Reconsideration, under Section 6.1.2.1.1, was added towards the end, *not* to supplement the Claims Process, but to *prevent* unnecessary Appeals.

The intent was to try to catch clear errors or mistakes in a Determination, (*i.e.* a "calculation error" or failure to take into account relevant information, or other failure to follow the standards governing the determination), that could potentially be corrected quickly and efficiently without having to go to a formal Appeal Panelist or Panel.

Section 6.1 was also added at this stage of the negotiations – *i.e.* after Section 4.3.7 setting forth the responsibilities of the Vendors during the Claims Process.  It provides that:

> Subject to and in accordance with Sections 4.3.7 and 4.3.8, Economic Class Members will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement.

This Section was primarily intended to deal with *Denials* (not Determinations).  And the reason why a claimant was given "up to" three opportunities "depending on the circumstances" was due to a recognition that, under some circumstances, there would be no way for a claimant to qualify, (*e.g.* did not satisfy the geographical requirements, or was clearly a casino, or settled in the GCCF), and additional attempts would be futile.

*Nevertheless,* each of these opportunities were always intended to be "subject to and in accordance with Sections 4.3.7 and 4.3.8."

With respect to ***each*** of the "up to three" opportunities, the Program would work with the claimant to facilitate the assembly and submission of Claims Forms and all supporting documentation, and to provide claimants with assistance, information, *opportunities* and notice

so that they have the best opportunity to be determined eligible for and receive the settlement payments to which they are entitled, ***before***  a final determination, subject to Reconsideration and/or Appeal.


## The Requirement to Provide the Claimant with the Precise Information and/or Analyses Relied on by the Program in Making its Denial and/or Determination

It was always understood as part of the negotiations and agreement with BP that the Program would be completely "transparent" in that the claimant would know exactly how the Program processed, evaluated, calculated, determined or denied the claim.

One of the main complaints about the GCCF, (whether fair or unfair), was that you would get a denial or a determination and you would have no idea what it was based upon.

It was always understood and agreed that this Settlement Program would not be like that. The Program would "show their math" and the Claimant would get a "spreadsheet" that explained the precise calculation.

This was central to the way that the Settlement was presented to the Court, the public and the Class.

Specifically, it is incorporated  in Section 4.3.7 of the Agreement, which requires the Vendors to provide "*assistance, information, opportunities and notice*" to achieve eligibility and the optimal level of compensation.

Further, Section 6.1.2.1.1 expressly provides that: "The Settlement Program shall provide access to the Claimant ... of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination."


## Previous Communications on the Subject

Class Counsel has raised this issue with the Program on several occasions.

For example, in an e-mail dialogue between Class Counsel and the Program on July 19, 2012, Class Counsel expressed the following:

> *Re: No. 32*
>
> Dear Christine,
>
> I understand that there are some mechanical / logistical issues, which we leave to your discretion.
>
> But, between the Determination Notice itself and/or the immediate access to the forms, calculations and worksheets as provided by Section 6.1.2.1.1, the Claimant has to be clearly directed to, and provided with, how the Program characterized fixed/variable costs, any exclusions

of extraordinary items, which items constitute revenues, etc.

This transparency factor was an essential element to the Agreement, and has been touted by Class Counsel (and/or others) to the Court, and at every seminar or other presentation.

We appreciate your time, consideration and assistance in this regard.

Thanks.
_____
From: Christine Reitano

Once a claimant moves to Reconsideration, the claimant will see a a PDF of the accountant worksheets that contain all claimant specific data/calculations.

Thanks

Christine
_____
From: Steve Herman

Thanks Christine.  I apologize to the extent I might be missing something in the process. Hopefully we are on the same page. But **I am really just trying to ensure that there is a process for (lower-case) "reconsideration", including opportunity for supplementation of documentation, before the Claimant is forced to engage in a formal Reconsideration / Appeal process that puts the Claimant on an irrevocable road to finality.** And, at the same time, that the Claimant has the opportunity and ability to see how the claim was processed / evaluated / determined by the Program _before_ such a formal Reconsideration / Appeal, so that he or she can decide whether to seek formal Reconsideration / Appeal, and to better articulate the basis for the challenge to the determination.

Thanks.
_____
From: Christine Reitano

Yes, there is an initial process, Reconsideration, which includes the opportunity for supplementation of documentation before the claimant engages in a formal and final Appeal process.  Claimants will have access to accounting data once they've moved for Reconsideration.

Christine
_____
From: Steve Herman

Maybe it's the nature of e-mail communication, but I think we might be talking past each other.

My fear is that the process, right now, (putting "insufficiency" aside), is, essentially: a Determination; which the claimant can either accept or seek Reconsideration; which the claimant (or BP) can then Appeal;   and then the process ends.

If the current process is more flexible than that, great. I apologize for all of the back-and-forth.

But **if that is the current process, then that is not what was negotiated, and disregards, in particular, Section 4.3.7** and Section 6.1.

**The Program is supposed to affirmatively work with and otherwise allow "reconsideration" as generally (and flexibly) provided by 4.3.7.**

> Section 6.1 expressly gives the Claimant up to (at least) three chances, (which I believe is further "subject to" additional informal opportunities to supplement and seek informal "reconsideration" under 4.3.7).
>
> In any event, the Claimant must be provided with the "forms, calculations and worksheets relied upon" *before* the Claimant is required by the Program to seek (formal) Reconsideration under Section 6.1.2.1.1, so that the Claimant can provide "the grounds that the Settlement Program committed a calculation error, failed to take into account relevant information or data or otherwise failed to follow the standards governing the determination" in the written request for reconsideration.
>
> Hope this is helpful.
>
> Thanks, and best wishes, - Steve

Later on July 19, 2012, Class Counsel similarly suggested inclusion of the following Preface to the then-existing DRAFT Appeal Procedure:

> Before formal Reconsideration or Appeal, a Claimant shall be provided with at least three chances to have their claims reconsidered and reviewed to assure accuracy, transparency, independence and adherence by the Settlement Program to the terms of the Settlement Agreement. [Section 6.1] The Settlement Program, in this regard, shall work with the Claimant to facilitate the assembly and submission of their Claims Forms and all supporting documentation, and use its best efforts to provide the Claimant with assistance, information, opportunities to be determined eligible for and receive the Settlement Payment(s) to which the Claimant is entitled under the Agreement. [Section 4.3.7] If, at that point, the Claimant continues to believe that he or she has not been afforded full compensation as provided under the Settlement Agreement, the Claimant shall have the right to formal Reconsideration, and Appeal, if necessary, as provided herein:

As another example, on August 7, 2012, in response to Brown Greer's July 30th Outstanding Issues Memo, Class Counsel again advised that:

> **Issue No. 11(b)** – I understand and appreciate that the Program has been and intends to continue to be flexible and interactive in allowing people to supplement, amend, complete and/or otherwise maximize their claims. At the same time, based on my understanding of the formal procedures, **there does not seem to be formal incorporation of Section 4.3.7 (whether independently or read in conjunction with Section 6.1).** According to the formal procedure (at least the way I understand it), in a nutshell: The Claimant submits his or her claim and supporting documentation, and receives a Notice or Determination of some kind. It's at that point up to the Claimant to seek Reconsideration within 30 days, and to submit additional documentation. At that point, the Claimant has the right to Appeal. (However, on appeal, the Claimant has no right to submit additional documentation.*) If the Claimant loses the appeal, that's it. **Under any reading of Section 6.1, it is contemplated that the Claimant would get, at the**

**very least, "up to three" chances, before formal Reconsideration.  (As noted in my previous submission, this was intended to refer to denials, and is, in any event, modified by Sections 4.3.7 and 4.3.8 [*i.e.* "Subject to and in accordance with.…"] which place the burden *on the Program,* without limitation.**) Here, in general, according to the formal procedure (at least as I understand it), you only get one shot. Then Reconsideration. Then Appeal. That's it. **I don't think that this is what was intended, agreed to, or otherwise contemplated.**

[*If BP takes an Appeal, the Claimant must be provided with the opportunity to submit additional documentation that rebuts whatever argument that BP is making.]

Again, recently, on September 11, 2012, Class Counsel communicated concerns *via* e-mail that the Settlement Agreement was not being followed in this regard:

The Settlement Agreement provides that the Program "shall work with Economic Class Members … to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes. The Settlement Program … shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class member is entitled under the terms of the Agreement." Section 4.3.7.   The term used is "shall". That is the express language in the Agreement, to which BP agreed.  Putting aside the question of how claims should be viewed by the Program on a substantive basis, **the Program should, as a matter of process, be telling the Claimant and/or his or her attorney, in the event of some confusion or uncertainty, what the issue or ambiguity is, so that the Claimant can attempt to address it *BEFORE* a formal Denial is issued, and the Claimant's options become limited to the narrow Reconsideration and Appeal path to finality that the Program has, thus far, set forth.**

## Examples of Failure to Implement

In the case of, for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [Claim No. ▮▮▮71], the Program should have contacted the claimant (and/or his attorney), presented the information contained within Orran Brown's September 11, 2012 8:24PM e-mail, and affirmatively solicited supplemental and/or clarifying information and/or documentation *before* denying the claim.

In the case of, for example, ▮▮▮▮ [Claim No. ▮▮▮49], the explanation that was provided in Christine Reitano's e-mail of August 31, 2012 12:59PM should have been

communicated to the claimant (and/or his attorney) so that the claim could have been supplemented with the corresponding Guidry trip ticket information / documentation ***before*** forcing the claimant to seek formal Reconsideration – and, ideally, even before issuing a less than optimal determination.

(And, in both of these cases, had the claimants not been represented by Class Counsel, who communicated directly with the Claims Administrator, it is unclear how the claimants would have known what the Program Vendors' denial and determination were based on, or how to submit a request for Reconsideration that would have appropriately responded, supplemented and/or clarified the issue in question.)

In the case of, for example, a Wetlands, Coastal or Sales Loss Claimant whose claim is effectively denied by mapping software that may or may not be reliable before the claim is even submitted, the Program should be actively working with those claimants (and/or their attorneys) to try to confirm that the mapping software is accurate, and to solicit from the claimant any additional information and/or documentation that might establish eligibility ***before*** the claimant is forced to "challenge" the "denial".

## Conclusion

The Claimant-friendly provisions are neither aspirational nor discretionary.

They are central to the Agreement.

BP agreed to them.

They are required.



# EXHIBIT K

BROWNGREER ‖ PLC

# MEMORANDUM

**TO:**　　**Patrick A. Juneau, Claims Administrator**

**FROM:**　　**BrownGreer PLC**

**DATE:**　　**July 17, 2012**

**RE:**　　**Sworn Written Statement for Sufficient Documentation of Benchmark Revenue for Seafood Compensation Program Claimants**

---

## I.  INTRODUCTION AND RECOMMENDATION

### A.  Introduction.

The Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Agreement") generally requires claimants to submit documentation to support their eligibility for, and level of, compensation under the Agreement.  In particular, the Seafood Compensation Program (the "Program") contains detailed provisions outlining the documentation required to support the economic loss claims of (1) Vessel Owners, (2) Commercial Fisherman Vessel Lessees, and (3) Boat Captains (collectively, the "Affected Claimants").  These claimants cannot support their claims adequately by establishing only annual Seafood-related revenues; they must establish, on a vessel-by-vessel basis, the amount of revenue derived from a specific catch type – shrimp, oyster, finfish, blue crab, or other Seafood – landed in the qualifying Gulf Coast Areas during the Benchmark years of 2007, 2008, and/or 2009.

As the Agreement recognizes, Trip Tickets typically provide all of this required information, so claimants who support their claims with Trip Tickets sufficiently allocate their revenue to specific vessels, catch types, landing areas, and dates.  Preliminary claims intake statistics reveal, however, that only about half of the Affected Claimants support their claims with Trip Tickets.  Claimants who do not use Trip Tickets must submit supporting documentation in the form of tax returns *and* other financial information; tax documents alone are insufficient.  Unfortunately, a significant percentage of non-Trip Ticket claimants support their claims with only tax documents and fail to include all of the additional financial information required to establish what revenue was attributable to what vessel, catch type, landing location, and date.  Without more, BrownGreer must treat these claims as incomplete or issue Affected Claimants lower payable awards based on inadequate documentation.

B. **Conclusion and Recommendation.**

Currently, to remedy the defect in their claims, the Affected Claimants must submit "sufficient documentation" to allocate the revenue identified in tax documents to specific vessels, catch types, landing locations, and dates. The Affected Claimants may or may not possess physical documents that contain this information for all of their claims. Further, an incompleteness notice that indicates that a claimant lacks "sufficient documentation" to support their claim might allow whatever ambiguity these claimants perceived in the Settlement Agreement to linger unnecessarily. BrownGreer recommends, therefore, that the Affected Claimants gain access to an unambiguous form in which they may provide a sworn statement setting forth the missing required revenue allocation information.

## II. DISCUSSION

A. **The Agreement requires "sufficient documentation" of revenue allocation.**

Exhibit 10 to the Agreement sets forth the documentation required for Affected Claimants to prove their claims' eligibility and level of compensation under the Seafood Program. (*See* Ex. 10 at 10-12, 14, 17-20, 31-32, 45-47, 56-58.) Affected Claimants must support their Seafood Program claims with either (1) Trip Tickets or (2) federal or state tax returns *and* other financial information. With respect to Vessel Owners and Commercial Fisherman Vessel Lessees without Trip Tickets, the Agreement requires supporting documentation as follows:

1. If Claimant is an entity, federal tax returns or state tax returns, and sufficient documentation to identify components of gross revenue derived from commercial [catch type-specific] harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

2. If Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms as well as sufficient documentation to identify those components of earnings derived from commercial [catch type-specific] harvesting by vessel for the Benchmark Period.

3. In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) the Claimant's revenue from [the specific catch type] as compared to other sources and (ii) Claimant's revenue from landings in the Gulf Coast Areas.

(Ex. 10 at 10-11, 17-20, 31-32, 45-46, 56-57.) Similarly, with respect to Boat Captains without Trip Tickets, the Agreement requires supporting documentation as follows:

1. Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns and supporting documents for the Benchmark Period and sufficient documentation to identify those components of earnings derived from commercial

[catch type-specific] harvesting for the Benchmark Period for the vessel(s) selected by the Claimant. In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from [catch type-specific] landings in the Gulf Coast Areas for each vessel while the Claimant was Boat Captain.

2. Also, the Claimant must provide documentation sufficient to establish the vessel size and type for the vessel(s) for which the Claimant seeks compensation.

3. In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

    (a) Captain's log book
    (b) Vessel log book
    (c) Share sheets
    (d) Sales or other production reports maintained in the normal course of business.

(Ex. 10 at 11-12, 14, 20, 31, 46-47, 57-58.)  In short, Affected Claimants must provide sufficient documentation of vessel-specific and catch type-specific revenue derived from Seafood landed in the Gulf Coast Areas[1] in the Benchmark Period, which can be (1) 2009, (2) 2008 and 2009, or (3) 2007, 2008 and 2009.  Without this information, BrownGreer must consider the claim incomplete or issue a lower payable award based on inadequate documentation.

**B.  A significant percentage of Affected Claimants submitted incomplete claims solely due to insufficient Benchmark Revenue allocation.**

As of July 16, 2012, 3,644 claimants have filed claims seeking compensation under the Seafood Program.  Of these claimants, 2,870 seek compensation as a Vessel Owner, Commercial Fisherman Vessel Lessee, or Boat Captain.  Of the 2,237 Affected Claimants indicating the type of proof of revenue they will submit on a Claim Form, only 49.7 percent, or 1,111, of these Affected Claimants submitted Trip Tickets in support of their claims; the other 50.3 percent, therefore, rely on tax and other financial information.  Our testing indicates that few of the claimants in this latter subsection have submitted an adequate breakdown of their Benchmark Revenue.

To illustrate more concretely the issue as it presents itself in document form, attached hereto as Exhibits B-F, please find examples of redacted insufficient non-Trip Tickets supporting documentation with cover pages explaining the reason why each example fails to meet the Seafood Program's requirements.  It appears that certain law firms representing large numbers of Affected Claimants made the mistake for all of their submitted claims, exacerbating the problem.

---

[1] The Settlement Agreement defines the "Gulf Coast Areas" as "the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida."  (Agreement at 3-4.)

**C. BrownGreer recommends making available a Sworn Written Statement for Sufficient Documentation of Benchmark Revenue to remedy deficient claims.**

Perhaps anticipating situations such as the one identified herein, the Agreement allows the Claims Administrator to "explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, without changing Claims criteria." (Agreement § 4.4.7, at 22.) Similarly, Exhibit 10 to the Agreement provides expressly that, "[i]f necessary, the Claims Administrator may require supplemental information from the Claimant" in order to make determinations related to (1) the allocation of revenue from a certain catch type as compared to other sources and (2) the allocation of revenue for that catch type derived from landings in the Gulf Coast Areas. (*See*, *e.g.*, Ex. 10 at 19.) Thus, to streamline the Claims process without changing Claims criteria, BrownGreer recommends the implementation of a Sworn Written Statement wherein Affected Claimants with deficient supporting documentation may allocate Benchmark Revenue to specific vessels and specific catch types for Seafood landed in the Gulf Coast Areas. Attached hereto as Exhibit A, please find the proposed form entitled, "Sworn Written Statement for Sufficient Documentation of Benchmark Revenue." Importantly, this proposed form captures allocations of revenue for Seafood landed both in the Gulf Coast Areas and outside the Gulf Coast Areas, which will serve, for accuracy and fraud purposes, as a check on the total revenue figures the Affected Claimants report.

## III. CONCLUSION

Affected Claimants must report and support through documentation Benchmark Revenue on a vessel-specific and catch-specific basis for amounts derived from landings made in the Gulf Coast Areas to receive full compensation under the Seafood Program. Claimants who cannot support their claims with Trip Tickets must do so with both tax information and other financial information. Absent an alternative solution, BrownGreer must treat a significant number of non-Trip Ticket claims as incomplete or must issue those claimants a lower payable award for lack of sufficient documentation of Benchmark Revenue allocation. To avoid this result, BrownGreer recommends making available to Affected Claimants a form in which the claimants may remedy the defect in their claim by providing sworn revenue allocation information.

4



# EXHIBIT L

| **SWS-1** | **Seafood Compensation Plan Sworn Written Statement for Sufficient Documentation of Benchmark Revenue** |
|---|---|

This Sworn Written Statement allows you to supplement your claim with vessel-specific Benchmark Revenue information.  You must include in this Statement <u>all</u> Benchmark Revenue earned on the vessel you identify in this Form relevant to your claim, indicating whether that revenue is all of the revenue for the entire vessel or all of the boat captain's share of revenue from that vessel. You cannot submit multiple Statements for the same vessel. You must complete the Benchmark Revenue Information only for the Catch Types you have claimed or will claim in the future.  If you need more space to complete this Statement, attach additional pages, and they will be incorporated into this document.   In order to have the financial information presented in this Form considered as part of your compensation calculation, you must either submit, or have already submitted, federal or state tax returns and schedules for the years that correspond to the Benchmark Revenue years you completed on this Form.

## A.  CLAIMANT INFORMATION

**Name:**  Last          First          Middle Initial

**Deepwater Horizon Settlement Program Claimant Number:**

**Social Security Number:**

*or*

**Individual Taxpayer Identification Number:**

*or*

**Employer Identification Number:**

## B.  SEAFOOD PROGRAM SWORN WRITTEN STATEMENT
## FOR SUFFICIENT DOCUMENTATION OF BENCHMARK REVENUE

Provide all supplemental information required to support your vessel-specific Benchmark Revenue in the sections below.

### 1.  AUTHORIZATION OF USE

If you do not submit copies of Trip Tickets to support your claim, the Claims Administrator will use this SWS-1 Form in conjunction with your federal or state tax records to calculate your loss.  If you do submit any Trip Tickets, you must indicate here whether you authorize the CA to use solely your SWS-1 Form to calculate your loss and potentially expedite the processing of your claim, or whether you prefer that the CA use your Trip Tickets if they result in a higher compensation amount than your SWS-1 Form.  Check one of these:

◯ Use only my SWS-1 Form to calculate my losses     **OR**     ◯ Use my Trip Tickets if they result in a higher award than my SWS-1 Form

### 2.  VESSEL INFORMATION

Vessel Name          Home Port County

City          State          Zip Code

State Registration Number          Federal Registration Number

Hull ID          Vessel Length          Vessel Type  ☐ Ice  ☐ Freezer  ☐ N/A

Complete this section only if the vessel identified above is included as part of a boat captain claim.  The revenue reported below is:

◯ the revenue for the entire vessel identified in this Form     **OR**     ◯ the boat captain's share of revenue for the vessel identified in this Form

### 3. STATEMENT OF REVENUE, LANDING, AND CATCH TYPE

For the singular vessel identified above, indicate by catch type – Shrimp, Oyster, Finfish, Blue Crab, or Other Seafood – the total revenue you derived from Seafood landed in and outside of the Gulf Coast Areas for years identified below.  As defined in the Settlement Agreement, the Gulf Coast Areas ("GCA") are the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida.  "Other Seafood" refers to "all forms of seafood included in Exhibit 3 of the *Deepwater Horizon* Economic And Property Damages Settlement Agreement (Seafood Distribution Chain Definitions) including stone crab and spiny lobster, but excluding shrimp, oysters, finfish and blue crab."

| SHRIMP | Landed In GCA | Landed Outside GCA |
|---|---|---|
| 2007 | TOTAL: $ | TOTAL: $ |
| 2008 | TOTAL: $ | TOTAL: $ |
| 2009 | TOTAL: $ | TOTAL: $ |

| OYSTER | Landed In GCA | | Landed Outside GCA | |
|---|---|---|---|---|
| Oyster Bed Type | Public Grounds | Private Leaseholds | Public Grounds | Private Leaseholds |
| 2007 | TOTAL: $ | TOTAL: $ | TOTAL: $ | TOTAL: $ |
| 2008 | TOTAL: $ | TOTAL: $ | TOTAL: $ | TOTAL: $ |
| 2009 | TOTAL: $ | TOTAL: $ | TOTAL: $ | TOTAL: $ |

| FINFISH | Landed In GCA | Landed Outside GCA |
|---|---|---|
| 2007 | TOTAL: $ | TOTAL: $ |
| 2008 | TOTAL: $ | TOTAL: $ |
| 2009 | TOTAL: $ | TOTAL: $ |

| BLUE CRAB | Landed In GCA | Landed Outside GCA |
|---|---|---|
| 2007 | TOTAL: $ | TOTAL: $ |
| 2008 | TOTAL: $ | TOTAL: $ |
| 2009 | TOTAL: $ | TOTAL: $ |

| OTHER SEAFOOD | Landed In GCA | Landed Outside GCA |
|---|---|---|
| 2007 | TOTAL: $ | TOTAL: $ |
| 2008 | TOTAL: $ | TOTAL: $ |
| 2009 | TOTAL: $ | TOTAL: $ |

## C. SIGNATURE

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that all the information I have provided in this Statement (and in any pages I have attached to or submitted with this Statement to provide additional information requested in this Statement) is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted with this Statement and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Statement may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

An attorney may sign the claimant's name on this Sworn Written Statement for Sufficient Documentation of Benchmark Revenue if the claimant has authorized the attorney in a Power of Attorney Agreement, a retainer agreement, or other document signed by the claimant in which the claimant has authorized the attorney or law firm to pursue claims for the claimant arising out of the Deepwater Horizon Incident. If the attorney chooses this option, the attorney must either submit, or have already submitted, a PDF of the signed authorization from the claimant before the signature can be accepted. If the attorney does not have a signed authorization from the claimant, the attorney may use the Power of Attorney Form created by the Claims Administrator for this purpose (POA-1), which is available using the Forms section of the website, www.deepwaterhorizonsettlements.com.

As the authorized attorney, by signing below, you are certifying that you have the required written authorization from the claimant to pursue claims for the claimant arising out of the Deepwater Horizon Incident on their behalf and have submitted this authorization.

| | | |
|---|---|---|
| **Claimant Signature**<br><br>**Date Signed:** | ___/___/___<br>(Month/Day/Year) | _____<br>Signature<br><br>_____<br>Name (Printed or Typed) |
| **Attorney Signature**<br><br>**Date Signed:** | ___/___/___<br>(Month/Day/Year) | _____<br>Signature<br><br>_____<br>Name (Printed or Typed) |



# EXHIBIT M



### Sworn Written Statement for Sufficient Documentation
### of Benchmark Revenue (SWS-1)

1.  ***Introduction.***   The Seafood Compensation Program created by the Deepwater Horizon Settlement Agreement requires Vessel Owners, Commercial Fisherman Vessel Lessees, and Boat Captains to establish, on a vessel-by-vessel basis, the amount of revenue they earned from a specific catch type – shrimp, oyster, finfish, blue crab, or other Seafood – landed in the qualifying Gulf Coast Areas during the Benchmark years of 2007, 2008, and/or 2009. This requirement applies regardless of whether the claimant uses Trip Tickets or Tax Documents and Other Financial Information to support their claim.  A large number of claimants submitted claims that failed to allocate revenue adequately to a specific vessel, catch type, landing area, and/or year, requiring the Claims Administrator to treat these claims as incomplete or issue lower payable awards based on inadequate documentation.

2.  ***Our Approach to This Issue.***   To allow Vessel Owners, Commercial Fisherman Vessel Lessees, and Boat Captains, under penalty of perjury, to remedy revenue allocation deficiencies in their claims, the Claims Administrator created the "Sworn Written Statement for Sufficient Documentation of Benchmark Revenue" ("SWS-1").  In SWS-1, claimants can indicate the revenue they earned on a specific vessel from landings in the Gulf Coast Areas in 2007, 2008, and/or 2009 for each compensable catch type.  Claimants must include all Benchmark Revenue earned on the vessel identified in SWS-1, indicating whether that revenue is all of the revenue for the entire vessel or all of the boat captain's share of revenue from that vessel.  SWS-1 does not replace Trip Tickets or Tax Documents and Other Financial Information.  Instead, claimants may use SWS-1 to allocate revenue proven in Trip Tickets or Tax Documents and Other Financial Information to a specific vessel, catch type, landing area, and year to receive the maximum eligible payment under the Seafood Compensation Program. Claimants and their counsel may submit a separate SWS-1 for each vessel claimed.  Claimants and their counsel may access a fillable PDF version of SWS-1 by clicking the following link:  http://deepwaterhorizoneconomicsettlement.com/statements.php Claimants may submit the form retroactively to remedy a revenue allocation deficiency identified in an Incompleteness Notice or proactively to avoid receiving an Incompleteness Notice for inadequate revenue allocation for claims where the documentation satisfies the other eligibility requirements. All Vessel Owners, Commercial Fisherman Vessel Lessees, and Boat Captains should consider submitting SWS-1 to complete their file. Attorneys can sign SWS-1 on behalf of their clients, as indicated at the bottom of the form.



# EXHIBIT N



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig          MDL                    NO. 2179
        "Deepwater Horizon" in the Gulf
        of Mexico, on April 20, 2010          SECTION J

Applies to:  *All Cases*          JUDGE                    BARBIER
                                            MAGISTRATE JUDGE SHUSHAN

---

**REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT:  STATUS OF POLICY CHANGES AFFECTING DOCUMENT REQUIREMENTS**

| **STATUS REPORT NO.** | **2 D** | **ATE** | **September 24, 2012** |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig     MDL               NO. 2179
        "Deepwater Horizon" in the Gulf
        of Mexico, on April 20, 2010              SECTION J

Applies to:  *All Cases*        JUDGE               BARBIER
                                            MAGISTRATE JUDGE SHUSHAN

## REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT:  STATUS OF POLICY CHANGES AFFECTING DOCUMENT REQUIREMENTS

### STATUS REPORT NO. 2, DATED SEPTEMBER 24, 2012

As the Claims Administrator reported in its Status Report No. 1, filed on September 5, 2012, we have encountered a significant percentage of incomplete claims across all claim types for various reasons.  In an effort to evaluate ways to make the Claims Process as efficient as possible, the Claims Administrator worked with the Parties and the Court to identify possible changes to policies governing certain of the document requirements in the Settlement Agreement.  As a result of those efforts, the Claims Administrator has adopted the following policy changes, which have been approved by the Parties.

| | POLICY CHANGES AFFECTING DOCUMENT REQUIREMENTS | | |
|---|---|---|---|
| | **CLAIM TYPE** | **DOCUMENT** | **POLICY CHANGE** |
| **1.** | **Business Economic Loss** | **Business License** | Claimants no longer need to submit a business or professional license. |
| **2.** | **Business Economic Loss** | **Profit and Loss Statements (P&Ls)** | 1.  If a claimant submits 12 monthly P&Ls, an annual P&L is not required.<br>2.  If a claimant submits 11 out of 12 monthly P&Ls, *and* an annual P&L, the 12th monthly P&L is not required.  The Claims Administrator will calculate the missing month's revenue and expenses. |
| **3.** | **Individual Economic Loss** | **License or Permit for the Claiming Job** | Claimants no longer need to submit a license or permit for the Claiming Job. |

| POLICY CHANGES AFFECTING DOCUMENT REQUIREMENTS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **DOCUMENT** | **POLICY CHANGE** |
| 4. | Individual Economic Loss; Individual Periodic Vendor or Festival Vendor (IPV/FV) | **Proof of Age** (*e.g.,* **Driver's license, passport, birth certificate or print-out from a public database**) | Claimants no longer need to submit documents to prove their age. The Claims Administrator will rely upon the age provided by the claimant in the Registration Form or in a Sworn Written Statement signed by the claimant. |
| 5. | Individual Economic Loss; IPV/FV | **Proof of Employability** (*e.g.,* **Social Security Card, Government-issued ID, temporary work visa, or green card**) | Claimants no longer need to submit documentation to prove employability, if the Claims Administrator can verify the claimant's Social Security Number or taxpayer identification number through public databases. If the Claims Administrator is not able to do so, the claimant will be required to submit proof of employability. |
| 6. | Seafood | **Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type** | (1) Claimants may complete, sign, and submit SWS-1 to provide the required allocation.<br><br>(2) Where a vessel owner has submitted a Seafood Compensation Claim relating to only one vessel and one catch type supported by the claimant's Tax Returns, a SWS-1 or Trip Tickets will not be required. Instead, the Claims Administrator will allocate the revenues from the claimant's Tax Returns to the one type of catch asserted on the Claim Form. Where the documents submitted by the claimant indicate that the revenues reported in the Tax Returns are not solely related to harvesting the catch type claimed, or reflect some landings outside of the Gulf Coast Areas, the Claims Administrator will contact the claimant and request SWS-1. |

| POLICY CHANGES AFFECTING DOCUMENT REQUIREMENTS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **DOCUMENT** | **POLICY CHANGE** |
| 7. | **Seafood** | **Vessel Registration and Ownership 4/20/10 to 12/31/10** | Claimants who have submitted proof of vessel registration for 2011 or 2012 (or if the Claims Administrator has obtained confirmation of such registration) may submit or the Program may use, any *one* of the following to show vessel registration and ownership:<br><br>(1) A copy of the current vessel registration as well as Trip tickets or landing reports issued by Louisiana or Florida that show registration information for the proper time period;<br><br>(2) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period;<br><br>(3) Information in Federal and/or State vessel registration databases where available for the proper time period;<br><br>(4) Saltwater products license showing vessel registration numbers for the proper time period;<br><br>(5) Vessel registration receipts for the proper time period; or<br><br>(6) Vessel title for the proper time period. |
| 8. | **Seafood** | **Commercial Fishing License Issued Before 4/20/10 for 2009 or 2010 Season** | As long as the Claimant has submitted valid commercial fishing license documents for 2011 or 2012, Claimants may submit, or the Program may use, any *one* of the following for proof of a commercial fishing license:<br><br>(1) Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and<br><br>(2) Commercial fishing license receipts for the proper time period. |
| 9. | **IPV/FV** | **License Required by Law to Make Sales** | Claimants no longer need to submit a license required by law to make sales. |
| 10. | **IPV/FV** | **Proof that the claimant sold the good(s) or service(s) claimed and did so regularly before 4/20/10** | Claimants no longer need to submit *all* of the following, but may submit any *one* of: Photographs reflecting the goods or services sold, news articles, sales flyers or advertisements reflecting the goods or services sold, and documents showing revenues and expenses. |

| POLICY CHANGES AFFECTING DOCUMENT REQUIREMENTS | | | |
|---|---|---|---|
| | **CLAIM TYPE** | **DOCUMENT** | **POLICY CHANGE** |
| 11. | **Vessel Physical Damage** | **Vessel Title** | Claimants no longer need to submit a vessel title, *if, and only if,* the claimant has submitted a vessel registration. In lieu of the title, a claimant must submit a Sworn Written Statement, which the Claims Administrator is developing now and will make available. The SWS will allow the claimant to verify that he or she owns the vessel and his or her ownership percentage. The Sworn Written Statement must be signed by the claimant. We will send an alert when this Sworn Written Statement is available. |
| 12. | **VoO Charter Payment** | **Proof of Training** | Proof of dispatch or being placed on hire will satisfy proof of training. |
| 13. | **Coastal Real Property** | **2010 Property Tax Assessment to Prove Value of a Parcel** | To prove value, claimants are no longer required to submit the 2010 Tax Assessment upfront. Instead, the Claims Administrator will rely on the Mapping Software, which contains the 2010 appraised value of the property. If the Mapping Software is missing the information, we will contact the claimant to submit the 2010 Property Tax Assessment. |
| 14. | **Real Property Sales** | **Documents required when the Mapping Software shows the parcel as not within the Compensation Zone** | Claimants whose Parcels do not appear in the Compensation Zone in the Mapping Software no longer must submit official documentation from the county or parish Assessor or a Professional Land Survey showing: (a) the actual presence of a Parcel for which there are no Parcel lines on the Real Property Sales Compensation Zone Map; (b) the Parcel is located within the geography identified in the Real Property Sales Compensation Zone Map; and (c) the county where the Parcel is located has designated the Parcel as Residential. Instead, the Claims Administrator will perform online research of the public property records and try to find the tax assessment notice issued under the name of the claimant/seller for the parcel, make a PDF of it, and then upload it into the claimant's claim file. If the Claims Administrator is not able to obtain the tax assessment, we will contact the claimant for the information. |

The removal of the business or professional license requirement applies only to Business Economic Loss, Individual Economic Loss and Individual Periodic Vendor/Festival Vendor claims. It does not change the license requirement for Seafood Program claims.

Claimants who have already received an Incompleteness Notice from the Program, review it to see if it asks for documents affected by any of the policy changes listed in the table above. If the Incompleteness Notice asks *only* for the documents mentioned in the changes above, the claimant does not need to do anything. The Claims Administrator will review the claim again and will issue a new Notice.

If the Incompleteness Notice includes items that are still required because they are not affected by these changes, the claimant will need to provide the documents that are still required. The claimant does not need to provide the documents that are no longer required.

The Claims Administrator will issue an email alert notifying law firms and claimants of these policy changes and what steps to take now, if any. We will also post this Court Report and an Alert on the general website and will work with claimants who call or visit a Claimant Assistance Center to explain these changes.

PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of September 2012.

/s/ Patrick M. Juneau
Claims Administrator



# EXHIBIT O

bp

BP America Inc.
P.O.Box 3092
Houston, Texas 77253

501 Westlake Park Blvd.
Houston, Texas 77079-2607
Mail Code 17.130

Direct: 281-366-8895
Fax:    281-366-3491
Mark.Holstein@bp.com

October 11, 2012

**Via Electronic Mail**

Patrick Juneau
Claims Administrator
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, Louisiana 70130

Re:  Revisions to or Clarification of Select Policy Decisions

Dear Mr. Juneau:

BP Exploration & Production Inc. ("BP") is in receipt of the Revisions to or Clarifications of Select Policy Decisions Following the October 1, 2012 Panel Meeting ("Revisions") issued by the Settlement Program.  We are pleased to report that BP and Class Counsel have been able to resolve several issues implicated by the Revisions (Issues 2, 12, and 13).  There is one issue (Issue 1a-b) that the parties have not been able to resolve.  BP will invoke its rights pursuant to Section 4.3.4 of the Settlement Agreement.  We provide below details regarding both the resolved and unresolved issues.

With respect to Issue 1a-b which the parties have not resolved, BP requests that, prior to taking the matter to the Court as required under the Agreement, you afford the parties an opportunity jointly to meet with you informally to discuss how that process will be undertaken.

I.    Issues As To Which Parties Have Reached Agreement

A.    Issue 2 (Reconciliation)

Class Counsel and BP agree that the following language should be added to the Claims Administrator's policy decision for Issue 2 as set forth in Claims Administrator's memo of October 1:  "The Settlement Program will perform a reconciliation of (i) revenue and (ii) total expenses in the claimant's P&Ls and tax returns.  Where such reconciliation reveals a material discrepancy between the claimant's P&Ls and tax return, the Claims Administrator will seek to resolve the discrepancy."

B.    Issue 12 (Seafood Data)

Class Counsel and BP agree that the Claims Administrator's policy decision for Issue 12 as set forth in the Claims Administrator's memo of October 8 should be amended by adding the following underlined language to the first sentence of 12(a)(3) and 12(b)(1)(c):  "The Claims

200597v1

Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim, <u>including without limitation trip tickets</u>, to note information that conflicts <u>in a material manner</u> with the allocation assertions in the Claim Form, <u>sworn written statement, or other evidence submitted by the Claimant</u>."

        C.     <u>Issue 13 (Real Estate Developer Exclusion)</u>

       Class Counsel and BP have agreed to the following resolution.  For purposes of determining whether the real estate developer exclusion applies, the Claims Administrator will evaluate a claimant's activities during the Benchmark Period through April 16, 2012.  If at any time during the Benchmark Period through April 16, 2012 the claimant engaged in activities that the Claims Administrator finds establish that the claimant was a Real Estate Developer under Section 2.2.4.7, the real estate developer exclusion applies.

II.     <u>Issue As To Which The Parties Have Not Reached Agreement</u>

       The parties have not been able to reach agreement with regard to Issue 1(a)-(b).  Our reasoning is set forth below.  As noted previously, BP requests that, prior to taking the matter to the Court as required under the Agreement, you afford the parties an opportunity jointly to meet with you informally to discuss how that process will be undertaken.

       The BEL framework expressly requires "Monthly and annual profit and loss ["P&L"] statements . . . or alternate source documents establishing monthly revenues and expenses." (See Ex. 4A, Item 4)  These documents are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on the actual monthly financial experience of claimants.  The decisions in Items 1(a)-(b) of the Revisions violate the requirements of Exhibit 4A of the Settlement Agreement because, for purposes of the compensation determination, they substitute accountant discretion in place of mandatory documentation setting forth the actual monthly financial experience of the claimant.

       *(a)  Monthly Allocations of Revenues/Expenses.*

       The Revisions appear to allow the Settlement Program to waive the monthly financial documentation requirements and instead to use annual financial information to create an allocated proxy for monthly performance for purposes of the compensation analysis.  The Settlement Program does not have the authority to waive express documentation requirements.  The entire BEL framework depends on the input of accurate monthly financial data.   Because the claimant's actual monthly results are the foundation for the compensation evaluations under the BEL framework, use of allocated proxy rather than actual data could severely distort the resulting outcomes, especially (but not only) in the tourism industry, which experiences substantial monthly and seasonal fluctuations in revenues and expenses.

       The unauthorized waiver of the mandatory monthly revenues and expenses financial information requirement also creates a substantial risk of fraud by encouraging claimants to omit from claims submissions the required monthly financial data which they possess or can prepare (with the benefit of the Settlement Agreement's accounting fee reimbursement

provision) in order to obtain a more favorable result through allocation which in fact distorts their monthly financial performance.

   *(b) Monthly Allocations of Owner and Officer Payroll.*

   Similarly and for the same reasons discussed above, the Settlement Program is not authorized to waive the requirement for monthly owner and officer payroll documentation and to instead use accounting judgment to project possible monthly performance based on annual data.  In addition, it is hard to conceive why such a waiver would be needed, even if it were authorized.  Even if a business claimant did not maintain monthly financial statements breaking out owner/officer compensation, it would be a simple and quick task to review payroll records or the general ledger to identify and sum such payments.

   *(c) BP's Proposed Compromise*

   In the interest of aiding claims processing while remaining consistent with the terms of the Settlement Agreement, BP is willing to agree to permit the Claims Administrator in his discretion to allocate revenue and expenses from quarterly P&L's for purposes of compensation only (not for causation) where (a) it is confirmed that monthly P&Ls do not exist and (b) the claimant at issue has annual revenue of less than $250,000, and (c) the claimant has not been flagged for moratoria screening - such a claimant must provide monthly P&Ls, which are required for moratoria analysis.  Using quarterly statements where monthly statements truly are unavailable significantly reduces, though it does not eliminate, the distortions resulting from allocating financial results rather than using actual monthly results.

* * *

   Please let us know if you have any questions.

Sincerely,

**Mark Holstein**

cc:   Hon. Sally Shushan
      Steven Herman
      James Roy

Christine Reitano
Mike Juneau
Orran Brown
Lynn Greer



# EXHIBIT P



# MEMORANDUM

**TO:**        **Class Counsel**
             **BP**

**FROM:**    **Patrick A. Juneau, Claims Administrator**

**DATE:**    **October 8, 2012**

**RE:**       **Revisions to or Clarifications of Selected Policy Decisions Following the October 1, 2012 Panel Meeting**

---

A Claims Administration Panel meeting was conducted on October 1, 2012, to discuss various of the items set out in the Claims Administrator's September 25, 2012 memorandum, announcing certain policy decisions.  In light of the discussion at that Panel meeting, the Claims Administrator sets forth the following clarifications and/or revisions to certain of the issues addressed in his September 25, 2012 memorandum.  This memorandum addresses only certain of the policies identified in the September 25, 2012 memorandum.  To the extent that any other issues are not addressed herein, the Claims Administrator's policies remain the same as they were announced in the September 25, 2012 memorandum.

1.        *"Alternate Source Documents" for Revenues and Expenses of Business Economic Loss Claimants:*  Pursuant to Section 4 of Exhibit 4A to the Settlement Agreement, the Claims Administrator has adopted the following interpretations of the Settlement Agreement with regard to the documents required to establish monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011:

(a)        *Monthly Allocations of Revenues/Expenses:*  If the claimant has submitted documents sufficient to determine the annual revenues and expenses of the business for a year, but no monthly profit and loss statements or other documents showing revenues and expenses by month for that year are available, the Claims Administrator may allocate the total annual revenues and expenses equally over the 12 months, or use alternative methods or documents to allocate the amounts over the 12 months.  The reviewing accountants will use their professional judgment to determine the most appropriate means for such allocation under the circumstances of a particular claim.  The claimant may be required to submit monthly profit and loss statements or other monthly documents for the year if the Claims Administrator in his discretion determines a need for such documents to resolve questions presented by a particular claim.  This policy statement refers only to calculations regarding the proper amount of an award for a given claim.  This policy statement does not apply to application of causation requirements set

1



out in the Settlement Agreement.  For purposes of satisfying causation requirements, a claimant is to provide "monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010, and if applicable, 2011." (Exhibit 4A, Sec. 4).

(b)     *Monthly Allocations of Owner and Officer Payroll*:  If the claimant has not submitted documents showing the amounts paid monthly as salary or otherwise to owners and officers during a year, the Claims Administrator may allocate the income shown on the owner's or officer's W-2 annual statement and/or tax return for that year equally over 12 months, or use alternative methods or documents to allocate the amounts over the 12 months.  The reviewing accountants will use their professional judgment to determine the most appropriate means for such allocation under the circumstances of a particular claim.  The claimant may be required to submit monthly profit and loss statements or other documents showing those amounts on a monthly basis if the Claims Administrator in his discretion determines a need for such documents to resolve questions presented by a particular claim.  This policy statement refers only to calculations regarding the proper amount of an award for a given claim.  This policy statement does not apply to application of causation requirements set out in the Settlement Agreement.  For purposes of satisfying causation requirements, a claimant is to provide "monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010, and if applicable, 2011." (Exhibit 4A, Sec. 4).

(c)     *Restatement of Profit and Loss Statements:*   If the claimant's profit and loss statements for a year were prepared on an accrual basis, the claimant will not be permitted to restate such statements on a cash basis in connection with the submission of a Business Economic Loss claim, for such restatement could result in a loss or a greater loss not related to the Spill but instead is a result only of the timing of cash received.  If the claimant's profit and loss statements for a year were prepared on a cash basis, the claimant may be permitted to restate such statements on an accrual basis in connection with the submission of a Business Economic Loss.

**11.     *Exclusion of a Benchmark Year for Seafood Program Claimants.***  In any instance in which Exhibit 10 permits a Seafood Program claimant to request that the Claims Administrator exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish "at the same level of effort . . . due to circumstances beyond the claimant's control," the Claims Administrator will consider each request on a case-by-case basis to determine: (1) whether the circumstances presented justified the claimant's absence from seafood harvesting exclusion for one or more years of  the Benchmark Period; and (2) the level of proof required to establish such justification.



**12.** ***Reliance Upon Available Data for Benchmark Revenue Allocation Required in the Seafood Program.*** On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:

   **(a)**   **Single Catch/Single Vessel Claimants:** If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:

   (1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.

   (2) The revenues shall be limited to those shown in the applicable tax returns.

   (3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.

**(b) SWS-1 Claimants:** If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:

   (1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:

   a)   The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.

   b)   The revenues shall be limited to those shown in the applicable tax returns.

   c)   The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such



other steps as are necessary to determine the correct allocation on the claim.

(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:

a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation. The Claims Administrator will base the resulting Eligibility Notice on the higher award.

b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns.

(c) **Louisiana Trip Ticket Database:** If the claimant is not subject to Subsections (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose. The Claims Administrator will not consider tax return revenues on such claims.

(d) **Specific Trip Tickets or Equivalent:** If the Claimant is not subject to Subsections (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

13. ***Determination of an Excluded Real Estate Developer.*** At the October 1, 2012 Claims Administration Panel meeting, the Parties confirmed their mutual intent in terms of defining a Real Estate Developer under Section 2.2.4.7 of the Settlement Agreement. The Parties voiced agreement on this issue. Based upon that agreement as confirmed by both Class Counsel and BP at the October 1, 2012 panel meeting, the Claims Administrator shall consider a Real Estate Developer to be any person or entity involved in the business of real estate development to any extent during the year 2010. In accord with Exhibit 18 of the Settlement Agreement, the Claims Administrator's determination will be based upon his review of (a) the claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the relevant business's or individual's activities as determined relevant under the circumstances of a particular claim, including the revenues and expenses of the business during 2010. Where the information available on the claim of an Individual Economic Loss claimant suggests that the claimant's employer in 2010 was a Real Estate Developer, the Claims Administrator will contact the claimant and determine on a case-by-case basis the appropriate measures to obtain sufficient information and/or documents regarding the claimant's employer to permit the Claims Administrator to make the necessary analysis of the employer's operations in 2010.

4