# EXHIBIT Q

## BROWNGREER ‖ PLC

# MEMORANDUM

**TO:**        **Patrick A. Juneau, Claims Administrator**

**FROM: Brow**       **nGreer PLC**

**DATE:**        **November 1, 2012**

**RE:**        **Benchmark Period Exclusion Requests**

---

## I.   INTRODUCTION AND RECOMMENDATION

### A.  Introduction.

A Seafood Compensation Program claimant's compensation award generally derives in large measure from that claimant's past revenue earned over a defined "Benchmark Period."  In other words, certain of a claimant's historic revenue drives his Seafood Program award amount.  In the Seafood Program, "the Benchmark Period is defined independently for each Seafood Compensation Program Plan and is set forth within the specific Plan."  (Ex. 10 at 7 n.6.)  Typically, the Benchmark Period includes revenue from (1) 2009, (2) the average of 2008 and 2009, or (3) the average of 2007, 2008, and 2009.[1]  (*See*, *e.g.*, Ex. 10 at 7.)

For most Seafood claim types, a claimant may request that the Claims Administrator ("CA") exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish "at the same level of effort . . . due to circumstances beyond the Claimant's control."  (*See*, *e.g.*, *id.*)  The Settlement Agreement ("SA") provides three non-exclusive examples of what constitutes "circumstances beyond [a] Claimant's control":  (1) illness, (2) disability, and (3) major mechanical failure.  (*See*, *e.g.*, *id.*)

The SA does not, however, provide guidance on what illnesses, disabilities, or mechanical failures might justify an exclusion or what proof of those setbacks a claimant must submit.  Similarly, the SA does not speak to what circumstances other than illness, disability, or

---

[1] The oyster Benchmark Period differs in that "[a]ll calculations of [oyster] Benchmark Period revenues, costs or payments use the average of annual figures across 2007, 2008 and 2009," unless the claimant entered the oyster industry after 2007.  (Ex. 10 at 28.)  The Crew Benchmark Period differs as well, but Crew cannot request exclusions, so this memo will not address Crew claims.

mechanical failure might qualify a claimant for an exclusion. Instead, whether and how to grant an exclusion rests solely in the CA's discretion.

In mid-September 2012, the CA implemented a policy for processing exclusion requests, but BP objected to the policy. The issue thereafter received lengthy consideration at the October 1, 2012 Claims Administration Panel meeting. On October 19, 2012, the CA issued a memorandum setting forth clarifications and revisions to certain of the issues addressed at the panel meeting, including the exclusion request issue. In that memorandum, the CA provided as follows:

> In any instance in which Exhibit 10 permits a Seafood Program claimant to request that the Claims Administrator exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish "at the same level of effort . . . due to circumstances beyond the claimant's control," the Claims Administrator will consider each request on a case-by-case basis to determine: (1) whether the circumstances presented justified the claimant's absence from seafood harvesting exclusion for one or more years of the Benchmark Period; and (2) the level of proof required to establish such justification.

## B. Conclusion and Recommendation.

BG took steps to implement the October 19, 2012 exclusion request policy and offers in this memo a proposed process and treatment for exclusion requests in the Seafood Program in line with the CA's policy decision. Of the 8,315 Seafood Claim Forms filed to date, 1,141 Forms (14%) include an exclusion request, so issuing claim-by-claim determinations will be a lengthy but important step in closing out the Seafood Program. Of the 1,141 claims with an exclusion request, we already denied 54 claims because the claimant signed a GCCF release, mooting the exclusion request. Between September 12th and September 28th – the period of time during which the CA's initial exclusion request policy was in place prior to BP's objection – we granted 73 exclusion requests, which led to eligible notices based on revenue amounts in the remaining years, and BP has not appealed any of these notices on the basis of an improperly granted exclusion request. Additionally, we issued Incompleteness Notices on 143 of the 1,141 total claims, meaning that the CA has not rendered a determination regarding the exclusion request but will have to if the claimants supplement their claims well enough to become eligible for payment. To date, we have preliminarily evaluated another 354 claims with exclusion requests, and we are holding these claims for a case-by-case review by the CA. As these 354 claims have already been through initial review, we will target them first for evaluation and potential notice, and the approximately 500 remaining claims still needing full reviews will trail in the normal course. We recommend adopting the rules and process proposed herein to guide the evaluation and determination of these exclusion requests.

2

415897

## II. <u>DISCUSSION</u>

For shrimp, oyster, finfish, blue crab, and other Seafood claims, the SA provides as follows:

In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in [shrimp, oyster, finfish, blue crab, or other Seafood] harvesting due to circumstances beyond the Claimant's control (such as illness, disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period. (Ex. 10 at 7, 28, 43-44, 55.)

To establish appropriate exclusion review and elevation criteria consistent with the SA language above, we must consider (1) exclusion-related information contained in the Claim Form, (2) the proof required to demonstrate circumstances warranting an exclusion, and (3) the specific types of exclusion requests claimants make. Informed by these three items, we should establish rules, definitions, and a review process to apply to all exclusion requests. We should also incorporate exclusion-related language into Notices acknowledging the exclusion review and explaining the determination made.

### A. <u>The Claim Form</u>.

Drawing from the language in the SA, the Seafood Program Claim Form allows claimants to identify four reasons for requesting an exclusion: (1) illness, (2) disability, (3) major mechanical failure, and (4) other. (*See*, Seafood Program Claim Form at 4.) In the Shrimp Plan, for example, claimants may complete this section:

| | Reason | Years |
|---|---|---|
| (h) If applicable, indicate the reason and applicable year(s) that you could not shrimp at the same level of effort during 2007-2009: | ☐ Illness<br>☐ Disability<br>☐ Major mechanical failure<br>☐ Other: _____ | ____<br>____<br>____<br>____ |

If a claimant checks one of the four "Reason" boxes, BG reviewers know that the claimant believes he should receive a Benchmark exclusion. The 1,110 Claim Forms with an exclusion request fall into these groups:

(1) Illness: 189
(2) Disability: 27
(3) Major mechanical failure: 224
(4) Other reasons: 670

These exclusion sections of the Claim Form, though, are not mandatory, and we have encountered a few instances where claimants do not check an exclusion "Reason" box but submit documentation suggesting that they believe they should receive an exclusion, such as invoices for pre-spill vessel repairs that might qualify for a "major mechanical failure" exclusion.

3

Importantly, the SA does not expressly require claimants to make a formal request to benefit from a Benchmark exclusion – it simply allows the CA to exclude a year or years if he determines that the claimant did not fish "at the same level of effort . . . due to circumstances beyond the Claimant's control[.]"  As such, we feel that we cannot limit exclusion review to those claimants who affirmatively identify in their Claim Form that they could not fish at a normal level at a certain time.  We recommend that exclusion review should extend to two groups of claimants:  (1) claimants who affirmatively seek an exclusion by so indicating on their Claim Form; and (2) claimants who do not affirmatively seek an exclusion in their Claim Form but nevertheless submit documentation that the CA construes as requiring exclusion review.  If the claimant's file presents neither condition, we will not consider excluding a Benchmark Year.

**B.  Required Proof of Circumstances Warranting Exclusion.**

As noted, the CA will consider, on a case-by-case basis, "the level of proof required to establish" a justifiable exclusion.  Our reviews to date indicate two primary patterns of "proof" submitted:  (1) many claimants indicate only on their Claim Form that they wish to have a Benchmark Year excluded and do not submit any additional supporting documentation; and (2) many claimants, in addition to making the request in the Claim Form, submit an unsworn cover letter with their claim noting briefly why they made an exclusion request and do not otherwise submit any actual supporting documentation proving their alleged setback actually occurred.  In making his claim-by-claim decisions, the CA will need to consider whether a sworn writing is required and the level of detail a sworn or unsworn document must contain in describing the reasons that allegedly justify the exclusion request.

**C.  Proposed Exclusion Rules.**

We recommend implementing the following three basic rules to govern all exclusion requests in the Seafood Program:

1.  BG will perform an exclusion review for (1) claimants who affirmatively seek an exclusion by so indicating on their Claim Form and (2) claimants who do not affirmatively seek an exclusion in their Claim Form but nevertheless submit documentation that the CA construes as requiring exclusion review.

2.  Exclusion requests will be granted only for "Qualifying Absences" from Seafood harvesting.

3.  Claimants must support all exclusion requests with "Sufficient Documentation."

**D.  Proposed Definitions.**

We recommend adopting the following definitions of key terms to apply to all exclusion requests in the Seafood Program.

4

1. "Illness" shall mean "a temporarily disordered, weakened, or unsound condition of body or mind that prevents Seafood harvesting activity."

2. "Disability" shall mean "the condition of being temporarily impaired physically or mentally by Illness or injury in a way that prevents Seafood harvesting activity."

3. "Major Mechanical Failure" shall mean "the cessation of normal functioning of Seafood harvesting vessels and/or equipment that (a) poses a palpable risk to the safety of the operator if not remediated or (b) prevents Seafood harvesting activity if not remediated, to exclude voluntary mechanical upgrades, cosmetic improvements, or other non-essential restorative efforts."

4. "Qualifying Absence" shall mean "an absence from Seafood harvesting that (1) is supported by Sufficient Documentation; (2) resulted from involuntarily-incurred circumstances beyond the claimant's control; and (3) is of the kind determined by the Claims Administrator as justifying an exclusion of Benchmark Revenue.  Qualifying Absences shall include, but shall not be limited to, absences caused by Illnesses, Disabilities, and Major Mechanical Failures."

5. "Sufficient Documentation" shall mean "(a) substantiating source documents proving that that the circumstances identified by the claimant as having caused a Seafood harvesting absence actually occurred as indicated or (b) a completed sworn written statement indicating under penalty of perjury that the circumstances identified by the claimant as having caused a Seafood harvesting absence actually occurred as indicated."[2]

**E.  Proposed Exclusion Review Process.**

We recommend the following process for review and elevation of all exclusion requests in the Seafood Program.

1. BG will elevate to the CA for a claim-by-claim rolling determination of "Qualifying Absences" that should qualify a claimant for an exclusion.  BG will automatically apply the CA's decisions whenever the previously-decided reason presents itself again with another claimant, granting those claims of the type that have previously been granted and denying those claims of the type that have been previously denied.

2. After a representative sample of rolling determinations has been made, BG will automatically *deny* any exclusion request for any Seafood harvesting absence that is not proven with Sufficient Documentation of the type identified by the CA as justifying an exclusion request.

---

[2] As the Claim Form is itself a writing sworn to under penalty of perjury, we recommend allowing descriptions contained in the Claim Form to satisfy the Sufficient Documentation requirement if the Claim Form's descriptions are themselves detailed enough to provide an adequate foundation for the exclusion request or if the Claim Form provides some explanation that the claimant further supplements with a detailed letter or other supporting document.

415897

3. After a representative sample of rolling determinations has been made, BG will automatically *deny* any exclusion request for any Seafood harvesting absence resulting from circumstances that the CA has identified as having been voluntarily-incurred and not beyond the claimant's control.

**F. Exclusion Request Examples and Recommended Outcomes.**

The exclusion requests we see are many and various. The five examples below illustrate some of the more common types of requests in the Seafood Program in terms of detail and supporting documentation. These five examples appear in the attached spreadsheet of the first 20 examples of exclusion requests presented to the CA for formal decision. Applying the above-described rules and process, we also offer our recommendations as to whether the CA should grant or deny the requested exclusions.

1. █████████

█████████ (Claimant ID █████████ Claim ID ███ 13) filed a Finfish Vessel Owner claim and requested that we exclude both 2008 and 2009 from his Benchmark Period. ███ █████████ indicates that he was not able to fish at the same level of effort in 2008 and 2009 because he had to serve as a caretaker for his mother after she received a kidney transplant. █████████ made his exclusion request solely in his Claim Form and did not submit any other documentation to support the request. The Claim Form appears as follows:



***Recommendation:*** We recommend granting exclusion requests for unexpectedly having to serve as a caretaker to an ill or disabled family member. However, █████████ request is incomplete. █████████ did not submit any supporting documentation of any kind, so his request stands solely on the information contained in his Claim Form, as illustrated above. That information, in this case, is not sufficiently detailed to allow for an exclusion, as it is not apparent what █████████ duties were for his mother or the duration of those duties – presumably, supporting documentation could demonstrate this information, and the CA could thereafter determine whether the specifics of █████████s circumstances justify an exclusion. We should notify him that we need this additional information and consider his request "incomplete" until we receive it.

415897

**2.** ████████████

████████████ (Claimant ID ████████, Claim ID ████ 25) filed a Shrimp Vessel Owner claim and requested that we exclude 2009 from his Benchmark Period. ████████ indicated that his son suffered a brain aneurysm and requires "constant care."  He further indicated that he missed the prime shrimping period of 2009 because his son's caretaker became ill and could not care for the son during that period. ████████ Claim Form, which includes more detail on the exclusion request reason than many other Claim Forms, stated:

████████████

Though ████████ did not submit a supplemental *sworn* writing in support of his exclusion request, he did submit a supplemental writing, as illustrated below:

████████████

***Recommendation:*** Illness or disability of an immediate family member requiring unexpected care by the claimant should be a justifiable excuse for an exclusion.  Like ████████ in Example 1 above, ████████ file does not contain a separate sworn affidavit of his

circumstances.  However, ████████ supplemented his sworn Claim Form with a letter detailing the circumstances requiring his involuntary absence from fishing.  Specifically, ███ ████ explained that, from June 2009 through November 2009, he was unable to shrimp because his son's caregiver underwent surgery and he had to assume the role of his son's primary caregiver; following the son's caregiver's return from surgery, ████████ "returned to fishing full time."  The combination of this explanatory letter and the details provided in the Claim Form should be sufficient to support his exclusion request.  Therefore, we recommend granting this request and excluding 2009 from ████████ Benchmark Period.

**3.** ████████

████████ (Claimant ID ████████ Claim ID ███ 25) filed an Oyster Boat Captain claim and requested that we exclude both 2007 and 2008 from his Benchmark Period.  Specifically, ████████ indicates that he lost his home, a boat, and the oyster beds on his claimed oyster lease due to Hurricane Katrina.  Many claimants with oyster-related claims cite Katrina as a reason for their exclusion request because the Oyster Plan requires that the year 2007 be included in the Benchmark Period, while other plans do not.  ████████ Claim Form appears as follows:

Like ████████ in Example 2 above, ████████ submitted a detailed description of his hardships in a letter:



***Recommendation:***  We recommend allowing exclusions for rebuilding oyster beds after Hurricane Katrina.  Indeed, █████████ lost his home, a boat, and the oyster beds on his claimed oyster lease as a result of that storm.  Though █████████ file does not contain a separate sworn affidavit of his circumstances, his supplemental letter details the timing and nature of the hardships he faced following Katrina.  This information supports the information provided in his sworn Claim Form, and we, therefore, recommend granting this request.

**4.** █████████████

█████████████ (████ Claimant ID █████████, Claim ID ███52) filed a Shrimp Vessel Owner claim and requested that we exclude 2009 from its Benchmark Period. ████████ Claim Form states simply that it experienced "Major Mechanical failure" in 2009, as illustrated below:



Claimants whose requests fit into one of the three expressly-provided for exclusion reasons typically do not include anything in their Claim Form other than an X in the Reason box and a listing of the year(s) requested for exclusion.  From the Claim Form alone, we cannot tell exactly on what most of these claimants base their requests.  ██████supplemented its Claim Form

9

415897

with both a cover letter and a sworn affidavit supporting its exclusion request.  Specifically,
█████ submitted the following handwritten letter and typed sworn statement: ████████

415897



   ***Recommendation:*** We recommend granting ▮▮▮▮ exclusion request, as it provided a detailed sworn description of the type and duration of the mechanical repairs that precluded the claimed vessel's operation, and such repairs are expressly identified in the SA as justifying an exclusion request.

   **5.**   ▮▮▮▮▮▮▮▮

   ▮▮▮▮▮▮▮▮ (Claimant ID ▮▮▮▮▮▮, Claim ID ▮▮09) filed an Oyster Boat Captain claim and requested that we exclude 2007 from his Benchmark Period.  Initially, his exclusion request was very typical of what we see – he did not originally file any supporting documentation; nor did he explain his request in a cover letter or any other correspondence.  He simply indicated on his Claim Form, as illustrated below, that the boat on which he served as captain was not in operation in 2007 due to the boat owner's disability.



Recently, however, we discussed ▮▮▮▮▮ claim with his counsel at Faegre during a routine conference call.  After we noted that ▮▮▮▮▮ had not submitted any supporting documentation, Faegre contacted their client and got him to sign and submit the following sworn statement:



**_Recommendation:_**  After having received this sworn statement, we recommend granting ▮▮▮▮▮ request.  While the disability or some condition of the vessel owner may be on the fringe of the types of reasons that could justify an exclusion, this request seems to be a legitimate one, as it appears that ▮▮▮▮▮ absence from Seafood harvesting in 2007 was beyond his control and not voluntarily-incurred, and it impaired his ability to work at a normal level of effort for the entire 2007 fishing season.  We note also that the speed with which Faegre prepared, had signed, and submitted this statement underscores the importance of folding exclusion request issues into our claimant outreach efforts, as we may be able to avoid denying exclusion requests by initiating contact up front.

## III.  **CONCLUSION**

If these rules are approved, we will use them to elevate claims with exclusion requests to the CA for review on a rolling basis.  The CA's decisions on those claims will inform, where possible, a more automated BG review and determination of similar requests made in other

12

415897

Seafood claims.  We will provide the CA frequently with an updated list of requests in the form of the spreadsheet that accompanies this memorandum to facilitate the CA's decision-making process.

415897

| Row | Claimant Name | Claimant ID | Claim ID | Catch Type | Operator Type | Exclusion Year(s) | Exclusion Type | Exclusion Reason | BG Recommendation | Claims Administrator's Decision |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 6. | | | | Shrimp | Vessel Owner | 2009 | Other | The claimant cited a reduction in the price of shrimp during the 2009 season, as well as a strike by shrimpers as justifications for excluding 2009 from his Benchmark Revenues. The claimant offered this explanation in a brief note that was submitted with his financial records. The claimant's tax records indicate that 2009 was unusually poor and we have independent knowledge of the shrimp strike. | Grant | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |



# EXHIBIT R

We prepared the language of a new FAQ, below, that addresses our treatment of these claims for the sake of transparency and clarity.

**FAQ ___.  Are Oyster sublease holders included in the settlement class and Seafood Compensation Program?**

Certain sublessees are included in the settlement class and the Seafood Compensation Program, while others have expressly reserved claims.  In order to be eligible for compensation under the Seafood Compensation Program, an Oyster Leaseholder claimant seeking recovery for oyster leaseholds in Louisiana, Florida, Mississippi, or Texas must be the sublessee of an oyster sublease (whether "state-issued" or "private") for which the State has issued an oyster lease ID number.  It is not sufficient that the State has issued an oyster lease ID number for the lease, but it must be the sublease itself that is registered with the State.

In Alabama, where the state does not issue oyster lease ID numbers for oyster leases (including subleases), claimants who are sublessees of oyster leases (whether "state-issued" or "private") are eligible for compensation from the Seafood Compensation Program.  Thus, if a claiming Oyster Leaseholder seeks compensation for a sublease in Louisiana, Florida, Mississippi or Texas that did not have a State-issued lease oyster ID number for the year 2010, then the claimant may be eligible for compensation under other aspects of the Seafood Compensation Program, (e.g., Oyster Harvester Lost Income Compensation, compensation under a different Seafood Compensation Program category such as the Shrimp Compensation Plan or Finfish Compensation Plan, or Oyster Leaseholder Interest claims for oyster leases in Louisiana, Florida, Mississippi or Texas that do have a State-issued lease ID number); however, that claimant's Oyster Leaseholder Interest claims and Oyster Leaseholder Lost Income claims arising out of any Louisiana, Florida, Mississippi or Texas oyster sublease without a State-issued lease ID number are Expressly Reserved Claims under the Settlement Agreement, such that they are neither compensated in nor released by the Economic Loss and Property Damages Settlement or the Individual Release.

In the event that both the lessee/sublessor and sublessee file claims with the Compensation Program, the compensation amount will be allocated between the lessee/sublessor and sublessee.

**F.  Inclusion of Subsidies and Other Payments in Benchmark Revenue.**

Under the Settlement Agreement, Economic Class Members must provide proof of revenue from commercial fishing in order to qualify for compensation.  This proof may come in the form of trip tickets and/or sworn statements combined with tax documents that demonstrate the revenue earned from fishing during the Benchmark Period.  Both of these forms of proof assume actual landings by the commercial fisherman.  We have not considered income from other sources, such as a government subsidy paid to fishermen in response to an economic crisis.

Faegre Baker Daniels uploaded a memorandum on behalf of ▓▓▓▓▓▓ (Claimant ID:▓▓▓▓67) concerning income he received from U.S. Customs under the Continued

Dumping and Subsidy Act of 2000. ████████ is a commercial shrimper who has filed Vessel Owner and Boat Captain claims under the Shrimp Compensation Plan.  In their memo, Counsel for ████ argue that compensation paid under the Continued Dumping and Subsidy Act in 2007 should be considered revenue from commercial shrimping and included with other qualifying revenue such as landings he made that year.  The subsidies, they argue, reflect money that ████████ would have earned if not for the illegal importation of shrimp in 2007. Furthermore, ██████ reported the subsidy income on his taxes as commercial fishing revenue.

Counsel concludes their argument by advocating a broad definition of "revenue from commercial shrimping" (Ex. 10 at 9) under the Settlement Agreement.[2]

> The Shrimp Compensation Plan does not limit the definition of commercial shrimping revenue to receipts for shrimp sold at the dock.  Any revenue obtained as a direct result of a claimant's efforts and status as a commercial shrimper can and should be included in the definition of shrimp revenue.  Here, Mr. Rojas's anti-dumping subsidy compensates him for revenue he lost due to artificially deflated prices – revenue that he would have realized absent unlawful trade practices.  Moreover, the subsidy is revenue he obtained specifically because he is a commercial shrimper operating a shrimping business.  As such, it is revenue from commercial shrimping.

*Recommendation:*

We believe such subsidies fall outside of the Settlement Agreement and recommend considering only revenue connected to actual Seafood landings when calculating a claimant's Benchmark Period Revenue.  We believe the plain meaning of the Settlement Agreement's language, "revenue from commercial shrimping," relates to the actual sales transactions that occur when a commercial fisherman returns to the docks from the water and lands his or her catch.  Should the definition of "revenue from commercial shrimping" be extended to include government subsidies it would set a precedent that would be extremely difficult to administer. Arguably, this expansion would open the door to such diverse forms of compensation as payments *not* to fish, money received for special non-fishing projects (*e.g.*, cleanups) and revenue from other government programs (*e.g.*, replanting oyster beds).  We believe that it would be impractical to adopt ██████ definition of "revenue from commercial shrimping" and that it falls outside of the intention of the parties as reflected in the wording of the Settlement Agreement.  Therefore, we recommend defining "revenue from commercial shrimping" as revenue derived from actual sales transactions between a commercial shrimper and seafood dealer.  Likewise, we would recommend excluding all government subsidies from claimants' Benchmark Period Revenue, including payments to commercial oyster harvesters for replanting and cleanup efforts.

---

[2] We have attached the memorandum in its entirety for your reference, though the relevant portions are excerpted here.



# EXHIBIT S

| | |
|---|---|
| **From:** | Andrew Oxenreiter <aoxenreiter@browngreer.com> |
| **Sent:** | Wednesday, July 31, 2013 9:47 PM |
| **To:** | Addie Kies; Bill Atkinson; Carrie Boteler; Catharyn Oroszlan; Corinne Kizner; Daniel Dovel; Edward Merwin; Jacob Pepper; Jonathan Hruska; Valerie Francks; Phil Strunk; Orran Brown, Jr.; Nancy Rachlis; Dennis Delmott |
| **Subject:** | FW: CDSOA issue / Fwd: Seafood International - Claim ID 90636 |
| **Attachments:** | Panel Decision Form - SEAFOOD 90636.pdf |

-----Original Message-----
From: Michael Juneau [mailto:mjuneau@dheclaims.com]
Sent: Wednesday, July 31, 2013 8:27 PM
To: Mark Staley; Robin Pilcher; Katherine Torres; tfriou@dheclams.com; Charles Hacker; Emily Kent; Ted Martens; John Petzold; neil.keenan@us.pwc.com; Orran Brown; Andrew Oxenreiter; Bill Atkinson
Cc: hmitchell@dheclaims.com
Subject: CDSOA issue / Fwd: Seafood International - Claim ID 90636

All:  See attached appeal decision I received tonight. This addresses the CDSOA issue that we discussed Tuesday – and about which each accounting firm is to provide its written recommendation to the CA as to whether or not this should be considered revenue prior to our next meeting on August 13th. I thought everyone should have the benefit of this one person's opinion since it deals with this issue.

Michael J. Juneau
Special Counsel
Deepwater Horizon Claims Center
mjuneau@dheclaims.com

Privileged & Confidential
Sent from my iPhone

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.



# EXHIBIT T

TO:             Patrick Juneau, Claims Administrator

FROM:           BP

DATE:           May 23, 2014

CC:             Class Counsel

RE:             BP Response to Proposed Policy 504 – Seafood Compensation Program:
                Inclusion of CDSOA Payments in Determining Benchmark Revenue

---

BP objects to Proposed Policy 504 and seeks a modification to Proposed Policy 504 because CDSOA Payments should not be included in determining Benchmark Revenue. The CDSOA program terminated on October 1, 2007 and any payments received by Shrimpers after that date cannot possibly relate to shrimping activity in the year of receipt and should not be considered commercial shrimping revenue during those periods. Put simply, the Policy Statement in Section II of Proposed Policy 504 should state: The Claims Administrator will **not** consider CDSOA payments as part of a claimant's Benchmark Revenue under the terms of the Shrimp Compensation Plan. In support, BP submits the following objections and concerns.

### CDSOA Payments Are Not Revenue

BP continues to disagree with the Settlement Program's view that CDSOA payments should be considered as part of a Claimant's Benchmark Revenue. As stated by BP in its April 8, 2014 response to Policy 328 regarding non-revenue items of entities, CDSOA payments are not revenue under the Settlement Agreement. The Settlement Program should exclude CDSOA payments because these payments are not properly considered to be operating revenue earned by claimants. CDSOA payments are allocations of funds collected by U.S. Customs and Border Protection derived from duties imposed against certain imported products. These funds are then distributed by the U.S. government to domestic firms in the industries affected by the dumping or foreign subsidies at issue. The aggregate level of CDSOA distributions depends on a variety of factors such as the duties imposed and collected, which vary widely over time, and are unrelated to revenue earned by recipients as the result of their operations. Instead, a firm's CDSOA receipts are based on "qualifying expenditures" in a variety of categories such as manufacturing facility, equipment, research and development and others. The payments are not compensation for any productive activities during the time period when they are received and as such are not earned. And the payments are for duties imposed prior to October 1, 2007 and thus could not be deemed to relate to any period after the date. Thus, CDSOA payments should not be considered as part of a Claimant's Benchmark Revenue under the terms of the Shrimp Compensation Plan and should be appropriately excluded from the calculation.

Further, BP's arguments are particularly relevant within the context of the Seafood Compensation Program. Most notably, Exhibit 10 requires Claimants to establish "revenue derived from commercial **shrimp harvesting by vessel**". *See, e.g.,* Exhibit 10, Shrimp Compensation Plan, Section I.B.1. (emphasis added)  First and foremost, CDSOA payments

cannot be tied to the *harvesting* of shrimp at all, nor can the payments be tied to any lost revenue from the dumping of shrimp, without a more comprehensive inquiry into the source of the payments and the particular product for which duties were imposed. Instead, as mentioned *supra*, CDSOA payments are allocations of funds collected by U.S. Customs and Border Protection derived from duties imposed against certain imported products and are based on qualifying expenditures in a variety of categories such as manufacturing facility, equipment, and research and development. As allowed by Proposed Policy 504, the Claims Administrator cannot assume that a Claimant who has filed only one claim does not harvest any other species. Nor can the Claims Administrator assume that all revenue on tax returns is from one species exclusively. Even if a Claimant filed only one claim and asserted all revenue was from shrimp harvesting, there must be some affirmation by the Claimant that all such revenue is from shrimp and substantiation from the claimant in the form of supporting documents for shrimp harvesting (such as a shrimping license). To do otherwise would allow a Claimant to funnel all revenue to one species when they are not entitled to do so because they harvested multiple species (or engaged in other activities).

Moreover, CDSOA payments cannot be tied to a vessel - as required by the Seafood Compensation Program. Rather, the payments are distributed by the U.S. government to domestic firms in the industries affected by the dumping or foreign subsidies at issue, and done so in an aggregate level that depends on a variety of factors such as the duties imposed and collected, which vary widely over time, and are unrelated to revenue earned by recipients as the result of their operations. However, Policy 504 allows a Claimant to submit tax returns that contain CDSOA payments without any linkage to a vessel (or catch type).

Accordingly, it is incorrect to treat CDSOA payments as revenue under the Seafood Compensation Program, as it will improperly compensate claimants based on a windfall that is unrelated to their commercial shrimping activities during the year of receipt. Therefore, BP proposes that Section II be modified such that CDSOA payments are not typically considered to be "revenue" for purposes of claims under the Shrimp Compensation Plan.

### Consideration of CDSOA Payments as Benchmark Revenue May Distort The Calculation of Compensation under the Seafood Compensation Program and Raises Causal Nexus Concerns

At a minimum, Policy 504 should be modified to clarify that payments received by Claimants under the CDSOA program will be attributed consistent with Policy 495 and the Fifth Circuit's October 2, 2013 decision in *In re Deepwater Horizon*. 732 F.3d 326 (5th Cir. 2013). Under the error correction and revenue/expense mismatching correction process set forth in Policy 495, CDSOA anti-dumping payments must be attributed to the year(s) in which the dumping activity occurred, which almost certainly is not the year in which the CDSOA payment was received.[1] Pursuant to Policy 495, "claimant-submitted accounting records are to be

---

[1]    By way of background, the Continued Dumping and Subsidy Offset Act of 2000 (CDSOA), when enacted, resulted in a change such that funds collected by the U.S. government under the Anti-Dumping/Countervailing Duty program (AD/CVD) were put into special accounts to be distributed to Affected Domestic Producers, one account for each relevant anti-dumping or countervailing duty order, rather than going into the federal government's coffers. Under CDSOA, after entries of merchandise subject to anti-dumping orders or countervailing duty orders were fully resolved and

adjusted 'in light of the necessity of revenue and expense matching to realistic measures of economic loss." (Policy 495, p.1)  Moreover, Policy 495 requires that errors be corrected and revenue reflect the period in which it was earned, not when payment is received. (Policy 495, n. 1 and p. 7.)

However, by treating CDSOA payments as revenue, and also stating that "[t]he claimant's tax return accounting method will determine the appropriate Benchmark Period year in which to allocate the CDSOA payments", while acknowledging that most fishermen report income on a cash-basis, Proposed Policy 504 is inconsistent with Policy 495 and also the Fifth Circuit's instructions in *In re Deepwater Horizon* with respect to cash basis Claimants.  732 F.3d 326, 336-339 (5th Cir. 2013).   As recognized by the Fifth Circuit, "only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses", and "a claimant's idiosyncratically-maintained [cash] records" should not dictate the way Exhibit 4C is applied to a claim."  *Id.* at 338.  Accordingly, the Claims Administrator's policy of accepting cash basis reporting merely because that is how the claimant kept its records reflects the same logic that was rejected by the Fifth Circuit in connection with the original BEL matching policy.

Therefore, while BP believes the better path is to exclude CDSOA payments from the definition of revenue, at a minimum, Policy 504 should be modified to expressly conform to Policy 495 and the Fifth Circuit's October 2, 2013 opinion.  Otherwise, Proposed Policy 504 is likely to lead to distorted compensation calculations under the Seafood Compensation Program. To the extent the Settlement Program implements this Policy in a manner that distorts the proper calculation of compensation under the Seafood Compensation Program or results in claims determinations that are inconsistent with the overall intent of the Settlement Agreement, BP reserves its rights to object to this and other related policies.

Further, Policy 504 raises causal nexus concerns in that the Policy would allow the Settlement Program to compensate Claimants for certain items in their financial statements (i.e.

---

related monies collected, distributions would be made to Affected Domestic Producers who met the specific conditions of the program.  Because of the nature of the process, the payments under CDSOA were often made many years after entry of the merchandise giving rise to the payments.  Also, on February 2, 2006, Congress passed the Deficit Reduction Omnibus Reconciliation Act, which included a provision that repealed CDSOA effective October 1, 2007, and funds collected for anti-dumping duties or countervailing duties imposed thereafter are no longer distributed to businesses and instead remain with the U.S. government.   As noted, due to the retrospective nature of trade duty collection, as a general matter, it takes a minimum of one year for anti-dumping duties under CDSOA to be computed and distributed and typically takes much longer.  *See, e.g.* "International Trade: Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act," GAO-05-979, released 9/26/05, http://www.gao.gov/assets/250/247930.html ("the length of time between entry and liquidation is often several years, and in that time, some importers go out of business, leaving CBP with no way to go back for collection of additional duties.")  Accordingly, any CDSOA payments received by a Claimant in 2007 will almost certainly relate to anti-dumping activity from 2006 or earlier.  Moreover, CDSOA was repealed effective October 2007, and any CDSOA payments received by a Claimant in 2008 or any year thereafter can only relate to dumping activity that occurred prior to October 1, 2007.

CDSOA payments) even though such items are (1) not revenue and (2) could not have possibly been affected by the Spill.  As BP has consistently maintained, a claimant is not a member of the class unless its injury constitutes "[l]oss of income, earnings or profits *suffered ... as a result of the DEEPWATER HORIZON INCIDENT*."  Settlement Agreement ¶ 1.3.1.2 (emphasis added). Where a Claimant has been the recipient of a CDSOA payment, the existence of such proceeds in a claimant's financial statements should be a flag that may indicate the claimant's alleged losses were not caused by the Oil Spill.  Such claims, therefore, require additional investigation and scrutiny by the Settlement Program.

## Proposed Policy 504 Will Lead to Inconsistent Treatment Under the Seafood Compensation Program

The Settlement Program's proposed approach in Policy 504 will lead to inconsistent treatment under the Seafood Compensation Program because Proposed Policy 504 "will limit the consideration of CDSOA payments solely to those claimants that receive a calculation based on their Tax Returns and will not consider CDSOA payments in conjunction with Trip Tickets."  Therefore, Policy 504 inevitably will increase compensation for Seafood Compensation Program Claimants whose claims are supported by tax returns relative to those supported by trip tickets as they will receive the benefit of CDSOA payments as part of the compensation calculation.  This proposal not only creates an incentive for Claimants to rely on tax returns instead of trip tickets; but as stated by BP in prior responses regarding the Seafood Compensation Program's documentation requirements, tax returns are not as reliable of an indicator of historical revenue (as compared to trip tickets) because tax returns often do not segregate fishing revenue from other sources of income, and often do not identify revenue by species.  Put simply, trip tickets provide the most consistently reliable source of a Claimant's revenue from each species. Accordingly, BP has concerns that Proposed Policy 504 will influence how Claimants will submit seafood claims moving forward, and will be more difficult and costly for the Settlement Program to review and administer so as to ensure an accurate review and calculation of a claimant's alleged loss under the Settlement Agreement.

Also, Proposed Policy 504 provides no basis for this differential treatment of claims based on trip tickets and tax returns.  BP, therefore, requests clarification from the Settlement Program regarding the reasons for this differentiation, and reserves the right to object to this Policy based on the information provided by the Settlement Program.



# EXHIBIT U

| | |
|---|---|
| **From:** | Dan Balhoff <balhoff@pabmb.com> |
| **Sent:** | Friday, June 20, 2014 8:33 AM |
| **To:** | |
| **Cc:** | J. David Forsyth (jdforsyth@sessions-law.com)'; Nancy Rachlis; 'Randi Ellis' |
| **Subject:** | RE: Input on Current Seafood Policy Questions |

Phil:

You have correctly stated Randi's and my position.

Thank you.

Dan Balhoff

---

**From:** Phil Strunk [mailto:pstrunk@browngreer.com]
**Sent:** Friday, June 20, 2014 6:45 AM
**To:** Dan Balhoff
**Cc:** J. David Forsyth (jdforsyth@sessions-law.com); Nancy Rachlis
**Subject:** RE: Input on Current Seafood Policy Questions

I am sending this email in follow-up to the conversation Dan and I had yesterday, so that David and Nancy have the benefit of that discussion.

Yesterday Dan was kind enough to give me a call and talk about the CDSOA issue below. Dan explained that after reviewing the question presented with regard to Anti-Dumping Subsidies, Dan agrees with BP's position. In addition to the considerations laid out in the BP response, Dan does not think that the revenues associated with the CDSOA grants arise from activities that are comparable to seafood harvesting, which was a major consideration in the decision having to do with Oyster Relay Income.

Dan offered to give us a written response but I was hoping to save him the trouble of doing so by copy of this email. Dan – please correct anything I wrote above that may be inaccurate. Thank you again for your assessment of this issue.

**Philip R. Strunk**
**BrownGreer PLC**
250 Rocketts Way
Richmond, Virginia  23231
Direct Dial:  (804) 521-7207
Facsimile:  (804) 521-7299
www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**From:** Phil Strunk
**Sent:** Tuesday, June 10, 2014 11:55 AM
**To:** Dan Balhoff
**Cc:** J. David Forsyth (jdforsyth@sessions-law.com); Nancy Rachlis
**Subject:** Input on Current Seafood Policy Questions

Dan,

As we get closer to the resolution of all Seafood Claims, we have encountered a few claims with lingering policy or implementation questions.  In the past, your assessment of similar items has been extremely helpful.  For that reason, we wanted to share the following Seafood items with you and solicit your recommendation on how to proceed.

In late 2013 we raised a question to you regarding the treatment of Oyster Lease Rehabilitation Payments in the Seafood Compensation Program.  This original memo is attached for your reference.  Those discussions resulted in Claims Administrator's Policy ID 496, stating that Oyster Relay payments will be included, "as part of a claimant's Public Oyster Harvesting Benchmark Revenue payments that the claimant received for participation in Oyster Relay or Oyster Rehabilitation programs if these payments were (a) reported on the claimant's tax return for each respective year and (b) the claimant provides sufficient evidence that the income reflected on his/her 1099(s) was from participation in an Oyster Relay or Oyster Rehabilitation program for the issuing entity."  The issues in this email relate to other requests from a handful of claimants to use revenue from government issued 1099s as part of their Benchmark Revenue determinations, specifically:

1.  Continued Dumping and Subsidy Offset Act ("CDSOA")
2.  Bycatch Reduction Devices ("BRD")
3.  Turtle Excluder Devices ("TED")
4.  State Data Collection Programs

Recently, the Claims Administrator's Office addressed income from 1099 grants for the Continued Dumping and Subsidy Offset Act ("CDSOA"), deciding to include the revenue from CDSOA 1099s in Benchmark Revenue determinations if the claimant reported the income on his or her tax return and he or she received a Seafood Compensation Program calculation based on their Tax Returns.  The Claims Administrator memorialized this decision as Policy ID 504 and posted that to the Parties for their comments.  Class Counsel deferred to the Claims Administrator's proposed Policy.  BP objected and submitted the attached comments for consideration by the Claims Administrator's Office.  Policy 504 and BP's comments are also attached for your reference.  In light of the disagreement between the Parties, we would appreciate your view of how the Program should treat CDSOA payments.

Additionally, a few claimants have inquired about the inclusion of additional sources of government grant revenue related to BRD (Bycatch Reduction Devices) and TED (Turtle Excluder Devices), and State data collection programs.  The Claims Administrator may need to address these government subsidies in a future policy statement and we would appreciate your thoughts on each one.  Our preliminary assessment is that we would not recommend inclusion of the BRD or TED income in Seafood Awards because these are not specifically tied to harvesting activities or activities analogous to harvesting activity.  Rather, they are one-time payments compensate fishermen for gear improvements and updates to their fishing vessels.  However, we might recommend inclusion of the revenue reported on a claimant's tax return and linked to a State data collection program, where that data was collected through activities analogous to Seafood harvesting.  These data collection programs address overall habitat restoration and represent an ongoing source or of revenue throughout the Benchmark Period.  Claimants have represented that the activities performed to participate in the

2

data collection program are similar to harvesting activities, though without the specific dockside landings, just as with the Oyster Relay Program.

We greatly appreciate your input on these items.  Please let me know if you would like for me to give you a call to discuss any of the topics on this list.  Thank you very much.

**Philip R. Strunk**
**B**ROWN**G**REER **PLC**
250 Rocketts Way
Richmond, Virginia  23231
Direct Dial:  (804) 521-7207
Facsimile:  (804) 521-7299
www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

---

**Attention:**
The information contained in this message and or attachments is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any system and destroy any copies.

**Thank You.**

---