# EXHIBIT  8

## REDACTED

## UN-REDACTED VERSION FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  **Oil Spill by the Oil Rig**          **MDL NO. 2179**
       **"Deepwater Horizon" in the Gulf**
       **of Mexico, on April 20, 2012**      **SECTION J**

**Applies to:** *All Cases*             **JUDGE BARBIER**
                          **MAGISTRATE JUDGE SHUSHAN**

### DECLARATION OF DAVID E. SMITH

1.    My name is David E. Smith.  I am a partner at BrownGreer PLC ("BrownGreer"), located at 250 Rocketts Way, Richmond, Virginia.  I received my B.S. in civil engineering from North Carolina State University and my J.D. from the University of Richmond.  I have been practicing law for over 16 years and have focused my practice on mass claims resolution and claims administration for the last ten years.  My focus is designing claims review platforms and working with programmers and Information Technology ("IT") personnel to create databases that process claims and generate appropriate notices and payments to qualifying claimants.  I am a certified Project Management Professional and I have worked on and/or supervised the database construction for numerous national settlement programs.

2.    The matters set forth in this declaration are based upon my personal knowledge, experience and training, as well as facts related to me in my capacity as a partner who supervised BrownGreer's efforts to build and maintain the claim review modules and program database (the "DWH Database") for the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement").

3.     BrownGreer provides vendor services to Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program (the "Program") established under the terms of the Settlement Agreement between BP and Class Counsel (the "Parties"). I have reviewed BP's Motion to Remove the Claims Administrator along with all of the Exhibits that make reference to the IT Systems and the DWH Database and am aware of its criticisms of the DWH Database and the Claims Administrator's reliance upon it.

## A.  Background of DWH Database Development.

4.     On March, 8 2012, the Court entered an Order Governing Transition Process, describing the transition from the GCCF to a new Court Supervised Settlement Program, which the Parties were negotiating.  The Program did not receive the final 1,000+ page Settlement Agreement and Exhibits until it was filed with the Court on April 18, 2012, as part of the Motion for Preliminary Approval.  Until receiving the Settlement Agreement and learning of its specific requirements, the Program could not code and build a system to implement its terms.

5.     Not until receiving the Settlement Agreement on April, 18 2012, did we learn for certain that there were 12 different major claim types, most of which had many subsidiary claims and permutations, and all with completely different eligibility and document requirements.  Our receipt of the Settlement Agreement on April 18, 2012, was the first time we learned that there was to be a separate $2.3 billion Seafood Compensation Program, which itself contained 22 different type of claims.

6.      Upon receipt of the Settlement Agreement, BrownGreer's attorneys, project managers and analysts began scouring it so that we could begin: (1) drafting the Claim Forms; and (2) drafting the business rules to inform the coding of the database.  Because of the extensive coding needed to prepare the Claim Forms for online filing, we had told the Parties that we

would need 60 days between our receipt of the final Claim Forms and when the DWH Database could be ready to accept claims online, which needed to happen on the day the Program opened. Because we did not receive the Settlement Agreement until 47 days before the Program's slated opening on June 4, 2012, that 60-day requirement became moot.  In late April and early May of 2012, we exchanged numerous drafts of the Claim Forms with the Parties and participated in frequent phone calls with them in an effort to reach consensus on the wording and format of these documents.  This effort lasted for several weeks, and as of May 16, 2012, only 19 days before the Program's scheduled opening, the Parties had not yet agreed on the final versions of the Claim Forms.

7.    To develop the business rules for the DWH Database, we needed to map out and understand every bit of minutiae within it to be able to review each claim to an accurate outcome.   During our review of the Settlement Agreement, we identified questions or inconsistencies within it that we believed could be impediments to its implementation.  In fact, BrownGreer and other appointed vendors ("Vendors") from the Court's Preliminary Approval Order uncovered so many questions and ambiguities and conflicts within the Settlement Agreement that Mr. Juneau asked the Parties to conduct a tutorial for members of the Claims Administrator's Office ("CAO") and all of the Vendors.  This tutorial occurred on May 8, 2012, and during the all-day session, representatives of the Parties discussed each Claim Type, explained the background of certain aspects of the Settlement Agreement, and answered questions from the Vendors.

8.    Mr. Juneau asked the Vendors to consolidate questions for the Parties and to present them through BrownGreer as they arose.  Accordingly, beginning in May of 2012, we received questions from our BrownGreer teams, as well as the CAO and other Vendors and

facilitated their exchange using spreadsheets that circulated to the Parties.  In the spring and summer of 2012, we sent the Parties 251 questions to clarify inconsistencies or to confirm our understanding of the Settlement Agreement and its Exhibits, and these questions have continued throughout the life of the Program.  To date, there have been almost 500 clarifying questions and/or Policies that the Settlement Agreement raised with the Parties because the CAO or the Vendors were not clear from the language of the Settlement Agreement as to how to implement a particular provision.

9.     At the request of the Claims Administrator, the Parties and Program representatives met with the Court on May 16, 2012, to discuss the Parties' impasse regarding the Claims Forms.  The Court directed the Parties to resolve their differences by the end of the day and, except for the Subsistence Claim form, the Parties were able to do so.   Although this was a mere 19 days before the Program opened on June 4, 2012, the DWH Program nevertheless opened its doors on time.  Claimants who had filed claims in the GCCF were able to start the Registration and Claim Form process with data that the Program had migrated from the old system into the new, and all claimants were able to complete the Registration Form and Claim Forms on the first day the Program opened.

10.     After the June 4, 2012 opening, the focus of everyone else involved in the Program immediately turned to when claims would be processed and paid.  Indeed, during June and July of 2012, the Program was under immense pressure to issue notices and pay claims and it was clear that the Parties fully expected that payments would begin flowing in July and had told the Class they should expect to see substantial money in their hands by then.  Mr. Juneau directed us to begin issuing Eligibility Notices by July 15, 2012 and "put money on the street" by July 31, 2012.

**11.**     So far, the Program had successfully designed, tested and implemented the database system to *accept* the claims; however, building the system to *review* those claims under the terms of the Settlement Agreement was underway but was an altogether different and significantly more complicated task.  Before we could pay claims, we obviously had to have a system to review them, decide if they possessed the attributes of a qualifying claim, determine if they had submitted all of the required documents, and, if so, calculate the value of the claim and then issue a comprehensive and understandable notice to the claimant explaining the outcome of our review.

**12.**     We also had to design the system to comport with the processing steps dictated by the Settlement Agreement.  It was not enough to have screens that allowed claims reviewers to answer questions to generate the right result.  The system also had to know the path each claim could follow under the Settlement Agreement because the Parties had agreed to terms that meant there were many different paths a claim could take.  For example, after we issued a notice, claimants had the opportunity to request Reconsideration and, if not satisfied with that outcome, could appeal to an appeals panel.  BP had appeal rights for claims over a certain monetary threshold.  Claims that were incomplete had several chances to submit additional information and, if finally denied as incomplete, could appeal to a Documentation Reviewer.  Our programmers built the database to implement the terms of the Settlement Agreement, moving claims along all the paths it contemplated and permitting immediate, secure online access and input by all the players with roles under the Settlement Agreement, and developing an incredibly complex set of logic where, if claims reviewers found a required document to be missing, the system would flag the claim as incomplete and move it towards an Incompleteness Notice.

13.     There were other requirements in the Settlement Agreement that the database logic had to implement.  For example, one threshold question was who could see what information about claims and when.  The Settlement Agreement provided that claimants and their lawyers could see information on their claims at different junctures than BP and Class Counsel, so we had to design the right access to the system for each constituent, ensuring that the proper information was provided to them at the right time. All of this exchange of information would occur through secure web-based Portals that we designed.

14.     Simultaneously with determining the Settlement Agreement's requirements, we worked with the CAO to develop the database and claim review modules that would be used to review and pay each claim type.  Mr. Juneau instructed his staff to obtain sign-off from the Parties on each module of the DWH Database that would be used to review and pay each claim type.  As a result, beginning in June and continuing throughout the summer of 2012, as we rolled out each claim type module, the CAO would test it and also make it available to the Parties so that their own IT experts could test it.  The Program did not pay any claim until the claim review module for that claim type had been approved by the CAO and the Parties.  BP and Class Counsel both reviewed and approved the claim review modules and never objected to any software development practices.

15.     On July 31, 2012, the Program issued its first payments to claimants.   The pressure to pay more claimants intensified as the weeks unfolded because the opt-out deadline was approaching on November 1, 2012 (originally set at October 1, 2012 by Section 8.2.1 of the Settlement Agreement), and the Parties wanted there to be widespread acceptance of the Program so there would be fewer opt outs and objections and so that the Settlement Agreement would

receive Final Judicial Approval.  Class Counsel demanded that all claims be paid by November 1, 2012.

16.     Thus, in the spring and summer of 2012, the construction of the DWH Database occurred amidst the expectations and directives that: (1) the Program open on June 4, 2012; (2) as many claims as possible be processed and paid as soon as possible before the Fairness Hearing, with Class Counsel demanding that *all* submitted claims be processed and paid before the Opt Out Deadline/Fairness Hearing; and (3) the Program immediately process claims to issue Eligibility Notices by July 15, 2012, and to "put money on the street" by July 31, 2012.

17.     The speed of the DWH Database construction benefited all of the Parties' interests, including BP's.  Designing, constructing and testing a database this complex in such a compressed timeframe was an extraordinary effort and lauded by BP at the Fairness Hearing on November 8, 2012.  Rick Godfrey, counsel for BP, stated as follows:

> Even before this Court has had the opportunity to determine whether or not on a final basis the settlement is fair, reasonable and adequate, Mr. Juneau, by the end of this week or early next, will have approved the payment of over one billion dollars in claims made to his facility under the terms of this settlement.  There is no precedence for this in our nation's jurisprudence.  This is a good thing.  It is a good thing not only for the claimants and for the communities of the Gulf Coast states, but it is good for our system of justice. [*See* Final Judicial Hearing Transcript, p. 50.]

### B.  The Program Maintains Appropriate IT Components and Controls.

18.     BP's expert, Mr. Charles Cipione whose opinions are contained within Exhibit 30 to the Motion, admits that he never personally has used or accessed the DWH Database on which he renders his opinions.  Instead of basing his opinions on personal knowledge, Mr. Cipione relied on his review of a report from IBM that is now almost a year old.  Mr. Cipione asserts that the DWH Database does not fit the needs of the Program and is ineffective and inefficient.  Despite the extremely short implementation period provided to us by the Parties and the Court

within the Preliminary Approval Order, the Program constructed a claims processing database and IT infrastructure to manage effectively the complex and detailed Settlement Agreement. The IBM Report recognized the unique challenges of the Program

# Redacted

Mr. Cipione himself agreed that this was a complex and dynamic system within paragraph 21 of his declaration: "My understanding of the IT System relied upon by the Claims Administrator is that it is a complex system that processes a high volume of claims information. Further, it is my understanding that the business rules and requirements of this system are in a constant state of flux." These are true statements. The DWH Database is a complex system as necessitated by the terms of the Settlement Agreement. Despite the 1,000+ page "settlement" agreed to by the Parties in the spring of 2012, the interpretations and constant shifting of directives has never provided the Program with any stability.

**19.**     Mr. Cipione states in paragraph 15 of his declaration that the Program's "information technology system is fundamentally flawed and does not provide the proper control structures necessary to ensure that claims are processed completely and accurately." Not only is this untrue and not based on his own personal knowledge of the DWH Database, but it is also not possible to make this conclusion based upon a review of the IBM Report.

# Redacted

Redacted

**20.**

Redacted

This statement presumes that after the "initial launch," there was a period of time when things settled down, when the requirements stabilized, and when the initial goals were reached.  None of those has ever happened.  Since we met the initial launch goal of June 4, 2012, the deliverable deadlines were followed in succession by:

9

(1) the Eligibility Notice issuance goal of July 15, 2012;
(2) the payment goal of July 31, 2012;
(3) the goal to roll out all 12 claim type review modules, notices and payments;
(4) changes to incompleteness requirements to facilitate fewer deficient claims;
(5) programming changes necessary to implement new policies (> 400), new rules on who may access a claim and when, holds on claims for policy issues and debates, stays and injunctions on certain types of claims resulting from contentious litigation; and
(6) any number of central pieces of the database that we have programmed, unprogrammed and reprogrammed to meet the ever-shifting nature, demands and instructions by the stakeholders to this Program.

21.     Since the Program first undertook the monumental task of building the system, we have had nothing but relentless "rushed, critical, development cycles" that have required "extraordinary efforts."

# Redacted

We have never been permitted that luxury or any respite whatsoever.  Mr. Cipione references in paragraph 21 of his declaration that the "business rules and requirements of this system are in a constant state of flux."  Nothing could be closer to the truth.

22.     Had the Claims Administrator and BrownGreer programmed the DWH Database using the "industry standard methods" endorsed by IBM and Mr. Cipione, the DWH Database likely would have taken anywhere from nine to twelve months to build and launch.

10/14/14
464603

1171340v2

Redacted

Within nine months of
the Program's June 4, 2012 opening, the Program had paid $1,613,766,586 to 22,636 claims
and 16,982 claimants, all of which were processed successfully through the DWH
Database.  Within twelve months of opening, the Program had paid a total of $2,398,136,630 to
34,617 claims and 25,637 claimants using the DWH Database.

    **C.  <u>BP's Reliance on the IBM Report is Flawed and Misplaced</u>.**

**23.**

Redacted

**24.**

Redacted

11

**25.**

Redacted

**26.**

Redacted

**27.**

<div align="center">

Redacted

</div>

**28.**     Neither Mr. Cipione nor Mr. Mark Hutchins, another of BP's experts who mentions the DWH Database within Exhibit 32 to the Motion, has ever used the DWH Database or even witnessed its use.  In fact, Mr. Cipione admits that his opinions rest almost entirely on the nearly one-year old IBM Report,

<div align="center">

Redacted

</div>

### D.  The DWH Database Processes Claims Completely and Accurately.

**29.**     BP and its experts, Mr. Cipione, Mr. Hutchins and Mr. Todd Brents, who references the DWH Database within Exhibit 31 to the Motion, suggest that the claims processing system does not process claims completely and accurately.   Others who have evaluated the system have concluded the opposite.

<div align="center">

Redacted

</div>

The independent Clifton Larson Allen ("CLA") audit concluded on page 8 of its final audit report that "DHECC applies the Settlement Agreement

consistently based on the results of claims testing across the different claims categories.  All claims categories revealed exceptions of less than 2% which indicates that DHECC correctly applied the Settlement Agreement."  BrownGreer's investigation of the *de minimus* exceptions noted by CLA revealed that these exceptions were caused by human errors resulting from data input mistakes.  They were not the result of programming errors or bad logic coded within the claim review modules.

      **30.**    Mr. Cipione alleges that the DWH Database does not keep complete claims information, referring to a series of letter exchanges between BP's lawyers and the Claims Administrator in the fall of 2013 regarding the Global Notes feature.  BP's focus on this Global Notes issue is misplaced.  The Global Notes feature of the DWH Database stores the ***internal*** records of written or oral communications that DWH personnel maintain with claimants or their designated representatives.  It was designed to track the procedural history of any outreach efforts, oral communications by claimants when they visit Claimant Assistance Centers or call the toll-free Claimant Communications Centers, and/or email the help desk or their designated law firm contacts.  This communications log is not part of the official record that determines the eligibility and/or compensation amount of a submitted claim.

      **(1)** The Global Notes feature exists to document communication records with claimants in order to investigate allegations of missed deadlines or mistreatment that appear in emails to the Claims Administrator, letters to the press or motions to the Court.  Even though Global Notes was designed as an internal tool, we recognized that in certain situations the communications log with a claimant might become part of the public record.  For that reason, we designed a spell-check feature along with an editing feature that allows supervisors to remove references to the full name or location of DWH personnel in case the Global Notes communications log became public.

      **(2)** Within its correspondence with the CAO in the fall of 2013, BP's counsel complained about a handful of Global Note entries edited by supervisors.  The communication entries were not deleted, only sanitized for misspellings, bad grammar or references to DWH personnel by full name.  Upon receipt of this

complaint by BP, Chis Reade, the CIO of the Program, immediately directed that the DWH Database implement a history table for all Global Note entries, even those that have been edited by supervisors. We successfully implemented that directive in November of 2013. Any *internal* Global Note entries that were edited for spelling errors or grammar had absolutely no bearing on any eligibility determination or compensation amounts for submitted claims. BP's reliance on this exchange of letters as evidence that the DWH Database is flawed or untrustworthy as a system of record is misplaced.

31.    Mr. Cipione further alleges that poor database design allows for the inaccurate processing of claims or the double payment of claims based on the same submitted documentation by separate claimants. This is inaccurate and a mischaracterization of the facts, as the claimants referenced in paragraph 72 of Mr. Cipione's declaration reflect *human error* in reviewing separate Business Economic Loss claimants with similar names, not a database design flaw or DWH Database limitation. The examples cited by Mr. Cipione in paragraph 72 and Exhibits J and K of his declaration were included in a letter from BP's counsel, Mr. Cantor, dated July 17, 2013 to the CAO. That letter raised two concerns: (1) that the internal controls of the Program allowed two Claimants to be compensated for the same loss; and (2) that the compensation calculations varied materially despite utilizing the same documentation for each calculation.

(1) The DWH Database was designed with a robust series of controls to prevent two claimants from being compensated for the same loss. It asks the claims reviewer to determine whether the document being reviewed belongs to the claimant. If the claims reviewer checks a box that the document belongs to another claimant, the system disables the document so that data entry cannot take place and the financial information from the document that does not belong to the claimant cannot be used in evaluating the claim.

In the case cited as an example by Mr. Cantor, Business Claimant #1, who had a similar name to and owned 33% of Business Claimant #2, submitted the tax return of Business Claimant #2. When reviewing the documents associated with Business Claimant #1, the claims reviewer should have checked a box indicating that the tax return belonged to someone other than the claimant. If the claims reviewer had done that, the DWH Database would have prevented further evaluation of the claim, and the Program would have

issued an Incompleteness Notice requesting the correct federal tax return for Business Claimant #1.  Instead, the claims reviewer did not check the box, and the DWH Database did not know to disregard the financial data from the incorrect document.  The claims reviewer made a mistake and did not check the box.  This was a ***human*** error and not a programming error or system flaw.

   **(2)** Regarding the second concern, the discrepancies between the two compensation calculations resulted because of differences in the way the Accountants designated certain expenses (*i.e.,* fixed vs. variable) during the separate Accountant Reviews.  That also was a human decision on how to allocate expenses, not a programming error or mistake.

**32.**    Within paragraph 5 of Exhibit 32 to BP's Motion, Mr. Hutchins alleges that the Claims Administrator failed to implement an information technology system "with appropriate or adequate security and controls" and that this "poor internal control environment surrounding the IT system results in a higher risk of fraudulent and inflated claim determinations."  However, Mr. Hutchins, like Mr. Cipione, never personally reviewed the DWH Database, and he does not specify what he considers to be "appropriate or adequate security and controls" or how what he alleges to be insufficient could result in a higher risk of fraudulent and inflated claim determinations.  What Mr. Hutchins fails to acknowledge is that there have not been any documented data breaches due to the alleged "[in]adequate security and controls."  Nor have the existing DWH Database and internal controls resulted in any increased amounts of fraudulent claims submissions or "inflated claim determinations."   As discussed above, the DWH Database processes claims accurately and correctly in accordance with the terms of the Settlement Agreement.  Mr. Hutchins' conclusions are unfounded.

### E.  The DWH Database Provides Visibility for Claims Processing and Reporting.

**33.**    Mr. Cipione criticizes the DWH Database in paragraph 57 of his declaration for its inability to monitor claims and for a lack of proper "summary reporting in order to maintain transparency in the process."  The existing DWH Database is transparent and thorough in its

monitoring and tracking of claims as they progress through the review modules and the notice and payment processes, even when manual programming intervention is required to implement a new policy or directive from the Courts or Parties.  The DWH Database maintains robust reporting tools that allow any user or supervisor working in the system to know exactly where claims are and the throughput for any given period of time.

34.     There are 563 separately coded reports available for users to generate at any time from the DWH Database.  This is in addition to the "queue counts" available on each review screen and the publicly available reports/statistics the Program posts each business day on the public website (www.deepwaterhorizoneconomicsettlement.com).   The DWH Database was designed to provide maximum reporting capabilities and flexibility to the CAO, the Court, BP, Class Counsel and all of the hundreds of users who process and review claims on a daily basis.

35.

# Redacted

This opinion,

is incorrect because both the Appeals Team and SIT conduct their daily claims review processes in the existing DWH Database.

(1) **Appeals Processing**.  Apart from very limited exceptions, such as when an appeal is filed by a claimant who is a non-Portal user, the appeal process is fully automated and entirely managed within the DWH Database.  Claimants, through screens in the DWH Database, file and pay for appeals, submit supporting memoranda, and complete all steps in the "baseball process" for Eligibility Notice appeals, and the "non-baseball process" for Denial Notice appeals.  Likewise, BP files appeals, submits supporting memoranda, and completes all applicable appeal steps through the DWH Database.  As of September 19, 2014, there have been approximately 5,700 appeals filed and managed through the DWH Database.  When appeals are withdrawn by the

initiating party or are resolved by agreement between the parties, such actions are entered by the parties and automatically recorded within the DWH Database. Similarly, when appeals are not resolved until a decision by an Appeal Panel, such decisions are also entered and automatically recorded within the DWH Database. The Appeal Panelists have submitted approximately 2,600 determinations through the DWH Database on appeals brought before them. Judge Shushan has similarly used the DWH Database to issue 235 decisions on Requests for Discretionary Review by the Court and is currently reviewing another 73 Requests. A small population of claimants are non-Portal users and submit hardcopy documentation that is added to the claimant's file. The BG Appeals Team handles these appeals through an Appeal Administration screen, which allows the user to input the appeal data into the system.

To track appeals, numerous automated reports are available to follow each stage of the appeal from payment of the appeal filing fee, to initial and final proposals, to claims with the appeal panel, to claims in the discretionary review process. Additionally, the DWH 8524 Report can automatically be generated for each individual claimant with an appeal to provide a real-time snapshot of that individual appeal from filing through the appeal panel decision. Appeal information is also available through the statuses and Events in the DWH Database, as well as the documents in the claimant's file. Finally, automatically generated Notices from the DWH Database inform users as to a claim's progress through the appeals process.

**(2) Fraud Investigations**. SIT reviews were conducted, tracked, supervised and reported on using the DWH Database. The SIT fraud review system was custom-built to include each part of a SIT review. SIT utilized 16 unique review queues that tracked the progress of each claimant proposed for SIT review, reported on the status of claimants in SIT review, and performed quality assurance on claims reviewed by SIT. Users were required to select one of 21 unique Fraud Determination Results to conclude a SIT review. The Program has processed 33,659 distinct claimants through the programmed SIT review screens.

The programmed SIT review queues enabled SIT case managers to: (a) review all submitted documentation; (b) review previous SIT determinations; (c) view every claim submitted by a claimant along with their statuses; (4) view all Global Notes communication records; (d) enter SIT findings with a detailed comment; and (e) enter a Fraud Determination Result that route the claimant to the appropriate next step in the SIT review process. Every comment and Fraud Determination Result for every claimant proposed for SIT review was tracked in the DWH Database. The DWH Database also contained SIT administration functionality that enabled SIT managers to apply bulk process SIT holds, add SIT Proposal Reasons, add Claim Type Fraud Reasons, move claimants with a SIT hold to any SIT review queue, and

18

manage scheme statuses and scheme case managers using the Scheme Management functionality.

36.     The DWH Database stores every document submitted by claimants, all workbooks or internal comments entered by reviewers in the claims review modules or SIT review queues, and the history of every action taken (automatic or manual) on every submitted claim.

37.     The DWH Database is functional, and it has successfully processed claims from intake through payment, with accuracy.  Although BP's experts, who have never actually seen or used the system, espouse unrealized risks and say the Claims Administrator was not justified in relying on the DWH Database, reality proves otherwise. The reality is that the DWH Database has implemented the Settlement Agreement with precision and towards the ultimate goal of compensating deserving claimants.   And, because the DWH Database has been an integral part in helping the Program accomplish its mission, it seems apparent that the Claims Administrator has been fully justified in using and relying upon it to perform his duties to the Court, the Parties and the citizens of the Gulf.

## F.  The DWH Database Maintains Robust Life-Cycle Recordkeeping.

38.     Mr. Cipione incorrectly criticizes the DWH Database for its supposed inability to track the "life-cycle" of all claims, particularly when a claim gets routed for an offline process such as an Accountant review for BEL claims or a Subsistence interview performed by Applied Marine Technology ("AMT"), the Vendor who conducts field visits in the Subsistence program.  BP's criticism is unfounded because the DWH Database does contain an extensive "life-cycle" tracking mechanism for both claims and claimants.   The "Claimant Review History" feature allows users to see every action taken at the claimant-level,  including the name of the reviewer, location of the reviewer, date, time, and specific actions performed

during that review and comments left by the reviewer.  This data can be seen by clicking the "View" button within this screen.  This same feature exists for each individual claim submitted by a claimant and can be viewed by clicking the "Claim Review History" button.  The Program tracks all stages of the claims review process by assigning Events to each action or queue.  The DWH Database displays a chronological list of all Events for every claimant and claim by clicking the "Events/Notices" button, which also allows the user to view all Notices submitted to that claimant.  The DWH Database also has summary reports that can be generated for any claimant-level program actions (the DWH 8600 Report) and for specific claim-level activities (the DWH 8700 Report) to display on one screen or PDF all claim/claimant activity.

39.     The DWH Database monitors and stores every change to a claim along with a history of all review actions undertaken by reviewers and/or automated processes.   The "Review History" features within every screen, the chronological listing of claimant and claim Events, and the summary DWH 8600 and 8700 reports "track all aspects of the claim process" from Claim Form submission to payment.  Redacted    The public reports posted on the DWH website every day since the launch of the Program indicate that we have processed over 208,000 claimant notifications for over 285,000 claim submissions that included payment of over $4.12 billion to over 50,500 eligible claimants.

40.     In addition to the robust system of claimant-level and claim-level Events that allow the programmers and end-users to track the exact location of any claim at any given time, the DWH Database also provides a series of claimant statuses that allow law firms, claims preparation companies or *pro se* claimants to know the status of their claim at any given time during the review process.  The DWH Database contains 563 separate reports that can be

generated on demand by users against hourly snapshots of production data.  The DWH Database also allows users to generate reports from a history of past datasets.  Detailed data behind each of the programmed reports is either available through the Portal or can be requested from the Data Team or Reporting Team.  Neither IBM nor BP asked to see the Program's Event Dictionary Report (DWH 8002) that details the description and purpose for 440 unique Events, or the Status Dictionary (DWH 8028) that describes the 187 statuses that provide information on where claims are in the review process.

41.     The existing DWH Database contains robust reporting capabilities and an entire chronological history of all claimant/claim events and reviewer "touches" through the claims review modules.  Any criticism that the Program is opaque or does not track the life-cycle of a claim is unfounded.  BP's experts, who again have never used the DWH Database, are simply not sufficiently informed to opine on its functionality or features.

### G.  The Program Utilized Appropriate IT Design Rigor and Best Practices in Constructing the DWH Database.

42.     Mr. Cipione asserts that the Program did not utilize industry best practices and appropriate IT controls and governance when designing, developing, testing and implementing the DWH Database.

# Redacted

Indeed, the CAO had less than six weeks to build and launch the Program after receipt of the executed Settlement Agreement.

43.     The CAO utilized best practices when constructing this customized DWH Database.  "Release management" is performed through a structured review and implementation method supervised by Chris Reade, the Program's CIO, and Garden City Group.  There are not any documented occurrences concerning security,

<p style="text-align:center; font-size:2em;">Redacted</p>

When the CIO commissioned a data penetration test in 2013 to determine the sufficiency of the IT firewalls and data encryption, the system passed with flying colors.

44.

<p style="text-align:center; font-size:2em;">Redacted</p>

45.     Mr. Cipione asserts within paragraph 47 of his declaration that "the management controls surrounding the IT System are poor to non-existent. The level of risk to processing

claims built in such an environment is extremely high and tantamount to an abdication of responsible management by the Claims Administrator." Those statements are unfounded. The Program's CIO, Chris Reade, has been with the Program since its inception. Mr. Reade has supervised all programming and coordinated the blinded testing and variance analysis conducted by the CAO along with representatives of BP and Class Counsel. The Program and its CIO implemented the following steps, unfairly criticized by BP as being insufficient or non-existent, when designing and building the DWH Database:

(1) **Requirements Gathering**: The Claims Administrator and its vendors conducted extensive "requirements gathering" after receiving a copy of the executed Settlement Agreement on April 18, 2012. We participated in countless conference calls and meetings with the Parties to plan all aspects of the Program. Mr. Juneau convened and all Vendors participated in a full-day "tutorial" seminar in New Orleans conducted by representatives of BP, Class Counsel and their respective experts who consulted and helped draft the claims processing, eligibility and documentation criteria contained within the Settlement Agreement. We circulated lists of 251 questions needing clarification during the spring and summer of 2012 for the Parties' input and answers after digesting and analyzing the Settlement Agreement. We followed these questions with numerous (> 400) requests for input on policies, which were borne of the need to clarify the intention and meaning of the Settlement Agreement. Despite the extensive requirements gathering and the presence of a signed Settlement Agreement, the Program remains in a constant state of flux.

(2) **Testing**: The Program has maintained a rigorous testing phase and has always kept separate its "Training" environment from the live production environment. Since day one, BrownGreer has maintained a Training environment where its systems engineers and team leads are able to test programming code and certain scenarios expected to occur within the DWH Database. This Training environment is where we test the raw functionality of the code and then try to break it or find flaws in the programming. Nothing gets promoted to "production" for use by claimants, law firms, the CAO personnel or the Parties with live production data until it passes all testing in the Training environment. The Program also maintains two separate environments for testing purposes before sending programming developments into production. The "Staging" environment is an exact copy of the approved testing environment with a copy of the prior day's production data. The Staging environment is not just "similar" to the production environment in structure and content; it is an exact copy of the database content and the only

differences in code are those changes that are currently being verified. This allows us to test specific fact patterns without using the live production environment and allows us know that the new programming changes will not cause any unexpected problems or ripple effects. Finally, the CAO has a "Sandbox" environment that is an exact copy of the production data and code in which it can interact with the system without altering any production data. The CAO can utilize the Sandbox to verify any code, data or functionality after new programming has been tested and promoted for implementation to the production environment.

Not only did BrownGreer thoroughly test the DWH Database, but so did the CAO and so did the Parties. Beginning in July of 2012, BrownGreer provided the CAO with full access to the DWH Database. As BrownGreer developed the database, we worked with the CAO, including Chris Reade's team, to test it. The CAO then involved the Parties, requiring that they sign off on each claim review module before the Program reviewed and paid claims. In the summer of 2012, the CAO released each module to the Parties and facilitated numerous meetings to review and discuss the DWH Database and claim review modules. Neither BP nor Class Counsel voiced any objection to the claims review modules designed and proposed by the Program.

In his declaration, Mr. Cipione uses the ill-founded assumption that the Program lacked a separate testing environment to leapfrog to the conclusion that "the lack of development and testing environments could result in claims being processed erroneously." The CAO implemented rigorous testing methods as explained in detail above. Both BP and Class Counsel had complete access to the claim review system in a training/testing environment, and these stakeholders never provided any comments or objections to the system design, system features or software development practices. The Program does not utilize "trial and error" tactics as suggested by Mr. Cipione. We develop new programming code and push it to the Training site for initial testing to ensure that it accomplishes the business need and does not cause any unintended consequences with the existing modules and code. Then we move it to Staging for an additional round of testing with a copy of the previous day's production data. Then the new code is pushed to the CAO and Garden City for additional testing and eventual promotion to the production environment.

**(3)** *Separation of Duties*: Mr. Cipione alleges that the failure to segregate programming duties puts the Program at risk to improperly pay claims or allow bad actors to jeopardize the integrity of the DWH Database. This is another "theoretical risk" that has never come to fruition. There have not been any documented issues or introduction of any intentional malicious code into the DWH Database. Likewise, the DWH Database has not been hacked, nor have we had any system breaches or negligent loss of any claimant personal identifying information. Moreover, there has always been a segregation of duties and supervisory control over all database programming since the

24

inception of the Program.  From June 4, 2012, until the IBM assessment, there were three independent groups monitoring every aspect of the database fields and table structures including the stored procedures and code for the review modules.  The three groups included:  (1)  BrownGreer, as the initial developer of the system; (2) the CAO's IT staff, as a partner in the development and implementation of the DWH Database, and (3) Garden City Group, as the official DBA and controller of the system infrastructure.  Each group had monitoring tools available and constantly watched for any anomalies.

BrownGreer also had a process in place that prohibited any single programmer from controlling the database changes.  Contrary to what IBM reported, BrownGreer had developers who first developed and tested all changes in a separate developer environment.  Once tested and approved by the developers, the developers turned the code over to Senior Team Leads who verified the code and processes for quality control and to ensure the work product met the user requirements.  Once approved, the Senior Team Leads released the code and changes to the BrownGreer Build Master who constructs the code process to be implemented in the Training environment.  At this stage in the Training environment the developers, the Senior Team Leads and the requesting parties at BrownGreer tested the new programming and logic.  If approved by all parties in the Training environment, the BrownGreer Build Master would create a production build and release all the code and stored procedures to the Senior DBA and Senior IIS Administrators, who would verify and push all code to production.  These Senior DBA and Senior IIS Administrators had a process to first backup the current production environment before implementing any new code.

Over the last year, the CAO has further enhanced the IT best practices by:  (1) in January of 2014, creating a clear separation of duties between system developers and programmers from this Senior DBA and Senior IIS Administrators; (2) creating a BrownGreer Staging environment that was an exact copy of production so BrownGreer could test its changes beyond the Training environment; and (3) in November of 2013, instituting the Change Control Board process in November of 2013 to document every change to the DWH Database.  In sum, the Program utilizes appropriate management controls and the structured Change Control Board mechanism for introduction of new code or data changes to the DWH Database.

46.    Mr. Hutchins alleges in paragraph 38 of his declaration that BrownGreer failed to assist the Claims Administrator in implementing controls for the claim review processes and DWH Database pursuant to the terms of its vendor agreement with the CAO.  This is completely untrue.  Among other things, BrownGreer's agreement with the CAO charged BrownGreer with

the obligation of "[i]mplementing and maintaining the Settlement Program System of Record including databases, web interfaces, and source code to include regularly scheduled backups and system maintenance in accordance with industry accepted standards including change control procedures . . [.]"  As described throughout this declaration, BrownGreer, along with the Garden City Group and the CAO's IT Department, did implement and maintain the "Settlement Program System of Record" that included:  (i) the DWH Database; (ii) role-based web interfaces or Portals that allow law firms, pro se claimants, Class Counsel, BP, the Court, Appeals Panelists, CAO personal and all claims reviewers from every vendor to access the DWH Database to perform claims review activities or generate reports; and (iii) storage of the source code in a structured, secure environment that includes regularly scheduled backups and system maintenance, along with a robust Change Control Board mechanism to both approve and track all DWH Database changes.  The Program would not have launched on June 4, 2012, and operated for the last 30 months to successfully process and pay qualifying claims without the cooperation and assistance of the Program's Vendors.

**H.  The Program's Reliance on External Systems and Manual Moves for Exception Processing was Dictated by the Business Needs of the Program.**

**47.**    Mr. Cipione opines that the DWH Database is inflexible and relies on manual programming intervention for certain claims that: (1) increases the costs to operate and maintain the DWH Database; and (2) introduces the risk of malicious data manipulation or the loss of data.  The design of the DWH Database does rely on some external processes to complete the review of certain claim types, but that was by design and created by necessity because of the time pressures to process and pay claims by July of 2012, after the announcement of the Settlement Agreement.    The Claims Administrator decided, with the knowledge and acquiescence of the Parties, that it would use Accountant Excel workbooks to process and

review Business Economic Loss claims.  Likewise, AMT, the vendor that conducts Field Visits and Interviews for Subsistence claims performs its work outside of the system to prevent claimants and law firms from obtaining a "template" or a crib sheet of questions and answers to successfully pass a Subsistence Field Visit.  That decision was made by the Court-Appointed Distribution Agent that supervises Subsistence claims.  Even with these external processes, the DWH Database tracks precisely:  (1) when a claim transfers to an external process; (2) which claims reviewer or Accountant has the claim; and (3) monitors when the claim is returned to the DWH Database with the review results.  Neither BP nor Class Counsel complained about the external Accountant workbooks when they were provided with templates and sample "blinded" claims for variance testing.

48.

# Redacted

This is not accurate, because the current system does accommodate exception processing.  The Program coded the Happy Path for ***known*** processes and procedures within the Settlement Agreement, and the resulting DWH Database was flexible enough to implement complex routing changes that resulted from clarifications, new directives (*e.g.,* the extra Re-Review step) and Court orders (*e.g.,* Policy 495 review processing for all affected IEL and BEL claims and the Discretionary Review by the District Court path during the appeals process).  It is unreasonable to expect anyone to have anticipated the myriad of changes necessary to implement the Program since receiving the Settlement Agreement on April 18, 2012.  The CAO was able to implement

any and all changes to the DWH Database within a matter of days or weeks without stopping all claims processing, which unequivocally demonstrates its flexibility and usefulness.

**49.**     BrownGreer constructed the "Happy Path" for claims based on the rules and procedures as set forth in the Settlement Agreement. We constructed an automated system to route claims through the ***known*** processes and detours that a claim could take under the Agreement's explicit terms, which was all the Program knew when designing and building the system.  Mr. Cipione recognizes the "changing environment" but criticizes the Program for failing to anticipate future needs that were never contemplated in the Settlement Agreement, such as the Re-Review process demanded by Class Counsel.

# Redacted

We have designed a flexible system that operates efficiently and processes claims accurately.

**50.**     This "settlement" has been contentious and in a state of flux from the outset as evidenced by:  (1) the extensive motions practice and appeals by BP to the District Court and appellate courts; (2) the inability of the Parties to agree on the form and content of the Claim Forms for all 12 claim types until 19 days before the launch of the Program; and (3) the almost 500 promulgated policies to clarify gaps or omissions within the Settlement Agreement.  The constant and never-ending changes to the Program requirements has prevented the Claims Administrator from maintaining a fully completed and automated database that does not require some manual intervention when new exceptions are announced by the Parties or the Courts.  For example, the adoption of Policy 70 for all Economic Loss claims necessitated major enhancements to the review screens and processes, as did the clarification of Policy 495

involving the revenue smoothing/matching. Adopted policies 484 and 492 for Subsistence claims created similar major programming enhancements. The yet-to-be resolved issues regarding Moratorium claims will involve yet another round of significant changes to the database system. The DWH Database implemented the "Happy Path" for the typical claims and has used new programming or "behind-the-scenes interventions" to accommodate new or unanticipated requirements until new business rules can be coded and automated. It is impractical and unfair for BP's experts to criticize the Program for not being clairvoyant enough to program numerous unforeseen contingencies that did not arise until months or years after the Program opened.

51.     BP ignores throughout its entire Motion and supporting Exhibits that all of the necessary processing steps for the Program have yet to be defined and constantly change, based in large part because of its own motion practices and its appeals to the District Court and Fifth Circuit Court of Appeals. This "constant state of flux" in the Program as admitted by Mr. Cipione in paragraph 21 of his declaration is what necessitates so much "exception processing" and constant reconfigurations of the DWH Database.

52.     Outside of BEL claims, the "typical" claim does not require any manual processing. A typical claim is not subject to constantly changing calculation steps (*e.g.,* Subsistence) and Court Orders stemming from the continuing disagreement between the Parties on the terms of the Settlement Agreement (*e.g.,* Business Economic Loss claims). Claims require manual manipulation when the Parties or CAO introduce new processing steps (*e.g.,* Re-Review, Discretionary Appeals to the District Court, revenue matching analysis of BEL claims and IEL claims predicated on the eligibility of the BEL employer). Even when claims leave the DWH Database for work or analysis by another vendor (P&N, PWC, Wetlands property

29

experts, mapping vendors, AMT, or HUB), the system tracks the check-out and check-in dates to know where the claim is in the review process.  Use of offline or out-of-system processes by AMT and the Accountants were dictated by the Parties and other Vendors to provide flexibility and accommodate the need for speedy reviews, notices and payments at the outset of the Program in the summer of 2012.  Even when the Program has to manually move or manipulate claims to accommodate new requirements, we place the following Events on the claim indicating that it went through a non-standard process along with a comment of why it was necessary and who requested it: (1) **Event 59**: Manual Override of Established Process for Claim; or (2) **Event 60:**  Manual Override of Established Process for Claimant.

53.     Program data demonstrates that manual moves are ***not*** required to move the "typical claim."  Through September 22, 2014, the Program received **284,983** unique claim submissions.  As explained above, the Data Team places an Event 59 on every claim that it moves manually and leaves a comment indicating why the claim was moved and who approved that move.  Of the 284,983 unique claims, only 97,730 claims had one or more manual moves performed by a programmer as indicated by the presence of an Event 59 in the claim history. That is 34.3% of all claims based on the raw numbers; however, only **19,294** of these claims (**6.77%**) were moved individually, which indicates a true processing "exception" that the DWH Database could not perform automatically.  The remaining 78,436 claims were moved in large batches by the programmers, which indicates:  (1) a policy change or processing decision by the Court or CAO that required claims to be moved to comply with new directives (*e.g.,* moving tens of thousands of BEL claims back to review to implement the Policy 495 revenue matching decision or moving 10,000 Subsistence claims that were placed on policy hold back to the initial review queues once new programming to implement Policy 484 (bartering) and Policy 492

(proof of licensure exemptions) were complete); or (2) moving batches of claims in bulk to Accountants, FWA auditors, QA reviewers, the Identity Verification team, etc. as we constructed the claims review modules and QA systems in the fall of 2012.  Regarding Mr. Cipione's allegations in paragraph 55 of his declaration of increased costs to implement manual moves or exception processing, utilizing programmers to move claims in bulk is much more efficient and cost-effective than using a claims reviewer or supervisor to move claims one by one or in small batches.

54.    Mr. Cipione criticizes the Claims Administrator for building an IT System that relies on manual moves and opines that he should not have launched or continued to use the DWH Database without remediating this "fundamental limitation."   The Program cannot "remediate" this perceived "fundamental limitation" of manual moves to accommodate claims processing that does not adhere to the Happy Path until the rules and procedures for processing all claims become static.  That has yet to occur despite the passage of almost 30 months since the execution of the Settlement Agreement on April 18, 2012.

55.    As new claims processing rules and procedures become final as agreed to by the Parties or directed by the Court, the Program then makes the necessary adjustments to the DWH Database to accommodate the changes and remove any exceptions processing.

# Redacted

We have constructed a series of automated "utility" features that allow supervisors to transfer claims/claimants to different users within the same queue, or "routing" features that allow teams to move claims/claimants to a different queue or assign items to a specific reviewer.  The DWH Database contains 27 separate utility features that allow supervisors to process claims without programmer

31

intervention and we continue to build new mechanisms to automatically process claims and re-route them as the business rules become stabilized.

I, David E. Smith, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 15th day of October, 2014.

_____

David E. Smith