# EXHIBIT  10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | HONORABLE CARL J. BARBIER |
| This document relates to all actions. | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

## DECLARATION OF BRIAN G. PYE

Brian G. Pye declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a Specialized Advisory Services Principal with CliftonLarsonAllen LLP ("CLA") and make this declaration in response to allegations contained in the Declaration of Todd Brents (the "Brents Declaration") [Doc. 13347-36].

2.     On May 17, 2013, CLA issued a Process Audit Report (the "Report") on the internal control environment of Deepwater Horizon Economic Claims Center ("DHECC"), as requested by the Claims Administrator's Office ("CAO").[1]   The Report covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012. *See* Report, p. 15.

3.     As explained in the Report, CLA performed an assessment for ten of the twelve claim categories named in the Settlement Agreement.   These ten categories were included in CLA's testing population during the assessment.   CLA did not include the two additional claim categories because neither of those categories was in production as of December 31, 2012.

---

[1] A copy of the Report is attached to the Brents Declaration as Exhibit 6.

4.      The purpose of CLA's procedures and sample testing was not to identify, or determine, any form of a dollar value misstatement that may have occurred related to paid claims for the entire population.  Rather, the purpose was to evaluate the design of internal controls over claims processing -- i.e., to evaluate if controls were in place and operating as intended for claim processing.

5.      CLA utilized "due professional care," as defined by International Professional Practices Framework (IPPF) when performing testing to select the sampling methodology that it utilized to identify the sample size of 96 claims.  Based on auditor judgment, CLA increased the AICPA minimum sample size standard for "Very Significant and Higher Risk" sample testing by 60%.

6.      CLA tested 96 claims and performed procedures analyzing key controls governing claim preparation, determination of causation, payment calculation, quality assurance review, and payment disbursement.  In selecting claims to be tested within each category, CLA utilized attribute risk sampling, which resulted in the review of claims with higher dollar values.[2]

7.      Based on its testing procedures, CLA identified four data input errors contained in the calculation spreadsheet used to calculate the claim payment.  The Report notes that two of the fifteen BEL claims reviewed contained errors and that two of the thirty-three Seafood Compensation claims reviewed contained errors.  *See* Report, pp. 29-31.  None of the claims in any of the other categories tested were found to be in error.  *See* Report, pp. 29-34.

---

[2] Paragraph 24 of the Brents Declaration wrongly assumes that CLA utilized a "substantive testing" methodology.  Mr. Brents did not speak with anyone from CLA before preparing his Declaration.  Had he contacted CLA, he would have learned that CLA utilized an "attribute risk sampling" methodology.

8.      Though the purpose of the assessment was to determine if controls were in place and operating as intended for claim processing (rather than to assess the dollar value of the misstatements that may have occurred related to paid claims for the entire population), the Report correctly notes that (a) the dollar value of the two errors that involved BEL claims resulted in total claim overpayments of $2,494 (out of total payments of more than $26.7 million for the fifteen BEL claims tested by CLA) and (b) the dollar value of the two errors that involved Seafood Compensation claims resulted in total claim overpayments of $418 (out of total payments of nearly $67 million for the thirty-three Seafood Compensation claims tested by CLA). *See* Report, pp. 29-31.

9.      As noted in the Report, CLA's testing clearly identified statistical evidence that the BEL and Seafood Compensation claims had internal control deficiencies that resulted in inaccuracies in the claims payments.  No additional testing was needed to establish that improvement was needed.[3]

10.      In the Report, CLA opined that the internal control environment at DHECC merited a rating of "Minor Improvement Needed." *See* Report, p. 12.  This rating indicated that overall internal controls were in place and were operating as intended to provide reasonable assurance that management's objectives were being met.  However, as noted above, the Report reveals that errors were uncovered by CLA.  Furthermore, the Report recommends enhanced internal quality control auditing of DHECC's claims processing and recommends that the CAO

---

[3] At the time of the Report, CLA had only completed the first of three planned testing phases. *See* Report, p. 15.  Additional testing by CLA would have been performed in Phases 2 and 3 of the project if CLA's services had not been terminated after Phase 1.  As the Report explains, it was anticipated that "changes would be made to DHECC's claims processes to improve the processing of claims on a go forward basis," just as it was observed that "[t]he CAO and its vendors identified opportunities for improvement and implemented those opportunities throughout [Phase 1] of [CLA's] Process Audit." *See* Report, p. 15.

"refine its quality assurance review process over data input and data capture and continue to provide training to increase the effectiveness of the quality assurance process." *See* Report, pp. 11 and 21.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 14, 2014

Brian G. Pye