# EXHIBIT  12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, | * * * | MDL NO. 2179 |
| on April  20, 2010 | * | SECTION J |
| | * | |
| This document relates to all actions. | * | |
| | * | HONORABLE CARL J |
| | * | BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| | * | |
| Bon Secour Fisheries, Inc., et al., on behalf of | * | Civil Action No. 12-97 |
| themselves and all others similarly situated, | * | |
| | * | SECTION J |
| Plaintiffs, | * | |
| | * | |
| v. | * | HONORABLE CARL J. |
| | * | BARBIER |
| | * | |
| BP Exploration & Production Inc.; BP | * | |
| America Production Company; BP p.l.c., | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| Defendants. | * | |

SUPPLEMENTAL JOINT DECLARATION OF MEADE MONGER IN SUPPORT
OF CONFIRMATION OF THE ECONOMIC AND PROPERTY SETTLEMENT
AGREEMENT AND EXPERT OPINION REGARDING THE VALUE OF THE CLAIMS
PROCESS TO CLASS MEMBERS

I, Meade Monger, submit this supplemental declaration ("Supplemental Declaration") as a supplement to my original Declaration filed on August 13, 2012 ("Declaration") in support of the parties seeking final approval of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, As Amended On May 2, 2012.  I am over the age of 18; the opinions, statements and conclusions expressed in this Supplemental Declaration are my own.

1

1.      I am a Managing Director of AlixPartners, LLP ("AlixPartners").   I founded and co-lead the Information Management Services practice of AlixPartners, a business unit with nearly 200 people globally.  I am an independent expert retained by counsel for BP Exploration and Production Inc. and BP America Production Company ("BP") in the MDL No. 2179 litigation.  I submit this Supplemental Declaration in support of the parties motions to obtain final approval of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended on May 2, 2012[1] and specifically to further opine on the continued progress of the Settlement Program since it commenced operations on June 4, 2012 based on my observations since the date of my Declaration. I also have had an opportunity to review objections filed by alleged class members who take issue with certain aspects of the claims process and the Settlement Program.

2.      Except as otherwise noted, I have personal knowledge as to all of the information set forth below.  All facts and opinions set forth in this declaration are based upon my personal experiences and knowledge, discussions with Settlement Program representatives and tours of the operations, information supplied to me by the Settlement Program and BP's attorneys, my review of other relevant information, and my opinions based upon my knowledge of the Settlement Program and understanding of the Settlement Agreement.

**Overview of Supplemental Declaration**

3.      The opinions in my Declaration were primarily based on the features of the Settlement Agreement and my initial observations of the Settlement Program at the beginning stages of its operations.  I am now supplementing these opinions based on my continued

---

[1] Capitalized terms in this declaration are defined in the Settlement Agreement.

observations of the progress of the Settlement Program's operations as well as my review of objections filed by alleged class members taking issue with certain aspects of the claims process and the Settlement Program.   As I explain throughout this Supplemental Declaration, my continued observations since my Declaration of the progress made by the Settlement Program confirm and amplify my opinions that the claims process is running as designed and is valuable to Class Members. Furthermore, my overall consideration of the Settlement Program, including my continued observations, leads me to conclude that the objections I reviewed are without merit.

4.     Since my Declaration was filed, I have had discussions with the Claims Administrator and members of his team, toured the Settlement Program operations, and tracked and analyzed status report data on a regular basis.  I am impressed with the overall process and sophistication of the operations as well as the results that have been achieved.  I have also continued to perform research on other claims matters including the cases for which I have been involved and publicly available information from other selected matters, as aspects of these other matters relate to my continued and my new, additional observations of the Settlement Program.

5.     As I stated in my Declaration, obtaining Settlement Payments prior to final approval is a unique feature of the Settlement and is beneficial to Claimants.  The number of claims eligible for payment and the number and amount of payments since the Settlement Agreement was preliminarily approved and through the time that I submitted this report is significant.

| March 8, 2012 to October 21, 2012 | | Claims | Amount (millions) |
|---|---|---|---|
| Claims Paid During Transition Period | | 16,121 | $405.0 |
| Claims Made Eligible and Paid | 4,580 | $178.6 | |
| Claims Made Eligible - Pending Acceptance and Payment | 6,018 | $517.5 | |
| Total Claims Made Eligible Since Inception | | 10,598 | $696.1 |
| Total Paid and Made Eligible | | 26,719 | $1,101.1 |

6.      The above metrics demonstrate that the pace of payment determinations and payments of the Settlement Program operations is more than reasonable and, under the circumstances (more fully described below), is impressive.  The pace of payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time. The other responsibilities included many efforts around immediately establishing effective operations and continuing to properly handle transition matters (claims in the Transition Process) as the Settlement Program got underway, which I discuss in more detail herein. Furthermore, without even considering the steps that have been taken by the Claims Administrator to make the process more automated and efficient that I describe below, the pace of payment determinations and payments to claimants naturally increases over time in my experience.  As with any function of this nature, the more experience that the Settlement Program team has with the process, the more efficient they will become.

7.      The Claims Administrator has installed many mechanisms reasonably designed to achieve prompt claims processing determination. These include electronic noticing functions and the interactive web portal that is now in place.  The Claims Administrator has also developed, tested, and implemented systematic procedures to increase the efficiency of the claim

review process and allow the Claims Administrator to manage the claims as they flow through the process, as well as perform and review the claim calculations based upon the claim type.

8.     The Claims Administrator's public status reporting has addressed claims that have been filed without all required documentation specified in the Settlement Agreement, Claim Forms and instructions ("Incomplete Claims"). The rates of these Incomplete Claims are common in my experience.  The rate of incompleteness has clearly not impacted the overall progress of the Settlement Program.  I fully expect that the Incomplete Claims rates will naturally decline over time, as happens in other claims matters.  In addition, the Claims Administrator has put processes in place, including public alerts to claimants and counsel regarding frequently observed incompleteness issues that will contribute to reducing and resolving the Incomplete Claims.  In my experiences administering successful claims programs, the Incomplete Claims rates that the Claims Administrator has reported are not atypical and can be resolved relatively efficiently.

9.     The Settlement Program has well-designed and impressive mechanisms in place to evaluate and process the information in the completed Claim Form and all supporting documentation under the terms of the Economic Damage Claim Process.  Specifically, Business Economic Loss Claims are subject to a unique provision in the Settlement Agreement that requires the Claims Administrator "to produce the greatest Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework" (Settlement Agreement section 4.3.8).  I observed the accounting processes, and in particular the "calculator" software program used by the Settlement Program for Business Economic Loss Claims, and was impressed with the levels of thought and sophistication that has gone into this specific claims determination process. The calculator also

computes the comparison of the Settlement Program's determination to the determination made by the Claimants.  Members of the Claims Administrator's team told me that they have observed calculations made by certain Business Economic Loss claimants that are consistent with those made by the Settlement Program.  The Settlement Program has a robust multi-step process with highly trained team members who are functionally well organized with multiple quality review steps.

10.    Claimant acceptance rates with respect to determination letters are evidence that the process works well and is consistent with Claimants' expectations.  Of the Claimants who have received eligibility notices and have taken action to either accept or sought reconsideration of the determination, 96% have accepted.[2] Unlike many other claims processes, there is very little subjectivity that goes into determining claim amounts. In my experience I find that claimants value objective and transparent claims processes because such processes give claimants comfort that they will receive the relief they have been promised under the settlement agreement.   In my experience, high acceptance rates are a sign that claimants have confidence that the Settlement Program is properly evaluating and paying claims under the terms of the Settlement Agreement.

11.    The support that the Settlement Program provides to Claimants is overwhelmingly strong.  The infrastructure in place is impressive in scope and capabilities. The Settlement Program currently has over 3,200 people working in locations throughout the country with the vast majority of those employees working in the Gulf Coast.  By mid-October 2012, the Settlement Program had reached these staffing levels through a surge of new hires that have completed training and testing to become capable claims processors. In addition, the Settlement

---

[2] This figure does not include those that have received an eligibility notice and have not yet decided to accept or seek reconsideration.

Program is highly proactive towards helping Claimants get through the process and has gone so far as to provide comprehensive training sessions and seminars for professionals assisting claimants with preparing claims. In my experience, it is rare to encounter such an aggressive allocation of resources in a claim process to claimant assistance or to see the level of pro-activity by the Settlement Program to help Claimants. It is also particularly impressive that the Settlement Program was able to staff the claims process substantially with new employees from the Gulf Coast states who are not otherwise regularly employed in claims administration processes.

      12.    I am impressed with the speed and smoothness of the operations only a few months into the process, especially considering that a large transition also took place from the GCCF. The transition of Class Members with GCCF claims into the Settlement Program was performed without interrupting the processing and payment of claims.

**Supplements to Opinions**

**Opinion 1** – The Settlement Program provides Class Members with the unique benefit of obtaining Settlement Payments prior to final approval, including the conclusion of any appeals.

      13.    Through October 21, 2012, 71,621 claims have been filed. There have been 9,577 notices of eligible claims with payment offerings of nearly $700M made to Class Members through this same date. Of these, 4,580 claims for $178.6M have been paid. This is sound progress since the beginning of the program. In addition to the fact that very few claims matters begin to pay claimants prior to final settlement approval, this percentage of claims paid in a few months' time is a much better pace than most claims programs I am familiar with. For

example, assuming the Settlement Program continues paying claims at the same rate they have in the month of October of an average of 99 per day, I estimate that the Settlement Program will pay over 30,000 claims before the Vioxx settlement ever made its first payments when comparing timelines of the two matters.  Put another way, in my experience with claims programs that I have administered as well as other programs that I have researched, the progress made on making payments to date in this matter is impressive.  It is not unusual in well run claims programs to encounter lower percentages of paid claims or no paid claims at this juncture of the claims administration.

14.     Overall, there have been a total of 28,373 notices of all types (eligible, denial, document deficiency) issued to Class Members.  This represents 40% of filed claims.  In my experience with claims programs that I have administered as well as other programs I have researched, issuing a determination notice to 40% of all filed claims at this point in a settlement is a very high rate in comparison to other claims matters.  In addition, the rate of notices per day is increasing and has gone from 107 per day on September 4, 2012 to 471 per day between September 4, 2012 and October 21, 2012.

15.     The data above directly refutes the contention made by an objector who contends that the Settlement Program's claim payment data reflects that the claims process is "bogged down" and a "bureaucratic nightmare". (Obj. Doc. 207). Far from being "bogged down", or somehow reflecting a "bureaucratic nightmare" as I explain above the claim payment data reflects the opposite: The Settlement Program is showing significant and comparatively impressive progress and the claims process is running smoothly and efficiently.

**Opinion 2** – The Settlement Program offers mechanisms for Class Members to maximize their

8

claims.

16.     In my Declaration, I stated that Class Members benefit by the terms of the Settlement Agreement that provide mechanisms for Claimants to maximize their claims.  I have now had an opportunity to get a demonstration, and the process appears to be executing the relevant provisions in the Settlement Agreement quite well.

17.     One of the beneficial attributes to certain claimants contained in the Settlement Agreement is that "the Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework. By way of example, but not to be exclusive, if the Claimant selected a Compensation Period or Benchmark Period based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied" (Settlement Agreement section 4.3.8).  To this end, the Settlement Program has developed tools and methodologies in its review process to fulfill this requirement.  The most prominent example of this is the software calculator developed for the Business Economic Loss clams.  The calculator recalculates claims under each possible Benchmark Period for a Class Member, based on the historical financial information provided in the claim.

**Opinion 3** – The Settlement Program has implemented processes and procedures that deliver a high level of support and assistance to Class Members.

18.     My Declaration discussed that there are multiple terms of the Settlement Agreement that provide assistance to Class Members that are not often required in other claims matters and provide benefits to Class Members.  Based on my review of the Settlement Program operations, I believe that the Claims Administrator is providing all of this support and assistance to class members at high levels.

19.     The Settlement Program took the unique and proactive approach to try and educate the independent professionals that would likely be retained by Claimants to assist them in submitting claims to the Program. The Claims Administrator and his team held a webinar for accounting professionals supporting Claimants in order to educate them on the claim filing process, document requirements, and the claim calculation for each claim type.  In addition to these webinars, the Claims Administrator and his staff have hosted eight seminars and conferences in the affected areas of the Settlement Program in order to provide the legal and accounting community a forum for education and Q&A on the claims process.  This continued outreach program by members of the Claims Administrator team shows me that the Settlement Program is focused on educating and arming Claimants and their professionals with the knowledge needed to properly submit claims so the claims can move expeditiously through the claims process.  In my experience, this level of proactive support to claimants is atypical and is of great value to Class Members.

20.     As mentioned in my earlier Declaration, the Claims Administrator has established 19 Claims Assistance Centers across the Gulf Region to allow Class Members ready,

face to face access to Settlement Program representatives.  These centers have been well received by Class Members.   To date, 41,173 visits have been made to Claims Assistance Centers, and 14,905 claims have been submitted through the centers.  In my experience, this level of in-person contact with claimants is uncommon.

21.      In addition to the number of procedures, policies, and training made available to Class Members and professionals, the Claims Administrator, Mr. Patrick Juneau, has made himself personally available to the public.  Mr. Juneau has visited each Claims Assistance Center where he talked to Class Members, local politicians and officials, as well as the local media. The effort to "get the word out" on the Settlement allowed for a great deal of visibility for the Program and helped educate potential Class Members on their rights in the Settlement. Given the demands of the job and the sheer volume of the work, I find the accessibility of the Claims Administrator to be very refreshing, and I believe Mr. Juneau is very accommodating to all parties as this process unfolds.  In my experience, this level of personal involvement and outreach by the Claims Administrator sends a very positive message to class members about the claims process and tends to encourage claimants to participate in the claims process.

22.      The websites and call centers have continued to be active conduits for Class Members and their representatives to interact with and receive information about the Settlement Program.  As of October 21, 2012, over 267,198 unique visitors have accessed the websites, and 181,242 calls have been fielded in the call center.  The claimant portal has proven to be an active and popular method for the submission of claims.  Through the most recent reporting, 49,776 claims, or 70% of those filed, were submitted through the online claims portal. In my experience, these high usage rates at this stage of the Settlement Program reflect that the Class is actively engaged and taking advantage of the valuable information about the claims

process that the Settlement Program has made available.

       *23.*    The Settlement Program has developed proactive measures to reach out and contact Class Members to resolve matters. For example, in processing claims with one or more missing documents, the Settlement Program does not resort to simply issuing a denial notice right away and waiting for the Class Member to respond, which is the typical standard operating procedures of most claims programs. Rather, it frequently attempts to reach the Class Member through phone calls, letters and/or notices on the claims portal to request and explain the missing documentation needed to process the claim. With these outreach efforts, they are able to process claims more quickly, and provide a high service level to Class Members.  Another area where these practices prove helpful is in processing Business Economic Loss Claims.  Many of these claims contain detailed, historical financial statements as supporting documentation. In processing the claims and seeking to understand the information submitted, the Settlement Program routinely calls Class Members directly to ensure the information is understood and used properly in calculating the claim. In my experience, this level of pro-activity is atypical and benefits claimants.

       *24.*    My observations and opinions in Paragraphs 19 through 23 above directly refute the objection of an alleged class member who claims that the Settlement is unfair based on the alleged deficiency of advice provided by the Settlement Program's various offices throughout the Gulf Coast. Obj. Doc. 142.


**Opinion 4** – The multi-tiered appeal rights for Class Members is a unique and beneficial element of the Settlement Program.

       25.    My Declaration discussed the terms of the Settlement Agreement

regarding multi-tiered appeal rights and the benefits of this process to Class Members.  I have reviewed the results to date, and the results demonstrate a very high acceptance rate by Claimants of the payment amounts determined by the Settlement Program.

26.     The first step of this multi-tiered appeals process, for the Claimants that dispute the claim amount determination set forth by the Settlement Program, is for Claimants to request reconsideration if the Claimant disputes the amount.  After reconsideration the Claimant can file an appeal to an Appeals Panel. To date, there have only been reconsideration requests made by Claimants, and no appeals have been filed.

The table below presents how I like to analyze reconsideration requests as a percentage of total eligibility notices.

| *Through October 21, 2012* | To Be Paid | Already Paid | Total |
|---|---|---|---|
| Payment Eligibility Notices | 9,577 | 515 | 10,092 |
| Reconsideration Requests | 297 | 93 | 390 |
| Acceptance Rate | 97% | 82% | 96% |

*Excludes reconsideration requests related to notifications to claimants not eligible for payment*

27.     Payment eligibility notices for Claimants that haven't previously been paid in full are accepted 97% of the time with no reconsideration requests. This is a very high acceptance rate, as I have seen other claims matters where initial acceptance rates approximate 75% and do not see as high as 97% often.  When I do see comparable acceptance rates this high, it tends to be in smaller claims matters as compared to the claims in the Settlement Program. This is a testimony to the clarity and attention to detail undertaken in preparing the claims

frameworks. Overall, there have been 390 reconsideration requests on 10,092 payment eligibility notices sent to date. Of the 390 reconsideration requests, approximately 24% are reconsideration requests made by Claimants for which the Settlement Program's records reflect that those Claimants have already been paid in full.

**Opinion 5** – The Settlement Program is uniquely accommodating to Class Members through a substantial and comprehensive infrastructure and guidelines in place to thoroughly handle claims expeditiously and is very generous to Claimants in comparison to most claims processes.

      *28.*    As mentioned in my Declaration, the Settlement Program consists of specialists in a wide range or fields, such as legal, financial, technology, fraud, appeals and reporting.  I have determined through my observations that the Settlement Program is doing a thorough and careful job of handling claims expeditiously and providing claimants with the benefits called for by the Settlement Agreement.

      *29.*    There are members of the Settlement Program who specialize in each area and the teams work well together.  The claims processing and claims review teams each consists of two shifts of professionals working seven days a week to improve the pace of processing. There are hundreds of accountants working seven days a week to process all Business Economic Loss and some Seafood Program claims that require accounting expertise. There is constant communication between teams as the Settlement Program works to process more claims and to send out more notices of eligibility to qualified claimants.  Everyone involved in the processing of claims undergoes rigorous and frequent training.  The Settlement Program demands high performers in the processing teams and those that cannot keep up with the work demands are moved in order for more highly qualified individuals to join the team.  The Settlement Program

has shown flexibility in problem solving and staffing by cross training many individuals at the Claims Assistance Centers to help triage claims with missing documentation by directly reaching out to Class Members to obtain the necessary documents. The entire team seems energized and focused on the task of processing claims as quickly and efficiently as possible. In my experience, this level of specialization, training and staffing create a more efficient and effective claims process that benefits claimants.

        30.    The Settlement Program has developed an interactive web portal that allows claimants to file claims online. The portal provides real time email updates on the status of the Settlement Program, process improvements in the Settlement Program, and changes to the Settlement Agreement. This email noticing process allows the Claims Administrator to immediately notify claimants once their claim has a review result. The notice informs the claimant whether their claim has been deemed Eligible, Denied, or Incomplete and gives specific instructions on next steps a claimant may need to take. The process will also provide for an immediate notice to the claimants if a claim is missing critical documents needed to determine eligibility. The immediacy of this noticing process will allow the Settlement Program to communicate more quickly with claimants and shorten the time needed to resolve claims.

        31.    The Settlement Program has now developed, tested, and implemented a review module that will increase the efficiency of the claim review process thereby decreasing the time it takes for a claim to be processed, approved, and paid. The review module takes a submitted claim form through the review system and produces a notice of eligibility for each claimant. This automated system maximizes the speed of moving each claim through the review process while simultaneously implementing an important feature of the Settlement Agreement; maximizing the eligible amount for each approved claim. Sophisticated software developed

15

specifically for this Settlement Program helps minimize chances for human error while the claim moves expeditiously through the system.  The review module provides an automated process to take the submitted claim form to an ultimate outcome notice of eligibility, denial, or incompleteness.  These notices are delivered immediately through the interactive web portal to all claimants signed on to use the portal.  The immediacy of results delivered to the claimant will result in more efficient and timely payments to eligible claimants.

32.     As I commented on above, the rate of Incomplete Claims observed by the Claims Administrator to date is not atypical and is resolved relatively easily.  The Settlement Program has good processes for handling Incomplete Claims.  The rate of Incomplete Claims identified this point in time into this Settlement Program are not unexpected.   It is even more common that claims filed in the beginning of the process have high incompleteness rates, and I expect that incomplete rates will decrease over time. Based on my experience and comparisons to other cases, incomplete rates are high for the claims received at the beginning of the process and drop significantly as claims are filed later on in the process. Among other things, those providing assistance to claimants (*e.g.*, attorneys and accountants) will gain experience in completing claims submissions, including documentation requirements. In addition, and as I explained in my original Declaration, the Settlement Agreement provides for specified reimbursement of accounting fees incurred by Claimants to assist with the preparation of successful claims. This is another value benefit to Class Members that can help Class Members meet the document requirements under the terms of the Settlement Agreement.

33.     In addition to incomplete rates naturally decreasing over time, the Settlement Program is taking many steps to automate processes and create efficiencies that will reduce the levels of Incomplete Claims.  Outcome notices are automatically generated by the

claims review system and sent to claimants to explain what required documents are missing. Additional processes have been implemented to review materials submitted by claimants in response to a notice of an Incomplete Claim.

34.     On top of the process efficiencies that the Settlement Program is implementing, the interactive web portal will also reduce inefficiencies and generally speed up the process. The interactive web portal will immediately notify Claimants using the portal of any missing documents once a claim has a review result of an Incomplete Claim. This feature will allow claimants to submit the missing documents in a timely manner, allowing for document incompleteness to be rapidly cured. The development of the interactive portal will help reduce Incomplete Claims by getting information directly to the claimants in a timely manner and by allowing claimants the ability to immediately upload any missing documents.

35.     In my experience, most Incomplete Claims can be resolved in an efficient manner. Claimants pursuing recoveries are responsive to requests for additional supporting documents once the missing documents are identified. A claims process that provides this information and is responsive to claimants' questions will allow them to successfully resolve Incomplete Claims.

36.     The Settlement Program has a thorough and multi-step quality review process consisting of the Claims Administrator vendor's quality control reviews, the internal audits, and the external audits. The Settlement Program has implemented a robust internal audit process and has engaged an external auditor to begin conducting external audits on a recurring basis. The internal audit process has been implemented by the Settlement Program to ensure that the integrity of the Settlement is intact. This process includes an initial audit of claims of each type to verify the procedures and claims calculations are working properly in each claim

category.  In addition, recurring random audits are conducted on an ongoing basis. Also, a 100% audit is conducted for all reconsideration and appeals requests.   These internal audits are conducted by the Settlement Program's team members. These audits provide value to Claimants in that the Settlement Program provides a secondary check of the Settlement Programs' team member calculations and procedures. An independent CPA firm has been hired by the Settlement Program to conduct an annual financial statement audit in accordance with Generally Accepted Auditing Standards and issue an opinion on the financial statements. In addition to the financial statement audit, the CPA firm will conduct an internal controls review three times per year to provide assurance that the Settlement Program is operating in compliance with the Settlement Agreement. These audits provide value to Claimants in that the Settlement Program will be evaluated by an independent third party with the appropriate experience and qualifications.

**Opinion 6 –** The Settlement Agreement created a unique mechanism to transition Class Members with GCCF claims into the Settlement Program without interrupting the processing and payment of new claims.

37.     As I described in my original Declaration, the transition from the GCCF process into the Settlement Program was seamless and did not interrupt the processing and payment of claims. My continued review of the results and discussions with the Settlement Program provides additional confirmation of this seamless transition. The primary evidence lies in the results that have been achieved since the inception of the Settlement Program operations (as discussed in detail above) which transition responsibilities were handled by the Settlement Program.

38.     I am particularly impressed with the progress the Settlement Program has

made on processing claims, determining and distributing notices, and making payments on claims while seamlessly making such a large transition. The transition from the GCCF to the Settlement Program had to be executed over a weekend as the GCCF operations ceased on a Friday and the Settlement Program operations commenced the following Monday. This short transition window was further complicated by the Settlement Program having to use new people in the Claims Assistance Centers due to the GCCF site operations personnel no longer being available to the Settlement Program.  The Settlement Program prepared for this by holding off-site hiring and training leading up to the transition cutoff date. There were also many facility related logistics such as new contracts and coordination with various local officials in order to be operational on June 4, 2012.

39.     Additional responsibilities at the time of the transition included development of all of the roles, materials, testing and training for properly implementing the Settlement and the terms thereof. All of this also required the development of a system and automation features so that the process can efficiently operate. New claims forms including online filing capabilities also had to be developed.

40.     Transition responsibilities continued for the Settlement Program well beyond the transition cutoff date. There were many payments and release form responsibilities trailing from the GCCF as the Settlement Program got underway. The GCCF made a full data transfer including significant amounts of data that required continuous cleaning, data mapping and reconciliation while the Settlement Program was already underway with ongoing operations. There were also many ongoing transition responsibilities of the Settlement Program related to banking and communications. The banking functions transferred from Citibank to JP Morgan at the transition from the GCCF to the Settlement Program, and a great deal of work was necessary

to process and fully reconcile the information associated with this banking transition. The transition communications also involved lots of work such as setting up new interactive web portals and preparing and distributing letters to claimants in the GCCF notifying them of the transition to the Settlement Program.

41.     To reinforce this point, the progress made by the Settlement Program since operations began while handling many transition responsibilities seamlessly is remarkable.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 22nd day of October, 2012.

_____
Meade Monger
Managing Director
AlixPartners, LLP

EXHIBIT I

Facts and Data Used in Forming Opinions

- *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012; DKT 6430
- Settlement Agreement between Merck & Co., Inc. and Negotiating Plaintiff's Counsel, in the VIOXX Products Liability Litigation
- *Deepwater Horizon* First Amended Order Creating Transition Process; DKT 5995
- *Deepwater Horizon* Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]; DKT 6418
- GCG Transition Run-Off Report as of July 19, 2012
- Appendix A Dashboard – Week Ending July 20, 2012; General Claims Fund and Seafood Compensation Fund
- Appendix A Dashboard – Week Ending August 03, 2012; General Claims Fund and Seafood Compensation Fund
- Appendix A Dashboard – Week Ending September 14, 2012; General Claims Fund and Seafood Compensation Fund
- Final Report of The Special Master for the September 11th Victim Compensation Fund of 2001
- Settlement Facility and Fund Distribution Agreement *Between* Dow Corning Corporation and The Claimants Advisory Committee
- In re "Agent Orange" Product Liability Litigation, 597 F. Supp 740 (E.D. N.Y. 1984)
- In re "Agent Orange" Product Liability Litigation, 603 F. Supp 239; 1985 U.S. Dist
- In re "Agent Orange" Product Liability Litigation, 689 F. Supp 1250; 1988 U.S. Dist
- Order Preliminarily Approving Knauf Settlement, Conditionally Certifying a Knauf Settlement Class, Issuing Class Notice, Scheduling a Settlement Fairness Hearing, and Staying Claims as to the Knauf Defendants
- Oil Pollution Act of 1990
- Exxon Qualified Settlement Fund News as of September 28, 2012
- In re: The EXXON VALDEZ Declaration of Lynn Lincoln Sarko in Support of Lead Counsel's Application for an Order Distributing Exxon Qualified Settlement Funds to NATV, NOOS, F00E, S01E, S03E, S04E, S01H, S01K, S02K, S04K, and S01L, Claimants and their Attorneys
- Status Report No. 1, Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damage Settlement
- Status Report No. 2, Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damage Settlement
- Status Report No. 3, Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damage Settlement
- DWH Payment Dashboard as of 10/22/12
- Notices, Appeals and Reconsideration Report through 10/21/12
- End of Day Dashboard Report 10/21/12
- Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement – October 21, 2012

- Transition Activity Report as of October 17, 2012
- DWHECC Organization Chart as of 10/15/2012
- The Agent Orange Settlement Fund Information Page, US Department of Veteran Affairs
- Exxon Valdez Oil Spill Trustee Council 2009 Status Report
- *In re Exxon Valdez*, 270 F. 3d 1215, 1233-36 (9th Cir. 2001)
- *Exxon Shipping v. Baker,* No. 07-219 (S. Ct filed June 25, 2008)
- Barnes, Robert. (2008, June 26). *Justices Slash Damages for Exxon Oil Spill*
- (2008, June 25). *Exxon Valdez case timeline*. Retrieved September 27, 2012 from Anchorage Daily
- Vioxx Settlement Registration Information from Brown Greer PLC Vioxx Settlement
- Vioxx Claims Administrator Court Report No. 29, July 27, 2010.
- In re: Sulzer Hip Prosthesis and Knee Prosthesis Product Liability Litigation, Docket # 3255 and # 3267
- In re: Sulzer Hip Prosthesis and Knee Prosthesis Products Liability Litigation, 455 F. Supp. 2d 709, 716 (N.D. Ohio 2006), MDL No. 1401
- In re Diet Drugs Prods. Liability Litigation, 385 F.3d 386 (3d Cir.2004), MDL No. 1203
- In re "Dalkon Shield" IUD Products Liability Litigation, 526 F.Supp. 887 (N.D. Calif. 1981), rev'd, 693 F.2d 847 (9th Cir.), cert. denied, 103 S.Ct. 817 (1983)
- Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (Or Found)?*, 61 Fordham L. Rev. 617 (1992).  Available at: http://ir.lawnet.fordham.edu/flr/vol61/iss3/3
- Review of other materials from my work experience that are relevant to this report