# EXHIBIT 13



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

July 1, 2013

**_By Hand Delivery_**

The Honorable Carl J. Barbier
United States District Judge
United States District Court, Eastern District of Louisiana
500 Poydras Street, Room C-256
New Orleans, LA 70131

      **Re:**    **Response to BP's June 21, 2013 Letter Requesting Examination**

Dear Judge Barbier:

      The Claim's Administrator's Office ("CAO") is in receipt of a copy of the June 21, 2013 letter from Mr. Mark Holstein of BP to the Court requesting an examination of the Deepwater Horizon Court Supervised Settlement Program (the "Program") and alleging that the CAO has inadequate operational controls, significantly higher than expected administration costs and expenses, substantially lower than expected claim processing efficiencies and productivity, and inadequately funded and insufficient processes to detect and prevent fraud, waste and abuse. As explained in detail herein, BP's alleged concerns are unwarranted. The facts demonstrate that the CAO and BrownGreer PLC ("BrownGreer"), Garden City Group, Inc. ("GCG"), PricewaterhouseCoopers, LLP ("PwC") and Postlethwaite & Netterville APAC ("P&N") (collectively, "the Vendors") have worked and continue to work efficiently and effectively in processing claims, and that the CAO has, from the Program's inception, demonstrated proficient oversight and supervision over the Program.

      Initially, however, the manner in which BP has placed its alleged concerns before the Court should be addressed. As the Court is aware, the Settlement Agreement sets forth a procedure for expressing such concerns to the CAO and for resolving any disagreements regarding the CAO's oversight and administration of the Settlement Agreement. Specifically, the Agreement provides that the Claims Administration Panel (consisting of the Claims Administrator, a representative of BP and a representative of Class Counsel) "shall address and attempt to resolve unanimously any issues or disagreements that arise regarding _the Claims Administrator's oversight responsibilities, Settlement administration, or any other issue involving the Settlement Program._" The Agreement further provides that only if the Panel is unable to unanimously resolve an issue should it be "referred to the Court for resolution." Settlement Agreement § 4.3.4. The concerns raised by BP in its June 21 letter are the precise kinds of issues that are required to be submitted to a Panel prior to seeking the Court's intervention; yet BP did not request a Panel prior to submitting its letter to the Court.

The Honorable Carl J. Barbier
July 1, 2013
Page 2

Instead, BP bypassed the Agreement's process, which it helped devise, and improperly chose to raise these issues directly with the Court in what appears to be an attempt by BP to discredit publicly the work and efforts of the CAO. Indeed, less than one hour after we received a copy of BP's letter on the evening of June 21, the CAO received an inquiry from *The Financial Times*, a British news publication, asking for comment on issues addressed in the letter. This curious sequence of events is obviously of much concern to the CAO. We have always encouraged BP and Class Counsel (collectively, "the Parties") to approach us with any issues or concerns that may arise throughout the course of the implementation of the Settlement, and we have always been more than willing to meet with the Parties to address any concerns or problems that are brought to our attention. The CAO and the Vendors have endeavored to faithfully implement and administer the Settlement according to its terms as agreed to by the Parties, in an objective, fair, cooperative, and transparent manner, and have attempted to resolve any problems or disagreements in the manner set forth in the Settlement Agreement. BP, like the CAO and Class Counsel, should have to abide by those same processes it helped establish.

Regardless, as to the substance of BP's assertions, even a brief recitation of relevant facts demonstrates that BP's alleged concerns regarding the Program's operation and administration are unjustified. As you know, the Program has been extremely aggressive and efficient from its inception, effecting a complete transition from the Gulf Coast Claims Facility ("GCCF") in less than three months. During that transition period, we successfully transitioned staff, opened 21 facilities, developed and implemented new IT systems, established internal controls and back office systems, and opened our doors for business. To date we have adjudicated 91,489 claims with a total of $3.78 billion in eligibility notices, which, within a one year timeframe, is an attestation to the effectiveness of the Program and the dedicated Program employees throughout the country. We have had an exception rate of less than 2% of the awards that have been calculated, and recently, the Program underwent an independent process audit by CliftonLarsonAllen, LP ("CLA"), which confirmed that "paid claims as a whole appear to be paid in accordance with the Settlement Agreement." In sum, the Program has been overwhelmingly successful in adjudicating claims accurately and in accordance with the Settlement Agreement.

As required by the Settlement Agreement, the CAO has always operated in an extremely transparent manner so that both Parties remain informed and have the opportunity to address concerns about the CAO's operations and internal controls as they arise. For example, as the claims systems were being developed during the transition period, both Parties were invited and encouraged to participate in the testing and certification of all calculators for the various claims types. Furthermore, as part of its Program oversight and in order to keep the Parties informed of the Program's actions, the CAO provides the Parties with detailed reports on various issues including claims intake and processing, claims backlog, incomplete and denial reasons, eligible notices and payments, Program updates, efficiency and utilization modeling, internal audit findings, and payment projections. *See* Exhibit A, Table illustrating various reports provided to the Parties and Program Metrics. Additionally, the Parties have received reports and documentation from the Vendors which include training materials, operational manuals, organizational charts, quality assurance reports, payment reports, and fraud analysis, and we

The Honorable Carl J. Barbier
July 1, 2013
Page 3

have always been willing to provide the Parties with any additional information they request, subject to the terms of the Settlement Agreement.

Furthermore, pursuant to Section 5.12.1.4 of the Settlement Agreement, the administrative expense budget is "subject to the reasonable approval of the BP Parties and Lead Class Counsel." To comply with this provision, the CAO submits its budget via email to BP and Class Counsel on a quarterly basis. The submitted budget contains enough detail to provide the Parties with the projected cost that will be incurred by each of the Vendors during each month of the fiscal quarter. In response to the proposed budgets, BP has at times made inquiries about a vendor's specific costs, but at no point within the history of the Program has BP or Class Counsel challenged or disapproved of the CAO's proposed budget. The CAO also provides BP with all invoices submitted by the Vendors and their subcontractors complete with detailed backup that includes individual timesheets, tasks performed, and expense detail and receipts, and BP is then allowed "a reasonable amount of time to raise concerns or objections to such invoices prior to their payment." *See* § 5.12.1.4 of the Settlement Agreement. Before its June 21 letter, BP had raised very few and only minor concerns regarding the invoices it has received and reviewed. Additionally, BP has responded by email that they have "no issue" for every invoice that has been paid by the CAO.[1]

From the Program's establishment in early 2012 through January 2013, when BP first appealed the CAO's January 15, 2013 Policy Announcement, BP appeared to be entirely satisfied with the CAO, the Vendors, and the implementation of the Settlement Agreement. For instance, at the Final Fairness Hearing held before this Court on November 8, 2012, BP voiced its approval of the ongoing claims process and the manner in which the Program was being administered. In fact, BP's attorney, Mr. Godfrey, requested that the Court issue a final approval order for the Settlement Agreement "so that Mr. Juneau can continue with his excellent work."[2] Furthermore, at the time of the Fairness Hearing, (1) the Settlement Program had already received more than 79,000 claims and had eligible payable award amounts of more than $1.3 billion to claimants, and (2) BP had received and reviewed five months of the Program's budgets and expenses.

The CAO also proactively reached out to the Parties approximately six months ago to meet and address many of the items BP now takes issue with in its June 21 letter. In fact, the CAO scheduled a meeting on November 28, 2012, with BP and the PSC to discuss the administrative budget, administrative costs of the Vendors, administrative costs of the program in general, financial audit review, quality assurance review, promotional fund, benchmark comparisons of this Program and the GCCF, and the scope and progress of the CLA external audit. BP cancelled the meeting and requested a new date. The CAO attempted to reschedule that meeting three additional times in January, but each time BP cancelled the meeting and requested a new date. The meeting was finally held on April 25, 2013, and all items of the

---

[1] As the Court is also aware, the four third-party vendors that the CAO oversees in the implementation of the Settlement, whom BP now questions, were selected *by the Parties* and appointed by the Court, and BP played a direct role in negotiating the Vendors' payment rates. While the CAO did not select the Vendors, we have been impressed with their work, expertise, and commitment.
[2] November 8, 2012 hearing transcript, p. 75.

3

The Honorable Carl J. Barbier
July 1, 2013
Page 4

original November 28, 2012 meeting agenda were discussed. At the conclusion of the meeting, BP was encouraged to submit any questions concerning Program operations to the CAO and was told by our office that subsequent meetings would be scheduled with each of the Vendors to provide answers to its questions.

BP submitted a list of questions on May 1 in the form of a detailed "Request for Information." My office responded with a letter on May 22 addressing many of the questions raised by BP and scheduled meetings for June 18 to further address BP's questions. Thereafter, in a June 7 letter, BP, for the first time, criticized the Vendors' use of independent contractors and alleged "vendor markup" and proposed a process to eliminate vendor markup. On June 18, meetings were conducted with BP, Class Counsel, the Court, and each of the Vendors separately. BP interacted directly with the Vendors regarding its questions and concerns.

The CAO heard nothing further from BP regarding any of the issues addressed in BP's June 21 letter, until it received a copy of the letter at 5:26 pm on June 21, 2013. Although we disagree with the manner in which BP has raised these issues directly to the Court instead of to the CAO, we nevertheless welcome the opportunity to respond to BP's allegations in the same spirit of transparency and cooperation that our office has always tried to foster. We address those allegations in the same order as they were raised by BP.

I.     **BP's comparison of the Program to the GCCF is misguided.**

BP attempts to discredit the Program's efficiency by stating that the GCCF resolved more claims per month than the Program does. However, for a number of reasons, the comparison of this Program to the GCCF is truly an apples-to-oranges comparison. The two programs simply do not align in their processing requirements or their statistical output.

This Program is responsible for implementing a 1,028 page Settlement Agreement, with 12 different claim types and, within each of those claim types, additional components requiring further analysis and processing. For example, the Seafood Compensation Program has 22 different claim types within it alone. This Program has substantially more requirements, nuances, technological support, quality assurance, layers of review, communications and notices to claimants, documentation, and claimant assistance than the GCCF had. Thus, BP's comparison of the costs and efficiencies of the Program and the GCCF is entirely misguided.

To understand the truly flawed nature of BP's comparison between the GCCF and the Program, we must recall the policies of the GCCF. The operations of the GCCF were divided into two phases.[3] Initially, the GCCF functioned in the Emergency Advanced Payment ("EAP") phase, during which claimants could receive compensation without signing a release. Notably, the EAP phase of the GCCF employed the so-called Claimant Verified Amount ("CVA") rule.[4] Under the CVA rule, losses alleged by claimants from certain industries were presumed to have been caused by the Spill, and the GCCF would pay the amount of losses claimed by the claimant

---

[3] BDO Consulting Independent Evaluation of the Gulf Coast Claims Facility, at 29.
[4] *Id.* at 51.

4

The Honorable Carl J. Barbier
July 1, 2013
Page 5

based on pre-Spill financial information without reviewing the underlying financial documents if that figure was higher than the GCCF-calculated amount.[5] As a result of this and other GCCF policies during the EAP phase, in excess of 169,000 claimants received a payment with minimal claim review.[6] While BP did not count these EAP claims separately in its assessment of claims resolved by the GCCF, it is significant that these paid EAP Claimants were eligible to participate in the expedited Quick Payment program that followed.[7]

The GCCF later announced the Interim and Final Payment phase, in which claimants had the option to receive an additional payment if they released all future claims against BP.[8] The Interim and Final Payment phase included an expedited Quick Payment option, which applied only to previously paid claimants.[9] Under the Quick Payment option, claimants who had received compensation during the EAP phase could receive an additional payment in exchange for only a signed release, without any further documentation of losses.[10] These Quick Payment claims necessitated limited processing by the GCCF, as the only document required on behalf of the claimant was a completed release.[11] Over the course of its administration, the GCCF processed a total of 134,637 Quick Payment releases.[12] That figure indicates that two-thirds of all the releases submitted to the GCCF were received under an expedited option that required very little processing.

In contrast, this Program does not include any such expedited option and employs no parallel to the CVA rule or the Quick Payment program. Instead, each claim requires full documentary support and a complete analytical review. For these reasons, BP's comparison of the efficiency and cost figures of the GCCF to those of this Program is tenuous at best.

We also note that, for the purposes of counting "resolutions" in the Program, BP includes only Denial and Eligibility Notices. This overlooks the instances in this Program where our review halts because the claim is incomplete. Indeed, 51% of the notices issued in this Program are Incompleteness Notices, each of which requires a follow-up with the claimant to obtain required documentation. In doing so, we are implementing the Settlement Agreement pursuant to its terms and consistently with BP's explicit requirements not to deviate from those terms. However, such a high rate of incomplete claims adversely affects the speed with which claims are resolved. Furthermore, the number of incomplete submissions underscores not only the significant documentary requirements for which BP negotiated, but also the diligence of the Program in faithfully administering the precise requirements of the Settlement Agreement.

Indeed, the examples below illustrate why the Program's claims-processing pace may be slower and costlier than BP apparently expects:

---

[5] *Id.*
[6] *Id.* at 34.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 36.
[12] Gulf Coast Claims Facility Overall Program Statistics (Status Report as of December 3, 2012).

The Honorable Carl J. Barbier
July 1, 2013
Page 6

1. The resolution of Coastal Real Property, Wetlands Real Property, and Real Property Sales Claims has been delayed because of factors solely outside of the Program's control. Most notably, there is a backlog of claims at the mapping companies which BP initially retained.

2. The Settlement Agreement is complex and lengthy, and before the Program even commenced, the CAO and the Vendors began raising questions to the Parties, seeking clarification of both minor and major points, all of which were necessary for the accurate development of software systems and implementation of the Agreement. Beginning in May 2012 and continuing today, my office has posed questions to the Parties, asking for their input on policy decisions. Often, the Parties do not agree, which then leads to further discussion, drafting of new policies to address the areas of disagreement, Administrative Panel meetings, and motions to the Court. Since the beginning of the Program, the CAO's office has raised 411 issues for clarification. This has resulted in 384 adopted policies and 27 issues that have not yet been resolved. We have met with the Parties numerous times to discuss policies, have sent countless emails seeking resolution, and still face new issues every day that must be clarified or resolved. While such debate and discussion is ongoing, our office must place holds on affected claims until the Parties agree on a resolution. Every time a hold is placed, the progress of the affected claims halts until the issue is resolved, thereby adversely affecting claim-processing speed.

3. The CAO advised BP that productivity would be affected and the claims process would be more costly if we adhered to the stringent document requirements that were potentially causing 51% of the current claim reviews to be incomplete. After presenting BP with several more cost-efficient alternatives, many of which were rejected, BP urged our office to continue conducting additional research to find required documents and insisted that we do outreach calls to try to obtain documents. We advised BP of the costs and time associated with such efforts, but BP nevertheless encouraged us to devote additional resources to this research and outreach.

4. BP's consultants have identified areas in our processes that they believe are redundant or unnecessary and have discussed those in our meetings. One example concerned the assignment of NAICS codes for BEL Claimants, which are codes the GCCF did not assign. At the June 18th meeting, BP's consultant asked BrownGreer why the Program spent the time looking beyond the tax return for confirmation of a NAICS code when we could simply take the NAICS code from of the tax return and proceed. At first blush, this may appear to be an efficient solution. However, as BrownGreer explained, the Settlement Agreement does not permit the Program to simply rely on tax returns, but instead insists that the Program look at several different sources for confirmation.

The Honorable Carl J. Barbier
July 1, 2013
Page 7

These are but a few examples of how the time and expense of this Program are, in large part, a result of the Settlement Agreement itself, which BP negotiated. And yet, in spite of its complexities, the Program's monthly administration costs are still less than those of the GCCF.

## II. The CAO operational oversight is significant and effective.

As detailed below, BP's attack on the CAO's overall monitoring of expenses and its oversight of the Vendors is unwarranted.

### A. The CAO oversees the Vendors' productivity and output on both daily and long-term bases.

As early as July 2012, one month into the Program, the CAO met with each of the Vendors to begin a process designed to analyze and monitor each of the Vendors' individual productivity and the Program's productivity as a whole. The process looked at full-time equivalents, numbers of employees in each position, average time a claim was checked out and worked on, time spent in management, and oversight of each employee. It further measured output by the number of Eligibility and Denial Notices issued. The entire point of this utilization exercise, then and continuing today, is to evaluate productivity, identify areas that are moving too slowly, and analyze how full-time equivalents should be decreased as efficiencies are realized. This utilization process has achieved significant results, including an 87% reduction in GCG's call center expenses (a reduction made in coordination with GCG and with their agreement). It has also helped to ensure that employees in the Claimant Assistance Centers ("CACs") were cross-trained on aspects of claims review so that they could stay fully occupied when claimant traffic in a CAC waned.

Additionally, beginning in October 2012, the CAO directed that each of the Vendors participate in daily calls with the CAO to discuss output targets and processes in an effort to streamline processes and minimize costs to the Program. The goal of these "SWAT" team calls was to increase the volume of notices issued by establishing daily and monthly productivity goals and measure actual performance against these benchmarks. *See* Exhibit B, the Notice Target Report sent to BP on June 14, 2013. The CAO has reduced the frequency of these meetings as the Program has matured from a ramp-up stage to a normalized production stage, but the CAO continues to circulate reports every business day to each of the Vendors illustrating their progress compared to daily and monthly targets in order to ensure maximum output and efficiency.

### B. The CAO analyzes changes in process and does not implement changes on an "*ad hoc*" basis.

The CAO has charged each of the Vendors with constantly evaluating ways to streamline processes and reduce costs. The CAO oversees regular meetings to discuss ways to eliminate duplication and maximize efficiencies and then seeks to implement cost-saving measures. As one example, BrownGreer previously prepared the non-accounting aspects of each BEL Claim at lower billable rates than that of P&N and PwC ("the Accountants") and then fed the claim to the

7

The Honorable Carl J. Barbier
July 1, 2013
Page 8

Accountants. BP suggested that all BEL Claim review work, including the non-accounting aspects, be performed by the Accountants. The CAO studied this suggestion and concluded that it would cost the Program significantly more each month and potentially diminish claims processing throughput.

In its letter, BP wrongly assumes that the CAO proposed to add 100 new accountants to the Program without any analysis of whether it would achieve desired results. The Accountants jointly recommended to the CAO that, due to the increasing backlog of BEL Claims, the hiring of an additional 100 accountants would be reasonable and appropriate. BP requested additional information from the Accountants regarding the basis for the engagement of these additional accountants. On May 10, 2013, the Accountants drafted a joint response to BP outlining the growing backlog of BEL Claims, which, at the time, totaled 37,510 and was increasing at a rate of 2,400 claims per month. *See* Exhibit C. In their response, the Accountants stated that with 100 additional accountants, the accounting firms should have the resources necessary to limit any further growth of the BEL Claims backlog.

After reviewing the Accountants' response, BP requested a Performance Study of BEL Claims processing. *See* Exhibit D. On June 4, 2013, the Accountants each prepared a response and submitted it to the CAO, who in turn provided it to BP. *See* Exhibits E and F. These responses explained that the Accountants' joint recommendation to the CAO was influenced by a P&N analysis that determined that the most significant factor in the backlog of BEL claims was the increase in new filings (a 17% increase in the three month rolling backlog between October 2012 and May 2013). These numbers clearly showed that, on a daily basis, the number of incoming BEL claims far surpassed the number of claims being processed to a determination notice. The Accountants opined that the most efficient way to combat this continually increasing backlog was to increase the number of accountants on staff, which would help to increase throughput, thus expediting overall final determinations.

The CAO also performed an independent analysis of projections of incoming claims and current claims' completion date, which demonstrated that all final determinations for BEL claims could be completed four months earlier if the additional accountants were hired. *See* Exhibit G. For these reasons, the hiring of 100 additional accountants was deemed necessary and justified.

Nevertheless, BP voiced its disagreement and requested further information on June 9. *See* Exhibit H. Following this exchange, the June 18 meetings between BP and the Vendors took place. At these meetings, BP had the opportunity to ask questions to the Accountants about the hiring of the additional accountants. The Accountants specifically responded to all of BP's questions, and unfortunately, the matter remains unresolved. We need to get this matter resolved so that claims can continue to be processed in a timely manner.

BP also criticizes the Program's information technology costs and suggests that the majority of the necessary computer programming has been completed and that all further programming is simply "bells and whistles." BP fails to recognize that the complexity of the Settlement Agreement has necessitated the design and development of a complex claims processing database. This database requires daily maintenance to ensure that it is working

8

The Honorable Carl J. Barbier
July 1, 2013
Page 9

properly and that all of its users, which include claims reviewers, the Vendors, the CAO, the Court, BP, Class Counsel, claimants, law firms, Appeal Panelists, the Guardian ad Litem, the Attorney Lien Adjudicator, the Documentation Reviewer, and the mapping companies, are able to access and use the system. The system requires Database Administrators to monitor the speed, reliability, security and storage capacity of the Program's database, which involves over 574 web pages in the interactive claimant Portal and claims review screens, over 93 separate Notice types to claimants, and over 1.1 million lines of code for the web pages and stored procedures.

Aside from the daily maintenance requirements, the Program continues to require programming changes because of different demands that are brought to light on a regular basis. Additionally, the CAO has received recommendations from CLA with regards to the IT system. For example, given the volume of changes made to the system by BrownGreer, the CLA audit suggested that a daily log be maintained in order to assist the CAO in monitoring changes that are made and ensuring that they are authorized, reasonable and tested before implementation. The CAO has since been monitoring BrownGreer's implementation of solutions for CLA's recommendations to improve security, minimize fraud and increase efficiencies.

Additionally, every week, the CAO's senior IT manager has conference calls with BrownGreer, reviews lists of programming needs, evaluates their necessity, and directs the priorities of the tasks. The following are examples of instances in which programming changes have led to increased efficiencies in the Program.

1. **Improve the efficient flow of information among all Parties and claimants.** This includes programming more descriptive statuses of claims to indicate whether a claim is on hold for a policy decision or in the appeals process, as well as, to identify with specificity the status of BEL Claims. This programming enhancement replaced the prior static status of "Under Review" to provide more transparent and meaningful information to claimants.

2. **Improve the process flows among all Vendors in the Program.** This includes not only routing claims more efficiently between the Vendors and specific review processes but also encompasses the creation of separate interactive Portals for the Court-appointed Guardian Ad Litem, the Court-appointed Attorney Lien Adjudicator, and the Documentation Reviewer. These communication tools foster the efficient transmission of data and documents so that these specialists can review the claims that they are charged with resolving.

3. **Meet a new need in the Program.** New procedures approved by the Parties necessitate programming changes to implement the directives of BP and Class Counsel. For example, the Wetlands Claims often involve complex, overlapping ownership issues where a potential claimant, as shown in the land records of a particular parish, has not submitted a claim seeking compensation. The Parties directed the Program to identify these absentee claimants, provide them notice of their potential Wetlands Claim, and stay the processing of the submitted claim for 30-

The Honorable Carl J. Barbier
July 1, 2013
Page 10

        45 days so the owner/potential claimant has an opportunity to submit a claim. These steps require significant programming adjustments to route the claims accordingly and to provide a mechanism for issuing a notice to a potential, unregistered claimant. These changes will facilitate the orderly and accurate processing of all Wetlands Claims.

4. **Adjust to a change in policy.** The change in policy to not strictly enforce the January 22, 2013, deadline for submission of all Seafood Claims necessitated programming changes to achieve the following goals: (i) re-open the online Seafood Claim form submission process through the Portal; (ii) identify the potential population of claimants who could fall within the "relation-back" principle adopted by the Parties and the Seafood Neutral; (iii) design questions for claims reviewers to determine whether a claimant satisfies the specified relation-back criteria; (iv) design and code a new notice to notify a claimant of the potential Seafood Claims that could be submitted within this grace period; and (v) code the online Portal to only open up the specific claims to which the claimant is entitled among 22 possible Seafood Claims.

5. **Ensure accuracy of claim results.** To improve the accuracy of the claim reviews and foster confidence in claimants, the Program is implementing a change to the Portal's document intake system that will allow claimants to name their own documents when submitting them for review to ensure more accurate results and increase the efficiency of the claim review process. This endeavor requires changes to the interactive Portal screens, document intake queues, document categorization processes that name all documents, and data capture screens that prepare claims for analysis.

     The characterization of these aforementioned changes as merely "bells and whistles," undertaken without any analysis, is simply inaccurate. These programming changes offer substantive and necessary improvements to the efficiency and cost-effectiveness of the claim processing system in this Program.

### C. BP's assumptions regarding staffing costs and expenses are flawed, and its conclusions are incorrect.

     BP's assertions regarding the CAO's oversight of staffing costs and expenses are also unfounded and incorrect.

1. **Staffing levels *do not* exceed models.** The CAO has prepared staffing models that set forth goals of full-time equivalents ("FTEs") for the Program. Quarterly, the CAO monitors each of the Vendors and works with the Vendors to adjust staff to match claims volume. Our modeling, however, should not be misunderstood or confused with a pure headcount system of modeling. The number reflected in our models is an FTE number, which may be lower than a pure headcount of staff. This is because some workers are part-time, and many work a shorter second shift. For

10

The Honorable Carl J. Barbier
July 1, 2013
Page 11

example, we modeled that BrownGreer would need 700 FTEs in the Claims Reviewer position. They actually have 777 employees in this position, but this equates to 644 FTEs.

2. **Garden City Group's Call Center Operations.** When the Program initially launched, it established, in accordance with the Parties' expectations, a highly accessible communications network for claimants. BP played a role in determining how many dedicated operators would be required at the time of launch with numerous communications between GCG and BP discussing the ramping up and down of staffing. Since that time, GCG has closely monitored its call center staffing levels and proactively worked with the CAO's office to reduce operator levels when appropriate. GCG also suggested reduced hours when call volume decreased. The pricing for GCG's dedicated operators has been on the same sliding scale since GCG started its work three years ago on the GCCF project and has been provided on every invoice submitted to and reviewed by BP. The phrase "dedicated" operators is also on the Rate Chart as part of the Agreement executed between the Settlement Trust and GCG which BP reviewed and provided no objections prior to execution.

Moreover BP's recent criticism of the GCG call center staffing is at odds with GCG's staff reductions since the beginning of the program. GCG currently employs less than 60 total operators, down from the original 450 operators employed at the beginning of the Program, which was the number reached after discussion with the Parties in order to satisfy both Parties' desire to have sufficient staffing levels to ensure no wait time on any calls. This represents an 87% reduction in staff from the outset of the program.

Furthermore, there are valid reasons to have two sites for the call center. First, this allows GCG to keep a call center running in the event that severe weather or some other unforeseen problem shuts down one center. Second, the Sarasota center was established at the direct request of the Parties for GCG to have a call center presence on the Gulf. As it happened, GCG had a long-standing relationship with a call center partner in the Gulf that pre-dates this Program by more than ten years, which allowed GCG to quickly establish a Gulf-coast call center. Because of that relationship, GCG was also able to launch this center with minimal start-up costs. Finally, BP was well aware at the outset of the Program that GCG planned to operate two call centers, and BP approved that plan.

In any event, considering the low number of operators at this point, this cost relative to the entire process is minimal. On this score, BP also complains that GCG should simply pass along its call center vendor pricing instead of GCG's own pricing. BP, which has been paying GCG the same rates for call center work since 2010 without complaint, cannot argue that GCG misled BP in any way. During eight months of negotiations with respect to the current contract, which BP attended, GCG made it clear that in Sarasota it was using a long established call center partner and that this was not a pass-through expense. BP understood this and in fact had no issue with the

The Honorable Carl J. Barbier
July 1, 2013
Page 12

provision in the contract only requiring GCG to send a redacted copy of the pricing agreement between GCG and their Sarasota call center partner. It is thus surprising that BP has now taken issue with these redacted subcontractor agreements.

Lastly, the CAO opted to keep a call center open on Saturday to provide convenient accessibility to claimants who work during the week. We will certainly continue to evaluate the relative benefits and costs associated with running the call centers and will continue to take whatever actions are deemed appropriate to maintain quality claimant service while reducing costs.

3. **Turnover Issue.** BP also criticizes the CAO and the Vendors for high monthly turnover of staff, citing a 4% monthly turnover rate at BrownGreer and asserting that "the CAO has never identified this as an issue or attempted to address it with the vendor." We understand that in preparation for the launch of the Program, BrownGreer and other Vendors were expected to hire hundreds of workers in a short period of time to support various aspects of this Program. Inherent in any hiring process of such magnitude is the risk that there will be a certain percentage of turnover among workers.

   But, from the beginning, the CAO and the Vendors have been concerned with retaining staff that produce efficient and correct claim outcomes. We had frequent discussions early on with BrownGreer setting forth our expectations, and BrownGreer implemented an employee testing program. BrownGreer's reviewers are continually monitored through their Quality Assurance program that involves accuracy metrics programmed into the system, supervisor feedback, and warning levels. If an employee is not able to perform actual reviews at an acceptable level pursuant to that Quality Assurance plan, the employee is terminated by BrownGreer.

   Other reasons why employees leave are inherent in the nature of the work involved and the temporary nature of this assignment, factors that the CAO and its Vendors cannot control. The CAO has continued to monitor the issue of employee turnover, and the Vendors are taking measures, such as cross-training, to further reduce staff turnover. In sum, we are continuing to work with the Vendors on this issue to reduce turnover rates.

4. **The CAO is proactive in handling independent pass through costs.** BP's criticism of BrownGreer's and GCG's use of independent contractors is similar to its previous allegations that the mark up on contractor rates by the Vendors resulted in "pure profit." Initially, the calculations used to show the alleged "pure profit" are incorrect for many reasons, starting with BP's inflated estimate of the number of independent contractors at issue. Although BP estimated the independent contractor headcount for BrownGreer at 1,320, the actual number is merely 190. *See* Exhibit I, BP's June 7, 2013 letter.

The Honorable Carl J. Barbier
July 1, 2013
Page 13

Furthermore, BP fails to consider the Vendors' overhead costs. For example, of the 190 independent contractors at BrownGreer, 132 are located in Richmond, VA. Unlike the Gulf offices, BrownGreer is responsible for all rent and overhead costs associated with workers located in its Richmond office. Furthermore, GCG entered a ten year, $2.6 million lease to house the additional personnel required for this Program, a commitment that will surely extend beyond the life of this Settlement Agreement. Again, these overhead costs are fully absorbed by these vendors.

Additionally, both BrownGreer and GCG absorb overtime costs themselves and do not bill BP overtime rates. GCG has also provided a savings of nearly $5 million based on GCG's decision not to bill overtime on this Program, plus nearly $1.5 million in savings because GCG has capped its highest hourly rate to nearly half the rate normally charged by its executives.

Lastly, BP also complains that the Vendors should simply pass along subcontractor vendor pricing instead of billing at their own contracted rates. The CAO has involved BP in every step of the Vendor contract negotiations, including onsite meetings with the Vendors. In those meetings, which were the proper forum for such discussions, not once did BP propose passing through subcontract labor. It was not until after the contracts were negotiated and executed that these issues were raised.

5. **The CAO's review of expenses is routine and ongoing.** From the outset of the Program, the CAO has utilized several methods to oversee staffing costs and expenses.

   First, all of the Vendors are required to comply with the CA Travel and Entertainment Policy. This policy lays out formal cost guidelines for travel (hotel and transportation) as well as the accepted per diem for meal expense comparable to the standard contractor amounts. All of the Vendors' invoices undergo a comprehensive review, and any potential exceptions are reported to the Vendors. In reviewing expense invoices, the CAO recalculates expenses based on the documentation provided and compares these expenses to the invoice summary provided by the vendor. These travel expenses are then compared to supporting documentation (receipts and invoices) to confirm that the expenses comply with the Policy.

   In reviewing labor invoices, the CAO confirms that invoice hours agree with approved timesheets. Invoice billing rates are then confirmed by comparing the rates provided for in the executed contract against those billed for the title of person/job description. Invoices are inspected for duplicate entries and excessive hours charged per day or total invoice. It is confirmed that the work performed is within the Scope of Services identified in the executed contract. Lastly, the invoiced hours are compared to the hours charged in prior months to confirm that there is no duplicate billing.

The Honorable Carl J. Barbier
July 1, 2013
Page 14

Furthermore, the need for travel is a necessity to meet the Parties' very explicit expectation that the Program have a significant local presence in New Orleans. Having a local presence of PwC accountants is also beneficial in that it provides for better integration between the two accounting groups, as they are in close proximity to each other and can share approaches and ideas. If the cost of this local presence is deemed by BP to now outweigh the benefits of a local presence, then we will certainly analyze this issue and evaluate ways to minimize associated travel expenses.

### III. The Program's Procedures to Detect and Mitigate Fraud are Robust and Effective.

The allegation that information "suggests that the efforts taken by the CSSP to detect fraud are relatively nominal in relation to the actions taken by the GCCF, which yielded numerous fraudulent claims" is baseless, and the suggestion that the Program's fraud detection and prevention efforts are left in the hands of claims reviewers who follow subjective, undetermined criteria to detect potentially fraudulent claims is simply wrong. To the contrary, the Program has utilized the experience of the same key personnel who directed the GCCF's fraud detection efforts and has developed and implemented an improved, more robust, and more efficient Fraud Detection Program as compared to that of the GCCF.

At the beginning of the Transition Process, the CAO coordinated with the Transition Coordinator and with the head of BrownGreer's Audit Team to develop the fraud and detection processes for the Program.[13] We listened to their suggestions for improvements to the process. To help us coordinate the process, we engaged David Welker, a former Special Agent in charge of the FBI's New Orleans Division, to serve as the Claims Administrator's Fraud, Waste, and Abuse Director. We set up the Special Investigation Team ("SIT"), and, although managed by essentially the same GCCF audit team, the process that it developed has not only resulted in significant cost savings when compared with the GCCF, but also has surpassed the GCCF's process in several ways.

BrownGreer does ask the Program's claims evaluators to identify suspect claims, because these evaluators are most familiar with the claim, but this Program does far more to detect fraud than just this. SIT also updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 394 businesses, employers, notaries, and tax preparers, all whose involvement or preparation of claims is suspect.

---

[13] It should be noted that BrownGreer played a key role in developing and implementing the GCCF's fraud detection and prevention program. BrownGreer's "audit team" implemented controls to verify the claimant's identity, identified and prevented payments on duplicate claims, and developed criteria and instructions for reviewers to identify suspect claims to submit for fraud review. The audit team's case managers analyzed individual claims, performed database queries, and developed and reviewed statistical trend reports to detect multi-claimant schemes. After identifying a suspect claim or a potential scheme, BrownGreer referred all claims to Guidepost Solutions, LLC ("Guidepost") for investigation. Guidepost's task was to return a finding on the presence or absence of fraud. BP's assertion that the GCCF fraud mitigation vendor – Guidepost – had identified 9,310 claims containing potential fraud is therefore incorrect. BrownGreer's audit team identified, while Guidepost confirmed, that these claims were potentially fraudulent.

The Honorable Carl J. Barbier
July 1, 2013
Page 15

Furthermore, select SIT reviewers regularly analyze various statistical trend reports to detect claim abnormalities, including analyses of P&L and sales, and use tax variances for the BEL claims. SIT's reviewers and case managers have access to over 30 reports, including reports that identify claimants sharing the same address, email, and payment information. They review these reports both to identify suspect claimant groups as well as to identify overlaps with any suspect claims. SIT programmatically identifies claims that were found to be potentially fraudulent in the GCCF and tags them for SIT review if the same claimant files a claim in the Program. SIT case managers manage and monitor the multi-claimant schemes identified in the GCCF to detect the same or new claimants filing claims sharing the same characteristics. SIT case managers also routinely develop reports based on the unique characteristics of the multi-claimant scheme as they monitor its progression. It is not unusual to run several reports to define the characteristics of the scheme and continue refining the reports as the scheme evolves. Typically, SIT identifies approximately 10 new potentially fraudulent multi-claimant schemes weekly. SIT currently monitors over 520 different multi-claimant schemes, involving over 4,000 claimants that have submitted potentially fraudulent claims.

David Welker and Roma Petkauskas, the head of BrownGreer's SIT, have regularly met with representatives from the National Center for Disaster Fraud ("NCDF") and the U.S. Attorney's office throughout the Gulf. On September 7, 2012, we attended a meeting with Don Cazayoux (U.S. Attorney for the Middle District of Louisiana) and approximately 30 attendees from the FBI, Secret Service, DOJ, Postal Inspection, and the U.S. Attorneys and their staff from the five Gulf States. We gave an overview of the Program and SIT processes. The attendees commended the fraud detection processes and welcomed the level of increased cooperation this Program has had with those agencies as compared to the level of cooperation experienced with the GCCF. This cooperation continues with the exchange of information that the NCDF provides relating to the tips it receives through its hotline. The Program continues to refer potentially fraudulent claims to the DOJ.

The statement that the Program's fraud detection efforts are "nominal," the suggestion that these efforts follow some subjective standard or non-existent criteria relying solely on claims evaluators to detect fraud, and the allegations that BP has not received "any empirical support" regarding the Program's Fraud Detection Program and its findings are not only false but ignore the substantial efforts that the Program has undergone to meet with BP on numerous occasions to describe all of the aspects of the Fraud Detection Program.

The CAO's Fraud Detection Program representatives have met with BP to discuss the Program, its processes, and its findings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. As we explained in these meetings, we realized that the GCCF incurred significant costs from its requirement that every potentially fraudulent claim be referred to Guidepost for a full external investigation. SIT has since implemented "in house" investigative processes to review suspect claims to make findings of fraud at a substantially reduced cost when compared with the processes of the GCCF. SIT has established direct access services with the IRS to verify tax and other financial documents, developed standardized authorization forms to obtain information from other third party sources, increased efforts in contacting employers and other witnesses, and retained a forensic accountant. SIT can make a determination of fraud

15

The Honorable Carl J. Barbier
July 1, 2013
Page 16

resulting from any one of these processes. SIT refers claims to HUB Enterprises, Inc., an outside investigation firm, for a full investigation only in instances where an on-site interview or inspection are the most efficient and reliable methods. As we reiterated again in the meeting on June 18, these adjustments have resulted in a more efficient fraud detection process – whereas the GCCF referred all suspect claims to Guidepost for external review, the Program is able to handle two-thirds of all fraud findings internally, which, as BP acknowledges, has significantly reduced the cost to the Program.

### IV.  The Accountants maintain uniform processes to detect errors in claimant-submitted information.

Contrary to BP's allegations, the Accountants follow uniform processes to detect potential errors in claimant-submitted information. First it is important to note that the Settlement Agreement does not call for the Accountants to perform auditing procedures on the claimant financial statements. The Accountants use professional judgment in reviewing and analyzing claimant submitted information. BEL Claims are calculated using required documentation outlined in the Settlement Agreement and, in some cases, additional documentation is requested by a claims reviewer and utilized in the review process. Claimants are required to submit multiple sources of financial information, which are used collectively during the review process to evaluate the claim and produce a determination. Inconsistencies between the financial documentation and items of question identified during the review are assessed when producing a final determination. Upon completion of a thorough evaluation, a final determination is made once the claim satisfies the requirements of the Settlement Agreement and is in line with program policies.

Moreover, the Accountants perform additional analytic work on claims including, but not limited to: variance analysis between book and tax Profit & Loss results, reconciliation of claimant prepared calculations with accountant-prepared template results, categorization of expenses, understanding of business operations and industry dynamics, correction of claimant accounting and non-accounting errors, supporting source documentation where necessary, and research of financial anomalies and patterns. The Accountants' application of these guidelines typically results in direct telephone communications with claimants and their representatives in order to perform a thorough evaluation and to address any concerns or inconsistencies. These guidelines and others aid in producing accurate claim determinations.

### V.  The CliftonLarsonAllen, LP External Audit Was Approved by BP.

BP complains about the scope of the CLA audit, but fails to acknowledge that BP was given every opportunity to influence the scope of that audit. *See* Exhibit J. In June 2012, and in an effort to provide complete Program transparency, the CAO proposed to the Parties that an external audit be conducted to address the claims process to ensure accurate, consistent, and timely processing of claims. The CAO gave both Parties the opportunity to comment on the audit scope that was included in the Request for Proposal ("RFP"), which was submitted to three independent firms for bidding: CliftonLarsonAllen LP, Reznick Group, and McGladrey. After careful deliberation, the CAO selected CLA.

The Honorable Carl J. Barbier
July 1, 2013
Page 17

From December 2012 through February 2013, CLA performed field work and testing of claims to assess the conformance of the Process to the Settlement Agreement. On February 15, CLA requested the scope to be increased to include more file testing as well as more extensive field work. At that point, the scope increase was presented to the Parties, who were asked for additional recommendations; *BP raised no issue with the revised scope of CLA's audit.* CLA provided the CAO with the first of three process audit reports in May 2013, and the CAO circulated copies of the report to the Parties. The scope of the remaining reports will provide a more in-depth review of the Program's processes.

BP complains that CLA's audit was performed at too high a margin of error (10%), but as BP acknowledges, the external audit was specifically designed to test the internal controls and processes of the Program. As of May 30, 2013, the CAO's internal Quality Control Team had audited 1,639 claims from an Eligible Notice population of 41,328. At a confidence interval of 95%, this sample size provides the Program with a margin of error of 2.38%, which is, in fact, less than the margin of error requested by BP for the external audit.

Additionally, as the internal claim audits have progressed each quarter, the CAO Quality Control Team has identified common trends within claim types that have allowed the Program to implement a risk-based approach for selecting samples. For example, the Program has observed that, as the Vendors have gained more experience using the Louisiana Wildlife and Fisheries Database for Louisiana Seafood Claims, the material exceptions for Louisiana Seafood Claims have significantly decreased. As a result, the CAO Quality Control Team now selects a smaller sample of Louisiana Seafood Claims (even though Louisiana accounts for 44% of all Seafood Claims) in order to focus on the higher risk claims submitted from Mississippi, Alabama, Florida, and Texas.

## VI. The CAO has been fully transparent and is operating in strict accordance with the Settlement Agreement.

The CAO has fostered a transparent environment focused on cooperation and teamwork, which requires our office, the Vendors, Class Counsel, and BP to recognize that every party has insights and suggestions that can benefit the Program as a whole. The CAO maintains this unwavering commitment to teamwork. BP's unfounded criticisms of the Program, its Vendors, and those who administer and implement the Agreement are not productive and do not benefit the Parties, the Court or the claimants. Our processes and operations have always been and continue to be transparent, as evidenced by our recent compliance with BP's requests for information and the recent Vendors' meetings set up by the CAO for BP's benefit. Rather than impose another audit or examination on the Program, we encourage BP to review the information that we have previously provided and allow us to work together to answer BP's questions and address its concerns in a manner contemplated by the Agreement.

Additionally, the CAO is providing oversight and supervision in full accordance with the Settlement Agreement and as directed by the Court. However, should the Parties take issue with the methodology that our office employs to oversee and supervise the Program, there is a process

The Honorable Carl J. Barbier
July 1, 2013
Page 18

for addressing such issues as specified in the Settlement Agreement. The CAO welcomes open discussions with the Parties regarding any issues of concern and is prepared to invoke an Administration Panel and, if necessary, raise any unresolvable issues to the Court.

Sincerely,

Patrick A. Juneau

cc: Magistrate Judge Shushan