UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

SPECIAL MASTER'S MEMORANDUM
CONCERNING HEARING ON OBJECTIONS TO SPECIAL MASTER'S REPORT

Pursuant to the Court's September 26, 2014 Order, Special Master Louis J. Freeh submits this memorandum concerning the November 7, 2014 hearing on objections to the Special Master's September 6, 2013 Report ("Report"). The Court directed the parties to exchange and file papers identifying: (a) any person a party intends to call as a witness; (b) any additional exhibits a party may seek to introduce at the hearing; and (c) a list of specific factual issues each party believes are in dispute and requiring resolution by the Court.

A. *Exchange of Positions with the Show Cause Parties*

On October 15, 2014, to facilitate narrowing issues for the November 7, 2014 hearing, the Special Master provided a draft of this memorandum to counsel for the Show Cause Parties, and requested in return a draft of the Show Cause Parties' filings.

Counsel for the Andry Lerner firm declined to comment on the Special Master's draft or to share an advance copy of the firm's filing, but suggested further discussions after the parties file their memoranda to explore ways to shorten and simplify the disputed issues.

Reitano's counsel reviewed the Special Master's draft, and substantially agreed with the factual issues presented by the Special Master in paragraphs 1, 2, 3, and 6. Reitano's counsel will offer additional documentary evidence on these issues. Reitano and the

Special Master disagree on the legal conclusion to be drawn from paragraph 21. Consistent with the September 26, 2014 Order, Reitano's counsel will present affidavits in lieu of live testimony on this issue. The legal issue will of course be reserved for the Court.

Jonathan Andry's counsel requested a copy of a new document obtained by the Special Master following the September 26, 2014 conference and referenced in paragraph 18 of this memorandum. On October 16, 2014, the Special Master provided a copy of this document to Andry's counsel.

The other parties did not respond substantively to the Special Master's draft.

### B. *Witnesses*

The Special Master does not intend to call any live witnesses, but reserves the right to cross-examine any witnesses called by the Show Cause Parties, and requests the opportunity to present rebuttal testimony on issues raised by the Show Cause Parties.

### C. *Additional Exhibits*

Summary exhibits that the Special Master may seek to introduce at the hearing are attached. The Special Master also will offer a copy of the Report with a disk containing images of documents cited in the Report's footnotes (as provided in discovery to the Show Cause Parties). The Special Master reserves the right to use additional records for cross examination, rebuttal or to address issues raised by the Show Cause Parties.

### D. *Specific Factual Issues in Dispute*

To identify specific factual issues in dispute, this memorandum briefly summarizes key findings of the Report, followed by specific factual objections to these findings raised by the Show Cause Parties in their filings and at the September 23, 2014 conference.

1. While practicing law together, Sutton and Reitano represented Casey Thonn ("Thonn") before the Gulf Coast Claims Facility ("GCCF"). Sutton had represented Thonn on other legal matters as well. When Reitano began work at the Claims Administration Office ("CAO") on April 1, 2012, she referred her GCCF cases to other lawyers. *See* Report at 25-26, 43; Reply of the Special Master in Responses to Objections Filed by the Show Cause Parties at 14 ("Reply").

*Factual Issues in Dispute*: None.

2. Reitano testified that she referred Thonn's claims to Andry and the Andry Lerner firm. Sutton and Lerner testified that Sutton referred Thonn's claims to Lerner and the Andry Lerner firm. *See* Report at 25-26, 28, 43; Reply at 14.

*Factual Issues in Dispute*: None. While the testimony presents different versions of the referral, contemporaneous records supports that both Reitano and Sutton referred Thonn's claims to the Andry Lerner firm before Reitano joined the CAO.

3. Reitano asked the Andry Lerner firm to honor the same 20 percent contingency fee agreement with Thonn that she had used. The Andry Lerner firm agreed to do so. Reitano testified she had no continuing financial interest in the Thonn claims after she began work at the CAO, and no evidence contradicts her statement. *See* Report at 26.

*Factual Issues in Dispute*: None.

4. Sutton said he told Lerner he expected 50 percent of any contingency fee payable on Thonn's claims based on work Sutton already had performed. The standard referral fee paid by the Andry Lerner firm is 40 percent. *See* Report at 43; Reply at 26.

*Factual Issues in Dispute*: None.

5. By agreement dated April 12, 2012, signed by Jonathan Andry and Thonn, the Andry Law Group entered into an attorney-client relationship with Thonn. *See* Reply at 14.

*Factual Issues in Dispute*: None.

6. A May 8, 2012 letter from an Andry Lerner attorney to Reitano with a copy to Andry enclosed an unexecuted "Attorney Referral Agreement" between Andry (not his firm) and Reitano, proposing that Reitano refer Andry potential BP claimants in exchange for a 50 percent referral fee. Exhibit A lists Thonn's claims as being "subject to this Agreement." No executed version of the agreement has been produced. *See* Report at 26-27; Reply at 26.

*Factual Issues in Dispute*: None.

7. Sutton received a 50 percent share of the contingency fees the Andry Lerner firm received from Thonn's DHECC claims as follows:

| Claim | Thonn Claim Payments | Andry Lerner Contingency Fees | Sutton Referral Payments |
|---|---|---|---|
| Vessel of Opportunity | $49,400.00<br>10-10-12 | $9,880.00<br>10-19-12 | $4,940.00<br>1-8-13 |
| Shrimp Vessel Owner | $166,652.10<br>2-28-13 | $33,330.42<br>3-11-13 | $16,665.21<br>3-28-13 |
| Shrimp Boat Captain | $190,350.25<br>4-29-13 | $38,070.05<br>5-14-13 | $19,035.02<br>6-5-13 |

*See* Report at 35-41 & Ex. A.

*Factual Issues in Dispute*: None.

8. The Andry Lerner firm treated the payments to Sutton on Thonn's claims differently than other referral fees, and did not include them on the "Settlement Accounting" recording disposition of the client's settlement funds. The Andry Lerner employee who tracked referral agreements said the Thonn claims were the only files of which she was aware that did not have a referral agreement in the file, and that the Andry

- 4 -

Lerner firm normally paid 40 percent of the contingency fees for referrals. *See* Report at 28-29; Reply at 25-26.

*Factual Issues in Dispute*:  None.

9.   The Andry Lerner firm did not pay the Thonn referral fees to Sutton directly, but first sent the referral fees to another law firm owned by Lerner.  Two of the payments were then sent from Lerner's firm to a dormant corporate bank account that Sutton could access.  The other payment was wired from Lerner's firm to the corporate account of a company that Lerner and Sutton co-owned.  The payment then was wired to the dormant corporate bank account that Sutton could access.  None of the referral fees were sent to any bank account of the Sutton & Reitano firm.  *See* Report at Ex. A.

*Factual Issues in Dispute*:  Andry, Lerner and Sutton have stated that there was no improper purpose in the way Sutton received the referral fees, and the payment structure was for business convenience.  Andry testified that he paid Lerner his share of the attorney's fees for the Thonn claims, and that he was unaware until near the time that Sutton resigned from the CAO that Sutton had been paid part of the fees.

*Summary of Response*:  Andry and Lerner treated the payments to Sutton differently than other claims at their firm.  From at least December 2012, Andry and Lerner knew that Sutton expected referral payments from Thonn's claims.  As he provided assistance to Andry and Lerner on other high-value DHECC claims, Sutton inquired of both as to the status of his next payments from them on the Thonn claims.  Sutton intended to receive the payments for the Thonn referral in a way that concealed these payments, and in a way that would not be reflected in the financial records of his law firm.  Andry and Lerner made the

payments in a way that helped Sutton achieve this goal of concealment and that deviated from the Andry Lerner firm standard referral fee practices.

10. Reitano began employment at the CAO in April 2012. Sutton began employment at the CAO in November 2012. Sutton and Reitano agreed to comply with the CAO policies relating to conflicts of interest and other ethical issues. Specifically, both agreed to carry out their work "[at] all times during the term of this Agreement free of any conflict of interest as an independent contractor not affiliated with another person or entity other than the Claims Administrator." Both agreed to "take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality" in performing the official duties at the Court Supervised Settlement Program ("CSSP"). *See* Report at 20; Reply at 14, 17.

*Factual Issues in Dispute*: None.

11. Andry and Lerner testified that they knew that CAO policies prohibited CAO employees from having an interest in a DHECC claim while working at the facility. *See* Report at 30; Reply at 17-18.

*Factual Issues in Dispute*: Lerner testified that he understood from Sutton that despite the general prohibition against CAO employees having financial interests in claims, Patrick Juneau had approved Sutton receiving a payment from Thonn's DHECC claims.

*Summary of Response*: On June 25, 2013, Sutton met with lawyers for The Andry Law Firm, and apparently explained that it was "common knowledge" that CAO staff could not have a financial interest in any DHECC case. Sutton said he "told Glenn you can't send me the Thonn referral fee – use it for Crown."

12.  Sutton did not disclose to the CAO that: (a) he had a financial interest in Thonn's DHECC claims; (b) he co-owned Crown LLC with Lerner, which paid Sutton a $10,000 monthly salary; and (c) another company in which Sutton had an ownership interest was filing a DHECC claim.  *See* Report at 24, 41, 62; Reply at 13-15, 26-28.

*Factual Issues in Dispute*:  Lerner testified that Sutton represented that he had disclosed his interest in Thonn's claims to Patrick Juneau, and that Patrick Juneau approved Sutton receiving referral fees on Thonn's claims.  Sutton has said he did not take improper actions on any of the claims where he had concealed financial interests, and that he disclosed his ownership of Crown to Patrick Juneau.

*Summary of Response*:  Sutton provided assistance on claims in which Andry and Lerner represented claimants at the time Sutton was concealing his financial relationships with them.  Sutton's statements also contradict Lerner's claim that Sutton represented that Patrick Juneau had approved payment of the Thonn referral fees to Sutton.  Specifically, on June 25, 2013, Sutton met with lawyers for The Andry Law Firm.  Sutton apparently said it was "common knowledge" that CAO staff could not have a financial interest in any DHECC case, and that he "told Glenn you can't send me the Thonn referral fee – use it for Crown." Moreover, Sutton failed to disclose that Lerner had an ownership interest in Crown, and that Lerner was paying Sutton a monthly salary as co-owner of Crown.

13.  There is no evidence that Sutton altered the valuation amount of any Andry Lerner claim while Sutton worked at the CAO.  *See* Report at 4.

*Factual Issues in Dispute*:  None.

14.  Andry and Lerner received assistance with pending DHECC claims from Sutton while Sutton was a CAO employee.  For example, Sutton searched claims that Andry

identified in March 2013 as important to him but that had become "stuck." These claims were among the highest value claims filed by the Andry Lerner firm. Andry exchanged text messages with Sutton as Sutton researched these high-value claims. For an important claim to Andry worth over $7 million, Sutton sent emails on March 6 and 7, 2013 to his DHECC co-workers, asking about the claim's status. Sutton's co-workers, unaware of Sutton's undisclosed relationship with Andry and Lerner, said they would "go ahead and pull the claim down" for processing, and then "push" the claim to the next review step, despite the fact that Sutton's inquiry was "unusual" and "uncommon." The next day, Sutton emailed Lerner, stating he was "working with [Andry] to get [another claim worth over $2 million that Andry identified as important] pushed through as quick as possible." After a phone call later that day with Andry, Sutton wrote Lerner: "[Andry] got paid on the Casey Thonn bp case last week so you can send me that." *See* Report at 48-53; Reply at 19-21.

*Factual Issues in Dispute*: Andry, Lerner and Sutton have stated that Sutton's responsibilities were to provide information on DHECC claims, that there is no evidence that any claims were inflated or given preferential treatment, that Sutton reviewed only a minimal number of claims filed by the Andry Lerner firm, and that Sutton's efforts to help Andry and Lerner were no different than his work for other counsel and claimants.

*Summary of Response*: Sutton's help to Andry and Lerner is different than help to the general public because of Sutton's concealed financial relationship with Andry and Lerner. Andry sought help from Sutton on high-value claims that Andry himself had labeled as important. When Sutton inquired about these claims at the CAO, he deprived his fiduciary of its right to disinterested decision making and full disclosure of Sutton's potential motivation. This breach caused tangible harm to the CSSP.

15. In another example, on March 15, 2013, while Andry and Sutton exchanged 35 text messages as Sutton searched the DHECC files concerning four claims together worth over $15 million in which Andry represented the claimants, Sutton also sent Lerner emails about Sutton's next payment from Andry Lerner and told Lerner that "[Andry] told me that he just disbursed so you won't get it for a few days." *See* Report at 53; Reply at 19-20.

*Factual Issues in Dispute*: Andry, Lerner and Sutton have stated that Sutton's responsibilities were to provide information on DHECC claims, that there is no evidence that any claims were inflated or given preferential treatment, that Sutton reviewed only a minimal number of claims filed by the Andry Lerner firm, and that Sutton's efforts to help Andry and Lerner were no different than his work for other counsel and claimants.

*Summary of Response*: Sutton's help to Andry and Lerner is different than help to the general public because of Sutton's concealed financial relationship with Andry and Lerner. Andry sought help from Sutton on high-value claims that Andry himself had labeled as important. When Sutton inquired about these claims at the CAO, he deprived his fiduciary of its right to disinterested decision making and full disclosure of his potential motivation. This breach caused tangible harm to the CSSP.

16. Andry Lerner and The Andry Law Firm are separate business entities which each have two members. Jonathan Andry serves as a common member in both entities. Both members of The Andry Law Firm had contact with Sutton in March 2013 concerning The Andry Law Firm's pending claim valued at over $7 million. *See* Report at 22, 48-53; Reply at 22-23, 31-32.

*Factual Issues*:  Jonathan Andry and Gibby Andry have stated that the Report conflated the separate entities, and that they were only seeking to advance their claims and did not do anything improper in their contact with Sutton.

*Summary of Response*:  As a leader in both The Andry Law Firm and the Andry Lerner firm, Jonathan Andry's actions on material matters can be chargeable to both of these closely-held entities.  This is particularly true here, where Andry used his access to Sutton for mutual advantage.

17.  In June 2013, when confronted by Patrick Juneau, Sutton lied about his financial relationship with Andry and Lerner.  When Juneau asked Sutton if he had financial ties to Andry, Lerner or Thonn, Sutton said he represented Thonn before joining the DHECC, but denied receiving any payment from Andry or Lerner or from Thonn's DHECC claims.  *See* Report at 41-42; Reply at 14.

*Factual Issues in Dispute*:  Sutton testified that he misunderstood Patrick Juneau's questions about the referral fees from the Thonn claims, until he went home after the interview and reviewed emails.

*Summary of Response*:  Sutton repeated his false statements to CAO staff over several days.  His multiple false exculpatory statements give rise to a strong inference of consciousness of guilt.

18.  On June 17, 2013, Michael Juneau spoke to Andry and asked if Sutton had any financial interest in Thonn's DHECC claims.  Andry said "[Sutton]/[Reitano] have no interest in anything.  Absolutely clear about that." Andry also said "[g]iven Tiger's situation – I've made a point to avoid that.  Given dynamic - made a real point to avoid any issue that would compromise him in any way." *See* Report at 33; Reply at 17.

*Factual Issues in Dispute*:  In his pleadings, Andry said the Special Master's findings that Andry had made false statements were "contradicted by the full record."  At the September 23, 2014 conference, Andry's counsel said Andry needed to testify to give context to an alleged 41-second telephone interview held by Michael Juneau.

*Summary of Response*:  Phone records show that Andry and Michael Juneau spoke for nine minutes on June 17, 2013.[1]  Juneau's contemporary notes detail Andry's false statements.  Andry followed his call with Juneau with immediate and multiple calls and text messages with Sutton.  Andry's submission of false material information is an instance of his inequitable conduct toward the CAO, as well as his intent to deceive.

19.   In testimony before the Special Master, Andry concealed and minimized the assistance Sutton provided to him.  For example, Andry told the Special Master that a March 7, 2013 lunch with Sutton came about "accidently" and without any "plan or arrangement" when the men ran into each other on the street.  Yet Andry and Sutton exchanged 11 text messages the morning of the lunch, and had a phone call moments before their lunch at 11:55 a.m.  Further, Andry said he mentioned at the lunch a claim of particular interest to him, but said Sutton never got back to him with any information about the claim.  Yet when Sutton returned from lunch with Andry, he found that he had received an email confirming that DHECC staff — at Sutton's request — would "go ahead and pull" for processing this particularly important claim.  After receiving this news, Andry exchanged text messages with Sutton, and Sutton called Andry.  Later that day, Sutton

---

[1] The Special Master obtained the phone records for the June 17, 2013 cell phone call after Andry's counsel made several references at the September 23, 2014 status conference to the need for Andry to testify so he could have a chance to explain what he said in a call that lasted only 41 seconds.

- 11 -

reviewed another claim for Andry worth over $3 million, and exchanged additional text messages with Andry.  *See* Report at 51-52; Reply at 20-21.

*Factual Issues in Dispute*:  Andry, Lerner and Sutton have said in their pleadings that no confidential information or special access was provided by Sutton.  At the September 23, 2014 conference, Andry's counsel said Andry would testify to explain the coincidence of the March 7 lunch and the context of his testimony.

*Summary of Response*:  Andry did not ask Sutton about all of his claims, but rather only about claims Andry himself identified as being important, all of which also were of great financial value.  Sutton researched the claims the same day, and exchanged messages with Andry as he conducted the research.  The effort to minimize the importance, value and existence of this help supports a strong inference of Andry's consciousness of wrongdoing.

20.  Only when The Andry Law Firm's claim was held up on appeal did Andry pursue a relationship with the then-current CAO appeals director — a relationship that consisted of regular emails, phone calls, and two lunches paid for by Andry at the Palace Café, where The Andry Law Firm claim was discussed.  *See* Report at 54-56; Reply at 30-31.

*Factual Issues in Dispute*:  Andry has stated in his pleadings that no confidential information or special access was provided by the then-current CAO appeals director.

*Summary of Response*:  Andry disregarded the ethical obligations of CAO staff and the perception of creating an appearance of a conflict of interest for his own benefit.

21.  While Reitano's lapses do not rise to the same level as conflicts of interest exhibited by other former CAO employees, Reitano nonetheless engaged in conduct contrary to the ethical obligations agreed to by CAO employees.  For example, Reitano advocated for an existing CSSP vendor to hire her husband.  Reitano also advanced the

positions of another CSSP vendor, strongly advocating the vendor's position against other CSSP staff who sought to evaluate certain business processes of the vendor. Since Reitano left the CAO, the program has engaged in reviews of business processes which have made clear that the prior business processes did not sufficiently protect and safeguard the CSSP function. *See* Report at 67-69, 74-78; Reply at 28-30.

*Factual Issues in Dispute*: Reitano has stated that she advocated for the CSSP vendor to hire her husband because he was qualified and appeared to have a good relationship with the CSSP vendor. Reitano also stated that she made her decisions in what she believed were the best interests of the CSSP.

*Summary of Response*: While Reitano's belief may mitigate the severity of her ethical breach, she nonetheless improperly used the power of her position to influence a CSSP vendor. Her loss of impartiality concerning another CSSP vendor is similarly important.

Respectfully submitted,

\_\_\_\_/s/ Louis J. Freeh_____
Louis J. Freeh
Special Master

Dated: October 17, 2014

## **TABLE OF EXHIBITS**

Exhibit 1        Significant Events March 5 to March 12, 2013

Exhibit 2        Significant Events March 15 to March 16, 2013

Exhibit 3        Significant Events March 20 to March 22, 2013

Exhibit 4        Significant Events June 17 to June 19, 2013

Exhibit 5        Significant Events March 16 to May 9, 2012

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing papers have been served this ___17th___ day of October, 2014, on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

                                        /s/Louis J. Freeh
                                        Louis J. Freeh