# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| STATE OF ALABAMA,<br>    *ex rel* Luther Strange, Attorney General,<br><br>    **Plaintiff**,<br><br>vs.<br><br>BP, PLC; BP EXPLORATION & PRODUCTION,<br>INC.; AND BP AMERICA PRODUCTION CO.,<br><br>    **Defendants.** | **CASE NO. 2:13-cv-00252**<br><br>**Jury Demand** |

## AMENDED COMPLAINT

### Complaint in Admiralty, Federal Statutory Law, and State Law

The State of Alabama, by and through its Attorney General, brings the following action against BP, PLC; BP Exploration & Production Company, Inc.; and BP America Production Company.

This Complaint duplicates claims that the State previously raised in this Court against the above-named Defendants, arising out of the same set of facts. As explained further *infra* at ¶¶ 18-23, the State re-pleads these claims in an abundance of caution, in response to Defendants' argument that the Court did not have jurisdiction over the State's original Complaint.

### NATURE OF ACTION

1. On April 20, 2010, a blowout, explosion, and multiple fires occurred aboard the mobile offshore drilling rig *Deepwater Horizon*, resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico ("the Spill") that has caused, is causing, and will

continue to cause, damage to the State of Alabama. This is an action for damages, penalties, and other relief by the State of Alabama ("the State") against parties known to be responsible for the Spill.

2.     The Defendants named in this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the Macondo well, the operation of the *Deepwater Horizon*, and the containment of the Spill.

3.     Defendants' actions resulted in the blowout of the Macondo well, caused the explosion, burning, and sinking of the *Deepwater Horizon* rig, and directly resulted in the release of crude oil and other pollutants into the waters of the Gulf of Mexico and of the State of Alabama. These pollutants have damaged, are damaging, and will continue to damage Alabama's coastal environment, communities, property, and economic livelihood. Businesses along Alabama's coast and throughout the State continue to suffer from the effects of the Spill, and the loss of tax revenues from these businesses has, is, and will continue to negatively impact the State.

4.     The image and attractiveness of Alabama's coastline and coastline communities for development, tourism, and other purposes have suffered, are suffering, and will continue to suffer because of the known impact of the Spill, as well as the uncertainty that will exist for years over the ongoing impact of the Spill on the Gulf of Mexico, the Gulf's natural resources, and Alabama's coastal resources and communities. This uncertainty will have lasting economic and other consequences that cannot be measured merely by estimating tax and revenue losses.

5.     The State, by and through its Attorney General, brings this enforcement action for a declaratory judgment, to recover the fines and penalties to which the State is entitled, as well as

for compensatory, punitive, and other damages, to the fullest extent allowed by Alabama and federal law.

6.      The State of Alabama reserves its rights to amend this Complaint by, among other things, adding new allegations, new claims, and new defendants.

## PARTIES, JURISDICTION, AND VENUE

### *Parties*

7.      Plaintiff is the State of Alabama, one of the sovereign States of the United States of America (referred to throughout as "Alabama" or the "State").

8.      The Attorney General, as chief law officer of the State of Alabama, is statutorily authorized to initiate and maintain this action. Ala. Code §§ 36-15-12, 36-15-21.

9.      Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS"[1]) allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714. BP Exploration is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010. It shall, however, be referred to as the MMS throughout this Complaint.

3

10. Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel. BP America is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

11. Defendant BP, PLC is a British public limited company with its corporate headquarters in London, England. BP, PLC is the global parent company of the worldwide business operating under the "BP" logo. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP, PLC. BP, PLC has accepted service of the Master Complaints filed in MDL 2179, and has acknowledged that it is subject to jurisdiction in the United States. BP, PLC does business in Alabama.

12. BP Exploration, BP America, and BP PLC are generally referred to herein collectively as "BP" or "Defendants." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

### *Jurisdiction*

13. The claims presented in sub-Section I of this Complaint are admiralty or maritime claims that arise under federal common law. Jurisdiction exists pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction." Jurisdiction also exists pursuant to the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United

States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

14.     The claims presented in sub-Section II invoke the Court's jurisdiction under the Oil Pollution Act of 1990 ("OPA").  *See* 33 U.S.C. § 2717 (b).

15.     The state-law claims presented in sub-Section III invoke the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

***Venue***

16.     Venue is proper in this District pursuant to 28 U.S.C.§ 1391(b).

17.     The State understands that this Complaint may be transferred by the United States Judicial Panel on Multi-District Litigation ("JPML") to the United States District Court for the Eastern District of Louisiana for coordinated or consolidated pretrial proceedings in MDL 2179. *See* 28 U.S.C. § 1407.   Should transfer occur, the State reserves the right to seek a remand of any and all issues and claims not resolved in the Transferee Court back to this Court for a jury trial, as discussed in more detail *infra* at ¶¶ 236-239.

**OPA PRESENTMENT and LITIGATION HISTORY**

***Litigation History***

18.     The State filed a complaint against Defendants in this Court on August 12, 2010. *See* Case No. 2:10-cv-690 ("Case 10-690").  That complaint was based on the same facts giving rise to this Complaint.  On the same date, the State filed a distinct complaint against several of Defendants' Macondo lease partners and contractors based on the same facts giving rise to this Complaint.  *See* Case No. 2:10-cv-691 ("Case 10-691").

19.     On November 4, 2010, the JPML transferred Cases 10-690 and 10-691 to the United States District Court for the Eastern District of Louisiana for consolidated pretrial proceedings in MDL 2179. On April 5, 2011, the State consolidated all of its claims in Cases No. 10-690 and 10-691 into one amended complaint for the ease of the MDL court's docket and the parties. In that amended complaint, the State reserved its right to a jury trial in this District upon remand from the MDL.

20.     The State avers that this Court had jurisdiction over Cases No. 10-690 and 10-691 when those cases were filed, and that this Court will regain jurisdiction and venue upon remand from the transferee court. The State further avers that Cases No. 10-690 and 10-691 are presently viable, distinct Complaints.

21.     The State files this original and distinct Complaint in response to Defendants' argument that the Courts do not have jurisdiction over Alabama's original complaint, Case No. 10-690, due to an alleged failure to comply with OPA's presentment requirement. *See* 33 U.S.C. §2713.

### *OPA Presentment*

22.     The United States Coast Guard designated BP as the responsible party for the Spill. *See* 33 U.S.C. § 2714. The State avers that it satisfied OPA's presentment requirement to BP before filing its original complaint against BP, Case No. 10-690.

23.     Notwithstanding its previous presentments, the State continued to submit supplemental claims to BP. On January 18, 2013, the State submitted to BP a substantiated, sum certain claim for economic and property damages associated with the Spill. Ninety days have elapsed from initial service of the State's sum certain claim, and BP has not responded to

the State's claim. Thus, Alabama has (again) satisfied OPA's presentment requirement to bring the claims alleged in Count II. *See* 33 U.S.C. § 2713.

## GENERAL ALLEGATIONS

### *The Macondo Lease, and BP's Exploration Plan and Drilling Permit*

24.      On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

25.      In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

26.      BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. In the event that a spill did occur, BP assured the MMS that it was prepared to respond. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

27.      Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

28.      After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

29.      On December 17, 2009, BP, MOEX Offshore, Andarko E&P, and Anadarko

7

executed an agreement that made Anadarko and MOEX (hereafter "Macondo lease partners") non-operational leaseholders.

### The Deepwater Horizon's Poor Safety and Maintenance Record

30.     The *Deepwater Horizon* was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean Offshore Deepwater Drilling, Inc. (hereinafter "Transocean" or "Macondo contractor") and put into service in February 2001.

31.     At all times relevant herein, the Deepwater *Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

32.     Prior to the Spill, BP had actual and/or constructive knowledge that BP's safety performance during offshore drilling operations was poor. BP also had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment.

### The Macondo Well

33.     The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep. BP knew or should have known that the threat

8

of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

34.     BP struggled with the Macondo well before the events of April 20, 2010. The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

35.     As the drilling schedule fell farther behind due to these and other problems, BP increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo in an effort to reduce costs. In order to reduce costs and save time on the behind-schedule and over-budget Macondo well, BP repeatedly chose to violate industry guidelines, safety practices and government regulations and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well.

### *Conduct Leading Up to the Explosion*

36.     By April 9, 2010, BP and Transocean had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In their rush to complete the well, BP made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

37.     BP chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

38.     BP knowingly used too few centralizers on one or more pieces of casing pipe, with the knowledge or acquiescence of other Defendants.

9

39. The float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

40. BP and its cementing contractor, Halliburton Energy Services, Inc. (hereinafter "Halliburton" or "Macondo contractor"), failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

41. BP and Halliburton knew that the cementing work the *Deepwater Horizon* was performing was especially risky. BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, BP and Halliburton made minimal efforts to contain the added risk. To save time and money, BP chose not to run a 9 to 12-hour procedure called a cement bond log to assess the integrity of the cement seal. BP also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

42. Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable. In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither BP nor Halliburton acted upon that data.

43. In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs. BP was aware of the risk of

BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. BP was also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon*.

44.     BP failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

45.     BP failed to ensure that the Deepwater *Horizon's* BOP had sufficient, functional, built-in redundancy to eliminate single-point failure modes.

46.     BP failed to ensure that all foreseeable repairs and foreseeable modifications to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

47.     BP failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

48.     BP could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*, but did not do so.

49.     BP could have installed a back-up acoustic trigger to activate the *Deepwater Horizon's* BOP in the event that the main trigger failed to activate.

50.     Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon*. In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches, and a balky propulsion system. In some

11

cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. These events contributed to the cause of the disaster, or made it worse.

51.     BP and its leasing partners were aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

52.     Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of BP's misconduct include:

    a.    Utilizing a defective well casing that was prone to fail when under heavy pressure;

    b.    Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

    c.    Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

    d.    Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf s crust;

    e.    Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

    f.    Failing to deploy a casing hanger lockdown sleeve;

    g.    Displacing mud in the well with less-dense seawater before cementing had fully set;

    h.    Using non-standard spacer fluid mixture and volume;

    i.    Continuing to operate the Macondo Well after the well failed pressure tests;

j.      Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

k.      Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

l.      Consciously electing not to install an acoustically activated remote-control shutoff valve;

m.      Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well;

n.      Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o.      Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

p.      Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well – for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q.      Failing to properly design, install, or maintain power supply to the blow-out preventer ("BOP"), including without limitation the use of only one blind shear ram, faulty maintenance, faulty post-market modifications, and other issues;

r.      Failing to properly design, install, or maintain connections from the blow-out preventer's control panel to the blow-out preventer;

s.      Failing to properly maintain and repair the BOP: Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems. In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and

t.      Failing to equip the vessel with sufficient safety equipment, including operational gas sensors and a gas alarm system.

53.     BP knew, or should have known, of the acts and omissions outlined above, and was negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

54.     In sum, BP knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel. Yet, they failed to take appropriate measures to prevent damage to the State of Alabama, its natural resources, and thousands of its citizens who are dependent upon the Gulf of Mexico and Alabama's coast to make a living.

### *Post-Explosion Conduct*

55.     BP's conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

56.     BP failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and BP misrepresented its capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations.

57.     BP attempted to downplay and conceal the severity of the oil spill after the explosion. BP's leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

58.     BP was also slow and incomplete in its announcements and warnings to Alabama's residents and businesspeople about the severity, forecast, and trajectory of the Spill.

59.     Furthermore, the chemical dispersants used by BP and other parties to accelerate the dispersal of the oil has significant side-effects as well. Corexit EC9500A and Corexit

EC9527A were the principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be <u>no</u> safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

60.     Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

61.     More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

62.     Oil, dispersants, and other pollutants released by BP remain in Gulf waters, the Gulf floor, Alabama waters, and land owned and/or within the jurisdiction of the State of Alabama, and continue to cause damage. Oil, dispersants, and other pollutants have settled into

the sediment on the Gulf floor and the bed underlying waters of Alabama, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water, land, property, and resources of Alabama.

## DAMAGES TO THE STATE OF ALABAMA

### *Environmental Damages*

63. The Spill has caused or contributed to, and will continue to cause or contribute to, injuries and damages to the State and its environment, wildlife, natural resources, economic resources, and residents.

64. The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine ecosystems and life.

65. Moreover, the chemical dispersants used during the Spill response are harmful to the health of humans and marine ecosystems and life.

66. As a direct result of the Spill, Alabama has suffered past, present, and future harm to, and contamination of, the State's waters, property estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources.

67. The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico, causing damage to the livelihoods of many Alabamians.

68. There are a wide variety of commercially valuable fish species and aquatic life in the Gulf of Mexico that have been and will continue to be harmed by the Spill. Sunken and dispersed oil continues to resurface and will continue to resurface, creating additional and continuous harm to marine ecosystems.

### *Economic Damages*

69. The Spill and the resulting contamination of the Alabama coastline have caused, are causing, and will continue to cause a loss of income for individuals and entities in Alabama, including those who rely on the Gulf of Mexico and/or its marine life for their livelihoods. This loss of income has, is, and will continue to result in a loss of revenue for the State, State programs, and those State entities that rely upon State revenues and budgeted financial support.

70. Moreover, Alabama has incurred, and continues to incur, a drop in Gulf-related tourism as a result of the Spill. This decrease in Alabama tourism has, is, and will continue to result in a loss of revenue for the State.

71. Alabama seeks both compensatory and punitive damages in this action. As discussed generally above, Alabama's compensatory damages include, but are not limited to, the following:

    a. Past, present, and future damages for harm to and contamination of waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources;

    b. Past, present, and future damages for physical injury to and destruction of State resources and property (both real and personal), located in or around the Gulf of Mexico and adjoining waters and estuaries, including but not limited to, Dauphin

Island, the Port of Mobile, Weeks Bay, Gulf State Park, and the beaches of Baldwin and Mobile Counties;

c.     Past, present, and future economic losses resulting from injury to or destruction of State property;

d.     Past, present, and future lost State revenues from taxes, royalties, rents, fees, licenses, or net profit shares;

e.     Past, present, and future costs expended by the State to assess, monitor, abate, remediate, remove, and /or clean contaminated State waters, land, and property;

f.     Past, present, and future costs expended by the State for providing increased or additional public services to address the oil disaster and protect human health and the environment;

g.     Past, present, and future damages associated with the long-term stigma of the oil disaster, including the loss of use of State property, taxes, royalties, license fees, revenues, and other income;

h.     Past, present, and future lost revenue and human-use opportunities associated with various natural resources in the Gulf region, including but not limited to fishing, swimming, beach-going, and viewing of birds and wildlife;

i.     Past, present, and future costs expended by the State for unemployment compensation claims or workers compensation claims related to Spill;

j.     Passive use losses as measured by contingent valuation methods;

k.     Damages in the form of attorneys' fees associated with, and as a direct consequence of, the Spill; and,

l.     The total cost of any and all assessments of damage incurred by the State as a result of the Spill.

72.    This list is by no means exhaustive. There are many other forms of harm or damage from the Spill that may be unknown, and the State reserves the right to amend this Complaint as additional information becomes available. *See infra* at ¶ 239.

# CAUSES OF ACTION

## I.    Claims Under General Maritime Law

### A. *Negligence*

73.    The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

74.    At all times material hereto, BP was participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

75.    At all times material hereto, BP owed and breached duties of ordinary and reasonable care to the State in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to the State to guard against and/or prevent the risk of an oil spill.

76.    The existence and breach of these legal duties are established under the general maritime law (and state law as pleaded in Count III).

77.    The blowout and explosions on the *Deepwater Horizon*, its sinking, and the resulting Spill were caused by the joint and concurrent negligence of BP, its Macondo lease partners, and its Macondo contractors, which renders them jointly, severally, and solidarily liable to the State.

78.    BP knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to the State and its marine and coastal environments and estuarine areas.

79.    BP was under a duty to exercise reasonable care while participating in drilling operations on the *Deepwater Horizon* to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

80.     BP was under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained, captured and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner

81.     BP knew or should have known that the acts and omissions described herein could result in damage to the State.

82.     BP and its Macondo lease partners and contractors, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties they owed to the State.

83.     BP's conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit the State. BP violated one or more of these statutory standards. The violations of these statutory standards constitute negligence per se under general maritime law (and Alabama law as pleaded in Count III).

84.     BP also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

85.    At all times material hereto, the *Deepwater Horizon* was leased and operated pursuant to a contract between BP and Transocean. Together, BP and Transocean were responsible for well design and control.

86.    BP owed duties to the State to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

87.    BP breached its duties to the State by, *inter alia*:

a. choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

b. using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

c. using too few centralizers to ensure that the casing was centered into the wellbore;

d. failing to implement a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

e. failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

f. cancelling the cement bond log test that would have determined the integrity of the cement job;

g. failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

h. using an abnormally large quantity of mixed and untested spacer fluid;

i. failing to train drilling vessel workers and/or onshore employees and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon; and,

      j.   requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore.

88.    All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to the State's injuries and damages.

89.    Engineers knowledgeable about blowout responses told BP how to kill the well days after the blowout. But, after conferring with its Macondo lease partners, BP chose to ignore the engineers' well-kill procedure.

90.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by the State were caused by the acts and/or omissions of BP that are beyond proof by the State, but which were within the knowledge and control of BP, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had BP, its lease partners, and its contractors satisfied the duty of care imposed on them, and the State, therefore, pleads the doctrine of *res ipsa loquitur*.

91.    In addition to the foregoing acts of negligence, the State avers that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of BP, its lease partners, and it contractors in the following non-exclusive particulars:

      a.   Failing to properly operate the *Deepwater Horizon*;

      b.   Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

      c.   Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;

      d.   Acting in a careless and negligent manner without due regard for the safety of others;

      e.   Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so

promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

f.  Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

g.  Negligently hiring, retaining and/or training personnel;

h.  Accelerating drilling operations in an effort to save money and pressuring employees to work with undue haste in the hours before the blowout, while ignoring or failing to acknowledge the warning signs of the impending disaster;

i.  Failing to take appropriate action to avoid or mitigate the accident;

j.  Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

k.  Failing to observe dangerous and recurring problems with hydrocarbons in the well, and instituting risky cementing and drilling procedures hours before the blowout;

l.  Failing to disclose or correct the fact that the battery on the BOP was weak and one of its control pods was broken;

m.  Consciously electing not to install an acoustically activated remote-control shutoff valve;

n.  Failing to institute common industry protective measures necessary to detect the buildup of hydrocarbons in the well before and during the cementing process;

o.  Using a defective well casing that was prone to failure under heavy pressure;

p.  Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

q.  Failing to warn in a timely manner;

r.  Failing to timely bring the oil release under control;

s.  Failing to provide appropriate accident prevention equipment;

t.  Failing to observe and read gauges that would have indicated excessive pressures in the well;

u.  Failing to react to danger signs; and,

v.  Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

23

92.     The State is entitled to a judgment finding BP, its Macondo lease partners, and its Macondo contractors liable, jointly, severally, and solidarily to the State for damages suffered as a result of their negligence and awarding the State adequate compensation in amounts determined by the trier of fact.

93.     The injuries to the State were also caused by and/or aggravated by the fact that BP failed to take necessary actions to mitigate the danger associated with its operations.

94.     As a direct and proximate result of BP's acts and/or omissions, the State has incurred damages, including, but not limited to, the following:

a.  Past, present, and future damages for harm to, and contamination of, waters properties, estuaries, sea beds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources;

b.  Past, present, and future damages for physical injury to, and destruction of, State resources and property (both real and personal) located in and around the Gulf of Mexico and adjoining waters and estuaries, including, but not limited to, Dauphin Island, the Port of Mobile, Weeks Bay, Gulf State Park, and the beaches of Baldwin and Mobile Counties;

c.  Past, present, and future economic losses resulting from injury to, or destruction of, State property;

d.  Past, present, and future lost State revenues from taxes, royalties, rents, fees, licenses, or net profit shares;

e.  Past, present, and future costs expended by the State to assess, monitor, abate, remediate, and/or clean contaminated State waters, land, and property;

f.  Past, present, and future costs expended by the State for providing increased or additional public services to address the oil disaster and protect human health and the environment;

g.  Past, present, and future damages associated with the long-term stigma of the oil disaster, including the loss of use of State property, taxes, revenues, and other income;

h.  Past, present, and future lost revenue and human-use opportunities associated with various natural resources in the Gulf region, including but not limited to fishing, swimming, beach-going, and viewing of birds and wildlife;

i.  Past, present, and future costs expended by the State for unemployment compensation claims or workers compensation claims related to the oil disaster;

j.  Passive use losses as measured by contingent valuation methods; and,

k.  All other damages or relief to which the State is entitled when additional information regarding the full extent of the State's damages becomes available.

**B. *Gross Negligence and Willful Misconduct***

95.  The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

96.  BP owed and breached duties of ordinary and reasonable care to the State in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to the State to guard against and/or prevent the risk of the Spill. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

97.  BP breached its legal duty to the State and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the *Deepwater Horizon*.

98.  BP knew or should have known that its wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

99.  BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the State by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding

25

proper drilling, casing, mudding, and cementing procedures; failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

100. BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the State by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

101. BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the State by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

102. BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the State by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon*.

103. BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the State by failing to have an adeqaute plan to cap and contain oil flowing from the Macondo well in the event of a blowout.

104. Engineers knowledgeable about blowout responses told BP how to kill the well days after the blowout. But, after conferring with its Macondo lease partners, BP chose to

26

ignore the engineers' well-kill procedure. This reckless disregard of the experts' opinions amounts to gross negligence.

105. The foregoing acts of gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment on the part of the BP directly and proximately caused damage to the State, including, but not limited to, damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with oil spill response actions, for all of which the State is entitled to compensatory and punitive damages.

## II. **The Oil Pollution Act**

106. The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

107. The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

108. The Coast Guard has named BP as the responsible party for the downhole release of oil. As the Responsible Party, BP is strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

109. BP is not entitled to limit its liability under Section 2704(a) of the OPA because the Spill was proximately caused by gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c). Moreover, BP has waived any right it may have to raise a statutory damage cap defense under OPA.

110.     In its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

111.     Pursuant to Section 2702(b)(1) of the OPA, the State is entitled to all removal costs it has incurred, or will incur, as a result of the Spill.

112.     The State is entitled to damages pursuant to 2702(b)(2)(A), which provides for recovery of damages "for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by . . . . State trustee."

113.     The State is also entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or personal property, including "damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the dimunition in the value of their property."

114.     The State is also entitled to damages pursuant to Section 2702(b)(2)(D) "equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources..."

115.     The State is further entitled to damages pursuant to Section 2702(b)(2)(F) "for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by" the Spill.

116.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. § 2717(f)(2), the State seeks a declaratory judgment that is binding in this action and any subsequent action or actions against BP, its lease partners, and its contractors, that they are

liable jointly and severally and without limitation, and that they are liable for removal costs and damages in this action and in any subsequent action or actions.

117.     The State further seeks all damages available to it pursuant to the OPA.

### III. State Law Claims For Relief

#### A. *Public Nuisance*

118.     The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

119.     BP's negligence caused and/or contributed to the blowout and subsequent Spill that invaded and polluted the public waters of the State, damaging all persons who came within the sphere of its operation, resulting in a devastating economic and ecological disaster that has interfered, is interfering, and will continue to interfere with the State's interests and the use and enjoyment of the State's waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the State of Alabama, which constitutes a public nuisance pursuant to Ala Code § 6-5-120, *et. seq.* and/or common law.

120.     BP acted in an unreasonable manner in creating the nuisance described herein. As a direct and proximate result of the creation and continuing creation of a public nuisance, the State and its citizens have suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, loss of revenue for the State, and a substantial increase in expenditures by the State to combat, abate, and remedy the effects of the nuisance caused by BP.

121.     BP was under a duty to take positive action to prevent or abate the interference, including determining the nature and extent of the past, present, and future harm to human, animal, and plant life, and other natural resources caused by the Spill, and appropriate measures needed to abate such harm and threat of harm to the State and its citizens, but failed to do so.

122.     As a direct and proximate result of the creation of a public nuisance by BP, and BP's failure to perform its duties and obligations, the State has suffered and will continue to suffer losses to pay for services to protect the public health and the environment on behalf of its citizens, for which the State is entitled to be compensated.

123.     BP, its Macondo lease partners, and its Macondo contractors are liable to the State, jointly and severally, to take all appropriate actions to remedy and abate the harm to the environment and public health caused by the public nuisance they created, and any other relief the Court deems just and appropriate.

### B. *Private Nuisance*

124.     The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

125.     BP's negligence caused and/or contributed to the blowout and subsequent Spill which directly and proximately caused an invasion that has interfered with the use and enjoyment of the waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the State of Alabama, and have materially diminished and continue to diminish the value thereof, constituting a private nuisance pursuant to Ala. Code § 6-5-120, *et. seq.* and/or state common law.

30

126.     BP was under a duty to take positive action to prevent or abate the interference, but failed to do so.

127.     BP's creation of the private nuisance proximately caused past, present, and future damages to the State by allowing oil, chemical dispersants, and other materials and substances to contaminate State property.

128.     As a direct and proximate result of the creation of the private nuisance, the State has suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, loss of tax base, loss of beneficial use, enjoyment, and exclusive possession of State property, and diminished value of State properties, for which the State is entitled to compensation.

129.     BP is liable to the State for actual and compensatory damages sustained as the direct and proximate result of the private nuisance alleged herein.

**C. Trespass**

130.     The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

131.     BP discharged a foreign polluting substance beyond the boundary of the State's property, which BP knew to a substantial certainty would, in due course, invade and intrude upon the State's property, interfering with the State's exclusive possessory rights and causing damage to the waters, property estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshland and other natural and economic resources of the State, materially diminishing the value thereof.

132.     The invasion and resulting damage to the State was reasonably foreseeable by BP when, owing to its gross negligence, willful, wanton and reckless indifference for the rights of

others, BP intentionally and outrageously failed to exercise reasonable care in the design, execution, and operation of the Macondo well and the manufacture, maintenance, and operation of the *Deepwater Horizon* and its appurtenances and equipment, which conduct resulted in the entry, intrusion, or invasion on the State's property.

133.　This deliberate invasion and contamination of the property owned by the State constitutes a trespass in violation of Alabama law and/or common law.

134.　As a direct and proximate result of their unauthorized invasion, entry and contamination, BP has caused and continues to cause damage to the State, including property damage, loss of income, the creation of conditions harmful to human health and the environment, loss of exclusive possession of property, loss of tax revenue, and diminished value of State property, for which BP is liable in damages.

135.　The intentional outrageous, malicious, oppressive, grossly negligent, willful, reckless, fraudulent, and wanton conduct of BP, as described herein, entitles the State to compensatory and punitive damages.

### D. *Fraudulent Concealment or Suppression of Material Facts*

136.　The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

137.　The State is entitled to recovery against Defendants for their fraudulent concealment or suppression of material facts concerning the Spill under Alabama law, general maritime law, and/or common law

138.　After the Spill, BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

139.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

140.    In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

141.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

142.    In fact, BP did not have proven equipment and technology to respond to the Spill; and had spent no money researching or fabricating any spill-response equipment.

143.    Despite its inability to respond and to control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

144.    The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

145.    Moreover, BP was aware, before the blowout, that Halliburton's cement testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

146.    BP failed to disclose, suppressed and/or concealed the foregoing material facts, and its failure to do so induced the State to act or to refrain from acting to protect its property, the environment, economy of the State, businesses, livelihoods, and income.

33

147.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by BP, the State has and will continue incur damage, including, but not limited to, damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with Spill response actions.

148.    Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the State is entitled to an award of compensatory and punitive damages.

### E. *Civil Penalties under the Alabama Environmental Management Act*

149.    The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

150.    The Alabama Environmental Management Act ("AEMA"), ALA. CODE §§ 22-22A-1 to -16, was enacted to provide a process for managing "the resources of the state . . . in a manner compatible with the environment, and the health and welfare of the citizens of the state." ALA. CODE § 22-22A-1. It grants the Alabama Department of Environmental Management ("ADEM") the duty and authority to regulate Alabama's air, land, and water resources and to protect the unique characteristics of Alabama's coastal region. ALA. CODE § 22-22A-2.

151.    Section 22-22A-5 authorizes the Attorney General to commence a civil action against any person to recover civil penalties for violations of the Alabama Water Pollution Control Act ("AWPCA"), the Alabama Air Pollution Control Act ("AAPCA"), the Alabama Hazardous Wastes Management Act ("AHWMA"), and the Alabama Solid Waste Disposal Act ("ASWDA"), among other statutory provisions, and any rule, regulation, or standard promulgated under those provisions.

152.   BP is a "person" within the meaning of the AEMA.

153.   The AEMA further authorizes, when the person in violation is a corporation and the violation is of the AWPCA or any rule, regulation, or standard promulgated thereunder, that the same civil penalties imposed upon the corporation may also be imposed on the responsible corporate officers.

154.   As alleged herein, BP has committed multiple, separate, and ongoing violations of the AWPCA, the AAPCA, the AHWMA, and the ASWDA, and the rules, regulations, and standards promulgated under those provisions.

155.   BP is liable to the State of Alabama for civil penalties of up to $25,000 for each and every violation of the AWPCA, the AAPCA, the AHWMA, and the ASWDA, and the rules, regulations, and standards promulgated under those provisions. Each day a violation continues constitutes a separate violation under the AEMA.

156.   Further, each and every one of BP's responsible corporate officers is liable for the same civil penalties as the Defendants for each and every violation of the AWPCA and its rules, regulations, and standards. but the State reserves the right to amend this Complaint as appropriate. Furthermore, the corporations are themselves liable for the fines and penalties imposed on the responsible corporate officers.

**F.   *Civil Penalties for Violations of the Alabama Water Pollution Control Act***

157.   The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

158.   The purpose of the AWPCA, ALA. CODE §§ 22-22-1 to -14, is "to conserve the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, for the propagation of wildlife, fish and aquatic life and for domestic, agricultural,

industrial, recreational and other legitimate beneficial uses [and] to provide for the prevention, abatement and control of new or existing water pollution." ALA. CODE § 22-22-2.

159.    Under the AWPCA and its implementing regulations, waters of the State include all waters of any river, stream, watercourse, pond, lake, coastal, ground or surface water, wholly or partially with the state, natural or artificial. ALA. CODE § 22-22-1(b)(2); ALA. ADMIN. CODE § 335-6-6-.02(ddd).

160.    The following water body segments are separate and distinct coastal waters of state for purposes of the AWPCA and its rules, regulations, and standards:

> (a)    Mobile River and all other rivers, creeks, lakes of the Mobile River Delta and their tributaries except as otherwise designated;
>
> (b)    Mobile River from its mouth to the Spanish River;
>
> (c)    Mobile Bay from west of a line drawn due south from the western shore of Chacaloochee Bay (Lat. 304047.3/Long. 0875944.2) to a point due east of the mouth of Dog River (Lat. 303353.2/Long. 0880515.3);
>
> (d)    Mobile Bay South of a line drawn due east from the mouth of Dog River (Lat. 303353.2/ Long. 0880515.3) and east of a line drawn due south from the western shore of Chacaloochee Bay (Lat. 304047.3/ Long. 0875944.2) and all other portions of Mobile Bay;
>
> (e)    Mobile Bay from all that portion lying south of a line extending in an easterly direction from the south bank of East Fowl River at its mouth (Lat. 302703.1/ Long. 0880622.6) through lighted beacon (FL 2 seconds) (Lat. 302707.5/ Long. 0880539.3) to lighted beacon (FLG 4 seconds "23") (Lat. 302718.3/ Long. 0880058.3) at the Mobile Ship Channel thence in a northeasterly direction to Daphne (Bench Mark 157, Lat. 303607.5/ Long. 0875416.4);
>
> (f)    Bon Secour Bay in its entirety (east and south of a line connecting Mullet Point, Lat. 302435.0/ Long. 0875423.2, and Engineers Point, Lat. 301350.1/ Long. 0880126.2, at Fort Morgan);
>
> (g)    Mississippi Sound and contiguous waters excepting: that portion of Portersville Bay 1,000 feet on each side of a straight line connecting the shore at Bayou Coden to a lighted beacon (FLR 4 seconds "6") (Lat. 302231.2/ Long. 0881425.8) and lighted beacon (FL 4 seconds "1") (Lat.

302223.7/ Long. 0881434.8); that portion of Portersville Bay 1,000 feet on each side of a straight line connecting the shore at Bayou La Batre and lighted beacons (FR) (Lat. 302311.0/ Long. 0881609.6), and (FLR 4 seconds "6") (Lat. 302105.2/1 Long. 0881702.2); and that portion of Bayou Aloe within 1,000 feet of the outfall (Lat. 301552.0/ Long. 0880702.1) of the Dauphin Island sewage treatment plant;

(h)     Waters excepted in the foregoing description of Portersville Bay and contiguous waters;

(i)     Oyster Bay and that portion of Bon Secour River west of a line drawn due north from the east bank of the inlet connecting Oyster Bay and Bon Secour River;

(j)     Coastal waters of the Gulf of Mexico contiguous to the State of Alabama;

(k)     Intracoastal Waterway from Bon Secour Bay to Alabama Highway;

(l)     Bon Secour River from Bon Secour Bay to one mile upstream from first bridge above its mouth;

(m)     Weeks Bay from Bon Secour Bay to Fish River;

(n)     Magnolia River from Weeks Bay to its source;

(o)     Fish River from Weeks Bay to Clay City;

(p)     Point Clear Creek from Mobile Bay to its source;

(q)     Fly Creek from Mobile Bay to its source;

(r)     Rock Creek from Mobile Bay to its source;

(s)     D'Olive Creek from D'Olive Bay to its source;

(t)     West Fowl River from Fowl River Bay to its source;

(u)     Bayou Coden from Portersville Bay to its source;

(v)     Bayou La Batre from Portersville Bay to its source;

(w)     Little River from Portersville Bay to its source;

(x)     Fowl River from Mobile Bay to its source;

(y)     Deer River and its forks from Mobile Bay to their sources;

(z)     Dog River from Mobile Bay to Halls Mill Creek;

(aa)    Little Lagoon (Baldwin County) in its entirety;

(bb)    Chickasaw Creek from limit of tidal effects to Mobile College;

(cc)    Perdido Bay and all connecting coves and bayous from the Gulf of Mexico to its source;

(dd)    Intracoastal Waterway from Alabama Highway 59 to Wolf Bay;

(ee)    Wolf Bay and all connecting coves and bayous from Intracoastal Waterway to Moccasin Bayou;

(ff)    Wolf Bay and all connecting coves and bayous from Moccasin Bayou to its source;

(gg)    Bay La Launch and all connecting coves and bayous from Wolf Bay to Arnica Bay;

(hh)    Arnica Bay and all connecting coves and bayous from Bay La Launch to Perdido Bay;

(ii)    Miflin Creek from Wolf Bay to limit of tidal effects;

(jj)    Hammock Creek from Wolf Bay to limit of tidal effects;

(kk)    Palmetto Creek from Perdido Bay to its source;

(ll)    Spring Branch from Perdido Bay to its source;

(mm)    Soldier Creek from Perdido Bay to its source;

(nn)    Perdido River from Perdido Bay to its source;

(oo)    Wolf Creek from Wolf Bay to its source;

(pp)    Sandy Creek from Wolf Bay to its source;

(qq)    Miflin Creek from limit of tidal effects to its source.

161.    Section 22-22-9(i)(3) of the AWPCA provides that "[e]very person, prior to discharging any new or increased pollution into any waters of this state, shall apply to the

38

commission in writing for a permit and must obtain such permit before discharging such pollution."

162.     Regulations promulgated under the AWPCA provide that "[n]o person shall discharge pollutants into waters of the state without first having obtained a valid NPDES permit or coverage under a valid General NPDES Permit. . . ." ALA. ADMIN. CODE r. 335-6-6-.03(1).

163.     The oil, dispersants, and other substances that BP caused to be discharged, as alleged herein, are pollutants under the AWPCA, and those pollutants were discharged by BP, and continue to be discharged, into each of the waters of the State set forth above and other such waters of the State as shall be determined. Such discharges resulted in new and increased pollution in each of the waters of the State enumerated above and others multiple times each day beginning on April 20, 2010, and continuing to the present.

164.     Defendants failed to obtain a valid NPDES permit or coverage under a valid General NPDES Permit prior to discharging pollutants, including oil, dispersants, and other substances into these waters of the State.

165.     Each and every time that a discharge of oil, dispersants, or other pollutants from the Macondo Well and/or Defendants' actions resulted in new or increased pollution in a water of the State, as set out above, constitutes a separate violation of Section 22-22-9(i)(3) of the AWPCA and ALA. ADMIN. CODE r. 335-6-6-.03(1) as to each such water body. Each day that each violation continues constitutes a separate and additional violation. For each such violation, and for each day that each such violation continues, BP is liable to the State of Alabama for a civil penalty of up to $25,000, and each responsible corporate officer of Defendants (and the corporation on their behalf) is liable for the same civil penalty.

166.    Section 22-22-9(i)(4) of the AWPCA provides that "[a]ny and all pollution" is a public nuisance.

167.    Each and every time that a discharge of oil, dispersants, or other pollutants from the Macondo Well and/or BP's actions resulted in new or increased pollution in a water of the State, as set out above, it created a public nuisance and constitutes a separate violation of Section 22-22-9(i)(4) of the AWPCA. Each day that each violation continues constitutes a separate and additional violation. For each such violation, and for each day that each such violation continues, BP is liable to the State of Alabama for a civil penalty of up to $25,000, and each responsible corporate officer of BP (and the corporation on their behalf) is liable for the same civil penalty.

168.    Regulations promulgated under the AWPCA establish minimum standards applicable "to all State waters, at all places and at all times, regardless of their use:"

> (a)    State waters shall be free from substances attributable to sewage, industrial wastes or other wastes that will settle to form bottom deposits which are unsightly, putrescent or interfere directly or indirectly with any classified water use.
>
> (b)    State waters shall be free from floating debris, oil, scum, and other floating materials attributable to sewage, industrial wastes or other wastes in amounts sufficient to be unsightly or interfere directly or indirectly with any classified water use.
>
> (c)    State waters shall be free from substances attributable to sewage, industrial wastes or other wastes in concentrations or combinations which are toxic or harmful to human, animal or aquatic life to the extent commensurate with the designated usage of such waters.

ALA. ADMIN. CODE r. 335-10-.06(a), (b) and (c).

169.    Each and every time that a discharge of oil, dispersants, or other pollutants from the Macondo Well and/or BP's actions resulted in new or increased pollution in a water of the State, as set out above, it violated each of these minimum standards and constitutes a separate

40

violation of ALA. ADMIN. CODE § 335-10-.06(a), (b) and (c). Each day that each violation continues constitutes a separate and additional violation. For each such violation, and for each day that each such violation continues, BP is liable to the State of Alabama for a civil penalty of up to $25,000, and each responsible corporate officer of BP (and the corporation on their behalf) is liable for the same civil penalty.

### G. Damages under the Alabama Water Pollution Control Act

170.    The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

171.    Section 22-22-9(m) of the AWPCA makes BP liable for, and authorizes the Attorney General to commence a civil action to recover, "damages for pollution of the waters of the state, including, but not limited to, any reasonable costs to prevent, minimize or clean up any damage resulting from pollution resulting from the wrongful act, omission or negligence of a person." BP is liable for both punitive and compensatory damages when the pollution resulted from intentional willful or wanton conduct. The Attorney General may recover compensatory damages when the pollution is caused by a negligent act or omission. BP is further liable for the costs incurred by ADEM or any agency in investigating the pollution.

172.    The oil, pollutants, dispersants, and other substances that Defendants caused to be discharged into the Gulf are pollutants under the AWPCA, and those pollutants were discharged into waters of the State.

173.    BP consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the State and its citizens.

174.    Section 22-22-9(n) provides that any person who violates the AWPCA and in doing so, causes the death of fish or other wildlife, is liable for damages necessary to restock the

waters or to replenish such wildlife. These damages are in addition to those set out in 22-22A-5(18) (the AEMA) and in 22-22-9(m). *Id.* Punitive damages are also recoverable under this section. If damages exceed $5,000, as in this case, "the damage shall be presumed to have been the direct and proximate result of negligence of the person shown to be responsible for such pollution." ALA. CODE § 22-22-9(n).

175.    BP's discharges of oil, dispersants, and other substances into the Gulf and waters of the State are violations of the AWPCA and have caused and will continue to cause the death of fish and other wildlife. BP is liable to the State for: 1) reasonable costs to prevent, minimize, or clean up any damage resulting from Defendants' pollution; 2) punitive damages; and 3) damages necessary to restock the waters and to replenish the fish and wildlife that has been killed or will be killed, in amounts to be determined by a jury.

**H. *Civil Penalties under the Alabama Air Pollution Control Act***

176.    The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

177.    The purpose of the AAPCA, ALA. CODE §§ 22-28-1 to -23, is to "protect human health and safety and, to the greatest degree practicable, prevent injury to plant and animal life and property, foster the comfort and convenience of the people, promote the social development of this state and facilitate the enjoyment of the natural attractions of this state." ALA. CODE § 22-28-3(a).

178.    Section 22-28-14 of the AAPCA authorizes the Alabama Environmental Management Commission to adopt regulations to promote the purposes of the Act. Alabama has adopted such regulations. *See* ALA. ADMIN. CODE §§ 335-3-1 to -20.

179.    Section 335-3-1-.08 of Alabama's air regulations promulgated under the AAPCA

provides that:

> No person shall permit or cause air pollution, as defined in Rule
> 335-3-1-.02(1)(e) of this Chapter by the discharge of any air
> contaminant for which no ambient air quality standards have been
> set under Rule 335-3-1-.03(1).

180.    "Air Pollution" means "the presence in the outdoor atmosphere of one or more air

contaminants in such quantities and duration as are, or tend to be, injurious to human health or

welfare, animal or plant life, or property, or would interfere with the enjoyment of life or

property . . ." *Id.* §§ 335-3-1-.02(1)(e). "Air Contaminant" means "any solid, liquid, or gaseous

matter, any odor, or any combination thereof, from whatever source." *Id.* § 335-3-1-.02(1)(d).

"Odor" means "smells or aromas which are unpleasant to persons or which tend to lessen human

food and water intake, interfere with sleep, upset appetite, produce irritation of the upper

respiratory tract, or cause symptoms of nausea, or which by their inherent chemical or physical

nature or method or processing are, or may be, detrimental or dangerous to health. Odor and

smell are used interchangeably herein." *Id.* § 335-3-1-.02(1)(ss).

181.    The AEMA provides that a civil penalty of up to $25,000 may be recovered by

the Attorney General for each violation of the AAPCA and that each day such violation

continues shall constitute a separate violation. ALA. CODE § 22-22A-5(18)(c).

182.    BP's discharge of oil and other substances into the waters and onto the lands of

the State, plus the in situ burning of the oil, has resulted in the presence of one or more

contaminants, including odors, in the outdoor atmosphere which are injurious to human health

and welfare, interfere with the enjoyment of life and property, are unpleasant to persons, and

tend to upset appetite. Accordingly, BP is causing air pollution in violation ALA. ADMIN. CODE § 335-3-1-.08.

183.   BP is liable to the State for a civil penalty of up to $25,000 for each violation of the AAPCA and its regulations and an additional penalty of up to $25,000 for each day that each such violation continues.

### I. Civil Penalties under the Alabama Hazardous Wastes Management Act

184.   The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

185.   The AHWMA, ALA. CODE §§ 22-30-1 to -24, was enacted because "the generation and management of hazardous waste is a continuing problem . . . that without adequate safeguards, the generation, transportation, treatment, storage and disposal of such wastes can create conditions which threaten human health or the environment." ALA. CODE § 2230-2.

186.   The AHWMA states that "no person shall engage in the . . . disposal of hazardous waste without having applied for and obtained a permit from [ADEM] issued under the authority of this section." ALA. CODE § 22-30-12(b).

187.   "Disposal" is defined as "[t]he discharge, deposit, injection, dumping, spilling, leaking or placing of any hazardous waste into or on any land or water so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters." ALA. CODE § 22-30-3(4).

188.   Some or all of the chemical dispersants used by BP in its attempts to remediate the oil spill disaster constitute hazardous waste under the AHWMA. BP has disposed of such hazardous waste into and on the land and water of the State in violation of the AHWMA.

44

189.    The AHWMA provides that "[a]ny person who intentionally, knowingly, recklessly or with criminal negligence . . . disposes of any hazardous waste identified or listed under this chapter without having obtained a permit or interim status therefor under this chapter ... [or] violates any provision of this chapter, any rule or regulation promulgated by the department, any provision of any permit issued by the department or any provision of any order issued under this chapter shall, upon conviction, be subject to a term of imprisonment of not more than 10 years nor less than one year and one day and in addition, may be fined not more than $50,000.00 for each violation; provided that if the conviction is for a violation committed after a first conviction of such person, under this chapter, such person shall be subject to a term of imprisonment of not more than 20 years nor less than two years and in addition, may be fined not more than $100,000.00 for each violation. Each day such violation continues shall constitute a separate violation for purposes of this subsection." ALA. CODE § 22-30-19(e).

190.    BP is liable to the State for a civil penalty of up to $50,000 for each violation of the AHWMA and its regulations and an additional penalty of up to $50,000 for each day that each such violation continues.

**J. *Civil Penalties under the Alabama Solid Waste Disposal Act***

191.    The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

192.    The Alabama Solid Waste Disposal Act ("ASWDA"), ALA. CODE §§ 22-27-1 to -18, prohibits the formation of unauthorized dumps, defined as "[a]ny collection of solid wastes either dumped or caused to be dumped or placed on any public or private property, whether or not regularly used, and not having a permit from the department." ALA. CODE § 22-27-2(36).

193.    The ASWDA provides that any person violating the ASWDA shall be guilty of a misdemeanor and upon conviction, shall be fined not less than $50.00 nor more than $200.00. "[I]f the violation or failure or refusal to obey or comply with such provision of this article or such rule or regulation is a continuing one, each day's violation shall constitute a separate offense and shall be punished accordingly." ALA. CODE § 22-27-7.

194.    BP's dumping of oil, in the form of tar balls and in other forms, and of dispersants, on lands and waters of the State is a violation of the ASWDA. BP is liable to the State for a civil penalty of up to $200 for each violation of the ASWDA and its regulations and an additional penalty of up to $200 for each day that each such violation continues.

### K. *Negligence*

195.    The State incorporates and re-alleges each and every allegation set forth above herein by reference.

196.    BP owed a duty to the State to exercise reasonable care with respect to the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and Macondo Well; with respect to the disaster's containment and prevention planning prior to the disaster; and with respect to the containment and prevention efforts following the initial oil disaster.

197.    BP had a heightened duty of care to the State because of the great danger and environmental concerns associated with deepwater drilling for oil in the Gulf.

198.    BP, directly or through agents, breached their legal duties to the State by failing to exercise reasonable care and were negligent in their construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in

planning and implementing oil containment and prevention activities before and after the oil disaster.

199. Upon information and belief, the State avers that the fire, explosion, resulting oil disaster, and damages were caused by BP's negligence in the following non-exclusive particulars:

a. Failing to properly operate the *Deepwater Horizon* and Macondo Well;

b. Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

c. Failing to properly inspect the *Deepwater Horizon* and Macondo Well to assure that its equipment and personnel were fit for their intended purposes;

d. Acting in a careless and negligent manner without due regard for the safety of others;

e. Failing to promulgate, implement, follow, and enforce procedures, rules, and regulations pertaining to the safe operations of the *Deepwater Horizon* and Macondo Well which, if they had been so promulgated, implemented, followed, and enforced, would have averted the fire, explosion, sinking and oil disaster;

f. Operating the *Deepwater Horizon* and Macondo Well with untrained and/or unlicensed personnel;

g. Inadequately and negligently training and/or hiring personnel;

h. Failing to take appropriate action to avoid and/or mitigate the accident;

i. Negligently implementing policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

j. Failing to ascertain that the *Deepwater Horizon* and Macondo Well and associated equipment were free from defects and/or in proper working order;

k. Failing to take reasonable precautions to prevent and timely warn of the failure of the Macondo Well or drilling rig;

l. Failing to timely bring the oil release under control;

47

m.   Failing to provide appropriate accident prevention equipment;

n.   Failing to undertake required tests and measurements of the Macondo Well and to observe or respond to measuring devices that indicated excessive pressures in the Macondo Well;

o.   Failing to react to danger signs of catastrophic Macondo Well or drilling rig failure;

p.   Using defective BOPs that were improperly installed, maintained, and/or operated;

q.   Conducting well and well cap cementing operations improperly;

r.   Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

s.   Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons;

t.   Failing to prepare an adequate oil disaster response plan;

u.   Failing to marshal sufficient resources to adequately respond to the oil disaster and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the State of Alabama;

v.   Failing to use BOPs appropriate for this drilling operation, and failure to test the BOPs that were used;

w.   Failing to follow plans and specifications applicable to the design and construction of the Macondo Well and its components;

x.   Failing to use safety devices adequate to arrest the flow of oil in the event of catastrophic failure of the Macondo Well or drilling rig;

y.   Failing to properly design the *Deepwater Horizon* and Macondo Well;

z.   Concealing or misrepresenting the nature, size and extent of the oil disaster;

aa.   Using dangerous chemical dispersants of an incorrect nature, type, and amount;

bb.   Acting in a manner that justifies imposition of punitive damages;

cc.   The knowing use of dangerous dispersants; and

dd. Such other acts of negligence and omissions as will be shown at the trial of this matter.

200. BP was also negligent in its attempts and omissions in trying to plug the Macondo Well, contain the oil, and clean-up the oil disaster on Alabama's waters and shores.

201. BP knew or should have known that its negligent conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, tax base, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the State of Alabama.

202. The past, present, and future injuries to the State were also caused by or aggravated by the fact that BP failed to take necessary actions to mitigate the danger associated with their operations.

203. In addition, the circumstances surrounding the fire, explosion, and sinking of the *Deepwater Horizon*, and the resulting Spill are such that, according to common knowledge and the experience of mankind, the accident could not have occurred had BP exercised the high degree of care imposed on them. Moreover, BP had full management and control of the instrumentalities that caused the oil spill. The State, therefore, pleads the doctrine of *res ipsa loquitur*.

204. As a direct and proximate result of BP's negligence, the State has and will continue to be damaged, including but not limited to, damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with oil disaster response actions.

205. The State demands judgment against BP and its Macondo contractors and leasing partners jointly and severally, for compensatory damages in an amount to be determined by a jury.

**L.**     *Wantonness*

206.    The State incorporates and re-alleges each and every allegation set forth above herein by reference.

207.    BP, directly or through agents, breached their legal duties to the State by failing to exercise reasonable care and acted with reckless, willful, and wanton disregard for the State in the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well.

208.    BP, directly or through agents, failed to create a plan to cap and contain an oil spill at the Macondo well in the event of a blowout.  This failure to plan for a foreseeable risk amounts to wantonness, which resulted in an uncontrolled oil spill that reached Alabama's waters and shores.

209.    Upon information and belief, the State avers that the fire explosion and sinking of the *Deepwater Horizon*, resulting Spill, and damages were caused by BP's reckless, willful, and wanton conduct as more fully set forth above.

210.    BP knew or should have known that its willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, tax base, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the State of Alabama.

211.    As a direct and proximate result of BP's wantonness, the State has and will continue to be damaged, including but not limited to, damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with oil disaster response actions.

212.   BP consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the State and its citizens.

213.   The State demands judgment against BP and its Macondo contractors and leasing partners, jointly and severally, for compensatory damages in an amount to be determined by a jury. The State further demands judgment against BP for punitive damages in an amount to be determined by a jury.

## IV.   **Punitive Damages**

*(Maritime and State law)*

214.   The State realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

215.   BP engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. The State, society as a whole, and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by BP's misconduct herein.

216.   BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

217.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting, time-saving, and financial gain.

218.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few barriers to gas flow.

219.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

220.    BP, focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

221.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

222.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log test to evaluate the integrity of the cement job.

223.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon*

by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

224.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

225.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

226.    BP recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant to the *Deepwater Horizon*.

227.    BP recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

228.    BP recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

229.    BP willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

230.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and thus the property of the State.

231.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures. As such, BP increased the magnitude of, and damage caused by, the Spill.

232.   BP's conduct was oppressive, wanton, malicious, reckless, or grossly negligent because BP:

    a.   ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

    b.   failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

    c.   violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

    d.   failed to take appropriate action to avoid or mitigate the accident;

    e.   failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

    f.   failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order; failed to provide appropriate disaster prevention equipment; and,

    i.   failed to have an appropriate emergency spill response plan or readily available spill response equipment.

233.   BP's conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because its conduct was motivated by financial gain; because it injured and endangered

human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of the people of Alabama and the economy of the State; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of their financial gain; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish them and deter further repetition by them or others.

234.    BP consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the State and its citizens.

235.    Accordingly, the State is entitled to an award of punitive damages in an amount to be determined by a jury at trial.

## RESERVATION OF RIGHTS

### *Right to a Trial by Jury*

236.    The State demands a jury trial for any and all claims pleaded herein in which a jury trial is available by law.

237.    Neither the State's pleading of general maritime claims, nor its participation in admiralty proceedings within MDL 2179 or this Court (if any), amounts to a waiver of the State's right to a jury trial. The State cannot be forced into a Hobson's Choice.

238.    Should this Complaint be transferred to MDL 2179, the State reserves its right to seek a remand of all issues and claims that uniquely apply to the State of Alabama—including, but not limited to, the quantification of the State's damages—to this Court for a trial by jury.

### *Right to File Amendments*

239.    The State reserves the right to amend this complaint and/or file additional complaints to supplement the State's present claims or assert additional claims against the Defendants named herein and/or against any additional parties.

## **PRAYER FOR RELIEF**

WHEREFORE, the State of Alabama requests judgment against Defendants as follows:

1.      declaratory and injunctive relief;

2.      economic and compensatory damages in amounts to be determined at trial;

3.      punitive damages;

4.      pre-judgment and post-judgment interest at the maximum rate allowable by law;

5.      attorneys' fees and costs of litigation; and,

6.      such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Respectfully Submitted,

LUTHER J. STRANGE
*Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130

Email:  lstrange@ago.state.al.us
        cmaze@ago.state.al.us
Phone: (334) 242-7300
Fax:    (334) 242-4891

COREY L. MAZE
*Special Deputy Attorney General*

WINFIELD J. SINCLAIR
*Assistant Attorney General*

Attorneys for the State of Alabama