# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
　　　Claims Administrator, and

　　　Special Master Louis J. Freeh

**From:** Class Counsel

**Matter:** <u>In re: Deepwater Horizon</u>
　　　　MDL No. 2179

**Re:** Investigations of Alleged / Potential "Fraud"

**Date:** October 6, 2014

　　　Class Counsel have always supported reasonable efforts to detect and prevent the payment of fraudulent claims. The Parties did not intend, nor do Class Counsel desire, that Settlement Program Claims based on fabricated documents or intentionally misleading statements be paid.

　　　At the same time, basic fairness, Due Process, and the express terms of the Settlement Agreement require that a Claimant who is suspected of alleged or potential fraud be provided with notice of the suspected fraud, and the bases therefore, with an opportunity to supplement, amend, clarify, dispute, withdraw, refund, or otherwise respond or explain.

Section 4.3.7 of the Settlement Agreement provides that:

> The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes. The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

Section 4.3.8 provides that:

> The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest Economic Damage Compensation Amount that such information and



PLAINTIFF'S
EXHIBIT
A

supporting documentation allows under the terms of the Economic Damage Claim Framework.

Section 6.1 provides that, subject to and in accordance with Sections 4.3.7 and 4.3.8:

Economic Class Members will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement.

Section 6.1.2.1.1 provides that, following the issuance of notice in writing to the Claimant of a final Denial or Determination of a Claim by the Settlement Program:

The Settlement Program shall provide access to the Claimant and the BP Parties of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination.

And Section 6.1.1.1 provides that the Denial of a Claim for Insufficient Documentation "shall be without prejudice to the Claimant's right at any time prior to termination of the Settlement Agreement to resubmit the Claim."

In addition, Section 4.4.7 provides that:

The criteria, documentation, proof, and Compensation Amount provisions of each of the Claims categories shall apply equally to all Claimants regardless whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim.

Section 4.4.9 provides that:

An Economic Class Member who had a claim with the GCCF that was rejected or denied by the GCCF for any reason shall be treated like any other Economic Class Member submitting a Claim to the Settlement Program. Specifically, there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement.

Finally, the Documentation provisions contained within Exhibit 4A, Exhibit 8, Exhibit 9 and elsewhere in the Settlement Agreement were extensively and carefully negotiated not only to, on the one hand, provide the Claims Administrator with sufficient evidence to validate the Claim, but also, at the same time and on the other hand, to limit the burden on Claimants, and to facilitate the timely and efficient evaluation and determination of Claims.

Several months ago, Class Counsel expressed our concern that what was intended to be a transparent and Claimant-friendly process, in which Claimants would be provided with full notice of issues, questions or concerns, and with the opportunity (and, indeed, assistance) to attempt to address those issues, questions or concerns, and then to have their Claims efficiently processed and viewed in a light most favorable to the Claimant, in a way that would maximize the value of his or her Claim, appeared to have been transformed into what seemed largely a Byzantine, opaque, and unduly burdensome fishing expedition in search of the purported "fraud" which has been widely advertised and alleged by BP in order to delay, reduce and/or avoid entirely BP's obligations under the Settlement and Trust Agreement.

We suggested that when fraud is alleged or suspected, the Settlement Program, the Special Master, the Program Vendors, and/or other agents or sub-contractors should advise the Claimant that: "We suspect your claim might be fraudulent, due to $\underline{X}$," with the Claimant, at that point, free to: **(a)** withdraw the Claim, **(b)** do nothing, or **(c)** attempt to respond to $\underline{X}$ with an explanation, clarification and/or additional documentation. In our view a fairer, less burdensome, less wasteful, less expensive, and more efficient way of weeding out potentially fraudulent claimants, while validating legitimate claims.

We noted that an inconsistency in the Claim File is not, in and of itself, an indicia of "fraud". Nor the incapacity to recall perfectly what happened during the 2007-2010 Benchmark and Compensation time-frame, the inability to produce documents that simply do not exist, nor an innocent error or mistake.

In the context of Seafood Claims, it was recognized and anticipated that there would likely be discrepancies between the frequently inaccurate and incomplete available trip ticket data, the good faith recollection and belief of a Claimant about what types of catch he or she was brining in during the Benchmark Period, and the formal Income Tax Returns (if any). The Program, it was agreed, would accept *either* available trip ticket data or tax returns, whichever was most favorable to the Claimant.

Subsistence Claims, by their very nature, are not likely to be supported by comprehensive formal business records, and may likely include discrepancies between and among the good faith recollections about the seafood or game was utilized during the Benchmark Period. As with the Category II and Category III Deckhand Claims, the Parties entered into the settlement with full knowledge and recognition that these Claims would have limited documentation, which is reflected in the carefully negotiated provisions of Exhibit 9 to the Settlement Agreement – including provisions for the CADA, potential interviews, and a field visit / investigation of all claims in excess of $10,000.

This is not to say that intentionally fraudulent conduct should be ignored or that truly fraudulent claims should be paid.

Page 3

But this is the settlement of a civil lawsuit, not a criminal law enforcement investigation. The Program, and the Special Master, have been asked by the Parties, and by the Court, to ensure compliance with the terms and the requirements of the Settlement Agreement; not (as BP now suggests) to investigate or enforce a broad array of local, state or federal statutes, ordinances, requirements or regulations. The purpose is not to "catch" people, but to validate legitimate settlement program claims.

Perhaps the result of applying the Settlement Agreement as written is that a minority of claims that someone might consider (or BP might with questionable good faith contend) to be "fraudulent" could slip through the cracks and get paid. But that result – while neither ideal nor actively desired by the Parties – was, in a manner of speaking, not only contemplated but indeed accepted by BP, in balancing the costs and benefits of various possible settlement terms and processes, in the attempt to achieve overall fairness, ease (*i.e.* from BP's point of view, "buy-in", which was very important to BP at the time), and efficiency.

The inevitable result of attempting to superimpose an absolute 'No Fraud Mandate' in the place of Sections 4.3.7, 4.3.8, 4.4.7, 4.4.9, 6.1, 6.1.2.1.1, the Documentation provisions, and the other terms, nature and spirit of the Settlement Agreement – (not to mention BP's obvious aim in attacking Claimants, Plaintiffs' Counsel, the Program Vendors, the Claims Administrator, and arguably even the Court, with its ads, its statements, and its court filings – even at the cost to BP of paying for expensive additional inquiries and analyses by program accountants and fraud investigators[1]) – is that legitimate claims are significantly, unnecessarily and inappropriately delayed, frustrated, burdened, held, abandoned, intimidated, deterred, reduced, compromised on appeal, and/or denied.

There are some people who undoubtedly believe that it's better that ten legitimate claims get delayed or denied than one potentially fraudulent claim be paid. Which is certainly a valid and reasonable point of view. But this Settlement was, for better or worse, drawn more in the spirit of Blackstone: The overriding objective was to provide legitimate Claimants with the maximum amount they were entitled to, based on the specified documentation, in an efficient, transparent, Claimant-friendly and Claimant-favorable way.

Class Counsel again request that, in the event of alleged or potential fraud, the Claimant be advised of the particular allegation, and the bases therefore, with a fair and reasonable opportunity to supplement, amend, clarify, dispute, withdraw, refund, or otherwise respond or explain. ·

As always, we appreciate your time and consideration.

---

[1] Indeed, having continuously and repeatedly pushed for more and more frequent, widespread, cumbersome, intrusive and expansive investigation, examination, analysis and adjustment of Claims, BP has rendered the Program inefficient, burdensome and expensive, only to turn around and disingenuously attack the Claims Administrator with respect to expense and inefficiency.