# EXHIBIT  9

**REDACTED**

**UN-REDACTED VERSION FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br><br>**HONORABLE CARL J. BARBIER**<br>**MAGISTRATE JUDGE SHUSHAN** |

**DECLARATION OF NEIL L. ZOLA**

Neil L. Zola declares and states as follows:

     1.     I am President of The Garden City Group, Inc. ("GCG").  Prior to joining GCG, I was a partner at a law firm in New York with a practice focused on class action litigation.  In 2000, I joined GCG as General Counsel, I became Chief Operating Officer in 2002 and President of the company in 2006. The following statements are based on my personal knowledge and information provided by other experienced GCG employees working under my supervision, and if called upon to do so, I could and would testify competently thereto.

     2.     GCG has been providing comprehensive legal administrative services in connection with class action settlements, mass tort claims, and bankruptcy matters for 30 years. With respect to handling class action settlement administrations in particular, GCG is the country's largest and most experienced firm, having worked on some of the most complex legal

    DECLARATION OF NEIL ZOLA

administrations of all time, including ten matters in excess of one billion dollars. Some of our more significant projects include the $3.4 billion Cobell Indian Trust settlement involving the resolution of Native American trust administration, the $3.05 billion VisaCheck/MasterMoney antitrust matter, and some of the largest securities class actions of all time including the $6.15 billion Worldcom Securities Settlement and the recent $2.4 billion Bank of America Settlement. In total we have administered some 2,500 class actions in our history. GCG is also one of the leading bankruptcy claims agents in the country. Among other large engagements, we recently assisted American Airlines in its Chapter 11 filing and emergence from bankruptcy. We were also selected by AlixPartners, among others, to act as claims agent in the landmark General Motors Corporation Chapter 11 Proceeding. Recently GCG was selected to assist in implementing a compensation program in the GM Ignition Compensation Claims Resolution Facility.

3.      The reason GCG keeps getting hired on the largest and most significant legal matters in the country is because of our quality work and superior controls. GCG was the first and to date the only class action claims administrator in the country to obtain a SOC 2, Type 1 certification. EisnerAmper, an internationally recognized firm providing audit, tax and advisory services, issued GCG's SOC 2 Report after conducting an examination in accordance with the attestation standards established by the American Institute of Certified Public Accounts ("AICPA"). According to BP, see, Declaration of Charles Cipione, ¶24, this attestation is very important.

4.      This Declaration is submitted to address assertions that relate to services provided by GCG to the Court Supervised Settlement Program ("CSSP") under the direction of the Claims Administrator, Patrick Juneau, that are raised in BP's Motion to Remove the Claims Administrator ("BP's Motion") and in particular the Declaration of Todd Brents (the "Brents

DECLARATION OF NEIL ZOLA

Declaration"), dated August 30, 2014.[1]

## A. **GCG'S ROLE**

5.      GCG has served as one of the Court-approved vendors in the CSSP under the direction of the Claims Administrator since the Program's inception.  GCG was selected as a vendor for the CSSP based, in large part, on our work in the Gulf Coast Claims Facility ("GCCF") overseen by Feinberg Rozen.  On the GCCF, GCG performed notice and outreach work, including building the secure website, call center operations and email communications; we mailed claim forms and handled the intake of claims materials; we built the software application for many facets of that facility; and we handled distribution, reporting, and processing of releases, among other tasks.  For this Program GCG has performed a variety of assignments, including, among other things: (1) Intake of all inbound mail for the program; (2) Dissemination of all outgoing mail including hardcopy claim forms, claim notices and settlement releases; (3) Launching and hosting the Economic and Property Damage Website, www.DeepWaterHorizonEconomicSettlement.com; (4) Housing the Network for the CSSP claims system; (5) Data entry of all hard copy Registration and Claim Forms, including document linking; (6) Document Categorization, which is the first step in the Claims Review process; (7) File Audit work to scrub the GCCF files to ensure that no personal identifiable information ("PII") was publicly available (this work is now complete); (8) Claim review for IEL, Seafood and Subsistence claims; (9) Incomplete claims analysis;  (10) Incomplete claim outreach; (11) Release and payment documentation Processing; (12) Opt-Out/Revocation processing; (13) Call Center work and handling other claimant correspondence, including email; and (14) Distribution of all checks and wires to the Class once other vendors and the CAO have made determinations about the amounts to be paid.

---

[1] This Declaration does not respond to the September 11, 2013 Declaration of Todd Brents that is included as an exhibit to the current Brents Declaration, which has already been addressed and rejected by the Court. If the Court wishes to hear about any of those issues again we will be happy to prepare a supplemental response.

**B.  GCG'S CONTRACT FOR CSSP SERVICES**

      6.     We began our work on this program in the spring of 2012, approximately one year before we entered into a formal contract for our services.  From the outset, we agreed to BP's request that GCG keep its same billing rates in place from the GCCF.  The rates we charged in the GCCF were approved by BP and Feinberg Rozen and our bills were paid in full in that matter, which began in the summer of 2010.  GCG is therefore using the same billing rates that were in place since 2010, except for the few areas where we have <u>reduced</u> our rates, as discussed below.  Nevertheless, BP now seems to argue, through the Brents Declaration, that certain of GCG's rates are excessive.  See <u>e.g.</u>, Brents Declaration, ¶¶10, 11, 30, 40-44, 52.  We disagree. GCG provides administrative services to the Deepwater Horizon Economic Claims Center ("DHECC") pursuant to our Agreement to Provide Claims Administration Staffing Services with the Claims Administrator and the Settlement Trust executed on April 17, 2013 (the "Agreement").  The Agreement was executed after eight months of negotiations in which BP representatives were heavily involved.  The Agreement includes a detailed rate chart with all labor rates capped at specified levels.  GCG has capped its highest hourly rate in the Program at $225 per hour, which is nearly half of the rate that our top executives charge customarily.[2] GCG's rate cap has resulted in a savings to BP in excess of $2 million as of August 31, 2014.

      7.     The assertion regarding our rates also ignores the significant voluntary discounts that we have provided, including a savings of more than $6.7 million based on GCG's decision not to bill overtime in this case, which was our right under the Agreement.

      8.     We also have provided a cap on document storage fees which was negotiated by the Claims Administrator's Office on behalf of BP, even though our original agreement with BP did not provide for such a cap.  The savings as a result of the cap is more than $3 million

---

[2] We note that our highest rate in this case is considerably lower than the rates charged by the individuals who submitted declarations in support of BP's motion. Indeed, the Brents Declaration indicates Mr. Brents' rate is $732/hour.  <u>See</u>, Brents Declaration, Exhibit 1.

      DECLARATION OF NEIL ZOLA

and growing considering the increase in activity on the Network.

## C. GCG CSSP STAFFING

9.     The Brents Declaration also criticizes GCG for hiring temporary workers in the Gulf Coast region.  See, Brents Declaration, ¶30.  This criticism is without merit.

10.     GCG's work on the GCCF was handled out of three of its primary offices, in Lake Success, New York; Seattle, Washington; and Dublin, Ohio.  When we were hired to work on the DHECC program, we were instructed by the parties, including BP, that we had to perform much of our work in the Gulf region.  GCG endorsed and quickly accommodated this approach.  I personally conducted an extensive investigation of more than a dozen potential sites from New Orleans to Baton Rouge before finding a building in Hammond, Louisiana that would meet our needs and those of the Program and that was acceptable to the parties.  GCG was able to fully build out and staff our 36,000 square foot Hammond Center facility in Louisiana within one month between April 1, 2012 and May 1, 2012.  I personally conducted many of the interviews of personnel for our first wave of hiring.  The availability of temporary personnel was a necessary and important part of our ability to efficiently ramp up services in the Gulf.  We trained all our staff well in advance of the June 4, 2012 commencement of the Program.  Our staff members in Hammond are very invested in and committed to GCG and the Program, as evidenced by our extremely low attrition rate.  Of the individuals presently with GCG in our Hammond Center, more than 90% have been with us since 2012 working on the Program – a hallmark of a successful operation.

11.     The Hammond Center has been visited on numerous occasions by representatives of the Claims Administrator's Office, BP, the Plaintiffs Steering Committee, McGladrey, LLP, CliftonLarsonAllen, LLP, the Freeh Group, IBM, and even AlixPartners, among others, and our operation has always received praise for its work.  In fact, both Judge Barbier and Magistrate Judge Shushan visited Hammond and saw first-hand the work we are doing there.  At its peak, the Hammond Center was running six days a week with two shifts

during weekdays to keep up with demand.

12.     Nevertheless, the Brents Declaration asserts that our hires in the Gulf had "no previous direct experience to carry out the tasks necessary for claims review and processing." See, Brents Declaration, ¶30.   This is untrue.  As mentioned above, to ramp up quickly it was necessary to hire temporary workers.  To do so, we interviewed some of the biggest placement agencies in the area and instructed them on the skill sets we needed for the different tasks we were to perform in Hammond.  For instance, we hired people with prior mailroom experience to work in our mailroom and people with prior experience in data entry to do that work for GCG.  We also hired paralegals, lawyers and others who had attended law school to handle some of the more sophisticated work that was assigned to Hammond.

13.     Notwithstanding that these temporary workers applied for jobs with GCG and understood that they would be working for GCG management in a GCG-run center, Brents then claims that it was wrong to bill these people out at GCG rates BP had already approved. Rather, he says that we should have passed through these costs directly to BP.  However, as explained above, the rates at which GCG bills out our people had already been vetted and approved for two years in the GCCF program.  And in the Agreement governing our work and payment terms there is a rate chart that states the level of person performing the work and the rate that will be charged for each level.  Moreover, nothing about the use of temporary workers is unusual when ramping up for a large program like this.  Companies in our industry routinely engage temporary workers from agencies and also utilize subcontractors in the course of their performance of services on the projects for which they are hired, and it is customary practice in the industry to bill out the individuals at hourly rates comparable to similarly situated employees.  In fact, in order to mobilize the resources for GCG to perform its obligations under the Agreement, including opening the Hammond Center in just one month and ramping up call center operations to the levels required by the parties, utilizing temporary staff was a necessary and effective way to proceed. And this approach is absolutely consistent with GCG's

Agreement with the Claims Administrator.

14.     By way of example, Section 6 of the Agreement makes clear that GCG will be compensated based on hourly rates and unit charges, set forth in Exhibit 2 of the Agreement. Nothing in the Agreement states that any GCG workers would be charged through to the Settlement Trust as an expense.

15.     Similarly, Section 15 of the Agreement is dedicated entirely to subcontracting "for some of the work for which Vendor is and will remain fully responsible" and expressly provides that pricing information and labor rates may be redacted by GCG in copies of subcontracts provided.  This provision also states that the Claims Administrator "shall have no financial or other responsibilities or obligations as to any Subcontracts relating to Vendor's operations in Sarasota, Florida [one of GCG's call centers], which shall be borne by Vendor. . .Vendor shall be liable for the acts and omissions of its subcontractors as if they were the acts and omissions of itself and its employees."

16.     These rates and Unit Charges were always represented as Fees under the Agreement and were never contemplated to be Expenses.  The Agreement section on "Reimbursement of Expenses" lists a whole variety of items (such as postage, mail supplies, office supplies, translation services, security guard service, truck rental and utilities).  Hourly rates for contract workers were never included in Expenses because those people were always billed out at the agreed upon Rate structure as a fee and not as a reimbursable expense.

17.     Brents now claims that the costs of these workers -- whom we trained, cultivated, and managed -- should be passed through because to do otherwise is to expose GCG and other vendors as trying to make a profit.  However, Brents provides no explanation for a distinction between these temporary workers, who are covered by the rate chart in our Agreement, and employees who are covered by the same rate chart.  So long as all of our staff are billed properly, i.e., as per the rate chart, there is no distinction.

18.     After criticizing us for using temporary workers, the Brents Declaration then

criticizes GCG for converting agency temporary workers to GCG employees, and without any substantiation wrongly states that we do so for an improper purpose.  See, Brents Declaration, ¶30.  GCG disputes this contention too.  As I explained directly to several representatives of BP, including AlixPartners, in June 2013, in the presence of Judge Shushan, GCG's practice of converting temporary workers to GCG employees is routinely done after personnel have been with us long enough for us to be comfortable with their work product.  And when we converted these workers from agency payrolls to our own, we continued to bill them out as per the BP-approved rate chart.

19.     Moreover, the hiring of temporary workers with the carrot of converting those workers is a powerful tool to get the best work out of people.  During my regular visits to the Hammond center I conduct town hall meetings to answer questions about the Program, the Center and GCG.  Invariably a question I receive is what can people do to become GCG employees.  The answer is always some variation of "keep working hard."  But until we were certain about the skill sets of our people and until we had a sense of how many people were really needed at the Center once the initial work load leveled off, it made no sense to convert people in the Hammond center.  When we were able to make all necessary judgments about which personnel to keep and which should be let go, we made a big announcement on the floor of the Center.  Mr. Juneau, who had previously visited the Center and was impressed with the operation, was in Hammond for the announcement and saw first-hand the overwhelming reaction by our people to the conversion news.  To have a workforce motivated toward a goal and to have that workforce feel rewarded by the process is positive for the entire Program.

20.     There is certainly nothing in the Agreement that prevents GCG from taking this management step, which is consistent with our policies, and has in fact benefitted the Program.  And regardless of the category of our work staff, we have monitored the level of staff servicing the Hammond Center and decreased our staff appropriately when dictated by work volume.  And when our work load decreased, we also advocated shutting down the night shift and

Saturday shift to reduce costs to the Program.  Since peaking at just under 325 people in August 2012, we currently have less than 140 in our Hammond Center.  And as stated above, most of those people have been with us since the beginning of the Program, a testament to the quality of our hires and the management in place at Hammond.

21.    Finally, contrary to what is implied in the Brents Declaration, GCG has consistently and significantly reduced our staffing on the project overall. Right now our total staffing levels are <u>less than 80%</u> of what they were at the peak of the Program.

**D.  GCG CSSP CALL CENTER OPERATIONS**

22.    In the context of BP's arguments about alleged failures of oversight and vendor costs, the Brents Declaration also raises questions about GCG call center staffing, including at our Gulf region facility in Sarasota, Florida.  <u>See</u> <u>e.g.</u>, Brents Declaration, Exhibit 10 at pp. 6-7, Exhibit 11 at p.3.  With respect to the levels of call center staffing, from the beginning of the CSSP, GCG was directed by BP to ramp up very heavily with dedicated operators to make sure the project launched smoothly and that calls were answered immediately.  BP played a significant role at the beginning of the Program in determining how many dedicated operators would be involved in this matter.

23.    Throughout the Program, GCG has diligently reviewed its staffing levels to ensure a balance of achieving service goals with maintaining cost effectiveness.  We regularly and proactively discussed staffing levels with the Claims Administrator's Office, and appropriate adjustments were made.  By way of example, attached to this Declaration as Exhibit 1 is a true and correct copy of an email, dated October 12, 2012, from me to the Claims Administrator's Office reviewing potential call center staffing adjustments that GCG proposed for the Claims Administrator's consideration.  This proposal included reductions for both staffing levels and hours.[3]  GCG's call center staffing has been drastically reduced since the

---

[3] This email was sent by GCG well prior to BP's criticism of our staffing levels, evidencing that GCG has always proactively managed its workforce.

DECLARATION OF NEIL ZOLA

launch of the case. In November 2012, we significantly reduced staff to increase capacity utilization while maintaining service levels after a review of internal utilization models. By June 2013, GCG was down to less than 60 total operators after having as many as 450 operators on average per month in order to satisfy the parties' desire to have sufficient staffing levels to ensure no wait time on any calls. Presently only 12 dedicated operators work on the project.

24.     Attachments to the Brents Declaration question GCG's Sarasota call center operation as redundant and overly costly. See, Brents Declaration, Exhibit 10 at pp. 6-7, Exhibit 11 at p.3. However, the Florida facility was established at the direct request of the parties for a call center presence in the Gulf. We were able to deliver that because we had an ongoing 10-year partnership with this particular call center. Moreover, redundancy was one of the goals of this center since the parties wanted to ensure that calls were never missed and the center never went down. For this reason, we had two centers in completely different regions of the country, one in the Gulf and one in the Midwest. If a snowstorm shut down the Ohio office, the Program would be covered by Sarasota and vice versa if there was a hurricane in the Gulf. The pricing for dedicated operators has been on the same sliding scale since the GCCF and on the Agreement's rate chart. This facility was subject to our ongoing and proactive monitoring of call center staffing levels and right-sizing, and was actively managed by GCG. GCG recommended closing this center after the call volume subsided greatly and we closed the center promptly once Mr. Juneau determined that the Gulf presence for the call center was no longer necessary to the Program.

**E. CSSP IT SYSTEMS**

25.     BP's motion and the Brents Declaration criticize the CSSP IT system, which he says was "built out by BG and GCG." See, Brents Declaration, ¶32. But GCG's systems have been vetted by at least three different auditing firms in the Program and GCG's systems have not been criticized.

1    ■ And in its audit report regarding GCG's Claims Payment Disbursements System, CLA

2    stated that "No exceptions were noted; therefore no management response is necessary." CLA

3    Audit at p. 24.

4    26.    As further discussed in the reports, GCG manages and maintains the network

5    and Data Center supporting the DHECC.    Numerous parties and third parties have visited

6    GCG's state-of-the-art Data Center in Ohio, including representatives from the Claims

7    Administrator's Office, CliftonLarsonAllen, LLP, and McGladrey, LLP, among others. There

8    have been no criticisms of the Data Center.  The Data Center hardware purchases referenced in

9    the Brents Declaration at ¶32 were made on a pass-through basis by GCG as approved by the

10   Claims Administrator after having been determined to be necessary for CSSP Data Center

11   operations, and with BP's knowledge. ████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████ As the CLA Audit notes, GCG's head of systems had prior to receiving the draft audit

15   report already investigated whether a chemical-based fire suppression systems was necessary

16   for GCG as a whole and determined that from our perspective it was not needed in light of

17   GCG's insurance coverage and because GCG maintains a redundant offsite facility to ensure

18   operations are not disrupted in the event of a fire.  However, for this case only, based on the

19   CLA recommendation, GCG obtained the fire suppression system for the Data Center.[4]

20   27.    Despite the Brents Declaration's implicit criticism of GCG's systems work, it

21   has not been criticized by any of the parties or numerous third parties who have conducted

22   reviews and audits in this case.  Moreover, the Claims Administrator continues to rely heavily

23   on GCG's systems expertise and has sought our assistance in the implementation of the new

24   DWH 2.0 System.

25

26   _____
     [4] Moreover, GCG did not pass through this cost to BP, but rather, absorbed it ourselves after discussion with the Claims
     Administrator's Office.

## F.  GCG'S WORK WITH THE CLAIMS ADMINISTRATOR

28.    The Brents Declaration and BP's motion assert in broad brush strokes that the Claims Administrator has failed to establish appropriate budget and cost reporting or to properly oversee vendors including GCG, which it contends resulted in excessive costs and improper financial benefits to vendors who purportedly increase their team size and extend their engagement through low productivity.  See e.g., Brents Declaration, ¶¶10-12, 30, 40-42, 44, 52.  At no time has GCG improperly increased its team size or otherwise sought to benefit from "low productivity," as the facts regarding our operations clearly show.

29.    Since the project's inception, GCG has worked closely with the Claims Administrator regarding all aspects of GCG's services. There has always been good coordination and communication between GCG and the Claims Administrator, and GCG continually keeps the Claims Administrator's Office apprised of what we are doing.  We have provided regular feedback of our work in a collaborative process.

30.    With respect to GCG's approach to monitoring, controlling and reducing costs while maintaining quality, GCG has worked diligently with the Claims Administrator to assist with any forecasts or budgets by providing projected fees and expenses and by providing any additional documentation, information or reporting the Claims Administrator has ever requested.  GCG regularly reviewed and continues to review our actual costs compared with budgeted levels.  We have reduced staff in consultation with the Claims Administrator's Office where appropriate, and also cross-trained staff to provide additional efficiencies while benefitting from individual experience with and knowledge of the Settlement, which also allows us to effectively respond to the changing needs of the Program.  GCG's turnover and training costs have been minimized by monitoring the productivity of all staff members, retaining the most efficient, and promoting the most effective.

31.    Moreover, as mentioned above, we have provided several price breaks to BP, including capping rates for four years, not charging overtime, and absorbing certain IT costs.

These are not the actions of a vendor trying to take advantage of the Claims Administrator or BP. Rather, we have always acted in the best interests of the Program. For example, in an effort to support the Program we took an office in New Orleans at the Gravier building. However, because we were not asked to do that by the Claims Administrator we have been absorbing those lease payments ourselves. Similarly, in order to accommodate the demands of this case in the early going GCG had to lease additional space (about 6,000 square feet) in our Lake Success, New York headquarters to house more staff. To obtain that space GCG was required to sign a ten-year lease that will cost us more than $2.6 million – a commitment that surely will extend beyond the life of this case. Again, we are absorbing these costs. Contrary to the Brents Declaration, GCG has acted responsibly in its financial commitment to the case. In sum, GCG is complying with all of its obligations under the Agreement and performing at the highest standards, as expected when the Claims Administrator determined to engage us.

32.     Certainly, there is nothing in any of the reports by third-party auditors here to suggest otherwise. For example, several of our highest ranking personnel were interviewed by the Freeh Group in connection with Special Master Louis J. Freeh's Independent External Investigation of the Deepwater Horizon Court Supervised Settlement Program prepared by the Special Master dated September 6, 2013 (the "Freeh Report"). No issues were noted by the Freeh Report with respect to GCG's call center operations, use of temporary personnel, billing practices or any other issue now raised by BP's motion.

33.     Finally, Mr. Brents submits throughout his affidavit that Mr. Juneau has not acted as a "reasonable and prudent" Claims Administrator. I disagree. GCG has worked with many Court-appointed "Claims Administrators", "Special Masters" and "Trustees" over the years. Based on my experience, I believe that Mr. Juneau should continue as Claims Administrator. He has acted professionally, with integrity and with great sensitivity toward the variety of issues that are presented to him almost daily. He has shown no bias toward one party or the other here, despite the allegations that have been leveled against him. Mr. Juneau is

always accessible and always willing to listen to different opinions on how to get things done. That said, he is a firm decision-maker and takes responsibility for his decisions, without blaming those around him.   I believe his actions in this case have been "reasonable" and "prudent."

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746 and I state that the facts set forth herein are true to the best of my knowledge, belief and information.

Dated: October \_\_11\_\_, 2014

NEIL L. ZOLA

- 14-      DECLARATION OF NEIL ZOLA

# Exhibit 1

**From:** Neil Zola
**Sent:** Friday, October 12, 2012 9:16 AM
**To:** David Odom; blevine@dheclaims.com; kfisher@dheclaims.com
**Cc:** Jennifer Keough; Stephen Cirami
**Subject:** Call Center Staffing

David/Bob/Kirk,  As you know, we believe that the staffing right now for our call center is heavy in relation to the volume of calls we are receiving.  Part of the reason for this was BP's edict at the beginning of the case for us to be "overstaffed."  Part of this also relates to the meeting we had last month where you told us to postpone our proposed staff reduction in light of the anticipated incompleteness outreach program.  Since it has now been determined that the PMO does not want our call center agents to make incompleteness calls we are again visiting the issue of a reduction.

Based on our review of various metrics we believe that a staff reduction is not the primary driver here.  Rather, in our view, the hours of call center operation need to be changed.  Currently, GCG's call center is open from 7am to 11pm Monday through Friday and Saturday from 9am to 6pm EST.  Considering that almost nobody calls the center before 8:30 am and after 8:30 pm, and considering that call volume on Saturdays is very light, we believe that the appropriate step is to go to a call center schedule of Monday through Friday from 8:30 am to 8:30 pm.

This change in schedule will not be easy to effectuate because it will require terminating many agents and will require us to rejigger the agent schedules to fit this new time slot.  (Currently, we have two shifts operating – one is from 7:00am to 3:00pm and the other is 3:00pm to 11:00pm.)  However, we feel the timing is right to start this process now and we would expect to maintain current staffing levels until the Final Approval Hearing and make the switch soon after that.

We have not yet analyzed all the cost savings to be realized by this move, although we expect them to be substantial.  Before we work up a serious plan, we wanted to make sure you were on board with the concept of reducing call center hours.  This is something that we do routinely in our other large class actions when the volume no longer warrants the extended hours that are set up at the beginning of the case.  We look forward to hearing from you on this.  Thanks.


Neil L. Zola
President
GCG
1985 Marcus Ave.
Lake Success, NY 11042
Phone:  631-470-5154
Facsimile:  631-940-6543
Neil.Zola@gcginc.com