**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in | * | |
| the Gulf of Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| Applies to: | * | HONORABLE CARL J. BARBIER |
| | * | |
| No. 12-970 and All Cases | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

**BP OBJECTIONS AND COMMENTS TO COURT-DESIGNATED NEUTRALS'
RECOMMENDATIONS FOR SEAFOOD COMPENSATION PROGRAM
SUPPLEMENTAL DISTRIBUTION**

In accordance with the Court's Order entered September 19, 2014, the BP Defendants,

BP Exploration & Production Inc. and BP America Production Company, respectfully submit the

following objections and comments to the Seafood Neutrals' Recommendations relating to a

proposed "supplemental distribution" from the Seafood Compensation Program Settlement Fund.

At the outset, BP expresses here its appreciation for the substantial and considered effort

of the Neutrals in undertaking their investigation.  Although a second distribution from the

Seafood Fund cannot occur now, at some point, should there be a second distribution from the

Fund, the methodology they set out is a reflection of their thorough work.

That being said, BP has several fundamental objections to, and concerns with, the

Neutrals' Recommendations.  The very notion of a supplemental distribution of any amount from

the Seafood Fund at this time is barred by the Settlement, for, as the Neutrals acknowledge, the

Court-Supervised Settlement Program ("CSSP") has not completed paying Seafood claims

eligible for Round One distributions.  (Rec. Doc. 13416-1, Recommendations at 14.)  Also, the

Neutrals' recommendation that steps be taken to correct errors and fraud ahead of any partial

distribution is a very small step in the right direction but it fails to guarantee the transparency and

accountability necessary to ensure that those errors and fraud occurring in the Seafood Program are remedied by the Claims Administrator before any second distribution occurs.

If, however, the Court is inclined to overrule BP's objections — which BP preserves herein and does not waive or modify in any respect — and order a partial distribution to occur now and without added provisions for ensuring that fraud and errors occurring in the Seafood Program are resolved in a fully transparent and accountable manner ahead of any partial distribution, then the Court should adopt the Neutrals' recommendation to target $500 million as the distribution amount.  (Rec. Doc. 13416-1, Recommendations at 14.)  BP concurs with the Neutrals' finding that this amount is "substantially greater" than the $400 million that the Seafood Compensation Program estimated would be available for a second distribution.  (*Id*. at 14 and n.37.)

*First*, BP objects to the Neutrals' Recommendation for a "partial distribution at this time" from the Seafood Fund targeting $500 million on grounds it would violate the Settlement.  Because Round One is not complete, the Settlement does not allow for a Round Two distribution of any amount to occur at this time.  While the Settlement anticipates there will be Round Two distributions to eligible Seafood claimants, they must occur only "*after*" Round One is complete and certain deductions to which BP is entitled have been computed.  (Rec. Doc. 6430, Settlement, Exhibit 10 at 3, emphasis added.)  The Settlement is unmistakably clear on this point as a textual matter, and the Court must enforce the Settlement according to its terms.

Additionally, as the Neutrals acknowledge, BP has filed a Rule 60(b)(3) motion seeking a return of part of the Fund in light of revelations regarding Mikal Watts.  (Rec. Doc. 13416-1, Recommendations at 14.)   For the reasons stated in BP's Rule 60(b)(3) Motion and accompanying Motion for Preliminary Injunction (13-6674, Rec. Doc. 2-3); as well as the

evidence and arguments presented at the Preliminary Injunction Hearing held February 26, 2014,
BP renews its request for a stay of any second distribution until the question of Mr. Watts' fraud
can be properly resolved.

The Seafood Program payments from the $2.3 billion Seafood Fund to claimants in
Round One are generous.   In Round One, seafood harvesters, boat captains and oyster
leaseholders are paid multiples of their estimated 2010 lost earnings from commercial fishing
ranging from 5.5 to 9.75, and crew are paid a multiple of 3.25.  (Rec. Doc. 6430, Settlement,
Exhibit 10.)  No deductions are taken for amounts BP paid to Seafood claimants for their work in
the Vessels of Opportunities program.  As the Neutrals attested in declarations filed in support of
approval of the Settlement, these Round One payments alone provide "fair, reasonable and
adequate" compensation to Seafood claimants even absent any Round Two distributions.  (Rec.
Doc. 7726-2, Balhoff Decl. at 2; Rec. Doc. 7726-7, Perry Decl. at 2.)

Given the Seafood Fund amount and scope of the Seafood Program, it is appropriate for
the Settlement to require that Round One payments be complete before any Round Two
payments begin.  Not only does this agreed-upon structure provide financial assurances for BP as
payor, but also it ensures eligible Seafood claimants are paid the proper amount in light of the
expectation that Round Two payments would be distributed in a proportionate manner and that is
what the Neutrals now recommend.  (Rec. Doc. 6430, Settlement, Exhibit 10 at 3.)

*Second*, BP objects on grounds that the "steps" recommended by the Neutrals to mitigate
any errors and fraud occurring during Round One of the Seafood Program are materially
insufficient.  (Rec. Doc. 13416-1, Recommendations at 19.)  Missing is any requirement for
transparency to ensure that errors and fraud in the Seafood Program are identified and disclosed

by the Claims Administrator, or for accountability to ensure errors and fraud are in fact remedied by the CSSP.

From the outset of the *Deepwater Horizon* incident, BP committed to pay legitimate claims and BP has worked tirelessly to honor its commitment. But BP should not be made to pay inaccurate and fraudulent claims. And, because the Neutrals recommend a pro rata distribution based on Round One payments, unless the fraud and errors are corrected ahead of a second distribution, the errors and fraud will simply be perpetuated and compounded in Round Two payments. Only correcting these errors and fraudulent payments prior to a Round Two distribution ensures that the Seafood Fund is fairly distributed in accordance with the Settlement.

Substantial problems with fraud and errors appear to have occurred in the Seafood Program as implemented by the Claims Administrator, who is entrusted under the Settlement with ensuring the "integrity of the overall Settlement Program." (Rec. Doc. 6430, Settlement, § 4.3.10.) Special Master Louis Freeh found the Seafood claims filed by Mr. Thonn and paid by the CSSP to "evidence fraudulent characteristics," and observed that this finding "***raises serious questions about the standards of proof to authenticate and validate the veracity of claims and the anti-fraud policies and procedures used by the DHECC and its vendors***." (Rec. Doc. 11287, 9/6/13 Special Master Report at 62, emphasis added.) Special Master Freeh has filed motions seeking return of monies paid by the CSSP for Seafood claims that he reports were fraudulently made. (Rec. Doc. 13010, 6/10/14 Special Master Motion; Rec. Doc. 13468, 10/7/14, Special Master Motion.) All of these Seafood claims exhibited glaring indicia of potential fraud yet they were paid by the CSSP.

BP experts likewise have raised red flags. A review of a random sample of paid Seafood claims by CPA Les Alexander, formerly in a regional managerial role with PwC, suggests

payment of Seafood claims on the basis of unsigned tax return forms without obtaining verification from the IRS, as occurred for Mr. Thonn's claim, is a regular occurrence at the CSSP creating the opportunity for fraudulent and inaccurate claims payments.  (BP Response to Policy 70 v.2, Alexander Decl., attached hereto as Exhibit A.)   KPMG audit partner and risk management expert, Mark Hutchins, has found that the Claims Administrator failed to meet "the basic standard of due care" with deficient internal controls and risk assessments that would be effective in detecting and mitigating errors and fraud.  (Rec. Doc. 13347-37, Hutchins Decl., Section I.)

Despite these concerns, and public assurances by the Claims Administrator that this would be a settlement program "with a tremendous amount of transparency,"[1] the Claims Administrator's Office (CAO) has not made available to the Parties or the public information concerning error correction or fraud mitigation.  McGladrey LLP has conducted a year-long audit of the CSSP, at a cost to BP of over $14 million, and the CAO has yet to provide any substantive information, data or documents from that audit despite BP's requests that the CAO do so.  (Decl. of Maria Travis, attached hereto as Exhibit C.)  ███████████████

████████████████████████████████████████████████

████████████████████  ███  Similarly, the CAO has not provided fraud related data requested by BP.  (Decl. of Maria Travis, attached hereto as Exhibit C; Decl. of Damon Dippel, attached hereto as Exhibit D.)

***Third***, BP objects to a recommendation by the Neutrals that the Claims Administrator be permitted to "limit and define" appellate rights of BP and class members.  (Rec. Doc. 13416-1,

---

[1]   Brendan Kirby, *Feinberg Promised to Be More Generous Than the Courts, but Was He Right?,* AL.com, (Apr. 22, 2012, 6:28 PM), http://blog.al.com/live/2012/04/feinberg_promised_to_be_more_g.html, attached hereto as Exhibit B.

Recommendations at 16.)  This proposal must be rejected as unauthorized by the Settlement and well established case law.  BP's right to seek Fifth Circuit review of any appealable orders is preserved and cannot be abrogated.

**1.  The Settlement Does Not Permit Adoption of the Neutrals' Recommendation for "Round Two" Distributions from the Seafood Fund Because Round One Is Incomplete.**

While the Neutrals have authority under the Settlement to recommend whether or not second distributions from the Seafood Fund should be proportional, neither the Neutrals nor the Court have authority to alter the timing proscribed by the Settlement for when such second distributions may occur.  (*See* Rec. Doc. 6430-22, Settlement, Exhibit 10, p.3.)  Because the preconditions for making second distributions from the Seafood Fund have not occurred, Round Two distributions cannot proceed at this time.

The Settlement is express that any second distributions from the Seafood Fund are to occur only "after" the eligible Seafood claims are paid in Round One:

> *After applying the terms of the Deepwater Horizon Economic and Property Damages Settlement Agreement (including determining the Seafood Compensation Program Amount) and paying eligible Seafood Compensation Program claims, the Claims Administrator shall determine the amount of funds, if any, constituting the remaining Seafood Compensation Amount.*

(Rec. Doc. 6430-22, Exhibit 10, p.3, emphasis added.)

Here, the words are clear and unambiguous.  Any second distributions may occur only after the specified preconditions are met.  "A court may not rewrite a term of a contract by 'interpretation' when that term is clear and unambiguous on its face." *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 947 (5th Cir. 1981); *see also Robin v. Sun Oil Co.*, 548 F.2d 554, 557 (5th Cir. 1977) ("We may not rewrite the contract except upon clear and convincing proof that there was an agreement which, by mutual mistake, was not carried into the written contract.").

Neither precondition for payment of second distributions from the Seafood Fund has occurred.  Not all eligible Seafood claims have been paid.  The Neutrals' concede this point:

> [T]here are still some claims which have not been paid.  Some of these claims are awaiting policy determinations; some are under appeal; and some currently are being investigated.  Furthermore, BP has filed a Rule 60(b)(3) motion which seeks a return of part of the Settlement Fund.  The balance which is available for distribution will not be determinable until these issues are finally resolved.

(Rec. Doc. 13416-1, Recommendations at 14.)   Based upon data released by the Claims Administrator, it appears there remain at least 1,388 unresolved Seafood claims, and, out of a total of 9,261 claims issued an eligibility notice with payment offers, only 7,963 have been paid.[2] (*See also* Decl. of Maria Travis, attached hereto as Exhibit C; Decl. of Damon Dippel, attached hereto as Exhibit D.)   Thus, Round One is not complete.   Moreover, per this Settlement provision, second distributions may not occur until after the Seafood Compensation Amount is computed, which requires determining the credit owed to BP under Section 4.2.7 of the Settlement.  The Neutrals agree that the credit amount is not yet determined.  (Rec. Doc. 13416-1, Recommendations at 21.)

The Settlement does not authorize the Court to change the terms of the agreement. Rather, the Settlement provides that its terms, "including the Exhibits thereto," "constitute the entire agreement and understanding among the Parties" and are "binding" upon them.  (Rec. Doc. 6430-1, Settlement, §26.1 at 90.)  The Court has jurisdiction over the Parties, the Economic Class Members, the Court Supervised Settlement Program and the Settlement Agreement "to interpret, implement, administer and enforce the Settlement Agreement, ***in accordance with its***

---

[2]   To derive from the Claims Administrator's report that 1,388 Seafood claims remain unresolved, the following entries from the Report are summed:  310 claims listed as "claims remaining to review" (Table 10, Column A, row 1); 472 claims remaining with "initial or preliminary incompleteness response," 239 claims that received "follow-up incompleteness responses," 297 claims with "requests for reconsideration," (Table 10, Column B, row 1); and 70 claims in the re-review process (Table 12, column A row 1 minus column B, row 1)  (Rec Doc. 13452, 9/30/14 Report by the Claims Administrator at 12, 15.)

*terms*."  (Rec. Doc. 8139, 12/21/12 Order and Judgment Granting Final Approval at 6, emphasis added.)

"Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement. That is, while the settlement agreement must gain the approval of the district judge, once approved its terms must be followed by the court and the parties alike."  *Klier v. Elf Atochem N. Am., Inc.,* 658 F.3d 468, 475 (5th Cir. 2011) (citations omitted).  "[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."  *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986).  Consequently, the Neutrals' recommendation to make "a partial distribution at this time" must be rejected.

## 2.   The Neutrals' Recommended Steps to Mitigate and Correct Fraud and Errors in the Seafood Program Must Be Modified to Require Transparency and Accountability.

Appropriately, the Neutrals recommend that no Round Two funds be distributed until the Claims Administrator takes steps to mitigate and correct errors or fraud previously occurring during the Seafood claims process.  (Rec. Doc. 13416-1, Recommendations at 19.)  The problem, however, is that the Neutrals do not require the Claims Administrator to disclose the findings of ongoing investigations into errors and fraud occurring in the Seafood Program, or what is going to be done by the CSSP to correct and mitigate errors and fraud.  Absent this transparency and accountability, BP, class members, and the public have no means to evaluate the steps undertaken and challenge them if insufficient.  BP requests that the Court modify the Neutrals' recommendation to require transparency and accountability.

Transparency was acknowledged by all as a fundamental principle embodied in the Settlement.  The Court observed, "the Settlement Agreement is designed to be transparent" (Rec.

Doc. 8138, 12/21/12 Order and Reasons Granting Final Approval at 110), and Class Counsel expressed that it was important to them that the settlement "had to be transparent and objective in application." (4/25/12 Hearing on Motions for Conditional Certification, Transcript at 57-58, attached here to as Exhibit E.)

The Claims Administrator promised there would be "transparency on steroids" in administering the CSSP.[3] As claims processing progressed, Mr. Juneau reported, "We have been consistent and transparent with the claims process."[4] And, Mr. Juneau promised, "Our goal is to operate in an efficient, transparent and fair manner. All allegations are taken seriously and investigated thoroughly."[5] And, the Claims Administrator professed that the investigation by Special Master Freeh of the CSSP "is consistent with our goal of transparency in the claims process."[6]

Moreover, simply by virtue of being a "court-supervised" settlement program, an expectation of transparency attaches to the operations of the CSSP. The judicial process embraces a presumption of public access to information. "Public access to judicial records serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 849-50 (5th Cir. 1993)

---

[3]   Louis Cooper, *New Oil Spill Claims Chief Vows Transparency*, Pensacola News Journal, Jun. 11, 2012, http://archive.pnj.com/article/20120611/NEWS01/306110012/New-oil-spill-claims-chief-vows-transparency, attached hereto as Exhibit F.

[4]   David Hammer, *BP Disputes Reading of Agreement to Calculate Damage Settlements,* WWLTV.com, Mar. 20, 2013, 11:23 PM), http://www.wwltv.com/story/news/local/investigations/david-hammer/2014/09/03/14581448, attached hereto as Exhibit G.

[5]   Ed Crooks, *BP Alleges Misconduct on Oil Spill Payouts*, Financial Times, Jun. 22, 2013, http://www.ft.com/intl/cms/s/0/10b24edc-dadf-11e2-a237-00144feab7de.html, attached hereto as Exhibit H.

[6]   Ed Crooks, *Ex-FBI Head to Probe BP Payout Claims*, Financial Times, Jul. 3, 2013, http://www.ft.com/intl/cms/s/0/8fcf9b5e-e361-11e2-9bb2-00144feabdc0.html, attached hereto as Exhibit I.

(citations omitted).   "The principle of public access to judicial records furthers not only the interests of the outside public, but also the integrity of the judicial system itself." *United States v. Holy Land Found. For Relief & Dev.*, 624 F.3d 685, 690 (5th Cir. 2010) (citation omitted).

To ensure transparency and accountability by the CSSP, the Settlement directs the Claims Administrator to "report and provide information to the Court, BP and/or LEAD CLASS COUNSEL (or their designee) as may be requested on an ongoing basis and/or as the Court directs," and mandates that "BP and Class Counsel shall have access to all Claim Files and Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose including, . . reviewing and auditing the Settlement Program . . ." with the limited exception that BP and Class Counsel "shall not have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal." (Rec. Doc. 6430, Settlement, §§ 4.3.2 and 4.4.14.)

In June 2013, BP expressed concern to the Court that there existed at the CSSP "inadequate operational controls" and "insufficient processes to detect and prevent fraud, waste and abuse."  (*See* 6/21/13 BP Letter, attached hereto as Exhibit J.)   BP requested "a full examination of the CSSP" be undertaken.  (*Id.*)

While investigations of the CSSP have been opened, there has been little in the way of transparency about what has been found or the results of the CSSP's own efforts to detect, prevent, correct and mitigate errors and fraud.  The Claims Administrator's Office ("CAO") has rebuffed requests by BP for substantive data, documentation and information regarding (i) the status of the year-long audit by McGladrey LLP, (ii) ███████████████████████ ████████████████████████ and (iii) results of the CAO's fraud detection and prevention

efforts.  (Travis Decl., attached hereto as Exhibit C; Dippel Decl., attached hereto as Exhibit D.)  This closed door approach by the CAO leaves BP concerned about the sufficiency of steps being undertaken to identify, correct and mitigate errors and fraud not only with respect to Seafood claims but throughout the entire Settlement Program.  *See Holy Land Found. For Relief & Dev.*, 624 F.3d at 690 (citation omitted) ("Public confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view.").

Special Master Freeh's discoveries of Seafood claims that he reports exhibit fraud suggest that the CSSP has not designed and put in place adequate measures to control and detect errors and fraud.[7]  He noted the Seafood claim by Mr. Thonn itself "***had had fundamental deficiencies that were not detected by several layers of CSSP review***."  (Rec. Doc. 12393, Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties at 12, emphasis added.)  Unsigned tax return forms and unsigned sworn statements submitted by Mr. Thonn were red flags that should have been investigated by the Settlement Program.[8]

---

[7]   On July 2, 2013, the Court appointed Special Master Freeh and gave him a mandate to "[e]xamine and evaluate the internal compliance program and anti-corruption controls within the CSSP, and make any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP."  (Rec. Doc. 10564, 7/2/13 Order.)  Additional duties were added by the Court including that Special Master Freeh should, in conjunction with the Claims Administrator's office, "examine and investigate" "any past or pending claims submitted to the CSSP  that are deemed to be suspicious," and initiate legal action to "clawback" the payment of fraudulent claims.  (Rec. Doc. 11288, 9/6/13 Order.)  And the Special Master was to report to the Court and the parties every 30 days.  (*Id.*)

[8]   As the exhibits to Special Master Freeh's report reflect, Mr. Thonn submitted unsigned tax returns for 2009 and 2010, and the tax return transcripts were requested in December 2013, after the CSSP paid his claims which occurred on February 28, 2013 and April 29, 2013.  (Rec. Doc. 12107, 1/8/14 Special Master Report at 8-9; Rec. Doc. 12107-2, Exhibit B, unsigned 2010 tax return form at 31-47; Rec. Doc. 12017-3, Exhibit C, unsigned 2009 tax return form at 48-62,  Rec. Doc. 12107-3, Exhibit C, 2009 IRS transcript requested, Rec. Doc. 12107-5, Exhibit E, 2010 IRS transcript requested.)

Special Master Freeh also flags as an area of concern situations in which claimants submit tax returns and sworn written statements reporting commercial fishing revenue that is significantly more favorable to those claimants than their trip tickets, as was the case with Mr. Thonn.  (Rec. Doc. 11287, 9/6/13 Freeh Report at 60-61.)  Special Master Freeh explains "***[t]his is significant because it increases the risk of claimants inflating compensation amounts by reporting fictitious revenue*** related to cash sales without adequate proof." (*Id.* at 61, emphasis added.)

BP, too, has pointed out to the CAO that paying Seafood claims on the basis of unsigned tax forms violates documentation requirements set forth in the Settlement, and creates unnecessary risks for fraud and errors to occur.  Only signed tax returns can verify that claimants submitted the same information to the IRS that they are now submitting to the CSSP, whereas reliance by the CSSP on unsigned tax forms coupled with unsubstantiated assertions in sworn statements about the source of revenue reported on those tax forms risks paying artificially inflated and/or inaccurate claims.[9]  (BP Response to Policy 70 v2, attached hereto as Exhibit A.) Les Alexander, a CPA, formerly a regional manager for PwC and now running his own practice in Birmingham, reviewed a random sample of Seafood claims at BP's request.    Out of 228 Seafood claims paid not using trip tickets but rather using the CSSP's tax return and sworn statement method, 192 of the claims (84%) contained unsigned tax forms, and only for 10 out of the 192 claims (5%) did the CSSP obtain a tax return transcript to verify the tax information the claimant submitted.  (*Id.*, Alexander Decl.  ¶¶ 16, 17, 22.)  Not only does this CSSP method

---

[9]    Where there is no taxpayer signature, whether through a handwritten signature or e-filing mechanism, a tax return form is invalid and is not legally recognized as a tax return.   (*See* BP Response to Policy 70 v2, Alexander Decl. ¶9, attached hereto as Exhibit A (quoting IRS Manual §1.2.12.1.5, Policy Statement 3-5); *Selgas v. Comm'r of Internal Revenue*, 475 F.3d 697, 700-01 (5th Cir. 2007) (where taxpayer filed unsigned tax return forms with IRS, "the fact that they were unsigned deprives them of legal effect.").   Taxpayers have several options when signing tax forms and, therefore, submitting valid returns to the CSSP, including signing by hand and e-filing.  Consequently, claimants should have little difficulty providing a copy of a valid tax return to the CSSP.  (BP Response to Policy 70 v2, Alexander Decl. ¶¶11-13, attached hereto as Exhibit A.)

violate Seafood Program documentation requirements, it creates "a fraud risk" and constitutes a "major deficiency" in the CSSP's "internal control system because it increases the risk that the CSSP will pay fraudulent and/or inaccurate claims." (*Id.* at 24.) And, despite BP's request that all claimants submitting tax return documentation be required to submit a signed form authorizing the CSSP to verify the submitted tax documents with the IRS, which would be a fraud deterrent, such a policy was not instituted by the CSSP until July 2014 and the CSSP policy applies only to newly submitted claims, not pending claims. (Final Policy 70 v.2, attached hereto as Exhibit K.)

While the CSSP and Special Master Freeh have access to Louisiana's trip ticket database to compare trip ticket data to information submitted by Seafood claimants, BP does not. Recently, the Court granted requests by Special Master Freeh to compel other federal and state government entities to provide him with access to additional databases that can be used to verify unsubstantiated claims of Seafood claimants.[10]

It appears that in numerous instances, rather than look to trip tickets to evaluate implausible Seafood claims, the CSSP paid them. Special Master Freeh found that Seafood claims by Jarred Burrle were paid by the CSSP based upon the unsubstantiated assertion that he landed over eight tons of seafood a month on his sixteen foot aluminum boat with no deckhand, an amount far in excess of average seafood landings for significantly larger boats. (Rec. Doc. 13010, Special Master Report at 1; Rec. Doc. 13010-1, Special Master Memo at 10.) Also, Special Master Freeh reports that the CSSP relied on sworn statements by Mr. Burrle that he sold

[10]   *See* Rec. Doc. 12827, 5/7/14 Order granting Special Master Freeh confidential access to trip ticket or equivalent databases from Florida Fish and Wildlife Conservation Commission; Rec. Doc. 12968, 6/3/14 Order granting Special Master Freeh confidential access to Individual Fishing Quota data from National Oceanic and Atmospheric Administration Fisheries; Rec. Doc. 13067 6/24/14 Order granting Special Master Freeh confidential access to license and vessel registration data from Louisiana Department of Wildlife and Fisheries.

seafood on a cash basis to nine entities when a simple internet search revealed that many of the entities did not even exist.[11] (Rec. Doc. 13010-1 at 7-9.)  Just this month, Special Master Freeh filed a motion seeking return of payments from two Seafood claimants that he reports falsely represented in unsubstantiated sworn written statements that all their 2009 revenue was from commercial shrimping when over 80% came from lucrative marine cleanup work.  An internet search easily locates an article referenced by Special Master Freeh featuring the claimant's cleanup business.  (Rec. Doc. 13468-1, 10/7/14 Special Master Motion at 2-5.)

BP also has identified Seafood claims in which the CSSP may have paid inflated Seafood compensation amounts to claimants based on a failure to adhere to Settlement requirements.  BP finds claims in which the CSSP has allowed Seafood claimants to substitute unsubstantiated sworn statements to establish historic revenue as a basis to compute the claimant's compensation amount, even when those statements appear to contradict existing documents.  (Rec. Doc. 13347-18, Cantor Decl. ¶14.)  Also, BP has identified Seafood claims where the Claims Administrator inappropriately has applied the limited exception provided under the Settlement — which allows the Claims Administrator discretion to disregard a year of a claimant's historic revenue if the claimant did not participate that year at the same level of effort due to circumstances beyond the claimant's control — by disregarding certain years of Seafood claimants' historic revenue even though it appears the circumstances were in fact under the claimant's control.  (*Id.* at ¶15.)  Additionally, BP finds Seafood claims where revenue unrelated to Seafood harvesting is improperly included as Seafood revenue thereby inappropriately increasing awards.  (*Id.* at ¶16.)

---

[11]   Additionally, Special Master Freeh reports that Mr. Burrle submitted falsified 2008 and 2010 tax returns to the CSSP.  According to Special Master Freeh, Mr. Burrle's 2008 tax return, while signed, was dated in 2011 and prepared only the GCCF asked for it; also, his 2010 tax return form was never filed with the IRS.  According to information from Special Master Freeh, the CSSP paid the claims without verifying that Mr. Burrle filed his returns with the IRS.  (Rec. Doc. 13010-1, Special Master Freeh Report at 2-4 and Exhibits D and F.)

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████        ████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████        ████████

████████████████████████████  BP also knows from Special Master Freeh's report that while the CAO's internal audit in January 2013 raised "red flags" regarding Mr. Thonn's claim, this "did not cause any further inquiry to occur" and the fraudulent Thonn claim nevertheless went on to be paid by the CSSP.  (Rec. Doc. 11287, 9/6/13 Special Master Report at 14-15.)

BP too has expressed concern about the CSSP's Quality Assurance / Quality Control function.  KPMG auditor and risk management expert, Mark Hutchins, found that the 2013 reports by the CAO's Quality Assurance/Quality Control department fail to meet industry standards for internal audit reports.  (Rec. Doc. 13347-37, Hutchins Decl. at ¶19.)   More generally, he finds no evidence that the CAO conducted a basic risk assessment of the CSSP, including claims processing, to determine the objective risks and therefore controls required, nor does it appear the CAO implemented any recognized internal control framework to ensure the integrity of the CSSP and the accuracy of claims processing.  (*Id.* at ¶¶ 14-19.)

BP also questions whether the information technology systems in place at the CSSP are sufficient to ensure Seafood claims are paid accurately.  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

Surely, after a year of work at an expense of over $14 million, there is something substantive for the Claims Administrator to share with BP and Class Counsel regarding the investigation and findings of outside auditor McGladrey LLP. ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████   ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

### 3. The Neutrals' Recommendation to Allow the Claims Administrator to Create Rules That May Limit the Parties' Appellate Rights Is Unauthorized and Must Be Rejected.

BP also objects to the Neutrals' recommendation that "the Claims Administrator shall have the discretion and authority to … limit and define appellate rights (including appellate rights to appeal panels, … the Magistrate Judge, the District Judge, and appellate courts)." (Rec. Doc. 13416-1, Recommendations at 16.) The Settlement specifies the determinations that are subject to review by the Appeal Panel, and the Claims Administrator has no authority to eliminate rights conferred by the agreement. Moreover, the CSSP's authority (through the Appeals Coordinator) to promulgate procedural rules to govern appeals applies only to the procedures for "Appeals" to the Appeal Panel. (Rec. Doc. 6430, Settlement § 6.3) The

Settlement does not purport to vest CSSP officers with authority to promulgate rules governing the courts' exercise of judicial review of decisions of the Appeal Panel, nor could it have done so. In addition, neither the Claims Administrator nor the Court has authority to "limit" or "define" any party's rights to appeal to the Fifth Circuit. As BP has explained at length in Fifth Circuit Appeal Nos. 13-30843, 13-31296, 13-31299, and 13-31302 (argued Oct. 6, 2014), BP never waived its statutory right to appeal from district court decisions on requests for judicial review, and the law is clear that appellate rights in complex settlement agreements are preserved absent an *explicit* and *unequivocal* waiver. Nothing in the Settlement even arguably approaches that standard, so BP's statutory right to seek Fifth Circuit review of any appealable orders is preserved and cannot be limited or interfered with by the Claims Administrator.

## CONCLUSION

For the foregoing reasons, BP respectfully requests that the Neutrals' recommendations be modified in three respects. *First*, in light of the fact that the Settlement does not permit second distributions from the Seafood Fund to occur at this time, the Neutrals' recommendations to proceed now with such Round Two distributions must be rejected. Issuance of second distributions at this time must also be rejected given the pending Rule 60(b)(3) Motion related to Mr. Watts' fraudulent inducement in connection with establishment of the Seafood Fund. *Second*, the Neutrals' recommendation that steps be taken to mitigate and correct fraud and errors in the Seafood Program before any second distributions are allowed to occur is a measure vital to the integrity of the CSSP and should be adopted. However, the specific steps the Neutrals recommend in this vein must be upgraded to incorporate the requisite transparency and accountability necessary to ensure that any errors and fraud in the Seafood Program are remedied before any second distributions occur. *Third*, the Neutrals' recommendation to vest authority in

the Claims Administrator to limit and define BP's appellate rights must be rejected as unauthorized.  In the event the Court overrules BP's objections, and orders second distributions either to proceed at this time and/or without the necessary modifications to the Neutrals' recommendations requested by BP, the Court should adopt the Neutrals' recommendation to target a second distribution of $500 million, an amount substantially greater than the Seafood Compensation Program estimated would be distributed in Second Round payments.

Dated:  October 20, 2014                   Respectfully submitted,


                                           */s/ Wendy L. Bloom*
Mark Holstein                              Richard C. Godfrey, P.C.
BP AMERICA INC.                            J. Andrew Langan, P.C.
501 Westlake Park Boulevard                Wendy L. Bloom
Houston, TX  77079                         KIRKLAND & ELLIS LLP
Telephone:  (281) 366-2000                 300 North LaSalle Street
Telefax:  (312) 862-2200                   Chicago, IL 60654
                                           Telephone:  (312) 862-2000
                                           Telefax:  (312) 862-2200


Daniel A. Cantor                           Jeffrey Bossert Clark
ARNOLD & PORTER LLP                        KIRKLAND & ELLIS LLP
555 Twelfth Street, NW                     655 Fifteenth Street, N.W.
Washington, DC 20004                       Washington, D.C. 20005
Telephone:  (202) 942-5000                 Telephone:  (202) 879-5000
Telefax:  (202) 942-5999                   Telefax:  (202) 879-5200


Jeffrey Lennard                            */s/ Don K. Haycraft*
Keith Moskowitz                            S. Gene Fendler (Bar #05510)
DENTONS US LLP                             Don K. Haycraft (Bar #14361)
233 South Wacker Drive                     R. Keith Jarrett (Bar #16984)
Suite 7800                                 LISKOW & LEWIS
Chicago, IL  60606                         701 Poydras Street, Suite 5000
Telephone:  (312) 876-8000                 New Orleans, Louisiana 70139
Telefax:  (312) 876-7934                   Telephone:  (504) 581-7979
                                           Telefax:  (504) 556-4108


*OF COUNSEL*


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.**
**AND BP AMERICA PRODUCTION COMPANY**

19

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of October 2014.

Dated:  October 20, 2014                              Respectfully submitted,


                                                      ***/s/ Don K. Haycraft***
                                                      Don K. Haycraft