# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "*DEEPWATER HORIZON*" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010, | § | |
| | § | JUDGE BARBIER |
| Applies to:  Nos. 10-2771, | § | |
| 10-4536 and All Other | § | MAG. JUDGE SHUSHAN |
| Cases. | § | |
| | § | |

---

## HALLIBURTON ENERGY SERVICES, INC.'S RESPONSE IN OPPOSITION TO BP EXPLORATION & PRODUCTION INC.'S AND BP AMERICA PRODUCTION COMPANY'S MOTION TO AMEND THE FINDINGS, ALTER OR AMEND THE JUDGMENT, OR FOR A NEW TRIAL, AND OBJECTION TO THE DECLARATION OF DAVID B. LEWIS

## TABLE OF CONTENTS

I.      BACKGROUND & SUMMARY OF ARGUMENT ........................................1

II.     APPLICABLE LEGAL STANDARD..........................................................3

III.   ARGUMENT ...........................................................................................4

      A.    BP Has No Basis to Complain About the Admission of Evidence That
           It Elicited During Its Cross-Examination of Dr. Beck..............................4

      B.    The Court Properly Admitted and Relied on Dr. Beck's Redirect Testimony
           Regarding the Magnitude of the Compressive Force on the Casing. ....................8

      C.    Substantial Corroborative Evidence Shows a Casing Breach, Rendering
           Harmless Any Error in the Admission of Dr. Beck's Testimony..........................12

      D.    BP Has No Basis to Claim It Was "Surprised" that Casing Breach Would
           Be an Issue at Trial or Would Be Relied Upon in the Court's Order....................19

      E.    BP's Post-Trial *Daubert* Objection to Dr. Beck's Testimony Is Untimely and
           Unavailing, Particularly Since the Evidentiary Error Alleged by BP Does
           Not Affect BP's Substantial Rights Given the Sufficiency of the Evidence
           Supporting the Casing Breach. ..............................................................23

IV.   CONCLUSION .......................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>*Case Law Authority*</u>:

*Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370 (5th Cir. 2000) ............................ 8

*Carbo v. Chet Morrison Servs., LLC*, No. 12-3007, 2013 U.S. Dist. LEXIS
       152979 (E.D. La. Oct. 24, 2013)............................................................. 24

*C.P. Interests Inc. v. California Pools, Inc.*, 238 F.3d 690 (5th Cir. 2001).............. 9

*Decorte v. Jordan*, 497 F.3d 433, 441 (5th Cir. 2007) ............................................ 24

*F&S Offshore, Inc. v. K.O. Steel Casting, Inc.*, 662 F.2d 1104 (5th Cir. 1981) ........ 22, 23

*Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986) ............................ 3

*Foradori v. Harris*, 523 F.3d 477 (5th Cir. 2008) .................................................... 23, 24

*Goodman v. Highlands Ins. Co.*, 607 F.2d 665 (5th Cir. 1979)................................. 3

*Harrington v. City of Chicago*, 433 F.3d 542 (7th Cir. 2006) .................................. 12, 23

*In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182,
       2009 U.S. Dist. WL 5216899 (E.D. La. Dec. 29, 2009)........................ 19, 22

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .............................................. 24

*Lidle v. Cirrus Design Corp.*, 2010 U.S. Dist. LEXIS 67031
       (S.D.N.Y. July 6, 2010) ........................................................................... 24

*Ohler v. United States*, 529 U.S. 753 (2000) ........................................................... 8

*Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601 (7th Cir. 2000).............................. 22

*Pryor v. Trane Co.*, 138 F.3d 1024 (5th Cir. 1998) ................................................. 3

*Ross v. Marshall*, 426 F.3d 745 (5th Cir. 2005) ...................................................... 3

*S. Pac. Transp. Co. v. Chabert*, 973 F.2d 441 (5th Cir. 1992) ................................. 13

*Schiller v. Physicians Res. Group, Inc.*, 342 F.3d 563 (5th Cir. 2003)..................... 3

*Sibley v. Lemaire*, 184 F.3d 481 (5th Cir. 1999)...................................................... 3

*Simon v. United States,* 891 F.2d 1154 (5th Cir. 1990) ............................................ 22

*Templet v. HydroChem Inc.*, 367 F.3d 473 (5th Cir. 2004) ...................................... 3, 23

*United States v. Bates*, No. 99-11382, 2000 U.S. App. Lexis 39182
(5th Cir. 2000) ........................................................................................... 24

*United States v. Hall,* 845 F.2d 1281 (5th Cir. 1988) ................................................. 8

*United States v. Truitt,* 440 F.2d 1070 (5th Cir. 1971) ............................................. 8, 12

*Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989) ....................................... 3

## *Statutes and Rules:*

Federal Rule of Civil Procedure 52(b) ........................................................................ 3

Federal Rule of Civil Procedure 59(a) ........................................................................ 3

Federal Rule of Civil Procedure 59(e) ........................................................................ 3

Halliburton Energy Services, Inc. ("HESI") files this Response in Opposition to BP Exploration & Production Inc.'s and BP America Production Company's (collectively, "BP") Motion to Amend the Findings, Alter or Amend the Judgment, or for a New Trial,[1] and Objection to the Declaration of David B. Lewis:

## I.
## BACKGROUND & SUMMARY OF ARGUMENT

The Court properly found that the evidence in the Phase One trial record established that there was a breach in the production casing below the float collar (*i.e.*, in the shoe track) which caused the cement to be placed improperly at the bottom of the Macondo well.  BP now erroneously claims:  (1) that the Court, in its Findings of Facts and Conclusions of Law—Phase One Trial (Dkt. No. 13355) ("Order"), relied on certain excluded opinion testimony from Dr. Gene Beck and, therefore, (2) *all* of the Court's findings with respect to the casing breach and flow path of hydrocarbons should be set aside in favor of BP's nonsensical flow path theory— that hydrocarbons flowed unrestrained through the annular cement sheath, through 189 feet of shoe track cement, through the fully-converted float collar, and up the production casing.  In its Motion, BP mischaracterizes the record and seeks to remedy its own failed trial tactics.  Indeed, BP itself introduced the very testimony that it now claims was excluded and upon which the Court relied to partially support its casing breach findings.

The Court did not err in admitting or relying on Dr. Beck's testimony regarding the magnitude of the compressive force BP placed on the production casing as it ran the production casing into the debris-filled Macondo well.  In its cross-examination of Dr. Beck, BP itself explored the bases for Dr. Beck's opinion that the Sperry data indicates at least 140,000 pounds of compressive force on the production casing.  Accordingly, BP's cross-examination re-

---

[1] Dkt. No. 13457 ("BP's Motion").

introduced Dr. Beck's testimony.  That cross-examination also opened the door to Dr. Beck's further testimony on redirect on the topic BP now contends was excluded.  Moreover, during Dr. Beck's redirect examination, BP did not object to HESI's questions regarding the basis and impact of the compressive force BP exerted on the production casing.  Tellingly, for its conclusion that BP placed as much as 140,000 pounds of compressive force on the production casing, the Court cites exclusively to Dr. Beck's testimony on BP's cross-examination and on HESI's redirect examination, to which BP did not object.  Accordingly, Dr. Beck's testimony was properly admitted, and the Court's reliance on that testimony is sound.

Even assuming that the Court erred, which it did not, any such error based on a limited portion of Dr. Beck's testimony was harmless and not prejudicial to BP.  BP improperly attempts to rely upon its limited objection to a small portion of Dr. Beck's testimony (relating to the 140,000 pounds of compressive force) to support its belated, larger objection to all of the evidence showing that BP breached the Macondo production casing.  As the Court made clear in the Order, substantial corroborative evidence in the record demonstrates that the casing was breached.  BP's contention now, that it was unfairly surprised by the Court's reliance on Dr. Beck's allegedly excluded testimony regarding the magnitude of the compressive force experienced by the production casing, is disingenuous in light of BP's cross-examination of Dr. Beck on that very issue.  BP also had ample notice that HESI would prove the casing breach at trial and, therefore, BP had every incentive to attempt a rebuttal of the evidence in support thereof.  Thus, BP's Motion represents an improper and untimely attempt to raise arguments that could have and should have been offered at trial.  Finally, BP's *Daubert* challenge to Dr. Beck's testimony is untimely and ignores the abundant authorities that permit an expert to testify based on his or her personal knowledge and specialized experience.  BP's Motion should be denied.

2

## II.
## APPLICABLE LEGAL STANDARD

BP seeks amended findings, an amended judgment, or a new trial pursuant to Federal Rules of Civil Procedure 52(b), 59(a), and 59(e).  Rule 52(b) serves primarily "to correct manifest errors of law or fact[.]" *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986).  Similarly, by providing for motions to alter or amend judgments, Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989). Moreover, the moving party must "clearly establish" the manifest error to succeed on its motion. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005).  The Fifth Circuit cautions that "reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004).  Rule 59(e) "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Schiller v. Physicians Res. Group, Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

A trial court will grant a new trial pursuant to Rule 59(a) when "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 n.3 (5th Cir. 1998).  "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999).  Further, "[a] trial judge sitting without a jury is entitled to even greater latitude in the admission or exclusion of evidence." *Goodman v. Highlands Ins. Co.*, 607 F.2d 665, 668 (5th Cir. 1979).

## III.
## ARGUMENT

**A.      BP Has No Basis to Complain About the Admission of Evidence That It Elicited During Its Cross-Examination of Dr. Beck.**

BP cannot complain about the admission of expert testimony that BP itself elicited.  In its Motion, BP relies on its objections during Dr. Beck's direct examination[2] and an objection to Dr. Beck's use of an animated demonstrative during his redirect examination[3] to argue that his testimony regarding the magnitude of the compressive force placed on the production casing was properly excluded and that the Court erred in relying on such testimony to find a breach in the casing.  However, BP's own cross-examination of Dr. Beck, in which it inquired into Dr. Beck's compressive force opinion, renders irrelevant the impact of any such objections.  In fact, BP's Motion represents a belated attempt to exclude testimony elicited in part by its own cross-examination, as well as Dr. Beck's redirect testimony offered after BP had opened the door to that topic by its decision to cross-examine Dr. Beck on the topic.

At the conclusion of Transocean's cross-examination of Dr. Beck, the Court adjourned for the day, which provided BP the evening of April 3 to further prepare for its cross-examination of Dr. Beck.  (*See* Tr. 7223:15-7226:2 (BP noted that this would allow it to "incorporate the questions that have already been done" and streamline its cross-examination of

---

[2] BP asserts that it objected to Dr. Beck's direct examination testimony that the production casing experienced as much as 140,000 pounds of compressive force, which caused the casing to buckle.  But it is unclear whether the Court sustained BP's objection to Dr. Beck's testimony about buckling generally, Tr. 7137:14-18, or BP's objection to Dr. Beck's attempt to explain his compressive force opinion through the use of an animated demonstrative, Tr. 7138:3-8.  The Court later noted that "[w]e are not going to the animation" but that it would allow Dr. Beck to "testify about what he thinks happened[.]"  Tr. 7146:19-23; *see also* Tr. 7148:11-22.  Regardless of the scope of the sustained objections during Dr. Beck's direct examination, BP later repeatedly referred to and reintroduced Dr. Beck's direct examination testimony regarding the magnitude of the compressive force BP placed on the production casing.  *See infra* pp. 4-8.

[3] *See infra* Section III(B).

Dr. Beck)).   The next day, BP elicited the following testimony on cross-examination, all of which is omitted from BP's Motion:

Q.     **[By BP]** . . . When did the casing part under your theory?

A.     I think the casing would have parted at the conversion of the float collar.

Q.     So it's your theory that the float collar had debris on the top of it; right?  On the top of it; right?

A.     Yes.

Q.     That then a pressure of 3142 released that debris; right?

A.     Yes.

Q.     And then that pressure still had enough energy, after clearing that clog, to then go down further and then breach casing; correct?

A.     Well, that's not my full theory.  So in conjunction with that pressure, there's additional stresses on that casing.  And what's important to note about that pressure, okay, that's not just 3000 psi being placed on the bottom of the casing.  It's a shock wave.  So when that sudden drop in pressure that we saw from 3142 psi all the way down to 200 –

Q.     Uh-huh.

A.     – just like you had opened a valve at the surface and bled the pressure off, like all the other pressure responses before.  When that happens, when you have that sudden of a pressure surge on a well, there's a shock wave – not only in the fluid, but a shock wave in the casing itself – that magnifies whatever stresses are in that casing.

.  .  .  .

So to be clear, I'm not talking about just 3000 psi being applied to the shoe track.  Okay.  I'm no fool, Mr. Regan.  I know 3000 psi is not going to break the shoe track.  Okay.  There's – it takes a lot of stress to break a shoe track.  And – I mean, if you'd like to see it, I have a demonstrative that shows what my theory is in more detail than this.  But this meets the needs.

My theory is that there was extreme stress placed in the casing when you ran it.  Okay.  We had fill in the casing, right.  We ran into something in the bottom of the well.  The shoe track was plugged up either at the guide shoe or at the guide shoe and at the float collar.  Okay.

5

Something gave way.  It doesn't even have to be the float collar that gave way for the shock wave to occur.  If the shoe track came apart or cleared or broke, right, there's still this same shock wave.

So what's critical is that there was a shock wave that occurred. That's fairly clear from the pressure data.  And we had the casing in an additional stress condition; we know that because it had fill in it.  It had to shove that fill up in there.  And so there were conditions where the casing had extra stress in it.  And my theory is that the shock wave broke the casing at some point.

Q.    What was the grade of casing?

A.    That was Q125 casing on the 7-inch.

Q.    Was it HC casing?

A.    I believe it was, yes.

Q.    "HC" stands for "high collapse"?

A.    High collapse, yes.

Q.    What was the – the burst rating of the casing?

A.    I don't remember right now, but 7-inch, 32-pound Q, that's got to be up in the 12,000 to 14,000-psi range.

Q.    Collapse rating?

A.    Probably very similar.

Q.    You agree, understanding that you have the shock wave theory –

A.    Let me back up.  Okay.  I'm just pulling numbers.  This is – I don't normally pull numbers out.  I go to a book and look those numbers up, but I do know that that's the general range.  That's very strong casing.  I'm not – I don't propose this theory lightly.  That's very strong casing.

Q.    *Yesterday you said you think about 140,000 pounds was taken when they were running the casing; is that correct?*

A.    I think right at the very end, right landing out, it was – it was a very sneaky time to start taking weight, but right when it landed out, *I see 140,000 pounds of compression being place in the casing*.

       . . . .

Q.    Did you see a daily drilling report where it says how much weight they actually took when they ran the casing?

A.    I saw a daily drilling report that reported what they observed as their weight.  But the daily drilling report is a written verbal report as opposed to the Sperry data being actual recorded data on a very

> high frequency, by being recorded, you know, every second or
> less.
>
> . . . .
>
> Q.   Do you see in the daily drilling report, with respect to the casing,
> when they ran it, it says:  'Saw 10,000 weight' – I'm not as good at
> this as – 'at 18,218'.  Okay.  Do you see that?
>
> A.   I see that, yes.
>
> Q.   All right.  So just for purposes of what the people who were
> running the casing wrote down that day, they say they saw a
> 10,000 weight.  You looked at other information.  You just said
> that.  But the people, who were doing it at the time, saw 10,000;
> correct?
>
> A.   Correct.
>
> Q.   When you run casing, you can have drill pipe stretch and casing
> stretch; correct?
>
> A.   Yeah, you can – you do.  I mean, it's not that you can, you do.
>
> Q.   So if you are looking at hook load or – when you are looking at
> hook load or weight on the bit, you have to take into account some
> stretch issues, correct?
>
> A.   Yes, you do.

(Tr. 7351:4-7356:4) (emphasis added).  No party objected to this testimony of Dr. Beck that BP elicited on cross-examination.

Thus, on cross-examination, BP directly referred to and reintroduced Dr. Beck's direct examination testimony that it now contends was excluded: "*Yesterday you said you think about 140,000 pounds was taken when they were running the casing; is that correct*?"  (Tr. 7354:4-5) (emphasis added).  BP also inquired thoroughly into the bases for Dr. Beck's opinion on that issue in a failed but calculated attempt to cast doubt on the credibility of the evidence.  *See* Tr. 7353:10-7356:4 (quoted *supra*).  BP's cross-examination demonstrates that it made a conscious litigation decision to inquire into the bases of Dr. Beck's testimony regarding the magnitude of the compressive force BP placed on the production casing.  BP's Motion thus violates the "well-established commonsense principle" that generally "a party introducing evidence cannot

7

complain . . . that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000). Further, even if such evidence was previously excluded during Dr. Beck's direct examination as BP claims, BP's decision to cross-examine Dr. Beck regarding his compressive force observations and conclusions opened the door and put any previously excluded testimony into the record. When a party asks an expert a question on cross-examination "pertain[ing]" to what would otherwise be excluded testimony because the topic was not in the expert's report, the party "open[s] the door" to the admission of that testimony. *Canal Barge Co. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir. 2000); *see also United States v. Truitt,* 440 F.2d 1070, 1071 (5th Cir. 1971) (noting that "[i]t is settled law that one waives his right to object to the admission of evidence if he later introduces evidence of the same or similar import himself"); *United States v. Hall,* 845 F.2d 1281, 1283 (5th Cir. 1988) (finding it was not plain error to "allow[] the jury to consider . . . proof adduced by the defendant as a deliberate part of trial strategy" where the defendant's counsel opened the door on cross-examination to the disputed testimony). Consistent with a determination that BP opened the door to Dr. Beck's compressive force testimony, in its findings of fact with respect to the magnitude of the compressive force experienced by the production casing, the Court cites exclusively to Dr. Beck's testimony that BP elicited on cross-examination, to which BP cannot object, and to Dr. Beck's testimony on redirect, to which BP did not object. *See* Order, ¶ 152 & note 60. The Court's reliance on such testimony was proper as, contrary to BP's claim, the testimony was not excluded and was admissible.

## B. The Court Properly Admitted and Relied on Dr. Beck's Redirect Testimony Regarding the Magnitude of the Compressive Force on the Casing.

The Court's decision to admit and rely on Dr. Beck's compressive force testimony on redirect also was proper on at least two grounds. First, BP's decision to cross-examine Dr. Beck on his identification in the Sperry data of 140,000 pounds of compressive force on the production

casing opened the door for HESI's redirect examination on that topic.  *See C.P. Interests Inc. v. California Pools, Inc.*, 238 F.3d 690, 699 (5th Cir. 2001) (finding no abuse of discretion in the district court's determination that plaintiff on redirect examination of its expert "was no longer confined to the scope of [the expert] report" because defendant had previously cross-examined the expert on issues beyond the report's scope).

Second, BP failed to object to Dr. Beck's compressive force testimony during HESI's redirect examination.  In its Motion, BP purports to rely on an objection it made during HESI's *redirect examination* of Dr. Beck, erroneously claiming that it objected "again" to Dr. Beck's "attempt to testify that he saw evidence of 140,000 pounds of compression placed on the casing[.]"  BP's Motion at 8.  BP's assertion is a mischaracterization of the record and of the nature and scope of that objection.  Set forth below are the questions HESI posed to Dr. Beck during redirect examination regarding the compressive force and its effect on the casing, all of which were posed and answered *without objection by BP*.  BP only objected to HESI's renewed proposal to show the Court Dr. Beck's animated demonstrative.  Contrary to BP's Motion, BP did not object to Dr. Beck's testimony regarding the compressive load or its magnitude.[4]

> Q.    Okay.  Lastly, I just want to turn to your – ***your opinion of what happened with respect to flow path***.  Okay?  And I think in response to BP's counsel's question, he said he understood that ***you think there were greater compressional forces as – according to you, based on your analysis of the Sperry data***.  Do you recall that?
>
> A.    Yes.
>
> Q.    All right.  The 10 kips that he referenced you to that he showed you in the daily drilling report, do you dispute that the casing

---

[4] It would have been incongruous, if not prejudicial to HESI, to allow BP to cross-examine Dr. Beck on his identification of 140,000 pounds of compressive force only to exclude the testimony elicited during HESI's redirect examination on the same topic.

experienced 10 kips of compressional load before it bottomed out? I'm sorry, and just in terms of sequence, not total compression.

A.     In sequence, I mean, there was a point in time that it saw a little – a bobble, a 10-kip bobble, or a 10,000-pound bobble.

Q.     ***And do you think – is that the only – based on your analysis of the various Sperry data he referenced, is that the only compressional load that that casing took when they ran it into the hole?***

A.     No, I don't – I don't think so.  I think that the morning report got it wrong, and maybe they just didn't notice what happened.  ***But when I look at the Sperry data, I see evidence of 140,000 pounds of compression placed on that casing***.

Q.     ***In your opinion, when that compressional load is applied to the casing at the bottom – when it's run into the hole, what is the effect?***

A.     Okay.  ***So when you place that much compression – that is a lot of compression to place on a casing string, particularly – on any string.  But a 7-inch string, it's going to buckle the daylights out of it.  That string is going to be buckled for a long way up the hole***.

       ***And when you buckle the string, you're not only – you're magnifying; right?  You're increasing that 140,000 pounds of stress by factors of 1 ½ to 2 ½ in terms of the stresses on that casing.***

Q.     In your opinion, Dr. Beck, ***was the compressional loads applied to that casing sufficient to compromise, in conjunction with the shock that you talked about during the float collar conversion, sufficient to [compromise] the integrity of the casing below the float collar?***

A.     ***I believe it was.  I believe that there was enough stress that with that amount of compression, with the buckling on the well, with the buckling on the casing, and with this pressure shock wave, I believe that broke the shoe track when – at the float collar conversion.***

(Tr. 7378:25-7380:19) (emphasis added).

As he had done on cross-examination in response to BP's questions, Dr. Beck again testified, *without objection by BP*, that the production casing was buckled by at least 140,000 pounds of compressive force, and that the compromised shoe track below the float collar "broke" during the operation to convert the float collar.  Not once during these five questions and answers did BP lodge an objection that such evidence was previously excluded.  Rather, BP's *only* objection during HESI's redirect examination came in response to HESI's renewed offer to show the court Dr. Beck's animated demonstrative after the five questions and answers identified above:

> MR. HILL:  Now, Your Honor, respectfully, ***this is exactly what the animation that you did not want to see – or that you ruled that we wouldn't be able to play yesterday shows***.  In response to BP's counsel's questions, I think he opened the door.
>
> Dr. Beck has testified about the underpinning of that.  ***If you would like to see a graphical representation of what he believed happened, we could shorten the clips at the beginning and show Your Honor***.
>
> MR. REGAN:  I would have like to see it at his deposition, and I'd like to see it in his report.  It wasn't in either one, and that's the problem.  I asked him about the picture in his report.  I put it up on the screen.  I asked him for his basis for how he thought the casing –
>
> THE COURT:  I'll sustain that – ***maintain the objection***.

(Tr. 7380:20-7381:10) (emphasis added).

Dr. Beck testified, without objection, about the 140,000 pounds of compressive force he identified on the Sperry data log and about his broader explanation as to the other evidence showing the casing breach and the flow path through the breach.  BP only objected to the renewed offer to show the Court Dr. Beck's demonstrative animation.  The Court "maintained" BP's objection as to the exclusion of the animation, but the Court did not exclude Dr. Beck's opinions about the compressive load specifically or his opinions about the casing breach generally.

11

It is disingenuous for BP now to claim that the entirety of Dr. Beck's testimony about the compressive load on the casing was excluded at trial.  If BP understood it to have been excluded (during Dr. Beck's direct examination) and wanted it to remain excluded, BP had no reason to cross-examine Dr. Beck about it.  But BP chose to question Dr. Beck on this issue.  *See Truitt*, 440 F.2d at 1071 ("It is settled law that one waives his right to object to the admission of evidence if he later introduces evidence of the same or similar import himself.").   If BP understood this evidence to have been excluded at trial, BP would not have elicited the testimony itself and would have objected during Dr. Beck's redirect examination when he testified about his compressive force conclusion.  But BP did not object.  And, if BP understood it to have been excluded at trial, then BP could have objected to HESI's Proposed Findings of Fact and Conclusions of Law which relied on Dr. Beck's testimony concerning the casing breach, including the very unobjected to record evidence and testimony that BP now claims was excluded.  *See* Dkt. No. 10468 at 181-184, 247-258.  Despite these numerous opportunities, BP made no objection at trial, filed no such objections to HESI's Proposed Findings of Fact and Conclusions of Law, and now improperly petitions the Court at this very late date to avoid the facts and to otherwise remedy the consequences of its own trial strategy.  *See Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006) ("Rule 59(e) does not provide a vehicle for a party to undo its own procedural failures.").   The record evidence and BP's strategic litigation decisions belie its current arguments, and BP's Motion should be denied.

### C.    Substantial Corroborative Evidence Shows a Casing Breach, Rendering Harmless Any Error in the Admission of Dr. Beck's Testimony.

Even if Dr. Beck's testimony about the 140,000 pounds of compressive force was erroneously admitted at trial, which it was not, any such admission was harmless error.  "In a bench trial, reversal is only warranted for the erroneous admission of evidence if all of the

competent evidence is insufficient to support the judgment, or it affirmatively appears that the incompetent evidence induced the court to make an essential finding which it otherwise would not have made." *S. Pac. Transp. Co. v. Chabert*, 973 F.2d 441, 448 (5th Cir. 1992).  BP cannot meet this standard; nor can it identify any prejudice resulting from the admission of Dr. Beck's testimony about the magnitude of the compressive force BP placed on the production casing. The substantial evidence corroborating the finding of a casing breach below the float collar renders harmless any claimed error in admitting Dr. Beck's testimony regarding the magnitude of compressive force on the casing.

BP overreaches when it asserts "[t]he casing-breach theory [with which the Court agreed] *depends critically* on the assertion that, when it was run into the well, the production casing 'experienced as much as 140,000 pounds of compressive force,' [] which supposedly would 'buckle the daylights out of' the production casing and leave it in a weakened state."  BP's Motion at 1 (citations omitted) (emphasis added).   After overstating the criticality of Dr. Beck's compressive force testimony to the casing breach theory, BP continues:  "There is, moreover, *no other evidence in the record* to support this weakened-casing element, which is central to the casing-breach theory, and therefore that theory cannot stand."  *Id.* at 2 (emphasis added).

BP is wrong.  BP ignores that Dr. Beck's report notes that "BP engineers were concerned that the long string production casing could buckle when it was being lowered into the well" and that Brian Morel requested "a buckling analysis on the long string production casing[.]"  TREX 8140 at 84.  Further, Dr. Beck opined that this analysis "indicated that buckling was possible under the conditions in which the casing was actually run into the hole."  *Id.* (emphasis added). As the Court observed, Dr. Beck's testimony regarding the magnitude of the compressive force BP placed on the production casing is not the only evidence in the record that indicates the

13

casing was weakened by being run into the well under the conditions present in the Macondo well.  *See* Order, ¶ 153.

While the magnitude of the compressive force identified by Dr. Beck is corroborative of his broader casing breach opinion, there is substantial additional evidence in the record that supports Dr. Beck's opinion and the Court's finding that there was a breach in the casing below the float collar.  Indeed, the Court was very clear as to what it considered the most persuasive evidence supporting a casing breach, and it was not the testimony about the compressive force applied to the casing.  After the Court stated that it "agrees with Dr. Beck's opinion and finds that a breach or opening occurred in the shoe track during the ninth attempted conversion [of the float collar]," the Court further stated:

> 156.  The Court finds ***particularly persuasive*** the fact that a breach in the shoe track is consistent with, and thus provides an explanation for, the data recorded after circulation was achieved—most notably the lower-than-expected circulating pressures.   Contrariwise, the Court finds BP's apparent explanation for the low circulating pressures—that the predicted pressures must have been incorrect—unpersuasive.

> 157.  Furthermore, a breach in the shoe track is consistent with, or at least is not incompatible with, other evidence and testimony regarding cement placement and how hydrocarbons entered the well, as explained below.

Order, ¶¶ 156-157 (emphasis added).

As further evidence of the casing breach below the float collar, the Court outlined substantial other record evidence:

First, the Court found that, once circulation broke, the rapid depressurization from 3,142 psi to about 150-200 psi and the resultant lower-than-expected circulating pressure indicate that "a breach or opening occurred in the shoe track during the ninth attempted conversion." *See*

Order, ¶ 155.[5]  In support of its findings, the Court relied on Dr. Beck's unobjected to testimony that the rapid depressurization was the signature of a mechanical failure in the float collar and shoe track, not of debris unplugging, *id.*, ¶ 145, an opinion that is consistent with the testimony of Transocean expert, Calvin Barnhill, *id.*, ¶ 138 (citing Tr. 4290:7-4291:9 (who testified that a gradual change in pressure is indicative of debris being cleared)).  Moreover, the Court relied on unobjected to testimony from Dr. Beck that the rapid depressurization and lower-than-expected circulating pressure, taken together, "demonstrate that rather than circulating mud through the three small ports at the bottom of the reamer shoe, the rig was actually circulating mud through a larger breach or opening in the shoe track below the float collar." *Id.*, ¶ 147.  This testimony is consistent with that of Bill Ambrose, Transocean's witness, who stated that the lower-than-expected circulating pressure indicated that "something has opened up in a larger geometry" in the path of circulation. *Id.*, ¶ 148 (citing Tr. 6174:14-19).  It also is consistent with the written report of Calvin Barnhill, Transocean's expert, which noted that the low circulating pressure indicated "[p]ossible damage to casing shoe track." *Id.*, ¶ 148 (citing TREX 7676, Attach. A.).  Finally, it is consistent with testimony from U.S. expert, Glen Benge, who stated that the sudden release from 3,142 psi presents "a big concern – that's a big risk because at that point you do not know where in the well you're circulating . . . Operationally you could have had a break in that well somewhere, and you're circulating at a much higher point." *Id.*, ¶ 149 (citing Tr. 2311:9-14, 2313:3-11).

Second, evidence showed the presence of large quantities of debris in the open hole, providing the conditions for compressing the end of the casing when BP ran it into the well and

---

[5] The Court also found that a breach below the float collar in the shoe track would not have been revealed by the positive pressure test, which only tests casing integrity from the float collar up to the top of the well.  *See* Order, ¶ 235.

set the casing into that debris.  *See* Order, ¶ 88, note 33 (citing TREX 3540 (a wireline log created prior to BP's running of the casing showing that "well conditions" prevented a wireline tool from reaching total depth), TREX 4515 (an email analysis initiated by BP just days prior to running the casing identifying 30,000 pounds of compressive force as sufficient to buckle the casing at the bottom of the well)); ¶ 107 (finding that BP ran the production casing with an unconverted float collar and without a mud filter, allowing debris to flow up the casing and above the float collar);[6] ¶¶ 108-109 (finding that after the casing was landed, BP "could not circulate mud at all" and "[t]he only explanation given at trial . . . is that debris blocked the flow path");[7] *and* ¶¶ 110-114 (finding that the crew's inability to circulate mud was due to debris blockage at both the reamer shoe and float collar, and circulation was only achieved when pressure built to 3,142 psi at a flow rate of 1 bpm, which is "approximately five times the pressure and less than one quarter the flow rate called for in [the float collar manufacturer's] specifications").[8]  This evidence about obvious blockage by debris at the reamer shoe—which is the very end of the production casing—further supports the Court's finding that the casing was compressed into debris when it was run to the bottom of the well.

Third, the Court's finding that there was a breach in the shoe track is consistent with the evidence showing the contemporaneous concerns of several BP engineering personnel who were involved in the attempted float collar conversion.  *See generally*, Order, ¶¶ 117-126 (citing Tr. 6305:13-16 (Nate Chaisson's testimony that Bob Kaluza said, "We may have blown something

---

[6] These findings are supported by, among other things, the following record evidence:  Tr. 7106:11-7107:20 (trial testimony of Dr. Beck); 7112:5-25 (trial testimony of Dr. Beck); Tr. 8366:8-8367:6 (trial testimony of Brent Lirette); TREX 2582.5.1.

[7] These findings are supported by, among other things, the following record evidence:  Tr. 7113:7-12 (trial testimony of Dr. Beck); TREX 8140 at 68.

[8] These findings are supported by, among other things, the following record evidence:  TREX 0007 at 1; TREX 2582 at 6; TREX 8140 at 72; Tr. 7109:2-25 (trial testimony of Dr. Beck); Tr. 7113:14-7114:17 (trial testimony of Dr. Beck); Tr. 7119:19-7120:20 (trial testimony of Dr. Beck).

higher up in the casing."); TREX 3188 (interview notes reflecting Bob Kaluza's statement regarding low circulating pressure, "that is odd you guys this is very low . . . That was an anomaly."); TREX 2584 (Brian Morel's email stating, "Yah, we blew it at 3,142, but still not sure what we blew yet."); TREX 4457 (Mark Hafle's email stating, "Shifted at 3,142 psi.  Or we hope so.  We are [circulating] now.")).   Ultimately, the Court found that while BP attempted to investigate the reason for the low circulating pressure, *see* Order, ¶¶ 125-126, BP never resolved "whether something was 'blown' or why the circulating pressure was low—other than to conclude, the next day, that the predicted pressures must have been incorrect—[and] BP instructed Halliburton to commence the cement job," *see id.*, ¶ 133.

Fourth, the Court's finding that there was a breach in the shoe track is supported by evidence of the speed with which the well blew out and by evidence gathered at the time the relief well operation intercepted the Macondo well.  Specifically, the Court agreed with Dr. Beck's unobjected to testimony that cement would exit the casing at the breach point and travel up into the annulus, leaving no cement in the annulus adjacent to the hydrocarbon zones below the breach point *and leaving no cement in the shoe track*.  *See* Order, ¶¶ 163-166.  This testimony also supports the finding that the blowout's rapidity suggests a lack of restrictions in the flow path, which is consistent with an absence of cement in the shoe track due to a casing breach below the float collar.  *See id.*, ¶¶ 164, 168.  The Court also found that, when the Macondo well was intercepted in September 2010 during relief operations, the absence of hydrocarbons in the upper annulus indicated that cement in the annulus set up and provided a barrier to flow, and that "one would *not* expect some of the annular cement to set up while the rest of the lower annulus and shoe track did not."  *See id.*, ¶¶ 169 (emphasis added).  Rather, the

17

Court found that this scenario is more consistent with a casing breach in the shoe track, whereby little to no cement was left in the shoe track to provide resistance to flow. *Id.*

Finally, the Court also found BP's alternative theory, the very flow path theory that BP again asks the Court to adopt, to be contrary to the evidence. *See generally*, *id.*, ¶¶ 170-178. BP's theory posits that cement was properly placed in the annulus and shoe track, but that hydrocarbons flowed through the annular cement, into the bottom of the reamer shoe, through 189 feet of shoe track cement,[9] through a fully-converted float collar,[10] and up into the casing. *See id.*, ¶¶ 170-171. However, the Court properly found that BP "ignores or dismisses the data recorded after circulation was achieved on the ninth conversion attempt, particularly the lower-than-expected circulation pressure, which, as noted, indicated that a larger opening was created in the flow path." *Id.*, ¶ 176. Moreover, the Court found that numerous simulations conducted by BP's flow path expert, Morten Emilsen, "could not exclude the breached shoe track as a plausible theory[.]" *Id.*, ¶ 173. The Court properly considered all of the evidence and found that there is "more support" in the record for "the chain of failures" leading to a casing breach than there is "for BP's chain of failures." *Id.*, ¶ 177.

As set forth above, the Court's finding that there was a breach in the shoe track below the float collar rests on a significant amount of evidence in addition to Dr. Beck's testimony regarding at least 140,000 pounds of compressive force being placed on the production casing.

---

[9] *See* Order, ¶ 97 (finding that the bottom 189 feet of the production casing below the float collar is the "shoe track") and ¶ 161 (finding that, had the cement been properly placed, "[t]ail cement would fill the shoe track" at the end of the cementing operation).

[10] The Court found that "the float collar did not fully and properly convert[.]" Order, ¶ 144. A substantial amount of record evidence showed that the float collar was either damaged or left unconverted during its attempted conversion process. *See generally*, *id.*, ¶¶ 134-142 and evidence cited therein. But the most compelling record evidence that the float collar did not convert is data from the negative pressure test, which indicated that 1,400 psi of pressure from *below* the float collar was transmitted *through* the float collar to the drill pipe *above* the float collar. In the converted position, the float collar "is rated to withstand 5,000 psi differential pressure from below." *See id*., ¶ 143. "[I]f the float collar had converted, it is unlikely 1,400 psi would have registered on the drill pipe." *Id.*

Indeed, the Court identified as "particularly persuasive" the consistency of the casing breach with the data regarding lower-than-expected circulating pressure after the ninth attempt to convert the float collar and with other evidence regarding cement placement and the most likely flow path of the hydrocarbons in the well, not Dr. Beck's testimony about compressive force.  Thus, the Court's determination that a casing breach prevented the cement job from achieving zonal isolation certainly does *not*, as BP asserts, rest critically on what BP claims to be excluded evidence.  *See* BP's Motion at 8.  Rather, the compressive force testimony provided by Dr. Beck is corroborative of other persuasive evidence indicating that there was a casing breach below the float collar.  Accordingly, despite the proper conclusion that there was no error in the Court's admission or consideration of Dr. Beck's testimony, any claimed error resulting therefrom was harmless, and BP's Motion must fail for this reason as well.  *See In re Katrina Canal Breaches Consol. Litig.,* No. 05-4182, 2009 U.S. Dist. WL 5216899, at *3 (E.D. La. Dec. 29, 2009) (denying a motion to amend the judgment or for new trial where movant contended it was unfairly surprised at trial by expert testimony that was outside the scope of the expert's report because "the Court had an abundance of other evidence to arrive at its conclusion").

### D. BP Has No Basis to Claim It Was "Surprised" that Casing Breach Would Be an Issue at Trial or Would Be Relied Upon in the Court's Order.

BP's assertions that it was "unfairly surprised" by, not given "notice" of, or "lacked incentive at trial to refute" Dr. Beck's testimony regarding the casing breach are absurd, *see* BP's Motion at 14, 17, 18, 20, as are its claims that it has been "actually prejudiced" by not being afforded an opportunity to provide "overwhelming evidence disproving the casing-breach theory" at trial, *see id.* at 19.  BP goes so far as to say it "had no incentive to offer evidence to refute the casing-breach theory and was understandably surprised that it formed a substantial basis for the Order's findings."  *Id.* at 18.  But BP itself engaged in a failed attempt to refute the

19

casing breach during its cross-examination of Dr. Beck.  BP's failure to rebut or adequately rebut a showing of casing breach was a result of BP's trial strategy and BP's choice not to rebut the record evidence supporting it; it certainly was not due to a lack of notice that Dr. Beck believed the evidence indicated there was a breach in the shoe track.

The so-called overwhelming, refuting evidence BP would have offered at trial appears to be the testimony of David B. Lewis, as contained in his untimely, post-trial declaration attached to BP's Motion, which should be rejected by the Court.[11]  *See* Dkt. No. 13457-3 ("Lewis Declaration").  While overly simplistic,[12] the substance of this declaration purports to go to the strength of the production casing used at Macondo, which is the type of testimony one might expect if the structural integrity and/or strength of the casing was at issue.  However, BP ignores the fact that casing strength and integrity clearly were at issue in the trial.  *Any theory positing damage to or a breach in the shoe track necessarily places squarely at issue the structural integrity and/or strength of the production casing below the float collar.*  Dr. Beck's report unambiguously identified damage to or a lack of integrity in the shoe track as one of his opinions.[13]  In fact, Figure 16 of Dr. Beck's report depicts the parting or breach of the shoe track below the float collar.[14]  BP's Motion ignores the fact that casing strength was at issue in the Phase One trial, and ignores the fact that nothing prevented BP from offering Mr. Lewis's

---

[11] For the reasons set forth herein, HESI objects to and moves to strike the post-trial Lewis Declaration as improper and untimely.

[12] While Mr. Lewis's declaration should be rejected by the Court as improper and untimely, it also does not refute the Court's casing breach finding.  Mr. Lewis purports to perform "industry standard calculations" regarding the burst pressures of HC Q-125 casing.  However, among several other defects, Mr. Lewis's calculations assume an ageless, pristine, continuous casing (without joints and threads where failure also can occur) and purport to evaluate the pressures required to burst the *wall* of his theoretical, continuous, pristine casing which was never installed in the Macondo well.

[13] *See, e.g.*, TREX 8140 at 62, 72-73, 75, 77 and 84 (all addressing damage to the shoe track and/or a lack of shoe track integrity).

[14] TREX 8140 at 85.

opinions on casing strength at trial to rebut Dr. Beck's opinion that there was a casing failure below the shoe track. There is no basis for BP's claim that it was surprised by Dr. Beck's opinions or by the Court's reliance on issues pertaining to casing strength and/or integrity.

Moreover, BP sat through trial while HESI and other parties marshalled evidence of the casing breach, including evidence that the lower-than-expected circulating pressure observed after the ninth attempt to convert the float collar was indicative of a casing breach below the float collar. As the Court found, the evidence supporting the casing breach is substantial,[15] and there can be no reasonable question that the structural integrity and strength of the shoe track were firmly at issue in the trial. Mr. Lewis took the stand to testify as BP's expert six days after Dr. Beck's testimony concluded. Despite BP's belated assurances that Mr. Lewis is fully qualified to rebut Dr. Beck's theory with industry-standard calculations, *see* BP's Motion at 19-20, despite the fact that casing integrity and strength were squarely at issue, despite the fact that BP reintroduced Dr. Beck's compressive force testimony six days prior, despite BP having laid the apparent groundwork for an attempt at rebuttal during its cross-examination of Dr. Beck[16], and despite the fact that BP had six days to prepare Mr. Lewis for his own trial testimony, Mr. Lewis offered no testimony rebutting Dr. Beck's casing breach theory and no testimony demonstrating that a breach in the shoe track is the "impossibility" that BP now falsely claims it to be.[17] That failure

---

[15] *See supra* Section III(C).

[16] During cross-examination, BP asked several questions of Dr. Beck that appeared to lay the groundwork for a potential attempt by BP to rebut the evidence showing a casing breach, including questions related to the specific "grade" of the casing, its "high collapse" rating, its "burst" rating and whether casing "stretch" should be accounted for when looking at data reflecting the "hook load" and "weight on bit" as reflected in the Sperry data log. *See* Tr. 7353:10-20, 7355:22-7356:4.

[17] In his declaration, Mr. Lewis cites one document as the basis for his calculations—"API TR 5C3 Technical Report on Equations and Calculations for Casing, Tubing, and Line Pipe Used as Casing or Tubing; and Performance Properties Tables for Casing and Tubing." Lewis Declaration, ¶ 13. This document is listed among the documents Mr. Lewis referenced in his Phase One trial expert report. *See* TREX 8098 ("Expert Report of David Lewis") at 34. Therefore, BP and Mr. Lewis could have provided the same testimony at trial that they now impermissibly purport to offer now via the untimely declaration.

falls squarely on BP's inability to rebut evidence showing the casing breach and BP's decisions at trial.  There is no basis in the trial record for BP to now offer, under a claim of surprise, evidence from its expert witness that could and should have been offered at trial.

Further, BP invites the Court to set a dangerous precedent in arguing that a litigant who ignores or misapprehends the nature and weight of the evidence at trial can claim surprise when a finder of fact relies on the great weight of that evidence in support of its findings.  "[M]anifest error is not demonstrated by the disappointment of the losing party." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).  BP claims that it was surprised initially by Dr. Beck's testimony at trial, but it failed to properly preserve that alleged error for appeal.  The proper procedure for a party alleging surprise by "new" expert testimony at trial is to seek a continuance or offer rebuttal testimony.  *See F&S Offshore, Inc. v. K.O. Steel Castings, Inc.*, 662 F.2d 1104, 1108-09 (5th Cir. 1981); *In re Katrina,* 2009 WL 5216899, at *2.  BP did neither.  At the time Dr. Beck proffered his expert testimony, BP had numerous experts, including Mr. Lewis, at trial or available to assist it in any attempt to rebut Dr. Beck's testimony or the other evidence indicating a casing breach.  Yet, BP did not seek a continuance in order to prepare any type of rebuttal or to prepare its cross-examination of Dr. Beck.  As the district court noted in denying the United States a new trial in *In re Katrina* under similar circumstances, the "phalanx of lawyers and experts present at trial were more than adequate to allow the Government to rectify any alleged surprise; however, it never requested any such relief." *In re Katrina,* 2009 WL 5216899, at *2.  Now, dissatisfied with the Court's findings, BP, with its own phalanx of lawyers and experts, attempts impermissibly to introduce, post-trial, new evidence from Mr. Lewis that was available to BP at the time of trial. *See Simon v. United States,* 891 F.2d 1154, 1159 (5th

Cir. 1990) (noting that a motion to alter or amend a judgment is not a proper vehicle for asserting arguments that could have been offered before the judgment was entered).

Reversible error from unfair surprise is limited to "situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify." *F&S Offshore*, 662 F.2d at 1108.  BP cannot credibly argue that Dr. Beck was a new expert witness or that HESI suddenly raised the casing breach for the first time at trial.  The Court should not permit BP to use Rule 59(e) to rehash arguments or to untimely introduce testimony that it should have introduced at trial.  *See Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) ("A Rule 59(e) motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment."); *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006) ("Rule 59(e) does not provide a vehicle for a party to undo its own procedural failures.").

> **E.    BP's Post-Trial *Daubert* Objection to Dr. Beck's Testimony Is Untimely and Unavailing, Particularly Since the Evidentiary Error Alleged by BP Does Not Affect BP's Substantial Rights Given the Sufficiency of the Evidence Supporting the Casing Breach.**

BP's untimely *Daubert* objection to Dr. Beck's casing breach testimony is unavailing.  Dr. Beck identified the possibility of buckling-induced casing breach in his initial expert report.  *See* TREX 8140 at 84-85.  The only *Daubert* challenge BP made to Dr. Beck's report focused exclusively on the allegedly impermissible legal conclusions contained in his report.  (Dkt. Nos. 5420-1; 5769).  BP renewed its pending *Daubert* challenge at trial but did not offer any other *Daubert* objection to Dr. Beck's testimony during direct, cross or redirect examination.  BP's post-trial *Daubert* objection to Dr. Beck's casing breach testimony is not timely and is, therefore, reviewed for plain error only.  *Foradori v. Harris*, 523 F.3d 477, 508 (5th Cir. 2008).  The plain error standard of review "requires a clear or obvious error that affects substantial rights."

*Decorte v. Jordan*, 497 F.3d 433, 441 (5th Cir. 2007); *see also United States v. Bates*, No. 99-11382, 2000 U.S. App. Lexis 39182, at *10 (5th Cir. Nov. 21, 2000).  BP cannot meet the plain error (or any other) standard.  Because the Court's findings regarding casing breach are sufficiently supported by other substantial evidence, the admission of Dr. Beck's testimony regarding the compressive load on the casing does not affect BP's substantial rights.  *Foradori*, 523 F.3d at 508 (where jury verdict was overwhelmingly supported by other evidence, the alleged error did not affect a defendant's substantial rights).

Moreover, Dr. Beck's testimony regarding the 140,000 pounds of compressive force was proper.  The Supreme Court has recognized that "engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases.  In other cases, the relevant reliability concerns may focus upon personal knowledge or experience."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (citations omitted); *see also Carbo v. Chet Morrison Servs. LLC*, 12-3007, 2013 U.S. Dist. LEXIS 152979, at *11-16 (E.D. La. Oct. 24, 2013);  *Lidle v. Cirrus Design Corp.*, No. 08-cv-1253, 2010 U.S. Dist. LEXIS 67031, at *10 (S.D.N.Y. July 6, 2010) ("Expert engineering testimony may rest on scientific foundations or on the personal knowledge or experience of the engineer.")  The Court recognized that Dr. Beck's casing breach testimony relied on his review of the relevant data,[18] which data has been in the possession of and available to BP since the *Deepwater Horizon* incident and was designated by BP on its trial exhibit list.[19]  Additionally, Dr. Beck testified about how his experience assisted him in forming his opinions based on the data he reviewed: "I live with buckling every day of my life in the job that I have.  I know the magnitudes of buckling.  I know what causes buckling, how much

---

[18] *See* Order at ¶ 88 and n. 33 ("Halliburton's expert Gene Beck explained at trial that data shows the production casing actually experienced as much as 140,000 pounds of compressive force…").

[19] *See* Dkt. No. 8622-1 ("The BP Parties' 2/19/2013 Good Faith Phase One Trial Exhibit List") (identifying TREX-043131 as "Sperry Sun data from 4/5/2010 to 4/20/2010").

compression causing [sic] buckling." (Tr. 7141:18-22).    Accordingly, Dr. Beck's expert testimony regarding casing buckling and its magnitude relies on both scientific foundations and on his personal knowledge and experience as a practicing engineer and is, therefore, proper. BP's post-trial *Daubert* objection should be denied.

## IV.
## CONCLUSION

For the reasons set forth herein, BP's Motion to Amend the Findings, Alter or Amend the Judgment, or for a New Trial should be denied in all respects.

Respectfully Submitted,

**GODWIN LEWIS PC**

**By:**  /s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Gavin E. Hill
State Bar No.  00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332
and
R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Misty Hataway-Coné
State Bar No.  24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s Response in Opposition to BP Exploration & Production Inc.'s and BP America Production Company's Motion to Amend the Findings, Alter or Amend the Judgment, or for a New Trial, and Objection to the Declaration of David B. Lewis has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 23rd day of October, 2014.

/s/ Donald E. Godwin.....................................
Donald E. Godwin