UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : | JUDGE BARBIER |
| | : | |
| | : | MAGISTRATE JUDGE SHUSHAN |

---

**UNITED STATES' OPPOSITION TO BP EXPLORATION & PRODUCTION INC. AND
BP AMERICA PRODUCTION COMPANY'S MOTION TO AMEND THE FINDINGS,
<u>ALTER OR AMEND THE JUDGMENT, OR FOR A NEW TRIAL</u>**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................ 1

**ARGUMENT** ...................................................................................................... 4

I.      BP Waived Any Objections to Dr. Beck's Testimony about the 140,000 Pounds of Compressional Force Applied to the Macondo Casing……………..…………… 4

II.     Even If the Disputed Evidence is Excluded, There Is Ample Evidence to Support the Court's Common Sense Conclusion that BP Damaged the Shoe Track, and Consequently Improperly Placed the Cement ............................................................ 8

III.    Whether or Not Due to a Casing Breach, the Cement Job Failed Because BP's Multiple Negligent Acts Resulted in Improper Placement of the Cement ................. 12

IV.    BP's Negligent Acts are Sufficient to Satisfy the "Multiple Negligent Acts" Formulation of Gross Negligence and Willful Misconduct ...................................... 16

        A.     No Threshold Number of Negligent Acts is Necessary to Satisfy the Multiple Negligent Acts Formulation of Gross Negligence……………. 16

        B.     BP is Grossly Negligent Under Any and All Cement Failure Theories ... 17

V.      BP Is Not Entitled to a "Do Over" Because It Failed to Rebut Dr. Beck or Exclude his Opinions Regarding a Casing Breach Before, During, or After the Phase One Trial ........................................................................................................... 19

**CONCLUSION** ................................................................................................. 23

## INTRODUCTION

The Court held that "BPXP committed a series of negligent acts or omissions that resulted in the discharge of oil, which together amount to gross negligence and willful misconduct under the CWA."[1] Phase One Findings of Fact and Conclusions of Law (Rec. doc. 13381-1) ("Phase One Findings") ¶¶ 518; 516-521. As noted by the Court in its findings (¶ 177 and fn. 68), this conclusion is entirely consistent with BP's own theory ("…BP's entire explanation for this tragedy and overarching theme at trial was that there was a series of failures."). BP's motion challenges this independent basis of the gross negligence finding.

At trial, the Court excluded a single demonstrative animation and, initially, some testimony related to Dr. Beck's use of the Sperry data to conclude that 140,000 pounds of compressive force was applied to the casing. BP seeks to leverage this sliver of testimony to exclude all of Dr. Beck's opinions about a casing breach, all of the Court's findings about damage to the casing, four other findings about the drilling margin, float collar, well circulation, and the cement bond log ("CBL"), and then overturn the Court's conclusion that "multiple acts" showed gross negligence and willful misconduct. The Motion should be denied for multiple reasons.

***First***, while BP argues that Dr. Beck's testimony about the potential load placed on the production casing based on the Sperry data also was excluded, the record clearly shows that BP waived its objection to that testimony and, under well-established law, this Court may rely on that testimony.

---

[1] The Court first determined that BP's actions concerning the disastrous negative pressure test, standing alone, constituted gross negligence and willful misconduct. (Phase One Findings ¶¶ 499-515, "*Findings Re: 'Gross Negligence' or 'Willful Misconduct' (Single Act)*" (italics in original.)). BP's motion does not in any way challenge the Court's factual findings and conclusions on this independent and determinative basis of liability.

**Second**, even if the evidence about the Sperry data is excluded, a review of the Phase One Findings demonstrates that ample other evidence supports the Court's conclusion that BP damaged the shoe track and consequently improperly placed the Macondo production casing cement.  Indeed, removal of the one disputed point of testimony would affect at most only a few sentences in the 150-plus page Phase One Findings,[2] and would not change a single ultimate finding or conclusion. For example, Dr. Beck himself discussed the potential for compression and buckling and a casing breach in his expert report and testimony; all that was (arguably) excluded was the use of the Sperry data to specify the amount of force that caused the buckling. Other experts in this case found that the undisputed data and observations leading up to the blowout demonstrated a likelihood or distinct risk that BP damaged the Macondo well production casing during its attempts to convert the float collar. Indeed, prior to pumping the cement job, even BP's own employees admitted that BP "blew" something in the casing. (*See, e.g.*, Phase One Findings ¶ 120,  "… Yah, we blew it at 3,142, **but still not sure what we blew yet**.") (emphasis in original).

**Third**, even assuming that the finding of damage to the shoe track is undone, the evidence clearly shows that BP otherwise improperly placed the cement, resulting in the cement's failure to provide a barrier to hydrocarbon flow. Regardless of its precise nature (*i.e.*, damaged shoe track, damaged float collar, channeling, contamination), the improper cement

---

[2] Exhibit 1 is a redline that excludes all references to the Sperry data, and indeed goes so far as to offer the Court additional edits to every other reference to buckling. These changes are not necessary (as explained), but if the Court chooses to make them, nothing else in the Findings would have to change.

  If the Court does amend any of the Phase One Findings, the United States respectfully requests that the Court also delete from ¶ 282 the phrase "the other regulations do not apply to contractors."  By their terms, the other regulations *do* apply to contractors. *See* 30 C.F.R. 250.400 ("The requirements of this subpart apply to lessees, operating rights owners, operators, and their contractors and subcontractors.").

placement resulted from multiple negligent acts by BP, including the four acts BP now seeks to cut from the chain of causation.

**Fourth**, BP implicitly argues that Phase One Findings ¶ 519 limits the number of its "negligent acts" to eight – four of which BP does not even dispute.[3]   The Court said only that BP's negligent actions "include" the eight specifically enumerated in the paragraph. More fundamentally, however, no threshold number of acts is necessary to satisfy the "multiple negligent acts" formulation of gross negligence and willful misconduct exemplified by *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1164 (2d Cir. 1978), *cert. denied,* 440 U.S. 959 (1979). BP committed *far* more than enough acts, even if one or more of the acts listed in paragraph 519 of the Phase One Findings were excluded. Eight minus four does not equal zero.

Ultimately, though, every possible cement job failure mode was foreseeable, and in fact was foreseen, by BP. Regardless of exactly *how* the cement job failed to provide a barrier, having *acknowledged and assumed* multiple risks in planning and executing the cement job (Phase One Findings ¶ 510), BP nonetheless relied on that cement when it should have had no expectation whatsoever that it would provide a barrier in the well. Transcript at 2591:17-2592:1 (Benge). The crude, succinct admissions of BP's Senior Drilling Engineer, which the Court quotes in the Phase One Findings (¶ 275) perversely sum up BP's own attitude towards the cement job -- the design of the cement job was "on [the] ragged edge" and BP would get a "shittie" cement job. Indeed, the Court found that BP "had multiple reasons to suspect the cement job would fail to achieve zonal isolation" (*Id.* ¶ 190), and that a CBL would have

---

[3] The four acts BP does not challenge are its use of lost circulation material ("LCM") as a spacer for the displacement and negative pressure test; its misinterpretation of the negative pressure test; allowing simultaneous operations to occur during displacement; and failing to provide a displacement schedule to the Transocean drill crew.

resolved at least some of those suspicions. *See, e.g.,* Phase One Findings ¶¶ 190-196. Nonetheless, having acknowledged that a failed cement job was a probable consequence of several of its own acts and omission, BP failed to act in the face of that probability (*e.g.*, by running a CBL, showing additional caution in interpreting the negative pressure test).

**Finally**, the Court should deny BP's fallback request for a new trial. BP was on notice of the theory that there was damage to the shoe track casing, but did not bring an expert to dispute it. BP had many chances to move to exclude Dr. Beck's testimony regarding a casing breach, and indeed had the opportunity to call a witness to rebut it, but did not do so. It is too late now.

*** 

BP's gross negligence and willful misconduct caused the Macondo blowout, as the Court correctly found. BP's motion attempts to resurrect a minor complaint that the company waived at trial and use that supposed error to undo a finding made after this Court's consideration of 29 days of trial and over 7,000 trial exhibits. Even if BP's complaint had merit, it would do nothing to erase the mountain of evidence confirming this Court's original conclusion. BP's motion should be denied in all respects.

## ARGUMENT

I. **BP Waived Any Objections to Dr. Beck's Testimony about the 140,000 Pounds of Compressional Force Applied to the Macondo Casing**

At trial, the Court excluded a single demonstrative animation that was not included in Dr. Beck's expert report. While the Court initially sustained an objection to certain testimony from Dr. Beck based on the "four corners rule," BP then waived its objections to the specific testimony at issue – whether the Sperry data showed that 140,000 pounds of compressional force

4

was applied to the Macondo production casing.[4]   Indeed, on cross-examination, BP counsel himself invited Dr. Beck's testimony on the Sperry data.

> Q. Yesterday you said you think about 140,000 pounds was taken when they were running the casing; is that correct?

> A. I think right at the very end, right landing out, it was -- it was a very sneaky time to start taking weight, but right when it landed out, I see 140,000 pounds of compression being placed in the casing.

Transcript 7354:4-9 (Beck Cross). Because BP asked Dr. Beck to repeat the testimony it now contends was previously excluded, BP's cross-examination invited error into the proceeding and waived any objection. *See United States v. Delgado*, 672 F.3d 320, 339 (5th Cir.), *cert. denied*, 133 S.Ct. 525 (2012) ("[W]hen injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such 'invited error.'"); *United States v. Breland*, 366 F. App'x 548, 553 n.1 (5th Cir. 2010).  BP's cross-examination of Dr. Beck on the challenged testimony "opened the door" to admission of that testimony.  *See Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).  Then, on redirect Dr. Beck testified, *without BP objection*, to his opinion that the Macondo production casing was breached.

> Q. And do you think -- is that the only -- based on your analysis of the various Sperry data he referenced, is that the only compressional load that that casing took when they ran it into the hole?

---

[4] Notably, BP did *not* object to Dr. Beck's trial testimony or the opinion in his report that buckling possibly occurred under the conditions in which the casing was run.

Q. All right. Dr. Beck, on page 84 of your report you cite to a couple of buckling analyses that were requested by BP prior to running the casing, correct?

A. Correct.

Q. And in that part of your report, *you opined that buckling possibly occurred under the conditions in which the casing was actually run into the hole, correct*?

A. Correct.

Transcript 7134:18-25 (Beck) (emphasis added).

A. No, I don't -- I don't think so. I think that the morning report got it wrong, and maybe they just didn't notice what happened. But when I look at the Sperry data, I see evidence of 140,000 pounds of compression placed on that casing.

Q. In your opinion, when that compressional load is applied to the casing at the bottom -- when it's run into the hole, what is the effect?

A. Okay. So when you place that much compression -- that is a lot of compression to place on a casing string, particularly -- on any string. But a 7-inch string, it's going to buckle the daylights out of it. That string is going to be buckled for a long way up the hole. And when you buckle the string, you're not only -- you're magnifying; right? You're increasing that 140,000 pounds of stress by factors of 1 1/2 to 2 1/2 in terms of the stresses on that casing.

Q. In your opinion, Dr. Beck, was the compressional loads applied to that casing sufficient to compromise, in conjunction with the shock that you talked about during the float collar conversion, sufficient to comprise [sic] the integrity of the casing below the float collar?

A. I believe it was. I believe that there was enough stress that with that amount of the compression, with the buckling on the well, with the buckling on the casing, and with this pressure shock wave, I believe that that broke the shoe track when -- at the float collar conversion.

Transcript 7379:15-7380:19 (Beck Redirect). Twice Dr. Beck testified to the 140,000 pounds of stress, while BP sat on its hands. Only at the point Halliburton sought to use the previously excluded animation, and after Dr. Beck had answered three separate questions about the casing breach, buckling, and the 140,000 pounds of stress placed on the casing, did BP object.

MR. HILL: Now, Your Honor, respectfully, this is exactly what the animation that you did not want to see -- or that you ruled that we wouldn't be able to play yesterday shows. In response to BP's counsel's questions, I think he opened the door. Dr. Beck has testified about the underpinning of that. If you would like to see a graphical representation of what he believed happened, we could shorten the clips at the beginning and show Your Honor.

MR. REGAN: I would have liked to see it at his deposition, and I'd like to see it in his report. It wasn't in either one, and that's the problem. I asked him about the picture in his report. I put it up on the screen. I asked him for his basis for how he thought the casing --

THE COURT: I'll sustain the -- maintain the objection.

6

Transcript 7380:20-7381:10 (Beck Redirect).

It is well-settled that a party must make a contemporaneous objection to the disputed testimony. *Breland*, 366 F. App'x at 552 (citations omitted).[5]  Because it is clear that BP "did not lodge a contemporaneous objection" or move to strike Dr. Beck's testimony on redirect about the Sperry data, compressional loads, and buckling, BP did not preserve its objection to any of that evidence. *Id. See also Pregeant v. Pan Am. World Airways, Inc.*, 762 F.2d 1245, 1248 (5th Cir. 1985) (Fed. R. Evid. 103(a) requires a timely objection or motion to strike). BP was required to continue to object to the testimony to preserve the benefit of the Court's earlier ruling. *See* Advisory Committee's 2000 Note on Fed. R. Evid. 103 ("If the court changes its initial ruling, or if the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal."); *U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990) (holding that even motion *in limine* that is granted does not suffice to preserve error when opposing counsel violates order at trial; new objection must be made to preserve issue); Graham, Federal Practice and Procedure § 5037.16, at n.33 (2d ed.) (citing *U.S. Aviation Underwriters*, 896 F.2d at 956, for proposition that prevailing party must police successful motions *in limine*).

As the appellant in *U.S. Aviation Underwriters* did, BP here tacitly contends that it is entitled to the benefit of a previous favorable ruling, even though it failed to object to the later testimony that it now contends contravened the earlier ruling.  *See id.*[6]  Instead, BP was required to refrain from eliciting itself the very evidence that it wanted to exclude and to further lodge an

---

[5] BP also was not specific in its grounds for each objection. *Falcon v. General Telephone Co. of Southwest*, 626 F.2d 369, 382 (5th Cir. 1980), *vacated on other grounds*, 450 U.S. 1036 (1981).

[6] Fed. R. Civ. P. 103(b) does not apply because it only relieves the objecting party from making (and the court from ruling on) further assertions of the same objection already denied.

objection to any subsequent attempt to introduce the evidence. *See id*. *See also Delgado*, 672 F.3d at 339; *Breland*, 366 Fed. Appx. at 552, 553 fn.1.

## II. Even If the Disputed Evidence is Excluded, There Is Ample Evidence to Support the Court's Common Sense Conclusion that BP Damaged the Shoe Track, and Consequently Improperly Placed the Cement

There is no manifest error in the Phase One Findings that requires amendment under Fed. R. Civ. P. 52(b). *See Fontenot v. Mesa Petro. Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986) ("The purpose of motions to amend is to correct manifest errors of law or fact or, in some situations, to present newly discovered evidence."); *Nunez v. Weeks Marine, Inc.*, No. 06-3777, 2007 WL 2325339, at *1 (E.D. La. Aug. 15, 2007). Rule Fed. R. Civ. P. 52(b) may be used "to correct manifest errors of law or fact" but not "to relitigate old issues, to advance new theories or to secure a rehearing on the merits." *Fontenot*, 791 F.2d at 1219. Ample evidence supports the Court's conclusion that BP improperly placed the Macondo production casing cement due to damage to the shoe track casing. Even if the Court simply excises the limited references to Dr. Beck's testimony on the 140,000 pounds of compressive force BP put on the Macondo casing, the record, particularly the recorded data, is sufficient to conclude that there was a breach in the Macondo shoe track below the float collar. *See, e.g.*, Phase One Findings ¶¶ 88, 145, 146, 147, 148, 149, 152, 153, 154, 156, 167, 168, and 169.

Dr. Beck's expert report is in evidence and the Court may rely on it. Dr. Beck stated the following regarding damage to the Macondo shoe track and its effect on the Macondo production casing cement job:

Third, BP may have damaged the shoe track during its failed attempt to convert the float equipment by applying excessively high pressures to the well. BP personnel were aware that something "blew out" during the failed float conversion,[126] and BP engineers were concerned that the long string production casing could buckle when it was being lowered into the well.[127] In the days leading up to installation of the long string production casing in the well, BP's Brian Morel requested that Halliburton personnel perform a buckling analysis on the long string production casing, and that analysis indicated that buckling from the float collar to the bottom of the shoe track was possible under the conditions in which the casing was actually run into the hole.[128]   It is possible that the entire shoe track separated from the float collar, meaning that there was, in essence, no shoe track at all. What "blew" down hole could have been the shoe track separating from the remainder of the long string production casing just below the float collar assembly. This is illustrated in Figure 16 below:



**Figure 16: Shoe Track Blowout**

If the shoe track separated from the long string production casing, there would have been no shoe track cement to act as a potential barrier to hydrocarbon flow. All of the cement, including the shoe track cement, would have been pumped up the annulus, leaving the main pay zone exposed and forming a free path for hydrocarbons to flow up the long string production casing through the damaged and unconverted float collar. The shoe track including the float collar and reamer shoe could have also failed in various other ways, compromising the cement job.

9

TREX-08140 (Beck Report) at pp. 84-85. Indeed, the Court found the most compelling evidence of a shoe track breach was that such a breach "is consistent with, and thus provides an explanation for, the data recorded after circulation was achieved – most notably the lower-than-expected circulating pressures."  Phase One Findings ¶ 156.[7]  In fact, it is simply common sense that lower than expected circulating pressures indicated a larger geometry had opened up in the path of circulation.[8]  Indeed, three experts in this case agreed that the sudden release of pressure during the attempted float collar conversion and lower than expected circulating pressures thereafter indicated the distinct risk that BP was circulating through a point higher in the production casing than the reamer shoe.[9]

Additional data further supports the Court's conclusion that a casing breach caused the cement to be improperly placed. For example, Dr. Beck testified that the rapidity of the blowout itself indicates that there was little restriction in flow from the formation into the casing and up to the surface. He simply could not reconcile that observation with flow that "was coming out of the formation, down the outside of the casing, through cement that would have been there, up the middle of the shoe track through cement that would be there unrestricted to the surface." Transcript at 7140:12-7141:3 (Beck). In addition, when the well was re-entered during the kill operation months later, the upper casing string was perforated and there was no evidence of

---

[7] The Court rightly rejected BP's implausible explanation for the lower than predicted circulating pressure – that, not one, but two, mud pump pressure gauges were incorrect.

[8]  Transcript at 6174:14-19 (Ambrose Cross).

[9]  TREX-07676 at pp. 18-19 & Attach. A (Barnhill Report); Transcript at 7115:5-16; 7122:9-7123:9 (Beck); Transcript at 2311:6-14, 2312:21-2313:19 (Benge). Although Mr. Benge did not offer an opinion on whether such a breach did in fact occur, he testified on direct examination that the sudden release of pressure meant BP did not know where it was circulating and that the lower circulating pressures indicated that some restriction simply was not there anymore. BP offered no objection to any of Mr. Benge's testimony on that point.

hydrocarbons in the upper annular section, indicating that there was at least some type of isolation in the annulus. *See* Transcript at 7142:20-7143:15 (Beck).[10]

Indeed immediately after the Court sustained BP's initial "four corners" objection, Halliburton counsel returned to the basis of Dr. Beck's opinion *before* he looked at the Sperry data.

> MR. REGAN: We have a rule in this case about the four corners --
>
> THE COURT: I am going to sustain the objection.
>
> MR. REGAN: Thank you, your Honor.
>
> BY MR. HILL:
>
> Q. Let's wrap up this way then. Based on what you reviewed and those things that were -- the things that you identified ***before***, can you explain to the Court the evidence that you looked at that indicate to you that there was a rupture or a breach below the FLOAT collar?
>
> A. So the first piece of evidence that I see is the conversion of the FLOAT collar, the sudden drop in pressure from over 3,000 to under 200 psi. That looks like a failure, like a rupture to me. And then the second piece of evidence that I have is that the rapidity with which the blowout happened, that there was unrestricted flow, in my opinion, into this wellbore. And the third piece of evidence that I have to try to explain is that when the well was re-entered and the upper casing string was perforated, there was no evidence of hydrocarbon in that upper annular section.

Transcript, 7142:15-7143:8 (Beck) (emphasis added). BP did not object to that testimony.

On the other hand, the Court rightly rejected BP's theories regarding float collar conversion, cement placement, and flow path because they were unsupported by the weight of the evidence. Most significantly, BP's theory regarding flow path ignores or dismisses the actual recorded data after circulation was achieved on the ninth attempt to convert the float collar – the

---

[10] Dr. Beck's opinion that cement was not placed across the hydrocarbon-bearing sands is not inconsistent with Mr. Benge's opinion that cement "was either not present across from a producing formation or it was not set and able to act as a barrier to flow, or both." TREX-05990 (Benge Report) at p. 1.

lower than expected circulating pressure – which indicated a larger opening in the flow path. [11] In addition, the Court specifically noted the lack of evidence to support BP's position that the tail cement in the shoe track failed and that the float collar, if converted, would not have stopped pressure from communicating through the well during the negative pressure test. *See* Phase One Findings ¶ 176.

### III.    Whether or Not Due to a Casing Breach, the Cement Job Failed Because BP's Multiple Negligent Acts Resulted in Improper Placement of the Cement

Even assuming *arguendo* that there was no casing breach, the evidence is overwhelming that BP improperly placed the cement in the well, resulting in the blowout and discharge of oil. Despite BP's continued protestations that unstable foam cement was the cause of the blowout, it is incontrovertible that "[n]o cement, no matter how well designed and stable, will achieve zonal isolation if not properly placed."  Phase One Findings ¶ 231. Indeed, the Court concluded, after weighing the evidence, that even if the foamed cement was unstable, evidence is lacking to support BP's notion that the tail cement in the shoe track also failed. *See id*. ¶¶ 176, 231.[12] Accordingly, it was reasonable for the Court to conclude, as it did, that the cement was improperly placed.

BP placed the cement in the well in a manner that was likely to result in cement contamination.  Benge  2284:24-25;  2288:15-2289:10;  2314:7-2315:4;  TREX-05990 (Benge Report) at 9, 13-25. Inadequate centralization of the casing led to channels in the annulus cement

---

[11] It is worth noting that BP did not even bring its own replacement cement expert Ronald Crook to trial. Rather, on the eve of trial, BP adopted a former Weatherford expert who opined that the cement was not set at the time of the negative pressure test and that the shoe track cement may have failed due to contamination from "rat hole swapping." *See* Rec. docs. 8253, 8181; TREX-22761 (Calvert Report) at pp. 15 & 19.

[12] In fact, even if all of the nitrogen had broken out of the Macondo foam cement slurry, the result would have been dense, unfoamed base/tail cement in the bottom of the well that could have provided a barrier. Transcript at 2579:11-2580:6 (Benge).

that provided flowpaths for hydrocarbons and cement contamination that would delay strength development. Transcript 2305:9-2308:22 (Benge); TREX-05990 (Benge Report) at pp. 1 & 3; TREX-08140 (Beck Report) at pp. 81-82, 86. Use of base oil, a small cement volume, and low pump rates further compromised cement placement by increasing the risks of channeling and mud contamination of the cement. BP's decision to forego a full bottoms-up circulation of the well before the cement job, in violation of its own best practices, further increased the likelihood of cement contamination. *See* Phase One Findings ¶ 510. BP's decisions virtually assured the cement integrity would be compromised. Transcript 2255:6-25 (Benge); TREX-05990 (Benge Report) at pp. 9, 15-16. *See also* Phase One Findings ¶ 510.

BP's own cement expert (while refusing to offer an opinion on the actual flow path of hydrocarbons)[13] agreed that improper placement of cement could have resulted in a flow path for hydrocarbons through the shoe track. *See* TREX-22761 (Calvert Report) at pp. 14, 19-20. He stated unequivocally that "contamination of cement alone could also compromise the cement job, and allow hydrocarbon flow." *Id.* at 19. Specifically, he posited that the shoe track cement could have been contaminated with drilling mud due to "rat hole inversion," which can result in semi-set cement or channels for hydrocarbon flow within the interior of the production casing. *See id.*; Transcript at 2621:1-2622:3 (Calvert).

Based on what BP knew at the time of the negative pressure test, BP should have had no expectation that the cement would provide a barrier in the well. *See* Phase One Findings ¶¶ 192, 194, 275, 510; Transcript at 2591:17-2592:1 (Benge).   Even if BP's improper placement of cement did not result from a damaged shoe track, it unquestionably resulted from a variety of

---

[13] "I have not been asked, and this report does not address, whether the hydrocarbons that ultimately led to the blowout of the Macondo Well flowed up or down the annulus; rather, this report addresses whether hydrocarbons could have flowed through the shoe track cement." TREX-22761 (Calvert Report) at p. 14.

BP's negligent acts, including those acts the Court cited in paragraph 519 of the Phase One Findings.

**Drilling the final 100 feet of the well with little or no margin.** The fragile condition of the Macondo wellbore directly drove BP's decisions that resulted in improper cement placement, including: using a small cement volume and a base oil pre-flush, not conducting a full bottoms-up circulation, and limiting pump rates during the cement job. *See* Phase One Findings ¶¶ 71, 192, 193, 207, 218, 510.

**Running the production casing with the float collar in unconverted mode and without a shoe filter.** The debris in the float collar contributed to the failure of the float collar to convert.  BP knew that an unconverted float collar could result in cement u-tubing out of the annulus and back into the well casing (in which case the cement would be improperly placed). *See id.* ¶¶ 191, 134-144.[14]   The consequences stemming from an unconverted float collar were entirely foreseeable risks on BP's part. *See id.* ¶ 509. Any movement of the cement once in place (*e.g.*, by u-tubing out of the annulus and into the well casing) would delay cement strength development – in addition to the certain mud contamination resulting from BP's other cementing decisions (*e.g.*, not circulating bottoms up, low pump rates, use of base oil). *See* TREX-08140 (Beck Report) at p. 86.

**Failing to verify whether the float collar converted by reverse circulating the well.** Had BP reversed-circulated the well, it would have confirmed the mechanical failure of the float collar. In turn, that should have led BP – were it acting prudently and responsibly -- to take

---

[14] BP expert David Calvert agreed that one of the consequences of running the float collar in unconverted mode was the potential for debris to get into the float equipment and that BP could not circulate because there was a blockage in either the float collar, reamer shoe, or both. Transcript at 2634:6-2635:11 (Calvert Cross).

appropriate actions to address that failure prior to commencing the cement job. *See* Phase One Findings ¶ 131. In addition, and more significantly, Mark Bly, the head of BP's internal incident investigation team, acknowledged that a properly converted, undamaged float collar was a mechanical barrier that had to be breached for the blowout to occur and that the float collar, whether designed to or not, would have stopped the flow of hydrocarbons from the well. Transcript at 960:4-8, 1089:25-1090:16, 1093:15-1094:12 (Bly); D-3584.

**Not conducting a cement bond log ("CBL")**. The cement job failed to achieve zonal isolation. BP had multiple reasons to suspect as such. *See* Phase One Findings ¶¶ 190, 191, 192, 193, 510. A CBL would have resolved some of BP's suspicions. *See id.*[15]  At a minimum, the CBL would have determined the location of the top of cement. *See id.* ¶ 181.   As the Court succinctly stated in its Phase One Findings, "If the top of cement was not at the designed location, [a CBL] would indicate that the cement job *was not properly placed* and/or that channeling had occurred."   *Id.* (emphasis added). Further, as noted above, BP knew that an unconverted float collar could result in the cement "u-tubing" out of the annulus and back into the well casing; a CBL would have revealed whether that happened. *See id.* ¶ 191.[16] Accordingly, BP's decision not to run a CBL, a profit-driven decision, is a negligent act in the chain of causation leading to the blowout, explosion and oil spill.

---

[15] BP's cement expert agreed. *See* TREX-22761 (Calvert Report) at p. 12 ("Where zonal isolation is not achieved, catastrophic consequences can occur. . . . One means of evaluating whether a cement job has achieved zonal isolation is a cement sheath evaluation, which includes the cement bond log.").

[16]Further, if BP's improper placement of cement had delayed the cement's strength development (*e.g.*, through contamination, movement by u-tubing) the time it would have taken to run the CBL would have given the cement additional time (approximately 10-12 hours) to cure, or set up, prior to the negative pressure test.

**IV.    BP's Negligent Acts are Sufficient to Satisfy the "Multiple Negligent Acts" Formulation of Gross Negligence and Willful Misconduct**

BP compounds its error with an untethered argument concerning the legal underpinnings of its "multiple negligent acts" basis of liability under *Tug Ocean Prince,* 584 F.2d at 1164; *see also*, *Water Quality Ins. Syndicate v. United States* ("*WQIS 2007*"), 522 F. Supp. 2d 220, 230 (D.D.C. 2007).  ***First***, the four negligent acts remaining under BP's proposed findings are plainly sufficient to support a finding of gross negligence. ***Second***, even if the Court were to adopt BP's theory of cement failure, a similar set of negligent acts by BP simply replaces those BP seeks to exclude.

**A. No Threshold Number of Negligent Acts is Necessary to Satisfy the Multiple Negligent Acts Formulation of Gross Negligence**

As explained above, the blowout and discharge of oil resulted in part from the four negligent acts BP seeks to exclude from the Court's findings. *See Tug Ocean Prince*, 584 F.2d at 1163-1164; 57A Am. Jur. 2d Negligence § 229 ("[S]everal connected or successive acts of simple negligence may support a finding of gross negligence, due to their compounding effect."). In its motion, BP does not challenge the Court's findings as to the other four negligent acts that caused the blowout, specifically, using LCM as a spacer for the displacement and negative pressure test, misinterpreting the negative pressure test, allowing simultaneous operations to occur during displacement, and failing to provide a displacement schedule to the Transocean drill crew. Rather, BP claims, without citation to any authority whatsoever, that those four negligent causal acts or omissions are insufficient in number to support a finding of gross negligence or willful misconduct.

Neither *Tug Ocean Prince* nor any other legal authority supports BP's apparent notion that gross negligence or willful misconduct based on multiple negligent acts requires some

16

threshold number of negligent acts or omissions. 584 F.2d 1151. Here, even if BP were correct (and it is not) that four of the negligent acts cited in paragraph 519 should be excluded, four negligent acts remain, including an act so egregious that this Court found that single act alone constituted gross negligence. In addition to its argument that four negligent acts is not enough, BP attempts to graft a general maritime law causation standard onto the CWA definition of gross negligence and willful misconduct. This mixes apples and oranges. The Court rejected this standard in making its Phase One Findings and should not be swayed by BP's attempts at misdirection.

In essence, what BP seeks in its motion is a reallocation of fault under general maritime law. Such a change is separate and distinct from the question of whether or not BP committed multiple negligent acts or omissions that resulted in the blowout. The answer to that question is an unequivocal "yes."

## B. BP is Grossly Negligent Under Any and All Cement Failure Theories

BP's gross negligence is not contingent on any particular mode of cement failure. Every possible failure mode was easily foreseeable – and even foreseen – by BP. Whether the cement was misplaced or channeled or unset or unstable, each and every failure mode is the direct result of BP's knowing, deliberate, and profit-motivated decision to use a cement design "on the ragged edge" that would likely result in a "shittie" cement job.

Even under BP's implausible theory that unstable foam cement alone resulted in the cement job's failure to achieve zonal isolation,[17] another set of equally negligent BP acts supports a finding of gross negligence. With regard to the cement job, it was BP's responsibility

---

[17] BP did not proffer any expert to opine on *why* the cement job failed. Indeed, BP's late adopted Weatherford expert refused to even offer an opinion on the actual flowpath of hydrocarbons in the wellbore. *See* TREX-22761 (Calvert Report) at p. 14.

to review Halliburton's recommendations on cement design and procedure, and it was ultimately BP's responsibility to determine whether the slurry design was appropriate for the well. *See* Phase One Findings ¶ 203. In fact, BP's own internal policies dictate that:

> Cement design and execution plays a key role in the well construction process and subsequent life of well integrity. A fundamental knowledge of how to design a cement job, coupled with an understanding of how to effectively execute a cement job is a core competency expected of any drilling engineer. ***Reliance on service company expertise is unacceptable***.

Phase One Findings ¶ 202, TREX-37005 at BP-HZN-2179MDL00360820. The fact that Halliburton could share some amount of responsibility related to the failure of the Macondo cement job does not absolve BP of the multiple negligent acts it committed under BP's own theory of the case. Specifically, those negligent acts would include:

**Drilling the final 100 feet of the well with little or no margin.** BP used foam cement at least in part because of its concern about damaging the fragile rock formations at the bottom of the Macondo well. Phase One Findings ¶ 207. Debris in the bottom of well could contaminate the foam cement and lead to instability.

**Using leftover Kodiak cement.** The leftover Kodiak cement was not intended to be foamed. BP had a financial incentive to use the leftover cement. *See id*. ¶¶ 209-212.

**Pumping the foam cement without a successful foam stability test.** BP knew the Macondo cement contained D-Air 3000 (an additive that increased the risk of instability and nitrogen breakout). The pre-cement job test results BP received indicated instability, which should have given BP pause. Instead, BP pressed forward without a successful foam stability test. *See id*. ¶ 230. In addition, BP increased the cement retarder concentration from 8 gallons to 9 gallons per sack knowing that it increased the risk of cement instability and nitrogen breakout and without having any test results on the cement with the 9 gallon concentration of cement

18

retarder. The Court found that D-Air 3000 and SCR-100 both caused destabilization and nitrogen breakout and BP shares blame for that. *See id.* ¶ 226. The Court also found that BP's decision to pump the foamed cement without a successful stability test "is another instance of BP proceeding in the face of a known risk and therefore lends further support to the conclusion that BP's conduct was reckless." *See id.* ¶ 521.

## V.   BP Is Not Entitled to a "Do Over" Because It Failed to Rebut Dr. Beck or Exclude his Opinions Regarding a Casing Breach Before, During, or After the Phase One Trial

In the alternative, BP seeks exclusion of Dr. Beck's casing breach testimony *in toto* or, alternatively, a new trial. BP is entitled to neither. Such relief would amount to letting BP sandbag the Court and the Parties with a *Daubert* motion and a rebuttal expert report 18 months post-trial, and only *after* the Court has issued an opinion unfavorable to BP. Rule 59(e) motions "cannot be used to raise arguments that could, and should, have been made before" a judgment issued. *Marseilles Homeowners Condominium Ass'n, Inc. v. Fidelity Nat. Ins. Co.*, 542 F.3d 1053, 1058 (5th Cir. 2008) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). In general, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly ...." *Pacific Ins. Co. v. American Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1, at 124 (2d ed.1995)).

There is no reason to exclude Dr. Beck's opinions or order a new trial because those opinions were fairly disclosed and BP had every opportunity to respond to them. Dr. Beck's expert report specifically referenced a BP buckling analysis that, according to Dr. Beck, "indicated that buckling from the float collar to the bottom of the shoe track was possible under the conditions in which the casing was actually run into the hole" and plainly stated an opinion

that it was possible the entire shoe track separated from the float collar.   Only now does BP try to exclude that opinion – after losing at trial.

It is too late to file a *Daubert* motion for Dr. Beck. When Dr. Beck took the stand BP did not even *hint* that his opinions regarding a casing breach should be excluded despite the fact that BP had examined Dr. Beck extensively (nearly seven hours) on his opinions at his deposition.[18] BP only referred to a pending *Daubert* motion regarding legal conclusions (Rec. doc. 5420) and to citations to government reports and testimony the Court had already ordered excluded (Rec. doc. 5448).

> MR. REGAN: Your Honor, Matt Regan on behalf of BP. In advance of Mr. Beck's testimony, I would just like to again renew the pending Daubert motion that we have with respect to Dr. Beck. And then it may be something that we have to do on a case-by-case basis in terms of testimony. But with respect to the report, there are elements and citations to particular government reports, government testimony that's been ruled out. And I think, as you've indicated before, that's something that you can look at when you're reviewing the report later on.
>
> THE COURT: We'll do that. We'll proceed like that. If the report needs to be redacted in any way, hopefully you all can agree to that. Okay?
>
> MR. HILL: Yes, Your Honor.

Transcript at 7056:2-15. Notably, BP did have Dr. Beck's report redacted for citations to excluded government reports, but not for any other purpose.[19]   Instead, BP counsel explicitly told the court *he had no objection to Dr. Beck explaining the basis for his opinion that the casing broke*.

---

[18] BP also attempts to use Dr. Beck's deposition as evidence to support its motion despite the fact that BP failed to bring that testimony to the Court's attention for nearly three years, and more importantly, failed to examine Dr. Beck on those issues at trial.

[19] BP also had the expert report of PSC expert Gregg Perkin redacted after his testimony at trial (TREX-07535), but did not request or insist on similar redactions for Dr. Beck in addition to the government reports information.

MR. REGAN: If you'll note, the very last sentence of that paragraph says his conclusion is illustrated in Figure 16. His Figure 16 is on page 85. It shows the casing broken in half. *If he wants to put that picture up and explain his basis for that opinion, I have no objection.* But there have been other animations that have been produced, and I think shown in opening, that are not found in this report that show casing moving and casing in different dimensions. I strongly object to that because this is a picture, Figure 16. *If he wants to explain it. He thinks the casing broke in half, he can do it and we can cross examine him on it.*

Transcript at 7139:6-16 (emphasis added). BP did not object to Dr. Beck testifying to what was in his report and never moved to exclude any portion of that testimony until now.[20]

Thus, BP has waived any other Rule 702 or *Daubert* objection to Dr. Beck's report or trial testimony. *See Foradori v. Harris*, 523 F.3d 477, 507 (5th Cir. 2008) (a party cannot preserve for appeal a specific issue regarding expert testimony by objecting to any other issue regarding testimony at trial); *Marceaux v. Conoco, Inc.*, 124 F.3d 730, 733 (5th Cir. 1997) ("Failure to object to expert testimony forfeits the objection[.]"). If a party wishes to attack expert testimony, the proper method is by a motion to strike. *See id.* (citing 11 James W. Moore et al., Moore's Federal Practice § 56.14[4][a], at 56-197 (3d ed. 1999)). While BP did object – but later waived the objection – to Dr. Beck's specific testimony that the Sperry data showed 140,000 pounds of compressional force applied to the casing, BP did *not* object to or move to strike any portion of Dr. Beck's expert report related to the casing breach, or his testimony that

---

[20] BP chose to make specific Daubert objections to other portions of Dr. Beck's testimony. *See, e.g.*, Transcript at 7174:8-17 (Beck) (emphasis added).

Q. The report is in evidence and speaks for itself. I just want to hit one point. In your professional opinion and experience, it is your opinion that that regulation in question, 250.421, is directed at safety and not royalty consideration in terms of the ability of the zone to produce.

A. That is --

MR. REGAN: Object to the question. *This is subject to the Daubert [sic] and also outside the scope of his professional expertise.*

THE COURT: I'll overrule the objection. Go ahead, sir.

the casing, in fact, broke.

Halliburton served Dr. Beck's report on October 17, 2011. On November 7, 2011, BP submitted six rebuttal expert reports and had a final chance to address any and all cementing issues with its replacement cement expert Ronald Crook on January 9, 2012.[21] *Not a single BP expert mentioned, let alone rebutted, the casing breach aspect of Dr. Beck's expert report.* Despite Dr. Beck's statement that BP requested from Halliburton a buckling analysis that "indicated that buckling from the float collar to the bottom of the shoe track was possible under the conditions in which the casing was actually run into the hole" (TREX-08140 (Beck Report) at p. 84), BP did not submit a rebuttal report from its casing expert David Lewis.

On December 15-16, 2011, BP deposed Dr. Beck, exploring his opinion for nearly seven hours.[22]  On January 25, 2012 BP filed 17 motions *in limine* and sought to exclude at least some portion of the expert testimony of 20 experts. BP even targeted Dr. Beck, but only sought exclusion of "portions of Dr. Beck's reports and deposition testimony that impermissibly offer legal conclusions."  (Rec. doc. 5420). That motion did not even mention Dr. Beck's opinion regarding shoe track damage. BP also filed a "Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job."  (Rec. doc. 5435). That motion targeted four experts (Benge for the United States and Bolado, Hughett, and Lewis for Halliburton) who opined on how BP's actions caused the failure of the Macondo cement job, yet BP did not even allude to Dr. Beck's opinions on shoe track damage. *See id*. After the Phase One trial originally scheduled for February 2012 was continued, BP had over a year before trial to seek leave of the Court to move

---

[21] BP did not call Mr. Crook to testify at the Phase One Trial.

[22] During those nearly seven hours, BP failed to ask Dr. Beck a single question about buckling despite the discussion of buckling in Dr. Beck's expert report.  TREX-08140 (Beck Report) at p. 84.

to exclude Dr. Beck's testimony regarding damage to the Macondo shoe track. BP did not.

BP was aware of Dr. Beck's opinion before, during, and after trial. BP chose not proffer a witness to rebut it. BP did not respond to Dr. Beck's opinion regarding a casing breach in its 700-plus pages of proposed findings. Aside from the motion *in limine* regarding what BP described as "legal conclusions," BP did not object to or seek to exclude Dr. Beck's expert report which, was admitted into evidence as direct testimony by Dr. Beck. If BP believed that the possible exclusion of some portion of Dr. Beck's trial testimony under the "four corners rule" was a basis to exclude Dr. Beck's casing breach opinion, BP could have and should have done so at trial. BP did not. *See Marseilles*, 542 F.3d at 1058 (district court did not abuse its considerable discretion in denying 59(e) motion when argument "could, and should have been made before the judgment issued.") (citing *Simon*, 891 F.2d at 1159). BP was not a "victim of surprise." Rather, BP was a "victim" of its own trial strategy.

## CONCLUSION

BP's arguments to amend the findings or, in the alternative, for a new trial lack any merit. BP waived its objections to the testimony at issue, and even if that testimony were excluded, there is ample evidence for the Court's finding that the Macondo casing was breached resulting in improper placement of cement. Whatever the reason for the failure of the cement to provide a barrier in the Macondo well, that failure resulted from the multiple negligent acts of BP. BP had its opportunity to be fully heard at the Phase One trial. It is not entitled to a "do over." For all of the foregoing reasons, BP's motion should be denied.

October 23, 2014                                    Respectfully submitted,

KALI N. BRACEY                                      SAM HIRSCH
Acting Deputy Assistant Attorney General           Acting Assistant Attorney General
Civil Division                                     Environment & Natural Resources Division
PETER FROST                                         SARAH HIMMELHOCH
Director, Torts Branch, Civil Division              Senior Litigation Counsel for E-Discovery
Admiralty and Aviation                              SCOTT CERNICH
STEPHEN G. FLYNN                                    Senior Counsel
Assistant Director                                  ABIGAIL ANDRE
MICHELLE DELEMARRE                                  DEANNA CHANG
Senior Admiralty Counsel                            A. NATHANIEL CHAKERES
SHARON SHUTLER                                      RACHEL HANKEY
JESSICA SULLIVAN                                    Trial Attorneys
JESSICA McCLELLAN
MALINDA LAWRENCE
Trial Attorneys

| /s/ R. Michael Underhill | /s/ Steven O'Rourke |
|---|---|

R. MICHAEL UNDERHILL, T.A.                          STEVEN O'ROURKE
Attorney in Charge, West Coast Office               Senior Attorney
Torts Branch, Civil Division                        Environmental Enforcement Section
U.S. Department of Justice                          U.S. Department of Justice
7-5395 Federal Bldg., Box 36028                     P.O. Box 7611
450 Golden Gate Avenue                              Washington, D.C. 20044
San Francisco, CA 94102-3463                        Telephone:  202-514-2779
Telephone: 415-436-6648                             Facsimile:   202-514-2583
Facsimile: 415-436-6632                             E-mail:  steve.o'rourke@usdoj.gov
E-mail: mike.underhill@usdoj.gov


DANIEL SPIRO                                         KENNETH A. POLITE, JR.
Senior Trial Counsel                                United States Attorney
KELLEY HAUSER                                       Eastern District of Louisiana
ELIZABETH YOUNG                                     SHARON D. SMITH
Trial Attorneys                                     Assistant United States Attorney
Civil Fraud Section, Commercial Litigation          Eastern District of Louisiana
Branch
U.S. Department of Justice
Ben Franklin Station
Washington, D.C. 20044
Telephone: 202- 616-3898
Facsimile: 202-307-3852
E-mail: daniel.spiro@usdoj.gov

Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis-Nexis File & Serve in accordance with Pretrial Order #12, and the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2719, on this 23rd day of October, 2014.

*/s/ Steven O'Rourke*
Steven O'Rourke