# Exhibit 2

Ex 1.docx



# Feinberg promised to be more generous than the courts, but was he right?

Brendan Kirby | bkirby@al.com By Brendan Kirby | bkirby@al.com
Email the author | Follow on Twitter
on April 22, 2012 at 7:00 AM, updated April 22, 2012 at 6:28 PM

**MOBILE, Alabama** -- Ken Feinberg pledged during his tenure as the **Gulf Coast oil spill** claims czar that he would be more generous to victims of the disaster than the legal system. Soon, the opening of a court settlement will reveal whether he was right.

Legal teams representing plaintiffs suing BP PLC, and some independent analysts, contend that the settlement submitted to a New Orleans judge last week will deliver the better deal.

The man who will be in charge of implementing the **settlement**, Patrick Juneau, was reluctant to make a direct comparison to Feinberg's Gulf Coast Claims Facility. But he said, "It looks like there are very, very favorable terms for the claimants."



View full size

Then-oil spill claims czar Ken Feinberg (right) walks with Travis Stringfellow as he tries to leave a meeting with possible claimants at the Bayou La Batre Community Center on Saturday, Aug. 21, 2010. A preliminary lawsuit settlement filed Wednesday, April 18, 2012, will test Feinberg's oft-repeated refrain that the claims process would be more generous to oil spill victims than the court system. (Press-Register/Bill Starling)

GCCF procedures were often marked by confusion and upset over who qualified, what documents that they needed to prove economic loss, and what criteria adjusters used to evaluate claims.

## Highlights of settlement

Here are some of the highlights of the preliminary settlement in the BP oil spill case that lawyers submitted to a federal judge last week:

• Eligibility: Most people and businesses

Edward Sherman, a Tulane University law professor who has closely followed the BP litigation, said that the process of collecting damages from the lawsuit should be much simpler. "I think they will do better," he said of claimants.

In an **interview** last week with the Press-Register, Feinberg defended his performance, noting that the claims office paid out about $6.5 billion and honored more than 500,000 claims in the

from Alabama, Mississippi Louisiana and parts of Florida and Texas who can document economic losses or medical damages from the spill are eligible. Those who accepted final payments from the Gulf Coast Claims Facility waived their right to sue, however, and are not eligible under the settlement.

• Timeline: Under a schedule urged by lawyers, notice of the settlement would be sent out by May 3. Claimants would have to file any objections by Aug. 31, and would have until Oct. 1 to opt out and pursue their own lawsuits against BP.

• Seafood compensation: Claimants can file for multiple types of economic losses. The total payout is capped at $2.3 billion; individual claimants will receive compensation for losses in 2010 plus a multiplier ranging from 2.25 to 8.75.

• Vessels of Opportunity claimants: Those who accused BP of failing to honor its commitments to them during the spill cleanup and containment are eligible to receive $41,600 to $88,400, depending on the vessel length. Claimants who completed training but never got sent out to work are eligible to receive $4,800 to $10,200, depending on vessel length.

• Business losses and wage losses: Such claimants will be eligible to receive compensation plus additional payouts, depending on such factors as the type of business, location and the amount of loss.

18 months between his appointment and the announcement of the settlement.

"I think it turned out, in retrospect, to be a very wise decision," he said.

U.S. District Judge Carl Barbier, who was appointed to preside over the thousands of lawsuits filed across the country, still must approve the preliminary settlement.

Juneau, a Louisiana lawyer, then will have 30 days to convert the old claims system to the new one.

## How it works

Under the settlement, seafood harvesters would receive 4 times their documented damages, with an industry-wide cap of $2.3 billion, which the court filings note is many times more than the sector's annual revenue. There is no cap on the payouts for other claims.

BP estimated last month that the settlement would cost it $7.8 billion. Still, various parties agree that the final figure might be higher.

The settlement's basic outlines are this: Those eligible to receive payouts are virtually all individuals and businesses that can demonstrate losses, so long as they did not accept a final offer from Feinberg's GCCF. The class includes everybody in Alabama, Mississippi and Louisiana, as well as parts of Florida and 4 counties in Texas.

Businesses that are exempt include banks, casinos and BP gas stations, among others.

The amounts that claimants would receive depend upon their proximity to the Gulf of Mexico and the type of damage suffered. For instance, people and businesses in Zone A — those close to the coast — are presumed to have suffered damage from the spill, and thus would get money as long as they show a revenue loss in 2010.

- **Accounting reimbursement:** The settlement provides for reimbursement to claimants for the costs of accounting services required to document losses.

- **Subsistence fishermen:** Such claimants will be able to receive compensation for lost fishing time, augmented by a multiplier of 2.25. This group may include deckhands who receive a portion of the catch on a commercial vessel as part of their pay, or perhaps those who fish regularly enough that they rely on seafood as part of their family's food budget.

- **Marketing campaign:** BP has agreed to create a $57 million fund to promote the Gulf Coast and its waters. The fund is designed to boost tourism and grow the seafood industry.

The payout amounts would be equal to their loss, times a multiplier. Any preliminary payments that the GCCF gave them would be deducted.

Bert Sanders, a Gulf Shores accountant who helped a number of clients navigate the claims process, said that, for the most part, he expects the settlement's payout calculations to be "a bit more liberal" than those of Feinberg's GCCF. "I think for most people, it will be relatively easy to assess whether they're better off," he said.

Sanders said that the GCCF, in general, offered twice the economic loss for non-seafood businesses that claimants had experienced during 2010. "It was basically kind of a one-size-fits-all deal," he said.

Rhon Jones, lawyer for the Beasley Allen firm in Montgomery, said he believes that Feinberg and GCCF adjusters did the best they could with what they had to work with. But, he added, "I think there's going to be many, many claimants who are going to get more a favorable result for having waited."

Jones said that the settlement crucially allows claimants to average their earnings from 2008 and 2009 — or 2007, 2008 and 2009 — to determine a baseline to compare against 2010 earnings.

That addresses a major complaint with GCCF, which examined only 2009 earnings to establish damages. GCCF critics contended that 2009 was an extremely tough year for the coastal economy because of the global financial crisis and collapsing real estate market.

Jones, who as one of 17 lawyers who served on the steering committee that negotiated the settlement with BP, said that the multiyear average provides a more accurate picture of the spill's impact.

The formula set forth in the settlement allows for a higher base payment, Jones said, and offers more generous multipliers to compensate for future losses and risks of further spill harm.

The settlement document cites the example of a $10,000 loss for a tourism-related loss. Under Feinberg, the claimant probably would have gotten that $10,000 plus an additional $10,000, for

### Settlement could be worth up to $600 million for lawyers

BP has agreed to pay legal fees for the plaintiffs' lawyers in the spill litigation separate from damages to the victims.

a total of $20,000. Under the new system, the $10,000 loss would be multiplied by 2.5 — $25,000 — and then added to the second $10,000, for a total of $35,000.

"You won't know until you know, but I think for most businesses, the settlement is fair," said Steve Nicholas, a lawyer with the Cunningham Bounds firm in Mobile.

Subject to approval from the judge, lawyers will seek an interim payment of $75 million. Additional interim payments equivalent to 6 percent of class claims would be paid every three months; the total fees would not exceed $600 million.

Claimants located farther from the Gulf will be eligible for compensation, but must demonstrate that their losses resulted from the spill. In asking the judge to approve the settlement, attorneys offered an example of a business in Fairhope, which lies in Zone B. That business would receive money if it showed a V-shaped revenue pattern — a loss of at least 8.5 percent in total revenue for 3 consecutive months in 2010, followed by an increase of at least 5 percent during the same months in 2011.

Aside from the prospect of higher payouts, the process also should be simpler for claimants who felt frustrated by the GCCF, according to lawyer Robert Cunningham, a Cunningham Bounds partner who also served on the steering committee.

The formulas will be published and available, Cunningham said, and claimants will not be required to produce "paperwork that doesn't exist."

Added Juneau, the claims administrator: "The one big, big, super advantage is there will be a very, very meticulous, detailed process with a tremendous amount of transparency. You can do the math yourself and see how it affects you."

## Greater transparency promised

Not everyone is prepared to declare the settlement an improvement over the GCCF.

"In theory, all that sounds like it makes sense, and I sincerely hope that is the case," said Orange Beach Mayor Tony Kennon, who was one of Feinberg's harshest critics.

For example, Kennon said he fears that applying the same multiplier to businesses within each zone does not take into account the variation among business claimants. "If that is the case, it will be wonderful for some and terrible for others," he said.

Claimants unhappy with their settlement offer can appeal to arbitrators; under the rules, the arbitrators would award them either the amount that they claimed or amount of the settlement offer. Arbitrators couldn't simply split the difference.

Also, unhappy claimants could out of the settlement and pursue separate litigation against BP. Lawyers involved in the case said they believe that the number of opt-outs will be small.

Also to be determined is how many people will make claims beyond the 110,000 named plaintiffs. The group of potential new claimants is huge and includes those rejected by Feinberg as well as those who never submitted a previous claim.

Sherman, the Tulane law professor, guessed the number of new claimants could exceed 10,000. "There are going to be a lot of people coming out of the woodwork," he said.

———

*Political Editor George Talbot contributed to this report.*

© 2014 AL.com. All rights reserved.