# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| This document relates to all actions. | * | |
| | * | Honorable CARL J. BARBIER |
| | * | |
| | * | Magistrate Judge SHUSHAN |
| | * | |
| | * | |
| | * | |

# BP'S REPLY IN SUPPORT OF MOTION
# TO REMOVE THE CLAIMS ADMINISTRATOR

**INTRODUCTION**

As Claims Administrator, Mr. Juneau has claimed that he performs a quasi-judicial function.  He undisputedly establishes the policies that govern the award of claims for damages allegedly suffered as a result of the Oil Spill, and he decides those claims.  Because the Court has retained jurisdiction over this class-action settlement, he does so as a Court-appointed officer, subject to the Court's review.  Mr. Juneau has gone so far as to assert quasi-judicial immunity. The law therefore requires—and the parties and the public therefore have a reasonable expectation—that Mr. Juneau be unbiased, conflict-free, and untainted by any appearance of partiality.

The incontrovertible facts are, however, that (i) the State of Louisiana, in what it has claimed is its *parens patriae* capacity and otherwise, has been adverse to BP, arguing that BP should compensate its resident claimants for losses allegedly caused by the Oil Spill in a manner strongly opposed by BP; and (ii) Mr. Juneau served as a lawyer and advocate for the State in that effort, arguing in the GCCF for the compensation protocols favored by Louisiana and opposed by BP.  Also undisputed is that Mr. Juneau never made accurate and full disclosure to the parties of these facts, or apparently ***any*** disclosure to the Court, of his role as an advocate for Louisiana and its claimants.  In his Opposition, Mr. Juneau suggests that his role was known informally to everyone, including *The New York Times*.  But the most striking aspect of the Opposition is that Mr. Juneau fails to acknowledge even now his past role as an advocate for the State regarding policies on issues that he, as Claims Administrator, has been charged with fashioning and applying.  Just as he told Special Master Freeh in 2013 that "I didn't have any involvement in anything in the spill . . . had really had no connection with the spill per se,"[1] he insists now that

---

[1]    Motion to Remove the Claims Administrator, Ex. 5, Transcribed Sworn Statement of Patrick Juneau before Special Master Louis Freeh at 8, Aug. 1, 2013, Rec. Doc. 12182-16 (withdrawn).

he was merely a "consultant" or "liaison," as a way of diverting attention from his zealous advocacy of positions adverse to BP.  And the Opposition does not (and cannot) dispute that he had considered in detail how claimants injured in the Oil Spill should be compensated, and advocated that position to the GCCF—which he undisputedly did not disclose in February 2012.[2]

## ARGUMENT

### A.    Mr. Juneau *Did* Serve as a Lawyer in the Matter in Controversy.

The Opposition rests on the unequivocal assertion that Mr. Juneau "never 'served as [a] lawyer in the matter in controversy.'"[3]  Both aspects of that assertion are incorrect.

First, he did serve "as a lawyer" and advocate for the State.  The Opposition calls him the State's "liaison" and refers to his work as "consulting."  Opp. at 14, 16.  But the record of his communications with the GCCF makes clear (i) that Mr. Juneau was more than a go-between, as use of the term "liaison" implies, and (ii) that he did more than "provide advice and counsel to the State in understanding GCCF claims processes and allocation protocols"[4] or serve as a "consultant to LA (state) about the whole Feinberg process"[5] as he says he told BP.  He acted as the State's advocate, which itself was acting to secure maximum relief to Louisiana residents. Then and later, even after the PSC and BP had entered into a compromise settlement agreement, the State took a position adverse to BP, asserting ultimately that ***even the settlement*** (much less BP's positions in the GCCF), offered "inadequate relief" to residents of Louisiana "in exchange for the relinquishment of strong legal claims against BP."[6]  To understand the degree of

---

[2]     Motion to Remove the Claims Administrator, Ex.10, Holstein Decl. ¶ 14 and Ex. H, Rec. Doc. 13370-13.

[3]     Memorandum in Opposition to BP's Motion to Remove the Claims Administrator at 11 ("Opposition" or "Opp."), Rec. Doc. 13497.

[4]     Opp. Ex. 2, Juneau Decl. ¶ 5, Rec. Doc. 13497-2.

[5]     Motion to Remove the Claims Administrator, Ex. 18, Rec. Doc. 13370-21.

[6]     State of Louisiana's Mem. in Response and in Opp. to BP's and PSC's Motions for Final Approval of Economic & Property Damages Class Settlement, Rec. Doc. 7345, at 6–7.

adversity between BP and Louisiana, one need know only that, while it was Mr. Juneau's client, Louisiana sued BP, claiming that the compensation provided to claimants was inadequate, and filed opposing briefs concerning the GCCF's process *in this very matter*.  This is well-known to Mr. Juneau, who drafted one of the adverse briefs filed by the State against BP—though he fails to mention this fact, stating only that he did not sign any pleadings or appear as counsel of record.

The Opposition argues that Mr. Juneau's work on behalf of the State cannot have been adverse to BP, because Mr. Feinberg "aggressively sought input and support of the governors of the Gulf States" and described Mr. Juneau's submissions as "'[v]ery, very helpful.'"  Opp. at 14–15.  But courts and others charged with deciding contested matters routinely seek opposing parties' views, and may call them "helpful" whether or not they are.  Mr. Feinberg's declaration swats away Mr. Juneau's self-characterization as a special consultant or liaison, noting that he "sought the input of numerous other *interested parties*," including BP.[7]  The State of Louisiana was acting to protect and advance the interests of Louisiana claimants against the interests of those who had opposing views, including most directly BP.  And Mr. Juneau, as the State's lawyer, sought to persuade the GCCF to create rules that would operate for the benefit of those claimants, not BP.

Second, Mr. Juneau acted as a lawyer for the State "in the matter in controversy." Whether two cases are the same "matter" for purposes of disqualification is indeed a "question of judgment and degree," as the court said in *Little Rock School District v. Pulaski County Special School District No. 1*.[8]  But when the Eighth Circuit held that the trial judge was not required to recuse himself in the pending school desegregation case because of his former law partner's

---

[7]   Opp. Ex. 4B, Feinberg Decl. ¶ 2 (citing Oct. 7, 2014 Letter from Kenneth Feinberg) (emphasis added).

[8]   839 F.2d 1296, 1302 (8th Cir. 1988).

submission of an *amicus* brief in a previous school desegregation case, the court did not merely

say—as the Opposition quotes it—that the previous case "involve[ed], to a large extent, different

issues and different remedies."  Quoted in full, the court said that the previous case "involve[ed],

to a large extent, different issues and different remedies *two decades ago*."[9]  Here, the elapsed

time between the end of Mr. Juneau's advocacy for the State and the commencement of his work

as a supposed neutral Claims Administrator was only *seven months*.  The issue is the same: The

CSSP claimants are a subset of the GCCF claimants, and their theories of liability and damages

are identical.  That the matter is the same is confirmed by the fact that Louisiana claimants on

whose behalf Mr. Juneau was working simply went from being claimants in the GCCF to being

claimants in the CSSP.  The problem is that Mr. Juneau went from being their advocate to being

the "neutral" adjudicating many of their claims.

> **B.    Mr. Juneau Has Never Disclosed His Role as an Advocate for the State.**

The Opposition acknowledges that there can be no waiver of a conflict of interest under

the statute absent "full disclosure on the record of the basis for disqualification."  Opp. at 7.  Mr.

Juneau cannot claim that he made a "full disclosure on the record"—indeed, he makes a

backhanded concession that he did not[10]—and the Opposition does not argue that BP waived the

conflict of interest posed by his representation of the State.

The Opposition argues instead that BP's motion is untimely because "Mr. Juneau's work

on behalf of Louisiana was well known to BP."  *Id*. at 9.  Regarding this argument, note that the

Opposition refers generally to his "work on behalf of Louisiana."  *Id.*  Yet the Opposition and

---

[9]    839 F.2d at 1302 (emphasis added).  More recently, the Eighth Circuit clarified—in a case cited in the
Opposition—that "the phrase 'matter in controversy' must mean something other than the word 'case,' and so
we do not rely on this technical distinction.  Instead, we look to the ***substance of the issues argued and decided***
in the two proceedings."  *Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957, 960 (8th Cir. 2004) (emphasis
added).

[10]    Opp. at 11 n.35.

Mr. Juneau's Declaration, argue repeatedly that his "work" was merely that of a "liaison" or "consultant," not that of a lawyer or advocate.  *Id.*  When interviewed for the job of Claims Administrator, Mr. Juneau says that he "told all parties . . . of my prior role as a ***consultant*** in the GCCF process for the State of Louisiana."  Opp. Ex. 2, Juneau Decl. ¶ 20.  Given that description of his role, it is no wonder that "there were no other questions . . . regarding [his] work for the State of Louisiana with the GCCF program."  *Id.* ¶ 21.  His disclosure was, at best, incomplete, and it was not accurate.

Likewise, it is hardly surprising that Special Master Freeh did not cross-examine Mr. Juneau after he volunteered an explanation of how he came to be appointed and offered the denial, "I didn't have any involvement in anything in the spill."  This representation was false.  The Opposition makes a point of the fact that Mr. Juneau was not answering a specific question about his prior representation.  But the misrepresentation is all the worse for being ***volunteered***, because there is no question of his having misunderstood a question.  Having offered to explain "[w]hat happened," he claimed that all he knew in 2013 was that settlement negotiations were underway and that that information came from the newspaper.  The Opposition tries to explain away his claim of non-involvement by quoting the transcript in a way that drops a word, thereby alters the verb tense, and changes Mr. Juneau's frame of reference.  The Opposition says that, at the time of his selection, "he indeed 'had no connection with the spill per se.'"  Opp. at 20.  But that is not what Mr. Juneau told the Special Master.  What he said—reinforcing his earlier statement that "I didn't have any involvement in anything in the spill"—was "I . . . ***had really had no connection*** with the spill per se."  Thus, his representation was not that he had no connection with the spill in February 2012, when he was interviewed, but that he ***had never had*** any connection.

Mr. Juneau cannot have it both ways.  He cannot (i) deny to this day that he was a lawyer and advocate for the State and its claimants, (ii) have told BP when he was interviewed that he was only a "consultant," and (iii) have told Special Master Freeh that "he didn't have any involvement," but, at the same time, claim that BP "has long been aware of its alleged grounds for disqualification."  Opp. at 11.  Once it learned of Mr. Juneau's active advocacy on behalf of the State, BP acted to understand what it could from materials available through the Public Records Act and promptly moved for his removal.[11]

###### C.      28 U.S.C. § 455 Requires Mr. Juneau's Removal.

Mr. Juneau concedes that 28 U.S.C. § 455 applies to special masters and land commissioners, but argues that § 455 extends no further.  He is wrong on that score, as we explain below.  But even if § 455 did not apply to him, the Code of Conduct for United States Judges clearly does apply.   In *Jenkins v. Sterlacci*,[12] the court disqualified the special master under the Code, because the Code "provides that '[a]nyone . . . who is an officer of a judicial system ***performing legal functions***, including an officer such as a . . . special master . . . is a judge for the purpose of this Code.'"  The court held that Canon 3.C(1)—and its counterpart, § 455(a)— are designed to achieve "prophylactic protection against bias on the part of '[a]ny one . . . ***performing judicial functions***.'"[13]

---

[11]    The Opposition argues that one BP official traveled in an entourage with Mr. Juneau for a day; that another official attended a large meeting at which he was present; that another was once on a conference call in which he was one of many participants; and the Louisiana Attorney General once copied two BP lawyers on a letter than incorporated by reference comments offered by Mr. Juneau.  The several BP officials had no awareness of Mr. Juneau's presence on these occasions, and there is no reason why they should have.  His mention in a letter on which two BP lawyers were copied is even less consequential.  Documents buried in an organization's files do not constitute notice.  *See In re Kensington Int'l, Ltd.*, 368 F.3d 289, 313 (3d Cir. 2004) (actual knowledge required where constructive knowledge is not "pervasive" for determining timeliness of a § 455 motion).

[12]    849 F.2d 627, 630 (D.C. Cir. 1988).  The Code also prohibits a judicial officer from performing any official duties in any matter in which "he . . . served as [a] lawyer in the matter in controversy."  Code of Conduct for United States Judges Canon 3(C)(1)(b); *see also* Code of Conduct for Judicial Employees Canon 3(F)(2)(a)(ii).

[13]    *Jenkins*, 849 F.2d at 631 (alterations in original) (emphasis added); *see also In re Kempthorne*, 449 F.3d 1265 (D.C. Cir. 2006) (holding that special master performed an adjudicatory function because his charge included

Mr. Juneau and his expert do not dispute that the Code applies and requires his disqualification; they disregard the Code altogether.  Mr. Juneau, as Claims Administrator, performs judicial functions as surely as does as any special master.  He receives the proof of loss submitted by claimants; he evaluates that proof in light of the standards established by the Settlement Agreement and the Court's Order approving it; he makes a determination whether the claimant qualifies for compensation; and he renders an award.[14]

Because Mr. Juneau performs judicial functions, § 455 also applies to require his disqualification.  The *Jenkins* court said that § 455 embodies the "same standard" as the Code of Conduct for United States Judges, Canon 3.C(1).  And the court observed that Canon 3.D and § 455(e) are the "same" in permitting waiver of a disqualification based on the appearance of partiality only if there is disclosure on the record of the basis for disqualification.[15]  The Opposition does not deny that Mr. Juneau performs an adjudicatory function, but cites one case for the proposition that § 455 does not control the disqualification of adjudicators whose function is pursuant to a "'private agreement.'"[16]  In that case, however, the court found that the Independent Administrator's role was not equivalent to that of a special master because "[a] special master is largely under the direction of the court," whereas the administrator was "under the control of the IBT [*i.e.*, the International Brotherhood of Teamsters.]"[17]  Mr. Juneau, by contrast, is subject to the direct, plenary supervision of the court by reason of a court-approved

---

finding facts and making recommendations based on the findings); *United States v. Werner*, 916 F.2d 175, 178 (4th Cir. 1990) (noting that § 455 was amended "to make 'the statutory grounds for disqualification of a judge . . . conform generally with the recently adopted canon of the Code of Judicial Conduct,'" and finding that under Canon 3.C's "functional" analysis, a land commissioner was subject to the disqualification provisions of § 455(a) (quoting H.R. Rep. No. 1453, 93d Cong., 2d Sess. 1)).

[14]  *See* Opp. at 16 ("Mr. Juneau's current role as Claims Administrator involves overseeing a process to determine the eligibility of various individual and business claimants to compensation . . . .").

[15]  *Jenkins*, 849 F.2d at 633.

[16]  Opp. at 6 (quoting *United States v. Int'l Bhd. of Teamsters*, 814 F. Supp. 1165, 1171 (S.D.N.Y. 1993)).

[17]  *Bhd. of Teamsters*, 814 F. Supp. at 1171 (internal quotation marks omitted).

7

Rule 23 class action settlement agreement that "resolved adversarial litigation in federal court" involving federal admiralty law claims, purported state law claims, and federal statutory claims.[18]

Under both the Code and § 455, disqualification of Mr. Juneau is mandatory, because they prohibit a judicial officer from serving where he served as a "lawyer in the matter in controversy"—as Mr. Juneau did in drafting a brief for the State in these proceedings. The Fifth Circuit has repeatedly noted that if "the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal."[19]

### D.     Mr. Juneau's Public Comments Give the Appearance of Bias.

Mr. Juneau accused BP's CEO of an actionable lie in a newspaper interview. Nowhere does Mr. Juneau deny under oath that he actually made those statements. This is fatal to his continuation as a neutral.

The Opposition is a diversion. It begins by defending public comments about which the motion did not complain. About the words in question, the Opposition argues that Mr. Juneau had a legitimate interest in protecting his professional integrity. But BP does not complain about Mr. Juneau's assertions of impartiality—that he is not "anti-oil" and that he has represented other oil companies in court. The problem arises from his charge that BP's CEO lied about him and that he believes legal "action" is justified. And about that statement, the Opposition says only

---

[18]   Opp. at 16.

[19]   *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 484 (5th Cir. 2003) (quoting *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997)). Thus, though BP acknowledges that *Republic of Panama v. American Tobacco Co.*, 217 F.3d 343 (5th Cir. 2000), was reversed, the proposition advanced in BP's original motion—that close cases should be decided in favor of disqualification—undoubtedly holds true. In *Sao Paolo State of the Federative Republic of Brazil v. American Tobacco Co.*, the Supreme Court determined that a reasonable person would not believe a judge had any interest or bias when he "took no part in the preparation or approval of" a brief, his name was "added mistakenly," and he was only "vaguely aware" of the case. 535 U.S. 229, 233 (2002) (per curiam) (internal quotation marks omitted). Here, in contrast, the Claims Administrator knew of his deep involvement in representing Louisiana. Thus, the question of disqualification is not a close one.

that in another article, published three weeks later, Mr. Juneau said he did not remember using the word "lie" and asserted his objectivity. But most people harboring biases still believe in their own impartiality. He may not have intended to suggest that he was "talking about lawsuits" against BP, but he did; he may not have remembered saying "lie," but he avoids denying it even now; and he cannot reclaim the appearance of impartiality merely by proclaiming it.

### E. The Claims Administrator Has Failed in Basic Administration.

The Claims Administrator justifies his failings as an administrator by blaming BP. Opp. at 32 ("BP overlooks the effects of its own efforts . . . .").[20] But the record demonstrates otherwise. The Claims Administrator adopted and zealously litigated an errant BEL compensation policy over BP's continuous objections that caused awards to be miscalculated for claims totaling hundreds of millions of dollars. No other settlement program in history has made so costly an error. And while the Claims Administrator congratulates himself for spending $37.0 million per month compared to a supposed $47.6 million for the GCCF, he misses the key point. During its life, the GCCF processed about *five times* as many claims as the CSSP has.[21] To support his failed program, Mr. Juneau relies on support from CSSP vendors whose own financial interests are at stake. The declarations in support of Mr. Juneau's motion provide no objective basis to overcome the serious issues outlined in BP's Motion.

Likewise, Mr. Juneau's efforts to defend his conflicted decisions by trying to proffer a record (often erroneous) that BP consented to some of his decisions misses the point. The Claims Administrator never should have been involved with those decisions in the first place.

---

[20]   *See also* Opp. Ex. 5, Levine Decl. ¶ 31 (referring to a BP "continuous litigation effort"), Rec. Doc. 13497-5.

[21]   *Compare* Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement at 3, *available at* http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdf (stating that 216,431 claims have been issued a Notice as of October 29, 2014), *with* Independent Evaluation of the Gulf Coast Claims Facility, Report of Findings & Observations at 59, June 5, 2012, *available at* http://www.justice.gov/iso/opa/resources/66520126611210351178.pdf ("During its one and one-half year tenure, the GCCF processed over one million claims . . . .").

And BP consented (where it fundamentally did not agree) only after considering the Claims

Administrator's views, stating explicitly that it was deferring to the CSSP's views and relying on

representations that the Program made while acting under his direction, completely unaware that

Mr. Juneau's views on these issues had already been formed and urged in his role as lawyer for

Louisiana and advocate for claimants.

## CONCLUSION

Mr. Juneau's decision to accept the Claims Administrator position, knowing that it would

implicate issues common to his work as a lawyer adverse to BP, is alone disqualifying.  His

failure to disclose it properly aggravates the circumstance.  And his willingness to make

representations as a purported neutral on matters that overlap with his work as a lawyer has

compromised the settlement program itself.  For these reasons, and the reasons set forth in BP's

Memorandum in Support of Its Motion to Remove the Claims Administrator, BP requests that

the Court enter an order removing the Claims Administrator.  If the Court denies this request, BP

requests that the Court permit it to conduct the discovery requested in its original Motion.

October 29, 2014                                      Respectfully submitted,

Mark Holstein                                          ___/s/ Kevin M. Downey_____
BP AMERICA INC.                                  Kevin M. Downey
501 Westlake Park Boulevard                  F. Lane Heard III
Houston, TX  77079                               WILLIAMS & CONNOLLY LLP
Telephone:  (281) 366-2000                    725 Twelfth Street, N.W.
Telefax:  (312) 862-2200                        Washington, DC  20005
                                                          Telephone:  (202) 434-5000
                                                          Telefax:  (202) 434-5029

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999


Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

**OF COUNSEL**

_/s/ Don K. Haycraft_
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
Wendy L. Bloom
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, on this 29th day of October, 2014.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft