# Exhibit 13

# Redacted

**REPLY AFFIDAVIT OF WILLIAM G. ROSS**

WILLIAM G. ROSS, being duly sworn, deposes and says:

I re-affirm all of the opinions expressed in my Affidavit dated September 2, 2014 in support of my conclusion that Patrick A. Juneau should be disqualified from serving as claims administrator in this action. I offer this Reply Affidavit in response to the memoranda of Mr. Juneau and class counsel and the Declaration of Professor Bruce A. Green in opposition to the motion of BP America Production Company and BP Exploration & Production Inc. ("BP") to remove Mr. Juneau from serving as Claims Administrator.

In preparation for making this Reply Affidavit, I have reviewed the following documents, in addition to the documents listed in paragraph 8 of my original Affidavit: "BP's Memorandum in Support of Motion to Remove the Claims Administrator;" "Memorandum in Opposition to BP's Motion to Remove the Claims Administrator" and exhibits thereto, including "Declaration of Bruce A. Green," executed October 14, 2014; "Class Counsel's Response to BP's Motion to Remove the Claims Administrator" and exhibits thereto; bills for professional services submitted by Juneau David to the Louisiana Department of Public Safety and Corrections for the months of July 2010 through June 2011; "Declaration of Maria Travis," dated October 28, 2014; "Memorandum in Response to Judge Barbier's February 2, 2011, Order on Behalf of the State of Louisiana," "Notice of Joinder in Motion to Supervise *Ex Parte* Communications Between BP Defendants and Putative Class Members;" e-mail from Felicia A. Guidry on behalf of Patrick A. Juneau to Ken Feinberg dated 11:15 a.m. on August 26, 2010; e-mail from Ken Feinberg to Patrick A. Juneau dated 8:15 a.m. on September 9, 2010; e-mail from Felicia A. Guidry on behalf of Patrick A. Juneau dated 3:02 p.m. on September 8, 2010; e-mail from Ken Feinberg to Patrick A. Juneau dated 11:18 a.m. on September 8, 2010; e-mail from Felicia A. Guidry on behalf of Patrick A. Juneau dated 11:12 a.m. on September 8, 2010; e-mail from Mary Anna Tobol to Susan Schmidt dated 12:33 p.m. on September 7, 2010; e-mail from Felicia A. Guidry on behalf of Patrick A. Juneau Mary Anna Tobol dated 12:09 on September 7, 2010; e-mail from Mary Anna Tobol to Patrick A. Juneau dated 1:13 p.m. on September 13, 2010; e-mail from Felicia A. Guidry to Ken Feinberg dated 4:40 p.m. on September 2, 2010; and e-mail from Ken Feinberg to Felicia A. Guidry and Patrick A. Juneau dated 9:20 a.m. on September 8, 2010 re "Ken's Schedule & Follow-Up."

**I.    The Judicial Canons and 28 U.S.C. Section 455 Apply to Mr. Juneau**

Professor Green's only response to my contention that Mr. Juneau is within the purview of 28 U.S.C. section 455 is to point out that this section applies to special masters pursuant to Federal Rule of Civil Procedure 53 and that "it is undisputed that Mr. Juneau was not appointed to serve as a special master pursuant to Rule 53." This is indeed undisputed, but the fact that Mr. Juneau was not appointed to serve as a special master does not by any means prove that he cannot be regarded as a judicial officer who is bound by the provisions of section 455. As I

1

explained in detail in my original Affidavit (¶¶ 11-18), there is substantial authority in case law and legislative history for the conclusion that the statute embraces persons who perform quasi-judicial duties, or at least that such persons should be held to the same standards of conduct in the adjudication of disqualification motions. Relying only upon a literal reading of the text of section 455, Professor Green does not address the ample authority that cuts against such a cramped interpretation of the statute.

As I explained in greater detail in my September 2, 2014 Affidavit, courts in various cases have held that the disqualification provisions of section 455 apply to persons who perform quasi-judicial duties, such as special masters, Ross Aff. ¶¶ 11-13, and that section 455 was designed to conform to the *Application* section of the American Bar Association's *Model Code of Judicial Conduct*, which defines a judge as "anyone who is authorized to perform judicial functions." (Ross Aff. ¶ 17). I noted in that affidavit that Federal Rule of Civil Procedure 53 governing special masters now explicitly references Section 455, but that the case authority I relied upon pre-dated the addition of this language to the Rule, and that the theory behind those cases still applied to Mr. Juneau's functions as Claims Administrator here. I also pointed out that Mr. Juneau himself has effectively acknowledged that he is bound by judicial standards insofar as he has invoked judicial immunity in connection with his duties as claims administrator and settlement trustee. (Ross. Aff. ¶ 14).

In addition, I maintain that even if one were to interpret Section 455 as not applying to Mr. Juneau, the *Code of Conduct for United States Judges* (the "Code") governs "Anyone who is an officer of the federal judicial system authorized to perform judicial functions," as stated in the Code's Compliance section. Since Mr. Juneau is a quasi-judicial officer who is bound by the Code, I reiterate my opinion that Mr. Juneau's service as an attorney for the state of Louisiana violates the precept of Canon 2 that a "Judge should avoid impropriety and the appearance of impropriety in all activities" and the rule of Canon 3(C)(1)(b) that "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which…the judge served as a lawyer in the matter in controversy." (Ross Aff., ¶¶ 21, 30). Nowhere does Professor Green address the Code in the filings made in opposition to BP's Motion to Remove.

Professor Green similarly has not responded to my opinion that Mr. Juneau's service as an attorney for the state of Louisiana creates a conflict of interest that should disqualify him from service as claims administrator under generally recognized principles of class action practice even if he is not classified as a quasi-judicial officer. (Ross Aff. ¶ 19).

## II.   Juneau's Representation of the State of Louisiana Was in the Same "Matter" as His Service as Claims Administrator.

With regard to Professor Green's contention that "Section 455(b)(2) is inapplicable because the contested 'matter' in which Mr. Juneau represented the State of Louisiana is not the same as the matters in which he is serving as Claims Administrator" (Green Decl. ¶ 8), I

2

disagree with Mr. Juneau and Professor Green's application of relevant case law to the facts of the present motion.

Professor Green's citation of *United States v. Voccola*, 99 F.3d 37, 42-43 (1st Cir. 1996) (Green Decl. ¶ 23) is inapt because that case involved not the judge's prior service as an attorney representing an adverse party, but rather her previous activities as a politically-appointed member of a committee investigating fraud in financial institutions, including the institution from which the defendant (charged with racketeering and mail fraud) borrowed money. The First Circuit held that the judge was not disqualified on the basis of her service on the investigatory committee. The court also held that she was not disqualified because she served as judge in a previous case, ending in default, in which the defendant was charged with failing to pay a promissory note.

Moreover, the judicial decisions cited by Mr. Juneau in his brief (Memorandum in Opposition to BP's Motion to Remove the Claims Administrator, pp. 11-12) involved cases where judges who were the subject of recusal motions had much more tenuous connections to other matters than Mr. Juneau has in the present case. Two of those decisions involved a judge's former law partners rather than the judge himself. In *Little Rock School District v. Pulaski County Special School District No. 1*, 839 F.2d 1296, 1302 (8th Cir. 1988), the Eighth Circuit refused to require the recusal of a judge whose former law partner had submitted an *amicus curiae* brief two decades earlier in what the court described as a "a case involving, to a large extent, different issues and different remedies." In another decision relied upon by Mr. Juneau, *Blue Cross & Blue Shield of Rhode Island v. Delta Dental of Rhode* Island, 248 F.Supp. 2d 39, 47 (D.R.I. 2003), a case alleging false statements by a dental plan, the court refused to order the disqualification of a judge whose former law partner had attended a meeting on behalf of the dental plan with the director of the state department of business regulation. The connection between the judge and previous litigation was similarly attenuated in *Renteria v. Schellpeper*, 936 F.Supp. 691, 692-93 (D.Neb. 1996), a case alleging use of excessive force by police officers. In that case, the court denied a motion to disqualify a judge who had defended police officers in civil rights cases in the city in which the case was pending and had been "consulted" about a case involving the same kind of practices that were the subject of the case in which the recusal motion was made.

In contrast with the judges in the foregoing cases, Mr. Juneau's activities as an attorney for the state were closely connected with his present quasi-judicial duties. As I explained in my original Affidavit, this connection compels Mr. Juneau's disqualification under both section 455(b)(2), which mandates disqualification "[w]here in private practice" a judge served as a lawyer in the matter in controversy" and also under sec. 455(a) because his "impartiality might reasonably be questioned."

It likewise violates the Code's precept against the appearance of judicial impropriety and the Code's requirement of disqualification of a judge who has "served as a lawyer in the matter in controversy." (Ross, Aff., ¶ 21, 30, Ross Reply Aff., *supra*).

3

Although Professor Green's Declaration correctly points out that Mr. Juneau served as a lawyer for Louisiana at a time when "the State was addressing the design of a voluntary extrajudicial process for resolving claims that has since been superseded" (Green Decl. ¶ 24), the subsequent change in the "process" is virtually irrelevant because the claims in both the extrajudicial and judicial processes arose out of the Deepwater Horizon Oil Spill and involved many of the same claimants, the same liabilities, and the same damages. Accordingly, I categorically disagree with Professor Green's assertion that "the two matters" are not the same matters for purposes of Section 455(b)(2) because they are only "loosely related" (Green Decl. ¶ 22). To the contrary, the pre-litigation and litigation processes could hardly be more closely related. Moreover, as I explained in my Affidavit, Mr. Juneau's work for Louisiana "appears to have involved him in the analysis and development of many of the same accounting practices that are at issue in the present litigation. Moreover, Mr. Juneau assisted the state of Louisiana in developing and advocating accounting and documentation standards that benefited some of the claimants whose claims he is adjudicating in his role as claims administrator." (Ross Aff. ¶ 22).

### III.  BP's Motion Is Timely

Professor Green does not respond to my contention that BP has not waived its right to object to Mr. Juneau's service, and he conflates my discussion of waiver with his explanation of why he believes that BP's motion is untimely. He asserts that I have misread federal case law, particularly the Fifth Circuit's decision in *Hall v. Small Business Administration*, 695 F.2d 175, 180 (5th Cir. 1983), by suggesting "that a party that is aware of the relevant facts may delay its objection unless the judge personally has made 'the full disclosure on the record of the basis for the disqualification' contemplated by the statute's waiver provision, Section 455(e), or the movant is aware of 'all the pertinent facts a full disclosure would provide.'" (Green Decl. ¶ 21). In fact, I have not asserted that a party may delay an objection until a full disclosure on the record has been made, but rather that the absence of such disclosure precludes a waiver. The language of the statute in providing the predicate for waiver -- "full disclosure on the record" -- could not be clearer. As the Fifth Circuit explained in *Hall*, "[u]nder sec. 455(e), counsel may waive the right to recusal only after a full disclosure on the record of the basis for disqualification." 695 F.2d at 180.

As I pointed out in my affidavit, timeliness is "an issue that is distinct from the question of waiver," Ross Aff., ¶ 37, citing *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989). Similarly, the Fifth Circuit in *Hall* treated timeliness and waiver as separate and distinct issues. 695 F.2d at 179-80. Although Professor Green correctly cites *Hall*, 695 F.2d at 180, as expressing approval of the proposition that "a party must raise the disqualification issue at the earliest moment after discovery of the facts allegedly supporting recusal," *United States v. Conforte*, 457 F.Supp. 641, 653 (D.Nev. 1978), that requirement is not inconsistent with my assertion that "there can be no timeliness issue" in the absence of a full disclosure "or evidence that BP knew all the pertinent facts a full disclosure would provide." (Ross Aff. ¶ 39).

4

The facts of *Hall* demonstrate that a party is not untimely when it files a recusal motion shortly after learning facts warranting such disqualification, even if the party previously knew some facts supporting recusal. In *Hall*, the Fifth Circuit held that the defendant's motion for a magistrate to vacate his judgment and recuse himself in a gender discrimination class action was timely because the defendant made the motion shortly after discovering that the magistrate's law clerk, a woman, had accepted employment and begun to work with plaintiffs' counsel approximately two days before the magistrate rendered his judgment. The Fifth Circuit reached this conclusion even though the defendant was aware at the time of the trial that the law clerk was a former employee of the defendant and was a member of the certified plaintiff class.

Moreover, the Fifth Circuit's decision to grant the recusal in *Hall* was based at least in part upon it determination that the defendant's counsel "did not lie in wait to determine whether her client would prevail and then file the motion only because she was disgruntled with the result." 695 F.2d at 179. Similarly, as I have explained in more detail in my affidavit, it is clear that BP is not making its recusal motion for a tactical reason such as an effort to overturn a particular, recent adverse decision by the Claims Administrator. (Ross Aff. ¶ 38).

Even if BP had constructive knowledge of some aspects of Mr. Juneau's activities on behalf of the state of Louisiana in connection with the oil spill at the time that it consented to his appointment as Claims Administrator, BP does not appear to have been aware of the full extent of Mr. Juneau's role until shortly before it brought its recusal motion. (Ross Aff. ¶ 39). At that time, BP became aware of Mr. Juneau's proposing a detailed set of guidelines for compensating oil spill claims in 2010. Moreover, as I explain below, it is my understanding that BP has learned even more relevant facts about Mr. Juneau's role since I filed my affidavit. These facts re-affirm that this is not a case in which a litigant seeks to "utilize a disqualification issue as part of [its] trial strategy." *Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1115 (5th Cir.), *cert. denied*, 449 U.S. 820 (1980).

### IV.  New Evidence Affirms Mr. Juneau Must Be Disqualified.

It is my opinion that documents produced in discovery since the time of my original Affidavit have provided substantial additional evidence that compel Mr. Juneau's disqualification. In particular, the billing records that Mr. Juneau submitted to the state of Louisiana for his work as counsel appear to provide detailed re-affirmation that his work as an attorney for the state involved him in the analysis and development of many of the same accounting and documentation standards aimed at benefiting some of the claimants whose claims he is now adjudicating in his role as claims administrator. For example, an entry for November 5, 2010 reveals that Mr. Juneau reviewed an e-mail "regarding compensation claims for crabbers, shrimpers, charterboats and deckhands and providing models pertaining to same." These billing records are replete with references to his work in drafting a "protocol" and "valuation templates" that presumably relate to these standards. The billing records also demonstrate in detail the ways in which Mr. Juneau was assisting the state of Louisiana in its efforts to obtain for its citizens

5

maximum compensation from BP, the very party whose interests he is required as claims administrator to treat fairly and objectively under the terms of the Settlement Agreement.



    Although Mr. Juneau emphasizes in his brief (Memorandum in Opposition to BP's Motion, p. 14) that his contract with the state specifically states that his work would "not include litigation," the bills indicate that his role as counsel for the state of Louisiana involved him in litigation on behalf of the state in ways that were adversarial toward BP. In particular, he assisted attorneys for the state of Louisiana in the preparation of its brief in support of the putative class's motion to request judicial supervision of the claims process. A bill for 1.2 hours on January 17, 2011 reveals that Mr. Juneau reviewed the "draft joint response to PSC's motion to supervise *ex parte* communications between BP and putative class members." On January 19, 2010, Mr. Juneau billed one hour for "review of PSC's memorandum in support of motion to supervise ex parte communications between defendant and class members," and on the same day he billed 3.50 hours for "reviewing extensive reply brief filed in federal court with exhibits." On January 19, 2010, Mr. Juneau also billed time for a conference with Liz Murrill "regarding filing," reviewed an e-mail from Ms. Murrill "regarding filing of briefs" and apparently prepared or

6

reviewed an "e-mail to Brady and Murrill regarding plaintiff's reply brief." On January 31, 2010, the day before the state filed its motion, Mr. Juneau billed 2.5 hours for "preparing edits to draft of motion and email to Liz Murrill regarding same." On the same day, Mr. Juneau also billed time for "subsequent telephone conference with Liz Murrill regarding filings;" for "review of email from Liz Murrill providing revised draft motion and inquiries pertaining to same;" for "review of email from Tom Sims regarding draft motion and providing GCCF stats stated in the motion" and for "review of email from Liz Murrill regarding draft motion and thoughts on same." On February 1, 2011, the date of the filing of the motion, Mr. Juneau billed time for reviewing an email from Liz Murrill "providing another revised draft of joinder motion," and on February 2, 2011, he billed an hour for reviewing the filed notice of joinder.

Mr. Juneau's billing records also suggest that he assisted the state of Louisiana in its preparation of its "Memorandum and Response to Judge Barbier's February 2, 2011 Order on behalf of the State of Louisiana," in which the state expressed objections to the manner in which the GCCF was processing claims. Mr. Juneau's billing records for the period between February 10, 2010 and February 17, 2011, the date on which the Memorandum was filed, contain numerous entries in which Mr. Juneau recorded time for working on a "memo" or "brief," apparently the state's Memorandum in response to Judge Barbier's Order. For example, he billed 1.8 hours on February 11, 2011 for "continued working on brief," 2.5 hours on February 13, 2011 for "revisions to brief," and two hours on February 15, 2011 for "assembling various suggestions and input and preparing proposed final brief."

If indeed Mr. Juneau assisted the state of Louisiana with its motion for judicial supervision and its subsequent response to Judge Barbier's Order, such activity would in my opinion provide especially convincing evidence that Mr. Juneau "served as a lawyer in the matter in controversy" within the meaning of section 455(b)(2) and would provide another compelling reason why Mr. Juneau's "impartiality might reasonably be questioned" within the meaning of section 455(a).

## V.    Juneau's Extrajudicial Statements.

Although Professor Green attempts to excuse Mr. Juneau's extrajudicial comments because "[a]s a practicing lawyer, Mr. Juneau has a legitimate interest in protecting his professional reputation when publicly attacked," the *Code of Judicial Conduct for United States Judges* ("the Code") makes no exception for persons who serve only temporarily or part-time as a judge. Indeed, by declaring that "[a]nyone who is an officer of the federal judicial system authorized to perform judicial functions is a judge for the purpose of this Code," the Code makes clear that its application is categorical. Rules against extra-judicial comments in the Code and other codes of judicial ethics are designed to serve the public interest by promoting public confidence in the judiciary and are not concerned with protecting the personal interests of judges. Accordingly, Professor Green's argument that Mr. Juneau somehow needed to speak through the news media because "his work does not take place in a judicial setting in which he can speak from the bench or by issuing opinions," is irrelevant and overlooks the fact that even ordinary judges have little or no direct opportunity to defend themselves from criticism from the bench or

in their opinions. For most judges, their work must speak for itself. The same is largely true for Mr. Juneau, although Mr. Juneau may actually have a better opportunity to publicly defend his work than do most judges insofar as his actions have been subject to the continuing oversight of Judge Barbier and have been the subject of various motions addressed to Judge Barbier.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: October 29, 2014

*William G. Ross*

William G. Ross