## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: **Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | * * * * | **MDL NO. 2179**<br><br>**SECTION J** |
| **This document relates to all actions.** | * * * * | **Honorable CARL J. BARBIER**<br><br>**Magistrate Judge SHUSHAN** |

## DECLARATION OF PROFESSOR THOMAS D. MORGAN

Thomas D. Morgan, declares under penalty of perjury that:

1.      I am a 1965 graduate of the University of Chicago Law School and a member of the Bar of Illinois. I am the S. Chesterfield Oppenheim Professor of Antitrust and Trade Regulation Law, Emeritus, at The George Washington University Law School where I was on the faculty from 1989 to 1998 and from 2000 to 2013. From 1998 to 2000, I was the first Rex E. Lee Professor of Law at J. Reuben Clark Law School, Brigham Young University. From 1980 to 1985, I was Dean, and from 1985 to 1989, Distinguished Professor at Emory University School of Law. From 1966 to 1980, less time for military service, I was a professor at the University of Illinois College of Law.

2.      The subject of most of my teaching and scholarly research has been the professional obligations of lawyers and judges. I have taught courses in that subject one or more times each year since 1974. I have authored or co-authored numerous publications, including a widely-used law school casebook in the subject, *Professional Responsibility: Problems and Materials* (12th edition 2014), published by Foundation Press. I served as one of two Associate Reporters for the American Law Institute's *Restatement of the Law (Third): The Law Governing Lawyers,* published in 2000, and as one of two Associate Reporters for the American Bar Association's Commission on Revision of the Model Rules of Professional Conduct, the Ethics 2000 Commission, whose work led to extensive revision of the ABA

1

Model Rules of Professional Conduct 2002. I have received two awards for lifetime contributions to legal ethics scholarship – the American Bar Foundation Keck Award in 2000 and the New York State Bar Association Sanford D. Levy Award in 2008. My curriculum vitae listing my publications, presentations and other professional activities and awards is attached to this declaration.

3.      The law firm of Williams & Connolly has retained me as an expert in this matter on behalf of its clients BP Exploration & Production, Inc. and BP America Production Company (collectively "BP"), in connection with BP's Motion to Remove the Claims Administrator in this matter, Mr. Patrick A Juneau (hereafter Mr. Juneau). I have been asked to review the materials submitted with respect to the Motion, including the Declaration of Professor Bruce Green that is Exhibit 3 to the Memorandum in Response to BP's Motion to Remove the Claims Administrator. I have given expert opinions on similar questions about lawyers and judges' professional conduct in affidavits, depositions and testimony in over 85 litigated cases, and my declarations, affidavits and testimony as an expert in those fields have been admitted in state and federal courts all over the country. I am being compensated at my current regular rate for time spent preparing this declaration.

4.      The documents I have reviewed in preparing this declaration are:

a.      The contract for Professional Legal Services between the State of Louisiana (hereafter the State) and the law firm of Juneau David, APLC, dated July 2, 2010.

b.      Billing records of Juneau David, APLC, to the State of Louisiana from August 2010 through July 2011.

c.      The First Amended Complaint in this matter, filed by the State of Louisiana on April 19, 2011.

d.      The First Amended Order Creating the Transition Process, filed March 8, 2012.

e.      The transcript of the Hearing on the Motions for Conditional Certification of Rule 23(B)(3) Classes for Settlement Purposes before this Court on April 25, 2012.

f.      The Preliminary Approval Order as to the Proposed Economic and Property Damages Settlement issued on May 2, 2012.

g.      The Deepwater Horizon Economic and Property Damages Settlement

2

Agreement, as Amended on May 2, 2012.

      h.     The transcript of the Final Fairness Hearing Proceedings before this Court on November 8, 2012.

      i.     This Court's Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement, filed December 21, 2012.

      j.     Mr. Juneau's Sworn Statement taken Before the Honorable Louis J. Freeh, Special Master, on August 1, 2013.

      k.     BP's Motion to Remove the Claims Administrator, filed September 2, 2014.

      l.     BP's Memorandum in Support of the Motion, filed September 2, 2014.

      m.     Declaration of Mark Holstein, filed September 2, 2014, and attachments thereto.

      n.     The affidavit of William G. Ross, filed September 2, 2014.

      o.     Class Counsel's Response to BP's Motion to Remove the Claims Administrator, filed on October 15, 2014.

      p.     Memorandum in Opposition to BP's Motion to Remove the Claims Administrator, also filed on October 15, 2014, and attachments thereto.

      5.     Based on the materials I have reviewed, I believe the following facts are largely undisputed.

      a.     The offshore drilling unit "Deepwater Horizon" caught fire on April 20, 2010, and sank on April 22, 2010, producing substantial oil discharge into the Gulf of Mexico.

      b.     On June 16, 2010, BP established the Gulf Coast Claims Facility (GCCF) run by Mr. Kenneth Feinberg, to process and pay economic damage claims associated with the oil spill.

      c.     On July 2, 2010, the State of Louisiana entered into a "Contract for Professional Legal Services" with the firm of Juneau David, APLC, for "advice and counsel to the State * * * related to the claims process and allocation protocols utilized and developed by the Responsible Parties associated with and/or arising from the Deepwater Horizon Oil Spill * * *." The contract was to pay Juneau David up to $175,000 and to be in effect until June 30, 2013, a period of three years.   The contract was signed on behalf of the law firm by Mr. Patrick A. Juneau.

d.  Mr. Juneau actively represented the views of his client, advocating such things as procedures that would reduce the necessity of individualized proof of damages and coordinating the work on behalf of the State with the work of the State's other counsel, as well as with lawyers for the other Gulf-region States.  Indeed, Mr. Juneau was so active in his work that, within 8 months of entering into the contract, the State agreed on March 3, 2011, to increase the "not to exceed" amount of the Juneau David legal services contract to $275,000 in order to "increase the number of hours required to provide legal services * * *."  Again, the contract was signed on behalf of his firm by Mr. Patrick A. Juneau.

e.  The State of Louisiana filed a First Amended Complaint in this matter on April 19, 2011.  Mr. Juneau did not sign the pleadings or appear as counsel of record.  However, Juneau David billed the State of Louisiana for meetings with and coordination of activities among Mr. Juneau and attorneys advising the State of Louisiana concerning potential claims against BP.

f.  Leading up to and during the same time period, class actions were filed by attorneys representing claimants who alleged business economic loss arising from the oil spill.

g.  On February 1, 2011, the State of Louisiana filed a joinder to the Motion to Supervise, and argued both that the GCCF was implementing inappropriate Protocols, and utilizing an inappropriate Release.  Some of these arguments appear to be similar to those advanced by Mr. Juneau in his emails to the GCCF on the State's behalf and, in any event, touch on similar subjects.

h.  On February 17, 2011, the State of Louisiana filed a brief in support of its joinder that argued that the GCCF's process had not been (i) prompt, (ii) uniform or understandable, or (iii) compliant with OPA.  It thus sought several points of relief, each of which was adverse to the interests of BP.  Although Mr. Juneau did not sign this pleading, his law firm's billing records suggest that the firm was the primary author.

i.  Effective July 21, 2011, Mr. Juneau cancelled the legal services contract between Juneau David and the State of Louisiana, and on July 25, 2011, the class action

4

plaintiffs moved this Court to appoint a Special Master to oversee the GCCF.

      j.      On March 8, 2012, this Court appointed Mr. Juneau as the "Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program." At the time of his appointment, there was no on-the-record disclosure of Mr. Juneau's earlier representation of the State of Louisiana, which in the words of his contract with the State were "related to the claims process and allocation protocols utilized and developed by the Responsible Parties associated with and/or arising from the Deepwater Horizon Oil Spill* * *."

      k.      Mr. Juneau has served actively in the Claims Administrator role, exercising authority granted by this Court, since the date of his appointment. The decisions he makes are extraordinarily substantive. On January 15, 2013, for example, at the request of Class Counsel, the Claims Administrator issued a Policy Announcement addressing accounting issues relating to proof of causation in the evaluation of individual claims. Mr. Juneau's authority to make determinations of policy and procedure that are consistent with the Settlement Agreement have been affirmed by this Court and by the Court of Appeals for the Fifth Circuit.

      l.      After learning more about Mr. Juneau's prior work on behalf of the State of Louisiana in this matter, on September 2, 2014, BP filed the pending Motion to Remove the Claims Administrator.

      6.      I know that this Court has invested extraordinary time and effort in creating the Supervised Claims Program and in hearing issues raised by the parties about the fairness of the process. But in my professional opinion, the issue presented by BP's Motion to Remove the Claims Administrator is not close and does not involve a question of the Court's managerial discretion. In my opinion, 28 U.S.C. §455 makes Mr. Juneau's role as Claims Administrator in this case a violation of Federal law.

      a.      The statutory language in 28 U.S.C. §455(a) clearly says: "Any justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

      b.      28 U.S.C. §455(b) describes specific situations where disqualification is required.

As related to the facts of this case, they are:

"(2)     Where in private practice he served as lawyer in the matter in controversy  * * *."

"(3)     Where he has served in government employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding."

c.     The quoted Language is not an admonition or suggestion; it is a statutory mandate. The corresponding provisions of the Code of Conduct for United States Judges are found in Canon 3(C)(1)(b).

d.     The reason for this mandatory disqualification is simple. The fact that a judge was previously paid by one of the litigants to frame issues in one way rather than another is likely to make the judge personally invested in seeing the issues that way. Think of it this way. No lawyer or party, whether plaintiff or defendant, should be required to have the lawyer he or she opposed yesterday rule on the same case in the role of judge tomorrow. Any lawyer or party would rightly fear that work previously done as an advocate tends to close the kind of open judicial mind to which both litigants are entitled.

e.     The force of the 28 U.S.C. §455(b) obligation represents such a basic requirement that even the parties may not consent to ignore it. 28 U.S.C. §455(e) makes clear: "No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)." The corresponding provision in the Code of Conduct for United States Judges is Canon 3(C)(4). Disqualification based on the judge's prior role as an advocate in a matter, in short, is so critical an element of our system of justice that- like an absence of jurisdiction-the parties may not waive it at all.

7.     In response to the absolute requirement of disqualification, Class Counsel and counsel for Mr. Juneau have looked for ways to escape it. They raise three issues.

a.     Their first claim is that the Claims Administrator is not a judicial officer to whom 28 U.S.C. §455 applies at all. In my opinion, they are wrong. I am aware, of course, that both sides have previously taken positions on the issue whether Mr. Juneau performs a judicial function that are different than they take today. But the Affidavit of Professor William G. Ross, dated September 6, 2014, does an excellent job of explaining why the Claims

Administrator is subject to 28 U.S.C. §455; I concur in both his analysis and his legal conclusion. I also rely on the language of the Compliance provision of the Code of Conduct for United States Judges, which says that the Code of Conduct and its standards for disqualification apply to "anyone who is an officer of the federal judicial system authorized to perform judicial functions."

  b. In his role as Claims Administrator, Mr. Juneau clearly makes decisions that determine the rights of Claimants and BP alike, and the fact that his decisions are ultimately subject to review by this Court does not make him less a judicial officer. A magistrate judge is also subject to District Court review, but magistrate judges are clearly subject to 28 U.S.C. §455. The point is that litigants are entitled to impartial review at each step in the judicial process and it is the standards of 28 U.S.C. §455 and the Code of Conduct for United States Judges that help assure litigants of that impartiality.

  c. The status most analogous to that of Claims Administrator is that of a Special Master. I acknowledge that Mr. Juneau does not bear the Special Master label and that he was not appointed pursuant to Rule 53 of the Federal Rules of Civil Procedure. But, functionally, his work is identical to that of a Special Master and I understand that in several of the previous cases in which he administered large settlements, he did his work under such a label. To assert that Mr. Juneau's work in this case requires any less impartiality and adherence to ethical standards than the work of a Special Master seems disingenuous.

  8. The second effort to avoid Mr. Juneau's disqualification is the assertion that the case now before the Court is a different matter from the one in which he acted as counsel for the State of Louisiana. Once again, in my opinion, that is incorrect.

  a. I certainly agree that there are several cases in which courts have rejected the idea that a current matter is the same one in which the judge was previously involved. In *United States v. State of Alabama,* 582 F.Supp. 1197 (N.D. Ala. 1984), for example, the fact that a District Judge had, as an advocate, earlier sued the state alleging racial discrimination in public education did not prevent his now hearing a case that involved alleged discrimination in higher education. The facts of the two matters differed widely. On the other hand, the fact that matters are technically different cases is not enough to render 28 U.S.C. §455(b)

inapplicable. *Preston v. United States*, 923 F.2d 731 (9th Cir. 1991), for example, found the fact that the judge had been "of counsel" of counsel to a firm representing a party that would be required to indemnify the government if the judge ruled a given way was enough to disqualify the judge. Technical identity between the cases is not the issue; the issue is whether the cases have such a close relation to each other that the judge has switched roles as a practical matter.

      b.     In the case before this Court, the same kinds of issues are presented to Mr. Juneau in his judicial role as those that he raised when he was private counsel for one of the parties, e.g., what kinds of individuals and businesses can be deemed to have economic loss, what proof is required to show claimants were in business at all, and how can claimants prove earnings before and after the spill. No one can criticize Mr. Juneau's asserting strong positions on protocols for payment and valuation templates that he asserted in his role as advocate for the State of Louisiana. But there is no escaping the fact that those are the same kinds of issues Mr. Juneau must determine in his judicial capacity today. That is precisely the problem that 28 U.S.C. §455(b) addresses. This Court has an important role in evaluating Mr. Juneau's decisions, but the point of 28 U.S.C. §455(b) is that BP in this case – and litigants in all cases-are entitled to determinations at each level of the judicial process unaffected by minds locked into views the decision maker advocated forcefully for one's opponent at an earlier stage of the controversy.

      c.     Further, while Mr. Juneau did not formally represent the private claimants who now appear before him, his billing records show that he was far more than the kind of "policy" advisor that Professor Green suggests. While it is difficult to tell from statements on a lawyer's bills exactly what discussions took place between Mr. Juneau and others, he billed for meetings and consultations with and about the Florida Legal Advisory Group and representatives of neighboring states' Attorneys General. His name may not have been on pleadings before the Court in this matter, but there is no escaping the fact that he was actively designing processes to help Louisiana citizens recover what they claimed. Only the remedial scheme has changed. While Mr. Juneau was an advocate, the remedial work was done through the GCCF; today, the work is done under the Court Supervised Claims Program. Both,

however, have and had the same aim of fairly compensating victims for the same kinds of losses. The external structure of the processes may differ, but there is no principled difference between the functions of the two remedial schemes. In my professional opinion, Mr. Juneau has clearly switched roles in the same case in violation of 28 U.S.C. §455.

  d.  Finally, the case before this Court actually does bear the same case number as the case filed against BP on behalf of the State of Louisiana. Even in that sense as well, Mr. Juneau crossed the statutory bar against moving from being an advocate to being a judge in the same case.

  9.  The rest of Mr. Juneau's response to the BP Motion to Remove can be boiled down to saying that BP either consented to his appointment as Claims Administrator, with knowledge of his prior work for the State, or should now be barred from objecting to it.

  a.  We have already seen that 28 U.S.C. §455(e) provides that §455(b) conflicts are not subject to consent at all. The same section goes on: "Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." Even if waiver of subsection (a) disqualification would be sufficient for disqualification based on prior advocacy, which it is not, there was clearly no "full disclosure on the record" of the kind §455(e) requires.

  b.  With respect to the issue of timeliness, the question in the cases cited by the parties is whether there has been "knowing concealment of an ethical issue for strategic purposes" by the party now seeking disqualification. *United States v. York,* 888 F.2d 1050, 1055 (5th Cir. 1989). I, of course, have no personal knowledge of what any person knew or did not know. I, like the other experts and even the respective parties, can only look at the documentary evidence. But I respectfully suggest that a careful reading of the facts shows that, at most, BP could have gleaned bits and pieces of information about Mr. Juneau's prior role that in retrospect might have let BP raise additional questions before consenting to his appointment. The idea that Mr. Juneau's meeting a BP representative on a helicopter, for example, or someone's making a note at a meeting demonstrate actual knowledge that BP withheld until the current motion seems transparently false.

  c.  The cases make clear the standard for finding "knowing concealment" is high. In

*Hall v. Small Business Administration*, 695 F.2d 175 (5th Cir. 1983), for instance, the defendant in a sexual discrimination class action suit was aware of part of the information that later formed the basis for its recusal motion, primarily the fact that the judge's law clerk was a former employee of the defendant and thus a class member. The full facts that eventually formed the basis for its recusal motion, however, were not known to the defendant, which brought the motion upon learning that the law clerk had accepted employment with the plaintiffs' law firm in the matter and (2) that the law clerk had written a resignation letter suggesting she had been the victim of sexual discrimination during her employment with the defendant. *Id at 178*. The Fifth Circuit ruled that the motion was timely because the defendant did not have the full facts until shortly before bringing its motion. *Id at 179*.

In *United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989), the defendant knew even prior to his trial that the judge and a defense witness had an indirect social relationship. But the Court held that the defendant did not "know all the facts" until later. Citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), the Court held that the primary duty to recuse falls on the judge and does not depend on a party's objection. The defendant's failure to raise the issue earlier was not a bar to his raising it after his conviction.

*Kensington Int'l, Ltd. v. D.K. Acquisition Partners*, 368 F.3d 289 (3d Cir. 2004), was even more like the present case. It was a complex matter involving asbestos claims. The problem leading to disqualification arose from the Court's use of a panel of experts to advise on how to handle a complex case. It turned out that the experts themselves had conflicts that made their use improper. As in this case, some of the conflicts could have been discovered based on bits and pieces of information in the record, but the Court found that knowledge sufficient to make raising the issue of disqualification untimely has to be "actual" knowledge, not information known by different individuals that is then sought to be treated collectively as "imputed" to a party. In *Kensington*, the Court found the facts were "too far removed and far too attenuated from the concept of knowledge that would cause a party to take action to protect their interest" earlier than they did. 368 F.3d at 315. In the case before this Court as well, there is no basis for a finding of intentional delay that would render the BP Motion to Remove untimely.

10

d.     I certainly do not accuse Mr. Juneau of intentional wrongdoing, but it appears that he either misunderstood the statutory standard for disqualification or misinterpreted the kind of prior work that it makes disqualifying. Indeed, when interviewed by Special Master Freeh, Mr. Juneau went out of his way to deny prior involvement in the current case, saying: "I didn't have any involvement in anything in the spill. I didn't represent any claimants in the spill, wasn't representing any defendants in the spill, had really no connection with the spill per se." Those certainly are not the words of someone making full disclosure. Far from there being evidence that BP had actual knowledge of Mr. Juneau's prior work that should bar its now challenging his role as Claims Administrator, Mr. Juneau seems implicitly to have taken the position that his prior role was irrelevant to the parties and that no waiver was required. For the reasons offered throughout this Declaration, in my professional opinion, that position is wrong and BP should not now be barred from bringing this Motion to Remove.

10.     I recognize that Mr. Juneau is a distinguished member of the Louisiana Bar and that he has great experience distributing awards in a variety of cases. Further, I recognize that this Court is well down the road supervising one of the largest claims proceedings in history. I question no one's good faith or honest effort in this matter, but I respectfully offer my opinion that the law governing federal judicial proceedings clearly requires that Mr. Patrick A. Juneau now be removed as Claims Administrator.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: October 29, 2014

Thomas D. Morgan

11

**Attachment**

## Curriculum Vitae
## THOMAS D. MORGAN

**Personal Data:**

Born:  February 8, 1942, in Peoria, Illinois

Home Office: 4251 Gulf Shore Blvd. N., Apt. 11D, Naples, FL 34103    (239) 263-7353

E-mail: tmorgan@law.gwu.edu

**Undergraduate Education:**

Northwestern University, Evanston, Illinois, 1959-62
B.A. degree, highest distinction   Member, Phi Beta Kappa

**Legal Education:**

University of Chicago Law School, Chicago, Illinois, 1962-65
J.D. degree with honors; Member, Order of the Coif
Comment Editor, Volume 32, University of Chicago Law Review

**Professional Experience:**

Oppenheim Professor of Antitrust and Trade Regulation Law, Emeritus, since 2014

Oppenheim Professor of Antitrust and Trade Regulation Law, George Washington
University, 1989-1998; 2000-2013

Rex E. Lee Professor of Law, Brigham Young University, 1998-2000

Dean, Emory University School of Law, 1980-85
Distinguished Professor of Law 1985-89

Professor of Law, University of Illinois, 1974-80
Associate Professor, Illinois, 1970-74; Assistant Professor, Illinois, 1966-67

Visiting Professor, Brigham Young University, Fall 1994
Monash University (Australia), Spring 1988
Cornell University, Winter 1974

Special Assistant to Assistant Secretary of Defense, 1969-70
Attorney, Office of Air Force General Counsel, 1967-69

Bigelow Teaching Fellow, University of Chicago Law School, 1965-66

11

**Publications:**

**A.    In the Field of Professional Responsibility**

THE VANISHING AMERICAN LAWYER (Oxford University Press 2010)

PROFESSIONAL RESPONSIBILITY: PROBLEMS AND MATERIALS (Foundation Press 1976); 2nd Edition 1981; 3rd Edition 1984; 4th Edition 1987; 5th Edition 1991; 6th Edition 1995, 7th Edition 2000, 8th Edition 2003, 9th Edition 2006, 10th Edition 2008 (co-authored with R. Rotunda); 11th Edition 2011; 12th Edition 2014 (co-authored with R. Rotunda and J. Dzienkowski); all with Teachers' Manuals.

SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (published annually since 1981) (co-authored with R. Rotunda)

AMERICAN LAW INSTITUTE, RESTATEMENT OF THE LAW (THIRD): THE LAW GOVERNING LAWYERS (2000) (with C. Wolfram & J. Leubsdorf)

LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL CONDUCT WITH THE ALI RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (2005)

LEGAL ETHICS (Gilbert Law Summaries) (8th Edition 2005)

"Where Do We Go From Here with Fee Schedules?," 59 A.B.A.J. 1403 (1973)

"The Evolving Concept of Professional Responsibility," 90 Harvard L. Rev. 702 (1977)

"Appropriate Limits on Participation by a Former Agency Official in Matters Before an Agency," 1980 Duke L.J. 1

"Conflicts of Interest and the Former Client in the Model Rules of Professional Conduct," 1980 American Bar Foundation Res. J. 993

"The Fall and Rise of Professionalism," 19 U. Richmond L. Rev. 451 (1985)

"Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem," 10 Univ. Arkansas (Little Rock) L. J. 37 (1987-88)

"An Introduction to the Debate over Fee Forfeitures," 36 Emory L. J. 755 (1987)

"Public Financial Disclosure by Federal Officials: A Functional Approach," 3 Georgetown J. Legal Ethics 217 (1989).

"The Quest for Equality in Regulating the Behavior of Government Officials: The Case of Extrajudicial Compensation," 58 George Washington L. Rev. 490 (1990)

"Thinking About Lawyers as Counselors," 42 Florida L. Rev. 439 (1990)

"Vintage Freedman in a New Bottle," Review of Freedman, Understanding Lawyers' Ethics, 4 Georgetown J. Legal Ethics 847 (1991)

"Heroes for Our Time: Going Beyond Ethical Codes," Clark Memorandum (Brigham Young University), Fall 1992, p. 23

"Economic Reality Facing 21st Century Lawyers," 69 Washington L. Rev. 625 (1994)

"Sanctions and Remedies for Attorney Misconduct," 19 S. Illinois U. L. Rev. 343 (1995)

"Legal Representation in a Pluralist Society," 63 George Washington L. Rev. 984 (1995) (co-authored with Robert W. Tuttle)

"American Perspectives on the Duty of Loyalty: Conflicts of Interest and Other Issues of Particular Concern to the International Practitioner," in Mary C. Daly & Roger J. Goebel, Eds., Rights, Liability, and Ethics in International Law Practice (1995)

"Law Faculty as Role Models," in ABA Section of Legal Education, Teaching and Learning Professionalism: Symposium Proceedings (1996)

"Suing a Present Client," 9 Georgetown J. Legal Ethics 1157 (1996), reprinted in 1 Journal of Institute for Study of Legal Ethics 87 (1996)

"Conflicts of Interest in the *Restatement*: Comments on Professor Moore's paper," 10 Georgetown J. Legal Ethics 575 (1997)

"Whose Lawyer Are You Anyway?," 23 William Mitchell L. Rev. 11 (1997)

"Use of the Problem Method for Teaching Legal Ethics," 39 William & Mary L. Rev. 409 (1998)

"Conflicts of Interest and the New Forms of Professional Associations," 39 S. Texas L. Rev. 215 (1998)

"What Insurance Scholars Should Know About Professional Responsibility," 4 Conn. Insurance L. J. 1 (1997-98)

"Interview with Professor Thomas Morgan on Professional Responsibility," 13 Antitrust 4 (Fall 1998).

"The Impact of Antitrust Law on the Legal Profession," 67 Fordham L. Rev. 415 (1998)

13

"Toward a New Perspective on Legal Ethics," Am Bar Foun, Researching the Law (2000)

"Real World Pressures on Professionalism," 23 U. Ark. (Little Rock) L. J. 409 (2001)

"Practicing Law in the Interests of Justice in the Twenty-First Century," 70 Fordham L. Rev. 1793 (2002)

"Toward Abandoning Organized Professionalism," 30 Hofstra L. Rev. 947 (2002)

"Creating a Life as a Lawyer," 38 Valparaiso L. Rev. 37 (2003)

"Sarbanes-Oxley: A Complication, Not a Contribution in the Effort to Improve Corporate Lawyers' Professional Conduct," 17 Georgetown J. Legal Ethics 1 (2003)

"The Client(s) of a Corporate Lawyer," 33 Capital U. L. Rev. 17 (2004)

"Educating Lawyers for the Future Legal Profession," 30 Okla. City U. L. Rev. 537 (2005)

"The Corporate Lawyer and the Perjury Trilemma," 34 Hofstra L. Rev. 965 (2006)

"It's Not Perfect, But the ABA Does a Key Job in State-Based Regulation of Lawyers," 11 Tex. Rev. of L. & Politics 381 (2007)

"Comment on Lawyers as Gatekeepers," 57 Case Western Res. L. Rev. 375 (2007)

"Professional Malpractice in a World of Amateurs," 40 St. Mary's L. J. 892 (2009).

"It's Not Your Parents' Profession Anymore: The Changing Course of Legal Careers," GW Law School Alumni Magazine, Summer 2010, p. 18.

"Should the Public Be Able to Buy Stock in Law Firms?" 11 Engage 111 (Sept. 2010).

"Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in Aggregate Settlements," 79 George Washington L. Rev. 734 (2011).

"Realistic Questions About Modern Lawyer Regulation," part of an on-line symposium at http://truthonthemarket.com/2011/09/19/thomas-morgan-on-realistic-questions-about-modern-lawyer-regulation.

"Calling Law a 'Profession' Only Confuses Thinking about the Challenges Lawyers Face," 9 U. St. Thomas L.J. 542 (2011).

"On the Declining Importance of Legal Institutions," 2012 Mich. St. L. Rev. 255.

"The Rise of Institutional Law Practice," 40 Hofstra L. Rev. 1005 (2012).

*"The Lost Lawyer*: An Important Outline of Symptoms, But a Flawed Diagnosis," 2014 J. Professional Lawyer 83 (2014).

**B.      In the Fields of Economic Regulation and Administrative Law**

MODERN ANTITRUST LAW AND ITS ORIGINS: CASES AND MATERIALS (West Publishing Co. 1994; 2nd Ed. 2001; 3rd Ed. 2005; 4th Ed. 2009; 5th Ed. 2014)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (West Publishing Co. 1976)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (2nd Edition 1985) (co-authored with J. Harrison & P. Verkuil)

REGULATION AND DEREGULATION: CASES AND MATERIALS (West Publishing Co. 1997; 2nd Edition 2004) (co-authored with Harrison and Verkuil)

"The General Accounting Office: One Hope for Congress to Regain Parity of Power with the President," 51 N. Carolina L. Rev. 1279 (1973)

Review of "Inner City Housing and Private Enterprise," 1972 U Ill. L Forum 833 (1973)

"Achieving National Goals Through Federal Contracts: Giving Form to an Unconstrained Administrative Process," 1974 Wisconsin L. Rev. 301

"Toward a Revised Strategy for Ratemaking," 1978 U. Illinois L. Forum 21

"Procedural Impediments to Optimal Rate Making," in W. Sichel, Ed., Public Utility Rate Making in an Energy-Conscious Environment (Westview Press 1979)

"Federal Chartering of Corporations" and "Shareholder Remedies in Corporations" in M.B. Johnson, Ed., The Attack on Corporate America: The Corporate Issues Sourcebook (McGraw-Hill 1978)

Review of "Economic Analysis and Antitrust Law," 33 Vanderbilt L. Rev. 1523 (1980)

"The Deregulation Bandwagon: Too Far, Too Fast?," 2 J. Law & Commerce 1 (1982)

Review of "Antitrust Stories," Antitrust Source, www.antitrustsource.com (Aug 2008)

"Antitrust Implications of Accreditation Standards That Limit Law School Enrollment," 101 Antitrust & Trade Regulation Report 2508 (BNA, July 15, 2011).

15

## C.   In the Field of Legal Education

"Computer-Based Legal Education at the University of Illinois: A Report of Two Years' Experience," 27 J. Legal Education 138 (1975) (with P. Maggs)

"Teaching Students for the 21st Century," 36 J. Legal Education 285 (1986)

"Thinking About Bar Examining: The Challenge of Protecting the Public," 55 Bar Examiner 27 (Nov.1986)

"President's Address", 90-1 AALS Newsletter 1 (Feb. 1990)

"Should We Oppose Ranking of Law Schools?, 90-2 AALS Newsletter 1 (Apr. 1990)

"Legal Education Organizations in Business," 90-3 AALS Newsletter 1 (Aug. 1990)

"The Challenge to Maintain Diversity in Legal Education," 90-4 AALS Newsletter 1 (Nov. 1990)

"A Defense of Legal Education in the 1990s," 48 Wash. & Lee L. Rev. 1 (1991)

"Admission of George Mason to Membership in the Association of American Law Schools," 50 Case Western Reserve L. Rev. 445 (1999)

"Training Law Students For the Future: On Train Wrecks, Leadership and Choices," 6 St. Thomas L. Rev. 297 (2009).

"The Changing Face of Legal Education: Its Impact on What it Means to Be a Lawyer," 45 Akron L. Rev. 811 (2012).

## Participation in Public Programs:

## A.  Endowed Lectures Given

Mellon Lecture, University of Pittsburgh - 1981
Altheimer Lecture, University of Arkansas (Little Rock) - 1987
Dunwody Lecture, University of Florida - 1990
Lane Foundation Lecture, Creighton University - 1990 & 2010
Tucker Lecture, Washington & Lee University - 1990
Pirsig Lecture, Wm. Mitchell Law School - 1996
Van Arsdell Lecture, University of Illinois - 1997
Keck Award Lecture, American Bar Foundation - 2000
Tabor Lecture, Valparaiso University - 2003
Sullivan Lecture, Capital University - 2004
Miller-Becker Lecture, University of Akron - 2011
Lichtenstein Lecture, Hofstra Law School - 2012
Payne Lecture, Mississippi College – 2012

**B. Representative Programs on Which Served as Speaker or Panelist**

Let's Make a Deal (the Ethics of Negotiation) – ABA Conference on Professional
    Responsibility (Palm Beach) – June 1992

Reporting a Client's Continuing Crime or Fraud – ABA Conference on Professional
    Responsibility (Chicago) – May 1993

Ethical Issues in Representing Older Clients – Fordham University School of Law
    (New York) – December 1993

Problem of Representing a Regulated Client, Eleventh Circuit Judicial Conference
    (Orlando) – May 1994

Ethical Issues in Products Liability Cases – Products Liability Committee of the ABA
    Litigation Section (Tucson) – February 1995

Ethical Issues Arising in the O.J. Simpson Case – University of Washington School of
    Law (Seattle) – May 1995

Competition Policy for the New South Africa (Pretoria) – November 1995

Ethical Issues in Representing Children – Fordham University School of Law (New York)
    – December 1995

Are We a Cartel? The ABA/DOJ Consent Decree – AALS Annual Meeting (San
    Antonio) – January 1996

Professional Responsibilities of the Law Teacher – AALS (Washington) – July 1996

Ethical Issues for Mediators and Advocates – ABA Annual Meeting (Orlando) –
    August 1996

Legal Issues in Cyberspace – ABA Annual Meeting (Orlando) – August 1996

Teaching Legal Ethics by the Problem Method – College of William & Mary--Keck
    Foundation Conference (Williamsburg) – March 1997

Litigators Under Fire: Handling Professional Dilemmas In and Out of Litigation –
    televised ALI/ABA CLE program (Washington) – April 1997

Conflicts of Interest in the New Forms of Law Practice – South Texas Law School
    Symposium (Houston) – September 1997

Fiduciary Obligations in Dismissal of a Law Firm Partner – Washington & Lee Law
    School Symposium (Lexington, VA) – April 1998

17

Impact of Disciplinary Action on Lawyer's Status as Certified Specialist - ABA
Committee on Specialization National Roundtable (Washington) - May 1998

Conflicts of Interest in the Restatement of the Law Governing Lawyers - National
Organization of Bar Counsel (Toronto) - July 1998

The Ethics of Teaching Legal Ethics - Association of American Law Schools
(Washington) - October 1998

The New Restatement of the Law Governing Lawyers: What Is It & How Does It Affect
Your Practice? - Assn of Bar of City of New York (New York) - November 1998

Imputation, Screens & Personal Conflicts - ABA Conference on Professional
Responsibility (La Jolla) - June 1999

The Future of Legal Education - Dedication of Sullivan Hall, the new Seattle University
Law Building (Seattle) - October 1999

Legal Ethics in the New Millennium - J. Reuben Clark Soc. (Dallas) - November 1999

Unauthorized Practice of Law and Ethical Risks to Lawyers from Multistate Practice -
ALAS Telephone Seminar (Chicago) - December 1999

Ethics 2000: Rewriting the Standards for Lawyer Conduct - American Intellectual
Property Law Association (La Quinta, CA) - January 2000

Real World Pressures on Professionalism - University of Arkansas at Little Rock Law
School (Little Rock, AR) - February 2000

Professional Responsibility Issues Arising Out of Electronic Commerce - ABA Section
of Public Contract Law (Annapolis, MD) - March 2000

Multidisciplinary Practice: Curse, Cure or Tempest in a Teapot - American Intellectual
Property Law Association (Pittsburgh, PA) - May 2000

Ethics 2000: Proposed Changes in the Law Governing Lawyers - Conference of Chief
Justices (Rapid City, SD) - July 2000

Attorney Standards in Federal Courts and Developments in the Multidisciplinary Practice
Controversy - Conference of Chief Justices (Baltimore) - January 2001

Multijurisdictional Practice - Turner Seminar (Memphis) - February 2001

Ethical Issues in Large Firms — Ass'n of Legal Administrators (Baltimore) - May 2001

18

Law Firm Ancillary Services - ALAS Annual Meeting (Bermuda) - June 2001

New Rule 1.6 on Disclosure of Confidential Client Information – ABA Civil Justice
Roundtable (Washington) - March 2002

Ethics for Corporate In-House Counsel - American College of Investment Counsel
(Chicago) - April 2002

Treading Water: A Young Lawyer's Guide to Ethics in Varying Practice Environments -
ABA Tax Section Young Lawyers Committee (Washington) - May 2002

Shifting Ethical Sands: Ethics 2000 and Beyond - Federal Communications Bar Ass=n
(Washington) - June 2002

Multijurisdictional Practice - ABA Forum on Franchising (Phoenix) - October 2002

The Sarbanes-Oxley Act of 2002 and the ABA Task Force on Corporate Responsibility
Report (ALAS Telephone Seminar) - October 2002

At the Bar and in the Boardroom: The Ethics of Corporate Lawyering - Federalist Society
(Washington) - Nov. 2002

Law Firm Risk Management: Post-Enron Challenges - Hildebrandt Conference (New
York) - Nov. 2002

Future Regulation of Securities Lawyers - ABA Section of Business Law, Committee on
Federal Securities Regulation (Washington) - Nov. 2002

What Lawyers Need to Know to Comply with the New SEC Professional Conduct Rules
- ABA Section of Business Law Televised Forum (Washington) - Feb 2003

Ethics in Representing Organizational Clients After Sarbanes-Oxley - ABA Section of
Business Law Spring Meeting (Los Angeles) - April 2003

Corruption in the Executive Suite: The Nation Responds - National Teleconference from
ABA Public Utility Section Spring Meeting (Washington) - April 2003

Sarbanes-Oxley Revolution in Disclosure and Corporate Governance: Complying with
the New Requirements – ABA National Institute (Washington) - May 2003

Client Confidentiality, Corporate Representation and Sarbanes-Oxley - ABA National
Conference on Professional Responsibility (Chicago) - May 2003

Friend or Foe: The Restatement of Law Governing Lawyers - ABA National Legal
Malpractice Conference (La Jolla) - September 2003

19

Where Were the Lawyers in Enron? - Cato Institute (Washington) - October 2003

Testified before the House Subcommittee on Capital Markets' Hearing on the Role of
Attorneys in Corporate Governance (Washington) - February 2004

The Lawyer-Lobbyist "on the Frontier": What Legal and Ethical Rules Apply? - ABA
Mid-Year Meeting (San Antonio) - February 2004

The Client(s) of a Corporate Lawyer - Capital U. Law School (Columbus) - March 2004

Ethical Issues Facing Public Interest Law Firms - Heritage Foundation (Washington) -
October 2004

Drafting an Ethical Code for a Diverse Legal Profession - Univ. of Memphis Law School
(Memphis) - October 2004

Ethical Issues in International Trade Cases - International Trade Trial Lawyers
Association (Washington) - November 2004

Professional Regulation of Business Lawyers Isn't Going to Get Any Easier - ABA
Section of Business Law (Washington) - November 2004

Problems for Corporate Lawyers in Complying with the Sarbanes-Oxley Act - New
Jersey Corporate Counsel Association (Livingston, NJ) - January 2005

Avoiding Conflicts in Business Law Practice: Seven Deadly Sins - ABA Section of
Business Law (Nashville) - April 2005

Fireside Chat on Legal and Accounting Ethics - SEC Historical Society (Washington) -
November 2005

When Good Clients Go Bad - ALAS Annual Meeting (Toronto) - June 2006

Lawyers Face the Future - St. Thomas Univ. Law School (Minneapolis) - August 2006

Regulating Corporate Morality - George Washington Corporate & Business Law Society
(Washington) - September 2006

Comments on Noisy Withdrawal - Case Law School Leet Symposium (Cleveland) -
October 2006

The ABA Role in Law School Accreditation - Federalist Society Lawyers' Convention
(Washington) - November 2006

Investigative Techniques: Legal, Ethical and Other Limits - ABA Section of Antitrust
Law (National) - December 2006

Ethics Issues in Corporate Internal Investigations - Georgia Bar (Atlanta) - March 2007

Are Regulatory Lawyers' Ethical Obligations Changing? - ABA Section of Public Utility Law (Washington) - April 2007

Antitrust Litigation Ethics From Soup to Nuts - ABA Section of Antitrust Law (Washington) - April 2007

How to Survive in Today's Competitive Environment and Comply With the Rules of Professional Conduct - Wisconsin State Bar (Milwaukee) - May 2007

Audit Response Letters: Will There Be Peace Under the Treaty? - ABA National Conference on Professional Responsibility (Chicago) - May 2007

The Buried Bodies Case: Alive and Well After Thirty Years - ABA National Conference on Professional Responsibility (Chicago) - May 2007

Organization and Discipline for an Independent Legal Profession - Visit of Leaders of the Iraqi and Kurdistan Bar Associations (Washington) - November 2007

Feeling Conflicted? The Experts Opine and Prescribe - Tennessee Bar Foundation (Nashville) - January 2008

Ethics Issues in Qui Tam Litigation - ABA National Institute on Civil False Claims (Washington) - June 2008.

Ethics and the Lawyer-Lobbyist - ABA Administrative Law Conference (Washington) - October 2008

Ethics in the Early Going - ABA Tort & Insurance Practice Section, Aviation & Space Law Committee Litigation National Program (Washington) - October 2008

Professional Malpractice in a World of Amateurs - St. Mary's Law School Symposium on Legal Malpractice (San Antonio) - February 2009

The World Economic Crisis and the Legal Profession - Order of Advocates of Brazil (Brazilian counterpart of the ABA) - (Rio de Janeiro) - May 2009

Principles of United States Antitrust Law - Commissioners and Staff of the CADE (Brazilian counterpart of the FTC) - (Brazilia) - May 2009

The World Economic Crisis, Antitrust Law and the Lawyer - Institute of Advocates of Brazil (Brazilian counterpart of the ALI) - (Rio de Janeiro) - May 2009

21

The World Economic Crisis and Antitrust Law - American Chamber of Commerce - (Bela Horizonte, Brazil) - May 2009

Antitrust Law: The Real U.S. Policies - Seminar celebrating the retirement of Prof. Joao Bosco Leopoldino da Fonseca of the Federal University of Minas Gerais (Bela Horizonte) - May 2009

Where Does It End? Duties to Former Clients - American Bar Association Center for Professional Responsibility (Chicago) - May 2009

The Last Days of the American Lawyer - Creighton Law School (Omaha) - Oct. 2009

Ethics Challenges for National Security Lawyers In and Out of Government - ABA Standing Committee on Law and National Security (Washington) - Nov. 2009

The Transformative Effect of International Initiatives on Lawyer Practice and Regulation: The Financial Action Task Force Guidelines - Association of American Law Schools Annual Meeting (New Orleans) - Jan. 2010

Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in Aggregate Settlements - Humphreys Complex Litigation Center Conference on Aggregate Litigation: Critical Perspectives (Washington) - March 2010

Abandoning Homogeneity in Legal Education - Georgetown Center for Study of the Legal Profession Program on Law Firm Evolution: Brave New World or Business as Usual? (Washington) - March 2010

Ethics Issues in Housing - ABA Forum on Affordable Housing (Washington) - May 2010

The Vanishing American Lawyer - Conference on Regulating and Deregulating Lawyers - Institute for Advanced Legal Studies (London) - June 2010

The Vanishing American Lawyer - Federalist Society Podcast - Sept. 2010.

Developments in Ethics 2010 - ABA Teleconference - Jan. 2011

A Transforming Legal Profession: The Challenges for Bar Associations - National Conference of Bar Presidents (Atlanta) - Feb. 2011

A Transforming Profession: The Challenges for Lawyers Starting Out - ABA Law Student Division (Washington) - Feb. 2011

A Transforming Profession: A Look Back Forty Years and the Challenges Ahead -
Alabama Bar Annual Meeting (Point Clear) - July 2011
Florida Bar Board of Governors (Palm Beach) - July 2011

On the Declining Importance of Legal Institutions - Conference at Michigan State Law School (East Lansing) - Sept. 2011

Calling Law a Profession Only Confuses Thinking About Challenges Lawyers Face - Conference at University of St. Thomas Law School (Minneapolis) - Sept. 2011

The Changing Face of Legal Education: Its Impact on What It Means to be a Lawyer - Miller-Becker Lecture at University of Akron Law School (Akron) - Oct. 2011

Law School Accreditation - Federalist Society (Washington) - Nov. 2011

Aggregate Litigation: Don't Let Your End Game Blow-Up - ALM Litigation Summit (Washington) - Nov. 2011

So Someone Objects to Your New Client - ABA Administrative Law & Regulatory Practice Section Fall Conference (Washington) - Nov. 2011

Ethical Dilemmas Facing Lawyers Practicing National Security Law - ABA Standing Committee on Law and National Security (Washington) - Dec. 2011

Needed Law Schools' Response to Changes in the Legal Profession - AALS Annual Meeting (Washington) - Jan. 2012

The Rise of Institutional Law Practice - Lichtenstein Lecture at Hofstra Law School (Hempstead, NY) - Feb. 2012

Blazing New Pathways Through the Legal World - Washington Area Legal Recruitment Administrators Association (Washington) - Mar. 2012

Ethics in Privacy and Social Media - ABA Antitrust Section (Washington) - Mar. 2012

Ethical Issues in Alternative Litigation Funding – Humphries Center at GW Law (Washington) – May 2012

The Vanishing American Lawyer: The Road Ahead -- Utah Bar Ass'n (Sun Valley, ID) -- July 2012

The Vanishing American Lawyer: The Changing Legal Profession -- Federal Bar Ass'n (Memphis, TN) -- Oct. 2012

The Professional World Facing New American Lawyers – 2012 Georgia Convocation on Professionalism (Atlanta) -- Nov. 2012

Testimony -- ABA Task Force on the Future of Legal Education (Dallas) -- Feb. 2013

Public Ownership of Stock in Law Firms -- Federalist Society Teleforum -- Apr. 2013

23

The ABA's 2012 Changes in Ethics Rules -- ABA Antitrust Section Spring Meeting (Washington) -- Apr. 2013

Proposals for Training Required for Bar Admission – AALS Annual Meeting (New York) – Jan. 2014

Law Professors of the Future: A New Balance of Teaching, Scholarship and Service? – AALS Annual Meeting (New York) – Jan. 2014

Are Lawyers Vanishing? – Transportation Lawyers' Ass'n (St. Petersburg, FL) – May 2014

## Major Civic and Professional Activities:

### A. In the Field of Professional Responsibility

Associate Reporter, American Law Institute Restatement of the Law (Third), The Law Governing Lawyers, 1986-2000

Associate Reporter, American Bar Association Ethics 2000 Commission, 1998-99

Reporter, American Bar Association Commission on Professionalism, 1985-86

Member, Advisory Board, ABA/BNA Lawyers' Manual on Professional Conduct, since 1984; Chair 1986-87 & 1992-93

Member, Advisory Council, Project on a Digital Archive of the Birth of the Dot Com Era: The Brobeck Papers, Library of Congress and Univ. of Maryland, 2005-2009

Chair, Federalist Society Practice Group on Professional Responsibility and Legal Education 2005-2007

Member, Drafting Committee, Multistate Professional Responsibility Examination, National Conference of Bar Examiners, 1986-89

Member, Committee on Professional Ethics, Illinois State Bar Association, 1974-1980; Vice Chair 1979-80

### B. In the Fields of Economic Regulation and Administrative Law

Vice Chair, ABA Section of Administrative Law & Regulatory Practice, 2001-2002

Consultant, Administrative Conference of the U.S., 1975-1979 & 1985-1989

Council Member, ABA Section of Administrative Law, 1983-1986

24

Chair, Section on Law and Economics, Ass'n of American Law Schools, 1979-1980

## C.    In the Field of Legal Education

President, Association of American Law Schools, 1990

Member, AALS Executive Committee, 1986-1991

Chair, AALS Special Committee on ABA Accreditation Standards, 2010

Chair, AALS Nominating Committee for President-Elect and Members of the Executive
Committee, 2010 (Member 2008 & 2011)

AALS Delegate to the ABA House of Delegates, 2011-2013

Chair, AALS Long Range Planning Committee, 1988-1989

Member, Planning Committee for Workshop on Tomorrow's Law Schools: Economics,
Governance and Justice, 2013

Member, AALS Special Committee on Faculty Recruitment Practices, 2005-2007

Member, AALS Committee on the Ethical and Professional Responsibilities of Law
Professors, 1988-1989

## Special Honors Received:

Illinois State Bar Foundation, Honorary Fellow (1988) (for contributions to study of lawyer
professionalism)

American Bar Foundation, Keck Foundation Award (2000) (for distinguished scholarship in
legal ethics and professional responsibility)

New York State Bar Association, Sanford D. Levy Professional Ethics Award (2008) (for
lifetime contributions to legal ethics scholarship)

## Legal Consulting:

Testified in twenty-five contested trials or hearings involving issues such as lawyer
discipline, disqualification, right to fees and malpractice.

Gave depositions in twenty-seven cases resolved prior to trial.

Submitted declarations or affidavits in thirty-nine other cases, typically in connection with
motions for summary judgment or motions to disqualify.

**Organization Memberships:**

American Bar Association
American Law Institute (Life Member)
American Bar Foundation (Fellow)
Illinois State Bar Association
Illinois Bar Foundation (Honorary Fellow)
ABA Center for Professional Responsibility
Association of Professional Responsibility Lawyers
American Judicature Society

**Current as of October 2014**