IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by | * | MDL NO. 2179 |
|   the Oil Rig "Deepwater Horizon" | * | |
|   in the Gulf of Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| This document relates to: | * | |
| All Cases and No. 12-970 | * | Honorable CARL J. BARBIER |
| | * | |
| | * | Magistrate Judge SHUSHAN |
| | * | |
| | * | |

**BP'S MOTION TO ENJOIN IMPLEMENTATION OF POLICIES TAINTED BY THE
CLAIMS ADMINISTRATOR'S PRIOR REPRESENTATION**

Since the creation of the first claims process to address valid claims arising from the Deepwater Horizon oil spill, BP has opposed payment of claims without adequate supporting documentation because of concerns about fraud.  As a private lawyer, Patrick Juneau advocated approaches that were adverse to BP on this important issue, consistent with the views of his client, the State of Louisiana.

At the time Mr. Juneau implemented policies relating to this subject as the Claims Administrator, he claimed to be an independent "neutral."  In fact, the Claims Administrator's approach cannot help but have been influenced by the hundreds of hours he spent advocating for low documentation requirements on behalf of claimants within the State of Louisiana.[1]  In light of his prior representation and advocacy on issues related to these CSSP policies, the Court should vacate and enjoin the policies.  The CSSP should be directed to reconsider their appropriateness through a process from which the Claims Administrator is recused.

---

[1]   *See* BP's Memorandum in Support of Motion to Remove the Claims Administrator ("Motion to Remove"), Sept. 2, 2014, Rec. Doc. 13370-1.

Mr. Juneau spent over 500 hours representing the State of Louisiana and advocating on behalf of its claimants against BP. In the words of Billy Plauché, another attorney for the State of Louisiana who worked with Mr. Juneau: "I think it would be great if Pat [Juneau] could attend [upcoming public meetings] – he does have the most familiarity with the private claims; and *I think folks will be happy to see the work he is doing on behalf of the State to support private claimants*."[2]

As set forth in more detail in BP's Motion to Remove the Claims Administrator, Mr. Juneau's representation of the State of Louisiana involved advocating that the GCCF adopt a protocol that required claimants to produce little documentation.[3] Mr. Juneau advocated that the GCCF should use industry data to substitute for evidence of loss whenever a claimant had "little or no documentation" of his actual damages.[4] Thus, for example, he argued that if a crab captain or crab deckhand did not have any evidence of loss, a baseline compensation model could nonetheless be used based upon the average small boat crabber.[5] Or if a hotel owner had "little or no documentation" of loss, (a difficult proposition to accept), the GCCF should assume that "a well-operated hotel should experience a net profit of approximately thirty-two percent (32%)."[6] He repeated these positions when it came to his review of the proposed permanent GCCF protocol as well.[7] Mr. Juneau emphasized at that time that the Oil Pollution Act, 33 U.S.C. §

---

[2] Ex. 1, Email from Billy Plauché to Stephanie Morris, Oct. 22, 2010 (emphasis added).

[3] *See* Emails from Patrick Juneau to Kenneth Feinberg, Nov. 2010, Motion to Remove Exs. 11, 14, & 15. Rec. Docs. 13370-14, 13370-17, & 13370-18.

[4] *See* Email from Patrick Juneau to Kenneth Feinberg, "Narratives for Valuation Templates," Nov. 24, 2010, Motion to Remove Ex. 14, Rec. Doc. 13370-17.

[5] *Id.* at 2-4.

[6] *Id.* at 17-18.

[7] Ex. 2, Email from Patrick Juneau to Kenneth Feinberg, Feb. 16, 2011.

2701, recognized not only tax returns and financial statements, but also other "similar documents" for supporting a claim.[8]

Unaware of the hundreds of hours Mr. Juneau had spent advocating in favor of claimants and against BP on documentation issues, BP jointly proposed his selection as Claims Administrator for the Court Supervised Settlement Program ("CSSP"). Although his prior representation raises many significant issues, the problem is most acute when he adopted policies on these subjects that are inconsistent with the requirements of the negotiated Settlement Agreement.

I.  POLICIES THAT SHOULD BE ENJOINED AND RECONSIDERED.

   A.  **Policy 333: No Employer Sworn Witness Statement Required for IEL Claims.**

The Settlement Agreement provides that an individual making an Individual Economic Loss claim who is not entitled to a causation presumption must submit a sworn written statement from his employer certifying that the claimant's losses are a result of the DWH Spill.

Exhibit 8A of the Settlement Agreement states:

> ii. Causation for a Claiming Job is established if the claimant provides an Employer Sworn Written Statement attributing the claimant's loss of income during the Compensation Period to the DWH Spill. The Employer Sworn Written Statement must articulate in detail how the claimant's losses at the Claiming Job are causally related to the DWH Spill. Such Employer Sworn Written Statement must also include contact information for an authorized representative of the employer.[9]

Despite this explicit requirement, the Claims Administrator proposed Policy 333, allowing claimants to avoid the requirement of an Employer Sworn Written Statement if the employer

---

[8]  *Id.*

[9]  Economic and Property Damages Settlement Agreement As Amended on May 2, 2012 ("Settlement Agreement") Exhibit 8A at 14, Rec. Doc. 6430-16.

refuses, the employer is deceased, or the employer is dissolved and no longer exists.[10] The Claim Administrator's policy enables him to pay claims based upon a Claimant Sworn Written Statement in lieu of an Employer Sworn Written Statement, and outlines the steps he would take to do so.[11] This policy impermissibly abrogates the specific requirements of the Settlement Agreement.

The Settlement Agreement's requirement that a claimant submit a Sworn Written Statement from his employer verifying that the claimants' losses are related to the spill provided a critical check on the submission of false claims by persons whose jobs were affected for wholly unrelated reasons—such as poor performance, or the economic crisis then impacting the entire country. ████████████████████████████████████████

Policy 333, as implemented by the Claim's Administrator, allows potentially fraudulent claims to be paid. For example, ████████████████████████████████████████

---

[10]   Ex. 3, Declaration of Wendy L. Bloom ¶¶ 6-7, Ex. B (Memo from Claims Administrator (Jan. 11, 2013)), & Ex. C (Claims Administrator's Approved Policy No. 333 (Feb. 8, 2013)).

[11]   *See id.*



███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

The Claims Administrator's adoption of Policy 333 and resulting non-enforcement of this contractual term is consistent with the views that Mr. Juneau set forth when he served as Louisiana's lawyer. He sought the payment of claimants with "little or no documentation."[16]

Here a lawyer (i) advocated a result; (ii) subsequently became the "neutral"; and (iii) implemented a result consistent with his prior advocacy that contradicted the plain language of the governing contract. In such a circumstance, the policy implemented cannot remain the governing rule.

### B. Policy 160: Subsistence Interviews Not Required.

BP recognized that subsistence claims presented an area particularly vulnerable to fraud with little means of verifying the information submitted.  Exhibit 9 to the Settlement Agreement:

> The CADA will *conduct* subsistence interviews with claimants and apply the compensation formula….The CADA shall establish a physical presence and a reasonable operating schedule to allow

---

[15] *See id.* (Eligibility Notice); *see* Ex. 5, O'Donnell, Christopher, *Hafner's fate unlikely to mean an about-face for SCF*, Sarasota Herald Tribune (Oct. 28, 2012).

[16] *See* Emails from Patrick Juneau to Kenneth Feinberg, Nov. 2010, Motion to Remove Exs. 11, 14, & 15, Rec. Docs. 13370-14, 13370-17, & 13370-18.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

        claimants to be interviewed in their geographical area including at Landing Dock locations.[18]

    Despite the clear language of the Settlement Agreement, the Claims Administrator once again proposed loosening the requirements. In Policy 160, the Claims Administrator announced "We will a [sic] conduct phone or in person interview *as and when* the [sic] we determine that doing so will facilitate the accurate processing of the claim or will address questions regarding the reliability of the evidence submitted on the claim."[19] ███████████████████████
████████████████████████████████████████████████████
████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
██████████████████

---

[18]    Settlement Agreement Exhibit 9 at 3-4, Rec. Doc. 6430-21.

[19]    Ex. 3, Bloom Decl. ¶ 12 & Ex. G (Policy 160 (July 15, 2012)) (emphasis added).
████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

███████ in express contradiction of the plain terms of the Settlement Agreement, Policy 160 remains in place, and the CADA does not interview each subsistence claimant as required under the terms of the Settlement Agreement. This presumably has affected the 2,500-plus subsistence claims that have been paid under $10,000, and thus do not warrant a field-visit.[26]

Without an interview requirement, the CSSP lacks any system to verify highly dubious subsistence claims. ███████

███████

---

[26]  Ex. 6, Declaration of Dzmitry Asinski ¶ 4.

███████

██████████████████████████████████████████████████████████████████

████████████

The Claims Administrator's prior representation requires that Policy 160 be enjoined and the terms of the Settlement Agreement be implemented.

C.   **Policy 317v.2: The Subsistence Consumption Maximums are Unreasonable.**

The Settlement Agreement provides that the quantities of lost natural resources compensated under the Subsistence Framework "shall not exceed reasonable consumption rates [as determined by the Claims Administrator]."[31]  Yet the Claims Administrator adopted Policy 317v.2, which allows a Subsistence Claimant to allege that 45% of a family member's caloric intake is from subsistence activities, and uniformly considers each individual claimant to have a "very active" lifestyle, and all family members to have "active" lifestyles, which drives up the estimated daily caloric consumption.[32]  This is not a "reasonable" consumption rate.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  We dare suggest that few, if any, human beings could consume that much seafood on a sustained basis.  Yet, per the claims being paid out by the Claims Administrator, hundreds of people in Louisiana are doing just that.

---

████████████████████████

[31]  Settlement Agreement Exhibit 9 at 2, Rec. Doc. 6430-21.

[32]  Ex. 3, Bloom Decl. ¶ 22, Ex. L (Policy 317v.2 (Jan. 2, 2013)), & Ex. H (Subsistence Criteria Updates (Jan. 11, 2013)).

████████████████████████████████████████

The elimination of the subsistence interview exacerbates the problem posed by this policy.  When claimants claim the maximum consumption rate identified on the form—45%—there is no back-stop to probe this claim through an interview.  The Claims Administrator's prior representation requires that Policy 317v.2 be enjoined and the terms of the Settlement Agreement be implemented.

### D. Policy 70v.2: Tax Verification Authorizations Not Uniformly Required or Employed

The Settlement Agreement requires valid tax returns[34] to support certain types of claims. The BEL framework documentation requirements provide that "[i]n order to be eligible for compensation, a business claimant must provide . . . [f]ederal tax returns (including all schedules and attachments)."[35]  Two of the IEL categories require submission of "Tax Information Documents," defined as "Tax Returns and Forms W-2 and/or 1099" with "Tax Return" defined as "[f]ederal or state income tax returns, including any relevant supporting schedules."[36]  Each of the Seafood Plans contains a "Documentation Required" section which provides that a Claimant "must provide documents" including (a) trip tickets or their equivalent or "[f]ederal or state tax and financial information" as follows:  "federal or state tax returns" for entities and "federal form 1040" for individuals.[37]

[REDACTED]

---

[34]  *See Selgas v. Comm'r of Internal Revenue*, 475 F.3d 697, 700-01 (5th Cir. 2007) (unsigned tax returns are of no legal effect).

[35]  *See* Settlement Agreement Exhibit 4A, Rec. Doc. 6430-8.

[36]  *See* Settlement Agreement Exhibit 8A, Rec. Doc. 6430-16.

[37]  *See* Settlement Agreement Exhibit 10, Rec. Doc. 6430-22.

████████████████████████████████████████████████████

████████

Despite the requirements of the Settlement Agreement, the Claims Administrator routinely accepts unsigned tax return forms to support claims and rarely obtains tax return transcripts to verify that unsigned tax returns documents submitted by claimants are identical to valid tax returns filed by claimants with the IRS.[39]

The Claims Administrator's Policy 70v.2, adopted in July 2014, requires only that ***newly filed*** claims need to include executed authorizations for the CSSP to conduct IRS verifications, but does not state when the Claims Administrator will verify tax return information when there is no signature on the return submitted, and does not require authorizations for claims that have already been filed, but are still pre-determination or pre-payment.[40]

Special Master Freeh's motions for return of payments made to certain claimants demonstrate that the CSSP's policy with respect to verifying suspicious tax returns must be more robust to be effective. Of the four claims for which the Special Master has moved for restitution, three relied on fraudulent tax returns. The Special Master found that Casey Thonn submitted unsigned tax return documents to the CSSP that he had created solely for the purpose of filing a claim, and which he had never submitted to the IRS.[41] This Court has ordered restitution on that basis,[42] and Thonn has agreed to plead guilty to a two-count bill of information that alleges he

---

38 ████████████████████████████████████████████████████

39 *See* Ex. 3, Bloom Decl. ¶ 31 & Ex. P (BP Response to Re-issued Policy 70v.2 – Fraud: Authorizations (July 15, 2014) (citing Alexander Decl. at ¶¶ 14-18, 24)).

40 *See* Ex. 3, Bloom Decl. ¶ 32 & Ex. R (Final Policy, Policy 70v.2: Fraud: Authorizations (July 24, 2014)).

41 Mem. in Support of Motion of the Special Master for Return of Payments Made to Casey C. Thonn and Others at 4-5, Jan. 8, 2014, Rec. Doc. 12107.

42 Order & Reasons at 18-20, Apr. 29, 2014, Rec. Doc. 12794.

created a "false Federal tax return" as part of his scheme.[43]  Similarly, the Special Master has found that Jarrod Burrle created false tax returns "created solely to support his fictitious claim,"[44] and that Gill Johnson, Sr. "presented the DHECC with 2008 and 2009 tax 'returns' that in fact had never been filed with the Internal Revenue Service."[45]  The Special Master was able to show the fraudulent nature of these tax documents only by obtaining tax return transcripts from the IRS, a step that the CSSP only rarely takes, despite the prevalence of unsigned or otherwise suspicious tax returns.[46]

The Claims Administrator's failure to require signed tax returns, and failure to systematically verify unsigned or otherwise suspicious tax returns, violates the Settlement Agreement and allows invites fraudulent claims.  This policy also is infirm in light of Mr. Juneau's prior representation.

## II. THE COURT HAS THE AUTHORITY AND OBLIGATION TO ENJOIN AND REVERSE INAPPROPRIATE POLICIES.

The Court's authority to enjoin these policies cannot be disputed.  The Court retains ongoing and exclusive jurisdiction and supervision over the Settlement Program.[47]  The Court similarly has continuing jurisdiction over the implementation, administration, and enforcement of the Settlement Agreement.[48]  More specifically, while the Claims Administrator has issued policies to implement the Settlement Agreement, the Court retains ultimate authority over such

---

[43]  Ex. 8, Bill of Information for Wire Fraud at 3, Case No. 14-cr-00207, Sept. 23, 2014; Ex. 9, Letter to Judge Duval from U.S. Department of Justice at 1, Case No. 14-cr-00207, Oct. 15, 2014.

[44]  Mem. in Support of Motion of the Special Master for Return of Payments Made to Jarrod A. Burrle and Others at 1, 6-7, June 10, 2014, Rec. Doc. 13010-1.

[45]  Mem. in Support of Motion of the Special Master for Return of Payments Made to Gill Johnson, Sr., and Others at 1, 2-5, Oct. 23, 2014, Rec. Doc. 13543-1.

[46]  *See* Ex. 3, Bloom Decl. ¶ 31 & Ex. P (BP Response to Re-issued Policy 70 v.2 – Fraud: Authorizations (July 15, 2014) (citing Alexander Decl. at ¶ 24)).

[47]  Settlement Agreement §§ 4.3.2, 4.4.7, 38.41; Order and Judgment ¶¶ 9, 17, Rec. Doc. 8139.

[48]  Settlement Agreement § 18.1; Order & Judgment ¶¶ 9, 17.

11

Policy decisions.[49] The Court may review and reconsider CSSP policies as needed to ensure the integrity of the CSSP.[50]

Thus there is no question that the Court has the authority to enjoin the implementation of these policies. And there is no question that it should. As set forth in detail above, each of these policies eliminates critical checks and balances against fraud by reducing the documentation claimants must present to verify that their claim is genuine. Now that more is known about the Claims Administrator's prior representation of the state of Louisiana and his advocacy on behalf of Louisiana claimants that now benefit from these policies, these policies must be looked at in a different light. And in that light, there is no question but that they must be enjoined. *See, e.g., LeRoy v. City of Houston*, 592 F. Supp. 415, 422 (S.D. Tex. 1984) ("[T]he purposes of § 455 are two-fold: to avoid the appearance of any impropriety and to prevent actual bias from infecting the decision-making in a case.").

---

[49] *See* Section 4.3.1 of the Settlement Agreement ("The Claims Administrator shall . . . be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court."); Section 4.3.1 ("issues or disagreements that cannot be unanimously resolved by the Claims Administration Panel will be referred to the Court for resolution."). Even if the Settlement said nothing about the Court's supervisory role, the Court has a duty to execute its supervisory authority to avoid fraud in the CSSP. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001, 88 L. Ed. 1250 (1944) (""[T]ampering with the administration of justice . . . is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."). The Court has recognized this supervisory responsibility to "ensure the integrity of the CSSP" during the administration of the claims process. *See* Order at 2, July 2, 2013, Rec. Doc. 10564.

[50] *See* Review of Issue from Panel (Matching of Revenue and Expenses), Rec. Doc. 8812 (reviewing and affirming Claims Administrator's January 15, 2013 policy decision).

## **CONCLUSION**

For the foregoing reasons, BP respectfully requests that the Court enjoin implementation of Policies 333, 160, 317v.2, and 70v.2 and order that the CSSP reconsider their appropriateness through a process from which the Claims Administrator is recused.[51]

---

[51] As detailed in BP's Motion to Remove the Claims Administrator, prior to the Court's approval of the Settlement Agreement the Claims Administrator advocated to BP that the Settlement Agreement's requirement that Business Economic Loss and Individual Economic Loss claimants provide a copy of their business license be eliminated.  *See* Motion to Remove at 8-9 & Ex. 10 (Holstein Decl.), Rec. Doc. 13370-1 & 13370-13.  Having now learned of Mr. Juneau's prior representation, BP requests that the Court vacate this policy as well, reinstating the requirement that Claimants submit business licenses as provided for in Settlement Agreement Exhibits 4A and 8.

|  |  |
|---|---|
| October 29, 2014 | Respectfully submitted, |
| Mark Holstein<br>BP AMERICA INC.<br>501 Westlake Park Boulevard<br>Houston, TX  77079<br>Telephone:  (281) 366-2000<br>Telefax:  (312) 862-2200 |   /s/ *Kevin M. Downey*  <br>Kevin M. Downey<br>F. Lane Heard III<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth Street, N.W.<br>Washington, DC  20005<br>Telephone:  (202) 434-5000<br>Telefax:  (202) 434-5029 |
| Daniel A. Cantor<br>Andrew T. Karron<br>ARNOLD & PORTER LLP<br>555 Twelfth Street, N.W.<br>Washington, DC 20004<br>Telephone:  (202) 942-5000<br>Telefax:  (202) 942-5999 |   /s/ *Don K. Haycraft*  <br>S. Gene Fendler (Bar #05510)<br>Don K. Haycraft (Bar #14361)<br>R. Keith Jarrett (Bar #16984)<br>LISKOW & LEWIS<br>701 Poydras Street, Suite 5000<br>New Orleans, LA 70139<br>Telephone:  (504) 581-7979<br>Telefax:  (504) 556-4108 |
| Jeffrey Lennard<br>Keith Moskowitz<br>DENTONS US LLP<br>233 South Wacker Drive<br>Suite 7800<br>Chicago, IL  60606<br>Telephone:  (312) 876-8000<br>Telefax:  (312) 876-7934 | Richard C. Godfrey, P.C.<br>Wendy L. Bloom<br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Telephone:  (312) 862-2000<br>Telefax:  (312) 862-2200 |
| *OF COUNSEL* | Jeffrey Bossert Clark<br>Dominic E. Draye<br>KIRKLAND & ELLIS LLP<br>655 Fifteenth Street, N.W.<br>Washington, DC 20005<br>Telephone:  (202) 879-5000<br>Telefax:  (202) 879-5200 |

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*
*AND BP AMERICA PRODUCTION COMPANY*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, on this 29th day of October, 2014.

/s/ Don K. Haycraft
Don K. Haycraft