# Exhibit &

Mary Anna Tabol

| | |
|---|---|
| **From:** | Ken Feinberg |
| **Sent:** | Thursday, February 17, 2011 8:00 AM |
| **To:** | Camille Biros; Jackie Zins |
| **Subject:** | FW: Response to GCCF Methodology |
| **Importance:** | High |

**From:** Felicia A. Guidry [mailto:FGG@juneaudavid.com] **On Behalf Of** Patrick A. Juneau
**Sent:** Wednesday, February 16, 2011 5:59 PM
**To:** Ken Feinberg
**Cc:** Mark Brady; Elizabeth Murrill; Terrell, Megan K.
**Subject:** Response to GCCF Methodology
**Importance:** High

Dear Ken:

The Gulf Coast Claims Facility (GCCF) published announcement regarding *the Payment Options, Eligibility and Substantiation Criteria & Final Payment Methodology* on February 2, 2011 (Draft), and in that document requested comment from all claimants and interested parties until Wednesday, February 16, 2011. The purpose of this email is to respond to the draft methodology.

**General Comments on Concepts:**

1. **Causation and eligibility.** The provisions of the GCCF Protocol dated November 23, 2010, provide that causation, that is the necessary connection between the damage incurred and the claim of the applicant, shall be determined by reference to OPA and federal law. The definition of this critical standard has never been explicitly stated by the GCCF and, up until this point, remains totally subjective and opaque as administered in its decision making process. The definition of proximate causation, as determined and stated in federal law, judicial ruling and administrative determinations by OPA, and the National Pollution Fund Center (NPFC), should be the basis of an objective and written standard. To bring clarity to the GCCF process when causation is denied by the GCCF it should be required to prepare a written explanation of the rationale for such determination as part of its notice to the claimant. That explanation should be specific to that claimant and contain sufficient information so as to enable that claimant the opportunity to supply further documentation, data and other proof or to dispute the GCCF"s application and understanding of the concept.

    The provisions of 33 C.F.R. §136.233(b), state as a necessary element of claimant's proof for loss of profits and income, evidence "[t]hat the claimant's income was reduced **as a consequence of injury to, destruction of, or loss of** the property or **natural resources**, . . .." [Emphasis added.] thereby clearly indicating that consequential causation is the test to be applied rather than a standard deriving from concepts of geographic location or contact with physical elements of the Spill. Recognition by the GCCF of the definition contained in the CFR acknowledging the consequential nature of proximate cause, will, to a significant degree,

1

eliminate misunderstandings of proximate causation and misapplication of the law regarding eligibility by GCCF staff and claimants.

In contrast to the provisions of the CFR, the Draft's language regarding proximate causation is loosely drawn and essentially undefined. The legally meaningful term causation is eliminated in favor of indefinite and indefinable standards. For example, at Section II, paragraph 1, the Draft refers to "attributable to the Oil Spill" and again in Section II, paragraph 4 of the Draft, "an identifiable link." Such indeterminate language for an essential element of a claim, utilized throughout the Draft does not advance the settlement of legitimate claims of loss but only serves to obfuscate the standard that must be applied by the GCCF under OPA. It entirely ignores the fact that consequential is the standard for causation called by the CFR provisions implementing OPA.

2. **Sufficiency of Documentation.** The Draft does not set forth with clarity what documentation of damage needs to be provided. That stands in stark contrast to the provisions of 33 C.F.R. §136.233(c) that provides in pertinent part, "The amount of the claimant's profits or earnings in **comparable periods and during the period when the claimed loss or impairment was suffered**, as established by **income tax returns, financial statements, and similar documents. . . . .**" The Draft defers until a later time when the "detailed guidance" will be available. Draft, pg.2, paragraph 3. The standard is not to be established by the GCCF, it has been defined for OPA purposes in the cited provision of the C.F.R. and it only remains to be determined what "similar documents" can be. It should be noted here that the CFR provisions do not contain any arbitrary limitations, i.e. April, 2010 to December, 2011—see Draft, Section III, pg 5, paragraph 2 for calculation of Future Damages.

3. **Expert Opinions as Basis of Draft's Methodology.** The Draft states that the GCCF "has sought the advice and guidance of experts who have studied the present and future (sic) condition of the Gulf." Draft, Section I, pg 1. Putting aside how the experts could study the future, it has been reported that as early as July, 2010, BP was seeking to retain top scientists at institutions of higher learning throughout the Gulf South as part of a defense strategy for anticipated litigation regarding the Spill. That effort clearly is within the right of BP. However, for the GCCF to cite the opinion of "experts" without full and complete disclosure of the names of the experts and a demonstration of the independent character of those unknown experts is not an acceptable basis upon which to build a credible methodology for the satisfaction of damage claims that are a consequence of the Spill. [See, Times-Picayune, July 16, 2010, "*BP buying up Gulf Scientists for legal defense, newspaper alleges.*"] [N.B. The Draft states that copies of the studies are attached. By reference to the Reuters News Agency report, dated February 2, 2011, the authority is *An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill*, John W. Tunnell, Jr., Harte Research Institute for Gulf of Mexico Studies, Texas A&M University – Corpus Christi. The publication states that the author was compensated for the report. In light of the recent court opinion as to the lack of independent character to the GCCF Administrator, any study by a contractor of the Administrator lacks independence.] All studies and opinions that are utilized for the estimation of the condition of the Gulf and any estimates upon the length of event should be published including the disclosure of the relationship of the persons creating such with BP or GCCF, so that claimants whose claims extend beyond that seemingly arbitrary term claimed by the GCCF on the basis of experts can be effectively and objectively challenged.

**Specific Issues of the Draft:**

2

1. **The Draft establishes a general term of event of two years.** The calculation of a loss of income and profits is at its essence a claim for business interruption to fishermen, supporting industries such as seafood processors, related industries such as restaurants, hoteliers, retailers and wholesalers of seafood, and dependent industries whose market base was and is composed of persons and companies involved in fishing and related industries. The calculation requires the knowledge of a known length of economic impact or an estimate based upon currently available evidence of the length of the impact. The Draft states that the GCCF has concluded that the economic effect of the Spill will be resolved within two to three years of the date of the Spill, April 20, 2010. The claimant's loss will be based upon a comparison of the 2010 financial data with average income from the prior years of 2008 -2009. Payments for future losses for 2011 and 2012, the length of event for future losses that are less than $500,000, will be 70% of the 2010 losses for 2011 and approximately 30% for 2012. Thus, the Final Payment Offer will be twice the amount of documented losses in 2010. Several flaws are apparent in this scheme.

The first flaw is that the concept is entirely devoid of the fact that the actual operation of industries is a function of the time of year and the losses as sought to be recognized by the Draft are not calculated on a full twelve month year. The Draft methodology is at its essence unfair and serves to reduce the overall recovery of claimants when the Administrator proposes to take post-Spill lost earnings and profits from May 2010 – December 2010 (an 8 month term) and use that figure to project out future losses over the next 2 years that encompass an entire 12 month cycle. This method benefits only BP.

To rectify this inequitable result the Administrator needs to adopt one of two methods. First, he could have the lost earnings and profits of the claimant analyzed from May 2010 – April 2011 and use the resulting loss amount as the basis for calculating Final Payment offers. This method would be more accurate, but not allow final payment offers to be calculated until May 2011 at the earliest.

Alternatively the Administrator could use the lost earnings and profits information and data from May 2010 – December 2010 and annualize that amount (multiply the losses incurred in the eight month period by twelve eighths or 1.5). This calculation would allow the losses attributable to the Spill to be incorporated into the calculation, while not slighting the claimant's rightful recovery. Furthermore, it would expedite the final payment offers because December 2010 income and loss amounts should be readily attainable or easily discoverable by the claimant.

The second flaw is the unstated assumption that the effect of the Spill will be uniform throughout the Gulf Coast area from Texas to Florida. The damages are distinct in all areas and each area and industry within those multiple areas will be entirely different and bear little if any causal relationship with each other. For example, the tourist industry of Florida may or may not recover based upon public perceptions generated by the existence of favorable press reporting and the profits will be impacted by any discounts that may be necessary as a business matter to rebuild the tourist market base to its pre-Spill condition. Again, the calculations do not take into account the lingering economic and income effects of the damage caused by Katrina, Rita, Gustav and Ike. The claims from businesses that were recovering from these storms of necessity need to be adjusted to compensate any additional capital expenditures made to cover storm related losses of property uncompensated-by insurance or otherwise—expenditures that temporarily reduced the net income during the years after the storms. The comparative income from these years has to be adjusted to reflect that additional

3

capital investment expense as part of income for purposes of measuring damages from the Spill.

The third flaw is that although the resource, the fishery, may be recovered in a physical sense, its economic value to the businesses, whether that be fishermen and supporting, related and dependent industries and businesses, will continue to suffer a diminution in value until the "brand" of Louisiana based seafood has recovered from the bad publicity it received subsequent to the storm.

Under OPA, a Natural Resource Damage Assessment (NRDA) is being prepared that will assess among other matters the damage to the fishery. Rather than assign an arbitrary term of event to all claims based upon experts whose independence is subject to question, the methodology must accept the determinations of the NRDA as to the damage to the natural resource in order to effectively administer the Trust for its beneficiaries. That report will be conclusive as to one essential element determining the length of event and having been made may enable an assessment of the length of time necessary to recover the "brand."

It should be noted that the terms of the Trust state that it shall continue to exist until 2016, and may be extended beyond that time if the estimated outstanding damages exceed $1 Billion. The beneficiaries of the Trust are those parties who incurred damages as a result of the Spill. The GCCF is the financial facility created by the Trust and administered by the GCCF Administrator, currently Mr. Kenneth R. Feinberg (Administrator). The GCCF is not a trustee of the Trust. For that reason claimants dealing with the GCCF and the Administrator do not have the protection afforded to beneficiaries in dealing with a trustee. For that reason, claimants need to exercise all due caution in dealing with the GCCF. This caution is further supported by the judicial finding that the status of the Administrator is not "independent" as has been claimed. *In re Oil Spill, U.S. District Court, Eastern District of Louisiana,* No. 10-MDL-2179, February 2, 2011. Moreover, the statements by the GCCF should consistently remind all potential applicants that they have until August 22, 2013 within which to file a claim and may have a longer period depending upon the time that they can demonstrate the discovery of damage as a consequence of the Spill. As currently promoted by the Administrator there is an aspect of insistence upon an immediate filing to protect rights and secure relief, preferably by a quick payment, implicit and explicitly made part of GCCF pronouncements. While it may be a legitimate objective of the Administrator to expedite the handling of the claims resulting from the Spill, the right of the damaged parties to complete compensation for their losses is the ultimate goal and their recovery should be the stated goal of the GCCF process; not closed files.

2. **The Draft Does Not Establish A Response Time**. Reference to the provisions of OPA and the CFR regulations promulgated under OPA show that a prime concern of the act is that the Responsible Party respond promptly to the claims of parties damaged by the event. The GCCF has already extended the time for the Responsible Party to make payment from that provided by 33 C.F.R. §136.103(c)(2), 90 days. Although it may be that the individual claimants already have a right to do so under OPA the same right should be explicitly acknowledged as applicable to claimants 90 days after making a GCCF application for an Interim Payment or Final Payment without a GCCF response either to pursue their claims under the NPFC process to proceed under OPA or in a legal proceeding. In either case GCCF should acknowledge that the final award in either such process is payable as an Other Resolved Claim from the Trust corpus of $20 Billion. [See Trust Recital 3.]

4

3. **The Draft methodology does not provide for losses yet to be incurred during the three years after the event.** The unstated premise of the Draft is that all damages manifested themselves or were discoverable in the period beginning April 20, 2010 and ending December 31, 2010. That premise is contrary to the clear language of OPA and CFR Regulations. Claims may be submitted according to 33 CFR §136.101 (a)(1) "For damages, within three years after—(i) The **date on which the injury and its connection with the incident in question were reasonably discoverable with the exercise of due care.**" (Emphasis added.) The methodology of comparing 2010 losses to an average of 2008 and 2009 completely glosses over the unique economic impact of the Spill particularly with respect to those affected in the areas in closest proximity to the Spill. The calculation does not take into consideration those who temporarily experienced higher than expected revenue streams in 2010 from post-spill recovery efforts (such as hotels and restaurants in Venice and Grande Isle). These businesses and individuals will likely have losses as a result of the spill that will not be realized and subject to quantification until 2011 or later. To rectify this inequity, the GCCF process should offer additional methods for calculating the loss that will ultimately be used as the cornerstone for final payment offers. Claimants should then be afforded the opportunity to utilize the most advantageous method at their disposal.

For example, consider a hotelier who experienced increased profits during the Draft sample period, i.e. April to December 2010, because of business generated by personnel working to contain the Spill. Such a business may begin to lose money in 2011 and after because their traditional market disappeared as a consequence of the Spill. That is to say, a business had a regular clientele who made it a practice to reserve rooms and stay for many years prior to the Spill. But as a consequence of the Spill some of this established clientele found other activities to do during this period of time every year. Hence the economic damage caused by the Spill will have a different commencement date and his event period will be determined by the time involved in rebuilding his client base. The Draft's arbitrary period of two years would deny the legitimate business a claim in that case which is consequentially caused by the Spill.

**Suggestions to Improve the performance of the GCCF Process:**

1. **Utilize the Existing System for Proving and Calculating a Claim.** The provisions of 33 C.F.R. §136.101 et seq., as well as the NPFC's Claimant Guide contains outlines for required documentation and compensation calculation concepts. There is no reason that these same concepts, that are substantially identical, and have been proven by experience, should not be adopted by the GCCF as the appropriate model. The standards for Lost Profits and Income which is the category that is the overall example for this memorandum, are as follows:

    <u>**Profits and Earning Capacity**</u>

    **§ 136.231   Authorized claimants.**

    (a) A claim for loss of profits or impairment of earning capacity due to the injury to, destruction of, or loss of real or personal property or natural resources may be presented by a claimant sustaining the loss or impairment. The claimant need not be the owner of the damaged property or resources to recover for lost profits or income.

    (b) A claim for loss of profits or impairment of earning capacity that also involves a claim for injury to, or economic losses resulting from

5

destruction of, real or personal property must be claimed under §136.213.

(c) A claim for loss of profits or impairment of earning capacity that also involves a claim for loss of subsistence use of natural resources must be claimed under §136.219.

### § 136.233  Proof.

In addition to the requirements of subparts A and B of this part, a claimant must establish the following:

(a) That real or personal property or natural resources have been injured, destroyed, or lost.

(b) That the claimant's income was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.

(c) The amount of the claimant's profits or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents. In addition, comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.

(d) Whether alternative employment or business was available and undertaken and, if so, the amount of income received. All income that a claimant received as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established.

### § 136.235  Compensation allowable.

The amount of compensation allowable is limited to the actual net reduction or loss of earnings or profits suffered. Calculations for net reductions or losses must clearly reflect adjustments for—

(a) All income resulting from the incident;

(b) All income from alternative employment or business undertaken;

(c) Potential income from alternative employment or business not undertaken, but reasonably available;

(d) Any saved overhead or normal expenses not incurred as a result of the incident; and

(e) State, local, and Federal taxes.

There is no reason to utilize any other methodology than that provided under the CFR regulations and the NPFC particularly in the light of the right of a claimant to leave the GCCF process and enter into the OPA process. To require a specific method for GCCF that is not congruent in all essential elements burdens the claimant with the requirement of preparing another claim and reformatting the presentation. And, although the cost of compiling a claim is compensable under OPA and the GCCF process, the administration of the claim—that probably would include the work necessary to convert from a GCCF claim to the OPA-- is not. Thus, the Draft imposes a hidden cost to the exercise of the claimant's rights, a burden on his efforts to protect his interests that is not justifiable.

**2. Under the CFR provisions a claimant could utilize economic models for his industry.**

The economic models produced for the State by AI (Models) could be part of a claimant's presentation under the CFR requirements. The Models were crafted from more than three hundred field industry interviews coupled with empirical data provided by the LA Department of Wildlife and Fisheries. At no time during the interviews utilized to formulate the Models was any evidence elicited from the interviewees that GCCF personnel had in any form or fashion inquired about the operation of the industry or their particular business. The Models provide industry "norms" from objective sources based upon a large sample population and should satisfy the documentation requirement as contained in the CFR.

The Draft does not explicitly state that examples for industry norms are to be made part of the process. There is no clear statement what the GCCF standard of evaluation is nor how it was calculated. The Models take into account the fact that documentation in industries and businesses affected by the Spill is not an exact science. That is to say, not every type of accounting statement supporting the claim that might be desirable is available to the claimant and may not be maintained as a standard of the community wherein the damage occurred. Each chart of accounts for the various affected industries is different based not only on size of the claimant but also on the industry segment that the claimant occupies. For example, a family style restaurant will not maintain the same chart of accounts that a franchise restaurant would maintain with a similar customer count. The models, utilizing a broad sample of businesses, clearly show that for the area and business in question, what are the normal ranges of income and expense items? Thus, if one or more individual accounting items is not available, the model will enable the applicant to adopt an industry based standard percentage. This not only provides meaningful assistance to the applicant, it also helps the GCCF to prevent inaccuracies on the part of an applicant and error on the part of the GCCF. If the numbers are significantly out of line with the model further investigation can identify the problem areas.

The State stands ready to discuss these issues with you.

PATRICK A. JUNEAU
Juneau David, APLC
Post Office Drawer 51268
Lafayette, LA 70505-1268

Telephone: 337-269-0052
Facsimile: 337-269-0061
Email: paj@juneaudavid.com
       fgg@juneaudavid.com