**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| Applies to: | * | **JUDGE BARBIER** |
| *No. 12-311, Cameron Int'l Corp. v.* | * | |
| *Liberty Ins. Underwriters, Inc., a/k/a* | * | **MAGISTRATE SHUSHAN** |
| *Liberty Int'l Underwriters* | * | |
| | * | |

**ORDER & REASONS**
**[As to Cameron's and LIU's Motions for Summary Judgment]**

The referenced member case involves an insurance coverage dispute between Plaintiff Cameron International Corporation ("Cameron") and its insurer, Defendant Liberty Insurance Underwriters, Inc. ("LIU"), over $50 million Cameron paid to settle most claims against it arising from the 2010 oil spill in the Gulf of Mexico. Briefly, Cameron's action seeks a judgment holding LIU liable for the amount Cameron paid in settlement and for the attorneys' fees Cameron has incurred defending itself in the underlying multidistrict litigation. Cameron also prays for extra-contractual damages or penalties under the Texas Insurance Code.

Before the Court are multiple motions for summary judgment, all of which are opposed. Cameron moves for partial summary judgment on its claims that LIU breached the policy and must reimburse Cameron for the $50 million and its defense expenses. (Rec. Doc. 12440) LIU filed a cross-motion on the issue of whether it breached the contract. (Rec. Doc. 12580) LIU also moves for partial summary judgment against Cameron's claims under the Texas Insurance Code and for defense expenses. (Rec. Docs. 12050, 12578) For the reasons set forth below, the Court finds that Cameron is entitled to summary judgment on its claims that LIU breached the policy and must

indemnify Cameron for the settlement amount.  However, the Court finds that LIU is entitled summary judgment against Cameron's claims for defense expenses and under the Texas Insurance Code.

## I.  FACTUAL BACKGROUND

The genesis of this coverage dispute is the April 20, 2010, blowout, explosion, and subsequent oil spill involving the mobile offshore drilling unit DEEPWATER HORIZON and the Macondo well it had recently drilled in the Gulf of Mexico.  BP (a non-party to the instant matter) owned the Macondo well and leased the relevant area of the outer continental shelf.  BP contracted with Transocean (also a non-party to the instant matter), owner of the DEEPWATER HORIZON, to drill the Macondo well.  Cameron manufactured and sold to Transocean the blowout preventer that connected the DEEPWATER HORIZON to the Macondo well.

The blowout and oil spill spawned hundreds, and eventually thousands of lawsuits, with over one hundred thousand claimants, asserting a variety of claims including economic loss, property and natural resource damage, wrongful death, personal injury, etc.  These cases were consolidated before this Court as Multidistrict Litigation 2179 ("MDL 2179").  BP, Transocean, Cameron, and other parties were named as defendants or third-party defendants in most cases or claims.  Many defendants sued each other, asserting a variety of claims that included, in some instances, contractual indemnity.  As explained further below, Cameron sought contractual indemnity from Transocean, who similarly sought contractual indemnity from BP.  Cameron also notified its insurers that it had potentially suffered a loss covered by its insurance policies.

A.      **Cameron's Insurance Tower and the LIU Policy**

Cameron purchased from LIU an excess casualty insurance policy for the July 1, 2009 to July 1, 2010 policy year ("the LIU Policy" or simply "the Policy").  The LIU Policy was an intermediate layer of insurance in a "tower" of insurance that Cameron purchased for the 2009-2010 policy year. All told, Cameron's insurance tower provided it with $500 million in coverage.

Illinois National Insurance Company provided the first[1] $25 million of coverage in Cameron's insurance tower.  The LIU Policy expressly refers to this policy as the "First Underlying Insurance Policy;" these Order and Reasons will use the same convention. With certain exceptions, the other policies in Cameron's insurance tower adopted the terms of the First Underlying Insurance Policy.  Once a covered "loss" exhausted the First Underlying Insurance Policy's $25 million limit, certain other insurers provided the next $75 million in coverage; i.e., coverage between $25 million and $100 million.   The LIU Policy expressly refers to these policies as "Other Underlying Insurance."  The LIU Policy was expressly written to be excess of the First Underlying Insurance Policy and the Other Underlying Insurance—which it collectively refers to as "Underlying Insurance" (a convention these Order and Reasons will also use)—and provided the next $50 million worth of coverage; i.e., LIU's coverage layer was between $100 million and $150 million.  Six other policies were expressly written to be excess of the LIU Policy and provided coverage between $150 million and $500 million.

---

[1] The insurance provided by Illinois National Insurance Company actually was excess of a $3 million "fronting policy" for which Cameron was responsible.  Because there is no dispute regarding this fronting policy and for the sake of convenience, it is ignored.

The LIU Policy also contained an "Other Insurance Clause"[2] that stated:

> If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of such other insurance. . . . However, this provision will not apply if the other insurance is specifically written to be excess of this policy.
>
> Other insurance includes any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities.

(LIU Policy, § V.F., Rec. Doc. 12050-2 at 20)  The Other Insurance Clause is separate from the Policy's provisions regarding Underlying Insurance, and, unlike those provisions, does not expressly refer to any specific "other insurance" of which it purports to be excess.    Instead, the Other Insurance Clause uses generic language.

**B.       The Contractual Indemnities**

As mentioned above, Transocean performed work for BP pursuant to a drilling contract ("the BP-Transocean Contract").  That contract contained the following clauses:

> 24.2  COMPANY RESPONSIBILITY
> Company [BP] shall assume full responsibility for and shall protect, release, defend, indemnify, and hold Contractor [Transocean] harmless from and against any loss, damage, expense, claim, fine, penalty, demand, or liability for pollution or contamination, including control and removal thereof, arising out of or connected with operations under this contract hereunder and not assumed by contractor in Article 24.1 above, without regard for negligence of any party or parties and specifically without regard for whether the pollution or contamination is caused in whole or in part by the negligence or fault of the contractor.
>
> 25.1  INDEMNITY OBLIGATION
> Except to the extent any such obligation is specifically limited to certain causes elsewhere in this contract, the parties intend and agree that the phrase "shall protect, release, defend, indemnify and hold harmless" means that the indemnifying party shall protect, release, defend, indemnify, and hold harmless the indemnified party or parties from and against any and all claims, demand, causes of action, damages, costs, expenses (including reasonable attorney fees), judgments and awards of any

---

[2]  These Order and Reasons will use Other Insurance Clause to refer specifically to the other insurance clause in the LIU Policy.  Capital letters when not be used when referring to other insurance clauses in a general or generic sense.

kind or character, without limit and without regard to the cause or causes thereof, including preexisting conditions, whether such conditions be patent or latent, the unseaworthiness of any vessel or vessels (including the drilling unit), breach of representation or warranty, expressed or implied, breach of contract, strict liability, tort, or the negligence of any person or persons, including that of the indemnified party, whether such negligence be sole, joint or concurrent, active, passive or gross or any other theory of legal liability and without regard to whether the claim against the indemnitee is the result of an indemnification agreement with a third party.

(BP-Transocean Contract, Rec. Doc. 12050-4 at 7-8) (emphasis omitted)  A contract also existed between Transocean and Cameron regarding the sale of the blowout preventer ("the Transocean-Cameron Contract").  The Transocean-Cameron Contract contained the following clause:

In the event that Purchaser [Transocean] is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Purchaser will provide Seller Group [Cameron] with the benefit of such indemnity to the fullest extent possible.

(Transocean-Cameron Contract, Rec. Doc. 12050-5 at 6)

## C.    The MDL 2179 Litigation and the BP-Cameron Settlement

As mentioned above, the DEEPWATER HORIZON/Macondo well incident generated thousands of claims that named Cameron, Transocean, BP, and others as defendants or third-party defendants.  On April 23, 2010, three days after the blowout, Cameron notified LIU that it incurred a potential loss under the LIU Policy.  Cameron also looked to Transocean for contractual indemnity based on the above-quoted provision in the Transocean-Cameron Contract, and formally requested such in August of 2010.  Transocean denied Cameron's request.  Cameron sued Transocean for indemnification.  Transocean counterclaimed against Cameron for damages and a declaration that it owed no indemnity.  Meanwhile, Transocean sought indemnity from BP under the above-quoted clause in the BP-Transocean Contract.  BP refused Transocean's demand, and they sued one another.

In October 2011, after over a year of intense pretrial litigation and with billions of dollars

5

at stake, Cameron and BP began to discuss a possible settlement.  Cameron kept its insurers, including LIU, apprised of the negotiations and received input from them.  BP and Cameron soon developed a draft settlement agreement that contemplated Cameron paying a sum of money (to be negotiated) to BP in exchange for BP agreeing to indemnify Cameron for most third-party pollution claims.  BP also required as a condition to settlement that Cameron's insurers waive their subrogation rights and that Cameron waive any contractual indemnification rights it might have against Transocean.  BP's concern was that if Cameron, or one of Cameron's insurers subrogated to Cameron's rights, sought indemnity from Transocean for the amount paid in settlement to BP, Transocean would similarly seek contractual indemnification from BP.  If both indemnity claims succeeded, then BP would end up receiving nothing in exchange for its agreement to indemnify Cameron; likewise, Cameron (or its subrogated insurer) would have paid nothing in exchange for BP's indemnification.

LIU initially objected to any settlement that would waive LIU's subrogation rights or otherwise impair LIU's ability, as Cameron's subrogee, to pursue contractual indemnification from Transocean.  LIU repeated this objection in a letter dated November 7, 2011.  There it also raised a new, albeit somewhat related, argument based on the Policy's Other Insurance Clause:

> Moreover, LIU declines to offer its policy limits for the following additional reason.  The LIU policy has the following Other Insurance provision:
>
> [quotes the Other Insurance Clause] . . .
>
> As the above language clearly provides, the LIU policy is excess not just of . . . the underlying policies of Illinois National ($25M limits), ACE American Insurance ($25M excess of $25M), and XLIC ($50M excess of $50M), but it is also excess of the contractual indemnity provided by Transocean to Cameron. . . .
>
> LIU understands that Cameron believes there may be "uncertainties" with respect to its contractual right to be indemnified by Transocean, however, that does

not negate the fact that Cameron has a contractual right to be indemnified by Transocean. LIU believes that until a court determines that Cameron is not entitled to contractual indemnity, the LIU policy is excess of Cameron's contractual right to be indemnified by Transocean. . . .

LIU has no obligation to indemnify unless both underlying limits and Transocean's contractual indemnity to Cameron have been exhausted. At the present time, such exhaustion has not happened.

Therefore . . . LIU would reject Cameron's request that LIU offer its $50M policy limits. LIU is not obligated to contribute its policy limits where Cameron has impaired or will be impairing LIU's subrogation rights and claims against Transocean and/or BP and/or all underlying limits and Other Insurance are not exhausted.

(Rec. Doc. 12588-1) LIU's letter also noted that Transocean had recently filed a motion for summary judgment against BP on the enforceability of the contractual indemnity in the BP-Transocean Contract and urged Cameron to file a brief in support of Transocean's motion.

The next day Cameron filed a motion for summary judgment against Transocean on the issue of Cameron's claim for contractual indemnity under the Transocean-Cameron Contract. Cameron also filed a brief in support of Transocean's motion against BP. Meanwhile, BP filed an opposition and cross motion to Transocean's motion for summary judgment referenced in LIU's letter, and both BP and Transocean filed oppositions Cameron's motion. All of these motions were scheduled for oral argument on the same day, December 16, 2011.

On December 12, BP and Cameron reached a tentative settlement that would resolve nearly all of Cameron's liability in exchange for $250 million. Cameron looked to its insurers to fund the settlement. Over the next three days, all of Cameron's insurers except LIU consented, including insurers that were excess of LIU.

In a letter dated December 13, LIU told Cameron that it "is not in a position to object to the settlement amount of $250M." (Rec. Doc. 12440-42). In a letter dated December 14, LIU stated that

it

> reiterates its position . . . regarding its non-objection to the settlement amount.  LIU
> is not seeking to stop or interfere with any business decision that Cameron believes
> it needs to make regarding settlement.  Furthermore, if Cameron chooses to settle,
> LIU will not assert that Cameron breached the consent requirements of the policy.

(Rec. Doc. 12440-41)[3]  Nevertheless, in both letters LIU repeated its objections to the "non-financial

terms" of the settlement that it expressed in its letter of November 7.  LIU's refusal left a $50 million

"hole" in the settlement funding.

Pressure mounted on Cameron as the December 16 oral argument approached.  BP

threatened to withdraw the settlement offer or increase the amount Cameron would have to pay if

the Court ruled from the bench or even indicated that either the indemnity clause in the BP-

Transocean Contract or the clause in the Transocean-Cameron Contract was invalid.  On December

15, mere hours before oral argument, Cameron confected the settlement by contributing $50 million

of its own money to the $200 million provided by its insurers other than LIU.  Cameron and BP also

agreed to alter certain language in the settlement pertaining to LIU's subrogation rights ("BP-

Cameron Settlement" or "the Settlement").  Cameron orally withdrew its motion for summary

judgment at oral argument.  Consequently, the Court has never determined the validity *vel non* of

Cameron's claim to contractual indemnity from Transocean.  To this day, Transocean has never

provided indemnity to Cameron.

## II.  PROCEDURAL HISTORY

Cameron initiated the instant suit against LIU on January 30, 2012.  LIU answered and then

moved to dismiss under Rule 12(c) of the Federal Rules.  On August 16, 2012, the Court issued an

---

[3]  LIU similarly states in its response to Cameron's motion for summary judgment that "Liberty [LIU] admits that it advised Cameron that if Cameron decided to settle with BP, it would not assert that the *amount* of the settlement violated the Policy's consent provision."  (Rec. Doc. 12623-15 at 9) (emphasis in original)

order denying most of LIU's motion.  (Aug. 16, 2010 Order, Rec. Doc. 7129, 2012 WL 3548036)[4]

Discovery followed, and then the parties filed the instant motions for summary judgment.  The Court

has considered the motions on the briefs and without oral argument.

### III.  LEGAL STANDARD

A court will enter summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).

The Court previously determined that the substantive law of Texas applies to this case.

### IV.  DISCUSSION

**A.      LIU's Indemnity Obligation Regarding Cameron's $50 Million Payment Under the BP-Cameron Settlement**

Cameron and LIU filed cross motions on the issue of whether LIU must indemnify Cameron

for the $50 million Cameron paid to confect the BP-Cameron Settlement.  LIU does not dispute that

Cameron's $50 million payment is a "loss" covered by the LIU Policy, nor does it dispute that the

limits of Underlying Insurance had been tendered and exhausted. Instead, LIU argues that the

Policy's Other Insurance Clause makes Liberty's Policy "excess" of Transocean's indemnification

obligation.  It is LIU's view, then, that its coverage obligation does not attach until Transocean's

indemnity obligation is exhausted or judicially determined to be nonexistent.  LIU further argues

that Cameron forfeited its right to coverage under the Policy when Cameron waived its right to

contractual indemnification from Transocean as part of the BP-Cameron Settlement.  That waiver,

---

[4]  The Court granted LIU's motion only insofar as it sought to dismiss Cameron's claim under a Louisiana statute, La. R.S. 22:1892.  The Court concluded that Texas law governed the case; therefore, relief under Louisiana law was not available.

claims LIU, constituted a material breach of the Policy's requirement that Cameron do nothing to impair LIU's subrogation rights.[5]

As to LIU's Other Insurance Clause argument, Cameron counters that there was no "other insurance" that applied to its loss, because Transocean refused and opposed Cameron's demands for contractual indemnification.   Cameron also argues that Transocean's purported contractual indemnity does not constitute "other insurance" under the Other Insurance Clause.  As to LIU's contention that Cameron impaired its right to subrogation, Cameron avers that LIU lost its subrogation rights when it wrongfully denied insurance to Cameron, and, in any event, the Cameron-BP Settlement expressly preserved LIU's rights.

    1.    The Other Insurance Clause

The Court first considers LIU's argument regarding the Other Insurance Clause.  Two years ago the Court rejected LIU's interpretation of the Other Insurance Clause when it ruled on LIU's Rule 12(c) motion.   That ruling was based partially on the doctrine of *contra proferentem*—when the language of Other Insurance Clause is construed in favor of coverage, no other insurance "applies" to Cameron's loss when the purported source of contractual indemnity denies refuses to pay.[6] Having revisited the issue, the Court finds that additional reasons support this conclusion.

When Cameron sought LIU's consent to the proposed settlement with BP in 2011, LIU explained its understanding of the Other Insurance Clause:

> As the [Other Insurance Clause] clearly provides, the LIU policy is excess not just of the $3M SIR [self-insured retention], and the limits of the underlying policies of Illinois National ($25M limits), ACE American Insurance ($25M excess of $25M),

_____

[5]  LIU's briefing presents the impairment of subrogation argument first, and the Other Insurance Clause argument second.  The Court has reversed the order of these arguments to match the order they will be addressed.

[6]  The ruling also was based on the legal standard and burden of proof applicable to a Rule 12(c) motion.

and XLIC ($50M excess of $50M), but it is also excess of the contractual indemnity provided by Transocean to Cameron. . . .  LIU has no obligation to indemnify unless both underlying limits and Transocean's contractual indemnity to Cameron have been exhausted.[7]

. . .

LIU declines to offer any amounts under its policy because the LIU policy has the following Other Insurance provision. . . .  An insurer cannot be asked to drop down and fill gaps in the insured's coverage that arise from terms and conditions the insured voluntarily assumes through a settlement agreement.[8]

. . .

The LIU policy has not yet attached to this loss for the reasons set forth in the other insurance clause.[9]

LIU's interpretation improperly conflates the Other Insurance Clause with Underlying Insurance.  The LIU Policy expressly identifies the insurance policies constituting "Underlying Insurance" and the specific amount of coverage provided by them ($100 million in aggregate).  The Policy states that LIU "will pay 'loss' in excess of the Underlying Insurance."  (LIU Policy Declaration Nos. 4 & 5, LIU Policy § I,  Rec. Doc. 12050-2 at 2, 3, 17)  The Policy also contains explicit and detailed language explaining how LIU's coverage operates with respect to Underlying Insurance.  For example, the Policy provides that "[c]overage under this policy will not apply unless and until you or the insurer(s) of the Underlying Insurance . . . has paid or is obliged to pay the full amount of such Limits of Liability."  (LIU Policy, § V.H, Rec. Doc. 12050-2 at 20)  In the event one of the Underlying Insurers refuses or is unable to pay a loss, the Policy makes clear that LIU will not drop down in coverage; rather, its coverage "will apply as if the Underlying Insurance was fully

---

[7]  (Letter dated Nov. 7, 2011 from LIU counsel to Cameron counsel, Rec. Doc. 12588-1 at 4)

[8]  (Letter dated  Dec. 13, 2011 from LIU counsel to Cameron counsel, Rec. Doc. 12440-42 at 3-4)

[9]  (Letter dated Dec. 14, 2011 from LIU counsel to Cameron counsel, Rec. Doc. 12440-41)

available and collectible."[10]  The LIU Policy also requires Cameron to "keep the policies listed in the Schedule of Underlying Insurance . . . in full force and effect."  (LIU Policy, § V.D., Rec. Doc. 12050-2 at 19) Should Cameron fail to maintain the requisite Underlying Insurance, the Policy states that LIU "will only be liable to the same extent that we would have been had you fully complied with these requirements."

None of the above provisions mention "other insurance;" they only apply to Underlying Insurance.  Nor does the Other Insurance Clause contain terms or requirements similar to those above respecting Underlying Insurance.  The Other Insurance Clause merely states:

> If other insurance applies to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance. . . .
>
> Other insurance includes any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities.

(LIU Policy § V.F., Rec. Doc. 12050-2).   In contrast to the provisions regarding Underlying Insurance, the Other Insurance Clause uses generic language that does not specifically reference the purported contractual indemnity in the Transocean-Cameron contract or, for that matter, any other type of "other insurance."  The Policy also does not state that "[c]overage under this policy will not apply unless and until [a potential source of other insurance] has paid or is obliged to pay . . . .", nor does it state that LIU will not drop down in coverage when a potential source of other insurance is not forthcoming, nor does it require Cameron to maintain the purported contractual indemnity with Transocean.

––––––––––––––––––––

[10] (LIU Policy, § V.B, Rec. Doc. 12050-2 at 18) ("In the event of bankruptcy, insolvency or refusal or inability to pay, of the insurer(s) of the Underlying Insurance shown in Item 5. of the Declaration, the insurance afforded by this policy will not replace such Underlying Insurance, but will apply as if the Underlying Insurance was fully available and collectible.")

The Policy treats Underlying Insurance and the Other Insurance Clause as distinct concepts.[11]

LIU's interpretation ignores this distinction and pretends that the terms governing Underlying

Insurance apply equally to the Other Insurance Clause.  The Policy's language does not support this.

The following excerpt from *Insurance Claims and Disputes*, a treatise on insurance law, drives this

point home:

> When an insurance policy is ***expressly stated*** to be excess over some ***underlying policy*** [(as the LIU Policy did with respect to the Underlying Insurance)], the excess insurer's liability should not be affected if the primary policy proves to be uncollectible. . . .   In all events, the excess insurer, having contracted with the insured and set a premium based on the existence of the underlying insurance, should have such liability as would have existed had the primary policy been collectible. This result will normally be called for by the terms of the excess policy . . . .

> The foregoing discussion deals with the effect of uncollectible insurance on the liability of a carrier that provides coverage that is expressly made excess over such insurance.  Questions can also arise, however, when the two policies provide coverage at the same level or have competing other insurance clauses that serve, pursuant to the rules discussed in §§ 7:1 and 7:3, to make one excess over the other. In those events, if one policy proves to be uncollectible and the other policy has an other insurance clause that, by its terms, is effective whether or not the insured's other insurance is collectible, it can be argued that the other insurance clause serves to reduce the insured's coverage. Specifically, an insurer might contend that it has either no liability or only pro rata liability, depending on the type of other insurance clause involved.
> . . .
> ***Such a result would be manifestly unfair and improper. Having not been required, either expressly or impliedly, to acquire additional insurance*** [or a contractual indemnity, as in this case]***, the insured should not be penalized because the additional insurance the insured happened to obtain proves to be uncollectible.*** When, therefore, the unambiguous terms of a policy provide for a loss or reduction of coverage under those circumstances, those policy terms should be ignored in accordance with the reasonable expectations rule discussed in § 6:3.

---

[11] *See* 2 Allan D. Windt, *Insurance Claims & Disputes* § 7:2, at 7-15 to 7-20 (6th ed. 2013) (referring to a "true excess policy" as one that "expressly refers to the underlying insurance, and, presumably, the premium charged by the insurer will reflect the insurer's reduced risk because of the existence of the underlying insurance.") (footnote omitted); 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* §§ 220: 32-:33, at 220-37 to -40 (3d ed. 1999) (distinguishing between "true excess insurance" and insurance with an "excess 'other insurance' clause").

2 Allan D. Windt, *Insurance Claims and Disputes* § 6:13, at 6-209 to 6-212 (6th ed. 2013) (emphasis added).[12]

It should be noted that the purported "other insurance" in this case is not even insurance; it is a claim for contractual indemnification against a non-insurer third party.  Texas law recognizes that the relationship between an insured like Cameron and its insurer like LIU is fundamentally different from other types of relationships potentially involving a recovery for loss, such as the one with a non-insurer third party like Transocean.  *See Certain Underwriters at Lloyd's of London v. Cardtronics, Inc.*, No. 01-13-00165, 2014 WL 2617273, at *8 (Tex. App. June 14, 2014).  Indeed, the policy considerations applicable to insurance contracts are very different from those applicable to non-insurance contractual indemnities.  *See In re Oil Spill by the Oil Rig Deepwater Horizon*, 841 F. Supp.2d 988, 1009 (E.D. La. 2012) ("Although insurance contracts are a type of indemnity contract, they are governed by different rules.  The purpose of an insurance contract is to distribute risk of loss across a large group.  These contracts are usually not negotiated, thus any ambiguities are construed in favor of the insured.  By contrast, an indemnity clause contained in a non-insurance contract is construed against coverage, because the agreement creates duties that differs or extends beyond those established by general principles of law. Such clauses are typically collateral or incidental to a contract that has a principal purpose other than risk shifting.") (citations omitted).  Thus, if LIU's interpretation of the Other Insurance Clause would be "manifestly unfair and improper" when the "other insurance" is actually insurance, its interpretation must be equally, if not

---

[12] Of course, here the Other Insurance Clause did not unambiguously provide for a loss or reduction of LIU's coverage when the purported source of "other insurance" refused or was unable to pay.  The Other Insurance Clause also does not state that LIU's Policy would be excess of other insurance "whether or not the . . . other insurance is collectible."  It instead used the ambiguous term "applies."  (*See* Aug. 16, 2012, Order & Reasons pp. 19-21, Rec. Doc. 7129, 2012 WL 3548036, at *11)

more, egregious when the purported source of "other insurance" is a claim for contractual indemnification from a non-insurer third party.

The fact is, insurance policies, particularly liability policies, "almost always contain" some sort of other insurance clause.  2 Windt, *supra*, § 7:1, at 7-2;  15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 219:1, at 219-6 (3d ed. 1999).  Indeed, the other policies in Cameron's insurance tower contained their own other insurance clauses or incorporated the one in the LIU Policy.  These clauses "are generally designed by insurers to 'avoid an insured's temptation or fraud of over-insuring . . . property or inflicting self-injury.'"  *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206 (5th Cir. 1996) (quoting *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 586 (Tex. 1969)).[13]  No such concern is present here.  Most importantly, other insurance clauses "govern the relationship between insurers, *they do not affect the right of the insured to recover under each concurrent policy*."  *Couch on Insurance*, *supra*, § 219:1, 219-8 (footnote omitted) (emphasis added); *see also* 2 Windt, *supra*, § 7:1, at 7-10 ("[T]he typical other insurance clause is not intended to affect the amount of coverage to which the insured is otherwise entitled.  As a result, the insured is indifferent to the fact that the clause is inserted in the policy.").  LIU's interpretation of the Other Insurance Clause conflicts with all of these principles.

LIU's view that coverage under its Policy had not attached and that it would not "drop down" in coverage when Transocean refused Cameron's demands for indemnification is incorrect.  It is undisputed that the BP-Cameron Settlement is a "loss" covered by the LIU Policy which exhausted the limits of the Underlying Insurance.  LIU's coverage obligation indeed was triggered.  To conclude otherwise would mean that having both insurance and a disputed claim for contractual

---

[13] Notably, the LIU underwriter who sold Cameron the LIU Policy expressed a similar understanding of other insurance clauses.  (Mandel Dep. at 83, Rec. Doc. 12440-6 at 18).

indemnity left Cameron less protected than it would have been had it only had insurance.  Such a result would be unconscionable.  *See Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 586 (Tex. 1969).

    2.    <u>LIU's Impairment of Subrogation Defense</u>

LIU argues that Cameron had contractual indemnity rights against Transocean encompassing its liability to BP, which Cameron released when it settled with BP.  LIU relies on paragraphs 4.3 and 4.5 from the BP-Cameron Settlement:

> 4.3 Cameron, on behalf of itself, the Cameron Releasing Parties, the Consenting Cameron Insurers, and any and all insurers, reinsurers, indemnitors, subrogees, or assignees of any Cameron Releasing Parties or Consenting Cameron Insurers, agrees not to pursue, demand, litigate, or otherwise seek any Claims for contribution, subrogation, indemnity, or Claims arising under any other theory of recovery, including Claims for fines, penalties, sanctions or punitive or exemplary damages, arising out of or related to the Deepwater Horizon Incident that any of them have, ever had, hereafter may have, or have acquired or may hereafter acquire against any Third Party, including against Transocean under the Transocean Contracts and against any insurer of Transocean (acting in its capacity as such); provided that the scope of this paragraph does not include any rights to insurance coverage that the Cameron Releasing Parties may have under the Cameron Policies. . . .

> 4.5 To the fullest extent allowed by law, Cameron hereby assigns all right, title, and interest to all Claims that the Cameron Releasing Parties have asserted or could assert against any Third parties, including any indemnification claims against Transocean under the Transocean Contracts and further including Claims for fines, penalties, sanctions or punitive or exemplary damages, arising out of or relating to the Deepwater Horizon Incident (the "Cameron Third Party Claims") to BPXP, and BPXP accepts all right, title, and interest to all Cameron Third Party Claims. To the extent that assignment of any Cameron Third Party Claims is deemed invalid by a court or arbitration panel of competent jurisdiction, Cameron agrees on behalf of the Cameron Releasing Parties to release, and covenants not so sue for, each and every such Cameron Third Party Claim for which the assignment had been deemed invalid.

(BP-Cameron Settlement, Rec. Doc. 12580-11 at 7)  LIU further argues that Cameron's release of these claims impaired LIU's subrogation rights and breached the "Transfer of Rights Clause" in the

LIU Policy:

> If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them.

(First Underlying Insurance Policy, § I.O, Rec. Doc. 12050-8 at 20).[14]  LIU concludes, then, that Cameron's breach of the Transfer of Rights Clause voided Cameron's right to coverage under the LIU Policy.

The Court finds, however, that Cameron did not breach the Transfer of Rights Clause or otherwise impair LIU's  rights via subrogation, because paragraph 4.4 of the BP-Cameron Settlement preserved LIU's ability to subrogate to and assert Cameron's claim for contractual indemnification against Transocean:

> 4.4 . . . *[N]otwithstanding any other provision of the Agreement*, including paragraphs 4.2 and 4.3, Cameron is *not* releasing *any subrogation or other rights* of [LIU], which issued policy number Q1B711985583046 to Cameron for the policy year July 1, 2009 to July 1, 2010.  BPXP and Cameron reserve all rights and claims that either may have against [LIU].

(BP-Cameron Settlement, Rec. Doc. 12580-11 at 7).

*Couch on Insurance* explains, "Since a release may be structured so as to preserve an insurer's rights, the execution of a release in such a situation does not violate the policy, destroy the insurer's right to subrogation, nor constitute a defense to an action on the policy."  16 *Couch on Insurance, supra*, § 224:102, at 224-129.  That is exactly what Cameron did here.  Notably, the initial version of the proposed settlement Cameron circulated to its insurers did not contain the quoted language in paragraph 4.4.  (*See* Rec. Doc. 12440-19).  Paragraph 4.4 was re-written to include the present language after LIU refused to participate in the Settlement and warned "[i]f

---

[14]  The Transfer of Rights Clause was incorporated into the LIU Policy from the First Underlying Insurance Policy issued by Illinois National Insurance Company.

17

Cameron's settlement extinguishes LIU's rights, including subrogation rights, such action will jeopardize any coverage which Cameron might otherwise have under the LIU policy." (Letter dated Dec. 14, 2011 from LIU's Counsel to Cameron's counsel, Rec. Doc. 12440-41) .

LIU argues that any purported preservation is hollow—that while paragraph 4.4 may purport to preserve LIU's subrogation rights, it does not preserve Cameron's indemnification rights against Transocean. This ignores the phrase "notwithstanding any other provision of the Agreement" in paragraph 4.4. This clause means that, to the extent there is a conflict between paragraphs 4.3 and 4.5, paragraph 4.4 controls.  Furthermore, when the "notwithstanding" clause is read with "*any subrogation or other rights of LIU*," it follows that the BP-Cameron Settlement preserved not only LIU's right to subrogate, but also Cameron's underlying claim to contractual indemnity against Transocean insofar as LIU would assert that right as Cameron's subrogee (and further assuming the indemnity claim is determined to be valid, enforceable, and not barred by some other defense).  Put differently, the BP-Cameron Settlement assigns or releases Cameron's rights against Transocean *except* to the extent necessary to preserve LIU's right, if it paid Cameron the $50 million in Policy Limits, to subrogate to and assert the indemnification claims that Cameron had against Transocean before the Settlement.  LIU's contrary interpretation would render paragraph 4.4 meaningless, running afoul of a basic principle of contract interpretation.  *See Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).

The Court's interpretation is further confirmed by paragraph 4.6 of the Settlement, which, like paragraph 4.4, was added to the BP-Cameron Settlement after LIU refused to participate:

> 4.6  . . .  Cameron, on behalf of itself and the Cameron Releasing Parties, further represents and warrants that, in the event that any of them pursue any insurance coverage Claim against any Cameron Insurer in respect to all or any portion of the Cash Payment specified in Article III of this Agreement, Cameron and

the Cameron Releasing Parties (a) shall only settle such insurance coverage Claim if the settlement includes an express waiver of any such Cameron Insurer's rights of contribution, subrogation, indemnity, and rights to bring Claims arising under any other theory of recovery . . . against the BP Released Parties or Third Parties, including Transocean; or (b) if such insurance coverage Claim does not settle, shall use their reasonable best efforts to litigate or arbitrate any such insurance coverage Claim so that any judgment, decision, or award expressly provides that any such Cameron Insurer has waived any right of contribution, subrogation, indemnity, and rights to bring Claims arising under any other theory of recovery . . . against the BP Released Parties or Third Parties, including Transocean; and (c) shall not seek enforcement of any favorable judgment, decision, or award without the consent of BPXP, which shall not be unreasonably withheld, with the understanding that the absence of the express waiver described in 4.6(b) shall be reasonable grounds for BPXP to withhold consent.

(BP-Cameron Settlement, Rec. Doc. 12580-11 at 7).  Paragraph 4.6 addresses Cameron's post-settlement coverage claim against LIU.  The paragraph requires, *inter alia*, that any settlement with LIU contain a waiver of LIU's subrogation rights against Transocean.  This provision also would be superfluous if the BP and Cameron already extinguished Liberty's rights in paragraphs 4.3 and 4.5.

For these reasons, the Court finds that the BP-Cameron Settlement did not breach the Policy's Transfer of Rights Clause or otherwise impair LIU's ability, as Cameron's subrogee,  to assert a claim for contractual indemnification against Transocean.

Additionally, and in the alternative, the Court agrees with Cameron's argument that LIU, by its own conduct, materially breached the Policy, which forfeited LIU's subrogation rights.  As discussed above, the Court has found that LIU's stated belief that its coverage obligation had not been triggered was erroneous.  The BP-Cameron Settlement in fact had triggered LIU's coverage obligation.  In light of these findings, and as further explained below, LIU breached the Policy when it refused—and continues to refuse—to contribute its Policy limits to the Settlement, which forfeits

19

LIU's subrogation rights.[15]

Specifically, the Court finds that LIU's conduct breached the Policy's requirement that LIU "promptly pay" a covered loss.  *See* (LIU Policy, § V.H, Rec. Doc. 12050-2); *cf.* 1 Windt, *supra*, § 3:11, at 3-81 (quoted in preceding footnote); *id.* § 2:21, at 2-83 ("A substantial part of the protection purchased by an insured is the right to receive policy benefits promptly."). LIU's conduct also constituted a constructive denial of liability, even if it did not expressly deny liability.  *See id.* § 3:10, at 3-80 (quoted in preceding footnote); *Scottsdale*, 488 F.3d 688-89 (discussed in preceding footnote).

LIU also breached its duty to accept a reasonable settlement.  An excess insurer owes its insured a duty to accept a reasonable settlement within policy limits, provided the underlying

---

[15] *See Scottsdale Ins. Co. v. Knox Park Constr., Inc.*, 488 F.3d 680, 688-89 (5th Cir. 2007) (Texas law) (holding that umbrella insurer waived its right to argue a $535,000 settlement violated the policy's consent-to-settle clause, because the insurer's refusal to provide coverage was based on its erroneous view that coverage existed only for liability in excess of $1,000,000, when in fact it provided primary coverage for some of the settled claims); *Stephens v. State Farm Mut. Auto Ins. Co.*, 508 F.2d 1363, 1366 (5th Cir. 1975), *partially abrogated on other grounds by Holyfield v. Members Mut. Ins. Co.*, 572 S.W.2d 672 (Tex. 1978) (Texas law) ("The rationale behind holding to this particular waiver theory is that a claimant should not be required to approach his insurer, hat in hand, and request consent to settle with another when he has already been told, in essence, that the insurer is not concerned, and he is to go his way. It is difficult to see why an insurer should be allowed, on the one hand, to deny liability and thus, in the eyes of the insured, breach his contract and, at the same time, on the other hand, be allowed to insist that the insured honor all his contractual commitments. . . . When the denied liability does exist (as may be later adjudicated), ***admittedly the subrogation rights of the insurer could be compromised by settlement.*** However, in the case of existent, denied liability, the denial is a breach of contract on the part of the insurer and its breach should, by rights, relieve the insured of the punitive effects of his failure to comply with consent provisions of the insurance policy.") (emphasis added); 16 *Couch on Insurance*, *supra*, § 224:148, at 224-179 to -180 ("Where an insurer denies liability on a policy, it is estopped from thereafter claiming that it was released when the insured settled with the wrongdoer, or that the insured breached the policy's subrogation provision, by impairing its subrogation rights, or extinguishing its subrogation rights.") (footnotes omitted); 1 Windt, *supra*, § 3:10, at 3-76 to 3-80 ("It is a basic principle of contract law that once one party to a contract breaches the agreement, the other party is no longer obligated to continue performing his or her own contractual obligations. As a result, once the carrier has wrongfully denied coverage, an insured is no longer bound by the insurance policy's provisions governing [*inter alia*,] . . . settlements with injured parties [and] releases of tortfeasors . . . . And finally, note that an expression by an insurer of its general position with regard to the applicable coverage issues, indicating the absence of coverage, will serve to free the insured from contractual obligations; the insurer's statements can be ***deemed the equivalent of a denial of liability***.") (emphasis added; footnotes omitted); *id.* § 3:11, at 3-81 ("The same should be true . . . whenever the company materially breaches one of its obligations to the insured, regardless of whether it has actually denied coverage.") (footnote omitted).  As explained below, an insurer will also breach the policy if it refuses to consent to a reasonable settlement.

insurers have tendered their policy limits.  *See Keck, Mahin & Cate, v. Nat'l Uniton Fire Ins. Co. of Pittsburgh*, 20 S.W.3d 692, 701 (Tex. 2000) (citing 1 Windt, *supra*, § 5:26).  When the existence of coverage is not an issue, a settlement typically is "reasonable" if, based on the facts that are or should have been known to the insurer, there is a reasonable possibility of a judgment against the insured in excess of the policy limits.  1 Windt, *supra*, at § 5:1, at 5-4 to 5-7.[16]  If an insurer withholds consent to a settlement it was obligated to accept, it breaches the contract, entitling the insured to coverage for the unauthorized settlement and releasing the insured from the policy conditions.  1 Windt, *supra*, § 3:9, at 3-62 to 3-63, 3-73.  This doctrine resolves the conflict of interest that frequently arises between the insured and its insurer in the settlement context.[17]  Consistent with many other principles in insurance law, the duty to settle generally favors the insured's interests over the insurers.  *See, e.g.*, *Int'l Ins. Co. v. Dresser Indus., Inc.*, 841 S.W.2d 437, (Tex. App. 1992) ("International would have us impose on [the insured] the financial risk of

---

[16] *See also G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved) ("[An insurer] ought to be held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the . . . indemnity company, should respond in damages."); 1 Windt, *supra*, § 3:8, at 3-56 ("When considering whether to consent to an insured's proposed settlement with a tortfeasor, an insurance company should thus take into account the interest of the insured and afford it at least as much consideration as its own interest."); 16 *Couch on Insurance*, *supra*, § 224:152, at 224-183 ("An insurer cannot be perceived as putting its interests before those of the insured.  Where the court suspects this is happening, it will decide various coverage issues against the insurer. . . . Further, an unreasonable delay in settling with an insured may waive the right to demand that the insured not settle with the wrongdoer so as to prejudice the right to subrogation.") (footnotes omitted).

[17] *See generally* 1 Windt, *supra*, § 5:1, at 5-2 to 5-4 ("When a claim against an insured can be settled for the policy limit, a conflict of interest exists between the insured and the insurance company.  It is generally in the insured's interest to settle for the policy limit, since doing so protects the insured from any potential personal liability.  However, it is generally not in the insurance company's interest to settle for the policy limit.  Apart from considerations of defense costs, the insurance company cannot do any worse than paying its policy limits.  As long as any chance existed, no matter how remote, that the insured might prevail, it would generally be in the insurance company's interest to litigate rather than settle for the policy limit.  Moreover, liability insurance policies, by their terms, give insurers complete discretion in deciding whether to settle or litigate.  In light of that fact, and the conflict of interest that can arise between the insurer and the insured in connection with whether a claim against an insured should be settled, the law has imposed on insurance companies an implied contractual obligation to settle under certain circumstances.") (footnotes omitted).

protecting excess insurers. . . . [However,] when deciding whether to try a lawsuit, an insured need not subordinate its own financial interests to that of the excess insurer: The protection of the excess insurer's pecuniary interests is simply not the object of the bargain.") (brackets, quotations, and citation omitted).

Again, there is no dispute that the BP-Cameron Settlement was covered by the LIU Policy and the limits of Underlying Insurance had been exhausted.  The Court's August 16, 2012 Order explained that the BP-Cameron Settlement was "within policy limits," even though the total settlement amount exceeded the LIU Policy.  (*See* Aug. 16, 2012 Order pp. 28-29, Rec. Doc. 7129, 2012 WL 3548036, at *15)  The only remaining issue is whether the settlement is "reasonable;" i.e., was there a reasonable possibility of a judgment in excess of the LIU Policy limits.

LIU effectively admits this element.  In its December 13, 2011 letter, LIU's counsel told Cameron that "LIU is not in a position to object to the settlement amount of $250M."  On December 14, LIU's counsel stated, "Initially, LIU reiterates its position set forth in my letter of yesterday regarding its non-objection to the settlement amount.  LIU is not seeking to stop or interfere with any business decision that Cameron believes it needs to make regarding settlement.  Furthermore, if Cameron chooses to settle LIU will not assert that Cameron breached the consent requirements of the policy."  In LIU's response to Cameron's statement of undisputed material facts, LIU states: "Liberty [LIU] admits that it advised Cameron that if Cameron decided to settle with BP, it would not assert that the *amount* of the settlement violated the Policy's consent provision."  (Rec. Doc. 12623-15 ¶¶ 20, 21) (emphasis in original)  In each instance, LIU only voices an objection to the "non-financial terms" of the BP-Cameron Settlement.

The only reasonable inference that can be drawn is that LIU viewed $250 million as a

"reasonable" settlement amount for Cameron—which, *a fortiori,* means that LIU believed there was a reasonable possibility that Cameron's liability would exceed LIU's Policy limit.[18] Thus, a conflict of interest existed between Cameron and LIU:  Cameron, faced with the possibility of devastating liability, had great interest in settling with BP for $250 million—well within the $500 million limit of its insurance tower—while LIU, who risked only its $50 million policy limit (putting aside any issues of statutory penalties, etc.), had considerable incentive to resist tendering its policy limit and instead force Cameron to pursue to exhaustion the claim for contractual indemnity against Transocean.  This conflict is precisely why the law imposes a duty on insurers to accept reasonable settlements.  *See* note 17, *supra.*

Given that LIU effectively admits that the Settlement was reasonable, LIU was compelled to consent to the settlement, including the waiver of subrogation rights.[19]  Consequently, LIU breached the duty to settle, which precludes it from complaining about any impairment to its subrogation rights.

For the foregoing reasons, the Court finds that LIU must indemnify Cameron for the $50 million Cameron paid to settle with BP.  The Court will grant in part Cameron's motion for summary judgment in this respect (Rec. Doc. 12440) and deny Liberty's cross motion for summary judgment (Rec. Doc. 12580).

---

[18]  This conclusion is further supported by the fact that insurers above LIU in the insurance tower consented to the settlement's terms.

[19]  While LIU complains about the impairment of subrogation/indemnity rights against Transocean, it should be understood that any indemnity, if upheld, would ultimately pass through to BP.  Of course, there is nothing unusual about one settling party (Cameron) agreeing not to pursue the other settling party (BP) for the amount the former paid in settlement.  Thus, the fact that the Settlement required Cameron and its insurers to waive their claims for indemnification and subrogation against Transocean was not unreasonable.

**B.      Cameron's Defense Expenses**

Cameron alleges in its amended complaint that the Policy requires LIU to pay Cameron's defense expenses in the underlying MDL—as distinguished from Cameron's defense costs in the instant coverage suit against LIU—therefore, Cameron is entitled to a declaratory judgment that LIU must reimburse Cameron for these expenses.  Cameron and LIU filed cross motions on this issue. (Rec. Docs. 12440, 12050).

The LIU Policy is generally subject to the terms and conditions of the First Underlying Insurance Policy, "[e]xcept for any definitions, terms, conditions and exclusions of [the LIU Policy.]"  (LIU Policy, § I, Rec. Doc. 12050-2 at 17).  The First Underlying Insurance Policy contains a duty to defend and a duty to pay for defense expenses.   By contrast, the LIU Policy states:

> III. DEFENSE
>
> A.      We will ***not*** be required to assume charge of the investigation of any claim or defense of any suit against you.
>
> B.      We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss" under this policy.  ***If we exercise such right, we will do so at our own expense.***
>
> C.      If the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are exhausted solely by payment of "loss", we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which, in our opinion, may give rise to a "loss" under this policy.  ***Such investigation or defense shall be at our own expense.***  We may, however, withdraw from the defense of such suit and tender the continued defense to you if our applicable Limits of Liability shown in Item 4. of the Declarations are exhausted by payment of "loss."

(LIU Policy, § III, Rec. Doc. 12050-2 at 18) (emphasis added)  The LIU Policy also states:

> Our liability under this policy will not exceed the following limit: 100.00% percent of "loss" excess of the Underlying Insurance stated in Item 5 of the Declarations, ***but for no greater than***:

24

> $50,000,000.00 -Each Occurrence
> $50,000,000.00 -Aggregate Limit (where applicable)

(LIU Policy, Declarations, Item 4, Rec. Doc. 12050-2 at 2) (emphasis added)  The Policy defines

"loss" as

> those sums which you are legally obligated to pay as damages, after making proper
> deductions for all recoveries and salvage, ***which damages are covered by the First
> Underlying Insurance Policy***.

(LIU Policy, § IV, Rec. Doc. 12050-2 at 18) (emphasis added)

The First Underlying Insurance Policy does not include "defense expenses" as "damages"

or a "loss."  (First Underlying Policy, § I.A., Endorsement 29 ¶ 10, Rec. Doc. 12050-8 at 5, 81)

Instead, the First Underlying Insurance Policy has a separate provision where it agrees to cover

"Defense Expenses" "in addition to the applicable limits of Insurance."  (First Underlying Policy,

Endorsement 29 ¶ 2.H, Rec. Doc. 12050-8 at 79).

Reading the relevant provisions together, the Court interprets the LIU Policy as disclaiming

both the duty to defend and the duty to reimburse defense expenses.  The parties' intent is clear from

the Policy's language: LIU did not have a duty to defend, but it had a right, at its option, to become

in involved in an investigation or defense.   If LIU chose to exercise this right, then it would be

liable for its defense expenses.  Outside of that circumstance, LIU's liability under the Policy

remained capped at $50 million.  The Court finds Cameron's contrary interpretation is unreasonable.

For this reason, LIU is entitled to summary judgment against Cameron's claim for a

declaratory judgment regarding defense expenses.  The Court will grant LIU's motion (Rec. Doc.

12050) in this regard and deny Cameron's motion (Rec. Doc. 12440).

## C.      Texas Insurance Code Chapter 542

Chapter 542 of the Texas Insurance Code prohibits an insurer from delaying payment of a

25

claim for more than 60 days after receiving all information reasonably requested from the insured. Tex. Ins. Code § 542.058.  An insurer that violates this requirement is required to pay, "in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with attorney's fees."  Tex. Ins. Code § 542.60.

Cameron brought claim under Chapter 542 of the Texas Insurance Code, which is premised on its assertion that the Policy required LIU to pay for Cameron's defense expenses.  Because the Court finds that Policy does not make LIU responsible for these expenses, the Chapter 542 claim must fail.  Accordingly, the Court will grant LIU's motion for summary judgment as to this claim. (Rec. Doc. 12050)

## D.      Texas Insurance Code Chapter 541

Cameron alleges in its amended complaint that LIU knowingly engaged in unfair claims settlement practices in violation of Chapter 541 of the Texas Insurance Code, which entitles it to triple the amount of "actual damages." Cameron claims that its "actual damages" are (1) the $50 million Policy limits and (2) the legal fees it has and will incur in the instant coverage suit against LIU.[20]  LIU moved for summary judgment against this claim, arguing, *inter alia*, that Chapter 541 requires an "independent injury" apart from the Policy limits and defense expenses it incurred in this coverage suit.  (Rec. Doc. 12050).  Cameron opposed, urging that the Texas Supreme Court has made clear that Chapter 541 does not require an "independent injury" and that, at a minimum, the Policy's benefits wrongfully withheld are the insured's "actual damages."

Chapter 541, Subchapter B, of the Texas Insurance Code prohibits certain practices in the insurance industry. *See* Tex. Ins. Code §§ 541.003, 541.051-.061.  Subchapter D provides a private

---

[20] Cameron distinguishes between its defense costs in the instant coverage suit against LIU and its defense costs in the underlying MDL.  Cameron asserts only the former are "actual damages" under Chapter 541.

cause of action to a person who sustains "actual damages" caused by a violation of Subchapter B.

*Id.* § 541.151.  If the plaintiff's suit is successful, she may obtain "the amount of actual damages, plus court costs and reasonable and necessary attorney's fees" and other relief not relevant here.  *Id.* § 541.152(a).  If the insurer is found to have "knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages."  *Id.* § 541.152(b).

In 1988, the Texas Supreme Court considered and rejected the same argument that LIU raises here, stating, "an insurer's unfair refusal to pay the insured's claim causes damages as  a matter of law in at least the amount of the policy benefits wrongfully withheld." *Vail v. Tex. Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988).  The court explained:

> The fact that the Vails have a breach of contract action against Texas Farm does not preclude a cause of action under the DTPA and article 21.21 of the Insurance Code.[21]  Both the DTPA and the Insurance Code provide that the statutory remedies are cumulative of other remedies.  It is well settled that persons without insurance are allowed to recover based on false representations of coverage, and that an insurer may be liable for damages to the insured for its refusal or failure to settle third-party claims.  It would be incongruous to bar an insured—who has paid premiums and is entitled to protection under the policy—from recovering damages when the insurer wrongfully refuses to pay a valid claim. Such a result would be in contravention of the remedial purposes of the DTPA and the Insurance Code.

*Id.* (citations omitted).  Twenty-two years later, the Fifth Circuit reached the opposite conclusion:

> In its briefing, AFS argues that it did not need to prove a separate injury in order to maintain its extra-contractual claims [under Tex. Ins. Code §§ 541.151-.152]. It argues that GAIC's denial of insurance proceeds, standing alone, entitled it to recover on its extra-contractual claims. This assertion does not comport with this court's case law.  *See Parkans Int'l LLC v. Zurich Ins. Co.*, 299 F.3d 514, 519 (5th Cir.2002) (a Texas insurance dispute case, noting that "[t]here can be no recovery for extra-contractual damages for mishandling claims unless the complained of actions or omissions caused injury independent of those that would have resulted

---

[21] *Vail* was decided under an earlier version of Chapter 541 of the Texas Insurance Code.  However, it is undisputed that the current and former versions of the Texas Insurance Code are identical substantively.

from wrongful denial of policy benefits").

*Great American Insurance Co. v. AFS/IBX*, 612 F.3d 800, 808 & n.1 (5th Cir. 2010).

After studying the relevant cases and commentaries, this Court respectfully disagrees with *Great American*. As one treatise on Texas insurance law explains, *Great American* misapplied the Fifth Circuit's 2002 decision in *Parkans*. *See* Mark L. Kincaid & Christopher W. Martin, *Texas Practice Guide Insurance Litigation* § 16:27, at 264-66 (2013-2014 ed.). *Parkans* dealt with a situation where the insured's claim was ***not*** covered by the insurance policy. In that circumstance, any bad faith claim necessarily must be based on an injury independent from the policy benefits, as no policy benefits are owed. Contrary to the situation in *Parkans*, both *Vail* and *Great American* concerned situations where coverage ***was*** owed under the policy. Neither the Texas Supreme Court nor the Texas legislature has ever overruled or abrogated *Vail*. Accordingly, it is this Court's belief that *Vail*, not *Parkans*, should have provided the rule of decision in *Great American*.

This raises an interesting question regarding the *Erie* doctrine: When the highest court of a state has clearly ruled on a particular aspect of state law, as occurred in *Vail*, and the federal court of appeals subsequently reaches an opposite conclusion on the same issue, as occurred in *Great American*, which decision is binding on a federal district court located in the same circuit as the federal court of appeals? If *Great American* was decided before *Vail*, and not after, this Court could disregard the *Great American* decision. *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 722 (5th Cir. 2004). But that is not the circumstance presented. Rather, it appears that *Great American* is binding on this Court, just as it would be on another panel of the Fifth Circuit. *Cf. id.* ("A prior panel opinion's interpretation of state law binds us no less firmly than a prior panel interpretation of federal law would. . . . [However,] we recognize that we need not follow a prior panel opinion

when a **subsequent** state court decision or statutory amendment shows that a prior panel decision was clearly wrong.") (emphasis added); *accord Brown v. General Steel Domestic Sales, LLC*, No. 08-00779, 2008 WL 2128057, at *5 & n.36 (C.D. Cal. 2008) ("[A]lthough a circuit court's prediction of state law is not binding in the same way as is its definitive interpretation of federal law, as a practical matter a circuit court's interpretations of state law must be accorded great deference by district courts within the circuit. . . . [I]n this regard, . . . were a party to appeal the district court's ruling, the Ninth Circuit would review its interpretation of California law *de novo*, and a Ninth Circuit panel (as opposed to the *en banc* court) would be bound to follow the circuit's prior decision.").  The Court acknowledges that this creates the "inadmissible" situation that two different rules will apply to litigants in state and federal courts merely due to the circumstance of diversity of citizenship.  *Fid. Union Trust Co. v. Field* , 311 U.S. 169, 180 (1940).  Nevertheless, it does not appear that this Court may disregard *Great American*.

Cameron also argues that *Great American*'s conclusion is non-binding dicta.  The Court does not agree.  Although *Great American* discussed the issue only briefly, its reasoning was essential to its decision to remand to determine whether evidence of an independent injury existed.  *See Int'l Truck & Engine Corp.*, 372 F.3d at 721 ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it. A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law.") (citations and quotations omitted).

For these reasons, the Court is compelled to hold that a claim under Chapter 541 requires an independent or separate injury.  The $50 million in Policy limits do not satisfy this requirement.  The

Court further finds that Cameron's defense expenses in the instant coverage suit against LIU will not support a claim under Chapter 541. As noted above, only a person who sustains "actual damages" may bring a Chapter 541 claim. Tex. Ins. Code § 151.151. If the plaintiff succeeds, then she may recover "the amount of actual damages, ***plus*** court costs and reasonable and necessary attorney's fees." *Id.* § 151.152(a) (emphasis added). This indicates that defense expenses in the coverage suit are not "actual damages." This conclusion is consistent with *Great American*, 612 F.3d at 800 (stating that attorney's fees in litigation other than the coverage suit may provide the separate injury necessary to support a Chapter 541 claim) and *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 354-55 (5th Cir. 2001) (awarding attorney's fees of $712,000 in connection with the insured's suit against the insurer, which was separate from the trebled "actual damages" award).

Because Cameron has not suffered "actual damages," its claim under Chapter 541 of the Texas Insurance Code will be dismissed as a matter of law. LIU is entitled to summary judgment on this claim.[22]

## V.  CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Cameron's Motion for Partial Summary Judgment on its Claims for Breach of Contract, Indemnity and Defense Expenses (Rec. Doc. 12440) is GRANTED IN PART and DENIED IN PART, LIU's Motion for Partial Summary Judgment Concerning Cameron's Forfeiture of Coverage (Rec. Doc. 12580) is DENIED, LIU's Motion for Partial Summary Judgment

---

[22] LIU filed two motions for summary judgment regarding the Chapter 541 claim. (Rec. Docs. 12050, 12578). Because the Court disposes of the Chapter 541 claim on the "independent injury" argument raised in LIU's first motion, it does not addressed the "reasonably clear" arguments in the second motion.

Concerning Cameron's Texas Insurance Code Claims is GRANTED (Rec. Doc. 12050), and LIU's Motion for Partial Summary Judgment on Cameron's § 541 Claim (Rec. Doc. 12578) is MOOT.

FURTHER ORDERED that Cameron is entitled to judgment as a matter of law as follows:

As to Cameron's "First Cause of Action" (breach of contract), judgment in favor of Cameron and against LIU in the amount of $50,000,000.00, the full amount of the Policy limits, plus legal interest and costs;

As to Cameron's "Second Cause of Action" (declaratory judgment for indemnity), a declaratory judgment that LIU must indemnify Cameron in the amount of $50,000,000.00;

FURTHER ORDERED that LIU is entitled to judgment as a matter of law and in LIU's favor on Cameron's remaining claims.

A final judgment will be entered consistent with this Order and Reasons.

Signed in New Orleans, Louisiana, this 31st day of October, 2014.

_____
United States District Judge