**CLAIMS ADMINISTRATION PANEL HEARING**

**OF THE DEEPWATER HORIZON ECONOMIC AND**

**PROPERTY DAMAGES SETTLEMENT PROGRAM**

* * * * * * * * * * * * * * * * * * * * 

Claims Administration Panel Meeting of **THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT PROGRAM** taken at 935 Gravier Street, Suite 1905, New Orleans, Louisiana, on Wednesday, **OCTOBER 22, 2014**, commencing at or about 1:40 p.m.

REPORTED BY:

Suzanne "Suzie" Wahl, CCR, CVR-CM
Certified Court Reporter
Certificate No. 99083

**APPEARANCES**

**CLAIMS ADMINISTRATION PANEL:**

Patrick Juneau

David Forsyth

Patrick Hron

**OFFICE OF SPECIAL MASTER, LOUIS J. FREEH:**

Thomas Souther

**BP:**

Steven M. Pyser

Keith Moskowitz

Mark Holstein

Randall Latta

**CLASS COUNSEL:**

Stephen J. Herman

James Roy

**CLAIMS ADMINISTRATION PANEL HEARING**

**MR. PATRICK JUNEAU:**

It's October 22. We are gathered here for a panel hearing on two separate matters. And I'll take them up separately. The first matter has to do with budget conferences and meetings and as that may relate to the confidentiality agreement that was signed on by the parties earlier in the matter. Let me pass these down. I'll give one to each side.

What I have here is the document setting this panel hearing, the communications from both sides with regard to their respective positions. I have the confidentiality agreement that was entered earlier with the related amendment, and from my perspective, and that's not from anybody else, any other document they want to consider. But I'm going to mark these collectively as CA #1 for the purposes of the record. And will you hand that down to the court reporter for incorporation into the record.

Now, I have the respective positions of the parties and have read them. My position in this matter is the budget meetings are, and should be,

incorporated within the context or within the purview of the confidentiality agreement. I understand the respective parties' positions in that regard.

What I'm want to do is throw it open to both parties, and anything y'all have to say about that, I mean, I've already put the documents as part of the record, anything y'all want to add to that. Additionally, the purpose of the panel hearing in this case, as in all cases, is just to see if there's any resolution that can be agreed upon unanimously between the parties. That's why we're here. I'm open for suggestions, recommendations or comments anybody may have.

I'll start with BP first and I'll do the reverse with the other.

**MR. HOLSTEIN:**

Thanks, Pat. Mark Holstein for BP. I first of all appreciate your holding this meeting. We appreciate the opportunity to express our views, so that's good. I would want to start by incorporating by reference our letter from Maria Travis to the facility on October 4th. We didn't intend to make it part of the record today, but I think --

**MR. JUNEAU:**

You can always ask the Court. I'm just putting what I think is germane today. I don't have a clue as to anything else.

**MR. HOLSTEIN:**

Yes. And really, our position is encompassing that letter, but just to be very clear. It's BP's position that -- and I'm just going to make some introductory comments and then I'll turn it over to my colleagues for anything they'd like to say -- BP's position is, this is a court-supervised settlement program. Supervised by the federal court.

And I think that the questions that you sent to us turn the issue on its head. Because I think our view is that the presumption here should be that the budget for this facility, the cost of this facility and the way the money gets spent is something the public is entitled to know. And the presumption should be because this is a federally court-supervised settlement program that there isn't any confidentiality.

And so our view is, the right question to ask is, why should it be confidential rather than why should it not be confidential. And so we

struggle with the questions you ask when you think they're inappropriate. It is true, and I know that you put in the record that there was an agreement for purposes of a quarter that there be confidentiality.

But that was in the context of some settlement discussions to resolve the budget in that quarter, and I think the document on its face makes it clear that that was a limited confidentiality and that the conduct of the parties before that time, and certainly BP's conduct since that time, has been that the presumption here is that the budget should not be confidential.

We think it's in the public's interest to know what happens here. We think it's consistent with statements that you have made publicly about the transparency of the program, which we agree. We think this program should be transparent and the public and the parties have a right to know how the money's being spent through the administrative program.

So that is essentially BP's position.

**MR. JUNEAU:**

Steve, you want to add to that at all?

**MR. PYSER:**

Sure. Steve Pyser, Williams & Connolly for BP. I think it would be helpful to begin with just clarifying one issue. When we opened, if I heard correctly, I think you said that the subject was whether conferences and meetings about the budget process would be confidential. Our understanding was, and maybe this was incorrect, is that the Claims Administrator, that you were seeking to consider all documents including written budget presentations, the budget information and budget packs that have been given to the parties. That those also would not be provided without an agreement as to confidentiality.

So I think kind of as a first order, we just need to understand more what the position of the Claims Administrator is as far as what is and isn't confidential.

**MR. JUNEAU:**

That's a fair question. It's my understanding under the terms of the settlement agreement, it provides certain language that speaks for itself. What we're supposed to supply, which you would be entitled to, we can supply that, but we, through all these myriad of discussions in an attempt to work with everybody, at the parties'

request, we spanned in the budget submissions that we've given to everybody volumes of information that are normally, in my opinion and based on what I'm told, are normally not provided.

There's a lot of confidential information in there that y'all requested has to do with rates, salaries, real specific information which is not normally incorporated in a budget. And we've been providing that in an attempt to work through and provide the parties with as much information as they could give. And at least it was my understanding that all that was done in the context of these meetings and the confidentiality.

So the question is, if the answer -- not the answer. The issue would be whether or not we would produce it. Yes. We will produce to you in the normal course of business budget information. We wouldn't provide you with the details of which we include even a lot of confidential information within the terms of what you requested in addition. So yes. We would provide it but not to the extent that it's being provided now. Because I don't think that's appropriate or required, if that answers your question.

**MR. PYSER:**

I think in part. I'm just trying to understand a little bit more of what information within the written information that's currently provided in addition to rates and salaries. It's the position of the CEO that it should be confidential. Beyond rates and salaries of vendors, what other information is it your position that should be confidential, that meets confidentiality protection?

**MR. HERMAN:**

You mean absent the agreement that you signed?

**MR. JUNEAU:**

I didn't hear the question, Steve.

**MR. HERMAN:**

I mean, everything's confidential under the agreement.

**MR. PYSER:**

Well, we disagree with that.

**MR. HERMAN:**

I'm just saying basically -- I'm just clarifying. You're saying that's his position absent the an agreement.

**MR. JUNEAU:**

My answer is, beyond what you would

standardly expect to be incorporated in a budget, we included a lot more detail, a lot more information than I think is in the confidential -- and detail which is normally not in a budget request. And that was the reason we provided it under the contract.

I'm not here to articulate each little sentence or diagram of it. We can do that. Eventually, we could show you what a sample budget would look like, but I mean, it would be, it wouldn't contain near like the detail of what you see now regarding a lot of things that I discussed. I just articulated a couple of them for you, but there are other matters like that.

**MR. HOLSTEIN:**

Just I jump in because I think this is getting at the nub of what we're struggling with. And the intent here is try to find a mutually-agreeable solution, because frankly, I don't think we signed an agreement that extends confidentiality to the entire budget process. I'm not aware of any such agreement.

Anyway, with that said, I think for us, Pat, the devil is in the details. Because the settlement agreement says that we have the right to

approve the budget without reasonably withholding that approval, and this is a budget which runs in excess of a hundred million dollars a quarter. That requires some sophistication. It's not, you know, just a couple of line items.

And we agree with you that the materials that you have been providing -- and let's put to the side a minute whether there's a rate card or a salary card that should be treated as confidential -- the level of information you've been providing is the kind of information that would typically, our view is, would be typically provided to underpin a very large budget, a hundred million plus dollar budget.

If you're saying for the most part that's what we would intend to give you but there are some things in there that are confidential, then we need to know what those are.

**MR. JUNEAU:**

Let me flip the question and ask you the reversal. If you're saying that everything that you see is now contained in the budget submission that you gave me, that you're entitled to, then I say that's subject to confidentiality. It doesn't do me any good to piecemeal paragraph one,

paragraph two, paragraph three. Is that your position that everything that you see now is not subject to confidentiality? Because y'all have the budget. Y'all have had them every month. Did you get everything? You've got the budget. You've got all the payment records, everything.

**MR. HOLSTEIN:**

Just so I'm clear for the record. Is this what we're referring to as the budget pack? So in other words, we get a packet from you for each budget cycle, which our team calls the budget pack. Is that what you're referring to?

**MR. JUNEAU:**

I'm referring to that, and you get all the payment schedules with the details that go with that. Y'all get that every month.

**MR. MOSKOWITZ:**

Just to be clear. So we get basically two different -- Keith Moskowitz on behalf of BP. I'm sorry. We get two types of documentation. One would be what we call the budget packs. They are spiral bound. We get them in connection with each meeting. They lay out the budget, and they're all linked to the budget. We separately get copies of invoices, right, from all the vendors. So it's

everybody you bill and the CAO.

So we get a separate stream of documents. And I guess the first question is, just to understand what we're talking about, are we talking about the invoices we get from all the vendors, or are we talking about also the budget packs, what we understand to be the budget packs. I just want to make sure we're clear on that. Is there two different types of documentation we get?

**MR. JUNEAU:**

I'm not sure that I fully understand, Keith. Other than to say you know exactly what we have given you.

**MR. MOSKOWITZ:**

Right.

**MR. JUNEAU:**

Not to evade the issue from anybody's standpoint. My question is, are you saying -- you know what we give you now. Are you saying all of that, no matter what we say, that is not subject to confidentiality? Because if that's the case, we're back to the same issue.

**MR. HOLSTEIN:**

Let me be really clear about out position, because I think it's hard to have this conversation

in the abstract, but let's try. I think our view is, the presumption ought to be that everything we currently receive is not confidential. Now, I say that because there may be some exceptions. You know, we understand, for example, that a rate card for a particular vendor, there may be an appropriate reason for that not to be public. And on an exception basis, we'd be willing to have that conversation.

But our view is, and we think the law is, that the presumption here is that everything you submit to us currently in connection with the budget is not confidential. And more specifically, we have not ever agreed with the exception of the one quarter where we entered into a confidentiality agreement for settlement purposes. We've never agreed that those things should be confidential.

**MR. JUNEAU:**

I think I understand that. Do you want to add something?

**MR. HERMAN:**

First of all, you start with the settlement agreement itself. The settlement agreement has a specific provision. I think it's 5.12.1.4. It defines what BP's entitled to. Within that

information, I assume everyone would agree that some of that information that BP's entitled to under the terms of the settlement agreement should probably be kept confidential. Invoices from the vendors that has specific rates, cost items, whatever they are. I don't know whether people consider that confidential prior to the third or fourth quarter of 2013. I kind of assume that they did, but it is what it is. It was what it was.

That settlement agreement, while it's court-supervised, I think is very distinguishable from other functions of a court in a way that a court works. The main thing being that this is not funded by tax-payer dollars. This is funded by agreement voluntarily by BP as a trust, even though it's supervised by the Court.

If someone were to request salary information about Judge Barbier's clerk, I have no idea whether they would be entitled to that information, but if they are, it seems fairly distinguishable from somebody who's working for a claims program that's being funded by BP versus things that are being supported by tax payers with public funds. So just because the private contractual settlement trust funded by BP is court-

supervised, I don't think that means that the public necessarily has an interest in learning, and I'm not sure why they would care more than just as a matter of passing curiosity, what specifically people who are paid by the program are doing and how much they are getting paid and what they're being paid for. So that's the first distinction under the settlement agreement.

Secondly, there is this kind of notion that because it was intended and agreed by the parties that the frameworks and the determinations would be transparent to class members that therefore everything having anything to do with the settlement program should be transparent to everybody. That's kind of the leap that I think BP has made recently.

We've tried to put forth our position on that, among other places, in record document 13496 at page 4. That cites to some other briefs and emails and other things that have been submitted and are a matter of public record. But the bottom line is, I don't recall ever in any of our settlement discussions having anyone be concerned about transparency to either BP or the public at large. The focus of transparency and the

provisions regarding transparency are so that the class members would know on the front end what the frameworks were going to be that were going to be applied to their claims and on the back end how exactly their claims have been determined or denied. That was the transparency.

And if you look at Mr. -- I don't remember who wrote this letter, either Maria or somebody else, but there's an October 10th letter addressed to Mr. Juneau regarding McGladrey, L.L.P. It talks about transparency and cites the order granting final approval of the settlement. And when you look at that, either what he's citing or she's citing or BP's citing is talking about to permit class members to understand how their claims will be evaluated under the settlement. Not BP, not the public at large.

I did a word search of the order and reasons. Every time the transparency is cited in the order and reasons, which are 125 pages long, this is record document 8138, first at page 8, then at page 55, then at page 81, then at pages 110 and 111, in every case the court is talking about transparent frameworks and this level of transparency permits class members to understand

how their claims will be evaluated under the settlement. That's page 8.

And the other part that's cited from 110 and 111 is, the settlement agreement is designed to be transparent as a claimant or his or her counsel reviews the frameworks relevant to particular circumstances but also sufficiently detailed to ensure that determinations made by the settlement program are objective, consistent and predictable.

All of these considerations of transparency are transparency for the benefit of the class members. Not for the benefit of BP and certainly not for the benefit of the public at large. So then you go to what happened in 2013. We started out under a settlement agreement with whatever section I cited before as to what BP was entitled to. Everything had, to everyone's knowledge, been running smoothly. The budgets had been sufficient, whatever they were for, I think, over a year at that point.

BP started to complain that the budgets weren't detailed enough, and there was a dispute about that. At that point, my recollection is that Judge Shushan suggested that going forward, and I understand and I'm looking at it now, that it was

theoretically only limited to the fourth quarter of 2013 in terms of that agreement. But as a general matter, I'm not sure that she anticipated, or anyone anticipated, that it would take more than one quarter to get things straight.

But in any event, she suggested, I recall, that the parties and the Claims Administrator work with the Freeh Group to try to address some of BP's concerns. That at the suggestion, I think, of either BP or the Freeh Group, I don't know, was expanded way beyond what BP is entitled to under the settlement agreement under that section. And was expanded into not just, quote/unquote, budgetary meetings but other, quote/unquote, workstream meetings.

I think there's a fraud, waste and abuse meeting. I think there's a business process meeting. I think there's a shareholders' meeting. There may be some other type of meeting, and through those meetings BP has been, and to my knowledge continues to be, provided with a lot of information that it's not entitled to under the settlement agreement about budgetary issues under the section 5 provision. But in addition to that, and Class Counsel has objected to these meetings

for probably a year now, gives BP, I think, unauthorized access and at least indirect influence to how claims are going to be processed and evaluated, which was clearly not the intent of the parties and not what the settlement agreement is.

In any event, at the time that all of these workstream meetings started, which are much more expansive, they include budgetary meetings but they also include these other workstream meetings, someone suggested, I think it was the Freeh Group, they said, look, if BP is going to be getting all this information that they don't have access to and I won't, you know, question what BP wants to do or wanted to do or might want to do with the information or why it wants this information to be public now, but for whatever reason it seemed to make sense at the time that if BP was going to get all of this additional access and additional insight and additional information that it should probably be kept confidential out of an abundance of caution.

BP, as far as I knew, agreed to that. Apparently agreed to it only for the fourth quarter of 2013, but when the issue came up again this year, I guess someone realized, or BP made the

argument or something, that arguably the confidentiality agreement was only limited on its face to the fourth quarter of 2013 budgetary issues. It was certainly my understanding and impression all through these workstream meetings and all though these budget meetings that it was intended to be confidential.

And when the amendment that I think Mr. Juneau put in the record, it's signed by somebody from BP on July 24th, 2014, it says, parties acknowledge and agree that all workstream meetings and stakeholders' meeting conducted among the parties whether or not formally designated as such are and shall be included within the definition of settlement meetings and settlement discussions under the September 26, 2013 confidentiality agreement.

So to the extent there was any ambiguity, at least in my mind, that ambiguity was cured and BP had formally agreed that all of the workstream stuff was supposed to be confidential. Which was frankly my understanding all along. BP doesn't want to have budget meetings or workstream meetings anymore. That's great with us. We've objected to them for months now. I'm perfectly happy to cut

them off if the Claims Administrator and/or the Freeh Group think that's best.

But if they're going to continue and the program is going to continue to provide BP with information that it's arguably not entitled to, in my mind definitely not entitled to, then BP should agree to keep it confidential. That's kind of the quid pro quo in my mind.

**MR. PYSER:**

So starting with one thing that I think we need to set straight in terms of what the history here is. BP has never agreed that budget information or budget meetings will be kept confidential. We just fundamentally disagree that that agreement was ever made. As so, I just want to set that as a fundamental principle. Just talking about the budget meetings in the fourth quarter, 2013, first, and the I'll take a step back and go through some of the same documents and information that Mr. Herman just discussed.

So the agreement about the confidentiality agreement, the original confidentiality agreement on September 26, 2013 was signed after the fourth quarter budget information had already been presented to the parties with no confidentiality

provisions. So the fourth quarter 2013 budget was discussed. No confidentiality was involved from any party. No one asked for confidentiality.

It was discussed, and only once there was a dispute and there were going to be settlement meetings and an internal audit was the confidentiality agreement signed in September of 2013 and only as to that quarter's settlement meetings and the internal audit process that was going forward.

So that's what the confidentiality agreement says. The words of it are plain. Going back to 5.12.1.4, the provision in the settlement agreement about BP's approval of the budget, reasonable approval of the budget, the end game of that provision is in the last sentence which is oversight by the district court.

So the analogy that was just drawn to clerks' salaries or court personnel salaries, I think, is a completely false analogy. Because what we're dealing with here is the budget of the program subject to reasonable approval. And if BP wants to challenge the budget, that's done through the oversight of the court; and there's no rationale in the settlement agreement, or anywhere

else, for that court process to be done in secret. And the evidence of all parties' understanding in 2013 that this budget process should go forward in public, in the public's view, is evidenced by the way it proceeded in 2013.

So if we go back to August of 2013, what we have is a dispute about the budget. August 7, 2013 there's a hearing before Magistrate Judge Shushan. The budget is discussed in open court. No one attempted to close the courtroom, keep people out, keep the public out because it's oversight of the court. And the default, when there's oversight of the federal courts, the default position is non-confidentiality. The default position of courts in the United States is that the public has a right to know.

And that applies to this court's supervised settlement program as it does to any other trial or court proceeding in the United States. And unless there is a good cause, as defined in Fifth Circuit case law for confidentiality, there is not confidentiality. So that's the default position. And you can see that process go forward in the August 7th hearing as the parties discussed in open court the budget and in the order that Magistrate

Judge Shushan handed down laying out a process for the parties to address budget issues going forward.

So for example, the order explained that the parties were to agree to a format of a budget and documentation and analysis to support the budget request. Proposed budgets were to be provided to BP and Class Counsel in advance. Both parties were to have an opportunity to suggest comments and revisions. Updates made by the Claims Administrator after those comments were to be shared with the parties and after there had been this dialogue envisioned in the August 7, 2013 order of the court, and that's docket 10955, once that had been done, remaining issues were to be brought to the court's attention.

Again, none of this said remaining issues were to be brought to the Court's attention somehow in secret. It was all envisioned to be done publically. No one asked for any confidential treatment at that time, and in fact, shortly thereafter on August 16, 2013, the CEO of the claims facility wrote a letter explaining transparency and what the claims facility in August 2013 saw the budget process looking like going forward.

And unlike what we just heard from Class Counsel, transparency was never intended to be limited just for the views of claimants. And the exact quote, and this is at docket 11401-3. It's a letter dated August 16, 2013. It says, and this is the claims facility speaking, "We are committed to continuing full transparency into our financial processes on the program and will continue an open dialogue with BP, PSC and the Court throughout the process."

So the understanding in August 2013 was that transparency was not limited to just what certain claimants or Class Counsel wanted, but transparency was a feature of the program as you, Mr. Juneau, have repeatedly said, and this is a good thing, that the program should be transparent. Transparent to the public, transparent to BP, transparent to the PSC.

So that was the understanding in August 2013. That's how the third quarter and fourth quarter budgets were handled. And there was also a comment that Class Counsel just made that they weren't sure, and I apologize if I don't get the language of your statement exactly right, that the agreement as to how the budget would be presented

was limited to just one quarter.

That's not consistent with the record where in the course of the August 2013 hearing and the subsequent order, we believe, and I think the record shows, that this was a procedure that Judge Shushan put into place and then spoke about the fact that in the future the budget should be provided at least 60 days in advance. And that allowed both parties to meet in a non-confidential way, have a budget process and allow both parties to have their say into the budget and, if there was a dispute, then go to a public forum in the Eastern District of Louisiana and have that dispute in public.

So there has never been any agreement by BP that we wouldn't have these budget issues aired in public. We think it's a fundamental part of the Court's supervision of the program, and we ask that the public proceeding and the budget information that's necessary for BP to reasonably evaluate a budget worth several hundred million dollars, or over a hundred million dollars a quarter, that that information in that dialogue continue in a public fashion, in a non-confidential fashion.

**MR. JUNEAU:**

As I'm gathering from the comments of the parties and the dialogue we've had here today, I'm not hearing a unanimous agreement as to what the resolution of this issue would be. As I appreciate the terms of the settlement agreement, if we have such a circumstance that arises from a panel hearing, then I can refer this matter to the court, which is appropriate to do, and let the court address the issue.

So that's what I'm going to do in this matter. I will refer this matter and the Court will set whatever it deems necessary.

**MR. ROY:**

Steve, just as a courtesy, what was the date of the hearing with Magistrate Shushan that you were referring to? That was the one, Keith, we were at, I believe.

**MR. MOSKOWITZ:**

Sure. It was August 7th.

**MR. PYSER:**

I believe it was August 7, 2013.

**MR. ROY:**

That was the one where Mr. Juneau called a couple of witnesses and put some evidence on. And just so we're clear, BP sees nothing about that

hearing that it believes should have been confidential. Is that my understanding? I'm just trying to understand your point. It's an open courtroom, so is it your position that everything discussed, admitted into evidence or anything else that day at that hearing should be public? I just want to be clear.

**MR. PYSER:**

Well, our position is that the budget process generally is non-confidential. So I'm not sure if there's a particular document you're referring to that you want to point my attention to. I can answer potentially whether a particular document, but as a general principle, there's no basis in the settlement agreement or in law for budget information to be confidential.

**MR. ROY:**

All right. I'm not trying to make a point except I want to be clear. You are not saying that everything that was submitted that day or offered that day should be a public document. You just don't know and you're not making a comment, and that's okay.

**MR. PYSER:**

I'm not going to comment in the abstract.

If you have particular documents.

**MR. ROY:**

I didn't bring them with me.

**MR. MOSKOWITZ:**

Jim, I think -- this is Keith Moskowitz, again. I think you put your finger on the question that's unanswered in this room which is, if there are specific elements of the budget information that a claim for confidentiality can be made over, we're open to hearing about what those are. We're not saying that there's no element of the budget that might have a viable claim of confidentiality. Whether it does or doesn't is going to depend on seeing what it is.

And so the question here -- and this is why, frankly, I'm not tracking the absence of potential unanimity of consent in the panel process -- are we talking about elements of the budget that a claim is being made? And that's confidential information. That's a vendor's proprietary information.

Okay. What is it? Let's look at it. Versus are we having a dispute over whether everything in that budget is entitled to a claim of confidentiality? What is the dispute we're having

here? Which one is it?

**MR. ROY:**

Let me ask you this. Once again, I have a point.

**MR. JUNEAU:**

No. Go ahead.

**MR. ROY:**

I mean, by that response, and I'm not trying to cross examine you, Keith, but by that response, my perception is, BP recognizes there are some things -- we may not be able to agree right now. We may not be able to argue it -- but there are some things that should remain confidential. Let's just assume, it may be wrong --

**MR. MOSKOWITZ:**

Stop there, sir. So there's something that may be confidential. If an argument could be made in advance, let's say, this piece of information is some highly proprietary business information of a vendor they claim confidential, we would evaluate it. Whether we agreed with it or not would be the subject of the evaluation.

We need to be looking at that information as opposed to saying the entire thing, everything in that budget, which is what I'm hearing Class

Counsel taking the position today. I'm hearing the Claims Administrator take the position. Every single piece of information in that budget. If I go up to Pat right now and sat with you, you're taking the position that every single page, every shred of information is confidential and should be treated as such. That's the distinction I'm trying to draw.

**MR. HERMAN:**

Steve, for two reasons. One, because there's an agreement that says that, and two, because it doesn't make sense in terms of time, money, effort, et cetera, for us to dispute with you and/or the Claims Administrator on a document by document basis what in the budget is going to be confidential and what isn't. That is the purpose of having a blanket agreement so you don't have to fight about all that stuff.

If you guys or someone wants to revoke the agreement and go back to some other process, then I guess we could do that. But (a), it should be limited to what BP's actually entitled to under the settlement agreement; and (b), I see a huge difference between the argument that BP's paying the bills, BP is therefore entitled to have some

transparency into what they're paying for and that within reason is outlined in the settlement agreement. And up until today, frankly, that's been true.

Mr. Juneau has given BP a lot of transparency. In my mind more than they were entitled to into what BP is paying for under the settlement agreement. BP doesn't seem to be arguing about that transparency, though. What BP is saying is, it's not enough that we get the information so that we know what we're paying for. We want to go an additional step and put that information in the Louisiana record or the New York Times or the American Zombie or whatever BP wants to give it to.

I see a tremendous difference between saying that BP should be entitled to reasonable transparency and reasonable information about what it's paying for versus saying that the general public should be entitled to the information. And I see a big difference between a hearing in front of Judge Shushan in an open courtroom versus a meeting which is classified as a settlement discussion or a settlement communication between the Special Master, the Claims Administrator and

the two parties trying to come to some resolution on disputed issues. And the fact that an open court proceeding is presumed to be public, I don't think translates at all into a, quote/unquote, workstream meeting that isn't even envisioned by the settlement agreement itself.

**MR. HOLSTEIN:**

Mark Holstein for BP. You said a lot of things that were your opinion. I respect that. You're entitled to your opinion. We have ours. You keep making reference to an agreement, and frankly, I don't know what you're talking about. BP has not ever agreed that the budget process would be confidential. So if there is a specific agreement, I'd appreciate it if you can tell us what it is.

**MR. HERMAN:**

It's my understanding, interpretation, intent of what somebody from BP signed on July 21st, 2014 that's called Amendment to September 26, 2013 Confidentiality Agreement. That document.

**MR. HOLSTEIN:**

You mind if I see that?

**MR. HERMAN:**

Yes. Sure.

**MR. ROY:**

It's part of a package Mr. Juneau circulated, CA #1.

**MR. HOLSTEIN:**

Well, I recognize the signature. It's mine. So this was in the context of the workstream meetings, and I think it's been clear to us, and frankly, I think it's been clear in the context of the documents that that did not include the budget process. There were separate documents covering the budget process. This refers to the meetings he listed out earlier; fraud, waste and abuse, the stakeholders' meetings, the IT meetings. Those are what we've characterized as workstream meetings. We signed this document. We live by this document.

**MR. PYSER:**

I guess for clarification, Class Counsel has taken the position that the document entitled "Amendment to September 26, 2013 Confidentiality Agreement" which discusses workstream meetings and stakeholder meetings as Mr. Holstein just described would also somehow reach out and reach the budget process. And what BP seeks to understand from Mr. Juneau is whether you share Class Counsel's position or whether you agree that the budget

meetings, which occurred long before this July 21, 2014 meeting, are separate and apart from this agreement.

**MR. JUNEAU:**

I'm talking to counsel here just a minute. I think the confidentiality agreement, the whole concept of what they were doing incorporates these budget meetings we've had. It started. We were getting ready to have a budget meeting and I think our CEO here said we need to have a confidentiality agreement. BP said they weren't going to sign it and put their spin into where we are. So I do think it was contemplated by the confidentiality agreement that was at issue.

Let me put something on the table for you that I think would be productive. I can send to both parties a budget data that we think would comply to what I said originally, contrary to what one of y'all said a minute ago, about what we did produce. I acknowledge part of what the obligations are. I said that, contrary to what one of y'all said I didn't say that. I think we can provide you with data we cited would be the solution and we would normally make under this.

The rest of the stuff in the meeting would

be confidential, and then you can tell me, you can tell me, or both sides can tell me whether or not, whether or not, for instance, from BP's standpoint if they're satisfied with that as a compliance or not. And if not, why not. That's on the BP side.

I've got two people I'm dealing with here. On the plaintiff side, the plaintiff may say, I don't know what you're going to say, Mr. Herman. You may say that data you shouldn't give. And if we have that, we're kind of back to square one in the dispute of things.

So what I'm going to do is, I'm going to send to both parties a type of document that I say would reflect the data that we would normally produce in normal operations. It wasn't generated by all these various meetings in an attempt to get as much information as we can. And I would ask that within -- we'll try to get that out, what's today, Wednesday. We'll try to get that no later than Friday. We'll have that out to the parties no later than Friday, and I would say by Wednesday of next week.

BP tells me whether that's acceptable or not. If not, I respect that. That's their right. Mr. Herman can voice his opinion if not. And then

I'll see whether I just got to formally refer this or not, but I think that's about as open as I can make the information.

**MR. HERMAN:**

It sounds logical to us.

**MR. ROY:**

It seems responsive to your objection because your difficulty is articulating something in the abstract, if I understood you correctly. This brings it right square on specific bits of information.

**MR. HOLSTEIN:**

I think so. I mean, look, we'll look at it, right. I think if what you're saying is, here's a package. This is what we propose to give you, whatever the time frame is, 60 days before we have to approve it and that the contents of this package are not confidential. We'll look at it and we'll tell you. I think you're right, Jim. I think that does give us an opportunity to consider it.

**MR. JUNEAU:**

Look, I live in the Wall Street Journal, okay. What I'm trying to work with you two parties to lay it on the table, I'm trying to get you, when

you say it's not confidential, I'm giving you a document that's put in the context of trying to work this thing out.

**MR. HOLSTEIN:**

I understood that.

**MR. JUNEAU:**

Well, I didn't.

**MR. HOLSTEIN:**

Let me try and be clear then. I apologize.

**MR. JUNEAU:**

What I'm trying to do, and if not I'll just cut the thing down right now and refer it to the court. I'm trying to be cooperative.

**MR. HOLSTEIN:**

My point is, it's not my intent to convey that what the exemplar you send us is intended to be public.

**MR. JUNEAU:**

I'm putting it out to the parties with the agreement the parties exemplar -- I don't have to define it for y'all -- is confidential at this point so that you can weigh it. I'm just telling you.

**MR. PYSER:**

With no further agreement about

confidentiality or waiving your rights in any way --

**MR. JUNEAU:**

No. You can still reserve --

**MR. PYSER:**

-- we'll accept the exemplar.

**MR. JUNEAU:**

That's fine. I'm all right with that.

**MR. PYSER:**

Go ahead. Finish.

**MR. JUNEAU:**

No. I'm through.

**MR. PYSER:**

I guess a lot of attention has now focused on this July 21, 2014 amendment to the confidentiality agreement, and a question that we're trying to understand is, there were budget documents and budget meetings for the third quarter of 2013, the fourth quarter of 2013, I believe, the first and second quarters of 2014. That all occurred before this July 21, 2014 amendment.

What is the position of the Claims Administrator's office as to those documents that were given to the parties, budget documents that were given to the parties and budget meetings that

occurred with the parties prior to this July 21, 2014 agreement? And by saying that, in no way does BP agree that this agreement limits our rights or calls the subsequent meetings confidential.

But I mean, if this is the keystone for when supposedly confidentiality became an issue, is everyone in agreement that prior to signing this agreement none of the budget documents or budget meetings were confidential?

**MR. HERMAN:**

That wasn't our understanding or intention.

**MR. JUNEAU:**

What did you say?

**MR. HERMAN:**

I said, that certainly wasn't our understanding or intention. I don't know if you ever went back and looked at the exact language of the previous document, but we always understood that as these meeting went on longer than we thought they should have that the same confidentiality would apply. And it was brought to our attention that, I guess, BP was alleging that there was some ambiguity. Then I thought that was the entire reason of this document was to avoid the exact hearing that we're sitting at right now to

eliminate the ambiguity.

**MR. ROY:**

It's not that we ever marched exactly in sync. I've got a little bit different recollection. My recollection is things were so toxic, you weren't here then, things were so toxic, not between us personally but between the parties and everything at this juncture, that I believe a member of the Freeh Group suggested that there be some kind of confidentiality agreement in order to even get everybody to come into the same room and be willing to open their mouths and attempt a candid conversation without fear of reading about it in the New York Times.

**MR. PYSER:**

I'll let Mr. Moskowitz speak to BP's understanding at the time.

**MR. MOSKOWITZ:**

I think we're mixing and matching the original agreement and the amendment. The amendment arose when the Claims Administrator's office was in the process of attempting to schedule what the Claims Administrator's office has been referring to these policy 495 meetings. So Randy Black, the CEO of the facility, had set up these

policy 495 meetings.

In connection with scheduling the 495 meetings, Mr. Black asked the parties, are you treating these meetings as confidential, okay. Because he apparently had looked at the original confidentiality agreement, and as it said on its face, it doesn't absorb such meetings. It doesn't cover them.

I mean, we've talked here at length about what the language is. It speaks for itself. And in an effort to facilitate the 495 agreements, but over its objection, BP has consistently taken the position that all of its meetings with the facility ought to be non-confidential, okay. It's consistently taken that position. It's never wavered in that position.

But in the choice between not having the 495 meetings at all or having them subject to confidentiality, because that was the choice, one might say it's a Hobson's choice, but that was the choice, BP made the decision to treat the 495 meeting as a confidential workstream meeting. And because the confidentiality agreement doesn't speak of workstream meetings -- as Mr. Forsyth recognized in his email that he sent to the parties on

September 10th, it doesn't say anything about workstream meetings. It doesn't say anything about stakeholder meetings -- the Claims Administrator's office drafted this amendment to confirm that these policy 495 meetings, if that's what brought this about, would be treated in the same way as workstream meetings where, again, BP doesn't believe those are or should be confidential but is given a choice to say you can either have them, if they're confidential, or you can't have them at all.

That's how the amendment came about. The amendment had nothing to do with the budget issues at all. It wasn't even something that was raised when this was brought up. It was squarely -- and then indeed if you go back and look at your emails, you'll notice that the agreement was executed on the eve of the next policy 495 meeting. And basically, the parties moved quickly to put this in place so that the policy 495 meeting could go forward.

Otherwise, it was going to get pulled because there's always been a quid pro quo, if you want this transparency into the facility, you have to agree to keep it confidential. If you don't

agree to keep it confidential, you don't get the transparency.

**MR. PYSER:**

Appreciating the difference of opinion there, there was an original question that I wanted to hopefully address at the Claims Administrator's office, which is, this amendment is dated July 21, 2014. So what is the position of the Claims Administrator's office about the budget documents and budget meetings that occurred prior to anyone signing this amendment, of which there were some documents.

**MR. JUNEAU:**

That's not an issue before me today. I mean, you want me to give you a legal argument one way or the other. I'm here to address the issues that we've been presented on the table here. There's a dispute between the parties. That's what we're here to do. You can take it up. I'm not going to respond to that because I don't think that's an issue before me. And that's the answer to your question.

**MR. PYSER:**

So the reason why I think it's a pertinent question, respecting your statement, is that Class

Counsel has put forward the view that the basis for future budget meetings being confidential is an agreement signed July 21, 2014. If BP is correct that this amendment does not govern budget meetings, that it is limited in a way that does not include budget meetings, is there any other basis that the Claims Administrator's office claims makes budget meetings confidential?

**MR. JUNEAU:**

Is there any other basis? Other than what I've articulated here today?

**MR. PYSER:**

Other than the July --

**MR. JUNEAU:**

I've stated what my opinion was, what I thought was incorporated. I haven't stated any other reason other than what I put on the record here today.

**MR. PYSER:**

And I apologize if I'm not understanding you correctly, but is there a basis for the claim of confidentiality over budget documents and budget meetings other than the amendment to the September 26, 2013 confidentiality agreement dated July 21, 2014?

**MR. JUNEAU:**

Well, before I answer that question, if I can, I'm trying to read between the lines. Is the purpose of this thing to take these documents, or whatever they are, and use these documents beyond administration of this case and for the benefit of the parties to use in some public -- I'm getting a disconnect with the public discourse here. That's what I don't understand. Show me anywhere where it says that these documents should be out in the public? What justifies that other than your statement that this is a court-supervised program? That's where I'm having the disconnect.

**MR. PYSER:**

I think where we're disconnected is that BP's position is that documents like the budget documents are not confidential unless there's a reason for them to be confidential. So what I'm asking is, what is the reason why budget documents and budget meetings would be confidential beyond this amendment which we have our dispute over?

**MR. JUNEAU:**

This office has responded on multiple occasions to the request for more detail. I can remember talking to Mr. Holstein on several

occasions about it. We need more data, more information so that we can assess how this affects BP financially. I responded to that, and we have submitted an extensive budget. Just explain to me why for your analysis and for BP's consideration. We have given you what you've asked for. Why is that not enough? Because you've got what you've asked for.

**MR. HOLSTEIN:**

Mark Holstein for BP. I don't think we've said it's not enough. I think all we're saying is, we don't agree with the proposition that that information should be confidential.

**MR. JUNEAU:**

Here's my question, Mark. What do you want? You've got the information to analyze and do whatever. What do you want to do with that data? I mean, it's the data you requested.

**MR. HOLSTEIN:**

There are lots of things we do with the data.

**MR. JUNEAU:**

Explain it to me.

**MR. HOLSTEIN:**

Well, I don't think that we need to. We

don't think that the law requires us to explain what we're going to do with the data. We can use that data -- our position is that this is non-confidential information and we can use it for any legal purpose.

**MR. HERMAN:**

But I think the other disconnect is that you're looking at now retroactively instead of how it developed from the outset. It developed from the outset with the understanding and agreement by everyone that it was confidential, and there is some agreement evidencing that from whatever the date was, September 26, 2103.

So the meetings go on and go on and go on with the understanding and agreement that all of the information is confidential, and that was, in my mind at least, to my understanding, confirmed, clarified in July 21st. It didn't come into effect on July 21, 2014. All this did, in my mind, was just clarify the agreement that everybody had been operating under for almost a year already.

So BP never would have gotten the information in the first place if BP had said from the outset, we don't necessarily just want this information to evaluate the budget, we want to give

it to the New York Times or give it to whoever we want to give it to. So to come back now and say, oh, well, you know, we never signed this agreement until July of 2014; therefore, everything you gave us before that is fair game is a disingenuous argument.

**MR. HOLSTEIN:**

Mark Holstein for BP. We're not saying that at all, Steve, and I think you're misrepresenting actually what we said. We have not said that that agreement that you just referenced in July of 2013 included the budget information.

**MR. HERMAN:**

I understand.

**MR. HOLSTEIN:**

We don't think it does.

**MR. HERMAN:**

Well, I understand that.

**MR. HOLSTEIN:**

Now you're making reference to some prior agreement where we've supposedly agreed that the budget information be confidential.

**MR. HERMAN:**

You clearly did.

**MR. MOSKOWITZ:**

Well, read it. What budget information does it define?

**MR. HERMAN:**

It defines the fourth quarter 2013 budget information.

**MR. MOSKOWITZ:**

Exactly. Exactly.

**MR. HOLSTEIN:**

And we honored that.

**MR. PYSER:**

Actually, a little bit more. It's the settlement meetings after there had already been budget information presented for the fourth quarter of 2013. So I think I've come back --

**MR. HERMAN:**

So the settlement discussions continue. You go to the next quarter. Nobody at that time went back and got a new confidentiality order. Nevertheless, everyone, except perhaps BP, was operating under the assumption and intent and agreement until today. I mean, you guys never published this stuff for a year.

**MR. ROY:**

Let me make an observation. Are we at the point here where we're never going to agree on

intent and in the past but we can agree that going forward whatever budget information and reports Mr. Juneau gives us, you and us, in order to review and approve a budget request that that package, that initial package, is going to come from Mr. Juneau in a format that he feels is not confidential? And if there's something else that's needed in addition that BP wants, seeks, whatever, then individual battles get fought over individual documents.

Is that generally where we are? Because all this discussion about the past, isn't it kind of moot if we're agreeing going forward on that format? I mean, we don't have to resolve it. I don't know if we're ever going to resolve it.

**MR. HOLSTEIN:**

Mark Holstein for BP. A fair observation, Jim, I think we've agreed we'll look at what Pat sends across. We've agreed we'll keep the exemplar non-public and we will respond on the basis of the exemplar whether we think it's sufficient or not. I can't evaluate that sitting here nor can you. But we're prepared to do it that way.

**MR. ROY:**

Is that what you're proposing, Pat?

**MR. JUNEAU:**

That's exactly what I'm proposing.

**MR. MOSKOWITZ:**

Keith Moskowitz. Just to be very clear, in agreeing to look at the exemplar, going through the perspective exercise, we fundamentally disagree that the budget meetings were ever part of any earlier agreement. Just to be clear, so we're not back and forth.

**MR. JUNEAU:**

I understand the fundamental disagreement -- that we fundamentally disagree that you disagree.

**MR. HERMAN:**

We haven't said we disagree. We just disagree with them.

**MR. MOSKOWITZ:**

Right. Something like that. Who's on first. And the second point being that we disagree more broadly, just to be very clear, because it gets lost in the translation of the agreements and the like. We fundamentally disagree more broadly that information about the program, budget or otherwise, should be in a blanket fashion treated as confidential, to go back to the point Mr. Pyser made earlier, to the extent that there's

information that a party contends deserves confidential treatment.

The process of evaluating that information under the norms that govern this circuit ought to be applied. Because what I'm trying to avoid here is any suggestion that by agreeing to go down a process of looking at specific information and saying is this acceptable and maybe something else we want is not, that we're in any way moving away from that general proposition I set forth. Just to clarify that.

**MR. PYSER:**

This is Steve Pyser for BP. And just to build on what Mr. Moskowitz just said, what I'm still trying to understand both from Class Counsel and more importantly from the claims administrator is, is there any basis or claim for confidentiality over budget information beyond the September 26, 2013 confidentiality agreement or the subsequent amendment. Understanding, of course, that BP does not agree that those confidentiality agreements cover budget information.

But if we put those out of the way, is there any other basis under which the Claims Administrator is claiming that the budget

information that's been presented is confidential?

**MR. JUNEAU:**

I'm sorry you don't like my previous answers, but I'm going to make it short. We have obligations, this office has an obligation to provide certain budget information which I have indicated and am indicating we would conform to. I'm telling you that the additional information, the detail of information is the result of all these numerous meetings in an effort to cooperate with everybody and give people information. It's far beyond which would be in a normal budget submission.

So I'm saying if in the context of all the things -- you weren't here -- to get the parties together, to see if they could get together and exchange information and hear information and get data that you normally wouldn't get and it was done in that setting -- what's the rule, 408 of the Federal Rules or something is very akin to that -- in an attempt to do that. That's what we're trying to do.

With that backdrop in addition to the answer I just gave you, that plus the bases I gave you, my understanding, what the parties were trying

to do with this agreement is the basis of what I'm saying confidentiality should apply to. I don't know how to answer it other than to tell you that way.

Let me make this one comment. I'm hearing this. There's a broader issue for me that I'm hearing in this discussion, and it's even broader than even the budget discussion we're talking about. I'm talking about the confidentiality argument. And the reason I say that is because it just came up.

I've seen the exchange of documents so forth and the recent submission by BP to the court on the seafood distribution, the second seafood distribution. There is a reference to comments and statements that were made in some of these meeting and stakeholder meetings. My take on that is, that's just my take -- I mean, people can argue this one way or the other -- I think that's a violation, it seems to me, that's a real serious question if that's a violation of the confidentiality order.

And the question I'm having and I'm struggling with as I sit here today when I read that yesterday is, what should I do about the

presently-scheduled stakeholder meetings until this dawn issue is resolved. I'm going to get to the court and get the issue resolved. I'm just putting that issue on the table for you because it's something that's of grave concern to me as I speak here.

And I'm not pretermitting people's positions to say it is or is not. That's for the court to decide, but I'm just being up front with y'all. That is a concern that I have as I'm sitting here hearing this argument today. I've indicated to you what I'm going to do about the submission of the exemplar document. Y'all can respond to me, and if you've still got a difference of opinion, can I get agreement, Mr. Roy, that I would refer that precise issue to the court?

**MR. HOLSTEIN:**

Just to be clear -- Mark Holstein for BP. Just to be clear for the record, the materials which you refer to in the response to the Special Masters, anything to do with workstream meetings we filed under seal.

**MR. JUNEAU:**

But, Mark, I'm questioning whether even the submission of that document, be it under seal or

otherwise, I mean, even under seal, I'm questioning whether or not that's a violation of the confidentiality. It's not for me to make rulings. It's a concern to me. People can go argue about that, but I'm just telling you. I can't be any more up front, and I'm telling you things that are on my mind and I'm looking at. Because we've got meetings scheduled next week.

**MR. HOLSTEIN:**

I just wanted to be clear for the record that we recognize that obligation --

**MR. JUNEAU:**

And I understood that.

**MR. HOLSTEIN:**

-- and we filed it under seal.

**MR. JUNEAU:**

I understood it was redacted. I understand that. I'll recognize that.

**MR. HOLSTEIN:**

You didn't say that in your comments.

**MR. JUNEAU:**

What's that?

**MR. HOLSTEIN:**

I just want to be clear.

**MR. JUNEAU:**

No. That's fine. Well, you know what I'm going to do about the, the changing in short order the matter about the exemplar. Let me then move now, if I can, to there's a second matter which we have before us, and that has to with the dispute we're having regarding the McGladrey report. I think it may be instructive for everybody before we even -- I have told, through our people, I have told both sides, and I'll telling y'all again today, we do not have, and I can't make it any clearer, do not have the final report from McGladrey. I want to make that clear.

Once we got that report, I told you the process that we would go about addressing that. I think it would be instructive, in all due candor to people, let me tell you where I perceive we are today. I'm waiting for this report. So I'm making inquiries. If you want, we are told by McGladrey that they intend to provide us with a final report by the time of our next audit committee meeting which is set for November 14th. This is the information I got.

I'm depending on me getting the information, but I'm trying to be up front with you. This is what I'm told. After McGladrey

presents their report to the audit committee, it's my intent, as I've said previously, to present that report to the Court and we will follow the instructions of the Court.

What I'm supposed to do, I'm subject to oversight of the Court as to distribution. I do know distribution was made when they sealed that report. After it was submitted to the Court, the Court directed me to give it to both parties. I think the Court may have even sent it to both parties. That's where we are in that regard.

The second point is, I'm going to give that final report to the Court. I think that's what's appropriate on my responsibilities and duties, and if the Court tells me I'm supposed to produce something more than that, I'll do whatever the Court instructs me to do. I just want to lay that on the table so everybody knows time lines and things.

Now, let me define that when I say time line, I'm having to establish a time line based on when somebody's telling me they're going to give me the report. So you'll know I'm based on this information that we have. Now, kind of with that said, let me come back to the issue before the

Court. I have the letter from Randy Latta that's dated October 10, 2014 concerning this issue. I have the response that I made on October 16. After that exchange of emails, Mark Holstein had sent me and email on October 17 and I responded on October 21, and attached to that is the actual agreement with the Claims Administrator and McGladrey.

I thought that these were relevant documents to what this issue is before this panel here today. And I'm going to mark that as CA #1 in connection with the McGladrey issue. And I'm going to hand that to the court reporter. And I'm handing copies of the respective documents to the parties now. That's where we are, and I'm going to throw it open with kind of the same process we followed in the past. If people want to add to the comments that I made, they can certainly do so. That's where we are. Let me start. I started with you first, Mark. I'll go with Steve to the PSC board.

**MR. HERMAN:**

Well, my recollection, and I could be wrong, is that there's really nothing in the settlement agreement that either entitles BP to demand an audit or conduct an audit or require the

Claims Administrator to undertake an audit. That the Claims Administrator on his own initiative got an audit from Clifton Larsen Allen. It was part of the way done, and BP objected to that audit for some reason. I don't know why. And at BP's urging, the Claims Administrator decided to discontinue that audit, and at BP's urging, the Claims Administrator agreed to undertake to get a new audit, even though BP really had no right under the settlement agreement to demand it or Pat had the obligation to undertake it.

There is a lot of discussion about the scope of the audit and who was going to do it, and my recollection is that BP, at least implicitly if not explicitly, agreed to the auditor, the scope of work, the audit agreement, which is attached as an exhibit, and based on the meetings I recall being in, it was very clear that the client was going to be the trust, slash, settlement program and not BP.

If you're looking at this submission by -- the declaration of Maria Travis which was submitted under seal, paragraph 9, the revised McGladrey agreement contemplates that BP and Class Counsel may have access, not shall have access, but may have access to the results with the approval of the

Claims Administrator.

If you look at paragraph 14, Mr. Latta said that the results of the McGladrey operational audit are necessary to allow BP and Class Counsel to determine if the settlement program has processes and controls in place to implement and administer the settlement agreement, and the parties have a right to know if there are systemic inaccuracies in the claims processing that require correction.

I understand that's his position, but it doesn't cite any provisions in the settlement agreement that actually support that, and it's always been our understanding, and this has come up in meetings before, that KPMG and/or Alix Partners or others are already auditing all of the claims anyway. So if there was a problem or a variance or whatever, then BP would certainly know about it and it would be reflected in their appeals, which I guess to some extent it is.

If you look at the actual agreement, the parties are the trust and McGladrey as the vendor. BP's not a party to it. When you look at paragraph 5, which I guess is what Ms. Travis was referring to, "Vendor shall provide to the Claims Administrator, and with the permission of the

Claims Administrator, to Lead Class Counsel and BP, any reports" -- and I understand that there aren't any, but -- "any reports arising out of the Scope of Services, requested by the Claims Administrator."

So I don't know how there could be an obligation to provide reports that don't exist, but even if the reports did exist, BP really has no right to them. There's a confidentiality provision under paragraph 8 as well as security requirements and claimant information handling requirements in section 11 of the agreement. There's a limitation on the rights of third party beneficiaries, and that, again, makes it clear that it's for the sole benefit of the Vendor, the Settlement Trust Trustee, and the Claims Administrator, and only to the extent applicable, BP and Lead Class Counsel.

There is a notation of BP's right to object, and presumably they've done that in accord with that provision. But it doesn't give them the right necessarily to get all the work papers, et cetera. I recall at some point BP did object to the audit, and our response was, well, there's nothing requiring the audit. If you don't want to do it and you don't want to pay for it and you

don't want to go through with it, then pull the plug. And BP apparently decided not to do that at that time.

And if you look at the signatories, it's just the settlement trust, the Claims Administrator and McGladrey. BP's not a signatory to the agreement because they're not a party. From our point of view, the Claims Administrator has thus far handled things correctly and BP has no right to any additional information.

**MR. HOLSTEIN:**

Mark Holstein for BP. I think there are a couple of things where you may have gotten the facts a little off, Steve.

**MR. HERMAN:**

That's probably correct.

**MR. HOLSTEIN:**

I know you said it was your recollection. I think Keith will clear up the record, but just a question. Is it Class Counsel's position that the public, including BP, of course, but the public is not entitled to the results in the McGladrey audit in whatever form they come and whenever it comes?

**MR. HERMAN:**

That the public is not entitled to the

results. I don't know why the public would be entitled, using the general sense, to the results. I'm not necessarily saying that it would be terrible if they got the results. I don't know. It depends what the issue is. But I don't know what gives the public a legal right to the results of the McGladrey audit, if that's your question.

**MR. HOLSTEIN:**

Well, I guess my question is slightly more direct, which is, is it Class Counsel's position that when the Court has possession of the McGladrey audit report that it should not be a public document?

**MR. HERMAN:**

I think it's Class Counsel's position that the Claims Administrator's suggested protocol is correct. He should provide the report to the Court and the Court should decide to what extent it should be made public. And Class Counsel, I would guess, would defer to the decision of the Court at that time.

**MR. HOLSTEIN:**

Okay. So let me try again because I think the point of a panel meeting is to see if we have common ground or not. And maybe you don't want to

answer the question, but my question is simply this. What is Class Counsel's position? Of course, you're right that the Court will decide. We get that. But what is Class Counsel's position? Should this be a public report or not?

**MR. HERMAN:**

I don't have any thought about it. I don't think that the public in general has an interest in the claims process. I think the class members have an interest in the claims process. I think that BP has an interest, you know, in the claims process. I don't think just average Joe Q public walking around has any interest in the claims process. So does he need the information or she need the information, no.

**MR. HOLSTEIN:**

Thank you.

**MR. HERMAN:**

And that's my personal feeling. You know, people find out about a lot of things that they really have no interest in. It's just part of living in the universe in the 21st century.

**MR. MOSKOWITZ:**

I just have a few things. Keith Moskowitz on behalf of BP. Just to clarify a few things on

the record. With regard to the auditing of the facility, BP has taken the position since the outset of the program that the program should be subject to both internal and external auditing functions that are commensurate with an operation of this size, scope and nature and directive. It's the position we've shared with the Claims Administrator since the outset of the program.

The Claims Administrator has put in place both certain internal and external auditing. BP has always taken the position that both that internal and external auditing should be made available to the parties and the public because of the nature of this particular settlement facility. BP has been provided with certain internal audit reports from earlier in the program. But the Claims Administrator has since ceased sending those reports to BP. I don't know if they've been sending them out to --

**MR. JUNEAU:**

Repeat that last. I just didn't hear the last part.

**MR. MOSKOWITZ:**

I said the internal auditing, we got three quarters worth of internal auditing at the outset

of the program. And then the provision of that internal auditing to BP, and I presume Class Counsel, I don't know what they get or don't get, stopped. And we have been requesting copies of those internal audit reports through the course of the workstream meetings, and I've been told that they will not be provided to us.

Since we're here today, we will reiterate our request to receive copies of those internal audit reports. With regard to external auditing, BP did raise issues with the CLA, or Clifton Larsen Allen audit report. Those were reflected in a letter submission that BP made to the Court on or about June of 2013, if I have the dates right. And that letter submission was the first in what became a number of submissions to the Court regarding the need for an audit, a rigorous external audit, a comprehensive external audit of the facility to address a number of issues.

And those issues included issues raised in the reports submitted by Judge Freeh, Special Master Freeh, to the Court, as well as auditing related to the budgeting and operation of the facility. It covered those, and that's all been documented in BP's submissions. BP reiterated that

request in connection with the Q3 2013 audit and again in papers filed with the Court with the Q4 2013 audit. And indeed if you go look at the Q4 2013 filings, you'll see BP made a specific request that an operational audit be launched.

There was, as a result of those papers, a request by the Court to attempt to resolve the Q4 budget dispute, which in part involved the resolution of the issue of whether there should be what is referred to as an operational audit or examination of the facility. Both our Class Counsel and Claims Administrator as of the result of those discussions interviewed several auditors set up by the Claims Administrator's office. This was in the fourth quarter of 2013.

Those auditors included Clifton Larsen Allen, McGladrey and one other, CohnReznick. Excuse me. And so those interviews were conducted. As a result of that process, the Claims Administrator selected McGladrey to perform the operational audit to be sure BP provided its input with regard to the auditors that were interviewed and voiced its support of McGladrey over the other two options.

So to be clear there. McGladrey then went

ahead and entered into an engagement with the claims facility to audit the program in a scope that was consistent with the topic and subject matters that had been put at issue with the Court arising out of the Freeh report, budget and other concerns.

The last point to clarify the record is, BP did not object to the McGladrey audit. BP did not request that the facility pull the plug on the McGladrey audit. What BP specifically raised was a concern about costs associated with the audit that was being driven as reported by McGladrey in the first quarter of 2014 by a particular element of the audit that related to claims auditing.

BP presented to McGladrey and the Claims Administrator an alternative way to accomplish the audit objectives related to the claims audit that would not result in, or at least we believe would not result in, the traumatic costs that McGladrey was incurring. So it wasn't to pull the plug on it. It wasn't to cease that audit. It was simply to approach the audit in a different fashion that would allow the audit to meet its objectives in a more cost efficient way.

The Claims Administrator's office declined

BP's recommendation and proceeded. BP documented in its correspondence to the Claims Administrator its issues with the costs associated with the audit that are an outgrowth of that, but that, to be clear, we never said, BP never said we want to kill the audit.

**MR. HERMAN:**

No. We said. We said, if you have a problem with it, then just kill it.

**MR. MOSKOWITZ:**

That we agree with.

**MR. JUNEAU:**

That's the first thing we agreed to.

**MR. HOLSTEIN:**

Mark Holstein for BP. So just to kind of put a point on it. One, I won't repeat everything that's in our letter. And, Pat, you put it in the record here so there's no need to. I would say a couple of things. One, every expert we have talked to, internally at BP and externally, is astonished, astonished at the cost of this audit and finds it incredible that an audit of a facility of this size would cost over $14 million. We're troubled by that.

And number two, we find it, and the experts

we've talked to find it, incredible that after a year there isn't a final report. We don't know why that is. We know it's been publically reported that the report has been in the hands of the Claims Administrator's office and the Claims Administrator is relining it. We'd be interested to know if that's true.

But we're a little concerned that we're playing the semantic game of final versus non-final but that there is a report. Hence, our request in our letter for work papers, and our request stands.

**MR. JUNEAU:**

That's a distorted view and a complete misrepresentation. I said, I have consistently said, as a matter of fact, for lack of a better word, it's like you're hiding the ball here is really what you're saying, call a spade a spade. And that is not true. I have said that when we have the report I'll give it to the people, and that's what I have done. I've said that consistently. But go ahead.

One other point, BP had objected to the increased work that McGladrey wanted to do. I, me, Pat Juneau, called BP and Class Counsel and McGladrey in this very room here and I said,

McGladrey, it's what you're saying why the increased cost. Explain it to these people and they can ask you whatever -- BP had a team of people. PSC was here -- and ask whatever questions you wanted to ask, and they answered whatever the question was.

And do I understand now that you're objecting to what the amount of their bill was even after what they said they were going to do?

**MR. HOLSTEIN:**

Yes.

**MR. LATTA:**

I think even at that time, as I recall, they were going to report on it in May. We're now sitting here in October.

**MR. JUNEAU:**

Well, you're talking about when is the report issued, I guess.

**MR. LATTA:**

And how much have they spent on the insurance papers as well. I don't think it was visible at that meeting.

**MR. HERMAN:**

That's the process we continue on at this time and cost what it's costing.

**MR. HOLSTEIN:**

Last point I would make. Again, on top of what we have in our letter, and I agree with what Randy just said, we did agree to an increased scope of audit. We thought at the time that that increase -- we continue to think the scope is appropriate. What I'm saying to you is that every expert we've talked to has said that the cost of an audit consistent with the scope that was agreed to should never have been in excess of $14 million. That's a runaway from our perspective.

Final point is, we simply do not agree with Class Counsel, or at least what I think Class Counsel said, that the results of this audit of a federally-court-supervised claims facility should not be public. We explained our arguments in our letter. We explained them in a prior discussion in terms of why we think a class action in a federal court should be public and our presumption should be it's not confidential.

Same arguments apply here. I won't repeat them. And so we just renew our request. Until the final report is concluded, we renew our request for the work papers so we can see, and the public can see, what has gone on for the last year with

McGladrey.

**MR. JUNEAU:**

Do you have anything else, Steve?

**MR. HERMAN:**

I don't think so.

**MR. JUNEAU:**

If not, I'm going to refer this matter to the Court for consideration. We obviously don't have a unanimous consent of what the agreement may be. I'll refer it to the Court to consider. Your request that's contained in your letter speaks for itself. I think that's it.

All right. That will conclude these hearings.

(Whereupon, the Meeting was concluded at or about 3:10 p.m.)

**COURT REPORTER'S CERTIFICATE**

I, SUZANNE "SUZIE" WAHL, Certified Court Reporter in and for the State of Louisiana, Certificate No. 99083, which is current and in good standing, as the officer before whom this testimony was taken under the authority of R.S. 37:2554, do hereby certify that the Claims Administration Panel Meeting was reported as hereinbefore set forth in the foregoing 93 pages;

That this testimony was reported by me in the Stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or rules of the Board; that I have acted in compliance with the prohibition on contractual relationships as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the Board;

That I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter. This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

This _____ day of _______________ 2014,

Suzanne "Suzie" Wahl, CCR, CVR-CM
Certificate No. 99083