# EXHIBIT A

**FILED**

JUN - 8 2010

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

UNITED STATES OF AMERICA, ex §
rel. JANAKI RAMADOSS, et al., § Case No. 99-cv-914-WRF
    Plaintiffs, §
                    §
v. §
                    §
CAREMARK, INC., et al., §
    Defendants. §
                    §

### ORDER DENYING THE STATES' MOTION TO DISMISS ON GROUNDS OF ELEVENTH AMENDMENT SOVEREIGN IMMUNITY

BEFORE THE COURT is the Joint Motion by State Plaintiffs to Dismiss Caremark's Medicaid Rebate Counterclaim (Docket no. 794), filed on September 30, 2009. The States of Arkansas, California, Louisiana, Texas, and Relator Janaki Ramadoss, on behalf of the States of Delaware, Illinois, and the Commonwealth of Massachusetts (collectively, the "States") request dismissal of Caremark's amended Seventh Affirmative Defense ("SAD") because the States argue that the SAD is barred by Eleventh Amendment immunity. Defendants Caremark, Inc., Caremark International, Inc., and Caremark International Holdings, Inc. (collectively "Caremark" or "Defendant") filed a response in opposition on October 12, 2009. The States replied in support of their motion on October 26, 2009.

For the following reasons, the Court DENIES the State Plaintiffs' Motion to Dismiss Caremark's Medicaid Rebate Counterclaim on the basis of Eleventh Amendment Immunity.

1

## Relevant Procedural Background

The issue of the States' Eleventh Amendment sovereign immunity arises before this Court upon remand from a panel of the U.S. Court of Appeals for the Fifth Circuit. *Texas v. Caremark, Inc.*, 584 F.3d 655 (5th Cir. 2009). In remanding, the panel explained that while it possessed jurisdiction to determine the issue of sovereign immunity raised by the States, it declined to do so because further record and factual development was warranted. *See id.* at 659-60. "Determination of whether the 'counterclaims' are for recoupment or for set-off is a factual question that must be decided with reference to the relevant Medicaid statutes and regulations. As such, it should be first addressed by the district court." *Id.* at 660.

In the wake of remand, two procedural actions occurred in short order that impact this Court's application of the Fifth Circuit's mandate to the case at hand. First, the Court issued an Order directing the parties to meet and confer and to file a Notice Regarding Additional Briefing in light of the Fifth Circuit panel's opinion, addressing four specific issues, including the need for any further discovery. Docket no. 781. In particular the Court noted that the appellate court's characterization of the key issue in dispute as factual, *see Caremark*, 585 F.3d at 660, might require discovery prior to resolution of the legal issue of Eleventh Amendment immunity or prior to disposition of any motion to dismiss. Docket no. 781, at 2. The parties responded accordingly in their Joint Notice Regarding Additional Briefing, declining to conduct any discovery and urging a briefing schedule on Eleventh

Amendment immunity. Docket no. 785.

Second, and as noted in the parties' Joint Notice Regarding Additional Briefing, Defendant moved to amend the portion of its answer that had been at issue before the Fifth Circuit panel. This Court granted the request. Accordingly, the "counterclaims" before the appellate court – that is, Defendant's original Seventh Affirmative Defense– no longer appear in the pleadings. *See Caremark*, 585 F.3d at 660.

Instead, before the Court at this time is the amended pleading by Defendant, either an affirmative defense (if Defendant's preferred nomenclature is used) or a counterclaim (if the States' preferred nomenclature is used), that states: "Caremark seeks recoupment only on government requests for reimbursement that are put directly at issue by the Plaintiffs' allegations, i.e., those that Caremark rejected, denied, or reduced for the reasons alleged to be unlawful." *See* Docket nos. 788, 789. Also before the Court, at the joint request of the parties, are the briefs regarding sovereign immunity alone and their attachments, absent any requests for the Court to hear testimony. And while the briefs cursorily reference evidence attached, the parties' arguments rely fundamentally on the Medicaid law and its application to this FCA case. Accordingly, while the issue before the Court might be described as a mixed question of law and fact, it is not solely a factual dispute. Any party who might characterize the issue as solely factual has waived its opportunity, in this now ten-year-old case, to further develop a factual record on this limited issue before this Court.

//

3

## Brief Factual Background

The facts of this case are well known to the Court and the parties. More detailed narratives of the underlying facts may be found in the Fifth Circuit panel's opinion, *Caremark*, 585 F.3d at 657, and in this Court's Order regarding summary judgment, Docket no. 692 (filed on Aug. 27, 2008).

Briefly, this *qui tam* case was initiated in 1999 by Plaintiff Ramados against Caremark under the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, and state laws. The United States of America intervened, followed by the states of Arkansas, California Louisiana, and Texas also intervened. Ramados amended her complaint. The complaints by the United States and the States alleged that Caremark, a pharmacy benefit manager, fraudulently withheld reimbursement payments owed to the states under the federal Medicaid program. *See* 42 U.S.C. § 1396 *et seq.*; *Schweiker v. Gray Panthers*, 453 U.S. 34, 36 (1981); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 183 (5th Cir. 2009). Medicaid, a program funded jointly by the federal government and the states, pays certain medical expenses for low-income persons. *See* 42 U.S.C. §§ 1396-1396u. "The Medicaid statute requires pharmaceutical manufacturers to rebate a portion of the price of their drugs [sold for Medicaid purposes] as a condition for participating in Medicaid." *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 221 (D.C. Cir. 2001); 42 U.S.C. § 1396r-8(b)(1)(A). The calculation of the rebate changes depending upon the source of the drug, and is made in conformance with a Rebate Contract entered into between each pharmaceutical manufacturer and a designated

4

government representative. *See* 42 U.S.C. §§ 1396r-8.

Defendant disputes Plaintiffs' allegations, and relevant to the issue presently before the Court, Defendant argues it is entitled, notwithstanding the States' invocation of Eleventh Amendment immunity, to state a recoupment affirmative defense against the States with respect to damages alone. The issue is whether Defendant may plead the recoupment affirmative defense or whether instead the States are immune from such an affirmative defense. The States argue that the SAD is a permissive counterclaim and is, accordingly, barred by Eleventh Amendment immunity. The parties argue about the impact of the Medicaid statutory scheme upon the question before the Court. The States claim that the statutory scheme precludes the SAD, or any such reduction by Defendant of any ultimate damage award to Plaintiff States. Caremark argues that in calculating damages in this case, the statutory framework requires that discounts or rebates received by the States, which statutorily reduce the medical expenditures of the State for that quarter, from pharmaceutical manufacturers, *see* 42 U.S.C. § 1396r-8(a)(1), be netted out (*i.e.*, discounted) from the calculation of damages if Caremark is found liable under the FCA.

### Analysis

The Eleventh Amendment confirmed an explicit limitation upon the judicial power of the United States. *Missouri v. Fiske*, 290 U.S. 18, 25 (1933). "The Judicial power of the United States shall not be construed to extend in any suit in law or equity, commenced or prosecuted against one of the United States by Citizens or Subjects of any Foreign State."

5

U.S. Const. Amdt. XI. "The 'entire judicial power granted by the Constitution does not

embrace authority to entertain a suit brought by private parties against a State without

consent given.'" *Fiske*, 290 U.S. at 25-26 (quoting *Ex parte New York*, 256 U.S. 490, 497

(1921)). "Immunity from suit under the Eleventh Amendment is a personal privilege which

may be waived." *Id.* at 24.; *see also Three Affiliated Tribes of Ft. Berthold Reservation v.

Wold Engin'g*, 476 U.S. 877, 891 (1986) (addressing a tribe's common law sovereign

immunity as opposed to Eleventh Amendment immunity).

Although waiver must be unequivocal, *see Atascadero State Hosp. v. Scanlon*, 473

U.S. 234 (1985), a state's consent to waive its Eleventh Amendment immunity may be

effected by a state's action, including its voluntary litigation conduct, such as, the state's

filing of a suit or claim in federal court. *See, e.g., Lapides v. Bd. of Regents of the Univ. Sys.

of Georgia*, 535 U.S. 613, 618-19 (2002) (addressing waiver in the context of a state's

removal of an action to federal court); *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536

F.3d 418, 431-32 (5th Cir. 2008). "[W]here a state voluntarily becomes a party to a cause,

and submits its rights for judicial determination, it . . . cannot escape the result of its own

voluntary act by invoking the prohibitions of the Eleventh Amendment." *Gunter v. Atl.

Coast Line R.R. Co.*, 200 U.S. 273, 284 (1906).

As put to this Court:

> The sovereign immunity issue turns on the relationship between Caremark's
> Seventh Affirmative Defense and the claims asserted by the States. . . .
> Resolution of the question requires factual examination of the transactions that
> form the basis of the underlying complaint and the transactions that are at the

> heart of Caremark's "counterclaims." If, as Caremark argues, its "counterclaims" are for "recoupment," they may be considered compulsory (bringing them within the scope of the States' waiver of sovereign immunity); if, on the other hand, they are for "set-off", they may be considered permissive. *See, e.g., Matter of Gober*, 100 F.3d 1195, 1207-08 (5th Cir. 1996) ("Recoupment is a demand asserted to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim; setoff, on the other hand, arises out of a transaction extrinsic to the plaintiff's claim.").

*Caremark*, 584 F.3d at 659-60.

Therefore, this Court must determine whether Caremark's newly amended SAD is a permissive or compulsory counterclaim with reference to the "transactions that form the basis of" the complaint and the SAD. Despite the further explication by the panel regarding recoupment and setoff, the Court does not resolve the question solely by reference to the language used by Caremark in its post-remand, amended and limited SAD.

**A.    Amended Pleading**

First, Caremark argues that the amendment of the SAD necessitates denial of the States' motion because either (1) the issue remanded from the Fifth Circuit is no longer before the Court given amendment; or (2) in the wake of amendment, the SAD now squarely falls within the Fifth Circuit panel's definition of a compulsory counterclaim, thereby waiving the States' sovereign immunity.

The Court disagrees with the first argument. Although the amended Seventh Amended Defense was not before the panel, the panel's mandate that sovereign immunity be decided prior to continuing the litigation is not moot. The issue of sovereign immunity

7

is clearly still disputed; therefore, Caremark's amended pleading does not moot the panel's mandate. Caremark's second argument – that the amended SAD falls within the panel opinion's definition of a compulsory counterclaim that would defeat sovereign immunity – is a closer question. Caremark's amended pleading does indeed limit its "counterclaim" to "recoupment," a term that the panel opinion concluded would cause the counterclaim to "be considered compulsory (bringing [it] within the scope of the States' waiver of sovereign immunity). *Caremark*, 534 F.3d at 659. Moreover, Caremark limited the recoupment demand to "only . . . government requests for reimbursement that are put directly at issue by the Plaintiffs' allegations, i.e., those that Caremark rejected, denied, or reduced for the reasons alleged to be unlawful." *See* Docket nos. 788, 789. Caremark's further limitation of the counterclaim that is now labeled recoupment is expressly limited to those claims put at issue by the States. For that reason, it appears at first blush that the amended SAD states a compulsory counterclaim requiring the denial of the States' motion to dismiss because the SAD limits the counterclaim to the same transaction or occurrences put at issue by the States.

However, the Court must pierce the plain language of the amended SAD because resolution of the Eleventh Amendment immunity issue "turns on the relationship between Caremark's [amended SAD] and the claims asserted by the States in the underlying suit." *See Caremark*, 584 F.3d at 659. If the language used by Caremark in its affirmative defense were the exclusive determiner of the scope of the waiver, the bounds of sovereign immunity would be placed in the hands of Caremark rather than the States – an absurd result, unless

the Eleventh Amendment permitted all counterclaims once a state voluntarily invoked federal jurisdiction – and the Fifth Circuit panel opinion would have noted that resolution of the immunity issue depended on the language of the pleading, rather than, as it explained, the relationship between the pleadings. *See id.*

Accordingly, the Court now turns to the relationship between the States' claims and Caremark's amended SAD for "recoupment" of government requests for reimbursement put at issue by Plaintiffs.

**B.      Relationship Between Claims and the Seventh Affirmative Defense**

To determine whether Caremark's SAD is a recoupment or a set-off, the Court must determine whether the SAD "arises out of the same transaction forming the basis of the plaintiff's claim" or "arises out of a transaction extrinsic to the plaintiff's claim." *See Caremark*, 584 F.3d at 659-60 (quoting *Matter of Gober*, 100 F.3d 1195, 1207-08 (5th Cir. 1996)). The Court undertakes this analysis according to the pleadings and the applicable law.

"Caremark seeks recoupment only on government requests for reimbursement that are put directly at issue by the Plaintiffs' allegations, i.e., those that Caremark rejected, denied, or reduced for the reasons alleged to be unlawful." *See* Docket nos. 788, 789. It is undisputed that Caremark's amended SAD goes only to the States' requests for reimbursement that the States alleged were unlawfully rejected, denied, or reduced.

//

//

9

The States argue that the SAD is still not a compulsory counterclaim for which immunity is waived because

> (1) the States' claims do not arise out of the same transactions or occurrences as the SAD;
> (2) the intent of rebate provisions of the Medicaid Act is that revenues are to be applied generally and prospectively to reduce aggregate costs of the operation of a state Medicaid program as opposed to retrospectively on a prescription-specific basis;
> (3) the method of assessing Medicaid rebates precludes the SAD because the amount of any rebate payable may not be finalized for years because pharmaceutical companies are given a generous amount of time to submit updated pricing data or request recalculation of rebates previously paid;
> (4) the pharmaceutical pricing data required to prove the SAD is subject to an absolute statutory privilege with no disclosure provision for litigation such as this; and finally,
> (5) even if the States have recovered excess third-party liability recovery from Caremark by failing to net out rebate revenue from reimbursement requests, the excess is provided to Medicaid recipients, under the Medicaid Act, and not to Caremark.

Caremark argues that the SAD is not a counterclaim at all, but rather is a statutory interpretation argument addressed to Plaintiffs' claims, *i.e.,* "whether the States are entitled to seek 'reimbursement' for the full amount of an agency's initial expenditure without accounting for the reduction in 'costs' resulting from any rebate." *See* Opp'n at 9. In Caremark's view, assuming as the Court must that Plaintiffs' allegations are true, "determining the drug 'cost' and the extent of Caremark's 'reimbursement' obligation . . . require[s] netting-out rebates received from drug manufacturers." *Id.* In the alternative, Caremark argues that if the SAD is a counterclaim, then it is a compulsory counterclaim for which the States have waived sovereign immunity.

1. **Claims By Texas, Florida, Arkansas, and Tennessee**

The States of Texas, Florida, Arkansas, and Tennessee (the "Four States") joined the

United States in its Complaint in Intervention. (Docket no. 78). The Complaint set forth six

causes of action, where each of the Four States joined the United States in three causes of

action for (1) reverse false claims under the federal False Claims Act, 31 U.S.C.

§ 3729(a)(7); (2) negligent misrepresentation; and (3) common law recoupment. Each of the

Four States then also separately stated claims pursuant to that state's code.

In Count IV(A)-(E), Texas set forth four claims for damages under the Texas

Medicaid Fraud Prevention Act ("TMFPA"), Tx. Hum. Res. Cod Ann. § 36.052, for fraud,

false statements, or misrepresentations resulting in the improperly rejection, denial, or

reduction of reimbursements due to the Texas Medicaid Program; and one claim for

recoupment, under Tex. Hum. Res. Code Ann. § 32.033, of all overpayments by the Texas

or on behalf of Medicaid recipients. *See* Docket no. 78, at 26-33.

Florida alleged, in Count V, that its Florida Medicaid Third-Party Liability Act, Fla.

Stat. § 409.910, provides a right of subrogation and recoupment to the state. Florida alleged

that Caremark falsely denied reimbursement requests by Florida Medicaid because the

Medicaid program "pharmacy" was "out of network," because Florida had no provision for

"paper claims reimbursement," and because the claim was purportedly filed outside the filing

limit date when Florida has a statutory period of five years to pursue reimbursement. Florida

also claimed that Caremark knowingly used a false record to avoid or decrease an obligation

to pay money to Florida in violation of Fla. Stat. § 68.082(2)(g).

In Count VI, Arkansas alleged that Caremark violated the Arkansas Medicaid False Claims Act, Ark. Code Ann. §§ 20-77-901– 911. Arkansas also alleged that the Medicaid beneficiary who is dual-eligible – that is, eligible for coverage by Medicaid and a third party – and has the right to have Caremark pay for a prescription at a point of sale, that right is transferred to Medicaid by operation of law and the State may seek full recovery of that third-party benefit.

Count VII sets forth Tennessee's claims against Caremark for violations of the Tennessee Medicaid False Claims Act. Tenn. Comp. R. & Regs. 1200-13-1-.04.(6); Tenn. Code Ann. § 71-5-182. Tennessee also pleaded assignment as a matter of state law third party insurance benefits to which a dual-eligible Medicaid beneficiary may be entitled.

Each of the Four States sets forth a claim that seeks in addition to damages, the recoupment or reimbursement of monies owed to the Four States by Caremark as a result of Caremark's allegedly false, misleading, or fraudulent denial or reduction of the Four States' requests for Medicaid reimbursement. *See, e.g.,* Docket no. 78, at ¶¶ 103, 145 (Texas); 107, 114 (Florida); 123 (Arkansas); and 135, 139 (Tennessee); *see also id.* at ¶¶ 142-43 (for repayment of losses sustained by states on account of negligent misrepresentation, and for recoupment of all funds the states are entitled to receive from Caremark for repayment of prescription claims for dual-eligible participants covered under private health care plans for which Caremark had primary payment responsibility).

## 2. State of Louisiana

Louisiana's Complaint (Docket no. 81) states a single cause of action arising "from Caremark's submission of reverse false claims to avoid, conceal, or decrease their obligation to pay or transmit Medicaid monies to the Louisiana Medicaid program." Docket no. 81, at 1. Louisiana set forth the federal and state statutory framework in its pleading, and alleged that it has enacted state recoupment statutes as permitted by 42 U.S.C. § 1396(a)(25). *See, e.g.,* La. Rev. Stat. § 46:153(E).

Louisiana, along with the Four States discussed above, pleaded several examples of Caremark's alleged reverse false claims, including: (1) rejection of reimbursement requests when the client's health plan did not offer a paper claim option;[1] (2) denial or reduction of reimbursement requests as "stale claims" where a health care plan allowed a paper claim option but the reimbursement request was not received by Caremark within the time period for filing a claim specified in the contracts between Caremark and its clients (contracts to which Medicaid was not a party); (3) use of a computerized "dummy code" resulted in outright and improper denial of Medicaid reimbursement requests; (4) rejection of reimbursement requests where the client health care plans purportedly did not permit a coordination of benefits ("COB"), that is, a process to determine which plan is primary or

---

[1] A plan that offers a "paper claim" option permits participants to purchase the drugs and receive reimbursement for the purchase at a later date. When a plan does not offer this option, participants do not have an option to pay for the prescription themselves and later seek reimbursement. *See* Complaint in Intervention By United States and Certain States (Docket no. 78), at 9, ¶ 20.

secondary; (5) rejection of reimbursement requests on the grounds that the plan benefit was terminated where in fact prescription reimbursements were available; (6) denial of reimbursement because information was allegedly missing from the requests when in fact the information was provided; (7) denial of reimbursement for reasons that "violate state and federal law" or reduced reimbursement because the pharmacy was considered out of network even though Medicaid is not a pharmacy; (8) denial or reduction of reimbursement despite notice and knowledge of Caremark's duties after federal action in June 1995 and notification by the Relator; (9) unjust enrichment; and finally (10) violations of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:438.3, as exemplified in the Complaint. *See* Docket no. 81, at 8-17.

### 3.   Common Transaction or Occurrence

The States first argue that they are immune from Caremark's allegedly permissive counterclaim because it does not arise from the same transaction or occurrence as that alleged by Plaintiffs. The determination of whether a counterclaim arises from the transaction or occurrence that is the subject matter of a claim, courts consider four factors:

> (1) whether the issues of fact and law raised by the claim and counterclaim are the same; (2) whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim.

*Tank Insulation Int'l v. Insultherm, Inc.*, 104 F.3d 83, 85-86 (5th Cir. 1997) (citations omitted).

14

Beginning with the fourth factor, the Court concludes that there is a logical relationship between the States' claims for damages resulting from alleged reverse false claims and Caremark's SAD which seeks recoupment of any overpayment by Caremark to the States arising from the calculation of reimbursements to the States' Medicaid programs. *See Montgomery Elevator Co. v. Building Engineering Serv. Co.*, 730 F.2d 377, 380 (5th Cir. 1984) ("A logical relationship exists when 'the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendants.'"). Here, the same operative facts serve as the basis of the claims and counterclaims because the counterclaims are explicitly limited to those claims put at issue by the claims. Caremark argues that at the general level of damages' computation, the States seek money for falsely denied or underpaid claims and Caremark in turn seeks a reduction of any such amount awarded based upon any amount by which the States were overpaid.

But, the States argue that federal and State Medicaid laws prohibit the logical relationship factor, which this Court concludes is satisfied, and the remaining three factors relevant to whether a counterclaim arises from the same transaction or occurrence.

### a. The Medicaid Statutory Scheme

Medicaid provides for partial federal funding of state Medicaid programs: programs or state plans that establish a scheme for reimbursing health care providers for medical services and products provided to needy individuals. *See* 42 U.S.C. § 1396a; *Harris v.*

15

*McRae*, 448 U.S. 297, 308 (1980). The rate at which this federal funding is provided is the "federal medical assistance percentage" or FMAP. 42 U.S.C. § 1396d(b); *see also Ariz. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1246 (9th Cir. 2007). "The federal government recalculates the FMAP reimbursement rate annually based on each state's per capita income." *Ariz. Health Care*, 508 F.3d at 1246 (citing 42 U.S.C. §§ 1396d(b), 1301(a)(8)(B)). "Although the federal contribution to a State's Medicaid program is referred to as a 'reimbursement,' the stream of revenue is actually a series of huge quarterly advance payments that are based on the State's estimate of its anticipated future expenditures." *Bowen v. Massachusetts*, 487 U.S. 879, 883-84 (1988) (citing 42 U.S.C. § 1396b(d) 1982 ed., Supp. V). The advanced federal funds are periodically adjusted to match actual expenditure, and statutory provisions govern the process for righting disputes, such as overpayment to a State. *See id.* at 884 (citing 42 U.S.C. §§ 1396b(d)(5)).

The Medicaid Drug Rebate Program provides for agreements between the States and pharmaceutical manufacturers. *See* Pub. L. No. 101-508, § 4401 (1990); *see also* 42 C.F.R. Part 447, Subpart I. To participate in Medicaid, pharmaceutical manufacturers must rebate to states a portion of the price of drugs purchased for Medicaid in order to ensure that states receive the benefit of "at least the best prevailing wholesale price." *Thompson*, 251 F.3d at 221; *see also* 42 U.S.C. § 1396r-8(b)(1)(A).

No party argues that pharmacy benefits managers, such as Caremark, are privy to this § 1396r Rebate Agreement. The amount of the rebate is determined by statute as well. 42

U.S.C. § 1396r-8(c) (providing for the calculation of rebate amount based upon the average manufacturer price and the best price, as statutorily defined, or the minimum rebate percentage as statutorily defined).

Income that the States receive as a result of these Rebate Agreements with pharmaceutical manufacturers "shall be considered to be a reduction in the amount expended under the State plan in the quarter for medical assistance" for purposes of computing the amount paid by the United States to the States, based upon the FMAP and "total amount expended" as medical assistance under the State plan. 42 U.S.C. § 1396r-8(b)(1)(B) (referring to *id.* § 1396b(a)(1)). In short, income received by the States from pharmaceutical manufacturers reduces the amount expended as medical assistance, which in turn, reduces the amount "paid" by the United States. *Id.*

### b. Application of the Medicaid Statutory Scheme to Pleadings

According to the Plaintiff States, this effect demonstrates that § 1396r-8(b)(1)(B) reduces Medicaid's burden on taxpayers and accordingly furthers the congressional purpose of cost-cutting in enacting the statute. *See Thompson*, 151 F.3d at 226. On this premise, Plaintiff States argue that the benefit of the Rebate Agreements "income" to States is a statutory benefit to the government and taxpayers, and not to third parties, such as Caremark. Plaintiff States view the SAD as a permissive counterclaim for set-off because Caremark seeks a reduction in any ultimate liability in the face of Plaintiffs' claims that at issue are only Caremark's improper rejection, denial, or underpayment of reimbursement requests. From

17

the States' perspective, Caremark's demand for reduction, by the amount that the States received in rebates or from other sources, is necessarily a different and permissive set-off claim because their claim only encompasses damages for Caremark's underpayment.

According to Caremark, the SAD is a compulsory counterclaim for recoupment because the relevant transaction or occurrence is not found with respect to liability but only with respect to damages and also because the proper calculation of any damages owed by Caremark to Plaintiff States necessitates a reduction of those damages by any amount the States received from the rebate program, according to 42 U.S.C. § 1396r-8(b)(1)(A). Caremark argues that whether the SAD is ultimately successful in reducing any damage award is a question for another day and that it is entitled to raise the issue as a result of the States' allegations. Relatedly, Caremark argues that Plaintiff States (and with them, the United States) have one view of the Medicaid statutes' application to the determination of damages in this case, while Caremark disputes this view and presents an alternative statutory interpretation. Caremark argues that Eleventh Amendment immunity cannot be invoked to prevent Caremark's advance of its view. Determination of the victorious statutory interpretation remains for another day, according to Caremark.

When the States seek reimbursement from Caremark, they demand an amount based on the full price the State initially paid for the pharmaceutical, without factoring in the rebate.[2] Caremark argues that no law requires the States to seek reimbursement of the gross

---

[2] *See* Docket no. 243, at 4 (Special Master finding of Plaintiffs' "tacit admission that gross amounts, rather than rebate-netted amounts, were submitted to Caremark for

costs, as opposed to the cost net the drug rebate, and that in fact State laws implementing the

Medicaid program require that States are limited to recovering from liable third parties "the

amount of the cost of medical care services paid." In support, Caremark points to examples,

including: Tex. Hum. Res. Code § 32.033(c); Ark. Code §§ 20-77-301(a), 306(b); Cal. Welf.

& Insts. Code §§ 14124.70(c), 14124.71(a); 16 Del. Admin. Code § 14600; 215 Ill. Comp.

Stat. § 5/356i(c); La. Rev. Stat. § 46:446; Mass. Gen Laws ch. 18 § 5G. It is noteworthy that

Caremark does not argue that Congress requires the States to return – on a prescription by

prescription or any other basis – reimbursement from a third party that exceeds the State's

actual cost. Caremark seeks to deduct any ultimately demonstrated excess from the amount,

if any, Plaintiffs ultimately prove that Caremark owes them.

In reply Plaintiff States urge that the net-of-rebates view is inconsistent with the

statutory scheme. First, the States argue, and the Court agrees, that they are permitted to

pursue third party liability to the full extent of the third party's liability in order to reduce the

burden on Medicaid. 42 U.S.C. § 1396a(25)(A), (B); 42 C.F.R. § 433.139(d). But the Court

does not view this provision and admirable goal as foreclosing the SAD as a matter of law.

Plaintiff States also argue that any excess is intended to benefit either the State or the United

States, and not Caremark.

In *Regents of the Univ. of New Mexico v. Knight*, a panel of the Federal Circuit

examined a similar issue in the context of a contractual dispute over patents and patent

---

reimbursement.").

19

applications. 321 F.3d 1111 (Fed. Cir. 2003). On appeal, the University argued that it had

not waived Eleventh Amendment immunity from money damages when it sued seeking only

declaratory and injunctive relief. *Id.* at 1123. The Federal Circuit held that the University,

as an arm of the state, waived its immunity with respect to counterclaims beyond just those

for recoupment, *i.e.*, those arising from the same transaction or occurrence as the state's

claims. *Id.* at 1124-25. In addition to recoupment counterclaims, the University also waived

its Eleventh Amendment immunity as to the "range of compulsory counterclaims [that] is

broader than counterclaims in recoupment." *Id.* at 1125. Relying on *Lapides*, the *Knight*

panel concluded that "seriously unfair results" threatened a suit in which a state is permitted

to file a suit seeking to enforce patent ownership arising from contract "and claim immunity

from liability for royalties or other compensation arising from those same contracts and

conduct." *Id.* at 1125-26. The Court then concluded that the counterclaims for money

damages were compulsory because they arose from the same transaction, that is, the

assignment of patent rights. *Id.* at 1126.

Though not resting any conclusion upon *Knight*, this Court finds the Federal Circuit's

analysis useful in this respect, the determination of transaction or occurrence might be made

at any number of levels or foci, and the proper level is a broader view than would require

resolution of whether under any set of proven facts at trial Caremark could ever effectively

advance the SAD under the Medicaid statutes and the False Claims Act. It is conceivable

that the federal courts could resolve the merits of Caremark's SAD simply on the basis of the

Medicaid and Drug Rebate program statutes and the briefing, but it is advisable instead to reserve merits review for another day. Instead, Caremark pleaded its SAD in such a manner that, although it may be barred on other legal grounds, it arises from the same transaction or occurrence – that is, the determination of the amount owed by Caremark to Plaintiff States, if any, under the False Claims Act and the Medicaid statutory and regulatory framework. Because the SAD arises under the same transaction or occurrence, Plaintiff States must voluntarily have waived their Eleventh Amendment immunity from such a calculation of damages because if not litigated in this case, Caremark is forever banned from raising the issue, at least as the issue is pleaded in the SAD.

The Court finds unpersuasive arguments that Caremark's SAD exposes the parties and the Court to examination of a complex and multi-faceted statutory scheme involving federal and state agency review. Such is the stuff of federal law suits. Equally unpersuasive are concerns about confidential information being exposed in discovery or the revelation of protected proprietary pricing information to Caremark because procedures exist to protect privileged and confidential information from inappropriate disclosure. The Court is prepared to address those issues at the right time, and if necessary, to guard the discovery process with watchful eye. Sanctions are available to respond to misuses of such information. None of these issues materially informs the question of recoupment versus set-off, which is really just the question of whether the transaction or occurrence is the same. The Court concludes that

it is, even though other law or fact may bar the SAD or limit its application.[3]

Also unavailing are arguments that the amounts at issue may not be calculable for some time. At issue in this case (by virtue of Plaintiffs' allegations and the SAD) are only the value of the reimbursement requests put directly at issue, that is, those that Caremark allegedly unlawfully rejected, denied, or reduced. The duration or degree of difficulty of valuation does not resolve the very limited question before this Court. This argument strengthens the States' version of one factor to the relevant test, *i.e.*, whether substantially the same evidence will support or refute the claims of both parties. *Tank Insulation*, 104 F.3d at 85-86. In denying the States' motion, the Court acknowledges that additional evidence will be relevant to this suit in light of the Court's conclusion here. However, this factor alone cannot overcome the remaining factors and the totality which weighs in favor of Caremark.

The Court makes no findings or conclusions about the wisdom of the SAD or its legal sufficiency. Rather, the Court merely concludes that the claims and the SAD both arise from the same transaction or occurrence, that is, the requests for reimbursement under Medicaid and whether Caremark's resulting rejection, denial, or reduction of those requests was lawful, and if not, in what amount were the reverse false claims deficient. Having so concluded, the

---

[3] For example, no party has raised the issue of exhaustion of administrative remedies, yet it applies to some but not all claims for damages from a Medicaid program. *See, e.g., Michigan Ass'n of Homes & Servs. for the Aging v. Shalala*, 127 F.3d 496, 502-03 (6th Cir. 1997).

Court determines that Plaintiff States waived their Eleventh Amendment immunity as to the SAD.

### Conclusion

For the foregoing reasons, the Court concludes that the State Plaintiffs waived their Eleventh Amendment immunity, and on that basis alone, the Court DENIES their Motion to Dismiss Caremark's Seventh Affirmative Defense. (Docket no. 794). The Court makes no determination, at this stage, whether other bars to the Seventh Affirmative Defense exist or of the merits of the Seventh Affirmative Defense.

Signed this 8ᵗʰ day of June, 2010.

ROYAL FURGESON
SENIOR UNITED STATES DISTRICT JUDGE