**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, on APRIL 20, 2010 | § | SECTION J |
| | § | |
| This Documents Relates to: | § | |
| | § | |
| Applies to:  No. 2:13-cv-01386 | § | JUDGE BARBIER |
| _____ | § | MAGISTRATE JUDGE SHUSHAN |
| | § | |
| EUGENE I. DAVIS, AS TRUSTEE OF | § | |
| THE SEAHAWK LIQUIDATING TRUST, | § | |
| the duly authorized successor to | § | |
| SEAHAWK DRILLING, INC., *et al.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BP EXPLORATION & PRODUCTION INC., | § | |
| | § | |
| Defendants. | § | |

---

**SECOND AMENDED COMPLAINT**

---

Eugene I. Davis, in his capacity as trustee of the Seahawk Liquidating Trust, the duly authorized successor to Seahawk Drilling, Inc. and its various subsidiaries[1] (collectively, "Seahawk"), hereby complains as follows:

**I.  NATURE OF ACTION**

1.      Seahawk provided contract drilling services to the oil and natural gas exploration and production industry exclusively in the Gulf of Mexico.  Seahawk owned a fleet of 20 rigs,

---

[1] These subsidiaries are as follows:  (a) Seahawk Mexico Holdings LLC; (b) Seahawk Drilling Management LLC; (c) Seahawk Offshore Management LLC; (d) Energy Supply International LLC; (e) Seahawk Drilling LLC; (f) Seahawk Global Holdings, LLC; and (g) Seahawk Drilling USA, LLC.

making it the second-largest jack-up drilling company in the region as of April 2010.  Seahawk

had a market capitalization of $220 million at the time, with its stock trading at approximately

$19 per share.  Unfortunately, Seahawk's business was essentially destroyed as a result of the

worst environmental disaster in U.S. history—namely the discharge of more than 4.9 million

barrels of oil into the Gulf of Mexico following the blowout of the deepwater Macondo well on

April 20, 2010 (the "Macondo Disaster").

       2.     The sheer physical and environmental devastation emanating from the Macondo

Disaster and its aftermath killed much of the demand for Seahawk's services and triggered a

precipitous 47.3% decline in Seahawk's stock price.  In the absence of such an environmental

calamity, Seahawk would have been able to obtain capital to diversify its business or pursue

other strategic initiatives outside of the Gulf of Mexico and otherwise.  Instead, the Macondo

Disaster and its aftermath led to reluctance in the market to finance or invest in drilling

companies operating in the region (particularly Seahawk, which—unlike other drillers—

operated only in the Gulf of Mexico) or their customers (exploration and production

companies).  With drastically reduced demand for its services and no ability to pursue strategic

initiatives, Seahawk was forced to file for bankruptcy and sell its fleet of drilling rigs in

February 2011.

       3.     Had it not been for the environmental catastrophe attendant to the Macondo

Disaster and the related aftermath, Seahawk would have been able:     (a) to operate more

profitably between the date of the spill and when it was forced to sell its rigs  (thereby obtaining

approximately $18.4 million in additional profits), (b) to maintain ownership of its profit-

generating rig assets (thereby obtaining at least $156.4 million in additional profits); and (c) to

complete a major pending acquisition (thereby diversifying its business and obtaining substantial

additional profits and other value). Seahawk seeks to recover more than $174.8 million in economic damages, including lost profits and impairment of ability to earn future profits, that it suffered as a direct and foreseeable result of the Macondo Disaster and its aftermath.

## II.  PARTIES

### A.  PLAINTIFF

4.  On February 11, 2011, Seahawk Drilling, Inc. and its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Corpus Christi Division) (the "Bankruptcy Court").

5.  The Seahawk Liquidating Trust was created in accordance with the Seahawk Liquidating Trust Agreement and the First Amended Joint Plan of Reorganization of the Debtors and Debtors-in Possession Under Chapter 11 of the Bankruptcy Code (the "Plan"), which was confirmed by the Bankruptcy Court on September 28, 2011.  The Plan expressly retained certain causes of action belonging to Seahawk, including the causes of action asserted in this action, for post-confirmation enforcement by the Seahawk Liquidating Trust under 11 U.S.C. § 1123(b). The Seahawk Liquidating Trust, therefore, has standing to assert the claims in this action.

6.  The Seahawk Liquidating Trust is a trust organized under Texas law.  Eugene I. Davis, a  resident of New Jersey, serves as trustee of the Seahawk Liquidating Trust (the "Trustee").

### B.  DEFENDANT

7.  BP Exploration & Production Inc. ("BP") is a Delaware corporation with its principal place of business in Houston, Texas.  BP was a leaseholder and the designated operator in the lease granted by the Minerals Management Service, n/k/a the Bureau of Ocean Energy Management, Regulation and Enforcement ("MMS"), allowing BP to perform oil exploration,

drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Macondo Disaster originated. BP was designated the "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714. On or about June 3, 2013, BP was served with process through its registered agent, CT Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, Louisiana 70808.

### III. JURISDICTION AND VENUE

8.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b). The claims in this action arise under the Oil Pollution Act of 1990. The Trustee presented his claims, as required by 33 U.S.C. § 2713, more than 90 days prior to filing this action.

9.  This Court has personal jurisdiction over BP because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

10.  Venue is proper in this district pursuant to 33 U.S.C. § 2717(b), as the discharge of hydrocarbons that is the basis of this action occurred within this district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391, in that a substantial portion of the events or omissions giving rise to the Trustee's claims occurred in this district. Finally, venue is appropriate in this district based on 28 U.S.C. § 1407 and the transfer order by the Judicial Panel on Multidistrict Litigation consolidating actions relating to the Macondo Disaster before this Court as MDL No. 2179. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).

### IV. FACTUAL BACKGROUND

#### A. SEAHAWK'S BUSINESS

14.  Seahawk's business consisted solely of providing contract drilling services to the oil and natural gas exploration and production industry in the Gulf of Mexico. In particular,

Seahawk operated a "jack-up" rig business with a fleet of 20 mat-supported jack-up rigs located entirely in the Gulf of Mexico.  Seahawk's ability to move its rigs to other regions of the world was limited because Seahawk's mat-supported, variable deckload rigs were less capable than other types of rigs at managing sea floor conditions found in other regions.  Seahawk, therefore, was essentially a "Gulf coast" business.

15.     Seahawk contracted with its Gulf of Mexico customers—primarily oil and natural gas producers and drilling service providers—on a "day rate" basis to provide rigs and drilling crews.  Under such day rate contracts, Seahawk charged its customers a fixed daily amount, regardless of the number of days needed to drill the well.  Typically, these contracts were terminable by Seahawk's customers if drilling operations were suspended due to events beyond the control of either party.  The demand for Seahawk's drilling services was influenced by the ability of its customers to obtain necessary permitting and financing for drilling projects and exploration and production, as well as other market factors.

16.     In August 2009, Seahawk was spun-off of Pride International, Inc.  The 20 rigs that Seahawk obtained through the spin-off had a long history of profitability.  Specifically, the average annual revenue generated from these rigs from 2002 through 2009 was approximately $322 million per year.  At Seahawk's cost structure after the spin-off, such revenues would have translated to annual EBITDA of approximately $65 million per year.

**B.     THE MACONDO DISASTER**

17.     In March 2008, BP leased the Mississippi Canyon Block 252 for oil and gas exploration and designated it as the Macondo Prospect ("Macondo").  Although BP subsequently

sold interests in the prospect, BP remained the operator and majority owner through all relevant time periods.  BP began exploration at Macondo on October 6, 2009.[2]

18.     To drill exploratory wells at Macondo, BP leased the Deepwater Horizon, which was a fifth-generation deepwater semi-submersible drilling vessel.  On April 20, 2010, Deepwater Horizon suffered an uncontrolled loss of hydrocarbon containment, or blowout incident, while operating at Macondo.   The blowout caused explosions on the Deepwater Horizon, thereby igniting a raging fire as oil and other hydrocarbons spewed onto the vessel from the blown-out well.  After burning for two days, the Deepwater Horizon sank to ocean floor.

19.     Oil and other hydrocarbons gushed out of the damaged well and into the Gulf of Mexico for three months.  Ultimately, 4.9 million barrels of oil spilled from the well, making it one of the largest marine oil spills in the history of the petroleum industry and the worst environmental catastrophe in U.S. history.  The spill was so large that it directly impacted approximately 68,000 square miles of navigable waters of the Gulf of Mexico (nearly the size of Oklahoma) and fouled over 600 miles of beaches and wetlands across five Gulf Coast states.  The Macondo Disaster caused significant damages to the waters of the Gulf of Mexico, shoreline beaches and wetlands, fisheries and various aquatic life forms, and other natural resources.  Much of the ecological damage was made worse by BP's administration of highly toxic dispersants, such as several variants of Corexit.

20.     The physical devastation to natural resources in the Gulf of Mexico resulting from the Macondo Disaster prompted the federal government to take regulatory action.[3]  On May 28, 2010, the U.S. Secretary of the Interior, after conducting a 30-day review of the Macondo

---

[2] The allegations relating to BP's acts, omissions and failures set forth in paragraphs 258-542 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.
[3] The allegations relating to regulatory action set forth in paragraphs 522-529 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.

Disaster, issued a directive declaring a six-month deepwater drilling moratorium in the Gulf of Mexico.  Although this moratorium formally applied only to deepwater drilling, the number of shallow-water drilling permits approved by the MMS declined significantly after the Macondo Disaster, as the MMS studied and recommended new safety measures for all drilling activities, including shallow-water drilling, in the Gulf of Mexico.  These regulatory actions were a direct and foreseeable result of the Macondo Disaster.  Indeed, the federal government would not have taken such actions in the absence of such an epic environmental catastrophe.  For the remainder of 2010 and well into 2011, oil and gas exploration and production companies and the offshore drilling industry in the region operated in an environment of regulatory uncertainty.

## C.   THE DESTRUCTION OF SEAHAWK'S STOCK PRICE AND ABILITY TO PURSUE STRATEGIC ALTERNATIVES

21.    The catastrophic environmental harm to the Gulf Coast region associated with the Macondo Disaster predictably triggered negative market sentiment towards offshore drilling companies, especially those with significant operations in the Gulf of Mexico.  In the face of such a disaster, investors and the financial community lost much of their appetite for even maintaining—let alone increasing—their financial exposure to offshore drilling companies, especially those with significant operations in the Gulf of Mexico.

22.    The stock prices of Seahawk, its closest competitor Hercules Offshore, Inc. ("Hercules"), and other drilling companies plummeted as a result of the Macondo Disaster, as shown below:



Indeed, Seahawk's stock price fell 47.3% in the one month from April 19 to May 19, 2010.

23.     The hesitancy of the financial community and investors to invest in (or lend to) the industry and the precipitous decline in Seahawk's stock price were disastrous for the company.  On April 20, 2010, only hours before the Macondo Disaster, Seahawk had executed a term sheet to purchase 13 independent leg jack-up rigs, associated rig crews and management, and associated rig contract backlog for $950 million.  The transaction was referred to within Seahawk's management team as "Project Talon."   Project Talon would have drastically improved the strength of Seahawk's business in several respects.

24.     First, consummation of Project Talon would have significantly diversified the company's business by making Seahawk the second-largest jack-up rig operator in the Middle East, thereby expanding its operations beyond the Gulf of Mexico.  The 13 rigs to be purchased as part of the Project Talon transaction were located in the Gulf of Suez and the Arabian Gulf.

25.     Second, consummation of Project Talon would have drastically increased Seahawk's projected earnings and cash flow.  The 13 rigs to be acquired had a firm contract backlog of $474.8 million and a backlog of $503.7 million, including options.  Further, these rigs had both higher utilization rates and higher day rates than Seahawk's existing fleet in the Gulf of Mexico.  Seahawk projected that the acquisition of these rigs through Project Talon would have contributed $204.1 million to Seahawk's combined, pro-forma EBITDA.

26.     Finally, consummation of Project Talon would have enhanced Seahawk's profitability by enabling it to capitalize upon various economies of scale.

27.     Unfortunately, the environmental harm attendant to the Macondo Disaster and its aftermath killed Project Talon.  The $950 million purchase price consisted of three components: (a) $450 million of senior secured notes; (b) $150 million in equity issued to the seller; and (c) a private equity placement of $350 million.  The collapse of Seahawk's stock price and the retreat of investors and the financial community from the industry made it impossible for Seahawk to raise the necessary capital through these mechanisms to complete the transaction.

28.     Had it not been for the Macondo Disaster and the associated environmental crisis, Seahawk would have been able to complete the Project Talon transaction.  Seahawk had entered into a fully executed term sheet approved by its board of directors, both parties were highly motivated to enter into the transaction, and the proposed transaction was well underway prior to the Macondo Disaster.  In particular:

- The deal was consistent with Seahawk's strategy of leveraging its nearly debt-free balance sheet in order to undertake an acquisition to diversify its business;

- The deal was more than four months in as of April 2010, with several high-level negotiations having taken place between Seahawk's CEO and the CEO and other high-level officers of the seller;

- The rigs to be acquired by Seahawk were not part of the core business of the seller, and the seller was highly motivated to sell the rigs;

- Seahawk had established a dedicated "due diligence" room for Project Talon nearly two months before the date of the Macondo Disaster;

- Seahawk had already obtained detailed tax guidance in connection with the transaction; and

- Seahawk had already signed a confidentiality agreement with a major hedge fund for the private placement of more than $300 million in connection with the transaction.

Project Talon was well on its way to completion at the time of the Macondo Disaster.

29.     Further, Seahawk would have been able to raise the necessary capital to complete the transaction had it not been for the Macondo Disaster.  Market sentiment in early 2010 was turning more bullish towards Seahawk and the offshore drilling industry as a whole.  In addition, Seahawk was experiencing higher utilization rates and day rates compared to the end of 2009.  As such, Seahawk's stock price would not have precipitously fallen absent the Macondo Disaster.  To the contrary, investor appetite toward Seahawk likely would have increased.

30.     In addition to killing Project Talon, the Macondo Disaster and its aftermath also effectively prevented Seahawk from pursuing other strategic initiatives.  For example, Seahawk could have acquired other international rigs or could have raised additional capital through private offerings.  Such strategic initiatives would have enabled Seahawk to diversify its business, operate rigs in more profitable geographic regions, and/or strengthen its balance sheet to better weather temporal downturns in the industry.  But Seahawk was effectively foreclosed from pursuing these initiatives following the sharp drop in Seahawk's stock price and the pull back of investors and financial institutions from lending or investing in drilling activity in the Gulf of Mexico as a result of the Macondo Disaster and its aftermath.

**D.     THE DISRUPTION OF SEAHAWK'S BUSINESS AND LOSS PROFITS**

31.     As a direct result of the Macondo Disaster and the environmental harm that it caused, the market demand for offshore drilling services in the Gulf of Mexico significantly deteriorated.  The reduced demand for drilling services—caused by the Macondo Disaster and its aftermath—led to reductions in both:    (a)  the number of rigs in operation on a daily basis (reflected in the utilization rate of Seahawk's rigs); and (b) the price, or "day rate," that Seahawk was able to charge for its rigs.  Had it not been for the Macondo Disaster and the associated environmental harm, Seahawk would have been able to more fully contract its rigs and charge higher rates for the rigs that it contracted.

32.     From May 2010 through February 2011, Seahawk would have obtained an additional $31.5 million in revenue through higher utilization rates and day rates in the absence of the Macondo Disaster and the natural, foreseeable consequences of the associated environmental catastrophe.  The additional operating costs associated with such increased utilization of Seahawks rigs would have been approximately $13.1 million, resulting in net lost profits of approximately $18.4 million from May 2010 through February 2011.

33.     Unable to reap these profits and unable to consummate the Project Talon transaction and/or other strategic initiatives as a result of the Macondo Disaster, Seahawk ultimately entered into an asset sale agreement with Hercules and filed a Chapter 11 bankruptcy case to liquidate its assets in February 2011.  Seahawk sold all of its rigs to Hercules in connection with the sale, which closed on April 27, 2011.

34.     Had it not been for the Macondo Disaster and the associated environmental catastrophe, Seahawk would not have been forced to liquidate its fleet of jack-up rigs—its sole income-producing assets—but rather would have been able to remain in operation through

consummation of Project Talon or otherwise.  By losing the opportunity to continue to own these rigs, Seahawk lost out on the ability to obtain future substantial profits from these rigs.

35.     Seahawk missed out on $19.9 million in lost profits in 2012 that it would have otherwise received had the company been able to continue owning and operating its rigs (as it would have in the absence of the Macondo Disaster).  Seahawk also missed out on approximately $286.8 million of lost future profits (valued at net present value) from being able to own and operate the rigs in the future.  In total, therefore, Seahawk suffered lost profits in excess of $306 million from being forced to sell its rigs as a result of the Macondo Disaster and its aftermath.  Because Seahawk received as much as $150.3 million in exchange for selling these assets, its net loss from not being able to maintain ownership of its rigs was at least $156.4 million.

36.     Seahawk suffered more than $174.8 million in lost profits with respect to these rigs through: (a) decreased demand for its rigs in 2010 and early 2011 (approximately $18.4 million); and (b) losing the opportunity to continue to own its rigs (at least $156.4 million of lost profits, net of the amount Seahawk received for the sale of these assets).  Had it not been for the Macondo Disaster and the associated environmental harm, Seahawk would have been able to operate more profitably in 2010 and early 2011 and to maintain ownership of its highly profitable rigs.

37.     In addition, Seahawk suffered additional damages, including lost profits and impairment of earning capacity, from the loss of Project Talon.  Had it not been for the Macondo Disaster and the associated environmental harm, Seahawk would have completed Project Talon, diversified its business, and generated substantial additional profits and other value from the rigs and other assets involved in that transaction.

E.     **PRESENTMENT OF SEAHAWK'S CLAIM**

38.     On January 18, 2013, the Trustee presented his claim to BP, pursuant to 33 U.S.C. § 2713, by delivering a copy of the following documents, by certified mail, e-mail, and facsimile, to the BP Claims Program:   (a) a cover letter to the BP Claims Program; (b) a claim form listing a "sum certain" and exhibits thereto; and (c) supporting documents attached to the claim form, including the expert report of Dr. E. Allen Jacobs, documents relied upon by Dr. Jacobs, and declarations submitted by Randall D. Stilley, Seahawk's former Chief Executive Officer, and James R. Easter, Seahawk's former Chief Financial Officer.[4]   BP subsequently acknowledged its receipt of these presentment-related documents.[5]

## V.   CAUSE OF ACTION UNDER THE OIL POLLUTION ACT OF 1990

39.     The Trustee re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

40.     The Oil Pollution Act of 1990 imposes liability upon a "responsible party for a . . . vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for damages that result from such incident as well as removal costs.   33 U.S.C. § 2702.

41.     BP, as the lessee or permitee of Macondo, is a "responsible party" under the Oil Pollution Act with respect to the Macondo Disaster.   BP, moreover, has been named as a "responsible party" by the U.S. Coast Guard.   Therefore, BP is strictly liable under 33 U.S.C. §

---

[4] A copy of these presentment-related documents (except for the voluminous documents relied upon by Dr. Jacobs) is attached hereto as Exhibit "A."

[5] A copy of BP's acknowledgment is attached hereto as Exhibit "B."

2702 for all damages due to and/or resulting from the Macondo Disaster and its environmental devastation.[6]

42.     BP is not entitled to limit its liability under 33 U.S.C. § 2704(a) because the Macondo Disaster was proximately caused by BP's gross negligence, willful misconduct, and/or violation of applicable safety, construction or operating regulations.  BP, moreover, waived the statutory limitation on liability in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," which was filed on October 19, 2010.

43.     The Macondo Disaster resulted in the discharge of more than 4.9 million barrels of oil into or upon the navigable waters of the Gulf of Mexico and the adjoining shorelines of several states.  The Macondo Disaster caused widespread environmental damage to the Gulf of Mexico and shorelines of several Gulf Coast states that consisted of the injury, destruction, or loss of various natural resources, including but not limited to the waters of the Gulf of Mexico, fisheries, and other aquatic and marine life in the region.

44.     Resulting from the Macondo Disaster, and due to the injury, destruction, or loss of property or natural resources entailed in and emanating from the Macondo Disaster and its aftermath, Seahawk suffered the following lost profits, impairment of earning capacity, and other economic damages:  (a) approximately $18.4 million from May 2010 through the sale of its rigs in early 2011; (b) at least $156.4 million from the sale of its rigs, discounted to net present value (and offsetting the value of the consideration that Seahawk received in exchange for the sale of those rigs); and (c) substantial additional amounts related to the loss of Project Talon.

---

[6] Given BP's strict liability, the Trustee need not make factual allegations regarding BP's culpability in order to state its claim.  Nonetheless, out of an abundance of caution, the allegations relating to BP's acts, omissions and failures set forth in paragraphs 258-542 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.

45.     Had it not been for the massive environmental catastrophe emanating from the Macondo Disaster, (a) the federal government would not have imposed a moratorium on deepwater drilling and/or taken other action that slowed the permitting process and created regulatory uncertainty for the entire drilling industry; (b) financial institutions and other investors would not have recoiled from investing in offshore drilling entities with operations in the Gulf of Mexico; and (c) the market for Seahawk's drilling services and its stock price would not have declined.   Each of these outcomes was a direct and entirely foreseeable result of an environmental disaster of the magnitude of the Macondo Disaster.

46.     BP is strictly liable to the Trustee, without limitation, for all of the above-referenced damages under the Oil Pollution Act of 1990.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Trustee respectfully requests that the Court enter judgment against BP for the following:

(a)     economic and compensatory damages sustained by Seahawk, including lost profits and/or impairment of earning capacity, in an amount to be determined at trial;

(b)     pre-judgment and post-judgment interest such amount at the maximum rate allowable by law and/or equity; and

(c)     such other relief that the Court deems just and proper.

Dated:  November 5, 2014


Respectfully submitted,


*/s/ Stephen J. Herman*
Stephen J. Harman, La. Bar No. 23129
Herman Herman & Katz LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Tel: (504) 581-4892
Fax: (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Plaintiffs' Liaison Counsel*

*/s/ James Parkerson Roy*
James Parkerson Roy, La. Bar No. 1511
Domengeaux Wright Roy & Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, LA 70501
Tel: (337) 233-3033
Fax: (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs' Liaison Counsel*


/s/ Conrad S.P. Williams, III
**WILLIAMS LAW GROUP, LLC**
CONRAD S.P. WILLIAMS, III (#14499)
MEREDITH R. DURHAM (#33112)
909 Poydras Street, Ste. 1625
New Orleans, Louisiana 70112
Office: (504) 200-0000
Fax No. (504) 200-0001
E-Mail: Duke@williamslawgroup.org
E-Mail: Meredith@Williamslawgroup.org

*/s/ Eric D. Madden*
**REID COLLINS &TSAI LLP**
Williams T. Reid, IV
Eric D. Madden
1601 Elm Street, 49th Floor
Dallas, TX 75201
(214) 420-8900 (telephone)
(214) 420-8909 (facsimile)
emadden@rctlegal.com


-and-

DIAMOND MCCARTHY LLP
Michael J. Yoder
909 Fannin Street, Suite 1500
Houston, Texas 77010
(713) 333-5100 (telephone)
(713) 333-5199 (facsimile)
myoder@diamondmccarthy.com

*Counsel for Eugene I. Davis, as Trustee of the
Seahawk Liquidating Trust*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

We hereby certify that the above and foregoing pleading will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order  No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United  States District Court for the Eastern District of Louisiana by using the CM/ECF System, which  will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 5th day of November, 2014.

 /s/ Meredith R. Durham