IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION: J |
| This Document Applies to:<br>No. 12-970, Bon Secour Fisheries, Inc., et al.<br>v. BP Exploration & Production Inc., et al. | * * * * | Honorable CARL J. BARBIER<br><br>Magistrate Judge SHUSHAN |

**AFFIDAVIT OF CHRISTINE REITANO FOR SUBMISSION IN EVIDENCE AT NOVEMBER 7, 2014 HEARING FOR SHOW CAUSE PARTIES**

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned Notary Public, personally came and appeared

**CHRISTINE REITANO**

a resident of full age and majority of the Parish of Orleans, State of Louisiana, who, after being duly sworn, did depose and say:

1.      Affiant is a licensed attorney, in good standing, in the State of Louisiana and the State of New York and she gives this affidavit based on her personal knowledge and beliefs.

**LACK OF FINANCIAL INTEREST IN THONN CLAIM
AFTER EMPLOYMENT AT THE CAO**

2.      Affiant did not retain any financial interest in a fee in the Thonn Claim after she terminated her attorney-client relationship with Thonn before she became employed at the

Claims Administrator's Office ("CAO").[1] Affiant truthfully testified at her sworn interview with Special Master Freeh ("SM Freeh") on July 29, 2013[2] that she did not retain a continued interest in a fee in the Thonn claim after she terminated her attorney-client relationship with Mr. Thonn before she began her employment at the CAO.[3] In the September 6, 2013 Report of the Special Master ("The 9/6 Report"), SM Freeh alleged and accused Ms. Reitano of giving false testimony on this subject, based largely on the mental impressions of one of his employees during an unrecorded interview with Ms. Christina Mancuso, an attorney working with the Andry-Lerner Law Firm.

3.      Subsequent to the 9/6 Report, in her Second (Supplemental) Response to the 9/6 Report,[4] Affiant included the sworn affidavit of Ms. Mancuso[5] which contradicted the unrecorded recollection of the interviewer who apparently submitted his findings to SM Freeh. Even though SM Freeh has had possession and knowledge of this contradiction of a very material fact which was the sole basis for his accusation of perjury against Affiant, he has not, until very recently and only after this court ordered the hearing on November 7, 2014, taken any steps to inform the court of this material sworn contradiction of his charges. In fact, in his Reply to the objections of the Show Cause Parties, filed on February 21, 2014 (Document No. 12393), when

---

[1] See Reitano Exhibits 1 and 2.

[2] See Reitano Exhibit 4.

[3] See Reitano Exhibits 5, 6 and 7.

[4] See Reitano Exhibit 9B.

[5] See Reitano Exhibit 8.

the opportunity presented itself for disclosure, Mr. Freeh did not even mention it in his Reply to the court.

4.     After this court ordered all parties submit a list of witnesses, exhibits and contested issues of fact for the November 7, 2014 hearing, SM Freeh finally disclosed that there is no basis for the perjury allegations against Ms. Reitano regarding the fee issue in the Thonn claim. In his submission to this court regarding contested issues of fact, SM Freeh has admitted that there is no evidence to contradict Ms. Reitano's sworn statements and account of her lack of a continued financial interest in the Thonn claim after she became employed at the CAO. Specifically, the Special Master makes these representations in his "Memorandum" concerning the hearing on November 7, 2014 (Document No 13504):

> 1.     While practicing law together, Sutton and Reitano represented Casey Thonn ("Thonn") before the Gulf Coast Claims Facility ("GCCF"). Sutton had represented Thonn on other legal matters as well. When Reitano began work at the Claims Administration Office ("CAO") on April 1, 2012, she referred her GCCF cases to other lawyers. *See* Report at 25-26, 43; Reply of the Special Master in Responses to Objections Filed by the Show Cause Parties at 14 ("Reply").
>
> *Factual Issues in Dispute*: None.
>
> 2.     Reitano testified that she referred Thonn's claims to Andry and the Andry Lerner firm. Sutton and Lerner testified that Sutton referred Thonn's claims to Lerner and the Andry Lerner firm. *See* Report at 25-26, 28, 43; Reply at 14.
>
> *Factual Issues in Dispute*: None. While the testimony presents different versions of the referral, contemporaneous records supports that both Reitano and Sutton referred Thonn's claims to the Andry Lerner firm before Reitano joined the CAO.

       3.     Reitano asked the Andry Lerner firm to honor the same 20 percent contingency fee agreement with Thonn that she had used. The Andry Lerner firm agreed to do so. **Reitano testified she had no continuing financial interest in the Thonn claims after she began work at the CAO, and no evidence contradicts her statement.** *See* **Report at 26.**

      *Factual Issues in Dispute*: None. (Emphasis added).
(Document 13504, p. 3).

5.     Stated another way, Affiant affirmatively states that the truth and the evidence gathered in the case confirms Ms. Reitano's truthful statements regarding her termination of her relationship with the Thonn matter before her employment with the CAO and the fact that she had no continuing interest, financial or otherwise, in the case after her employment at the CAO began.

## THE REMAINING ALLEGED "LAPSES" BY MS. REITANO

6.     The remainder of this affidavit will address: (a) the allegations of the Special Master regarding Affiant's suggestion to Garden City Group ("GCG"), a vendor in the Court Supervised Settlement Program ("CSSP"), that they consider hiring her attorney husband for a job in their planned New Orleans office; and (b) the allegations of the Special Master regarding Affiant's alleged support of Brown Greer ("BG"), another vendor in the CSSP, when other CSSP employees were supposedly seeking to evaluate certain business processes of Brown Greer. Both of these allegations can be found in Paragraph 21, Pages 12 and 13 of the Special Master's Memorandum Concerning Hearing on Objections to Special Master's Report (Document 13504). Even the Special Master admits that these alleged and so-called "lapses" "do not rise to the same level as conflicts of interest exhibited by other former CAO employees" and that "Reitano's

belief may mitigate the severity of her ethical breach..." There are no allegations against Ms. Reitano other than the Thonn claim addressed above and these two remaining "lapses."

**THE SUGGESTION THAT GCG HIRE MS. REITANO'S ATTORNEY HUSBAND**

7. The Special Master alleges that Ms. Reitano "advocated" for GCG to hire her husband for a job. The facts do not bear out this claim. Ms. Jennifer Keough of GCG (not Neil Zola as alleged by the Special Master) asked Ms. Reitano for a *suggestion* of a New Orleans attorney to work in their New Orleans office.[6] Ms. Reitano *suggested* her husband, Lionel Sutton, as a candidate. Ms. Reitano informed Ms. Keough, via email, that Mr. Sutton was interested in the position and, at the same time, told Ms. Keough that Mr. Sutton would "call Pat on Monday to get his thoughts," obviously to see if it would be OK for GCG to hire Mr. Sutton. Ms. Keough responded that Mr. Zola (GCG) told Ms. Keough to tell Ms. Reitano that Mr. Zola would like to talk to Mr. Sutton *before* the issue was mentioned to Mr. Juneau, thus discouraging Ms. Reitano and Mr. Sutton from seeking the thoughts and approval of Mr. Juneau in advance. After Ms. Keough told Ms. Reitano not to have Mr. Sutton speak to Mr. Juneau before speaking to Mr. Zola, she (Ms. Reitano) had nothing further to do with the issue. On information and belief, Mr. Zola and Mr. Sutton spoke to each other and Mr. Sutton was not offered a position.

8. In support of this allegation of a conflict, the Special Master cites federal statutes regarding federal civil service employees and cases involving federal employees. (See Reply of Special Master, Document 12393, pp. 29-30). Affiant was not a federal employee at any time and she was not subject to the Rules for federal civil service employees.

---

[6] See Reitano Exhibit 10.

9.  Affiant did not "advocate" for her husband to be employed by GCG. An "advocate" is defined by Merriam Webster as "a person who pleads the cause of another." Ms. Reitano simply responded to a request from Ms. Keough for the name of a lawyer in New Orleans and even told Ms. Keough that Mr. Sutton would call the Claims Administrator to "get his thoughts" on whether hiring Mr. Sutton would be appropriate. Affiant's response was no more than a "suggestion" which is defined by Merriam Webster as "to mention something as a possibility." If the discussion had gone beyond the discussion between Mr. Zola and Mr. Sutton, Ms. Reitano would certainly have gotten the approval of Mr. Juneau before she would allow the suggested employment begin.

### MS. REITANO SUPPORTS ALL VENDORS, INCLUDING BROWN GREER

10.  Ms. Reitano was hired by Patrick Juneau in early 2012 and began her employment on April 1, 2012 to serve as Claims Counsel for the CAO with the following responsibilities:

1.  Work with the Parties to identify any policy/legal issues and seek resolution at the direction of the claims administrator

2.  Assist the Claims Administrator with interpretation of the Settlement Agreement, Court Orders and other legal documents

3.  Work with the vendors and Contract Administrator's staff on legal issues and provide guidance as needed. (Exhibit 1, Schedule 1).[7]

Ms. Reitano carried out these responsibilities to their fullest, from the inception of her employment in April 2012, until her untimely termination in June of 2013.[8] Careful review and

---

[7] See also, Reitano Exhibit 2.

[8] See Reitano Exhibit 3.

understanding of these duties reveals that Ms. Reitano was not responsible for development of "business processes" which was the exclusive job of the vendors.

11. In early July, 2012, Ms. Reitano was designated by the Claims Administrator to be the "funnel" through which ALL communication regarding the Economic Settlement Program, its vendors, policies, procedures, rules, FAQ's, etc, must be directed. In late July, the Program transitioned from using Excel spreadsheets to using memoranda for the exchange of policy questions and comments. If the Settlement Agreement was vague or incomplete on a specific issue, or unique factual circumstances came to light during the review, or there was a need for an administrative process, the Claims Administrator proposed or implemented a policy by circulating a memo to the Parties for comment, acceptance or rejection. Ms. Reitano was assigned the duty of collecting and distributing the responses to the parties. The Claim's Administrator's Process of policy creation using the memo format resulted in the creation of 155 policies.

These issues were typically identified by the Vendors, predominately BrownGreer, during the review process. Ms. Reitano's responsibilities involved working with the vendors and Contract Administrator's staff on legal issues and providing guidance as needed. To this end, Ms. Reitano worked with a multitude of Vendor review teams and their respective team leaders on nearly all legal issues. Ms. Reitano, at the direction of and behalf of the Claims Administrator, provided guidance and oversight on the following issues: Seafood Program Implementation Issues (for which there are 22 components); Wetlands Implementation Issues; Coastal Property Implementation issues; IEL Claims; BEL Claims; Subsistence Claims; Transition Issues; Payment Processing Issues; Prior Payment Offsets; Opt Outs; Attorney Representation and Attorney Lien Resolution Issues; Third Party Claims and Garnishment Issues; Structured Settlements, Bar Dates; Seafood Second

Distribution; Development of Confidentiality Order; Development of several Court Appointed Procedures (CAP's); Development of Multiple Sworn Written Statements; Frequently Asked Questions (FAQs); Notice Templates; Guardian Ad Litem Appointment and Procedures; Moratoria Issues; Real Estate Developer Issues; Tourism issues; Fraud and Abuse Procedures and Implementation Issues; Reconsideration and Appeals Implementation Issues; the creation of a Re-Review Process; Communication issues; and Global Notes.

12. Ms. Reitano, at the direction of the Claims Administrator, worked with the Vendors to create an application called the Policy Keeper. In addition to being an electronic file cabinet of all Settlement Program policies, Policy Keeper allowed the Claims Administrator, the Vendors, BP and Class Counsel to draft, review and implement policies. During her employment at the CAO, Ms. Reitano was a staunch advocate of open communication and transparency. It was always her position in group discussions regarding public policy publication, that each and every policy and its history be published and made public.

13. On page 12 of the 9/6 Report, SM Freeh states:

> "BG relied upon Reitano to advance BG's interests within the CAO in an effort to resist and to undermine the implementation of business practices to control its costs and to eliminate inefficiencies."

This statement is simply not true and is insupportable. Ms. Reitano worked on a daily basis with all vendors, including Brown Greer, and she worked with employees of all vendors to identify any policy/legal issues and to seek resolution from the Parties at the direction of the claims Administrator. In the 9/6 Report, SM Freeh identifies three examples of what he calls the effort by Ms. Reitano on behalf of Brown Greer to "resist and undermine the implementation of new business practices which would control costs and eliminate inefficiencies:"

A.   <u>The "502" errors</u>: These so called errors were reported by Chris Reade and had nothing to do with costs, budgets or alleged inefficiencies. If anything, they were IT errors. After investigation, even Mr. Reade admitted that the occurrence of the alleged error only occurred at one-hundredth of a percentage point. Mr. Reade subsequently apologized to Brown Greer's IT officer. If anything, all Ms. Reitano did was facilitate the resolution of the issue as specifically provided in her contract.

B.   <u>Sara Cullen's email request for Brown Greer training materials and processes</u>:   Ms. Cullen did not make the request for these materials from a recognizable CSSP email address. She made it from an email address of a private company which involved Mr. Odom and Mr. Reade which they were presumably operating outside of the CSSP. The 9/6 Report refers to Mr. Orran Brown's "resistence" to providing the material and SM Freeh accuses Ms. Reitano of supporting Brown Greer in its opposition to providing the materials to a potential competitor, not the CSSP. Ms. Reitano facilitated a resolution of this matter between the vendor, Brown Greer, and certain staff members who were apparently not acting on behalf of the CSSP. Ms. Reitano was simply supporting a vendor, in this case Brown Greer, in addressing and resolving a problem. At all times, Ms. Reitano was acting in the best interest of the CSSP and performing her contractual duties.

C.   <u>BPRG[9] recommends transferring initial reviews from Brown Greer to the accountants</u>: Ms. Reitano was present during the consideration and final dismissal of this costly idea. After an investigation of the costs and delay which such an idea would pose, it was decided by consensus that it was a very costly proposal because it would have cost the program an additional $1.1 million

---

[9] Business Processing Reporting Group. This group included David Odom, Scott Sherick, Kirk Fisher and Chris Reade none of whom are believed to continue to work at the CAO.

dollars a month and would have slowed the process down significantly because the accountants were not keeping up with the current reviews by Brown Greer in the first place. These facts are fully explained and supported in the Declaration of Lynn Greer (Document No. 13497-6, Paragraph 31, pp. 19-21) filed as Exhibit 6 to the recent Response of the Claims Administrator (Document 13497) to BP's most recent motion to remove him gives full details on why this suggestion/recommendation was rejected. Ms. Reitano's involvement was not a "lapse" of anything. Her involvement and participation were part of her defined duties and the decision not to implement this change in the process was for the benefit of the program. Her judgment, as well as the judgment of all who agreed that the idea for a change was a very bad idea, was right on target and resulted in a savings to the program.

_____
CHRISTINE REITANO

Sworn to and subscribed before me this ___6___ day of November, 2014.

_____
NOTARY PUBLIC
Printed Name: Lionel H. Sutton III
Bar/Notary Number: 20386