10:01AM

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

2

3     ***********************************************************

4   IN RE:  OIL SPILL BY THE
   OIL RIG *DEEPWATER HORIZON*
5   IN THE GULF OF MEXICO ON
   APRIL 20, 2010
6                    CIVIL ACTION NO. 10-MD-2179 "J"
                    NEW ORLEANS, LOUISIANA
7                    MONDAY, JULY 29, 2013, 10:00 A.M.

8   THIS RELATES TO ALL CASES

9     ***********************************************************

10

11              SWORN STATEMENT OF **CHRISTINE REITANO**
         TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
12                 SPECIAL MASTER

13   APPEARANCES:

14                    LOUIS J. FREEH, SPECIAL MASTER
                    STEVE TIDWELL
15                    MICHAEL MCCALL

16                    

17                    MARY OLIVE PIERSON
                    ATTORNEY AT LAW
18                    POST OFFICE BOX 14647
                    BATON ROUGE LA  70809
19                    (ATTORNEY FOR CHRISTINE REITANO)

**REITANO EXHIBIT 4**

20

21   OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                    CERTIFIED REALTIME REPORTER
22                    REGISTERED MERIT REPORTER
                    500 POYDRAS STREET, ROOM HB406
23                    NEW ORLEANS, LA  70130
                    (504) 589-7779
24                    Cathy_Pepper@laed.uscourts.gov

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
   PRODUCED BY COMPUTER.

**C O N F I D E N T I A L**

2

1          I N D E X

2    EXAMINATIONS                                    PAGE

3

4    **CHRISTINE REITANO**.................................   5

5    EXAMINATION BY MR. FREEH..........................   5

6    EXAMINATION BY MS. PIERSON....................... 146

7    EXAMINATION BY MR. FREEH......................... 150

8

9

10          E X H I B I T S

11

12   DESCRIPTION                                     PAGE

13

14   EXHIBIT 02B......................................  57

15   EXHIBIT 02D......................................  59

16   EXHIBIT 02D1.....................................  61

17   EXHIBIT 03.......................................  63

18   EXHIBIT 02.......................................  69

19   EXHIBIT 02A......................................  75

20   EXHIBIT 04.......................................  76

21   EXHIBIT 04A......................................  83

22   EXHIBIT 05.......................................  86

23   EXHIBIT 05A......................................  92

24   EXHIBIT 05B......................................  93

25   EXHIBIT 06.......................................  95

OFFICIAL TRANSCRIPT

SM-02-CR00707

1   EXHIBIT 06A.........................................  95

2   EXHIBIT 01.........................................  112

3   EXHIBIT 07.........................................  134

4   EXHIBIT 08.........................................  134

5   EXHIBIT 07A........................................  135

6   EXHIBIT 09.........................................  136

7   EXHIBITS 10, 11, 12................................  137

8   EXHIBIT 13.........................................  146

9   EXHIBIT 14.........................................  147

10  EXHIBIT 15.........................................  148

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

SM-02-CR00708

4

|   |   |
|---|---|
| 1 | P-R-O-C-E-E-D-I-N-G-S |
| 2 | MONDAY, JULY 29, 2013 |
| 10:03AM 3 | |
| 10:03AM 4 | |
| 10:04AM 5 | MR. FREEH:  We'll go on the record.  I'm Louis Freeh, |
| 10:05AM 6 | and Steve Tidwell, Mike McCall are with me, Christine Reitano |
| 10:05AM 7 | and her lawyer.  I'll let her lawyer state her full name and |
| 10:05AM 8 | contacts. |
| 10:05AM 9 | MS. PIERSON:  My name is Mary Olive Pierson.  My |
| 10:05AM 10 | Louisiana Bar Roll Number is 11004.  I'm located at |
| 10:05AM 11 | 8702 Jefferson Highway, Suite B in Baton Rouge, Louisiana, |
| 10:05AM 12 | that's 70809.  My mailing address is P.O. Box 14647, |
| 10:05AM 13 | Baton Rouge 70898.  My phone number is (225) 927-6765.  And my |
| 10:05AM 14 | e-mail is mop@mopslaw.com. |
| 10:05AM 15 | MR. FREEH:  Great.  Thank you very much. |
| 10:05AM 16 | So this is an interview being conducted in |
| 10:05AM 17 | connection with the Court's order appointing me as the |
| 10:05AM 18 | Special Master to look at some of the aspects of the claim |
| 10:05AM 19 | administration process, including allegations and facts and |
| 10:05AM 20 | circumstances surrounding the conduct of some of its employees. |
| 10:06AM 21 | So what we'll do as we start is I'm going to put |
| 10:06AM 22 | you under oath.  And then also advise you and your lawyer that, |
| 10:06AM 23 | obviously, as a special master we're a judicial officer, so, of |
| 10:06AM 24 | course, anything that would be said to us, intending it to be |
| 10:06AM 25 | false or misleading or incomplete could be construed by the |

**C O N F I D E N T I A L**

SM-02-CR00709

| | | |
|---|---|---|
| 10:06AM | 1 | court or by some other authority as a false material statement, |
| 10:06AM | 2 | and since you'll be under oath, any material false statement |
| 10:06AM | 3 | with knowledge of its falsity, incompleteness or misleading |
| 10:06AM | 4 | could also be construed as a violation of Title 18 1001.  And |
| 10:06AM | 5 | we're telling that to all of our witnesses. |
| 10:06AM | 6 | So let me start by putting you under oath. |
| 10:06AM | 7 | And the oath is: |
| 10:07AM | 8 | Do you swear that the testimony and evidence you |
| 10:07AM | 9 | will give today will be the truth, the whole truth and nothing |
| 10:07AM | 10 | but the truth to your full ability, so help you God? |
| 10:07AM | 11 | THE WITNESS:  Yes. |
| | 12 | **CHRISTINE REITANO** |
| | 13 | was called as a witness and, after being first duly sworn by |
| | 14 | the Special Master, was examined and testified on her oath as |
| | 15 | follows: |
| | 16 | EXAMINATION |
| | 17 | BY MR. FREEH: |
| 10:07AM | 18 | Q.   So would you prefer to be called *Ms. Reitano* or *Mrs.,* |
| 10:07AM | 19 | I'm sorry? |
| 10:07AM | 20 | A.   Ms. Reitano, I guess, is what I go by. |
| 10:07AM | 21 | Q.   Ms. Reitano.  Okay.  Fine. |
| 10:07AM | 22 | Ms. Reitano, we could start, then, by asking you some |
| 10:07AM | 23 | questions just about your educational background, so maybe you |
| 10:07AM | 24 | could just tell us where you went to college, where you went to |
| 10:07AM | 25 | law school, and then I'll lead you through some questions about |

**C O N F I D E N T I A L**

SM-02-CR00710

| | | |
|---|---|---|
| 10:07AM | 1 | your professional life before you started the employment with |
| 10:07AM | 2 | the claims administration. |
| 10:07AM | 3 | A.   Okay.  I went to college at the University of Pennsylvania |
| 10:07AM | 4 | in Philadelphia, and I went to law school at Tulane University |
| 10:07AM | 5 | here in New Orleans. |
| 10:07AM | 6 | Q.   And what year did you graduate from Tulane law school? |
| 10:07AM | 7 | A.   1991. |
| 10:07AM | 8 | Q.   And after taking the Louisiana bar, I take it you're a |
| 10:08AM | 9 | lawyer in good standing in Louisiana? |
| 10:08AM | 10 | A.   Yes. |
| 10:08AM | 11 | Q.   And what was your first professional employment as an |
| 10:08AM | 12 | attorney? |
| 10:08AM | 13 | A.   I always did contract work, so I want to say that it was |
| 10:08AM | 14 | this attorney in Lafayette.  I can't remember his name now. |
| 10:08AM | 15 | His first name was Charles, and I was helping him out with some |
| 10:08AM | 16 | environmental cases on a part-time basis. |
| 10:08AM | 17 | And then there was another law firm called |
| 10:08AM | 18 | *Oats & Hudson*.  And again, I was doing hourly research-type |
| 10:08AM | 19 | work for them. |
| 10:08AM | 20 | But the first, what I call *my real job* -- |
| 10:08AM | 21 | Q.   Yes. |
| 10:08AM | 22 | A.   -- was working for Leger & Mestayer on the tobacco |
| 10:08AM | 23 | litigation. |
| 10:08AM | 24 | Q.   And approximately when was that? |
| 10:08AM | 25 | A.   I think I began that in 1994. |

**C O N F I D E N T I A L**

SM-02-CR00711

7

10:08AM 1    Q.    And just on a general basis, what were your

10:09AM 2    responsibilities and role in that particular employment?

10:09AM 3    A.    It started out, you know, that we were doing a lot of

10:09AM 4    document review, and then -- you know, then it turned into

10:09AM 5    doing some motion writing, and then, eventually, you know, kind

10:09AM 6    of supervising the floor of document reviewers.

10:09AM 7          And I went to a lot of hearings and meetings with

10:09AM 8    Walter Leger, just assisting him with everything he was

10:09AM 9    doing --

10:09AM 10   Q.    Yes.

10:09AM 11   A.    -- on the tobacco litigation.

10:09AM 12   Q.    Did your work at that time include any motion practice or

10:09AM 13   arguing before the court?

10:09AM 14   A.    No.  I wouldn't argue before the court, but I would do --

10:09AM 15   you know, I might write the motions themselves.

10:09AM 16   Q.    And maybe you could take us, then, to your next

10:09AM 17   substantive or full-time legal employment after that and just

10:09AM 18   give us a year, please.

10:09AM 19   A.    After that, I guess at some point I -- you know, I had my

10:10AM 20   children.  I had two in a row.  And so then I was working only

10:10AM 21   part time on the tobacco litigation.

10:10AM 22         And then after that, after it was settled, then I

10:10AM 23   started working with my husband.  He was a sole practitioner.

10:10AM 24   And he would hire me out, and I would work under his name on

10:10AM 25   different and various class-action suits, Vioxx, Neurontin.  We

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 10:10AM | 1 | were doing some breast implant.  He had the train derailment |
| 10:10AM | 2 | case.  It was just -- you know, just different... |
| 10:10AM | 3 | Q.   And approximately when did that start, the affiliation and |
| 10:10AM | 4 | employment in connection with your husband? |
| 10:10AM | 5 | A.   Let's see. |
| 10:10AM | 6 | Q.   Approximately. |
| 10:10AM | 7 | A.   If that was -- it was on and off.  I guess if I had my |
| 10:11AM | 8 | other son in -- in 2002 I had my youngest and I would have |
| 10:11AM | 9 | stayed home, again, for three years. |
| 10:11AM | 10 | So I would say -- and then there was the -- I had |
| 10:11AM | 11 | started working on Vioxx before the hurricane.  And then that |
| 10:11AM | 12 | was interrupted, and we moved to New Iberia for a year.  So |
| 10:11AM | 13 | when I came back, I guess I would say, once again really |
| 10:11AM | 14 | picking up, but it was still on a part-time basis, probably |
| 10:11AM | 15 | 2007, 2008. |
| 10:11AM | 16 | Q.   And your husband you referred to, of course, is |
| 10:11AM | 17 | Lionel Sutton? |
| 10:11AM | 18 | A.   Yes. |
| 10:11AM | 19 | Q.   And approximately when were you married? |
| 10:11AM | 20 | A.   1997. |
| 10:11AM | 21 | Q.   And do you have a common household?  Do you share a common |
| 10:11AM | 22 | household since then? |
| 10:11AM | 23 | A.   Yes. |
| 10:11AM | 24 | Q.   Do you file joint tax returns? |
| 10:11AM | 25 | A.   Right. |

**C O N F I D E N T I A L**

SM-02-CR00713

9

| | | |
|---|---|---|
| 10:11AM | 1 | Q.    And you have two children, two boys? |
| 10:12AM | 2 | A.    Three. |
| 10:12AM | 3 | Q.    Three? |
| 10:12AM | 4 | A.    Yeah.  I had two back to back, 16 and 15, and I have an |
| 10:12AM | 5 | 11-year-old. |
| 10:12AM | 6 | Q.    That's great. |
| 10:12AM | 7 | It's a full-time job? |
| 10:12AM | 8 | A.    Yes, it is.  It is.  And so I just tried to keep my hand |
| 10:12AM | 9 | in things, you know, but I was a stay-at-home mom in a sense, |
| 10:12AM | 10 | too. |
| 10:12AM | 11 | Q.    When you started to get legal assignments or legal work |
| 10:12AM | 12 | from Mr. Sutton, did he have his own law firm at that time? |
| 10:12AM | 13 | A.    Yes. |
| 10:12AM | 14 | Q.    And was it called *Sutton* or *Sutton & Reitano*? |
| 10:12AM | 15 | A.    It was called *The Law Offices of Lionel Sutton, III*.  And |
| 10:12AM | 16 | at one point I think he tried to create some sort of, you know, |
| 10:12AM | 17 | partnership or something called *Sutton & Reitano*.  And then it |
| 10:12AM | 18 | didn't happen.  And so he started using the name Sutton & |
| 10:12AM | 19 | Reitano as a d/b/a as I was working for him, because it made it |
| 10:12AM | 20 | easier to go by that name since I was now actually in the |
| 10:13AM | 21 | office. |
| 10:13AM | 22 | Q.    The law firm Lionel Sutton, III, where was that |
| 10:13AM | 23 | headquartered at the time when you started to do work for him? |
| 10:13AM | 24 | A.    When I started, it was at 610 Baronne and in New Orleans. |
| 10:13AM | 25 | Q.    And did I understand you to say that it was not then |

**C O N F I D E N T I A L**

SM-02-CR00714

10:13AM  1    formally changed to a --

10:13AM  2    A.    No.

10:13AM  3    Q.    -- PLC?

10:13AM  4    A.    No.

10:13AM  5    Q.    Had it ever been since then?

10:13AM  6    A.    No.

10:13AM  7    Q.    So in terms of its registration as a law firm, it's just

10:13AM  8    Lionel Sutton, III?

10:13AM  9    A.    Right.

10:13AM  10   Q.    But it's commonly referred to, and you've referred to it

10:13AM  11   yourself, as *Sutton & Reitano*?

10:13AM  12   A.    Exactly.    Exactly.

10:13AM  13   Q.    With respect to the work you did in connection with your

10:13AM  14   husband at Sutton, we'll call it *Sutton & Reitano*, again, prior

10:13AM  15   to your work with the claims administrator, what type of

10:13AM  16   assignments and what type of practice did you have during this

10:14AM  17   period?

10:14AM  18   A.    So it was mostly work on class actions and complex

10:14AM  19   litigation, and so it was a lot of discovery work, a lot of

10:14AM  20   research and writing, depositions.    You know, never really

10:14AM  21   going before the judge and arguing, that sort of thing.    Just,

10:14AM  22   you know, kind of very academic, that type of work.

10:14AM  23   Q.    Were you representing plaintiffs at that time?

10:14AM  24   A.    No.    No.    I would just assist my husband with -- with

10:14AM  25   the -- with his clients for the most part.

**C O N F I D E N T I A L**

SM-02-CR00715

10:14AM  1    Q.    Were his clients, at least some of them, class-action
10:14AM  2    plaintiffs?
10:14AM  3    A.    No.  He would get involved -- well, yes, yes.  Some of
10:14AM  4    them were class-action plaintiffs, yes.  And then in other
10:14AM  5    situations, he would partner with another firm who was
10:14AM  6    actually, you know, part of the Plaintiff Steering Committee or
10:15AM  7    something else, and then I would work on that class action
10:15AM  8    through his office.
10:15AM  9    Q.    And during the course of those assignments and that work,
10:15AM 10    did you come to know and meet other lawyers with whom he
10:15AM 11    worked?
10:15AM 12    A.    Yes.  But not to that great of an extent, because the
10:15AM 13    class-action stuff I would work on, he didn't get heavily
10:15AM 14    involved in.  You know, it was more me doing hourly work on
10:15AM 15    those class actions, if that makes sense.
10:15AM 16    Q.    So with respect to an attorney named John Andry, do you
10:15AM 17    know him?
10:15AM 18    A.    Oh, well, that's different.  John Andry and my husband
10:15AM 19    went to law -- were in the same law school class.  And when my
10:15AM 20    husband -- my husband was formerly married.  He was married in
10:15AM 21    law school.  He went through a divorce while he was in law
10:15AM 22    school, and then John Andry's family was there to support him
10:16AM 23    and kind of help him through the divorce.  So they were best
10:16AM 24    friends after law school.
10:16AM 25          Then, eventually, they did -- he, John and Gibby

**C O N F I D E N T I A L**

SM-02-CR00716

12

10:16AM  1   bought a building together.  That's the building --

10:16AM  2         MR. TIDWELL:  Is that Gibby Andry?

10:16AM  3         THE WITNESS:  Yes.

10:16AM  4         That is the building at 610 Baronne, and they

10:16AM  5   each had one floor.  And they did work on a few cases together,

10:16AM  6   but they weren't a partnership.  So one of the cases I worked

10:16AM  7   on, the BellSouth-Centennial case, is one that they had

10:16AM  8   together.

10:16AM  9         I'm not -- I don't remember and I'm not aware of

10:16AM  10  the others, but I think there were more than one.  But they

10:16AM  11  were friends.  They did have a falling out over a fee for a

10:16AM  12  while, but --

10:16AM  13        And, also, at one point, John and Gibby -- I'm

10:16AM  14  not sure.  You'll have to ask my husband the time frame.  But

10:17AM  15  at one point they bought my husband out of his interest in the

10:17AM  16  building, and in return, he was to -- was to stay there rent

10:17AM  17  free in the building, so --

10:17AM  18  BY MR. FREEH:

10:17AM  19  Q.   That's the building at 610?

10:17AM  20  A.   That's right.

10:17AM  21        And then they had the falling out over the fee.  And

10:17AM  22  I think when I came to the building, must have been 2008, 2009,

10:17AM  23  you know, it was kind of tense.  It was kind of weird.  But we

10:17AM  24  stayed there, at least when I was going in every day, for about

10:17AM  25  another year and a half before we moved out to the Gravier

**C O N F I D E N T I A L**

SM-02-CR00717

13

10:17AM 1   building.

10:17AM 2   Q.   Were there other tenants in the building at 610?

10:17AM 3   A.   No, not to my knowledge.  It was just Gibby, John and my

10:17AM 4   husband.

10:17AM 5   Q.   And when did you first meet your husband?

10:17AM 6   A.   I met him in -- when I was a first year in law school.

10:18AM 7   Or -- it was either 1988, 1989.

10:18AM 8   Q.   At Tulane?

10:18AM 9   A.   At Tulane.

10:18AM 10  Q.   And at that time did you meet John Andry through your

10:18AM 11  husband, your future husband?

10:18AM 12  A.   I might have met John Andry first.   John Andry --

10:18AM 13         MS. PIERSON:  You mean before your husband?

10:18AM 14         THE WITNESS:  Yeah.

10:18AM 15  BY MR. FREEH:

10:18AM 16  Q.   In law school?

10:18AM 17  A.   Yeah.

10:18AM 18  Q.   Okay.

10:18AM 19  A.   John Andry was very outgoing.  You couldn't not meet

10:18AM 20  John Andry.

10:18AM 21         MR. TIDWELL:  Was he a law student at the time?

10:18AM 22         THE WITNESS:  Yes, yes.

10:18AM 23  BY MR. FREEH:

10:18AM 24  Q.   The brother, is he also a lawyer?

10:18AM 25  A.   Yes, he is.

**C O N F I D E N T I A L**

SM-02-CR00718

10:18AM 1    Q.   Did he go to Tulane?

10:18AM 2    A.   Yes, he did.

10:18AM 3    Q.   Around the same time?

10:18AM 4    A.   I think he was a year ahead of John and Tiger.  A year or

10:18AM 5    two years, I'm not sure.

10:18AM 6    Q.   Did you meet him --

10:18AM 7    A.   Yeah.

10:18AM 8    Q.   -- at or about the same time?

10:18AM 9    A.   You know, the school was pretty small, so you got familiar

10:18AM 10   with everyone there, yeah.

10:18AM 11   Q.   There came a time when you then found employment with

10:18AM 12   Patrick Juneau; is that correct?

10:19AM 13   A.   Right.

10:19AM 14   Q.   Could you tell us about when that was, or when the

10:19AM 15   discussions first started with respect to your working there?

10:19AM 16   A.   Yes.  So we had moved into the building, 935 Gravier, in

10:19AM 17   the early spring of 2012 -- no, 2011.  I'm sorry.  So we were

10:19AM 18   there a year.

10:19AM 19        So then a year later my husband mentioned to me that

10:19AM 20   he thought that a lot of the BP settlement work was going to be

10:19AM 21   done in our building.  And I thought -- you know, I had always

10:19AM 22   done this type of contract work for PSC's, so to speak, and I

10:19AM 23   really hated the kind of personal injury practice my husband --

10:19AM 24   the other part of his practice that he was involved in, so I

10:19AM 25   was like, oh, that would be fantastic.  I would like to do that

**C O N F I D E N T I A L**

**SM-02-CR00719**

10:19AM  1    hourly work again.

10:19AM  2          And then very shortly thereafter, he learned that

10:19AM  3    Pat Juneau had been appointed as the Special Master or court

10:20AM  4    administrator.  And I said, "Well, boy, I would love to work

10:20AM  5    for him."

10:20AM  6          So my husband gave Pat Juneau a call, and sometime

10:20AM  7    in -- I think it would have been early March, Pat Juneau

10:20AM  8    actually came to our office.

10:20AM  9    Q.    That would be 2010?

10:20AM  10   A.    2012.

10:20AM  11   Q.    2012?

10:20AM  12   A.    That's right.  In early March of 2012.  It must have been

10:20AM  13   right after he had been appointed.

10:20AM  14         He came and he sat down and he talked to the two of

10:20AM  15   us, and he kind of, you know, spelled out what he thought the

10:20AM  16   program would entail and what his needs would be.  And I told

10:20AM  17   him about my experience, you know, that it was very just, you

10:20AM  18   know, document research oriented, administrative oriented.

10:21AM  19         And he had in mind that he was just going to have a

10:21AM  20   very small office, that he would have one lawyer, maybe a

10:21AM  21   paralegal, maybe a secretary, and maybe an accountant.

10:21AM  22         And he asked if we were involved in any BP-related

10:21AM  23   cases.  And at the time I did have just a handful of GCCF

10:21AM  24   clients, and I told him about that.  And he said, "Well, you

10:21AM  25   wouldn't be able to represent them anymore."

**C O N F I D E N T I A L**

| | |
|---|---|
| 10:21AM 1 | I said I understood.  And I didn't mind.  I had had |
| 10:21AM 2 | those clients for a year and nothing was happening in the GCCF |
| 10:21AM 3 | program. |
| 10:21AM 4 | And then he -- |
| 10:21AM 5 | Q.   Let me just stop you there, if I might, please. |
| 10:21AM 6 | A.   Yes. |
| 10:21AM 7 | Q.   Did you specifically identify who the clients were? |
| 10:21AM 8 | A.   I don't recall if I told him name by name or if I just |
| 10:21AM 9 | spoke generally about it. |
| 10:21AM 10 | Q.   Did you at a later time specifically identify those |
| 10:21AM 11 | clients to him? |
| 10:21AM 12 | A.   I don't believe I did.  I just terminated my relationships |
| 10:22AM 13 | with them and, you know, notified the program, the GCCF |
| 10:22AM 14 | program, and that's all I actively did. |
| 10:22AM 15 | Q.   And who were those clients?  Can you recall them as you |
| 10:22AM 16 | sit here? |
| 10:22AM 17 | A.   Yes, I can. |
| 10:22AM 18 | Q.   If you need to look at something, that's okay. |
| 10:22AM 19 | A.   No, I'm okay.  Casey Thonn, Tim Gonzales, Jessica Backes, |
| 10:22AM 20 | B-A-C-K-E-S, Melvin Backes, Ronald Backes.  And Ronald Backes |
| 10:22AM 21 | also filed a claim on behalf of a bar he owned called |
| 10:22AM 22 | *Tooloula's*, T-O-O-L-O-U-L-A, apostrophe S. |
| 10:22AM 23 | Q.   And except for Casey Thonn, do you know as you sit here |
| 10:22AM 24 | today, whether any of the other parties you just mentioned |
| 10:22AM 25 | pursued and filed claims with Mr. Juneau's -- |

**C O N F I D E N T I A L**

SM-02-CR00721

10:23AM  1   A.   I do not know except to the extent of what I've read in

10:23AM  2   either -- it was Welker's investigative report.  I know that

10:23AM  3   the Backes' claims were already on some kind of fraud hold at

10:23AM  4   the time, so they just -- they were dealing with their attorney

10:23AM  5   who had referred them to us in the first place.

10:23AM  6        Tim Gonzales, I remember that they told me they were

10:23AM  7   going to stay on their own, and I advised them to, because at

10:23AM  8   the time, you know, they were saying the settlement program,

10:23AM  9   all you have to do is file your documentation and the program

10:23AM 10   will do the rest.

10:23AM 11        So when I read that they hadn't filed the claim, I

10:23AM 12   was surprised, because I thought they would have, and they

10:23AM 13   would have done it on their own.

10:23AM 14   Q.   So when you talked to Mr. Juneau as you just described,

10:24AM 15   about that employment, at that moment had you previously met

10:24AM 16   him?

10:24AM 17   A.   Mr. Juneau?

10:24AM 18   Q.   Mr. Juneau.

10:24AM 19   A.   Yes.  Yes.  But, you know, it would have been just -- my

10:24AM 20   husband, that was the first job he had, my husband had out of

10:24AM 21   law school.  He worked for Pat Juneau in Lafayette.  And I was

10:24AM 22   still in law school here at Tulane at the time, and we would

10:24AM 23   drive back and forth.  We would commute.

10:24AM 24        And so if he had -- maybe I would have gone out to

10:24AM 25   lunch with him, or if they had a Christmas party.  You know, it

**C O N F I D E N T I A L**

SM-02-CR00722

10:24AM 1    was just that sort of relationship.

10:24AM 2    Q.    So approximately how many times would you have met

10:24AM 3    Mr. Juneau prior to him coming to the office to discuss your

10:24AM 4    past employment?

10:24AM 5    A.    I guess five to ten.  You know, I would go to the office

10:24AM 6    sometimes.  I really can't recall.  It could have been more

10:24AM 7    than that, you know.  I'm not sure.

10:25AM 8    Q.    You said that was your husband's first job out of law

10:25AM 9    school?

10:25AM 10   A.    Yes.

10:25AM 11   Q.    That was with Mr. Juneau's law firm?

10:25AM 12   A.    That's right.

10:25AM 13   Q.    And do you know approximately when that was when he

10:25AM 14   started to work with him?

10:25AM 15   A.    I want to say 1990.

10:25AM 16   Q.    And if you know, did he work with him as an associate at

10:25AM 17   first or a partner?

10:25AM 18   A.    Associate.

10:25AM 19   Q.    Did he have any particular responsibilities or practice

10:25AM 20   area that he performed there?

10:25AM 21   A.    I don't think so.  I don't think he had specialized at

10:25AM 22   that point in any way.  It was, you know, whatever they

10:25AM 23   assigned to him.

10:25AM 24   Q.    And do you know how large a law firm it was at that time,

10:25AM 25   approximately?

**C O N F I D E N T I A L**

SM-02-CR00723

10:25AM 1    A.   I know it was Juneau Judice Hill.  I think there were

10:25AM 2    three partners, and each would have had an associate.  And I

10:25AM 3    think Mike Juneau was there.  My guess would be maybe ten

10:25AM 4    attorneys.

10:25AM 5    Q.   And as best you know, for how long a period was your

10:26AM 6    husband associated with that law firm?

10:26AM 7    A.   Maybe two -- two to four years.  I don't remember.  But I

10:26AM 8    know at one point Pat Juneau suffered some health condition,

10:26AM 9    and he had to, you know -- he retired temporarily from working.

10:26AM 10   And I think there was already maybe some fraction between the

10:26AM 11   partners at the firm.  But, you know, because Tiger was the

10:26AM 12   associate for Pat Juneau -- you'll have to ask my husband.  I

10:26AM 13   don't know if it was that my husband didn't want to work for

10:26AM 14   either the other two partners or vice versa, but at that point,

10:26AM 15   he went on his own.

10:26AM 16   Q.   And you said "Tiger," that's your husband's nickname?

10:26AM 17   A.   Yes.  I assumed you might know that because I've seen it

10:26AM 18   referenced in some of the documents.

10:26AM 19   Q.   Do you know how he got that nickname?

10:27AM 20   A.   He told me when -- the day they brought him home from the

10:27AM 21   hospital, his grandmother looked in the crib and said, "That's

10:27AM 22   a little tiger in there."

10:27AM 23        It's not unusual.  You know, my husband is from

10:27AM 24   New Iberia, which they call *Cajun country*, and they have

10:27AM 25   some -- you know, Egore, T-Bob.  They all have a name of that

**C O N F I D E N T I A L**

10:27AM 1  sort.

10:27AM 2  Q.   Let's go back to, again, the early part of 2012 when you

10:27AM 3  and your husband start to talk about the possibility, I assume

10:27AM 4  at that time, of you going to work for Mr. Juneau.

10:27AM 5  A.   Right.   Right.

10:27AM 6  Q.   Do you specifically ask your husband to make an

10:27AM 7  introduction so you can have a job opportunity there or is it

10:27AM 8  your husband who initiates the idea, if you recall?

10:27AM 9  A.   I believe my husband initiated the idea, and I was -- you

10:27AM 10 know, I was happy to go with it, wherever it led.

10:27AM 11 Q.   At that point, were the offices adjoining each other on

10:28AM 12 the same floor.   Had Mr. Juneau set up that operation yet?

10:28AM 13 A.   Oh, no.   And it didn't -- I mean, they were looking at

10:28AM 14 spaces at that time.

10:28AM 15      You know what is funny -- it's funny, though, because

10:28AM 16 we moved into that building the year before.   We were the first

10:28AM 17 tenants literally.   There was no one in that building.   And all

10:28AM 18 the floors had the old Chevron stuff in there.   You know,

10:28AM 19 whiteboards just left behind, all the desks, everything.   It

10:28AM 20 was like a ghost town.

10:28AM 21      And we had -- we were building out a space on the

10:28AM 22 19th floor to be our permanent office, and it was taking a very

10:28AM 23 long time.   And then later on -- I don't think I knew right

10:28AM 24 then at that first visit, but later on it would just happen, by

10:28AM 25 coincidence, that the claims administrator's office would be on

**C O N F I D E N T I A L**

10:28AM 1    the same floor as what was going to be our permanent office,

10:29AM 2    and that they would actually share a wall.

10:29AM 3    Q.   And do you understand that, when you described it using

10:29AM 4    the word as just a *coincidence*?

10:29AM 5    A.   Oh, absolutely.

10:29AM 6    Q.   Did your husband assist at all in helping him find or

10:29AM 7    secure that space, to your knowledge?

10:29AM 8    A.   Not to my knowledge.   No.

10:29AM 9    Q.   The meeting you described where Mr. -- you said Mr. Juneau

10:29AM 10   came over to your office to discuss the employment?

10:29AM 11   A.   Right.

10:29AM 12   Q.   Besides your husband, Mr. Juneau and yourself, was anyone

10:29AM 13   else at that meeting?

10:29AM 14   A.   No.

10:29AM 15   Q.   And approximately how long did the meeting take?

10:29AM 16   A.   Oh, I think we talked for about a half an hour or

10:29AM 17   45 minutes.

10:29AM 18   Q.   And you mentioned that Mr. Juneau described that he was

10:29AM 19   going to have a *small* operation, I think was the word used.

10:29AM 20   A.   Yes.   I don't think anyone could have envisioned, at least

10:29AM 21   at the time it didn't seem that he envisioned, how massive of a

10:30AM 22   scale the program was going to turn out to be.

10:30AM 23   Q.   Did he discuss that in any way or contemplate or forecast

10:30AM 24   how large the operation would be or how long your employment

10:30AM 25   would be?

**C O N F I D E N T I A L**

SM-02-CR00726

10:30AM 1   A.   No, not at that time.

10:30AM 2   Q.   Was salary discussed there?

10:30AM 3   A.   No, not at that time.  We didn't talk about salary at that

10:30AM 4   time.

10:30AM 5   Q.   And you said, I think, that he said at that meeting he was

10:30AM 6   looking to hire one attorney?

10:30AM 7   A.   Yes.

10:30AM 8   Q.   And what, if anything, did he say about that attorney?

10:30AM 9   What functions, role, responsibility would he or she have?

10:30AM 10  A.   I guess the functions would be -- how did he put it?  You

10:30AM 11  know, you just -- the legal interpretation of the agreement.

10:30AM 12  You know, he was going to be charged with implementing this

10:30AM 13  document, and, you know, I think that was the gist of it.  And

10:31AM 14  then, you know, all this other oversight, you know, you had to

10:31AM 15  have the thing set up to actually see what that was going to

10:31AM 16  entail.

10:31AM 17  Q.   Now, when you say *this document*, you're referring to the

10:31AM 18  court settlement?

10:31AM 19  A.   Yes.

10:31AM 20  Q.   At the time you first met him, had you read the court

10:31AM 21  settlement?

10:31AM 22  A.   No, I didn't.  I can't remember.  I must have -- I

10:31AM 23  certainly saw the agreement before it was -- even received

10:31AM 24  preliminary approval.  But, no, I hadn't seen it right then and

10:31AM 25  there at the time, at that first meeting.

**C O N F I D E N T I A L**

SM-02-CR00727

10:31AM 1   Q.   Did he give you any more description about what the

10:31AM 2   function would be of his sole lawyer for the operation?

10:31AM 3   A.   No.

10:31AM 4   Q.   Did you ask any questions about what your duties would be?

10:31AM 5   A.   No.  Because it was very preliminary, you know.  We just

10:32AM 6   discussed, in general, you know, what was going on.  And, you

10:32AM 7   know, at that time I didn't know if he was going to consider me

10:32AM 8   or not.  You know, it was somewhat casual and informal.

10:32AM 9   Q.   Did there come a time when you had another discussion with

10:32AM 10  him about employment?

10:32AM 11  A.   After that most of the discussions were by phone, because

10:32AM 12  after that he was extremely busy.  He was going from one point

10:32AM 13  to the next point to -- I think he was trying to set things up.

10:32AM 14  These vendors were being appointed.  There were all sorts of

10:32AM 15  meetings going on, and he essentially was asking me to sit

10:32AM 16  tight.

10:32AM 17  Q.   So when you say *sit tight*, you were not having continuing

10:32AM 18  discussions with him about your employment?

10:32AM 19  A.   No.  No.  I think I did call him in the interim before,

10:33AM 20  you know, he called and told me I would have the position, but

10:33AM 21  he had to meet with the parties and so forth and the judge.

10:33AM 22  And, no, I didn't spend much time -- I didn't have another

10:33AM 23  meeting with him.

10:33AM 24  Q.   And when you say that you continued to discuss the

10:33AM 25  employment on phone calls, it sounds like the phone calls were

**C O N F I D E N T I A L**

SM-02-CR00728

24

| | | |
|---|---|---|
| 10:33AM | 1 | fairly short and not very detailed? |
| 10:33AM | 2 | A.   Yes. |
| 10:33AM | 3 | Q.   Was salary discussed during any of those conversations? |
| 10:33AM | 4 | A.   Yes.  One phone call discussed salary. |
| 10:33AM | 5 | Q.   And did he initiate that conversation? |
| 10:33AM | 6 | A.   Yes. |
| 10:33AM | 7 | Q.   And what salary did he offer or quote? |
| 10:33AM | 8 | A.   I -- he -- I think he had -- maybe he asked me what I |
| 10:33AM | 9 | would like to make, and I think I said, you know, like $20,000 |
| 10:33AM | 10 | a month. |
| 10:33AM | 11 | Q.   And did he agree to that? |
| 10:33AM | 12 | A.   Not then and there, no. |
| 10:33AM | 13 | Q.   Did he later agree to it? |
| 10:34AM | 14 | A.   Yes.  I think that was approximately what, you know, I |
| 10:34AM | 15 | first was to receive. |
| 10:34AM | 16 | Q.   Do you remember approximately how many phone calls you had |
| 10:34AM | 17 | between the meeting you described in person and when you were |
| 10:34AM | 18 | eventually hired by him? |
| 10:34AM | 19 | A.   No, I don't recall exactly.  It might have been one or |
| 10:34AM | 20 | two. |
| 10:34AM | 21 | Q.   And during that period, I take it, you were discussing the |
| 10:34AM | 22 | employment possibility with your husband? |
| 10:34AM | 23 | A.   Yes. |
| 10:34AM | 24 | Q.   On more than one occasion? |
| 10:34AM | 25 | A.   I mean, just wondering, thinking, you know, anticipating. |

**C O N F I D E N T I A L**

SM-02-CR00729

10:34AM 1    Q.    Did you ask your husband what he thought the employment

10:34AM 2    would entail or what you would be doing as an attorney?

10:34AM 3    A.    No, I didn't.  I mean, I felt ready, you know, that I'm

10:35AM 4    used to looking at legal documents; I'm used to organizing

10:35AM 5    people; you know, used to gathering information; keeping track

10:35AM 6    of things; supervising; organizing, all that sort of thing.

10:35AM 7          So I really thought it -- I wouldn't know until I saw

10:35AM 8    what that settlement agreement was.  And then I had the

10:35AM 9    experience, which I was happy to have had, with the GCCF

10:35AM 10   program, so I had a good sense of what type of claims were out

10:35AM 11   there, what kind of documentation was involved, you know, how

10:35AM 12   you analyze that, how you make sure the documentation is

10:35AM 13   sufficient, and that sort of thing.

10:35AM 14   Q.    Was your experience, which you refer to with the GCCF, was

10:35AM 15   as a plaintiff's attorney, as a claimant's attorney, correct?

10:35AM 16   A.    That's right.  That's right.

10:35AM 17   Q.    Now you were being interviewed for a position as a

10:35AM 18   counsel, lawyer to the administrator?

10:35AM 19   A.    That's right.  It would be a new vantage point, which I

10:36AM 20   found very, very interesting.  Because I have always been kind

10:36AM 21   of academically minded when it comes to the law, and if you're

10:36AM 22   on one side or the other side, you don't necessarily get to the

10:36AM 23   very right answer.  You know, you argue your side of the

10:36AM 24   situation.

10:36AM 25         So I was looking very forward to being in this

**C O N F I D E N T I A L**

10:36AM 1    neutral position where you get to look at both sides and come

10:36AM 2    up with the best answer.

10:36AM 3    Q.    Did Mr. Juneau describe it to you as a *neutral position*?

10:36AM 4    A.    Absolutely.  Absolutely.  That was first and foremost the

10:36AM 5    dictate that he had.

10:36AM 6    Q.    How did he articulate or detail what neutral would mean?

10:36AM 7    A.    Neutral meant that you -- well, one --

10:36AM 8    Q.    Not what it would mean, but what he said to you, if he

10:36AM 9    said anything about it?

10:36AM 10   A.    He said that we're not there to take a position or, you

10:37AM 11   know, take a side or have, you know, communications with one

10:37AM 12   side and not -- that everything had to be balanced,

10:37AM 13   transparent, a very open process, and we're just there to

10:37AM 14   implement the agreement.

10:37AM 15   Q.    And when did he first say that to you?

10:37AM 16   A.    That was -- it was after I had been hired, but things

10:37AM 17   didn't get going.  We still didn't have an office.  There still

10:37AM 18   hadn't been preliminary approval of the agreement.  But we

10:37AM 19   met -- he and I met preliminarily with two attorneys, Joe Rice

10:37AM 20   and Calvin Fayard, who spent three or four hours one morning

10:37AM 21   walking us through the terms of the settlement agreement.

10:37AM 22          And I had noted what I -- to myself, what I had

10:37AM 23   thought were vast improvements in the agreement over, say, the

10:38AM 24   GCCF program.

10:38AM 25          And in just saying that to Mr. Juneau, he said,

**C O N F I D E N T I A L**

10:38AM 1   "Well, that's good that you think that, but it doesn't really

10:38AM 2   matter what those terms are, good, bad or indifferent.  Our job

10:38AM 3   is just to implement it in a fair and neutral manner."

10:38AM 4   Q.   And when approximately did you have the meeting with the

10:38AM 5   two attorneys and Mr. Juneau, and was anyone else present?

10:38AM 6   A.   I think John Baden was present.  And I want to say

10:38AM 7   mid-April, early April that meeting might have taken place.

10:38AM 8   Q.   And that was, you said, after you were hired?

10:38AM 9   A.   Yes.

10:38AM 10  Q.   And who did you understand these lawyers to be?

10:38AM 11  A.   They were part of the PSC.

10:38AM 12  Q.   Representing the plaintiffs?

10:38AM 13  A.   Yes.  They had negotiated -- they had worked -- were

10:38AM 14  largely involved in negotiating the terms of the agreement.

10:39AM 15  Q.   At the time you were hired, I know you said you didn't get

10:39AM 16  underway right way, but at the time you were hired, had you

10:39AM 17  read and reviewed and studied the settlement agreement?

10:39AM 18  A.   As soon as it was provided to me.  And I would say, again,

10:39AM 19  that was probably mid-April.

10:39AM 20  Q.   Was that after you were hired?

10:39AM 21  A.   Yes.

10:39AM 22  Q.   So prior to being hired, you did not look at the

10:39AM 23  settlement agreement?

10:39AM 24  A.   Right.

10:39AM 25  Q.   Did you see a draft of it?

**C O N F I D E N T I A L**

SM-02-CR00732

10:39AM 1    A.    No.

10:39AM 2    Q.    Mr. Juneau never asked you to review it?

10:39AM 3    A.    Not prior to being hired.

10:39AM 4    Q.    Did he ever ask you any legal questions or ask any advice

10:39AM 5    with respect to the settlement or its terms?

10:39AM 6    A.    No.   Oh, before being hired?

10:39AM 7    Q.    Before being hired?

10:39AM 8    A.    No.

10:39AM 9    Q.    After you were hired, did he task you at any time to

10:39AM 10   review the agreement and give him any advice or guidance with

10:39AM 11   respect to its implementation?

10:39AM 12   A.    Not in a general manner like that, no.

10:40AM 13        Once the program began, countless issues, from one

10:40AM 14   moment to the next, came up as to how do we interpret -- it

10:40AM 15   wasn't so much interpretation as implementation.   Taking words

10:40AM 16   and actually turning them into formulas or forms or questions

10:40AM 17   on a claim form or something on the screen or taking every

10:40AM 18   scenario and hypothetical -- you know, the agreement didn't

10:40AM 19   envision every scenario that was out there for every claimant,

10:40AM 20   and so issues came up right away, you know.

10:40AM 21        And so to the extent -- I assume you're familiar with

10:40AM 22   BrownGreer and then the two accounting firms in Garden City.

10:40AM 23   BrownGreer was really -- is really the heavy machine that, you

10:40AM 24   know, put together the program, the claim forms, the

10:41AM 25   instruction booklets, the CACs.   You know, they did -- they do

**C O N F I D E N T I A L**

SM-02-CR00733

10:41AM  1    the first line of the EIN and SSN verification, the causation

10:41AM  2    analysis, the analysis of exclusions and whatnot.

10:41AM  3              And so they are a big bank of attorneys, accountants,

10:41AM  4    IT people, computer programmers, and Orran Brown and Lynn Greer

10:41AM  5    are, you know, the partners there.

10:41AM  6              And they have multiple, multiple teams that would

10:41AM  7    start -- they started to try to differentiate and have these

10:41AM  8    specialized teams that would work on different aspects of the

10:41AM  9    program, and then those teams would, you know, identify an

10:41AM 10    issue or a problem.  They would outline it.  They would try to,

10:41AM 11    in advance of bringing it to our office, they would try to come

10:41AM 12    up with recommendations.

10:41AM 13              And that would be presented to me, and I would

10:42AM 14    usually talk it out with Orran or, you know, the group of team

10:42AM 15    members that actually worked on that.  As you get a good

10:42AM 16    understanding and flavor of what the issue was and a good

10:42AM 17    understanding of exactly what the settlement agreement says and

10:42AM 18    what the claims administrator duties are, and then we would,

10:42AM 19    you know, on a very regular basis, sit down with Mr. Juneau and

10:42AM 20    brief him on these different issues and areas of concerns and

10:42AM 21    recommendations.  And then he would say, you know, "Okay.

10:42AM 22    Let's present this recommendation to the parties."

10:42AM 23    Q.   So I'm understanding you to say after you were hired, you

10:42AM 24    would specifically review, address, and implement and counsel

10:43AM 25    Mr. Juneau with respect to the agreement as claims or issues or

**C O N F I D E N T I A L**

**SM-02-CR00734**

10:43AM 1   matters raised up; is that fair to say?

10:43AM 2   A.   Yes, that's fair to say.

10:43AM 3   Q.   So going back to my original question, after you were

10:43AM 4   hired, he never said:  Take this whole agreement, look at it,

10:43AM 5   analyze it.  Now you're on board.  Give me any legal advice,

10:43AM 6   give me any legal views?

10:43AM 7   A.   Not in a vacuum.  I mean, I didn't need to give him any

10:43AM 8   legal advice or views in a vacuum.  Sure, he charged me with

10:43AM 9   reading and understanding the agreement.

10:43AM 10  Q.   So he told you to read it and review it and understand it?

10:43AM 11  A.   Absolutely.

10:43AM 12  Q.   And did you have a meeting with him after that where you

10:43AM 13  gave him your review and opinions or recommendations or

10:43AM 14  interpretations or did you identify problem areas with respect

10:43AM 15  to the agreement?

10:43AM 16  A.   The agreement is a thousand pages.  Okay?  And it was

10:44AM 17  impossible, I would say, for anyone to identify any holes in

10:44AM 18  that agreement until you put it into practice.

10:44AM 19  Q.   So did you review the agreement on your own, sua sponte,

10:44AM 20  with or without his instructions, to see if there were any

10:44AM 21  holes or gaps or things that you had to contemplate in advance

10:44AM 22  to prevent problems or issues?

10:44AM 23  A.   Yes.  I looked at it, too, with an eye to that, but there

10:44AM 24  wasn't anything glaring that jumped out at me.

10:44AM 25  Q.   Did anything jump out at you?

**C O N F I D E N T I A L**

SM-02-CR00735

| | | |
|---|---|---|
| 10:44AM | 1 | A.   No. |
| 10:44AM | 2 | Q.   So you had no questions or concerns as a lawyer, legal |
| 10:44AM | 3 | insights into gaps or problems that you would want to brief |
| 10:44AM | 4 | Mr. Juneau about? |
| 10:44AM | 5 | A.   No, I didn't.  I didn't think there were any glaring |
| 10:44AM | 6 | problems that presented themselves with the agreement at the |
| 10:44AM | 7 | first reading. |
| 10:44AM | 8 | Q.   Now, were you his only lawyer in-house at that point? |
| 10:44AM | 9 | A.   Mike Juneau, his son, I guess, was retained in some |
| 10:45AM | 10 | fashion, either -- I don't know if Mr. Juneau's firm was hired, |
| 10:45AM | 11 | but Mike Juneau was there as an attorney as well.  And |
| 10:45AM | 12 | David Duval was hired, too, another attorney hired. |
| 10:45AM | 13 | Q.   Did you work with those two lawyers with respect to your |
| 10:45AM | 14 | legal functions? |
| 10:45AM | 15 | A.   Sure. |
| 10:45AM | 16 | Q.   And what type of interaction or how did you divide up your |
| 10:45AM | 17 | responsibilities, if at all? |
| 10:45AM | 18 | A.   Well, initially, David Duval was appointed to be the |
| 10:45AM | 19 | appeals coordinator.  I was given the title *claims counsel.* |
| 10:45AM | 20 | Mike Juneau, he called him *special counsel.* |
| 10:45AM | 21 | In the summer, he wasn't -- I guess over time -- he |
| 10:45AM | 22 | would spend about two days a week at the office.  And I think |
| 10:46AM | 23 | in the beginning I was handling the brunt of the program from |
| 10:46AM | 24 | the legal perspective. |
| 10:46AM | 25 | Q.   Would you describe your role there as Mr. Juneau's general |

**C O N F I D E N T I A L**

SM-02-CR00736

10:46AM 1   counsel at that time?

10:46AM 2   A.   At that time.  But he had to hire outside counsel, too,

10:46AM 3   for things, you know, concerning the contracts, you know -- but

10:46AM 4   I guess general counsel in terms of --

10:46AM 5   Q.   In house.

10:46AM 6   A.   -- in house interpreting that agreement.

10:46AM 7   Q.   Okay.  In that role, did you yourself retain outside

10:46AM 8   counsel for any legal support?

10:46AM 9   A.   Absolutely not.  No.  No.

10:46AM 10  Q.   Did you talk to any lawyers outside of the claims

10:46AM 11  administration with respect to any legal questions or guidance

10:47AM 12  or research?

10:47AM 13  A.   No.

10:47AM 14  Q.   Did you do your own legal research on questions?

10:47AM 15  A.   Legal research wasn't necessarily part of it, but when the

10:47AM 16  legal research needed to be done, we had this outside counsel

10:47AM 17  of the Sessions law firm.  We needed some legal research with

10:47AM 18  regard to liens and garnishments, to which are part of the

10:47AM 19  program.

10:47AM 20       We eventually needed outside counsel to help us with

10:47AM 21  the myriad of property issues that are involved in the claims.

10:47AM 22  So they would do the research, and they would, you know, give

10:47AM 23  me a memo or an argument or something and I would analyze it.

10:47AM 24  But they would do the research.  I did not do research myself.

10:47AM 25  Q.   In the period that you were there, approximately how much

**C O N F I D E N T I A L**

SM-02-CR00737

10:47AM 1    legal research or other legal work did you yourself give out to

10:47AM 2    external counsel beyond the one you just described?

10:48AM 3    A.    None.

10:48AM 4    Q.    Did you have any occasion to want any other legal research

10:48AM 5    done in the course of your work?

10:48AM 6    A.    No.  Not that -- nothing other than that was provided by

10:48AM 7    the people we had in place.

10:48AM 8          Now, other attorneys, I know that Mike Juneau needed

10:48AM 9    some research done on HIPAA, you know, things of that nature,

10:48AM 10   some of the things that were involved with BEL, but he took

10:48AM 11   charge of that.

10:48AM 12   Q.    So you were not involved in that process?

10:48AM 13   A.    I was in the sense that eventually, over time, you know,

10:48AM 14   that there had to be this system -- I'm sure you've heard about

10:48AM 15   the policy-deciding process or the policy-making process.

10:48AM 16         And it started out with some spreadsheets.  As

10:49AM 17   BrownGreer started to draw up its claims forms and its

10:49AM 18   registration forms and its instruction booklets and its notice

10:49AM 19   templates, you had to get into the details of this program to

10:49AM 20   know where the problems were.

10:49AM 21         You really had to get into the weeds.  You could not,

10:49AM 22   like, as you had suggested, look at this settlement agreement

10:49AM 23   and something jump off the page and say, "Oh, this is not going

10:49AM 24   to work at all."  It wasn't until you really got into the weeds

10:49AM 25   that you could identify some of these problems.

**C O N F I D E N T I A L**

SM-02-CR00738

10:49AM 1        So BrownGreer would create this spreadsheet and they

10:49AM 2   would, you know, have the question that they couldn't readily

10:49AM 3   decide.  Then they would have their recommendation.  Then they

10:49AM 4   would have two spaces for class counsel's response and BP's

10:49AM 5   response.

10:49AM 6        And it started out with this spreadsheet.  They would

10:50AM 7   give it to me and Mr. Juneau to initially review.  It would be

10:50AM 8   sent to the parties.  You would wait for the parties'

10:50AM 9   responses.  They would get them back.  And you would try to

10:50AM 10  marry things up.  And where there were inconsistencies, you'd

10:50AM 11  go back to the drawing board and try to come up with a new

10:50AM 12  recommendation and so forth and so on.

10:50AM 13       And, I mean, ultimately, maybe there are 200 policies

10:50AM 14  that have been approved for public publication, but there were

10:50AM 15  nearly 400 policies in this program.  Once I began work on this

10:50AM 16  program, I went under.  My life was over.

10:50AM 17       You know, it became -- the e-mails initially, those

10:50AM 18  first few weeks and months, were so constant, every moment.

10:50AM 19  And it wasn't, you know, the type of e-mail that goes to junk

10:50AM 20  mail.  It was a live issue with regard to every e-mail.

10:50AM 21       And, you know, Cathy had mentioned to me dreaming

10:51AM 22  about typing, and I would dream about scrolling through my

10:51AM 23  computer looking at these e-mails.

10:51AM 24       And at one point -- so we're working through these

10:51AM 25  spreadsheets, we're working through these spreadsheets.  You

**C O N F I D E N T I A L**

SM-02-CR00739

10:51AM  1   have for class counsel or the PSC, they have key people who are

10:51AM  2   very knowledgeable about certain aspects of the program.  And

10:51AM  3   those people would maybe talk to some BrownGreer people or they

10:51AM  4   would talk to some accountants or -- you know, it was a lot

10:51AM  5   going on and there was no continuity, no consistency.

10:51AM  6        Class counsel -- I think it was class counsel who

10:51AM  7   first brought it up.  They wanted to know what the protocol was

10:51AM  8   for addressing our office and for addressing the vendors.  And

10:51AM  9   they wanted -- they were suggesting at the time that there be

10:52AM 10   some kind of streamlined narrowing of resources and issues.

10:52AM 11        And, basically, what you needed was an issue tracker.

10:52AM 12   And I realized that immediately.  There are so many issues for

10:52AM 13   so many different aspects of this program, it's impossible to

10:52AM 14   track if some are doing this and some are doing that, so --

10:52AM 15   Q.   So this would be a good point to interrupt you.  Did you

10:52AM 16   put into place or ask that an issue tracker system be put into

10:52AM 17   place?

10:52AM 18   A.   Yes, I did ask.  I absolutely did.

10:52AM 19   Q.   Who did you ask?

10:52AM 20   A.   I talked to everyone about that.  We would have big

10:52AM 21   meetings, you know, sometimes with the vendors and whatnot.

10:52AM 22   And I said, "There has to be" -- you know, people would ask me,

10:52AM 23   "What do you need?  You know, how can we help you?"

10:52AM 24        Because we had different people in the office, but

10:52AM 25   they didn't -- they were doing -- they were covering this area

**C O N F I D E N T I A L**

10:52AM 1 called *business processes*, and then you had one attorney, you

10:53AM 2 know, doing the rest.

10:53AM 3          And so they would -- and they are all -- you know,

10:53AM 4 they have all kinds of resources and tools, so, you know, I

10:53AM 5 said, "This is what I need, is some way to track all these

10:53AM 6 issues."

10:53AM 7          And initially what was presented to me was some

10:53AM 8 software called *SharePoint*.  And I --

10:53AM 9 Q.   And who presented that?

10:53AM 10 A.   I think it was Orterrio (spelled phonetically) and

10:53AM 11 Chris Reade at our office.

10:53AM 12          And, you know, I tried to use it, but you couldn't

10:53AM 13 put -- you couldn't attach documents to it, because lots of

10:53AM 14 times there are documents or memos that should be kept

10:53AM 15 together, you know, or add notes or add e-mails.  You know, it

10:53AM 16 wasn't really what I envisioned or what I would have liked.

10:53AM 17          So eventually, you know, those -- once we got through

10:53AM 18 that first round of spreadsheets, that first Excel sheet, which

10:54AM 19 took months and months and months to completely resolve and get

10:54AM 20 all answers for and everything, then things slowed down

10:54AM 21 somewhat, but not too much.

10:54AM 22          And Orran Brown, who has this, you know, innate sense

10:54AM 23 of duty, this excellent work ethic, he eventually became my

10:54AM 24 partner in working this program.  And he would, on a weekly

10:54AM 25 basis, whether it was a binder or whatever of the different

**C O N F I D E N T I A L**

SM-02-CR00741

10:54AM 1  issues and recommendations, and we began with this e-mail

10:54AM 2  system to the parties.  Okay.  We would propose something, they

10:54AM 3  would send something back, and then we would go back and then

10:54AM 4  they would either agree to it or whatever.

10:54AM 5  Q.   When you say *the parties*, who do you refer to?

10:54AM 6  A.   BP and class counsel or the PSC.

10:54AM 7       Eventually, to jump ahead to get to what you're

10:54AM 8  getting at, eventually BrownGreer did build an application

10:55AM 9  called the *Policy Keeper*, which is exactly what I envisioned

10:55AM 10 and exactly what the program needed.

10:55AM 11 Q.   When was that put into place?

10:55AM 12 A.   March.

10:55AM 13 Q.   March this year?

10:55AM 14 A.   Yes, yes.

10:55AM 15      And so what they had to do is, once they had this

10:55AM 16 application, this system built that the parties could log on

10:55AM 17 to, BP and class counsel, that individual vendors could log on

10:55AM 18 to, that the CA's office could log on to, they had to go and

10:55AM 19 backfill all that legislative history.  Everything we had done

10:55AM 20 offline up until this point, they backfilled into this policy

10:55AM 21 keeper.

10:55AM 22      And they kept all -- they were able to attach all the

10:55AM 23 documents that went to it, all the comments, all the e-mails,

10:55AM 24 anything anyone ever said about that policy would be kept in

10:56AM 25 one place.

**C O N F I D E N T I A L**

10:56AM 1     Now, before we -- in the process of backfilling, we

10:56AM 2  sent this compendium, we called it the *compendium of policies*,

10:56AM 3  back out to the parties for another updated review.  "Make sure

10:56AM 4  this is what you agreed to.  Make sure" -- you know, some of

10:56AM 5  the policies, you would have four different things that

10:56AM 6  pertained to one subject because they would, you know, update

10:56AM 7  each other.  And so there was some reconciliation done, some

10:56AM 8  cleanup work that was done, but that basically became the

10:56AM 9  policy keeper.

10:56AM 10  Q.   You referred before to 200, then you said 400 policies.

10:56AM 11  Are we talking about a universe of 200 to 400 policies?

10:56AM 12  A.   That's right.

10:56AM 13  Q.   Who drafted those policies?

10:56AM 14  A.   It was the collaboration of everyone.  You know, for the

10:56AM 15  most part, I would say that BrownGreer's attorneys, from their

10:57AM 16  different teams, drafted them.

10:57AM 17  Q.   Did you draft any of them?

10:57AM 18  A.   I collaborated and, you know, probably worked on some of

10:57AM 19  them as well.  You know, we had to do --

10:57AM 20  Q.   Which ones, if you recall?

10:57AM 21  A.   The drafting of probably would have been some of the

10:57AM 22  wetlands claims.  Because those were claims that we had to use

10:57AM 23  our outside counsel, and we had two different, now, firms

10:57AM 24  working on the wetlands claims.

10:57AM 25     Initially, we -- a woman named Rose LeBreton was

**C O N F I D E N T I A L**

SM-02-CR00743

10:57AM 1    hired to do the wetlands claims.  And she was working on this

10:57AM 2    big wetlands claim called *Lake Eugenie*, and she realized she

10:57AM 3    had a conflict there, so she recused herself from that claim.

10:57AM 4         And then Peter Title from Sessions was a property

10:58AM 5    lawyer, and so he would work on Lake Eugenie.  And Lake Eugenie

10:58AM 6    is or was, you know, a multi, multi-million dollar claim that

10:58AM 7    brought forth so many issues of competing title and state tax

10:58AM 8    adjudication issues.  So almost all of the wetland issues were

10:58AM 9    borne of this one claim.

10:58AM 10        So I would get research or advice or suggestions or

10:58AM 11   recommendations from Peter and Rosie, and because they weren't

10:58AM 12   familiar with what our policies should look like or, you know,

10:58AM 13   the straightforwardness of them, the presentation, I drafted

10:58AM 14   those.

10:58AM 15   Q.   Okay.  So of the 200 to 400 policies, how many would you

10:58AM 16   have collaborated on yourself, roughly?

10:58AM 17   A.   A good, good, good number.

10:58AM 18   Q.   Can you approximate the number or a percentage?

10:59AM 19   Collaborate means you reviewed them before they were finalized.

10:59AM 20   A.   Oh, reviewed before, maybe 100 percent.

10:59AM 21   Q.   You reviewed all of them?

10:59AM 22   A.   Yeah.

10:59AM 23   Q.   How about collaborating in terms of making changes or

10:59AM 24   additions?

10:59AM 25   A.   Well, I tried to keep my hands out of the BEL only because

**C O N F I D E N T I A L**

SM-02-CR00744

| | | |
|---|---|---|
| 10:59AM | 1 | I hate accounting, hate accounting principles and all that |
| 10:59AM | 2 | stuff, and I really didn't feel like I had that much to offer |
| 10:59AM | 3 | except for, you know, from the very -- the general principles |
| 10:59AM | 4 | of what the settlement agreement set out to do. |
| 10:59AM | 5 | And for BEL, for me it was more administerial than |
| 10:59AM | 6 | the others, because I just had to have the BEL policies come |
| 10:59AM | 7 | into the fold so that they would be part of the same process. |
| 10:59AM | 8 | Q.   But my question was:  Of the 200 to 400 policies, I know |
| 11:00AM | 9 | you've reviewed them all you've told us, but how many did you |
| 11:00AM | 10 | actually collaborate in terms of making changes in -- |
| 11:00AM | 11 | A.   I guess you would go back and subtract the BEL policies, |
| 11:00AM | 12 | and the remainder I really collaborated, although I did |
| 11:00AM | 13 | collaborate on a portion of the BEL ones as well. |
| 11:00AM | 14 | Q.   Now, would you, on occasion, send legal memoranda, notes, |
| 11:00AM | 15 | to Mr. Juneau? |
| 11:00AM | 16 | A.   No.  I discussed everything in person with him.  That's |
| 11:00AM | 17 | how we did it.  If somebody -- you know, BrownGreer might be |
| 11:00AM | 18 | sending him -- they would have sent both of us the legal |
| 11:00AM | 19 | memoranda and notes. |
| 11:00AM | 20 | Q.   Did you ever send him a legal memo or put a note on one of |
| 11:00AM | 21 | their memos in writing to him? |
| 11:00AM | 22 | A.   I don't remember doing that.  Maybe.  Maybe one or two. |
| 11:00AM | 23 | But, in general, I like to have face-to-face meetings with him, |
| 11:01AM | 24 | because then I sit him down and have him decide, you know. |
| 11:01AM | 25 | Q.   In those face-to-face meetings, did you take notes?  Do |

**C O N F I D E N T I A L**

SM-02-CR00745

11:01AM 1    you have records of that?

11:01AM 2    A.   Oh, I probably have notes all over the place, all over my

11:01AM 3    office.  You know, I'm a person that starts a pad and then puts

11:01AM 4    it down and starts a pad and put it down.

11:01AM 5    Q.   Did you keep a separate or somehow segregated set of notes

11:01AM 6    with respect to meetings you had with him where you briefed him

11:01AM 7    or discussed these legal matters you've just told us about?

11:01AM 8    A.   No.  No, I didn't do it in that kind of a specific

11:01AM 9    fashion.

11:01AM 10           I do know that Orran sat down and he wrote -- he was

11:01AM 11   kind of like the secretary.  He wrote every single thing, and

11:01AM 12   he was generally always with me.

11:01AM 13   Q.   So at those meetings he would take notes?

11:01AM 14   A.   In the sense that he would be the one who would have to go

11:01AM 15   do something, so he would write himself -- or both of us, I

11:02AM 16   guess both of us would be charged with, okay, what is the next

11:02AM 17   step that we have to do now?

11:02AM 18   Q.   Would Mr. Juneau take notes?

11:02AM 19   A.   No.

11:02AM 20   Q.   Did you ever ask for more attorneys to help you?  It

11:02AM 21   sounds like you were quite busy, particularly during the period

11:02AM 22   we discussed.

11:02AM 23   A.   Yes, I was busy.  And, you know, people kept asking me if

11:02AM 24   I wanted an assistant or a secretary, and I just knew that is

11:02AM 25   not what I needed, or a paralegal.  Because somebody -- to just

**C O N F I D E N T I A L**

SM-02-CR00746

11:02AM  1    help me, they would have to know everything I was doing and

11:02AM  2    tracking, and that just didn't seem -- you know, it needed to

11:02AM  3    be that I had to allocate some of what I was doing, so I did

11:02AM  4    say, "I think we need more attorneys in this office."

11:02AM  5    Q.    Who did you say that to?

11:02AM  6    A.    Probably Mike.  Probably David Duval.  Probably everyone

11:03AM  7    in a general sense.  Because I thought, you know, for a legal

11:03AM  8    program, we were attorney, you know, low and other types heavy,

11:03AM  9    so --

11:03AM  10   Q.    Did you ask Mr. Juneau?

11:03AM  11   A.    I eventually -- I don't think I directly asked him, except

11:03AM  12   for when I started envisioning my husband as having a role at

11:03AM  13   the administrator's office.

11:03AM  14           He was doing less and less legal work.  He was just

11:03AM  15   focusing on these other business interests.  He was right there

11:03AM  16   next door.  He had already had a relationship with Mr. Juneau,

11:03AM  17   and he -- because one of his businesses is an oil and gas

11:03AM  18   supply boat company.

11:03AM  19           And I knew that one of the looming, big issues in

11:04AM  20   this program was the moratoria issue.  And I just kept thinking

11:04AM  21   to myself, if I have to take that on, too, you know -- I would

11:04AM  22   do it.  I could do it.

11:04AM  23           But I really thought, you know, here he is, he has

11:04AM  24   the time to work part-time.  He has the expertise to bring to

11:04AM  25   that issue.  And he -- and Mike had said, you know, he

**C O N F I D E N T I A L**

11:04AM 1    wanted -- he wanted more support for his father, too.

11:04AM 2         And I thought, I know how highly my husband holds

11:04AM 3    Mr. Juneau in his regard, and I thought it would be a perfect

11:04AM 4    fit. So I think I most definitely mentioned to Mr. Juneau, I

11:04AM 5    thought that hiring my husband, I really thought it would be

11:04AM 6    the perfect fit.

11:04AM 7    Q.   So you recommended to Mr. Juneau that he hire your

11:04AM 8    husband?

11:04AM 9    A.   Yes.

11:04AM 10   Q.   Did you recommend that he hire any other lawyers?

11:05AM 11   A.   I never recommended him because the people I had thought

11:05AM 12   about, you know, who might be good to help me on, were not

11:05AM 13   interested in doing it.

11:05AM 14   Q.   What people were they?

11:05AM 15   A.   One was Susan Kohn. And -- who else did I have in mind?

11:05AM 16   Actually, the other was a paralegal, not an attorney,

11:05AM 17   Tammy Roberts.

11:05AM 18   Q.   Did you ask them if they were interested in working for

11:05AM 19   you?

11:05AM 20   A.   Susan Kohn, I don't remember if I asked her directly or if

11:05AM 21   I asked a friend of hers, and her -- my -- a mutual friend, and

11:05AM 22   the mutual friend reached out to her and said she -- she was

11:05AM 23   content with what she was doing.

11:05AM 24   Q.   What about Tammy Roberts?

11:05AM 25   A.   Tammy Roberts, the paralegal, at one point I decided not

**C O N F I D E N T I A L**

SM-02-CR00748

11:05AM 1   to ask her because I felt like a paralegal wasn't what the

11:05AM 2   situation called for.

11:06AM 3   Q.   So you didn't --

11:06AM 4   A.   But really, you know, I just -- I was just doing.  I

11:06AM 5   wasn't really, you know -- I didn't think -- we had a CEO, you

11:06AM 6   know, and, I mean, he was to be a big part of the firm.  I

11:06AM 7   thought that was more his job than mine to worry about how the

11:06AM 8   office is staffed and who should be doing what.  I just did the

11:06AM 9   work.

11:06AM 10  Q.   You didn't ask anyone else if they were interested in

11:06AM 11  working with you directly?

11:06AM 12  A.   No.

11:06AM 13  Q.   And you recommended to Mr. Juneau that he hire your

11:06AM 14  husband?

11:06AM 15  A.   Yes.

11:06AM 16  Q.   And approximately when that was?

11:06AM 17  A.   Well, maybe October.

11:06AM 18  Q.   Did your husband ask you to make that request?

11:06AM 19  A.   No, he didn't.  Although I talked to him about it, he did

11:06AM 20  not ask me to make that request.

11:06AM 21  Q.   And what was the conversation?

11:06AM 22  A.   He thought that the -- that was something he could do, but

11:06AM 23  he could only do it part time because, you know, he was

11:06AM 24  committed to these other business interests.

11:06AM 25  Q.   Did you discuss salary with him?

**C O N F I D E N T I A L**

SM-02-CR00749

A.    No.

Q.    Did you tell him what his role and responsibilities would be?

A.    He knew because he could see what I was doing every day, day in and day out.  I would talk about it when I got home.  It was basically fielding a lot problems.

        MR. TIDWELL:  You mentioned you didn't think you had a CEO.  What did you mean by that?

        THE WITNESS:  No, I didn't -- no.  I said we did have a CEO.  And I thought --

        MR. TIDWELL:  That it was his responsibility.

        THE WITNESS:  -- you know, that's his responsibility, his role, you know, to manage and see how the office is outfitted.

        MR. TIDWELL:  So did you talk to Mr. Odom about that, about how to bring him on?

        THE WITNESS:  About bringing my husband on?  Yes.

BY MR. FREEH:

Q.    Did he think it was a good idea?

A.    Yes, he did.

Q.    You said that your husband knew what your responsibilities were because you talked about them to him?

A.    Yes.  I mean, it was -- I would come home, especially in the beginning, seven, eight o'clock at night, have just enough time to make dinner, and then I was back working on e-mails

**C O N F I D E N T I A L**

SM-02-CR00750

11:07AM 1    again.

11:07AM 2    Q.   So you would talk to him in what type of detail about your

11:08AM 3    particular work?

11:08AM 4    A.   Not so much detail.  You really couldn't.  Like,

11:08AM 5    Mr. Juneau and I used to talk about how -- you know, he gave up

11:08AM 6    talking -- explaining to his wife what was going on, because

11:08AM 7    you just couldn't.  You just really couldn't.  Just that there

11:08AM 8    is a lot to cover, a lot going on.  There is a lot of different

11:08AM 9    claim types.  There is a lot of teams that have to be led and

11:08AM 10   directed.  A lot of issues that have to be resolved and put to

11:08AM 11   rest.  And there was just a lot of ground to cover.  I think

11:08AM 12   that was what his understanding was.

11:08AM 13   Q.   But you said that your husband -- or at least you told

11:08AM 14   your husband that the job was, you said, problem solving?  Is

11:08AM 15   that your phrase?

11:08AM 16   A.   I don't know that I told him that.  I'm trying -- you

11:08AM 17   know, it was just issues, issues, issues, issues.

11:08AM 18   Q.   But then did you tell him what kind of issues he would be

11:08AM 19   dealing with?

11:09AM 20   A.   Well, the issues were --

11:09AM 21   Q.   No, not what they were.  But did you tell your husband

11:09AM 22   what the issues were?

11:09AM 23   A.   I'm trying to think.  I don't know.  I don't know.  I

11:09AM 24   don't think I probably ever specifically talked about it.  And

11:09AM 25   one thing that was a relief to me when he did start working

**C O N F I D E N T I A L**

SM-02-CR00751

| | | |
|---|---|---|
| 11:09AM | 1 | was, okay, now -- now you know why I'm on the phone at |
| 11:09AM | 2 | eleven o'clock, midnight.  Now you see what is going on. |
| 11:09AM | 3 | Q.   Approximately when did he start his employment? |
| 11:09AM | 4 | A.   I think November.  If not November 1st, sometime in |
| 11:09AM | 5 | November. |
| 11:09AM | 6 | Q.   Before he started his employment, did you talk to him |
| 11:09AM | 7 | about how the two of you would handle any conflicts that he |
| 11:09AM | 8 | might have? |
| 11:09AM | 9 | A.   No.  He and I did not discuss that.  That was not on my |
| 11:09AM | 10 | mind. |
| 11:09AM | 11 | Q.   You weren't concerned about that? |
| 11:09AM | 12 | A.   No, because I thought that had been resolved before I was |
| 11:09AM | 13 | hired. |
| 11:09AM | 14 | Q.   How did you think it was resolved? |
| 11:09AM | 15 | A.   That Pat Juneau and my husband spoke about his other |
| 11:10AM | 16 | business interests at that time. |
| 11:10AM | 17 | Q.   Do you know -- |
| 11:10AM | 18 | A.   And I was sure that they were going to talk about it when |
| 11:10AM | 19 | he hired him.  They would have that discussion. |
| 11:10AM | 20 | Q.   How were you sure they would have that discussion? |
| 11:10AM | 21 | A.   Well, I guess I can't say I was sure.  I thought they |
| 11:10AM | 22 | would have that discussion. |
| 11:10AM | 23 | Q.   Were you ever present when they had a discussion about |
| 11:10AM | 24 | conflicts? |
| 11:10AM | 25 | A.   No, I was not. |

**CONFIDENTIAL**

| | | |
|---|---|---|
| 11:10AM | 1 | Q.    When you were in the process of introducing your |
| 11:10AM | 2 | husband -- or recommending husband, did Mr. Juneau interview |
| 11:10AM | 3 | him as far as you know? |
| 11:10AM | 4 | A.    As far as I know, he did have -- set a time to do that. |
| 11:10AM | 5 | Q.    Did your husband report to you what the interview was? |
| 11:10AM | 6 | A.    Not really.  Not that I recall anything special about it. |
| 11:10AM | 7 | Q.    Did you have any curiosity as to what Mr. Juneau and him |
| 11:10AM | 8 | discussed? |
| 11:10AM | 9 | A.    Just whether he was going to be considered.  And I think |
| 11:10AM | 10 | he might have told me that they were looking to hire him on a |
| 11:10AM | 11 | part-time basis, and, for the most part, to lead the moratoria |
| 11:11AM | 12 | team. |
| 11:11AM | 13 |        MR. FREEH:  We have been going a little more than an |
| 11:11AM | 14 | hour.  I'm happy to take a break or keep going.  It's up to you |
| 11:11AM | 15 | guys. |
| 11:11AM | 16 |        THE WITNESS:  I'm fine. |
| 11:11AM | 17 |        MR. FREEH:  Counsel? |
| 11:11AM | 18 |        MS. PIERSON:  I'm fine. |
| 11:11AM | 19 | BY MR. FREEH: |
| 11:11AM | 20 | Q.    Okay.  Let's go back to the period when you come on board |
| 11:11AM | 21 | in a general-counsel-type role, as you described, and I know it |
| 11:11AM | 22 | wasn't a general counsel title.  Had you ever had a corporate |
| 11:11AM | 23 | client before that you advised in terms of a corporate action |
| 11:11AM | 24 | or corporate operations, anything like that in your previous |
| 11:11AM | 25 | practice? |

**C O N F I D E N T I A L**

SM-02-CR00753

11:11AM 1    A.    No.  Not in that manner, no.

11:11AM 2    Q.    Had you had any experience at all in what they call

11:11AM 3    *corporate governance*?

11:11AM 4    A.    No.

11:11AM 5    Q.    Do you -- what is your understanding of *corporate*

11:11AM 6    *governance*?

11:11AM 7    A.    I'm not sure.

11:11AM 8    Q.    Had you had any experience before going to work with

11:11AM 9    Mr. Juneau in the area of conflicts?

11:12AM 10   A.    No.  Not -- no.  I didn't deal with any conflicts.

11:12AM 11   Q.    Did you ever have a conversation with Mr. Juneau about

11:12AM 12   what he expected with respect to the identification and

11:12AM 13   resolution of conflicts?

11:12AM 14   A.    No.  Not a direct conversation, no.

11:12AM 15   Q.    You mentioned before there was a woman working on this --

11:12AM 16   I think, Lake Eugenie?

11:12AM 17   A.    Lake Eugenie.

11:12AM 18   Q.    Eugene, I'm sorry.  And she had a conflict?

11:12AM 19   A.    Yes.

11:12AM 20   Q.    What type of conflict was that?

11:12AM 21   A.    I guess she had represented some of the landowners who

11:12AM 22   were filing the claim, on another case.

11:12AM 23   Q.    And then you said she recused herself?

11:12AM 24   A.    Or she said -- she had asked Mr. Juneau if he thought she

11:12AM 25   should stay working on that or not, and I think he decided that

**C O N F I D E N T I A L**

SM-02-CR00754

11:12AM 1   we would have Peter Title do that work instead.

11:12AM 2   Q.   Now, were you privy or present for that conversation, if

11:13AM 3   you recall?

11:13AM 4   A.   He might have directed me to respond to her.  I don't

11:13AM 5   remember.  I don't know if I responded to do her in that

11:13AM 6   fashion or if he did directly, but it was probably just by

11:13AM 7   e-mail.

11:13AM 8   Q.   You had used the word *recusal*.  You said she had recused

11:13AM 9   herself?

11:13AM 10   A.   Well, I used that word, but -- because I assume that

11:13AM 11   ultimately that's what you would call what she did, but she did

11:13AM 12   not -- she did not review that claim.

11:13AM 13   Q.   After you were hired and as you began the legal counsel

11:13AM 14   and legal job that you described, what was your understanding

11:13AM 15   as to the claims administrator's conflicts procedure or process

11:13AM 16   or policies?

11:13AM 17   A.   I don't know that there was a process or a procedure in

11:13AM 18   place.  I just know that there were documents that we signed.

11:14AM 19   Q.   And were those the documents that you signed yourself when

11:14AM 20   you went to work for him?

11:14AM 21   A.   Yes.

11:14AM 22   Q.   I'm going to show you that in a little bit and ask you

11:14AM 23   some questions.

11:14AM 24           Did you draft that document?

11:14AM 25   A.   No, I did not.

**C O N F I D E N T I A L**

11:14AM 1    Q.   Do you know who did?

11:14AM 2    A.   No.

11:14AM 3    Q.   Did you make any changes while you were working there in

11:14AM 4    terms of the language in the particular document that you had

11:14AM 5    signed?

11:14AM 6    A.   No, I did not.

11:14AM 7    Q.   Did you ever ask outside counsel or any other lawyer to do

11:14AM 8    a conflicts review of the claims process and give you any

11:14AM 9    opinion or recommendations?

11:14AM 10   A.   No, I did not.

11:14AM 11   Q.   When you took over the job as counsel to Mr. Juneau,

11:14AM 12   lawyer, as you've described it, did you have any experience in

11:14AM 13   ethics --

11:14AM 14   A.   No.

11:14AM 15   Q.   -- as a lawyer?

11:14AM 16   A.   No.

11:14AM 17   Q.   After you took on the position, did you make any inquiries

11:14AM 18   or did you cause any work or review to be done of the claims

11:15AM 19   administrator ethics process?

11:15AM 20   A.   No.

11:15AM 21   Q.   Did anybody ever ask you to do that?

11:15AM 22   A.   No.

11:15AM 23   Q.   Did you ever have a conversation with Mr. Juneau about the

11:15AM 24   code of conduct or the ethics with the claims administration

11:15AM 25   office?

**C O N F I D E N T I A L**

SM-02-CR00756

| | | |
|---|---|---|
| 11:15AM | 1 | A.    No. |
| 11:15AM | 2 | Q.    Did anybody that worked with you ever have that |
| 11:15AM | 3 | conversation with you? |
| 11:15AM | 4 | A.    No. |
| 11:15AM | 5 | Q.    Was that a subject that you did not see as part of your |
| 11:15AM | 6 | responsibilities? |
| 11:15AM | 7 | A.    No, I saw it as part of my responsibilities, but I never |
| 11:15AM | 8 | envisioned an issue arising from it, so I wasn't overly |
| 11:15AM | 9 | concerned with it. |
| 11:15AM | 10 | Q.    And when you say it, we're talking about ethics now? |
| 11:15AM | 11 | A.    Right. |
| 11:15AM | 12 | Q.    Just code of conducts and ethics and conduct by people |
| 11:15AM | 13 | working. |
| 11:15AM | 14 | A.    That's right.  Right. |
| 11:15AM | 15 | Q.    So you saw it as part of your responsibilities but you |
| 11:15AM | 16 | never discussed it with Mr. Juneau? |
| 11:15AM | 17 | A.    No.  Because there was no problem.  No issue. |
| 11:16AM | 18 | Q.    Did you have a code of ethics? |
| 11:16AM | 19 | A.    How do -- what do you mean by that? |
| 11:16AM | 20 | Q.    Did the claims administration have a code of ethics? |
| 11:16AM | 21 | A.    I don't think so. |
| 11:16AM | 22 | Q.    Did you ever ask about one? |
| 11:16AM | 23 | A.    No, I didn't. |
| 11:16AM | 24 | Q.    Did it have a conflicts policy? |
| 11:16AM | 25 | A.    Yes.  In my agreement, there is a conflicts policy. |

**C O N F I D E N T I A L**

SM-02-CR00757

11:16AM 1    Q.    Beyond your agreement, was there a conflicts code?

11:16AM 2    A.    I don't think so.

11:16AM 3    Q.    Did you ever ask if there was one?

11:16AM 4    A.    No, I didn't.

11:16AM 5    Q.    Did you ever think it was important to write one?

11:16AM 6    A.    Not until after --

11:16AM 7            MS. PIERSON:  May I interrupt and ask, are you

11:16AM 8    talking about a policy that would be in addition to the code of

11:16AM 9    professional conduct that applies to all attorneys?

11:16AM 10           MR. FREEH:  I'm asking about the claims

11:16AM 11   administration.  I think that was in my question.

11:16AM 12           MS. PIERSON:  So you're talking about a separate

11:16AM 13   code?

11:16AM 14           MR. FREEH:  I'm not talking about the code of

11:16AM 15   attorneys' conduct.

11:16AM 16           MS. PIERSON:  Okay.

11:16AM 17           MR. FREEH:  Yeah.

11:16AM 18           THE WITNESS:  No.  I really didn't have time to worry

11:16AM 19   about other things other than what I was working on.

11:16AM 20           MR. TIDWELL:  What was your understanding who was

11:17AM 21   responsible for that particular -- if you want to call it an

11:17AM 22   *HR function*?

11:17AM 23           THE WITNESS:  I would have thought that would have

11:17AM 24   been David Odom's responsibility, and whether he had to work

11:17AM 25   with Sessions as the outside counsel to accomplish what that

**C O N F I D E N T I A L**

SM-02-CR00758

11:17AM  1   process or that code should be, that's who I would have thought

11:17AM  2   would have covered that.

11:17AM  3   BY MR. FREEH:

11:17AM  4   Q.   I had asked you before if you had had a conversation with

11:17AM  5   anyone in the administration, and I would include, of course,

11:17AM  6   Mr. Odom there, about an ethics policy, a conflicts policy, and

11:17AM  7   I believe your answer to that was no.

11:17AM  8   A.   That's correct.

11:17AM  9   Q.   And that was because the issue never arose?

11:17AM  10  A.   Yes.

11:17AM  11  Q.   And you had no self-generated interest or you didn't

11:17AM  12  initiate any inquiries about that during the period that you

11:17AM  13  were there?

11:17AM  14  A.   No.  It was not forefront in my mind.  You know, I

11:17AM  15  didn't -- I didn't feel I had any of those ethical conflicts,

11:17AM  16  and, you know, I had a lot, a lot, a lot, a lot of work to do.

11:18AM  17  Q.   But my question, so you understand, I'm not asking about

11:18AM  18  conflicts per se.  I'm just asking you about a code of

11:18AM  19  ethics --

11:18AM  20  A.   Should that be there --

11:18AM  21  Q.   -- or a code conduct or a code about conflicts, separate

11:18AM  22  and apart from what attorneys are required?

11:18AM  23  A.   No.  I guess I was relying upon what attorneys are

11:18AM  24  required, but, you know, no, I didn't worry about it or think

11:18AM  25  about it.  To me that was office management, protocol, you

**C O N F I D E N T I A L**

11:18AM 1   know, that sort of thing.

11:18AM 2   Q.   But you say *attorneys*.  There were a lot of people in the

11:18AM 3   administration process, both inside and outside in terms of

11:18AM 4   vendors, who were not attorneys, correct?

11:18AM 5   A.   Correct.

11:18AM 6   Q.   And you never had a conversation, you said, with Mr. --

11:18AM 7   A.   You know what's interesting, now that you bring it up, I

11:18AM 8   think that the vendors all had these type of policies.  Okay?

11:18AM 9   And I did, I guess in my mind, I thought eventually our office

11:19AM 10  would have its own policy, that -- you know, just -- just like

11:19AM 11  the vendors did, as the oversight body, whether they borrowed

11:19AM 12  from their policies or created their own, but I didn't task

11:19AM 13  myself with making that happen.

11:19AM 14  Q.   And you did or did not see that as part of your

11:19AM 15  responsibilities?

11:19AM 16  A.   No, I probably assumed it was.  I -- you know.

11:19AM 17       Oh, to make sure that that was part of the office?

11:19AM 18  Q.   Yes.

11:19AM 19  A.   Oh, no.  No, no.

11:19AM 20  Q.   You didn't see that as part of your responsibility?

11:19AM 21  A.   I didn't see that as part of my responsibility, no.  I

11:19AM 22  thought we had outside counsel, Sessions firm, for those

11:19AM 23  general type of issues and questions, and I would have thought

11:19AM 24  it would have been their -- it would have been our

11:19AM 25  responsibility to, you know, secure that from them.

**C O N F I D E N T I A L**

SM-02-CR00760

11:19AM 1   Q.   But you never specifically inquired whether the Sessions

11:19AM 2   firm or someone else was doing this or thinking about it or

11:19AM 3   engaging in that type of analysis?

11:20AM 4   A.   No, I did not.

11:20AM 5   Q.   You said the outside vendors, you think, had policies?

11:20AM 6   A.   I think they probably did.

11:20AM 7   Q.   Did you see them?

11:20AM 8   A.   Their ethics policies?

11:20AM 9   Q.   Ethics and conflicts.  Let's make the question include

11:20AM 10  ethics and conflicts.

11:20AM 11  A.   No, I don't think I saw that.  But just in talking to

11:20AM 12  people and knowing when situations did arise, I think from that

11:20AM 13  I had the impression that they had these policies.

11:20AM 14  Q.   Did you ask to see them?

11:20AM 15  A.   No, I did not.

11:20AM 16  Q.   Did you have any conversations with their lawyers about

11:20AM 17  whether they had them or not?

11:20AM 18  A.   No, I did not.

11:20AM 19  Q.   Let me ask you now some specific questions about the

11:20AM 20  employment.  I'm going to ask you about these documents that we

11:20AM 21  referred to.

11:20AM 22          So when you were brought on board, you signed a

11:20AM 23  couple of documents; is that correct?

11:20AM 24  A.   Right.  Correct.

11:20AM 25  Q.   All right.  And one is an employment agreement?

**C O N F I D E N T I A L**

SM-02-CR00761

11:20AM 1   A.    Correct.

11:20AM 2   Q.    We're going to give you a copy of that just to look at.

11:21AM 3         MR. TIDWELL:  This is -- for the record, this is 02B.

11:21AM 4         MR. FREEH:  02B.  Okay.

11:21AM 5         (WHEREUPON, at this point in the proceedings,

11:21AM 6   Exhibit 02B was marked for identification.)

11:21AM 7         MR. TIDWELL:  And it's the "Undertaking of

11:21AM 8   Christine Reitano in Furtherance of Court's Order Appointing

11:21AM 9   Claims Administrator."

11:21AM 10  BY MR. FREEH:

11:21AM 11  Q.    Let me make sure you have copies of these.  You can take a

11:21AM 12  look at it for a moment just to refresh your recollection.  I'm

11:21AM 13  going to be asking you, Ms. Reitano, about the conflicts of

11:21AM 14  interest and recusal, which is paragraph 9 on page 5.  You can

11:21AM 15  read through it and take a moment.

11:21AM 16        MS. PIERSON:  These are going to be attached to the

11:21AM 17  court reporter's document?

11:21AM 18        MR. TIDWELL:  Yes, ma'am.

11:21AM 19        MR. FREEH:  Yes.

11:21AM 20        MS. PIERSON:  Which I gave her my information.  I

11:21AM 21  would like to get a copy of that when this is done.

11:21AM 22        MR. FREEH:  Well, that will be subject to the judge's

11:21AM 23  discussion and ruling.  We're not going to provide you a copy

11:21AM 24  today or immediately.

11:21AM 25        MS. PIERSON:  Well, I'm sure that the judge gets it

**C O N F I D E N T I A L**

SM-02-CR00762

11:21AM 1    first, but --

11:21AM 2         MR. FREEH:  Yeah.  Well, he's going to have to make a

11:21AM 3    decision about releasing it.

11:22AM 4         MS. PIERSON:  Right.

11:22AM 5         THE WITNESS:  (Witness reviews the document.)  Okay.

11:22AM 6    BY MR. FREEH:

11:22AM 7    Q.    Okay.  So this is a document, referring to 02B, which you

11:22AM 8    signed, entitled the "Undertaking," by you, "in Furtherance of

11:22AM 9    Court's Order Appointing Claims Administrator."  Are you

11:22AM 10   familiar with that?

11:22AM 11   A.    Yes.

11:22AM 12   Q.    And you signed that; is that correct?

11:22AM 13   A.    Yes.

11:22AM 14   Q.    And you said before that you didn't prepare or draft this?

11:22AM 15   A.    Correct.

11:22AM 16   Q.    Do you know who did?

11:22AM 17   A.    No, I don't.

11:22AM 18   Q.    All right.  Directing your attention to page 5,

11:22AM 19   paragraph 9, *Conflict of Interest and Recusal*.  Going about

11:23AM 20   halfway down the paragraph, it says, quote:  Reitano shall not

11:23AM 21   participate, without prior written approval from the claims

11:23AM 22   administrator, in any activity that presents or would appear to

11:23AM 23   present to a reasonable person who is knowledgeable of the

11:23AM 24   relevant facts, a conflict of interest with the transition

11:23AM 25   process or the proposed court-supervised claims program.

**C O N F I D E N T I A L**

SM-02-CR00763

11:23AM  1          Do you see that?

11:23AM  2     A.    Yes.

11:23AM  3     Q.    So what was your understanding about how that would impact

11:23AM  4     or how that would guide your actions and behavior as an

11:23AM  5     attorney, but also as a part of the supervised claims program?

11:23AM  6     A.    That I couldn't have any interest in or involvement in

11:23AM  7     BP-related claims.

11:23AM  8     Q.    Anything more than that?  And I'll direct your attention

11:23AM  9     to the language that says "or would appear to present to a

11:24AM 10     reasonable person...a conflict of interest."

11:24AM 11     A.    That even the appearance of a conflict of interest, that

11:24AM 12     even the appearance that I have an interest in something.

11:24AM 13     Q.    And as your attorney indicated before, you're also

11:24AM 14     familiar, I'm sure, with the general provisions of attorney

11:24AM 15     conduct, not specific to this particular position, but attorney

11:24AM 16     conflicts and conduct regarding the avoidance of both conflicts

11:24AM 17     and the appearance of conflicts?

11:24AM 18     A.    Right.

11:24AM 19     Q.    Did you also sign at the same time a second document,

11:24AM 20     which was a certification of confidentiality of claims?

11:24AM 21          We're going to show you 02D.

11:24AM 22          (WHEREUPON, at this point in the proceedings,

11:24AM 23     Exhibit 02D was marked for identification.)

11:24AM 24          THE WITNESS:  I don't know that that was at the same

11:24AM 25     time.

**C O N F I D E N T I A L**

11:24AM  1    BY MR. FREEH:

11:24AM  2    Q.    Okay.  The date on that is July 18th --

11:25AM  3    A.    Yeah, those weren't prepared --

11:25AM  4    Q.    -- 2012.

11:25AM  5    A.    -- until well into the program.

11:25AM  6    Q.    So the undertaking, which we just referred to, 02B, you

11:25AM  7    did not sign that contemporaneous with you starting your

11:25AM  8    employment?  There is no date on the document I have.

11:25AM  9    A.    You know, I can't be sure.  These things were being

11:25AM  10   e-mailed back and forth.

11:25AM  11          MS. PIERSON:  It has a date on the first page, at the

11:25AM  12   top.

11:25AM  13

11:25AM  14          MR. FREEH:  It's entered into on April 18, 2012, but

11:25AM  15   there is no date on the signature page.

11:25AM  16          MS. PIERSON:  Okay.

11:25AM  17   BY MR. FREEH:

11:25AM  18   Q.    Is it your recollection that you signed it on April 18th

11:25AM  19   or you're not sure?

11:25AM  20   A.    I'm not sure.

11:25AM  21   Q.    It could have been much later?

11:25AM  22   A.    No, no.  It was at or near April 18th.  These things were

11:25AM  23   being e-mailed.

11:25AM  24          MR. TIDWELL:  And so 02D is Appendix B in the

11:25AM  25   United States District Court for the Eastern District of

**CONFIDENTIAL**

SM-02-CR00765

11:25AM 1    Louisiana, "Certification Regarding Confidentiality of Claims

11:26AM 2    Information."

11:26AM 3    BY MR. FREEH:

11:26AM 4    Q.    We show you 02D, as in David.

11:26AM 5    A.    (Witness reviews the document.)   Absolutely, I remember

11:26AM 6    this in connection with the confidentiality order.

11:26AM 7    Q.    I'm going to show you 02D1, which is entitled

11:26AM 8    "Confidential Information, Confidentiality/Non-Disclosure

11:26AM 9    Agreement," and ask you to take a look at that.

11:26AM 10           (WHEREUPON, at this point in the proceedings,

11:26AM 11   Exhibit 02D1 was marked for identification.)

11:26AM 12   BY MR. FREEH:

11:26AM 13   Q.    And the last page has a signature with the date of

11:26AM 14   July 17th, 2012.  And I believe it's your signature?

11:27AM 15   A.    Yes, it is.

11:27AM 16   Q.    So this was signed on July 17th, 2012?

11:27AM 17   A.    Right.

11:27AM 18   Q.    Which would be several months after you went to work?

11:27AM 19   A.    That's right.

11:27AM 20   Q.    Do you know why there was a delay with respect to the

11:27AM 21   execution of it?

11:27AM 22   A.    I would assume that this was something that our office was

11:27AM 23   working with Sessions to prepare and create, and there was just

11:27AM 24   a delay in completing it.

11:27AM 25   Q.    At the end of that document there is a heading, we don't

**C O N F I D E N T I A L**

11:27AM 1   have a page, but it's the second page from the end, which says

11:27AM 2   "Conflict of Interest and Recusal," and just direct your

11:27AM 3   attention to that page.

11:27AM 4            MS. PIERSON:  It's actually the fourth page from the

11:27AM 5   end.  You're not counting the definitions?

11:27AM 6            MR. FREEH:  Fourth page.  Yeah.

11:27AM 7   BY MR. FREEH:

11:27AM 8   Q.   It's entitled "Conflict of Interest and Recusal" in caps

11:27AM 9   at the top of the page.

11:27AM 10  A.   Okay.  Yeah, I see that.

11:27AM 11  Q.   And that's a two-page document within a larger document,

11:28AM 12  and that also was signed on July 17th, 2012?

11:28AM 13  A.   Uh-huh (affirmative response).

11:28AM 14  Q.   And that's your signature?

11:28AM 15  A.   Yes.

11:28AM 16  Q.   And again, that was several months after you started work?

11:28AM 17  A.   Yes.

11:28AM 18  Q.   The same question, do you know why there was a delay in

11:28AM 19  getting that executed?

11:28AM 20  A.   The same explanation.  That I assume our office was

11:28AM 21  working with Sessions to prepare this document, and there was a

11:28AM 22  delay in completing it.

11:28AM 23  Q.   Let me show you a document, Ms. Reitano, which we marked

11:28AM 24  as Exhibit Number 03 for today.

11:28AM 25            (WHEREUPON, at this point in the proceedings,

**C O N F I D E N T I A L**

SM-02-CR00767

11:28AM 1   Exhibit 03 was marked for identification.)

11:28AM 2          MR. TIDWELL:  03 is an e-mail dated July 1, 2012,

11:29AM 3   from Christine Reitano to Jennifer Keough, subject is "Re:

11:29AM 4   Sarasota," and it's marked 03.

11:29AM 5          MR. FREEH:  Do you have an extra copy for the

11:29AM 6   attorney?

11:29AM 7          MR. MCCALL:  No.

11:29AM 8          MR. FREEH:  Let them look at it.

11:29AM 9              I want to ask you a few questions about that.

11:29AM 10         MS. PIERSON:  Does it start from the back?

11:29AM 11         MR. FREEH:  Yes.  It's a two-page document.

11:29AM 12         MS. PIERSON:  Ms. Keough is with the Garden City

11:29AM 13  Group?

11:29AM 14         MR. TIDWELL:  Yes, ma'am.

11:30AM 15         THE WITNESS:  Okay.

11:30AM 16         MS. PIERSON:  Let me finish reading it.

11:30AM 17         MR. FREEH:  Sure.  Take your time.

11:30AM 18         MS. PIERSON:  Okay.

11:30AM 19  BY MR. FREEH:

11:30AM 20  Q.   Okay.  So this is a set of e-mail exchanges on or about

11:30AM 21  July 1, 2012, with Jennifer Keough?

11:30AM 22  A.   Yes.

11:30AM 23  Q.   And who is Jennifer Keough at that time?

11:30AM 24  A.   Jennifer Keough is -- maybe she's the vice president at

11:30AM 25  Garden City Group.

**C O N F I D E N T I A L**

SM-02-CR00768

| | | |
|---|---|---|
| 11:30AM | 1 | Q.    What was your relation or interaction on a regular basis |
| 11:31AM | 2 | with Ms. Keough at that point? |
| 11:31AM | 3 | A.    Well, she was kind of the lead person or contact person at |
| 11:31AM | 4 | Garden City, and I dealt with Garden City for their role in the |
| 11:31AM | 5 | program, which was basically the intake part of the program and |
| 11:31AM | 6 | then the payment process. |
| 11:31AM | 7 | Q.    Would it be fair to say that you had an oversight role |
| 11:31AM | 8 | with respect to Ms. Keough in that process? |
| 11:31AM | 9 | A.    Yes. |
| 11:31AM | 10 | Q.    And in this exchange that you looked at, you're asking her |
| 11:31AM | 11 | to consider hiring your husband; is that correct? |
| 11:31AM | 12 | A.    Well, when I had -- I had gone to Sarasota because they |
| 11:31AM | 13 | have a call center there.  And one of the other oversight -- |
| 11:31AM | 14 | one of the other areas of oversight was the communications, |
| 11:31AM | 15 | what people were saying about -- you know, when callers were |
| 11:32AM | 16 | calling in with questions, what the respondents were saying, so |
| 11:32AM | 17 | I went to see that site. |
| 11:32AM | 18 |        And she said -- you know, at that time she had -- |
| 11:32AM | 19 | Garden City had a small office in the building as well, to have |
| 11:32AM | 20 | a couple of their attorneys stay there on a more regular basis |
| 11:32AM | 21 | to attend the meetings.  And she had asked me if I knew anyone |
| 11:32AM | 22 | who might be interested in working on the program for |
| 11:32AM | 23 | Garden City. |
| 11:32AM | 24 |        And I -- again, the same sort of situation, you know, |
| 11:32AM | 25 | Tiger wasn't practicing much law at the time.  I thought that |

**C O N F I D E N T I A L**

SM-02-CR00769

11:32AM  1    he might be a good fit.  And Susan Kohn is also someone else I
11:32AM  2    had thought for that position as well.
11:32AM  3    Q.   Did you send an e-mail to Ms. Keough with regard to Susan?
11:32AM  4    A.   No.  Because I had to ask my friend to ask Susan, and she
11:33AM  5    said she wouldn't be interested.
11:33AM  6    Q.   Before you sent the e-mail on July 1st, had you discussed
11:33AM  7    this with your husband?
11:33AM  8    A.   I probably did.  I don't know before -- no, I wouldn't
11:33AM  9    have discussed it with him until I had the conversation with
11:33AM 10    her -- or, I guess it says -- whenever I actually met with her,
11:33AM 11    that day, I might have discussed it with him, to see if he
11:33AM 12    would even be interested in doing it.
11:33AM 13    Q.   Well, before you proposed your husband's name as a
11:33AM 14    candidate, are you saying you did speak to your husband or you
11:33AM 15    didn't speak to your husband?
11:33AM 16    A.   No, because the idea never crossed my mind until she asked
11:33AM 17    if I knew an attorney who would be interested.
11:33AM 18    Q.   All right.  But I'm referring now to the e-mail, 03.  At
11:33AM 19    the time you sent the e-mail, had you had a discussion with
11:33AM 20    your husband to see whether or not he was interested in this?
11:33AM 21    A.   Yes.
11:33AM 22    Q.   And he was?
11:33AM 23    A.   Sort of.
11:33AM 24    Q.   Well, would you have sent the e-mail if he wasn't?
11:33AM 25    A.   Well, he was open to discussing it.

**C O N F I D E N T I A L**

11:34AM 1   Q.   So he was interested in it?

11:34AM 2   A.   Yes.

11:34AM 3   Q.   And did you see that as a conflict of interest?

11:34AM 4   A.   No, I did not.  Because I didn't feel like we were in --

11:34AM 5   the claims administrator's office was in conflict with one of

11:34AM 6   the vendors.

11:34AM 7   Q.   But you oversaw their activities and supervised them from

11:34AM 8   time to time on different matters, correct?

11:34AM 9   A.   That's true.  But I would think I could almost do that

11:34AM 10   within our office.

11:34AM 11   Q.   So as you sit here today, you don't see that as a

11:34AM 12   conflict?

11:34AM 13   A.   Well, I think different people would disagree.

11:34AM 14   Q.   I'm not asking about different people.  As you sit here

11:34AM 15   today, do you see it as a conflict?

11:34AM 16   A.   At the time I did not see it as conflict.

11:34AM 17   Q.   Do you see it as a conflict now?

11:34AM 18   A.   Um -- I guess I view my relationship with them as a

11:35AM 19   working relationship.

11:35AM 20   Q.   Let the record reflect several seconds of hesitation, and

11:35AM 21   I'll ask the question a third time.

11:35AM 22       As you sit here today, do you see this communication

11:35AM 23   asking Jennifer Keough to consider hiring your husband a

11:35AM 24   conflict of your duties at that time?

11:35AM 25   A.   No.  She had asked me if I knew an attorney who would be

**C O N F I D E N T I A L**

SM-02-CR00771

11:35AM 1   good.  Maybe I didn't think it out, you know.  I do not and did

11:35AM 2   not see it as a conflict.

11:35AM 3   Q.   Did you discuss it with Mr. Juneau?

11:35AM 4   A.   No.

11:35AM 5   Q.   Did you tell anybody you were going to send this e-mail?

11:35AM 6   A.   No.

11:35AM 7   Q.   Let me direct your attention back to a document we showed

11:35AM 8   you before, which was your employment undertaking.

11:35AM 9        Can we have that document again, that's 02B.

11:36AM 10       And again, paragraph 9 on page 5, "...in any activity

11:36AM 11  that presents or would appear to present to a reasonable person

11:36AM 12  who is knowledgeable of the relevant facts, a conflict of

11:36AM 13  interest with a transition process or the proposed

11:36AM 14  court-supervised claims program."

11:36AM 15       As you sit here today, do you think that was an

11:36AM 16  appearance of a conflict?

11:36AM 17  A.   No, I didn't.  Because I thought we were working together.

11:36AM 18  Q.   And your husband, obviously, was not retained for that

11:36AM 19  position, correct?

11:36AM 20  A.   Correct.

11:36AM 21       MR. TIDWELL:  Do you know if there was a follow-up

11:36AM 22  conversation with anybody at Garden City?  Did he speak to

11:36AM 23  anyone there?

11:36AM 24       THE WITNESS:  No, I did not.

11:36AM 25       MR. TIDWELL:  No, did he?

**C O N F I D E N T I A L**

**SM-02-CR00772**

11:36AM 1    THE WITNESS:  Did he?  He may have spoken to Neil

11:36AM 2    Zola.

11:36AM 3        MR. TIDWELL:  Neil Zola would be?

11:36AM 4        THE WITNESS:  The president.

11:37AM 5        MR. TIDWELL:  The president of Garden City.

11:37AM 6        THE WITNESS:  I think so.

11:37AM 7        MR. TIDWELL:  You think it was Neil Zola.

11:37AM 8        THE WITNESS:  I think so.

11:37AM 9        MR. TIDWELL:  So did your husband indicate to you

11:37AM 10   that they had a conversation, do you recall?

11:37AM 11       THE WITNESS:  I can't remember.  I can't remember if

11:37AM 12   my husband called Neil or if I called Neil.  We might have both

11:37AM 13   spoken to Neil.  I think my husband might have called him.

11:37AM 14       MR. TIDWELL:  So he was not interested or it didn't

11:37AM 15   just work out?  How did you understand it came to an end?

11:37AM 16       THE WITNESS:  He was not interested.

11:37AM 17       MR. TIDWELL:  Okay.

11:37AM 18   By MR. FREEH:

11:37AM 19   Q.   Did you call at any time while you were there working for

11:37AM 20   Mr. Juneau any of the other contractors, vendors, people

11:37AM 21   related to the program on behalf of finding your husband a job?

11:38AM 22   A.   No.

11:38AM 23   Q.   That was the only instance?

11:38AM 24   A.   Yes.  And I didn't initiate that.

11:38AM 25   Q.   Well, you sent the e-mail.

**C O N F I D E N T I A L**

SM-02-CR00773

11:38AM 1   A.   Yes.  After a conversation with her in person.

11:38AM 2   Q.  Let me show you an exhibit we've marked 02, or Number 2.

11:38AM 3         (WHEREUPON, at this point in the proceedings,

11:38AM 4   Exhibit 02 was marked for identification.)

11:38AM 5         MR. TIDWELL:  For the record, 02 is a Gulf Coast

11:38AM 6   Claims Facility "Client Authorization Form" for Casey Thonn.

11:38AM 7   It's signed by Mr. Thonn on 10/14/11.

11:38AM 8         MR. FREEH:  Okay.  I'll let you look at that for a

11:38AM 9   moment with your lawyer.

11:39AM 10        THE WITNESS:  (Witness reviews the document.)

11:39AM 11        MS. PIERSON:  Can we take a five-minute break.

11:39AM 12        MR. FREEH:  Absolutely.  Let's take a ten-minute

11:39AM 13   break.

11:39AM 14        (WHEREUPON, at this point in the proceedings, a brief

11:39AM 15   recess was taken.)

12:00PM 16        MR. FREEH:  Okay.  So we're back on the record at

12:00PM 17   noon after a short break.

12:00PM 18   BY MR. FREEH:

12:00PM 19   Q.  Ms. Reitano, I was asking you questions before about your

12:00PM 20   roles and responsibilities with respect to working with

12:01PM 21   Mr. Juneau.

12:01PM 22   A.   Yes.

12:01PM 23   Q.  And I did not ask you about whether compliance functions

12:01PM 24   were at all in your responsibilities or portfolio.

12:01PM 25        Compliance, let me define that, meaning that, you

**C O N F I D E N T I A L**

SM-02-CR00774

12:01PM 1  know, the people, both within the claims administration, your

12:01PM 2  vendors were abiding by appropriate rules and policies and

12:01PM 3  procedures for doing their business without conflicts, without

12:01PM 4  ethical violations, making any reporting to government

12:01PM 5  agencies, for instance, if you saw money laundering or evidence

12:01PM 6  of any improper activities.

12:01PM 7       In other words, a compliance function, making sure

12:01PM 8  that your administration colleagues with Mr. Juneau's office,

12:01PM 9  but also your vendors, were complying with all the necessary

12:01PM 10 rules and procedures?

12:01PM 11 A.   It wasn't my role necessarily, but if something were

12:02PM 12 brought to my attention, I would probably have brought it

12:02PM 13 directly to Mr. Juneau, maybe David Welker and David Odom.

12:02PM 14 Q.   Do you recall anything in that compliance basket, as I've

12:02PM 15 described it, being brought to your attention while you were

12:02PM 16 there?

12:02PM 17 A.   No, I don't recall.

12:02PM 18 Q.   And did you ever have a specific conversation with

12:02PM 19 Mr. Juneau about compliance with respect to the claims

12:02PM 20 administration office?

12:02PM 21 A.   No.

12:02PM 22 Q.   And did you discuss with anyone else in the claims

12:02PM 23 administration organization who, if anyone, was responsible for

12:02PM 24 or looking at compliance?

12:02PM 25 A.   No.

**C O N F I D E N T I A L**

SM-02-CR00775

12:02PM  1    Q.    Do you know or are you aware of asking -- strike that.

12:02PM  2          Are you aware or do you know of any third party that

12:02PM  3    looked at any of the compliance processes or the compliance

12:02PM  4    policies and procedures of your administration while you were

12:02PM  5    there?

12:02PM  6    A.    No.  I didn't cover that.  That wasn't my role.  I could

12:03PM  7    maybe assume Sessions did that.  But, no.

12:03PM  8    Q.    Then you never had a discussion with Sessions about that?

12:03PM  9    A.    No.

12:03PM  10   Q.    Or Mr. Odom?

12:03PM  11   A.    No.

12:03PM  12   Q.    Let me show you what we started right before the break,

12:03PM  13   which is Exhibit 02.  Two is a GCCF client authorization form

12:03PM  14   dated -- well, there's two dates, 10/14/11 and 10/11/11.

12:03PM  15         And do you have that in front of you?

12:03PM  16   A.    Yes, I do.

12:03PM  17   Q.    Could you just tell us what that document is, please?

12:03PM  18   A.    This is the authorization form that you had to file with

12:03PM  19   the GCCF program letting them know or documenting that you are

12:03PM  20   representing this claimant.

12:03PM  21   Q.    All right.  And that was your submission on or about

12:03PM  22   October 14, 2011?

12:03PM  23   A.    Correct.

12:03PM  24   Q.    And was Casey Thonn your client at that time?

12:03PM  25   A.    Yes.

**C O N F I D E N T I A L**

SM-02-CR00776

| | | |
|---|---|---|
| 12:03PM | 1 | Q.   And how did he come to be your client? |
| 12:03PM | 2 | A.   He came to be my client because, I think, in the early |
| 12:04PM | 3 | part of 2011, or the end of 2010, this other family, the |
| 12:04PM | 4 | Bakeses that I had mentioned before, had been referred to my |
| 12:04PM | 5 | husband, and they wanted to -- help, assistance with filing |
| 12:04PM | 6 | their GCCF claim.  And I believe Casey was a friend of theirs, |
| 12:04PM | 7 | and so later came as well. |
| 12:04PM | 8 | Q.   And would you describe him as your client, a firm client, |
| 12:04PM | 9 | a client of both you and your husband at that time? |
| 12:04PM | 10 | A.   A firm client.  I signed him up. |
| 12:04PM | 11 | Q.   And did your husband work on any of the matter relating to |
| 12:04PM | 12 | his claims at that time? |
| 12:04PM | 13 | A.   The GCCF claim?  No. |
| 12:04PM | 14 | Q.   The GCCF. |
| 12:04PM | 15 | A.   Right. |
| 12:04PM | 16 | Q.   No? |
| 12:04PM | 17 | A.   No. |
| 12:04PM | 18 | Q.   And what, if anything, did you the do, without telling me |
| 12:05PM | 19 | your conversations with him, that is, with Mr. Thonn, what, if |
| 12:05PM | 20 | anything, did you do in terms of processing his claim? |
| 12:05PM | 21 | A.    In terms of processing his claims, it was a question of |
| 12:05PM | 22 | documenting his file, responding to incompleteness notices, |
| 12:05PM | 23 | once again, reaching out to him for more documentation.  He |
| 12:05PM | 24 | had -- I accompanied him on one of his field visit interviews |
| 12:05PM | 25 | for the subsistence portion of his claim, and that was |

**C O N F I D E N T I A L**

SM-02-CR00777

12:05PM 1   essentially it.

12:05PM 2   Q.   And is your recollection he had several claims?  He had a

12:05PM 3   subsistence claim, he had a vessel claim as well as a food

12:05PM 4   claim?

12:05PM 5   A.   He had -- to my recollection, he had a fisherman claim and

12:06PM 6   a subsistence claim.  I was unaware of the vessel claim.

12:06PM 7           MR. TIDWELL:  So you're not aware if he was a

12:06PM 8   previous client with your husband?

12:06PM 9           THE WITNESS:  He was not a previous client with my

12:06PM 10  husband, to my --

12:06PM 11          MR. TIDWELL:  On a personal injury matter or

12:06PM 12  anything?

12:06PM 13          THE WITNESS:  No, not prior to.  He did also have --

12:06PM 14  see, he also had a personal injury claim at around the same

12:06PM 15  time.

12:06PM 16          MR. TIDWELL:  Same time.  And y'all were handling

12:06PM 17  that?

12:06PM 18          THE WITNESS:  Yes.

19

20

21

22

23

24

25

**C O N F I D E N T I A L**

SM-02-CR00778

BY MR. FREEH:

Q.   Were you handling that or was your husband?

A.   I was handling it until I took the position as a claims administrator.

Q.   And was your husband also working on it?  Working, meaning anything in regard to the case.

A.   The personal injury case?  I don't think so.  Initially, you know, it was just a question of trying to settle it with the insurance company, and then something happened on the insurance company's end.

It probably should have resolved a lot quicker, probably should have resolved before I took the position with the claims administrator, but it didn't.  So I just left that to my husband when I left the firm.

Q.   So at the time that you joined the claims administration, you and your firm and your husband, in one fashion or the other, were assisting Mr. Thonn on two matters, one relating to the Gulf claim and another unrelated personal injury matter?

A.   That's right.

Q.   And you said when you left the firm, it went to your husband in terms of the continuing representation?

A.   Not for the -- not for the GCCF claim.  I terminated my relationship with Casey, and I also notified the program that I was not handling his GCCF claim.

Q.   And we'll show you 02A, which is a letter you wrote to the

**C O N F I D E N T I A L**

SM-02-CR00779

12:07PM 1   GCCF dated March 30th, 2012, saying that you are confirming you

12:08PM 2   are no longer representing Casey Thonn in connection with the

12:08PM 3   claim.

12:08PM 4           (WHEREUPON, at this point in the proceedings,

12:08PM 5   Exhibit 02A was marked for identification.)

12:08PM 6           MR. TIDWELL:  02A, the Sutton & Reitano letter to the

12:08PM 7   Gulf Coast Claims Facility.

12:08PM 8           THE WITNESS:  That's correct.

12:08PM 9   BY MR. FREEH:

12:08PM 10  Q.   And that's the notification that we just discussed?

12:08PM 11  A.   Yes.

12:08PM 12  Q.   I may have asked you this before, but I'll repeat it, did

12:08PM 13  you at any time specify to Mr. Juneau or anybody at the claims

12:08PM 14  administration that you had represented an individual named

12:08PM 15  *Thonn* in the previous GCCF matter?

12:08PM 16  A.   I don't remember if I named him specifically or not.

12:08PM 17          MR. TIDWELL:  When you say *named specifically* --

12:08PM 18          THE WITNESS:  Like I told him I had -- was

12:08PM 19  representing people in the GCCF program.  I don't know if I

12:08PM 20  said Casey Thonn, Tim Gonzales, Jessica Backes.  You know, I

12:08PM 21  may or may not have.  I don't know.

12:08PM 22  BY MR. FREEH:

12:08PM 23  Q.   When you started working at the claims administration, did

12:09PM 24  you notify and provide those names specifically to anyone in

12:09PM 25  the claims administration process as people that you had

**C O N F I D E N T I A L**

SM-02-CR00780

12:09PM 1    previously represented?

12:09PM 2    A.   No.  I did not in a formal way.  And I was not asked to.

12:09PM 3    Q.   And as far as you know, was there any process or procedure

12:09PM 4    where that would have been done?  In other words, someone

12:09PM 5    coming on board, putting on record or noticing the

12:09PM 6    administration that they had represented previous people who

12:09PM 7    could be claimants?

12:09PM 8    A.   No, there was no process for that.

12:09PM 9    Q.   Did anybody ever ask you about whether there was a process

12:09PM 10   like that?

12:09PM 11   A.   No.

12:09PM 12   Q.   Did you ever think or come to the point where you were

12:09PM 13   interested in setting up such a process?

12:09PM 14   A.   No.  In my mind, once I terminated my relationship with

12:09PM 15   him and left the firm, it was -- it was done.  It was done, and

12:09PM 16   here I was now, an independent contractor working in my own

12:10PM 17   name on this program.  And as I mentioned before, I had a good

12:10PM 18   deal of work on my plate.  I really had to keep my nose to the

12:10PM 19   grindstone and just do that.

12:10PM 20   Q.   Let me show you what we've marked as Exhibit 04, which is

12:10PM 21   a series of documents with some attachments.  It's an e-mail

12:10PM 22   train dated on or around September 17, 2012.  So we're going to

12:10PM 23   let you look at that.

12:10PM 24        (WHEREUPON, at this point in the proceedings,

12:10PM 25   Exhibit 04 was marked for identification.)

**C O N F I D E N T I A L**

SM-02-CR00781

12:10PM 1        MR. TIDWELL:   04 is an e-mail from Lynn Greer at

12:10PM 2   BrownGreer dated September 17, 2012, to Ms. Reitano,

12:10PM 3   Jennifer Keough at Garden City Group.   The subject is

12:10PM 4   "Expedited Claims," and the attachments are "No claims left

12:10PM 5   behind."

12:10PM 6   BY MR. FREEH:

12:10PM 7   Q.    So take a look at that.   There's a number of attachments.

12:10PM 8   Take whatever time you need to review it.   Your attorney is

12:10PM 9   looking at it with you, and I'm going to ask you some questions

12:11PM 10  about it.

12:13PM 11  A.    (Witness reviews the document.)   Okay.   I've read the gist

12:13PM 12  of it.

12:13PM 13  Q.    Okay.   So let me direct your attention to page 3 of

12:13PM 14  document, which has been marked as 04, which is the first in

12:13PM 15  the string of e-mails, at least that we have, and it's an

12:13PM 16  e-mail from you dated September 17, 2012, to Matt Lundy with a

12:13PM 17  copy to Lynn Greer.

12:13PM 18  A.    Okay.

12:13PM 19  Q.    Who is Matt Lundy?

12:13PM 20  A.    Matt Lundy is one of the attorneys, maybe one of the PSC

12:14PM 21  attorneys, involved in the program.

12:14PM 22  Q.    And prior to this date, September 17, 2012, had you had

12:14PM 23  any contact or interaction with him?

12:14PM 24  A.    Perhaps.   If I did -- I don't know -- I know he was

12:14PM 25  involved with structured settlements, okay, and I don't know if

**C O N F I D E N T I A L**

SM-02-CR00782

12:14PM  1    he was at one of the -- at a very large PSC meeting we had held

12:14PM  2    in September.

12:14PM  3    Q.    So addressing the communication on September 17th --

12:14PM  4    A.    Yes.

12:14PM  5    Q.    -- it looks like you're responding to an e-mail that he

12:14PM  6    sent you or some contact, is that your understanding?

12:14PM  7    A.    Yes.

12:14PM  8    Q.    And what do you remember about that, please?

12:14PM  9    A.    Well, I don't remember the specifics, but it's talking

12:14PM  10   about e-mail designating the claims you wished to be expedited

12:14PM  11   to BrownGreer.

12:14PM  12           We had had a meeting with the PSC.  At the time, you

12:15PM  13   know, the program was trying to do several things at once,

12:15PM  14   create claim forms, registration forms, instruction booklets,

12:15PM  15   open up CA -- the CAC centers, start intaking and start

12:15PM  16   reviewing.

12:15PM  17           And then the next step, which we began to really

12:15PM  18   receive a lot of criticism for, was payment.  People wanted --

12:15PM  19   it wasn't enough that you opened your doors.  It wasn't enough

12:15PM  20   that now you were actually taking in claims.  It wasn't enough

12:15PM  21   that you had begun the review process.  Now we need to see

12:15PM  22   payments on the street or this settlement agreement isn't going

12:15PM  23   to have the backing or approval that it needs.

12:15PM  24           So one thing we did when we met with the PSC group

12:16PM  25   was we discussed that one of the biggest problems now, even

**C O N F I D E N T I A L**

SM-02-CR00783

12:16PM 1    though that we were reviewing claims, was that these claims

12:16PM 2    were grossly deficient for their documentation.

12:16PM 3            And that, okay, we're reviewing them, and we didn't

12:16PM 4    want to hurry up and send a lot of incompleteness notices,

12:16PM 5    because that was a big source of complaint with the GCCF

12:16PM 6    program.

12:16PM 7            So we said, you know, "Our hands are tied.  You know,

12:16PM 8    we cannot make this happen any faster.  We can't make -- you

12:16PM 9    know, we can't issue awards if the documentation is

12:16PM 10   incomplete."

12:16PM 11           Well, some of the members were like -- one of the

12:16PM 12   things -- in addition to this, internally, our business

12:16PM 13   processes people we're trying to come up with a method to

12:16PM 14   identify from the universe of claims those claims that were

12:16PM 15   complete so that we could push those ahead and review them.

12:17PM 16   Well, how do you do that without actually looking at the claim?

12:17PM 17   It became really a futile endeavor.

12:17PM 18           But they talked about the low -- grab the low-lying

12:17PM 19   fruit.  Grab the claims that are easiest to process and require

12:17PM 20   less documentation.  VOO would be an example of that.  Those

12:17PM 21   were some of the first claims that came out.

12:17PM 22           So what the PSC also offered was, "Look, we know the

12:17PM 23   settlement agreement because we wrote it.  We -- we have the

12:17PM 24   best accountants.  We have the best this, that and the other.

12:17PM 25   We can identify for you, on a very short-term basis, claims

**C O N F I D E N T I A L**

SM-02-CR00784

12:17PM 1      that are fully documented and ready for payment.  And we will

12:17PM 2      give you these list of claims so you can go -- so the program

12:17PM 3      can advance this portion and have a sampling, if you will."

12:17PM 4      Okay?

12:17PM 5           And so one of the components -- in reading the rest

12:18PM 6      of the e-mail, what I see as maybe being an issue here as well

12:18PM 7      is, okay, not only do you have this list of claims that were

12:18PM 8      ready to go, but the payment component, the payment module at

12:18PM 9      this time hadn't been finished to do it online.  And so

12:18PM 10     Garden City had to do this work offline.

12:18PM 11          And so around this time, there were a lot of

12:18PM 12     complaints about, "Hey, I know I have an award and now I'm not

12:18PM 13     getting the payment," or "You said I would get a payment and

12:18PM 14     I'm not getting the payment."

12:18PM 15          And I had a few conversations with Jen and Lynn, they

12:18PM 16     seemed to be the interactive -- the interface here between

12:18PM 17     BrownGreer, who sent out the eligibility notice, and

12:18PM 18     Garden City that actually paid the claim, they were the

12:18PM 19     interface.  "Hey, what's going on with payments here?  What's

12:18PM 20     going on with wires?"

12:18PM 21          I mean, Garden City really got hounded during that

12:19PM 22     time for -- as quickly as they could, they needed to assemble

12:19PM 23     these documents so that they could actually pay a claim.

12:19PM 24          So from what I gather, he, at one point, had a list

12:19PM 25     of claims to be expedited, and now he's asking why they aren't

**C O N F I D E N T I A L**

SM-02-CR00785

12:19PM  1    paid.

12:19PM  2         I also noticed that, you know, you have Casey Thonn

12:19PM  3    listed on this attachment.

12:19PM  4         MR. TIDWELL:  So what is the "No claims left behind"?

12:19PM  5    Who generated that?

12:19PM  6         THE WITNESS:  The no claims left behind, you will

12:19PM  7    have to ask Lynn Greer.

12:19PM  8         No claims left behind, I'm not -- that -- when I

12:19PM  9    first read that, I thought that meant -- you know, we had the

12:19PM 10    transition process going on at the same time this was all going

12:19PM 11    on.  And, you know, so some of those claims had to get paid,

12:19PM 12    you know, some people who had the option to elect their

12:19PM 13    60 percent payment and stay in the program, or maybe now they

12:20PM 14    decided they wanted the 40 percent too.  They didn't want to go

12:20PM 15    throughout the program.

12:20PM 16         So initially I thought that's what the "No claim

12:20PM 17    left behind" report meant.

12:20PM 18         We also posted on the -- (Witness reviews the

12:20PM 19    document.)

12:20PM 20         Or it could be -- if it doesn't mean that, it

12:20PM 21    could just be the push to make sure, even though we're doing

12:20PM 22    this offline, that we make sure we get everything run through

12:20PM 23    the system.  And I'm really not certain which one it means.

12:20PM 24    BY MR. FREEH:

12:20PM 25    Q.   Let me ask you a specific question or two.  Again, going

**C O N F I D E N T I A L**

82

12:20PM 1    back again to page 3 of 04.  Okay?

12:20PM 2            You said, "I had forwarded your e-mail" -- "your

12:20PM 3    e-mail," meaning Matt's I would assume.

12:20PM 4    A.    Matt's, exactly.

12:20PM 5    Q.    -- "designating the claims you wish to be expedited to

12:21PM 6    BrownGreer, but there was no attachment."

12:21PM 7            Then at the back of that document, we have an

12:21PM 8    attachment.  Is that the attachment that he subsequently

12:21PM 9    forwarded to you?

12:21PM 10   A.    It must be.  I'm not sure.  I'm not sure.

12:21PM 11   Q.    Because the prior page, which is, obviously, in the e-mail

12:21PM 12   string --

12:21PM 13   A.    Yes.

12:21PM 14   Q.    -- and you're copied, of course, on Lynn Greer's

12:21PM 15   September 17, 2:40 p.m. e-mail, which is on page 1.  On page 2

12:21PM 16   of that e-mail string, you've got the graphic there with two

12:21PM 17   claims, 1407 and 2251, at least in the left margin --

12:21PM 18   A.    Okay.

12:21PM 19   Q.    -- identified, correct?

12:21PM 20   A.    Right.

12:21PM 21   Q.    And those are claims for an individual named Cramer, who

12:21PM 22   is represented by Lundy?

12:21PM 23   A.    Okay.

12:21PM 24   Q.    And that's Pat Lundy, as far as you know?

12:21PM 25   A.    Matt.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 12:21PM | 1 | Q.   Matt Lundy.  All right. |
| 12:22PM | 2 | So my question, again, goes back to page 3 -- |
| 12:22PM | 3 | A.   Oh, here we go.  We have -- I'm sorry.  Number 10 here |
| 12:22PM | 4 | defines for you what "no claim left behind" means. |
| 12:22PM | 5 | Q.   Okay.  That's on page 2 of the document? |
| 12:22PM | 6 | A.   On page 2.  And that makes sense. |
| 12:22PM | 7 | Q.   All right.  So my question is:  When you said you didn't |
| 12:22PM | 8 | include the attachment, and then he said, "Will send shortly," |
| 12:22PM | 9 | the attachment is then -- |
| 12:22PM | 10 | A.   I don't know. |
| 12:22PM | 11 | Q.   -- the one in the back? |
| 12:22PM | 12 | A.   I don't know.  And -- |
| 12:22PM | 13 | MR. TIDWELL:  We did that with recovery and that's |
| 12:22PM | 14 | it. |
| 12:22PM | 15 | MR. FREEH:  Do you have 04A? |
| 12:22PM | 16 | (WHEREUPON, at this point in the proceedings, |
| 12:22PM | 17 | Exhibit 04A was marked for identification.) |
| 12:22PM | 18 | MR. TIDWELL:  Here is 04A.  It's just a chart that |
| 12:22PM | 19 | depicts names, claim types, claimants, claim ID, signed release |
| 12:22PM | 20 | and statement to submitted, and then payment received and |
| 12:22PM | 21 | payment mailed to client. |
| 12:22PM | 22 | MS. PIERSON:  So is the question whether this |
| 12:23PM | 23 | document, 04A, was -- ended up being the attachment or whether |
| 12:23PM | 24 | this multiple-page document -- |
| 12:23PM | 25 | MR. TIDWELL:  Yes.  We're trying to determine -- |

**C O N F I D E N T I A L**

SM-02-CR00788

12:23PM  1          THE WITNESS:  How can you not tell?

12:23PM  2          MR. TIDWELL:  Because it depends on the how the

12:23PM  3  e-mail server works sometimes.

12:23PM  4          THE WITNESS:  Oh.  I couldn't tell you which one was

12:23PM  5  the attachment.  I had many PSC attorneys sending me these

12:23PM  6  expedited lists, which I would not open up, and I would just

12:23PM  7  forward directly to BrownGreer.  So I would not have been

12:23PM  8  interested in what the exact list was.

12:23PM  9  BY MR. FREEH:

12:23PM 10  Q.    And you don't recall, as you look at this e-mail, what the

12:23PM 11  attachment was that he agreed to send?

12:23PM 12  A.    No, I didn't.  I must have just seen there was no

12:23PM 13  attachment.  I don't know.  There was no attachment, and I

12:23PM 14  said, you know, "If you want me to forward this list, you need

12:23PM 15  to provide the attachment."

12:23PM 16  Q.    How often in the course of your work did you have

12:24PM 17  instances like this where an attorney, whether he be part of

12:24PM 18  the client class representation or not, you know, inquire to

12:24PM 19  you about a claim and then you took some internal action to

12:24PM 20  determine the status?

12:24PM 21  A.    I would -- you know, eventually, I did not have time to

12:24PM 22  entertain those type of issues.  The only ones that I would

12:24PM 23  entertain, and eventually it just came to be, that attorneys

12:24PM 24  would present to me those issues that might have far-reaching

12:24PM 25  implications.  Or that were so -- or they knew me, they just

**C O N F I D E N T I A L**

SM-02-CR00789

12:24PM 1   got to me, and I would be able to, you know, get to the

12:24PM 2   problem, and see.

12:24PM 3   Q.   So as best you can recall, it's not that long ago, how

12:24PM 4   often did that happen?  Or was that a daily occurrence or --

12:24PM 5        Because -- and I'll just give you the background of

12:24PM 6   the question so you understand where it's coming from.  We

12:25PM 7   don't have a lot of e-mails like this where you're actually

12:25PM 8   involved in or talking about or checking for a lawyer the

12:25PM 9   status of a claim.

12:25PM 10       So the question is:  Did you do this on a rare basis,

12:25PM 11  which you would determine from looking at the few e-mails, or

12:25PM 12  did you do it on a regular basis?

12:25PM 13  A.   I would say a rare basis.

12:25PM 14  Q.   A rare basis?

12:25PM 15  A.   Yes.  It wasn't my role.  It was really the bigger

12:25PM 16  picture, the policies, steering the program in the right

12:25PM 17  direction.

12:25PM 18       MR. FREEH:  Any other questions on that e-mail?

12:25PM 19       MR. TIDWELL:  No, sir.

12:25PM 20       MR. FREEH:  Michael?

12:25PM 21       MR. MCCALL:  I have another e-mail I want to ask

12:25PM 22  about.  Before we leave the Thonn issue, I have just a couple

12:25PM 23  questions.

12:25PM 24       MR. FREEH:  We're not going to leave it, but go

12:25PM 25  ahead.  Go ahead.

**C O N F I D E N T I A L**

SM-02-CR00790

12:25PM 1      MR. MCCALL:  I just want to go back to that other

12:25PM 2  representation that you had been handling for Mr. Thonn.

12:25PM 3      THE WITNESS:  The personal injury?

12:25PM 4      MR. MCCALL:  The personal injury, I understand.

12:25PM 5  Right.

12:25PM 6          Can you tell us, if you recall, the respondent

12:25PM 7  or defendant in that case and in what court it was heard?

12:25PM 8      THE WITNESS:  Oh, gosh.  Oh, goodness.  I'm sorry.  I

12:26PM 9  cannot remember.  I can't remember if this was a -- I don't

12:26PM 10  remember if he had gotten the information -- what the issue

12:26PM 11  was.  I think the driver, it wasn't his insurance, it wasn't

12:26PM 12  his car.  I'm sorry.  I can't remember.  I'm sure that you can

12:26PM 13  get that information, but I don't remember.

12:26PM 14      MR. MCCALL:  But there was only that one other

12:26PM 15  representation that you had for Mr. Thonn?

12:26PM 16      THE WITNESS:  Yes.  Yes.

12:26PM 17      MR. MCCALL:  Okay.  Thank you.

12:26PM 18  BY MR. FREEH:

12:26PM 19  Q.   All right.  We're going to show you an exhibit marked as

12:26PM 20  05, which is another e-mail dated June 11, 2013.

12:26PM 21          If you can show that to Ms. Reitano, let her look at

12:26PM 22  it, and I'm going to ask you some questions.

12:26PM 23          (WHEREUPON, at this point in the proceedings,

12:26PM 24  Exhibit 05 was marked for identification.)

12:26PM 25      MR. TIDWELL:  This is an e-mail from Stephen Cirami

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 12:26PM | 1 | at Garden City Group dated Tuesday, June 11th to Lionel Sutton |
| 12:26PM | 2 | and Christine Reitano.   The subject is "Wire payment," and it's |
| 12:27PM | 3 | marked Number 05. |
| 12:27PM | 4 | And again, Counsel, you're right, start from the |
| 12:27PM | 5 | back. |
| 12:27PM | 6 | MR. FREEH:  It's a three-page document.  Yes, just |
| 12:27PM | 7 | take a look at it, please. |
| 12:27PM | 8 | MS. PIERSON:  You didn't specify the year.  That's |
| 12:27PM | 9 | June 11th of 2013. |
| 12:27PM | 10 | MR. TIDWELL:  2013.  Thank you. |
| 12:27PM | 11 | MS. PIERSON:  This year. |
| 12:27PM | 12 | THE WITNESS:  (Witness reviews the document.)  Okay. |
| 12:28PM | 13 | BY MR. FREEH: |
| 12:28PM | 14 | Q.   So I'll go to page 2, which is your e-mail on June 11, |
| 12:28PM | 15 | 2013, to Cirami. |
| 12:28PM | 16 | Cirami is who? |
| 12:28PM | 17 | A.   He is another member of Garden City Group.  The group that |
| 12:28PM | 18 | handles the payment process. |
| 12:28PM | 19 | Q.   And the e-mail says, "Tiger has an attorney friend with a |
| 12:28PM | 20 | claimant in the program." |
| 12:28PM | 21 | Who is the attorney friend? |
| 12:28PM | 22 | A.   I do not recall.  I don't even recall this e-mail.  I |
| 12:28PM | 23 | don't know if he told me or he just asked as a hypothetical. |
| 12:28PM | 24 | Q.   So as you sit here today, you don't recall -- |
| 12:28PM | 25 | A.   No. |

**C O N F I D E N T I A L**

SM-02-CR00792

12:28PM 1    Q.    -- who was that?

12:28PM 2          Was your e-mail prompted by a conversation with your

12:28PM 3    husband?

12:28PM 4    A.    He must have asked me how does this person get their --

12:28PM 5    you know, which everybody wanted to know, the how to's of the

12:28PM 6    program.

12:28PM 7    Q.    Would he not be able to determine that himself at that

12:29PM 8    point?  Wasn't he employed at that point?

12:29PM 9    A.    No, he was not.

12:29PM 10   Q.    June 11, 2013?

12:29PM 11   A.    Oh, 2013.

12:29PM 12         MS. PIERSON:  That's this year.  Last month.

12:29PM 13         THE WITNESS:  Well, maybe he didn't know the process

12:29PM 14   because he didn't -- you know, he did moratoria.  He might not

12:29PM 15   have known the details of the payment process.

12:29PM 16   BY MR. FREEH:

12:29PM 17   Q.    I'm sorry, you have no recollection of that at all?

12:29PM 18   A.    No, this is more recently.  This might be -- this might be

12:29PM 19   about Gibby Andry.

12:29PM 20   Q.    And what makes you think about that?

12:29PM 21   A.    Well, because it's talking about a client getting -- who

12:29PM 22   represented himself, that -- that I think is Gibby.  That was

12:29PM 23   the only claim that -- or I've been told that Gibby had, was

12:29PM 24   his own law firm claim.

12:29PM 25         So he probably -- oh, yes, yes.  It was Gibby.  And

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 12:30PM | 1 | this is the reason why.  I mean, to me this was just such a, |
| 12:30PM | 2 | you know, elementary question.  Yes, you can get wired.  You |
| 12:30PM | 3 | don't have to receive a check. |
| 12:30PM | 4 | And the reason Gibby wouldn't even know that or be |
| 12:30PM | 5 | able to figure that out because he's like technologically |
| 12:30PM | 6 | incompetent.  So he -- and this was the only claim, so he |
| 12:30PM | 7 | didn't know how the payment process, the wiring worked. |
| 12:30PM | 8 | And I'm sorry if I didn't know at first because I |
| 12:30PM | 9 | didn't realize it was -- yeah, the attorney is the claimant.  I |
| 12:30PM | 10 | didn't realize that this was 2013, so I was trying to go back |
| 12:30PM | 11 | to 2012. |
| 12:30PM | 12 | Q.   And now you recall that Gibby was the claimant? |
| 12:30PM | 13 | A.   Gibby just wanted to know how he could get wired, yeah. |
| 12:30PM | 14 | Q.   And did your husband discuss the nature of that claim with |
| 12:30PM | 15 | you? |
| 12:30PM | 16 | A.   No. |
| 12:30PM | 17 | Q.   Did you understand what the claim was? |
| 12:30PM | 18 | A.   Yes, I did.  It was one of the law-firm-type awards that |
| 12:31PM | 19 | are, you know, a headache for BP, if you will. |
| 12:31PM | 20 | Q.   And was that with the Gibby attorney law firm? |
| 12:31PM | 21 | A.   Yes.  Yes. |
| 12:31PM | 22 | Now, I'm not sure of who filed under what name.  Was |
| 12:31PM | 23 | it Gibby and John or just Gibby?  I don't know. |
| 12:31PM | 24 | MR. TIDWELL:  That's a great question that maybe you |
| 12:31PM | 25 | can help us clear up. |

**C O N F I D E N T I A L**

12:31PM 1      THE WITNESS:  I'm not going to be able to.

12:31PM 2      MR. TIDWELL:  Gibby is associated with what law firm?

12:31PM 3  What's the name of his law firm?

12:31PM 4      THE WITNESS:  One is the Andry firm and one is the

12:31PM 5  Andry group now?

12:31PM 6      MR. TIDWELL:  So there's an Andry firm -- Andry Law

12:31PM 7  Firm and an Andry Law Group?

12:31PM 8      THE WITNESS:  I'm not sure.  There were two brothers

12:31PM 9  that worked together.  Falling out.

12:31PM 10  BY MR. FREEH:

12:31PM 11  Q.    Jonathan and Gibby?

12:31PM 12  A.    Yes.  Had a falling out.  One became something with Andry.

12:31PM 13  I think they both retained the Andry name, but I don't know

12:32PM 14  particularly or specifically.

12:32PM 15      MS. PIERSON:  Do you want me to try to help you

12:32PM 16  answer that?

12:32PM 17      MR. TIDWELL:  If you have an answer, that would be

12:32PM 18  helpful.

12:32PM 19      MS. PIERSON:  I don't know if I have the answer, but

12:32PM 20  I know something that I've been told.  When they were together,

12:32PM 21  the two brothers, the spill happened, and they had a falling

12:32PM 22  out of some sort after the spill.  I'm guessing now it might

12:32PM 23  have had to do with how they were going to handle the claim, so

12:32PM 24  they split.

12:32PM 25      But when they did, one lawyer, and I think it's

**C O N F I D E N T I A L**

SM-02-CR00795

12:32PM 1   Gibby, has the clients -- the claimant, the claimant-type

12:32PM 2   clients, and a lot of them.  The other brother doesn't have any

12:32PM 3   claimant clients, but he -- that firm is the one that filed the

12:32PM 4   BEL claim because of 2010.

12:32PM 5           MR. TIDWELL:  I see.

12:32PM 6           MS. PIERSON:  You see?  And so that's the $7

12:32PM 7   million-so claim.

12:32PM 8           THE WITNESS:  That would be Gibby's.

12:32PM 9           MR. FREEH:  That's the Andry Law Firm?

12:32PM 10          MS. PIERSON:  They have names that sound very much

12:33PM 11  alike.  But one firm has claimant clients and one firm has law

12:33PM 12  firm clients, period, as far as I know.

12:33PM 13          MR. TIDWELL:  But you know that Gibby Andry has a

12:33PM 14  seven some-odd million claim for BEL.

12:33PM 15          THE WITNESS:  Yes, yes.

12:33PM 16          MS. PIERSON:  That's the one that BP is most

12:33PM 17  aggravated about.

12:33PM 18  BY MR. FREEH:

12:33PM 19  Q.   All right.  So we're leaving now the June 11, 2013, matter

12:33PM 20  we just discussed.  But you don't recall discussing the details

12:33PM 21  of the claim with your husband?

12:33PM 22  A.   No.

12:33PM 23  Q.   Did you make any other additional inquiries about that

12:33PM 24  claim subsequent to this?

12:33PM 25  A.   No.

**C O N F I D E N T I A L**

SM-02-CR00796

| | | |
|---|---|---|
| 12:33PM | 1 | Q.   Did your husband, as far as you know? |
| 12:33PM | 2 | A.   Not as far as I know. |
| 12:33PM | 3 | Q.   Do you know if that claim was paid or not? |
| 12:33PM | 4 | A.   I believe that claim was put on hold.  And then, just from |
| 12:33PM | 5 | what I've read from the court transcripts and motions, that it |
| 12:34PM | 6 | was reviewed several times for any impropriety or |
| 12:34PM | 7 | miscalculation, and none were found.  But I don't know if the |
| 12:34PM | 8 | hold has been removed or not. |
| 12:34PM | 9 | Q.   I'm going to show you 05A, which is an earlier e-mail |
| 12:34PM | 10 | string, which is dated June of 2013, 05A. |
| 12:34PM | 11 | (WHEREUPON, at this point in the proceedings, |
| 12:34PM | 12 | Exhibit 05A was marked for identification.) |
| 12:34PM | 13 | MR. TIDWELL:  05A, from Stephen Cirami again at |
| 12:34PM | 14 | Garden City Group, Tuesday, June 11, 2013, to Lionel Sutton, |
| 12:34PM | 15 | "Re:  The wire payment."  It's a follow on to that one. |
| 12:34PM | 16 | MS. PIERSON:  So that's going to be after this last |
| 12:34PM | 17 | one? |
| 12:34PM | 18 | MR. TIDWELL:  Uh-huh (affirmative response). |
| 12:34PM | 19 | MR. FREEH:  No.  It's going to be before. |
| 12:34PM | 20 | MR. TIDWELL:  No.  I believe it's before. |
| 12:34PM | 21 | MR. FREEH:  This is June 2013. |
| 12:34PM | 22 | MR. MCCALL:  It's the same day. |
| 12:34PM | 23 | MS. PIERSON:  It's the same day an hour later. |
| 12:34PM | 24 | MR. TIDWELL:  Yes, it's a follow-up. |
| 12:34PM | 25 | MS. PIERSON:  An hour or so later. |

**C O N F I D E N T I A L**

12:34PM 1          MR. FREEH:  Right.  And this just adds the top

12:34PM 2    portion of the conversation.

12:34PM 3          MR. TIDWELL:  It's when Mr. Sutton starts the

12:35PM 4    conversation, starts it going, and became just between the two

12:35PM 5    of them, I believe.

12:35PM 6          THE WITNESS:  (Witness reviews the document.)

12:35PM 7          MS. PIERSON:  Okay.

12:35PM 8          MR. FREEH:  You might as well -- also we'll show you

12:35PM 9    05B, which is the same subject matter e-mail, but it's dated

12:35PM 10   January of 2013.  We can have them altogether.

12:35PM 11          (WHEREUPON, at this point in the proceedings,

12:35PM 12   Exhibit 05B was marked for identification.)

12:35PM 13          MS. PIERSON:  So it's six months before this.

12:35PM 14          MR. FREEH:  05B is six months before that, yes.

12:35PM 15          MR. TIDWELL:  And 05B is an e-mail from

12:35PM 16   Christine Reitano dated Monday, January 28, 2013, to

12:35PM 17   Stephen Cirami regarding wire transfers.

12:36PM 18          THE WITNESS:  Okay.  Yes.

12:36PM 19   BY MR. FREEH:

12:36PM 20   Q.   Okay.  So the question -- I'll start with 05B.  That's the

12:36PM 21   one you just looked at, January 28, 2013.

12:36PM 22          And this is correspondence between you and Cirami

12:36PM 23   talking about payments to attorney I-O-L-T-A accounts; is that

12:36PM 24   correct?

12:36PM 25   A.   Correct.

**C O N F I D E N T I A L**

SM-02-CR00798

12:36PM  1    Q.    Do you have any recollection as to why you were having

12:36PM  2    this very general exchange, at least in January 2013?

12:36PM  3    A.    Well, Keith Moskowitz is from BP.  He probably is trying

12:37PM  4    to assist with, you know -- maybe he was trying to marry up the

12:37PM  5    medical settlement program with the way they do things in the

12:37PM  6    economic settlement program, so he just asked a very general

12:37PM  7    question, and Steve Cirami gave him the response.

12:37PM  8    Q.    So you were just relaying the question?

12:37PM  9    A.    Sure.

12:37PM 10    Q.    Okay.

12:37PM 11          MS. PIERSON:  Do you want to know what IOLTA stands

12:37PM 12    for?

12:37PM 13          MR. FREEH:  I know what it stands for.

12:37PM 14          MR. TIDWELL:  I think so.

12:37PM 15          THE WITNESS:  Is that a joke?

12:37PM 16          MS. PIERSON:  No.  It's just an acronym.

12:37PM 17    BY MR. FREEH:

12:37PM 18    Q.    I direct your attention to 05A, which, again, is back in

12:37PM 19    the June 2013 time frame, which is the last string in the one

12:37PM 20    we had showed you with 05.

12:37PM 21          And there Cirami is sending an e-mail to Mr. Sutton.

12:37PM 22    You're not copied on that, but he says, "We've had situations

12:37PM 23    where lawyers have represented themselves and had their funds

12:38PM 24    sent to the IOLTA and then they transferred it out."  Etcetera,

12:38PM 25    etcetera.

**C O N F I D E N T I A L**

12:38PM 1      You were not privy to that, I understand, by looking

12:38PM 2  at the e-mail in terms of a copy, but were you part of this

12:38PM 3  discussion at the time?

12:38PM 4  A.    No.

12:38PM 5  Q.    No?

12:38PM 6  A.    Huh-uh (negative response).

12:38PM 7  Q.    And did you have a discussion with your husband at that

12:38PM 8  point about attorney payments to the IOLTA account?

12:38PM 9  A.    No.

12:38PM 10  Q.    All right.  I'm going to show you what's been marked as

12:38PM 11  Exhibit 06.

12:38PM 12      (WHEREUPON, at this point in the proceedings,

12:38PM 13  Exhibit 06 was marked for identification.)

12:38PM 14      MR. TIDWELL:  And 06 is from Lionel Sutton

12:38PM 15  @dheclaims.com dated Tuesday, June 4, 2013.  It's to

12:38PM 16  Katherine Torres, and the subject is the "Sher Garner Claim."

12:38PM 17      MR. FREEH:  And then we'll also show you 06A, which

12:39PM 18  is a June 20, 2013, e-mail.  You're not on these e-mails.

12:39PM 19      (WHEREUPON, at this point in the proceedings,

12:39PM 20  Exhibit 06A was marked for identification.)

12:39PM 21      MR. TIDWELL:  And while you're looking at that one,

12:39PM 22  that one is from Katherine Torres.

12:39PM 23      THE WITNESS:  This one is from Katherine.

12:39PM 24      MR. TIDWELL:  That one, yeah.  And this is also from

12:39PM 25  Katherine Torres.  It's Thursday, June 20, 2013, to

**C O N F I D E N T I A L**

SM-02-CR00800

| | | |
|---|---|---|
| 12:39PM | 1 | Lionel Sutton.  Charles.r.hacker@uspwc.com is copied.  It is |
| 12:39PM | 2 | also about -- the subject is "Sher Garner," and it's marked |
| 12:39PM | 3 | 06A. |
| 12:39PM | 4 | BY MR. FREEH: |
| 12:39PM | 5 | Q.   You're not on any of these e-mails.  We're just going to |
| 12:39PM | 6 | ask you whether you have any memory of this or whether you were |
| 12:39PM | 7 | involved in any of the conversations, if you recall. |
| 12:39PM | 8 | A.   (Witness reviews the document.)  No. |
| 12:39PM | 9 | Q.   Was the Sher Garner firm a firm that had claims in front |
| 12:39PM | 10 | of the administrator, as far as you know? |
| 12:40PM | 11 | A.   As far as I know, yeah. |
| 12:40PM | 12 | Q.   Did you get involved in any of the inquiries or |
| 12:40PM | 13 | processing? |
| 12:40PM | 14 | A.   No.  They would -- I remember their name and in the |
| 12:40PM | 15 | context of BEL issues, and maybe Tiger and Mike were involved |
| 12:40PM | 16 | in some meetings with them.  You know, occasionally, if a firm |
| 12:40PM | 17 | had -- was very vocal and had some grievances, then Mr. Juneau |
| 12:40PM | 18 | would have a meeting with them.  And for these type of firms, |
| 12:40PM | 19 | he usually included Mike and/or Tiger. |
| 12:40PM | 20 | Q.   But you didn't have any of those meetings yourself? |
| 12:40PM | 21 | A.   No. |
| 12:40PM | 22 | Q.   All right.  I'm going to go back to the *Thonn* claim that |
| 12:40PM | 23 | you had previously represented and then left and recused |
| 12:40PM | 24 | yourself from once you went on board the administration. |
| 12:41PM | 25 | A.   Okay. |

**C O N F I D E N T I A L**

12:41PM 1   Q.   The GCCF claim, not the personal liability case, where did

12:41PM 2   that claim go and did you yourself refer it to a particular

12:41PM 3   firm?

12:41PM 4   A.   I told Casey to either go see John Andry, or I think I

12:41PM 5   might have -- maybe just John Andry.  The only other person I

12:41PM 6   would have referred him to was SmithStag.  And that's basically

12:41PM 7   what I did.

12:41PM 8         He called me, Casey did, said, "I met with," I think

12:41PM 9   a girl named "Christine at John Andry's office, and I liked

12:41PM 10   what they had to say.  And they are going to take my case."

12:41PM 11   And that was that.

12:41PM 12   Q.   Can I ask you why you recommended it go to the John Andry

12:41PM 13   firm?

12:41PM 14   A.   Because John -- you know, when I was in the building there

12:41PM 15   with him, I knew from the beginning he was trying to be a

12:42PM 16   member of the PSC.  He was heavily involved in it.  John is --

12:42PM 17   and he's very smart.  He's a very good lawyer.  And he was

12:42PM 18   working a lot of the GCCF claims, and it just made sense to me.

12:42PM 19   This is a person I know who is heavily involved with the BP oil

12:42PM 20   spill and what happened afterward.

12:42PM 21   Q.   Were you aware at that point that your husband had

12:42PM 22   business relationships and legal relationships with John Andry?

12:42PM 23   A.   They had terminated by that time, to my knowledge.

12:42PM 24   Q.   What about the Crown relationship?

12:42PM 25   A.   The Crown relationship was my husband's business interest

**C O N F I D E N T I A L**

SM-02-CR00802

12:42PM 1   in this other entity called *Crown*.  That's a water reclamation

12:42PM 2   company, that, in my mind, had nothing to do with anything.

12:42PM 3        MR. TIDWELL:  Do you know who is involved in that,

12:43PM 4   Crown, the officers and partners?

12:43PM 5        THE WITNESS:  Yes, yes -- well, no, I may not.  I do

12:43PM 6   in general.  I was very disinterested in this company.  Okay?

12:43PM 7   Very disinterested in it.

12:43PM 8        But there is a person by the name of Joey

12:43PM 9   Dartez, a person by the name of Tim.  And my husband can give

12:43PM 10  you the officers.  You know, it evolved over time.  Initially

12:43PM 11  it was just three or four of them.

12:43PM 12       Someone had -- had invented some technology on

12:43PM 13  how to clean frac water.  And I told my husband, "You can get

12:43PM 14  involved in this, but, you know, we don't have a dime to put up

12:43PM 15  in any of these kind of business ventures."

12:43PM 16       And so they had this technology, and I guess the

12:43PM 17  EPA -- different people looked at it, and said, "Yes, it's

12:43PM 18  great.  It's wonderful."  But they didn't -- between them, they

12:43PM 19  didn't have the capital to finance this business to build a

12:43PM 20  machine.

12:43PM 21       And so my husband has a friend from law school

12:44PM 22  by the name of Glen Lerner, and he is an attorney out of

12:44PM 23  Las Vegas.  And he makes lots of money because he has -- he's

12:44PM 24  an advertising lawyer.  And I don't think of him as a

12:44PM 25  practicing lawyer.  I mean, he cuts commercials is basically

**C O N F I D E N T I A L**

SM-02-CR00803

12:44PM  1    what he does.

12:44PM  2                 And he has the "One call, that's all" slogan,

12:44PM  3    only he does it bigger than life.  He does it gigantic.  If you

12:44PM  4    go to Las Vegas, he's like a celebrity.

12:44PM  5                 I've seen him and his family.  We would see each

12:44PM  6    other in the summer.  And he's just got a bigger-than-life

12:44PM  7    personality.  Lots of ideas.

12:44PM  8                 Apparently, at the time my husband is getting

12:44PM  9    involved in -- you know, is looking at this technology, Glen

12:44PM  10   has another friend with similar technology in Romania, so maybe

12:44PM  11   that's how they hooked up, and is very interested.  And he

12:45PM  12   becomes part of Crown.  And he -- and he -- to gain entrance,

12:45PM  13   he puts up the money to build the machine.

12:45PM  14   BY MR. FREEH:

12:45PM  15   Q.   "He" meaning Lerner?

12:45PM  16   A.   He meaning Lerner.

12:45PM  17   Q.   When does your husband, as far as you know, first get

12:45PM  18   involved in the Crown discussions and venture?

12:45PM  19   A.   It's either -- I want to say 2010, but I'm not sure.  I

12:45PM  20   think it's sometime -- it's got to be 2010, because I'm pretty

12:45PM  21   sure it's before we moved over to --

12:45PM  22   Q.   And at the time he became involved, you knew he was

12:45PM  23   involved with John Andry?

12:45PM  24   A.   I knew who was involved?

12:45PM  25   Q.   Your husband?

**C O N F I D E N T I A L**

SM-02-CR00804

12:45PM 1    A.    Well, in the sense that they were friends?  Because at

12:45PM 2    that time I don't think they even had the building together

12:45PM 3    anymore and weren't talking.

12:45PM 4    Q.    No.  I'm talking about the Crown venture.

12:45PM 5    A.    At the time my husband got involved in the Crown venture,

12:45PM 6    he probably wasn't talking to John Andry.  I mean, it was very

12:46PM 7    uncomfortable in that building.  They did not talk to each

12:46PM 8    other.

12:46PM 9    Q.    Did you come to learn that John Andry was involved with

12:46PM 10   Crown?

12:46PM 11   A.    Oh, I've never come to learn that.

12:46PM 12   Q.    You had no information that he was involved with Crown?

12:46PM 13   A.    No.

12:46PM 14   Q.    Did you know that your husband was receiving payments from

12:46PM 15   Crown?

12:46PM 16   A.    I know that he was supposed to be at some point.  Glen had

12:46PM 17   put up the million dollars to build the machine.  And then

12:46PM 18   after they built the machine, they had to go bring it up to

12:46PM 19   different sites to demonstrate it, and then there were other

12:46PM 20   costs that were involved.  And so he had to keep putting money

12:46PM 21   in.

12:46PM 22          So where initially I think there were four of them,

12:46PM 23   and they each had a 25 percent share, 25, 25, Glen said, "Look,

12:46PM 24   I need more equity in the company if I keep putting up this

12:47PM 25   capital."

**C O N F I D E N T I A L**

12:47PM 1      And I don't know the details of it, but just from

12:47PM 2  what I was told, that in exchange for him getting a bigger

12:47PM 3  percentage of the company, he would --

12:47PM 4  Q.   So "he," you're referring --

12:47PM 5  A.   He, Glen.

12:47PM 6  Q.   -- to Mr. Lerner?

12:47PM 7  A.   He, Mr. Lerner, would, for a period of time, pay to the

12:47PM 8  others, in their various roles, one was manager, one was this,

12:47PM 9  one was that, a monthly salary.   Okay?

12:47PM 10      Now, as far as I know, I didn't see that salary, you

12:47PM 11  know.   I was like, "Oh, where's this salary?"   I'm just -- at

12:47PM 12  this point I'm just concerned about what I'm doing, what I'm

12:47PM 13  making, my job.   That's yours.   That's your deal.

12:47PM 14  Q.   Did you ever ask your husband if he was receiving any

12:47PM 15  payments from Crown at that period?

12:47PM 16  A.   No.

12:47PM 17  Q.   And he never advised you that he was?

12:47PM 18  A.   Well, let me take that back.   I probably would have said,

12:47PM 19  you know, "Did you get -- did you get that salary?"   And he --

12:48PM 20  it was usually something to the effect, "Glen hasn't paid it

12:48PM 21  yet.   He's going to," that sort of thing.

12:48PM 22      I think maybe -- and I don't know specifically,

12:48PM 23  maybe -- maybe in September of 2012 -- I don't know.   I don't

12:48PM 24  know.   I just don't remember.   I don't.   And we didn't really

12:48PM 25  discuss it.

**C O N F I D E N T I A L**

SM-02-CR00806

12:48PM 1    Q.    When you were preparing your joint tax returns with your

12:48PM 2    husband, do you recall reviewing that as income?

12:48PM 3    A.    I did not participate in that.

12:48PM 4    Q.    You didn't participate at all in that?

12:48PM 5    A.    No.  No.

12:48PM 6    Q.    Did you have an outside tax preparer?

12:48PM 7    A.    Yes, we do.  She's out of Lafayette.  Caroline Boudreaux.

12:48PM 8    It's Boudreaux and Henderson, something like that.

12:48PM 9    Q.    Now, did you know that Jonathan Andry and Mr. Lerner were

12:49PM 10   partners in a law firm?

12:49PM 11   A.    No.  I learned some time after, but at the time I started

12:49PM 12   work, I did not know that.

12:49PM 13   Q.    When did you learn that?

12:49PM 14   A.    I don't know.  You know, kind of at some point -- you

12:49PM 15   know, maybe it was after this all happened.

12:49PM 16   Q.    So after you left the employment recently?

12:49PM 17   A.    Yes.  But I did know -- you know, I didn't have firm

12:49PM 18   personal knowledge that they had started a firm.  But I know

12:49PM 19   that Glen, and this was back at the time of the GCCF, was

12:49PM 20   giving John money to advertise for the GCCF clients.  So I

12:49PM 21   didn't know how their relationship progressed or what

12:49PM 22   relationship they had between them.

12:49PM 23   Q.    But you understood, and I want to say the answer to this,

12:49PM 24   but you understood, while you were there, that Lerner had some

12:50PM 25   interest or some financial interest in the claims process in

**C O N F I D E N T I A L**

12:50PM 1    the sense that he had been providing money?

12:50PM 2    A.   He might have.  He might have.

12:50PM 3    Q.   You didn't know that for a fact?

12:50PM 4    A.   No.

12:50PM 5    Q.   But you said you knew that he had invested money for

12:50PM 6    advertisement?

12:50PM 7    A.   I knew that for -- oh, I --

12:50PM 8    Q.   I thought that's what you said.

12:50PM 9    A.   Yeah, I did.  I mean, that was my understanding, but this

12:50PM 10   was quite some time ago.  Probably in 2010.

12:50PM 11   Q.   Right.  But while you --

12:50PM 12   A.   I mean, before there was a settlement program, anyway.

12:50PM 13   Q.   Right.  I understand what you're saying.

12:50PM 14           But while you were in your position with Mr. Juneau,

12:50PM 15   you had knowledge at that point that Lerner had some prior

12:50PM 16   financial interest in this whole process?

12:50PM 17   A.   Yeah, to that extent.

12:50PM 18   Q.   And I asked you this, but I wasn't sure, did you know that

12:50PM 19   Jonathan, John Andry was a partner in the Andry Law Firm in

12:50PM 20   Las Vegas?

12:50PM 21   A.   No.

12:50PM 22   Q.   Did you know that Jonathan was a partner in the

12:51PM 23   Andry Lerner firm here in -- Baronne Street?

12:51PM 24   A.   No.  Because I didn't know of the Andry Lerner firm.

12:51PM 25   Q.   And did you know that Gibby was a partner with John Andry

**C O N F I D E N T I A L**

12:51PM 1   in the firm at 828 Baronne Street?

12:51PM 2   A.   No.

12:51PM 3           MS. PIERSON:  Well, that's the two brothers.

12:51PM 4           THE WITNESS:  But they weren't at -- where's

12:51PM 5   828 Baronne?

12:51PM 6   BY MR. FREEH:

12:51PM 7   Q.   That's their legal address.

12:51PM 8   A.   Oh, I thought -- I thought if they were ever a firm

12:51PM 9   together, it would have been at 610 Baronne.

12:51PM 10  Q.   There's a separate firm there.

12:51PM 11  A.   Okay.  I don't know about the 828 firm.

12:51PM 12  Q.   When you told your husband -- I think you used the word

12:51PM 13  *told* -- you told your husband to send the *Thonn* claim to

12:51PM 14  John Andry.

12:51PM 15  A.   Oh, no, I didn't tell -- well, I guess so.  I guess.

12:51PM 16  Q.   Well, I don't want to put words in your mouth.  That's

12:51PM 17  what you said.

12:51PM 18  A.   No, I didn't.  I told Thonn to go see John Andry, period.

12:52PM 19  End of it.  I had no discussion with my husband.  I had no

12:52PM 20  discussion with John Andry.  You know, I didn't, that was it.

12:52PM 21  I told Casey Thonn, "Go see John Andry."  Casey Thonn called me

12:52PM 22  up, said, "I like him.  That's who I'm going to go with."

12:52PM 23  Q.   At that point when you told Mr. Thonn, in your words to,

12:52PM 24  "Go see John Andry," you knew that John Andry had some interest

12:52PM 25  in this entire claim process; is that correct?

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 12:52PM | 1 | A.   In the settlement program? |
| 12:52PM | 2 | Q.   Settlement program. |
| 12:52PM | 3 | A.   Well, no, I didn't know -- I assumed he was going to |
| 12:52PM | 4 | file -- like everyone was going to take their GCCF claims and |
| 12:52PM | 5 | transition them over to the settlement program.  I knew he had |
| 12:52PM | 6 | GCCF claimants. |
| 12:52PM | 7 | Q.   Did you know at that point that he was involved in the |
| 12:52PM | 8 | GCCF process in terms of a lawyer representing claimants? |
| 12:52PM | 9 | A.   Yes. |
| 12:52PM | 10 | Q.   And was that one of the reasons that you sent Mr. Thonn |
| 12:53PM | 11 | there? |
| 12:53PM | 12 | A.   Yes? |
| 12:53PM | 13 | Q.   Were there any other reasons? |
| 12:53PM | 14 | A.   No. |
| 12:53PM | 15 | Q.   Did you believe at that point that if Mr. Thonn's claim |
| 12:53PM | 16 | was paid, your husband would get some derivative financial |
| 12:53PM | 17 | interest? |
| 12:53PM | 18 | A.   No.  I did not believe that or have any expectation of |
| 12:53PM | 19 | that. |
| 12:53PM | 20 | Q.   Do you recall being interview by Mr. Juneau and others on |
| 12:53PM | 21 | June 20, 2013? |
| 12:53PM | 22 | A.   Yes.  June 20, 2013, yes. |
| 12:53PM | 23 | Q.   And that was at Gravier Street? |
| 12:53PM | 24 | A.   Yes. |
| 12:53PM | 25 | Q.   And Michael Juneau, Patrick Juneau, and Dave Welker was |

**C O N F I D E N T I A L**

SM-02-CR00810

12:53PM 1    there?

12:53PM 2    A.    Right.

12:53PM 3    Q.    Were you by yourself at that point?

12:53PM 4    A.    Yes.

12:53PM 5    Q.    And about how long was the interview?

12:53PM 6    A.    Half hour.

12:53PM 7    Q.    At one point you were asked --

12:53PM 8          MR. TIDWELL:  Do you want me to --

12:53PM 9          MR. FREEH:  No.  Thank you.

12:53PM 10   BY MR. FREEH:

12:53PM 11   Q.    At one point you were asked about Tiger, and I'm going to

12:54PM 12   read from the report.  This is not my report.  This is the

12:54PM 13   report of the people who were present.

12:54PM 14   A.    Okay.

12:54PM 15   Q.    "She," meaning you, "she thinks that Tiger is stupid as

12:54PM 16   hell.  She felt that Tiger's falling out with his father really

12:54PM 17   hurt him.  She thinks he is really smart, and it appeared to

12:54PM 18   her he was just wasting his time on small accident cases and

12:54PM 19   such.  She saw an opportunity for Tiger in this program."

12:54PM 20         I take it, the "program," meaning the claims

12:54PM 21   administration process?

12:54PM 22   A.    Yes.  Yes.

12:54PM 23   Q.    Going -- I'm quoting the document.

12:54PM 24         "She knows he has taken things so seriously in the

12:54PM 25   program.  She indicated that the accountants came up to him

**C O N F I D E N T I A L**

SM-02-CR00811

12:54PM 1   because they respect his judgment and integrity.  She felt that

12:54PM 2   Tiger working in the program would get him away from Lerner."

12:54PM 3        Is that something you wanted to accomplish?

12:54PM 4   A.   I don't remember saying that -- that it would get him away

12:54PM 5   from Lerner.  I didn't -- I don't remember saying that.

12:54PM 6   Q.   Okay.

12:55PM 7   A.   I think what I said was, I didn't want him involved in

12:55PM 8   these kind of risky business ventures.  I'd much prefer he go

12:55PM 9   back to using -- going back to, you know, a practice of law,

12:55PM 10   which he was very disenchanted with the personal injury thing

12:55PM 11   and everything else.  But he is very smart.

12:55PM 12        And once he started working at the claims

12:55PM 13   administrator's office, he was plugged in.  He was supposed to

12:55PM 14   work there part time, and he was there more hours, aside from

12:55PM 15   me, than anyone else at the office who was actually employed

12:55PM 16   full-time.

12:55PM 17   Q.   Then they report you saying the following, again, it's

12:55PM 18   their report, June 20, 2013, quote:  The program has been good

12:55PM 19   for him.  She doesn't believe he will take it to any other

12:55PM 20   level.  She believes Tiger has a good compass, and this was out

12:56PM 21   of character for him.

12:56PM 22        Do you remember saying something to that effect?

12:56PM 23   A.   I don't remember saying something to that effect, but, you

12:56PM 24   know, maybe I was responding to -- you know, they were reading

12:56PM 25   to me e-mails that I had no knowledge of.  And they were taking

**C O N F I D E N T I A L**

12:56PM 1  things -- which later I felt were taken out of context.

12:56PM 2  Because the following day I asked him to print out those

12:56PM 3  e-mails, because I couldn't understand what I was being

12:56PM 4  questioned from.

12:56PM 5       So the way some of the questions were asked, it

12:56PM 6  looked like -- you know, I was like, well, what's going on

12:56PM 7  here?  And I'm trying -- you know, I'm speculating.  I'm, you

12:56PM 8  know, guessing.  And I'm under -- you know, it was very

12:56PM 9  shocking.

12:56PM 10  Q.   Then you're quoted as saying the following, quote:  She

12:56PM 11  thought this might be Tiger's way of getting Lerner to do what

12:56PM 12  he was supposed to do, close quote.

12:56PM 13  A.   I don't remember saying that either.

12:57PM 14  Q.   You don't remember saying that?

12:57PM 15  A.   "Tiger's way of getting Lerner to" -- I don't know if

12:57PM 16  those are my exact words, but what I can -- what I think I had

12:57PM 17  been saying at the time was, when they are talking about those

12:57PM 18  e-mails asking about -- or saying something to the effect "use

12:57PM 19  the *Thonn* money," that he was talking about perhaps paying the

12:57PM 20  salaries that he wasn't paying.

12:57PM 21  Q.   Right.

12:57PM 22  A.   Yeah.

12:57PM 23  Q.   So were you aware, then, that your husband was supposed to

12:57PM 24  receive a salary from Mr. Lerner?

12:57PM 25  A.   Yes.

**C O N F I D E N T I A L**

SM-02-CR00813

12:57PM 1    Q.    And were you also aware at this time that he wasn't

12:57PM 2    receiving it on a regular basis?

12:57PM 3    A.    Yes.

12:57PM 4    Q.    And your husband complained to you about that?

12:57PM 5    A.    Yes.

12:57PM 6    Q.    He complained to you more than once?

12:57PM 7    A.    Yeah, probably more than once.  Maybe not.  Maybe once.

12:57PM 8    You know, like I said, I didn't have expectations from that

12:57PM 9    business.  I didn't want -- I really didn't want to know about

12:58PM 10   it, you know.

12:58PM 11        I would have -- when I did go to my husband's office

12:58PM 12   on a regular basis, I thought, okay, now the two of us being

12:58PM 13   here, we can rebuild the practice, you know.  And once this

12:58PM 14   Crown venture came into play, his time was dedicated to doing

12:58PM 15   that, you know.

12:58PM 16        Maybe that's -- if I said something, "to get away

12:58PM 17   from Lerner," I would have rather he stayed and dedicated

12:58PM 18   himself to the practice of law.  Maybe that's not anything he

12:58PM 19   wanted to do.

12:58PM 20        And then I think that's why I was so happy, and I

12:58PM 21   thought that's where, you know, he was, so -- I don't know what

12:58PM 22   you've been told from others as to his performance on that

12:58PM 23   program, but I know that he did a good job.  And I -- I was so

12:58PM 24   happy.  I just thought he would be a perfect fit for the

12:59PM 25   program, and the program would be something really good for

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 12:59PM | 1 | him.  I didn't see it as a one-way street by any stretch of the |
| 12:59PM | 2 | imagination. |
| 12:59PM | 3 | Q.   What was your understanding as to the salary he was |
| 12:59PM | 4 | supposed to be getting? |
| 12:59PM | 5 | A.   Well, of course, he told me after, and because he was |
| 12:59PM | 6 | working -- he told them he would be working on a part-time |
| 12:59PM | 7 | basis because he had these other business interests, he was |
| 12:59PM | 8 | keeping his law practice, that he was going to be paid 240 a |
| 12:59PM | 9 | year.  I can't remember what that comes out in terms of a |
| 12:59PM | 10 | monthly salary. |
| 12:59PM | 11 | Q.   240 from Lerner and Crown? |
| 12:59PM | 12 | A.   No.  I thought you meant with the program. |
| 12:59PM | 13 | Q.   No. |
| 12:59PM | 14 | A.   Oh, you mean salary -- I'm sorry. |
| 12:59PM | 15 | Q.   About the salary that -- you said your husband complained |
| 12:59PM | 16 | a few times to you that he wasn't receiving his salary. |
| 12:59PM | 17 | A.   I think he was supposed to receive $10,000 a month for a |
| 12:59PM | 18 | certain length of time, which I do not know how long that was. |
| 12:59PM | 19 | Q.   And you knew at a certain point that he wasn't being paid |
| 01:00PM | 20 | that, I think you said? |
| 01:00PM | 21 | A.   Yeah.  Because, I mean, when it was just me working at the |
| 01:00PM | 22 | program and, you know, so I was making 300, you know, it would |
| 01:00PM | 23 | have been helpful -- if you're giving up your interest in this |
| 01:00PM | 24 | great company and you're supposed to be getting $10,000 a |
| 01:00PM | 25 | month, it would have been helpful to have that extra $10,000 a |

**C O N F I D E N T I A L**

SM-02-CR00815

01:00PM  1    month, especially when it came the month to pay the tuition or

01:00PM  2    whatever else.

01:00PM  3            So I said, "Are you getting that or not?"  And he

01:00PM  4    must have said -- you know, made up some -- not made up -- but

01:00PM  5    he must have said, you know, "Glen hasn't paid the account

01:00PM  6    yet."

01:00PM  7            And that's the only one time I remember, like,

01:00PM  8    specifically asking.  And it was before we both worked on the

01:00PM  9    program.  Because thereafter I said to myself:  If he doesn't

01:00PM 10    get paid a dime of that salary, I don't care.  Now we just need

01:00PM 11    to focus our energies on this and we'll be okay.

01:01PM 12    Q.   When you were talking about the salary, the Lerner salary

01:01PM 13    with him, did you give him any suggestions as to how he could

01:01PM 14    collect it?

01:01PM 15    A.   No.  God, no.  I didn't -- no.

01:01PM 16    Q.   Did he ask you your opinion about --

01:01PM 17    A.   No.

01:01PM 18    Q.   -- how he could collect it?

01:01PM 19    A.   No.  No.  No.  No.

01:01PM 20    Q.   And do you know if the salary was ever paid?

01:01PM 21    A.   I think portions of it.

01:01PM 22    Q.   Has Mr. Lerner been making any payments since you and your

01:01PM 23    husband left the current employment?

01:01PM 24    A.   I do not know.

01:01PM 25    Q.   Have you had a conversation with your husband about that?

**C O N F I D E N T I A L**

SM-02-CR00816

01:01PM 1   A.    No.  No, we haven't been -- since this began, other than

01:01PM 2   initially going through that first -- walking through that

01:01PM 3   first set of e-mails, we really avoid talking about this now.

01:01PM 4   Q.    So, again, let me go back.  Again, this is not my report,

01:01PM 5   but this is the report of the people that you met with on

01:01PM 6   June 20th.  I'm looking at a document, which I have marked for

01:02PM 7   myself as 01.  I haven't given you a copy of it.

01:02PM 8          (WHEREUPON, at this point in the proceedings,

01:02PM 9   Exhibit 01 was marked for identification.)

01:02PM 10  BY MR. FREEH:

01:02PM 11  Q.    And the quote is:  "She thought this might be Tiger's way

01:02PM 12  of getting Lerner to do what he was supposed to do."

01:02PM 13          And I asked you that before, do you have any

01:02PM 14  recollection of saying that?

01:02PM 15  A.    No.  That sounds like a paraphrase, but -- that's all I

01:02PM 16  can think, that it was a paraphrase of what I thought, he

01:02PM 17  should be paying them this salary, and he's telling them, you

01:02PM 18  know, "Pay the salary."

01:02PM 19  Q.    Did you intend to say at the time that you thought that

01:02PM 20  your husband working in the claims administration would be a

01:02PM 21  way to get Lerner to pay him a salary?

01:02PM 22  A.    No, absolutely not.  Never crossed my mind whatsoever.

01:02PM 23  Not at all.

01:02PM 24  Q.    And that doesn't sound -- when I read this to you, "She

01:02PM 25  thought this might be Tiger's way of getting Lerner to do what

**C O N F I D E N T I A L**

01:03PM  1    he was supposed to do" --

01:03PM  2    A.   I don't know what "this" is.  And, like I said, that

01:03PM  3    doesn't -- I don't recall saying those words.  To me it sounds

01:03PM  4    like a paraphrase of me saying that whatever money -- whatever

01:03PM  5    obligations my husband is insisting upon in those e-mails, is

01:03PM  6    because he's owed a salary.

01:03PM  7              And I'm not suggesting for one moment that he's

01:03PM  8    coercing it in some way.  I don't even know how he would.  I

01:03PM  9    don't even know by what means or methods he would have to do

01:03PM  10   that.  It wouldn't enter my mind at all.

01:03PM  11   Q.   Well, you know as you sit here today that he was already

01:03PM  12   very actively involved in trying to get claims paid for certain

01:03PM  13   people, correct?

01:03PM  14   A.   No.  No.  That wasn't part -- you know, that wasn't part

01:03PM  15   of my role.

01:03PM  16   Q.   I didn't ask you that.  I didn't ask you that.

01:03PM  17   A.   As I sit here today --

01:03PM  18   Q.   Let me rephrase the question.

01:03PM  19   A.   Yeah.

01:03PM  20   Q.   As you sit hear today, you know for a fact that your

01:04PM  21   husband was using e-mails and other means to have some of these

01:04PM  22   claims paid?

01:04PM  23   A.   Which claims?

01:04PM  24   Q.   Claims before the claims administrator, Mr. Juneau.

01:04PM  25   A.   Oh, claims in general?

**C O N F I D E N T I A L**

SM-02-CR00818

114

| | | |
|---|---|---|
| 01:04PM | 1 | Q.   No.  Claims specifically. |
| 01:04PM | 2 | A.   Claims specifically before Mr. Juneau, my husband was |
| 01:04PM | 3 | helping to get paid? |
| 01:04PM | 4 | Q.   To get claims paid and processed. |
| 01:04PM | 5 | A.   To get them paid and processed just the way, you know, he |
| 01:04PM | 6 | was instructed to do, I guess.  I mean, to -- basically, in my |
| 01:04PM | 7 | mind, what he was doing is when a situation -- when a question |
| 01:04PM | 8 | was brought to him, whether an attorney contacted him directly |
| 01:04PM | 9 | or he has told me that Mr. Juneau himself would ask him to look |
| 01:04PM | 10 | into this case or that case, as did -- Mr. Juneau did that with |
| 01:04PM | 11 | another attorney there as well, David Duval. |
| 01:04PM | 12 |         I don't think I was ever asked to check the status or |
| 01:05PM | 13 | update of a case, because I was just too busy to. |
| 01:05PM | 14 |         But he did -- |
| 01:05PM | 15 | Q.   I didn't ask you that. |
| 01:05PM | 16 |         Did you know while you were working for Mr. Juneau |
| 01:05PM | 17 | that your husband was actively involved in trying to get claims |
| 01:05PM | 18 | related to Mr. Lerner and Mr. John Andry paid? |
| 01:05PM | 19 | A.   Oh.  No. |
| 01:05PM | 20 | Q.   Do you know that now? |
| 01:05PM | 21 | A.   That he was trying to get them paid? |
| 01:05PM | 22 | Q.   Claims of their clients paid in the process of the claims |
| 01:05PM | 23 | administration? |
| 01:05PM | 24 | A.   No. |
| 01:05PM | 25 | Q.   You don't know that now as you sit here today? |

**C O N F I D E N T I A L**

SM-02-CR00819

| | | |
|---|---|---|
| 01:05PM | 1 | A.    No.   Because even looking at the one e-mail that I think |
| 01:05PM | 2 | I've seen to P & N, or something like that, that would be an |
| 01:05PM | 3 | e-mail anyone would write on behalf of anyone. |
| 01:05PM | 4 | The e-mails I've read are, one, trying to understand |
| 01:05PM | 5 | what the eligibility notice says and what the RTP means; and |
| 01:05PM | 6 | two, just to get a status check on something, which you would |
| 01:06PM | 7 | do for -- but that doesn't mean pay this.  I haven't seen |
| 01:06PM | 8 | anything that said, "Pay this." |
| 01:06PM | 9 | Q.    Did you know at the time that you worked for Mr. Juneau |
| 01:06PM | 10 | that your husband had business interests with Mr. Landry? |
| 01:06PM | 11 | A.    With Mr. Andry? |
| 01:06PM | 12 | Q.    John Andry, sorry. |
| 01:06PM | 13 | A.    No. |
| 01:06PM | 14 | Q.    Do you know that now? |
| 01:06PM | 15 | A.    No. |
| 01:06PM | 16 | Q.    You never had that conversation with your husband? |
| 01:06PM | 17 | A.    No. |
| 01:06PM | 18 | Q.    Did you know when you worked for Mr. Juneau that your |
| 01:06PM | 19 | husband had business arrangements and business interests with |
| 01:06PM | 20 | Mr. Lerner? |
| 01:06PM | 21 | A.    Yes. |
| 01:06PM | 22 | Q.    And have you discussed that with your husband recently? |
| 01:06PM | 23 | A.    No.   Just -- not in the sense that I've gained any new |
| 01:06PM | 24 | information.  No, I haven't discussed, beyond, like I told you, |
| 01:06PM | 25 | since -- beyond looking at the e-mails, I have no knowledge |

C O N F I D E N T I A L

01:06PM  1    about his business or his interests with his business partner.

01:07PM  2    Q.   When you say *the e-mails*, are those the ones you were

01:07PM  3    shown during this interview we just talked about?

01:07PM  4    A.   Yes -- well, I wasn't shown.  They are the ones I've read

01:07PM  5    in the investigative report.  And they look to be the same ones

01:07PM  6    that I was questioned upon at that --

01:07PM  7    Q.   Is it your understanding, from reading those e-mails, that

01:07PM  8    your husband was trying to get claims paid for certain people?

01:07PM  9    A.   No.

01:07PM  10   Q.   What's your understanding as to what he was trying to do

01:07PM  11   in those e-mails?

01:07PM  12   A.   Like I said, all I can think was that he was trying to

01:07PM  13   say, "You have to pay me my salary.  You owe me money for my

01:07PM  14   salary, and I know that this claim has settled."

01:07PM  15   Q.   Let me continue, if I might.  In other words, "You now

01:07PM  16   have money, so you can pay me the salary you owe me" --

01:07PM  17   A.   Yeah.

01:07PM  18   Q.   -- does that complete your understanding?

01:07PM  19   A.   Yes.

01:07PM  20   Q.   At the time that he wrote those e-mails, when you both

01:08PM  21   worked for the claims administration, were you aware that

01:08PM  22   that's what he was doing?

01:08PM  23   A.   Not -- no.  In no way whatsoever.

01:08PM  24   Q.   So this came as a big surprise and shock to you?

01:08PM  25   A.   Yes, it did.

**C O N F I D E N T I A L**

01:08PM 1   Q.   Have you talked to your husband about it?

01:08PM 2   A.   To the extent that he walked me through those e-mails, and

01:08PM 3   then, like I said, we haven't discussed it any further or in

01:08PM 4   any detail.  He's -- he's hired by his attorney, and I have

01:08PM 5   mine.  We're two separate people doing two separate things.

01:08PM 6   Q.   Well, as you sit here today as the attorney advising

01:08PM 7   Mr. Juneau, would you say that was a conflict of interests when

01:08PM 8   he was doing that?

01:08PM 9             MS. PIERSON:  For her or for him?

01:08PM 10            MR. FREEH:  For him.

01:08PM 11            THE WITNESS:  For him?  Yes.

01:09PM 12            MR. FREEH:  I don't have any other questions on that

01:09PM 13   matter.

01:09PM 14            MR. TIDWELL:  You mentioned that your husband had an

01:09PM 15   interest in a boat, an oil supply boat?

01:09PM 16            THE WITNESS:  He has an interest in a boat company

01:09PM 17   that brings supplies to offshore --

01:09PM 18            MR. TIDWELL:  Do you know the name of that company?

01:09PM 19            THE WITNESS:  Romeo Papa.

01:09PM 20            MR. TIDWELL:  Romeo Papa.

01:09PM 21            So, as you explained -- I need to try and get

01:09PM 22   some clarification on that relationship.  Do you know whether

01:09PM 23   or not Romeo Papa has any claims?

01:09PM 24            THE WITNESS:  No, I do not.  But I do know that my

01:09PM 25   husband discussed at length and in detail with Mr. Juneau that

**C O N F I D E N T I A L**

01:09PM   1    whole relationship and everything going on with it.

01:10PM   2            MR. TIDWELL:  So you don't know whether there was --

01:10PM   3    whether he asked written permission and whether or not he got

01:10PM   4    written permission?

01:10PM   5            THE WITNESS:  No, I do not.  I do not.  I do not.

01:10PM   6            MR. TIDWELL:  What do you know about your husband

01:10PM   7    representing in federal civil court here a -- in a matter

01:10PM   8    involving Robert Perez, Romeo Papa, and a claim against -- it's

01:10PM   9    an insurance claim?

01:10PM  10            THE WITNESS:  I don't know about that.

01:10PM  11            MR. TIDWELL:  You don't know anything about that.

01:10PM  12            Well, so if there is not a written -- how would

01:10PM  13    you interpret -- what would be your thought on if there is not

01:10PM  14    a written record anywhere about permission to do that,

01:10PM  15    particularly when it appears that some of that was while he was

01:10PM  16    working in the CAO, cutting to what Judge Freeh asked you,

01:11PM  17    sitting where you are now, would you consider those to be

01:11PM  18    conflicts of interest?

01:11PM  19            THE WITNESS:  Romeo Papa?

01:11PM  20            MR. TIDWELL:  Romeo Papa.  Him having an interest in

01:11PM  21    an entity that has a claim before the CAO?

01:11PM  22            THE WITNESS:  Oh, I didn't catch that part.  They do

01:11PM  23    have a claim before the CAO?

01:11PM  24            MR. TIDWELL:  Yes.

01:11PM  25            THE WITNESS:  Well, yes, I would consider that a

**C O N F I D E N T I A L**

01:11PM 1    conflict if it wasn't discussed and disclosed.

01:11PM 2            MR. TIDWELL:  Right.  Same thing with him

01:11PM 3    representing Perez here in a civil matter here in federal

01:11PM 4    court?

01:11PM 5            THE WITNESS:  Just representing him in a civil

01:11PM 6    matter?

01:11PM 7            MR. TIDWELL:  Yes.  If he is currently and was

01:11PM 8    through the time of his employment actively representing as

01:11PM 9    attorney of record Robert Perez --

01:11PM 10            THE WITNESS:  In a non-related matter?

01:11PM 11            MR. TIDWELL:  Well, in the context of Romeo Papa and

01:11PM 12    Robert Perez.

01:11PM 13            THE WITNESS:  Well, Robert Perez is his partner in

01:12PM 14    Romeo Papa.

01:12PM 15            MR. TIDWELL:  Okay.  Thank you.

01:12PM 16    BY MR. FREEH:

01:12PM 17    Q.   When you told your former client, Thonn, to go see

01:12PM 18    John Andry, did you have any conversations with your husband at

01:12PM 19    that time about whether that would create any conflict?

01:12PM 20    A.   If Thonn went to John Andry?

01:12PM 21    Q.   Yes.

01:12PM 22    A.   No.

01:12PM 23    Q.   So that never came up, that was never a subject of a

01:12PM 24    conversation?

01:12PM 25    A.   No.  Because he didn't have a relationship with John

**C O N F I D E N T I A L**

01:12PM 1    Andry, to my knowledge.

01:12PM 2    Q.   But did you ask him at that point if he did?

01:12PM 3    A.   I didn't ask him because I felt like I knew he didn't.

01:12PM 4    You know, I knew there had been -- I knew they didn't have the

01:12PM 5    building together.  I knew they didn't have cases together.

01:12PM 6    And I knew they weren't speaking to each other.  So what

01:12PM 7    relationship would they have and why would I ask?

01:12PM 8    Q.   Well, you knew that John Landry [verbatim] was associated

01:12PM 9    with Lerner.

01:12PM 10   A.   Well --

01:12PM 11   Q.   You said that.

01:12PM 12   A.   I knew that Lerner at some time on a different -- you

01:13PM 13   know, the GCCF, had put up money to help with the advertising.

01:13PM 14   Q.   And that knowledge didn't make you ask a question to your

01:13PM 15   husband at the time whether there was still any relationship or

01:13PM 16   if there was any relationship at all?

01:13PM 17   A.   Oh, I might have -- no, because I knew that.  Because I

01:13PM 18   knew there wasn't.  Because, you know, Glen was kind of in the

01:13PM 19   middle and he was trying to get the two of them to make amends,

01:13PM 20   and they wouldn't.

01:13PM 21        I mean, if -- if I discussed anything with my

01:13PM 22   husband, his response would have been, "I'm not doing anything

01:13PM 23   with him."

01:13PM 24   Q.   But at the time you told Mr. Thonn to go to Landry, did

01:13PM 25   you not know that Landry and Lerner --

C O N F I D E N T I A L

SM-02-CR00825

01:13PM 1    A.    No.

01:13PM 2    Q.    -- were law partners?

01:13PM 3    A.    No, I didn't.

01:13PM 4    Q.    You did not?

01:13PM 5    A.    No.

01:13PM 6          MS. PIERSON:  By the way, for the record, his name is

01:13PM 7    Andry, no L.

01:13PM 8          MR. FREEH:  Andry.  Thank you.

01:13PM 9    BY MR. FREEH:

01:14PM 10   Q.    And as you said before we took the break, there was no

01:14PM 11   conflict process that was followed, or you certainly didn't

01:14PM 12   follow any with respect to that referral?

01:14PM 13   A.    No.  No.

01:14PM 14   Q.    You said your law firm was coincidentally located at some

01:14PM 15   point directly across from Mr. Juneau's space?

01:14PM 16   A.    Uh-huh (affirmative response).

01:14PM 17   Q.    Did you use each other's space for any separate

01:14PM 18   businesses?  In other words, did Mr. Juneau's colleagues in

01:14PM 19   office use your space for meetings?

01:14PM 20   A.    Oh, no.  No.

01:14PM 21   Q.    Did you use any of their space for meetings not related to

01:14PM 22   the claims administration?

01:14PM 23   A.    Did I use any of their -- no.  But Tiger, I know, had --

01:14PM 24   had permission to have a deposition, his law practice,

01:15PM 25   something related to that, in one of the conference rooms in

**C O N F I D E N T I A L**

SM-02-CR00826

01:15PM 1   the CA's office.

01:15PM 2   Q.   Who did he have that permission from?

01:15PM 3   A.   Mr. Juneau.

01:15PM 4   Q.   Were you involved in getting that permission?

01:15PM 5   A.   No.  No.

01:15PM 6   Q.   Do you know who was?

01:15PM 7   A.   No.

01:15PM 8   Q.   Were you aware that Mr. Sutton was assigning claims

01:15PM 9   administration employees to do work related to his firm and not

01:15PM 10  the claims administration process?

01:15PM 11  A.   While he was working there?

01:15PM 12  Q.   While he was working there.

01:15PM 13  A.   Well, one time, I think, I -- I think -- I thought this

01:15PM 14  was when he wasn't working there.  I think one time, you know,

01:15PM 15  the -- the -- Tracy Steilberg, who works at the office, was his

01:15PM 16  personal secretary for many years.  And I think one time she

01:16PM 17  did type something for him, because he couldn't type.  But

01:16PM 18  that's the only thing I'm aware of.

01:16PM 19  Q.   Were you aware that he was asking claims administration

01:16PM 20  employees to help him with the filing of LLCs and other legal

01:16PM 21  papers?

01:16PM 22  A.   No, I was not aware of that.

01:16PM 23  Q.   That never came to your attention?

01:16PM 24  A.   No.

01:16PM 25       MR. MCCALL:  Mrs. Reitano, did you ever use that

**C O N F I D E N T I A L**

SM-02-CR00827

01:16PM 1    Sutton Reitano law firm space to meet with any CAO staff

01:16PM 2    members --

01:16PM 3              THE WITNESS:  No.

01:16PM 4              MR. MCCALL:  -- about CAO business?

01:16PM 5              THE WITNESS:  It wasn't even furnished.  Because once

01:16PM 6    we moved into that office, I began working on this program, so

01:16PM 7    only my husband has a desk.  No, I did not.

01:16PM 8              MR. MCCALL:  Do you know if your husband ever used it

01:16PM 9    to meet with any other CAO staff members to discuss CAO

01:16PM 10   business?

01:16PM 11             THE WITNESS:  No.  I don't know.  But I don't think

01:16PM 12   so either.

01:16PM 13             MR. FREEH:  We'll take just a brief minute -- let's

01:17PM 14   go out and talk.  We may be almost finished, so let me just

01:17PM 15   check.

01:17PM 16             MS. PIERSON:  May I ask a question?

01:17PM 17             MR. FREEH:  Sure.

01:17PM 18             MS. PIERSON:  When you are concluded, there's a

01:17PM 19   couple of documents that I would like to offer into this

01:17PM 20   record, and some questions I would like for her to ask to

01:17PM 21   complete -- or to answer to complete the record, since

01:17PM 22   Judge Barbier is going to be the one to decide what all this

01:17PM 23   might or might not mean.  There are some things that I think he

01:17PM 24   needs to know in addition to what might have been covered here

01:17PM 25   today.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 01:17PM | 1 | MR. FREEH:  Well, we should have a sidebar about that |
| 01:17PM | 2 | first. |
| 01:17PM | 3 | MS. PIERSON:  It's not a whole lot. |
| 01:17PM | 4 | MR. FREEH:  And you can make a proffer. |
| 01:17PM | 5 | MS. PIERSON:  I can make a proffer. |
| 01:17PM | 6 | MR. FREEH:  And then we can decide whether we should |
| 01:17PM | 7 | do it here or in a separate proceeding. |
| 01:17PM | 8 | All right.  We're just going to take a short |
| 01:17PM | 9 | break and caucus. |
| 01:18PM | 10 | (WHEREUPON, at this point in the proceedings, a brief |
| 01:26PM | 11 | recess was taken.) |
| 01:26PM | 12 | MR. FREEH:  We can go back on the record.  We took a |
| 01:27PM | 13 | break.  We've had a sidebar with Ms. Reitano's counsel.  She's |
| 01:27PM | 14 | going to introduce some records, ask her client a few |
| 01:27PM | 15 | questions.  We have several -- a few more questions from our |
| 01:27PM | 16 | side, and then I think we're not going to have any questions |
| 01:27PM | 17 | about the matters we discussed her counsel putting on the |
| 01:27PM | 18 | record. |
| 01:27PM | 19 | MR. TIDWELL:  To finish up on Document Number 4 -- |
| 01:27PM | 20 | MR. FREEH:  I'll give you time to retrieve that. |
| 01:27PM | 21 | MS. PIERSON:  What is 4? |
| 01:27PM | 22 | MR. TIDWELL:  Four is an e-mail from Lynn Greer. |
| 01:27PM | 23 | THE WITNESS:  Uh-huh (affirmative response).  Yep. |
| 01:27PM | 24 | MR. TIDWELL:  Okay.  And then also 04A. |
| 01:27PM | 25 | THE WITNESS:  Right. |

**C O N F I D E N T I A L**

SM-02-CR00829

01:27PM 1      MR. TIDWELL:  To the best of your recollection, as

01:27PM 2  you sit here today, the -- 04A is the in-question chart that

01:28PM 3  you were needing that you questioned Matt Lundy on?

01:28PM 4      THE WITNESS:  Yes.  And we -- my counsel and I were

01:28PM 5  just discussing it when you left the room.  It wouldn't make

01:28PM 6  sense that Matt Lundy would send a list of other people and

01:28PM 7  their claimants, so it makes much more sense that this is --

01:28PM 8      MS. PIERSON:  Let me just interject.  Assuming that

01:28PM 9  04A is the list of people represented by Lundy.

01:28PM 10     THE WITNESS:  Exactly.

01:28PM 11     MS. PIERSON:  Because it doesn't say so.

01:28PM 12     MR. TIDWELL:  Right.  So that means what we have

01:28PM 13  attached to 04 is what is in Lynn Greer's Point Number 10, that

01:28PM 14  this is what she posted to the Garden City site is these here,

01:28PM 15  is the ones at the back?

01:28PM 16         Counselor, not those.  I'm sorry.

01:28PM 17     THE WITNESS:  It's possible.

01:28PM 18     MR. TIDWELL:  It's these, these right here.

01:28PM 19     THE WITNESS:  It's possible.

01:29PM 20     MR. TIDWELL:  All right.

01:29PM 21     MS. PIERSON:  Well, is there a row 1402?

01:29PM 22     MR. TIDWELL:  Well, the fact is that we've got as an

01:29PM 23  attachment "No claims left behind," 300 kilobytes, and it's an

01:29PM 24  Excel spreadsheet.  This is an Excel spreadsheet.

01:29PM 25     MS. PIERSON:  Right.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 01:29PM | 1 | MR. TIDWELL:  So that's what we're trying to confirm. |
| 01:29PM | 2 | This is her attaching for whatever reason with |
| 01:29PM | 3 | the explanations she put in here, that this is the "no claims" |
| 01:29PM | 4 | that she decided people needed to see in the context of this |
| 01:29PM | 5 | discussion, because as you'll note at the top, "Casey Thonn." |
| 01:29PM | 6 | THE WITNESS:  Right. |
| 01:29PM | 7 | MR. TIDWELL:  Read Number 10. |
| 01:29PM | 8 | THE WITNESS:  Yes, I know. |
| 01:29PM | 9 | "Report to address claims we showed as having |
| 01:29PM | 10 | received all the payment documents where we had no record that |
| 01:29PM | 11 | they had been paid." |
| 01:29PM | 12 | And that's what I was explaining to you. |
| 01:29PM | 13 | Because this was an offline process, to ensure that payments |
| 01:29PM | 14 | were getting made, actual -- you know, when it's done online, |
| 01:30PM | 15 | the computer checks it off, you know.  When it's being done |
| 01:30PM | 16 | offline, a human being has to decide, okay, we got all the |
| 01:30PM | 17 | documents for these, but they haven't been paid.  Where is the |
| 01:30PM | 18 | human who is going to sit down and actually write the check? |
| 01:30PM | 19 | MR. TIDWELL:  Right.  And because on that chart, the |
| 01:30PM | 20 | ones -- the approvals that would need to have a Y for yes, do |
| 01:30PM | 21 | not have them? |
| 01:30PM | 22 | MS. PIERSON:  Let's see. |
| 01:30PM | 23 | THE WITNESS:  Does that mean that they don't have |
| 01:30PM | 24 | their documentation? |
| 01:30PM | 25 | MR. TIDWELL:  Yeah. |

**C O N F I D E N T I A L**

01:30PM 1     THE WITNESS:  Right.  Exactly.

01:30PM 2     MR. TIDWELL:  That's the "No claims left behind"

01:30PM 3  Excel spreadsheet that she said --

01:30PM 4     THE WITNESS:  And one of Garden City's -- one of the

01:30PM 5  outreach functions -- there was a lot of outreach going on at

01:30PM 6  the time for both incompleteness -- and there was

01:30PM 7  incompleteness with the payment documentation.

01:30PM 8     So Garden City people or BrownGreer people, I

01:30PM 9  guess they would keep this sort of chart to say, okay, you have

01:30PM 10  this, this, this, and this, but we need to call them and make

01:30PM 11  sure that they have this, and then they can get paid.

01:30PM 12     MR. MCCALL:  Ms. Reitano, prior to these allegations

01:31PM 13  against your husband surfacing, when you were working in the

01:31PM 14  CAO and when your husband also began -- or was working within

01:31PM 15  the CAO, do you feel that there was -- there was any -- there

01:31PM 16  were any conflicts in the sense of grudges, unpleasant

01:31PM 17  relationships, somebody being out to get you or vice versa?

01:31PM 18  Did you have any particularly unpleasant relationships with any

01:31PM 19  members of the upper-level CAO management?

01:31PM 20     THE WITNESS:  Not -- no.  And at that time I wouldn't

01:31PM 21  think so.

01:31PM 22     I think there was -- you know, in the beginning

01:31PM 23  of the program, there was -- you just had a few lawyers, and

01:31PM 24  then you had this business processing group, which -- you know,

01:31PM 25  Pat Juneau, I don't believe, hired or anticipated, like -- as I

**C O N F I D E N T I A L**

SM-02-CR00832

01:31PM 1    told you, he just thought that there were going to be, you

01:32PM 2    know, a few lawyers and this and that.

01:32PM 3              And I think that it was difficult to decide to

01:32PM 4    what extent should these people, these people in our office,

01:32PM 5    shadow the vendors and what they were doing.  To what extent

01:32PM 6    should they do that?  Should -- to what extent -- should they

01:32PM 7    do auditing?  Should they be reporting on the vendors' data?

01:32PM 8    You know?

01:32PM 9              I think the vendors were of the mind, "This is

01:32PM 10   our data.  We should report on it."

01:32PM 11             It was hard, I think, to find what their role

01:32PM 12   was -- should be initially.  You know, there might have been a

01:32PM 13   sense, too, that when they were going in there and, you know,

01:32PM 14   shadowing or doing what they were doing, that maybe they were

01:32PM 15   interfering with the work that needed to get done at the time.

01:32PM 16        MR. MCCALL:  Excuse me.  Which people in the office

01:33PM 17   are we talking about not going in and shadowing the vendors and

01:33PM 18   looking over their shoulder?

01:33PM 19        THE WITNESS:  Whoever that business processing team

01:33PM 20   is.

01:33PM 21             You know, they had somebody by the name of

01:33PM 22   Scott Scheurich (spelled phonetically), I know he did a lot.

01:33PM 23   They had a SWAT-team process where they went and they -- you

01:33PM 24   know, they are trying to analyze.  And they are coming up

01:33PM 25   with -- how do I explain it?  They were coming up with, like,

C O N F I D E N T I A L

SM-02-CR00833

01:33PM 1    business theories and ideas, how to change this, how to do

01:33PM 2    this, how to do that better.

01:33PM 3                When I guess the vendors felt like, "We've been

01:33PM 4    appointed by the court.  We know how to do what we should be

01:33PM 5    doing."  You know?

01:33PM 6                And I think, ultimately, it was just decided

01:33PM 7    that -- that part of our office's role was put to better use by

01:33PM 8    performing the auditing function, which I think ended up being

01:33PM 9    very successful and very helpful.

01:34PM 10               But, no, I didn't feel like I had any conflict

01:34PM 11   or animosity or that anyone was out to get me or that I was

01:34PM 12   out -- you know, I just feel like there were different roles,

01:34PM 13   you know, that the legal part was different from -- I wasn't

01:34PM 14   sure what the business processing people were doing, and I kind

01:34PM 15   of kept to my realm and they kept to their realm.

01:34PM 16               MR. MCCALL:  Do you feel that there was any animosity

01:34PM 17   toward the vendors on the part of these business processing

01:34PM 18   people, toward any of the vendors, that you were aware of?

01:34PM 19               THE WITNESS:  I think the vendors probably felt some.

01:34PM 20               MR. MCCALL:  The vendors felt some toward the

01:34PM 21   business processing people?

01:34PM 22               THE WITNESS:  No.  They felt that there was animosity

01:34PM 23   toward them.  BrownGreer in particular, I think, felt that

01:34PM 24   someone was kind of waiting for them to have a misstep, or when

01:34PM 25   something wasn't done in a very timely fashion, they were, you

**C O N F I D E N T I A L**

01:35PM 1    know -- it was brought down upon them very heavily.  And

01:35PM 2    they -- they stood their course.

01:35PM 3                I mean, they -- things didn't come out of the

01:35PM 4    gate, like the whole tent didn't just blow up and wasn't there

01:35PM 5    ready to go.  The circus wasn't ready to go as soon as you

01:35PM 6    opened the case.  It took a long time.  But they all the while

01:35PM 7    maintained that we are going to have this slow, sort of

01:35PM 8    building process, and then we're going to ramp up.  And then no

01:35PM 9    one is going to be able to catch up with us.

01:35PM 10                And by that they meant our end of the review

01:35PM 11   would become so systematic that the accountants would then

01:35PM 12   inherit -- or suffer from the backlog, because they would never

01:35PM 13   be able to catch up to BrownGreer.

01:35PM 14                And I think initially all the criticism was --

01:35PM 15   the scapegoat was BrownGreer.  Because as our office is

01:35PM 16   being -- you know, is receiving all these complaints, you're

01:36PM 17   not reviewing fast enough, you're not making payments fast

01:36PM 18   enough, you know, the eyes turn to BrownGreer, why aren't you

01:36PM 19   doing this?  You said you would do this in this amount of time,

01:36PM 20   blah, blah.

01:36PM 21                And eventually, I think it was Mike Juneau who

01:36PM 22   stepped in and said, "Look, we've got to kind of -- our role at

01:36PM 23   our office is not one of lording over these court-appointed

01:36PM 24   vendors.  It is to stand by their side and kind of work with

01:36PM 25   them."

**C O N F I D E N T I A L**

SM-02-CR00835

01:36PM 1        MR. MCCALL:  You mentioned among those people on the

01:36PM 2    business process side who, BrownGreer, for example, felt were

01:36PM 3    in conflict.  I think you mentioned Scott Scheurich?

01:36PM 4        THE WITNESS:  Yes.

01:36PM 5        MR. MCCALL:  Are there other individuals that you

01:36PM 6    recall who were also perceived by BrownGreer, or any of the

01:36PM 7    other vendors, as having this --

01:36PM 8        THE WITNESS:  I think they perceived it as, you

01:36PM 9    know -- and it wasn't specific people.  It was just as --

01:37PM 10   coming up -- our office coming up with a lot of theories and

01:37PM 11   ideas that, at the end of the day, really didn't help anything.

01:37PM 12   And they tried to go along, go along, go along, but eventually,

01:37PM 13   it became a source of frustration for them.

01:37PM 14       MR. MCCALL:  Mr. Scheurich was terminated at some

01:37PM 15   point from the CAO; is that correct?

01:37PM 16       THE WITNESS:  Right.

01:37PM 17       MR. MCCALL:  Do you know why?  Do you know anything

01:37PM 18   about that?

01:37PM 19       THE WITNESS:  I'm trying to remember.  I don't

01:37PM 20   remember the details.  I don't know.

01:37PM 21           At one point, you know, we had all kinds of

01:37PM 22   programs going on, like an outreach and SWAT and this and that.

01:37PM 23   And I think they had put Scott at the head of one of these sort

01:37PM 24   of outreach programs, or something of that nature, and he was

01:37PM 25   just taking things off on a tangent.  And I think eventually

**C O N F I D E N T I A L**

01:38PM 1    that came to Pat.

01:38PM 2              You know, the other people in the office would

01:38PM 3    know better.  They are the ones who met about it and discussed

01:38PM 4    it and ultimately decided to terminate it -- to terminate him.

01:38PM 5    I think Bob Levine and David Odom and Pat Juneau probably sat

01:38PM 6    down and discussed whatever was going on with him.

01:38PM 7              But, you know, this was background for me.  And

01:38PM 8    I -- I had my big enough plate, and really, you know, I just

01:38PM 9    had to keep reminding myself, that's not my realm.  Those

01:38PM 10   people are getting paid.  They have their roles.  They are

01:38PM 11   full-time employees, that they need to take care of that, the

01:38PM 12   CEO needs to take care of that.

01:38PM 13             I just really -- but, of course, you're in the

01:38PM 14   office with people.  I would hear personal things from, you

01:38PM 15   know, the vendors about how, you know, they felt like, you

01:38PM 16   know, it was very interfering and unnecessary and maybe there

01:39PM 17   were other agendas or whatnot, but nothing -- nothing that I

01:39PM 18   got overly involved in.

01:39PM 19             MR. MCCALL:  Did you -- you didn't participate in any

01:39PM 20   discussions with Mr. Juneau, Mr. Odom, Mr. Levine regarding the

01:39PM 21   decision of whether to terminate Mr. Scheurich.

01:39PM 22             THE WITNESS:  No.

01:39PM 23             MR. MCCALL:  Thank you.

01:39PM 24   BY MR. FREEH:

01:39PM 25   Q.   I've just got a few more questions.

**C O N F I D E N T I A L**

01:39PM 1          We were asking questions -- I was asking questions

01:39PM 2     about the relationships, as far as you were aware of them at

01:39PM 3     the time, being when you worked at the administrator, between

01:39PM 4     Jonathan Andry and Glen Lerner.

01:39PM 5     A.    Right.

01:39PM 6     Q.    And you said you were not aware they were partners

01:39PM 7     together in the law firm?

01:39PM 8     A.    Not in the law firm.  I didn't know they had created a law

01:39PM 9     firm, or I didn't recall.

01:39PM 10    Q.    So you were not aware they had a law firm at 610 Baronne

01:39PM 11    Street called Andry Lerner, LLC?

01:39PM 12    A.    I thought it was -- I thought the law firm at 610 Baronne

01:40PM 13    was Andry Group -- or Andry Law Group.

01:40PM 14    Q.    Were you aware that the law firm that Jonathan Andry had

01:40PM 15    in New Orleans, regardless of the address, had claims pending

01:40PM 16    before the administrator?

01:40PM 17    A.    Yes.

01:40PM 18    Q.    And you knew that due to the nature and course of your

01:40PM 19    work or did you learn it in some other way?

01:40PM 20    A.    Oh, that -- I guess in the nature or in the course -- I

01:40PM 21    don't know.  I just -- I think it was because Casey went to him

01:40PM 22    and he said, "Yes, I'll take your case."  And he had all of

01:40PM 23    these GCCF cases, as I said, I just assumed that he did.

01:40PM 24    Q.    So let me show you what I've marked as 07.

01:40PM 25          (WHEREUPON, at this point in the proceedings,

**C O N F I D E N T I A L**

01:40PM  1    Exhibit 07 was marked for identification.)

01:40PM  2              MR. FREEH:  I'm sorry, Counsel.  We may have to bump

01:40PM  3    your numbers up a few for your exhibits.

01:40PM  4    BY MR. FREEH:

01:40PM  5    Q.    But let me show you what I've marked as Exhibit Number 07,

01:41PM  6    which is a -- letterhead for Andry and Lerner.

01:41PM  7    A.    Yes.

01:41PM  8    Q.    So were you not aware that Lerner was at least, apparently

01:41PM  9    on the face of Exhibit 07, associated with the firm that your

01:41PM 10    client had been sent to by your direction?

01:41PM 11    A.    No.  I didn't know that they had a letterhead and -- you

01:41PM 12    know.

01:41PM 13    Q.    I'll show you another document which I've marked 08.

01:41PM 14              (WHEREUPON, at this point in the proceedings,

01:41PM 15    Exhibit 08 was marked for identification.)

01:41PM 16    BY MR. FREEH:

01:41PM 17    Q.    The one marked 07 is dated August 14, 2012.

01:41PM 18              And then I'll send you one which I've marked as 08,

01:41PM 19    which is the same letterhead form, Andry Lerner LLC, residing

01:41PM 20    Jonathan Andry and Glen Lerner as principles, dated July 30,

01:42PM 21    2012, addressed to the "Deepwater Horizon Economic Claims

01:42PM 22    Center, Re:  Claimant 100051739, Casey Thonn."

01:42PM 23              So again, the same question, you were not aware that

01:42PM 24    they had that relationship?

01:42PM 25    A.    And the same answer.  I wasn't aware that they had gone to

**C O N F I D E N T I A L**

01:42PM 1   the -- you know, had started a firm to do these cases in the

01:42PM 2   settlement program.

01:42PM 3   Q.   And again, I think that goes back to my earlier question,

01:42PM 4   which you did answer.  When you told -- or recommended that

01:42PM 5   Casey go to Andry, you didn't do anything further to check

01:42PM 6   whether that was going to cause any conflict or whether it made

01:42PM 7   any conflict?

01:42PM 8   A.   Right.  Right.  Right.  In my mind, it was John Andry.

01:42PM 9   Q.   May I have those back?

01:42PM 10  A.   Uh-huh.

01:42PM 11       MS. PIERSON:  Well, point of clarification, that's

01:42PM 12  with regard to his VOO claim.  And the one she sent over there

01:43PM 13  was not a VOO claim, was it?

01:43PM 14       THE WITNESS:  No.  It was a GCCF claim.

01:43PM 15       MR. TIDWELL:  There is multiple claims that they are

01:43PM 16  handling, right.

01:43PM 17  BY MR. FREEH:

01:43PM 18  Q.   May I have that one back, please?

01:43PM 19  A.   I think we already gave it back.

01:43PM 20  Q.   Oh, they are together.  Okay.

01:43PM 21       (WHEREUPON, at this point in the proceedings,

01:43PM 22  Exhibit 07A was marked for identification.)

01:43PM 23  BY MR. FREEH:

01:43PM 24  Q.   And, again, I'll show you what I've marked as Exhibit 07A,

01:43PM 25  which there's no reason you would have seen this.  This is a

**C O N F I D E N T I A L**

SM-02-CR00840

01:43PM 1   Bizapedia report dated March 11, 2012, which is a

01:43PM 2   publicly-available report and which reflects that Lerner is

01:43PM 3   associated.

01:43PM 4           You're not again --

01:43PM 5   A.   No, I did not see that.

01:43PM 6   Q.   You weren't aware of that?

01:43PM 7   A.   No.

01:43PM 8   Q.   And I'll show you what I've marked as Exhibit 09, which is

01:44PM 9   a document entitled "Deepwater Horizon Claims Center, Claimant

01:44PM 10  Details" dated -- that's the date we printed it.  I'm looking

01:44PM 11  at the date that it was --

01:44PM 12          MR. TIDWELL:  Unless it shows on the next page, it

01:44PM 13  might not have one.

01:44PM 14          (WHEREUPON, at this point in the proceedings,

01:44PM 15  Exhibit 09 was marked for identification.)

01:44PM 16  BY MR. FREEH:

01:44PM 17  Q.   It's a seven-page document.  I'm not going to recite a

01:44PM 18  date.  They have an event date of February 26, 2013, but I

01:44PM 19  don't purport that to be the date of the document.

01:44PM 20          Anyway, I'm going to show it to you.  It's a list of

01:44PM 21  claimant information, and it lists as the -- represented by

01:45PM 22  Andry Law Group/Andry Lerner, LLC.  Casey Thonn is the name,

01:45PM 23  Casey Charles Thonn, with the address of 332 Jacobs Street.

01:45PM 24          And I would ask you to look at that.  Is that a

01:45PM 25  document that is a document from the claims administrator or is

**C O N F I D E N T I A L**

SM-02-CR00841

01:45PM 1    it a document that, as far as you could tell, because I can't,

01:45PM 2    it was generated somewhere else?

01:45PM 3    A.    This looks like a claims administrator document.

01:45PM 4    Q.    And it clearly reflects that Lerner is working on the

01:45PM 5    *Thonn* claim by looking at the document?

01:45PM 6    A.    Yes.

01:45PM 7    Q.    Okay.

01:45PM 8         MS. PIERSON:  And we don't know the date of this?

01:45PM 9         MR. FREEH:  It's hard to tell.  I look at the last

01:45PM 10   page and there is a February date.

01:45PM 11        THE WITNESS:  You know what that looks like?  That

01:45PM 12   looks like if someone goes into a claimant's file and then they

01:45PM 13   pull up all the documents that they can review that have been

01:46PM 14   submitted for the claimant's file.

01:46PM 15        MR. FREEH:  All right.

01:46PM 16        (WHEREUPON, at this point in the proceedings,

01:46PM 17   Exhibits 10 through 12 were marked for identification.)

01:46PM 18   BY MR. FREEH:

01:46PM 19   Q.    I'll show you what have been marked 10, 11 and 12, which

01:46PM 20   is a series of documents.  These are public business reports.

01:46PM 21   So if you do, like, a public information search on a business

01:46PM 22   that was registered in the State of Louisiana, it's my

01:46PM 23   understanding that these are the documents that are generated.

01:46PM 24        But before I show you them, I'm going to ask you,

01:46PM 25   were you aware of different LLCs that your husband either

**C O N F I D E N T I A L**

01:46PM 1  founded or was a partner or a named registrant in at the time

01:46PM 2  you were working at the claims administration?

01:46PM 3  A.   Other than the two I've mentioned -- or that have been

01:46PM 4  discussed, I was not aware.  I did read somewhere in the -- I

01:47PM 5  think it was Welker's report, that there was a long list of

01:47PM 6  them.  And I'm sure you're going to show me the list.  And, no,

01:47PM 7  I was not aware of these other ones.

01:47PM 8  Q.   So let me show you what's marked as Exhibit 10.  It's a

01:47PM 9  company referred to as *Monster Demolition*.

01:47PM 10  A.   No.

01:47PM 11  Q.   Is this the first time that you're hearing that name?

01:47PM 12  A.   Yes.

01:47PM 13  Q.   How about Crown, LLC, which, of course, you said you had

01:47PM 14  heard about?

01:47PM 15  A.   Yes, I did hear about that.

01:47PM 16  Q.   All right.  And did you know at the time you were working

01:47PM 17  at the claims administrator that Mr. Lerner was an officer of

01:47PM 18  Crown?

01:47PM 19  A.   Yes.  Well, I didn't know he was an -- I didn't know what

01:47PM 20  his title was, but I knew that they were members together.

01:47PM 21  Q.   All right.  Did you inquire at the time what the exact

01:47PM 22  relationship was between Lerner and Crown?

01:48PM 23  A.   No.  My understanding was that he was capitalizing the

01:48PM 24  company.

01:48PM 25  Q.   And you said, I think, you were aware at the time you were

**C O N F I D E N T I A L**

| | |
|---|---|
| 01:48PM 1 | claims administrator that Lerner was paying certain salaries or |
| 01:48PM 2 | not paying certain salaries owed to your husband? |
| 01:48PM 3 | A.    Right.  He had a obligation to or had agreed to pay |
| 01:48PM 4 | salaries in return for more percentage of the business. |
| 01:48PM 5 | Q.    I'll show you 11, and it's just a business-generated |
| 01:48PM 6 | report.  But it does reflect Mr. Lerner as an officer on |
| 01:48PM 7 | page 2. |
| 01:48PM 8 | A.    Okay. |
| 01:48PM 9 | Q.    And then I'll ask you about some other LLCs. |
| 01:48PM 10 | A.    Okay. |
| 01:48PM 11 | Q.    And I'll represent and I'll show you the document, your |
| 01:48PM 12 | husband is listed either as a registered agent and/or officer, |
| 01:48PM 13 | and I'll ask you if you have heard of these before. |
| 01:48PM 14 |       One is SDA Enterprises? |
| 01:48PM 15 | A.    No. |
| 01:48PM 16 | Q.    And it lists an address of 610 Baronne Street.  That was |
| 01:49PM 17 | the previous office. |
| 01:49PM 18 |       And you had not heard of that -- |
| 01:49PM 19 | A.    No. |
| 01:49PM 20 | Q.    -- before today? |
| 01:49PM 21 | A.    No. |
| 01:49PM 22 | Q.    How about Can You Hear Me Now, LLC? |
| 01:49PM 23 | A.    No. |
| 01:49PM 24 | Q.    610 Baronne Street.  First time today? |
| 01:49PM 25 | A.    Yes. |

**C O N F I D E N T I A L**

SM-02-CR00844

01:49PM 1    Q.    And Navajo Enterprises, LLC?

01:49PM 2    A.    No.

01:49PM 3    Q.    111 Pine Park in Lafayette, Louisiana.   Does that address

01:49PM 4    ring a bell to you?

01:49PM 5    A.    The address doesn't even ring a bell.

01:49PM 6    Q.    And there is an officer there named Johnny Walker.   Do you

01:49PM 7    know Johnny Walker?

01:49PM 8    A.    I know the name.

01:49PM 9    Q.    But you're not sure in what context?

01:49PM 10   A.    Right.

01:49PM 11   Q.    Do you know a Mark Corcoran?

01:49PM 12   A.    No.

01:49PM 13   Q.    Charles Laborde, L-A-B-O-R-D-E?

01:49PM 14   A.    No.

01:49PM 15   Q.    How about a company named Full Dimension Trading Company,

01:50PM 16   LLC?

01:50PM 17   A.    That sounds familiar.   But I don't remember.

01:50PM 18   Full Dimension.   I don't know.   Is his brother in that, do you

01:50PM 19   know?   Is there another Sutton in there?

01:50PM 20   Q.    The State of Louisiana secretary of state -- these are

01:50PM 21   all, by the way, documents publicly available from the

01:50PM 22   secretary of state at Louisiana.

01:50PM 23          With respect to Full Dimension Trading Co.,

01:50PM 24   Lionel Sutton is listed as a registered agent and an officer.

01:50PM 25   There is no one else listed there?

**C O N F I D E N T I A L**

SM-02-CR00845

| | | |
|---|---|---|
| 01:50PM | 1 | A.   The name alone sounds familiar. |
| 01:50PM | 2 | Q.   And it recites a business address of 110 East Pershing |
| 01:50PM | 3 | Street, New Iberia. |
| 01:50PM | 4 | A.   Okay.  He has a law office -- well, he rents space at that |
| 01:50PM | 5 | law office in New Iberia. |
| 01:50PM | 6 | Q.   "He" meaning your husband? |
| 01:50PM | 7 | A.   Yes. |
| 01:50PM | 8 | Q.   And then I've got one, 4K Partners, LLC? |
| 01:51PM | 9 | A.   Yes.  4K was an LLC my husband's father set up in the name |
| 01:51PM | 10 | of the four children. |
| 01:51PM | 11 | Q.   And is Michael Sutton one of the children? |
| 01:51PM | 12 | A.   Yes. |
| 01:51PM | 13 | Q.   And he's reflected as an officer. |
| 01:51PM | 14 | I'll pass this to you and your counsel so you can |
| 01:51PM | 15 | look at it. |
| 01:51PM | 16 | A.   But he's no longer a part of 4K. |
| 01:51PM | 17 | Q.   Now, I have one here, I'm just going to ask you a question |
| 01:51PM | 18 | about it.  We covered it before.  Sutton & Reitano, it's got, |
| 01:51PM | 19 | paren, a professional law corporation, close paren. |
| 01:51PM | 20 | Is it your statement that that's not a legally |
| 01:51PM | 21 | incorporated entity? |
| 01:51PM | 22 | A.   Yes. |
| 01:51PM | 23 | Q.   It's not? |
| 01:51PM | 24 | A.   It's not. |
| 01:51PM | 25 | Q.   Another LLC where your husband is listed as registered |

**C O N F I D E N T I A L**

01:52PM 1   agent, Ms. Ashley, LLC?

01:52PM 2   A.   That's a boat.

01:52PM 3   Q.   Is that the boat that we talked about before?

01:52PM 4   A.   No.  I think that was associated with his family.

01:52PM 5   Q.   And an officer here is listed as T-Blue, LLC?

01:52PM 6   A.   That was another company associated with his family.

01:52PM 7   Q.   And there is a Martin Belden, B-E-L-D-E-N?

01:52PM 8   A.   I don't know.

01:52PM 9   Q.   T-Blue we talk about.

01:52PM 10           Secretariat, LLC?

01:52PM 11  A.   No.

01:52PM 12  Q.   5494 Shoreline Drive, New Iberia?

01:52PM 13  A.   That's his father's address.

01:52PM 14  Q.   Had you heard that before today?

01:52PM 15  A.   No.

01:52PM 16  Q.   And as an officer reflected on the State of Louisiana

01:52PM 17  secretary of state document, which I'll pass to you and your

01:52PM 18  attorney in a moment, Robert Perez.

01:52PM 19           Is that the Perez we spoke about before?

01:53PM 20  A.   Yes, it is.

01:53PM 21  Q.   And were you aware that he had a claim pending before the

01:53PM 22  claims administration?

01:53PM 23  A.   No, I was not.

01:53PM 24  Q.   Tampa Seahorse LLC?

01:53PM 25  A.   That sounds like another --

**C O N F I D E N T I A L**

SM-02-CR00847

01:53PM 1    Q.    It says, "Shoreline Drive, New Iberia."

01:53PM 2    A.    Yeah.  I was going to say another family thing.

01:53PM 3    Q.    And the registration reflects as officers Robert Perez and

01:53PM 4    T-Blue LLC.

01:53PM 5    A.    Okay.  That's why they initially started with that boat

01:53PM 6    company, was his family and Robert Perez.

01:53PM 7    Q.    I'm going to pass that to you.  You can look at it.  And

01:53PM 8    then I just need it back when you're done.

01:53PM 9              MR. FREEH:  And that's all the questions I have.

01:53PM 10             MR. MCCALL:  Is that Document Number 12?

01:53PM 11             MR. FREEH:  12.

01:53PM 12             THE WITNESS:  (Witness reviews the document.)

01:54PM 13             MS. PIERSON:  Counsel, the only one that I looked at

01:54PM 14   here was Sutton & Reitano, and it says that it's a

01:54PM 15   "professional law corporation," has not filed a report since

01:54PM 16   February of 2010.  And it's inactive.

01:54PM 17             MR. FREEH:  I think your client said it was never

01:54PM 18   really formalized as an organization.

01:54PM 19             MS. PIERSON:  Right.

01:54PM 20             So let me just ask her, were you aware that it

01:54PM 21   was registered with the secretary of state as a professional

01:54PM 22   corporation?

01:54PM 23             THE WITNESS:  I think what my husband told me was he

01:54PM 24   attempted to do something and then it fell through or something

01:54PM 25   like that, so he just used the name then.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 01:54PM | 1 | MS. PIERSON:  I just want to make sure that we're not |
| 01:54PM | 2 | making a material misstatement.  If he registered it, did you |
| 01:54PM | 3 | know it? |
| 01:54PM | 4 | THE WITNESS:  No. |
| 01:54PM | 5 | MS. PIERSON:  I mean, of course, you can go to the |
| 01:54PM | 6 | secretary of state website and plug in his name and come up |
| 01:55PM | 7 | with all of this.  Have you ever done that? |
| 01:55PM | 8 | THE WITNESS:  No. |
| 01:55PM | 9 | MR. TIDWELL:  Counselor, is 13 and 14 all right for |
| 01:55PM | 10 | you? |
| 01:55PM | 11 | MS. PIERSON:  Oh, sure.  I like 13.  It's a lucky |
| 01:55PM | 12 | number. |
| 01:55PM | 13 | BY MR. FREEH: |
| 01:55PM | 14 | Q.   In response to your counsel's question that you never did |
| 01:55PM | 15 | that, going back to some previous questions I asked, that you |
| 01:55PM | 16 | didn't think that that was a conflict check that should have |
| 01:55PM | 17 | been done when he was brought on board at your recommendation? |
| 01:55PM | 18 | A.   I assumed it was.  I assumed it was done. |
| 01:55PM | 19 | Q.   Who were you assuming would follow that up or be |
| 01:55PM | 20 | responsible for that? |
| 01:55PM | 21 | A.   I guess the claims administrator and the CEO. |
| 01:55PM | 22 | Q.   But you never took any steps to see that that was done? |
| 01:55PM | 23 | A.   No.  That was his hiring and his interview and all of |
| 01:55PM | 24 | that.  I stayed out of it. |
| 01:56PM | 25 | Q.   But you recommended that he be hired? |

**C O N F I D E N T I A L**

SM-02-CR00849

01:56PM 1   A.   That's right.

01:56PM 2   Q.   And he was your husband?

01:56PM 3   A.   Right.

01:56PM 4   Q.   And you knew that he had outside business --

01:56PM 5   A.   Well, I knew that they would discuss -- I knew that he had

01:56PM 6   businesses, and I knew that would all have to be discussed to

01:56PM 7   the satisfaction of the claims administrator and the CEO.

01:56PM 8   Q.   How did you know that?

01:56PM 9   A.   Because you have this agreement that talks about conflict

01:56PM 10  of interests.

01:56PM 11  Q.   So you assumed because there was a written agreement that

01:56PM 12  he would discuss it?

01:56PM 13  A.   That he would have sign -- yes.  That that would be, you

01:56PM 14  know, a prerequisite to his being hired.

01:56PM 15  Q.   Did he, in fact, sign an employment agreement that had a

01:56PM 16  conflicts of interest provision?

01:56PM 17  A.   I believe, yes.

01:56PM 18  Q.   Did you ever see it?

01:56PM 19  A.   The signed copy?  No.  Or unless it's -- unless it's

01:56PM 20  attached to all the exhibits that were part of the motion filed

01:56PM 21  by BP to halt the payment process.

01:57PM 22  Q.   Did -- when your husband came on board, did he also sign a

01:57PM 23  code of conduct?

01:57PM 24  A.   I'm not sure.

01:57PM 25  Q.   Do you recall that he had some questions and reservations

**C O N F I D E N T I A L**

SM-02-CR00850

01:57PM 1    about signing it with respect to some of the language?

01:57PM 2    A.   No.  I don't recall that.

01:57PM 3    Q.   He never expressed that to you?

01:57PM 4    A.   No.  No, we never discussed that.

01:57PM 5    Q.   Did you ever see a signed copy?

01:57PM 6    A.   No.

01:57PM 7         MR. TIDWELL:  Did anyone ever discuss -- did you ever

01:57PM 8    discuss with any of the leadership or hear any discussions

01:57PM 9    regarding what the background process was for new CAO hires and

01:57PM 10   who would conduct the backgrounds?

01:57PM 11        THE WITNESS:  No.

01:57PM 12        MR. FREEH:  Okay.  Counsel, please.

01:57PM 13        MS. PIERSON:  I added an exhibit.  I added a letter

01:57PM 14   to Mr. Gonzales' just for the purpose of showing what it would

01:57PM 15   be written on.

01:57PM 16        (WHEREUPON, at this point in the proceedings,

01:57PM 17   Exhibit 13 was marked for identification.)

01:57PM 18                         EXAMINATION

01:57PM 19   BY MS. PIERSON:

01:57PM 20   Q.   Ms. Reitano, I'm going to show you now what purports to be

01:58PM 21   an unsigned copy, not on letterhead, of a document.  We've

01:58PM 22   labeled it Number 13.  It's a letter addressed to Casey Thonn

01:58PM 23   on Kent Street in Slidell, and -- from you.

01:58PM 24        Is this a copy of the letter that you sent to him on

01:58PM 25   March 30th of 2012?

**C O N F I D E N T I A L**

01:58PM 1    A.   Yes, it is.

01:58PM 2    Q.   Did your work with the claims administration office begin

01:58PM 3    after that date?

01:58PM 4    A.   Yes, it did.

01:58PM 5              (WHEREUPON, at this point in the proceedings,

01:58PM 6    Exhibit 14 was marked for identification.)

01:58PM 7    BY MS. PIERSON:

01:58PM 8    Q.   Okay.  Now, attached to that, you've provided to me and

01:58PM 9    we've marked it as Number 14, is this the original retainer

01:58PM 10   agreement that you had with Mr. Thonn?

01:58PM 11   A.   Yes, it is.

01:58PM 12   Q.   And is that his signature?

01:58PM 13   A.   Yes.

01:58PM 14   Q.   Is that your signature at the bottom?

01:58PM 15   A.   Yes, it is.

01:58PM 16   Q.   Now, I notice that it's signed -- it says at the top,

01:58PM 17   Christine Reitano and an addressed at 9 --

01:58PM 18   A.   35 Gravier.

01:58PM 19   Q.   -- 935 Gravier, and it's signed Christine Reitano,

01:58PM 20   Esquire, at 16 Baronne Street.

01:58PM 21              Can you explain to us how that came to be?

01:59PM 22              MR. FREEH:  16 or 610?

01:59PM 23              THE WITNESS:  610.

01:59PM 24              MS. PIERSON:  610, I'm sorry.

01:59PM 25              THE WITNESS:  We had -- this date right here, this

**C O N F I D E N T I A L**

SM-02-CR00852

01:59PM 1    is when we --

01:59PM 2    BY MS. PIERSON:

01:59PM 3    Q.    Which date?

01:59PM 4    A.    The date of this contract, March 16, 2011, would have been

01:59PM 5    right at the time we moved from 610 Baronne to 935 Gravier

01:59PM 6    Street.  And I guess when the secretary pulled up the retainer

01:59PM 7    form, she changed the address on the top and neglected to

01:59PM 8    change the address on the bottom.

01:59PM 9    Q.    But that is, in fact, the contract you signed with him?

01:59PM 10   A.    Yes, it is.

01:59PM 11              (WHEREUPON, at this point in the proceedings,

01:59PM 12   Exhibit 15 was marked for identification.)

01:59PM 13   BY MS. PIERSON:

01:59PM 14   Q.    And I'm going to show you another letter.  I marked it

01:59PM 15   Number 15.  It's a letter addressed to Tim Gonzales signed by

01:59PM 16   you.  And I'm offering it only to show that this would have

01:59PM 17   been the form that you would have sent the letter to Mr. Thonn,

01:59PM 18   on letterhead?

01:59PM 19   A.    Exactly.  I sent the same letter to all of the GCCF

01:59PM 20   clients and would have done the same thing for each.

01:59PM 21   Q.    Now, with regard to Mr. Thonn and also you mentioned --

02:00PM 22   was her name Backer?

02:00PM 23   A.    Backes.

02:00PM 24   Q.    -- the Backes people and Mr. Gonzales, since March the

02:00PM 25   30th of 2012, when you went to work for Mr. Juneau at the

**C O N F I D E N T I A L**

SM-02-CR00853

02:00PM 1    claims administration office, have you received any

02:00PM 2    compensation at all as a result of any of their claims with BP?

02:00PM 3    A.   No.

02:00PM 4    Q.   And do you have any expectation to receive any funds from

02:00PM 5    them?

02:00PM 6    A.   No, I do not.

02:00PM 7    Q.   Have you had an expectation to receive funds after

02:00PM 8    March the 30th of 2012?

02:00PM 9    A.   No.

02:00PM 10            MR. FREEH:  Can I ask a follow-up question?

02:00PM 11            MS. PIERSON:  Sure.

02:00PM 12            MR. FREEH:  With respect to counsel's last questions,

02:00PM 13   has your husband, to your knowledge, receive any compensation

02:00PM 14   with respect to the *Thonn* claim referral after March 12th?

02:00PM 15            THE WITNESS:  Not to my knowledge.

02:00PM 16            MR. FREEH:  Did you ever ask him?

02:00PM 17            THE WITNESS:  Well, we didn't discuss it after this

02:00PM 18   all arose.  You know, I know what's alleged.  You know, I read

02:01PM 19   the e-mail and I know what -- the e-mails, and I know what the

02:01PM 20   speculations are.  But we've decided not to discuss it since

02:01PM 21   this whole situation arose.

02:01PM 22   BY MS. PIERSON:

02:01PM 23   Q.   I want to be clear about that, too, that you have -- you

02:01PM 24   have, as a result of this investigation and allegations and so

02:01PM 25   forth that have been going on for two months now, about two

**C O N F I D E N T I A L**

02:01PM 1    months, you have seen a lot of e-mails that have provided you

02:01PM 2    with information.

02:01PM 3             And my question is:  With regard to the *Thonn* fee,

02:01PM 4    which is discussed in some of those e-mails that I've seen, did

02:01PM 5    you know about that prior to seeing those e-mails recently?

02:01PM 6    A.   No.

02:01PM 7             MS. PIERSON:  Okay.

02:01PM 8                               EXAMINATION

02:01PM 9    BY MR. FREEH:

02:01PM 10   Q.   And it's your testimony that once you learned of it, you

02:01PM 11   never asked your husband about it?

02:01PM 12   A.   Not -- not did he receive a fee.

02:01PM 13   Q.   You never asked him the question?

02:01PM 14   A.   No.  We decided not to discuss it.

02:02PM 15   Q.   Tell me about the discussion when you decided not to

02:02PM 16   discuss it.  You must have had some communication.

02:02PM 17   A.   Yes, we did.  And we said we've both been retained by

02:02PM 18   attorneys, and we're going to treat this separately with --

02:02PM 19   separate people with separate issues.

02:02PM 20   Q.   When did you first retain your attorney?  Was it after you

02:02PM 21   left the employment temporarily?

02:02PM 22   A.   Yes.

02:02PM 23   Q.   So between the point that you retained counsel and --

02:02PM 24   A.   Between the point -- he told me that we did not receive

02:02PM 25   any fees -- we didn't receive any *BP* fees.

C O N F I D E N T I A L

SM-02-CR00855

| | | |
|---|---|---|
| 02:02PM | 1 | Q.   Well, okay.  That's a different question. |
| 02:02PM | 2 | When did he make the statement, "We did not receive |
| 02:02PM | 3 | any," to use your words, "*BP* fees"? |
| 02:02PM | 4 | A.   I guess maybe when I first asked him about the e-mails. |
| 02:02PM | 5 | Q.   So you did ask him about the e-mails? |
| 02:02PM | 6 | A.   Oh, yeah.  He walked through them with me. |
| 02:02PM | 7 | Q.   Can you tell us about that. |
| 02:02PM | 8 | A.   I thought I already went through it with you. |
| 02:02PM | 9 | Q.   You did. |
| 02:03PM | 10 | A.   We talked about the possibility that -- what it meant -- |
| 02:03PM | 11 | first of all, he talked about the VOO fee and talked about how |
| 02:03PM | 12 | that was something that settled before he began work on the |
| 02:03PM | 13 | program. |
| 02:03PM | 14 | We talked about the way he was inquiring -- asking |
| 02:03PM | 15 | Glen to pay the obligations, and if he was to use money, you |
| 02:03PM | 16 | know -- if he didn't have money, you know, that to maybe use |
| 02:03PM | 17 | the *Casey Thonn* money to pay his salary obligations.  And that |
| 02:03PM | 18 | was the extent of it. |
| 02:03PM | 19 | Q.   So this was before you both retained counsel? |
| 02:03PM | 20 | A.   Yes. |
| 02:03PM | 21 | Q.   So in those conversations, did he, in fact, tell you that |
| 02:03PM | 22 | he would contact Lerner for payment on his salary when he would |
| 02:04PM | 23 | learn that payments were being made on a separate claim? |
| 02:04PM | 24 | A.   No. |
| 02:04PM | 25 | Q.   He did not tell you that? |

**C O N F I D E N T I A L**

02:04PM 1    A.    No.

02:04PM 2    Q.    Did you ask him about that in the e-mails as it was

02:04PM 3    referenced?

02:04PM 4    A.    Generally, what he said to me was, "I always told Glen,

02:04PM 5    you know, you're behind."  And Glen would always tell me, "I'm

02:04PM 6    waiting for such and such to settle.  I'm waiting for this to

02:04PM 7    settle."  He said, that was always the relationship.

02:04PM 8          You know, and Mr. Lerner has offices all over the

02:04PM 9    country.  He has a huge practice.  And he said that was always

02:04PM 10   kind of their discussion.

02:04PM 11         "You owe money to the account."

02:04PM 12         "Oh, I'm waiting for this."

02:04PM 13   Q.    Do you maintain separate or joint bank accounts?

02:04PM 14   A.    We have a joint bank account that's our personal bank

02:04PM 15   account.

02:04PM 16   Q.    Were the salary payments from Lerner that were made

02:05PM 17   deposited into that account?

02:05PM 18   A.    No.

02:05PM 19   Q.    Do you know where they were?

02:05PM 20   A.    He has a separate account for the business.

02:05PM 21   Q.    Have you ever looked at statements for that account?

02:05PM 22   A.    No.

02:05PM 23   Q.    Have you ever asked to look at statements for that

02:05PM 24   account?

02:05PM 25   A.    No.

**C O N F I D E N T I A L**

SM-02-CR00857

153

| | | |
|---|---|---|
| 02:05PM | 1 | MR. TIDWELL:  To clarify, what account is that for? |
| 02:05PM | 2 | THE WITNESS:  Crown. |
| 02:05PM | 3 | MR. FREEH:  Anything else? |
| 02:05PM | 4 | Okay.  So we're going to make a request, you |
| 02:05PM | 5 | don't have to respond to it now, but we're going to request |
| 02:05PM | 6 | your client to provide us, for our review, a copy of their |
| 02:05PM | 7 | jointly-filed tax returns for the last three years. |
| 02:05PM | 8 | MS. PIERSON:  No problem. |
| 02:05PM | 9 | MR. FREEH:  You can consider that.  Okay. |
| 02:05PM | 10 | Very well. |
| 02:05PM | 11 | MS. PIERSON:  The only problem is getting them.  I |
| 02:05PM | 12 | mean, you can have them.  I guess they can -- I haven't |
| 02:05PM | 13 | discussed that with them. |
| 02:05PM | 14 | MR. FREEH:  Well, why don't you discuss it with her. |
| 02:05PM | 15 | MS. PIERSON:  I mean, I just don't know -- if you |
| 02:05PM | 16 | wanted my tax returns for the last three years, I know exactly |
| 02:05PM | 17 | where they are.  I just don't know where theirs are. |
| 02:06PM | 18 | MR. FREEH:  You can discuss that.  We don't need an |
| 02:06PM | 19 | answer today. |
| 02:06PM | 20 | Anything else, Counsel, you wish to put on the |
| 02:06PM | 21 | record?  Or, Ms. Reitano, anything else you want to say or put |
| 02:06PM | 22 | on the record? |
| 02:06PM | 23 | MS. PIERSON:  There's a lot I would like to say. |
| 02:06PM | 24 | THE WITNESS:  Let's leave it at that. |
| 02:06PM | 25 | MS. PIERSON:  I'm just going to wait for your report |

**C O N F I D E N T I A L**

SM-02-CR00858

02:06PM   1    and get my indemnity from BP for much ado about nothing --

02:06PM   2    well, with regard to her.

02:06PM   3              MR. FREEH:  Okay.  Thank you very much.

02:06PM   4              MR. TIDWELL:  We will mention that you're not

02:06PM   5    adjourned.  We might have to recall you.

02:06PM   6              MS. PIERSON:  Not a problem.

02:06PM   7              MR. TIDWELL:  Thank you, ma'am.

02:06PM   8              MR. FREEH:  Okay.  Thank you.

        9              (WHEREUPON, the proceedings at 2:06 p.m. were

       10    concluded.)

       11                           *    *    *

       12

       13

       14                    REPORTER'S CERTIFICATE

       15

       16        I, Cathy Pepper, Certified Realtime Reporter, Registered
            Merit Reporter, Certified Court Reporter of the State of
       17    Louisiana, Official Court Reporter for the United States
            District Court, Eastern District of Louisiana, do hereby
       18    certify that the foregoing is a true and correct transcript to
            the best of my ability and understanding from the record of the
       19    proceedings in the above-entitled and numbered matter.

       20                            s/Cathy Pepper
                                     _____
       21                            Cathy Pepper, CRR, RMR, CCR
                                     Certified Realtime Reporter
       22                            Registered Merit Reporter
                                     Official Court Reporter
       23                            United States District Court
                                     Cathy_Pepper@laed.uscourts.gov

       24

       25

                              **C O N F I D E N T I A L**

SM-02-CR00859

**$**

$10,000 [3] - 110:17, 110:24, 110:25
$20,000 [1] - 24:9

**0**

01 [2] - 112:7, 112:9
01..........
.......... [1] - 3:2
02 [4] - 69:2, 69:4, 69:5, 71:13
02..........
.......... [1] - 2:18
02A [3] - 74:25, 75:5, 75:6
02A..........
.......... [1] - 2:19
02B [6] - 57:3, 57:4, 57:6, 58:7, 60:6, 67:9
02B..........
.......... [1] - 2:14
02D [4] - 59:21, 59:23, 60:24, 61:4
02D..........
.......... [1] - 2:15
02D1 [2] - 61:7, 61:11
02D1..........
.......... [1] - 2:16
03 [5] - 62:24, 63:1, 63:2, 63:4, 65:18
03..........
.......... [1] - 2:17
04 [6] - 76:20, 76:25, 77:1, 77:14, 82:1, 125:13
04..........
.......... [1] - 2:20
04A [7] - 83:15, 83:17, 83:18, 83:23, 124:24, 125:2, 125:9
04A..........
.......... [1] - 2:21
05 [4] - 86:20, 86:24, 87:3, 94:20
05..........
.......... [1] - 2:22
05A [5] - 92:9, 92:10, 92:12, 92:13, 94:18
05A..........
.......... [1] - 2:23
05B [5] - 93:9, 93:12, 93:14, 93:15, 93:20
05B..........
.......... [1] - 2:24
06 [3] - 95:11, 95:13, 95:14
06..........
.......... [1] - 2:25
06A [3] - 95:17, 95:20, 96:3
06A..........
.......... [1] - 3:1
07 [5] - 133:24, 134:1, 134:5, 134:9, 134:17
07..........
.......... [1] - 3:3
07A [2] - 135:22, 135:24
07A..........
.......... [1] - 3:5
08 [3] - 134:13, 134:15, 134:18
08..........
.......... [1] - 3:4
09 [2] - 136:8, 136:15
09..........
.......... [1] - 3:6

**1**

1 [3] - 63:2, 63:21, 82:15
10 [7] - 3:7, 83:3, 125:13, 126:7, 137:17, 137:19, 138:8
10-MD-2179 [1] - 1:6
10/11/11 [1] - 71:14
10/14/11 [2] - 69:7, 71:14
100 [1] - 39:20
100051739 [1] - 134:22
1001 [1] - 5:4
10:00 [1] - 1:7
11 [9] - 3:7, 86:20, 87:14, 88:10, 91:19, 92:14, 136:1, 137:19, 139:5
11-year-old [1] - 9:5
110 [1] - 141:2
11004 [1] - 4:10
111 [1] - 140:3
112 [1] - 3:2
11th [2] - 87:1, 87:9
12 [4] - 137:17, 137:19, 143:10, 143:11
12..........
.. [1] - 3:7
12th [1] - 149:14
13 [4] - 144:9, 144:11, 146:17, 146:22
13..........
.......... [1] - 3:8
134 [2] - 3:3, 3:4
135 [1] - 3:5
136 [1] - 3:6
137 [1] - 3:7
14 [5] - 71:22, 134:17, 144:9, 147:6, 147:9
14..........
.......... [1] - 3:9
1402 [1] - 125:21
1407 [1] - 82:17
146 [2] - 2:6, 3:8
14647 [2] - 1:17, 4:12
147 [1] - 3:9
148 [1] - 3:10
15 [3] - 9:4, 148:12, 148:15
15..........
.......... [1] - 3:10
150 [1] - 2:7
16 [4] - 9:4, 147:20, 147:22, 148:4
17 [5] - 76:22, 77:2, 77:16, 77:22, 82:15
17th [4] - 61:14, 61:16, 62:12, 78:3
18 [2] - 5:4, 60:14
18th [3] - 60:2, 60:18, 60:22
1988 [1] - 13:7
1989 [1] - 13:7
1990 [1] - 18:15
1991 [1] - 6:7
1994 [1] - 6:25
1997 [1] - 8:20
19th [1] - 20:22
1st [2] - 47:4, 65:6

**2**

2 [6] - 69:2, 82:15, 83:5, 83:6, 87:14, 139:7
20 [6] - 1:5, 95:18, 95:25, 105:21, 105:22, 107:18
200 [5] - 34:13, 38:10, 38:11, 39:15, 40:8
2002 [1] - 8:8
2007 [1] - 8:15
2008 [2] - 8:15, 12:22
2009 [1] - 12:22
2010 [8] - 1:5, 15:9, 72:3, 91:4, 99:19, 99:20, 103:10, 143:16
2011 [4] - 14:17, 71:22, 72:3, 148:4
2012 [25] - 14:17, 15:10, 15:11, 15:12, 20:2, 60:4, 60:14, 61:4, 61:16, 62:12, 63:2, 63:21, 75:1, 76:22, 77:2, 77:16, 77:22, 89:11, 101:23, 134:17, 134:21, 136:1, 146:25, 148:25, 149:8
14..........
.......... [1] - 3:9
2013 [25] - 1:7, 4:2, 86:20, 87:9, 87:10, 87:15, 88:10, 88:11, 89:10, 91:19, 92:10, 92:14, 92:21, 93:10, 93:16, 93:21, 94:2, 94:19, 95:15, 95:18, 95:25, 105:21, 105:22, 107:18, 136:18
20th [1] - 112:6
225 [1] - 4:13
2251 [1] - 82:17
240 [2] - 110:8, 110:11
25 [3] - 100:23
26 [1] - 136:18
28 [2] - 93:16, 93:21
29 [2] - 1:7, 4:2
2:06 [1] - 154:9
2:40 [1] - 82:15

**3**

3 [3] - 77:13, 82:1, 83:2
30 [1] - 134:20
300 [2] - 110:22, 125:23
30th [4] - 75:1, 146:25, 148:25, 149:8
332 [1] - 136:23
35 [1] - 147:18

**4**

4 [3] - 95:15, 124:19, 124:21
40 [1] - 81:14
400 [5] - 34:15, 38:10, 38:11, 39:15, 40:8
45 [1] - 21:17
4K [3] - 141:8, 141:9, 141:16

**5**

5 [5] - 2:4, 2:5, 57:14, 58:18, 67:10

**500** [1] - 1:22
504 [1] - 1:23
5494 [1] - 142:12
57 [1] - 2:14
589-7779 [1] - 1:23
59 [1] - 2:15

**6**

60 [1] - 81:13
61 [1] - 2:16
610 [13] - 9:24, 12:4, 12:19, 13:2, 104:9, 133:10, 133:12, 139:16, 139:24, 147:22, 147:23, 147:24, 148:5
63 [1] - 2:17
69 [1] - 2:18

**7**

7 [1] - 91:6
70130 [1] - 1:22
70809 [2] - 1:18, 4:12
70898 [1] - 4:13
75 [1] - 2:19
76 [1] - 2:20

**8**

828 [3] - 104:1, 104:5, 104:11
83 [1] - 2:21
86 [1] - 2:22
8702 [1] - 4:11

**9**

9 [4] - 57:14, 58:19, 67:10, 147:17
92 [1] - 2:23
927-6765 [1] - 4:13
93 [1] - 2:24
935 [3] - 14:16, 147:19, 148:5
95 [2] - 2:25, 3:1

**A**

A.M [1] - 1:7
abiding [1] - 70:2
ability [2] - 5:10, 154:18
able [8] - 15:25, 37:22, 85:1, 88:7, 89:5,

90:1, 130:9, 130:13
above-entitled [1] - 154:18
absolutely [9] - 21:5, 26:4, 30:11, 32:9, 35:18, 61:5, 69:12, 112:22
academic [1] - 10:22
academically [1] - 25:21
accident [1] - 106:18
accompanied [1] - 72:24
accomplish [2] - 53:25, 107:3
account [10] - 95:8, 111:5, 152:11, 152:14, 152:15, 152:17, 152:20, 152:21, 152:24, 153:1
accountant [1] - 15:21
accountants [5] - 29:3, 35:4, 79:24, 106:25, 130:11
accounting [3] - 28:22, 40:1
accounts [2] - 93:23, 152:13
acronym [1] - 94:16
action [7] - 7:25, 11:1, 11:4, 11:7, 11:13, 48:23, 84:19
ACTION [1] - 1:6
actions [3] - 10:18, 11:15, 59:4
actively [4] - 16:14, 113:12, 114:17, 119:8
activities [2] - 66:7, 70:6
activity [2] - 58:22, 67:10
actual [1] - 126:14
add [2] - 36:15
added [2] - 146:13
addition [3] - 53:8, 79:12, 123:24
additional [1] - 91:23
additions [1] - 39:24
address [13] - 4:12, 29:24, 104:7, 126:9, 133:15, 136:23, 139:16, 140:3, 140:5, 141:2, 142:13, 148:7, 148:8
addressed [4] - 134:21, 146:22, 147:17, 148:15
addressing [3] - 35:8,

78:3
adds [1] - 93:1
adjoining [1] - 20:11
adjourned [1] - 154:5
adjudication [1] - 39:8
administerial [1] - 40:5
administration [31] - 4:19, 6:2, 32:11, 51:24, 52:20, 53:11, 54:5, 55:3, 70:1, 70:8, 70:20, 70:23, 71:4, 74:15, 75:14, 75:23, 75:25, 76:6, 96:24, 106:21, 112:20, 114:23, 116:21, 121:22, 122:9, 122:10, 122:19, 138:2, 142:22, 147:2, 149:1
administrative [1] - 15:18
administrator [18] - 10:15, 15:4, 25:18, 29:18, 51:19, 58:22, 74:4, 74:13, 96:10, 113:24, 133:3, 133:16, 136:25, 137:3, 138:17, 139:1, 144:21, 145:7
Administrator [2] - 57:9, 58:9
administrator's [5] - 20:25, 42:13, 50:15, 66:5, 107:13
ado [1] - 154:1
advance [3] - 29:11, 30:21, 80:3
advertise [1] - 102:20
advertisement [1] - 103:6
advertising [2] - 98:24, 120:13
advice [5] - 28:4, 28:10, 30:5, 30:8, 39:10
advise [1] - 4:22
advising [1] - 117:6
affiliation [1] - 8:3
agencies [1] - 70:5
agendas [1] - 132:17
agent [3] - 139:12, 140:24, 142:1
aggravated [1] - 91:17
ago [2] - 85:3, 103:10
agree [3] - 24:11, 24:13, 37:4
agreed [3] - 38:4,

84:11, 139:3
Agreement [1] - 61:9
agreement [33] - 22:11, 22:23, 25:8, 26:14, 26:18, 26:21, 26:23, 27:14, 27:17, 27:23, 28:10, 28:18, 29:17, 29:25, 30:4, 30:9, 30:15, 30:16, 30:18, 30:19, 31:6, 32:6, 33:22, 40:4, 52:25, 53:1, 56:25, 78:22, 79:23, 145:9, 145:11, 145:15, 147:10
ahead [5] - 14:4, 37:7, 79:15, 85:25
alike [1] - 91:11
ALL [1] - 1:8
allegations [3] - 4:19, 127:12, 149:24
alleged [1] - 149:18
allocate [1] - 42:3
almost [3] - 39:8, 66:9, 123:14
alone [1] - 141:1
altogether [1] - 93:10
amends [1] - 120:19
amount [1] - 130:19
analysis [3] - 29:2, 56:3
analyze [4] - 25:12, 30:5, 32:23, 128:24
Andry [56] - 11:16, 11:18, 12:2, 13:10, 13:12, 13:19, 13:20, 88:19, 90:4, 90:5, 90:6, 90:7, 90:12, 90:13, 91:9, 91:13, 97:4, 97:5, 97:12, 97:22, 99:23, 100:6, 100:9, 102:9, 103:19, 103:23, 103:24, 103:25, 104:14, 104:18, 104:20, 104:21, 104:24, 114:18, 115:11, 115:12, 119:18, 119:20, 120:1, 121:7, 121:8, 133:4, 133:11, 133:13, 133:14, 134:6, 134:19, 134:20, 135:5, 135:8, 136:22
Andry's [2] - 11:22, 97:9
animosity [3] - 129:11, 129:16, 129:22

answer [11] - 25:23, 26:2, 54:7, 90:16, 90:17, 90:19, 102:23, 123:21, 134:25, 135:4, 153:19
answers [1] - 36:20
anticipated [1] - 127:25
anticipating [1] - 24:25
anyway [2] - 103:12, 136:20
apart [1] - 54:22
apostrophe [1] - 16:22
appeals [1] - 31:19
appear [3] - 58:22, 59:9, 67:11
appearance [4] - 59:11, 59:12, 59:17, 67:16
APPEARANCES [1] - 1:13
appeared [1] - 106:17
Appendix [1] - 60:24
application [2] - 37:8, 37:16
applies [1] - 53:9
appointed [6] - 15:3, 15:13, 23:14, 31:18, 129:4, 130:23
appointing [1] - 4:17
Appointing [2] - 57:8, 58:9
appropriate [1] - 70:2
approval [4] - 22:24, 26:18, 58:21, 78:23
approvals [1] - 126:20
approved [1] - 34:14
approximate [1] - 39:18
APRIL [1] - 1:5
April [5] - 27:7, 27:19, 60:14, 60:18, 60:22
area [3] - 18:20, 35:25, 49:9
areas [3] - 29:20, 30:14, 64:14
argue [2] - 7:14, 25:23
arguing [2] - 7:13, 10:21
argument [1] - 32:23
arise [1] - 56:12
arising [1] - 52:8
arose [3] - 54:9, 149:18, 149:21
arrangements [1] - 115:19
articulate [1] - 26:6

Ashley [1] - 142:1
aside [1] - 107:14
aspects [4] - 4:18, 29:8, 35:2, 35:13
assemble [1] - 80:22
assigned [1] - 18:23
assigning [1] - 122:8
assignments [3] - 9:11, 10:16, 11:9
assist [3] - 10:24, 21:6, 94:4
assistance [1] - 72:5
assistant [1] - 41:24
assisting [2] - 7:8, 74:17
associate [4] - 18:16, 18:18, 19:2, 19:12
associated [7] - 19:6, 90:2, 120:8, 134:9, 136:3, 142:4, 142:6
assume [7] - 20:3, 28:21, 50:10, 61:22, 62:20, 71:7, 82:3
assumed [7] - 19:17, 55:16, 105:3, 133:23, 144:18, 145:11
assuming [2] - 125:8, 144:19
AT [1] - 1:17
attach [2] - 36:13, 37:22
attached [4] - 57:16, 125:13, 145:20, 147:8
attaching [1] - 126:2
attachment [13] - 81:3, 82:6, 82:8, 83:8, 83:9, 83:23, 84:5, 84:11, 84:13, 84:15, 125:23
attachments [3] - 76:21, 77:4, 77:7
attempted [1] - 143:24
attend [1] - 64:21
attention [9] - 58:18, 59:8, 62:3, 67:7, 70:12, 70:15, 77:13, 94:18, 122:23
attorney [37] - 6:12, 6:14, 11:16, 17:4, 22:6, 22:8, 25:2, 25:15, 31:11, 31:12, 36:1, 42:8, 43:16, 59:5, 59:13, 59:14, 59:15, 63:6, 65:17, 66:25, 77:8, 84:17, 87:19, 87:21, 89:9, 89:20, 93:23, 95:8, 98:22, 114:8,

3

114:11, 117:4, 117:6, 119:9, 142:18, 150:20
**ATTORNEY** [2] - 1:17, 1:18
**attorneys** [19] - 19:4, 26:19, 27:5, 29:3, 33:8, 38:15, 41:20, 42:4, 53:9, 54:22, 54:23, 55:2, 55:4, 64:20, 77:20, 77:21, 84:5, 84:23, 150:18
**attorneys'** [1] - 53:15
**auditing** [2] - 128:7, 129:8
**August** [1] - 134:17
**authority** [1] - 5:1
**Authorization** [1] - 69:6
**authorization** [2] - 71:13, 71:18
**available** [2] - 136:2, 140:21
**avoid** [1] - 112:3
**avoidance** [1] - 59:16
**award** [1] - 80:12
**awards** [2] - 79:9, 89:18
**aware** [27] - 12:9, 71:1, 71:2, 73:7, 97:21, 108:23, 109:1, 116:21, 122:8, 122:18, 122:19, 122:22, 129:18, 133:2, 133:6, 133:10, 133:14, 134:8, 134:23, 134:25, 136:6, 137:25, 138:4, 138:7, 138:25, 142:21, 143:20

**B**

**Backer** [1] - 148:22
**Backes** [7] - 16:19, 16:20, 75:20, 148:23, 148:24
**BACKES** [1] - 16:20
**Backes'** [1] - 17:3
**backfill** [1] - 37:19
**backfilled** [1] - 37:20
**backfilling** [1] - 38:1
**background** [4] - 5:23, 85:5, 132:7, 146:9
**backgrounds** [1] - 146:10

**backing** [1] - 78:23
**backlog** [1] - 130:12
**bad** [1] - 27:2
**Baden** [1] - 27:6
**Bakeses** [1] - 72:4
**balanced** [1] - 26:12
**bank** [4] - 29:3, 152:13, 152:14
**Bar** [1] - 4:10
**bar** [2] - 6:8, 16:21
**Barbier** [1] - 123:22
**Baronne** [12] - 9:24, 12:4, 103:23, 104:1, 104:5, 104:9, 133:10, 133:12, 139:16, 139:24, 147:20, 148:5
**basis** [16] - 6:16, 7:1, 8:14, 29:19, 36:25, 48:11, 64:1, 64:20, 79:25, 85:10, 85:12, 85:13, 85:14, 109:2, 109:12, 110:7
**basket** [1] - 70:14
**Baton** [2] - 4:11, 4:13
**BATON** [1] - 1:18
**became** [8] - 34:17, 36:23, 38:8, 79:17, 90:12, 93:4, 99:22, 131:13
**become** [1] - 130:11
**becomes** [1] - 99:12
**BEFORE** [1] - 1:11
**began** [10] - 6:25, 28:13, 34:15, 37:1, 50:13, 78:17, 112:1, 123:6, 127:14, 151:12
**begin** [1] - 147:2
**beginning** [4] - 31:23, 45:24, 97:15, 127:22
**begun** [1] - 78:21
**behalf** [3] - 16:21, 68:21, 115:3
**behavior** [1] - 59:4
**behind** [10] - 20:19, 77:5, 81:4, 81:6, 81:8, 81:17, 83:4, 125:23, 127:2, 152:5
**BEL** [9] - 33:10, 39:25, 40:5, 40:6, 40:11, 40:13, 91:4, 91:14, 96:15
**Belden** [1] - 142:7
**BELDEN** [1] - 142:7
**believes** [1] - 107:20
**bell** [2] - 140:4, 140:5
**BellSouth** [1] - 12:7
**BellSouth-Centennial** [1] - 12:7

**best** [8] - 11:23, 19:5, 26:2, 79:24, 85:3, 125:1, 154:18
**better** [3] - 129:2, 129:7, 132:3
**between** [19] - 19:10, 24:17, 80:16, 93:4, 93:22, 98:18, 102:22, 133:3, 138:22, 150:23, 150:24
**beyond** [4] - 33:2, 53:1, 115:24, 115:25
**big** [8] - 29:3, 35:20, 39:2, 42:19, 44:6, 79:5, 116:24, 132:8
**bigger** [4] - 85:15, 99:3, 99:6, 101:2
**bigger-than-life** [1] - 99:6
**biggest** [1] - 78:25
**binder** [1] - 36:25
**bit** [1] - 50:22
**Bizapedia** [1] - 136:1
**blah** [2] - 130:20
**blow** [1] - 130:4
**Blue** [3] - 142:5, 142:9, 143:4
**board** [8] - 30:5, 34:11, 48:20, 56:22, 76:5, 96:24, 144:17, 145:22
**boat** [7] - 42:18, 117:15, 117:16, 142:2, 142:3, 143:5
**Bob** [2] - 19:25, 132:5
**body** [1] - 55:11
**booklets** [3] - 28:25, 33:18, 78:14
**borne** [1] - 39:9
**borrowed** [1] - 55:11
**bottom** [2] - 147:14, 148:8
**Boudreaux** [2] - 102:7, 102:8
**bought** [2] - 12:1, 12:15
**BOX** [1] - 1:17
**Box** [1] - 4:12
**boy** [1] - 15:4
**boys** [1] - 9:1
**BP** [14] - 14:20, 15:22, 37:6, 37:17, 59:7, 89:19, 91:16, 94:3, 97:19, 145:21, 149:2, 150:25, 151:3, 154:1
**BP's** [1] - 34:4
**BP-related** [2] - 15:22, 59:7

**break** [8] - 48:14, 69:11, 69:13, 69:17, 71:12, 121:10, 124:9, 124:13
**breast** [1] - 8:1
**brief** [5] - 29:20, 31:3, 69:14, 123:13, 124:10
**briefed** [1] - 41:6
**bring** [4] - 42:24, 45:16, 55:7, 100:18
**bringing** [2] - 29:11, 45:17
**brings** [1] - 117:17
**brother** [3] - 13:24, 91:2, 140:18
**brothers** [2] - 90:8, 90:21, 104:3
**brought** [10] - 19:20, 35:7, 39:7, 56:22, 70:12, 70:15, 114:8, 130:1, 144:17
**Brown** [2] - 29:4, 36:22
**BrownGreer** [19] - 28:22, 28:23, 33:17, 34:1, 35:3, 37:8, 40:17, 77:2, 78:11, 80:17, 82:6, 84:7, 127:8, 129:23, 130:13, 130:15, 130:18, 131:2, 131:6
**BrownGreer's** [1] - 38:15
**brunt** [1] - 31:23
**build** [4] - 37:8, 98:19, 99:13, 100:17
**building** [20] - 12:1, 12:4, 12:16, 12:17, 12:19, 12:22, 13:1, 13:2, 14:16, 14:21, 20:16, 20:17, 20:21, 64:19, 97:14, 100:2, 100:7, 120:5, 130:8
**built** [2] - 37:16, 100:18
**bump** [1] - 134:2
**business** [34] - 36:1, 42:15, 44:24, 47:16, 70:3, 79:12, 97:22, 97:25, 98:15, 98:19, 107:8, 109:9, 110:7, 115:10, 115:19, 116:1, 123:4, 123:10, 127:24, 128:19, 129:1, 129:14, 129:17, 129:21, 131:2, 137:20, 137:21, 139:4, 139:5, 141:2,

145:4, 152:20
**business-generated** [1] - 139:5
**businesses** [3] - 42:17, 121:18, 145:6
**busy** [4] - 23:12, 41:21, 41:23, 114:13
**BY** [56] - 1:4, 1:24, 1:25, 2:5, 2:6, 2:7, 5:17, 12:18, 13:15, 13:23, 45:18, 48:19, 54:3, 57:10, 58:6, 60:1, 60:17, 61:3, 61:12, 62:7, 63:19, 69:18, 74:1, 75:9, 75:22, 77:6, 81:24, 84:9, 86:18, 87:13, 88:16, 90:10, 91:18, 93:19, 94:17, 96:4, 99:14, 104:6, 106:10, 112:10, 119:16, 121:9, 132:24, 134:4, 134:16, 135:17, 135:23, 136:16, 137:18, 144:13, 146:19, 147:7, 148:2, 148:13, 149:22, 150:9

**C**

**CA** [1] - 78:15
**CA's** [2] - 37:18, 122:1
**CAC** [1] - 78:15
**CACs** [1] - 28:25
**Cajun** [1] - 19:24
**callers** [1] - 64:15
**Calvin** [1] - 26:20
**candidate** [1] - 65:14
**cannot** [2] - 79:8, 86:9
**CAO** [12] - 118:16, 118:21, 118:23, 123:1, 123:4, 123:9, 127:14, 127:15, 127:19, 131:15, 146:9
**capital** [2] - 98:19, 100:25
**capitalizing** [1] - 138:23
**caps** [1] - 62:8
**car** [1] - 86:12
**care** [3] - 111:10, 132:11, 132:12
**Caroline** [1] - 102:7
**case** [13] - 8:2, 12:7, 49:22, 74:6, 74:7, 86:7, 97:1, 97:10,

114:10, 114:13,
130:6, 133:22
cases [8] - 6:16, 12:5,
12:6, 15:23, 106:18,
120:5, 133:23, 135:1
CASES [1] - 1:8
Casey [21] - 16:19,
16:23, 69:6, 71:24,
72:6, 74:23, 75:2,
75:20, 81:2, 97:4,
97:8, 104:21, 126:5,
133:21, 134:22,
135:5, 136:22,
136:23, 146:22,
151:17
casual [1] - 23:8
catch [3] - 118:22,
130:9, 130:13
CATHY [1] - 1:20
Cathy [3] - 34:21,
154:15, 154:20
cathy_Pepper@laed.
uscourts.gov [1] -
1:23
Cathy_Pepper@laed
.uscourts.gov [1] -
154:23
caucus [1] - 124:9
causation [1] - 29:1
CCR [2] - 1:20, 154:20
celebrity [1] - 99:4
Centennial [1] - 12:7
Center [2] - 134:22,
136:9
center [1] - 64:13
centers [1] - 78:15
CEO [6] - 44:5, 45:8,
45:10, 132:12,
144:21, 145:7
certain [8] - 35:2,
81:23, 110:18,
110:19, 113:12,
116:8, 139:1, 139:2
certainly [2] - 22:23,
121:11
CERTIFICATE [1] -
154:14
certification [1] -
59:20
Certification [1] - 61:1
Certified [3] - 154:15,
154:16, 154:21
CERTIFIED [1] - 1:21
certify [1] - 154:17
change [2] - 129:1,
148:8
changed [2] - 10:1,
148:7
changes [3] - 39:23,
40:10, 51:3

character [1] - 107:21
charge [1] - 33:11
charged [3] - 22:12,
30:8, 41:16
Charles [3] - 6:15,
136:23, 140:13
charles.r.hacker@
uspwc.com [1] -
96:1
chart [4] - 83:18,
125:2, 126:19, 127:9
check [7] - 89:3,
114:12, 115:6,
123:15, 126:18,
135:5, 144:16
checking [1] - 85:8
checks [1] - 126:15
Chevron [1] - 20:18
children [4] - 7:20,
9:1, 141:10, 141:11
Chris [1] - 36:11
Christine [8] - 4:6,
57:8, 63:3, 87:2,
93:16, 97:9, 147:17,
147:19
CHRISTINE [4] - 1:10,
1:18, 2:4, 5:12
Christmas [1] - 17:25
Cirami [8] - 86:25,
87:15, 87:16, 92:13,
93:17, 93:22, 94:7,
94:21
circumstances [1] -
4:20
circus [1] - 130:5
City [18] - 28:22,
63:12, 63:25, 64:4,
64:19, 64:23, 67:22,
68:5, 77:3, 80:10,
80:18, 80:21, 87:1,
87:17, 92:14,
125:14, 127:8
City's [1] - 127:4
civil [3] - 118:7, 119:3,
119:5
CIVIL [1] - 1:6
Claim [1] - 95:16
claim [68] - 4:18,
16:21, 17:11, 28:17,
28:24, 39:2, 39:3,
39:6, 39:9, 46:9,
49:22, 50:12, 72:6,
72:13, 72:20, 72:25,
73:3, 73:4, 73:5,
73:6, 73:14, 74:18,
74:22, 74:24, 75:3,
78:14, 79:16, 80:18,
80:23, 81:16, 83:4,
83:19, 84:19, 85:9,
88:23, 88:24, 89:6,

89:14, 89:17, 90:23,
91:4, 91:7, 91:14,
91:21, 91:24, 92:3,
92:4, 96:22, 97:1,
97:2, 104:13,
104:25, 105:15,
116:14, 118:8,
118:9, 118:21,
118:23, 135:12,
135:13, 135:14,
137:5, 142:21,
149:14, 151:23
Claimant [2] - 134:22,
136:9
claimant [10] - 28:19,
71:20, 87:20, 89:9,
89:12, 91:1, 91:3,
91:11, 136:21
claimant's [3] - 25:15,
137:12, 137:14
claimant-type [1] -
91:1
claimants [5] - 76:7,
83:19, 105:6, 105:8,
125:7
claims [104] - 6:2,
10:15, 16:25, 17:3,
20:25, 25:10, 29:18,
29:25, 31:19, 32:10,
32:21, 33:17, 38:22,
38:24, 39:1, 50:15,
51:8, 51:18, 51:24,
52:20, 53:10, 58:21,
58:25, 59:5, 59:7,
59:20, 66:5, 67:14,
70:1, 70:19, 70:22,
72:12, 72:21, 73:2,
74:3, 74:13, 74:15,
75:13, 75:23, 75:25,
77:4, 78:10, 78:20,
79:1, 79:14, 79:19,
79:21, 79:25, 80:2,
80:7, 80:25, 81:4,
81:6, 81:8, 81:11,
82:5, 82:17, 82:21,
96:9, 97:18, 102:25,
105:4, 106:20,
107:12, 112:20,
113:12, 113:22,
113:23, 113:24,
113:25, 114:1,
114:2, 114:4,
114:17, 114:22,
116:8, 116:21,
117:23, 121:22,
122:8, 122:10,
122:19, 125:23,
126:3, 126:9, 127:2,
133:15, 135:15,
136:25, 137:3,

138:2, 138:17,
139:1, 142:22,
144:21, 145:7,
147:2, 149:1, 149:2
Claims [8] - 57:9,
58:9, 61:1, 69:6,
75:7, 77:4, 134:21,
136:9
clarification [2] -
117:22, 135:11
clarify [1] - 153:1
class [15] - 7:25,
10:18, 11:1, 11:4,
11:7, 11:13, 11:15,
11:19, 34:4, 35:1,
35:6, 37:6, 37:17,
84:18
class-action [4] -
7:25, 11:1, 11:4,
11:13
clean [1] - 98:13
cleanup [1] - 38:8
clear [2] - 89:25,
149:23
clearly [1] - 137:4
Client [1] - 69:6
client [19] - 48:23,
71:13, 71:24, 72:1,
72:2, 72:8, 72:9,
72:10, 73:8, 73:9,
83:21, 84:18, 88:21,
119:17, 124:14,
134:10, 143:17,
153:6
clients [15] - 10:25,
11:1, 15:24, 16:2,
16:7, 16:11, 16:15,
91:1, 91:2, 91:3,
91:11, 91:12,
102:20, 114:22,
148:20
close [2] - 108:12,
141:19
Co [1] - 140:23
Coast [2] - 69:5, 75:7
code [13] - 51:24,
52:12, 52:18, 52:20,
53:1, 53:8, 53:13,
53:14, 54:1, 54:18,
54:21, 145:23
coercing [1] - 113:8
coincidence [2] -
20:25, 21:4
coincidentally [1] -
121:14
collaborate [3] -
39:19, 40:10, 40:13
collaborated [3] -
38:18, 39:16, 40:12
collaborating [1] -

39:23
collaboration [1] -
38:14
colleagues [2] - 70:8,
121:18
collect [2] - 111:14,
111:18
college [2] - 5:24, 6:3
coming [7] - 18:3,
76:5, 85:6, 128:24,
128:25, 131:10
comments [1] - 37:23
commercials [1] -
98:25
committed [1] - 44:24
Committee [1] - 11:6
common [2] - 8:21
commonly [1] - 10:10
communication [3] -
66:22, 78:3, 150:16
communications [2] -
26:11, 64:14
commute [1] - 17:23
company [14] - 42:18,
74:9, 98:2, 98:6,
100:24, 101:3,
110:24, 117:16,
117:18, 138:9,
138:24, 140:15,
142:6, 143:6
Company [1] - 140:15
company's [1] - 74:10
compass [1] - 107:20
compendium [2] -
38:2
compensation [2] -
149:2, 149:13
competing [1] - 39:7
complained [3] -
109:4, 109:6, 110:15
complaint [1] - 79:5
complaints [2] -
80:12, 130:16
complete [4] - 79:15,
116:18, 123:21
completely [1] - 36:19
completing [2] -
61:24, 62:22
complex [1] - 10:18
compliance [8] -
69:23, 69:25, 70:7,
70:14, 70:19, 70:24,
71:3
complying [1] - 70:9
component [1] - 80:8
components [1] - 80:5
computer [3] - 29:4,
34:23, 126:15
COMPUTER [1] - 1:25
concerned [3] - 47:11,

52:9, 101:12
concerning [1] - 32:3
concerns [2] - 29:20, 31:2
concluded [2] - 123:18, 154:10
condition [1] - 19:8
conduct [10] - 4:20, 51:24, 52:12, 53:9, 53:15, 54:21, 59:15, 59:16, 145:23, 146:10
conducted [1] - 4:16
conducts [1] - 52:12
conference [1] - 121:25
Confidential [1] - 61:8
confidentiality [2] - 59:20, 61:6
Confidentiality [1] - 61:1
Confidentiality/Non [1] - 61:8
Confidentiality/Non-Disclosure [1] - 61:8
confirm [1] - 126:1
confirming [1] - 75:1
Conflict [3] - 58:19, 62:2, 62:8
conflict [26] - 39:3, 49:18, 49:20, 58:24, 59:10, 59:11, 66:3, 66:5, 66:12, 66:15, 66:16, 66:17, 66:24, 67:2, 67:12, 67:16, 117:7, 119:1, 119:19, 121:11, 129:10, 131:3, 135:6, 135:7, 144:16, 145:9
conflicts [24] - 47:7, 47:24, 49:9, 49:10, 49:13, 50:15, 51:8, 52:24, 52:25, 53:1, 54:6, 54:15, 54:18, 54:21, 56:9, 56:10, 57:13, 59:16, 59:17, 70:3, 118:18, 127:16, 145:16
connection [5] - 4:17, 8:4, 10:13, 61:6, 75:2
consider [6] - 23:7, 64:11, 66:23, 118:17, 118:25, 153:9
considered [1] - 48:9
consistency [1] - 35:5
constant [1] - 58:19
construed [2] - 4:25,

5:4
contact [4] - 64:3, 77:23, 78:6, 151:22
contacted [1] - 114:8
contacts [1] - 4:8
contemplate [2] - 21:23, 30:21
contemporaneous [1] - 60:7
content [1] - 43:23
context [5] - 96:15, 108:1, 119:11, 126:4, 140:9
continue [1] - 116:15
continued [1] - 23:24
continuing [2] - 23:17, 74:21
continuity [1] - 35:5
contract [4] - 6:13, 14:22, 148:4, 148:9
contractor [1] - 76:16
contractors [1] - 68:20
contracts [1] - 32:3
conversation [20] - 24:5, 44:21, 49:11, 49:14, 50:2, 51:23, 52:3, 54:4, 55:6, 65:9, 67:22, 68:10, 69:1, 70:18, 88:2, 93:2, 93:4, 111:25, 115:16, 119:24
conversations [7] - 24:3, 56:16, 72:19, 80:15, 96:7, 119:18, 151:21
coordinator [1] - 31:19
copied [3] - 82:14, 94:22, 96:1
copies [1] - 57:11
copy [12] - 57:2, 57:21, 57:23, 63:5, 77:17, 95:2, 112:7, 145:19, 146:5, 146:21, 146:24, 153:6
Corcoran [1] - 140:11
corporate [5] - 48:22, 48:23, 48:24, 49:3, 49:5
corporation [3] - 141:19, 143:15, 143:22
correct [3] - 14:12, 25:15, 54:8, 55:4, 55:5, 56:23, 56:24, 57:1, 58:12, 58:15, 64:11, 66:8, 67:19, 67:20, 71:23, 75:8,

82:19, 93:24, 93:25, 104:25, 113:13, 131:15, 154:17
correspondence [1] - 93:22
costs [1] - 100:20
counsel [33] - 25:18, 29:24, 31:19, 31:20, 32:1, 32:2, 32:4, 32:8, 32:16, 32:20, 33:2, 35:1, 35:6, 37:6, 37:17, 38:23, 48:17, 48:21, 48:22, 50:13, 51:7, 51:11, 53:25, 55:22, 124:13, 124:17, 125:4, 141:14, 143:13, 146:12, 150:23, 151:19
Counsel [3] - 87:4, 134:2, 153:20
counsel's [3] - 34:4, 144:14, 149:12
Counselor [1] - 125:16
counselor [1] - 144:9
counting [1] - 62:5
countless [1] - 28:13
country [2] - 19:24, 152:9
couple [4] - 56:23, 64:20, 85:22, 123:19
course [14] - 4:24, 8:16, 11:9, 33:5, 54:5, 82:14, 84:16, 110:5, 130:2, 132:13, 133:18, 133:20, 138:13, 144:5
COURT [2] - 1:1, 1:20
court [15] - 5:1, 7:13, 7:14, 15:3, 22:18, 22:20, 57:17, 58:25, 67:14, 86:7, 92:5, 118:7, 119:4, 129:4, 130:23
Court [8] - 60:25, 154:16, 154:16, 154:17, 154:22, 154:22
Court's [3] - 4:17, 57:8, 58:9
court-appointed [1] - 130:23
court-supervised [2] - 58:25, 67:14
cover [3] - 46:8, 46:11, 71:6
covered [3] - 54:2, 123:24, 141:18

covering [1] - 35:25
Cramer [1] - 82:21
create [5] - 9:16, 34:1, 61:23, 78:14, 119:19
created [2] - 55:12, 133:8
crib [1] - 19:21
criticism [2] - 78:18, 130:14
crossed [2] - 65:16, 112:22
Crown [18] - 97:24, 97:25, 98:1, 98:4, 99:12, 99:18, 100:4, 100:5, 100:10, 100:12, 100:15, 101:15, 109:14, 110:11, 138:13, 138:18, 138:22, 153:2
CRR [2] - 1:20, 154:20
curiosity [1] - 48:7
current [1] - 111:23
cuts [1] - 98:25
cutting [1] - 118:16

D

d/b/a [1] - 9:19
daily [1] - 85:4
Dartez [1] - 98:9
data [2] - 128:7, 128:10
date [17] - 60:2, 60:8, 60:11, 60:15, 61:13, 77:22, 136:10, 136:11, 136:18, 136:19, 137:8, 137:10, 147:3, 147:25, 148:3, 148:4
dated [16] - 63:2, 71:14, 75:1, 76:22, 77:2, 77:16, 86:20, 87:1, 92:10, 93:9, 93:16, 95:15, 134:17, 134:20, 136:1, 136:10
dates [1] - 71:14
Dave [1] - 105:25
David [9] - 31:12, 31:18, 42:6, 53:24, 61:4, 70:13, 114:11, 132:5
days [1] - 31:22
deal [3] - 49:10, 76:18, 101:13
dealing [2] - 17:4, 46:19
dealt [1] - 64:4

decide [6] - 34:3, 40:24, 123:22, 124:6, 126:16, 128:3
decided [9] - 43:25, 49:25, 81:14, 126:4, 129:6, 132:4, 149:20, 150:14, 150:15
deciding [1] - 33:15
decision [2] - 58:3, 132:21
dedicated [2] - 109:14, 109:17
Deepwater [2] - 134:21, 136:9
DEEPWATER [1] - 1:4
defendant [1] - 86:7
deficient [1] - 79:2
define [1] - 69:25
defines [1] - 83:4
definitely [1] - 43:4
definitions [1] - 62:5
delay [4] - 61:20, 61:24, 62:18, 62:22
Demolition [1] - 138:9
demonstrate [1] - 100:19
depicts [1] - 83:19
deposited [1] - 152:17
deposition [1] - 121:24
depositions [1] - 10:20
derailment [1] - 8:1
derivative [1] - 105:16
describe [3] - 26:3, 31:25, 72:8
described [10] - 17:14, 21:3, 21:9, 21:18, 24:17, 33:2, 48:21, 49:12, 51:12, 70:15
DESCRIPTION [1] - 2:12
description [1] - 23:1
designating [2] - 78:10, 82:5
desk [1] - 123:7
desks [1] - 20:19
detail [5] - 26:6, 46:2, 46:4, 117:4, 117:25
detailed [1] - 24:1
Details [1] - 136:10
details [5] - 33:19, 88:15, 91:20, 101:1, 131:20
determine [4] - 83:25, 84:20, 85:11, 88:7
dheclaims.com [1] - 95:15
dictate [1] - 26:5

C O N F I D E N T I A L

SM-02-CR00864

different [21] - 7:25,
11:18, 29:8, 29:20,
35:13, 35:24, 36:25,
38:5, 38:16, 38:23,
46:8, 66:8, 66:13,
66:14, 98:17,
100:19, 120:12,
129:12, 129:13,
137:25, 151:1
different.. [1] - 8:2
differentiate [1] - 29:7
difficult [1] - 128:3
dime [2] - 98:14,
111:10
Dimension [3] -
140:15, 140:18,
140:23
dinner [1] - 45:25
direct [6] - 49:14,
59:8, 62:2, 67:7,
77:13, 94:18
directed [2] - 46:10,
50:4
directing [1] - 58:18
direction [2] - 85:17,
134:10
directly [8] - 42:11,
43:20, 44:11, 50:6,
70:13, 84:7, 114:8,
121:15
disagree [1] - 66:13
disclosed [1] - 119:1
Disclosure [1] - 61:8
discovery [1] - 10:19
discuss [21] - 18:3,
21:10, 21:23, 23:24,
44:25, 47:9, 67:3,
70:22, 89:14,
101:25, 123:9,
145:5, 145:12,
146:7, 146:8,
149:17, 149:20,
150:14, 150:16,
153:14, 153:18
discussed [29] - 22:2,
23:6, 24:3, 24:4,
40:16, 41:7, 41:22,
48:8, 52:16, 65:6,
65:9, 65:11, 75:10,
78:25, 91:20,
115:22, 115:24,
117:3, 117:25,
119:1, 120:21,
124:17, 132:3,
132:6, 138:4, 145:6,
146:4, 150:4, 153:13
discussing [4] -
24:21, 65:25, 91:20,
125:5
discussion [15] - 23:9,

47:19, 47:20, 47:22,
47:23, 57:23, 65:19,
71:8, 95:3, 95:7,
104:19, 104:20,
126:5, 150:15,
152:10
discussions [6] -
14:15, 23:11, 23:18,
99:18, 132:20, 146:8
disenchanted [1] -
107:10
disinterested [2] -
98:6, 98:7
District [5] - 60:25,
154:17, 154:22
DISTRICT [2] - 1:1,
1:1
divide [1] - 31:16
divorce [2] - 11:21,
11:23
document [49] - 7:4,
7:6, 15:18, 22:13,
22:17, 50:24, 51:4,
57:17, 58:5, 58:7,
59:19, 60:8, 61:5,
61:25, 62:11, 62:21,
62:23, 63:11, 67:7,
67:9, 69:10, 71:17,
77:11, 77:14, 81:19,
82:7, 83:5, 83:23,
83:24, 87:6, 87:12,
93:6, 96:8, 106:23,
112:6, 134:13,
136:9, 136:17,
136:19, 136:25,
137:1, 137:3, 137:5,
139:11, 142:17,
143:12, 146:21
Document [2] -
124:19, 143:10
documentation [9] -
17:9, 25:11, 25:12,
72:23, 79:2, 79:9,
79:20, 126:24, 127:7
documented [1] - 80:1
documenting [2] -
71:19, 72:22
documents [18] -
19:18, 25:4, 36:13,
36:14, 37:23, 50:18,
50:19, 56:20, 56:23,
76:21, 80:23,
123:19, 126:10,
126:17, 137:13,
137:20, 137:23,
140:21
dollar [1] - 39:6
dollars [1] - 100:17
done [24] - 14:21,
14:22, 17:13, 32:16,

33:5, 33:9, 37:19,
38:7, 38:8, 51:18,
57:21, 76:4, 76:15,
126:14, 126:15,
128:15, 129:25,
143:8, 144:7,
144:17, 144:18,
144:22, 148:20
door [1] - 42:16
doors [1] - 78:19
down [11] - 15:14,
29:19, 36:20, 40:24,
41:4, 41:10, 58:20,
126:18, 130:1, 132:6
draft [4] - 27:25,
38:17, 50:24, 58:14
drafted [3] - 38:13,
38:16, 39:13
drafting [1] - 38:21
draw [1] - 33:17
drawing [1] - 34:11
dream [1] - 34:22
dreaming [1] - 34:21
drive [1] - 17:23
Drive [2] - 142:12,
143:1
driver [1] - 86:11
due [1] - 133:18
duly [1] - 5:13
during [10] - 10:16,
11:9, 24:3, 24:21,
41:21, 54:12, 80:21,
116:3
duties [3] - 23:4,
29:18, 66:24
duty [1] - 36:23
Duval [4] - 31:12,
31:18, 42:6, 114:11

E

e-mail [45] - 4:14,
34:19, 34:20, 37:1,
50:7, 63:2, 63:20,
65:3, 65:6, 65:18,
65:19, 65:24, 67:5,
68:25, 76:21, 77:1,
77:16, 78:5, 78:10,
80:6, 82:2, 82:3,
82:11, 82:15, 82:16,
84:3, 84:10, 85:18,
85:21, 86:20, 86:25,
87:14, 87:19, 87:22,
88:2, 92:9, 93:9,
93:15, 94:21, 95:2,
95:18, 115:1, 115:3,
124:22, 149:19
e-mailed [2] - 60:10,
60:23

e-mails [30] - 34:17,
34:23, 36:15, 37:23,
45:25, 77:15, 85:7,
85:11, 95:18, 96:5,
107:25, 108:3,
108:18, 112:3,
113:5, 113:21,
115:4, 115:25,
116:2, 116:7,
116:11, 116:20,
117:2, 149:19,
150:1, 150:4, 150:5,
151:4, 151:5, 152:2
early [6] - 14:17, 15:7,
15:12, 20:2, 27:7,
72:2
easier [1] - 9:20
easiest [1] - 79:19
East [1] - 141:2
Eastern [2] - 60:25,
154:17
EASTERN [1] - 1:1
Economic [1] - 134:21
economic [1] - 94:6
educational [1] - 5:23
effect [4] - 101:20,
107:22, 107:23,
108:18
Egore [1] - 19:25
eight [1] - 45:24
EIN [1] - 29:1
either [11] - 13:7, 17:2,
19:14, 31:10, 37:4,
97:4, 99:19, 108:13,
123:12, 137:25,
139:12
elect [1] - 81:12
elementary [1] - 89:2
eleven [1] - 47:2
eligibility [2] - 80:17,
115:5
employed [2] - 88:8,
107:15
employees [4] - 4:20,
122:9, 122:20,
132:11
employment [26] -
6:1, 6:11, 7:2, 7:17,
8:4, 14:11, 17:15,
18:4, 21:10, 21:24,
23:10, 23:18, 23:25,
24:22, 25:1, 47:3,
47:6, 56:20, 56:25,
60:8, 67:8, 102:16,
111:23, 119:8,
145:15, 150:21
end [9] - 61:25, 62:1,
62:5, 68:15, 72:3,
74:10, 104:19,
130:10, 131:11

endeavor [1] - 79:17
ended [2] - 83:23,
129:8
energies [1] - 111:11
engaging [1] - 56:3
ensure [1] - 126:13
entail [3] - 15:16,
22:16, 25:2
enter [1] - 113:10
entered [1] - 60:14
Enterprises [2] -
139:14, 140:1
entertain [2] - 84:22,
84:23
entire [1] - 104:25
entitled [5] - 58:8,
61:7, 62:8, 136:9,
154:18
entity [3] - 98:1,
118:21, 141:21
entrance [1] - 99:12
environmental [1] -
6:16
envision [1] - 28:19
envisioned [5] -
21:20, 21:21, 36:16,
37:9, 52:8
envisioning [1] -
42:12
EPA [1] - 98:17
equity [1] - 100:24
especially [2] - 45:23,
111:1
Esquire [1] - 147:20
essentially [2] - 23:15,
73:1
etcetera [2] - 94:24,
94:25
ethic [1] - 36:23
ethical [2] - 54:15,
70:4
ethics [12] - 51:13,
51:19, 51:24, 52:10,
52:12, 52:18, 52:20,
54:6, 54:19, 56:8,
56:9, 56:10
Eugene [1] - 49:18
Eugenie [5] - 39:2,
39:5, 49:16, 49:17
event [1] - 136:18
eventually [16] - 7:5,
11:25, 24:18, 32:20,
33:13, 36:17, 36:23,
37:7, 37:8, 42:11,
55:9, 84:21, 84:23,
130:21, 131:12,
131:25
evidence [2] - 5:8,
70:5
evolved [1] - 98:10

exact [3] - 84:8,
108:16, 138:21
exactly [11] - 10:12,
24:19, 29:17, 37:9,
37:10, 82:4, 125:10,
127:1, 148:19,
153:16
EXAMINATION [6] -
2:5, 2:6, 2:7, 5:16,
146:18, 150:8
EXAMINATIONS [1] -
2:2
examined [1] - 5:14
example [2] - 79:20,
131:2
Excel [4] - 36:18,
125:24, 127:3
excellent [1] - 36:23
except [4] - 16:23,
17:1, 40:3, 42:11
exchange [3] - 64:10,
94:2, 101:2
exchanges [1] - 63:20
exclusions [1] - 29:2
excuse [1] - 128:16
executed [1] - 62:19
execution [1] - 61:21
EXHIBIT [21] - 2:14,
2:15, 2:16, 2:17,
2:18, 2:19, 2:20,
2:21, 2:22, 2:23,
2:24, 2:25, 3:1, 3:2,
3:3, 3:4, 3:5, 3:6,
3:8, 3:9, 3:10
Exhibit [30] - 57:6,
59:23, 61:11, 62:24,
63:1, 69:4, 71:13,
75:5, 76:20, 76:25,
83:17, 86:24, 92:12,
93:12, 95:11, 95:13,
95:20, 112:9, 134:1,
134:5, 134:9,
134:15, 135:22,
135:24, 136:8,
136:15, 138:8,
146:17, 147:6,
148:12
exhibit [3] - 69:2,
86:19, 146:13
EXHIBITS [1] - 3:7
exhibits [2] - 134:3,
145:20
Exhibits [1] - 137:17
expectation [3] -
105:18, 149:4, 149:7
expectations [1] -
109:8
expected [1] - 49:12
Expedited [1] - 77:4
expedited [4] - 78:10,

80:25, 82:5, 84:6
experience [6] -
15:17, 25:9, 25:14,
49:2, 49:8, 51:12
expertise [1] - 42:24
explain [2] - 128:25,
147:21
explained [1] - 117:21
explaining [2] - 46:6,
126:12
explanation [1] -
62:20
explanations [1] -
126:3
expressed [1] - 146:3
extent [9] - 11:12,
17:1, 28:21, 103:17,
117:2, 128:4, 128:5,
128:6, 151:18
external [1] - 33:2
extra [2] - 63:5,
110:25
extremely [1] - 23:12
eye [1] - 30:23
eyes [1] - 130:18

F

face [5] - 40:23, 40:25,
134:9
face-to-face [2] -
40:23, 40:25
Facility [2] - 69:6, 75:7
fact [6] - 103:3,
113:20, 125:22,
145:15, 148:9,
151:21
facts [3] - 4:19, 58:24,
67:12
fair [4] - 27:3, 30:1,
30:2, 64:7
fairly [1] - 24:1
falling [6] - 12:11,
12:21, 90:9, 90:12,
90:21, 106:16
false [3] - 4:25, 5:1,
5:2
falsity [1] - 5:3
familiar [7] - 14:9,
28:21, 39:12, 58:10,
59:14, 140:17, 141:1
family [7] - 11:22,
72:9, 96:5, 142:4,
142:6, 143:2, 143:6
fantastic [1] - 14:25
far [14] - 48:3, 48:4,
76:3, 82:24, 84:24,
91:12, 92:1, 92:2,
96:10, 96:11, 99:17,

101:10, 133:2, 137:1
far-reaching [1] -
84:24
fashion [5] - 31:10,
41:9, 50:6, 74:16,
129:25
fast [2] - 130:17
faster [1] - 79:8
father [3] - 43:1,
106:16, 141:9
father's [1] - 142:13
Fayard [1] - 26:20
February [3] - 136:18,
137:10, 143:16
federal [2] - 118:7,
119:3
fee [5] - 12:11, 12:21,
150:3, 150:12,
151:11
fees [3] - 150:25,
151:3
felt [1] - 143:24
felt [13] - 25:3, 44:1,
106:16, 107:1,
108:1, 120:3, 129:3,
129:19, 129:20,
129:22, 129:23,
131:2, 132:15
few [12] - 12:5, 34:18,
63:9, 80:15, 85:11,
110:16, 124:14,
124:15, 127:23,
128:2, 132:25, 134:3
field [1] - 72:24
fielding [1] - 45:6
figure [1] - 89:5
file [7] - 8:24, 17:9,
71:18, 72:22, 105:4,
137:12, 137:14
filed [8] - 16:21, 16:25,
17:11, 89:22, 91:3,
143:15, 145:20,
153:7
filing [3] - 49:22, 72:5,
122:20
finalized [1] - 39:19
finance [1] - 49:19
financial [3] - 102:25,
103:16, 105:16
Fine [1] - 5:21
fine [2] - 48:16, 48:18
finish [2] - 63:16,
124:19
finished [2] - 80:9,
123:14
Firm [3] - 90:7, 91:9,
103:19
firm [56] - 6:17, 9:12,
9:22, 10:7, 11:5,
18:11, 18:24, 19:6,

19:11, 31:10, 32:17,
44:6, 55:22, 56:2,
72:8, 72:10, 74:14,
74:16, 74:20, 76:15,
88:24, 89:18, 89:20,
90:2, 90:3, 90:4,
90:6, 91:3, 91:11,
91:12, 96:9, 96:16,
97:3, 97:13, 102:10,
102:17, 102:18,
103:23, 103:24,
104:1, 104:8,
104:10, 104:11,
121:14, 122:9,
123:1, 133:7, 133:8,
133:9, 133:10,
133:12, 133:14,
134:9, 135:1
firms [3] - 28:22,
38:23, 96:18
first [40] - 5:13, 6:11,
6:15, 6:20, 13:5,
13:6, 13:12, 14:15,
17:5, 17:20, 18:8,
18:17, 20:16, 20:24,
22:20, 22:25, 24:15,
26:4, 26:15, 29:1,
31:7, 34:18, 35:7,
36:18, 58:1, 60:11,
77:14, 79:21, 81:9,
89:8, 99:17, 112:2,
112:3, 124:2,
138:11, 139:24,
150:20, 151:4,
151:11
fisherman [1] - 73:5
fit [4] - 43:4, 43:6,
65:1, 109:24
five [2] - 18:5, 69:11
five-minute [1] - 69:11
flavor [1] - 29:16
floor [5] - 7:6, 12:5,
20:12, 20:22, 21:1
floors [1] - 20:18
focus [1] - 111:11
focusing [1] - 42:15
fold [1] - 40:7
follow [6] - 67:21,
92:15, 92:24,
121:12, 144:19,
149:10
follow-up [3] - 67:21,
92:24, 149:10
followed [1] - 121:11
following [3] - 107:17,
108:2, 108:10
follows [1] - 5:15
food [1] - 73:3
FOR [1] - 1:18
forecast [1] - 21:23

forefront [1] - 54:14
foregoing [1] - 154:17
foremost [1] - 26:4
form [6] - 28:17,
71:13, 71:18,
134:19, 148:7,
148:17
Form [1] - 69:6
formal [1] - 76:2
formalized [1] -
143:18
formally [1] - 10:1
former [1] - 119:17
formerly [1] - 11:20
forms [6] - 28:16,
28:24, 33:17, 33:18,
78:14
formulas [1] - 28:16
forth [6] - 17:23,
23:21, 34:12, 39:7,
60:10, 149:25
forward [3] - 25:25,
84:7, 84:14
forwarded [2] - 82:2,
82:9
founded [1] - 138:1
four [9] - 19:7, 26:20,
38:5, 98:11, 100:22,
124:22, 141:10
fourth [2] - 62:4, 62:6
frac [1] - 98:13
fraction [1] - 19:10
frame [2] - 12:14,
94:19
fraud [1] - 17:3
free [1] - 12:17
FREEH [109] - 1:11,
1:14, 4:5, 4:15, 5:17,
12:18, 13:15, 13:23,
45:18, 48:13, 48:17,
48:19, 53:10, 53:14,
53:17, 54:3, 57:4,
57:10, 57:19, 57:22,
58:2, 58:6, 60:1,
60:14, 60:17, 61:3,
61:12, 62:6, 62:7,
63:5, 63:8, 63:11,
63:17, 63:19, 68:18,
69:8, 69:12, 69:16,
69:18, 74:1, 75:9,
75:22, 77:6, 81:24,
83:15, 84:9, 85:18,
85:20, 85:24, 86:18,
87:6, 87:13, 88:16,
90:10, 91:9, 91:18,
92:19, 92:21, 93:1,
93:8, 93:14, 93:19,
94:13, 94:17, 95:17,
96:4, 99:14, 104:6,
106:9, 106:10,

8

112:10, 117:10, 117:12, 119:16, 121:8, 121:9, 123:13, 123:17, 124:1, 124:4, 124:6, 124:12, 124:20, 132:24, 134:2, 134:4, 134:16, 135:17, 135:23, 136:16, 137:9, 137:15, 137:18, 143:9, 143:11, 143:17, 144:13, 146:12, 147:22, 149:10, 149:12, 149:16, 150:9, 153:3, 153:9, 153:14, 153:18, 154:3, 154:8
Freeh [2] - 4:5, 118:16
FREEH.................. ..... [2] - 2:5, 2:7
friend [9] - 43:21, 43:22, 65:4, 72:6, 87:19, 87:21, 98:21, 99:10
friends [2] - 11:24, 12:11, 100:1
front [2] - 71:15, 96:9
fruit [1] - 79:19
frustration [1] - 131:13
Full [2] - 140:15, 140:23
full [7] - 4:7, 5:10, 7:17, 9:7, 107:16, 132:11, 140:18
full-time [4] - 7:17, 9:7, 107:16, 132:11
fully [1] - 80:1
function [4] - 23:2, 53:22, 70:7, 129:8
functions [5] - 22:9, 22:10, 31:14, 69:23, 127:5
funds [3] - 94:23, 149:4, 149:7
funny [2] - 20:15
furnished [1] - 123:5
Furtherance [2] - 57:8, 58:8
futile [1] - 79:17
future [1] - 13:11

**G**

gain [1] - 99:12
gained [1] - 115:23
gaps [2] - 30:21, 31:3

Garden [19] - 28:22, 63:12, 63:25, 64:4, 64:19, 64:23, 67:22, 68:5, 77:3, 80:10, 80:18, 80:21, 87:1, 87:17, 92:14, 125:14, 127:4, 127:8
Garner [3] - 95:16, 96:2, 96:9
garnishments [1] - 32:18
gas [1] - 42:17
gate [1] - 130:4
gather [1] - 80:24
gathering [1] - 25:5
GCCF [28] - 15:23, 16:2, 16:13, 25:9, 25:14, 26:24, 71:13, 71:19, 72:6, 72:13, 72:14, 74:22, 74:24, 75:1, 75:15, 75:19, 79:5, 97:1, 97:18, 102:19, 102:20, 105:4, 105:6, 105:8, 120:13, 133:23, 135:14, 148:19
general [16] - 7:1, 23:6, 28:12, 31:25, 32:4, 40:3, 40:23, 42:7, 48:21, 48:22, 55:23, 59:14, 94:2, 94:6, 98:6, 113:25
general-counsel-type [1] - 48:21
generally [3] - 16:9, 41:12, 152:4
generated [5] - 54:11, 81:5, 137:2, 137:23, 139:5
ghost [1] - 20:20
Gibby [19] - 11:25, 12:2, 12:13, 13:3, 88:19, 88:22, 88:23, 88:25, 89:4, 89:12, 89:13, 89:20, 89:23, 90:2, 90:11, 91:1, 91:13, 103:25
Gibby's [1] - 91:8
gigantic [1] - 99:3
girl [1] - 97:9
gist [2] - 22:13, 77:11
given [2] - 31:19, 112:7
glaring [2] - 30:24, 31:5
Glen [14] - 98:22, 99:9, 100:16, 100:23, 101:5, 101:20, 102:19, 111:5, 120:18, 133:4,

134:20, 151:15, 152:4, 152:5
God [2] - 5:10, 111:15
Gonzales [5] - 16:19, 17:6, 75:20, 148:15, 148:24
Gonzales' [1] - 146:14
goodness [1] - 86:8
gosh [1] - 86:8
governance [2] - 49:3, 49:6
government [1] - 70:4
grab [2] - 79:18, 79:19
graduate [1] - 6:6
grandmother [1] - 19:21
graphic [1] - 82:16
Gravier [6] - 12:25, 14:16, 105:23, 147:18, 147:19, 148:5
great [6] - 4:15, 9:6, 11:12, 89:24, 98:18, 110:24
Greer [5] - 29:4, 77:1, 77:17, 81:7, 124:22
Greer's [2] - 82:14, 125:13
grievances [1] - 96:17
grindstone [1] - 76:19
grossly [1] - 79:2
ground [1] - 46:11
group [5] - 29:14, 78:24, 87:17, 90:5, 127:24
Group [9] - 63:13, 63:25, 77:3, 87:1, 87:17, 90:7, 92:14, 125:13
Group/Andry [1] - 136:22
grudges [1] - 127:16
guess [5] - 5:20, 7:19, 8:7, 8:13, 18:5, 19:3, 22:10, 31:9, 31:21, 32:4, 40:11, 41:16, 47:21, 49:21, 54:23, 55:9, 65:10, 66:18, 98:16, 104:15, 114:6, 127:9, 129:3, 133:20, 144:21, 148:6, 151:4, 153:12
guessing [2] - 90:22, 108:8
guidance [2] - 28:10, 32:11
guide [1] - 59:4
GULF [1] - 1:3
Gulf [3] - 69:5, 74:18,

75:7
guys [1] - 48:15

**H**

half [3] - 12:25, 21:16, 106:6
halfway [1] - 58:20
halt [1] - 145:21
hand [1] - 9:8
handful [1] - 15:23
handle [2] - 47:7, 90:23
handles [1] - 87:18
handling [7] - 31:23, 73:16, 74:2, 74:3, 74:24, 86:2, 135:16
hands [2] - 39:25, 79:7
happy [5] - 20:10, 25:9, 48:14, 109:20, 109:24
hard [2] - 128:11, 137:9
hate [2] - 40:1
hated [1] - 14:23
HB406 [1] - 1:22
head [1] - 131:23
headache [1] - 89:19
heading [1] - 61:25
headquartered [1] - 9:23
health [1] - 19:8
Hear [1] - 139:22
hear [4] - 113:20, 132:14, 138:15, 146:8
heard [6] - 33:14, 86:7, 138:14, 139:13, 139:18, 142:14
hearing [1] - 138:11
hearings [1] - 7:7
heavily [4] - 11:13, 97:16, 97:19, 130:1
heavy [2] - 28:23, 42:8
held [1] - 78:1
hell [1] - 106:16
help [13] - 5:10, 11:23, 32:20, 35:23, 41:20, 42:1, 43:12, 72:5, 89:25, 90:15, 120:13, 122:20, 131:11
helpful [4] - 90:18, 110:23, 110:25, 129:9
helping [3] - 6:15, 21:6, 114:3

Henderson [1] - 102:8
hereby [1] - 154:17
herself [3] - 39:3, 49:23, 50:9
hesitation [1] - 66:20
highly [1] - 43:2
Highway [1] - 4:11
Hill [1] - 19:1
himself [5] - 41:15, 88:7, 88:22, 109:18, 114:9
HIPAA [1] - 33:9
hire [7] - 7:24, 22:6, 32:2, 43:7, 43:10, 44:13, 48:10
hired [24] - 24:18, 26:16, 27:8, 27:15, 27:16, 27:20, 27:22, 28:3, 28:6, 28:7, 28:9, 29:23, 30:4, 31:10, 31:12, 39:1, 47:13, 47:19, 50:13, 117:4, 127:25, 144:25, 145:14
hires [1] - 146:9
hiring [4] - 43:5, 64:11, 66:23, 144:23
history [1] - 37:19
hold [3] - 17:3, 92:4, 92:8
holds [1] - 43:2
holes [2] - 30:17, 30:21
home [5] - 8:9, 9:9, 19:20, 45:5, 45:23
HONORABLE [1] - 1:11
hooked [1] - 99:11
Horizon [2] - 134:21, 136:9
HORIZON [1] - 1:4
hospital [1] - 19:21
hounded [1] - 80:21
hour [5] - 21:16, 48:14, 92:23, 92:25, 106:6
hourly [3] - 6:18, 11:14, 15:1
hours [2] - 26:20, 107:14
house [3] - 31:8, 32:5, 32:6
household [2] - 8:21, 8:22
HR [1] - 53:22
Hudson [1] - 6:18
huge [1] - 152:9
human [2] - 126:16, 126:18
hurricane [1] - 8:11

**C O N F I D E N T I A L**

SM-02-CR00867

hurry [1] - 79:4
hurt [1] - 106:17
husband [124] - 7:23,
8:4, 8:16, 10:14,
10:24, 11:18, 11:20,
12:14, 12:15, 13:4,
13:5, 13:11, 13:13,
14:19, 14:23, 15:6,
17:20, 19:6, 19:12,
19:13, 19:23, 20:3,
20:6, 20:8, 20:9,
21:6, 21:12, 24:22,
25:1, 42:12, 43:2,
43:5, 43:8, 44:14,
44:18, 45:17, 45:21,
46:13, 46:14, 46:21,
47:15, 48:2, 48:5,
64:11, 65:7, 65:14,
65:15, 65:20, 66:23,
67:18, 68:9, 68:12,
68:13, 68:21, 72:5,
72:9, 72:11, 73:8,
73:10, 74:2, 74:5,
74:14, 74:16, 74:21,
88:3, 89:14, 91:21,
92:1, 95:7, 97:21,
98:9, 98:13, 98:21,
99:8, 99:17, 99:25,
100:5, 100:14,
101:14, 102:2,
104:12, 104:13,
104:19, 105:16,
108:23, 109:4,
110:15, 111:23,
111:25, 112:20,
113:5, 113:21,
114:2, 114:17,
115:10, 115:16,
115:19, 115:22,
116:8, 117:1,
117:14, 117:25,
118:6, 119:18,
120:15, 120:22,
123:7, 123:8,
127:13, 127:14,
137:25, 139:2,
139:12, 141:6,
141:25, 143:23,
145:2, 145:22,
149:13, 150:11
husband's [6] - 18:8,
19:16, 65:13, 97:25,
109:11, 141:9
hypothetical [2] -
28:18, 87:23

I

Iberia [6] - 8:12,
19:24, 141:3, 141:5,

142:12, 143:1
ID [1] - 83:19
idea [4] - 20:8, 20:9,
45:19, 65:16
ideas [3] - 99:7, 129:1,
131:11
identification [23] -
49:12, 57:6, 59:23,
61:11, 63:1, 69:4,
75:5, 76:25, 83:17,
86:24, 92:12, 93:12,
95:13, 95:20, 112:9,
134:1, 134:15,
135:22, 136:15,
137:17, 146:17,
147:6, 148:12
identified [1] - 82:19
identify [8] - 16:7,
16:10, 29:9, 30:14,
30:17, 33:25, 79:14,
79:25
III [3] - 9:15, 9:22, 10:8
imagination [1] -
110:2
immediately [2] -
35:12, 57:24
impact [1] - 59:3
implant [1] - 8:1
implement [3] - 26:14,
27:3, 29:24
implementation [2] -
28:11, 28:15
implementing [1] -
22:12
implications [1] -
84:25
important [1] - 53:5
impossible [2] -
30:17, 35:13
impression [1] - 56:13
improper [1] - 70:6
impropriety [1] - 92:6
improvements [1] -
26:23
IN [2] - 1:4, 1:5
in-house [1] - 31:8
in-question [1] - 125:2
inactive [1] - 143:16
include [4] - 7:12,
54:5, 56:9, 83:8
included [1] - 96:19
including [1] - 4:19
income [1] - 102:2
incompetent [1] - 89:6
incomplete [2] - 4:25,
79:10
incompleteness [5] -
5:3, 72:22, 79:4,
127:6, 127:7
inconsistencies [1] -

34:10
incorporated [1] -
141:21
indemnity [1] - 154:1
independent [1] -
76:16
indicate [1] - 68:9
indicated [2] - 59:13,
106:25
indifferent [1] - 27:2
individual [3] - 37:17,
75:14, 82:21
individuals [1] - 131:5
informal [1] - 23:8
Information [2] - 61:2,
61:8
information [9] - 25:5,
57:20, 86:10, 86:13,
100:12, 115:24,
136:21, 137:21,
150:2
inherit [1] - 130:12
initiate [2] - 24:5,
54:12, 68:24
initiated [1] - 20:9
initiates [1] - 20:8
injury [4] - 14:23,
73:11, 73:14, 74:7,
74:18, 86:3, 86:4,
107:10
innate [1] - 36:22
inquire [2] - 84:18,
138:21
inquired [1] - 56:1
inquiries [4] - 51:17,
54:12, 91:23, 96:12
inquiring [1] - 151:14
inside [1] - 55:3
insights [1] - 31:3
insisting [1] - 113:5
instance [2] - 68:23,
70:5
instances [1] - 84:17
instead [1] - 50:1
instructed [1] - 114:6
instruction [3] -
28:25, 33:18, 78:14
instructions [1] -
30:20
insurance [4] - 74:9,
74:10, 86:11, 118:9
intake [1] - 64:5
intaking [1] - 78:15
integrity [1] - 107:1
intend [1] - 112:19
intending [1] - 4:24
interaction [3] - 31:16,
64:1, 77:23
interactive [1] - 80:16
Interest [1] - 58:19,

62:2, 62:8
interest [22] - 12:15,
54:11, 57:14, 58:24,
59:6, 59:10, 59:11,
59:12, 66:3, 67:13,
97:25, 102:25,
103:16, 104:24,
105:17, 110:23,
117:15, 117:16,
118:18, 118:20,
145:16
interested [14] -
43:13, 43:18, 44:10,
64:22, 65:5, 65:12,
65:17, 65:20, 66:1,
68:14, 68:16, 76:13,
84:8, 99:11
interesting [2] - 25:20,
55:7
interests [9] - 42:15,
44:24, 47:16, 110:7,
115:10, 115:19,
116:1, 117:7, 145:10
interface [2] - 80:16,
80:19
interfering [2] -
128:15, 132:16
interim [1] - 23:19
interject [1] - 125:8
internal [1] - 84:19
internally [1] - 79:12
interpret [2] - 28:14,
118:13
interpretation [2] -
22:11, 28:15
interpretations [1] -
30:14
interpreting [1] - 32:6
interrupt [2] - 35:15,
53:7
interrupted [1] - 8:12
interview [7] - 4:16,
48:2, 48:5, 105:20,
106:5, 116:3, 144:23
interviewed [1] -
25:17
interviews [1] - 72:24
introduce [1] - 124:14
introducing [1] - 48:1
introduction [1] - 20:7
invented [1] - 98:12
invested [1] - 103:5
investigation [1] -
149:24
investigative [2] -
17:2, 116:5
involved [34] - 11:3,
11:14, 14:24, 15:22,
25:11, 27:14, 32:21,
33:10, 33:12, 77:21,

77:25, 85:8, 96:7,
96:12, 96:15, 97:16,
97:19, 98:3, 98:14,
99:9, 99:18, 99:22,
99:23, 99:24, 100:5,
100:9, 100:12,
100:20, 105:7,
107:7, 113:12,
114:17, 122:4,
132:18
involvement [1] - 59:6
involving [1] - 118:8
IOLTA [4] - 93:23,
94:11, 94:24, 95:8
issue [14] - 29:10,
29:16, 34:20, 35:11,
35:16, 42:20, 42:25,
52:8, 52:17, 54:9,
79:9, 80:6, 85:22,
86:10
issues [27] - 28:13,
28:20, 29:20, 29:25,
30:22, 32:21, 35:10,
35:12, 36:6, 37:1,
39:7, 39:8, 42:19,
46:10, 46:17, 46:18,
46:20, 46:22, 55:23,
84:22, 84:24, 96:15,
150:19
IT [1] - 29:4

J

Jacobs [1] - 136:23
January [4] - 93:10,
93:16, 93:21, 94:2
Jefferson [1] - 4:11
Jen [1] - 80:15
Jennifer [6] - 63:3,
63:21, 63:23, 63:24,
66:23, 77:3
Jessica [2] - 16:19,
75:20
job [13] - 6:20, 9:7,
17:20, 18:8, 20:7,
27:2, 44:7, 46:14,
50:14, 51:11, 68:21,
101:13, 109:23
Joe [1] - 26:19
Joey [1] - 98:8
John [40] - 11:16,
11:18, 11:22, 11:25,
12:13, 13:3, 13:10,
13:12, 13:19, 13:20,
14:4, 27:6, 89:23,
97:4, 97:5, 97:9,
97:12, 97:14, 97:16,
97:22, 99:23, 100:6,
100:9, 102:20,
103:19, 103:25,

104:14, 104:18,
104:20, 104:21,
104:24, 114:18,
115:12, 119:18,
119:20, 119:25,
120:8, 135:8
Johnny [2] - 140:6,
140:7
joined [1] - 74:15
joint [4] - 8:24, 102:1,
152:13, 152:14
jointly [1] - 153:7
jointly-filed [1] - 153:7
joke [1] - 94:15
Jonathan [7] - 90:11,
102:9, 103:19,
103:22, 133:4,
133:14, 134:20
Judge [2] - 118:16,
123:22
judge [3] - 10:21,
23:21, 57:25
judge's [1] - 57:22
judgment [1] - 107:1
Judice [1] - 19:1
judicial [1] - 4:23
JULY [2] - 1:7, 4:2
July [8] - 60:2, 61:14,
61:16, 62:12, 63:2,
63:21, 65:6, 134:20
jump [3] - 30:25,
33:23, 37:7
jumped [1] - 30:24
June [17] - 86:20,
87:1, 87:9, 87:14,
88:10, 91:19, 92:10,
92:14, 92:21, 94:19,
95:15, 95:18, 95:25,
105:21, 105:22,
107:18, 112:6
Juneau [74] - 14:12,
15:3, 15:6, 15:7,
17:14, 17:17, 17:18,
17:21, 18:3, 19:1,
19:3, 19:8, 19:12,
20:4, 20:12, 21:9,
21:12, 21:18, 26:3,
26:25, 27:5, 28:2,
29:19, 29:25, 31:4,
31:9, 31:11, 31:20,
33:8, 34:7, 40:15,
41:18, 42:10, 42:16,
43:3, 43:4, 43:7,
44:13, 46:5, 47:15,
48:2, 48:7, 49:9,
49:11, 49:24, 51:11,
51:23, 52:16, 67:3,
68:20, 69:21, 70:13,
70:19, 75:13, 96:17,
103:14, 105:20,

105:25, 113:24,
114:2, 114:9,
114:10, 114:16,
115:9, 115:18,
117:7, 117:25,
122:3, 127:25,
130:21, 132:5,
132:20, 148:25
Juneau's [7] - 16:25,
18:11, 31:10, 31:25,
70:8, 121:15, 121:18
junk [1] - 34:19

### K

Katherine [4] - 95:16,
95:22, 95:23, 95:25
keep [9] - 9:8, 39:25,
41:5, 48:14, 76:18,
100:20, 100:24,
127:9, 132:9
Keeper [1] - 37:9
keeper [2] - 37:21,
38:9
keeping [2] - 25:5,
110:8
Keith [1] - 94:3
Kent [1] - 146:23
Keough [10] - 63:3,
63:12, 63:21, 63:23,
63:24, 64:2, 64:8,
65:3, 66:23, 77:3
kept [7] - 36:14, 37:22,
37:24, 41:23, 42:20,
129:15
key [1] - 35:1
kilobytes [1] - 125:23
kind [24] - 7:5, 10:22,
11:23, 12:23, 14:23,
15:15, 17:3, 25:11,
25:20, 35:10, 41:8,
41:11, 46:18, 64:3,
98:15, 102:14,
107:8, 120:18,
129:14, 129:24,
130:22, 130:24,
152:10
kinds [2] - 36:4,
131:21
knowing [1] - 56:12
knowledge [13] - 5:3,
13:3, 21:7, 21:8,
97:23, 102:18,
103:15, 107:25,
115:25, 120:1,
120:14, 149:13,
149:15
knowledgeable [3] -
35:2, 58:23, 67:12

known [1] - 88:15
knows [1] - 106:24
Kohn [3] - 43:15,
43:20, 65:1

### L

LA [2] - 1:18, 1:22
labeled [1] - 146:22
Laborde [1] - 140:13
LABORDE [1] -
140:13
Lafayette [4] - 6:14,
17:21, 102:7, 140:3
Lake [5] - 39:2, 39:5,
49:16, 49:17
landowners [1] -
49:21
Landry [4] - 115:10,
120:8, 120:24,
120:25
language [3] - 51:4,
59:9, 146:1
large [3] - 18:24,
21:24, 78:1
largely [1] - 27:14
larger [1] - 62:11
Las [3] - 98:23, 99:4,
103:20
last [8] - 61:13, 88:12,
92:16, 94:19, 137:9,
149:12, 153:7,
153:16
laundering [1] - 70:5
law [49] - 5:25, 6:4,
6:6, 6:17, 9:12, 9:22,
10:7, 11:19, 11:21,
11:24, 13:6, 13:16,
13:21, 17:21, 17:22,
18:8, 18:11, 18:24,
19:6, 25:21, 32:17,
64:25, 88:24, 89:18,
89:20, 90:2, 90:3,
91:11, 98:21,
102:10, 107:9,
109:18, 110:8,
121:2, 121:14,
121:24, 123:1,
133:7, 133:8,
133:10, 133:12,
133:14, 141:4,
141:5, 141:19,
143:15
LAW [1] - 1:17
Law [7] - 9:15, 90:6,
90:7, 91:9, 103:19,
133:13, 136:22
law-firm-type [1] -
89:18

lawyer [21] - 4:7, 4:22,
6:9, 13:24, 15:20,
23:2, 25:18, 31:2,
31:8, 39:5, 51:7,
51:12, 51:15, 69:9,
85:8, 90:25, 97:17,
98:24, 98:25, 105:8
lawyers [9] - 11:10,
27:10, 31:13, 32:10,
43:10, 56:16, 94:23,
127:23, 128:2
lead [3] - 5:25, 48:11,
64:3
leadership [1] - 146:8
learn [5] - 100:9,
100:11, 102:13,
133:19, 151:23
learned [3] - 15:2,
102:11, 150:10
least [8] - 11:1, 12:24,
21:20, 46:13, 77:15,
82:17, 94:2, 134:8
leave [3] - 85:22,
85:24, 153:24
leaving [1] - 91:19
LeBreton [1] - 38:25
led [2] - 20:10, 46:9
left [19] - 20:19, 74:13,
74:14, 74:20, 76:15,
77:4, 81:4, 81:6,
81:8, 81:17, 82:17,
83:4, 96:23, 102:16,
111:23, 125:5,
125:23, 127:2,
150:21
legal [33] - 7:17, 9:11,
22:11, 25:4, 28:4,
30:5, 30:6, 30:8,
31:2, 31:14, 31:24,
32:8, 32:11, 32:14,
32:15, 32:16, 32:17,
33:1, 33:4, 40:14,
40:18, 40:20, 41:7,
42:7, 42:14, 50:13,
50:14, 97:22, 104:7,
122:20, 129:13
legally [1] - 141:20
Leger [2] - 6:22, 7:8
legislative [1] - 37:19
length [2] - 110:18,
117:25
Lerner [43] - 98:22,
99:15, 99:16, 101:6,
101:7, 102:9,
102:24, 103:15,
103:23, 103:24,
107:2, 107:5,
108:11, 108:15,
108:24, 109:17,
110:11, 111:12,

111:22, 112:12,
112:21, 112:25,
114:18, 115:20,
120:9, 120:12,
120:25, 133:4,
133:11, 134:6,
134:8, 134:19,
134:20, 136:2,
136:22, 137:4,
138:17, 138:22,
139:1, 139:6,
151:22, 152:8,
152:16
less [3] - 42:14, 79:20
letter [9] - 74:25, 75:6,
146:13, 146:22,
146:24, 148:14,
148:15, 148:17,
148:19
letterhead [3] - 134:6,
134:11, 134:19,
146:21, 148:18
letting [1] - 71:19
level [2] - 107:20,
127:19
Levine [2] - 132:5,
132:20
liability [1] - 97:1
liens [1] - 32:18
life [4] - 6:1, 34:16,
99:3, 99:6
line [1] - 29:1
Lionel [8] - 8:17, 9:15,
9:22, 10:8, 87:1,
92:14, 95:14, 96:1,
140:24
list [10] - 80:2, 80:7,
80:24, 84:8, 84:14,
125:6, 125:9,
136:20, 138:5, 138:6
listed [8] - 81:3,
139:12, 140:24,
140:25, 141:25,
142:5
lists [3] - 84:6, 136:21,
139:16
literally [1] - 20:17
litigation [4] - 6:23,
7:11, 7:21, 10:19
live [1] - 34:20
LLC [15] - 133:11,
134:19, 136:22,
138:13, 139:22,
140:1, 140:16,
141:8, 141:9,
141:25, 142:1,
142:5, 142:10,
142:24, 143:4
LLCs [3] - 122:20,
137:25, 139:9

located [2] - 4:10, 121:14
log [3] - 37:16, 37:17, 37:18
look [24] - 4:18, 16:18, 26:1, 27:22, 30:4, 33:22, 39:12, 57:2, 57:12, 61:9, 63:8, 69:8, 76:23, 77:7, 84:10, 86:21, 87:7, 114:9, 116:5, 136:24, 137:9, 141:15, 143:7, 152:23
Look [3] - 79:22, 100:23, 130:22
looked [8] - 19:21, 30:23, 64:10, 71:3, 93:21, 98:17, 108:6, 143:13, 152:21
looking [19] - 20:13, 22:6, 25:4, 25:25, 34:23, 48:10, 70:24, 77:9, 79:16, 85:11, 95:1, 95:21, 99:9, 112:6, 115:1, 115:25, 128:18, 136:10, 137:5
looks [4] - 78:5, 137:3, 137:11, 137:12
looming [1] - 42:19
lording [1] - 130:23
Louis [1] - 4:5
LOUIS [2] - 1:11, 1:14
Louisiana [12] - 4:10, 4:11, 6:8, 6:9, 61:1, 137:22, 140:3, 140:20, 140:22, 142:16, 154:16, 154:17
LOUISIANA [2] - 1:1, 1:6
love [1] - 15:4
low [3] - 42:8, 79:18
low-lying [1] - 79:18
lucky [1] - 144:11
lunch [1] - 17:25
Lundy [5] - 77:16, 77:19, 77:20, 82:22, 82:24, 83:1, 125:3, 125:6, 125:9
lying [1] - 79:18
Lynn [8] - 29:4, 77:1, 77:17, 80:15, 81:7, 82:14, 124:22, 125:13

**M**

ma'am [3] - 57:18, 63:14, 154:7
machine [5] - 28:23, 98:20, 99:13, 100:17, 100:18
mail [46] - 4:14, 34:19, 34:20, 37:1, 50:7, 63:2, 63:20, 65:3, 65:6, 65:18, 65:19, 65:24, 67:5, 68:25, 76:21, 77:1, 77:16, 78:5, 78:10, 80:6, 82:2, 82:3, 82:11, 82:15, 82:16, 84:3, 84:10, 85:18, 85:21, 86:20, 86:25, 87:14, 87:19, 87:22, 88:2, 92:9, 93:9, 93:15, 94:21, 95:2, 95:18, 115:1, 115:3, 124:22, 149:19
mailed [3] - 60:10, 60:23, 83:21
mailing [1] - 4:12
mails [30] - 34:17, 34:23, 36:15, 37:23, 45:25, 77:15, 85:7, 85:11, 95:18, 96:5, 107:25, 108:3, 108:18, 112:3, 113:5, 113:21, 115:4, 115:25, 116:2, 116:7, 116:11, 116:20, 117:2, 149:19, 150:1, 150:4, 150:5, 151:4, 151:5, 152:2
maintain [1] - 152:13
maintained [1] - 130:7
manage [1] - 45:13
management [2] - 54:25, 127:19
manager [1] - 101:8
manner [3] - 27:3, 28:12, 49:1
March [11] - 15:7, 15:12, 37:12, 37:13, 75:1, 136:1, 146:25, 148:4, 148:24, 149:8, 149:14
margin [1] - 82:17
Mark [1] - 140:11
marked [43] - 57:6, 59:23, 61:11, 62:23, 63:1, 63:4, 69:2, 69:4, 75:5, 76:20, 76:25, 77:14, 83:17,

86:19, 86:24, 87:3, 92:12, 93:12, 95:10, 95:13, 95:20, 96:2, 112:6, 112:9, 133:24, 134:1, 134:5, 134:13, 134:15, 134:17, 134:18, 135:22, 135:24, 136:8, 136:15, 137:17, 137:19, 138:8, 146:17, 147:6, 147:9, 148:12, 148:14
married [3] - 8:19, 11:20
marry [2] - 34:10, 94:4
Martin [1] - 142:7
Mary [1] - 4:9
MARY [1] - 1:16
massive [1] - 21:21
MASTER [2] - 1:11, 1:14
Master [3] - 4:18, 5:14, 15:3
master [1] - 4:23
material [3] - 5:1, 5:2, 144:2
matt [1] - 82:25
Matt [6] - 77:16, 77:19, 77:20, 83:1, 125:3, 125:6
Matt's [2] - 82:3, 82:4
matter [13] - 27:2, 72:11, 73:11, 74:18, 75:15, 91:19, 93:9, 117:13, 118:7, 119:3, 119:6, 119:10, 154:18
matters [5] - 30:1, 41:7, 66:8, 74:17, 124:17
MCCALL [22] - 1:15, 63:7, 85:21, 86:1, 86:4, 86:14, 86:17, 92:22, 122:25, 123:4, 123:8, 127:12, 128:16, 129:16, 129:20, 131:1, 131:5, 131:14, 131:17, 132:19, 132:23, 143:10
McCall [1] - 4:6
mean [30] - 13:13, 20:13, 24:25, 25:3, 26:6, 26:8, 30:7, 34:13, 44:6, 45:8, 45:23, 52:19, 80:21, 81:20, 89:1, 98:25,

100:6, 103:9, 103:12, 110:14, 110:21, 114:6, 115:7, 120:21, 123:23, 126:23, 130:3, 144:5, 153:12, 153:15
meaning [8] - 69:25, 74:5, 82:3, 99:15, 99:16, 106:15, 106:20, 141:6
means [7] - 39:19, 81:23, 83:4, 113:9, 113:21, 115:5, 125:12
meant [6] - 26:7, 81:9, 81:17, 110:12, 130:10, 151:10
MECHANICAL [1] - 1:24
medical [1] - 94:5
meet [8] - 11:10, 13:5, 13:10, 13:19, 14:6, 23:21, 123:1, 123:9
meeting [3] - 21:9, 21:13, 21:15, 22:5, 22:25, 23:23, 24:17, 27:4, 27:7, 30:12, 78:1, 78:12, 96:18
meetings [12] - 7:7, 23:15, 35:21, 40:23, 40:25, 41:6, 41:13, 64:21, 96:16, 96:20, 121:19, 121:21
Melvin [1] - 16:20
member [2] - 87:17, 97:16
members [8] - 29:15, 79:11, 123:2, 123:9, 127:19, 138:20
memo [2] - 32:23, 40:20
memoranda [2] - 40:14, 40:19
memory [1] - 96:6
memos [2] - 36:14, 40:21
mention [1] - 154:4
mentioned [14] - 14:19, 16:24, 21:18, 34:21, 43:4, 45:7, 49:15, 72:4, 76:17, 117:14, 131:1, 131:3, 138:3, 148:21
MERIT [1] - 1:21
Merit [2] - 154:16, 154:21
Mestayer [1] - 6:22
met [12] - 13:6, 13:12, 17:15, 18:2, 22:20,

26:19, 65:10, 78:24, 97:8, 112:5, 132:3
method [1] - 79:13
methods [1] - 113:9
MEXICO [1] - 1:5
Michael [3] - 85:20, 105:25, 141:11
MICHAEL [1] - 1:15
mid [2] - 27:7, 27:19
mid-April [2] - 27:7, 27:19
middle [1] - 120:19
midnight [1] - 47:2
might [36] - 7:15, 13:12, 16:5, 19:17, 24:19, 27:7, 40:17, 43:12, 47:8, 48:10, 50:4, 64:22, 65:11, 68:12, 68:13, 84:24, 88:14, 88:18, 90:22, 93:8, 97:5, 103:2, 108:11, 112:11, 112:25, 116:15, 120:17, 123:23, 123:24, 128:12, 136:13, 154:5
Mike [11] - 4:6, 19:3, 31:9, 31:11, 31:20, 33:8, 42:6, 42:25, 96:15, 96:19, 130:21
million [4] - 39:6, 91:7, 91:14, 100:17
million-so [1] - 91:7
mind [15] - 15:19, 16:1, 43:15, 47:10, 54:14, 55:9, 65:16, 76:14, 98:2, 112:22, 113:10, 114:7, 128:9, 135:8
minded [1] - 25:21
mine [2] - 44:7, 117:5
minute [3] - 69:11, 69:12, 123:13
minutes [1] - 21:17
miscalculation [1] - 92:7
misleading [2] - 4:25, 5:3
misstatement [1] - 144:2
misstep [1] - 129:24
module [1] - 80:8
mom [1] - 9:9
moment [8] - 17:15, 28:14, 34:18, 57:12, 57:15, 69:9, 113:7, 142:18
Monday [1] - 93:16
MONDAY [2] - 1:7, 4:2

money [16] - 70:5, 98:23, 99:13, 100:20, 102:20, 103:1, 103:5, 108:19, 113:4, 116:13, 116:16, 120:13, 151:15, 151:16, 151:17, 152:11
Monster [1] - 138:9
month [6] - 24:10, 88:12, 110:17, 110:25, 111:1
monthly [2] - 101:9, 110:10
months [10] - 34:18, 36:19, 61:18, 62:16, 93:13, 93:14, 149:25, 150:1
mop@mopslaw.com [1] - 4:14
moratoria [3] - 42:20, 48:11, 88:14
morning [1] - 26:20
Moskowitz [1] - 94:3
most [6] - 10:25, 23:11, 38:15, 43:4, 48:11, 91:16
mostly [1] - 10:18
motion [3] - 7:5, 7:12, 145:20
motions [2] - 7:15, 92:5
mouth [1] - 104:16
moved [7] - 8:12, 12:25, 14:16, 20:16, 99:21, 123:6, 148:5
MR [215] - 2:5, 2:7, 4:5, 4:15, 5:17, 12:2, 12:18, 13:15, 13:21, 13:23, 45:7, 45:11, 45:15, 45:18, 48:13, 48:17, 48:19, 53:10, 53:14, 53:17, 53:20, 54:3, 57:3, 57:4, 57:7, 57:10, 57:18, 57:19, 57:22, 58:2, 58:6, 60:1, 60:14, 60:17, 60:24, 61:3, 61:12, 62:6, 62:7, 63:2, 63:5, 63:7, 63:8, 63:11, 63:14, 63:17, 63:19, 67:21, 67:25, 68:3, 68:5, 68:7, 68:9, 68:14, 68:17, 68:18, 69:5, 69:8, 69:12, 69:16, 69:18, 73:7, 73:11, 73:16, 74:1, 75:6, 75:9, 75:17, 75:22,

77:1, 77:6, 81:4, 81:24, 83:13, 83:15, 83:18, 83:25, 84:2, 84:9, 85:18, 85:19, 85:20, 85:21, 85:24, 86:1, 86:4, 86:14, 86:17, 86:18, 86:25, 87:6, 87:10, 87:13, 88:16, 89:24, 90:2, 90:6, 90:10, 90:17, 91:5, 91:9, 91:13, 91:18, 92:13, 92:18, 92:19, 92:20, 92:21, 92:22, 92:24, 93:1, 93:3, 93:8, 93:14, 93:15, 93:19, 94:13, 94:14, 94:17, 95:14, 95:17, 95:21, 95:24, 96:4, 98:3, 99:14, 104:6, 106:8, 106:9, 106:10, 112:10, 117:10, 117:12, 117:14, 117:18, 117:20, 118:2, 118:6, 118:11, 118:20, 118:24, 119:2, 119:7, 119:11, 119:15, 119:16, 121:8, 121:9, 122:25, 123:4, 123:8, 123:13, 123:17, 124:1, 124:4, 124:6, 124:12, 124:19, 124:20, 124:22, 124:24, 125:1, 125:12, 125:18, 125:20, 125:22, 126:1, 126:7, 126:19, 126:25, 127:2, 127:12, 128:16, 129:16, 129:20, 131:1, 131:5, 131:14, 131:17, 132:19, 132:23, 132:24, 134:2, 134:4, 134:16, 135:15, 135:17, 135:23, 136:12, 136:16, 137:9, 137:15, 137:18, 143:9, 143:10, 143:11, 143:17, 144:9, 144:13, 146:7, 146:12, 147:22, 149:10, 149:12, 149:16, 150:9, 153:1, 153:3, 153:9, 153:14, 153:18, 154:3, 154:4, 154:7,

154:8
MS [70] - 2:6, 4:9, 13:13, 48:18, 53:7, 53:12, 53:16, 57:16, 57:20, 57:25, 58:4, 60:11, 60:16, 62:4, 63:10, 63:12, 63:16, 63:18, 69:11, 83:22, 87:8, 87:11, 88:12, 90:15, 90:19, 91:6, 91:10, 91:16, 92:16, 92:23, 92:25, 93:7, 93:13, 94:11, 94:16, 104:3, 117:9, 121:6, 123:16, 123:18, 124:3, 124:5, 124:21, 125:8, 125:11, 125:21, 125:25, 126:22, 135:11, 137:8, 143:13, 143:19, 144:1, 144:5, 144:11, 146:13, 146:19, 147:7, 147:24, 148:2, 148:13, 149:11, 149:22, 150:7, 153:8, 153:11, 153:15, 153:23, 153:25, 154:6
multi [2] - 39:6
multi-million [1] - 39:6
multiple [4] - 29:6, 83:24, 135:15
multiple-page [1] - 83:24
must [9] - 12:22, 15:12, 22:22, 82:10, 84:12, 88:4, 111:4, 111:5, 150:16
mutual [2] - 43:21, 43:22
myriad [1] - 32:21

N

name [30] - 4:7, 4:9, 6:14, 6:15, 7:24, 9:18, 9:20, 16:8, 19:25, 65:13, 76:17, 89:22, 90:3, 90:13, 96:14, 98:8, 98:9, 98:22, 117:18, 121:6, 128:21, 136:22, 138:11, 140:8, 141:1, 141:9, 143:25, 144:6, 148:22
named [10] - 11:16, 38:25, 75:14, 75:16,

75:17, 82:21, 97:9, 138:1, 140:6, 140:15
names [3] - 75:24, 83:19, 91:10
narrowing [1] - 35:10
nature [5] - 33:9, 89:14, 131:24, 133:18, 133:20
Navajo [1] - 140:1
near [1] - 60:22
nearly [1] - 34:15
necessarily [3] - 25:22, 32:15, 70:11
necessary [1] - 70:9
need [16] - 16:18, 30:7, 35:23, 36:5, 42:4, 77:8, 78:21, 84:14, 100:24, 111:10, 117:21, 126:20, 127:10, 132:11, 143:8, 153:18
needed [11] - 32:16, 32:17, 32:20, 33:8, 35:11, 37:10, 41:25, 42:2, 80:22, 126:4, 128:15
needing [1] - 125:3
needs [4] - 15:16, 78:23, 123:24, 132:12
negative [1] - 95:6
neglected [1] - 148:7
negotiated [1] - 27:13
negotiating [1] - 27:14
Neil [6] - 68:3, 68:3, 68:7, 68:12, 68:13
Neurontin [1] - 7:25
neutral [5] - 26:1, 26:3, 26:6, 26:7, 27:3
never [26] - 10:20, 28:2, 30:4, 43:11, 52:7, 52:16, 54:9, 55:6, 56:1, 65:16, 71:8, 100:11, 101:17, 112:22, 115:16, 119:23, 122:23, 130:12, 143:17, 144:14, 144:22, 146:3, 146:4, 150:11, 150:13
New [9] - 6:5, 8:12, 9:24, 19:24, 133:15, 141:3, 141:5, 142:12, 143:1
NEW [2] - 1:6, 1:22
new [4] - 25:19, 34:11, 115:23, 146:9

next [7] - 7:16, 23:13, 28:14, 41:16, 42:16, 78:17, 136:12
nickname [2] - 19:16, 19:19
night [1] - 45:24
NO [1] - 1:6
non [1] - 119:10
non-related [1] - 119:10
none [2] - 33:3, 92:7
noon [1] - 69:17
nose [1] - 76:18
note [2] - 40:20, 126:5
noted [1] - 26:22
notes [8] - 36:15, 40:14, 40:19, 40:25, 41:2, 41:5, 41:13, 41:18
nothing [7] - 5:9, 16:2, 33:6, 98:2, 132:17, 154:1
notice [4] - 33:18, 80:17, 115:5, 147:16
noticed [1] - 81:2
notices [2] - 72:22, 79:4
noticing [1] - 76:5
notification [1] - 75:10
notified [2] - 16:13, 74:23
notify [1] - 75:24
November [3] - 47:4, 47:5
Number [13] - 4:10, 62:24, 69:2, 83:3, 87:3, 124:19, 125:13, 126:7, 134:5, 143:10, 146:22, 147:9, 148:15
number [5] - 4:13, 39:17, 39:18, 77:7, 144:12
numbered [1] - 154:18
numbers [1] - 134:3

O

o'clock [2] - 45:24, 47:2
oath [5] - 4:22, 5:2, 5:6, 5:7, 5:14
Oats [1] - 6:18
obligation [1] - 139:3
obligations [3] - 113:5, 151:15, 151:17
obviously [3] - 4:23,

67:18, 82:11
occasion [3] - 24:24, 33:4, 40:14
occasionally [1] - 96:16
occurrence [1] - 85:4
October [2] - 44:17, 71:22
odd [1] - 91:14
Odom [6] - 45:15, 54:6, 70:13, 71:10, 132:5, 132:20
Odom's [1] - 53:24
OF [3] - 1:1, 1:5, 1:10
offer [3] - 24:7, 40:2, 123:19
offered [1] - 79:22
offering [1] - 148:16
office [53] - 9:21, 11:8, 15:8, 15:20, 18:3, 18:5, 20:22, 20:25, 21:1, 21:10, 26:17, 29:11, 31:22, 35:8, 35:24, 36:11, 37:18, 41:3, 42:4, 42:13, 44:8, 45:13, 51:25, 54:25, 55:9, 55:17, 61:22, 62:20, 64:19, 66:5, 66:10, 70:8, 70:20, 97:9, 107:13, 107:15, 109:11, 121:19, 122:1, 122:15, 123:6, 128:4, 128:16, 130:15, 130:23, 131:10, 132:2, 132:14, 139:17, 141:4, 141:5, 147:2, 149:1
OFFICE [1] - 1:17
office's [1] - 129:7
officer [9] - 4:23, 138:17, 139:6, 139:12, 140:6, 140:24, 141:13, 142:5, 142:16
officers [3] - 98:4, 98:10, 143:3
offices [2] - 20:11, 152:8
Offices [1] - 9:15
Official [2] - 154:16, 154:22
OFFICIAL [1] - 1:20
offline [5] - 37:20, 80:10, 81:22, 126:13, 126:16
offshore [1] - 117:17
often [2] - 84:16, 85:4
OIL [2] - 1:4, 1:4

oil [3] - 42:17, 97:19, 117:15
old [1] - 20:18
Olive [1] - 4:9
OLIVE [1] - 1:16
ON [1] - 1:5
once [16] - 8:13, 28:13, 34:15, 36:17, 37:15, 72:23, 76:14, 78:13, 96:24, 107:12, 109:6, 109:7, 109:13, 123:5, 150:10
One [1] - 99:2
one [108] - 9:16, 12:5, 12:6, 12:7, 12:10, 12:13, 12:15, 15:20, 19:8, 20:17, 22:6, 23:12, 24:4, 24:19, 24:24, 25:22, 26:7, 26:11, 26:20, 28:13, 33:2, 34:24, 36:1, 37:25, 38:6, 39:9, 40:20, 40:22, 41:14, 42:17, 42:19, 43:15, 43:25, 46:25, 52:22, 53:3, 53:5, 56:25, 64:13, 64:14, 66:5, 72:24, 74:16, 74:17, 77:20, 78:1, 78:24, 78:25, 79:11, 80:5, 80:24, 81:23, 83:11, 84:4, 86:14, 89:18, 90:4, 90:12, 90:25, 91:3, 91:11, 91:16, 92:15, 92:17, 93:21, 94:19, 95:21, 95:22, 95:23, 95:24, 101:8, 101:9, 105:10, 106:7, 106:11, 110:1, 111:7, 113:7, 115:1, 115:4, 121:25, 122:13, 122:14, 122:16, 123:22, 127:4, 130:9, 130:23, 131:21, 131:23, 134:17, 134:18, 135:12, 135:18, 136:13, 139:14, 140:25, 141:8, 141:11, 141:17, 143:13
one-way [1] - 110:1
ones [10] - 38:20, 40:13, 84:22, 116:2, 116:4, 116:5, 125:15, 126:20, 132:3, 138:7
online [2] - 80:9,

126:14
open [4] - 26:13, 65:25, 78:15, 84:6
opened [2] - 78:19, 130:6
operation [4] - 20:12, 21:19, 21:24, 23:2
operations [1] - 48:24
opinion [2] - 51:9, 111:16
opinions [1] - 30:13
opportunity [2] - 20:7, 106:19
option [1] - 81:12
order [2] - 4:17, 61:6
Order [2] - 57:8, 58:9
organization [2] - 70:23, 143:18
organizing [2] - 25:4, 25:6
oriented [2] - 15:18
original [2] - 30:3, 147:9
ORLEANS [2] - 1:6, 1:22
Orleans [3] - 6:5, 9:24, 133:15
Orran [4] - 29:4, 29:14, 36:22, 41:10
Orterrio [1] - 36:10
outfitted [1] - 45:14
outgoing [1] - 13:19
outline [1] - 29:10
outreach [4] - 127:5, 131:22, 131:24
outside [13] - 32:2, 32:7, 32:10, 32:16, 32:20, 38:23, 51:7, 53:25, 55:3, 55:22, 56:5, 102:6, 145:4
overly [2] - 52:8, 132:18
oversaw [1] - 66:7
oversight [5] - 22:14, 55:11, 64:7, 64:13, 64:14
owe [3] - 116:13, 116:16, 152:11
owed [2] - 113:6, 139:2
own [10] - 9:12, 17:7, 17:13, 19:15, 30:19, 32:14, 55:10, 55:12, 76:16, 88:24
owned [1] - 16:21

P

p.m [2] - 82:15, 154:9

P.O [1] - 4:12
pad [2] - 41:3, 41:4
page [30] - 33:23, 57:14, 58:18, 60:11, 60:15, 61:13, 62:1, 62:3, 62:4, 62:6, 62:9, 62:11, 63:11, 67:10, 77:13, 82:1, 82:11, 82:15, 83:2, 83:5, 83:6, 83:24, 87:6, 87:14, 136:12, 136:17, 137:10, 139:7
PAGE [2] - 2:2, 2:12
pages [1] - 30:16
paid [24] - 80:18, 81:1, 81:11, 92:3, 101:20, 105:16, 110:8, 110:19, 111:5, 111:10, 111:20, 113:12, 113:22, 114:3, 114:4, 114:5, 114:18, 114:21, 114:22, 116:8, 126:11, 126:17, 127:11, 132:10
Papa [8] - 117:19, 117:20, 117:23, 118:8, 118:19, 118:20, 119:11, 119:14
papers [1] - 122:21
paragraph [4] - 57:14, 58:19, 58:20, 67:10
paralegal [5] - 15:21, 41:25, 43:16, 43:25, 44:1
paraphrase [3] - 112:15, 112:16, 113:4
paren [2] - 141:19
Park [1] - 140:3
part [40] - 6:16, 7:21, 8:14, 10:25, 11:6, 14:24, 20:2, 27:11, 32:15, 32:18, 38:15, 40:7, 42:24, 44:6, 44:23, 48:11, 52:5, 52:7, 52:15, 55:14, 55:17, 55:20, 55:21, 59:5, 64:5, 72:3, 84:17, 95:2, 99:12, 107:14, 110:6, 113:14, 118:22, 129:7, 129:13, 129:17, 141:16, 145:20
part-time [6] - 6:16, 8:14, 42:24, 48:11, 110:6

participate [4] - 58:21, 102:3, 102:4, 132:19
particular [8] - 7:2, 18:19, 46:3, 51:4, 53:21, 59:15, 97:2, 129:23
particularly [4] - 41:21, 90:14, 118:15, 127:18
parties [8] - 16:24, 23:21, 29:22, 34:8, 37:2, 37:5, 37:16, 38:3
parties' [1] - 34:8
partner [9] - 11:5, 18:17, 36:24, 103:19, 103:22, 103:25, 116:1, 119:13, 138:1
Partners [1] - 141:8
partners [8] - 19:2, 9:11, 19:14, 29:5, 98:4, 102:10, 121:2, 133:6
partnership [2] - 9:17, 12:6
party [2] - 17:25, 71:2
pass [3] - 141:14, 142:17, 143:7
past [1] - 18:4
Pat [11] - 15:3, 15:6, 15:7, 17:21, 19:8, 19:12, 47:15, 82:24, 127:25, 132:1, 132:5
Patrick [2] - 14:12, 105:25
Pay [2] - 112:18, 115:8
pay [10] - 80:23, 101:7, 111:1, 112:21, 115:7, 116:13, 116:16, 139:3, 151:15, 151:17
paying [5] - 108:19, 108:20, 112:17, 139:1, 139:2
payment [20] - 64:6, 78:18, 80:1, 80:8, 80:13, 80:14, 81:13, 83:20, 83:21, 87:2, 87:18, 88:15, 89:7, 92:15, 126:10, 127:7, 145:21, 151:22
payments [11] - 78:22, 80:19, 93:23, 95:8, 100:14, 101:15, 111:22, 126:13, 130:17, 151:23, 152:16

pending [2] - 133:15, 142:21
Pennsylvania [1] - 6:3
people [49] - 25:5, 29:4, 33:7, 35:1, 35:3, 35:22, 35:24, 41:23, 43:11, 43:14, 52:12, 55:2, 56:12, 64:15, 66:13, 66:14, 68:20, 70:1, 75:19, 75:25, 76:6, 78:18, 79:13, 81:12, 98:17, 106:13, 112:5, 113:13, 116:8, 117:5, 125:6, 125:9, 126:4, 127:8, 128:4, 128:16, 129:14, 129:18, 129:21, 131:1, 131:9, 132:2, 132:10, 132:14, 148:24, 150:19
Pepper [3] - 154:15, 154:20, 154:20
PEPPER [1] - 1:20
per [1] - 54:18
perceived [2] - 131:6, 131:8
percent [4] - 39:20, 81:13, 81:14, 100:23
percentage [3] - 39:18, 101:3, 139:4
Perez [9] - 118:8, 119:3, 119:9, 119:12, 119:13, 142:18, 142:19, 143:3, 143:6
perfect [3] - 43:3, 43:6, 109:24
performance [1] - 109:22
performed [1] - 18:20
performing [1] - 129:8
perhaps [2] - 77:24, 108:19
period [11] - 10:17, 19:5, 24:21, 32:25, 41:21, 48:20, 54:12, 91:12, 101:7, 101:15, 104:18
permanent [2] - 20:22, 21:1
permission [2] - 118:3, 118:4, 118:14, 121:24, 122:2, 122:4
Pershing [1] - 141:2
person [13] - 24:17, 40:16, 41:3, 58:23, 64:3, 67:11, 69:1, 88:4, 97:5, 97:19,

98:8, 98:9
person...a [1] - 59:10
personal [13] - 14:23, 73:11, 73:14, 74:7, 74:18, 86:3, 86:4, 97:1, 102:18, 107:10, 122:16, 132:14, 152:14
personality [1] - 99:7
perspective [1] - 31:24
pertained [1] - 38:6
Peter [3] - 39:4, 39:11, 50:1
Philadelphia [1] - 6:4
phone [7] - 4:13, 23:11, 23:25, 24:4, 24:16, 47:1
phonetically [2] - 36:10, 128:22
phrase [1] - 46:15
picking [1] - 8:14
picture [1] - 85:16
Pierson [1] - 4:9
PIERSON [70] - 1:16, 4:9, 13:13, 48:18, 53:7, 53:12, 53:16, 57:16, 57:20, 57:25, 58:4, 60:11, 60:16, 62:4, 63:10, 63:12, 63:16, 63:18, 69:11, 83:22, 87:8, 87:11, 88:12, 90:15, 90:19, 91:6, 91:10, 91:16, 92:16, 92:23, 92:25, 93:7, 93:13, 94:11, 94:16, 104:3, 117:9, 121:6, 123:16, 123:18, 124:3, 124:5, 124:21, 125:8, 125:11, 125:21, 125:25, 126:22, 135:11, 137:8, 143:13, 143:19, 144:1, 144:5, 144:11, 146:13, 146:19, 147:7, 147:24, 148:2, 148:13, 149:11, 149:22, 150:7, 153:8, 153:11, 153:15, 153:23, 153:25, 154:6
PIERSON..................
........ [1] - 2:6
Pine [1] - 140:3
place [9] - 17:5, 27:7, 33:7, 35:16, 35:17, 37:11, 37:25, 41:2,

50:18
Plaintiff [1] - 11:6
plaintiff's [1] - 25:15
plaintiffs [4] - 10:23, 11:2, 11:4, 27:12
plate [2] - 76:18, 132:8
play [1] - 109:14
PLC [1] - 10:3
plug [1] - 144:6
plugged [1] - 107:13
Point [1] - 125:13
point [65] - 7:19, 9:16, 12:13, 12:15, 18:22, 19:8, 19:14, 20:11, 23:12, 23:13, 25:19, 31:8, 34:24, 35:15, 37:20, 43:25, 57:5, 59:22, 61:10, 62:25, 64:2, 69:3, 69:14, 75:4, 76:12, 76:24, 80:24, 83:16, 86:23, 88:8, 92:11, 93:11, 95:8, 95:12, 95:19, 97:21, 100:16, 101:12, 102:14, 103:15, 104:23, 105:7, 105:15, 106:3, 106:7, 106:11, 110:19, 112:8, 120:2, 121:15, 124:10, 131:15, 131:21, 133:25, 134:14, 135:11, 135:21, 136:14, 137:16, 146:16, 147:5, 148:11, 150:23, 150:24
policies [21] - 34:13, 34:15, 38:2, 38:5, 38:10, 38:11, 38:13, 39:12, 39:15, 40:6, 40:8, 40:11, 50:16, 55:8, 55:12, 56:5, 56:8, 56:13, 70:2, 71:4, 85:16
Policy [1] - 37:9
policy [11] - 33:15, 37:20, 37:24, 38:9, 52:24, 52:25, 53:8, 54:6, 55:10
policy-deciding [1] - 33:15
policy-making [1] - 33:15
portfolio [1] - 69:24
portion [4] - 40:13, 72:25, 80:3, 93:2
portions [1] - 111:21
position [12] - 23:20,

25:17, 26:1, 26:3, 26:10, 51:17, 59:15, 65:2, 67:19, 74:3, 74:12, 103:14
possibility [2] - 20:3, 24:22, 151:10
possible [2] - 125:17, 125:19
POST [1] - 1:17
posted [2] - 81:18, 125:14
POYDRAS [1] - 1:22
practice [13] - 7:12, 10:16, 14:23, 14:24, 18:19, 30:18, 48:25, 107:9, 109:13, 109:18, 110:8, 121:24, 152:9
practicing [2] - 64:25, 98:25
practitioner [1] - 7:23
prefer [2] - 5:18, 107:8
preliminarily [1] - 26:19
preliminary [3] - 22:24, 23:5, 26:18
prepare [3] - 58:14, 61:23, 62:21
prepared [1] - 60:3
preparer [1] - 102:6
preparing [1] - 102:1
prerequisite [1] - 145:14
present [10] - 27:5, 27:6, 29:22, 47:23, 50:2, 58:23, 59:9, 67:11, 84:24, 106:13
presentation [1] - 39:13
presented [4] - 29:13, 31:6, 36:7, 36:9
presents [2] - 58:22, 67:11
president [3] - 63:24, 68:4, 68:5
pretty [2] - 14:9, 99:20
prevent [1] - 30:22
previous [7] - 48:24, 73:8, 73:9, 75:15, 76:6, 139:17, 144:15
previously [3] - 17:15, 76:1, 96:23
principles [3] - 40:1, 40:3, 134:20
print [1] - 108:2
printed [1] - 136:10
privy [2] - 50:2, 95:1
problem [8] - 29:10, 30:14, 46:14, 52:17, 85:2, 153:8, 153:11,

154:6
problems [7] - 30:22, 31:3, 31:6, 33:20, 33:25, 45:6, 78:25
procedure [3] - 50:15, 50:17, 76:3
procedures [3] - 70:3, 70:10, 71:4
proceeding [1] - 124:7
proceedings [28] - 57:5, 59:22, 61:10, 62:25, 69:3, 69:14, 75:4, 76:24, 83:16, 86:23, 92:11, 93:11, 95:12, 95:19, 112:8, 124:10, 133:25, 134:14, 135:21, 136:14, 137:16, 146:16, 147:5, 148:11, 154:9, 154:18
PROCEEDINGS [2] - 1:24, 4:1
process [44] - 4:19, 26:13, 33:12, 33:15, 38:1, 40:7, 48:1, 50:15, 50:17, 51:8, 51:19, 54:1, 55:3, 58:25, 64:6, 64:8, 67:13, 75:25, 76:3, 76:8, 76:9, 76:13, 78:21, 79:19, 81:10, 87:18, 88:13, 88:15, 89:7, 102:25, 103:16, 104:25, 105:8, 106:21, 114:22, 121:11, 122:10, 126:13, 128:23, 130:8, 131:2, 145:21, 146:9
processed [2] - 114:4, 114:5
processes [3] - 36:1, 71:3, 79:13
processing [8] - 72:20, 72:21, 96:13, 127:24, 128:19, 129:14, 129:17, 129:21
PRODUCED [1] - 1:25
professional [6] - 6:1, 6:11, 53:9, 141:19, 143:15, 143:21
proffer [2] - 124:4, 124:5
program [65] - 15:16, 16:3, 16:13, 16:14, 17:8, 17:9, 21:22, 25:10, 26:24, 28:13, 28:24, 29:9, 31:23,

32:19, 33:19, 34:15,
34:16, 35:2, 35:13,
36:24, 37:10, 42:8,
42:20, 58:25, 59:5,
60:5, 64:5, 64:22,
67:14, 68:21, 71:19,
74:23, 75:19, 76:17,
77:21, 78:13, 79:6,
80:2, 81:13, 81:15,
85:16, 87:20, 88:6,
94:5, 94:6, 103:12,
105:1, 105:2, 105:5,
106:19, 106:20,
106:25, 107:2,
107:18, 109:23,
109:25, 110:12,
110:22, 111:9,
123:6, 127:23,
135:2, 151:13
programmers [1] -
29:4
programs [2] -
131:22, 131:24
progressed [1] -
102:21
prompted [1] - 88:2
property [2] - 32:21,
39:4
propose [1] - 37:2
proposed [3] - 58:25,
65:13, 67:13
protocol [2] - 35:7,
54:25
provide [4] - 57:23,
75:24, 84:15, 153:6
provided [4] - 27:18,
33:6, 147:8, 150:1
providing [1] - 103:1
provision [1] - 145:16
provisions [1] - 59:14
PSC [10] - 27:11, 35:1,
37:6, 77:20, 78:1,
78:12, 78:24, 79:22,
84:5, 97:16
PSC's [1] - 14:22
public [3] - 34:14,
137:20, 137:21
publication [1] - 34:14
publicly [2] - 136:2,
140:21
publicly-available [1]
- 136:2
pull [1] - 137:13
pulled [1] - 148:6
purport [1] - 136:19
purports [1] - 146:20
purpose [1] - 146:14
pursued [1] - 16:25
push [2] - 79:15,
81:21

put [21] - 4:21, 22:10,
28:24, 30:18, 35:16,
36:13, 37:11, 40:20,
41:4, 46:10, 92:4,
98:14, 100:17,
104:16, 120:13,
126:3, 129:7,
131:23, 153:20,
153:21
puts [2] - 41:3, 99:13
putting [5] - 5:6, 76:5,
100:20, 100:24,
124:17

Q

questioned [3] -
108:4, 116:6, 125:3
questions [31] - 5:23,
5:25, 23:4, 28:4,
28:16, 31:2, 32:11,
32:14, 50:23, 55:23,
56:19, 63:9, 64:16,
69:19, 77:9, 85:18,
85:23, 86:22, 108:5,
117:12, 123:20,
124:15, 124:16,
132:25, 133:1,
143:9, 144:15,
145:25, 149:12
quicker [1] - 74:11
quickly [1] - 80:22
quite [2] - 41:21,
103:10
quote [6] - 24:7,
58:20, 107:18,
108:10, 108:12,
112:11
quoted [1] - 108:10
quoting [1] - 106:23

R

raised [1] - 30:1
ramp [1] - 130:8
rare [3] - 85:10, 85:13,
85:14
rather [1] - 109:17
RE [1] - 1:4
Re [3] - 63:3, 92:15,
134:22
reached [1] - 43:22
reaching [2] - 72:23,
84:24
read [16] - 17:1, 17:11,
22:20, 27:17, 30:10,
57:15, 77:11, 81:9,
92:5, 106:12,
112:24, 115:4,

116:4, 126:7, 138:4,
149:18
Reade [1] - 36:11
readily [1] - 34:2
reading [5] - 30:9,
31:7, 63:16, 80:5,
107:24, 116:7
ready [5] - 25:3, 80:1,
80:8, 130:5
real [1] - 6:20
realize [2] - 89:9,
89:10
realized [2] - 35:12,
39:2
really [37] - 8:13,
10:20, 14:23, 18:6,
25:7, 27:1, 28:23,
33:21, 33:24, 36:16,
40:2, 40:12, 42:23,
43:5, 44:4, 44:5,
46:4, 46:7, 48:6,
53:18, 76:18, 78:17,
79:17, 80:21, 81:23,
85:15, 101:24,
106:16, 106:17,
109:9, 109:25,
112:3, 131:11,
132:8, 132:13,
143:18
realm [3] - 129:15,
132:9
REALTIME [1] - 1:21
Realtime [3] - 154:15,
154:21
reason [4] - 89:1,
89:4, 126:2, 135:25
reasonable [3] -
58:23, 59:10, 67:11
reasons [2] - 105:10,
105:13
rebuild [1] - 109:13
receive [12] - 24:15,
78:18, 89:3, 108:24,
110:17, 149:4,
149:7, 149:13,
150:12, 150:24,
150:25, 151:2
received [4] - 22:23,
83:20, 126:10, 149:1
receiving [5] - 100:14,
101:14, 109:2,
110:16, 130:16
recently [4] - 88:18,
102:16, 115:22,
150:5
recess [2] - 69:15,
124:11
recite [1] - 136:17
recites [1] - 141:2
reclamation [1] - 98:1

recollection [8] -
57:12, 60:18, 73:2,
73:5, 88:17, 94:1,
112:14, 125:1
recommend [1] -
43:10
recommendation [4] -
29:22, 34:3, 34:12,
144:17
recommendations [6]
- 29:12, 29:21,
30:13, 37:1, 39:11,
51:9
recommended [8] -
43:7, 43:11, 44:13,
97:12, 135:4, 144:25
recommending [1] -
48:2
reconciliation [1] -
38:7
record [17] - 4:5, 57:3,
66:20, 69:5, 69:16,
76:5, 118:14, 119:9,
121:6, 123:20,
123:21, 124:12,
124:18, 126:10,
153:21, 153:22,
154:18
RECORDED [1] - 1:24
records [2] - 41:1,
124:14
recovery [1] - 83:13
Recusal [2] - 58:19,
62:2, 62:8
recusal [2] - 50:8,
57:14
recused [4] - 39:3,
49:23, 50:8, 96:23
refer [3] - 25:14, 37:5,
97:2
referenced [2] - 19:18,
152:3
referral [2] - 121:12,
149:14
referred [10] - 8:16,
10:10, 17:5, 38:10,
56:21, 60:6, 72:4,
97:6, 138:9
referring [4] - 22:17,
58:7, 65:18, 101:4
reflect [2] - 66:20,
139:6
reflected [2] - 141:13,
142:16
reflects [3] - 136:2,
137:4, 143:3
refresh [1] - 57:12
regard [9] - 32:18,
34:20, 43:3, 65:3,
74:6, 135:12,

148:21, 150:3, 154:2
regarding [4] - 59:16,
93:17, 132:20, 146:9
Regarding [1] - 61:1
regardless [1] -
133:15
REGISTERED [1] -
1:21
registered [7] -
137:22, 139:12,
140:24, 141:25,
143:21, 144:2,
154:21
Registered [1] -
154:15
registrant [1] - 138:1
registration [4] - 10:7,
33:18, 78:14, 143:3
regular [9] - 29:19,
64:1, 64:20, 85:12,
109:2, 109:12
Reitano [30] - 4:6,
5:18, 5:20, 5:21,
5:22, 9:14, 9:17,
9:19, 10:11, 10:14,
57:8, 57:13, 58:20,
62:23, 63:3, 69:19,
75:6, 77:2, 86:21,
87:2, 93:16, 122:25,
123:1, 127:12,
141:18, 143:14,
146:20, 147:17,
147:19, 153:21
REITANO [3] - 1:10,
1:18, 5:12
Reitano's [1] - 124:13
REITANO..................
................. [2] - 2:4
related [8] - 15:22,
59:7, 68:21, 114:18,
119:10, 121:21,
121:25, 122:9
RELATES [1] - 1:8
relating [2] - 72:11,
74:17
relation [1] - 64:1
relationship [19] -
18:1, 42:16, 66:18,
66:19, 74:23, 76:14,
97:24, 97:25,
102:21, 102:22,
117:22, 118:1,
119:25, 120:7,
120:15, 120:16,
134:24, 138:22,
152:7
relationships [8] -
16:12, 97:22,
127:17, 127:18,
133:2

relaying [1] - 94:8
release [1] - 83:19
releasing [1] - 58:3
relevant [2] - 58:24,
67:12
relief [1] - 46:25
relying [1] - 54:23
remainder [1] - 40:12
remember [33] - 6:14,
12:9, 17:6, 19:7,
22:22, 24:16, 40:22,
43:20, 50:5, 61:5,
68:11, 75:16, 78:8,
78:9, 86:9, 86:10,
86:12, 86:13, 96:14,
101:24, 107:4,
107:5, 107:22,
107:23, 108:13,
108:14, 110:9,
111:7, 131:19,
131:20, 140:17
reminding [1] - 132:9
removed [1] - 92:8
rent [1] - 12:16
rents [1] - 141:4
repeat [1] - 75:12
rephrase [1] - 113:18
report [19] - 17:2,
48:5, 81:17, 106:12,
106:13, 107:17,
107:18, 112:4,
112:5, 116:5, 126:9,
128:10, 136:1,
136:2, 138:5, 139:6,
143:15, 153:25
REPORTER [1] - 1:20,
1:21, 1:21
Reporter [7] - 154:15,
154:16, 154:16,
154:21, 154:21,
154:22
reporter's [1] - 57:17
REPORTER'S [1] -
154:14
reporting [2] - 70:4,
128:7
reports [1] - 137:20
represent [2] - 15:25,
139:11
representation [4] -
74:21, 84:18, 86:2,
86:15
represented [10] -
49:21, 75:14, 76:1,
76:6, 82:22, 88:22,
94:23, 96:23, 125:9,
136:21
representing [10] -
10:23, 27:12, 71:20,
75:2, 75:19, 105:8,

118:7, 119:3, 119:5,
119:8
request [4] - 44:18,
44:20, 153:4, 153:5
require [1] - 79:19
required [2] - 54:22,
54:24
research [15] - 6:18,
10:20, 15:18, 32:12,
32:14, 32:15, 32:16,
32:17, 32:22, 32:24,
33:1, 33:4, 33:9,
39:10
research-type [1] -
6:18
reservations [1] -
145:25
residing [1] - 134:19
resolution [1] - 49:13
resolve [1] - 36:19
resolved [5] - 46:10,
47:12, 47:14, 74:11,
74:12
resources [2] - 35:10,
36:4
respect [21] - 10:13,
11:16, 14:15, 28:5,
28:11, 29:25, 30:14,
31:13, 32:11, 41:6,
49:12, 61:20, 64:8,
69:20, 70:19, 107:1,
121:12, 140:23,
146:1, 149:12,
149:14
respond [2] - 50:4,
153:5
responded [1] - 50:5
respondent [1] - 86:6
respondents [1] -
64:16
responding [3] -
72:22, 78:5, 107:24
response [5] - 34:4,
34:5, 94:7, 120:22,
144:14
response) [5] - 62:13,
92:18, 95:6, 121:16,
124:23
responses [1] - 34:9
responsibilities [11] -
7:2, 18:19, 31:17,
45:2, 45:21, 52:6,
52:7, 52:15, 55:15,
69:20, 69:24
responsibility [7] -
22:9, 45:11, 45:12,
53:24, 55:20, 55:21,
55:25
responsible [3] -
53:21, 70:23, 144:20

rest [4] - 17:10, 36:2,
46:11, 80:5
result [2] - 149:2,
149:24
retain [2] - 32:7,
150:20
retained [6] - 31:9,
67:18, 90:13,
150:17, 150:23,
151:19
retainer [2] - 147:9,
148:6
retired [1] - 19:9
retrieve [1] - 124:20
return [2] - 12:16,
139:4
returns [4] - 8:24,
102:1, 153:7, 153:16
review [18] - 7:4, 28:2,
28:10, 29:24, 30:10,
30:13, 30:19, 34:7,
38:3, 50:12, 51:8,
51:18, 77:8, 78:21,
79:15, 130:10,
137:13, 153:6
reviewed [6] - 27:17,
39:19, 39:20, 39:21,
40:9, 92:6
reviewers [1] - 7:6
reviewing [5] - 78:16,
79:1, 79:3, 102:2,
130:17
reviews [9] - 58:5,
61:5, 69:10, 77:11,
81:18, 87:12, 93:6,
96:8, 143:12
Rice [1] - 26:19
RIG [1] - 1:4
ring [2] - 140:4, 140:5
risky [1] - 107:8
RMR [2] - 1:20, 154:20
Robert [7] - 118:8,
119:9, 119:12,
119:13, 142:18,
143:3, 143:6
Roberts [3] - 43:17,
43:24, 43:25
role [17] - 7:2, 22:9,
31:25, 32:7, 42:12,
45:2, 45:13, 48:21,
64:4, 64:7, 70:11,
71:6, 85:15, 113:15,
128:11, 129:7,
130:22
roles [4] - 69:20,
101:8, 129:12,
132:10
Roll [1] - 4:10
Romania [1] - 99:10
Romeo [8] - 117:19,

117:20, 117:23,
118:8, 118:19,
118:20, 119:11,
119:14
Ronald [2] - 16:20
room [1] - 125:5
ROOM [1] - 1:22
rooms [1] - 121:25
Rose [1] - 38:25
Rosie [1] - 39:11
Rouge [2] - 4:11, 4:13
ROUGE [1] - 1:18
roughly [1] - 39:16
round [1] - 36:18
row [2] - 7:20, 125:21
RTP [1] - 115:5
rules [2] - 70:2, 70:10
ruling [1] - 57:23
run [1] - 81:22

S

s/Cathy [1] - 154:20
salaries [4] - 108:20,
139:1, 139:2, 139:4
salary [30] - 22:2,
22:3, 24:3, 24:4,
24:7, 44:25, 101:9,
101:10, 101:11,
101:19, 108:24,
110:3, 110:10,
110:14, 110:15,
110:16, 111:10,
111:12, 111:20,
112:17, 112:18,
112:21, 113:6,
116:13, 116:14,
116:16, 151:17,
151:22, 152:16
sampling [1] - 80:3
Sarasota [2] - 63:4,
64:12
sat [3] - 15:14, 41:10,
132:5
satisfaction [1] -
145:7
saw [7] - 22:23, 25:7,
52:7, 52:15, 56:11,
70:5, 106:19
scale [1] - 21:22
scapegoat [1] -
130:15
scenario [2] - 28:18,
28:19
Scheurich [4] -
128:22, 131:3,
131:14, 132:21
school [14] - 5:25, 6:4,
6:6, 11:19, 11:21,

11:22, 11:24, 13:6,
13:16, 14:9, 17:21,
17:22, 18:9, 98:21
Scott [3] - 128:22,
131:3, 131:23
screen [1] - 28:17
scrolling [1] - 34:22
SDA [1] - 139:14
se [1] - 54:18
Seahorse [1] - 142:24
search [1] - 137:21
second [2] - 59:19,
62:1
seconds [1] - 66:20
Secretariat [1] -
142:10
secretary [10] - 15:21,
41:11, 41:24,
122:16, 140:20,
140:22, 142:17,
143:21, 144:6, 148:6
secure [2] - 21:7,
55:25
see [45] - 8:5, 22:15,
27:25, 30:20, 45:4,
45:13, 47:2, 52:5,
55:14, 55:20, 55:21,
56:7, 56:14, 59:1,
62:10, 64:17, 65:11,
65:20, 66:3, 66:11,
66:15, 66:16, 66:17,
66:22, 67:2, 73:14,
78:21, 80:6, 85:2,
91:5, 91:6, 97:4,
99:5, 101:10,
104:18, 104:21,
104:24, 110:1,
119:17, 126:4,
126:22, 136:5,
144:22, 145:18,
146:5
seeing [1] - 150:5
seem [2] - 21:21, 42:2
segregated [1] - 41:5
self [1] - 54:11
self-generated [1] -
54:11
send [1] - 37:3,
40:14, 40:20, 65:3,
67:5, 79:4, 83:8,
84:11, 104:13,
125:6, 134:18
sending [3] - 40:18,
84:5, 94:21
sense [16] - 9:9,
11:15, 25:10, 33:13,
36:22, 41:14, 42:7,
83:6, 97:18, 100:1,
103:1, 115:23,
125:6, 125:7,

127:16, 128:13
sent [16] - 34:8, 38:2, 40:18, 65:6, 65:19, 65:24, 68:25, 78:6, 80:17, 94:24, 105:10, 134:10, 135:12, 146:24, 148:17, 148:19
separate [13] - 41:5, 53:12, 54:21, 104:10, 117:5, 121:17, 124:7, 150:19, 151:23, 152:13, 152:20
separately [1] - 150:18
September [8] - 76:22, 77:2, 77:16, 77:22, 78:2, 78:3, 82:15, 101:23
series [2] - 76:21, 137:20
seriously [1] - 106:24
server [1] - 84:3
Sessions [9] - 32:17, 39:4, 53:25, 55:22, 56:1, 61:23, 62:21, 71:7, 71:8
set [8] - 20:12, 22:15, 23:13, 40:4, 41:5, 48:4, 63:20, 112:3, 141:9
setting [1] - 76:13
settle [3] - 74:8, 152:6, 152:7
settled [3] - 7:22, 116:14, 151:12
settlement [21] - 14:20, 17:8, 22:18, 22:21, 25:8, 26:21, 27:17, 27:23, 28:5, 29:17, 33:22, 40:4, 78:22, 79:23, 94:5, 94:6, 103:12, 105:1, 105:2, 105:5, 135:2
settlements [1] - 77:25
seven [3] - 45:24, 91:14, 136:17
seven-page [1] - 136:17
several [7] - 61:18, 62:16, 66:20, 73:2, 78:13, 92:6, 124:15
shadow [1] - 128:5
shadowing [2] - 128:14, 128:17
shall [1] - 58:20
share [3] - 8:21, 21:2, 100:23

SharePoint [1] - 36:8
sheet [1] - 36:18
Sher [3] - 95:16, 96:2, 96:9
shock [1] - 116:24
shocking [1] - 108:9
Shoreline [2] - 142:12, 143:1
short [4] - 24:1, 69:17, 79:25, 124:8
short-term [1] - 79:25
shortly [2] - 15:2, 83:8
shoulder [1] - 128:18
show [30] - 50:22, 59:21, 61:4, 61:7, 62:23, 69:2, 71:12, 74:25, 76:20, 86:19, 86:21, 92:9, 93:8, 95:10, 95:17, 133:24, 134:5, 134:13, 135:24, 136:8, 136:20, 137:19, 137:24, 138:6, 138:8, 139:5, 139:11, 146:20, 148:14, 148:16
showed [3] - 67:7, 94:20, 126:9
showing [1] - 146:14
shown [2] - 116:3, 116:4
shows [1] - 136:12
side [8] - 25:22, 25:23, 26:11, 26:12, 124:16, 130:24, 131:2
sidebar [2] - 124:1, 124:13
sides [1] - 26:1
sign [5] - 59:19, 60:7, 145:13, 145:15, 145:22
signature [6] - 60:15, 61:13, 61:14, 62:14, 147:12, 147:14
signed [18] - 50:18, 50:19, 51:5, 56:22, 58:8, 58:12, 60:18, 61:16, 62:12, 69:7, 72:10, 83:19, 145:19, 146:5, 147:16, 147:19, 148:9, 148:15
signing [1] - 146:1
similar [1] - 99:10
single [1] - 41:11
sit [18] - 16:16, 16:23, 23:15, 23:17, 29:19, 40:24, 66:11, 66:14, 66:22, 67:15, 87:24,

113:11, 113:17, 113:20, 114:25, 117:6, 125:2, 126:18
site [2] - 64:17, 125:14
sites [1] - 100:19
sitting [1] - 118:17
situation [5] - 25:24, 44:2, 64:24, 114:7, 149:21
situations [3] - 11:5, 56:12, 94:22
six [2] - 93:13, 93:14
Slidell [1] - 146:23
slogan [1] - 99:2
slow [1] - 130:7
slowed [1] - 36:20
small [5] - 14:9, 15:20, 21:19, 64:19, 106:18
smart [3] - 97:17, 106:17, 107:11
SmithStag [1] - 97:6
software [1] - 36:8
sole [2] - 7:23, 23:2
solving [1] - 46:14
some-odd [1] - 91:14
someone [2] - 56:2, 65:1, 76:4, 98:12, 129:24, 137:12
sometime [3] - 15:6, 47:4, 99:20
sometimes [3] - 18:6, 35:21, 84:3
somewhat [2] - 23:8, 36:21
somewhere [2] - 137:2, 138:4
son [2] - 8:8, 31:9
soon [2] - 27:18, 130:5
sorry [13] - 5:19, 14:17, 49:18, 83:3, 86:8, 86:12, 88:17, 89:8, 110:14, 115:12, 125:16, 134:2, 147:24
sort [14] - 9:16, 10:21, 18:1, 20:1, 25:6, 25:13, 55:1, 64:24, 65:23, 90:22, 101:21, 127:9, 130:7, 131:23
sorts [1] - 23:14
sound [2] - 91:10, 112:24
sounds [7] - 23:25, 41:21, 112:15, 113:3, 140:17, 141:1, 142:25
source [2] - 79:5, 131:13

space [6] - 20:21, 21:7, 121:15, 121:17, 121:19, 121:21, 123:1, 141:4
spaces [2] - 20:14, 34:4
speaking [1] - 120:6
SPECIAL [2] - 1:11, 1:14
Special [3] - 4:18, 5:14, 15:3
special [3] - 4:23, 31:20, 48:6
specialized [2] - 18:21, 29:8
specific [6] - 41:8, 56:19, 59:15, 70:18, 81:25, 131:9
specifically [14] - 16:7, 16:10, 20:6, 29:24, 46:24, 56:1, 75:16, 75:17, 75:24, 90:14, 101:22, 111:8, 114:1, 114:2
specifics [1] - 78:9
specify [2] - 75:13, 87:8
speculating [1] - 108:7
speculations [1] - 149:20
spelled [3] - 15:15, 36:10, 128:22
spend [2] - 23:22, 31:22
spent [1] - 26:20
spill [3] - 90:21, 90:22, 97:20
SPILL [1] - 1:4
split [1] - 90:24
spoken [2] - 68:1, 68:13
sponte [1] - 30:19
spreadsheet [5] - 34:1, 34:6, 125:24, 127:3
spreadsheets [4] - 33:16, 34:25, 36:18
spring [1] - 14:17
SSN [1] - 29:1
staff [2] - 123:1, 123:9
staffed [1] - 44:8
stand [1] - 130:24
standing [1] - 6:9
stands [2] - 94:11, 94:13
start [13] - 4:21, 5:6, 5:22, 8:3, 20:3, 29:7, 46:25, 47:3, 63:10, 78:15, 87:4, 93:20

started [24] - 6:1, 7:3, 7:23, 8:11, 9:11, 9:18, 9:23, 9:24, 14:15, 18:14, 29:7, 33:16, 33:17, 34:6, 42:12, 47:6, 62:16, 71:12, 75:23, 102:11, 102:18, 107:12, 135:1, 143:5
starting [1] - 60:7
starts [4] - 41:3, 41:4, 93:3, 93:4
State [4] - 137:22, 140:20, 142:16, 154:16
state [7] - 4:7, 39:7, 140:20, 140:22, 142:17, 143:21, 144:6
statement [5] - 5:1, 5:2, 83:20, 141:20, 151:2
STATEMENT [1] - 1:10
statements [2] - 152:21, 152:23
States [3] - 60:25, 154:16, 154:22
STATES [1] - 1:1
status [4] - 84:20, 85:9, 114:12, 115:6
stay [6] - 9:9, 12:16, 17:7, 49:25, 64:20, 81:13
stay-at-home [1] - 9:9
stayed [4] - 8:9, 12:24, 109:17, 144:24
Steering [1] - 11:6
steering [1] - 85:16
Steilberg [1] - 122:15
STENOGRAPHY [1] - 1:24
step [2] - 41:17, 78:17
Stephen [3] - 86:25, 92:13, 93:17
stepped [1] - 130:22
steps [1] - 144:22
STEVE [1] - 1:14
Steve [2] - 4:6, 94:7
still [5] - 8:14, 17:22, 26:17, 120:15
stood [1] - 130:2
stop [1] - 16:5
straightforwardness [1] - 39:13
streamlined [1] - 35:10
Street [1] - 103:23, 104:1, 105:23, 133:11, 136:23,

**C O N F I D E N T I A L**

139:16, 139:24, 141:3, 146:23, 147:20, 148:6
STREET [1] - 1:22
street [2] - 78:22, 110:1
stretch [1] - 110:1
strike [1] - 71:1
string [5] - 77:15, 82:12, 82:16, 92:10, 94:19
structured [1] - 77:25
student [1] - 13:21
studied [1] - 27:17
stuff [3] - 11:13, 20:18, 40:2
stupid [1] - 106:15
sua [1] - 30:19
subject [10] - 38:6, 52:5, 57:22, 63:3, 77:3, 87:2, 93:9, 95:16, 96:2, 119:23
submission [1] - 71:21
submitted [2] - 83:20, 137:14
subsequent [1] - 91:24
subsequently [1] - 82:8
subsistence [3] - 72:25, 73:3, 73:6
substantive [1] - 7:17
subtract [1] - 40:11
successful [1] - 129:9
suffer [1] - 130:12
suffered [1] - 19:8
sufficient [1] - 25:13
suggested [1] - 33:22
suggesting [2] - 35:9, 113:7
suggestions [2] - 39:10, 111:13
Suite [1] - 4:11
suits [1] - 7:25
summer [2] - 31:21, 99:6
supervised [4] - 58:25, 59:5, 66:7, 67:14
supervising [2] - 7:6, 25:6
supplies [1] - 117:17
supply [2] - 42:18, 117:15
support [3] - 11:22, 32:8, 43:1
supposed [9] - 100:16, 107:13, 108:12, 108:23,

110:4, 110:17, 110:24, 112:12, 113:1
surfacing [1] - 127:13
surprise [1] - 116:24
surprised [1] - 17:12
surrounding [1] - 4:20
Susan [5] - 43:15, 43:20, 65:1, 65:3, 65:4
Sutton [26] - 8:17, 9:12, 9:14, 9:15, 9:17, 9:18, 9:22, 10:8, 10:11, 10:14, 75:6, 87:1, 92:14, 93:3, 94:21, 95:14, 96:1, 122:8, 123:1, 140:19, 140:24, 141:11, 141:18, 143:14
SWAT [2] - 128:23, 131:22
SWAT-team [1] - 128:23
swear [1] - 5:8
SWORN [1] - 1:10
sworn [1] - 5:13
system [5] - 33:14, 35:16, 37:2, 37:16, 81:23
systematic [1] - 130:11

**T**

T-Blue [3] - 142:5, 142:9, 143:4
T-Bob [1] - 19:25
TAKEN [1] - 1:11
talks [1] - 145:9
Tammy [3] - 43:17, 43:24, 43:25
Tampa [1] - 142:24
tangent [1] - 131:25
task [2] - 28:9, 55:12
tax [6] - 8:24, 39:7, 102:1, 102:6, 153:7, 153:16
team [4] - 29:14, 48:12, 128:19, 128:23
teams [5] - 29:6, 29:8, 29:9, 38:16, 46:9
technologically [1] - 89:5
technology [4] - 98:12, 98:16, 99:9, 99:10
templates [1] - 33:19

temporarily [2] - 19:9, 150:21
ten [3] - 18:5, 19:3, 69:12
ten-minute [1] - 69:12
tenants [2] - 13:2, 20:17
tense [1] - 12:23
tent [1] - 130:4
term [1] - 79:25
terminate [3] - 132:4, 132:21
terminated [5] - 16:12, 74:22, 76:14, 97:23, 131:14
terms [17] - 10:7, 26:21, 27:2, 27:14, 28:5, 32:4, 39:23, 40:10, 48:23, 51:4, 55:3, 72:20, 72:21, 74:21, 95:2, 105:8, 110:9
testified [1] - 5:14
testimony [2] - 5:8, 150:10
THE [96] - 1:4, 1:5, 1:11, 5:11, 12:3, 13:14, 13:22, 45:9, 45:12, 45:17, 48:16, 53:18, 53:23, 58:5, 59:24, 63:15, 67:24, 68:1, 68:4, 68:6, 68:8, 68:11, 68:16, 69:10, 73:9, 73:13, 73:18, 75:8, 75:18, 81:6, 84:1, 84:4, 86:3, 86:8, 86:16, 87:12, 88:13, 90:1, 90:4, 90:8, 91:8, 91:15, 93:6, 93:18, 94:15, 95:23, 98:5, 104:4, 117:11, 117:16, 117:19, 117:24, 118:5, 118:10, 118:19, 118:22, 118:25, 119:5, 119:10, 119:13, 123:3, 123:5, 123:11, 124:23, 124:25, 125:4, 125:10, 125:17, 125:19, 126:6, 126:8, 126:23, 127:1, 127:4, 127:20, 128:19, 129:19, 129:22, 131:4, 131:8, 131:16, 131:19, 132:22, 135:14, 137:11,

143:12, 143:23, 144:4, 144:8, 146:11, 147:23, 147:25, 149:15, 149:17, 153:2, 153:24
theirs [2] - 72:6, 153:17
themselves [3] - 7:15, 31:6, 94:23
theories [2] - 129:1, 131:10
thereafter [2] - 15:2, 111:9
thinking [3] - 24:25, 42:20, 56:2
thinks [2] - 106:15, 106:17
third [2] - 66:21, 71:2
THIS [1] - 1:8
Thonn [37] - 16:19, 16:23, 69:6, 69:7, 71:24, 72:19, 74:17, 75:2, 75:15, 75:20, 81:2, 85:22, 86:2, 86:15, 96:22, 104:13, 104:18, 104:21, 104:23, 105:10, 108:19, 119:17, 119:20, 120:24, 126:5, 134:22, 136:22, 136:23, 137:5, 146:22, 147:10, 148:17, 148:21, 149:14, 150:3, 151:17
Thonn's [1] - 105:15
thousand [1] - 30:16
three [9] - 8:9, 9:2, 9:3, 19:2, 26:20, 87:6, 98:11, 153:7, 153:16
three-page [1] - 87:6
throughout [1] - 81:15
Thursday [1] - 95:25
TIDWELL [86] - 1:14, 12:2, 13:21, 45:7, 45:11, 45:15, 53:20, 57:3, 57:7, 57:18, 60:24, 63:2, 63:14, 67:21, 67:25, 68:3, 68:5, 68:7, 68:9, 68:14, 68:17, 69:5, 73:7, 73:11, 73:16, 75:6, 75:17, 77:1, 81:4, 83:13, 83:18, 83:25, 84:2, 85:19, 86:25, 87:10, 89:24, 90:2, 90:6, 90:17,

91:5, 91:13, 92:13, 92:18, 92:20, 92:24, 93:3, 93:15, 94:14, 95:14, 95:21, 95:24, 98:3, 106:8, 117:14, 117:18, 117:20, 118:2, 118:6, 118:11, 118:20, 118:24, 119:2, 119:7, 119:11, 119:15, 124:19, 124:22, 124:24, 125:1, 125:12, 125:18, 125:20, 125:22, 126:1, 126:7, 126:19, 126:25, 127:2, 135:15, 136:12, 144:9, 146:7, 153:1, 154:4, 154:7
Tidwell [1] - 4:6
tied [1] - 79:7
Tiger [13] - 14:4, 19:11, 19:16, 64:25, 87:19, 96:15, 96:19, 106:11, 106:15, 106:19, 107:2, 107:20, 121:23
tiger [1] - 19:22
Tiger's [5] - 106:16, 108:11, 108:15, 112:11, 112:25
tight [2] - 23:16, 23:17
Tim [5] - 16:19, 17:6, 75:20, 98:9, 148:15
timely [1] - 129:25
Title [3] - 5:4, 39:4, 50:1
title [4] - 31:19, 39:7, 48:22, 138:20
TO [1] - 1:8
to's [1] - 88:5
tobacco [3] - 6:22, 7:11, 7:21
today [20] - 5:9, 16:24, 57:24, 62:24, 66:11, 66:15, 66:22, 67:15, 87:24, 113:11, 113:17, 113:20, 114:25, 117:6, 123:25, 125:2, 139:20, 139:24, 142:14, 153:19
together [16] - 12:1, 12:5, 12:8, 28:24, 36:15, 67:17, 90:9, 90:20, 100:2, 104:9, 120:5, 133:7, 135:20, 138:20
took [11] - 33:10,

36:19, 51:11, 51:17, 74:3, 74:12, 84:19, 121:10, 124:12, 130:6, 144:22
TOOLOULA [1] - 16:22
Tooloula's [1] - 16:22
tools [1] - 36:4
top [8] - 60:12, 62:9, 93:1, 126:5, 147:16, 148:7
Torres [3] - 95:16, 95:22, 95:25
toward [4] - 129:17, 129:18, 129:20, 129:23
town [1] - 20:20
track [3] - 25:5, 35:14, 36:5
tracker [1] - 35:11, 35:16
tracking [1] - 42:2
Tracy [1] - 122:15
Trading [2] - 140:15, 140:23
train [2] - 8:1, 76:22
TRANSCRIPT [1] - 1:24
transcript [1] - 154:17
transcripts [1] - 92:5
transferred [1] - 94:24
transfers [1] - 93:17
transition [4] - 58:24, 67:13, 81:10, 105:5
transparent [1] - 26:13
treat [1] - 150:18
tried [5] - 9:8, 9:16, 36:12, 39:25, 131:12
true [2] - 66:9, 154:17
truth [3] - 5:9, 5:10
try [7] - 29:7, 29:10, 29:11, 34:9, 34:11, 90:15, 117:21
trying [23] - 23:13, 46:16, 46:23, 74:8, 78:13, 79:13, 83:25, 89:10, 94:3, 94:4, 97:15, 108:7, 113:12, 114:17, 114:21, 115:4, 116:8, 116:10, 116:12, 120:19, 126:1, 128:24, 131:19
Tuesday [3] - 87:1, 92:14, 95:15
tuition [1] - 111:1
Tulane [6] - 6:4, 6:6, 13:8, 13:9, 14:1,

17:22
turn [2] - 21:22, 130:18
turned [1] - 7:4
turning [1] - 28:16
two [18] - 7:20, 9:1, 9:4, 14:5, 15:14, 19:7, 19:14, 24:20, 26:19, 27:5, 28:22, 31:13, 31:22, 34:4, 38:23, 40:22, 47:7, 62:11, 63:11, 71:13, 71:14, 74:17, 81:25, 82:16, 90:8, 90:21, 93:4, 104:3, 109:12, 115:6, 117:5, 120:19, 138:3, 149:25
two-page [2] - 62:11, 63:11
type [20] - 6:18, 10:15, 10:16, 10:22, 14:22, 25:10, 31:16, 34:19, 46:2, 48:21, 49:20, 55:8, 55:23, 56:3, 84:22, 89:18, 91:1, 96:18, 122:17
types [3] - 42:8, 46:9, 83:19
typing [1] - 34:22

U

ultimately [4] - 34:13, 50:11, 129:6, 132:4
unaware [1] - 73:6
uncomfortable [1] - 100:7
under [7] - 4:22, 5:2, 5:6, 7:24, 34:16, 89:22, 108:8
understood [3] - 16:1, 102:23, 102:24
Undertaking [2] - 57:7, 58:8
undertaking [2] - 60:6, 67:8
underway [1] - 27:16
United [3] - 60:25, 154:16, 154:22
UNITED [1] - 1:1
universe [2] - 38:11, 79:14
University [2] - 6:3, 6:4
unless [3] - 136:12, 145:19
unnecessary [1] - 132:16

unpleasant [2] - 127:16, 127:18
unrelated [1] - 74:18
unsigned [1] - 146:21
unusual [1] - 19:23
up [59] - 8:14, 20:12, 22:15, 23:13, 26:2, 28:14, 28:20, 29:12, 30:1, 31:16, 33:17, 34:10, 34:11, 35:7, 37:20, 46:5, 48:14, 55:7, 67:21, 72:10, 76:13, 78:15, 79:4, 79:13, 83:23, 84:6, 89:25, 92:24, 94:4, 98:14, 99:11, 99:13, 100:17, 100:18, 100:24, 104:22, 106:25, 110:23, 111:4, 119:23, 120:13, 124:19, 128:24, 128:25, 129:8, 130:4, 130:8, 130:9, 130:13, 131:10, 134:3, 137:13, 141:9, 144:6, 144:19, 148:6, 149:10
update [2] - 38:6, 114:13
updated [1] - 38:3
upper [1] - 127:19
upper-level [1] - 127:19

V

vacuum [2] - 30:7, 30:8
vantage [1] - 25:19
various [2] - 7:25, 101:8
vast [1] - 26:23
Vegas [3] - 98:23, 99:4, 103:20
vendors [22] - 23:14, 35:8, 35:21, 37:17, 55:4, 55:8, 55:11, 56:5, 66:6, 68:20, 70:2, 70:9, 128:5, 128:9, 128:17, 129:3, 129:17, 129:18, 129:19, 129:20, 130:24, 131:7, 132:15
vendors' [1] - 128:7
venture [4] - 99:18, 100:4, 100:5, 109:14
ventures [2] - 98:15,

107:8
verbatim [1] - 120:8
verification [1] - 29:1
versa [2] - 19:14, 127:17
vessel [2] - 73:3, 73:6
vice [3] - 19:14, 63:24, 127:17
view [1] - 66:18
views [2] - 30:6, 30:8
violation [1] - 5:4
violations [1] - 70:4
Vioxx [2] - 7:25, 8:11
visit [2] - 20:24, 72:24
vocal [1] - 96:17
VOO [4] - 79:20, 135:12, 135:13, 151:11

W

wait [2] - 34:8, 153:25
waiting [4] - 129:24, 152:6, 152:12
walked [2] - 117:2, 151:6
Walker [2] - 140:6, 140:7
walking [2] - 26:21, 112:2
wall [1] - 21:2
Walter [1] - 7:8
wasting [1] - 106:18
water [2] - 98:1, 98:13
website [1] - 144:6
weeds [2] - 33:21, 33:24
week [1] - 31:22
weekly [3] - 36:24
weeks [1] - 34:18
weird [1] - 12:23
Welker [2] - 70:13, 105:25
Welker's [2] - 17:2, 138:5
wetland [1] - 39:8
wetlands [4] - 38:22, 38:24, 39:1, 39:2
whatnot [3] - 29:2, 35:21, 132:17
whatsoever [2] - 112:22, 116:23
WHEREUPON [25] - 57:5, 59:22, 61:10, 62:25, 69:3, 69:14, 75:4, 76:24, 83:16, 86:23, 92:11, 93:11, 95:12, 95:19, 112:8, 124:10, 133:25,

134:14, 135:21, 136:14, 137:16, 146:16, 147:5, 148:11, 154:9
whiteboards [1] - 20:19
whole [7] - 5:9, 30:4, 103:16, 118:1, 124:3, 130:4, 149:21
wife [1] - 46:6
Wire [1] - 87:2
wire [2] - 92:15, 93:17
wired [2] - 89:2, 89:13
wires [1] - 80:20
wiring [1] - 89:7
wish [2] - 82:5, 153:20
wished [1] - 78:10
witness [1] - 5:13
WITNESS [93] - 5:11, 12:3, 13:14, 13:22, 45:9, 45:12, 45:17, 48:16, 53:18, 53:23, 58:5, 59:24, 63:15, 67:24, 68:1, 68:4, 68:6, 68:8, 68:11, 68:16, 69:10, 73:9, 73:13, 73:18, 75:8, 75:18, 81:6, 84:1, 84:4, 86:3, 86:8, 86:16, 87:12, 88:13, 90:1, 90:4, 90:8, 91:8, 91:15, 93:6, 93:18, 94:15, 95:23, 98:5, 104:4, 117:11, 117:16, 117:19, 117:24, 118:5, 118:10, 118:19, 118:22, 118:25, 119:5, 119:10, 119:13, 123:3, 123:5, 123:11, 124:23, 124:25, 125:4, 125:10, 125:17, 125:19, 126:6, 126:8, 126:23, 127:1, 127:4, 127:20, 128:19, 129:19, 129:22, 131:4, 131:8, 131:16, 131:19, 132:22, 135:14, 137:11, 143:12, 143:23, 144:4, 144:8, 146:11, 147:23, 147:25, 149:15, 149:17, 153:2, 153:24
Witness [9] - 58:5, 61:5, 69:10, 77:11,

81:18, 87:12, 93:6,
96:8, 143:12
witnesses [1] - 5:5
woman [2] - 38:25,
49:15
wonderful [1] - 98:18
wondering [1] - 24:25
word [5] - 21:4, 21:19,
50:8, 50:10, 104:12
words [10] - 28:15,
70:7, 76:4, 104:16,
104:23, 108:16,
113:3, 116:15,
121:18, 151:3
works [2] - 84:3,
122:15
worry [3] - 44:7,
53:18, 54:24
write [5] - 7:15, 41:15,
53:5, 115:3, 126:18
writing [3] - 7:5,
10:20, 40:21
written [7] - 58:21,
118:3, 118:4,
118:12, 118:14,
145:11, 146:15
wrote [5] - 41:10,
41:11, 74:25, 79:23,
116:20

## Y

y'all [1] - 73:16
year [16] - 6:6, 7:18,
8:12, 12:25, 13:6,
14:4, 14:18, 14:19,
16:2, 20:16, 37:13,
87:8, 87:11, 88:12,
110:9
years [6] - 8:9, 14:5,
19:7, 122:16, 153:7,
153:16
youngest [1] - 8:8
yourself [10] - 10:11,
21:12, 32:7, 33:1,
39:16, 50:19, 96:20,
96:24, 97:2, 106:3

## Z

Zola [3] - 68:2, 68:3,
68:7

**C O N F I D E N T I A L**

SM-02-CR00879

SM-02-CR00880

**EXHIBITS SHOWN TO CHRISTINE REITANO IN INTERVIEW WITH SPECIAL MASTER
LOUIS J. FREEH ON JULY 29, 2013**

[Produced from handwritten notes taken during the interview by Michael S. McCall, Senior Consultant,
Freeh Group International Solutions]

| Sequence | Exhibit No. | DESCRIPTION |
|---|---|---|
| 1 | 02B | "Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator" dated April 18, 2012 |
| 2 | 02D | "Certification Regarding Confidentiality of Claims Information" bearing signature of Christine Reitano and dated July 18, 2012 |
| 3 | 02D1 | Deepwater Horizon Claims Center forms:  "Confidentiality/Non-Disclosure Agreement;" "Conflict of Interest and Recusal;" "Gifts, Entertainment and Gratuities" and "Definitions For Contractor Policies," each bearing signature of Christine Reitano and dated July 17, 2012 |
| 4 | 03 | E-mail exchange between Christine Reitano and Jennifer Keough, subject "Re:  Sarasota" dated June 29 through July 1, 2012 |
| 5 | 02B | [Shown to The Witness again]  "Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator" dated April 18, 2012 |
| 6 | 02 | Gulf Coast Claims Facility "Client Authorization Form" pertaining to representation of Casey Thonn, Claimant ID no. 1060469, by Christine Reitano bearing a signature and handwritten date "10/14/11" |
| | | BREAK |
| 7 | 02 | [Shown to The Witness again following break] Gulf Coast Claims Facility "Client Authorization Form" pertaining to representation of Casey Thonn, Claimant ID no. 1060469, by Christine Reitano bearing a signature and handwritten date "10/14/11" |
| 8 | 02A | Letter on Sutton and Reitano letterhead to Gulf Coast Claim Facility dated March 30, 2012 re GCCF Claim No. 1060469, bearing signature of Christine Reitano |
| 9 | 04 | Series of e-mails among Lynn Greer, Christine Reitano, Jennifer Keough and Matt Lundy, all dated September 17, 2012 and captioned "Expedited Claims" |
| 10 | 04A | Undated, untitled chart depicting claim information for 13 claimants, beginning with Janice Barnett and ending with Bruce Strong |
| 11 | 05 | Series of e-mails among Christine Reitano, Stephen Cirami and Lionel Sutton, all dated June 11, 2013 and captioned "Wire payment" |
| 12 | 05A | Series of e-mails among Christine Reitano, Stephen Cirami and Lionel Sutton, all dated June 11, 2013 and captioned "Wire payment"  [Includes same e-mails as Exhibit 05, with additional e-mails on which Reitano was not copied.] |
| 13 | 05B | Series of e-mails between Christine Reitano, Stephen Cirami and Keith Moskowitz, all dated January 28, 2013 and captioned "Wire Transfers" |
| 14 | 05A | [Shown to The Witness again]  Series of e-mails among Christine Reitano, Stephen Cirami and Lionel Sutton, all dated June 11, 2013 and captioned "Wire payment"  [Includes same e-mails as Exhibit 05, with additional e-mails on which Reitano was not copied.] |
| 15 | 06 | Series of e-mails between Katherine Torres and Lionel Sutton (Mark Staley copied on the initial e-mail only), all dated June 4, 2013 and captioned "Sher Garner Claim" |

1

| Sequence | Exhibit No. | DESCRIPTION |
|---|---|---|
| 16 | 06A | E-mail from Katherine Torres to Lionel Sutton (Charles R. Hacker copied), dated June 20, 2013 and captioned "Sher Garner" |
| 17 | 01 | Summary of June 20, 2013 interview of Christine Reitano by Michael Juneau et. al. [Excerpts were read aloud to The Witness, but the document was not shown to The Witness.] |
| 18 | 07 | Letter on Andry Lerner LLC letterhead dated August 14, 2012 from Leslie B. Tate to Deepwater Horizon Economic Claims Center, re Claimant ID No. 100051739, Casey Thonn (with enclosures) |
| 19 | 08 | Letter on Andrey Lerner LLC letterhead dated July 30, 2012 from Leslie B. Tate to Deepwater Horizon Economic Claims Center, re Claimant ID No. 100051739, Casey Thonn (with enclosures) |
| 20 | 07A | Printout of undated webpage from Bizapedia.com containing corporate registry information regarding Andry Lerner, LLC (contains notation, "Information current as of Mar 11, 2012") |
| 21 | 09 | Seven-page website printout bearing logo of Deepwater Horizon Claims Center with Claimant Details regarding Claimant ID 100051739, Casey Thonn |
| 22 | 10 | One-page website printout of corporate registry information regarding Monster Demolition, L.L.C. |
| 23 | 11 | Two-page State of Louisiana Secretary of State website printout containing corporate registry information regarding CROWN, LLC |
| 24 | 12 | Seventeen-page packet of State of Louisiana Secretary of State website printouts containing corporate registry information regarding SDA Enterprises, LLC; Can U Hear Me Now, L.L.C. and eight other corporate entities |
| 25* | 13 | Letter dated March 13, 2012 from Christine Reitano to Casey Thonn regarding GCCF Claim No. 1060469 [Document presented by The Witness' counsel] |
| 26* | 14 | Retainer Agreement of Christine Reitano to represent Casey Thonn, dated at Slidell, Louisiana March 16, 2011[Document presented by The Witness' counsel] |
| 27* | 15 | Letter on Sutton & Reitano letterhead dated March30, 2012 from Christine Reitano to Tim Gonzales  [Document presented by The Witness' counsel] |

*The preparer of the above list is not certain of the order in which Exhibits 13, 14 and 15 were shown to The Witness.  These three Exhibits were the last three Exhibits shown to The Witness.

2

SM-02-CR00882