IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br>Honorable CARL J. BARBIER<br><br>Magistrate Judge SHUSHAN |

## CHRISTINE REITANO'S INITIAL OBJECTION TO FREEH REPORT WITH INCORPORATED MEMORANDUM AND REQUEST FOR (1) PRODUCTION OF DOCUMENTS; (2) EXTENSION OF TIME TO FILE FINAL OBJECTIONS; (3) EVIDENTIARY HEARING ON ALL ISSUES; AND (4) A STATUS CONFERENCE WITH ALL "SHOW CAUSE" PARTIES

NOW INTO COURT, through undersigned counsel, and reserving each and every right to object to the jurisdiction of this court and to object to the complete lack of substantive and procedural due process as it relates to Christine Reitano, comes Christine Reitano who responds as follows to the Order entered by this court on September 6, 2013 (Document No. 11288).

1.

Christine Reitano is a resident of full age and majority of the Parish of Orleans. She is not a party to these proceedings. Undersigned counsel is not enrolled in the case for her or any other party to the proceedings. Ms. Reitano is neither a claimant nor the attorney for any claimant in the captioned case.

2.

Undersigned counsel for Christine Reitano obtained a copy of the "Freeh Report," (Document No. 11287) from a reporter at the Wall Street Journal. Undersigned counsel received a copy of the Order of this court (Document No. 11288) by accessing the electronic filing system in the Eastern



REITANO
EXHIBIT 9A

District. Neither the report nor the court order have been properly served on Christine Reitano and, in fact, it does not appear that there has been any effort of procedural due process to serve Ms. Reitano with the report and the order except by the Wall Street Journal. The Order states that Ms. Reitano has "fourteen days" to file a response to the Report. Fourteen days from the Order is Friday, September 20, 2013.

3.

In spite of the lack of jurisdiction of this court and the complete lack of procedural due process in notifying Ms. Reitano of the court order, not to mention the total lack of substantive due process in the trial, conviction and sentence recommendation for Ms. Reitano reached by Special Master Freeh (SM Freeh),[1] the court order specifically provides that Ms. Reitano is to "show cause" why this court should not adopt two findings made by SM Freeh, specifically, (a) a finding to disallow the Andry Law Firm's claim in the case; and (b) a finding disqualifying Ms. Reitano and others from representing claimants in the case–the recommended sentence and deprivation of property rights. First, Ms. Reitano has no interest in, no stake in, and no standing to even discuss or comment upon the Andry Law Firm's claim. Second, prior to Ms. Reitano's employment with the Claims Administrator's Office (CAO) on April 1, 2012, she terminated, in writing, her representation of the claimants she previously represented and she has not represented any claimant in these proceedings since her employment in the CAO on April 1, 2012 and she has not collected

---

[1] The Guide to Judiciary Policy, Vol. 2, Part B entitled Published Advisory Opinions includes Published Opinion No. 72 entitled Use of the title "Judge" by Former Judges. This Published Opinion is applicable in this matter. In spite of this Opinion, BP has persisted, in its public relations blitz, in referring to SM Freeh as "Judge Freeh" in an obvious effort to imply that the findings of SM Freeh should be given the status of findings by this court. According to the Opinion, SM Freeh should have already taken steps to advise BP of this issue.

any fees from any former clients who may have been claimants before or after that date. Furthermore, she has no expectation to receive any such "referral" fees or any other fees from the payment of any current claims in the case.  However, the sentence suggested for Ms. Reitano as a result of the Freeh Report is that she be prohibited from representing any claimants in the future, a clear deprivation of property rights.[2]  This sentence recommendation was made without any semblance of due process and without any opportunity for Ms. Reitano to contest or challenge the findings of SM Freeh, which are based solely on the evidence selected by him and interpreted by him.

4.

The order of the court continues that, pursuant to Rule 53(f), "these parties"[3] may file a response or an objection or a motion with supporting memoranda no later than 14 days from September 6, 2013. SM Freeh notes in Footnote 11 on page 13 of the "Independent Investigation" that SM Freeh has collected all of the numerous documents referenced in the report (in no less than 559 footnotes) and that he will provide them to certain law enforcement agencies but he will not permit access to the underlying documents, interviews and other evidence at this time to anyone else, "unless otherwise ordered by the court."   There is no due process standard in the United States of America which provides that this court can accept, adopt, incorporate, or approve of SM Freeh's report until the persons singled out in the report for punishment or discrimination have had an opportunity to effectively respond and be heard and have a meaningful opportunity to challenge the

---

[2] And this is not to mention the international defamation she has endured, the loss of her job, the unwarranted ruination of her reputation and the breach of her employment contract.

[3] This is obviously not a reference to the legal notion of "parties," since Ms. Reitano is not a "party" to the case.

selective evidence which was relied on by SM Freeh in deriving his over-and far-reaching conclusions, verdict and sentencing recommendations. Therefore, it is an impossible task to respond to the report in any meaningful way unless and until this court orders SM Freeh to produce to the "show cause parties" all of the documents, notes, interviews, transcripts, information, etc. in his possession which he collected and/or used to reach the myriad of conclusions and opinions in the report.

5.

The court system in the United States of America is obviously an adversarial system. Ms. Reitano has been ordered to show cause before this court and Ms. Reitano respectfully requests that this court enter an order advising her who her adversary is in these proceedings. Is it the Court? Is it SM Freeh? Is it British Petroleum? Is it Mr. Juneau? Is it the Claims Administration Office? Is it the Plaintiffs' Steering Committee? Is it all of these parties?

The worst alleged misconduct described for Ms. Reitano in all of the 89 pages of the Report seems to be that (1) she suggested to Garden City Group that they consider hiring her husband for a job and they did not hire him;[4] or, (2) perhaps it is the allegation that she is so clever she did NOT sign a referral fee agreement in the Thonn case in order to obtain a referral fee![5] Ms. Reitano was terminated from her position at the Claims Administration Office apparently because of this alleged misconduct which is in stark contrast to the treatment of other high level executives of the Claims

---

[4] See page 67-69 of the Report.

[5] There is not a scintilla of evidence referenced in the Freeh Report that Ms. Reitano even received the alleged letter of May 8, 2012 that allegedly contained the referral fee agreement she was supposed to sign and which was never signed.

Case 2:10-md-02179-CJB-DPC   Document 13626-9   Filed 11/06/14   Page 5 of 113

Case 2:10-md-02179-CJB-SS   Document 11414   Filed 09/18/13   Page 5 of 6

Office who remain employed in spite of the significant conflicts recognized by SM Freeh in his report.

WHEREFORE, Christine Reitano prays that this Initial Objection be received[6] and, reserving all rights to object to the jurisdiction of this court and the lack of procedural and substantive due process, that the Court order:

(1) the production of all of the evidence gathered by SM Freeh;

(2) an extension of time for Christine Reitano to file her final objections and response until 30 days after the production of the evidence by SM Freeh;

(3) an evidentiary hearing be held no less than 30 days after all final objections and responses are filed by the "show cause" parties; and

(4) a status conference with the court and all "show cause" parties in order that this matter may proceed in an orderly fashion.

Respectfully Submitted:

/s/ Mary Olive Pierson
Mary Olive Pierson, La. Bar No. 11004
8702 Jefferson Highway, Suite B (70809)
Post Office Box 14647
Baton Rouge, LA 70898
(225) 927-6765 - Telephone
(225) 927-6775 - Facsimile
mop@mopslaw.com - Email

*Counsel for Christine Reitano*

---

[6] Undersigned counsel was required to get special instructions on how to file this Initial Objection because counsel is not an attorney of record and is not a "Registered Oil spill MDL Litigation Firm" as required by Pretrial Order No. 12 which was also provided to counsel by a friend (not the New York Times) who was aware of the order.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Christine Reitano's Initial Objection and Request for (1) Production of Documents; (2) Extension of Time to File Final Objections; (3) Evidentiary Hearing on All Issues; and (4) Status Conference was filed electronically via the CM/ECF system on this 18th day of September, 2013.  Notice of this filing will be sent (hopefully) to all known counsel of record via the CM/ECF system.


        /s/ Mary Olive Pierson
        Mary Olive Pierson

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * <br> * <br> * <br> * | MDL NO. 2179 <br><br> SECTION: J <br><br> Honorable CARL J. BARBIER <br><br> Magistrate Judge SHUSHAN |

## <u>CHRISTINE REITANO'S SUPPLEMENTAL (SECOND) RESPONSE AND OBJECTION TO FREEH REPORT WITH INCORPORATED MEMORANDUM AND RENEWED REQUEST FOR (1) PRODUCTION OF DOCUMENTS; (2) EXTENSION OF TIME TO FILE FINAL OBJECTIONS; (3) EVIDENTIARY HEARING ON ALL ISSUES; AND (4) A STATUS CONFERENCE WITH ALL "SHOW CAUSE" PARTIES</u>

NOW INTO COURT, through undersigned counsel, and reserving each and every right to object to the jurisdiction of this court and to object to the complete lack of substantive and procedural due process as it relates to Christine Reitano, comes Christine Reitano who responds as follows to the Orders entered by this court on September 6, 2013 (Document No. 11288) and on September 19, 2013 (Document No. 11442).[1] On October 16, 2013, the Court granted an extension of time to November 15, 2013 to file objections to certain other Non-Parties, not including Ms. Reitano. (Document No. 11664).[2]

---

[1]Ms. Reitano, a Non-Party who has not been served, appears solely because of a pending court-ordered deadline of October 18, 2013 issued to the "Non-Parties" to show cause why the findings of the Special Master should not be adopted by the court. (Document No. 11288 and Document No. 11442). Ms. Reitano specifically reserves her right to make any and all further and supplemental objections to the Special Master's Report and the Court's Orders, including those grounds for dismissal set forth in Federal Rule of Civil Procedure 12(b) and the grounds relating to the scope of the Special Master's authority under Rule 53 and the grounds for his disqualification pursuant to 28 U.S.C. § 455.

[2] Ms. Reitano had not joined in the Andry Law Firm "Second Motion for Production and Extension of Time." (Document No. 11610).



REITANO
EXHIBIT 9B

1.

Christine Reitano is a resident of full age and majority of the Parish of Orleans. She is not a party to these proceedings. Undersigned counsel is not enrolled in the case for her or any other party to the proceedings. Ms. Reitano is neither a claimant nor the attorney for any claimant in the captioned case.

2.

Ms. Reitano renews and reiterates each and every paragraph and allegation set forth in her "Initial Objection to Freeh Report with Incorported Memorandum and Request for (1) Production of Documents; (2) Extension of Time to file Final Objections; (3) Evidentiary Hearing on All Issues; and (4) a Status Conference with all 'Show Cause' Parties." (Document No. 11414). Since the Court's Order of September 19, 2013, the Special Master has provided heavily redacted and grossly incomplete documents which he collected, claiming that they are the only documents relevant to Ms. Reitano. This is obviously not true. For example, Ms. Reitano was not even provided with a complete transcript of her own interview which, under no standard or circumstances, could be described as irrelevant.[3] In addition, the Special Master declined to include in his "findings" any reference to the termination letter from Ms. Reitano to Mr. Casey Thonn which cannot be legitimately described as "irrelevant."[4] (See **Exhibit A**). Further, the Special Master redacted and

---

[3] Ms. Reitano received more pages of the statement of Mr. Jon Andry than she did of her own statement.

[4] Ms. Reitano knows that SM Freeh has this letter because it was produced by Ms. Reitano during her interview with SM Freeh. In fact, when counsel for Ms. Reitano advised that there were documents she wanted to make a part of the record (the termination letter), SM Freeh objected and said he would be the decider of what information went into the record. Reluctantly, and contrary to his professed "open-door policy" for the receipt of information, (Report, p. 14), after the letter was described to him, he allowed the letter to be introduced. But, he did not

misrepresented the statements of Ms. Christina Mancuso in his findings. (See Affidavit of Ms. Christina Mancuso attached as **Exhibit B**). Therefore, it is essential that the notes from the interview of Ms. Mancuso and the unredacted "summary" of her statement be provided.

3.

In addition to the specific examples cited in the preceding paragraph, the Special Master has parsed the information discovered in his investigation in a manner that exceeds the scope of his authority under Rule 53. The Special Master is a judicial officer of the Court. He is not an advocate or litigant–which he appears more likely to be with every additional filing made by him in the case. His proper role is not, as he has done, to finely comb the record and disclose to Ms. Reitano only those snippets and excerpts of the record that allegedly support only the biased and selected facts in his report. His proper role is to disclose the record, in its entirety, to Ms. Reitano. She is entitled, at the very least, to the same and equal access to the full record as the Special Master in order to show that he has not presented the facts as a neutral, unbiased officer of the court. Furthermore, since the Court is required to review the evidence gathered by the Special Master "de novo," the entire record and all of the evidence should be produced immediately to all of the Non-Parties.

4.

Ms. Reitano renews her Initial Request for production of ALL of the evidence gathered by Mr. Freeh and objects to the restricted, redacted and limited response provided so far. Without the full record, she will not have an opportunity to effectively respond and be heard and she will not have a meaningful opportunity to challenge the selective evidence which was relied on by SM Freeh

---

consider it relevant enough to his conclusions about Ms. Reitano to include it in his report or in his selected and redacted production.

Page 3 of 5

in deriving his over-and far-reaching conclusions, verdict and sentencing recommendations. Therefore, Ms. Reitano files this Supplemental Response in accordance with the Order and deadline set by the Court, but reserves her right to further supplement her response when the full record is produced by Mr. Freeh.  It is an impossible task to respond to the report in any meaningful way unless and until this court orders SM Freeh to produce to Ms. Reitano all of the documents, notes, interviews, transcripts, information, etc. in his possession, UNREDACTED, which he collected and/or used to reach the conclusions and opinions in the report.

5.

In her Initial Response, Ms. Reitano asked for the identity of her adversary.  Since that time it has been learned that the Special Master has hired his own lawyer and become the client of his own Law Firm. (See attached emails with Greg Paw attached as **Exhibit C**). This relationship has been used by SM Freeh to assert an attorney client privilege to avoid production of some of the evidence gathered by him. Ms. Reitano objects on the ground that the Special Master is just that and he cannot hire his own law firm to represent him in order to claim a privilege on materials gathered for the court and which must be reviewed "de novo."  Such conduct is far beyond the scope of a Special Master under Rule 53 and should not be sanctioned by the Court.

WHEREFORE, Christine Reitano prays that this Supplemental Objection and Response be received and, reserving all rights to object to the jurisdiction of this court, the lack of procedural and substantive due process, and the scope of the authority of the Special Master, she moves the Court to order:

(1) the production of ALL of the evidence, unredacted, gathered by SM Freeh;

(2) an extension of time for Christine Reitano to file her final objections and response until

30 days after the production of all of the evidence by SM Freeh;

(3) an evidentiary hearing be held no less than 30 days after all final objections and responses are filed by the "show cause" parties; and

(4) a status conference with the court and all "show cause" parties in order that this matter may proceed in an orderly fashion.

Respectfully Submitted:

_/s/ Mary Olive Pierson_
Mary Olive Pierson, La. Bar No. 11004
8702 Jefferson Highway, Suite B (70809)
Post Office Box 14647
Baton Rouge, LA 70898
(225) 927-6765 - Telephone
(225) 927-6775 - Facsimile
mop@mopslaw.com - Email

*Counsel for Christine Reitano*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Christine Reitano's Supplemental (Second) Response and Objection to Freeh Report with Incorporated Memorandum and Renewed Request for (1) Production of Documents; (2) Extension of Time to file Final Objections; (3) Evidentiary Hearing on All Issues; and (4) A Status Conference with all "Show Cause" Parties" was filed electronically via the CM/ECF system on this 17th day of October, 2013. Notice of this filing will be sent (hopefully) to all known counsel of record via the CM/ECF system.

_/s/ Mary Olive Pierson_
Mary Olive Pierson

March 30, 2012

Casey Thonn
3836 Kent Street
Slidell, LA 70458

      RE:    *GCCF Claim No.: 1060469*

Dear Casey:

Please allow this letter to confirm that we will no longer be representing you regarding your GCCF Claim.

My new position as Counsel to the Special Master in the Court Supervised Claims Program for the BP Settlement Fund prevents me from representing any claims or interests made upon the fund.

I wish you the best of luck in the pursuit of your claim and a happy and prosperous future.

With kindest personal regards, I remain

Sincerely,

**SUTTON & REITANO**


Christine Reitano



## AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF** *Orleans*

    **BEFORE ME,** the undersigned Notary Public, personally came and appeared,

### CHRISTINA E. MANCUSO

Who, after being first duly sworn did state as follows:

1)   I am an attorney employed by the Andry Lerner L.L.C. law firm ("AL") in New Orleans, Louisiana. I make this Affidavit. The statements contained in this Affidavit are within my personal knowledge, and, if called upon to testify, I could and would testify competently thereto.

2)   I attended Baylor University in Waco, Texas (B.A., 1982) and Baylor Law School (J.D. 1984). I was admitted to the State Bar of Texas in 1984 and practiced at several firms from 1984 – 1990. I worked at Baron & Budd, P.C. in Dallas, Texas from 1990 until 2007 in Mass-Tort/Multi-Party Toxic Tort litigation. I hold an AV® Preeminent™ Rating by Martindale-Hubbell.

3)   I am the senior AL staff attorney handling claims for property and economic damages resulting from the BP "Deepwater Horizon" Oil Spill in the Gulf of Mexico on April 20, 2010 ("Oil Spill"). My responsibilities include the preparation, filing, and processing of our clients' Oil Spill claims. I am knowledgeable about AL's Oil Spill client files.

4)   In the normal course of business, AL uses various contracts and agreements to set forth the terms of AL's representation of its clients. These forms include:
    a. Attorney-Client Contract – When AL is contacted by a prospective client about representation, AL sends a proposed Attorney-Client Contract to the prospective client.
    b. Attorney Referral Agreement – When AL is contacted by another attorney regarding representation of a client, AL sends a proposed Attorney Referral Agreement to the attorney.

5)   Casey Thonn ("Thonn") is a commercial fisherman that suffered losses as a result of the Oil Spill. AL filed five claims on his behalf. To date, Thonn has received three settlement checks – A VoO settlement check in the amount of $49,400.00, A Seafood Vessel Owner settlement check in the amount of $166,652.10 and Boat Captain settlement check in the amount of $190,350.25 – a total of $406,402.35. To my

EXHIBIT

B

knowledge, the Thonn claims were processed in the regular course of business and in a normal manner according to the applicable DWHCC procedures, Policies and Appellate decisions. Thonn was awarded and paid less settlement funds on both his Boat Captain Claim and his Vessel Owner claim than the sums requested in the initial DWHCC filings.

6)    I was interviewed by the Freeh Group Investigative Team ("Investigators") on August 7, 2013. My understanding of the Report of Special Master Louis J. Freeh, dated September 6, 2013[1] ("Report") is that any references therein to statements made by me are taken from the notes of the Freeh Group Investigative Team related to my interview ("Interview Report"), a copy of which was provided pursuant to an Order of the Court[2] as bates range SM-01-TALF-00386-00388.[3] That document states:

> *"The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product."*

As such, it is necessary to clarify certain misconceptions reflected in the Interview Report.

7)    I had an initial conversation with a Ms. Christine Reitano ("Reitano") by telephone in which she indicated to me that she was sending to AL a DWHCC claim – that of a commercial shrimper named Casey Thonn. During this call, Reitano inquired of me whether our firm would honor and maintain the Attorney-Client Contract percentage of 20%, to which she and Mr. Thonn had previously agreed. I confirmed that AL would certainly honor that Attorney-Client Contract percentage.

8)    The only sum mentioned in our conversation was that of the 20% Attorney-Client Contract. At no time during this conversation did we discuss an Attorney Referral Agreement. After that call in the regular course of business, after contacting Jonathan Andry, I sent to Reitano a proposed, unsigned Attorney Referral Agreement.

---

[1] [Rec. Doc. 11287]
[2] [Rec. Doc. 11442]
[3] See Exhibit A

2

9) There is a discrepancy in the Report regarding my interview. The Report states "but that Ms. Reitano also requested a referral fee."[4]

Explanation: Reitano did not request a referral fee from me during this call or during any other calls which I had with her.

10) There is a discrepancy in the Report regarding my interview. The Report states: "Ms. Mancuso also stated that Ms. Reitano asked AndryLerner honor the *percentage referral fee* (italics added) that was contained in the Thonn disc"[5] as described to the Freeh Investigators.

However, the Interview Report indicates: "Ms. Mancuso said that Ms. Reitano requested she have Andry Lerner honor the *attorney percentage* [italics added], for Ms. Reitano in the Thonn contract, as set forth as a fee agreement in that contract."

It was my understanding that Ms. Reitano asked me if Andry Lerner would honor the *Attorney-Client Contract percentage fee*. To my knowledge there was not then, and there is not today, any Attorney Referral Agreement on the Reitano/Thonn disc, only the Attorney-Client Contracts - that is contracts between attorneys Smith Stagg and Casey Thonn and attorney Reitano and Casey Thonn.

11) There is an ambiguity in the Interview Report which states: "requested she (Mancuso) have AndryLerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, *as set forth as a fee agreement in that contract* (italics added)."[6]

The wording is clear up to "Thonn contract". The wording of "as set forth as a fee agreement in that contract" I believe references the Attorney-Client Contract, not an Attorney Referral Agreement.

12) The Interview Report states: "Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet."[7]

Explanation: I sent Ms. Reitano an Attorney Referral Agreement. I did not send her a "contract packet."

13) The Interview Report states: "Ms. Mancuso also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano."[8]

Explanation: I recall that I sent an Andry Lerner claimant Attorney-*Client* Contract to Mr. Thonn with the same percentage requested by Ms. Reitano.

---

[4] Report Page 26, 3rd Paragraph
[5] Report Page 26, 4th Paragraph
[6] Interview Report Page 2, line 2
[7] Interview Report Page 2, lines 2 & 3
[8] Interview Report Page 2, lines 3 & 4

3

14) The Interview Report reads: "Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral *contract* [Italics added]."[9]

Explanation: I have no present knowledge if Ms. Reitano ever returned an executed Attorney Referral Agreement. However, the Attorney-Client Contract signed by Thonn was received by AL.

15) The Report states: "Ms. Mancuso remembered communications with Ms. Reitano about the referral and the fee."[10]

Explanation: I only recall discussing with Ms. Reitano the Attorney-Client Contract and the exchange of client information to process the claims.

16) Reitano did provide information along with a CD disc containing numerous documents and client information to AL. Reitano worked on the Thonn claim with the Gulf Coast Claim Facility and AL relied on this work and information and it was validated in the subsequent meetings and contact with Thonn.

17) In my interview I explained the standard option in the Settlement Agreement in conjunction with the DWHCC Policies which permit a Claimant to use the annual Tax Return income to confirm commercial fishing income as opposed to the use of trip tickets, as stated in DWHCC Policy No. 262[11]:

> "*Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE: The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:*
>
> *On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:*
>
> *(a) Single Catch/Single Vessel Claimants: If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:*
> *(1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.*
> *(2) The revenues shall be limited to those shown in the applicable tax returns.*
> *(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the*

---

[9] Interview Report Page 2
[10] Report Page 25
[11] See Exhibit B

4

*documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*

*(b) SWS-1 Claimants:  If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:*

*(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:*

*a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.*

*b) The revenues shall be limited to those shown in the applicable tax returns.*

*c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*

*(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:*

*a)  The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation.  The Claims Administrator will base the resulting Eligibility Notice on the higher award.*

*b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns."*

18) From my work I know that the Louisiana Department of Wildlife and Fisheries ("LDWF") Trip Tickets Database is not always an accurate source of complete information on the landings of commercial fishermen, mainly due to human error in data entry, as well as the failure to submit trip tickets.[12]  From my work I know trip tickets are used generally by the State for conservation, regulation, and the review of the gear and area specific catch information that will improve the accuracy of stock assessments from the Louisiana waters which aid the LDWF to oversee fishing limits, fishing boundaries, management of public waters, and regulation enforcement.

19) The Thonn Expert Economic Report filed with the Boat Captain Claim indicated that the settlement sum should be in the amount of $259,459.00.  An initial Eligibility Notice was issued in the amount of amount of $885.58.

20) Pursuant to the Settlement Agreement, the DWHCC has an affirmative duty to provide the claimant with the highest possible settlement value from the submitted documents[13]:

*"The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting*

---

[12] See Exhibit C, DWHCC Policy No. 404
[13] Settlement Agreement (Section 4.3.8)

*documentation under the terms in the Economic Damage Claim Process to produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows under the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK."*

21) Per my conversation with our DWHCC firm liaison it was my understanding that DWHCC does often initially issue an Eligibility Notice using trip tickets as the basis of calculation due to the software of the DWHCC computer. An AL attorney in fact sent an email dated January 22, 2013 to the firm liaison inquiring as to why the DWHCC often initially uses trip tickets in calculating loss instead of using the submitted documents which request the use of Tax Returns.[14]

22) Per the terms of the Settlement Agreement and Policies, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the DWHCC calculation. A Post-Reconsideration Eligibility Notice was then issued for $189,647.64 per terms of the Settlement Agreement. Upon review, it was determined that the Eligibility Notice sum was *incorrect in that the DWHCC should not have deducted Shrimp Cost Percentage from his Boat Captain claim in the calculation loss, that such a deduction in the loss calculation is only done on the Vessel Owner* claim per the terms of the Settlement Agreement. On this good faith basis, AL then filed an Appeal on this Eligibility Notice due to the manner in which the Settlement Agreement was written regarding the Shrimp Cost Percentage deduction, and requested the amount of $648,648.00 per the language in the Settlement Agreement and DWHCC Policies as of that date. *Please see Settlement Agreement Shrimp Compensation Plan[15] which states:*

> *"If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5."*

23) AL filed the Appeal due to "error calculation", "error in reviewing submitted documentation" and "error in Prior Payment Offer."[16] The filing of this Appeal then opened up to BP the entire DWHCC claim file to oversight review by an appellant Judge with the possibility of such Appeal eventually going to Judge Barbier.

24) The Thonn appeal documents received by AL show that BP's Initial Proposal Regarding Claim No. 19691[17] attached a copy of Thonn's 2009 Tax Return and Economic Expert Report BP and states on Page 1:

> *"BP agrees with the Settlement Programs calculation of Claimant's Compensation Amount. BP therefore, submits an Initial Proposal*

---

[14] See Exhibit D
[15] [Rec. Doc. 6430-22]
[16] See Exhibit E, Coastal Claims Group Letter, Dated January 7, 2013
[17] See Exhibit F

6

> *Compensation Amount $22,932.00, the amount Claimant is entitled to according to the terms of the Settlement Agreement Seafood Compensation Framework."*

25) AL also received BP's Final Proposal filed Feb 4, 2012[18] which states:

> *"As BP explained in its Initial Proposal, the Settlement program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset"* and *"BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Offset Payment of $72,500.00."*

26) The Notice of Appeal Panel Decision was issued March 28, 2013[19] which awarded claimant $189,189.00, the amount of BP's Final Proposal. The Appeal Panel stated:

> *"The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim."*

The Appeal and the appeal fee were lost by Thonn. The Post-Appeal Eligibility Notice was issued on April 9, 2013. BP did not seek judicial review of the Appellate Panel's decision which is permitted under the terms of the DWHCC Appeal process. In fact, during the Appeal process, a new DWHCC Policy, No. 342, had been issued on February 8, 2013, which interpreted and clarified the Agreement as written and addressed this very issue of shrimp cost percentage deduction for an individual who is both a Vessel Owner and a Boat Captain.[20]

27) The Thonn Expert Economic Report indicated that the Vessel Owner Claim should be $327,272. A DWHCC Eligibility Notice for Thonn's Vessel Owner Claim was issued in the amount of $864.78.  Per the terms of the Settlement Agreement, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the claim calculation. The Post-Reconsideration Eligibility Notice was then issued for $238,636 ($166,136.13 after the offset of prior seafood payments). However, the Notice inadvertently omitted accounting fee reimbursement pursuant to the Settlement Agreement.  Upon review, it was determined that the Eligibility Notice sum was correct in that the Thonn Vessel Owner Economic Expert Report was in error, as the *calculations omitted to subtract the Shrimp Cost Percentage* in the loss calculation. AL then filed an Appeal on this Post-Reconsideration Eligibility Notice to obtain the allowed reimbursement for accounting fees *only*, pursuant to the terms of the Settlement Agreement.

28) The filing of the Appeal opened up to BP the claim file on this claim. Working through our DWHCC firm liaison, pursuant to DWHCC procedure, the issue was resolved, the accounting fees reimbursement was added to the Claim and a Post-

---

[18] See Exhibit G
[19] See Exhibit H
[20] See Exhibit I

Reconsideration Eligibility Notice dated January 28, 2013 was issued listing $515.97 as reimbursement for accounting fees. AL then withdrew the Appeal.

29)   The suggestion that the chart shown in the Report on Page 60 reflects "suspicious and fraudulent characteristics" is misleading, as the Chart simply reflects that the claims were processed according to the Settlement Agreement and the DWHCC process and Policies. The Settlement Agreement and the DWHCC Policies provide for and allow a commercial fisherman to request the use of Tax Returns instead of trip tickets to calculate loss.[21]

30)   The Report states on Page 58 the title "Unsubstantiated Increases in the Value of Mr. Thonn's Claim…"

Mr. Thonn's Federal Internal Revenue filings for 2009 and 2010 do substantiate his income for those years in accordance with the Settlement Agreement and approved DWHCC Policies.[22]

31)   I have met with claimant Thonn and spoken with him on numerous occasions. I reviewed the documents he provided to Reitano. In working with him, my impression of his character is that of a diligent and hard-working individual.

32)   At no time during the course of filing claims with the DWHCC was I told, it was implied, suggested or intimated that any claims filed by AL would receive special attention or treatment or would be treated in any other manner other than through the known DWHCC claim procedure process. No individual or entity requested me to perform any kind of action in the processing and filing of Thonn's claims which was outside of the usual DWHCC claim processing procedure.

33)   Exact claim status information can be obtained on the firm's filed claims as well as unfiled but registered claims on the DWHCC Website, the various reports, claim files, Notices, definitions and claim filing summaries which are available for view and are reached through the attorney portal for AL permits AL to keep current on the following:

a)   The number of claims filed on behalf of what number of claimants
b)   The number of claims which have submitted a signed claim form.
c)   The number of claimants who have started a Registration Form but did not complete it, completed a Registration Form and filed a claim and completed a Registration Form but have not completed the claim form.
d)   Which claims have Eligibility Notices and the amounts.
e)   The number of offers and amounts which have been accepted, paid and how many are pending payment.
f)   The number of claims in accounting.

---

[21] See Exhibit B
[22] See Exhibit B

8

g) The number of claims which are eligible but no payment is warranted due to prior Oil Spill payment(s).

h) The claims which are designated Incomplete, those designated Incomplete and waiting for a Response, those claim designated Incomplete in which a Response has been sent and is again in Review.

i) The number of claims in which Responses have been sent but not yet processed.

j) The number of claims which have been excluded from the Class, closed, withdrawn, on appeal and / or denied.

k) The number of claims which are still In Claim Review and In Claims Review but with no Notice yet issued.

l) The overall statistics of the submissions to the DWHCC.

34) Status Reports filed routinely by DWHCC Claims Administrator Patrick Juneau in the Multi-District Litigation also help in monitoring the flow of claims by the DWHCC in order to compare firm filings to the filings submitted to the DWHCC.[23]

35) The type of information contained in the email dated May 9, 2013, between Lionel Sutton and Glen Lerner, which I was only recently shown, is made available to any firm filing DWHCC claims through the Attorney Claim Portal website's Reporting tab and other sources as described in Paragraphs 33 and 34, above.[24]

**SWORN TO AND SIGNED** below before me, Notary Public, after reading the whole, on _Ottober 13_, 2013, in the jurisdiction mentioned above.

AFFIANT:

_____

CHRISTINA E. MANCUSO

Witness 1: _Christine Hay_          _Lewis Scott Joanen_
Printed Name: _CHRISTINE HAY_       Notary Public
                                    LEWIS SCOTT JOANEN
Witness 2: _Terry P. Alleman_       Notary Public
Printed Name: _Terry P. Alleman_    Bar No. 21431, ID No. 59231
                                    Printed Name: _Parish of Orleans, State of Louisiana_
                                    Notary No./Bar No.: _My commission is for life_
                                    My Commission Expires: _at death_

--------

[23] See Exhibit J, Claims Administrator Status Report of May 13, 2013
[24] See Exhibit K, dated May 9, 2013, reflecting AL's claim portal statistics

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179")*

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master—Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Christina Mancuso |
| Title: | Toxic Tort Litigation Attorney |
| Office: | AndryLerner |
| Date/Time: | August 7, 2013 9:00 AM |
| Attendees: | Walt Donaldson, Steve Tidwell, Laure Kirk, David Courcelle (attorney for Mancuso) |
| Location: | 935 Gravier S., New Orleans, La. 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Christina Mancuso.

On the above date and times, Christina Mancuso was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Mancuso was advised concerning the need for truthfulness and honesty and was further advised concerning the penalties for perjury under Title 18 USC section 1001. She was further advised that she would not be adjourned as a witness and could be recalled.



Regarding the Casey Thonn claim, Ms. Mancuso said that the first time she became involved with this claim based on a telephone call from Christine Reitano. During the call, Ms. Reitano told Ms. Mancuso she was sending two claims on a disc for referral to Andry Lerner. She does not recall if there was actually another claim, other than Mr. Thonn's, on the disc. Ms. Mancuso said that Ms. Reitano

1



EXHIBIT
A

SM-01-TALF00386

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL 2179")

requested she have Andry Lerner honor the attorney percentage, for Ms. Reitano, in the Thonn
contract, as set forth as a fee agreement; in that contract. Ms. Mancuso recalled that she sent Ms.
Reitano an attorney referral contract packet. She also recalled that she sent an Andry Lerner claimant
attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano. When
asked if a contract is always sent to the claimant, Ms. Mancuso said that some lawyers do and others do
not. Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral contract. In the Andry
Lerner process, that would not be a role she would handle.



Ms. Mancuso confirmed again that she had never known or met Mr. Sutton. Regarding Ms. Reitano,
she did recall she had two or three conversations with Ms. Reitano, generally regarding whether Ms.

2

SM-01-TALF00387



CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179")

Reitano had or had not sent the disc with the claims and there were no conversations after that.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

3

SM-01-TALF00388

**EXHIBIT B**

**DEEPWATER HORIZON CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-262 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

I. Profile - EXTERNAL

| Subject | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. | |
|---|---|---|
| Active Date | 10/8/12 | Policy Impact | ☐All Claims Regardless of Active Date ☑All Claims Greater than Active Date |
| Type of Decision | | Claims Administrator Decision |
| Settlement Agreement Reference | | Exhibit 10 |
| Affected Claim Types and/or Review Processes | | Seafood |
| Superseding Information | | Policy 262 supersedes Policy 257 on 10/08/2012 Policy 262 supersedes Policy 241 on 10/08/2012 Policy 262 supersedes Policy 212 on 10/08/2012 |

II. Summary

Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type.  UPDATE:  The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:

On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:

(a) Single Catch/Single Vessel Claimants:  If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:
(1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.
(2) The revenues shall be limited to those shown in the applicable tax returns.
(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(b) SWS-1 Claimants:  If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:
(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:
a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.
b) The revenues shall be limited to those shown in the applicable tax returns.
c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:
a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation.  The Claims Administrator will base the resulting Eligibility Notice on the higher award.
b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns.
(c) Louisiana Trip Ticket Database:  If the claimant is not subject to Subsections (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose.  The Claims Administrator will not consider tax return revenues on such claims.
(d) Specific Trip Tickets or Equivalent:  If the Claimant is not subject to Subsections (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

## DEEPWATER HORIZON
## CLAIMS CENTER
#### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-404 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

#### I. Profile   EXTERNAL

| Subject | Seafood Program: Handling Errors in Vessel Registration Information Reported in the LDWF Trip Ticket Database | |
|---|---|---|
| Active Date | 8/28/13 | Policy Impact | ☑All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| Type of Decision | | Clarified by Seafood Neutral |
| Settlement Agreement Reference | | |
| Affected Claim Types and/or Review Processes | | Seafood |

#### II. Summary

The Claims Administrator prepared and sent a memorandum to the Seafood Neutral explaining the substance and procedural history of the announced policy and requesting his opinion on how to resolve the issue. At the Seafood Neutral's request, the Claims Administrator then provided the Seafood Neutral – with a copy to the Parties – certain claims information germane to the issue. After considering that information alongside the announced policy, the Seafood Neutral advised the Claims Administrator that he agreed with the proposed approach. Accordingly, after thorough consideration of the Parties' responses and the Seafood Neutral's opinion, the Claims Administrator announces the final policy as originally announced, repeated verbatim below:

In Louisiana, seafood dealers are required to report the seafood they purchase from commercial fishermen to the Louisiana Department of Wildlife and Fisheries ("LDWF"). In reporting this sales information, the dealer must identify by registration number the vessel that landed the catch. A number of claimants have indicated that the seafood dealers to whom they sold their catch entered the wrong registration number, and, therefore, reported the sale to the LDWF under the wrong vessel. This erroneous reporting creates a discrepancy in the Claims Administrator's reviews of the affected Louisiana-based commercial fishermen's claims in the Seafood Compensation Program. If a claimant believes that his landings were reported to the LDWF under the wrong vessel and wishes to have the revenue associated with those misreported sales considered as part of the claimant's Seafood Compensation Program claim, the claimant must submit (1) a sworn written statement describing the discrepancy in detail and (2) sworn written statement from the dealer who incorrectly reported the landings confirming and explaining the dealer's reporting error.



EXHIBIT
C

EXHIBIT
D

Chris Mancuso

**Subject:** FW: General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

**From:** Nikeita Ashe [mailto:nashe@dhecc.com]
**Sent:** Tuesday, January 22, 2013 2:10 PM
**To:** Kailey LeBoeuf
**Cc:** Mary Rubio
**Subject:** RE: General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

Kailey,

I just wanted to inform you that we have implemented a new Re-Review process in addition to Reconsideration. You may seek a Re-Review if you have additional supporting documentation. I don't think that is your case here, but I wanted to inform you of that update for future references. I can seek clarification for you on the use of Trip Tickets vs. Income Tax Returns, however, without having an actual CID, receiving clarification may be difficult. Please let me know how you'd like me to move forward.

Thanks,
Nikeita

**From:** Kailey LeBoeuf [mailto:KLeboeuf@andrylawgroup.com]
**Sent:** Tuesday, January 22, 2013 2:58 PM
**To:** Nikeita Ashe
**Cc:** Mary Rubio
**Subject:** General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

Niketia,

        I have a question regarding eligibility notices that I would appreciate your input on.  My question is limited to claimants under the seafood compensation program.  We have received many eligibility notices from the claims facility regarding several claimants in which the claims facility used trip tickets to calculate the claimants loss in lieu of the claimants income Tax Return.  I understand that we can upload the SWS 1 to request that the claims facility use either the claimants trip tickets OR income tax returns to calculate the loss.  In some of these instances, we  have uploaded the SWS 1 with the claim form (requesting that the claims facility use Income Tax Returns), and the claims facility still uses trip tickets to calculate the loss.  In other circumstances, we may have not uploaded a SWS 1 requesting that the facility use Income Tax Returns to calculate a loss, and the claims facility uses the trip tickets to calculate the loss.

        ALL of the claimants that I am referring to would have received eligibility notices in a higher amount if the claims facility would have used Income Tax Returns.  This is despite the fact that we have either uploaded the SWS 1 requesting that the facility use Income Tax Returns and despite the fact that Section 4.3.8 provides that the claims administrator shall process the information completed to produce the greatest economic damage compensation amount.

        The problem that this causes is that we have to request for reconsideration to request that the claims facility use Income Tax Returns (which should have been done anyway considering the SWS 1 and/or Section 4.3.8).  1.  This really holds up the entire process.  2. We then receive a post reconsideration eligibility notice and sometimes the amount is still incorrect.  3. This means we now have to appeal, which causes even more delays and involves paying fees.

1

I just do not understand how this keeps happening.  I do not have a list of clients that this has happened to, but this has definitely been going on.  Is there any way you can look into this for me?  Any assistance would be greatly appreciated.  Thank you for your time.

Sincerely,

Kailey

Kailey L. LeBoeuf Esq.
Andry Lerner, L.L.C.
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-525-5535
Facsimile: 504-586-8933
E-Mail: kleboeuf@andrylawgroup.com

CONFIDENTIALITY NOTICE:  This e-mail transmission (and the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  It is intended only for use by the person(s) to whom it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution of or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone to arrange for the return of the documents.

Kailey L. LeBoeuf Esq.
Andry Lerner, L.L.C.
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-525-5535
Facsimile: 504-586-8933
E-Mail: kleboeuf@andrylawgroup.com

CONFIDENTIALITY NOTICE:  This e-mail transmission (and the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  It is intended only for use by the person(s) to whom it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution of or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone to arrange for the return of the documents.



800 Mariner's Plaza Drive, Ste. 821
Mandeville, LA 70448
985-778-2016 (Main Office)
www.CoastalClaimsGroup.com

January 7, 2013

Jonathan B. Andry, Esq.
Andry Lerner, LLC
610 Baronne Street
New Orleans, LA 70113

> Re:   Casey Thonn, Claimant ID No. 100051739
>        Boat Captain Claim ID No. 19691

Dear Mr. Andry:

Per your request, we have reviewed the Post-Reconsideration Eligibility Notice for the above referenced claim. We have found that the Claims Center has incorrectly calculated this loss for the following reasons:

1. The adjuster incorrectly calculated a Shrimp Cost Percentage resulting in a lower Base Loss even though this claim was based on Tax Return information, as per the Settlement Agreement (relevant Pages Attached for your review).

2. They also incorrectly calculated the Base Compensation for this claim as the Base Compensation was supposed to equal the Base Loss.

I have attached our revised calculations based upon the terms of the Settlement Agreement. Mr. Thonn's Boat Captain Claim should have results in a Final Compensation Amount of $648,648. If you have any additional questions, please let me know.

With kindest personal regards, I remain

Very truly yours,

*Leslie M. Butler*

Leslie M. Butler
Director of Operations

/lbt
Enclosure



EXHIBIT
E



**Historical Shrimp – Casey Thonn**
Claimant ID No. 100051739, Claim No. 19691

| Vessel Size | Additional Catch Factor | Shrimp Cost Percentage | Vessel Owner/ Commercial Fisherman Vessel Lessee Share | Boat Captain Share |
|---|---|---|---|---|
| < 30 feet | | | | |
| 30-44 feet | | | | |
| 45-74 feet (Ice) | | | | |
| 45-74 feet (Freezer) | | | | |
| 75+ feet (Ice) | | | | |
| 75+ feet (Freezer) | | | | |
| RTP | | 8.25 7.25 | | |

Key — Enter Raw Data / Selected Data

| | 2007 | 2008 | 2009 | | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| | | | 156,000 | | | | 156,000 |
| Averages | 2007-2009 | 2008-2009 | 2009 | Averages | 2007-2009 | 2008-2009 | 2009 |
| | 156,000 | 156,000 | 156,000 | | 156,000 | 156,000 | 156,000 |

| | | | | | |
|---|---|---|---|---|---|
| 1 Gross Revenue Benchmark Period | 156,000 a | | 156,000 a | | |
| Additional Catch Factor | 1.20 | | 1.20 | Based on vessel size from above |
| 2 Additional Catch Adjusted | 187,200 c=a*b | | 187,200 c=a*b | |
| Adjustment for change in prices 10-11 | 1.2 d | | 1.2 d | For all size vessels |
| 3 Total adjusted Benchmark Revenue | 224,640 e=c*d | | 224,640 e=c*d | |
| 4 Benchmark shrimp cost | 60,840 | | SKIP | |
| 5 Base Shrimp Loss | 57,330 g=(e-f)*.35 | | 78,624 f=e*.35 | |
| 6 Base compensation | 22,932 | | 78,624 g=f | |
| RTP | 7.25 i | | 7.25 h | |
| 7 Final compensation | 189,189 j=h+(h*i) | | 648,648 I=g+(g*h) | |

3.  Calculate Total Adjusted Benchmark Shrimp Revenue by multiplying the Additional Catch Adjusted Benchmark Shrimp Revenue by 1.2, the Adjustment for Changes in 2010-11 Prices.

Total Adjusted Benchmark Shrimp Revenue = (Additional Catch Adjusted Benchmark Shrimp Revenue * Adjustment for Changes in 2010-11 Prices).

4.  If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, calculate Benchmark Shrimp Cost.   Benchmark Shrimp Cost is calculated by multiplying Benchmark Shrimp Revenue by the Shrimp Cost Percentage. The Shrimp Cost Percentage, presented in Table 12, is expressed as a percentage of revenue and reflects standard industry non-labor variable costs.   If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5.

Benchmark Shrimp Cost = (Benchmark Shrimp Revenue * Shrimp Cost Percentage)   = $0

**TABLE 12**

| VESSEL SIZE | SHRIMP COST PERCENTAGE |
|---|---|
| <30 feet | 42% |
| 30-44 feet | 39% |
| 45-74 feet Ice | 39% |
| 45-74 feet Freezer | 42% |
| 75+ feet Ice | 54% |
| 75+ feet Freezer | 52% |

5.  Calculate the Base Shrimp Loss using the Shrimp Loss Percentage of 35%.

a.  If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = (Total Adjusted Benchmark Shrimp Revenue – Benchmark Shrimp Cost) * 35%

22

029320

b.     If the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = Total Adjusted Benchmark Shrimp Revenue * 35%

6.     Determine Base Compensation by multiplying Base Shrimp Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee or Boat Captain share. Vessel Owner and Boat Captain shares differ by boat size and type and are presented in Table 13.

a.     Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Vessel Share

b.     Base Compensation for Shrimp Boat Captains is calculated as:

i.     If Shrimp Boat Captain Compensation is calculated based on trip tickets then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Boat Captain Share

ii.     If Shrimp Boat Captain Compensation is calculated based on tax returns and financial records, then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss

### TABLE 13

| VESSEL TYPE AND SIZE | SHRIMP VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | SHRIMP BOAT CAPTAIN SHARE |
|---|---|---|
| <30 feet | 45% | 45% |
| 30-44 feet | 45% | 40% |
| 45-74 feet Ice | 45% | 30% |
| 45-74 feet Freezer | 45% | 30% |
| 75+ feet Ice | 45% | 25% |
| 75+ feet Freezer | 45% | 25% |

23

029321

CC: "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM>,
"jandry@andrylawgroup.com" <jandry@andrylawgroup.com>
Subject: BP's Initial Proposal - Claim No. 19691 - Casey Thonn
Date: Thu, 24 Jan 2013 20:18:56 -0500
To: "DDuval@dheclaims.com" <DDuval@dheclaims.com>, "jgoodwin@browngreer.com"
<jgoodwin@browngreer.com>,
"ClaimForms@deepwaterhorizoneconomicsettlement.com"
<ClaimForms@deepwaterhorizoneconomicsettlement.com>
From: "Warlick, Sarah E." <Sarah.Warlick@aporter.com>
Transaction Date (UTC): 2013-01-25 01:20:05
Original Requestor: Sarah.Warlick@aporter.com

Mr. Duval,

Please find enclosed BP's Initial Proposal with respect to the appeal of
claim number 19691 - Casey Thonn.

Kind regards,
Sarah

Sarah E. Warlick
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: +1 202.942.6409
sarah.warlick@aporter.com<mailto:sarah.warlick@aporter.com>
www.arnoldporter.com<http://www.arnoldporter.com>

_____

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any
attachments) was not intended or written to be used, and cannot be used, for
the purpose of (i) avoiding U.S. federal tax-related penalties or (ii)
promoting, marketing or recommending to another party any tax-related matter
addressed herein.

_____

This communication may contain information that is legally privileged,
confidential or exempt from disclosure. If you are not the intended
recipient, please note that any dissemination, distribution, or copying of
this communication is strictly prohibited. Anyone who receives this message
in error should notify the sender immediately by telephone or by return e-
mail and delete it from his or her computer.

_____

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com



<u>BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 19691</u>

<u>INTRODUCTION</u>

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of Its Initial Proposal with regard to the appeal of Claim No. 19691 (Claimant Casey Thonn). The Settlement Program issued its original Eligibility Notice awarding the Claimant a Compensation Amount of $83.10 on November 6, 2010. Following the Claimant's Request for Reconsideration, the Settlement Program revised its calculation and issued a Compensation Amount of $22,932.00. The Claimant then filed this Appeal on January 7, 2013.

In his appeal, Claimant argues that (1) the Settlement Program incorrectly applied the Seafood Compensation Framework's Shrimp Compensation formula, (2) the Settlement Program deducted Claimant's prior seafood-related payment twice, and (3) the Settlement Program did not accurately calculate the Claimant's Accounting Support Reimbursement.

The Settlement Program properly calculated Claimant's Award Amount. BP, therefore, submits an Initial Proposal Compensation Amount of $22,932.00 and Initial Proposal Prior Payment Offset of $72,500. Although BP agrees that the Settlement Program miscalculated the Claimant's Accounting Support Reimbursement, the Claimant is only entitled to $1,000, not the more than $10,000 it is requesting.

<u>EXPLANATION OF BP's POSITION</u>

The claim at issue is a Seafood Program shrimp boat captain claim for the vessel Boss Hoss (Hull ID LAZ62111E101). This claim is governed by the Seafood Compensation Framework's Shrimp Compensation Plan (the "Plan"). Settlement Agreement, Exhibit 10.

A.    <u>The Settlement Program Correctly Calculated Claimant's Compensation Amount</u>

1

The Plan requires a vessel owner seeking compensation under the Historical Revenue Method, like this Claimant, to provide evidence to demonstrate his or her commercial shrimping revenue during the selected Benchmark Period. Settlement Agreement, Ex. 10 at 18-19. The Settlement Agreement is clear that a claimant must substantiate its claimed losses by submitting, among other things, (a) "[t]rip tickets or their equivalents" or (b) "[f]ederal or state tax and financial information . . . to identify components of gross revenue derived from commercial shrimp harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits" a claim. *Id.* at 19. The Settlement Program uses this financial data to determine the claimant's Benchmark Shrimp Revenue, which is the basis for determining the Claimant's claimed losses resulting from the Spill. *Id.* at 21.

The Benchmark Shrimp Revenue can be based on either a Claimant's gross revenue or a Claimant's earnings. According to the Plan, "[t]he Claims Administrator may determine the *gross vessel revenue* or Boat Captain *earnings* from shrimp landings in the Gulf Coast areas based on the Claimant's tax returns...." *Id.* (emphasis added). The Benchmark Revenue figure is then inputted into a formula to arrive at a Total Adjusted Benchmark Shrimp Revenue. *Id.* at 21-22.

The Settlement Program must then determine the amount of costs, if any, to deduct from a claimant's revenue. If the Settlement Program used a claimant's *gross revenue* as its Benchmark Revenue, then it must calculate a Claimant's Benchmark Costs. *Id.* at 22. The Shrimp Cost Percentage is used to determine a Claimant's Benchmark Shrimp Cost. *Id.* According to the Plan, the Shrimp Cost Percentage is "expressed as a percentage of revenue and reflects standard industry non-labor variable costs." The resulting Benchmark Shrimp Cost is then subtracted from the Claimant's gross revenue. However, if a claimant's earnings are used

2

for Benchmark Revenue, the Program does not need calculate or subtract any additional costs. *Id.* This makes economic sense. Gross revenue is a claimant's revenue before any deductions for variable costs are applied. A claimant's earnings, on the other hand, already include deductions for these costs and do not need to have additional costs subtracted from them.

The Claimant is arguing that simply because he is a Boat Captain and he used tax returns for his financial data that the Shrimp Cost Percentage should not be used to calculate and then deduct Benchmark Costs for his claim. This is contrary to the plain language of the Settlement Agreement. The Settlement Agreement states that the Benchmark Cost calculation should only be skipped if, "the Claimant is a Boat Captain <u>and</u> Benchmark Revenue was calculated based upon his <u>earnings</u>, such as from tax return[s] or financial information." *Id.* (emphasis added). Here, the Settlement Program used Claimant's *gross revenue* of $156,000, indicated on his 2009 federal tax return as "Gross receipts," to calculate Claimant's Benchmark Revenue. Claimant's 2009 Form 1040, Schedule C, attached hereto as Exhibit 1. The Settlement Program, therefore, properly applied the Shrimp Cost Percentage to Claimant's Benchmark Revenue to determine and then subtract Claimant's Benchmark Costs from his gross revenue.[1]

B.    The Settlement Program Properly Deducted Claimant's Prior Seafood Spill-Related Payments

According to the Seafood Compensation Framework, "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments...." Settlement Agreement, Ex. 10 at 3. In order to apply this requirement, the Settlement Agreement instructs that "[t]he Claims Administrator shall offset any compensation under the Seafood Compensation Program by the total of the Seafood

---

[1] The accounting report submitted with Claimant's original claim is also in agreement with the Settlement Program's calculation. *See* Coastal Claims Group Report at 8, attached hereto as Exhibit 2.

3

Spill-Related Payment amount." *Id.* at 85. The Agreement defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood." *Id.* at n. 3.

In his Appeal, the Claimant asserts that the Settlement Program applied his prior payment offset twice. Indeed, the Eligibility Notices for Claimant's Boat Captain Claim (No. 19691) and Vessel Owner Claim (No. 19690) both include a prior payment offset of $72,500. BP agrees that this offset should only apply once. BP notes that the Settlement Program has corrected this error in the Claimant's Post-Reconsideration Eligibility Notice for Claim 19691. According to the "Summary of All Eligible Seafood Compensation Program Claims," the prior payment offset has only been applied once.[2]

C.    The Claimant is Only Entitled to Accounting Support Reimbursement of $1,000

The Settlement Agreement provides for Accounting Support Reimbursements to reimburse claimants for "reasonable and necessary accounting fees related to Claims preparation." Settlement Agreement § 4.4.13. The calculation of a Claimant's reimbursement depends on whether the Claimant is a business or an individual. *Id.* at §§ 4.4.13.7-8. A Business Claimant's reimbursement, "may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000." *Id.* at 4.4.13.8. A Business Claimant is defined as, "an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member Claiming Economic Damage allegedly arising out of...the Deepwater Horizon Incident." *Id.* at § 38.15.

_____

[2] If the offset of $72,500 has been applied to a prior Award received by the Claimant, BP agrees that it should not be applied here. However, if it has not been applied to any prior Award, BP submits that the offset should apply to this claim.

4

The Claimant asserts that he is a Business Claimant, because he filed a Form 1040 Schedule C for his shrimping business. The record evidence indicates that Claimant filed a Schedule C and is, therefore, entitled to accounting support reimbursement as a Business Claimant. According to the Claimant's Memorandum in Support of its Appeal, it is seeking reimbursement of $10,562.50 in fees for claim preparation work for Claimant's Boat Captain claim. *See* Coastal Claims Invoice, attached hereto as Exhibit 3. In its Post-Reconsideration Eligibility Notice, the Settlement Program identified $1,161.25 in reimbursable fees for this claim. As a Business Claimant with a pre-RTP Compensation Amount of less than $50,000, reimbursement is capped at $1,000. Therefore, BP submits that Claimant is eligible for an Accounting Support Reimbursement Payment of $1,000.

***

In light of the above, BP agrees with the Settlement Program's calculation of Claimant's Compensation Amount. BP, therefore, submits an Initial Proposal Compensation Amount of $22,932.00, the amount the Claimant is entitled to according to the terms of the Settlement Agreement's Seafood Compensation Framework. Additionally, BP agrees that Claimant's Prior Seafood Spill-Related Payments should only be deducted once, but without evidence that these payments have been deducted from other Claims for which the Program has issued payment, BP submits an Initial Proposal Prior Payment Offset of $72,500. Finally, BP submits that Claimant is entitled to Accounting Support Reimbursement of $1,000.

### BP'S FINAL PROPOSAL REGARDING CLAIM NO. 19691

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of Its Final Proposal with regard to the appeal of Claim No. 19691 by the Claimant (Casey Thonn).  The Claimant is appealing that (1) the Settlement Program incorrectly applied the Seafood Compensation Framework's Shrimp Compensation formula, (2) the Settlement Program deducted Claimant's prior seafood-related payment twice, and (3) the Settlement Program did not accurately calculate the Claimant's Accounting Support Reimbursement.

As BP explained in its Initial Proposal, the Settlement Program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset.  BP also explained that it agrees that the Settlement Program miscalculated the Claimant's Accounting Support Reimbursement, but that the Claimant is only entitled to $1,000, not the more than $10,000 it is requesting.  BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Payment Offset of $72,500.

### EXPLANATION OF BP's POSITION

A.    The Settlement Program Correctly Calculated Claimant's Compensation Amount

The claim at issue is a Seafood Program shrimp boat captain claim for the vessel Boss Hoss (Hull ID LAZ62111E101).  This claim is governed by the Seafood Compensation Framework's Shrimp Compensation Plan (the "Plan").  Settlement Agreement, Exhibit 10.  As part of the calculation of a Claimant's Compensation Amount, the Settlement Program must determine the amount of costs, if any, to deduct from a claimant's revenue.  If the Settlement Program used a claimant's *gross revenue* as a claimant's Benchmark Revenue, then it must calculate Benchmark Costs.  *Id.* at 22.  The claimant's Benchmark Revenue is multiplied by a Shrimp Cost Percentage to determine a claimant's Benchmark Shrimp Cost.  *Id.*  According to

1

the Plan, the Shrimp Cost Percentage is "expressed as a percentage of revenue and reflects standard industry non-labor variable costs." *Id.* The resulting Benchmark Shrimp Cost is then subtracted from the Claimant's gross revenue. However, if a claimant's *earnings* are used for Benchmark Revenue, the Program does not need to calculate or subtract any additional costs. *Id.* This makes economic sense. Gross revenue is a claimant's revenue before any deductions for variable costs are applied. A claimant's earnings, on the other hand, already include deductions for variable costs and do not need to have additional costs subtracted from them.

According to the Claimant, however, he should not have any Benchmark Costs deducted from his gross Benchmark Revenue. In his Initial Proposal, the Claimant argued that simply because he is a Boat Captain and he used tax returns for his financial data that the Shrimp Cost Percentage should not be used to calculate and then deduct Benchmark Costs from his gross revenue. Claimant's Memorandum in Support of Appeal at 1. The Claimant has misinterpreted the Settlement Agreement. The Agreement states that the Benchmark Cost calculation should only be skipped if, "the Claimant is a Boat Captain **and** Benchmark Revenue was calculated based upon his **earnings**, such as from tax return[s] or financial information." *Id.* (emphasis added). To be exempt from the Benchmark Cost calculation, therefore, a claim must satisfy a two-part test: (1) it must be a Boat Captain claim and (2) Benchmark Revenue must be based on a Claimant's *earnings*.

The Claimant's Boat Captain claim does not satisfy this test. The Program used Claimant's *gross revenue* -- not its earnings -- as Claimant's Benchmark Revenue. Specifically, the Settlement Program used Claimant's 2009 gross revenue of $156,000, indicated on his federal tax return as "Gross income." Claimant's 2009 Fsorm 1040, Schedule C, attached to BP Initial Proposal as Exhibit 1. The Settlement Program, therefore, properly applied the Shrimp

2

Cost Percentage to Claimant's Benchmark Revenue to determine and then subtract Claimant's

Benchmark Costs from his gross revenue.[1]

B.   The Settlement Program Properly Deducted Claimant's Prior Seafood Spill-Related Payments

According to the Seafood Compensation Framework, "[c]ompensation received by an

eligible Claimant under the Seafood Compensation Program will be reduced by the amount of

prior Seafood Spill-Related Payments...." Settlement Agreement, Ex. 10 at 3.  In order to apply

this requirement, the Settlement Agreement instructs that "[t]he Claims Administrator shall

offset any compensation under the Seafood Compensation Program by the total of the Seafood

Spill-Related Payment amount." *Id.* at 85.  The Agreement defines Seafood Spill-Related

Payments as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or

through the Transition Facility for economic loss claims relating to Seafood." *Id.* at n. 3.

The Settlement Agreement has only applied the prior payment offset once.  Although

the Eligibility Notices for Claimant's Boat Captain Claim (No. 19691) and Vessel Owner Claim

(No. 19690) both include a prior payment offset of $72,500, the "Summary of All Eligible

Seafood Compensation Program Claims" on these Eligibility Notices only apply the offset once.

C.   The Claimant is Only Entitled to Accounting Support Reimbursement of $1,000

The Settlement Agreement provides for Accounting Support Reimbursements to

reimburse claimants for "reasonable and necessary accounting fees related to Claims

preparation."  Settlement Agreement § 4.4.13.  A Business Claimant's reimbursement, "may not

exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business

Claims over $50,000 with all other Claims limited to $1000." *Id.* at 4.4.13.8.  A Business

---

[1] The accounting report submitted with Claimant's original claim is also in agreement with the Settlement Program's calculation. *See* Coastal Claims Group Report at 8, attached to BP Initial Proposal as Exhibit 2.

3

Claimant is defined as, "an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member Claiming Economic Damage allegedly arising out of…the Deepwater Horizon Incident." *Id.* at § 38.15.

The record evidence indicates that Claimant filed a Schedule C and is, therefore, entitled to accounting support reimbursement as a Business Claimant. As a Business Claimant with a pre-RTP Compensation Amount of less than $50,000, reimbursement is capped at $1,000. Therefore, BP submits that Claimant is eligible for an Accounting Support Reimbursement Payment of $1,000.

***

In light of the above, BP agrees with the Settlement Program's calculation of Claimant's Compensation Amount. BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00, the amount the Claimant is entitled to according to the terms of the Settlement Agreement's Seafood Compensation Framework. Additionally, BP agrees that Claimant's Prior Seafood Spill-Related Payments should only be applied once, but without evidence that this offset has been applied to other Claims for which the Program has issued payment, BP submits a Final Proposal Prior Payment Offset of $72,500. Finally, BP submits that Claimant is entitled to Accounting Support Reimbursement of $1,000.

RECEIVED - HAMMOND
FEB 0 4 2013
GARDEN CITY GROUP

CC: "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM>,
"jandry@andrylawgroup.com" <jandry@andrylawgroup.com>
Subject: BP's Final Proposal - Claim No. 19691 - Casey Thonn
Date: Mon, 4 Feb 2013 21:14:54 -0500
To: "DDuval@dheclaims.com" <DDuval@dheclaims.com>, "jgoodwin@browngreer.com"
<jgoodwin@browngreer.com>,
"ClaimForms@deepwaterhorizoneconomicsettlement.com"
<ClaimForms@deepwaterhorizoneconomicsettlement.com>
From: "Warlick, Sarah E." <Sarah.Warlick@aporter.com>
Transaction Date (UTC): 2013-02-05 02:15:08
Original Requestor: Sarah.Warlick@aporter.com

Mr. Duval,

Please find enclosed BP's Final Proposal with respect to the appeal of claim
number 19691 - Casey Thonn.

Kind regards,
Sarah

Sarah E. Warlick
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: +1 202.942.6409
sarah.warlick@aporter.com<mailto:sarah.warlick@aporter.com>
www.arnoldporter.com<http://www.arnoldporter.com>

_____

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any
attachments) was not intended or written to be used, and cannot be used, for
the purpose of (i) avoiding U.S. federal tax-related penalties or (ii)
promoting, marketing or recommending to another party any tax-related matter
addressed herein.

_____

This communication may contain information that is legally privileged,
confidential or exempt from disclosure. If you are not the intended
recipient, please note that any dissemination, distribution, or copying of
this communication is strictly prohibited. Anyone who receives this message
in error should notify the sender immediately by telephone or by return e-
mail and delete it from his or her computer.

_____

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com


EXHIBIT
G



**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE OF APPEAL PANEL DECISION
### DATE OF NOTICE: March 28, 2013

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business THONN | First CASEY | Middle |
|---|---|---|---|
| Claimant ID | 100051739 | **Claim ID** | 19691 |
| Claim Type | Seafood Compensation Program | | |
| Law Firm | Andry Law Group/Andry Lerner, LLC | | |
| Vessel Name | | **Hull ID** | |

### II. APPEAL PANEL DECISION

The Economic and Property Damages Settlement Agreement ("Settlement Agreement") written by Class Counsel and BP requires the Claims Administrator to designate an Appeals Coordinator to coordinate the Appeals Process. This Notice is an official communication from the Appeals Coordinator and relates to the claim identified in Section I. BP or the claimant appealed this claim, and the Appeals Coordinator submitted the claim for Appeal Panel review. The Appeal Panel has completed its review of the Appeal and has reached a final decision on the claim. The details of the Appeal Panel's decision are below:

| | | Proposal Chosen |
|---|---|---|
| **Compensation Amount** | $189,189.00 | BP |
| **Risk Transfer Premium Multiplier** | 0.00 | BP |
| **Prior Payment Offset** | $72,500.00 | BP |

The Compensation Amount awarded by the Appeal Panel will appear in Section 2, line 1 of your Post-Appeal Eligibility Notice. We will increase this Compensation Amount by the applicable Risk Transfer Premium, if any, and also decrease this Compensation Amount by any applicable offsets to determine your Award Amount. If this was a Claimant Appeal of a Post-Reconsideration Eligibility Notice and the claimant prevailed upon appeal, the pre-Risk Transfer Premium Compensation Amount will be increased by 5%. If we have received notice of any outstanding lien, we will also deduct that applicable amount from your Award Amount.

The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim.

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

For questions about this Notice of Appeal Panel Decision or the status of your other claim(s), contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com.** If you are a law firm or claims preparation company, you should call or email your designated DWH Contact for help or assistance. You may also visit a Claimant Assistance Center for help. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

**EXHIBIT**
H

## IV. SUMMARY OF OTHER SUBMITTED CLAIMS

We received one or more additional Claim Forms from you that are not included or addressed in this Notice. This chart summarizes the status of those claims as of the date of this Notice. You will receive or have already received separate Notices for each additional claim. You may monitor the status of your other claims by using the DWH Portal. If you do not use the DWH Portal, contact us by one of the methods listed in Section III of this Notice to find out the current status of your other claims or use the "Check My Status" feature located on the homepage of the official Settlement Program website at **www.deepwaterhorizoneconomicsettlement.com**.

| | Claim Type | Claim ID | Claim Status |
|---|---|---|---|
| 1. | Seafood Compensation Program | 19690 | Payment Received |
| 2. | VoO Charter Payment | 20741 | Payment Received |
| 3. | Subsistence | 97550 | Claim Form Submitted |



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

APR – 2 2013

DWH0337392288

CASEY THONN
C/O: ANDRY LAW GROUP/ANDRY LERNER, LLC
610 BARONNE STREET
NEW ORLEANS, LA 70113

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-342 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|
| | I. Profile - EXTERNAL |

| Subject | Seafood Program: Calculation of Boat Captain Income on Claims by Owner/Operators | |
|---|---|---|
| Active Date | 2/8/13 | Policy Impact | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| Type of Decision | | Clarified by Seafood Neutral |
| Settlement Agreement Reference | | Exhibit 10 |
| Affected Claim Types and/or Review Processes | | Seafood |

**II. Summary**

Under Exhibit 10, Class Members who owned or leased and captained their own vessel during the qualifying time period have both (1) a Vessel Owner and (2) a Boat Captain claim in the Seafood Compensation Program. The Historical Revenue Compensation Method, which is available for all of the Seafood species types, uses revenues in past Benchmark Years to calculate an award amount that differs by operator type. When a claimant who is both Boat Captain and Vessel Owner/Lessee has submitted a Schedule C to support the Boat Captain claim, the Claims Administrator will use the gross revenues in Line 1 of the Schedule C as the revenues in past Benchmark Years and then will apply the Exhibit 10 Cost Percentage, the Loss Percentage and the Boat Captain share set by Exhibit 10 to derive the number multiplied by the RTP to get the award amount for the claimant on the Boat Captain claim. The Claims Administrator will not use Schedule C Line 29 net profits number (or the net profits number shown on any line in other tax forms) on the Boat Captain claim of a claimant who is both Boat Captain and Vessel Owner/Lessee, for doing so would eliminate the premise for an award to that claimant on a Vessel Owner/Lessee claim. The Seafood Neutral has informed the Claims Administrator that he agrees with this policy.

EXHIBIT
I





## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig
   "Deepwater Horizon" in the Gulf
   of Mexico, on April 20, 2010

Applies to: *All Cases*

MDL NO. 2179

SECTION J

JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

---

REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER
HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT
AGREEMENT ON THE STATUS OF CLAIMS REVIEW

| STATUS REPORT NO. | 9 | DATE | May 13, 2013 |
|---|---|---|---|

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig        MDL NO. 2179
     "Deepwater Horizon" in the Gulf
     of Mexico, on April 20, 2012        SECTION J

Applies to: *All Cases*             JUDGE BARBIER
                                 MAGISTRATE JUDGE SHUSHAN

### REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW

### STATUS REPORT NO. 9, DATED MAY 13, 2013

         The Claims Administrator of the Deepwater Horizon Economic and Property Settlement Agreement (the "Settlement Agreement") submits this Report to inform the Court of the current status of the implementation of the Settlement Agreement. The Claims Administrator will provide any other information in addition to this Report as requested by the Court.

         I.     STATUS OF THE CLAIMS REVIEW PROCESSES AND CLAIM PAYMENTS

     A.  Claim Submissions.

       1.  Registration and Claim Forms.

         The Claims Administrator opened the Settlement Program with needed functions staffed and operating on June 4, 2012, just over 30 days after the Claims Administrator's appointment. We have received 147,920 Registration Forms and 164,758 Claim Forms since the Program opened, as shown in the Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement ("Public Report") attached as Appendix A.  Claimants have begun but not fully completed and submitted 11,866 Claim Forms.  The Forms are available online, in hard copy, or at Claimant Assistance Centers located throughout the Gulf. Of the total Claim Forms submitted, 14% of claimants filed in the Seafood Program, 20% filed Individual Economic Loss

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

(IEL) Claims, and 32% filed Business Economic Loss (BEL) Claims (including Start-up and

Failed BEL Claims). *See* App. A, Table 2.  DWH staff at the Claimant Assistance Centers

assisted in completing 30,119 of these Claim Forms. *See* App. A, Table 3.  The nineteen

Claimant Assistance Centers also provide other forms, including Personal Representative Forms,

Subsistence Interview Forms and Sworn Written Statements and Authorizations.

### 2. Minors, Incompetents and Deceased Claimants.

The table below describes the claims filed on behalf of minors, incompetents and

deceased claimants in the Settlement Program.

| | Table 1. Minors, Incompetents and Deceased Claimants | Minor Claimants | | Incompetent Claimants | | Deceased Claimants | |
|---|---|---|---|---|---|---|---|
| | | Total | Change Since Last Report | Total | Change Since Last Report | Total | Change Since Last Report |
| 1. | Claims Filed | 45 | +2 | 61 | +5 | 224 | +16 |
| 2. | Referred to GADL | 30 | +6 | 16 | 0 | N/A | N/A |
| 3. | Eligible for Payment | 6 | +5 | 26 | +2 | 93 | +8 |
| 4. | Approval Orders Filed | 3 | +3 | 21 | +3 | 73 | +16 |

### 3. Third Party Claims.

Court Approved Procedure Order No. 1 (as entered September 9, 2012, and amended

March 11, 2013) ("CAP") defines the process by which the Claims Administrator will receive,

process and pay the claims and/or liens asserted by attorneys, creditors, governmental agencies,

or other third parties against the payments to be made by the Claims Administrator to eligible

claimants under the Settlement Agreement ("Third Party Claims").  The Amended CAP

streamlines the enforcement documentation requirements to support a Valid Third Party Claim

and provides that the Court will adopt a Third Party Claim dispute resolution process for attorney

fee liens and Third Party Claims other than those asserted by a state or federal agency.  On April

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

9, 2013, the Court appointed Judge Jerry Brown as the Attorney Liens Adjudicator. On April 15,

2013, the Court approved the Rules Governing the Third Party Claims Dispute Resolution

Process as to Attorney Fee Liens. We issued Alerts about the Amended Court Approved

Procedure, Judge Brown's appointment and the Court's approval of the Attorney Fee Lien

Dispute Resolution Rules on April 22, 2013.

   We now require a Third Party Claimant to send us enforcement documentation soon after

the initial Third Party Claim assertion. We notify the affected Settlement Program claimant

about an Enforced Third Party Claim against a potential Settlement Payment as soon as we

receive sufficient documentation, regardless of where the underlying Settlement Program Claim

is in the review process. The claimant may, but does not have to, object to the Third Party Claim

at this time. After we send an Eligibility Notice to the affected Settlement Program claimant

against whom an Enforced Lien has been asserted, we send the claimant/claimant's attorney and

the Third Party Claimant a Notice of Valid Third Party Claim and provide the claimant 20 days

to notify us of any objection to the Third Party Claim. We also updated the Third Party Claims

Frequently Asked Questions on the DWH Settlement website to explain all of these changes.

   We continue to process and pay Third Party Claims as reflected in Table 2 below.

| | Table 2. Third Party Claims | | | | | |
|---|---|---|---|---|---|---|
| | Type of Third Party Claim ("TPC") | TPCs Asserted | TPCs Asserted Against Claimants With a DHCC ID | TPCs Asserted Against Payable Claims | Valid TPCs Asserted Against Payable Claims | TPCs Paid/ Ready for Payment (TPC Clmt) | Claims with TPCs Paid/ Ready for Payment (Clmt) |
| 1. | Attorney's Fees | 2,340 | 1,882 | 325 | 174 | 119 | 279 |
| 2. | IRS Levies | 448 | 422 | 39 | 40 | 29 | 33 |
| 3. | Individual Domestic | 257 | 148 | 75 | 59 | 46 | 53 |

---

[1] The streamlined enforcement requirements allow us to assess validity earlier in the process, although we will not know if a valid TPC is asserted against a payable claim until the Eligibility Notice goes out.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | Table 2: Third Party Claims | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Support Obligations** | | | | | | |
| 4. | **Blanket State-Asserted Multiple Domestic Support Obligations** | 4 states | N/A | N/A | N/A | 0 | 0 |
| 5. | **3rd Party Lien/Writ of Garnishment** | 542 | 233 | 13 | 7 | 4 | 3 |
| 6. | **Claims Preparation/ Accounting** | 831 | 643 | 29 | 10 | 1 | 6 |
| 7. | Other | 25 | 21 | 1 | 0 | 0 | 0 |
| | TOTAL | 4,443 | 3,349 | 482 | 290 | 199 | 374[2] |

To date, we have removed 1,392 lien holds due to parties releasing their claims or resolving disputes.

B.  Claims Review.

We completed our first reviews and issued our first outcome notices on July 15, 2012, and Payments on July 31, 2012.  There are many steps involved in reviewing a claim so that it is ready for a notice.

1.  Identity Verification.

The Tax Identity Number (TIN) Verification review is the first step in the DWH claims review process.  The table below contains information on the total number of claimants reviewed in the Program, the outcome of those reviews, and the percentage of claimants that receive Verification Notices after review.

---

[2] If the TPC amount is in dispute, we pay the Claimant the undisputed portion of his/her/its Settlement Payment.  A Third Party Claim can be asserted against one or more Settlement Program Claims.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 3. Identity Verification Review Activity | | | | |
|---|---|---|---|---|
| Outcome | Claimants Reviewed Since Last Report | Monthly Percentage | Total Claimants Reviewed | Total Percentage |
| 1. Verified During Review | 4,017 | 84.4% | 41,398 | 78.4% |
| 2. SSN Notice Issued | 73 | 1.5% | 2,307 | 4.4% |
| 3. ITIN Notice Issued | 10 | .2% | 398 | .8% |
| 4. EIN Notice Issued | 661 | 13.9% | 8,683 | 16.4% |
| 5. Total Reviewed | 4,761 | 100% | 52,786 | 100% |

The table below contains information on the number of TIN Verification Notices issued, how many have been cured after the claimant responded to the Notice, and the average time to cure in days.

| Table 4. Identity Incompleteness Activity | | | | |
|---|---|---|---|---|
| Notice Type | Notices Issued | Number Cured | Percentage Cured | Average Time to Cure in Days |
| 1. SSN Notice | 2,307 | 1,846 | 80% | 137 |
| 2. ITIN Notice | 398 | 334 | 84% | 160 |
| 3. EIN Notice | 8,683 | 7,467 | 86% | 80 |
| 4. Total Issued | 11,388 | 9,647 | 85% | 125 |

## 2. Employer Verification Review ("EVR").

The EVR process ensures that all employees of the same business are treated uniformly and that each business is placed in the proper Zone.  The review also walks through the intricate analysis necessary to assign the right NAICS code to a business. The EVR team has completed the EVR analysis for over 150,000 businesses and rental properties.

From April 11, 2013, through May 10, 2013, the team completed the EVR step for 13,072 businesses and properties.  We identified an average of 429 new businesses and properties to review each day and completed the EVR review for an average of 436 businesses

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

and properties each day.  We continue to review new businesses and rental properties on a first-in, first-out basis.

     3.  **Exclusions.**

     The Exclusions review process ensures that claims and claimants excluded under the Settlement Agreement are appropriately denied.  The Exclusions team guides the reviewers and the EVR team when questions arise during the exclusion determination.  Table 5 below shows the number of Denial Notices issued to date for each Exclusion Reason and the team responsible:

| | Table 5. Exclusions | | | |
|---|---|---|---|---|
| | **Exclusion Reason** | **Team Responsible** | **Denial Notices Since Last Report** | **Total Denial Notices** |
| 1. | GCCF Release | Exclusions | 1,313 | 6,164 |
| 2. | BP/MDL 2179 Defendant | | 13 | 198 |
| 3. | US District Court for Eastern District of LA | | 0 | 22 |
| 4. | Not a Member of the Economic Class | Claims Reviewers | 14 | 154 |
| 5. | Bodily Injury | | 0 | 2 |
| 6. | BP Shareholder | | 0 | 6 |
| 7. | Transocean/Halliburton Claim | | 0 | 0 |
| 8. | Governmental Entity | Claims Reviewers/ EVR | 66 | 611 |
| 9. | Oil and Gas Industry | | 73 | 353 |
| 10. | BP-Branded Fuel Entity | | 3 | 27 |
| 11. | Menhaden Claim | EVR | 1 | 10 |
| 12. | Financial Institution | | 30 | 160 |
| 13. | Gaming Industry | | 58 | 549 |
| 14. | Insurance Industry | | 22 | 116 |
| 15. | Defense Contractor | | 62 | 247 |
| 16. | Real Estate Developer | | 37 | 39 |
| 17. | Trust, Fund, Financial Vehicle | | 5 | 12 |
| 18. | Total Denial Notices from Exclusions | | 1,697 | 8,670 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

### 4. Claimant Accounting Support Reviews.

A special team handles Claimant Accounting Support ("CAS") reviews. CAS reimbursement is available under the Settlement Agreement for IEL, BEL, and Seafood claims. After a claim is returned from the Accountants or BrownGreer's reviewers as payable and the Compensation Amount is known, the CAS team reviews accounting invoices and CAS Sworn Written Statements. Table 6 includes information on the number of CAS reviews we have completed to date, whether the Accounting Support documentation was complete or incomplete, and the amounts reimbursed.

| | | | Table 6. Claimant Accounting Support Reviews | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | CAS Review Result | | | | Total CAS Reviews | | CAS $ Amount Reimbursed | |
| | | Complete | | Incomplete | | | | | |
| | Claim Type | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date |
| 1. | BEL | 729 | 6027 | 68 | 590 | 797 | 6617 | $1,760,236.88 | $8,230,892.82 |
| 2. | IEL | 43 | 804 | 19 | 168 | 62 | 972 | $9,530.93 | $51,897.92 |
| 3. | Seafood | 214 | 3182 | 28 | 481 | 242 | 3663 | $144,823.59 | $1,137,210.36 |
| 4. | TOTAL | 986 | 10,013 | 115 | 1,239 | 1,101 | 11,252 | $1,914,591.40 | $9,420,001.10 |

### 5. QA Review.

The Quality Assurance ("QA") process addresses three fundamental needs of the Settlement Program, which are to: (a) ensure that all claims are reviewed in accordance with the policies of the Settlement Agreement by targeting anomalous claims results through data metrics analysis; (b) provide a mechanism to monitor reviewer performance and the necessary tools to efficiently and effectively provide feedback to reviewers; and (c) identify areas of review resulting in high error rates that require retraining or refined review procedures and data validations.

7

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

We have implemented a reviewer follow-up process for all claim types. We provide
daily follow-up to reviewers whose claims resulted in different results after a QA review the day
before. We also have a report that identifies specific reviewers who require re-training, and
reveals whether there are issues that warrant refresher training for all reviewers. Table 7 shows,
by Claim Type, the number of claims identified for QA review through the database QA process,
as well as how many QA reviews have been completed, how many are in progress, and how
many are awaiting review.

| | Table 7 - Quality Assurance Reviews | | | | | |
|---|---|---|---|---|---|---|
| | Claim Type | Total Claims Needing QA To Date | QA Reviews Completed | % Completed | QA Reviews in Progress | Claims Awaiting QA | QA Reviews Completed Since Last Report |
| 1. | Seafood | 19,574 | 17,554 | 90% | 1,301 | 719 | 4,282 |
| 2. | IEL | 15,432 | 9,571 | 62% | 726 | 5,135 | 2,050 |
| 3. | BEL | 8,783 | 6,778 | 77% | 406 | 1,599 | 1,895 |
| 4. | Start-Up BEL | 830 | 624 | 75% | 32 | 174 | 128 |
| 5. | Failed BEL | 1,330 | 1,201 | 90% | 20 | 109 | 101 |
| 6. | Coastal Real Property | 14,704 | 14,504 | 99% | 120 | 80 | 1,989 |
| 7. | Real Property Sales | 626 | 622 | 99% | 0 | 4 | 24 |
| 8. | VoO Charter | 7,241 | 7,227 | 100% | 10 | 4 | 151 |
| 9. | Subsistence | 9,271 | 2,322 | 25% | 155 | 6,794 | 752 |
| 10. | Wetlands | 2,262 | 2,057 | 91% | 93 | 112 | 322 |
| 11. | Vessel Physical Damage | 507 | 313 | 62% | 9 | 185 | 229 |
| 12. | TOTAL | 80,560 | 62,773 | 78% | 2,872 | 14,915 | 11,923 |

**6. Claim Type Review Details.**

Table 8 provides information on the number of claims filed, how many claims have been
reviewed to Notice, the claims remaining to review, and how many claims were reviewed to

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

either a Notice or "Later Notice" to date, by claim type.  Table 8 splits the claims reviewed to a

"Later Notice" into separate sections distinguishing claims receiving Notices after we conduct a

Reconsideration review from claims reviewed for additional materials submitted by a claimant in

response to an Incompleteness Notice.

**Table 8: Throughput Analysis of Claims Filed and Notices Issued**

**A. Claims Reviewed to First Notice**

| | Claim Type | Status of All Claims Filed | | | | Productivity Since Last Report on 4/11/13 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total Claims Filed To Date | Reviews Completed to Notice | | Claims Remaining to Review | | New Claims Filed | Avg Daily Claims Filed | Reviews Completed to First Notice | Avg Daily Reviews to First Notice |
| 1. | Seafood | 23,862 | 19,998 | 84% | 3,864 | 16% | 245 | 8 | 2,890 | 96 |
| 2. | IEL | 29,946 | 23,857 | 80% | 6,089 | 20% | 984 | 33 | 2,599 | 87 |
| 3. | IPV/FV | 232 | 212 | 91% | 20 | 9% | 11 | 0 | 14 | 0 |
| 4. | BEL | 46,424 | 21,895 | 47% | 24,529 | 53% | 4,576 | 153 | 1,941 | 65 |
| 5. | Start-Up BEL | 3,226 | 1,986 | 62% | 1,240 | 38% | 298 | 10 | 148 | 5 |
| 6. | Failed BEL | 2,519 | 1,777 | 71% | 742 | 29% | 146 | 5 | 166 | 6 |
| 7. | Coastal RP | 23,841 | 22,031 | 92% | 1,810 | 8% | 1,981 | 66 | 2,597 | 87 |
| 8. | Wetlands RP | 5,234 | 2,855 | 55% | 2,379 | 45% | 895 | 30 | 363 | 12 |
| 9. | RPS | 1,142 | 951 | 83% | 191 | 17% | 95 | 3 | 77 | 3 |
| 10. | Subsistence | 18,947 | 2,605 | 14% | 16,342 | 86% | 2,838 | 95 | 1,290 | 43 |
| 11. | VoO | 8,292 | 8,111 | 98% | 181 | 2% | 100 | 3 | 142 | 5 |
| 12. | Vessel | 1093 | 860 | 79% | 233 | 21% | 128 | 4 | 111 | 4 |
| 13. | TOTAL | 164,758 | 107,138 | 65% | 57,620 | 35% | 12,297 | 410 | 12,338 | 411 |

**B. Claims Reviewed to Later Notice**

| | Claim Type | Initial or Preliminary Incompleteness Response | | | Follow-Up Incompleteness Responses | | | Requests for Reconsideration | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Responses | Claims with Later Notice | Remaining Claims | Total Responses | Claims with Later Notice | Remaining Claims | Total Requests | Claims with Later Notice | Remaining Claims |
| 1. | Seafood | 4,409 | 2,402 | 2,007 | 961 | 421 | 540 | 1,384 | 624 | 760 |
| 2. | IEL | 11,297 | 6,353 | 4,944 | 2,698 | 1,190 | 1,508 | 1,513 | 582 | 931 |
| 3. | IPV/FV | 74 | 66 | 8 | 22 | 9 | 13 | 15 | 2 | 13 |
| 4. | BEL | 11,276 | 6,794 | 4,482 | 3,637 | 1,844 | 1,793 | 1,756 | 587 | 1,169 |
| 5. | Start-Up BEL | 1,066 | 723 | 343 | 497 | 209 | 288 | 171 | 36 | 135 |
| 6. | Failed BEL | 568 | 366 | 202 | 279 | 141 | 138 | 237 | 92 | 145 |
| 7. | Coastal RP | 3,529 | 2,964 | 565 | 818 | 577 | 241 | 907 | 587 | 320 |

9

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | Table 8. Throughput Analysis of Claims Filed and Notices Issued | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8. | Wetlands RP | 175 | 128 | 47 | 21 | 15 | 6 | 266 | 101 | 165 |
| 9. | RPS | 157 | 148 | 9 | 36 | 34 | 2 | 121 | 88 | 33 |
| 10. | Subsistence | 613 | 112 | 501 | 25 | 1 | 24 | 29 | 5 | 24 |
| 11. | VoO | 831 | 810 | 21 | 333 | 305 | 28 | 536 | 372 | 164 |
| 12. | Vessel | 508 | 438 | 70 | 183 | 135 | 48 | 79 | 42 | 37 |
| 13. | TOTAL | 34,503 | 21,304 | 13,199 | 9,510 | 4,881 | 4,629 | 7,014 | 3,118 | 3,896 |

### C. Claim Payments.

#### 1. Notices and Payments.

We issued our first payments to claimants on July 31, 2012. Tables 4 and 5 of the Public Report attached at Appendix A provide detail on the notices and payments issued to date. As of May 10, 2013, we have issued 40,459 Eligibility Notices with Payment Offers totaling $3,224,375,803 billion. As of that date, we also have made over $2.14 billion in payments on 31,980 claims.

#### 2. Claimants in Bankruptcy.

Since the Claims Administrator approved the procedures for making Settlement Payments to claimants in bankruptcy on February 20, 2013, we have issued Bankruptcy Notices to approximately 60 claimants who had previously received Eligibility Notices. We continue to review these claim files to determine if the claimants submitted the documents necessary to remove the bankruptcy hold so the claims can be paid. For claimants who have not submitted all of the requested documentation, we continue to reach out to those claimants to let them know what needs to be submitted to so they can receive payment on their claims.

### D. Re-Reviews, Reconsiderations and Appeals.

#### 1. Re-Review Reviews and Outcomes.

The Claims Administrator implemented a Re-Review process beginning on January 18, 2013, that provides claimants with the opportunity to request a Re-Review of their claim within

10

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

30 days after an Eligibility or Denial Notice if they have additional documents not previously submitted to support their claim. This Re-Review leads to a Post Re-Review Notice, from which claimants may then request Reconsideration if they wish. To date, there have been 30,727 Eligibility and Denial Notices issued from which claimants can seek Re-Review. Of those, 5,017 are still within the 30 day window to seek Re-Review and have not yet done so, leaving 25,710 that have passed the window for seeking Re-Review. Of those, claimants have asked for Re-Review of 1,326 claims. Thus, the rate of Re-Review from all final determinations is 5.2%. The rate of Re-Review from Eligibility Notices is 4% and the rate of Re-Review from Denial Notices is 10%.

Table 9 summarizes the Re-Reviews Reviews we have completed, the number of Post-Re-Review Notices we have issued, and whether the outcome of the Re-Review review resulted in an award that was higher (↑), lower (↓),or the same (↔). The table also includes information showing whether an original Exclusion Denial was confirmed or overturned on Re-Review. The number of Notices issued is fewer than the reviews completed because there is a 36 hour lag time between when the review is completed and when the Notice is issued.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | Table 9: Re-Reviews | | | | |
|---|---|---|---|---|---|
| | A: Re-Review Requests and Reviews | | | | |
| | Claim Type | Requests Received To Date | Reviews Completed To Date | | |
| | | | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | Seafood | 330 | 111 | 24 | 6 |
| 2. | IEL | 116 | 15 | 2 | 1 |
| 3. | IPV/FV | 7 | 0 | 0 | 0 |
| 4. | BEL | 381 | 130 | 4 | 7 |
| 5. | Start-Up BEL | 16 | 5 | 0 | 0 |
| 6. | Failed BEL | 38 | 34 | 0 | 2 |
| 7. | Coastal | 242 | 182 | 16 | 10 |
| 8. | Wetlands | 137 | 113 | 0 | 7 |
| 9. | Real Property Sales | 10 | 10 | 0 | 1 |
| 10. | Subsistence | 11 | 0 | 0 | 0 |
| 11. | VoO | 34 | 34 | 2 | 2 |
| 12. | Vessel | 4 | 1 | 0 | 1 |
| 13. | TOTAL | 1,326 | 635 | 48 | 37 |

| | Table 9: Re-Reviews | | | | | | |
|---|---|---|---|---|---|---|---|
| | B: Re-Review Notices Issued | | | | | | |
| | Claim Type | Notices Issued | | Outcome of Review | | | |
| | | Total Issued to Date | Weekly Average | Compensation Amount for Eligible Claims | | | Exclusion/Denials |
| | | | | | | | Confirmed | Overturned |
| 1. | Seafood | 101 | 5 | 53 | 4 | 38 | 5 | 1 |
| 2. | IEL | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| 3. | IPV/FV | 6 | 0 | 0 | 0 | 0 | 6 | 0 |
| 4. | BEL | 130 | 7 | 56 | 8 | 18 | 45 | 2 |
| 5. | Start-Up BEL | 4 | 0 | 3 | 0 | 0 | 1 | 0 |
| 6. | Failed BEL | 25 | 1 | 0 | 0 | 0 | 25 | 0 |
| 7. | Coastal | 88 | 5 | 21 | 1 | 16 | 51 | 1 |
| 8. | Wetlands | 21 | 1 | 2 | 0 | 0 | 20 | 1 |
| 9. | Real Property Sales | 4 | 0 | 0 | 1 | 0 | 3 | 0 |
| 10. | Subsistence | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11. | VoO | 30 | 2 | 7 | 5 | 12 | 8 | 2 |
| 12 | Vessel | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| 13. | TOTAL | 414 | 22 | 142 | 19 | 84 | 169 | 7 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## 2. Reconsideration Reviews and Outcomes.

To date, there have been 68,114 Eligibility, Denial and Incompleteness Denial Notices issued from which claimants can seek Reconsideration.  Of those, 7,989 are still within the 30 day window to seek Reconsideration and have not yet done so, leaving 60,125 that have passed the window for seeking Reconsideration.  Of those, claimants have asked for Reconsideration of 6,972 claims.  Thus, the rate of Reconsideration from all final determinations is 11.6%.  The rate of Reconsideration from Eligibility Notices is 6% and the rate of Reconsideration from Denial and Incompleteness Denial Notices is 22%.

Table 10 summarizes the Reconsideration Reviews we have completed, the number of Post-Reconsideration Notices we have issued, and whether the outcome of the Reconsideration review resulted in an award that was higher ($\uparrow$), lower ($\downarrow$), or the same ($\leftrightarrow$). The table also includes information showing whether an original Exclusion Denial was confirmed or overturned on Reconsideration.  The number of Notices issued is fewer than the reviews completed because there is a 36 hour lag time between when the review is completed and when the Notice is issued.

| | Table 10: Reconsideration | | | |
|---|---|---|---|---|
| | B. Reconsideration Requests and Reviews | | | |
| | | | Reviews Completed To Date | | |
| | Claim Type | Requests Received To Date | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | Seafood | 1,377 | 846 | 56 | 60 |
| 2. | IEL | 1,502 | 1014 | 76 | 72 |
| 3. | IPV/FV | 15 | 4 | 0 | 0 |
| 4. | BEL | 1,744 | 1337 | 96 | 96 |
| 5. | Start-Up BEL | 170 | 139 | 13 | 10 |
| 6. | Failed BEL | 232 | 196 | 7 | 14 |
| 7. | Coastal | 902 | 789 | 51 | 56 |
| 8. | Wetlands | 267 | 262 | 17 | 19 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 10. Reconsideration | | | | |
| --- | --- | --- | --- | --- |
| **B. Reconsideration Requests and Reviews** | | | | |
| | | | Reviews Completed To Date | |
| Claim Type | Requests Received To Date | Total | Completed Since Last Report | Average Weekly Reviews |
| 9. Real Property Sales | 120 | 117 | 0 | 8 |
| 10. Subsistence | 28 | 10 | 0 | 1 |
| 11. VoO | 537 | 507 | 18 | 36 |
| 12. Vessel | 78 | 63 | 9 | 5 |
| 13. TOTAL | 6,972 | 5,284 | 343 | 377 |

| | Notices Issued | | Outcome of Review | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Claim Type | Total Issued to Date | Weekly Average | Compensation Amount for Eligible Claims | | | Exclusion/Denials | |
| | | | | | | Confirmed | Overturned |
| 1. Seafood | 628 | 16 | 333 | 44 | 162 | 86 | 3 |
| 2. IEL | 687 | 17 | 97 | 6 | 29 | 559 | 1 |
| 3. IPV/FV | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| 4. BEL | 623 | 16 | 213 | 19 | 107 | 262 | 23 |
| 5. Start-Up BEL | 36 | 1 | 7 | 0 | 5 | 23 | 1 |
| 6. Failed BEL | 92 | 2 | 0 | 0 | 0 | 92 | 0 |
| 7. Coastal | 595 | 16 | 62 | 12 | 212 | 299 | 10 |
| 8. Wetlands | 104 | 3 | 11 | 1 | 17 | 75 | 0 |
| 9. Real Property Sales | 94 | 2 | 0 | 0 | 2 | 90 | 2 |
| 10. Subsistence | 5 | 0 | 0 | 0 | 0 | 5 | 0 |
| 11. VoO | 462 | 12 | 58 | 2 | 109 | 252 | 41 |
| 12. Vessel | 46 | 1 | 25 | 1 | 7 | 13 | 0 |
| 13. TOTAL | 3,376 | 87 | 806 | 85 | 650 | 1,760 | 81 |

3. Appeals.

(a) *BP Appeals.*

To date, we have issued 13,311 Eligibility Notices that meet or exceed the threshold amounts rendering them eligible for BP to appeal. Of those, 430 are still within the time for BP to appeal, leaving 12,881 that have passed the window for BP to consider whether to appeal. Of

14

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

those 12,881, BP has appealed 1,377, or only 10.6%. However, out of the 1,377 claims BP has

appealed, they have subsequently withdrawn 142 appeals, and another 34 have been resolved for

the same amount of the Eligibility Notice. Thus, out of the 1,377 claims BP has appealed, 176

have either been withdrawn or resolved, confirming that the outcome of the review was correct.

If we remove those 176 from the 1,377 BP has appealed to arrive at a more realistic "rate of

disagreement" BP has with our results, that leaves 1,201 claims out of 12,881, or a 9.3% rate of

disagreement.

Table 11 provides summary information on the status of BP's appeals.

| | Table 11: Status of BP Appeals | | | |
|---|---|---|---|---|
| | A. Appeal Filing/Resolution | | | |
| | Status | As of 4/11/13 | Since Last Report | Total |
| 1. | BP Appeals Filed | **1,020** | 357 | **1,377** |
| 2. | Appeals Resolved | **349** | 224 | **575** |
| (a) | Withdrawn | 103 | 39 | 142 |
| (b) | Panel Decided | 40 | 117 | 157 |
| (c) | Settled by Parties | 171 | 39 | 210 |
| (d) | Remanded by Panel | 0 | 19 | 19 |
| (e) | Administratively Closed | 7 | 0 | 7 |
| (f) | Closed for Reconsideration Review | 28 | 12 | 40 |
| | B. Pending Appeals | | | |
| 3. | In Pre-Panel Baseball Process | | 549 | |
| 4. | Currently Before Panel | | 252 | |
| 5. | TOTAL PENDING | | **801** | |

(b) *Claimant Appeals.*

Before a claimant may appeal, he must seek Reconsideration and receive a Post-

Reconsideration Notice. To date, we have issued 3,376 Post-Reconsideration Notices. Of those,

745 are still within the time for the claimant to appeal, leaving 2,631 that have passed the

window for the claimant to consider whether to appeal. Of those 2,631, claimants have appealed

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

431, or 16.3%. Of the 431 Claimant Appeals, 264 are appeals of Post-Reconsideration Denial

Notices and 166 are appeals of Post-Reconsideration Eligibility Notices.

Table 12 provides summary information on the status of Claimant Appeals:

| | Table 12. Status of Claimant Appeals | | | |
|---|---|---|---|---|
| | A. Appeal Filing/Resolution | | | |
| | Status | As of 4/11/13 | Since Last Report | Total |
| 1. | Claimant Appeals Filed | 384 | 47 | 431 |
| 2. | Appeals Resolved | 111 | 87 | 198 |
| (a) | Panel Decided | 66 | 84 | 150 |
| (b) | Settled by Parties | 26 | -2 | 24 |
| (c) | Remanded by Panel | 0 | 1 | 1 |
| (d) | Administratively Closed | 4 | 0 | 4 |
| (e) | Withdrawn | 15 | 4 | 19 |
| | B. Pending Appeals | | | |
| 3. | In Pre-Panel Baseball Process | 51 | | |
| 4. | In Pre-Panel Non-Baseball Process | 71 | | |
| 5. | Currently Before Panel | 111 | | |
| 6. | TOTAL PENDING | 233 | | |

(c) *Resolved Appeals.*

As reported in the tables above, 773 Claimant and BP Appeals have been resolved. Table

13 provides a summary of these resolved appeals, by Claim Type.

16

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | | Appeals Settled or Decided by Panel | | | | | | | Closed Because Claimant Asked For Recon. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Claim Type | | Award Amount after Appeal Compared to Original Notice | | | | | | Withdrawn | Admin. Closed | | |
| | | Higher | Lower | Same | Denial Upheld | Denial Over turned | Remand | | | | |
| 1. | Seafood | 10 | 76 | 7 | 5 | 0 | 1 | 39 | 3 | 8 | 149 |
| 2. | BEL | 65 | 156 | 7 | 34 | 5 | 12 | 89 | 5 | 31 | 404 |
| 3. | Wetlands Real Property | 0 | 1 | 2 | 2 | 0 | 0 | 2 | 0 | 0 | 7 |
| 4. | Coastal Real Property | 0 | 2 | 4 | 5 | 0 | 1 | 4 | 0 | 0 | 16 |
| 5. | Real Property Sales | 0 | 2 | 2 | 13 | 0 | 0 | 2 | 1 | 0 | 20 |
| 6. | VoO Charter Payment | 17 | 29 | 14 | 22 | 9 | 2 | 17 | 2 | 0 | 112 |
| 7. | IEL | 5 | 8 | 2 | 19 | 2 | 1 | 4 | 0 | 1 | 42 |
| 8. | VPD | 10 | 6 | 0 | 0 | 0 | 3 | 4 | 0 | 0 | 23 |
| 9. | Total | 107 | 280 | 38 | 100 | 16 | 20 | 161 | 11 | 40 | 773 |

Table 13. Outcome After Appeal

## II.   CLAIMANT OUTREACH EFFORTS

We have continued our Claimant Outreach efforts since the previous Court Status Report:

### A. Law Firm Contacts.

The Law Firm Contacts team continued to increase their outreach efforts related to Identity Verification Incompleteness Notices, in addition to continued outreach efforts across several damage categories related to incompleteness reasons. Firm Contacts continued to facilitate conference calls held in collaboration with the accountants to efficiently address documentation requirements and resolve outstanding Program questions. Firm Contacts also continued outreach efforts regarding incomplete payment documentation.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**B. Communications Center (CCC).**

The CCC continues to enhance Claimant Outreach efforts by working directly with each damage category. Continued outreach campaigns included calls to claimants who emailed the Program with questions or status inquiries, incomplete claims, Identity Verification issues, and to claimants with incomplete payment documentation. The CCC continuously seeks self-improvement. By increasing the frequency of structured and informal Agent feedback, the CCC is improving Agent competency and realizing an increase in positive feedback from Claimants.

**C. Claimant Assistance Centers (CACs).**

The Claimant Outreach Program (COP) continues at the CACs. To date, the COP has completed over 42,500 outreach calls to claimants. The CACs continued outreach efforts to claimants with incomplete claims across all damage categories. In addition to these outreach efforts, the team called claimants who filed claims of all claim types in a CAC.

**D. Summary of Outreach Calls.**

The table below summarizes some of the Claimant Outreach Program efforts:

| Row | Location | Calls Made | Incomplete Claims Affected | Claims With New Docs After Call | % of Claims With New Docs After Call | Claimants Visiting CAC After Call | % of Claimants Visiting CAC |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| 1. | BrownGreer | 42,506 | 16,221 | 12,142 | 75% | 6,068 | 37% |
| 2. | Garden City Group | 39,485 | 6,257 | 4,354 | 70% | 408 | 7% |
| 3. | P&N | 10,967 | 3,115 | 2,404 | 77% | 91 | 3% |
| 4. | PWC | 738 | 298 | 264 | 89% | 9 | 3% |
| 5. | Total | 93,696 | 25,891 | 19,164 | 74% | 6,576 | 25% |

Table 14. Outreach Call Volume (As of 5/10/13)

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

### III.   POLICY KEEPER

On May 7, 2013, we added 242 additional policies to Policy Keeper.  With the addition of these new policies, Policy Keeper now has 306 policies for the public to review.  The Parties agreed to publicize these policies because they affect how claims are processed in the Settlement Program and inform claimants and the public about policy decisions not explicitly delineated within the Settlement Agreement.  By providing these policies to the public, they help claimants and Appeals Panelists understand what policy was in place when the Claims Administrator reviewed a particular claim.  Further, to provide transparency in how the Settlement Program reviews claims, we included superseded policies.  Several policies have a long history and have changed significantly over time, thereby changing the review steps and criteria for certain Claim Types.  For these reasons, we provided claimants and the public with any policy that may have affected the review of their claims.

### IV.   CONCLUSION

We offer this Report to ensure that the Court is informed of the status of the Program to date.  If the Court would find additional information helpful, we stand ready to provide it at the Court's convenience.

/s/ Patrick A. Juneau
PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

19

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of May, 2013.

/s/ Patrick A. Juneau
Claims Administrator

20

## Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement

May 1, 2013

Claims Administrator Patrick Juneau has announced that the Settlement Program began issuing payments on July 31, 2012, and has been issuing outcome Notices since July 15, 2012. The Program will issue Notices on a rolling basis as we complete reviews, and they will include Eligibility Notices, Incompleteness Notices, and Denial Notices. Each Notice will provide information explaining the outcome. We will post Notices on the secure DWH Portal for any law firm or unrepresented claimant who uses the DWH Portal. We will notify firms and unrepresented claimants by email at the end of each day if we have posted a Notice that day. Firms and unrepresented claimants may then log onto the DWH Portal to see a copy of the Notice(s). Law Firms or claimants who do not use the DWH Portal will receive Notices in the mail. Claimants who receive an Eligibility Notice and qualify for a payment will receive that payment after all appeal periods have passed, if applicable, and the claimant has submitted all necessary paperwork, including a fully executed Release and Covenant Not to Sue.

| Table | Filings by State of Residence | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Registration Forms | | | | Claims | | |
| | State | Form Begun | Form Submitted | Total | % | Form Begun | Form Submitted | Total | % |
| 1. | Alabama | 821 | 27,279 | 28,100 | 18% | 1,592 | 30,769 | 32,361 | 18% |
| 2. | Florida | 1,968 | 50,849 | 52,817 | 34% | 5,010 | 51,164 | 56,174 | 32% |
| 3. | Louisiana | 1,627 | 35,288 | 36,915 | 24% | 2,578 | 44,835 | 47,413 | 27% |
| 4. | Mississippi | 549 | 17,995 | 18,544 | 12% | 673 | 19,344 | 20,261 | 11% |
| 5. | Texas | 244 | 8,306 | 8,550 | 6% | 673 | 7,106 | 7,779 | 4% |
| 6. | Other | 1,068 | 8,203 | 9,271 | 6% | 1,096 | 11,540 | 12,636 | 7% |
| 7. | Total | 6,277 | 147,920 | 154,197 | 100% | 11,866 | 164,758 | 176,624 | 100% |

### Chart 1: Filings by State of Residence



| Table | Claims Type | Number of Claims by Claim Type | | | | Unique Claimants |
|---|---|---|---|---|---|---|
| | | Form Begun | Form Submitted | Total | % | with Form Submitted |
| 1. | Seafood Compensation Program | 422 | 23,862 | 24,284 | 14% | 10,244 |
| 2. | Individual Economic Loss | 6,225 | 29,946 | 36,171 | 20% | 29,918 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 143 | 232 | 375 | <1% | 232 |
| 4. | Business Economic Loss | 2,500 | 46,424 | 48,924 | 28% | 41,051 |
| 5. | Start-Up Business Economic Loss | 260 | 3,226 | 3,486 | 2% | 2,931 |
| 6. | Failed Business Economic Loss | 252 | 2,519 | 2,771 | 2% | 2,372 |
| 7. | Coastal Real Property | 845 | 23,841 | 24,686 | 14% | 16,745 |
| 8. | Wetlands Real Property | 211 | 5,234 | 5,445 | 3% | 1,745 |
| 9. | Real Property Sales | 181 | 1,142 | 1,323 | 1% | 918 |
| 10. | Subsistence | 672 | 18,947 | 19,619 | 11% | 18,940 |
| 11. | VoO Charter Payment | 93 | 8,292 | 8,385 | 5% | 5,925 |
| 12. | Vessel Physical Damage | 62 | 1,093 | 1,155 | 1% | 958 |
| 13. | Total | | 11,866 | 164,758 | 176,624 | 100% | 120,034 |

### Chart 2: Number of Claims by Claim Type



**DEEPWATER HORIZON CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

Appendix A

Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement
Case 2:10-md-02179-CJB-SS   Document 9907-1   Filed 05/13/13   Page 2 of 3
May 11, 2013

| Table | Claimant Assistance Center | Filings by Claimant Assistance Center | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Registrations/Forms | | | | Claims | | | |
| | | Form Begun | Forms Submitted | Total | | Form Begun | Form Submitted | Total | |
| 1. | Apalachicola, FL | 26 | 1,256 | 1,282 | 5% | 37 | 1,750 | 1,787 | 6% |
| 2. | Bay St. Louis , MS | 9 | 529 | 538 | 2% | 31 | 633 | 664 | 2% |
| 3. | Bayou La Batre, AL | 21 | 849 | 870 | 3% | 50 | 973 | 1,023 | 3% |
| 4. | Biloxi , MS | 36 | 1,247 | 1,283 | 5% | 59 | 1,503 | 1,562 | 5% |
| 5. | Bridge City, TX | 2 | 332 | 334 | 1% | 15 | 575 | 590 | 2% |
| 6. | Clearwater, FL | 73 | 2,092 | 2,165 | 8% | 357 | 1,594 | 1,951 | 6% |
| 7. | Cut Off, LA | 13 | 425 | 438 | 2% | 24 | 574 | 598 | 2% |
| 8. | Fort Walton Beach , FL | 12 | 1,207 | 1,219 | 5% | 52 | 1,655 | 1,707 | 6% |
| 9. | Grand Isle, LA | 5 | 142 | 147 | 1% | 6 | 215 | 221 | 1% |
| 10. | Gretna/Harvey, LA | 38 | 1,949 | 1,987 | 8% | 50 | 1,981 | 2,031 | 7% |
| 11. | Gulf Shores, AL | 20 | 1,826 | 1,846 | 7% | 60 | 2,430 | 2,490 | 8% |
| 12. | Houma, LA | 25 | 787 | 812 | 3% | 42 | 1,018 | 1,060 | 4% |
| 13. | Lafitte, LA | 4 | 286 | 290 | 1% | 12 | 387 | 399 | 1% |
| 14. | Mobile, AL | 61 | 5,671 | 5,732 | 23% | 184 | 6,086 | 6,270 | 21% |
| 15. | Naples, FL | 24 | 1,195 | 1,219 | 5% | 35 | 1,090 | 1,125 | 4% |
| 16. | New Orleans – CBD BG, LA | 15 | 332 | 347 | 1% | 22 | 346 | 368 | 1% |
| 17. | New Orleans East, LA | 45 | 1,877 | 1,922 | 8% | 108 | 2,189 | 2,297 | 8% |
| 18. | Panama City Beach, FL | 23 | 1,619 | 1,642 | 7% | 95 | 2,346 | 2,441 | 8% |
| 19. | Pensacola, FL | 25 | 1,206 | 1,231 | 5% | 64 | 1,471 | 1,535 | 5% |
| 20. | Total | 477 | 24,827 | 25,304 | 100% | 1,303 | 28,816 | 30,119 | 100% |

Chart 3: Number of Claims by Claimant Assistance Center



Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement

Case 2:10-md-02179-CJB-SS   Document 9507-1   Filed 05/13/13   Page 3 of 3

May 11, 2013

### Notices Issued

| Table 4 # | Claim Type | Eligible – Payable | Eligible – No Payment | Incomplete | Exclusion Denial | Prior GCCF Release | Causation Denial | Other Denials | Incomplete Denials | Opt-Outs | Withdrawn | Closed | Total Claims Issued Notice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Seafood Compensation Program | 6,475 | 983 | 5,767 | 41 | 2,217 | 0 | 202 | 882 | 1,164 | 1,915 | 394 | 20,040 |
| 2. | Individual Economic Loss | 1,280 | 360 | 11,766 | 1,904 | 1,753 | 28 | 504 | 4,893 | 511 | 240 | 973 | 24,212 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 4 | 0 | 56 | 4 | 22 | 0 | 37 | 69 | 2 | 28 | 10 | 232 |
| 4. | Business Economic Loss | 7,266 | 141 | 8,264 | 387 | 438 | 1,201 | 32 | 2,750 | 555 | 319 | 619 | 21,972 |
| 5. | Start-Up Business Economic Loss | 299 | 11 | 934 | 22 | 34 | 29 | 21 | 440 | 66 | 47 | 86 | 1,989 |
| 6. | Failed Business Economic Loss | 8 | 6 | 552 | 34 | 83 | 136 | 408 | 368 | 60 | 33 | 96 | 1,784 |
| 7. | Coastal Real Property | 15,526 | 19 | 1,947 | 4 | 516 | 0 | 2,167 | 719 | 141 | 139 | 924 | 22,102 |
| 8. | Wetlands Real Property | 1,482 | 1 | 74 | 6 | 48 | 0 | 819 | 8 | 9 | 120 | 297 | 2,864 |
| 9. | Real Property Sales | 383 | 0 | 35 | 4 | 38 | 14 | 349 | 28 | 3 | 19 | 85 | 958 |
| 10. | Subsistence | 472 | 0 | 979 | 9 | 964 | 0 | 6 | 1 | 125 | 31 | 27 | 2,614 |
| 11. | VoO Charter Payment | 6,804 | 14 | 122 | 9 | 0 | 0 | 526 | 544 | 25 | 41 | 45 | 8,130 |
| 12. | Vessel Physical Damage | 460 | 9 | 217 | 4 | 0 | 0 | 38 | 78 | 12 | 10 | 35 | 863 |
| 13. | Total | 40,459 | 1,544 | 30,713 | 2,428 | 6,113 | 1,408 | 5,109 | 10,780 | 2,673 | 2,942 | 3,591 | 107,760 |

### Payment Information

| Table 5 # | Claim Type | Eligibility Notices Issued with Payment Offer Number | Eligibility Notices Issued with Payment Offer Amount | Accepted Offers Number | Accepted Offers Amount | Payments Made Number | Payments Made Amount | Unique Claimants Paid |
|---|---|---|---|---|---|---|---|---|
| 1. | Seafood Compensation Program | 6,475 | $919,549,076 | 4,742 | $812,033,996 | 4,249 | $794,466,992 | 2,726 |
| 2. | Individual Economic Loss | 1,280 | $14,893,090 | 1,035 | $11,611,461 | 939 | $10,281,963 | 939 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 4 | $14,396 | 3 | $7,961 | 3 | $7,961 | 3 |
| 4. | Business Economic Loss | 7,266 | $1,726,213,863 | 6,363 | $1,494,475,895 | 5,306 | $889,361,558 | 5,140 |
| 5. | Start-Up Business Economic Loss | 299 | $72,948,962 | 258 | $42,432,057 | 226 | $31,595,190 | 215 |
| 6. | Failed Business Economic Loss | 8 | $1,218,046 | 3 | $589,357 | 3 | $589,357 | 3 |
| 7. | Coastal Real Property | 15,526 | $95,623,321 | 13,829 | $86,345,130 | 12,530 | $74,554,747. | 10,004 |
| 8. | Wetlands Real Property | 1,482 | $84,341,416 | 1,344 | $65,752,707 | 1,269 | $55,089,828 | 568 |
| 9. | Real Property Sales | 383 | $21,730,196 | 365 | $20,996,749 | 349 | $20,912,824 | 324 |
| 10. | Subsistence | 472 | $4,317,052 | 383 | $3,456,000 | 330 | $2,914,641 | 330 |
| 11. | VoO Charter Payment | 6,804 | $274,543,232 | 6,620 | $268,186,886 | 6,415 | $262,089,805 | 4,917 |
| 12. | Vessel Physical Damage | 460 | $8,783,152 | 401 | $7,146,264 | 361 | $5,105,595 | 347 |
| 13. | Total | 40,459 | $3,224,375,803 | 35,346 | $2,813,054,463 | 31,980 | $2,146,970,462 | 25,516 |

Legend:

1. Form Begun - Includes electronically filed registration or claim forms for the period of time between the moment a claimant or his attorney has initiated the submission of a form and moment they complete that filing by submitting the electronic signature. This definition also includes hard copy registration or claim forms where the DWH Intake Team is in the process of linking the scanned images and has not yet completed the data entry on that form.

2. Form Submitted - Includes electronically filed registration or claim forms after the claimant or his attorney completes the electronic signature and clicks the submit button. This definition also includes hard copy registration or claim forms where the DWH Intake Team has completed both the linking of scanned images and the data entry on that form.

3. Unique Claimants with Form Submitted - Counts the unique number of claimants with at least one Claim Form Submitted for each Claim Type. Because claimants may file claims for more than one Claim Type, the sum of all Claim Types will not equal the count of total unique claimants.

4. Notices Issued - The count of Notices Issued in Table 4 counts each unique claim issued a Notice only once. For claims issued multiple Notices, this report uses the following hierarchy when counting the claim: (1) Eligible – Payable; (2) Eligible – No Payment; (3) Denial; (4) Incomplete; (5) Withdrawn; (6) Closed.

5. Payment Information - The timing of payment can be affected by a number of factors. Even after the DHECC receives a Release, delay in receipt of a W-9, or in receipt of the Attorney Fee Acknowledgement Form can delay payment. In addition, any alterations or omissions on the Release Form, or an assertion of a third-party lien against an award amount, can delay payment. As a result, this report will show a higher number of Accepted Offers than Amounts Paid.

6. Note: The Claims Administrator continually monitors the status of all claim filings. Through this process, the Claims Administrator may find duplicate claims from the same claimant. In such cases, the Claims Administrator will close the duplicate claim and only process the remaining valid claim. This report excludes duplicate claims from all counts of claims filed.



DEEPWATER HORIZON CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

DWH 8127

**Analysis of Submissions from Andry Law Group/Andry Lerner, LLC**
(As of 5/9/13 )



EXHIBIT K

| Table 1: Firm Representation | | | |
|---|---|---|---|
| | Category | Count | |
| 1. | Registration Form Begun | 88 | 22% |
| 2. | Registration Form Signed w/o Claim Form | 66 | 16% |
| 3. | Claim Form Begun | 2 | <1% |
| 4. | Claim Form Signed | 246 | 61% |
| 5. | Total Number of Claimants Represented by Firm | 402 | 100% |

| Table 2: Claims Filed | | | |
|---|---|---|---|
| | Claim Type | Total | |
| 1. | Seafood Compensation Program | 151 | 32% |
| 2. | Individual Economic Loss | 79 | 17% |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0% |
| 4. | Business Economic Loss | 89 | 19% |
| 5. | Start-Up Business Economic Loss | 8 | 2% |
| 6. | Failed Business Economic Loss | 3 | 1% |
| 7. | Coastal Real Property Damage | 9 | 2% |
| 8. | Wetlands Real Property Damage | 10 | 2% |
| 9. | Real Property Sales Damage | 1 | <1% |
| 10. | Subsistence Damage | 38 | 8% |
| 11. | VoO Charter Damage | 62 | 13% |
| 12. | Vessel Physical Damage | 16 | 3% |
| 13. | Total Claims Filed | 466 | 100% |

| Table 3: Notices Issued | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Claim Type | Eligibility Notice - Payable | Eligibility Notice - Not Payable | Incomplete | Denial - Exclusion | Denial - Prior Econ. Release | Denial - Causation | Denial - Other | Incomplete Denial | Withdrawn | Closed | Total Claims Issued Notices |
| 1. | Seafood Compensation Program | 34 | 18 | 57 | 0 | 0 | 0 | 0 | 1 | 6 | 4 | 120 |
| 2. | Individual Economic Loss | 4 | 0 | 34 | 6 | 0 | 0 | 3 | 0 | 1 | 2 | 50 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. | Business Economic Loss | 14 | 1 | 26 | 1 | 0 | 3 | 0 | 2 | 2 | 0 | 49 |
| 5. | Start-Up Business Economic Loss | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 6. | Failed Business Economic Loss | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| 7. | Coastal Real Property Damage | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 8. | Wetlands Real Property Damage | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 4 |
| 9. | Real Property Sales Damage | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 10. | Subsistence Damage | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 11. | VoO Charter Damage | 46 | 0 | 5 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 58 |
| 12. | Vessel Physical Damage | 4 | 0 | 4 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 10 |
| 13. | Total | 106 | 19 | 131 | 7 | 1 | 5 | 15 | 3 | 10 | 6 | 303 |

| Table 4: Payment Information | | | | | | |
|---|---|---|---|---|---|---|
| | Claim Type | Eligibility Notices Issued with Payment Amount - Number | Amount | Accepted Offer - Number | Amount | Payments Made - Number | Amount |
| 1. | Seafood Compensation Program | 34 | $2,669,564 | 26 | $2,291,956 | 26 | $2,508,336 |
| 2. | Individual Economic Loss | 4 | $41,499 | 0 | $0 | 0 | $0 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | $0 | 0 | $0 | 0 | $0 |
| 4. | Business Economic Loss | 14 | $4,480,471 | 11 | $3,495,447 | 9 | $1,703,287 |
| 5. | Start-Up Business Economic Loss | 1 | $54,830 | 0 | $0 | 0 | $0 |
| 6. | Failed Business Economic Loss | 0 | $0 | 0 | $0 | 0 | $0 |
| 7. | Coastal Real Property Damage | 3 | $17,370 | 3 | $17,370 | 3 | $17,370 |
| 8. | Wetlands Real Property Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 9. | Real Property Sales Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 10. | Subsistence Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 11. | VoO Charter Damage | 46 | $1,817,400 | 46 | $1,817,400 | 46 | $1,823,818 |
| 12. | Vessel Physical Damage | 4 | $26,198 | 3 | $20,842 | 2 | $18,159 |
| 13. | Total | 106 | $9,107,332 | 89 | $7,643,014 | 86 | $6,070,970 |



Chart 1: Registration and Claim Form Filings by Day

'Andry Law Group/Andry Lerner, LLC has confirmed representation of an additional 26 claimants, but the firm has not yet begun any Registration or Claim Forms as of the date of this report. The report does not count these claimants, because they are not in the DWH Program yet.



DWH 8127

**Analysis of Submissions from Andry Law Group/Andry Lerner, LLC**
**(As of 5/9/13 )**

| | | | | | | | | | | | | | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Claims Not Under Review | 0 | 6 | 0 | 8 | 0 | 0 | 0 | 0 | 4 | 0 | | | 15 | 4% |
| (a) Claim Form Not Submitted | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | | | 3 | 1% |
| (b) Claimant Editing Claim Form | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | | | 1 | <1% |
| (c) Claim Closed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | | | 4 | 1% |
| (d) Claim Closed – Claimant Opted Out of Settlement | 0 | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | | | 7 | 2% |
| (e) Claim Form Untimely Submitted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0% |
| (f) Claim Withdrawn | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0% |
| 2. Claims Not Yet Issued Notice | 38 | 36 | 0 | 7 | 2 | 1 | 6 | 6 | 0 | 34 | 0 | 6 | 136 | 32% |
| (a) Claim Form Submitted | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 8 | 0 | 0 | 13 | 3% |
| (b) Claim Processing Awaiting Policy Decision | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (c) Under Timeliness Review | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1% |
| (d) In Claims Review | 2 | 31 | 0 | 4 | 1 | 0 | 6 | 3 | 0 | 25 | 0 | 6 | 78 | 19% |
| (e) Claim Closed – Parcel Included in Claim Zone after Parcel Eligibility Review | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (f) In QA Review | 20 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 26 | 6% |
| (g) In Accountant Review | 12 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 4% |
| 3. Claims with Notice Sent | 40 | 18 | 0 | 13 | 0 | 0 | 0 | 4 | 1 | 4 | 4 | 2 | 86 | 21% |
| (a) Notice Issued after Claim Form Review: Signature Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (b) Notice Issued After Claim Review: Field Visit Required | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (c) Notice Issued After Parcel Eligibility Review: Claim Eligible | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (d) Notice Issued after Parcel Eligibility Information Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (e) Notice Issued After Preliminary Claim Review: Claim Incomplete | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| (f) Notice Issued After Claims Review: Payable Claim or Claim Eligible But No Payment Due Determination | 5 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 2% |
| (g) Notice Issued After Claims Review: Claim Incomplete | 8 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 16 | 4% |
| (h) Notice Issued After Follow-Up Review: Claim Incomplete | 15 | 5 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 27 | 6% |
| (i) Notice Issued After Claims Review: Claim Denied | 0 | 7 | 0 | 2 | 0 | 0 | 4 | 1 | 0 | 1 | 1 | | 16 | 4% |
| (j) Notice Issued After Claims Review: Claim Denied After Failure to Cure Incompleteness | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 1 | <1% |
| (k) Notice Issued After Claimant Request: Claim Withdrawn | 6 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | | 10 | 2% |
| (l) Notice Issued After Review: Duplicate Claim | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 5 | 1% |
| (m) Notice Issued After Review: Reclassified Claim | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0% |
| (n) Notice Issued After Review: Claim Closed | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 2 | <1% |
| 4. Claims with Responses to Notice | 41 | 19 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 5 | 93 | 22% |
| (a) Response to Preliminary Incompleteness Notice Received | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| (b) Response to Incompleteness Notice Received | 2 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 1% |
| (c) Response to Follow-Up Incompleteness Notice Received | 4 | 1 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 16 | 4% |
| (d) In Claims Review after Notice Issued | 9 | 10 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 5% |
| (e) In QA Review after Notice Issued | 13 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 4% |
| (f) In Accountant Review after Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (g) Claimant Requested Re-Review After Payable Claim or Claim Eligible But No Payment Due Determination | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1% |
| (h) Claimant Withdrew Re-Review Request after Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (i) Notice Issued after Follow-Up Claim Form Review: Signature Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (j) Notice Issued After Re-review: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (k) Notice Issued After Re-Review: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (l) Offer Accepted / Claimant waives right to request Re-Review / Reconsideration | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| (m) Offer Accepted / Claimant waives right to request Reconsideration | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (n) Offer Accepted / Claimant waives right to request Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (o) Claimant Requested Re-Review after Claim Denied | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 11 | 3% |



DEEPWATER HORIZON
CLAIMS CENTER

DWH 8127

**Analysis of Submissions from Andry Law Group/Andry Lerner, LLC**
**(As of 5/9/13 )**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (p)  Claimant Requested Reconsideration After Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (q)  Claimant Requested Reconsideration After Claim Denied | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| (r)  Claimant Requested Reconsideration After Claim Denied for Failure to Cure Incompleteness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (s)  Claimant Withdrew Reconsideration Request After Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (t)  Claimant Withdrew Reconsideration Request After Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (u)  Claimant Withdrew Reconsideration Request After Claim Denied for Failure to Cure Incompleteness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (v)  Deadline to Request Reconsideration for Eligibility Notice Expired | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| (w)  In Claims Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (x)  In QA Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (y)  In Accountant Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (z)  Notice Issued After Reconsideration: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (aa)  Notice Issued After Reconsideration: Claim Incomplete | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 1% |
| (ab)  Response to Post-Reconsideration Incompleteness Notice Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ac)  Notice Issued After Reconsideration: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ad)  Claimant Requested Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ae)  Notice Issued After Claimant Request: Appeal of Eligible Claim | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (af)  Notice Issued After Claimant Request: Appeal of Denied Claim | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 6 | 1% |
| (ag)  Appeal Payment Processed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ah)  Claimant Withdrew Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ai)  BP Requested Payment Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (aj)  BP Withdrew Payment Appeal Request | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ak)  BP Waived Right to Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (al)  Claimant's Initial Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (am)  BP's Initial Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (an)  Notice Issued After Appeal: Initial Proposal Submitted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ao)  Claimant's Final Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (ap)  BP's Final Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (aq)  Notice Issued After Appeal: Final Proposal Submitted | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| (ar)  Claimant's Compromise Amount for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (as)  BP's Compromise Amount for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (at)  Notice Issued After Appeal: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (au)  Notice Issued After Appeal Panel Review: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (av)  Notice Issued After Appeal: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 5.  Payments | 28 | 0 | 0 | 9 | 0 | 0 | 3 | 0 | 0 | 0 | 46 | 3 | 89 | 21% |
| (a)  Release Sent to Claimant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (b)  Claim Payment Documentation Accepted | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 1% |
| (c)  Claimant Elects 5% Reduction in Compensation Amount to Pay for Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (d)  Appeal Payment Processed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (e)  Final Payment Processing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (f)  Payment Issued on Claim | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| (g)  Payment Received | 24 | 0 | 0 | 9 | 0 | 0 | 3 | 0 | 0 | 0 | 46 | 2 | 84 | 20% |
| 6.  Total | 147 | 79 | 0 | 54 | 2 | 1 | 9 | 10 | 1 | 38 | 62 | 16 | 419 | 100% |



DEEPWATER HORIZON
CLAIMS CENTER

**From:** Mary Olive Pierson
**Sent:** Wednesday, September 25, 2013 12:35 PM
**To:** 'Greg Paw'
**Subject:** RE: Special Master Production to Christine Reitano - 9/24/13 - Email 1 of 2

Mr. Paw:



Also, I am curious about the basis for the "attorney client privilege and the work product privilege" asserted at the bottom of the notes of the Odom and Mancuso interviews.  Who is the client with the privilege?

Mary Olive Pierson                                    **EMAIL #1**

P.O. Box 14647 (70898)

8702 Jefferson Highway, Suite B

Baton Rouge, LA 70809

Office: (225) 927-6765



On Sep 26, 2013, at 4:53 PM, "Greg Paw" <paw@freehgroup.com> wrote:

Dear Ms. Pierson —



Finally, you asked about the basis for the "attorney client privilege and the work product privilege" asserted at the bottom of the interview notes for Mr. Odom and Ms. Mancuso, and asked who the client is with the privilege. Our investigation was conducted at the direction of the Special Master, who is an attorney. Several attorneys, including myself, were involved in the interview and reporting process. We maintain a privilege to these work papers, which are appropriately marked so as to maintain confidentiality.

Please feel free to contact me should you have any further questions or require any further information.

Regards,

Greg

**EMAIL #2**

Gregory A. Paw
Counsel to Special Master Louis J. Freeh
paw@freehgroup.com
267-421-7032

**EMAIL #3**

On Thu, Sep 26, 2013 at 6:11 PM, Mary Olive Pierson <mop@mopslaw.com> wrote:
Last item first: you mention a lot of lawyers but you have not identified the client with your asserted. "Attorney client" privilege. Who is it?

Sent from my iPhone

**EMAIL #4**

| | |
|---|---|
| From: | Greg Paw <paw@freehgroup.com> |
| Sent: | Thursday, September 26, 2013 6:51 PM |
| To: | Mary Olive Pierson |
| Cc: | Marie Tremont |
| Subject: | Re: Special Master Production to Christine Reitano - 9/24/13 - Email 1 of 2 |

Dear Ms. Pierson —

While I thought this point was clear from my message of earlier today, please note that our client is the Special Master. If I can provide any further information to you, please let me know.

Regards,

Greg

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In Re:  Oil Spill by the Oil Rig                 MDL NO. 2179
"Deepwater Horizon" in the
Gulf of Mexico, on April 20, 2010                SECTION: J

                                                 Honorable CARL J. BARBIER

                                                 Magistrate Judge SHUSHAN

---

**CHRISTINE REITANO'S THIRD SUPPLEMENTAL RESPONSE
TO FREEH REPORT AND RESERVATION OF RIGHTS**

---

## I. INTRODUCTION

### A. GENERAL OBJECTION

This Court has no jurisdiction over Ms. Christine Reitano.  This fact has been demonstrated in Ms. Reitano's First and Second Supplemental Responses to the Freeh Report. (Documents 11414, 11681, and 11681-1, 2, and 3).  This fact has also been placed before the Court in Ms. Reitano's  Motion to Dismiss for Lack of Jurisdiction.  (Documents 11683 and 11683-1.  No hearing has been set for the motion to dismiss and no hearing has been held to allow Ms. Reitano to present evidence and/or cross examine the so-called "evidence" presented by Mr. Freeh in his obviously biased and non-independent report. In fact, Ms. Reitano has not even been provided access to all of the evidence allegedly gathered by Special Master Freeh (SM Freeh) which was used to arrive at his insupportable allegations.  Ms. Reitano, by filing this Third Response to the Freeh Report, does not waive any of her rights or objections to any further order of this court affecting her person or rights without first addressing the fact that the court lacks jurisdiction over Ms. Reitano.  Only one further order would be appropriate insofar as Ms.



REITANO
EXHIBIT 9C

Reitano is concerned and that is an order dismissing the allegations against her and dissolving the show cause order.

If the Freeh investigation and report were truly "independent," it would have presented all of the evidence available for the court to consider and make a determination about the allegations before the court. This was not done. Not even close. Mr. Freeh made no effort at objectivity and his report was obviously result driven. His investigation methods are unexplained and incomplete. He has openly refused to share all of the evidence upon which he supposedly relied, unless ordered to do so by the court. If his evidence is worth what he claims, there should be no problem in exposing it to sunlight, scrutiny and cross-examination. Ms. Reitano reserves the right to further respond to SM Freeh's findings upon receipt of ALL available evidence

In the case of Ms. Reitano, SM Freeh's most serious allegation about her has been discredited with sworn testimony and SM Freeh has made no effort to correct his false accusations.

## B. INCORPORATION OF ALL PRIOR FILINGS

As part of this Third Response to the Freeh Report, Ms. Reitano renews and reiterates each and every paragraph and allegation, including exhibits, as set forth in her Initial Response (Document 11414), her Supplemental Response (Document 11681, 11681-1, 2 and 3) and her Motion to Dismiss (Document 11683 and 11683-1).

## II. THE WHOLE TRUTH ABOUT CHRISTINE REITANO AND HER ROLE AT THE CLAIM ADMINISTRATOR'S OFFICE

In spite of Mr. Freeh's blatant and unsupported efforts to diminish the job that Christine Reitano did while at the Claim Administrator's Office (CAO), she was a valued, hard working

and faithful employee. In order for the court to properly consider the allegations against her, Ms. Reitano's role at the CAO must be discussed.

Ms. Reitano was hired by Patrick Juneau in early 2012 and began her employment on April 1, 2012 to serve as Claims Counsel for the CAO with the following responsibilities:

- Work with the Parties to identify any policy/legal issues and seek resolution at the direction of the claims administrator

- Assist the Claims Administrator with interpretation of the Settlement Agreement, Court Orders and other legal documents

- Work with the vendors and Contract Administrator's staff on legal issues and provide guidance as needed (See **Exhibit 1**).

Though SM Freeh does not discuss Ms. Reitano's fulfillment of her responsibilities, Ms. Reitano did, in fact, carry out these responsibilities to their fullest, from the inception of her employment in April 2012, until her untimely and unlawful termination in June of 2013.

The Claims Administrator implemented several hundred policies during the course of Ms. Reitano's employment. Ms. Reitano, at the direction of the Claims Administrator, worked with the court appointed Vendors to develop the processes used by the Claims Administrator to adopt and promulgate policies needed to implement the Settlement Agreement as drafted by the Parties. The first policies formulated in the Settlement Program started with an Excel spreadsheet of questions circulated numerous times to the Parties for answers and comments that the Settlement Agreement did not specifically address until, ultimately, 169 policies were created.

During this period, the Parties were working with their respective teams to understand their own negotiating history, as well as exploring with each other the scope of each issue as it arose, the various potential consequences of different positions, and attempting to resolve the issue and reach agreement without the need to convene a Panel. There were numerous ex parte communications between the Vendors and the Parties during this period, and the need to

centralize and streamline the processes by which issues were communicated and resolved became apparent to both the Claims Administrator and the Parties.

In early July, 2012, Ms. Reitano was designated by the Claims Administrator to be the "funnel" through which ALL communication regarding the Economic Settlement Program, its vendors, policies, procedures, rules, FAQ's, etc, must be directed

In late July, the Program transitioned from using Excel spreadsheets to using memoranda for the exchange of policy questions and comments. If the Settlement Agreement was vague or incomplete on a specific issue, or unique factual circumstances came to light during the review, or there was a need for an administrative process, the Claims Administrator proposed or implemented a policy by circulating a memo to the Parties. The Claim's Administrator's Process of policy creation using the memo format resulted in the creation of 155 policies.

These issues were typically identified by the Vendors, predominately BrownGreer, during the review process. Ms. Reitano's responsibilities involved working with the vendors and Contract Administrator's staff on legal issues and providing guidance as needed. To this end, Ms. Reitano worked with a multitude of Vendor review teams and their respective team leaders on nearly all legal issues.   Ms. Reitano, at the direction of and behalf of the Claims Administrator, provided guidance and oversight on the following issues: Seafood Program Implementation Issues (for which there are 22 components); Wetlands Implementation Issues; Coastal Property Implementation issues; IEL Claims; BEL Claims; Subsistence Claims; Transition Issues; Payment Processing Issues; Prior Payment Offsets; Opt Outs; Attorney Representation and Attorney Lien Resolution Issues; Third Party Claims and Garnishment Issues; Structured Settlements, Bar Dates; Seafood Second Distribution; Development of Confidentiality Order; Development of several Court Appointed Procedures (CAP's);

Development of Multiple Sworn Written Statements; Frequently Asked Questions; Notice Templates; Guardian Ad Litem Appointment and Procedures; Moratoria Issues; Real Estate Developer Issues; Tourism issues; Fraud and Abuse Procedures and Implementation Issues; Reconsideration and Appeals Implementation Issues; the creation of a Re-Review Process; Communication issues; and Global Notes.

Once these issues had been identified and a recommendation thereupon formulated, Ms. Reitano had the further responsibility of seeking resolution of such issues at the direction of the Claims Administrator. Mr. Juneau recognized the magnitude of Ms. Reitano's workload in his sworn statement:

> Q. How did you come to hire her? Did someone recommend her to you?
>
> A. She applied for the job. She said, "You have an opportunity I would like." This was the real formative stage of the thing. I didn't even have an office at the time.
>
> We were using the sixth floor conference room in the building - - you know where our offices is there. Sutton and his wife, as you know, have an office in that building. She mentioned to me, "If you" - - "I would be very much interested in working in that program."
>
> Q. Before she approached you, did you know her?
>
> A. No. No. No. I knew him. I did not know her.
>
> No, let me take that back. I may have met her, because she was married to him, once - - maybe once or twice; but, I mean, I don't even know if I would have recognized her at the time.
>
> Q. She was not a social friend?
>
> A. Oh, no.
>
> Q. You had never worked with her as an attorney?
>
> A. Never.

Q. Did there come a time when you did, in fact, hire her?

A. There was.

Q.  What convinced you or persuaded you that she would be someone appropriate to hire for that position?

A. Well, she is very bright. I mean, it was very obvious talking to her. She had a good academic resume, I thought. She was very bright.

We were in the - - in the formative stages of the case. Judge, let me tell you something, that stage of the world, it was scrambled eggs. I got a Court Order telling me to open this facility on June 4th, and to make the transition, which turned out to be a half billion dollar claim. You're looking at it, me and Mike. That's all. That's really all we got.

All of these issues are bubbling. We knew we had to activate this thing. It ain't the easiest thing in the world in five states to find somebody who doesn't have any contact with the *BP* litigation.

She approached me. She seemed very bright to me, credentials. I did the same process I told you about earlier, about circulating the resume and so forth, got the approval.

Q. So you sent it to BP and the plaintiffs' counsel?

A. Absolutely. I've done that consistently.

Q. Did BP come back with any comments or - -

A. No. As a matter of fact, they drafted the first agreement that was signed with her.

Q. Never raised any concerns about her - -

A. Never.

Q. - - employment?

A. Never.

To be honest with you we have dealt with 10 million issues in this case. The girl -- well, the lady proved out to be very

intelligent, very quick in understanding, you know, documents about that thick.

    She--she did quality work that I saw over that extended period of time, from inception til--Tiger Sutton came on November 1, as I recall.

    That period of time, I mean, she was more or less a funnel, because I had no other source, you know, that we were dealing with. She was carrying a pretty substantial load during that period of time." (SM-01-CR00689-692, Juneau Statement, incorporated herein by reference.)

Even BP Counsel, Keith Moscowitz, in his Statement/Declaration filed by BP with its original request for injunction supports the fact that Ms. Reitano "was carrying a pretty substantial load" and that she was actually doing her job.[1]  A careful analysis of the true meaning of the Moscowitz affidavit was previously provided to Mr. Freeh in correspondence dated August 9, 2013.  (See **Exhibit 2**, attached hereto.)

Ms. Reitano, at the direction of the Claims Administrator, worked with the Vendors to create an application called the Policy Keeper. In addition to being an electronic file cabinet of all Settlement Program policies, Policy Keeper allowed the Claims Administrator, the Vendors, BP and Class Counsel to draft, review and implement policies. During her employment at the CAO, Ms. Reitano was a staunch advocate of open communication and transparency. It was always her position in group discussions regarding public policy publication, that each and every policy and its history be published and made public.

In addition to this work, Ms. Reitano also had the title and role of "Document Reviewer," a significant role in and of itself. Additionally, while Mr. David Duval was "Appeals Coordinator," in late May, early June of 2013,[2] Ms. Reitano was assigned the role of fielding the substantive issues arising from the Appeals Process as appeals escalated in the face of the BEL

_____

[1] The Moscowitz affidavit is Document Number 10761-5.
[2] Only days before her abrupt and unlawful termination.

policy interpretation controversy. As mentioned above, Ms. Reitano fulfilled her obligations to the utmost, always going above and beyond the call of duty.

Unfortunately for Ms. Reitano, ever since BP's claims of fraud and multiple requests to enjoin the claims process arose, each and every one of the hundreds of actions of Ms. Reitano, has been scrutinized with a microscope. On the other hand, and fortunately for Ms. Reitano, as set out in the official findings referenced below, not one single impropriety was found to exist in all that work product.

Pursuant to the Court's direction the Claim's Administrative Office continued its internal investigation, including a review of the Deepwater Horizon Program policies and claims processes, resulting in a Supplemental Report on Review of Conduct and Claims Processing Issues,[3] submitted on July 17, 2013 which found, in pertinent part as follows:

- p. 5 "As previously reported, Christine Reitano's duties included serving as the Documentation Reviewer ... As noted in our prior report, we have reviewed the 4 claims in which denial was overturned and found no indication of wrongdoing in those instances."

- p. 5 "The Program has conducted a comprehensive review of the various "policies" that have been developed and implemented during the course of the Program. That review focused on those policies that BP did not specifically "accept" or agree to. A total of 230 policies fall into this category....After this comprehensive review, this group concluded that the Program's policies are appropriate and are free of any undue or improper influence from Ms. Reitano or Mr. Sutton."

- p. 6-7 "A dedicated team at BG is charged with responsibility for determining whether particular claimants are to be assigned a "Tourism" designation....The Program has gone back to review all such determinations given that Christine Reitano was in part involved in these discussions....We have found no indication of

---

[3] Filed in the record of these proceedings as part of an earlier motion and identified as Document No. 10774-5. It is incorporated herein by reference.

any wrongdoing and have concluded that the individual decisions were appropriate and well- founded in each instance."

- p. 7 (Real Estate Developer) "Decision on this issue have been made by the BG Real Estate Developer Team and Patrick Juneau, Michael Juneau and Christine reitano from the CAO....We have found no indication of any wrongdoing and have concluded that the individual decisions were appropriate and well- founded in each instance."

- p. 23 "Conclusion. After reviewing all the policies that BP did not explicitly accept, the Claims administrator concluded that Ms. Reitano or Mr. Sutton did not have any undue influence on any policies or their implementation to the claims review process. Moreover, the Claims administrator confirmed that BP has had an opportunity to review all but seven of the policies created during the course of the Settlement Program. The Claims administrator and his vendors concluded that the Settlement Program policies remain accurate and that the Settlement Program willl continue to implement the policies in the claims review processes."

Ms. Reitano gave guidance to the implementation of nearly 400 policies spanning the spectrum of issues inherent in this complex agreement, and not a single impropriety has been or can be detected. It is nothing short of astonishing that SM Freeh, the "expert" investigator, could not find any room in his biased, facially inconsistent and supposedly "independent" report to mention these objective, factual and truthful findings about Ms. Reitano and her work.

It is readily apparent that Ms. Reitano's role at the Claims Administrator's Office was central and encompassing.  It is doubtful that any one person at the CA's office possessed as much institutional knowledge about the Program as she did. And yet, SM Freeh does not portray Ms. Reitano in the light in which the above objective evidence would cast her. Throughout his interview and his Report, SM Freeh set out to make Ms. Reitano responsible for duties regarding governance and the creation and implementation of a Code of Conduct which were not her duties in the first place, but the duties of outside counsel and David Odom, the CEO.  And, conversely,

he did not give her any credit for the faithful and diligent performance of her real duties. For example, SM Freeh asked her numerous questions about his erroneous idea that Ms. Reitano was somehow in charge of project governance (Odom's job) and conflict determination and resolution which was the job of the Sessions-Fishman Law Firm. After Ms. Reitano's sworn interview to SM Freeh on July 29, 2013, she supplemented her testimony on August 9, 2013 with correspondence containing correct information on conflict resolution. (See Exhibit 2). SM Freeh has not seen fit to amend or supplement his report with this evidence.

In his report, Mr. Freeh seeks without warrant, to diminish and ridicule Ms. Reitano's legitimate contributions to the Program by underplaying them or not mentioning them at all, and instead attempts to make her the scapegoat for the duties and shortcomings of those who were in fact responsible for those duties. It is legitimate to ask: Who is Mr. Freeh protecting?

## III. SPECIFIC RESPONSES TO FREEH REPORT

A.    THE THONN FEE:  The Attorney-Client Contract Fee is NOT a Referral Fee.

Without a doubt, this is the most serious, but false charge leveled at Ms. Reitano. The charge was squarely discredited over two months ago in a sworn affidavit from Ms. Christine Mancuso. In spite of this presentation of "credible evidence," SM Freeh has made zero effort to correct his obvious mistake.

Beginning on page 25 of his report, Mr. Freeh discusses what he headlines as "Evidence of Material False Statements and Omissions by ...Christine Reitano... Regarding the Thonn Referral Fee." He relies heavily on his "opinion" of what he or his associates *think or claim* Ms. Christina Mancuso said in her interview and the sworn testimony of Ms. Reitano. He dismisses Ms. Reitano's testimony as false because he erroneously interpreted Ms. Mancuso's statement and, therefore, concluded that Ms. Reitano must be lying. The error of his ways has been fully

demonstrated with sworn testimony, which he has completely failed to acknowledge, even though he has had the information for over two months.  This is what Mr. Freeh reports:

> p. 2 "...Christina Mancuso said Ms.Reitano contacted her about the Thonn claim and requested a referral fee."

> p. 5 "Ms. Reitano denied under oath that she had any involvement in arranging a referral fee for the Thonn claim. However, an attorney at AndryLerner [Ms. Mancuso]and Andry Lerner firm records contradict her denial. Ms. Reitano continues to insist she had no knowledge or role in arranging a referral fee for the Thonn claim despite this *credible evidence* to the contrary." (Italics in text).

> p. 10 "Ms. Reitano should be disqualified based on her involvement in arranging the Thonn referral payments with AndryLerner, and her denial of this conduct.

> p. 26 "Contradicting Ms. Reitano's assertions, Ms. Mancuso, the Andry Lerner attorney handling the Thonn claim, told investigators that not only did Ms. Reitano contact her about the Thonn claim, but that Reitano also requested a referral fee.

> p. 26 "Ms. Mancuso also stated that Ms. Reitano asked that AndryLerner honor the percentage *referral* fee that was contained in the Thonn disc." (Italics added).

These interpretations of Ms. Mancuso's statements are completely wrong.  Mr. Freeh obviously relied very heavily on his "interpretation" of what his associates claim Ms. Mancuso said in her interview about the Thonn fee and her discussions with Ms. Reitano on the subject.  Ms. Mancuso's interview was not recorded and only notes of the interview exist to sustain his interpretation of what Ms. Mancuso said.[4]  Unfortunately for Mr. Freeh, Ms. Mancuso has a better recollection of not only what she told Mr. Freeh's associates, but she also has very good recall of the events which Mr. Freeh erroneously interpreted.

---

[4] So far we have only been given a redacted version of the notes.  This mistake in interpreting what the witness said is because of the faulty practice of FBI and former FBI employees to not use recorders.  It is a very bad practice/habit.

In order to make sure the truth was told, Ms. Mancuso has signed a sworn affidavit (credible evidence) of the real facts regarding her conversations with Ms. Reitano and this sworn testimony makes it very clear that Mr. Freeh is 100% wrong on his allegations and opinions about Ms. Reitano's alleged participation in the Thonn case after she terminated her professional relationship with Mr. Thonn. (The Mancuso affidavit was attached to Ms. Reitano's Supplemental (Second) response to the Freeh report and it is incorporated herein by reference. See Document 11681-2). This affidavit contradicts 100% of what Mr. Freeh called "credible evidence" that Ms. Reitano requested a referral fee in the Thonn case from Ms. Mancuso. The affidavit also contradicts Mr. Freeh's allegation that Ms. Reitano was lying about her conversations with Ms. Mancuso. Both Ms. Mancuso and Ms. Reitano have the same interpretation and recollection of their conversations. It is Mr. Freeh who got it wrong and it is he who did not tell the truth.

One thing is clear from the redacted notes of the Mancuso interview, her affidavit, and the testimony of Ms. Reitano: Neither Mr. Freeh nor his associates understand the difference between an attorney-client fee contract and an attorney referral fee contract. Or, based on Mr. Freeh's obvious bias as seen throughout his report, perhaps he intentionally conflated these two concepts in order to reach his desired goal, which makes him not-so-independent.

Ms. Reitano correctly testified that she did not arrange or have any expectation of receiving a referral fee for Casey Thonn's claim after she terminated her professional relationship with Mr. Thonn. During her entire employment at the CAO, she was unaware that her husband had any expectation of receiving a fee on the Thonn case. No one from the CAO ever asked her if she arranged or expected to receive a referral fee on the Thonn case. Mr. Freeh's false accusations are derived from his convoluted, false and erroneous "opinion" of what

Ms. Mancuso said in her interview. His error is further derived from his very apparent lack of understanding of the difference between an attorney-client fee contract and an attorney referral contract. There is no evidence at all, much less "credible evidence" as Mr. Freeh claims, that Ms. Reitano was in any way, shape or form involved in arranging a referral fee or had any expectation to receive a referral fee from the Casey Thonn claim. The affidavit of Ms. Mancuso is "credible evidence" that all of Mr. Freeh's allegations and opinions of Ms. Reitano regarding the Thonn fee are totally false and are not supported by any evidence at all.

One additional and very disturbing fact is that Mr. Freeh was originally ordered to provide monthly reports after his initial report. There is nothing in the record to confirm that this order has been followed. Nevertheless, even if Mr. Freeh did not feel compelled to file the court-ordered supplemental reports, surely if he were truly an "independent" special master, he would have taken the time to correct his previous report in order that the Court could be fully informed of the truth regarding the Thonn fee and the error of his previous report on such a serious matter. He has known the truth for over two months and he has made no effort to correct his errors.

B.      CAO HIRES ATTORNEYS CHRISTINE REITANO AND LIONEL SUTTON

On page 19, Freeh reports: "Ms. Reitano recommended to Mr. Patrick Juneau that her husband be hired....The CAO's CEO, David Odom, expressed reservations about Mr. Sutton's qualifications. Mr. Odom stated that he initially advised Mr. Patrick Juneau and Mr. Michael Juneau, CAO Special Counsel, not to hire Mr. Sutton because he heard in the community that Mr. Sutton was believed to have 'ethical issues.'[5] . . . Mr. Odom also referenced Ms. Reitano's 'big sales job' to both Mr. Patrick Juneau and Mr. Michael Juneau to get her husband hired." Contradicting Odom's opinions, Freeh also finds:

---

[5] This is, at its best, unreliable hearsay from unidentified people "in the community." No reliable investigator would include this in a report, much less rely on it for any purpose.

> p. 19 "In his statements, Mr. Patrick Juneau said that Mr. Odom expressed reservations about hiring Mr. Sutton, *but* his reservation was limited to the fact that Mr. Sutton was married to Ms. Reitano."

> p. 19 "Mr. Michael Juneau said that Mr. Odom had expressed reservations about Mr. Sutton"s reputation."

However, according to the notes of Michael Juneau's interview, he *also* said: "When asked if anyone expressed reservations when Mr. Sutton was hired, Mr. Michael Juneau said that Mr. Odom had said to his father that he had concerns about Sutton. Michael Juneau continued by saying that he felt that Mr. Odom may have had concerns because he might have felt that by bringing in Mr. Sutton *his own position may be threatened.* "[6] This apparent bias on the part of Mr. Odom is not noted anywhere in the Freeh Report.

In addition to reporting the biased opinions of Mr. Odom regarding Mr. Sutton, Mr. Freeh also relied on Mr. Odom to criticize Ms. Reitano because her step daughter (Mr. Sutton's daughter) applied for the Media and Press Coordinator position at the CAO. Mr. Freeh alleges:

> p. 19 "Mr. Odom also stated that the DHECC media and press coordinator position initially was to be filled by Mr. Sutton's and Reitano's daughter. Mr. Odom *understood* that their daughter turned the job offer down as *she thought she was not qualified.* Mr. Odom felt that at some point it was beginning to appear the Reitano wanted to make the CAO a 'family affair.'"[7] (Italics added).

Mr. Odom should not quit his day job to become a mind reader. Ms. Ashley Elizabeth Sutton most certainly did not "think" she was not qualified for the job. She was qualified and she knew she was very qualified. She turned down the job because it was apparent that the Claim Administrator was not knowledgeable about computers and was completely unfamiliar with the

---

[6] Michael Juneau interview, July 16, 2013, incorporated by reference, Bates NumberSM-01-CR00658, p. 4).

[7] Mr. Odom was desperate to get a new PR person. The firm already hired on contract was a failure and not doing anything. He told Ms. Reitano of his desperation and she told him about her step-daughter, who was a rising star in public relations, and simply told him to call her. Actually, except for the showing the obvious bias of Mr. Odom and SM Freeh, this paragraph has no place in the Report.

value and use of social media in public relations. The claims process is 100% computer driven and social media is essential in any public relations assignment. This lack of knowledge of the Claim Administrator was not impressive. In addition, Mr. Odom, who participated in her interview, appeared to have no interest in her skills or education. In spite of the generous salary offered, it appeared that the job was a dead end and that is why it was turned down. (See Affidavit of Ashley Elizabeth Sutton, attached as **Exhibit 3**).

C.   THE RECOMMENDATION OF MR. SUTTON FOR A JOB HE DID NOT GET AT GARDEN CITY GROUP.[8]

Freeh reports the following:

p. 9 "In response to an inquiry from the GCG, Ms. Reitano personally recommended that the GCG, one of the DHECC's vendors, hire her husband for a proposed legal position."

p. 9 "The Vendor (Neil Zola), who told the special master it was "ludicrous" to hire Mr. Sutton due to the conflict of interest, did not hire Mr. Sutton.

This alleged "issue" is further discussed on page 67 and 68.

p. 67-68 "In approximately July, 2012, he (Zola) approached Ms. Reitano, at the time an attorney at the CAO, asking whether she knew of any attorneys in New Orleans that would be qualified and interested in such a position. Mr. Zola responded that Ms. Reitano got back to him and said that her husband would be interested in the job."

The truth is that Zola did not approach Ms. Reitano. It was Jennifer Keough of his office who did. Keough specifically asked Ms. Reitano to recommend someone that Ms. Reitano thought could get along with Zola. At a dinner meeting in June, the month before, it appeared that Mr. Zola and Mr. Sutton got along very well, so Ms. Reitano recommended him to Ms. Keough. Mr. Freeh should know this because it is reflected in the senders and recipients of the

---

[8] This anecdotal information is completely inconsequential in this matter. It has no significance in considering Ms. Reitano's job performance.

emails he refers to in his report. Instead, Mr. Freeh reports: "Mr. Zola's account of Ms. Reitano's recommendation of her husband for a job is corroborated by a series of emails...Keough wrote: when you talk to Tiger see what he thinks.. Reitano responded that Tiger is interested... Tiger will talk to Pat....Keough responded Zola thought it would be better if Mr. Sutton called him (Zola) before consulting with Mr. Patrick Juneau." Therefore, the emails, contrary to SM Freeh's assertions about them, prove that it was actually Zola who discouraged Mr. Sutton from getting approval of Mr. Juneau in advance. On page 68, Freeh notes that Mr. Sutton, in his interview, "recalled that Neil Zola called him regarding the job and expressed concern that Mr. Patrick Juneau might think GCG was trying to get into "his good graces or something" by hiring Mr. Sutton (as if Zola would object to getting in Mr. Juneau's good graces!). He (Sutton) stated that he told Mr. Zola he understood and that was the end of it."

No one, until now, has ever claimed that the consideration of hiring Mr. Sutton for the job, which never got off the ground, was "ludicrous,"[9] or that tossing this idea around and discarding it could possibly be a reason to accuse Ms. Reitano of any impropriety.

D.  THE ALLEGATION OF IMPROPRIETY BECAUSE MS. REITANO WAS SUPPORTIVE OF BROWNGREER

First, it has to be understood and made clear that Ms. Reitano's job was to be supportive of ALL of the Vendors to the Program. (See Exhibit 1).

Freeh reports on page 12 that: "BG relied upon Reitano to advance BG's interests within the CAO in an effort to resist and to undermine the implementation of business practices to control its costs and to eliminate inefficiencies."

---

[9] It was certainly not any more "ludicrous" than Mr. Zola inviting members of the CAO (which would include Mr. Juneau) in October of 2012 to attend the Giants/Saints game in New York in December in GCG's reserved suite, even though such and invitation was a violation of the "DHECC Code of Conduct Policy" governing gifts and gratuities applicable to "All Program Contractors, Subcontractors, and Vendors." (See **Exhibit 4**). It is also a violation if any employees of the CAO attended the game as a guest of GCG.

On page 74, Mr. Freeh comes to the far reaching conclusion, so far that it is out of reach, that "BG utilized Mr. Sutton and Ms. Reitano to promote BG's own business and financial interests within the CAO in an effort to resist and undermine the implementation of new business practices which would control costs and eliminate inefficiencies." Mr. Freeh is correct when he states: "According to Patrick Juneau, Ms. Reitano became an integral part of his legal team, working on policy and general legal matters." In common parlance, a young person would respond to this statement: "Well, Duh?" Just take a look at Exhibit 1 which describes Ms. Reitano's job as exactly that. Ms. Reitano's role, not even remotely captured in Mr. Freeh's report, is described in the first section of this response. Ms. Reitano worked on a daily basis with Orran Brown and his employees working to identify any policy/legal issues and seeking resolution from the Parties at the direction of the Claims Administrator.

Mr. Freeh goes on to present 3 examples, apparently with the hope of demonstrating an effort on the behalf of BG to "resist and undermine the implementation of new business practices which would control costs and eliminate inefficiencies." Mr. Freeh's first mistake in this endeavor is that 2 out of the 3 scenarios have nothing to do with costs or efficiencies whatsoever. The discussion regarding the "502" errors identified by Chris Reade has nothing to do with costs or budgets. It potentially could have had something to do with an IT error, except for the fact that Mr. Reade recognized the following day that the actual occurrence of the error only occurred at a hundredth of a percentage point. Mr. Reade subsequently apologized to BrownGreer's IT officer, a fact which Mr. Freeh could have easily discovered in a legitimate investigation and reported it accurately.

Second, the discussion about Ms. Sara Cullen's request for BG's training materials and processes had nothing to do with costs, efficiencies, or budgets either. The request does,

however, implicate a rather complicated problem, in that the request came from Ms. Cullen's "Carrollton Group" email address. The "Carrollton Group" is an "outside employer" or "software company," involving Mr. Odom and Mr. Reade, as discussed in Mr. Freeh's report on p. 73, which just so happens to be the same business that Mr. Odom represented to Mr. Juneau did not involve any business that "would have caused a conflict of interest with his position at the DHECC." (See page 73 of the Freeh Report). Remarkably, Mr. Freeh omits or excises this objective, readily ascertainable fact from his discussion regarding Ms. Cullen's request for Mr. Brown's operational and procedural information. Instead he takes issue with Mr. Brown's "resistance" in supplying internal, confidential information to a business which operates outside of the Program.

The final scenario presented by Mr. Freeh is the situation where *"Former* Director of BPRG,"[10] Mr. Scott Sherick, requests data regarding BG reviewers and their tasks, more specifically, reviewers tasked with Tax ID Verification and other "Initial Causation Review" tasks. At the time of these email exchanges, the BPRG was holding meetings with the Vendors and requesting data in an alleged effort to improve overall "utilization." Mr. Sherick was requesting this information because the BPRG was recommending that this initial review role performed on all claims, including BEL claims, be transferred from the BrownGreer reviewers to the accountants in the instance of BEL reviews. This is what Mr. Brown was alluding to when he wrote: "I assume they are trying to figure out how many new people will have to be hired and trained by the accountants to assume all BEL duties." (Freeh Report, p. 75).

---

[10] This acronym stands for Business Processing Reporting Group and the group consisted of Sherrick, Odom, Fisher and Reade (all officials of the Program) who, also together as a group, had formed Crescent City Group. Crescent City Group is criticized for its conflicts in a section of the Report, but none of the members were singled out for their obvious conflict and given the same or even similar treatment as Ms. Reitano, who actually had no conflicts. In fact, the BPRG/CCG members are all still employed at the CAO and, on information and belief, Mr. Sherrick has been rehired.

The proposal or recommendation promulgated by BPRG to transfer the role of causation review from BG to the accountants was not logical. BG had spent months developing the protocols and procedures, as well as training staff to perform these categories of review. Secondly, and more importantly, the BPRG proposed transfer of roles from BG to the accountants was at a time when the accountants were experiencing a significant backlog. By January 2013, BG's processes, now mature and working, were resulting in a steady flow of claims to the accountants. On the other hand, at the time the BPRG was pursuing the potential shift of duties from BG to the accountants, there were approximately 5000 BEL claims sitting, waiting for review in accountant queues. One can only speculate as to the rationale for pursuing such measures. This recommendation was fully vetted and was not adopted.

Furthermore, this recommendation lacked any capacity to "control costs or inefficiencies." The "factual" assertions made by Mr. Freeh in this regard are simply incorrect, just as the unsubstantiated assertions regarding the statements of Ms. Mancuso have been proven to be incorrect by her affidavit. These erroneous assertions amount to material errors that should not have been made in the first place and now that they have been made, they must be corrected.

## CONCLUSION

There is only one appropriate order remaining to be issued in this matter with regard to Christine Reitano—her motion to dismiss for lack of jurisdiction should be GRANTED and the show cause order purportedly addressed to her should be dissolved.  No negative action should be taken with regard to Ms. Reitano and the recommendations of Mr. Freeh regarding Ms. Reitano should be dismissed.

Respectfully submitted,

    /s/ Mary Olive Pierson
Mary Olive Pierson, La. Bar No. 11004
8702 Jefferson Hwy., Suite B (70809)
P.O. Box 14647
Baton Rouge, LA 70898
(225) 927-6765 - Office
(225) 927-6775 - Fax
mop@mopslaw.com - Email

*Counsel for Christine Reitano*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Christine Reitano's Third Supplemental Response to Freeh Report and Reservation of Rights has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179 on this 16th day of December, 2013.

                    /s/ Mary Olive Pierson
                    Mary Olive Pierson

Revised Execution Version

## SUPPLEMENT AND AMENDMENT TO UNDERTAKING OF
## CHRISTINE REITANO IN FURTHERANCE OF
## THE COURT'S ORDER APPOINTING CLAIMS ADMINISTRATOR

This Supplement and Amendment (this "Amendment") to the Undertaking of Christine Reitano in Furtherance of the Court's Order Appointing Claims Administrator (the "Undertaking") is made and entered into by and among **Christine Reitano** ("Reitano"); BP Exploration and Production, Inc. ("BP"), solely for the purposes of the Indemnification provisions of Paragraph 4 below; and Patrick Juneau ("Juneau"), as Claims Administrator of the Court Supervised Claims Program, and as Trustee of the *Deepwater Horizon* Economic and Property Damages Trust (the "Settlement Trust"); and, for the purpose of taking cognizance of and approving the terms of this Amendment as provided in paragraph II below, the "Lead Class Counsel" (formerly the "Interim Class Counsel" as identified in the Undertaking) as of the 4th day of May, 2012 (the "Amendment Effective Date"). All of the parties identified above and appearing herein are identified collectively as the "Parties". Any terms not defined in this Amendment shall have the meanings ascribed to them in the Undertaking.

### RECITALS:

A. The Undertaking was made and entered into by and among Reitano, BP and Interim Class Counsel on April 18, 2012.

B. Paragraph 1(b) of the Undertaking provides that "[u]pon the establishment of the Settlement Trust, this Agreement [*sic*, the Undertaking] shall be amended to reflect that Reitano is retained as an independent contractor by the Settlement Trust and that the Settlement Trust shall become responsible for the Compensation obligations set forth in Paragraph 2 below".

C. The Settlement Trust has been established as of May 4, 2012, Juneau has been named as Trustee, and the creation and establishment of the Settlement Trust has been approved by the Court.

D. In addition, the "Agreement in Principle" (as identified in the Undertaking) has been formalized, its terms embodied in, and has been superseded by the "*Deepwater Horizon* Economic and Property Damages Settlement Agreement (the "Settlement Agreement") dated as of April 18, 2012, which has been approved on an interim basis by the Court.

E. Accordingly, the Parties desire to and do hereby enter into this Amendment in order to implement the terms of Paragraph 1(b) of the Undertaking and to bring the status of the Undertaking current with the developments which have occurred after its date.



EXHIBIT
1

## SUPPLEMENT AND AMENDMENT TO UNDERTAKING:

NOW THEREFORE, in consideration of the recitals and undertakings contained herein, the Parties agree as follows:

I. The Undertaking be and is hereby supplemented and amended as of the Amendment Effective Date in the following respects:

1. By replacing the word "Undertaking" with the word "Agreement" wherever it appears.

2. By amending Paragraph 1(a), <u>Claims Administrator Services</u>, to: (i) replace, wherever they appear, the words "final settlement agreement among the parties, should such agreement by finalized and filed and approved by the Court" (or any variation thereof), with the words "the Settlement Agreement"; and (ii) precede the current text with the following sentence: "The description and scope of the services to be performed by Reitano are as set forth on attached Schedule 1."

3. By amending Paragraph 2, <u>Compensation</u>, to: (i) insert the words "by the Settlement Trust", after the words "shall be compensated" on the first line of subparagraph (a) and again after the words "shall be reimbursed" on the first line of subparagraph (b); (ii) replace the figure "$20,833" with the figure "$25,000" on the first line; (iii) replace the date "April 1, 2012" with the words "the Effective Date" on the fourth line; and (iv) add at the end the following:  "Any single expenditure of more than $2,000, or expenditures exceeding $5,000 in the aggregate in any individual calendar month, shall require advance written approval by the Claims Administrator or his Chief Financial Officer."

4. By amending Paragraph 3, <u>Funding Mechanism for Payment of Compensation and Expenses</u>, to: (i) insert the words "by the Settlement Trust", after the words "shall be paid", on the first line of subparagraph (a); (ii) insert the words "to the Settlement Trust", after the words "shall submit", on the first line of subparagraph (b); (iii) delete the words "and Interim Class Counsel" after the term "BP" on the fourth – fifth lines of subparagraph (b); and (iv) substitute the words "the Settlement Trust", for the term "BP", wherever it appears in subparagraph (c).

5. By deleting Paragraph 4, <u>Indemnification</u>, in its entirety (to be replaced by a separate agreement).

6. By amending Paragraph 5, <u>Term and Termination</u>, to: (i) replace the date "April 18, 2012" with the words "the Amendment Effective Date"; and (ii) substitute the words "the Settlement Trust" for the term "BP" after the words "the audit right of".

7. By amending Paragraph 6, <u>Notices</u>, to add:

"if to the Settlement Trust or to the Claims Administrator:

Mr. Patrick Juneau
The *Deepwater Horizon* Economic and Property Damages Trust
935 Gravier Street, Suite 1905
New Orleans, LA 70112
Telephone: (504) 264-9740
Fax:        (504) 264-9746
Email: mjj@dhcclaims.com

8. By amending Paragraph 10, <u>Miscellaneous</u>, to replace, wherever they appear, the words "Reitano, and BP" with the words "Reitano, BP and the Settlement Trust".

II. Lead Class Counsel has reviewed this Amendment, takes cognizance of its terms and consents hereto, subject to the same terms, conditions and qualifications as contained in Paragraph 7 of the Undertaking.

III. As supplemented and amended hereby, the Undertaking remains and shall remain in full force and effect in accordance with its terms.

    IN WITNESS WHEREOF, the Parties have executed this Amendment as of the Effective Date.

_____
Christine Reitano

BP Exploration & Production, Inc.

By: _____

Its: _____

_____
Patrick Juneau,
Claims Administrator of the
Court Supervised Claims Program,

        and

Trustee of the *Deepwater Horizon* Economic and
Property Damages Trust

Lead Class Counsel
_____        8-1-12
James P. Roy

[00179013-2]

Stephen J. Herman

{00179013-2}

## Schedule 1

## Description and Scope of Service

Christine will serve as Claims Counsel for the Claims Administrators Office with the following responsibilities:

- Work with the Parties to identify any policy / legal issues and seek resolution at the direction of the Claims Administrator
- Assist the Claims Administrator with interpretation of the Settlement Agreement, Court Orders and other legal documents
- Work with the vendors and Contract Administrator's staff on legal issues and provide guidance as needed

**MARY OLIVE PIERSON**

ATTORNEY AT LAW

POST OFFICE BOX 14647

BATON ROUGE, LOUISIANA 70898-4647

TELEPHONE: 225-827-6765
TELECOPIER: 225-927-6775
E-Mail: mop@mopslaw.com

PHYSICAL ADDRESS:
8702 JEFFERSON HWY.
SUITE B
BATON ROUGE, LA 70809

August 9, 2013

Louis J. Freeh, Chairman                  Via Email: louisjfreeh@pepperlaw.com
Pepper Hamilton, LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC 20005-2004

Attention: Matthew Dolan                   Via Email: dolan@freehgroup.com

Re:    Christine Reitano

Dear Mr. Freeh:

You will recall that during your interview with my client, Christine Reitano, you asked her several questions about whether she had the responsibility for checking out conflicts among the staff or the attorneys working for the Claims Administrator. If my memory serves me correctly, Ms. Reitano correctly informed you that it was not her responsibility and that she felt it was the responsibility of the Claims Administrator and the CEO of the Claims Administration office.

Recently, I have reviewed BP's Memorandum in Support of its Renewed Motion for a Preliminary Injunction in which they make allegations about conflicts which have arisen with certain members of the pool of Appeal Panelists. I am writing to inform you that, prior to her termination, Ms. Reitano was never made aware of any of the facts related to the alleged conflicts with the Appeal Panelists and continued to be unaware of those facts until we obtained BP's Memorandum in Support of its Renewed Motion. Ms. Reitano played no part in the discovery of the alleged conflicts or the determination of the resolution of those conflicts. This further validates Ms. Reitano's responses that she was not responsible for these matters.

In fact, I have now written to the Claims Administrator in an effort to determine just exactly why the Appeals Panelists, who apparently had actual conflicts while they continued working as Appeals Panelists, were treated extremely differently from Ms. Reitano, who was fired even though she had divested herself of any potential conflicts prior to going to work for the Claims Administrator. That disparity in treatment, however, is not the main purpose of this correspondence.

**EXHIBIT**

**2**

Mary Olive Pierson

Louis J. Freeh
August 9, 2013
Page 2

I am writing to you because I have had an opportunity to review in great detail the Declaration of Mr. Keith Moskowitz which was attached as Exhibit 4 to BP's Original Motion for Injunctive Relief.[1]  This affidavit was one of the primary pieces of "evidence" used at the original injunction hearing and probably formed a substantial basis for all of the misinformed allegations about Ms. Reitano.  I have taken the liberty of internally comparing the various components of Mr. Moskowitz's sworn affidavit and also comparing the "allegations" to the actual description of Ms. Reitano's job as set forth in Schedule 1 of her Employment Agreement. Upon this close examination, the intended gravitas of Mr. Moskowitz's affidavit disappears in relation to the allegations against Ms. Reitano.

Although I previously provided you with the contents of Schedule 1 which describe Ms. Reitano's job duties, I am providing them here and again for your convenience:

Description and Scope of Services for Christine Reitano (Document No. 10761-2)

Christine will serve as Claims Counsel for the Claims Administrators Office with the following responsibilities:

- Work with the Parties to identify any policy / legal issues and seek resolution at the direction of the Claims Administrator

- Assist the Claims Administrator with interpretation of the Settlement Agreement, Court Orders and other legal documents

- Work with the vendors and Contract Administrator's staff on legal issues and provide guidance as needed

---

[1]Document Number 10761-5, Case 2:10-md-02179

Mary Olive Pierson

Louis J. Freeh
August 9, 2013
Page 3

         With that backdrop, I provide for you the following comparison and translation of Mr.
Moskowitz's affidavit testimony:

Analysis of Moskowitz Affidavit
Document No. 10761-5

| | |
|---|---|
| Under the refined process, the Claims Administrator issues a written Request for Input from BP and Class Counsel regarding a question or issue identified by the Claims Administrator related to the implementation or administration of the Settlement. (Affidavit, Para. 5) | Ms. Reitano sent out the written requests for input described above. (Affidavit, Para. 6)<br><br>Translated: Ms. Reitano wrote letters to all parties at direction of Claims Administrator. (See Schedule 1 to Supplement to Reitano Undertaking) |
| Once BP and Class Counsel respond to the Request for input,... (Affidavit, Para. 5) | ...[Ms. Reitano] collected the parties' comments and input on policy issues. (Affidavit, Para. 6)<br><br>Translated: Ms. Reitano received letters from all parties. (See Schedule 1 to Supplement to Reitano Undertaking) |
| ...the Claims Administrator issues a written Policy Statement which constitutes the Claims Administrator's position on the question or issue. (Affidavit, Para. 5) | She also announced policy decisions made by the Settlement Program to the parties. (Affidavit, Para. 6)<br><br>Translated: Ms. Reitano informed the parties of the decisions of the Claim Administrator (See Schedule 1 to Supplement to Reitano Undertaking) |

Mary Olive Pierson

Louis J. Freeh
August 9, 2013
Page 4

| | |
|---|---|
| If both parties "agree" with the Policy Statement, the Claims Administrator will issue a Final Policy Announcement (sometimes referred to as a "policy decision"), and the policy decision will be implemented by the Claims Administrator. However, if the parties do not agree with the Policy Statement, the parties typically provide comments for the Claims Administrator's consideration, and either classify the policy as a "Claims Administrator Decision," which means that they are acknowledging the policy subject to a reservation of the right to object to the policy in the future, including, but not limited to, instances in which the policy is applied to specific claims. (Affidavit, Para. 5) | I have personally corresponded, or been included on correspondence, with Ms. Reitano regarding many of the Settlement Program's policy determinations. (Affidavit, Para. 6)<br><br>Translated: Ms. Reitano wrote letters to all parties about phases of the policy determination decision and Mr. Moskowitz was copied on the letters.  Also, Mr. Moskowitz wrote to the Claim Administration office and he copied Ms. Reitano.<br>(See Schedule 1 to Supplement to Reitano Undertaking) |
| As described above, representatives of the Settlement Program, Plaintiffs' Steering Committee and BP have met for Panel Meetings contemplated by the Settlement Agreement. The Panel Meetings are intended to resolve issues or disputes related to settlement administration. (Affidavit, Para. 8) | From my personal experience, Ms. Reitano attended many of these Panel Meetings.  From my personal experience, Mr. Sutton and Ms. Reitano also attended meetings between the Settlement Program, the PSC, and BP regarding policies that govern claim payments in a range of areas, including seafood compensation, subsistence claims, business economic loss claims, and claims for the moratorium placed on oil and gas exploration. (Affidavit, Para. 8).<br><br>Translated: Ms. Reitano attended meetings with representatives of all parties.<br>(See Schedule 1 to Supplement to Reitano Undertaking) |

As you can plainly see, even Mr. Moskowitz's allegations, on close scrutiny, only claim that Ms. Reitano was doing her job of keeping the parties informed (including Mr. Moskowitz), receiving their correspondence, sharing it with the Claim Administrator and informing the parties of his decisions.  She also attended meetings by all of the parties, including Mr. Moskowitz.  As I said to you in a prior letter, Ms. Reitano helped develop the collaborative process, which the parties approved, and she helped facilitate the working of the process.

Mary Olive Pierson

Louis J. Freeh
August 9, 2013
Page 5

      I realize that when I volunteered to share information with you, you said you did not wish to
hear or receive any information from me.  However, as the attorney for Ms. Reitano, I would be
remiss in my duties if I did not bring these things to your attention and the court's attention before
the conclusion of your investigation.  In my view, knowledge is power and I want you to have all the
knowledge that I have.

      Thank you for your time and attention.

                  Sincerely,

                  Mary Olive Pierson

cc:    Judge Carl Barbier (via federal express)
       Hale Boggs Federal Building
       500 Poydras St. Room C256
       New Orleans, LA 70130
       Telephone: 504-589-7525

       Steve Tidwell, Managing Director (via email: tidwell@freehgroup.com)
       Freeh Group International Solutions

       Mike McCall, Senior Consultant (via email: mccall@freehgroup.com)
       Freeh Group International Solutions, LLC

       Mark Holstein (via fax: (281) 366-5901)
       BP Legal

       James P. Roy (via email: Jimr@wrightroy.com)
       Domengeaux, Wright, Roy & Edwards

       Stephen J. Herman (via fax: (504) 561-6024)
       Herman, Herman & Katz, LLP

       Patrick Juneau (via email: pjuneau@dheclaims.com)
       the Deepwater Horizon Economic and Property Damages Trust

       Christine Reitano (via email)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig      MDL NO. 2179
"Deepwater Horizon" in the
Gulf of Mexico, on April 20, 2010      SECTION: J

                         Honorable CARL J. BARBIER

                         Magistrate Judge SHUSHAN

---

## AFFIDAVIT OF ASHLEY ELIZABETH SUTTON

---

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

        BEFORE ME the undersigned notary public personally came and appeared

              ASHLEY ELIZABETH SUTTON,

          a resident of full age and majority of the State of Louisiana

who, after being sworn, did depose and say that:

1. I applied for a job as the Media and Press Coordinator for the claims office for the Deepwater Horizon Settlement Facility. My education, background and experience more than qualified me for the job.

2. I was interviewed for the position by Mr. David Odom and Mr. Patrick Juneau.

3. I have read certain parts of the "External Investigation Report" prepared by Mr. Louis Freeh and, in particular, I read page 19 where Mr. Freeh states:

> "Mr. Odom also stated that the DHECC media and press coordinator position initially was to be filled by Mr. Sutton's and Reitano's daughter. Mr. Odom *understood* that their daughter turned the job offer down as *she thought* she was not qualified. Mr. Odom felt that at some point it was beginning to appear the Reitano wanted to make the CAO a "family affair." (Italics added).

The information obtained by Mr. Freeh about what Mr. Odom said he "understood" about what Affiant "thought" and/or what Mr. Odom "felt" about Affiant turning down the job at the Claim Administrator's office could not possibly be farther from the truth. Affiant was more than



qualified for the position of Press and Media Coordinator and the salary offered was very substantial. However, in spite of the salary and benefits, Affiant turned down the job primarily because it appeared that the Claim Administrator, Mr. Juneau, who participated in the interview, was materially deficient in use of computers, did not have any appreciation for their use in public relations and he was particularly deficient in his knowledge of the use of social media in public relations. Affiant desired to work for an employer who understood the value of and could personally use computers and were familiar with the internet and social media and its importance in public relations.

4. Mr. Odom, who also participated in the interview of Affiant, did not appear to be interested in Affiant's education, experience and abilities. Based on Mr. Odom's conduct during the interview, Affiant did not feel like Mr. Odom would be a good person to work for, no matter what the salary and this was a secondary reason Affiant turned down the position.

WITNESSES:

_____        _____
Sarah Howard                            ASHLEY ELIZABETH SUTTON

_____
Cindy Hayes

Sworn to and subscribed before me this _16th_ day of December, 2013.


_____
NOTARY PUBLIC
Printed Name: _Christine Reitano_
Bar/Notary Number: _22142_

# Ashley Sutton

828 Valmont   New Orleans, La. 70115

P: (281) 703-4480   E: ashleys116@yahoo.com   T: @ashleys116   L: linkedin.com/in/ashleysutton

## EDUCATION

**Loyola University New Orleans**                                        New Orleans, La.
*Bachelor of Arts*                                                              May 2009
- Major: Communications; Public Relations          Minor: Criminal Justice

## SKILLS
- Microsoft Office, Word, Excel, PowerPoint, MyMediaInfo, Wordpress, Campaigner, Constant Contact, Adobe InDesign, Adobe Illustrator and PRTrak.

## SOCIAL MEDIA
- Twitter, Blogspot.com, HootSuite, TweetDeck, Google Plus, Facebook and MySpace

## EXPERIENCE

**Gambel Communications**                                                Metairie, La.
*Communications Strategist*                                         August 2009 to present
- Managed multiple clients on daily public relations practices including but not limited to strategy, media relations, community relations, issue management, special events and interactive outreach including social media.
- Tasked with engaging and employing the use of emerging technologies in all communications to effectively reach a dynamic yet strategically targeted audience.
- Developed meaningful partnerships and relationships with members of the local, regional and national media.
- Responsible for partnering traditional and grassroots public relations tactics and strategies with social media and interactive outlets.
- Conceptualized and implemented various special events for clients including Broadway Across America, Crescent River Pilots Foundation, City Year Louisiana, Hotel Monteleone and FestiGals®.
- Clients include: Bonefish Grill, Jamba Juice New Orleans, Entergy Louisiana, New Orleans Ballet Association, Healthy Lifestyle Choices, Business Council of New Orleans and the River Region, *The Man Who Ate New Orleans*, Broadway Across America, FestiGals®, Pinkberry Louisiana, *Wedding Style Magazine*, Chaffe McCall Law Firm, Taste Buds Restaurants- Zea Rotisserie & Grill, City Year Louisiana and Making Strides Against Breast Cancer.

**National First Place, Bateman Team (Nationally recognized public relations competition)**   New Orleans, La.
*Team Member*                                                        December 2008 to May 2009
- Co-created a public relations campaign for a nonprofit client, College Bound Aid.
- Implemented *The Bling Starts Here* campaign, which raised New Orleans student's awareness of the benefits of higher education and the financial resources available to them.
- Conducted both primary and secondary research through online databases, personal interviews, surveys and focus groups with primary influencers.
- Compiled a resource guide for parents and students to aid them in the college preparation process.
- Represented the campaign as a featured guest on WWLTV Morning News with Sally Ann Roberts.
- Reached over 150,000 New Orleanians through media and personal contact.

**Keating Magee Momentum Marketing**                                      New Orleans, La.
*Account Executive/Coordinator Intern*                          September 2008 to December 2008
- Provided assistance to the account executive/coordinator on day-to-day activities of clients.
- Created media lists by using media database resource programs.
- Maintained current client activities including: media deadlines, special events deadlines and communication plan timelines.
- Provided support in maintaining relationships with media outlets through follow up calls and interview scheduling.
- Measured media placement through PRTrak.
- Accompanied the account executive/ coordinator to media visits and interviews to get the experience and understanding of the various media outlets.
- Created media kits for clients.

**Habitat for Humanity of Durham, NC**                                     Durham, N.C.
*Assistant to Special Events and Marketing Coordinator*           May 2008 to August 2008
- Helped plan Habitat's annual Bull Moon Ride event.
- Marketed to more than 75 local businesses.
- Responsible for writing - press releases for various Habitat news and events

# Ashley Sutton

828 Valmont   New Orleans, La. 70115

P: (281) 703-4480   E: ashleys116@yahoo.com   T: @ashleys116   L: linkedin.com/in/ashleysutton

---

**Public Relations Student Society of America: Loyola University New Orleans**                    New Orleans, La.
*Secretary/Event Planning Committee/Vice President*                                                             January 2008 to May 2009
- Co-created a nationally recognized regional activity, *Crisis Communication: New Orleans is open for business.*
- Aided with scheduling and creating a New Orleans Tour, complete with assigned destinations and public relations/communication professional speakers.
- Communicated with professionals and organized monthly events for members.
- Designed and wrote pamphlets and flyers that were distributed before and during the regional activity.

## ACTIVITIES
*2010-Present*
- Public Relations Association of Louisiana (PRAL) New Orleans Chapter- Vice President of Membership
- Young Leadership Council
- New Orleans Chamber of Commerce
- Jefferson Chamber of Commerce
- French Quarter Business Association
- Greater New Orleans Women's Breakfast
- American Marketing Association
- Women In Media
- Public Relations Association of Louisiana (PRAL)
- PlayNOLA

*2009-2010*
- Public Relations Society of America (PRSA)
- International Association of Business Communicators (IABC)
- American Marketing Association
- New Orleans Young Professional Society
- Young Nonprofit Professionals Network
- Young Leadership Council
- 504Ward

*2005-2009*
- Public Relations Student Society of America (PRSSA)

## HONORS
- 2009 PRSA Silver Anvil Award- *The Bling Starts Here* Campaign
- 2008-2009 PRSSA National First Place Bateman Team- *The Bling Starts Here* Campaign
- 2009 PRSSA Presidential Service Award

References and writing samples available upon request.

From: Michael Juneau <mjuneau@dheclaims.com>
Subject: RE: Giants/Saints
Date: October 8, 2012 5:11:50 PM CDT
To: Neil Zola <Neil.Zola@gardencitygroup.com>, Patrick Juneau <pjuneau@dheclaims.com>, David Odom <dodom@dheclaims.com>, Bob Levine <blevine@dheclaims.com>, Kirk Fisher <kfisher@dheclaims.com>, Chris Reade <readec@dheclaims.com>, Christine Reitano <creitano@dheclaims.com>
Cc: Jennifer Keough <jennifer.keough@gardencitygroup.com>, Stephen Cirami <Stephen.Cirami@gardencitygroup.com>

Neil:

Thanks much for your invitation. I did want to let you know, however, that our office's policy on gifts/gratuities provides that none associated with the DwH program are to receive gifts of any sort, including event tickets, etc. But thank you for the offer nonetheless.

Michael J. Juneau
DwH Claims Center
Special Counsel

From: Neil Zola [mailto:Neil.Zola@gardencitygroup.com]
Sent: Monday, October 08, 2012 3:54 PM
To: Patrick Juneau; David Odom; Bob Levine; Kirk Fisher; Chris Reade; Christine Reitano; Michael Juneau
Cc: Jennifer Keough; Stephen Cirami
Subject: Giants/Saints

We wanted to let you know that GCG has reserved a suite for the Giants/Saints game in New York on December 9th for our clients. We held off sending out any invitations to you until the Saints finally won a game. Glad to see they came through last night. Please let me know if you would like to attend and how many tickets you each need. We would like to invite other members of your group as well but wanted to make sure first that it was okay with you. There will likely be other clients of ours there that afternoon too. Feel free to call me with any questions.

Best Regards, Neil

Neil L. Zola
President
GCG
1985 Marcus Ave.
Lake Success, NY 11042
Phone: 631-470-5154
Facsimile: 631-940-6543
Neil.Zola@gcginc.com

This communication (including any attachments) is intended for the use of the intended recipient(s) only and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In Re:  Oil Spill by the Oil Rig
"Deepwater Horizon" in the
Gulf of Mexico, on April 20, 2010

MDL NO. 2179

SECTION: J

Honorable CARL J. BARBIER

Magistrate Judge SHUSHAN

## AFFIDAVIT OF CHRISTINE REITANO

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

BEFORE ME the undersigned notary public personally came and appeared

CHRISTINE REITANO,

a resident of full age and majority of the State of Louisiana who, having been sworn, did depose and say that:

1.      She has read the foregoing "Christine Reitano's Third Supplemental Response to Freeh Report and Reservation of Rights" and that all of the allegations of fact contained therein are true and correct to the best of her knowledge, information and belief.

2.  Her testimony on July 29, 2013 was all true.

3.  She had no knowledge of a referral fee being expected or paid to her husband in the Thonn case until after she was unlawfully terminated from the CAO and all of her testimony on this subject was true and correct.

4.  She has read the Freeh Report regarding the referral fee in the Thonn case and read his version of what Ms. Mancuso supposedly said in her interview.  She has also read the subsequent Affidavit of Ms. Mancuso.   Ms. Mancuso's Affidavit is correct and Mr. Freeh's original interpretation of Ms. Mancuso's statement to his associates is totally inaccurate and wrong.

WITNESSES:

_Julian Sutton_

_Gabriel Sutton_

_Christine Reitano_
CHRISTINE REITANO

Sworn to and subscribed before me this _12_ day of December, 2013.

_____
NOTARY PUBLIC
Printed Name: _Gabriel Sutton III_
Bar/Notary Number: _20386_

EXHIBIT
5