## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  **Oil Spill by the Oil Rig**        **MDL NO. 2179**
     **"Deepwater Horizon" in the Gulf**
     **of Mexico, on April 20, 2012**       **SECTION J**

Applies to: *All Cases*       **JUDGE BARBIER**
      **MAGISTRATE JUDGE SHUSHAN**

## DECLARATION OF LYNN C. GREER

1.  ***Personal Information and Background.***  My name is Lynn C. Greer.  I am the

President and a founding partner of BrownGreer PLC ("BrownGreer"), located at 250

Rocketts Way, Richmond, Virginia.  I received my B.A from the University of North

Carolina at Chapel Hill and my J.D. from the University of Virginia.  I have been a

practicing lawyer for over 26 years and have dedicated my practice exclusively to all

aspects of multiple claims resolution for over 24 years, advising management, trustees,

claims administrators and companies on the successful implementation and administration of

resolution plans. In addition to this experience, I have directed and presided over the

management of national litigation and have developed processes and systems for receiving,

tracking, monitoring, consolidating, and streamlining the data and information generated in

such litigation. After first joining the Dalkon Shield Claimants Trust ("Trust") in 1990 to lead

its management of litigation filed against the Trust in forty states, I became Manager of the

Trust's legal department and ultimately rose to General Counsel and Executive Director. Since

the Trust's closure in 2000, I have dedicated my professional career on meeting the unique

needs of clients or Courts involved in or faced with multiple claims or lawsuits and co-founded

BrownGreer in 2002 to focus exclusively on providing different and innovative solutions for



REITANO
EXHIBIT 11

managing such situations.  I have served as Court-appointed Special Master and Claims Administrator and have been involved in the administration and management of all of BrownGreer's engagements, which include more than 60 major programs involving nearly 2,000,000 claimants and the disposition of over $24 billion in payments to qualifying claimants.

2.     *Personal Knowledge.*  The matters set forth in this Declaration are based upon my personal knowledge, experience, and training, as well as facts related to me in my capacity as supervising partner for BrownGreer's work on the Court Supervised Settlement Program ("Program") for the Deepwater Horizon Economic and Property Damages Settlement Agreement.

3.     *BrownGreer's Role in the Deepwater Horizon Program.*  BrownGreer was appointed by the Court to assist Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("Program") with its implementation.   Among other services, BrownGreer has: assisted with the creation of the process for the review of claims received by the Program; procured and trained staff needed to process the claims; procured and trained the staff in the Claimant Assistance Centers ("CACs") used in the Program. BrownGreer also worked with the Claims Administrator's Office to develop and implement internal controls and fraud detection and prevention measures.

A. **BrownGreer's Involvement in the GCCF and Transition to the Program.**

4.     *Involvement in the GCCF.*  In June of 2010, BrownGreer was retained to assist Kenneth Feinberg with processing claims presented to the Gulf Coast Claims Facility ("GCCF").  We served the GCCF from our Richmond, VA headquarters from June 2010 and through the transition from the GCCF to the Program.

2

5.     *Preparation for the New Court Supervised Settlement Program.*  In January

of 2012, we met with BP and representatives of the Plaintiffs' Steering Committee ("PSC")

("the Parties") about assisting with a new Court Supervised Settlement Program. We

understood at the time that the Parties were still negotiating and drafting the Settlement

Agreement but that they wanted vendors in place to provide a seamless transition between

the GCCF and the Program.  Beginning on February 1, 2012, and continuing throughout

the spring of 2012, BrownGreer met extensively and frequently with the Parties to discuss

all aspects of administering the Program.  At that time, the Parties anticipated that the new

Program would commence within 60 days and demanded that we take immediate steps to

hire a workforce to be ready to review claims as soon as the Program opened.   They

further explained that they wanted: (1) the hub of BrownGreer's claims review activity to be

in New Orleans; and (2) BrownGreer to take over the Site Offices from the GCCF, which had

been staffed by Worley Catastrophe Response, LLC ("Worley").  The new offices would be

called the "Claimant Assistance Centers" (CACs) in the new Program. There were to be 19

CACs located throughout the Gulf.  Although the Parties charged BrownGreer with running

the CACs, they specifically prohibited us from hiring anyone from Worley to staff those

offices or to play any role in the new Program, even though they had direct experience.  The

Parties understood that the 19 CACs, in addition to the 15th floor at the Exchange Center on

Gravier Street in New Orleans, were all new offices for BrownGreer and would require us to

hire those with whom we had never worked, given that our headquarters is in Richmond, VA.

Although the exact opening date of the Program was uncertain, the Parties told us to begin

hiring immediately, even if the employees did not have anything to do at first, and Dan Cantor

on behalf of BP specifically instructed us to "fill every seat." We agreed to hire locally to

support the system, and between February 2, 2012, and June 4, 2012, we hired and trained

1,035 new individuals to work on the Program: 756 were hired locally in the Gulf and 279

were hired in Richmond to serve as additional support for the Program.  We dispatched

experienced supervisors from Richmond to the Gulf to help with the training and oversight of

the new workers and maintained a significant presence of experienced supervisory staff in the

Gulf throughout 2012.  The Program had not yet opened in the spring of 2012 when we were

onboarding significant personnel, and the review system for the new Program had not yet been

developed;  however, we developed training modules using blinded claims from the GCCF to

test the new workers on basic skills necessary for claims review and to assess proficiency and

accuracy so that when the Program opened, our workforce would be familiar with the types of

documentation that accompanied the claims and would understand the level of detail and

precision required for a successful review.  Workers who did not demonstrate proficiency and

accuracy in their review of test claims were released, and new workers were hired to fill the

seat vacated by the departing individual.

   6.    *The Transition.*  On March 8, 2012, the Court entered a Transition Order, which

announced that the Parties were working on a settlement program to assume the claims of the

GCCF and to receive new claims associated with the Spill.  The Order named Patrick Juneau as

the Claims Administrator of the new Program and the Transition Process and named me as the

Transition Coordinator to oversee the continued processing of claims under the GCCF's rules

until the new Program opened.  There was to be no gap between the GCCF and the new

Program.  Instead, we were tasked with continuing to review claims, issue notices and handle

all issues arising from GCCF claims, while at the same time building the infrastructure for and

planning the new Program. During the Transition Period, which ran from March 8, 2012, until the Program opened on June 4, 2012, the Transition Process paid $377,214,845.

7.   *Opening of Program*.   During the Transition Period, BrownGreer continued to work with the Parties on preparing for the opening of the Program.   Critical to the Program's ability to open was the need for the Parties to approve the Claim Forms that were to be used for the filing of each of the 12 claim types provided in the Settlement Agreement.   Because the new Program had entirely different requirements from the GCCF, it was necessary to start anew with coding and building the system to implement the terms of the Settlement Agreement.   We advised the Parties that we needed a minimum of 60 days to program, code, and test the Claim Forms.   Nevertheless, as of May 16, 2012, only 19 days before the Program's opening on June 4, 2012, the Parties had not reached an agreement.   On May 16, 2012, I attended a status conference with the Court, Mr. Juneau and other members of the Claims Administrator's Office ("CAO"), along with representatives from BP and Class Counsel. The Court ordered the Parties to agree on the Claim Forms by the end of the day, which they did. From May 17, 2012, through June 3, 2012, our programmers and all of our teams worked around the clock to build the infrastructure and database platform necessary to allow the Program to open on June 4, 2012, while continuing to process and pay claims in the GCCF.   At 7:00 a.m. CT on Monday, June 4, 2012, the new Program kicked off without a hitch, with the claims filing system available online, 19 CACs Centers open and staffed with BrownGreer employees, and two call centers ready to answer questions.   That morning, we also posted 21 webinars on the website we had prepared to walk lawyers and claimants through each screen in completing a Registration Form or Claim Form online and on how to use the DWH Portal interface for law firms and unrepresented claimants.

### B. BrownGreer's Use of Independent Contractors.

8.  **_BrownGreer's Hiring Practices._** BrownGreer's standard and preferred hiring practice is to hire employees directly, and this has been our consistent preference since opening in 2002.  However, when faced with demands for a large workforce to be engaged quickly, we have used staffing agencies to assist us with screening and onboarding individuals.  The Program presented an acute situation and unprecedented demand for a large workforce that needed to be hired quickly.  Accordingly, we engaged the services of staffing agencies with a presence in the Gulf region to assist with our staffing efforts, searching for candidates with varying skillsets and including professionals with finance and accounting degrees, as well as JDs, MBAs and CPAs.

9.  **_BrownGreer's Contractor Conversion Process._**  Since 2002, whenever BrownGreer has retained the services of contractors to serve on a project, our consistent practice has been to convert contractors to employees as soon as those contractors have worked enough hours to convert without paying the agency a fee.  The number of hours a contractor must work before being able to convert without a fee varies and depends on the staffing agency and the level of employee.  This practice benefits the employees because they become eligible for certain benefits that contractors are not eligible to receive, and we have learned from those converted that there is a greater sense of security associated with being an employee, rather than a contractor.  These benefits, along with being immersed as a full employee into the culture of our firm, translates into increased morale in our workforce and an enhanced "ownership" of each task.

10.   ***Conversion of Contractors to Employees in the Program.***  Consistent with our long-standing employment practice of converting contractors to employees as soon as possible, BrownGreer monitored hours of each contractor working on the Program and established a schedule for conversion.  Certain contractors were not eligible for conversion because their staffing agencies were the sponsors of their H1B visa applications.  Others who were able to be converted and met BrownGreer's job performance standards were converted on a rolling basis.

11.   ***Establishment of BrownGreer's Billing Rates.***  BrownGreer provided services to the Program for over a year before we had a contract in place with the CAO.   On January 28, 2013, Orran Brown and I met with representatives of BP, along with David Odom, former Chief Executive Officer of the CAO, Kirk Fisher, former Chief Operations Officer of the CAO, and David Forsyth, counsel to the CAO, to negotiate and discuss our contract.  Following that meeting, and although BrownGreer's contract was with the Claims Administrator and not BP, the CAO instructed us to negotiate our billing rates directly with BP.   Accordingly, on February 8, 2013, I had a call with Maria Travis from BP and personally negotiated billing rates for positions who were working on the Program.  As a result of that conversation, BrownGreer lowered the rates for certain positions.  At no time during our contract negotiations with the CAO or BP, including my February 8, 2013 conversation with Ms. Travis, did the issue of independent contractors versus employees arise.  BrownGreer has consistently billed for positions in compliance with our contract, which incorporated the billing rates approved by BP.

12.   ***Mr. Moskowitz's June 7, 2013 Letter.***   On June 10, 2013, we received from David Odom a copy of a letter dated June 7, 2013, which was written by BP's Counsel, Keith Moskowitz, regarding BrownGreer's and other vendors' use of independent contractors on the

7

Program.  The letter made assumptions based on what Mr. Moskowitz thought a staffing

agency would charge for an "average" contractor and then used those assumptions to guess

what BrownGreer's markup would be.  Mr. Moskowitz then multiplied that assumption by

1,320, which was the number of independent contractors he thought BrownGreer used on the

Program.  Along with the number of independent contractors used by other vendors, Mr.

Moskowitz concluded that, "the monthly markup of the vendors appears to approximate $14M

per month that is pure profit for the CSSP vendors."  Among other reasons why Mr.

Moskowitz's letter was severely flawed as it related specifically to BrownGreer were the

following:

(1) **Number of Contractors.**  Consistent with our long-standing employment
practices, by the time of Mr. Moskowitz's letter, which was over year after
BrownGreer had hired the bulk of its workers, we had converted all but 190
contractors to permanent employees.  These 190 contractors represented only 12%
of BrownGreer's staff that was allocated to the Program.  Included among those
190 contractors were those with advanced skill sets, such 56 computer
programmers and technology experts who could not be converted to a direct
employee because the staffing agency was a sponsor of their H1B visa application.
The remaining 134 included varying skillsets and were more recent hires who
were slated for conversion as soon as they became eligible.  Thus, when
conducting his calculation for what he thought constituted the monthly markup
figure for an "average contractor", Mr. Moskowitz's assumptions were misplaced
and its use of 1,320 contractors was off by 1,130 individuals.

(2) **"Pure Profit."**  Mr. Moskowitz's conclusion that any markup was certainly "pure
profit" was also fundamentally flawed, for it assumed that BrownGreer had no
overhead related to our contractors.  In fact, BrownGreer has absorbed significant
overhead in connection with our retention of contractors on this project, including but
not limited to the following: (a) BrownGreer's Human Resources Department set and
confirmed contractor candidate qualifications with each agency, and none of this
administrative support was billed to BP; (b) BrownGreer's supervisors approved
contractors' time and managed Human Resources issues, and none of this supervisory
time was billed to BP; (c) BrownGreer's payroll department and a contractor's
supervisor reconciled the contractor's time, and none of this administrative time was
billed to BP; (d) of the 190 total contractors at the time of Mr. Moskowitz's letter,
132 were located in BrownGreer's Richmond offices, where BG covered all
overhead; (e) when the need for overtime existed, BrownGreer paid its contractors 1.5

times the applicable rate to reviewer contractors for any time worked over 40 hours, and BrownGreer did not bill the overtime rate to BP.

13.   ***Budget Meeting with BP on June 18, 2013.***   On June 18, 2013, I, Orran Brown and Roma Petkauskas attended a meeting at the CAO with representatives of BP, Class Counsel, the CAO's office, as well as Judge Shushan.   It was my understanding that each vendor was participating in separate meetings to answer BP's questions in connection with the administrative budget for the Program.   During that meeting, the issue of independent contractors arose, and we explained why the assumptions in Mr. Moskowitz's June 7, 2013 letter were flawed, including an explanation of our hiring and conversion practices, the number of contractors we currently had, and examples of overhead costs expended on our contractors. Despite our explanations, BP has continued to accuse BrownGreer falsely of enjoying pure profit associated with our contractors.

## C.   Appeals Process and BEL Results.

14.   ***BrownGreer's Involvement in Appeals Process.***   One of BrownGreer's functions in the Program is to assist the CAO with the processing of appeals.   This assistance has included helping to draft the Rules Governing the Appeals Process, as well as developing and maintaining the database Portal through which BP and claimants appeal a claim, transmit Initial and Final Proposals, and through which the Appeals Panelist(s) render a decision. BrownGreer helps the Appeals Coordinator keep track of all deadlines and has assisted with the development and circulation of reports regarding the status and results of all appeals. Because of BrownGreer's involvement in the appeals process, we have first-hand knowledge of how it works and the background necessary to place results in context.

15.   *Explanation of the "Baseball" Appeals Process.*  Section 6.2 of the Settlement

Agreement and Section 3.A of Exhibit 25 to the Settlement Agreement establish an appeals

process known as the "baseball" process. Pursuant to this "baseball" process, 15 days after an

appeal is filed, the Claimant and BP exchange, in writing, their respective Initial

Proposals.   Ten days later, if neither party has accepted the other's Initial Proposal, the

Claimant and BP exchange their Final Proposals.  During this period of exchanging Initial and

Final Proposals, either party may elect to accept the other's Initial or Final Proposal and

resolve the appeal without it reaching an Appeal Panelist for decision. Separately, during this

same time period, the parties may choose to reach a mutually agreed upon compromise amount

that is different from their Initial or Final Proposals.   Thus, under the "baseball" appeals

process, before an appeal is submitted to an Appeal Panelist to render a decision, the Rules

encourage resolution by requiring the Claimant and BP to go through a two-step process for

exchanging proposals.

If the Claimant and BP do not resolve the appeal during the Initial/Final Proposal stage,

the claim advances to an Appeal Panelist for determination.  The Settlement Agreement

mandates that the Appeal Panelist choose *only* from among the two Final Proposal figures

submitted by the parties and may choose no other amount.

During the Initial and Final Proposal portions of the "baseball" process, Claimants

routinely submit settlement proposal amounts that are substantially similar, but slightly lower

than the amount of the underlying Original Award amount in an effort to resolve the appeal in a

negotiated manner to save the time and effort of a protracted appeal.   If the Appeal Panelist

determines to rule in favor of the claimant, the Panelist can only award the amount listed by the

claimant on his or her Final Proposal.  If the claimant's Final Proposal is the same as the

Program's Original Offer, then the Appeal Panelist will choose that one; however, in instances where the claimant, for whatever reason, submits a Final Proposal figure that lower than the Original Award amount, the Appeal Panelist must select that amount when finding in favor of the claimant.

16.   ***BP's Use of Appeal Results to Argue Error Rates in the Claims Process.***  I have reviewed the Declaration of Todd Brents and am familiar with his assertion that there have been 2,268 BEL claim determinations that have been appealed "for which the appeals panel has reached an outcome."  I am also familiar with his conclusion that the Program made "errors" in 463 of these 2,268 BEL claim determinations simply because the amount after an appeal was lower than the amount of the Program's original offer. In the table in paragraph 27 of his Declaration, Mr. Brents labels a column "Error Rate (Reduction in Amount)," thereby equating a reduction after appeal as an error.  Although Mr. Brents glosses over in a footnote that his figures include claims "either decided by the appeals panel or resolved by the parties that resulted in a reduction to the award amount," he leaps to a conclusion that in all instances where there is a reduction, the Program made an "error,' which ignores the nature of the baseball process and its encouragement for the Parties to reach a resolution before the claim advances to an Appeal Panelist.

17.   ***Mr. Brent's Mischaracterization of Appeal Results.***  To characterize the 2,268 BEL results as those decided by an Appeal Panelist and to equate a lower post-Appeal amount as being indicative of an "error" in the Program's amount is inaccurate and at odds with the nature and purpose of the "baseball" process.   We researched the 2,268 BEL claims Mr. Brents' refers to in his Declaration and looked specifically at the 463 he claims reflect "error"

by the Program because their post-appeal amount was lower than the Program's offer and
found the following:

(1) The 2,268 resolved BEL claims have **not** all been resolved by way of an Appeal Panel decision. Instead, 2,268 is the sum of all the BEL appeal outcomes and includes not only those resolved by an Appeal Panelist's decision, but also those resolved by the Parties before the claim reached an Appeal Panelist.

(2) Out of the 463 claims Mr. Brents says were errors because the Appeals Panelist awarded a lower amount than the Program's final determination, only 236 actually progressed to the point of being decided by an Appeal Panelist. The remaining 227 were resolved by the parties and were not decided by an Appeal Panelist. The majority of these 227 claims were resolved for an agreed-upon award amount that was substantially similar to the Original Award amount. In fact, 182 out of the 227 BEL claims resolved by the parties were resolved for an award amount that was within 75% of the Original Award amount, and 116 of those were resolved for an award amount that was within 90% of the Original Award amount.

(3) Of the 236 claims that did progress to an Appeals Panelist decision, the overwhelming majority were decided by the Appeal Panelist using the Final Proposal figure provided by the Claimant. In only 27 instances did the Appeal Panelist select the Final Proposal figure that was asserted by BP. This represents only .01 % out of the total of the 2,268 resolved appealed BEL claims.

### D. Fraud Prevention and Internal Controls

**18.   *The Program's Fraud Detection Structure*.** Since the beginning of the Program,

the Program's fraud detection processes have been led by David Welker. Until the recent

formation of the Fraud Waste & Abuse ("FWA") department within the CAO, Mr. Welker was

supported by BrownGreer's Special Investigations Team (SIT), which was led by Roma

Petkauskas, who is a Certified Fraud Examiner. In addition to Roma, members of SIT

included lawyers, a Forensic Accountant, Financial Claims Reviewers and Non-Financial

Claims Reviewers. SIT trained all BrownGreer claims reviewers working on the Program to

spot questionable claims and also developed and shared with other Program Vendors and the

Parties processes and systems for flagging claims and forwarding those to SIT for further

review.

19.    The pre-FWA program involving Mr. Welker and BrownGreer's SIT department, accomplished the following:

(1) SIT educated claims handlers to note fraud flags, developed systemic metrics to analyze suspect trends, and developed robust data analytics to detect multi-claimant schemes. As a result of these efforts, SIT received potential fraud proposals for 31,889 claimants. Of these, SIT labeled 13,476 claimants as participants in 802 different multi-claimant schemes.

(2) SIT subjected 10,047 claims to Further Investigation after confirming that there were initial indicia of potential fraud, and SIT made preliminary determinations of potential fraud for 1,988 claimants. Of these 1,988 preliminary determinations of fraud, SIT recommended and the CAO agreed to refer 1,504 claimants to the DOJ for possible additional investigations. The referral and suspension of the claims of these 1,504 claimants resulted in potential savings of $136,340,829 to the Settlement Program based on the average calculated award amount for each Claim Type.

20.    ***BP's Knowledge of Program's Fraud Detection and Control Process.*** Long before the Program opened on June 4, 2012, BrownGreer, with Mr. Juneau's approval, met and participated in conference calls with representatives of BP to discuss controls, including change control processes. Pursuant to those meetings, BrownGreer provided BP with documents BP requested about our procedures and practices. For example, on April 26, 2012, BrownGreer Special Counsel Kristina Tyler transmitted BrownGreer's Change Control Processes and Procedures to Nick Lawson with BP and copied Mr. Juneau, John Baden and Dan Cantor (a copy of this email is attached as Ex. A). In an effort to be responsive to each request from BP regarding our controls and processes, we kept a log of all requests and the date we complied with each  (copy attached as Ex. B).

After the Program opened, Mr. Welker and Ms. Petkauskas met with representatives of BP and Class Counsel numerous times to explain the Program's fraud and control processes. These meetings occurred on June 26, 2012, August 7, 2012, January 16, 2013, and June 18, 2013. During those meetings, BP never raised concerns or questions about the fraud

13

processes being employed by the Program.  The only dissatisfaction raised by BP was that they could not get access to certain data, which was prohibited by the Confidentiality Order.  I am not aware of any other complaints or data requests purportedly made by BP.

21.  ***Gibson Dunn & Crutcher's January 27, 2014 Letter on Error and Risk Detection and Mitigation.***  On February 6, 2014, Roma Petkauskas received a letter from David Welker dated February 3, 2014, which accompanied a letter with attachment from George H. Brown with Gibson Dunn, & Crutcher ("Gibson Dunn") dated January 27, 2014, on behalf of BP, regarding "Error and Risk Detection and Mitigation in the Deepwater Horizon Court Supervised Settlement Program."  Mr. Welker asked Roma to review the materials from Mr. Brown and to provide comment on the controls already in place, measures taken to tighten controls, and/or any additional observation she had regarding the content of either the letter or its attachment.  A copy of Mr. Welker's letter dated February 3, 2014, along with Mr. Brown's letter and attachment are attached to as Ex. C.

22.  ***Response to Gibson Dunn's Letter***.  In response to this request, Roma sent a letter dated February 19, 2014, to Mr. Welker, which included a 33 page, single-spaced attachment describing: (1) the SIT's Fraud Detection and Prevention Process; (2) Business Economic Loss Framework Controls; and (3) a Description of BrownGreer's Internal Controls.  A copy of the letter and materials Roma provided to Mr. Welker is attached as Ex. D.

23.  ***BrownGreer's DWH Operations Manual.***  Roma's February 19, 2014 letter also referenced the BrownGreer DWH Operations Manual and Operations Manual Appendix as a source that provides a thorough review of all of the process and rules BrownGreer follows in performing claims review functions.  As early as May 7, 2012, Mr. Juneau had requested each Vendor to submit an Operations Manual to him to document fully all processes being

14

performed in the Program.  The BrownGreer DWH Operations Manual and Appendix total

2,312 pages and document fully every step and control we follow in the implementation of

claims review pursuant to the Settlement Agreement.  BrownGreer wrote its manual over the

course of several months and provided it to the CAO first on February 1, 2013.  Since then, we

have updated and provided new versions to the CAO each quarter to reflect new policies or

processes.  BrownGreer also made its DWH Operations Manual and Appendix available to BP

on or around June 14, 2013, in response to BP's request for certain information prior to the

June 18, 2013 budget meeting.

24.   ***BEL Controls Proposed by Gibson Dunn***. In Mr. Brown's January 27, 2014

letter, he referenced a detailed list of proposed controls that he expected to share with the

Program soon, which he explained were focused on entity level controls and BEL claims

processing controls.  On February 21, 2014, Mr. Welker gave Roma Petkauskas a copy of the

proposed controls he had received from BP, a copy of which is attached as Ex. E.  In this

document, BP had identified 327 risks in the processing of BEL claims. Mr. Welker asked

BrownGreer to analyze and, if possible, respond briefly to each risk/control listed.  We

explained that many of the controls would be applicable to the Program's accounting firms

(PwC and P&N), and Mr. Welker asked us to share the list with them as well, which we did.

25.   ***Response to Gibson Dunn's BEL Controls Proposals***.  Because many of the

statements and risks BP raised were directly explained and covered in our Operations Manual,

it was apparent to us upon review of the list that either BP had never reviewed BrownGreer's

Operations Manual that had been available to them on or around June 14, 2013, or they had

reviewed it and chosen to ignore it. Nevertheless, from February 21, 2014 until March 13,

2014, BrownGreer researched and drafted responses to each of the risks or controls from BP's

15

list of 327 that were applicable to our processes or systems.  On March 13, 2014, we provided

Mr. Welker with our response to the controls from BP's list that pertained to BrownGreer.  A

copy of the document we sent to Mr. Welker in response is attached as Ex. F.

26.    *Gibson Dunn's March 5, 2014 List of Proposed Entity Controls.* That same day,

on March 13, 2014, Mr. Welker sent Roma Petkauskas another spreadsheet from Mr. Brown,

which Mr. Welker described as a second round of controls BP believes should be used in the

Program.  Mr. Brown had sent this list to the CAO on March 5, 2014.  Upon review, we

determined that, again, the vast majority of the items in the claim processing section were

addressed in BrownGreer's Operations Manual, which BP had been given on or about June 14,

2013.  We asked Mr. Welker for guidance on how to respond.

27.    *CAO's Request for Information in Response to Gibson Dunn's March 5, 2014*
*List of Controls.* We received further direction on June 2, 2014, when the CAO's Internal

Audit department contacted Roma Petkauskas to seek BrownGreer's input on 78 items from

BP's March 5, 2014 list of suggested entity controls.  For each item, the CAO's office asked us

to confirm whether:  (1) the control was currently in place; (2) if not, whether it should be

implemented; (3) whether the control was manual or automated; (4) the frequency of the

control; and (5) a description of the control in place.  The 78 items were those related to

BrownGreer's processes.

28.    *BrownGreer's Response to Gibson Dunn's March 5, 2014 List of Controls.*

BrownGreer researched each of the 78 controls listed on BP's March 5, 2014 list and

confirmed that, not only were all 78 controls were in place, but also that BrownGreer's current

processes provided even broader and stricter controls than what BP had recommended in many

instances.  For example, one of the proposed mitigating internal controls recommended

establishing quality assurance (QA) protocols using a risk based approach to focus QA efforts

on the appropriate areas of the claims process.  In fact, BrownGreer employs sophisticated

automated data metrics and daily analysis processes to identify claims for QA.  The metrics are

identified in Appendix XXV.A of the Operations Manual.  Discrepancies found in QA

Reviews are recorded in the system.  BrownGreer runs weekly reports that quantify user

performance based on these reports and those reports are provided to supervisors.  Supervisors

examine these reports and follow up with reviewers weekly.  Section  XXV.D of the

Operations Manual describes the follow up process in detail.  On June 20, 2014, we provided

the CAO with our analysis of whether the control was in place, whether it was automated, the

frequency of it, and we described the control in place.  A copy of this analysis is attached as

Ex. G.

29.   *BP's Disregard of Existing Internal Controls and Processes.*  I have read the

Declaration of Mark Hutchins and am familiar with his opinion that although BrownGreer was

to assist the Claims Administrator in implementing controls for the claims process, there is "no

indication that such controls were developed or implemented." (Hutchins, ¶ 38).    To render

such an opinion, it is apparent that Mr. Hutchins is unfamiliar with the internal controls

detailed in BrownGreer's:  (1)  February 19, 204 response to Gibson, Dunn's January 27, 2014

letter; (2) March 13, 2014 response to Gibson, Dunn's list of BEL Controls Proposal; (3) June

20, 2014 analysis of the 78 controls applicable to BrownGreer from Gibson, Dunn's March 5,

2014 list of entity controls; or (4) DWH Operations Manual and Appendices.  These

documents reflect the comprehensive and robust system of controls that had been implemented

in the Program, and in fact show that *all* of the controls contained in the March 5, 2014 list

from Gibson, Dunn as they related to BrownGreer were in place and had been for some time.
BP had been privy to these controls, at a minimum through its access to the BrownGreer
Operations Manual and the explanation of the Program's fraud detection and prevention
processes in at least four in-person meetings.  Furthermore, BrownGreer's internal controls had
been provided in detail in the Declaration of Orran L. Brown, filed with the CAO's response to
BP's Renewed Motion For An Emergency Preliminary Injunction To Suspend Payments on
August 26, 2013, a copy of which is attached as Ex. H.   Either Mr. Hutchins was personally
unaware of all of these controls, or he chose to ignore them in favor of making a blanket
assertion that they do not exist.

30.   *The Casey Thonn Claim.*  Mr. Hutchins again blames the alleged absence of
controls in the system or processes in place within the Program for not detecting fraudulent
activity by Casey Thonn and other Seafood Program claimants, although he does not explain
specifically how the controls listed on BP's January 27, 2014 or March 5, 2014 list would have
detected "fraudulent activity by Casey Thonn and other Seafood Claimants."  On May 2, 2012,
before claims review began, BrownGreer, on behalf of the Claims Administrator,
recommended to the Parties that the DWH Program obtain authorizations to verify tax forms
from all claimants at the time they filed claims to give the Claims Administrator the ability to
confirm that claimants who relied upon tax returns as proof of their income or losses actually
submitted those returns to the IRS and to deter submissions from claimants who did not file
such tax returns.  Class Counsel strongly opposed this, stating that the measure was too
intrusive.  On June 15, 2012, BP ultimately agreed that the Program would not require
authorization forms to verify tax forms from all claimants at the time they filed claims, and
would only require them as the Claims Administrator judged necessary.  During the GCCF,

BrownGreer had referred the Casey Thonn claim to audit, and Guidepost (the investigative arm of the GCCF Program) had cleared the claim, finding "no evidence of fraud." In light of the prior investigation by Guidepost that cleared his claims, the Program would not have required authorization forms, and the claim was reviewed in accordance with the Seafood Protocols.

### E.  Mr. Juneau's Exercise of Control.

31.  *Use of Freeh Report by BP.*  In Todd Brents' Declaration, he recites excerpts from Special Master Freeh's report regarding BrownGreer and concludes that a reasonable and prudent Claims Administrator would "not tolerate such 'brazen behavior' or disregard to his authority." BrownGreer and the Special Master resolved all issues from the September 6, 2013 Report relating to BrownGreer in filings with the Court dated November 12, 2013, and November 13, 2013, respectively. Notwithstanding that resolution and determination that the Program could continue with BrownGreer in its same role, BP has resurrected the report to attack Mr. Juneau and to suggest that it proves he had ineffective controls over his vendors. That is not what the Special Master's report said. In fact, an example given to Special Master Freeh by certain former members of the CAO of BrownGreer's alleged "resistance" to the "CAO's oversight efforts to control costs and to create efficiencies" ironically illustrates the ultimate control Mr. Juneau consistently displayed on issues relating to efficiencies and costs. On January 14, 2013, David Odom, notified BrownGreer that a decision had been made to transfer front-end data entry on BEL claims from BrownGreer to the accountants. Mr. Odom stated that he and Mr. Juneau had met with the accountants and had decided to transition BEL functions over to the accountants. He said that Kirk Fisher would set up a meeting to work out the details. That same day, I replied to Mr. Odom's email, thanking him for it, and sending him a memo outlining all tasks currently being performed by BrownGreer on BEL claims to

help inform the transition process from BrownGreer to the Accountants. (*See* email exchange attached as Ex. I.) Over the course of the next week, we learned from one of the Accounting vendors that Mr. Odom had never met with them, had never asked them their opinion, that the current division of responsibilities between BrownGreer and the Accountants was working, and that the accountants did not want to absorb the front-end data entry work. We also learned that the transition from Brown Greer to the Accountants would cost the Program $1.1 million more per month because BrownGreer's billing rates were lower than the rates of the Accountants. Furthermore, at the time of this proposed transition, there was already a backlog of approximately 3,300 BEL claims awaiting Accountant review, and we were pushing new BEL claims to Accountant Review at a faster rate than the Accountant Reviewers could review them, because their review involved a comprehensive look at all aspects of the claim. At the time, we were sending the Accountants an average of 243 claims a day, but because of their extensive review, they were completing an average of 137.5 claims each day. Thus, at the time of the Odom-Fisher plan, the  front-end work done by BrownGreer was outpacing the Accountants by over 500 claims per week, adding at least 2,000 claims per month to the backlog of claims with the Accountants. To keep up with the pace of claims being sent to the Accountants for review and for them to take on the new responsibility of the front-end data entry, new Accountants would need to be hired and trained, which would take time and risk slowing down the process and increasing the backlog. For all of these reasons, we discussed and asked questions about the transition but willingly would have made the transition if the CAO had decided ultimately to make the proposed change. I attended a meeting on January 23, 2013, among David Odom, Kirk Fisher, Pat Juneau, Mike Juneau, and other members of the CAO on January 23, 2013, to discuss the transition. It is my understanding and recollection

20

that the Accountants also met with the CAO that day. After those meetings, Mr. Juneau

decided not to transfer the front-end data entry work from BrownGreer to the Accountants,

which saved the Program and thus, BP, $1.1 million per month.

32.   *BrownGreer's Reporting Relationship to the CAO*. Mr. Brents also comments

on David Odom's representation to Special Master Freeh that Orran Brown "made it clear to

him from the outset of Mr. Odom's tenure at the CAO that Mr. Brown reported only to Mr.

Patrick Juneau," which Mr. Brents characterizes as "brazen behavior that a reasonable and

prudent Claims Administrator would not tolerate." Mr. Brents' characterization has no basis

in fact. In his interview with Mr. Freeh, Mr. Odom was referring to a statement that arose

during BrownGreer's contract negotiations with BP, which occurred at Arnold & Porter's

offices in DC on January 28, 2013, eight months after Mr. Odom was named CEO. That

meeting was attended by Orran Brown, me, representatives of BP, David Odom, Kirk Fisher,

and David Forsyth. The subject of reporting arose in the context of a discussion about the

chain of command and how one of the murkiest parts of our engagement at the time was who

directed our work and to whom we reported, because we worked directly with Patrick Juneau,

Michael Juneau, the legal team at the CAO's office, David Odom, Kirk Fisher, Bob Levine,

and others in Mr. Juneau's office, and we had been getting directions and requests from all of

them. We discussed how the draft contract referred to the relationship between BrownGreer

and the "Claims Administrator," which was defined in the contract to have the same meaning

as provided in the Settlement Agreement. The Settlement Agreement defined the "Claims

Administrator" as Patrick Juneau and not the "Claims Administrator's Office" or anyone else

in that Office, which was contributing to our uncertainty about who directed our work. We

were trying to obtain some clarity in our written contract on to whom we reported. It was

during this discussion that Mr. Brown made a statement that, according to the terms of the contract and the definitions in the then working draft, our relationship was with Mr. Juneau as Claims Administrator, and we ultimately took our direction from him.  The statement—which did nothing more than state our reading of the current version of the contract—is not evidence of intolerable "brazen behavior."


I, Lynn C. Greer, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 15th day of October, 2014.

_____
Lynn C. Greer