**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : : : | MDL No. 2179 SECTION: J JUDGE BARBIER MAG. JUDGE SHUSHAN |
| This Document Relates to: 10-4536 | | |
| …………………………………………….. | | |

**CLEAN WATER ACT – PENALTY PHASE**

**UNITED STATES' OPPOSITION TO:**

**BPXP'S MOTION TO STRIKE THE EXPERT REPORTS OF WALTER H. CANTRELL AND RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO PRIOR INCIDENTS (Rec. Doc. 13475)**

## Table of Contents

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKROUND................................................................................................. 2

   I.   BPXP'S Contentions of "Re-litigation" and "Mini-Trials" are Without Merit: Admiral Cantrell Merely Compares the Prior Incidents to the Extant Phase One Record and Findings.. 4

   II.   The Court's Phase One Findings Confirm that the Pattern Common to these Four Prior Violations was also a Causal Factor at Macondo......................................................................... 8

   III.   These Prior Incidents are Legally Relevant Under Several of the Statutory Factors Under 311(b)(8).................................................................................................................................. 12

CONCLUSION................................................................................................................... 13

**INTRODUCTION**

Under the Clean Water Act (CWA), Congress "wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." *See e.g.*, Tull v. United States, 481 U.S. 412, 422 (1987). Nonetheless, BPXP seeks to prevent the Court from considering four criminal violations at other BP facilities that are highly relevant to the penalty assessment. This is true because they reveal a common theme that also applies to the Macondo well: BP's failure to effectively implement safety programs, resulting in disastrous criminal violations of environmental law.[1]

If permitted to present its evidence, the United States will demonstrate that the BP Group (BP)[2] has a long history of promising improved safety results after committing both criminal and civil violations of environmental law. BPXP's arguments in support of excluding this evidence – that the evidence will result in cumulative evidence and mini-trials, that the violations are not sufficiently similar, or that the statute precludes such evidence -- each fail.

---

[1] The parties have already thoroughly briefed the relevance of prior violations to the statutory factors in Section 311 of the CWA. The United States does not repeat the arguments contained in the prior briefing. Ex. #1 (United States' Opposition to BPXP's Motion in Limine to Exclude (1) Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents; Rec. Doc. 12460). *See also* United States' Memorandum in Support of its Motion in Limine to Permit Relevant Evidence Concerning BP p.l.c. and Other BP Affiliates. Ex. #2 (Rec. Doc. 12355).

[2] BP means the BP Group which BP defines as "BP p.l.c. and its subsidiaries." *See* Ex. #3 (BP Annual Report for 2010, at 3). Where multiple BP entities are referenced "BP" is also used. As set forth in the United States' Memorandum in Support of its Motion in Limine to Permit Relevant Evidence Concerning BP p.l.c. and Other BP Affiliates and in the expert report of Dr. Frederick Quivik, (Ex. #4 [Filed Under Seal]), BP does not operate through legal subsidiaries but rather as a group entity through its business segments and units. *See* Ex. #2 (Rec. Doc. 12355-1 at 3-11). Indeed, none of the safety policies cited by any party at trial were issued by BPXP, but rather by BP Group entities. *See e.g.* Ex. #4 (Quivik at 69-75, *see also* 24-75); Ex. #5 (Expert Report of Walter Cantrell at 13-15 [Filed Under Seal]). BPXP was not the only BP entity involved in the drilling of the well. The Court, for example, found BP America Production, Inc. reckless in the blowout. Rec. Doc. 13381-1 (revised findings), ¶ 541-542.

First, the evidence proffered by the United States will not result in re-litigation or mini-trials. The expert opinion proffered by Admiral Cantrell will succinctly summarize BP's past failures based upon BP's own statements and reports. BPXP has listed only two expert witnesses to rebut this testimony. Accordingly, the specter of mini-trials and re-litigation is as illusory as BP's promises to implement effective safety systems at its facilities.

Second, this Court's finding that there was a process safety system in place on the rig does nothing to render BP's failures to follow its system at Macondo and elsewhere irrelevant. The four violations, and Admiral Cantrell's expert analysis of them, reflect BP's longstanding, broken promises to operate all BP companies safely, as well as BP's lack of will and discipline to do so. BP's prior violations and the penalties levied for them did not deter the behavior that led to the Macondo disaster, even as BP insisted after these four prior incidents that the company had learned its lesson.

Third, as explained in previous briefs attached hereto, consideration of the prior violations falls within the plain language of Section 311 of the CWA, where statutory factors are designed to allow the Court to "tailor" the penalty to each defendant and situation in order to properly deter future violations. Accordingly, BP's history of violations and failure to change is precisely the type of evidence the Court should consider in fashioning a penalty.

## FACTUAL BACKROUND

The Court will hear evidence of only four of BP's criminal environmental violations. The United States will not preview its entire evidence here, but in sum, the evidence BPXP seeks to exclude will show that BP entities were criminally sanctioned for safety violations at both

Endicott Island and Grangemouth.[3] Despite having claimed to have learned its lessons from those two violations, BP's Texas City refinery exploded in 2005 killing fifteen people and injuring more than 170.[4] After that explosion, BP vowed to address its safety shortfalls across the *entire company*.[5] BP admitted expressly that the explosion at the refinery occurred due to "[a] culture that evolved over the years [that] seemed to *ignore risk, tolerated noncompliance, and accepted incompetence*."[6] This incident resulted in a guilty plea admitting criminal violations of environmental law.[7]

Just the next year BP's Prudhoe Bay pipeline ruptured due to the same cultural failures; 200,000 gallons of oil leaked over the Alaskan tundra, and BP once again promised it would learn its lesson.[8] For a fourth time, a BP entity pled guilty to criminal violations.[9] In the wake of these incidents, the President of BP America, Mr. Bob Malone, told the Congress of the United

---

[3] Ex. #5 (Cantrell Report at 5-6, 8-9); Ex. #6 (TREX-22394); Ex. #7 (TREX-8069 at 4).

[4] Ex. #5 (Cantrell Report at 6); Ex. #8 (TREX-2430 at viii).

[5] Ex. #5 (Cantrell Report at 14-15); Ex. #9 (January 15, 2007 BP press release, "BP Will Implement Recommendations of Independent Safety Panel"); Ex. #10 (TREX-98, The BP Magazine (2006) at 12); Ex. #11 (TREX-6007); Ex. #12 (TREX-45409, John Mogford, Speech to the Center for Chemical Process Safety, April 24, 2006 at 1); Ex. #13 (The 2006 Prudhoe Bay Shutdown: Will Recent Regulatory Changes and BP Management Reforms Prevent Future Failures? Hearing May 16, 2007 (Serial 110-46) at 82-83, 89-91); Ex. #14 (Hearing before the Committee on Energy and Natural Resources. The BP Pipeline Failure, September 12, 2006 (S. Hrg. 109-766) at 16-17, 24-26, 87).

[6] Ex. #15 (TREX-6280 at 6-7 (emphasis added)).

[7] Ex. #16 (TREX-3819); Ex. #17 (*United States v. BP Products N. Am. Inc.*, Crim H-07-434). BP Products North America, Inc. pled guilty to a knowing violation of Section112 (r)(7) of the Clean Air Act. *Id.*

[8] Ex. #14 (Hearing September 12, 2006 at 16-17, 24-26, 87); Ex. #18 (TREX-6008); Ex. #13 (Hearing May 16, 2007 at 82, 83-84, 86-87, 89-91).

[9] Ex. #19 (TREX-22412). BP Exploration (Alaska) Inc. plead guilty to a negligent discharge of harmful quantities of oil in violation of the Clean Water Act, Section 309(c)(1). *Id.*

States he would take measures to ensure that "BP never again experiences a tragedy like Texas City."[10] BP broke these promises.

Then, in 2010, the *Deepwater Horizon* exploded, killing eleven men and releasing millions of barrels of oil into the Gulf of Mexico. The cause? Repeated instances in which BP ignored risk, tolerated non-compliance, violated BP's internal policies and practices, and repeatedly traded lower cost for more risk and less safety.[11] BP has failed time and again to keep its promises to operate safely – the core culpability issue in this case and thus a proper consideration for assessment of penalty here.

## I. BPXP'S Contentions of "Re-litigation" and "Mini-Trials" are Without Merit: Admiral Cantrell Merely Compares the Prior Incidents to the Extant Phase One Record and Findings.

*Consideration of Prior Violations Will Not Result in Re-litigation of Phase One.* BPXP argues the Court should exclude BP's prior violations because the United States will use them to "re-litigate" the causes of the Macondo blowout, specifically the Court's finding that BP had a process safety system in place that, while imperfect, was not the cause of the blowout.[12] The United States has no such intention, in fact, Admiral Cantrell's report does not include a single sentence addressing whether BP's Operating Management (process safety) System was in place

---

[10] Ex. #13 (Hearing May 16, 2007 at 82-84, 86-87, 89-91). Mr. Malone made representations that BP America was ensuring multiple changes would take place at BP's U.S. operations.

[11] *See* Phase One Findings of Facts and Conclusions of Law ("Findings" or " FOF"), Rec. Doc. 13381-1 (revised findings), ¶¶ 56-60, 64-65, 68-69, 71, 106-107, 130-133, 144, 179, 182-183, 189-196, 222-225, 230, 249, 270-280, 282, 290, 296, 297-299, 362-369, 505-514, 519-521, fn. 28, 70, 71; *see also* Ex. #20 (Cantrell Round Three Report at 6-14 [Filed Under Seal]).

[12] Rec. Doc. 13475-1, BPXP Mem. at 1-2, 4-10.

on the *Deepwater Horizon*. Nor does the United States or Admiral Cantrell intend to offer any additional evidence regarding the causes of the Macondo blowout.

Instead, Admiral Cantrell is simply comparing the prior violations to the evidence and findings from Phase One to demonstrate the pattern of conduct within the BP Group that has led to these violations. Specifically, he applies his thirty years of experience in ensuring safe and reliable operation of high-risk systems to analyze whether BP *actually used* the safety systems it had in place.[13] He confirms that BP had such systems in place at Grangemouth, Texas City, and Prudhoe Bay, but he also confirms that BP did not implement them appropriately – just as it failed to do for the Macondo well. Admiral Cantrell explains that to "implement" such a system does "not mean the issuance of policies or the declaration of intentions, but the adherence to policies and practices *during operations*."[14] The Court's Findings confirm that BP failed to comply with policies and procedures and ignored risk in drilling the Macondo well.[15]

BPXP claims that "none of the four prior incidents discussed in the Cantrell reports are remotely similar to the *Deepwater Horizon* incident."[16] The company tries to support that assertion by providing its own characterization of those prior events. At the same time, BPXP

---

[13] *See* Ex. #5 and Ex. #20. Admiral Cantrell designed and implemented many systems that ensure safe and reliable operations – including his involvement with the SUBSAFE program in the wake of the *U.S.S. Thresher* disaster, as well as work with NASA's space shuttle program after the Columbia disaster. He knows what it takes to turn an organization around in the wake of disaster – having helped accomplish such turnarounds with both the Navy and NASA. As Admiral Cantrell would testify, it was incumbent upon BP leadership, as it was with the Navy and NASA, to ensure change post-disaster. *Id.*

[14] Ex. #20 (Cantrell Round Three Report at 4, 9-14); Ex. #5 (Cantrell Report at 13-17, 25-30).

[15] Process safety systems "include components dedicated to hazard identification, risk analysis, and risk management." FOF ¶ 468.  BP clearly failed to comply when proceeding in the face of known risk and failing to comply with BP policies and procedures designed to mitigate risk. *See infra* fn. 11, *supra* pp. 8-12.

[16] Rec. Doc. 13475-1, BPXP Mem. at 2, 14.

5

chides Admiral Cantrell for citing evidence admitted in Phase One as he analyzes whether the prior incidents include features similar to the Macondo disaster. But only a comparison of the Macondo disaster to the four prior incidents will demonstrate whether they are similar (as the U.S. asserts) or not (as BP maintains). Admiral Cantrell's comparison and analysis of BP's prior violations to the Phase One Findings and the evidence *already* in the record is not "re-litigation."[17]

Given the "prior violation" text of Section 311(b), these prior incidents may well be admissible even if dissimilar to the Macondo disaster, but their probative value could be affected by the degree of similarity. The importance of assessing probative value makes comparison essential. Consider the criminal defendant who takes his chances at a bench trial and is convicted of robbing a pedestrian at the point of a knife. Under the sentencing statute triggered by this knife-aided robbery, the sentencing judge is to consider prior convictions. Our defendant has two: One for robbery of a pedestrian at the point of a gun and the other for theft from a big-box store after hours, during the security guard's off-site dinner break, and without the aid of a weapon. Even if the relevant statute tells the sentencing judge to consider both violations in setting sentence, a comparison of the features of the prior convictions to the current one may well influence the probative value the sentencing judge gives each prior conviction. The only difference here is that the nature of the similarities between Macondo and the prior incidents rests in part on technical, specialized knowledge and experience. Accordingly, this Court will be aided by Admiral Cantrell's assessment of the degree of similarity between and among Macondo

---

[17] Under the schedule set for Penalty Phase, Admiral Cantrell had to submit his first report before the Phase One ruling was available. In that report he cited to Phase One evidence, but that necessity does not suggest any re-litigation of Phase One.

and the prior incidents. And the same could be true for any expert BPXP successfully presents to speak to the degree of dissimilarity of these events.

If the Phase One record and ruling of the Court demonstrate the existence of the kinds of failures in implementation at Macondo that Admiral Cantrell identifies in examining BP's prior violations, it is hard to imagine more probative evidence for assessment of a penalty intended to secure deterrence and retribution.[18] But that comparison can be made only by hearing the evidence on the prior violations in conjunction with what the Phase One record already reveals about Macondo, ideally with the aid of expert analysis.

*Consideration of the Four Prior Criminal Violations Will Not Result in "Mini-Trials."*
BPXP's expressed fear of "mini-trials" for each prior incident is also unfounded. Each prior violation at issue rests on a guilty plea, including the agreed upon factual basis for that violation.[19] There can be no fair debate about the existence of these violations, nor their operative facts. Additionally, Admiral Cantrell has reviewed and relied on BP's own investigation reports in forming his opinion regarding the similarities among the incidents.[20] Thus, Admiral Cantrell, in limiting his review to plea agreements and BP investigative reports, limited his analysis of the prior violations to statements and facts comprising admissions by BP.

---

[18] BPXP claims that "none of the four prior incidents discussed in the Cantrell reports are remotely similar to the *Deepwater Horizon* incident," then simultaneously argues that any discussion of the similarities would be re-litigating Phase One. Rec. Doc. 13475-1, BPXP Mem. at 2, 14. Comparison and analysis of BP's prior violations to the Phase One Findings and the evidence *already* in the record is not "re-litigation," particularly where the evidence of prior violations was specifically excluded from previous phases at BP's request.

[19] Ex. #5 (Cantrell Report at 5-9); Ex. #6 (TREX-22394); Ex. #16 (TREX-3819); Ex. #17 (*United States v. BP Products N. Am. Inc.*, Crim H-07-434); Ex. #19 (TREX-22412).

[20] Ex. #5 (Cantrell Report at 1, 5-9).

7

To substantiate its claim of mini-trials, BPXP says it will call three witnesses to rebut the United States' sole witness.[21] In Phase One, three experts for BP also prepared reports to rebut the PSC process safety expert (Dr. Bea); none of the three appeared at trial.[22] But if BPXP calls these witnesses now, any concern about case management already has been addressed through "chess clock" time limits set for this phase of trial. No party has suggested that the Court's current allocation of trial time is insufficient.

## II.     The Court's Phase One Findings Confirm that the Pattern Common to these Four Prior Violations was also a Causal Factor at Macondo.

BP's violations at Endicott Island, Grangemouth, Texas City, Prudhoe Bay, and Macondo share a number of key features, beyond the pollution of the environment and the admitted, criminal, violation of law.[23] As analyzed in more detail in Admiral Cantrell's report, despite the differences among the incidents at Texas City, Prudhoe Bay, and Grangemouth all those incidents resulted from the same kinds of failures by BP. The Court's Phase One findings confirm that BP's pattern of misconduct in those first three disasters continued at Macondo. For example:

---

[21] Rec. Doc. 13475-1, BPXP Mem. at 2, 11-12.

[22] Two of these witnesses Dr. Sutcliffe and Mr. Burch provided reports in Phase One containing many of the same opinions they seek to offer in the Penalty Phase. Rec. Doc. 5317. Neither witness was called to testify at trial in Phase One. Neither expert, in forming his (or her) opinion, reviewed the events and causes leading to the blowout at the Macondo Well to address any similarities to the prior incidents. Ex. #21 (Deposition of Kathleen Sutcliffe at 20:9-23:13, 27:11-22, 100:5-104:20, 115:4-117:15, 118:8-120:20, 121:19-123:15 [Filed Under Seal]); Ex. #22 (Deposition of Morris Burch at 16:4-24, 41:1-44:2, 47:11-50:14, 55:22-57:5, 114:4-116:7 [Filed Under Seal]).

[23] The United States is not presenting evidence regarding the more than 3,000 prior civil environmental and safety violations by BP. Nor are we presenting any BP violations of the non-environmental laws, such as securities law. The evidence BPXP challenges here is limited to major criminal violations of environmental law stemming from the same kinds of failings that occurred at Macondo.

***Emphasis on Costs, Not Safety.*** Prior investigations at Texas City, Prudhoe Bay and Grangemouth all raised concerns that BP's intense focus on cost came at the price of safety.[24] Phase One demonstrated that when it comes to cost, nothing at BP had changed. The Court found a number of risky decisions at Macondo were profit-driven, including decisions to drill without a safe drilling margin, not to run a cement bond log ("CBL"), and to use lost circulation material spacer ("LCM").[25]

***Failure to Comply with Policies and Procedures.*** BP knew that creating policies and procedures is meaningless without actual implementation and enforcement of those procedures. At each incident, reports found "many areas where procedures, policies, and expected behaviors were not met."[26] At Texas City, for example, there was "a high tolerance for mavericks who acted more in the interest of expediency with little regard for operational procedures."[27] The Phase One record shows that BP repeated this pattern of deviating from safe practices in many ways. The Court found that BP failed to comply with internal practices when it did not convert

---

[24] Ex. #5 (Cantrell Report at 17-19). This was publically recognized by BP America's President in testimony to Congress after Texas City and Prudhoe Bay who stated: "It is clear that budget impacted our culture and that we stopped being curious. We asked our people to keep our operations cost competitive and safe and we failed to provide them with the systems and the skills required to recognize and mitigate all of the risks that are inherent in operating complex facilities….Budget pressures, poorly managed, can impact the culture of the organization." Ex. #13 (Hearing May 16, 2007 at 83, 86); *see also* Ex. #8 (TREX-2430 at 59-60, 82-84, 90-91); Ex. #23 (TREX-6011 at 10); Ex. #24 (TREX-277 at 3-4, 7-8, 40-41, 56, 71-72).

[25] *See* FOFs at ¶¶ 60, 65, 195, 211, 298, 299, and 519; Ex. #5 (Cantrell Report at 18-19). The Court also noted that BP's decision to use leftover cement from the Kodiak well was driven by cost, and this decision increased risk of the cement failing. FOF ¶¶ 210-211, 221-230.

[26] Ex. #20 (Cantrell Round Three Report at 9-14); Ex. #5 (Cantrell Report at 27-29); Ex. #7 (TREX-08069 at 9, 62, 64-65); Ex. #25 (TREX-6262 at ii, 81, 139, 164, 169); Ex. #24 (TREX-277 at 73); Ex. #8 (TREX-2430 at 92, 142-144, 165).

[27] Ex. #15 (TREX-6280 at 16, 19).

the float collar before running it across any hydrocarbon bearing zone,[28] did not run a bottoms-up despite internal standards requiring at least two,[29] and failed to comply with best practices for running a CBL.[30] Several of these decisions were driven by cost.

*Ignoring or Failing to Mitigate Risk.* Complacency and tolerance of major risks contributed to the incidents at Grangemouth, Texas City, Prudhoe Bay, and Macondo.[31] For example, investigators at Texas City found "a culture deeply imbued with risk taking."[32] BP brought these same failings to Macondo. The Court found that BP made numerous decisions in "isolation" and without mitigating the "associated risks," including those that should have increased the caution surrounding the negative pressure test.[33] Indeed, the Court found that numerous acts of negligence amounted to an extreme deviation from due care and a conscious disregard of known risks including: drilling the final 100 feet of the well with little or no margin, running the production casing with the float collar in unconverted mode and without a shoe filter, failing to verify whether the float collar converted by reverse circulating the well, not conducting

---

[28] *See* FOF ¶¶ 106 and 107. The Court found that "[r]unning the casing with the float collar in unconverted mode increased the risk that debris from the well would flow into and plug the reamer shoe, the float collar, or both. BP could have mitigated this risk by using a shoe filter, which is designed to filter cuttings and other debris that could possibly plug the float equipment. In fact, Weatherford's specifications stated that the M45AP float collar 'should be run with a Weatherford Mud Master filter shoe.' BP did not use any type of shoe filter." Thus, BP also failed to follow manufacturer recommendations.

[29] *See* FOF ¶¶ 192, 510, fn. 71.

[30] *See* FOF ¶¶ 183, 195, 510, 519; Ex. #20 (Cantrell Round Three Report at 9-14).

[31] Ex. #5 (Cantrell Report at 19-22, 25-27); Ex. #25 (TREX-6262 at ii, 67, 81, 139, 140-141, 167); Ex. #15 (TREX-6280 at 6-7, 10-13); Ex. #24 (TREX-277 at 7, 92-94).

[32] Ex. #15 (TREX-6280 at 7).

[33] *See* FOFs at ¶¶ 60, 65, 131-133, 192-195, 223-226, 230, 248-249, 275-277, 298, 509-510. For example, the Court pointed to the added risk a series of decisions placed on the cement job and negative pressure testing. FOF ¶ 510; Ex. #20 (Cantrell Round Three Report at 6-9).

a CBL, using LCM as a spacer for the displacement and negative pressure test, misinterpreting the negative pressure test, allowing simultaneous operations to occur during displacement, and failing to provide a displacement schedule to the Transocean drill crew.[34]

*Contractor Oversight.* After criminal violations at Endicott Island, BP promised to improve its oil and gas operations company-wide. In that incident, BP pled guilty to failing to timely report the release of hazardous substances, admitting that it exercised inadequate oversight and supervision of the Health, Safety, and Environmental functions of its contractors.[35] As part of the plea agreement, BP promised that it would implement policies and procedures to ensure its operations, including those involving contractors, would not present a threat to the environment.[36] At Macondo, BP likewise failed to properly oversee its contractors, including communicating with contractors regarding risk.[37] Indeed, throughout the MDL, BP continues to deny its responsibility for contractor oversight, blaming Transocean, Halliburton, and other contractors for BP's own risky decisions.[38]

Prior to this litigation, BP admitted to considerable similarities among these incidents and promised company-wide change to address systemic shortcomings. BP's Baker Panel found the similarities between the causes of the Grangemouth and the Texas City incidents to be

---

[34] *See* FOF ¶¶ 519-520.

[35] Ex. #6 (TREX-22394 at 9-11, 19, 21-22, 25-26). As part of the agreement, the Government agreed to forego charging criminal violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(2). *Id.* at 16.

[36] *Id.*

[37] *See* FOF ¶¶ 201-204, 221-230, 277, 368-369, 519, 551; Ex. #5 (Cantrell Report at 34-35, 67-68).

[38] *See* BP's Post-Trial Brief (Rec. Doc. 10466 at 25-43).

"striking."[39] BP America's President, Bob Malone, also acknowledged to Congress the similarities between the findings concerning the Prudhoe Bay and Texas City violations.[40] Furthermore, after the release of the Bly report, BP acknowledged similarities between the recommendations intended to address the Macondo well disaster and the ones made concerning Texas City.[41] BP leadership acknowledged the similarities in findings when comparing these incidents, and represented that it would change operations as a result.[42]

Identification of similarities between BP's course of misconduct in these prior violations and BP's performance at Macondo, as defined by the Phase One record, would be probative under any analysis of the Section 311 penalty factors and penalty assessment generally. Admiral Cantrell's reports identify exactly such similarities.

### III.     These Prior Incidents are Legally Relevant Under Several of the Statutory Factors Under 311(b)(8)

Consideration of the prior violations falls within the plain language of Section 311 of the CWA.[43] However, the parties have already thoroughly briefed the law regarding the relevance of prior violations to the statutory factors in Section 311. The United States briefed these issues in Rec. Doc. 12460, pages 14-30, and related discussions were set out in the United States'

---

[39] Ex. #5 (Cantrell Report at 3, 14); Ex. #8 (TREX-2430 at 183-184, 221-224).

[40] Ex. #13 (Hearing May 16, 2007 at 88-91); Ex. #5 (Cantrell Report 3, 14).

[41] Ex. #5 (Cantrell Report at 3, 14); Ex. #26 (TREX-45046 at 5-6).

[42] Ex. #5 (Cantrell Report at 3-4, 14-15); Ex. #13 (Hearing May 16, 2007 at 88-91); Ex. #26 (TREX-45046 at 5-6).

[43] As Judge Vance stated in her Reasons for Accepting BPXP's Plea Agreement regarding the Macondo blowout "the record shows that, although not the BP entity charged in this case, the BP family of companies has a history of deficient safety management." *See* Ex. #27 (United States v. BPXP, Criminal Action No. 12-292, Rec. Doc. 65, Reasons for Accepting Plea Agreement, at 5-6). The criminal sentencing statute provides that the court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C § 3553(a).

Memorandum in Support of its Motion in Limine to Permit Relevant Evidence Concerning BP p.l.c. and Other BP Affiliates (Rec. Doc. 12355-1). Because the Court has already received multiple briefings on these issues, we avoid repeating the same arguments and attach those briefs as exhibits. In summary those briefs demonstrate that:

- The plain language and legislative history of Section 311(b) does not exclude this type of evidence;

- The evidence at issue in this motion fits into several of the applicable statutory penalty factors (*e.g., culpability* or *other matters as justice may require)*, and is not solely limited to the "prior violations" factor;

- Operations are driven by the BP Group, through functions and business units, not by legal entities such as BPXP. Indeed, BPXP has no employees. To consider only BPXP is to create a legal fiction for the purpose of assessing a penalty which is in direct conflict with the evidence of how BP operates;[44] and

- Various lines of case law hold that it is relevant and appropriate to look at the violator's corporate family when determining a civil penalty.

## **CONCLUSION**

The United States does not seek to introduce evidence of prior violations to show what caused the Macondo blowout. That was the subject of the Phase One trial, and should not be re-litigated by any party. Rather, by comparing the evidence and the Court's Findings in Phase One with what BP itself has said or admitted about the prior criminal violations, the United States intends to show that BP has a history of deficient safety management and cost cutting, notice of those deficiencies, and the breaking of promises to cure those deficiencies. These facts are acutely relevant to the questions of deterrence and punishment under the applicable statutory

---

[44] In addition to Rec. Doc 12355-1, the United States has provided an expert report from Dr. Frederick Quivik. Ex. #4.

13

penalty factors. The expert testimony proffered here will help the Court to assess whether BP's prior violations occurred in contexts similar to or otherwise relevant to the one in which the Macondo disaster occurred. That testimony will aid the Court in assessing the probative worth of the prior violations in setting the civil penalty here. BPXP's motion should be denied in all respects.

                Respectfully submitted,

| | |
|---|---|
| JOYCE R. BRANDA | SAM HIRSCH |
| Acting Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| PETER FROST | SARAH HIMMELHOCH |
| Director, Torts Branch, Civil Division | Senior Litigation Counsel |
| Admiralty and Aviation | NANCY FLICKINGER |
| STEPHEN G. FLYNN | Senior Attorney |
| Assistant Director | RICHARD GLADSTEIN |
| SHARON SHUTLER | PATRICK CASEY |
| MALINDA LAWRENCE | Senior Counsel |
| LAURA MAYBERRY | A. NATHANIEL CHAKERES |
| Trial Attorneys | JUDY HARVEY |
| | RACHEL KING |
| | ERICA PENCAK |
| R. MICHAEL UNDERHILL, T.A. | ABIGAIL ANDRE |
| Attorney in Charge, West Coast Office | RACHEL HANKEY |
| Torts Branch, Civil Division | BRANDON ROBERS |
| U.S. Department of Justice | Trial Attorneys |

                /s/ Steven O'Rourke
                STEVEN O'ROURKE
                Senior Attorney
                Environmental Enforcement Section
                U.S. Department of Justice
                P.O. Box 7611
                Washington, D.C. 20044
                Telephone:  202-514-2779
                Facsimile:   202-514-2583
                E-mail:  steve.o'rourke@usdoj.gov

                    KENNETH A. POLITE, JR.
                    United States Attorney
                    Eastern District of Louisiana
                    SHARON D. SMITH
                    Assistant United States Attorney
                    Eastern District of Louisiana
                    650 Poydras Street, Suite 1600
                    New Orleans, LA 70130
                    Telephone: (504) 680-3000
                    Facsimile: (504) 680-3184
                    E-mail: sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  November 10, 2014.　　　　　　　　　/s/  Steven O'Rourke

　　　　　　　　　　　　　　　　　　　　　　U.S. Department of Justice