# EXHIBIT 1

**UNITED STATES' OPPOSITION TO:**

**BPXP'S MOTION TO STRIKE THE EXPERT REPORTS OF WALTER H. CANTRELL AND RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO PRIOR INCIDENTS (Rec. Doc. 13475)**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : | MDL No. 2179 |
| | : | SECTION: J |
| | : | |
| | : | JUDGE BARBIER |
| This Document Relates to: 10-4536 | : | MAG. JUDGE SHUSHAN |
| ………………………………………….. | : | |

**<u>CLEAN WATER ACT – PENALTY PHASE</u>**

**UNITED STATES' OPPOSITION TO BPXP'S MOTION IN LIMINE TO EXCLUDE (1) ADDITIONAL EVIDENCE OF CULPABILITY AND (2) EVIDENCE RELATING TO PRIOR INCIDENTS**

## Table of Contents

Table of Authorities .................................................................................................. ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.  Penalty Considerations Should be Driven by their Primary Purpose of Deterrence ................ 2

    A.  The Court in Assessing a Penalty Should Consider BP's Long History of Promising (and Failing) to Change ......................................................................................... 3

    B.  BP's Prior Violations Reflect a Pattern of Failures in BP's Management Practices ........ 6

        1.  BP's Own Investigations Demonstrate the Similarity Between Prior Violations and the Deepwater Horizon Disaster ................................................................ 7

        2.  BP Failed to Provide Proper Oversight Over its Contractors and Manage Risk as Required in its Criminal Plea Arising from the Endicott Island Incident ............... 11

        3.  BP Understood Failure to Change Meant a Greater Risk of Disaster ......................... 13

II.  Prior Violations are Relevant to Several of the Statutory Factors Under 311(b)(8) .............. 14

    A.  Under the "Prior Violations" Factor, Incidents that Resulted from Similar Management and Process Safety Failures are Relevant and Should Be Considered ......................... 14

    B.  Prior Violations" Is Not Limited to Solely Section 311 Violations Committed by BPXP .............................................................................................................. 15

        1.  The Term "Violations" is Not Limited to Section 311 Violations ......................... 15

        2.  The CITGO Case Provides Guidance on the "Any History of Prior Violations" Factor Under  Section 311(b)(8) ........................................... 18

        3.  Violations of BP p.l.c. and its Affiliates, not only BPXP, Should Be Considered .. 21

    C.  Consideration of Other Incidents under "Culpability" Factors Is Appropriate ............. 23

    D.  Consideration of Other Incidents Under "Other Matters" is  Appropriate. ................... 27

III.  BPXP'S Contentions of Undue Delay, Waste of Time or Cumulative Evidence are Unsupported. ................................................................................................. 28

CONCLUSION .......................................................................................................... 30

*Table of Authorities*

**Cases**

Atlantic States Legal Found. Inc. v. Universal Tool & Stamping Co., 786 F. Supp. 743
 (N.D. Ind. 1992) .................................................................................................... 20

Coates v. A C and S, Inc., No. 90-1448, 1994 WL 34048 (E.D. La. Jan. 26, 1994) ................... 29

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102 (1980) ........................... 16

Dartez v. Fibreboard Corp.,  765 F.2d 456 (5th Cir. 1985) ......................................................... 29

Dole v. Williams Enters, Inc., 876 F. 2d 186 (D.C. Cir. 1989) .................................................... 28

First Nat. Bank of Louisville v. Lustig, Nos. 87-5488, 88-1682, 1993 WL 411176
 (E.D. La. Oct. 7, 1993) .......................................................................................... 29

Herrington v. Hiller, 883 F.2d 411 (5th Cir. 1989) ...................................................................... 29

In re: Chicago Flood Litig., 93 C 1214, 1995 WL 437501 (N.D. Ill. July 21, 1995) ................... 26

In the Matter of Ketchikan Pulp Co., No. CWA-1089-12-22-309(g), 1995 WL 814171
 (Nov. 22, 1995) ...................................................................................................... 20

Louisiana Envtl. Action Network v. LWC Mgmt. Co., Inc., No. 07-0595,
 2008 WL 687190 (W.D. La. Mar. 10, 2008) .......................................................... 28

New York v. EPA, 443 F. 3d 880 (D.C. Cir. 2006) ...................................................................... 17

PIRG v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158 (D.N.J. 1989), rev'd on other
 grounds, 913 F.2d 64 (3d Cir. 1990) ...................................................................... 20

Russello v. United States, 464 U.S. 16 (1983) ............................................................................. 16

Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London, 587 F.3d 714
 (5th Cir. 2009) ....................................................................................................... 16

Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546 (5th Cir. 1996) ........... 27

Sierra Club v. El Paso Gold Mines, Inc., No. 01 PC 2163 OES, 2003 WL 25265873
 (D. Colo. Feb. 10, 2003) ........................................................................................ 20

Tull v. United States, 481 U.S. 412 (1987) ............................................................ 1, 27

Uniroyal Chem. Co., Inc. v. Deltech Corp., 160 F.3d 238 (5th Cir. 1998) ................................. 16

United States v. Allegheny Ludlum, 187 F. Supp. 2d 426 (W.D. Pa. 2002), rev'd on other
    grounds, 366 F.3d 164 (3d Cir. 2004) ...................................................................... 20

United States v. Citgo Petroleum Corp., No. 2:08-cv-0893, 2011 WL 10723934 (W.D. La.
    Sept. 29, 2011), vacated and remanded, 723 F.3d 547 (5th Cir. 2013) .............................. passim

United States v. Egan Marine Corp., No. 08 C 3160, 2011 WL 8144393
    (N.D. Ill. Oct. 13, 2011) ....................................................................................... 20

United States v. Gonzales, 520 U.S. 1 (1997) ............................................................... 17

United States v. Gulf Park Water Co., Inc., 14 F. Supp. 2d 854 (S.D. Miss. 1998) .................... 20

United States v. Hanousek, 176 F.3d 1116 (9th Cir. 1999) ................................................. 16

United States v. Holmes, 607 F.3d 332 (3rd Cir. 2010) ..................................................... 28

United States v. Jeffrey Pruett, Crim. No. 09-00112, 2011 WL 159925
    (W.D. La. Jan. 12, 2011) ...................................................................................... 26

United States v. Municipal Auth. of Union Township, 150 F. 3d 259 (3rd Cir. 1998) ................ 23

United States v. Pruett, 681 F. 3d 232 (5th Cir. 2012) ..................................................... 16

**Statutes**

OPA, Pub. L. No. 101-380, § 4301(b)(7)(A), 104 Stat. 484 (1990) ...................................... 18

18 U.S.C. § 3553(a) ............................................................................................ 14

30 U.S.C. § 1268(a) ............................................................................................ 18

33 U.S.C. § 1319(c)(1) .......................................................................................... 6

33 U.S.C. § 1319(d) ......................................................................................... 20, 23

33 U.S.C. § 1321(b)(3) .................................................................................. 6, 18, 20

33 U.S.C. § 1321(b)(7) ........................................................................................ 16

33 U.S.C. § 1321(b)(7)(D) ..................................................................................... 25

33 U.S.C. § 1321(b)(8) .................................................................................. passim

42 U.S.C. § 300h-2(c)(4)(B) ................................................................................. 18

42 U.S.C. § 6901 ....................................................................................................... 19

42 U.S.C. § 7413(c)(1) ............................................................................................... 6

42 U.S.C. § 7524(b) ................................................................................................... 18

42 U.S.C. § 9603(a) ..................................................................................................... 6

## Federal Rules

40 C.F.R. § 19.4 ......................................................................................................... 25

## Federal Regulations

Fed. R. Evid. 403 ............................................................................................ 2, 29, 30

Fed. R. Evid. 404(b) ........................................................................................... 15, 25

Fed. R. Civ. P. 26 ..................................................................................................... 29

## Other Authorities

22A Fed. Prac. & Proc. Evid. § 5220 ..................................................................... 26

Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the CWA, EPA Office of
    Enforcement and Compliance Assurance, Aug. 1998 ................................................ 21

## **INTRODUCTION**

BP Exploration and Production, Inc. ("BPXP") seeks to preclude from the Court's consideration of the appropriate penalty under Clean Water Act ("CWA") Section 311(b) any (1) additional evidence regarding BPXP's culpability; and (2) evidence concerning the BP Group's[1] ("BP") prior history of violations. The Court should deny BPXP's motion *in limine* as contrary to the mandate of the CWA or, at a minimum, as premature. BP's prior violations are highly probative and relevant to the penalty calculation, as Congress "wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." *See* Tull v. United States, 481 U.S. 412, 422 (1987). Further, this Court already has indicated that BP's history of prior violations may be relevant and admissible during the penalty phase of these proceedings.[2] Deterrence cannot be achieved without proper consideration of BP's history of prior violations and failure to change its practices. BPXP asserts too narrow a reading of the penalty factors under CWA 311(b)(8). In doing so, BPXP ignores case law and statutory construction principles that militate against its narrow reading of the penalty factors.

BPXP's concern about "mini trials" threatening the management of proceedings is speculative and unsupported. No witnesses have been identified, nor discovery taken that support such a suggestion. Case management concerns can be addressed in a far less drastic way than precluding presentation of highly probative evidence. The United States could ask the

---

[1] BP refers to the "BP Group," including BP p.l.c. and its subsidiaries. Where multiple BP entities are referenced "BP" is also used. *See* Ex. #1 (TREX-6033, BP Annual Report for 2010, at 3). The United States incorporates herein the facts presented and arguments made in its Memorandum in Support of its Motion to Allow Relevant Evidence Concerning BP p.l.c. and Other BP Affiliates ("U.S. MIL on Affiliates") (Doc. Rec. 12355-1).

[2] Order and Reasons Regarding Motions *in Limine* to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil or Regulatory Proceedings, Rec. Doc. 5635 at 4-5.

Court to consider the more than 2,700 prior environmental and safety violations and incidents committed by BP.[3]  However, the United States will not seek to introduce such evidence at trial. Instead, the United States plans to make a very streamlined presentation that asks the Court to consider no more than ten the other major environmental violations in BP's recent past that resulted from the same basic process safety and management failures that caused the Macondo disaster.  Such violations are relevant to BP's history of violations and to its culpability, or to other matters that justice demands the Court consider.  The United States may also present an analysis of incidents involving BPXP's drilling practices in the Gulf of Mexico, which are relevant to BP's culpability or to "other matters."  In total, the United States may present evidence concerning not more than ten environmental violations and drilling incidents. Therefore, BPXP's motion should be denied as without merit.  In the alternative, BPXP's motion is premature.  The "weighing" process required by Fed. R. Evid. 403 for undue delay, waste of time, or cumulative evidence cannot be accomplished until that evidence is before the Court.

## ARGUMENT

**I.** **Penalty Considerations Should be Driven by their Primary Purposes of Deterrence and Retribution**

As set forth in the United States *Motion in Limine* to Permit Relevant Evidence Concerning BP P.L.C. and Other BP Affiliates ("U.S. MIL on Affiliates"), and previously

---

[3]These more than 2,700 prior environmental and safety violations and incidents include notices of violation, incidents of non-compliance, administrative penalties, citations, and consent decrees issued by the EPA, Department of Interior, Occupational Safety and Health Administration, Coast Guard, and other federal, state, and international agencies to various BP entities including BPXP, BP Products North America, Inc., BP America Production Company, and BP Exploration Alaska, Inc.

explained by this Court, the primary purpose of civil penalties is deterrence and retribution necessitating that each penalty be tailored to the specific defendant and situation.  (Rec. Doc 12355 at 11-12; Order and Reasons. Doc. 5446 at 19-22).

There is little doubt that BPXP will ask the Court to find that BPXP has paid enough, understands the seriousness of what occurred, has learned its lesson, and that there is no further need for deterrence.[4]  These statements should not be heard in a vacuum.  The fact that BP has made the same assurances and promises after previous violations is highly probative of BP's credibility, and for assessing a sufficient penalty to deter future catastrophes.  BPXP also suggests that the Court should consider its presence and role in the local economy and community.  (Rec. Doc. 12340 at 14).  However, the Court should not ignore that BP's continued presence and participation has been allowed based on its assurances to regulators that it would address the safety shortfalls identified in prior violations at all of its operations.

In the wake of Texas City and Prudhoe Bay, Bob Malone, Chairman and President of BP America, Inc. ("BP America") – the parent company of BPXP and all BP subsidiaries operating in the U.S. - asked Congress "that we be measured by what we do, not what we say."[5] That is precisely the exercise the Court should undertake as part of an appropriate penalty analysis.

**A.**      **The Court in Assessing a Penalty Should Consider BP's Long History of Promising (and Failing) to Change**

The BP Group has a long history of promising to change after both criminal and civil violations of law.  The Court has heard extensive evidence of the failures in safety and management practices that led to the Deepwater Horizon explosion and blowout. What the Court

---

[4] Indeed, BPXP made identical claims to Judge Vance stating "BP has learned from the Deepwater Horizon blowout and spill, and it has acted upon the lessons learned." Ex. #2 (Joint Memorandum at 41).

[5] Ex. #3 (May 16, 2007, Hearing before the House Committee on Energy and Natural Resources at 93).

has not heard is that these practices are part of a corporate-wide pattern of conduct that BP has repeatedly vowed, and then failed to address. While BPXP claims in its motion that prior violations and incidents bear no similarity or relevance to the Deepwater Horizon incident, this is directly contrary to the position it took before this disaster occurred both internally, to the public, and to governing authorities. After the catastrophic explosion at the Texas City refinery on March 23, 2005, which killed 15 people and injured more than 170, BP vowed to address its safety shortfalls and implement them across the *entire company*.[6] BP admitted that not only was the Texas City explosion preventable, it was a process safety failure, a cultural failure, and a management failure.[7] The next year, when a poorly maintained Prudhoe Bay pipeline ruptured, causing 200,000 gallons of oil to leak over the Alaska tundra due to the same failures, BP once again promised it would learn its lesson.[8] In the wake of these incidents, Mr. Malone told Congress he would implement measures to ensure that "BP never again experiences a tragedy like Texas City,". . . "We have learned the lessons of the past."[9] BP made the same representations to EPA's Office of Grants and Debarment, assuring that the Company as a whole would address its process safety, integrity, and risk management across *all U.*S. operations, not just in the specific incidents at issue.[10] Years earlier, as part of a criminal plea and Compliance

---

[6] Ex. #4 (January 15, 2007 BP press release, "BP Will Implement Recommendations of Independent Safety Panel"); Ex. #5 (TREX 2430 Baker Panel at viii); Ex. #6 (TREX 98, The BP Magazine (2006) at 12); Ex. #7 (TREX 6007).

[7] Ex #8 (TREX-45409, John Mogford, Speech to the Center for Chemical Process Safety, April 24, 2006 at 1).

[8] Ex. #9 (September 12, 2006, Hearing before the Committee on Energy and Natural Resources, United States Senate at 25, 87).

[9] Ex. #3 (May 16, 2007 Testimony at 82, 83-84, 86-87, 89-91). Mr. Malone made representations that BP America was ensuring multiple changes would take place at BP's U.S. Operations.

[10] Ex. #10 (2009 Debarment presentation at 2, 3).

Agreement with EPA's debarment office, BP had made all the same assurances for *all* of its oil exploration, drilling and production operations, to no apparent consequence.[11]

The record demonstrates that BP failed to fulfill these promises. In 2010, the *Deepwater Horizon* exploded, killing eleven men and releasing millions of barrels of oil. The cause – the same process safety, cultural, and management failures cited in previous violations. Indeed, the very same promises that were made after Texas City are being made after the Deepwater Horizon disaster. Once again, BP has promised to embed the lessons from the *Deepwater Horizon* across BP worldwide.[12] BP has even promised to set up a new safety organization as a result of the *Deepwater Horizon* incident, however, it said it would do the same after Texas City.[13] As part of its contention that criminal penalties were reasonable, BPXP argued that it had improved its contractor management and oversight programs after the Deepwater Horizon.[14] However, as explained below, BP had already committed to make these improvements to its drilling activities as part of a criminal plea in 2000. Indeed, BP's poor safety history and the pattern in its prior incidents and violations has been documented by many sources.[15] The CWA civil penalty for the Macondo oil spill should be set to end this pattern.

BPXP asks the Court to ignore this pattern of failures because the violators were other BP affiliated entities. However, BP America told Congress and EPA that it would ensure changes

---

[11] Ex. #11 (Endicott Compliance Agreement); Ex. #12 (TREX-22394, Endicott Plea Agreement).

[12] Ex. #13 (A Safer, Stronger BP: Our Quest to Earn Back America's Trust, Speech by Bob Dudley, January 12, 2012 at 2).

[13] *Id.*; Ex. #8 (TREX-45409, April 24, 2006, John Mogford at 5).

[14] Ex. #2 (Joint Memorandum in Support of Proposed Guilty Plea by BPXP at 43-44).

[15] *See e.g.,* Ex. #14 (TREX 6026 at 3-4,7-8, 65-72 (Failure to Learn)); Ex. #15 (Guy Chazan, BP's Safety Drive Faces Rough Road, WSJ, February 1, 2011); Ex. #16 (Sarah Lyall, In BP's Record, a History of Boldness and Costly Blunders, NYT, July 12, 2010); Ex. #17 (Abrahm Lustgarten and Ryan Knutson, Reports at BP Over Years Find History of Problems, WP, June 8, 2010).

took place at all U.S. operations. This demonstrates that safety and risk management practices were driven by BPXP's parent companies - the same parent companies driving practices at Endicott, Texas City, and Prudhoe Bay. If prior violations can be excluded solely because they relate to entities other than BPXP, then BP's assurances to Congress and EPA have been empty promises. BP has asked this Court to consider its plans taken as a direct result of the prior violations. Thus, the Court, in assessing a penalty, should consider the facts regarding the events that led to these plans and whether BP's actions addressed the known risks.[16]

**B.**     <u>**BP's Prior Violations Reflect a Pattern of Failures in BP's Management Practices**</u>

Like Texas City, the Macondo incident was preventable. One BP executive recognized that if BP's practices did not change, it would have another Texas City sized event every 10-15 years; it was closer to five years.[17] Just a glance at BP's prior environmental crimes reflects a repeat pattern of failure to address noncompliance:

- In 2000, BP Exploration Alaska Inc. ("BPXA") pled guilty to a violation of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603(a), regarding the release of hazardous substances ("Endicott plea"). As part of this agreement, BP agreed it would identify and manage all environmental risk and implement procedures ensuring that the environmental performance of its contractors was adequately supervised at all BP facilities engaged in exploration, drilling and/or production of oil (including explicitly drilling in the Gulf of Mexico).[18]

- Five years later, on March 23, 2005, and only months after its probationary period ended under its Endicott plea, the explosion at Texas City occurred. BP Products North America

---

[16] After Grangemouth, Alaska, and Texas City, BP p.l.c. instituted its Six-Point Plan and Operations Management System ("OMS"), which BP has asked the Court to consider as improving process safety in GOM Drillings and Completions. Ex. #18 (Hayward Deposition at 145:8-10, 208:16-23); Ex. #19 (Armstrong 49:13-50:12).

[17] Ex. #6 (TREX 98 at 15).

[18] Even though BPXA was the defendant, the agreement pertained to all BP operations, not just BPXA. Ex. #12 (TREX-22394, Endicott Plea Agreement at 9-10). BP America Inc. and BP Amoco Corp. guaranteed the performance of both BP Exploration (Alaska) Inc. and BP Exploration and Oil. *Id.* at 10-11.

Inc. ("BPPNA") pled guilty in 2007 to a felony for knowing violations of the Clean Air Act, 42 U.S.C. § 7413(c)(1).

- One year later, BP's Prudhoe Bay pipeline in Alaska leaked 200,000 gallons of oil onto the Alaska tundra (the largest spill on the tundra to date) leading to a 2007 guilty plea by BPXA for violation of 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) of the Clean Water Act for the negligent discharge of oil.[19]  This is the same statute to which BPXP pled guilty for the Macondo spill.

- On April 20, 2010, the Macondo well explosion and blowout occurred, five years after the Texas City explosion occurred, which in turn had followed Endicott by almost exactly five years.

BP's own internal documents demonstrate that it understood the lessons from Texas City and other environmental incidents needed to be applied across the entire company, including drilling operations in the Gulf of Mexico.[20]  BP understood that the lessons from the environmental violations like those at Texas City are transferrable to all BP operations and facilities.[21]

1. **BP's Own Investigations Demonstrate the Similarity Between Prior Violations and the Deepwater Horizon Disaster**

According to BP's own policy, the central purpose of incident investigations is to "facilitate the sharing of investigation findings to prevent or reduce the risk of future incidents."[22]  Yet, BP's implementation of prior lessons has been woefully deficient.[23]  Indeed,

---

[19] Ex. #20 (TREX 3819 Plea Agreement, 4:07-cr-434); Ex. #21 (TREX-6008, Criminal Information 3:07-cr-00125); Ex. #22 (TREX-22412, Prudhoe Bay Plea Agreement, 3:07-cr-00125-TMB (Document 6)).

[20] *see e.g* Ex. #23 (TREX 4148 at 1-10); Ex. #24 (BP Group Process Safety Fundamentals 2009 BP-HZN-2179MDL04773889 at 1, 4-6, 8); Ex. #25 (Process Safety, Fargie 2007 at BP-HZN-2179MDL04736453-77). BP explained "the lessons that can be learned from them are very relevant." Ex. #26 (BP-HZN-2179MDL04680897-1061, at 0898).

[21] Indeed, on April 20, 2010, Wells Manager Dave Rich was attending a course based on Texas City and the Baker report, because as he explained "the concepts are transferable." Ex. #27 (Rich Depo. 36:23-40:24); see also Ex. #28 (Dupree Depo. 298:15-301:24); Ex. #29 (Lacy Depo. 332:16-333:21, 811:12-813:3); Ex. #30 (Lynch Depo. 815:2-818:1, 822:24-824:15).

[22] Ex. #31 (TREX 1742 at 4).

7

BP's own reports acknowledge its failure to implement lessons from prior investigations.  BP's report regarding the Texas City explosion noted that its findings were strikingly similar to those that had been made five years earlier at a BP petrochemical complex in Grangemouth, Scotland, but BP had never applied the lessons from Grangemouth at Texas City.[24]

Despite their differences in operations, BP's own statements and expert testimony will show that the Texas City, Prudhoe Bay, and Grangemouth disasters all resulted from the same flaws in BP's management system.  BP investigations revealed that in each incident, BP failed to (1) prevent cost pressures from impacting safety; (2) ensure compliance with policies and procedures; (3) undertake required audits, and verify and close their findings; (4) ensure clear accountabilities; (5) appreciate major hazards and risks;[25] (6) properly supervise contractors; (7) emphasize process safety not just personal safety;[26] (8) use appropriate leading process safety indicators; [27] and (8) incorporate lessons learned.  Each of these factors also were flaws at Macondo.  A few examples are discussed below to demonstrate how these incidents reflect systematic failures in the policies and practices of the BP Group.

---

[23] Even after the explosion at Texas City, BP paid a $50 million dollar penalty for violations, including more than 400 considered willful, of its civil settlement agreement with OSHA. Ex. #32 (TREX 6028).

[24] The Baker report stated that "the Panel considers the similarities between the 'lessons' from Grangemouth and the Texas City incident to be striking."  Ex. #5 (TREX 2430, Baker Panel at 183, 222; Ex. #33 (TREX-06280, Bonse at 7).  Grangemouth had experienced a series of major incidents in several months including a fire.  Ex. #34 (TREX 6011).

[25]See infra footnote 50.

[26] Ex. #5 (2430, Baker at 21, 90, 165, 193); Ex. #34 (TREX 6011 at 10); Ex. #35 (TREX 277 at 39,  80).

[27] Ex. #5 (2430, Baker at 185, 193-194); Ex #34 (TREX 6011 at 14); Ex. #36 (TREX 6262 at 144); Ex. #35 (TREX 277 at 7).

***Emphasis on Costs, Not Safety.*** Prior investigations at Texas City, Prudhoe Bay and
Grangemouth all raised concerns that BP's intense focus on cost came at the price of safety.[28]
The Phase I trial demonstrated that when it comes to cost, nothing at BP had changed. In 2007
the President of BP America testified to Congress, "[i]t is clear that budget impacted our culture .
. . We asked our people to keep our operations cost competitive and safe and we failed to provide
them with the systems and the skills required to recognize and mitigate all of the risks that are
inherent in operating complex facilities."[29] However, just months after BP's testimony, Tony
Hayward began an agenda to "change the company culture" with respect to cost, believing the oil
group was "overcautious" and that "assurance is killing us."[30] In 2009, E&P was asked to
produce $7 billion for dividends to BP p.l.c., leading a former senior manager to admit that while
"not explicitly" asked to compromise safety for costs, there was "tremendous pressure" to do
so.[31] Just as cost pressures compromised safety at prior incidents, "BP engaged in a pattern of
conduct . . . whereby it repeatedly prioritized cost and time ahead of safety concerns . . . [which]
rendered the Macondo well a high-risk and dangerous well."[32]

***Failure to Ensure Compliance with Policies and Procedures.*** BP knew that creating
policies and procedures is meaningless without actual implementation and enforcement of those

---

[28] Ex. #5 (TREX 2430, Baker Panel at 59, 82-83); Ex. #34 (TREX 6011 at 9 (Grangemouth found "HSE
was unofficially sacrificed to cost reductions, and cost pressures inhibiting staff from asking the right
questions; eventually staff stopped asking."); Ex. #35 (TREX 277 at 7-8, 40-41, 71-72). At Texas City,
one investigation revealed that "production and budget compliance" got "recognized and rewarded
before anything else at Texas City." Ex. #37 (TREX 020360 at p. 6).

[29] Ex. #3 (May 16, 2007 Testimony at 83-84).

[30] Ex. #18 (Hayward Depo. 108:9-109:14).

[31] Ex. #29 (K. Lacy Depo. 711:4-7, 773:22-774:13, 795:6-796:5). BPXP was under pressure to raise
these dollars by driving efficiency. Ex. #19 (Armstrong Depo. 319:13-321:20, ); Ex. #38 (TREX 3877).

[32] Ex. #39 (TREX 8141, Beck Rebuttal Report at 6-7, 13-15); see also, Ex. #40 (TREX-20001, Bea
Report at viii, xx, 25, 55, 59-60, 63-65).

procedures. After the Texas City explosion, BP's investigation report, similar to the Bly Report in this case, found "many areas where procedures, policies, and expected behaviors were not met." Further, consequences for non-compliance were not imposed.[33] BP's report found that audits had not been performed to determine if procedures were followed. The report concluded that in the future, BP must verify and audit to ensure procedures are followed.[34] The Baker Commission, tasked by BP to further evaluate process safety after the Texas City disaster, echoed these conclusions.[35] It is noteworthy that failure to have a comprehensive audit practice had been identified five years earlier at Grangemouth, and was identified later at Prudhoe Bay.[36]

Nonetheless, despite clear failures and recommendations from these previous incidents, BP did not audit[37] the Macondo drilling team for compliance with policies and procedures.[38] It is not surprising then, that as with Texas City, the Phase I record shows that the Macondo wells team deviated from safe practices in many ways,[39] including multiple failures to assess risk as

---

[33] Ex. #36 (TREX 6262 at ii, 164). BP's investigation report was prepared by John Mogford, BP's Senior Group Vice President for Safety and Operations. See also Ex. #33 (TREX-06280, Bonse at 19).

[34] Ex. #36 (TREX 6262 at 168–169). Including physical verification of the work activity. *Id.* at 173.

[35] Ex. #5 (TREX 2430, Baker at xiv-xv, 143, 210).

[36] Ex. #34 (TREX 6011 at 10, 14); Ex. #35 (TREX 277 at 14-15, 77, 95).

[37] Even for the audits that were conducted on the Deepwater Horizon, there was inadequate closure and verification of audit findings and actions. See e.g. Ex. #41 (TREX 1, Bly at 184). The same issues were raised at Grangemouth, Texas City and Prudhoe Bay. Ex. #34 (TREX 6011 at 10); Ex. #36 (TREX 6262 at 139); Ex. #42 (TREX 3405 at 2); Ex. #35 (TREX 277 at 7).

[38] Ex. #40 (TREX 20001, Bea at xxiii, 27, 39-40, 49, 74).

[39] For example, the phase I record demonstrates the following failings: (1) prepare a well control bridging document, Ex. #41 (TREX 1, Bly at 79); Ex. #43 (TREX 93, DWOP at B-10); (2) comply with Engineering Technical Practice (ETP), GP 10-60 requiring the top of cement be determined by a "proven cement evaluation technique" Ex. #41 (TREX 1, Bly at 66); (3) review strength development tests for the cement slurry and discuss wait on cement time with its contractor; Ex. #44 (Benge 2274:6-2278:7); Ex. #45 (Kellingray Depo. 359:4-360:6, 362:25-363:8); and (4) update the risk register as required by Beyond the Best. Ex. #40 (TREX 20001, Bea at xvii, 56).

part of a Management of Change ("MOC") process.[40]  Five years earlier, the Texas City

investigation identified the same failures; MOC compliance was at best minimal and at worst

ignored.  Similar problems were identified at Prudhoe Bay, despite the incident involving a

different subsidiary, demonstrating a company-wide problem at BP.[41]

     ***Failure to Ensure Clear Accountabilities.***  The lack of clear accountability is another

causal factor for which BP prior incidents bear striking resemblance.  BP's investigation at Texas

City, for example, concluded that the "many changes in a complex organization had led to a lack

of clear accountabilities and poor communication."[42]  Similarly, BP allowed the Macondo well

team to continue to drill despite the team having described its actions as "paranoia," "chaos,"

"insanity," and "flying by the seat of our pants."[43]  The lack of clear accountabilities was made

explicit by the wells team leader: "What is my authority? . . .  I do not know what I can and can't

do. The operation is not going to succeed if we continue in this manner." *Id*.

     2.     **<u>BP Failed to Provide Proper Oversight Over its Contractors and Manage
Risk as Required in its Criminal Plea Arising from the Endicott Island
Incident</u>**

---

[40] BP's drilling policy requires that deviations from its practices or any significant changes to the well program be documented and approved in a formal MOC. Ex. #43 (TREX 00093 at A-11).  BP failed to perform MOC (and the associated risk assessment) prior to reducing the number of centralizers, replacing Well Site Leader Sepulvedo with Kaluza, when making changes to the temporary abandonment procedures, and when deciding not to run a full bottoms up.  Ex. #41 (TREX 1, Bly at 64-65, 78); Ex. #40 (TREX 20001, Bea at 57-58, 70); Ex. #43 (TREX 00093 at A-8); Ex. #46 (TREX 06291 at 5); Ex. #47 (Beck 7089:18-22), The Bly report concludes that BP needs to review and assess the consistency, rigor, and effectiveness of the current risk management and MOC processes practiced by Drillings and Completions. Ex. #41 (TREX 1 at 183).

[41] Ex. #36 (TREX 6262 at 164-65); Ex. #35 (TREX 277 at 80-81).

[42] Ex. #36 (TREX 6262 at ii.) BP found that responsibilities throughout BP's refining organization were "muddled." Ex. #5 (TREX 2430 at 91-92); Ex. #33 (TREX 6280 at 6).

[43] Ex. #48 (TREX 1144).

BP has argued it bears no responsibility for the actions taken by Halliburton and Transocean at the Macondo well.[44]  This contention squarely contradicts representations made by BP in a criminal plea years earlier.  More than 10 years prior to the Deepwater Horizon explosion, BPXA, another BP America subsidiary, admitted in a guilty plea it had "exercised inadequate oversight and supervision of the Health, Safety and Environmental (HSE) functions" of its contractors.[45]  This violation took place at a drilling rig operated by a contractor offshore in Alaska (Endicott Island), similar to the situation at Macondo where the *Deepwater Horizon* was operated by Transocean.[46]  As part of its Endicott criminal plea, BP agreed it would implement procedures ensuring that the environmental performance of its contractors was adequately supervised at *all BP facilities engaged in exploration drilling and/or production of oil,* including specifically operations in the Gulf of Mexico.[47]  Further, BP agreed to ensure that (1) all company operations, including contractors', would not present risks to the environment; (2) all environmental risk and related operational risk would be identified, managed and avoided; (3) all environmental laws would be adhered to; (4) appropriate policies and procedures would be in place; and (5) that quality assurance would be performed through audits.[48]  BP did not comply with these requirements while drilling the Macondo Well, as multiple instances of failing to

---

[44] Post-Trial Brief of BP Defendants, Document 10466, at 16-20, 31-45.

[45] Ex. #12 (TREX-22394, Endicott Plea Agreement at 25-26).

[46] Ex. #12 (TREX-22394, Endicott Plea Agreement at 21-22).

[47] Ex. #12 (TREX-22394, Endicott Plea Agreement at 9-11). This explicitly included the Gulf of Mexico.

[48] Ex. #12 (TREX-22394, Endicott Plea Agreement at 19).

properly identify, manage, and avoid environmental and related operational risks were established in Phase I.[49]

Despite clear knowledge that disaster could occur without adequate supervision and oversight of contractor operations, BP now disclaims any responsibility for its Macondo contractors' actions. Well control is the biggest environmental concern in drilling a well.[50] Yet BP failed to supervise and manage the risks to well control created by its contractors from both the cement job and well monitoring.[51]

### 3. **BP Understood Failure to Change Meant a Greater Risk of Disaster**

BP testified that "we did realize that it could happen to us… we could have a -- a major incident along the lines of Texas City. It could happen inside of exploration and production."[52] What BPXP, an exploration and production business unit, seeks to exclude from penalty consideration is evidence showing that BP understood the potential for the Macondo disaster, but failed to do what was needed to prevent it.

---

[49] The record shows no formal risk assessments were performed for a number of decisions which increased the risk of a blowout, including using leftover cement, foamed cement, limiting volume and circulation, the number of centralizers, lcm as spacer, displacing the riser without a cement plug, and performing simultaneous operations during displacement. Ex. #44 (Benge 2244:16-2245:12, 2254:17-2256:4); Ex. #47 (Beck 7182:14-7183:21; 7203:3-17); Ex. #49 (TREX-05990, Benge Report at 2, 9, 11, 13-16, 19-22, 30, 37). The entire risk analysis for the Macondo well only evaluated the impacts to cost and schedule, and never evaluated risk to safety and the environment. Ex. #40 (TREX-20001, Bea at xvi, 56).

[50] Ex. #50 (O'Bryan at 9241); Ex. #51 (TREX 4171).

[51] Ex. #41 (TREX 1, Bly at 77, BP admitted "the BP Macondo well team did not provide effective quality assurance on Halliburton's technical services*"); see e.g. Id.* at 182-187. BP also failed to ensure through a well control bridging document that Transocean's well control and well monitoring procedures were well defined and followed. Ex. #41 (Bly at 79, 185); Ex. #43 (TREX 93, DWOP 15.2.17 at B-10).

[52] Ex. #19 (Armstong Depo. 398:14-24); Ex. #6 (TREX 98 at 14).

## II.    Prior Violations are Relevant to Several of the Statutory Factors Under 311(b)(8)

The cramped reading of the statutory factors proposed by BPXP is inconsistent with the plain language and legislative history of Section 311 of the CWA.  Given the purpose of Section 311 to deter and punish and its origins in the ExxonValdez oil spill, Congress intended the penalty factors to be read broadly.[53]  Evidence of conduct or incidents can be relevant to more than one statutory factor.  Indeed, the Fifth Circuit has permitted consideration of evidence that was not addressed under any specific penalty factor.  *See* United States v. Citgo Petroleum Corp., 723 F.3d 547, 554 (5th Cir. 2013).  Here, the evidence of prior violations and incidents is highly relevant to at least three of the eight statutory penalty factors in Section 311(b)(8): (1) any history of prior violations; (2) culpability; and (3) any other matters that justice may require.

## A.    Under the "Prior Violations" Factor, Incidents that Resulted from Similar Management and Process Safety Failures are Relevant and Should Be Considered

As Judge Vance stated in her Reasons for Accepting BPXP's Plea Agreement regarding the Macondo blowout, "the record shows that, although not the BP entity charged in this case, the BP family of companies has a history of deficient safety management."[54]

---

[53]Although the plain language of the statute is clear, the legislative history of the 1990 amendments to the CWA 311(b) provisions governing oil spills supports a broad construction of the penalty factors.The amendments significantly strengthened the penalty provisions in 311(b)(8) and increased the penalty amount.  In the wake of the Exxon Valdez spill, Congress established a comprehensive federal regime to prevent and minimize the impact of oil spills. The punitive and deterrent value of the civil penalties provisions in Section 311 of the Clean Water Act is central to this scheme.  OPA, Pub. L. No. 101-380, § 4301(b)(7)(A), 104 Stat. 484, 536 (1990)(codified at 33 U.S.C. § 1321(b)(7)(A)).  Second, Congress significantly increased maximum penalty amounts.  Id. §§ 4301(b)(7)(A), (b)(7)(D), 104 Stat. 536 (codified at 33 U.S.C. §§ 1321(b)(7)(A), (b)(7)(D)).Compare 33 U.S.C. § 1321(b)(6)(B)(1990) with OPA, Pub. L. No. 101-380, § 4301(b)(7)(D), 104 Stat. 484, 537 (1990) (codified at 33 U.S.C. § 1321(b)(7)(D)).

[54] *See* Ex. #52 (TREX-63208, United States v. BPXP, Criminal Action No. 12-292, Rec. Doc. 65, Reasons for Accepting Plea Agreement, at 5-6). The criminal sentencing statute provides that the court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C § 3553(a).

Contrary to BPXP's assertions, the Court's ruling in Phase I reserved the right to hear such evidence in Phase 3.[55]  In that Order, the Court held that "[e]vidence of prior conduct should be excluded under FRE 404(b) because the alleged prior conduct is not sufficiently similar to the Deepwater Horizon incident, *particularly with respect to the issues that will be tried in Phase I.*" (emphasis added).  *Id.* at 4.  The Court was careful to state that "[i]t may be that some of this evidence [of prior accidents or alleged misconduct] will become more relevant and admissible at a later phase, e.g., if and when the Court is required to consider . . . *the assessment of CWA penalties.*"[56]

The United States does not seek to introduce evidence of BP's environmental and safety history in Phase 3 to show what caused the Macondo blowout, the subject of the Phase I trial, but rather for penalty purposes to show that the management and process safety failures that caused the Macondo catastrophe were similar to those that caused BP's other major environmental and safety disasters.

**B.     "Prior Violations" Is Not Limited to Solely Section 311 Violations Committed by BPXP**

BP's prior violations are directly relevant to the Section 311(b)(8) penalty factor "any history of violations" which should be broadly construed.[57]

1.     **The Term "Violations" is Not Limited to Section 311 Violations**

---

[55] Order and Reasons Regarding Motions *in Limine* to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil or Regulatory Proceedings, Rec. Doc. 5634 at 4-5.

[56] Rec. Doc. 5634 at 5-6.

[57] The United States does not contend that evidence of prior violations of any kind whatsoever is relevant and admissible in every Section 311 case.  Rather, violations of other statutes and at other facilities can be relevant when (as here) they show patterns of conduct that are helpful in deciding the size of a penalty that should be assessed for a later violation.

Neither the plain language nor structure of Section 311 show that the only relevant "prior history" is the history of other Section 311 violations committed by BPXP.  BP Brief at 11.  The starting place of the Court's analysis is the language of the statute itself.[58]  However, BPXP's statutory construction of the meaning and scope of the terms *violation and violations* as used in Sections 311(b)(3), 311(b)(7) and 311(b)(8) of the CWA is mistaken.  33 U.S.C. §§ 1321(b)(3), 1321(b)(7), 1321(b)(8).  The key rule of statutory construction at issue is not, as BPXP contends, the presumption that "words have the same meaning when used in different sections of the same statute."  BP Brief at 11.  The key principle is that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *See* United States v. Gonzales, 520 U.S. 1, 5 (1997), *quoting* Russello v. United States, 464 U.S. 16, 23 (1983); United States v. Pruett, 681 F. 3d 232, 242, n.5 (5th Cir. 2012) (construing 309(c) of the CWA, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").[59]

Here, Section 311(b)(3) prohibits "[t]he discharge of oil or hazardous substances . . ."  33 U.S.C. § 1321(b)(3).  Section 311(b)(7) provides that civil penalties may be imposed against "[a]ny person who is the owner, operator, or person in charge of any . . . facility from which oil or a hazardous substance is discharged *in violation of paragraph (3)* . . ." 33 U.S.C. §

---

[58] Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London, 587 F.3d 714, 718, fn.9 (5th Cir. 2009), citing Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).

[59] *See* United States v. Hanousek, 176 F. 3d 1116, 1121 (9th Cir. 1999) (same); Uniroyal Chem. Co., Inc. v. Deltech Corp., 160 F.3d 238, 244 (5th Cir. 1998) (district  court refused to read element of "disposal" into category of liable parties under CERCLA).

16

1321(b)(7).  Section 311(b)(8), however, more broadly provides that "in determining the amount of a civil penalty under paragraphs (6) and (7), [the court shall consider] *any history of prior violations* . . . ."  33 U.S.C. § 1321(b)(8).  Although Congress expressly limited the phrase "*in violation of paragraph (3)"* in Section 311(b)(7) to violations of Section 311(b)(3) of the CWA, Congress imposed no similar restriction on the phrase "*any history of prior violations,"* which appears only one subsection later.

In <u>Gonzales</u>, the Supreme Court held that the requirement in a federal statute that a five-year sentence could not be imposed concurrently to "any other term of imprisonment" applied to state, as well as federal, sentences.  The question of statutory construction before the Supreme Court was similar to that before the Court here.  The issue was whether the phrase "any other term of imprisonment" "meant what it said, or whether it should be limited to some subset" of prison sentences.  The Court reasoned that read naturally, the word "any" has an expansive meaning that is, "*one or some indiscriminately of whatever kind*."  Congress did not add any language limiting the breadth of that word.  The Court explained that only in the first sentence did Congress *explicitly* limit the scope of the phrase "any" to those "for which [a defendant] may be prosecuted in a court of the United States."  Given that Congress expressly limited the phrase "any crime" to federal crimes only in the first sentence, the Court found it significant that no similar restriction modified the phrase "any other term of imprisonment," which appeared two sentences later.  *Id.* at 5; *see also*, <u>New York v. EPA</u>, 443 F. 3d 880, 885-886 (D.C. Cir. 2006) (holding the word "any" has expansive reach when construing the Clean Air Act).

Here, given that Congress has expressly provided in Section 311(b)(7) that civil penalties may be assessed for discharges "*in violation of paragraph (3),*" it is significant that there is no

similar restriction on "*any history of prior violations,*" to be considered by the Court in

determining the amount of the penalty to be imposed in Section 311(b)(8).  Thus, contrary to

BPXP's assertions, under the plain language of Section 311(b)(8), the Court is not limited to

considering prior violations of Section 311 of the CWA.

     In addition, contrary to BPXP's assertions, the plain language of Section 311(b)(8) of the

CWA, 33 U.S.C. § 1321(b)(8), is broader with respect to this factor, not analogous to, Section

309(d) of the CWA, 33 U.S.C. § 1319(d).  Significantly, Section 311(b)(8) refers to "*any history*

*of prior violations,*" in contrast to Section 309(d), which more narrowly refers to "*any history of*

*such violations.*"  Nowhere in Section 311(b)(8) did Congress limit the language "*any history*

*prior violations*" to prior violations that occurred at the same facility, under the same statute, or

within a specified period of time before the violations leading to liability.  In contrast, in Section

309(d), the Congressional usage of the words "*of such violations*" immediately after the words

"*any history*" generally limits the prior violations to be considered under this factor to those

enumerated in Section 309(d) of the CWA.[60]  The broader scope of this penalty factor under

Section 311(b)(8) is consistent with the sweeping prohibition on the discharge of oil and

hazardous substances Section 311(b)(3), 33 U.S.C. §1321(b)(3).

    2.    **The CITGO Case Provides Guidance on the "Any History of Prior**
         **Violations" Factor Under Section 311(b)(8)**

---

[60] Unlike Section 311(b)(8) of the CWA, a number of other environmental penalty provisions contain
limiting language regarding this penalty factor.  For example, 42 U.S.C. § 7524(b), which contains the
Mobile Source Enforcement Penalty Factors, provides: "the violator's history of compliance *with this*
*subchapter.*"  The Safe Drinking Water Act's violation of State Program Requirements, 42 U.S.C. §
300h-2(c)(4)(B), includes "any history of *such* violations."  Certain other environmental statutes even
limit the consideration of prior violations to the same facility.  *See, e.g.*, the Surface Mining Control and
Reclamation Act, at 30 U.S.C. § 1268(a) (penalties for violating permit conditions) ("permittee's history
of previous violations *at the particular surface coal mining operation*"). [emphasis supplied].  Those
restrictions are lacking in Section 311(b)(8).

BPXP incorrectly contends that "the limited case law under Section 311 does not provide any substantive guidance on the scope of the 'history of prior violations' factor." BP Brief at 9. The Fifth Circuit in CITGO did in fact issue sufficient guidance.

In CITGO, the United States brought an action seeking civil penalties under the same CWA provisions addressed here, Sections 311(b)(3) and 311(b)(8). The Court did not limit its consideration to violations of Section 311(b), as BPXP claims the Court is required to do. Rather, both the district court and the Fifth Circuit considered CITGO's history of prior violations under Section 309, as well as Section 311 of the CWA, and under the Resource Conservation, Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq. The district court found that "Citgo is guilty of prior violations and does not appear to have recognized the importance of compliance, pollution control, environmental responsibility, and the overall duty imposed on businesses to operate safely," based on its determination that CITGO had over 950 days of Section 309 permit exceedances from the wastewater treatment plant alone, as well as six illegal discharges into a surge pond. [61] The Fifth Circuit upheld these findings, stating that Citgo's history of violations "reflected a lack of environmental responsibility and a general disregard of its duty to operate its business safely." CITGO, at 553. The 950 days of permit violations clearly refer to prior violations of Section 309 (which governs permit conditions and limitations), and the six discharges to the surge pond refer to prior RCRA violations,[62] not to violations of Section

---

[61] U.S. v. Citgo Petroleum Corp., 2011 WL 10723934 (W.D. La. Sept. 29, 2011); CITGO, 723 F.3d at 550, 553; see also Ex. B to BP's Brief at 2 n.2, 13; Ex. C to BP's Brief at 20, 34, 46. See Ex.#53 (Citgo Transcript 1308, 1315-1317, 1376-1381, 1463-64, 1559-1561, 1756, 2432,-33, 2494-2495).

[62] See Ex. #53 (Citgo Transcript 1145-46, 1308, 1315-1317, 1353-54, 1376-81, 1393-98, 1410-11, 1420-21, 1463-64, 1559-61, 1567-68, 1756, 1759-60, 1821-27, 1936, 2329-30, 2379-80, 2383, 2432-33, 2462-64, 2477-79, 2487-91, 2494-95).

311 of the CWA (which governs prohibited discharges of oil and hazardous substances). BP's position that Section 311(b)(8) is limited to violations of the same statutory provision simply cannot be reconciled with CITGO, which considered other CWA violations as well as RCRA violations in assessing a Section 311(b)(8) penalty.[63]

BPXP's reliance on cases decided under Section 309(d) of the CWA is no more availing. BPXP fails to acknowledge the more restrictive statutory language – "such" violations – under that provision, or the impact of the different regulatory scheme involved.[64] Even under that narrower provision, however, many courts have considered a history of violations extending well back in time.[65] Moreover, none of the cases cited by BPXP concerned the issue of whether a history of prior violations other than those under the CWA should be considered by a court under Section 309(d) of the CWA. BP Brief at 12-13. *See* In the Matter of Ketchikan Pulp Co., 1995

---

[63] Nor does the other case cited by BP regarding Section 311(b)(8), U.S v. Egan Marine Corp., 2011 WL 8144393 (N.D. Ill. Oct. 13, 2011), support BP contention that the Court's consideration of "any history of prior violations" should be restricted to prior violations of Section 311 of the CWA.

[64] For example, several courts have focused on the "intermittent" versus chronic nature of the violations, which makes sense in a permitting scheme involving discharges from a point source in excess of lawful, permitted limits, *see e.g.*, Sierra Club v. El Paso gold Mines, Inc., Civ. A. 01 PC 2163 OES, 2003 WL 25265873, at *10 (D. Colo. Feb. 10, 2003), but which is nonsensical here, in a case involving a massive explosion and protracted, 87-day uncontrolled and prohibited discharge of oil.

[65] Several courts in cases under Section 309(d) also have shown a willingness to hear evidence about past violations at other facilities owned and operated by a defendant. *See, e.g.* United States v. Allegheny Ludlum, 187 F. Supp. 2d 426, 433 (W.D. Pa. 2002), *rev'd on other grounds*, 366 F.3d 164 (3d Cir. 2004)(1990 to 1997, and back into the 1980's based on consideration of CWA violations settled in state administrative actions "to fall within the broad range of information available for assessing [defendant's] history of CWA violations"); PIRG v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158, 1163 (D.N.J. 1989), *rev'd on other grounds*, 913 F.2d 64 (3d Cir. 1990) (eleven years); United States v. Gulf Park Water Co., Inc., 14 F. Supp. 2d 854 (S.D. Miss. 1998) (more than twelve years); Atlantic States Legal Foundation Inc. v. Universal Tool & Stamping co., 786 F. Supp. 743 (N.D. Ind. 1992) (thirteen years, since defendant was first regulated in 1975).

20

WL 814171 (Nov. 22, 1995) (prior history of violations under the Clean Air Act and Toxic
Substances Control Act not involving the Ketchikan pulp plant considered in evaluating claim
involving the pulp plant under Section 309 of the CWA).

Further, contrary to BPXP's assertions, EPA's internal civil penalty policy for settlement
of Section 311 cases does not take a narrow view of the *"any history of prior violations"* factor
under Section 311(b)(8) of the CWA. Indeed, the opposite is true. BPXP directs the Court to
only two of the three types of prior violations set forth in the guidance: "violations of spill
prevention and response regulations," and "discharges in violation of Section 311(b)(3)."
Inexplicably, BPXP fails to mention the third type of prior violation listed: "any violation of an
environmental statute that relates to the respondent's ability to prevent or mitigate a discharge in
violation of Section 311(b)(3)."[66] EPA indicates that "[r]elated violations, for example, could
include certain operation and maintenance violations that indicate a respondent's inattention to
pollution control requirements." These are exactly the type of prior violations that the United
States asks this Court to consider: violations that show BP's inattention to safety and
management practices for pollution control that led to explosions, catastrophes, and discharges at
other BP facilities. Thirdly, BPXP ignores that the guidance also calls for violations of affiliated
entities to be considered, expressly stating that "[r]elevant violations at any other facility under
common ownership or control should be considered . . ."[67]

### 3. **Violations of BP p.l.c. and its Affiliates, not only BPXP, Should Be Considered**

---

[66]*See* Ex. #54 (Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the CWA, EPA Office of
Enforcement and Compliance Assurance, Aug. 1998, at 1).

[67]The Penalty Policy continues that prior "[v]iolations include admitted violations . . . , adjudicated
violations, findings of violations by EPA or other agencies that have not been withdrawn or overturned by
a reviewing authority, and cases that were settled by consent and involved the payment of a penalty
(whether or not liability was admitted)." Id. at 14.

As set forth in the United States Memorandum in Support of its Motion in Limine to Permit Relevant Evidence Concerning BP p.l.c. and Other BP Affiliates (Rec. Doc. 12355-1), the United States has asked this Court to consider the actions and finances of BPXP's corporate affiliates when evaluating each of the penalty factors, not just the "mitigation" factor as BP proposes. As explained in detail in that Motion, BP does not operate through corporate subsidiaries but rather as a group entity through its business segments and units. (Rec. Doc. 12355 at 3-6, 7-11). Contrary to BPXP's assertions, Section 311(b)(8) does not show "that only prior violations by the named defendant should be considered." BP Brief at 14. The plain language of Section 311(b)(8) does *not* expressly limit the consideration of "any history of prior violations" to the named defendant. In fact, consideration is explicitly limited to the named defendant for only three of the eight penalty factors: (1) "the economic benefit to the violator"; (2) "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge"; and (3) "the economic impact of the penalty on the violator." As noted above, BPXP cites EPA's penalty policy, but ignores that on this issue it calls for affiliated entities to be considered.

Although neither BPXP nor the United States have found case law under Section 311(8)(b) of the CWA involving prior violations committed by affiliates, as noted above, Judge Vance rejected contentions that prior violations should be limited to BPXP in reviewing its criminal plea,[68] citing to the "BP family of companies."[69] Additionally, as detailed in the U.S.

---

[68] Ex #2 (Joint memo at 50 arguing prior incidents are only relevant as evidence of BP's efforts to learn); Ex. #52 (January 30, 2013 Reasons for Accepting Plea Agreement, Case No. 2:12-cr-00292-SSV-DEK, pg. 5-6 [Rec. Doc. 65]).

[69] See Ex. #52 (TREX-63208, United States v. BPXP, Criminal Action No. 12-292, Rec. Doc. 65, Reasons for Accepting Plea Agreement, at 5-6).

MIL on Affiliates, it is well established that Courts have considered evidence regarding the

finances of parent corporations when evaluating "the economic impact of the penalty on the

violator" under Section 309(d) of the CWA.  *See* United States v. Municipal Auth. of Union

Township ("Dean Dairy"), 150 F. 3d 259, 263 (3rd Cir. 1998)[70]  This is true in the Fifth Circuit,

where in the CITGO case the court considered the finances of CITGO's parent corporation for

ability to pay purposes.[71]

Further, BPXP does not want the penalty factors to be limited when it does not suit its

own interest, for example where it wishes the Court to consider efforts to mitigate by other BP

entities, arguing that "there may be some penalty factors where the actions of other BP entities

may have some relevance."  BP Brief at 15 n. 6.  BP cannot have it both ways. Of all the penalty

factors, the ***one factor*** for which BP argues the court should consider conduct of all BP entities --

the mitigation factor -- is one of the few that is expressly limited to the "violator." None of the

prior violations, culpability, nor other matters penalty factors include similar language limiting

the factor to the violator.

## C.    Consideration of Other Incidents of BP and its Affiliates under "Culpability" Factors Is Appropriate

What BPXP primarily seeks to preclude in its discussion of the penalty factor of

culpability is evidence of its serious environmental incidents that resulted in felony convictions

and other instances of non-compliance.  BP Brief at 1.  BPXP makes three major points in

---

[70] Further authorities are recited in the U.S. MIL on Affiliates. Rec. Doc. 12355 at 12-13.

[71] *See* U.S. v. Citgo, 2011 WL 10723934 ("The Court recognizes that Citgo is a multi-billion dollar, international company."); Ex. #55 (Transcript of Citgo trial at 1145-46, 1158-1160, 1210-1214, 1223-1235, 1272-1273, 1288-1304).  Citgo's international parent company is Petroleos de Venezuela, S.A. ("PDVSA").

arguing that any additional evidence regarding the "degree of culpability" should be precluded: (1) Phase I already addressed BPXP's fault and, given the extensive record from the Phase 1 and II trials, no further evidence should be permitted; (2) the "degree of culpability" involves the level of fault for the violation at issue, including gross negligence; and (3) any additional evidence will be cumulative and should be excluded.[72]  These arguments should be rejected.

BPXP's argument that the "degree of culpability" must equal fault, negligence or gross negligence, is similar to the arguments addressed in the Motion *in limine* to preclude evidence of Anadarko's culpability.[73]  The United States incorporates here the arguments and authorities set forth in the United States' Opposition to Anadarko's motion.[74]  Briefly, as outlined in the Opposition, while "fault or negligence" bear a relationship to the degree of culpability, they are not the same.  While the penalty factor "degree of culpability" encompasses gross negligence, willful misconduct, and even criminal behavior, it is a more general term that also encompasses any behavior that is blameworthy or meriting condemnation.[75]  This is particularly true in the context of a strict liability statute, where the plaintiff does not need to establish negligence in order to show evidence of culpability in the penalty phase.

BPXP's reliance on the United States' briefs in the CITGO litigation to argue that "degree of culpability" equates with fault is misplaced.  In CITGO, it is unsurprising that the

---

[72] BP Brief at 3, 4-6 7-8.

[73] Anadarko's Motion *in Limine* to Exclude all Evidence Regarding Anadarko's Culpability, Rec. Doc. 12343.

[74]  *See*, US Memo. in Support of Opposition to Anadarko's Motion *in Limine* to Exclude all Evidence Regarding Anadarko's Culpability.

[75] Indeed, the Fifth Circuit indicated that degrees of culpability can begin with strict liability and encompass higher degrees as well, noting "[b]ecause CITGO was found to be negligent – *a higher degree of culpability than strict liability,"* the United States argued that the district court's penalty was too low. United States v. CITGO, 723 F.3d 547, 553 (5th Cir. 2013).

district court record and United States brief contained references to gross negligence when discussing culpability, because the penalty phase and gross negligence issues in Section 311(b)(7)(D) were tried together.[76]  Nowhere did the United States or the Court indicate that the "degree of culpability" is limited to evidence of negligence or gross negligence.

BPXP's real argument is that, because it successfully argued that its "prior bad acts" should not be tried in Phase I under a FRE 404(b) standard, now that it is in the penalty phase of the trial it is too late to present such evidence.  The Court's Second Amended Pretrial Order No. 41, Rec. Doc. 6592 ("Case Management Order No. 4"), however, defines the proceedings as the Trial of Liability, Limitation, Exoneration, and Fault ("Trial"), and divides it into "at least" two Phases, leaving open the possibility that culpability related issues may be tried later.  Phase I was limited to "Issues . . .  allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010."  In precluding the evidence from Phase I, the Court exercised discretion to draw the line and rule that the pattern of BP's past conduct, although relevant, would not be included in the Phase of the trial that focused solely on the cause of the fire and explosion on April 20, 2010.[77]  The penalty phase, however, has a different purpose.  The Court *must* consider the eight statutory penalty factors and is instructed to consider prior violations.  The Court's task in the penalty phase is to fix a penalty that deters future illegal behavior.  As set forth above, the Court

---

[76] If the degree of culpability rises to the level of gross negligence or willful misconduct, the court has discretion to nearly quadruple the strict liability penalty up to $4,300 per barrel discharged. 33 U.S.C. § 1321(b)(7)(D); 40 C.F.R. § 19.4.

[77] Phase I was limited to "Issues arising out of the conduct of various parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010, and the sinking of the MODU DEEPWATER HORIZON during those time periods (collectively, the "Incident").

expressly stated that BP's prior environmental crimes and violations may be relevant and
admissible during the assessment of CWA penalties.

The Court also can dispense with concerns about the "needless presentation" of
cumulative evidence.  First, BP's history of violations simply cannot be cumulative since it was
excluded from Phase I.  Moreover, "the language of Rule 403 implies cumulation is not bad *per
se*; it is the "needless presentation" that is to be avoided.  22A *Fed. Prac. & Proc. Evid.* § 5220.
Other courts have waited until closer to trial, when the record is more fully developed, to rule on
motions *in limine* to exclude evidence of prior incidents.[78]  The United States has indicated it
does not intend to present evidence that duplicates evidence already in the record.[79]  Concerns
regarding cumulative evidence can be handled when evidence is presented, just as they were in
Phases I and II.

Finally, the evidence of prior violations and incidents is highly relevant to "the degree of
culpability involved."  At a minimum, the prior violations and incidents should have, and did,
put BP on notice that its reckless behavior and emphasis on cost-cutting could have disastrous
consequences as it engaged in the inherently dangerous activity of deepwater drilling.  BP's

---

[78]  *See, e.g.,* In re the Chicago Flood Litig., 1995 WL 437501, at *7 (N.D. Ill. July 21, 1995) (in case cited
by the parties and the court involving litigation of claims grounded in negligence and product liability,
court denied motion *in limine* and refrained from excluding evidence until closer to trial); United States v.
Jeffrey Pruett, 2011 WL 159925 (W.D. La. Jan. 12, 2011) (uncharged matters related to facilities not
named in the indictment were relevant but court could not evaluate Rule 403 concerns about jury
confusion until it heard at least part of the government's case).

[79]  Contrary to any suggestion by BP, the United States has never asserted that it would seek to introduce
cumulative evidence to the previous phases under the culpability factor.  Indeed, to the contrary, the
United States stated that "in large part we agree that Phase One and Two cover this factor.  However, to
the extent that evidence was not relevant to Phase One or was excluded from Phase One, this factor may
not be fully closed." Ex. #56 (November 14, 2013 letter).

failure to learn its lessons from the prior incidents, resulting in its admitted criminal negligence at Macondo, clearly comprises blameworthy behavior that should be penalized.

**D.    Consideration of Other Incidents Under "Other Matters" is Appropriate.**

BPXP mistakenly accuses the United States of trying to "shoehorn" evidence of BP's prior incidents into the "any other matters that justice may require" penalty factor.  BPXP, not the United States, asks this Court to ignore the language and structure of the CWA.  The broad "any other matters" factor allows the Court to consider "any other" evidence it deems appropriate that may not strictly fall within the previous seven factors.  If Congress had not intended the courts to have flexibility in evaluating all relevant evidence, it would not have included this final factor.

The Court should exercise its broad discretion under this final penalty factor to recognize that the environmental and process safety history of BP corporate entities beyond BPXP are relevant.  In fact, BP has argued that "[j]ustice requires that a penalty here be compared to and calibrated with penalties sought and obtained against other companies, both in relation to this case and other environmental incidents." [80] The Supreme Court in *Tull* described the process of weighing the penalty factors as "highly discretionary."  Tull v. United States, *supra,* 481 U.S. at 427.  *Accord*, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 576 (5th Cir. 1996).  The Fifth Circuit, along with others, has held repeatedly that the district court's determination of the amount of a penalty to be assessed is reviewed under the highly deferential abuse-of-discretion standard.  *Id.*; United States v. CITGO, *supra,* 723 F.3d at 551.

---

[80] *See* BPXP's Submission to the Court's February 21, 2014 Order Regarding Preparation for Discovery in the Penalty Phase, Exhibit 11 (March 3, 2014).

The appellate cases relied on by BPXP support the position of the United States, not the defendant.  *See* United States v. Holmes, 607 F. 3d 332, 338 (3rd Cir. 2010); Dole v. Williams Enters, Inc., 876 F. 2d 186, 189 n. 4 (D.C. Cir. 1989).  In those cases, the Courts held that when the word "other" is used in catch-all provisions at the end of a list of factors, the word "other" refers to items that are separate and distinct from the rest of the list.  Here, if the Court determines that the history of prior violations and environmental and safety incidents of BP p.l.c. and its affiliates is separate and distinct from the history of prior violations and incidents of BPXP, then the history of prior violations and incidents of BP p.l.c. and its affiliates can and should considered under the "any other matters as justice may require" penalty factor.

A case in Louisiana cited in a footnote by BPXP, Louisiana Environmental Action Network v. LWC Mgmt. Co., Inc., 2008 WL 687190 (W.D. La. March 10, 2008), squarely supports the United States' argument.  In LWC Management Co., a case under Section 309 of the CWA, the plaintiff filed a motion to compel the defendants to identify "all actions alleging that [the defendants] violated any federal, state or local water pollution control law, including the Clean Water Act and the Safe Drinking Act."  In challenging the request, the defendants contended that past violations of the Safe Drinking Water Act were not relevant because the "history of such violations" factor in Section 309 applied only to violations of the CWA. Magistrate Judge Hayes granted the plaintiff's motion to compel, stating that "prior violations of state or federal environmental law could fall under the catch-all provision of 'other matters as justice may require.'"  *Id*. at 2.

## III.   BPXP'S Contentions of Undue Delay, Waste of Time or Cumulative Evidence are Unsupported.

BPXP contends that exclusion of evidence of prior violations or culpability will streamline discovery and trial, and prevent the introduction of cumulative evidence and avoid "mini trials" on prior violations.  This issue is a red herring, as there is no such evidence before the Court.[81]  Nowhere does BPXP explain how the Court should engage in the "weighing" process required by Rule 403 for undue delay or other Rule 403 considerations when the evidence is not before the Court. As noted in the United States Rule 26 filing, this evidence can be handled with limited witness testimony.  While Fed. R. Evid. 403 permits exclusion of relevant evidence when its probative value is outweighed by the danger of waste of time or undue delay, it is an extraordinary remedy that must be used sparingly.[82]  The federal rules favor admission, not exclusion, of evidence that in some degree advances the inquiry.  First Nat. Bank of Louisville v. Lustig, 1993 WL 411176 (E.D. La. Oct. 7, 1993).

In Phase I, BP claimed that allowing evidence of past incidents would turn into a "time-destroying and issue distracting frolic across history" (Rec. Doc 4514 at p. 6).  In reality, the PSC had one expert witness designated to discuss prior incidents, and BP had two rebuttal experts.[83]  After the Court granted BP's *Motion in Limine* regarding prior violations and

---

[81] Indeed, BP's expressed concern of trial delay abruptly ends when it suits its own interests.  For example, BP has refused to entertain stipulations that would limit presentation of evidence on the "mitigation" factor –instead insisting that it should be allowed to present live witnesses and documents even if cumulative.  (Rec. Doc. 12340 at 9).  Further, BP insists on significant and burdensome discovery regarding the unconcluded natural resource damage assessment, even though it has limited relevance and will delay trial.

[82] Dartez v. Fibreboard Corp., 765 F.2d 456, 461 (5th Cir. 1985) (upholding admission into evidence of testimony related to another asbestos manufacturer where testimony was relevant to an issue in the case); Herrington v. Hiller, 883 F.2d 411, 414 (Fifth Cir. 1989) (reversing district court's exclusion of evidence); Coates v. A C and S, Inc., 1994 WL 34048 (E.D. La. Jan. 26, 1994).

[83] BP chose not to list numerous rebuttal witnesses to discuss incidents which BP has itself admitted were due to its own management and cultural failures.  See Ex. #57 (BP's Good Faith Phase I Trial Witness Lists, Rec. Doc. 5317, January 20, 2012).

misconduct for Phase I, *not a single witness* was removed from any party's witness list.[84]  For

the penalty phase, BPXP has no basis for suggesting that any discovery or evidence will be

burdensome or time consuming.[85]  As noted above, the United States will not present evidence of

the more than 2,700 prior environmental and safety violations and incidents committed by BP

(unless BP opens the door by arguing it has a good safety record or environmental record).  The

United States instead plans to make a streamlined presentation focusing on very few incidents

that resulted from the same basic process safety and management failures that caused the

Macondo disaster, including a few examples of the risky drilling practices that were a cause of

the Macondo disaster.

      Any concerns regarding undue delay, waste of time or similar concerns can be managed

through typical case management limitations.[86]  The Phase III penalty trial can be similar to or

more limited in scope and duration than the Phase II trial by following a normal sequence of

disclosures and discovery under the Federal Rules of Civil Procedure.  The United States has

proposed reasonable limitations both on the number of expert witnesses and in trial hours.

## CONCLUSION

      For all the above stated reasons, BPXP's Motion *in Limine* should be denied.

---

[84] BP's two rebuttal witnesses were not removed from its witness list until months later in the middle of trial.  Morris Burch was removed on April 7, 2013, the day before BP began its case.  Kathleen Sutcliffe was not removed until several days later on April 10, 2013.  See Ex. #58 (emails from BP attorneys).

[85] Indeed, the United States has to date proposed no discovery on this topic, and instead suggested it was considering whether any discovery on this factor is necessary.  BP points, without any assertion that these are burdensome, to requests regarding the involvement of other BP entities in the Macondo well.  However, this discovery is relevant to multiple penalty factors including economic impact of the penalty on the violator and mitigation.

[86] The Court should not be swayed by BP's threats to call tens or hundreds of rebuttal witnesses.  BP must also justify its need for rebuttal witnesses under Fed. R. Evid. 403.

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys


R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:  415-436-6648
Facsimile:  415-436-6632
E-mail:  mike.underhill@usdoj.gov

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
RICHARD GLADSTEIN
PATRICK CASEY
Senior Counsel
A. NATHANIEL CHAKERES
JUDY HARVEY
RACHEL KING
ERICA PENCAK
ABIGAIL ANDRE
RACHEL HANKEY
BRANDON ROBERS
Trial Attorneys


/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  (504) 680-3000
Facsimile:  (504) 680-3184
E-mail:  sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  March 6, 2014.                                                   /s/  Steven O'Rourke

                                                                       U.S. Department of Justice