# EXHIBIT 8

**UNITED STATES' OPPOSITION TO:**

**BPXP'S MOTION TO STRIKE THE EXPERT REPORTS OF WALTER H. CANTRELL AND RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO PRIOR INCIDENTS (Rec. Doc. 13475)**



JANUARY 2007

# THE REPORT OF
## THE BP U.S. REFINERIES INDEPENDENT SAFETY REVIEW PANEL



Suttles

EXHIBIT NO. 2430

TREX-02430

BP-HZN-2179MDL01022710

JANUARY 2007

# THE REPORT OF
## THE BP U.S. REFINERIES INDEPENDENT SAFETY REVIEW PANEL





James A. Baker, III

Nancy Leveson

Frank L. "Skip" Bowman

Sharon Priest

Glenn Erwin

Isadore "Irv" Rosenthal

Slade Gorton

Paul V. Tebo

Dennis Hendershot

Douglas A. Wiegmann

L. Duane Wilson

*From left to right: Glenn Erwin,*
*Sharon Priest, Paul V. Tebo,*
*James A. Baker, III,*
*Isadore "Irv" Rosenthal,*
*Frank L. "Skip" Bowman,*
*Dennis Hendershot,*
*Nancy Leveson, L. Duane Wilson.*

*Not pictured: Slade Gorton and*
*Douglas A. Wiegmann*

# EXECUTIVE SUMMARY

## Background of the Panel's Review

On March 23, 2005, the BP Texas City refinery experienced one of the most serious U.S. workplace disasters of the past two decades, resulting in 15 deaths, more than 170 injuries, and significant economic losses. The U.S. Chemical Safety and Hazard Investigation Board (CSB), an independent federal agency charged with investigating industrial chemical accidents, promptly began an accident investigation that is ongoing.

On August 17, 2005, the CSB issued an urgent safety recommendation to the BP Global Executive Board of Directors that it commission an independent panel to assess and report on the effectiveness of BP North America's corporate oversight of safety management systems at its refineries and its corporate safety culture. In making its urgent recommendation, the CSB noted that the BP Texas City refinery had experienced two other fatal safety incidents in 2004, a major process-related hydrogen fire on July 28, 2005, and another serious incident on August 10, 2005. Based on these incidents and the results of the first few months of its preliminary investigation, the CSB cited serious concerns about:

- the effectiveness of the safety management system at the BP Texas City refinery,

- the effectiveness of BP North America's corporate safety oversight of its refining facilities, and

- a corporate safety culture that may have tolerated serious and longstanding deviations from good safety practice.

BP embraced the urgent recommendation of the CSB to form an independent panel. In a press release issued on August 17, 2005, the company noted that the Texas City explosion was the worst tragedy in BP's recent history and that it would "do everything possible to ensure nothing like it happens again." The company also said it would act promptly to deal with the independent panel's recommendations.

On October 24, 2005, BP announced the formation of the BP U.S. Refineries Independent Safety Review Panel. Former Secretary of State James A. Baker, III chairs the Panel, which includes the following additional members:

- Retired Admiral Frank L. "Skip" Bowman, President and Chief Executive Officer of the Nuclear Energy Institute;

- Glenn Erwin, who monitors refinery safety nationwide for the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union;

- Slade Gorton, former U.S. Senator from Washington State and member of the 9/11 Commission;

*The Panel's charter directs it to make a thorough, independent, and credible assessment of the effectiveness of BP's corporate oversight of safety management systems at its five U.S. refineries and its corporate safety culture. The charter further directs the Panel to produce a report examining and recommending needed improvements to BP's corporate safety oversight, corporate safety culture, and corporate and site safety management systems.*



*Effectiveness of BP's corporate process safety management system.* BP has an aspirational goal and expectation of "no accidents, no harm to people, and no damage to the environment," and is developing programs and practices aimed at addressing process risks. These programs and practices include the development of new standards, engineering technical practices, and other internal guidance, as well as the dedication of substantial resources. Despite these positive changes, the Panel's examination indicates that BP's corporate process safety management system does not effectively translate corporate expectations into measurable criteria for management of process risk or define the appropriate role of qualitative and quantitative risk management criteria.

The findings above, together with other information that the Panel obtained during its examination, lead the Panel to conclude that material deficiencies in process safety performance exist at BP's five U.S. refineries. Some of these deficiencies are common among multiple refineries, and some of the deficiencies appear to relate to legacy systems in effect prior to BP's acquisition of the refineries.

BP appears to have established a relatively effective personal safety management system by embedding personal safety aspirations and expectations within the U.S. refining workforce. However, BP has not effectively implemented its corporate-level aspirational guidelines and expectations relating to process risk. Therefore, the Panel found that BP has not implemented an integrated, comprehensive, and effective process safety management system for its five U.S. refineries.

*Panel observations relating to process safety management practices.* The Panel observed several positive notable practices or, in the case of BP's process safety minimum expectation program, an excellent process safety management practice. The notable practices relate to creation of an engineering authority at each refinery and several other refinery-specific programs that are described in more detail in Section VI.B.

## Performance Evaluation, Corrective Action, and Corporate Oversight

Maintaining and improving a process safety management system requires the periodic evaluation of performance and the correction of identified deficiencies. As discussed more fully in Section VI.C, significant deficiencies existed in BP's site and corporate systems for measuring process safety performance, investigating incidents and near misses, auditing system performance, addressing previously identified process safety-related action items, and ensuring sufficient management and board oversight. Many of the process safety deficiencies are not new but were identifiable to BP based upon lessons from previous process safety incidents, including process incidents that occurred at BP's facility in Grangemouth, Scotland in 2000.

*Measuring process safety performance.* BP primarily used injury rates to measure process safety performance at its U.S. refineries before the Texas City accident. Although BP was not alone in this practice, BP's reliance on injury rates significantly hindered its perception of process risk. BP tracked some metrics relevant to process safety at its U.S. refineries. Apparently, however, BP did not understand or accept what this data indicated about the risk of a major accident or the overall performance of its process safety management systems. As a result, BP's corporate safety management system for its U.S. refineries does not effectively measure and monitor process safety performance.

The process safety performance metrics that BP uses are evolving. BP now monitors at the corporate level several leading and lagging process safety metrics. BP is also working with external experts to review process safety performance indicators across the company and the industry.

*Incident and near miss investigations.* BP acknowledges the importance of incident and near miss investigations, and it employs multiple methods at different levels of the organization to distribute information regarding incidents and lessons learned. Although BP is improving aspects of its incident and near miss investigation process, BP has not instituted effective root cause analysis procedures to identify systemic causal factors that may contribute to future accidents. When true root or system causes are not identified, corrective actions may address immediate or superficial causes, but not likely the true root causes. The Panel also believes that BP has an incomplete picture of process safety performance at its U.S. refineries because BP's process safety management system likely results in underreporting of incidents and near misses.

*Process safety audits.* The Panel found that BP has not implemented an effective process safety audit system for its U.S. refineries based on the Panel's concerns about auditor qualifications, audit scope, reliance on internal auditors, and the limited review of audit findings.

The Panel also is concerned that the principal focus of the audits was on compliance and verifying that required management systems were in place to satisfy legal requirements. It does not appear, however, that BP used the audits to ensure that the management systems were delivering the desired safety performance or to assess a site's performance against industry best practices. BP is in the process of changing how it conducts audits of safety and operations management systems, including process safety audits.

*Timely correction of identified process safety deficiencies.* BP expends significant efforts to identify deficiencies and to correct many identified deficiencies, which BP often does promptly. BP, however, has sometimes failed to address promptly and track to completion process safety deficiencies identified during hazard assessments, audits, inspections, and incident investigations. The Panel's review, for example, found repeat audit findings at BP's U.S. refineries, suggesting that true root causes were not being identified and corrected. This problem was especially apparent with overdue mechanical integrity inspection and testing. Although BP regularly conducts various assessments, reviews, and audits within the company, the follow through after these reviews has fallen short repeatedly. This failure to follow through compromises the effectiveness of even the best audit program or incident investigation.

In addition, BP does not take full advantage of opportunities to improve process operations at its U.S. refineries and its process safety management systems. BP does not effectively use the results of its operating experiences, process hazard analyses, audits, near misses, or accident investigations to improve process operations and process safety management systems.

*Corporate oversight.* BP acknowledges the importance of ensuring that the company-wide safety management system functions as intended. The company's system for assuring process safety performance uses a bottom-up reporting system that originates with each business unit, such as a refinery. As information is reported up, however, data is aggregated. By the time information is formally reported at the Refining and Marketing segment level, for example, refinery-specific performance data is no longer presented separately.

The Panel's examination indicates that BP's executive management either did not receive refinery-specific information that suggested process safety deficiencies at some of the U.S. refineries or did not effectively respond to the information that it did receive. According to annual reports on health, safety, security, and environmental assurance that BP management provided to the Environment and Ethics Assurance Committee of BP's Board of Directors for 1999 through 2005, management was monitoring process safety matters, including plant and operational integrity issues. The reports identify safety and integrity management risks that various levels of the organization confronted and describe management actions proposed to address and mitigate those risks. From 2001 to 2003, for example, BP developed and implemented standards for process safety and major accident risk assessments and increased monitoring and reporting of action item closure, sharing of lessons learned, overdue planned inspections, and losses of containment. The reports and other documents that the Panel examined indicate, however, that issues persisted relating to assurance of effective implementation of BP's policies and expectations relating to safety and integrity management.

For these reasons, the Panel believes that BP's process safety management system was not effective in evaluating whether the steps that BP took were actually improving the company's process safety performance. The Panel found that neither BP's executive management nor its refining line management has ensured the implementation of an integrated, comprehensive, and effective process safety management system.

BP's Board of Directors has been monitoring process safety performance of BP's operations based on information that BP's corporate management presented to it. A substantial gulf appears to have existed, however, between the actual performance of BP's process safety management systems and the company's perception of that performance. Although BP's executive and refining line management was responsible for ensuring the implementation of an integrated, comprehensive, and effective process safety management system, BP's Board has not ensured, as a best practice, that management did so.  In reviewing the conduct of the Board, the Panel is guided by its chartered purpose to examine and recommend any needed improvements.  In the Panel's judgment, this purpose does not call for an examination of legal compliance, but calls for excellence. It is in this context and in the context of best practices that the Panel believes that BP's Board can and should do more to improve its oversight of process safety at BP's five U.S. refineries.

# The Panel's Recommendations

The Panel was charged with making recommendations to improve BP's corporate safety culture, corporate oversight of process safety, and process safety management systems. For each recommendation below, the Panel has developed commentary that is an integral part of the recommendation and that provides more specific guidance relating to implementation of the recommendation. See Section VII for a discussion of the recommendations and the related commentary. Each recommendation below should be read in conjunction with the related commentary.

## RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP

The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

## RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM

BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

## RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE

BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

## RECOMMENDATION #4 – PROCESS SAFETY CULTURE

BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

## RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY

BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

## RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT

BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

## RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY

BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

## RECOMMENDATION #8 – PROCESS SAFETY AUDITING

BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

## RECOMMENDATION #9 – BOARD MONITORING

BP's Board should monitor the implementation of the recommendations of the Panel (including the related commentary) and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations (including the related commentary). The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

## RECOMMENDATION #10 – INDUSTRY LEADER

BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management.

The Panel believes that these recommendations, together with the related commentary in Section VII, can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

# VI. FINDINGS

## A. Corporate Safety Culture

A positive safety culture is important for good process safety performance. Absent a healthy safety culture, even the best safety management systems will be largely ineffective in ensuring and sustaining excellent process safety performance. In 2003, the Conference Board studied best practices in corporate safety and health among major corporations, analyzing how leading companies develop safety cultures. While this study focused on management and management practices, the Conference Board's 2003 report indicates that one of the key themes emerging from the study

> was that management practices alone are not sufficient to achieve outstanding safety performance; *all* of a company's workers must be engaged and involved. Ultimately, achieving excellence is about empowering all workers—management, supervisors, employees, and even contractors—to make safety and health practices truly work.[1]

The report also provides that "[c]ompanies have found that if safety and health values are not consistently (and constantly) shared at all levels of management and among *all* employees, any gains that result from declaring safety and health excellence a 'priority' are likely to be short-lived."[2]

Through BP's investigation of the March 2005 Texas City accident, it appears to the Panel that BP has come to appreciate the importance of cultural factors in promoting good process safety performance.[3] It also appears that BP now understands that a positive safety culture is a critical driver of process safety performance.

The Panel makes five fundamental observations about BP's corporate safety culture with respect to BP's U.S. refineries. First, BP has not provided effective process safety leadership. BP has not adequately established process safety as a core value across all its five U.S. refineries. While BP has an aspirational goal of "no accidents, no harm to people," BP has not provided effective leadership in making certain its management and U.S. refining workforce understand what is expected of them regarding process safety performance. BP has emphasized personal safety in recent years and has achieved significant improvement in personal safety performance, but BP did not emphasize process safety. BP mistakenly interpreted improving personal injury rates as an indication of acceptable process safety performance at its U.S. refineries. BP's reliance on this data, combined with an inadequate process safety understanding, created a false sense of confidence that BP was properly addressing process safety risks. The Panel further found that process safety leadership appeared to have suffered as a result of high turnover of refinery plant managers.

Second, at some of its U.S. refineries BP has not established a positive, trusting, and open environment with effective lines of communication between management and the workforce, including employee representatives. Creating trust within the organization at all levels is key to establishing an environment in which safety critical information can be shared among the workforce and with management with confidence that the information will be used primarily for one purpose—to improve safety conditions and performance.

Third, BP has not always ensured that it identified and provided the resources required for strong process safety performance at its U.S. refineries, including both financial and human resources. Despite having numerous staff at different levels of the organization that support process safety, BP does not have a designated, high-ranking leader for process safety dedicated to its refining business. While the Panel did not develop or identify sufficient information to conclude whether BP ever intentionally withheld resources on any safety-related assets or projects for budgetary or cost reasons, the Panel believes that the company did not always ensure that adequate resources were effectively allocated to support or sustain a high level of process safety performance. In addition, BP's corporate management mandated numerous company-wide initiatives that apply to the U.S. refineries and that, while well intentioned, have overloaded personnel at BP's U.S. refineries. This "initiative overload" may have undermined process safety performance. In addition, operations and maintenance personnel in BP's five U.S. refineries sometimes work high rates of overtime, and this could impact their ability to perform their jobs safely and increase process safety risk.

Fourth, BP did not effectively incorporate process safety considerations into management decision-making that affects the U.S. refineries. BP tended to have a short-term focus, and its decentralized management system and entrepreneurial culture have delegated substantial discretion to U.S. refinery plant managers without clearly defining process safety expectations, responsibilities, or accountabilities. In addition, while accountability is a core concept in BP's Management Framework for driving desired conduct, BP has not demonstrated that it has effectively held executive management and refining line managers and supervisors, both at the corporate level and at the refinery level, accountable for process safety performance at its U.S. refineries.

Finally, BP has not instilled a common, unifying process safety culture among its U.S. refineries. Rather, the Panel found that each refinery has its own separate and distinct process safety culture. While some refineries are far more effective than others in promoting process safety, significant process safety culture issues exist at all five U.S. refineries, not just Texas City. Indeed, the refineries show some similar process safety cultural weaknesses, even though they do not share a unified process safety culture. The Panel found instances of a lack of operating discipline, tolerance of serious deviations from safe operating practices, and apparent complacency toward serious process safety risks at each refinery.

## PROCESS SAFETY LEADERSHIP

In a positive process safety culture, all constituencies of the refinery's workforce—from the plant managers to superintendents to HSSE professionals to hourly employees and contractors—regard process safety as a core value, and all levels of the workforce appreciate that process safety expectations are not considered secondary to production goals, budgetary objectives, or other competing considerations. While site leadership is certainly important in establishing a positive process safety culture, the Panel believes that leadership from the top of the company, starting with the Board and going down, is essential. In the Panel's opinion, it is imperative that BP's leadership set the process safety "tone at the top" of the organization and establish appropriate expectations regarding process safety performance. Those expectations must reflect an unwavering commitment to process safety and infuse into BP's workforce the mindset that process accidents are not acceptable. Those expectations must also be translated into measurable goals designed to move BP toward the achievement of excellence in process safety performance.

Through interviews of the refinery workforce, a review of BP documents, and the process safety culture survey, the Panel determined that BP has not adequately established process safety as a core value across its U.S. refineries. The Panel believes that a primary reason that process safety is not more widely shared as a core value in the U.S. refinery workforce is that BP executive and corporate refining management have not provided effective process safety leadership. Instead, they provided the refining workforce with a plethora of messages concerning many values, and these tended to dilute the importance of any corporate vision on safety generally, much less process safety in particular. As discussed below, the Panel believes that BP has not provided effective leadership on or established appropriate operational expectations regarding process safety performance at its U.S. refineries. The Panel also believes that the lack of effective leadership was systemic, touching all levels of BP's corporate management having responsibilities relating to BP's U.S. refineries.

BP has emphasized personal safety but not process safety. BP has relied largely upon injury statistics, rather than process safety metrics, in performance contracts and variable pay programs that it uses to drive conduct within its organization. BP interpreted improving injury rates, which are widely tracked in the industry, as an indication of acceptable process safety performance at its U.S. refineries, BP's reliance on this data and its inadequate process safety understanding created a false sense of confidence that BP was properly addressing process safety risks at these refineries.

The Panel's review indicates that experienced refinery workers are often reluctant to take supervisory positions, resulting in inexperienced supervisors. Consistent with the sentiment expressed during interviews, more than 20 percent of Whiting's maintenance/craft technicians, HSSE employees, and operators indicated their impression that sometimes there was insufficient staff in their work groups to perform their jobs safely. On the other hand, contractors' responses suggested that they were generally satisfied with the amount of staff in their work groups.

Many hourly workers interviewed at Texas City reported that understaffing had historically been a significant issue at that refinery, and many BP documents reflect this concern. Survey results demonstrate this perception, as reflected by 26 percent of employees in the nine process safety functional groups, as a whole, indicating that sometimes there was insufficient staff in their work groups to perform their jobs safely. For the six process safety functional groups highlighted throughout this report (*i.e.*, operators, maintenance/craft technicians, HSSE employees, engineering professionals, operations management, and maintenance management), negative response rates ranged between 20 percent and 32 percent. On the other hand, contractors provided a low negative response rate of nine percent and a high positive response rate of 78 percent.

Many workers interviewed at Carson expressed concern about staffing at all levels of that refinery. Many management employees stated that their departments were understaffed, leaving them unable to keep up with the recent increase in paperwork, audits, and initiatives. Additionally, hourly employees interviewed said that their units were staffed adequately for normal operations but not for emergency procedures or upset conditions. Survey results provided a mixed message. Sixteen percent of employees in Carson's nine process safety functional groups indicated their belief that there was sometimes insufficient staff in their work groups to perform their jobs safely. Carson operators and maintenance/craft technicians provided the highest negative response rates of 21 percent and 20 percent, respectively. In contrast, contractors and employees in the other process safety functional groups tended to respond more positively.

Cherry Point's interviewees and survey respondents generally did not express concern about staffing problems at the refinery.

BP now appreciates the loss of its refining expertise and is taking meaningful steps to address it. The Refining Technology function, which once had as few as 35 people, currently has more than 150 and is still growing. BP is examining line management for its U.S. refineries to see where it needs strengthening, and many of the refineries are hiring at various levels, particularly operators and engineers.

### > U.S. refinery funding

Good process safety performance requires adequate resources, including funding for inspecting, testing, maintaining, and repairing or replacing equipment; resources for training and educating personnel; resources for keeping operating procedures up-to-date; and resources for implementing best or good industry practices. If a refinery is underresourced, maintenance may be deferred, inspections and testing may fall behind, old and obsolete equipment may not be replaced, and process risks will inevitably increase. The Panel does not believe that BP has always ensured that the resources required for strong process safety performance at its U.S. refineries were identified and provided.

The Texas City refinery illustrates this point. From 1992 to the 1998 merger with BP, Amoco consistently and significantly cut costs in the Texas City refinery.[23] Between 1992 and 1999, total maintenance spending fell 41 percent; from 1992 to 2000, total capital spending fell 84 percent.[24] Notwithstanding this sustained period of budget cutting, after the merger BP issued a company-wide challenge to each of the refineries to cut their budgets an additional 25 percent without jeopardizing the integrity of the facility. According to at least one senior manager, progress toward meeting that challenge to cut costs 25 percent became a milestone in each refinery plant manager's performance contract. Pursuant to that corporate challenge, Texas City continued to cut costs,[25] and some data indicate the refinery came close to meeting the 25 percent target.

In 2002, BP commissioned a report by A.T. Kearney to understand, among other things, "the historical facts which have led to the deterioration of the Texas City refinery performance."[26] The report noted the funding trends discussed above and connected the significant reductions in refinery spending with the corresponding deterioration in the refinery's integrity and reliability:[27]

- In the last ten years, maintenance budget allocation has been controlled essentially by a "top down" allocation of funds.[28]
- Budget cuts were imposed based on the previous year's spend, and did not take into account the specific needs of the refinery.[29]
- Prior to 2002, the refinery did not carry out a thorough, "bottom up" analysis of maintenance needs or challenge the budget allocation process.[30]
- Evidence from annual performance reports suggested that cost cutting was not carried out as a structured, managed, and measured process.[31]
- There was no application of best practice in order to reach the budget reductions without reducing the level of maintenance work.[32]

In October 2002, refining corporate management requested that from a budgetary perspective, Texas City "enter 'crisis mode.' . . . [while] not compromis[ing] the safety and environmental performance of our units."

Although BP began to increase funding for the U.S. refineries in 2002, and between 2002 and 2006 the budgets for the U.S. refineries increased every year, BP nonetheless continued to issue budgetary challenges. For example, in late 2004 BP issued a 25 percent regional capital budget challenge for the five U.S. refineries for 2005 seeking to reduce capital spending. Numerous interviews and documents reflect that Texas City continued to feel considerable budget pressure, and some at the refinery were critical of the refinery's senior leadership for not pushing harder for larger budgets.

Despite BP's increased funding for its U.S. refineries from 2002 onward, the Panel's impression is that BP did not act with sufficient urgency to make up for what had been many years of insufficient funding, and as a result, at least some of the refineries continued to be underinvested. The Panel does not mean to suggest that BP deliberately underinvested in the refineries and notes that it does not have sufficient data to quantify such an assessment. Moreover, during the course of the review, the Panel did not develop or identify sufficient information to conclude whether BP ever intentionally withheld resources on any safety-related assets or projects for budgetary or cost reasons. The Panel believes, however, that the company did not always ensure that adequate resources were effectively allocated to support or sustain a high level of process safety performance.

It is not clear to the Panel why the U.S. refineries did not receive greater funding. The Panel did not have access to specific refinery budget requests and allocations or other detailed documentation. As a result, the Panel could not attempt to ascertain whether and the extent to which refinery requests for funding that arguably impact process safety were reduced or rejected. As part of its business plan, each refinery requests capital for three different purposes: (1) license-to-operate (funding needed to be in legal compliance and otherwise remain open to operate); (2) sustainability (capital needed to maintain long-term operations); and (3) commercial (money for new opportunities, expansions, and so forth).

The Panel understands that BP examines each "bucket" differently: license-to-operate requests receive little push back; sustainability requests get reviewed by technical experts; and commercial requests are considered last and receive the heaviest scrutiny. According to various BP personnel, license-to-operate and sustainability requests typically receive full allocations, with the vast majority of the annual fluctuations in refinery spending falling on commercial requests. While BP does not have a "safety" component *per se* in its refinery budgets, the Group Vice President—Refining informed the Panel that he had not encountered a situation in which BP failed to provide a refinery with the necessary resources to address a known safety problem. Because that same executive also acknowledged to the Panel—as did some other members of BP management—that some of the U.S. refineries were underinvested in prior years, the question of "why" is raised. Did the refinery plant managers and their staff fail to see the need to spend more? Were they paring back on the amounts requested because they believed this was what their superiors wanted to see? Did they believe that they were more likely to be rewarded for meeting aggressive cost-cutting goals? The Panel is unable to answer these questions because of the BP "three bucket" budgeting approach, which makes it difficult to identify safety-

related requests, the lack of historical budget documentation, and the turnover of most of the refinery plant managers from the 2000-2004 period.

Browne's recent presentations within BP appear to acknowledge the previous underinvestment and to suggest that it was largely the result of an inability on the part of refining line management to see the need to spend more money. In his October 2006 BP town hall meetings, Browne commented that for a number of years, BP had a "make do" mentality when times in the refinery business were tough and there was not much money to go around. Browne also commented that the other side of "making do" is the fact that if a business gets used to not having something, it does not notice its absence. If the business makes do for a long time, it begins to become blind to some of the risks that the business faced because the business just got used to them. The Panel generally agrees with Browne's comments, and the Panel commends BP for its July 2006 announcement that it would increase its spending in the U.S. refineries on maintenance, turnarounds, inspections, and training to $1.2 billion in 2005, to $1.5 billion in 2006, and to an average of $1.7 billion each year from 2007 to 2010.

Regardless of the reason at least some of the refineries were underinvested, it is apparent that refinery-level management has been concerned about the sufficiency of BP's funding. For example, the Whiting 2005 site specific business plan lists the refinery's first "key risk" as

> Availability and Infrastructure Renewal—Whiting is a very old facility with aging infrastructure. Reduced spending in past years has resulted in degradation of a lot of this infrastructure and coupled with poor work processes has resulted in significant availability, safety and environmental issues and high reactive maintenance costs.

Similarly, the Texas City plans for 2003 and 2004 list "Infrastructure Reliability and Mechanical Integrity" as short/near term risks, and the 2003 gHSEr audit of Texas City noted that the "condition of the infrastructure and assets is poor." And again, corporate-level refining managers acknowledged to the Panel that some of the refineries historically were underfunded.

Interviews with refinery personnel reflect concerns about process safety funding at three of the refineries. While employees at Cherry Point and Carson generally did not complain about the funding of their refineries, many workers at Texas City, Toledo, and Whiting did. Many employees interviewed at Texas City expressed the belief that BP was generally unwilling to spend the money to maintain the integrity of equipment, although they uniformly believed that BP had demonstrated a substantial monetary commitment to the refinery since March 2005. The January 2005 Telos survey report relating to Texas City noted the "strong sense that the [site's safety] commitment . . . is contradicted by the lack of resources . . . ."[33] Many hourly workers interviewed in Toledo said they believed that the maintenance budget had been slashed, with significant negative process safety implications for the refinery. However, Toledo management disputed any budget cutting, and documents indicate that the maintenance budget in Toledo has, in fact, increased since 2002. Many hourly workers interviewed at Whiting reported believing that the refinery was significantly underfunded and that as a result, preventive maintenance was seldom practiced, the refinery had a "run until it breaks" mentality, and the workforce had a great deal of experience running equipment with "Band-Aids."

# INCORPORATION OF PROCESS SAFETY INTO MANAGEMENT DECISION-MAKING

In addition to a lack of a high-ranking process safety leader who can ensure that process safety is sufficiently considered in management decision-making, the Panel detected several issues with BP's approach to incorporating process safety into management decision-making. In the implementation of its business plans, BP establishes various goals and metrics for performance, including financial performance, operating performance, environmental performance, and personal safety performance. In this process, as discussed in Section IV and elsewhere in this report, BP relies to a large degree on its performance contract system to drive conduct in a manner consistent with its corporate goals. To a large degree, the BP system focuses on measurement and monitoring of performance results against these corporate objectives, established at the corporate level and cascaded through the BP organization using performance contracts. These performance contracts establish goals and metrics, and management at different levels of the organization monitors performance against the metrics to provide assurance that corporate objectives are being accomplished. The system also uses many goals and metrics, including financial results and production, that are capable of measurement and feedback in the short-term. For Refining, other metrics used include availability of refineries for operation and personal injury rates. The performance system has a decidedly short-term emphasis, with performance contracts typically focused on annual metrics and goals.

Without commenting specifically on the use of performance contracts, the Panel believes that this general approach of establishing performance metrics and targets to accomplish corporate objectives, including the use of annual metrics, is not unusual. The Panel believes, however, that process safety considerations, many of which have implications that extend well beyond one year, have not been considered adequately in BP's management decision-making process and the implementation system used to drive conduct, at least in the U.S. refining operations. Many decisions relating to process safety involve costs and benefits that are both long-term in nature and sometimes difficult to measure. In making these decisions, how should management measure the benefits of expenditures intended to improve process safety performance, such as expenditures for training or additional testing of equipment? The costs, in terms of present dollars to be spent, can be determined or estimated with relative certainty; the benefits, in terms of an incremental reduction of process risk (*i.e.*, incremental reduction of likelihood of occurrence of a process incident), perhaps occurring over an indeterminate period, can often be very difficult to estimate. The benefit of some of these types of expenditures may not be known or realized for many years.

In addition, while BP promulgates broad, aspirational goals, it delegates substantial discretion to refinery plant managers without clearly defining process safety expectations or responsibilities. BP's framework lacks meaningful checks and balances, and while accountability is a core concept in BP's Management Framework for driving desired behavior, BP has not demonstrated that it has effectively held those with refinery line accountability responsible for process safety performance at its U.S. refineries.

## > Short-term focus

The Panel observes that BP directs a great deal of attention to short-term performance that is capable of quick measurement, analysis, and feedback (*e.g.*, profitability, production, environmental performance, and injury rates). BP provides clear expectations for performance in these areas, and can promptly ascertain how various decisions and events impact BP's performance. This focus is reflected in BP's reliance on performance contracts, which are the primary consideration in determining annual bonuses. The metrics and milestones contained in performance contracts have historically focused on short-term performance in areas such as profitability, production, environmental, and injury rates, all of which are measured in a relatively short (one year) period.

Assessments of process safety performance and capabilities, however, require metrics that differ from those used to assess performance in other areas and a management system that can measure performance against those metrics. The fact that a facility has not had a significant process safety incident for some time may say little about the true state of process safety at that site or the potential for a major process incident. Decisions and events impacting process safety or human capability may not have a discernible impact for many years. For example, a

decision to reduce spending on inspections, testing, or maintenance may have no apparent negative impact on process safety performance for a lengthy period. By the same token, increasing spending on inspections, testing, or maintenance may not lead to an ascertainable improvement in process safety performance in the short-term, as the lead times between the decision and the noticeable effect can be substantial. These long-term concepts such as process safety performance and human capabilities appear to be less well tracked, understood, and managed by BP's systems. BP management historically has neither particularly emphasized these items nor driven their results.

This observation finds a parallel in BP's own lessons from the Grangemouth incidents in 2000. Following the Grangemouth incidents, BP mobilized a task force to undertake a review of all operating units and functions at that refinery. One of the task force's findings was that BP was too focused on short-term cost reduction, and not focused enough on longer-term investment for the future. The task force also found that BP reinforced the short-term cost reduction focus through performance contract metrics, and the task force concluded that "HSSE was unofficially sacrificed to cost reductions, and cost pressures inhibited staff from asking the right questions; eventually staff stopped asking." It appears to the Panel that this problem also applied to the U.S. refineries.

## > Process safety expectations, responsibilities, and accountabilities

BP's Management Framework is based upon delegation and accountability through a chain of command that has numerous links. Through delegation, BP attempts to ensure that the most appropriate person is responsible for meeting expectations; through accountability, it attempts to ensure that each person in the chain of command has an interest in making certain that the responsible delegate performs the task.

In the broadest sense, BP's Board of Directors is accountable for ensuring process safety because it is ultimately accountable to BP's owners, the shareholders. BP's Board of Directors itself does not manage; instead, it delegates responsibility for all of BP's operations, including process safety in the U.S. refineries, to the Group Chief Executive. The Group Chief Executive himself does not manage BP's operations. While remaining accountable to the Board, he delegates responsibility to the Chief Executive, Refining and Marketing for all aspects of the refining business's performance. This series of delegations and commensurate accountability continues through two more levels until responsibility rests with the refinery plant managers. At each refinery, the plant manager is directly responsible for ensuring process safety in the refinery and all management in the refining line above the plant manager remain accountable. The refinery plant manager then cascades responsibility down throughout the refinery while remaining accountable. The overarching principle is that responsibility is delegated downward until it reaches the most appropriate person. Each person in the chain of command continues to be accountable, but the person closest to the task is responsible for ensuring that expectations are met.

In theory, this framework appears to be logical and coherent. In practice, however, the Panel perceives four problems. First, BP has often been unclear about specific accountabilities and responsibilities, creating confusion and situations in which no one appears to have responsibility for decisions impacting process safety. Second, the BP framework relies on a chain of individual-to-individual interfaces with few independent checks or reviews so that any single dysfunctional relationship can create a break in the process safety system management chain. Third, BP has not provided clear process safety performance expectations to refinery line management, including refinery plant managers. Fourth, the Panel has seen little information suggesting that BP has held people accountable for process safety performance.

**Unclear responsibilities.**   While BP appears to have been clear about the general concept of line accountability, it is apparent that responsibilities with respect to BP's refining organization have often been muddled. BP has a complex structure, and BP has frequently reorganized, created new positions, and shifted responsibilities between organizations. As a result, it has not always been clear with respect to process safety just who was responsible for what. Referring to Texas City, the Mogford Report observes:

> This large complex organization has many interfaces requiring clear accountabilities and good communication both horizontally and vertically throughout the organization. In reality, the Investigation Team found examples of a lack of

accountability, unclear roles and responsibilities, and poor communication with employees tending to work within silos. This, in turn, creates a confusion around some of the many interfaces.[35]

The Panel observed many instances of this lack of clarity. In the view of the Panel and within BP, the respective responsibilities and accountabilities of, and the inter-relationships among, the Safety and Operations function, the Group Technology function, and the Refining and Marketing HSSE and Technology organization (all of which are outside the refinery line organization) are not clear. At the refinery level, it is apparent that situations existed in which no one was clearly responsible for work that clearly impacts process safety (for example, the preparation of management of change analyses), and some refinery workers were uncertain how and where process safety management fit within the refinery's organization. While the BP Management Framework recognizes that accountabilities for process safety performance run with the line, BP must clarify the responsibilities of those in the line and of staff that supports the line to be successful in fostering good process safety performance.

**Absence of checks and reviews.**   At each link in the management chain, a BP manager or supervisor delegates responsibility to a person below, and the delegator satisfies his or her ongoing accountability by monitoring the delegatee's performance. BP's structure provides very few independent checks and reviews with respect to the functionality of this chain. As a practical matter, this framework depends heavily upon having healthy, productive relationships between the individuals at each and every link in this chain of command.

A problem can occur in this management framework if a breakdown in communication or understanding exists at any one of these interfaces. With respect to process safety, there are many potential reasons for such a breakdown, including

- the delegatee may not perceive a process hazard, the need to correct a process safety problem, or a process safety cultural weakness, and as a result, the delegator does not learn of the issue;
- the delegatee may believe that other goals, such as financial, production, or cost-cutting objectives, are more important to the delegator than process safety goals; and
- the delegator may not have sufficient understanding of the issues facing the delegatee, whether because of poor communication, lack of substantive knowledge, or otherwise.

Even a single dysfunctional relationship in the chain—whether between a supervisor and a superintendent, a refinery plant manager and the regional vice president, or the head of global refining and the Chief Executive, Refining and Marketing—can create a significant break in the management system for ensuring process safety performance.

**Lack of process safety expectations.**   Under BP's Management Framework, the refinery plant manager is accountable for all aspects of the refinery's operations with the exception of those encompassed by the centralized group functions, such as Tax and Accounting. While the refinery plant manager has many direct reports to whom accountabilities may be further delegated, BP regards the refinery plant manager as the person responsible for the refinery's financial, operational, environmental, and safety performance. While those in the line above the refinery remain accountable for all aspects of the refinery's performance, including safety, BP's management framework is clear that refinery corporate management satisfies its responsibility by monitoring performance, not by supervising the operations of the refineries.

BP recognizes that in this organizational framework, the refinery plant manager has a tremendous amount of discretion in running the business. Some people at BP refer to this as an "empowerment ethos."[36] As Browne has described, "we want them to be entrepreneurs, not bureaucrats doing exactly what they are told from above."[37]

On a day-to-day level, the refinery plant manager makes countless decisions relating to or affecting process safety. Particularly in the short-term, many of these decisions often involve balancing of various other refinery objectives and goals, such as production, profitability, cost reduction, and scheduling. While BP provides plant managers with reasonably clear guidance and direction with respect to financial,

environmental, and operational goals and targets, it does not provide comparable guidance as to process safety.[38] Refinery plant managers well understand BP's aspirational goal (and Group Value) that there be "no accidents, no harm to people," but BP does not provide the plant managers with specific directions on how to achieve that goal. Historically, BP has not included any targets or milestones for process safety objectives in refining performance contracts or variable pay programs, nor has BP provided any meaningful guidance to refinery personnel on how process safety objectives should be considered when they may compete with other refinery objectives.

Specific business plans reflect the same absence of focus on process safety. Each refinery's specific business plan contains detailed financial metrics and targets, along with key performance indicators based on delivery of strategic objectives. Through 2005, however, the only safety-related key performance indicators were days away from work case frequency and recordable injury frequency, neither of which is an appropriate indicator of process safety performance. The absence of any process safety-related metrics in Refining performance contracts, variable pay programs, and site-specific business plans left local refinery management largely on its own in making decisions that could affect process safety.

It appears to the Panel that BP recognizes the need to provide more clarity on process safety expectations. In the Group HSSE Report issued in mid-2005 to the EEAC, BP proposed several "safety interventions" to improve safety performance, including a reworking of gHSEr to "become more prescriptive for those units who [sic] can benefit from more guidance and implementation assistance." In his second interview with the Panel, Browne acknowledged the need to reset process safety expectations, and BP has begun tracking, from the Board down to the refineries, what BP calls the eight "enduring milestones" that include some leading and lagging indicators of process safety. Finally, BP is now including better metrics for process safety in Refining performance contracts and variable pay programs.

**Lack of holding people accountable.**    In order for BP's framework to be meaningful, BP must truly hold people accountable for process safety performance against meaningful performance metrics—with rewards for good performance and repercussions for poor performance. If BP does not actually hold people accountable for process safety performance against such metrics, then BP will have an organization in which no one is responsible for process safety performance. When refinery personnel perceive that neither they nor others are actually held accountable for process safety, it is difficult to see how a positive safety culture can be sustained, or how process safety risks will not increase. Both the Mogford Report and the Stanley Report noted the lack of accountability (referred to as the perception of "[n]o consequences of good or bad performance" in the Mogford Report) as significant drivers of poor process safety performance at Texas City.[39]

BP provided the Panel with few examples of actually holding people at all levels accountable for process safety performance.[40] The Texas City accident provides a good illustration. Under BP's Management Framework, those accountable for that accident, and Texas City's process safety performance generally, include the Group Chief Executive, the head of the Refining and Marketing segment, and on down the chain to the Texas City plant manager, the refinery operations manager, and various supervisors and superintendents in the ISOM unit. While recognizing that the process safety culture problems at Texas City developed during the course of many years and that some people in the line of accountability had been in those positions for only a short time, the Panel considered the extent to which BP held all levels of the line in some way accountable. In making this assessment, the Panel understands that accountability within BP is not tantamount to fault.

The Group Chief Executive's 2005 bonus was 40 percent less than his 2004 bonus, notwithstanding the fact that BP had its best financial performance ever in 2005. While BP did not expressly inform the Panel that the Board reduced the Group Chief Executive's bonus because of the Texas City incident, the Panel believes that it may reasonably infer that the Board did exact a significant financial penalty on the Group Chief Executive at least in part for that accident.

The Panel has little specific information about the financial or other repercussions of the Texas City ISOM accident on other members of corporate management. The only information BP provided the Panel in this regard was the representation that for 2005, the Refining and Marketing senior executive team received bonuses that were, on average, 13 percent lower than those of their peers in BP's other two segments. BP did not provide the Panel with any information indicating what the bonuses would have been absent the accident, or even which members of

**Prioritization of inspections and maintenance.**   Finally, as shown in the table below, employees in some process safety functional groups at Toledo, Texas City, and Whiting provided high negative response rates regarding the prioritization of inspection and maintenance at their refineries. At Toledo, for example, more than half of operators (56 percent), half of maintenance/craft technicians, 32 percent of HSSE employees, 30 percent of operations management, and 26 percent of engineering professionals expressed a belief that inspection and maintenance were not high priorities. At Texas City, 37 percent of operators, 36 percent of maintenance/craft technicians, 28 percent of maintenance management, and 21 percent of engineering professionals also expressed that belief. Finally, at Whiting, 26 percent of operators, maintenance/craft technicians, and HSSE employees responded in the same manner. Respondents at Carson and Cherry Point were far more positive. At these refineries, neither the contractors nor any of the six employee groups shown below had negative response rates in excess of 19 percent.  At Carson, contractors and five employee groups had negative response rates of ten percent or less, with zero negative responses from operations management. At Cherry Point, contractors and four employee groups had negative response rates of ten percent or less.

### Table 44

**Percentages of Disagree/Tend to Disagree Responses to Survey Item:**
**"In order to ensure process safety at my refinery, inspection and maintenance are made high priorities."**

| Category | Carson | Cherry Point | Texas City | Toledo | Whiting |
|---|---|---|---|---|---|
| Operators | 19 | 13 | 37 | 56 | 26 |
| Maintenance/Craft Technicians | 10 | 7 | 36 | 50[‡] | 26 |
| Full-Time HSSE Employees | 5 | 4 | 19 | 32[‡] | 26 |
| Engineering Professionals | 7 | 4 | 21 | 26 | 16 |
| Operations Management | 0 | 10 | 19 | 30 | 9 |
| Maintenance Management | 4[‡] | 13[‡] | 28 | * | 9 |
| Contractors | 8 | 6 | 15 | 10 | 11 |

[*]  Survey data are not available because of the small number (fewer than 15) of potential respondents.
[‡]  Fewer than 25 respondents were in this group.


## > Results from various BP audits

In addition to results from the technical reviews and process safety culture survey, the Panel's review of BP's gHSEr audits and prior process safety management audits indicates that BP does not ensure timely compliance with internal process safety standards and programs at its five U.S. refineries.

**2003 gHSEr audit.**   In the 2003 gHSEr report, a number of common themes emerged, largely related to behaviors, implementation, and follow through that have impacted HSE performance. According to this report, the most significant of these common themes included a "[w]idespread tolerance of non-compliance with basic HSE rules." In addition, the 2003 report contained a section captioned "Actions which could address these gaps." These action items stressed that activities to reduce non-compliance should include

- clear articulation of the "rules" and how compliance will be monitored;
- incentivization of staff (and contractors);
- leadership through engagement, personal behaviors, and challenges; and
- clear policies on how noncompliance will be dealt with throughout the line, not just at the operator level.

**2004 Internal Audit.**   An internal audit report relating to 2004 but issued in August 2005 discussed noncompliance with BP's standards on health, safety, and environmental matters. Among other things, this report noted that

> [t]here have been senior management interventions, especially in the [Refining and Marketing] segment, to address this compliance issue leading to focus teams undertaking unannounced spot checks ("Monitoring Events") on assets to assess compliance in specific areas including control of work, driving safety and the 8 golden rules. The findings of the Monitoring Events have been directly communicated to the relevant Segment [Group Vice-President] but it is as yet unclear what sustained impact is achieved.

> Overall the issue identified in the 2003 summary paper does not appear to have materially improved during 2004 despite the increased attention by Senior Management. Whilst this is disappointing it is not unexpected due to the scale of the organisation and past experiences of attempts to fundamentally alter behavioural safety issues.

**Prior BP process safety management audits.**   BP's own process safety audits also indicate that BP was not ensuring timely compliance with various internal process safety standards and programs at its U.S. refineries. Set forth below for each of BP's U.S. refineries are examples of findings from those internal audit reports in the area of inspections, testing, and/or maintenance.

### Carson (2005)
- 134 pressure relief valves were past due inspection, which was a significant reduction since the 2002 compliance review.
- 46 pressure vessels were past due date for internal inspection, and 120 pressure vessels were past due for wall-thickness measurements.
- Out of a random sampling of ten turbines, only one had a record of being tested for overspeed trip.

### Cherry Point (2005)
- Critical alarms were not generally tested, except at the hydrocracker unit. While the review found that a plan existed to implement such a testing program over a period of up to five years, the audit team advised that it considered this could be accomplished sooner.
- Management statistics for steam turbine overspeed trip testing were not readily apparent. According to the compliance report, this information is produced on a regular basis for assurance at other BP refineries.

### Texas City (2004)
- There was below 100 percent compliance with testing of on stream and turnaround critical instruments, overspeed trips on rotating equipment, and relief valves, as well as with inspection of piping, pressure vessels, and storage tanks.
- Many procedures for testing of critical instruments and emergency shut-down systems were out of date and some were missing.
- Interval-based inspections and risk-based inspection tasks were not integrated into one inspection management system for execution and tracking.

### Toledo (2004)
- 54 pressure safety valves were overdue for testing.
- Inspections of ten relief valves were being postponed without documented technical justification or risk assessment.
- 77 items of preventive maintenance were overdue by six months or more.
- Original equipment manufacturer manuals for certain critical alarms could not be produced.

**Whiting (2006)**

- Not all of the alarms and interlocks that serve a safety function were included in the mechanical integrity maintenance program.
- Numerous past due inspections and extended inspection due dates existed, and the management system to evaluate and control variances to test and inspection intervals was ad hoc or not well defined.
- Rupture disks positioned below relief valves may have failed in a manner that would have rendered the associated relief valves ineffective.

*Finding:*

*BP's safety management system does not ensure timely compliance with internal process safety standards and programs at BP's five U.S. refineries.*

> **Inadequate process safety knowledge and competency is a theme common to other panel findings**

The Panel also believes that deficiencies relating to process risk knowledge and competence in BP's U.S. refining organization are likely contributing causal factors for other findings elsewhere in this report. For example,

- Instances of a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process safety risks existed at each of BP's U.S. refineries.

- BP has not adequately established process safety as a core value across its five U.S. refineries.

- BP mistakenly used improving personal safety performance (*i.e.*, personal injury rates) as an indication of acceptable process safety performance at its five U.S. refineries; BP's reliance on this data and inadequate process safety understanding created a false sense of confidence that it was properly addressing process safety risks at those refineries.

- BP's investigation system has not instituted effective root cause analysis procedures to identify systemic causal factors.

- BP's process safety management system likely results in under reporting of incidents and near misses at BP's U.S. refineries.

As discussed elsewhere in this report, the Panel believes that the effects of widespread deficiencies in process safety training and education have manifested themselves in a number of ways at BP's U.S. refineries.

> **Steps BP has taken to date**

In recognition of the need to better determine the qualifications and competencies required of its workforce, including its U.S. refining workforce, BP has established in its Safety and Operations functional group a new position titled Vice-President of Organization Capability. BP has advised that the responsibilities of this position include developing plans to identify the skills and capabilities that are required for different work groups within the BP organization, including the U.S. refineries; assessing the capabilities of the workforce; and addressing any gaps or deficiencies in skills and capabilities through, among other things, training and development programs. BP has also advised that

- its Safety and Operations functional group is developing Group-wide training programs for leaders, including first level leaders (supervisors), superintendents, and operators;

- the training programs being developed for leaders include new training protocols and standards on safety across the Group;

- Refining has instituted an operations superintendent training program;

- its human resources function is developing Group-wide training programs for all managers and supervisors; and

- its Safety and Operations functional group is developing a set of standardized principles and expectations for board operator training.

In addition, the Panel understands that BP has taken or has begun to take a number of actions at Texas City relating to training and skill development. For example, BP has advised that at Texas City, it has instituted leadership development and other training programs involving a projected 300,000 training hours per year and has implemented enhanced training programs for all employees, including orientation for new hires, start-up and distillation training, and education on safety and environmental compliance, operations, and operator competency. For a brief listing of measures that BP has undertaken or announced since March 2005, including measures relating to training, see "BP Post-Texas City Measures" in Appendix F.

# C. Performance Evaluation, Corrective Action, and Corporate Oversight

In order to maintain and improve the effectiveness of a complex management system, such as a process safety management system, management must periodically evaluate the system's performance and address any identified deficiencies or opportunities for improvement. Continual improvement, which the total quality management concept of Plan-Do-Check-Act contemplates, represents a fundamental objective of management systems generally and safety management systems specifically.[1] As noted in the ANSI Z10 standard, an organization should evaluate its system's performance "through monitoring, measurement, assessment, incident investigations, and audits."[2] Upon identifying deficiencies within the system, the organization should then take corrective actions.[3]

An organization also should establish and implement a process for management to review the overall effectiveness of its safety management systems and make needed improvements. In a complex organization with multiple levels of management and with safety management systems having a site-specific element, some level of oversight at the corporate level (*i.e.*, above the operating business units) is required to evaluate the overall effectiveness of the corporate management system. Such a corporate-level review should take place at least annually and culminate in any improvements necessary to ensure the continued suitability, adequacy, and effectiveness of the systems.[4] This corporate oversight of the overall performance of the management systems provides the primary means by which an organization's leaders can assure themselves that the system is functioning as intended and that the organization is achieving its established performance goals.

These evaluations represent an essential element of BP's Plan-Perform-Measure-and-Improve cycle, which in turn serves as a fundamental element of the continuous improvement contemplated by BP's health and safety management system.[5] In this part of the Panel's report, the Panel will review the extent to which BP has implemented this continuous improvement cycle, with a particular focus on the "Measure-and-Improve" portion of the cycle.

**BP's record.**   BP has a mixed record of evaluating process safety performance, taking corrective actions, and implementing an effective continual improvement cycle. The Panel's review indicates that significant deficiencies existed in BP's site and corporate systems for measuring, monitoring, and evaluating process safety performance; investigating prior incidents and near misses; auditing system performance and compliance with applicable standards; and addressing previously identified process safety-related action items in a timely and thorough manner. Based on these deficiencies, the Panel believes that BP has not effectively implemented the Measure-and-Improve elements of its own system for continuous improvement of process safety management.

In addition, the Panel observes that many of the process safety deficiencies it identified during its review are not new to BP. Many of these same deficiencies were identifiable to BP based upon lessons from previous process safety incidents, including three major process incidents that occurred at BP's petrochemical complex in Grangemouth, Scotland in 2000. As a government report investigating the Grangemouth incidents noted,

> [i]nadequate performance measurement and audit systems, poor root cause analysis of incidents, and incorrect assumptions about performance based on lost time accident frequencies (DAFWCF—days away from work case frequencies) and a lack of key performance indicators for loss of containment incidents meant that the company did not adequately measure the major accident hazard potential.[6]

The Grangemouth review also "suggested major weaknesses . . . in monitoring, audit[,] and review."[7]

The Panel considers the similarities between the "lessons" from Grangemouth and the Texas City incident to be striking: a lack of leadership and accountability,[8] insufficient awareness of process safety,[9] inadequate performance measurement,[10] a safety program too focused on personal safety,[11] and a failure to complete corrective actions.[12] Although the incidents occurred five years apart at different sites in different

countries, many of the underlying deficiencies identified after the incidents appear to be the same, especially as they relate to evaluating process safety performance and then taking corrective actions.

## MEASURING PROCESS SAFETY PERFORMANCE

Regular measurement and monitoring of process safety performance allows an organization to evaluate the effectiveness of steps taken to control and reduce process risk.[13] The process of measuring and monitoring should provide "information to determine whether the day-to-day arrangements for hazard and risk identification, prevention, and control are in place and operating effectively . . . ."[14]

In order to measure the safety performance of their operations, many companies have incorporated leading and lagging indicators, also known as metrics or key performance indicators, into their safety management systems. Managers use these metrics to track safety performance, compare or benchmark safety performance against the performance of other companies or facilities, and set goals for continuous improvement of safety performance. The Panel notes that regulatory agencies, industry groups, and labor organizations have undertaken efforts to advance the state of the art in terms of developing process safety indicators. See Section III for a more complete discussion of indicators. The USW, for example, developed one such indicator in 1996. The CCPS and the UK HSE also have devoted significant efforts to the issue of process safety indicators since the mid-1990s. UK HSE, which regulates workplace health and safety in the United Kingdom, recently published Developing Process Safety Indicators, A Step-By-Step Guide for Chemical and Major Hazard Industries.[15] In the United States, the CCPS has renewed its work with a project on the development of process safety metrics.[16]

**Reactive monitoring: use of lagging indicators.**   When considering the measurement element of the continuous improvement cycle for process safety, it is critical to distinguish between reactive versus active measuring and monitoring. Reactive monitoring of process safety includes the identification, reporting, and investigation of process-related injuries, incidents, and property damage.[17] Reactive monitoring allows an organization to identify and correct deficiencies in response to specific incidents or trends. Reactive monitoring uses lagging indicators to measure historical, after-the-fact performance.[18] These indicators show when the desired safety outcome has not been achieved and the safety control system has failed to prevent an incident. Examples of lagging indicators include the number of unexpected loss-of-containment incidents and failures of safety critical instrumentation/alarms.[19] Because of their nature, lagging indicators of process safety performance suffer from the disadvantage that they only suggest corrective actions after an accident.

The refining industry commonly uses personal safety lagging indicators or injury rates. Largely derived from OSHA reporting, injury rates such as days away from work and recordable injury frequency have become established and generally accepted measures of personal safety performance. Companies collect and report these metrics at regular intervals. Additionally, many companies set goals based upon reducing lagging indicators such as recordable injury frequency. Although companies may set performance targets based upon reducing lagging indicators related to personal injury rates, the Panel believes (as BP aspires) that the ultimate goal for safety performance should be zero incidents.

Although recognized and generally accepted lagging indicators exist in the United States for personal safety, there is no universally agreed upon lagging indicator for process safety. Because process safety accidents occur infrequently and are often unrelated to each other in their causal factors, past process safety accidents have limited value in predicting future process-related incidents. Consequently, for purposes of managing process risks, organizations should develop leading process safety performance indicators that, if monitored, can be used to avoid or prevent process incidents.

**Active monitoring: use of leading indicators.**   Active monitoring evaluates the present state of a facility through the routine and systematic inspection and testing of work systems, premises, plant, and equipment,[20] including rotating equipment, pressure vessels, piping, relief

# USING RESULTS OF INCIDENT INVESTIGATIONS

As discussed above, an important component of an effective incident and near miss investigation program is the sharing of lessons learned from investigations throughout the organization. The Panel believes that BP's systems for using and sharing information from incidents and near misses are not effective in a number of respects. For example, BP does not appear to use near miss data to analyze whether the type of system control failure leading to the near miss was of a type anticipated in relevant hazard assessments. Because it does not analyze the data in this way, BP does not take advantage of an opportunity to reduce the likelihood of similar failures.

Additionally, BP sometimes does not effectively share lessons that are learned from near misses. The company's investigation into the Texas City accident found little evidence that the Texas City refinery had implemented BP Group programs to sure lessons learned.[117] The Mogford Report also concluded that the Texas City refinery had not learned lessons from the process safety experiences of other refineries.[118] During its recent audit at Texas City, a third party auditor found that the refinery did not properly incorporate information from near miss investigations as part of its review of process hazard analyses or PHAs. For example, the audit team identified near misses that had occurred before the last PHA but were not considered in revalidating the PHA. This point underscores the importance of ensuring not only that information is shared, but also that sites and individuals who receive it must be able to evaluate the information and take actions to manage risks of a similar occurrence.

The Panel, however, does not believe that this issue is limited to Texas City. Some of the responses to the process safety culture survey support this belief. Many BP employees and contractors, for example, disagreed or tended to disagree with a survey item stating that workers were informed about the results of process related incident, accident, and near miss investigations. Specifically, between 23 percent and 33 percent of contractors at all of BP's U.S. refineries except Carson responded in that manner. More than 20 percent of maintenance/craft technicians also responded negatively at Texas City (32 percent), Toledo (44 percent), and Whiting (21 percent). In addition, there were negative responses from 33 percent of HSSE employees at Texas City, 33 percent of engineering professionals at Toledo, 29 percent of operators at Texas City, 27 percent of operators at Toledo, and 21 percent of HSSE employees at Toledo. Responses from Carson and Cherry Point employees in the six groups shown below, however, tended to be more positive, with no more than 16 percent of any group responding negatively to the quoted survey item. Indeed, employees in five of the six groups at each of those two refineries had negative response rates of less than ten percent, indicating a general perception that workers were informed about the results of process related incidents, accidents, and near miss investigations.

## Table 65

**Percentage of Disagree/Tend to Disagree Responses to Survey Item:**
**"Workers are informed about the results of process related incident, accident, and near miss investigations."**

| Category | Carson | Cherry Point | Texas City | Toledo | Whiting |
|---|---|---|---|---|---|
| Operators | 6 | 3 | 29 | 27 | 10 |
| Maintenance/Craft Technicians | 16 | 6 | 32 | 44[‡] | 21 |
| Full Time HSSE Employees | 0 | 8 | 33 | 21[‡] | 8 |
| Engineering Professionals | 6 | 2 | 24 | 33 | 11 |
| Operations Management | 2 | 5 | 19 | 9 | 3 |
| Maintenance Management | 0[‡] | 13[‡] | 27 | * | 3 |
| Contractors | 16 | 24 | 23 | 33 | 30 |

* Survey data are not available because of the small number (fewer than 15) of potential respondents.
‡ Fewer than 25 respondents were in this group.

> **BP's response to other major process safety incidents: lessons from Grangemouth**

The Panel believes that BP's responses to other major process safety incidents provide an important insight into BP's effectiveness in correcting identified deficiencies. For this reason, the Panel considered BP's management of process safety at the U.S. refineries against the backdrop of three major process incidents that occurred at BP's petrochemical complex in Grangemouth, Scotland during a two-week period in 2000.[119]

The three incidents involved a power distribution failure (May 29, 2000), a medium pressure steam main rupture (June 7, 2000), and a fire in an operating unit (June 10, 2000).[120] No fatalities or serious injuries occurred, but the UK HSE considered that the absence of injury was only due to "good fortune."[121] The incidents received significant media coverage and caused public concern regarding BP's "operating competence and the ability to manage the site safely."[122]

The UK HSE and the Scottish Environment Protection Agency jointly investigated the incidents under the United Kingdom's Control of Major Accident Hazards regulations. Among their conclusions, the agencies noted that BP Group policies for health and safety management "set high expectations but these were not consistently achieved because of organisational and cultural reasons at the [c]omplex."[123]

BP conducted its own review, individually investigating each incident using the company's root cause investigation procedures. Following these investigations, BP convened a task force to undertake a wider review of all operating units and functions across the complex.[124] The task force's main investigation generated more than 800 prioritized recommendations.[125] A small core team of this task force also developed "key themes that were relevant complex-wide, and potentially had wider organisational implications for the Company."[126]

Based upon its review, the Panel considers the similarities between the lessons from Grangemouth and the events of the Texas City incident to be striking. As shown in the table below, the circumstances may be different, but the underlying issues are very much the same.

## Table 66

**Comparisons of Selected Findings from Investigations of the Grangemouth and Texas City Incidents**

| Issue | Grangemouth | Texas City |
|---|---|---|
| **Leadership and Accountability** | "Insufficient management attention and resources [were] given to maintaining and improving technical standards for process operations and enforcing adherence to standards, codes of practice, good engineering practice, company procedures and the HSE guidance."[127] | "Process safety, operations performance, and systematic risk reduction priorities had not been set and consistently reinforced by management."[128] |
| **Understanding of process safety** | "There was a need to build awareness and competencies in process safety and integrity management within senior leadership and the organization in order to develop a meaningful value conversation around cost [versus] safety. There was a lack of experience in some areas, and limited refresher training plans."[129] | "[The Texas City Refinery suffers from] an inability to see risks and, hence, toleration of a high level of risk. This is largely due to poor hazard/risk identification skills throughout management and the workforce, exacerbated by a poor understanding of process safety . . . . There was no ongoing training program in process hazards risk awareness and identification for either operators or supervisors/managers."[130] |

| Issue | Grangemouth | Texas City |
|---|---|---|
| **Safety focus** | "With no formal structure or specific focus on process safety, many of the components of process safety management (PSM) were not formalized at Grangemouth. There was no site governance structure to provide overview and assurance that process safety issues were being handled appropriately. Process safety needed to be elevated to the same level as personal safety."[131] | "The investigation team was not able to identify a clear view of the key process safety priorities for the site or a sense of a vision or future for the long term." <br><br> "[Texas City culture was] [f]ocused on environment and personal safety, not process safety." <br><br> "There was little ownership of PSM through the line organization."[132] |
| **Performance measurement** | "BP Group and Complex Management did not detect and intervene early enough on deteriorating performance . . . . Inadequate performance measurement and audit systems, poor root cause analysis of incidents, and incorrect assumptions about performance based on lost time accident frequencies (DAFWCF—days away from work case frequencies) and a lack of key performance indicators . . . meant that the company did not adequately measure the major accident hazard potential."[133] | "The safety measures focused primarily on occupational safety measures, such as recordable and lost time injuries. This focus on personal safety had led to the sense that safety was improving at the site. There was no clear focus or visibility on measures around process safety, such as lagging indicators on loss of containment, hydrocarbon fires, and process upsets."[134] |
| **Timely completion of corrective actions** | "Over the years a number of maintenance and reliability reviews, task forces and studies had been conducted, but many of the recommendations had not been implemented. There was a maintenance backlog and mechanical integrity testing was not prioritized to ensure that safety critical equipment received timely preventive maintenance."[135] | "Repeated failure to complete recommended actions from audits, peer reviews and past incident investigations."[136] <br><br> "There is currently a backlog of unclosed action items in the tracking databases related to various aspects of process safety management, including those stemming from incident investigations. Some of the latter extend back over a period of more than twelve months."[137] |

The Panel recognizes that BP implemented some corrective actions after the Grangemouth incident. For example, as the UK HSE acknowledged, BP developed a comprehensive strategy and set of priorities aimed at improving the complex's health and safety performance.[138] The incidents also led the company to issue the Group process safety/integrity management standard and to begin the Refining strategic performance unit project to develop what BP now terms process safety minimum expectations.

In the end, however, it appears that BP largely viewed the Grangemouth incident as three separate events. Although BP attempted to identify and communicate broader learnings, it does not appear that the effort was successful. A senior manager, who at the time was at another refinery in the United Kingdom, recalled limitations on the information that was coming out of the investigation and that most of the lessons learned addressed only one of the three incidents. Other managers whom the Panel interviewed offered similar views.

Individual business units may have learned and incorporated lessons from Grangemouth, but the Panel believes that a systematic and sustained effort to implement the lessons learned from the Grangemouth incidents at BP's refineries in the United States was not made. BP did not do enough

to confirm the application of lessons learned to sites other than Grangemouth. Perhaps because no fatalities occurred at Grangemouth, the Panel believes that BP eventually focused on other concerns as time passed and the internal and external scrutiny surrounding the incidents faded.

No one knows whether BP could have prevented the Texas City accident had the company made more comprehensive and lasting changes after the Grangemouth incidents in 2000. But the Panel believes that in its response to Grangemouth, BP missed an opportunity to make and sustain company-wide changes that would have resulted in safer workplaces for its employees and contractors.

---

*Finding:*

> *BP does not effectively use the results of its operating experiences, process hazard analyses, audits, near misses, and accident investigations, such as the Grangemouth investigation, to improve process operations at its five U.S. refineries and process safety management systems.*

---