# EXHIBIT 15

**UNITED STATES' OPPOSITION TO:**

**BPXP'S MOTION TO STRIKE THE EXPERT REPORTS OF WALTER H. CANTRELL AND RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO PRIOR INCIDENTS (Rec. Doc. 13475)**



# Management Accountability Project

## Texas City Isomerization Explosion
## Final Report

### February 2007

**BP CONFIDENTIAL -- FOR INTERNAL USE ONLY**

*Limited Distribution -- Copy 14*

6280
Exhibit No. _____
Worldwide Court
Reporters, Inc.

First, many of the management accountability failings we discovered permeated the entire BP organization:



The accountability delegations were muddled and confusing throughout the organization from the ISOM unit all the way to the R&M Segment leadership. For instance, Willie Willis convened a group shortly before the disaster to study and define accountabilities in the West Plant (the ISOM unit was a part of the West Plant). Similarly, the accountabilities, delegations and authority were confused at the Texas City site level, and between Texas City management, the Refining SPU, and the R&M Segment leadership.

Second, it was also apparent (team members attested visually) that the Texas City Refinery had not been adequately maintained for some years prior to 2002. While capital spending increased beginning in 2002, the infrastructure had deteriorated substantially, and it was apparent from the ISOM unit all the way to the Segment leadership that too few resources were directed to this problem.

Third, it is important to understand that neither poorly maintained assets nor muddled and confused lines of authority directly contributed or caused the ISOM tragedy. Indeed, none of the management accountability failings identified by the team caused the disaster. Rather, the culture prevalent at Texas City Refinery was the single most direct causal connection point as evidenced in part by these incidents:

- A unit was started up, although apparently no clear start-up order was given, and an operator who was not considered one of the most competent ISOM operators worked the control board.
- A very competent step-up supervisor sat in the satellite control room and took insufficient corrective action while he and others saw that too much product was poured into the splitter tower and the temperature and pressure continued to build.
- Both ISOM staff and management failed to announce generally within the Refinery, a unit start-up at the beginning of the day shift.
- A supervisor missed a hand over, came into work late, and then left early without a proper hand over to his relief at the critical time of a unit start-up.
- A supervisor was in charge of the ISOM who was not fully qualified on the unit.

CONFIDENTIAL                                                                                                        BPISOM00488920

In sum, the Texas City Refinery had a culture of risk taking coupled with a failure to understand the process safety implications of prior incidents (resulting in 3 deaths and a major explosion in the 12 prior months), a long tradition of failure to comply with simple procedures, the desire to avoid conflict within its organization, and a penchant for placing persons in key roles who lacked adequate professional training.

There were many management failures from the ISOM unit all the way up to R&M Segment leadership. A culture that evolved over the years seemed to ignore risk, tolerated non-compliance, and accepted incompetence – all of which were present on the night shift on March 22 and the day shift on March 23, 2005.

Finally, Texas City Refinery either did not learn or did not apply the lessons from prior incidents at Texas City and other BP refineries including the prior Grangemouth incidents. To his credit, Don Parus investigated and learned that there had been 23 deaths over the past 30 years at Texas City Refinery prior to the ISOM disaster. He began to speak to management and his workforce at all levels about this appalling record.

But Texas City Refinery was also a place with a culture deeply imbued with risk taking often times without a clear mitigation plan. Texas City, and the Refining SPU and Segment leadership did not understand the real cultural issues and they therefore did not establish the correct priorities. They focused on individual safety KPI's only, which told them they were doing fine. The initiatives created by Don Parus – "Just Culture", "1000 day goals" – missed the point. They did not work as far as improving process safety or otherwise mitigating a culture of risk taking. What was needed was leadership that put process safety first, recognized risks and required that persons be placed in roles based on competence.

Management failures must be identified so we can learn the lessons of the past and never repeat them. We should hold management, at least, to the same standards of performance to which we also hold other employees responsible.

As a consequence, management accountable for the operations of the Texas City Refinery has to be judged and held accountable for its management shortcomings regardless whether they had any direct causal impact on the ISOM disaster. Our consideration, therefore, does not place fault based on hindsight; rather, our consideration is predicated upon an analysis of the information relevant individuals had at the time and whether their actions were consistent with the management accountability framework set forth in BPMF, which is the same standard used by our senior leadership on a daily basis.

b.   Tiers 1-4

Building upon the local Texas City investigation conducted by Kathleen Lucas that assessed discipline for the disaster, the team considered which persons potentially had management accountability, direct or shared, for any other aspect of the disaster (including Lucas and Willis themselves). The matrix immediately following lists those persons and places them in the appropriate level of accountability tier. (It was determined that other persons, notably Ross Pillari, did not have any management accountability related to the disaster).

7

CONFIDENTIAL

BPISOM00488921

Willis is truly an impressive story of how someone advanced in an organization by exploiting every ounce of talent he had despite lacking strong formal technical training and background.

Gower and Parus devoted their careers to this company largely in refining environments and have held many positions of substantial management authority with significant past accomplishments.

Hoffman similarly devoted his career to refining and this company, and perhaps more than many others combined substantial technical skills with past leadership accomplishments as a refinery manager.

V. **Disciplinary Recommendations: Detailed Analysis**

The team believes that each of the individuals identified in Tier 1 (Hoffman, Gower, Parus, Willis) failed to perform their management accountabilities in significant ways, and recommends that BP seek ways to conclude their employment relationships on fair and just terms, in a timely manner.

a. Mike Hoffman, GVP Refining & Marketing

Since 2002, Mike had line accountability for Refining in the Segment, including process safety management. He was also the HSE tag for the R&M Segment Executive Team. Mike's deep technical expertise and knowledge stemming from a solid career in refinery operations combined with his accountability for all of BP's refineries put him in a unique position to place Texas City Refinery in its proper perspective for the Group.

Nevertheless, he doesn't appear to have drawn the necessary inferences from the warning signals that were expressed in the 2002 AT Kearney Report. Despite all of the messages and signals, we found that he did not regularly ask fundamental questions which might have highlighted operational risks at the TXC refinery. This is further demonstrated by Mike's lack of personal contact to the Refinery. Despite TXC being the largest refinery, he does not appear to have given them the proper focus as illustrated by his lack of personal visits even after the occurrence of alarming incidents in 2004 (one explosion and three fatalities).

Mike was well aware of the years of under-investment at TXC refinery both from presentations and personal visits. He approved many programs intended to improve the condition of the facility. He never turned down any request for money related to safety that we are aware of. He recognized the need for investment at TXC and increased capex and revex budgets.

However, he never came up with an investment strategy addressing the question of how to manage operational risks inherent at this site against a backdrop of constrained capital for the entire portfolio. He appears to have been unable to develop the right strategy for his SPU within the Group constraints and to properly develop his organization and establish a clear performance management structure. Particularly during the period between early 2002 and June 2004 the accountabilities of the different managers were disputed and unclear at almost every level. A document, called the "Blue Book" but without a date of publication (we believe it was issued post the incident) clarified the organizational structure in Refining, although there still

10

seemed to be disputes about reporting lines even in June 2006. In addition, it appears that notwithstanding some of the warning signals, he did not fully appreciate some of the risks identified in many parts of the site.

Mike was conflict adverse within his own leadership team, by among other things, leaving Don Parus in place against his own judgment. He also delegated performance reviews and QPRs to Pat Gower, while he nevertheless continued to hold the performance contract for Don Parus – a structure that contributed to management confusion and was inconsistent with BPMF principles. There was a clear standoff between Mike and John Manzoni resulting in Mike's isolation from the Segment's leadership team, which prevented him from creating strategic clarity as well as how to develop the SPU especially in light of the capex limitations. This isolation was also an impediment to John's familiarity with the Refining SPU's problems.

Mike was ineffective as a Group Vice President. He fostered a 'Fortress Refining' mentality in part by failing to have an effective relationship with his manager and shutting out other company resources. The team concluded from the interview that Mike blames 'BP' and his predecessors for the March 23rd disaster rather than considering his own accountability. No doubt, his predecessors took actions that resulted in a drastic need for infrastructure investment by the time he took over.

However, despite the warning messages in the 2002 AT Kearney report that the TXC Refinery was at serious risk from past management actions or inactions, he did not address the crucial issues including process safety management. Indeed, the "1000 Day Goals" initiated by Don Parus mainly progressed the integration possibilities within the South Houston complex. To the extent these goals had a safety component, that component focused on personal safety; management at all levels missed the significance of critical dimensions related to process safety (Mike was at the forefront of the management structure as an expert in refining and refineries). The gaps in BP's response became more evident when increases in capital spending did not prevent the serious incidents in 2004 which were precursors to the ISOM disaster.

We have concluded that Mike has not performed his duties effectively. His recent resignation from employment is consistent with the team's recommendation concerning his employment status.

b.  Pat Gower, Regional VP, North America

Since October, 2003, Pat carried direct accountability as the Regional Vice President for US Refining. This included five refineries, with Texas City Refinery as the largest and most challenging facility, implicitly signaling that it should have been Pat's number one priority. Pat has substantial experience with refining generally, and at TXC in particular beginning as early as 1982. He understood the problems of under-investment at TXC Refinery and maintenance budget reductions; notably, he was TXC Refinery Maintenance Manager in 1999. He also understood the shift toward a culture of non-compliance and risk tolerance. He was (or should have been through his "kick the tires" unaccompanied walk-abouts) aware of critical symptoms such as unreported fires, leaks, emergency shutdowns, and reliability issues. Pat did not adequately appreciate the process safety implications of the dilapidated state of the TXC Refinery.

CONFIDENTIAL

BPISOM00488925

Despite the fact that in his judgment, Don was not a strong refinery leader, he failed to initiate the appropriate changes. He waited until January, 2005, to introduce Kathleen Lucas to strengthen the operational management at the Texas City Refinery (and then failed to give her adequate support).

Although Pat was aware of the serious condition at TXC from many reports, we found no evidence that Pat made Mike Hoffman adequately aware that TXC Refinery had substantial operational challenges exacerbated by a high tolerance for operational risk. Pat also gave the impression to the team that he acted as an observer rather than managing difficult reporting and governance issues. For example, he acknowledged that Don did not appreciate him as a supervisor and did not communicate with him, but in response, he did nothing directly with Don to mitigate this troublesome situation. He also does not appear to take appropriate accountability for the incident although he did not shy away from taking on the difficult task of representing BP before government agencies and others regarding the March 23rd incident.

It is the team's conclusion that Pat failed to actively control and supervise the performance of the most complex and difficult facility even in the face of alarming reports and findings, and the severe precursor incidents in 2004.

c.  Don Parus, Texas City Refinery BUL

Don became the TXC Refinery BUL in June 2004 encompassing complete responsibility for the Refinery. Prior to this role, Don was the South Houston Integrated Site (SHIS) Director since 2002. Don has a solid professional background, which includes refining technical and managerial experience as well as having held functional positions in procurement and refining strategic planning. He was closely involved in the Veba deal and consequently had detailed knowledge of the Gelsenkirchen refinery which is considered a best in class benchmark within BP's refinery portfolio. This refinery, though smaller, is structurally comparable to the TXC refinery and was the subject of an AT Kearney study familiar to Don.

As the new SHIS Director, Don immediately recognized in 2002, the need to conduct a detailed study of the TXC Refinery modeled along the lines of the AT Kearney/Veba Report. One of the report's conclusions, "Asset safety is one of the biggest issues identified. There were serious concerns about the *potential for a major site incident* due mainly to the very large numbers of hydrocarbon escape [over 80 in the 2000 – 2001 period]", illustrated an important aspect of the TXC Refinery situation. The fundamental issues identified in the AT Kearney report (lack of investment, inadequate technical competence, lack of compliance, and lack of proper prioritization) were also substantiated in several other reports including the gHSEr audit and subsequent report led by Rick Porter in 2003; the CoW audit in May 2004; the Telos Report in late 2004/early 2005, and subsequently the Mogford report issued after the incident.

Don started several initiatives: he arranged for weekly site visits by the management, he initiated piping integrity project intended to stem hydrocarbon releases, and he championed increased capital spend. From what we can discern, the general view of Don and other managers was that the piping project would address many of the issues arising from hydrocarbon releases. Other safety initiatives focused upon – and effectively reduced – the rate of lost time and reportable accidents. Don also began an extensive education effort within TXC about the prior history of fatalities after the 2004 accidents. He deserves significant credit for all of the things he did. However, when it came to process safety and despite the warning in the

12

AT Kearney/Veba Report and others, and even after the March 2004 fire, he did not appreciate the increasingly critical issues related to process safety, but rather continued the emphasis on personal safety and other measures.

Don also failed to give clear messages about the seriousness of the issues at TXC Refinery. He did not address important issues such as process safety and risk tolerance when giving presentations to senior leaders, including Pat Gower, Mike Hoffman, and John Manzoni.

In the team's judgment, he spent a substantial (and perhaps disproportionate) amount of his time focused on the external environment and internal activities such as the Innovene separation. While one might justify those focused areas prior to June 2004 when he held the site director position, it is difficult to understand why he did not change his direct focus in-line with a Refining BUL once he became the BUL for Texas City Refinery. There was a standoff between Don and Pat Gower and the invariable result was that Don did not receive or request appropriate support.

Recognizing the complexity of the TXC Refinery situation and the lack of support from senior management, it is tempting to conclude that Don was on a mission impossible, and that he did not get adequate support from his principals. However, we have concerns about Don's effectiveness as a leader, evidenced by his lack of prioritization and his inability to ask for help in finding solutions to his problems. Don did not generally consult much with Gower or anyone else outside Texas City on refining issues and he seemed to prefer acting like a CEO rather than a "hands-on" refining BUL. Further Don's responses to the 2004 fatalities at TXC Refinery, while attention-getting, were not properly balanced by effective leadership and action to avoid re-occurrence.

Don takes clear accountability for the March 23 tragedy and expressed remorse and contrition. However, while the team identified several mitigating factors, it is our conclusion that Don failed to adequately carry out his accountabilities from a management perspective.

d.   Willie Willis, Manufacturing Delivery Leader (MDL), West Plant

Willie was responsible for the West Plant from September 2003 and assumed responsibility for the ISOM unit in September 2004. Willie's career began at the Cherry Point Refinery in 1979 as an operator and gradually progressed to leadership positions. It is our understanding that at the time of the incident, Willie was named as a succession plan candidate for senior refinery leadership roles including a group leader role, notwithstanding that he does not have any formal technical education qualifying him for this job. Despite his lack of technical expertise, he knew that a lack of compliance, apathy, and poor plant conditions among other things were problems at the Texas City Refinery site.

When Willie took on the ISOM unit in September 2004, he rejected several offers for detailed handover, which perhaps could have heightened his awareness of issues from past start ups. Because of his experience, Willie could identify some of the issues that the ISOM unit presented; however, he failed to check the competencies of the people in his organization. As the MDL for the West Plant, Willie was accountable to ensure that his managers carried out a unit start-up following proper procedures; that the roles and responsibilities of those engaged in operations were clear; that the right people were in the right job; and that there were no issues of excessive overtime. In the view of the team, these accountabilities were not adequately carried out. With regard to overtime, some or most of the individuals involved in the start-up

13

CONFIDENTIAL

had been working continuous days for several weeks, 12 hours per day as noted in the Mogford report.

Moreover, other troubling aspects of Willis' managerial style are the unintended consequences of the 'Willie Willis Way'. The 'Willie Willis Way', i.e., creating his own set of rules and procedures for which he was well-known, were lauded by others at the refinery. However, this approach ultimately led to operational breaches including such things as lack of clarity around the rules for step-up supervisors, not having proper handovers, and not following the start-up procedures.

Willie accepted accountability for the incident and expressed remorse and contrition. It is also apparent that he should not have been placed in an MDL role as he lacked the requisite technical and strategic competencies. However, in areas in which he was competent, he failed to appropriately perform his duties as a manager.

In conclusion, there are substantial mitigating considerations for Willis including his lack of technical and educational background and the short tenure of his responsibility for the ISOM unit. However, he was in charge of the unit when this tragic accident occurred and perhaps more than others he understood the risk taking culture that was so prevalent at the TXC Refinery. It is the team's conclusion that overall, Willis did not properly carryout his management accountabilities.

## VI. Observations and Recommendations

At the request of the senior executive sponsors, we have in a brief format identified in this section some of the significant observations we made about BP Group matters, the overriding culture aspects so prevalent in analyzing management accountability, and finally about the Texas City Refinery itself. These observations simply reflect what we saw as substantial factors that either influenced management or were the consequences of various management processes.

We have also taken the liberty to submit some high-level recommendations in response to these observations. We note that some of these observations parallel both the Mogford Report and the Baker Panel Report, nevertheless, we independently observed them and believe that senior BP management should be aware of these points. Moreover, it is possible that some actions are already underway consistent with these recommendations. Further conversation by senior leaders about these observations is recommended.

CONFIDENTIAL

BPISOM00488928

| OBSERVATIONS | RECOMMENDATIONS |
|---|---|
| 5. Lack of senior management presence at critical times in TXC | <ul><li>Regular field trips to major operations by senior management should be required in situations comparable to events that occurred at TXC in 2004 indicating a need for action.</li><li>Senior management presence underlines commitment to safety; hence visits should include not only Segment leaders, but also Function and Region leaders (GVP Refining; GVP R&M HSSE and Technology; GVP Safety and Operations, GVP Region)</li><li>Visits must include deep dive reviews -- systemic and integrated, addressing the important problems and issues</li></ul> |
| 6. "Steers" from London were understood as "orders" | Challenges must be clearly stated as challenges to ensure a constructive debate within management of both opportunities and risks |
| **CULTURE** | |
| 1. Stand offs | |
| The process of delegation was dysfunctional due to standoff relationships from TXC Refinery Management up to the CEO, R&M Segment | Stand offs must not be tolerated; these are clearly impediments to business delivery |
| 2. Fortress | |
| Fortress environments at TXC and the SPU level | As "The Group Comes First", each unit (Segment, Business, Function, Region) must behave as a part of the Group in alignment with "neighboring" businesses, functions and Region to create congruent outcomes |
| 3. 'Mavericks' (a breakaway from the status quo) | |
| There was a high-tolerance for mavericks who acted more in the interest of expediency with little regard for operational procedures | <ul><li>Breakaways can be acceptable, and even desirable, but only if transparent and after being challenged with respect to all other interests at stake</li><li>Management self-discipline is required</li></ul> |
| 4. Operational daily handovers | |
| No clear management expectation for routine daily operational handovers (evidenced by events on March 23, 2005) | Rigorously documented handover to be signed off by supervisor should be the required norm |

16

CONFIDENTIAL                                                                BPISOM00488930

| OBSERVATIONS | RECOMMENDATIONS |
|---|---|
| **4. Overtime** | |
| History of accepting high levels of OT; during turnarounds, there is a tendency to work extensive consecutive 12 hour days | Threshold for level of overtime must be defined on an individual basis for persons in safety-sensitive positions |
| **5. Presentations and communications did not completely reflect reality** | |
| a. Environment of good news presented in the first place; preference over bad news | Bad news and issues should be presented unambiguously at the beginning of presentations |
| b. Failure to consistently reveal the dilapidated state of the physical assets | Presentations should be verified by field trips |
| **6. Striking emphasis on commercial accomplishments relative to focus on asset improvement and process safety** | Safety always needs priority over financials and commercial, including during presentations |
| **7. Boiling frog syndrome was evident at TXC** | |
| Examples:<br>- There was a reported fire on site on average every week<br>- "Broken windows" problem | • Each manager needs to benchmark the performance of his/her unit regularly against best practices in the industry, and not against his/her past experience<br>• Rigorous reporting of events, failures and near misses must be the norm, enforced by performance contracts and assessments |
| **8. Lack of compliance** | |
| There was high level of tolerance for lack of compliance for routine daily operations | "Discipline and rigor" need to be corporate values, and then instilled through all levels of management |

CONFIDENTIAL

BPISOM00488933