# EXHIBIT 25

**UNITED STATES' OPPOSITION TO:**

**BPXP'S MOTION TO STRIKE THE EXPERT REPORTS OF WALTER H. CANTRELL AND RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO PRIOR INCIDENTS (Rec. Doc. 13475)**

# FATAL ACCIDENT INVESTIGATION REPORT

## Isomerization Unit Explosion Final Report

## Texas City, Texas, USA

Date of Incident: March 23, 2005
Date of Report: December 9th 2005

Approved for release by J. Mogford, Investigation team leader

6262
Exhibit No.
Worldwide Court Reporters, Inc.

BP-HZN-BLY00188729

TREX-06262

The team found no evidence of anyone consciously or intentionally taking actions or decisions that put others at risk.

While the site management had introduced improvement programs, such as the 1000-day program, had completed a site-wide Major Accident Risk assessment exercise (MAR) and, following previous incidents, had begun to introduce many improvements in the areas of training, audit, and culture, the team found many areas where procedures, policies, and expected behaviors were not met.

In the course of this investigation, the team found many areas, although not critical factors in the incident, where practices should be improved and have included recommendations to achieve this.

The investigation used the BP root cause methodology supplemented by the CCPS (Center for Chemical Process Safety) guidance. Documentary or instrumentation records were given credence and where evidence was purely drawn from interviews corroboration has been sought from at least two parties. Where confirmation could not be gained it has been noted in the report.

These underlying causes are identified as follows:

- Over the years, the working environment had eroded to one characterized by resistance to change, and lacking of trust, motivation, and a sense of purpose. Coupled with unclear expectations around supervisory and management behaviors this meant that rules were not consistently followed, rigor was lacking and individuals felt disempowered from suggesting or initiating improvements.
- Process safety, operations performance and systematic risk reduction priorities had not been set and consistently reinforced by management.
- Many changes in a complex organization had led to the lack of clear accountabilities and poor communication, which together resulted in confusion in the workforce over roles and responsibilities.
- A poor level of hazard awareness and understanding of process safety on the site resulted in people accepting levels of risk that are considerably higher than comparable installations. One consequence was that temporary office trailers were placed within 150 feet of a blowdown stack which vented heavier than air hydrocarbons to the atmosphere without questioning the established industry practice.
- Given the poor vertical communication and performance management process, there was neither adequate early warning system of problems, nor any independent means of understanding the deteriorating standards in the plant.

The underlying reasons for the behaviors and actions displayed during the incident are complex, and the team has spent much time trying to understand them.

addressed through quarterly status reports, which also present percent completion without prioritization.

A MOC is complete when all safety and environmental action items have been resolved and documented. An action item is considered resolved when either the recommendation has been adopted as written or the recommendation has been justifiably rejected. A recommendation may be justifiably rejected when, based upon adequate evidence, one of the following is true;

1. The analysis upon which the recommendation is based contains material factual errors.
2. The recommendation is not necessary to protect the health and safety of employees or contractor employees.
3. An alternative measure would provide a sufficient level of protection.
4. The recommendation is technologically and/or economically infeasible.
5. The equipment is out of service.

When a recommendation is justifiably rejected, this action must be communicated to the PHA, investigation, or audit team and any subsequent recommendations of the team resolved.

An action item is marked complete when the action item has been fully implemented or justifiably rejected and documentation has been recorded in the site PSM Action Item Tracking System. The documentation need not be detailed, but must be a positive statement of action (e.g., Completed as recommended-date, Training completed-date, Rejected-solution infeasible-substantiation-date, etc.). If the supporting documentation is lengthy (e.g., an RV study, complex engineering calculations, etc.), a synopsis must be entered into the tracking system and a complete copy sent to the site PSM group.

The PSM Action Item Tracking System has an additional check. When the individual assigned a safety or environmental action item responds to the action item with the resolution and justification for closure, the response is reviewed by both the unit Superintendent and the PSM group for concurrence. In the event of rejection by either, the action item is returned to the responder for reconsideration and appropriate response.

As of March 23, 2005, the ISOM unit had seven safety action items that were past due from the 2003 HAZOP revalidation. None of these action items were directly related to the Raffinate Splitter or Blowdown Drum.

### *5.9.4 Conclusions*

The "What If" Analysis technique is not robust enough to consider all modes of operation or process upset scenarios. Nor are any reviews adequate if real incident and historical data is not considered. The ability to identify the major risks present on the site is highly dependent upon the level of risk awareness of the individuals involved in the process. The lack of reporting of process excursions/incidents also hinders all types of hazard analyses.

It is not clear why the startup was conducted across two shifts. Previous startups, including preliminary packing to establish liquid levels, have been easily completed within a single shift. By spanning two shifts, an additional risk was created, which could only be managed by ensuring good communication between the two shifts.

#### *5.10.11 Operations Upset/Problem Reporting*

Process upsets, including lifting relief valves, were not routinely reported and investigated at the ISOM unit. While systems exist and could be used for this purpose, there appeared to be little diligence in reporting. Operations log books for the ISOM unit seldom reported pressure excursions on startups, including when relief valves lifted and vented vapors to the blowdown drum.

There also appears to have been little feedback to Operations management and Engineering, concerning equipment problems and departures from the formal operating procedures.

#### *5.10.12 Conclusions*

Despite the startup procedure not being fully updated, the procedure is generally of high quality, addressing all the safety warnings and key process control steps in detail. Many steps in the procedure were not followed, and the fact that the procedures were not updated indicates that they were not seen as important documents. Supervisors and Superintendents did not verify that the procedures were available and correct or being followed. Poor handover procedures meant that risks were not discussed and the correct procedures were not available to the board operator.

In general, employees were unaware of the risks of operating without the procedures, considering this to be a routine operation needing little evaluation or thought. As a result of this, the Control of Work process broke down.

### 5.11 Training (Knowledge & Skills)

#### *5.11.1 Training Program*

A local site policy, SH-PSM-5 "Training for Process Safety," outlines the requirements for training of operators and supervisors. The content of the training depends upon the employee or contractor's duties and responsibilities relative to the covered process.

The policy requires:

> *"Employees involved in operating or directing the operation of a covered process must be trained in an overview of the process and in the operating procedures. The training must include an emphasis on specific safety and health hazards, emergency operations and safe work practices, policies and regulations applicable to the employee's job tasks or work environment. Employees or contractors involved in maintaining or inspecting a covered process must be trained in an overview of the process and in the safe work practices applicable to the maintenance or inspection task."*

appear to be an effective system in place to verify that recommendations from audits were satisfactorily resolved.

An action from the 2004 PSM audit requiring unit-specific training for newly assigned managers, superintendents, supervisors, and engineers remained open awaiting development of specific training matrices for each position. A target date of end 2005 was set with a followup audit within 12 months to check compliance.

#### *5.18.5 Conclusions*

The Texas City site has been subject to several audits in recent years, but these audits focused on documented management systems and processes rather than actual practices, such as following operating procedures. The audits also appeared to ignore the history of previous incidents, process excursions, and near-misses. Verification and audit processes were inadequate to provide early warning of process safety risk. There also appeared to be few self-verification processes, such as documented assessments by supervisors and superintendents of the units they were accountable for, for example, that procedures were being followed. Action items did not appear to be tracked and effectively closed, especially those of nonspecific and cultural aspects.

### 5.19 Risk

#### *5.19.1 Risk Awareness*

As discussed in Section 5.11.9, process safety knowledge and skills within management and the workforce were generally poor. This was most evident in the area of risk awareness, where hazard/risk identification skills appeared to be generally poor throughout the supervision and crew of the ISOM unit. This was also evident in the PHA conducted as part of the MOC for the J.E. Merit trailer siting.

There was no ongoing training program in risk awareness and identification for either operators or supervisors/managers. There were two trainee outside operators on the Raffinate Splitter, and their hazard training was largely passed down by experience from others. Sometimes this guidance was poor, perhaps due to an element of complacency, such as when heavy vapors were seen emitting from the blowdown stack at 12:40 hrs, and a more experienced operator told the trainee not to be concerned.

The poor understanding of risk is also reflected in some of the Process Hazard Analyses (PHAs), including Hazop studies and the MAR assessment. For example, the MAR did not address blowdown stacks in the top 80 risks considered, and Hazops on the ISOM unit did not adequately address explosion risks. It is interesting to note that the site environmental aspect and impact assessment, conducted for ISO 14001 certification, identified blowdown drums during shutdowns and RV releases as the second highest impact ranking. However, it is apparent that blowdown drums did not receive the same focus for safety risks as they did for environmental risk.

There are two contributory factors for the poor identification of risk in these studies. Independent leaders/hazard analysts are preferred for these PHA teams due to their greater objectivity, and are responsible for probing the team members for local input, but may not have done so effectively. However, if team members have no training or motivation, and do not recognize local risks, the extent of probing will not change the final work product. If key risks are not addressed in PHAs, then the cycle is somewhat self-sustaining and lesser risks will likely be considered the most important, leading to complacency that no high risks remain. Similarly, the MOC risk review for the J.E. Merit trailer placement did not include any consideration of the risks associated with the blowdown stack, located within 150 feet.

There were no plans to systematically reduce safety risks in the refinery. No individual or group seems to have the accountability for driving process risk reduction across the site. There were no plans, for example, regarding the ultimate replacement/reconfiguration of the blowdown stacks in the site. Site management did not appear to be focused on understanding and reducing the highest risks.

### *5.19.2 Risk Acceptance*

When risks were identified, management and the workforce appeared to tolerate a high level of risk. The investigation team observed many examples of a high level of risk being accepted within the site. Two simple examples concerned vehicles and trailer siting.

A significant number of vehicles were allowed access into the site. Without designated parking areas, parking appeared to be tolerated almost anywhere, often on the shoulder of refinery roads in close proximity to hydrocarbon processing units and piperacks. Sometimes vehicle engines were left running.

The extensive use of trailers for housing people in close proximity to hydrocarbon processing units has already been addressed in detail in Section 5.11. The absence of a MOC for some trailers, and the superficial nature of the checklist risk assessment for others, reinforces the tolerance of risk.

To visitors, the risks associated with vehicles and trailers appeared unnecessary and seemed to have grown incrementally by custom and practice.

During the course of the investigation, there were several minor fires within the site, in addition to the serious incident on the RHU. Rather than major concern that any fire doesn't have a place in an oil refinery, employees generally appeared unconcerned, as fires were considered commonplace and a "fact of life" in the refinery. The lack of formal reporting, in part driven by the incomplete use of Traction, other than reference in ERT logs and investigation around previous fires, further supports the high tolerance level of risk.

Other examples of high risk tolerance concerned the failure to conduct a review of the Splitter startup procedure with the operations crew prior to the startup, as required by the procedure; unbalanced crews with all the PTs on the night shift; and the absence of both the Superintendent and Shift Supervisor during the startup, when it is common knowledge that

startup is a potentially higher risk activity. The decision to split the startup between two shifts coupled with an ineffective shift relief process are also clear examples, as was the decision to continue with startup despite operational issues and the lack of onsite supervision.

Finally, the risks associated with allowing F-20, an item of safety critical equipment, to continue to operate with appreciable internal corrosion were apparently accepted following its last inspection.

### *5.19.3 Conclusions*

There was a general inability to see key process risks, and both management and the workforce appeared to routinely tolerate a high level of risk. Numerous observations pointed to a high level of risk having become accepted. This was largely due to poor hazard/risk identification skills throughout management and the workforce, exacerbated by a poor understanding of process safety.

## 5.20 Communication

### *5.20.1 Operations*

The startup procedure includes the following note on the importance of good communication for safety:

> *"Through all phases of a startup, maximum attention must be paid to safety, details and communications. This must be shared between involved units, shifts and individual crewmembers. Good planning, scheduling, judgment and communication make safe and efficient startups."*

The acting Superintendent (who was the Training Coordinator stepped up) was aware that the Splitter was being started up, but did not visit the unit to review progress with the operators. The startup was not mentioned at the Shift Director's morning meeting to indicate to those in proximity that the unit was to be started. Attendance at the Shift Director's meeting is not mandatory, and there is very limited time allocated for discussion of process unit operations. In fact, there is only 15-minutes duration for this primary cross-unit communication. The acting Superintendent appears to have devoted most of his time on March 23 to the turnaround on the ARU.

The Day Shift Supervisor did not advise adjacent process units or others in the immediate vicinity of the ISOM unit that the Splitter was being started up. In addition to the occupants of the trailers, there were several hundred contractors involved in the Ultracracker turnaround who were unaware of the startup.

The Day Shift Supervisor did not clearly leave someone in charge when he left the site on the morning of March 23 for a personal family matter. There were varying views on who was in charge of the Raffinate Splitter between the acting Superintendent, Day Shift Supervisor and Operators.

The startup took place over two shifts, but there was no apparent effort to ensure additional communication between the two shifts to allow for the potential added risk. The handover at shift relief was less than adequate; no passdown between the Shift Supervisors, and the passdown between outside operators was brief and did not occur on the unit. There were no written expectations with explicit requirements for shift handover.

The Superintendent and Training Coordinator stated in interviews that they were unaware that operators were routinely deviating from the written startup procedure by using the 8-inch vent valve to control pressure excursions. Operators had not informed supervision of these departures from procedures, and there was no system in place to verify that practices conformed to procedures.

### *5.20.2 Process Safety*

General awareness in PSM appeared low throughout the organization. When the PSM rule was promulgated in 1992, there were training and awareness initiatives which had not been systematically refreshed. The use of e-mail to distribute information and bulletins does not appear to have been effective in maintaining process safety knowledge. Management, supervision and the workforce were largely unaware of regulatory requirements and Company standards, and local practices, such as MOC, were geared towards a minimal compliance basis. Sometimes these local practices were not followed and not enforced. Process safety did not appear to be a priority.

Examples of this lack of understanding of PSM and effective implementation of process safety included the following: The Operations Superintendent did not approve the J.E. Merit trailer for occupancy, and did not ensure that actions items from the trailer MOC were properly resolved. He allowed the other trailers to be sited in his area without a MOC being initiated. The Training Coordinator did not update the ISOM operating procedure for startup after a turnaround, and the Operations Superintendent certified that procedures were accurate and up to date without verifying. The Training Coordinator and Operations Superintendent allowed gaps in the training of some operators, and some training records were incomplete. The Shift Supervisor did not enforce, and the operators did not follow, the startup operating procedure.

As previously stated (see section 5.13.2.2), Amoco Process Safety Standard No.6 required blowdown drums on light hydrocarbon duty be considered for phasing out. Although this was known by the refinery PSM team, there was a general lack of awareness within the line organization, including the MDL and Operations Superintendent. This state of affairs existed despite one of the principal objectives of the site Process Safety Committee being:

> *"Effectively communicating and disseminating process safety related information throughout the refinery and chemical plants."*

baffles, decommissioning the quench system, and adding additional inlets, possibly reducing its effectiveness. Several uncontrolled areas were close to F-20, e.g., roads and trailer sites, all within 150 ft, with the permanent catalyst warehouse located within 350 ft. The use of a flare system or other closed relief system would have probably significantly reduced the impact of the incident.

## 6.2 Causal Analysis of Critical Factors

For each Critical Factor, Possible Immediate Causes and Possible Management System Causes (Root Causes) were identified using BP's Comprehensive List of Causes (CLC) methodology. The CLC is a "pre-defined tree" technique, which provides a systematic method of considering possible root causes associated with an incident. Predefined trees are one of the main Root Cause Analysis methodologies used within the petrochemical industry. This approach encourages investigators to contemplate a wide range of factors and not just those that come to mind through brainstorming. The investigator does not have to build the tree, but rather apply the critical causal factors to each branch in turn, and discard those branches that are not relevant to the specific incident. Further information on predefined trees is available from CCPS incident investigation guidelines (ref. 4).

The Possible Immediate Causes and Possible Management System Causes are presented in Appendix 34.

## 6.3 Underlying Cultural Issues

The significant number of identified immediate and management system causes (root causes), indicated many linked issues requiring further evaluation. In order to understand which recommendations would prevent reoccurrence it was decided to go deeper to the underlying cultural issues. The following issues have been distilled from the system causes:

### *6.3.1 Business Context*

The investigation identified the lack of clearly defined and broadly understood context and business priorities for the Texas City site as the first cultural issue for the incident. The investigation team was not able to identify a clear view of the key process safety priorities for the site or a sense of a vision or future for the long term.

- Focused on environment and personal safety, not process safety
- There was little ownership of PSM through the line organization
- The development of people was a low priority, with inadequate training
- In staff's minds this created no future

This led to a workplace environment characterized by poor motivation, unclear expectations around supervisory/management behaviors, no clear system of reward and consequences, low trust between groups (such as between employees and contractors, and workers and management), and highly inward looking.

- Created a poorly motivated workforce who behaved in a disempowered way
- Lack of enforcement of following procedures, etc.
- Lack of role models at supervisor and superintendent levels
- Little expectation of behaviors and performance
- No consequences of good or bad performance
- Reward structure leads to unintended circumstances
- Inward looking at plant and site level
- Lack of completion or follow-through
- No verification of actions
- Fear to challenge and say "no"
- Lack of teamwork evidenced by many behaviors and attitudes

Examples of this environment include:

- Failure to follow procedures was identified as a causal factor in several previous investigations, but there were not any consequences for this behavior at either supervisory/management or operator level (The "Just Culture" had not been fully implemented at the time of the incident).
- An explicit description of the desired behaviors for supervisory/management personnel was not readily available and evidenced by the absence of supervisors during key events such as critical shift handovers during a startup procedure.
- Supervisors did not reinforce the importance of following procedures.
- At its last inspection, appreciable corrosion and internal damage was discovered in F-20, an item of safety critical equipment, but it was neither repaired nor a work order submitted for later repair.
- A reward system that encourages supervisors and operators to work for extended periods of time (circa 30 days of straight 12-hour shifts throughout) with no clear consideration of fatigue.
- Many examples were given where individuals felt that making suggestions for improvements had little value and, over the years, had moved into a mode where they would follow instructions in an incomplete and routine way without thinking.

The last independent survey of the workforce produced bottom quartile People Assurance Survey (PAS) scores for the site, further emphasizing the low morale and distrust of site leadership.

The "check the box" approach to processes, such as MOC, is indicative of the poor motivation and reluctance to go beyond minimum compliance, and sometimes even the

works better within immediate work groups but not well outward or upward. An example of this is the West Plant MDL, who was unaware of the actual shift relief practices utilized in the ISOM unit.

As previously stated, the low investment in developing supervisory levels contributed to this lack of clarity and poor communication due to the low leadership skill levels of those involved. This is exacerbated by a lack of reward or recognition for those who step across boundaries and stand in personal leadership.

This complexity creates an organization which requires behaviors across boundaries, between different groups and companies, but the clear divisions seen ensure that people are unlikely to communicate with or influence across these boundaries. Because of this, natural teams are often incomplete or incoherent.

#### *6.3.4 Inability to See Risk*

The fourth cultural issue is the inability to see risks and, hence, toleration of a high level of risk. This is largely due to poor hazard/risk identification skills throughout management and the workforce, exacerbated by a poor understanding of process safety. Although some effort had been expended to raise awareness and understanding in the early 1990s, when OSHA promulgated the PSM rule, this basic training had not been effectively refreshed over the intervening years. There was no ongoing training program in process hazards risk awareness and identification for either operators or supervisors/managers.

- No risk reduction plan
- Passed down by experience, which was sometimes bad
- Gradually increasing risks and no process for systemic review
- Accepting incrementally lower standards throughout operations

As previously stated, there were not effective holistic plans to systematically reduce risks in the refinery. Examples of this include no plan in place regarding the ultimate replacement/reconfiguration of the blowdown stacks in the site. The most recent Major Accident Risk (MAR) assessment for the site failed to address the risks associated with blowdown stacks. The ISOM unit and its associated blowdown stack did not feature in the list of the top 80 risks at the site. Similarly, the MOC risk review for the J.E. Merit trailer placement did not include any consideration of the risks associated with the blowdown stack, located within 150 feet.

The Investigation Team observed many examples of a high level of risk within the site. At the most basic level was the significant number of vehicles allowed on the site, in close proximity to hydrocarbon processing units, and the extensive use of trailers for housing people in close proximity to hydrocarbon processing units. To visitors, this appeared unnecessary but had grown by custom and practice.

During the course of the investigation there were a number of (minor) fires within the site, in addition to the serious incident on the RHU. The general reaction of the workforce to these fires appeared to be not to worry, as fires were a fact of life in the refinery. Indeed, this was supported by the lack of investigation around previous fires. There were references to fires in Emergency Response Team logs without any documented investigation reports.

Other examples of high risk tolerance concerned the failure to conduct a review of the Splitter startup procedure with the crew, as required by the procedure; the absence of supervision during the startup, when it is common knowledge that startup is a higher risk activity; and the lack of reporting of significant process upsets, such as relief valves lifting during previous startups.

All of these observations point to both a high level of risk having become accepted and an inability to see key process risks.

### *6.3.5 Lack of Early Warning*

The fifth and final cultural issue is the lack of a holistic early warning system for process safety exposures. The site has numerous measures for tracking various types of operational, environmental and safety performance, but no clear focus on the leading indicators for potential catastrophic or major incidents. Numerous audits had been conducted at the site in line with regulatory and corporate requirements, but had generally failed to identify the systemic problems with work practices uncovered by this investigation.

- Vertical communication is poor.
- Many Key Performance Indicators, but not transparent or useful for loss of containment, showing Recordable Injury frequency improvement.
- Audit was process focused and did not gain verification of action.

The safety measures focused primarily on occupational safety measures, such as recordable and lost time injuries. This focus on personal safety had led to the sense that safety was improving at the site. There was no clear focus or visibility on measures around process safety, such as lagging indicators on loss of containment, hydrocarbon fires, and process upsets. Examples seen of this include that site leadership was not focused on trend analysis of measures that were likely to deliver an accurate sense of process safety at the site. Loss of containment incidents and process incidents did not get the attention they warranted. Many were not even formally reported or investigated, and thus corrective actions were not identified and addressed.

A large number of audit reports were reviewed by the Investigation Team, demonstrating that audits were being routinely conducted. The reports indicated that, for the most part, these audits were focused primarily upon review of processes and documentation. With the exception of the "Big 4" safe work practice audit, none of the audits reviewed focused on verification and assessed, for example, whether or not procedures were being followed, and whether work practices were actually consistent with the procedures.

## 7. Proposals for Corrective Actions

The following recommendations address the root causes and underlying cultural issues that the Investigation Team identified on the ISOM unit. Many of these recommendations are already documented in existing policies and procedures, but are either not being followed or are not specific enough. The site must ensure that actions are followed through and that verification processes are reinforced to ensure that all existing policies and procedures are being followed. In addition, adequate resources will need to be provided in order to complete all action items in this report in a timely manner, and to ensure that the actions achieve the desired outcomes. Site leadership should determine if these recommendations apply more widely within the site than the ISOM unit.

### 7.1 People

#### *7.1.1 Leadership*

- Drive the Just Fair Culture with visible leadership, especially in the matter of verification; ensure the work force is competent to deliver their accountabilities and self-verify using job content audits for compliance; participate and communicate at all levels. Design new "diagonal slice" processes.
- Set clear and explicit Accountability and "Chain of Command organizational chart," including geographical responsibility for Simultaneous Operations.
- Develop clear measurements for leading indicators of catastrophic incidents (e.g., process upsets, loss of containment, fires, High Potential incidents (HIPOs), and indicators of major risk) vs. lagging indicators (i.e., reportables, spills, slips, trips and falls) and use to manage performance.
- Staffing plans for turnarounds and high workload periods must show explicit consideration for fatigue.
- Define and set expected behaviors, competencies and accountabilities, for leadership and supervision (Superintendents and Supervisors, applying to all step-up personnel as well), including explicit expectations for sounding emergency alarms.
- Site management must set and communicate a clear safety priority relative to activity and expenditure. They must ensure that sufficient resources and investment are available for integrity management and risk reduction at the site.
- Reset Line Management priorities to make management team members more visible on the process units and regularly engage employees in face to face communication.
- Implement Advanced Safety Audit (ASA) on a site-wide basis with clear expectations for the need to perform quality ASAs with face-to-face conversations. Provide training as required at all levels.