UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>Black Elk Energy v. BP Exploration & Production, et al.<br>No. 2:13-cv-02006 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## SECOND AMENDED COMPLAINT FOR DAMAGES

### Rule 9(h)

**NOW COMES,** through the undersigned counsel, Plaintiff, Black Elk Energy Offshore Operations, LLC, who submits its Second Amended Complaint and respectfully states and alleges as follows:

### Introduction

On April 20, 2010, a well blowout on the oil rig *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The uncontrolled blowout caused explosions and a raging fire aboard the *Deepwater Horizon*; after burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that interfered with, damaged, depleted, and destroyed offshore, marine and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (hereinafter "Oil Spill"). As a direct and foreseeable result of the Oil Spill and its devastating impact on the marine and coastal environments, the oil and gas exploration, production and associated activities in the Gulf of Mexico were significantly interrupted, resulting in economic losses to Plaintiff and other

- 1 -

companies and employees similarly situated. This Complaint asserts claims under the Oil Pollution Act of 1990 (hereinafter "OPA"), seeking damages arising from the Oil Spill and its environmental devastation.

## PARTIES

**A.     Plaintiff**

1.    Plaintiff, Black Elk Energy Offshore Operations, LLC, (hereinafter "Plaintiff"), is a business that is domiciled in Texas, with its principal place of business/operations in Texas, which suffered economic damages as a result of the Oil Spill and due to the Oil Spill's environmental devastation.

**B.     Defendant**

2.    Defendant, BP Exploration & Production Inc., (hereinafter "BPXP") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BPXP was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service (hereinafter "MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated. BPXP was designated the "Responsible Party" by the U.S. Coast Guard under OPA, 33 U.S.C. §2714. This Court has personal jurisdiction over BPXP, because BPXP is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

## JURISDICTION AND VENUE

3.    Jurisdiction exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b).

4.    Prosecution and venue in this district is proper under 28 U.S.C. §1391 because

Defendant does business herein, Plaintiff resides and does business herein, and many of the events or omissions giving rise to the claims asserted herein occurred in this district.  Venue is also proper pursuant to the OPA, 33 U.S.C. 2717(b), as the discharge occurred in this district. Venue is also appropriate in this district consistent with 28 U.S.C. §1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows Plaintiff to directly file their complaints arising out of the Oil Spill in this District.

## FACTUAL ALLEGATIONS

5.      BPXP is the "responsible party" for the Oil Spill under OPA, 33 U.S.C. §2714. Because of the strict liability of responsible parties for all damages due to and arising from the Oil Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability.  Nonetheless, out of an abundance of caution, the factual background relating to BPXP's acts, omissions and failures set forth in Paragraphs 258-542 of the Amended B1 Master Complaint, Document 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, are adopted and incorporated as if fully restated herein.

6.      Plaintiff further adopts and incorporates as if restated herein all factual allegations with information contained in the Direct Filing Short Form/Short Form Joinder, Rec. Doc. No. 85484, filed by Plaintiff into No. 10-8888.

7.      As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance (hereinafter "SONS") under the authority of the

National Oil and Hazardous Substance Pollution Contingency Plan (hereinafter "NCP") (40 CFR §300.323). The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

8. On April 30, 2010, MMS and the U.S. Coast Guard (hereinafter "USCG"), as a direct and foreseeable result of the Oil Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors. This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

9. Also on April 30, 2010, as a direct and foreseeable result of the Oil Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the *Deepwater Horizon* explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

10. On May 7, 2010, MMS, as a direct and foreseeable result of the Oil Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them

that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

11. In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* (hereinafter "Safety Report").

12. In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling. In particular, the Safety Report targets the effectiveness of blowout preventers (hereinafter "BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

13. Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Oil Spill and its environmental devastation.

14. On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Oil Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

15. As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS. On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratorium (hereinafter "May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices, and procedures.

16. Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS. It also prohibited drilling any wellbore sidetracks and bypasses. Moreover, it halted spudding of any new wells. It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

17. Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Oil Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

18. On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the OCS. The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04. These actions were taken as a direct and foreseeable result of the Oil Spill and its environmental devastation.

19. On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Oil Spill's environmental devastation, and BP's incapacity to adequately respond to the Oil Spill. NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios.

20. On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

21. In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratorium was unenforceable.

22. On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 (hereinafter "July Moratorium").

23. In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

24. That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium. The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

25. With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or intervention operations; or waterflood, gas injection, or disposal wells.

26. The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October 2010.

27. On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end to the July Moratorium, which had been scheduled to extend through the month of November 2010.

28. On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater*

*Horizon* explosion and the protracted Oil Spill response.

29. In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control, such as the kind experienced in the Oil Spill.

30. On January 3, 2011, MMS notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

31. The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses in various industries across the Gulf Coast OCS and the Pacific OCS.

32. The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Outer Continental Shelf or the Gulf of Mexico and its resources in connection with offshore deepwater drilling activities. Further, the Macondo incident, the Oil Spill, and the governmental response created a dramatic decrease in all aspects of energy production activities in the Gulf of Mexico, and accordingly, caused economic damages to all persons or entities affiliated with, or dependent upon, such industries.

33. Plaintiff is an oil and gas exploration and production company based in Texas. Plaintiff has many interests in the Gulf of Mexico. The BP Oil Spill disaster and the resulting shut down of oil and gas related operations in the Gulf of Mexico affected many of Plaintiff's assets in this region. Plaintiff has taken action to mitigate its losses caused by the BP Oil Spill

disaster by focusing on non-gulf related assets. However, some losses were unavoidable.

34.     Prior to the BP Oil Spill, Plaintiff had a partial interest in three potential wells to be drilled in the Gulf of Mexico. Pursuant to their interests, Plaintiff and other interest-holders entered into an agreement with a drilling company to hire a drilling rig known as the "Bob Palmer" at a specific daily rate. The terms of that agreement dictated that the interest-holders would be obligated to pay the daily rate for the drilling rig once the wells became available for drilling, regardless of whether the drilling rig was actually performing drilling operations. Due to the BP Oil Spill and resultant moratorium on offshore oil and gas exploration and production operations in the Gulf of Mexico, Plaintiff and the other interest-holders could not obtain the necessary permits to begin drilling the wells in question. However, all interest holders were still contractually obligated to pay their respective pro rata shares of the daily rate for the drilling rig. As a result, the operator declared *force majeure,* mitigating the damages to Black Elk to $1,756,519.00.  Plaintiff suffered significant financial damages by paying for a drilling rig that did not drill a well.  In particular, a drilling contractor had been retained in connection with the High Island interests. (HI A376).   The drilling contractor had been retained by the operator, Apache.  Black Elk had acquired a non-operating interest in the well and was bound by the contractual terms of the operating agreement.  As a result of being unable to secure drilling permits, and/or as a result of the delay in securing drilling permits, Apache was forced to invoke the *force majeure* provision of the operating agreement and/or drilling contract.  As a result of this, certain payments became due and owing to the drilling contractor.  Apache paid those amounts, billed the non-operators for their respective portions of those amounts, which included Black Elk.  Black Elk timely paid its proportionate share, as it was required to do under the operating agreement.  That payment and loss was a result of, and due to, the Deepwater Horizon

incident.

## CLAIM FOR RELIEF

35. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

36. The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

37. The Coast Guard has named BPXP as the "responsible party" under OPA for the downhole release of oil. Therefore, BPXP is strictly liable pursuant to 33 U.S.C. § 2702 for all damages due to or resulting from the Oil Spill and its environmental devastation.

38. Defendant BPXP is not entitled to limit its liability under 33 U.S.C. § 2704(a) because the Oil Spill was proximately caused by its gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

39. Moreover, in its Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990, filed on October 19, 2010, BPXP waived the statutory limitation on liability under the OPA.

40. BPXP, as the operator on the Macondo well, was required to take the necessary precautions to "keep the well under control at all times." BPXP was required to "use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick." BPXP was required to "use and maintain equipment and materials necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment." 30 C.F.R. §§ 205.400 – 250.401.

41.     As a direct result of the Oil Spill and its environmental devastation, Plaintiff is entitled to recover from BPXP for such damages in amounts to be determined by the trier of fact.

42.     OPA imposes strict liability for *all* damages due to and/or resulting from the Oil Spill and its environmental devastation. Therefore, the concepts of "superseding" or "intervening" cause are not applicable. In the alternative, the Moratoria were not "intervening" or "superseding" causes with respect to damages arising from the Oil Spill. The Moratoria, rather, were direct and foreseeable consequences of the environmental havoc wreaked by a spill designated as one of National Significance.

43.     The size, scope, and breadth of the Oil Spill's environmental damage caused foreseeable actions by the federal and state governments, including the closures of massive portions of the Gulf to fishing and shipping. The Oil Spill's destructive and contaminating qualities directly affected all industries in the Gulf and the federal agencies that oversee them. The Moratoria was enacted by one such federal agency within its authority to ensure the safety by affecting very narrow activities of an industry under its control.

## PRESENTMENT

44.     To the extent required by law, and/or by consent and/or stipulation by BPXP, Plaintiff has satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), by the submission of their claims to the BP OPA Claims Program, the Deepwater Horizon Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility (hereinafter "GCCF"), as BP's agents and/or designees.

45.     In particular, on January 18, 2013, a Claim, including a "sum certain" and a brief description of the claim as well as some supporting documentation, was sent by USPS Express Mail to and filed online with (confirmation number EI376592394US) to the BP OPA Claims

Program in Houston, Texas. This information, along any other previous claims information made to BPXP is cited in support thereof.

46. Because Plaintiff previously asserted claims against the responsible party through its prior claim to the Gulf Coast Claims Facility, Document Number 1175570, the presentment on or about January 18, 2013 was made (and/or re-made) out of an abundance of caution. This information, along any other previous claims information made to BPXP is cited in support thereof.

47. BPXP either denied the claims or otherwise failed to satisfy within 90 days of presentment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against BPXP as follows:

1. Economic and compensatory damages for loss of amounts paid in connection with HI A376 well, which is $1,756,519.00;

2. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

3. Such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

   /s/   Stephen J. Herman                                 /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129          **James Parkerson Roy**, La. Bar No.11511
**HERMAN HERMAN & KATZ LLC**                  **DOMENGEAUX WRIGHT ROY**
820 O'Keefe Avenue                                           **& EDWARDS, LLC**
New Orleans, Louisiana 70113                   556 Jefferson Street, Suite 500
Telephone: (504) 581-4892                        Lafayette, Louisiana 70501
Fax. No. (504) 569-6024                              Telephone: (337) 233-3033
Email: sherman@hhklawfirm.com            Fax No. (337) 233-2796
*Plaintiffs Liaison Counsel*                            E-Mail: jimr@wrightroy.com
                                                                      *Plaintiffs Liaison Counsel*

/s/ Conrad S.P. Williams, III
**WILLIAMS LAW GROUP, LLC**
CONRAD S.P. WILLIAMS, III (#14499)
MEREDITH R. DURHAM (#33112)
909 Poydras Street, Ste. 1625
New Orleans, Louisiana 70112
Office: (504) 200-0000
Fax No. (504) 200-0001
E-Mail: duke@williamslawgroup.org

### PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

-16-

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above of the foregoing Second Amended Complaint for Damages has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of November, 2014.

/s/  Conrad S.P. Williams, III