**EXHIBIT  TWO:**

**United States General Accounting Office, Civil Penalties:**

**Agencies Unable to Fully Adjust Penalties for Inflation Under Current Law, GAO-03-409**

**(Mar. 2003)**

**("GAO Penalty Inflation Report")**

**United States General Accounting Office**

# GAO

Report to the Committee on
Governmental Affairs, U.S. Senate, and
the Committee on Government Reform,
House of Representatives

**March 2003**

# CIVIL PENALTIES

# Agencies Unable to Fully Adjust Penalties for Inflation Under Current Law



**G A O**
Accountability ★ Integrity ★ Reliability

# GAO
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-03-409, a report to the
Senate Committee on Governmental
Affairs and the House Committee on
Government Reform

**March 2003**

## CIVIL PENALTIES

# Agencies Unable to Fully Adjust Penalties for Inflation Under Current Law

## Why GAO Did This Study

Civil penalties are an important element of regulatory enforcement, allowing agencies to punish violators appropriately and to serve as a deterrent to future violations. In 1996, Congress enacted the Inflation Adjustment Act to require agencies to adjust certain penalties for inflation. GAO assessed federal agencies' compliance with the act and whether provisions in the act have prevented agencies from keeping their penalties in pace with inflation.

## What GAO Recommends

Congress may wish to consider amending the act to (1) require or permit agencies to adjust their penalties for lost inflation; (2) make the calculation and rounding procedures more consistent with changes in inflation; (3) permit agencies with exempt penalties to adjust them for inflation; and (4) give some agency the responsibility to monitor compliance and provide guidance.

The Department of Justice, the Department of the Treasury, and the Office of Management and Budget did not comment on the first three matters for congressional consideration. The agencies suggested changes to the fourth matter, but we did not make those changes.

www.gao.gov/cgi-bin/getrpt?GAO-03-409.

To view the full report, including the scope and methodology, click on the link above. For more information, contact Victor Rezendes (202) 512-6806 or rezendesv@gao.gov.

## What GAO Found

As of June 2002, 16 of 80 federal agencies with civil penalties covered by the Inflation Adjustment Act had not made the required initial adjustments to their penalties. Nineteen other agencies had not made required subsequent adjustments, and several other agencies had made incorrect adjustments. The act does not give any agency the authority to monitor compliance or to provide guidance to agencies. More important, several provisions of the act have prevented some agencies from fully adjusting their penalties for inflation. One provision limited the agencies' first adjustments to 10 percent of the penalty amounts, even if the penalties were decades old and hundreds of percent behind inflation. The resultant "inflation gap" can never be corrected under the statute and grows with each subsequent adjustment. (The figure below illustrates the effect of the cap on one agency's $1,000 penalty set in 1958.) Also, the act's calculation and rounding procedures require agencies to lose a year of inflation each time they adjust their penalties, and can prevent some agencies from making adjustments until inflation increases by 45 percent or more (i.e., 15 years or more at recent rates of inflation). Finally, the act exempts penalties under certain statutes from its requirements entirely. Consequently, more than 100 exempted penalties have declined in value by 50 percent or more since Congress last set them.



**Ten Percent Cap on Initial Penalty Adjustments Resulted in Large Inflation Gaps**

Source: GAO.

# Contents

## Letter

| | |
|---|---|
| Results in Brief | 2 |
| Background | 4 |
| Objectives, Scope, and Methodology | 9 |
| Many Agencies Did Not Make Required Penalty Adjustments | 11 |
| The Inflation Adjustment Act Has Prevented Agencies from Keeping Certain Penalties in Pace with Inflation | 16 |
| Conclusions | 36 |
| Matters for Congressional Consideration | 38 |
| Agency Comments and Our Evaluation | 39 |

**Letter ... 1**

## Appendixes

| | | |
|---|---|---|
| Appendix I: | Final Rules That Adjust Civil Penalties for Inflation as of June 30, 2002 | 42 |
| Appendix II: | Amount of Inflation and Estimated Length of Time Needed to Trigger Penalty Adjustments in Selected Agencies | 47 |

## Tables

| | | |
|---|---|---|
| Table 1: | The 10 Percent Cap on Initial Adjustments Resulted in Large "Inflation Gaps" for Some Penalties | 17 |
| Table 2: | Rounding Rules in the Inflation Adjustment Act Prevented PWBA from Increasing Its Penalties in 2001 | 28 |
| Table 3: | When PWBA Penalties Are Eligible for Adjustment, the Increases Will Be about Twice That Needed to Keep Pace with Inflation | 29 |
| Table 4: | Inflation Adjustment Act Exempted at Least 238 Civil Penalties from Coverage | 34 |
| Table 5: | A Substantial Amount of Inflation Has Elapsed with Regard to Some Exempted Penalties | 35 |
| Table 6: | Final Rules That Adjust Cabinet Departments' Civil Penalties for Inflation (as of June 30, 2002) | 43 |
| Table 7: | Final Rules That Adjust Independent Agencies' Civil Penalties for Inflation (as of June 30, 2002) | 45 |
| Table 8: | Amount of Inflation and Estimated Length of Time Needed to Trigger Next Penalty Adjustments in Six Selected Agencies | 47 |

## Figures

| | | |
|---|---|---|
| Figure 1: | The 10 Percent Cap on Initial Adjustments Prevented FAA from Keeping Its $1,000 Penalty in Pace With Inflation | 19 |

**Contents**

Figure 2:   The Size of the Inflation Gap Resulting from the 10
Percent Cap Grows with Each Subsequent Adjustment          21
Figure 3:   CPI Lag in the Inflation Adjustment Act Reduces the
Amount of Inflation That Can Be Considered          24
Figure 4:   Inflation Lost Due to CPI Lag Cannot Be Recovered          25
Figure 5:   Less Inflation Can Be Considered When Penalty
Adjustments Are More Frequent          26
Figure 6:   Rounding Rules Can Prevent Penalty Adjustments for
Decades          30
Figure 7:   Rounding Based on the Size of the Increase More Closely
Tracks Inflation than Rounding Based on the Size of the
Penalty          32
Figure 8:   Rounding Based on the Size of the Increase without the
CPI Lag More Closely Tracks Inflation          33

## Abbreviations

| | |
|---|---|
| CMS | Centers for Medicare and Medicaid Services |
| CPI | Consumer Price Index |
| EPA | Environmental Protection Agency |
| ERISA | Employee Retirement Income Security Act |
| FAA | Federal Aviation Administration |
| FMS | Financial Management Service |
| IRS | Internal Revenue Service |
| MSHA | Mine Safety and Health Administration |
| NHTSA | National Highway Traffic Safety Administration |
| NPR | National Performance Review |
| OFFM | Office of Federal Financial Management |
| OMB | Office of Management and Budget |
| OPS | Office of Pipeline Safety |
| OSHA | Occupational Safety and Health Administration |
| PWBA | Pension and Welfare Benefits Administration |
| SSA | Social Security Administration |
| USCG | United States Coast Guard |

This is a work of the U.S. Government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. It may contain copyrighted graphics, images or other materials. Permission from the copyright holder may be necessary should you wish to reproduce copyrighted materials separately from GAO's product.



**G A O**
Accountability • Integrity • Reliability

**United States General Accounting Office**
**Washington, D.C. 20548**

March 14, 2003

The Honorable Susan M. Collins
Chairman
The Honorable Joseph I. Lieberman
Ranking Minority Member
Committee on Governmental Affairs
United States Senate

The Honorable Tom Davis
Chairman
The Honorable Henry A. Waxman
Ranking Minority Member
Committee on Government Reform
House of Representatives

Civil monetary penalties are one method by which agencies enforce federal laws and regulations, with penalty assessments and collections totaling hundreds of millions of dollars per year. Dozens of federal agencies are currently authorized to levy such penalties for violations involving such issues as public health and safety, environmental protection, securities transactions, and international trade. For example, within the past few years,

- a major automobile manufacturer agreed to pay $425,000 in civil penalties to settle charges that it failed to promptly recall vehicles with ignition-switch problems and withheld information in investigations into fires in its vehicles,

- a furniture manufacturer agreed to pay a $900,000 civil penalty to settle allegations that it knowingly failed to report a substantial hazard in cedar chests involved in the suffocation deaths of five children, and

- a company agreed to pay civil penalties totaling $30,000 to settle allegations that it violated export control and antiboycott laws by shipping chemicals to Iran through the United Arab Emirates.

Congress generally establishes civil penalty maximums in the underlying statutes, and those maximum penalties are generally reserved for the worst offenses.  In 1996, Congress amended the Federal Civil Penalties Inflation Adjustment Act of 1990 to require agencies to issue regulations adjusting their covered penalties for inflation.[1]  The statute as amended (hereinafter referred to as the "Inflation Adjustment Act") required agencies with covered penalties to publish initial penalty adjustments in the *Federal Register* by October 23, 1996, and to examine their penalties for additional inflation adjustments at least once every 4 years thereafter.[2]  The act limited the first such adjustment to 10 percent of the penalty amount and required specific calculation and rounding procedures to be followed, but excluded penalties under certain statutes from coverage (e.g., the Occupational Safety and Health Act of 1970 and the Internal Revenue Code of 1986).

This report examines the implementation of the Inflation Adjustment Act. Specifically, our objectives were to determine (1) whether, as of June 30, 2002, agencies with penalties covered by the act had made the required penalty adjustments and (2) whether provisions in the act have prevented agencies from keeping their penalties in pace with inflation.  A complete discussion of our scope and methodology is included later in this report.  In brief, we focused part of our work on six agencies that the most recent data available indicated had large penalty assessments.  We also focused on the five agencies that levy penalties under the excluded statutes. We conducted this review under our basic legislative authority to undertake work supporting Congress, and are reporting the results to you as the current Chairmen and Ranking Minority Members of the two Committees that sponsored the Federal Civil Penalties Inflation Adjustment Act of 1990.

## Results in Brief

As of June 2002, 16 of 80 federal agencies with civil penalties covered by the Inflation Adjustment Act had not adjusted any of their penalties for inflation.  Only 9 of the 64 agencies that made initial penalty adjustments

---

[1]The 1990 act was amended in 1996 by the Debt Collection Improvement Act, which added the requirement for agencies to adjust their civil penalties by regulation (Pub. L. 104-134, Sec. 31001(s)(1),110 Stat. 1321-373).  See 28 U.S.C. 2461 note.

[2]The Inflation Adjustment Act does not clearly indicate whether second-round adjustments should be made within 4 years of the initial deadline (i.e., by October 23, 2000) or within 4 years after the initial adjustment—whenever it occurred. In this report we considered the statute to require second-round adjustments within 4 years of the first adjustment.

did so by the statutory deadline of October 23, 1996, and some of the adjustments were not made until years after the deadline.  Also, 19 of the 64 agencies that made initial adjustments had not made required subsequent adjustments for eligible penalties, and several other agencies made the adjustments incorrectly.  The act does not give any agency the authority or responsibility to monitor agencies' compliance or provide guidance on its implementation.  Lack of monitoring and guidance may have contributed to the widespread lack of compliance with the act's requirements and the numerous questions raised to us regarding its provisions.

Several provisions in the Inflation Adjustment Act have prevented agencies from keeping their civil penalties in pace with inflation.

- The 10 percent cap on initial adjustments prevented some agencies from accounting for hundreds of percent of inflation that had occurred since certain penalties were last set or adjusted by Congress.  The "inflation gap" that results from this 10 percent cap can never be corrected under this statutory authority and grows with each subsequent adjustment. Several agencies with penalties covered by the act indicated that, because of the 10 percent cap, their penalties had lost effectiveness and their enforcement options had been limited.  However, officials in those agencies were generally noncommittal with regard to elimination of the cap, neither supporting nor opposing such action.

- The act's requirements on how the penalty adjustments should be calculated and rounded prevent agencies from capturing all of the inflation that occurs between adjustments and prevent agencies from increasing certain penalties until inflation has increased by 45 percent or more.  Therefore, at recent rates of inflation, agencies may not be able to adjust some of their penalties for 15 years or more.  Agency officials frequently told us that these provisions in the act were unclear and produced undesirable effects.  Each agency in our review with covered penalties supported changes to the act to allow more timely and accurate penalty adjustments.

- The act exempted 238 penalties from its requirements.  Many of these exempted penalties have not been adjusted for decades, and more than half would be at least 50 percent higher if fully adjusted for inflation. Nevertheless, officials in four of the five agencies with exempted penalties indicated that their penalties did not currently need to be increased.

This report contains several matters for consideration by Congress that can help ensure that agencies will keep their civil penalties in pace with inflation. First, if Congress wants federal civil penalties to retain their original deterrent values, it should consider amending the Inflation Adjustment Act to require or permit agencies to make catch-up adjustments accounting for all of the inflation that occurred since Congress last set or adjusted those penalties. Second, if Congress wants agencies to make timely and accurate adjustments of their civil penalties, Congress should consider amending the calculation and rounding procedures in the act to be more consistent with changes in inflation. Third, if Congress believes that exempted penalties are currently in need of adjustment, it could amend the statute to permit agencies to do so. Finally, to improve compliance with the statute, Congress could give one or more entities in the executive branch the authority and responsibility to monitor the act's implementation and provide guidance to agencies.

## Background

Prior to 1996, agencies generally did not have the authority to adjust civil penalty maximums that were established in statute. Congress would occasionally adjust individual penalties or specific groups of penalties, but not all civil penalties. As a result, by 1990, many penalties had not been changed for decades. When the Federal Civil Penalties Inflation Adjustment Act of 1990 was enacted, Congress noted in the "Findings" section of the legislation that inflation had weakened the deterrent effect of many civil penalties. The stated purpose of the 1990 act was "to establish a mechanism that shall (1) allow for regular adjustment for inflation of civil monetary penalties; (2) maintain the deterrent effect of civil monetary penalties and promote compliance with the law; and (3) improve the collection by the Federal Government of civil monetary penalties." However, the act did not give agencies the authority to adjust their civil penalties for inflation. Instead, the 1990 act required the President to report to Congress every 5 years on how much each covered civil penalty had to be increased to keep pace with inflation. In addition, the act required the President to report annually on penalty assessments and collections.

In July 1991, the Office of Management Budget (OMB) submitted the first (and ultimately the only) report to Congress under the Federal Civil Penalties Inflation Adjustment Act describing the penalty increases needed to keep pace with inflation.[3] Based on submissions from dozens of agencies, the report identified almost 1,000 civil monetary penalties that were covered by the act, and listed, by agency, the statutory modifications that were required to fully adjust the penalties for inflation. Also, in satisfaction of the annual reporting requirement, the report also provided information on civil penalty assessments and collections during fiscal year 1990. At the request of OMB's Office of Federal Financial Management, the Department of the Treasury's Financial Management Service (FMS) published those reports until 1998 (providing information on assessments and collections through fiscal year 1997). Congress abolished this annual reporting requirement as part of the Federal Reports Elimination Act of 1998.[4]

Congress amended the 1990 act in 1996, replacing the 5-year reporting obligation with a requirement that agencies publish regulations in the *Federal Register* adjusting each of their covered civil penalties for inflation. The act as amended required each agency's first inflation adjustment regulation to be published by October 23, 1996, and requires the agencies to examine their covered penalties at least once every 4 years thereafter and, where possible, make penalty adjustments. However, the act limited the agencies' initial penalty adjustments to 10 percent of the penalty amounts. The Inflation Adjustment Act also exempted penalties under the Internal Revenue Code of 1986, the Tariff Act of 1930, the Occupational Safety and Health Act of 1970, and the Social Security Act.

## Adjustment Procedures

The Inflation Adjustment Act requires agencies to follow specific procedures when making penalty adjustments. For example, section 5 of the act defines a "cost-of-living adjustment" as the following:

---

[3]Office of Management and Budget, *Civil Monetary Penalty Assessments and Collections: 1990 Report to Congress and Civil Monetary Penalty Inflation Adjustment Report* (Washington, D.C.: July 1991).

[4]Pub. L. 105-362, Nov. 10, 1998.

…the percentage (if any) for each civil monetary penalty by which -
(1) the Consumer Price Index[5] for the month of June of the calendar year preceding the adjustment, exceeds (2) the Consumer Price Index for the month of June of the calendar year in which the amount of such civil monetary penalty was last set or adjusted pursuant to law.

Therefore, if an agency made its first round of adjustments in October 1996 and the penalty was last set or adjusted in October 1990, the agency was required to calculate the unrounded cost-of-living adjustment by comparing the June 1995 Consumer Price Index (CPI) with the CPI for June 1990.

The Inflation Adjustment Act also provides specific criteria for how agencies should round any penalty increase. Section 5 of the act says the following:

Any increase determined under this subsection shall be rounded to the nearest (1) multiple of $10 in the case of penalties less than or equal to $100; (2) multiple of $100 in the case of penalties greater than $100 but less than or equal to $1,000; (3) multiple of $1,000 in the case of penalties greater than $1,000 but less than or equal to $10,000; (4) multiple of $5,000 in the case of penalties greater than $10,000 but less than or equal to $100,000; (5) multiple of $10,000 in the case of penalties greater than $100,000 but less than or equal to $200,000; and (6) multiple of $25,000 in the case of penalties greater than $200,000.

For example, if a maximum civil penalty of $5,000 was last set in 1990, and there had been 17 percent inflation from June 1990 through June 1995 (the relevant time frame for an adjustment in 1996), the unrounded increase would be $850 ($5,000 times 0.17).  Because the $5,000 penalty was greater than $1,000 but less than or equal to $10,000, the statute indicates that the $850 increase should be rounded to the nearest multiple of $1,000, which is $1,000.  Therefore, the adjusted penalty after rounding would be $6,000.

However, section 6 of the Inflation Adjustment Act states that the first penalty adjustment under these procedures "may not exceed 10 percent of such penalty."  Therefore, in the above example the $1,000 rounded increase would be limited to 10 percent of the $5,000 penalty amount, or $500.  As a result, the adjusted penalty after the 10 percent cap would be

---

[5]The Consumer Price Index is published monthly by the Bureau of Labor Statistics and is the most widely used measure of inflation.

$5,500.  The legislative history of the Inflation Adjustment Act does not explain why Congress established the 10 percent cap, the penalty exemptions, or the particular adjustment procedures.

## Prior GAO Work on Civil Penalties

Our previous work has indicated that the establishment and adjustment of civil penalty maximums is only one part of the penalty process.  Civil penalty maximums are generally reserved for the most egregious cases (e.g., those involving willful intent to violate the law and/or fatalities).  Agencies investigate potential violations and determine the amount of penalty to be sought based on a variety of factors, including the severity of the incident, whether the individual or organization involved has a previous history of violations, and the individual or organization's ability to pay the fine.  In February 2001, we reported on the implementation of a statutory provision that required federal agencies to provide small entities (e.g., small businesses and small governments) with civil penalty relief.[6]  We concluded that the requirement was being implemented by the agencies differently, and that small entities may not be receiving any more relief than larger entities.

We have reported several other times on the assessment of civil penalties and the collection of civil penalty debt.  For example, see the following.

- In August 1994, we reported on the enforcement of the Employee Retirement Income Security Act of 1974 (ERISA), noting that the Pension and Welfare Benefits Administration's (PWBA) enforcement program could be strengthened by increasing the use of penalties authorized by the statute to deter plans from violating the law.[7]

---

[6]U.S. General Accounting Office, *Regulatory Reform: Implementation of Selected Agencies' Civil Penalty Relief Policies for Small Entities,* GAO-01-280 (Washington, D.C.: Feb. 20, 2001).

[7]U.S. General Accounting Office, *Pension Plans: Stronger Labor ERISA Enforcement Should Better Protect Plan Participants,* GAO/HEHS-94-157 (Washington, D.C.: Aug. 8, 1994).  Effective February 3, 2003, the name of the Pension and Welfare Benefits Administration was changed to the Employee Benefits Security Administration.  In this report, we refer to the agency as PWBA because that was its name during the time frame covered by this review.

- In March 1996 we said "penalties play a key role in environmental enforcement by deterring violators and by ensuring that regulated entities are treated fairly and consistently so that no one gains a competitive advantage by violating environmental regulations."[8]

- In March 1999, we reported that the potential usefulness of civil monetary penalties in relation to noncompliant nursing homes was being hampered because of delays in the application of the sanctions by the Health Care Financing Administration.[9]

- In May 2000, we reported that the Office of Pipeline Safety (OPS) had decreased the number and amount of fines while increasing the use of less severe corrective actions.[10]  We questioned this approach, and recommended that the agency determine the impact of the reduced use of fines on compliance with safety requirements.  We subsequently reported that OPS had increased its use of fines.[11]

- In December 2001, we reported on the growth in civil monetary penalty receivables at the Centers for Medicare and Medicaid Services (CMS).[12] In that report, OMB stated that it has broad oversight responsibility in monitoring and evaluating governmentwide debt collection activities. However, OMB said it is the agencies' responsibility to monitor, manage, and collect the debt, and the agency's Office of the Inspector General's responsibility to audit debt collection activities.

---

[8]U.S. General Accounting Office, *Water Pollution: Many Violations Have Not Received Appropriate Enforcement Attention*, GAO/RCED-96-23 (Washington, D.C.:  Mar. 20, 1996).

[9]U.S. General Accounting Office, *Nursing Homes: Additional Steps Needed to Strengthen Enforcement of Federal Quality Standards*, GAO/HEHS-99-46 (Washington, D.C.: Mar. 18, 1999).

[10]U.S. General Accounting Office, *Pipeline Safety: The Office of Pipeline Safety Is Changing How It Oversees the Pipeline Industry*, GAO/RCED-00-128 (Washington, D.C.: May 15, 2000).

[11]U.S. General Accounting Office, *Pipeline Safety: Status of Improving Oversight of the Pipeline Industry*, GAO-02-517T (Washington, D.C.: Mar. 19, 2002).

[12]U.S. General Accounting Office, *Civil Fines and Penalties Debt: Review of CMS' Management and Collection Processes*, GAO-02-116 (Washington, D.C.: Dec. 31, 2001).

We have also specifically commented on the adjustment of civil penalties for inflation.  In September 1993, the National Performance Review (NPR) recommended that federal civil monetary penalties be adjusted for inflation.[13]  Specifically, NPR recommended that a "catch-up" penalty adjustment be made to bring penalties up to date, and that the need for additional inflation adjustments be automatically reassessed every 4 years. NPR estimated that implementation of the recommendation would increase federal receipts by nearly $200 million during the fiscal year 1994 through fiscal year 1999 period. In our December 1994 report on NPR, we generally agreed with the recommendation, noting that civil penalties should be periodically adjusted so that they do not lose relevancy.[14]

## Objectives, Scope, and Methodology

The objectives of this report are to determine (1) whether, as of June 30, 2002, agencies with penalties covered by the Inflation Adjustment Act had made the required penalty adjustments and (2) whether provisions in the act have prevented agencies from keeping their penalties in pace with inflation.  To address the first objective, we electronically searched the *Federal Register* and determined whether the required penalty adjustment regulations had been published by all federal agencies that the 1991 OMB report and the 1997 Department of the Treasury report indicated had civil penalty authorities that were covered by the Inflation Adjustment Act.  We defined an "agency" to be each organizational unit that was separately listed in those reports or that separately published penalty adjustment regulations in the *Federal Register*.

We also examined the adjusted penalties and determined whether any of them were eligible for a second round of adjustments.  We focused part of our analysis on six agencies with large penalty assessments in 1997 (the most recent data available)—the Environmental Protection Agency (EPA); the Mine Safety and Health Administration (MSHA) and PWBA within the Department of Labor; and the Federal Aviation Administration (FAA), the National Highway Traffic and Safety Administration (NHTSA), and the United States Coast Guard (USCG) within the Department of Transportation.

---

[13]National Performance Review, *From Red Tape to Results: Creating a Government That Works Better and Costs Less* (Washington, D.C.: Sept. 7, 1993).

[14]U.S. General Accounting Office, *Management Reform: Implementation of the National Performance Review's Recommendations*, GAO/OCG-95-1 (Washington, D.C.: Dec. 5, 1994).

We also focused on those six agencies in the second objective, comparing the amount of penalty adjustments made under the 10 percent cap with the amount of inflation that had occurred since the agencies' penalties were last set or adjusted.  As called for by the act, we used the CPI for urban workers during the month of June in the relevant years as our measure of the historical rates of inflation.  We then calculated the amount of inflation that had not been accounted for by the agencies' initial adjustments—what we refer to in this report as the "inflation gap."  We interviewed officials in each agency to determine their views regarding the effect of the 10 percent cap on their agencies' civil penalties and enforcement efforts.

We also focused on those six agencies to examine the effects of the adjustment calculation requirements and rounding rules in the statute. Specifically, we used certain commonly occurring penalty amounts to demonstrate how the statute requires the penalties to be adjusted and rounded, and developed projections of how closely the resultant penalties tracked a possible rate of inflation.  Our projections assume an annual rate of inflation of 2.5 percent—about the average rate since the Inflation Adjustment Act was enacted in 1996.

We focused another part of our review on the five agencies responsible for penalties that are exempted from the act's requirements—CMS within the Department of Health and Human Services, the Occupational Safety and Health Administration (OSHA) within the Department of Labor, the U.S. Customs Service (Customs) and the Internal Revenue Service (IRS) within the Department of the Treasury, and the Social Security Administration (SSA).  We interviewed officials in each of the five agencies, asking if they knew why their agencies' penalties had been excluded, the effect of the exclusions on their ability to keep their penalties in pace with inflation, and whether they believed their penalties should now be adjusted for inflation. We also contacted officials from OMB, the Department of Justice, and FMS within the Department of the Treasury to obtain their views regarding the need for central management oversight of the act.

We focused part of our review on the extent to which the Inflation Adjustment Act permits agencies to keep their civil penalties in pace with inflation.  However, we made no attempt to ascertain whether any individual penalty was set at a sufficient level to deter violations of federal law or regulation.  We also did not attempt to determine the extent to which the agencies' maximum civil penalties are administered.  Also, because there is no current comprehensive database that identifies each agency with civil penalty authority subject to the provisions of the Inflation Adjustment Act, we cannot be sure that we have identified all of the agencies or penalties covered by the act. We did not attempt to verify whether a penalty adjusted for inflation by an agency appropriately met the definition of a covered penalty in the Inflation Adjustment Act.[15]  We conducted our work from March 1, 2002, through September 1, 2002, at the headquarters offices of the above-mentioned agencies in accordance with generally accepted government auditing standards.

We provided a draft of this report to OMB, the Department of Justice, and the Department of the Treasury for their review and comment. The comments that we received are reflected in the "Agency Comments and Our Evaluation" section of this report.

## Many Agencies Did Not Make Required Penalty Adjustments

Our review indicated that lack of compliance with the Inflation Adjustment Act has been widespread.  As of June 2002, 16 of 80 federal agencies with civil penalties covered by the act had not adjusted any of their penalties for inflation.  Only 9 of the 64 agencies that made initial penalty adjustments did so by the statutory deadline of October 23, 1996, and some of the adjustments were not made until years after the deadline.  Also, 19 of the 64 agencies that made initial adjustments had not made required subsequent adjustments for eligible penalties, and several other agencies made the adjustments incorrectly.  The act does not give any agency the authority or responsibility to monitor agencies' compliance or provide guidance on its implementation.  Representatives from the six agencies with covered penalties that we contacted all supported giving some federal entity that authority and responsibility.

---

[15]For example, some agencies adjusted broadly applicable civil penalty statutes (e.g., the False Claims Act or the Program Fraud Civil Remedies Act of 1986), whereas other agencies administering penalties under those statutes did not.

## Sixteen Agencies with Covered Penalties Did Not Make Initial Penalty Adjustments

As noted previously, the Inflation Adjustment Act required each federal agency with covered civil penalties to publish a regulation in the *Federal Register* by October 23, 1996, making initial inflation adjustments to its civil penalties (to a maximum of 10 percent). We reviewed OMB's 1991 report to Congress and other sources and determined that 80 federal agencies had at least one civil penalty that was covered by the act's requirements.[16] Our review of the *Federal Register* indicated that, as of June 30, 2002, 16 of the 80 agencies had not published the required penalty adjustment regulations. (See app. I for a list of the 80 agencies and which ones did and did not publish regulations.)

We contacted 4 of the 16 agencies that had not published regulations, those that appeared to have multiple civil penalties and/or active civil penalty programs—the Department of Education, the Federal Energy Regulatory Commission, the Food and Drug Administration within the Department of Health and Human Services, and Customs.[17] In separate reports published during this review, we recommended that each of the four agencies publish the required initial penalty adjustment regulations.[18] Each of the agencies agreed to do so, and some have since published the required adjustments.[19]

---

[16]We also determined that the Consumer Product Safety Commission has its own agency-specific civil penalty inflation adjustment authority that supersedes the Inflation Adjustment Act as the governing criteria for its penalties. See the Consumer Product Safety Improvement Act of 1990, Pub. L. 101-608,104 Stat. 3110 (Nov. 16, 1990).

[17]The 12 other agencies that had not published initial inflation adjustment regulations generally had only a few civil penalties identified in previous OMB and Treasury reports as covered under the Inflation Adjustment Act. Those 12 agencies are the Bureau of Land Management, the Fish and Wildlife Service, and the Minerals Management Service within the Department of the Interior; the Department of State; the Enforcement Office within the Department of the Treasury; the Federal Emergency Management Agency; the International Trade Commission; the Office of Personnel Management; the National Aeronautics and Space Administration; the National Transportation Safety Board; the Small Business Administration; and the Surface Transportation Board.

[18]U.S. General Accounting Office, *Federal Energy Regulatory Commission's Compliance with Requirement to Adjust Civil Monetary Penalties for Inflation*, GAO-02-888R (Washington, D.C.: July 15, 2002); *The Department of Education's Compliance with the Inflation Adjustment Act*, GAO-02-1030R (Washington, D.C.: Aug. 26, 2002); *Food and Drug Administration's Compliance with the Inflation Adjustment Act*, GAO-02-933R (Washington, D.C.: Aug. 1, 2002); and *U.S. Customs Service: Compliance with the Inflation Adjustment Act*, GAO-02-1045R (Washington, D.C.: Sept. 9, 2002).

[19]For example, the Federal Energy Regulatory Commission published its regulation at 67 Fed. Reg. 52410 (Aug. 12, 2002). The Department of Education published its regulation at 67 Fed. Reg. 69654 (Nov. 18, 2002).

Officials in these agencies said they did not know why their agencies had not adjusted their penalties earlier.

Some of the penalty adjustment regulations that were published covered all of the department or agency's civil penalties, but others covered only a particular subunit within the department or agency.  For example, the Department of Agriculture's initial inflation adjustment regulation covered eight different agencies within the department (e.g., the Agricultural Marketing Service, the Animal and Plant Health Inspection Service, and the Food Safety and Inspection Service).  In contrast, nine agencies within the Department of Transportation (e.g., FAA, USCG, and NHTSA) each published separate penalty adjustment regulations.

Only 9 of the 64 agencies making penalty adjustments published their regulations by the statutory deadline of October 23, 1996.  Most of the other 55 agencies published their regulations by the end of 1997, but 7 agencies did not do so until 1998 or later.  For example, the Office of the Attorney General within the Department of Justice did not publish its initial Inflation Adjustment Act regulation until August 30, 1999.  The Wage and Hour Division within the Department of Labor's Employment Standards Administration did not publish its initial regulation until December 7, 2001—more than 5 years after the statutory deadline.

All six of the agencies that we focused on in this part of our review had published a first round of penalty adjustment regulations by June 2002.  However, none of the agencies published their regulations by the October 23, 1996, statutory deadline.  For example, MSHA did not publish its initial penalty adjustments until April 22, 1998—nearly 18 months after the deadline.

## Nineteen Agencies Did Not Make Required Second-Round Adjustments

The Inflation Adjustment Act required agencies with covered civil penalties to examine those penalties and, where possible under the act's procedures, make at least one more round of penalty adjustments within 4 years after the initial adjustments.  Therefore, if an agency published its initial penalty adjustments on October 23, 1996, it should have examined those penalties and, where possible, published a second round of adjustments by October 23, 2000.  However, as we viewed the act, if the agency did not publish the initial adjustments until 2 years after the deadline (i.e., October 23, 1998), the agency was not required to publish a second round of adjustments for eligible penalties until October 23, 2002.

As appendix I shows, 29 of the 64 agencies that published initial penalty adjustment regulations under the Inflation Adjustment Act had not published a second round of adjustments by June 30, 2002.  However, in some cases, 4 years had not elapsed since the agencies' initial penalty adjustments.  In other cases, the agencies' penalties were not eligible for a second round of adjustments under the procedures prescribed in the Inflation Adjustment Act.  In total, 19 agencies had at least one penalty that was eligible for a second adjustment as of June 30, 2002, but the agencies had not adjusted those penalties.

Among the six agencies that we focused on in this part of our review, two agencies—FAA and NHTSA—had published a second round of adjustments for all of their eligible penalties by June 30, 2002.[20]  One agency—PWBA—had no penalties that were eligible for adjustment under the Inflation Adjustment Act's procedures.  The three remaining agencies—EPA, USCG, and MSHA—had penalties that were eligible for a second round of adjustments as of June 30, 2002, but had not adjusted those penalties in a manner consistent with the act's requirements.

- EPA published a second round of adjustments on June 18, 2002 (nearly 5 ½ years after its first adjustments), but later withdrew the rule after we advised EPA that the adjustments were inconsistent with the Inflation Adjustment Act's requirements.[21]  EPA officials told us that the agency would publish another adjustment regulation in 2003.

- USCG could have adjusted 56 of its 122 previously adjusted penalties by June 2002.

- MSHA could have adjusted at least 2 of its 5 previously adjusted penalties by June 2002.

---

[20]FAA adjusted 1 of its 8 civil penalties in 2002, and NHTSA adjusted 7 of its 16 civil penalties in two separate regulations in 1999 and 2001.

[21]U.S. General Accounting Office, *Federal Civil Penalties Inflation Adjustment Act*, B-290021 (Washington, D.C.: July 15, 2002).

In separate reports published during this review, we recommended that USCG and MSHA publish a second round of penalty adjustments, and each agency subsequently agreed to do so.[22]

## No Agency Is Responsible for Monitoring Compliance or Providing Guidance

Several provisions in the Inflation Adjustment Act are unclear, and agencies raised a number of questions during our review regarding some of the act's requirements.

- The act does not clearly indicate whether second-round adjustments should be made within 4 years of the October 23, 1996, deadline, or within 4 years of the initial adjustment—whenever it occurred.

- Although it is clear that the Inflation Adjustment Act covers penalty maximums and minimums set in statute, it is not clear whether penalties set administratively by the agencies are covered by the act's requirements.

- It is not clear whether the term "last set or adjusted" refers to the date an adjustment was published in the *Federal Register* or the date the adjustment took effect.

- Officials in several agencies raised questions during our review regarding how the rounding rules in the statute should be interpreted. In January 2002, the Federal Election Commission's General Counsel developed a memo examining various interpretations of those provisions and indicating that agencies were interpreting the requirements differently.

- Officials in one agency said it was unclear whether future inflation adjustments should be based on the penalty prior to or after rounding.

When the Inflation Adjustment Act was enacted in 1996, Congress did not give any federal agency the authority or responsibility to monitor agencies' compliance with the act or to provide guidance to agencies on how the act should be implemented.  In November 1996, at the request of OMB's Office

---

[22]U.S. General Accounting Office, *United States Coast Guard: Implementation of the Inflation Adjustment Act*, GAO-03-221R (Washington, D.C.: Nov. 1, 2002) and *Mine Safety and Health Administration: Implementation of the Inflation Adjustment Act*, GAO-03-288R (Washington, D.C.: Nov. 27, 2002).

of Federal Financial Management (OFFM), FMS developed written guidance on the Inflation Adjustment Act and held a workshop on how the act should be implemented.  As noted previously, FMS also reported on agencies' civil penalty assessments and collections until 1998 at the request of OFFM.  However, FMS has not provided any guidance to agencies on the Inflation Adjustment Act since 1996 and has never monitored agencies' compliance with the act.

In contrast, other crosscutting regulatory reform statutes make a particular executive branch agency responsible for monitoring compliance and providing guidance to other agencies.  For example, the Paperwork Reduction Act gives OMB the authority and responsibility to approve agencies' proposed information collections and to provide guidance to the agencies on how the act should be implemented.[23]  Also, the Regulatory Flexibility Act requires the Small Business Administration's Chief Counsel for Advocacy to monitor and report at least annually on agencies' compliance with the act.[24]

Representatives from all six of the agencies with covered penalties that we contacted supported giving some federal entity the authority and responsibility to monitor agencies' compliance with the Inflation Adjustment Act and to provide guidance to the agencies on the act's implementation.  One representative said that FMS had been very helpful during the act's early implementation, but since then there had been no entity that the agencies could turn to for advice and guidance.

# The Inflation Adjustment Act Has Prevented Agencies from Keeping Certain Penalties in Pace with Inflation

Several provisions in the Inflation Adjustment Act have limited agencies' ability to keep their penalties in pace with inflation.  The 10 percent cap on initial adjustments prevented some agencies from fully adjusting for hundreds of percent of inflation that had occurred since certain penalties were last set or adjusted by Congress.  The resultant "inflation gap" cannot be corrected under this statutory authority through subsequent adjustments and, in fact, grows with each adjustment.  Also, the act's requirements on how the penalty adjustments should be calculated and rounded prevents agencies from capturing all of the inflation that occurs between adjustments, and can prevent agencies from increasing certain

---

[23]See 44 U.S.C. 3504.

[24]See 5 U.S.C. 612.

penalties until inflation increases by 45 percent or more.  In addition, the act exempted hundreds of penalties from inflation adjustment, some of which have not been adjusted for decades.

## Ten Percent Cap Results in Penalty "Inflation Gaps"

The Inflation Adjustment Act limited covered agencies' first adjustments under the statute to 10 percent of the penalty amount.  In the six agencies that we focused on in this portion of our review, all 232 initial penalty adjustments were capped at 10 percent.[25]  As table 1 shows, none of these 10 percent adjustments were sufficient to fully account for the amount of inflation that had occurred since the underlying penalties were last set or adjusted.  The size of the inflation gap varied by agency and by penalty within agencies.  In some cases, the cap did not severely limit the agencies' ability to account for inflation.  For example, the 10 percent adjustment that MSHA made to its five penalties in 1998 (using the June 1997 CPI) accounted for all but 4 percent of the inflation that occurred since those penalties were last adjusted in 1992.

**Table 1:  The 10 Percent Cap on Initial Adjustments Resulted in Large "Inflation Gaps" for Some Penalties**

| Agency | CPI year used for initial adjust-ment | Number of penalties adjusted and capped at 10 percent | Year penalties were last set or adjusted | | Inflation gap after adjustment (percent) | | Inflation gap after adjustment (dollars) | |
|---|---|---|---|---|---|---|---|---|
| | | | Oldest | Most recent | High | Low | High | Low |
| EPA | 1995 | 74 | 1972 | 1992 | 266 | 2 | $ 282,400 | $ 74 |
| PWBA | 1996 | 7 | 1974 | 1990 | 281 | 11 | 281 | 11 |
| MSHA | 1997 | 5 | 1992 | 1992 | 4 | 4 | 2,150 | 2 |
| FAA | 1995 | 8 | 1958 | 1990 | 418 | 7 | 20,120 | 488 |
| NHTSA | 1996 | 16 | 1966 | 1992 | 374 | 2 | 2,126,400 | 13 |
| USCG | 1996 | 122 | 1968 | 1992 | 343 | 11 | 41,100 | 10 |
| **Total** | | **232** | | | | | | |

Source: GAO analysis of agency initial inflation adjustment regulations.

Note: The inflation gap estimates represent the difference between the increase needed to fully account for inflation and the 10 percent adjustment.  The 74 penalties that EPA adjusted and capped at 10 percent includes 2 penalties that the agency adjusted in June 1997 that were not included in the agency's December 1996 publication.

[25]Although all of the penalties in the six agencies that were adjusted were capped at 10 percent, some of the agencies' penalties were not adjusted. For example, EPA did not increase certain penalties that were enacted into law in 1996.

However, in other cases the 10 percent cap on agencies' initial adjustments resulted in sizable inflation gaps.  For example, one of the civil penalties that FAA adjusted in 1996 was a maximum $1,000 penalty for, among other things, possession of a firearm discovered at a baggage security checkpoint.  The penalty was set in 1958 and, until 1996, had not been changed.[26]  As figure 1 illustrates, if adjusted for inflation in 1996 (using the June 1995 CPI), this penalty would have increased by more than 400 percent to $5,277.  However, because the Inflation Adjustment Act limited agencies' first adjustments to 10 percent, FAA was only able to increase this penalty by $100 to $1,100—$4,177 less than it would have been if fully adjusted for the amount of inflation that occurred from 1958 through 1995.

---

[26]In November 2002, this penalty was increased to $10,000 as part of the establishment of the Department of Homeland Security. (Pub. L. 107-296, Section 1602, Nov. 25, 2002).

**Figure 1: The 10 Percent Cap on Initial Adjustments Prevented FAA from Keeping Its $1,000 Penalty in Pace With Inflation**



Source: GAO analysis of FAA data.

The 10 percent cap on initial adjustments also resulted in sizable inflation gaps for several other penalties in the six selected agencies. For example, see the following.

- If fully adjusted for inflation in 1996, a NHTSA penalty last set in 1972 at $800,000 for a series of violations involving the failure to meet bumper standard testing criteria would have increased by 275 percent to more than $3 million. However, the 10 percent cap limited the increase to $80,000, leaving an inflation gap of more than $2.1 million.

- An EPA penalty last set at $25,000 in 1976 for violation of the Toxic Substances Control Act would have increased by nearly 170 percent to more than $67,000 if fully adjusted for inflation in 1995. However, the 10

percent cap meant that the penalty could only increase by $2,500, leaving an inflation gap of nearly $40,000.

- A PWBA penalty was last set at $100 per day in 1974 for refusal to provide information in a timely manner needed to determine compliance with certain requirements in ERISA. If fully adjusted for inflation in 1996, the penalty would have increased to more than $300 per day. However, with the 10 percent cap, the penalty could only increase by $10, leaving an inflation gap of more than $200.

**Size of Inflation Gap Resulting from the 10 Percent Cap Grows with Subsequent Adjustments**

Because of other provisions in the Inflation Adjustment Act, the inflation gap resulting from the 10 percent cap on initial adjustments cannot be corrected under this statutory authority—and, in fact, grows with each penalty adjustment. The act defines the term "cost of living adjustment" as the percentage by which the CPI for the year preceding the adjustment exceeds the CPI for the year in which the penalty was last set or adjusted. Therefore, agencies' second adjustments under the statute could only take into consideration the amount of inflation since the first adjustment.[27] As a result, any inflation gap remaining as a result of the 10 percent cap becomes permanent. Furthermore, because the capped penalties are smaller than they would have been without the 10 percent restriction, the size of subsequent adjustments using that smaller base are also smaller, resulting in a widening of the inflation gaps.

For example, in the previously mentioned FAA penalty, the 10 percent cap on the agency's December 1996 adjustment resulted in an adjusted penalty of $1,100 and an inflation gap of $4,177. Under the Inflation Adjustment Act, FAA was required to examine this penalty by December 2000 and to calculate the cost of living adjustment needed to account for inflation from June 1996 through June 1999. Inflation increased by about 6 percent during this period, so the unrounded increase in this penalty would have been $66 ($1,100 times .06), resulting in an unrounded adjusted penalty of $1,166. However, FAA could not go back and recapture any of the $4,177 inflation gap that resulted from the 10 percent cap on the 1996 adjustment.

---

[27]During our review, we determined that the National Science Foundation had adjusted its covered penalties in a manner that erroneously accounted for all of the changes in the CPI since the penalties were set in 1978. The agency agreed with our recommendation to correct this error. See U.S. General Accounting Office, *National Science Foundation's Compliance With the Inflation Adjustment Act*, GAO-02-932R (Washington, D.C.: July 26, 2002). See the corrected adjustment in 67 Fed. Reg. 55728 (Aug. 30, 2002).

As figure 2 shows, by June 1999, the $1,000 penalty set in 1958 would have been $5,750 if fully adjusted for inflation. Therefore, the inflation gap resulting from the 10 percent cap would have increased from $4,177 to $4,584 ($5,750 minus $1,166).

**Figure 2: The Size of the Inflation Gap Resulting from the 10 Percent Cap Grows with Each Subsequent Adjustment**



Source: GAO analysis of FAA data.

**Agencies Generally Noncommittal Regarding Elimination of 10 Percent Cap**

The limited legislative history that exists regarding the 1996 amendment to the Inflation Adjustment Act does not explain why the 10 percent cap was established.  Until the 1996 amendment, no earlier executive branch or congressional initiative had called for any cap on the amount of inflation adjustments.  In fact, legislation passed by the House of Representatives in 1993 included a provision for an immediate one-time catch-up adjustment.[28] Officials in the six selected agencies said that they did not know why Congress established the 10 percent cap on initial penalty adjustments.

In its second inflation adjustment regulation, NHTSA expressed concern that even with two inflation adjustments, some of the agency's penalty amounts may be inadequate because of the 10 percent cap.[29]  Specifically, NHTSA said the following:

> Upon review, we concluded that application of the formulae permit some of our penalties to be increased at this time. We are doing so before the passage of four years in order to enhance the deterrent effect of these penalties because of their importance to our enforcement programs. Even with these increases, these penalties appear less than adequate as a full deterrent to violations of the statutes that we enforce. For example, the maximum penalty for a related series of violations under the National Traffic and Motor Vehicle Safety Act of 1966 as amended in 1974 was $800,000. It would have increased more than threefold, to $2.45 million, in June 1996 if (fully) adjusted for inflation. However, the adjustment was capped at $880,000. Further, under this aggregate penalty ceiling, on a per vehicle basis the maximum penalty amounts to less than one dollar per vehicle where a substantial fleet was in violation of the Safety Act.

We asked representatives from each of the six agencies that we focused on in this part of our review whether their agencies believed the 10 percent cap should be lifted and agencies either required or allowed to make catch-up adjustments.  Although the agency representatives generally agreed that the 10 percent cap was a significant limitation on the maximum amount of the civil penalty that could be assessed on the "worst offenders," they were generally noncommittal with regard to this issue, neither supporting nor

---

[28]See H.R. 3400.  This provision was deleted from the bill that was subsequently enacted as Pub. L. 103-356.

[29]64 Fed. Reg. 37876 (July 14, 1999).

opposing the elimination of the cap.   One representative said he was not aware of any instance in which his agency had imposed its largest penalty (an $1,100 penalty for each day a violation occurred), so he did not believe a catch-up adjustment to account for lost inflation would have any effect on the agency's enforcement actions.   However, he indicated that the same situation might not be true for the agency's other civil penalties.   The Department of Labor representative said his department would not support changing the statute to *require* agencies to make catch-up adjustments, but said it would have no problem changing the statute to *allow* agencies to do so.

## CPI Lag Reduces Amount of Inflation That Can Be Considered

When determining whether adjustments to their penalties are permitted, the Inflation Adjustment Act requires agencies to compare the CPI from June of the year preceding the adjustment with the CPI in June of the year in which the penalty was "last set or adjusted pursuant to law."[30]   Therefore, if an agency made its first round of penalty adjustments in October 1996 and examined those penalties in October 2000 to determine if further adjustments were warranted, the agency would have to compare the CPI for June 1996 with the CPI for June 1999—not the most current CPI data available or even the most recent June CPI data.   As figure 3 shows, this "CPI lag" feature in the statutory adjustment procedures reduces the amount of inflation that can be accounted for from 10 percent (the amount of inflation from June 1996 through June 2000) to 6.1 percent (the amount of inflation from June 1996 through June 1999).

---

[30]During our review, EPA officials raised questions to us regarding the interpretation of this requirement.  Specifically, they asked whether the term "last set or adjusted pursuant to law" referred to the date an adjustment was published in the *Federal Register* or the date the adjustment took effect.  This issue has relevance for EPA because the agency published its first round of adjustments in December 1996 but the adjustments took effect in January 1997.  Other agencies' adjustments also took effect in different years than their publication.

**Figure 3:  CPI Lag in the Inflation Adjustment Act Reduces the Amount of Inflation That Can Be Considered**



Source: GAO.

The inflation lost as a result of the CPI lag in the statute cannot be recovered later because the statute requires each subsequent adjustment to be calculated from the CPI for the year in which the penalty was last set or adjusted (i.e., June 2000 in the above example)—*not* from the CPI used to make the last adjustment (June 1999).[31]  Therefore, as figure 4 shows, each time an agency makes an adjustment the agency loses a year of inflation that can never be recovered.

---

[31]NHTSA calculated its August 2001 adjustment without losing a year of inflation by comparing the CPI index of June 2000 with the index that it last used to make the adjustment (June 1996), not the index for June in the year the adjustment was last made (June 1997).  (See 66 Fed. Reg. 41149, Aug. 7, 2001.)  Although we understand why NHTSA would want to use the earlier index, we believe that this approach is inconsistent with the act's requirements.

**Figure 4: Inflation Lost Due to CPI Lag Cannot Be Recovered**



Source: GAO.

Also, the amount of inflation lost as a result of the CPI lag in the Inflation Adjustment Act increases in proportion to the frequency with which the agency makes penalty adjustments. Each time that an agency adjusts its penalties, the agency loses a year of inflation. As figure 5 illustrates, if the agency in the above example had examined and been able to adjust its penalties twice during the period from 1996 to 2000, once in 1998, and again in 2000, the agency would have only been able to consider the amount of inflation that occurred from June 1996 through June 1997 (2.3 percent) and from June 1998 through June 1999 (2.0 percent)—a total of 4.3 percent— not the full amount of inflation that occurred from June 1996 through June 2000 (10 percent) or even the amount that occurred from June 1996 through June 1999 (6.1 percent).

**Figure 5:  Less Inflation Can Be Considered When Penalty Adjustments Are More Frequent**



Source: GAO.

| Agencies Believe CPI Lag Should Be Changed | Representatives from the six agencies with covered penalties that we focused on in this part of our review generally said the CPI lag in the Inflation Adjustment Act should be corrected.  One official from Department of Labor said that it "doesn't make much sense" to have a system in which agencies lose a year of inflation each time they make an adjustment, and supported changing the act in this area. |

## Rounding Rules Can Prevent Adjustments for Long Periods

The rounding rules in the Inflation Adjustment Act can also significantly affect the size and the timing of agencies' penalty adjustments.  As noted previously, the act requires agencies to round penalty increases to certain dollar amounts, depending on the size of the *penalty* (not the size of the penalty *increase*).  Specifically, the act provides that any increase should be rounded to the nearest

- multiple of $10 in the case of penalties less than or equal to $100,

- multiple of $100 in the case of penalties greater than $100 but less than or equal to $1,000,

- multiple of $1,000 in the case of penalties greater than $1,000 but less than or equal to $10,000,

- multiple of $5,000 in the case of penalties greater than $10,000 but less than or equal to $100,000,

- multiple of $10,000 in the case of penalties greater than $100,000 but less than or equal to $200,000, and

- multiple of $25,000 in the case of penalties greater than $200,000.

For example, if the CPI increased by 10 percent during the relevant period since a $7,500 penalty was last set or adjusted, the resultant penalty increase ($750) would be rounded to the nearest multiple of $1,000—which is $1,000.  Therefore, the new rounded penalty would be $8,500 ($7,500 plus $1,000).

Our analysis indicated that these requirements can prevent agencies from adjusting certain penalties until inflation increases substantially— sometimes 45 percent or more.  At recent rates of inflation that can mean that agencies cannot make penalty adjustments for 15 years or more.  For example, after a first round of adjustments in July 1997, one of PWBA's seven civil penalty maximums at the time was $11, five were $110, and one was $1,100.[32]  Under the statute, any effort by the agency to increase its penalties during calendar year 2001 (4 years after the agency's last adjustment) could include any increase in inflation that occurred from June 1997 through June 2000.  During that period, the CPI increased by about 7.5 percent.  However, as table 2 shows, multiplying each of the 1997 penalty amounts by 7.5 percent and applying the rounding rules in the act does not result in a penalty adjustment for any of the agency's penalties.

---

[32]Subsequently, Congress established three other PWBA civil penalty maximums—two at $1,000 and one at $100.  On January 22, 2003, PWBA published a final rule adjusting each of these penalties by 10 percent effective March 24, 2003.  See 68 Fed. Reg. 2875 (Jan. 22, 2003).

**Table 2:   Rounding Rules in the Inflation Adjustment Act Prevented PWBA from Increasing Its Penalties in 2001**

| Penalty amount after 1997 increase | Unrounded penalty increase (1997 penalty times 0.075) | Unrounded penalty (unrounded increase plus 1997 penalty) | Statute requires increase to be rounded to nearest multiple of | Rounded increase |
|---|---|---|---|---|
| $11 | $0.83 | $11.83 | $10 | 0 |
| 110 | 8.25 | 118.25 | 100 | 0 |
| 1,100 | 82.50 | 1,182.50 | 1,000 | 0 |

Source: GAO analysis of PWBA data.

In fact, PWBA's penalties are not eligible for an increase under the rounding rules in the Inflation Adjustment Act until the CPI increases by 45.5 percent.  Assuming a 2.5 percent annual rate of inflation in the future (about the average rate since the Inflation Adjustment Act was passed in 1996), PWBA would not be able to increase any of its civil penalties for 17 years.[33]

Appendix II shows the maximum civil penalty amounts in each of the six selected agencies after the first round of adjustments, the number of penalties at each maximum penalty amount, the inflation trigger points for each penalty amount, and the number of years that would have had to elapse before those penalties could be adjusted again (assuming a 2.5 percent rate of inflation).  Of the 232 penalties in the six agencies, 208 (about 90 percent) could not be adjusted under the statute within the 4-year period contemplated in the statute.  Ninety-eight of the penalties (about 42 percent) could not be adjusted for at least 10 years, and 44 (about 19 percent) could not be adjusted for 17 years or more.  For example, after the first round of adjustments (assuming a 2.5 percent inflation rate), see the following:

- Six NHTSA penalties at the $1,100 level could not be adjusted under the statute for 17 years.  These penalties include statutory violations involving failure to comply with requirements to reduce traffic deaths and injuries, the tracing and recovery of stolen vehicles and component

---

[33]For example, at 2.5 percent inflation per year, compounded annually, a 45.5 percent increase in the CPI would take 16 years.  With the 1-year CPI lag, the total is 17 years.  At double that rate of inflation (5 percent per year), these penalties would be eligible for adjustment under the rounding rules in 9 years.

parts, and the providing of information needed to determine the crashworthiness of motor vehicles.  One NHTSA penalty at the $5.50 level (for each 0.1 mile per gallon exceeding the fuel standard for automobiles under the standard times the number of those automobiles) could not be adjusted for 28 years.

- Two EPA penalties at the $1,100 level could not be adjusted under the statute for 17 years.  These include penalties for certain violations of the Clean Water Act and the Federal Insecticide, Fungicide, and Rodenticide Act.

- Twenty-seven USCG penalties at the $1,100 and $110 levels could not be adjusted under the statute for 17 years.  The penalties involve violations related to the reporting of marine casualties, hazardous substance discharges, bridge maintenance and operation, and other statutory violations.

In general, penalties that are just over the lower end of the rounding categories (e.g., $110 or $1,100) take longer to adjust than penalties at the upper end of those categories (e.g., $1,000 or $10,000).

**Rounding Can Result in Penalty Adjustments That Outpace Inflation**

When the agencies are finally able to adjust their penalties for inflation, the size of the adjustments permitted under the rounding rules in the statute can be significantly larger than the amount of inflation that has occurred. For example, as illustrated in table 3 for the PWBA penalties discussed above, although the CPI must increase 45.5 percent before the agency can make an adjustment, the adjustment that is ultimately provided will be twice that amount—90.9 percent.

**Table 3:  When PWBA Penalties Are Eligible for Adjustment, the Increases Will Be about Twice That Needed to Keep Pace with Inflation**

| Penalty amount after first round of adjustments | Percentage increase in CPI needed to adjust penalty | Unrounded increase | Rounded increase | New penalty | Percentage increase in penalty amount |
|---|---|---|---|---|---|
| $11 | 45.5 | $5 | $10 | $21 | 90.9 |
| 110 | 45.5 | 50 | 100 | 210 | 90.9 |
| 1,100 | 45.5 | 500 | 1,000 | 2,100 | 90.9 |

Source: GAO analysis of PWBA data.

Figure 6 illustrates the 17-year period that may be required for an adjustment of the $1,100 penalty and the overcompensation that can occur because of the rounding rules. Assuming a 2.5 percent annual rate of inflation and applying the adjustment formula in the statute, in 2014 (17 years after the agency's first adjustment) PWBA's $1,100 penalty could be increased by $1,000 to $2,100. However, if the penalty had just kept pace with inflation (i.e., increased 2.5 percent each year for 17 years) the penalty would have only increased by about $574 to $1,674—about $426 less than the rounded adjustment pursuant to the Inflation Adjustment Act.

**Figure 6: Rounding Rules Can Prevent Penalty Adjustments for Decades**



Source: GAO.

The figure also shows that in subsequent penalty adjustments under the statute (again assuming a 2.5 percent annual rate of inflation), the size of the rounded penalty is almost always above the penalty amount if it had just kept pace with inflation. For example, applying the rounding rules, the $2,100 rounded penalty would be eligible for another $1,000 increase to $3,100 in the year 2024—10 years after the previous adjustment. However, if the original $1,100 penalty had just kept pace with inflation from 1997 through 2024 it would be $2,143—$957 less than the rounded penalty. By the fifth adjustment in 2038, the rounded civil penalty ($5,100) is projected

to be more than $2,000 larger than the penalty if it had simply kept pace with inflation ($3,027).

**Rounding Based on the Size of the Increase Yields More Frequent, Accurate Adjustments**

During our review, we determined that several agencies were rounding their penalty adjustments incorrectly.  Specifically, the agencies were rounding the increases based on the size of the unrounded penalty *increase* rather than the size of the *penalty*.[34]  Although this method is inconsistent with the requirements of the Inflation Adjustment Act, as figure 7 shows (again using the $1,100 penalty for illustration and assuming a 2.5 percent annual rate of inflation), rounding based on the size of the increase yields more frequent results than the statutory approach (rounding based on the size of the penalty), and the results more closely track the actual changes in inflation over time.  The agency could make adjustments every 2 years (as illustrated in the figure), but must do so at least once every 4 years.

---

[34]See, for example, U.S. General Accounting Office, *Farm Credit Administration: Compliance with the Inflation Adjustment Act*, GAO-02-1084R (Washington, D.C.: Sept. 24, 2002) and *Department of Commerce: Compliance with the Inflation Adjustment Act*, GAO-02-1085R (Washington, D.C.: Sept. 30, 2002).

**Figure 7: Rounding Based on the Size of the Increase More Closely Tracks Inflation than Rounding Based on the Size of the Penalty**



Source: GAO.

Although rounding based on the size of the increase produces improved results, the resulting penalty adjustments are less than they would be if the actual rates of inflation were used. For example, as figure 7 shows, by the year 2021, the penalty amount derived by rounding based on the size of the increase would be $1,480—$510 less than if the penalty had just kept pace with the projected rate of inflation ($1,990). However, virtually all of the difference between these two figures is caused by the CPI lag feature discussed earlier (in which only a portion of the amount of inflation occurring during an adjustment period is counted). As figure 8 shows, rounding penalty adjustments based on the size of the increase without the CPI lag allows the agency to make adjustments each year, and the result is a much closer fit to the projected rate of inflation. By the year 2021, the rounded penalty is only $10 more ($2,000 versus $1,990) than if it had directly kept pace with inflation.

**Figure 8:  Rounding Based on the Size of the Increase without the CPI Lag More Closely Tracks Inflation**



Source: GAO.

**Agencies Believe Rounding Rules Should Be Changed**

Representatives from all six of the agencies that we focused on in this part of our review strongly supported changing the rounding rules in the Inflation Adjustment Act.  All of them said the rules were problematic because of their complexity and/or their effects on the agencies' ability to make timely and accurate adjustments.  Alternatives that they suggested to the current approach included rounding based on the size of the penalty increase (rather than the size of the penalty itself) and elimination of rounding altogether.

**Some Exempted Penalties Have Not Been Adjusted in Decades**

The Inflation Adjustment Act requires each agency to adjust its civil penalties for inflation, but explicitly exempts penalties established under certain statutes:  (1) the Social Security Act, (2) the Occupational Safety and Health Act of 1970, (3) the Internal Revenue Code of 1986, and (4) the Tariff Act of 1930.  As table 4 shows, the exemptions in the act account for at least 238 penalties enforced by five federal agencies: CMS within the Department of Health and Human Services, OSHA within the Department of Labor, Customs and IRS within the Department of the Treasury, and SSA.

The legislative history of the act does not indicate why these statutes were exempted from the inflation adjustment requirements.

**Table 4:  Inflation Adjustment Act Exempted at Least 238 Civil Penalties from Coverage**

| Exempted statute | Department/agency | Number of civil penalties excluded |
|---|---|---|
| Social Security Act | Department of Health and Human Services/CMS | 70 |
| | SSA | 5 |
| Occupational Safety and Health Act of 1970 | Department of Labor/ OSHA | 6 |
| Internal Revenue Code of 1986 | Department of the Treasury/IRS | 128 |
| Tariff Act of 1930 | Department of the Treasury/Customs | 29 |
| **Total** | | **238** |

Source: GAO analysis of 1991 OMB report on civil penalties supplemented with recent data from Health and Human Services, OSHA, IRS, Customs, and SSA.

All of OSHA's six exempted civil penalties were last adjusted by Congress in 1990.  Therefore, as of June 2002, all of them were 38 percent less than if they had fully kept pace with inflation since 1990.  However, as table 5 illustrates, the dates that the other agencies' exempted penalties were last set or adjusted vary substantially.  As a result, the amount of inflation that has elapsed since the agencies' last adjustments also varies.  For example, eight IRS penalties have not been changed since 1954, but three other IRS penalties were set in 1998.  As a result, by June 2002 the amount of inflation that had occurred since the agency's penalties were last set or adjusted ranged from 10 percent (for the 1998 penalties) to 569 percent (for the 1954 penalties).  One Customs penalty had not been adjusted since 1879—resulting in an inflation gap of more than 1,700 percent.  Overall, 142 (nearly 60 percent) of the 238 exempted penalties would need to be increased by 50 percent or more to be fully adjusted for inflation as of June 2002. Twenty-six of the penalties (about 11 percent) would need to be adjusted by at least 100 percent.

**Table 5:  A Substantial Amount of Inflation Has Elapsed with Regard to Some Exempted Penalties**

| Agency | Years in which exempted penalties were last set or adjusted | | Amount of inflation since last adjustment (percent) as of June 2002 | |
|---|---|---|---|---|
| | Oldest | Most recent | High | Low |
| CMS | 1986 | 1999 | 64 | 8 |
| IRS | 1954 | 1998 | 569 | 10 |
| OSHA | 1990 | 1990 | 38 | 38 |
| Customs | 1879 | 1993 | 1,736 | 22 |
| SSA | 1988 | 1994 | 53 | 22 |

Source: GAO analysis of 1991 OMB report on civil penalties supplemented with recent data from Health and Human Services, OSHA, IRS, Customs, and SSA.

Note: CPI information is only available since 1913, so the amount of inflation elapsed for the oldest customs penalty (1879) is calculated since 1913.

These inflation gaps notwithstanding, officials in four of the five agencies with exempted penalties—CMS, IRS, Customs, and OSHA—said that their penalties did not need to be adjusted for inflation.

- CMS officials said that, despite their age, some of the maximum penalties in the Social Security Act are still fairly high, thereby giving the agency the flexibility it needs when deciding on the size of the penalty imposed.  They also said that some of the penalties could be compounded monthly, weekly, or daily, resulting in even higher penalty maximums if needed.  As a result, they said that CMS has the leverage it needs to counteract the effects of inflation on penalty amounts that were set by Congress, in some cases, decades earlier.

- IRS officials said that the agency's penalties for fixed dollar amounts can be compounded daily.  As a result, they said, the maximum penalty assessed could be substantial even without adjusting for inflation.  In addition, they said that IRS penalties sometimes contain formulas (e.g., a percentage of the amount invested or of the amount of tax due) that implicitly account for inflation.[35]

---

[35]For example, one penalty states that if a person either fails to register a tax shelter by a certain prescribed date or files false or incomplete information regarding the registration, IRS can either impose a penalty of up to $500 or 1 percent of the aggregate amount invested in the tax shelter—whichever is greater.  See 26 U.S.C. 6707(a).

- Customs officials said that they are satisfied with the adequacy of the fixed amount penalties provided for within the Tariff Act and the deterrent effect that they provide.  For example, the most commonly assessed fixed amount penalty—a $5,000 penalty for violation of 19 U.S.C. 1436 assessed against a master of a vessel, operator of a vehicle, or pilot of an aircraft for failing to comply with statutory requirements concerning report of arrival of conveyances and presentation of accurate cargo and passenger manifest information—has proven to be an effective deterrent.

- OSHA officials said that Congress increased the agency's penalties seven-fold in 1990—far in excess of the amount of inflation that had occurred since those penalties were previously set in 1970.  As a result, they said, the 1990 penalty amounts were still sufficient to keep their penalties in pace with the amount of inflation that has occurred since 1970. In addition, they said the agency's policy allows penalties to be assessed on a violation-by-violation basis that allows the agency to create a multiplier effect.  They indicated that this multiplier effect could raise the penalty to an amount that would exceed the inflation-adjusted levels.

In contrast, SSA officials said that inflation adjustments are currently needed for at least some of their penalties because they have become eroded by inflation over time and become less effective.

## Conclusions

Civil monetary penalties are an important element of regulatory enforcement. Suitably severe maximum penalties allow agencies to punish willful and egregious violators appropriately and serve as a deterrent to future violations.  However, civil penalties can lose their ability to punish and deter if unadjusted for inflation.  Therefore, as we have said previously, we believe that civil penalties should be periodically adjusted for the effects of inflation so that they do not lose their relevancy.  Doing so can also increase federal receipts from those penalties, perhaps by tens of millions of dollars per year.

Our review indicated that the Inflation Adjustment Act limits agencies' ability to keep their civil penalties in pace with inflation.

- Because of the 10 percent cap on initial penalty adjustments, some civil penalties are hundreds of percent less than they would be if fully adjusted for the amount of inflation since Congress last set or adjusted

them.  Viewed another way, those penalties currently represent only a fraction of their original value.  The inflation gap resulting from the 10 percent cap can never be recovered under the statutory authority and grows each year.

- Because of the rounding rules in the statute, agencies can be prevented from making a second round of penalty adjustments until inflation increases 45 percent or more.  Therefore, at recent rates of inflation, agencies may not be able to readjust their penalties for 15 years or more after their initial adjustments.

- Because of the way that the statute requires the agencies to use CPI data to calculate the raw adjustment, agencies will lose a year of inflation each time they make an adjustment.  That lost inflation that can never be recaptured in subsequent adjustments.  Also, the statute requires agencies to use CPI data that are at least 7 months old, and perhaps as much as 18 months old.

- Because the statute exempted certain penalties from the act's requirements, the agencies administering those penalties are unable to make even the modest adjustments permitted as a result of the 10 percent cap, rounding rules, and CPI lag features discussed above.  More than 100 of these exempted penalties have declined in value by 50 percent or more since Congress last set them.

Our review also indicated widespread lack of compliance with and confusion about the Inflation Adjustment Act's requirements.  Agencies' failure to comply with those requirements may have cost the government millions of dollars in lost penalties from individuals and organizations that are the worst offenders of health, safety, environmental, and other statutes.  We believe that an agency charged with monitoring agencies' compliance with the Inflation Adjustment Act could have identified the compliance problems earlier in the act's implementation, and may have been able to prevent them from occurring.  For example, an oversight agency could have developed a database that would determine when penalties were due for an adjustment and notified the agencies of their responsibilities under the act.  The agency could also suggest ways to make implementation of the act's requirements better or easier.  For example, the agency could provide a standard format by which agencies could explain how their penalties were adjusted and list the new penalty amounts, and/or could have provided agencies with computer programs to facilitate the computation of penalty adjustments and revised penalty amounts.  In

addition, detailed guidance to the agencies regarding the Inflation Adjustment Act's requirements might have prevented some of the questions and problems that have arisen during its implementation.  Finally, an oversight agency could collect information regarding civil penalty assessments and collections that has been unavailable for the past 5 years.  That information could help Congress understand which agencies have civil penalty authority, the extent to which certain penalties are being used, and the extent to which agencies are developing alternatives to the exemptions from the Inflation Adjustment Act and the limitations imposed by the act on their penalty adjustments.

## Matters for Congressional Consideration

If Congress wants federal civil penalties to regain their full impact and deterrent effects, it should consider amending the Inflation Adjustment Act to require agencies to adjust their penalties for the full amount of inflation that has occurred since they were last set or adjusted by Congress.  This catch-up adjustment could occur all at once or in a series of adjustments.  Alternatively, Congress could amend the act to permit (but not require) agencies to make catch-up adjustments.

If Congress wants federal civil penalties to be adjusted on a more timely and accurate basis, it should consider amending the Inflation Adjustment Act to

- allow agencies to use more current CPI data to calculate the size of penalty increases, and require that changes in the CPI be calculated without losing a year of inflation and

- either eliminate the rounding provisions altogether (e.g., adjust penalties for the actual amount of inflation that occurred) or change the way in which penalty increases are rounded (e.g., round based on the size of the increase rather than the size of the penalty itself).

If Congress wants penalties currently exempted from the act to be covered, it should consider amending the Inflation Adjustment Act and permitting agencies to adjust those penalties for inflation.

Finally, Congress should consider giving one or more executive branch agencies the authority and responsibility to monitor the act's implementation and provide guidance to the agencies.  A single agency could be made responsible for both providing guidance to agencies on the implementation of the Inflation Adjustment Act and monitoring compliance

with the act. Alternatively, those functions could be given to separate agencies. The agency or agencies could also collect basic information on which agencies have civil penalty authority, the amount of penalty assessments and collections, and the agencies' use of alternative mechanisms to increase assessments and collections.

# Agency Comments and Our Evaluation

On February 11, 2003, we provided a draft of this report to OMB, the Department of Justice, and the Department of the Treasury for their review and comment. We also provided a draft for technical review to the six selected agencies with covered penalties and the five agencies with penalties not covered by the Inflation Adjustment Act. Two of the agencies with covered penalties—NHTSA and PWBA—provided us with technical comments, which we incorporated as appropriate. For example, in response to a comment from NHTSA, we clarified that both FAA and NHTSA had published a second round of penalty adjustments by June 30, 2002, for all of the agencies' eligible penalties.

On February 26, 2003, we received written comments on the draft report from the Director of the Audit Liaison Office within the Department of Justice. On behalf of the department, she suggested that we change our matter for congressional consideration to state that Congress should provide not only the authority and responsibility to monitor the act's implementation, but also the "necessary resources." We did not make this change because we do not believe that these roles will require significant, dedicated resources. The Director did not comment on the other proposed changes to the act's requirements (e.g., elimination of the inflation gap created by the 10 percent cap or changes to the rounding rules).

On February 27, 2003, we received written comments on the draft report from the Commissioner of FMS within the Department of the Treasury. The Commissioner said that FMS is "not the appropriate organization" for monitoring compliance with the Inflation Adjustment Act given the act's "unique and complex features" and because such monitoring is not directly related to the agency's responsibility for overseeing the collection of delinquent debt. He said it is FMS's view that each federal agency is responsible for managing and collecting civil monetary penalty debt. He also said that each federal agency's inspector general has a responsibility for overseeing agency compliance with the Inflation Adjustment Act. We agree that inspectors general can help oversee the act's implementation within particular agencies. However, we also believe that some type of central oversight and guidance function is also needed to ensure

consistency in how the act is interpreted and applied, and to gather information about civil penalty assessments and collections throughout the government.  In addition, several of the departments and agencies with inspectors general did not make—the required penalty adjustments—an indication that reliance on inspectors general alone may not result in improved compliance with the act.  Also, at least two agencies with penalties covered by the act do not have inspectors general, so it is unclear what entities would oversee implementation in these agencies.  Therefore, we did not change our matter for congressional consideration.

The Commissioner of FMS also provided comments on specific sections of the draft report, which we incorporated as appropriate.  For example, he suggested that we clarify that FMS developed written guidance on the Inflation Adjustment Act and held a workshop on how the act should be implemented at the request of OFFM, not at the agency's initiative.  The Commissioner did not comment on the other proposed changes to the act's requirements.

On March 7, 2003, we received written comments on the draft report from OMB staff in OFFM and the Office of the General Counsel.  The OMB staff agreed with the report's conclusions on the Inflation Adjustment Act's requirements, namely that Congress directly assigned to each federal agency the responsibility to comply with the act's requirements and did not assign to any agency the responsibility to provide centralized governmentwide guidance and oversight.  As such, the staff said that it is the responsibility of each agency to comply with the act's requirements, and that oversight of each agency's compliance with the act resides first with that agency's inspector general office.  The OMB staff also said they did not agree that a centralized role of providing guidance and oversight of governmentwide compliance with the act was necessarily needed. However, they said that if it were concluded that a federal agency should take on this added responsibility, an agency other than OMB would likely be more appropriate for serving this role.  As we indicated in our response to a similar comment from the Commissioner of FMS, we agree that agency inspectors general can help oversee the act's implementation within particular agencies. However, we also believe some type of central oversight and guidance function is also needed to ensure consistency in how the act is interpreted and applied.  Therefore, we did not change our matter for congressional consideration.

We are sending copies of this report to the Secretary of the Treasury, the Attorney General, and the Director of OMB.  We are also sending copies to each of the six agencies with covered penalties that we focused on in this review, and to each of the five agencies with penalties that are not covered by the act.  It will also be available at no charge on GAO's homepage at http://www.gao.gov.  If you have any questions concerning this report, please call Curtis Copeland or me at (202) 512-6806.  Major contributors to this report include Andrea Levine, Joe Santiago, John Tavares, and Michael Volpe.

Victor S. Rezendes
Managing Director
Strategic Issues

# Final Rules That Adjust Civil Penalties for Inflation as of June 30, 2002

Tables 6 and 7 identify the departments and agencies that the Office of Management and Budget's (OMB) 1991 report or other sources indicated have civil penalty authority and that are covered by the requirements of the Federal Civil Penalties Inflation Adjustment Act, as amended (Inflation Adjustment Act). The tables also identify the initial and subsequent penalty adjustment final rules that had been published as of June 30, 2002. Because there is no current comprehensive database that identifies each agency with civil penalty authority subject to the provisions of the Inflation Adjustment Act, we cannot be sure that we have identified all of the covered agencies or penalties. Also, the adjustment regulations listed reflect the results of our search of the *Federal Register* from 1996 through June 30, 2002. Other penalty adjustment regulations may have been published that we did not discover.

In some cases, cabinet departments published a single rule that adjusted penalties for all subagencies/offices within the department (e.g., the Department of Agriculture's July 31, 1997, initial adjustment). In other cases, agencies within the departments each made their own adjustments (e.g., the Department of Transportation). The phrase "not made" in a cell indicates that a required initial or subsequent adjustment had *not* been made as of June 30, 2002, for at least one eligible penalty. The phrase "not required" in a cell in the "subsequent adjustment" column indicates that no adjustment was required as of June 30, 2002, either because 4 years had not elapsed since the initial adjustment or because not enough inflation had occurred to permit an adjustment under the rounding rules in the statute.

Appendix I
**Final Rules That Adjust Civil Penalties for
Inflation as of June 30, 2002**

**Table 6: Final Rules That Adjust Cabinet Departments' Civil Penalties for Inflation (as of June 30, 2002)**

| Department | Subagency/office | Initial adjustments | | Subsequent adjustments | |
|---|---|---|---|---|---|
| | | Date of publication | *Federal Register* citation | Date of publication | *Federal Register* citation |
| Agriculture | Agricultural Marketing Service | 07/31/1997 | 62 FR 40924 | not made | |
| | Animal and Plant Health Inspection Service | | | | |
| | Food and Consumer Service | | | | |
| | Food Safety and Inspection Service | | | | |
| | Forest Service | | | | |
| | Grain Inspection, Packers and Stockyards Administration | | | | |
| | Federal Crop Insurance Corporation | | | | |
| | Office of the Secretary | | | | |
| Commerce | Bureau of Export Administration | 10/24/1996 | 61 FR 55092 | 11/01/2000 | 65 FR 65260 |
| | Economic Development Administration | | | | |
| | Economics and Statistics Administration | | | | |
| | Bureau of Economic Analysis | | | | |
| | Import Administration | | | | |
| | National Oceanic and Atmospheric Administration | | | | |
| | Office of the Secretary | | | | |
| Defense | Army Corps of Engineers | 12/26/1996 | 61 FR 67944 | not made | |
| | Office of the Secretary | | | | |
| Education | | not made | | | |
| Energy | Office of General Counsel | 09/02/1997 | 62 FR 46181 | not made | |
| Health and Human Services | Food and Drug Administration | not made | | | |
| | Office of Inspector General | 10/07/1996 | 61 FR 52299 | not made | |
| Housing and Urban Development | Office of Federal Housing Enterprise Oversight | 12/31/1997 | 62 FR 68152 | 01/04/2001 | 66 FR 709 |
| | Office of the Secretary | 09/24/1996 | 61 FR 50207 | not made | |
| | | 10/04/1996 | 61 FR 52215 | | |
| Interior | Bureau of Land Management | not made | | | |
| | Fish and Wildlife Service | not made | | | |
| | Minerals Management Service | not made | | | |
| | Office of Surface Mining Reclamation and Enforcement | 11/28/1997 | 62 FR 63274 | 11/21/2001 | 66 FR 58644 |
| Justice | Executive Office for Immigration Review | 02/12/1999 | 64 FR 7066 | not required | |
| | Office of the Attorney General | 08/30/1999 | 64 FR 47099 | not required | |

**Appendix I**
**Final Rules That Adjust Civil Penalties for**
**Inflation as of June 30, 2002**

(Continued From Previous Page)

| | | Initial adjustments | | Subsequent adjustments | |
|---|---|---|---|---|---|
| Department | Subagency/office | Date of publication | *Federal Register* citation | Date of publication | *Federal Register* citation |
| Labor | Mine Safety and Health Administration | 04/22/1998 | 63 FR 20031 | not made | |
| | Pension and Welfare Benefits Administration | 07/29/1997 | 62 FR 40695 | not required | |
| | Wage and Hour Division | 12/07/2001 | 66 FR 63501 | not required | |
| | Office of Worker's Compensation Program | 10/17/1997 | 62 FR 53955 | not made | |
| State | | not made | | | |
| Transportation | Federal Aviation Administration | 12/20/1996 | 61 FR 67443 | 02/11/2002 | 67 FR 6364 |
| | Federal Highway Administration | 03/13/1998 | 63 FR 12413 | not made | |
| | Federal Railroad Administration | 03/10/1998 | 63 FR 11618 | not required | |
| | Maritime Administration | 11/05/1996 | 61 FR 56900 | not made | |
| | National Highway Traffic Safety Administration | 02/04/1997 | 62 FR 5167 | 07/14/1999 | 64 FR 37876 |
| | | | | 08/07/2001 | 66 FR 41149 |
| | Office of the Secretary | 02/13/1997 | 62 FR 6719 | not made | |
| | Research and Special Projects Administration | 01/21/1997 | 62 FR 2970 | not made | |
| | Saint Lawrence Seaway Development Corporation | 10/22/1996 | 61 FR 54733 | not made | |
| | United States Coast Guard | 04/08/1997 | 62 FR 16695 | not made | |
| Treasury | Bureau of Alcohol, Tobacco, and Firearms | 10/23/1996 | 61 FR 54935 | not required | |
| | Office of Enforcement | not made | | | |
| | Office of Foreign Assets Controls | 10/23/1996 | 61 FR 54936 | not made | |
| | Office of the Comptroller of the Currency | 01/22/1997 | 62 FR 3199 | 12/11/2000 | 65 FR 77250 |
| | Office of Thrift Supervision | 10/31/1996 | 61 FR 56118 | 10/17/2000 | 65 FR 61260 |
| | U. S. Customs Service | not made | | | |
| Veterans Affairs | | 11/01/1996 | 61 FR 56449 | not made | |

Source: GAO analysis of OMB's 1991 report and individual agency *Federal Register* documents.

Note:  Some final rules making initial and subsequent adjustments were revised after the initial publication dates to reflect technical corrections.

Appendix I
**Final Rules That Adjust Civil Penalties for**
**Inflation as of June 30, 2002**

**Table 7:   Final Rules That Adjust Independent Agencies' Civil Penalties for Inflation (as of June 30, 2002)**

| Agency | Initial adjustments | | Subsequent adjustments | |
|---|---|---|---|---|
| | Original date of publication | *Federal Register* citation | Original date of publication | *Federal Register* citation |
| Commodity Futures Trading Commission | 10/28/1996 | 61 FR 55564 | 07/25/2000 | 65 FR 45709 |
| Environmental Protection Agency | 12/31/1996 | 61 FR 69359 | 06/18/2002[a] | 67 FR 41343 |
| Equal Employment Opportunity Commission | 05/16/1997 | 62 FR 26933 | not required | |
| Farm Credit Administration | 10/22/1996 | 61 FR 54728 | 07/27/2000 | 65 FR 46087 |
| Farm Credit System Insurance Corporation | 10/24/1996 | 61 FR 55079 | 08/22/2001 | 66 FR 44027 |
| Federal Communications Commission | 02/03/1997 | 62 FR 4917 | 10/13/2000 | 65 FR 60868 |
| Federal Deposit Insurance Corporation | 11/12/1996 | 61 FR 57987 | 10/31/2000 | 65 FR 64884 |
| Federal Election Commission | 03/12/1997 | 62 FR 11316 | not made | |
| Federal Emergency Management Agency | not made | | | |
| Federal Energy Regulatory Commission | not made | | | |
| Federal Maritime Commission | 10/08/1996 | 61 FR 52704 | 08/15/2000 | 65 FR 49741 |
| Federal Reserve System | 11/01/1996 | 61 FR 56407 | 10/12/2000 | 65 FR 60583 |
| Federal Trade Commission | 10/21/1996 | 61 FR 54548 | 10/13/2000 | 65 FR 60857 |
| General Services Administration | 12/20/1996 | 61 FR 67234 | not made | |
| International Trade Commission | not made | | | |
| Merit Systems Protection Board | 09/18/1996 | 61 FR 49049 | not required | |
| National Credit Union Administration | 11/06/1996 | 61 FR 57290 | 09/22/2000 | 65 FR 57277 |
| National Aeronautics and Space Administration | not made | | | |
| National Transportation Safety Board | not made | | | |
| National Science Foundation | 11/20/1996 | 61 FR 59027 | 06/16/1998 | 63 FR 32761 |
| Nuclear Regulatory Commission | 10/11/1996 | 61 FR 53553 | 10/04/2000 | 65 FR 59270 |
| Office of Government Ethics | 08/30/1999 | 64 FR 47095 | not required | |
| Office of Personnel Management | not made | | | |
| Pension Benefit Guaranty Corporation | 07/10/1997 | 62 FR 36993 | not required | |
| Railroad Retirement Board | 01/27/1997 | 62 FR 3790 | not made | |
| Securities and Exchange Commission | 11/08/1996 | 61 FR 57773 | 02/02/2001 | 66 FR 8761 |
| Small Business Administration | not made | | | |
| Surface Transportation Board[b] | not made | | | |
| Tennessee Valley Authority | 10/24/1996 | 61 FR 55097 | 03/05/2002 | 67 FR 9924 |
| United States Postal Service | 10/29/1996 | 61 FR 55750 | not made | |
| | 11/01/1996 | 61 FR 56450 | | |

Source: GAO analysis of *Federal Register* documents.

Note:  Some final rules making initial and subsequent adjustments were revised after the initial publication dates to reflect technical corrections.

**Appendix I
Final Rules That Adjust Civil Penalties for
Inflation as of June 30, 2002**

[a]As discussed in the report, EPA's second round of adjustments was withdrawn after we advised EPA that the adjustments were inconsistent with the Inflation Adjustment Act's requirements.

[b]The Interstate Commerce Commission Termination Act of 1995 (Pub. L. 104-88, 109 Stat. 803) abolished the Interstate Commerce Commission and transferred certain regulatory functions to the newly created Surface Transportation Board (Board).  The act took effect on January 1, 1996.  Therefore, the Board was not required to make an initial round of adjustments for eligible civil penalties until January 1, 2000.  As of June 30, 2002, the Board had not made those adjustments.

# Amount of Inflation and Estimated Length of Time Needed to Trigger Penalty Adjustments in Selected Agencies

Table 8 illustrates, for six selected agencies, the (1) size of the agencies' penalty amounts after the first round of adjustments, (2) the number of covered penalties at each amount, (3) the relevant rounding category in the Federal Civil Penalties Inflation Adjustment Act, as amended (Inflation Adjustment Act), for each penalty amount, (4) the amount of inflation needed to trigger a second round of penalty adjustments at that penalty amount, (5) the rounded penalty amount after adjustment, (6) the percentage increase that rounded penalty represents (when compared to the earlier amount), and (6) the number of years it will take (at 2.5 percent inflation per year) to trigger this adjustment.  The amount of inflation needed to trigger an adjustment is calculated by taking half of the rounding multiple and dividing that by the size of the penalty.  For example, for the $11 Pension and Welfare Benefits Administration penalty, half of the $10 rounding multiple is $5, which when divided by $11 equals 45.4 percent.  As the table shows, some of the agencies' penalties cannot be adjusted for more than 15 years under the rounding rules, and the rounded increases are twice the amount of actual inflation to trigger an adjustment.

**Table 8:  Amount of Inflation and Estimated Length of Time Needed to Trigger Next Penalty Adjustments in Six Selected Agencies**

| Agency | Penalty amounts after first-round adjustments | Number of covered penalties at this amount | Statute requires increase to be rounded to nearest multiple of | Percentage inflation increase needed to trigger next adjustment | Number of years to next adjustment assuming a 2.5 percent annual inflation rate | Rounded penalty amount | Rounded percentage increase |
|---|---|---|---|---|---|---|---|
| Pension and Welfare Benefits Administration | $ 11 | 1 | $ 10 | 45.5 | 17 | $ 21 | 90.9 |
| | 110 | 5 | 100 | 45.5 | 17 | 210 | 90.9 |
| | 1,100 | 1 | 1,000 | 45.5 | 17 | 2,100 | 90.9 |
| Mine Safety and Health Administration | 55 | 1 | 10 | 9.1 | 5 | 65 | 18.2 |
| | 66 | 1 | 10 | 7.6 | 4 | 76 | 15.2 |
| | 275 | 1 | 100 | 18.2 | 8 | 375 | 36.4 |
| | 5,500 | 1 | 1,000 | 9.1 | 5 | 6,500 | 18.2 |
| | 55,000 | 1 | 5,000 | 4.6 | 3 | 60,000 | 9.1 |
| Federal Aviation Administration | 1,100 | 1 | 1,000 | 45.5 | 17 | 2,100 | 90.9 |
| | 2,200 | 1 | 1,000 | 22.8 | 10 | 3,200 | 45.5 |
| | 11,000 | 5 | 5,000 | 22.8 | 10 | 16,000 | 45.5 |
| | 27,500 | 1 | 5,000 | 9.1 | 5 | 32,500 | 18.2 |

Appendix II
Amount of Inflation and Estimated Length of
Time Needed to Trigger Penalty Adjustments
in Selected Agencies

*(Continued From Previous Page)*

| Agency | Penalty amounts after first-round adjustments | Number of covered penalties at this amount | Statute requires increase to be rounded to nearest multiple of | Percentage inflation increase needed to trigger next adjustment | Number of years to next adjustment assuming a 2.5 percent annual inflation rate | Rounded penalty amount | Rounded percentage increase |
|---|---|---|---|---|---|---|---|
| National Highway Traffic Safety Administration | 5.5 | 1 | 10 | 91.0 | 28 | 15.5 | 181.8 |
| | 1,100 | 6 | 1,000 | 45.5 | 17 | 2,100 | 90.9 |
| | 1,650 | 1 | 1,000 | 30.4 | 12 | 2,650 | 60.6 |
| | 2,200 | 1 | 1,000 | 22.8 | 10 | 3,200 | 45.5 |
| | 11,000 | 1 | 5,000 | 22.8 | 10 | 16,000 | 45.5 |
| | 110,000 | 2 | 10,000 | 4.6 | 3 | 120,000 | 9.1 |
| | 275,000 | 1 | 25,000 | 4.6 | 3 | 300,000 | 9.1 |
| | 440,000 | 1 | 25,000 | 2.9 | 3 | 465,000 | 5.7 |
| | 880,000 | 2 | 25,000 | 1.5 | 2 | 905,000 | 2.8 |
| United States Coast Guard | 22 | 1 | 10 | 22.8 | 10 | 32 | 45.5 |
| | 55 | 2 | 10 | 9.1 | 5 | 65 | 18.2 |
| | 110 | 9 | 100 | 45.5 | 17 | 210 | 90.9 |
| | 185 | 1 | 100 | 27.1 | 11 | 285 | 54.1 |
| | 220 | 7 | 100 | 22.8 | 11 | 320 | 45.5 |
| | 550 | 15 | 100 | 9.1 | 5 | 650 | 18.2 |
| | 1,100 | 18 | 1,000 | 45.5 | 17 | 2,100 | 90.9 |
| | 2,200 | 2 | 1,000 | 22.8 | 11 | 3,200 | 45.5 |
| | 3,300 | 1 | 1,000 | 15.2 | 7 | 4,300 | 30.3 |
| | 5,500 | 22 | 1,000 | 9.1 | 5 | 6,500 | 18.2 |
| | 11,000 | 23 | 5,000 | 22.8 | 10 | 16,000 | 45.5 |
| | 22,000 | 4 | 5,000 | 11.4 | 6 | 27,000 | 22.7 |
| | 27,500 | 13 | 5,000 | 9.1 | 5 | 32,500 | 18.2 |
| | 55,000 | 1 | 5,000 | 4.6 | 3 | 60,000 | 9.1 |
| | 110,000 | 1 | 10,000 | 4.6 | 3 | 120,000 | 9.1 |
| | 137,500 | 2 | 10,000 | 3.7 | 3 | 147,500 | 7.3 |

**Appendix II
Amount of Inflation and Estimated Length of
Time Needed to Trigger Penalty Adjustments
in Selected Agencies**

*(Continued From Previous Page)*

| Agency | Penalty amounts after first-round adjustments | Number of covered penalties at this amount | Statute requires increase to be rounded to nearest multiple of | Percentage inflation increase needed to trigger next adjustment | Number of years to next adjustment assuming a 2.5 percent annual inflation rate | Rounded penalty amount | Rounded percentage increase |
|---|---|---|---|---|---|---|---|
| Environmental Protection Agency | 550 | 1 | 100 | 9.1 | 5 | 650 | 18.2 |
| | 660 | 1 | 100 | 7.6 | 4 | 760 | 15.2 |
| | 1,100 | 2 | 1,000 | 45.5 | 17 | 2,100 | 90.9 |
| | 2,750 | 2 | 1,000 | 18.2 | 8 | 3,750 | 36.4 |
| | 3,300 | 1 | 1,000 | 15.2 | 7 | 4,300 | 30.3 |
| | 5,000 | 1 | 1,000 | 10.0 | 5 | 6,000 | 20.0 |
| | 5,500 | 10 | 1,000 | 9.1 | 5 | 6,500 | 18.2 |
| | 11,000 | 11 | 5,000 | 22.8 | 10 | 16,000 | 45.5 |
| | 22,000 | 1 | 5,000 | 11.4 | 6 | 27,000 | 22.7 |
| | 27,500 | 31 | 5,000 | 9.1 | 5 | 32,500 | 18.2 |
| | 55,000 | 3 | 5,000 | 4.6 | 3 | 60,000 | 9.1 |
| | 82,500 | 3 | 5,000 | 3.1 | 3 | 87,500 | 6.1 |
| | 110,000 | 1 | 10,000 | 4.6 | 3 | 120,000 | 9.1 |
| | 137,500 | 5 | 10,000 | 3.7 | 3 | 147,500 | 7.3 |
| | 220,000 | 1 | 25,000 | 5.7 | 3 | 245,000 | 11.4 |

Source: GAO.

Note: The projection of the number of years to next adjustment was based on a 2.5 percent inflation rate compounded annually and the addition of 1 year to reflect the Consumer Price Index lag requirement in the Inflation Adjustment Act.

| | |
|---|---|
| **GAO's Mission** | The General Accounting Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics. |
| | Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to GAO Mailing Lists" under "Order GAO Products" heading. |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: |
| | U.S. General Accounting Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548 |
| | To order by Phone:   Voice:  (202) 512-6000<br>                               TDD:   (202) 512-2537<br>                               Fax:    (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Public Affairs** | Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800<br>U.S. General Accounting Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

**PRINTED ON** ♲ **RECYCLED PAPER**

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

**Official Business**
**Penalty for Private Use $300**

**Address Service Requested**

**Presorted Standard**
**Postage & Fees Paid**
**GAO**
**Permit No. GI00**

