**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, ON APRIL 20, 2010 | * | SECTION J |
| | * | |
| This Document Relates to: | * | |
| | * | HONORABLE CARL J. BARBIER |
| No. 10-4536 | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |

**STATE OF MISSISSIPPI'S MEMORANDUM IN SUPPORT OF**
**MOTION TO STRIKE EXPERT REPORTS AND TESTIMONY OF**
**DR. ROBERT COX DUE TO CONFLICT OF INTEREST AND**
**<u>VIOLATION OF MISSISSIPPI ETHICS LAWS</u>**

# **TABLE OF CONTENTS**

Page

I.      Introduction.................................................................................................1

II.     The State of Mississippi's Standing to File this Motion.......................................2

III.    Factual and Procedural History of Dr. Cox's Dual Roles as a Public Servant of the
        State of Mississippi and Testifying Expert for BP................................................4

IV.     Argument. ...................................................................................................6

        A.      Applicable Legal Standards. ...............................................................7

                1.      Mississippi ethics law. ............................................................7

                2.      Disqualification of an expert due to a conflict of interest.............................9

        B.      Dr. Cox Should Be Disqualified For Being a Retained Expert That Is Adverse
                To His Position as a Public Servant and Official of Mississippi. ........................10

        C.      In the Alternative, Dr. Cox Should Be Disqualified Under the Two-Part Test
                Enunciated in *Koch*. ...........................................................................12

                1.      Was it objectively reasonable for the State of Mississippi to conclude
                        that a confidential relationship existed between it and Dr. Cox? ..............12

                2.      As a public official, Dr. Cox has been privy to confidential and
                        privileged information in order to evaluate chemical contamination
                        exposure for the State of Mississippi. ........................................13

                3.      Mississippi's public interest clearly weighs in favor of disqualifying
                        Dr. Cox............................................................................14

                        a.      The citizens of Mississippi have a right to have a fair and
                                unbiased evaluation of their exposure to chemical
                                contamination by their public official.............................14

                        b.      The Mississippi ethics in government law prohibits a public
                                official from deriving a pecuniary benefit from work they
                                participated in during the period of public service. ......................15

                4.      BP has a plethora of experts already retained with similar credentials
                        who can testify in place of Dr. Cox. .........................................16

V.      Conclusion. ................................................................................................17

# TABLE OF AUTHORITIES

Page

**CASES**

*Massachusetts v. U.S. Veterans Admin.*, 541 F.2d 119 (1st Cir. 1976) ........................................ 3

*Ctr. For Biological Diversity, Inc. v. BP Am. Prod. Co*., 704 F.3d 413 (5th Cir. 2013) ............... 2

*Koch Refining Co. Jennifer L. Boudreaux M/V*, 85 F.3d 1178 (5th Cir. 1996) ............ 9, 10, 12, 18

*Massachusetts v. EPA*, 549 U.S. 497 (U.S. 2007) ........................................................................ 2

*Illinois v. Outboard Marine Corp., Inc*., 619 F.2d 623 (7th Cir. 1980)....................................... 3

*Wang Lab, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246 (E.D. Va. 1991)......................................... 9

*Yelton v. Phi, Inc.,* 2011 WL 2294392, at *2 (E.D. La. June 8, 2011) ........................ 9, 10, 12, 18

**STATUTES**

33 U.S.C. § 1251 ............................................................................................................................ 3

33 U.S.C. § 1321 ............................................................................................................................ 1

33 U.S.C. § 1365 ............................................................................................................................ 3

33 U.S.C. § 2702 ............................................................................................................................ 1

33 U.S.C. §1362 ............................................................................................................................. 3

**OTHER AUTHORITIES**

Miss. Code Ann. § 25-4-101 .................................................................................................. 7, 8, 9

Miss. Code Ann. § 25-4-103 ......................................................................................................... 8

Miss. Code Ann. § 25-4-105 .................................................................................................... 8, 16

**RULES**

Federal Rule of Civil Procedure 24 .............................................................................................. 2

I.     **Introduction.**

Dr. Robert Cox, the Director of the Mississippi Regional Poison Control Center ("Poison Control Center"), works with the Mississippi State Department of Health ("MDOH") on issues relating to the protection of Mississippi residents from potential exposures to contaminants released as a result of the *Deepwater Horizon* Oil Spill and related response actions (the "Spill"). Contrary to Mississippi's ethics laws, Dr. Cox has used his position with the State and knowledge gained from that position to provide expert opinions for BP Exploration & Production, Inc. ("BP") despite the fact that BP is adverse to the State's interest.

In connection with the Clean Water Act ("CWA") Penalty Phase under 33 U.S.C. § 1321(b)(8) ("Penalty Phase"), Dr. Cox, as BP's hired gun, submitted expert reports on August 15, 2014, September 12, 2014, and September 26, 2014. Dr. Cox's deposition in conjunction with his expert opinions was taken on October 14, 2014. Dr. Cox's expert opinions prepared for the Penalty Phase on behalf of BP relate to environmental issues stemming from the Spill that are *adverse to and in conflict with the interests of the State of Mississippi* regarding the State's ongoing Natural Resource Damage Assessment ("NRDA") and claims under the Oil Pollution Act, 33 U.S.C. § 2702(a) ("OPA").

The State of Mississippi ("Mississippi" or "State") files this Motion to Disqualify Dr. Robert Cox as an Expert and to Strike his Expert Declarations of August 12, 2012 and October 22, 2012 submitted in the Medical Benefits Class Act Settlement; Reports of August 15, 2014, September 12, 2014 and September 26, 2014; and testimony of October 14, 2014, due to the conflict of interest between his position as the Managing and Medical Director of the Poison Control Center and his concurrent, adverse expert declarations, reports and testimony on behalf of BP in violation of established law.

## II.      The State of Mississippi's Standing to File this Motion.

"In order to have standing to assert federal jurisdiction, a plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Ctr. For Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 424 (5th Cir. 2013).

The State of Mississippi has an action pending in MDL 2179.  While Mississippi is not a participant in the Penalty Phase, the State of Mississippi is actively participating in the NRDA that is currently ongoing pursuant to the OPA.  Mississippi may have NRDA claims to pursue in any subsequent NRDA phase of this proceeding.  Mississippi also has economic loss claims under OPA pending before the Court.  As an interested party whose OPA claims may be impacted by evidence the parties seek to present in the Penalty Phase on the nature and extent of the natural resource and economic injuries stemming from the Spill, Mississippi has a right to seek protection and redress from this Court.

The United States Supreme Court has recognized, that "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (U.S. 2007).  Rather, States have special interests as sovereigns to ensure their citizens are afforded compliance with federal statutes, and thus are "entitled to special solicitude in our standing analysis." *Id*. at 520 (holding that Massachusetts and several other states have standing to challenge the EPA's failure to promulgate regulations combating global climate change under the Clean Air Act) (emphasis added).  Accordingly, Mississippi is seeking to protect the respective interests of their citizens regarding the States' NRDA and economic loss claims.

Additionally, while the State of Mississippi is not seeking intervention in the Penalty Phase in the true sense of the process, Federal Rule of Civil Procedure 24(a), intervention as a matter of right, provides that the Court must permit anyone to intervene who "is given an

unconditional right to intervene by a federal statute." *Id.*  Several courts have determined that the CWA (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*) provides a right for a State to intervene in a CWA proceeding.  *See Massachusetts. v. U.S. Veterans Admin.*, 541 F.2d 119, 121 (1st Cir. 1976) (holding that under the plain language of the statute, the State of Massachusetts is a "citizen" permitted to initiate a citizen suit under the Clean Water Act); *Illinois v. Outboard Marine Corp., Inc.*, 619 F.2d 623, 630 (7th Cir. 1980) ("The right of the State of Illinois to intervene is both practical and desirable.  Congress made clear in the FWPCA that the States have a vital role in the elimination of pollution."), *vacated and remanded on other grounds*, 453 U.S. 917 (1981).[1]

The State of Mississippi comes before the Court as an interested party seeking to disqualify Dr. Robert Cox as an expert and to strike his expert declarations, reports and testimony.  As Mississippi was not involved in the prior phases of the litigation and, in fact, was not even a party to the litigation until after Dr. Cox rendered his first opinion, it was unaware of his position with BP until becoming aware of his proposed opinions and testimony in this Penalty Phase.  Mississippi asserts that Dr. Cox is an expert who clearly changed sides during the course of this litigation; thus, he should be disqualified on that basis alone.

---

[1] 33 U.S.C. § 1365 provides for citizen suits to be brought under the CWA.  Specifically, § 1365(b) states that "[n]o action may be commenced . . .  (B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, *but in any such action in a court of the United State any citizen may intervene as a matter of right*."  33 U.S.C. § 1365(b)(1)(B)(emphasis added).

A "citizen" is defined within § 1365 as "a person or persons having any interest which is or may be adversely affected."  Turning to the general definitions section of the statute, the term "'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a state, or any interstate body."  33 U.S.C. §1362(5).

III.   **Factual and Procedural History of Dr. Cox's Dual Roles as a Public Servant of the State of Mississippi and Testifying Expert for BP.**

Since prior to the Spill, Dr. Cox has served as the Managing and/or Medical Director of the Mississippi Poison Control Center, a Mississippi "governmental entity". *See* Transcript for October 14, 2014 Deposition of Dr. Cox, at 215, lns. 8-13, excerpts of which are being sought for filing under seal as Exhibit "A"; August 12, 2012 Declaration of Dr. Cox, ¶ 1, a copy of which is attached as composite Exhibit "B". Dr. Cox is a medical toxicologist who, in addition to his role with the Poison Control Center, is an emergency room doctor at the University of Mississippi Medical Center ("UMMC").

In his capacity as Director of the Poison Control Center, Dr. Cox has worked very closely with the MDOH on a number of interactions and regarding chemical exposures and the associated risks. *See* Exhibit "A" at 17, lns. 11-19, 18-19, 22, 24-25, 213-215; Order and Reasons entered on January 11, 2013, Rec. Doc. 8217, Appendix A, excerpts of which are attached as Exhibit "C". The most substantial portion of Dr. Cox's work is in the capacity of Poison Control Director. *See* Exhibit "A" at 24-25.

The role of the Poison Control Center includes assisting the "general public and/or the healthcare community in the assessment and management of poisoning cases with the intention of reducing the morbidity, mortality and cost of care in the state of Mississippi." *See* Mississippi Poison Control Center webpage, at http://www.umc.edu/poisoncontrol/, a copy of which is attached as Exhibit "D". The Mississippi Poison Control Center has an annual budget of $1.2 million. Approximately fifty percent (50%) of the Poison Control Center's budget comes from the MDOH and approximate fifty percent (50%) comes from the UMMC. *See id*. Dr. Cox receives a salary for his work for the State. *See* Exhibit "A" at 214, lns. 13-19.

4

During the State's response to the Spill, Dr. Cox, as part of his official position, represented to this Court that he

> . . . worked with the Mississippi State Department of Health on issues relating to the protection of Mississippi residents from potential exposures to contaminants released in connection with the oil spill.  In that role, Dr. Cox reviewed, on a daily basis, environmental monitoring data collected along the Gulf Coast of Mississippi, received calls directed to the state poison control center related to potential exposures, and assisted with the review of hospital admissions data.

*See* Exhibit "C", Appendix A at 3.  Much of this information disclosed to him as a public official, particularly his role in "reviewing hospital admissions data," was confidential.

A person in Dr. Cox's position is exposed to and must review information that is confidential, proprietary and not subject to production even pursuant to a public records request. As for future contamination issues and potential health risks, information provided to the Poison Control Center is uploaded daily to a national database used for toxic surveillance for the United States. *See* Exhibit "D".  Thus, Dr. Cox is in the unique position of gathering confidential information through his official position to discern and warn Mississippians regarding present and future residual effects of toxic exposure, including the effects of the Spill on their health. By the nature of his position as Director of the Poison Control Center, privileged and confidential information is provided to Dr. Cox to allow him to perform his job without unduly alarming the citizens of Mississippi.  Due to his position and his long-term work for the MDOH, Dr. Cox has a confidential relationship with the State of Mississippi.

Despite this confidential relationship, on or prior to 2011 to the present day, Dr. Cox was retained as a legal consultant by BP to render opinions in these MDL proceedings that are adverse to the State of Mississippi's interest, particularly its NRDA and economic loss claims. *See* Exhibit "B"; Reports of Dr. Cox dated August 15, 2014, September 12, 2014, and September 26, 2014, copies of which are being requested for filing under seal as composite Exhibit "E".  In

addition to the salary he receives from the State, Dr. Cox is being compensated at a significant hourly rate by BP. *See* Exhibit "E", August 15, 2014 Report at 2, ¶ 3. Dr. Cox provided the aforementioned opinions for BP while acting as the Director of the Mississippi Poison Control Center – and having an obligation to review the dangers of the chemical contamination from the Spill for the citizens of Mississippi. *See* Exhibit "A" at 9, lns. 8-9.

Dr. Cox's paid employment with BP has been and remains concurrent with his employment as a public servant in his dual director capacity of a Mississippi governmental entity and his separate legal consulting business. *See* Exhibit "A" at 8-9; Exhibit B; Exhibit C, Appendix A at 3; Exhibit D, August 15, 2014 Report at 2-3.

Mississippi has a right to have its code of ethics enforced to prohibit a public official from deriving pecuniary gain which would cause its citizens to doubt the credibility of his opinions as a government official due to the appearance of impropriety arising from his dual and more lucrative employment as a legal consultant. Dr. Cox's conduct in testifying as a legal consultant for pecuniary gain with knowledge and information gained as part of his official position is in violation of Mississippi's ethics laws.

## IV.    <u>Argument.</u>

Dr. Robert Cox's declarations, reports and testimony on behalf of BP should be excluded from the evidence at the Penalty Phase trial, and he should be prevented from having any further involvement in this case as his official position and close work for the State of Mississippi create a conflict of interest. First, Dr. Cox was an integral part of Mississippi's surveillance response to the Spill, particularly with regard to the protection of Mississippi residents from potential exposures to contaminants released in connection with the Spill. Dr. Cox should be disqualified under the bright-line rule as an expert who switched sides.

Second, and in the alternative, it was objectively reasonable for the State of Mississippi to assume it had a confidential relationship with Dr. Cox.  Due to the nature of his position, confidential and privileged information was disclosed to Dr. Cox by the State of Mississippi and MDOH regarding the chemical exposure of Mississippians as a result of the Spill which allowed him to evaluate safety issues without unduly alarming the citizens of Mississippi.  The citizens of Mississippi should be able to rely on Dr. Cox to inform them about the risks of exposure to toxic chemicals without worrying if his opinions are biased or credible due to the pecuniary gain from his more lucrative employment as a legal consultant to BP.  Dr. Cox's conduct is adverse to the State's clear interest in its ability to promote the efficiency of the public services it performs and the public's interest clearly weighs in favor of disqualifying Dr. Cox.  Mississippi has a right to have its ethics in government laws enforced – which were created to prevent the appearance of impropriety and to prohibit a public official from deriving pecuniary gain which would cause any doubt to the credibility of the public official's opinion.

Finally, there is a plethora of experts who have already provided declarations in the Medical Benefits Class Action Settlement who have studied the Spill and have substantially similar qualifications as does Dr. Cox but who do not have a long-term, official position with an adverse party.  As a result, BP would not be prejudiced by his disqualification.

**A.    Applicable Legal Standards.**

    1.    <u>Mississippi ethics law.</u>

The Mississippi ethics in government law is located at §§ 25-4-101, *et seq.*, of the Mississippi Code.  The public policy behind this law is described as follows:

> The legislature declares that elective and *public office and employment is a public trust and any effort to realize personal gain through official conduct*, other than as provided by law, or as a natural consequence of the employment or position, *is a violation of that trust.*  Therefore, public servants shall endeavor to pursue a course of *conduct which will not raise suspicion among the public* that they are

7

likely to be engaged in acts that are in violation of this trust and which will not reflect unfavorably upon the state and local governments.

Miss. Code Ann. § 25-4-101 (emphasis added).

Under the ethics laws, a "public servant" is prohibited from doing the following:

(1)     No public servant shall use his official position to obtain pecuniary benefit for himself other than that compensation provided for by law, or to obtain, or attempt to obtain, pecuniary benefit for any relative or any business with which he is associated.

        *  *  *

(3)     No public servant shall:

        *  *  *

(e)     Perform any service for any compensation for any person or business after termination of his office or employment in relation to any case, decision, proceeding or application with respect to which he was directly concerned or in which he personally participated during the period of his service or employment.

Miss. Code Ann. § 25-4-105(1) and (3)(e).  A "public servant" is defined as:

(p)     "Public servant" means:

        *  *  *

(ii)     Any officer, director, commissioner, supervisor, chief, head, agent or employee of the government or any agency thereof, or of any public entity created by or under the laws of the State of Mississippi or created by an agency or governmental entity thereof, any of which is funded by public funds or which expends, authorizes or recommends the use of public funds; or

(iii)     Any individual who receives a salary, per diem or expenses paid in whole or in part out of funds authorized to be expended by the government.

Miss. Code Ann. § 25-4-103(p)(ii) and (iii).

The State of Mississippi submits that Dr. Cox, acting as a public servant under Miss. Code Ann. § 25-4-103(p), used his official position and information derived from his status as

the Medical and Managing Director of the Poison Control Center to obtain a substantial pecuniary benefit of hundreds of thousands of dollars for work performed for BP that is contrary to the State's interest.  Dr. Cox's actions are a direct conflict of interest in violation of § 25-4-101 and § 25-5-105(1).  This conduct impugns the State's ability to promote the efficiency of the public services it performs.

### 2.        Disqualification of an expert due to a conflict of interest.

"Federal courts have the inherent power to disqualify experts, although cases that grant disqualification are rare."  *Yelton v. Phi, Inc.,* 2011 WL 2294392, at *2 (E.D. La. June 8, 2011), quoting *Koch Refining Co. Jennifer L. Boudreaux M/V,* 85 F.3d 1178, 1181 (5th Cir. 1996).  In *Koch,* the Court acknowledged the bright-line rule where an expert switched sides, stating that "if that were the case, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention.  This is a clear case for disqualification."  *Koch*, 85 F..3d at 1181, quoting *Wang Lab, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D. Va. 1991).

In the absence of an expert switching sides, the Fifth Circuit articulated in *Koch* a two-part test to determine whether an expert witness should be disqualified:  (1) whether it was "objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed"; and (2) whether any "confidential or privileged information [was] disclosed by the first party to the expert."  *Koch,* 85 F.3d at 1181.  "An assumption of confidentiality is reasonable when there has been a 'longstanding series of interactions' between the expert and party 'which have more likely than not coalesced to create a basic understanding of the restraining party's modus operandi, patterns of operation, decision-making process, and

the like.'" *Yelton*, 2011 WL 2294392, at *2 (quoting *Koch,* 85 F.3d at 1182).  "In order for an expert witness to be disqualified, an affirmative answer must be given to both parts of the test, and the party seeking disqualification bears the burden of proving that disqualification is warranted."  *Id.*  "The Fifth Circuit has also held that courts should consider whether the public interest weighs in favor of disqualifying the expert."  *Id.*  Specifically, "[t]he main policy objectives militating against disqualification are ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling."  *Id*. (quoting *Koch,* 85 F.3d at 1183).  Finally, this Court concluded, citing *Koch,* that courts should consider "whether another expert is available and whether the opposing party had time to hire him or her before trial."  *Id.*

In *Yelton*, this Court supported the Fifth Circuit's holding in *Koch* that a mere three-year relationship which included a "long series of interactions and payment of $8,000 was enough to establish a confidential relationship." *Id*. at *3 (citing *Koch,* 85 F.3d at 1181-84).

**B.    Dr. Cox Should Be Disqualified For Being a Retained Expert That Is Adverse To His Position as a Public Servant and Official of Mississippi.**

The bright-line rule for disqualification is that an expert may perform services for a party when that expert was previously retained by the adverse party in the same litigation.  In the instant matter, Mississippi suffers a more egregious circumstance.  One of its public officials, a person currently holding the position as Poison Control Director with a long standing relationship with MDOH, and who by his own admission was working very closely on behalf of MDOH in the surveillance response to the Spill to evaluate the State's concerns of chemical contamination, is simultaneously employed by BP, an adverse party.

It is undisputed that Dr. Cox's knowledge, at least in part, was gained while "work[ing] with the Mississippi State Department of Health ("DOH") on issues relating to the protection of

Mississippi residents from potential exposures to contaminants released in connection with the oil spill.   In that role, Dr. Cox reviewed, on a daily basis, environmental monitoring data collected along the Gulf Coast of Mississippi, received calls directed to the state poison control center related to potential exposures, and assisted with the review of hospital admissions data." *See* Exhibit "C", Appendix A at 3. The firsthand knowledge and experience that Dr. Cox gained through his health surveillance work for the State of Mississippi concerning the Spill has been portrayed as buttressing his expert reports.  *See* Exhibit "A" at 215, lns. 8-13.  Yet, since 2011 to the present day, Dr. Cox has also been serving as a legal consultant for BP to render opinions that are adverse to the State.

The allegiance of Dr. Cox is clear in his expert reports.  On a myriad of occasions in his reports as a legal consultant, his opinions and analysis clearly advocate the positions of his newest employer, BP, that are contrary to the State's interests in its NRDA and economic loss claims.  *See* Exhibit "B"; Exhibit "E", August 15, 2014 Report at 61 and 70-71.  Moreover, Dr. Cox's Supplemental Declaration addresses the issues of potential future harmful exposures from the Spill.  *See* Exhibit "B", Declaration dated October 22, 2012, ¶ 10.  Dr. Cox concluded that there was no realistic possibility that either the clean-up workers or residents could be exposed to harmful levels of the constituents of the Corexit dispersants after September 2010.  To reach this conclusion, Dr. Cox opined that concentrations of dispersant-related compounds found in the water never exceeded aquatic life benchmarks – which is an issue that directly relates to Mississippi's NRDA claims.  *See* Exhibit "B", Declaration dated October 22, 2012, ¶ 10.

The aforementioned issues present a glimpse of Dr. Cox's opinions that are adverse to Mississippi, its citizens, Mississippi's ongoing NRDA and any claims the State may have against BP stemming from the NRDA.  Dr. Cox, a Mississippi public official called in by MDOH to

determine issues regarding exposure of chemical contamination arising from the Spill, clearly changed his position during the course of this litigation, thus, he should be disqualified on that basis alone.

        **C.**    **In the Alternative, Dr. Cox Should Be Disqualified Under the Two-Part Test Enunciated in _Koch_.**

Should the Court find that the bright-line test is not applicable, in the alternative, Dr. Cox's conduct requires his disqualification under the two-prong test established in _Koch_.

        1.    <u>Was it objectively reasonable for the State of Mississippi to conclude that a confidential relationship existed between it and Dr. Cox?</u>

As to the first prong, Robert Cox, M.D., Ph.D., is a public servant and official of Mississippi. Since before the Spill, Dr. Cox has served as the Medical Director and Managing Director of the Poison Control Center.  _See_ Exhibit "A" at 22, lns. 17-18.   The Poison Control Center is a governmental entity with an annual budget of over a million dollars that is funded equally by two state agencies, the MDOH and UMMC.   _See_ Exhibit "D".  In his capacity as Director of the Poison Control Center, Dr. Cox has worked very closely with the MDOH on a number of interactions and regarding chemical exposures and the associated risks.  _See_ Exhibit "A" at 17, lns. 11-19, 18-19, 22, 24-25, 213-215; Exhibit "C", Appendix A at 3.

In _Yelton_, this Court supported the Fifth Circuit's holding in _Koch_ that a mere three-year relationship which included a long series of interactions was enough in order to create the assumption of a confidential relationship.  _Yelton,_ 2011 WL 2294392, at *3 (citing _Koch,_ 85 F.3d at 1181-84).  Dr. Cox has served as a public servant and official of Mississippi for over ten (10) years and has worked substantially with the MDOH on a number of events involving contamination and the public health of citizens of Mississippi. _See_ Exhibit "A" at 17-19, 22, 24-25, and 213-215.   Dr. Cox's position and his long term work for MDOH constitutes a confidential relationship or, at the very least, the assumption of a confidential relationship.

2.      As a public official, Dr. Cox has been privy to confidential and privileged
information in order to evaluate chemical contamination exposure for the
State of Mississippi.

As to the second prong of the disqualification test, Dr. Cox has been privy to confidential and privileged information due to the very nature of his position as Director of the Poison Control Center.  As Director of the Poison Control Center, one of the key concerns he oversees for the State of Mississippi "with other local, state and federal agencies, is to provide around-the-clock information and assistance to the public and health care providers in the event of a chemical or biological weapons-of-mass-destruction incident."  *See* Exhibit "D".

As for future contamination issues and potential health risks, the Center "maintains a database of information regarding the nature, causes, management and outcomes of all poisonings reported to the center.  This information is used to identify trends and improve both poison prevention and the medical management of poisonings.  This information is uploaded daily to a national database used for toxic surveillance for the United States."  *See* Exhibit "D". Thus, Dr. Cox is in the unique position of gathering confidential information through his official position to discern and warn Mississippians regarding present and future residual effects of toxic exposure, including the effects of the Spill on their health.

As part of his official position and work on issues relating to the protection of Mississippi residents from potential exposures to contaminants released in connection with the Spill, Dr. Cox "reviewed on a daily basis, environmental monitoring data collected along the Gulf Coast of Mississippi, received calls directed to the state poison control center related to potential exposures, and assisted with the review of hospital admissions data."  *See* Exhibit "C", Appendix A at 3.  Much of this information disclosed to him as a public official, particularly his role in "reviewing hospital admissions data," was confidential.   A person in Dr. Cox's position is

13

exposed to and must review information that is confidential, proprietary and not subject to being produced pursuant to a public records request.

It is apparent that Dr. Cox formulated his opinions for BP, at least in part, by using the information he gathered and was privy to as the Director of the Poison Control Center during Mississippi's response to the Spill.  *See* Exhibit "A" at 216, lns. 8-9; 215-16; Exhibit "E", August 15, 2014 Report at 61.  Dr. Cox's specialized knowledge of confidential information is further demonstrated in his August 15, 2014 report, in which he shows a clear understanding of the state health surveillance for Mississippi and very little knowledge as to the surveillance for Alabama, Florida and Louisiana.  *See* Exhibit "E", August 15, 2014 Report at 61-62.  Due to his position with the State of Mississippi, Dr. Cox has been, and continues to be, privy to confidential and/or privileged information of the State that relates to Mississippi's NRDA and economic loss claims.

        3.      <u>Mississippi's public interest clearly weighs in favor of disqualifying Dr. Cox.</u>

            a.     *The citizens of Mississippi have a right to have a fair and unbiased evaluation of their exposure to chemical contamination by their public official.*

Public funds of approximately $1.2 million are provided to the Poison Control Center on an annual basis to inform, protect and treat the citizens of Mississippi in instances of biological or chemical threats.  Dr. Cox is the Director of the Poison Control Center and has been responsible for overseeing the efforts to inform, protect and treat the citizens of Mississippi regarding the effects of the Spill.  Despite his public official position with Mississippi, Dr. Cox is concurrently working for BP on the effects of the Spill on the State of Mississippi and its citizens – providing opinions that are contrary to the State's interest.

The State of Mississippi has a significant interest in promoting the efficiency of the public services it provides, including the prompt and unbiased evaluation of exposure of chemical contamination for citizens. The Poison Control Center assesses cases with "the intention of reducing the morbidity, mortality and cost of care in the state of Mississippi." *See* Exhibit "D". The State of Mississippi has a significant interest in the NRDA and the potential NRDA claims the State may have to pursue. The State also has a significant interest in its economic loss claims associated with the State's increased costs of health care stemming from the Spill.

The citizens of Mississippi rely on the Director of the Poison Control Center to determine whether it is safe to venture outside, travel to the beach or swim in the event of an emergency involving toxic exposure and, thereafter, for their health concerns as they relate to residual toxic exposure. The public must not question the State-provided analysis of potential danger to chemical exposure because of a public official's desire to gain present and future pecuniary benefits. The Center's concern for the welfare of the public expressed by its Director must be beyond reproach or the appearance of any impropriety to allow for this public trust to exists, especially in sensitive and alarming issues such as the citizens' health.

If a citizen of Mississippi called the Poison Control Center today and claimed to have negative health effects due to exposure to oil from the Spill, either through physical contact or ingestion of seafood, can we count on Dr. Cox to treat the matter objectively? *The answer to this question is the heart of this Motion.*

> b. *The Mississippi ethics in government law prohibits a public official from deriving a pecuniary benefit from work they participated in during the period of public service.*

The State of Mississippi originally filed its claims in Mississippi, which were subsequently transferred to this Court. As a result, the State believes this Court should look to

and be guided by the laws of the State of Mississippi with regard to ethical issues directly concerning a designated expert in this matter.

As a "public servant" of Mississippi, Dr. Cox is prohibited from using his official position to obtain pecuniary benefit for himself other that the compensation provided by law. Miss. Code Ann. § 25-4-105(1).  He is also prohibited from performing any service for any compensation after termination of his position in relation to any case, decision, proceeding or application in which he was directly concerned or personally participated.  Miss. Code Ann. § 25-4-105(3)(e).  Dr. Cox, however, did not even wait until after leaving his official position before working for BP – he is working concurrently for the State and BP in a "case, decision, proceeding or application in which he was directly concerned or personally participated" and in which the parties are adverse.  Dr. Cox's opinions provided on behalf of BP relate to environmental issues stemming from the Spill, which directly relate to the State's ongoing NRDA and claims under OPA.

Mississippi has a right to have its ethics laws enforced to prohibit a public official from deriving pecuniary gain which would cause its citizens to doubt the credibility of his opinions due to the appearance of impropriety due to his dual and more lucrative employment as a legal consultant.  Dr. Cox's conduct in testifying as a legal consult for pecuniary gain with knowledge and information gained from his official position with the State is in violation of Mississippi's ethics laws.  This conduct impugns the State's ability to promote the efficiency of the public services it performs.

    4. <u>BP has a plethora of experts already retained with similar credentials who can testify in place of Dr. Cox.</u>

Finally, as to the issue of whether another expert is available and whether the opposing party had time to hire him or her before trial, there is a plethora of experts already retained by BP

in the Medical Benefits Class Action Settlement who have equal or more extensive educational backgrounds and expertise on the matters upon which Dr. Cox is testifying and who are not servicing as a public official in Mississippi.  *See* Exhibit "C", Appendix A.   More specifically, at least since the time of the Medical Benefits Class Action Settlement, BP has at least six (6) other retained experts who have doctorate degrees and certifications in toxicology and years of experience in workplace and occupational exposure assessments and/or who are physicians that are board certified in toxicology, internal medicine and environmental medicine.  *See* Exhibit "C", Appendix A.   The education, qualifications and experience of these individuals all seem to be replicative of Dr. Cox's areas of expertise.[2]

## V.     __Conclusion.__

Dr. Robert Cox's declarations, reports and testimony should be excluded from the evidence at the Penalty Phase trial and any further involvement in this case due to his conflict of interest.  Dr. Cox's official position with the Poison Control Center and the knowledge he gained from that position in the surveillance response for the State of Mississippi is in direct conflict with his current adverse position as a legal consultant for BP.  Dr. Cox should be disqualified under the bright-line rule as an expert who switched sides.

Dr. Cox has been in a confidential relationship with a government entity of the State of Mississippi.  At the very least, it was objectively reasonable for the State of Mississippi to assume it had a confidential relationship with Dr. Cox.  Moreover, due to the nature and duration of his position, Dr. Cox received and has access to confidential and privileged information of the State.

---

[2] Mississippi reserves all rights to challenge any experts BP may designate in any subsequent proceeding involving Mississippi's claims.

The public's interest clearly weighs in favor of disqualifying Dr. Cox.  The citizens of Mississippi rely on Dr. Cox to inform them about their exposure to toxic chemicals without worrying if his opinion is bias or credible due to his pecuniary gain from an adversary of the State.  Dr. Cox's conduct is adverse to the State's clear interest in its ability to promote the efficiency of the public services it performs.  Moreover, Mississippi has a right to have its ethics laws enforced, which were created to prohibit a public official from deriving pecuniary gain which would cause any doubt regarding the official's credibility.  Dr. Cox's conduct violates the State's ethics laws regarding a public official.

Finally, there are several other experts who have already proffered declarations in the Medical Benefits Class Action Settlement who have equal, if not, more extensive qualifications as Dr. Cox but who do not have a long-term public official position with the State of Mississippi. As a result, BP would not be prejudiced by Dr. Cox's disqualification.

As Mississippi has satisfied all aspects for disqualification provided in *Yelton v. Phi, Inc.,* 2011 WL 2294392, at *2 (E.D. La. June 8, 2011) and *Koch Refining Co. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996), Mississippi respectfully requests that this Court enter an order striking Dr. Robert Cox's declarations and reports provided in this matter and prohibiting Dr. Cox from further serving or providing testimony as an expert for BP on all subject matter that is adverse to the State of Mississippi's interests.

RESPECTFULLY SUBMITTED this Fourteenth day of November, 2014.

*/s/**James M. Hood, III*_____
James M. Hood, III (MS Bar No. 8637)
Walter Sillers Building
550 High Street, Suite 1200
Jackson, MS 39201
Telephone:    (601) 359-3680
Facsimile:    (601) 359-4231

*Attorney General of the State of Mississippi, for and on behalf of the State of Mississippi*

**OF COUNSEL:**

Michael C. Moore (MS Bar No. 3452)
**MIKE MOORE LAW FIRM, LLC**
P.O. Box 321048
Flowood, MS 39232-1048
Telephone:    (601) 933-0070
Facsimile:    (601) 933-0071

William M. Quin II (MS Bar No. 10834)
**MCCRANEY MONTAGNET QUIN & NOBLE, PLLC**
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone:    (601) 707-5725
Facsimile:    (601) 510-2939

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

RESPECTFULLY SUBMITTED this Fourteenth day of November, 2014.


*/s/**James M. Hood, III***
James M. Hood, III