**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | *   MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * |
| GULF OF MEXICO, ON APRIL 20, 2010 | *   SECTION J |
| | * |
| This Document Relates to: | * |
| | *   HONORABLE CARL J. BARBIER |
| No. 10-4536 | * |
| | *   MAGISTRATE JUDGE SHUSHAN |

# EXHIBIT "B"

## TABLE OF CONTENTS

1.    Declaration of Robert Cox, M.D., Ph.D. dated August 12, 2014
      (Dkt. 7112-4)

2.    Supplemental Declaration of Robert Cox, M.D., Ph.D. dated
      October 22, 2012 (Dkt. 7732-2)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | *  MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * |
| GULF OF MEXICO, ON APRIL 20, 2010 | *  SECTION J |
| | * |
| This Document Relates to: | * |
| | *  HONORABLE CARL J. BARBIER |
| No. 10-4536 | * |
| | *  MAGISTRATE JUDGE SHUSHAN |


# EXHIBIT "B"


1.      Declaration of Robert Cox, M.D., Ph.D. dated August 12, 2014
        (Dkt. 7112-4)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>        **Plaintiffs,**<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>        **Defendants.** | * * * * * * * * * * * * | **NO. 12-CV-968**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

## DECLARATION OF ROBERT COX, M.D., PH.D.

I, Robert Cox, am over twenty-one years of age and of sound mind and body.  My declaration is based on personal knowledge, experience, and review of materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

### EXPERIENCE

1.      I am a board-certified Emergency Physician and Medical Toxicologist.  I am currently employed as a professor in the School of Medicine at the University of Mississippi Medical Center in Jackson, Mississippi, and am the Director of the Mississippi Poison Control

1

Exhibit "B"

Center and the Director of the Medical Toxicology Service at the University of Mississippi Medical Center. I also am an attending physician at the Adult Emergency Department at the University of Mississippi Medical Center. Approximately 70,000 patients are treated yearly at this facility.

2.    I hold doctorates in both chemistry and medicine. I earned a doctorate in Analytical Chemistry from the University of Iowa in 1980 and earned my doctorate in Medicine from the University of Texas Southwestern Medical School in 1987. I have practiced and taught medicine for over 20 years. I hold board certifications in Medical Toxicology and Emergency Medicine through the American Board of Medical Specialties, and a certification in Toxicology through the American Board of Toxicology. Both organizations require specific training to become eligible and a lengthy examination to become certified. Both also have continuing education processes and recertification examinations to maintain certification. A copy of my curriculum vitae is attached to this declaration as Exhibit A.

3.    I have personally conducted research on hydrocarbon air pollutants in Houston, Texas and Nashville, Tennessee, and I developed some of the original methods for measuring hydrocarbons at the part-per-billion levels in the atmosphere.

4.    I was involved in the health surveillance response concerning the Deepwater Horizon (DWH) oil spill for the State of Mississippi. In that role, I reviewed on a daily basis environmental monitoring data collected along the Gulf Coast of Mississippi, and worked with the Mississippi State Department of Health to ensure that Mississippi residents were protected from potential exposures to contaminants released in connection with the oil spill. My work with the Department of Health included evaluating air monitoring data; receiving calls directed to the state poison control center related to potential exposures; and assisting with the review of

hospital admissions data.  During the DWH response, I also spent time at the Mobile, Alabama Incident Command Post interacting with federal and state agencies responding to the oil spill. Over the course of the incident, I did not observe evidence of significant exposures or significant exposure-related health effects to residents of Mississippi or the other Gulf States.

5.     I did not personally participate in any settlement negotiations between BP and the plaintiffs, nor did I have an advisory role during the settlement process.

### SCOPE OF EXPERT OPINION

6.     I have been asked to provide my opinion regarding the potential health risks to residents of the Gulf Coast communities of Alabama, Florida, Louisiana, and Mississippi resulting from inhalation exposures to the components of crude oil, dispersants, and other compounds associated with the DWH oil spill.  More specifically, my analysis focuses on potential health risks from inhalation exposures to individuals who were residents of specified beachfront areas ("Zone A Residents") and certain wetland areas ("Zone B Residents"), hereinafter referred to collectively as "Gulf Coast Residents", as depicted in Exhibits 9-11 of the Medical Benefits Class Action Settlement Agreement ("Medical Settlement Agreement").

7.     My analysis does not address the potential health risks from inhalation exposures to individuals who were engaged in the clean-up, remediation efforts, or other responsive actions in connection with the DWH oil spill (collectively "Clean-Up Workers"), which I understand will be addressed in the separate declaration of Dr. Peter Lees.

8.     I also have been asked to provide my opinion regarding the potential health risks to both Clean-Up Workers and Gulf Coast Residents resulting from dermal exposures to the components of crude oil and dispersants associated with the DWH oil spill.

9.    The materials that I reviewed in reaching my opinions, as described below, include environmental and occupational monitoring data from the U.S. Environmental Protection Agency (EPA), the National Institute for Occupational Safety and Health (NIOSH), state departments of environmental quality (from Alabama, Florida, Louisiana, and Mississippi), and the National Oceanic and Atmospheric Administration (NOAA).    I have also reviewed summaries of environmental data on selected compounds prepared by Dr. Peter Lees in a separate declaration, which I understand will be submitted to the Court.    I have also reviewed numerous studies and reports regarding the toxicity and other characteristics of the constituents of crude oil, dispersants, and other response-related compounds.    A list of the materials I reviewed in preparing this declaration is set forth in Exhibit B to this declaration.

10.    Numerous materials are cited throughout this declaration.    Citations are provided by numbers within parentheses next to the statement that they support — *e.g.*, (1).    The numbers within the parentheses refer to the list of materials reviewed that is set forth in Exhibit B.

## SUMMARY OF CONCLUSIONS

11.    Based on my review and analysis of the data and materials set forth in Exhibit B, and as an expert in the fields of toxicology, medicine, and environmental science, it is my opinion that:

(a)    Residents living along the Gulf Coast in Alabama, Florida, Louisiana, and Mississippi (*i.e.*, Gulf Coast Residents) (1) were <u>not</u> exposed to airborne concentrations of the components of crude oil, dispersants, or other compounds associated with the DWH oil spill at levels that would be expected to result in any significant adverse health effects, and (2) are highly unlikely to be exposed to any such airborne concentrations in the future that would result in significant adverse health effects;

(b)     The potential for significant dermal exposures to the components of crude oil and dispersants for Clean-Up Workers was small, and any such exposures should have been prevented by appropriate use of personal protective equipment; and

(c)     The potential for significant dermal exposures to the components of crude oil and dispersants for Gulf Coast Residents was small to non-existent because of the low concentrations of potentially toxic compounds in oil that reached the Gulf Coast and the low probability for prolonged human skin contact with those compounds.

## GENERAL RISK-ASSESSMENT PRINCIPLES

12.     In general, human chemical risk assessment can be summarized as follows: chemical toxicity plus human exposure to a sufficiently high concentration (defined by the chemical's inherent toxicity) leads to potential human health risk.  In other words, in order for there to be a <u>potential</u> health risk from particular chemicals, those chemicals must be inherently toxic <u>and</u> there must be a significant human exposure to those chemicals.

13.     The assessment of toxicity, exposure, and risk is chemical-specific (*e.g.*, benzene or 2-butoxyethanol), and not product-specific (*e.g.*, crude oil or dispersant).  In addition, toxicity and risk must be evaluated in connection with the level of exposure and the dose, or the quantity of chemical taken into the body.  In this respect, a fundamental principle of toxicology is that the dose makes the toxin.  Even essential substances, such as water and oxygen, can be toxic in large enough doses.

14.     For the inhalation route of exposure, the exposure dose is evaluated based on the concentration of the chemical in air, the duration and frequency of exposure, and the inhalation rate of the individual while exposed to the chemical.  For purposes of assessing the potential for exposure-related health risks to a large population of individuals (such as the population at issue

5

here), the critical factors to evaluate are the concentration of the chemical in the air and the duration and frequency of exposure.

15.     As discussed above, duration of exposure is a critical factor in assessing the potential for health risk.  For environmental exposures, air monitoring data that provide average or median concentrations of a chemical in air are more relevant and useful in assessing the potential for health risks than data that provide isolated peak levels.  An isolated elevated level (*i.e.*, a single level that exceeds toxicological benchmarks), unless <u>extremely</u> high (as can occur in an industrial accident), is unlikely to result in adverse health effects.  Rather, an individual must be exposed repeatedly at levels that exceed relevant benchmarks before there is a potential health risk.

16.     Federal agencies have established standards defining exposure levels below which significant adverse health effects are not expected.  For example, the U.S. Occupational Safety and Health Administration (OSHA) has established a set of safety standards for occupational exposures (*e.g.*, Permissible Exposure Limits), and the U.S. Agency for Toxic Substances and Disease Registry (ATSDR) has established another set of health standards for community, or ambient, exposures (*e.g.*, Minimal Risk Levels).  Ambient air standards are generally more conservative (*i.e.*, lower) than occupational standards because they are based on continuous, 24-hour a day exposures, and are intended to protect vulnerable populations, such as the elderly and children.  The ambient air standards for compounds potentially related to the DWH oil spill are addressed in greater detail below.

17.     To summarize, my assessment of the potential for health risks to Gulf Coast Residents from exposure to airborne concentrations of the constituents of oil, dispersants, and other spill-related compounds is based on two key sources of information: toxicity of the

6

chemical constituents and characterization of the level of exposure to those constituents. The exposure component — *i.e.*, the review of available air monitoring data — is addressed primarily in the separate declaration of Dr. Lees. I will address the toxicity component and, using exposure data prepared by Dr. Lees, as well as exposure data summarized by various government agencies, will evaluate the potential for health risks to Gulf Coast Residents from alleged exposure to the constituents of oil, dispersants, and other spill-related compounds.

## TOXICOLOGY OF DWH-RELATED COMPOUNDS

18. In connection with the DWH oil spill, Gulf Coast Residents potentially could have been exposed to constituents of the MC252 crude oil, constituents of the two dispersant products (Corexit 9500 and Corexit 9527A) used during the Response, and to compounds released from the controlled burning of crude oil.

### *Constituents of MC252 Oil*

19. The crude oil released during the DWH oil spill was comprised of a number of components: (a) volatile aliphatic hydrocarbons, such as methane, heptane, butane, hexane, and cyclohexane; (b) less volatile aliphatic hydrocarbons, such as decane and undecane; (c) volatile aromatic hydrocarbons, such as benzene, toluene, xylenes, and ethylbenzene (often referred to collectively as BTEX); (d) less volatile aromatic hydrocarbons, such as propylbenzene and pentylbenzenes; (e) naphthenic hydrocarbons, that are cyclic aliphatics; and (f) polycyclic aromatic hydrocarbons (PAHs), such as naphthalene, benzo(a)pyrene and phenanthrene.

20. Many of the components of crude oil are not of significant concern from a human health perspective, regardless of the route of exposure, when experienced at levels typically present in the aftermath of an oil spill. For example, with the exception of hexane, the aliphatic hydrocarbons have minimal human toxicity at concentrations resulting from oil spills, though they can lead to skin irritation as a result of dermal exposure. Specifically, the volatile aliphatic

hydrocarbons, such as heptane and pentane, do not have sufficient human toxicity to result in significant human health effects unless inhaled at <u>extremely</u> high concentrations. Likewise, the less-volatile aliphatic hydrocarbons, such as decane and higher aliphatic compounds, are similar to the components of paraffin wax and mineral oil and also have minimal human toxicity (6).

21.      Other components of crude oil, such as the PAHs and less-volatile aromatic hydrocarbons, are generally of less toxicological concern for respiratory exposures because they have relatively limited volatility, meaning that they have a low tendency to evaporate at normal temperatures and pressures and thus are not likely to be present in ambient air at concentrations of concern. Some PAHs and other less-volatile hydrocarbons can be associated with particulates that are formed when oil is burned (for example, as a result of the controlled *in situ* burning of oil). The potential health risks associated with inhalation of particulate matter are discussed separately below.

22.      The components of crude oil that are of greatest concern from a human toxicology perspective if <u>inhaled</u> at significant concentrations are the volatile aromatic hydrocarbons (*e.g.*, BTEX), hexane, and naphthalene. These compounds have been associated with adverse health effects when inhaled at sufficient concentrations and for sufficient durations. Government agencies have established standards defining airborne concentrations of these compounds above which adverse health effects <u>might</u> be expected. As discussed in greater detail below, the airborne levels of these compounds measured along the Gulf Coast in connection with the DWH oil spill were well below levels at which adverse health effects might be expected.

23.      In addition, BTEX, hexane, and naphthalene have many emission sources, including engine exhaust, industrial emissions, cigarette smoke, and charcoal grills, and are present in the ambient air of most communities. Therefore, when evaluating the air monitoring

data collected in connection with the DWH oil spill, it is important to keep in mind that the measured compounds are regularly present at low levels in ambient air because of the sources discussed above.  Representative ambient concentrations of these compounds at various locations across the United States are provided below in Table 1.  In general, airborne concentrations of these compounds in urban areas result primarily from industrial sources and automobiles, and airborne concentrations of these compounds in indoor areas result primarily from emissions from building materials and consumer products.  The potential adverse health effects associated with these compounds would not be expected to result from exposure to these compounds at typical ambient concentrations.

**Table 1: Representative Ambient Concentrations in Air in the United States (ranges — values in ug/m³)[1]**

| Compound | Rural | Urban | Indoor |
|---|---|---|---|
| Benzene | 1.3-2.6 | 1.6-58 | 1.6-10.5 |
| Toluene | 1.3-264 | 0.4-735 | 2.6-90 |
| Ethylbenzene | 0.04-0.4 | 3.5-78 | 4.3-17 |
| Xylenes | 0.04-3.5 | 1.3-382 | 4.3-43 |
| Hexane | 0.04-0.4 | 5.6-88 | 1.9-10.6 |
| Naphthalene | 0.02[2] | 0.9-891 | 0.8-1599 |

24.     Some of the components of MC252 crude oil also can be of toxicological concern if they come into direct contact with the skin (*i.e.*, <u>dermal</u> exposure).  As discussed in greater detail below, most of the volatile aromatic components of the MC252 oil were dissolved in the water column, and thus removed from the oil, prior to reaching the ocean surface.  Any residual

---

[1] Data compiled from the ATSDR Toxicological Profiles for these compounds (1-5).

[2] Data collected from the Sandhill Crane National Wildlife Refuge in Gautier, Mississippi, which is a remote, not rural, location.

volatile aromatics and hexane were subject to evaporation as the oil travelled toward the shoreline. As a result, these volatile components were effectively not present in oil that might have been contacted by the vast majority of Clean-Up Workers and Gulf Coast Residents (13, 20). As a result, with respect to potential dermal exposures, the main constituents of concern from a toxicological perspective are polycyclic aromatic hydrocarbons (PAHs).

25.     PAHs are formed during the incomplete burning of coal, oil, gas, wood, tobacco or charbroiled meat, and are present throughout the environment and food chain. They are also present in coal tar medications used to treat dermatologic disorders. The greatest sources of exposure to PAHs for most of the United States population are inhalation of these compounds in tobacco, wood smoke, and urban air pollution, ingestion of the compounds in foodstuffs such as charbroiled meat, and contact with the compounds in cosmetics and shampoos made with coal tar. Prolonged dermal exposures to high levels of PAHs have been associated with certain adverse health effects.

### *Constituents of the Corexit Dispersants*

26.     Two dispersants were used during the DWH response: Corexit 9500 and, to a lesser extent, Corexit 9527A. *See* Decl. of Dr. Dutton, at ¶ 24. Corexit 9500 contains propylene glycol, dioctyl sodium sulfonate (DOSS), and petroleum distillates (49). Corexit 9527A contains propylene glycol, DOSS, and 2-butoxyethanol (50). In addition, both Corexit dispersants may have contained dipropylene glycol monobutyl ether (DPnB) and sorbitans (28, 51).

27.     All of the dispersant components are commonly encountered in the home environment and in everyday life. Each is addressed specifically in greater detail below.

28.     Propylene glycol is a Generally Recognized As Safe (GRAS) food additive by the U.S. Food and Drug Administration (FDA) (9), and is commonly found in cosmetics, bath and

shower soaps, facial cleansers, deodorants, mouthwashes, toothpastes, and children's cough syrup. Propylene glycol is also an ingredient in products used to make artificial smoke and mists for theatrical productions and rock concerts. Propylene glycol is not known to be associated with any significant adverse health effects. Frequent dermal contact with propylene glycol can cause minor skin irritation (9).

29.     DOSS is used in food as a wetting and emulsifying agent, in cosmetics, and in stool-softener medications. DOSS is relatively non-toxic, although dermal contact with DOSS may cause sensitization and contact dermatitis (43). In addition, DOSS contains sulfur and thus can cause allergies in individuals who are sulfa allergic.

30.     DPnB is used in disinfectant sprays, home cleaning products, acrylic latex paints, paint removers, and adhesives. According to a thorough toxicological evaluation of DPnB by the international Organisation for Economic Co-operation and Development (OECD), DPnB has minimal human toxicity (45). Acute exposure studies summarized by OECD showed that DPnB has low toxicity via all routes of exposure, though it can result in slight irritation to the skin (dermal) and mucous membranes (inhalation).

31.     Petroleum distillates are used in air fresheners, deodorizers, adhesives and car wax. The petroleum distillates used in Corexit 9500 (hydrotreated light) are a mixture of napthenic hydrocarbons (cyclic aliphatics) and paraffins, and might contain a small amount (less than 0.1% by volume) of aromatic hydrocarbons (6, 52). If inhaled at sufficiently high levels, petroleum distillates can cause dizziness, headache, and nausea. Petroleum distillates also can cause skin irritation with prolonged contact.

32.     Sorbitans, which are derivatives of sorbitol, a naturally occurring sugar, are a type of surfactant. Sorbitans are generally not considered toxic and, in fact, certain sorbitans have

been approved for use in foods such as whipped oil toppings and cake mixes (53). In their pure form, sorbitans can be irritating to the skin if touched. The sorbitans[3] in the two dispersants are widely used in consumer products, such as shampoos, skin creams, tanning lotions, mouthwash, and baby bath products.

33.     2-Butoxyethanol is commonly used in liquid soaps and household cleaners, and has been used to replace hydrocarbons in many paints, varnishes, and strippers. Humans are exposed to 2-butoxyethanol on a daily basis, and breathing low concentrations of vapors, or intermittent dermal contact, are not known to be toxic. For instance, occupational exposures to low levels of 2-butoxyethanol have not been found to cause changes in liver, kidney, or blood parameters outside of normal clinical ranges. However, 2-butoxyethanol can be toxic if ingested or inhaled in large enough quantities. In this respect, human toxicity data have shown that the primary effects of exposure to large doses of 2-butoxyethanol are reversible metabolic acidosis and some hematologic changes. 2-Butoxyethanol also has been found to cause hemolysis (a breakdown of red blood cells) in laboratory rodents. However, based on research conducted by the EPA, humans are much less sensitive to this effect than are laboratory species, and hemolysis is unlikely to occur in humans unless they are exposed to extremely high concentrations, such as those that occur in overdoses (44).

34.     Nalco Company, which produces the Corexit dispersants, has provided Material Safety Data Sheets (MSDS) for Corexit 9500 and Corexit 9527A. In general, MSDSs are intended to provide information to workers regarding chemicals' physical properties, toxicities,

---

[3] The sorbitans in the Corexit dispersants are sorbitan, mono-(9Z)-9-octadecenoate; sorbitan, tri-(9Z)-9-octadecenoate, poly(oxy-1,2-ethanediyl) derivs; and sorbitan, mono-(9Z)-9-octadecenoate, poly(oxy-1,2-ethanediyl) derivs (59).

and associated potential health effects, and to include first-aid measures and procedures for handling and working with the chemicals in a safe manner.

35.     The Nalco MSDS for Corexit 9500 lists the human health risk as "slight," stating that prolonged exposure to Corexit 9500 can cause dermal and respiratory irritation and other minor health effects (49).  The Nalco MSDS for Corexit 9527A lists the human health risk as "moderate," stating that repeated or excessive exposure to Corexit 9527A can cause dermal and respiratory irritation and other adverse health effects (50).

36.     It is important to note that the toxicity information provided in the Nalco Corexit MSDSs relates to the effects that might occur if an individual is exposed to the pure, undiluted Corexit products, at sufficient levels and for sufficient durations.  Thus, the potential human health effects described above are much less likely to occur after the dispersants have been applied to an oil spill in the ocean, in which case the dispersants will have been significantly diluted.  These potential health effects are even less likely to occur to individuals located onshore after the dispersants have been applied miles offshore in such a scenario, in which case the dispersants will have undergone additional dilution, as well as evaporation and biodegradation.

### Compounds Released From Surface Burning of Crude Oil

37.     The burning of crude oil in connection with the DWH oil spill could have contributed to the formation of certain "criteria pollutants" — such as particulate matter, ozone, and sulfur dioxide — and polychlorinated dibenzodioxins and furans.

38.     The criteria pollutants are always present in ambient air and can be generated by numerous industrial processes and automobile exhaust, as well as natural processes such as forest fires.  EPA has set standards, called National Ambient Air Quality Standards (NAAQS), for these criteria pollutants that are designed to be protective of public health.  The primary

13

NAAQSs are intended to be protective of vulnerable populations, including children, people with asthma, and the elderly. All states perform regular air monitoring for the criteria pollutants to assess air quality generally and to determine compliance with the NAAQS.

39.     Particulate matter (PM) is a mixture of solid particles and liquid droplets, and is found in ambient air. Particulate matter is defined based on its size — $PM_{10}$, or coarse particulate matter, refers to particles that are less than 10 micrometers; and $PM_{2.5}$, or fine particulate matter, refers to particles that are less than 2.5 micrometers in diameter. Fine particulates pose a greater potential risk to human health than coarse particulates because they are easily inhaled deeper into the lungs, and can cause a number of respiratory symptoms, such as irritation of the airways, coughing, difficulty in breathing, and exacerbation of pre-existing respiratory conditions.

40.     Ozone is formed through the reaction of hydrocarbons and nitrogen oxides in the atmosphere in the presence of sunlight. Ozone is a natural component of the atmosphere. The ozone layer in the stratosphere serves a vital function of filtering out ultraviolet rays. Ground level ozone is present as a result of numerous industrial sources and other human activities. Ozone is most likely to be of concern on hot, sunny days in urban environments. Inhalation of ozone can cause a number of respiratory symptoms, including coughing, throat irritation, and exacerbation of pre-existing respiratory conditions.

41.     Sulfur dioxide ($SO_2$) is produced by the burning of sulfur-containing fuel. However, the oil released during the DWH spill was sweet crude oil, which contains very low sulfur content (30). Because of the low sulfur content of the MC252 oil, $SO_2$ would not be expected to form in appreciable concentrations as a result of the DWH oil spill or the burning of

14

MC252 oil.  To the extent $SO_2$ was present in air in measureable quantities during the course of the DWH incident, it was likely not the result of spilled oil (30).

42.    Polychlorinated dibenzodioxins and furans (commonly referred to as dioxins) are a class of compounds formed from the incomplete combustion of organic matter in the presence of chlorine.  Low levels of dioxins are ubiquitous in the environment and the food chain. Humans are primarily exposed to dioxins through the diet, primarily in fish and fatty foods. Exposures to high levels of dioxins have been associated with adverse human health effects (46).

### REVIEW OF INHALATION EXPOSURE DATA

43.    Based on my review and analysis of the community and industrial hygiene air monitoring data, as well as my knowledge and understanding of relevant toxicological risk standards, it is my opinion that Gulf Coast Residents were _not_ exposed to airborne concentrations of the components of crude oil, dispersants, or other spill-related compounds at levels that would be expected to result in any significant adverse health effects.

#### *Unique Aspects of the DWH Oil Spill Minimized Potential for Exposure*

44.    Before addressing the air monitoring data collected during the DWH response, it is important to note that the unique characteristics of the DWH oil spill reduced the potential for exposures to the constituents of oil that are of toxicological concern, thereby minimizing potential health impacts to Gulf Coast Residents.

45.    First, the spill occurred nearly one mile beneath the ocean surface.  As a result, many of the more water-soluble oil components — such as benzene, toluene, ethylbenzene, and xylenes — dissolved in the water column prior to reaching the surface.  Therefore, only small amounts of these components reached the surface of the Gulf of Mexico, thus significantly reducing the potential for exposure to these compounds (12, 15).

15

46.     Second, the spill occurred nearly 50 miles from the southernmost tip of Louisiana and over 100 miles from populated areas in southern Mississippi, Louisiana, and Alabama.[4] Volatile compounds that did reach the ocean surface (such as hexane) underwent evaporation, photodegradation and significant dilution prior to reaching the Gulf Coast.  As a result, there was little or no potential for exposure of Gulf Coast Residents to the volatile compounds typically associated with oil spills (*e.g.*, benzene, toluene, ethylbenzene, xylenes, and lighter alkanes) (12, 18).  As expected, and as discussed in greater detail below, air monitoring conducted along the Gulf Coast found airborne concentrations of volatile organic compounds to be well below levels of concern for potential human health risks.

47.     The oil that remained after the volatile components were removed spent weeks to months at sea prior to reaching the coast (20).  A number of processes, including photo-oxidation, biodegradation, evaporation, dispersion, and dissolution, acted on the less-volatile components of the oil as it moved toward the shoreline.  As a result, crude oil rapidly "weathered," and the oil that reached the shoreline was significantly depleted of most of the remaining potentially toxic components of crude oil (*e.g.*, PAHs) (20).

### *Available Air Sampling and Monitoring Data*

48.     A significant amount of air monitoring data was collected in relation to the DWH oil spill.  These air monitoring data can be used to characterize the levels at which Gulf Coast Residents might have been exposed to the constituents of oil, dispersants, and other spill-related

---

[4] Specifically, the MC252 well was 50 miles from the Pass a Loutre Wildlife Management Area in southern Louisiana; 61-94 miles from minimally populated towns in the southernmost portion of Louisiana (3,920 combined residents); 100-125 miles from small cities —  such as Biloxi, Pascagoula and Gulfport, Mississippi, and Gulf Shores, Alabama  (more than 180,000 combined residents); and 125-150 miles from larger population centers — such as Mobile, Alabama and New Orleans, Louisiana (more than 620,000 combined residents) (Google Maps, US Census 2010).

compounds.  BP, EPA, and others evaluated air quality at fixed-monitoring stations along the Gulf coasts of Alabama, Florida, Louisiana, Mississippi, and Texas from the first week of the Response until December 2010.  These data are summarized in the declaration of Dr. Lees.  *See* Decl. of Dr. Lees, at ¶¶ 22-26, 40.

49.     EPA also deployed mobile air monitoring equipment in Trace Atmospheric Gas Analyzer (TAGA) buses, which are self-contained mobile laboratories that conduct instant-result monitoring of air quality.  The TAGA buses conducted instant-result monitoring from May 5, 2010 to August 20, 2010 along the coasts of Alabama, Florida, Louisiana, and Mississippi.  The TAGA buses measured airborne concentrations of benzene, toluene, xylenes and constituents of both of the dispersants used during the response (specifically, 2-butoxyethanol and DPnB).

50.     In addition to the environmental sampling conducted along the Gulf Coast, BP, OSHA, and NIOSH conducted comprehensive industrial hygiene air monitoring on Clean-Up Workers, collecting thousands of samples for hydrocarbons, oil mist, and components of the two dispersant products (Corexit 9500 and Corexit 9527A) used during the Response.  Although the industrial hygiene samples do not provide a direct measure of exposures experienced by members of the Gulf Coast community, they do provide a useful "worst case scenario."  In other words, if Clean-Up Workers, who were in direct contact with the oil and were the closest in proximity to the sources of oil and dispersants, were not exposed at significant levels of concern, it is highly unlikely that members of the public were exposed at such levels.  These data are summarized and discussed in greater detail in the declaration of Dr. Lees.  *See* Decl. of Dr. Lees, at ¶¶ 19-21, 34-39.

### Results of Air Monitoring Along the Gulf Coast

51.     As discussed above, BP, EPA, and others conducted air sampling at fixed-monitoring locations along the Gulf Coast.  The results of these sampling efforts were compiled by Dr. Lees and are summarized below in Tables 2 and 3.

### Table 2: EPA Sampling Statistics

| Analyte | # of Results | # of Non-Detects | Percentage Non-Detects | Max (ug/m$^3$) | Median* (ug/m$^3$) | 99th percentile* (ug/m$^3$) |
|---|---|---|---|---|---|---|
| Benzene | 1656 | 752 | 45% | 43 | 0.4 | 3.1 |
| Ethylbenzene | 1657 | 961 | 58% | 14 | 0.4 | 2.3 |
| Hexane | 1563 | 432 | 28% | 1800 | 0.6 | 25.9 |
| Naphthalene | 1771 | 904 | 51% | 1200 | 1.8 | 9.6 |
| Toluene | 1657 | 557 | 34% | 42 | 0.8 | 10.0 |
| m,p-Xylene | 1564 | 823 | 53% | 59 | 0.4 | 4.2 |
| o-Xylene | 1657 | 951 | 57% | 17 | 0.4 | 2.2 |
| Xylenes, Total | 93 | 0 | 0% | 10 | 0.9 | 7.6 |

*In calculating the medians and 99th percentiles, non-detect samples were treated as having a value of 1/2 the detection limit.

### Table 3: BP Sampling Statistics

| Analyte | # of Results | # of Non-Detects | Percentage Non-Detects | Max (ug/m$^3$) | Median* (ug/m$^3$) | 99th percentile* (ug/m$^3$) |
|---|---|---|---|---|---|---|
| Benzene | 3294 | 3115 | 95% | 274 | 8.0 | 16.0 |
| Ethylbenzene | 3294 | 3154 | 96% | 691 | 10.9 | 21.7 |
| Hexane | 3293 | 3045 | 92% | 617 | 8.8 | 32.0 |
| Hydrogen Sulfide | 3233 | 3135 | 97% | 62 | 6.1 | 17.8 |
| Naphthalene | 5273 | 4785 | 91% | 1030 | 0.2 | 9.4 |
| Toluene | 3295 | 2796 | 85% | 1018 | 9.4 | 90.5 |
| Xylenes, Total** | 3293 | 3084 | 94% | 948 | 32.55 | 65.1 |

*In calculating the medians and 99th percentiles, non-detect samples were treated as having a value of 1/2 the detection limit.

** Total xylene results were calculated by summing the m,p-xylene and o-xylene results for the same sample ID and analytical method.  Total xylene results were treated as non-detects if both m,p-xylene and o-xylene were below their respective detection limits.

52.     As described in greater detail below, the concentrations of the compounds measured at the EPA and BP fixed-monitoring stations were extremely low, and were far below levels at which any significant adverse health effects might be expected.   In addition, the concentrations measured at the fixed-monitoring stations are not necessarily related to the DWH oil spill, because many onshore sources (such as industries, cars, and cigarette smoke) emit the same compounds.   With respect to benzene in particular, it is likely that the concentrations measured onshore were <u>not</u> related to the DWH oil spill, because studies have shown that benzene was almost entirely absent from the oil by the time it reached the surface of the Gulf of Mexico (which was over 100 miles away from the majority of the Gulf Coast monitoring locations) (13, 15).

### *Toxicological Benchmarks*

53.     Chemical concentrations measured in air were compared to toxicological benchmarks to determine whether significant adverse health effects might be expected.   A number of toxicological benchmarks have been established setting ambient airborne exposure levels below which no adverse health effects are expected.   These benchmarks include Minimal Risk Levels (MRLs) established by the U.S. Agency for Toxic Substances and Disease Registry (ATSDR), and Deepwater Horizon-specific Screening Levels established by the EPA.

54.     An ATSDR MRL is an estimate of the maximum level of daily human exposure to a compound that is likely to be without an appreciable risk of adverse health effects (non-carcinogenic) over a specified duration of exposure.   MRLs are established for chemicals for which reliable and sufficient data exist to identify either the target organ(s) of effect, or the most sensitive health effect(s), for a specific duration within a given route of exposure.   MRLs are

derived for three durations of exposure: Acute (up to two weeks of exposure), Intermediate (15 to 365 days of exposure) and Chronic (over 365 days of exposure).

55. Considering the duration of the DWH oil spill (87 days), and the duration over which the oil spill potentially could have impacted ambient air quality along the Gulf Coast (conservatively, approximately 106 days), only Acute and Intermediate MRLs should be used for comparison. In these respects, the last overflight observation of potentially recoverable oil on the ocean surface was August 3, 2010 (55). In addition, numerous studies have concluded that MC252 oil that reached the shoreline was almost entirely free of volatile compounds (such as BTEX) and PAHs, and thus would not be expected to contribute significantly to airborne concentrations of these compounds along the Gulf Coast (20, 55). Finally, other than one small application near the source-control area on September 4, 2010, dispersants were not applied in connection with the DWH oil spill after July 19, 2010. *See* Decl. of Dr. Dutton, at ¶¶ 24, 26. In other words, by August 2010, there was little potential for community exposures to airborne concentrations of the constituents of oil and dispersants in connection with the DWH oil spill.

56. In addition to the ATSDR MRLs, EPA established its own set of Screening Levels in connection with the DWH oil spill for select VOCs — specifically, benzene, toluene, ethylbenzene, and xylenes. These Screening Levels were defined as the levels at which there would be "low concern for increased risk of health problems for measurements in this range" (22). EPA further stated that "[c]oncentrations slightly above these levels for short durations do not generally pose health concerns. There may be some health concern if people are exposed to 'higher' levels continuously for a year or more" (22). The EPA DWH Screening Levels "assume a person is breathing a pollutant continuously (24 hours a day, seven days a week) for as long as one year" (22).

57. Table 4 below sets forth the ATSDR MRLs for the oil spill-related compounds that are potentially of concern from a toxicological perspective, and the EPA DWH Screening Levels for benzene, toluene, ethylbenzene, and xylenes. The MRLs, which are typically expressed as parts per billion (ppb) concentration units, have been converted to micrograms per meter cubed (ug/m$^3$) for all compounds except 2-butoxyethanol to conform to the more frequently used monitoring data units. As discussed above, Chronic MRLs are not appropriate benchmarks for comparison for measurements collected in connection with the DWH oil spill. However, comparisons to the Chronic MRLs are provided below because, for some compounds, the Chronic MRLs are the only comparison value available.

**Table 4: Toxicological Benchmark Values**

| Analyte | EPA DWH Screening Level | ATSDR MRLs | | |
|---|---|---|---|---|
| | | Acute | Intermediate | Chronic |
| Benzene (ug/m$^3$) | 20 | 28.8 | 19.2 | 9.6 |
| Toluene (ug/m$^3$) | 5,000 | 3,770 | - | 302 |
| Ethylbenzene (ug/m$^3$) | 3,000 | 21,711 | 8,684 | 261 |
| Xylenes, total (ug/m$^3$) | 2,000 | 8,684 | 2,605 | 217 |
| n-Hexane (ug/m$^3$) | - | - | - | 2115 |
| Naphthalene (ug/m$^3$) | - | - | - | 3.7 |
| Hydrogen sulfide (ug/m$^3$) | - | 98 | 28 | - |
| 2-butoxyethanol (ppm) | - | 6 | 3 | 0.2 |
| Propylene glycol (ug/m$^3$) | - | - | 28 | - |

*Comparison to Toxicological Benchmarks*

Components of MC252 Oil

58. The EPA and BP sampling results summarized in Tables 2 and 3 were compared to the ATSDR MRLs and the EPA DWH Screening Levels in Table 4 to determine the risk of potential adverse health effects at the levels of these compounds that were measured in ambient

air over the course of the DWH oil spill. These comparisons are provided in Tables 5 and 6 below. Note that for some compounds, such as naphthalene and hexane, only Chronic MRLs are available. As discussed above, Chronic MRLs are derived for exposures greater than 365 days in duration, and thus are not directly applicable in evaluating potential health effects to Gulf Coast Residents in connection with the DWH oil spill. Nevertheless, comparisons to the Chronic MRLs are provided in the tables below and are shaded in grey to indicate that such comparisons must be viewed as extremely conservative measures of the potential for adverse health effects. Where available, the Acute and Intermediate MRLs are much more appropriate benchmarks on which to base conclusions about potential human health risk.

**Table 5: Comparison of EPA Monitoring Results to Toxicology Benchmarks**

| Compound | # of Detects | # of Non-Detects | % of Results < MRL or Screening Level* | | | |
| | | | EPA DWH SL | Acute MRL | Intermediate MRL | Chronic MRL |
|---|---|---|---|---|---|---|
| Benzene | 904 | 752 | 99.9% | > 99.9% | 99.9% | 99.8% |
| Ethylbenzene | 696 | 961 | 100% | 100% | 100% | 100% |
| Hexane | 1131 | 432 | - | - | - | 100% |
| Naphthalene | 867 | 904 | - | - | - | 98.4% |
| Toluene | 1100 | 557 | 100% | 100% | - | 100% |
| Xylenes, Total** | 93 | 0 | 100% | 100% | 100% | 100% |

- No MRL Available
* Non-detect results for which the detection limit was greater than the MRL or Screening Level were excluded.

**Table 6: Comparison of BP Monitoring Results to Toxicology Benchmarks**

| Compound | # of Detects | # of Non-Detects | % of Results < MRL or Screening Level* | | | |
|---|---|---|---|---|---|---|
| | | | EPA DWH SL | Acute MRL | Intermediate MRL | Chronic MRL |
| Benzene | 179 | 3115 | 99.4 | 99.5 | 99.4 | 93.3*** |
| Ethylbenzene | 140 | 3154 | 100 | 100 | 100 | > 99.9 |
| Hexane | 248 | 3045 | - | - | - | 100 |
| Naphthalene | 488 | 4785 | - | - | - | 97.5 |
| Toluene | 499 | 2796 | 100 | 100 | - | 99.8 |
| Xylenes, Total** | 209 | 3084 | 100 | 100 | 100 | 99.8 |
| Hydrogen Sulfide | 98 | 3135 | - | 100 | 99.9 | - |

- No MRL Available
* Non-detect results for which the detection limit was greater than the MRL or Screening Level were excluded
** Total xylene results were calculated by summing the m,p-xylene and o-xylene results for the same sample ID and analytical method. Total xylene results were treated as non-detects if both m,p-xylene and o-xylene were below detection limits.
*** The percentage of benzene results below the Chronic MRL may be misleadingly low because approximately 85% of the benzene samples collected had detection limits above the Chronic MRL. Non-detect results for which the detection limit was greater than the MRL were excluded in calculating the percentage, making the total sample size artificially small and, consequently, the percentage of results above the Chronic MRL artificially high.

59. As shown in Tables 5 and 6 above, more than 99% of all measurements for BTEX compounds and hydrogen sulfide were below the EPA DWH Screening Levels and the ATSDR Acute and Intermediate MRLs. As discussed above, average or median concentrations are more scientifically relevant in assessing the potential for human health effects than are isolated peak values. Thus, although there were a few isolated values that exceeded the Toxicology Benchmarks, these exceedances would not be likely to result in significant adverse health effects. Of greater importance are the median and 99th percentile values, which for all of these compounds were well below the DWH Screening Levels and Acute and Intermediate MRLs (see Tables 2 and 3 above). Exposures of Gulf Coast Residents to the BTEX compounds and hydrogen sulfide at the levels depicted in Tables 2 and 3 would not be expected to result in any significant adverse health effects.

60.     As discussed above, no EPA DWH Screening Levels or ATSDR Acute or Intermediate MRLs are available for naphthalene or n-hexane. Accordingly, the only standards for comparison are the chronic MRLs, which, as discussed above, are an extremely conservative measure of the potential for human health effects. All of the measurements for n-hexane, and roughly 98% of the measurements for naphthalene, were below the Chronic MRLs for these compounds. Community exposures to n-hexane and naphthalene at these levels would not be expected to result in any significant adverse health effects.

61.     Based on the sampling results described above, it is my opinion that Gulf Coast Residents would not be expected to experience significant adverse health effects based on exposure to airborne concentrations of the components of the MC252 oil.

### Components of Corexit Dispersants

62.     The potential for Gulf Coast Residents to be exposed to airborne concentrations of the components of the two Corexit dispersants was extremely low. The subsea applications of dispersants occurred at the source of the discharge — approximately 50 miles offshore from the southernmost point of Louisiana and over 100 miles from large population centers in Mississippi, Louisiana, and Alabama. *See* Decl. of Dr. Dutton, at ¶ 31. Likewise, the vessel applications occurred primarily in the source-control area, and all but one of the aerial dispersant applications occurred greater than three nautical miles offshore, and 98% of the aerial dispersant applications occurred greater than ten nautical miles offshore. *See* Decl. of Dr. Dutton, at ¶ 28. As a result, even apart from the available air monitoring data, which are discussed below, it is highly unlikely that Gulf Coast Residents were exposed to potentially harmful levels of dispersant components.

63.     The CDC reached a similar conclusion, stating in a report prepared for health professionals in connection with the DWH oil spill that: "Once the dispersant is applied to the oil slick it begins to break down in the environment.  In aquatic environments it begins to break down within 16 days.  Because of the strict guidelines that must be followed to utilize dispersants it is unlikely that the general public will be exposed to straight product" (56).

64.     That Gulf Coast Residents were not exposed to airborne concentrations of the dispersant constituents at levels of concern is further supported by the available air monitoring data.  BP and EPA did not sample for the components of Corexit 9500 and Corexit 9527A at the fixed-monitoring stations described above.  However, EPA did utilize Trace Atmospheric Gas Analyzer (TAGA) buses, which are self-contained mobile laboratories that conduct instant-result monitoring of air quality, to sample for airborne concentrations of various chemicals, including 2-butoxyethanol and DPnB.  According to EPA, these are "the two chemicals found in the COREXIT dispersants that have the highest potential to get into the air in any significant amounts" (28).  EPA conducted monitoring for these two dispersant components from May 18 through June 6, 2010 at locations along the Gulf Coasts of Alabama, Florida, Louisiana, and Mississippi.  Based on the results of this monitoring, EPA concluded:

> The TAGA buses detected very low levels of these chemicals [2-butoxyethanol and DPnB] in the air, at a limited number of the locations sampled along the Gulf Coast.  *The levels found were well below those that are likely to cause health effects*, and suggest that the use of dispersants on the oil spill would not have a significant impact on air quality on land.  (28)

65.     In addition to the TAGA bus sampling, the industrial hygiene results collected by BP, OSHA, and NIOSH provide a useful "worst case" scenario for assessing potential inhalation exposures experienced by Gulf Coast Residents to the components of dispersants.  In this respect, if Clean-Up Workers, who were the closest in proximity to the sources of dispersants, were not exposed at levels of concern, it is highly unlikely that Gulf Coast Residents located

25

onshore were exposed at levels of concern.  Importantly, industrial hygiene samples analyzed for the dispersant components were collected primarily from Clean-Up Workers engaged in dispersant-related job tasks (*i.e.*, on vessels applying and monitoring for dispersants), thus representing an <u>extreme</u> worst-case scenario.  *See* Decl. of David Dutton, at ¶¶ 33, 36.

      66.    BP, OSHA, and NIOSH collected over 1,000 samples for 2-butoxyethanol from Clean-Up Workers engaged in the DWH response.  Summary results of industrial hygiene sampling for 2-butoxyethanol, and comparison of those results to the ATSDR MRLs, are provided in Table 7 below.  As shown in the table, 2-butoxyethanol was not detected in over 75% of the samples collected, and <u>all</u> of the measurements for 2-butoxyethanol were below the Acute and Intermediate MRLs.  Exposures at these levels would not be expected to result in significant adverse health effects.

**Table 7: OSHA, NIOSH, and BP Industrial Hygiene Sampling for 2-Butoxyethanol (units expressed in parts per million)**

| Entity | # Results | % Non-Detect | Median | Max | % < Acute MRL | % < Intermediate MRL |
|--------|-----------|--------------|--------|-----|---------------|----------------------|
| BP | 1,029 | 80% | 0.03 | 0.76 | 100 | 100 |
| OSHA | 18 | 100% | - | - | 100 | 100 |
| NIOSH | 34 | 3% | <0.01 | 0.3 | 100 | 100 |

      67.    BP, OSHA, and NIOSH also conducted industrial hygiene sampling for propylene glycol.  As noted above, propylene glycol is not known to be associated with any significant adverse health effects.  Propylene glycol was detected in less than 18% of the 62 combined samples collected by BP, OSHA, and NIOSH.  The detection limits used by BP and OSHA were generally too high to determine compliance with the Intermediate MRL for propylene glycol. However, NIOSH conducted sampling for propylene glycol using detection limits below the MRL.  The NIOSH sampling results for propylene glycol, and comparisons of those results to

the ATSDR Intermediate MRL, are provided in Table 8 below. As shown in Table 8, the majority of the measurements for propylene glycol were below the Intermediate MRL. Importantly, these measurements were collected from Clean-Up Workers engaged in dispersant-related activities, and thus represent an extreme worst-case scenario for assessing potential health risks for Gulf Coast Residents located onshore, who would have been exposed, if at all, to much lower levels. Exposures at such levels would not be expected to result in significant adverse health effects.

**Table 8: NIOSH Industrial Hygiene Sampling for Propylene Glycol**
**(units expressed in ug/m³)**

| Compound | # Results | % Non-Detect | Median | Max | % < Inter. MRL |
|---|---|---|---|---|---|
| Propylene glycol (ug/m³) | 24 | 46% | 12 | 170 | 70.1 |

68. With the exception of petroleum distillates, the components of the Corexit dispersants are water soluble and relatively non-volatile. Because the Corexit dispersants were generally applied several miles off the Gulf Coast, none of these components would be expected to be present in the ambient air along the coast. Based on the sampling results described above and my knowledge of the chemistry and toxicology of the chemicals in the Corexit dispersants, it is my opinion that Gulf Coast Residents were exposed to negligible levels, if any, of the components of Corexit 9500 and Corexit 9527A, and would not be expected to develop adverse health conditions as a result of these minimal exposures.

<u>Compounds Released From Burning of Crude Oil</u>

69. As discussed above, EPA and the Gulf States conduct regular air monitoring at fixed-monitoring locations in Alabama, Florida, Louisiana, and Mississippi to assess airborne

concentrations of the criteria pollutants and to determine compliance with the NAAQS. This air monitoring was conducted before, during, and after the DWH oil spill.

70.    Based on this air monitoring, EPA has concluded that the DWH oil spill (including the controlled burning of oil in connection with the spill) did not have a significant impact on ozone and particulate concentrations along the Gulf Coast, stating:

> Since late April, 2010, EPA has been monitoring the air at multiple sites along the Gulf Coast for certain pollutants that are associated with petroleum products and from the burning oil out at sea. EPA's air monitoring to date, has found that *air quality levels for ozone and particulates are normal on the Gulf coastline for this time of year* and odor-causing pollutants associated with petroleum products are being found at low levels (61).

71.    I have reviewed the data on levels of ozone and particulates along the Gulf Coast for the Gulf States for 2010 (and for 2007-2009 for comparison). Based on my personal review, I agree with the statement above made by EPA. The NAAQs Toxicology benchmarks for ozone and fine particulates were not exceeded for the coastal monitoring sites within 150 miles of the DWH site during 2010. Accordingly, one would not expect increased health risk to Gulf Coast Residents based on exposure to ozone and particulate matter as a result of the DWH oil spill.

72.    In addition, EPA conducted sampling to measure emissions of dioxins — specifically, polychlorinated dibenzodioxins and furans (PCDD/PCDFs) — from the controlled *in situ* burns (47). Based on this sampling, EPA and NOAA performed a risk assessment to identify the potential health risks to Clean-Up Workers and members of the general public from inhalation exposures to PCDD/PCDFs and fish ingestion exposures to PCDD/PCDFs (48).

73.    EPA concluded that while PCDD/PCDFs were created from the burning of oil, they were created at low levels — levels similar to the emissions from residential woodstoves and forest fires and two orders of magnitude lower than open burning of residential waste (47). The two most toxic dioxin compounds, 2,3,7,8-TCDD and 1,2,3,7,8-PCDD, were not detected

above the *in situ* burns. EPA concluded, using very conservative methodology, that levels of PCDD/PCDFs generated by the *in situ* burns did not pose an appreciable cancer risk for Clean-Up Workers and members of the general public (48). Similarly, the measured levels of PCDD/PCDFs from the controlled *in situ* burns were far below the ATSDR MRL for non-carcinogenic health effects for these compounds (48).

74. Accordingly, one would not expect increased health risk to Gulf Coast Residents or Clean-Up Workers based on exposure to PCDD/PCDFs emissions resulting from the *in situ* burning of crude oil in connection with the DWH oil spill.

## LOW POTENTIAL FOR DERMAL EXPOSURES OF CONCERN

75. For both Gulf Coast Residents and Clean-Up Workers, there was little potential for dermal exposures to the components of crude oil and dispersants at concentrations and for durations sufficient to cause potential health concerns. First, the potentially toxic volatile components of the MC252 oil and the Corexit dispersants, described in greater detail above, were not present onshore in sufficient quantities to cause any significant adverse health effects. Second, Clean-Up Workers, who were generally closer in proximity to the oil and dispersants, were required to wear appropriate personal protective equipment, which should have prevented most, if not all, dermal exposures. Accordingly, the evidence leads me to conclude that there were not widespread dermal exposures to the components of crude oil or dispersants for either Gulf Coast Residents or Clean-Up Workers at concentrations and for durations that might be expected to cause significant adverse health effects.

### *Gulf Coast Residents*

#### MC252 Oil

76.     Gulf Coast Residents located onshore had no potential for exposure to fresh crude oil, which was released from approximately one mile beneath the ocean surface and approximately 50 miles offshore.  However, Gulf Coast Residents potentially could have come into contact with "weathered" oil and tar balls (oil that has undergone a number of physical and biological processes, such as evaporation, dissolution, and biodegradation).

77.     As discussed above, weathered oil and tar balls do not contain significant amounts of the more water-soluble, volatile compounds (such as BTEX).  For instance, in samples analyzed for BTEX by the Operational Science Advisory Team (OSAT) to the Federal On-Scene Coordinator (FOSC), BTEX compounds were never detected in MC252 oil that reached the shore or in nearshore sediments (55).  As a result, PAHs are the primary compounds of concern with regard to the potential for adverse health effects from dermal exposure to weathered oil or tar balls.  Government studies have concluded that PAHs in weathered crude oil samples collected along the Gulf Coast were significantly depleted by the time the oil reached the shoreline (approximately 86-98 percent depletion), thus reducing the potential for health risks to Gulf Coast Residents from dermal exposure to weathered oil or tarballs (20, 55).

78.     In addition, Gulf Coast Residents' exposure to weathered oil and tar balls, on beaches or along other parts of the Gulf Coast generally, would have been restricted to short-term dermal exposure.  Significant adverse health effects are not expected without repeated, prolonged dermal exposure to these compounds (7, 54, 58).  In addition, intermittent or occasional skin contact with weathered oil or tar balls is not expected to have significant adverse

health effects if good personal hygiene measures are followed (*e.g.*, washing any contacted oil off of the skin) (54, 58).

79. Based on the low concentration of PAHs (and other potentially toxic compounds) in the weathered oil, and the low probability for prolonged human skin contact, it is my opinion that there is little risk of significant adverse human health effects from dermal exposures to crude oil for Gulf Coast Residents in connection with the DWH oil spill.

80. My conclusions are corroborated by risk assessments performed for the Federal On-Scene Coordinator (FOSC) of the U.S. Coast Guard by the Operational Science Advisory Team (OSAT-2). At the request of the FOSC, the OSAT-2 team evaluated the risk from dermal contact with weathered oil in connection with the DWH oil spill. The OSAT-2 team concluded that the risk from dermal exposure to weathered oil from the DWH oil spill was far below EPA standards for both carcinogenic and non-carcinogenic human health risks (20).

### Corexit Dispersants

81. Gulf Coast Residents had little or no potential for significant dermal exposure to the two Corexit dispersants. The Corexit dispersants were applied subsea in the source-control area, which was approximately 50 miles offshore and 100 miles from state populations, and by airplane and vessel at various locations across the Gulf of Mexico. The vessel applications occurred primarily in the source-control area, and all but one of the aerial dispersant applications occurred greater than three nautical miles offshore, and 98% of the aerial dispersant applications occurred greater than ten nautical miles offshore. *See* Decl. of Dr. Dutton, at ¶ 28. In short, in almost all cases, dispersants were applied greater than ten nautical miles offshore, and on only one occasion were dispersants applied less than three nautical miles offshore.

82.     In addition, because the dispersants biodegraded in surface water and were significantly diluted after they were applied to oil slicks on the water surface, any components of the Corexit dispersants that did reach shore would have done so at levels so low as to have no meaningful impact on human health.  In this respect, Lisa Jackson, Administrator of the EPA, has stated: "We know that surface use of dispersants decreases the environmental risks to shorelines and organisms at the surface and when used this way, *dispersants break down over several days to weeks*" (57).  EPA Administrator Jackson also recognized that "when they are used on the surface, dispersants biodegrade much more rapidly than oil" (57).

83.     The conclusion that the Corexit dispersants biodegraded and were diluted in the Gulf, and thus would be unlikely to reach the shore in any significant quantities, is corroborated by water sampling data collected by the OSAT-1 team.  Specifically, in a report prepared for the FOSC, the OSAT-1 team analyzed 4,850 near-shore water samples collected between May 13, 2010 and October 20, 2010 for dispersant-related compounds (specifically, 2-butoxyethanol, DPnB, propylene glycol, and DOSS).  The OSAT-1 team concluded that "none of the concentrations of dispersant-related chemicals found in water samples collected during the response exceeded the [EPA aquatic life] benchmarks" for these substances in water and "[o]nly 66 samples (60 water and 6 sediment, 1.4% of total) had detectable levels of dispersant-related chemicals" (55).  DPnB was the most commonly detected dispersant compound; however, concentrations of DPnB never exceeded 0.003 milligrams per liter (mg/L), 333 times lower than the EPA screening level for DPnB in water — 1 mg/L (55).

84.     As a result, Gulf Coast Residents had limited potential for dermal exposure to the Corexit dispersants and their constituents, and any exposures that did occur would have been to extremely low levels of these compounds.  Dermal exposures to low levels of the Corexit

dispersants and their constituents (which, in any event, would have been rare) would not be expected to result in significant adverse health effects.

### *Cleanup Workers*

#### MC252 Oil

85.     Clean-Up Workers potentially could have been exposed to oil at different stages of weathering, depending on the location in which they were working.  Clean-Up Workers engaged in response activities near-shore and onshore potentially could have been exposed to weathered oil.  As described above, intermittent dermal contact with weathered crude oil is unlikely to result in significant adverse health effects, particularly if good personal hygiene practices are utilized.  In addition, all Clean-Up Workers were required to wear appropriate personal protective equipment (PPE), such as gloves and coveralls, as specified in the PPE Matrix created by BP and OSHA.  *See* Decl. of Dr. Dutton, at ¶¶ 56, 57.  If used properly, PPE likely would have prevented any significant dermal exposures to the components of crude oil and there would be little potential health risk.

86.     Clean-Up Workers engaged in response activities closer to the source of the discharge could have been exposed to crude oil that was less weathered.  Note, however, that even Clean-Up Workers engaged in response activities directly above the MC252 well were not exposed to "fresh" crude oil, as the oil traveled through approximately one mile of water prior to reaching the ocean surface, during which time it was significantly "scrubbed" of a number of the more water-soluble, volatile components, such as BTEX.[5]  Like other Clean-Up Workers, Clean-

---

[5] Some crude oil was piped to the surface in connection with containment efforts, and thus did not travel through approximately one mile of water.  *See* Decl. of Dr. Dutton, at ¶ 15.  There may have been some potential for dermal exposure to this "fresh" crude oil for some Clean-Up Workers in the source-control area.  If used properly, PPE likely would have prevented any significant dermal exposures to crude oil that was piped to the surface.

Up Workers engaged in response activities near the source were required to wear appropriate PPE, which should have prevented or substantially reduced dermal exposures to crude oil. In addition, many of the Clean-Up Workers at the source were professional oil spill responders, who had received extensive training in handling crude oil and protecting themselves from potentially harmful exposures to crude oil. *See* Decl. of Dr. Dutton, at ¶ 53.

87.     The conclusion that Clean-Up Workers did not experience widespread dermal exposures to crude oil in connection with the DWH oil spill is corroborated by the findings of NIOSH. NIOSH conducted a Health Hazard Evaluation (HHE) to evaluate potential exposures and health effects among Clean-Up Workers involved in the response to the DWH oil spill. As part of the HHE, NIOSH investigators conducted exposure monitoring and observational assessments for the full spectrum of response activities. *See* Decl. of Dr. Dutton, at ¶ 64. At the conclusion of its investigation, NIOSH concluded that dermal exposures to crude oil were minimal, and that Clean-Up Workers wore appropriate PPE in most cases, stating (17):

> [W]e sought to identify potential dermal exposures to oil, dispersant, or other chemicals. Observational exposure characterization was performed at numerous beaches in Louisiana, Mississippi, Alabama, and Florida where cleanup was occurring. Even at beach cleaning worksites where oil residue was judged by our teams to be heavy, worker exposure to oil residue was typically observed to be limited, with no evidence of exposure to dispersant. While the use of PPE (gloves, coveralls, face shields, goggles, etc.) was typically found to be matched to the level of expected or potential dermal exposure at many sites, PPE was not always used as directed.
>
> The potential existed for dermal contact with oil while placing and removing the skimmer and boom from the water and during cleaning activities on deck. However, workers wore the necessary protective equipment during tasks with increased potential for dermal contact.

88.     NIOSH investigators did find that some Clean-Up Workers had the potential for dermal exposure to the components of crude oil. For example, NIOSH investigators noted that wildlife cleaning and rehabilitation and decontamination operations presented the opportunity for

repeated and prolonged skin contact with oily water (36, 40). However, as previously mentioned, oil that reached the Gulf Coast was extremely weathered and depleted of the majority of the potentially toxic PAHs (20). In addition, Clean-Up Workers wore appropriate PPE in most cases, which should have significantly reduced the frequency and extent of any dermal exposures to crude oil (38, 41). Given the weathered condition of the oil and the use of appropriate PPE in most cases, the potential for significant human health risks from dermal exposure to crude oil, even for those Clean-Up Workers with the highest potential for exposure, was minimal.

Corexit Dispersants

89. Most Clean-Up Workers had little or no potential for significant dermal exposure to the two Corexit dispersants. Dispersants were not applied onshore, and aerial applications of dispersants were not permitted to occur within two nautical miles of any rig, platform or vessel. *See* Decl. of Dr. Dutton, at ¶ 27. In addition, as described above, once applied to oil slicks on the surface of the Gulf, the Corexit dispersants biodegraded and were significantly diluted, thus reducing the potential for potentially harmful dermal exposures to the dispersants and their constituents. Finally, Clean-Up Workers were required to wear appropriate PPE, which, if used properly, should have prevented any significant dermal exposures to the dispersants.

90. Clean-Up Workers engaged in the vessel application of dispersants had among the highest potential for dermal exposures to the Corexit dispersants. NIOSH conducted multiple investigations of dispersant spraying operations in connection with the DWH oil spill, and determined that appropriate use of PPE, which was observed by NIOSH investigators to have been worn by Clean-Up Workers applying the dispersants, should have prevented any significant dermal exposures to the Corexit dispersants (35).

91.     Accordingly, the evidence leads me to conclude that widespread dermal exposures of Clean-Up Workers to the Corexit dispersants and their constituents were unlikely, and I would not expect significant adverse health effects from any exposures that did occur.

## CONCLUSION

92.     After a thorough review of the relevant exposure data associated with the DWH oil spill, I conclude that Gulf Coast Residents in Alabama, Florida, Louisiana, and Mississippi were <u>not</u> exposed to airborne concentrations of the components of crude oil, dispersants, or other spill-related compounds at levels that would be expected to result in any significant adverse health effects.

93.     I also conclude that the potential for significant dermal exposures to the components of crude oil and dispersants for Clean-Up Workers and Gulf Coast Residents was very small, and any such exposures for Clean-Up Workers, who were in closer proximity to the oil and dispersants, should have been prevented by appropriate use of personal protective equipment.  Based on the weathered nature of the oil and the lack of opportunity for prolonged skin contact with the oil and dispersants, I would not expect significant adverse health effects from any dermal exposures to the components of crude oil and dispersants that did occur in connection with the DWH oil spill.

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.


Date:  August 12, 2012                    Robert Cox, M.D., Ph.D

36

Case 2:10-md-02179-CJB-SS Document 7201-3 Filed 08/13/12 Page 38 of 210

# EXHIBIT A

# CURRICULUM VITAE

**Name**: Robert D. Cox, M.D., Ph.D.          **Date of Appointment**: January 2, 1996

**Present Position**:                    Professor, Department of Emergency Medicine
                              Medical Director, Mississippi Regional Poison Control Center
                              Director, Medical Toxicology Service
                              University of Mississippi Medical Center (all)

**Date and Place of Birth**: November 20, 1954 - Chicago, IL

**Marital Status**: Married; Spouse - Dawna M. Cox

**Educational Background:**

| | | |
|---|---|---|
| College: | B.A., Chemistry and Biology<br>Augustana College<br>Rock Island, IL | 1976 |
| Graduate: | Ph.D., Chemistry<br>University of Iowa<br>Iowa City, IA | 1980 |
| Medical: | M.D.<br>University of Texas Southwestern Medical School<br>Dallas, TX | 1987 |

**Postgraduate Training**:

| | | |
|---|---|---|
| Internship: | Internal Medicine<br>Baylor University Medical Center<br>Dallas, Texas | 1987 - 1988 |
| Residency: | Emergency Medicine<br>UCLA Medical Center<br>Los Angeles, California | 1988 - 1991 |
| Preceptorship: | Medical Toxicology Preceptorship<br>Los Angeles Regional Poison Control Center<br>Los Angeles, California | 1988 - 1991 |

**Honors and Awards:**

| | |
|---|---|
| Fellow<br>American College of Medical Toxicology | 2007 |
| Fellow<br>American College of Emergency Physicians | 2003 |

Updated February 1, 2011

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 2

| | |
|---|---|
| Outstanding Faculty Award<br>Emergency Medicine Residency<br>University of Mississippi Medical Center | 1998 |
| Faculty Career Development Award<br>Emergency Medicine Foundation | 1992 |
| Lieutenant Colonel, Aide De Camp, Governor's Staff<br>State of Georgia | 1991 |
| Alpha Omega Alpha Medical Honor Society<br>University of Texas Southwestern Medical School | 1987 |
| Vernie A. Stembridge Award in Pathology<br>University of Texas Southwestern Medical School | 1987 |
| Southwestern Medical Foundation Scholar<br>University of Texas Southwestern Medical School | 1986 |
| Southwestern Medical Foundation Scholar<br>University of Texas Southwestern Medical School | 1985 |
| Chilton Research Fellowship<br>Biochemistry Department<br>University of Texas Southwestern Medical School | 1984 |
| Phi Beta Kappa Scholastic Honor Society<br>Augustana College | 1976 |
| Magna Cum Laude<br>Augustana College | 1976 |
| Beta Beta Beta Biological Honor Society<br>Augustana College | 1975 |

**Specialty Certification:**

| | |
|---|---|
| Medical Toxicology, ABMS - ABEM<br>    (recertification) | 2000<br>2008 |
| Emergency Medicine, ABMS - ABEM<br>    (recertification) | 1993<br>2002 |
| Toxicology, American Board of Toxicology<br>    (recertification)<br>    (recertification)<br>    (recertification) | 1993<br>1998<br>2003<br>2007 |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 3

**Licensure:**

| | |
|---|---|
| State of Mississippi Medical License | 1996 - present |
| State of Texas Medical License | 1996 – 1997 |
| State of Georgia Medical License | 1991 – 1997 |
| State of California Medical License | 1988 – 1991 |
| State of Texas Medical License | 1987 – 1988 |

**Professional Memberships:**

American College of Medical Toxicology
American Academy of Clinical Toxicology
American College of Emergency Physicians

**Academic and Professional Appointments:**

| | |
|---|---|
| Acting Managing Director<br>Mississippi Poison Control Center<br>University of Mississippi Medical Center | 2005 – present |
| Professor<br>Department of Emergency Medicine<br>University of Mississippi Medical Center | 2004 – present |
| Medical Director<br>Mississippi Poison Control Center<br>University of Mississippi Medical Center | 2002 – present |
| Associate Chair<br>Department of Emergency Medicine<br>University of Mississippi Medical Center | 2001 - 2010 |
| Associate Professor<br>Department of Emergency Medicine (and)<br>Department of Pharmacology and Toxicology<br>University of Mississippi Medical Center | 1996 - 2004 |
| Director<br>Medical Toxicology Service<br>University of Mississippi Medical Center | 1996 - present |
| Assistant Professor<br>Section of Emergency Medicine<br>Department of Surgery (and)<br>Department of Pharmacology & Toxicology<br>Medical College of Georgia | 1991 - 1995 |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 4

Research Director                                       1991 - 1995
Section of Emergency Medicine
Medical College of Georgia

Senior Scientist                                              1983
Radian Corporation
Austin, TX

Staff Scientist                                              1980
Radian Corporation
Austin, TX

Research Chemist                                           1979
Analytical Chemistry Department
Gulf South Research Institute
New Orleans, LA

**Publications:**

1. Cox RD, Orledge J. Inadvertent poisoning of seven teenagers with monosodium methanearsonate. *Clin Toxicol* 2011, accepted for publication.

2. Cox RD, Nony PA, Liles CH. Summary of mortality due to diabetes and diabetes-related conditions in human PCB cohort studies. *Organohalogen Compd* 2010;72:64-67.

3. Cox RD, Nony PA. A quantitative method for polychlorinated dioxin/furan congener source comparisons. *Organohalogen Compd* 2010;72:61-63.

4. Cox RD, Hood A, Calcote T. Impact of pill identification calls on poison control center volume: Influence of a policy on controlled substances. *Clin Toxicol* 2010;48:643.

5. Cox RD, Kyle PB, Brackin B, Snazelle MS. Blood lead levels in Mississippi children. *J Miss Med Assoc* 2010;51:206-210.

6. Cox RD, Orledge J, Burns BA. Accidental poisoning with monosodium methanearsonate. *Clin Toxicol* 2009;47:711.

7. Cox RD. Burns, Chemical. eMedicine from WebMD. Updated December 03, 2009. Available at: http://emedicine.medscape.com/article/769336-overview.

8. Cox RD. HAZMAT. eMedicine from WebMD. Updated December 03, 2009. Available at: http://emedicine.medscape.com/article/764812-overview.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 5

9.  Cox RD, Amundson, T, Bracken B. Evaluation of the patterns of potentially toxic exposures in Mississippi following Hurricane Katrina. *Clin Toxicol* 2008;46:722-727.

10. Cox RD. Chemical Burns. in *Emergency Medicine On-Line*. Boston Medical Publishing Group, Boston, MA, 2008, (Chapter update).

11. Mills WJ, Nienow C, Swetman GLM, Cox R, Tondeur Y, Webber JP, Leblanc A. Lipids analysis as a significant, often unrecognized source of uncertainty in pops results for human blood. Organohalogen Compounds 2007;60:1158-1161.

12. Cox RD, Amundson T, Smith C, McKay K. Impact of Hurricane Katrina on Poison Control Center call volume and type. *Clin Toxicol* 2006;44:675-676.

13. Thompson JR, Mueller HW, Cox RD. Returns and recurrence for Bartholin's Cysts in an emergency department setting. *Ann Emerg Med* 2006;48:S49.

14. Cox RD. HAZMAT. in *Emergency Medicine On-Line*. Boston Medical Publishing Group, Boston, MA, 2006, (Chapter update).

15. Kolb JC, Cox RD, Jackson-Williams L, Nicholson S. Incidence of acute neurological abnormalities associated with hyperglycemia. *Ann Emerg Med* 2005;46:S71.

16. Cox RD, Kolb JC, Galli RL, Carlton FR, Cook AM. Evaluation of potential adverse health effects resulting from chronic domestic exposure to the organophosphate pesticide methyl parathion. *Clin Toxicol* 2005;43:243-253.

17. Cox RD. Chemical Burns. in *Emergency Medicine On-Line*. Boston Medical Publishing Group, Boston, MA, 2005, (Chapter update).

18. Cox RD, Phillips WJ. Ethylene glycol toxicity. *Military Med* 2004;169:660-663.

19. Cox RD, Koelliker DE, Bradley KG. Association between Droperidol use and sudden death in two patients intoxicated with illicit drugs. *Vet Human Toxicol* 2004;46:21-23.

20. Bradley KG, Cox RD. Acute upper-airway obstruction in a two-year-old child who ingested an herbicide preparation. *J Miss Med Assoc* 2004;45:98-101.

21. Cox RD. Use patterns for a university hospital-based medical toxicology service. *J Toxicol / Clin Toxicol* 2003;41:677-678.

22. Cox RD. Comparison of urinary paranitrophenol and plasma/RBC cholinesterase measurements in the evaluation of domestic methylparathion exposure. *J Toxicol / Clin Toxicol* 2003;41:736-737.

23. Kolb JC, Carlton FB, Cox RD, Summers RL. Blunt trauma in the obstetric

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 6

patient: monitoring practices in the ED. *Am J Emerg Med* 2002;20:524-527.

24. Kolb JC, Keith JC, Cox RD, Rock WA. A computerized medical record can enhance enrollment in prospective studies. *Acad Emerg Med* 2002;9:396.

25. Kolb JC, Flowers M, Cox RD. Enhanced radiological clinical information with a computerized charting system. *Acad Emerg Med* 2002;9:420-21.

26. Cox RD, Krupnick JE, Bush SM, Houpt A. Seizures caused by concomitant use of lindane and dextroamphetamine in a child with attention deficit hyperactivity disorder. *J Miss Med Assoc* 2000;41:690-692.

27. Gitter MF, Cox RD. Clonidine overdose in an adolescent patient. *J Miss Med Assoc* 2000;41:757-759.

28. Cox RD, Summers RL. Quantitative Comparison of fluoride neutralization potential of various hydrofluoric acid burn therapies. *Ann Emerg Med* 1999;34:S54.

29. Cox RD, Galli RL, Kolb JC, Carlton FR, Houpt AM. Evaluation of adverse health effects from domestic methylparathion exposure. *Toxicol Sci* 1999;48:1187.

30. Kolb JC, Cox RD, Galli RL, Carlton FR, Houpt AM. Impact of domestic methylparathion exposure on children's health. *Toxicol Sci* 1999;48:1188.

31. Galli RL, Cox RD, Kolb JC, Carlton FR, Houpt AM. The utility of plasma and RBC cholinesterase measurements in the evaluation of chronic organophosphate toxicity. *Toxicol Sci* 1999;48:1189.

32. Krupnick JE, Cox RD, Summers RL. Injuries sustained during competitive whitewater paddling: a survey of athletes in the 1996 Olympic trials. *Wilderness and Environmental Medicine* 1998;9:14-18.

24. Kolb JC, Carlton FB, Cox RD, Summers RL. Evaluation of the obstetric trauma patient: a survey of teaching programs. *Ann Emerg Med* 1997;30:399.

25. Hughes M, Brackin B, Cox R, Hotchkiss R, Hume A. Illegal use of methylparathion. *J Toxicol / Clin Toxicol* 1997;35:517

26. Cox RD. HAZMAT. in *Emergency Medicine On-Line*. Boston Medical Publishing Corp, Boston, MA, 1997.

27. Cox RD, Brooks J. Chemical Burns. in *Emergency Medicine On-Line*. Boston Medical Publishing Group, Boston, MA, 1997.

28. Cox RD, Slott ER. Organic solvents: contribution to indoor air pollution. in *Indoor Air Pollution*, EJ Bardana, A Montanaro, eds, Marcel Dekker Inc, New York, 1995.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 7

29. Cox RD. Decontamination and management of hazardous materials exposure
    victims in the emergency department. in The 1996 Year Book of
    Occupational and Environmental Medicine, EA Emmett, AL Frank, eds,
    Mosby, Chicago, IL, 1995

30. Cox RD, Crawford T, Frumkin H, Looney BB, Manning RO, Santerre C.
    *Analysis of Environmental and Medical Data Concerning the Health
    Implications of Potential Toxic Chemical Exposure in the Virginia and Hyde
    Park Area, Richmond County, Georgia.* prepared for the Governor of the
    State of Georgia and the Governor's Task Force for Southern Wood
    Piedmont Residents, Richmond County Health Department, Augusta,
    Georgia, 1995.

31. Cox RD, Osgood KA. Evaluation of intravenous magnesium sulfate for
    the treatment of hydrofluoric acid burns. *J Toxicol / Clin Toxicol*
    1994;32:123-136.

32. Cox, RD, Wagner M, Woolard DJ. Infants and children with fever without
    source. *Ann Emerg Med* 1994;23:598 (letter).

33. Cox RD. Decontamination and management of hazardous materials
    exposure victims in the emergency department. *Ann Emerg  Med*
    1994;23:761-770.

34. Holp DL, Hobbs E, Cox RD. Incidence of drug interactions in elderly
    patients in the emergency department. *Ann Emerg Med*  1994;23:916

35. Cox RD, Manning RO. *Summary and Analysis of Soil Sampling for
    Neighborhoods Near the Southern Wood Piedmont Site, Augusta, Georgia.*
    State of Georgia Governor's Task Force for Southern Wood Piedmont
    Residents, Richmond County Health Department, Augusta, Georgia, 1993.

36. Cox RD and Bayer M. A toxicologic approach to the diagnosis of
    occupational lung disease. *Immunol Allergy  Clin N Amer* 1992;12:749-768.

37. Smiley RS, Koehler G, Cox RD, et al. *Hazardous Materials Medical
    Management Protocols.* State of California Emergency Medical Services
    Authority, Sacramento CA, 1991; EMSA #231.

38. Cox RD, Steinmetz JI, Lewis DL, Wetherold RG. *Evaluation of VOC
    (Volatile Carbon) Emissions from Wastewater Systems (Secondary
    Emissions).* 1984; EPA-600/2-84-080, PB84-173780 .

39. Cox RD. Sample collection and analytical techniques for volatile organics in
    air. in *Measurement and Monitoring of Non-Criteria (Toxic) Contaminants
    in Air* , Air Pollution Control Association, Pittsburgh, PA 1983;101.

40. Reinhardt JW, Boyer DB, Frank CW, Cox RD, Gay DD. Exhaled mercury
    following removal and insertion of amalgams. *J Prosthetic Dentistry*
    1983;49:652-656.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 8

41. Earp RF, Cox RD. Identification of organics in ambient air using multiple gas chromatographic detectors. Chapt 10 in *Identification and Analysis of Organic Pollutants in the Air* , L Keith ed, Ann Arbor Science Publishers Inc., Ann Arbor, MI 1983;159.

42. Lee KW, Cox RD, Earp RF. A purge and cryogenic trapping technique used to correlate ambient air organics with wastewater emissions. Chapt 14 in *Identification and Analysis of Organic Pollutants in the Air*, L Keith, ed, Ann Arbor Science Publishers, Inc., Ann Arbor, MI, 1983;231.

43. Lewis DL, Cox RD, Lee KW. Specialized quality assurance for measurement of volatile organics in the environment. in *Measurement and Monitoring of Non-Criteria (Toxic) Contaminants in Air* , Air Pollution Control Association, Pittsburgh, PA, 1983;268

44. Cox RD, Baughman KJ, Earp RF. A generalized screening and analysis procedure for organic emissions from hazardous waste disposal sites. In *Management of Uncontrolled Hazardous Waste Sites - 1982* , Hazardous Materials Control Research Institute, Silver Spring, MD, 1982;58-62.

45. Schmidt CE, Balfour WD, Cox RD. Sampling techniques for emission measurements at hazardous waste sites. in *Management of Uncontrolled Hazardous Waste Sites -1982*, Hazardous Materials Control Research Institute, Silver Spring, MD, 1982;334-339.

46. Cox RD, Balfour WD, Langley GL. Quality control for ambient level hydrocarbon sampling and analysis. in *Proceedings of the 75th Annual Meeting of the Air Pollution Control Association* , Air Pollution Control Association, Pittsburgh, PA, 1982;No 82-232

47. Cox RD, Earp RF. Determination of trace level organics in ambient air by high resolution gas chromatography with simultaneous photoionization and flame ionization detection. *Anal Chem* 1982;54:2265-2270.

48. Cox RD, Frank CW. Rapid determination of nitrate and nitrite in blood and urine by chemiluminescence. *J Analyt Toxicol* 1982;6:148-152.

49. Cox RD, Frank C W. Determination of total N-nitroso content in cutting fluids. *Anal Chem* 1982;54: 557-559.

50. Cox RD, Nikolaisen L, Caputo RE, Frank CW. A Screening procedure for the determination of total N-Nitroso content in urine. *Anal Chem* 1982;54:253-256.

51. Cox RD, McDevitt MA, Tannahill GK, Lee KW. Determination of low levels of total nonmethane hydrocarbon content in ambient air. *Environ Sci Technol* 1982;16:57-61.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 9

52. Gebhart JE, Ryan JF, Cox RD, Pellizzari ED, Michael LC, Sheldon LS. The master analytical scheme: development of effective techniques for isolation and concentration of organics in water. in *Advances in the Identification and Analysis of Organic Pollutants in Water* , L Keith ed, Ann Arbor Science Publishers Inc., Ann Arbor, MI, 1981;31-48.

53. Svare CW, Peterson LC, Reinhardt JW, Boyer DB, Frank CW, Gay DD, Cox RD. The effect of dental amalgams on mercury levels in expired air. *J Dental Research* 1981;60:1668-1671.

54. Cox RD, Lee KW, Tannahill GW, Williamson HJ. *Collection and Analysis of Nonmethane Hydrocarbon Transport Data: Louisville, KY and Nashville, TN Ozone Study* 1981;EPA-904/9-80-005, PB81-152910

55. Cox RD. Determination of nitrate and nitrite at the parts per billion level by chemiluminescence. *Anal Chem* 1980;52:332.

56. Reinhardt JW, Boyer DB, Gay DD, Cox RD, Frank CW, Svare CW. Mercury vapor expired after restorative treatment: preliminary study. *J Dental Research* 1979;58:2005.

57. Gay DD, Cox RD, Reinhardt JW: Chewing releases mercury from fillings. *Lancet* 1979;1(8123):985-986 (letter).

**Hospital Documents:**

1. Cox RD. 2009 Service Summary for the Mississippi Poison Control Center, University of Mississippi Medical Center, 20010.

2. Cox RD. 2008 Service Summary for the Mississippi Poison Control Center, University of Mississippi Medical Center, 2009.

3. Cox RD. 2007 Service Summary for the Mississippi Poison Control Center, University of Mississippi Medical Center, 2008

4. Cox RD. 2006 Service Summary for the Mississippi Poison Control Center, University of Mississippi Medical Center, 2007

5. Cox RD. 2005 Service Summary for the Mississippi Poison Control Center, University of Mississippi Medical Center, 2006

6. Cox RD. 2004 Summary of Emergency Department Outpatient Transfer Calls, University of Mississippi Medical Center, 2005.

7. Cox RD. 2003 Summary of Emergency Department Outpatient Transfer Calls, University of Mississippi Medical Center, 2004.

8. Cox RD. 2002 Summary of Emergency Department Outpatient Transfer Calls, University of Mississippi Medical Center, 2003.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 10

9. Cox RD. 2001 Summary of Emergency Department Outpatient Transfer Calls, University of Mississippi Medical Center, 2002.

10. Cox RD. Hazardous Materials Exposure Medical Response Plan. University of Mississippi Medical Center, 2001.

11. Vaughn CA, Phillips WJ, Cox RD. University Medical Center Procedural Sedation Protocol, University of Mississippi Medical Center, 2001.

12. Cox RD. 2000 Summary of Emergency Department Outpatient Transfer Calls, University of Mississippi Medical Center, 2001.

13. Cox RD. 1999 Summary of Emergency Department Outpatient Transfer Calls, University of Mississippi Medical Center, 2000.

14. Cox RD. Medical Disaster Response Plan. University of Mississippi Medical Center, 1998.

15. Cox RD. Protocol for the Use of Fentanyl for Procedural Sedation in the Adult Emergency Department. University of Mississippi Medical Center, 1998.

16. Cox RD. Protocol for the Use of IV N-Acetylcysteine for the Treatment of Acetaminophen Toxicity. University of Mississippi Medical Center, 1998.

17. Cox RD. Hazardous Materials Disaster Preparedness Plan. Medical College of Georgia, 1993.

**Presentations:**

**Research Presentations:**

1. Moriarity RS, Cox RD, Nony PA. Mortality due to diabetes-related conditions in human PCB cohort studies. presented at the Global Obesity Summit 2010, Jackson, MS, November, 2010. No 56.

2. Cox RD, Hood A, Calcote T. Impact of pill identification calls on poison control center volume: Influence of a policy on controlled substances. presented at the 2010 North American Congress of Clinical Toxicology Annual Meeting, Denver, CO, October, 2010. No 189.

3. Cox RD, Nony PA, Liles CH. Summary of mortality due to diabetes and diabetes-related conditions in human PCB cohort studies. presented at Dioxin 2010-30[th] International Symposium on Halogenated Persistent Organic Pollutants (POPs), San Antonio, TX, September, 2010. No 314.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 11

4.  Cox, RD, Nony, PA. A quantitative method for polychlorinated dioxin/furan congener source comparisons. presented at Dioxin 2010-30[th] International Symposium on Halogenated Persistent Organic Pollutants (POPs), San Antonio, TX, September, 2010. No 245.

5.  Cox RD, Orledge J, Burns BA. Accidental poisoning with monosodium methanearsonate. presented at the 2009 North American Congress of Clinical Toxicology Annual Meeting, San Francisco, CA, September, 2009. No 47.

6.  Mills WJ, Nienow C, Swetman GLM, Cox R, Tondeur Y, Webber JP, Leblanc A. Lipids analysis as a significant, often unrecognized source of uncertainty in pops results for human blood. presented at Dioxin 2007-27[th] International Symposium on Halogenated Persistent Organic Compounds, Tokyo, Japan, September, 2007.  Paper number 91019.

7.  Cox RD, Amundson T, Smith C, McKay K. Impact of Hurricane Katrina on Poison Control Center call volume and type. presented at the 2006 North American Congress of Clinical Toxicology Annual Meeting, San Francisco, CA, September, 2006. No 103.

8.  Thompson JR, Mueller HW, Cox RD. Returns and recurrence for Bartholin's Cysts in an emergency department setting. presented at the 2006 American College of Emergency Physicians ACEP Research Forum, New Orleans, LA, October 2006.  No. 155.

9.  Finley RW, Goddard J, Raoult D, Eremeeva ME, Cox RD, Paddock CD. *Rickettsia parkeri*: A case of tick-borne, eschar-associated spotted fever in Mississippi. presented at the International Conference on Emerging Infectious Diseases, Atlanta, Georgia, March, 2006.  No. 188.

10. Kolb JC, Cox RD, Jackson L, Nicholson S. Incidence of acute neurologic abnormalities associated with hyperglycemia. presented at the 2005 American College of Emergency Physicians Scientific Assembly, Washington, DC, September, 2005. No. 253.

11. Cox RD. Comparison of urinary paranitrophenol and plasma/RBC cholinesterase measurements in the evaluation of domestic methylparathion exposure. presented at the 2003 North American Congress of Clinical Toxicology Annual Meeting, Chicago, IL, September, 2003, No. 228.

12. Cox RD. Use patterns for a university hospital-based medical toxicology service. presented at the 2003 North American Congress of Clinical Toxicology Annual Meeting, Chicago, IL, September, 2003, No. 89.

13. Flowers WM Jr., Lawhon NC, Kays RK, Habig GH, Wallace S, Stephens S, Thompson J, Cox RD, Kolb JC.  Performance Improvement by a Radiology/Emergency Department Team. presented at  the Southern Medical Association 96th Annual Scientific Assembly, Washington DC, November, 2002.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 12

14. Kolb J, Cox R, Summers R. Interobserver Reliability of Well's Criteria Using a Checksheet. presented at the 2002 American College of Emergency Physicians Scientific Assembly, Seattle, WA, October, 2002, No. 100.

15. Kolb J, Cox R, Jackson L. Focal Neurologic Changes in Hyperglycemia. presented at the 2002 American College of Emergency Physicians Scientific Assembly, Seattle, WA, October, 2002, No. 278.

16. Kolb J, Cox R, Reed S. Emergency Department Patient Accuracy of Subjective Fever. presented at the 2002 American College of Emergency Physicians Scientific Assembly, Seattle, WA, October, 2002, No. 97.

17. Kolb J, Cox R, Rock W, Summers R. Reliability of Rapid D-Dimer ELISA in Urban Predominantly African American Emergency Department. presented at the 2002 American College of Emergency Physicians Scientific Assembly, Seattle, WA, October, 2002, No. 94.

18. Cox RD, Summers RL. Quantitative Comparison of fluoride neutralization potential of various hydrofluoric acid burn therapies. presented at the 1999 Scientific Assembly for the American College of Emergency Physicians, Las Vegas, NV, 1999, No. 209.

19. Cox RD, Galli RL, Kolb JC, Carlton FR, Houpt AM. Evaluation of Adverse Health Effects From Domestic Methylparathion Exposure. presented at the 38th Annual Meeting of the Society of Toxicology, New Orleans, LA March, 1999, Paper No. 1187.

20. Kolb JC, Cox RD, Galli RL, Carlton FR, Houpt AM. Impact of Domestic Methylparathion Exposure on Children's Health. presented at the 38th Annual Meeting of the Society of Toxicology, New Orleans, LA March, 1999, Paper No. 1188.

21. Galli RL, Cox RD, Kolb JC, Carlton FR, Houpt AM. The Utility of Plasma and RBC Cholinesterase Measurements in the Evaluation of Chronic Organophosphate Toxicity. presented at the 38th Annual Meeting of the Society of Toxicology, New Orleans, LA March, 1999, Paper No. 1189.

22. Kolb JC, Carlton FB, Cox RD, Summers RL:  Evaluation of the Obstetric Trauma Patient:  A Survey of Teaching Programs. presented at the 1997 Scientific Assembly for the American College of Emergency Physicians, San Francisco, CA, 1997, No. 94.

23. Hughes M, Brackin B, Cox R, Hotchkiss R, Hume A. Illegal Use of Methylparathion. presented at the 1997 North American Congress of Clinical Toxicology, St. Louis, MO, September, 1997, No. 88.

24. Holp DL, Hobbs E, Cox RD. Incidence of drug interactions in elderly patients in the emergency department. presented at 1993 National Meeting of the Society of Academic Emergency Medicine, San Francisco, CA, May 1993, Paper No. 112.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 13

25. Cox RD, Osgood KA. Evaluation of intravenous magnesium sulfate and intradermal calcium gluconate for the treatment of acute hydrofluoric acid dermal burns. presented at the 1993 Scientific Assembly for the American College of Emergency Physicians, Chicago, IL, October 1993.

26. Cox RD. Sample collection and analytical techniques for volatile organics in air presented at the APCA International Specialty Conference on: *Measurement and Monitoring of Non-Criteria (Toxic) Contaminants in Air* Chicago, IL, March, 1983.

27. Lewis DL, Cox RD, Lee KW. Specialized quality assurance for measurement of volatile organics in the environment. presented at the APCA International Specialty Conference on: *Measurement of Non-Criteria (Toxic) Contaminants in Air* Chicago, IL, March, 1983.

28. Cox RD, Baughman KJ. A generalized screening and analysis procedure for organic emissions from hazardous waste disposal sites. presented at the 3rd National Conference and Exhibition on: *Management of Uncontrolled Hazardous Waste Sites* Washington, DC, November, 1982.

29. Schmidt CE, Balfour WD, Cox RD. Sampling techniques for emission measurements at hazardous waste sites. presented at the 3rd National Conference and Exhibition on: *Management of Uncontrolled Hazardous Waste Sites* , Washington, DC, November, 1982.

30. Cox RD, Lee KW, Earp RF. A purge and cryogenic trapping technique used to correlate ambient air organics with wastewater emissions. presented at the 184th National Meeting of the American Chemical Society, Kansas City, MO, September, 1982, Paper No ENVR-044.

31. Earp RF, Cox RD, Lee KW. Identification of organics in ambient air using multiple gas chromatographic detectors presented at the 184th National Meeting of the American Chemical Society, Kansas City, MO, September 1982, Paper No ENVR-045.

32. Cox RD, Langley GJ, Balfour DF. Quality assurance for ambient level hydrocarbon sampling and analysis. presented at the 1982 National Meeting of the Air Pollution Control Association, New Orleans, LA, June 1982, Paper No. 82-232.

33. McDevitt MA, Cox RD, Earp RF. Part per billion level determination of C2-C10 hydrocarbon species in ambient air. presented at the 33rd Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Atlantic City, NJ, March 1982, Paper No. 781.

34. Cox RD, Lee KW, Earp RF. Simultaneous use of photoionization (PID) and flame ionization (FID) detection for ambient air hydrocarbon analysis. presented at the 33rd Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Atlantic City, NJ, March 1982, Paper No. 782.

35. Cox RD, Ogle LD, Lee KW. Design and development of a sampling system

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 14

for trace level organic species in ambient air using multicomponent sorbent traps. presented at the 33rd Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Atlantic City, NJ, March 1982, Paper No. 545.

36. Brennan ST, Frank CW, Cox RD. Nitrate, nitrite and N-nitrosamines in animal feeds. presented at the 32nd Pittsburgh Conference on Analytical Chemistry and applied Spectroscopy, Atlantic City, NJ, March 1981, Paper No. 373.

37. Brennan ST, Frank CW, Cox RD. Determination of nitrate and nitrite in atmospheric particulate. presented at the 32nd Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Atlantic City, NJ, March 1981, Paper No. 374.

38. Williams CH, Lewis DS, Ogle LD, Lee KW, Cox RD. Thermal desorption or solvent extraction of tenax resin for the trace analysis of C6-C20 organic pollutants in air. presented at the 3rd Annual Utah Conference on Industrial Hygiene, Salt Lake City, UT, October 1980.

39. Gebhart JE, Cox RD, Ryan JF. The master analytical scheme: development of effective techniques for isolation and concentration of organics in water. presented at the 2nd Chemical Congress of the North American Continent symposium on: *Advances in the Identification and Analysis of Organic Pollutants in Water,* San Francisco, CA, August 1980.

40. Nikolaisen L, Cox RD, Frank CF. A practical method for the determination of N-nitrosamines in urine. presented at the 31st Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Atlantic City, NJ, March 1980, Paper No. 351.

41. Cox RD, Frank CW. Rapid determination of nitrate in blood and urine. presented at the 31st Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Atlantic City, NJ, March 1980, Paper No. 521.

42. Cox RD, Frank CW. Determination of total N-nitrosamines in cutting oils. presented at the 30th Pittsburgh Conference on analytical Chemistry and Applied Spectroscopy, Cleveland, OH, March 1979, Paper No. 482.

43. Cox RD. The determination of nitrate and nitrite at the parts per billion level" presented at the 30th Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, Cleveland, OH, March 1979, Paper No. 483.

**Invited Lectures:**

1. "Interpretation of Drug and Alcohol Screens". Presented to the Mississippi Board of Nursing, Jackson, MS. April, 2009.

2. "Surveillance of Lead Levels in Mississippi Children". Presented at the Lead

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 15

and Healthy Homes Meeting, Mississippi State Department of Health, Jackson, MS. June, 2008.

3. "Prevalence of Elevated Blood Lead Levels in Mississippi Children". Presented to the Lead Advisory Committee, Mississippi State Department of Health and the Centers for Disease Control and Prevention, Jackson, MS. November, 2007.

4. "Taking a Medical History for Agricultural Occupations". Presented at the Agromedicine Safety and Health Summit, Stoneville, MS, March 2007.

5. "Potential Chemical Agents of Terrorism". Presented to the Mississippi Association of Public Health Physicians, Jackson, MS, 2005.

6. "Interpretation of Alcohol Levels and Urine Drug Screens". Presented to AMFED Companies, Madison, MS, 2005.

7. "Cyanides and Fumigating Agents as Potential Agents of Chemical Terrorism". presented at the ATSDR/ACMT Symposium on Chemical Agents of Opportunity, University of Alabama School of Medicine, Birmingham, AL, 2004.

8. "Cyanides and Fumigating Agents as Potential Agents of Chemical Terrorism". presented at the ATSDR/ACMT Symposium on Chemical Agents of Opportunity, The Second Mediterranean Emergency Medicine Congress, Barcelona, Spain, September, 2003.

9. Moderator, Disaster Medicine: Emergency Medicine/Disaster Medicine Thesis Presentations. The Second Mediterranean Emergency Medicine Congress, Barcelona, Spain, September, 2003.

10. "Ketamine for Procedural Sedation". presented at Procedural Sedation for the Non-Anesthesiologist, July, 2001.

11. "Evaluation of the Sick Child". presented at Update in Emergency Medicine, Jackson, MS, 1999.

12. "Basic Management of the Overdose Patient". presented at the 1999 Nurse Practitioner Update, Jackson, MS, June, 1999.

13. "Evaluation of Potential Adverse Health Effects from Domestic Malathion Exposure". presented at the North Texas Poison Center Clinical Toxicology Lecture Series, Dallas, TX, April, 1999.

14. "Acetaminophen Toxicity", presented at the University of Mississippi Continuing Education Symposium on Medical Toxicology, Jackson, MS, April, 1998.

15. "The Chemically-Altered Trauma Patient", presented at the Medical College of Georgia Multiple Trauma Symposium, Augusta, Georgia, Sept., 1995.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 16

16. "Management of Hazardous Materials Exposure Victims", presented at Grand Rounds, Department of Emergency Medicine, University of Mississippi, Jackson, Mississippi, April, 1995.

17. "An Emergency Department Protocol for Management of Hazardous Materials Exposure Victims", presented at the Medical College of Georgia Multiple Trauma Symposium, Augusta, Georgia, Sept., 1993.

18. "Prehospital Management of Hazardous Materials Exposure Victims", presented at the Georgia Changes Symposium for Emergency Care Providers, Augusta, Georgia, March, 1993.

19. "Management of Hazardous Materials Exposure Victims", presented at the Toxicology Seminar, Department of Pharmacy, University of Georgia, Athens, Georgia, Nov., 1992.

**Patents:**

1. Cox RD, Frank CW. Method for determination of nitrate and nitrite. US Patent No 4412006, October, 1983.

2. Frank CW, Nord PJ, Cox RD. Method for composition and determination of N-nitrosamines. US Patent No 4256462, March, 1981.

**Software authored:**

1. Cox, RD, Program for Extracting Performance Improvement Data from Combined Cerner EMStation and Patient Tracking Databases. Jackson, MS, 2008.

2. Cox RD, Perry A. Mississippi Poison Control Center Internet Site. http://poisoncontrol.umc.edu 2006.

3. Cox RD. Hospital Antidote and Disaster Preparedness Database. (FileMaker Pro) 2005.

4. Cox RD. Emergency Medicine Resident Procedure Log. Allows importation and categorization of procedures from EMStation to a separate database and separate resident procedure entry for non-ED procedures, to meet RRC requirements, (Microsoft Access). University of Mississippi Medical Center, Jackson, MS, 2000, updated 2002, updated 2003.

5. Cox RD. Emergency Medicine Resident Follow-up Log. Allows storage and access of resident follow-up cases to meet RRC requirements, (Microsoft Access). University of Mississippi Medical Center, Jackson, MS, 2000, updated 2002, updated 2003.

6. Cox RD. Customization for Vitalworks Emergency Medicine Physician Documentation Software for the Teaching Hospital Environment, (Microsoft

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 17

SQL). University of Mississippi Medical Center, Jackson, MS, 2000, updated 2001, updated 2002, updated 2003.

7. Cox RD. Performance Improvement Program for using Vitalworks Emergency Medicine Physician Documentation Software in the Teaching Hospital Environment, (Microsoft Access). University of Mississippi Medical Center, Jackson, MS, 2000, updated 2001.

8. Cox RD. Patient Transfer Database (FileMaker Pro). University of Mississippi Medical Center, Jackson, MS, 1999.

9. Cox RD, Houpt AM. Department of Emergency Medicine, University of Mississippi Medical Center Internet Site. http://emergencymedicine.umc.edu 1998, updated 1999 - 2002.

10. Cox RD, Cox DM. Emergency Nursing Performance Improvement Software (Microsoft Excel). University of Mississippi Medical Center, Jackson, MS, 1998; updated 1999.

11. Cox RD. Fast-Track Patient Volume and Time to Treatment Database (Microsoft Excel). University of Mississippi Medical Center, Jackson, MS, 1998.

12. Cox RD. Emergency Department Patient Log and Time to Treatment Database (Microsoft Excel). University of Mississippi Medical Center, Jackson, MS, 1998.

13. Cox RD. Emergency Department Chart Tracking Program (Microsoft Excel). University of Mississippi Medical Center, Jackson, MS, 1998.

14. Cox RD. Emergency Medicine Residency Procedure Log (Microsoft Excel). University of Mississippi Medical Center, Jackson, MS 1997; network update 1998.

15. Cox RD. Emergency Medicine Residency Conference Attendance Database (Microsoft Excel). Medical College of Georgia, Augusta, GA 1994, updated for University of Mississippi Medical Center, Jackson, MS, 1997; network update 1998.

16. Cox RD. Acetaminophen Kinetics, Nomogram and Treatment Program (Microsoft Excel). University of Mississippi Medical Center and Mississippi Regional Poison Control Center, Jackson, MS, 1998.

17. Cox RD. Cardiac Ischemia Risk Predictive Instrument (Microsoft Excel). University of Mississippi Medical Center, Jackson, MS 1997; network update 1998.

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 18

18. Cox RD. Schedule Tracking and Preparation Software for Emergency
    Medicine (Microsoft Excel).. Medical College of Georgia, Augusta, Georgia,
    1993; updated 1994; updated for the University of Mississippi Medical
    Center, Jackson, MS, 1997.

19. Cox RD. Environmental Chemical Data Mapping Software. Governor's Task
    Force for Assessment of Health Needs of Southern Wood Piedmont
    Residents (Microsoft Excel)., Augusta, Georgia, 1993.

20. Cox RD. Software for Gas Chromatographic Peak Identification Using Dual
    Flame Ionization and Photoionization Detectors (Basic). Radian Corporation,
    Austin, TX, 1982.

**Other Activities and Appointments:**

**Administrative Appointments:**

| | |
|---|---|
| 2007 – 2008 | Chair<br>Agromedicine Committee<br>University of Mississippi Medical Center |
| 2005 – present | Acting Managing Director<br>Mississippi Poison Control Center<br>University of Mississippi Medical Center |
| 2002 – present | Medical Director<br>Mississippi Poison Control Center<br>University of Mississippi Medical Center |
| 2000 – present | Project Director<br>EMStation Clinical Documentation System<br>Department of Emergency Medicine<br>University of Mississippi Medical Center |
| 2000 – 2002 | Chair<br>Pharmacy and Therapeutics Committee<br>University of Mississippi Medical Center |
| 1998 – 2002 | Performance Improvement Director<br>Department of Emergency Medicine<br>University of Mississippi Medical Center |
| 1997 – 2004 | Compliance Officer<br>Department of Emergency Medicine<br>University of Mississippi Medical Center |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 19

| | |
|---|---|
| 1997 – present | Director<br>Medical Toxicology Service<br>University of Mississippi Medical Center |
| 1995 | Medical Advisor<br>Richmond County Emergency Management Agency<br>Augusta, Georgia |
| 1995 | Medical Advisor<br>Medical College of Georgia Public Safety Division<br>Augusta, Georgia |
| 1993 - 1995 | Chair<br>Subcommittee for Technical Evaluation of Environmental Data<br>for the Governor's Task Force for Assessment of Health Needs<br>of Southern Wood Piedmont Residents<br>Augusta, Georgia |

**Committee Assignments**

National:

| | |
|---|---|
| 2003 – present | Council of Medical Directors<br>American Association of Poison Control Centers |
| 2003 – 2004 | National Advisory Committee for Acute<br>Exposure Guideline Levels for Hazardous Substances<br>American College of Medical Toxicology/US Environmental<br>Protection Agency |
| 2002 – 2004 | Chemical/Bioterrorism Preparedness Committee<br>American College of Medical Toxicology |
| 1994 - 1995 | Independent Review Panel<br>Human Radiation Experimentation Research<br>at the DOE Savannah River Site<br>US Department of Energy |
| 1994 - 1995 | Peer Review Board<br>Consolidated Incineration Facility Heath Risk Assessment at the<br>DOE Savannah River Site<br>US Department of Energy |

State:

| | |
|---|---|
| 2006 - present | Childhood Lead Poisoning Prevention Advisory Board<br>Mississippi State Department of Health<br>Jackson, Mississippi |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 20

| | |
|---|---|
| 2002, 2006 | The Mississippi Pesticide Advisory Task Force<br>Jackson, Mississippi |
| 1992-1995 | Task Force<br>State of Georgia Governor's Task Force for Assessment of<br>Health Needs of Southern Wood Piedmont Residents<br>Augusta, Georgia |
| 1992 - 1995 | Advisory Board<br>Georgia Environmental Technologies Consortium,<br>Georgia Research Alliance |
| 1992 - 1995 | Advisory Committee<br>Georgia Hazardous Waste Trust Fund,<br>Georgia Environmental Protection Division,<br>Georgia Department of Natural Resources |
| 1989 - 1991 | Advisory Committee on Hazardous Materials,<br>State of California Emergency Medical Systems |

Institutional:

| | |
|---|---|
| 2007 – present | Pharmacy and Therapeutics Committee<br>University of Mississippi Medical Center |
| 2005 – 2006 | Public Health Project Tracking and Liaison Committee<br>University of Mississippi Medical Center |
| 1997 - 2002 | Pharmacy and Therapeutics Committee<br>University of Mississippi Medical Center |
| 1996 – 2001, 2003 | Disaster Preparedness Committee<br>University of Mississippi Medical Center |
| 1993 - 1995 | Toxic and Hazardous Materials/Chemical Carcinogens<br>Committee, Medical College of Georgia |

**Other Positions Held:**

| | |
|---|---|
| 1989 - 1991 | Emergency Physician<br>Southern California Kaiser Permanente Medical Group<br>Woodland Hills Hospital, Woodland Hills, CA |
| 1986 - 1987 | Extern<br>Labor and Delivery Department,<br>Parkland Memorial Hospital, Dallas, TX |
| 1984 | Chilton Research Fellow<br>Biochemistry Department<br>University of Texas Health Science Center<br>Dallas, TX |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 21

|  | |
|---|---|
| 1978 - 1979 | Project Manager<br>East Kentucky Power Environmental Impact Project<br>Institute of Agricultural Medicine<br>University of Iowa, Oakdale, IA |
| 1978 - 1979 | Private Consultant<br>Water Quality Management Incorporation, Corralville, IA, John<br>Deere Corporation, Dubuque, IA,<br>3M Corporation, Minneapolis, MN |

**Journal Peer Review Staff**

| | |
|---|---|
| 2004 – 2010 | Journal of Toxicology/Clinical Toxicology |
| 2009-2010 | Medical Toxicology |
| 2005 | Environmental Pollution |
| 2005 | Environmental Health Perspectives |
| 2004 – 2006 | Medical Sciences |
| 1981 – 1983 | Analytical Chemistry |

**Research And Training Grants Awarded:**

| | |
|---|---|
| 2010 | Project Director<br>Poison Control Center Upgrade Grant<br>Health Resources Services Administration, $262,856 |
| 2010 | Principal Investigator<br>Real Time Disease Detection<br>The Mississippi State Department of Health, Department of<br>Epidemiology and the Centers for Disease Control and<br>Detection, $250,000 |
| 2009 | Project Director<br>Poison Control Center Upgrade Grant<br>Health Resources Services Administration, $248,000 |
| 2009 | Principal Investigator<br>Real Time Disease Detection<br>The Mississippi State Department of Health, Department of<br>Epidemiology and the Centers for Disease Control and<br>Detection, $250,000 |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 22

| | |
|---|---|
| 2008 | Principal Investigator<br>Real Time Disease Detection<br>The Mississippi State Department of Health, Department of Epidemiology and the Centers for Disease Control and Detection, $253,403. |
| 2006 | Principal Investigator<br>Poison Control Center, Emergency Planning and Response<br>The Mississippi State Department of Health, Office of Emergency Preparedness and Response, funded through the Department of Homeland Security and HRSA, $550,000. |
| 2005 | Principal Investigator<br>Poison Control Center, Emergency Planning and Response<br>The Mississippi State Department of Health, Office of Emergency Preparedness and Response, funded through the Department of Homeland Security and HRSA, $600,000. |
| 2004 | Principal Investigator<br>Emergency Bioterrorism Preparedness Grant for the Mississippi Regional Poison Control Center<br>The Mississippi State Department of Health, Office of Emergency Preparedness and Response, funded through HRSA and the Department of Homeland Security, $600,000. |
| 1997 | Principal Investigator<br>Investigation of Human Health Effects Resulting from Domestic Exposure to Methylparathion,<br>The University of Mississippi Medical Center, $100,000. |
| 1994 | Principal Investigator<br>Establishment of the Georgia Toxicology Center of Excellence, Research Equipment Grant,<br>Georgia Environmental Technology Consortium,<br>Georgia Research Alliance, $216,945. |
| 1994 | Independent Review Panel<br>Human Radiation Experimentation Search at the DOE Savannah River Site, US Department of Energy, Environmental Research and Development Association, $5,000. |
| 1994 | Peer Review Board Member<br>Heath Risk Assessment for the Consolidated Incineration Facility at the Savannah River Site, US Department of Energy, Environmental Research and Development Association, $36,538. |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 23

| | |
|---|---|
| 1993 | Principal Investigator
Evaluation of Health Risks and Public Concerns
Involving the Savannah River Site Consolidated Incinerator
Facility for Treatment of Mixed Hazardous Wastes,
US Department of Energy,
Environmental Research and Development Association, $30,921. |
| 1992 | Principal Investigator
Emergency Medicine Foundation Faculty Development Grant,
Evaluation of the Treatment of Hydrofluoric Burns with
Intravenous Magnesium Sulfate, $13,085;
Study of Gastric Volatilization and Inhalation of Hydrocarbons
Following Ingestion, $11,915,
Emergency Medicine Foundation. |
| 1982 | Principal Investigator
Development of Hazard Recognition Guidelines
for the NIOSH Hazardous Waste Occupational
Safety and Health Guidance Manual,
National Institute for Occupational Safety and Health,
$5,000. |
| 1981 | Program Director
Evaluation of VOC (Volatile Organic Carbon) Emissions from
Wastewater Systems - Secondary Emissions,
US Environmental Protection Agency, $63,500. |

**Teaching Activities:**

The University of Mississippi Medical Center

| | |
|---|---|
| 2005 - present | Advanced Disaster Life Support. Potential Chemical Agents of Terrorism, Bioterrorism Agents, Case Scenarios. Decontamination Procedures. |
| 2005 | Basic Disaster Life Support. Chemical Incidents. |
| 2004 – present | Didactic Lecture Series for 4th-year Medical Student Emergency Medicine Clerkship. Lectures include: Medical Management of the Poisoned Patient, Environmental Emergencies, Common Overdoses, Treatment of Common Infections. |
| 1997 - present | Medical Toxicology Rotation for Medical Students. Course Director. |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 24

| | |
|---|---|
| 1997 - present | Pharmacology for Medical and Graduate Students. PH620/722: Lectures include: Principles of Medical Management of Poisoned Patients, Medical Toxicology Clinical Correlation, Occupational and Environmental Toxicology, Common Drug Overdoses, Pesticides and Heavy Metal Toxicity, Chemical Warfare Agents, Spiders and Snakes, Toxic Syndromes. |
| 1996 - present | Medical Toxicology Series for Emergency Medicine Residents. Lectures include: Interpretation of Alcohol and Drug Screens, Cyanide Toxicity, Corrosive Agents, Toxic Alcohols, Cardiotoxic Agents-Cocaine, Evaluation and Treatment of the Poisoned Patient, Caustic Agents, Toxic Syndromes, Toxic Gases, Gastric Decontamination of the Poisoned Patient, Acetaminophen Toxicity-Mechanism and Treatment, Salicylate Toxicity and Treatment, Organophosphate Insecticide Toxicity, Toxicity of Herbicides and Fumigants, Hydrofluoric Acid Toxicity, Medical Management of Hazardous Materials Exposure Victims, Heavy Metal Toxicity, Food Poisoning, Iron Toxicity, Lithium Toxicity, Toxicity of Psychiatric Medications. |
| 1996 - present | Emergency Medicine Resident Lecture Series. Lectures include: Statistical Evaluation of Medical Studies, Medico-legal Aspects of Emergency Medicine, Disaster Medicine, Occult Bacteremia in Febrile Children, Evaluation of the Sick Child, HCFA Charting Guidelines. |

Medical College of Georgia:

| | |
|---|---|
| 1992 - 1995 | PHM 501: Introduction to Toxicology for Senior Medical Students. Lectures include: Medical Management of Overdose Patients, Hydrocarbon Ingestions, Toxic Syndromes, Acetaminophen Ingestions, Computer Databases in Toxicology. |
| 1992 - 1995 | PHM 551: Pharmacology for Medical and Graduate Students. Lectures include: Medical Toxicology Clinical Correlation. |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 25

| | |
|---|---|
| 1991 - 1995 | Medical Toxicology Series for Emergency Medicine Residents. Lectures include: Evaluation and Treatment of the Poisoned Patient, Acetaminophen Toxicity-Mechanism and Treatment, Iron Toxicity-Mechanism and Treatment, Lithium Toxicity-Renal Mechanism and Treatment, Cyclic Antidepressant Toxicity, Toxicity of Alcohols, Toxicity of Antiarrhythmics, Neuroleptic Malignant Syndrome, Organophosphate Insecticide Toxicity, Antihypertensive Overdoses, Hydrofluoric Acid Toxicity, Medical Management of Hazardous Materials Exposure Victims. |
| 1991 - 1995 | Emergency Medicine Resident Lecture Series. Lectures include: Occult Bacteremia in Febrile Children, Outpatient Antibiotic use in the Emergency Department, Introduction to Research, Use of Computer Databases, Use of Thrombolytic Agents for Acute MIs. |
| 1994 | Surgery Department Research Conference: Hydrofluoric Acid Burns. |
| 1991 | Pharmacology and Toxicology Department Seminar: Medical Management of Hazardous Materials Exposure Victims. |

UCLA

| | |
|---|---|
| 1990 | Emergency Medicine Grand Rounds: Environmental Toxicology of Sulfur Compounds |

University of Iowa

| | |
|---|---|
| 1976-1978 | Quantitative Chemical Analysis |
| 1977-1979 | Chemistry and Physics of the Environment |
| 1979 | Introduction to Analytical Research for Chemistry Graduate Students |

**Community Activities**

Television interviews:

| | |
|---|---|
| July 6, 2010 | Spice/K-2 Abuse in Mississippi and Nationally Channel 3, Jackson, MS |
| Jan 2009 | Hypothermia Dangers Channel 16, Jackson, MS |
| Mar 2006 | Increase in Mississippi Poison Control Center Volume Channel 16, Jackson, MS |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 26

| | |
|---|---|
| Aug 2002 | Hospital Overcrowding<br>Channel 12, Jackson, MS |
| Mar 2002 | Snakebite Antivenom Shortage<br>Channels 3, 12 and 16, Jackson, MS |
| Aug 2000 | Hyperthermia<br>Channel 12, Jackson, MS |
| July 1999 | Hyperthermia<br>Channel 3, Jackson, MS |
| Nov 1997 | Hospital Disaster Preparedness<br>Channel 3, Jackson, MS |
| Oct 1997 | Health Effects of Methylparathion Exposure<br>Channel 12, Jackson, MS |
| Jan 1995 | Effect of Lowering the Legal Blood Alcohol Level on Trauma<br>Channel 6, Augusta, GA |
| Feb 1995 | Hypothermia and Protection from the Cold<br>Channel 6, Augusta, GA |
| Apr 1994 | Protection of Children from Household Poisoning<br>Channel 6, Augusta, GA |
| Dec 1993 | Hypothermia and Frostbite<br>Channel 12, Augusta, Georgia |

Radio Interviews

| | |
|---|---|
| Aug 2006 | Arsenic in Soil in the Mississippi Coast<br>The Mississippi Network |
| Jan 2006 | The EMS Report Card for Mississippi<br>PBS, Jackson, MS |

Newspaper interviews:

| | |
|---|---|
| June 2010 | K-2 Use in Mississippi<br>Desoto Appeal, Memphis, TN |
| June 2007 | Antibiotics in Asian Fish<br>USA Today, Atlanta, GA |
| June 2007 | Snake Dangers in Mississippi<br>Clarion Ledger, Jackson, MS |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 27

| | |
|---|---|
| May 2007 | Antibiotics in Asian Fish<br>Clarion Ledger, Jackson, MS |
| Jan 2007 | Streptococcal Toxic Shock Syndrome<br>Enterprise General News<br>Hattiesburg, MS |
| Aug 2006 | Normal Arsenic Levels in Mississippi Coastal Soils<br>Mississippi Sun Herald<br>Biloxi, MS |
| Aug 2006 | Report on Arsenic Contamination in the Mississippi Coast<br>API press release |
| Feb 2006 | Poisoning Dangers in Children<br>Mississippi Methodist Rehabilitation Center Newsletter<br>Jackson, MS |
| Jan 2006 | The EMS Report Card for Mississippi<br>Mississippi Medical News |
| Dec 2005 | Potential Ethylene Glycol Toxicity in Schoolchildren in<br>Chechnya<br>Almanac Panorama, Russian Weekly Newspaper |
| Dec 2005 | Christmas Safety Precautions<br>Hattiesburg American, Hattiesburg, MS |
| Dec 2005 | Christmas Toxic Injuries<br>Mississippi Methodist Rehabilitation Center Newsletter<br>Jackson, MS |
| Sep 2005 | Hurricane Katrina UMC Medical Response<br>Clarion Ledger, Jackson, MS |
| Sep 2005 | Press release on Carbon Monoxide Toxicity and Generators<br>Following Hurricaine Katrina<br>Jackson, MS |
| Dec 2004 | Fireworks Injuries<br>Madison Herald, Madison, MS |
| Jul 1999 | Snake Bites in Mississippi<br>Clarion Ledger, Jackson, MS |
| Oct 1997 | Adverse Health Effects from Illegal Domestic Methylparathion<br>Use<br>Los Angeses Times, Los Angeses, CA |

Robert D. Cox, M.D., Ph.D.
Curriculum Vitae
Page 28

| | |
|---|---|
| Oct 1997 | Adverse Health Effects from Illegal Domestic Methylparathion Use<br>Clarion Ledger, Jackson, MS |
| Sep 1997 | Dangerous Adulterated Marijuana<br>Clarion Ledger, Jackson, MS |
| Nov 1995 | Findings of the Technical Subcommittee of the Governor's Task Force on Southern Wood Piedmont Residents<br>Augusta Chronicle, Augusta, GA |
| Sep 1994 | Yellow Jacket Stings<br>Augusta Chronicle, Augusta, GA |
| May 1994 | Snakebites<br>Augusta Chronicle, Augusta, GA |
| Sep 1993. | Environmental conditions in the Hyde Park area<br>Augusta Chronicle, Augusta, GA |

Medical services:

| | |
|---|---|
| Sep 2005 | Red Cross Shelter physician volunteer following Hurricaine Katrina, Brandon, MS |
| Mar 1994 | Provided medical support for the Georgia United Methodist Convention, Augusta, Georgia |
| 1994 -1995 | Medical Advisor for the Richmond County Emergency Management Agency |
| 1992 - 1995 | Member, Governor's Task Force for the Evaluation of Long Term Health needs of Southern Wood Piedmont Residents in Richmond County, Georgia |
| Feb 1991 | Medical Staff Member, Los Angeles County Earthquake Disaster Drill |

Donations:

| | |
|---|---|
| 1997 - present | Toxicology Research Fund<br>University of Mississippi Medical Center |
| 2005 - present | Mississippi Methodist Children's Home |
| 2004 | Tsunami Relief Fund, American Red Cross |
| 1994 - 1995 | President's Club, Partner's Level,<br>Medical College of Georgia Foundation |

# EXHIBIT B

## MATERIALS REVIEWED

1. ATSDR. Toxicological Profile for Benzene. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2007.
2. ATSDR. Toxicological Profile for Toluene. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2000.
3. ATSDR. Toxicological Profile for Xylene. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2007.
4. ATSDR. Toxicological Profile for Ethylbenzene. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2010.
5. ATSDR. Toxicological Profile for Naphthalene, 1-Methylnaphthalene, and 2-Methylnaphthalene Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2005.
6. ATSDR. Toxicological Profile for Total Petroleum Hydrocarbons (TPH). Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1999.
7. ATSDR. Toxicological Profile for Polycyclic Aromatic Hydrocarbons (PAHs). Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1995.
8. ATSDR. Toxicological Profile for 2-Butoxyethanol and 2-Butoxyethanol Acetate. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1998.
9. ATSDR. Toxicological Profile for Propylene Glycol. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1997.
10. ATSDR. Toxicological Profile for N-Hexane. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1999.
11. BP. Personal Exposure Monitoring Results Summary 3Q 2011.
12. Middlebrook AM, Murphy DM, Ahmadov R, *et al*. Air quality implications of the *Deepwater Horizon* oil spill. *PNAS Early Edition*, December 28, 2011. Available at: www.pnas.org/cgi/doi/10.1073/pnas.1110052108.
13. Ryerson TB, Camilli R, Kessler JD, *et al*. Chemical data quantify *Deepwater Horizon* hydrocarbon flow rate and environmental distribution. *PNAS Early Edition*, January 10, 2012. Available at: www.pnas.org/cgi/doi/10.1073/pnas.1110564109 .
14. deGouw JA, Middlebrook AM, Warneke C, *et al*. Organic aerosol formation downwind from the Deepwater Horizon oil spill. *Science* 2011;331:1295-1299.
15. Ryerson TB, Aiken KC, Angevine WM, et al. Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 2011;38: L07803, doi:10.1029/2011GL046726.

16. Brock CA, Murphy DM, Bahreini, Middlebrook AM. Formation and growth of organic aerosols downind of the Deepwater Horizon oil spill. *Geophys Res Lett* 2011;38: L17805, doi:10.1029/2011GL048541.

17. King BS, Gibbons JD. Health Hazard Evaluation of the Deepwater Horizon Response Workers. National Institute for Occupational Safety and Health, 2011.

18. Ravishankara AR, Goldman J. Air Chemistry in the Gulf of Mexico Oil Spill Area NOAA WP-3D Airborne Chemical Laboratory Flights of 8 and 10 June 2010. Available at: http://www.noaa.gov/deepwaterhorizon/publications_factsheets/index.html . Accessed 3/25/2012.

19. Smith S, Mayer L, De Robertis A. *et al*. NOAA Ship Thomas Jefferson Deepwater Horizon Mission Report. 2010. Available at: http://www.noaa.gov/sciencemissions/PDFs/tj_deepwaterhorizon_responsemissionreport_june3_11_2010final.pdf . Accessed on 3/25/2012.

20. Operational Science Advisory Team (OSAT-2) Gulf Coast Management Team. Summary Report for Fate and Effects of Remnant Oil in the Beach Environment. Prepared for Lincoln D. Stroh, CAPT, U.S. Coast Guard Federal On-Scene Coordinator. February 10, 2011. Available at: http://www.restorethegulf.gov/sites/default/files/u316/OSAT-2%20Report%20no%20ltr.pdf. Accessed on 3/31/2012.

21. Benner RA, Said KR, Jester ELE, et al. Investigation of Corexit® 9500 Dispersant in Gulf of Mexico Seafood Species. 2010. Available at: http://www.fda.gov/downloads/Food/FoodSafety/Product-SpecificInformation/Seafood/UCM250307.pdf . Accessed 4/2/2012.

22. EPA Response to BP Spill in the Gulf of Mexico. Volatile Organic Compounds (VOCs) on the Gulf Coastline.  Available at: http://www.epa.gov/bpspill/vocs.html . Accessed 3/21/12.

23.  Centers for Disease Control and Prevention. Gulf Oil Spill 2010: Deep Water Horizon Oil Spill Human Health Interim Clinical Guidance. Available at: http://www.bt.cdc.gov/gulfoilspill2010/oilspill_clinical.asp . Accessed on 3/29/2012.

24. EPA Response to BP Spill in the Gulf of Mexico. Download Environmental Data. Available at: http://www.epa.gov/bpspill/download.html . Accessed 4/8/2012.

25. EPA. Air Data. Reports. Monitor Values Report. Available at: http://www.epa.gov/airdata/ad_rep_mon.html . Accessed 4/9/2012.

26. EPA Offshore air sampling for dispersant –related compounds. Available at: http://www.epa.gov/bpspill/dispersant-air-sampling.html. Accessed on 4/20/2012.

27. Mississippi 2010 Air Quality Data Summary. Mississippi Department of Environmental Quality, Jackson, MS 2010.

28. EPA Mobile air monitoring on the Gulf Coast: TAGA Buses.  Available at: http://www.epa.gov/bpspill/taga.html . Accessed on 4/19/2012.

29. OSHA Assessing Worker Exposures. Available at: http://www.osha.gov/oilspills/index_sampling.html . Accessed on 4/20/2012.

30. EPA Response to BP Spill in the Gulf of Mexico. Hydrogen Sulfide Monitoring on the Gulf Coast. Available at: http://www.epa.gov/BPSpill/h2s.html . Accessed 4/23/2012.

31. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0115. Interim Report #1A. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

32. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0115. Interim Report #2A. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

33. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0115. Interim Report #3A. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

34. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0115. Interim Report #4A. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

35. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Interim Guidance for Protecting Deepwater Horizon Response Workers and Volunteers. July 26, 2010. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/protecting/#effects . Accessed 4/23/2012.

36. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.  Summary of Potential Hazards to Deepwater Horizon Response Workers.  Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/hazsumm.html . Accessed 4/23/2012.

37. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.  NIOSH Reports of Deepwater Horizon Response/Unified Area Command Illness and Injury Data.  Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/data.html . Accessed 4/23/20122.

38. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0129. Interim Report #5. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

39. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0129. Interim Report #7. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

40. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0129. Interim Report #8A. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

41. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. Health Hazard Evaluation of Deepwater Horizon Response Workers HETA 2010-0129. Interim Report #9. Available at: http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html . Accessed 3/19/2012.

42. Aguilera F, Mendez J, Pasaro E, Laffon B. Review of the health effects of exposure to spilled oils on human health. *J Appl Toxicol* 2010;30:291-301.

43. Anderson SE, Franco J, Lukonska E, et al. Potential immunotoxicological health effects following exposure to Corexit 9500A during cleanup of the Deepwater Horizon oil spill. J Toxicol Environ Health, Part A 2011;74:1419-1430.

44. EPA. Toxicological Review of Ethylene Glycol Monobutyl Ether (EGBE). 2010 EPA/635/R-08/006F. U.S. Environmental Protection Agency, Washington, DC.

45. Organisation for Economic Co-operation and Development. Propylene Glycol Ethers. UNEP Publications, 2003.

46. ATSDR. Toxicological Profile for Chlorinated Dibenzo-*p*-Dioxins. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1998.

47. Aurell J, Gullett BK. Aerostat Sampling of PCDD/PCDF Emissions from the Gulf Oil Spill in Situ Burns. U.S. Environmental Protection Agency, Research Triangle Park, NC.

48. Schaum J, Cohen M, Perry S, et al. Screening Level Assessment of Risks due to Dioxin Emissions from Burning Oil from the BP Deepwater Horizon Gulf of Mexico Oil Spill. U.S. Environmental Protection Agency, Washington, DC.

49. Nalco. Material Safety Data Sheet for COREXIT® 9500. MSDS for 9500. Sugar Land, TX, 6/14/2005.

50. Nalco. Material Safety Data Sheet for COREXIT® EC9527A. MSDS for 9527A. Naperville, IL, 5/11/2010.

51. Nalco. COREXIT Ingredients. 8/23/2011.

52. IPCS INCHEM. Distillates (Petroleum), Hydrotreated Light. ICSC 1379, 2001.

53. Code of Federal Regulations. CFR 172.842 – Sorbitan monostearate, 2011.

54. BP. Material Safety Data Sheet for Mississippi Canyon 252 Weathered Crude Oil (Louisiana Light Sweet Crude), Houston, TX, 6/28/2010.

55. Operational Science Advisory Team (OSAT) Unified Area Command. Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring. Prepared for Paul F. Zukunft, RADM, U.S. Coast Guard Federal On-Scene Coordinator Deepwater Horizon MC252. December 17, 2010. Available at: CDC. Oil Spill Dispersant (COREXIT®EC9500A and EC9527A) Information for Health Professionals. Available at: http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf . Accessed on 8/10/2012

56. Centers for Disease Control and Prevention, Agency for Toxic Substances

Disease Registry. Oil Spill Dispersant (COREXIT ®EC9500A and EC9527A) Information for Health Professionals. 5/13/2010. Available at: http://www.cdc.gov/nceh/oil_spill/docs/Oil%20Spill%20Dispersant.pdf . Accessed on 7/15/12.

57. Statement of Lisa P. Jackson, Administrator, U.S. Environmental Protection Agency/ Legislative Hearing on Use of Oil Dispersants in BP Oil Spill/Senate Committee on Appropriations: Appropriations: Subcommittee on Commerce, Justice, Science, and Related Agencies, EPA Press Office, 7/5/2010. Available at: http://yosemite.epa.gov/opa/admpress.nsf/0/571400992A5345A58525776100509 550 . Accessed on 8/10/12.

58. National Oceanic and Atmospheric Administration. NOAA's Oil Spill Response Understanding Tar Balls. U.S. Department of Commerce. Available at: http://www.noaa.gov/factsheets/new%20version/tar_balls.pdf . Accessed on 8/11/12.

59. EPA. EPA Response to BP Spill in the Gulf of Mexico. EPA's List of Authorized Dispersants (NCP Product Schedule). Available at: http://www.epa.gov/bpspill/dispersants-qanda.html#list . Accessed on 8/6/12.

60. CTEH. Material Safety Data Sheet for Mississippi Canyon 252 On-Shore/Near Shore IH Monitoring Strategy MC 252 Well Incident, Petroleum Crude Oil – Sweet, Document # 2200-T2-DO-PN-4003, 2/6/2009.

61. Declaration of Peter S.J. Lees, Ph.D., C.I.H.

62. Declaration of David R. Dutton, Ph.D.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  OIL SPILL BY THE OIL RIG      *   MDL NO. 2179
"DEEPWATER HORIZON" IN THE           *
GULF OF MEXICO, ON APRIL 20, 2010    *   SECTION J
                                     *
This Document Relates to:            *
                                     *   HONORABLE CARL J. BARBIER
    No. 10-4536                      *
                                     *   MAGISTRATE JUDGE SHUSHAN

# EXHIBIT "B"

2.      Supplemental Declaration of Robert Cox, M.D., Ph.D. dated
        October 22, 2012 (Dkt. 7732-2)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>            Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>            Defendants. | * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## SUPPLEMENTAL DECLARATION OF ROBERT COX, M.D., PH.D.

I, Robert Cox, am over twenty-one years of age and of sound mind and body. My declaration is based on personal knowledge, experience, and review of materials described herein. If called to testify, I could testify to the matters set forth in this declaration.

1.     I submitted a declaration to the Court on August 13, 2012. In that declaration, I concluded that: (a) Gulf Coast Residents were not exposed to airborne concentrations of the components of crude oil, dispersants, or other spill-related compounds at levels that would be expected to result in any significant adverse health effects; (b) the potential for significant dermal exposures to the components of crude oil and dispersants for Clean-Up Workers and Gulf Coast

1

Residents was very small, and any such exposures for Clean-Up Workers, who were in closer proximity to the oil and dispersants, should have been prevented by appropriate use of personal protective equipment; and (c) based on the weathered nature of the oil and the lack of opportunity for prolonged skin contact with the oil and dispersants, significant adverse health effects would not be expected from any dermal exposures that did occur in connection with the Deepwater Horizon (DWH) oil spill.

2.      I have reviewed objections to the Medical Benefits Class Action Settlement Agreement, as well as the declarations attached thereto, as set forth in Appendix A to this declaration.  None of these objections or declarations changes my opinions, conclusions, and analyses as set forth in my initial declaration.  However, because a number of the objections and declarations deviate from sound science and are based on misinformation regarding the DWH oil spill, I respond to a number of points raised therein.

3.      Numerous materials are cited throughout this declaration.  Citations are provided by numbers within parentheses next to the statement that they support — *e.g.*, (1).  The numbers within the parentheses refer to the list of materials reviewed that is set forth in Appendix B.

## GENERAL ISSUES

4.      I will first address five discrete issues that were raised in the objections and attached declarations: (1) the chemical composition of MC252 crude oil and the Corexit dispersants; (2) the potential for exposure to oil and/or dispersants after August 2010 (and particularly in the wake of Hurricane Isaac); (3) the reliability of blood testing for demonstrating exposure to the components of oil and/or dispersants in relation to the DWH oil spill; (4) the lack of any scientific basis for the theorized medical condition referred to as Multiple Chemical Sensitivities; and (5) the unfounded assertion that the DWH oil spill was the worst public health

2

crisis in the history of the United States. In addition, later in this declaration, I will specifically address a number of the more scientifically flawed objections and declarations in greater detail.

### *Chemical Composition of MC252 Oil and Corexit Dispersants*

5. A number of objectors raise concerns regarding a claimed lack of knowledge regarding the chemical compositions and/or toxicological properties of the MC252 oil and the Corexit dispersants. *See, e.g.*, Objection of Lance Clay Brown, at 4 ("The chemical make up of Macondo Well crude and chemical dispersant is unknown."); Objection of Smith Stag, L.L.C., *et al.*, Decl. of William R. Sawyer, at ¶ 14 (noting that the Material Safety Data Sheet for Corexit 9500A states that "No toxicity studies have been conducted on this product" and asserting that "[t]his alone automatically renders the product as suspect in the mind of any qualified individual performing an environmental risk assessment"). Contrary to the concerns raised in these objections, and as described in my initial declaration, the chemical compositions and toxicological properties of the MC252 oil and the Corexit dispersants are in fact well known. *See* Decl. of Robert Cox, at ¶¶ 19-36.

6. Moreover, it is not the case, as Dr. Sawyer suggests, that no toxicity studies have been conducted on the Corexit dispersants. As discussed in greater detail in my initial declaration, the primary constituents of the Corexit dispersants have all undergone extensive toxicological evaluation and testing. *See id.* at ¶¶ 27-33. The vast majority of these dispersant constituents are considered to have minimal to no toxicity, and none of the constituents would be expected to cause significant human health effects at the low levels measured during the DWH oil spill. *Id.* at ¶¶ 27-33, 62-68. In fact, as described in my initial declaration, a number of the individual constituents of the Corexit dispersants are commonly used in consumer products and foodstuffs. *Id.* ¶¶ 27-33. Thus, members of the public are regularly exposed to the dispersant

constituents through use of soaps, makeup, toothpaste, medications, and foodstuffs, and "[t]he exposure to humans through the use of dispersant was trivial as compared with usual prescribed doses" (1).

7.     Thus, as described herein and in my initial declaration, and notwithstanding any objections to the contrary, the chemical compositions and toxicological properties of the MC252 oil and Corexit dispersants are well known.

### *Potential for Future Exposure*

8.     A number of objectors raise concerns regarding the possibility that individuals in the Gulf Coast region could be exposed to oil and/or dispersants from the DWH oil spill in the future (or after the cutoff dates provided in the Medical Benefits Class Action Settlement Agreement).  In particular, a number of objectors raise concerns regarding tar balls that have surfaced in the wake of Hurricane Isaac.

9.     With respect to the Corexit dispersants applied in response to the DWH oil spill, there is no realistic possibility that Clean-Up Workers or Gulf Coast Residents could be exposed to potentially harmful levels of the constituents of the Corexit dispersants after September 2010. As explained in my initial declaration, dispersants were not applied in connection with the DWH oil spill in any significant quantities after July 19, 2010 (there was one small application near the source-control area on September 4, 2010).  Decl. of Dr. Cox, at ¶ 55 (citing Decl. of Dr. Dutton, at ¶¶ 24, 26).  In addition, the dispersants were applied many miles away from the shoreline.  *Id.* at ¶¶ 62, 81.  Once applied to an oil slick in the ocean, the dispersant concentrations drop rapidly as a result of biodegradation, dilution, and dissolution.  *See id.*, at ¶¶ 63, 82.  As a result, even while the DWH oil spill was ongoing, only minimal quantities of dispersant constituents were detected in water and sediment near the shoreline (3).  Thus, it is virtually impossible that

individuals were or could be exposed to the dispersant components months (or even weeks) after the last application of dispersants in connection with the DWH oil spill, let alone years later.

10.     As described in my initial declaration, the conclusion that the Corexit dispersants were not present in the environment months after application because of biodegradation and dilution is supported by water and sediment sampling data collected by the Operational Science Advisory Team (OSAT). The OSAT-1 team analyzed over five thousand water and sediment samples collected near-shore between May 13, 2010 and October 20, 2010 for dispersant-related compounds, and concluded that the concentrations of dispersant-related compounds found in water never exceeded aquatic life benchmarks (no benchmark for dispersant-related compounds in sediment exists), and only 1.4% of the samples analyzed had detectable levels of dispersant-related compounds. *Id*. at ¶ 83. Accordingly, there is no scientific basis for concluding that Clean-Up Workers or Gulf Coast Residents could have been exposed to the constituents of dispersants applied in connection with the DWH oil spill after September 2010.[1]

11.     The objections also raise concerns regarding the potential for future exposure to MC252 oil. For example, in a declaration attached to the objections submitted by Smith Stagg, L.L.C., *et al.*, Dr. Sawyer states that he "strongly" disagrees with "the assertion by BP's experts who claim there were very few samples containing potentially harmful levels of oil components (PAHs or BTEX) consistent with oil form [sic] the Macondo well, and none after August 3,

---

[1]  Researchers from Auburn University also evaluated data on a number of water samples analyzed for dispersants from the Orange Beach, Alabama area between September 28, 2010 and January 26, 2011 (2). The researchers concluded that small amounts of 2-butoxyethanol and propylene glycol in water samples from the Orange Beach area were the result of stormwater discharge, and did not originate from Corexit dispersants used during the DWH response. As I mentioned in my initial declaration, the chemical components of the Corexit dispersants are used in a variety of common products, including soaps, shampoos, toothpaste, and medications. Given the ubiquitous nature of the chemicals in the dispersants, the presence of these chemicals in urban water runoff from other sources is not a surprise.

2010." Decl. of Dr. Sawyer, at ¶ 43. Dr. Sawyer also notes that the use of the August 3, 2010 cutoff date is a "false assertion as residual oil contamination is both ubiquitous and self-evident." *Id.* at ¶ 44.

12.     As a threshold matter, the August 3, 2010 cutoff date was not determined by BP's experts. Rather, the August 3, 2010 date was taken directly from a report prepared by the OSAT-1 team for the Federal On-Scene Coordinator (FOSC) of the U.S. Coast Guard. In that report, the OSAT-1 team concluded that: (1) "[t]he last overflight observation of potentially recoverable oil on the ocean surface was made on 3 August [2010]"; and (2) "[s]ince 3 August 2010, <1% of water samples and ~1% of sediment samples exceeded EPA's Aquatic Life benchmarks for polycyclic aromatic hydrocarbons (PAHs). Analysis of individual samples indicated that none of the water sample exceedances were consistent with MC252. Of the sediment exceedances, only those within 3 km of the wellhead were consistent with MC252." (3)

13.     Moreover, the presence of MC252 oil on beaches after August 3, 2010, including tar balls that surfaced in the wake of Hurricane Isaac in 2012, does not contradict the conclusion that there were few samples containing potentially harmful levels of oil components after August 3, 2010. As I explained in my initial declaration, weathered oil and tar balls that reached shore in connection with the DWH oil spill did not contain significant amounts (if any) of the more water-soluble and/or volatile compounds (such as BTEX and hexane), as such compounds dissolved rapidly in the water column or evaporated prior to reaching the shoreline. Decl. of Dr. Cox, at ¶¶ 45-47, 76-77. In addition, PAHs, which are the remaining potentially toxic components of the oil, were substantially depleted by the time the oil reached shore. *Id.* at ¶¶ 47, 77. As stated in the OSAT-2 report, "weathered oil samples showed 86-98 percent depletion of total polycyclic aromatic hydrocarbons (PAHs)" (4). The OSAT-2 team further concluded that

"[c]alculated potential cancer and non-cancer health effects from short and long-term exposures [to the weathered MC252 oil were] below [EPA] acceptable health based risk and hazard levels" (4).[2]

14.     The tar balls that surfaced in the wake of Hurricane Isaac are similarly unlikely to cause potential health effects.  In a study conducted by the environmental research team at Auburn University, researchers concluded that "the concentration of [PAHs] in the post Hurricane Isaac samples are not substantially different from PAH concentrations in emulsified oil which first arrived on Alabama's beaches" immediately after the DWH oil spill (5).  As described above, weathered oil and tar balls that reached Gulf Coast beaches in the aftermath of the DWH oil spill did not contain potentially harmful levels of toxic components.  Thus, despite Dr. Sawyer's unsupported claims to the contrary, the scientific evidence clearly shows that weathered oil and tar balls to which individuals potentially could have been exposed in connection with the DWH oil spill (including tar balls that surfaced in the wake of Hurricane Isaac) do not present significant human health risks.

15.     Some objectors may also raise concerns related to a sheen of oil that was observed in the vicinity of the MC252 well in September 2012.  According to an October 10, 2012 press release issued by the U.S. Coast Guard (USCG), samples of the sheen collected on September 26, 2012 "correlate[]" to MC252 oil.  The USCG stated that "[t]he exact source of the sheen is uncertain at this time but could be residual oil associated with wreckage and/or debris left on the seabed from the Deepwater Horizon incident in 2010" (6).  BP has identified the cofferdam, a piece of containment equipment used during the response, as the "probable source of the surface

---

[2] Notably, the OSAT-2 team also stated that "[a]lthough some uncertainty remains regarding the degree of exposure and risk from contact with petroleum residues on beaches, it is likely that the procedures used in the screening risk assessment <u>overestimate risk</u> rather than underestimate any public health threat" (4) (emphasis added).

sheen," based on nearly three days of visual inspection with a video camera mounted on a Remotely Operated Vehicle.[3] The USCG has determined that the "sheen is not feasible to recover and does not pose a risk to the shoreline" (6).

16.     The observed sheen does not present a potential health risk to individuals residing along the Gulf Coast. First, the sheen is located in the vicinity of the MC252 well, which is approximately 50 miles offshore and over 100 miles from populated areas along the Gulf Coast. *See* Decl. of Dr. Cox, at ¶ 46. Second, the sheen is comprised of a relatively small quantity of oil — as demonstrated by the fact that the USCG deemed the sheen too thin to recover — and thus is not likely to impact air quality onshore.

### *Blood Testing for Volatile Organic Compounds*

17.     Some objectors rely upon blood test results allegedly showing elevated levels of volatile organic compounds (VOCs), including BTEX and n-hexane, as support for their claims that they were exposed to excessive levels of the components of oil and/or dispersants in connection with the DWH oil spill. Such claims are scientifically unfounded.

18.     First, the VOCs associated with crude oil, such as BTEX and n-hexane, only persist in blood for a matter of hours (or at most, days). According to the U.S. Centers for Disease Control and Prevention (CDC) and the Agency for Toxic Substances and Disease Registry (ATSDR), "benzene, toluene, ethylbenzene, xylene, and hexane . . . have a short half

---

[3] *See* Ltr. to Hon. Sally Shushan, United States Magistrate Judge, United States District Court for the Eastern District of Louisiana, from Andrew Langan, Kirkland & Ellis LLP, Re Oil Sheen Observed Near MC 252 (Oct. 18, 2012). This work included a visual inspection of the Macondo well, two relief wells, riser pipe and cofferdam, which was overseen by the USCG and observed by representatives for the Bureau of Safety and Environmental Enforcement ("BSEE"), Bureau of Ocean Energy Management ("BOEM"), and the State On-Scene Coordinators for Louisiana, Mississippi and Florida. The ROV inspection observed no oil leaking from the riser pipe and the integrity of the Macondo well and relief wells were confirmed; oil was only observed leaking from the cofferdam. *Id.*; U.S. Coast Guard Press Release, ROVs Investigate Possible Sheen Source (Oct. 18, 2012), http://www.restorethegulf.gov/release/2012/10/18/rovs-investigate-possible-sheen-source.

life in the blood and [blood] test results only reflect very recent exposures (within hours or days) prior to testing" (7). N-hexane, for example, has a half-life in blood of 1.5-2 hours, and n-hexane and its metabolites are cleared from the body entirely in a matter of days (8).

19.     As a result, blood testing conducted weeks or months after alleged contact with oil and/or dispersants from the DWH oil spill would not be reflective of exposure in connection with the spill. Rather, such test results, to the extent they are even accurate, would be reflective of exposures that occurred immediately before the blood was drawn. It is not surprising that some individuals might have elevated VOC levels in their blood because, as described in my initial declaration, BTEX chemicals (benzene, toluene, ethylbenzene, and xylenes) and n-hexane are present in a number of sources that are encountered in everyday life, including engine exhaust, cigarette smoke, and numerous consumer products. *See* Decl. of Dr. Cox, at ¶ 23. Because of the numerous sources of volatile hydrocarbons in the environment, the presence of small quantities of these substances in the blood is normal. According to the CDC and ATSDR, "[d]etection of VOCs in blood is common but test results only reflect very recent exposures. . . . These chemicals only stay in the blood a short time therefore test results only reflect very recent exposures (within hours or days of testing)" (7).

20.     For example, the ATSDR toxicological profile for ethylbenzene notes that "[t]he highest exposure to ethylbenzene for the general public is most likely to occur via inhalation associated with the use of self-service gasoline pumps or while driving a gasoline-powered motor vehicle especially in high traffic areas or in tunnels" (9). As reported in the ATSDR profile, a study measuring exposures associated with the pumping of fuel found that the "subjects in the study had significantly higher levels of gasoline components in their blood after pumping gasoline than before" (9).

21.     Second, some objectors have pointed to analyses performed by Metametrix Clinical Laboratory to support their claims that, because of alleged exposures in connection with the DWH oil spill, they have excessive levels of n-hexane and other VOCs in their blood.  I have serious concerns regarding the reliability of the clinical analyses performed by Metametrix, as explained in greater detail below.

22.     On its website, Metametrix provides a guidance document entitled *Volatile Solvents Guide*, which gives an overview of the compounds measured by the laboratory.  In the Guide, Metametrix reports that the "only published study on the level of n-hexane gives the 95th percentile level for the presence of this solvent in the blood as a range of 403-812 ppb [parts per billion]," citing a study conducted in 1991 by Brugnone, *et al* (12).  The concentration unit used in the Brugnone study was ng/L, which Metametrix erroneously concluded was equivalent to ng/mL (or parts per billion), while ng/L is actually parts per <u>trillion</u>.  Thus, the "normal" ranges for hexane quoted by Metametrix are off by a factor of 1,000.  Metametrix perpetuates this error on all of its data report sheets, using a normal range that is off by a factor of 1,000.  Such basic errors call into question the legitimacy of any blood testing results provided by this laboratory.

23.     Moreover, in the *Volatile Solvents Guide*, Metametrix espouses alternative medical therapies to clear volatile hydrocarbons from the blood, such as use of amino acids that Metametrix claims will "detoxify" solvents and improve intestinal bacteria to restore healthy elimination of toxins.  The Metametrix Guide also discusses colonic cleansing to rapidly reduce the level of circulating toxins in the body.  None of these "therapies" has ever been shown to have merit in a well-designed scientific study, and they are not recognized by the medical and scientific communities.  Considering that volatile hydrocarbons are naturally cleared from the

blood in one to several hours via the lungs and liver, it is hard to fathom how irrigating the colon could have any beneficial effect.

24.     CDC and ATSDR guidelines issued during the DWH oil spill did not recommend the use of blood testing to determine exposure to VOCs or to guide clinical care, stating: "The laboratory tests for blood VOCs are technically difficult to perform.  For example, test tubes must be prepared and stored in a specific manner.  For detecting environmental exposures, the laboratory must be equipped to perform analyses with detection limits in the parts per trillion range for these contaminants." (7)  For instance, failure to properly clean the test tubes, which requires boiling the butyl rubber tops of the test tubes in methanol and baking them in a vacuum for 21 days, can result in concentrations of n-hexane and other VOCs that are thousands of times above background (10).[4]  Based on Metametrix's baseline results, which are significantly above background levels reported in the literature (11, 12), it would appear that Metametrix is measuring n-hexane in the butyl rubber of its test tubes, and not in the patient's blood.  This methodological error, in conjunction with the unit conversion error discussed above, leads me to conclude that none of the hydrocarbon data from Metametrix is reliable.

---

[4] The Division of Laboratory Sciences of the National Center for Environmental Health (NCEH), Centers for Disease Control and Prevention is, in my opinion, the best laboratory in the world for determining background levels of chemicals in human blood.  NCEH publishes a detailed report entitled *Human Exposure to Environmental Chemicals* approximately every five years.  In one of its evaluation studies, NCEH found that the butyl rubber in vacutainer tubes used in drawing blood can produce concentrations of these substances that are thousands of times above background (10).  In another study, researchers from NCEH found that the butyl rubber tops of vacutainers produced n-hexane contamination to the level of 400 ppt.  NCEH was able to clean the vacutainer tops by boiling them in methanol and then baking them in a vacuum for 21 days (11).  Metametrix uses standard vacutainers for its analyses, but does do not appear to conduct any quality assurance measures, such as use of "blanks" or other rigorous validation measures as performed by NCEH, to ensure the validity of its results.

### Multiple Chemical Sensitivities

25.     The objections submitted by Smith Stag, L.L.C., *et al.* raise the possibility that individuals exposed to oil and/or dispersants from the DWH oil spill may have developed multiple chemical sensitivities (MCS), stating: "One of the classic problems seen with individuals with toxic exposures is their development of multiple chemical sensitivities.  A large percentage, if not a majority, of the people who have entered our program return home only to realize that chemicals they readily tolerated before their illness now cause major problems." Objections of Smith Stag, L.L.C., *et al*., Decl. of Michael Robichaux, at ¶ 33.

26.     MCS is a theorized medical condition characterized by vague and non-specific symptoms—such as nausea, headaches, and fatigue—allegedly occurring after low-level exposure to chemicals or odors.  The concept of chemical sensitivity was first proposed in the 1960s by an organization called the Society for Human Ecology, which later changed its name to the American Academy of Environmental Medicine.  The American Academy of Environmental Medicine has never been recognized by the American Board of Medical Specialties (a board governing all medical specialties, from Allergy to Surgery), and the concept of MCS has been discredited.

27.     MCS is not recognized as a disease or medical condition by the International Classification of Disease (ICD-10), the medical organization responsible for assigning codes for recognized diseases.  In addition, a number of medical organizations have published strong position statements against the concept of MCS because of the lack of science demonstrating that MCS is a real condition, including (13, 14):

(a)     In 1992, the American Medical Association's Council on Scientific Affairs stated: "Until such accurate, reproducible, and well-controlled studies are available, that multiple chemical sensitivity should not be considered a recognized clinical syndrome" (15).

(b)     In 1991, the American College of Occupational Medicine stated: "[T]his syndrome has yet to be established by traditional investigative activities that withstand peer review" (16).

(c)     In 1999, the American Academy of Allergy Asthma and Immunology stated: "Because of the subjective nature of the illness, an objective case definition is not possible.  Allergic immunotoxic, neurotoxic, cytotoxic, psychological, sociologic, and iatrogenic theories have been postulated for both etiology and production of symptoms, but there is an absence of scientific evidence to establish any of these mechanisms as definitive. . . .A causal connection between environmental chemicals, foods, and/or drugs and the patient's symptoms continues to be speculative and cannot be based on the results of currently published scientific studies" (17).

(d)     In 2011, the National Institutes of Health stated: "Several theories have been advanced to explain the cause of multiple chemical sensitivity, including allergy, toxic effects and neurobiologic sensitization.  There is insufficient scientific evidence to confirm a relationship between any of these possible causes and symptoms" (18).

28.     In short, there is no scientific evidence that MCS is truly a disease (though there is some evidence that it may be a psychological condition).  Likewise, there is no scientific basis for the treatments often used to treat MCS, which include efforts to remove chemicals from the body by use of saunas, massages, and other such treatments.  In this respect, the California Medical Association's Scientific Task Force on Clinical Ecology concluded that "no convincing

13

evidence was found that patients treated by clinical ecologists have recognizable syndromes, that the diagnostic tests employed are efficacious or reliable or that the treatments used are effective" (13).

### *Public Health Context*

29.     Dr. Robichaux states in his declaration that the "Deepwater Horizon explosion marked the beginning of the most serious public health crisis in the history of the United States." Decl. of Dr. Robichaux, at ¶ 31.  As a physician, and one who was directly involved in the health surveillance response to the DWH oil spill for the State of Mississippi, I take serious issue with this claim, which is preposterous.

30.     There have been no deaths attributed to the DWH oil spill since the initial explosion on April 20, 2010.  Moreover, the symptoms reported by Clean-Up Workers involved in responding to the spill have been mild, with the most serious symptoms relating to heat-related conditions, and not chemical exposures (19, 20).  The CDC has stated that "[f]or several months CDC and state health departments tracked potential health effects related to the oil spill in the affected communities" and "[n]o trends in illnesses were identified by the multiple surveillance systems used" (7).

31.     Contrast this with the influenza epidemic of 1918, in which 675,000 deaths occurred in the United States; the AIDS epidemic with over 619,000 deaths to date in the United States; Hurricane Katrina in 2005, during which 1,833 people were killed; the outbreak of the West Nile virus in 2012, resulting in over 3,500 reported cases of the virus and 147 deaths in the United States (21); and even the recent outbreak of fungal meningitis due to contaminated medications with 23 deaths to date.

14

32.     When one examines the facts, there is no comparison — there is simply no basis for Dr. Robichaux's suggestion that the DWH oil spill is the most serious public health crisis in the history of the United States.

### DR. SAWYER'S DECLARATION

33.     I respond in greater detail to the Declaration of Dr. William Sawyer, which is provided in support of the objections submitted by Smith Stag, L.L.C., *et al*., because a number of the issues raised therein are misguided and/or deviate from sound scientific approach and analysis.

#### *Relevance of Studies from Prior Spills*

34.     Throughout his declaration, Dr. Sawyer fails to acknowledge and account for the differences between the DWH oil spill and previous spills.  For example, Dr. Sawyer states that "[p]rior epidemiological studies demonstrate statistically significant increased morbidity among coastal residential communities, volunteers and clean-up workers during much smaller scale crude oil releases and exposures."  Decl. of Dr. Sawyer, at ¶ 3.  Dr. Sawyer also states that he has "summarized the known adverse health effects related to human exposures to crude oil based on peer-reviewed and published epidemiological studies of other similar, but smaller releases."  *Id.* at ¶ 17.

35.     However, as described in my initial declaration, the DWH oil spill was unique, occurring approximately one mile beneath the ocean surface and over 100 miles from populated areas in southern Mississippi, Louisiana, and Alabama.  *See* Decl. of Dr. Cox, at ¶¶ 44-47.  As a result, most of the more water-soluble aromatic hydrocarbons (such as BTEX) were removed as the oil traveled to the ocean surface, other volatile compounds such as n-hexane underwent evaporation, photodegradation, and dilution prior to reaching the shoreline, and the vast majority

15

of other potentially toxic components, such as polycyclic aromatic hydrocarbons (PAHs), were removed as the oil moved toward the shoreline as a result of photo-oxidation, biodegradation, evaporation, dispersion, and dissolution. *Id.* at ¶¶ 45-47.

36.     In other words, the unprecedented depth and offshore nature of the spill, as compared with other spills, significantly reduced airborne concentrations of the constituents of the oil to which individuals may have been exposed, particularly at the shoreline.  As one would expect, comprehensive air monitoring conducted by BP and numerous federal agencies over the course of the DWH response demonstrated that the airborne concentrations of volatile hydrocarbons, such as those found in the MC252 oil, were very low both onshore and in offshore samples collected from the breathing zones of Clean-Up Workers.  The levels found onshore were typical of levels measured in suburban and rural areas of the United States, and were well below levels at which significant adverse health effects might be expected.  *Id.* at ¶¶ 51-74; *see also* Decl. of Peter Lees, at ¶¶ 37-39.

37.     Thus, the spill-related epidemiological studies cited by Dr. Sawyer are not relevant to the DWH oil spill because they were conducted in connection with very different types of spills and crude oil releases.  For example, Dr. Sawyer discusses a study of respiratory symptoms observed in clean-up workers one year after the *Prestige* oil spill in Spain in 2002. Decl. of Dr. Sawyer, at ¶ 18-19.  However, the *Prestige* oil spill involved heavy fuel oil — which has been shown to weather significantly slower than crude oil (22) — that contained a high concentration of aromatic hydrocarbons (such as BTEX) and heavy metals (23, 24).  In addition, the *Prestige* spill involved a release of oil directly on to the ocean surface in a discrete area (24). In contrast, the DWH oil spill involved a light sweet crude oil released nearly a mile beneath the

ocean surface, which significantly reduced (or eliminated) concentrations of volatile aromatic hydrocarbons at the surface.

38.     Likewise, Dr. Sawyer cites to studies by Rodriguez-Trigo, *et al.* and Perez-Cadahia, *et al*., which he claims demonstrate the presence of biomarkers and elevated rates of genotoxic damage following an oil spill.  Decl. of Dr. Sawyer, at ¶¶ 28-29.  As a threshold matter, Dr. Sawyer mischaracterizes the Rodriguez-Trigo study, which states that: "[1] [t]he clinical significance of exhaled biomarkers and chromosomal findings are uncertain . . . [2] [t]he association between oil exposure and the observed changes may not be causal . . . [and] [3] the findings may not apply to spills involving other types of oil or to different populations of oil spill workers" (23).  Thus, even to the extent that genotoxic effects were observed following prior oil spills, it does not follow that such effects would be expected in relation to the DWH oil spill, which involved a different type of oil released nearly a mile beneath the surface (thus removing the vast majority of the more water-soluble aromatic hydrocarbons, such as BTEX).

39.     Moreover, genotoxic effects have not been observed after other oil spills.  For instance, a study of an exposed population following the *MV Braer* oil spill in Shetlands Island, Scotland found no evidence of genotoxic effects (26, 27).  In addition, if genotoxic effects were to occur in the wake of an oil spill, a main medical condition of concern would be an increased incidence of cancer.  Risk assessments conducted in the wake of prior oil spills have not observed significant increases in the incidence of cancer (1, 22, 27).  Accordingly, there is little scientific basis for concluding that individuals exposed to oil spills are at risk of genotoxic effects, and no basis for concluding that Clean-Up Workers or Gulf Coast Residents have the potential to develop genotoxic effects as a result of the DWH oil spill.

40.     My comments above should not be read to imply that epidemiological studies from prior oil spills are completely irrelevant in evaluating the potential for health effects from the DWH incident.  Rather, such studies can be instructive and provide a useful starting point, but they must be viewed in context and applied cautiously.  As discussed above, Dr. Sawyer fails to take into account the unique nature of the DWH oil spill and the low concentrations of oil components measured in air, and thus his recitation of the findings of studies conducted in connection with prior—and quite different—oil spills provides little insight into what health effects might be expected in connection with the DWH oil spill.

### *Relevance of Other Epidemiological Studies Cited by Dr. Sawyer*

41.     Dr. Sawyer also references a number of epidemiological studies relating to health effects associated with exposure to the components of crude oil, including toluene, ethylbenzene, n-hexane, and other petroleum hydrocarbons.  Decl. of Dr. Sawyer, at ¶¶ 10, 30-37.  In relying on such studies, Dr. Sawyer ignores the fundamental principle of toxicology that the dose makes the toxin.  *See* Decl. of Dr. Cox, at ¶ 13.  As I outlined in my initial declaration, "in order for there to be a potential health risk from particular chemicals, those chemicals must be inherently toxic and there must be a significant human exposure to those chemicals."  *Id.* at ¶ 12.  Thus, although it is certainly true that some of the components of crude oil have been associated with certain health effects, one cannot ignore the exposure component of the analysis — *i.e.*, there must be exposure to the potentially toxic compound at sufficient concentrations and for sufficient durations in order for there to be a potential health risk from the particular compound.

42.     Dr. Sawyer presents a number of studies in which health effects were observed in connection with exposure to certain crude oil components.  However, in the studies presented by Dr. Sawyer, the levels of exposure were thousands (and in some cases, millions) of times higher

than the levels measured during the DWH oil spill. That health effects were observed in populations exposed at such high levels has absolutely no bearing on the potential for health effects for Clean-Up Workers and Gulf Coast Residents in relation to the DWH oil spill. Two of the more egregious examples provided by Dr. Sawyer are addressed below.

43.     First, Dr. Sawyer states that n-hexane "can cause a neurological disorder called peripheral neuropathy characterized by numbness in the feet and legs," and notes (without citation) that this condition "has occurred in workers exposed to 500-2,500 PPM in the air." Decl. of Dr. Sawyer, at ¶ 10. Dr. Sawyer's apparent suggestion that Clean-Up Workers or Gulf Coast Residents could develop peripheral neuropathy from exposures to n-hexane in relation to the DWH oil spill is completely unfounded for at least two reasons: (1) the concentrations of n-hexane measured during the DWH oil spill were significantly below the 500-2,500 ppm range reported by Dr. Sawyer; and (2) only chronic exposures to n-hexane can result in peripheral neuropathy.

44.     As discussed in my initial declaration, BP, the U.S. Environmental Protection Agency (EPA), and others conducted comprehensive air sampling at fixed-monitoring locations along the Gulf Coast over the course of the DWH oil spill. Decl. of Dr. Cox, at ¶ 51. The results of the EPA and BP sampling results for n-hexane are summarized in Table 1 below.

**Table 1: Community Sampling Results for n-Hexane**

| Entity | # of Results | # of Non-Detects | Percentage Non-Detects | Max (ppm) | Median* (ppm) | 99th percentile* (ppm) |
|--------|------------|------------------|------------------------|-----------|---------------|------------------------|
| EPA    | 1563       | 432              | 28%                    | 0.51      | 0.00017       | 0.0073                 |
| BP     | 3293       | 3045             | 92%                    | 0.17      | 0.0025        | 0.0091                 |

* In calculating the medians and 99th percentiles, non-detect samples were treated as having a value of 1/2 the detection limit.

45.     As shown in Table 1 above, the airborne concentrations of n-hexane measured along the Gulf Coast during the DWH oil spill were far below the 500-2,500 ppm range reported

by Dr. Sawyer. Specifically, the median concentrations measured by EPA and BP during the DWH oil spill were 2.9 to 14.7 million and 200,000 to 1 million times lower respectively than the levels at which Dr. Sawyer reports peripheral neuropathy might be expected.[5] Likewise, the results of industrial hygiene sampling for n-hexane, as reported in the initial declaration of Dr. Peter Lees, were also significantly below the 500-2,500 ppm range. *See* Supp. Decl. of Dr. Lees, at ¶ 16. Thus, there is simply no scientific basis for concluding (or even suggesting) that peripheral neuropathy could be caused by exposures to n-hexane at the levels measured during the DWH oil spill.

46. In addition, as alluded to above, an isolated exposure to n-hexane at 500-2,500 ppm would not be expected to result in peripheral neuropathy. Rather, peripheral neuropathy has been associated with <u>repeated</u> exposures in occupational settings to significantly elevated levels of n-hexane (*i.e.*, 500-2,500 ppm) over a period of months to years (8). Given that the DWH oil spill lasted only a few months, and the fact that n-hexane has a short half-life in air, there was little to no potential for chronic exposures to n-hexane in relation to the spill. Accordingly, there is no evidence to suggest that Clean-Up Workers or Gulf Coast Residents could potentially develop peripheral neuropathy from exposures to n-hexane in connection with the DWH oil spill.[6]

47. Second, Dr. Sawyer describes studies showing reproductive toxicity and severe malformations associated with exposures to toluene, ethylbenzene, and other aromatic

---

[5] The concentrations of n-hexane measured during the DWH oil spill were also well below the chronic MRL for that compound. *See* Decl. of Dr. Cox, at ¶ 60.

[6] It is worth noting that peripheral neuropathy is one of the common complications of diabetes mellitus. Louisiana, Mississippi and Alabama have the highest rates in the United States of diabetes mellitus, primarily due to the high rates of obesity in those states. As a result, it is likely that many individuals in the Gulf Coast region will develop peripheral neuropathy as a complication of diabetes mellitus, but not, as described above, from n-hexane exposures in relation to the DWH oil spill.

hydrocarbons.  Decl. of Dr. Sawyer, at ¶ 35.  Some of the studies Dr. Sawyer cites relate to medical conditions experienced by women who repeatedly sniffed glue, solvents, and spray paint while pregnant (28, 29).  This form of exposure, known as solvent abuse, is associated with exposure to extremely high concentrations of toluene and other hydrocarbons, as well as hypoxia (low levels of oxygen) (30).  The concentrations to which individuals engaged in solvent abuse are exposed are over one million times higher than those measured along the Gulf Coast during the DWH oil spill.  In fact, the concentrations of toluene and ethylbenzene measured by EPA along the Gulf Coast during the DWH oil spill were lower than typical concentrations found in major urban areas in the United States.  *See* Decl. of Dr. Cox, at ¶¶ 23, 51.  Thus, there is absolutely no scientific basis for suggesting that the reproductive health effects described in the studies cited by Dr. Sawyer are likely to occur in Clean-Up Workers or Gulf Coast Residents from exposure to toluene, ethylbenzene, or other aromatic hydrocarbons released in connection with the DWH oil spill.

### *Sampling Results and Potential for Additive Toxicological Effects*

48.     Dr. Sawyer also cites to the results of a single air sample collected on May 18, 2010, in the Venice, Louisiana, marina boom off-loading/staging area.  Decl. of Dr. Sawyer, at ¶ 6.  It is not clear from Dr. Sawyer's declaration who collected the sample or by what means.  Based on the location in which the sample was collected (a marina boom off-loading/staging area), it would appear that this sample is an industrial hygiene sample, in which case the results should be compared to occupational exposure limits (OELs), and not to community screening levels established by EPA.  Such a comparison is provided in the separate declaration of Dr. Peter Lees.  *See* Supp. Decl. of Dr. Lees, at ¶ 12.

49.     Even assuming that it is appropriate to compare the sample results reported by Dr. Sawyer to community standards, however, Dr. Sawyer's analysis suffers from a number of flaws, which include the following:

(a)     Dr. Sawyer appears to assume that the airborne concentrations measured were "individually-liberated volatile components of southern Louisiana crude" (*i.e.*, components of the MC252 crude oil).  Decl. of Dr. Sawyer, at ¶ 6.  However, as discussed in my initial declaration, BTEX, hexane, and heptane are emitted from numerous sources.  Given that this sample was collected in a "marina boom off-loading/staging area," it is highly likely that other sources (such as exhaust from the use of heavy equipment, diesel engines, vehicles, and boats) contributed to the sample results.  And in fact, numerous studies have found that benzene was not present — or was present at negligible levels — in MC252 oil that reached the surface of the Gulf of Mexico (31-33).  Thus, it is highly likely that the benzene measurement reported by Dr. Sawyer was <u>not</u> the result of the MC252 oil, but rather was the result of other sources, such as engine exhaust.

(b)     It is inappropriate to draw conclusions from a single sample when thousands of samples were collected in connection with the DWH oil spill.  As discussed in my initial declaration, in assessing environmental exposures, air monitoring data that provide average or median concentrations of a chemical in air are more relevant and useful in assessing the potential for health risks than are data that provide isolated peak levels.  Decl. of Dr. Cox, at ¶ 15.  With respect to benzene, for example, Dr. Sawyer notes that the sample cited had a benzene concentration of 116 ug/m$^3$.  This single value may appear high (though, as discussed in greater detail by Drs. Lees and Green, it is still below all relevant OELs), but the sampling effort as a whole tells a different story.  For instance, out of the 1,656 24-hour air samples that EPA

collected along the Gulf Coast during the DWH oil spill, the median benzene result was 0.4 ug/m$^3$ and the 99th percentile result was 3.1 ug/m$^3$. As I explained in my initial declaration, one elevated result (unless excessively high, which this sample was not) is not indicative of a potential human health risk.[7]

(c)     Dr. Sawyer next adds up the concentrations of the sampled compounds and notes that "additive and combined toxicological effects" are "anticipated." Decl. of Dr. Sawyer, at ¶ 6. However, additive toxicological effects would only be "anticipated" if the individual compounds act through a common mechanism and are associated with a common health end point. For example, chronic exposures to high levels of benzene can result in decreased lymphocyte count, anemia, and leukemia, but chronic exposures to other volatile hydrocarbons do not. Thus, being exposed to toluene in addition to benzene, for example, would not increase the risk of decreased lymphocyte count or leukemia. Moreover, Dr. Sawyer provides no support for his assertion that additive toxicological effects would be anticipated, and fails to conduct a traditional mixture risk assessment, which, given the extremely low concentrations of the individual compounds measured in connection with the DWH oil spill, would show little to no excess risk of potential health effects. Such a mixture risk assessment is provided in the separate declaration of Dr. Lees. *See* Supp. Decl. of Dr. Lees, at ¶ 14.

## MR. KIRBY'S DECLARATION

50.     I would also like to comment on the declaration of James H. Kirby III, and in particular on his paper entitled *Findings of Persistency of Polycyclic Aromatic Hydrocarbons in Residual Tar Product Sourced from Crude Oil Released during the Deepwater Horizon MC252*

---

[7] There are occupational limits for one-time, short duration exposures to extremely elevated levels, known as Immediately Dangerous to Life and Health (IDLH). The IDLH for benzene is 500 ppm (or 1,597,000 ug/m$^3$), which is 13,767 times higher than the benzene measurement cited by Dr. Sawyer.

*Spill of National Significance*, which forms the basis for his declaration.  Mr. Kirby's declaration is submitted in support of the objections filed by Smith Stag, L.L.C., *et al*, and also forms the basis for certain assertions made in the objection filed by attorney Joseph Darrell Palmer on behalf of four objectors.

51.     Mr. Kirby's paper was never published in a peer-reviewed medical journal, and Mr. Kirby is not qualified to opine on many of the topics that he addresses in his declaration. Namely, Mr. Kirby does not have a degree or training in environmental or analytical chemistry, and his resume does not reflect any previous experience with oil spill clean-up, biodegradation processes, the design of properly controlled environmental studies, putative contaminants analysis, or human health issues.

52.     Mr. Kirby's lack of familiarity, training, and education in these fields becomes apparent when reading his declaration and attached paper, which contain numerous scientific errors.  These errors can be roughly categorized into three categories: (1) Mr. Kirby relies on an ultraviolet (UV) light methodology that has not been previously published and for which no validation data has been presented to support its sensitivity or specificity; (2) Mr. Kirby makes a number of significant errors in concluding that the tar samples he identifies contain excessive levels of PAHs; and (3) Mr. Kirby grossly misapplies the dermal absorption IH SkinPerm Model in concluding that the Corexit products in tar samples enhance the absorption of PAHs into exposed skin.   In short, the methodological and scientific errors in Mr. Kirby's paper are overwhelming, resulting in conclusions that are unfounded, illogical, and simply incorrect.

### UV Methodology

53.     Mr. Kirby's paper suggests that a hand-held UV light can be employed to detect MC252 oil and Corexit products and to differentiate tar samples containing Corexit products

from those that do not contain Corexit products. Mr. Kirby's UV test has never been published or validated, and Mr. Kirby provides no data to support the test's sensitivity or specificity. Moreover, Mr. Kirby's UV method does not meet common scientific practice, which would involve measuring the fluorescence spectra with a laboratory spectrophotometer and elaborate statistical and computer modeling (35-37).

54.    It is not possible, as Mr. Kirby suggests, to identify a specific compound or mixture of compounds with the UV method presented. In order to identify a specific substance, Mr. Kirby would have to compare his results to a known standard at a similar concentration and under similar weathering conditions. Instead, Mr. Kirby compares his results to the UV response of an oil sample that is "physically similar" — *i.e.*, a sample of tar that looks the same. Based on this comparison, Mr. Kirby concludes that the two samples that show similar UV responses are chemically the same. There is no scientific basis for such a conclusion.

55.    Mr. Kirby states that he used this UV method to inspect forty hotel rooms in a Gulf Coast hotel, all of which "were found to have some level of petroleum hydrocarbon contamination that was visible under inspection with UV light." Decl. of Mr. Kirby, at 1. It is true, as Mr. Kirby suggests, the PAHs and other hydrocarbons will fluoresce under UV light. However, Mr. Kirby's method could show a response even when no oil or dispersant is present, as there are a large number of organic and inorganic compounds that fluoresce in UV light (a number of which one would expect to find in a hotel room). These compounds include, among others, bodily fluids (such as blood, urine, semen, and sweat) and many forms of laundry detergents, soaps, and cleaning liquids (38). In addition, other substances likely to be found in a beach environment that fluoresce in UV light include chlorophyll (found in seaweed debris), algae, jellyfish, coral, and some common carbonate and silicate minerals in beach sand (39, 40).

Thus, it is not scientifically valid or appropriate to assume, as Mr. Kirby does, that any positive fluorescent response to UV light indicates the presence of hydrocarbons or dispersant.

56.     Mr. Kirby also claims on page 8 and in Figures 6 and 7 of his attached paper that fluorescent spots on a subject's legs are absorbed hydrocarbons from kneeling in Gulf waters. Mr. Kirby notes that "[t]he dermal absorption is not visible under ambient light conditions, but will show up as a fluorescent signature in response to 370 nm UV light illumination of the skin surface."  However, as discussed above, fluorescence in response to UV light at 370 nm is not proof of petroleum hydrocarbons or dispersant, as a multitude of substances will fluoresce at that frequency.  For instance, a number of organisms and substances that would be expected to be present in Gulf waters, such as dissolved organic material, pieces of coral, or algae, could easily get on a person's legs when kneeling along the shore (37, 40).[8]

57.     Finally, Mr. Kirby's claim of dispersants being present in the weathered oil is entirely unfounded.  It is highly unlikely that any dispersant was actually associated with the oil sampled by Mr. Kirby.  As described above, given the highly soluble and biodegradable nature of dispersants, it is unlikely that any dispersant arrived at the shoreline, a conclusion that was confirmed by the almost complete lack of detection of Corexit components in near-shore water and sediment samples collected by the OSAT-1 team between the Mississippi and Florida coasts. Decl. of Dr. Cox, at ¶ 83.  The fluorescence response to Mr. Kirby's UV light (which he describes as a "red shift") is more likely due to the many chemical changes that occur during the weathering process of crude oil, and is not indicative of the presence of Corexit in the beach samples.

---

[8] An alternative hypothesis not considered by Mr. Kirby is that the fluorescing substance is a chemical produced by the skin in response to sun exposure (41).  For example, the compound pentosidine fluoresces at 370 nm and is one of a group of compounds produced by the skin in response to sun exposure and other conditions.

*PAH Exposure Analysis*

58.     Mr. Kirby notes that 48 samples of "weathered tar product sourced from crude oil dispersed with Corexit® brand chemical dispersants" were submitted to a laboratory for PAH analysis.   Mr. Kirby concludes that 90% of those samples "were found to have PAH concentrations consistently in excess of [Immediately Dangerous to Life and Health (IDLH)] limits (80 mg/m$^3$) as stated in the NIOSH/OSHA Occupational Health Guidelines for Chemical Hazards and published in the NIOSH Pocket Guide to Chemical Hazards, 2007 (third printing)."

59.     In drawing this conclusion, Mr. Kirby makes a number of critical scientific errors. Most notably, the IDLH standard applies to ***airborne*** concentrations of chemical substances, and cannot be used to assess the potential health risk from chemical concentrations in a ***solid*** sample. According to NIOSH: "An IDLH exposure condition is one that poses a threat of exposure to *airborne* contaminants when that exposure is likely to cause death or immediate or delayed permanent adverse health effects or prevent escape from such an environment" (44).   Mr. Kirby's comparison of PAH levels in solid tar samples to IDLH air standards is thus illogical and scientifically incorrect, as the IDLH has no relevance to chemicals in water, sediment, soil, or tar.[9]   Such comparisons are inappropriate because, among other reasons, air is not the same density as soil or tar, and the inhalation and dermal exposure pathways differ significantly. Thus, PAH concentrations in a solid tar sample cannot be compared to IDLH standards, which are based on the concentration of a substance per cubic meter of *air*.   By comparing the PAH concentrations in the tar samples to the IDLH standard, Mr. Kirby grossly overstates the

---

[9] The units for the IDLH are micrograms of substance per cubic meter of air ($\mu$g/m$^3$).   In Mr. Kirby's paper, the laboratory reported the units of PAHs in micrograms of substance per kilogram of material ($\mu$g/kg).   The lab results represent the weight of a chemical in the weight of a **solid sample**.   Mr. Kirby's comparison of the IDLH, expressed in $\mu$g/m$^3$, and the lab results, expressed in $\mu$g/kg, is completely erroneous, and his reporting of how many times the $\mu$g/kg value is greater than the $\mu$g/m$^3$ value is illogical and scientifically meaningless.

potential health effects from the PAHs in the tar samples.[10]  Mr. Kirby is truly comparing apples and oranges.

60.     In contrast to Mr. Kirby's deeply flawed analysis, the OSAT-2 team analyzed weathered oil samples using validated methodologies and correct benchmarks for comparison and concluded that: (1) "weathered [MC252] oil samples showed 86-98 percent depletion of [PAHs]; and (2) "[c]alculated potential cancer and non-cancer health effects from short and long-term exposures [to the weathered MC252 oil were] below [EPA] acceptable health based risk and hazard levels" (4).

***Dermal Absorption Analysis***

61.     Finally, Mr. Kirby suggests that "tar product derived from weathered crude oil dispersed with Corexit® brand dispersants behaves as though it contains a built-in absorption accelerant."  In support of this assertion, Mr. Kirby states:

> A sample of tar product was collected for analysis.  The results showed Benzo(a)anthracene, a Class B-2 probable human carcinogen, present in the tar sample at a concentration of 196 ppb.  Using the dermal toxicity model, IHSkinPerm_V1.03, and correcting for the enhancement factor caused by the presence of Corexit dispersant that elevated the solubility parameter in the model, it showed that if a person with wet skin contacted this sample, the absorbed dose would have been 3.948 mg of this toxicant and would have occurred in less than a minute of contact (Decl. of Mr. Kirby, at 3).

62.     Put simply, Mr. Kirby's conclusion borders on the absurd.  To achieve a dose of 3.948 mg from dermal contact with tar with 196 ppb (or 0.196 mg/kg) benzo(a)anthracene would require absorption of 100% of the benzo(a)anthracene in more than 20 kg (or 44 pounds) of tar in

---

[10] It should also be noted that PAHs in weathered oil and tar balls are not capable of volatilizing to produce appreciable *airborne* concentrations, much less concentrations that could pose an immediate danger to life and health.

under one minute.[11]  It is difficult to imagine a situation in which an individual would have dermal contact with 44 pounds of tar.  It is even more incredible to assume that one would absorb 100% of the benzo(a)anthracene in that tar in under one minute.

63.     As discussed above, Mr. Kirby states that the tar sample he collected had a concentration of benzo(a)anthracene of 196 ppb.  To put that number in perspective, the U.S. Food and Drug Administration (FDA) allows shampoos to contain up to 5% coal tar (containing PAHs).  *See* 21 C.F.R. § 358.  For example, 0.5% coal tar shampoos contain approximately 60,000 ppb benzo(a)anthracene (42) — *i.e.*, 300 times the amount of benzo(a)anthracene measured in Mr. Kirby's sample.  In other words, one would likely receive substantially higher dermal exposures to PAHs using a coal tar shampoo (such as those used to prevent dandruff) than one could get from contacting weathered tar on a Gulf Coast beach.

### CANIPE AND McLANE OBJECTIONS

64.     Two objectors, Matthew Canipe and Timothy McLane, raise concerns regarding exposure to airborne concentrations of the constituents of oil and dispersants downwind of the spill, noting that their prior residence in Panama City Beach, Florida was directly downwind of the spill.  These claims are scientifically unfounded.

65.     First, during the DWH oil spill, the prevailing wind conditions actually drove the oil away from the Florida coast — in late April and May 2010, the prevailing winds were directed northwest of the spill site; in June and July 2010, the prevailing winds were generally directed north of the spill site (43).  Accordingly, Panama City Beach, Florida, which is located northeast of the spill site, was not consistently located downwind of the DWH oil spill, and the

---

[11] The calculation is as follows: 3.948 mg benzo(a)anthracene / 0.196 (mg/kg tar) = 20.143 kg tar.

winds generally acted to keep the oil west of the Florida panhandle (43). Moreover, Panama City Beach is approximately 184 miles from the MC252 well. As described in my initial declaration, many of the more water-soluble volatile hydrocarbons dissolved in the water column prior to reaching the surface of the Gulf, and the remainder of the volatile components underwent significant photodegredation and dilution prior to reaching the Gulf Coast. Decl. of Dr. Cox, at ¶¶ 44-46. As a result, there was little potential for Gulf Coast Residents to be exposed to airborne concentrations of the volatile components of the MC252 oil, particularly in locations as far removed from the spill site as Panama City Beach, Florida.

66. Second, as described in my initial declaration, over the course of the DWH oil spill, EPA and BP conducted air sampling at fixed-monitoring locations along the Gulf Coast, including at locations along the Florida coast. Decl. of Dr. Cox, at ¶ 48. The airborne concentrations of the constituents of the MC252 oil measured as part of this sampling effort were extremely low, and were far below levels at which any significant adverse health effects might be expected. *Id.* at ¶¶ 51-52, 58-61. The CDC reached a similar conclusion, stating that "[d]uring the Gulf oil spill, analyses of environmental air samples for VOCs along the Gulf shore found air concentrations that would not likely result in long term health effects to residents of Gulf coast communities" (7). The results of the EPA fixed-monitor sampling in Panama City Beach, Florida are provided in Table 2 below, and show that none of the volatile oil components reached Panama City Beach in significant concentrations.

**Table 2: EPA Air Sampling in Panama City Beach, Florida**

| Chemical | # of Samples | Median | Max | # > EPA SL or ATSDR MRL |
|---|---|---|---|---|
| Benzene ($\mu g/m^3$) | 24 | 0.29 | 1.60 | 0 |
| Toluene ($\mu g/m^3$) | 20 | 0.44 | 1.78 | 0 |
| Ethylbenzene ($\mu g/m^3$) | 36 | 0.09 | 0.30 | 0 |
| Xylenes ($\mu g/m^3$) | 39 | 0.07 | 0.27 | 0 |

67.     Table 2 demonstrates that the airborne concentrations of BTEX measured by EPA in Panama City Beach during the DWH oil spill never exceeded the EPA Screening Levels or the ATSDR MRLs.[12] In fact, the median concentration for benzene was 70 times lower than the benchmark levels, and the median concentrations of toluene, etylbenzene, and xylenes were 11,000 to 30,000 times lower than the benchmark levels.

68.     EPA did not conduct air sampling for components of the Corexit dispersants in Panama City Beach. However, as described in my initial declaration, airborne concentrations of the dispersant components measured along the Gulf Coast were uniformly very low, and were well below levels at which adverse health effects might be expected. *See* Decl. of Dr. Cox, at ¶¶ 62-68. Thus, it can be concluded that Panama City Beach, Florida, which is located 184 miles from the MC252 well, was minimally impacted by the DWH oil spill.

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Date:  October 22, 2012

Robert Cox, M.D., Ph.D

---

[12] The EPA Screening Levels and ATSDR MRLs are discussed in greater detail in my initial declaration in ¶¶ 53-57.

# APPENDIX A
## Objections Reviewed

1. Objection to Medical Benefits Portion of Proposed Class Action Settlement; Susan Forsyth, *et al.* (10-cv-07777; Rec. Doc. 213) ("Joseph Darrell Palmer Objection").

2. Statement of Objections; Joseph Yerkes, *et al.*(10-cv-07777; Rec. Doc. 185) ("Smith Stag, L.L.C., *et al.* Objection").

3. Statement of Objections; Carolyn Booker and Zena Coleman (10-cv-07777; Rec. Doc. 208).

4. Objection to Medical Settlement; Lance Clay Brown (10-cv-07777; Rec. Doc. 130).

5. Objection to Terms of the Medical Benefits Class Action Settlement; Matthew Judson Canipe (10-cv-07777; Rec. Doc. 203).

6. Objection to Proposed Medical Settlement Agreement; Malcolm Coco and Jared Shane Elrod (10-cv-07777; Rec. Doc. 180).

7. Halliburton Energy Services, Inc.'s Objections to Plaintiffs' Memorandum in Support of Final Approval of Medical Benefits Class Action Settlement and BP's Motion for Final Approval of the Medical Benefits Class Action Settlement (10-cv-07777; Rec. Doc. 93).

8. Objection to Terms of the Medical Benefits Class Action Settlement; Timothy Patrick McLane (10-cv-07777; Rec. Doc. 205).

9. Notice of Consolidated Objection to the Fairness and Adequacy of the Proposed Medical Benefits Class Action Settlement Agreement; Reynaldo Abreu, *et al.* (10-cv-07777; Rec. Doc. 92).

**APPENDIX B**
**Materials Reviewed**

1. Goldstein BD, Osofsky HJ, Lichtveld M. The Gulf oil spill. NEJM 2011; 364:1334-1348.

2. Hayworth JS, Clement TB. Provenance of Corexit-related chemical constituents found in nearshore and inland Gulf Coast waters. *Mar Pollut Bull* 2012; 64:2005-2014.

3. Operational Science Advisory Team (OSAT) Unified Area Command. Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring. Prepared for Paul F. Zukunft, RADM, U.S. Coast Guard Federal On-Scene Coordinator Deepwater Horizon MC252. December 17, 2010. Available at: CDC. Oil Spill Dispersant (COREXIT®EC9500A and EC9527A) Information for Health Professionals. Available at: http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf. Accessed on 8/10/2012.

4. Operational Science Advisory Team (OSAT-2) Gulf Coast Management Team. Summary Report for Fate and Effects of Remnant Oil in the Beach Environment. Prepared for Lincoln D. Stroh, CAPT, U.S. Coast Guard Federal On-Scene Coordinator. February 10, 2011. Available at: http://www.restorethegulf.gov/sites/default/files/u316/OSAT-2%20Report%20no%20ltr.pdf. Accessed on 3/31/2012.

5. Clement TP, Hayworth JS, Mulabagal V, John GF, Yin F. 2012. Research Brief-II. Impact of Hurricane Isaac on Mobilizing Deepwater Horizon Oil Spill Residues along Alabama's Coastline - A Physicochemical Characterization Study. *Available at* http://www.eng.auburn.edu/news/2012/09/ce-isaac.html.

6. Office of Response and Restoration. Incident News, USCG Press Release 10Oct12. Available at: http://incidentnews.gov/entry/16611. Accessed on 10/20/12.

7. Centers for Disease Control and Prevention. CDC/ATSDR Guidance on the Interpretation and Use of Blood Laboratory Analyses for Volatile Organic Compounds. Available at: http://emergency.cdc.gov/gulfoilspill2010/pdf/Clinician_VOC_FactSheet.pdf. Accessed on 8/18/12.

8. ATSDR. Toxicological Profile for N-Hexane. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1999.

9. ATSDR. Toxicological Profile for Ethylbenzene. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2010.

10. Chambers DM, McElprang DO, Waterhouse MG, Blount BC. An improved approach for accurate quantitation of benzene, toluene, ethylbenzene and styrene in blood. *Anal Chem* 2006; 78:5375-5383.

11. Chambers DM, Blount BC, McElprang DO, Waterhouse MG, Morrow JC. Picogram measurement of volatile n-alkanes (n-hexane through n-dodecane) in blood using solid-phase

microextraction to assess nonoccupational petroleum-based fuel exposure. *Anal Chem* 2008; 80:4666-4674.

12. Brugnone R, Maranelli G, Romeo L, Giuliari C, et al. Ubiquitous pollution by n-hexane and reference biological levels in the general population. *Int Arch Occup Environ Health* 1991; 63:157-160.

13. Kurt TL. Multiple chemical sensitivities – a syndrome of pseudotoxicity manifest as exposure perceived symptoms. *Clin Toxicol* 1995; 33:101-105.

14. Magill MK, Suruda A. Multiple Chemical Sensitivity Syndrome. Am Fam Physician 1998; 58:721-728.

15. American Medical Association. Clinical Ecology. JAMA 268(24):3465-3467, 1992.

16. American College of Occupational and Environmental Medicine. ACOEM statement about distinctions among indoor air quality, MCS, and ETS. ACOEM, 1991.

17. American Academy of Allergy Asthma and Immunology, Position statement on Idiopathic Environmental Intolerances. Available at: http://www.aaaai.org/Aaaai/media/ MediaLibrary/PDF%20Documents/Practice%20and%20Parameters/Idiopathic-environmental-intolerances-1999.pdf. Accessed on 9/15/12.

18. National Institutes of Health. Environmental Health and Toxicology. IUPAC Glossary of Terms used in Toxicology. US Department of Health and Human Services. Available at: http://sis.nlm.nih.gov/enviro/iupacglossary/glossarym.html. Accessed on 10/1/2012.

19. King BS, Gibbons JD. Health Hazard Evaluation of the Deepwater Horizon Response Workers. National Institute for Occupational Safety and Health, 2011

20. Centers for Disease Control and Prevention. Gulf Oil Spill 2010: Deep Water Horizon Oil Spill Human Health Interim Clinical Guidance. Available at: http://www.bt.cdc.gov/gulfoilspill2010/oilspill_clinical.asp. Accessed on 3/29/2012.

21. Centers for Disease Control and Prevention. West Nile Virus. Available at: www.cdc.gov/ncidod/dvbid/westnile/index.htm. Accessed 10/2/2012.

22. Baars B-J. The wreckage of the oil tanker 'Erika' - human health risk assessment of beach cleaning, sunbathing and swimming. *Toxicol Lett* 2002; 128:55-68.

23. Rodriguez-Trigo G., Zock JP, Pozo-Rodriguez F, Gomez FP, et al. Changes in fishermen 2 years after the *Prestige* oil spill. *Ann. Intern Med* 2010; 153(8):489-498.

24. Zock JP, Rodriguez-Trigo G, Rodriguez-Rodriguez E, et al. Long-term health effects of Prestiage oil spill (Galicia, Spain). *Epidemiology* 2009; 20:S242-S243.

25. Rodriguez-Trigo G, Zock JP, Pozo-Rodriguez F, et al. Health changes in fisherman 2 years after clean-up of the Prestige oil spill. Ann Int Med 2010; 153:489-498.

26. Cole JB, Capulas WA, Aldridge K, et al. Biomonitoring of possible human exposure to environmental genotoxic chemicals: Lesons from a study following the wreck of the oil tanker Braer. *Environ Mutagen* 1997; 30: 97-111.

27. Aguilera F, Méndez, Pásaro E, et al. Review on the effects of exposure to spilled oils on the human health. *J Appl Toxicol* 2010; 30:291-301.

28. Hersh JH, Podruch PE, Rogers G, et al. Toluene embryopathy. *Pediatrics* 1985; 106:922-927.

29. Hersh JH. Toluene embryopathy: two new cases. *J Med Genetics* 1989; 26:333-337.

30. Clinical Management of Poisoning and Drug Overdose. 3rd ED. LM Hassad ed. WB Saunders, Philadelphia, PA, 1998.

31. Middlebrook AM, Murphy DM, Ahmadov R, *et al*. Air quality implications of the *Deepwater Horizon* oil spill. *PNAS Early Edition*, December 28, 2011. Available at: www.pnas.org/cgi/doi/10.1073/pnas.1110052108.

32. Ryerson TB, Camilli R, Kessler JD, *et al*. Chemical data quantify *Deepwater Horizon* hydrocarbon flow rate and environmental distribution. *PNAS Early Edition*, January 10, 2012. Available at: www.pnas.org/cgi/doi/10.1073/pnas.1110564109.

33. Ryerson TB, Aiken KC, Angevine WM, et al. Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 2011;38: L07803, doi:10.1029/2011GL046726.

34. Centers for Disease Control and Prevention. Community Fact Sheet. Volatile Organic Compounds and Your Health. Available at: http://emergency.cdc.gov/gulfoilspill2010 /pdf/Resident_VOC_FactSheet.pdf. Accessed on 10/17/12.

35. Abercrombie, M. 2011. Use of in situ and remote sensors, sampling and systems for assessing impacts and mitigation of oil and dispersant. Deepwater Horizon oil spill principal investigator workshop, October 25-26, 2011 - final report.

36. Stelmaszewski, A. 2004. Fluorescence method for the determination of oil identity. *Optica Applicata* 34(3): 405-418.

37. Baker A, Spencer RGM. Characterization of dissolved organic matter from source to sea using fluorescence and absorbance spectroscopy. Science Tot Environ 2004;333:217-232.

38. Science Learning. UV and fluorescence. Available at: http://www.sciencelearn.org.nz/ Contexts/You-Me-and-UV/Science-Ideas-and-Concepts/UV-and-fluorescence. Accessed on 10/2/2012.

39. Mail Online. The red, green, blue and yellow sea: Fluorescent lights turn the bottom of the Red Sea into a sponge disco.  Available at: http://www.dailymail.co.uk/sciencetech /article-2165450/The-red-green-blue-yellow-sea-Neon-lights-turn-the-Red-Sea-sponge-disco.html.

40. Schubert H, Schiewer U, Tschirner E. Fluorescence characteristics of cyanobacteria (blue-green algae). J Plankton Research 1989; 11:353-359.

41. Beisswenger P. Howell S, Mackensie T, Corstiens H, et al. Two fluorescent wavelengths, 440(ex)/520(em) nm and 370(ex)/440(em) nm, reflect advanced glycation and oxidation end products in human skin without diabetes.  *Diabetes Technol Ther*  2012; 14(3): 285-292.

42. Neutrogenia Corporation. Letter to FDA, October 24, 2000, FDA Docket 00P-1210/CP1.

43. LeHenaff ML, Kourafalou VH, Paris CB, et al. Surface evolution of the Deepwater Horizon oil spill patch: combined effects of circulation and wind-induced drift. Environ Sci Technol 2012; 46. 7267-7273.

44. Bollinger N.  NIOSH Respirator Selection Logic (2004).  *Available at* www.cdc.gov/ niosh/ docs/2005-100/pdfs/2005-100.pdf.

45. Declaration of Dr. Peter Lees (August 13, 2012).

46. Declaration of Dr. David R. Dutton (August 13, 2012).

47. Supplemental Declaration of Dr. Peter Lees (October 22, 2012).