UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| **THIS PLEADING APPLIES TO:** No. 12-311 | * * * | JUDGE BARBIER MAG. JUDGE SHUSHAN |
| | * | **JURY TRIAL DEMANDED** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF MITCHELL J. AUSLANDER IN SUPPORT OF CAMERON INTERNATIONAL CORPORATION'S MOTION FOR ATTORNEYS' FEES

Mitchell J. Auslander, pursuant to 28 U.S.C. section 1746, hereby declares as follows:

1.      I am over 21 years of age, of sound mind, in all respects competent to make this declaration, and have personal knowledge of the facts stated herein.

2.      I am a partner with the law firm of Willkie Farr & Gallagher LLP ("Willkie Farr") in New York, New York.

3.      I am a member of the New York Bar and have been admitted *pro hac vice* for the instant suit.

4.      In November 2011, I was retained by Cameron International Corporation ("Cameron") to serve as counsel for insurance matters relating to the Deepwater Horizon incident and have represented Cameron since that time.

**Presentment Of Claim**

5.      Cameron manufactured the blowout preventer used on the Deepwater Horizon, an ultra-deepwater, semi-submersible offshore oil drilling rig that exploded in April 2010, killing 11 men and injuring 17 others. The explosion caused an oil spill in the Gulf of Mexico that flowed

HIGHLY CONFIDENTIAL

**EXHIBIT 1**

13141735.8

unabated for three months.  It was the largest accidental marine oil spill in the history of the petroleum industry, and gave rise to hundreds of thousands claims, exposing Cameron to potentially billions of dollars in liability.  In an effort to minimize its exposure to potentially ruinous litigation, Cameron began to negotiate a global settlement of claims with BP in late 2011.

6.      In negotiating with BP, Cameron simultaneously needed to ensure that it would have coverage from its tower of insurance carriers for any potential settlement.  Cameron had in place a tower of 10 excess casualty insurance policies that afforded it $500 million in coverage for the 2009-2010 policy year.  Five of the ten policies are governed by New York law, and the remainder may have been governed by Louisiana or Texas law.  Six of the policies are subject to arbitration in the United Kingdom.

7.      Willkie Farr is an international firm with a specialty in insurance matters and deep institutional knowledge regarding how to manage complex multi-layer insurance coverage disputes of the type faced by Cameron.  I personally have over thirty years of experience in insurance law and coverage disputes, particularly complex coverage disputes involving multi-layer policy towers and third party claims.  At the time Willkie Farr was engaged, Liberty and two of Cameron's other insurers were represented by the international law firm of Clyde & Co.

8.      On December 15, 2011, BP and Cameron entered into a Confidential Settlement Agreement, Mutual Releases And Agreement To Indemnify (the "BP-Cameron Settlement Agreement") pursuant to which BP agreed to indemnify Cameron for all liabilities arising from the Deepwater Horizon incident in exchange for a settlement payment of $250 million.  All of Cameron's insurers, except Liberty, agreed to pay a share of the BP-Cameron Settlement Agreement.  Despite diligent negotiations with Liberty through its counsel, Paul Koepff of Clyde

HIGHLY CONFIDENTIAL

13141735.8

& Co., Liberty refused to pay its $50 million policy limits based on a novel, and ultimately flawed, reading of its "Other Insurance" provision. Cameron made several demands in December 2011 and January 2012 that Liberty pay what it owed under the Liberty Policy but Liberty refused.

9.     By that point, Cameron and Willkie Farr had forged a deep working relationship regarding the insurance coverage issues related to the Deepwater Horizon incident. Willkie Farr had first-hand knowledge of the facts and circumstances surrounding the settlement with BP and the reasons for Liberty's refusal to pay. It would have been costly, time-consuming, and contrary to Cameron's best interests to find alternative litigation counsel, and to get that counsel up to speed on the relevant facts and law, prior to filing suit against Liberty. Accordingly, on January 30, 2012, Cameron, through Willkie Farr and Stone Pigman Walther Wittmann LLC ("Stone Pigman") (which was already representing Cameron with respect to other Deepwater Horizon issues), filed suit against Liberty.

### Work Performed By Willkie Farr & Gallagher LLP

10.     Having prevailed on summary judgment against Liberty on its breach-of-contract claim and pursuant to Texas law, Cameron now seeks to recover $3,389,445.96 in attorneys' fees and related non-taxable expenses, which includes the following components:

     a.     ▮▮▮▮ in fees for ▮▮▮▮ hours of work performed by Willkie Farr attorneys, law clerks, and legal assistants between January 30, 2012 and September 30, 2014;[1]

     b.     ▮▮▮▮ in fees for ▮▮▮▮ hours of work performed by Cameron's local counsel, Stone Pigman, over that same period;[2]

---

[1] This produces a blended hourly rate of ▮▮▮▮.

- 3 -

13141735.8

      c.     █████   in electronic research costs incurred by Cameron.

11.    A number of Willkie Farr attorneys and legal assistants have worked on this case between January 2012 and the present. While staffing has varied depending on the needs of the case at particular times, the legal team from Willkie Farr mainly consisted of myself, my partner Jeffrey Korn, two associate attorneys, and one legal assistant. A number of additional timekeepers worked on the case at different times as a result of departures from the firm and the need for extra help in busy periods. Attached as Exhibit A is a spreadsheet detailing the billing rates charged by Willkie Farr attorneys, law clerks, and legal assistants who provided more than 10 hours of legal services to Cameron in connection with the instant suit, along with the total number of hours they worked. Attached as Exhibit B are individual biographies detailing the backgrounds and qualifications for the same Willkie Farr attorneys, law clerks, and legal assistants. Attached as Exhibit C are more comprehensive biographies for the Willkie Farr partners and associate attorneys who were primarily responsible for managing this case.

12.    As detailed in the attached biographies, Cameron's attorneys are seasoned professionals with extensive experience in complex litigation who have achieved significant successes for their clients. Willkie Farr is an international firm and its attorneys routinely work on high profile litigation matters of national and international scope in courts across the United States. I have over 30 years of experience in complex commercial litigation. My practice focuses primarily on insurance and re-insurance matters worldwide.

13.    My partner Jeffrey Korn has approximately 15 years of experience in complex commercial litigation. He has worked on numerous high-profile litigations, both at Willkie Farr and at Cravath, Swaine & Moore LLP.

---

[2] This produces a blended hourly rate of █████ The blended hourly rate for work performed by attorneys from Willkie Farr and Stone Pigman is █████

HIGHLY CONFIDENTIAL

13141735.8

14. Willkie Farr associates are licensed attorneys. Willkie Farr law clerks perform substantive legal work under the direction and supervision of licensed attorneys.

15. Willkie Farr legal assistants are qualified to perform substantive legal work based on their educational background and training. They routinely perform substantive legal work under the direction and supervision of attorneys. During this litigation, Willkie Farr legal assistants routinely performed substantive legal work including but not limited to (1) assisting in preparation for depositions, (2) editing, cite-checking, blue booking, and Shepardizing briefs, (3) coordinating document productions, and (4) engaging in factual research for briefs. Willkie Farr legal assistants performed this work under the direction and supervision of Willkie Farr licensed attorneys.

16. Throughout the litigation, Willkie Farr billed Cameron for legal services on an hourly basis, calculated based on the number of hours worked by Willkie Farr attorneys, legal assistants, and other personnel multiplied by their hourly rates. Each month, Willkie Farr invoiced Cameron for work performed during the preceding month. These invoices contained a series of time entries reflecting (1) the date when work was performed, (2) the identity of the individual performing the work, (3) a description of the work performed, and (4) the amount of time spent in increments of six minutes. Willkie Farr attorneys, law clerks, and legal assistants are responsible for preparing their own time entries, which are then included on the invoices.

17. Attached as Exhibit D are true and correct copies of the 34 invoices Willkie Farr sent to Cameron for work performed throughout this litigation (the "Invoices"). Throughout the litigation, Cameron incurred total fees of ▋▋▋▋. Cameron has paid its invoices promptly

- 5 -

HIGHLY CONFIDENTIAL

13141735.8

each month, and through September 30, 2014 has paid Willkie Farr ▇▇▇▇▇▇▇. This number will increase once the fees incurred in connection with this motion are totaled.[3]

18.     I was the attorney responsible for reviewing invoices before they were sent to Cameron for payment. In the course of our engagement, I had conversations with Cameron's in-house legal department, which also reviewed each invoice we submitted, to the extent they had questions about our bills.

19.     My understanding of Texas law governing the recoverability of attorneys' fees under Section 38.001(8) is that if work was performed on the case solely to develop the successful breach-of-contract claim or was necessary in support of both the successful breach-of-contract claim and another claim, those attorneys' fees are recoverable. However, any fees which were incurred solely in support of a claim other than the successful breach-of-contract claim are not recoverable and must be segregated out from the claimed recovery. As detailed below, Willkie Farr has segregated recoverable from non-recoverable fees and reduced Cameron's fee application accordingly. An Excel spreadsheet, generated from the Invoices, details the reductions described below and is attached as Exhibit E.

20.     As an initial matter, Willkie Farr attorneys identified ▇▇▇▇ hours of attorney time that was spent on tasks pertaining solely to Cameron's breach-of-contract claim on which Cameron prevailed on summary judgment. The value of this attorney time is ▇▇▇▇▇▇▇ at standard hourly rates. Cameron seeks the full value of this work in the instant fee application.[4]

---

[3] Cameron hereby reserves the right to increase the amount of fees sought in the Motion to reflect the fees incurred in connection with preparing the Motion, pursuant to Texas law. *See, e.g., Chaparral Texas, L.P. v. W. Dale Morris, Inc.*, 2009 WL 455282, at *12, n. 5 (S.D. Tex. Feb. 23, 2009) ("In general, a plaintiff is entitled to an award of reasonable attorneys' fees in connection with the time spent to prepare the fee application") (citations omitted).

[4] All time, amounts, and discounts discussed in paragraphs 20 through 31 of this Declaration relate solely to fees incurred by Cameron on account of work performed by Willkie Farr. Time, amounts, and discounts relating to work performed by Stone Pigman are detailed in the Declaration of Carmelite Bertaut submitted contemporaneously herewith.

HIGHLY CONFIDENTIAL

13141735.8

21.     Cameron also asserted unsuccessful bad-faith claims (which will be the subject of an appeal) in addition to its successful breach-of-contract claim.  My understanding is that fees incurred solely in furtherance of the bad faith claim are not compensable at this time.

22.     To satisfy the fee segregation requirement of the law, Willkie Farr attorneys under my supervision have reviewed each entry on the Invoices to fairly estimate the amount of time that was spent solely in support of the bad faith claim.  By way of example, Willkie Farr attorneys segregated and excluded time for entries containing descriptions such as ███████

██████████████████████████████████████████████████

████████████████; and ███████████████████████

████████████████████████████████████████████████

██████████████████████████ Willkie Farr attorneys identified ██████

hours of attorney time that was spent on tasks pertaining solely to the unrecoverable bad faith claim, the value of which is ████████ at standard hourly rates.  I have excluded this amount from Cameron's current fee application.

23.     Willkie Farr attorneys have also identified ██████ hours of work, valued at ████████ at standard hourly rates, with associated narratives describing work that was performed both for the recoverable breach of contract claim and the non-recoverable bad faith claim.  This is work that would have been performed even in the absence of Cameron's bad faith claim.  Examples of such entries include ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████; and

████████████████████████████████████████████

████████████████████████████ After reviewing these

- 7 -

HIGHLY CONFIDENTIAL

13141735.8

entries, we estimate that 75% of the work described therein would have been necessary even if the bad faith claim had not been asserted. Accordingly, I have discounted the fees in those entries by 25%, or ███████. Cameron thus seeks ███████ for these mixed entries.[5]

24.    Willkie Farr attorneys have also identified a number of entries related to fee issues. These entries arose in two contexts. First, Cameron asserted a coverage claim under the Liberty Policy to recover legal fees and expenses it paid in defending the Oil Spill MDL. My understanding is that time spent in relation to this claim is not recoverable because the Court rejected Cameron's claim for these defense expenses. Second, Cameron argued that the reasonable fees incurred in prosecuting this lawsuit are recoverable as damages resulting from Liberty's bad faith, and because Cameron is the prevailing party on its breach of contract claim. This latter category is recoverable because that work forms the foundation for recovery—and would have been required to be performed in any event—in this fee application.[6]

25.    Here, the efforts that went into pursuing Cameron's claim for bad faith damages measured by fees incurred in this action were heavily relied upon and form the basis for this fee application. Specifically, in preparing his declaration, Cameron's expert witness Dane Ciolino relied in large part upon his expert report prepared in connection with Cameron's earlier fee-related claims. The work associated with preparing and reviewing this report is the foundation for this fee application. Moreover, the depositions of Mr. Ciolino and Mr. Feldman (Liberty's fee expert) focused entirely on coverage-related issues. Finally, the Invoices were originally compiled and produced to Liberty in connection with the fee claim. Even though the majority of

---

[5] One associate, James Caputo, assigned each task in a given narrative with individual amounts of time. In mixed entries of this kind, Willkie Farr attorneys separated the non-recoverable narrative from the recoverable narratives. The non-recoverable narratives were then written off entirely.

[6] See, e.g., Chaparral Texas, L.P. v. W. Dale Morris, Inc., 2009 WL 455282, at *12, n. 5 (S.D. Tex. Feb. 23, 2009) ("In general, a plaintiff is entitled to an award of reasonable attorneys' fees in connection with the time spent to prepare the fee application") (citations omitted).

HIGHLY CONFIDENTIAL

13141735.8

this work was necessary for the preparation of this fee application, Cameron does recognize that not all work associated with Cameron's fee request in connection with its bad faith claim is recoverable given that the bad-faith claim was ultimately unsuccessful.

26.     Many of the time entries related to these two fee issues, however, could not distinguish whether the work was in furtherance of the non-recoverable claim for MDL defense expenses or the partially recoverable claim for attorneys fees as bad faith damages.  Accordingly, we have discounted entries of this kind by 50% because the terms "fee issues" or "invoices," which commonly appear in entries falling into both categories, could relate to either the unrecoverable MDL defense expenses claim or Cameron's recoverable request for reasonable attorneys fees under Section 38.001.

27.     Willkie Farr attorneys identified █████ hours of attorney time that was spent on tasks pertaining *solely* to the assessment of fees, the value of which is █████████ at standard hourly rates.  To the extent we were able to identify such entries, we have excluded the entirety of entries which related (1) solely to the MDL defense expense claim or (2) legal research and drafting work regarding Cameron's argument that fees in the current suit constitute compensatory damages under Texas's bad faith statute.  In total, we have discounted █████████ from entries related solely to fee-related work.  Cameron has thus only sought █████████ for work entirely related to its fee claims.

28.     As noted above, the remaining entries in this category are generically "fee related" rather than specific to one claim.  We have discounted these entries by 50%.  In total, Willkie Farr attorneys have identified ███ hours of work, valued at █████████ at standard hourly rates, with associated narratives describing work pertaining to *both* the recoverable breach-of-contract claim and fee-related work.  Examples of such entries include █████████

- 9 -

13141735.8



Applying the 50% discount discussed above, we have excluded fees amounting to ▉▉▉▉▉  We have done this, rather than seek a higher amount given the fact that the fee-related work is partly compensable, in an effort to account for any potential vague or duplicative entries, and to avoid a needlessly complicated parsing of the Invoices.  Cameron thus seeks ▉▉▉▉ for these entries.

29.     In addition, I understand that Texas law does not allow administrative work to be recovered as attorneys fees.  Willkie Farr attorneys have identified ▉▉▉ hours of work performed by non-legal and non-paralegal staff (such as library and litigation technology support services), valued at ▉▉▉▉ at standard hourly rates.  We have segregated and excluded this full amount.

30.     Willkie Farr attorneys have also identified ▉▉▉ hours of legal assistant time, valued at ▉▉▉▉ at standard hourly rates.  We have excluded ▉▉▉▉ from this amount (a 25% reduction) to account for work they performed that we viewed as administrative in nature.  We estimate, based on reviewing the invoices and billing records in this case, that at least 75%, or more, of the work performed by Willkie Farr legal assistants in this case was substantive legal work.

31.     In sum, with respect to Cameron's application for recovery of its attorneys' fees for its successful breach of contract claim, the net value of recoverable fees is ▉▉▉▉ for ▉▉▉ hours of work, after exclusions for (a) work that related solely to the bad faith claims; (b) work that related solely to Cameron's contract claim for MDL defense expenses; (c) work that

- 10 -

HIGHLY CONFIDENTIAL

13141735.8

related partially to either of those claims; (d) work performed by non-legal and non-paralegal staff; and (e) work performed by legal assistants that was not substantive legal work. However, to account for the possibility that any portion of the net recoverable fees were incurred for duplicative work, unrecoverable claims, or for any other reason Liberty could argue that individual diary entries are not recoverable, we have applied an additional discount of 5%, or ██████████. This reduction, combined with those already described, reduces the total fees Cameron seeks to recover for Willkie Farr attorney, law clerk, and legal assistant services to ██████████

32.     Cameron has incurred electronic legal research expenses of ████████ from Westlaw, Lexis, and Bloomberg Law through October 31, 2014. These expenses are set forth in an excerpted statement from Willkie Farr's accounting department, which is attached as Exhibit F. I estimate that at least 75%, or ████████, of those research expenses were incurred in connection with Cameron's breach of contract claim, and that no more than 25% of the research expenses related solely to unrecoverable claims.

33.     Cameron is also entitled to recover the reasonable attorneys' fees it has incurred or will incur following the entry of judgment in this case on October 31, 2014 (the "Judgment"), including fees for this motion, post-judgment briefing and any fees Cameron will incur in the event that Defendants appeal the Judgment. My understanding of the Court's procedure is that those attorneys' fees will be the subject of a later application rather than being estimated and ruled on at this time. If that understanding is incorrect I will provide a supplemental declaration estimating future attorneys' fees.

34.     Cameron also is entitled to recover prejudgment interest at the Texas statutory rate of 5% for the $50 million judgment it has won on its breach-of-contract claim. In addition,

- 11 -

HIGHLY CONFIDENTIAL

13141735.8

Cameron is entitled to 5% interest for all recoverable attorneys' and legal assistants' fees it paid

prior to entry of the Judgment. Prior to the Judgment, Cameron had paid Willkie Farr

████████████ in recoverable attorneys' and legal assistants' fees, which was calculated by

taking the total amount paid and subtracting the amounts detailed above incurred in connection

with unrecoverable claims and work that was not substantive legal work. The total amount of

prejudgment interest Cameron is owed will be calculated separately.

### Defendants' Conduct Necessitated The Amount Of Work Performed

35.      Throughout the litigation, Willkie Farr, in conjunction with Cameron, has worked

to limit attorneys' fees by, among other things, utilizing the fewest number of attorneys and legal

assistants necessary at any given time, limiting discovery requests and depositions, and

exercising discretion with regard to motion practice.

36.      We worked closely with Stone Pigman to avoid duplication of efforts and to limit

fees and other expenses.

37.      Nevertheless, Cameron has been forced to incur significant attorneys' fees to

prosecute its case. The reason is the manner in which Defendants have conducted the litigation.

38.      Liberty made numerous motions. Liberty moved for judgment on the pleadings,

for summary judgment three times, for one protective order, for reconsideration of this Court's

discovery orders, four times to compel and for compliance with subpoenas, and appealed

Magistrate Judge Shushan's order denying relief sought in one of Liberty's motions to compel.

39.      Moreover, Liberty repeatedly flouted its discovery obligations. Cameron was

forced to devote a large amount of time, effort, and expense to secure basic fact discovery.

Specifically, Cameron learned six weeks before the original court-imposed deadline for fact

discovery that Liberty did not intend to search for electronic documents, forcing an extension of

- 12 -

HIGHLY CONFIDENTIAL

13141735.8

the discovery deadline. Seven months after discovery had started, and only after Cameron sought relief from the Court, Liberty finally produced its electronic files, but in doing so violated Pretrial Order 16 and this Court's Case Management Order by failing to indicate where documents began or ended and by failing to produce a load file and metadata. This dramatically increased the fees incurred by Cameron, as it prevented Willkie Farr from reviewing and searching Liberty's documents in a cost effective manner.

40.    As another example, Liberty ignored Local Rule 7-7 and several orders from this Court limiting the parties to one 25-page summary judgment motion when it filed three summary judgment motions totaling 64 pages of legal memoranda and several hundred pages of appendices and exhibits. Liberty's latter two motions, which included 43 pages of legal memoranda, addressed substantially (if not entirely) overlapping issues including whether Liberty was obligated to pay Cameron's claim, whether Cameron improperly impaired Liberty's subrogation rights, and the meaning of the BP settlement agreement. As this Court recognized, "Liberty's motions for partial summary judgment violate[d] the spirit if not the letter of the scheduling order." March 31, 2014 Order [Dkt. No. 12610]. Summary judgment memoranda of law ultimately totaled nearly 250 pages.

**Defendants Rebuffed Cameron's Attempts To Resolve The Case Consensually**

41.    Before the litigation was filed, Cameron offered to settle the dispute with Liberty for substantially less than the Court has now awarded Cameron. Liberty refused to settle the case, offering a fraction of the amount the Court ultimately ordered, requiring Cameron to litigate through judgment to obtain what it was owed under its insurance policy. This dramatically prolonged the litigation and increased the fees incurred by Cameron.

HIGHLY CONFIDENTIAL

13141735.8

### Complexity And Difficulty Of The Case

42.     This case was time consuming and challenging.  The parties engaged in 19 depositions, taking testimony from 12 fact witnesses and seven expert witnesses.  Of the seven expert depositions, five were substantially focused on issues relevant to Cameron's breach-of-contract claim.  The depositions took place in New York, Texas, Louisiana, California, and Bermuda.

43.     The parties conducted extensive and broad-ranging discovery.  This included numerous requests of third-party witnesses in both the United States and abroad.  The parties and non-parties produced over 65,000 pages of documents, approximately 27,000 pages each by Cameron and Liberty and nearly 12,000 pages by non-parties.

44.     Moreover, the novelty and intricacy of the legal issues made this case far more complicated than an ordinary breach-of-contract case.  For example, Liberty admitted that this was the first time it was asserting this interpretation of its "Other Insurance" clause, necessitating extensive legal research of nationwide state, federal, and secondary sources.  Moreover, the parties confronted exceedingly difficult and novel questions in litigating Cameron's breach-of-contract claim including, among others:  (1) the meaning, operation, and relationship between underlying insurance, exhaustion,  and other insurance provisions; (2) subrogation issues; (3) the relationship between contested contractual indemnities and traditional insurance; (4) waiver issues, and; (5) choice of law.  Willkie Farr's extensive work in these legal areas ultimately culminated in a favorable result on summary judgment for Cameron.

45.     Plaintiff also had to contend with three formidable adversaries.  Defendants were represented by insurance coverage law firms from New York, Texas, and Louisiana.

### *Arthur Andersen* Factors

HIGHLY CONFIDENTIAL

13141735.8

46.     The eight factors set forth in *Arthur Andersen & Co. v. Perry Equipment Corp.*,

945 S.W.2d 812, 818 (Tex. 1997) and its progeny regarding an appropriate attorneys' fee award

support the reasonableness of the requested amounts in this instance.

47.     As detailed above, the time and labor devoted to this matter, *Arthur Andersen*

factor (1), was reasonable, necessary and appropriate in light of Liberty's aggressive and

obstructionist litigation tactics, its unwillingness to engage in reasonable settlement discussions,

and the complexity of the legal issues in dispute.

48.     Cameron's decision to retain national counsel is consistent with the decisions of

similarly situated parties.  Likewise, the fees Cameron seeks are consistent with fees charged for

similar, complex, high-stakes insurance coverage disputes in the Fifth Circuit by attorneys with

similar experience, reputation, and ability.  (*See Arthur Andersen* factors 3 and 7.)

49.     Hourly rates in excess of $1,000 for senior partners handling complex commercial

litigation are not uncommon in the Fifth Circuit.  *See* "Texas Lawyers Charging $1,000 an Hour

Rare, but Not Much Longer," The Texas LawBook (Mar. 1, 2012) ("There's no difference in the

rates of Texas and New York firms any more.").)  Indeed, a National Law Journal Billing Survey

conducted in 2013 noted that the following Texas-based firms had partners who billed at hourly

rates in excess of $1,000: Haynes & Boone LLP; Bracewell & Giuliani LLP; and Andrews Kurth

LLP.  In this case, Liberty itself used a New York firm, until it was forced to withdraw as a result

of a conflict.  Liberty continued to retain the services of counsel from Texas and Louisiana.

50.     The fees Cameron seeks are also reasonable in light of the amounts involved and

the results obtained in this litigation (*Arthur Andersen* factor 4), namely, full recovery of its $50

million policy limits, plus interest, and judicial recognition that Cameron's bad faith claim for

treble damages would have been viable had it been brought in state court.  *See* Order & Reasons

- 15 -

HIGHLY CONFIDENTIAL

13141735.8

at 27-30, dated October 31, 2014. Indeed, this court has noted that the *Arthur Anderson* factors

support a fee award when "in comparison with the [] total amount of the outstanding claim" the

fees are "relatively modest." *See Malin Int'l Ship Repair & Drydock, Inc. v. M/V SEIM*

*SWORDFISH*, 611 F. Supp. 2d 627, 635 (E.D. La. 2009) (Barbier, J.) *aff'd sub nom. Malin Int'l*

*Ship Repair & Drydock, Inc. v. Veolia Es Special Servs.*, Inc., 369 F. App'x 553 (5th Cir. 2010).

In that case, the fees represented approximately 6.7% of the overall claim (█████ in fees vs.

a $1.2 million claim). *Id.* Here, the $3,389,445.96 in fees are ██████████████ of

the overall $50,000,000 judgment, ████ even before adding three years of pre-judgment

interest.

51.     After considering the factors set forth above, and based on my review and

knowledge of the file and work performed in this case, I respectfully suggest that the attorneys'

fees Cameron seeks to recover in connection with this matter are entirely reasonable and

customary.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2014 in New York, New York.

Mitchell J. Auslander

- 16 -

HIGHLY CONFIDENTIAL

# EXHIBIT A

# TO

# DECLARATION

# OF

# MITCHELL J. AUSLANDER

# SUBMITTED UNDER SEAL

## Attorney and Legal Assistant Summary Biographies

### I.      Partners

**Mitchell J. Auslander**: Mr. Auslander is a partner and Co-Chair of the Litigation Department. He is also Chairman of the firm's Insurance and Reinsurance Coverage Practice Group. Mr. Auslander specializes in commercial litigation with a particular emphasis on insurance and reinsurance matters worldwide, as well as government investigations. Mr. Auslander is recognized nationally for his ability to resolve complex commercial disputes amicably and for his litigation talents when an early resolution is not available. He is the author of the *Litigation Avoidance and Prevention* chapter of the highly acclaimed treatise Commercial Litigation in New York Courts (Robert L. Haig, 3d ed. 2010, Updated 2013). Mr. Auslander received a J.D. from Rutgers University School of Law in 1980 and a B.A. from New York University in 1977. Mr. Auslander joined the firm in 1980 and has provided assistance on this case from its inception.

**Jeffrey B. Korn**: Mr. Korn is a partner in the Litigation Department, focusing on antitrust litigation and counseling, securities litigation, M&A litigation, and other complex business law disputes. He has represented a wide range of clients, including public and private companies, their officers and directors, mutual funds, private equity funds, hedge funds, and securities underwriters in both state and federal courts and before the antitrust and securities enforcement agencies. Mr. Korn received a J.D. from Columbia University in 2000 and a B.A. from Duke University in 1997. He joined the firm in 2007 and has provided assistance on this case from its inception.

### II.     Special Counsel

**Ian K. Hochman**: Mr. Hochman is special counsel in the Litigation Department of Willkie Farr & Gallagher LLP in New York. He received a J.D. from the University of Miami School of Law in 1997 and a B.A. from the University of Pennsylvania in 1994. Mr. Hochman joined Willkie Farr in 1999, after serving as a law clerk to the Honorable Lacey A. Collier, United States District Judge for the Northern District of Florida (1997-1999). Mr. Hochman counsels a wide range of clients on e-discovery issues and effective trial strategies. He provided assistance on this case from January to April 2013.

### III.    Associates

**James F. Caputo**: Mr. Caputo was an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York from 2007 to 2013. He received a J.D. from Georgetown University in 2007 and a B.A. from University of Notre Dame in 2000. He provided assistance on this case from June to December 2013.

**Nathan M. Huddell**: Mr. Huddell is an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York. He received a J.D. from Columbia University in 2012 and a B.A. from Wesleyan University in 2007. Mr. Huddell joined Willkie Farr in 2012. He provided assistance on this case from May to June 2013.

**AUSLANDER B**

**Lars Hulsebus**: Mr. Hulsebus is an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York. He received a J.D. from Georgetown University in 2013 and a B.A. from Drake University in 2006. Mr. Hulsebus joined Willkie Farr in 2013. He provided assistance on this case in June 2012.

**Shaimaa Hussein**: Ms. Hussein is an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York. Se received a J.D. from Georgetown University in 2010 and a B.A. from State University of New York Stony Brook in 2007. Ms. Hussein joined Willkie Farr in 2011. She provided assistance on this case from February to March 2013.

**Douglas Mishkin**: Mr. Mishkin was an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York from 2009 to 2013. He received a J.D. from Cornell University in 2009 and a B.A. from Duke University in 2005. He provided assistance on this case from December 2011 to July 2013.

**William O'Brien**: Mr. O'Brien is an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York. He received a J.D. from Seton Hall University in 2013 and a B.A. from University of Maryland in 2009. Mr. O'Brien joined Willkie Farr in 2013 and began providing assistance on this case beginning in November 2013.

**Zarah Holly Popal**: Ms. Popal is an associate in the Litigation Department of Willkie Farr & Gallagher LLP in Washington, D.C. She received a J.D. from George Washington University in 2010 and a B.A. from University of Virginia in 2006. Ms. Popal joined Willkie Farr in 2011. She provided assistance on this case from February to March 2013.

**Sharona Sternberg**: Ms. Mishkin was an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York from 2011 to 2013. She received a J.D. from Harvard University in 2011 and a B.A. from Barnard College in 2008. She provided assistance on this case in February 2013.

**Hayley T.J. Tozeski**: Ms. Tozeski is an associate in the Litigation Department of Willkie Farr & Gallagher LLP in Washington, D.C. She received a J.D. from Georgetown University in 2010 and a B.A. from Brandeis University in 2005. She joined the firm in 2011 and has provided assistance on this case from its inception.

**Jeffrey A. Williams**: Mr. Williams was an associate in the Litigation Department of Willkie Farr & Gallagher LLP in New York from 2007 to 2014. He received a J.D. from Fordham University in 2009 and a B.A. from Hamilton College in 2002. He provided assistance on this case from its inception to February 2013.

## V.     Law Clerks

**Gabriel Brunswick**: Mr. Brunswick is a law clerk in the Business Reorganization & Restructuring Department of Willkie Farr & Gallagher LLP in New York. He received a J.D. from New York University in 2014 and a B.A. from Northwestern University in 2009. Mr. Brunswick joined Willkie Farr in 2014. He provided assistance on this case from June to July 2013.

**Cristina Quinones-Betancourt**: Ms. Quinones-Betancourt is a law clerk in the Litigation Department of Willkie Farr & Gallagher LLP in New York. She received a J.D. from Cornell University in 2014 and a B.A. from Le Moyne College in 2009. Ms. Quinones-Betancourt joined Willkie Farr in 2014. She provided assistance on this case from June to July 2013.

## VII.   Legal Assistants

**Christopher M. Brancato**: Mr. Brancato is a senior legal assistant in the Litigation Department of Willkie Farr & Gallagher LLP in New York. He received a B.A from the Richard Stockton College of New Jersey in 2004 and joined Willkie Farr in 2012. Mr. Brancato is qualified to perform substantive legal work through extensive in-house training and a decade of previous litigation experience. He provided assistance on this case in April 2013.

**Megan L. Fantoni**: Ms. Fantoni is a legal assistant in the Litigation Department of Willkie Farr & Gallagher LLP in New York. She received a B.A. from Tufts University in 2013 and joined Willkie Farr later that year. Ms. Fantoni is qualified to perform substantive legal work through extensive in-house training and litigation experience gained during her time at Willkie Farr. She provided assistance on this case beginning in September 2014.

**Nathan Ford**: Mr. Ford was a legal assistant in the Litigation Department of Willkie Farr & Gallagher LLP in New York from 2007 to 2012. He received a B.S. from Vanderbilt University in 2007. Mr. Ford was qualified to perform substantive legal work on this case due to his extensive in-house training and five years of previous litigation experience. Mr. Ford provided assistance on this case from June to July 2012.

**Katherine Garland**: Ms. Garland was a legal assistant in the Litigation Department of Willkie Farr & Gallagher LLP in New York between 2012 and 2014. She received a B.A. from University of Michigan in 2008 and joined Willkie Farr in 2012. Ms. Garland was qualified to perform substantive legal work through extensive in-house training and 2 years' previous litigation experience. She provided assistance on this case from November 2012 to July 2014.

**Shelly Lipkis**: Ms. Lipkis is a legal assistant in the Litigation Department of Willkie Farr & Gallagher LLP in New York. She received a B.A. from George Washington University in 2006, her paralegal certification from New York University in 2007, and joined Willkie Farr in 2011. Ms. Lipkis is qualified to perform substantive legal work though extensive in-house training and over 7 years' litigation experience. She provided assistance on this case from February to June 2014.

**Anne B. Rosenblum**: Ms. Rosenblum was a legal assistant in the Litigation Department of Willkie Farr & Gallagher LLP in New York between 2013 and 2014. She received a B.A. from Dartmouth College in 2012. Ms. Rosenblum was qualified to perform substantive legal work through extensive in-house training and litigation experience. She provided assistance on this case from August 2013 to April 2014.

# WILLKIE FARR & GALLAGHER LLP

AUSLANDER C

---

## Mitchell J. Auslander
Partner

**New York**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
T 212 728 8201
F 212 728 9201
mauslander@willkie.com



Mitchell J. Auslander is a partner and Co-Chair of the Litigation Department. He is also Chairman of the firm's Insurance and Reinsurance Coverage Practice Group. Mitch specializes in commercial litigation with particular emphasis on insurance and reinsurance matters worldwide, as well as government investigations.

Mitch is recognized nationally for his ability to resolve complex commercial disputes amicably and for his litigation talents when an early resolution is not available. He is the author of the *Litigation Avoidance and Prevention* chapter of the highly acclaimed treatise Commercial Litigation in New York Courts (Robert L. Haig, 3d ed. 2010, Updated 2013).

## Selected Significant Matters

- "Special Relationship" Litigation – Obtained a jury verdict for national insurance broker in U.S. District Court for the Southern District of Florida, in a precedent-setting case involving the concept of "special relationship"

- In re Insurance Brokerage Antitrust Litigation – Represented Marsh & McLennan Companies Inc. in defense of federal multidistrict litigation arising out of government investigations of insurance industry and massive insurance recovery from its insurers

- Nationwide Policyholder Litigation – Lead counsel in cases brought throughout the United States alleging violations of federal and state law by insurance companies and brokers

- State Antitrust Investigations – Lead counsel in state investigations and civil litigation arising out of insurance practices

**My Practices**

Insurance & Reinsurance

Litigation

Insurance & Reinsurance

Complex Commercial Disputes

**Education**

Rutgers University School of Law, J.D., 1980

New York University, B.A., 1977

**Bar Admissions**

New York, 1981

**Court Admissions**

United States Court of Appeals, 2nd Circuit, 1988

United States Court of Appeals, 3rd Circuit

United States Court of Appeals, 9th Circuit

United States Court of Appeals, 11th Circuit

United States District Court, Eastern District of New York, 1981

United States District Court, Southern District of New York, 1981

United States Supreme Court

- Finite Risk Reinsurance Investigation – Lead counsel in governmental investigation of finite risk reinsurance products

- Student Loan Investigation – Lead counsel in governmental investigation arising out of student loan practices

- Student Health Insurance Investigation – Lead counsel in governmental investigation arising out of student health insurance practices

- Reinsurance Litigation – Lead counsel for reinsurance intermediary in trial of $400 million reinsurance dispute

- Insurance Coverage Disputes

  o Manufacturer of blow-out preventer in Deepwater Horizon coverage dispute

  o Various clients in disputes arising out of natural disasters worldwide

  o Consulting firm in professional liability claim

  o Banks and other professionals in subprime and Madoff-related coverage disputes

  o National bank in coverage disputes following two massive financial frauds

  o Financial institution in massive insurance recovery for claims arising out of government investigations

  o Security company in professional liability arbitration

  o Various clients in directors and officers and professional liability and property coverage disputes, including claims arising out of mortgage industry meltdown and insider trading allegations

  o Various clients in major property damage and business interruption coverage disputes

  o Various clients in coverage disputes arising out of bankruptcy proceedings

  o Insurance brokers in scores of insurance disputes involving casualty, property, business interruption, D&O, E&O, political risk, product liability insurance

  o Insurance companies as policyholders seeking coverage under their own policies

## Selected Publications and Lectures

- "Litigation Avoidance and Prevention," *Commercial Litigation in New York Courts* (Robert L. Haig, 3d ed. 2010, Updated 2013)

- *The Metropolitan Corporate Counsel*, "FDIC Issues Advisory Statement Regarding D&O Insurance Policies, Exclusions and Indemnification For Civil Money Penalties" (December 2013)

- American Management Association – "The Anatomy of a Directors & Officers (D&O) Class Action Securities Claim and Subprime Lending Exposures" (New York, NY)

- Advisen, "Casualty Insights Conference: Coverage, Litigation Management, Negotiations, Law Update" (New York, NY)

- New York County Lawyers Association – "Advice from the Experts: Successful Strategies for Winning Commercial Cases in New York State Courts" (New York, NY)

- Marsh Inc., "Hot Topics in Excess Casualty" (New York, NY)

- Marsh Inc., "Managing Insurance Claims After Hurricane Sandy" (New York, NY)

- Sandpiper Partners, "Law Firm Cyber Risk Conference" (New York, NY)

- Teaches various Insurance and Litigation Practice Courses (New York, NY)

## Recognition, Honors & Awards

- *Client Choice Awards* (Lexology/ILO, 2014) – Honored for excellence in the area of Insurance and Reinsurance. Mitch is praised for being a "superb and persuasive communicator" who "thinks very creatively to find out-of-the-box solutions"

- *Chambers USA* (2014) – Ranked among the leading individuals practicing in the area of Insurance. *Chambers* has noted Mitch's "leadership skills and his 'excellent strategic sense, which inspires confidence in clients'"

- *Client Choice Awards* (Lexology/ILO, 2013) – Honored for excellence in the area of Litigation in the United States. Mitch is lauded for his "ability to see a range of desired outcomes during the early stages of even the most complex matters and deftly maneuvers the matter towards those objectives"

- *International Who's Who of Insurance & Reinsurance Lawyers* (2013)

- *Benchmark Litigation* (2015) – Ranked as a "Litigation Star"

- *ICFM Leading Lawyers 500* (2013)– Recognized as one of *Intercontinental Finance Magazine's* "top 500 lawyers in the world"

- *American Lawyer Media/Martindale Hubbell's 2013 Top Rated Lawyers in Insurance Law* – Received AV Preeminent® peer review rating
- Recipient of Boris Kostelanetz President's Award (2013) conferred by New York City Lawyer's Association

# WILLKIE FARR & GALLAGHER LLP

## Jeffrey B. Korn
Partner

**New York**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
T 212 728 8842
F 212 728 9842
**jkorn@willkie.com**

Jeffrey B. Korn is a partner in the Litigation Department, focusing on antitrust litigation and counseling, securities litigation, M&A litigation, and other complex business law disputes. He has represented a wide range of clients, including public and private companies, their officers and directors, mutual funds, private equity funds, hedge funds, and securities underwriters in both state and federal courts and before the antitrust and securities enforcement agencies.

## Selected Significant Matters
**Antitrust Litigation and Counseling**

- Jeffrey regularly counsels clients in connection with significant M&A matters across a wide range of industries, including financial information technology, pharmaceuticals, airlines, retail, telecommunications, insurance, and banking.

- *The Men's Wearhouse's Acquisition of Jos. A. Bank* – Represented The Men's Wearhouse in securing unconditional approval of its acquisition of Jos. A. Bank following second request investigation by FTC

- *In the Matter of Polypore International, Inc.* – Represented divestiture buyer in required divestiture of Microporous following post-closing investigation and trial;

- *In re Modafinil Antitrust Litigation* - Represented pharmaceutical company in class action antitrust litigation and FTC investigation arising from settlement of patent litigation (E.D. Pa.);

- *In re Nifedipine Antitrust Litigation* - Represented pharmaceutical



**My Practices**

Litigation

Securities Litigation & Enforcement

Antitrust and Competition

**Education**

Columbia University School of Law, J.D., 2000

Duke University, B.A., 1997

**Bar Admissions**

New York, 2001

**Court Admissions**

United States District Court, Southern District of New York

United States Court of Appeals, 2nd Circuit

United States Court of Appeals, D.C. Circuit

company in class action antitrust litigation relating to distribution of generic nifedipine in the United States (D.D.C.);

- *State of Ohio v. American International Group, et al* - Represented insurance broker in antitrust enforcement and damages action brought by the Ohio Attorney General arising from alleged industry-wide conspiracy (Ohio Ct. Com. Pl.);

- *Clayworth v. Pfizer* – Represented pharmaceutical company in action brought under California's Cartwright Act arising from alleged industry-wide price fixing conspiracy (Cal.);

**Securities and M&A Litigation**

- *White Mountains v. The Allstate Corporation* – Obtained dismissal of action against buyer and then represented buyer in purchase price adjustment dispute in arbitration;

- *In re Quest Software, Inc. Shareholder Litig.* - Represented private equity buyer in litigation arising out of $2 billion "going private" transaction (Del., Cal.);

- *In re AboveNet, Inc. Shareholder Litig.* - Representing target and board of directors in litigation arising out of $2 billion merger transaction (Del., N.Y.);

- *In re Cogdell Shareholder Litig.* - Represented REIT acquiror in litigation arising out of $765 million acquisition (Md., N.C.);

- *In re Transatlantic Shareholders Litig.* - Represented potential acquiror in litigation brought by shareholders and competing bidder arising out of $3 billion merger (Del., N.Y.);

- *NetCoalition v. SEC* - Represented NetCoalition in appeal challenging reasonableness of fees for market data (D.C. Cir.);

- *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., et al.* - Represented hedge fund in securities class action arising from collapse of structured investment vehicle during recent credit crisis (S.D.N.Y.);

- *In re The Reserve Fund Securities Litig. and Related Actions* - Represented money market mutual fund in high-profile "break the buck" litigation in more than 40 separate class, individual, and derivative lawsuits brought by investors in state and federal courts throughout the country (MDL);

- *In re Enron Securities Litig. and Related Actions* - Represented major financial institution in all Enron-related actions (MDL);

- *In re Lucent Technologies, Inc. Securities Litig.* - Represented telecommunications company in connection with numerous lawsuits and related SEC investigation (D.N.J.);

- *In re Builders Firstsource, Inc. Shareholders & Derivative Litigation* - Represented private equity firm in shareholder challenge to proposed recapitalization of company (Del. Ch.);

- *Bay Harbour Management LLC v. Carothers, et al.* – Represented officers of bankrupt furniture company in securities lawsuit brought in connection with debt securities offering (S.D.N.Y.).

## Selected Professional and Business Activities

Jeffrey serves as Vice-Chair of the Exemptions and Immunities Committee of the Section of Antitrust Law of the American Bar Association.

Jeffrey's recent publications include: *Proof of Conspiracy Under Federal Antitrust Law* (co edited); "If At First You Don't Succeed: The Use Of Scheme Liability After Janus," *Investment Lawyer* (March 2013); "Gallus Revisited: Summary Judgment After Jones v. Harris," *Investment Lawyer* (Sept. 2012); "Jones v. Harris: Eighteen Months Later," *Investment Lawyer* (Nov. 2011); *eDiscovery for Corporate Counsel* (contributing author); and "Competitive Information Sharing In Merger Negotiations: How Much Is Too Much?," *Wall Street Lawyer* (April 2007) (co authored with Katherine Forrest).

Jeffrey serves as a member of the Board of Visitors of the Columbia School of Law.

# WILLKIE FARR & GALLAGHER LLP

## Hayley T.J. Tozeski
Associate



**Washington**
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
T 202 303 1237
F 202 303 2237
**htozeski@willkie.com**

Hayley T.J. Tozeski is an associate in the Litigation Department. Her focus includes compliance and enforcement, internal investigations, securities litigation, and general complex commercial disputes. She represents public and private companies, including Big Four accounting firms, insurance brokers, banks, and investment entities, their officers and directors, and private individuals in civil and criminal investigations, enforcement actions, and litigation.

Ms. Tozeski is an Adjunct Professor at Georgetown University Law Center, where she teaches advanced legal writing.

## Selected Significant Matters

Ms. Tozeski has advised on the following significant matters:

### Investigations and White Collar Defense

- Represents multinational pharmaceutical company in DOJ and SEC investigation of alleged FCPA violations in numerous countries.

- Represents private investment and financial services firms with respect to compliance with federal securities laws and inquiries by SEC, DOJ, and FINRA.

- Represented audit committee of foreign reinsurer in investigation relating to potential accounting improprieties.

- Represented executive in internal investigation related to insider trading allegations.

**My Practices**

Litigation

**Education**

Georgetown University Law Center, J.D., 2010

Brandeis University, B.A., 2005

**Bar Admissions**

District of Columbia, 2013

New York, 2011

Massachusetts, 2010

**Court Admissions**

United States District Court, Southern District of New York, 2011

**Civil Litigation**

- Represents Cameron International Corporation in a coverage dispute arising out of the Deepwater Horizon disaster. Secured $50 million judgment against Cameron's insurer.

- Represents AIG risk management executives in securities class actions arising out of mortgage-related financial instruments.

- Represented Dallas philanthropist in breach of contract action related to her sale of a renown painting. Member of trial team that secured unanimous verdict in client's favor.

- Represented Bloomberg L.P and it employee against employment discrimination claims. Case dismissed on award of summary judgment to defendants.

**Congressional Relations**

- Represents Comcast Corporation in connection with its acquisition of Time Warner Cable and related transactions.

**Pro Bono**

- Represents indigent defendants in federal criminal matters. Obtained dismissal of federal criminal charges against attorney charged in mortgage fraud conspiracy.

- Successfully represented Tibetan refugees who sought legal status based on political persecution suffered in China.

- Represents indigent women and families in matrimonial and immigration matters.

## Selected Publications and Lectures

- Tax Evasion – To Convict or Collect? Can the Government Have it Both Ways Under the Expended Definition of "With Respect to Stock" in Code Section 301 after *Boulware v. United States*?, 63 TAX LAW. 621 (Winter 2010)

# EXHIBIT D

# TO

# DECLARATION

# OF

# MITCHELL J. AUSLANDER

# SUBMITTED UNDER SEAL

# EXHIBIT E

# TO

# DECLARATION

# OF

# MITCHELL J. AUSLANDER

# SUBMITTED UNDER SEAL

# EXHIBIT F

# TO

# DECLARATION

# OF

# MITCHELL J. AUSLANDER

# SUBMITTED UNDER SEAL