1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

IN RE:   OIL SPILL BY THE OIL RIG    *    10-MD-2179
5            *DEEPWATER HORIZON* IN THE     *
         GULF OF MEXICO ON           *    Section J
6        APRIL 20, 2010              *
                                     *    November 7, 2014
7                                    *
Applies to:   12-970                 *    New Orleans, Louisiana
8        * * * * * * * * * * * * * * * * * *
9

10
                    EVIDENTIARY HEARING BEFORE
11              THE HONORABLE CARL J. BARBIER
                    UNITED STATES DISTRICT JUDGE
12

13  <u>Appearances</u>:

14
    For the Special Master:      Pepper Hamilton, LLP
15                               BY:  GREGORY A. PAW, ESQ.
                                      DEREK E. HINES, ESQ.
16                                    BRIAN M. NICHILO, ESQ.
                                 3000 Two Logan Square
17                               Eighteenth and Arch Streets
                                 Philadelphia, Pennsylvania 19103
18

19  For Lionel H. Sutton III:    Sutton Law Firm
                                 BY:  LIONEL H. SUTTON III, ESQ.
20                               935 Gravier Street, Suite 1910
                                 New Orleans, Louisiana 70112
21

22  For Christine Reitano:       MARY OLIVE PIERSON, ESQ.
                                 8702 Jefferson Highway, Suite B
23                               Post Office Box 14647
                                 Baton Rouge, Louisiana 70898
24

25

1   Appearances:

2

3   For Jon Andry:                 Unglesby Law Firm
                                    BY:  LEWIS O. UNGLESBY, ESQ.
                                    246 Napoleon Street
4                                   Baton Rouge, Louisiana 70802

5

6   For Glen J. Lerner:            Zuckerman Spaeder, LLP
                                    BY:  WILLIAM W. TAYLOR III, ESQ.
                                         AMIT P. MEHTA, ESQ.
7                                   1800 M Street, NW, Suite 1000
                                    Washington, DC 20036

8

9   For Glen J. Lerner:            Jones Walker, LLP
                                    BY:  PAULINE F. HARDIN, ESQ.
10                                  201 St. Charles Avenue, Suite 5100
                                    New Orleans, Louisiana 70170

11

12  For Andry Lerner, LLC:         Heller Draper Patrick Horn
                                      & Dabney, LLC
13                                  BY:  DOUGLAS S. DRAPER, ESQ.
                                    650 Poydras Street, Suite 2500
14                                  New Orleans, Louisiana 70130

15

16  For The Andry Law             Smith & Fawer, LLC
    Firm, LLC:                     BY:  STEPHEN M. GELÉ, ESQ.
                                    201 St. Charles Avenue, Suite 3702
17                                  New Orleans, Louisiana 70170

18

19  For Gilbert "Gibby"            Phelps Dunbar, LLP
    Andry IV:                      BY:  HARRY ROSENBERG, ESQ.
                                    365 Canal Street, Suite 2000
20                                  New Orleans, Louisiana 70130

21

22  Official Court Reporter:       Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, Box 2-13
                                    New Orleans, Louisiana 70130
23                                  (504) 589-7778

24

25  Proceedings recorded by mechanical stenography using
    computer-aided transcription software.

1                          <u>I N D E X</u>

2                                                        <u>PAGE</u>

3    Mark Staley
          Direct Examination By Mr. Unglesby            20
4         Cross-Examination By Mr. Paw                   31
          Redirect Examination By Mr. Unglesby           36
5
     Christopher Rinaldi
6         Direct Examination By Mr. Unglesby             39
          Cross-Examination By Mr. Paw                   41
7
     Christina Mancuso
8         Direct Examination By Mr. Unglesby             44
          Cross-Examination By Mr. Mehta                 52
9         Cross-Examination By Mr. Paw                   56
          Cross-Examination By Ms. Pierson               66
10        Redirect Examination By Mr. Unglesby           68

11   Lionel Sutton
          Direct Examination By Mr. Unglesby             74
12        Cross-Examination By Mr. Mehta                 97
          Cross-Examination By Ms. Pierson              148
13        Cross-Examination By Mr. Gelé                 149
          Cross-Examination By Mr. Rosenberg            152
14        Cross-Examination By Mr. Paw                  154

15   Leslie Ingram
          Direct Examination By Mr. Unglesby            169
16        Cross-Examination By Ms. Hardin               173
          Cross-Examination By Mr. Paw                  180
17        Redirect Examination By Mr. Unglesby          186

18   Gilbert V. Andry IV
          Direct Examination By Mr. Gelé                190
19
     Oral Argument
20        Lionel H. Sutton III, Esq.                    217
          Mary Olive Pierson, Esq.                      218
21        William W. Taylor III, Esq.                   218
          Lewis O. Unglesby, Esq.                       224
22        Stephen M. Gelé, Esq.                         232
          Gregory A. Paw, Esq.                          234
23
     Ruling of the Court                                241

24

25

**MORNING SESSION**

**(November 7, 2014)**

07:57  1
07:57  2
08:02  3  THE COURT:  Good morning, everyone.  Please be
08:02  4  seated.
08:02  5          Go ahead and call the case, Stephanie.
08:03  6  THE DEPUTY CLERK:  MDL 10-2179, In Re: Oil Spill by
08:03  7  the Oil Rig *Deepwater Horizon* in the Gulf of Mexico on
08:03  8  April 20, 2010, Civil Action 12-970, Bon Secour Fisheries,
08:03  9  Inc., et al., versus BP Exploration and Production, Inc.,
08:03  10  et al.
08:03  11          THE COURT:  Has everyone who needs to show an
08:03  12  appearance here signed the sign-in sheet this morning?
08:03  13          MR. UNGLESBY:  I'm sorry.  I couldn't hear you,
08:03  14  Judge.
08:03  15          THE COURT:  I wanted to know if everyone who needs to
08:03  16  show an appearance here this morning has signed in.  We have
08:03  17  these sign-in sheets.
08:03  18          Have you used these sign-in sheets, Stephanie?
08:03  19          THE DEPUTY CLERK:  Yes, sir.
08:04  20          THE COURT:  Just to lay a little background here.
08:04  21  Obviously this matter arises out of the *Deepwater Horizon* MDL,
08:04  22  and in particular pertains to the economic class settlement
08:04  23  which is the subject of Civil Action 12-970, Bon Secour
08:04  24  Fisheries, et al.
08:04  25          In accordance with that settlement agreement,

1   the Court established the *Deepwater Horizon* Court Supervised

2   Settlement Program, which established the *Deepwater Horizon*

3   Economic Claims Center.   In or around June of 2012 I think it

4   got up and running.   The settlement itself was originally filed

5   with the Court -- I don't have the exact date in front of me,

6   but sometime in March of 2012.

7          In or around June of 2012 -- I'm sorry, 2013,

8   certain matters were brought to the Court's attention by the

9   claims administrator, where there was information that some

10  possible unethical or improper conduct was occurring within the

11  claims office; and as a result of that, the claims

12  administrator, with the Court's approval, undertook first an

13  internal investigation conducted by the claims administrator

14  and his staff and particularly Mr. Welker, the in-house fraud

15  and abuse person.

16         After getting initial reports, informal reports

17  from the claims administrator, the Court decided that the best

18  course of action would be to bring in an outside independent

19  investigator to conduct a more thorough investigation.   And so

20  I appointed Mr. Louis Freeh and the Freeh Group as a special

21  master for that purpose.   That formal appointment was made on

22  July 2, 2013, as Record Document 10564.   Mr. Freeh and the

23  Freeh Group undertook their investigation, issued their initial

24  report on September 6, 2013.   That report is titled "The

25  Independent External Investigation of the *Deepwater Horizon*

Court Supervised Settlement Program."  It was dated that same

date, September 6, 2013, and that's at Record Document 11287.

When I received the report on that same day, I

ordered that it be filed into the public record.  And on the

same day I issued a show cause order, and that show cause order

is what brings us here today.  That show cause order is

Record Document 11288.  As part of that show cause order, it

ordered as follows:

"It is further ordered that Lionel Sutton,

Christine Reitano, Jon Andry, Glen Lerner, and any associated

law firms show cause why the Court should not adopt the

following findings and recommendations of the special master:

"(a) Disallowing The Andry Law Firm's claim

under the unclean hands doctrine;

"(b) Disqualifying attorneys Lionel Sutton,

Christine Reitano, Glen Lerner, and Jon Andry, as well as any

associated law firms, from representing claimants in the Court

Supervised Settlement Program," again, pursuant to the unclean

hands doctrine.

Pursuant to Rule 53(f), these parties were

ordered that they should file any responses or objections to

the special master's report.  Rule 53 has a default deadline of

21 days unless otherwise ordered by the Court.  The Court

ultimately extended the response deadline several times at the

request of the show cause parties.  And when I refer to show

cause parties or respondent parties here today, I will be talking about Mr. Sutton, Ms. Reitano, and Misters Andry and Lerner and their law firms.  So we ultimately extended the response deadline to January 3, 2014, which is approximately four months following the date of the original show cause order.

Each of the show cause parties have filed responses and various objections.  The Court has already dealt with a lot of the procedural and jurisdictional objections, so we are not going to go into that today.

Rule 53, which pertains to the use of special masters, provides that after a special master files his report -- 53(f) is the relevant rule.  53(f)(1) provides that there should be an opportunity for a hearing, etc.  It says:

"In acting on the master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions."

It goes on to say in Rule 53(f)(3) that in reviewing factual findings the Court must decide *de novo* all objections to findings of fact made or recommended by a master unless there is a stipulation otherwise, which there is not, of course, in this case.

53(f)(4) provides that in reviewing legal

08:10   1    conclusions, the Court decides *de novo* objections to

08:10   2    conclusions of law.

08:10   3              So what I plan to do here today -- I set this

08:10   4    evidentiary hearing pursuant to Rule 53(f) for the purpose of

08:11   5    giving the show cause or respondent parties an opportunity to

08:11   6    be heard, to submit any additional evidence that they may wish

08:11   7    to submit that is relevant to their objections to the special

08:11   8    master's report.  So what I plan to do initially is to -- the

08:11   9    special master's report is already in evidence, but I want to

08:11   10   formally admit it in connection with this hearing, and then we

08:11   11   will go forward from there.

08:11   12             Mr. Paw.

08:11   13        **MR. PAW:**  Yes, Your Honor.  In addition to the report

08:11   14   that you mentioned, I had circulated to the show cause parties

08:11   15   earlier this week a thumb drive that contains links for each of

08:11   16   the footnotes in the report back to the discovery documents

08:11   17   that had been provided to the show cause parties during the

08:11   18   course of the time since our report was issued.  So it's a

08:11   19   companion document to the report, but it will make the report

08:12   20   much easier for the Court to be able to review by having the

08:12   21   documents that have been provided in discovery to the show

08:12   22   cause parties.

08:12   23             So I would move for the admission of the thumb

08:12   24   drive along with the report, Your Honor.

08:12   25        **THE COURT:**  You have provided that to all parties?

08:12  1    **MR. PAW:**  I have, Your Honor.  I understand they have

08:12  2  objections to it, but they have all received the thumb drive.

08:12  3    **THE COURT:**  I'm going to admit that subject to the

08:12  4  objections.  And the parties can voice objections as we go

08:12  5  along or as -- they have already raised some objections

08:12  6  preliminarily, and I understand what some of those are, but for

08:12  7  the time being, I'm admitting that subject to the objections.

08:12  8  Okay?

08:12  9    **MR. PAW:**  Thank you, Your Honor.

08:12  10    **THE COURT:**  Have the show cause parties discussed --

08:12  11  I haven't given much thought to the order in which you all will

08:12  12  proceed.  Who is going to go first?

08:12  13    **MS. PIERSON:**  Lucky me.

08:12  14    **THE COURT:**  Lucky you.  All right.  Go ahead.

08:13  15    I want to remind everyone that I want to focus

08:13  16  on what I think the real issue or issues are in this case, and

08:13  17  that really revolves around the so-called referral payments

08:13  18  made by Andry, Andry Lerner to Mr. Sutton and the circumstances

08:13  19  of that and what the implications of that may or may not be.

08:13  20  Okay?

08:13  21    **MS. PIERSON:**  Yes, sir.

08:13  22    Your Honor, in connection with my -- I will be

08:13  23  brief this morning.  I understood your outline of issues at the

08:13  24  last status conference and the two areas that were to be

08:13  25  concerned, and I'll be very brief.

1    I have prepared and I have submitted to
2  everyone, including Mr. Paw -- as you know, we filed with our
3  exhibit list, which is Document 13509.  Mr. Paw and I discussed
4  the manner of proving up Ms. Reitano's claim.
5    I should say for the record I do represent
6  Christine Reitano.  I don't think I said my name.
7    **THE COURT:**  I don't think you have a claim -- did you
8  say your name?  I know who you are, but you better --
9    **MS. PIERSON:**  My name is Mary Olive Pierson.
10    **THE COURT:**  Okay, Ms. Pierson.
11    **MS. PIERSON:**  My bar roll is 11004 in Louisiana, and
12  I am here to represent Christine Reitano.
13    **THE COURT:**  Is Ms. Reitano here today?  I didn't see
14  her.
15    **MS. PIERSON:**  No, Your Honor, she is not.
16    Mr. Paw and I -- when I listed my witnesses, I
17  listed Ms. Reitano and Ms. Christina Mancuso.  We agreed that
18  we would use your suggestion that affidavits could be used.
19  And I have submitted to him and all the parties an affidavit
20  which contains a reference to 10 exhibits.
21    Speaking of exhibits, I had filed a motion to
22  supplement my exhibit list with three declarations of
23  BrownGreer employees, which I had received only the day before.
24  And I saw one of them had some information in it that was
25  applicable to Ms. Reitano.  I am withdrawing --

08:15   1          **THE COURT:**  I glanced at those real quickly, and I

08:15   2   couldn't see what the relevance of those --

08:15   3          **MS. PIERSON:**  I am going to withdraw the request to

08:15   4   offer Mr. Brown and Mr. Smith, but Ms. Lynn Greer's declaration

08:15   5   in connection with the response of the special master --

08:15   6          **THE COURT:**  What's the particular point from that

08:15   7   declaration?

08:15   8          **MS. PIERSON:**  She discusses in detail a suggestion by

08:15   9   certain staff employees of the CAO to begin the review process

08:15   10  of claims by going through the accountants first and then to

08:15   11  BrownGreer.  And that matter was discussed, and it's in her

08:15   12  affidavit, I believe, on page -- I noted the page in here.

08:15   13         **THE COURT:**  Anybody have any objection to this

08:15   14  exhibit?

08:15   15         **MR. PAW:**  I have no objection, Your Honor.

08:16   16         **MS. PIERSON:**  It's only one little section.

08:16   17         **THE COURT:**  I will admit it and I will look at it.

08:16   18              You want to mark that somehow?

08:16   19         **MS. PIERSON:**  Yes.  That exhibit is --

08:16   20         **THE COURT:**  Why don't you pull it out and hand it in.

08:16   21  We will call it Reitano 1.

08:16   22         **MS. PIERSON:**  Actually, I think it's called

08:16   23  Reitano 10.  I numbered the exhibits in accordance to how they

08:16   24  came up in the affidavit, for the most part.

08:16   25         **THE COURT:**  It cross-references to the affidavit.

08:16   1          **MS. PIERSON:**  Yes, it does.

08:16   2          **THE COURT:**  So this is Reitano 10, which is

08:16   3   referenced in your affidavit, correct?

08:16   4          **MS. PIERSON:**  Excuse me.  11, it's Reitano Exhibit 11

08:16   5   without attachments.  Her declaration contained a lot of

08:16   6   documents that were not relevant.

08:16   7          **THE COURT:**  Without objection that's admitted.

08:16   8          **MS. PIERSON:**  Your Honor, I have all of the exhibits

08:16   9   here with the original of Ms. Reitano's affidavit on the inside

08:17   10  cover, with an index to the exhibits and her affidavit.  And

08:17   11  this is the copy we would offer into the record.

08:17   12         **THE COURT:**  What are all those exhibits?  What's that

08:17   13  big binder?  What's in there?

08:17   14         **MS. PIERSON:**  Ms. Reitano's contract, a supplement to

08:17   15  her contract, a letter from Mr. Juneau firing her.

08:17   16  Christine -- her sworn statement to the Freeh Group.

08:17   17         **THE COURT:**  I assume that's -- is that part of what

08:17   18  you have submitted already?

08:17   19         **MR. PAW:**  It is, Your Honor.

08:17   20         **THE COURT:**  I'm trying to not load up the record with

08:17   21  a lot of duplicate documents.

08:17   22         **MS. PIERSON:**  The next three exhibits -- I never

08:17   23  understood what Mr. Freeh had or didn't have in connection with

08:17   24  Ms. Reitano's two letters to Mr. Thonn terminating her --

08:17   25         **THE COURT:**  What I'm trying to -- if you want to put

1    them in, I guess we could put them in.  But I'm trying to only
2    put in what we need to put into the record for this hearing.
3    It seems to me some of the stuff you want to put in is not
4    subject to any dispute here.
5              MS. PIERSON:  It really isn't.
6              THE COURT:  That she was hired, how she was hired,
7    her contract, whatever, none of that's in dispute, is it?
8              MS. PIERSON:  It is also no longer in dispute that
9    she told the truth about that, but that's part of what I'm
10   saying here.
11             THE COURT:  Okay.
12             MS. PIERSON:  Yes, we have incorporated her three
13   objections to the Freeh report and some e-mails between her --
14             THE COURT:  If no one has any objections, we will
15   admit that binder.  You have them all -- what are they?
16   Reitano numbers what?  Number 11 that you referred to earlier
17   is included in that, or is that in addition to that?  That's in
18   there?
19             MS. PIERSON:  Yes, it's in here.  These are numbered
20   1 through 11.
21             THE COURT:  So the 11 that we referred to just a
22   minute ago separately is also included in that binder?
23             MS. PIERSON:  Yes, it is.  And they are marked
24   Reitano 1 and Reitano 2, to distinguish them from anyone
25   else's --

08:18  1          **THE COURT:**  Do we have to put two copies of 11 in?

08:18  2          **MS. PIERSON:**  I have another copy.

08:18  3          **THE COURT:**  No.  I'm saying why do we need two -- you

08:18  4  introduced 11 separately, but now it's in that book apparently.

08:18  5          **MS. PIERSON:**  I can take it out.

08:19  6          **THE COURT:**  No, just leave it in.  We will use that

08:19  7  one.  We'll use the whole book.

08:19  8          **MS. PIERSON:**  We don't need two copies.

08:19  9              So this is everything.  And her original signed

08:19  10  affidavit is on the inside cover.

08:19  11          **THE COURT:**  All right.  Very well.  Without objection

08:19  12  that's admitted.  All of those are admitted.

08:19  13          **MS. PIERSON:**  So back to the presentation,

08:19  14  Your Honor.  I'm not going to belabor the point, but in the

08:19  15  affidavit -- when Mr. Paw and I exchanged -- he sent out a

08:19  16  draft of what he intended to file for exhibits and issues and

08:19  17  testimony.  And in that, for the first time he stated that

08:19  18  Ms. Reitano had testified that she did not continue to have a

08:19  19  financial interest in the Thonn claim after she terminated her

08:19  20  relationship and went to work for the claims administration

08:19  21  office.

08:19  22              And he listed in his submission to the Court

08:20  23  that there's no factual issue in dispute about that anymore

08:20  24  because he has no evidence to contradict that.  In her

08:20  25  affidavit -- I printed and quoted what he said.  It's on page 3

of 10.

THE COURT:  I have that.  That's what you filed yesterday, right?

MS. PIERSON:  Yes.

THE COURT:  What you're talking about, her affidavit is Record Document 13626, correct?

MS. PIERSON:  I think that it is, but we did get a notice of deficiency after discussion with your clerk.

THE COURT:  I'm going to allow it to be filed.  I don't know what the deficiency was.  Probably some technicality.

MS. PIERSON:  Actually, we asked for the deficiency because the law clerk said that you preferred not to --

THE COURT:  You asked to deficient your own document?

MS. PIERSON:  Yes, because the law clerk didn't want it in the record.

THE COURT:  Regardless, let's just get past this. I'm going to admit this.  Okay?

MS. PIERSON:  And it has a document number now?

THE COURT:  Yes.  It's 13626.

So, Stephanie, you can make sure the deficiency is removed.  Okay?

MS. PIERSON:  So, Your Honor, I'm pleased that you got that yesterday.  So on page 3 we do quote what Mr. Paw now says.  And we, in paragraph 5 of the affidavit, stated that

1   simply another way.  Instead of saying the negative side, we
2   said the positive side is the evidence bears out Ms. Reitano's
3   truthful testimony.  Actually, we considered that to be the
4   most serious claim that was made against Ms. Reitano because it
5   involved an allegation of potential perjury.  Now that's been
6   removed, as we can tell.
7          In connection with what you have said this
8   morning about the show cause order was to show cause two things
9   about the Andry Lerner law firm, we have nothing to do with
10  that.
11         But as far as the attorneys being disqualified
12  from representing claimants, unfortunately, Ms. Reitano has
13  already been disqualified by Mr. Juneau from that, and so in
14  her case, if you find that she doesn't meet the standards of
15  these claims against her, she will have to be reinstated,
16  because she has already been disqualified prior to this hearing
17  today, about five months ago.
18         I'm not going to go into -- there are two other
19  issues that -- Mr. Paw and I have sort of agreed on the factual
20  thing, but we disagreed on the legal findings, and that was
21  whether or not Ms. Reitano had a conflict of interest because
22  she suggested her husband to be an employee of one of the
23  vendors, and that never took place.  In fact, the e-mails that
24  are attached indicate that Ms. Reitano, in an e-mail
25  conversation with the vendor's employee, said that "Tiger will

08:22  1    check with Pat to see if that's okay."

08:22  2              And she got a return e-mail that said that the

08:23  3    head of the vendor, Mr. Zola, said, "Oh, don't do that.  I will

08:23  4    talk to Tiger first."  So we disagree on the significance of

08:23  5    that.  He didn't go to work for that vendor.  In fact, it never

08:23  6    went any further than that e-mail conversation.  But Mr. Paw

08:23  7    and Mr. Freeh want to call that advocating for him.  She merely

08:23  8    made a suggestion.

08:23  9              The other one has to do with, quote, advocating

08:23  10   for BrownGreer, which is one of the vendors.  Part of her

08:23  11   job -- and the reason why we included her contract in here was

08:23  12   that she was supposed to lend support to all of the vendors at

08:23  13   all times.  One of the issues that was raised by Mr. Freeh was

08:23  14   that some staff members wanted some information from

08:23  15   BrownGreer, and there was resistance at BrownGreer about it,

08:23  16   and Ms. Reitano inquired about that.

08:23  17             It turned out that the request for the

08:24  18   information from BrownGreer came from a young woman at an

08:24  19   address called the Carrollton Group, which was not recognized

08:24  20   at that time in the claims department.

08:24  21             **THE COURT:**  Those are IT people.

08:24  22             **MS. PIERSON:**  Yes.  So anyway --

08:24  23             **THE COURT:**  I'm not trying to cut you off here, but

08:24  24   you are getting into argument here.  We are supposed to have an

08:24  25   evidentiary hearing.  I want to get on to taking evidence.

08:24   1        **MS. PIERSON:**  Anyway, those three items are addressed

08:24   2   in the affidavit and the exhibits.  And I appreciate the

08:24   3   Court's time.  I appreciate that we have been allowed to come

08:24   4   here and present this evidence.

08:24   5        **THE COURT:**  Thank you very much.

08:24   6            All right.  Who is up --

08:24   7        **MS. PIERSON:**  By the way, should I note -- as you

08:24   8   said, I do object to the evidentiary value of what's on that

08:24   9   USB drive that Mr. Paw referred to.

08:24   10       **THE COURT:**  Okay.  Thank you.

08:24   11           Who is up next?

08:24   12       **MR. UNGLESBY:**  Good morning, Judge.

08:25   13       **THE COURT:**  Good morning.

08:25   14       **MR. UNGLESBY:**  Lewis Unglesby for Mr. Andry.

08:25   15           Your Honor, I think I can --

08:25   16       **THE COURT:**  Do you want to specify which Mr. Andry

08:25   17   you represent?

08:25   18       **MR. UNGLESBY:**  I'm sorry.  Jon Andry.

08:25   19           I think, if I put this on the Elmo, I will make

08:25   20   sure that you and I are on the same outline.  Is that all I

08:25   21   have to do?

08:25   22       **THE COURT:**  Yes.

08:25   23       **MR. UNGLESBY:**  All right.  As I appreciate, the Court

08:25   24   asked us these questions.

08:25   25       **THE COURT:**  What is that?

1    **MR. UNGLESBY:**  Excuse me, Your Honor.  That's you

2    talking the last time we were here.  And you said, "We know the

3    payments were made.  The question is, were they paying

4    Mr. Sutton to do this?  Then was he doing -- or was he doing

5    something he would do anyway?"

6            You said that's the heart of the case.  You want

7    to know how the payments were made, why they were made, and

8    whether there was impropriety ethically, civilly, or whatever.

9    That is the question -- those questions we are prepared to

10   answer today, Judge.  If you have others, you have to tell me,

11   but that's where we're going with our presentation.

12           **THE COURT:**  All right.  Proceed.

13           **MR. UNGLESBY:**  I call Mr. Staley.

14           **THE COURT:**  Is he in the courtroom?

15           **MR. UNGLESBY:**  Yes.

16           **MR. CHEATWOOD:**  Your Honor, Roy Cheatwood.  I

17   represent Postlethwaite, Mr. Staley.

18           **THE COURT:**  Would you like to sit in the jury box,

19   close by?

20           **MR. CHEATWOOD:**  Yes, sir.  Thank you, Judge.

21           **MR. UNGLESBY:**  Judge, given that we have introduced

22   the report and the thumb drive, which constitutes quite a bit

23   of opinion and hearsay, I'm assuming I have some latitude in

24   leading the witnesses; but if I'm wrong I guess somebody will

25   tell me.

THE COURT:  All right.

**MARK STALEY,**

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  State your full name and correct spelling for the record, please.

THE WITNESS:  Mark Staley, S-T-A-L-E-Y.

THE COURT:  Proceed.

**DIRECT EXAMINATION**

BY MR. UNGLESBY:

Q.   Mr. Staley, by whom are you employed?

A.   I'm employed by Postlethwaite & Netterville.

Q.   Do you have any connection to the *Deepwater Horizon* claims office?

A.   Yes, I do.  I'm one of the directors in charge for Postlethwaite & Netterville.

Q.   Will you explain to the judge what that involves.

A.   We are one of the accounting vendors that's involved with reviewing business economic loss and seafood compensation program claims.

Q.   Is there more than one accounting firm working there?

A.   Yes.

Q.   Do you know the names of the others?

A.   Yes.

Q.   Go ahead and tell us.

A.   It's Price Waterhouse Coopers.

**MARK STALEY - DIRECT**

08:28  1    Q.   Mr. Staley, what is your job in relationship to -- excuse
08:28  2    me.  Do you know who Tiger Sutton is?
08:28  3    A.   Yes, I do.
08:28  4          MR. UNGLESBY:  Judge, can I refer to him as Tiger for
08:28  5    simplicity rather than --
08:28  6          THE COURT:  That's fine if Mr. Sutton doesn't mind.
08:28  7    BY MR. UNGLESBY:
08:28  8    Q.   How do you know Mr. Sutton?
08:28  9    A.   I know him as a former representative of the claims
08:28  10   administration office.
08:28  11   Q.   While you were working -- while he was working and you
08:28  12   were working at the claims office, did you have interaction
08:28  13   with Mr. Sutton?
08:28  14   A.   Yes, I did.
08:28  15   Q.   Would you describe it for the Court, please.
08:28  16   A.   We were in the process of reviewing claims.  We met
08:28  17   frequently with representatives of the claims administration
08:28  18   office, particularly Mr. Sutton, to talk through various issues
08:28  19   and policies and interpretations of the settlement agreement.
08:28  20   Q.   Likewise, would you discuss with him particular claims
08:28  21   that were being made in order to get ideas as to what to do or
08:28  22   how to do or how to evaluate?
08:28  23   A.   There were particular claims that were discussed as part
08:29  24   of the conversations with the CA.
08:29  25   Q.   All right.  And did you consider Mr. Sutton maybe not a

**MARK STALEY - DIRECT**

1    friend but a friendly business associate?

2    **A.**   I considered him my client, as a representative of the CA.

3    **Q.**   Now, did you yourself ever deal with claimants or have

4    independent knowledge of the specifics of claims?

5    **A.**   Occasionally I would get involved in certain claims, yes.

6    **Q.**   Would you explain that to the judge.

7    **A.**    In certain situations, particularly in the beginning when

8    we were setting up the program, we were working through the

9    various claims, applying the settlement agreement,

10   understanding the settlement agreement.  And we would start our

11   process, which exists today, where we would have to perform

12   outreach to claimants or their representatives to obtain more

13   information necessary in order to be able to process the claim

14   according to the agreement.

15   **Q.**   All right.  Now, this case, the allegation has been

16   suggested that something unusual or improper was done by

17   Mr. Sutton regarding the Andry -- I'm going to call it the

18   Andry brothers' claim.  I will do that, if that's okay with

19   you, because there's different Andry law firms, but Gibby and

20   Jon, Andry brothers' claim, we know what we are talking about,

21   correct?

22   **A.**   Correct.

23   **Q.**   All right.  That's the claim that's referenced in the

24   special master's report you have seen?

25   **A.**   Yes.

**MARK STALEY - DIRECT**

08:30  1   **Q.**   All right.  Now, on that case, sir, did you ever have a

08:30  2   personal conversation with Tiger Sutton about that claim?

08:30  3   **A.**   Not that I can recall.

08:30  4   **Q.**   Never called you?  Never met with you?  Nothing?

08:30  5   **A.**   Not that I can recall.

08:30  6   **Q.**   During this same time frame, March 2013 and February 2013,

08:30  7   you are meeting with Mr. Sutton at different times for

08:30  8   different reasons?

08:30  9   **A.**   Yes.

08:30  10  **Q.**   All right.  Now, Mr. Rinaldi is what in regard to you?

08:30  11  Where does he sit?

08:31  12  **A.**   Mr. Rinaldi is one of our employees.  He is -- at the time

08:31  13  of February and March, he was a senior claims analyst.

08:31  14  **Q.**   All right.  And is Mr. Rinaldi a person who, you came to

08:31  15  learn, was working on the Andry brothers' claim?

08:31  16  **A.**   Yes.

08:31  17  **Q.**   In the report, particularly I'm going to page 50, there is

08:31  18  a statement that Mr. Staley -- that you, Mr. Staley, had been

08:31  19  contacted on March 6 by Mr. Sutton, asking about the status of

08:31  20  the Andry brothers' claim.  Do you remember that?

08:31  21  **A.**   I'm aware of his contact.

08:31  22  **Q.**   And it appears that you don't respond to that until the

08:31  23  next day?

08:31  24  **A.**   It's my understanding.

08:31  25  **Q.**   All right.  So I just want to make a point here, I think.

**MARK STALEY - DIRECT**

08:31   1      Because Tiger Sutton asked you to do something, you
08:32   2   don't stop what you are doing in your normal course of events
08:32   3   and go run to make Tiger happy, do you?
08:32   4   A.   No, sir.  We try to be as responsive as possible.  And I
08:32   5   did not respond on the 6th, to the best of my knowledge.
08:32   6   Q.   Correct.  So he makes an inquiry about the claim, and the
08:32   7   next day you tell him:  "This Andry Law Firm claim was in line
08:32   8   to be processed.  I have asked Chris to go ahead and pull the
08:32   9   claim down and process it.  I will keep you posted on the
08:32  10   status."
08:32  11      MR. UNGLESBY:  I will put that on the board up here,
08:32  12   if I may, Judge.
08:32  13           Did I read that right?
08:32  14      THE COURT:  What is it?  Is that from the special
08:32  15   master's report?
08:32  16      MR. UNGLESBY:  That's page 50 of the special master's
08:32  17   report, and it just simplifies the e-mails --
08:32  18      THE COURT:  I just want to clarify for the record
08:32  19   while we are talking about what's on the screen.
08:32  20      MR. UNGLESBY:  Yes, sir.
08:32  21   BY MR. UNGLESBY:
08:32  22   Q.   Now, Mr. Staley let's talk about your language, okay,
08:33  23   because it's interpreted by the special master.
08:33  24           "Pull the claim down," what does that mean?
08:33  25   A.   Pulling the claim down is kind of everyday language that

**MARK STALEY - DIRECT**

08:33   1   we use.  As claims move through the process -- which we are

08:33   2   kind of in the middle of the process, so claims were coming

08:33   3   in -- they go into an allocation queue; and from there claims

08:33   4   get pulled out of the allocation queue to be able to move to

08:33   5   the next step, which is to actually put it into the queue of an

08:33   6   accountant.

08:33   7   **Q.**   That's normal business?

08:33   8   **A.**   Yes.

08:33   9   **Q.**   Now, then, if you look here, we go on to say that Sutton

08:33   10   thanks you for that.  "Let me know if there's any problems."

08:33   11        And then about four days later, you respond to

08:33   12   Sutton:  "The Andry Law Firm claim has been prepared and pushed

08:33   13   to accounting QC review as of today.  If it comes back for any

08:33   14   reason, I will let you know."

08:33   15        Do you see that?

08:33   16   **A.**   Yes.

08:33   17   **Q.**   What did that mean, "pushed to accounting"?

08:34   18   **A.**   It's synonymous for submitted.  So when we are reviewing a

08:34   19   claim and we're done with the initial review, you submit the

08:34   20   claim or push the claim forward to the next step in the

08:34   21   process, which was QC.

08:34   22   **Q.**   And once it goes to QC, have you lost control of it?

08:34   23   **A.**   At that time, yes.

08:34   24   **Q.**   And Mr. Sutton has no control over QC?

08:34   25   **A.**   Not to my knowledge.

**MARK STALEY - DIRECT**

08:34  1  **Q.**   Right.  And there is nothing you ever saw in this report

08:34  2  that reflects that Mr. Sutton ever, in any way, shape, or form

08:34  3  has any effort to contact or even know who QC is, is there?

08:34  4  **A.**   I'm sorry.  Can you repeat the question?

08:34  5  **Q.**   There's nothing you never saw in this report or any

08:34  6  evidence that you are aware of regarding your work and

08:34  7  Mr. Rinaldi's work where Mr. Sutton ever interacts with anybody

08:34  8  at whoever QC is, does he?

08:34  9  **A.**   I can't be certain of whether he did or didn't interact

08:34  10  with someone in QC.

08:34  11  **Q.**   You haven't seen anything to that effect?

08:34  12  **A.**   I have not.

08:34  13  **Q.**   No.  Now, do you know who QC is?

08:34  14  **A.**   At that time it was being performed by the other

08:35  15  accounting vendor, Price Waterhouse.

08:35  16  **Q.**   By another group, by Price Waterhouse?

08:35  17  **A.**   Correct.

08:35  18  **Q.**   So it goes from P&N to Price Waterhouse?

08:35  19  **A.**   Correct.

08:35  20  **Q.**   Did it work the other way too?  If they were doing it,

08:35  21  would it go from Price Waterhouse to you guys?

08:35  22  **A.**   Not at that time.

08:35  23  **Q.**   Now, was there any request, any request by Mr. Sutton to

08:35  24  expedite this claim?

08:35  25  **A.**   Not to my knowledge.

MARK STALEY - DIRECT

| | |
|---|---|
| 08:35 | 1 |
| 08:35 | 2 |
| 08:35 | 3 |
| 08:35 | 4 |
| 08:35 | 5 |
| 08:35 | 6 |
| 08:35 | 7 |
| 08:35 | 8 |
| 08:35 | 9 |
| 08:35 | 10 |
| 08:36 | 11 |
| 08:36 | 12 |
| 08:36 | 13 |
| 08:36 | 14 |
| 08:36 | 15 |
| 08:36 | 16 |
| 08:36 | 17 |
| 08:36 | 18 |
| 08:36 | 19 |
| 08:36 | 20 |
| 08:36 | 21 |
| 08:36 | 22 |
| 08:36 | 23 |
| 08:36 | 24 |
| 08:36 | 25 |

**Q.**   To give it special treatment?

**A.**   Not to my knowledge.

**Q.**   And the claim, as far as you know, was received and handled, once you became aware of it, in the normal course?

**A.**   Yes.

**Q.**   In fact, didn't you make an inquiry at some point, Mr. Staley, of Mr. Sutton, whether you wanted it to -- or excuse me.  Did Mr. Rinaldi make an inquiry of you, whether he should work it in some kind of special way; and you responded, no, just work it in the normal course?

**A.**   He asked if there was anything we needed to do special, and the answer was, no, just work it in the normal course.

**Q.**   Now, you don't know how the eligibility notices worked in terms of whether two weeks was normal course of business or uniquely fast or slow, do you?

**A.**   We monitor when notices are generated as another quality control check.  At that time we -- our organization wasn't monitoring them, but we were aware.  And so two weeks is not unusual to me.

**Q.**   Right.  In fact, there are many cases that once it finishes through your process, about two weeks later the eligibility notice goes out?

**A.**   Once it finishes the initial review and goes to QC, the process can take varying lengths of time.  It could be as quick as two weeks.

MARK STALEY - DIRECT

08:36  1    Q.    Now, finally, in the course of this investigation, you had

08:36  2    to learn about this claim, did you not, sir?

08:37  3    A.    Yes.

08:37  4    Q.    Did you find out why this case, The Andry Law Firm claims,

08:37  5    had been stuck in the accounting queue since the prior

08:37  6    December?

08:37  7    A.    Yes.

08:37  8    Q.    Would you explain to the judge.

08:37  9    A.    Initially when the claim was being worked by our

08:37  10   organization, it was being worked by Mr. Rinaldi.  He had

08:37  11   inquired of the claimant or their representative the need for

08:37  12   additional information.  The information he needed was not

08:37  13   present at the time.

08:37  14          After a short period of time, he issued an incomplete

08:37  15   notice.  He did not realize, however, in that time that the

08:37  16   claimant had submitted the information to the file, and so the

08:37  17   claim went out for incomplete notice.  Once it went out for

08:37  18   incomplete notice, it circles back into the program and then

08:37  19   gets fed into the process at a later day, which is what was

08:37  20   taking place.

08:37  21   Q.    Is Mr. Rinaldi directly relating to the claimant or the

08:38  22   claimant's accountant to make that request?

08:38  23   A.    I'm sorry.  Can you repeat the question?

08:38  24   Q.    Does he communicate directly with the claimant or the

08:38  25   claimant's accountant to make this request for this additional

**MARK STALEY - DIRECT**

1    information?

2    **A.**    My understanding is he communicated directly with either

3    the claimant or the claimant's accountant for requesting the

4    information.

5    **Q.**    And his name is always Chris Rinaldi?

6    **A.**    To my knowledge.

7    **Q.**    All right.  Now, in fairness, that was just a mistake

8    right?

9    **A.**    We had the information we needed and could have processed

10   the claim at that time.

11   **Q.**    And had that occurred -- if you can tell me, Mr. Staley,

12   all things being equal, had that started in December, just as

13   you started it in March, it would have finished much sooner,

14   correct?

15   **A.**    I can't be certain because I am aware that additional

16   missing information was later determined.

17   **Q.**    After you discovered this problem, you have no obligation

18   nor do you report back verbally to Tiger Sutton all about what

19   occurred, did you?

20   **A.**    I didn't find it necessary to report any information

21   around the specifics of this claim back to Tiger.

22   **Q.**    Tiger Sutton doesn't call you up or complain or ask for

23   special treatment or put any pressure on you whatsoever, does

24   he, sir?

25   **A.**    Not to my knowledge.

**MARK STALEY - DIRECT**

**Q.**   Really, he can't, can he?

**A.**   He can call me, certainly, or meet with me, as claims administrators do and did.  But we have got strong controls and a tight procedure, and we follow that procedure.

**Q.**   And the claim itself -- just since I have you have up there, Mr. Staley, to make this what we all believe to be true but to put it in the record -- the policies and procedures of the claims administrative office, agreed to by BP and by the plaintiffs, are formula-driven, are they not?

**A.**   The settlement agreement is designed to be formula-driven.

**Q.**   That's right.  And so you put in the information.  If it's the accurate information, it's going to spit back out a number; you win, you lose, you get $5 or you get $10.  That's the way -- the formula is going to control it?

**A.**   Generally speaking.

**Q.**   Mark Staley, Tiger Sutton, Pat Juneau, Mark Holstein -- nobody can make a phone call or send an e-mail that's going to change that formula, can they, for an individual case?

**A.**   The formula is set, and our systems are designed to produce the results of the formula without interference.

**Q.**   You never had at any time direct communication with Tiger Sutton except this inquiry through the e-mail and your responses to him?

**A.**   On this specific claim, that's correct.

**Q.**   And is it your understanding, from your work, Mr. Staley,

MARK STALEY - CROSS

08:41 1    and your meetings, that it was permitted and part of Tiger

08:41 2    Sutton's job to make inquiries about the status of claims and

08:41 3    claimants?

08:41 4    A.   That was my understanding.

08:41 5         MR. UNGLESBY:  Obviously, Judge, you can interrupt me

08:41 6    at any time you have a question.

08:41 7              That's all I have of Mr. Staley.

08:41 8         THE COURT:  Anyone else on this side of the room have

08:41 9    any additional questions for Mr. Staley?

08:41 10             Mr. Paw, do you have any questions for him?

08:41 11        MR. PAW:  Yes, I do, Your Honor.

08:41 12                        CROSS-EXAMINATION

08:41 13   BY MR. PAW:

08:41 14   Q.   Good morning, Mr. Staley.

08:41 15   A.   Good morning.

08:41 16   Q.   Mr. Unglesby asked you about the timing of how a claim

08:41 17   moves, and he mentioned that The Andry Law Firm claim had first

08:41 18   come up in December of 2012 and then it sat in the pool for a

08:42 19   while, as more information was being received by the claims

08:42 20   center; is that correct?

08:42 21   A.   That's correct.

08:42 22   Q.   He said, "Well, maybe this could have been processed

08:42 23   quicker," or something like that.

08:42 24             Isn't it a fact that the timing of when claims get

08:42 25   processed is very important to claimants?

**MARK STALEY - CROSS**

08:42  1   **A.**    The timing of when claims get processed is important to

08:42  2   claimants?

08:42  3   **Q.**    Correct.

08:42  4   **A.**    I would think that, from the claimant's point of view, the

08:42  5   timing is important.

08:42  6   **Q.**    One of the complaints, as a matter of fact, that the CAO

08:42  7   receives from claimants is that their claims are not being

08:42  8   processed fast enough; isn't that correct?

08:42  9   **A.**    That's correct.

08:42  10  **Q.**    So when a claim gets pulled down and moved into the line

08:42  11  to be processed can be a pretty important fact, can't it?

08:42  12  **A.**    I believe so.

08:42  13  **Q.**    Now, you mentioned that you viewed Mr. Sutton as your

08:43  14  client in your position at the CAO; is that correct?

08:43  15  **A.**    As a representative of our client, yes.

08:43  16  **Q.**    And you were going to try to do things that your client

08:43  17  asks you to do because you want to make your client, if you

08:43  18  can, consistent with your workplace rules, pleased with your

08:43  19  work?

08:43  20  **A.**    We want to be responsive to our client.

08:43  21  **Q.**    Thanks.  So when you receive a request from Mr. Sutton to

08:43  22  try to do something, to try to move a claim to accounting

08:43  23  review or whatever it may be, you are going to try to fulfill

08:43  24  that if it's appropriate to fulfill.

08:43  25            **MR. SUTTON:**  Your Honor, I object.  There's no

**MARK STALEY - CROSS**

08:43 1    evidence that there was any request.

08:43 2            THE COURT:  Wait, wait, wait.  Are you representing

08:43 3    yourself here?

08:43 4            MR. SUTTON:  Yes.  Lionel Sutton representing --

08:43 5            THE COURT:  You don't have an attorney here today?

08:43 6            I overrule the objection.  Go ahead.

08:43 7    BY MR. PAW:

08:43 8    Q.   Can you answer the question?

08:43 9    A.   Sorry.  Can you repeat the question?

08:43 10   Q.   If you get a request to move a claim along into accounting

08:43 11   or into the next phase or whatever it may be as a claim, you

08:43 12   are going to try to do that, if you can, consistent with your

08:43 13   workplace rules?

08:44 14   A.   Yes.

08:44 15   Q.   Now, Mr. Unglesby asked you about receiving an e-mail on

08:44 16   May 6 and waiting to respond to it a little bit.  So you are

08:44 17   not jumping on Mr. Sutton's request; is that correct?

08:44 18   A.   That's what he stated, yes.

08:44 19           MR. PAW:  Can you project the March 6.

08:44 20   BY MR. PAW:

08:44 21   Q.   I'm showing you what's been marked as Special Master

08:44 22   Exhibit 1, Mr. Staley.  Do you have that in front of you?

08:44 23   A.   Yes, I do.

08:44 24   Q.   8:56 on March 6, there's an e-mail from Mr. Sutton?

08:44 25           MR. GELÉ:  Your Honor, we would like to object to

**MARK STALEY - CROSS**

08:44   1   this exhibit.  He hasn't introduced it in any way.  It's a

08:44   2   summary exhibit.  I represent The Andry Law Firm.  I'm Stephen

08:44   3   Gelé?

08:44   4          **THE COURT:**  What's your objection?

08:44   5          **MR. GELÉ:**  Our objection is that it's improper for a

08:44   6   number of reasons, Your Honor.  It in no way shows the

08:44   7   completeness of all the --

08:45   8          **THE COURT:**  Well, supporting documents are going to

08:45   9   be in evidence too, so I overrule the objection.

08:45  10   **BY MR. PAW:**

08:45  11   **Q.**   Mr. Staley, I was pointing to a March 6, 8:56 a.m. e-mail

08:45  12   from Mr. Sutton to you:  "I have some questions about the

08:45  13   above-referenced claim.  I believe it is being handled by

08:45  14   Christopher Rinaldi with your firm.  Please have Christopher

08:45  15   contact me when he has a chance."

08:45  16          That's the e-mail that Mr. Unglesby referred to when

08:45  17   he was asking you some questions, correct?

08:45  18   **A.**   Correct.

08:45  19   **Q.**   Do you remember seeing that on the 6th, sir?

08:45  20   **A.**   I can't recall if I saw it on the 6th or the 7th, but I

08:45  21   definitely saw it on one of those two days.

08:45  22   **Q.**   So let's go to the 7th on the same exhibit, No. 1.

08:45  23          Top entry, March 7, 2013, 9:17.  He resends the

08:45  24   e-mail to you on the 7th, correct?

08:46  25   **A.**   Correct.

## MARK STALEY - CROSS

1   **Q.**   At 9:17?

2   **A.**   Correct.

3   **Q.**   And by what, 12:13 -- if you look down a little bit

4   further -- you are responding, correct?

5   **A.**   Correct.

6   **Q.**   So it's not something that you let languish in your inbox

7   in some way when you saw an e-mail from Mr. Sutton?

8   **A.**   That's correct.

9   **Q.**   Now, you mentioned that he asked to speak to Mr. Rinaldi.

10   In all of your experience with Mr. Sutton, in all the meetings

11   that you have had with him and all the discussions that you

12   have had with him, had Mr. Sutton ever before asked to talk to

13   a line accountant?

14   **A.**   Not to my knowledge.

15   **Q.**   Did you find that unusual, that he wanted to talk to a

16   line accountant here?

17   **A.**   I found it unusual, yes.

18   **Q.**   Did you have any idea that there was any financial

19   connection between Mr. Sutton and any member of The Andry Law

20   Firm?

21   **A.**   No, I did not.

22   **Q.**   Did you know that Mr. Sutton was receiving a percentage of

23   fees from cases that Mr. Jon Andry had before the DHECC?

24   **A.**   I was not aware of that.

25        **MR. PAW:**  Go one more page.

**MARK STALEY - REDIRECT**

08:47   1   BY MR. PAW:
08:47   2   **Q.**   Mr. Staley, I want to point your attention to March 11,
08:47   3   2013.  Your response to Mr. Sutton, what time did you send that
08:47   4   response that day?
08:47   5   **A.**   Your exhibit says 2341.
08:47   6   **Q.**   So roughly 20 minutes before midnight on March 11, you are
08:47   7   responding to Mr. Sutton?
08:47   8   **A.**   According to your exhibit, yes.
08:47   9   **Q.**   The request that he made was important enough to write an
08:47   10  e-mail at 20 minutes before midnight to let him know what had
08:47   11  happened?
08:48   12  **A.**   That's when the e-mail was written.
08:48   13  **Q.**   Was it important to get back to Mr. Sutton?
08:48   14  **A.**   It was important to respond to Mr. Sutton as a
08:48   15  representative of the CA, yes.
08:48   16          **MR. PAW:**  No further questions, Your Honor.
08:48   17          **THE COURT:**  All right.  Mr. Unglesby, any followup?
08:48   18          **MR. UNGLESBY:**  Just one, Judge.
08:48   19                          **REDIRECT EXAMINATION**
08:48   20  BY MR. UNGLESBY:
08:48   21  **Q.**   Mr. Staley, it wasn't important to respond to Mr. Sutton
08:48   22  because he was Mr. Sutton; it was important to respond because
08:48   23  you had found out, through accident, that this case had been
08:48   24  stuck where it didn't belong for about four months, hadn't you?
08:48   25  **A.**   I had found out that we had sent an incomplete notice when

**MARK STALEY - REDIRECT**

08:48   1   we had the information we needed.  Mr. Sutton inquired about

08:48   2   it, so I owed him a response.

08:48   3   **Q.**   And once that incomplete notice got sent and nobody

08:48   4   uploaded to see that it had been satisfied, the claim, for lack

08:49   5   of a better word, was essentially out there in the stratosphere

08:49   6   until somebody grabbed it, right, and caught it?

08:49   7   **A.**   It was circling back into the program and it was getting

08:49   8   itself ready to be processed.

08:49   9   **Q.**   And but for Mr. Sutton's inquiry, we don't know when it

08:49  10   would have ever been found, do we?

08:49  11   **A.**   I can't answer that.

08:49  12   **Q.**   There wasn't a process, my point, when a claimant would

08:49  13   call up and say, "What happened to my claim?"  That's how

08:49  14   people like you would go to go check the claim, because there

08:49  15   would be an inquiry, or there was not a process to just

08:49  16   periodically, every five days, to purge the system and see if

08:49  17   there are any claims in here that should have been processed

08:49  18   that we missed, correct?

08:49  19   **A.**   We did not have a process to go look for claims that we

08:49  20   would have missed.

08:49  21   **Q.**   Right.  Now, clearly -- let's just take Mr. Paw's

08:49  22   assumptions and turn them into reality, sir.  You are under

08:50  23   oath, and I know you are a fine young fellow and want to tell

08:50  24   the truth.

08:50  25           Tiger Sutton did not have the power or the authority,

**MARK STALEY - REDIRECT**

| | | |
|---|---|---|
| 08:50 | 1 | nor did he exercise any influence over you to do a thing wrong, |
| 08:50 | 2 | did he? |
| 08:50 | 3 | **A.**   No, sir. |
| 08:50 | 4 | **Q.**   Nothing you don't do every day in the normal course of |
| 08:50 | 5 | your work? |
| 08:50 | 6 | **A.**   That's correct. |
| 08:50 | 7 |      **MR. UNGLESBY:**  Thank you, Your Honor. |
| 08:50 | 8 |      **THE COURT:**  Thank you, Mr. Staley.  You can step |
| 08:50 | 9 | down. |
| 08:50 | 10 |      **MR. CHEATWOOD:**  Your Honor, can Mr. Staley be |
| 08:50 | 11 | released from the subpoena at this time? |
| 08:50 | 12 |      **THE COURT:**  Anybody have any objection? |
| 08:50 | 13 |      Without objection, he is released. |
| 08:50 | 14 |      Call your next witness, Mr. Unglesby. |
| 08:50 | 15 |      **MR. CHEATWOOD:**  Your Honor, Mr. Rinaldi is also a |
| 08:50 | 16 | Postlethwaite employee that I represent. |
| 08:50 | 17 |      **THE COURT:**  All right.  Very well. |
| 08:50 | 18 |      **MR. CHEATWOOD:**  Thank you, sir. |
| 08:50 | 19 |        **CHRISTOPHER RINALDI,** |
| 08:50 | 20 | having been duly sworn, testified as follows: |
| 08:51 | 21 |      **THE DEPUTY CLERK:**  State your full name and correct |
| 08:51 | 22 | spelling for the record, please. |
| 08:51 | 23 |      **THE WITNESS:**  My name is Christopher Rinaldi. |
| 08:51 | 24 | Rinaldi is spelled R-I-N-A-L-D-I; Christopher is |
| 08:51 | 25 | C-H-R-I-S-T-O-P-H-E-R. |

## CHRISTOPHER RINALDI - DIRECT

DIRECT EXAMINATION

BY MR. UNGLESBY:

Q.   What do you do, sir?

A.   I am a senior claims analyst at Postlethwaite & Netterville.

Q.   Do you have any connection to the *Deepwater Horizon* matter?

A.   I work for Postlethwaite, which is an accounting vendor for the Deepwater Horizon Economic Claims Center.

Q.   All right.  Have you in your life, before this started, ever met Tiger Sutton?

A.   No.

Q.   Have you ever talked to Tiger Sutton?

A.   No.

Q.   Had Tiger Sutton ever called you and tried to talk to you?

A.   No.

Q.   Nor you him?

A.   No.

Q.   Now, explain to the judge -- well, let me short-circuit it.  Is what Mr. Staley told us about how this claim, the Andry brothers' claim got stuck in the queue accurate?

A.   Yes.  I called out -- I did not receive the information directly to my e-mail inbox, which I normally do.  I sent an incomplete notice.  And then in March, when looking back at the claim, my best conclusion is -- how Mr. Staley described it is

**CHRISTOPHER RINALDI - DIRECT**

08:52  1    what happened to the claim.

08:52  2    **Q.**   Now, sir, when you sent out your incomplete notice for

08:52  3    more information, did you send it to Mr. Gibby Andry, or did

08:52  4    you send it to Mr. Gibby Andry's accountant, or did you send it

08:52  5    to both?

08:52  6    **A.**   It was a while ago.  I can't recollect who I talked to,

08:52  7    but my best memory is the accountant.  The incomplete notice is

08:53  8    an automated process, so I don't know who I sent it to.

08:53  9    **Q.**   But you don't send it as John Doe; you send it as

08:53  10   Christopher Rinaldi?

08:53  11   **A.**   From my knowledge, my name isn't on it.  My name would be

08:53  12   on an e-mail I sent to them.  When I call, I obviously give my

08:53  13   name and where I am from.  But I don't believe my name is on

08:53  14   the incomplete notice.

08:53  15   **Q.**   So whomever it was at Gibby Andry's office would have

08:53  16   known to respond to you?

08:53  17   **A.**   They should have.

08:53  18   **Q.**   So it wasn't like -- y'all don't have secret names there

08:53  19   at the claims office, do you?

08:53  20   **A.**   No.

08:53  21   **Q.**   Now, when you asked Mr. Staley -- when you recognized the

08:53  22   mistake and you asked Mr. Staley should you do anything unique

08:53  23   or different, why did you ask him that?

08:53  24   **A.**   I thought there might have been a complaint.  I just

08:53  25   thought I messed up, so I was a little nervous when I saw that

CHRISTOPHER RINALDI - CROSS

08:53    1    and looked back on the history of the claim.

08:54    2    Q.    All right.  But your nervousness -- let's be clear,

08:54    3    Mr. Rinaldi.  It's quite all right, we all mess up.  But your

08:54    4    nervousness was not because somebody named Tiger Sutton was

08:54    5    asking any questions.  You didn't even know that.  Your

08:54    6    nervousness was this case has been stuck by accident for a few

08:54    7    months?

08:54    8    A.    I saw I made a mistake, and I wanted to correct the

08:54    9    mistake.

08:54   10    Q.    Did you ever even know that Tiger Sutton was the person

08:54   11    who started this inquiry before this investigation?

08:54   12    A.    No.

08:54   13    Q.    I didn't think so.  All right.

08:54   14          And, of course, he never talked to you?

08:54   15    A.    No.

08:54   16          THE COURT:  Any questions for this witness from this

08:54   17    side of the room?

08:54   18          Mr. Paw, do you have any?

08:54   19          MR. PAW:  Very briefly, Your Honor.

08:54   20                    CROSS-EXAMINATION

08:54   21    BY MR. PAW:

08:54   22    Q.    Good morning, Mr. Rinaldi.

08:54   23    A.    How are you doing?

08:55   24    Q.    When you were addressing this issue back in March of 2013,

08:55   25    Mr. Staley was not your direct boss, but he was actually the

**CHRISTOPHER RINALDI - CROSS**

08:55   1  boss above that, was he not?

08:55   2  **A.**   Two levels above me.

08:55   3  **Q.**   Two levels above you.

08:55   4       Had you ever dealt directly with Mr. Staley at that

08:55   5  time about particular claims?

08:55   6  **A.**   Yes.

08:55   7  **Q.**   How frequently would you interact with Mr. Staley?

08:55   8  **A.**   It wasn't routine, but -- it wasn't abnormal, it wasn't

08:55   9  routine.  I don't know how many times.

08:55  10  **Q.**   But as someone who is really your boss' boss, it's fair to

08:55  11  say that when Mr. Staley comes to your office, it's something

08:55  12  you are going to pay close attention to?

08:55  13  **A.**   Yes.

08:55  14       **MR. PAW:**   No further questions, Your Honor.

08:55  15       **THE COURT:**   Any redirect, Mr. Unglesby?

08:55  16       **MR. UNGLESBY:**   I'm getting coaching here, Judge.

08:55  17  Half a second.

08:55  18       Never mind, Your Honor.  No, no redirect.

08:55  19       **MR. CHEATWOOD:**   Your Honor, may I ask that

08:56  20  Mr. Rinaldi be released from the subpoena as well.

08:56  21       **THE COURT:**   Anybody have any objection?

08:56  22       All right.  He is released.

08:56  23       Thank you, Mr. Rinaldi.

08:56  24       **MR. CHEATWOOD:**   Thank you, Judge.

08:56  25       **THE COURT:**   Call your next witness, Mr. Unglesby.

08:56　1　　　　　　　**MR. UNGLESBY:**  Well, I have to check with

08:56　2　Mr. Rosenberg and see if he is here.

08:56　3　　　　　　　**THE COURT:**  Sounds like you need a lot of coaching

08:56　4　here today.

08:56　5　　　　　　　**MR. UNGLESBY:**  More than you know.  I have gotten,

08:56　6　wherever I have gotten in life, listening to other people,

08:56　7　doing what they tell me.

08:56　8　　　　　　　　　Our next witness, if he is available right now,

08:56　9　is here, is Mr. Duval.  If he is not, I will put on Christina

08:56　10　Mancuso.

08:56　11　　　　　　　**THE COURT:**  Whoever's here, let's call.

08:56　12　　　　　　　**MR. ROSENBERG:**  Your Honor, I apologize to the Court

08:56　13　and Mr. Unglesby.  I really anticipated, with all respect to my

08:56　14　colleagues here, there would be more loquacious lawyers -- more

08:56　15　chatty lawyers, Your Honor, that would take more time.

08:56　16　　　　　　　　　Mr. Duval, I think, is expected within a few

08:56　17　minutes, but he is not here.

08:56　18　　　　　　　**THE COURT:**  Is Ms. Mancuso here?

08:57　19　　　　　　　**MR. ROSENBERG:**  Yes.

08:57　20　　　　　　　**THE COURT:**  Let's take her.

08:57　21　　　　　　　　　　**CHRISTINA MANCUSO,**

08:57　22　having been duly sworn, testified as follows:

08:57　23　　　　　　　**THE DEPUTY CLERK:**  State your full name and correct

08:57　24　spelling for the record, please.

08:57　25　　　　　　　**THE WITNESS:**  My name is Christina Mancuso,

08:57   1   M-A-N-C-U-S-O.
08:57   2              THE COURT:  Is it Christine or Christina?
08:57   3              THE WITNESS:  Christina, with an A.
08:57   4                        DIRECT EXAMINATION
08:57   5   BY MR. UNGLESBY:
08:57   6   Q.   And where are you employed, ma'am?
08:57   7   A.   I am employed at Andry Lerner, on Baronne Street here in
08:57   8   New Orleans.
08:57   9   Q.   And what do you do there?
08:57   10  A.   I am a senior attorney working with on BP claims.
08:57   11  Q.   Are you a lawyer, Ms. Mancuso?
08:57   12  A.   Pardon me.
08:57   13  Q.   Are you a lawyer?
08:57   14  A.   I am.
08:57   15  Q.   Tell the judge a little bit about your background in terms
08:58   16  of your educational qualifications.
08:58   17  A.   I went to Baylor University and Baylor Law School in
08:58   18  Texas.  I am a toxic tort litigation attorney.  I worked at a
08:58   19  few firms, and then I was about 20 years at Baron & Budd in
08:58   20  Dallas, Texas.
08:58   21  Q.   And how did you come here?
08:58   22  A.   A former partner at Baron & Budd, Lance Pool, knew Jon and
08:58   23  asked me to come and set up the BP claims process at the firm.
08:58   24  Q.   Do you have a Martindale-Hubbell rating?
08:58   25  A.   I do.  I have AV permanent rating.

**CHRISTINA MANCUSO - DIRECT**

08:58  1   **Q.**   And if I appreciate that, ma'am, since I have one, the V
08:58  2   part requires that you be a person of highest integrity or you
08:58  3   never get an A, a B, or a C; isn't that true?
08:58  4   **A.**   That's true.
08:58  5   **Q.**   Ms. Mancuso, did you get interviewed by the Freeh Group?
08:58  6   **A.**   I did.
08:59  7   **Q.**   On how many occasions?
08:59  8   **A.**   Once.
08:59  9   **Q.**   Subsequent to that, did you give an affidavit and make
08:59  10  known that there were mistakes in the report, as you had read
08:59  11  them?
08:59  12  **A.**   There were errors in my testimony, yes.
08:59  13  **Q.**   One of them had to do with the fact that Christine
08:59  14  Reitano, Mr. Sutton's wife, never asked for any money from a
08:59  15  case called Casey Thonn, did she?
08:59  16  **A.**   In my conversations with her, no, she did not.
08:59  17  **Q.**   Now, you made that -- that appeared the opposite way in
08:59  18  the Freeh report, didn't it?
08:59  19  **A.**   In the Freeh report, I used terms of art.  I used
08:59  20  "attorney-client contract" and "attorney referral agreement."
08:59  21  And when I saw the transcript of my testimony, these -- the
08:59  22  transcript notes had interchanged attorney-client referral fee
08:59  23  and that type of thing.  So it just needed a clarification as
09:00  24  to what I had actually said.
09:00  25  **Q.**   It was written to reflect that Christine Reitano and her

**CHRISTINA MANCUSO - DIRECT**

09:00  1    husband Lionel Sutton had conspired to corrupt the claims

09:00  2    office by receiving secret money from Casey Thonn.  And that

09:00  3    was not true for Christine Reitano at all, was it?

09:00  4    A.    To my knowledge, no.

09:00  5    Q.    Now, let's talk about -- the judge has ruled on the Casey

09:00  6    Thonn case.  I'm not here to litigate the Casey Thonn case.

09:00  7          You followed the procedures as the claims office

09:00  8    required them, did you not, ma'am?

09:00  9    A.    I did.

09:00  10   Q.    I want you to explain to Judge Barbier how this process

09:00  11   worked in general, because I understand that Thonn shows up in

09:00  12   your office with work previously done by Sutton and Reitano for

09:00  13   what was called a GCCF.

09:00  14         Can you put that into English and explain it?

09:00  15   A.    Yes.  The GCCF was prior to the *Deepwater Horizon*

09:01  16   facility, and our firm received a CD with documents that

09:01  17   Christine Reitano had done and interacted with the GCCF in her

09:01  18   attempt to get settlement funds for Casey Thonn from the GCCF.

09:01  19   Q.    Are there three separate aspects of a claim like this?

09:01  20   A.    What do you mean, "three different aspects"?

09:01  21   Q.    Like isn't there something called a VoO claim?

09:01  22   A.    We had filed, actually, five claims -- eventually then

09:01  23   filed five claims:  a vessel of opportunity claim, a shrimp

09:01  24   owner claim -- vessel owner claim, a shrimp boat captain claim,

09:01  25   a subsistence claim, and I believe there was a vessel damage

CHRISTINA MANCUSO - DIRECT

1    claim.

2    Q.    Now, in the Feinberg time, in the summer before the

3    *Deepwater Horizon* claims office was created, had there been an

4    award made for subsistence or VoO by the Feinberg group of

5    seventy-something thousand dollars?

6    A.    The Feinberg group did not handle the VoO claims.  They

7    were handled outside the GCCF.  So no vessel of opportunity

8    claim had been filed under the GCCF.

9    Q.    All right.  Was there a number assigned eventually, in

10   July of 2011, of approximately $70,000, something like that?

11   A.    Casey Thonn had received previous payments from either BP

12   or the GCCF for about $72,500.

13   Q.    All right.  And then when he showed up at your office, you

14   went forward to try to accomplish what exactly?

15   A.    To file any claims that he had with the *Deepwater Horizon*.

16   Q.    All right.  And how did those work?

17   A.    Well, we filed it, we received notices on the boat -- the

18   VoO claim, we got.  That was fine.

19         The boat captain and the vessel owner claim, we filed

20   and we received notices in November of 2012.  They were each

21   for about $800, which is probably not even a profit of a

22   shrimper for a day.  And so we requested reconsideration on

23   both of those to use tax returns.

24   Q.    I think it's sort of important.  Isn't it correct, ma'am,

25   that the first notice you get is November 1 and the second

**CHRISTINA MANCUSO - DIRECT**

09:03  1    notice is November 6?

09:03  2    **A.**   Yes, for the vessel owner and the boat captain claims.

09:03  3    **Q.**   You don't know what day Tiger Sutton first went to work

09:03  4    for the claims office, do you?

09:03  5    **A.**   I do not.

09:03  6    **Q.**   As far as you know, you worked on many claims at The Andry

09:03  7    Law Firm?

09:03  8    **A.**   Yes, I did.

09:03  9    **Q.**   Every day?

09:03  10   **A.**   Yes.

09:03  11   **Q.**   During the time that Tiger Sutton was there, at any time,

09:03  12   Ms. Mancuso, did you ever observe, were you ever told, did you

09:03  13   ever infer, did you ever see anywhere, anybody in that office

09:03  14   knew, "Hey, if you have a problem, call Tiger.  He will fix

09:03  15   it"?

09:03  16   **A.**   No.

09:03  17   **Q.**   You, ma'am, created a document -- that's part of our

09:03  18   submission we have already given to the Court.  I won't burden

09:03  19   him with another exhibit -- identifying how the claims were

09:03  20   being paid at the Andry Lerner firm compared to how claims were

09:04  21   being paid in general.  Do you remember that?

09:04  22   **A.**   Yes.

09:04  23   **Q.**   And am I not correct that the rate of pay, the value of

09:04  24   pay, and the timing of pay for the Andry Lerner claims was

09:04  25   almost precisely in the middle?

CHRISTINA MANCUSO - DIRECT

09:04  1   **A.**   Yes.

09:04  2   **Q.**   Huh?

09:04  3   **A.**   Yes.

09:04  4   **Q.**   Did you ever see anything to indicate that the Andry

09:04  5   Lerner firm was getting any special treatment or attention or

09:04  6   help from that claims office?

09:04  7   **A.**   No, I did not.

09:04  8   **Q.**   Do you know of any way possible in your work that anybody

09:04  9   in that claims office could manipulate or change the formula?

09:04  10  **A.**   No.

09:04  11  **Q.**   Or give your clients more or less money for whatever

09:04  12  reason?

09:04  13  **A.**   No.

09:04  14  **Q.**   But let's talk about the appeals.  November 1.  He's not

09:04  15  there yet, Tiger.  November 6, he is just getting there.

09:04  16          You get two notices.  They are, in your view, very

09:04  17  deficient, $800 apiece, right?

09:05  18  **A.**   Yes.

09:05  19  **Q.**   What do you do?

09:05  20  **A.**   We ask for reconsideration.

09:05  21          Some of the claims had -- I know the boat captain

09:05  22  claim did not have accounting fees attached to it.  We also

09:05  23  believed at that time, pursuant to a policy, I believe, 242,

09:05  24  that the shrimp cost percentage was missing from the boat

09:05  25  captain claim.  And also the previous payment had been taken

**CHRISTINA MANCUSO - DIRECT**

1   out on the boat captain eligibility notice, and it had already

2   been taken out on the vessel owner eligibility notice as well,

3   so that was a mistake.

4   **Q.**   There was a double deduction?

5   **A.**   Yes.

6   **Q.**   Now, what do you do then?  What happens?  What happened

7   then?

8   **A.**   We asked for reconsideration, and then we received a

9   post-reconsideration eligibility notice.

10  **Q.**   Now, who does that, the reconsideration?  Is it done by a

11  Gulf Coast claims office or something?

12  **A.**   No.  That's done by the *Deepwater Horizon*.

13  **Q.**   *Deepwater Horizon*?

14  **A.**   Uh-huh.

15  **Q.**   Do you know if Tiger Sutton had anything to do with that?

16  **A.**   I do not.

17  **Q.**   All right.  And what happened to the reconsideration?

18  **A.**   The reconsideration, both notices came back as an

19  eligibility notice.

20  **Q.**   And then what happened?

21  **A.**   And then those claims were accepted and paid.

22  **Q.**   I thought you appealed.

23  **A.**   We -- well, we got the post-reconsideration notice, and

24  then we did have those things that were lacking, so we

25  appealed.

**CHRISTINA MANCUSO - DIRECT**

1   Q.   Now, the appeal itself -- I know the judge knows this, but

2   when the appeal happens, is there notice to BP?

3   A.   Yes, because BP actually answers in the appeal process.

4   Q.   Right.  So this claim, the Casey Thonn claim, the Andry

5   Lerner firm is drawing particular attention to it by appealing

6   the claims?

7   A.   Yes.

8   Q.   BP won the appeal, didn't they?

9   A.   We did not.  We did not.  We lost our appeal.

10  Q.   BP won?

11  A.   BP won the appeal.

12       THE COURT:  I'm not sure where we are going with

13  this.  Let's see if we can move ahead to what I think is

14  important in this hearing.

15  BY MR. UNGLESBY:

16  Q.   To your knowledge, Ms. Mancuso, do you know, in all -- you

17  worked at that office every day.  During the time Tiger Sutton

18  worked at the claims office, do you know of anything, any time,

19  anywhere that Tiger Sutton assisted an Andry Lerner claimant

20  uniquely to any other claimant?

21  A.   I do not.

22  Q.   Do you know of any help Andry Lerner was getting out of

23  that claims office?

24  A.   No.

25       MR. UNGLESBY:  Can I have one second, Judge?  I have

CHRISTINA MANCUSO - CROSS

09:08  1    no more questions, but I think my co-counsel does.

09:08  2            THE COURT:  Your co-counsel?  Who is your co-counsel?

09:08  3            MR. UNGLESBY:  That's what I -- our team.

09:08  4            THE COURT:  What team are you on?  I don't know what

09:08  5    team this is.

09:08  6            MR. UNGLESBY:  The accused.

09:08  7            THE COURT:  Who is this and who do you --

09:08  8            MR. MEHTA:  Oh, I'm sorry.  My name is Amite Mehta.

09:08  9    It's A-M-I-T-E, M-E-H-T-A.

09:08  10           THE COURT:  Who do you represent?

09:08  11           MR. MEHTA:  I represent Mr. Lerner, Your Honor.

09:08  12           THE COURT:  Okay.  Go ahead.

09:08  13           MR. MEHTA:  Your Honor, we have submitted to the

09:08  14   Court a summary exhibit, which I will mark as --

09:08  15           THE COURT:  Do you have any questions for this

09:08  16   witness?

09:08  17           MR. MEHTA:  I do, Your Honor.  I just want to refer

09:08  18   her to a document that's in this particular exhibit.

09:08  19                 If I could ask you to pull up Tab 10.

09:08  20                 May I proceed, Your Honor?

09:08  21           THE COURT:  Go ahead.

09:08  22                       CROSS-EXAMINATION

09:09  23   BY MR. MEHTA:

09:09  24   Q.   Good morning, Ms. Mancuso.  I'm showing you what is an

09:09  25   e-mail from you to someone by the name of poopsie1@hotmail.com,

**CHRISTINA MANCUSO - CROSS**

09:09   1   dated April 3, 2012.  Do you see that in front of you, ma'am?

09:09   2   **A.**   I do.

09:09   3   **Q.**   And who is poopsie1@hotmail.com?

09:09   4   **A.**   That is the e-mail for Casey Thonn.

09:09   5   **Q.**   You write in this e-mail:  "Casey, a pleasure to speak

09:09   6   with you today.  Called and left a message for attorney

09:09   7   Christine Reitano 'Re: please send me the disc with claim

09:09   8   information of claimant Casey Thonn.'"

09:09   9        Ma'am, what were you referring to in this e-mail

09:09   10   about a disc with claim information?

09:09   11   **A.**   Christine Reitano told me that she would send me a disc

09:09   12   with all of Casey Thonn's documents on it.

09:09   13   **Q.**   Do you recall what those documents consisted of?

09:09   14   **A.**   They were a lot of conversations, e-mails with the GCCF.

09:10   15   There were tax returns.  There were fishing licenses, that type

09:10   16   of thing.  Documents related to a claim that he would have

09:10   17   filed with the GCCF.

09:10   18   **Q.**   Is it fair to say that those documents reflected work the

09:10   19   law firm of Sutton and Reitano had done on behalf of Mr. Thonn

09:10   20   before he came to Andry Lerner?

09:10   21   **A.**   Yes.

09:10   22   **Q.**   Is it also fair to say that you, as the lawyer for Andry

09:10   23   Lerner, that then represented Mr. Thonn, used those documents

09:10   24   to file claims on his behalf?

09:10   25   **A.**   Yes, we did use the documents.

**CHRISTINA MANCUSO - CROSS**

09:10  1    **Q.**    Let me also ask you a question -- ask you about Mr. Lerner
09:10  2    a little bit.  Did you work in the office on a day-to-day basis
09:10  3    at Andry Lerner?
09:10  4    **A.**    I did.
09:10  5    **Q.**    So you would know who was coming and going in that office,
09:10  6    correct?
09:10  7    **A.**    Yes.
09:10  8    **Q.**    Was Mr. Lerner someone who was an everyday presence in the
09:10  9    Andry Lerner office?
09:10 10    **A.**    He was not.
09:10 11    **Q.**    How often would Mr. Lerner be in the Andry Lerner office?
09:10 12    **A.**    He would come in occasionally.
09:10 13    **Q.**    Occasionally, how often do you mean?  Every few months?
09:11 14    **A.**    Every few months, yes, that sounds about right.
09:11 15    **Q.**    And when Mr. Lerner was in the office -- could you tell
09:11 16    the Court what he would do when he was in the office?
09:11 17    **A.**    We would meet, go over some ideas, or just the general way
09:11 18    that the firm was.
09:11 19    **Q.**    Would he talk to you about specific claims?
09:11 20    **A.**    He did not.
09:11 21    **Q.**    Ever have a conversation in your time at Andry Lerner with
09:11 22    Mr. Lerner about any specific claim?
09:11 23    **A.**    Pardon me.
09:11 24    **Q.**    Did you ever have a conversation with Mr. Lerner during
09:11 25    your time at Andry Lerner about a specific claim?

**CHRISTINA MANCUSO - CROSS**

| | | |
|---|---|---|
| 09:11 | 1 | **A.**   I may have, but I don't recall at this time. |
| 09:11 | 2 | **Q.**   Ever recall talking to him about the Casey Thonn case? |
| 09:11 | 3 | **A.**   I do not recall talking to him about the Casey Thonn case. |
| 09:11 | 4 | **Q.**   Mr. Lerner was not somebody who was actually involved in |
| 09:11 | 5 | the making of claims on behalf of clients, was he? |
| 09:11 | 6 | **A.**   I was involved in the claim, the daily claim process. |
| 09:11 | 7 | **Q.**   Mr. Lerner was not, correct? |
| 09:11 | 8 | **A.**   Mr. Lerner came in occasionally and would just review in |
| 09:12 | 9 | general the business. |
| 09:12 | 10 | **Q.**   Just one additional area of questioning.  During your time |
| 09:12 | 11 | there -- Mr. Unglesby had asked whether you had ever heard that |
| 09:12 | 12 | Mr. Sutton was someone who could help Andry Lerner at the |
| 09:12 | 13 | claims administrator's office. |
| 09:12 | 14 | You answered no, you had never heard that, correct? |
| 09:12 | 15 | **A.**   That is true. |
| 09:12 | 16 | **Q.**   Did you ever hear that Andry Lerner had an anonymous |
| 09:12 | 17 | insider at the claims office that could help you? |
| 09:12 | 18 | **A.**   No, I never heard that. |
| 09:12 | 19 | **Q.**   In fact, isn't it true, the first time you heard |
| 09:12 | 20 | Mr. Sutton's name was when news of these events broke? |
| 09:12 | 21 | **A.**   That is correct. |
| 09:12 | 22 | **MR. MEHTA:**  Nothing further for this witness.  Thank |
| 09:12 | 23 | you. |
| 09:12 | 24 | **THE COURT:**  Anyone else over here? |
| 09:12 | 25 | Mr. Paw, do you have any questions for this |

CHRISTINA MANCUSO - CROSS

09:12    1    witness?
09:12    2              MR. PAW:  I do, Your Honor, just a few.
09:12    3                        CROSS-EXAMINATION
09:12    4    BY MR. PAW:
09:12    5    Q.   Good morning, Ms. Mancuso.
09:12    6    A.   Good morning.
09:12    7    Q.   You were discussing the disc that you received that had
09:13    8    some work product in the course of the Casey Thonn referral and
09:13    9    your use of that material to prepare Mr. Thonn's DHECC claims;
09:13   10    is that correct?
09:13   11    A.   Yes, we used some of the documents.
09:13   12    Q.   And you said there were some e-mails in there, I guess, to
09:13   13    the GCCF and other e-mail communication that had been done by
09:13   14    the attorneys prior to you being on the case?
09:13   15    A.   Yes.
09:13   16    Q.   Did you see work product in that material from Mr. Sutton?
09:13   17    A.   I did not.
09:13   18    Q.   Was most of the work product in that material from
09:13   19    Ms. Mancuso -- excuse so -- from Ms. Reitano?
09:13   20    A.   To my knowledge, what I can recall now, it was Christine
09:13   21    Reitano.
09:13   22    Q.   And Mr. Unglesby asked you about eligibility notices that
09:13   23    were issued on Mr. Thonn's claim?
09:13   24    A.   Yes.
09:13   25    Q.   And he said that the eligibility notices were first issued

## CHRISTINA MANCUSO - CROSS

09:13    1    on November 1 and November 6, days before Mr. Sutton was

09:13    2    working at the CAO or the DHECC; is that correct?

09:13    3    A.   I don't know when Mr. Sutton started working at the DHECC.

09:14    4    Q.   But that was a point that Mr. Unglesby was making with you

09:14    5    about the November 1 and November 6 notices?

09:14    6    A.   We received eligibility notices for the vessel owner claim

09:14    7    on November 1 and the boat captain claim on November 6, the

09:14    8    first ones.

09:14    9    Q.   For roughly 800 and some dollars on both claims?

09:14    10    A.   Yes.

09:14    11    Q.   In the time that Mr. Sutton is working at the DHECC,

09:14    12    that's when you filed the appeals of those initial notices,

09:14    13    correct?

09:14    14    A.   I don't know when Mr. Sutton started working at the DHECC,

09:14    15    but we filed --

09:14    16          THE COURT:  Can we stipulate to that?  I thought it

09:14    17    was November 1, 2012.

09:14    18          MR. PAW:  I believe that's correct.

09:14    19          THE WITNESS:  We filed appeals after the eligibility

09:14    20    notices.

09:14    21          THE COURT:  Mr. Sutton, is that correct?  You began

09:14    22    work there November 1, 2012?

09:14    23          MR. SUTTON:  If that was a Monday, but at the

09:14    24    beginning of November.

09:14    25          THE COURT:  Okay.  Go ahead, Mr. Paw.

CHRISTINA MANCUSO - CROSS

09:14   1          MR. PAW:   Thank you, Your Honor.

09:14   2   BY MR. PAW:

09:14   3   Q.   Those eligibility notices, based on the appeal, were

09:15   4   issued much later than November 1, 2012, correct?

09:15   5   A.   I believe they were issued in 2012 and then possibly in

09:15   6   January following.

09:15   7   Q.   December 3, 2012, sound correct to you, roughly?

09:15   8   A.   It could be, yes.

09:15   9   Q.   And one of the claims went from $864 to $166,000, correct?

09:15   10  A.   Yes, pursuant to a policy which allows you to ask for the

09:15   11  use of tax returns instead of trip tickets, because trip

09:15   12  tickets are --

09:15   13  Q.   And the other claim went from $885 to $190,000, roughly?

09:15   14  A.   Yes.

09:15   15  Q.   For the same reason, correct?

09:15   16  A.   Yes.

09:15   17  Q.   Mr. Unglesby said to you, "Well, there is a formula here.

09:15   18  It's nothing to be manipulated at the DHECC."  He asked you

09:15   19  that, right?

09:15   20  A.   Yes.

09:15   21  Q.   The formula part of the DHECC maybe can't be manipulated,

09:15   22  but there are other potential problems within the program, are

09:15   23  there not?

09:15   24  A.   What do you mean by "problems"?

09:16   25  Q.   Well, for example, if the place where the numbers are

CHRISTINA MANCUSO - CROSS

1    being taken from is a false document and the numbers that go

2    into the formula are based on a false document, that's going to

3    give you an answer to what a claim is worth that's worthless.

4              MR. TAYLOR:  Objection as to relevance in this case,

5    Your Honor.

6              THE COURT:  I sustain the objection because I think

7    the question states the obvious.  I don't think it's something

8    this lady would be capable of testifying about, what goes on in

9    a claims office.

10             MR. PAW:  Thank you, Your Honor.

11   BY MR. PAW:

12   Q.    You had said that you did not know Mr. Sutton's name until

13   this case had become publicly known in the newspaper; is that

14   correct?

15   A.    Yes.

16   Q.    Did you know that Mr. Sutton had received referral fees on

17   any of Mr. Thonn's claims?

18   A.    I didn't know -- I don't know Mr. Sutton.  I don't know

19   anything about any referral fees.

20   Q.    So you weren't aware of that?

21   A.    No.  I have no idea of anything like that.

22   Q.    But you are aware of referral fees in general at the Andry

23   Lerner firm; is that correct?

24   A.    Yes.

25   Q.    And you have worked with various people at the firm to

## CHRISTINA MANCUSO - CROSS

09:17  1    track the referral fees that the firm may owe to a referring

09:17  2    attorney?

09:17  3    **A.**    Yes.  I work with the referring attorney contact, yes.

09:17  4    **Q.**    And that's an accepted practice.  It's something that's

09:17  5    taking place across Louisiana, across New Orleans every day,

09:17  6    that referring attorneys are getting fees as part of a split

09:17  7    with an attorney that does the work before the claims center;

09:17  8    is that correct?

09:17  9    **A.**    Certainly.

09:17  10   **Q.**    And there's ethical rules and obligations that talk about

09:17  11   what you have to do to obtain that kind of a fee, correct?

09:17  12   **A.**    Yes.

09:17  13   **Q.**    Including that you want to have the referral agreement in

09:17  14   writing, right?

09:17  15   **A.**    Yes.

09:17  16   **Q.**    And that you want to advise your client, obviously, about

09:18  17   the referral agreement?

09:18  18   **A.**    Yes.  Generally the clients do come from their attorney

09:18  19   and they know that attorney has sent them to our office.

09:18  20   **Q.**    And I have seen documents from your office -- and tell me

09:18  21   if this is the standard practice -- where you're settling a

09:18  22   claim, and right on the settlement document it will say

09:18  23   "referral fee paid to attorney X" from different cities; is

09:18  24   that correct?

09:18  25   **A.**    Yes, some of our forms do have that.

**CHRISTINA MANCUSO - CROSS**

09:18  1  **Q.**   That was a standard practice, was it not?

09:18  2  **A.**   It's the usual practice, yes.

09:18  3  **Q.**   And you actually have a form referral agreement that you

09:18  4  use.  It's on your computer system, and you just modify it for

09:18  5  a given case, right?

09:18  6  **A.**   Yes.

09:18  7  **Q.**   And what kind of things do you have to modify in that form

09:18  8  when you send it out to a --

09:18  9  **A.**   The names, the percentages, anything that the referring

09:18  10  attorney might want to have.

09:18  11  **Q.**   Because some attorneys get different percentage referral

09:18  12  fees than other attorneys, right?

09:18  13  **A.**   That is true.

09:18  14  **Q.**   So you have to know what that percentage is to be able to

09:18  15  fill it into the blank and be able to send it out to the

09:18  16  referring attorney so that everybody knows what that percentage

09:19  17  is?

09:19  18  **A.**   Certainly.

09:19  19  **Q.**   I'm going to show you what I have previously marked as

09:19  20  Exhibit 8.

09:19  21       **MR. PAW:**  May I approach, Your Honor?

09:19  22       **THE COURT:**  Can you just put it on the screen?

09:19  23       **MR. PAW:**  On the screen?

09:19  24       **THE COURT:**  That's what we have them for here.

25

**CHRISTINA MANCUSO - CROSS**

09:19    1   **BY MR. PAW:**

09:19    2   **Q.**   The version that's on the screen, ma'am, is marked, has a

09:19    3   sticker on it, Exhibit 1, from a prior marking, I believe.

09:19    4                **THE COURT:**  This is your Exhibit 8 for this hearing?

09:19    5                **MR. PAW:**  Correct, Your Honor.

09:19    6                **THE COURT:**  Just so the record is clear.

09:19    7                **MR. PAW:**  Can you go to the first page of that,

09:19    8   please.

09:19    9   **BY MR. PAW:**

09:19   10   **Q.**   Ma'am, do you recognize what that document is?

09:19   11   **A.**   I do.

09:19   12   **Q.**   What is that document?

09:19   13   **A.**   That is a letter that I sent to Christine Reitano after I

09:19   14   spoke with Jon Andry after I had my phone call with Christine

09:19   15   Reitano.

09:19   16   **Q.**   And it's dated May 8, 2012?

09:20   17   **A.**   It is.

09:20   18   **Q.**   And what does the document discuss?

09:20   19   **A.**   Basically I am sending her an attorney referral agreement

09:20   20   for her review and signature.

09:20   21   **Q.**   And you mentioned that you had had a discussion with Jon

09:20   22   Andry about this before you sent the letter?

09:20   23   **A.**   Yes.

09:20   24   **Q.**   Please tell the Court what the nature of that discussion

09:20   25   was.

CHRISTINA MANCUSO - CROSS

09:20   1   A.   When I spoke to Christine Reitano, I did not know who she

09:20   2   was; and during the phone call with her, it seemed to me that

09:20   3   she was giving us the Thonn case.  She did not ask for a

09:20   4   referral agreement.

09:20   5          So after the phone call, I went to Jon.  And I didn't

09:20   6   know what he may have -- or what he knew.  And I said, "Do you

09:20   7   want me to send a referral agreement?"

09:20   8          And he said, "I don't know if she wants a referral

09:20   9   agreement.  Let's go ahead and send her a courtesy copy."

09:20  10          And so I did.

09:20  11   Q.   So you prepared the referral agreement after the

09:20  12   discussion with Mr. Andry and sent it by U.S. mail to the

09:21  13   Sutton and Reitano --

09:21  14   A.   Yes.  We didn't know if she wanted a referral agreement or

09:21  15   not.  I didn't know her, but it seemed to me from my

09:21  16   conversation that she was giving us the Casey Thonn case and

09:21  17   did not want a referral agreement.

09:21  18   Q.   Ma'am, if you look through the attachment to your letter,

09:21  19   it is the attorney referral form that we were talking about?

09:21  20          MR. PAW:  Can you please go through it.

09:21  21   BY MR. PAW:

09:21  22   Q.   Do you recognize that document?

09:21  23   A.   I do.

09:21  24   Q.   And is that, in fact, the form that we talked about in

09:21  25   terms of the standard form that the firm uses?

## CHRISTINA MANCUSO - CROSS

09:21  1   **A.**   It is.

09:21  2   **Q.**   It's an agreement between Mr. Jon Andry personally, not

09:21  3   The Andry Law Firm or not the Andry Lerner firm; is that

09:21  4   correct?

09:21  5   **A.**   Yes.

09:21  6   **Q.**   Why is it in Mr. Andry's name personally?

09:21  7   **A.**   This is a form created by him, and you would have to ask

09:21  8   him.

09:21  9   **Q.**   And did you consider the Thonn case to be a referral that

09:21  10  was the responsibility of Mr. Andry as opposed to Mr. Lerner?

09:21  11  **A.**   I did not consider the Casey Thonn case to be a referral,

09:22  12  pursuant to my conversation with Christine Reitano.

09:22  13  **Q.**   Did you have an understanding of who was the responsible

09:22  14  attorney at Andry Lerner for this claim?

09:22  15  **A.**   I was the responsible attorney at Andry Lerner for this

09:22  16  claim, to do the filings with the *Deepwater Horizon*.

09:22  17  **Q.**   How about for business purposes?  Did you have an

09:22  18  understanding?

09:22  19  **A.**   Pardon me.

09:22  20  **Q.**   For business purposes, for the accounting of the law firm,

09:22  21  was this considered a Lerner claim or an Andry claim?

09:22  22  **A.**   You would have to ask Jon.  I don't know what would it be.

09:22  23  **Q.**   Ma'am, let me point you to paragraph 5 in this document on

09:22  24  page 2.

09:22  25               **THE COURT:**  Can you blow that up?

CHRISTINA MANCUSO - CROSS

09:22  1    **THE WITNESS:**  I should have brought my glasses.

09:22  2    **THE COURT:**  We'll blow it up for you.

09:23  3    BY MR. PAW:

09:23  4    **Q.**   Can you read that now?

09:23  5    **A.**   I can.

09:23  6    **Q.**   What does paragraph 5 discuss?

09:23  7    **A.**   It discusses a 50/50 disbursement, 50 to Reitano and 50 to

09:23  8    Andry.

09:23  9    **Q.**   And again, you had mentioned that that 50 percent figure

09:23  10   needs to be inserted into this document?

09:23  11   **A.**   Yes.

09:23  12   **Q.**   Where did you come up with the figure of the 50 percent as

09:23  13   opposed to some other percentage?

09:23  14   **A.**   Checking with Jon.

09:23  15   **Q.**   So Mr. Andry told you it was a 50 percent referral?

09:23  16   **A.**   Yes.

09:23  17   **Q.**   There's a spreadsheet the firm maintains of referred

09:23  18   cases; is that correct?

09:23  19   **A.**   I assume there is one.  I haven't seen one.

09:24  20   **Q.**   Did you work with Ms. Tate on maintaining the spreadsheet?

09:24  21   **A.**   No, I did not.

09:24  22   **Q.**   Do you know if the records of The Andry Law Firm and the

09:24  23   Andry Lerner firm in any way reflect that there was a referral

09:24  24   fee on the Thonn claim?

09:24  25   **A.**   I do not know that.

CHRISTINA MANCUSO - CROSS

09:24    1            MR. ROSENBERG:  Your Honor, I thought I heard Mr. Paw
09:24    2    misspeak when he said "The Andry Law Firm."  There's been no
09:24    3    evidence that The Andry Law Firm has been involved, Your Honor.
09:24    4            MR. PAW:  I did misspeak at first, and then I --
09:24    5            THE COURT:  You mean Andry Lerner.
09:24    6            MR. PAW:  I'm trying to keep it clear for the record
09:24    7    that it was the Andry Lerner firm, yes.
09:24    8            MR. ROSENBERG:  Thank you, Mr. Paw.
09:24    9            Thank you, your Honor.
09:24   10    BY MR. PAW:
09:24   11    Q.   To just clarify the question, is there any reflection in
09:24   12    the Andry Lerner law firm records that there is a referral fee
09:24   13    that's due on the Thonn case?
09:24   14            MR. MEHTA:  Objection, Your Honor.  She testified
09:24   15    she --
09:24   16            THE COURT:  Overruled.  Overruled.
09:24   17            THE WITNESS:  I have no idea.
09:24   18            MR. PAW:  No further questions, Your Honor.
09:24   19            THE COURT:  Mr. Unglesby, any redirect?
09:24   20            MR. UNGLESBY:  I'll defer to Ms. Pierson.
09:25   21            MS. PIERSON:  Thank you, Your Honor.
09:25   22                        CROSS-EXAMINATION
09:25   23    BY MS. PIERSON:
09:25   24    Q.   Ms. Mancuso, we met about a year ago.  My name is Mary
09:25   25    Olive Pierson from Baton Rouge.  I just have a couple of

**CHRISTINA MANCUSO - CROSS**

09:25  1    questions.
09:25  2            With regard to the letter dated May 8 that was
09:25  3    addressed to my client Ms. Mancuso, do you know if she --
09:25  4            **THE COURT:**  Ms. Reitano.
09:25  5    **BY MS. PIERSON:**
09:25  6    **Q.**   Excuse me.  Ms. Reitano.  The letter that was addressed to
09:25  7    Ms. Reitano on May 8, do you have any knowledge that she ever
09:25  8    received that letter?
09:25  9    **A.**   No, I do not have that knowledge.
09:25  10   **Q.**   And with regard to the fee agreement, referral fee
09:25  11   agreement that was included in there, did she ever send back a
09:25  12   signed copy of that agreement?
09:25  13   **A.**   To my knowledge, I don't think she ever sent back a signed
09:25  14   copy.
09:25  15   **Q.**   Did you ever have a conversation with her after that about
09:25  16   the substance of your earlier conversations about a contingency
09:25  17   fee agreement?
09:25  18   **A.**   No, I never spoke to her about a referral fee.
09:25  19   **Q.**   And the contingency fee arrangement in the attorney-client
09:25  20   contract between Mr. Thonn and his earlier attorneys called for
09:25  21   a 20 percent contingency; is that correct?
09:26  22   **A.**   It did.
09:26  23   **Q.**   And that's what you discussed with Ms. Reitano on the
09:26  24   phone prior to her sending the CD to your office?
09:26  25   **A.**    Yes.  She asked me to honor the 20 percent contract she

CHRISTINA MANCUSO - REDIRECT

09:26　　1　had with Casey Thonn, and I said that we would.

09:26　　2　**Q.**   The 20 percent contingency fee, is that normal?  Are the

09:26　　3　contingency fees higher than that, lower than that, or had the

09:26　　4　Court entered any order about how high they could go?

09:26　　5　**A.**   The Court has entered an order that they can only be

09:26　　6　25 percent, but at times they are lower.

09:26　　7　**Q.**   And she was just ensuring that in this case, which did

09:26　　8　call for a lower fee, that that would apply?

09:26　　9　**A.**   Yes.

09:26　 10　　　　**MS. PIERSON:**  Thank you.

09:26　 11　　　　**THE COURT:**  Mr. Unglesby, do you have anything?

09:26　 12　　　　**MR. UNGLESBY:**  Just one thing, Your Honor.  I want to

09:26　 13　double-check something.

09:26　 14　　　　　　　　　**REDIRECT EXAMINATION**

09:26　 15　BY MR. UNGLESBY:

09:26　 16　**Q.**   Mr. Paw showed us Exhibit 8.  I just want to clarify a

09:27　 17　couple things.  Do you happen to know if in May 2012 Tiger

09:27　 18　Sutton worked for the claims office?

09:27　 19　**A.**   I have no knowledge of that.

09:27　 20　**Q.**   What is the name of that firm it got sent to?

09:27　 21　**A.**   Sutton and Reitano.

09:27　 22　**Q.**   All right.  Do you believe that's the Sutton that's in

09:27　 23　this case?

09:27　 24　**A.**   Now I believe it's the Sutton in this case.

09:27　 25　**Q.**   All right.  And like Ms. Pierson said, you never got back

**CHRISTINA MANCUSO – REDIRECT**

09:27  1    one of these from Ms. Reitano?

09:27  2    **A.**   To my knowledge, no.

09:27  3    **Q.**   Now, one other thing, ma'am.  I realize you don't have all

09:27  4    the documents here in front of you, but do you happen to

09:27  5    know -- aren't there are disbursement sheets from Andry Lerner

09:27  6    where the client gets their money and there is a legal fee

09:28  7    taken out that do not show the name of the referring attorney

09:28  8    but merely show the 20 percent?

09:28  9    **A.**   Yes, that is true.

09:28  10   **Q.**   And there is, in fact, a referring attorney, and a check

09:28  11   is written to him?

09:28  12   **A.**   Yes, that is true.

09:28  13   **Q.**   Likewise, there were prior to May 2012 lawyers throughout

09:28  14   New Orleans and South Louisiana who were referring cases to

09:28  15   firms like Andry Lerner because they had the facility to

09:28  16   process the complicated task of making a BP claim, right?

09:28  17   **A.**   Yes.

09:28  18   **Q.**   And that is sort of a complicated task, despite the best

09:28  19   efforts of everyone?

09:28  20   **A.**   It is.

09:28  21   **Q.**   Now, in the course of that, do you recall that competition

09:28  22   amongst the firms like Andry Lerner, those people who were

09:28  23   trying to get the BP cases, required that everybody go to

09:29  24   50 percent?

09:29  25   **A.**   Yes, at times.

## CHRISTINA MANCUSO - REDIRECT

09:29   1   **Q.**   Jon started out trying to pay less, but by May he had to

09:29   2   pay 50 to everybody, right?

09:29   3   **A.**   True.

09:29   4   **Q.**   Standard procedure?

09:29   5   **A.**   Yes.

09:29   6   **Q.**   One more thing.  Since you worked with the claims office,

09:29   7   isn't it true that the role of the claims office, told to you

09:29   8   in writing and through any communication with Nikita

09:29   9   (phonetic), who was your portal, was that the goal was to help

09:29   10  people get their claims paid in the most open and transparent

09:29   11  way possible?

09:29   12  **A.**   Yes.

09:29   13        **MR. UNGLESBY:**  That's all I have, Judge.  I don't

09:29   14  know if the Court has any questions.

09:29   15        **THE COURT:**  I do have one or two.

09:29   16        Ms. Mancuso, I don't remember the document

09:29   17  number now, but I think there was a record of an e-mail that

09:30   18  you sent -- you sent an e-mail to Mr. Thonn right after you had

09:30   19  your conversation with Ms. Reitano?

09:30   20        **THE WITNESS:**  Yes, I remember it.

09:30   21        **THE COURT:**  Can somebody pull that up?  What was the

09:30   22  date?  I'm just trying to establish the date.

09:30   23        Do you remember the date?

09:30   24        **THE WITNESS:**  I want to say it was May.

09:30   25        Was it May?

|  |  |  |
|---|---|---|
| 09:30 | 1 | **THE COURT:**  I thought it was in April. |
| 09:30 | 2 | **MR. PAW:**  It's April 3, Your Honor. |
| 09:30 | 3 | **THE WITNESS:**  Okay.  It says April 3. |
| 09:30 | 4 | **THE COURT:**  So that was the same day or within a day |
| 09:30 | 5 | or so of you speaking with Ms. Reitano; is that correct? |
| 09:30 | 6 | **THE WITNESS:**  Yes. |
| 09:30 | 7 | **THE COURT:**  I want to make sure I understand what you |
| 09:30 | 8 | said earlier.  This referral came from Ms. Reitano, not from |
| 09:30 | 9 | Mr. Sutton; is that correct? |
| 09:30 | 10 | **THE WITNESS:**  I didn't think in the phone call it was |
| 09:30 | 11 | a referral.  I didn't know her. |
| 09:30 | 12 | **THE COURT:**  Well, she called you. |
| 09:30 | 13 | **THE WITNESS:**  Jon said -- I believed that she was |
| 09:30 | 14 | giving me -- giving us the case.  That's what I believed. |
| 09:30 | 15 | **THE COURT:**  I'm not trying to parse legal terms here, |
| 09:31 | 16 | but she's referring a case to your office. |
| 09:31 | 17 | **THE WITNESS:**  Yes. |
| 09:31 | 18 | **THE COURT:**  Whether she's asking for a fee or not is |
| 09:31 | 19 | another issue. |
| 09:31 | 20 | **THE WITNESS:**  Okay. |
| 09:31 | 21 | **THE COURT:**  But that came from Ms. Reitano, not from |
| 09:31 | 22 | Mr. Sutton. |
| 09:31 | 23 | **THE WITNESS:**  It did.  It did. |
| 09:31 | 24 | **THE COURT:**  All the work product that you saw on that |
| 09:31 | 25 | disc came from Ms. Reitano, apparently? |

09:31 1        THE WITNESS:  Christine, yes.

09:31 2        THE COURT:  That's all the questions I have.  Thank

09:31 3   you, ma'am.  You can step down.

09:31 4        MR. UNGLESBY:  Judge, can we have a five-minute

09:31 5   break?

09:31 6        THE COURT:  All right.  Take about five minutes.  We

09:31 7   will be right back.  And who's going to be your next witness?

09:31 8        MR. UNGLESBY:  Mr. Duval.

09:31 9        THE DEPUTY CLERK:  All rise.

09:34 10       (Recess.)

09:39 11       THE COURT:  Please be seated.

09:39 12            Mr. Unglesby, do you have another witness?

09:39 13       MR. UNGLESBY:  David Duval, please.

09:39 14       THE COURT:  Counsel, approach the bench before we

09:39 15  take this witness.

09:39 16       (Off the record.)

09:41 17       THE COURT:  I had suggested to counsel that maybe we

09:41 18  could move this thing along and have a short stipulation.

09:41 19            Mr. Unglesby, you are going to propose

09:42 20  something.  Is that --

09:42 21       MR. UNGLESBY:  Yes, Your Honor.  We propose that if

09:42 22  called, Mr. Duval would testify that all of his dealings with

09:42 23  Jon Andry on behalf of the Andry brothers' claims or the Andry

09:42 24  Lerner claims were the same kind of dealings that Mr. Duval had

09:42 25  with many lawyers every day in his normal work as an appellate

09:42   1   lawyer, and that he had no -- never did make any effort to, nor

09:42   2   could he, in any way, shape, or form effect an appeal and was

09:42   3   never asked to.

09:42   4           THE COURT:  Okay.  Anybody object to that

09:42   5   stipulation?

09:42   6               All right.  Without objection, we will take that

09:42   7   as a stipulation.

09:42   8           MR. GELÉ:  Your Honor, on behalf of The Andry Law

09:42   9   Firm, we would like to propose a stipulation that there was no

09:42  10   communications between Mr. Gibby Andry and Mr. Duval other than

09:42  11   in writing that's in the record.

09:42  12           THE COURT:  Do you have any evidence to the contrary,

09:42  13   Mr. Paw?

09:42  14           MR. PAW:  Your Honor, I don't have the telephone

09:43  15   records in front of me.  This is the first that I've heard that

09:43  16   this is what the issue in dispute was going to be.  The records

09:43  17   will reflect whatever they reflect.

09:43  18           THE COURT:  If there are records that show they had

09:43  19   phone calls or e-mails or whatever, it's in the record.

09:43  20           MR. GELÉ:  There are no records of phone calls.

09:43  21           THE COURT:  Then you are fine.  I don't know if we

09:43  22   need a stipulation then.

09:43  23           MR. GELÉ:  Thank you, Your Honor.

09:43  24           THE COURT:  Anything else?  So we don't need

09:43  25   Mr. Duval.

09:43   1                  You're released, sir.  Thank you.

09:43   2                  Who is next?

09:43   3            MR. UNGLESBY:  Mr. Sutton.

09:43   4                       **LIONEL SUTTON III,**

09:43   5     having been duly sworn, testified as follows:

09:43   6            **THE DEPUTY CLERK:**  State your full name and correct

09:43   7     spelling for the record, please.

09:43   8            **THE WITNESS:**  Lionel Howard Sutton III, L-I-O-N-E-L,

09:43   9     H-O-W-A-R-D, S-U-T-T-O-N.

09:44  10                       **DIRECT EXAMINATION**

09:44  11     **BY MR. UNGLESBY:**

09:44  12     **Q.**   Mr. Sutton, would you give the judge your occupation and

09:44  13     your address, please.

09:44  14     **A.**   I'm an attorney.  I practice at 935 Gravier Street,

09:44  15     Suite 1910, New Orleans.

09:44  16     **Q.**   And is 930 Gravier Street the previous location of Sutton

09:44  17     and Reitano law firm?

09:44  18     **A.**   935 --

09:44  19     **Q.**   Yes.

09:44  20     **A.**   Yes.

09:44  21     **Q.**   And the letter we saw, Exhibit 8 here from Mr. Paw earlier

09:44  22     today, written to your wife Christine Reitano, went to that law

09:44  23     firm?

09:44  24     **A.**   It went to 600, Suite 600, which was the previous address.

09:44  25     **Q.**   Yes.  You and she practiced law together?

**LIONEL SUTTON III - DIRECT**

09:44  1   **A.**   Yes.

09:44  2   **Q.**   The firm itself -- did you own the firm or did she own the

09:44  3   firm?

09:44  4   **A.**   It's not really a firm.  I'm just a sole practitioner.  We

09:44  5   d/b/a Sutton and Reitano.  When my wife started working with

09:44  6   me, she just liked to have her name in there too, and it was

09:44  7   easier.

09:44  8        But I have always practiced by myself just under my

09:45  9   own social security number as a sole practitioner since, I

09:45  10  think, 1993.

09:45  11  **Q.**   But any work she did for Casey Thonn or anyone else ran

09:45  12  through Sutton and Reitano, ran through you?

09:45  13  **A.**   Well, it actually ran through me, yes.  I don't think she

09:45  14  even was under her own insurance or anything.  It was all me.

09:45  15  **Q.**   Now, let's just get some things straight right here at the

09:45  16  front.  Okay, Mr. Sutton?

09:45  17  **A.**   Yes.

09:45  18  **Q.**   When you were first confronted by Mr. Welker and

09:45  19  Mr. Juneau about an allegation that you were sending cases to

09:45  20  Jon Andry's law firm, called Andry Lerner, for kickbacks, you

09:45  21  knew that wasn't true, didn't you?

09:45  22  **A.**   Correct.  It was just Andry -- they just said Andry.  They

09:45  23  didn't say anything about Andry Lerner.

09:45  24  **Q.**   But while you denied that, you didn't tell them the truth,

09:45  25  did you?

**LIONEL SUTTON III - DIRECT**

09:45  1   **A.**   That's correct.

09:46  2   **Q.**   And then when you were interviewed later by lawyers, and

09:46  3   the judge had them produce their notes, Billy Gibbens and Kyle

09:46  4   Schonekas, for one of the parties in this matter, you didn't

09:46  5   tell them the whole truth, did you?

09:46  6   **A.**   I repeated to them what I told Pat Juneau.

09:46  7   **Q.**   Right.  Now, when you got put under oath, you told the

09:46  8   truth?

09:46  9   **A.**   That's correct.

09:46  10  **Q.**   But you didn't tell your whole story, did you?

09:46  11  **A.**   I answered the questions that Mr. Freeh asked me.

09:46  12  **Q.**   Right.  Your lawyer said, "You just answer what he asks

09:46  13  you," and you didn't volunteer anything?

09:46  14  **A.**   That's correct.

09:46  15  **Q.**   Well, now is your chance.

09:46  16          First I want you to tell the judge, Mr. Sutton -- and

09:46  17  I know it's unpleasant, but I need you to tell the Court, why

09:46  18  was this Crown account used to receive money from Glen Lerner?

09:46  19  **A.**   I have to give a little bit of background on that.

09:47  20  **Q.**   Go ahead.

09:47  21  **A.**   Originally we had a company, Crown, and I maintained the

09:47  22  account in New Orleans.  At some point Glen Lerner's

09:47  23  accountant -- and I think he was in Las Vegas at the time --

09:47  24  started handling the account.  So the Crown account was then in

09:47  25  Las Vegas.

**LIONEL SUTTON III - DIRECT**

1    I kept the Crown account open at Regions Bank in
2    New Orleans and just used that as my own personal account, and
3    I did for some time.
4         Sutton and Reitano, as I said before, it's a sole
5    practitioner.  Everything operates through me.  We have a trust
6    account and then we have the Sutton and Reitano operating
7    account.  But over the years, since it's just me, the Sutton
8    and Reitano operating account is just like a joint account for
9    my wife and I.  We pay office expenses with that, but we also
10   pay groceries and mortgage and things like that.  So it's sort
11   of like we have the Sutton and Reitano trust account, the joint
12   account.
13        And then I was using the Crown as my personal account
14   at the time.  So I put stuff that I -- you know, money into
15   that personal account.
16   **Q.**   The fact is you didn't want Christine to know about this,
17   did you?
18   **A.**   That's correct.  The main thing is I didn't want her to
19   know I had that extra money so that I could spend it on what I
20   wanted to spend as opposed to, if it was in the joint account,
21   it would have been spent strictly on what she wanted to spend
22   it on, to be honest.
23   **Q.**   Looking back on it, sir, really -- and I know it's tough
24   to have to do this -- don't you wish you had just gone ahead
25   when Pat Juneau and Welker were interviewing you and told them

LIONEL SUTTON III - DIRECT

09:48  1   the whole story?

09:48  2   A.    Yes.

09:48  3   Q.    And there was a reason you didn't?

09:48  4   A.    Yes.

09:48  5   Q.    And tell the judge why.

09:48  6   A.    Well, originally, when Pat Juneau asked me, I didn't think

09:48  7   it had anything to do with Thonn, according to what Pat was

09:48  8   telling me.  When Pat Juneau, Mike Juneau, and Welker

09:48  9   questioned me, at that point my wife had already been

09:48  10  suspended, I guess, and she was right outside.  And I didn't

09:49  11  want her to realize that she had gotten in all this trouble

09:49  12  because of me trying to hide money from her.  That's what it

09:49  13  was.

09:49  14  Q.    Now, Casey Thonn, other than him, did you have any other

09:49  15  cases involving the *Deepwater Horizon* that intersected with

09:49  16  Andry or Andry Lerner?

09:49  17  A.    No.

09:49  18  Q.    The money you got from Casey Thonn, why did you believe

09:49  19  you were entitled to that money?

09:49  20  A.    Because of the work my firm did on the case prior to him

09:49  21  going over to the Andry Lerner group.

09:49  22         And there's been a bunch of questions about referral

09:49  23  fees and this and that.  And I looked at it a little bit

09:49  24  different than what Mr. Paw was looking at it.

09:49  25  Q.    Now, I'm not going to go into what you -- Mr. Lerner's

**LIONEL SUTTON III - DIRECT**

1  lawyers will handle your interaction with Mr. Lerner, but let's
2  get a couple things clear.  Did you ever talk to Jon Andry
3  about the Casey Thonn case?
4  **A.**   I don't recall ever having a conversation with Jon about
5  Casey Thonn.
6  **Q.**   Did you ever ask him for any money from the Casey Thonn
7  case?
8  **A.**   I don't think so.
9  **Q.**   In fact, didn't you and Mr. Andry, while you were
10 repairing your friendship -- during the course of this
11 interaction at the *Deepwater Horizon*, you and Mr. Andry had a
12 history, didn't you?
13 **A.**   Yes.
14 **Q.**   It was a good one and then a bad one?
15 **A.**   It was a good one for a long time and a bad one for a
16 short time after.
17 **Q.**   And what was bad about it?
18 **A.**   He and I had a disagreement on a case we were both
19 involved in, and I thought he shorted me a little bit on the
20 disbursement.
21 **Q.**   And as a result of that, you didn't really trust Mr. Andry
22 when it came to money, did you?
23 **A.**   That's correct.
24 **Q.**   Now, it's been alleged -- and we are going to use -- I
25 have to get my document.  But it's been alleged in here that

**LIONEL SUTTON III - DIRECT**

1   you accessed claims for Andry and Andry Lerner an unusual
2   number of times in regard to your authority there at the
3   *Deepwater Horizon* to look into various claims.
4          Do you remember that?
5   **A.**   Yes.
6   **Q.**   So let's take them.  Let's start with Casey Thonn.
7   **A.**   Okay.
8   **Q.**   Who and what provoked you to access the Casey Thonn
9   portal -- is that the right word?
10  **A.**   Yes.  Yes, portal.
11  **Q.**   Explain that to the judge while I go get something.  Okay?
12  **A.**   Okay.  On the computers that we had on our desk at the
13  DHECC, I could log in and look at a particular law firm portal,
14  which just showed -- which was what the law firm could see
15  themselves.  They showed all of the claims they had filed and
16  the status in general.  Or you could pull on the claimant's
17  name and see the claimant's file.
18         What it allowed you to do is look at all of the paper
19  they had filed; everything, all the paperwork was in there.
20  And then also, you could see whether it was still -- if it had
21  been picked up by BrownGreer yet, if it was still at
22  Garden City, if it was in accounting review, if it was in QC,
23  or if eligibility had been -- notice had been issued.  I think
24  you could see most of those kind of things.
25         But that was a fluid process.  At the beginning you

LIONEL SUTTON III - DIRECT

1   couldn't see as much as you could see later on, as I was there

2   longer.

3   **Q.**   So it might show -- if you wanted to look up the Lewis

4   Unglesby case, it might show you doing it 11 times in

5   10 minutes to get to 11 pages; is that --

6   **A.**   Well, there was a problem with the portal in that when

7   you -- let's say I want to look up Lewis Unglesby and I wanted

8   to look up the tax return for 2009 and I clicked on the tax

9   return for 2009.  Sometimes, when you would then close that and

10  think you were going to go back to the other, the previous

11  screen, it kicked you all the way back.  Then I would have had

12  to plug in Lewis Unglesby again to get back to where I was.

13  And it did that quite often.  I mean, it was a problem.

14        So the answer to your question is sometimes it might

15  show me logging in for your claim five times in several

16  minutes, but I was really only looking, trying to access it one

17  time, just looking at different things.

18  **Q.**   Who was it that asked you to look at the Casey Thonn case?

19  **A.**   On several occasions Casey Thonn asked me to look at it.

20  Other times I looked at it on my own.

21  **Q.**   Why was Casey after you to look at it?

22  **A.**   I remember just in general he wanted to know what was

23  going on.  But I particularly remember that there was an

24  instance where he had broken up with a girl that he told me was

25  working at -- I think he said BrownGreer.  And he was worried

**LIONEL SUTTON III - DIRECT**

09:53  1    that she could do something with his claim, and so he wanted me

09:53  2    to check it to make sure that she hadn't derailed or gone in --

09:53  3    I told him that there was no way anybody could do that but that

09:53  4    I would check it for him.  I recall him asking me that on one

09:53  5    particular --

09:53  6    **Q.**   There was no way anybody could alter any claim, could

09:53  7    they, Mr. Sutton?

09:53  8    **A.**   Not that I was I ware of.

09:54  9    **Q.**   There was no way anybody could interfere with the process?

09:54  10   **A.**   Not that I was aware of.

09:54  11   **Q.**   Speed it up, slow it down?

09:54  12   **A.**   That's correct.

09:54  13   **Q.**   What did you do to help Andry Lerner?  Anything?

09:54  14   **A.**   Nothing.

09:54  15   **Q.**   Well, according to page 67 of this report, the claims

09:54  16   administrative office was the victim of a scheme by the

09:54  17   claimant's attorneys, Lerner and Andry, who utilized and paid

09:54  18   the CAO insider, Sutton, to advance their DHECC claims.

09:54  19         That's what was written down about you and put in the

09:54  20   paper, wasn't it?

09:54  21   **A.**   Yes.

09:54  22   **Q.**   Is that true?

09:54  23   **A.**   No.  I didn't advance any claims for anybody.

09:54  24   **Q.**   Has anyone showed you one claim ever that they said you

09:54  25   advanced improperly?

**LIONEL SUTTON III - DIRECT**

| | | |
|---|---|---|
| 09:54 | 1 | **A.** No. |
| 09:54 | 2 | **Q.** Now, it's also been said that you looked up cases for Jon |
| 09:54 | 3 | Andry. |
| 09:54 | 4 | **A.** Yes. |
| 09:54 | 5 | **Q.** Okay. And in truth, you did. You looked at the Talen's |
| 09:55 | 6 | Marine case seven times -- |
| 09:55 | 7 | **A.** Yes. |
| 09:55 | 8 | **Q.** -- between February 6, 2013, and April 29, right? |
| 09:55 | 9 | **A.** Yes. |
| 09:55 | 10 | **Q.** Was that an unusual thing for you to do when a lawyer was |
| 09:55 | 11 | trying to get a claim paid? |
| 09:55 | 12 | **A.** No. That was my job. |
| 09:55 | 13 | **Q.** On the 15th of March, you looked up one time a case called |
| 09:55 | 14 | Motivation, Inc., for a minute. Do you remember that? |
| 09:55 | 15 | **A.** I've seen that record. I have no personal recollection of |
| 09:55 | 16 | that, but I do remember Jon asking me to look up two cases. I |
| 09:55 | 17 | don't remember -- |
| 09:55 | 18 | **Q.** And after lunch you looked up one time a case called |
| 09:55 | 19 | Vishnu. Do you remember that? |
| 09:55 | 20 | **A.** Again, I don't recall the names, but I did see that record |
| 09:55 | 21 | and that would go with what I remember. |
| 09:55 | 22 | **Q.** And you looked up Gibby Andry's brother's claim -- the |
| 09:55 | 23 | Gibby Andry claim, at Gibby's request. |
| 09:55 | 24 | **A.** The Andry Law Firm claim, yes. |
| 09:55 | 25 | **Q.** You talked to Gibby Andry about that? |

**LIONEL SUTTON III - DIRECT**

09:55   1   **A.**   Yes.

09:55   2   **Q.**   Not Jon Andry?

09:56   3   **A.**   No.  Gibby was the one handling The Andry Law Firm claim.

09:56   4   **Q.**   Gibby Andry knew nothing about you getting paid any money

09:56   5   through Glen Lerner, did he?

09:56   6   **A.**   No.  The Andry Law Firm was completely separate.  They had

09:56   7   one claim, The Andry Law Firm claim.  That was Gibby.  That

09:56   8   didn't have anything to do with Andry Lerner.

09:56   9   **Q.**   Right.  Now -- but let's look at something else, if I may,

09:56   10   sir, because we have this chart that we were given by Mr. Paw.

09:56   11   I'm going to ask you about a few people.

09:56   12          Do you remember somebody named Norman Rickey

09:56   13   (phonetic)?

09:56   14   **A.**   No.

09:56   15   **Q.**   Do you know he had a lawyer named Breit Drescher?  Does

09:56   16   that name mean anything to you?

09:56   17   **A.**   No.

09:56   18   **Q.**   Did you know you looked up Norman Rickey's claim 15 times?

09:57   19   **A.**   No, but it would have had to have been somebody called and

09:57   20   asked me to check on their claim.

09:57   21   **Q.**   How about Harry Still?  Is Harry Still a friend of yours?

09:57   22   **A.**   No.  Harry Still, that rings a bell.  I remember that.

09:57   23   **Q.**   He's a lawyer.

09:57   24   **A.**   Yes.  From Alabama I think.

09:57   25   **Q.**   And you looked up claims for Harry Still constantly,

**LIONEL SUTTON III - DIRECT**

09:57　1　didn't you, according to the chart?

09:57　2　**A.**　Yes.  He came in and had a meeting with Pat Juneau and I

09:57　3　after I looked up claims for him.

09:57　4　**Q.**　Right.  19 times you looked up claims for Harry Still,

09:57　5　many on his own personal claim.  Does that sound right to you,

09:57　6　from your looking at the chart?

09:57　7　**A.**　Yes, it does.

09:57　8　　　　I don't have that chart in front of me.  Were you

09:57　9　showing it to me?

09:57　10　**Q.**　How about Sher Garner law firm?  Are they good friends of

09:57　11　yours?

09:57　12　**A.**　I didn't know them until this case.  I knew one of the

09:57　13　lawyers there, but I didn't know it was Sher Garner.

09:57　14　**Q.**　Did you have any financial relationship with them?

09:57　15　**A.**　No.

09:57　16　**Q.**　Did they have a very large claim, personal claim?

09:57　17　**A.**　I understood it to be.  I was never aware of the amount.

09:58　18　**Q.**　And they had other people, like the Pere Marquette Hotel,

09:58　19　Center for Restorative Breast Surgery, the St. Charles Surgical

09:58　20　Hospital, Sun Electric, Texas Brine Company, and various

09:58　21　finance companies.

09:58　22　　　　You looked up all those claims, didn't you?

09:58　23　**A.**　If the records show that I did, I did.

09:58　24　**Q.**　You looked up Sher Garner's claims more than you looked up

09:58　25　the Andry Lerner claim?

**LIONEL SUTTON III - DIRECT**

09:58  1   **A.**   Sher Garner had -- would come in once a week or call in

09:58  2   once a week for us to look up and do status for claims for

09:58  3   them.  So they were one of the more active firms in getting me

09:58  4   to check stuff.

09:58  5   **Q.**   So this was not unique or unusual whatsoever, if Gibby

09:58  6   Andry asked you to look up his case?

09:58  7   **A.**   Not at all.

09:58  8   **Q.**   Or if Casey Thonn asked to you look up his case?

09:58  9   **A.**   That's correct.

09:58  10  **Q.**   And while you don't remember Jon Andry ever asking you to,

09:59  11  the fact is you looked up three claims for Jon Andry,

09:59  12  Motivation, Vishnu, and Talen's Marine.

09:59  13  **A.**   I remember him asking me to look up three claims.  I

09:59  14  didn't remember those two names.

09:59  15  **Q.**   Now, Talen's Marine had a particular interest to you,

09:59  16  didn't it?

09:59  17  **A.**   Yes.

09:59  18  **Q.**   As did Casey Thonn.  Independent of values, weren't you

09:59  19  trying to learn something, Mr. Sutton?

09:59  20  **A.**   Well, Talen's Marine --

09:59  21  **Q.**   Explain that to the judge.

09:59  22  **A.**   At some point Pat Juneau came and asked me to -- told me

09:59  23  that Jon Andry was questioning the process on Talen's Marine,

09:59  24  and he wanted me to figure out what was going on with the

09:59  25  Talen's Marine claim.

**LIONEL SUTTON III - DIRECT**

09:59  1        When I looked it up, I realized Talen's Marine was a

09:59  2  multifacility claim.  And I don't remember the exact numbers,

09:59  3  but let's say they had nine marinas but they were only making a

09:59  4  claim for five.

09:59  5        What was happening was, the claims office would say,

09:59  6  "We need all the tax returns," and the claimant's office, which

09:59  7  would be Jon Andry's office, would send the tax returns.  Then

10:00  8  they would call back and say, "We need more tax returns."

10:00  9  They'd say they would send them.

10:00 10        What happened was the lawyer, the claimant lawyer

10:00 11  didn't realize that he needed to send in tax returns.

10:00 12    **THE COURT:**  Mr. Sutton, hold on a second.  Let's see

10:00 13  if we can move -- this sounds pretty irrelevant to me.  Let's

10:00 14  move this along.

10:00 15  **BY MR. UNGLESBY:**

10:00 16  **Q.**   I'll ask right to the heart of it.

10:00 17        Do you remember at the beginning, Mr. Sutton, we put

10:00 18  up what the judge said he wanted to know?  Did you do anything

10:00 19  for these people, Andry and Lerner, that you didn't do for

10:00 20  everybody else?

10:00 21  **A.**   No.

10:00 22  **Q.**   Did you do anything for these people, Andry and Lerner,

10:00 23  that you didn't do for everybody else because you were getting

10:00 24  a referral fee?

10:00 25  **A.**   No.

LIONEL SUTTON III - DIRECT

10:00    1    **Q.**   Did you hide the referral fee in the Crown account to keep

10:00    2    it from anybody but your wife?

10:00    3    **A.**   No.   And I didn't consider it a referral fee.   He

10:00    4    stopped -- we stopped representing the guy.   He went to that

10:00    5    firm.   They represented him.   It was a fee split after our

10:00    6    representation, is how I understood it to be.

10:00    7    **Q.**   All right.   And when his case was on appeal, Thonn's cases

10:00    8    were on appeal, which resulted in Thonn receiving money and

10:01    9    ultimately you receiving money, could you control anything to

10:01   10    do with those appeals?

10:01   11    **A.**   Not that I'm aware of.

10:01   12    **Q.**   Huh?

10:01   13    **A.**   I did not, and I don't think I could have.

10:01   14    **Q.**   Now, those appeals made the whole world aware of the Casey

10:01   15    Thonn case, did they not, in terms of BP and the appellate

10:01   16    lawyer?

10:01   17    **A.**   I think he appealed one claim, yes.

10:01   18    **Q.**   Now, during that same time, were you representing Casey

10:01   19    Thonn individually in a car wreck?

10:01   20    **A.**   Yes.

10:01   21    **Q.**   And so that caused you to continuously have contact with

10:01   22    him?

10:01   23    **A.**   Yes.

10:01   24    **Q.**   You considered him your client?

10:01   25    **A.**   Yes.   I was only part-time at the DHECC.   I still had a

LIONEL SUTTON III - DIRECT

1    law practice and I still had other businesses.

2    **Q.**   Well, there is some confusion about that.  You were under

3    a different contract than everybody else, weren't you?

4    **A.**   That's correct.

5    **Q.**   Would you explain that to the judge.

6    **A.**   Initially, when Pat talked to me, he asked me how much

7    time I could put in.

8          I said, "I still have a law practice.  I still have

9    other businesses.  I could probably only give you about

10   75 percent of my time."

11         He said, "Okay.  How about I pay you 20 grand a

12   month?"

13         I said, "That would be fine," and that was the deal

14   we struck.  I got a contract probably sometime in the middle of

15   November from David Odom at Business Processes, and it said in

16   the contract that the contractor, me, would provide

17   substantially all of my time to the DHECC.

18         I wrote back to David Odom in an e-mail and said, "I

19   have a problem with this.  This doesn't reflect what Pat and I

20   agreed to or my salary," which was a reduced salary.  And so I

21   wrote -- we changed it to where I would provide a substantial

22   majority of my time to the DHECC.

23         Remember, my wife was full-time.  She was getting

24   $25,000 a month.  I was getting 20 percent less because I was

25   only working part-time.

LIONEL SUTTON III - DIRECT

10:02  1   Q.   Now, Mr. Sutton, you have seen the e-mails between you and
10:03  2   The Andry Law Firm, particularly -- or Andry Lerner, pardon
10:03  3   me -- particularly Susie DeSantis, have you not?
10:03  4   A.   Yes.
10:03  5   Q.   Who is she?
10:03  6   A.   I understood her to be, I think, the office manager at the
10:03  7   Andry Lerner group, but she worked for Glen, as I understood
10:03  8   it.
10:03  9   Q.   All right.  And who is Jeff Cahill?
10:03  10  A.   Jeff Cahill is the accountant that handles all of Glen
10:03  11  Lerner's business.  He was the accountant for Crown, and I
10:03  12  understood he just handled all the finances.
10:03  13  Q.   Now, you have told us -- you're under oath and you
10:03  14  understand you have to tell the truth.
10:03  15  A.   Yes.
10:03  16  Q.   You have told us you never talked to Jon Andry.  You're
10:03  17  aware of an e-mail that says something like "Jon told me
10:03  18  disbursed last week.  You should be getting yours" or "you
10:03  19  should be getting mine," something to that effect.
10:03  20         Do you know that e-mail?
10:03  21  A.   Right.  I have no recollection of ever talking to Jon
10:03  22  about the Thonn claim.
10:03  23  Q.   Period?
10:03  24  A.   Period.
10:03  25  Q.   So you don't know if maybe you should have e-mailed Jon's

**LIONEL SUTTON III - DIRECT**

1   office or something?

2   **A.**   Again, I don't remember ever talking to him.  So if I said

3   Jon, I could have meant his office.  I don't know.  I don't

4   recall ever speaking to him about the Thonn claim at all.

5   **Q.**   All right.  Finally, on the Andry brothers' inquiry that

6   you made to Staley and Rinaldi, there's been something made of

7   fact that you knew Chris Rinaldi's name.  Do you recall that?

8   **A.**   Yes.

9   **Q.**   Do you think you got that from Gibby or from the

10  accountant?

11  **A.**   I don't know.  It could have been on the sheet, the screen

12  that I saw.  Sometimes you could see which accountant was

13  handling the claim, sometimes you couldn't.  Sometimes there

14  would be -- we had what was called global notes.  The

15  accountants weren't as good about keeping global notes as they

16  were supposed to, but sometimes it would have been reflected.

17         I don't recall anybody telling me.  I don't know how

18  I would have known it other than somebody would have told me or

19  I would have seen it on the screen, one or the other.

20  **Q.**   In fact -- describe for the Court the distinction between

21  the way the lines of authority worked, which you didn't know

22  then, at Price Waterhouse versus Postlethwaite & Netterville,

23  as it related to your access to accountants.

24  **A.**   They had two top accountants at each firm that I dealt

25  with regularly.  I dealt with Mark Staley and, I think,

LIONEL SUTTON III - DIRECT

1    Katherine at Postlethwaite & Netterville.  And then at Price
2    Waterhouse I dealt mostly with Chuck Hager and Emily.
3          But sometimes I would also deal with the accountants
4    handling the claim if there was a specific issue that came up.
5    Regularly I would do that at Price Waterhouse.  They would
6    bring in -- if I had a question -- somebody from Price
7    Waterhouse would bring in the accountant.  There were several
8    times where I would meet with the actual accountant handling
9    the claim and the claimant attorney.  On a number of occasions
10   that was done.  I didn't realize that maybe that was all Price
11   Waterhouse and never with Postlethwaite.  I really didn't make
12   that distinction.  It didn't seem unusual to me one way or the
13   other.
14   Q.   You weren't trying to go around Mark Staley or over his
15   head or use any pressure on Christopher Rinaldi, who you didn't
16   even know, were you?
17   A.   No.  I was just really trying to make it easier on him.
18   "Hey, you don't need to be bothered.  I just wanted to check
19   the status.  This is the guy handling it."
20         And when Mark responded to me, that was fine with me
21   too.  It didn't matter one way or the other to me.
22   Q.   The point is, Mr. Sutton, it's been suggested that this
23   was some nefarious scheme by you to help the Andry brothers get
24   their claim paid.
25         Were you doing anything improper for them, any

LIONEL SUTTON III - DIRECT

10:07   1   different than you did for Sher Garner or 10,000 other people?
10:07   2   **A.**   Not at all.
10:07   3   **Q.**   Now, the claim, as set up itself, the process -- I think
10:07   4   the Court knows this, but I want you to tell us -- isn't it
10:07   5   impossible for somebody like you to actually have any influence
10:07   6   in how things work?
10:07   7   **A.**   That was -- my understanding was that all of that was
10:07   8   already set.  You could look at the settlement, you could
10:07   9   figure out what your amount was based on the numbers, and
10:07   10  that's what you would get.
10:07   11       Obviously there were policy decisions that may change
10:07   12  things, as everybody is aware of all the policy decisions that
10:07   13  have been made since then, but I didn't have anything to do
10:07   14  with that.
10:07   15  **Q.**   You could not, did not try -- let's not deal with what you
10:07   16  were capable of.  You didn't try to advantage, manipulate,
10:07   17  increase, or benefit any law firm above another, did you, sir?
10:07   18  **A.**   No, never.
10:08   19  **Q.**   Huh?
10:08   20  **A.**   Never.
10:08   21  **Q.**   And you didn't delay any Andry Lerner claims or take any
10:08   22  action whatsoever to hinder any Andry Lerner claims, waiting on
10:08   23  getting paid by Glen Lerner?
10:08   24  **A.**   No, I did not.
10:08   25  **Q.**   Conversely, you didn't hurry up and do something for Andry

**LIONEL SUTTON III - DIRECT**

10:08   1   Lerner, waiting on getting paid by Glen Lerner?

10:08   2   **A.**   That's right.

10:08   3   **Q.**   Now, Mr. Paw has various charts of e-mails and

10:08   4   communications with you, and it suggested in the report that

10:08   5   after all this comes out and you become aware of it, there is a

10:08   6   lot of communication between you and Jon and Gibby.  Have you

10:08   7   seen that chart?

10:08   8   **A.**   I think so.

10:08   9   **Q.**   All right.  So what?  Were you guys coming up with some

10:08   10   unusual new scheme that was going to change the facts?

10:08   11   **A.**   No.

10:08   12   **Q.**   Huh?

10:08   13   **A.**   No.

10:08   14   **Q.**   Have you seen a single piece of paper, Mr. Sutton -- and

10:08   15   you have looked at lots of paper since this started, haven't

10:08   16   you -- anywhere that you wouldn't have cared if Greg Paw was

10:09   17   standing next to you when you sent the e-mail?

10:09   18   **A.**   Everything I did for Andry Lerner claims or Andry Law Firm

10:09   19   claim was -- I did for everybody that asked.  I mean, more so

10:09   20   for other people.  That was my job.

10:09   21        My job was -- from the very first time I started

10:09   22   there, Pat would come in and say, "Hey this guy Harry Still, he

10:09   23   has a lot of questions about his claims."  And I would meet

10:09   24   with Harry Still, and I would meet with the accountant with

10:09   25   Harry Still.

**LIONEL SUTTON III - DIRECT**

10:09  1          Same thing with a number of claims.  Many times they
10:09  2   would come into the office.  I mean, I don't remember Jon Andry
10:09  3   or Glen Lerner or Gibby Andry ever coming into the office.
10:09  4   Many times claimant attorneys came into the office.  I pulled
10:09  5   the accountant up from the ninth floor.  We sat in a conference
10:09  6   room.  We went through their claims.  We said, "This is what's
10:09  7   wrong with the claim.  This is what you need to do to get it
10:09  8   paid."
10:09  9          I mean, that was all done in Pat Juneau's conference
10:09  10  room, at his direction.  I mean, that's the kind of stuff that
10:10  11  I did.  That was my job.  I didn't even do that for Jon Andry
10:10  12  and Gibby or Glen.  I just responded to their questions about
10:10  13  status.
10:10  14  **Q.**   But those things that you were doing, they were open,
10:10  15  aboveboard, everybody wanted you to do it?
10:10  16  **A.**   Yes.
10:10  17  **Q.**   You helped people that were on the PSC, like Joe Rice,
10:10  18  figure out how to file claims, right?
10:10  19  **A.**   Yes.  Joe Rice, I even took an accountant over to Joe
10:10  20  Rice's private office away from our building and sat with him
10:10  21  at the direction of Mike Juneau and explained to him how he
10:10  22  should file claims.
10:10  23  **Q.**   Now, Jon Andry never paid you a dime, did he?
10:10  24  **A.**   That's correct.  All I know is I got the Thonn fee.
10:10  25  **Q.**   Through Glen Lerner?

LIONEL SUTTON III – DIRECT

10:10  1   A.   Yes.

10:10  2   Q.   And you never had an agreement with Jon Andry, did you?

10:10  3   A.   Like I said a number of times, I don't remember ever

10:10  4   remember speaking to Jon Andry about the Thonn claim at all.

10:10  5   Q.   As far as you know, the actual Andry Lerner firm didn't

10:11  6   have an agreement with you, did they?

10:11  7   A.   There was never any written agreement or anything like

10:11  8   that, no.  I didn't think there needed to be, to be clear.  I

10:11  9   heard Mr. Paw's questions.  There is a difference here.

10:11  10          MR. UNGLESBY:  One second.

10:11  11  BY MR. UNGLESBY:

10:11  12  Q.   Finally, Mr. Sutton, the sad truth of this is, all this

10:11  13  trouble was caused because you were afraid your wife was going

10:11  14  to be mad at you and you wanted to razoo that money and her not

10:11  15  know about it.  Isn't that true?

10:11  16  A.   I wanted to control the money without her knowing about

10:12  17  it, and once I got in trouble with Pat, I was afraid that she

10:12  18  was going to find out and be mad at me, yes.

10:12  19  Q.   I'm sorry.  Reading problem by me.

10:12  20          There are no e-mails that you have to Jon Andry, are

10:12  21  there, regarding Casey Thonn?

10:12  22  A.   I don't think so.

10:12  23          MR. UNGLESBY:  That's all I have, Your Honor.

10:12  24          THE COURT:  Any other questions for this witness on

10:12  25  this side of the table?

LIONEL SUTTON III - CROSS

| | | |
|---|---|---|
| 10:12 | 1 | **MR. MEHTA:**  Yes, Your Honor.  On behalf of Mr. Lerner |
| 10:12 | 2 | we have questions. |
| 10:12 | 3 | **THE COURT:**  All right. |
| 10:12 | 4 | **CROSS-EXAMINATION** |
| 10:12 | 5 | BY MR. MEHTA: |
| 10:13 | 6 | **Q.**   Mr. Sutton, good morning.  On behalf of Mr. Lerner, I want |
| 10:13 | 7 | to go through some of your e-mails with Mr. Lerner about the |
| 10:13 | 8 | Casey Thonn matter and some of your other e-mails in this case |
| 10:13 | 9 | that the special master cited in his report. |
| 10:13 | 10 | But before we start there, can I ask you -- you |
| 10:13 | 11 | testified earlier that Sutton and Reitano represented Casey |
| 10:13 | 12 | Thonn.  Can you explain what Sutton and Reitano, through your |
| 10:13 | 13 | wife Christine, did for Mr. Thonn? |
| 10:13 | 14 | **A.**   We filed his GCCF claim.  We did whatever it took to do |
| 10:13 | 15 | his GCCF claim, filing all the paperwork, corresponding back |
| 10:13 | 16 | and forth with the GCCF.  I think there were even several site |
| 10:13 | 17 | visits that you had to go on through the GCCF. |
| 10:13 | 18 | It was my understanding that the claim was very close |
| 10:13 | 19 | to being completed and paid at the time that we had to stop |
| 10:13 | 20 | representing Mr. Thonn. |
| 10:14 | 21 | **Q.**   Is it fair to say your firm, through your wife, was doing |
| 10:14 | 22 | work on behalf of -- to get these claims paid? |
| 10:14 | 23 | **A.**   Yeah.  At the GCCF it was just one claim.  They didn't |
| 10:14 | 24 | have it all separated out like Ms. Mancuso testified to. |
| 10:14 | 25 | **MR. MEHTA:**  I ask you to pull up Tab 3.  Just blow |

LIONEL SUTTON III - CROSS

10:14   1   that up.
10:14   2   BY MR. MEHTA:
10:14   3   Q.   Mr. Sutton, do you recognize this document as the client
10:14   4   authorization form that was submitted on behalf of Casey Thonn?
10:14   5   A.   Yes.
10:14   6   Q.   And it's dated November -- excuse me -- October 11, 2011,
10:14   7   right?
10:14   8   A.   And 10-14.  Yeah.
10:14   9   Q.   And 10-14.  And this is months before your wife Christine
10:14  10   ever went to go work for the claims administrator, right?
10:14  11   A.   Right.
10:14  12   Q.   And this document shows that Casey Thonn is being
10:14  13   represented by the law firm of Sutton and Reitano, correct?
10:14  14   A.   Correct.
10:14  15   Q.   But the attorney for Sutton and Reitano --
10:14  16           MR. PAW:  We have no objection to any of this.  This
10:14  17   is all in the record.  I don't know that there is any issue --
10:14  18           THE COURT:  I don't know what the dispute is about
10:15  19   this.  Why are we going into this?
10:15  20           MR. MEHTA:  Very well, Your Honor.  There was just
10:15  21   some line of questioning earlier about who, in fact, did the
10:15  22   work; and I wanted to demonstrate that it was, in fact, Sutton
10:15  23   and Reitano, the law firm.
10:15  24           THE COURT:  It says Christine Reitano.
10:15  25           MR. MEHTA:  Understood, but she is working on behalf

**LIONEL SUTTON III - CROSS**

1  of the law firm.  I just wanted to make sure that was --

2       THE COURT:  He said there is no law firm.  They are

3  sole practitioners, and they just use the name Sutton --

4       THE WITNESS:  No.  I'm the sole practitioner.  She

5  operates under me, under my umbrella as -- we d/b/a Sutton and

6  Reitano.

7       THE COURT:  That's not what you said earlier,

8  Mr. Sutton, but go ahead.

9  BY MR. MEHTA:

10 Q.   Let me see if I can clarify.  You are the owner of -- what

11 is the name of the law firm as it is registered, Mr. Sutton?

12 A.   We never had it registered.  It was Lionel Sutton.  At

13 some point we did register Sutton and Reitano Law as a

14 professional corporation, but we never used it.

15      I have always done business just as either Lionel

16 Sutton or the Law offices of L.A. Sutton III or any type of

17 d/b/a like that.  It's always been under my own -- typically

18 under my own social security number and operated.

19      When Christine came to work for me, she was really

20 only part-time.  She worked under me.  She worked for me, under

21 me.

22 Q.   You use the same Sutton and Reitano as a d/b/a, correct?

23 A.   Yes.

24      THE COURT:  Let's move on.  Move on.

25      MR. MEHTA:  Very well, Your Honor.

LIONEL SUTTON III - CROSS

10:16  1   **BY MR. MEHTA:**

10:16  2   **Q.**   At some point your wife went to go work for the CAO,

10:16  3   correct?

10:16  4           **THE COURT:**  We know that too.  You don't have to

10:16  5   repeat that here.  You're going into things that are not at

10:16  6   issue or in dispute.  So let's move on.

10:16  7           **MR. MEHTA:**  I'll try to do that, Your Honor.

10:16  8               If you could just pull up Tab 5, please.

10:16  9   **BY MR. MEHTA:**

10:16  10  **Q.**   At some point you told Mr. Lerner that Ms. Reitano would

10:16  11  be going to work for the CAO.

10:16  12          **MR. MEHTA:**  This is Tab 5.  If you could pull that

10:16  13  e-mail down a little bit, please.

10:16  14          **THE COURT:**  What's the exhibit number, Counsel, that

10:16  15  you're referring -- what's on the screen, which exhibit number?

10:16  16          **MR. MEHTA:**  This is Lerner Exhibit 1, Tab 5, in that

10:16  17  summary, Your Honor.

10:16  18          **THE WITNESS:**  Is that in this book you gave me?

10:16  19          **MR. MEHTA:**  Yes, that's in the book you have before

10:17  20  you, Mr. Sutton.

10:17  21              If you would scroll to the bottom of the page,

10:17  22  please.

10:17  23  **BY MR. MEHTA:**

10:17  24  **Q.**   You wrote:  "Just between you and me, just because they

10:17  25  have not made the announcement yet, Christine has been hired by

LIONEL SUTTON III - CROSS

10:17  1    the special master to run his office for the BP settlement."

10:17  2         Do you see that?

10:17  3    A.   Yes.

10:17  4    Q.   That's dated March 16, 2012, a few weeks before she went

10:17  5    to go work for the CAO?

10:17  6    A.   Yes.

10:17  7         MR. MEHTA:  If you would scroll up the screen,

10:17  8    please.

10:17  9    BY MR. MEHTA:

10:17  10   Q.   Mr. Lerner responds:  "How can we use that to our

10:17  11   benefit?"  Do you see that?

10:17  12   A.   Yes.

10:17  13   Q.   What did you understand Mr. Lerner to mean by that?

10:17  14   A.   Nothing really.  That was just Glen asking.  I didn't

10:17  15   really have any understanding of it.

10:17  16   Q.   Further up you actually answer:  "Not sure."

10:17  17   A.   Right.

10:17  18   Q.   And then further up Mr. Lerner actually asks:  "Is there a

10:17  19   conflict with my case?  Is Andry Lerner going in front of her

10:17  20   with our business relationship?  Will she get my Florida cases

10:17  21   too?"  Do you see that?

10:17  22   A.   Right.  Yes.

10:17  23   Q.   Your response to that question is:  "No conflict."  Right?

10:17  24   A.   Right.

10:17  25   Q.   Why did you respond that way, Mr. Sutton?

**LIONEL SUTTON III - CROSS**

10:17  1   **A.**   Because I understood, from when Pat came right around that
10:18  2   time to talk to Christine and I, that he was just hiring
10:18  3   Christine.  It was going to be he, Christine, and a secretary
10:18  4   to work in Pat's office, just to monitor everything; that it
10:18  5   was all the vendors, the other people that were actually doing
10:18  6   the claims.  She was just working for Pat in his office.  He
10:18  7   thought there was only going to be three of them in the office.
10:18  8   So I didn't think she was going to have anything to do with
10:18  9   claims or anything like that.

10:18  10          **THE COURT:**  You didn't think she was working for the
10:18  11  claims facility?

10:18  12          **THE WITNESS:**  I don't know at that time if there was
10:18  13  actually --

10:18  14          **THE COURT:**  Did you think she was working for Juneau
10:18  15  personally and not for the whole facility?

10:18  16          **THE WITNESS:**  At that time I don't know that Juneau
10:18  17  even explained that there was a facility.

10:18  18          **THE COURT:**  So you didn't understand that that was a
10:18  19  conflict of interest --

10:18  20          **THE WITNESS:**  No.

10:18  21          **THE COURT:**  -- to have your wife working there when
10:18  22  you are in business with people, with Mr. Lerner?  You didn't
10:18  23  think that was a conflict of interest?

10:18  24          **THE WITNESS:**  No, no.

10:18  25          **THE COURT:**  What year did you graduate from law

LIONEL SUTTON III - CROSS

| | |
|---|---|
| 10:18 | 1 |
| 10:18 | 2 |
| 10:18 | 3 |
| 10:18 | 4 |
| 10:18 | 5 |
| 10:18 | 6 |
| 10:18 | 7 |
| 10:18 | 8 |
| 10:18 | 9 |
| 10:18 | 10 |
| 10:18 | 11 |
| 10:19 | 12 |
| 10:19 | 13 |
| 10:19 | 14 |
| 10:19 | 15 |
| 10:19 | 16 |
| 10:19 | 17 |
| 10:19 | 18 |
| 10:19 | 19 |
| 10:19 | 20 |
| 10:19 | 21 |
| 10:19 | 22 |
| 10:19 | 23 |
| 10:19 | 24 |
| | 25 |

1   school, Mr. Sutton?

2          THE WITNESS:  '90.

3          THE COURT:  What law school?

4          THE WITNESS:  Tulane.

5          THE COURT:  All right.  Go ahead.

6          MR. MEHTA:  Thank you, Your Honor.

7   BY MR. MEHTA:

8   Q.   Your communication with Mr. Lerner was -- you didn't think

9   it would be a conflict of interest, correct?

10  A.   That's correct.

11  Q.   At some point you had to transfer -- your firm transferred

12  the case of Casey Thonn to Andry Lerner, right?

13  A.   We told him we couldn't represent him anymore and --

14  Q.   Why did you have to transfer the case?

15  A.   When Pat came to the office to talk to me and Christine,

16  he said that I could no longer represent anybody in relation to

17  the settlement.

18  Q.   Now, there was some testimony earlier about that Christine

19  was the one who was responsible for transferring the case.

20          It's also true that you participated in transferring

21  the case to Andry Lerner, right, Mr. Sutton?

22  A.   Yes.

23          MR. MEHTA:  Could you pull up Tab 7, please.  Go to

24  the last page, page 3, Tab 7 -- bottom of page 2.

LIONEL SUTTON III - CROSS

10:19   1   BY MR. MEHTA:

10:19   2   Q.   This is an e-mail between you and Mr. Lerner dated

10:19   3   March 29, 2012.  This is just a couple days before your wife

10:19   4   goes to work for the CAO, correct?

10:19   5   A.   Yes.

10:20   6   Q.   You're telling Mr. Lerner:  "We have two cases we need to

10:20   7   send over before Monday.  These two are clients that I have

10:20   8   represented in many different matters over the years, so I need

10:20   9   to make sure that it's handled right.  Let me know who I should

10:20  10   send the files to and who they can call for an introduction."

10:20  11   A.   Yes.

10:20  12   Q.   All right.  Now, Mr. Sutton, if you go higher up in that

10:20  13   e-mail you actually identify the name of one of those clients,

10:20  14   correct?

10:20  15   A.   Yes.

10:20  16        MR. MEHTA:  Keep scrolling up.

10:20  17   BY MR. MEHTA:

10:20  18   Q.   And the name of that client was Tim Gonzales (phonetic)?

10:20  19   A.   Yes.

10:20  20        MR. MEHTA:  Keep going up.

10:20  21        THE WITNESS:  Tim Gonzales.

10:20  22   BY MR. MEHTA:

10:20  23   Q.   Tim Gonzales.  That was the name of the one client.  Who

10:20  24   was the other client, Mr. Sutton?

10:20  25   A.   Casey Thonn.

LIONEL SUTTON III - CROSS

10:20   1   Q.   And nowhere in this e-mail did you actually identify Casey
10:20   2   Thonn's name to Mr. Lerner, correct?
10:20   3   A.   Right.
10:20   4   Q.   Now, why did you approach Mr. Lerner about referring these
10:20   5   two cases to his firm?
10:20   6   A.   Because I wasn't talking to Jon at the time.
10:21   7   Q.   Why weren't you talking to Mr. Andry at that time?
10:21   8   A.   Because we had had that falling out that I described
10:21   9   earlier.
10:21   10  Q.   You need to speak up.
10:21   11  A.   Because we had the falling out that I described earlier.
10:21   12  Q.   And at the time you referred these cases over to Andry
10:21   13  Lerner, did you have any discussion with Mr. Lerner about any
10:21   14  expectation you had about a fee on this case?
10:21   15  A.   I know at some point we discussed about me getting a fee.
10:21   16  I don't know when that was exactly.
10:21   17  Q.   Before I turn back to Thonn, let me just ask you real
10:21   18  quick about Crown.  Can you just tell the Court what Crown, LLC
10:21   19  is?
10:21   20  A.   Crown, LLC is a company that was started even before the
10:21   21  oil spill, to clean up -- well, we licensed technology to clean
10:21   22  produced water and flowback water from shale oil drilling.
10:21   23  Q.   And who was -- you were a business partner in Crown?
10:21   24  A.   Yeah.  I was a minority owner.  There were four initial
10:21   25  members, which were Glen Lerner, Joey Dartez (phonetic), Tim

LIONEL SUTTON III - CROSS

10:21  1  Elmhurst, and myself.

10:22  2  Q.   And when was Crown, LLC founded, again?

10:22  3  A.   I think it was in 2010, prior to the oil spill.  It didn't

10:22  4  have anything to do with the oil spill.  It was something

10:22  5  different.

10:22  6  Q.   Now, at some point did you come to an agreement with

10:22  7  Mr. Lerner and your other partners to sell certain shares of

10:22  8  Crown to Mr. Lerner?

10:22  9  A.   Yes.

10:22  10  Q.   And when was that?

10:22  11  A.   Oh, I think we started talking in the beginning of -- the

10:22  12  beginning of 2012, and I believe we reached an agreement like

10:22  13  in May of 2012.

10:22  14  Q.   And would you tell the Court, please, what that agreement

10:22  15  was.

10:22  16  A.   Originally we each owned 25 percent.  Glen had agreed to

10:22  17  put up a certain amount of money to build a machine for his

10:22  18  25 percent.  It turned out that it was costing us a lot more

10:22  19  money to demonstrate and to get the business.  And so he was

10:22  20  asked to invest more money, and he said, if he was going to

10:22  21  invest more money, he wanted more shares.  So the other two

10:22  22  partners negotiated with him the value of the shares and what

10:22  23  he would pay, and I went along with whatever they agreed to.

10:23  24  Q.   That agreement was struck, again, in May 2012 or

10:23  25  June 2012?

LIONEL SUTTON III - CROSS

A.    I think he was supposed to start paying June 1, I believe, of 2012.  So we reached a verbal agreement by that time.  I don't think we ever had it finalized until sometime after.

Q.    And what was the agreement that was reached in June 2012?

A.    The agreement was that each of the other three partners -- myself, the other two -- were going to sell an additional eight shares to Glen for $120,000, to be paid $10,000 a month over 12 months.

Q.    And that agreement was struck months before you ever went to work for the CAO, right?

A.    Yes.

Q.    In fact, in early June 2012 you had no employment prospects with the CAO, right?

A.    Correct.

        MR. MEHTA:  I'm not going to ask Mr. Sutton to look at these tabs, Your Honor, but if I could just reference several tabs in the exhibit binder for the Court, that reflect the agreement that Mr. Sutton has just described.  They are Tabs 13, 14, 15, and 16, 18 and 19 and 20.  And I think there are e-mails that corroborate the testimony Mr. Sutton has just provided.  In the interest of efficiency, I won't go through each of them with Mr. Sutton.

BY MR. MEHTA:

Q.    Let me turn back to Casey Thonn and the summer of 2012, Mr. Sutton.  Are you still in touch with Casey Thonn in the

LIONEL SUTTON III - CROSS

10:24    1    summer of 2012?

10:24    2    A.   Yes.

10:24    3         MR. MEHTA:  Would you pull up Tab 22, please.  Blow

10:24    4    that e-mail up in full, please, the bottom part included.

10:24    5    BY MR. MEHTA:

10:24    6    Q.   This is an e-mail dated June 21, 2012.  It's from Leslie

10:24    7    Butler Tate, who was an employee at Andry Lerner, to you,

10:24    8    Mr. Sutton.  Again, this is June 21, 2012, still months before

10:24    9    you went to work for the CAO?

10:24   10    A.   Yes.

10:24   11    Q.   And is it accurate that in this e-mail Ms. Tate is

10:24   12    actually sending you a copy of the report package for Casey

10:24   13    Thonn that she intends to file with the CAO?

10:25   14    A.   Yes.

10:25   15    Q.   And she notes at the bottom of that e-mail that the client

10:25   16    has already accepted this amount, right?

10:25   17    A.   Yes.

10:25   18    Q.   And you actually respond to this e-mail and say:  "I just

10:25   19    wanted to see it.  As long as the client accepts, I'm fine."

10:25   20    Right?

10:25   21    A.   Yes.

10:25   22    Q.   So here you are, Mr. Sutton, in June, months before you

10:25   23    went to work for the CAO, and you are still involved in the

10:25   24    Casey Thonn claim to some extent, right?

10:25   25    A.   Yes.

LIONEL SUTTON III - CROSS

1    **MR. MEHTA:**  Can you also pull up Tab 26.  Just pull

2   up that middle e-mail there.  Thank you.

3   **BY MR. MEHTA:**

4   **Q.**   Now, this e-mail is August 24, 2012.  This is about six

5   weeks or so before you go to work for the CAO, right,

6   Mr. Sutton?

7   **A.**   Yes.

8   **Q.**   At this point you still have no job opportunity or

9   prospect with the CAO, right?

10   **A.**   Right.

11   **Q.**   And here you are on August 24, you're e-mailing with Susan

12   DeSantis, who was Mr. Lerner's employee, and she was working at

13   Andry Lerner, correct?

14   **A.**   Yes.

15   **Q.**   And you were asking her to e-mail you the BP claim number

16   for Casey Thonn?

17   **A.**   Yes.

18   **Q.**   And she actually provides that to you, right?

19   **A.**   That's the number.  I don't know if that's the claim

20   number or not, but it looks like she gave me a number.

21   **Q.**   Do you have any memory about why you were asking for the

22   BP number for Casey Thonn?

23   **A.**   No, I don't have any independent recollection of that.  I

24   would think that I just wanted it for the file, but I don't

25   know.

LIONEL SUTTON III - CROSS

**Q.**   In any event, this is another e-mail in which you are still involved with the Casey Thonn claim before you ever go to work for the CAO, right?

**A.**   Yes.

**Q.**   Can you tell the Court how your job opportunity with the CAO came about?

**A.**   Our offices were right next door.  My office and the DHECC office was right next to each other.

I would see Pat regularly.  I don't remember if Christine, my wife, told me that Pat wanted to talk to me about possibly hiring me or if Pat saw me and said something, but at some point, however it got to that point, I went in and talked to Pat about being hired.

**Q.**   And what job did Mr. Juneau offer you, sir, and what did you understand your responsibilities would be?

**A.**   He originally wanted somebody with some oil and gas experience to come in and oversee the moratorium process, because he expected that at some point that was going to get to be a big deal, and he wanted somebody to kind of look over that.  Also, he asked me if I wanted the oversee the subsistence part.

That was the two things that we talked about when I went in there.

**Q.**   Did your job responsibilities end up involving those things?

## LIONEL SUTTON III - CROSS

**A.** Yes and no. The subsistence, really I didn't have too much to do because they had a person that actually did that. So to the extent that she ever had any questions about the settlement, she would ask me. But really, I didn't have to do much there.

And then the moratoria, it turned out that the parties hadn't come up with a moratoria program or framework even by the time I resigned. So I never really got involved in that.

**Q.** What did you end up doing mostly at the CAO, Mr. Sutton?

**A.** Whatever Pat would tell me to do, which was usually assisting claimants or claimants' attorneys or accountants with their claims.

**Q.** At the time you were being interviewed by Mr. Juneau, did you tell him about your ownership interest in Crown?

**A.** I told him that I was an owner of an environmental cleanup business and an offshore boat business. At some point he knew the name Crown. I don't know if I ever told him the name at that time; but in my résumé that I submitted to him, I listed that I was the owner of various businesses.

**Q.** Did you ever disclose to him that Mr. Lerner, who also had an interest in these Andry Lerner claims, was a partner of yours in Crown?

**A.** No.

**Q.** Why not, Mr. Sutton?

LIONEL SUTTON III - CROSS

10:28    1    A.   It never came up.  They knew I had other businesses.
10:28    2    Nobody ever asked who the partners were in it, and I never
10:28    3    brought it up.
10:28    4    Q.   Fair to say that Mr. Lerner never asked you not to
10:28    5    disclose his ownership interest in Crown to Mr. Juneau, right?
10:29    6    A.   That's correct.
10:29    7    Q.   That was your decision not to make that disclosure?
10:29    8    A.   Yes.
10:29    9         MR. MEHTA:  If you could pull up Tab 31, please.
10:29   10         Go to the second -- scroll down to the second
10:29   11    page, top e-mail.
10:29   12    BY MR. MEHTA:
10:29   13    Q.   All right.  This is an e-mail from you to Susan DeSantis.
10:29   14    If you could scroll up, you will see the date.  The date of the
10:29   15    e-mail is October 26, 2012, at 12:17 p.m.
10:29   16    A.   Okay.
10:29   17    Q.   And you're asking Ms. DeSantis:  "Hope all is well.  Casey
10:29   18    Thonn told me he got his VoO money last week.  Can you check on
10:29   19    my fee?"  Correct?
10:29   20    A.   Yes.
10:29   21    Q.   Now, this is days before you are going to work for the
10:29   22    CAO, right?
10:29   23    A.   Yes.
10:29   24    Q.   And the VoO money has already been paid out to Mr. Thonn?
10:29   25    A.   That was my understanding in the e-mail, that he had

LIONEL SUTTON III - CROSS

1    already gotten his money.

2    **Q.**   And you're checking with Mr. Lerner's employee,

3    Ms. DeSantis, to get your fee, right?

4    **A.**   Yes.

5    **Q.**   Now, you still haven't gone to work.

6           Mr. Sutton, did you disclose the fact that you had a

7    fee interest in Casey Thonn to Mr. Juneau?

8    **A.**   No.

9    **Q.**   Why didn't you do that?

10   **A.**   Because I wasn't representing him anymore and I just

11   didn't bring it up.

12   **Q.**   Now, that was -- so you didn't think there was a conflict

13   of interest; is that accurate?

14   **A.**   I didn't think there was a conflict for my firm to get

15   paid for the work we had done on the case prior to the case

16   going to be represented by somebody else.

17   **Q.**   And in the same way you didn't disclose Crown to

18   Mr. Juneau, you didn't disclose this.  Mr. Lerner didn't direct

19   you not to disclose your fee interest in Casey Thonn, right?

20   **A.**   That's correct.

21   **Q.**   And that was your decision not to disclose the fee

22   interest in Casey Thonn?

23   **A.**   My decision.

24   **Q.**   Now, did you tell your wife at this time, Mr. Sutton --

25   this is late October 2006 -- that you were seeking a fee on

LIONEL SUTTON III - CROSS

10:30   1   Casey Thonn?

10:31   2   **A.**   No.

10:31   3   **Q.**   I'm sorry, my apologies.   2012.

10:31   4   **A.**   No.

10:31   5   **Q.**   Why not?

10:31   6   **A.**   Because I was going to keep the money for myself.

10:31   7   **Q.**   Did you tell Glen Lerner that you are weren't disclosing

10:31   8   your fee interests in Casey Thonn to your wife?

10:31   9   **A.**   I don't think so.

10:31  10   **Q.**   Do you recall, Mr. Sutton, around this time having a

10:31  11   conversation with Mr. Lerner about expecting a fee on the Thonn

10:31  12   claims?

10:31  13   **A.**   I know we had some conversations.   I don't have any

10:31  14   independent recollection of the time frame.

10:31  15   **Q.**   You have been a show cause party in this matter and,

10:31  16   therefore, you have gotten discovery in this case, correct?

10:31  17   **A.**   Correct.

10:31  18   **Q.**   You reviewed it at all?

10:31  19   **A.**   Yes.

10:31  20   **Q.**   Included in that review is Mr. Sutton's sworn testimony

10:31  21   before the special master?

10:31  22   **A.**   You mean Mr. Lerner.

10:31  23   **Q.**   Excuse me.   Mr. Lerner.   Yes.

10:31  24   **A.**   Yes.

10:31  25   **Q.**   And you have read Mr. Lerner's testimony and you know he

LIONEL SUTTON III - CROSS

10:31   1   remembers a conversation with you about -- before you go work

10:31   2   for the CAO, right?

10:31   3   **A.**    Yes.

10:31   4   **Q.**    -- about the Casey Thonn case?

10:31   5   **A.**    Yes.

10:31   6   **Q.**    And Mr. Lerner remembers that you told him specifically

10:32   7   that Mr. Juneau had actually approved the fee that you would

10:32   8   receive on Casey Thonn, right.

10:32   9   **A.**    I remember reading that he said that, yes.

10:32   10  **Q.**    Do you remember such a conversation?

10:32   11  **A.**    No.

10:32   12  **Q.**    Do you have any reason to dispute Mr. Lerner's

10:32   13  recollection of that conversation?

10:32   14  **A.**    No.

10:32   15  **Q.**    If Mr. Lerner remembers it that way, would you have been

10:32   16  lying to him if you had told him that Mr. Juneau had approved

10:32   17  that fee?

10:32   18          **MR. PAW:**  Objection to that, Your Honor.

10:32   19          **THE COURT:**  Overruled.  Overruled.

10:32   20          **THE WITNESS:**  Yes.  If I told Glen that I got their

10:32   21  fee approved by Pat Juneau, that was a lie, because I never

10:32   22  discussed the fee with Pat Juneau.

10:32   23  BY MR. MEHTA:

10:32   24  **Q.**    Let's talk about the fee agreement, Mr. Sutton.  It's not

10:32   25  something that was ever in writing, correct?

LIONEL SUTTON III - CROSS

10:32    1    **A.**   That's correct.

10:32    2    **Q.**   Why didn't you insist on having that fee agreement in

10:32    3    writing, sir?

10:32    4    **A.**   Because I didn't understand it to be the type of fee

10:32    5    agreement that needed to be in writing.

10:32    6    **Q.**   Why not?

10:32    7    **A.**   Because there's two different things.  There's a referral

10:32    8    agreement where a client comes to you and for whatever reason

10:32    9    you are not comfortable handling a case by yourself, you refer

10:32    10    it to somebody else, but you continue to represent the client.

10:33    11    You have to have that in writing where you both represent the

10:33    12    client, how the fee is going to be split, that sort of thing.

10:33    13           This was a case where the client came in.  We

10:33    14    represented him.  We stopped the representation.  We could no

10:33    15    longer represent him anymore.  He went to some other lawyer to

10:33    16    get represented.  And at the end we split the fee based on the

10:33    17    amount of work they had done.  That happens to me all the time,

10:33    18    and that's what I thought this was.

10:33    19    **Q.**   Mr. Sutton, if I could understand what you are saying,

10:33    20    this is a situation, because you and your firm had done work --

10:33    21    at least your firm had done work on Mr. Thonn's claim and had

10:33    22    to pass it off -- you didn't think that kind of agreement to

10:33    23    share in the fee needed to be put in writing?

10:33    24    **A.**   Right.  We were no longer going to continue representing

10:33    25    him.  We had stopped our representation.

LIONEL SUTTON III - CROSS

10:33   1   **Q.**   Is it your understanding of the Louisiana rules of

10:33   2   professional ethics that that kind of fee sharing doesn't need

10:33   3   to be put in writing?

10:33   4   **A.**   That was my understanding, and that has been my

10:33   5   understanding on a number of occasions.

10:33   6          **MR. MEHTA:**  Let me ask you if you would pull up

10:34   7   Tab 33, please.

10:34   8              Just blow up the top of that e-mail, please.

10:34   9   **BY MR. MEHTA:**

10:34  10   **Q.**   This is an e-mail from you to Mr. Lerner dated November 5,

10:34  11   2012.  You see there at the bottom of that e-mail, about six

10:34  12   lines down it says:  "Jon owes me $5,000 on a case."  Do you

10:34  13   see that?

10:34  14   **A.**   Yes.

10:34  15   **Q.**   That was your reference to your share of the fee on Casey

10:34  16   Thonn, right?

10:34  17   **A.**   I think so, yes.

10:34  18   **Q.**   And this is just about four days after you have gone to

10:34  19   work for the claims administrator's office, right?

10:34  20   **A.**   Right.  I think that was the same thing you had showed me

10:34  21   earlier for the October disbursement.

10:34  22          **MR. MEHTA:**  If you would also pull up Tab 35.

10:34  23              Blow up that e-mail.  Start at the bottom.

10:34  24   **BY MR. MEHTA:**

10:34  25   **Q.**   It's an e-mail between you and Mr. Lerner dated

LIONEL SUTTON III - CROSS

10:34  1   November 7, 2012, just six days after you started work at the
10:35  2   CAO, right?
10:35  3   A.   Right.
10:35  4   Q.   This is also an e-mail in which you were asking Mr. Lerner
10:35  5   to pay you the Casey Thonn -- your share of the Casey Thonn
10:35  6   fee, right?
10:35  7   A.   The last part of that, where it says "what Jon owes me."
10:35  8   The other stuff was about Crown.
10:35  9   Q.   Right.  "Getting paid on expenses, so getting caught up
10:35  10  this week for October and next week for November plus
10:35  11  expenses."  That's a reference to your Crown --
10:35  12  A.   Yes, that was Crown.
10:35  13  Q.   And "what Jon owes me," that's a reference to the fee?
10:35  14  A.   The $5,000 on the previous e-mail, yes.
10:35  15  Q.   And Mr. Lerner responds:  "I can't pay what Jon owes you
10:35  16  until I get it."
10:35  17  A.   Yes, I see that.
10:35  18       MR. MEHTA:  Scroll up a little further.
10:35  19  BY MR. MEHTA:
10:35  20  Q.   And you mention to Mr. Lerner here:  "What about the rest?
10:35  21  You told me this two weeks ago."  That's in reference to Crown?
10:35  22  A.   Yes.
10:35  23  Q.   "I talked to Susie two weeks ago.  Jon has had the money
10:35  24  for a month."  That's in reference to Casey Thonn?
10:35  25  A.   That's to Thonn, yes.

LIONEL SUTTON III - CROSS

10:35  1    **Q.**   Now, this is November 7.  You're asking for your fee to
10:35  2    get paid.
10:35  3               **MR. MEHTA:**  If you could pull up Lerner Exhibit 2.
10:36  4               Now, this is -- I represent to the Court this
10:36  5    was disclosed to us by the special master.  It is the -- it's a
10:36  6    log of Mr. Sutton's accesses to the CAO database.
10:36  7               **THE WITNESS:**  Is that a number on the book you gave
10:36  8    me?
10:36  9               **MR. MEHTA:**  No.  But I can --
10:36  10              **THE WITNESS:**  That's all right.  I have it on the
10:36  11   screen.
10:36  12   **BY MR. MEHTA:**
10:36  13   **Q.**   Those two e-mails we just saw was for you asking for a fee
10:36  14   in early November 2012, correct, Mr. Sutton?
10:36  15   **A.**   Yes.
10:36  16   **Q.**   And you can see here in about middle of the page, the
10:36  17   first time you ever even accessed the Casey Thonn claim online,
10:36  18   on the portal, was December 17, 2012?
10:36  19   **A.**   That's what it shows.
10:36  20   **Q.**   You were asking for your fee six weeks before you ever
10:36  21   even looked up the claim, right?
10:36  22   **A.**   Yes.
10:36  23   **Q.**   Now, you didn't get paid that Casey Thonn fee in November,
10:36  24   right, Mr. Sutton, that first fee?
10:37  25   **A.**   Right.

LIONEL SUTTON III - CROSS

10:37   1   **Q.**   You didn't get paid in December, right?

10:37   2   **A.**   Right.

10:37   3   **Q.**   You got paid in early January or mid-January 2013?

10:37   4   **A.**   I think that's correct.

10:37   5   **Q.**   Turn to Tab 44, please.  Now, it's an e-mail between you

10:37   6   and Mr. Lerner dated the January 4, 2013.  You've been there

10:37   7   for about two months at the CAO.

10:37   8        And you write:  "Speaking of Jeff, can you have him

10:37   9   send me my fee on Casey Thonn?  Jon sent it to him last month."

10:37   10  **A.**   Yes.

10:37   11  **Q.**   Now, you testified earlier that you had not spoken to

10:37   12  Mr. Andry about Casey Thonn, right?

10:37   13  **A.**   Right.  I said I don't ever recall having any discussion

10:37   14  with Jon Andry about --

10:37   15  **Q.**   And so the fact that you wrote "Jon sent it to him last

10:37   16  month" doesn't actually mean you actually spoke to Mr. Andry

10:37   17  about that?

10:37   18  **A.**   That's right.

10:37   19  **Q.**   In fact, you probably got that information from Susan

10:37   20  DeSantis, Mr. Lerner's employee?

10:37   21  **A.**   I would think so.

10:37   22  **Q.**   This here says:  "Speaking of Jeff, can you have him send

10:38   23  me the fee for Casey Thonn?"  Right?

10:38   24  **A.**   Right.

10:38   25  **Q.**   Now, why, sir, are you asking for Jeff -- by the way, let

LIONEL SUTTON III - CROSS

10:38    1    me ask first, who is Jeff?

10:38    2    **A.**    Jeff Cahill.

10:38    3    **Q.**    And who is Jeff Cahill?

10:38    4    **A.**    My understanding, that he is the accountant that handles

10:38    5    everything for Glen Lerner's business.

10:38    6    **Q.**    So you're asking Mr. Lerner's accountant to send you the

10:38    7    money and not the money directly from Andry Lerner, correct?

10:38    8    **A.**    I don't know if I knew that there was a difference at the

10:38    9    time.

10:38   10    **Q.**    Did it surprise you that you were supposed to be asking

10:38   11    for the money from Jeff instead of Andry Lerner directly?

10:38   12    **A.**    No.  I didn't know -- I don't know if I understood that

10:38   13    there would be a difference.

10:38   14    **Q.**    Would it have mattered to you, Mr. Sutton, whether you

10:38   15    were going to be paid directly from Jeff Cahill or got a check

10:38   16    from Andry Lerner?

10:38   17    **A.**    No.

10:38   18    **Q.**    You just wanted to get paid, right?

10:38   19    **A.**    Yes.

10:38   20    **Q.**    You didn't direct that this fee go first to Mr. Cahill,

10:38   21    right?

10:39   22    **A.**    That's right.

10:39   23    **Q.**    And it wouldn't have mattered to you whether you picked up

10:39   24    the check at Andry Lerner's offices or you got the wire later

10:39   25    on?

LIONEL SUTTON III - CROSS

| | | |
|---|---|---|
| 10:39 | 1 | A.    That's correct. |
| 10:39 | 2 | Q.    If you'd turn, please, to Tab 45.  Mr. Sutton -- |
| 10:39 | 3 | MR. MEHTA:  If you'd blow up the middle of that page |
| 10:39 | 4 | there, please.  It's January 7, 2013.  If you'd scroll down a |
| 10:39 | 5 | little bit. |
| 10:39 | 6 | BY MR. MEHTA: |
| 10:39 | 7 | Q.    This is again between you and Mr. Lerner.  And you write: |
| 10:39 | 8 | "Did you check on my fee from Casey Thonn?  Susan sent it to |
| 10:39 | 9 | Jeff in mid-December."  Do you see that? |
| 10:39 | 10 | A.    Yes. |
| 10:39 | 11 | Q.    Mr. Lerner responds and he also has now copied Mr. Cahill, |
| 10:39 | 12 | who is his employee. |
| 10:39 | 13 | A.    Yes. |
| 10:39 | 14 | Q.    "Jeff, did we receive monies from Andry?  If so, Tiger, |
| 10:39 | 15 | how much is your fee?" |
| 10:39 | 16 | A.    Yes. |
| 10:39 | 17 | Q.    Now, were you surprised that Mr. Lerner wouldn't have |
| 10:39 | 18 | known what your fee was?  He was asking? |
| 10:40 | 19 | A.    No. |
| 10:40 | 20 | Q.    Why did that not surprise you? |
| 10:40 | 21 | A.    Because Glen was a big picture guy.  He didn't really pay |
| 10:40 | 22 | attention to that kind of stuff. |
| 10:40 | 23 | Q.    In fact, do you even recall whether you had a specific |
| 10:40 | 24 | conversation with Mr. Lerner about what your share of the Casey |
| 10:40 | 25 | Thonn fee would be? |

LIONEL SUTTON III - CROSS

10:40  1   **A.**   I know we had those conversations.  I don't recall the

10:40  2   specifics of it.

10:40  3          **MR. MEHTA:**  If you would please scroll up to the top

10:40  4   there.

10:40  5   **BY MR. MEHTA:**

10:40  6   **Q.**   Mr. Sutton, you then write:  "They sent you the check for

10:40  7   my fee.  The total on Thonn was about 10,000 plus or minus.

10:40  8   They sent you five for me and kept the other five.  Check with

10:40  9   Susie.  She has the accounting."

10:40  10  **A.**   Yes.

10:40  11  **Q.**   And so you were having here to explain to Mr. Lerner

10:40  12  actually how much the Casey Thonn fee was, right?

10:40  13  **A.**   Yes.

10:40  14  **Q.**   And how much money Jeff Cahill was actually being sent?

10:40  15  **A.**   Yes.

10:40  16  **Q.**   It appears here that Mr. Lerner didn't have any

10:40  17  independent knowledge of that until you told him, right?

10:40  18  **A.**   Looks like it.

10:41  19         **THE COURT:**  Let me interrupt you.

10:41  20             Mr. Sutton.

10:41  21         **THE WITNESS:**  Yes.

10:41  22         **THE COURT:**  If you don't recall speaking to

10:41  23  Mr. Lerner or Mr. Andry about this, how did you come up with

10:41  24  the 50 percent?  How did you know you had a 50 percent

10:41  25  agreement with him?

**LIONEL SUTTON III - CROSS**

10:41  1        **THE WITNESS:**  No, I said I have a recollection that I
10:41  2  spoke to Glen about it.  I don't remember the specifics of
10:41  3  when, but I --
10:41  4        **THE COURT:**  Where did the 50 percent referral fee
10:41  5  come from?
10:41  6        **THE WITNESS:**  That would have been something I would
10:41  7  have told Glen.
10:41  8        **THE COURT:**  Where did you get that from?  Where did
10:41  9  the number come from?
10:41  10        **THE WITNESS:**  From myself and Glen.
10:41  11        **THE COURT:**  Well, you must have had an agreement with
10:41  12  someone.  What was the agreement -- with who?
10:41  13        **THE WITNESS:**  The agreement was, based on the work
10:41  14  that I had done, that I thought I was entitled to 50 percent of
10:41  15  the fee.  That was the agreement with Glen.
10:41  16            He asked me if I knew when we made that
10:41  17  agreement or the specifics of it, and I don't recall when we
10:41  18  did it.  I know we had those conversations, but I don't know
10:41  19  when they -- specifically when they were.
10:41  20        **THE COURT:**  Did you ever submit any records to
10:42  21  Mr. Lerner, Mr. Andry, anybody else showing the time -- your
10:42  22  billing, time and expenses, number of hours you spent, any
10:42  23  expenses you incurred on Mr. Thonn's claim?
10:42  24        **THE WITNESS:**  No, just the disc of all the stuff we
10:42  25  had done.

LIONEL SUTTON III - CROSS

10:42  1          THE COURT:  Stuff your wife had done, huh?

10:42  2          THE WITNESS:  Well, it was for me.  It was my firm.

10:42  3          THE COURT:  Okay.  Go ahead.

10:42  4  BY MR. MEHTA:

10:42  5  Q.   We can see here Mr. Lerner's response at the top is to

10:42  6  "make sure out of the 5K Jon kept, I get half, since I'm

10:42  7  sending the full 5 to Tiger."  Do you see that?

10:42  8  A.   Yes.

10:42  9  Q.   So Mr. Lerner's expectation was that he would send you

10:42  10 your half, $5,000, right?

10:42  11 A.   That's what it looks like.

10:42  12 Q.   And it looks like he thought that he would get half of the

10:42  13 remaining and share that with Mr. Andry, right?

10:42  14 A.   Yeah.  I think he was sending that to Jeff, but I was

10:42  15 copied on it.  That's my understanding of it.

10:42  16          MR. MEHTA:  Please turn to Tab 46.

10:43  17          Blow up the middle of that page.

10:43  18 BY MR. MEHTA:

10:43  19 Q.   This is the same e-mail chain that we just saw, in which

10:43  20 Mr. Lerner is asking Jeff, "Did we receive monies from Andry?

10:43  21 If so, Tiger, how much is your fee?"

10:43  22          This is a different chain, but Mr. Cahill here

10:43  23 actually responds:  "We received 4940 at the end of the year."

10:43  24 Do you see that?

10:43  25 A.   Yes.

LIONEL SUTTON III - CROSS

10:43  1   **Q.**   And that's the first Thonn fee, right?

10:43  2   **A.**   Yes.

10:43  3   **Q.**   If you scroll up, you respond to Mr. Cahill and

10:43  4   Mr. Lerner:  "Yes, that is my share.  Please deposit in the

10:43  5   Crown account so I can get it."

10:43  6   **A.**   Yes.

10:43  7   **Q.**   Now, the Crown account is the Crown account that you have

10:43  8   testified about earlier, right, the one that you --

10:43  9   **A.**   The old Crown account.

10:43  10  **Q.**   The old Crown account, the one that you only had your --

10:43  11  you only personally controlled, right?

10:43  12  **A.**   Yes.

10:43  13  **Q.**   And you were the one here that's directing that money to

10:43  14  the old Crown account, right?

10:43  15  **A.**   Correct.

10:43  16  **Q.**   You had not prior to this had any discussions with anyone,

10:43  17  including Mr. Lerner, about where to spend this money?

10:43  18  **A.**   Correct.

10:44  19  **Q.**   Now, Mr. Sutton, you testified earlier, but I want to just

10:44  20  make sure we understand.  Why did you ask that the money be

10:44  21  sent to that Crown account?

10:44  22  **A.**   Well, that was an account that Jeff Cahill had the wiring

10:44  23  numbers and instructions to, so it was much easier for me to

10:44  24  get the money faster and quicker, for him to do that, because

10:44  25  that's the ones he had.  And then, once I had it in there, I

LIONEL SUTTON III - CROSS

10:44    1    could do what I wanted with it because my wife didn't have any

10:44    2    control over that account.

10:44    3    **Q.**   You didn't end up transferring any of this Thonn fee from

10:44    4    old Crown account to the Sutton and Reitano operating account,

10:44    5    right?

10:44    6    **A.**   I don't recall what I did exactly with it, but, I mean,

10:44    7    most of it was still in there.  I've spent it, but I don't

10:44    8    recall what I did with it.

10:44    9    **Q.**   Again, the reason you didn't put this money in the Sutton

10:44   10    Reitano account was to keep it hidden from your wife, right?

10:44   11    **A.**   The reason I wanted it in that account was that I

10:44   12    controlled it.  If it went in Sutton and Reitano, then she

10:44   13    controlled it.  So whether I -- it's not that she wouldn't

10:44   14    know; it was so I could control the money.  I had sole control

10:44   15    of that account.

10:45   16          **THE COURT:**  I thought this was your law firm and she

10:45   17    worked for you, but now you are saying she controlled Sutton

10:45   18    and Reitano --

10:45   19          **THE WITNESS:**  No.  Judge, what I said earlier was

10:45   20    that we used the Sutton and Reitano account as a joint account.

10:45   21    We ended up paying everything through that account, like bills,

10:45   22    groceries, everything.  It became --

10:45   23          **THE COURT:**  Out of your law firm account?

10:45   24          **THE WITNESS:**  Yes.  Not the trust account, but just

10:45   25    the -- it became our personal account.  Because it's just me.

LIONEL SUTTON III - CROSS

10:45  1   I don't have a separate law firm.

10:45  2   BY MR. MEHTA:

10:45  3   **Q.**   So if you had had this $5,000 deposited in the law firm

10:45  4   account that you're talking about, the one you used for

10:45  5   personal expenses, your wife would have seen that money hit

10:45  6   those books?

10:45  7   **A.**   I don't know if she would have seen it hit the books, but

10:45  8   at some point she would have known that we had $5,000 in that

10:45  9   account.

10:45  10  **Q.**   But by moving it to the Crown account, she wouldn't have

10:45  11  seen that?

10:45  12  **A.**   Right.

10:45  13  **Q.**   And you never discussed with Mr. Lerner, did you, the

10:45  14  reason you wanted it sent to the Crown account, right?

10:45  15  **A.**   No.

10:45  16  **Q.**   Mr. Sutton, let me just make sure that this is clear.  You

10:46  17  have been accused or the special master has said that the

10:46  18  reason the money was sent to this Crown account, sent via Jeff

10:46  19  Cahill, was that it was to, quote, launder this money.

10:46  20         Are you aware of that allegation?

10:46  21  **A.**   Yes.

10:46  22  **Q.**   Why did you send the money to this Crown account?

10:46  23         **THE COURT:**  That's been testified to about five

10:46  24  times.

       25

LIONEL SUTTON III - CROSS

10:46 | 1 | BY MR. MEHTA:

10:46 | 2 | Q.   It wasn't to launder money?

10:46 | 3 | THE COURT:  Let's move on, Counsel.

10:46 | 4 | MR. MEHTA:  Turn to Tab 54, please.

10:46 | 5 | BY MR. MEHTA:

10:46 | 6 | Q.   This is a series of e-mails between you and Mr. Lerner

10:46 | 7 | starting in -- this is January 29.

10:46 | 8 | MR. MEHTA:  Would you blow that up, please.

10:46 | 9 | BY MR. MEHTA:

10:46 | 10 | Q.   This is an e-mail from Mr. Lerner.  This is late January:

10:46 | 11 | "Can you ask Chris what I need to do to get my BP claims in

10:46 | 12 | some sort of priority?  We have over a thousand claims and

10:46 | 13 | hundreds on file and yet only trickling in a check or two per

10:46 | 14 | week.  I need my claims expedited" -- Mr. Lerner asks you.

10:46 | 15 | "More money coming in means I can get started getting my sea

10:47 | 16 | legs, and it will keep us going in other areas."

10:47 | 17 | Now, first, Mr. Sutton, this is an e-mail that

10:47 | 18 | Mr. Lerner is actually asking you to ask your wife, right, not

10:47 | 19 | you, how to get the BP claims in some kind of priority, right?

10:47 | 20 | A.   Right.

10:47 | 21 | Q.   If you had had some kind of secret agreement with

10:47 | 22 | Mr. Lerner to be an insider, wouldn't it have made more sense

10:47 | 23 | for him to ask you this question and not your wife?

10:47 | 24 | A.   Yes.

10:47 | 25 | Q.   But he is asking your wife.

LIONEL SUTTON III - CROSS

10:47  1          If you turn to the next e-mail, your response is --
10:47  2  you actually provide him information about the status of Andry
10:47  3  Lerner claims, correct?
10:47  4  A.    Yes.
10:47  5  Q.    Now, Mr. Lerner did not ask you to provide him this
10:47  6  information in his prior e-mail?
10:47  7  A.    That's right.  He was just complaining about the slow
10:47  8  payment of claims.
10:47  9  Q.    So why did you provide him with this summary of claims
10:47  10  information, Mr. Sutton?
10:48  11  A.    Because that showed that the problem wasn't that we were
10:48  12  paying claims slow; that showed that the problems were that
10:48  13  they weren't getting the stuff done on time.
10:48  14  Q.    Did you provide this information to him because you were
10:48  15  getting -- you had a share of the fee in the Casey Thonn matter
10:48  16  and expecting that?
10:48  17  A.    No.  That came off of the law firm portal.  I mean, it
10:48  18  just showed that, "Hey, look, you guys are complaining about us
10:48  19  and our payments being slow, but it's not the claims office.
10:48  20  You haven't responded to this.  You haven't signed.  You
10:48  21  haven't did the incompleteness notice."  I mean, it's all those
10:48  22  kind of things.
10:48  23  Q.    Not my precise question.  Did you send Mr. Lerner this
10:48  24  information because you were getting paid, because you were
10:48  25  paid on the Casey Thonn claim or for some other reason?

LIONEL SUTTON III - CROSS

10:48   1   **A.**   For some other reason.

10:48   2   **Q.**   And what was that reason?

10:48   3   **A.**   To show that the problem is not that our claims office is

10:48   4   being slow; the problem is the people that are sending in the

10:48   5   claims.

10:48   6   **Q.**   Mr. Sutton, the information you sent Mr. Lerner here on

10:49   7   the 29th, was it confidential in any way?

10:49   8   **A.**   No.

10:49   9   **Q.**   And where did the information come from?

10:49   10  **A.**   It came off the law firm portal where you could see how

10:49   11  many claims the law firm filed.  I mean, it has all that

10:49   12  information.  They have access to it, as I understood.  And

10:49   13  there is a report that goes out every month, I believe, with

10:49   14  all that on it.

10:49   15  **Q.**   All right.  And is this the kind of information -- you

10:49   16  testified earlier that you provided information regularly to

10:49   17  the other lawyers.  Is this the kind of information that you

10:49   18  had provided to other lawyers?

10:49   19  **A.**   Well, if somebody -- yes.  When somebody would call

10:49   20  complaining about the slow pace of our office, the first thing

10:49   21  I would do is see whether it was actually our office or if it

10:49   22  was their office.

10:49   23  **Q.**   Mr. Lerner responds:  "It's good to have friends in high

10:49   24  places."  What did you understand him to mean by that?

10:49   25  **A.**   I think he was being sarcastic because I just regurgitated

LIONEL SUTTON III - CROSS

10:49  1    the problem back to him.

10:49  2    Q.   And then he asked you:  "How can we speed up our review

10:49  3    process?"

10:49  4    A.   Right.

10:49  5         MR. MEHTA:   Turn to the next e-mail, please.   Blow

10:49  6    that up, the answer.

10:50  7    BY MR. MEHTA:

10:50  8    Q.   Your response is "you can't."

10:50  9    A.   Right.

10:50  10   Q.   "You can't."

10:50  11   A.   Right.

10:50  12   Q.   You can't speed up the processing of your claims.

10:50  13        Why did you answer "you can't," Mr. Sutton?

10:50  14   A.   Because the claims process was the claims process.  There

10:50  15   was nothing to do to speed it up.  It was -- like I said there:

10:50  16   "It will get faster on its own as the gray areas are resolved

10:50  17   and applied across the board.  They can make sure that any

10:50  18   incompleteness notices are responded to as soon as possible."

10:50  19        I mean, that's the only way to make things go faster,

10:50  20   is for you to do your part as a claimant attorney or a

10:50  21   claimant.  It was nothing that we would be doing.

10:50  22   Q.   You also told Mr. Lerner:  "What you can do is make sure

10:50  23   that any incomplete notices are responded to ASAP.  Previously

10:50  24   responses to incomplete notices were sent to the back of the

10:50  25   line, but we will be streamlining that process very soon."

## LIONEL SUTTON III - CROSS

10:50  1    **A.**    Right.   There was a time where you -- when somebody got an

10:50  2    incompleteness notice, it went all the way back to the back of

10:50  3    the line.   But I think, as Mr. Staley testified, at some point

10:51  4    when the incompleteness notice got responded to, the claim

10:51  5    would pick up from there.

10:51  6    **Q.**    Did you tell Mr. Lerner that?   Is that information that

10:51  7    was uniquely provided to Mr. Lerner?

10:51  8    **A.**    No.

10:51  9    **Q.**    That's something you told lots of different lawyers,

10:51  10   right?   Get your incompleteness notices answered and get your

10:51  11   responses in?

10:51  12   **A.**    That was the number one problem with claims being delayed,

10:51  13   is that lawyers weren't getting their incompleteness notices

10:51  14   responded --

10:51  15   **Q.**    This was not unique advice to Mr. Lerner, right?

10:51  16   **A.**    No, not at all.

10:51  17   **Q.**    And this wasn't advice you were providing him because you

10:51  18   had been paid on the Casey Thonn fee, right?

10:51  19   **A.**    Right.

10:51  20   **Q.**    Just pause for a moment.   How often were you talking to

10:51  21   Mr. Lerner at this -- how often were you communicating with

10:51  22   Mr. Lerner during this period of time?

10:51  23   **A.**    I don't know.   I mean, there were periods where we would

10:51  24   talk pretty much when something big with Crown was going on,

10:51  25   and there was times where we wouldn't talk that frequently.

LIONEL SUTTON III - CROSS

10:52  1        I don't know.  He was -- you couldn't always get Glen

10:52  2   on the phone.  Sometimes it would just be e-mails.

10:52  3   Q.   But you were in pretty regular communication with him

10:52  4   about Crown, right?

10:52  5   A.   Yeah, most of our communications were about Crown.

10:52  6   Q.   You also communicated about your family?

10:52  7   A.   Yes.

10:52  8   Q.   Because you have been personal friends for many years?

10:52  9   A.   Yes.

10:52  10  Q.   In all the time you communicated with Mr. Lerner, did he

10:52  11  ever once ask you to look up an Andry Lerner claim?

10:52  12  A.   No.

10:52  13  Q.   Did he ever once ask you to manipulate an Andry Lerner

10:52  14  claim?

10:52  15  A.   No.

10:52  16  Q.   Did he ever once ask you to expedite a specific Andry

10:52  17  Lerner claim?

10:52  18  A.   No, other than in a general sense like you saw in the

10:52  19  e-mails.

10:52  20  Q.   Right.  Other than that general e-mail he sent, he never

10:52  21  once called you up and said, "Lionel, would you please move a

10:52  22  certain claim to the front of the line"?

10:52  23  A.   That's correct.

10:52  24       MR. MEHTA:  Turn to Tab 63, please.

10:53  25            If you would blow up that middle e-mail, please.

## LIONEL SUTTON III - CROSS

| | | |
|---|---|---|
| 10:53 | 1 | Scroll to the top.  Scroll up. |
| 10:53 | 2 | BY MR. MEHTA: |
| 10:53 | 3 | Q.   It's an e-mail, Mr. Sutton, that's dated March 8, 2013, |
| 10:53 | 4 | between you and Mr. Lerner. |
| 10:53 | 5 | A.   Yes. |
| 10:53 | 6 | Q.   It's an e-mail that's been highlighted in the special |
| 10:53 | 7 | master's responses, and it concerns the Talen's claim. |
| 10:53 | 8 | A.   Right. |
| 10:53 | 9 | Q.   You wrote that you had "had lunch with Jon yesterday." |
| 10:53 | 10 | A.   Yes. |
| 10:53 | 11 | Q.   That's in reference to Mr. Andry, right? |
| 10:53 | 12 | A.   Yes. |
| 10:53 | 13 | Q.   You said:  "It was nice.  Things seemed to be healing. |
| 10:53 | 14 | Thanks for pushing it." |
| 10:53 | 15 | Why did you write that? |
| 10:53 | 16 | A.   Because I was letting -- thanking Glen for trying to get |
| 10:53 | 17 | Jon and I talking again.  Things seemed to be healing and we |
| 10:53 | 18 | were starting to talk, whereas before we hadn't really talked. |
| 10:54 | 19 | Q.   And you wrote:  "I'm working with him" -- that's |
| 10:54 | 20 | Mr. Andry? |
| 10:54 | 21 | A.   Yes. |
| 10:54 | 22 | Q.   -- "to get your Talen's claim pushed through as quick as |
| 10:54 | 23 | possible." |
| 10:54 | 24 | A.   Yes. |
| 10:54 | 25 | Q.   What did you mean by that, Mr. Sutton? |

LIONEL SUTTON III - CROSS

10:54    1    A.   That was right in response to Pat Juneau asking me to find

10:54    2    out what's going on with the Talen's claim and me determining

10:54    3    that Jon Andry wasn't or the firm wasn't giving them the tax

10:54    4    returns that they needed.

10:54    5         I went to lunch.  I saw -- I explained to Jon what he

10:54    6    needed to do to respond, to get the Talen's claim moved

10:54    7    forward.  That's --

10:54    8    Q.   Sorry to interrupt.  Earlier you were testifying about the

10:54    9    Talen's claim.  There was a multifacility claim, correct?

10:54   10    A.   Right.

10:54   11    Q.   And you had learned, based upon an inquiry, that Andry

10:54   12    Lerner had not submitted all the tax returns for each of the

10:54   13    facilities, right?

10:54   14    A.   Right.

10:54   15    Q.   Now, who asked you specifically to look up the Talen's

10:54   16    claim in this time period in early March?

10:54   17    A.   Pat Juneau.

10:54   18    Q.   If you could please turn to Tab 61.

10:55   19         The e-mail that we just looked at between you and

10:55   20    Mr. Lerner was dated March 7, right?

10:55   21    A.   Right.

10:55   22    Q.   And this is an e-mail between Mr. Andry and Mr. Juneau

10:55   23    that's dated March 6, correct?

10:55   24    A.   Yes.

10:55   25    Q.   It's the day right before the e-mail you just -- we just

LIONEL SUTTON III - CROSS

10:55   1    looked at with Mr. Lerner, right?

10:55   2    A.    Right.

10:55   3    Q.    And Mr. Andry seems to be sending Mr. Juneau a list of

10:55   4    claims here?

10:55   5    A.    Yes.

10:55   6    Q.    And you can see there in the middle of that e-mail a

10:55   7    number of the claims that he sends to Mr. Juneau are the

10:55   8    Talen's Marine claim, right?

10:55   9    A.    Yes.

10:55   10   Q.    Now, you never saw this e-mail at the time, right?

10:55   11   A.    No, I never saw that until --

10:55   12   Q.    But Mr. Juneau -- your recollection is Mr. Juneau did ask

10:55   13   you to take a look at the Talen's claim?

10:55   14   A.    Yeah.  He came in my office, and Jon Andry had -- he

10:55   15   actually said Jon Andry had called him and wanted to know about

10:55   16   the Talen's claim and would I see what was going on with it.

10:55   17   Q.    All right.  So if you go back to Tab 63, please.

10:55   18   A.    You see, it's multifacility, so there is a bunch of

10:55   19   different claim numbers but just one claim, I thought.

10:56   20   Q.    Go back to Tab 63.  You say to Mr. Lerner:  "I'm working

10:56   21   with him to get your Talen's claim."  At this point would

10:56   22   Mr. Lerner have even known there was a Talen's claim?

10:56   23   A.    I don't know.

10:56   24   Q.    You say:  "I'm working with him to get your Talen's claim

10:56   25   pushed through as quick as possible."

LIONEL SUTTON III - CROSS

10:56   1    **A.**   Right.

10:56   2    **Q.**   What did you mean by that?

10:56   3    **A.**   I meant that I explained to Jon that the holdup on his

10:56   4    Talen's claim was that they were not responding to the

10:56   5    incompleteness notices properly and that if he would do that,

10:56   6    then the claim would move on like it was supposed to.

10:56   7    **Q.**   So, in other words, what you are saying here is that --

10:56   8    what you told Mr. Lerner is essentially what you were doing at

10:56   9    the behest of Mr. Juneau?

10:56   10   **A.**   Yes.  And like Mr. Staley testified, push through, that

10:56   11   was a term they used.  I mean, I wasn't --

10:56   12   **Q.**   You weren't trying to communicate to Mr. Lerner that you

10:56   13   were giving any special treatment to these Talen's claims,

10:56   14   right?

10:56   15   **A.**   No.  I was doing what I was supposed to do.

10:56   16   **Q.**   Did you have any further conversations with Mr. Juneau

10:56   17   about the Talen's claim, Mr. Sutton?

10:57   18   **A.**   Yes.

10:57   19   **Q.**   Could you please tell us about that.

10:57   20   **A.**   After this, after reviewing the claim when Pat asked me

10:57   21   and reporting to Jon what the problem was, I went and told Pat

10:57   22   that in the course of my reviewing the claim, I saw that it was

10:57   23   classified as a recreational marina as opposed to a commercial

10:57   24   fuel dock, which I thought may have resulted in it being

10:57   25   classified as tourism versus something else, which I thought

LIONEL SUTTON III - CROSS

10:57  1  may have changed the amount that they would be getting.  I

10:57  2  wasn't seeing the number, so I don't know, but my understanding

10:57  3  was that tourism had a bigger multiplier than something else.

10:57  4       So I went and told Pat.  I said, "Look, this thing

10:57  5  may have been misclassified by BrownGreer originally as tourism

10:57  6  when it should have been a commercial fuel dock, and it may

10:57  7  affect the claim.  I don't want somebody to see later, if this

10:57  8  thing gets appealed, that I looked at it and I should have

10:57  9  caught that mistake.  So I am bringing it to you to let you

10:57  10  know what I found."

10:57  11  Q.   So what you were telling Mr. Juneau, in essence, was that

10:57  12  this claim was classified perhaps at a higher rate than it

10:58  13  should have been?

10:58  14  A.   Could have been.  I don't remember that at the time I knew

10:58  15  the exact numbers, but, yes, my concern was that if it was

10:58  16  tourism it could have been paid at a higher rate than if it was

10:58  17  a commercial fuel dock.

10:58  18  Q.   If it was misclassified at a higher category and at a

10:58  19  higher rate, that meant the Andry Lerner law firm could have

10:58  20  received more money as a fee than what it should have if the

10:58  21  claim was properly classified, right?

10:58  22  A.   That could have been.  Again, I don't know the numbers.

10:58  23  Q.   What you were essentially doing was suggesting to

10:58  24  Mr. Juneau that this claim actually was worth less to The Andry

10:58  25  Law Firm than the way it was actually classified?

LIONEL SUTTON III - CROSS

| | | |
|---|---|---|
| 10:58 | 1 | **MR. GELÉ:**  I think you're talking about Andry Lerner. |
| 10:58 | 2 | BY MR. MEHTA: |
| 10:58 | 3 | **Q.**   Sorry, Andry Lerner. |
| 10:58 | 4 | **A.**   No.  I was saying that I thought it may have been |
| 10:58 | 5 | misclassified, and I was concerned that if that resulted in a |
| 10:58 | 6 | higher number, a higher award, somebody may see that I looked |
| 10:58 | 7 | at the claim and say I should have caught that mistake.  And I |
| 10:58 | 8 | wanted Mr. Juneau to be aware of it. |
| 10:58 | 9 | **Q.**   Would you -- Mr. Sutton, if you were a paid insider, as |
| 10:58 | 10 | you have been alleged to be, or the Andry Lerner law firm, |
| 10:59 | 11 | would you have brought to Mr. Juneau's attention the fact that |
| 10:59 | 12 | there was a misclassification that could have resulted in less |
| 10:59 | 13 | money for Andry Lerner? |
| 10:59 | 14 | **A.**   Well, I can't speculate because I wasn't a paid insider. |
| 10:59 | 15 | But, no, that doesn't seem like something that a paid insider |
| 10:59 | 16 | would do. |
| 10:59 | 17 | **Q.**   Let me move a little bit more forward in time -- |
| 10:59 | 18 | **THE COURT:**  How much more do you have, Counsel?  We |
| 10:59 | 19 | need to move this along. |
| 10:59 | 20 | **MR. MEHTA:**  Yes, sir.  I have probably just about |
| 10:59 | 21 | 10 minutes, Judge, not much longer. |
| 10:59 | 22 | **THE COURT:**  Let's go ahead. |
| 10:59 | 23 | BY MR. MEHTA: |
| 10:59 | 24 | **Q.**   There are database accesses on March 15, Mr. Sutton. |
| 10:59 | 25 | **MR. MEHTA:**  If you could pull up Lerner Exhibit 2 and |

LIONEL SUTTON III - CROSS

| | |
|---|---|
| 10:59 | 1 | turn to March 15.  It's about four or five, six pages in. |
| 10:59 | 2 | BY MR. MEHTA: |
| 10:59 | 3 | Q.   Do you see in the middle of the page there, you look up |
| 10:59 | 4 | Talen's Marine, Casey Thonn, Motivation, and Vishnu |
| 11:00 | 5 | Enterprises.  Do you see that? |
| 11:00 | 6 | A.   Yes. |
| 11:00 | 7 | Q.   Now, would it surprise you that on this same date you had |
| 11:00 | 8 | text messages and phone calls with Jon Andry? |
| 11:00 | 9 | A.   No. |
| 11:00 | 10 | Q.   Would it surprise you that Mr. Andry might have called you |
| 11:00 | 11 | about looking up these claims? |
| 11:00 | 12 | A.   No.  I know he called and asked me to look up two claims. |
| 11:00 | 13 | I just didn't know the names of them, Motivation and Vishnu.  I |
| 11:00 | 14 | mean, I remembered that he called and asked me about two claims |
| 11:00 | 15 | that I couldn't remember the names, though. |
| 11:00 | 16 | Q.   Here we are now, we're in the middle of March, Mr. Sutton. |
| 11:00 | 17 | You've been there November, December, January, and February, |
| 11:00 | 18 | 5 1/2 months? |
| 11:00 | 19 | A.   Yes. |
| 11:00 | 20 | Q.   The documents show you looked up a grand total of four |
| 11:00 | 21 | Andry Lerner claims in that time period, correct? |
| 11:00 | 22 | A.   Yes. |
| 11:00 | 23 | Q.   Of those four claims how many did Mr. Andry ask you to |
| 11:00 | 24 | look up? |
| 11:00 | 25 | A.   Three. |

LIONEL SUTTON III - CROSS

11:00  1    **Q.**   And they would be?

11:00  2    **A.**   He initially would have asked me the look up Talen's, and

11:00  3    then later Pat asked me to go and find out what was going on

11:01  4    with Talen's.  And then Jon would have asked me to look up

11:01  5    Motivation and Vishnu.

11:01  6    **Q.**   So three claims you were asked to look up by Mr. Andry in

11:01  7    5 1/2 months, correct?

11:01  8    **A.**   Yes.

11:01  9    **Q.**   How many claims did Mr. Lerner ask you to look up in

11:01  10   5 1/2 months?

11:01  11   **A.**   I don't think he asked me to look up any.

11:01  12   **Q.**   Did you ever discuss the Motivation claim with Mr. Lerner?

11:01  13   **A.**   I don't think so.

11:01  14   **Q.**   Did you ever discuss the Vishnu Enterprises claim with

11:01  15   Mr. Lerner?

11:01  16   **A.**   I don't think so.

11:01  17        **MR. MEHTA:**  Turn to Tab 70, please.  That paragraph

11:01  18   in the middle there.

11:01  19   **BY MR. MEHTA:**

11:01  20   **Q.**   It's an e-mail dated March 21.  I won't read the whole

11:01  21   thing, but it's between you and Jeff Cahill, who is

11:01  22   Mr. Lerner's accountant.

11:01  23        Just so we are clear, the first few lines of that, in

11:01  24   which you say:  "I was due $100,000 as Crown direct payments."

11:02  25   Do you see that?

LIONEL SUTTON III - CROSS

1   A.   Yes.

2   Q.   All right.  And that's a reference to the deal that you

3   had struck the prior year with Mr. Lerner?

4   A.   Yeah.  That was the 120 for the eight shares that the

5   three partners sold.

6   Q.   Now, you had testified earlier that the deal was to pay

7   you $10,000 a month, correct?

8   A.   It was to pay all three of us each $10,000 a month, yes.

9   Q.   So you were due $100,000 at this point.  Was Mr. Lerner

10  not paying you in a timely manner?

11  A.   No.  It looked like he had paid me 36 of the hundred, so

12  he hadn't paid -- he wasn't paying me every month.

13  Q.   So at the bottom there it says:  "The above is in addition

14  to the $16,666 Andry fee, which you should send as soon as you

15  get it."

16        Now, by "Andry fee," you meant the second Thonn fee;

17  isn't that right?

18  A.   Yes.

19  Q.   Then you say:  "All funds can be deposited directly into

20  the old Crown account."

21  A.   Right.

22  Q.   So here again, Mr. Sutton, you are directing that that

23  money be sent to the old Crown account, right?

24  A.   Yes.

25  Q.   And only you are the one that's directing it to be sent

LIONEL SUTTON III - CROSS

| | |
|---|---|
| 11:03 | 1 |
| 11:03 | 2 |
| 11:03 | 3 |
| 11:03 | 4 |
| 11:03 | 5 |
| 11:03 | 6 |
| 11:03 | 7 |
| 11:03 | 8 |
| 11:03 | 9 |
| 11:03 | 10 |
| 11:03 | 11 |
| 11:03 | 12 |
| 11:03 | 13 |
| 11:03 | 14 |
| 11:03 | 15 |
| 11:03 | 16 |
| 11:04 | 17 |
| 11:04 | 18 |
| 11:04 | 19 |
| 11:04 | 20 |
| 11:04 | 21 |
| 11:04 | 22 |
| 11:04 | 23 |
| 11:04 | 24 |
| 11:04 | 25 |

1    there, not anyone else?

2    A.   That's right.

3    Q.   And is it for the same reasons you testified about

4    earlier?

5    A.   Yes.

6    Q.   Just a couple more e-mails.

7         MR. MEHTA:   If you'd turn, please, to Tab 75.  It's

8    also an e-mail that's highlighted in the special master's

9    report.  Start at the second page, at the bottom.

10   BY MR. MEHTA:

11   Q.   E-mail chain between you and Mr. Lerner in May 2013.  You

12   say to Mr. Lerner:  "Glad to see you're so" -- I'm sorry.

13   Mr. Lerner says to you:  "Glad to see you working so hard while

14   I try to figure out how to keep paying for S."

15        And you respond higher up:  "You forget I'm also

16   working hard to get you money so I can pay for S."

17        Do you see that?

18   A.   Yes.

19   Q.   What were you referring to there?

20   A.   We were talking about Crown.  Because if you look at the

21   e-mail that preceded that, we were talking about Crown.  I

22   mean, at that point we were going on a lot of demonstrations,

23   doing a lot of work to try to -- I mean, we thought we were

24   right on the verge of getting Crown to hit.  I mean, it was --

25   we were doing a lot of work on it.

LIONEL SUTTON III - CROSS

11:04 | 1   **Q.**   You weren't referring there to getting money to him

11:04 | 2   through claims paid, correct?

11:04 | 3   **A.**   Right.

11:04 | 4   **Q.**   So further up you say -- he responds:  "Ooh la la.  Work

11:04 | 5   harder.  How's Chris?"

11:04 | 6   **A.**   Right.

11:04 | 7   **Q.**   Your response is:  "She's good.  It has actually been

11:04 | 8   pretty fun working together on this."

11:04 | 9   **A.**   Yes.

11:04 | 10  **Q.**   If you go up to the next page, Mr. Lerner responds:  "They

11:04 | 11  are not paying claims.  Insane."

11:04 | 12  **A.**   Yes.

11:04 | 13  **Q.**   Then you respond, Mr. Sutton, with claims information,

11:04 | 14  summary claims information?

11:04 | 15  **A.**   Yes.  Yes.

11:04 | 16  **Q.**   And this is a lot like the e-mail you sent to Mr. Sutton

11:05 | 17  about -- excuse me -- Mr. Lerner about four months earlier,

11:05 | 18  correct?

11:05 | 19  **A.**   Yeah, same thing.  I say, "Here is your report," which

11:05 | 20  that's the report on their portal.

11:05 | 21  **Q.**   All right.  So this information was not -- again, this

11:05 | 22  e-mail, Mr. Lerner wasn't asking for the information, right?

11:05 | 23  **A.**   Right.  He was complaining about us not paying claims.

11:05 | 24  And once again I was saying, "It's not us.  It's you guys."

11:05 | 25  **Q.**   So again, when he complained about the speed of claims,

LIONEL SUTTON III - CROSS

11:05  1   you're providing him with the information about what the status

11:05  2   of the claims are?

11:05  3   A.   In a general sense --

11:05  4   Q.   In a general sense, right?

11:05  5   A.   -- not the status of the claims.

11:05  6   Q.   And this information, again, was not confidential?

11:05  7   A.   Right.

11:05  8   Q.   It was available on the portal, correct?

11:05  9   A.   It was confidential to the law firm.  Only they can have

11:05  10  it, yes.

11:05  11  Q.   And then again, you showed some examples.  "Your firm was

11:05  12  issued an incompleteness notice on Talen's on 12-3.  What

11:05  13  appears to be a complete response was not received by us until

11:05  14  5-3.  During the six-month period a lot of claims got in front

11:05  15  of yours."

11:05  16  A.   Right.

11:05  17  Q.   This advice -- Mr. Sutton, was this the kind of advice

11:05  18  that you uniquely provided to Mr. Lerner?

11:06  19  A.   No.  That was an example that I just -- Pat asked me to

11:06  20  look at Talen's back in March.  I explained what they needed to

11:06  21  do back in March to respond to an incompleteness notice, and it

11:06  22  still took them two months to do it.  So it was like, "Hey,

11:06  23  we're not doing anything wrong.  You guys are."

11:06  24  Q.   Were you giving Mr. Lerner this advice in exchange for the

11:06  25  money you were receiving on Casey Thonn?

LIONEL SUTTON III - CROSS

11:06  1   **A.**   No.
11:06  2   **Q.**   What about in exchange for the money you were getting on
11:06  3   Crown?
11:06  4   **A.**   No.
11:06  5   **Q.**   Why were you providing the advice then?
11:06  6   **A.**   Because he was explaining about our process, and I wanted
11:06  7   him to know "It's not our process, it's your process."  That's
11:06  8   what we did.
11:06  9   **Q.**   Final few questions, Mr. Sutton.  You have been accused of
11:06  10  agreeing with Mr. Lerner and Mr. Andry to corrupt the claims
11:06  11  process.  Did you enter into such an agreement?
11:06  12  **A.**   No.
11:06  13  **Q.**   You have also been accused of providing special benefits
11:06  14  to Mr. Andry and Mr. Lerner in exchange for money.  Did you do
11:06  15  that?
11:06  16  **A.**   No.
11:06  17  **Q.**   You have also been accused of agreeing to be an insider
11:06  18  for Andry Lerner in exchange for money.  Did you do that, sir?
11:06  19  **A.**   No.
11:06  20          **MR. MEHTA:**  Nothing further.  I pass the witness.
11:07  21  Thank you, Your Honor.
11:07  22               Thank you, Mr. Sutton.
11:07  23          **THE COURT:**  Someone else over here has a question?
11:07  24          **MS. PIERSON:**  I just have a couple of questions for
11:07  25  Mr. Sutton.  I want to confirm just a couple things.

LIONEL SUTTON III - CROSS

| | | |
|---|---|---|
| 11:07 | 1 | CROSS-EXAMINATION |
| 11:07 | 2 | BY MS. PIERSON: |
| 11:07 | 3 | Q.   When your wife, Ms. Reitano, went to work for the claims |
| 11:07 | 4 | office on April 1st, 2012, did she terminate her work at Sutton |
| 11:07 | 5 | and Reitano? |
| 11:07 | 6 | A.   Yes. |
| 11:07 | 7 | Q.   And she went to work full-time for the claims office? |
| 11:07 | 8 | A.   Yes. |
| 11:07 | 9 | Q.   We are not going to go back over all these e-mails.  I've |
| 11:07 | 10 | been over them a thousand times. |
| 11:07 | 11 | THE COURT:  I can promise you that, you're not going |
| 11:07 | 12 | to do that. |
| 11:07 | 13 | MS. PIERSON:  No, we're not going to do that. |
| 11:07 | 14 | BY MS. PIERSON: |
| 11:07 | 15 | Q.   I'm not even going to ask you to do that, but I have |
| 11:07 | 16 | looked at them a lot of times.  Can you confirm for the |
| 11:07 | 17 | Court -- |
| 11:07 | 18 | THE COURT:  We have all looked at them a lot of |
| 11:07 | 19 | times.  They are in the record. |
| 11:07 | 20 | MS. PIERSON:  I'm sorry? |
| 11:07 | 21 | THE COURT:  We have all looked at them a lot of |
| 11:07 | 22 | times.  They are all in the record. |
| 11:07 | 23 | MS. PIERSON:  I'm going to try to show something |
| 11:07 | 24 | that's not on these e-mails. |
| | 25 | |

LIONEL SUTTON III - CROSS

11:07  1   **BY MS. PIERSON:**

11:07  2   **Q.**   Is it true that on all of those e-mails where you discuss

11:08  3   with -- whoever you are discussing with the Thonn case,

11:08  4   Ms. Reitano's name and e-mail address is nowhere to be found?

11:08  5   **A.**   That's correct.

11:08  6          **MS. PIERSON:**  Thank you, Your Honor.

11:08  7          **THE COURT:**  You're welcome.

11:08  8              Anybody else on this side?

11:08  9          **MR. GELÉ:**  Stephen Gelé, on behalf of The Andry Law

11:08  10  Firm, Your Honor.  I just have a couple of questions,

11:08  11  hopefully.

11:08  12         **THE COURT:**  Spell your last name for me.

11:08  13         **MR. GELÉ:**  Sure.  G-E-L-E, Your Honor.

11:08  14         **THE COURT:**  Thank you.

11:08  15                **CROSS-EXAMINATION**

11:08  16  **BY MR. GELÉ:**

11:08  17  **Q.**   Good morning, Mr. Sutton.  I believe you earlier

11:08  18  testified, on the questioning from Mr. Unglesby, that you

11:08  19  didn't do anything on behalf of the Andry Lerner law firm that

11:08  20  you wouldn't do for any other law firm representing a claimant.

11:08  21  Correct?

11:08  22  **A.**   Right.

11:08  23  **Q.**   I would like to ask that question regarding the *pro se*

11:08  24  claim of The Andry Law Firm.  Did you do anything on behalf of

11:08  25  the *pro se* claim of The Andry Law Firm that you wouldn't have

LIONEL SUTTON III - CROSS

11:08  1   done for any other claimant?

11:08  2   A.    No.

11:08  3   Q.    Mr. Sutton, back on January 13, 2014, I took your

11:09  4   statement under oath.  Do you remember that?

11:09  5   A.    Yes.

11:09  6   Q.    Did you tell the truth during that statement?

11:09  7   A.    Yes.

11:09  8         MR. GELÉ:  Your Honor, to prevent us from having to

11:09  9   go through those same questions, I would just like to offer

11:09  10  that statement on behalf of The Andry Law Firm.  It's Exhibit 5

11:09  11  to our exhibit book that we produced.  It's in the record as

11:09  12  Document 12172-7.  It's attached to our response to the Freeh

11:09  13  report.

11:09  14        THE COURT:  Anybody have any objection?

11:09  15        MR. PAW:  No objection, Your Honor.

11:09  16        THE COURT:  Okay.

11:09  17        MR. GELÉ:  Thank you, Your Honor.

11:09  18        MR. ROSENBERG:  May it please the Court, Your Honor.

11:09  19  Harry Rosenberg on behalf of Gilbert "Gibby" Andry.  And I have

11:09  20  very few questions.

11:09  21        THE COURT:  That is The Andry Law Firm, right?

11:09  22        MR. ROSENBERG:  It is, Your Honor.

11:09  23        THE COURT:  Gibby is not a named respondent here, so

11:09  24  I don't know why he has two lawyers.  The Andry Law Firm has

11:10  25  the claim, not Gibby Andry.

LIONEL SUTTON III - CROSS

11:10  1        **MR. ROSENBERG:**  Your Honor, two reasons, if I might

11:10  2  respond.  The Andry Law Firm is a show cause party, but the

11:10  3  special master in his report has also singled out

11:10  4  individually --

11:10  5        **THE COURT:**  He is not singled out in the show cause

11:10  6  order at all.

11:10  7        **MR. ROSENBERG:**  He is singled out -- Your Honor, with

11:10  8  all due respect, he is singled out in the report, and he is

11:10  9  singled out in the --

11:10  10        **THE COURT:**  He is mentioned in the report.

11:10  11        **MR. ROSENBERG:**  He is mentioned more than three dozen

11:10  12  times.

11:10  13        **THE COURT:**  That doesn't make him a party to the show

11:10  14  cause order.  So I don't know what you need to ask that hasn't

11:10  15  been asked already, but it seems to me he is not a party to

11:10  16  this hearing individually.  His law firm is, but not him

11:10  17  individually.  Mr. Gelé just questioned the witness on behalf

11:10  18  of his law firm.

11:10  19        **MR. ROSENBERG:**  I understand.

11:10  20        **THE COURT:**  What did you want to ask, Mr. Rosenberg?

11:10  21        **MR. ROSENBERG:**  All I had is a couple of questions.

11:10  22        **THE COURT:**  Go ahead and ask, but we can't have

11:11  23  multiple lawyers for the same party.  This thing is dragging on

11:11  24  here.  What do you want to ask?  Go ahead and ask.

11:11  25        **MR. ROSENBERG:**  Your Honor, I'll be very succinct --

LIONEL SUTTON III - CROSS

1    **THE COURT:**  We have probably already spent more time
2    arguing about it.
3        **MR. ROSENBERG:**  I agree, Your Honor.
4        **THE COURT:**  Just ask the questions.  We are not going
5    to do this throughout this hearing, though.  He is not going to
6    have two lawyers.  Okay.  You and Mr. Gelé can agree as to who
7    is going to take the witness, but you can't both take the
8    witness.  That's my point.
9        **MR. ROSENBERG:**  We will work that out, Your Honor.  I
10   understand.
11       **THE COURT:**  Please.  Okay.  Go ahead and ask your
12   questions.  Two questions, you said, right?
13       **MR. ROSENBERG:**  Three, Your Honor, but that's it.
14       **THE COURT:**  We went from two to three.
15       **MR. ROSENBERG:**  I'm sorry, Your Honor.  I increased
16   it by 50 percent.
17                          **CROSS-EXAMINATION**
18   BY MR. ROSENBERG:
19   **Q.**   Mr. Sutton, Gibby Andry never asked you to do anything to
20   expedite or personally favor The Andry Law Firm claim, did he,
21   sir?
22   **A.**   No.
23   **Q.**   And to your knowledge, Gibby Andry never asked anyone in
24   the claims office for special treatment of The Andry Law Firm
25   claim, did he, sir?

LIONEL SUTTON III - CROSS

11:12  1   **A.**   I have no knowledge of what he discussed with anybody else

11:12  2   other than myself.

11:12  3   **Q.**   And Gibby Andry never knowingly asked you to breach or

11:12  4   assisted you in knowingly breaching any fiduciary duty for his

11:12  5   personal gain, did he, sir?

11:12  6   **A.**   No, sir.

11:12  7          **MR. ROSENBERG:**  Thank you, Judge.

11:12  8          **THE COURT:**  One, two, three.  Very good

11:12  9   Mr. Rosenberg.

11:12  10          Anybody else over here?  If not, Mr. Paw.

11:12  11          **MR. PAW:**  Judge, could I ask --

11:12  12          **THE COURT:**  I'm sorry.  Wait.  Mr. Unglesby has

11:12  13   something.

11:12  14          **MR. UNGLESBY:**  I'm agreeing with him.

11:12  15          **MR. PAW:**  I was going to ask if we could take a quick

11:12  16   break, Your Honor, before I start.

11:12  17          **THE COURT:**  Five minutes.

11:12  18          **MR. PAW:**  Yes, please.  Thank you.

11:12  19          **THE DEPUTY CLERK:**  All rise.

11:12  20          (Recess.)

11:22  21          **THE COURT:**  Please be seated.

11:22  22          Let's resume.  Mr. Paw, I think you're up next.

11:22  23          **MR. PAW:**  Yes, Your Honor.

11:22  24          **THE COURT:**  There's been a lot of testimony, a lot of

11:22  25   questioning, a lot of answers by Mr. Sutton.  So let's try not

LIONEL SUTTON III - CROSS

11:22   1    to just repeat what's already come out.

11:22   2            MR. PAW:  Yes, Your Honor.  We'll move it along.

11:22   3            THE COURT:  Go ahead.

11:22   4                         CROSS-EXAMINATION

11:22   5    BY MR. PAW:

11:22   6    Q.   Mr. Sutton, you were discussing your employment agreement

11:22   7    with the CAO during one of your direct examinations.  Do you

11:22   8    recall that?

11:23   9    A.   Yes.

11:23   10   Q.   And you said there was a difference in whether you were

11:23   11   supposed to do substantially all -- or substantially the

11:23   12   majority of your time was devoted to the claims office?

11:23   13   A.   No.  I said the first contract that David Odom sent me

11:23   14   said "substantially all," but it was amended to say "a

11:23   15   substantial majority."

11:23   16   Q.   Well, what wasn't amended was the provisions in the

11:23   17   contract that talked about your ethical obligations to avoid a

11:23   18   conflict of interest at the claims center, correct?

11:23   19   A.   I didn't amend any of that.

11:23   20   Q.   That was always in all versions of the contracts that you

11:23   21   saw?

11:23   22   A.   The two that I saw, yes.

11:23   23   Q.   You had an obligation to avoid a conflict of interest?

11:23   24   A.   Yes.

11:23   25   Q.   And the appearance of impropriety?

LIONEL SUTTON III - CROSS

A.   Yes.

Q.   And there was also a code of conduct, similarly, that the CAO required you to avoid a conflict of interest?

A.   I don't recall seeing a code of conduct ever.

Q.   The code of conduct that was enacted before you came in to work on October 15?

A.   Right.

Q.   You don't recall that at all?

A.   No.  All I remember is the actual contract -- whatever the six-page draft version, executive version that Pat and I signed, I remember that.

     As I explained to Mr. Freeh in my deposition, there was some other paperwork that was given to us in March.  I had some questions about it, that some of it didn't apply to me. And I asked Mike Juneau about it, but I don't recall us ever going through that again.  So the only thing I have any recollection of is the actual employment agreement.

Q.   And we can agree that the employment agreement says you have to avoid a conflict of interest?

A.   You asked me that.  Yes.

Q.   I'm just making it clear.

A.   Yes.

Q.   Sir, you talked about the payments that you received and you answered the questions about the use of the Crown account to move those payments to you, the old Crown account.

LIONEL SUTTON III - CROSS

11:24  1        You received a number of payments to that old Crown
11:24  2  account, correct?
11:24  3  A.   Yes.
11:24  4  Q.   All of the payments that you received for your salary or
11:24  5  whatever expenses you had from Crown, LLC also went to that
11:24  6  account?
11:24  7  A.   For the sale of my stock and -- that and other things,
11:24  8  yes.
11:24  9  Q.   So if you look at the bank records for your old Crown
11:24  10  account that you had access to, you will see a number of wire
11:25  11  transfers from the Glen Lerner company, correct?
11:25  12  A.   Well, from Jeff Cahill.  I don't know if -- I don't
11:25  13  understand "Glen Lerner company."
11:25  14  Q.   On your bank record it says "Glen J. Lerner wire
11:25  15  transfer."
11:25  16  A.   What I'm saying, I'm not familiar with the term Glen
11:25  17  Lerner company.  I know it was all part of Glen Lerner.  I
11:25  18  don't know what Glen Lerner company is.
11:25  19  Q.   So there is going to be some wire transfers from Glen J.
11:25  20  Lerner on your bank accounts?
11:25  21  A.   I would assume, yes.
11:25  22  Q.   And there's going to be a number of wire transfers on your
11:25  23  bank account from Crown, LLC as well?
11:25  24  A.   I would assume.  I don't know for sure.
11:25  25  Q.   So the payments that you received for the Thonn referral

LIONEL SUTTON III - CROSS

1    fee, or whatever you would like to refer to it as, the Thonn
2    fee, those are going to appear in the stream of all the other
3    payments that come from Glen J. Lerner and Crown, LLC?
4    A.   Yes.
5    Q.   Now, you mentioned an IOLTA or a trust account and an
6    operating account for Sutton and Reitano, correct?
7    A.   Yes.
8    Q.   You did not reflect the Thonn fees on your operating
9    account or your trust account for the Sutton and Reitano firm;
10   is that correct?
11   A.   That's correct.  I think.  Not for the Thonn fee on this.
12   The Thonn fee for the case I represented him on, the motor
13   vehicle, would be reflected.
14   Q.   The motor vehicle?
15   A.   Yes.
16   Q.   Because I've seen the check for the motor vehicle
17   accident.  That's deposited into your trust account, right?
18   A.   Right.
19   Q.   But unlike the motor vehicle accident, the checks for the
20   fee from the *Deepwater Horizon* claim are nowhere reflected on
21   the Sutton and Reitano books, correct?
22   A.   I don't think so, right.
23   Q.   You testified that one of the reasons you did that is
24   because you didn't want your wife to know that you had that
25   money and you wanted to be able to control it in your way,

LIONEL SUTTON III - CROSS

11:26  1   correct?

11:26  2   A.   Correct.

11:26  3   Q.   Your wife regularly reviewed the Sutton and Reitano bank

11:26  4   records?

11:26  5   A.   I don't know if she regularly reviewed the bank records.

11:26  6   She had the ability to write checks out of there.

11:27  7   Q.   She wrote most of the checks out of there?

11:27  8   A.   Yeah, I would say -- but most of it was household stuff.

11:27  9   Q.   Right.  So she is going to look at the transactions that

11:27  10  come in and out of that account, right?

11:27  11  A.   Yes.

11:27  12  Q.   And you couldn't have a transaction in there that would

11:27  13  suggest you had a payment from a DHECC claim or she would have

11:27  14  seen it?

11:27  15  A.   I didn't want her to see the money.  I don't know if a

11:27  16  transaction would have shown a DHECC claim.  I'm not -- I don't

11:27  17  follow you there.

11:27  18  Q.   Well, if she saw a transfer from Glen Lerner, wouldn't she

11:27  19  say to you, "Why are you getting a transfer from Glen Lerner?"

11:27  20  A.   I don't know if she would have -- like you said, I got a

11:27  21  bunch of transfers from Glen Lerner.

11:27  22       I am not sure.  I can't say what she would have done.

11:27  23  I can tell you that I didn't want her to know that I had the

11:27  24  money so that I could spend it.

11:27  25  Q.   So we can agree that you didn't want her to know, you kept

LIONEL SUTTON III - CROSS

11:27  1    it off the books, and there is nothing in your books from that

11:27  2    law firm that reflects that you received that money?

11:27  3    **A.**   Well, we didn't have books.

11:27  4    **Q.**   You don't keep an accounting spreadsheet?

11:27  5    **A.**   No.

11:27  6    **Q.**   How do you do your taxes?

11:27  7    **A.**   From the -- Quicken.

11:27  8    **Q.**   Was the Thonn money included on your taxes?

11:28  9    **A.**   Well, it would have been except we have to give it back.

11:28  10   So I did my tax returns just last month, and so it wouldn't

11:28  11   have been included.

11:28  12   **Q.**   The Thonn money was not included on your tax returns?

11:28  13   **A.**   No.  No, because we've been ordered to give it back.

11:28  14   **Q.**   You have appealed that, haven't you?

11:28  15   **A.**   Yeah.  But it's -- if we don't have to pay it back, it

11:28  16   would be amended to reflect.  But I just did my tax returns in

11:28  17   October.  The standing order right now from the Court is that

11:28  18   we have to pay that money back.

11:28  19          **THE COURT:**  So you have not paid the money back,

11:28  20   right?

11:28  21          **THE WITNESS:**  No.

11:28  22          **THE COURT:**  And you didn't include it on your tax

11:28  23   return?

11:28  24          **THE WITNESS:**  Right.

11:28  25          **THE COURT:**  Okay.

LIONEL SUTTON III - CROSS

11:28
11:28
11:28
11:28
11:28
11:28
11:28
11:28
11:28
11:28
11:28
11:28
11:29
11:29
11:29
11:29
11:29
11:29
11:29
11:29
11:29
11:29
11:29
11:29
11:29

1    BY MR. PAW:

2    Q.   You discussed the Talen's claim in response to counsel's

3    questions, and as I recall, you said that Mr. Juneau asked you

4    to look at the Talen's claim.

5    A.   Yes.

6    Q.   And you were shown a letter that -- or an e-mail that

7    Mr. Andry sent to Mr. Juneau, I believe, dated March 6 --

8    A.   Yes.

9    Q.   -- that had the Talen's claim as a column.  Do you recall

10   that?

11   A.   Yes.

12   Q.   And then Mr. Juneau comes to you and asks you to look at

13   that claim?

14   A.   I don't know about the e-mail.  He showed me the e-mail

15   today, and I saw what the e-mail said.  I can tell you that

16   Mr. Juneau came and asked me to look at the Talen's claim.  And

17   as I recall, he told me he had gotten a telephone call from

18   Jon Andry asking him about the Talen's claim, and he wanted me

19   the check on it.  You didn't show me that e-mail.

20   Q.   On March 6 there are also telephone calls from Jon Andry

21   to Mr. Juneau?

22   A.   Okay.  Okay.

23   Q.   Would it surprise you --

24   A.   That would be in line with what Mr. Juneau told me.

25   Q.   That would be in line with what Mr. Juneau told you,

LIONEL SUTTON III - CROSS

11:29  1   right?

11:29  2   A.    Yes.

11:29  3   Q.    Would it surprise you to know that Mr. Juneau asked his

11:29  4   assistant, Rebecca Foreman, to look up the status of all the

11:29  5   claims on that e-mail for Mr. Andry?

11:29  6   A.    No.

11:29  7   Q.    Can you take a look at Exhibit 23, please.  I'll show it

11:29  8   on the screen.

11:30  9            March 7, 2013.  Who is Rebecca Foreman?

11:30  10  A.    She's his secretary.

11:30  11  Q.    And who is Jennifer Goodwin?

11:30  12  A.    She's with BrownGreer.

11:30  13  Q.    And here's a number of claims that Rebecca Goodwin

11:30  14  [verbatim] is asking Jennifer Goodwin to take a look at.

11:30  15  A.    Yes.

11:30  16  Q.    Whitco Supply, Talen's Marine, Andry Law Firm, Premium

11:30  17  Catering -- it looks like some kind of a typo, but DODL

11:30  18  Equipment?

11:30  19  A.    Yes.

11:30  20  Q.    Were those all the same claims that were on that e-mail

11:30  21  that your counsel showed you?

11:30  22  A.    It wasn't my counsel, but I don't know.  I recognize

11:30  23  Talen's.  The only one I was looking at was Talen's Marine, to

11:30  24  be honest.  I don't know what the other ones were.

11:31  25  Q.    They are in the same claims.

LIONEL SUTTON III - CROSS

11:31   1   **A.**   Okay.

11:31   2   **Q.**   We can look at them.  We can get the other --

11:31   3   **A.**   You asked me.  I don't remember.  If they were, they were.

11:31   4   **Q.**   So Mr. Juneau's assistant is asking BrownGreer about the

11:31   5   status of these claims?

11:31   6   **A.**   That's how I read that e-mail, but I wasn't included on

11:31   7   that e-mail.  I don't know what you are asking me.

11:31   8   **Q.**   You said that you never spoke to Jon Andry about the Thonn

11:31   9   claim.  Am I remembering your testimony correctly?

11:31   10   **A.**   I said I don't have a recollection of ever speaking to Jon

11:31   11   about the Thonn claim.  I don't recall ever having any

11:31   12   conversation with him about it.

11:31   13   **Q.**   The text messages that you're sharing with Jon Andry in

11:31   14   the time period that you're also looking up claims that are

11:31   15   from the Andry Lerner law firm, were those text messages

11:31   16   involving Mr. Andry's claims?

11:32   17   **A.**   I don't know.  I remember Jon asking me about two claims,

11:32   18   the two that I didn't remember the name.  I remember him asking

11:32   19   me at some point about Talen's.  I remember Pat asking me about

11:32   20   Talen's.  I don't remember Jon ever discussing Thonn with me.

11:32   21   I mean, that's what I've been saying.

11:32   22   **Q.**   Okay.  And the two claims you remember -- he said

11:32   23   Motivation and Vishnu were two of the claims?

11:32   24   **A.**   No.  I didn't remember the names.  I said I remember him

11:32   25   asking me about two claims that I didn't remember the names.

LIONEL SUTTON III - CROSS

11:32  1    They showed me two claims.  Those must be the names.  I don't

11:32  2    remember -- I don't have an independent recollection of those

11:32  3    particular claims.

11:32  4    **Q.**   Let's take a look at a timeline for March 15.

11:33  5           You have a number of text messages with Mr. Andry,

11:33  6    and then 10-16 you have an e-mail where you're asking

11:33  7    Mr. Cahill about the status of the Thonn money.

11:33  8    **A.**   Yes.

11:33  9    **Q.**   Do you see that on that exhibit?

11:33  10   **A.**   Yes.

11:33  11          **MR. PAW:**  Let's go down further, please.

11:33  12   **BY MR. PAW:**

11:33  13   **Q.**   A number of more text messages in the morning with

11:33  14   Mr. Andry.  You say here -- 11-26, Sutton to Lerner:  "Jon told

11:33  15   me that he just disbursed.  So you won't get it for a few

11:33  16   days," referring to the Thonn payment; is that correct?

11:33  17   **A.**   What time?  I'm sorry.  I'm trying to read it.

11:33  18   **Q.**   11-26.  Right there, sir.

11:33  19   **A.**   Yes.

11:33  20   **Q.**   Do you remember that e-mail?

11:33  21   **A.**   No.

11:33  22   **Q.**   Now, following the string of -- I don't know, you can

11:33  23   count them up -- 20, 30 text messages that you had with Jon

11:34  24   Andry, did you ask Jon Andry in the course of those text

11:34  25   messages when he was going to be disbursing the Thonn claim?

## LIONEL SUTTON III - CROSS

11:34  1   **A.**   I told you I don't have any recollection of ever

11:34  2   discussing the Thonn claim with Jon Andry.  That's all I can

11:34  3   tell you.

11:34  4   **Q.**   Did you make the information up in this e-mail, "Jon told

11:34  5   me he just disbursed.  So you won't get it for a few days"?

11:34  6   **A.**   No, I doubt it.

11:34  7   **Q.**   You didn't lie about it?

11:34  8   **A.**   I don't think so.

11:34  9   **Q.**   Then 11:59 Sutton looks up the Motivation, Inc. claim --

11:34  10  **A.**   Yes.

11:34  11  **Q.**   -- right?  That's one of the claims that we have been

11:34  12  talking about here, and that's after a few text messages from

11:34  13  Jon Andry?

11:34  14  **A.**   I remember Jon asking me to look up a claim that I

11:34  15  couldn't recall the name of.  That seemed to be the claim.

11:34  16  **Q.**   And it's logical, when that look-up follows two text

11:34  17  messages from Jon Andry, that those text messages were asking

11:34  18  you in some way to look that claim up for him?

11:34  19  **A.**   Oh, I don't know about that.

11:34  20  **Q.**   How did you know to look that claim up?

11:34  21  **A.**   I remember him asking me.

11:34  22  **Q.**   How did he ask you?

11:35  23  **A.**   I remember talking to him.  I thought I remembered him

11:35  24  asking me.  I don't remember the text messages.  It could have

11:35  25  been, but I don't know.  I can't tell you.  I don't know.

LIONEL SUTTON III - CROSS

11:35  1   **Q.**   Well, here's the records.  These are the records here.

11:35  2   **A.**   I see that there was a text message from me to Jon and

11:35  3   then a text message from Jon to me.  I don't recall what those

11:35  4   messages were about.

11:35  5   **Q.**   Let's see if there is one more that you can try to learn a

11:35  6   little -- see if you understand what it's about.  Lerner to

11:35  7   Sutton:  "Okay.  What do I owe you?  What did he send me for

11:35  8   you?"

11:35  9   **A.**   Yes.

11:35  10  **Q.**   You text-messaged to Jon.  Jon text-messages to you.  Jon

11:35  11  text-messages again to you.  And then you e-mail back to Lerner

11:35  12  "16,665."

11:35  13  **A.**   Right.  I see the e-mails and I see what you have as text

11:35  14  messages, yes.

11:35  15  **Q.**   Did you just ask in those three text messages Jon Andry

11:35  16  about how much he had sent to Lerner for the Thonn claim?

11:36  17  **A.**   Mr. Paw, I've told you a number of times I don't have any

11:36  18  recollection of speaking to Jon Andry about the Thonn claim.  I

11:36  19  just don't.  You can ask me it over and over again.  I don't

11:36  20  have any recollection of that.

11:36  21  **Q.**   Is it a wrong assumption to think that in those three

11:36  22  messages you are asking him about the Andry claim?

11:36  23  **A.**   Probably.

11:36  24  **Q.**   It's probably wrong?

11:36  25  **A.**   Yeah.

LIONEL SUTTON III - CROSS

11:36  1        **MR. UNGLESBY:**  Your Honor --

11:36  2        **THE WITNESS:**  Because we weren't -- there is nothing

11:36  3  about the Andry claim.  I'm not sure what you --

11:36  4        **MR. UNGLESBY:**  My objection is I don't know about

11:36  5  assumptions being evidence.  That's argument, but it's not

11:36  6  evidence.

11:36  7        **THE COURT:**  Overrule the objection.

11:36  8  BY MR. PAW:

11:36  9  **Q.**   Mr. Sutton, you also said that you never received any

11:36  10 money from Andry or Andry Lerner; is that correct?

11:37  11 **A.**   I don't know if I said that.

11:37  12 **Q.**   I thought that's what I heard you say earlier today.

11:37  13 **A.**   I got the Thonn fee.  I'm not sure what you --

11:37  14 **Q.**   Well, that's my point exactly.  You received money from

11:37  15 the Andry Lerner law firm in the Thonn claim?

11:37  16 **A.**   I received the Thonn fee.  I don't think that's ever been

11:37  17 in dispute.  I mean, that was what was on the board when we

11:37  18 started this morning.  I'm not sure what you are asking me.

11:37  19 **Q.**   What seems to be in dispute, though, is that that Thonn

11:37  20 fee comes from the Andry Lerner law firm, right?

11:37  21 **A.**   Andry Lerner represented Thonn.  Yes.  I would assume

11:37  22 that's where -- who had the fee.

11:37  23 **Q.**   Just because the wire transfer comes from Glen Lerner's

11:37  24 law firm doesn't mean that you didn't get the fee from Andry

11:37  25 Lerner?

## LIONEL SUTTON III - CROSS

11:37  1   **A.**   That would be correct, yes.

11:37  2   **Q.**   Right?  You can agree with that?

11:37  3   **A.**   Yes.

11:37  4   **Q.**   It's a pretty simple assumption.

11:37  5   **A.**   That would be my assumption.

11:37  6   **Q.**   And you were shown some e-mails that you sent with

11:37  7   Mr. Lerner where you were talking about claim status.  You said

11:37  8   none of it is confidential, just sharing information about his

11:37  9   claims.

11:37  10              But I noticed something about both of those e-mails.

11:38  11   You said in one:  "A lot of claims got in front of yours."

11:38  12   **A.**   Yes.

11:38  13   **Q.**   Then you said in the other:  "At an intake rate of more

11:38  14   than 200 claims per day, your clients will be way behind."

11:38  15   **A.**   Yes.

11:38  16   **Q.**   So what you are saying to Mr. Lerner is the timing of when

11:38  17   a claim gets looked at is important?

11:38  18   **A.**   No.  What I was saying is that if you don't respond to the

11:38  19   incompleteness notices -- and people were filing 200 claims a

11:38  20   day.  If you don't respond to incompleteness notices, you are

11:38  21   going to get way behind.  I mean, that was my point.

11:38  22   **Q.**   So if your claim is way behind, it's going to take a lot

11:38  23   longer to process than if someone can say, "Oh, we are going to

11:38  24   have it determined or considered earlier"?

11:38  25   **A.**   If you don't respond to your incompleteness notices in a

LIONEL SUTTON III - CROSS

11:38  1    timely manner, you are going to get way behind.  That's what I
11:38  2    told him.  I think that's pretty -- I think everybody knows
11:38  3    that.
11:38  4              MR. PAW:  No further questions, Your Honor.
11:38  5              THE COURT:  All right.  I forgot, did you call this
11:38  6    witness originally?
11:38  7              MR. UNGLESBY:  I did.
11:39  8              THE COURT:  It's been so long ago.  Do you have any
11:39  9    redirect?
11:39  10             MR. UNGLESBY:  No, sir, I don't have any redirect.
11:39  11             THE COURT:  Mr. Sutton, you can step down.
11:39  12                  Call your next witness.
11:39  13             MR. UNGLESBY:  Wait.  I don't know if Mr. Lerner did.
11:39  14             THE COURT:  You called the witness.
11:39  15             MR. UNGLESBY:  I'm sorry --
11:39  16             THE COURT:  You called -- he was your witness.
11:39  17             MR. UNGLESBY:  In theory, but --
11:39  18             THE WITNESS:  Well, you called him.
11:39  19                  You can step down, Mr. Sutton.
11:39  20                  Okay.  Do you have another witness,
11:39  21    Mr. Unglesby?
11:39  22             MR. UNGLESBY:  Ms. Tate.  This is a very short
11:39  23    witness.
11:39  24             THE COURT:  Good.
       25

LESLIE INGRAM - DIRECT

| | | |
|---|---|---|
| 11:39 | 1 | **LESLIE INGRAM,** |
| 11:39 | 2 | having been duly sworn, testified as follows: |
| 11:39 | 3 | **THE DEPUTY CLERK:**  State your full name and correct |
| 11:39 | 4 | spelling for the record, please. |
| 11:40 | 5 | **THE WITNESS:**  My name now is Leslie Ingram, |
| 11:40 | 6 | I-N-G-R-A-M.  My address is 398 Azalea Drive, Mandeville 70471. |
| 11:40 | 7 | **DIRECT EXAMINATION** |
| 11:40 | 8 | BY MR. UNGLESBY: |
| 11:40 | 9 | **Q.**   Your father was Perrin Butler, the lawyer? |
| 11:40 | 10 | **A.**   Yes. |
| 11:40 | 11 | **Q.**   Ms. Tate, do you have occasion to work for Jon Andry? |
| 11:40 | 12 | **A.**   Yes. |
| 11:40 | 13 | **Q.**   What did you do there? |
| 11:40 | 14 | **A.**   I was paralegal and basically headed up his BP claims |
| 11:40 | 15 | section. |
| 11:40 | 16 | **Q.**   Did you work with Christina Mancuso? |
| 11:40 | 17 | **A.**   Yes. |
| 11:40 | 18 | **Q.**   During the course of that, did you ever come to know a |
| 11:40 | 19 | person named Tiger Sutton? |
| 11:40 | 20 | **A.**   I did not know him personally. |
| 11:40 | 21 | **Q.**   Did you send him an e-mail that the judge has previously |
| 11:40 | 22 | seen regarding a guy named Casey Thonn? |
| 11:40 | 23 | **A.**   Yes. |
| 11:40 | 24 | **Q.**   And that involved an expert report of Coastal Claims? |
| 11:40 | 25 | **A.**   Yes. |

LESLIE INGRAM - DIRECT

1    **Q.**   And why did you do that?

2    **A.**   Casey asked me to.

3    **Q.**   When you were questioned by the special master, you

4    couldn't remember why you did it --

5    **A.**   Correct.

6    **Q.**   -- but after you reflected on it, you realized Casey Thonn

7    asked you to send it to Tiger Sutton?

8    **A.**   Correct.

9    **Q.**   Now, at the time that occurred in the summer of 2012,

10   Tiger Sutton didn't work at the claims office, did he?

11   **A.**   Correct.

12   **Q.**   So as far as you, he, or anyone else knew, there was no

13   reason he couldn't have it.  Casey Thonn wanted him to have it,

14   and that was his lawyer?

15   **A.**   As far as I knew, yes.

16   **Q.**   All right.  And he approved that.  Casey Thonn

17   specifically asked for that?

18   **A.**   Yes, he specifically asked me to send it to him.

19   **Q.**   All right.  Then as far as -- it said in the report that

20   you were troubled, the way it was written -- the word you were

21   "troubled" about the lack of a referral agreement.

22            Are you troubled -- were you troubled, Ms. Ingram?

23   **A.**   No.

24   **Q.**   All right.  In fact, in those days there were lots of

25   cases running through there.  People were trying -- were in

LESLIE INGRAM - DIRECT

1   competition to get them.  Part of your job and Mr. Andry's job
2   and Ms. Mancuso's job and Ms. LeBoeuf's job and anyone else
3   there was to take in -- intake and process claims.  If people
4   wanted referral agreements, you sent them to them as fast as
5   you could?
6   A.   Correct.
7   Q.   And it just depended on what the particular individual
8   instructions were?
9   A.   Correct.
10  Q.   As far as you were concerned, Mr. Thonn, in the summer of
11  that year, certainly had a lawyer, Tiger Sutton, because you
12  were communicating with him?
13  A.   I personally wasn't communicating with him other than the
14  one e-mail.  But, yes, as far as I knew, yes.
15  Q.   And Jon told you, did he not, that he didn't think there
16  would be a referral agreement?
17  A.   Correct.
18  Q.   Now, the way this worked, though, is actually, depending
19  on the different agreements with the different lawyers --
20  20 percent was the fee, not 40, the way it was written in the
21  report?
22  A.   Correct.  20 percent was the fee that the judge had
23  limited all attorneys' fees to.
24  Q.   Right.  So if you were splitting it, it would be
25  10 percent each or whatever the agreement was?

**LESLIE INGRAM - DIRECT**

11:43  1   **A.**   Correct.

11:43  2   **Q.**   All right.  Now, at some point you had a conversation with

11:43  3   Jon, and he said he couldn't believe that Tiger was asking for

11:43  4   a fee.  And your understanding was that basically there was no

11:43  5   more discussion about it, and you didn't think Jon agreed to

11:43  6   pay him a fee, did you?

11:43  7   **A.**   Correct.

11:43  8   **Q.**   And you don't know -- you didn't know ever whether Tiger

11:43  9   Sutton got paid a fee?

11:43  10   **A.**   No, I did not.  I was no longer working there.

11:43  11   **Q.**   Now, in the time that you did work there, after Tiger came

11:43  12   there, did you ever have any inclination -- indication,

11:43  13   information, suggestion that somehow Andry Lerner cases would

11:43  14   get special treatment or better treatment by the claims

11:44  15   administration office?

11:44  16   **A.**   Absolutely not.

11:44  17   **Q.**   Did any of your problems that you may have had with

11:44  18   communication in the claims administration office go away

11:44  19   because Tiger Sutton showed up there?

11:44  20   **A.**   Absolutely not.

11:44  21   **Q.**   The same administrative difficulties that always occurred,

11:44  22   good and bad?

11:44  23   **A.**   Yes.

11:44  24   **Q.**   And the system itself, as set up at the claims office,

11:44  25   wasn't it intended to be completely transparent so that anybody

LESLIE INGRAM - CROSS

11:44  1  could learn about their claim as long as they knew how to
11:44  2  access it through the portal?
11:44  3  A.   That was my understanding.
11:44  4  Q.   Right.  And there was no -- the goal of the claims office
11:44  5  was to help people get their claims paid?
11:44  6  A.   That was our understanding, yes.
11:44  7  Q.   This was not an adversarial proceeding with BP.  When you
11:44  8  wanted to file a claim, you didn't have to ask BP, like you do
11:44  9  in a lawsuit, what their position is.  This was a claims
11:45  10 office?
11:45  11 A.   Correct.
11:45  12       MR. UNGLESBY:  Thank you.
11:45  13       THE COURT:  Anybody else have any questions?
11:45  14       MR. UNGLESBY:  Ms. Hardin has some questions.
11:45  15       MS. HARDIN:  Yes, Your Honor.  Briefly.  Pauline
11:45  16 Hardin on behalf of Glen Lerner.
11:45  17                    CROSS-EXAMINATION
11:45  18 BY MS. HARDIN:
11:45  19 Q.   Now, Ms. Ingram, you said that you worked for the Andry
11:45  20 Lerner law firm.  Could you tell us the approximate dates?
11:45  21 A.   Well, I began working for Jon Andry in November of 2010.
11:45  22 I believe it was sometime in 2011 is when he partnered with
11:45  23 Glen to form Andry Lerner.  And because I was primarily heading
11:45  24 up the BP section and that's what they had partnered for, I was
11:45  25 then transferred to payroll under Andry Lerner.

**LESLIE INGRAM - CROSS**

11:45  1   **Q.**   When did you end your relationship with Andry Lerner?

11:46  2   **A.**   October 31, 2012, was my last full-time day, and then

11:46  3   November 1 through the 15 I worked contract for -- I think it

11:46  4   was either two or three days a week to help transition them

11:46  5   between me leaving and the rest of the staff filling the spot.

11:46  6   **Q.**   Now, we know you were interviewed by the special master.

11:46  7   Can you tell the Court how you were contacted?

11:46  8   **A.**   Well, I originally found out about the meeting because an

11:46  9   Outlook calendar notice popped up.  Then after I saw that,

11:46  10  about an hour or so later I got a phone call from someone, I

11:46  11  guess, with Mr. Freeh's office.

11:46  12  **Q.**   And did you ask that representative of Mr. Freeh's office

11:47  13  anything?

11:47  14  **A.**   Yes.  I asked him if I could have my fiancé come with me.

11:47  15  They said "No."

11:47  16          Then I asked if I should -- if I could bring an

11:47  17  attorney, and their response was, "Well, no one can be in the

11:47  18  room with you."  So I took that as no.

11:47  19  **Q.**   All right.  And did you go and were you interviewed by a

11:47  20  representative of Mr. Freeh's staff?

11:47  21  **A.**   Yes.

11:47  22  **Q.**   And you went alone?

11:47  23  **A.**   Yes.

11:47  24  **Q.**   Was your interview recorded in any fashion?

11:47  25  **A.**   Not that I was aware of other than handwritten notes.

LESLIE INGRAM - CROSS

11:47  1  **Q.**   And were you ever given a copy of those handwritten notes
11:47  2  by Mr. Freeh's representatives?
11:47  3  **A.**   No, no, I was not.
11:47  4  **Q.**   So you never got a chance to look at them --
11:47  5  **A.**   No.
11:47  6  **Q.**   -- or review them for accuracy?
11:47  7  **A.**   Correct.  No, I was not.
11:47  8  **Q.**   And you have provided an affidavit to the Court indicating
11:47  9  that they are inaccurate in a number of ways, right?
11:47  10  **A.**   Yes.
11:47  11          **MS. HARDIN:**  All right.  Let's look at Lerner 3.  If
11:48  12  you could pull that up, the first page.
11:48  13             All right.  If you would go to that first part
11:48  14  and highlight it.
11:48  15  **BY MS. HARDIN:**
11:48  16  **Q.**   Do you see that this is the interview of Leslie Butler
11:48  17  Tate?
11:48  18  **A.**   Yes.
11:48  19  **Q.**   That's you, right?
11:48  20  **A.**   Yes.
11:48  21  **Q.**   It says "Date, Time, August 8, 1:00"; is that right?
11:48  22  **A.**   No, that is not correct.
11:48  23  **Q.**   When was it?
11:48  24  **A.**   August 2.
11:48  25  **Q.**   And have you gone back to your records to make sure that

LESLIE INGRAM - CROSS

11:48  1    you are right?

11:48  2    A.   Yes.

11:48  3    Q.   So you were not interviewed on this date?

11:48  4    A.   No, I was not.

11:48  5    Q.   Going to the second page.

11:49  6    A.   May I make one comment about the date?  I did call -- when

11:49  7    the report came out, I called Mr. Tidwell, who had been one of

11:49  8    the people who interviewed me, to let him know that that was

11:49  9    incorrect in the report.  And he told me, "Don't worry about

11:49  10   it."

11:49  11          MS. HARDIN:  All right.  Next go to the second page,

11:49  12   the third paragraph.

11:49  13          If you could highlight the part that says:  "The

11:49  14   Thonn claim with the Sutton referral fee was the only one."  Do

11:49  15   you see that?  It starts at the end of the fourth line.  Keep

11:49  16   going.  It starts there.  Then go to the end of "she stated

11:49  17   that this troubled her."

11:49  18   BY MS. HARDIN:

11:50  19   Q.   All right.  When they were talking to you, they were

11:50  20   talking to you about a referral fee, correct?

11:50  21   A.   Correct.

11:50  22   Q.   All right.  And a referral fee to a law firm means

11:50  23   something, does it not?

11:50  24   A.   Yes.

11:50  25   Q.   And is a referral fee necessarily the same thing as a fee

LESLIE INGRAM - CROSS

11:50  1    that was earned by a law firm?

11:50  2    A.   No, not as far as I understand it.

11:50  3    Q.   All right.  And so they have you stating here that "the

11:50  4    Thonn claim with a Sutton referral fee was the only one without

11:50  5    an agreement contract while she worked at Andry Lerner.  She

11:50  6    stated that this troubled her."

11:50  7         Did you tell them that?

11:50  8    A.   No.

11:50  9    Q.   What did you tell them?

11:50  10   A.   That there was no referral agreement on -- with the Sutton

11:50  11   and Reitano, there was no referral agreement for the Casey

11:50  12   Thonn claim.  I did not have a paper that was signed by anyone

11:51  13   that said that there was a referral agreement.

11:51  14   Q.   And did you tell them that this troubled you?

11:51  15   A.   No, I did not.

11:51  16   Q.   Were there other cases where the paperwork didn't

11:51  17   necessarily --

11:51  18   A.   Yes.

11:51  19   Q.   -- all get together?

11:51  20   A.   Yes.  The way we were working the claims, as different

11:51  21   attorneys partnered up with Jon to refer claims over, they

11:51  22   wanted us to get started working on them right away.  And

11:51  23   sometimes it was an after-the-fact that once we started getting

11:51  24   claims from those attorneys, their paperwork between Jon and

11:51  25   Glen and that referring firm -- it would take a little bit of

LESLIE INGRAM - CROSS

11:51   1   time to get that in.  But it was always in before disbursements

11:51   2   were done.

11:51   3   Q.   All right.  And while the investigators were questioning

11:52   4   you, did you at that time have a sense of any concerns about

11:52   5   the way they were questioning you?

11:52   6   A.   Several times, when I would give a response, it felt like

11:52   7   they were kind of twisting it to try and fit into an agenda.  I

11:52   8   would make a comment or a statement, and then they would reword

11:52   9   it, trying to get me to agree that that was what I was stating.

11:52  10   A couple of times, "No, that's not what I mean by that."

11:52  11          So, to me, it felt like there was predetermined

11:52  12   agenda of what exactly they were trying to find out.

11:52  13          MS. HARDIN:  Okay.  If you would look at the last

11:52  14   page of the document, the paragraph that starts with "finally."

11:53  15          If you would highlight the "finally" paragraph

11:53  16   above that.

11:53  17   BY MS. HARDIN:

11:53  18   Q.   All right.  They say at the end of their report:

11:53  19   "Finally, we explained the meeting should be kept in confidence

11:53  20   and not discussed with anyone else," and then they say, "except

11:53  21   legal counsel, including other employees or anyone outside of

11:53  22   the CSSP."

11:53  23          What do you recall them telling you?

11:53  24   A.   Everything except the portion about "except legal

11:53  25   counsel."

LESLIE INGRAM - CROSS

11:53  1  **Q.**   So they told you you shouldn't discuss --

11:53  2  **A.**   Yes.

11:53  3  **Q.**   -- your interview with anyone?

11:53  4  **A.**   Correct.

11:53  5  **Q.**   And they didn't tell you you could talk to legal counsel

11:53  6  about it?

11:53  7  **A.**   I don't remember them bringing up legal counsel at all.

11:53  8         **MS.  HARDIN:**  Thank you very much.

11:54  9         **THE COURT:**  Mr. Paw, your questions.

11:45  10        **MR. PAW:**  Yes, Your Honor.  Briefly.

11:54  11             Hi, Ms. Ingram.

11:54  12        **THE WITNESS:**  Hi.

11:54  13        **MR. PAW:**  Counsel, could you leave Exhibit 3 up,

11:54  14  please?

11:54  15        **MS.  HARDIN:**  Okay.  Could I do one further

11:54  16  statement?  If that would be all right.

11:54  17  **BY MS.  HARDIN:**

11:54  18  **Q.**   You talked briefly with Mr. Unglesby about a conversation

11:54  19  you had with Mr. Andry and a comment that he made about Sutton

11:54  20  wanting a fee.

11:54  21             Could you discuss that in a little more detail for

11:54  22  the Court, what Jon Andry said, what that conversation was

11:54  23  about, how it was brought up?

11:54  24  **A.**   Jon and I were getting ready to have a meeting in a

11:55  25  conference room at his office.  I was already in the conference

LESLIE INGRAM - CROSS

11:55  1   room.  Jon walked in and said, "Can you believe Tiger wants a
11:55  2   fee on the Thonn case?"
11:55  3          My response was, "I didn't think we could do that."
11:55  4   And that was the end of the conversation.  We went about our
11:55  5   business.  That was the extent of that conversation.
11:55  6   Q.   And when did that take place?
11:55  7   A.   It had to have been sometime while I was on the contract
11:55  8   part-time, so sometime between November 1 and 15, because what
11:55  9   we were discussing was the wrapping up of me being there.
11:55  10         MS.  HARDIN:  Thank you.
11:55  11         THE COURT:  Why did you say you didn't think you
11:55  12   could do that?
11:55  13         THE WITNESS:  It was my understanding that because
11:55  14   Tiger was now at that point working at the claims center, he
11:55  15   was not allowed to have a fee on the case.  That was all I
11:55  16   knew.
11:55  17         THE COURT:  Okay.  Go ahead, Mr. Paw.
11:55  18         MR. PAW:  Thank you, Your Honor.
11:55  19                    CROSS-EXAMINATION
11:55  20   BY MR. PAW:
11:56  21   Q.   So your time at the Andry Lerner law firm overlapped
11:56  22   roughly two weeks with the time that Mr. Sutton was working at
11:56  23   the claims office; is that correct?
11:56  24   A.   I don't remember the date he started.  I don't know.
11:56  25   Q.   How did you come to know that he started there?

LESLIE INGRAM - CROSS

1    **A.**    I'm sure someone in the office told me.  Jon probably told

2    me.  I don't remember exactly.

3    **Q.**    Mr. Unglesby just asked you the question about did things

4    magically improve or get better.  If I represent to you that

5    everyone in the courtroom's agreed that November 1 was his

6    first day at work and your last day at the firm was

7    November 15, it's not like you had a tremendous amount of

8    overlap with Mr. Sutton's tenure, is there?

9    **A.**    No.

10            **MR. PAW:**  Counsel, could you highlight that sentence

11   you highlighted before about the referral.  I think it was on

12   the second page, something about -- that sentence about "she

13   stated that this troubled her."  Yes, that sentence, and the

14   sentence above that.

15   **BY MR. PAW:**

16   **Q.**    You were asked some questions about this sentence in the

17   report.  Now, as I understand it, what your testimony is -- and

18   I think I understood this from the time that you met with the

19   staff here -- by the time that a claim got to the settlement

20   stage, that is, disbursement, every claim except for the Thonn

21   claim did have a referral fee agreement in place.  There may

22   have been some delay in getting it to the firm, but by the time

23   you get to settlement everybody has the written paperwork in

24   place?

25   **A.**    If it was a referral claim, yes.

LESLIE INGRAM - CROSS

11:57  1  **Q.**   Right.  And that's what I understood that you told us.

11:58  2  **A.**   Yes.

11:58  3  **Q.**   You said, "If there is a referral, by the time you get to

11:58  4  settlement, there is going to be the referral paperwork in

11:58  5  place."

11:58  6  **A.**   Correct.  And --

11:58  7  **Q.**   Go ahead.

11:58  8  **A.**   I told you all that we didn't have a referral contract on

11:58  9  Thonn.  And when I asked Jon if there was going to be a

11:58  10 referral contract, he said no.

11:58  11 **Q.**   And my point really is that other than Thonn, you don't

11:58  12 know of a case where the disbursement was made and there wasn't

11:58  13 a written referral agreement in place?

11:58  14 **A.**   If it was a referring claim.  I mean, we had claims in the

11:58  15 office that were directly with Andry Lerner or Andry law group.

11:58  16 **Q.**   Of course.  Those claims you are not going to have a

11:58  17 referral agreement no matter what.

11:58  18 **A.**   Correct, correct.

11:58  19 **Q.**   I'm talking about the claims where you have a referral

11:58  20 fee.  For those claims, by the time you make a disbursement,

11:58  21 except for the Thonn claim, all those claims you had a written

11:58  22 referral agreement in place?

11:59  23 **A.**   Correct.  But still, Thonn was not a referral claim as far

11:59  24 as I was understanding because we didn't have a referral

11:59  25 agreement.

**LESLIE INGRAM - CROSS**

11:59    1    **Q.**    Right.  You say that because from your experience you

11:59    2    didn't know that there was a referral fee in the Thonn case?

11:59    3    **A.**    Correct.

11:59    4    **Q.**    And you were actually the person who disbursed the first

11:59    5    payment that came from the DHECC to Mr. Thonn, correct?

11:59    6    **A.**    Probably.  I don't remember exactly.

11:59    7    **Q.**    I'll show you the paperwork.

11:59    8    **A.**    That time frame, probably at the time that's what I was

11:59    9    doing.

11:59    10   **Q.**    Okay.  Take a look at Exhibit 10, please.  This is going

11:59    11   to be up on the screen from our projector.

11:59    12             Ma'am, can you see that on your screen?

11:59    13   **A.**    Yes.

11:59    14   **Q.**    Do you recognize what that document is?

11:59    15   **A.**    Yes.

11:59    16   **Q.**    What is that?

11:59    17   **A.**    It's a settlement accounting form that I filled out for

12:00    18   the Casey Thonn VoO claim.

12:00    19   **Q.**    Vessel of opportunity claim?

12:00    20   **A.**    Yes.

12:00    21   **Q.**    That claim was paid for roughly $49,400, correct?

12:00    22   **A.**    Correct.

12:00    23   **Q.**    Here you have this settlement sheet dated October 19,

12:00    24   2012, correct?

12:00    25   **A.**    Correct.

LESLIE INGRAM - CROSS

| | | |
|---|---|---|
| 12:00 | 1 | **Q.**   And then, what, you sit across the table from Mr. Thonn |
| 12:00 | 2 | and you go through this sheet with him? |
| 12:00 | 3 | **A.**   I don't remember if I did or if Christina Mancuso did, but |
| 12:00 | 4 | one of us would have sat -- I don't remember if he came in or |
| 12:00 | 5 | if we mailed it to him.  I don't remember.  Sometimes the |
| 12:00 | 6 | clients, if they were out of town or they didn't want to come |
| 12:00 | 7 | to the office, they would ask us to mail it to them.  They |
| 12:00 | 8 | would read through it, call us if they had any questions, sign |
| 12:00 | 9 | it, mail it back. |
| 12:00 | 10 | **Q.**   The key thing is that you have a piece of paper that |
| 12:00 | 11 | explains all the expenses, all the deductions from the award, |
| 12:00 | 12 | correct? |
| 12:00 | 13 | **A.**   Correct. |
| 12:00 | 14 | **Q.**   Is there anything on this form that would indicate to you |
| 12:01 | 15 | that there is a referral being paid in this case? |
| 12:01 | 16 | **A.**   No. |
| 12:01 | 17 | **Q.**   And look through the subsequent pages.  You'll see a |
| 12:01 | 18 | number of checks that went out.  That's page 2, a check to |
| 12:01 | 19 | Casey Thonn himself. |
| 12:01 | 20 | Go back to that for just one second. |
| 12:01 | 21 | That's the actual award check to Mr. Thonn, correct? |
| 12:01 | 22 | **A.**   I guess. |
| 12:01 | 23 | **Q.**   Can you see the payee's name? |
| 12:01 | 24 | **A.**   I see it.  I didn't prepare it, so I don't know. |
| 12:01 | 25 | **Q.**   But it's part of the business record that goes with the |

LESLIE INGRAM - CROSS

12:01 1 settlement sheet, isn't it?

12:01 2 **A.** Okay -- well, no, not while I was there. I wouldn't have

12:01 3 had this. The office manager would have had this.

12:01 4 **Q.** Would the settlement accounting sheet be something you

12:01 5 would have seen?

12:01 6 **A.** The settlement accounting sheet I prepared, and then I

12:01 7 would give that -- once it was approved, signed by me and the

12:01 8 client, I would then give that to the office manager, who would

12:02 9 cut the checks.

12:02 10 **THE COURT:** Mr. Paw, let's see if we can move this

12:02 11 along.

12:02 12 **MR. PAW:** Yes, Your Honor.

12:02 13 **BY MR. PAW:**

12:02 14 **Q.** Ma'am, I have just one last question for you. You signed

12:02 15 an affidavit earlier in this case, and you said in that

12:02 16 affidavit that -- you talked about the referral fee percentage.

12:02 17 You said, "That meant 40 percent was the split

12:02 18 between attorneys under normal circumstances, depending on what

12:02 19 work they had done or planned to do in the future. We would

12:02 20 split 60 percent of the attorneys' fees to Andry Lerner and

12:02 21 40 percent of the attorneys' fees to the referring attorney."

12:02 22 Is that accurate?

12:02 23 **A.** Yeah.

12:02 24 **Q.** Under normal circumstances, the split is 40/60?

12:02 25 **A.** I mean, it depended on which attorney it was. Most of the

**LESLIE INGRAM – REDIRECT**

1  splits were 40/60, some were 50/50, some were 30/70.

2  **Q.**   Understood.  Your affidavit says "under normal

3  circumstances 40/60."  Thank you, ma'am.

4            **MR. PAW:**  No further questions.

5            **THE COURT:**  Any redirect of this witness?

6            **MR. UNGLESBY:**  One.

7                  **REDIRECT EXAMINATION**

8  **BY MR. UNGLESBY:**

9  **Q.**   Ms. Ingram, as far as you know, Jon Andry did not believe

10  there was ever going to be a referral fee paid to Tiger Sutton,

11  did he?

12  **A.**   As far as I knew, no.  Jon never indicated that there was

13  going to be a fee, referral fee.

14  **Q.**   At this time frame of Mr. Paw's discussion, October of

15  2012, Sutton hadn't gone to work there yet?

16  **A.**   As far as I knew, no.

17  **Q.**   So the money staying in the account behind and eventually

18  disbursed in December that makes up this amount, you don't know

19  what happened between October and December in terms of

20  Jon Andry and anybody else and Tiger Sutton?

21  **A.**   I have no idea, no.  I was not working there.

22  **Q.**   But you do know that he said, as far as he knew, no.

23  **A.**   Correct.

24            **MR. UNGLESBY:**  That's all.

25            **THE COURT:**  All right, ma'am.  You can step down.

| | | |
|---|---|---|
| 12:04 | 1 | Thank you. |
| 12:04 | 2 | We are going to take a recess for lunch.  Let me |
| 12:04 | 3 | ask counsel how many -- I'm trying to get a sense of how many |
| 12:04 | 4 | witnesses we have left.  That's going to determine how long the |
| 12:04 | 5 | lunch hour is. |
| 12:04 | 6 | MR. UNGLESBY:  For Mr. Andry, I have no more |
| 12:04 | 7 | witnesses. |
| 12:04 | 8 | THE COURT:  Mr. Lerner. |
| 12:04 | 9 | MR. TAYLOR:  William Taylor for Mr. Lerner, |
| 12:04 | 10 | Your Honor.  I believe that we are satisfied with the record, |
| 12:04 | 11 | with the state that it's in, and probably will not call any |
| 12:04 | 12 | additional witnesses. |
| 12:04 | 13 | I would like to ask the Court, if you please, |
| 12:04 | 14 | whether you intend to permit counsel to argue this afternoon. |
| 12:04 | 15 | THE COURT:  Probably not, but we will see. |
| 12:04 | 16 | MR. TAYLOR:  I do want to place some objections on |
| 12:04 | 17 | the record. |
| 12:04 | 18 | THE COURT:  We will give you a chance to do that. |
| 12:04 | 19 | Mr. Sutton, do you plan to produce any |
| 12:04 | 20 | additional testimony or evidence? |
| 12:04 | 21 | MR. SUTTON:  I may introduce some exhibits, but I |
| 12:05 | 22 | have no other testimony or witnesses. |
| 12:05 | 23 | THE COURT:  And Mr. Tanner we have already finished, |
| 12:05 | 24 | right? |
| 12:05 | 25 | MS. PIERSON:  We are not. |

12:05  1          **MR. DRAPER:**  We have no intention.

12:05  2          **THE COURT:**  Am I hearing that we are basically

12:05  3  finished with the testimony?

12:05  4          **MR. GELÉ:**  Actually, no, Your Honor.  Stephen Gelé

12:05  5  representing The Andry Law Firm.  We would like to call

12:05  6  Mr. Gibby Andry briefly after lunch.

12:05  7          **THE COURT:**  So Mr. Lerner is not going to testify?

12:05  8          **MR. TAYLOR:**  Correct.  He testified at length before.

12:05  9  We have been through his transcript.

12:05  10         **THE COURT:**  His deposition is in evidence?

12:05  11         **MR. TAYLOR:**  Yes, sir.

12:05  12         **THE COURT:**  Well, I guess we can take an hour for

12:05  13  lunch then.  It's 12:05.  We will come back at 1:05.

12:06  14         **THE DEPUTY CLERK:**  All rise.

12:06  15         (Lunch recess.)

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:40 | 1 | **AFTERNOON SESSION** |
| 01:15 | 2 | **(November 7, 2014)** |
| 01:21 | 3 | THE COURT:  Please be seated. |
| 01:21 | 4 | Good afternoon, everyone.  Let's see.  Where are |
| 01:21 | 5 | we?  Who is next?  Mr. Gelé. |
| 01:21 | 6 | MR. TAYLOR:  On behalf of Glen Lerner we need to |
| 01:21 | 7 | introduce some exhibits into evidence. |
| 01:21 | 8 | THE COURT:  Let's clean up the exhibits after they're |
| 01:21 | 9 | all -- let's take the testimony.  Okay? |
| 01:21 | 10 | MR. TAYLOR:  All right. |
| 01:21 | 11 | THE COURT:  Just remind me of that, Mr. Taylor. |
| 01:21 | 12 | MR. TAYLOR:  And I did want to place on the record |
| 01:21 | 13 | the renewal of the objections we have previously made just |
| 01:21 | 14 | so -- |
| 01:21 | 15 | THE COURT:  You will have a chance to do that after |
| 01:21 | 16 | we complete the testimony. |
| 01:21 | 17 | Go ahead. |
| 01:21 | 18 | MR. GELÉ:  Stephen M. Gelé, of the law firm of |
| 01:21 | 19 | Smith & Fawer, representing The Andry Law Firm, Your Honor.  I |
| 01:22 | 20 | would like to call to the stand Gibby V. Andry IV. |
| 01:22 | 21 | THE COURT:  Very well. |
| 01:22 | 22 | **GILBERT V. ANDRY IV,** |
| 01:22 | 23 | having been duly sworn, testified as follows: |
| 01:22 | 24 | THE DEPUTY CLERK:  State your full name and correct |
| 01:22 | 25 | spelling for the record, please. |

01:22  1        **THE WITNESS:**  Good afternoon, Judge.

01:22  2        **THE COURT:**  Hi.

01:22  3        **THE WITNESS:**  Gilbert V. Andry IV.  I go by "Gibby."

01:22  4   When you are the fourth, you get a nickname, or at least I did.

01:22  5   G-I-L-B-E-R-T, V, A-N-D-R-Y, I-V.  G-I-B-B-Y.

01:22  6                    DIRECT EXAMINATION

01:22  7   BY MR. GELÉ:

01:22  8   **Q.**  Mr. Andry, throughout the questioning today, occasionally

01:22  9   there's been a few errors where attorneys referenced Andry

01:23  10  Lerner or The Andry Law Firm when they meant the other.  Could

01:23  11  you briefly explain to the Court the distinction between

01:23  12  The Andry Law Firm, the Andry Law Group, and Andry Lerner.

01:23  13       **THE COURT:**  I think we have been through this several

01:23  14  times now, and I think I even know that.

01:23  15       **MR. GELÉ:**  We will be very brief, Your Honor.

01:23  16       **THE WITNESS:**  The Andry Law Firm, Judge, is a law

01:23  17  firm that subsumed a partnership between my brother and myself

01:23  18  in about 2000.  It's The Andry Law Firm, LLC.  I'm the managing

01:23  19  partner of that.  I have been since its origination, and I

01:23  20  still am to this day.  It's an ongoing business and files tax

01:23  21  returns yearly.

01:23  22            The Andry Law Group originated as a result of

01:23  23  kind of the BP catastrophe occurring and the Gulf getting

01:24  24  polluted.  I didn't want to do -- no offense, but I didn't want

01:24  25  to do BP claims.  I had kind of started doing catastrophic

GILBERT V. ANDRY IV - DIRECT

1    injuries, single injury claims, and didn't like class action

2    work anymore.  Now, that's been reinforced with all of this,

3    you can bet.

4            My brother wanted to.  That was kind of his

5    model.  So he started the Andry Law Group and then with Glen

6    Lerner formed, I guess, a joint venture where they did BP

7    claims.

8            The Andry Law Firm does not, never has, and

9    never will represent anybody in the BP litigation except for

10   myself and my firm.

11   BY MR. GELÉ:

12   Q.   Did The Andry Law Firm and the Andry Law Group have

13   separate physical offices?

14   A.   Yes.  From the time that BP happened or shortly

15   thereafter -- there might have been a little bit of a

16   transition.  But even at that time, we were on the -- The Andry

17   Law Firm was on the first floor of 610 Baronne Street, and then

18   Andry Law Group was on the second floor.

19           I know we are like the Brady Bunch, Judge.  There's a

20   lot of the Andrys.  My dad and my uncle, all of our kids -- all

21   of their kids have been attorneys, and I know it's a little bit

22   confusing.

23           But ultimately, sometime within that time frame,

24   after BP really started getting going, I moved with The Andry

25   Law Firm down to 828 -- or I should say up to

GILBERT V. ANDRY IV - DIRECT

01:25   1   828 Baronne Street, which is where I have been ever since.

01:25   2   **Q.**   Does the Andry Law Group have any financial interest in

01:25   3   The Andry Law Firm?

01:25   4   **A.**   Absolutely not.

01:25   5   **Q.**   Are you a member of the Andry Law Group?

01:25   6   **A.**   No, I am not.

01:25   7   **Q.**   Does The Andry Law Firm have any financial interest in

01:25   8   Andry Lerner?

01:25   9   **A.**   No, none whatsoever.

01:25   10   **Q.**   Does Andry Lerner have any financial interest in The Andry

01:25   11   Law Firm?

01:25   12   **A.**   No, sir.

01:25   13   **Q.**   Are you a member of Andry Lerner?

01:26   14   **A.**   No, I am not.  Nor have I ever been of either the Andry

01:26   15   Law Group or Andry Lerner.

01:26   16   **Q.**   Much has been made in this case -- much is made in the

01:26   17   Freeh report over phone calls.  Why did you call Mr. Sutton?

01:26   18   **A.**   Well, like I said from the first time that I was

01:26   19   interviewed in that question-and-answer session by Mr. Paw, I

01:26   20   went to law school with Tiger.  I was a year ahead of those

01:26   21   guys -- I'm a little bit older than they are -- and then we

01:26   22   proceeded on with our lives.

01:26   23          At that point in time, my son was playing football at

01:26   24   Newman.  He was a senior.  And I'm one of those football dads,

01:26   25   Judge.  I'm there all the time and get to know all of the

GILBERT V. ANDRY IV - DIRECT

1    parents.

2              Tiger Sutton's son was also playing on that football

3    team.  And I heard just from talking to him periodically that

4    he had started working at some point in time -- I didn't know

5    when, I didn't know the time frame or anything about it -- at

6    the claims office.

7              So when we filed our claim, The Andry Law Firm

8    claim -- which, by the way, I prepared with a CPA, David

9    Kushner, who is a topnotch CPA.  He is the CPA for the Herman

10   firm that's liaison counsel.  He is a very respected guy.  And

11   he suggested we might have a claim.  Had him look at it, and we

12   do have a claim, we did have a claim.  So we filed it.

13             So filed in August.  August comes and goes.  Filed in

14   September.  September comes and goes.  All the way through to

15   December and even after that, I don't hear about it.  I'm

16   calling periodically, saying, "Tiger, check the status.  What's

17   going on here?"  Hardly ever -- I've been a special master

18   before.  I know claimants call.  I know it gets to be a pain in

19   the butt.  So I tried not to call every day.  I tried not even

20   to call every week.  But I knew Tiger from football.  I knew he

21   worked there and called him to check the status, which he did.

22   Q.   Why did you call Tiger Sutton so many times in succession?

23   A.   Anybody in here that's done business with me -- I don't

24   know if it's the Chalmette in me, Judge.  When I get something

25   on my mind, I just keep on dialing.  I will call repeatedly,

GILBERT V. ANDRY IV - DIRECT

01:28  1  one after the other, assuming that they didn't hear the phone
01:28  2  and then finally get them.  That's just the way that I operate.
01:28  3  I always have.  It's a personal problem.  I realize that.
01:28  4       But if you look at the information that's been
01:28  5  provided, it suggests that I called 20 times when I might have
01:28  6  called two, because most of them were misses or we didn't
01:28  7  actually speak.  But I was just calling because checking status
01:28  8  at that point in time was on my mind.  Nothing was getting
01:29  9  done, and I'm hearing about people that I know getting paid.
01:29  10      And it ended up being by March -- or December --
01:29  11 excuse me -- where I knew people that had filed claims after I
01:29  12 did that had already gotten paid, and I hadn't heard word one.
01:29  13 We hadn't even got out of whatever the first stage of it was.
01:29  14 Q.   Did you ever promise Mr. Sutton anything in your
01:29  15 communications with Mr. Sutton?
01:29  16 A.   Absolutely not.
01:29  17 Q.   Did you ever ask for any special treatment from
01:29  18 Mr. Sutton?
01:29  19 A.   Absolutely not.
01:29  20 Q.   To your knowledge, did you receive any special treatment
01:29  21 from Mr. Sutton?
01:29  22 A.   Obviously not, because my claim was stuck in a computer
01:29  23 somewhere until March.
01:29  24 Q.   Did you ever speak to Mr. Sutton about anything other than
01:29  25 The Andry Law Firm claim?

## GILBERT V. ANDRY IV - DIRECT

1  **A.**   Perhaps.  His son played football.  And I'm one of those
2  guys -- I had a nephew that followed my son, and now my
3  youngest son is on the same team, Judge.  And that's one of the
4  things that I enjoy doing and going watching every day.
5  **Q.**   Did you know what ethical obligations Mr. Sutton had in
6  connection with his work at the CAO?
7  **A.**   No.
8  **Q.**   Did you ever --
9  **A.**   Wait.  Nor as a claimant did I ever think that that was
10  something that I needed to know.  I only needed to know one
11  thing:  What was the status?
12  **Q.**   Did you ever discuss The Andry Law Firm's BEL claim with
13  David Duval?
14  **A.**   First of all, I don't know what you mean when you say "BEL
15  claim."  All of those technicalities get lost on me.
16        **THE COURT:**  I think he meant B-E-L, business economic
17  loss claim.  I've never heard it called a BEL claim either, but
18  I assume that's what you mean.  Right?
19        **MR. GELÉ:**  That's exactly what I meant, Your Honor.
20  Capital B, capital E, capital L.
21        **THE WITNESS:**  All the terms mean --
22        **THE COURT:**  We have enough acronyms in this case.
23        **THE WITNESS:**  I'm sure you do.
24         I never attempted to dial, never did dial, and
25  didn't even ever see, although he appears to be a nice guy,

**GILBERT V. ANDRY IV - DIRECT**

01:31   1   Mr. Duval, until he walked into the courtroom this morning,

01:31   2   Judge.

01:31   3   **BY MR. GELÉ:**

01:31   4   **Q.**   Mr. Andry, who, you or your brother, prepared the business

01:31   5   economic loss claim filed by The Andry Law Firm?

01:31   6   **A.**   I did with David Kushner.

01:31   7           And when I say I did, again going back to the phone

01:31   8   calls, Judge, when we started getting the process going, I'm on

01:31   9   the phone with Chick, as I call him.  "Chick, what do you need

01:31   10  next?  Do you have everything that you need?"  Just doing what

01:31   11  we do in the practice of law, the blue collar grind.  I was

01:31   12  making sure that it gets done.

01:32   13          So I did that.  I didn't know how to file it.  I'm

01:32   14  not very good with computers.  I was embarrassed when I walked

01:32   15  in today, Judge, and you have a computer up there -- I don't

01:32   16  have one in my office, if you can call it that, but I have one

01:32   17  for show.  So in terms of the filing of it, I didn't file it,

01:32   18  but I made sure that all the I's were dotted T's were crossed

01:32   19  as it relates to the information.

01:32   20  **Q.**   Was the claim filed *pro se*?

01:32   21  **A.**   Yes, it was.

01:32   22  **Q.**   Who interacted with the accounting firm Kushner LaGraize

01:32   23  that assisted you with your claim?

01:32   24  **A.**   Me.

01:32   25  **Q.**   Who acquired the requested documents from the accounting

**GILBERT V. ANDRY IV – DIRECT**

1   firm Kushner?

2   A.    From or to?

3   Q.    From.

4   A.    From -- to and from -- I have a bookkeeper named Stan that

5   works with me.  So with Stan, he and I were making sure that

6   Kushner LaGraize got everything that they needed and that we

7   had a viable claim.

8   Q.    Who handled the writing of the appeal of The Andry Law

9   Firm's business economic loss claim?

10  A.    I did.

11          And what I mean -- when I say that, Judge, I know

12  that you have written tons of them when you practiced.  I found

13  out what law I needed to apply, what the standard was,

14  researched the law, made sure that I understood what the facts

15  were in terms of presentation, and presented it so that it

16  could be a viable appeal.  Through many, many edits, because

17  I'm not a very good writer, so it takes a while.

18  Q.    Mr. Andry, before the allegations of misconduct by BP

19  against Mr. Sutton, before then did you have any knowledge of a

20  BP claim filed by Mr. Thonn?

21  A.    Absolutely not.

22  Q.    Before the allegations of misconduct by BP against

23  Mr. Sutton, did you have any knowledge of a claim filed by a

24  company named Talen's?

25  A.    No.

GILBERT V. ANDRY IV - DIRECT

01:33    1    **Q.**   Before the allegations of misconduct by BP against
01:34    2    Mr. Sutton, did you know that Mr. Sutton had represented a BP
01:34    3    claimant before he worked for the CAO?
01:34    4    **A.**   I did not know any of that.
01:34    5            Now, Judge, none of that was communicated.  I had no
01:34    6    idea about anything that Andry Lerner was doing or any of
01:34    7    Tiger's business interests.  I was worried about one thing:
01:34    8    the status of my claim.
01:34    9    **Q.**   Before the allegations of misconduct by BP against
01:34   10    Mr. Sutton, did you know that a BP claim that Mr. Sutton had
01:34   11    worked on had been referred to Andry Lerner?
01:34   12    **A.**   Absolutely not.
01:34   13    **Q.**   Before the allegations of misconduct by BP against
01:34   14    Mr. Sutton, did you know that Mr. Sutton had received a fee for
01:34   15    his work on the Thonn claim?
01:34   16    **A.**   No.
01:34   17    **Q.**   Before the allegations of misconduct by BP against
01:34   18    Mr. Sutton, did you ever discuss any Andry Lerner claim
01:34   19    whatsoever with Mr. Sutton?
01:34   20    **A.**   No.  I don't know the -- name one of an Andry Lerner
01:34   21    claim.  I had nothing to do with BP, nothing to do with Andry
01:35   22    Lerner.  I practiced the law that I practice.
01:35   23    **Q.**   Before the allegations of misconduct by BP against
01:35   24    Mr. Sutton, did you ever discuss any Andry Lerner claims with
01:35   25    anyone?

GILBERT V. ANDRY IV - DIRECT

**A.**   No.

**Q.**   Did you act in concert with anyone to assist Mr. Sutton to break a fiduciary duty?

**A.**   No.  When that allegation was made and my name was mentioned in the report --

        And, Judge, I want to apologize.  I wasn't trying to waste your time or double up.  Here I'm thinking that The Andry Law Firm, who had nothing to do with any of this -- doesn't represent a plaintiff or a claimant -- that when the Freeh report is done it's all going to say exactly what happened, viable claim confirmed just like Mr. Juneau found.  And I get the report and I read it.  I didn't know whether to laugh or cry.  Probably a combination.  I'm mentioned personally in the thing.

        This is federal court.  I'm from St. Bernard Parish and Plaquemines Parish.  I'm thinking, Oh, no.  Why is this?  This shouldn't be.  I'm mentioned personally and I had nothing to do with any of this.

        So that's when I went and hired a second attorney.  So I wasn't trying to waste Your Honor's time.  I didn't know what to think.

            **MR. GELÉ:**  I have no other questions, Your Honor.

            **THE COURT:**  All right.  Thank you.

            Any questions for Mr. Gibby Andry from this side of the courtroom?

01:36    1             Mr. Paw, do you have any questions?

01:36    2             MR. PAW:  No, Your Honor, no questions.

01:36    3             THE COURT:  Thank you, Mr. Andry.

01:36    4             THE WITNESS:  Thank you.  I wish it was under better

01:36    5    circumstances, Judge.

01:36    6             THE COURT:  Any other testimony?  Any other witness

01:36    7    by any party, any of the show cause parties.

01:37    8             MR. UNGLESBY:  No, sir.

01:37    9             MR. TAYLOR:  No, Your Honor.

01:37    10            THE COURT:  I'm just confirming Mr. Lerner is

01:37    11   electing not to testify and Mr. Jon Andry is electing not to

01:37    12   testify.  I'm sure they understand this is not a criminal case,

01:37    13   but I want to make sure that I give them an opportunity.  If

01:37    14   they wish to testify here today, they have that opportunity.

01:37    15            MR. UNGLESBY:  Right.  Jon Andry does recognize that.

01:37    16   He is an officer of the Court.  If you have any questions, he

01:37    17   will answer them.

01:37    18            THE COURT:  No.  I'm not calling a witness.  I'm just

01:37    19   asking if they wish to offer --

01:37    20            MR. TAYLOR:  On behalf of Mr. Lerner, we went through

01:37    21   the transcript of his deposition.  Everything that needs to be

01:37    22   said is said in that transcript.

01:37    23            THE COURT:  Okay.  Okay.  So Ms. Reitano has no

01:37    24   additional witnesses or evidence, correct?

01:37    25            MS. PIERSON:  No, Your Honor.

01:37   1          THE COURT:  Mr. Sutton, do you have anything else?

01:37   2          MR. SUTTON:  No, sir.

01:37   3          MR. DRAPER:  Nothing on behalf of the Andry Lerner

01:37   4   law firm, Your Honor.

01:37   5          THE COURT:  Mr. Gelé or Mr. Rosenberg, no further

01:38   6   evidence?

01:38   7          MR. ROSENBERG:  No, Your Honor.  I've learned my

01:38   8   lesson from this morning, so I'm not going to offer any.

01:38   9          THE COURT:  Okay.

01:38   10         MR. GELÉ:  No further witnesses, Your Honor.

01:38   11         THE COURT:  I'll give you credit for one thing,

01:38   12  Mr. Rosenberg.  You are the first and only lawyer I can ever

01:38   13  remember that said, "I have three questions," and you actually

01:38   14  asked only three questions.  Usually lawyers stand up say, "I

01:38   15  have one more question," and it goes on for 30 minutes.

01:38   16         MR. ROSENBERG:  Thank you, Your Honor.

01:38   17         THE COURT:  Mr. Paw, do you have anything else to

01:38   18  offer in the nature of a witness or evidence that you didn't

01:38   19  submit initially?

01:38   20         MR. PAW:  No, Your Honor.  The only thing I would say

01:38   21  is that I would move for the admission of the exhibits that I

01:38   22  referenced during examinations today at the hearing.  It's 1,

01:38   23  2, 8, 10, and 23.

01:38   24         THE COURT:  Was that all part of the disc or is that

01:38   25  in addition to those?

1       **MR. PAW:**  The summary exhibits are not on that,

2   Your Honor, the summary exhibits that we had with the timeline.

3           **THE COURT:**  That's the ones you just referred to?

4           **MR. PAW:**  1 and 2 are the summary exhibits.

5           **THE COURT:**  Okay.

6           **MR. PAW:**  8, 10, and 23 are other exhibits.

7           **THE COURT:**  Any objection to any of that?  Those will

8   be admitted.

9           **MR. GELÉ:**  Yes, Your Honor.  We would object to the

10  summary exhibit.

11          **THE COURT:**  What's the basis of you objecting to a

12  summary exhibit?  The supporting documents are available.

13  What's the basis to object to that, Mr. Gelé?

14          **MR. TAYLOR:**  Not to the summary exhibits.

15          **MR. GELÉ:**  My objection is they are more prejudicial

16  than probative.

17          **THE COURT:**  When an opponent introduces evidence at

18  trial, it's usually not helpful to you.  That's the way it

19  works in court, but that's not a basis to object to it.

20          **MR. TAYLOR:**  I wasn't objecting to the summaries

21  insofar as they are summaries.  We have other objections.

22          **THE COURT:**  It's perfectly permissible and common to

23  have a summary of voluminous documents.  We do that all the

24  time.  A number of parties have done it in this matter.  So I

25  overrule the objection, if that's the objection.

01:40   1        Anybody else need to clean up in terms of

01:40   2   exhibits?  There was some reference to making sure all the

01:40   3   exhibits are in.

01:40   4        **MR. UNGLESBY:**  None by Mr. Jon Andry.

01:40   5        **THE COURT:**  Stephanie, tell everybody what you have

01:40   6   listed as to what's been offered and admitted here today so we

01:40   7   are all on the same page.

01:40   8        **THE DEPUTY CLERK:**  I only have the special master's

01:40   9   report with the thumb drive and now, of course --

01:40  10        **THE COURT:**  We are going to label that as

01:40  11   Special Master 1?

01:40  12        **THE DEPUTY CLERK:**  You just called off some exhibits,

01:40  13   1, 2, 8, 10, 23.  Is that already in the record?

01:40  14        **MR. PAW:**  Those were the exhibits that we referenced

01:40  15   during the examination.

01:40  16        **THE DEPUTY CLERK:**  Did you give them to me?

01:40  17        **THE COURT:**  You need to make sure Stephanie has

01:40  18   those.  Okay?

01:40  19        **MR. PAW:**  Yes.

01:40  20        **THE DEPUTY CLERK:**  So we already have one called

01:40  21   No. 1?

01:40  22        **MR. PAW:**  Yes.

01:40  23        **THE DEPUTY CLERK:**  So do we want to name the special

01:40  24   master report and the thumb drive something else?

01:40  25        **THE COURT:**  Yes, whatever, as long as it's clear what

1   we are talking about.

2            THE DEPUTY CLERK:  Do you want to label it No. 3?

3            MR. PAW:  Number 3 is fine.  Thank you.

4            THE COURT:  What is that we just labeled No. 3?

5            MR. PAW:  The thumb drive, Your Honor.

6            THE COURT:  The thumb drive?  Okay.  I think I

7   referred to it earlier as No. 1, but I want to make sure we

8   know what we are talking about.

9            THE DEPUTY CLERK:  Then we have Christine Reitano's

10  Exhibits 1 through 11, the affidavit with exhibits.  And then

11  we have The Andry Law Firm's.  We have the sworn statement of

12  Lionel Sutton III.  Is that correct?

13           MR. GELÉ:  Yes.  It's our Exhibit 5.

14           THE DEPUTY CLERK:  Do we want to call that your

15  No. 1?

16           MR. GELE:  That's our Exhibit 5.

17           THE DEPUTY CLERK:  Exhibit 5?

18           MR. GELÉ:  Yes.

19           THE DEPUTY CLERK:  Okay.

20           THE COURT:  Do you have 1 through 4 or not?

21           MR. GELÉ:  Yes, we do, Your Honor.

22           THE DEPUTY CLERK:  Okay, but they weren't offered.

23           MR. GELÉ:  They weren't offered with a witness, but

24  we would like to offer them at this time.

25           THE COURT:  What are those?

01:41　1　　　　　　**MR. GELÉ:**  Just the documents that we attached to our

01:41　2　response and additionally the phone records that are under a

01:41　3　confidentiality order.

01:41　4　　　　　　**THE COURT:**  Is this duplicative of what Mr. Paw has

01:42　5　already submitted?

01:42　6　　　　　　**MR. GELÉ:**  Potentially 1 through 8, but I don't

01:42　7　believe he submitted the phone records.

01:42　8　　　　　　**MR. PAW:**  No, no.  The phone records are 4,000 pages

01:42　9　of documents.

01:42　10　　　　　　**THE COURT:**  You're submitting 4,000 phone records?

01:42　11　　　　　　**MR. GELÉ:**  Yes, Your Honor.

01:42　12　　　　　　**THE COURT:**  What's the point of that?  What are you

01:42　13　trying to prove?

01:42　14　　　　　　**MR. GELÉ:**  The point, Your Honor, is to establish the

01:42　15　volume of calls into the CAO and also the phone records are the

01:42　16　basis for the --

01:42　17　　　　　　**THE COURT:**  Well, I think it's common knowledge and I

01:42　18　will take judicial notice that there are voluminous calls made

01:42　19　to the CAO, have been and probably still are.  So I don't think

01:42　20　we need to put 4,000 records in to prove that, if that's all

01:42　21　you are trying to prove, Mr. Gelé.

01:42　22　　　　　　**MR. GELÉ:**  I would just also, for the record,

01:42　23　Your Honor, object to the summary exhibit going in but not the

01:42　24　phone records.

01:42　25　　　　　　**THE COURT:**  Okay.

01:42    1          THE DEPUTY CLERK:  So are Exhibits 1 through 4 going
01:42    2   in?
01:42    3          THE COURT:  No.  I did not admit those.
01:42    4          THE DEPUTY CLERK:  Just Exhibit 5?
01:42    5          THE COURT:  Yes.
01:42    6          THE DEPUTY CLERK:  I don't have any other exhibits
01:42    7   that are offered or admitted.
01:43    8          THE COURT:  Anything else that anyone has that
01:43    9   Stephanie did not just mention?
01:43   10          MR. TAYLOR:  Yes, Your Honor.
01:43   11          THE COURT:  Mr. Taylor.
01:43   12          MR. TAYLOR:  We have marked separately 17 exhibits.
01:43   13   I believe that they are part of what's on the thumb drive.  But
01:43   14   if they are not marked separately, then there is no way of
01:43   15   referring to them except as some document that Mr. Paw has put
01:43   16   on the thumb drive.  I believe it will be helpful to the Court
01:43   17   and helpful to the parties to have these particular exhibits.
01:43   18          THE COURT:  What are they?
01:43   19          MR. TAYLOR:  They are our summary exhibit, Exhibit 1,
01:43   20   which we provided to the Court.  Exhibit 2 is the database
01:43   21   access log of Lionel Sutton.  Exhibit 3 is the Leslie Tate
01:43   22   interview memorandum.  Exhibit 4 is the *Deepwater Horizon*
01:44   23   property settlement agreement.  We know the Court is familiar
01:44   24   with that.
01:44   25          THE COURT:  I don't think we need to put the

01:44    1   *Deepwater Horizon* settlement agreement in this record.  It's in

01:44    2   the record.  It's a public document.

01:44    3        MR. TAYLOR:  There is a paragraph in it that we refer

01:44    4   to.  Exhibit 5 is the update on the review of the code of

01:44    5   conduct, which is the July 2, 2013 report.  Exhibit 6 is the

01:44    6   supplemental report dated July 17 --

01:44    7        THE COURT:  Supplemental report from what?

01:44    8        MR. TAYLOR:  From the CAO, July 17, 2013.

01:44    9        THE COURT:  Report on what?

01:44   10        MR. TAYLOR:  On this matter.

01:44   11        THE COURT:  Oh, that internal investigation?

01:44   12        MR. TAYLOR:  Yes.

01:44   13        THE COURT:  I see what you mean.

01:44   14        MR. TAYLOR:  Exhibit 7 is the declaration of

01:44   15   Mr. Juneau which is from another portion of these proceedings.

01:44   16   There's a paragraph or two in it directly relevant to this

01:44   17   matter, particularly his instructions to his underlings to

01:45   18   process claims in the way that's most beneficial to claimants.

01:45   19        THE COURT:  Well, that's not only his instruction,

01:45   20   that's what the settlement agreement says.

01:45   21        MR. TAYLOR:  I understand, but it's evidence of

01:45   22   Mr. Juneau, who is the head of the office, who says that that

01:45   23   is what happened.

01:45   24             Exhibit 8 is the declaration of Jeffrey Cahill.

01:45   25   Exhibit 9 is the declaration of Susan DeSantis dated

01:45  1    December 2, 2013.  We have hard copies of all this.  Exhibit 10
01:45  2    is the affidavit of Christina Mancuso dated October 13, 2013.
01:45  3    Exhibit 11 is the declaration of Leslie Tate, December 12,
01:45  4    2013.  Exhibit 12 is the declaration of Susan DeSantis from
01:45  5    this week, November 4, 2014.  Exhibit 13 is the affidavit of
01:45  6    James Bagwell, January 16, 2014, which relates to phone records
01:45  7    and is, in fact, a summary.
01:45  8              Exhibit 15 is the claims for Andry clients for
01:46  9    which Sutton accessed the CAO database at least once.  It's a
01:46  10   chart.  Exhibit 16 is the number of claimants for whom Sutton
01:46  11   accessed their computer records, also a chart.  Exhibit 17 is
01:46  12   the general ledger entries from the Glen Lerner firm which
01:46  13   demonstrate the manner in which -- which are the records of the
01:46  14   payments which went into the Crown account.
01:46  15             THE COURT:  All right.
01:46  16             THE DEPUTY CLERK:  Did you also say Exhibit 14?
01:46  17             MR. TAYLOR:  If I didn't, I meant to.  Exhibit 14 is
01:46  18   the summary of Mr. Sutton's access to the CAO database.
01:46  19             THE COURT:  Anybody have any objections to any of
01:46  20   those?
01:46  21             MR. PAW:  No, Your Honor.
01:46  22             THE COURT:  Those will be admitted.  Do you have that
01:46  23   list that you just read from you could give to Stephanie too?
01:46  24             MR. TAYLOR:  Yes.  I was going to give it to the
01:46  25   clerk, if I may approach.

01:46  1    **THE COURT:**  Okay.  Go ahead.

01:46  2    **MR. SUTTON:**  Your Honor, I have one exhibit, which is

01:47  3    the letter from Mr. Juneau to BP attaching my résumé when I

01:47  4    applied for the job.  I mark that as Exhibit 1.

01:47  5    **THE COURT:**  Anybody have any objection?

01:47  6    **MR. PAW:**  No, Your Honor.

01:47  7    **THE COURT:**  Without objection, that's admitted.  It

01:47  8    will be Sutton 1.

01:47  9    **MR. UNGLESBY:**  Your Honor, Jon Andry has two.  I

01:47  10   thought that they were included with Mr. Paw, but he tells me

01:47  11   they are not.

01:47  12   **THE COURT:**  What are they?

01:47  13   **MR. UNGLESBY:**  The e-mail that Staley and Rinaldi

01:47  14   talked about going back to September 17 between Matt Lundy and

01:47  15   Christine Reitano and Lynn Greer, and then the one of June 4,

01:47  16   2013, between Katherine Torres, Lionel Sutton, and Mark Staley

01:47  17   regarding other claims that were expedited.  That's all I have.

01:47  18   **THE COURT:**  Okay.  Anybody have anything else?

01:48  19   **THE DEPUTY CLERK:**  Jon Andry 1, it will be the e-mail

01:48  20   from September 17, 2012, Jon Andry 2 from June 4, 2013.

01:48  21   **MR. UNGLESBY:**  Right.

01:48  22   **THE COURT:**  Okay.

01:48  23   **MR. GELÉ:**  Yes, Your Honor.  I guess, Your Honor,

01:48  24   just as Mr. Taylor did, just for clarity of the record, I do

01:48  25   want to run through the docket numbers of the other Andry Law

01:48  1   Firm exhibits so there will be no confusion.  Exhibit 1 is
01:48  2   Docket 12172.1.  Exhibit 2 is Docket 12172.2.  Exhibit 3 is --
01:49  3           THE COURT:  Wait.  What are you doing, now?  I
01:49  4   thought we talked about your exhibits just a few minutes ago.
01:49  5           MR. GELÉ:  That's what I was clearing up, Your Honor.
01:49  6   You stated that those are already in the record.  The problem
01:49  7   is they don't correspond with the numbers.
01:49  8           THE COURT:  No, I didn't say they were already in the
01:49  9   record.  We admitted No. 5.  You said Exhibit 5.  Then I asked
01:49  10  you what 1 through 4 are, and it sounded like there was nothing
01:49  11  in there that was relevant or it would be so cumulative and
01:49  12  unnecessary that I said I'm not admitting 1 through 4.  I think
01:49  13  that's what I said a few minutes ago.
01:49  14          MR. GELÉ:  Then I apologize, Your Honor.  I
01:49  15  misunderstood.
01:49  16          THE COURT:  So I don't know what you are doing now.
01:49  17  What are you even talking about?
01:49  18          MR. GELÉ:  Well, then I would like to attempt to
01:49  19  introduce these.
01:49  20          THE COURT:  Introduce what?
01:49  21          MR. GELÉ:  These Exhibits 1 through 4.
01:49  22          THE COURT:  1 through 4?  I already said they are not
01:49  23  going to be admitted.  That's the 4,000 phone records or
01:49  24  whatever they are.
01:49  25          MR. GELÉ:  No, it's not, Your Honor.

THE COURT:  That's what you just said a few minutes ago when you were standing up, Mr. Gelé.

MR. GELÉ:  I apologize, Your Honor, if I was unclear, but that was Exhibit 9.  I'm talking about the first eight exhibits.

THE COURT:  You told me you had five exhibits.  We admitted No. 5.  I asked you what the other four were, and when you described it I ruled that it wasn't admissible.  There was nothing to be admitted.  Now you are talking about something else.

MR. GELÉ:  Then, Your Honor, if I misspoke, I apologize.  I don't believe I did.  I have eight exhibits that are already in the record.  I would just like to read in the docket numbers.  My understanding is they are not objected to.  The ninth exhibit was the one you ruled should not be admitted.

THE COURT:  Well, I tell you, this record is going to be so messed up because your numbers are all over the board.

Stephanie, am I wrong that we were talking about Exhibit 5 earlier from him?

THE DEPUTY CLERK:  Right.  That's the only one --

THE COURT:  Now you're saying it's No. 9, it's not No. 5?

MR. GELÉ:  No, Your Honor.  The one that's admitted is No. 5.  The one that you excluded, the phone records, is No. 9.

01:50
01:50
01:50
01:50
01:50
01:50
01:50
01:50
01:50
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51
01:51

1   THE COURT:  Well, I thought we were talking about 1

2   through 4.

3   THE DEPUTY CLERK:  Originally that's what I thought

4   we were too.

5   MR. GELÉ:  That's not what I was referencing.  These

6   are unobjected to, Your Honor.  It will take me one second just

7   to read the numbers so it will be clear.

8   THE COURT:  What are they?

9   MR. GELÉ:  They include Mr. Andry's affidavit.  They

10  include the eligibility notice.  They include an e-mail from

11  Mr. Andry to Mr. Juneau.  They include the secretary of state's

12  report explaining the difference in the firms.  We have already

13  done the sworn statement of Mr. Sutton.  They include a

14  production by the special master, different excerpts of key

15  e-mails that I didn't see necessary to run through on testimony

16  to shorten this, but I do believe they should be entered in.

17  They are already in the record with docket numbers.  I would

18  just like to read in the docket numbers, the corresponding

19  numbers, so the record on appeal would be clear.

20  THE COURT:  Anybody have any objection to this?

21  MR. PAW:  No.

22  THE COURT:  Okay.  Go ahead, Mr. Gelé.

23  MR. GELÉ:  I believe I was already through No. 2,

24  Your Honor.

25  THE DEPUTY CLERK:  Wait one second.

01:51   1          THE COURT:  I can tell you your record is totally

01:51   2   messed up.

01:51   3          THE DEPUTY CLERK:  So you are admitting eight?

01:51   4          MR. GELÉ:  Exactly, yes.  Exactly.

01:51   5          THE DEPUTY CLERK:  Start from the beginning, please.

01:51   6          MR. GELÉ:  Number 1 is Docket 12172-1.

01:51   7          THE COURT:  What is it?  Identify what it is.

01:51   8          MR. GELÉ:  Sure.  That is the eligibility notice from

01:51   9   the claims center, Your Honor.

01:52  10          Number 2 is 12172-2.  That's an e-mail between

01:52  11   Mr. Gibby Andry and Mr. Juneau.

01:52  12          Number 3 is docket 12172-5, and that is an

01:52  13   affidavit of Mr. Andry.

01:52  14          THE COURT:  Is what Mr. Rosenberg just handed our

01:52  15   case manager copies of what you are talking about?

01:52  16          MR. ROSENBERG:  Yes, Your Honor.

01:52  17          MR. GELÉ:  Exactly, Your Honor.

01:52  18          THE COURT:  We don't want to go rooting through the

01:52  19   record to find these documents, so you gave us copies?

01:52  20          MR. GELÉ:  Yes, Your Honor, I have provided the Court

01:52  21   with copies.

01:52  22          MR. ROSENBERG:  Sorry about being an interloper

01:52  23   again.

01:52  24          MR. GELÉ:  Thank you, Harry.

01:52  25          THE COURT:  If we have them all there, what are their

01:52  1  numbers, Stephanie?

01:52  2          THE DEPUTY CLERK:  This is actually 1 through 8.

01:52  3          THE COURT:  So you are offering this exhibit binder,

01:53  4  1 through 8?

01:53  5          MR. GELÉ:  Exactly, Your Honor.

01:53  6          THE COURT:  Anybody have any objections?

01:53  7          MR. PAW:  No objection, Your Honor.

01:53  8          THE COURT:  They are admitted.

01:53  9          MR. GELÉ:  Thank you, Your Honor.

01:53  10          THE COURT:  Anything else, Mr. Gelé?

01:53  11          MR. GELÉ:  No, Your Honor.  Thank you.

01:53  12            Mr. Taylor.

01:53  13          MR. TAYLOR:  Your Honor, I don't think there is any

01:53  14  doubt that, on behalf of Glen Lerner and the other show cause

01:53  15  parties, we have made objections which the Court has overruled

01:53  16  as to a number of aspects in this case.

01:53  17          THE COURT:  I don't want you to repeat them here.

01:53  18          MR. TAYLOR:  I don't want to try the Court's

01:53  19  patience, but I don't want to run the risk of anybody --

01:53  20          THE COURT:  Anything that's already been ruled on by

01:53  21  the Court you don't have to repeat.

01:53  22          MR. TAYLOR:  I take it that that's the case.  I have

01:53  23  had the court of appeals tell me that even though the judge

01:53  24  said that was the case --

01:53  25          THE COURT:  If you read the Rules of Evidence, it

1   says once the Court has made a ruling on them, you don't have

2   to reurge them.

3           MR. TAYLOR:  I don't think there is any disagreement

4   between Mr. Paw and us that all those objections are preserved

5   and I will not --

6           THE COURT:  Well, it doesn't matter what Mr. Paw

7   thinks about it.  It's what I have said.  We are not going to

8   regurgitate those again.

9           MR. TAYLOR:  All right, Your Honor.  I don't want to,

10  but Mr. Paw will likely be more of an adversary in some other

11  forum than the Court, so I would like to make sure that he is

12  not taking a different position.  But be that as it may, I

13  think the record is clear.

14          One other thing, Your Honor.  With all due

15  respect, I would urge you to let me argue this afternoon on

16  behalf of Mr. Lerner to explain to you why he --

17          THE COURT:  All right.  Here's what I'm going to do.

18  It's almost 2:00.  That clock hasn't been corrected for the

19  time change.  Anybody have anything else?  No?  Okay.  I'm

20  going to take about 15 or 20 minutes, we will take a recess,

21  and I will come back and I will entertain some limited argument

22  from the parties, maybe 10 or 15 minutes from each.

23          MR. UNGLESBY:  Each side?

24          THE COURT:  Each side, yeah.

25          MR. TAYLOR:  Each party or each side?

01:55   1          THE COURT:  Each party.  You can waive it if you
01:55   2   want, Mr. Unglesby.  You don't have to make it.
01:55   3          MR. UNGLESBY:  I just don't need 15 minutes.
01:55   4          THE COURT:  Maybe you all can take -- I don't know
01:55   5   how much time Ms. Pierson is going to want, but --
01:55   6          MR. UNGLESBY:  We will be fast.
01:55   7          THE COURT:  Why don't you all, between the three or
01:55   8   four of you, split about 30 minutes.  Then I will give Mr. Paw
01:55   9   equal time if he wants it.  We will come back in about 20
01:55  10   minutes.
01:55  11          THE DEPUTY CLERK:  All rise.
01:55  12          (Recess.)
02:00  13          THE COURT:  Please be seated everyone.  Sorry I took
02:42  14   a little longer than I anticipated.
02:42  15              Who is going to go first?  Mr. Unglesby?
02:43  16          MR. UNGLESBY:  No, Your Honor.
02:43  17          THE COURT:  You were on your feet.  I thought you
02:43  18   were going --
02:43  19          MR. UNGLESBY:  Yes, sir, I am.  It's our position,
02:43  20   Your Honor -- we will do whatever you want, of course, but it
02:43  21   appears that the substantial evidence burden would be on the
02:43  22   special master, so it seems like he ought to get to go first.
02:43  23          THE COURT:  Well, we are hearing your objections to
02:43  24   his report and so I think you get to go first to argue your
02:43  25   objections.

02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:43
02:44
02:44
02:44
02:44
02:44
02:44
02:44
02:44
02:44
02:44
02:44
02:44

1    **MR. UNGLESBY:**  Well, we have our order.

2    **THE COURT:**  Okay.

3    **MR. SUTTON:**  Your Honor, I'm going to go first.

4    **THE COURT:**  You all have divided your 30 minutes?

5    **MR. UNGLESBY:**  Yes, sir.

6    **THE COURT:**  Good.

7    **MR. SUTTON:**  Your Honor, as an officer of the Court
8    and as a former member/employee of the Court supervised claims
9    administration, I want to take this opportunity to apologize to
10   the Court for the problems I have caused.

11           I also want to apologize to Mr. Juneau even
12   though he is not here.  I think he would agree that during my
13   time at the claims administration, I worked very diligently
14   with him to try to make the program work in the manner he
15   wanted it to work, transparent and open.  Although I made some
16   mistakes, to this day I maintain that I did nothing, insofar as
17   the program, improper insofar as dealing with any claims.

18           I did make mistakes, Your Honor, but it was my
19   mistake.  It had nothing to do with my wife and nothing to do
20   with Jon Andry, Gibby Andry, or Glen Lerner.  I want to take
21   this opportunity to apologize to them also for that mistake and
22   for dragging them into this problem.  It was all of my own
23   making, none of theirs.  I apologize to the Court and those
24   guys also.

25           **THE COURT:**  All right.  Thank you, Mr. Sutton.

1          Who is next?

2         **MS. PIERSON:**  Your Honor, on behalf of Ms. Reitano,

3 again we appreciate the opportunity to have this hearing.  I

4 don't think that I need to go over the facts.  I think I have

5 fully set that forth in the affidavit of Ms. Reitano.

6         I have believed since I met Ms. Reitano and

7 since I knew what the facts were that it was very unfortunate

8 that she was brought into this situation.  I would hope that

9 this Court would dismiss the charges against her that have been

10 made based on the showing that we have made.

11         And also since she was already removed from the

12 claims, although she doesn't have any clients right now, I

13 think that for a lawyer to have someone say, "You can't be in

14 this program," is damaging to themselves and to their

15 reputation, and I would like for her to be reinstated as a

16 potential attorney who can come before this Court with honor

17 and represent claimants not only in the CSSP but in other

18 cases.  Thank you very much.

19        **THE COURT:**  You're welcome.

20        Next.

21        **MR. TAYLOR:**  William Taylor for Glen Lerner,

22 Your Honor.  I actually have five points that I would like to

23 make.

24        **THE COURT:**  Okay.

25        **MR. TAYLOR:**  The first one is this.  This case before

02:46  1   you is not about whether Lionel Sutton is mixed up in his views
02:46  2   about conflicts of interest because he clearly is.  It is
02:46  3   whether or not the special master's report which the Court has
02:46  4   referred to is sustained by the evidence.  We have made our
02:46  5   legal arguments.  You know what they are.  We are talking about
02:46  6   the evidence today.
02:46  7            The special master's report says in no uncertain
02:46  8   terms that there was an agreement among Mr. Sutton, Mr. Andry,
02:46  9   and Mr. Lerner to corrupt the DHECC process in order to enrich
02:46  10  themselves.  That's page 21.  At page 81 he says three
02:46  11  attorneys worked together to corrupt a settlement process; at
02:47  12  page 82, in return for payments from Mr. Lerner and Jon Andry,
02:47  13  Sutton checked on their client's claims.  That's our text for
02:47  14  this hearing.
02:47  15           These are allegations of bribery.  There is no
02:47  16  other way to say it.  We have felt since the last brief from
02:47  17  the special master that the special master was reformulating
02:47  18  his theory; and if that's so, he should say so.  But if he
02:47  19  continues to maintain that our clients are here because of
02:47  20  allegations of corruption, then the question is what the
02:47  21  evidence is about that.
02:47  22           The third point, Your Honor, Glen Lerner
02:48  23  believed that Mr. Sutton had obtained approval from Mr. Juneau
02:48  24  for the payment of the Crown and the Thonn monies.  If I can
02:48  25  put up tabs 84 and 85, and I will refer you to the transcript

1  of his testimony at page 59 which I won't put up --

2         Do I need to hit a button?  Which one?  84 at

3  the bottom there, highlight that paragraph right there.

4         This is after the thing breaks but the parties

5  are in consternation.  They are upset.  Mr. Sutton writes to

6  Mr. Lerner, who is obviously concerned and upset about what's

7  going on, "Juneau knew about all of my businesses."

8         Now at 85, same place at the bottom, "When this

9  first came up" -- go back one more -- "it wasn't even the Thonn

10 case."

11        I'm sorry.  It's in the same place.  There.

12 Second line.  "It wasn't even the Thonn case because I told Pat

13 about that case before I started.  When this first came up, I

14 told Pat that the only case I sent was Thonn before I started.

15 He told me that he already knew about Thonn because he

16 remembered that I told him."

17        That's what Glen Lerner believed.  He believed

18 it because Mr. Sutton told it to him at the time before Sutton

19 went to work at the CAO but after he knew he was going to work

20 there.  And if he didn't tell him that exactly, he let him

21 believe that.  What exactly Sutton told to Lerner we can't

22 reconstruct, whether it's "Yes, I told Pat about Thonn," "Yes,

23 I told Pat about Crown," and that's said to Mr. Lerner -- okay,

24 he is aware there is a potential for conflict because remember

25 back in the spring he asks if there is a conflict in Christine

02:50  1    Reitano going to the CAO.

02:50  2              Mr. Lerner is no fool.  He understands that

02:50  3    there is a potential conflict which is raised by each of them

02:51  4    going there and he inquires specifically of Mr. Sutton when

02:51  5    Sutton says, "I want a fee for the work we did on Thonn,"

02:51  6    sometime before he goes to work there -- Mr. Lerner is a man of

02:51  7    good will and of trust, and he believed that when Mr. Sutton

02:51  8    told him that it was approved that, in fact, it was and it was

02:51  9    okay.

02:51  10             Fourth point.  Mr. Lerner and Mr. Andry had a

02:51  11   vigorous argument about whether the Thonn fee that Mr. Sutton

02:51  12   was asking for should be paid.  You heard Ms. Tate say today

02:51  13   that "Jon Andry said to me, 'Do you believe that Tiger Sutton

02:51  14   wants a fee?'"  And I will refer you to the transcript of the

02:52  15   testimony of both of them, Mr. Lerner and Mr. Andry.

02:52  16   Mr. Lerner says, "No doubt about it, Jon did not agree that we

02:52  17   should pay this money."  He did a Pontius Pilate.  Mr. Andry

02:52  18   says, "I objected to it because I believed that Mr. Sutton was

02:52  19   at the CAO and it was a conflict."

02:52  20             The case is not about whether Mr. Andry was

02:52  21   right or Mr. Lerner was right.  It is about whether the two of

02:52  22   them together conspired to corrupt the process.  There is

02:52  23   nothing in this record, either in the report or in the record,

02:52  24   that shows Mr. Lerner and Mr. Andry on the same page about

02:52  25   this.

02:52
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:53
02:54
02:54
02:54
02:54
02:54
02:54
02:54
02:54
02:54
02:54
02:54

1          The fifth point -- I think it's five.  The fifth

2    point, why is the money paid to the Crown account?  The answer

3    to that is very simple.  It is in the exhibits.  It's in the

4    transcript and it is in the Susan DeSantis affidavit.  The

5    agreement between Mr. Lerner and Mr. Andry for the Andry Lerner

6    firm was that if Lerner originated a case, he got 50 percent of

7    the fee.  Lerner clearly originated the Thonn case.  Andry said

8    to Lerner, "I'm going to give you your 50 percent.  If you want

9    to give it to Sutton, that's your business," but he was not

10   going to have a check written from the Andry Lerner law firm to

11   Sutton.

12          Now, as I said, you can argue about whether

13   Mr. Andry was right or Mr. Lerner was right, and you can

14   certainly argue about the wisdom of Mr. Lerner's having a

15   continuing financial relationship with Tiger Sutton.  The point

16   is that in the face of allegations that these two men conspired

17   together to corrupt the process by making secret payments to

18   Tiger Sutton for the Casey Thonn case, this doesn't pass the

19   sniff case.

20          There's no evidence in this record which would

21   get anywhere close to a Rule 29 on a bribery case.  There is no

22   one who says there was an effort at secrecy here.  There is no

23   one who says that Glen Lerner didn't tell the truth from the

24   beginning and admit, when anybody asked him, that he insisted

25   on paying the fee to Tiger Sutton because Sutton had done work

02:54   1   on it and he had given his word.

02:55   2                   The fifth point, Your Honor --

02:55   3        THE COURT:  I thought that was your fifth point.

02:55   4        MR. TAYLOR:  Sixth.

02:55   5        THE COURT:  Your sixth.  You said you had five, but

02:55   6   you are on No. 6 now, but that's okay.

02:55   7        MR. TAYLOR:  Well, I'm afflicted with the lawyer's

02:55   8   disease.

02:55   9        THE COURT:  Go ahead.

02:55   10        MR. TAYLOR:  Six and this is it.

02:55   11        THE COURT:  All right.

02:55   12        MR. TAYLOR:  We have made the point to you that what

02:55   13   these men and this woman are here to answer for is whether they

02:55   14   should be sanctioned under the unclean hands doctrine for the

02:55   15   conduct which is the subject matter of this report.

02:55   16                   It's abundantly clear, Your Honor, that that

02:55   17   doctrine, whatever its application in other contexts, doesn't

02:55   18   have any legal application here and certainly wouldn't, as a

02:55   19   matter of law, authorize the Court to deprive this law firm of

02:55   20   the 600 cases of which it now has attorney-client relationships

02:55   21   with claimants in the BP case.

02:56   22                   You have already ruled that the Thonn fee has to

02:56   23   be returned.  That's moot.  I suggest to Your Honor --

02:56   24        THE COURT:  Has Mr. Lerner returned his fee?

02:56   25        MR. TAYLOR:  Your Honor, we have an application

02:56  1  pending before you for release of the funds that are being held
02:56  2  in escrow to pay that.  There are funds in escrow.
02:56  3  THE COURT:  Well, it doesn't have to come out of
02:56  4  other fees.  It was a simple question.  It sounds like he has
02:56  5  not paid it.
02:56  6  MR. TAYLOR:  No, it has not been paid either by the
02:56  7  firm, which has the first obligation -- and Andry and Lerner
02:56  8  are, I suppose, jointly and severally liable on it.  But we
02:56  9  are, frankly, hoping that Your Honor will resolve that question
02:56  10  in the course of these proceedings today.  Thank you very much.
02:56  11  THE COURT:  You're welcome.
02:56  12  Mr. Unglesby.
02:56  13  MR. UNGLESBY:  I think we are doing pretty good with
02:56  14  our time, Judge.  As you said earlier, what's the heart of the
02:56  15  case, the question what's the evidence that Tiger Sutton was
02:57  16  paid improperly to do anything that he wouldn't do anyway or
02:57  17  wasn't doing anyway and, alternatively, why you didn't ask the
02:57  18  question implicit in that question was whether Tiger tried to
02:57  19  do something, even if he failed, that was improper or in any
02:57  20  way advantageous or special treatment to Andry Lerner.
02:57  21  Back when this first started and BP came in
02:57  22  here, you asked this question of them and it's still a good
02:57  23  question:  "What evidence do you have to support your
02:57  24  allegations that either of the two attorneys" -- which were
02:57  25  Reitano and Sutton -- "in any way did or were able to

02:57
02:57
02:57
02:57
02:57
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:58
02:59
02:59
02:59
02:59
02:59
02:59
02:59

1   improperly influence the calculation of claims, the way they

2   were valued, or the way they were analyzed?"  The answer to

3   both those questions is the same as it was then, no, and that's

4   overwhelming.

5          Now, the burden of proof under Rule 53 is to a

6   substantial certainty, which is the second highest burden or

7   proof right under reasonable doubt.  Now that we have the

8   report -- which I understand that the report has a lot of

9   conclusions and assumptions and innuendos and things in it, but

10  that's the nature of a report is to do that.  It's not just

11  one, two, three, four, five, six.  But now deconstructing the

12  report, giving an opportunity for everyone to look at it and to

13  get the evidence out, it's clear that these are the facts.

14         There is nothing at all to the idea that

15  Mr. Sutton tried to expedite the Andry brothers' case.  I think

16  that Mr. Staley, Mr. Rinaldi, and Mr. Duval with the

17  stipulation put that completely to rest, that there was no

18  misconduct, no misunderstanding, no impropriety whatsoever in

19  relationship to the Andry brothers' case.  I can understand how

20  someone could put two and three and four things together and

21  come out to eleven, but now that we have heard from the people

22  and everybody has looked at the evidence and the hour-by-hour,

23  day-by-day, there is nothing to that, period.  So that leaves

24  us, then, with Sutton.

25         Now, beside the fact that it's clearly

1    established and it's not disputed that Andry believes Sutton
2    isn't getting paid, the fact of the matter is Sutton doesn't do
3    anything for Mr. Lerner or at the request of Mr. Lerner or at
4    the request of Mr. Andry at all.  The testimony you heard --
5    and I believe there's some charts there, Judge, in the
6    submissions -- is that the Andry Lerner cases are getting paid
7    at the same level or a little perhaps below the average at the
8    time that Mr. Sutton is working in the office.
9            You have the e-mail which was evidently -- and
10   you know how these things unfortunately happen, just like the
11   misquoting of Ms. Reitano and Ms. Mancuso.  You have the e-mail
12   that was left out -- and I don't mean left out by the special
13   master, it was left out to be given to the special master --
14   where at the beginning of this trail where there hadn't been a
15   nickel paid or even requested, to our knowledge, by Sutton in
16   their conversations, he is asking if his -- Lerner is asking
17   can Christine, does Christine -- he knows she's a good, smart
18   woman.  She's a good worker.  "Is that going to help me get our
19   claims moved?"
20           There is nothing nefarious about that, actually,
21   because it's the kind of question you would ask.  If you know
22   you have a competent person in there in charge, you would ask
23   that kind of question, getting that competent person, will that
24   get our claims moving, but the answer comes back right away no,
25   there's nothing you can do, you know.

1    There was at one time something made in the
2    report of the idea that the e-mail "between you and me" -- and
3    it lists what's in the portal about the claimants, you know,
4    you have 400 and 42 this, 42 that.  Your Honor is aware of
5    that.
6         We have learned, with the opportunity to present
7    our evidence, that "between you and me" meant wasn't secret
8    like it's a secret between Glen and Tiger.  It was "Don't tell
9    Jon because I don't want to burn Jon, who will get his feelings
10   hurt, but this is why your cases aren't moving."
11        We know from the affidavit of Susie DeSantis
12   that they put into evidence, two actually, that Mr. Andry is
13   against and has no knowledge that there is going to be any
14   money getting paid to Tiger Sutton.
15        Most importantly, your question:  What did these
16   people do and what were they supposed to get in return for that
17   improper?  Now, I've been looking for however long I've been in
18   this case to find something that answers that question that
19   would be adverse to my client and it's just not there, Judge.
20   It's not there.  You have an entire claims office available to
21   answer the question, and I know the answer because they have
22   answered the question.
23        "At any time did you get any pressure,
24   influence, etc., from Tiger Sutton to help anybody at Andry
25   Lerner?"

1        "No."

2            Conversely on the Andry Lerner side, we gave you

3    the two employees, Ms. Mancuso and Ms. Ingram who testified,

4    "No, there was nothing like that, nothing at all.  We put our

5    claims in.  Some got paid.  Some didn't.  We had problems."

6            Look at Thonn himself.  I know now that there is

7    this issue about Thonn's tax returns, but no one suggests, nor

8    can they, that Andry is responsible for Thonn's chicanery.  The

9    fact is tax returns were a legitimate way to calculate claims

10   and this claim was properly calculated if those were, in

11   reality, tax returns.

12           Now, what did Andry Lerner do?  They appeal.

13   Who appeals a secret deal?  And look at the timing.  Sutton not

14   only doesn't do anything to help Thonn, but the way it works

15   out with the request for reconsideration and then the appeals

16   and all, it's gone from Sutton.  The claims administration

17   office is never fooling around with the Thonn case at all.

18   It's out of their control almost immediately.

19           There's no way to come to any conclusions that

20   Jon Andry or the people here in New Orleans were trying, as the

21   charge says, to corrupt the claims office or get any advantages

22   or any benefits or ask Mr. Sutton to do anything that he wasn't

23   supposed to do.

24           Look at the charts.  We appreciate Mr. Paw

25   spending the time that he did to create the charts identifying

03:05
03:05
03:05
03:05
03:05
03:05
03:05
03:05
03:05
03:05
03:05
03:05
03:06
03:06
03:06
03:06
03:06
03:06
03:06
03:06
03:06
03:07
03:07
03:07
03:07

1   all of the different contacts, but when we are finished the

2   evidence is our evidence.  The evidence is our evidence.

3   Mr. Sutton looks at all kind of claims for all kind of people

4   and does all kind of work for them far in excess of anything he

5   does for Andry Lerner.

6          He looks at three Andry Lerner claims throughout

7   this whole process.  Three.  And one, we understand, Talen's,

8   has to do with the question of you have nine facilities, five

9   tax returns, you're only making five claims, you need nine tax

10  returns, you know, the give-and-take that goes on within the

11  office, no help at all other than this is what you have to do,

12  this is the rules, following the transparency in the charge, in

13  the agreement that Your Honor hears about every day to help the

14  claimants get the most money for their claim under the

15  procedures available within the office.  Now, there is not a

16  shred of evidence that that charge is violated any way, shape,

17  or form by anyone at Andry Lerner.

18         So what we have when we get finished here is

19  Gibby's stubbornness.  So he is calling all the time asking

20  about his case.  It may be irritating, as reflected in the

21  report, but it's not illegal or improper.  You can't make

22  anything out of that.

23         You have the Talen's claim.  He looked at one

24  from Harry Still three times as much as he looked at Talen's

25  and we know the reasons and it's never paid.  Nothing is ever

03:07   1   done with it.  There is no effort to do anything wrong with it.

03:07   2           You have Mediation and Vishnu, which are looked

03:07   3   at collectively for apparently, according to the computer,

03:07   4   about a minute and a half.  You have Casey Thonn which, if

03:07   5   Mr. Paw's math is correct, Mr. Sutton checks numerous times.

03:07   6   Some of it is because, as he explained to you, the uniqueness

03:07   7   of the computer -- if you want to check, you have to look five

03:07   8   times to get one thing -- but also because Casey Thonn is

03:07   9   asking him to.

03:07   10          We get off to a bad start with this report

03:07   11  because unfortunately, I guess, Ms. Tate, or now Ms. Ingram,

03:08   12  doesn't remember that it's Casey Thonn who told her to send the

03:08   13  original documents back in July when it would have been okay to

03:08   14  do it in July to Tiger Sutton.

03:08   15          This all evolves into a simplistic fact that

03:08   16  there's a legitimate disagreement between Tiger's belief that

03:08   17  he is entitled to have this money because of the work that

03:08   18  Christine Reitano at Sutton and Reitano did and his subsequent

03:08   19  job at the claims office and the misstatement to Mr. Lerner

03:08   20  that it was okay.

03:08   21          Now, sure, in a perfect world, we wouldn't be

03:09   22  here if anybody along the way had said, "Well, wait a minute.

03:09   23  Let's just double-check that with Pat Juneau."  But at the

03:09   24  other end of the coin, Your Honor, these are lawyers talking to

03:09   25  each other.  They don't have any reason to be mistrustful or

1   distrustful in terms of what they are told.  They are not

2   policemen.  They are lawyers.

3           All we have got here is a gigantic

4   misunderstanding and miscommunication with no harm at all.

5   Nothing was corrupted.  Nobody got an advantage.  Equally

6   important, nobody asked for one.  Not a single time, Judge, did

7   anybody ask for one.  And I think that is imperative that you

8   recognize now, you know, now that all of the cards are out on

9   the table and you have had the testimony and you have had the

10  people in person that you could see, and we appreciate that.  I

11  wanted you to see people; not just read them, but see them.

12          The evidence is that this was a mistake, bad

13  judgment by Mr. Lerner probably, bad management by Mr. Andry in

14  terms of making sure that what he thought was happening was, in

15  fact, happening, but zero misconduct to justify any kind of

16  harsh penalty or unclean hands ruling or forfeiture of the fees

17  beyond the fee that you have already ruled on.

18          Now, to answer your question has Mr. Andry paid

19  the fee back, no, not through malevolence.  Honestly, Mr. Andry

20  isn't exactly making a lot of money these days, and this is

21  more important right now.  But is he going to pay the fee back?

22  Yes, of course.  That's all.

23          Now, I'm here to answer -- you know, as you know

24  from the years of being a lawyer, the worst thing that happens

25  to a lawyer is he misses what the judge really wanted to know

1    and then he loses when the judge rules and he thinks, "Darn, I
2    could have answered that had I known it."  So if there is
3    something, Your Honor, that is giving you pause or worry that
4    I'm not addressing, please tell me.
5              THE COURT:  Thank you, Mr. Unglesby.
6              MR. GELÉ:  Stephen Gelé for The Andry Law Firm.  I
7    will be brief, Your Honor.
8              What the evidence has shown, Your Honor, is that
9    Gibby Andry, the managing member of The Andry Law Firm, handled
10   The Andry Law Firm claim.  There's been no evidence presented
11   that Gibby Andry of The Andry Law Firm did anything improper.
12   There was nothing wrong with calling to check on status of a
13   claim, and Gibby Andry and The Andry Law Firm had nothing to do
14   with the payment to Mr. Sutton.
15             The innuendo that's been created that somehow
16   Gibby Andry used two other law firms or another lawyer with
17   which he had no business relationship with to somehow conspire
18   and make a payment the Mr. Sutton is just absurd.  There's no
19   evidence that Mr. Gibby Andry or The Andry Law Firm had any
20   involvement in the payment to Mr. Sutton.
21             Further, Your Honor, even if the unclean hands
22   doctrine applies legally, which we deny and we addressed that
23   in our opposition to the Freeh report, or if some other legal
24   standard applies, for example, the legal standard that the
25   special master tried to argue in their reply, I guess,

1  abandoning the unclean hands doctrine when they claim that
2  there was a knowing acting in concert to assist in a breach of
3  a fiduciary duty -- a standard that they had to run to Delaware
4  law to find, which we deny applies -- even if those do apply,
5  there is no evidence of any actions by Gibby Andry or The Andry
6  Law Firm that would constitute unclean lands.  There's no
7  evidence of any actions by Gibby Andry or The Andry Law Firm
8  that would suggest that Gibby Andry knowingly assisted in the
9  breach of a fiduciary duty.  In fact, Gibby Andry, when he
10  testified to such, his testimony went unchallenged by the
11  special master earlier today.

12          Your Honor, at the end of the day, it is unjust
13  to punish The Andry Law Firm and/or Gibby Andry for
14  Mr. Sutton's ethical breaches.  The Andry Law Firm's claim
15  should be paid.  We have learned through much discovery, with
16  much effort, that the claim was never expedited.  Rather, the
17  claim was accidentally unduly delayed and that claim should
18  have been paid long ago.  Because of the delay and because of
19  the Freeh report conflating The Andry Law Firm with other
20  firms, Mr. Gibby Andry and The Andry Law Firm have already
21  suffered by being impugned by BP's national advertising claim,
22  and impugned wrongly.

23          Clearly, the different law firms should be
24  treated as separate entities.  The Andry Law Firm had nothing
25  to do with any improprieties.  Therefore, Your Honor, we ask

1    that The Andry law firm should be paid.  The Andry Law Firm

2    should not be sanctioned.  In addition, we ask that the motion

3    that was filed by Mr. Rosenberg on behalf of Mr. Gibby Andry

4    asking that he be stricken from the Freeh report be granted.

5    Thank you.

6           THE COURT:  Thank you.

7              Mr. Paw.

8           MR. PAW:  Thank you, Your Honor.  The evidence

9    presented today in no way really goes to the core of the

10   conflict that Mr. Sutton labored under while he was at the

11   claims administration office.  He had a conflict with his

12   relationship and his financial ties through the Crown

13   relationship with Mr. Lerner and his financial ties with

14   Mr. Jon Andry and Mr. Lerner through the Thonn claim.  These

15   conflicts draw into serious question the motivations that lie

16   behind Mr. Sutton's actions while he was at the claims

17   administration office and draw into question his impartiality

18   as he was acting in that role.

19              The time lines we have presented to the Court

20   both in the oppositions to the show cause pleadings and as well

21   as today make clear the interaction of the various motivations

22   here.  You see that Mr. Sutton is working hard to make sure

23   that he gets his next payment on the Thonn claim at the same

24   time that he is researching and responding to questions to

25   Mr. Andry.  He is really at the beck and call of Mr. Andry as

03:16  1   he raises questions about his claims.  He tasks the CAO office
03:16  2   junior accountants with checking on the status of a claim which
03:16  3   resulted in the claim being brought to an earlier position for
03:16  4   consideration rather than to continue to languish where it had
03:16  5   been.
03:16  6           So while we talk about there is no benefit here,
03:16  7   there is clearly a benefit.  That claim moved from being in a
03:16  8   place where it wasn't being considered to being considered
03:16  9   within a course of four days.  Outsiders who look at this
03:16  10  process, they view that as a very valuable consideration.
03:16  11  There has been quite a bit that you will see in the commentary
03:17  12  in local newspapers and local interest groups that talk about
03:17  13  how important that place is inside the CAO.  So this absolutely
03:17  14  had an impact.
03:17  15          Mr. Andry and Mr. Lerner knew that it was
03:17  16  improper for Mr. Thonn to receive a payment.  They moved the
03:17  17  payment purposefully away from the Andry Lerner law firm.  You
03:17  18  heard employees of the firm testify they had no idea that there
03:17  19  was a referral fee because this was all kept in the dark.  I
03:17  20  disagree with whichever of the counsel it was that said none of
03:17  21  this was secret.  This all was secret.  This all was kept in
03:17  22  the dark.
03:17  23          They moved it out to Mr. Lerner's law firm in
03:17  24  Nevada and then moved it back to a dormant account here so that
03:17  25  Mr. Sutton could have access to it off the books of his law

firm, away from his wife who was reviewing the law firm's books, who had an obligation if she saw something wrong, if she saw a tie coming from Glen Lerner to come back to Mr. Juneau and say that there is something suspicious.  So this was all done very purposefully.

Mr. Andry knew absolutely that these payments were being made.  I entirely disagree with Mr. Unglesby. December 14, 2012, he directs Glen Lerner, "You just got paid. Pay him out of that."  There's no question he knew what was taking place here.

I disagree also with Mr. Lerner's counsel in that this is not the only money, Judge, that ultimately is going to wind up going to Glen Lerner's law firm.  You have got the 50 percent that's carved out as Mr. Sutton's fee, and the suggestion in some of the paper is that 50 percent represented Mr. Lerner's fee.  That's wrong.  Mr. Lerner was looking for the share of the money that went back and stayed in the Andry Lerner law firm.  He wasn't just being benevolent and giving Mr. Sutton 50 percent of the fee and then walking away and saying, "Oh, nothing in this for me."

He has an e-mail March 20, 2013 -- this is in our timeline, it's in the report -- "I'm confused on Thonn.  I am supposed to give referral attorney 50 percent, correct? That was our deal with him."

Not "my deal."  "Our deal with him."

1    "If fee was $33,000 and you send me $16,000 for

2  my end and I'm supposed to send him the full $16,000, then I

3  got no fee."

4    "I got no fee."

5    His office assistant responds back, "Your

6  40 percent will be in the draw."

7    So this isn't an act of charity.  This is not an

8  act of benevolence that Mr. Lerner did.  And they did it

9  because they were buying access.  This gave them the ability to

10  continue to have some sway over Mr. Sutton, continue to have

11  him do -- it may not be significant work, but it's work of

12  looking up these claims and providing this information.  They

13  didn't want that stream to cut off in any way.

14    What tells you most about this, Judge, is that

15  when they are confronted about it, they lie.  Mr. Sutton, the

16  lies are almost too numerous to count, the different stories

17  that he works through when he talks to Mr. Mike Juneau,

18  Mr. Welcker, when he talks to the special master.  Each time

19  the story changes just a little bit.  Even today his story

20  changed a little bit.  While he says he has come clean, while

21  he says he is talking about what really happened now, I'm not

22  really sure that's the case.  I'm not sure that he really

23  understands what the truthful version is of the facts.

24    **THE COURT:**  Remind me.  In his sworn statement to the

25  special master, did he state at all that the reason that he

1    directed the payments to the old Crown account were to hide

2    them from his wife?

3         MR. PAW:  I don't believe so, Your Honor.  I would

4    have to look at that.

5         THE COURT:  The first time he testified to that was

6    today?

7         MR. PAW:  I believe so, Your Honor.  I can look at

8    the transcript and, if I can, maybe I can supplement the record

9    with an answer to that.

10         Really more significantly, too, in this regard,

11    Your Honor, is Mr. Jon Andry because as an officer of the

12    Court, as someone who has hundreds of cases before the DHECC,

13    he was called by Mr. Mike Juneau in his official capacity and

14    asked does Mr. Sutton have an interest in the Thonn claim, the

15    Thonn claim in particular.  That's the word that Mr. Juneau

16    used.  Mr. Andry said he has no interest in anything,

17    absolutely clear about that, no interest in anything.

18         If this was all some innocent issue, he wouldn't

19    have had to have lied that day, and that was a critical factor.

20    I think that it goes great lengths to understanding and really

21    explaining for the Court what the intentions of these parties

22    are here.

23         Your Honor, even today part of the testimony

24    that we heard today was false.  Mr. Sutton testified at length

25    about this Talen's claim, that Mr. Juneau came to him and asked

1  him to look up the Talen's claim.  They say this about the

2  claims because they are trying to divert that he did it because

3  of Mr. Andry.  So they try to say Mr. Juneau told him to do it

4  instead.  Mr. Juneau was very clear, page 96 of his August 1

5  statement:

6          Mr. Freeh asked him:  "Do you recall ever

7  directing him to deal with an attorney named Jon Andry with

8  respect to claims that Andry had before the administrator?"

9          Mr. Juneau's answer:  "I never directed him to

10  do that."

11          The documents I presented to the Court today,

12  Exhibit 23, it's clear that when Mr. Andry raised the questions

13  to Mr. Juneau about these claims, what Mr. Juneau did was to

14  ask his administrative assistant to check out the status of

15  those claims.  He didn't have to go to Mr. Sutton.

16          Mr. Lerner talks about that he had an assurance

17  from Mr. Sutton that this had been disclosed to Mr. Juneau and

18  that Mr. Juneau approved of payment of a referral fee.  If you

19  look at the record and look at Mr. Lerner's deposition

20  transcript and you overlay it with the documents, Your Honor,

21  it's clear that Mr. Lerner has a very good recollection of

22  conversations that he had with Mr. Sutton.  It's clear that

23  they talked about a referral.  It's clear that they talked

24  about wanting to bring the case to Glen Lerner and not to

25  Jon Andry because there had been some bad blood.  All this

happens in the March 2012 time period.  It's all shown in the e-mails.

It's clear that Mr. Lerner says, "Is there a conflict with my cases, Andry Lerner going in front of her with our business relationship?"

And Mr. Sutton says, "No conflict."  He says, "Andry screwed me.  I want you to have the case."

They say that they have no discussion of the details of the case.  Mr. Lerner said that this conversation that he had where Mr. Sutton provided the assurances happened within a few days of the case being referred to the Andry Lerner law firm.

You saw the exhibit today.  The Andry Lerner law firm got this case on April 3, 2012.  There would be no reason in April of 2012 for Mr. Sutton to have a conversation with Mr. Juneau about whether it was a conflict for him to take a fee on the Thonn case.  He wasn't an employee.  He was six, seven months away from being an employee.

So Mr. Lerner has in large part an accurate recollection of the conversations that he had when the Thonn case was referred.  He has moved that conversation from happening in the fall of 2012 to happening -- excuse me.  He said it happened in the fall of 2012, but in fact it happened in March of 2012.  So it just doesn't support the position that he has asked the Court to take.

1    Your Honor, if you view this evidence in its
2    entirety, you give the reasonable inferences that the evidence
3    is entitled to, none of which I contend have been rebutted here
4    today, and it's clear that the show cause parties have breached
5    their obligations and they have done it for their benefit and
6    for their advantage.  To maintain the integrity of the judicial
7    process, the confidence in the DHECC program that's been
8    entrusted with billions of dollars for the public advantage,
9    the application of the equitable relief of unclean hands is the
10   appropriate remedy under these facts.  Thank you.

11        THE COURT:  Thank you.

12        This has been a difficult process for the Court,
13   for all the parties, to get to where we are here today.  These
14   kinds of issues, dealing with lawyer conduct or alleged
15   misconduct, are never something that I take any pleasure in
16   having to deal with.  Let me make some preliminary remarks
17   before I get into -- well, let me just say this to start.

18        The one thing that's clear and undisputed -- and
19   this is something that I think was made clear in the earlier
20   hearing that we had here in court -- is despite all the
21   problems and issues and allegations surrounding the conduct of
22   the parties to this hearing, there was never any corruption of
23   the claims processing evaluations in this case.  There were
24   numerous inquiries, phone calls, e-mails, text messages, even
25   two lunches where the Andry Lerner firm in various ways made

attempts to have their claims paid or expedited or moved.

My thoughts about that are, first of all, that as someone mentioned, this whole settlement is not designed to be an adversarial process.  This is unlike a litigated case. The parties reached a settlement.  There were rules set up in terms of how claims would be analyzed and paid.

The settlement agreement itself even provided expressly that the claims facility, the claims administrator and people he tasked with handling claims, were there to assist claimants in the filing of their claims and helping them make sure that their claims were filed properly, that they submitted the necessary and appropriate documentation.

There's even a provision in the settlement agreement that says that if a claimant checked the wrong box and it turned out that because they checked the wrong box they would have otherwise qualified for a higher payment, that the claims administrator was to correct that and see that they were paid the appropriate higher amount or greatest amount that they were properly and legally entitled to.

So there was nothing inherently inappropriate or improper about the fact that people with the claims program, including Mr. Sutton and Ms. Reitano and Mr. Duval when he was involved on the appeal level, were there to and did, in fact, field phone calls, e-mails, inquiries from claimants or their attorneys and attempted to assist those claimants in having

1   their claims paid.

2            As I said, there is no evidence that the claims,

3   and particularly the claims of the Andry Lerner firm or the

4   claim of The Andry Law Firm itself, were manipulated in any way

5   or corruptly manipulated or anything like that.  So I find no

6   evidence to support anything like that.

7            There is evidence, I believe, that Mr. Andry and

8   Mr. Lerner were able to use their relationship with Mr. Sutton.

9   These folks all went to Tulane Law School together so they have

10  been friends or acquaintances over many years.  That gave them

11  some ability to probably get more attention from Mr. Sutton

12  than they would otherwise.

13           The most troublesome part of this case obviously

14  revolves around the payments that were made, three separate

15  payments totaling about $40,000 that were made in a circuitous

16  way emanating originally from the -- this is in relation to the

17  Casey Thonn claims, multiple claims by Mr. Thonn, where

18  Andry Lerner sent 50 percent of the legal fees to Glen Lerner

19  or Glen Lerner & Associates in Las Vegas, and in turn

20  Glen Lerner & Associates or Mr. Lerner or his office in

21  Las Vegas sent those monies to an account called the "old Crown

22  account."  This was the otherwise dormant Crown, LLC account in

23  New Orleans which was controlled by Mr. Sutton.  Mr. Sutton

24  thereafter was able to access that money and use it for

25  whatever he used it for.

03:34  1        Mr. Sutton has admitted that he has, over the
03:34  2  course of this matter, made numerous, several at least, false
03:34  3  statements to different people about the matters at issue.  He
03:35  4  first admits -- well, first of all, he was hired on or about
03:35  5  November 1, 2012, to work at the claims facility.  He signed an
03:35  6  employment agreement which includes a provision prohibiting him
03:35  7  from having any conflicts of interest or even what might be
03:35  8  considered an appearance of impropriety.

03:35  9        He admits that he failed to disclose significant
03:35  10  and pertinent information to Mr. Juneau.  Particularly, he
03:35  11  failed to disclose that after going to work at the claims
03:35  12  facility that he maintained or retained a continuing financial
03:36  13  interest in the Casey Thonn claims that were then pending
03:36  14  before the claims facility.

03:36  15        Although he says that he mentioned and that
03:36  16  Mr. Juneau knew that he had other business interests, including
03:36  17  this company called Crown, LLC, he admits that he did not
03:36  18  disclose to Mr. Juneau that one of his business partners in
03:36  19  Crown, LLC was none other than Mr. Glen Lerner, who was a
03:36  20  partner in the Andry Lerner law firm which was handling, I
03:36  21  think, on order of a thousand claims before the claims facility
03:36  22  to which he was going to work.

03:36  23        It hasn't been mentioned today, but there is
03:37  24  also evidence that Mr. Sutton also failed to mention or
03:37  25  disclose to Mr. Juneau that he also was a partner in another

1  company called Romeo Papa, which as I understand it is some
2  sort of offshore vessel operating company, which was an active
3  claimant in the settlement program during the time that
4  Mr. Sutton is working there, and he fails to disclose his
5  interest as a part owner of that company.

6       The Casey Thonn claim was apparently handled
7  primarily or perhaps entirely not by Mr. Sutton but by
8  Christine Reitano, his wife, before she went to work, I think,
9  around the 1st of April, 2012, at the claims facility.  From
10  the evidence before the Court, she did all of the work on that
11  case.  She then referred it over to Andry Lerner.  There's
12  evidence of the conversation between Ms. Reitano and
13  Ms. Mancuso.

14       There was an issue as to whether Ms. Reitano
15  asked for or requested a referral fee.  Ms. Mancuso has stated
16  under oath that there was no discussion of a referral fee but
17  rather there was a discussion about whether Andry Lerner would
18  honor the original 20 percent attorney's fee on the case for
19  Mr. Thonn.  I'm having some trouble sorting that out because
20  despite that testimony -- and, of course, Ms. Reitano denies
21  that she requested any fee or expected any fee and so did
22  Ms. Mancuso.  Despite that, shortly after that conversation,
23  Ms. Mancuso sent a letter to Ms. Reitano enclosing a referral
24  fee agreement, which she says she sent at the request of
25  Jon Andry, and it provided for a 50/50 split or a 50 percent

referral fee, which as it turned out is exactly what occurred in this case.

After this all became public -- well, after it all came to the Court's attention in I think it was June of 2013 -- and as I recall, the way this came about is that there was some -- I don't know if it was an anonymous tip or report to Mr. Welcker or Mr. Juneau that there was some payment or payments being made from Andry or Andry Lerner to Mr. Sutton inside the program. There was an internal investigation started by Mr. Juneau, with the knowledge of the Court. He had alerted me to what was going on or what he knew at the time.

As part of that, he questioned Mr. Sutton. Then there was another conversation or questioning shortly thereafter with Mr. Welcker also present, Dave Welcker being the former special agent in charge of the local FBI office who is in-house at the claims facility to handle fraud, waste, and abuse issues.

Their records, their reports, or their notes show and Mr. Sutton admitted here today that he lied to them or made false statements and denied that he was getting any kind of payments or had gotten any kind of payments or had any financial interest in any claims before the claims facility. I think there was testimony here today that he also lied to several attorneys that are involved in the case that questioned him, took statements from him after all this arose. Apparently

it was not until he was confronted with the e-mails and other evidence that he had, in fact, received these payments that Mr. Sutton finally admitted, when questioned under oath by the special master's office, that he had, in fact, received these payments.

With regard to how the payments were made, it was clearly designed to hide these payments, disguise the payments.  Mr. Sutton says that he did this only to hide the payments, hide these monies from his wife, Christine Reitano. I, frankly, find that not very credible.  That may have been an ancillary purpose or maybe a benefit to him, but I think the main reason was to disguise these payments and make it look like they were part of the monies he was regularly receiving as part of the business deal that he had with Mr. Lerner in this Crown, LLC.

During the same time frame, he was getting periodic payments of various amounts, from $10,000 up to $20,000 at a time over this same time period in 2012, 2013, and those monies were being paid to this Crown, LLC account that he controlled here in New Orleans.  Those monies were supposedly for his interest in Crown, LLC.  So he then has the money for these Thonn referral fees, legal fees run through the same Crown, LLC and apparently does not report them as part of his law firm income.

If this had only been intended to hide the

1  payments from Ms. Reitano, there was a lot easier way to do it
2  than the circuitous route that the parties used here.  Either
3  Andry Lerner or Mr. Lerner could have just given Mr. Sutton a
4  check and he could have done with it as he wished, cashed it or
5  deposited it wherever he wanted.  So to me it's very
6  significant the way these payments were handled or were made.
7           Getting back to the attempts to assist
8  Andry Lerner with their claims, there were obvious efforts or
9  attempts by Mr. Lerner to see if he could get Mr. Sutton to
10  somehow expedite their claims.  Again, there is nothing
11  inherently wrong with that, but there's a very obvious at least
12  appearance of impropriety doing that when you are in a business
13  relationship with someone, you are paying them money on a
14  regular basis, and then they also have an interest in one of
15  the claims you're handling.  However, there's really no
16  evidence -- I think there were attempts to do that.  I don't
17  think there's any evidence that these claims were actually
18  expedited, not to any significant extent that I could tell from
19  the evidence.
20           With respect to the large claim, The Andry Law
21  Firm claim, if you want to say it was moved, it was moved
22  forward because it had been held up mistakenly, as admitted by
23  the accountants who testified earlier today.  So I don't see
24  anything inherently improper on that discrete issue.
25           With respect to Ms. Reitano, I don't find there

03:48  1   is any clear or convincing evidence that she did, in fact,

03:48  2   request or know about the referral fee that Mr. Sutton

03:48  3   requested.  As I mentioned, there's some evidence from which

03:48  4   someone might suspect that she did know, but I don't think the

03:48  5   evidence is sufficient for me to make that finding.

03:48  6          With respect to the other issues with respect to

03:49  7   Ms. Reitano, one dealt with her apparently trying to see if she

03:49  8   could get a job -- this is before Mr. Sutton went to work at

03:49  9   the program.  She approached one of the vendors -- I think it

03:49  10  was Garden City -- about hiring her husband.  I think

03:49  11  Ms. Reitano, just like Mr. Sutton, needs to go back and take

03:49  12  classes in legal ethics and understand what a conflict of

03:49  13  interest is.  You don't go to a vendor who's working for you

03:49  14  and seek a job for your husband at the same time.

03:49  15         The response from that vendor was just as you

03:49  16  would expect.  They reported it up the chain to the claims

03:49  17  administrator and a stop was put to that approach.  It was

03:50  18  something she should not have done.  She should have recognized

03:50  19  that created a conflict of interest, I believe, but it had

03:50  20  nothing to do with affecting the claims program, as such, here.

03:50  21         Whether or not that gave grounds for Mr. Juneau

03:50  22  to terminate her employment, that or other things, I'm not here

03:50  23  to decide today.  That's a matter that's the subject of a

03:50  24  separate piece of litigation.  That's not before the Court here

03:50  25  today.  With respect to the special master's report, I think

03:50  1  she shouldn't have done that.  Again, I don't see any -- well

03:50  2  I'll just leave it at that.

03:51  3          Mr. Jon Andry.  I think Mr. Lerner described

03:51  4  Mr. Andry's conduct best several times in his sworn statement

03:51  5  or deposition where I think Mr. Andry tried to just wash his

03:51  6  hands of this.  He knew it was improper, what they were doing,

03:51  7  what Mr. Lerner wanted to do, that is, pay the referral fee to

03:51  8  Mr. Sutton while he was working inside the program.  Mr. Andry

03:51  9  said it was improper.  He said he didn't want to pay the fee,

03:51  10  but there's several pieces of evidence that convince the Court

03:51  11  that Mr. Andry was aware that the money he was sending from

03:51  12  Andry Lerner to Glen Lerner & Associates in Las Vegas, that

03:52  13  Glen Lerner would use that money to pay the referral fee to

03:52  14  Mr. Sutton.

03:52  15          December 14, 2012, this is right around the time

03:52  16  they are talking about the very first payment.  They had gotten

03:52  17  the first fee on the first Thonn claim and they are deciding

03:52  18  how to deal with it.  Mr. Lerner is getting pressured by

03:52  19  Mr. Sutton to pay him his fee and he is trying to understand

03:52  20  what the arrangement is.

03:52  21          There's an e-mail from Jon Andry to Glen Lerner.

03:53  22  He asks, "Did you talk with Tiger about Thonn?"

03:53  23          Glen Lerner responds, "Thonn?"

03:53  24          Jon Andry responds, "I spoke with Susan and told

03:53  25  her we needed to figure out what to do and how to do it.  She

1  determined that it would be better to wait until the total
2  Thonn was done as the initial amount was relatively low."
3          Then it goes on below that and Glen Lerner says,
4  "What is Thonn?"
5          Jon Andry says, "It is Casey Thonn, the case
6  that Tiger referred."  This is all December 14.
7          Glen Lerner responds, "We are going to pay Thonn
8  but only once I'm paid, not paying out of my pocket."
9          Jon Andry responds, "You just got a
10  disbursement.  Pay it out of that."
11          That was on December 14.  Then, of course, there
12  were a couple of more payments made.  Then when they are
13  talking in March, March 20, 2013, about the roughly $16,000
14  payment, there's an e-mail from Susan DeSantis at Andry Lerner
15  to Glen Lerner and Jeff Cahill.  She says, "I am mailing you
16  the following checks from Andry Lerner, LLC:  Check 1308,
17  $16,665.21, 50 percent Casey Thonn referral fee."
18          Glen Lerner responds to Susan DeSantis,
19  Jeff Cahill, and Jon Andry.  So Andry is copied on the e-mail.
20  Glen Lerner says, "I am confused on Thonn.  I am supposed to
21  give referral attorney 50 percent, correct?  That was our deal
22  with him.  If fee was $33,000 and you send me $16,000 for my
23  end and I'm supposed to send him the full $16,000, then I got
24  no fee, same as the last referral."
25          Ms. DeSantis responds to all, meaning all copied

on the e-mail, "Your 40 percent will be in a draw, not referral."

So what I conclude from those messages is that although Mr. Jon Andry knew that it was improper for Andry Lerner to pay these monies as a referral fee to Mr. Sutton while he was employed inside the program, nonetheless he sends the money to Mr. Lerner, washes his hands of it and says, "You just got the money.  Pay it out of there."

Then it's obvious that Mr. Lerner is not happy with having to pay the entire 50 percent over to Mr. Sutton, so he inquires, "What am I going to get out of this?"

The response from the Andry Lerner firm is: "Your 40 percent will be in a draw and not referral."

So he is going to get 40 percent of the other half of the fee.  So the monies did come from Andry Lerner.  In a real sense, it was paid by Jon Andry and Glen Lerner in a circuitous way, again, to ultimately get to Mr. Sutton here in New Orleans.

What's really troubling, too, beyond those facts, is the following.  When Mr. Jon Andry is initially approached by Mr. Mike Juneau and asked about any payments or financial interest that Mr. Sutton had in any claims that the Andry Lerner firm was handling, Mr. Andry flatly denied it.

Also, when he was questioned under oath by the special master in his sworn statement of July 30, 2013,

1  Mr. Andry made several statements which do not appear to be

2  accurate or true.  First of all, at page 27 he was being asked

3  about -- this was a meeting he had with Mr. Sutton at

4  Mr. Andry's law office.  Mr. Sutton had requested to meet with

5  him right after he had gotten suspended or terminated from the

6  program.  He was asked:

7          "QUESTION:  What was discussed during this meeting?

8          "ANSWER:  That he (Mr. Sutton) was suspended from the

9      facility because allegedly he had an interest in the cases

10     that I had.  And I said, 'That's a bunch of garbage.  You

11     don't have any interest in the cases and I don't

12     understand that.'"

13         Bottom of page 31, Mr. Andry was talking about

14  discussions with Mr. Glen Lerner about the request for payments

15  by Mr. Sutton.  He says he talked to Glen about the propriety

16  of paying a referral fee:

17         "ANSWER:  It wasn't, from my perspective, that they

18     weren't entitled to the fee, because when we got the

19     Casey Thonn matter there was an extensive body of work

20     that Ms. Reitano did shepherding the claim through the

21     Gulf Coast Claims Facility.  So as a result of that, I

22     never thought they weren't entitled to the fee, but it was

23     just talked to me or explained to me, I guess, by Lerner

24     during that time that we talked about it that it wasn't

25     proper for them to receive a fee because they worked at

04:01    1    the facility or she worked at the facility."

04:01    2         Then the next page:

04:01    3      "QUESTION:  Was that a continuing conversation you

04:01    4    had with Mr. Lerner?

04:01    5      "ANSWER:  Yes, it was.

04:01    6      "QUESTION:  Did you ever reach an agreement on

04:01    7    whether or not a fee should be paid?

04:01    8      "ANSWER:  Yes.

04:01    9      "QUESTION:  And when, approximately, was that?

04:01   10      "ANSWER:  April of this year," and he is talking

04:01   11    about 2013.

04:01   12      "QUESTION:  So in April of this year both Ms. Reitano

04:01   13    and Mr. Sutton, to your knowledge, were working at the

04:01   14    facility?

04:01   15      "ANSWER:  That is correct.

04:01   16      "QUESTION:  What was the agreement or consensus that

04:01   17    you reached with Mr. Lerner?

04:02   18      "ANSWER:  That I nor Andry Lerner was going to pay

04:02   19    Mr. Sutton a fee.

04:02   20      "QUESTION:  Was a fee ever paid, to your knowledge?

04:02   21      "ANSWER:  I've learned subsequently a fee was paid by

04:02   22    Glen.  Andry Lerner did not issue any checks to Sutton at

04:02   23    all.

04:02   24      "QUESTION:  How was Mr. Sutton paid by Mr. Lerner?

04:02   25      "ANSWER:  I have learned subsequent to all -- when

1      all of this broke, I talked to Glen about it and I learned
2      that Glen had a relationship with Tiger and that Tiger
3      asked Glen for the fee, and that Glen said, 'Okay.  I'll
4      pay you the fee.'  And that's when they put the money
5      into -- it was a wire transfer into the Crown account
6      because that's what Tiger asked for."

7         So Mr. Andry is telling the special master that
8 he didn't know anything about the fee being paid, that fee was
9 paid or going to be paid by Mr. Lerner, until this all broke
10 publicly.  As I pointed out before, that is not truthful.  Then
11 he goes on pages 34 and 35:

12      "QUESTION:  Was it your understanding, then, that the
13      deal to pay the fee was between Mr. Lerner and Mr. Sutton?
14      "ANSWER:  Unequivocally.
15      "QUESTION:  You were not a party to that?
16      "ANSWER:  No.
17      "QUESTION:  And you objected to it, you said?
18      "ANSWER:  Yes.
19      "QUESTION:  And you were surprised to hear about it?
20      "ANSWER:  Yes."

21         Again on page 41 -- remember, he is giving this
22 statement in July of 2013 -- he makes the comment, "I never had
23 any idea about payments to Sutton until recently."

24         Again, it's clear that Mr. Andry knew that it
25 was improper to make these payments.  He talks about that again

04:04   1   on page 48.  He knows that since "Christine sent us the case,
04:04   2   she can't work on it or get a fee.  And so I just presumed
04:04   3   Tiger was in the same position."
04:05   4          With respect to Mr. Lerner, again there's no
04:05   5   question that Mr. Lerner was well aware that it was improper
04:05   6   for these payments to be made to a lawyer working inside the
04:05   7   claims facility while Mr. Lerner and his firm were representing
04:05   8   approximately a thousand claimants before the same program, the
04:05   9   same facility.
04:06   10          He also knew or had to know that it was a huge
04:06   11   conflict of interest for him to be a business partner of
04:06   12   Mr. Sutton in this outfit called Crown, LLC and to be making
04:06   13   substantial monthly payments to Mr. Sutton while, again, he was
04:06   14   asking Mr. Sutton from time to time to help him move his claims
04:06   15   along.
04:06   16          The conflict of interest here was so blatant and
04:06   17   so obvious that we had a paralegal that recognized these
04:06   18   conflicts of interest and these lawyers didn't.  It's just
04:06   19   mind-boggling to me.  So I think they knew exactly what they
04:06   20   were doing.  I don't believe that they didn't know that these
04:06   21   were big conflicts of interest.
04:06   22          As far as Mr. Lerner, Mr. Lerner claims that,
04:07   23   "Well, I just asked Mr. Sutton if it was a conflict of interest
04:07   24   and he said no, so I thought it was okay."  Well, you know,
04:07   25   Mr. Lerner is a lawyer too.  He can't just rely on what

Mr. Sutton tells him as far as whether the circumstances, the knowledge he has, creates a conflict of interest.  He apparently does nothing else.  He doesn't ask Mr. Sutton to get anything in writing to waive any kind of possible conflict.  He doesn't approach Mr. Juneau.  Apparently he doesn't get an ethics opinion from anybody.  He just does it.  He just makes the payment.  Again, he assists Mr. Sutton in using this circuitous routing of these payments.

Again, Mr. Lerner had multiple conflicts he was aware of.  When Ms. Reitano goes to work there, he knows now his business partner's wife is working inside the program.  The second conflict is that he knows Mr. Sutton is demanding and requesting -- pressuring him, really, for payment of these referral fees on the Thonn claims.

Lastly, importantly again, he knows that they are also doing business simultaneously in this other outfit called Crown, an ongoing business relationship with a lot of money passing back and forth while all this is going on.

None of this is reduced to writing, by the way, these agreements to pay referral fees or share fees in this case.

Mr. Sutton, Mr. Jon Andry, and Mr. Lerner, of course, are all attorneys:  Mr. Andry and Mr. Sutton being members of the bar of this state; and Mr. Lerner being, as I appreciate it, a member of the bar of Nevada but subjecting

himself to the jurisdiction of this Court by participating with his law firm, Andry Lerner, in claims before the Court within the confines of MDL 2179.

There's even an order I issued early on in this case which waived the normal *pro hac vice* requirements and procedures that an out-of-state lawyer has to go through to practice in this court.  We waived that to facilitate because we knew we had so many out-of-state lawyers coming into this Court and I wanted to make it as painless as possible for them to do that.  So we waived the fees, we waived the usual requirements, except I made it clear in a subsequent order that we were not waiving the part of the *pro hac vice* rule which says that when you participate in this MDL in this Court, you are subjecting yourself to the jurisdiction of the Court and to the ethical rules and Rules of Professional Conduct adopted by the Court.

This Court applies the Louisiana rules and has adopted the Louisiana Rules of Professional Conduct.  There are several rules that I think may be pertinent, may be applicable.

First of all, there was suggestion by Mr. Sutton quibbling over whether this was a referral fee or not a referral fee.  "It wasn't a referral fee because it was just compensating me for the work I have done before the case was referred to Andry Lerner."

Rule 1.5 says, "A lawyer should not make an

1    agreement for, charge, or collect an unreasonable fee."  Then

2    it goes on to say the factors to be considered in determining

3    the reasonableness of a fee include (1) the time and labor

4    required, and there's certain other requirements.  That's the

5    most important one here, though.

6              So normally if a lawyer is going to request a

7    fee for his services, in terms of sharing a fee with another

8    lawyer, there has to be some kind of assessment of who did what

9    work and how much work, and usually that's based on the amount

10   of time expended and the amount of expenses incurred.

11             Also Rule 1.5(e) says, "A division of fee

12   between lawyers who are not in the same firm may be made only

13   if:

14             "(1) The client agrees in writing to the

15   representation by all the lawyers involved and is advised in

16   writing as to the share of the fee that each lawyer will

17   receive," which was not done in this case;

18             "(2) The total fee is reasonable;

19             "(3) Each lawyer renders meaningful legal

20   services for the client in the matter."

21             It's a pretty obvious ethical rule -- I know in

22   Louisiana, I suspect in many other states -- that you can't get

23   a referral fee or whatever you call it unless you have actually

24   done some work.  You can't just get a fee for referring a case

25   to another lawyer without doing some work.  The work has to be

04:13  1    meaningful and it has to be in proportion or based on an

04:13  2    assessment of the work you have done.

04:13  3              In this case none of that occurred, as I see it.

04:13  4    The 50 percent, rather obviously, wasn't based on any kind of

04:14  5    assessment of how much work Ms. Reitano had done compared to

04:14  6    how much Andry Lerner had done.  It was simply their usual or

04:14  7    rather typical referral fee to a referring lawyer.

04:14  8              Rule 3.3, "A lawyer shall not knowingly make a

04:14  9    false statement of fact or law to a tribunal."  Well,

04:14  10   Mr. Juneau may not be technically a tribunal, but he is a Court

04:14  11   appointed claims administrator.  And as far as I'm concerned,

04:14  12   if a lawyer, particularly a lawyer who is working for him,

04:14  13   makes a false statement to my Court appointed claims

04:15  14   administrator, as Mr. Sutton has admitted he made on several

04:15  15   occasions, that's the same as making a false statement to the

04:15  16   Court.

04:15  17             Likewise, Mr. Andry made the statements that I

04:15  18   think were false during his sworn statement.  He made false

04:15  19   statements to Mr. Juneau's office and Mr. Welcker first and

04:15  20   then to the Court appointed special master.  I think he

04:15  21   violated Rule 3.3 also.

04:15  22             Finally, I guess you call it the catchall rule

04:16  23   down at the end of the Rules of Professional Conduct, Rule 8.4,

04:16  24   "It is professional misconduct for a lawyer to (a) violate or

04:16  25   attempt to violate the Rules of Professional Conduct, knowingly

1  assist or induce another to do so, or to do so through the acts

2  of another."  I think Mr. Sutton, Mr. Andry, and Mr. Lerner

3  each violated that rule.

4         It's also professional misconduct for a lawyer

5  to "(c) engage in conduct involving dishonesty, fraud, deceit,

6  or misrepresentation."  I think that clearly occurred in this

7  case, too, for the reasons I have mentioned.

8         Finally, it's misconduct for a lawyer to engage

9  in conduct that is prejudicial to the administration of

10  justice, and that may be the most important rule of all here.

11         Mr. Unglesby is a very good lawyer but,

12  Mr. Unglesby, you said one thing that I have to strongly

13  disagree with here when you said despite all of this there was

14  no harm done.  The harm that's been done by all that's occurred

15  in this case here is to the integrity of this Court Supervised

16  Settlement Program, to the integrity of the legal system.

17         The fallout from what started with Mr. Sutton's

18  misconduct and mushroomed from there has caused or created a

19  tremendous injury to what we are doing here.  It ultimately led

20  to much of what's happened since then in the sense of claims

21  being delayed, the claims program being shut down for a period

22  of time, a tremendous amount of adverse publicity, criticisms

23  of Mr. Juneau, of the claims facility, of the Court, of

24  everybody concerned with this.

25         I'm not suggesting that Mr. Sutton and these

04:19  1   others are responsible for all of that.  I'm suggesting that
04:19  2   this is where it started.  So it's a contributing factor to all
04:19  3   of that that's unfortunately occurred and we have had to deal
04:19  4   with.  So there has been harm.
04:20  5            Finally, with respect to The Andry Law Firm
04:20  6   claim, as I said, there has been absolutely no evidence that
04:20  7   that claim was improperly or corruptly manipulated in any way.
04:20  8   As far as I can recall, it's been reviewed and re-reviewed
04:20  9   numerous times.  I don't find any evidence or certainly not
04:20  10  sufficient evidence of any type of misconduct by Mr. Gibby
04:20  11  Andry that would warrant the Court applying any kind of unclean
04:21  12  hands doctrine or any other doctrine or legal theory to say
04:21  13  that that claim should not be paid on the basis of what
04:21  14  happened in this investigation.
04:21  15           As was pointed out I think accurately, the most
04:21  16  that can be said is that Mr. Gibby Andry was pretty aggressive
04:21  17  in terms of trying to push his law firm's claim through and get
04:21  18  it paid, but that conduct is not sufficient to say that his
04:22  19  claim should be denied on that basis.
04:22  20           I am not prepared today to decide what sanctions
04:22  21  should be imposed.  I need to give that some thought.  As I
04:22  22  said, I have pointed out where I think the professional
04:23  23  misconduct occurred.  I need to give some more thought to what
04:23  24  the appropriate action should be on that.
04:23  25           Anyone here now from the claims facility?  I

1    don't see anyone.

2              I know we were talking about at one point a

3    universe of some 600 claims that had been held up, the

4    Andry Lerner firm's -- maybe Mr. Paw can tell me -- and there

5    was some negotiations over -- I had said I want the legitimate

6    claims to be paid and the ones that are suspicious or

7    red-flagged we will hold up and investigate further.  There

8    have been a few of those, we know.  What's the status of paying

9    the claims that have been cleared and should be paid and then

10   escrowing those fees?

11            **MR. DRAPER:**  I can address that, Your Honor.  There

12   is a process in place where the legitimate claims are paid.  I

13   get the money.  It is then --

14            **THE COURT:**  I don't know.  Did you identify yourself

15   earlier?

16            **MR. DRAPER:**  Douglas Draper on behalf of the

17   Andry Lerner firm.

18            **THE COURT:**  Okay, Mr. Draper.

19            **MR. DRAPER:**  The checks come to me.  I sign the

20   checks.  They are then brought over to the client.  I report

21   back to the claims administrator as well as Mr. Paw when the

22   money has been distributed.  The legal fees are sitting in an

23   escrow account that I control.  So I'm holding the legal fee

24   portion.

25            **THE COURT:**  So the claims that have been cleared,

04:24  1    those claimants are being paid, but the legal fees are being

04:24  2    escrowed, correct?

04:24  3               MR. DRAPER:  Yes.  Yes.

04:24  4               MR. PAW:  That's correct, Your Honor.

04:24  5               THE COURT:  I wanted to clarify that because that was

04:24  6    my understanding.

04:25  7               Anybody have anything else to say?  I think I

04:25  8    have said all I need to say right now.

04:25  9               MR. UNGLESBY:  You are going to tell us when to come

04:25  10   back?

04:25  11              THE COURT:  I'll figure out how to deal with it.  I

04:25  12   haven't thought beyond what I just said, Mr. Unglesby.

04:25  13              I want to repeat again as I started.  This is a

04:25  14   very unfortunate set of circumstances that arose here.  I

04:25  15   really regret that it's come to this.  This is not what I

04:25  16   thought I was signing up to do when I took this job, to deal

04:25  17   with something like this, but it has to be addressed.  Court is

04:25  18   adjourned.

04:26  19              THE DEPUTY CLERK:  All rise.

04:26  20              (Proceedings adjourned.)

04:26  21                              *  *  *

22

23

24

25

1                              **<u>CERTIFICATE</u>**

2            I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                        *s/ Toni Doyle Tusa*
                                         Toni Doyle Tusa, CCR, FCRR
10                                       Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25