# EXHIBIT 2

```
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
2

3   IN RE:  OIL SPILL        )   MDL NO. 2179
    BY THE OIL RIG            )
4   "DEEPWATER HORIZON" IN    )   SECTION "J"
    THE GULF OF MEXICO, ON    )
5   APRIL 20, 2010            )   JUDGE BARBIER
                              )   MAG. JUDGE SHUSHAN
```

******************

VOLUME 1

*****************

Deposition of DR. KATHLEEN SUTCLIFFE, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 17th day of October, 2014.

89

1  Q. Well, did -- did experts in this case
2  testify about some of the risks that occurred in
3  drilling the Macondo Well?
4      A. I think that some experts testified on
5  that. But, again, I was looking at BP's safety
6  culture and BP's safety culture in the time
7  leading up to April 20th, 2011.
8      Q. But you weren't -- you weren't in an
9  ability to address whether that safety culture was
10 being enacted appropriately, given that you
11 couldn't -- you could not identify what were risky
12 or dangerous decisions?
13         MR. FOWKES: Object to the form.
14     A. Actually, I -- I really need to -- to
15 respectfully say that I -- I don't understand
16 safety culture in that same way. I'm -- and I'm
17 not sure we're on the same page on that. I mean,
18 safety culture, what it is, is that it's the
19 norms, beliefs, and values of an organization that
20 affect how people think, feel, and behave about
21 safety. And what I showed in my analysis,
22 particularly in -- in the Enact section, is that
23 people were enacting the practices of the
24 organization that were re- -- required, stop the
25 job safety observations and conversations, audits,

90

1  the performance reviews that took into account
2  both process and personal safety, metrics, and
3  also where safety was -- was a key criterion. So
4  those -- I demonstrated that people were acting
5  with safety in mind.
6      Q. (BY MS. HANKEY) Did the employees at --
7  at Texas City act with safety in mind?
8      A. Again, I was not analyzing the safety
9  culture at Texas City. I was analyzing the safety
10 culture in the Gulf of Mexico.
11     Q. Employees at Texas City had stop work
12 authority, correct?
13     A. I -- I believe they did, yes.
14     Q. And did you -- do you know how often they
15 exercised that stop work authority?
16     A. Again, as I said earlier, I didn't study
17 Texas City in that way.
18     Q. Do you know whether the employees at Texas
19 City felt that they had authority to stop work?
20     A. No. Again, I would have to go back to
21 the -- the reports, because I honestly don't
22 remember.
23     Q. Do you know whether employees at Texas
24 City had safety on the mind?
25     A. I didn't study the safety culture at Texas

91

1  City.
2      Q. Should a stop work have been issued during
3  the negative pressure test?
4      A. Again, I -- I didn't study that --
5  Macondo, per se. So I -- I really can't weigh in
6  on that.
7      Q. In a good safety culture, do you place
8  profits ahead of safety?
9      A. I think the issue of process and safety
10 are -- are very important, and all organizations
11 have to balance their activities.
12     Q. So when a good -- if you have a good
13 safety culture, do you put profits before safety?
14         MR. FOWKES: Object to the form.
15     A. Generally speaking, I mean -- first of
16 all, you can -- you can make profits without
17 interrupting safety. So you have to really know
18 more specifically about what you're -- what you're
19 asking.
20     Q. (BY MS. HANKEY) If you can make profits
21 without interrupting safety, should you ever put
22 profit ahead of safety?
23     A. Generally speaking, organizations have to
24 balance. But if you want -- you know, I mean,
25 hypothetically, is it a good thing just to always

92

1  put profits ahead of safety? No. Of course not.
2      Q. In a good safety culture, do you proceed
3  without mitigating risk?
4      A. Again, in -- in -- in a strong safety
5  culture, people are thinking about risks and the
6  hazards in their work and are going about their
7  work with safety in mind.
8      Q. BP has not performed a root cause analysis
9  of the Macondo incident; is that correct?
10         MR. FOWKES: Object to the form.
11     A. My understanding is that BP, right after
12 the event, did an analysis and that -- that it
13 was -- in my view, because it happened so quickly,
14 it was -- that was laudable.
15     Q. (BY MS. HANKEY) And do you -- do you
16 understand that BP explicitly excluded root cause
17 analysis from its investigation?
18     A. First of all, may I just ask how you
19 define "root cause analysis"? Because --
20     Q. Well, how do you define "root cause
21 analysis"?
22     A. No, I'm asking you. In -- in part,
23 because in my field, there are many, many
24 definitions for "root cause analysis," so I'm just
25 curious about how you're defining it.

23 (Pages 89 to 92)

101

1  feet with no drilling margin came with a risk that
2  it might encounter another overpressurized [sic]
3  sand package that would initiate a potentially
4  uncontrollable well control event.
5          Did I read that correctly?
6      A. Yes, you did.
7      Q. Do you know what a "safe drilling margin"
8  is?
9      A. I'm not a technical expert. So, no, I --
10 I don't know what a "safe drilling margin" is.
11     Q. Did you consider these events in making
12 your determination to BP's process safety --
13 safety culture?
14     A. Again, I didn't examine process safety;
15 and my role was to examine BP's safety culture in
16 the time leading up to the DEEPWATER HORIZON, and
17 I did not examine the Macondo incident.
18     Q. Do you know whether BP violated the law in
19 these events as described by the Court?
20         MR. FOWKES: Objection; foundation,
21 legal conclusion.
22     A. I don't -- I don't have an opinion on
23 that.
24     Q. (BY MS. HANKEY) Does violating -- if they
25 did, in fact, violate the law in continuing to

102

1  drill without a safe drilling margin, does that
2  reflect on BP's safety culture?
3          MR. FOWKES: Object to the form.
4      A. Again, you know, what I found is that
5  there was a prevailing attitude in BP, widely
6  shared, strongly held: Safety is important. We
7  care about safety. We want to act in safe ways.
8  That's what I found.
9      Q. (BY MS. HANKEY) Is it safe to drill
10 knowing that you may cause a potentially
11 uncontrollable well control event?
12         MR. FOWKES: Object to the form.
13     A. I -- I don't know that I can answer that,
14 because I don't -- because I don't have an answer.
15 I don't know.
16     Q. (BY MS. HANKEY) Do you know whether BP
17 took any steps -- any steps to mitigate the risk
18 of an uncontrollable well control event when they
19 decided to drill the 100 feet as described here in
20 the Court's findings?
21         MR. FOWKES: Object to the form.
22     A. I don't know anything about this incident.
23     Q. (BY MS. HANKEY) Do you know whether they
24 violated BP's code of conduct when they drilled,
25 knowing they could potentially cause an

103

1  uncontrollable well control event?
2          MR. FOWKES: Object to the form.
3      A. Actually, I have not studied this, so I
4  can't -- I can't say one way or another.
5      Q. (BY MS. HANKEY) Well, you've studied BP's
6  code of conduct. Does BP's code -- what does BP's
7  code of conduct say about proceeding with this
8  type of risk?
9          MR. FOWKES: Object to the form.
10     A. I don't have it. I would have to -- to
11 think about it, and I have not studied this --
12 this incident.
13     Q. (BY MS. HANKEY) Did BP violate any of the
14 policies and practices of OMS in con -- continuing
15 to drill without a safe drilling margin?
16     A. Again, I -- I can't answer that question,
17 because I haven't studied this and I don't know
18 the particulars.
19     Q. Did BP violate beyond the best in de- --
20 deciding to drill another 100 feet without a safe
21 drilling margin?
22     A. I can't answer the question.
23     Q. Do you know whether they violate- --
24 violated any of BP's policies and pro- --
25 procedures?

104

1      A. I'm not -- I can't answer the question. I
2  didn't study this.
3      Q. Do you know who in leadership was informed
4  of this decision, to drill ahead despite the risk
5  of a well control event?
6      A. I have not studied this.
7      Q. Do you know whether they did lessons
8  learned regarding this event?
9          MR. FOWKES: When you say -- when you
10 say "this event," are you just -- are you talking
11 about the Macondo incident or --
12         MS. HANKEY: I'm talking --
13         MR. FOWKES: -- or Paragraph 58?
14         MS. HANKEY: I'm sorry, I'm talking
15 about Paragraph 58.
16     A. You know, I -- I know, generally speaking,
17 that people at BP did lessons learned. I don't
18 know whether there was a lessons learned event for
19 this -- this event. I don't know. I didn't study
20 it.
21     Q. (BY MS. HANKEY) What did training offered
22 by BP tell the drilling team that they should do
23 in the face of this risk?
24     A. Again, what I know about training is that
25 it -- the -- the amount of money for training

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER
Worldwide Court Reporters, Inc. (800)-745 1101

197

1  Well, per se. I studied BP safety culture, and
2  that's what I did.
3     Q. Your report says that you've -- you've
4  reviewed all of the depositions in this case; is
5  that right?
6     A. I reviewed all of the depositions that
7  were available as of October in 2011, and I think
8  that there were other depositions that came in
9  after the that. I can think about the deposition,
10 for example, of -- of Dwayne Wilson. So there may
11 be another -- other depositions that I have
12 forgotten that came in after October. But, yes.
13    Q. In terms of how wells were drilled and the
14 op- -- the operations conducted in drilling a
15 well, what other levels did you look at?
16    A. I wasn't looking at how wells were
17 drilled, necessarily. I mean, there was evidence
18 that I saw about looking at risk reg- -- risk
19 registers, stage gate processes, things like that.
20 For this particular report that I did here, I was
21 really examining BP's safety culture and, in part,
22 in response to Rear Admiral Cantrell.
23    Q. How did you address BP's safety culture --
24 when you say that you were addressing BP's safety
25 culture -- and you -- you were not looking at the

198

1  Macondo Well, correct?
2     A. I was looking at some data related to
3  Macondo, so there -- I have data in this report
4  from Macondo and how BP enacted its culture on
5  Macondo. And we see evidence of that, and I can
6  take you to the end of the report where all of
7  that evidence is.
8     Q. Did you look at how -- so you say that you
9  looked at Macondo -- you looked at some evidence
10 of Macondo. What evidence did you exclude from
11 your analysis?
12    A. I was looking at evidence related to how
13 certain practices were being enacted, and those
14 examples came from the Macondo Well.
15    Q. So --
16    A. Well, they came from the DEEPWATER
17 HORIZON. And some of them might have been when
18 the well was being -- when the well was being
19 drilled. I think the -- some of them might have
20 been from the year before.
21    Q. So which -- what practices and procedures
22 that BP implemented or enacted after Texas City
23 did you evaluate and -- as how it was enacted on
24 the Macondo Well?
25    A. I was looking at the -- stop the job. I

199

1  was looking at the safety observations and
2  conversations. I was looking at performance
3  evaluations. I was looking at safety audits. I
4  was looking at the audits that were conducted on
5  the DEEPWATER HORIZON. So there were a number of
6  things. I was looking at the daily reports. So
7  all of those things were -- were after Texas City.
8     Q. Did you review the daily report for the
9  negative pressure test?
10    A. I did not look at the negative pressure
11 test.
12    Q. Did you look at any of the daily reports
13 for the cement job that was performed on
14 April 19th?
15    A. I did -- I did not look at the cement job.
16 I do not -- I was not examining the well.
17    Q. Let's look at the Bates page ending in
18 -387. Do you see in the middle of the page there,
19 it says, "Rules are known..."? Or I should say
20 the middle of the top section. "Rules are known
21 but people do not think that they have to follow
22 them, too many options - need to establish and
23 follow procedures"?
24    A. Yes, I see that.
25    Q. Did you evaluate whether policies and

200

1  procedures were followed on the Macondo Well?
2     A. Again, you know, I looked -- generally
3  speaking, I examined the extent to which people
4  were enacting the policies that were really
5  critical for safety culture. And as I've stated
6  before, those would be stop the job. Why is it
7  important? Because we really wanted people to
8  take care in examining risks or concerns or
9  whatever and make sure that they feel safe
10 speaking up.
11        The other one is safety observations
12 and conversations. Why? Because in a strong
13 safety culture, you want people to stay
14 intelligently wary. And -- and the other things
15 that I mentioned. So those were the practices, as
16 I stated earlier -- I think in this deposition --
17 I didn't look at, you know, did -- did X person on
18 X day comply with XYZ thing? I didn't dig that
19 deeply into compliance. But were people following
20 the rules and did I see other evidence of
21 compliance? Yes.
22    Q. If --
23    A. But did I follow one thing through? No, I
24 didn't.
25    Q. If people only follow the rules

50 (Pages 197 to 200)