# EXHIBIT A



E-SERVICE
56256399
Oct 28 2014
10:01PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

---

**In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**

**This Pleading Relates To**
- **10-4182** (*Alabama v. BP*)
- **10-4183** (*Alabama v. Transocean, et. al*)
- **13-2645** (*Alabama v. Anadarko & MOEX*)
- **13-2646** (*Alabama v. Transocean*)
- **13-2647** (*Alabama v. Halliburton*)
- **13-2813** (*Alabama v. BP*)

**MDL No. 2179**
**SECTION: J**

**JUDGE BARBIER**
**MAGISTRATE SHUSHAN**

---

## STATE OF ALABAMA'S SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF DISCOVERY REQUESTS

Pursuant to the Court's orders and Federal Rules of Civil Procedure 26, 33, 34, and 36, the State of Alabama ("State") submits the following supplemental responses to the Defendants' First Set of Discovery Requests served on July 14, 2014.

### SPECIFIC RESPONSES AND OBJECTIONS

The State responds as follows to the Defendants' specific interrogatories and requests for production, subject to and without waiving the State's general objections, *see infra* at pp. 48-58 each of which is specifically and fully incorporated into each of the individual responses below.

## INTERROGATORIES

**INTERROGATORY NO. 1:**        For each individual category of damages claimed in the State of Alabama's Fed. R. Civ. P. 26(a) Initial Disclosures and any Amendments thereto, describe in detail the bases to support the damages computation for each category, including how the State applies each economic theory that it identifies to compute its damages for that category.

## OBJECTIONS:

The State objects to Interrogatory #1 on the grounds that it is overly broad and unduly burdensome, as it seeks to have the State identify all "bases" to support its damages computation at this stage of the case.  Discovery is in its early stages and the State cannot ascertain at this time all bases for which it will support its claims until fact and expert discovery have concluded. The State also objects to Interrogatory #1 on the grounds that it is overly broad and unduly burdensome to the extent this Request seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

The State objects to Interrogatory #1 to the extent that Defendants seek either the legal or expert bases supporting the State's claims.  No response is required or given regarding legal and expert conclusions.  Accordingly, the State's response is limited to factual bases.

## RESPONSE:

Subject to and without waiving its specific and general objections, the State responds as follows:

### 1)  Factual Basis Supporting All Claims

On April 20, 2010, the *Deepwater Horizon* oil rig suffered a catastrophic explosion and ultimately sank into the ocean on April 22, 2010.  The explosion and sinking of the *Deepwater Horizon* set off an oil spill, which lasted more than 80 days and released millions of gallons of

crude oil and oil hydrocarbon constituents into the Gulf of Mexico.  The Defendants' wrongful acts caused the aforementioned explosion, sinking, and oil spill.[1]

The State's lands were heavily oiled during the summer months of 2010, and these lands continue to be oiled.  The State's waters were also heavily oiled, resulting in the closure of the State's fishing territories.  These oiling events did not exist in severity or point of origin before the 2010 oil spill, and they have caused, and continue to cause, physical and economic injury to the State's coastal property interests.

The State of Alabama's coastline, its waters, and the neighboring region serve as a major tourism and economic driver to the State.  The oil spill caused significant economic damage that negatively impacted the entire State, its tax streams, its budget, and the departments called to respond in the disaster's wake.  The oil spill's continued impact and stigma created and continues to create uncertainty surrounding the Gulf Coast's long-term viability.

### 2)  Additional Factual Basis for Tax Loss Claim

The State of Alabama's tax streams are dependent, in part, on the viability of the Gulf Coast's economy and resources.  The oil spill negatively impacted the Gulf Coast economy, its tourism industry, supporting industries, and businesses to the Gulf Coast economy and the tourism industry. The State's macroeconomic climate was negatively impacted by the spill, and as a result, the State's tax streams were depressed from what they should have been as a result of the oil spill.

While the State's damage analysis is not complete, and is ongoing, the State anticipates using pre-spill tax stream and economic data, public and State-based, from a pre-spill benchmark

---

[1] The State reserves the right to include and/or supplement this factual basis with the Court's findings in its order regarding the two-phase limitation and liability trial, once that order is filed.

in conjunction with one or more economic models and/or analysis to determine what the State's tax streams should have been during the spill and in post-spill months had the disaster not occurred. The difference between the State's "but for" and "actual" tax stream performance will demonstrate that the State suffered losses to its tax streams as a consequence of the oil spill.

### 3) Additional Factual Basis for Financial Impact Claim

The State's Education Trust Fund ("ETF") is the primary recipient of the State's tax streams.  The State's ability to fund and project funding for K-12 education programs is based on the State's collection of taxes. By funding the State's K-12 education programs, the State avoids increased costs that would otherwise occur but for funding.  Because the Defendants' oil spill caused tax collections to decrease, the State's ability to fund its education programs likewise decreased and/or was impacted. This impact on the State's education system has resulted and will result in additional expenditures and decreased tax revenues for the State. While the State's damage analysis is not complete and is ongoing, the State anticipates utilizing one or more accepted models to determine the increased costs to the State as a result of the oil spill's impact on the State's tax streams.

### 4) Additional Factual Basis for the ADECA Claim

Pursuant to U.S. Department of Labor grant number EM-20645-10-60-A-1, the Alabama Department of Economic and Community Affairs ("ADECA") implemented and oversaw a dislocated worker program created in response to and as a result of the oil spill's economic toll. The program was designed to assist and train dislocated workers in alternative occupations, and the Department is contractually obligated to seek reimbursement for costs associated with the program. While the State's calculation of the claim is not complete, it is anticipated that the

Department's calculation will be based on the sum of unreimbursed costs and salaries incurred in administering the dislocated worker program.

### 5)  Additional Factual Basis for the ADEM Claim

The Alabama Department of Environmental Management ("ADEM") was a lead and coordinating responder for the State's oil spill response activities. At the inception of the spill, ADEM employees worked to coordinate the State's response efforts at the Unified Command center in Mobile, Alabama, and ADEM incurred response costs associated with those activities. In addition, ADEM continues to utilize its own employees to respond to oiling events which still occur within the State's waters and on the State's lands. Because oiling events continue to be reported and/or observed, ADEM employees continue to respond, and will continue to respond and incur costs associated with their response.

While the State has not concluded its calculation of ADEM's claim—in part because oiling events continue to occur and will continue to occur—the State anticipates that ADEM's claim calculation will be the sum of past unreimbursed response cost activities associated with the spill.  In addition, it is anticipated that the State's calculation will include response costs/increased costs (*i.e.* salaries, equipment costs, testing, and other costs) associated with the expected, continued oiling response.

### 6)  Additional Factual Basis for the DCNR Claim

The Department of Conservation and Natural Resources' ("DCNR") Park's Division, Gulf State Park, saw decreased revenues from individuals that otherwise would have come to the State's Gulf Coast if not for the oil spill. While the State has not completed its analysis for trial, the State anticipates using a pre-spill data-benchmark to determine how the Gulf State Park should have performed in the spill and post-spill years had the disaster not occurred. The

5

difference between Gulf State Park's "but for" and "actual" performance will show the requisite damages associated with the oil spill.

The DCNR Marine Resources Division, Licensing, generates revenues associated with the purchase of saltwater fishing licenses.  The Gulf of Mexico is the only saltwater body adjacent to Alabama's coastline, and during the Summer 2010 months, the Gulf of Mexico was oiled, closed for fishing, or otherwise stigmatized as a result of the oil spill.  While the State has not completed its analysis for trial, the State anticipates using a pre-spill data-benchmark to determine how saltwater license purchase revenues would have performed in the spill and post-spill years had the disaster not occurred. The difference between the saltwater license revenue "but for" and "actual" performance will show the requisite damages associated with the oil spill.

### 7)  Additional Factual Basis for the ABC Board Claim

The Alcoholic Beverage Control Board ("ABC") oversees the sale and distribution of alcoholic beverages within the State, as well as the enforcement of State alcohol regulations. ABC's revenues declined due to the lack of tourism traffic and depressed economy created by the Defendants' oil spill. While the State has not completed its assessment of the ABC claim, the State anticipates using a pre-spill data-benchmark to determine how ABC's revenues would have performed in the spill and post-spill years had the spill not occurred. The difference between ABC's "but for" and "actual" performance will show the requisite damages associated with the oil spill.

### 8)  Additional Factual Basis for the Department of Labor Claim

The Alabama Department of Labor ("Labor") oversees and implements the Alabama Unemployment Compensation Trust Fund (the "Fund"), which is designed to provide weekly unemployment compensation to qualified Alabama workers laid off from their jobs and is funded

6

by unemployment compensation taxes paid by Alabama employers. As a direct result of the Defendants' oil spill and the ensuing economic impact, the Fund incurred additional expenses. Labor tracked these expenses and maintained claim files that will be produced in response to the Defendants' Requests for Production.

* * *

Each of these losses was a direct result of the oil spill, which in turn, was a direct result of the Defendants' wrongful acts.  Additionally, each of these losses is a consequence of injury to the State's proprietary interests, which in turn, was caused by the Defendants' wrongful acts.

**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

**1)  Factual Basis Supporting All Claims**

On April 20, 2010, the *Deepwater Horizon* oil rig suffered a catastrophic explosion and ultimately sank into the ocean on April 22, 2010.  The explosion and sinking of the *Deepwater Horizon* set off an oil spill, which lasted more than 80 days and released millions of gallons of crude oil and oil hydrocarbon constituents into the Gulf of Mexico.  The Defendants' wrongful acts caused the aforementioned explosion, sinking, and oil spill.[2]

The State's lands were heavily oiled during the summer months of 2010, and these lands continue to be oiled.  The State's waters were also heavily oiled, resulting in the closure of the State's fishing territories.  These oiling events did not exist in severity or point of origin before

---

[2] The State reserves the right to include and/or supplement this factual basis with the Court's findings in its order regarding the two-phase limitation and liability trial, once that order is filed.

the 2010 oil spill, and they have caused, and continue to cause, physical and economic injury to the State's coastal property interests.

The State of Alabama's coastline, its waters, and the neighboring region serve as a major tourism and economic driver to the State.  The oil spill caused significant economic damage that negatively impacted the entire State, its tax streams, its budget, and the departments called to respond in the disaster's wake.  The oil spill's continued impact and stigma created and continues to create uncertainty surrounding the Gulf Coast's long-term viability.

### 2)  Additional Factual Basis for Tax Loss Claim

The State of Alabama's tax streams are dependent, in part, on the viability of the Gulf Coast's economy and resources.  The oil spill negatively impacted the Gulf Coast economy, its tourism industry, supporting industries, and businesses to the Gulf Coast economy and the tourism industry. The State's macroeconomic climate was negatively impacted by the spill, and as a result, the State's tax streams were depressed from what they should have been as a result of the oil spill.

While the State's damage analysis is not complete, and is ongoing, the State anticipates using pre-spill tax stream and economic data, public and State-based, from a pre-spill benchmark in conjunction with one or more economic models and/or analysis to determine what the State's tax streams should have been during the spill and in post-spill months had the disaster not occurred. The difference between the State's "but for" and "actual" tax stream performance will demonstrate that the State suffered losses to its tax streams as a consequence of the oil spill.

### 3)  Additional Factual Basis for Financial Impact Claim

The State's Education Trust Fund ("ETF") is the primary recipient of the State's tax streams.  The State's ability to fund and project funding for K-12 education programs is based on

8

the State's collection of taxes. By funding the State's K-12 education programs, the State avoids increased costs that would otherwise occur but for funding. Because the Defendants' oil spill caused tax collections to decrease, the State's ability to fund its education programs likewise decreased and/or was impacted. This impact on the State's education system has resulted and will result in additional expenditures and decreased tax revenues for the State. While the State's damage analysis is not complete and is ongoing, the State anticipates utilizing one or more accepted models to determine the increased costs to the State as a result of the oil spill's impact on the State's tax streams.

### 4)  Additional Factual Basis for the ADECA Claim

Pursuant to U.S. Department of Labor grant number EM-20645-10-60-A-1, the Alabama Department of Economic and Community Affairs ("ADECA") implemented and oversaw a dislocated worker program created in response to and as a result of the oil spill's economic toll. The program was designed to assist and train dislocated workers in alternative occupations, and the Department is contractually obligated to seek reimbursement for costs associated with the program. While the State's calculation of the claim is not complete, it is anticipated that the Department's calculation will be based on the sum of unreimbursed costs and salaries incurred in administering the dislocated worker program.

### 5)  Additional Factual Basis for the ADEM Claim

The Alabama Department of Environmental Management ("ADEM") was a lead and coordinating responder for the State's oil spill response activities. At the inception of the spill, ADEM employees worked to coordinate the State's response efforts at the Unified Command center in Mobile, Alabama, and ADEM incurred response costs associated with those activities. In addition, ADEM continues to utilize its own employees to respond to oiling events which still

9

occur within the State's waters and on the State's lands. Because oiling events continue to be reported and/or observed, ADEM employees continue to respond, and will continue to respond and incur costs associated with their response.

While the State has not concluded its calculation of ADEM's claim—in part because oiling events continue to occur and will continue to occur—the State anticipates that ADEM's claim calculation will be the sum of past unreimbursed response cost activities associated with the spill.  In addition, it is anticipated that the State's calculation will include response costs/ increased costs (*i.e.* salaries, equipment costs, testing, and other costs) associated with the expected, continued oiling response.

### 6)  Additional Factual Basis for the DCNR Claim

The Department of Conservation and Natural Resources' ("DCNR") Park's Division, Gulf State Park, saw decreased revenues from individuals that otherwise would have come to the State's Gulf Coast if not for the oil spill. While the State has not completed its analysis for trial, the State anticipates using a pre-spill data-benchmark to determine how the Gulf State Park should have performed in the spill and post-spill years had the disaster not occurred. The difference between Gulf State Park's "but for" and "actual" performance will show the requisite damages associated with the oil spill.

The DCNR Marine Resources Division, Licensing, generates revenues associated with the purchase of saltwater fishing licenses.  The Gulf of Mexico is the only saltwater body adjacent to Alabama's coastline, and during the Summer 2010 months, the Gulf of Mexico was oiled, closed for fishing, or otherwise stigmatized as a result of the oil spill.  While the State has not completed its analysis for trial, the State anticipates using a pre-spill data-benchmark to determine how saltwater license purchase revenues would have performed in the spill and post-

spill years had the disaster not occurred. The difference between the saltwater license revenue "but for" and "actual" performance will show the requisite damages associated with the oil spill.

### 7) Additional Factual Basis for the Department of Labor Claim

The Alabama Department of Labor ("Labor") oversees and implements the Alabama Unemployment Compensation Trust Fund (the "Fund"), which is designed to provide weekly unemployment compensation to qualified Alabama workers laid off from their jobs and is funded by unemployment compensation taxes paid by Alabama employers. As a direct result of the Defendants' oil spill and the ensuing economic impact, the Fund incurred additional expenses. Labor tracked these expenses and maintained claim files that will be produced in response to the Defendants' Requests for Production.

\* \* \*

Each of these losses was a direct result of the oil spill, which in turn, was a direct result of the Defendants' wrongful acts.  Additionally, each of these losses is a consequence of injury to the State's proprietary interests, which in turn, was caused by the Defendants' wrongful acts.

The State provides this first supplemental response with the understanding that the Parties and the Court are continuing to resolve various issues regarding document production. Moreover, discovery, as well as the State's damage analyses, is continuing in nature.

**INTERROGATORY NO. 2:**      For each individual category of damages claimed in the State of Alabama's Fed. R. Civ. P. 26(a) Initial Disclosures and any Amendments thereto, identify the data, formulas, analyses and documents, including the publically-available information that bear on the nature and extent of the injuries that the State claims it has suffered, that the State has considered and relied upon to support its claim for each damages category.

## OBJECTIONS:

The State objects to the terms "formulas" and "analyses," as these terms are not defined and can be subject to numerous interpretations.

The State objects to Interrogatory #2 to the extent that Defendants seek expert-related "data, formulas, analyses, and documents."  No response is required or given regarding the State's experts.

The State objects to Interrogatory #2 as overly broad and unduly burdensome, as the State cannot ascertain all data, formulas, analyses and documents, including the publically-available information, that will support the State's claims until fact and expert discovery have concluded.  The State also objects to Interrogatory #2 on the grounds that it is overly broad and unduly burdensome to the extent it seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

## RESPONSE:

Subject to and without waiving its specific and general objections, the State responds as follows:

**1)  Physical Property Damage**

While the State's damage analysis is evolving and has not been completed for trial, the State anticipates that the following information may have a bearing on the nature and extent of property injuries the State has suffered: oiling data and information; data and information

referencing the location and operation of oil removal activities within Alabama's territorial waters and lands; property ownership information; information maintained by the Baldwin County and Mobile County tax assessors; and, expert work product and reliance materials (to the extent necessary).

### 2) Tax Losses

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates that the following information may have a bearing on the nature and extent of the State's tax losses associated with the oil spill:  revenue abstracts as produced pursuant to the State's Initial Disclosures; various economic data as produced pursuant to the State's Initial Disclosures; periodic tax revenue data and information maintained by the Department of Revenue and the Department of Finance; and, expert work product and reliance materials (to the extent necessary).

### 3) Financial Impact and Increased Cost of Public Services

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates that the following information may have a bearing on the nature and extent of the State's claim for increased cost of public services:  the State's expert report and expert work product concerning the State's tax losses associated with the oil spill; State of Alabama graduation rates; State of Alabama K-12 education funding reports and data; Alabama school district enrollment, retention and spending data; ETF data and performance reports; and, expert work product and reliance materials (to the extent necessary).

### 4) ADECA Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following information may have a bearing on the nature and extent

of the State's claim for increased costs associated with ADECA's dislocated worker program: dislocated worker grant documentation; data and supporting information concerning personnel, benefits, travel, administrative, miscellaneous and contractual costs associated with implementation of the dislocated worker program in response to the oil spill; files concerning enrollment and implementation of the dislocated worker program; and, expert work product and reliance materials (to the extent necessary).

### 5) ADEM Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following information may have a bearing on the nature and extent of the State's claim on behalf of ADEM:  State of Alabama MC252 oiling event information; costs and expenses associated with ADEM's oil spill response activities; and, expert work product and reliance materials (to the extent necessary).

### 6) DCNR Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following information may have a bearing on the nature and extent of the State's claim on behalf of DCNR:  data and information concerning revenues generated by Gulf State Park; data and information concerning revenues generated as a result of saltwater fishing license sales; and, expert work product and reliance materials (to the extent necessary).

### 7) ABC Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following information may have a bearing on the nature and extent of the State's claim on behalf of ABC: data concerning ABC store sales; data concerning ABC wholesale sales; and, expert work product and reliance materials (to the extent necessary).

### 8) Department of Labor Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following information may have a bearing on the nature and extent of the State's claim on behalf of Labor: data concerning the unreimbursed unemployment compensation rendered to Alabama workers from the State's Fund as a result of the oil spill; claim files evidencing the State's payment of unemployment compensation to workers as a result of the oil spill; and, expert work product and reliance materials (to the extent necessary).

## SUPPLEMENTAL RESPONSE:

Subject to and without waiving its specific and general objections, the State responds as follows:

### 1) Physical Property Damage

While the State's damage analysis is evolving and has not been completed for trial, the State anticipates that the following categories of information may have a bearing on the nature and extent of property injuries the State has suffered: oiling data and information; data and information referencing the location and operation of oil removal activities within Alabama's territorial waters and lands; property ownership information; information maintained by the Baldwin County and Mobile County tax assessors; and, expert work product and reliance materials (to the extent necessary).

Specifically, the State has either produced response documentation, or the response documentation information is just as equally accessible to BP, that may serve the basis of the State's physical property damage claims, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National

15

Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries; SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based on aerial observations; ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling Summaries; SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

The State is also supplementing its document production by producing copies of real property records evidencing the State of Alabama's ownership interest in certain properties owned by the State of Alabama that were subject to oiling, mitigation and response events during the DWH oil spill. Copies of deeds related to the certain State-owned parcels that were oiled are publically available at http://www.co.baldwin.al.us/PageView.asp?edit_id=126.

**2) Tax Losses**

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates that the following categories of information may have a bearing on the nature and extent of the State's tax losses associated with the oil spill: revenue abstracts as produced pursuant to the State's Initial Disclosures; various economic data as produced pursuant to the State's Initial Disclosures; periodic tax revenue data and information maintained by the Department of Revenue and the Department of Finance; and, expert work product and reliance materials (to the extent necessary).

Specifically, information responsive to this Interrogatory that may serve the basis to support the State's tax loss claims may be derived or ascertained from the following document types and locations: the State's monthly tax revenue abstracts as produced pursuant to the

16

State's Initial Disclosures; various, publically-available economic data as produced pursuant to the State's Initial Disclosures; Department of Finance Education Trust Fund and General Fund tax revenue reports, as produced to BP in the State's productions; publically available tax stream and economic data, as referenced in the State's September 29, 2014 "Alabama Tax Stream Information" letter to the Defendants.

Moreover, the State has either produced response documentation, or the response information is just as equally accessible to BP, that may also serve the basis of its tax loss damage claims, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries; SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys  conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based on aerial observations; ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling Summaries;  SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

### 3)  Financial Impact and Increased Cost of Public Services

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates that the following categories of information may have a bearing on the nature and extent of the State's claim for increased cost of public services:  the State's expert report and expert work product concerning the State's tax losses associated with the oil spill; State of Alabama graduation rates; State of Alabama K-12 education funding reports and data;

Alabama school district enrollment, retention and spending data; ETF data and performance reports; and, expert work product and reliance materials (to the extent necessary).

At this time, information responsive to this Interrogatory that may serve as a basis to the State's financial impact and increased cost of public services claims may be derived or ascertained from the following document types and locations:  the State's monthly tax revenue abstracts as produced pursuant to the State's Initial Disclosures; various, publically-available economic data as produced pursuant to the State's Initial Disclosures; Department of Finance monthly Education Trust Fund and General Fund tax revenue reports, as produced to BP in the State's productions; publically available tax stream and economic data, as referenced in the State's September 29, 2014 "Alabama Tax Stream Information" letter to the Defendants; education program and appropriation statistics located at the following locations:

- http://www03.alsde.edu/accountability/preaccountability.asp;

- http://www.lfo.state.al.us/appropriations.htm.

Moreover, the State has either produced response documentation, or the response information is just as equally accessible to BP, that may also serve the basis of its financial impact and increased cost of public services claims damage claims, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries; SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based

18

on aerial observations; ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling Summaries;  SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

### 4)  ADECA Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following categories of information may have a bearing on the nature and extent of the State's claim for increased costs associated with ADECA's dislocated worker program: dislocated worker grant documentation; data and supporting information concerning personnel, benefits, travel, administrative, miscellaneous and contractual costs associated with implementation of the dislocated worker program in response to the oil spill; files concerning enrollment and implementation of the dislocated worker program; and, expert work product and reliance materials (to the extent necessary).

As communicated with the Court and the Defendants, the State is presently withholding the production of sensitive dislocated worker program documents pending resolution of an agreeable confidentiality order.  The State is also working to generate reports that will reflect the costs associated with the dislocated worker program, and will supplement this Response identifying those reports.

Moreover, the State has either produced response documentation, or the response information is just as equally accessible to BP, that may also serve the basis of the ADECA claim, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries;

SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based on aerial observations; ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling Summaries;  SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

**5)  ADEM Claim**

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following categories of information may have a bearing on the nature and extent of the State's claim on behalf of ADEM:  State of Alabama MC252 oiling event information; costs and expenses associated with ADEM's oil spill response activities; and, expert work product and reliance materials (to the extent necessary).

The State is working to resolve any potential deficiencies in its production with regards to costs and expenses associated with ADEM's response efforts. Moreover, the State has either produced response documentation, or the response information is just as equally accessible to BP, that may also serve the basis of the ADEM claim, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries; SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based on aerial

observations; ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling Summaries;  SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

### 6) DCNR Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following categories of information may have a bearing on the nature and extent of the State's claim on behalf of DCNR:  data and information concerning revenues generated by Gulf State Park; data and information concerning revenues generated as a result of saltwater fishing license sales; and, expert work product and reliance materials (to the extent necessary).

Information responsive to this Interrogatory may be derived or ascertained from documentation reflecting saltwater fishing license sales and Gulf State Park revenues, as produced with the State's Initial Disclosures.  Moreover, the State has either produced response documentation, or the following information is just as equally accessible to BP, that may also serve the basis of the DCNR claim, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries; SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based on aerial observations;

ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling Summaries;  SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

### 7)  Department of Labor Claim

While the State's damage analysis is continuing in nature and has not been completed for trial, the State anticipates the following categories of information may have a bearing on the nature and extent of the State's claim on behalf of Labor: data concerning the unreimbursed unemployment compensation rendered to Alabama workers from the State's Fund as a result of the oil spill; claim files evidencing the State's payment of unemployment compensation to workers as a result of the oil spill; and, expert work product and reliance materials (to the extent necessary).

As communicated with the Court and the Defendants, the State is presently withholding the production of sensitive unemployment compensation fund documents pending resolution of an agreeable confidentiality order.   Moreover, the State has either produced response documentation, or the following information is just as equally accessible to BP, that may also serve the basis of the Laobr claim, including, but not limited to: Shoreline Treatment Recommendations ("STR"s); the Baldwin and Mobile County Operations Plan; Alabama Branch Situation Reports; Segment Inspection Reports (SIR); Operations Segment Tracker; National Response Center ("NRC") summaries, Tracker and monthly reports; Daily Waste Tracking Reports; Waste summaries; SCAT team Daily Summary Reports; Alabama Oily Solids and Material Collected; Operation Deep Clean Operations Reports and data; Aerial Oil surveys conducted by State and Federal Agencies including USCG, NOAA, ADEM, NGAL, City of Orange Beach and City of Gulf Shores; maps of oiling locations based on aerial observations;

ICS 209 Daily Summaries; Snorkel SCAT Surveys and SOM Maps; SCAT Maximum Oiling

Summaries;  SCAT Maximum Oiling data and Mapping; and Shoreline Pit Data and Maps.

* * *

The State provides this supplementation with the understanding that the Parties and the

Court are continuing to resolve various issues with document production. Moreover, discovery,

as well as the State's damage analyses, are continuing in nature.


**INTERROGATORY NO. 3:**        For each individual category of damages claimed in
the State of Alabama's Fed. R. Civ. P. 26(a) Initial Disclosures and any Amendments
thereto, identify each individual who provided input to or who assisted with the damages
computation, and describe the input and assistance that those individuals provided.

**OBJECTIONS:**

The State objects to Interrogatory #3 on the grounds that it is overly broad and unduly

burdensome, as it seeks to have the State identify every individual who has assisted the State

prepare its claims.

The State objects to Interrogatory #3 to the extent that Defendants seek the identity,

input, and assistance of the State's experts.  No response is required or given regarding the

State's experts.


**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as

follows:

The following non-attorney, non-expert individuals provided facts that assisted the State

identify the following categories of claims:

23

**1)** Physical property damage:

- o  Mr. Scott Brown (ADEM)

- o  Mr. Roy Collins (ADEM)

- o  Mr. Steven Jenkins (ADEM)

- o  Mr. Fred Leslie (ADEM)

- o  Mr. Ed Poolos (ADEM)

- o  Mr. Paul Rogers (ADEM)

**2)** Tax loss claim:

- o  Mr. Kelly Butler (Finance)

- o  Mr. Joe Garrett (Revenue)

- o  Ms. Julie Magee (Revenue)

- o  Ms. Ashley Moon (Revenue)

- o  Mr. Bill Newton (Finance)

**3)** Financial Impact and Resulting Increased Costs to Public Services:

- o  Mr. Kelly Butler (Finance)

- o  Dr. Joe Morton (Education)

- o  Mr. Bill Newton (Finance)

- o  Dr. Warren Craig Pouncey (Education)

**4)** ADECA Claim

- o  Mr. Billy Hornsby (ADECA)

- o  Ms. Tammy Rolling (ADECA)

**5)** ADEM Claims

- o   Mr. Scott Brown (ADEM)

- o   Mr. Roy Collins (ADEM)

- o   Mr. Steven Jenkins (ADEM)

- o   Mr. Fred Leslie (ADEM)

- o   Mr. Ed Poolos (ADEM)

- o   Mr. Paul Rogers (ADEM)

**6)** ABC Claim

- o   Mr. Mac Gipson (ABC)

- o   Ms. Cheryl Mason (ABC)

**7)** DCNR Claim

- o   Mr. Chris Blakenship (DCNR)

- o   Mr. Greg Lien (DCNR)

- o   Ms. Ashley Peters (DCNR)

**8)** Department of Labor Claim

- o   Mr. Donald Gunn (Labor)

- o   Mr. Hoyt Russell (Labor)

- o   Mr. Tom Surtees (Labor)

**<u>SUPPLEMENTAL RESPONSE:</u>**

Subject to and without waiving its specific and general objections, the State responds as follows:

The following non-attorney, non-expert individuals provided facts that assisted the State identify the following categories of claims:

**1)** Physical property damage:

- o   Mr. Scott Brown (ADEM)

- o   Mr. Roy Collins (ADEM)

- o   Mr. Steven Jenkins (ADEM)

- o   Mr. Fred Leslie (ADEM)

- o   Mr. Ed Poolos (ADEM)

- o   Mr. Paul Rogers (ADEM)

**2)** Tax loss claim:

- o   Mr. Kelly Butler (Finance)

- o   Mr. Joe Garrett (Revenue)

- o   Ms. Julie Magee (Revenue)

- o   Ms. Ashley Moon (Revenue)

- o   Mr. Bill Newton (Finance)

**3)** Financial Impact and Resulting Increased Costs to Public Services:

- o   Mr. Kelly Butler (Finance)

- o   Dr. Joe Morton (Education)

- o   Mr. Bill Newton (Finance)

- o   Dr. Warren Craig Pouncey (Education)

**4)** ADECA Claim

- o   Mr. Billy Hornsby (ADECA)

- o   Ms. Tammy Rolling (ADECA)

**5)**  ADEM Claims

- o   Mr. Scott Brown (ADEM)

- o   Mr. Roy Collins (ADEM)

- o   Mr. Steven Jenkins (ADEM)

- o   Mr. Fred Leslie (ADEM)

- o   Mr. Ed Poolos (ADEM)

- o   Mr. Paul Rogers (ADEM)

**6)**   DCNR Claim

- o   Mr. Chris Blakenship (DCNR)

- o   Mr. Greg Lien (DCNR)

- o   Ms. Ashley Peters (DCNR)

**7)**   Department of Labor Claim

- o   Mr. Donald Gunn (Labor)

- o   Mr. Hoyt Russell (Labor)

- o   Mr. Tom Surtees (Labor)

**INTERROGATORY NO. 4:**        Identify and describe all analyses, studies, assessments, or evaluations regarding the nature, extent, or degree of economic or financial impact, actual or anticipated, of the *Deepwater Horizon* Incident and/or Oil Spill on the State of Alabama, including any financial impact on State public services.

**OBJECTIONS:**

The State objects to the extent this Request seeks information that is neither relevant, reliable, nor reasonably calculated to lead to the discovery of admissible evidence at trial.

The State objects to the terms "analyses," "assessments," "studies," and "evaluations" as vague and ambiguous, as these terms are not defined and can be subject to numerous interpretations.

The State objects to Interrogatory #4 on the grounds that it is overly broad and unduly burdensome, as it seeks to have the State identify all "analyses, studies, assessments, or evaluations regarding the nature, extent, or degree of economic or financial impact," regardless of whether the State has actually seen, reviewed, considered or knows of the referenced documents' existence. The State also objects to Interrogatory #4 on the grounds that it is overly broad and unduly burdensome to the extent it seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds by noting that the following studies may fall within Defendants' request:

1) *Some Preliminary Macroeconomic Impacts of the 2010 Deepwater Horizon Oil Gusher on Alabama*, Samuel Addy and Ahmad Ijaz (September 2010).

This report is publically available on-line at

http://cber.cba.ua.edu/Prel_MacroEcon_Impacts_on_AL_of_2010_BP_Oil_Spill.pdf, and thus the State does not describe the report in further detail.

2) *Potential Impact of the Gulf Oil Spill on Tourism*, Oxford Economics

This report is publically available on-line at https://www.ustravel.org/sites/default/files/page/2009/11/Gulf_Oil_Spill_Analysis_Oxford_Economics_710.pdf, and thus the State does not describe the report in further detail.

3) *BP Oil Spill Drains Alabama Economy – Again*, Franklin Business & Law Journal (Volume 2012 Issue 2).

This report is publicly available at http://connection.ebscohost.com/c/articles/85669461/

bp-oil-spill-drains-alabama-economy-again, and thus the State does not describe the report in

further detail.

## SUPPLEMENTAL RESPONSE:

Subject to and without waiving its specific and general objections, the State responds by

noting that the following studies may fall within Defendants' request:

1) *Some Preliminary Macroeconomic Impacts of the 2010 Deepwater Horizon Oil Gusher on Alabama*, Samuel Addy and Ahmad Ijaz (September 2010).

This report is publically available on-line at

http://cber.cba.ua.edu/Prel_MacroEcon_Impacts_on_AL_of_2010_BP_Oil_Spill.pdf, and thus

the State does not describe the report in further detail.

2)  *Potential Impact of the Gulf Oil Spill on Tourism*, Oxford Economics

This          report         is          publically          available         on-line          at

https://www.ustravel.org/sites/default/files/page

/2009/11/Gulf_Oil_Spill_Analysis_Oxford_Economics_710.pdf, and thus the State does not

describe the report in further detail.

3) *BP Oil Spill Drains Alabama Economy – Again*, Franklin Business & Law Journal (Volume 2012 Issue 2).

This report is publicly available at http://connection.ebscohost.com/c/articles/85669461/

bp-oil-spill-drains-alabama-economy-again, and thus the State does not describe the report in

further detail.

4)  Preliminary Oil Spill Analysis by Dr. Keivan Deravi (Fall 2010)

Dr. Deravi's preliminary oil spill analysis was prepared to assist the State in settlement negotiations with BP.  The analysis was provided to BP in the late Summer / early Fall of 2010, and thus the State does not describe the report in further detail.

**INTERROGATORY NO. 5:**        For each parcel of State-owned real property in Baldwin, Mobile, Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston counties provide: (i) any property valuations for each year from 2000 until the present; and (ii) any restrictions on the use or sale of such parcel in each year from 2000 through the present.

**OBJECTIONS:**

The State objects to the term "valuations," as the term is vague and ambiguous and subject to numerous interpretations of its meaning and reference.

The State objects to Interrogatory #5 as overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at trial, as it seeks property information on properties upon which the State is not making a claim.

The State objects to Interrogatory #5 to the extent that it calls for an expert or legal opinion and/or a legal conclusion.  No response is required regarding legal and expert opinions.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

In Alabama, tax-assessor property valuations are conducted and maintained by the respective County where the property exists.  The State therefore directs Defendants to the following public websites (as provided in the State's Initial Disclosures), which can be used in conjunction with the property parcel exhibit (as also provided in the State's Initial Disclosures),

whereby the Defendants can obtain the necessary property valuations for the properties at issue in this trial:

- Baldwin County Parcel Viewer, http://isv.kcsgis.com/al.baldwin_revenue/;

- Baldwin County Tax Assessor Website, http://www.deltacomputersystems.com/al/al05/index.html;

- Baldwin County Property Map, https://www.co.baldwin.al.us/PageView.asp?PageType=R&edit_id=987;

- Baldwin County Judge of Probate Property Records, http://www.deltacomputersystems.com/al/al05/drlinkquerya.html;

- Mobile County Revenue Commission Property Records, http://www.mobilecopropertytax.com/bill_search.shtml;

- Mobile County Property Parcel Mapper, http://www.mobile-propertytaxapps.com/taxmaps/;

To the extent the State possesses non-expert work product property valuations on the properties at issue, the State will produce those valuations pursuant to the Defendants' Request for Production #10.

**INTERROGATORY NO. 6:** Describe in detail how property tax assessments and/or appraisals are performed for each type of property for which the State claims property tax damages and/or damages to real or personal property owned by the State in Baldwin, Mobile, Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston counties and any other county in which the State claims property tax damages and/or damages to real or personal property owned by the State.

**OBJECTIONS:**

The State objects to Interrogatory #6 as overbroad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence at trial, as it seeks property information on properties which the State is not making a claim. The State also objects

to Interrogatory #6 as overly broad and unduly burdensome to the extent it seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State directs the Defendants to its Objections and Answer to Interrogatory #5. Because tax-assessed property valuations are actually rendered by Baldwin and Mobile County tax assessors for properties in their respective counties, the State does not possess specific knowledge as to the details on how each property is specifically valued. However, property assessment valuations should be conducted in accordance with the Alabama Appraisal Manual, which can be found at the following website: http://revenue.alabama.gov/advalorem/forms/ADV-BudgetEx2014.pdf.

**INTERROGATORY NO. 7:** For each piece or parcel of Property that you claim has suffered or will suffer a "physical injury to a proprietary interest" as enunciated in *Robins Dry Dock*, 275 U.S. 303 (1927) or its progeny, as a result of the *Deepwater Horizon* incident and/or Oil Spill, provide a detailed description of:

(i) The nature of your "proprietary interest" (e.g., ownership) and
(ii) How your alleged damages were or will be realized (e.g., the Property was sold at a loss, money was spent to repair the Property, etc.).

**OBJECTIONS:**

The State objects to Interrogatory #7, as a description of the State's "proprietary interest" pursuant to *Robins Dry Dock* calls for a legal opinion and/or legal conclusion. No response is required or given for legal conclusions or opinions.

The State objects to Interrogatory #7 as it seeks expert-related analyses of how the States' damages will be calculated. No response to expert-related information is required or given here. Such information will be provided pursuant to the Court's scheduling order.

32

The State objects to Interrogatory #7 as overly broad and unduly burdensome to the extent it seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

The State, through its agencies and departments, holds legal title to each of the properties identified in its initial disclosures (as amended).  The State also owns all lands beneath navigable waters within its jurisdiction, as well as all tidally-influenced coastal lands up to the mean high tide line within its jurisdiction.

The following is a non-exhaustive list of additional proprietary interests in coastal-area lands for which the State may or may not possess legal title:

- The State exercises police powers over all lands and waters within its jurisdiction;

- ADEM issues permits, certifications, licenses, and/or variances for land uses within the State's coastal area;

- ADEM has the duty of preserving and regulating the State's coastal resources, which include human, natural, cultural, or historical assets within the State's coastal area;

- The State is legally obligated to insure that beach sand, dunes, and vegetation are not disturbed and to protect these locations from adverse uses;

- Any land created by a beach nourishment project that is seaward of the mean high tide line becomes the State's property, subject to access and recreational use by the public and

landowners. DCNR must determine that there is no adverse impact on marine resources or the riparian or littoral rights of adjacent property owners;  and,

- DCNR supervises the protection, propagation, and conservation of all seafood and other animal life existing in Alabama waters.

**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

The State seeks to recover damages for injury to the properties identified on pages AL-ED-000001 through AL-ED-000009 of the State's production, except that the properties identified on AL-ED-000008 as being owned by the University of Alabama (Nos. 4703060000009.000; 4703050000007.000; 470307000001.000; 4703080000001.000) are not part of the State's claim.  The State, through its agencies and departments, holds legal title to each of these properties, and each of these properties suffered a physical injury that resulted from the *Deepwater Horizon* incident and/or the resulting oil spill.

In addition to the properties listed above, the State also has a proprietary interest in coastal-area lands for which the State may or may not possess legal title.  The following is a non-exhaustive list of the State's proprietary interests in those lands:

- The State exercises police powers over all lands and waters within its jurisdiction;

- The State owns all lands beneath navigable waters within its jurisdiction, as well as all tidally-influenced coastal lands up to the mean high tide line within its jurisdiction;

- ADEM issues permits, certifications, licenses, and/or variances for land uses within the State's coastal area;

- ADEM has the duty of preserving and regulating the State's coastal resources, which include human, natural, cultural, or historical assets within the State's coastal area;

- The State is legally obligated to insure that beach sand, dunes, and vegetation are not disturbed and to protect these locations from adverse uses;

- Any land created by a beach nourishment project that is seaward of the mean high tide line becomes the State's property, subject to access and recreational use by the public and landowners. DCNR must determine that there is no adverse impact on marine resources or the riparian or littoral rights of adjacent property owners;  and,

- DCNR supervises the protection, propagation, and conservation of all seafood and other animal life existing in Alabama waters.

These lands suffered a physical injury that was caused by the *Deepwater Horizon* incident and/or the resulting oil spill.

The State's losses are a result of physical injury to property and the resulting economic damages.  The calculation of those losses requires an expert analyses that will be produced pursuant to the Court's scheduling order.


**INTERROGATORY NO. 8:**        If you contend that you can recover damages under general maritime law against Halliburton Energy Services, Inc. and/or Transocean for any loss or injury *other than* injury to property that was physically touched by oil (or other contaminant) released as a result of the *Deepwater Horizon* Incident and/or Oil Spill, describe in detail the legal and factual bases for this contention and the losses or injuries for which you seek to recover under general maritime law.

**OBJECTIONS:**

The State objects to Interrogatory #8 to the extent that it seeks the "legal" basis for the State's claims under general maritime law.  No response is required or given with regard to legal opinions or conclusions.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State seeks to recover under general maritime law all losses and/or injuries identified herein and in the State's initial disclosures (as amended).  The State refers Defendants to its Responses to Interrogatories #1 and #2 for the factual basis of the State's claims under general maritime law.

**INTERROGATORY NO. 9:**      For each parcel of Property that the State contends has been oiled, and/or continues to be oiled, as a result of the Deepwater Horizon Incident and/or Oil Spill describe in detail all bases for such contention(s).

**OBJECTIONS:**

The State objects to Interrogatory #9 as overly broad and unduly burdensome for several reasons.  First, the State contends that many parcels of property not relevant to this case have been, and continue to be, oiled.   Second, many of these bases are equally available to Defendants.   Third, the State cannot identify "all bases" for its claims until it receives the Defendants' discovery responses, as Defendants possess oiling information that the State presently does not.   Fourth, listing and describing every report, newspaper story, eyewitness account, etcetera, that supports the State's contention that its property was oiled, and continues to be oiled, would be so unduly burdensome and voluminous as to be wasteful of the Parties' time.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

36

Federal Government data, reports, and studies (including SCAT data), reports, and findings of oiling events within the State's territorial waters and lands, establish that oil from the Macondo well heavily oiled, and continues to oil, the State's property.  By way of example only, and without limitation, oil spill response data reflects that, between June 1, 2011 and December 4, 2012, over 6 tons of oil and oil contaminated materials were removed from SCAT segment ALBA 2-031, which is located within the State-owned property of Gulf State Park. Moreover, personnel working in and/or on behalf of the oil spill response, including State of Alabama oil spill response personnel, United States Coast Guard personnel, BP and BP-contractor personnel, observed and continue to observe oiling events, oiling volume, and the timing of oiling events, within the State's territorial waters and lands.

The State will produce data and information that reflects proof of oiling events, to the extent that such data and information is in the control and custody of the State and is not equally or more accessible to the Defendants.

**INTERROGATORY NO. 10:**        Describe in detail all the public service costs (e.g., state monitoring costs) that the State claims have been incurred or increased as a result of the *Deepwater Horizon* Incident and/or Oil Spill.

**OBJECTIONS:**

The State objects to Interrogatory #10 on the grounds that it is overly broad and unduly burdensome, as the State cannot ascertain all of its costs as many costs are ongoing and the State cannot identify all of the data and information that will support its claims until fact and expert discovery have concluded.   The State also objects to Interrogatory #10 on the grounds that it is overly broad and unduly burdensome to the extent this Request seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

The State refers Defendants to the State's Initial Disclosures (as amended) and the State's Responses to Interrogatories #1, #2, and #4.  To the extent the Defendants seek the content of documents illustrating the specific value and category of costs, the State will produce documents pursuant to the Defendants' Requests for Production.  To the extent the Defendants seek the State's position on the ultimate cost of continued oil monitoring and response, an analysis of the ultimate cost will be the subject of expert testimony, and as such, the State will supplement pursuant to the Court's Scheduling Order.

With these caveats and objections, and with the understanding that the State's analysis is continuing in nature and is not complete for trial, the State offers the following unreimbursed response cost totals known at this time:

- **ADECA**:  Response costs associated with the implementation of the dislocated worker program:

| | |
|---|---|
| Contract / Grant Facilitation Costs: | $1,571,140.05 |
| ADECA Personnel: | $171,103.88 |
| Benefits | $14,677.51 |
| Travel: | $1,411.27 |
| *Total:* | $1,758,332.71 |

- **ADEM**: Prior unreimbursed increased cost of public services associated with ADEM's response efforts:

| | |
|---|---|
| Total Salaries: | $215,345.43 |
| Fringe Benefits: | $80,538.80 |
| Indirect Cost/Overhead: | $73,339.49 |
| Per Diem: | $20,535.41 |
| *Total*: | $389,759.13 |

38

- **Labor**: Oil spill-related costs and expenses associated with the Unemployment Compensation Trust Fund.

| | |
|---:|---:|
| Fund Costs: | $4,287,031.00 |
| Salaries & Benefits: | $129,327.00 |
| Travel: | $7,967.00 |
| *Total*: | $4,424,325.00 |

Labor continues to assess its incurred costs and expenses related to oil spill unemployment compensation claimants and payments.

In addition, the State (and specifically, ADEM) will continue to incur costs and expenses for past and future monitoring and response activities to locate and remove MC252 oil from the State's beaches and submerged lands.  To that end, the State has inspected, and will continue to periodically inspect, approximately 50 miles of shoreline impacted by the spill in Baldwin and Mobile Counties to identify new incidents of MC252 oiling, including buried oil on land and submerged oil offshore. The State's monitoring effort will continue for as long as MC252 oil continues to be found in Alabama's waters and shoreline.  Costs and expenses for these activities include, but are not limited to, environmental personnel salaries, benefits, and indirect costs; water and land transportation; and equipment.

As explained in the above-referenced Responses, costs have also increased to the State as a result of the financial impact of oil spill-related tax losses. The specific value and category of tax loss, as well as the impact of those tax losses, which generate increased costs to the State, will be the subject of expert opinion and work product, and as such, will be supplemented pursuant to the Court's Scheduling Order.

Furthermore, the State has incurred costs and expenses, and will continue to incur costs and expenses, related to the assessment of the damages to be litigated in this phase of the State's

39

trial.  *See* 33 U.S.C. §2701(5) (defining "damages" listed in §2702(b) to include "the cost of assessing these damages").  The State will disclose and detail these costs, which the State will continue to incur through discovery and trial, at a time to be determined by the Court.

> **INTERROGATORY NO. 11:**      Describe in detail all Revenue received by Alabama as a result of any compensation payments related to the Incident and/or Oil Spill, including as a result of any payments made to businesses and individuals (e.g., from insurance claims or via the Gulf Coast Claims Facility (GCCF), Vessels of Opportunity program (VOO), Court Supervised Settlement Program (CSSP), Business and Economic Loss (BEL) settlement, or other facilities), and describe how such Revenue is identified in tax receipts.

**OBJECTIONS:**

The State objects to Interrogatory #11 as it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

The State objects to Interrogatory #11 as overbroad, unduly burdensome, unreasonable and oppressive, as the State does not possess a reliable mechanism to determine the origin of oil-spill related payments to State businesses or individuals as requested.  Indeed, a response would require the individual review and audit of millions of tax returns filed with the State to determine the origin of oil-spill related funds—the conclusion of which would be wholly unreliable and irrelevant in this matter.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

The State can neither describe nor identify all revenue received by the State as a result of compensation payments made by BP to third-party individuals and businesses, if any.

As for payments from BP to the State, the State refers Defendants to its Response to Interrogatory #14.

**INTERROGATORY NO. 12:**     Identify and describe in detail the State response and recovery efforts related to the *Deepwater Horizon* Incident and/or Oil Spill for which the State contends it incurred costs and was not reimbursed, including the cost of such efforts.

**OBJECTIONS:**

The State objects to Interrogatory #12 on the grounds that it is overly broad and unduly burdensome, as the State cannot ascertain all of its unreimbursed costs as many costs are ongoing and the State cannot identify all of the data and information that will support its claims until fact and expert discovery have concluded.   The State also objects to Interrogatory #12 on the grounds that it is overly broad and unduly burdensome to the extent this Request seeks the content of documents that will be produced pursuant to the Defendants' Requests for Production.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State refers Defendants to the State's initial disclosures (as amended) and its Responses to Interrogatories #1, #2, #8, #10, and #11.

In addition, the State identifies the following State Departments for which it is bringing claims in this litigation for unreimbursed response and/or increased public service costs:

1)     **Labor** opened a satellite unemployment office in the Bayou La Batre, Mobile County area, to assist on-site with individuals making claims for unemployment compensation

41

benefits.  As explained above, Labor incurred costs associated with the processing of oil spill-related unemployment compensation claims.

2)    **ADECA** incurred unreimbursed response and/or increased public service costs associated with its dislocated worker program as described above.

3)    **ADEM** incurred unreimbursed response costs due to its designation as the lead oil spill response agency for the State of Alabama. Unreimbursed costs were  incurred as a result of this agency coordinating the State of Alabama oil spill response within the Unified Command; planning and implementing shoreline protection measures from MC252 oil contamination of Alabama waters and coastal lands; participating in the Shoreline Contamination Assessment Technique (SCAT) process; monitoring the movement of MC252 oil within Alabama waters and the depositing and re-depositing of MC252 oil on Alabama land; oil monitoring operations for the removal and disposal of oil and oil contaminated materials from Alabama waters and land; and monitoring, responding and removing MC252 oil from Alabama waters and land from recurring MC252 re-oiling events which continue to occur.

**INTERROGATORY NO. 13:**        Identify and describe in detail all insurance claims made by the State from 2010 until the present related to the *Deepwater Horizon* Incident and/or Oil Spill, including: (i) the policy on which each claim was made; (ii) the amount of each claim; and (iii) the result or expected result of each claim.

**OBJECTIONS:**

The State objects to Interrogatory #13 because it seeks irrelevant and/or inadmissible evidence and is not reasonably calculated to lead to the discovery of admissible evidence. The State also objects to Interrogatory #13 because it calls for speculation.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State is currently unaware of any claim having been made by any State entity under any policy of insurance related to damages or costs caused by the oil spill.

**INTERROGATORY NO. 14:**     Provide an accounting of all funds, payments, grants, contributions, or donations that the State has received from BP from 2010 until the present, including all disbursements of tourism, seafood and other block grants, and any other payments or economic assistance received, relating to the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to Interrogatory #14 as it seeks information that is irrelevant and/or inadmissible and is not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to Interrogatory #14 to the extent that it seeks discovery of information that Defendant BP is contractually barred from use as an offset and/or mitigation against the State's claims.

The State objects to Interrogatory #14 as irrelevant to the claims and defenses presented in this phase of Alabama's case.  Defendants have not filed a claim/counter-claim alleging that the State has improperly expended or disbursed any funds, payments, grants, contributions, or donations received from Defendant BP.

The State objects to Interrogatory #14 to the extent that it seeks information that is equally (if not more so) in the control and custody of Defendant BP.

The State objects to Interrogatory #14 as it seeks an accounting of the disbursement of funds by entities outside the control of the State.

**RESPONSE:**

43

Subject to and without waiving its specific and general objections, the State responds as follows:

The State is in the process of obtaining, to the best of its ability, an accounting of payments made by BP to the State. This process is on-going, and subject to supplementation.

Based on its present understanding, the State has received the following funds, payments, grants, contributions, or donations from BP:

**1) General Grants**

The State received two $25,000,000 general grants from BP; one on May 10, 2010 and the other on June 11, 2010. These grants were initially received by the Department of Finance, and funds from the grants were subsequently allocated to EMA and ADEM:

- <u>Alabama Emergency Management Agency</u>: EMA received $25,000,000 from the May 10, 2010 Grant and $5,000,000 from the June 11, 2010 Grant. This amount was distributed as sub-grants to local governments and paid expenses related to response activities, including the Baldwin County Emergency Operations Center. The State continues its review of this Request and will supplement its response accordingly

- <u>Alabama Department of Environmental Management</u>: ADEM was allocated $20,000,000 from the June 11, 2010 Grant to construct emergency barriers across the Alabama coastal areas known as "Katrina Cut" and Perdido Pass, in order to protect the State's inshore waters and estuaries from (further) damage from oil. BP subsequently paid ADEM an additional $15,000,000 for the Katrina Cut project. BP is in possession of all documentation previously provided by the State to substantiate the costs incurred to construct this project, as well as all records reflecting the amounts paid to the State.

Because BP funded an additional $15,000,000 for the Katrina Cut project, the State transferred a portion of ADEM's $20,000,000 allocation of the June 11, 2010 Grant to other State Departments, including: EMA, Office of the Attorney General, Office of the Governor, the Governor's Office of Faith-Based Initiatives, the Department of Finance, the Alabama Historical Commission, and DCNR. The State continues its review of this Request and will supplement its response accordingly.

### 2)  Tourism Grants

The State received two tourism grants from BP: (1) a $15,000,000 grant pursuant to an agreement dated May 25, 2010 and (2) a $16,000,000 grant pursuant to an agreement dated March 7, 2011.  Of this amount, $30,999,999.92 was disbursed for tourism related activities and programs. The State will produce an accounting and/or account ledger, which will reflect the receipt and expenditure of funds related to the tourism grants.

### 3)  Mental Health Grant

The State received a $12,000,000 mental health grant from BP pursuant to an agreement dated August 27, 2010. These funds were distributed to the Alabama Department of Mental Health.  As of January 28, 2014, $11,296,080.63 of these funds had been disbursed. The State will produce an accounting and/or account ledger, which will reflect the receipt and expenditure of funds related to the mental health grant.

### 4)  Seafood Marketing & Testing Program

The State received $9,000,000 for seafood marketing and testing from BP on May 26, 2010.[3]  The Alabama Department of Conservation and Natural Resources has provided BP with

-----

quarterly and annual reports documenting all expenditures related to the Seafood Testing and Marketing programs which BP has in its possession. BP also has possession of all records that reflect the amounts BP has provided to the State to fund these programs.

**5) Various Response Costs**

The State has received payments from BP to reimburse the State for costs and expenses related to its oil spill response. BP is in possession of all data and information submitted by the State of Alabama in support of its claims for reimbursement of spill-related response costs, and BP is also in possession of all data and records indicating the amounts submitted to and paid by BP.

**6) NRD Assessment Costs**

While not relevant to this phase of Alabama's case, the State received $4,000,000 from BP to reimburse the State for Natural Resources Damage Assessment costs.

\* \* \*

Again, the State's accounting of its receipts from BP is on-going.  The State will supplement this Response once the State has completed said accounting, which will likely occur after Defendant BP produces information regarding all of its payments to the State.

---

[3] The State also received $500,000 through the Deepwater Horizon Economic and Property Damages Settlement.

**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving its objections, the State responds as follows:

Based on its present understanding, the State has received the following funds, payments, grants, contributions, or donations from BP:

**1) General Grants**

The State received two general grants from BP totaling $50,000,000 (one for $25 million on May 10, 2010 and the other for $25 million on June 11, 2010) and additional payments related to the construction of the Katrina Cut project.   The following State agencies and departments received and disbursed these funds as follows:

- Alabama Emergency Management Agency ("EMA"):

EMA received a total of $35,169,872.74 in BP funds and disbursed a total of $35,169,872.74 of those funds.  AL-ED-000031681 ("Historical Commission - BP Oil Spill, Fund 1419") reflects the receipt and disbursement of these funds with regard to the State Historical Commission.  The State will provide Defendants with an accounting of the total disbursement in a future production (and will identify that record as such).

- Alabama Department of Environmental Management ("ADEM"):  ADEM received a total of $21,556,982.74 in BP funds and disbursed a total of $21,556,982.74 of those funds in accordance with the entries reflected in AL-ED-000031674 ("Environmental Management - BP Oil Spill, Fund 1403").

- The Office of the Governor:  The Governor's office received a total of $4,411,173.71 in BP funds and disbursed a total of $975,201.32 of those funds in accordance with the entries reflected in AL-ED-000031677 ("Governor's Office - BP Oil Spill, Fund 1410").   The Governor's office retains a balance of funds in the amount of $3,435,972.39.

- Alabama Department of Finance ("Finance"):

  o *Receipt*: Finance received a total of $10,990,013.04 in BP funds and disbursed a total of $2,383,650.39 in accordance with the entries reflected in AL-ED-000031675 ("Department of Finance-BP Oil Spill Fund 1417").  Finance retains a balance of funds in the amount of $8,606,362.65.

  o *Distribution*:  Fund 1417 included disbursements to the Alabama Department of Public Safety and the Alabama Department of Conservation and Natural Resources.  AL-ED-000031671 ("Department of Public Safety - BP Oil Spill, Fund 1416") reflects the receipt and disbursement of the funds received by the Department of Public Safety.   The Alabama Department of Conservation and Natural Resources received $79,800.00.

  **2)  Tourism Grants**

  The State received two tourism grants from BP: (1) a $15,000,000 grant pursuant to an agreement dated May 25, 2010 and (2) a $16,000,000 grant pursuant to an agreement dated March 7, 2011.   AL-ED-000031688 ("Tourism - BP Oil Spill Fund 1401") reflects the disbursement of these funds.

  **3)  Mental Health Grant**

  The State received a $12,000,000 mental health grant from BP pursuant to an agreement dated August 27, 2010.  AL-ED-000031683 ("Mental Health - BP Oil Spill, Fund 1408") reflects the disbursement of these funds.   Included within the disbursements from Fund 1408 are disbursements to the Governor's Office of Faith Based and Community Initiatives, which are reflected in AL-ED-000031680 ("Governor's Office on Faith Based-BP Oil Spill Fund 1411").

### 4)  Seafood Marketing & Testing Program

The State received $9,000,000 for seafood marketing and testing from BP on May 26, 2010.[4]  The Alabama Department of Conservation and Natural Resources has provided BP with quarterly and annual reports documenting all expenditures related to the Seafood Testing and Marketing programs, which BP has in its possession.  BP also has possession of all records that reflect the amounts BP has provided to the State to fund these programs.

### 5)  Various Response Costs

The State has received payments from BP to reimburse the State for costs and expenses related to its oil spill response. BP is in possession of all data and information submitted by the State of Alabama in support of its claims for reimbursement of spill-related response costs, and BP is also in possession of all data and records indicating the amounts submitted to and paid by BP.

### 6)  NRD Assessment Costs

While not relevant to this phase of Alabama's case, the State received an initial payment of $4,000,000 from BP to reimburse the State for Natural Resources Damage Assessment costs, and BP has paid additional funds in response to requests for NRD Assesment reimbursement. BP is in possession of all data and records indicating the amounts submitted to and paid by BP.

* * *

This Response is based on the best information available to the State on this date.  The State reserves the right to supplement this Response as more information becomes available.

---

[4] The State also received $500,000 through the Deepwater Horizon Economic and Property Damages Settlement.

49

**SECOND SUPPLEMENTAL RESPONSE:**

Subject to and without waiving its objections, the State responds as follows:

Based on its present understanding, including Defendants' Response to the State's Interrogatories #13 and #14, the State has received the following grants, funds, payments, contributions, and/or donations from BP:

**1)  May 2010 Block Grant**

The State received a $25,000,000 grant from BP on May 10, 2010.  The Alabama Emergency Management Agency received and distributed these funds as grants to local governments, commissions, and bureaus in accordance with the entries in AL-ED-000806961 ("Emergency Management – BP Oil Spill, Fund 1400").

**2)  June 2010 Block Grant**

The State received a second $25,000,000 grant from BP on June 11, 2010.  These funds were received and distributed by the Alabama Department of Environmental Management (for use on the Katrina Cut and/or Perdido Pass projects) and the Alabama Emergency Management Agency (for additional grants to local governments and other costs/uses).  ADEM and EMA distributed these funds in accordance with the entries reflected in AL-ED-000031674 ("Environmental Management - BP Oil Spill, Fund 1403") and AL-ED-000806961 ("Emergency Management – BP Oil Spill, Fund 1400").

**3)  Two Tourism Grants**

The State received two tourism grants from BP: (1) a $15,000,000 grant pursuant to an agreement dated May 25, 2010 and (2) a $16,000,000 grant pursuant to an agreement dated March 7, 2011.   AL-ED-000031688 ("Tourism - BP Oil Spill Fund 1401") reflects the disbursement of these funds.

50

**4)  Mental Health Grant**

The State received a $12,000,000 mental health grant from BP pursuant to an agreement dated August 27, 2010.  AL-ED-000031683 ("Mental Health - BP Oil Spill, Fund 1408") reflects the disbursement of these funds.  Included within the disbursements from Fund 1408 are disbursements to the Governor's Office of Faith Based and Community Initiatives, which are reflected in AL-ED-000031680 ("Governor's Office on Faith Based-BP Oil Spill Fund 1411").

**5)  Seafood Marketing & Testing Program**

The State received $9,000,000 for seafood marketing and testing from BP on May 26, 2010.[5]  The Alabama Department of Conservation and Natural Resources has provided BP with quarterly and annual reports documenting all expenditures related to the Seafood Testing and Marketing programs, which BP has in its possession.  BP also has possession of all records that reflect the amounts BP has provided to the State to fund these programs.

**6)  Various Response Costs**

The State has received payments from BP to reimburse the State for costs and expenses related to its oil spill response. BP is in possession of all data and information submitted by the State of Alabama in support of its claims for reimbursement of spill-related response costs, and BP is also in possession of all data and records indicating the amounts submitted to and paid by BP.

**7)  NRD Assessment Costs**

While not relevant to this phase of Alabama's case, the State received an initial payment of $4,000,000 from BP to reimburse the State for Natural Resources Damage Assessment costs,

---

[5] The State also received $500,000 through the Deepwater Horizon Economic and Property Damages Settlement.

and BP has paid additional funds in response to requests for NRD Assesment reimbursement. BP is in possession of all data and records indicating the amounts submitted to and paid by BP.

* * *

Based on information available to the State at this time, the following State departments and agencies received and distributed the above-listed payments and other, smaller payments from BP (including payments related to the cost overrun on the Katrina Cut project):

1)   **Alabama Emergency Management Agency ("EMA")**:

EMA received a total of $35,169,872.74 in BP funds and disbursed a total of $35,169,872.74 of those funds.  AL-ED-000031681 ("Historical Commission - BP Oil Spill, Fund 1419") reflects the receipt and disbursement of these funds with regard to the State Historical Commission.

2)   **Alabama Department of Environmental Management ("ADEM")**:   ADEM received a total of $21,556,982.74 in BP funds and disbursed a total of $21,556,982.74 of those funds in accordance with the entries reflected in AL-ED-000031674 ("Environmental Management - BP Oil Spill, Fund 1403").

3)   **The Office of the Governor**:   The Governor's office received a total of $4,411,173.71 in BP funds and disbursed a total of $975,201.32 of those funds in accordance with the entries reflected in AL-ED-000031677 ("Governor's Office - BP Oil Spill, Fund 1410"). The Governor's office retains a balance of funds in the amount of $3,435,972.39.

4)   **Alabama Department of Finance ("Finance")**:   Finance received a total of $10,990,013.04 in BP funds and disbursed a total of $2,383,650.39 in accordance with the entries reflected in AL-ED-000031675 ("Department of Finance-BP Oil Spill Fund 1417").   Finance retains a balance of funds in the amount of $8,606,362.65.   Fund 1417 included disbursements

to the Alabama Department of Public Safety and the Alabama Department of Conservation and Natural Resources.  AL-ED-000031671 ("Department of Public Safety - BP Oil Spill, Fund 1416") reflects the receipt and disbursement of the funds received by the Department of Public Safety.  The Alabama Department of Conservation and Natural Resources received $79,800.00. An accounting of DCNR's expenditures is not responsive in this phase of Alabama's case because it contains expenses/payments related to the on-going NRD Assessment.

* * *

This Response is based on the information available to the State at this time.  The State reserves the right to supplement this Response as more information becomes available.

**INTERROGATORY NO. 15:**       Provide an accounting of all funds, payments, grants, contributions or donations that the State has received from any source other than BP (such as the United States) from 2010 until the present relating to the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to Interrogatory #15 as it seeks information is irrelevant and/or inadmissible and is not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to Interrogatory #15 to the extent that it seeks information that is in the control and custody of Defendants.

The State objects to this Request on the grounds that it is overbroad, unduly burdensome, unreasonable, duplicative, and/or oppressive, without limitation, as to subject matter and where compliance with this Request would be unreasonably difficult as well as prohibitively expensive or time-consuming.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State responds as follows:

The State is in the process of gathering the requested (non-NRD) payments. The State identified a federal grant received by ADECA in Response to Interrogatory #1.  Based upon the information available to the State at this time, between February 1, 2011 and July 31, 2013, ADEM received approximately $1.3 million from the National Pollution Funds Center for the reimbursement of response and removal actions directed by the Federal On-Scene Commander for the oil spill response.

The State continues its review of this Request and will supplement its response accordingly.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**      All documents from 1980 until the present summarizing or relating to collections of any Revenue for the State, including how such Revenues are calculated, assessed, and collected.

**OBJECTIONS:**

The State objects to RFP #1 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to the time frame "from 1980 until the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 2:**      All documents from 1980 until the present relating to any analyses, studies, forecasts, projections, or budget reports of all Revenue streams for the State.

**OBJECTIONS:**

The State objects to RFP #2 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to the time frame "from 1980 until the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time

period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

The State objects to the phrase/terms "analyses, studies, forecasts, projections, and budget reports" is vague, ambiguous, and undefined.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 3:**   All documents from 1980 until the present relating to any analyses, studies, projections, or budget reports of production of Revenue by and/or allocation of Revenue to State departments or agencies for which the State claims lost Revenue as a result of the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #3 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to the time frame "from 1980 until the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

The State objects to the phrase/terms "analyses, studies, projections, or budget reports of production of Revenue" as vague, ambiguous, and undefined.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

> **REQUEST FOR PRODUCTION NO. 4:**    All documents relating to any costs increased, or incurred by the State, as a result of the *Deepwater Horizon* Incident and/or the Oil Spill, including but not limited to response, removal, repair, and replacement costs as a result of the *Deepwater Horizon* Incident and/or Oil Spill and any purported increased public service costs (*e.g.*, State monitoring costs) because of any alleged physical injury to any Property associated with the *Deepwater Horizon* Incident and/or Oil Spill.

**OBJECTION:**

The State objects to RFP #4 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 5:**      All documents from 1980 to the present relating to any analyses, studies or projections of the effects or impacts of any events, incidents, disasters, or circumstances (*e.g.*, oil spills, natural disasters, national/regional economic recessions, the post-Oil Spill moratorium declared on all deepwater offshore drilling on the Outer Continental Shelf, etc…) on the State's economy and/or its Revenue.

## OBJECTIONS:

The State objects to RFP #5 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #5 on the grounds that the terms "analyses," "studies," "projections," "events," "incidents," "disasters," "circumstances," "natural disasters," and "national/regional economic recessions" are each vague, ambiguous, overly broad, and undefined.

The State objects to the time frame "from 1980 to the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

## RESPONSE:

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 6:**     All analyses, studies or projections from 1980 until the present relating to economic trends or conditions that impact the State economy and/or State Revenue.

**OBJECTIONS:**

The State objects to RFP #6 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #6 on the grounds that the terms "analyses," "studies," "projections," "economic trends," "conditions," and "impact" are each vague, ambiguous, overly broad, and undefined.

The State objects to the time frame "from 1980 until the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 7:**     All documents relating to the oiling of Alabama's coastline, shoreline, inland, submerged land, or other land, including each parcel of Property, as a result of the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #7 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #7 on the grounds that the term "oiling" is vague, ambiguous, and undefined.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 8:**   All documents related to any water and/or sediment sampling, testing, and/or oil fingerprinting performed on Alabama property in connection with the Oil Spill.

**OBJECTION:**

The State objects to RFP #8 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 9:**   All documents identifying or describing your ownership interest or proprietary interest in each piece or parcel of Property.

**OBJECTIONS:**

The State objects to RFP #9 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 10:**    All documents from 1980 until the present assessing, appraising, summarizing, reflecting or relating to the value of any property owned by Alabama, or for which Alabama claims a proprietary interest, in Baldwin, Mobile, Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston counties, whether or not alleged to be damaged as a result of the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #10 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.   By way of example, and not limitation, the State makes no claims for properties in Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston Counties; thus, documents concerning properties in these counties are not reasonably calculated to lead to the discovery of admissible evidence and production of said documents would be disproportionately burdensome on the State.

The State objects to RFP #10 on the grounds that the terms "summarizing" and "reflecting" are each vague, ambiguous, overly broad, and undefined.

The State objects to the time frame "from 1980 until the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

61

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 11:**    All documents relating to the methods used to determine the value of any property owned by Alabama, or for which Alabama claims a proprietary interest, in Baldwin, Mobile, Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston counties, whether or not alleged to be damaged as a result of the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #11 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.   By way of example, and not limitation, the State makes no claims for properties in Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston Counties; thus, documents concerning properties in these counties are not reasonably calculated to lead to the discovery of admissible evidence and production of said documents would be disproportionately burdensome on the State.

**RESPONSE:**

Subject to the State's general and specific objections, the State's response in Interrogatory #6 responds to this Request.  To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

62

**REQUEST FOR PRODUCTION NO. 12:**     All documents identifying or describing any alleged physical injury or physical damage to each piece or parcel of Property.

**OBJECTIONS:**

The State objects to RFP #12 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 13:**     All documents describing any State-owned real property in Baldwin, Mobile, Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston counties.

**OBJECTIONS:**

The State objects to RFP #13 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.   By way of example, and not limitation, the State makes no claims for properties in Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston Counties; thus, documents concerning properties in these counties are not reasonably calculated to lead to the discovery of admissible evidence and production of said documents would be disproportionately burdensome on the State.

The State further objects to RFP #13 as documents that merely "describ[e]" a State-owned real property—*e.g.* magazine articles and brochures—are as numerous as they are unlikely to lead to the discovery of admissible evidence.

63

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 14:**    All documents related to any statements made by you or on your behalf concerning the condition or quality of any Property.

**OBJECTIONS:**

The State objects to RFP #14 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 15:**    All documents relating to any reductions or planned reductions in State spending for State public services, including but not limited to documents relating to the nature of and reasons for the reductions and any data or analysis used to determine or estimate the reductions and any purported impact of such reductions.

**OBJECTIONS:**

The State objects to RFP #15 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #15 to the extent that it seeks privileged or confidential documents of the State's legislative or executive branch.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 16:**    All documents from 1980 until the present summarizing Tourism-Related Activity and/or Tourism-Related Expenditure in Alabama or relating to any analyses, studies or projections of tourism in Alabama.

**OBJECTIONS:**

The State objects to RFP #16 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #16 on the grounds that the terms "analyses," "studies," and "projections" are each vague, ambiguous, overly broad, and undefined.

The State objects to the time frame "from 1980 until the present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 17:**     All documents describing any actual, planned, or anticipated Alabama tax law or tax policy change as a result of or arising from the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #17 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #17 on the grounds that it cannot "anticipate" legislative action, and thus cannot produce documents that "anticipate" legislative action.

The State objects to RFP #17 to the extent that it seeks privileged or confidential documents of the State's legislative or executive branch.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information for actual or planned tax law changes and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 18:**     For the years 1980 to present, all documents relating to Alabama's unemployment and underemployment rates, including claims data and the methods used to calculate such rates.

**OBJECTIONS:**

The State objects to RFP #18 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to the time frame "1980 to present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 19:**   For the years 1980 to present, all documents relating to reports, studies, analyses, or assessments of the real estate market in Alabama generally or in Baldwin, Mobile, Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva or Houston counties.

**OBJECTIONS:**

The State objects to RFP #19 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.   By way of example, and not limitation, the State makes no claims for properties in Washington, Clarke, Monroe, Conecuh, Escambia, Covington, Geneva, and Houston Counties; thus, documents concerning properties in these counties are not reasonably calculated to lead to the discovery of admissible evidence and production of said documents would be disproportionately burdensome on the State.

The State objects to RFP #10 on the grounds that the term "analyses" is vague, ambiguous, overly broad, and undefined.

The State objects to the time frame "1980 to present" as it is inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information as pertaining to the properties at issue in this case and will supplement this RFP Answer accordingly.  To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 20:**     All documents relating to any insurance claims the State has made related to the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #20 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.   By way of example, and not limitation, evidence of insurance payments to the State is inadmissible under the collateral source doctrine.

**RESPONSE:**

The State is not aware of any oil spill-related insurance claims that would be responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 21:**     All documents relating to payments, grants, contributions or donations to the State, or individuals and entities within the State, by BP or others, including the United States government, related to the *Deepwater Horizon* Incident and/or the Oil Spill, including documents showing the economic or financial impact of such payments, grants, contributions or donations on any measure of State economic or financial performance, including but not limited to employment, personal income, tourism activity, commercial fishing activity, state, county and local revenue, or state, county and local expenditures.

**OBJECTIONS:**

The State objects to RFP #21 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. By way of example, and not limitation, evidence of third-party payments to the State is inadmissible under the collateral source doctrine. By way of example, and not limitation, evidence of payments from BP to the State is inadmissible where the Parties agreed that said payment would not be admissible to mitigate Alabama's claims.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 22:**   All documents relating to BP's community outreach efforts, the expenditures regarding those efforts, and campaigns, marketing, advertisements, and other efforts funded by the State, BP or others, including the federal government, intended to promote tourism, seafood, fishing, recreation, or other economic activity in the Gulf Coast region after April 20, 2010, or otherwise related to the *Deepwater Horizon* Incident and/or the Oil Spill, including documents showing the economic or financial impact of such efforts.

**OBJECTIONS:**

The State objects to RFP #22 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #22 on the grounds that the terms "campaigns," "marketing," "advertisements," and "other efforts" are each vague, ambiguous, overly broad, and undefined.

The State objects to RFP #22 on the grounds that expenditures and outreach efforts undertaken by Defendants and the Federal Government are equally accessible to Defendants, if not more so.

**RESPONSE:**

The information requested is equally accessible to the Defendants, and as such, the State stands on its objections. To the extent the State possesses information solely related to its efforts to promote tourism, seafood, fishing, recreation, or other economic activity in the Gulf Coast region, the State will perform a reasonable search and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 23:**    All documents relating to the positive economic or financial impact of response and removal efforts in the State of Alabama related to the Deepwater Horizon Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #23 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 24:**     All documents commending, praising, or otherwise noting or referencing the efforts of BP (including contractors and other entities assisting BP) to respond to, or otherwise mitigate, minimize, or prevent any environmental, economic, human health, or other effects of the *Deepwater Horizon* Incident and/or the Oil Spill.

**OBJECTIONS:**

The State objects to RFP #24 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #24 on the grounds that the terms "commending," "praising," and "otherwise noting or referencing" are each vague, ambiguous, overly broad, and undefined.

The State objects to RFP #24 on the grounds that documents commending or praising BP are equally accessible to Defendants, if not more so.

The State objects to RFP #24 on the grounds that the State does not presently possess the knowledge of every contractor and entity that assisted BP in the response effort.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 25:**     All communications among, directed to or sent from State employees relating to the economic or financial impact, actual or anticipated, of the *Deepwater Horizon* Incident and/or the Oil Spill on the State of Alabama, including, without limitation, any State department or agency meeting minutes, agendas, presentations, new releases, and reports.

**OBJECTIONS:**

The State objects to RFP #25 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

The State objects to RFP #25 to the extent that it seeks privileged or confidential documents of the State's legislative or executive branch.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly.

**REQUEST FOR PRODUCTION NO. 26:**    All documents considered, used, or relied upon in preparing the State of Alabama's Fed. R. Civ. P. 26(a) Initial Disclosures and any Amendments thereto.

**OBJECTION:**

The State objects to RFP #26 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly. To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 27:**    All documents that reflect the data, formulas, analyses and economic theories that support the categories of damages that the State identified in the State of Alabama's Fed. R. Civ. P. 26(a) Initial Disclosures and any Amendments thereto, including those documents that reflect the publically-available information that bear on the nature and extent of the injuries that the State claims that it suffered.

**OBJECTIONS:**

**OBJECTIONS:**

The State objects to RFP #27 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

As pertaining to publically available documents and data that bear on the nature and extent of the injuries that the State claims it suffered, the State responds that the Defendants are just as capable of obtaining the information. Nonetheless, the State will make a reasonable effort to direct the Defendants to the location of publically-available data sources.

To the extent this RFP Request seeks information that is not within the public domain, the State will perform a reasonable search and supplement its RFP Answer accordingly.   To the extent this Request seeks the disclosure of experts or expert work product materials, the State will produce information related to experts in accordance with the Court's Scheduling Order.

**REQUEST FOR PRODUCTION NO. 28:**     All documents considered, used, or relied upon in responding to any interrogatories that have been served on the State of Alabama.

**OBJECTIONS:**

The State objects to RFP #28 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, the State will perform a reasonable search for the requested information and supplement this RFP Answer accordingly.

## GENERAL RESPONSES AND OBJECTIONS

The State asserts the following objections to each of the Defendants' interrogatories and requests for production, including the definitions and instructions associated therewith. These general objections are incorporated by reference into each specific response set forth above and are neither waived nor limited by any specific responses.

1.      The State objects to Defendants' Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

2.      The State objects to Defendants' Discovery Requests to the extent they call for information or seek discovery from State Departments or Agencies beyond those State Departments, Agencies, and Subdivisions identified in the Court's July 16, 2014 order.  MDL 2179 Doc. 13149.  The State's responses will be narrowed to the Departments, Agencies, and Subdivisions identified by the Court in its Order.

3.      To the extent that Defendants seek the production of documents prior to January 1, 2008 that relate to the State's tax loss and financial impact claims (*i.e.* RFPs 1-3, 5-6, 16, 18), the State objects to the requests as overly broad, unduly burdensome, and inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.  To the extent that Defendants seek the production of documents prior to April 20, 2010 in any other request for production (*i.e.* RFPs 4, 7-15, 17, 19-28), the State objects to the requests as overly broad, unduly burdensome, and inconsistent with the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

74

4.      The State objects to the Defendants' Discovery Requests to the extent they seek documents or information not related to the issues to be tried in this Phase of Alabama's trial.

5.      The State objects to the Defendants' Discovery Requests to the extent they seek documents or information related to the on-going Natural Resource Damage Assessment, as the Court has ruled that the State's claim for natural resource damages is excluded from this Phase of Alabama's trial.  *See* MDL 2179 Doc. 13149 at 3.

6.      The State objects to Defendants' Discovery Requests to the extent they seek documents or information relating to Phases One or Two of the litigation. *See, e.g.*, MDL 2179 Doc. 3354 ("No party may serve any party with any further Phase One RFPs, interrogatories, or RFAs without leave of Court.").  Discovery for Phase One and Phase Two is complete, and the trial record for the Limitation and Liability Trial is closed.   The State expressly reserves the right to rely on discovery taken and the record developed in Phase One and Phase Two of the Limitation and Liability Trial in this phase of Alabama's trial.

7.      The State objects to Defendants' Discovery Requests to the extent they are compound and contain multiple subparts that should be counted as separate requests. The Court expressly limited Defendants to 60 requests for production and interrogatories.  MDL 2179 Doc. 13149. The Defendants' Discovery Requests exceed these Court imposed limitations through their use of compound and multi-part requests.

8.      The State objects to Defendants' Discovery Requests to the extent they call for the production of ESI in any manner other than required under Federal Rule of Civil Procedure 34, the Rules and Orders of this Court, and ongoing negotiations and discussions among counsel.

9.      The State objects to Defendants' Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine,

the joint-defense or common-interest privilege, or any other applicable privilege, exemption, or immunity.

10.     The State objects to Defendants' Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial, is not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and/or the discovery of such information would be prejudicial to the efforts of State and any opposing parties to resolve their disputes in a fair and efficient manner.

11.     The State objects to Defendants' Discovery Requests to the extent they call for information or documents not within the State's possession, custody, or control, including but not limited to information or documents under the possession, custody, or control of Alabama's counties and municipalities.  All responses are made on behalf of the State only, and are limited to information and documents within the State's possession, custody, or control.

12.     The State objects to the Defendants' Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overly broad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

13.     The State objects to the Defendants' Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence.

14.     The State objects to Defendants' Discovery Requests as premature to the extent they call for expert discovery or seek information or documents that may not be identified until all fact and expert discovery is complete.   To the extent Defendants' Discovery Requests seek to ascertain the identity, writings, and/or opinions of testifying experts or non-testifying consulting experts, the State objects, as Defendants' Discovery Requests violate the work-product privilege. To the extent the State wishes to support its claims with expert opinion and work product, the State will produce expert opinions and work product in accordance with the Court's Scheduling Order and the Federal Rules of Civil Procedure.

15.     The State objects to Defendants' Discovery Requests to the extent they seek information or documents subject to the deliberative process privilege, which protects the disclosure and distortion of candid discussions, advisory opinions, recommendations, and deliberations necessary for optimum decision-making and policy-making processes within the State's governmental branches, agencies, departments, divisions, etc.

16.     The State objects to Defendants' Discovery Requests to the extent they seek disclosure of executive privilege-protected communications by and between the State's governor and/or other high ranking officials of the executive branch. The disclosure of such executive communications would adversely affect and/or disrupt the operations and/or decision-making processes of the executive branch.

17.     The State objects to Defendants' Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the Marine Board of Investigation, and the protections of the Health Insurance Portability and Accountability Act, or that would

result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

18.     The State objects to the Defendants' Discovery Requests to the extent they seek documents already in the possession of the Defendants or equally available to the Defendants from sources other than the State, including publicly available sources.

19.     The State objects to Defendants' "Instructions" included in their Interrogatories to the extent they exceed the State's obligations under the Federal Rules of Civil Procedure, the Court's Pre-trial Orders, and/or the Court's Scheduling Order.   The State will read and respond to Defendants' Interrogatories pursuant to the Federal Rules of Civil Procedure and any applicable order of the Court.

20.     The State objects to Defendants' "Instructions" included in their Requests for Production to the extent they exceed the State's obligations under the Federal Rules of Civil Procedure, the Court's Pre-trial Orders, and/or the Court's Scheduling Order.   The State will read and respond to Defendants' Interrogatories pursuant to the Federal Rules of Civil Procedure and any applicable order of the Court.  The State further objects to, and will read and respond to the Defendants' "Instructions," as follows:

(a) Alabama objects to the timeframe "2000 to the present" for the reasons stated in paragraph 3 above.  The State will apply the time frame imposed by the Court in its July 29 and July 31, 2014 orders regarding the time period to be applied to Defendants' corresponding search terms.  *See* MDL 2179 Docs. 13210, 13230.

(b)     The State objects to the production of county-level data for the reasons stated in paragraph 11 above.

(c)     The State has no additional objection.

78

(d)     The State has no additional objection.

(e)     The State objects to this instruction to the extent that it conflicts with Federal Rule of Civil Procedure 26(e)(1)(A), which requires supplementation of a response "in a timely manner if the party learns that in some material respect the … response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to [the opposing party] during the discovery process or in writing[.]"  The State will comply with the requirements of Rule 26(e)(1)(A).

21.     The State objects to Defendants' "Definitions" in their Request for Production to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  The State further objects to, and will read and respond to, the Defendants' "Definitions" as follows:

(a)   The Defendants' definition of "You," "your," and "yours" is objectionable to the extent that it includes State departments, agencies, and personnel that were excluded from the scope of discovery in the Court's July 16, 2014.  MDL 2179 Doc. 13149 at 1-3.  The State will interpret these terms consistently with the Court's order.

(b)   "Person:" The State has no additional objection.

(c)   The State objects to the Defendants' definition of "Communication," to the same extent that Defendants object to the State's definition of the same term, as the Parties' definitions are virtually identical.   The State will read and respond to Defendants' requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(d)     The State objects to the Defendants' definition of "Document" or "documents," to the same extent that Defendants object to the State's definition of the same terms, as the Parties'

definitions are substantially similar.  The State further objects to this definition to the extent that Defendants seek to require production of information that is exempt from preservation pursuant to PTO 22 or any other order of the Court.

(e)     The State objects to the Defendants' definition of "Identify," to the same extent that Defendants object to the State's definition of the same term, as the Parties' definitions are virtually identical.  The State will read and respond to the Defendants' requests with the understanding that the term "identify" means, in the context of an individual, an individual's name, and where the context reasonably requires, his or her employer, and in the context of a document or ESI, a Bates number or other available information necessary to isolate the document or ESI.

(f)     "Including:" The State has no additional objection.

(g)     The State objects to the Defendants' definition of "Relating to," to the same extent that Defendants object to the State's definition of the same term, as the Parties' definitions are virtually identical.  The State will read and respond to the Defendants' requests with the understanding that "relating to" has its plain and ordinary meaning in standard English usage.

(h)     "And" and "or:" The State has no additional objection.

(i)     "MC252 #1 Macondo Well:" The State has no additional objection.

(j)     "Macondo Well:" The State has no additional objection.

(k)     The State objects to the Defendants' definition of "*Deepwater Horizon* Incident" or "incident," to the same extent that Defendants object to the State's definition of the same terms, as the Parties' definitions are virtually identical.

(l)     "OPA:" The State has no additional objection.

80

(m)     With respect to Defendants' definition of "Oil Spill," the State understands the Defendants' usage of the term "oil" to include all materials included within OPA's definition of "oil."  *See* 33 U.S.C. §2701(23).  The State objects to Defendants' definition of "Oil Spill" to the extent that Defendants define "oil" to be any narrower than the definition given that term by OPA.

(n)     The State objects to Defendants' definition of "Oil Spill Response" as the phrase "any effort to clean up" is vague and ambiguous.  The State will read and respond to this term as including actions taken within the State of Alabama to respond to, prevent, or otherwise mitigate the effects of the *Deepwater Horizon* incident or spill.

(o)     "Property" or "Properties:" The State has no further objections.

(p)     The State objects to the Defendants' definition of "Revenue" as the definition is overbroad, unduly burdensome, and seeks information on all revenue sources, regardless of whether the revenue sources have any connection to the spill.  The State will read and respond to this term as including those revenue sources that reasonably have a connection to the State's claims.

(q)     "Tourism-related activity:" The State has no further objection.

(r)     The State objects to Defendants' definition of "Tourism-related expenditure," specifically the phrase "as well as expenses that are paid for or reimbursed by others," as the phrase is vague and ambiguous.  The State will read and respond to this term without reference to the above-referenced phase.

(s)     The State objects to Defendants' definition of "BP" to the extent Defendants seek to limit the scope of BP's corporate obligations in this litigation, either in the discovery phase or at trial.  The State will respond to this term as if it also seeks information on BP plc or any other

BP entity that the State contends is responsible, either in whole or in part, for the State's damages.

(t)     The State objects to Defendants' definition of "Defendants" as overly broad to the extent that it includes any person or entity named as a Defendant "in any complaint filed in MDL 2179." The State will read and respond to this term as including only those Defendants named in the Court's order governing this phase of Alabama's trial. *See* MDL 2179 Doc. #13149.

(u) The State objects to Defendants' definition of "State" or "Alabama" as overly broad to the extent that it includes State departments, agencies, and personnel that were excluded from the scope of discovery in the Court's July 16, 2014. MDL 2179 Doc. 13149 at 1-3. The State will interpret these terms consistently with the Court's order.

(v) The State objects to Defendants' definition of "United States" as overly broad. The State will read and respond to Defendants' requests by disclosing responsive information that is known by the State to be from or to the United States or a known entity thereof.

22.     The State objects to Defendants' "Definitions" in their Interrogatories for the reasons stated in paragraph 21, which contains the State's objections to the "Definitions" in Defendants' Requests for Production. The State adopts and fully incorporates its objections in paragraph 21 herein.

23.     These responses are made without waiving, in any manner, the State's right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, pretrial orders or rulings, or any other ground permitted by any applicable law or rule.

24.     To the extent that the State states it will produce documents in response to the requests, the State will produce such documents on a rolling basis with such reasonable speed as

the State can locate and process them, without sacrificing a meaningful review for responsiveness, privilege, and confidentiality, as this is the only feasible and physically possible method given the scope and breadth of the requests.

25.     Neither the State's agreement to produce documents, if any, nor the State's agreement to search for documents responsive to a request shall imply that responsive documents exist, or constitute the State's admission or acknowledgment as to the relevance or admissibility of any documents or as to the truth of any allegation or assumption contained in the requests.

26.     To the extent that the  State responds that it will search for and produce responsive documents, the State is only undertaking to make a good-faith effort to conduct a reasonable search of non-privileged documents of the files and records of those individuals likely to have meaningful information responsive to a request as maintained in the ordinary course of business, and/or to apply a reasonable set of search terms, including those the parties have already agreed upon, to available collections of ESI as maintained in the ordinary course of business reasonably likely to yield a meaningful amount of information responsive to a request. The State is not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of the State's employees and agents where any such items are not included within the results of a reasonable search as described above.

27.     Where documents are identified, the State incorporates into its response all similar documents, which are equally available to the Defendants via electronic searches of the State's production.

28.     The State's decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the

document requests themselves, should not be construed as: (a) a stipulation that the material is relevant or admissible, (b) a waiver of State's general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

29.     The State reserves the right to modify, amend, or supplement its responses, which are made based on the current status of its knowledge, understanding, belief, and searches for documents. The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.

**CERTIFICATE OF SERVICE**

I hereby certify that October 28, 2014, the above and foregoing has been served on Counsel for the Defendants by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice of electronic service in accordance with the procedures established in MDL 2179.

/s/ Corey L. Maze                        .
COREY L. MAZE
*Special Deputy AG, State of Alabama*

## DECLARATION

I hereby declare that the foregoing responses to interrogatories are true and correct based on the information available to the State on this date.  *See* Fed. R. Civ. P. 33(b).  The State's investigation of facts and information relating to Defendants' interrogatories is continuing and may be supplemented pursuant to the Court's scheduling order.

Date:   October 28, 2014

 /s/ Corey L. Maze                             .
COREY L. MAZE
*Special Deputy AG, State of Alabama*

86