**Deepwater Horizon Economic Claims Center**

Claims Processing Review Report
November 2014



Assurance • Tax • Consulting

McGladrey LLP



1861 International Dr.
McLean, Virginia 22102
O 703.336.6400 F 703.336.6401
www.mcgladrey.com

November 7, 2014

Patrick Juneau
Claims Administrator
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, Louisiana 70112

Dear Mr. Juneau:

In accordance with our agreement, effective October 16, 2013, we have performed services related to various functions within the Deepwater Horizon Economic Claims Center ("DHECC") and across the Court Supervised Settlement Program ("CSSP"). As part of our engagement, we have completed our review of the CSSP's claims processing procedures. The enclosed report contains the results of that review, and is divided into the following sections:

- **Introduction**— provides an introduction to the review performed, describing our scope and approach, procedures performed, a summary of our sampling approach and projection, and a general description of the manner in which our findings and observations are organized.

- **Award calculation findings** – details our specific award calculation findings noted by claim category.

- **Documentation deficiencies** – details our specific documentation deficiencies noted by claim category.

- **Zero-Paid claims** – describes our approach for reviewing the various processes associated with claims that were the subject of appeal, reconsideration, re-review, denial, opt-out and other processes that resulted in a zero payment.

- **Other observations** – provides program-level and claim category-specific process improvement internal control, and other observations.

This report is intended for the sole benefit and use of DHECC management. Without our express written consent, this report may not be disclosed to, relied upon, or used by any third party, except disclosure may be made to DHECC's external auditors, the U.S. District Court for the Eastern District of Louisiana, and regulators in connection with fulfilling their respective responsibilities. McGladrey does not authorize the use of this report other than by those and in the manner described in this paragraph, and will not be responsible for any unauthorized use of this report

We appreciate the cooperation afforded us during this review, and the opportunity to be of continued service to DHECC.

Sincerely,

McGladrey LLP

## Table of Contents

**Introduction** ......................................................................................................... **1**

     Background of the organization............................................................................................ 1
     Scope..................................................................................................................................... 1
     Approach .............................................................................................................................. 2
     Procedures performed.......................................................................................................... 3
     Sampling approach and projection....................................................................................... 5
     Categorization and reporting of findings.............................................................................. 6

**Award Calculation Findings** ............................................................................. **8**

     Summary of results.............................................................................................................. 8
     Seafood Compensation...................................................................................................... 10
     Business Economic Loss.................................................................................................... 12
     Failed Business Economic Loss......................................................................................... 14
     Start-up Business Economic Loss...................................................................................... 15
     Individual Economic Loss ................................................................................................... 18
     Individual Periodic Vendor / Festival Vendor..................................................................... 21
     Subsistence ....................................................................................................................... 22
     Vessel of Opportunity ........................................................................................................ 24
     Vessel Physical Damage.................................................................................................... 25
     Coastal Real Property ........................................................................................................ 27
     Wetlands Real Property...................................................................................................... 28
     Real Property Sales........................................................................................................... 29
     40% Request ..................................................................................................................... 30

**Documentation Deficiencies**........................................................................... **31**

     Summary of results............................................................................................................ 31
     Seafood Compensation...................................................................................................... 33
     Business Economic Loss.................................................................................................... 35
     Failed Business Economic Loss......................................................................................... 37
     Start-up Business Economic Loss...................................................................................... 38
     Individual Economic Loss ................................................................................................... 40
     Individual Periodic Vendor / Festival Vendor..................................................................... 42
     Subsistence ....................................................................................................................... 43
     Vessel of Opportunity ........................................................................................................ 44
     Vessel Physical Damage.................................................................................................... 45
     Coastal Real Property ........................................................................................................ 47
     Wetlands Real Property...................................................................................................... 48
     Real Property Sales........................................................................................................... 50
     40% Request ..................................................................................................................... 52

**Zero-Paid Claims** ............................................................................................. **53**

**Other Observations** ......................................................................................... **55**

**Appendix A: Projected comparison to paid amount** ..................................... **73**

**Appendix B: Standards for consulting services** ........................................... **75**

**Appendix C: Management's response** .............................................................. **77**

© 2014 McGladrey LLP. All Rights Reserved.

# Introduction

McGladrey LLP ("McGladrey," "we," or "our") was engaged by the Deepwater Horizon Economic Claims Center ("DHECC" or Claims Administrator's Office ("CAO")) effective October 16, 2013 to perform certain services for the Court Supervised Settlement Program ("CSSP" or "Program"). In accordance with our agreement with DHECC, we have performed a review of the CSSP's claims processing procedures with the objective of evaluating the level to which the claims processed by the Program comply with the Settlement Agreement (as defined below). In addition, through substantive compliance testing, we evaluated whether the CSSP has an appropriate and effective system of controls over the assessment and processing of claims in accordance with the Settlement Agreement, as evidenced by processing accuracy.

### Background of the organization

In August 2010, various lawsuits against BP Exploration & Production Inc., BP America Production Company (collectively referred to as "BP"), and the other defendants concerning the oil spill by the oil rig "Deepwater Horizon" that occurred in the Gulf of Mexico on April 20, 2010 (the "Deepwater Horizon Incident" or "DWH Spill") were consolidated before one court for the litigation of damages from the Deepwater Horizon Incident. In advance of the trial, the parties to the litigation, namely the Plaintiffs' Steering Committee ("PSC") and BP (collectively, the "Parties"), began settlement negotiations and eventually entered into an Economic and Property Damages Settlement Agreement dated April 18, 2012, amended May 1, 2012, and approved by the United States District Court of the Eastern District of Louisiana (the "Court") on December 21, 2012 (the "Settlement Agreement").

The DHECC, led by the Claims Administrator and supervised by the Court, was established as a means to process and disburse settlement, or claim, payments in accordance with the Settlement Agreement. In addition to processing such claims, the Claims Administrator was tasked with the coordination of the Transition Process – the evaluation of claims pending under the legacy Gulf Coast Claim Facility ("GCCF"). The manner in which pending GCCF claims should be treated is outlined throughout the Settlement Agreement, and further clarified in a Court-issued transition order.

The CSSP includes several vendors that, together, are responsible for the processing and payment of claims submitted and awarded under the Settlement Agreement. Specifically, the vendors include BrownGreer PLC, The Garden City Group, Inc., HUB Enterprises, Inc., Postlethwaite & Netterville, APAC, and PricewaterhouseCoopers LLP (collectively, the "Vendors").

### Scope

The Settlement Agreement outlines twelve categories for which a claimant can file a claim. Within the Settlement Agreement, specific eligibility and documentation requirements are provided for in respective Frameworks. Our review included a review of a sample of claims paid from inception of the Program through October 3, 2013[1] (the "Review Period") selected from each of the twelve claim categories, as listed here:

- Seafood Compensation
- Business Economic Loss
- Failed Business Economic Loss
- Start-up Business Economic Loss
- Individual Economic Loss
- Individual Periodic / Festival Vendor

- Subsistence
- Vessel of Opportunity
- Vessel Physical Damage
- Coastal Real Property
- Wetlands Real Property
- Real Property Sales

---

[1] Upon agreement with DHECC and the Parties about the Review Period, we requested a population of all claims paid through September 30, 2013. Due to data back-up procedures taken by the Program, the closest available date was October 3, 2013.

With respect to claims processing, our scope was limited to evaluating compliance with the Settlement Agreement and policies issued by the Claims Administrator ("Supplemental Policies"). As agreed upon with the DHECC, and outlined in Exhibit 1 of our agreement with DHECC, our scope and procedures were intended to specifically exclude matters of interpretation of the Settlement Agreement. In those instances where we determined that a matter of interpretation of the Settlement Agreement was necessary in order for us to properly evaluate a potential finding, interpretive guidance was requested of, and provided by, the CAO. Further, the objective of our review focused on compliance with the Settlement Agreement, and not the materiality of our findings relative to any financial statement presentation. Our review also included a sampling of claims that were appealed, denied, reconsidered, re-reviewed, or withdrawn, and claimants who opted out of the Program during the Review Period. For these claims, our approach was to evaluate whether or not the respective processes were consistently and appropriately performed by the Program. Such claims are referred to as "Zero-Paid" claims throughout this report. Note – this term does not necessarily represent the final determination of a claim. As part of the claims processing procedures, upon completion of these Zero-Paid processes, some claims were ultimately approved for payment and paid.

Finally, we reviewed claims paid under the terms of the Transition Process, described in Section 4.2 of the Settlement Agreement. These claims include claimants who elected to receive the remaining 40% of the award calculated under the GCCF program, rather than submit a claim under the CSSP.

### Third party scope limitations

The Program uses various tools and databases to facilitate information gathering and other procedures required by the Settlement Agreement. Examples include a mapping tool that determines the compensation zone in which a claimant will be considered, the GCCF database that includes information related to payments made to claimants in the GCCF program, a database that provides acreage information for oyster leasehold claimants, and a Subsistence Activity Location Identifier ("SALI") tool that determines closure periods for Subsistence. The vendors responsible for developing and maintaining these third party tools and databases are not under contract with DHECC. Rather, these vendors are under contract with BP, one of the Parties. As part of our review, despite several requests to these vendors, we were unable to obtain evidence to verify that the testing procedures performed on the tools and databases prior to deployment were appropriate and complete. We were also unable to obtain evidence from these vendors to verify that an appropriate change management process over these tools and databases has been in place throughout the life of the Program.

While such scope limitations were incurred, it is our understanding that the Parties have agreed to use the tools and databases to process economic and property claims. In addition, the Settlement Agreement prescribes the use of one or more of these tools for various purposes. As such, we have placed a similar reliance on the tools and databases in order to perform our procedures and have not independently evaluated their efficacy.

### Approach

Our work was performed in accordance with the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Consulting Services ("SSCS"). The SSCS recognizes the difference between attest services and consulting services and that different standards apply to consulting services engagements. These standards recognize that the nature of consulting services work is determined solely by the agreement between the practitioner (McGladrey) and the client (DHECC), and that the work is generally performed only for the use and benefit of the client. Consulting services differ fundamentally from the CPA's function of attesting to the assertions of other parties. In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter. In a consulting service, the practitioner develops the findings, conclusions, and recommendations presented.

Our services did not constitute an external review of management's assertions concerning the effectiveness of the DHECC's internal control systems. Accordingly, we do not express such an opinion.

The AICPA Code of Professional Ethics (the "Code") requires that all services be performed with professional competence, due professional care, proper planning and supervision, that advice is based upon obtaining sufficient relevant data, and finally that such services are performed with integrity and objectivity. The Code requires the additional, and much more extensive, standards of "independence" only for the performance of attest engagements, and therefore we do not make any representations regarding our independence as defined by the Code with respect to this engagement. See Appendix B for a detailed description of the SSCS.

### Procedures performed

The following bullet points generally describe the procedures performed to execute our review of the DHECC's claims processing procedures in accordance with the standards described above.

- Communicated our objectives, scope, and sampling approach to the following parties:
  - o   Claims Administrator
  - o   DHECC Chief Executive Officer
  - o   DHECC Chief Financial Officer
  - o   Representatives of the Plaintiff Steering Committee
  - o   Representatives of BP plc
  - o   Representatives of the Freeh Group (Court-appointed Special Master)
- Reviewed the Settlement Agreement and Supplemental Policies in detail and met with Program personnel to gain an understanding of each claim category and respective processing procedures. To the extent available, Program manuals, such as the Operations Manual, and Program-developed flowcharts were obtained and reviewed.
- Obtained from the Program a population of claims deemed "paid" in the claims processing system for the Review Period.
- Reconciled the population received through October 3, 2013 to the Program's September 30, 2013 financial statements, noting reconciling items caused by the different period-ends in the two reports.
- Obtained a population of all claims appealed, denied, re-reviewed, and re-considered within the Review Period.
- For each claim category, selected a sample of claims for review. A detailed description of our sampling approach is described below.
- Developed detailed work programs for each respective claim category. As some claim categories warranted multiple work programs, a total of 26 claims processing work programs were developed and executed. The following list includes general descriptions of the review procedures performed:

  1. *Registration form review* – Every claimant is required to complete a registration form with some basic personal information. Our review verified the accuracy of the registration form data entered into the claim processing system.

  2. *Claim form review* – Every claimant is required to complete one of the twelve different claim forms depending on the nature of their claim. Our review verified the accuracy of the claim form data entered into the claim processing system. In addition, our review verified existence of the claimant's, or claimant's authorized representative's signature on the claim form.

  3. *Document categorization and data capture review* – For each claim type, claimants are required to submit specific information to support the elements of their claim. Our review determined if the required information was in the file and the data was accurately entered into the claim processing system.

4.  *Individual/entity verification review* – The Settlement Agreement requires claimants to be natural persons or entities[2]. Each claimant is required to undergo a review based on the requirements as outlined in the Settlement Agreement and Supplemental Policies. Our review tested the class membership requirements in accordance with the Settlement Agreement.

5.  *Causation/eligibility analysis review* – Claims submitted have specific causation and/or eligibility requirements that must be satisfied, depending on the type of claim and the claimant's location. Our review evaluated whether or not the appropriate elements of causation and/or eligibility had been met for each applicable claim in the sample.

6.  *Award compensation calculation* – Award compensation is based upon specific calculation guidelines set forth for each claim category in the appropriate Framework outlined in the Settlement Agreement. Our review evaluated if the award determined by the Program was calculated in accordance with these guidelines.

7.  *Payment review* – In our review of the final payment amount, we examined the disbursement process, which included preparation of the eligibility notice and receipt of the release. Our review sought to determine if the release had been signed and if the actual payment went to the proper individual or entity.

- Executed the respective work programs for the claims selected. Our procedures were executed by obtaining direct access to the claim processing system maintained by the Program, as well as the tools and databases discussed above.

- Held numerous meetings with the Program to discuss the facts surrounding each potential instance of non-compliance in order to determine the appropriateness of reporting the instance as a finding.

- Categorized our findings into Award Calculation Findings, Documentation Deficiencies, and Other Observations, as defined on page eight of this report.

- For all claims with Award Calculation Findings noted, the award determination of the respective claim was recalculated. This value is defined as the "McGladrey Calculated Award Amount".

- The value of the over- or under- award determination for each claim was then established by comparing the McGladrey Calculated Award Amount to the award amount determined by the Program, after considering any re-review or re-consideration which may have occurred, and prior to any appeals. It is important to note that while our sample was selected using data related to final payment amounts, our review pertained to the procedures executed by the Program, which does not include the appeals process. As such, we compared our McGladrey Calculated Award Amount to that determined by the Program.

- Using the statistical approach described below, the over- and under-determinations were then projected to the entire population for each discrete claim category.

- For all claims with Documentation Deficiencies, we recalculated the award amount using only the conforming documentation on hand.

- Using the statistical approach described below, the aggregate value of the Documentation Deficiencies was then projected to the entire population for each discrete claim category.

- For information purposes, we have also compared the McGladrey Calculated Award Amount to the final payment amount of each claim within our sample (which includes any adjustments made during the appeal process). Similar to the process described above for the Program-determined award amount, we projected the results of this comparison to the entire population. The results of this projection are included in Appendix A.

---

[2] Settlement Agreement, Section 1, Class Definition

© 2014 McGladrey LLP. All Rights Reserved.

Due to the fact that Zero-Paid claims did not result in an award compensation amount, our review of these claims focused on the processing procedures followed by the Program. As such, the review procedures we performed varied from those described above. The following list includes general descriptions of the review procedures performed for Zero-Paid claims:

- Denial Notice – Upon completion of a claim review, claimants are issued either an eligibility notice or a notice of denial, which contains language regarding the claimant's right to request reconsideration or re-review, or ultimately appeal of the denial decision. Our review verified that claimants were properly notified of, and qualified for, one or more of these processes.

- Reason for Denial – Claimant denial notices cite the reason for denial. Our review consisted of verification and confirmation of the reasons cited, as well as a review of supporting documentation and related rationale used to conclude that zero payment was appropriate.

- Payment Review – Certain Zero-Paid claims were ultimately paid. Our review included verification that the decision to pay after initial denial was supported by appropriate documentation. In these cases, the award compensation calculation was also reviewed for compliance with process-level guidelines for the relative claim category.

### Sampling approach and projection

Paid claims were evaluated based on the claim categories described in the Settlement Agreement. Claims were separately evaluated by category because processing requirements and the complexity of issues and judgments vary across the different claim categories. The sampling method known as Classical Variables Sampling was utilized for all claim categories, with the exception of Failed Business Economic Loss, Individual Periodic Vendors / Festival Vendors (due to the small number of paid claims in these categories), and Zero-Paid claims, where a combination of judgmental and random samples of claims were examined.

Based on our objectives, and working with a statistical sampling subject matter expert[3], we concluded that utilization of Classical Variables Sampling was the most appropriate sampling approach for this review. Classical Variables Sampling allows for the projection of the test results to the population of claim award amounts – prior to any appeals – to determine a range of over- or under-statements for each claim category. (Note: Appendix A provides an alternative projection of the test results to the population of paid claim amounts).

A sample of claims from within each paid claim category population was selected for review, as follows:

1. Sample size was determined using the following criteria, as agreed-upon by DHECC and the Parties:
   a. Confidence level: 95%
   b. Expected error rate: 10%
2. A significance threshold was calculated equal to 5% of the total value of paid claims.[4]
3. All claims in the population were sorted from largest to smallest.

---

[3] Dr. Lynford Graham is a Certified Public Accountant with more than 30 years of public accounting experience in audit practice and in various National Firm policy development groups. He is a Visiting Professor of Accountancy at Bentley University in Waltham MA, a consultant and an author. Dr. Graham is a past member of the Auditing Standards Board. He chaired the AICPA's Audit Risk Guide Task Force (Assessing and Responding to Audit Risk) and was the Chair of the Task Force for the 2008, 2012, and 2014 revisions of the AICPA Audit Guide on Audit Sampling.

[4] We selected our sample from a population of paid claims available to us and as of October 3, 2013. The total difference between the value of the paid population and the value of the pre-appeal determination population has no significant effect on the results of our testing.

4. Starting at the top (largest) and working down the sorted list of claims, claim paid values were added until the cumulative sum reached the threshold described in Step 2.

5. A visual inspection of the sorted list was performed to establish a logical break point to capture the largest claims.

6. Using the break point described in Step 5, 100% of claims larger than that amount were included in the sample. The number of claims selected using this approach ranged from 1 to 14 claims. Claims selected for review in this manner are included in the "100% Stratum".

7. All claims not selected in Step 6 were then assigned to between two and four strata for optimized sampling.

8. Random samples of claims were then drawn using IDEA Version 9 by Audimation, Inc. This program is widely used in the auditing profession and is referenced and used for the illustrations in the AICPA 2014 Audit Guide *Audit Sampling*.

9. Sampling terminology in this report is as defined in the AICPA 2014 Audit Guide *Audit Sampling*.

When using Classical Variables Sampling, variability is reduced by subdividing the population into different (more homogenous) strata, while selection of individually significant items is ensured as described above. Stratification can also serve to optimize the estimated sample, improve the likely representativeness of the projected error, and improve the precision of the computed confidence bounds to meet the established criteria. The underlying assumption in the determination of estimated sample sizes is that the variability in the characteristic of interest, errors, is determined by proxy by examining the variability in claims in each stratum. The actual observed variability is then used in the evaluation.

## Categorization and reporting of findings

During the course of our work, our preliminary findings and observations were discussed with the Program and applicable Vendors. Our detailed findings and observations are included by claim category throughout this report. Additionally, observations that do not pertain to an individual claim category are included in the Program-level section of the Other Observations section below. For each claim category, our findings are grouped into three distinct classifications, defined below. In addition, our review of Zero-Paid Claims is reported in a separate section.

### Award Calculation Findings

The Settlement Agreement and Supplemental Policies describe, in detail, how the award compensation amount for each claim submitted to the Program should be determined. As part of our procedures, we noted instances where the McGladrey Calculated Award Amount differs from the compensation award amount determined by the Program, prior to appeal. For each of our findings, we have included the standard against which we evaluated the Program ("Evaluation Standard"). These findings are defined and reported as *Award Calculation Findings*.

### Documentation Deficiencies

The Settlement Agreement outlines the specific documentation that must be submitted by the claimant for each claim category. The Settlement Agreement also provides for the Claims Administrator to facilitate claimant's assembly and submission of claim forms and all necessary supporting documentation, without changing claims criteria. As such, Supplemental Policies agreed upon by the Parties, which have the authority to clarify the Settlement Agreement, have been issued in order to facilitate the submission of required documentation[5]. During our review, we noted instances where required documentation was either missing

---

[5] Settlement Agreement, Sections 4.3.7 and 4.4.7

© 2014 McGladrey LLP. All Rights Reserved.

from the files or did not meet prescribed requirements. Due to the absence of conforming documentation, our findings are valued based on the pre-appeal award amount attributable to the nonconforming and/or missing documentation[6]. Additionally, for each of these findings, we have included the applicable Evaluation Standard. These findings are defined and reported as *Documentation Deficiencies*. As to claims in this category, we draw no conclusion as to whether a Documentation Deficiency had any impact on the amount of the award.

As described above, for most claim categories, our samples were selected using an approach that allows for the projection of our results across the entire population of each claim category. Such a projection has been done separately for both Award Calculation Findings and Documentation Deficiencies. The approach used to project the Award Calculation Findings results in a most-likely amount and an estimated range (computed by statistical confidence bounds) of over- or under-statements for each claim category. The approach used for Documentation Deficiencies estimates a most-likely amount and a range of likely claim amounts that have been processed for payment which contain one or more missing, or incomplete, required documents. Due to the differing nature and possible overlap of the two types of findings described above, their results cannot be combined. As such, we have separately projected the two categories of findings.

### Other Observations

In addition to the findings described above, we have also made observations about process improvements, the design of internal controls, and other matters surrounding the processing of the claims, based on the observed accuracy of the claims processing. In testing the claims processing procedures and noting the findings described above, the operating effectiveness of controls was also considered.

Throughout our fieldwork, we provided DHECC with interim reports. Each interim report included those observations that had been identified via supporting documentation and discussion with relevant CSSP personnel. As part of this process, recommendations were provided to, and management responses were received from, DHECC management. To the extent that an observation noted in the body of this report was not also communicated to management in an interim report, we have so indicated.

### Management's response

DHECC management has requested an opportunity to respond to the information contained within this report. Appendix C includes management's responses. These responses are management's opinions and are included for convenience only. The scope of our work did not include any procedures with respect to management's responses and accordingly, we offer no assessment as to the completeness or accuracy of these responses.

---

[6] In Appendix A, our findings are valued based on the paid amount attributable to the nonconforming and/or missing documentation.

© 2014 McGladrey LLP. All Rights Reserved.

# Award Calculation Findings

As described above, the Settlement Agreement and Supplemental Policies describe, in detail, how the award compensation amount for each claim submitted to the Program should be determined. As part of our procedures, we noted instances where the McGladrey Calculated Award Amount differs from the compensation amount determined by the Program, prior to appeal. These findings are reported below as Award Calculation Findings.

## Summary of results

Using Classical Variables Sampling for most claim categories, we reviewed 1,852 claims processed and paid during the Review Period. The following table provides specific detail about the total population of such claims, and the size and value of the sample selected using the statistical approach. Similar information for Zero-Paid claims has been included in the respective section of this report. The following claim category specific sections include similar information about the populations and samples selected for the respective claim category.

|  | Count | Pre-Appeal Value |
|---|---|---|
| Population | 53,512 | $ 3,747,423,264 |
| Sample | 1,852 | 741,047,090 |
| *100% Stratum[7]* | *116* | *283,114,590* |
| *Randomly selected* | *1,736* | *457,932,500* |

The following tables summarize the results of our work. The first table pertains to the number of Award Calculation Findings noted while the second table presents the dollar value of such findings. The second table also presents the most likely over- or under-statement of pre-appeal claim award amounts, as determined by the Program, in the population.

|  | Reviewed claims | | |
|---|---|---|---|
|  |  | Number with Award Calculation | |
| Claim category | Number | Findings | % |
| Seafood Compensation | 250 | 22 | 8.8% |
| Business Economic Loss | 247 | 13 | 5.3% |
| Failed Business Economic Loss | 10 | 3 | 30.0% |
| Start-Up Business Economic Loss | 112 | 11 | 9.8% |
| Individual Economic Loss | 172 | 47 | 27.3% |
| Individual Periodic / Festival Vendor | 4 | 0 | 0.0%- |
| Subsistence | 152 | 5 | 3.3% |
| Vessel of Opportunity | 175 | 0 | 0.0% |
| Vessel Physical Damage | 142 | 16 | 11.3% |
| Coastal Real Property Damage | 180 | 3 | 1.7% |
| Wetlands Real Property Damage | 125 | 0 | 0.0% |
| Real Property Sales | 120 | 2 | 1.7% |
| 40% Request | 163 | 0 | 0.0% |
| Total | 1,852 | 122 | 6.6% |

---

[7] Thresholds were determined by claim category and are detailed in the respective sections below.

© 2014 McGladrey LLP. All Rights Reserved.

| | Reviewed claims | | | Population of claims | | |
|---|---|---|---|---|---|---|
| **Claim category** | **Total pre-appeal dollar value** | **Net over- (under-) determination of pre-appeal award amounts** | **%** | **Total pre-appeal dollar value** | **Most likely over- (under-) determination of pre-appeal award amounts** | **%** |
| Seafood Compensation | $197,392,181 | $ 1,323,029 | 0.7% | $ 992,084,526 | $ 5,251,058 | 0.5% |
| Business Economic Loss | 344,681,281 | 115,715 | 0.0% | 2,064,428,048 | 8,965,998 | 0.4% |
| Failed Business Economic Loss | 1,443,904 | (17,695) | (1.2%) | 1,785,888 | (51,296) | (2.9%) |
| Start-Up Business Economic Loss | 69,143,213 | 475,054 | 0.7% | 95,995,300 | 607,560 | 0.6% |
| Individual Economic Loss | 7,771,559 | 22,169 | 0.3% | 35,879,899 | 615,156 | 1.7% |
| Individual Periodic / Festival Vendor | 40,280 | 0 | 0.0% | 77,085 | 0 | 0.0% |
| Subsistence | 1,917,396 | 5,684 | 0.3% | 10,185,177 | 74,476 | 0.7% |
| Vessel of Opportunity | 10,773,831 | 0 | 0.0% | 272,297,421 | 0 | 0.0% |
| Vessel Physical Damage | 4,871,844 | 125,672 | 2.6% | 10,352,431 | 403,020 | 3.9% |
| Coastal Real Property Damage | 6,679,482 | 6,506 | 0.1% | 108,036,806 | 1,291,262 | 1.2% |
| Wetlands Real Property Damage | 61,595,928 | 0 | 0.0% | 87,370,142 | 0 | 0.0% |
| Real Property Sales | 11,949,994 | 47,438 | 0.4% | 26,294,423 | 353,465 | 1.3% |
| 40% Request | 22,786,198 | 0 | 0.0% | 42,636,118 | 0 | 0.0% |
| Total | $741,047,091 | $ 2,103,572 | 0.3% | $3,747,423,264 | $ 17,510,699 | 0.5% |

Where possible, we have provided a precision amount within a footnote. As described above, we selected our sample using a 95% confidence interval. When designing a 95% confidence interval there will be a 2.5% chance the most likely amount could be either above the computed upper limit or below the computed lower limit.

# Results by claim category

## Seafood Compensation

The Seafood Compensation category of the Settlement Agreement provides for damages suffered by a commercial fisherman, seafood crew, or seafood vessel owner that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012, and damages suffered by *inter alia*, oyster leaseholders and IFQ owners.[8] The Framework for Seafood Compensation claims is outlined in Exhibit 10 of the Settlement Agreement.

The following table provides specific detail about the total population of Seafood claims processed by the Program during the Review Period, and the size and pre-appeal value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 7,459 | $ 992,084,526 |
| Sample | 250 | 197,392,181 |
| *100% stratum*[9] | *9* | *50,239,110* |
| *Randomly selected* | *241* | *147,153,071* |

The following table summarizes the Award Calculation Findings noted in the Seafood Compensation claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population of the claim category. The most likely over-determination of Seafood claims by the Program, during the Review Period, was $5,251,058[10].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect application of prior payments | 9 | $ 1,336,997 |
| Incorrect calculation of benchmark revenue | 8 | (17,274) |
| Incorrect reimbursement of accounting fees | 5 | 3,306 |
| Total value of findings in our sample | 22 | $ 1,323,029 |
| Most likely over-determination of pre-appeal award amounts in the population | $ 5,251,058 | |

---

[8] Settlement Agreement section 1.3.1.1
[9] 100% of claims with a paid value greater than  $4,000,000
[10] The precision of the most likely over-determination is +/- $6,960,799, based on a 95% confidence level.

**Incorrect application of prior payments**

*Evaluation Standard:* Settlement Agreement, Exhibit 10 – In determining a claimant's award compensation, the Program considers prior payments from BP or other programs made to the claimant to determine the remaining amount due.  The application of prior payment offsets is also addressed in the following policies:

Policy 211 v1 (active as of 7/18/12) and Policy 211 v2 (active as of 5/29/13) state that "The Settlement Agreement directs the Claims Administrator to determine whether the claimant has already received Seafood Spill-Related Payments from BP or the GCCF and, if so, to offset those against the total compensation amount.  The Settlement draws a fundamental distinction between (1) business activities associated with the actual harvesting or catching of Seafood and (2) non-harvesting business activities that nevertheless involved Seafood, such as the processing or wholesale distribution of Seafood.  The Seafood Compensation Program covers claims for losses related to harvesting Seafood, while the Business Economic Loss ("BEL") and Individual Economic Loss Programs ("IEL") cover claims for losses related to non-harvesting business activities that involve Seafood.  The Claims Administrator determined the term 'Seafood Spill-Related Payment' as used in Exhibit 10 includes only prior payments made for Seafood harvesting activities, as the Seafood Program compensates only Seafood harvesters."  As a result, under this policy, only "prior payments for Seafood harvesting activities would offset payments made to Seafood harvesters for harvesting activities  under the Seafood Program."

Policy 272 (active as of 10/10/12) states that "The Seafood Neutral, BP and Class Counsel agreed that Prior Spill-Related Payments relating to Seafood must be deducted from payments to Oyster Leaseholder claimants under the Oyster Leaseholder Compensation Plan."  The policy further states that "Exhibit 10 at p. 2 provides that 'compensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document.'  Footnote 3 defines Seafood Spill-Related Payments as 'compensation paid to a claimant through the OPA Process, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood.'  All Oyster Leaseholder claims are covered by the Seafood Program and are Seafood interests.  The Settlement Agreement does not delineate between property and other characterizations of the prior payments.  Instead, the only distinction between the types of offsets under the Seafood Spill Related Payment Reduction Procedures is that between Seafood and non-Seafood related prior payments."

During our review, we noted nine instances where the respective claimant's prior payments were not accurately considered in the calculation of the net award compensation amount.

**Incorrect calculation of benchmark revenue**

*Evaluation Standard:* Settlement Agreement, Exhibit 10 – "In accordance with the Settlement Agreement, Seafood Compensation claimants are required to provide the Program with trip tickets (or trip ticket equivalents)."  These documents are then used to calculate the claimant's gross revenue during the benchmark period.  In order to correctly calculate a claimant's compensation, claimant-provided information must be accurately and completely entered into the Program's claim processing system.

In eight instances, we noted that the information on the trip tickets (or trip ticket equivalents) was not entered into the claims processing system correctly.

**Incorrect reimbursement of accounting fees**

*Evaluation Standard:* Settlement Agreement, Section 4.4.13 -- "The BP Parties will reimburse reasonable and necessary accounting fees related to Claims preparation." As part of the provision, the Settlement Agreement requires the submission of specific supporting documentation and establishes certain limitations. For example, supervisory hours may not exceed 25% of the total time spent, and claimants are subject to certain overall limitations based on dollar amounts and/or percentage of compensation amount (excluding RTP).

During our review, we noted five instances where the claimant was reimbursed for accounting fees that exceeded one or more of these limits.

## Business Economic Loss

The Business Economic Loss ("BEL") category of the Settlement Agreement provides for damages incurred by an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member claiming Economic Damage allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident[11]. This claim category does not include claimants who qualify for Failed Business Economic Loss or Start-up Business Economic Loss claim. The Framework for BEL claims is outlined in Exhibits 4A – 4E of the Settlement Agreement.

The following table provides specific detail about the total population of BEL claims processed by the Program during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 9,983 | $ 2,064,428,048 |
| Sample | 247 | 344,681,281 |
| *100% stratum*[12] | *10* | *112,188,472* |
| *Randomly selected* | *237* | *232,492,809* |

The following table summarizes the types of Award Calculation Findings noted in the BEL claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of BEL claims by the Program, during the Review Period, was $8,965,998[13].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect determination of Risk Transfer Premium | 2 | $ 465,393 |
| Inappropriate accounting treatment | 11 | (349,678) |
| **Total value of findings in our sample** | **13** | **$ 115,715** |
| **Most likely over-determination of pre-appeal award amounts in the population** | $ 8,965,998 | |

### Incorrect determination of Risk Transfer Premium

*Evaluation Standard:* Settlement Agreement, Section 38 -- A Risk Transfer Premium ("RTP") is "the amount paid to a Claimant for any and all alleged damage, including potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages."

Settlement Agreement, Exhibit 15 — Defines applicable RTPs by claim type.

---

[11] Settlement Agreement, Section 38.15

[12] 100% of claims with a paid value greater than $6,000,000

[13] The precision of the most likely over-determination is +/- $88,366,892, based on a 95% confidence level.

We noted two instances where the incorrect RTP was assigned to the BEL claim. One instance was due to inaccurate determination of the employer designation, while the other was due to inaccurate determination of the compensation zone.

### Inappropriate accounting treatment

*Evaluation Standard:* Settlement Agreement, Exhibit 4C -- Describes a two-step process that "compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." For purposes of the calculation, Attachment A in Exhibit 4D provides a defined list of fixed and variable expenses, agreed to by the parties.

We noted 11 instances where a revenue item, an expense item, or both were incorrectly classified as prescribed by the Settlement Agreement.

## Failed Business Economic Loss

The Failed Business Economic Loss claim category of the Settlement Agreement provides for damages incurred by business entities that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets. The Framework for Failed Business Economic Loss claims is outlined in Exhibit 6 of the Settlement Agreement.

The following table provides specific detail about the total population of Failed Business Economic Loss claims paid during the Review Period, and the size and value of the sample. Due to the size of the population, the Classical Variables Sampling technique was not used. Rather, sample items were selected randomly after the selection of the 100% items. A projected over- or under-determination could be made and was made from the sample results.

|  | Count | Value |
|---|---|---|
| Population | 24 | $ 1,785,888 |
| Sample | 10 | 1,443,904 |
| 100% stratum[14] | 8 | 1,427,504 |
| Randomly selected | 2 | 16,400 |

The following table summarizes the Award Calculation Findings noted in the Failed Business Economic Loss claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely under-determination of Failed Business Economic Loss claims by the Program, during the Review Period, was $51,296[15].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect calculation of EBITDA | 3 | $ (17,695) |
| Most likely under-determination of pre-appeal award amounts in the population | | $ (51,296) |

#### Incorrect calculation of EBITDA

*Evaluation Standard:* Settlement Agreement, Exhibit 6, Section V – Outlines the methodology for calculating the compensation award amount for Failed Business Economic Loss claims. As part of the calculation, the claimant's EBITDA (earnings before interest, tax, depreciation, and amortization) for the twelve month period prior to May 1, 2010 must be determined.

We noted three instances where such EBITDA was not calculated correctly.

---

[14] 100% of claims with a paid value greater than $86,000

[15] The number of findings was too small to compute a precision from the sample. A projection of the findings was made by stratum using the Difference method.

## Start-up Business Economic Loss

The Start-up Business Economic Loss claim category of the Settlement Agreement provides for damages incurred by business entities with less than 18 months of operating history at the time of the Deepwater Horizon Incident. The Framework for Start-up Business Economic Loss claims is outlined in Exhibit 7 of the Settlement Agreement.

The following table provides specific detail about the total population of Start-up Business Economic Loss claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 442 | $ 95,995,300 |
| Sample | 112 | 69,143,213 |
| *100% stratum*[16] | *14* | *41,683,854* |
| *Randomly selected* | *98* | *27,459,359* |

The following table summarizes the Award Calculation Findings noted in the Start-up Business Economic Loss claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of Start-up Business Economic Loss claims by the Program, during the Review Period, was $607,560[17].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect classification of claim within category | 1 | $ 463,283 |
| Incorrect data entry | 4 | 347,313 |
| Incorrect recording of VoO expenses | 1 | 54,374 |
| Inappropriate accounting treatment of expenses | 2 | 52,498 |
| Incorrect application of prior payment | 1 | 20,094 |
| Incorrect calculation of benchmark revenue | 1 | 452 |
| Incorrect determination of Risk Transfer Premium | 1 | (462,960) |
| Total value of findings in our sample | 11 | $ 475,054 |
| Most likely over-determination of pre-appeal award amounts in the population | $ 607,560 | |

### Incorrect classification of claim within category

*Evaluation Standard:* Settlement Agreement, Exhibit 7, Framework for Start-up Business Economic Loss Claims – "A 'Start-up Business' is considered to be a claimant with less than eighteen months of operating history at the time of the DWH Spill."

---

[16] 100% of claims with a paid value greater than $1,000,000
[17] The precision of the most likely over-determination is +/- $2,895,278, based on a 95% confidence level.

We noted one instance where the respective Start-up Business Economic Loss claimant's profit and loss statements were provided for 2007, indicating that the claimant's operations extended beyond 18 months. Therefore, this claim should not have been processed under the Start-up Business Economic Loss framework.

### Inaccurate data entry

*Evaluation Standard:* In order to correctly calculate a claimant's compensation, claimant-provided information must be accurately and completely entered into the Program's claim processing system.

We noted four instances where the information entered into the Accountant Compensation Calculation Schedules Excel workbook ("Accountant's Workbook") did not agree to the supporting documentation provided by the claimant.

### Incorrect recording of VoO expenses

*Evaluation Standard:* Settlement Agreement, Exhibit 7, Section IV, Footnote 11 – "Claimants are required to report payments received under the VoO program. If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Actual Profit/Loss for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities."

We noted one instance where the respective Start-up Business Economic Loss claimant received payments under the VoO program, but failed to separately report costs incurred in VoO and non-VoO activities. No pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities was performed to determine actual profit/loss for non-VoO activity alone.

### Inappropriate accounting treatment of expenses

*Evaluation Standard:* Settlement Agreement, Exhibit 7, Section I – "Fixed and variable payroll expenses shall be calculated in the same manner as in the Business Compensation Framework." The treatment of fixed and variable expenses under the Business Compensation Framework is discussed in the BEL section above.

In our review of Start-up Business Economic Loss claims, we noted two instances where an expense item was incorrectly classified as variable or fixed.

### Incorrect application of prior payment

*Evaluation Standard:* Settlement Agreement, Exhibit 7, Section IV.C – In calculating the claimant's compensation, the Program is required to "Deduct any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, any VoO Settlement Payment Offset and VoO Earned Income Offset, where applicable."

We noted one instance where the respective Start-up Business Economic Loss claimant's prior payment was not accurately deducted from the award compensation amount.

### Incorrect calculation of benchmark revenue

*Evaluation Standard:* Settlement Agreement, Exhibit 7, Section I – The benchmark period is defined as the "post-spill time period between May 2011 and April 2012 corresponding to the months of the Compensation Period that serves as the basis for estimating the claimant's Expected Profit during 2010." The actual revenue earned and actual variable costs incurred by the claimant's business during the benchmark period is then one way in which the claimant's expected revenue and expected costs can be determined. Expected revenue and expected costs are then compared to actual revenue and actual costs to calculate the claimant's compensation.

We noted one instance where the benchmark period was calculated incorrectly.

© 2014 McGladrey LLP. All Rights Reserved.

**Incorrect determination of Risk Transfer Premium**

*Evaluation Standard:* Settlement Agreement, Section 38 -- A Risk Transfer Premium ("RTP") is "the amount paid to a Claimant for any and all alleged damage, including potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages."

Settlement Agreement, Exhibit 15 — Defines applicable RTPs by claim type.

We noted one instance where the incorrect RTP was assigned to claims based on an inaccurate industry designation.

## Individual Economic Loss

The Individual Economic Loss ("IEL") category of the Settlement Agreement provides for damages incurred by individuals due to or resulting from the Deepwater Horizon Incident. Individual Economic Loss claims do not include claims by self-employed individuals filing IRS Form 1040 Schedules C, E, or F for the 2010 calendar year or any part of a fiscal year in 2010, who are covered under the Business Economic Loss methodology; Seafood Vessel Owners, Commercial Fishermen, Seafood Crew or Oyster Leaseholders, who are covered under the Seafood Compensation Program, VoO Claims, or Subsistence Claims.[18] The Framework for IEL claims is outlined in Exhibits 8A – 8E of the Settlement Agreement.

The following table provides specific detail about the total population of IEL claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 2,901 | $ 35,879,899 |
| Sample | 172 | 7,771,559 |
| *100% stratum[19]* | *10* | *3,321,572* |
| *Randomly selected* | *162* | *4,449,987* |

The following table summarizes the Award Calculation Findings noted in the IEL claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of IEL claims by the Program, during the Review Period, was $615,156[20].

| **Award Calculation Findings** | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect processing and/or computation by system | 5 | $ 39,333 |
| Incorrect application of Industry Growth Factor | 27 | 28,664 |
| Inappropriate recognition of bonus | 3 | 22,136 |
| Incorrect determination of Risk Transfer Premium | 4 | (8,900) |
| Incorrect application of prior payment | 1 | (25,100) |
| Inaccurate data entry | 12 | (33,788) |
| **Total value of findings in our sample[21]** | **47** | **$ 22,169** |
| *Most likely over-determination of pre-appeal award amounts in the population* | $ 615,156 | |

---

[18] Settlement Agreement section 5.3.6.2

[19] 100% of claims with a paid value greater than $150,000

[20] The precision of the most likely over-determination is +/- $1,154,835, based on a 95% confidence level.

[21] Total count and/or value of findings in our sample does not equal the sum of the pre-appeal award amounts by finding type in order to compensate for claims with multiple findings.

### Inaccurate processing and/or computation by system

*Evaluation Standard:* The Program's claim processing system should accurately perform all required calculations as detailed in the Settlement Agreement.

We noted five instances where, even when the data was input correctly, the system computed the award amount incorrectly.

### Incorrect application of Industry Growth Factor

*Evaluation Standard:* Settlement Agreement, Exhibit 8A – Outlines the requirements IEL claimants must meet in order to qualify for the Industry Growth Factor ("IGF"). One such requirement is that the "Claiming Job [be] a **non-salaried, hourly** wage job" (emphasis added).

During the Review Period, we noted 27 instances where claimants with a non-hourly wage job received the IGF.

### Inappropriate recognition of bonus

*Evaluation Standard:* Settlement Agreement, Exhibit 8A – "All bonuses and/or commissions shall be allocated pro rata across the period for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time."

We noted three instances where IEL claims were processed without appropriately allocating bonus figures in either the benchmark or compensation period.

### Incorrect determination of Risk Transfer Premium

*Evaluation Standard:* Settlement Agreement, Section 38 -- A Risk Transfer Premium ("RTP") is "the amount paid to a Claimant for any and all alleged damage, including potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages."

Settlement Agreement, Exhibit 15 — Defines applicable RTPs by claim type.

We noted four instances where the incorrect RTP was assigned to claims based on an inaccurate employer designation or compensation zone assignment.

### Incorrect application of prior payments

*Evaluation Standard:* Settlement Agreement, Exhibit 8A – In calculating the claimant's compensation, the Program is required to "subtract any Spill-Related Payments".

We noted one instance where the respective claimant's Spill-Related Payment was not accurately included in the calculation of the net award compensation amount.

**Inaccurate data entry**

*Evaluation Standard:* In order to correctly calculate a claimant's compensation, claimant-provided information must be accurately and completely entered into the Program's claim processing system.

We noted 12 instances where the information entered into the claims processing system did not agree to the supporting documentation provided by the claimant.

© 2014 McGladrey LLP. All Rights Reserved.

## Individual Periodic Vendor / Festival Vendor

The Individual Periodic Vendor ("IPV") category in the Settlement Agreement provides for economic damage that was sustained by an eligible individual who regularly sold food, souvenir, art, tourist-related or water-related goods or services at retail during 2009 and 2010, and whose primary customer was non-local consumers. The Festival Vendors claim category in the Settlement Agreement provides for economic damage that was sustained by an individual who regularly made festival sales before April 20, 2010 and claims a loss of revenue and earnings related to a Festival in which the Festival Vendor participated or would have participated absent the DWH Spill. The Framework for IPV claims is outlined in Exhibit 8D of the Settlement Agreement.

The following table provides specific detail about the total population of IPV / Festival Vendor claims paid during the Review Period, and the size and value of the sample selected using a random sampling approach. Due to the size of the population, the Classical Variables Sampling technique was not used. Rather, a combination of judgmental and random sampling approach was taken.

|  | Count | Value |
|---|---|---|
| Population | 8 | $ 77,085 |
| Sample | 4 | 40,280 |
| 100% stratum[22] | 1 | 24,000 |
| Randomly selected | 3 | 16,280 |

During the course of our review of IPV / Festival Vendor claims, we noted no Award Calculation Findings.

---

[22] Largest claim in population

© 2014 McGladrey LLP. All Rights Reserved.

## Subsistence

The Subsistence damages category of the Settlement Agreement provides for damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and game, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by  claimant due to or resulting from the Deepwater Horizon Incident.[23] The Framework for Subsistence claims is outlined in Exhibit 9 of the Settlement Agreement.

The following table provides specific detail about the total population of Subsistence claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 1,248 | $ 10,185,177 |
| Sample | 152 | 1,917,396 |
| *100% stratum[24]* | *11* | *346,605* |
| *Randomly selected* | *141* | *1,570,791* |

The table below summarizes the Award Calculation Findings noted in the Subsistence claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of Subsistence claims by the Program, during the Review Period, was $74,476[25].

| **Award Calculation Findings** | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Exceeded consumption limit | 1 | $ 5,037 |
| Incorrect gender selected | 2 | 662 |
| Incorrect closure days | 1 | 125 |
| Incorrect data entry | 1 | (140) |
| **Total value of findings in our sample** | **5** | **$ 5,684** |
| *Most likely over-determination of pre-appeal award amounts in the population* | \multicolumn{2}{c}{**$ 74,476**} |

---

[23] Settlement Agreement section 1.3.1.3

[24] 100% of claims with a paid value greater than $30,000

[25] The precision of the most likely over-determination is +/- $756,711, based on a 95% confidence level.

© 2014 McGladrey LLP. All Rights Reserved.

**Exceeded consumption limit**

*Evaluation Standard:* Settlement Agreement, Exhibit 9– The Claims Administrator is responsible for determining reasonable consumption rates of natural resources, which shall not be exceeded in the calculation of the compensation amount. The reasonable consumption rate determined by the Claims Administrator, upon consultation with an outside expert, was 45% of the daily caloric intake per person[26].

We noted one instance where a claimant received compensation based on calculations that exceed this consumption limit.

**Incorrect gender**

*Evaluation Standard:* In order to correctly calculate a claimant's compensation, the gender of the claimed person(s) must be properly determined and entered into the Program's claim processing system. The calculation of a Subsistence award considers the gender of each individual included in the claim. The program uses the claim form and affidavit ("interview form") to obtain such information.

We noted two instances in which the gender of the claimed persons was inaccurately entered into the formula.

**Incorrect closure days**

*Evaluation Standard:* Settlement Agreement, Exhibit 9– Requires "the time period of loss of Subsistence use consistent with the closure or impairment of geographic areas relied upon by the Claimant between April 20, 2010 and December 31, 2011." This information is used to calculate the Subsistence loss per the loss formula.

We noted one instance where the incorrect closure period was entered into the formula.

**Incorrect data entry**

*Evaluation Standard:* In order to correctly calculate a claimant's compensation, claimant-provided information must be accurately and completely entered into the Program's claim processing system.

We noted one instance where the gross harvest amount provided by the claimant was incorrectly entered into the claim processing system.

---

[26] Katzmarzyk, Peter T., *Addendum: Report on Estimates of Caloric Intake and Caloric Value of Foods for Residents in the Gulf Coast Region of the United States.* November 7, 2012.

## Vessel of Opportunity

The Vessel of Opportunity Charter Payment ("VoO") category of the Settlement Agreement provides compensation for claimants who registered to participate in BP's Vessels of Opportunity program and executed a VoO Master Vessel Charter Agreement with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as Charterer, and completed the initial VoO training program[27]. The Framework for VoO claims is outlined in Section 5.5 of the Settlement Agreement.

The following table provides specific detail about the total population of VoO claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 6,793 | $ 272,297,421 |
| Sample | 175 | 10,773,831 |
| 100% stratum[28] | 11 | 3,241,993 |
| Randomly selected | 164 | 7,531,838 |

During the course of our review of VoO claims, we noted no Award Calculation Findings.

---

[27] Settlement Agreement section 1.3.1.4
[28] 100% of claims with a paid value greater than $160,000

## Vessel Physical Damage

The Vessel Physical Damage ("VPD") category in the Settlement Agreement provides for damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program. The Framework for VPD claims is outlined in Exhibit 14 of the Settlement Agreement.

The following table provides specific detail about the total population of VPD claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 695 | $ 10,352,431 |
| Sample | 142 | 4,871,844 |
| *100% stratum[29]* | *10* | *2,031,980* |
| *Randomly selected* | *132* | *2,839,864* |

The following table summarizes the Award Calculation Findings noted in the VPD claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of VPD claims by the Program, during the Review Period, was $403,020[30].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Inappropriate inclusion or exclusion of expenses | 7 | $ 68,747 |
| Support does not sufficiently prove causation | 3 | 46,745 |
| Incorrect application of prior payment | 1 | 5,250 |
| Incorrect data entry | 5 | 4,930 |
| Total value of findings in our sample | 16 | $ 125,672 |
| *Most likely over-determination of pre-appeal award amounts in the population* | $ 403,020 | |

#### Inappropriate inclusion or exclusion of expenses

*Evaluation Standard:* Settlement Agreement, Exhibit 14, Sections 1 & 2 – Provides examples of damage and parts that are reimbursable under the terms of the Agreement.

We noted seven instances where expenses submitted for reimbursement by the Program were inappropriately included or excluded from the calculation of the total compensation for a claimed vessel.

---

[29] 100% of claims with a paid value greater than $90,000

[30] The precision of the most likely over-determination is +/- $318,288, based on a 95% confidence level.

© 2014 McGladrey LLP. All Rights Reserved.

### Support does not sufficiently prove causation

*Evaluation Standard:* Settlement Agreement, Exhibit 14, Section 1 – "Physical damage shall be defined as physical damage that was sustained by an Eligible Claimant's Eligible Vessel due to or resulting from the DWH Spill or the DWH Spill response cleanup operations".

We noted three instances where, based on the documentation and information provided, we could not conclude that the claim met these eligibility requirements.

### Incorrect application of prior payment

*Evaluation Standard:* Supplemental Policy 44 – In calculating the claimant's compensation, the Program "will deduct prior payments for physical damage to a vessel made in the GCCF from Vessel Physical Damage Claims if the vessel claimed in the DWH Program is the same claimed in the GCCF."

In one instance, we noted a VPD claimant whose prior spill-related payments properly decreased the compensation amount determined by the Program to zero; however, based on review of the relevant cash disbursement report, the claimant received the full amount of the award

### Incorrect data entry

*Evaluation Standard:* In order to correctly calculate a claimant's compensation, claimant-provided information must be accurately and completely entered into the Program's claim processing system.

We noted five instances where the expense amounts captured in the claims processing system, for the purpose of calculating compensation, did not match the amounts on the underlying supporting documentation (i.e. receipts, invoices, estimates, etc.) submitted by the claimant.

## Coastal Real Property

The Coastal Real Property Damages ("Coastal") category of the Settlement Agreement provides for damages to Coastal Real Property alleged by a claimant as a result of the Deepwater Horizon Incident. The Framework for Coastal claims is outlined in Exhibits 11A – 11C of the Settlement Agreement.

The following table provides specific detail about the total population of Coastal claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 18,797 | $ 108,036,806 |
| Sample | 180 | 6,679,482 |
| *100% stratum[31]* | *10* | *4,807,110* |
| *Randomly selected* | *170* | *1,872,372* |

The following table summarizes the Award Calculation Findings noted in the Coastal claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of Coastal claims by the Program, during the Review Period, was $1,291,263[32].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect allocation based on legal ownership | 3 | $ 6,506 |
| **Most likely over-determination of pre-appeal award amounts in the population** | \$ 1,291,263 | |

#### Incorrect allocation based on legal ownership

*Evaluation Standard:* Settlement Agreement, Exhibit 11A – "For an eligible parcel for which there are more than one Eligible Claimants, the Coastal Real Property Compensation Amount shall be allocated based on the period of legal possession of the particular Eligible Parcel by each Eligible Claimant between April 20, 2010, and December 31, 2010."

During our review, we noted three instances where the award compensation was calculated using the incorrect allocation of ownership, either due to the wrong number of days owned being determined, or the wrong percentage of ownership being used.

---

[31] 100% of claims with a paid value greater than $115,000

[32] The number of findings was too small to compute a precision from the sample. A projection of the finding was made by stratum using the Difference method.

© 2014 McGladrey LLP. All Rights Reserved.

## Wetlands Real Property

The Wetlands Real Property Damages ("Wetlands") category of the Settlement Agreement provides for damages to Wetlands Real Property alleged by a claimant as a result of the Deepwater Horizon Incident. The Framework for Wetlands claims is outlined in Exhibit 12A of the Settlement Agreement.

The following table provides specific detail about the total population of Wetlands claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 2,046 | $ 87,370,142 |
| Sample | 125 | 61,595,928 |
| *100% stratum*[33] | *8* | *48,640,364* |
| *Randomly selected* | *117* | *12,955,564* |

During the course of our review of Wetlands claims, we noted no Award Calculation Findings.

---

[33] 100% of claims with a paid value greater than $1,000,000

© 2014 McGladrey LLP. All Rights Reserved.

## Real Property Sales

The Real Property Sales ("RPS") damages category of the Settlement Agreement provides for damages alleged by a claimant as a result of selling residential property during the period April 21, 2010 through December 31, 2010 due to the Deepwater Horizon Incident[34]. The Framework for RPS claims is outlined in Exhibits 13A and 13B of the Settlement Agreement.

The following table provides specific detail about the total population of RPS claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 497 | $ 26,294,423 |
| Sample | 120 | 11,949,994 |
| 100% stratum[35] | 5 | 2,699,748 |
| Randomly selected | 115 | 9,250,246 |

The following table summarizes the Award Calculation Findings noted in the RPS claim category, as well as the respective total count and net value of such findings.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely over-determination of RPS claims by the Program, during the Review Period, was $353,465[36].

| Award Calculation Findings | | |
|---|---|---|
| Type of finding noted in our sample | Count | Net over- (under-) determination of pre-appeal award amounts |
| Incorrect allocation based on legal ownership | 2 | $ 47,438 |
| *Most likely over-determination of pre-appeal award amounts in the population* | | **$ 353,465** |

### Incorrect allocation based on legal ownership

*Evaluation Standard:* Settlement Agreement, Exhibit 13A, Appendix B – Defines eligible RPS claimants as sellers of Residential Parcels within the Real Property Sales Compensation Zone who owned a Residential Parcel in the Real Property Sales Compensation Zone on April 20, 2010 and executed a sales contract for the sale of that Residential Parcel that meets certain criteria. As part of the documents required to submit a claim, eligible claimants are required to submit an "Official copy of the deed for the Residential Parcel sale that took place during the time period April 21, 2010 to December 31, 2010".

Upon review of the required documentation, we noted two instances where the claimant was awarded 100% of an RPS compensation award when the deed submitted indicated that the claimant owned less than 100% of the property on April 20, 2010.

---

[34] Settlement Agreement section 5.9.2

[35] 100% of claims with a paid value greater than $300,000

[36] The number of findings was too small to compute a precision from the sample. A projection of the finding was made by stratum using the Difference method.

© 2014 McGladrey LLP. All Rights Reserved.

## 40% Request

40% Request claims originated with the GCCF. Prior to the enactment of the Settlement Agreement and CSSP, GCCF was the facility responsible for adjudicating and paying claims filed against BP for various damages presumably caused by the 2010 Deepwater Horizon oil spill. Under the Transition Order, claimants were offered opportunities to file claims and receive 60% of the amount deemed payable without signing releases and with the understanding that, when the Settlement Agreement was implemented, these claimants could make a request for the 40% balance, or file a new claim. The scope of this section is limited to those claimants that requested the remaining 40% of their award compensation without filing a new claim. If a claimant opted to file a new claim, the final claim award would be the greater of the 40% balance from the GCCF program, or the new award determined by DHECC, less prior Transition Process payments. The testing of these claims is included in the appropriate claim category above. Upon payment of either amount, a release was signed by the claimant.[37] The guidance for the Transition Claims Process is outlined in the First Amended Order Creating Transition Process, dated March 8, 2012.

The following table provides specific detail about the total population of 40% Request claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 2,619 | $42,636,118 |
| Sample | 163 | 22,786,198 |
| 100% stratum[38] | 9 | 12,462,278 |
| Randomly selected | 154 | 10,323,920 |

During the course of our review of 40% Request claims paid during the Review Period, we noted no Award Calculation Findings.

---

[37] Settlement Agreement, section 4.2
[38] 100% of claims with a paid value greater than $150,000

© 2014 McGladrey LLP. All Rights Reserved.

# Documentation Deficiencies

The Settlement Agreement outlines the specific documentation that must be submitted by the claimant for each claim category. It also provides for the Claims Administrator to facilitate claimants' assembly and submission of claim forms and all necessary supporting documentation, without changing claims criteria. As such, Supplemental Policies, which have the authority to clarify the Settlement Agreement, have been issued in order to facilitate the submission of required documentation. During our review, we noted instances where required documentation was either missing from the files or did not meet prescribed requirements. Due to the absence of conforming documentation, our findings are valued based on the pre-appeal award amount attributable to the nonconforming and/or missing documentation[39]. These findings are reported below as Documentation Deficiencies. We draw no conclusion as to whether a Documentation Deficiency had any impact on the amount of the award.

### Summary of results

Using Classical Variables Sampling for most claim categories, we reviewed 1,852 claims processed and paid during the Review Period. The following table provides specific detail about the total population of such claims, and the size and value of the sample selected using the statistical approach. Similar information for Zero-Paid claims has been included in the respective section of this report. The following sections of this report include similar information about the populations and samples selected for each claim category.

|  | Count | Pre-Appeal Value |
|---|---|---|
| Population | 53,512 | $ 3,747,423,264 |
| Sample | 1,852 | 741,047,090 |
| *100% Stratum[40]* | *116* | *283,114,590* |
| *Randomly selected* | *1,736* | *457,932,500* |

The following tables summarize the results of our work. The first table pertains to the number of Documentation Deficiencies identified. The second table presents the dollar value of pre-appeal award amounts with non-conforming documentation and includes the most likely pre-appeal award amounts in the population that have been processed for payment and which contain one or more missing or incomplete required documents.

|  | Reviewed claims | | |
|---|---|---|---|
| **Claim category** | **Number** | **Number with Documentation Deficiencies** | **%** |
| Seafood Compensation | 250 | 46 | 18.4% |
| Business Economic Loss | 247 | 51 | 20.6% |
| Failed Business Economic Loss | 10 | 1 | 10.0% |
| Start-Up Business Economic Loss | 112 | 23 | 20.5% |
| Individual Economic Loss | 172 | 5 | 2.9% |
| Individual Periodic / Festival Vendor | 4 | 0 | 0.0% |
| Subsistence | 152 | 0 | 0.0% |
| Vessel of Opportunity | 175 | 3 | 1.7% |
| Vessel Physical Damage | 142 | 12 | 8.5% |
| Coastal Real Property Damage | 180 | 3 | 1.7% |
| Wetlands Real Property Damage | 125 | 4 | 3.2% |
| Real Property Sales | 120 | 4 | 3.3% |
| 40% Request | 163 | 0 | 0.0% |
| *Total* | *1,852* | *152* | *8.2%* |

---

[39] In Appendix A, our findings are valued based on the paid amount attributable to the nonconforming and/or missing documentation

[40] Thresholds were determined by claim category and are detailed in the respective sections below.

© 2014 McGladrey LLP. All Rights Reserved.

**Documentation Deficiencies**                                              **Claims processing review**

| | Reviewed claims | | | Population of claims | | |
|---|---|---|---|---|---|---|
| **Claim category** | **Total pre-appeal dollar value** | **Pre-appeal award amounts with Documentation Deficiencies[41]** | **%** | **Total pre-appeal dollar value** | **Most likely pre-appeal award amounts with Documentation Deficiencies** | **%** |
| Seafood Compensation | $197,392,181 | $ 23,206,065 | 11.8% | $ 992,084,526 | $ 68,388,913 | 6.9% |
| Business Economic Loss | 344,681,281 | 59,925,569 | 17.4% | 2,064,428,048 | 441,053,085 | 21.4% |
| Failed Business Economic Loss | 1,443,904 | 10,000 | 0.7% | 1,785,888 | 80,000 | 4.5% |
| Start-Up Business Economic Loss | 69,143,213 | 15,425,818 | 22.3% | 95,995,300 | 19,924,508 | 20.8% |
| Individual Economic Loss | 7,771,559 | 70,905 | 0.9% | 35,879,899 | 790,556 | 2.2% |
| Individual Periodic / Festival Vendor | 40,280 | 0 | 0.0% | 77,085 | 0 | 0.0% |
| Subsistence | 1,917,396 | 0 | 0.0% | 10,185,177 | 0 | 0.0% |
| Vessel of Opportunity | 10,773,831 | 438,984 | 4.1% | 272,297,421 | 2,130,223 | 0.8% |
| Vessel Physical Damage | 4,871,844 | 733,760 | 15.1% | 10,352,431 | 1,023,852 | 9.9% |
| Coastal Real Property Damage | 6,679,482 | 37,996 | 0.6% | 108,036,806 | 2,085,116 | 1.9% |
| Wetlands Real Property Damage | 61,595,928 | 1,488,040 | 2.4% | 87,370,142 | 2,224,402 | 2.5% |
| Real Property Sales | 11,949,994 | 294,375 | 2.5% | 26,294,423 | 403,403 | 1.5% |
| 40% Request | 22,786,198 | 0 | 0.0% | 42,636,118 | 0 | 0.0% |
| *Total* | $741,047,091 | $101,631,512 | 13.7% | $3,747,423,264 | $538,104,058 | 14.4% |

Where possible, we have provided a precision amount within a footnote. As described above, we selected our sample using a 95% confidence interval. When designing a 95% confidence interval there will be a 2.5% chance the most likely amount could be above the computed upper limit or below the computed lower limit. By definition, Documentation Deficiencies are over-determinations and cannot be less than the total value of findings identified in our sample.

---

[41] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, 105 of the 152 Documentation Deficiencies were valued at the full pre-appeal award amount.

© 2014 McGladrey LLP. All Rights Reserved.

# Results by claim category

## Seafood Compensation

The Seafood Compensation category of the Settlement Agreement provides for damages suffered by a commercial fisherman, seafood crew, or seafood vessel owner that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012, and damages suffered by *inter alia*, oyster leaseholders and IFQ owners.[42] The Framework for Seafood Compensation claims is outlined in Exhibit 10 of the Settlement Agreement.

The following table provides specific detail about the total population of Seafood claims processed by the Program during the Review Period, and the size and pre-appeal value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 7,459 | $ 992,084,526 |
| Sample | 250 | 197,392,181 |
| *100% stratum*[43] | *9* | *50,239,110* |
| *Randomly selected* | *241* | *147,153,071* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of claims that included such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of Seafood pre-appeal award amounts in the population with Documentation Deficiencies is $68,388,913[44].

| Documentation Deficiencies | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[45] |
| Lease provided does not establish, as of April 20, 2010, the claimant as the lessee of the oyster leasehold | 37 | $ 15,277,666 |
| No copy of lease or title for the leasehold provided | 9 | 7,925,869 |
| Incomplete support for accounting reimbursement | 2 | 2,530 |
| Total value of findings in our sample[46] | 46 | $ 23,206,065 |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | $ 68,388,913 | |

---

[42] Settlement Agreement section 1.3.1.1

[43] 100% of claims with a paid value greater than $4,000,000

[44] The precision of pre-appeal award amounts with Documentation Deficiencies is +/- $42,602,790, based on a 95% confidence level.

[45] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, five of the 46 Documentation Deficiencies were valued at the full pre-appeal award amount.

[46] Total count and/or value of findings in our sample does not equal the sum of the pre-appeal award amounts by finding type in order to compensate for claims with multiple findings.

**Lease provided does not establish, as of April 20, 2010, the claimant as the lessee of the oyster leasehold**

*Evaluation Standard:* Settlement Agreement, Exhibit 10 -- "To establish eligibility to participate in the Oyster Compensation Plan, an Oyster Leaseholder Claimant must provide: (A) Valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold."

We noted 37 claims where the lease or title provided by the claimant did not establish the claimant as the lessee or owner of the leasehold on the spill date as required by the Settlement Agreement.

**No copy of lease or title for the leasehold provided**

*Evaluation Standard:* Settlement Agreement, Exhibit 10 -- "To establish eligibility to participate in the Oyster Compensation Plan, an Oyster Leaseholder Claimant must provide: (A) Valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold."

We noted nine claims where the required oyster lease or title for the leasehold was not provided by the claimant.

**Incomplete support for accounting reimbursement**

*Evaluation Standard:* Settlement Agreement, Section 4.4.13.9 -- Accounting fee "reimbursement requests must be itemized by date and person, and will specify the work being performed on behalf of the Claimant."

During our review we noted two instances where the supporting documentation for accounting fees did not meet this required level of detail.

## Business Economic Loss

The Business Economic Loss ("BEL") category of the Settlement Agreement provides for damages incurred by an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member claiming Economic Damage allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident[47]. This claim category does not include claimants who qualify for Failed Business Economic Loss or Start-up Business Economic Loss claim. The Framework for BEL claims is outlined in Exhibits 4A – 4E of the Settlement Agreement.

The following table provides specific detail about the total population of BEL claims processed by the Program during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 9,983 | $ 2,064,428,048 |
| Sample | 247 | 344,681,281 |
| *100% stratum[48]* | *10* | *112,188,472* |
| *Randomly selected* | *237* | *232,492,809* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of BEL pre-appeal award amounts in the population with Documentation Deficiencies is $441,053,085[49].

| Documentation Deficiencies | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[50] |
| Missing dates on which profit and loss statements were created | 48 | $ 59,714,269 |
| Other missing documentation | 4 | 270,201 |
| **Total value of findings in our sample[51]** | **51** | **$ 59,925,569** |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | \$ 441,053,085 | |

---

[47] Settlement Agreement, Section 38.15

[48] 100% of claims with a paid value greater than $6,000,000

[49] The precision of pre-appeal award amounts with Documentation Deficiencies is +/- $113,608,949, based on a 95% confidence level.

[50] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, 50 of the 51 Documentation Deficiencies were valued at the full pre-appeal award amount.

[51] Total count and/or value of findings in our sample does not equal the sum of the pre-appeal award amounts by finding type in order to compensate for claims with multiple findings.

### Missing dates on which profit and loss statements were created

*Evaluation Standard:* Settlement Agreement, Exhibit 4A – Requires the submission of "Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Profit and loss statements shall identify the dates on which they were created". The requirement for profit and loss ("P&L") statement creation dates is also addressed in the following policies:

Policy 85 (active as of 5/31/12) states that "If a claimant has already submitted P&L statements that do not identify the dates on which they were created, the claimant may resubmit the P&L statements with addition of the dates on which they were created or may provide a separate document identifying the dates on which the P&L statements were created."

Policy 464 (active as of 9/04/13) supersedes Policy 85 and states that "The Claims Administrator will require verification of the dates on which a claimant's profit and loss statements were created. That verification may be verbal or in writing."

During our review, we noted 48 BEL claims that were processed and approved for payment with claimant-provided P&L statements that did not identify the dates on which they were created, or for which the creation date was unknown.

### Other missing documentation

*Evaluation Standard:* Settlement Agreement, Exhibit 4A – As described above, the Settlement Agreement requires specific documentation to be provided by the claimant.

In addition to the missing or unknown P&L creation dates discussed, we noted four instances in which BEL claims were processed without obtaining all of the required documentation. Specifically, one claim file did not contain the required lodging taxing returns, one claim file did not contain the required occupancy reports, and two claim files did not contain the required monthly sales and use tax returns.

## Failed Business Economic Loss

The Failed Business Economic Loss claim category of the Settlement Agreement provides for damages incurred by business entities that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets. The Framework for Failed Business Economic Loss claims is outlined in Exhibit 6 of the Settlement Agreement.

The following table provides specific detail about the total population of Failed Business Economic Loss claims paid during the Review Period, and the size and value of the sample. Due to the size of the population, the Classical Variables Sampling technique was not used. Rather, sample items were selected randomly after the selection of the 100% items. A projected over- or under-determination could be made and was made from the sample results.

|  | Count | Value |
|---|---|---|
| Population | 24 | $ 1,785,888 |
| Sample | 10 | 1,443,904 |
| *100% stratum[52]* | *8* | *1,427,504* |
| *Randomly selected* | *2* | *16,400* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items. As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of Failed Business Economic Loss pre-appeal award amounts in the population with Documentation Deficiencies is $80,000[53].

| Documentation Deficiencies | | |
|---|---|---|
| Finding type noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[54] |
| Missing balance sheets | 1 | $ 10,000 |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | | *$ 80,000* |

### Missing balance sheets

*Evaluation Standard:* Settlement Agreement, Exhibit 6, Section IV – Outlines the Documentation Requirements for submission of Failed Business Economic Loss claims. These requirements include "actual annual and monthly financial statements (including income statements and balance sheets)" for various periods from 2009 through 2010.

During our review, we noted one claim in which the claimant did not provide the required balance sheets.

---

[52] 100% of claims with a paid value greater than $86,000

[53] The number of findings was too small to compute a precision from the sample. A projection of the findings was made by stratum using the Difference method.

[54] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, this Documentation Deficiency was valued at the full pre-appeal award amount.

© 2014 McGladrey LLP. All Rights Reserved.

## Start-up Business Economic Loss

The Start-up Business Economic Loss claim category of the Settlement Agreement provides for damages incurred by business entities with less than 18 months of operating history at the time of the Deepwater Horizon Incident. The Framework for Start-up Business Economic Loss claims is outlined in Exhibit 7 of the Settlement Agreement.

The following table provides specific detail about the total population of Start-up Business Economic Loss claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 442 | $ 95,995,300 |
| Sample | 112 | 69,143,213 |
| *100% stratum*[55] | *14* | *41,683,854* |
| *Randomly selected* | *98* | *27,459,359* |

The following table summarizes the Documentation Deficiencies noted, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population of the claim category. The most likely value of Start-up Business Economic Loss pre-appeal award amounts in the population with Documentation Deficiencies is $19,924,508[56].

| **Documentation Deficiencies** | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[57] |
| Missing dates on which profit and loss statements were created | 22 | $ 11,860,980 |
| Missing profit and loss statements from the benchmark period | 2 | 3,565,934 |
| Missing sworn written statement | 1 | 90,895 |
| Total value of findings in our sample[58] | 23 | $ 15,425,818 |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | $ 19,924,508 | |

---

[55] 100% of claims with a paid value greater than $1,000,000

[56] The precision of pre-appeal award amounts with Documentation Deficiencies is +/- $3,418,585, based on a 95% confidence level.

[57] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, 20 of the 23 Documentation Deficiencies were valued at the full pre-appeal award amount.

[58] Total count and/or value of findings in our sample does not equal the sum of the pre-appeal award amounts by finding type in order to compensate for claims with multiple findings.

© 2014 McGladrey LLP. All Rights Reserved.

### Missing dates on which profit and loss statements were created

*Evaluation Standard:* Settlement Agreement, Exhibit 4A[59] – "Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Profit and loss statements shall identify the dates on which they were created." The requirement for creation dates on profit and loss ("P&L") statements is also addressed in the following policies:

Policy 85 (active as of 5/31/12) states that "If a claimant has already submitted P&L statements that do not identify the dates on which they were created, the claimant may resubmit the P&L statements with addition of the dates on which they were created or may provide a separate document identifying the dates on which the P&L statements were created."

Policy 464 (active as of 9/04/13) supersedes Policy 85 and states that "The Claims Administrator will require verification of the dates on which a claimant's profit and loss statements were created. That verification may be verbal or in writing."

During our review, we noted 22 Start-up Business Economic Loss claims that were processed and approved for payment based upon P&L statements that did not identify the dates on which they were created, or for which the creation date was unknown.

### Missing profit and loss statements from the benchmark period

*Evaluation Standard:* Settlement Agreement, Exhibit 4A – "Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011."

We noted two instances where the profit and loss statements (or alternate source documents establishing monthly revenues and expenses) for the claimed benchmark period were not contained in the claim file.

### Missing sworn written statement

*Evaluation Standard:* Settlement Agreement, Exhibit 4A – If a claimant falls within the lodging industry, which includes vacation rental properties, the claimant must provide "documentation to identify how the rental property is managed, such as (i) a management contract from a third-party management company or (ii) a Sworn Written Statement from an owner that manages its own property."

We identified one instance where the Program noted that the vacation rental was managed by the claimant but the required documentation was not provided.

---

[59] These documentation requirements also extend to Start-up Business Economic Loss claims.

© 2014 McGladrey LLP. All Rights Reserved.

## Individual Economic Loss

The Individual Economic Loss ("IEL") category of the Settlement Agreement provides for damages incurred by individuals due to or resulting from the Deepwater Horizon Incident. Individual Economic Loss claims do not include claims by self-employed individuals filing IRS Form 1040 Schedules C, E, or F for the 2010 calendar year or any part of a fiscal year in 2010, who are covered under the Business Economic Loss methodology; Seafood Vessel Owners, Commercial Fishermen, Seafood Crew or Oyster Leaseholders, who are covered under the Seafood Compensation Program, VoO Claims, or Subsistence Claims.[60] The Framework for IEL claims is outlined in Exhibits 8A – 8E of the Settlement Agreement.

The following table provides specific detail about the total population of IEL claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 2,901 | $ 35,879,899 |
| Sample | 172 | 7,771,559 |
| *100% stratum*[61] | *10* | *3,321,572* |
| *Randomly selected* | *162* | *4,449,987* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of IEL pre-appeal award amounts in the population with Documentation Deficiencies is $790,556[62].

| Documentation Deficiencies | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[63] |
| Other missing or incomplete documentation | 4 | $ 47,219 |
| Sworn written statement not sufficient to prove causation | 1 | 23,686 |
| **Total value of findings in our sample** | **5** | **$ 70,905** |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | \$ 790,556 | |

---

[60] Settlement Agreement section 5.3.6.2

[61] 100% of claims with a paid value greater than $150,000

[62] The number of findings was too small to compute a precision from the sample. A projection of the findings was made by stratum using the Difference method.

[63] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, four of the five Documentation Deficiencies were valued at the full pre-appeal award amount.

**Other missing or incomplete documentation**

*Evaluation Standard:* As described in Exhibits 8A through 8E of the Settlement Agreement, for each type of IEL claimant, specific documentation is required to be provided by the claimant.

Throughout our procedures, we noted four instances where IEL claims were processed without obtaining all of the required documentation. Specifically, one claim was processed without receipt of the SSN Verification Notice sent to the claimant, one claim file did not contain require supporting documentation for offsetting earnings, one claim file contained income information that was not verified, and one claim file lacked a claim form with the appropriate signature from the claimant.

**Sworn written statement not sufficient to prove causation**

*Evaluation Standard:* Settlement Agreement, Exhibit 8A – Outlines various ways in which an IEL claimant can prove causation. Included is the option to submit a sworn written statement (SWS-12) from the claimant's employer attributing the claimant's economic losses to the spill. The Settlement Agreement States that the employer sworn written statement must articulate in detail how the claimant's losses at the claiming job are causally related to the DWH Spill.

We noted one claim where the employer sworn written statement did not articulate in detail how the spill caused the loss.

## Individual Periodic Vendor / Festival Vendor

The Individual Periodic Vendor ("IPV") category in the Settlement Agreement provides for economic damage that was sustained by an eligible individual who regularly sold food, souvenir, art, tourist-related or water-related goods or services at retail during 2009 and 2010, and whose primary customer was non-local consumers. The Festival Vendors claim category in the Settlement Agreement provides for economic damage that was sustained by an individual who regularly made festival sales before April 20, 2010 and claims a loss of revenue and earnings related to a Festival in which the Festival Vendor participated or would have participated absent the DWH Spill. The Framework for IPV claims is outlined in Exhibit 8D of the Settlement Agreement.

The following table provides specific detail about the total population of IPV / Festival Vendor claims paid during the Review Period, and the size and value of the sample selected using a random sampling approach. Due to the size of the population, the Classical Variables Sampling technique was not used. Rather, a combination of judgmental and random sampling approach was taken.

|  | Count | Value |
|---|---|---|
| Population | 8 | $ 77,085 |
| Sample | 4 | 40,280 |
| *100% stratum[64]* | *1* | *24,000* |
| *Randomly selected* | *3* | *16,280* |

During the course of our review of IPV / Festival Vendor claims, we noted no Documentation Deficiencies.

---

[64] Largest claim in population

© 2014 McGladrey LLP. All Rights Reserved.

## Subsistence

The Subsistence damages category of the Settlement Agreement provides for damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and game, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by claimant due to or resulting from the Deepwater Horizon Incident.[65] The Framework for Subsistence claims is outlined in Exhibit 9 of the Settlement Agreement.

The following table provides specific detail about the total population of Subsistence claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 1,248 | $ 10,185,177 |
| Sample | 152 | 1,917,396 |
| *100% stratum[66]* | *11* | *346,605* |
| *Randomly selected* | *141* | *1,570,791* |

During the course of our review of Subsistence claims, we noted no Documentation Deficiencies.

---

[65] Settlement Agreement section 1.3.1.3
[66] 100% of claims with a paid value greater than $30,000

## Vessel of Opportunity

The Vessel of Opportunity Charter Payment ("VoO") category of the Settlement Agreement provides compensation for claimants who registered to participate in BP's Vessels of Opportunity program and executed a VoO Master Vessel Charter Agreement with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as Charterer, and completed the initial VoO training program[67]. The Framework for VoO claims is outlined in Section 5.5 of the Settlement Agreement.

The following table provides specific detail about the total population of VoO claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 6,793 | $ 272,297,421 |
| Sample | 175 | 10,773,831 |
| *100% stratum*[68] | *11* | *3,241,993* |
| *Randomly selected* | *164* | *7,531,838* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of VoO pre-appeal award amounts in the population with Documentation Deficiencies is $2,130,223[69].

| Documentation Deficiencies | | |
|---|---|---|
| Finding type noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[70] |
| Missing Power of Attorney, or equivalent | 3 | $ 438,984 |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | $ 2,130,223 | |

### Missing Power of Attorney, or equivalent

*Evaluation Standard:* Settlement Agreement, Section 4.4.5 – "Economic Class Members must submit Claim Forms to participate in the Settlement Program. Each Claim Form must be signed under penalty of perjury and individually signed by the Natural Person or Entity who or which suffered damages." If represented by legal counsel, a properly authorized attorney may sign and submit the claim form on behalf of the claimant.

In three instances, we noted that a claim form was signed and submitted by an attorney; however, the appropriate documentation to establish authority to do so was not in the claim file. As a result, these claim forms may be deemed unsigned. For two of these instances, a Power of Attorney was identified; however, the form only allowed for representation in the GCCF, and did not extend to the current Settlement Program.

---

[67] Settlement Agreement section 1.3.1.4

[68] 100% of claims with a paid value greater than $160,000

[69] The number of findings was too small to compute a precision from the sample. A projection of the finding was made by stratum using the Difference method.

[70] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, all three of the Documentation Deficiencies were valued at the full pre-appeal award amount.

## Vessel Physical Damage

The Vessel Physical Damage ("VPD") category in the Settlement Agreement provides for damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program. The Framework for VPD claims is outlined in Exhibit 14 of the Settlement Agreement.

The following table provides specific detail about the total population of VPD claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 695 | $ 10,352,431 |
| Sample | 142 | 4,871,844 |
| *100% stratum[71]* | *10* | *2,031,980* |
| *Randomly selected* | *132* | *2,839,864* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of VPD pre-appeal award amounts in the population with Documentation Deficiencies is $1,023,852[72].

| **Documentation Deficiencies** | | |
|---|---|---|
| **Finding type noted in our sample** | **Count** | **Pre-appeal award amounts with Documentation Deficiencies noted in our sample[73]** |
| Vessel registration and/or title does not properly evidence ownership during the required period | 10 | $ 589,613 |
| Inappropriate signature on SWS-42 | 1 | 121,997 |
| Insufficient support for vessel replacement | 1 | 22,150 |
| **Total value of findings in our sample** | **12** | **$ 733,760** |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | \multicolumn{2}{c} **$ 1,023,852** |

---

[71] 100% of claims with a paid value greater than $90,000

[72] The approximate precision of pre-appeal award amounts with Documentation Deficiencies is +/- $318,000, based on a 95% confidence level, but is limited on the lower limit by the actual "Total value of findings in our sample" reported above.

[73] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, all 12 of the Documentation Deficiencies were valued at the full pre-appeal award amount.

**Vessel registration and/or title does not properly evidence ownership during the required period**

*Evaluation Standard:* Settlement Agreement, Exhibit 14, Section 2A – Requires that the "physical damage occurred between April 20, 2010 and December 31, 2011." This section also requires that "the eligible claimant owned the eligible vessel for which physical damage is claimed at the time the damage occurred."

The requirement for evidence of ownership is also addressed in Policy 260 (active 10/03/12), which states that "the Settlement Agreement requires claimants to submit proof of both registration of the damaged vessel to the claimant and proof of title to the damaged vessel in the claimant's name, during the period from 4/20/10 to 12/31/11. Claimants who have submitted proof of registration or title to a vessel but not both, effective 10/3/13, are not required to submit proof of both registration and title, but instead submit a Sworn Written Statement (SWS-42) in place of the missing title or registration."

We noted that, during the Review Period, 10 VPD claims were processed and approved for payment based upon registrations and/or titles to the damaged vessels that were dated (and covered periods) before or after the period 4/20/10 to 12/31/11. As such, the registrations and/or titles on file did not sufficiently meet the eligibility requirement set forth in the Settlement Agreement and Policy 260.

**Inappropriate signature on SWS-42**

*Evaluation Standard:* Policy 260 – Allows claimants to submit a sworn written statement ("SWS-42"), in place of a title or registration (but not both), for the purpose of proving ownership or registration of the claimed vessel. The policy also states, "The claimant (**and not a lawyer or claims preparer**) (emphasis added) must sign the SWS-42, but a "wet ink" signature is not required."

In one instance, we noted that the SWS-42 submitted was signed by an individual other than the claimant.

**Insufficient support for vessel replacement**

*Evaluation Standard:* Settlement Agreement, Exhibit 14, Section 2 – Allows a claimant to be reimbursed for costs incurred to replace an eligible vessel if the cost to do so is less than the cost to repair the Vessel. To allow for such a comparison, the Settlement Agreement requires the submission of "a cost estimate and proof the costs are reasonable and necessary."[74]

We noted one instance where the documentation provided did not include costs estimates to repair or replace the vessel.

---

[74] Settlement Agreement, Exhibit 14, Section 2

© 2014 McGladrey LLP. All Rights Reserved.

## Coastal Real Property

The Coastal Real Property Damages ("Coastal") category of the Settlement Agreement provides for damages to Coastal Real Property alleged by a claimant as a result of the Deepwater Horizon Incident. The Framework for Coastal claims is outlined in Exhibits 11A – 11C of the Settlement Agreement.

The following table provides specific detail about the total population of Coastal claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

| | Count | Value |
|---|---|---|
| Population | 18,797 | $ 108,036,806 |
| Sample | 180 | 6,679,482 |
| 100% stratum[75] | 10 | 4,807,110 |
| Randomly selected | 170 | 1,872,372 |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claims category. The most likely value of Coastal pre-appeal award amounts in the population with Documentation Deficiencies is $2,085,116[76].

| **Documentation Deficiencies** | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[77] |
| No spousal signature on release | 3 | $ 37,996 |
| **Most likely pre-appeal award amount in the population with Documentation Deficiencies** | $ 2,085,116 | |

**No spousal signature on release**

*Evaluation Standard:* Settlement Agreement, Exhibit 26 – As part of the Settlement Agreement, claimants are required to sign a Full and Final Release. In doing so, the claimant is "forever waiving and releasing all claims that [he/she] may have against BP or any other party in connection with the Deepwater Horizon Incident." Exhibit 26 of the Settlement Agreement requires that the Individual Release be signed by the spouse of a married, individual claimant.

We noted three instances where the claimant's spouse did not sign the Individual Release.

---

[75] 100% of claims with a paid value greater than $115,000

[76] The number of findings was too small to compute a precision from the sample. A projection of the finding was made by stratum using the Difference method.

[77] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, all three of the Documentation Deficiencies were valued at the full pre-appeal award amount.

© 2014 McGladrey LLP. All Rights Reserved.

## Wetlands Real Property

The Wetlands Real Property Damages ("Wetlands") category of the Settlement Agreement provides for damages to Wetlands Real Property alleged by a claimant as a result of the Deepwater Horizon Incident. The Framework for Wetlands claims is outlined in Exhibit 12A of the Settlement Agreement.

The following table provides specific detail about the total population of Wetlands claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 2,046 | $ 87,370,142 |
| Sample | 125 | 61,595,928 |
| 100% stratum[78] | 8 | 48,640,364 |
| Randomly selected | 117 | 12,955,564 |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claim category. The most likely value of Wetlands pre-appeal award amounts in the population with Documentation Deficiencies is $2,224,402[79].

| Documentation Deficiencies | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[80] |
| Unsigned claim form | 3 | $ 1,485,610 |
| No spousal signature on release | 1 | 2,430 |
| Total value of findings in our sample | 4 | $ 1,488,040 |
| Most likely pre-appeal award amount in the population with Documentation Deficiencies | $ 2,224,402 | |

### Unsigned claim form

*Evaluation Standard:* Settlement Agreement, Section 4.4.5 – "Economic Class Members must submit Claim Forms to participate in the Settlement Program. Each Claim Form must be signed under penalty of perjury and individually signed by the Natural Person or Entity who or which suffered damages."

We noted three instances where the claim form for the respective claim did not include the claimant's signature.

---

[78] 100% of claims with a paid value greater than $1,000,000

[79] The approximate precision of pre-appeal award amounts with Documentation Deficiencies is +/- $18,502,950, based on a 95% confidence level, but is limited on the lower limit by the actual "Total value of findings in our sample" reported above.

[80] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, all four of the Documentation Deficiencies were valued at the full pre-appeal award amount.

**No spousal signature on release**

*Evaluation Standard:* Settlement Agreement, Exhibit 26 – Claimants are required to sign a Full and Final Release. In doing so, the claimant is "forever waiving and releasing all claims that [he/she] may have against BP or any other party in connection with the Deepwater Horizon Incident." Exhibit 26 of the Settlement Agreement requires that the Individual Release be signed by the spouse of a married, individual claimant.

We noted one instance where the claimant's spouse did not sign the Individual Release.

## Real Property Sales

The Real Property Sales ("RPS") damages category of the Settlement Agreement provides for damages alleged by a claimant as a result of selling residential property during the period April 21, 2010 through December 31, 2010 due to the Deepwater Horizon Incident[81]. The Framework for RPS claims is outlined in Exhibits 13A and 13B of the Settlement Agreement.

The following table provides specific detail about the total population of RPS claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 497 | $ 26,294,423 |
| Sample | 120 | 11,949,994 |
| *100% stratum[82]* | *5* | *2,699,748* |
| *Randomly selected* | *115* | *9,250,246* |

The following table summarizes the noted Documentation Deficiencies, as well as the respective total count and compensation award amounts, prior to any appeal, of such items.

As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in the claims category. The most likely value of RPS pre-appeal award amounts in the population with Documentation Deficiencies is $403,403[83].

| **Documentation Deficiencies** | | |
|---|---|---|
| Type of finding noted in our sample | Count | Pre-appeal award amounts with Documentation Deficiencies noted in our sample[84] |
| No spousal signature on release | 2 | $ 198,125 |
| No signed sales contract | 2 | 96,250 |
| **Total value of findings in our sample** | **4** | **$ 294,375** |
| *Most likely pre-appeal award amount in the population with Documentation Deficiencies* | $ 403,403 | |

#### No spousal signature on release

*Evaluation Standard:* Settlement Agreement, Exhibit 26 – Claimants are required to sign a Full and Final Release. In doing so, the claimant is "forever waiving and releasing all claims that [he/she] may have against BP or any other party in connection with the Deepwater Horizon Incident." Exhibit 26 of the Settlement Agreement requires that the Individual Release be signed by the spouse of a married, individual claimant.

We noted two instances where the claimant's spouse did not sign the Individual Release.

---

[81] Settlement Agreement section 5.9.2

[82] 100% of claims with a paid value greater than $300,000

[83] The approximate precision of pre-appeal award amounts with Documentation Deficiencies is +/- $6,452,428, based on a 95% confidence level, but is limited on the lower limit by the actual "Total value of findings in our sample" reported above.

[84] "Pre-appeal award amounts with Documentation Deficiencies" was calculated using only the conforming documentation on hand. Based on this process, three of the four Documentation Deficiencies were valued at the full pre-appeal award amount.

**No signed sales contract**

*Evaluation Standard:* Settlement Agreement, Exhibit 13A – Requires the submission of a "copy of the **signed** sales contract(s) for the sale that took place during the time period April 21, 2010 to December 31, 2010" (emphasis added).

During our review of RPS claims, we noted two instances where the sales contract was either missing or did not include all necessary signatures.

## 40% Request

40% Request claims originated with the GCCF. Prior to the enactment of the Settlement Agreement and CSSP, GCCF was the facility responsible for adjudicating and paying claims filed against BP for various damages presumably caused by the 2010 Deepwater Horizon oil spill. Under the Transition Order, claimants were offered opportunities to file claims and receive 60% of the amount deemed payable without signing releases and with the understanding that, when the Settlement Agreement was implemented, these claimants could make a request for the 40% balance, or file a new claim. The scope of this section is limited to those claimants that requested the remaining 40% of their award compensation without filing a new claim. If a claimant opted to file a new claim, the final claim award would be the greater of the 40% balance from the GCCF program, or the new award determined by DHECC, less prior Transition payments. The testing of these claims is included in the appropriate claim category above. Upon payment of either amount, a release was signed by the claimant.[85] The guidance for the Transition Claims Process is outlined in the First Amended Order Creating Transition Process, dated March 8, 2012.

The following table provides specific detail about the total population of 40% Request claims paid during the Review Period, and the size and value of the sample selected using a Classical Variables Sampling approach.

|  | Count | Value |
|---|---|---|
| Population | 2,619 | $ 42,636,118 |
| Sample | 163 | 22,786,198 |
| 100% stratum[86] | 9 | 12,462,278 |
| Randomly selected | 154 | 10,323,920 |

During the course of our review of 40% Request claims paid during the Review Period, we noted no Documentation Deficiencies.

---

[85] Settlement Agreement, section 4.2
[86] 100% of claims with a paid value greater than $150,000

# Zero-Paid Claims

The Zero-Paid Claims category consisted of those claims where, at some time during the Review Period, it was determined that no payment was due to the claimant. The objective of reviewing these claim files was to determine if the applicable processes set forth in the Settlement Agreement were carried out appropriately. Additional detail about each type of Zero-Paid process is included below. Note: As part of the claims processing procedures, upon completion of these Zero-Paid processes, some claims were ultimately approved for payment and paid when warranted.

The following table provides specific detail about the total population of Zero-Paid claims processed during the Review Period, and the size of the sample selected using an Attribute random sampling approach and a 95% confidence level with an expected error rate of 3% and a tolerable error rate of 7%.

|  | Population[87] | Sample Size | Number of findings | % |
|---|---|---|---|---|
| Appealed claims | 4,577 | 40 | 0 | 0.0% |
| Reconsidered claims | 13,859 | 92 | 0 | 0.0% |
| Re-reviewed claims | 3,831 | 16 | 0 | 0.0% |
| Denied claims | 48,552 | 149 | 0 | 0.0% |
| Other | 46,538 | 149 | 0 | 0.0% |
| Total |  | 446 | 0 | 0.0% |

*Appeals (including reconsideration and re-review)*

Section 6 of the Settlement Agreement provides for these processes, which are described in detail below. In order for a claimant to qualify for Reconsideration or Re-Review, the claimant must have received either a Denial Notice or an Eligibility Notice from the Claims Administrator where the claimant disputed the award decision. The notice would describe the reason for denial and provide information regarding the claimant's right to request Reconsideration or Re-Review.

Appeal: The Settlement Agreement allows for the parties to the claim (claimants and BP) to file an Appeal if either party disagreed with the claim award decision. The Appeals process is documented in Section 6 of the Settlement Agreement and Exhibit 25. The process of the Appeal is determined by the type of disagreement and the amount of the award in dispute. Under the terms of the Settlement Agreement, BP is allowed to appeal any claim award greater than $25,000. Claimants could appeal any claim award amount decision, and could appeal decisions of merit, however, only after going through the reconsideration process.

The filing of an Appeal by either party requires the payment of a filing fee. Our procedures did not include verification of the processes to collect and, when appropriate, refund such fees to claimants.

Reconsideration: Per Settlement Agreement, Section 6.1.2.1.1., "Within 30 days of issuance of notice in writing to the Claimant of a final determination of a Claim by the Settlement Program, a Claimant may request in writing reconsideration by the Settlement Program of that determination on the grounds that the Settlement Program committed a calculation error, failed to take into account relevant information or data or otherwise failed to follow the standards governing the determination." The Reconsideration process is available to all claimants; however, it is a pre-requisite for any appeal initiated by the claimant.

---

[87] The population of Zero-Paid claims has not been totaled, due to the fact that a claim could have been in one or more Zero-Paid processes throughout the Review Period.

Re-Review: Upon receipt of a Denial Notice, claimants have the option to request a Re-Review. In doing so, the claimant must provide the Program with *new* documentation. The re-review process is not provided for in the Settlement Agreement. Rather, it is a process implemented by the Program.

### Denied Claims

The population of Denied claims consisted of claims where the claimant was issued a "Denial Notice" prior to October 4, 2013. A sample of Denied claims was tested to determine if the process established by the Settlement Agreement was properly followed to reach the appropriate conclusion to deny the claim. Note – inclusion in our population of Denied claims does not necessarily equate to zero payment. In some cases, the claim may have been reconsidered, re-reviewed, or appealed, and a compensation amount ultimately awarded.

### Other

This category consisted of claims that were Zero-Paid by process or by claimant action. These items were tested to determine if the process for the applicable reason correctly classified the claim into the respective definitions. Included in this category were claims that were incomplete, closed, withdrawn, or opted out.

## Results of procedures performed

During the course of our review of Zero-Paid claims, we noted no significant findings.

# Other Observations

During the course of our review, we have made a number of observations and recommendations related to process improvements, internal controls, and other matters which have been discussed with management. It should be noted that the Claims Administrator's ability to implement recommendations provided may be limited by the terms of the Settlement Agreement. Below are the Program-level observations, followed by observations that are specific to individual claim categories.

## Program-level observations

### Procedures to clarify conflicting or insufficient information

To process claims in accordance with the Settlement Agreement and Supplemental Policies, the Program is required to review various claimant-provided documents as well as information compiled into various databases and tools utilized by the Program. During the course of our review, we noted instances where the information gathered from these sources was inconsistent and/or ambiguous. Rather than follow-up with the claimant to determine which details were accurate and, therefore, should be relied upon for purposes of determining the award amount, claims were processed with the information available. In instances where inconsistent information was in the file, our scope did not include the determination of what information was accurate. As such, we were unable to quantify the potential effect that additional procedures might have had on the award determination. Examples of inconsistencies within claim files are provided, as appropriate, throughout the remaining sections of this report. In addition to those noted, the following examples were found in more than one claim category:

- The Settlement Agreement includes provisions to offset claim awards for "Prior Payments" made under the GCCF or any other payment made by BP in response to the spill, regardless of claim type. A database was developed to maintain a list of the Prior Payments based on information provided by BP. We noted instances where the claimant indicated they received a Prior Payment on their registration form, but the payment was not included in the database and, as a result, no Prior Payment offset was applied to the claim and additional procedures were not consistently performed to resolve these discrepancies.

- As part of each claim form, claimants (or their authorized representative) are required to include either a wet signature or an e-signature. The Program has developed a process to review wet signatures in order to determine if the name in the signature field matches the name of the claimant or the individual authorized to file the claim on behalf of the claimant. As for electronic signatures, the Program does not have a process to match the name in the signature field to the name of the claimant or the individual authorized to file the claim on behalf of the claimant. We noted instances where the name included in the signature field did not match the name of the claimant or the individual authorized to file the claim on behalf of the claimant and no additional procedures were performed to resolve the discrepancy.

[Observation not previously included in an interim report.]

### Alternatives to use of sworn written statements

In situations where sworn written statements are an acceptable form of documentation, claims processors are sometimes requesting sworn written statements first, rather than the more objective documentation referenced in the Settlement Agreement. The Settlement Agreement often times allows for the claimant to provide a choice of documents in order to substantiate their claim. Often, included in the choice of documents is a sworn written statement. We believe that if the claim is incomplete, the incompleteness notice should initially request one of the more substantial documents of those choices. By requesting sworn written statements when more meaningful documentation may be available, claims processors may not be performing an appropriate level of due diligence or exercising appropriate professional skepticism.

**Updates to the Operations Manual**

The Operations Manual has not been updated to reflect certain process changes. For example, the CSSP has determined that an accountant's review will not be performed on leaseholds, individual fishing quota, and seafood crew claims. This change in process is not accurately reflected in the manual. Outdated procedures in the Operations Manual could lead to improper claims processing.

**Accurate reporting of paid claims**

In the course of our review, we noted instances where the total payment reported in the claims processing system for a specific claim did not agree to the actual cash disbursement. These variances – estimated at $11.3 million – related to an error in the claims system reporting logic which double-counted withheld lien payments in the Total Payment reporting field for 428 claims. From our review of the instances in our sample, the issue did not result in duplicate or improper payment to lien holders.

The Program stated that the claims portal screens require a separate correction procedure from the public reports in order to correct the reporting issue. As the screens are used internally by the Program and claims reviewers rather than for public reporting, the Program prioritized updating the public reports ahead of updating the claims screens. Additionally, it is important to note that while the Total Payments amount may be incorrect, the screens show the correct line item details for each claim. Management represents that the Total Payments internal reporting screen has been corrected.  [Observation not previously included in an interim report.]

**Public reporting related to 40% Request claim category**

Payment and other statistics relating to the 40% Request claims type were not historically included in the public reports presented by the Program. Without such reporting, interested parties were not provided complete information as to the activities of, and funds released under, the CSSP. Upon receipt of a recommendation in an interim report, the Program began including such information in its public reports in March 2014.

**Compensation awarded for damage to property owned by trusts**

In several of the Real Property claim categories, we noted claims that were filed by individuals based on property legally owned by a trust. In most instances, it appeared that the individual filing the claim was a trustee of the trust; however, the claim form submitted did not indicate that the individual was filing on behalf of the trust. As such, compensation was awarded to the individual rather than the trust. [Observation not previously included in an interim report.]

**Entity Verification Review reporting**

The claims system did not capture in the Entity Verification Review (EVR) report the date on which the Entity Identification Number (EID) was created. Lack of this information on the report would have prevented the claims processor and reviewer from determining the appropriate application of Policies to the EID at the time of creation.

**Contracting with third party mapping tool vendors**

As part of the claims process, third party mapping software tools are used to validate certain geographical zone eligibility. The vendors responsible for these tools have been contracted directly by BP. Therefore, the CAO has had no oversight regarding the accuracy of the tool, or any changes that may have been implemented. In addition, for certain claim categories, these vendors have been involved in determining eligibility, and providing calculated compensation amounts. This direct relationship with BP and involvement in the claims processing procedures creates a perceived lack of impartiality and the possibility of undue influence by BP.

**Change control board processes**

In December 2013, the CAO implemented a Change Control Board for the purpose of authorizing and managing changes implemented on the production claims processing solution. Upon reviewing the process in an effort to validate its implementation and operating effectiveness, we noted the following:

- There is no audit trail for a change made to the system.

- There is no ability to generate an automated population of changes implemented within a given period of time in the system. Additionally, the process to manually establish a population lacks sufficient segregation of duties.

- Evidence of approvals for system changes lacks the level of detail to understand the specific change that the approver is authorizing.

The inability to validate the audit trail for change controls may result in unauthorized changes being implemented in production which could ultimately degrade the integrity of the production systems.

**Review of claims portal user accounts**

There is no process to review the claims portal user accounts for reasonableness and appropriateness on a periodic basis. Specifically, during our review we noted the following:

- Administrator privileges were assigned to an individual who was not part of the authorized DHECC access team member listing.

- There is no process in place to document evidence of authorization for access to the DHECC Portal.

- Where exceptions to access restrictions were noted, there is no process in place to log or document justification for those exceptions.

- The system is unable to log failed attempts to access the DHECC Portal.

The absence of such a review process increases the risk that accounts associated with terminated personnel are not removed in a timely manner, and/or accounts are assigned access that is not necessary for the associated personnel's job function.

**Explanations of manual overrides**

There is no formal process to document reasons for, and approvals of, manual overrides within the claims processing system. Through discussion with the Program, we understand that such information is maintained in various locations and formats. Lack of descriptive information and formally documented approvals increases the risk that claims will be inappropriately handled.

**System limitations with respect to complete history of claims**

The claims system lacks the functionality to extract complete data for a selected claim ID throughout the claim lifecycle. As a result, the ability to analyze all relevant claim ID data is impaired which may result in the failure to fully understand trends and monitor if claims were processed appropriately.

### Reconciliation of claims data to financial information

Sound internal audit procedures generally suggest that the completeness and accuracy of population information be validated prior to the sample selection process. In performing our procedures to gain such comfort, we noted the following:

- The claims data requested as of September 30, 2013 was not available as it had not been retained. A claim data backup dated October 4, 2013 was the closest date available, and included claim payment activity through October 3, 2013. The cash disbursement schedule reflected disbursements through October 2, 2013 with no disbursements made from October 3, 2013 through October 6, 2013. As such, several adjustments were necessary to facilitate the reconciliation of the claim data to the cash disbursement schedule.

- Financial records in the form of a system-generated trial balance or financial statement as of September 30, 2013 were not readily available for purposes of the reconciliation process. In lieu of such records, a cash disbursement schedule maintained by the CFO was used for purposes of the reconciliation. Financial statements are prepared annually.

- Formal reconciliation of claim payment data per the claims system to claim payments per the financial records did not routinely or periodically occur.

At completion of the reconciliation process, a variance of $5.4 million (0.15% of cumulative paid claims) remained unexplained. An inability to fully reconcile the population to financial information increases the risk of incomplete and inaccurate data.

### Second claims processing system ("Limited Access Portal") was established

Through discussions with key personnel at the CAO and BG, we understand that the Limited Access Portal was developed to preserve confidentiality and limit accessibility to specific claimant information, beyond the limitations that exist within the primary claims processing system. This creates inefficiencies resulting from having to maintain two systems. In addition, such a scenario also results in increased risks to the claims process. These include the risk that:

- Authorized changes and updates are not made to the Limited Access Portal;
- Unauthorized changes are made to the Limited Access Portal; and
- Controls over the two systems are not consistent.

Management represents that no claims were processed or paid through this system, and it has since been shut-down.

### Monitoring production environment

There is no formal process in place to proactively monitor the claims system production environment or IIS (Internet Information Server) for performance degradation and security events. Additionally, related issue resolution responsibilities are currently undefined.

The absence of a monitoring process increases the risk that unauthorized access to systems would not be detected in a timely manner, thus compromising the integrity of the data and systems.

### Entity identification numbers

Master Entity Identifications ("EIDs") are not always readily available in a claim. Rather, when multiple EIDs are created for an entity, only one will have an attached Entity Verification Report ("EVR"). Lack of such information in each claim file reduces efficiencies related to the review of claims.

## Seafood Compensation

### Funding of spill-related prior payments

The Settlement Agreement provides for $2.3 billion to be dedicated to the Seafood Compensation Program. Section 4.2.7 states that "Transition payments made by the Transition Process during the Transition Process and transition payments made by the Settlement Program to Economic Class Members that are Commercial Fishermen, Seafood Crew, Seafood Boat Captains, Seafood Deckhands, Oyster Leaseholders, and Seafood Vessel Owners shall reduce, dollar for dollar, the $2.3 billion amount for the Seafood Compensation Program." During our review, we noted that spill-related prior payments associated with the Seafood Compensation Program were sometimes deducted from the General Fund rather than the Seafood Compensation Fund. [Observation not previously included in an interim report.]

### Procedures to clarify conflicting or insufficient information

In order for Seafood claimants to be eligible for Oyster leasehold awards, they must provide a "Valid oyster lease entered into by Claimant that established, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold. Claimants are required to provide documentation that their leasehold interest is in good standing, such as proof of renewal" according to Exhibit 10 of the Settlement Agreement. We noted instances whereby the amount of acreage represented by the lease differed from the amount of acreage shown on the 2010 renewal receipt. Additional procedures were not consistently performed to resolve these differences. [Observation not previously included in an interim report.]

### Controls to validate a claimant's right to file a seafood oyster claim

The controls in place to validate a claimant's right to file Seafood oyster claims using leasehold IDs are not adequately designed to provide the desired level of reliability. Claim reviewers are using individual judgment to research and validate oyster leasehold ownership information when there is a transfer and/or partial ownership submission. The claims system tracks leasehold IDs by claim; however, this data is not being used as an automated control. Use of individual judgment, rather than an available automated control increases the risk that invalid claims are being processed for payment.

### Documentation of Seafood leasehold claims

The manner in which Seafood leasehold documents are scanned, named, and linked within the claims processing system creates inefficiencies. First, leasehold documents are scanned in bulk and saved to the database numerous times. Further, naming conventions lack the leasehold ID. Finally, leaseholds are linked to the claimant IDs rather than the respective claim for which the document is provided. As a result, the level of effort required to identify the leaseholds supporting a claim is significant and the process is susceptible to error.

### Business Economic Loss

#### Accounting vendor quality assurance responsibilities

DHECC's service agreement with one of the accounting firm vendors states that the vendor would be responsible for ensuring consistency and quality assurance ("QA") over all eligible BEL claims. In May of 2013, the process was changed to eliminate that vendor's role in performing this QA review over claims assigned to the other accounting firm vendor. Neither firm's contract with the DHECC was amended to reflect the change in their responsibilities.

This change of responsibility for ensuring consistency and QA over all eligible BEL claims, from one accounting firm to both accounting firms, increases the risk of inconsistency over eligible BEL claims.

#### Use of tax returns

BEL claims have been processed and approved for payment based upon tax returns which have not been verified as having been filed with the Internal Revenue Service ("IRS"). The Settlement Agreement requires the submission of the claimant's complete tax return, including schedules and attachments, for economic loss claims. It does not require verification that the tax returns were filed. Acceptance of an unverified tax return increases the risk that the return was not filed and, therefore, may be inaccurate, incomplete, or invalid. Policy 70 v2, "Authorization for Validation" was made active July 24, 2014 and requires the claimant to submit "at the same time a signed and contemporaneously dated IRS Form 4506 and a signed and contemporaneously dated Form 4506-T (collectively, the "Tax Forms"), authorizing the Settlement Program to verify with the IRS the Tax Information Documentation provided by the Claimant."

#### Access to certain cells within the Accountant's Workbook

Cells containing formulas in the Accountant's Workbook for BEL and FBEL (Business Economic Loss and Failed Business Economic Loss) are not always protected from edits ("protected"). Accountant's Workbook cells that include formulas and are not protected increase the risk of inaccurate claim payments due to inappropriate or accidental formula changes or deletions. Specifically, we observed the following:

Unprotected BEL Accountant Workbook (version 4.9.3) observations:

- Tab - A3 Tax Return – Variance % formulas
- Tab - C4 Reconciliation – Total formulas

Unprotected FBEL Accountant Workbook (version 3.5) observations:

- Tab - A3 Tax Return sheet – Variance % formulas
- Tab - A4 Tax Reconciliation – Net income / (loss) per books in tax return and Difference formulas
- Tab - A6 Liquidation Detail – Total Liquidated Assets formulas
- Tab - C3 Reconciliation – Total Claimant Compensation formulas

#### Change management with respect to the BEL Accountant's Workbook

We noted opportunities to improve the change management process over the BEL Accountant's Workbook. From the population of BEL Accountant Workbook changes, three complex changes were selected for review (V4.7, V4.8 and V4.9). The selected changes did not reflect formally documented approvals, tests plans that reconciled to the requirements of the change and evidence of comprehensive testing. The risk of BEL Accountant's Workbooks determining inaccurate claim amounts increases when adequate change management controls are not in place. [Observation not previously included in an interim report.]

### Failed Business Economic Loss

#### Reporting of claim

In our review of Failed Business Economic Loss claims, we noted one claim in our sample of ten that was incorrectly categorized and reported as a Failed Business Economic Loss claim when, in fact, it was processed and paid appropriately as a Business Economic Loss claim. [Observation not previously included in an interim report.]

No other observations were noted. However, some other observations noted in the BEL claim category may also apply to Failed Business Economic Loss claims.

© 2014 McGladrey LLP. All Rights Reserved.

## Start-up Business Economic Loss

During the course of our review of Start-up Business Economic Loss claims, we noted no other observations. However, some other observations noted in the BEL claim category may also apply to Start-up Business Economic Loss claims.

© 2014 McGladrey LLP. All Rights Reserved.

### Individual Economic Loss

#### Calculation of Claimant Specific Growth Factor

Instances were noted wherein the claims reviewer abandoned the calculation of the Claimant Specific Growth Factor ("CSGF") due to a gap in pay period documentation when it appears there is sufficient information available to accurately compute the claimant specific growth factor. Specifically, examples can be provided wherein the Year to Date ("YTD") field on pay stubs could easily and accurately be used to fill in gaps thus allowing the calculation to be performed. The resulting difference between the claimant specific growth factor that should have been used and the general growth factor that was used can have a financial impact.

The IEL computation includes the CSGF which is computed by comparing the first four months of the benchmark period year(s) to the first four months of 2010. The growth factor is expressed as a percentage and is meant to take into account the claimant's year to year earnings change. The growth factor is used to increase (or decrease) the claimant's expected earnings, which leads to an increase (or decrease) in the claimant's final award. The growth factor can be anywhere between -1.5% and +10%. If the growth factor is calculated to be lower than -1.5% or higher than +10%, the growth factor used is limited to either -1.5% or +10%. If the claimant did not provide sufficient pay period documentation to compute a claimant specific growth factor, the Settlement Agreement provides for the use of a "General Growth Factor" of +2%.

#### Procedures to clarify conflicting or insufficient information

To process claims in accordance with the Settlement Agreement and Supplemental Policies, the Program is required to review various claimant-provided documents as well as information compiled into various databases and tools utilized by the Program. During the course of our review, we noted instances where the information gathered from these sources was inconsistent and/or ambiguous. Rather than follow-up with the claimant to determine which details were accurate and, therefore, should be relied upon for purposes of determining the award amount, claims were processed with the information available. In instances where inconsistent information was in the file, our scope did not include the determination of what information was accurate. As such, we were unable to quantify the potential effect that additional procedures might have had on the award determination. Examples of inconsistencies within claim files are as follows:

- According to the Settlement Agreement, IEL claimants are able to establish location of economic loss for the Claiming Job other than their employer's location. The IEL claimant must provide evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location. We noted instances where the claimant indicated that employment occurred at an alternate location, however, information provided by the claimant to support that indication was minimal or conflicted with other information in the file. Additional procedures were not consistently performed to resolve the conflicting information.

- Exhibit 16 of the Settlement Agreement has defined "Moratoria Losses" as "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity." Moratoria Losses are excluded from the program and no Class Member shall recover from Moratoria Losses. In some instances we noted information in the file that was indicative of a possible moratoria exclusion; however, moratoria reviews or additional procedures were not consistently performed.

- Exhibit 8A of the Settlement Agreement defines a Claimant's Lost Earnings as, "The claimant's Expected Earnings from all Claiming Jobs minus the claimant's Actual Earnings from all Claimant Jobs during the Compensation Period, minus any Offsetting Earnings." Offsetting Earnings are defined as "Earnings from any Non-Claiming Job(s) during the claimant's Compensation Period in excess of earnings from any Non-Claiming Job(s) during the claimant's Benchmark Period." Upon review of tax records we identified instances whereby the claimant's earnings on his/her tax return differed from the amount stated on the W-2 and additional procedures were not consistently performed to resolve such differences.

[Observation not previously included in an interim report.]

© 2014 McGladrey LLP. All Rights Reserved.

### Individual Periodic Vendor / Festival Vendor

During the course of our review of IPV / Festival Vendor claims, we noted no other observations.

## Subsistence

### Procedures to clarify conflicting or insufficient information

Subsistence claimants submit required information using both the claim form and interview form. Policy 160 (effective July 15, 2012) states that the Program will conduct a "phone or in person interview as and when [they] determine that doing so will facilitate the accurate processing of the claim or will address questions regarding the reliability of the evidence submitted on the claim."[88] We noted instances where the information submitted on the two forms was inconsistent, or there were multiple versions of the interview form, and a clarifying interview was not performed by the Program. Rather, claims were processed with the information from the most recent interview form. In instances where inconsistent information was in the file, our scope did not include the determination of what information was accurate. As such, we are not able to determine whether performing a clarifying interview would have impacted the award amount. [Observation not previously included in an interim report.]

### Central repository for Subsistence directives

The Settlement Agreement allows the Court Appointed Distribution Agent (CADA) to provide clarification of policies and operational guidance to Subsistence claim reviewers. Directives are issued to reviewers in the form of trainings and/or through email notification. A complete population of directives is not maintained in a centralized location. Lack of a central repository increases the risk that claims will be processed without proper consideration of the relevant directive. [Observation not previously included in an interim report.]

---

[88] Claims Administrator's Approved Policy 160

© 2014 McGladrey LLP. All Rights Reserved.

## Vessel of Opportunity

During the course of our review of VoO claims, we noted no other observations.

## Vessel Physical Damage

### Procedures to clarify conflicting or insufficient information

During the course of our review, we noted instances where claim files contained inconsistent information within and across various forms of required documentation. Such inconsistencies indicate an elevated level of risk that the information provided, and on which the compensation award was calculated, is inaccurate. To mitigate such risk, we believe that the Program should have performed additional research and/or follow-up with the claimant, to confirm the accuracy of the information provided and enhance the integrity of the file. Specifically, we noted that, in one instance, the claimant provided two documents pertaining to the ownership of the vessel that appeared to be inconsistent. The first document, the state registration, listed two individuals as owners of the vessel. The second document, a sworn written statement signed by the claimant, asserted that the claimant owned 100% of the vessel. In accordance with the Settlement Agreement, the sworn written statement was relied upon to calculate the award amount. However, we believe that the potential variance in ownership percentage (100% vs. 50%) should have warranted further research by the claims reviewer to confirm the accuracy of the information. [Observation not previously included in an interim report.]

## Coastal Real Property

During the course of our review of Coastal claims, we noted no other observations.

## Wetlands Real Property

### Claims with multiple parcels aggregated under a single tax assessment ID

During the course of our review, we noted several Wetlands Real Property claims for compensation relating to parcels aggregated under a single tax assessment ID required significant processing time before eventually being paid. Some of these delays were the result of claimant-requested Re-reviews, Reconsiderations, or Appeals, as the original processing of the claims may not have included compensation for all lots, tracts of land, or parcels. Some of the processing delay was due to the Program's development and implementation of solutions to the various issues, which are embodied in Policies 443 and 502. In addition, outside real estate experts were retained by the Program to assist in addressing certain issues, including overlapping boundaries and conflicting ownership records, as well as updating the Wetlands Database (the Database).

As background, the Settlement Agreement requires the use of the Database. However, when lots or tracts are grouped together in a single tax assessment ID, the Database identifies them as one parcel. As a result, during the Review Period, the Database assigned a compensation amount for only one parcel regardless of the number of lots or tracts included in the tax assessment ID. Using the Database in those situations resulted in lower compensation than if the parish or county had reported each lot or tract on a separate tax assessment ID. This often prompted the claimant to request a Re-review, Reconsideration or Appeal. We noted that one claim in the sample, filed in September 2012, was for numerous lots/tracts. The claimant was compensated over the Review Period in four separate payments, with additional payments due to the claimant in excess of $1 million as of October 3, 2013, our Review Period end date. In April 2014, the Program requested that the claimant file 24 new claims in order to obtain compensation for the remaining tracts in the original claim selected for testing. This was pursuant to the two new policies referenced above that addressed these issues (Policy 443 published in September 2013 and Policy 502 published in April 2014). As of the conclusion of our field work, these additional payments had not yet been paid to this claimant.

The underlying issue is outside the control of the Claims Administrator. It is due to the manner in which certain Parishes control tax records. [Observation not previously included in an interim report.]

## Real Property Sales

### Procedures to clarify conflicting or insufficient information

In order for an RPS claimant to be eligible for benefits, they must have "owned a Residential Parcel in the Real Property Sales Compensation Zone on April 20, 2010," according to Exhibit 13A of the Settlement Agreement. We noted instances whereby the claimant's ownership percentage of the property on April 20, 2010 differed from his/her ownership percentage on the date the property was sold. Additional procedures were not consistently performed to reconcile the two different ownership percentages. [Observation not previously included in an interim report.]

### Evidence to support procedures performed

The Settlement Agreement requires that the RPS claimant provide an "official copy of the deed for the parcel for which you are seeking compensation showing that you are the owner of the parcel." When the Program received a deed that lacked a certain stamps indicating that the deed was an official copy, the Program used publicly-available websites and databases to confirm the accuracy of the information on the deed. We noted that such procedures were not documented in the claim file, resulting in an inconsistent level of documentation with respect to deeds required under the RPS Framework. [Observation not previously included in an interim report.]

© 2014 McGladrey LLP. All Rights Reserved.

### 40% Request

#### Transition payments

During our review, we noted that there were many Transition Claimants who had received a 60% payment during the Transition Period but had neither filed a claim nor requested the 40% balance due to them. As of the date of this report, the 40% residual balances due the Transition Claimants remained unpaid.

These payments are pursuant to a Transition Order filed by the Court in March 2012 that specified how claims pending with the GCCF would be processed and paid until the CSSP commenced. In June 2012, claimants were sent a letter advising them of their options, which were: 1) participate in the CSSP, 2) accept the remaining 40% of the GCCF/Transition Offer in return for a release, or 3) opt out of the CSSP, while preserving their rights to seek additional compensation.

The underlying issue is outside the control of the Claims Administrator. This was an issue of disagreement among the Parties, which was ultimately determined by an Order of the Court. [Observation not previously included in an interim report.]

#### Refund of 6% hold-back amount from 60% transition payments to claimants

Certain Transition Claimants' 60% claim payments were reduced by 6% at the time of distribution. The funds withheld were in accordance with a Court Order dated January 18, 2012. The purpose of this fund was later determined to be inconsistent with the Settlement Agreement and the hold-back amounts were directed to be refunded to applicable claimants. Some 6% refunds were made when 40% Request payments were distributed; however, the Program was directed to discontinue this practice in October 2012 and to distribute all such remaining refunds. As of the date of this report, there were 23 Transition Claimants who had not received a refund. Pending refunds total $116,842. [Observation not previously included in an interim report.]

### Zero-Paid Claims

#### Opt Out documentation

Section 8.2 of the Settlement Agreement outlines the procedures that must be followed for Economic Class Members to exclude themselves from the Economic Class ("Opt Out"). To do so, individuals are required to submit a written request. The Settlement Agreement further states that "A written request to Opt Out may not be signed by any form of electronic signature, but must be signed by a handwritten signature." During our review, we noted that the claims processing system did not contain such signed statements. Rather, the signed documentation was retained in the files of a vendor. Lack of maintenance of such documents in the claims processing system increases the risk that the documentation will not be subject to the security and retention policies of the Program, or may not be available when the Program requires it. [Observation not previously included in an interim report.]

#### Claim status in system

We noted instances whereby the claim system did not include information sufficient to ascertain the current status of the claim. Specifically, this was the case when Special Investigation Team ("SIT") reviews had been taken. The claim system portal should be a complete source of information and status on every claim. [Observation not previously included in an interim report.]

# Appendix A: Projected comparison to paid amount

As described throughout this report, all findings have been evaluated by comparing the McGladrey Calculated Award Amount to the eligibility amount, as determined by the Program, prior to any appeal (i.e. pre-appeal award amounts). Such comparisons allow the user to evaluate the effectiveness of claim processing that falls under the control of the Claims Administrator, without regard to any impact that the appeal process may have had on the final payment of the claim.

Since the amount actually paid to claimants can sometimes be determined through the appeal process – outside the control of the Claims Administrator – the approach taken throughout this report does not reflect a comparison between the McGladrey Calculated Award Amount and the amount that was ultimately paid by the CSSP. The analysis contained in this appendix makes such a comparison.

The following table summarizes the Award Calculation Findings noted in each claim category. As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in each category. Based on a 95% confidence level, the most likely over- (under-) payment and precision of Award Calculation Findings in the total population of each claim category is shown below.

| Claim category | Over- (under-) payment of claims | |
| --- | --- | --- |
| | Most likely | Precision (+/-) |
| Seafood Compensation | $ (2,451,353) | $ 27,528,244 |
| Business Economic Loss | 18,322,281 | 58,879,523 |
| Failed Business Economic Loss | (110,511) | Not determinable |
| Start-up Business Economic Loss | (3,602,909) | 3,262,418 |
| Individual Economic Loss | 318,592 | 1,134,093 |
| Individual Periodic / Festival Vendor | 0 | Not determinable |
| Subsistence | 74,476 | 756,711 |
| Vessel of Opportunity | 0 | Not determinable |
| Vessel Physical Damage | (47,259) | 819,426 |
| Coastal Real Property Damage | 1,291,280 | Not determinable |
| Wetlands Real Property Damage | 873,122 | Not determinable |
| Real Property Sales | 384,083 | Not determinable |
| 40% Request | 0 | Not determinable |
| Total | $ 15,051,802 | Not determinable |

The following table summarizes the Documentation Deficiencies noted in each claim category. As described above, we performed our procedures in a manner that would allow us to project the results of our testing to the entire population in each claim category. Based on a 95% confidence level, the most likely value of paid award amounts in the total population of each claim category with Documentation Deficiencies is shown below. In some instances, the number of findings was too small to compute a precision from the sample. With respect to claims containing Documentation Deficiencies, we draw no conclusion as to whether a Documentation Deficiency had any impact on the amount of any payment.

| Claim category | Value of paid award amounts with missing or incomplete required documentation | |
|---|---|---|
| | Most likely | Precision (+/-) |
| Seafood Compensation | $ 73,074,237 | $ 42,379,573 |
| Business Economic Loss | 433,740,559 | 116,513,879 |
| Failed Business Economic Loss | 80,000 | Not determinable |
| Start-Up Business Economic Loss | 19,820,043 | 3,361,577 |
| Individual Economic Loss | 790,364 | Not determinable |
| Individual Periodic / Festival Vendor | 0 | Not determinable |
| Subsistence | 0 | Not determinable |
| Vessel of Opportunity | 2,170,612 | Not determinable |
| Vessel Physical Damage[89] | 892,134 | 556,542 |
| Coastal Real Property Damage | 2,085,117 | Not determinable |
| Wetlands Real Property Damage[90] | 1,993,143 | 17,921,222 |
| Real Property Sales[91] | 403,403 | 6,452,428 |
| 40% Request | 0 | Not determinable |
| **Total** | $ 535,049,612 | Not determinable |

---

[89] The lower limit cannot be below $657,810, which is the actual paid value of the findings noted in our sample.
[90] The lower limit cannot be below $1,488,040, which is the actual paid value of the findings noted in our sample.
[91] The lower limit cannot be below $294,375, which is the actual paid value of the findings noted in our sample.

# Appendix B: Standards for consulting services

We performed our work in accordance with the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Consulting Services ("SSCS"). The SSCS recognizes the difference between attest services and consulting services and that different standards apply to consulting services engagements. These standards recognize that the nature of consulting services work is determined solely by the agreement between the practitioner (McGladrey LLP) and the client (DHECC), and the work is generally performed only for the use and benefit of the client. Consulting services differ fundamentally from the CPA's function of attesting to the assertions of other parties. In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter. In a consulting service, the practitioner develops the findings, conclusions, and recommendations presented. The SSCS are listed below, with a brief description as to how our approach met the respective Standard.

**Professional competence**: The review team was comprised of individuals with the knowledge, skills, and abilities necessary to execute the procedures in a quality and complete manner. All work was performed under oversight and guidance provided by the engagement partner and a project manager. The engagement partner is a Certified Public Accountant ("CPA"), Certified Fraud Examiner ("CFE"), and Project Management Professional ("PMP"). The project manager is a CPA and CFE. The claims review team consisted of a partner with extensive industry and subject matter knowledge and experience, as well as several directors, managers, supervisors, senior associates, and associates. . The team was supported by a team of IT specialists, including a director and a manager. Our approach also included review by both a quality assurance partner and risk management partner throughout various phases of the engagement.

**Due professional care:** To execute the review completely and in a quality manner, and ensure due professional care was instilled in every phase, our project included specific review requirements. Each work program required the review and approval of the engagement partner and/or claims review team partner and a team director/manager after completion of the planning and fieldwork phases. Similarly, a high level review was conducted by an additional partner during the planning and reporting phases.

**Planning and supervision:** Planning for the review was performed at the commencement of the engagement. As a result, our approach and engagement schedule was drafted and presented to DHECC points of contact, as well as other relevant stakeholders, for consensus. As needed, additional planning was performed throughout the execution of our work, and amendments to the project planning were communicated and implemented.

**Sufficient relevant data:** As part of the planning process described above, a sampling methodology was developed and applied to all claim categories, with the exception of Failed Business Economic Loss and Individual Periodic Vendors. The sampling methodology allows for a 95% confidence level, and the ability to project our findings to the respective claim category population. As part of the review approach, documents obtained for purposes of testing compliance with the Settlement Agreement were reviewed in a manner that ensured all relevant testing attributes were considered.

**Client Interest:** Our work has been performed with the integrity and objectivity required to meet the objectives of the review. Evidence of such objectivity is found in the observations noted above. Similarly, throughout our engagement, recommendations have been offered that take into consideration the organization's best interest, including the resources available to it and related risk it faces without implementation.

**Understanding with Client:** Mutual understanding of the scope of the review is included in our agreement dated October 16, 2013. During the planning phase of the engagement, our approach and any limitations were more clearly defined and communicated to DHECC points of contact. Throughout execution of the review, amendments to the approach as well as additional limitations identified were communicated to DHECC points of contact verbally or via written status reports.

© 2014 McGladrey LLP. All Rights Reserved.

**Communication with Client:** Throughout all phases of the engagement, we have communicated with DHECC points of contact regarding the scope and approach of our work. Such communication – both formal and informal – included the status of our work, any obstacles or barriers identified and the respective recovery plan, and estimates to complete. Additionally, observations identified were communicated for report writing purposes.

# Appendix C: Management's response

DHECC management has requested an opportunity to respond to the information contained within this report. The following pages include management's responses. These responses are management's opinions and are included for convenience only. The scope of our work did not include any procedures with respect to management's responses and accordingly, we offer no assessment as to the completeness or accuracy of these responses.



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## I.    Introduction

McGladrey LLP was retained by the Claims Administrator in October of 2013 to conduct a review of the organization and operation of the Court Supervised Settlement Program ("CSSP") to evaluate compliance with the terms of the Settlement Agreement. The CSSP's response to McGladrey's Claims Review Report ("Report") follows. McGladrey's Report reveals that the CSSP is processing and paying claims accurately. The Report's findings in that regard are that:

- McGladrey examined 1,852 claims totaling $741 Million.

- Of these 1,852 claims, McGladrey identified 122 claims as having calculation errors. The net value of the Award Calculation Findings is $2.1 Million.

- The value of the Award Calculation Findings in the sample amounts to an error rate of less than one-half of one percent, or approximately 0.3%.

- Even after extrapolating these findings to the entire claims population, the Report still projects an error rate of less than 1%, or approximately 0.5% ($17.5 Million in calculation errors over $3.7 Billion in awards).

McGladrey's findings, therefore, reflect that on an aggregate basis, the claims award calculations are 99.5% correct.[1] By any objective measure, these error rates are extremely low. Nevertheless, the CSSP submits this response because it disagrees with certain aspects of the Report and believes that certain aspects might be easily misinterpreted.

## II.    Background

Before discussing McGladrey's Report, it is important to briefly review how the Settlement Agreement is applied.

### A.    CSSP's Development of Policies

Section 4.3.1 of the Settlement Agreement directs the Claims Administrator to "faithfully implement and administer the Settlement, according to its terms and procedures, *for the benefit*

---

[1]    This cited error rate addresses the processing of claims at the stage prior to the settlement program's appeals process. The Settlement Agreement sets out a detailed appeals process in which BP or the claimants may appeal an award calculation and contest any errors that they believe were made in processing the claim.

*of the Economic Class,* consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." Settlement Agreement, Section 4.3.1 (emphasis added)

Section 4.3.7 of the Settlement Agreement further mandates that the Claims Administrator facilitate the claims process by:

> work[ing] with Economic Class Members... to facilitate Economic Class Members' assembly and submission of Claims Forms, *including all supporting documentation necessary to process Claims Forms* under the applicable Claims Processes. [and to] use its *best efforts* to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the *best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled* under the terms of the Agreement. (emphasis added)

As part of the implementation of the Settlement Agreement, the CSSP developed and promulgated specific policies to address potential ambiguities in the Settlement Agreement, which policies were subject to judicial review at the Parties' discretion. Importantly, the Parties have the right to object to and appeal any Policy Statement with which they disagree. Where neither Party appealed the relevant Policy Statements at the time they were implemented, the Parties are deemed to have agreed to them.

**B.    McGladrey's Scope of Work**

In its Report, McGladrey acknowledges that the scope of its work with respect to claims processing was limited to evaluating the CSSP's compliance with the Settlement Agreement and the policies issued by the Claims Administrator. Its work specifically did not extend to matters of interpretation of the Settlement Agreement. In fact, matters of interpretation of the Settlement Agreement were excluded from McGladrey's agreement with the Claims Administrator, and, if any interpretation were necessary, interpretive guidance was to be obtained from the Claims Administrator's Office ("CAO").

The CSSP believes that McGladrey's appropriate analysis was limited to the question of whether the CSSP is applying the Settlement Agreement in accordance with the interpretations and Policy Statements issued by the CAO. To the extent that McGladrey's conclusions are inconsistent with the CAO's Policy Statements and interpretations, the CSSP believes that such conclusions are contrary to and exceed the scope of McGladrey's engagement.

**C.    Financial Audit and Process Review of CSSP Prior to McGladrey's Review**

Although not required by the Settlement Agreement, the Claims Administrator initially engaged the national accounting firm CliftonLarsonAllen ("CLA") in 2012 to conduct both a Financial Audit and a Process Review regarding the CSSP's claims processing. CLA was selected to perform both in September of 2012.

CLA's process examination was split into three phases, because the CSSP claims processing system was still undergoing changes as the Program's Policy Statements were being developed to address ambiguities in the Settlement Agreement. CLA completed the first phase

and issued its report on May 17, 2013. CLA indicated an overall error rate in amounts paid by the CSSP of less than 1.0%.

BP requested in September of 2013 that the CSSP replace CLA with McGladrey to perform another review. After BP created and approved McGladrey's proposed scope of work, the Claims Administrator engaged McGladrey in October of 2013.

## III.    **Substantive Responses**

McGladrey separates its Report into three main categories: Award Calculation Findings, Documentation Deficiencies Findings, and Other Observations. As McGladrey notes in the Report, the Award Calculation Findings should not be combined with the Documentation Deficiencies Findings. The respective categories of the Report address different issues and utilize different analyses. Therefore, the CSSP has responded separately to each of the categories of findings below.

### A.    **Award Calculation Findings**

As noted above, it is apparent from the Report that the CSSP's claim processing has been extremely accurate. Of the 1,852 claims reviewed, McGladrey found that only 122 of those claims contained any errors pertaining to the award amount as calculated by the CSSP. Of those 122 claims, 46 were for amounts less than $1,000.

Out of the $741 Million worth of claims sampled for its report, McGladrey found aggregate award calculation errors of only $2.1 Million or about 0.3%. When this finding is projected to the entire population of claims, the projection still results in an error rate of less than 1.0%, or approximately 0.5% (or $17.5 Million in "award calculation errors" over $3.7 Billion in awards).

Although McGladrey's calculated error rate demonstrates that the CSSP correctly calculates final awards for virtually all claims, at least one of McGladrey's larger findings deserves further analysis. An Oyster Leaseholder claim reviewed by McGladrey was designated as not having offset prior payments made under the Gulf Coast Claims Facility ("GCCF") program. The GCCF classified this claimant's business within a Business Economic Loss category, which would not allow an offset against a claim made under the separate Seafood Compensation Program. McGladrey's proposed application of an offset would improperly require the CSSP to change the GCCF's classifications, which were made based on the GCCF's own protocols and procedures. The CSSP believes that it was correct to accept the classification as assigned by the GCCF for offset purposes.

The finding for this single claim was $1.1 Million -- which is 84% of the net award calculation errors asserted by McGladrey in the Seafood Compensation category, and 53% of the net award calculation errors asserted across all Award Calculation Findings.

### B.    **Documentation Deficiencies Findings**

McGladrey's report contains additional findings related to "Documentation Deficiencies" within the claims reviewed. It is important to note that McGladrey "draw[s] no conclusion as to

whether a Documentation Deficiency had any impact on the amount of the award." While the Documentation Deficiencies identified by McGladrey may assist the CSSP in refining its processes, the CSSP believes that attaching dollar values to those deficiencies serves no purpose. A claim's inclusion in this category of findings does not indicate that the claim was improperly paid. McGladrey reviewed the exact same claims for both the Award Calculations and the Documentation Deficiencies. The CSSP notes that any errors related to Award Calculations were quantified in the Award Calculation Findings and were not impacted by the Documentation Deficiency Findings.

Further, McGladrey's process resulted in the full value of the claim being assigned to the majority of claims for which it found a Documentation Deficiency. McGladrey did not conclude that any of these claims should or should not have been paid or whether or not these claims were over or underpaid as a result of the Documentation Deficiency. Its conclusion simply is that the CSSP should have obtained one or more additional documents (or merely additional dates on existing documents) in processing the claim. A Documentation Deficiency, therefore, should not be translated into a dollar amount, because McGladrey is not concluding that the claim calculations were wrong or that the claimant is not entitled to payment. For this reason, the CSSP believes that further extrapolation of the dollar value to all claims is meaningless.

McGladrey's conclusion is that 8.2% of the claims it reviewed contained a Documentation Deficiency. However, the majority of those deficiencies focused on two issues (financial statement creation dates and proof of ownership of oyster leaseholds), which are discussed in greater detail below. These two findings account for 116 of the 152 claims (76%) McGladrey identified as containing Documentation Deficiencies. The CSSP disagrees that these claims are deficient pursuant to the terms of the Settlement Agreement and the Policy Statements, because either the claim files contained alternative documentation that supported the award or the CSSP undertook efforts as directed by the Settlement Agreement to confirm that documentation existed to support the claim. If these two categories of deficiencies were excluded, only about 2% of claims reviewed by McGladrey across all categories would be considered to contain a Documentation Deficiency (as defined by McGladrey).

## 1.   Creation Dates for Financial Statements for BEL and SBEL Claims

The primary Documentation Deficiency noted for BEL and SBEL claims by McGladrey is the lack of a creation date relative to financial statements used in calculating the claims (70 out of a total of 74 BEL or SBEL claims identified as having a documentation deficiency). For those financial statements that did not reflect a creation date, the substantive information within the statements was verified by the accounting vendors through other means, to ensure the integrity of the financial information. McGladrey did not consider the impact of this work in its analysis. In addition, McGladrey's views regarding this Documentation Deficiency are inconsistent with the views of the two court-appointed accounting firms responsible for processing certain aspects of BEL and SBEL claims: PricewaterhouseCoopers and Postlethwaite & Netterville.

Since the date-of-creation issue relates to the timing or temporal nature of the documentation presented with the claim initially, the definition directly related to that concept in the Settlement Agreement is informative. Section 38.38 of the Settlement Agreement provides:

"Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this *shall include* all periodic financial statements regularly prepared in the ordinary course of business. *In addition*, "contemporaneous" or "contemporaneously" prepared evidence or documentation, *even if not proximate in time* to the event or occurrence to which it relates, *shall include* (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, *or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.* (emphasis added)

In the course of its audit of financial statements of the Settlement Trust for the year 2013, CLA evaluated the effect of this issue and stated:

We evaluated the creation date and alternative document requirements and determined that they did not represent <u>exclusive</u> requirements in order to process and pay a claim. Considering these factors, we considered the alternative documentation and procedures sufficient to mitigate the underlying risk and concluded this is a compliance documentation item with <u>no</u> financial impact.

Thus, CLA determined that the lack of a creation date on the face of the financial statement had <u>no</u> financial statement impact because the verification procedures employed by the CSSP worked.

Of the 48 BEL claims identified by McGladrey as involving a financial statement lacking a date of creation, 41 actually contained evidence as to the timing of the statement's preparation. And of the 22 SBEL claims identified by McGladrey, 20 contained evidence as to the timing of the financial statement preparation. This evidence includes monthly sales and use tax returns, lodging reports, excel spreadsheets, monthly real estate agent commission reports, partial creation dates, bank statements, and similar documents. And of the BEL and SBEL awards issued, neither party has ever asserted on appeal that any financial statement was deficient because it lacked a creation date. The additional data and documentation included in the claimant's files support the awards made and should not be considered a deficiency.

## 2.     Lease in Claimant File – Oyster Leaseholder Claims

To establish eligibility for the Seafood Compensation Program, the Settlement Agreement requires Oyster Leaseholder Claimants to provide certain documentation to the Claims Administrator. *See* Settlement Agreement, Exhibit 10. Of the 48 "Documentation Deficiencies" in the Seafood category identified by McGladrey, 46 concern whether a claimant's file included a lease in effect as of the date of the spill, establishing the claimant as the correct owner of the oyster leasehold. Because of the Claims Administrator's duty to assist the claimant in assembling and submitting documentation necessary to process his claim such that he has the best opportunity to be determined eligible for and receive the recovery to which the claimant is

entitled, the CSSP has accepted appropriate alternative documentation to prove that a claimant held a valid oyster lease on the day of the spill. The exceptions identified by McGladrey do not account for additional supporting documentation and Louisiana law that establish that every Oyster Leaseholder award was properly paid by the CSSP.

The CSSP believes that McGladrey's position is not supported by the Settlement Agreement or the conduct of the Parties. The CSSP relied on *all* of the documentation available to it. This documentation included acts of sale, judgments of possession, rental receipts that showed the claimant was the owner for years before and following the spill, and research through a database maintained by the State of Louisiana. As such, the CSSP is confident that the claims were paid to the holder of the lease at the time of the spill.

### a.    Alternative Documentation Available in the Claimant's File

Oyster leases are issued by the State of Louisiana and are automatically renewed every fifteen years unless the leaseholder chooses not to renew the lease or fails to make the annual rental payment. For each of the oyster leaseholder exceptions noted by McGladrey, by the time the claim was processed the CSSP had either (1) a renewal lease dated after April 20, 2010; (2) a judgment of possession placing the claimant in possession of the lease prior to April 20, 2010; (3) a transfer of title to the leaseholder claimant dated prior to April 20, 2010; or (4) a copy of the lease that expired prior to April 20, 2010. By the time the claim was processed, the CSSP also had renewal receipts for the same leasehold, issued to the same leaseholder, in the years prior to and following the Spill. The renewal receipts were provided by the claimant or obtained through a publicly available website maintained by the Louisiana Department of Wildlife and Fisheries ("LDWF").

A comparison of the title or lease documents contained in the claimant file with the renewal receipts closes any "gap" that McGladrey identified and clearly establishes (1) the chain of title of the leasehold and (2) that the claimant was the lessee of record on April 20, 2010. Further, neither party has ever asserted on appeal any objection on this basis as to these awards to Oyster Leaseholder Claimants.

The vendors regularly vet leasehold ownership information derived from payment receipts against the information in the claimant files and the LDWF website. The claim reviewer and the team lead independently verify any potential discrepancy in leasehold ownership before completing the claim review. The verification process supports a finding that every Oyster Leaseholder Claim has been properly paid.

### b.    The CSSP Has Obtained a Lease for Every "Documentation Deficiency" Finding

There are in fact written leases that confirm the leasehold ownership rights as determined by the CSSP through the process described above. When McGladrey raised this Documentation Deficiency issue to the CSSP, the CSSP sought to further address the underlying concern by obtaining additional independent evidence as to the ownership of the leasehold rights. For leases that McGladrey identified as missing from the 46 claims, the CSSP obtained a certified copy of the lease from the LDWF that was in effect at the time of the spill. Every lease obtained verifies

(1) that the CSSP paid the Oyster Leaseholder award to the owner of the lease and (2) that the claimant was the leaseholder at the time of the spill.  Such documents confirm that the awards had in fact been paid to the correct owners of the leasehold interests.

## C.    Other Observations

McGladrey's Report refers to Other Observations relating to process improvements, internal controls, and other matters of the CSSP.  McGladrey acknowledges that the CAO's ability to implement the recommendations may be limited by the terms of the Settlement Agreement.  The CAO will take McGladrey's Observations under advisement and address them with the Parties and the vendors.  To the extent that the Other Observations can be addressed in a manner that complies with the Settlement Agreement, benefit the Program, are agreed to by the Parties, and have not already been implemented, the CAO will take appropriate action.

**The Court Supervised Settlement Program**

www.mcgladrey.com

McGladrey LLP is the leading U.S. provider of assurance, tax and consulting
services focused on the middle market, with more than 7,000 people in 75 cities
nationwide. McGladrey is a licensed CPA firm and serves clients around the
world through RSM International, a global network of independent assurance,
tax and consulting firms. McGladrey uses its deep understanding of the needs
and aspirations of clients to help them succeed.

For more information, visit www.mcgladrey.com, like us on Facebook at
McGladrey News, follow us on Twitter @McGladrey and/or connect with us on
LinkedIn.

© 2014 McGladrey LLP. All Rights Reserved.

