

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

I. <u>**Introduction**</u>

McGladrey LLP was retained by the Claims Administrator in October of 2013 to conduct a review of the organization and operation of the Court Supervised Settlement Program ("CSSP") to evaluate compliance with the terms of the Settlement Agreement. The CSSP's response to McGladrey's Claims Review Report ("Report") follows. McGladrey's Report reveals that the CSSP is processing and paying claims accurately. The Report's findings in that regard are that:

- McGladrey examined 1,852 claims totaling $741 Million.

- Of these 1,852 claims, McGladrey identified 122 claims as having calculation errors. The net value of the Award Calculation Findings is $2.1 Million.

- The value of the Award Calculation Findings in the sample amounts to an error rate of less than one-half of one percent, or approximately 0.3%.

- Even after extrapolating these findings to the entire claims population, the Report still projects an error rate of less than 1%, or approximately 0.5% ($17.5 Million in calculation errors over $3.7 Billion in awards).

McGladrey's findings, therefore, reflect that on an aggregate basis, the claims award calculations are 99.5% correct.[1] By any objective measure, these error rates are extremely low. Nevertheless, the CSSP submits this response because it disagrees with certain aspects of the Report and believes that certain aspects might be easily misinterpreted.

II. <u>**Background**</u>

Before discussing McGladrey's Report, it is important to briefly review how the Settlement Agreement is applied.

A. <u>**CSSP's Development of Policies**</u>

Section 4.3.1 of the Settlement Agreement directs the Claims Administrator to "faithfully implement and administer the Settlement, according to its terms and procedures, *for the benefit*

---

[1] This cited error rate addresses the processing of claims at the stage prior to the settlement program's appeals process. The Settlement Agreement sets out a detailed appeals process in which BP or the claimants may appeal an award calculation and contest any errors that they believe were made in processing the claim.

*of the Economic Class,* consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." Settlement Agreement, Section 4.3.1 (emphasis added)

Section 4.3.7 of the Settlement Agreement further mandates that the Claims Administrator facilitate the claims process by:

> work[ing] with Economic Class Members... to facilitate Economic Class Members' assembly and submission of Claims Forms, *including all supporting documentation necessary to process Claims Forms* under the applicable Claims Processes. [and to] use its *best efforts* to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the *best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled* under the terms of the Agreement. (emphasis added)

As part of the implementation of the Settlement Agreement, the CSSP developed and promulgated specific policies to address potential ambiguities in the Settlement Agreement, which policies were subject to judicial review at the Parties' discretion. Importantly, the Parties have the right to object to and appeal any Policy Statement with which they disagree. Where neither Party appealed the relevant Policy Statements at the time they were implemented, the Parties are deemed to have agreed to them.

### B. McGladrey's Scope of Work

In its Report, McGladrey acknowledges that the scope of its work with respect to claims processing was limited to evaluating the CSSP's compliance with the Settlement Agreement and the policies issued by the Claims Administrator. Its work specifically did not extend to matters of interpretation of the Settlement Agreement. In fact, matters of interpretation of the Settlement Agreement were excluded from McGladrey's agreement with the Claims Administrator, and, if any interpretation were necessary, interpretive guidance was to be obtained from the Claims Administrator's Office ("CAO").

The CSSP believes that McGladrey's appropriate analysis was limited to the question of whether the CSSP is applying the Settlement Agreement in accordance with the interpretations and Policy Statements issued by the CAO. To the extent that McGladrey's conclusions are inconsistent with the CAO's Policy Statements and interpretations, the CSSP believes that such conclusions are contrary to and exceed the scope of McGladrey's engagement.

### C. Financial Audit and Process Review of CSSP Prior to McGladrey's Review

Although not required by the Settlement Agreement, the Claims Administrator initially engaged the national accounting firm CliftonLarsonAllen ("CLA") in 2012 to conduct both a Financial Audit and a Process Review regarding the CSSP's claims processing. CLA was selected to perform both in September of 2012.

CLA's process examination was split into three phases, because the CSSP claims processing system was still undergoing changes as the Program's Policy Statements were being developed to address ambiguities in the Settlement Agreement. CLA completed the first phase

and issued its report on May 17, 2013. CLA indicated an overall error rate in amounts paid by the CSSP of less than 1.0%.

BP requested in September of 2013 that the CSSP replace CLA with McGladrey to perform another review. After BP created and approved McGladrey's proposed scope of work, the Claims Administrator engaged McGladrey in October of 2013.

### III. Substantive Responses

McGladrey separates its Report into three main categories: Award Calculation Findings, Documentation Deficiencies Findings, and Other Observations. As McGladrey notes in the Report, the Award Calculation Findings should not be combined with the Documentation Deficiencies Findings. The respective categories of the Report address different issues and utilize different analyses. Therefore, the CSSP has responded separately to each of the categories of findings below.

#### A. Award Calculation Findings

As noted above, it is apparent from the Report that the CSSP's claim processing has been extremely accurate. Of the 1,852 claims reviewed, McGladrey found that only 122 of those claims contained any errors pertaining to the award amount as calculated by the CSSP. Of those 122 claims, 46 were for amounts less than $1,000.

Out of the $741 Million worth of claims sampled for its report, McGladrey found aggregate award calculation errors of only $2.1 Million or about 0.3%. When this finding is projected to the entire population of claims, the projection still results in an error rate of less than 1.0%, or approximately 0.5% (or $17.5 Million in "award calculation errors" over $3.7 Billion in awards).

Although McGladrey's calculated error rate demonstrates that the CSSP correctly calculates final awards for virtually all claims, at least one of McGladrey's larger findings deserves further analysis. An Oyster Leaseholder claim reviewed by McGladrey was designated as not having offset prior payments made under the Gulf Coast Claims Facility ("GCCF") program. The GCCF classified this claimant's business within a Business Economic Loss category, which would not allow an offset against a claim made under the separate Seafood Compensation Program. McGladrey's proposed application of an offset would improperly require the CSSP to change the GCCF's classifications, which were made based on the GCCF's own protocols and procedures. The CSSP believes that it was correct to accept the classification as assigned by the GCCF for offset purposes.

The finding for this single claim was $1.1 Million -- which is 84% of the net award calculation errors asserted by McGladrey in the Seafood Compensation category, and 53% of the net award calculation errors asserted across all Award Calculation Findings.

#### B. Documentation Deficiencies Findings

McGladrey's report contains additional findings related to "Documentation Deficiencies" within the claims reviewed. It is important to note that McGladrey "draw[s] no conclusion as to

whether a Documentation Deficiency had any impact on the amount of the award." While the Documentation Deficiencies identified by McGladrey may assist the CSSP in refining its processes, the CSSP believes that attaching dollar values to those deficiencies serves no purpose. A claim's inclusion in this category of findings does not indicate that the claim was improperly paid. McGladrey reviewed the exact same claims for both the Award Calculations and the Documentation Deficiencies. The CSSP notes that any errors related to Award Calculations were quantified in the Award Calculation Findings and were not impacted by the Documentation Deficiency Findings.

Further, McGladrey's process resulted in the full value of the claim being assigned to the majority of claims for which it found a Documentation Deficiency. McGladrey did not conclude that any of these claims should or should not have been paid or whether or not these claims were over or underpaid as a result of the Documentation Deficiency. Its conclusion simply is that the CSSP should have obtained one or more additional documents (or merely additional dates on existing documents) in processing the claim. A Documentation Deficiency, therefore, should not be translated into a dollar amount, because McGladrey is not concluding that the claim calculations were wrong or that the claimant is not entitled to payment. For this reason, the CSSP believes that further extrapolation of the dollar value to all claims is meaningless.

McGladrey's conclusion is that 8.2% of the claims it reviewed contained a Documentation Deficiency. However, the majority of those deficiencies focused on two issues (financial statement creation dates and proof of ownership of oyster leaseholds), which are discussed in greater detail below. These two findings account for 116 of the 152 claims (76%) McGladrey identified as containing Documentation Deficiencies. The CSSP disagrees that these claims are deficient pursuant to the terms of the Settlement Agreement and the Policy Statements, because either the claim files contained alternative documentation that supported the award or the CSSP undertook efforts as directed by the Settlement Agreement to confirm that documentation existed to support the claim. If these two categories of deficiencies were excluded, only about 2% of claims reviewed by McGladrey across all categories would be considered to contain a Documentation Deficiency (as defined by McGladrey).

1. **Creation Dates for Financial Statements for BEL and SBEL Claims**

The primary Documentation Deficiency noted for BEL and SBEL claims by McGladrey is the lack of a creation date relative to financial statements used in calculating the claims (70 out of a total of 74 BEL or SBEL claims identified as having a documentation deficiency). For those financial statements that did not reflect a creation date, the substantive information within the statements was verified by the accounting vendors through other means, to ensure the integrity of the financial information. McGladrey did not consider the impact of this work in its analysis. In addition, McGladrey's views regarding this Documentation Deficiency are inconsistent with the views of the two court-appointed accounting firms responsible for processing certain aspects of BEL and SBEL claims: PricewaterhouseCoopers and Postlethwaite & Netterville.

Since the date-of-creation issue relates to the timing or temporal nature of the documentation presented with the claim initially, the definition directly related to that concept in the Settlement Agreement is informative. Section 38.38 of the Settlement Agreement provides:

"Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this *shall include* all periodic financial statements regularly prepared in the ordinary course of business. *In addition*, "contemporaneous" or "contemporaneously" prepared evidence or documentation, *even if not proximate in time* to the event or occurrence to which it relates, *shall include* (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, *or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.* (emphasis added)

In the course of its audit of financial statements of the Settlement Trust for the year 2013, CLA evaluated the effect of this issue and stated:

> We evaluated the creation date and alternative document requirements and determined that they did not represent <u>exclusive</u> requirements in order to process and pay a claim. Considering these factors, we considered the alternative documentation and procedures sufficient to mitigate the underlying risk and concluded this is a compliance documentation item with <u>no</u> financial impact.

Thus, CLA determined that the lack of a creation date on the face of the financial statement had <u>no</u> financial statement impact because the verification procedures employed by the CSSP worked.

Of the 48 BEL claims identified by McGladrey as involving a financial statement lacking a date of creation, 41 actually contained evidence as to the timing of the statement's preparation. And of the 22 SBEL claims identified by McGladrey, 20 contained evidence as to the timing of the financial statement preparation. This evidence includes monthly sales and use tax returns, lodging reports, excel spreadsheets, monthly real estate agent commission reports, partial creation dates, bank statements, and similar documents. And of the BEL and SBEL awards issued, neither party has ever asserted on appeal that any financial statement was deficient because it lacked a creation date. The additional data and documentation included in the claimant's files support the awards made and should not be considered a deficiency.

2.   **Lease in Claimant File – Oyster Leaseholder Claims**

To establish eligibility for the Seafood Compensation Program, the Settlement Agreement requires Oyster Leaseholder Claimants to provide certain documentation to the Claims Administrator. *See* Settlement Agreement, Exhibit 10. Of the 48 "Documentation Deficiencies" in the Seafood category identified by McGladrey, 46 concern whether a claimant's file included a lease in effect as of the date of the spill, establishing the claimant as the correct owner of the oyster leasehold. Because of the Claims Administrator's duty to assist the claimant in assembling and submitting documentation necessary to process his claim such that he has the best opportunity to be determined eligible for and receive the recovery to which the claimant is

entitled, the CSSP has accepted appropriate alternative documentation to prove that a claimant held a valid oyster lease on the day of the spill. The exceptions identified by McGladrey do not account for additional supporting documentation and Louisiana law that establish that every Oyster Leaseholder award was properly paid by the CSSP.

The CSSP believes that McGladrey's position is not supported by the Settlement Agreement or the conduct of the Parties. The CSSP relied on *all* of the documentation available to it. This documentation included acts of sale, judgments of possession, rental receipts that showed the claimant was the owner for years before and following the spill, and research through a database maintained by the State of Louisiana. As such, the CSSP is confident that the claims were paid to the holder of the lease at the time of the spill.

### a. Alternative Documentation Available in the Claimant's File

Oyster leases are issued by the State of Louisiana and are automatically renewed every fifteen years unless the leaseholder chooses not to renew the lease or fails to make the annual rental payment. For each of the oyster leaseholder exceptions noted by McGladrey, by the time the claim was processed the CSSP had either (1) a renewal lease dated after April 20, 2010; (2) a judgment of possession placing the claimant in possession of the lease prior to April 20, 2010; (3) a transfer of title to the leaseholder claimant dated prior to April 20, 2010; or (4) a copy of the lease that expired prior to April 20, 2010. By the time the claim was processed, the CSSP also had renewal receipts for the same leasehold, issued to the same leaseholder, in the years prior to and following the Spill. The renewal receipts were provided by the claimant or obtained through a publicly available website maintained by the Louisiana Department of Wildlife and Fisheries ("LDWF").

A comparison of the title or lease documents contained in the claimant file with the renewal receipts closes any "gap" that McGladrey identified and clearly establishes (1) the chain of title of the leasehold and (2) that the claimant was the lessee of record on April 20, 2010. Further, neither party has ever asserted on appeal any objection on this basis as to these awards to Oyster Leaseholder Claimants.

The vendors regularly vet leasehold ownership information derived from payment receipts against the information in the claimant files and the LDWF website. The claim reviewer and the team lead independently verify any potential discrepancy in leasehold ownership before completing the claim review. The verification process supports a finding that every Oyster Leaseholder Claim has been properly paid.

### b. The CSSP Has Obtained a Lease for Every "Documentation Deficiency" Finding

There are in fact written leases that confirm the leasehold ownership rights as determined by the CSSP through the process described above. When McGladrey raised this Documentation Deficiency issue to the CSSP, the CSSP sought to further address the underlying concern by obtaining additional independent evidence as to the ownership of the leasehold rights. For leases that McGladrey identified as missing from the 46 claims, the CSSP obtained a certified copy of the lease from the LDWF that was in effect at the time of the spill. Every lease obtained verifies

(1) that the CSSP paid the Oyster Leaseholder award to the owner of the lease and (2) that the claimant was the leaseholder at the time of the spill. Such documents confirm that the awards had in fact been paid to the correct owners of the leasehold interests.

### C. <u>Other Observations</u>

McGladrey's Report refers to Other Observations relating to process improvements, internal controls, and other matters of the CSSP. McGladrey acknowledges that the CAO's ability to implement the recommendations may be limited by the terms of the Settlement Agreement. The CAO will take McGladrey's Observations under advisement and address them with the Parties and the vendors. To the extent that the Other Observations can be addressed in a manner that complies with the Settlement Agreement, benefit the Program, are agreed to by the Parties, and have not already been implemented, the CAO will take appropriate action.

**The Court Supervised Settlement Program**