UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION J |
| | * | JUDGE CARL J. BARBIER |
| | * | MAGISTRATE JUDGE SHUSHAN |

## FIRST REPORT BY THE AUDIT COMMITTEE

TO THE HONORABLE CARL J. BARBIER, UNITED STATES DISTRICT JUDGE:

The Audit Committee (Committee) of the Deepwater Horizon Economic and Property Settlement Agreement (Settlement Agreement) submits this initial Report to inform the Court generally of the actions of the Committee taken to date, and to inform the Court of its initial review of financial reports filed by two accounting and consulting firms, which are being presented to the Court by the Claims Administrator.

The members of the Committee were appointed by court order on April 16, 2014. Subsequent to creation and appointment the Committee has met on at least a monthly basis to become familiar with the Settlement Agreement and the operations of the Claims Administrator's Office. On June 17, 2014, the Committee formally adopted its Charter and has been functioning in conformity therewith and intends to do so in the future. With

1

recommendation of the Committee, the Claims Administrator has upgraded its internal audit function by hiring an experienced senior-level Director of Internal Auditing.

Over the past four months the members of the Committee have received two sets of reports from the professional financial advisors retained by the DHECC prior to our appointment as an independent audit committee. In July we received reports from Clifton Larson Allen ("CLA") who served as *external* financial statement auditors for the calendar years ending December 31, 2013 and 2012. In November, we received process audit reports from McGladrey pursuant to a consulting contract entered into on October 16, 2013. The Audit Committee has had the benefit of full presentations (in-person) by representatives of CLA and McGladrey of their reports and full opportunity to question the representatives (with and without management present) so the Committee could more fully and better understand the reports, the recommendations, and management responses.

Significantly, these two advisors reported under different standards: CLA reported under *auditing standards* which require that the firm perform sufficient procedures to form an opinion on the fairness of the financial information contained in the financial statements, while McGladrey reported under *consulting standards* which require only the development of findings, conclusions, and recommendations determined by them to be pertinent to the objectives defined in the approved scope of work. This distinction in the reporting standards is significant to properly interpret the interrelationship between the reports submitted by the two advisors.

McGladrey's process audit reports under its consulting contract have been most helpful in refining procedures at the DHECC, and will be relied upon by the Audit Committee in our role

of monitoring management responses and remediation, and meeting our other duties. At the initial implementation of the Settlement Agreement, the Claims Administration Office (CAO) did not have the luxury of a lengthy period to methodically plan and ramp-up its operation, but instead they began operations on short notice using the systems and procedures available within the court-appointed vendors. Procedures to upgrade and refine these processes to provide greater accuracy, efficiency, and fraud detection capabilities were being identified and implemented simultaneously while the processing of claims was ongoing—in order not to unduly delay claims payment. The final reports from McGladrey identify a number of remaining process issues that are in various stages of implementation by the CAO. While these issues are certainly worthy of management attention, none of the issues identified by McGladrey for follow up and monitoring were characterized as material weaknesses or significant deficiencies in internal controls by CLA in the course of their audit reports. Nor is there any suggestion that management has not been responsive to issues it is required to address.

The area of claims payment is of primary importance to the Settlement Agreement and the Court, and both McGladrey and CLA tested this area thoroughly using sophisticated statistical sampling procedures. However, McGladrey's process audit reports provide detail information that could be misinterpreted if taken out of context, if interpreted in isolation from one another, or if otherwise misunderstood. The members of the Audit Committee concluded that it would be beneficial to the Court for us to provide our perspective on the context of these process audit reports on the claims payment process.

Page 7 of the McGladrey Claims Review Report states a useful distinction between two types of sample deviations identified in their statistical samples:

- Award Calculation Findings—representing monetary errors in calculating awards payable under the guidelines of the Settlement Agreement, and

- Documentation Deficiencies—representing claims that have one or more missing or incomplete document requirements.

McGladrey appropriately advises that "due to the differing nature and possible overlap of the two types of findings described above, their results cannot be combined. As such we have separately projected the two categories of findings." The projection of identified errors in award calculations is contained on page 9 of the report and the projection of documentation deficiencies is contained on page 32 of their report.

**<u>Documentation Deficiencies</u>**

Because the McCladrey process audit uses the Settlement Agreement as the standard against which it audits (unlike an internal or external financial audit, a forensic accounting audit, a fraud audit, or a procedures audit, each of which concentrate on assessing compliance with national standards, internal rules or procedures or discovery of fraud or abuse), it is appropriate to consider portions of the Settlement Agreement deemed relevant by the Audit Committee.

By way of brief perspective as the Court well knows, Section 4 of the Settlement Agreement addresses "Implementation of the Settlement." Section 4.3.7 places a clear duty on

4

the Claims Administrator and his employees to facilitate the claims process by "... work[ing] with Economic Class Members ... to facilitate Economic Class Members' assembly and submission of Claims Forms, *including all supporting documentation* necessary to process Claim Forms under the applicable Claims Processes... [and to] use its best efforts to provide Economic Class Members with assistance, information, *opportunities* and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement" (emphasis and brackets added). This plain language appears to the Audit Committee to be an affirmative statement that undue rigidity in meeting the standards regarding documentation set forth in the Settlement Agreement is not contemplated.

Section 4.4.7 further addresses the notion of reasonable flexibility in reviewing claims. "... [T]he Claims Administrator shall explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, without changing Claims criteria." Documentation "deficiencies" that are determined not to change "criteria" would not appear to be prohibited, nor would they disqualify a claim from payment. Thus, the Audit Committee reads the Settlement Agreement not to contemplate rigidity in documentation that is not probative of the *purpose* of the documentation, and further affirmatively encourages the Claims Administrator to develop "streamlined procedures."

Since the major documentation issues relate to the timing or temporal nature of the documentation presented with the claim, the related definitions which address the nature of supporting documentation (and corrective activity) in the Settlement Agreement is also

informative. In Section 38.38 "Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean *documents or other evidence* generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business. In addition, "contemporaneous" or "contemporaneously" prepared *evidence* or *documentation*, even if not proximate in time to the event or occurrence to which it relates, shall include (1) *documentation* that is based on or derived from *other data, information, or business records* created at or about the time of the event, occurrence or item in question, (2) a statement that is *consistent with documentation* created at or about the time of the event, occurrence or item in question, or (3) would support a *reasonable inference* that such event, occurrence, or *other item in question actually occurred* (emphasis added)."

Of course, the Audit Committee fully and respectfully recognizes that ultimate interpretation of these issues is for the Court. They are brought to the Court's attention only because the Committee believes they provide independent and additional guidance and perspective for its assessment of the "documentation deficiencies" discussion.

In identifying documentation deficiencies McGladrey took an exceptionally strict and narrow interpretation of compliance with the Settlement Agreement. On page 2 of their report they state that "…our scope and procedures were intended to specifically exclude matters of interpretation of the Settlement Agreement…Further, the objective of our review focused on compliance with the Settlement Agreement, and not the materiality of our findings relative to any financial statement presentation." Because of this restrictive focus, McGladrey made no

6

effort to identify alternative procedures that may have been employed by the claims reviewer to mitigate the risks which the documentation requirement were apparently intended to address (as we note briefly above we believe the Settlement Agreement contemplates, if not requires, the Claims Administrator to seek assurance through alternative sources ). Nor did they make any effort to differentiate the relative significance of individual documentation deficiencies (*e.g.*, the failure of a spouse to sign a required document or a missing power of attorney when a claim was filed by an attorney on behalf of a claimant). The formal or minor deficiencies were considered of equal significance and weight to, for example, a material missing sales tax return. Where such omissions or deficiencies were identified, the *entire claim* was considered "deficient" for purposes of evaluation on pages 31 and 32, although McGladrey clearly notes on page 32 that, "[w]*e draw no conclusion as to whether a Documentation Deficiency had any impact on the amount of the award*" (emphasis added). Yet these "deficiencies" were used to calculate a "most likely pre-appeal award amount," which we question can be accurately done within the scope of a process audit without performing a forensic accounting audit.

In their sample of 1,852 claims, McGladrey identified documentation deficiencies (subject to the narrow definition described above) in 8.2% of the claims. While acknowledging that such deficiencies may have had no relevance to the award amount they estimated the monetary value of such deficient claims at 14.4% of the total population of $3.7 billion. More than 90% of the projected claims with deficiencies pertain to two particular types of deficiencies: (i) the absence of a clearly indicated creation date for the financial statements submitted with the claims and (ii) copies of oyster leases for certain seafood compensation claims. As noted above, the Committee reads the Settlement Agreement to encourage (if not require) flexibility on the

part of the CAO in resolving documentation issues for claimants; and in the case of these two documentation deficiencies identified alternative procedures were used by the CAO to establish the legitimacy of such claims, although McGladrey (understandably in light of their understanding of their limited scope engagement) *excluded any consideration of the adequacy of such alternative procedures.*

These explicit documentation deficiencies were addressed by CLA in conjunction with their external audit of the 2013 financial statements. After a review and testing of the alternative procedures, CLA stated in their Management Letter dated July 22, 2014, that in reference to both creation dates for statements and oyster lease issues, "[c]onsidering these factors, we considered the alternative documentation and procedures sufficient to mitigate the underlying risk and concluded that this is a compliance documentation item with no financial impact." The members of the Audit Committee agree with the conclusions of CLA as to the availability and adequacy of alternative procedures in these two categories. While the Committee came to its conclusions independently, a further discussion of these two types of documentation exceptions is included in "Management's Response" to McGladrey's Claims Review Report in Appendix C.

**Award Calculation Findings**

While the Audit Committee considers documentation issues to be important, and management has continued to recognize its responsibility to comply with the Settlement Agreement, the members of the Committee believe that far more significant weight should be given to the findings related to the accuracy of award calculations as summarized on pages 8 and 9 of the McGladrey report. After testing 1,852 claims totaling $741 million, McGladrey identified monetary errors of only $2.1 million representing .28% of the total population. When

projected to the entire population using statistical sampling techniques the projected error is less than 0.5%. The initial view of the Audit Committee is that given the number of claims in the tested population (over 53,000), the multiple types of businesses and individuals involved as claimants, the varying degrees of sophistication of the underlying supporting documentation and the inherent complexity of the Settlement Agreement, a monetary error rate of less than 1 or 2% is a significant accomplishment.

In the introduction to its report on page 1 McGladrey stated, "[i]n addition, through substantive compliance testing, we evaluated whether the CSSP has an appropriate and effective system of controls over the assessment and processing of claims in accordance with the Settlement Agreement, as evidenced by processing accuracy." Based on the projected error rates of less than 0.5%, the members of the Audit Committee agree that this standard ("an appropriate and effective system of controls") has been met. Moreover, these findings on award calculations are consistent with the finding of CLA's independent audit procedures which also used sophisticated statistical sampling techniques. CLA's testing covered all claims awarded in calendar year 2013. In its Management Letter dated July 22, 2014, CLA reported the following concerning errors identified in claims payments:

"In those cases in which monetary errors were identified, such errors were extrapolated and evaluated using established statistical sampling methodology. The statistically estimated error in monetary terms was within the range of precision included in our sample design and consequently, an adjustment to the claims related accounts in the financial statements was not considered necessary. *The financial implications of such identified errors were judged to be immaterial to the financial statements*" (emphasis added).

9

The goal of any financial control system is to provide reasonable, but not absolute, assurance that errors will not occur in amounts that would be significant. Based on the reports of both Clifton Larson Allen and McGladrey, the Committee concludes that such goals were being met during the period of review.

Of course, the Audit Committee recognizes it obligation to continue to perform the functions expected of it by the Court, including continuing review of the issues raised by the audit and consulting reports. A meeting in December is scheduled to expressly address management responses to the reports, along with the Committee's other ongoing duties.

**RESPECTFULLY SUBMITTED** this 17th day of November, 2014.

For the Committee:

*/s/ Raymond Lamonica*
P. Raymond Lamonica, chairman

Lloyd A. Tate, member
D. Larry Crumbley, member

Certificate

This First Report of Audit Committee has been provided to counsel for the Claims Administrator by facsimile transmission for filing with the Court and service on other parties as deemed proper this 17th day of November, 2014.

*/s/ PR Lamonica*
P. Raymond Lamonica