# EXHIBIT 8

## to

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF (1) ITS MOTION *IN LIMINE* TO ADMIT EVIDENCE PERTAINING TO ANADARKO'S CONTENTIONS CONCERNING NON-OPERATORS AND (2) IN OPPOSITION TO ANADARKO'S MOTION TO ENFORCE THE COURT'S ORDER EXCLUDING CULPABILITY EVIDENCE AGAINST ANADARKO**

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL        )    MDL NO. 2179
     by the OIL RIG,          )
 4   DEEPWATER HORIZON in      )    SECTION "J"
     the GULF OF MEXICO,       )
 5   April 20, 2010            )    JUDGE BARBIER
                               )
 6                             )    MAG.  JUDGE
                               )    SHUSHAN
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21            Videotaped and oral deposition
22   of DAVID SUNDING, taken at Pan-American
23   Building, 601 Poydras Street, 11th Floor, New
24   Orleans, Louisiana, 70130, on the 30th of
25   October, 2014.
```

1      VIDEOGRAPHER:   The date is October the

2   30th, 2014.   The time is 8:24 a.m. This is

3   the video deposition of David Sunding in

4   regards to the oil spill by the oil rig

5   DEEPWATER HORIZON in the Gulf of Mexico on

6   April 20th, 2010.

7                    DAVID SUNDING,

8   having been first duly sworn, testified as

9   follows:

10                   EXAMINATION

11   BY MS. HARVEY:

12      Q.     Good morning, Dr. Sunding.   My

13   name is Judy Harvey.   I'm with the Department

14   of Justice.   This is my colleague, Nancy

15   Flickinger, and Rachel king.   And you met

16   Mr. Mason.

17            And I just wanted to start off

18   with a few instructions.   Just remember for

19   the court reporter to give verbal answers to

20   the questions.   And let's try not to

21   interrupt each other through the -- through

22   the deposition.   I tend to talk pretty

23   quickly.   So if, for some reason, you've

24   misheard what I said or you don't understand

25   the question, please ask me to rephrase.   If

1  Water Act, the penalty liability is also

2  strict liability, right?  Are you aware?

3      A.    That's consistent with my

4  understanding.

5      Q.    Okay.  And are you aware that

6  the Clean Water Act in assessing a penalty

7  also accounts for the magnitude of harm by

8  the possibility of penalties on a per barrel

9  basis?

10     A.    Yes.  And I'm aware that the

11  seriousness of the violation, which is

12  related to what you're talking about, is one

13  of the so-called gravity factors.

14     Q.    Okay.  And in this section about

15  the -- the federal law, you cite some of the

16  legislative history; is that right?

17     A.    Yes.

18     Q.    Okay.  And did you conduct a

19  legislative history review?

20     A.    You know, I -- so I did -- I did

21  look to see if there was anything I could

22  find -- I'm not a lawyer, so I can't do a

23  legislative history review the way an

24  attorney might do.  But I did think it was

25  interesting to go back and see if I could

1   find anything that anybody said around the

2   time that OPA was enacted that would bear on

3   what Congress was trying to accomplish with

4   these provisions.

5       Q.      And other than the specific

6   citations to the legislative history that you

7   include in this section, did you look at any

8   other legislative history about the Clean

9   Water Act, Section 311, or OPA?

10      A.      I think I saw some other things

11  on the -- the Internet, a few other

12  quotations.  But the -- the main thing that I

13  drew from that research is included here,

14  which is that the penalties are intended to

15  punish and deter.

16      Q.      Did you -- you said you found

17  something else in an Internet research.  Did

18  you include that particular piece of

19  legislative history in your considered

20  materials?

21      A.      I didn't rely on it, no.

22      Q.      Right.  But did you -- your list

23  is a list of your considered materials --

24      A.      Right.

25      Q.      -- which includes anything that

1    you looked at --

2           A.      Right.

3           Q.      -- in forming your opinion.  And

4    what I'm asking is whether or not that piece

5    of legislative history is on your considered

6    list.

7           A.      I don't know if it's on there or

8    not.

9           Q.      Okay.  In your review of the

10   legislative history, are you aware of

11   anything in which a member of Congress

12   specifically mentioned optimal deterrence?

13          A.      No, I don't remember seeing that

14   phrase.

15          Q.      And same with -- there was no

16   mention in the legislative history that you

17   reviewed of absolute deterrence?

18          A.      Well, no, not -- not the use of

19   that -- that's a term of art to economists,

20   not the use of those -- those two words

21   together.

22          Q.      Okay.  And --

23          A.      But -- but the -- but the review

24   that I did do is consistent with the notion

25   that -- that absolute deterrence is what's

1    trying to be achieved.  And I think that's

2    consistent with other parts of the Clean

3    Water Act.

4         Q.    But you, in your review, saw no

5    cite to economic theories in the legislative

6    history?

7         A.    No.  No.  I didn't see anybody

8    citing Posner or anything like that.

9         Q.    And in looking at the

10   legislative history documents, did you review

11   anything in which a member of Congress

12   expressed a concern about a potential for

13   overdeterrence?

14        A.    I don't remember seeing a

15   statement about that, although I think there

16   are notions -- the idea that there is a

17   concern about overdeterrence, I think, is

18   implicit in some of the penalties factors;

19   but I didn't see a statement about

20   overdeterrence.

21        Q.    In the legislative history?

22        A.    It -- not that I recall.  There

23   may have been a statement about, you know,

24   not wanting to put somebody out of business;

25   but beyond that, I -- I really can't think of

1    any specifics.

2         Q.      And such a -- anything you

3    reviewed would be within -- contained within

4    your report and these citations here, right,

5    on the legislative history that you

6    considered in forming your opinion, correct?

7         A.      It should be.

8         Q.      In fact, when Congress passed

9    OPA in 1990, it also increased penalties in

10   the civil -- in the -- increased Clean Water

11   Act civil penalties for oil spills.  Are you

12   aware of that fact, that these happened at

13   the same time?

14        A.      Yes, that's my understanding.

15        Q.      And that as part of that

16   package, it added the per barrel provision to

17   Section 311(b)?

18        A.      Yes, I'm aware of that.

19        Q.      Okay.  And that it had a broader

20   standard for gross negligence when the

21   package was passed?

22        A.      I don't remember that.

23        MR. LOTTERMAN:  Object to form.

24        A.      I don't remember that.

25        Q.      Okay.  As part of your work in

1    this case or, specifically, in determining

2    whether or not -- or the purpose of federal

3    law, did you review any cases, other than

4    what we've talked about earlier at Citgo and

5    the materials in this case?

6            MR. LOTTERMAN:  Object to form.

7            A.    Can you give me the question one

8    more time?

9            Q.    Sure.  In support of your

10   opinion regarding the purpose of federal law,

11   what cases did you review?

12           MR. LOTTERMAN:  Are you asking him did

13   he consider or did he rely on?  I think --

14           Q.    In support of your opinion.  So

15   what did you rely on?

16           MR. LOTTERMAN:  Rely on.  Okay.  Thank

17   you.

18           A.    Beyond cases?

19           Q.    No.  Just cases.

20           A.    Just cases.  You know, I can't

21   think -- I don't think my review of cases was

22   terribly informative with respect to what was

23   the purpose of Clean Water Act penalties.

24           Q.    So you didn't rely on Citgo for

25   your understanding of what the purpose of

1       A.      There may be somebody smoking a
2  cigarette next to a gas can on an oil rig
3  right now, and nobody would know about it.
4  Yes.
5       Q.      And you didn't perform any
6  analysis of whether Anadarko knew of any
7  risks occurring at the Macondo rig prior to
8  the oil spill, did you?
9       A.      No.
10      Q.      And so you can't rule out that
11 Anadarko might have known of risky behavior
12 going on at the Macondo oil spill prior to
13 the blowout?
14      MR. LOTTERMAN:  Object to form.
15      A.      No, that was not -- that was not
16 part of my analysis.
17      Q.      Did you investigate whether
18 Anadarko performed any analysis to determine
19 whether or not prior to entering into the
20 Macondo agreement any due diligence of BP's
21 well operations?
22      A.      No.  The -- the jumping off
23 point for my thought related to these
24 questions was largely the -- the culpability
25 ruling in which the judge determined that

208

1    Anadarko was not culpable and, in fact, not

2    responsible.

3          Q.     Well, are you making a legal

4    conclusion there about what the judge ruled?

5          A.     No.  I'm telling you what I

6    assumed.

7          Q.     What you assumed --

8          A.     I told you what my jumping off

9    point was.

10          Q.     It was the culpability ruling.

11   You said it was largely due to the

12   culpability ruling.  Anything else?

13          A.     And what was your question,

14   again?

15          Q.     I'm -- I'm responding to your

16   response.  I asked you whether you -- or I'll

17   ask it another way.

18                 With respect to Anadarko's

19   conduct that this well -- the -- your

20   opinions are based on the culpability ruling,

21   correct?

22          A.     Largely, yes.  I didn't get into

23   any investigation of Anadarko's conduct, what

24   they -- what they knew, what they didn't

25   know, what they did or didn't do.

```
 1   DEEPWATER HORIZON that Anadarko had access
 2   to, other things that it was impractical to
 3   have access to.  And, again, I -- I believe
 4   that was even in Mr. Walkup's report, that
 5   there are -- are limits to the information
 6   that's available to non-operators.
 7        Q.    Right.  But that's a pretty
 8   general statement.  I'm trying to figure out
 9   what particular limitation you're concerned
10   about that made penalizing a non-operator
11   inefficient.
12             Did you review the daily reports
13   that Anadarko had access to?
14        A.    No.  And I will represent to you
15   that my assumptions along these lines are
16   general.
17        Q.    And so you did not review the
18   documentation that -- or you did not review
19   any mud logs that Anadarko had access to?
20        A.    Of course not, no.
21        Q.    And you don't have an opinion as
22   to the -- what -- the information provided to
23   Anadarko, how that could have informed their
24   knowledge of what was actually going on at
25   the well?
```

1       MR. LOTTERMAN:  Object to form.

2       A.      Correct.  Yes.  I think that's

3  right.

4       Q.      And do you know whether

5  Anadarko, if it was unsatisfied with the

6  information it was receiving from BP, whether

7  it could have asked BP for additional

8  information?

9       MR. LOTTERMAN:  Object to form.

10      A.      No.  Again, the jumping off

11  point for my analysis was the culpability

12  ruling.  Yeah.

13      Q.      So you didn't review any

14  depositions that discussed information that

15  was provided to Anadarko?

16      A.      No.  I was -- I was under the

17  impression that was not relevant to what I

18  was doing.

19      Q.      But you're forming an opinion

20  about -- that they -- that they have limits

21  on -- on -- on their ability to access

22  information and that that makes it

23  inefficient to impose a penalty on them.  So

24  you are rendering an opinion on information,

25  but you're not rendering an opinion on any

```
 1    specific information?
 2         A.    Correct.
 3         Q.    So it could be any information
 4    -- they could have had access to 99 percent
 5    of the information that BP had access to and
 6    that you would still conclude that no penalty
 7    was warranted against Anadarko?
 8         A.    No.  I -- you -- you just
 9    stretched that way beyond what I said.
10         Q.    You said you -- you -- your --
11    the basis for your opinion was the judge's
12    culpability order, correct?
13         A.    Part, yes, and all the materials
14    that I reviewed as part of this case.
15         Q.    Right.  But you're telling me
16    that you don't know -- or you don't have an
17    understanding of what was contained in the
18    information that was provided to Anadarko,
19    correct?
20         A.    I don't have technical
21    understanding of it, correct.
22         Q.    Did you review anything -- any
23    depositions discussing Anadarko's ability to
24    influence operations at the well?
25         A.    You know, I -- I may have.  It
```

1   1979, one of the ones that's cited in your

2   report, correct?

3           A.      Yes.

4           Q.      Okay.  And turning to

5   Holmstrom's conclusion on Page 89, Holmstrom

6   says -- I'll wait for you to get there.

7                   Holmstrom says:  Essentially,

8   any imperfect information about actions or

9   states of nature can be used to improve --

10          MR. LOTTERMAN:  Where are you?  I'm

11  sorry.

12          MS. HARVEY:  It is in the concluding

13  remarks --

14          MR. LOTTERMAN:  All right.

15          MS. HARVEY:  -- paragraph -- the second

16  paragraph, middle of the paragraph.

17          MR. LOTTERMAN:  Got it.  Thank you.

18          Q.      In our view -- or, in -- in view

19  of our result, that essentially any imperfect

20  information about actions or states of nature

21  can be used to improve contracts, we have an

22  explanation of the observed complexity of

23  real contracts.

24                  Would you agree with the

25  statement that essentially any imperfect

1    information could help to decrease problems

2    associated with moral hazard?

3         A.     Yes, in general.  If -- if the

4    principal has access to more information,

5    that can be used to improve the functioning

6    of the contract, but one has to

7    counterbalance that against the cost of

8    acquiring information.

9         Q.     Right.  Holmstrom further

10   concludes, if you go down to the very bottom

11   of the page -- actually -- it's actually on

12   the next page, on Page 90.

13             When the same situation repeats

14   itself over time, the effects of uncertainty

15   tend to be reduced and dysfunctional behavior

16   is more accurately revealed, thus alleviating

17   the problem of moral hazard.

18             Do you agree with that

19   statement?

20        A.     As a general matter, sure.

21        Q.     Okay.  And did you investigate

22   at all whether Anadarko and BP -- the nature

23   of their relationship, whether or not it was

24   longstanding?

25        A.     Well, remember, I mean, this --

```
1   example is -- is that of waste generators,

2   correct?

3        A.     Yes.  Can you give me just one

4   minute --

5        Q.     Uh-huh.

6        A.     -- to read the whole paragraph?

7              Okay.

8        Q.     Okay.  And so did you

9   investigate whether Anadarko took all

10  possible precautions with respect to its

11  investments at Macondo?

12       A.     I don't think that was in the

13  scope of my -- the scope of my engagement.

14       Q.     Okay.  And did you investigate

15  whether Anadarko could invest in safety

16  choices that occurred at Macondo?

17       A.     No.  Again, my understanding was

18  that was all outside the scope of my

19  engagement.

20       Q.     All right.  Let's turn to

21  Page 256 in the Boyd article.  It's -- it's

22  the end.  I like the conclusions in the

23  beginning part, not the math in between.

24       MR. LOTTERMAN:  Page 256?

25       MS. HARVEY:  Yes.
```

 1   and change external damage, now you can

 2   sometimes get a rationale with, you know,

 3   with big enough economic benefit and small

 4   enough external damage, so small enough

 5   number of barrels spilled, where you might

 6   need penalties beyond payment of external

 7   damages to achieve absolute deterrence.

 8        Q.    But I'm not talking about --

 9   assume the damage is the same between a spill

10   that is 2 million barrels and a spill that is

11   5 million barrels.  Assume the damage is the

12   same.  Then the number of barrels does not

13   then factor into your analysis on absolute

14   deterrence; is that correct?

15        A.    With the understanding that is

16   an awfully big assumption, yes.  I think

17   you're probably right.

18        Q.    All right.  Now we can -- let's

19   go to the factors.

20             In your analysis of -- contained

21   in your report on the seriousness of the

22   spill, you did no independent economic -- or

23   sorry.  Let me start that again.

24             Okay.  You did no independent

25   analysis of the seriousness of the spill; is

1    that correct?

2          A.      No, I did not.

3          Q.      Okay.  And what is your

4    understanding of -- do you understand the

5    seriousness factor to consider both harm and

6    potential harm?

7          A.      I don't think it's clear.  I

8    think it's pretty vague.

9          Q.      So you don't -- you didn't do

10   any research to try to determine whether or

11   not under the seriousness factor you consider

12   potential harm?

13         A.      No, I didn't do any research on

14   that specific question.

15         Q.      But your opinion is only with

16   regard to harm; is that right?

17         A.      My opinion -- so my assumption

18   that I made with respect to seriousness is

19   that it's serious.

20         Q.      And did -- and you said earlier

21   you did no independent analysis of Anadarko's

22   culpability; is that correct?

23         A.      That's correct.

24         Q.      Okay.  And you did no

25   independent analysis of Anadarko's efforts to

1    mitigate the effects of the spill, correct?

2         A.     Well, I'm not sure exactly what

3    you mean by independent analysis.

4         Q.     You're not relying on your

5    economic expertise in forming an opinion

6    about mitigation?

7         A.     That's fair enough.  I'm relying

8    on the documents that are cited here in the

9    report.

10        Q.     Nothing beyond the documents

11   that are cited in the report, correct?

12        A.     With respect to efforts to

13   mitigate, no.

14        Q.     And did you do any research to

15   determine what the mitigation factor means,

16   that is, how have courts interpreted the

17   mitigation factor?

18        A.     Yes.  I think that was part of

19   -- I think we were talking earlier today

20   about my search for how courts have

21   interpreted each of these eight factors,

22   understanding that I had some knowledge of

23   what each of these things mean coming into

24   it, but I did do a little looking around to

25   see if there had been decisions related to

```
 1   application of these factors in a 311 case.
 2   And again, other than Citgo, I couldn't find
 3   anything.
 4           But -- but here, too, this is
 5   also why I looked at the settlement policy,
 6   understanding that this is not a settlement
 7   discussion that we're having now.  That was
 8   another source of information on -- on at
 9   least how the government might interpret each
10   of these eight factors.
11       Q.    So it's your understanding,
12   based on the settlement policy and Citgo,
13   that this is -- that each of these three
14   activities that you list constitute
15   mitigation?
16       A.    Yes.
17       Q.    And is that understanding based
18   on anything else other than that?
19       A.    No.  And my understanding, as an
20   economist, of what -- what these penalties
21   are intended to accomplish, these seemed to
22   be things that are relevant.
23           So they -- they would be, in
24   particular, the only factors that I would
25   talk about in talking about mitigation.
```

1    Q.      From the perspective as an

2  economist?

3    A.      Yes, applying the eight Clean

4  Water Act penalty factors.

5    Q.      And did you compare -- did you

6  do any factual comparison of Anadarko's

7  efforts to mitigate versus efforts by other

8  oil and gas companies other than BP?

9    A.      You mean in other spills?

10   Q.      No.  In this spill.

11   A.       In this spill, no, at least not

12  that I can remember.  I can't remember, for

13  example, what I looked at with respect to

14  MOEX.

15   Q.      And in the economic benefit

16  factor, the only thing you're relying on is

17  the United States' statement regarding this

18  factor?

19   A.      Yes.

20   Q.      And you didn't do your own

21  analysis of economic benefit?

22   A.      No, I didn't.

23   Q.      And --

24   A.      When -- when -- let me just

25  clarify that, though.

```
 1                No analysis is not the same

 2   thing as thinking about it.  I never did a

 3   cash flow model of Anadarko's economic

 4   benefit.  But certainly when I read the

 5   documents, I'm aware that economic benefit is

 6   normally the starting point of a penalty

 7   analysis, and that's certainly been my

 8   experience.

 9        Q.     From a legal perspective?

10        A.     I mean from a practical

11   perspective.

12        Q.     But here you're citing Citgo,

13   correct?  So you're making a conclusion about

14   what Citgo is saying?

15        A.     What footnote are you on?

16        Q.     This is in your economic benefit

17   section.  You -- well, you don't specifically

18   cite Citgo, but --

19        A.     I don't cite Citgo, no.

20        Q.     You say:  Therefore, this

21   factor, which the Fifth Circuit has called

22   the starting point of the penalty analysis,

23   weighs in Anadarko's favor.

24                What are you referring to there?

25        A.     Right.  So starting point comes
```

```
 1  from Citgo.
 2       Q.     Did you read the entirety of the
 3  Citgo opinion?
 4       A.     I believe so.
 5       Q.     Okay.  Do you know whether it
 6  requires consideration of all of the penalty
 7  factors?
 8       A.     I believe that it does.  That's
 9  what I remember.
10       Q.     And that -- okay.  Let's -- and
11  turning to prior violations by Anadarko, your
12  -- the source of your opinion in that is
13  based on a proposed stipulation; is that
14  correct?
15       A.     Yes, that's correct.
16       Q.     Okay.  And nothing else?
17       A.     No.
18       Q.     Okay.  And it's certainly
19  possible that there are other violations that
20  occurred outside of the offshore Gulf of
21  Mexico 311 that was the subject of this
22  stipulation?  Let me -- let me ask the
23  question, and I'll rephrase it.
24              Did you investigate any other --
25  any other Anadarko Clean Water Act violations
```

1    other than what's in the stipulation?

2         A.     No.   No.  My -- my feeling was

3    these are the ones that were relevant.

4         Q.     And you state that you -- that

5    Anadarko's operations are, quote, a model of

6    responsible and safe operations.  But your

7    opinion is based only on the -- their history

8    of violations; is that correct?  You're not

9    looking at anything else to render that

10   opinion, that Anadarko's operations are a

11   model of safe and responsible operations?

12        A.     No, I didn't do a comparative

13   analysis.  I know some have been done, and I

14   think I looked at those.  I think they're

15   part of the materials that are listed in my

16   report.  But no.  The -- the fact that

17   Anadarko is a large company and has a total

18   of $12,000, $12,834, in total civil penalties

19   over a nine-year period -- or, I'm sorry, a

20   seven-year period, that's what I was

21   referring to.

22        Q.     But you didn't actually

23   investigate whether Anadarko actually, in

24   fact, had safe operations?  You didn't go to

25   the -- to Anadarko's rigs to assess this,

```
1    correct?
2         A.    No.
3         Q.    Okay.
4         A.    No.
5         Q.    You didn't read any information
6    about their safety violations at -- their --
7    their HS&E violations?  You didn't read any
8    statistics along those lines, correct?
9         A.    No.
10        Q.    All right.  And in terms of the
11   factor, other penalties for the same
12   instance, you state that -- actually --
13   sorry -- going -- going back to the prior
14   violation, you also say that Anadarko's
15   operations in the Gulf are significant.
16              What did you do to determine
17   that?
18        A.    Well, again, we looked at the --
19   with respect to deepwater, we looked at the
20   shares, you know, the lease shares.
21        Q.    So based on their number of
22   leases, their interest in number of leases?
23        A.    Yes.  And again, just a general
24   knowledge of how much they're producing,
25   which I would characterize is a lot.
```

```
1          Q.     But you did no analysis to
2    compare, for example, their production to
3    other companies' production?
4          A.     No.  That did not seem
5    necessary.
6          Q.     Okay.  Going to the other
7    penalties factor.  You -- you list a number
8    of things, including the -- the BP criminal
9    settlement, the Transocean consent decree and
10   criminal plea agreement, the MOEX settlement
11   and the Halliburton settlement.
12              And you say that most of these
13   penalties were paid by actual or potentially
14   culpable parties, and that's the reason that
15   you give for concluding that that factor
16   should be given little to no weight.
17              When you say most, that's --
18   that's not all encompassing, correct?
19         A.     Sure.  For example, I think MOEX
20   at the end of the day would not have been a
21   culpable party.  That -- that was what I
22   meant when I said that.
23         Q.     Okay.  But they did pay a
24   penalty, correct?
25         A.     Yes, they did, prior to the
```

1   culpability ruling.

2          Q.     But not prior to the negligence

3   ruling, correct?

4          A.     I believe that's right.

5          Q.     In terms of the economic impact

6   of the penalty on Anadarko, you cite to

7   Anadarko's discovery responses and -- and

8   Mr. Gwin's deposition.

9                 Is that the only source of

10  information you have about the economic

11  impact of the penalty on Anadarko?

12         A.     Yes, this -- this admission by

13  Anadarko that it's able to pay as of that

14  date.

15         Q.     And so that's the only

16  information that you're using to conclude

17  that -- render an opinion about economic

18  impact of the penalty, correct?

19         A.     That is correct.   Yep.

20         Q.     Okay.   And in looking at the

21  final factor, other factors as justice may

22  require, you look at revenues and Anadarko's

23  jobs.

24                You did no comparative analysis

25  of Anadarko's contributions to any other oil

1   companies' contributions, correct?

2       MR. LOTTERMAN:  Object to form.

3       A.      Well, there is a statement in my

4   report about -- let me pull it.  Here we go.

5       Q.      I guess I'm asking you just a

6   question of whether you did any of your own

7   research in -- quantitative research in

8   determining the -- Anadarko's contributions,

9   other than what's listed here.

10      MR. LOTTERMAN:  Object to form.

11      A.      I was looking for something, and

12  I'm not finding it in here.

13              The thing -- I won't take more

14  of your time.  The thing I'm looking for in

15  here, I thought I had some information on

16  Anadarko employment, you know, sort of

17  summary statistics on that.  So apart from

18  that, though, I think the answer is no.

19      MR. LOTTERMAN:  I think she just asked

20  you about that.  Page 19.  She just asked you

21  about the factors.  She's trying to find out

22  if the factors you list under Section 8 --

23      A.      Oh.  That's --

24      MR. LOTTERMAN:  Yeah.

25      A.      I'm sorry.  I was looking in the

1   wrong section.  That's where it is.

2        MR. LOTTERMAN:  She's asking if you

3   have anything beyond what you list there, I

4   believe is her question.

5        A.    Okay.  Would you mind -- sorry.

6   I had to -- I had to look around.  But yeah.

7        Q.    Okay.  So let's -- let's just --

8   so that we know exactly what we're talking

9   about, you say that as of December 31st,

10  2013, Anadarko employed 5,700 employees and

11  approximately 530 jobs in Anadarko's Gulf of

12  Mexico related operations.  And for that, you

13  cite Anadarko's discovery responses; is that

14  correct?

15       A.    Yes.

16       Q.    But beyond that, you did not do

17  anything to determine if those statements

18  were accurate?

19       A.    Beyond the citations listed

20  here, no.

21       Q.    So you didn't do anything to

22  verify the fact that -- or the statement here

23  that Anadarko provided thousands of

24  additional jobs related to Anadarko's

25  Gulf-related operations and indirect jobs and

```
 1   investments in supporting industries related

 2   to Anadarko's Gulf-related operations?

 3         A.     No.  So the -- the citation is

 4   what it is.

 5         Q.     Okay.

 6         MS. HARVEY:  Can we go off the record?

 7         VIDEOGRAPHER:  Sure.  Off the record at

 8   4:12.

 9             (Off the record at 4:12 p.m. to

10   4:27 p.m.)

11         VIDEOGRAPHER:  Back on the record at

12   4:27.

13         Q.     (By Ms. Harvey) Let's talk for a

14   minute about the Pitchford article that you

15   cite.  It's Tab 22 in your binder, and we can

16   mark that as the next exhibit.

17         MR. LOTTERMAN:  13410.

18         (Exhibit Number 13410 marked.)

19         Q.     You cite Pitchford to suggest

20   that if penalties are imposed here, that

21   could require a non-operator to raise its

22   rate of return; and, therefore, the operator

23   then may cut corners on safety expenditures;

24   is that right?

25         A.     Yes.
```