# EXHIBIT 10

## to

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF (1) ITS MOTION *IN LIMINE* TO ADMIT EVIDENCE PERTAINING TO ANADARKO'S CONTENTIONS CONCERNING NON-OPERATORS AND (2) IN OPPOSITION TO ANADARKO'S MOTION TO ENFORCE THE COURT'S ORDER EXCLUDING CULPABILITY EVIDENCE AGAINST ANADARKO**

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUSISANA

## IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179 "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

Response to Expert Report of Kenneth E. Arnold of 15 August 2014 and Response to Expert Report of Professor David L. Sunding of 15 August 2014

---

### EXPERT REPORT OF

### GARDNER W. WALKUP, JR.

### ON BEHALF OF

### THE UNITED STATES OF AMERICA

---



SEPTEMBER 12, 2014

---

Gardner W. Walkup, Jr.

**DATED: September 12, 2014**

## Table of Contents

1   Executive Summary ................................................................................................... 3
2   Review of Sunding Report ....................................................................................... 4
  2.1   Empirical trends in NOP participation in deepwater activities ........................... 4
    2.1.1   Dr. Sunding's analysis of lease ownership ................................................. 4
  2.2   Empirical trends in deepwater activity ................................................................ 5
  2.3   Operator and NOP financial and operational relationship ................................... 7
  2.4   Summary of Dr. Sunding's report ....................................................................... 9
3   Response to Expert Report of Kenneth E. Arnold ..................................................... 9
  3.1   Factors that impact safety in oil and gas exploration and production ............... 10
    3.1.1   Non-operators' role in safety leadership and culture ................................. 11
    3.1.2   Non-operators' role in improving perception of risk and decision-making 14
    3.1.3   Non-operators' role in building HSE capacity .......................................... 16
    3.1.4   Additional areas where non-operators can contribute to E&P safety ......... 17
  3.2   Offshore safety goes beyond "operations" ....................................................... 17
4   Non-operators' capacity and information to influence offshore safety ................... 18
  4.1   Non-operators routinely receive detailed well plans and communicate with operators about those plans ........................................................................................... 19
  4.2   Non-operators typically have access to detailed information about planned and ongoing well operations .............................................................................................. 20
  4.3   With detailed information they receive, non-operators are in a unique position to monitor deepwater activities and to make inquiries if they have safety or other concerns ........................................................................................................................ 22
  4.4   Under contractual agreements, non-operators have rights that provide some capacity to influence key operational decisions .......................................................... 25
  4.5   Summary of non-operators' capacity and information to influence decisions ... 27
5   Impact of CWA penalties ....................................................................................... 27

**Appendix A** – Considered Materials

# 1   Executive Summary[1]

In this report, I respond to Dr. Sunding's[2] and Mr. Arnold's[3] expert reports of 15 August 2014.

As summarized in Section 2, it is my opinion that:

- Dr. Sunding's empirical analysis is flawed and does not support his conclusions regarding capital investment in deepwater activities.
- An alternative, more pragmatic analysis of recent deepwater activity contradicts Dr. Sunding's assertions.
- Dr. Sunding has misapprehended the relationship between Operators and Non-Operating Parties ("NOPs") and as a result his cited literature does not apply to the specifics of this case and cannot be used to support his conclusions regarding the imposition of CWA penalties.

As summarized in Section 3, it is my opinion that:

- NOPs pursuing industry best practice can influence safety culture and thus improve the quality of offshore safety.
- Offshore safety also depends on factors beyond just culture (as contended by Mr. Arnold) and NOPs can contribute to these factors as well.
- Offshore safety also goes significantly beyond "operations" (as contended by Mr. Arnold) and NOPs can and do positively impact these other areas, in addition to contributing to operational issues.
- Mr. Arnold's contention that only Operators should be held responsible for safety is based on his incorrect view that NOPs cannot contribute to HSE performance.

As summarized in Section 4, it is my opinion that both Dr. Sunding's and Mr. Arnold's contention that NOPs lack the capacity and information to influence HSE performance of deepwater activities is incorrect. Rather, based on my experience and as documented in industry literature, it is my opinion that NOPs have both the capacity and information to positively influence HSE. I support my opinion, and rebut the contentions of Dr. Sunding and Mr. Arnold, by reviewing Anadarko's actions as a NOP at Macondo.

As summarized in Section 5, it is my opinion that the imposition of material CWA penalties on both BP (as operator) and Anadarko (as NOP) better serves the interest of the public than penalties solely on BP.

---

[1] The information in Section 2 of my initial report ("Information Required by the Federal Rules of Civil Procedure") has not changed and is incorporated into this report by reference.

[2] Expert Report of Professor David L. Sunding, dated 15 August 2014 ("Sunding Report").

[3] Expert Report of Kenneth E. Arnold, dated 15 August 2014 ("Arnold Report").

# 2   Review of Sunding Report

First, Dr. Sunding's empirical analysis concerning non-operators' activity in the Gulf is flawed because it does not properly account for well-known industry realities.  I have completed my own analysis of recent industry deepwater activity in the Gulf of Mexico, which contradicts Dr. Sunding's conclusions.  Second, Dr. Sunding misapprehends the nature of the relationship between operators and NOPs when he characterizes them as "passive investors" and accordingly his cited literature does not support his conclusion concerning penalties.

In this section I present:

- Dr. Sunding's empirical analysis is flawed (Section 2.1).
- An alternative, more pragmatic analysis of recent deepwater activity, contradicts Dr. Sunding's assertions (Section 2.2).
- Dr. Sunding has misapprehended the relationship between Operators and NOPs and thus his cited literature does not apply (Section 2.3).

## 2.1  Empirical trends in NOP participation in deepwater activities

### 2.1.1  Dr. Sunding's analysis of lease ownership

In Section II of his report, Dr. Sunding contends that "*imposing penalties on non-operating investors will deter capital investment in deepwater exploration and production.*"[4]  Dr. Sunding suggests that just the threat of such actions has already changed the behaviors of industry participants and this change in industry behavior supports his contention about reduced capital investment if a penalty is imposed on Anadarko.  I disagree that the empirical evidence suggests the threat of imposing CWA penalties has reduced deepwater activity.  Dr. Sunding's statistical analysis is flawed due to his lack of understanding of the E&P business.

#### 2.1.1.1  Leasehold ownership and economic activity

In his report, Dr. Sunding states that deepwater activities create an important source of economic activity.  This economic activity is primarily driven by the capital spending during exploration and production and the revenue (both public and private) generated during production.  However, Dr. Sunding's analysis focuses only on leasehold ownership.  Leasehold ownership, and changes to that ownership position, has very little impact on the economic contributions of deepwater activities.  A more meaningful analysis would focus on the trends in exploration and development activity and any

---

[4] Sunding Report at 16.

changes in these trends.  I have performed such an analysis in Section 2.2, which
contradicts Dr. Sunding's conclusions.

### 2.1.1.2  High impact industry dynamics ignored in Sunding's analysis

The conclusions that Dr. Sunding draws from his statistical analysis of leasehold
ownership before and after December 15, 2010 are flawed because he made the very
large assumption that any changes were due to the public filing of a complaint indicating
possible CWA penalties being imposed on the NOPs at Macondo.  This assumption
demonstrates Dr. Sunding's lack of familiarity with the E&P business.  A number of
other, larger events and trends occurred within the timeframe of Dr. Sunding's analysis
that he has not accounted for in anyway.  These include:

- The industry trend of Gulf of Mexico E&P participants evolving towards the more
  technically challenging, and much more costly lower tertiary projects, which is
  changing the mix of market participants with majors playing a bigger role and
  smaller independents leaving the market.
- The moratorium on deepwater activity imposed by the US government in the
  wake of Macondo created significant delays and a resulting portfolio reallocation
  away from deepwater for some players.
- The emergence of compelling onshore North American opportunities resulted in a
  portfolio reallocation of some players especially smaller companies away from
  deepwater.  Larger companies have struggled in the resource plays and are more
  active in deepwater.
- The cost of global deepwater activities has rapidly increased since 2010 resulting
  in a portfolio reallocation away from deepwater for some players, particularly
  smaller companies.
- The scale of the Macondo spill was greater than expectations and many players
  "stood on the sidelines" until improved containment systems could be developed
  and deployed.
- New deepwater regulations (e.g. operational and financial) have resulted in
  changing of market participants.

Without a consideration of these contemporaneous factors, Dr. Sunding's conclusion that
leasehold ownership changes are solely due to the threat of CWA penalties on NOPs at
Macondo cannot be supported.

## 2.2  Empirical trends in deepwater activity

Immediately following the Macondo incident, deepwater activity in the Gulf of Mexico
drastically declined because of the moratorium; however, with the new regulatory system
in place and with the development of new containment technology Gulf of Mexico
deepwater activity has dramatically recovered.  This surge in activity was the feature

article in the 2014 May issue of the Journal of Petroleum Technology.[5]  A key parameter of deepwater activity is the number of active rigs.  In the figure below, the number of "floater" rigs (semisubmersibles and drillships) are meant for deepwater while the number of "jackups" are meant for shallow waters.  As can be seen in the figure, deepwater activity has clearly accelerated and is now greater than before Macondo.  The shallow water activity level has not materially changed.  This contradicts Dr. Sunding's conclusion that capital contributions for deepwater activities has decreased because of a threat of CWA penalties on NOPs.



Source: "Industry Flexes Muscles Again in Gulf of Mexico" JPT, May 2014

I conducted an analysis to gain insights on NOP participation by looking at the average ownership of current and future projects based on publically-available information.[6]  The greatest economic contribution is the result of development (when most of the capital is spent) and production (when most of the revenues are collected).  I have thus focused my analysis on determining whether there are any changes in NOP behavior tied to development and production activities (in contrast to Dr. Sunding's analysis of lease owner behavior, which is not closely tied to economic activity).  My analysis shows that the average equity share of operators on projects with start dates of 2010 or earlier is 65% while the average equity share of operators on projects with start dates after the filing of the United States' complaint of 2011 or later (i.e. includes projects under-construction

---

[5] Parshall, J. "Industry Flexes Muscles Again in Gulf of Mexico," Journal of Petroleum Technology, May 2014.

[6] Credit Suisse. "US Gulf of Mexico" August 15, 2013 (US_PP_WAL000459-US_PP_WAL000495); Research Spreadsheet Prepared in Connection with Report (US_PP_WAL003615).

and in the planning stages) is 61%. For the operator's average share to decrease, as the trend shows here, the opposite has to be true for the NOP ownership share: it must have increased from 35% to 39%. Clearly, NOP participation is not falling as predicted by Dr. Sunding because of the chance of CWA penalties being imposed on Anadarko.

The average equity share of all owners per project also reveals insight into the behavior of industry market participants. The average share of all owners for project start dates of 2010 or earlier was 45% while for projects with start dates after 2011 (i.e. includes projects under-construction and in the planning stages) is 38%. This indicates that the number of NOPs for the newer projects has gone up. Finally, the average ownership share (all owners, both operating and non-operating) of projects currently producing is 45%. This decreases to 42% for projects under-construction and 33% for projects in the planning stages. Again, these falling average percentages occur because there are more NOPs in the newer, post-Macondo projects, which is exactly the opposite of what Dr. Sunding has predicted.

## 2.3 Operator and NOP financial and operational relationship

Dr. Sunding states that his conclusion that Anadarko should not be penalized as a "*non-operating investor*" is based (in part) on his "*review of operator and non-operator financial and operational relationships in offshore oil and gas exploration and production.*"[7]   However, it is apparent that Dr. Sunding's understanding of the NOPs' role and NOPs' relationships with operators does not conform to the actual roles and relationships in practice. Since Dr. Sunding does not cite the references he used in his review of the operator and non-operator relationship, I am unable to determine whether Dr. Sunding's misinterpretation of these relationships is due to the sources he used or whether it is due to his limited E&P experience.

Dr. Sunding only uses the term "non-operating investor" when referring to NOPs. This is a clear indication that he is unfamiliar with NOPs and the relationship between NOPs and operators. In fact, my search of the industry's technical paper database (www.onepetro.org) returns no entries for this term, and even Anadarko's other expert, Mr. Arnold, declines to use that term.

As discussed in my first paper, it is industry best practice for NOPs to be actively engaged in deepwater activities. As discussed below in Sections 3 and 4, NOPs can contribute to a broad range of decisions (both design and operational) that impact HSE performance because they have the information and capacity to do so. It is clear from my experience, and the industry literature cited in my first report and below, that NOPs are not passive investors; rather, NOPs are co-owners with significant rights and responsibilities. Yet Dr. Sunding repeatedly assumes NOPs are passive investors and that a large information asymmetry exists between operators and NOPs. None of these

---

[7] Sunding Report at 2.

assumptions of Dr. Sunding's about NOPs are correct.  This incorrect view invalidates many of his conclusions, particularly those of "efficient deterrence."

Dr. Sunding states "*The literature shows that penalizing a non-culpable, nonoperating investor does not result in rational or efficient deterrence, and could be counterproductive.*"[8]  The references Dr. Sunding cites to support his conclusions do not consider parties similar to relationship of Operators and NOPs and as such his use of these references is not appropriate.

For example, in Section D.2, Dr. Sunding states, "*The standard model of moral hazard shows that, when both investor and operator are well capitalized (i.e. when the operator is not judgment-proof), there is no social gain from assigning liability to the investor.*"  However, the reference he cites to support this assertion[9] is not actually about "*assigning liability to the investor.*"  Rather, the intent of this paper is to examine how regulation and competitive forces can lead an economic "agent" to focus on cost minimization to such an extent that HSE risks are increased.  It examines the specific case of the regulation of a natural monopoly and extends the conclusions to the more general principal-agent relationship.[10]  This relationship is not analogous to Operator/NOPs relationship as I discussed in my first report and expand on in Section 4 below.

Dr. Sunding's appeal to the literature of "moral hazards" is also flawed as it is based on the assumption of significant asymmetric information.  Dr. Sunding's view that this asymmetry exists between operators and NOPs is exaggerated and is in fact another example where he has misrepresented the operator / NOPs relationships in practice.  I discuss below in Section 4 that NOPs have access to significant information in deepwater activities due to the information requirements of the joint operating agreement (JOA) and through their roles on project teams and by other means, such as through communications with the operator.  Additionally, in my first report I itemized a number of key reasons (e.g., "strategic learning") why NOPs have access to key HSE information.  Dr. Sunding's theoretical considerations of moral hazards are not applicable here because they assume a significant lack of information by the NOP that does not exist.

In section D.3, Dr. Sunding claims, "*Extending civil penalties to investors can increase the frequency of oil spills.*"  The paper by Pitchford that he cites in support of his opinion is titled "How Liable Should the Lender Be? The Case of Judgment-Proof Firms and Environmental Risks."  This paper considers "*a potentially judgment-proof firm* [could be bankrupted in the case of environmental incident], *a lender, and a potential victim.*"[11]

---

[8] Sunding Report at 6.

[9] Laffont, J. J. 1995. "Regulation, Moral Hazard and Insurance of Environmental Risks."" Journal of Public Economics 58, pp. 319-336. (DEFEXP022922).

[10] The example cited in the paper of a principal-agent relationship is a patient-doctor relationship.

[11] Pitchford, R., 1995, "How Liable Should the Lender Be? The Case of Judgment-Proof Firms and Environmental Risks," American Economic Review 85 (DEFEXP023128).

The paper concludes that extending liability to the lender could decrease safety.  Without regards to the merits of the economic analysis, I can conclude that Dr. Sunding has incorrectly drawn an analogy between NOPs and a lender.  NOPs have a very different role than a lender.  As I discussed in my initial report and below in Section 4, NOPs are actively engaged in many deepwater activities and have a different level of information than a lender.

Dr. Sunding, building on this flawed analogy, cites Pitchford to argue: (1) non-operators will demand a higher rate of return to compensate for an increased risk of penalties (like a bank would charge); (2) this will result in a lower rate of return for the operator; and (3) the operator may cut corners on safety to increase its return.

This reasoning exposes Dr. Sunding's flawed analogy between an NOP and a "lender."  It is true that as a lender increases the interest rate it charges (to cover greater risk in this case) the return to the owners (not just the operator) will be reduced.  However, this zero-sum-game is not how the contractual relationship between operators and NOPs works in the real E&P world.  The governing Model Form JOAs make it clear that operators and NOPs share the same upsides and downsides.  The only way for the NOPs to get a higher return is if the operator earns a higher return.  Dr. Sunding's incorrect understanding of the operator and NOP relationship has led him to the wrong conclusion that CWA penalties on a NOP will reduce HSE performance.

### 2.4  Summary of Dr. Sunding's report

Dr. Sunding's attempt to suggest imposing CWA penalties on Anadarko would not create an efficient, an absolute or an efficient deterrent are fatally flawed by incorrect assumptions about the roles of NOPs.  Dr. Sunding's analysis of the impact on NOP decision making, and by extension over-all deepwater activity, is likewise critically flawed because he did not consider a number of key industry factors.  An examination of NOP actions that are closely tied to economic activity (exploration, development and production) shows that deepwater activity has accelerated and NOPs' share has increased, which disproves Dr. Sunding's opinion.  As a result, Dr. Sunding's conclusion that imposing material CWA penalties is not in the public's interest cannot be supported.

## 3   Response to Expert Report of Kenneth E. Arnold

Mr. Arnold contends in his expert report that "*the key to offshore safety is for operations to be performed within a culture of safety*."[12]  Further, he contends "*only the Operator can establish and maintain that culture*" because non-operators "*lack the information and*

---

[12] Arnold Report at 2.

*capacity to control or influence operational decisions.*"[13]  Based on these assumptions, Mr. Arnold concludes that it is not in the public interest to hold a non-operator accountable for offshore safety.

I contend that Mr. Arnold's assumptions are based on too narrow a perspective of offshore safety.  As a result of his flawed assumptions, Mr. Arnold's conclusion is likewise unsupported.  As I stated in my first report and expanded upon here, I contend that imposing material CWA penalties on Anadarko (in addition to CWA penalties on the operator) will incentivize behaviors by Non-Operating Parties ("NOPs")[14] that will improve offshore safety, while not imposing such material penalties (but imposing penalties on the operator) will incentivize NOP behaviors that will reduce the HSE performance of deepwater activities.  Thus, it is my opinion that imposing material CWA penalties on Anadarko is in the public interest.

In this section I present my opinions that:

- Offshore safety depends on factors other than just "culture" and NOPs pursuing industry best practice can contribute to all of these factors (including culture) and thus improve offshore safety.  (Section 3.1)
- Offshore safety goes significantly beyond "operations" and NOPs can and do positively impact these other areas in addition to contributing to operational issues (Section 3.2)

## 3.1  Factors that impact safety in oil and gas exploration and production

Mr. Arnold contends in his expert report that "*the key to offshore safety is for operations to be performed within a culture of safety.*"[15]  I agree that a culture of safety is critical to offshore safety; however, in contrast to Mr. Arnold, it is my opinion that NOPs can and do play a role in contributing that culture.  In addition, Mr. Arnold's focus on culture is incomplete.  Safety culture is but one of several key human factors that are needed to

---

[13] Arnold Report at 2.

[14] As recognized by Mr. Arnold, different terms for the non-operating working interest participating parties have been introduced in this case that do not conform to industry norms (e.g. non-operating investor) to demonstrate the passive behaviors of some parties.  In this report, I will use the common term "non-operating parties" ("NOPs") to distinguish between non-operating interest owners that are participating parties to certain activities from those that are not.  In my experience, this term is common as are others like "non-operators," "partners," and Mr. Arnold's choice of "non-operating working interest owners."

[15] Arnold Report at 3.

ensure offshore safety according to the Society of Petroleum Engineers ("SPE") technical report, "The Human Factor: Process Safety and Culture" ("2014 SPE Safety Report").[16]

Mr. Arnold was a member of the steering committee that generated this important post-Macondo SPE report that identifies the following ten key factors as contributing to safety in oil and gas exploration and production activities:

1. Leadership and Culture
2. Perception of Risk and Decision-Making
3. Communication of Risk
4. Human Factors in Design
5. Individual and Team Capacity
6. Collaborative and Distributed Team (i.e. teams working in geographical dispersed locations) Working
7. Commercial and Contractual Environment
8. Workload Transition
9. Assurance of Safety-Critical Human Activities
10. Investigation and Learning from Incidents

The order of the list of human factors above does not imply significance; however, the report identified three factors as those that organizations should prioritize because these three factors create a "*base*" that is required for progress on the others to be achieved. These three factors are:

1. Leadership and Culture
2. Perception of Risk and Decision-Making
3. Individual and Team Capacity

The examination of each of these factors below demonstrates that NOPs can and do contribute to offshore safety.

### 3.1.1  Non-operators' role in safety leadership and culture

Mr. Arnold identifies the safety culture of an "*organization*" as critical to offshore safety. Further, he states that "*The safety culture of an organization is the product of individual and group values, attitudes, competencies, and patterns of behaviour that determine the commitment to, and the style and proficiency of, an organization's health and safety programmes*" and "*Safety in operations depends on the staff at every level knowing that*

---

[16] SPE Technical Report. "The Human Factor: Process Safety and Culture," SPE 170575, March 2014 (US_PP_WAL002467).

*their superiors really believe and act with these shared values.*" Mr. Arnold then concludes that NOPs cannot help "*develop*" and "*sustain*" a safety culture.[17]

While I agree with some of Mr. Arnold's characterizations above (but not Mr. Arnold's conclusions about NOPs), I believe it critical to understand these general observations within the specific considerations of deepwater activities since this perspective reveals the important role that NOPs can play, through active-participation, in safety leadership and culture.

NOPs can contribute to and help lead and maintain the safety culture. For example, the 2014 SPE Safety Report discussed above mentions the importance of site visits by "leaders" to demonstrate safety leadership:

> *Leaders can be trained in what behaviors during site visits have the most impact on process safety. Before making visits and inspections, leaders can be prepared on what to look for, what to ask for, and how to understand what the answers mean. While such approaches can never be technically fool proof, and executives and other managers can be misled, it is the activity itself that is most critical. Such activities send a clear message about what the leader finds important enough to ask about.*[18]

The industry literature demonstrates that such leadership is not confined to the Operators. For example, a publication by OMV (an integrated international oil and gas company) notes that NOPs can play an important role in promoting HSE safety culture through site visits.[19] It stated that in addition to performing audits and review, NOPs can contribute by conducting field visits. Such visits, which can be conducted with or without partners, can reinforce a message that HSE is important and also shows a serious commitment to HSE because senior leadership is involved. Moreover, according to OMV, NOPs should not hesitate to be proactive with the operator when they perceive issues such as safety or quality control. The article cites an example where the operator was struggling with service quality and HSE issues. The non-operator's (OMV's) senior management asked to visit the operator's offshore facilities both to demonstrate their concern about the issues and to listen to understand the situation. The visit resulted in finding both technical and cultural shortcomings which were communicated back to the operator who immediately put an action plan into place.[20]

---

[17] Arnold Report at 3.

[18] SPE 2014 Safety Report, at 9-10.

[19] Lawrie, Graeme. "The Role of a Non-Operating Partner in Contributing to HSE Excellence." SPE 155941, SPE/APPEA International Conference on Health, Safety and Environment in Oil and Gas Exploration and Production. September 2012 ("Lawrie 2012") (US_PP_WAL002336-US_PP_WAL002348).

[20] Lawrie 2012, at 6-7.

Another instance noted by OMV where the NOPs demonstrated HSE safety culture leadership in collaboration with the operator through a site visit involved a visit to a construction yard of a manufacturer of equipment for the project. The operator arranged the visit with its four NOPs, and pointed out that each of the NOPs were major oil and gas companies who also might be future customers for the manufacturer's vessels. The visit highlighted the importance of HSE to the construction company, concluding that the coordinated visit "*was an excellent opportunity for operator and NOPs to pass a strong consistent message that HSE must come before on-time delivery.*"[21]

Leadership extends beyond site visits. Project Managers routinely leverage NOPs on leadership efforts. The example of the Typhoon Project in deepwater Gulf of Mexico where Chevron was operator and BHP Billiton was the NOP is instructive. For that project, managers from Chevron (as operator), BHP Billiton (as NOP), and the contractors formed a safety leadership team to promote a culture of safety to achieve incident and injury-free performance across the multiple companies, interfaces, and scope of involvement.[22] The team's purpose was to impact workers through:

- *Owning and communicating the project's Environmental and Safety objectives;*
- *Building genuine, harmonious relationships between all organizations and individuals;*
- *Creating a culture of acknowledgement and recognition for Environmental and Safety efforts and accomplishments;*
- *Sharing information, lessons learned, etc.;*
- *Keeping a finger on the pulse of the project; and*
- *Working issues and interfaces*

Although Macondo was an exploration well, it is important to note that the vast majority of activity (e.g. drilling) actually occurs during the development stage.[23] Deepwater activities during development are managed by Integrated Project Teams ("IPTs") that are comprised of operating and NOP personnel. The Model Form JOA used by most market participants in the USA grants NOPs a representation on the IPTs equal to their equity share.[24] Since the average equity share of operators for projects under-construction or in

---

[21] Lawrie 2012, at 7.

[22] Visser, Robert C., Joseph D. Williams and Bob Aquadro. "Typhoon Offshore Safe and Clean: Authentic Leadership to Produce an Incident and Injury-Free Environment." OTC 14127, 2002 Offshore Technology Conference. May 2002 (US_PP_WAL001809-US_PP_WAL001815).

[23] It is typical to segment the lifecycle of a deepwater project into four stages; namely, exploration, delineation, development and production.

[24] Strictly speaking the Model Form JOA discriminates a "Feasibility" team and a "Project Team." The "Project Team" manages the Selection, Define and Execution stages. IPT representation is addressed for the Project Team within the JOA (Appendix G) (US_PP_WAL003631-US_PP_WAL003647).

the planning stages is currently less than 60%[25], this means that almost 40% of the people on IPTs could be NOPs' staff. The Operator has a strong influence on the safety culture of the IPT because the operator has the right to choose the Project Manager (to whom the IPT reports) and the leadership of the Project Manager is critical to establishing the safety culture of the IPT; however, the safety culture of the IPT is also strongly influenced by the NOPs and contractors.

A final example of safety culture and leadership noted in the 2014 SPE Safety Report is the role of safety assurance. This is an area where NOPs have clear roles and responsibilities. For example, Exhibit K to the Model Form JOA used most commonly in the USA provides NOPs the right to audit and inspect the operator's Safety Management Systems.[26] In addition, while Mr. Arnold states, "*I am not aware of any report that even suggests that NO-WIOs can be or should be responsible for offshore safety*," examples of such are noted in the industry literature.[27] Specifically, Norway and the UK (see Section 5.4.2.1 and Section 5.4.2.2 in my August 15, 2014 Expert Report) both have specific regulations regarding NOPs' responsibilities regarding E&P HSE assurance. This is common knowledge in the industry.[28]

Safety culture is critical to E&P safety as Mr. Arnold correctly notes; however, as demonstrated above Mr. Arnold's contention that NOPs have no role in developing and sustaining that culture is not consistent with industry practice.

### 3.1.2 Non-operators' role in improving perception of risk and decision-making

The second priority identified in the 2014 SPE Safety Report is the importance of decision processes, especially decisions processes where HSE risks are explicitly addressed. The decision process is defined in the Report as "*the entire process from awareness of a situation (perceiving a potential hazard or failing to do so), making projections of what might happen, planning possible courses of action, and choosing what to do.*"[29]

The majority of my consulting practice has been, and continues to be, focused on improving the quality of decision processes, particularly those decisions made on large projects like deepwater projects. Decision Analysis, or Decision Engineering, is the field of study that provides much of the academic support to solutions to these challenges to

---

[25] Credit Suisse. "US Gulf of Mexico" August 15, 2013 (US_PP_WAL000459-US_PP_WAL000495).

[26] Exhibit K to 2007 810 Joint Operating Agreement (Deepwater) (US_PP_WAL001765-US_PP_WAL001767).

[27] Lawrie 2012, at 2.

[28] Lawrie 2012, at 2.

[29] 2014 SPE Safety Report, at 11.

quality decision making (e.g. assessments of risks and uncertainties, overcoming cognitive and motivational biases, consideration of appropriate ranges of options, logically correct reasoning and organizational alignment, etc.).[30]  NOPs have the opportunity, and do if industry best practice is followed, to ensure decision-making challenges are successfully overcome.

As discussed above, a significant portion of deepwater activities are managed by IPTs. These IPTs use a "stage-gate project management process" that was explicitly developed to help improve decision quality.[31]  NOPs have great influence on IPTs because they will likely have significant representation on the IPT.  Additionally, the "stage-gates" in this process are explicitly meant to provide the Operators and NOPs an opportunity to assess decision quality.

The key role of assurance in improving the perception of risk and decision making was identified in the 2014 SPE Safety Report.  It found that the decision challenges must be addressed at various levels, and that methods to assure proper decision-making include documentation, procedures, "management of change," and internal audits, as well as "lessons learned":

> *It is important that lessons learned relate to the decision-making process rather than only the outcome of the decision. The "health status" can be assessed through regular meetings, facilitated focus groups, perception surveys and management reviews with corrective actions. Safety management systems and their assurance measures need to be tailored to the maturity of the organization.[32]*

NOPs have the ability to participate in all of these assurance steps.  Decision documentation is routinely available to NOPs.  The increasing role of NOPs with regard to management of change is included in changes to the Model Form JOA as summarized in my original report (see Section 5.2).  The "health status" and "safety management systems" are all part of NOPs' active-participation.  The role of NOPs in "audits" is important and clearly demonstrates that NOPs can be actively engaged, even though some coordination may be required if there are multiple partners.[33]

---

[30] Bratvold,  R.B. and Begg, S., "Making Good Decisions," 2010 Society of Petroleum Engineers (US_PP_WAL000098-US_PP_WAL000312).

[31] Walkup, Gardner and J. Robert Ligon. "The Good, the Bad, and the Ugly of the Stage-Gate Project Management Process in the Oil and Gas Industry." SPE 102926 2006 SPE Annual Technical Conference and Exhibition. September 2006 (US_PP_WAL002234-US_PP_WAL002245).

[32] 2014 SPE Safety Report, at 13.

[33] Lawrie 2012.

### 3.1.3 Non-operators' role in building HSE capacity

The 2014 SPE Safety Report identifies a number of challenges to building and assuring individual and team capacity for HSE and concludes that improvements cannot be fully addressed by a single company. Rather, "*because of the extensive use of contractor services and partnerships, there is critical industry-wide component to properly addressing this challenge*" to safety capacity issues.[34]

The role of NOPs in reviewing operators' HSE capabilities, processes and performance has increased since the events at Macondo. For example, Chevron has developed and deployed an "operational excellence" process to not only audit its operators' HSE capabilities and performance but to collaboratively and proactively manage risks as NOPs.[35] Chevron acknowledged that it was "*just as important to understand the [HSE] risks and capabilities of [non-operated joint ventures][36] as those of its owned and operated assets.*"[37]

To understand the safety risks and capacities when acting as a non-operator, Chevron established a team within its HSE organization. This team was tasked with developing a process to create, together with Chevron's partners, a joint understanding of safety strengths and risks through shared learning and best practices. Chevron reports that operators have been "*extremely receptive to site visits and feedback*," in part because the outcomes benefit both the operator and Chevron, and that the relationships facilitate "*partners*" learning from each other. In particular, the process established by Chevron has led to improved safety performance. Examples of activities completed as a result included: seconding employees to the non-operated project to assist with the implementation of risk-reducing processes; presentations from subject matter experts about risk-reducing processes; establishment of joint HSE safety committees; and increased site visits from non-operator management. Revisions have been made to management plans to include HSE priorities, where past plans focused on more on financial and operating criteria.[38]

---

[34] SPE 2014 Safety Report, at 15.

[35] Chevron Operational Excellence Audit Group, "HES Assessments of Non-Operated Joint Ventures," SPE 168575, SPE International Conference on Health, Safety and Environment, Long Beach, CA,17-19 March 2014 ("Chevron HSE Report") (US_PP_WAL002445-US_PP_WAL002456).

[36] Note: The term NOJV (non-operated joint venture) as used by Chevron includes more than formal "joint ventures" and includes NOPs as defined in the Model Form JOA used commonly in the Gulf of Mexico.

[37] Chevron HSE Report, at 1.

[38] Chevron HSE Report, at 3-9.

As with safety leadership/culture and perception of risk/decision-making, NOPs have an important role in building and assuring individual/team capacity with regards to E&P HSE.

### 3.1.4 Additional areas where non-operators can contribute to E&P safety

The remaining factors identified in the 2014 SPE Safety Report as key to safety in E&P are: Communication of Risk; Human Factors in Design; Collaborative and Distributed Team Working (across multiple locations); Commercial and Contractual Environment; Workload Transition; Assurance of Safety-Critical Human Activities; and Investigation and Learning from Incidents.

NOPs have contributions to make in all of these key areas. Design decisions were discussed in my original report and I further elaborate on these below in Section 4. The collaborative team working is highly impacted by the extensive use of IPTs used for deepwater activities and NOPs are key to IPTs as discussed above. The Model Form JOA used as the basis for most "contractual environments" memorializes the industry custom and best practice of active-participation of NOPs discussed in my first report. Since no one company has all the "learnings from incidents," the inclusion of NOPs to contribute to this factor is critical.

## *3.2 Offshore safety goes beyond "operations"*

Mr. Arnold contends that "*the key to offshore safety is for operations to be performed within a culture of safety.*"[39] In fact, there are a number of instances in his report where Mr. Arnold ties "offshore safety" to "operations." I agree that operations are important to offshore safety; however, as discussed in detail in the 2014 SPE Safety Report, "operations," particularly operational decisions, are only part of offshore safety. This is important because the role of NOPs, as discussed in my first report (see Section 5.2) and below in Section 4, is more extensive in non-operational activities such as well design that are nonetheless critical to "offshore safety."

The 2014 SPE Safety Report is clear on the distinction between operations and other non-operational activities, and equally clear E&P process safety depends on more than operations. The Report concludes that interference with human performance under real-time pressures "*extend[s] beyond the immediate operational situation*," and includes the role of management, degree of "*back-office*" support, technology, and other activities or arrangements that "*may date months or years before operations began but still have a direct bearing on front-line operations.*"[40]

---

[39] Arnold Report at 2.

[40] 2014 SPE Safety Report, at 3.

Finally, this important report identified that solely depending on those doing the actual operations ("*closer to the workface*") to ensure quality HSE decisions is not a best practice but rather, to the extent possible, operational decisions should be "*rule-based*" meaning determined *a priori* to actual operations during design:

> *One important aspect of Operational Control of Work centers on the role of risk assessment. Experience has shown that those closest to the action become biased in favor of achieving the goal and downplay risks. The closer to the workface, the more decision-making should be rule-based rather than risk-based.*[41]

This "rule-based" approach where key decision are actually removed from those conducting the operations in real time is in direct conflict with Mr. Arnolds' contention that "*Operational safety requires a culture in which the people who actually do the work always make the right choices.*"[42]

As I have discussed in my first report (Section 5.2), and expand on in Section 4 below, NOPs play a critical role during design (e.g. cement design, temporary abandonment design) to assure HSE quality and thus NOPs can impact operational performance if the "rule based" best practice is pursued.

## 4   Non-operators' capacity and information to influence offshore safety

Mr. Arnold contends that NOPs "*lack the information and capacity to control or influence operational decisions*" and are "*not . . . situated to ensure offshore safety.*"[43] Dr. Sunding assumes that NOPs are "*passive investors*" and also that they are limited in their access to information and ability to induce or supervise an operator's safety investment. Collectively, both argue that NOPs do not have the information necessary nor the capacity or ability to influence decisions impacting safety. As I set forth in my initial report, NOPs are in a position to play an important role in connection with drilling a well and other deepwater activities. In this section, to respond to Mr. Arnold and Dr. Sunding's arguments, I review the roles that NOPs have the opportunity to play, and in my experience actually do play, and compare that to Anadarko's conduct as a non-operator in connection with Macondo.[44]

---

[41] 2014 SPE Safety Report, at 17.

[42] Arnold Report at 2.

[43] Arnold Report at 5.

[44] Although I point to many examples in this Response that contradict Dr. Sunding's portrayal of non-operators as "passive" and "investors," and that contradict Arnold's assertions concerning non-operators' roles as well, space does not permit a full discussion and I also incorporate by

### 4.1 Non-operators routinely receive detailed well plans and communicate with operators about those plans

In my initial report, I explained that industry has developed certain practices to manage the many decisions involved in the expensive and risky deepwater activity. (Section 5.2). The design process, which is necessary for the successful drilling and completion of a deepwater well, can involve dozens of people from many disciplines and months of elapsed time, but that effort is justified given the expenses and risks of the activity. As indicated in my initial report, a well plan, in my experience, will contain detailed information. In my experience, this will include the likely PPFG (pore pressure/fracture gradient) to be encountered at each step of the drilling process, based on seismic data and data from analog wells. It also will contain any other key technical information, including cementing design and procedures (which would include plans to conduct a cement bond log), temporary abandonment procedures, and so forth. Anadarko's drilling engineer, Mr. Bob Quitzau, agreed that the drilling plan is broad in scope – including not just the casing and equipment but everything step by step through to temporary abandonment.[45]

All of these standard industry practices contradict the assumptions of Mr. Arnold and Dr. Sunding. A non-operator certainly is in a position to influence and weigh in on the contents and decisions made in the well plan and it is industry best practice for a non-operator to do so. As indicated in the depositions I reviewed, sharing well designs and plans are standard practice. Anadarko executive Mr. Derek Hollek testified that Anadarko routinely shares its well plan and design with its non-operating partners.[46] Quitzau testified that when he worked for another major oil and gas company that was a non-operator on a project, Quitzau contributed to the well design.[47] The facts here also do not support Dr. Sunding's position that a penalty will have no deterrent effect. Anadarko was in a position to receive detailed information as to what BP anticipated would be the challenges and risks at Macondo. It also could have noted any omissions from the plan or, if decisions were deferred, could have requested future coordination as appropriate, before the time-sensitive situations arose on the rig. Anadarko failed to utilize its capacity to obtain and review the well plan. After Anadarko entered into contracts with BP, before the Deepwater Horizon began to drill at Macondo, Anadarko

---

reference the United States' June 2, 2014 Proffer of Evidence Regarding Defendant Anadarko's Involvement with the Macondo Well, Rec. Doc. 12965.

[45] Deposition of Robert Quitzau (May 25-26, 2011) ("Quitzau Dep."), at 54:17-55:02; 372:16-373:20.

[46] Deposition of Darrell Hollek (July 17, 2014) ("Hollek Dep."), at 172, 182.

[47] Mr. Quitzau had never participated in a NOP role for Anadarko but had done so with a prior employer (Mobil). On that well, Inpex was the Operator and Mobil was the NOP. Mr. Quitzau not only reviewed the well plan but played a large role in the development of the well plan. Quitzau Dep., at 19:17-21:08.

internally discussed having a pre-spud or partner's meeting[48] with BP, but ultimately decided not to proceed with it.[49]  Anadarko also requested copies of the drilling and geologic programs from BP[50] but it is not clear whether they received the plans or never followed up on the request.  It is undisputed that Mr. Quitzau and other APC employees involved with Macondo never obtained the well plan.[51]  Anadarko's decision not to review the well plan is important and in my experience uncommon.  Although I understand that, as a legal matter, Anadarko did not have a responsibility to get and respond to the well plan, Anadarko's failure to take this routine initial step at Macondo, despite its ability to do so, in my opinion departs from standard practice and may have compounded safety issues at Macondo.

### 4.2   Non-operators typically have access to detailed information about planned and ongoing well operations

Mr. Arnold and Dr. Sunding both contend that non-operators do not have enough information about deepwater activities to effectively contribute to decisions that impact the risk of deepwater activities.  I agree that non-operators may not have access to the same information as the operator about the day-to-day operations at a rig site.  However, non-operators are entitled to key technical information about the operations at the well (as Anadarko's own experience at Macondo demonstrates), and modern technological advancements continue to provide NOPs greater access to real-time and near real-time operational information as well.

The model industry form deepwater joint operating agreement that I discussed in my initial report provides for the transmission of real-time data and other information about well operations to NOPs.[52]  This provision of the model form was incorporated into the

---

[48] In my experience it is very common for such a meeting so NOPs can become intimately familiar with the well plan in an efficient manner. The draft version of the new Model Form JOA makes this type of meeting mandatory for exploration wells. AAPL Model Form of Offshore Deepwater Operating Agreement (2014), available at http://ocsadvisoryboard.org/index-2.html. (Article 10.1, Pre-Exploratory Well AFE Meeting).

[49] TREX-02327.

[50] APC-SHS2A-000001166.

[51] Quitzau Dep. at 54:04-16 (reviewed one schematic); 454:14-17.  BP provided a 2 or 3 page schematic of the well casings versus depths with the initial Authorization for Expenditure (AFE), and Anadarko approved that schematic through execution of the AFE.  TREX-01919 (AFE signed December 17, 2009); Deposition of Michael Beirne ("Beirne Dep."), at 218:05-22. Obviously, that non-technical schematic does not substitute for the full well plan.

[52] AAPL Model Form of Offshore Deepwater Operating Agreement, AAPL-810 (2007), at Article 5.7.  (US_PP_WAL001596-US_PP_WAL001764).

joint operating agreement for Macondo.[53]  At Macondo, and other deepwater wells, NOPs have ability to obtain a significant amount of HSE relevant information.  Anadarko employees accessed the real-time data for the well, which provided access to logging data that allowed Anadarko to follow drilling at Macondo through the pay zones.[54]  Anadarko employees also had access to information about Macondo's daily operations through a program called WellSpace, which included daily operating reports, daily drilling reports, mudlogging reports, and pore pressure/fracture gradient reports.[55]  In my experience, it is common for non-operators to require and be provided with such information.

If the information non-operators receive is insufficient or incomplete, non-operators can contact operators with follow-up questions or requests for information.  Anadarko conceded that it had "open lines of communication with BP."[56]  Anadarko witnesses testified that Anadarko had the ability to raise concerns with BP or ask questions if needed to BP about Macondo.[57]  BP's technical contact Robert Bodek reported he had "many, many telephone calls" with Anadarko's drilling engineer Bob Quitzau about Macondo, and provided "*operational updates dozens of times on numerous occasions" to "keep partners in the loop.*"[58]  Anadarko agreed that it could contact BP "*any time through the existing channels.*"[59]  I reviewed numerous examples of email exchanges between Anadarko and BP about operations at the well, which confirm Anadarko's intimate knowledge of the technical operations at the well based on the information it received.[60]  This access to information clearly differentiates real-world Operator/Non-Operator relationships from that described by both Dr. Sunding and Mr. Arnold.

---

[53] TREX-01243, at Article 5.7.

[54] Defendant APC's Objections and Responses to the United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission ("APC Phase 1 Discovery Responses"), dated July 25, 2011, at 58; Deposition of Alan O'Donnell (May 5, 2011) ("O'Donnell Dep."), at 187:06-16, 254:22-255:07; Quitzau Dep. at 142:07-14.

[55] Quitzau Dep. at 37:02-13.  Daily drilling reports provided to Anadarko included a forecast of the next 24-hours of operations.  For example, prior to the temporary abandonment procedures at Macondo, daily reports indicated Anadarko received information about cementing, centralizers and spacers.  TREX-02637, TREX-02638, TREX-02639.

[56] Supplemental Objections and Responses of Defendant APC to Revisions to the United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission ("APC Supplemental Phase 1 Discovery Responses"), dated Sept. 27, 2011, at 11.

[57] Deposition of Paul Chandler (May 4, 2011) ("Chandler Dep."), at 93:02-19 (Anadarko could "raise objections or ask questions if needed" to BP about Macondo, and Chandler did so on occasion during operations at Macondo.)

[58] Deposition of Robert Bodek (April 11-12, 2011) ("Bodek Dep."), at 715:06-12, 717:08-11.

[59] Quitzau Dep. at 425:07-426:03.

[60] For example, TREX-01218 (discussing sand overpressure issue and plan forward for casing) and TREX-02630 (discussing mud losses and pressure data).

### 4.3   With detailed information they receive, non-operators are in a unique position to monitor deepwater activities and to make inquiries if they have safety or other concerns

Unlike shareholders, lenders or banks, NOPs are well–positioned, and have financial and strategic reasons, to monitor the progress of the deepwater activities closely and to raise any technical and safety concerns as discussed in my first report. The facts in this case support my opinion and contradict Mr. Arnold's arguments that non-operators do not have the capacity or information to play a constructive HSE role, and Dr. Sunding's assumptions about the non-operators' role. A BP Chief land manager, Kirk Wardlaw, who participated in the negotiation of the JOA and other contracts with Anadarko, testified that if a partner became concerned about the safety of a particular drilling operation and reported that to BP, he would report that information directly to his vice-president for exploration.[61] BP's Robert Bodek believed Anadarko understood from a technical perspective what was happening at the well.[62] In my opinion and experience, these kinds of communications between operators and non-operators are typical.

All of these communications undermine Mr. Sunding's position concerning the asymmetry of information, for as a result of these communications Anadarko knew of the numerous difficulties encountered while drilling Macondo. It admits that it knew of kicks, losses and other problems between December, 2009, and April 20, 2010, on the following dates:  2/17/10, 3/2/10, 3/8/10, 4/3/10, 4/4/10, and 4/9/10.[63] Mr. Quitzau prepared PPFG graphs showing the narrow drilling margin, and circulated them to Anadarko managers.[64] Anadarko communicated with BP concerning the March 8 kick and resulting work stoppage and was aware of other problems with the progress of drilling.[65] Anadarko also made a number of technical suggestions to BP, which contrary to the position of Mr. Arnold and Dr. Sunding shows that there is some ability for non-operators to have input into technical matters.

There are several examples that illustrate the capacity of non-operators to play a non-passive role. The commitment that Anadarko received from BP to "tie-back" production

---

[61] Deposition of Kirk Wardlaw (June 9, 2011) ("Wardlaw Dep."), at 17:18-23, 27:08-15; 145:06-17.

[62] Bodek Dep. at 373:13-18.

[63] Anadarko Phase 1 Discovery Responses, at 52.

[64] Quitzau Dep. at 333:10-336:16; TREX-02653; Deposition of Stuart Strife (Oct. 5, 2011), at 141:16-143:23; TREX-05550; TREX-02624, TREX-02627, TREX-02628 (examples of PPFG plots provided to Anadarko); ANA-MDL-000007258.

[65] Bodek Dep. at 185:14-187:10; Quitzau Dep. at 50:17-24, 66:13-67:24, 578:12-24.  TREX-02655 (March 24, 2010 email from APC's Derek Folger to Mr. Quitzau, asking "What is BP up to at Macondo? . . . . What is going on at that well?").

from Macondo (if exploration was successful) to the Pompano platform was a significant technical and financial issue as described further in Section 4.4.  During the drilling at Macondo, Anadarko was very aware of the fragility of the well and actually made a recommendation regarding mud weight to help better control the well.[66]  When the well entered the pay zone, Anadarko tried to influence the Operator (unsuccessfully) to reconsider the size of the liner (7 5/8" versus 7") so as to allow greater flow rates during production.[67]

The facts concerning the final days of drilling and Anadarko's communications with BP during that time further contradict the position of Dr. Sunding that a penalty will have no appropriate impact.  In my opinion, Anadarko was very aware of the fragility of the formation and the bottom of the wellbore.  Anadarko witnesses and documents show that it knew of the drilling and well control issues being experienced at Macondo from April 4, 2010, when the pay zone was hit, to the date Anadarko authorized BP to proceed with temporary abandonment on April 20, 2010.  On April 9, 2010, Mr. Quitzau wrote in an email that " *[BP] clearly cannot tolerate any well control incident based on their recent mud losses*" and that "*[i]f there is any risk of seeing a pressure gradient increase below the pay sand, it would be wise to case the future completion zone now.*"[68]  (This was the same day that BP drilled 100 feet deeper.)[69]  On April 31, 2010, BP advised Anadarko that BP was calling Total Depth early "*due to safety concerns and wellbore integrity issues.*"  BP explained that, *"[h]aving both loss zones, and comparatively over-pressured sands in the open hole provided for little to no margin to continue drilling.*"[70]

Although I am advised that Anadarko had no legal duty to ask BP questions at this time, in my opinion, it was positioned to play a constructive role at this point in the drilling of Macondo.  One can only speculate as to how the course of events might have changed had Anadarko made even one inquiry as to BP's planning process for cementing or temporary abandonment or other HSE precautions at this time.  Instead of asking about planning or HSE issues, Anadarko proposed the idea of drilling deeper (this was after the extra 100 feet of drilling occurred).[71]  Given the fragility of the well this recommendation, which was ultimately rejected by BP, clearly might have had significant HSE implications.  In my opinion, these facts show the weaknesses of the positions of both Dr. Sunding and Mr. Arnold.

---

[66] Quitzau Dep. at 131-32, 417:10-419:21 (Anadarko had "some experience with ballooning issues and I was just trying to help out"); TREX-02630.

[67] TREX-02633.

[68] TREX-02635.

[69] Findings of Fact and Conclusions of Law, Phase 1 Trial, Rec. Doc. 13355, at 19 (¶ 65).

[70] TREX-01256.

[71] TREX-01592; TREX-01593; O'Donnell Dep. at 198-199.

Many of the risk factors relevant to deepwater were observed at Macondo, and Anadarko knew of them, but Anadarko failed to take a safety first approach and failed to assign someone to monitor the well from a safety perspective.  Thus, the facts here demonstrate that a penalty is warranted to incentivize different practices going forward and to avoid rewarding APC for its conduct at Macondo.  Anadarko's failure to pay even basic attention to HSE may reflect a desire to reduce their costs by reducing the allocation of human resources to Macondo, in my opinion.  As a result there were a number of shortcomings:

- First, at the time of the Macondo incident, there were a number of Anadarko personnel from multiple groups tracking the operations; however, it appears from the depositions that none of these people was ever provided training or provided specific instructions from management as to what the policy of Anadarko was regarding the roles and responsibilities of NOPs.  There was no evidence of Anadarko policies in that regard and Mr. Quitzau testified that he was not provided with any instructions as to his role.[72]

- Second, Anadarko witnesses testified that they did not take the BP prior major HSE incidents into account as part of their due diligence of the Macondo project, nor did Anadarko assign anyone to track or keep an eye on safety practices despite the difficulties in drilling Macondo.  Nick Huch, the Anadarko landman who negotiated the JOA and other contracts, testified that he made no inquiry into BP's past safety and environmental record.[73]  Quitzau testified that he did not monitor the Macondo well for safety of the operations and did not view that as part of his job.[74]  I acknowledged in my initial report the distinction between input

---

[72] Quitzau Dep. at 65:19-66:12; 578:25-579:13.

[73] Huch Dep. at 187-189.  Huch testified as follows:

*Q. Prior to January 2010, did you review BP's Gulf of Mexico regional oil spill response plan? A. No. Q. As of the end of 2009, had you had any discussions with anybody at Anadarko about BP's past health, safety or environmental record? A. No. Q. As of the end of 2009, did you personally have any concerns about BP's health, safety or environmental record in connection with whether Anadarko should acquire interest in the Macondo Prospect? A. No. Q. As of the end of 2009, had you engaged in any discussions internally at Anadarko regarding BP's ability to manage or contain a blowout? A. No. Q. As of the end of 2009, had you participated in any discussions internally at Anadarko regarding BP's ability to contain an oil spill at Macondo? A. No. Q. As of the end of 2009, did you have any concerns about BP's ability to manage or contain a blowout at Macondo? A. No.*

[74] Quitzau Dep. at 402:21-403:09.  Quitzau testified:

*Q. Did you ever monitor the Macondo well for the safety of the operations on the well? A. I did not. Q. Did you view it as your role and responsibility to do so? A. I did not. Q. Did you ever receive any instruction from anyone at Anadarko to*

into the well plan, and operation decisions.  Nonetheless, in my view a NOP
pursuing industry best practice would have required that the operator clearly
articulate the drilling plan including the temporary abandonment plans.  This
would have allowed the NOP to respond to the last moment changes to these
plans and the associated risk created by these changes.

All of these shortcomings should not be encouraged but would be under the reasoning of
Dr. Sunding and Mr. Arnold.

### 4.4   Under contractual agreements, non-operators have rights that provide some capacity to influence key operational decisions

As discussed above, the joint operating agreement provides non-operators with the right
to substantial information about important well operations and other deepwater activities.
The operating agreement also provides non-operators with the capacity to influence key
operational and HSE decisions and contradicts the positions of Dr. Sunding and Mr.
Arnold. For example, the operating agreement at Macondo describes the rights of NOPs
to audit the operator's HSE management systems and the right to inspect worksites
including the rig.[75]  Not only did Anadarko fail to exercise these rights,[76] but testimony
from the Anadarko employee who negotiated the agreements with BP revealed he did not
even read these HSE provisions of the JOA, and was not aware that anyone who worked
on Macondo from Anadarko would have been responsible for reviewing these key HSE
provisions.[77]  In my opinion, this behavior should not be incentivized or endorsed.

Under the operating agreement (both the model form and for Macondo), non-operators
also have the ability to approve or disapprove authorizations for expenditures (AFEs) at
the well.  Mr. Arnold contends that this approval only provides non-operators with
"limited influence."  I disagree, and an example from Anadarko's own experiences with
non-operators contradicts Mr. Arnold.  A non-operator (ConocoPhillips) requested
substantial information from Anadarko (who was the operator) about a workover
procedure prior to making an AFE election.[78]  Among the questions asked by the NOP

---

*monitor the Macondo well for safety? A. I did not. Q. Did you think that that should
be part of your job? A. I did not.*

[75] Article 5.10 of the JOA states that the Operator is responsible for executing HSE obligations
"with the support and cooperation of the Non-Operators" and Exhibit K of the JOA further details
HSE duties and obligations.  TREX-01243.

[76] Wardlaw Dep. at 108-111.

[77] Huch Dep. at 182:15-22.

[78] ANA-MDL-000111525.

was whether Anadarko had "*adequate emergency spill response capability*" if an incident occurred during the workover. Anadarko granted the NOP an extension on making the AFE election so that the NOP could provide its management with the additional information on the workover procedure and response plans. This example demonstrates that the AFE approval process can and does provide NOPs with additional information about the safety of planned operations, and ensure that there are adequate measures in place to reduce and mitigate risks.

Another example from this case contradicts Mr. Arnold's view that a NOP does not have the capacity or information to exert any influence. The JOA also provides for NOP input after total depth for the well is declared by the operator.[79] At Macondo, after reaching total depth, BP recommended to set the production casing and circulated an AFE to the co-owners for approval for this operation.[80] Anadarko met internally to discuss the proposal and ultimately agreed to sign the AFE.[81] The final AFE to set the production casing noted that the funds would be used to pay for the production casing, casing hanger, cement, casing accessories, lock-down sleeve and its installation.[82] In conjunction with the decision to set the production casing, on April 20, 2010, Anadarko approved the decision to temporarily abandon the well,[83] but under the JOA's election procedures also could have proposed alternative operations at that time.[84] Again, in this instance, this non-operator had an opportunity and the capacity and information to at least inquire and discuss the procedures it was about to authorize.

Although Anadarko's experts express the opinion that non-operators lack the ability to exert influence over key operational decisions, Anadarko's experience in obtaining a tie-back to the Pompano facility suggests otherwise. As discussed in the deposition of Anadarko's negotiator Nick Huch, Anadarko requested that in the event that Macondo was successful, the processing and handling of all production be accomplished (if feasible) through a subsea tie-back to the Pompano facility, which was co-owned by BP and an Anadarko subsidiary.[85] The parties memorialized this commitment in the Well Participation Agreement.[86] In my experience, the selection of a "development plan" is the single biggest decision in the maturation of a deepwater project, or any mega-project,

---

[79] TREX-01243, at 10.2 (exploratory operations at objective depth).

[80] TREX-02855 (April 14, 2010 email from BP's Michael Beirne to other BP employees, emphasizing that before setting the production casing, BP needed approval from the co-owners).

[81] O'Donnell Dep. at 209:12-211:16.

[82] TREX-01922.

[83] TREX-01931.

[84] TREX-01243, at Article 10.2.

[85] Huch Dep. at 70-71; TREX-02309 (email from Huch to BP, stating "one of the moving considerations for Anadarko agreeing to enter into a partnering arrangement with BP on Macondo was for production to be tied-back to Pompano.").

[86] TREX-01943, at 3.3.

from a value-based perspective. The concession BP provided to Anadarko is very significant, not only in the possible impact to lowering decision quality,[87] but in the flexibility BP loses as majority equity holder (value of control). Anadarko's negotiations on the tie-back do not demonstrate the actions of a "passive investor" and undermine Mr. Arnold and Dr. Sunding's contentions that Anadarko lacked the ability to influence key decisions.

### 4.5 Summary of non-operators' capacity and information to influence decisions

As the above discussion makes clear, NOPs have the rights via the JOA, the information obtained both during design and real time information from operations to influence decisions and because of that can to make a contribution to HSE performance. There are no constraints, either contractually or established within industry practice for NOPs to be active-participants; rather, any lack of participation is a conscious choice made by NOPs usually made to reduce costs.

## 5  Impact of CWA penalties

Mr. Arnold's concludes "*Making them [NOPs] responsible for offshore safety will not improve safety.*"[88]  It is my opinion that this conclusion (which is based on Mr. Arnold's narrow view of the human factors driving offshore safety, his flawed opinion that only operations are key to offshore safety, and his incorrect view that NOPs lack the information and capacity to influence HSE performance) is invalid.

Similarly, Dr. Sunding's final opinion that Anadarko should receive no CWA penalties is flawed because it is based on incorrect assumptions that NOPs cannot influence HSE performance.  It is industry best practice for NOP to do so through targeted active participation as discussed in my first report and expanded on in this report.

Since not penalizing Anadarko could be viewed as endorsement of the passive approach Anadarko took at Macondo, it is in the public's interest to ensure a material penalty is

---

[87] In my first report, I introduce the concept of "stage-gate" decision making, which is a framework designed to improve overall decision quality.  During the first stage of the state-gate process, Feasibility, the integrated project team (IPT) (which includes representation from non-operators) determines whether a particular case can be identified that is economic; however, this does not commit the project to that concept.  It is during the second stage, Selection, that the team identifies the specific development plan to pursue.  As defined in Section 12.4.1 of the model form JOA, this would include the production facilities and systems to be used.  By committing to a production plan prior to the selection phase, BP and Anadarko lowered the quality of decision making.

[88] Arnold Report at 2.

imposed on Anadarko. Such a penalty will incentivize future NOPs to pursue active participation, which will support HSE performance of deepwater activities.

## Appendix A – Considered Materials

In addition to the documents cited in the Round 1 and Round 2 expert reports, as well as the consideration materials identified in conjunction with the Round 1 expert report, the following documents were considered in preparation of this Round 2 report:

| Bates, Exhibit, TREX, or Other Description |
|---|
| APC-SHS2A-000001166-APC-SHS2A-000001166 |
| ANA-MDL-000007258-ANA-MDL-000007261 |
| ANA-MDL-000021803-ANA-MDL-000021815 |
| ANA-MDL-000111525-ANA-MDL-000111533 |
| DEFEXP000452-DEFEXP000536 |
| DEFEXP000800-DEFEXP000869 |
| DEFEXP000870-DEFEXP000896 |
| DEFEXP000897-DEFEXP000924 |
| DEFEXP001010-DEFEXP001024 |
| DEFEXP001025-DEFEXP001077 |
| DEFEXP001078-DEFEXP001117 |
| DEFEXP001118-DEFEXP001212 |
| DEFEXP001213-DEFEXP001262 |
| DEFEXP001263-DEFEXP001279 |
| DEFEXP001280-DEFEXP001302 |
| DEFEXP001303-DEFEXP001320 |
| DEFEXP001340-DEFEXP001353 |
| DEFEXP001410-DEFEXP001429 |
| DEFEXP001430-DEFEXP001460 |
| DEFEXP012004-DEFEXP012022 |
| DEFEXP012023-DEFEXP012040 |
| DEFEXP012544-DEFEXP012562 |
| DEFEXP012596-DEFEXP012628 |
| DEFEXP023040-DEFEXP023047 |
| DEFEXP023128-DEFEXP023135 |
| Expert Report of Kenneth E. Arnold (dated August 15, 2014) |
| Report of Professor David L. Sunding (dated August 15, 2014) |
| Expert Report of Charles F. Mason (dated August 15, 2014) |
| US_PP_MAS011666-US_PP_MAS011818 |
| US_PP_WAL003609-US_PP_WAL003614 |
| US_PP_WAL003615-US_PP_WAL003615 |
| US_PP_WAL003616-US_PP_WAL003630 |
| US_PP_WAL003631-US_PP_WAL003647 |
| US_PP_WAL003648-US_PP_WAL003650 |
| US_PP_WAL003651-US_PP_WAL003859 |
| |