# EXHIBIT 11

## to

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF (1) ITS MOTION *IN LIMINE* TO ADMIT EVIDENCE PERTAINING TO ANADARKO'S CONTENTIONS CONCERNING NON-OPERATORS AND (2) IN OPPOSITION TO ANADARKO'S MOTION TO ENFORCE THE COURT'S ORDER EXCLUDING CULPABILITY EVIDENCE AGAINST ANADARKO**

The table below draws connections between the opinions of APC's experts and the opinions of Mr. Walkup in the portions of his Round 2 Report that APC is now seeking to preclude. Note that this table does not contain an exhaustive list of the facts and statements at issue, but is provided to show the rebuttal nature of Mr. Walkup's testimony regarding APC's activities at Macondo, and the interconnectedness between APC's contentions regarding non-operators (that it is expressing through its experts) and APC's role as a non-operator at Macondo.

| I. Non-Operators' Access to Information about Well Design & Operations ||
|---|---|
| **Kenneth Arnold's Round 1 Opinions:**<br>• *On information generally:* "NO-WIO's normally ask for and receive information on the status of the well's progress for business reasons . . . ." p.5.<br>• *On well design:* "[A] NO-WIO is not expected to check design calculations . . . . [The authorization for expenditure process] is not intended to convey a detailed report of the well design, the alternatives considered and calculations that led to the recommendation." p.5 & p.5 n.17.<br>• *On operations:* "The type and quality of information furnished to an NO-WIO in this way is typically not sufficient for a NO-WIO engineer to monitor operations on a real time basis." p.5<br>• *On safety:* "The information contained in the AFEs and the information furnished directly from the operations do not allow real-time monitoring of the operation in sufficient detail to detect problems and make accurate decisions." p.6.<br><br>**David Sunding's Round 1 Opinions:**<br>• Moral hazard model is characterized by asymmetry of information where principal ("operator") has superior information and agent ("investor") has imperfect information. p.7.<br>• Referring to a situation where investor "cannot observe . . . the safety measures undertaken by an operator." p.7.<br>• "[B]ecause of the practical limits on an investor's access to information…it is not efficient to impose penalties on non-culpable investors." p.8.<br>• ". . . [I]t it is more efficient to impose [civil penalties] on entities with information . . . ." p.8. | **Gardner Walkup's Round 2 Response:**<br>• *On information generally:* "I reviewed numerous examples of email exchanges between Anadarko and BP about operations at the well, which confirm Anadarko's intimate knowledge of the technical operations at the well based on the information it received. This access to information clearly differentiates real-world Operator/Non-Operator relationships from that described by both Dr. Sunding and Mr. Arnold." p.21.<br>• *On well design:* "Non-operators routinely receive detailed well plans . . . . Anadarko was in a position to receive detailed information as to what BP anticipated would be the challenges and risks at Macondo. It also could have noted any omissions from the plan or, if decisions were deferred, could have requested future coordination as appropriate, before the time-sensitive situations arose on the rig. Anadarko failed to use its capacity to obtain and review the well plan." p.19.<br>• *On operations:* "I agree that non-operators may not have access to the same information as the operator about the day-to-day operations at a rig site. However, non-operators are entitled to key technical information about the operations at the well (as Anadarko's own experience at Macondo demonstrates), and modern technological advancements continue to provide NOPs greater access to real-time and near real-time operational information as well." p.20<br>• *On safety:* "…Anadarko knew of the numerous difficulties encountered while drilling at Macondo" (p.22) and "In my opinion, Anadarko was very aware of the fragility of the formation and the bottom of the wellbore . . . . Instead of asking about planning or HSE issues, Anadarko proposed the idea of drilling deeper . . . ." p.23. |

|  |
|---|
| **II.    Communications with Partners** |

| **Kenneth Arnold's Round 1 Opinions:** | **Gardner Walkup's Round 2 Response:** |
|---|---|
| <ul><li>"During exploration, a NO-WIO might have informal conversations with the Operator's staff, such as when the Operator is preparing an AFE to drill a well or change the scope of an approved AFE (e.g., sidetrack a well because of drilling problems, temporarily abandon (or plug and abandon) a well before reaching the agreed objectives.).  But a NO-WIO is not expected to check design calculations or detailed operating procedures." p.5.</li></ul> | <ul><li>"Anadarko conceded that it had 'open lines of communications with BP.'  Anadarko witnesses testified that Anadarko had the ability to raise concerns with BP or ask questions if needed to BP about Macondo." p.21.</li><li>"BP's technical contact reported he had 'many, many telephone calls' with Anadarko's drilling engineer Bob Quitzau about Macondo, and provided 'operational updates dozens of times on numerous occasions' to 'keep partners in the loop.'" p.21.</li><li>"Anadarko agreed that it could contact BP 'any time through the existing channels.'" p.21.</li><li>"Anadarko communicated with BP concerning the March 8 kick and resulting work stoppage . . . ." p.22.</li></ul> |

|  |
|---|
| **III.    Non-Operator's Influence over Operations** |

| **Kenneth Arnold's Round 1 Opinions:** | **Gardner Walkup's Round 2 Response:** |
|---|---|
| <ul><li>"A NO-WIO has extremely limited influence." p.5.</li><li>"[O]nce a NO-WIO has obtained a leasehold interest and designated another entity as the Operator, there is little it can do to influence ongoing operational decisions." p.6.</li><li>"…[T]he culture of an operation can be developed and sustained only by the organization in charge of that operation.  Because a NO-WIO is not routinely present on the jobsite, it can do neither." p.5.</li></ul>**David Sunding's Round 1 Opinions:**<ul><li>"In general, investors not only have imperfect information; they also have an imperfect ability to control operators." p.7.</li><li>Opines that it is more efficient to impose penalties on entities with "actual control over the operation and potential violations." p.8.</li><li>Refers to non-operators as "passive investors." p.2.</li></ul> | <ul><li>"Anadarko also made a number of technical suggestions to BP, which contrary to the position of Mr. Arnold and Dr. Sunding shows that there is some ability for non-operators to have input into technical matters . . . . During the drilling at Macondo, Anadarko was very aware of the fragility of the well and actually made a recommendation regarding mud weight to help better control the well." pp.22-23.</li><li>"Anadarko requested that in the event that Macondo was successful, the processing and handling of all production be accomplished (if feasible) through a subsea tie-back to the Pompano facility, which was co-owned by BP and an Anadarko subsidiary . . . . In my experience, the selection of a 'development plan' is the single biggest decision in the maturation of a deepwater project . . . Anadarko's negotiations on the tie-back do not demonstrate the actions of a 'passive investor' and undermine Mr. Arnold and Dr. Sunding's contentions that Anadarko lacked the ability to influence key decisions." pp.26-27.</li></ul> |

2

| IV. Non-Operator/Operator Contractual Relationships ||
|---|---|
| **Kenneth Arnold's Round 1 Opinions:**<br>• "NO-WIOs are not otherwise situated to ensure offshore safety. Operating Agreements typically provide that the Operator (i) is not subject to NO-WIO's control (ii) hires the drilling contractor, and (iii) makes reports to the Government. Operating Agreements also typically provide the Operator maximum and exclusive control over exploratory operations. Anadarko's Operating Agreement with BP and MOEX, effective October 1, 2009, is no exception." p.5.<br>• "The blowout here occurred before the end of exploratory operations, so typical Operation Agreement provisions giving NO-WIOs more influence over later stages did not kick in." p.5, n.18.<br><br>**David Sunding's Round 1 Opinions:**<br>• Includes citations to literature analogizing non-operating partners in offshore drilling activities to different principal/agent relationships, including bank lenders and Superfund site owners. pp.7-8. | **Gardner Walkup's Round 2 Response:**<br>• "The operating agreement also provides non-operators with the capacity to influence key operational and HSE decisions and contradicts the positions of Dr. Sunding and Mr. Arnold. For example, the operating agreement at Macondo describes the rights of NOPs to audit the operator's HSE management systems and the right to inspect worksites including the rig." p.25.<br>• "Under the operating agreement (both model form and for Macondo), non-operators also have the ability to approve or disapprove authorizations for expenditures (AFEs) at the well. Mr Arnold contends that this approval only provides non-operators with 'limited influence.' I disagree, and an example from Anadarko's own experiences with non-operators contradicts Mr. Arnold." p.25.<br>• "Another example from this case contradicts Mr. Arnold's view that a NOP does not have the capacity or information to exert any influence. The JOA also provides for NOP input after total depth for the well is declared by the operator. At Macondo, after reaching total depth, BP recommended to set the production casing and circulated an AFE to the co-owners for approval for this operation. Anadarko met internally to discuss the proposal and ultimately agreed to sign the AFE . . . . Anadarko approved the decision to temporarily abandon the well, but under the JOA's election procedures could have proposed alternative operations at that time." p.26. |