# EXHIBIT 16

## to

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF (1) ITS MOTION *IN LIMINE* TO ADMIT EVIDENCE PERTAINING TO ANADARKO'S CONTENTIONS CONCERNING NON-OPERATORS AND (2) IN OPPOSITION TO ANADARKO'S MOTION TO ENFORCE THE COURT'S ORDER EXCLUDING CULPABILITY EVIDENCE AGAINST ANADARKO**

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUSISANA

IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179 "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

Response to Expert Report of Kenneth E. Arnold of 15 August 2014 and Response to Expert Report of Professor David L. Sunding of 15 August 2014

EXPERT REPORT OF

GARDNER W. WALKUP, JR.

ON BEHALF OF

THE UNITED STATES OF AMERICA



SEPTEMBER 12, 2014

*[signature: Gardner W. Walkup Jr.]*

Gardner W. Walkup, Jr.

**DATED: September 12, 2014**

Finally, this important report identified that solely depending on those doing the actual operations ("*closer to the workface*") to ensure quality HSE decisions is not a best practice but rather, to the extent possible, operational decisions should be "*rule-based*" meaning determined *a priori* to actual operations during design:

> *One important aspect of Operational Control of Work centers on the role of risk assessment. Experience has shown that those closest to the action become biased in favor of achieving the goal and downplay risks. The closer to the workface, the more decision-making should be rule-based rather than risk-based.*[41]

This "rule-based" approach where key decision are actually removed from those conducting the operations in real time is in direct conflict with Mr. Arnolds' contention that "*Operational safety requires a culture in which the people who actually do the work always make the right choices.*"[42]

As I have discussed in my first report (Section 5.2), and expand on in Section 4 below, NOPs play a critical role during design (e.g. cement design, temporary abandonment design) to assure HSE quality and thus NOPs can impact operational performance if the "rule based" best practice is pursued.

## 4   Non-operators' capacity and information to influence offshore safety

Mr. Arnold contends that NOPs "*lack the information and capacity to control or influence operational decisions*" and are "*not . . . situated to ensure offshore safety.*"[43] Dr. Sunding assumes that NOPs are "*passive investors*" and also that they are limited in their access to information and ability to induce or supervise an operator's safety investment. Collectively, both argue that NOPs do not have the information necessary nor the capacity or ability to influence decisions impacting safety. As I set forth in my initial report, NOPs are in a position to play an important role in connection with drilling a well and other deepwater activities. In this section, to respond to Mr. Arnold and Dr. Sunding's arguments, I review the roles that NOPs have the opportunity to play, and in my experience actually do play, and compare that to Anadarko's conduct as a non-operator in connection with Macondo.[44]

---

[41] 2014 SPE Safety Report, at 17.

[42] Arnold Report at 2.

[43] Arnold Report at 5.

[44] Although I point to many examples in this Response that contradict Dr. Sunding's portrayal of non-operators as "passive" and "investors," and that contradict Arnold's assertions concerning non-operators' roles as well, space does not permit a full discussion and I also incorporate by

## 4.1 Non-operators routinely receive detailed well plans and communicate with operators about those plans

In my initial report, I explained that industry has developed certain practices to manage the many decisions involved in the expensive and risky deepwater activity. (Section 5.2). The design process, which is necessary for the successful drilling and completion of a deepwater well, can involve dozens of people from many disciplines and months of elapsed time, but that effort is justified given the expenses and risks of the activity. As indicated in my initial report, a well plan, in my experience, will contain detailed information. In my experience, this will include the likely PPFG (pore pressure/fracture gradient) to be encountered at each step of the drilling process, based on seismic data and data from analog wells. It also will contain any other key technical information, including cementing design and procedures (which would include plans to conduct a cement bond log), temporary abandonment procedures, and so forth. Anadarko's drilling engineer, Mr. Bob Quitzau, agreed that the drilling plan is broad in scope – including not just the casing and equipment but everything step by step through to temporary abandonment.[45]

All of these standard industry practices contradict the assumptions of Mr. Arnold and Dr. Sunding. A non-operator certainly is in a position to influence and weigh in on the contents and decisions made in the well plan and it is industry best practice for a non-operator to do so. As indicated in the depositions I reviewed, sharing well designs and plans are standard practice. Anadarko executive Mr. Derek Hollek testified that Anadarko routinely shares its well plan and design with its non-operating partners.[46] Quitzau testified that when he worked for another major oil and gas company that was a non-operator on a project, Quitzau contributed to the well design.[47] The facts here also do not support Dr. Sunding's position that a penalty will have no deterrent effect. Anadarko was in a position to receive detailed information as to what BP anticipated would be the challenges and risks at Macondo. It also could have noted any omissions from the plan or, if decisions were deferred, could have requested future coordination as appropriate, before the time-sensitive situations arose on the rig. Anadarko failed to utilize its capacity to obtain and review the well plan. After Anadarko entered into contracts with BP, before the Deepwater Horizon began to drill at Macondo, Anadarko

---

reference the United States' June 2, 2014 Proffer of Evidence Regarding Defendant Anadarko's Involvement with the Macondo Well, Rec. Doc. 12965.

[45] Deposition of Robert Quitzau (May 25-26, 2011) ("Quitzau Dep."), at 54:17-55:02; 372:16-373:20.

[46] Deposition of Darrell Hollek (July 17, 2014) ("Hollek Dep."), at 172, 182.

[47] Mr. Quitzau had never participated in a NOP role for Anadarko but had done so with a prior employer (Mobil). On that well, Inpex was the Operator and Mobil was the NOP. Mr. Quitzau not only reviewed the well plan but played a large role in the development of the well plan. Quitzau Dep., at 19:17-21:08.

internally discussed having a pre-spud or partner's meeting[48] with BP, but ultimately decided not to proceed with it.[49] Anadarko also requested copies of the drilling and geologic programs from BP[50] but it is not clear whether they received the plans or never followed up on the request. It is undisputed that Mr. Quitzau and other APC employees involved with Macondo never obtained the well plan.[51] Anadarko's decision not to review the well plan is important and in my experience uncommon. Although I understand that, as a legal matter, Anadarko did not have a responsibility to get and respond to the well plan, Anadarko's failure to take this routine initial step at Macondo, despite its ability to do so, in my opinion departs from standard practice and may have compounded safety issues at Macondo.

### 4.2   Non-operators typically have access to detailed information about planned and ongoing well operations

Mr. Arnold and Dr. Sunding both contend that non-operators do not have enough information about deepwater activities to effectively contribute to decisions that impact the risk of deepwater activities. I agree that non-operators may not have access to the same information as the operator about the day-to-day operations at a rig site. However, non-operators are entitled to key technical information about the operations at the well (as Anadarko's own experience at Macondo demonstrates), and modern technological advancements continue to provide NOPs greater access to real-time and near real-time operational information as well.

The model industry form deepwater joint operating agreement that I discussed in my initial report provides for the transmission of real-time data and other information about well operations to NOPs.[52] This provision of the model form was incorporated into the

---

[48] In my experience it is very common for such a meeting so NOPs can become intimately familiar with the well plan in an efficient manner. The draft version of the new Model Form JOA makes this type of meeting mandatory for exploration wells. AAPL Model Form of Offshore Deepwater Operating Agreement (2014), available at http://ocsadvisoryboard.org/index-2.html. (Article 10.1, Pre-Exploratory Well AFE Meeting).

[49] TREX-02327.

[50] APC-SHS2A-000001166.

[51] Quitzau Dep. at 54:04-16 (reviewed one schematic); 454:14-17. BP provided a 2 or 3 page schematic of the well casings versus depths with the initial Authorization for Expenditure (AFE), and Anadarko approved that schematic through execution of the AFE. TREX-01919 (AFE signed December 17, 2009); Deposition of Michael Beirne ("Beirne Dep."), at 218:05-22. Obviously, that non-technical schematic does not substitute for the full well plan.

[52] AAPL Model Form of Offshore Deepwater Operating Agreement, AAPL-810 (2007), at Article 5.7. (US_PP_WAL001596-US_PP_WAL001764).

joint operating agreement for Macondo.[53]  At Macondo, and other deepwater wells, NOPs have ability to obtain a significant amount of HSE relevant information.  Anadarko employees accessed the real-time data for the well, which provided access to logging data that allowed Anadarko to follow drilling at Macondo through the pay zones.[54]  Anadarko employees also had access to information about Macondo's daily operations through a program called WellSpace, which included daily operating reports, daily drilling reports, mudlogging reports, and pore pressure/fracture gradient reports.[55]  In my experience, it is common for non-operators to require and be provided with such information.

If the information non-operators receive is insufficient or incomplete, non-operators can contact operators with follow-up questions or requests for information.  Anadarko conceded that it had "open lines of communication with BP."[56]  Anadarko witnesses testified that Anadarko had the ability to raise concerns with BP or ask questions if needed to BP about Macondo.[57]  BP's technical contact Robert Bodek reported he had "many, many telephone calls" with Anadarko's drilling engineer Bob Quitzau about Macondo, and provided "*operational updates dozens of times on numerous occasions*" to "*keep partners in the loop.*"[58]  Anadarko agreed that it could contact BP "*any time through the existing channels.*"[59]  I reviewed numerous examples of email exchanges between Anadarko and BP about operations at the well, which confirm Anadarko's intimate knowledge of the technical operations at the well based on the information it received.[60]  This access to information clearly differentiates real-world Operator/Non-Operator relationships from that described by both Dr. Sunding and Mr. Arnold.

---

[53] TREX-01243, at Article 5.7.

[54] Defendant APC's Objections and Responses to the United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission ("APC Phase 1 Discovery Responses"), dated July 25, 2011, at 58; Deposition of Alan O'Donnell (May 5, 2011) ("O'Donnell Dep."), at 187:06-16, 254:22-255:07; Quitzau Dep. at 142:07-14.

[55] Quitzau Dep. at 37:02-13.  Daily drilling reports provided to Anadarko included a forecast of the next 24-hours of operations.  For example, prior to the temporary abandonment procedures at Macondo, daily reports indicated Anadarko received information about cementing, centralizers and spacers.  TREX-02637, TREX-02638, TREX-02639.

[56] Supplemental Objections and Responses of Defendant APC to Revisions to the United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission ("APC Supplemental Phase 1 Discovery Responses"), dated Sept. 27, 2011, at 11.

[57] Deposition of Paul Chandler (May 4, 2011) ("Chandler Dep."), at 93:02-19 (Anadarko could "raise objections or ask questions if needed" to BP about Macondo, and Chandler did so on occasion during operations at Macondo.)

[58] Deposition of Robert Bodek (April 11-12, 2011) ("Bodek Dep."), at 715:06-12, 717:08-11.

[59] Quitzau Dep. at 425:07-426:03.

[60] For example, TREX-01218 (discussing sand overpressure issue and plan forward for casing) and TREX-02630 (discussing mud losses and pressure data).

### 4.3  With detailed information they receive, non-operators are in a unique position to monitor deepwater activities and to make inquiries if they have safety or other concerns

Unlike shareholders, lenders or banks, NOPs are well–positioned, and have financial and strategic reasons, to monitor the progress of the deepwater activities closely and to raise any technical and safety concerns as discussed in my first report.  The facts in this case support my opinion and contradict Mr. Arnold's arguments that non-operators do not have the capacity or information to play a constructive HSE role, and Dr. Sunding's assumptions about the non-operators' role.  A BP Chief land manager, Kirk Wardlaw, who participated in the negotiation of the JOA and other contracts with Anadarko, testified that if a partner became concerned about the safety of a particular drilling operation and reported that to BP, he would report that information directly to his vice-president for exploration.[61]  BP's Robert Bodek believed Anadarko understood from a technical perspective what was happening at the well.[62]  In my opinion and experience, these kinds of communications between operators and non-operators are typical.

All of these communications undermine Mr. Sunding's position concerning the asymmetry of information, for as a result of these communications Anadarko knew of the numerous difficulties encountered while drilling Macondo.  It admits that it knew of kicks, losses and other problems between December, 2009, and April 20, 2010, on the following dates:  2/17/10, 3/2/10, 3/8/10, 4/3/10, 4/4/10, and 4/9/10.[63]  Mr. Quitzau prepared PPFG graphs showing the narrow drilling margin, and circulated them to Anadarko managers.[64]  Anadarko communicated with BP concerning the March 8 kick and resulting work stoppage and was aware of other problems with the progress of drilling.[65]  Anadarko also made a number of technical suggestions to BP, which contrary to the position of Mr. Arnold and Dr. Sunding shows that there is some ability for non-operators to have input into technical matters.

There are several examples that illustrate the capacity of non-operators to play a non-passive role.  The commitment that Anadarko received from BP to "tie-back" production

---

[61] Deposition of Kirk Wardlaw (June 9, 2011) ("Wardlaw Dep."), at 17:18-23, 27:08-15; 145:06-17.

[62] Bodek Dep. at 373:13-18.

[63] Anadarko Phase 1 Discovery Responses, at 52.

[64] Quitzau Dep. at 333:10-336:16; TREX-02653; Deposition of Stuart Strife (Oct. 5, 2011), at 141:16-143:23; TREX-05550; TREX-02624, TREX-02627, TREX-02628 (examples of PPFG plots provided to Anadarko); ANA-MDL-000007258.

[65] Bodek Dep. at 185:14-187:10; Quitzau Dep. at 50:17-24, 66:13-67:24, 578:12-24.  TREX-02655 (March 24, 2010 email from APC's Derek Folger to Mr. Quitzau, asking "What is BP up to at Macondo? . . . . What is going on at that well?").

from Macondo (if exploration was successful) to the Pompano platform was a significant technical and financial issue as described further in Section 4.4.  During the drilling at Macondo, Anadarko was very aware of the fragility of the well and actually made a recommendation regarding mud weight to help better control the well.[66]  When the well entered the pay zone, Anadarko tried to influence the Operator (unsuccessfully) to reconsider the size of the liner (7 5/8" versus 7") so as to allow greater flow rates during production.[67]

The facts concerning the final days of drilling and Anadarko's communications with BP during that time further contradict the position of Dr. Sunding that a penalty will have no appropriate impact.  In my opinion, Anadarko was very aware of the fragility of the formation and the bottom of the wellbore.  Anadarko witnesses and documents show that it knew of the drilling and well control issues being experienced at Macondo from April 4, 2010, when the pay zone was hit, to the date Anadarko authorized BP to proceed with temporary abandonment on April 20, 2010.  On April 9, 2010, Mr. Quitzau wrote in an email that " *[BP] clearly cannot tolerate any well control incident based on their recent mud losses*" and that "*[i]f there is any risk of seeing a pressure gradient increase below the pay sand, it would be wise to case the future completion zone now*."[68]  (This was the same day that BP drilled 100 feet deeper.)[69]  On April 31, 2010, BP advised Anadarko that BP was calling Total Depth early "*due to safety concerns and wellbore integrity issues*."  BP explained that, "*[h]aving both loss zones, and comparatively over-pressured sands in the open hole provided for little to no margin to continue drilling*."[70]

Although I am advised that Anadarko had no legal duty to ask BP questions at this time, in my opinion, it was positioned to play a constructive role at this point in the drilling of Macondo.  One can only speculate as to how the course of events might have changed had Anadarko made even one inquiry as to BP's planning process for cementing or temporary abandonment or other HSE precautions at this time.  Instead of asking about planning or HSE issues, Anadarko proposed the idea of drilling deeper (this was after the extra 100 feet of drilling occurred).[71]  Given the fragility of the well this recommendation, which was ultimately rejected by BP, clearly might have had significant HSE implications.  In my opinion, these facts show the weaknesses of the positions of both Dr. Sunding and Mr. Arnold.

---

[66] Quitzau Dep. at 131-32, 417:10-419:21 (Anadarko had "some experience with ballooning issues and I was just trying to help out"); TREX-02630.

[67] TREX-02633.

[68] TREX-02635.

[69] Findings of Fact and Conclusions of Law, Phase 1 Trial, Rec. Doc. 13355, at 19 (¶ 65).

[70] TREX-01256.

[71] TREX-01592; TREX-01593; O'Donnell Dep. at 198-199.

Many of the risk factors relevant to deepwater were observed at Macondo, and Anadarko knew of them, but Anadarko failed to take a safety first approach and failed to assign someone to monitor the well from a safety perspective. Thus, the facts here demonstrate that a penalty is warranted to incentivize different practices going forward and to avoid rewarding APC for its conduct at Macondo. Anadarko's failure to pay even basic attention to HSE may reflect a desire to reduce their costs by reducing the allocation of human resources to Macondo, in my opinion. As a result there were a number of shortcomings:

- First, at the time of the Macondo incident, there were a number of Anadarko personnel from multiple groups tracking the operations; however, it appears from the depositions that none of these people was ever provided training or provided specific instructions from management as to what the policy of Anadarko was regarding the roles and responsibilities of NOPs. There was no evidence of Anadarko policies in that regard and Mr. Quitzau testified that he was not provided with any instructions as to his role.[72]

- Second, Anadarko witnesses testified that they did not take the BP prior major HSE incidents into account as part of their due diligence of the Macondo project, nor did Anadarko assign anyone to track or keep an eye on safety practices despite the difficulties in drilling Macondo. Nick Huch, the Anadarko landman who negotiated the JOA and other contracts, testified that he made no inquiry into BP's past safety and environmental record.[73] Quitzau testified that he did not monitor the Macondo well for safety of the operations and did not view that as part of his job.[74] I acknowledged in my initial report the distinction between input

---

[72] Quitzau Dep. at 65:19-66:12; 578:25-579:13.

[73] Huch Dep. at 187-189. Huch testified as follows:

> Q. Prior to January 2010, did you review BP's Gulf of Mexico regional oil spill response plan? A. No. Q. As of the end of 2009, had you had any discussions with anybody at Anadarko about BP's past health, safety or environmental record? A. No. Q. As of the end of 2009, did you personally have any concerns about BP's health, safety or environmental record in connection with whether Anadarko should acquire interest in the Macondo Prospect? A. No. Q. As of the end of 2009, had you engaged in any discussions internally at Anadarko regarding BP's ability to manage or contain a blowout? A. No. Q. As of the end of 2009, had you participated in any discussions internally at Anadarko regarding BP's ability to contain an oil spill at Macondo? A. No. Q. As of the end of 2009, did you have any concerns about BP's ability to manage or contain a blowout at Macondo? A. No.

[74] Quitzau Dep. at 402:21-403:09. Quitzau testified:

> Q. Did you ever monitor the Macondo well for the safety of the operations on the well? A. I did not. Q. Did you view it as your role and responsibility to do so? A. I did not. Q. Did you ever receive any instruction from anyone at Anadarko to

into the well plan, and operation decisions. Nonetheless, in my view a NOP pursuing industry best practice would have required that the operator clearly articulate the drilling plan including the temporary abandonment plans. This would have allowed the NOP to respond to the last moment changes to these plans and the associated risk created by these changes.

All of these shortcomings should not be encouraged but would be under the reasoning of Dr. Sunding and Mr. Arnold.

### 4.4 Under contractual agreements, non-operators have rights that provide some capacity to influence key operational decisions

As discussed above, the joint operating agreement provides non-operators with the right to substantial information about important well operations and other deepwater activities. The operating agreement also provides non-operators with the capacity to influence key operational and HSE decisions and contradicts the positions of Dr. Sunding and Mr. Arnold. For example, the operating agreement at Macondo describes the rights of NOPs to audit the operator's HSE management systems and the right to inspect worksites including the rig.[75] Not only did Anadarko fail to exercise these rights,[76] but testimony from the Anadarko employee who negotiated the agreements with BP revealed he did not even read these HSE provisions of the JOA, and was not aware that anyone who worked on Macondo from Anadarko would have been responsible for reviewing these key HSE provisions.[77] In my opinion, this behavior should not be incentivized or endorsed.

Under the operating agreement (both the model form and for Macondo), non-operators also have the ability to approve or disapprove authorizations for expenditures (AFEs) at the well. Mr. Arnold contends that this approval only provides non-operators with "limited influence." I disagree, and an example from Anadarko's own experiences with non-operators contradicts Mr. Arnold. A non-operator (ConocoPhillips) requested substantial information from Anadarko (who was the operator) about a workover procedure prior to making an AFE election.[78] Among the questions asked by the NOP

---

*monitor the Macondo well for safety? A. I did not. Q. Did you think that that should be part of your job? A. I did not.*

[75] Article 5.10 of the JOA states that the Operator is responsible for executing HSE obligations "with the support and cooperation of the Non-Operators" and Exhibit K of the JOA further details HSE duties and obligations. TREX-01243.

[76] Wardlaw Dep. at 108-111.

[77] Huch Dep. at 182:15-22.

[78] ANA-MDL-000111525.

was whether Anadarko had "*adequate emergency spill response capability*" if an incident occurred during the workover. Anadarko granted the NOP an extension on making the AFE election so that the NOP could provide its management with the additional information on the workover procedure and response plans. This example demonstrates that the AFE approval process can and does provide NOPs with additional information about the safety of planned operations, and ensure that there are adequate measures in place to reduce and mitigate risks.

Another example from this case contradicts Mr. Arnold's view that a NOP does not have the capacity or information to exert any influence. The JOA also provides for NOP input after total depth for the well is declared by the operator.[79] At Macondo, after reaching total depth, BP recommended to set the production casing and circulated an AFE to the co-owners for approval for this operation.[80] Anadarko met internally to discuss the proposal and ultimately agreed to sign the AFE.[81] The final AFE to set the production casing noted that the funds would be used to pay for the production casing, casing hanger, cement, casing accessories, lock-down sleeve and its installation.[82] In conjunction with the decision to set the production casing, on April 20, 2010, Anadarko approved the decision to temporarily abandon the well,[83] but under the JOA's election procedures also could have proposed alternative operations at that time.[84] Again, in this instance, this non-operator had an opportunity and the capacity and information to at least inquire and discuss the procedures it was about to authorize.

Although Anadarko's experts express the opinion that non-operators lack the ability to exert influence over key operational decisions, Anadarko's experience in obtaining a tie-back to the Pompano facility suggests otherwise. As discussed in the deposition of Anadarko's negotiator Nick Huch, Anadarko requested that in the event that Macondo was successful, the processing and handling of all production be accomplished (if feasible) through a subsea tie-back to the Pompano facility, which was co-owned by BP and an Anadarko subsidiary.[85] The parties memorialized this commitment in the Well Participation Agreement.[86] In my experience, the selection of a "development plan" is the single biggest decision in the maturation of a deepwater project, or any mega-project,

---

[79] TREX-01243, at 10.2 (exploratory operations at objective depth).

[80] TREX-02855 (April 14, 2010 email from BP's Michael Beirne to other BP employees, emphasizing that before setting the production casing, BP needed approval from the co-owners).

[81] O'Donnell Dep. at 209:12-211:16.

[82] TREX-01922.

[83] TREX-01931.

[84] TREX-01243, at Article 10.2.

[85] Huch Dep. at 70-71; TREX-02309 (email from Huch to BP, stating "one of the moving considerations for Anadarko agreeing to enter into a partnering arrangement with BP on Macondo was for production to be tied-back to Pompano.").

[86] TREX-01943, at 3.3.

from a value-based perspective. The concession BP provided to Anadarko is very significant, not only in the possible impact to lowering decision quality,[87] but in the flexibility BP loses as majority equity holder (value of control). Anadarko's negotiations on the tie-back do not demonstrate the actions of a "passive investor" and undermine Mr. Arnold and Dr. Sunding's contentions that Anadarko lacked the ability to influence key decisions.

### 4.5  Summary of non-operators' capacity and information to influence decisions

As the above discussion makes clear, NOPs have the rights via the JOA, the information obtained both during design and real time information from operations to influence decisions and because of that can to make a contribution to HSE performance. There are no constraints, either contractually or established within industry practice for NOPs to be active-participants; rather, any lack of participation is a conscious choice made by NOPs usually made to reduce costs.

## 5   Impact of CWA penalties

Mr. Arnold's concludes "*Making them [NOPs] responsible for offshore safety will not improve safety*."[88] It is my opinion that this conclusion (which is based on Mr. Arnold's narrow view of the human factors driving offshore safety, his flawed opinion that only operations are key to offshore safety, and his incorrect view that NOPs lack the information and capacity to influence HSE performance) is invalid.

Similarly, Dr. Sunding's final opinion that Anadarko should receive no CWA penalties is flawed because it is based on incorrect assumptions that NOPs cannot influence HSE performance. It is industry best practice for NOP to do so through targeted active participation as discussed in my first report and expanded on in this report.

Since not penalizing Anadarko could be viewed as endorsement of the passive approach Anadarko took at Macondo, it is in the public's interest to ensure a material penalty is

---

[87] In my first report, I introduce the concept of "stage-gate" decision making, which is a framework designed to improve overall decision quality. During the first stage of the state-gate process, Feasibility, the integrated project team (IPT) (which includes representation from non-operators) determines whether a particular case can be identified that is economic; however, this does not commit the project to that concept. It is during the second stage, Selection, that the team identifies the specific development plan to pursue. As defined in Section 12.4.1 of the model form JOA, this would include the production facilities and systems to be used. By committing to a production plan prior to the selection phase, BP and Anadarko lowered the quality of decision making.

[88] Arnold Report at 2.