# EXHIBIT 17

## to

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF (1) ITS MOTION *IN LIMINE* TO ADMIT EVIDENCE PERTAINING TO ANADARKO'S CONTENTIONS CONCERNING NON-OPERATORS AND (2) IN OPPOSITION TO ANADARKO'S MOTION TO ENFORCE THE COURT'S ORDER EXCLUDING CULPABILITY EVIDENCE AGAINST ANADARKO**

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF LOUSISANA

IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179 "DEEPWATER
HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

Reply to Rebuttal Report of Kenneth E. Arnold of 12 September 2014

---

EXPERT REPORT OF

GARDNER W. WALKUP, JR.

ON BEHALF OF

THE UNITED STATES OF AMERICA

---



SEPTEMBER 26, 2014

---

Gardner W. Walkup, Jr.

---

DATED: September 26, 2014

US_PP_EXP004118

## Contents

1   Executive Summary ................................................................................................ 3

2   Exploration versus development................................................................................ 4

  2.1   NOPs are active-participants during exploration ................................................ 4

    2.1.1   Industry literature......................................................................................... 4

  2.2   There are obvious drivers for NOPs to be active-participants during exploration
  activities ............................................................................................................ 5

  2.3   The JOA anticipates active participation by NOPs during exploration .............. 6

  2.4   Relevancy of the exploration versus development distinction to offshore safety 9

  2.5   Conclusion....................................................................................................... 10

3   Control versus active-participation and influence ................................................... 10

  3.1   Norway's "see to it" requirement....................................................................... 11

  3.2   UK's "Safety Case"........................................................................................... 11

  3.3   Use of the Sharma paper .................................................................................. 12

  3.4   Conclusion....................................................................................................... 12

4   Mr. Arnold mischaracterizes the nature of design and operational decisions and the
  role of NOPs in these decisions ............................................................................... 12

  4.1   Nature of design and operational decisions....................................................... 13

  4.2   Mr. Arnold incorrectly identified my examples as "operational" decisions ...... 15

  4.3   Anadarko's ability to influence causal factors of the blowout at Macondo....... 16

  4.4   Conclusion....................................................................................................... 18

5   Summary ............................................................................................................... 18

Appendix A – Considered Materials

US_PP_EXP004119

# 1   Executive Summary[1]

Mr. Arnold, in his September 12, 2014 rebuttal report ("Round Two report" or "Response"), contends that my initial report misstates the industry best practice of active-participation by non-operating parties (NOPs) at the exploration phase and disputes my conclusion that imposing material CWA penalties on Anadarko will lead to higher degree of safety in deepwater activities.

While I agree that exploration is a different phase from development in deepwater activities, I cannot agree with Mr. Arnold's conclusions. Firstly, Mr. Arnold is wrong when he states that the industry literature only demonstrates NOP active-participation during development and not exploration. Secondly, Mr. Arnold does not contest the key driving forces that lead to NOP active-participation that I cited in my original report. These driving forces apply to both exploration and development. Mr. Arnold's contention that the model form joint operating agreement (JOA) used extensively by industry participants only memorializes active-participation by NOPs during development and not during exploration is incorrect as well. Finally, Mr. Arnold's distinction between exploration and development activities ignores that many more development wells are drilled for any project than exploration wells and that the activities this Court has determined caused the Macondo blow-out were not specific to exploration activities but are shared by development wells (e.g., setting production casing and subsequent activities).

Mr. Arnold disagrees with me on grounds that NOPs have limited control over day-to-day operations. It has never been my contention that NOPs have day-to-day operational control; rather, it is my opinion that through active-participation NOPs can, and do, contribute positively to the performance of deepwater activities. Thus, the examples that Mr. Arnold provides regarding Norway's "see to it" requirement, the "safety-case" in the U.K., and Sharma's technical report all strongly support my view of active-participation by NOPs and demonstrate the beneficial impact on offshore safety that a material CWA penalty on Anadarko will provide by incentivizing this active-participation.

Finally, Mr. Arnold overstates the independence of operational decisions "made on the rig" from design decisions and, in fact, disputes the industry norm that operations are primarily focused on executing the design or plan determined *a priori*. He grossly misapprehends the decision-making process related to deepwater activities and thereby arrives at the incorrect conclusion that NOPs are unable to influence offshore safety.

NOPs are not "passive investors" or "non-operating investors." NOPs can and do actively participate in deepwater activities, including exploration activities, and can make

---

[1] The information contained in Section 2 of my initial report ("Information Required by the Federal Rules of Civil Procedure") has not changed and is incorporated into this report by reference. I reserve the right to revise or supplement the opinions contained in this report if additional relevant information becomes available to me.

US_PP_EXP004120

positive contributions to HSE priorities. The diversity of capabilities and experiences all parties bring to the extremely challenging deepwater environment of the Gulf of Mexico should be encouraged and utilized. A material CWA penalty imposed on Anadarko will incentivize this beneficial active-participation, while not imposing such a penalty will be viewed as support for the passive role that Mr. Arnold has espoused, which will not be in the best interests of the public.

# 2 Exploration versus development

In my original report, I demonstrate that NOPs are active-participants for deepwater activities. Mr. Arnold goes to great lengths to distinguish between exploration and development activities to argue that, while it is indisputable that NOPs are active-participants during development, they are not during exploration activities. Because he argues that the Macondo incident occurred during exploration, he concludes that imposing material CWA penalties on Anadarko is not in the best interest of the public. Mr. Arnold's analysis regarding NOP participation in exploration versus development activities is flawed and his conclusion regarding CWA penalties is not supported.

## 2.1 NOPs are active-participants during exploration

Mr. Arnold contends that NOPs are not active-participants during exploration but the only support he provides for this contention is to note that the model form JOA does not require such participation during exploration and to claim that some of my cited literature is not specific to exploration (even though Mr. Arnold agrees such literature demonstrates NOPs are active-participants during development). Below, I show that Mr. Arnold's conclusions are not supported.

### 2.1.1 Industry literature

Mr. Arnold claims that some of the literature I cited only refers to development and this supposed lack of reference means NOPs are not active-participants during exploration. In this he is incorrect. For example, he suggests that my use of the Herman et al. 2006 OTC paper[2] only indicates NOPs participation in development. However, the quote cited by Mr. Arnold from the paper was a very selective choice. Immediately preceding the paragraph Mr. Arnold quoted is this:

> *At Chevron, we have utilized many types of commercial and equity arrangements for **our exploration activities**. While these equity arrangements are quite often viewed as a means to reduce costs, there are other key benefits to these types of arrangements. Following are other significant benefits:*

---

[2] Herman, A., et al., "Changing Dynamics in Deepwater Ownership." OTC 17783, 2006 Offshore Technology Conference (May 2006) (US_PP_WAL001843).

US_PP_EXP004121

- *Risk management of the overall portfolio;*
- *Access to key resources, such as drilling rigs for ultra-deep water;*
- *Alignment with partners of like-interests and -drivers in a lease area;*
- ***Bringing in of partners with key technical or project experience***;
- *Gaining access to data that may help to evaluate other opportunities.*

(Bolding added). There is no way for Chevron to gain the benefits of bringing in an NOP with "key technical or project experience" during exploration without the NOP acting as an active-participant.

In the paper I cited in my second report, "The Role of a Non-Operating Partner in Contributing to HSE Excellence" by Mr. Lawrie of the oil and gas company OMV, the active-participation of NOPs in exploration is explicitly stated:

> <u>*Non-Operating Companies opportunities to influence HSE*</u>
>
> *The relationship between the operator and their non-operating partners (this number can be wide ranging, from just one partner to, in some cases, up to 6 or 7 partners) usually commences at the license application / license award stage. **There will be then a planning process involving the exploration departments of the various partners to determine, for example, if seismic data should be collected and eventually over the selection of suitable candidate wells for exploration drilling.** So one of the first managed processes between partners maybe the award of a contract(s) to acquire seismic data. **This process will hopefully continue through to the well planning and the selection of; a rig / drilling contractor; service companies; etc."** (bold added)* [3]

It is clear from these examples that, in addition to the active-participation during development that Mr. Arnold acknowledges, that NOPs are active-participants during exploration as well.

## 2.2   There are obvious drivers for NOPs to be active-participants during exploration activities

In my original report, I itemized a number of key drivers for NOP active-participation during deepwater activities (Section 5.3). These drivers of NOP active-participation are not addressed by Mr. Arnold and include:

- Strategic learning by NOPs from the operator
- Risk-management of the financial exposure

---

[3] Lawrie, Graeme, "The Role of a Non-Operating Partner in Contributing to HSE Excellence." SPE 155941, SPE/APPEA International Conf. on Health, Safety and Environment in Oil and Gas Exploration and Production (September 2012) (US_PP_WAL002336).

- Investor-relations management
- Managing risks to high production rates through well design
- Reputational risk management

All of these drivers of NOP active-participation apply to deepwater exploration as well as to deepwater development activities. One caveat would be that the financial exposure is less during exploration; however, since it is common for deepwater exploration wells to exceed $150 million, exploration costs are still high. The other key caveat is that not all exploration wells (even successful ones) are destined to be production wells and so risk to high production rates may not be relevant. However, again because of the extreme cost of deepwater exploration wells, it is common for successful exploration wells to become production wells (as was the plan at Macondo). One could argue that investor-relations management and potentially reputational risk management are in fact greater drivers of NOP active-participation during exploration because of the greater uncertainty on outcome (e.g., dry hole versus "keeper").

Mr. Arnold has not disputed that NOPs are active-participants during development (via their roles on integrated project teams (IPTs), etc.). It is inconsistent to argue that the same "culture" that results in this active-participation during development would not also support active-participation during exploration. This is particularly true given that the activities undertaken during exploration and development can be very similar. For example, it would be common for an exploration well, if successful, not to be abandoned but for production casing to be set and for the well to be temporarily abandoned and to later be completed and used as a production well.[4] The activities from and including the setting of the production casing are very similar to the activities at a development well.

## *2.3 The JOA anticipates active participation by NOPs during exploration*

Mr. Arnold fails to explain why NOPs would not be active-participants. He simply argues in Section 3 of his rebuttal report that the joint operating agreement (JOA) during exploration does not require active-participation.[5] Mr. Arnold contends that only the development phase is relevant to NOP participation. In this, Mr. Arnold is incorrect because he focuses on the JOA's provision on NOP participation in integrated project teams (IPTs) that are established during the development phase.

Mr. Arnold concedes, "*To be sure, nothing prohibits operators from inviting NO-WIOs to be active participants in the Exploration Stage,*" but then contends "*this is not the norm.*"

---

[4] This was the plan for the Macondo well. TREX-1919.

[5] Mr. Arnold also points to regulations and argues that the regulations do not require participation by NOPs. I am not providing an expert opinion on the regulations but note that making the decision to be active-participants or passive investors based only upon compliance with regulations is in direct contradiction to Mr. Arnold's own opinion in his original report stating, "*Compliance with regulations alone cannot create a safety culture. On the contrary, it fosters a harmful 'compliance mentality.*'" Arnold Report, dated August 15, 2014, at 3.

**6**

US_PP_EXP004123

Further, "*the idea of forming integrated teams before Appraisal or Development was not even discussed by Moore (as a rationale for creating a separate deepwater model OA in 1999) or contemplated by the 2007 version of AAPL 810.*"[6]

The fallacy of Mr. Arnold's conclusion is that "integrated teams" are not the only way that NOPs can be active-participants in deepwater activities. As discussed in my earlier Reports, IPTs are a powerful way for NOPs to be actively engaged, especially since the model form JOA allows representation by NOPs equal to their equity share as discussed in my Response Report (Section 3.1.1). There are numerous other opportunities, however, for NOPs to be actively engaged, both formal (e.g. "partner meetings" that can be called by NOPs and Operators) and informal (e.g. "operational updates"). I summarize many of the possible means of active-participation by NOPs during exploration that do not require a formal integrated team and are supported by the model JOA in Section 4.2 of my Response Report.

For example, the model industry form deepwater JOA provides for the transmission of real-time data and other information about well operations to NOPs, including during exploration. If the information NOPs receive is insufficient or incomplete, NOPs can contact operators with follow-up questions or requests for information. In this case, Anadarko conceded that it had "open lines of communication with BP."[7] Anadarko witnesses testified that they had the ability to raise concerns or to ask questions to BP about Macondo.[8] BP's technical contact Robert Bodek reported he had "many, many telephone calls" with Anadarko's drilling engineer Bob Quitzau about Macondo, and provided "*operational updates dozens of times on numerous occasions*" to "*keep partners in the loop.*"[9] Anadarko agreed that it could contact BP "*any time through the existing channels.*"[10]

In addition to the extensive information that the JOA requires operators provide to NOPs during exploration[11] and the standard industry practice to have formal and informal lines of communication between parties during exploration, the model form JOA provides considerable opportunities for NOPs to be active-participants during exploration. A very important right for active-participation by NOPs is provided in Section 10.2 of the model form JOA entitled "Exploratory Operations at Objective Depth." This section allows a NOP to propose alternative operations to the operator's plans (within 24 hours of receiving the operator's plan) but requires that an AFE and an operations plan be provided. These alternative operations include operations like additional logging but could also include deepening the well.[12] For an NOP to be in a position to exercise these

---

[6] Arnold Rebuttal Report, dated Sept. 12, at 5-6.

[7] Supplemental Objections and Responses of Defendant APC to Revisions to the United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission), dated Sept. 27, 2011, at 11.

[8] Deposition of Paul Chandler (May 4, 2011), at 93:02-19.

[9] Deposition of Robert Bodek (April 11-12, 2011), at 715:06-12, 717:08-11.

[10] Deposition of Robert Quitzau (May 25-26, 2011), at 425:07-426:03.

[11] AAPL Model Form of Offshore Deepwater Operating Agreement, AAPL-810 (2007), at Article 7.

[12] These provisions were included in the Macondo JOA as well. TREX-1243, at Section 10.2.

US_PP_EXP004124

rights within 24 hours requires that they be actively participating up to that point. This right is specific to exploration and is wholly inconsistent with Mr. Arnold's view that the JOA does not provide opportunities for active-participation by NOPs during exploration.

Mr. Arnold notes the active-participation right of NOPs to propose alternative operations in his paper but misstates how this is implemented within the model form JOA:

> *NO-WIOs can refuse to approve AFEs (which may seriously impact their financial interests in the well) or submit an alternate AFE which must be approved by a majority of working interest owners (often, as in the case of Macondo, this is impossible as the operator holds a majority interest).*[13]

Mr. Arnold has misstated the "majority" requirement in this JOA provision and misinterpreted that statement in my initial report. For example, when a NOP submits an alternative AFE for operations at objective depth, the participating parties must go through an "election" process on the different alternatives (see Section 10.2). The flexibility of "election" rights is demonstrated by Section 8.2.2 of the model form JOA as:

> *Approval by Election*
> *Approval by Election shall be decided by an affirmative Election by one or more Parties, entitled to make an Election, with a combined Electing interest of _____ percent ( __%) or more.*

The blank in the model form is purposeful. This percentage is frequently a key negotiation point between parties and NOPs can sometimes successfully negotiate the need for a supermajority (e.g., two-thirds). Even when a simple majority is negotiated, Mr. Arnold's contention that acceptance of the NOP's alternative plan is "impossible" because operators "often…holds a majority" ignores the fact that in fully a third of projects operators do not hold an absolute majority (i.e. greater than 50%).[14] To avoid conflict and last minute delays, in my experience, Operators strive to have a collaborative relationship with NOPs.

At Macondo, the JOA provided that an election required approval of 10% of the electing interest (i.e., working interest share).[15] Given that Anadarko had a working interest of 25%, its support for a proposal alone would have been enough to require BP to implement an alternative operation at objective depth (e.g., additional testing) prior to temporarily abandoning the well.[16] This is in direct contradiction to Mr. Arnold's statement that it is "impossible" for NOPs to influence operations without the concurrence of the Operator and supports my opinion that active-participation by NOPs

---

[13] Arnold Rebuttal Report, Sept. 12, 2014, at 12.
[14] Credit Suisse, "US Gulf of Mexico," August 15, 2013 (US_PP_WAL000459).
[15] TREX-1243, at Section 8.2.2 and Section 8.1.1.
[16] TREX-1243, at Section 10.2.2 (election procedure in response to highest priority proposal for exploratory operations at objective depth).

US_PP_EXP004125

during exploration is an best practice because such participation is needed to exercise the rights of NOPs in the JOA.

## *2.4 Relevancy of the exploration versus development distinction to offshore safety*

Mr. Arnold contends that because Macondo was an exploration well the industry best practice of active participation of NOPs during development is not relevant. As demonstrated above, NOPs are active-participants during exploration. Contrary to his position, the role of NOPs during development also is important to considerations of future offshore safety.

Firstly, as determined by this Court, the causal factors of the Macondo incident in the Phase 1 Findings of Fact and Conclusions of Law had little to do with the fact that this was an exploration well.[17] Rather, many of the causes could equally arise in both exploration and development wells.[18] Thus, the fact that Macondo was an exploration well is not key to considerations of future offshore safety, especially since the number of development wells for any project dramatically exceeds the number of exploration wells. It would not be uncommon for more than 20 times as many production wells than exploration wells to be drilled for a deepwater project.[19] Thus, Mr. Arnold's contention that active-participation during development is not relevant cannot be supported in this case.

It also seems that Anadarko did not consider most of the activities at Macondo that led to the explosion (as determined by this Court) to be exploration since oversight for the well had passed from its exploration department to its development group before the blowout occurred. Mr. O'Donnell (Anadarko General Manager of Gulf of Mexico of the

---

[17] The Court found that the reckless, negligent, and grossly negligent acts that caused the blowout, explosion, and oil spill included: "drilling the final 100 feet of the well with little or no margin; running the production casing with the float collar in unconverted mode *and* without a shoe filter; failing to verify whether the float collar converted by reverse circulating the well; not conducting a CBL; using LCM as a spacer for the displacement and negative pressure test; misinterpreting the negative pressure test; allowing simultaneous operations to occur during displacement; and failing to provide a displacement schedule to the Transocean drill crew.  Notably, the decisions regarding drilling the final 100 feet, the CBL, and LCM-spacer were profit-driven decisions . . . . BPXP was also negligent by pumping foamed cement without a successful stability test.  Although cement instability did not cause the actual mode of failure (given the Court's conclusion that the cement was improperly placed through a breach in the shoe track), it is another instance of BP proceeding in the face of a known risk and therefore lends further support to the conclusion that BP's conduct was reckless."  Rec Doc. 13355, at ¶¶ 499-521.

[18] The activities that caused the incident began (other than the decision to drill the last 100 feet) with the running of the "production casing" and continued through temporary abandonment.  All of these activities frequently happened during development.

[19] Deepwater exploration activities are conducted under conditions of greater uncertainty than development activities; however, the cumulative risk of development is still significant because of the much larger number of development wells drilled.

US_PP_EXP004126

development group) signed the final AFE (setting the production casing) on 15 April 2010 and its Election to temporarily abandon the well on 20 April 2010.[20]

## *2.5 Conclusion*

Mr. Arnold contends that NOPs are not active-participants during exploration activities and further contends that since Macondo was an exploration well, there is no need to impose civil penalties on Anadarko because reinforcing active-participation is not needed.

However, NOPs are and have opportunities to be active-participants during exploration as demonstrated above by industry literature, the compelling reasons that drive NOP behavior, and the model form JOA. Additionally, the distinction between exploration and development is not relevant to this case given the causal factors of the Macondo incident, which are not unique to exploration drilling but are equally evident in development wells. Further, there are vastly more development wells than exploration wells and the impact of CWA penalties to the future HSE performance of both exploration and development wells should be considered. Thus, Mr. Arnold's opinions are not supported. My conclusion that material CWA penalties imposed on Anadarko will reinforce industry best practices of NOP active-participation and will lead to a higher degree of safety in deepwater activities—both in exploration and development—is supported.

# 3 Control versus active-participation and influence

Mr. Arnold contends that "*Walkup glosses over another key point in the sources he relies upon – NO-WIOs have limited, or no, control.*" Unfortunately, Mr. Arnold has misunderstood my position as I agree that NOPs do not have primary operational control but I disagree with his position that they have *no* control or ability to influence key safety decisions. It is my opinion that NOPs can (and do if following industry best practices) influence deepwater activities through active-participation and through this participation can positively impact HSE performance. Mr. Arnold's citations to the "see to it" requirements in Norway and the "safety case" in the UK support my contention that active-participation is required by certain jurisdictions and that such participation does not create the "too many cooks" problem Mr. Arnold raises in his report. Finally, Mr. Arnold's citations from the Sharma paper also support my opinion regarding NOPs' ability to positively influence HSE through active participation.

---

[20] Deposition of Alan O'Donnell (May 5, 2011), at 140:21-141:24 ("[T]he [production] casing cost would come from the development group instead of from the exploration group since it is – it is going to be a development"); id. at 216:05-217:05 (discussing O'Donnell's approval of the temporary abandonment decision on behalf of Anadarko).

US_PP_EXP004127

## 3.1 Norway's "see to it" requirement

An example of Mr. Arnold's analysis supporting my opinion is his quote on page 8 of his Rebuttal Report from Norway's Petroleum Safety Authority Guidelines that discuss the duties of NOPs (referred to as "licensees" in this example), namely:

> *The term see to it has been used as it is used in Section 10-6 of the Petroleum Act to describe **the licensee's** and the operator's **special duty to follow up**. The term see to it is used to clarify that it is primarily the individual player's duty to comply with the regulations. To **see to it entails a duty, through establishment of management systems and through audits, to follow up that the participants in the activities comply with requirements** stipulated in and in pursuance of the Act. **The responsibility to see to it that the regulations are complied with, will thus be a general and overall duty to follow up while carrying out the activities.** (bold added).*

Mr. Arnold's quotation choice corresponds nicely to the degree of active-participation I have argued the "see to it" requires of NOPs. Establishing "management systems" and "audits" and "follow up" to ensure that Operators are acting in accordance with standards is an example of the NOP active-participation. This "see to it" participation enables NOPs to contribute positively to HSE performance.

## 3.2 UK's "Safety Case"

Mr. Arnold's efforts to define the UK's "safety case" also support my opinion that NOPs can be active-participants and their participation improves (rather than reduces) HSE performance. His attempt to demonstrate that the "safety case" does not provide NOPs "control" misses the point because that was never my opinion. Rather, I cite the UK example to show how another country requires active-participation by NOPs in order to improve HSE, in particular in the area of due diligence of the Operator. Mr. Arnold quotes on page 9 of his rebuttal report the following excerpt from the UK regulations on NOP responsibilities:

> *The licensee [NOP] shall (a) ensure that any operator appointed by him is capable of satisfactorily carrying out his functions and discharging his duties under the relevant statutory provisions; and (b) take all reasonable steps to ensure that any operator appointed by him carries out his functions and discharges his duties under the relevant statutory provisions.*

The safety case requirement to "ensure" an Operator is "capable" and the requirement to "ensure" that the operator carries out his duties through "all reasonable steps" certainly qualify as active-participation. The qualifier to the above that "*[i]f the appointee is self-reliant, adequately resourced and has a good track record... then a light touch will be appropriate*" does not eliminate the active-participation of NOPs. For example, at Macondo, Anadarko staff testified that they had no process to evaluate the HSE track

US_PP_EXP004128

record of operators,[21] nor did they investigate BP's recent HSE performance prior to Macondo.[22] Both would have been required by the UK safety case, and demonstrate how a NOP can improve HSE performance.

## 3.3 Use of the Sharma paper

Mr. Arnolds also contends that my use of a paper by Sharma[23] is misplaced. But as above, this is because of Mr. Arnold's incorrect assumption my opinion is that NOPs typically have control over day-to-day operations. Rather, my opinion is that NOPs actively-participate in deepwater activities and this includes improving HSE performance. Again, the quote that Mr. Arnold chose to include in his report on page 10 supports my opinion rather than counters it:

> *The JV [joint venture] is a particularly important learning tool for non-operators; the knowledge necessary for a non-operator to eventually become an effective operator is highly tacit and integrated with the operator's organizational structure of internal processes.*

As I discussed in my original report (Section 5.3.1) NOP learning (i.e., sufficient learning to become or improve as operator) requires a high degree of participation. It is insufficient to simply "monitor" activities to learn how decisions are made. Mr. Arnold's choice of quote supports my opinions.

## 3.4 Conclusion

Contrary to Mr. Arnold's characterization, my opinion is not that NOPs exert day-to-day control during exploration activities. Rather, NOPs are active-participants that routinely improve deepwater activities, including HSE activities. My opinion is supported by Mr. Arnold's discussion of other jurisdictions and choice of literature references.

# 4 Mr. Arnold mischaracterizes the nature of design and operational decisions and the role of NOPs in these decisions

Mr. Arnold has misstated the nature of design and operational decisions. Mr. Arnold disputes my position that operations, to the maximum extent possible, should merely implement design decisions in order to minimize operational decision made on the rig

---

[21] Anadarko Phase 1 Discovery Responses, dated July 25, 2011, at 54-55.
[22] Deposition of Nicholas Huch (May 16, 2011), at 187-189.
[23] Sharma, Arun K., "'Will My Partners Slow Me Down?' The Effect of Partner Ownership and Experience on Deepwater Project Execution Time." SPE 116077, 2008 SPE Annual Technical Conference and Exhibition (September 2008) (US_PP_WAL002264).

US_PP_EXP004129

without advance planning. Mr. Arnold does not dispute that non-operators can play a constructive role during the design and planning process, but instead incorrectly narrows the scope of design, claiming that measures that can and should be planned for in advance are merely operational decisions made on the rig without advance planning.[24] Thus, he argues that the role of non-operators is exceedingly limited and that many activities that were causal to the Macondo explosion were solely operational. Moreover, he overlooks the obvious fact that Anadarko was aware that Macondo was a fragile well. Anadarko could have requested BP's drilling and temporary abandonment plans at any time, and in particular when Total Depth was called and BP advised Anadarko that it was stopping due to "safety concerns and wellbore integrity issues."[25] Even though I agree that non-operators do not have day-to-day control of operations on the rig, at Macondo, Anadarko missed the opportunity to improve the temporary abandonment procedures because it failed to request and review BP's plan for temporary abandonment, a right that it had under the JOA.[26]

## *4.1   Nature of design and operational decisions*

Mr. Arnold disputes my position that operations should, to the maximum extent possible, merely implement design decisions and that the operational decisions made on the rig without advance planning should be minimized.[27] Contrary to Mr. Arnold's opinion, the distinction between planning and operations is widely accepted in the industry. For example[28] in the paper "Integrating Engineering and Operations for Successful HTHP [High Pressure High Temperature] Exploratory Drilling," the authors state "*The simplest theory of engineering and operations relating to projects like drilling is that engineering prepares the design and operations implements it.*"[29]

As this quote makes very clear, the primary focus of operations is to implement design decisions, contrary to Mr. Arnold's claim. The goal of planning is to eliminate or minimize occurrences where "[o]perators have to make decisions that designs do not specifically anticipate." Clearly, deepwater activities are undertaken under conditions of significant uncertainty. An important step in the design process is to assess these uncertainties and develop contingency plans so if conditions arise during operations that

---

[24] Arnold Rebuttal Report at 11-12.

[25] TREX-1592.

[26] Macondo JOA, TREX-1243, at 10.2 (the Operator's proposal for operations at objective depth, including temporary abandonment "shall include an associated AFE *and a plan for the operation*.") (emphasis added).

[27] Arnold Rebuttal Report at 11: "… *I do not agree with [Walkup] that operation decisions are 'usually limited to implementing design decisions.' Operators regularly have to make decisions that designs do not specifically anticipate.*"

[28] I prefer to use the term "design" because the collaborative efforts include geologists and other geoscientists, as well as, engineers. This is particularly true in deepwater drilling where quality pre-drill pore-pressure and fracture gradients assessments are critical.

[29] Smith, J.R., et al., "Integrating Engineering and Operations for Successful HTHP Exploratory Drilling," SPE Drilling and Completion (Dec. 1997) ("Smith paper") (US_PP_WAL002037).

US_PP_EXP004130

differ from the plan, alternative contingency plans exist. Thus, good planning (that includes contingency planning) will reduce significant last-minute changes that have to be made on the rig. Since NOPs can influence and improve the quality of planning, the active-participation of NOPs can help reduce changes.

Given this relationship between design and operations, it is generally understood that the most important driver to successful deepwater activities (including HSE) is the quality of the design phase. Chevron's Deepwater Exploration and Production Business Unit has developed a "stage-gate" decision process for drilling deepwater wells that is analogous to the common stage-gate decision process used for development that I discussed in my first report (Section 5.2).[30] These processes are designed to improve decision quality in all decisions but recognize that decision quality during the three planning phases (collectively known as Front-end loading or FEL) are the most important.[31] This is demonstrated in the Figure below from the Chevron paper that demonstrates Chevron's belief that success of drilling is primarily driven by the design.[32]



As this figure clearly demonstrates, design drives success. It is important to understand that design decisions not only cover the "what" is going to be done but the "why" and "how" as well. Both the primacy of design and the breadth of design decisions are captured in this quote from the Smith, et al. paper:

---

[30] Breidenthal, John L., et al., "Well Design, Execution & Collaboration: An Operator's Tool for the Planning and Drilling of a Deepwater Gulf of Mexico Well." SPE 117432 (2006) (US_PP_WAL002281).
[31] Walkup, Gardner and J. Robert Ligon, "The Good, the Bad, and the Ugly of the Stage-Gate Project Management Process in the Oil and Gas Industry." SPE 102926. 2006 SPE Annual Technical Conf. and Exhibition (Sept. 2006) (US_PP_WAL002234).
[32] In this figure, Phases 1-3 involve planning activities, Phase 4 is the actual drilling and Phase 5 is commonly referred to as the "look-back" and includes capturing lessons learned.

US_PP_EXP004131

*Planning was the most important factor in the success achieved on this well. It established what needed to be done, why, and how. Its success was the result of integrating both engineering and operations viewpoints into the plan.*[33]

## 4.2 Mr. Arnold incorrectly identified my examples as "operational" decisions

Mr. Arnold does not address my position that it is industry best practices for NOPs to contribute to the quality of the design decisions for deepwater activities,[34] and further does not dispute that there is NOP participation in planning activities (except to maintain that NOPs are not active in the exploration phase). Instead, Mr. Arnold has incorrectly concluded that most of the decisions I identified as design decisions are operational decisions and that NOPs would play no role in these measures. Specifically, he concludes that cementing program (e.g., foam cement versus conventional cement), cement integrity evaluation (e.g., prerequisites to run a cement bond log ("CBL")), and temporary abandonment procedures (e.g., fluid levels or negative pressure test design) are not design (planning) decisions. Indeed, he apparently concedes only that casing is part of design.[35] The only support he provides that cementing and temporary abandonment procedures are operational decisions is that these decisions are not explicitly identified in the model form JOA (current and 2014 planned versions) definition of the "well plan." In my experience, the planning process includes extensive information about all aspects (the "what," the "why" and the "how") of drilling and completing the well and if it does not, a non-operator as part of best practices should request further detail.[36]

Cement design can frequently involve sophisticated mathematical modelling and laboratory testing that collectively can takes weeks of effort. These procedures should be planned and are not merely "operational decisions to be made on the rig" as contended by Mr. Arnold. In fact doing a cement job on a deepwater well, without the benefit of a detailed design, would be dangerous. Support that cement design is a design activity can again be found in the Smith et. al paper that discusses a specific deepwater Gulf of Mexico well:

---

[33] Smith paper (US_PP_WAL002037).

[34] Mr. Arnold argues that NOPs may come in at many different stages of deepwater drilling, in some cases after the planning/design process has been completed and thus cannot influence those design decisions. Arnold Rebuttal Report at 13. However, NOPs have the ability to review design prior to joining a project and could condition their joining on changes to the plan if they felt changes were warranted. In addition, at Macondo specifically, there was a suspension of operations before Anadarko joined, which provided them ample opportunity to conduct a review of design prior to the re-start of operations with the new rig. Finally, in practice, design and operations are iterative, providing multiple opportunities for NOP input.

[35] Arnold Rebuttal Report, at 12: *"the one item on Walkup's list that is legitimately part of the design stage – casing – often is changed as the well is drilled."* Of course, in my opinion a good design will anticipate drilling issues and provide for contingency casings, again minimizing last-minute unplanned changes.

[36] Indeed, Anadarko's head of GOM development operations Darrell Hollek testified that Anadarko routinely shares well plans and designs with its non-operating partners. Deposition of Darrell Hollek (July 17, 2014), at 172, 182.

US_PP_EXP004132

*The determination that well control, **cementing**, and bit performance were the primary challenges to success **was necessary for developing effective plans** and validated by both the success of our results and the trouble time caused by lost circulation, well control, and **cementing**.*[37]

By "cement integrity decisions" I was referring to the practice of determining during the design process the conditions when a cement bond log (CBL) would be run. As support that such a decision is a design decision, I refer to the Macondo well, where a "decision tree" had been developed prior to operations to determine when a CBL should be run.[38]

Finally, the temporary abandonment procedures are clearly (by definition) a planning process. The model form JOA Section 10.2 "Exploration Operations at Objective Depth" provides the Operator an exclusive 24 hours to propose an activity once the objective depth has been achieved. This includes a proposal to temporarily abandon a well. However, the model form JOA requires that "*the Operator's proposal shall include an associated AFE **and a plan for the operation**.*" (bold added).[39] Thus, the temporary abandonment procedures (i.e. the "plan" for the temporary abandonment) are a design activity. The purpose for this requirement is to allow the NOPs to review the plans for the operation and to provide input (influence) as needed. It is interesting to note that at Macondo, when BP requested concurrence to conduct a temporary abandonment operation as required by the JOA, it offered no "plan for the operation" nor did Anadarko request this plan.[40] This passive behavior is inconsistent with the requirements of the JOA.

These are just some of the activities that, contrary to Mr. Arnold's narrow characterization of "design" or "planning" activities, clearly should be worked out in advance. In my opinion, the other activities that I listed in my initial report also are design measures and NOPs can participate and have input in them.

### 4.3   Anadarko's ability to influence causal factors of the blowout at Macondo

Mr. Arnold makes the sweeping statement on page 3 in the summary of his rebuttal (but not supported anywhere in the body of his report) that "*the Macondo blowout was not caused by design decisions normally included in a well plan presented to the NO-WIO,*

---

[37] Smith paper at 243 (also acknowledging that, "Planning was the most important factor in the success achieved on this well.").

[38] Findings of Fact and Conclusions of Law, Phase One Trial, Rec. Doc. 13355, at ¶ 186.

[39] This provision was also included in the Macondo JOA, TREX-1243, at Section 10.2.

[40] See TREX-1931. In order to meet the 24 hour deadline, BP would need to circulate its temporary abandonment plans to the non-operators in advance for consultation and comment prior to seeking their approval. BP did circulate draft AFE's prior to the deadline to permit discussion with Anadarko (see, e.g., Deposition of Michael Beirne (June 28-29, 2011), at 495:21-496:01), and easily could have done the same thing with a TA plan.

US_PP_EXP004133

*but from operating decisions*" and argues that Anadarko as an NOP could not have influenced these "*operating*" decisions. I disagree with both of these opinions.

Based on my technical view, the vast majority of NOPs pursuing active-participation would have been keenly aware that zonal isolation at Macondo was going to be very difficult given the obvious fragility of this well and would have required the Operator to share plans ("what," "why," and "how") to ensure zonal isolation was achieved and that this isolation was adequately tested. These inquiries would have certainly focused on how the production casing was set and cemented to achieve zonal isolation. For example, the decision not to run a CBL, which this Court found causal to the blowout, was based on a "decision tree" determined during the planning process specifically for Macondo.[41] This should have been part of the temporary abandonment plans that the JOA requires be provided to NOPs. The temporary abandonment plans also should have included procedures for float collar conversion and the design of the negative pressure test (including what spacer to use). By not requiring BP to provide the temporary abandonment plans as required by the JOA, Anadarko missed the opportunity to review these plans and communicate any HSE concerns.

Additionally, while the Court determined that cement instability did not cause the actual mode of failure (because the Court determined the cement was improperly placed), it did find that BPXP was negligent by pumping foamed cement without a successful stability test. Again, when it failed to review BP's plans for the cement job, Anadarko missed the opportunity to identify the lack of successful stability tests and ensure the tests were completed prior to execution of the cement job.

It is true that many last-minute changes occurred at Macondo, but it is not true, as Mr. Arnold contends, that NOPs have no ability to influence these changes. Firstly, as I discussed above, in my opinion most NOPs that had chosen to be active participants would have identified zonal isolation (which is always critical) as likely to be difficult and would have been in active discussions with the operator about this during operations. Any changes to the program that would have impacted either the achievement of zonal isolation, or the testing of this isolation, would likely have been shared with the NOP or at the very least the Operator would have been more sensitive to the impacts of these changes. Secondly, significant changes to details and procedures to achieve zonal isolation can be considered "major" changes and thus likely to trigger a "management of change process" that is usually part of an operator's Safety and Environmental Management System (SEMS). NOPs, under Exhibit K of the JOA, have the right to audit SEMS and in doing so can influence the quality of how these systems and how they are applied. In this case, however, the NOP chose not to audit the Operator's SEMs as I discuss in my Round Two report.

---

[41] Findings of Fact and Conclusions of Law, Phase One Trial, Rec. Doc. 13355, at ¶ 186.

US_PP_EXP004134

### *4.4 Conclusion*

Success in deepwater requires the integration of both planning and operational activities. Industry best practices are to drive success by ensuring quality planning, including contingency planning, so that operations are focused primarily on implementing the plans as designed. Thus industry best practices aim to reduce to the greatest extent possible deviations from these plans, particularly changes made late or under emergency conditions. Since NOPs can influence the quality of design decisions, they have the ability to help reduce operational changes to the plan. Even at Macondo, NOPs could have requested BP's plan for zonal isolation once total depth was achieved. And, consistent with the JOA, Anadarko had the right to request BP's detailed plan for temporary abandonment, but failed to do so. Thus, even though Anadarko did not have day-to-day control, as a NOP, it was in a position to influence BP and potentially the course of events at Macondo.

## 5  Summary

Mr. Arnold's rebuttal report presented three challenges to my initial report. Firstly, Mr. Arnold claims that it is "commonly accepted" that NOPs do not actively-participate during exploration; however, he provides no direct support for this statement. Above and in my original report, I present industry literature that demonstrates active-participation by NOPs during exploration. I also present a set of strategic and tactical reasons why NOPs actively participate in deepwater activities including exploration that are unchallenged by Mr. Arnold. Additionally, I demonstrate that the model form JOA provides for and anticipates significant active-participation by NOPs during exploration contrary to Mr. Arnold's unsupported statement that it does not. Based on this, it becomes clear that Mr. Arnold's contention that NOPs are not active-participants during exploration cannot be supported.

Mr. Arnold, using his flawed contention that NOPs are not active during exploration, concludes that CWA penalties on Anadarko are not in the public's interest because the blow-out at Macondo occurred while the "lease was in exploration." This conclusion cannot be supported for a number of reasons as I have demonstrated. Firstly, NOPs are active during exploration. Secondly, the causes of the disaster, as determined by this Court, were not unique to exploration activities. Finally, the vast majority of wells drilled in deepwater projects are development wells not exploration wells and given that the causes of the Macondo blowout have been determined not to be exclusive to exploration wells, incentivizing the active-participation of NOPs in both exploration and development wells is critically important.

The second challenge that Mr. Arnold provides to my original report is that NOPs do not have control. In support of his position he quotes key parts of Norway's "see to it" requirement, the U.K.'s "safety case" requirements, and portions of the Sharma paper I cited in my original report. However, Mr. Arnold has misapprehended my opinion as I

US_PP_EXP004135

do not claim that NOPs have control on the rig. My opinion is that NOPs influence the quality of deepwater activities (including exploration activities) through their active-participation. The quotes Mr. Arnold has provided strongly support this active-participation of NOPs and further demonstrate that in some jurisdictions such active-participation is required by regulations.

The final challenge Mr. Arnold presents to my original report is that I have incorrectly represented the nature of design and operational decisions and that I have been overly broad in my definition of design decisions. Mr. Arnold concludes that NOPs have little influence because their impact on operational decisions is minimal and most key HSE decisions are operational only. However, I have demonstrated that it is Mr. Arnold who has misapprehended the nature of design and operational decisions and I have provided specific industry examples to support my views. In particular, the primacy of design decisions and the primary role of operations to implement a plan as designed is key because this clearly demonstrates that NOPs can influence offshore safety in significant ways if they follow the industry best practice of active-participation.

Anadarko, on the other hand, has consistently, both in court records and publically, declared it pursued only a passive role at Macondo. A passive role is not consistent with industry practices; rather, as demonstrated above and contrary to Mr. Arnold's view, NOPs are active-participants in deepwater activities including exploration. This active participation improves the quality of deepwater activities and as the industry expands into deeper waters and deep targets the contributions of NOPs will be critical. Material CWA penalties imposed on Anadarko will reinforce active-participation, while not penalizing Anadarko will be viewed as support for a passive role, particularly given Anadarko claims of passivity in this case.

US_PP_EXP004136

# Appendix A

List of Considered Materials (in addition to the documents cited in my Round 1 and Round 2 and Round 3 reports and my Round 1 and Round 2 lists of documents considered):

| |
|---|
| US_PP_WAL003862-US_PP_WAL004101 |
| US_PP_WAL004102-US_PP_WAL004360 |
| US_PP_WAL004361-US_PP_WAL004368 |