# EXHIBIT 3

## to

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE LEGAL OPINION TESTIMONY OF DAVID SUNDING**

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL        )    MDL NO. 2179
     by the OIL RIG,          )
 4   DEEPWATER HORIZON in     )    SECTION "J"
     the GULF OF MEXICO,      )
 5   April 20, 2010           )    JUDGE BARBIER
                              )
 6                            )    MAG.  JUDGE
                              )    SHUSHAN
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21              Videotaped and oral deposition
22   of DAVID SUNDING, taken at Pan-American
23   Building, 601 Poydras Street, 11th Floor, New
24   Orleans, Louisiana, 70130, on the 30th of
25   October, 2014.
```

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**

1      VIDEOGRAPHER:  The date is October the

2  30th, 2014.  The time is 8:24 a.m. This is

3  the video deposition of David Sunding in

4  regards to the oil spill by the oil rig

5  DEEPWATER HORIZON in the Gulf of Mexico on

6  April 20th, 2010.

7              DAVID SUNDING,

8  having been first duly sworn, testified as

9  follows:

10              EXAMINATION

11  BY MS. HARVEY:

12      Q.    Good morning, Dr. Sunding.  My

13  name is Judy Harvey.  I'm with the Department

14  of Justice.  This is my colleague, Nancy

15  Flickinger, and Rachel king.  And you met

16  Mr. Mason.

17              And I just wanted to start off

18  with a few instructions.  Just remember for

19  the court reporter to give verbal answers to

20  the questions.  And let's try not to

21  interrupt each other through the -- through

22  the deposition.  I tend to talk pretty

23  quickly.  So if, for some reason, you've

24  misheard what I said or you don't understand

25  the question, please ask me to rephrase.  If

1  States' pleadings?

2      A.    Yes.

3      Q.    Do you recall which ones?

4      A.    You know, I don't know what you

5  would call it, but it would be one of the

6  very early pleadings.  At least one.

7      Q.    Do you remember the subject of

8  it?

9      A.    It was just saying that -- that

10 the United States thought that there were

11 Clean Water Act penalties that should be

12 paid.

13     Q.    Did you read any United States'

14 pleadings concerning Anadarko's involvement

15 at the well?

16     A.    Not that I recall.

17     Q.    Other than the case materials in

18 this case and Citgo, did you review any other

19 court documents, court opinions?

20     A.    You know, I -- I looked -- on

21 the EPA -- on the EPA enforcement website,

22 there's a listing of Clean Water Act penalty

23 cases and then the disposition of them.  So I

24 reviewed that to look at some other cases to

25 see if I could find anything in the record

25

1   that was similar to this.  And I was not able

2   to, ultimately.

3        Q.     You don't list the cases that

4   you reviewed in your considered materials?

5        A.     No, because there wasn't -- let

6   me put it this way.  It didn't change my

7   opinion.  I -- I thought -- so it wasn't --

8   these were things that I looked at on the

9   Web, you know, just pulled it down off the

10  EPA enforcement website and looked through

11  there.  There was nothing that looked

12  relevant to what we were doing here.  So in

13  that sense, it didn't affect my opinion.

14       Q.     Right.  But you're supposed to

15  provide for us a list of all the materials

16  that you considered --

17       MR. LOTTERMAN:  Object to form.

18       Q.     -- even if it didn't -- even if

19  it didn't affect your opinion.

20       MR. LOTTERMAN:  Is that a question?

21       MS. HARVEY:  I'm getting to the

22  question.

23       MR. LOTTERMAN:  Okay.  I'll object to

24  the form.

25       Q.     So you're saying in your report

56

1      VIDEOGRAPHER:  Back on the record at

2  9:40.

3      Q.    (By Ms. Harvey) Dr. Sunding,

4  we've gone over some of your prior experience

5  in this case, but I want to make sure I

6  understand what you are not an expert in.

7          You're not a biologist, correct?

8      A.    That's correct.

9      Q.    Okay.  And you have -- you're

10  not going to render opinions here on the

11  seriousness of the violation from an

12  environmental perspective, correct?

13      A.    No, certainly not.  With respect

14  to seriousness, I really don't have anything

15  to say beyond what's in the report.

16      Q.    You've done no independent

17  evaluation of the seriousness of the

18  violation, correct?

19      A.    No.  That's correct.  That was

20  one of the -- the, you know, very few sort of

21  starting points -- you know, starting points

22  that I had in this assignment, that I should

23  just assume that the violation was serious --

24      Q.    Okay.

25      A.    -- within the meaning of the --

1    the Clean Water Act penalty factors.

2         Q.      But you have no -- you have no

3    expertise in evaluating an environmental

4    harm, correct?

5         A.      That's not correct.

6         Q.      But you're not rendering an

7    opinion here on the extent of environmental

8    harm?

9         A.      No, I'm not -- I'm not saying

10   anything about, you know, the economic value

11   of environmental harms, natural resource

12   damage, nothing like that.

13        Q.      And you're not an expert in the

14   oil and gas industry, correct?

15        A.      Well, I think I'm an expert in

16   some economic aspects of the oil and gas

17   industry.  I don't have, say, day-to-day

18   experience on a rig or anything of that

19   nature.  Certainly not.

20        Q.      What expertise do you have on

21   the -- when you say you're not -- you have no

22   expertise in operator and non-operator

23   relationships in the oil and gas industry, do

24   you?

25        MR. LOTTERMAN:  Object to form.

1   you've done no work focused specifically on

2   the Gulf of Mexico deepwater operations?

3          A.     I think that's probably correct.

4   The only reason I'm hesitating is deepwater

5   Gulf of Mexico may have been part of some

6   larger aggregate that I was looking at.  But

7   other than that, I can't think of an

8   instance.

9          Q.     And nothing specifically focused

10  it -- focused on deepwater Gulf of Mexico?

11         A.     Yes, I think that's right.

12         Q.     And you have no expertise in

13  mitigation techniques, how you mitigate the

14  effects of an oil spill, do you?

15         A.     No, I don't.

16         Q.     And no experience in source

17  control techniques, how to suspend the flow

18  of oil from the source of a well?

19         A.     No.  That's correct.

20         Q.     And you don't intend to render

21  an opinion in this case on any of those

22  issues?

23         A.     No.  Beyond the -- beyond the --

24  so in the third section of my first report --

25  I guess you were talking about source

1  Water Act, the penalty liability is also

2  strict liability, right?  Are you aware?

3       A.    That's consistent with my

4  understanding.

5       Q.    Okay.  And are you aware that

6  the Clean Water Act in assessing a penalty

7  also accounts for the magnitude of harm by

8  the possibility of penalties on a per barrel

9  basis?

10      A.    Yes.  And I'm aware that the

11 seriousness of the violation, which is

12 related to what you're talking about, is one

13 of the so-called gravity factors.

14      Q.    Okay.  And in this section about

15 the -- the federal law, you cite some of the

16 legislative history; is that right?

17      A.    Yes.

18      Q.    Okay.  And did you conduct a

19 legislative history review?

20      A.    You know, I -- so I did -- I did

21 look to see if there was anything I could

22 find -- I'm not a lawyer, so I can't do a

23 legislative history review the way an

24 attorney might do.  But I did think it was

25 interesting to go back and see if I could

1  find anything that anybody said around the

2  time that OPA was enacted that would bear on

3  what Congress was trying to accomplish with

4  these provisions.

5      Q.    And other than the specific

6  citations to the legislative history that you

7  include in this section, did you look at any

8  other legislative history about the Clean

9  Water Act, Section 311, or OPA?

10     A.    I think I saw some other things

11  on the -- the Internet, a few other

12  quotations.  But the -- the main thing that I

13  drew from that research is included here,

14  which is that the penalties are intended to

15  punish and deter.

16     Q.    Did you -- you said you found

17  something else in an Internet research.  Did

18  you include that particular piece of

19  legislative history in your considered

20  materials?

21     A.    I didn't rely on it, no.

22     Q.    Right.  But did you -- your list

23  is a list of your considered materials --

24     A.    Right.

25     Q.    -- which includes anything that

1    you looked at --

2         A.    Right.

3         Q.    -- in forming your opinion.  And

4    what I'm asking is whether or not that piece

5    of legislative history is on your considered

6    list.

7         A.    I don't know if it's on there or

8    not.

9         Q.    Okay.  In your review of the

10   legislative history, are you aware of

11   anything in which a member of Congress

12   specifically mentioned optimal deterrence?

13        A.    No, I don't remember seeing that

14   phrase.

15        Q.    And same with -- there was no

16   mention in the legislative history that you

17   reviewed of absolute deterrence?

18        A.    Well, no, not -- not the use of

19   that -- that's a term of art to economists,

20   not the use of those -- those two words

21   together.

22        Q.    Okay.  And --

23        A.    But -- but the -- but the review

24   that I did do is consistent with the notion

25   that -- that absolute deterrence is what's

1    trying to be achieved.  And I think that's

2    consistent with other parts of the Clean

3    Water Act.

4         Q.    But you, in your review, saw no

5    cite to economic theories in the legislative

6    history?

7         A.    No.  No.  I didn't see anybody

8    citing Posner or anything like that.

9         Q.    And in looking at the

10   legislative history documents, did you review

11   anything in which a member of Congress

12   expressed a concern about a potential for

13   overdeterrence?

14        A.    I don't remember seeing a

15   statement about that, although I think there

16   are notions -- the idea that there is a

17   concern about overdeterrence, I think, is

18   implicit in some of the penalties factors;

19   but I didn't see a statement about

20   overdeterrence.

21        Q.    In the legislative history?

22        A.    It -- not that I recall.  There

23   may have been a statement about, you know,

24   not wanting to put somebody out of business;

25   but beyond that, I -- I really can't think of

1   any specifics.

2           Q.      And such a -- anything you

3   reviewed would be within -- contained within

4   your report and these citations here, right,

5   on the legislative history that you

6   considered in forming your opinion, correct?

7           A.      It should be.

8           Q.      In fact, when Congress passed

9   OPA in 1990, it also increased penalties in

10  the civil -- in the -- increased Clean Water

11  Act civil penalties for oil spills.  Are you

12  aware of that fact, that these happened at

13  the same time?

14          A.      Yes, that's my understanding.

15          Q.      And that as part of that

16  package, it added the per barrel provision to

17  Section 311(b)?

18          A.      Yes, I'm aware of that.

19          Q.      Okay.  And that it had a broader

20  standard for gross negligence when the

21  package was passed?

22          A.      I don't remember that.

23          MR. LOTTERMAN:  Object to form.

24          A.      I don't remember that.

25          Q.      Okay.  As part of your work in

```
1   Clean Water Act penalties were?

2        A.    No.

3        Q.    Okay.

4        A.    I wouldn't say so.

5        Q.    And how did you conduct your

6   case research?

7        A.    Well, again, I'm not a lawyer,

8   so I don't -- you know, I maybe don't have

9   access to the same tools.

10       MR. LOTTERMAN:  I also want to caution

11  in this answer that you not divulge any --

12  either any information regarding the drafting

13  or the preparation of the report or any input

14  you may have received or discussion with your

15  attorneys.

16       A.    Right.  So I think I mentioned

17  earlier that one of the things I did was to

18  look at the EPA enforcement database to look

19  at prior cases, whether they'd been settled

20  or -- or gone all the way to a decision.

21  But, really, I mean, there are very few cases

22  I looked at as part of my work in this case.

23  Citgo was one.  And then I think in the -- in

24  Judge Barbier's ruling that we were

25  discussing earlier regarding Anadarko's
```

1       MR. LOTTERMAN:  Oh, dear.

2       A.      All right.

3       Q.      It's your opinion here that,

4   quote, as a matter of economics, civil

5   liability for damages under OPA and civil

6   penalties under the Clean Water Act have the

7   same effect on regulated entities,

8   deterrence.  Is that your opinion?

9       A.      Yes.

10      Q.      Okay.  However, you're aware,

11  'cause you cited in your report, that this

12  court has ruled that private parties could

13  agree to an indemnification clause for OPA

14  damages, but as a matter of public policy,

15  they could not agree to an indemnification

16  clause for penalty.  You're aware of that?

17      A.      I am aware of that, yes.

18      Q.      So as a matter of public

19  policies, this court, through Judge Barbier's

20  opinion, views OPA damages and Clean Water

21  Act penalties differently?

22      MR. LOTTERMAN:  Object to form.

23      A.      I feel like that's sort of

24  getting outside the area, getting outside of

25  my area.  That feels like it's getting into

```
 1   law and out of economics.
 2         Q.     But you cite --
 3         A.     My -- my -- my point here is
 4   that, from an incentive point of view,
 5   whether you pay money for damages or
 6   penalties has an effect on behavior.
 7         Q.     And you're aware that, as a
 8   general matter, damages can be deducted as
 9   business expenses and penalties cannot be?
10   Are you aware of that?
11         A.     Yes.
12         Q.     And you're aware that, in fact,
13   in the settlement between BP and Anadarko in
14   this case, Anadarko deducted that settlement
15   as a business expense, correct?
16         A.     I didn't know that specifically,
17   but it doesn't surprise me.
18         Q.     So the 4 billion that Anadarko
19   paid, it wasn't a net of 4 billion, if you
20   take into account the deduction?
21         A.     That would be a pre-tax amount,
22   correct, at least some portion of it.
23         Q.     And do you have an understanding
24   of whether it's possible to get insurance for
25   penalties?
```

1   now that you ask.

2          Q.     All right.  I'll fact check it

3   on the break.

4          A.     Okay.  My understanding is that

5   that was additive to the 4 billion.

6          Q.     Okay.  Are there any other

7   provisions, specific provisions, within the

8   settlement agreement that you're relying on

9   to form your opinion in this case about

10  optimal deterrence?

11         A.     Well, of course, the immunity

12  from OPA liability would be part of it,

13  too --

14         Q.     Right.

15         A.     -- part of the bargain struck

16  between the two parties.

17         Q.     And are you aware at all of what

18  -- are you aware of any of the negotiations

19  between BP and Anadarko leading up to the

20  settlement?

21         A.     No, I'm not.

22         Q.     Okay.  Are you aware of what BP

23  was claim -- claiming and the amount of

24  invoices associated with the spill for -- let

25  me -- let me phrase that a little more

```
1   cleanly.
2            Are you aware of the amount that
3   BP was seeking from Anadarko for unpaid
4   invoices associated with spill costs?
5        A.    No.
6        Q.    And are you aware of whether the
7   parties did any sort of internal calculations
8   of the response costs or expected damages at
9   the time they were in negotiations?
10       A.    I don't have any specific
11  knowledge about those calculations.
12       Q.    Did you ask to see any?
13       A.    No.
14       Q.    And did you investigate whether
15  there was any other possible business reason
16  that motivated Anadarko to settle with BP for
17  the amount of 4 billion?
18       A.    No.  I don't remember inquiring
19  about that.
20       Q.    Okay.  Are you aware of when the
21  settlement was reached between BP and
22  Anadarko in this matter, date-wise?
23       A.    I have been aware at some point.
24  I don't remember the date off the top of my
25  head.
```

```
1          Q.     Okay.  Does -- October 2011,
2     does that sound right to you?
3          A.     Could be.
4          Q.     Okay.  And did you do any
5     investigation of what -- in October 2011,
6     what was going on with respect to the
7     litigation in this matter, in the
8     multidistrict litigation?
9          A.     Did I specifically do an
10    independent investigation of that question?
11    No.
12         Q.     And you have no other knowledge
13    of what -- what was going on in terms of
14    deadlines -- court deadlines when the
15    settlement was reached?
16         A.     No, nothing that specific.
17         Q.     Okay.  So you're not aware that
18    the settlement between Anadarko and BP was
19    announced shortly before expert reports in --
20    in that matter were due?
21         MR. LOTTERMAN:  Object to form.
22         A.     No, I don't -- I know some
23    things about the general timeline.  I don't
24    know about that in particular.
25         Q.     Are you aware that prior to --
```

1  you have a massive oil spill, that -- that

2  any economic benefit is -- is outweighed,

3  your opinion would be that economic deter --

4  absolute deterrence is achieved solely by

5  making the violator pay for those damages,

6  correct?

7       A.    That if you had -- just to make

8  sure we're tracking.  If you had -- the

9  obverse of my example on Page 6, if you had a

10 firm causing a billion dollars in external

11 harm and receiving a hundred million in

12 economic benefit, then payment of the

13 external harm would actually remove the

14 incentive to violate.  So there's no need for

15 an additional penalty on top of external

16 harms -- on top of paying for external harms.

17      Q.    And you agree, even when you

18 have -- well, then, does your opinion carry

19 over to BP?  That is, if -- in this case, if

20 you have a -- actually, let's -- let's

21 scratch that.  I'll get to it a different

22 way.

23           So assuming BP paid its share of

24 OPA damages in external harm and there was no

25 economic benefit that BP accrued, would it be

1    and change external damage, now you can

2    sometimes get a rationale with, you know,

3    with big enough economic benefit and small

4    enough external damage, so small enough

5    number of barrels spilled, where you might

6    need penalties beyond payment of external

7    damages to achieve absolute deterrence.

8         Q.    But I'm not talking about --

9    assume the damage is the same between a spill

10   that is 2 million barrels and a spill that is

11   5 million barrels.  Assume the damage is the

12   same.  Then the number of barrels does not

13   then factor into your analysis on absolute

14   deterrence; is that correct?

15        A.    With the understanding that is

16   an awfully big assumption, yes.  I think

17   you're probably right.

18        Q.    All right.  Now we can -- let's

19   go to the factors.

20             In your analysis of -- contained

21   in your report on the seriousness of the

22   spill, you did no independent economic -- or

23   sorry.  Let me start that again.

24             Okay.  You did no independent

25   analysis of the seriousness of the spill; is

1   that correct?

2        A.     No, I did not.

3        Q.     Okay.  And what is your

4   understanding of -- do you understand the

5   seriousness factor to consider both harm and

6   potential harm?

7        A.     I don't think it's clear.  I

8   think it's pretty vague.

9        Q.     So you don't -- you didn't do

10  any research to try to determine whether or

11  not under the seriousness factor you consider

12  potential harm?

13       A.     No, I didn't do any research on

14  that specific question.

15       Q.     But your opinion is only with

16  regard to harm; is that right?

17       A.     My opinion -- so my assumption

18  that I made with respect to seriousness is

19  that it's serious.

20       Q.     And did -- and you said earlier

21  you did no independent analysis of Anadarko's

22  culpability; is that correct?

23       A.     That's correct.

24       Q.     Okay.  And you did no

25  independent analysis of Anadarko's efforts to

1    mitigate the effects of the spill, correct?

2         A.    Well, I'm not sure exactly what

3    you mean by independent analysis.

4         Q.    You're not relying on your

5    economic expertise in forming an opinion

6    about mitigation?

7         A.    That's fair enough.  I'm relying

8    on the documents that are cited here in the

9    report.

10        Q.    Nothing beyond the documents

11   that are cited in the report, correct?

12        A.    With respect to efforts to

13   mitigate, no.

14        Q.    And did you do any research to

15   determine what the mitigation factor means,

16   that is, how have courts interpreted the

17   mitigation factor?

18        A.    Yes.  I think that was part of

19   -- I think we were talking earlier today

20   about my search for how courts have

21   interpreted each of these eight factors,

22   understanding that I had some knowledge of

23   what each of these things mean coming into

24   it, but I did do a little looking around to

25   see if there had been decisions related to

1  application of these factors in a 311 case.

2  And again, other than Citgo, I couldn't find

3  anything.

4        But -- but here, too, this is

5  also why I looked at the settlement policy,

6  understanding that this is not a settlement

7  discussion that we're having now.  That was

8  another source of information on -- on at

9  least how the government might interpret each

10  of these eight factors.

11      Q.    So it's your understanding,

12  based on the settlement policy and Citgo,

13  that this is -- that each of these three

14  activities that you list constitute

15  mitigation?

16      A.    Yes.

17      Q.    And is that understanding based

18  on anything else other than that?

19      A.    No.  And my understanding, as an

20  economist, of what -- what these penalties

21  are intended to accomplish, these seemed to

22  be things that are relevant.

23        So they -- they would be, in

24  particular, the only factors that I would

25  talk about in talking about mitigation.

1     Q.     From the perspective as an

2  economist?

3     A.     Yes, applying the eight Clean

4  Water Act penalty factors.

5     Q.     And did you compare -- did you

6  do any factual comparison of Anadarko's

7  efforts to mitigate versus efforts by other

8  oil and gas companies other than BP?

9     A.     You mean in other spills?

10    Q.     No.  In this spill.

11    A.      In this spill, no, at least not

12  that I can remember.  I can't remember, for

13  example, what I looked at with respect to

14  MOEX.

15    Q.     And in the economic benefit

16  factor, the only thing you're relying on is

17  the United States' statement regarding this

18  factor?

19    A.     Yes.

20    Q.     And you didn't do your own

21  analysis of economic benefit?

22    A.     No, I didn't.

23    Q.     And --

24    A.     When -- when -- let me just

25  clarify that, though.

```
 1                 No analysis is not the same

 2   thing as thinking about it.  I never did a

 3   cash flow model of Anadarko's economic

 4   benefit.  But certainly when I read the

 5   documents, I'm aware that economic benefit is

 6   normally the starting point of a penalty

 7   analysis, and that's certainly been my

 8   experience.

 9         Q.     From a legal perspective?

10         A.     I mean from a practical

11   perspective.

12         Q.     But here you're citing Citgo,

13   correct?  So you're making a conclusion about

14   what Citgo is saying?

15         A.     What footnote are you on?

16         Q.     This is in your economic benefit

17   section.  You -- well, you don't specifically

18   cite Citgo, but --

19         A.     I don't cite Citgo, no.

20         Q.     You say:  Therefore, this

21   factor, which the Fifth Circuit has called

22   the starting point of the penalty analysis,

23   weighs in Anadarko's favor.

24                What are you referring to there?

25         A.     Right.  So starting point comes
```

1    from Citgo.

2         Q.     Did you read the entirety of the

3    Citgo opinion?

4         A.     I believe so.

5         Q.     Okay.  Do you know whether it

6    requires consideration of all of the penalty

7    factors?

8         A.     I believe that it does.  That's

9    what I remember.

10        Q.     And that -- okay.  Let's -- and

11   turning to prior violations by Anadarko, your

12   -- the source of your opinion in that is

13   based on a proposed stipulation; is that

14   correct?

15        A.     Yes, that's correct.

16        Q.     Okay.  And nothing else?

17        A.     No.

18        Q.     Okay.  And it's certainly

19   possible that there are other violations that

20   occurred outside of the offshore Gulf of

21   Mexico 311 that was the subject of this

22   stipulation?  Let me -- let me ask the

23   question, and I'll rephrase it.

24             Did you investigate any other --

25   any other Anadarko Clean Water Act violations

1    other than what's in the stipulation?

2         A.    No.  No.  My -- my feeling was

3    these are the ones that were relevant.

4         Q.    And you state that you -- that

5    Anadarko's operations are, quote, a model of

6    responsible and safe operations.  But your

7    opinion is based only on the -- their history

8    of violations; is that correct?  You're not

9    looking at anything else to render that

10   opinion, that Anadarko's operations are a

11   model of safe and responsible operations?

12        A.    No, I didn't do a comparative

13   analysis.  I know some have been done, and I

14   think I looked at those.  I think they're

15   part of the materials that are listed in my

16   report.  But no.  The -- the fact that

17   Anadarko is a large company and has a total

18   of $12,000, $12,834, in total civil penalties

19   over a nine-year period -- or, I'm sorry, a

20   seven-year period, that's what I was

21   referring to.

22        Q.    But you didn't actually

23   investigate whether Anadarko actually, in

24   fact, had safe operations?  You didn't go to

25   the -- to Anadarko's rigs to assess this,

1    correct?

2          A.      No.

3          Q.      Okay.

4          A.      No.

5          Q.      You didn't read any information

6    about their safety violations at -- their --

7    their HS&E violations?  You didn't read any

8    statistics along those lines, correct?

9          A.      No.

10         Q.      All right.  And in terms of the

11   factor, other penalties for the same

12   instance, you state that -- actually --

13   sorry -- going -- going back to the prior

14   violation, you also say that Anadarko's

15   operations in the Gulf are significant.

16               What did you do to determine

17   that?

18         A.      Well, again, we looked at the --

19   with respect to deepwater, we looked at the

20   shares, you know, the lease shares.

21         Q.      So based on their number of

22   leases, their interest in number of leases?

23         A.      Yes.  And again, just a general

24   knowledge of how much they're producing,

25   which I would characterize is a lot.

1          Q.     But you did no analysis to

2    compare, for example, their production to

3    other companies' production?

4          A.     No.  That did not seem

5    necessary.

6          Q.     Okay.  Going to the other

7    penalties factor.  You -- you list a number

8    of things, including the -- the BP criminal

9    settlement, the Transocean consent decree and

10   criminal plea agreement, the MOEX settlement

11   and the Halliburton settlement.

12              And you say that most of these

13   penalties were paid by actual or potentially

14   culpable parties, and that's the reason that

15   you give for concluding that that factor

16   should be given little to no weight.

17              When you say most, that's --

18   that's not all encompassing, correct?

19         A.     Sure.  For example, I think MOEX

20   at the end of the day would not have been a

21   culpable party.  That -- that was what I

22   meant when I said that.

23         Q.     Okay.  But they did pay a

24   penalty, correct?

25         A.     Yes, they did, prior to the

```
 1   culpability ruling.

 2          Q.     But not prior to the negligence

 3   ruling, correct?

 4          A.     I believe that's right.

 5          Q.     In terms of the economic impact

 6   of the penalty on Anadarko, you cite to

 7   Anadarko's discovery responses and -- and

 8   Mr. Gwin's deposition.

 9                 Is that the only source of

10   information you have about the economic

11   impact of the penalty on Anadarko?

12          A.     Yes, this -- this admission by

13   Anadarko that it's able to pay as of that

14   date.

15          Q.     And so that's the only

16   information that you're using to conclude

17   that -- render an opinion about economic

18   impact of the penalty, correct?

19          A.     That is correct.  Yep.

20          Q.     Okay.  And in looking at the

21   final factor, other factors as justice may

22   require, you look at revenues and Anadarko's

23   jobs.

24                 You did no comparative analysis

25   of Anadarko's contributions to any other oil
```

```
 1   companies' contributions, correct?
 2         MR. LOTTERMAN:  Object to form.
 3         A.     Well, there is a statement in my
 4   report about -- let me pull it.  Here we go.
 5         Q.     I guess I'm asking you just a
 6   question of whether you did any of your own
 7   research in -- quantitative research in
 8   determining the -- Anadarko's contributions,
 9   other than what's listed here.
10         MR. LOTTERMAN:  Object to form.
11         A.     I was looking for something, and
12   I'm not finding it in here.
13              The thing -- I won't take more
14   of your time.  The thing I'm looking for in
15   here, I thought I had some information on
16   Anadarko employment, you know, sort of
17   summary statistics on that.  So apart from
18   that, though, I think the answer is no.
19         MR. LOTTERMAN:  I think she just asked
20   you about that.  Page 19.  She just asked you
21   about the factors.  She's trying to find out
22   if the factors you list under Section 8 --
23         A.     Oh.  That's --
24         MR. LOTTERMAN:  Yeah.
25         A.     I'm sorry.  I was looking in the
```

 1    wrong section.  That's where it is.

 2        MR. LOTTERMAN:  She's asking if you

 3    have anything beyond what you list there, I

 4    believe is her question.

 5        A.    Okay.  Would you mind -- sorry.

 6    I had to -- I had to look around.  But yeah.

 7        Q.    Okay.  So let's -- let's just --

 8    so that we know exactly what we're talking

 9    about, you say that as of December 31st,

10    2013, Anadarko employed 5,700 employees and

11    approximately 530 jobs in Anadarko's Gulf of

12    Mexico related operations.  And for that, you

13    cite Anadarko's discovery responses; is that

14    correct?

15        A.    Yes.

16        Q.    But beyond that, you did not do

17    anything to determine if those statements

18    were accurate?

19        A.    Beyond the citations listed

20    here, no.

21        Q.    So you didn't do anything to

22    verify the fact that -- or the statement here

23    that Anadarko provided thousands of

24    additional jobs related to Anadarko's

25    Gulf-related operations and indirect jobs and

1  investments in supporting industries related

2  to Anadarko's Gulf-related operations?

3          A.      No.  So the -- the citation is

4  what it is.

5          Q.      Okay.

6          MS. HARVEY:  Can we go off the record?

7          VIDEOGRAPHER:  Sure.  Off the record at

8  4:12.

9              (Off the record at 4:12 p.m. to

10 4:27 p.m.)

11         VIDEOGRAPHER:  Back on the record at

12 4:27.

13         Q.      (By Ms. Harvey) Let's talk for a

14 minute about the Pitchford article that you

15 cite.  It's Tab 22 in your binder, and we can

16 mark that as the next exhibit.

17         MR. LOTTERMAN:  13410.

18         (Exhibit Number 13410 marked.)

19         Q.      You cite Pitchford to suggest

20 that if penalties are imposed here, that

21 could require a non-operator to raise its

22 rate of return; and, therefore, the operator

23 then may cut corners on safety expenditures;

24 is that right?

25         A.      Yes.