# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY  THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | * | |
| OF MEXICO, ON APRIL 20, 2010 | * | SECTION J |
| | * | |
| This document relates to: | * | |
| | * | HONORABLE CARL J. BARBIER |
| No. 10-4536 | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

## BPXP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE DR. DIANE AUSTIN'S OPINIONS AND TESTIMONY

United States expert Dr. Diane Austin, an anthropologist, purports to describe the short and long-term "sociocultural effects" of the *Deepwater Horizon* oil spill on "nearly all the communities and economic sectors of the Gulf of Mexico coastal region."  (Ex. A, 8/15/14 Austin Rpt. at 3).  As confirmed by her recent deposition testimony, Dr. Austin's sweeping opinions regarding the impact of the spill on the mental health and economic well-being on the entire Gulf of Mexico region are unreliable and irrelevant under *Daubert*:

- Although Dr. Austin contends that sociocultural effects "continue today," she completed her research in January 2012 and last collected data in March 2012.  Thus, Dr. Austin admits that she has **no data or analysis** to support her opinions about the long-term persistence of any effects beyond March 2012.

- Dr. Austin has acknowledged that she studied a limited number of people in only five rural Gulf communities and cannot extrapolate her findings from those individuals and communities to the entire Gulf Coast population.

- Dr. Austin's broad opinions cannot be scientifically tested to determine their reliability, because she has failed to produce the interview notes and matrices on which she relied and she never considered key demographic information about her research subjects that could have been responsible for the effects which she attributes to the spill.

- Dr. Austin is not qualified to render the opinions that she offers about the mental health conditions and economic well-being of the limited number of people she studied, let alone of the entire Gulf Coast population.

- Dr. Austin's opinions are cumulative of the opinions of other United States experts and documents and reports.

For these reasons, as explained more fully below, BPXP respectfully requests that the Court exclude Dr. Austin's reports and opinions from the upcoming Penalty Phase trial.

## BACKGROUND

The United States has designated Dr. Austin to testify regarding alleged sociocultural effects of the spill on Gulf Coast residents based on a limited "ethnographic" research study commissioned by the Bureau of Ocean Energy Management ("BOEM") and conducted by Dr. Austin and a team of researchers between September 2010 and January 2012. This study resulted in a two-volume BOEM report titled "Offshore Oil and the Deepwater Horizon: Social Effects on Gulf Coast Communities." (Ex. B, BOEM Social Effects Rpt. Vol. 1 & 2, Deposition Exhibit 11922 at 17, and Deposition Exhibit 11923 ("BOEM Report"); Ex. C, Austin Dep. at 51:12-15 (noting that some parts of the study began in April 2010)).

Dr. Austin's ethnographic research is based on observations by researchers "who spend time in affected communities observing and interacting with individuals and groups within those communities, and recording those observations in written (and sometimes audio and/or video) notes." (Ex. A, 8/15/14 Austin Rpt. at 6). These notes do not contain methodically-recorded information about gender, age, income, or prior mental health conditions of the individuals. (Ex. C, Austin Dep. at 73:16-22, 76:2-7, 80:5-15, 80:22-81:5). Austin's work focused on only five Gulf communities, none of which are urban areas. (*Id.* at 81:20-82:23, 90:9-11).

Despite the fact that Dr. Austin's reports for the Penalty Phase focus on the "mental health and social well-being" and "economic and material well-being" of Gulf Coast residents,

Dr. Austin has no professional training or certification in medicine or psychology, and she considers an analysis of economic data outside her expertise.  (*Id.* at 36, 41-42, 65:14-20, 284).

The ethnographic approach has serious limitations in how its results can be applied.  By her own admission, Dr. Austin's work is ***not*** designed to measure the impact of any harm on Gulf Coast communities as a result of the *Deepwater Horizon* incident and oil spill; rather, her analysis purports to demonstrate in qualitative terms the "range" of impacts felt or perceived by members of the community.  (*Id.* at 124:16-18).   Dr. Austin repeatedly admitted that no quantitative conclusions could be reached from the BOEM Report.[1]

The "data" generated by Dr. Austin's ethnographic approach "are not designed to provide statistically significant results."  (Ex. D, 9/26/14 Austin Rpt. at 19).  Dr. Austin concedes that one cannot extrapolate what percentage of the population is experiencing any positive or negative effects of the spill from the work that she did.  (Ex. C, Austin Dep. at 258:15-21).  Dr. Austin also admits that her work does not determine or evaluate the validity of what her interview team was told by interviewees, even though she bases her expert opinions on this same information.  (*Id.* at 280:1-9).

## LEGAL STANDARDS

To be admissible under Federal Rule of Evidence 702, as the Supreme Court has held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony must be both reliable and relevant.  *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir.

---

[1]   (*See, e.g.*, Ex. C, Austin Dep. at 67:6-12 (purpose of expert reports was not to quantify the effects of the spill, and Austin has not at any time quantified effect of spill); 58:10-19 ("I did an ethnographic study, which is not a quantitative study"); 61:23-62:3 (did not collect quantitative data on tourism); 62:11-15 (did not collect quantitative data on oil and gas industry); 62:16-21 (did not collect quantitative data on fabrication and shipbuilding); 64:3-8 (did not collect quantitative data on effect of tourism grants); 64:13-18 (did not collect quantitative data on effect of claims payments); 284:25-285:21 (did not quantify the degree to which anyone's health or well-being was affected by the spill)).

2010).  Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Federal courts have found that expert testimony is irrelevant where there is "too great an analytical gap between the data and the opinion proffered."  *See, e.g.*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  As a result, conclusory assumptions or unsupported extrapolations are irrelevant and inadmissible.  *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

In addition, under Rule 702, "[b]efore a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"  *United States v. Cooks*, 589 F.3d 173, 179-80 (5th Cir. 2009) (citing Fed. R. Evid. 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."  *Id.*; *see Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

## ARGUMENT

Dr. Austin's opinions regarding the "sociocultural effects" of the *Deepwater Horizon* spill are unreliable and irrelevant by her own admission.  Because Dr. Austin's opinions cannot meet the requirements set forth in Rule 702 or *Daubert*, her opinions should be excluded.

**I.     Dr. Austin's Opinions About Long-Term Effects of the Spill Are Not Based on Any Data or Analysis and Should Be Excluded.**

Dr. Austin's expert reports contend that effects from the spill continue "today."  *See, e.g.*, (Ex. A, 8/15/14 Austin Rpt. at 3 ("Many effects from the *Deepwater Horizon* disaster continue today"); 30 ("[C]oncerns about the safety of Gulf seafood persist even today.")).  Yet neither Dr. Austin nor her research team performed any work or reviewed any data to verify that the alleged effects continue to the present day.

At her deposition, Dr. Austin agreed that her opinions are limited to the research that she and her research team conducted through January 2012. (Ex. C, Austin Dep. at 289:22-290:1). Dr. Austin testified that she does not intend to offer opinions about any effects of the spill from March 2012 through the present day. (*Id*. at 138:20-139:3). She further agreed that her testimony would be limited to the short-term effects of the spill that were realized as of March 2012. (*Id*. at 139:4-8). In fact, Dr. Austin expressly and voluntarily withdrew her opinions about the present-day concerns over safety of Gulf seafood after admitting that she reviewed no data and performed no analysis after March 2012. (*Id*. at 138:4-10;[2] Ex. A, 8/15/14 Austin Rpt. at 30-31; Ex. D, 9/26/14 Austin Rpt. at 26). Dr. Austin's admissions are consistent with the concession in her rebuttal report that, "[b]y design" her report "focuses 'on the short term effects, those that occurred in the first 20 months . . . .'" (Ex. D, 9/26/14 Austin Rpt. at 7).

In light of Dr. Austin's own statements about the limitations of her analysis and the absence of any research or data after March 2012, her opinions about the long-term and continuing presence of the spill's effects are inherently unreliable.[3] BPXP respectfully requests that Dr. Austin's opinions be excluded on this basis or, at a minimum, that any opinions regarding alleged effects after March 2012 or that "continue today" should be stricken.

---

[2]   Q.   (BY MS. KARIS) So do you intend to offer to this Court an opinion about what concerns about seafood safety exist today, even though you have no data, no analysis, and no research since March of 2012?

MS. FIDLER: Objection; form.

A.  I will withdraw that opinion.

[3]   While Dr. Austin claimed on direct examination that her opinions could be extrapolated temporally beyond 2012, where "conditions are the same," she conceded that conditions for the industries she addressed changed annually, and that in any event, she did not perform an analysis to be able to determine whether or not conditions were the same as those that existed when she conducted her research. (Ex. C, Austin Dep. at 301:22-302:21, 303:15-20). In short, Dr. Austin has admitted she has no basis for speaking to long term impacts.

## II.     Dr. Austin's Opinions About Short-Term Effects Should Be Stricken Because She Admits that Only Information About the Range of Effects Can Be Extrapolated.

Dr. Austin uses the results of her study of certain limited Gulf populations to assert opinions regarding the population of the entire Gulf Coast.  For example, Dr. Austin states that the "*Deepwater Horizon* disaster caused serious harm in nearly every community and almost every major economic sector across the Gulf of Mexico coastal region from Louisiana to Alabama." (Ex. A, 8/15/14 Austin Rpt. at 46).  Dr. Austin makes this broad statement about the entire Gulf Coast even though she has admitted that her work focused on only five specific Gulf communities, none of which are urban areas.  (Ex. C, Austin Dep. at 82:15-23, 90:9-11).  Not only did Dr. Austin focus on only five communities, but she directed her work to specific economic sectors that were expected to be important at the start of the study.  (*Id.* at 85:3-20).

Dr. Austin has conceded that the ethnographic approach she used "does not seek to generalize from a sample to a population." (Ex. D, 9/26/14 Austin Rpt. at 17).  Despite this admission regarding the limits of her research methodology, Dr. Austin generalizes throughout her reports that the experience of a few individuals is representative of all individuals within a particular economic sector or community.  For example, in her rebuttal report, Dr. Austin reveals that she and BOEM researchers spoke only to a total of 338 individuals involved in commercial fishing.  (*Id.* at 19).  Yet Dr. Austin applies what some of those individuals told her to ***all*** local fishermen and seafood processors throughout the Gulf: "First, the efforts by BP to 'mitigate' seafood market effects were not accepted by local fishermen and processors, or by consumers. . . . The 'spill' thus contributed to existing problems as well as additional ones." (*Id.* at 26).  By Dr. Austin's own admission, her research methodology does not support these types of broad opinions regarding the entire Gulf population.

At her deposition, Dr. Austin claimed that one can generalize the *range* of effects found in a qualitative study like the BOEM Report to a larger population.[4]  (Ex. C, Austin Dep. at 239:7-23).  But even if Dr. Austin is correct on this point, predicting a general range of effects without knowing the number of people falling into each category within the range makes her opinions unreliable and irrelevant under *Daubert*.  Indeed, Dr. Austin has conceded that her work does not allow one to extrapolate what percentage of the population is experiencing any positive or negative effects of the spill.  (*Id.* at 239:24-240:10, 258:15-21).  Given this concession regarding the limits of her analysis, her opinions should be excluded as unreliable and irrelevant.

## III.   Dr. Austin's Opinions Are Based on Notes of Interviews that Are Not Original and Exclude Highly Relevant Information.

### A.   The United States Did Not Produce Original Interview Notes or a Completed Interview Matrix.

Dr. Austin's expert reports are based, through Dr. Austin's complete reliance on the BOEM Report,[5] on the BOEM researchers' notes of interviews or other interactions with individuals in the Gulf Coast.[6]  (Ex. C, Austin Dep. at 247:16-248:2).  These interview notes,

---

[4]   Dr. Austin repeatedly affirmed in her deposition that the purpose of the BOEM Report was to identify the range of impacts. (*See, e.g.*, Ex. C, Austin Dep. at 112:13-15 ("The research that we did was to look at the range of effects of the spill that included any response to them"); 124:16-18 ("This was a qualitative research study. We did not attempt to quantify effects. We were studying the range of effects"); 156:14-15 ("Again, the purpose of this study was to show there are range of effects"); 201:12-16 ("The -- again, the study that we did was to look at what was happening in these communities and the range of effects. We did not attribute everything happening in these communities to the spill")).

[5]   (Ex. C, Austin Dep. at 28:15-18 ("Through the process by which the information that we relied -- that was relied on to create these reports [BOEM Report Vol. 1 and 2], then I used these reports to produce my expert opinion."); *see also* Ex. A, 8/15/14 Austin Rpt. at 3-4, 6-8; Ex. C, Austin Dep. at 25:19-26:11, 26:20-27:21, 28:8-25).

[6]   Dr. Austin draws a distinction between notes of interviews and notes of "community interactions" that may have been witnessed and/or participated in by the BOEM researchers. (Ex. C, Austin Dep. at 278:1-12).  References to "interview notes" in this brief include any types of notes made by BOEM researchers as part of their work in the Gulf Coast communities.

generally handwritten, were taken by the individual researchers, typed up after the researchers' interactions, and then inserted into a database.  (*Id.* at 217:22-218:15).

The United States did not produce or otherwise provide BPXP with the original interview notes.  Instead, the United States produced only exports of the notes from a database, which is two steps removed from the researchers' original notes.  This failure to produce original notes prevents BPXP from evaluating the process by which the BOEM researchers and Dr. Austin interpreted and processed their notes and from assessing the bias and/or reliability of their data collection methods.  Notwithstanding BPXP's repeated requests for a complete set of interview notes[7] both before and after Dr. Austin's deposition (*see* Ex. E, 10/9/14 E-Mail from P. Bartoszek to S. Himmelhoch and Ex. F, 10/30/14 E-Mail from D. Tressler to S. Himmelhoch), the United States refuses to produce a complete set of the original interview notes.

The United States also refuses to produce the BOEM researchers' completed interview matrix.  Researchers chose who they would interview based on a matrix of population sectors that was created at the BOEM Report's outset to guide researchers in identifying interviewees from various sectors and populations.  (Ex. C, Austin Dep. at 85:3-20).  In response to questions regarding the reliability of the BOEM Report's research methods and whether there was any control for bias, Dr. Austin pointed to this matrix as a specific step taken to "maximize validity during the BOEM study."  (Ex. D, 9/26/14 Austin Rpt. at 23).  Although the matrix was populated with information throughout the course of the BOEM study (Ex. C, Austin Dep. at 86:10-14), the United States produced only a blank version of the matrix, and failed to comply with BPXP's request for populated versions.  (Ex. F, 11/5/14 E-Mail from S. Himmelhoch to D.

---

[7]   The United States also refused BPXP's request for any audio or video recordings of interviews that are referenced in the BOEM Report, and which are therefore relied on by Dr. Austin through her complete reliance on the BOEM Report for her opinions.  (Ex. E, 10/9/14 E-Mail from P. Bartoszek to S. Himmelhoch).

Tressler).  Because the BOEM Report is based entirely on these interviews, information about whether and how the researchers met their goals for reaching a variety of interviewees is critical to understanding if the study was properly controlled for bias, used a valid cross-section of the Gulf population, and was otherwise properly and reliably conducted.

Given the United States' refusal to produce this critical information about the interviews that make up the BOEM Report and Dr. Austin's opinions, the methodology used in Dr. Austin's reports cannot be fully evaluated and tested, and her opinions must be excluded.

**B.    The BOEM Report Failed to Consider Relevant Demographic Information.**

Although the United States never produced the original interview notes, Dr. Austin testified regarding certain aspects of how the BOEM Report was prepared.  Notably, Dr. Austin confirmed that the interview notes do not contain methodically-recorded information about gender, age, income range or prior mental health of individuals who were interviewed.  (Ex. C, Austin Dep. at 73:16-22, 76:2-7).  The lack of such fundamental demographic information makes it impossible to determine whether the impacts that Dr. Austin attributes to the spill are actually a result of the spill or some other factor attributable to the selection bias of the limited interview population.

For example, Dr. Austin conceded that the BOEM researchers could not identify which interviewees were below the poverty line, and which were making six-figure incomes.  (*Id.* at 78:20-79:12).  Without knowing the income status of interviewees, one cannot put their comments about economic impact into context.  Dr. Austin also conceded that she has no data or information on the individual mental health of the interviewees.  (*Id.* at 80:6-15).  Without knowing whether the interviewees had preexisting mental health conditions, for example, one cannot determine whether any alleged mental health conditions are a result of the spill or of some prior event.  (*See* Ex. G, Bonanno Dep. at 176-77, 220-21).  In addition to information about

preexisting mental health conditions, demographic information such as age, gender, ethnicity, and socioeconomic status are "routinely" collected and reported as part of social science research of this sort, and is necessary to determine whether a sample is representative.  (*Id.* at 231-34). Because this type of data does not exist, the validity of Dr. Austin's opinions can never be tested, and those opinions are inherently unreliable.

**IV.** **Dr. Austin Is Not Qualified to Offer Any Opinions Regarding Health, Well-Being or Economics in the Gulf Coast, and the Opinions She Would Offer Are Cumulative.**

      **A.** **Dr. Austin is Not Qualified to Offer Opinions Regarding Health and Social Well-Being.**

Dr. Austin makes far-reaching claims regarding the impact of the *Deepwater Horizon* incident on the "health and social well-being" of communities along the Gulf Coast, particularly with respect to mental health.  For example, Dr. Austin opines that the incident "precipitated significant mental health concerns" and "increased stress and anxiety." (Ex. A, 8/15/14 Austin Rpt. at 3, 5, 25, 40-43).  Dr. Austin also broadly concludes that some of these alleged effects were "exacerbated" by "[t]he lack of community health facilities," including "mental health services," in Gulf Coast communities.  (*Id.* at 42).  Thus, as Dr. Austin acknowledges, her report involves "making assessments about the factors that influence mental health and the range of effects on individuals in the course of this."  (Ex. C, Austin Dep. at 80:19-21).

Dr. Austin admitted in deposition that she has no expertise or qualifications in mental health or psychology:

    Q.    Do you have a degree in psychology?
    **A.**    **No, I do not.**

    Q.    Do you have a degree in any medical field?
    **A.**    **No, I do not.**

    Q.    Do you consider yourself a psychologist?
    **A.**    **No, I do not.**

> Q. Do you hold yourself out as somebody who can diagnose psychological impairment?
>
> **A. No. I have never made any attempt to do so.**
>
> Q. Do you consider yourself somebody who can diagnose physical impairment; that is, health impact?
>
> **A. No. I'm—have never made any attempt to do that, either.**

(Ex. C, Austin Dep. at 38).

Dr. Austin is an anthropologist—not a psychologist, psychiatrist, or medical doctor—and thus she is not qualified to assess or diagnose any mental, behavioral, or physical health condition. (*Id.* at 36, 41-42, 284).[8] As a result, Dr. Austin lacks any expertise or qualifications in mental or behavioral health, and is unqualified to offer any opinions regarding the health or well-being, including mental and behavioral health, of Gulf Coast individuals or communities. She is likewise not qualified to offer any opinions about the factors that influence mental health or any effects on the mental health of individuals and communities.

Perhaps recognizing her lack of qualifications to opine on the mental health or well-being of individuals or communities, Dr. Austin contends that she only sought to reach conclusions regarding mental health conditions to the extent those terms are used in "common English." (*Id.* at 295). In other words, Dr. Austin claimed in deposition that her opinions regarding depression, anxiety, and stress, for instance, are limited to "the common way that we talk about" those conditions. (*Id.* at 296). According to Dr. Austin, her opinions regarding mental health conditions such as depression, anxiety, and stress do not require any expertise:

> Q. (By Ms. Karis) You don't need an expertise, is what you're saying, for just talking about, as you called it, a common way of talking about anxiety?
>
> **A. That is correct.**

---

[8] Dr. Austin acknowledged that her only "formal training" in mental health consists of one course in social psychology and one course in cognitive psychology. (*Id.* at 42-43).

(Ex. C, Austin Dep. at 296).

To the extent any of Dr. Austin's opinions regarding mental health speak only to lay understandings of mental health conditions, such opinions are not the type of "scientific, technical, or other specialized knowledge" that is the proper subject of expert testimony.  *See* Fed. R. Evid. 702.  It is well-established that "[a]n expert is not permitted to state his opinion on a matter of common knowledge." *Farris v. Interstate Circuit*, 116 F.2d 409, 412 (5th Cir. 1941). "To warrant or permit use of expert testimony . . . the subject matter must be closely related to a particular profession, business or science *and not within the common knowledge of the average layman* . . . ."  *Faircloth v. Lamb-Grays Harbor Co., Inc.*, 467 F.2d 685, 694 (5th Cir. 1972) (emphasis added) (quoting *McKee v. Aetna Life Ins. Co.*, 423 F.2d 623, 624 (6th Cir. 1970)).  As a result, even if this Court were to accept Dr. Austin's contention that her opinions relate only to "common" understandings of mental health conditions, those opinions should be excluded as improper expert testimony under Rule 702.

### B. Dr. Austin Is Not Qualified to Offer Opinions Regarding the Economic Impact of the Spill on Gulf Coast Economies.

Dr. Austin does not consider herself an economist, she has no degrees in economics, and the limited course-work that she completed in economics was in pursuit of her bachelor's degree. (Ex. C, Austin Dep. at 41:9-13, 38:22-23, 40:6-11).  Nevertheless, Dr. Austin's report includes an entire section expressing various opinions about the impact of the *Deepwater Horizon* incident on the economy of the Gulf Coast region, specifically focusing on the "economic and material well-being effects of the spill to the fishing, offshore oil and gas, tourism, and shipbuilding sectors."  (Ex. A, 8/15/14 Austin Rpt. at 4).  For example, according to Dr. Austin:

- Some participants in the commercial fishing industry were harmed by the spill, while others benefited from the Vessels of Opportunity program.  (Ex. A, 8/15/14 Austin Rpt. at. 27-31).

- Some participants in the offshore oil and gas industry were harmed by the spill, while others were helped by BPXP programs.  (*Id.* at 31-35).

- Some participants in the tourism industry were harmed.  (*Id.* at 35-36).

- Some participants in the shipbuilding industry were harmed.  (*Id.* at 36-37).

- The economic effects of the *Deepwater Horizon* incident ranged from minimal to devastating.  (*Id.* at 26).

In addition to her lack of qualifications to testify regarding economic issues, Dr. Austin's economic analyses are not rooted in any economic data.  Dr. Austin admits, for example, that she did not rely "on any analysis of formal data on the tourism industry."  (Ex. C, Austin Dep. at 192:9-10).  The BOEM Report on which Dr. Austin relies did not include any kind of econometric or quantitative analysis.  (*Id.* at 58:6-19).  In fact, Dr. Austin believes that an analysis of economic data is outside her area of expertise.  (*Id.* at 65:14-20).  This is not surprising, considering that Dr. Austin does not consider herself qualified to conduct an econometric study or analysis, and she has never published in the field.  (*Id.* at 44:3-7).  Nor did Dr. Austin consult with an economist in preparing her expert reports.  (*Id.* at 64:19-22).

In short, Dr. Austin is not qualified to offer an opinion on the economic effects of the oil spill on any industry or any individuals in the Gulf Coast.  Dr. Austin does not consider herself to be an expert in economics (*id.* at 41:9-13), and neither should the Court.

### C.    Dr. Austin's Opinions Are Cumulative of the BOEM Report and Other U.S. Experts Dr. Richard Clapp and Dr. Charles Mason.

Dr. Austin admits that the two-volume BOEM Report served as the basis for her expert report.  (*Id.* at 94:6-9).[9]  According to Dr. Austin, her expert report is a "succinct perspective on the harms discussed in the two volumes, totaling more than 400 pages, which [she and her

---

[9]    (*See also* Ex. C, Austin Dep. at 28:15-18 ("Through the process by which the information that we relied -- that was relied on to create these reports [BOEM Report Vol. 1 and 2], then I used these reports to produce my expert opinion."); Ex. C, Austin Dep. at 25:19-26:11, 26:20-27:21, 28:8-25; Ex. A, 8/15/14 Austin Rpt. at 3-4, 6-8).

colleagues] produced for the BOEM as a result of our study of the social effects of the *Deepwater Horizon* disaster." (Ex. D, 9/26/14 Austin Rpt. at 4).

As Dr. Austin's deposition testimony confirms, the United States intends to call Dr. Austin at trial to highlight and provide a "succinct perspective" on the contents of the BOEM Report. This type of expert highlighting and summary fails the test for relevance under *Daubert*: "Having an expert witness simply summarize a document (which is just as easily summarized by a jury) with a tilt favoring a litigant, without more, does not amount to expert testimony." *In re Prempro Products Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008), *aff'd in part, rev'd in part*, 586 F.3d 547 (8th Cir. 2009). Because Dr. Austin's expert report is merely a cumulative summary of the BOEM Report, her opinions are irrelevant and should be excluded. *S.E.C. v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

Furthermore, Dr. Austin's opinions regarding the health and well-being of Gulf Coast communities are also cumulative and duplicative of those offered by another expert for the United States, Dr. Richard Clapp. Dr. Clapp's three expert reports for the Penalty Phase address "health impacts" of the *Deepwater Horizon* incident, including mental health impacts. (*See* 8/15/14 Clapp Rpt. at 6; 9/12/14 Clapp Rpt. at 22-25; 9/26/14 Clapp Rpt. at 6-8). Because Dr. Clapp offers opinions regarding the mental health impact of the incident, any discussion by Dr. Austin of the mental health impact of the spill in Gulf Coast communities is cumulative and duplicative, and should be stricken.[10]

---

[10] BPXP separately moves to exclude the opinions and testimony of Dr. Clapp, including on the basis that he has no qualifications to opine on mental health. If the Court grants BPXP's motion, Dr. Austin's opinions regarding health and well-being should nonetheless be stricken for the reasons described elsewhere in this motion, including that she lacks any qualifications to offer them.

Finally, the United States has another expert designated to testify regarding the economic impact of the spill: Dr. Charles Mason, who is an economist.  At best, Dr. Austin's analyses of the economic effects of the spill are cumulative of Dr. Mason's opinions, providing an independent basis to exclude Dr. Austin's opinions.

## CONCLUSION

For the foregoing reasons, BPXP respectfully requests that the Court enter an order excluding the reports and testimony of Dr. Austin at the upcoming Penalty Phase trial.

Dated: December 5, 2014          Respectfully submitted,

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**Attorneys for BP Exploration & Production Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of December, 2014.

/s/ Don K. Haycraft