# EXHIBIT B



OCS Study
BOEM 2014-617

# Offshore Oil and *Deepwater Horizon*: Social Effects on Gulf Coast Communities
# Volume I: Methodology, Timeline, Context, and Communities





Ex 11922

**Worldwide Court Reporters, Inc.**

**U.S. Department of the Interior**
**Bureau of Ocean Energy Management**
**Gulf of Mexico OCS Region**



OCS Study
BOEM 2014-617

# Offshore Oil and *Deepwater Horizon*: Social Effects on Gulf Coast Communities
# Volume I: Methodology, Timeline, Context, and Communities

Authors

Diane Austin
Brian Marks
Kelly McClain
Tom McGuire
Ben McMahan
Victoria Phaneuf
Preetam Prakash
Bethany Rogers
Carolyn Ware
Justina Whalen

Prepared under BOEM Contract
M10AC20003
by
Bureau of Applied Research in Anthropology,
School of Anthropology, University of Arizona
1009 E. South Campus Dr.
Tucson, AZ 85721-0030

Published by

U.S. Department of the Interior
Bureau of Ocean Energy Management
Gulf of Mexico OCS Region

New Orleans, LA
June 2014

# DISCLAIMER

This report was prepared under contract between the Bureau of Ocean Energy Management (BOEM) and the University of Arizona, School of Anthropology's Bureau of Applied Research in Anthropology.  This report has been technically reviewed by BOEM, and it has been approved for publication.  Approval does not necessarily signify that the contents reflect the views and policies of BOEM, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

# REPORT AVAILABILITY

To download a PDF file of this Gulf of Mexico OCS Region report, go to the U.S. Department of the Interior, Bureau of Ocean Energy Management, Environmental Studies Program Information System website and search on OCS Study BOEM 2014-617.

This report can be viewed at select Federal Depository Libraries.  It can also be obtained from the National Technical Information Service; the contact information is below.

> U.S. Department of Commerce
> National Technical Information Service
> 5301 Shawnee Rd.
> Springfield, Virginia  22312
> Phone:  (703) 605-6000, 1(800)553-6847
> Fax:  (703) 605-6900
> Website:  http://www.ntis.gov/

# CITATION

Austin, Diane; Marks, B.; McClain, K., McGuire, T., McMahan, B., Phaneuf, V., Prakash, P., Rogers, B., Ware, C., Whalen, J. 2014. Offshore oil and *Deepwater Horizon*: Social Effects on Gulf Coast Communities, Volume I: Methodology, Timeline, Context, and Communities. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2014-617.  265 pp.

# CONTENTS

List of Tables ............................................................................................................................ vii

List of Figures .......................................................................................................................... viii

Preface ....................................................................................................................................... ix

Summary ................................................................................................................................... 11
    Social Effects of the Macondo Well Blowout ...................................................................... 11
    Social Effects of the Response .......................................................................................... 13

Chapter One: The Study ............................................................................................................ 16
    1.1. Approach and Methods .............................................................................................. 16
    1.2. Overview of the Study Communities ......................................................................... 21
    1.3. References ................................................................................................................. 27

Chapter Two: The Spill, Response, and Cleanup ..................................................................... 32
    2.1. Overview of the Response and Cleanup ................................................................... 32
    2.2. Timeline of Key Events ............................................................................................. 35
    2.3. References ................................................................................................................. 49

Chapter Three: Context ............................................................................................................. 64
    3.1. The Petroleum Industry in the Region ...................................................................... 64
    3.2. Hurricanes ................................................................................................................. 69
    3.3. Socioeconomic Impacts of Oil Spills and Other Technological Disasters ................. 72
    3.4. Legal and Regulatory Framework for Responding to Oil Spills ................................. 79
    3.5. References ................................................................................................................. 86

Chapter Four: The Interplay of Migration, Ethnicity, Social Networks along the Gulf Coast ... 100
    4.1. Migration ................................................................................................................... 101
    4.2. Race and Ethnicity .................................................................................................... 105
    4.3. Social Networks ........................................................................................................ 111
    4.4. Native Americans ...................................................................................................... 115
    4.5. Vietnamese and Vietnamese-Americans ................................................................. 121
    4.6. Hispanics ................................................................................................................... 129
    4.7. References ................................................................................................................. 132

Chapter Five: Bayou La Batre and Mobile County, Alabama .................................................. 145
    5.1. Mobile County History .............................................................................................. 145
    5.2. Bayou La Batre and its Environs ............................................................................... 147
    5.3. Specific Effects of the Spill ....................................................................................... 157
    5.4. References ................................................................................................................. 161

Chapter Six: Biloxi and Harrison County, Mississippi ............................................................. 166

6.1. Harrison County History ................................................................................... 167
6.2. Biloxi and its Environs ..................................................................................... 169
6.3. Specific Effects of the Spill .............................................................................. 180
6.4. References ......................................................................................................... 184

Chapter Seven: Pointe-a-la-Hache, Empire, Port Sulphur, and Plaquemines Parish, Louisiana 188
7.1. Plaquemines Parish History .............................................................................. 189
7.2. Pointe a la Hache and its Environs: Introduction ............................................. 195
7.3. Empire and its Environs: Introduction ............................................................. 202
7.4. Port Sulphur and Environs ................................................................................ 209
7.5. References ......................................................................................................... 213

Chapter Eight: Larose, Cut Off, and Lafourche Parish, Louisiana ........................... 220
8.1. Lafourche Parish History .................................................................................. 220
8.2. Larose-Cut Off ................................................................................................. 226
8.3. Specific Effects of the Spill .............................................................................. 236
8.4. References ......................................................................................................... 242

Chapter Nine: Dulac and Terrebonne Parish, Louisiana .......................................... 249
9.1. Terrebonne Parish History ................................................................................ 250
9.2. Dulac and its Environs ...................................................................................... 253
9.3. Specific Effects of the Spill .............................................................................. 262
9.4. References ......................................................................................................... 265

## LIST OF TABLES

Table 1.1. Population Change within the Study Areas, 2000 to 2010 .......................................... 23

Table 1.2. Educational Attainment within the Study Areas, 2010................................................. 23

Table 1.3. Educational Attainment within the Study Areas, 2000................................................. 24

Table 1.4. Employment Status of Population in Study Areas, 2010.............................................. 24

Table 1.5. Employment Status of Population in Study Areas, 2000.............................................. 25

Table 1.6. Racial Composition of Study Communities in 2010 ................................................... 25

Table 1.7. Racial Composition of Study Communities in 2000 ................................................... 26

Table 2.1. Phases in the NRDA Process ..................................................................................... 83

Table 4.1. Demographic Statistics for Selected Gulf Coast States and Counties/Parishes......... 105

Table 4.2. Ancestry Statistics for Selected Gulf Coast States and Counties/Parishes ............... 106

Table 4.3. Number of Persons in the Study Communities Identifying as American Indian and
        Native Alaskan Alone in 2000 ................................................................................. 119

Table 5.1. Landings in Bayou La Batre ..................................................................................... 156

Table 6.1. Landings in Biloxi ................................................................................................... 177

Table 7.1. Landings at Empire-Venice, LA ............................................................................... 205

Table 9.1. Change in Dulac Population, by Census-Designated Race ....................................... 255

Table 9.2. Landings in Dulac-Chauvin ..................................................................................... 258

## LIST OF FIGURES

Figure 1.1. Map of study communities ........................................................................ 22

Figure 2.1. Billboard along a Louisiana highway in 2011 ............................................ 35

Figure 3.1. Truck belonging to L.E. Daviet Lumber Co. in Larose carrying mud and
background. ............................................................................................. 66

Figure 3.2. Cones of uncertainty associated with Hurricane Ike, 2008 ....................... 70

Figure 4.1. Early Indian tribes, culture areas, and linguistic stocks, William C. Sturtevant,
Smithsonian Institution 1967 ................................................................. 116

Figure 4.2. Indian reservations near the study areas. .................................................. 118

Figure 5.1. Map showing Mobile County and Bayou La Batre, AL .......................... 145

Figure 5.2. Map of southern Mobile County, compiled from ethnographers' notes ................. 149

Figure 6.1. Map showing Harrison County and Biloxi, MS ....................................... 166

Figure 6.2. Map of the Mississippi Coast showing the locations of key industries, compiled
from ethnographers' notes ...................................................................... 174

Figure 7.1. Map showing Plaquemines Parish and study communities ....................... 188

Figure 7.2. Pogy boat stranded on the Empire bridge after Hurricane Katrina ........................ 206

Figure 8.1. Map showing Lafourche Parish and Larose–Cut Off study community ................. 221

Figure 8.2. Land cover and land use, Lafourche and Terrebonne parishes ................. 225

Figure 8.3. Map of Larose-Cut Off as defined by local residents, compiled from
ethnographers' notes ............................................................................ 227

Figure 8.4. Map of levees, flood gate, and floodwall in south Lafourche, LA .......................... 232

Figure 9.1. Map showing Terrebonne Parish and Dulac study community ................. 249

Figure 9.2. The Morganza to the Gulf Hurricane Protection Project ......................... 253

Figure 9.3. Map of Dulac, as defined by local residents, compiled from ethnographers' notes  254

# PREFACE

"Through many decades, the United States has shown a persistent and remarkable ability to tolerate the costs of petroleum use, presumably because people feel the benefits are greater in the aggregate, or perhaps because of a disconnect between the benefits and costs" (Hultman 2010).

The *Deepwater Horizon* disaster officially began on April 20, 2010 with the blowout of the Macondo well in the U.S. Gulf of Mexico, though the circumstances that culminated in the explosion of the rig were based in earlier decisions and events. Likewise, when the disaster officially ended on August 3, 2010, with BP successfully sealing the well in concrete, many of its effects were only beginning to appear. The disaster caused the deaths of 11 people, physically injured 17 more, and released an estimated 4.9 million barrels of crude oil into the Gulf of Mexico more than 40 miles off the Louisiana coast. It occurred in a region accustomed to disasters, so some of its effects were mitigated by the expertise and mechanisms in place throughout the region to manage them. The spill's impacts were heightened, however, by the fact that the region was still recovering from recent, severe hurricanes and flooding. In short, this disaster, laid upon those prior experiences, created a new set of actors, resources, and responses.

The research on which this report is based began almost immediately after the rig exploded and continued over a 2-year period. At the time of the explosion, researchers from the Bureau of Applied Research in Anthropology (BARA) at the University of Arizona were finalizing a study of fabrication and shipbuilding along the Gulf of Mexico, and were gathering data for a study of the history of the deepwater era, which began offshore in the Gulf of Mexico in the 1970s. The researchers in the field turned their attention to the disaster and began documenting its effects. Those in the BARA office began responding to calls from people within the affected region, and began working with the staff of what was at that time the U.S. Minerals Management Service (MMS) to plan this study. Given the uncertain and rapidly evolving situation, the study was designed to allow for flexibility and so that research questions and analyses would address the concerns of the diverse groups living in the region; be appropriate for those being studied; and provide information and new understanding to local, state, and federal entities. BARA researchers contacted colleagues at coastal universities and developed a research partnership with anthropologists at Louisiana State University (LSU) and with local institutions, community-based organizations, and independent community researchers in Mississippi and Louisiana. Key local partners included the Katrina Research Center at the University of Southern Mississippi, the United Houma Nation, Bayou Grace Community Services of Chauvin, Louisiana, and the Dulac Community Center of Dulac, Louisiana.

While some of the effects of this disaster were immediately obvious and readily documented, others emerged more slowly as the nature and scope of the event and its aftermath continued to unfold. The research approach was designed to capture this evolution and was focused in three areas: (1) coastal counties of Mississippi and Alabama; (2) Lafourche, Terrebonne, and east St. Mary parishes in Louisiana; and (3) Jefferson, Orleans, Plaquemines, and St. Bernard parishes in Louisiana. It focuses on the short-term effects, those that occurred in the first 20 months after the disaster began, and provides the context within which those effects were experienced.

The report is organized in two volumes. The first begins with a Summary of the major findings of the research. The summary includes references to sections throughout the report that

contain information to support the findings. Next is a discussion of the approach and methodology of the study and the selection of the study communities. This is followed by a summary and then detailed timeline of key events in the unfolding disaster which triggered local effects. Specific dates and events are referred to throughout the report, but readers are encouraged to read the timeline to better understand the complicated and rapidly changing conditions under which people in the coastal communities were living and working during the study period. The next chapters establish the context within which this disaster occurred, and describe the communities that were the focus of the study, highlighting in each some of the locally-specific and synergistic effects of the disaster.

The second volume describes five key economic sectors in the region–offshore oil and gas, fishing, tourism, shipbuilding and fabrication, and retail–and summarizes how the disaster has impacted the people, businesses, and communities involved in each of those sectors. For each sector, readers will find a general introduction, a brief summary of the methodology used to gather the information upon which the analysis is based, and a brief history of the sector. These are followed by an outline of events that shaped that sector in the region, leading up to the explosion of *Deepwater Horizon* in April 2010, a summary of the immediate impacts, and a discussion of the issues that faced businesses and workers in the sector throughout 2011.The second volume also includes chapters that take a closer look at the impacts of the disaster on non-governmental organizations (NGOs), the claims process, and the differential effects of the disaster according to ethnicity. The volume ends with a discussion of the ongoing uncertainty associated with this disaster more than two years after it began, and key research questions to be addressed in the coming years.

This work could not have been done without the help and support of hundreds of individuals who live and work along the U.S. Gulf of Mexico, and it is to them that the authors offer our sincerest thanks. Though research reports cannot bring back loved ones or restore coastal wetlands, it is our hope that the findings of this study can help us all better understand what happened and what it has meant to the people and communities most directly affected by it.

REFERENCE

Hultman, Nathan. 2010. Beyond petroleum: The broader effects of the Deepwater Horizon. The Brookings Institution. Available at:
http://www.brookings.edu/opinions/2010/0824_bp_oil_spill_hultman.aspx?p=1

# SUMMARY

The U.S. Gulf of Mexico has been central to the history and development of the global offshore petroleum industry since 1947 when the first successful well was completed out of sight of land off the coast of Morgan City, Louisiana (see Chapter 1, Volume II). In the Gulf, petroleum is stored under high pressure within a layered sedimentary basin. Successful extraction and development requires that the pressure be controlled, and, when that fails, blowouts sometimes occur. Still, the April 20, 2012 Macondo blowout was unprecedented in the history of the Gulf offshore industry, both for its size and for the amount of oil it released into the Gulf (see Chapter 2, this volume). Also, although thousands of wells have been drilled in the Gulf, in 2010 the *Deepwater Horizon* was one of only 33 rigs drilling in water deeper than 500 feet. Consequently, despite the vast knowledge and experience with the offshore petroleum industry in the region, there was much uncertainty about the blowout and what to do about it.

The Gulf of Mexico is also home to several major estuaries and supports both commercial and recreational fishing (see Chapter 2, Volume II). In addition, its beaches, coastal communities, and cities such as New Orleans attract millions of tourists each year (see Chapter 3, Volume II). Its diverse population is as varied as its topography, made up of people whose ancestors have lived in the regions for hundreds of years as well as immigrants who were drawn to the region as recently as 2005, when storms provided opportunities for cleanup and construction (see Chapter 4, this volume). This is also a region where disasters occur with some frequency, where human activities combine with events such as hurricanes and result in loss of life and property (see Chapter 3, this volume). The effects of the BP disaster can only be understood in this context. Indeed, the failure to distinguish this event from other disasters exacerbated, and in some cases created, some of its effects. This study, conducted between April 2010 and December 2012, examines the social and economic effects of the disaster on the people and communities along the coasts of Louisiana, Mississippi, and Alabama. It focuses on the short-term effects that occurred in the first 20 months after the disaster began and provides the context within which those effects were experienced.

## SOCIAL EFFECTS OF THE MACONDO WELL BLOWOUT

The Macondo well blowout created tremendous social effects. Eleven men lost their lives and 17 others suffered physical injuries in the explosion that destroyed the *Deepwater Horizon* drilling rig. Over 30,000 people work in the Gulf of Mexico offshore petroleum industry. The deaths, injuries, and trauma faced by survivors on the rig affected them and their families and friends, and served as a stark reminder of the risk and danger associated with work offshore. During the time efforts were underway to cap the well and stop the oil flowing into the Gulf, the area around the well was closed, immediately affecting drilling, production, and all associated activity. Within five days, all deepwater drilling in the Gulf was suspended (see Chapter 2, this volume). The Department of the Interior lifted the suspension in October 2010 and approved the first deepwater drilling permit in February 2011. The suspension had a direct effect on drilling companies, their contractors, rig fabricators, and many others that provide the people, supplies, and equipment necessary for drilling to occur. The explosion also affected the petroleum industry

more broadly, raising questions about its overall role and performance and accelerating safety reforms that were already underway (see Chapter 1, Volume II).

The petroleum industry is highly cyclical, responding to oil prices that fluctuate according to the futures market as well as supply and demand. This cyclical pattern is one of the factors that have contributed to labor shortages within the industry (see Chapter 3, this volume). At the time of the blowout, the petroleum industry had been experiencing a slowdown driven in large part by the 2008 economic recession (see Chapter 1, Volume II). In the Gulf of Mexico, drilling generally peaks during the late spring and summer months. Many in the industry were expecting 2010 to provide evidence that the industry was starting to recover. Therefore, when drilling was halted, many companies attempted to wait out the delays and hold on to workers – reassigning them, cutting back on their hours, and otherwise attempting to avoid layoffs. Some companies transferred their operations and employees overseas and to onshore fields, taking advantage of the shale gas boom occurring at the time. Still, many workers in the most precarious positions within the industry, those working as contract employees with temporary or hourly positions, lost their jobs and were unable to find other work. Those employees remained largely invisible throughout the study (see Chapter 1, Volume II).

The Macondo blowout released an estimated 4.9 million barrels of crude oil into the Gulf of Mexico and resulted in the closure of Gulf fishing areas from central Louisiana to west Florida. Both commercial and recreational fishermen were affected. Many fishermen were expecting a bounty year, the first since the hurricanes of 2005, so the effects were devastating (see Chapter 2, Volume II). The disaster and closures disrupted both the May and August shrimp seasons. The presence of oil in the Gulf and coastal wetlands also affected finfish, oysters, and crabs. As the fishermen were affected, so, too, were the fuel docks, processors, charter boat companies, and bait shops (see Chapter 2, Volume II).

The disaster also had an immediate effect on tourism in the region. Some beaches were closed, and fishing rodeos and festivals were cancelled. Media coverage of the spill exacerbated concerns of potential tourists (see Chapter 3, Volume II). By mid-May, BP had announced it would provide tourism grants to all four impacted Gulf states, and efforts to attract tourists back to the region continued throughout the study. The pace of recovery depended on the location of the business and what sector it occupied, such as gaming, charter boat fishing, or lodging.

As in any region, as the industries that form the backbone of the economy faltered, so, too, did many others. The shipbuilding and fabrication industry is dependent on the offshore petroleum and fishing industries, as well as military contracts, so the effects on that industry varied. For example, by 2011 the recovery in oilfield construction and repair was focused primarily on the larger vessels and primarily of benefit to the larger yards (see Chapter 4, Volume II). Retailers experienced extensive social and economic effects, though these varied widely depending on the type of business they operated and its location and customer base (see Chapter 5, Volume II).

## SOCIAL EFFECTS OF THE RESPONSE

The social effects of the Macondo well blowout were exacerbated by the response. People of the Gulf region are accustomed to disasters and have response strategies in place at the household, community, state, and regional levels. But this disaster was different. As directed by the federal government's National Oil and Hazardous Substances Pollution Contingency Plan (National Contingency Plan), the Coast Guard was responsible for directing all response efforts to contain and clean up the oil (see Chapter 2, this volume). The Secretary of Homeland Security declared this to be the first Spill of National Significance and appointed a National Incident Commander to coordinate resources and communication at the national level.

The Coast Guard named BP the Responsible Party for the spill, making the corporation legally liable for specified damages resulting from the discharged oil and the costs of removing the oil (see Chapter 2, this volume). BP had an extensive network of contractors and subcontractors to provide the people, vessels, equipment, and supplies to support its offshore operations, but its network for spill response and cleanup was much smaller. Almost immediately, BP began flying personnel and contractors from around the world into the region. The company rented hotel rooms, condominiums, beach houses, and docks, providing immediate benefits to those who owned the properties. Yet the size and scope of the disaster quickly exhausted BP's networks and many other companies became involved, some with extensive experience and others which were newcomers. Given the recession in the rest of the United States, many job seekers headed to the region, causing some locals to draw parallels to the boom years of the 1970s when oil and gas activity was at its peak (see Chapter 3, this volume). To help mitigate the effect of the disaster on fishermen, BP created the Vessels of Opportunity (VOO) program to employ local boat owners and operators to deliver boom and to seek and clean up oil (see Chapters 2 and 7, Volume II). Many fishermen did benefit from their participation in the program, but so, too, did others who saw and capitalized on an opportunity to make a lot of money.

Efforts to mitigate the effects of the oil began while oil was still gushing from the well. No one was certain of the amount of oil, where it was, or where it was heading. The disaster began just before the 2010 hurricane season, and as the oil continued to flow so too did concerns about where it would end up. The decision to use four common strategies – onsite burning, skimmers, booms, and dispersants – was made early (see Chapter 2, this volume). Smoke from the fires could be seen for miles and contributed to concerns about acute health effects of responders and coastal residents. The booms were ineffective in tidal surge, but BP, the Coast Guard, and local governments continued to argue for more boom, and tens of thousands of people went into action ordering, warehousing, transporting, and installing boom across the region from Texas to Florida. Despite concerns of ecologists about the effect of the wakes made by thousands of vessels as they moved in and out of the Gulf through fragile wetlands, the activity continued for months. Though many argued that without the dispersants the ecological effects of the disaster would have been much worse, their use remained controversial throughout the study period. The dispersants broke up the oil and helped sink it, exacerbating fear and mistrust about the oil and the dispersants (see Chapters 1 and 2, Volume II).

As the oil was gushing into the Gulf, Louisiana state officials began releasing freshwater through Mississippi River diversion channels, arguing that the action would keep oil from moving into the estuaries. Freshwater diversions have been a significant – and controversial – aspect of coastal restoration plans for decades. The freshwater lowered the salinity within the

oyster breeding grounds resulting in the death of as many as 80% of the oysters (see Chapter 2, Volume II). Also, despite the efforts to keep the oil in the Gulf, oil began appearing on wildlife and beaches and in the wetlands. Cleanup efforts began almost immediately and continued throughout the study period (see Chapter 2, this volume).

The disaster required response at all levels of government. Extensive planning and coordination were needed to acquire and make available the necessary people, supplies, and equipment, including boom, vessels, fuel, and docks. The Gulf region has tremendous capacity to respond to disasters, but as noted earlier, the oil disaster was coordinated through BP rather than the state and local networks already in place. Thus, the existing disaster response network was only somewhat effective (see Chapter 6, Volume II).

Especially as the region moved farther into hurricane season, many people expressed concern that oil could come ashore (see Chapter 6, Volume II). But, given the uncertainties surrounding whether, when, and where it would arrive, residents and officials were left scrambling to prepare. From National Park Service representatives responsible for protecting cultural resources across the entire Gulf coast to local homeland security and emergency preparedness officials who had to rewrite emergency response plans to take into account the possibility of oil-contaminated flooding, few were idle during the summer months. Fortunately for everyone, no major hurricanes came ashore along the Gulf coast during 2010 or 2011.

The disaster quickly became a major political event. The storms of 2005, especially Hurricane Katrina, attracted lots of national and international interest, and the region was under intense scrutiny for several years afterward. Media spokespeople relied on contacts from that period and began to establish new ones. And, as the disaster continued, it drew more attention. Within the coastal communities, that attention generated major effects (see Chapter 6, Volume II). From television and computer screens to the front page of newspapers, people around the world saw images of oiled beaches and marshes and dead and dying marine animals. At the time, the use of social media was growing rapidly. Individuals with cell phones, digital cameras, and internet blogs gathered information and were able to spread it almost instantaneously, though they often provided little or no context. Because the availability and use of these technologies was still uneven, individuals thousands of miles away at times received information as or even before locals did. Uncertainty about the effects of the release persisted throughout the study period (see Chapter 9, Volume II).

As the disaster continued, the social, psychological, and economic effects on coastal residents grew. Yet, many people, from philanthropists to individual donors, pointed to BP's culpability and withheld support. Residents who lost income or experienced other negative effects of the disaster turned to the churches and non-profits which typically provide disaster assistance. Those organizations scrambled for resources and faced huge hurdles trying to respond (see Chapter 6, Volume II).

Tens of thousands of people across the United States also attempted to respond, but the disaster did not generate the sorts of volunteer opportunities that follow hurricanes (see Chapter 6, Volume II). Many individuals and organizations had helped rebuild the region after the hurricanes of 2005 and 2008 and others reacted to the images of oiled wildlife that appeared on television screens and newspaper front pages. Yet, there were few opportunities for people to travel to the region for hands-on participation. Some offered their ideas for how to cap the well in internet campaigns while others sent their hair or donated clothing to local non-profits.

Over time, the effects on coastal communities diverged, depending on factors such as the location of the community, whether or not oil came ashore nearby, the social and political

14

dynamics in the community, prior experience with oil spills and contamination from industry activity, the mix of industries and sectors within those industries that dominated local economies, the role of community members in the cleanup, the community's connections to regional, state, and national resources, and the ethnic makeup of the residents (see Chapters 5 through 9, this volume). The ability of individuals and communities to secure resources depended on their political and legal status. Some Native American and Asian communities were able to tap into networks of support, for example, while many undocumented immigrants were afraid to seek assistance (see Chapter 4, this volume, and Chapter 8, Volume II). Important community factors include the state in which the community was located and whether or not it was unincorporated. The situation was complicated, however, because many residents earn their livelihoods on oil rigs and platforms or large fishing vessels, often far from the place they live, a situation exacerbated by coastal erosion and storms. Add that the disaster began during the worst recession the region had experienced in decades and followed years of unusual economic activity tied to post-hurricane rebuilding, and it is clear why neither residents nor the researchers could readily separate the effects of the disaster from the effects of other events.

Beyond its legal responsibility for the spill, BP recognized that it would be held accountable for the enormous economic and social effects of the spill. In addition to directing money to specific purposes, such as the tourism fund mentioned above, BP established a claims process to address financial losses (see Chapter 7, Volume II). In August, BP established the Gulf Coast Claims Facility (GCCF) to settle claims arising from the disaster. Both processes were hindered by a lack of adequate knowledge of local and regional economies or household livelihood strategies, and by early promises to settle claims quickly. Many coastal residents' frustrations were exacerbated by what they perceived to be actions by both BP and the first GCCF administrator which appeared to assume that local economies would recover within a year. Throughout the study, residents and community leaders debated questions of who should be compensated and how much (see Chapters 5 through 9, this volume and Chapter 7, Volume II).

At the end of 2012, much remained unknown about health effects, the claims process, the condition of major Gulf fisheries, the fate of deepwater petroleum exploration and production and the offshore workforce, and more (see Chapter 9, Volume II). Nevertheless, those in positions of responsibility, at the household, organization, and community level, had to continue to make decisions and to act on issues about which they lacked full understanding.

# CHAPTER ONE: THE STUDY

Bethany Rogers, Brian Marks, and Diane Austin

The *Deepwater Horizon* disaster has drawn attention from people and organizations across the globe. The explosion of the rig, the release of oil into the Gulf of Mexico, and the efforts to contain, disperse, and clean up that oil are only a few of the events that have contributed to this ongoing disaster. Several studies have analyzed the explosion, its causes, and its immediate consequences (National Commission 2011; Deepwater Horizon Study Group 2011; NAE-NRC 2010). Millions of dollars are being spent trying to assess the environmental effects of the oil and dispersants used in the cleanup efforts (NOAA 2010; Kujawinski et al. 2011; Laleian et al. 2011). Much less is going toward assessing the effects of this disaster on the people who live and work in the coastal communities affected by it (although see Alliance for Justice 2011; APRC 2011a; GNO, Inc. 2010, 2011a; The Knowland Group 2010; Oxford Economics 2010; Tunnell 2011). This report summarizes the results of an early effort to measure, document, and describe the social effects of this event on coastal communities in Louisiana, Mississippi, and Alabama. The study focuses on the period from April 2010 through early 2012. It was funded by the U.S. Bureau of Ocean Energy Management (BOEM)[1] and conducted by researchers from the University of Arizona (UA) and Louisiana State University (LSU), in partnership with local organizations and community researchers in three study areas in these coastal states.

This study contributes to the small body of research that assesses the economic impacts of oil spills drawn variously from gross measures of economic performance, statistical economic modeling, public opinion surveys, insurance adjustment practice, and liability law (Restrepo & Associates 1982; Grigalunas et al. 1986; Cohen 1993; García Negro et al. 2009; GNO, Inc. 2010, 2011a, 2011b; Goldberg 2010; APRC 2011a, 2011b). The research demonstrates the contribution of ethnographic research to understanding local economic activity and social relationships among places and over time, augmenting information derived from macro-economic statistics, econometric modeling, and journalism. It complements the work of social scientists who have studied past oil spills (Omohundro 1982; Assaf et al. 1986; Dyer 1993; Bonnieux and Rainelli 1993; Jorgensen 1995; Fall et al. 2001; Picou et al. 1999; Picou et al. 2009).

Though this disaster constituted far more than an oil "spill," the terms oil spill and disaster are used interchangeably in this report.

## 1.1. APPROACH AND METHODS

Researchers in the Bureau of Applied Research in Anthropology (BARA) at the University of Arizona have investigated the socioeconomic effects of the offshore petroleum industry in the Gulf of Mexico since the mid-1990s (see, for example, Wallace et al. 2001;

---

1 The study began under the U.S. Minerals Management Service (MMS). The MMS was reorganized twice following the *Deepwater Horizon* explosion. Responsibility for the study was transferred first to the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). On October 11, BOEMRE was replaced by the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE).

Austin and McGuire 2002; Austin et al. 2008; McGuire, Austin, and Woodson 2013). The U.S. Outer Continental Shelf (OCS) produces about 15% of the nation's domestic natural gas and 27% of its domestic oil. The BOEM (Bureau of Ocean Energy Management) is the federal bureau responsible for managing development of that resource. BOEM's Environmental Studies Program conducts and sponsors research and synthesizes available environmental, social, and economic information to support decision-making related to the development of offshore energy and mineral resources (see also Section 2.4.1). Using ethnographic research methods, combining participant observation with formal and informal discussions with knowledgeable individuals, BARA researchers have worked with other social scientists and historians, as well as community researchers, to understand this complex industry which involves hundreds of communities, thousands of businesses, and hundreds of thousands of people.

### 1.1.1. Responding to the Disaster: Ethnography in Three Study Areas

When the *Deepwater Horizon* drilling rig exploded on April 20, 2010, BARA researchers were finalizing a study of fabrication and shipbuilding along the Gulf of Mexico and were gathering data for a study of the history of the deepwater era, which began offshore in the Gulf of Mexico in the 1970s. Both in the field in and in the Tucson office, BARA researchers began gathering information about what was happening and started working with social scientists at the U.S. Minerals Management Service (MMS) to plan this study. Given the complex and evolving situation, the study was designed to allow for flexibility so that its research questions, methods, and analyses would address the concerns of the diverse groups living in the region, be appropriate for those being studied, and provide information to local, state, and federal entities. BARA researchers identified academic and community research partners at LSU; the Katrina Research Center at the University of Southern Mississippi; the United Houma Nation; Bayou Grace Community Services of Chauvin, Louisiana; and the Dulac Community Center of Dulac, Louisiana. The researchers focused on coastal Louisiana, Mississippi, and Alabama in order to capture the many direct and indirect impacts of the spill as well as the region's diversity in terms of economic sectors, industries, occupations, and ethnic groups.

Taking this approach, the researchers prioritized small cities and communities, businesses, and organizations that could be accessed readily using ethnographic methods. Thus, except on rare occasions when a researcher was following a specific lead, the study does not address the impacts of the disaster on large urban areas or on large corporations whose main offices and decision makers are located outside the region. The principal exception to this was where team members extended their efforts beyond the study areas to explore ethnic group dynamics. In particular, one research team member visited and interacted with Vietnamese populations from southeast Texas to Mobile County, Alabama in order to explore and explain the presence of these populations and the ways that their members were specifically affected by the disaster and its aftermath (see Section 1.1.2). The research design was approved by Institutional Review Boards at the UA and LSU and project descriptions, consent forms, and disclosure documents were prepared in English, Spanish, and Vietnamese. The UA Principal Investigator led workshops for both university and community researchers in community-based research approaches and in research methods.

The study began in September 2010 and continued through early 2012. Given the size of the study area, team members had to address the practical demands of conducting research in

communities that are widely dispersed throughout a region that, in many places, is better suited to travel by boat than by car. For example, significantly impacted communities around New Orleans lie in Jefferson, Orleans, Plaquemines, and St. Bernard parishes and include: Grand Isle, an island community of Jefferson Parish, a 2½ hour drive to the southwest of New Orleans; Venice, an oil and gas port at the southern tip of Plaquemines Parish; and the fishing villages of Hopedale and Yscloskey at the far eastern end of Saint Bernard Parish. South Terrebonne Parish is organized around five bayous, and going from one to another requires traveling up and down bayou roads connected only occasionally by bridges. In addition, conversations with appropriate government and business officials and organizational leaders required trips to neighboring cities and towns such as Belle Chasse, Chalmette, and Houma; to county and parish government seats; and to the large urban areas such as New Orleans and Mobile.

Within each study area, the composition and approach of the research team varied as the team members adapted to the patterns and rhythms of communities, and to the researchers' own strengths and connections. In each location, the researchers developed a network of relevant contacts for this study from their existing research, personal relationships and initial scoping fieldwork. In Lafourche Parish, for example, some of the people participating in this study have shared their insights, experiences and stories in BARA studies on the offshore petroleum industry dating back to the mid-1990s. One United Houma Nation community researcher first interacted with BARA researchers in 1996 as a participant in a baseline study of the industry's historical impacts on her tribe (Wallace et al. 2001). Similarly, one LSU ethnographer has spent years documenting the ethnic landscape of Plaquemines Parish (Ware 1996), and her embedded relationships with the Croatian and Creole communities proved crucial for gaining entrée into the oyster fishing community that is principally composed of members of these two ethnic groups. A community researcher from Ironton had family members and lifelong friends who worked in various occupations in the parish, including oil and gas, churches, and parish government. Team members used these ties to establish the relevant research contacts and trust that are the essential components for carrying out successful ethnographic research.

At the same time, in all study communities, the researchers established new connections and relationships for this study. The community researchers worked in various occupations and, in their dual roles as social service providers, librarians, and directors of NGOs as well as researchers, helped extend and strengthen these ties. For example, they provided connections to important players in the post-spill NGO landscape, as well as insight into the political and funding dynamics at play within the non-profit sector. They also provided an intimate view of the needs and concerns of individuals and families working to recover or successfully enduring the effects of the disaster. The resulting community-focused collaborative ethnography, wherein long-term resident and short-term ethnographers have informed and complemented the work of one another, incorporates multilevel, multisite, and multittemporal perspectives that bring understanding to situations of mobility, diversity, and volatility (Colson and Kottak 1996; Austin and McGuire 2002). Indeed, it makes possible the capture of what Sally Falk Moore (1987) has called "change-in-the-making."

## 1.1.2. Coastwide Assessment of Vietnamese Communities

One UA researcher undertook a coastwide assessment of Vietnamese-American Gulf Coast communities in the spring and summer of 2011 for two reasons. First, in contrast to its experience with several ethnic groups in the region, the research team did not have much ethnographic data on the Vietnamese communities from previous studies. Since many first-generation Vietnamese-Americans have limited English proficiency, this study included a field researcher conversant in Vietnamese. Second, and more pressing, journalistic observations (see Alexander-Bloch 2010; Pickett 2010; Sasser 2010) indicated that many Vietnamese Gulf Coast residents were seriously affected by the oil spill due to their involvement in commercial fisheries and seafood processing, and that they lacked ready alternative livelihoods to fall back upon. For these reasons, the study organizers decided to assess the social and economic condition of Vietnamese communities from east Texas through southern Alabama and, also through this process, the organizers sought to gain insight into the socioeconomic situation of Gulf Coast communities outside the study areas where most ethnographic research was focused.

The researchers used several methods to identify Vietnamese communities for field visits. They reviewed census data on the racial demographics and reported ancestry of residents in the coastal parishes and counties of Alabama, Mississippi, Louisiana, and Texas and considered as potential fieldwork sites those tracts where a large percentage of respondents reported Asian racial identity and Vietnamese ancestry. The observations of other fieldworkers and the researchers' own experience also informed fieldwork site selection, as did contemporary and historical accounts of Vietnamese community locations (Arden 1981; Starr 1981; Durrenberger 1996; Montero 1979; Airriess and Clawson 1991; Moberg and Thomas 1993; Boudreaux 2011: 75-6; Nash 1992; Bounds 2011; Tomingas-Hatch 2009; Truitt 2009). Based on this tentative list, the field researcher drew up a schedule for coastal communities from Mobile County, Alabama, to Port Arthur, Texas, and undertook between one and four weeks of fieldwork in each of the following places: southern Alabama, southern Mississippi, New Orleans East, Lower Plaquemines Parish, Barataria and the westbank in Jefferson Parish, Terrebonne Parish, St. Mary Parish, Iberia and Vermillion parishes, and Port Arthur to Sabine Pass, Texas.

Some Vietnamese communities, like the Versailles neighborhood of New Orleans East, are well known. In these large ethnic enclaves, finding businesses and residents was facilitated by their clustering in shopping centers, apartment buildings, cafés, churches, temples, and local non-profit agencies, often with Vietnamese-language signage out front and paired American and Republic of Vietnam flags flying above. Smaller communities proved harder to locate and required careful observation and follow-up from prior conversations. Dulac, Louisiana, for instance, has very few Vietnamese residents recorded in Census data but they own and operate a portion of the town's fishing fleet, especially the large, steel-hulled Gulf shrimp trawlers and tuna long-liners that dock along the Bayou Grand Caillou. Dulac is important to the livelihood of many Vietnamese people, but not as a residence; fishermen commute there from the nearby city of Houma, or even as far as New Orleans. Other communities, like tiny hamlets in east Texas and St. Mary Parish, were too small to show up as distinct places in the U.S. Census, but in many of these the researcher found Vietnamese commercial fishermen, Vietnamese-owned and -operated seafood docks, and even Vietnamese-language masses at local Catholic churches.

The fieldwork format followed closely that used elsewhere in the study; it involved short "drop-in" conversations with a sample of retail businesses serving the Vietnamese community, businesses operated by Vietnamese-Americans, community institutions, commercial fishermen and seafood processing workers where present, and workers in other major economic sectors, such as shipbuilding and casinos, relevant in those specific places; attendance at community events like festivals, public meetings, and religious services; and, when possible and convenient for respondents, longer conversations with key informants. Most fieldwork was conducted in Vietnamese and notes were taken in English.  No conversations were audio recorded. The conversations were unstructured, often including considerable introductions on the part of the researcher and lengthy inquiries from respondents asking about the researcher's background, experience studying the language, and even ethnic background and marital status.

### 1.1.3. Summary

Overall, this research has included three ethnographers and seven community researchers who were "in the field" continuously between April 2010 and December 2011, one faculty member who alternated between the study areas and Tucson in three to four week rotations during this period, four faculty members and six university students who each spent at least a month in the field gathering information about a specific community or economic sector, and five university students who provided logistic and office support. In the field, researchers participated in, and observed, local and regional meetings and festivals. They took photos of highway billboards and community activities, visited workplaces and homes, lived with local residents, and monitored local media output. They identified people who are experts in their communities, businesses, and organizations and talked with them, often on multiple occasions, to learn and record their perspectives. These interactions ranged from short drop-in encounters to in-depth, audio-recorded oral history accounts. The researchers also worked closely with community leaders to identify data to help define, explain, and assess the impacts of the *Deepwater Horizon* and of the offshore oil and gas industry in general. The researchers developed this process to accurately describe how this disaster was experienced and understood by the people it affected most directly. In the office, students transcribed audio files and notes, created and managed databases, and gathered secondary data.

The focus of this study is on social effects, interpreted broadly to include impacts on household and community economies, social gatherings such as crab boils and fishing rodeos, social networks such as those among community-based organizations and large non-profit organizations, and interactions between the public and agencies involved in the spill response and recovery, including the cleanup and damage claims. Researchers did not, however, gather systematic data about household and business revenues and expenses or address the legal liability of any party for the economic harms reported to the team. While the study does not evaluate seafood safety, the health effects of exposure to oil and dispersants, or the spill's ecological consequences on wildlife and fisheries, it does examine how these concerns affect people and the institutions of which they are a part.

The ethnographic data collected in the field serve two purposes. First, respondents described their economic conditions and social circumstances in the wake of the oil spill, often comparing their current situation with how things were before and during the spill, and comparing their personal and family experiences with those of others in their community.

Second, respondents shared their stories of migration, resettlement, and community development in the Gulf Coast. Vietnamese participants, for example, shared information about where they lived in Vietnam and how they fled the country, where they lived initially in the United States and how they came to live and work along the Gulf Coast. Native Americans talked of how members of their communities have been forced to move because of the widening of highways and coastal erosion. These data on the experiences of people from a variety of backgrounds shed light on the socioeconomic impacts of the BP oil spill on Gulf Coast communities; they also contribute to the larger project of understanding how ethnic groups and enclaves in the region are influenced by offshore oil and gas development.

## 1.2. OVERVIEW OF THE STUDY COMMUNITIES

Researchers sought a depth of understanding, particularly of the cumulative impacts of the disaster across economic sectors. The primary study area includes Terrebonne, Lafourche, and Plaquemines parishes, Louisiana; Harrison County, Mississippi; and Mobile County, Alabama with a study team committed to each.  In the summer of 2010 each team identified a specific community for in-depth study in order to illustrate the synergies among various apparently disparate events and effects, and how those synergies lessened or exacerbated the impacts of the disaster (see Figure 1.1). From east to west, the focal communities are Bayou la Batre, Alabama; east Biloxi, Mississippi; and the oil and gas and fishing communities of lower Plaquemines Parish, Larose, and Dulac, Louisiana (see Chapters 5 through 9, this volume). These communities include people in a wide range of situations, for example, families and households with some members who fish, others who work in oil, and others in retail, and this mix allowed the researchers to examine how the people who lived and worked in this region before, during, and after the disaster had managed through the first two years. Tables 1.1 through 1.4 provide general demographic data on each of the communities, and the parishes/counties where they are located. As shown, some of the study communities had fewer people in 2010 than in 2000, due primarily to the loss of population following the storms of 2005-2008. These data are discussed more extensively in the community descriptions (Chapters 5 through 9, this volume).



Figure 1.1. Map of study communities
Source: Ben McMahan

Table 1.1. Population Change within the Study Areas, 2000 to 2010

| Total Population | Mobile County | Harrison County | | Terrebonne Parish | Lafourche Parish | | Plaquemines Parish | | |
|---|---|---|---|---|---|---|---|---|---|
| 2010* | 412,992 | 187,105 | | 111,860 | 96,318 | | 23,042 | | |
| 2000** | 399,843 | 189,601 | | 104,503 | 89,974 | | 26,757 | | |
| Total Population | Bayou la Batre | Biloxi | Biloxi-39530 Zip Code | Dulac | Larose | Cutoff | Empire | Pointe a la Hache | Port Sulphur |
| 2010* | 2,558 | 44,054 | 8,086 | 1,463 | 7,400 | 5,976 | 993 | 187 | 1,760 |
| 2000** | 2,313 | 50,644 | 17,214 | 2,458 | 7,306 | 5,635 | 2,211 | N/A | 3,115 |

Source: U.S. Census Bureau 2000, 2010: Profile of General Population and Housing Characteristics

Table 1.2. Educational Attainment within the Study Areas, 2010

| 2010- Educational Attainment-Population over 25 years | Bayou la Batre (Mobile County) | Biloxi (Harrison County) | Biloxi - 39530 5-Digit ZCTA (Harrison County) | Dulac- (Terrebonne Parish) | Larose (Lafourche Parish) | Cut Off (Lafourche Parish) | Empire (Plaquemines Parish) | Pointe a la Hache (Plaquemines Parish) | Port Sulphur (Plaquemines Parish) |
|---|---|---|---|---|---|---|---|---|---|
| High School or higher | 63.7% | 85.3% | N/A | 55.0% | 68.2% | 75.4% | 79.7% | N/A | 68.2% |
| Bachelor's degree or higher | 12.5% | 22.9% | N/A | 9.7% | 11.9% | 8.8% | 18.4% | N/A | 3.5% |
| Graduate or professional degree | 6.7% | 8.4% | N/A | 3.3% | 3.6% | 1.9% | 0.0% | N/A | 1.6% |

Source: U.S. Census Bureau 2006-2010: American Community Survey 5-year estimates: Educational Attainment

Table 1.3. Educational Attainment in the Study Areas, 2000

| 2000-Educational Attainment-Pop over 25 years | Bayou la Batre (Mobile County) | Biloxi (Harrison County) | Biloxi-39530 5-Digit ZCTA (Harrison County) | Dulac-(Terrebonne Parish) | Larose (Lafourche Parish) | Cut Off (Lafourche Parish) | Empire (Plaquemines Parish) | Pointe a la Hache (Plaquemines Parish) | Port Sulphur (Plaquemines Parish) |
|---|---|---|---|---|---|---|---|---|---|
| High School or Higher | 54.9% | 81.9% | 72.8% | 39.0% | 60.7% | 69.2% | 60.3% | N/A | 61.2% |
| Bachelor's degree or higher | 7.4% | 19.2% | 14.6% | 3.9% | 8.6% | 9.3% | 11.8% | N/A | 5.3% |
| Graduate or professional degree | 3.6% | 7.2% | 5.0% | 1.6% | 2.5% | 1.9% | 3.3% | N/A | 1.3% |

Source: U.S. Census Bureau 2000: Educational Attainment by Gender

Table 1.4. Employment Status of Population in Study Areas, 2010

| 2010-Employment Status of Population 16 and Over | Bayou la Batre (Mobile County) | Biloxi (Harrison County) | Biloxi - 39530 5-Digit ZCTA (Harrison County) | Dulac-(Terrebonne Parish) | Larose (Lafourche Parish) | Cut Off (Lafourche Parish) | Empire (Plaquemines Parish) | Pointe a la Hache (Plaquemines Parish) | Port Sulphur (Plaquemines Parish) |
|---|---|---|---|---|---|---|---|---|---|
| In Labor Force | 61.7% (1,170) | 68.4% (24,497) | N/A | 54.3% (491) | 60.5% (3,048) | 61.4% (2,437) | 83.2% (480) | N/A | 61.3% (629) |
| Civilian Unemployed | 7.8% (148) | 3.6% (1,288) | N/A | 6.3% (57) | 2.2% (109) | 3.7% (146) | 11.8% (68) | N/A | 5.1% (52) |

Source: U.S. Census Bureau 2006-2010: American Community Survey 5-year estimates: Selected Economic Characteristics

Table 1.5. Employment Status of Population in Study Areas, 2000

| 2000-Employment Status of Pop 16 and Over** | Bayou la Batre (Mobile County) | Biloxi (Harrison County) | Biloxi-39530 5-Digit ZCTA (Harrison County) | Dulac-(Terre-bonne Parish) | Larose (Lafourche Parish) | Cut Off (Lafourche Parish) | Empire (Plaque-mines Parish) | Pointe a la Hache (Plaquemines Parish) | Port Sulphur (Plaque-mines Parish) |
|---|---|---|---|---|---|---|---|---|---|
| In Labor Force | 53.7% (918) | 66.8% (26,461) | 65.5% (9,259) | 44.9% (824) | 55.4% (3,136) | 57.2% (2,445) | 54.6% (865) | N/A | 51.3% (1,209) |
| Civilian Unemployed | 6.0% (102) | 3.6% (1,427) | 3.8% (534) | 3.0% (55) | 2.3% (130) | 2.2% (93) | 6.2% (99) | N/A | 2.9% (68) |

Source: U.S. Census Bureau 2000: Summary

Table 1.6. Racial Composition of Study Communities in 2010

| 2010* | White alone | Black or African American alone | Asian alone | American Indian and Native Alaskan alone | Native Hawaiian and Other Pacific Islander alone | Some Other Race | Two or More Races | Hispanic or Latino (of any race) |
|---|---|---|---|---|---|---|---|---|
| Bayou la Batre | 1,543 (60.3%) | 314 (12.3%) | 583 (22.8%) | 9 (0.4%) | 2 (0.1%) | - | - | 72 (2.8%) |
| Biloxi | 30,129 (68.4% ) | 8,632 (19.6% ) | 1,951 (4.4%) | | | 1,662 (3.8%) | 1,351 (3.1%) | 3,847 (8.7%) |
| Biloxi - 39530 Zip Code | 3,930 (48.6%) | 2,638 (32.6% ) | 759 (9.4%) | | | 518 (6.4%) | 150 (1.9%) | 929 (11.5%) |
| Dulac | 709 (48.5%) | 28 (1.9%) | 11 (0.8%) | 617 (42.2%) | | | 86 (5.9%) | 62 (4.2%) |
| Larose | 6,129 (82.8% ) | 373 (5.0%) | 157 (2.1%) | 279 (3.8%) | | 318 (4.3%) | | 568 (7.7%) |
| Cutoff | 5,785 (84.3% ) | 95 (1.6%) | | 277 (4.6%) | | 292 (4.9%) | 191 (3.2%) | 436 (7.3%) |
| Empire | 661 (66.6% ) | 212 (21.3% ) | 75 (7.6%) | | | 24 (2.4%) | 13 (1.3%) | 25 (2.5%) |
| Pointe a la Hache | 16 (8.6% ) | 170 (90.9%) | | 1 (0.5%) | | | | 0 (0.0%) |
| Port Sulphur | 441 (25.1%) | 1,136 (64.5% ) | | 97 (5.5%) | | 31 (1.8%) | 29 (1.6%) | 36 (2.0%) |

Source:  U.S. Census Bureau 2010: Profile of General Population and Housing Characteristics

Table 1.7. Racial Composition of Study Communities in 2000

| 2000** | White alone | Black or African American alone | Asian alone | American Indian and Native Alaskan alone | Native Hawaiian and Other Pacific Islander alone | Some Other Race | Two or More Races | Hispanic or Latino (of any race) |
|---|---|---|---|---|---|---|---|---|
| Bayou la Batre | 1,213 (52.4%) | 237 (10.2%) | 770 (33.3%) | 6 (0.3%) | 10 (0.4%) | - | - | 44 (1.9%) |
| Biloxi | 36,177 (71.4% ) | 9,643 (19.0% ) | 2,590 (5.1%) | | | 725 (1.4%) | 1,203 (2.4%) | 1,848 (3.6%) |
| Biloxi - 39530 Zip Code | 10,030 (58.3% ) | 4,787 (27.8% ) | 1,591 (9.2%) | | | 291 (1.7%) | 393 (2.3%) | 657 (3.8%) |
| Dulac | 1,327 (54.0%) | 61 (2.5%) | 12 (0.5%) | 969 (39.4%) | | | 77 (3.1%) | 42 (1.7%) |
| Larose | 6,252 (85.6%) | 413 (5.7%) | 174 (2.4% ) | 282 (3.9%) | | | 124 (1.7%) | 184 (2.5%) |
| Cutoff | 5,151 (91.4% ) | 63 (1.1%) | 71 (1.3% ) | 213 (3.8%) | | | 73 (1.3%) | 120 (2.1%) |
| Empire | 1,344 (60.8% ) | 747 (33.8%) | 61 (2.8%) | | | 20 (0.9%) | 30 (1.4%) | 26 (1.2%) |
| Pointe a la Hache (N/A) | | | | | | | | |
| Port Sulphur | 1,412 (45.3%) | 1,384 (44.4%) | | 219 (7.0%) | | 28 (0.9%) | 52 (1.7%) | 30 (1.0%) |

Source: U.S. Census Bureau 2000: Profile of General Population and Housing Characteristics

## 1.3. REFERENCES

Airriess, C. and D. Clawson. 1991. Versailles: A Vietnamese enclave in New Orleans, Louisiana. Journal of Cultural Geography 12(1):1-13.

Alexander-Bloch, Benjamin. 2010. Vietnamese-American fishers fight for oil spill claim approval. New Orleans Times-Picayune. December 15.

Alliance for Justice. 2011. One Year After the Gulf Oil Spill–Is Justice Being Served? Available at: http://www.afj.org/connect-with-the-issues/the-corporate-court/crude_justice/oneyearreport.pdf

Arden, H. 1981. The wanderers from Vung Tau: Troubled odyssey of Vietnamese fishermen. National Geographic 160(3):378-95.

APRC. 2011a. Measures of the effects of the Gulf oil spill on individuals and businesses and proposed compensation schema. Report to the Gulf Coast Claims Facility and Exhibit C of the Gulf Coast Claims Facility's "Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology." Available at: http://www.gulfcoastclaimsfacility.com/exhibit_c.pdf

APRC. 2011b. APRC methodology for calculating interim payments for 2011 losses due to the oil spill. Report to the Gulf Coast Claims Facility and Attachment A of the Gulf Coast Claims Facility's "Modification to Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology". Available at: http://www.gulfcoastclaimsfacility.com/ATTACHMENT_A.pdf

Assaf, George B., Brent G. Kroetch, and Subodh C. Mathur. 1986. Nonmarket valuations of accidental oil spills – A survey of economic and legal principles. Marine Resource Economics 2(3): 211-37.

Austin, Diane E. and Thomas R. McGuire (eds.). 2002. Social and economic impacts of OCS activities on individuals and families: Volume II: Case studies of Morgan City and New Iberia, Louisiana. OCS Study MMS 2002-023. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor. 2008. History of the offshore oil and gas industry in southern Louisiana. Volume I: Papers on the evolving offshore industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Bonnieux, F. and P. Rainelli. 1993. Learning from the Amoco Cadiz oil spill: Damage valuation and the court's ruling. Organization and Environment 7(3): 169-88.

Boudreaux, Edmond. 2011. The seafood capital of the world: Biloxi's maritime history. Charleston, SC: The History Press.

Bounds, Jamie. 2011. Vietnamese in Mississippi. Available at: http://mshistory.k12.ms.us/articles/372/vietnamese-in-mississippi.

Cohen, Maurie J. 1993. Economic impact of an environmental accident: A time-series analysis of the Exxon Valdez oil spill in southcentral Alaska. Sociological Spectrum 13(1): 35-63.

Colson, E. and C. Kottak. 1996. Linkages methodology for the study of sociocultural transformations. In: Moran, E., ed. Transforming Societies, Transforming Anthropology. Ann Arbor: University of Michigan Press. Pp 103-133.

Deepwater Horizon Study Group. 2011. Final report on the investigation of the Macondo Well blowout. Berkeley: Center for Catastrophic Risk Management.

Durrenberger, E. 1996. Gulf Coast soundings: People and policy in the Mississippi shrimp industry. Lawrence, KS: The University Press of Kansas.

Dyer, Christopher L. 1993. Tradition loss as secondary disaster - Long-term cultural impacts of the Exxon Valdez oil spill. Sociological Spectrum 13(1): 65-88.

Falk Moore, Sally 1987. Explaining the present: Theoretical dilemmas in processual ethnography. American Ethnologist 14:727-736.

Fall, James A., Rita Miraglia, William Simeone, Charles J. Utermohle, and Robert J. Wolfe. 2001. Long-term consequences of the Exxon Valdez oil spill for coastal communities of southcentral Alaska. U.S. Department of the Interior, Minerals Management Service. April 15.

García Negro, M.C., S. Villasante, A. Carballo Penela, and G. Rodríguez Rodríguez. 2009. Estimating the economic impact of the Prestige oil spill on the Death Coast (NW Spain) fisheries. Marine Policy 33(1): 8-23.

Goldberg, John C. 2010. Liability for economic loss in connection with the Deepwater Horizon spill. Available at: http://www.gulfcoastclaimsfacility.com/Goldberg.Memorandum.of.Law.2010.pdf

Greater New Orleans, Inc (GNO, Inc.). 2010. A Study of the Economic Impact of the Deepwater Horizon Oil Spill – Part One – Fisheries. With Innovative Emergency Management, Inc. 15 October. Available at: http://gnoinc.org/wp-content/uploads/Economic_Impact_Study_Part_I_-_Full_Report.pdf

Greater New Orleans, Inc (GNO, Inc.). 2011a. A Study of the Economic Impact of the Deepwater Horizon Oil Spill – Part Two – Moratoria. January 13. Available at:

http://gnoinc.org/wp-content/uploads/Economic_Impact_Study_Part_II_-_Moratoria_FINAL.pdf

Greater New Orleans, Inc (GNO, Inc.). 2011b. A Study of the Economic Impact of the Deepwater Horizon Oil Spill – Part Three – Public Perception. March 25.Available at: http://gnoinc.org/wp-content/uploads/GNO_Inc_EIS_FINAL_FINAL_Publication.pdf

Grigalunas, Thomas A., Robert C. Anderson, Gardner M. Brown, Jr., Richard Congar, Norman F. Meade, and Philip E. Sorensen. 1986. Estimating the cost of oil spills: lessons from the Amoco Cadiz incident. Marine Resource Economics 2(3): 239–62.

Jorgensen, Joseph G. 1995. Ethnicity, not culture? Obfuscating social science in the Exxon Valdez oil spill case. American Indian Culture and Research Journal 19(4): 1-124.

The Knowland Group. 2010. The Gulf Coast oil spill and the hospitality industry. McLean, Virginia: The Knowland Group.

Kujawinski, Elizabeth B., Melissa C. Kido Soule, David L. Valendinte, Angela K. Boysen, Krista Longnecker, and Molly C. Redmond. 2011. Fate of dispersants associated with the Deepwater Horizon oil spill. Environmental Science and Technology 45(4): 1298-1306.

Laleian, Artin, and Thomas Azwell. 2011. The tradeoffs of chemical dispersant use in marine oil spills. Deepwater Horizon Study Group Working Paper. Berkeley: Center for Catastrophic Risk Management.

McGuire, Tom, Diane Austin, and Drexel Woodson. 2013. Gulf Coast communities and the fabrication and shipbuilding industry: A comparative community study. Volume III: Technical papers. U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Moberg, Mark and J. Stephen Thomas. 1993. Class segmentation and divided labor: Asian workers in the Gulf of Mexico seafood industry. Ethnology 32(1):87-99.

Montero, D. 1979. Vietnamese-Americans: Patterns of Resettlement and Socio-economic Adaptation in the United States. Boulder, CO: Westview Press.

Moore, S.F. 1987. Explaining the present: theoretical dilemmas in processual ethnography. American Ethnologist 14:727-736.

Nash, J. 1992. Vietnamese Catholicism. Metarie, LA: Art Review Press.

National Academy of Engineering and National Research Council (NAE – NRC). 2010. Interim Report on Causes of the Deepwater Horizon Oil Rig Blowout and Ways to Prevent Such Events. Washington D.C.: NAE-NRC.

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling. 2011. Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling – Report to the President. Washington, D.C.: National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling.

National Oceanographic and Atmospheric Administration (NOAA). 2010. Deepwater Horizon Oil: Characteristics and Concerns. Washington, D.C.: Office of Response and Restoration, Emergency Response Division, National Oceanographic and Atmospheric Administration.

Omohundro, John T. 1982. The impacts of an oil spill. Human Organization 41(1): 17-25.

Oxford Economics. 2010. Tourism economics: The impact of the BP oil spill on visitor spending in Louisiana – Prepared for the Louisiana Office of Tourism. Oxford: Oxford Economics.

Pickett, Rhoda. 2010. After oil spill, Vietnamese immigrant collects cans, sells eggs to make ends meet. Mobile Press-Register. July 6.

Picou, J., C. Formichella, B. Marshall, and C. Arata. 2009. Community impacts of the Exxon Valdez oil spill: A synthesis and elaboration of social science research. In: S. Braund and J. Kruse, eds. Synthesis: Three decades of Social Science Research on Socioeconomic Effects Related to Offshore Petroleum Development in Coastal Alaska. MMS OCS Study Number 2009- 006. Anchorage, AK: Minerals Management Service, Alaska, OCS Region.

Picou, J., and D. Gill. 1996. The Exxon Valdez oil spill and chronic psychological stress. In: Exxon Valdez Oil Spill Symposium and Stanley D. Rice, eds. Proceedings of the Exxon Valdez Oil Spill Symposium: held at Anchorage, Alaska, USA, 2-5 February 1993. Bethesda, MD: American Fisheries Society.

Restrepo & Associates. 1982. IXTOC I oil spill economic impact study. Prepared for the Bureau of Land Management under Contract No. AA-851-CTO-65. New Orleans: Bureau of Land Management.

Sasser, Bill. 2010. Vietnamese, Cambodian fishermen among hardest hit by BP oil spill. Christian Science Monitor. May 8.

Starr, P. 1981. Vietnamese fisherfolk on America's Gulf Coast. International Migration Review 15(1):226-38.

Tomingas-Hatch, Emma. 2009. Preserving Vietnamese culture and language in southern Louisiana: Altars as symbols of identity. Available at:
http://www.louisianafolklife.org/LT/Articles_Essays/Vietnamesealtars.html

Truitt, Allison. 2009. Offerings to kings and Buddha: Vietnamese ritual activities at Chua Bo De. Available at:
http://www.louisianafolklife.org/LT/Articles_Essays/offeringskingsbuddha.html

Tunnell Jr., John W. 2011. An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill. Corpus Christi, TX: Harte Research Institute for Gulf of Mexico Studies at Texas A&M University-Corpus Christi.

Wallace, Barbara, James Kirkley, Thomas R. McGuire, Diane Austin, and David Goldfield. 2001. Assessment of historical, social, and economic impacts of OCS development on Gulf Coast communities. Volume II: Narrative report. OCS Study MMS 2001-027. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Ware, Carolyn. 1996. Croatians in southeastern Louisiana: An overview. Louisiana Folklore Miscellany: 15-25.

# CHAPTER TWO: THE SPILL, RESPONSE, AND CLEANUP

Brian Marks, Preetam Prakash, Bethany Rogers, and Diane Austin

## 2.1. OVERVIEW OF THE RESPONSE AND CLEANUP

The response to the *Deepwater Horizon* disaster involved some 25,000 people at its peak in June 2010, from operations to stop the leak a mile below the sea to efforts to contain and clean up the oil rising to the surface and arriving onshore. The cleanup involved numerous local, state and federal agencies interacting with BP, the Responsible Party, a constellation of more than 150 private contractors and sub-contractors, and thousands of people, many from the coastal communities most threatened by the spill and others from around the country (K. Nelson 2010; Curran 2010; Yang 2010; Johnson 2010).

On April 21, 2010, the day after the rig exploded, even as rescue crews continued vainly searching the Gulf for the 11 men who had been killed, BP and the rig's owner and operator, Transocean, were sending down ROVs (remotely operated vehicles) attempting to close the well's blowout preventer (BOP) on the sea floor (National Commission 2011: 131). While these unsuccessful attempts to stop the leak continued, exponentially rising estimates of the oil flowing from the broken well led to an escalation in the resources brought to bear on the growing plume. Chemical dispersants were first sprayed on surface oil slick on April 22nd and, a day later, the first Unified Area Command was established by the Coast Guard in Robert, Louisiana (National Commission 2011: 132, 143).

By April 29th, with national media attention growing alongside coastal residents' anxieties about possible harm to fisheries, beaches, wetlands, and indeed their entire way of life (Kaufman and Robertson 2010), the BP spill was designated a Spill of National Significance and an overall federal National Incident Commander was assigned (National Commission 2011: 136). Eventually, four Area Commands were established with their own On-Scene Coordinators, all working under the command of National Incident Commander USCG Admiral Thad Allen. In the final days of April, Louisiana's Governor declared a State of Emergency as oil began making landfall in Plaquemines Parish, and the Louisiana Department of Wildlife and Fisheries (LDWF) began closing portions of state waters to fisheries, just weeks before the opening of the state's May inshore shrimp season (National Commission 2011: 138-140; Smith 2010; Robertson 2010). By the end of April, the Unified Command had deployed the first of what would become 3,000 boats and vessels in the Vessels of Opportunity (VOO) program, wherein commercial fishermen, pleasure boat owners, and contractors searched for oil, ferried personnel and supplies, placed protective booms, and skimmed and burned floating oil (DeSantis 2010a; Warren 2010).

Early in May, four new methods to contain or stop the leak were being deployed at what had become a large flotilla of response vessels at the former site of the *Deepwater Horizon*. The unsuccessful efforts to staunch the flow of oil included firing "junk shots" of various materials into the BOP and lowering a containment dome over the BOP. BP began drilling a first relief well, a last-resort solution to drill down, intercept, and seal off the problem well, on May 2nd; a second, backup relief well was begun on May 17. On May 16, a Riser Insertion Tube Tool began siphoning off a portion of the oil leaking from the broken riser, somewhat reducing the flow into the Gulf, but only for nine days (National Commission 2011: 132-146). At the end of the month,

a "top-kill" procedure, pumping drilling mud into the broken riser to check the flow of oil and gas coming up, also failed to stop the spill (Nuckols 2010; National Commission 2011: 150-157).

Also in May, as the surface slick continued to grow and move with winds and tides, NOAA Fisheries began closing portions of federal waters to fisheries. The agency declared a Federal Fishery Resource Disaster, and announced an expanded closed zone of 22% of Federal Gulf waters, on the 25th of the month (National Commission 2011: 140; Restore the Gulf 2010a). Some state waters in Mississippi, Alabama, and Florida were also closed to fishing in June and July, and closure boundaries shifted day to day in federal and state waters; federal closures reached a peak of 37% of the Gulf on June 2nd (National Commission 2011: 159; Mississippi Department of Environmental Quality 2010a; Florida Fish and Wildlife Conservation Commission 2010a). State and federal fisheries closures shrank after the beginning of August 2010, but some federal waters remained closed until April 2011 (Restore the Gulf 2011a), and small areas in Louisiana remained closed past April 2011 (LDWF 2011a; LDWF 2011b).

Oil spill and response efforts also included freshwater diversions. In May 2010, Louisiana's governor ordered freshwater diversions of the Mississippi River to be opened to push oil slicks away from the state's marshes. Fresh river water poured into normally brackish water oyster grounds, killing most of the oysters near diversion outfalls (Buskey 2010).

Between April 20 and July 15, 4.9 million barrels of oil from the *Deepwater Horizon* spilled into the Gulf (National Commission 2011: 346). The estimated 1.8 million gallons of chemical dispersants sprayed into that oil from the air and at the deep sea leak site between April 22 and July 19 (Restore the Gulf 2010b) remain a contentious subject (Juhasz 2011: 96-110). On May 10th, the U.S. EPA announced a testing protocol for subsea dispersants use and on May 26 instructed BP to reduce dispersant use by 75% (National Commission 2011: 145, 160). The EPA directed BP to stop using dispersants altogether on July 14th (National Commission 2011: 161), although a Congressional investigation has raised doubts about how closely these directives were followed by Unified Command, as many exceptions were granted allowing more dispersant spraying than authorized by the May 26 EPA directive (Markey 2010, Wald 2010).

Health and safety issues facing the thousands of response workers were highlighted early in legal actions by commercial fishermen and environmental justice advocates. The Occupational Safety and Health Administration (OSHA) issued a directive on the use of respirators and protective gear on May 16th following those actions (Juhasz 2011: 121-32; Subra 2011: 15; DeSantis 2010b). Concerns about air quality offshore for VOO workers and onshore in coastal communities were underscored when limited air monitoring during Summer 2010 showed air from the *Deepwater Horizon* site in the Gulf blowing onshore contained particulate matter at levels equal to America's most polluted cities. The air quality was worse offshore (Juhasz 2011: 132-4; Buskey 2011d). In 2011, the Louisiana Department of Health and Hospitals (LDHH) reported 415 health complaints related to the oil spill, 329 of which came from cleanup workers on shore or at sea (Goldstein et al. 2011: 1338). In one well-publicized incident, seven VOO workers from Lafourche Parish, Louisiana were hospitalized after cleaning oil in Breton Sound on May 26. However, the fishermen and BP disagreed about what made the men sick. BP blamed a degreaser used on their boats, while the men argued exposure to oil and dispersants was the cause (DeSantis 2010c).

VOO program hiring practices were also controversial. Coastwide, BP contracted out VOO to Parsons International, an engineering, construction, technical, and management services firm (Johnson 2010), which sub-contracted with numerous Gulf coast boat companies to manage local VOO task forces. Local authorities – parish presidents, town mayors, a Native American

leader – had considerable discretion over VOO hiring. Local boaters objected to the hiring of out-of-state boats and captains; commercial fishermen objected to the hiring of sport fishermen, locals or not, while they were without work and unable to fish due to closures. These issues led, in some jurisdictions, to fishermen protesting apparent favoritism and unfair practices (Pleasant 2010; L. Nelson 2010; Murtaugh 2010; Mobile Press-Register Editorial Board 2010).

On shore, the dozens of spill subcontractors sought thousands of workers to clean marsh plants, vacuum up oil, shovel and bag tar balls from beaches, and handle the logistics of the cleanup effort. Recreational boat marinas were taken over by BP and its contractors, becoming temporary cities of responders and largely off-limits to reporters and the public (King 2010; K. Nelson 2010; Pleasant 2010). People seeking work flocked to the Gulf Coast and local residents tried to get spill cleanup jobs, but the recruiting process was highly unpredictable. As many as 500 workers were recruited in a single afternoon to form Rapid Response beach cleanup teams for priority beach cleanups. This occurred, for example, just prior to President Obama's first visit to Grand Isle, Louisiana (King 2010). Days later, a poorly organized jobs fair in Gulfport, Mississippi, had to be cancelled because too many people arrived looking for cleanup employment (Thomas 2010). Many of the workers brought into Rapid Response beach cleanup teams and Shoreline Cleanup Assessment Teams were African-Americans from economically distressed Gulf Coast towns and cities; their presence in majority-white and wealthier beach communities provoked anxiety among some coastal white residents (Juhasz 2011: 192-200; BR053 2011; Marks Field Notes, 2011).

On June 30th, Hurricane Alex temporarily stopped efforts to cap the well and clean oil in the Gulf; three weeks later, Tropical Storm Bonnie halted response activities again (Fountain 2010; Kaufman 2010). Despite these delays, on July 15th BP succeeded for the first time in capping the well and stopping the flow of oil into the Gulf. The leak was permanently stopped on August 3 following the completion of a concrete seal (National Commission 2011: 165-167). An August 4 Federal government report on the fate of the *Deepwater Horizon* oil claimed 74% of the oil "was gone." The report stated that 26% of the oil remained in the Gulf by that date. This latter amount, estimated at 1.27 million barrels, represented approximately two-thirds of the total amount spilled in the *Exxon Valdez* disaster. Another 25% of the oil had evaporated into the atmosphere or dissolved into the Gulf, 16% had naturally dispersed, 17% was recovered from the wellhead, and the remaining 16% had been burned, skimmed, or chemically dispersed (National Commission 2011: 167-169; Lubchenco et al. 2010).

Once the well was capped, the cleanup operation was rapidly demobilized. After a slow startup in May and June, the VOO program was still only ramping up (Philips 2010) when, on August 7, BP officials in Alabama announced they would begin shrinking the VOO program in that state (Dezember 2010). VOO ended in Mississippi and Alabama on September 15, 2010, after spending $500 million to employ 3,500 vessels (Kent 2010). Cleanup activities shrank gulfwide in the fall of 2010. By November, only 11,000 cleanup workers were still employed and just 1,000 VOO boats were still working across the Gulf of Mexico (Robertson and Rudolf 2010). In 2011, shoreline cleanup programs in many parts of the Gulf transitioned to monitoring, although Tropical Storm Lee, which turned up tar balls, mats of oil and tar, and leftover booms in places like Fourchon Beach, Louisiana, led to a temporary resurgence of cleanup activities (Schleifstein 2011).

The cleanup will continue to affect Gulf Coast residents through legal and medical monitoring programs underway or expanding in 2012. Lawsuits by former VOO captains for back pay, compensation for boat damages, and payments for "stand-by" days when they were on contract but not deployed would outlive the program, becoming prominent in the local media in early 2011 (Crowe 2011; Ferrara 2011; Murtaugh 2011) and again surfacing as part of the March 2012 settlement between BP and the Plaintiff's Steering Committee (PSC; Mowbray 2012b). This settlement also promised to address cleanup workers' health claims through compensation and health monitoring (Burdeau 2012b; New Orleans Times-Picayune 2012a), while several medical studies unrelated to the BP-PSC settlement began to collect data from oil response workers. One such study (Busby 2012), funded by the National Institutes of Health (NIH), was highly visible along Gulf Coast highways from late 2011 through early 2012 with large billboards featuring images of beach cleanup workers and asking former workers to call if they needed "Help with the oil spill?" (Figure 2.1).



Figure 2.1. Billboard along a Louisiana highway in 2011
Source: Brian Marks

## 2.2. TIMELINE OF KEY EVENTS

The *Deepwater Horizon* disaster was not a single event but, instead, a long series of events that continue to unfold and impact the people and environments of the Gulf Coast. The following timeline highlights key events that directly or indirectly caused social effects within the study area between April 20, 2010 and April 20, 2012. The events are organized into nine categories: Spill Response & Cleanup; Offshore Drilling Moratorium / Suspension / Permitting; Public Health; Claims Process / Legal; Commercial Fisheries; Economic Issues; Environmental Restoration; and Social Services and Non-Governmental Organizations (NGOs).

| Date | Event |
|---|---|
| 4/20/10 | (Spill Response & Cleanup) Approx. 9:50 p.m. CDT – An unexpected influx of hydrocarbons (commonly referred to as a "kick") escalated to a blowout on the Deepwater Horizon rig, just after the crew finished drilling the exploratory Macondo well. Gas that flowed onto the rig floor through a mud-gas vent line ignited in two separate explosions, eventually sinking the platform. The explosions kill 11 platform workers and injure 17 others; another 98 people survive without serious physical injury (BOEMRE 2011; National Commission 2011) |
| 4/21/10 | (Spill Response & Cleanup) First attempts by BP and Transocean to close the Blow-Out Preventer (BOP) on the sea floor using Remotely Operated Vehicles (ROVs) (National Commission 2011: 131) |
| 4/22/10 | (Spill Response & Cleanup) Chemical dispersants sprayed for the first time on oil from Deepwater Horizon (National Commission 2011: 143) |
| 4/23/10 | (Spill Response & Cleanup) U.S. Coast Guard (USCG) establishes Unified Area Command in Robert, LA (later moved to New Orleans) (National Commission 2011: 131)<br>(Spill Response & Cleanup) USCG suspends search for 11 missing Deepwater Horizon workers (National Commission 2011: 131) |
| 4/24/10 | (Spill Response & Cleanup) ROVs locate two places where oil is leaking from the riser pipe (Restore the Gulf 2010a).<br>(Spill Response & Cleanup) Unified Command reports oil leaking at 1,000 barrels / day (National Commission 2011: 132) |
| 4/26/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Interior Secretary Salazar orders immediate inspections of all deepwater drilling rigs in the Gulf of Mexico (BOEMRE 2010a) |
| 4/27/10 | (Spill Response & Cleanup) The Departments of Interior and Homeland Security establish the Joint Investigation Team (JIT) to investigate causes of the Deepwater Horizon explosion. JIT is made up of staff from the Minerals Management Service (MMS), soon to be renamed the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) and USCG (BOEMRE 2011) |
| 4/28/10 | (Spill Response & Cleanup) Controlled in-situ burning of surface oil slicks scheduled to begin (Restore the Gulf 2010b)<br>(Spill Response & Cleanup) Admiral Landry reports NOAA scientists believe as much as 5,000 barrels / day could be leaking (National Commission 2011: 133) |
| 4/29/10 | (Spill Response & Cleanup) Coast Guard designates *Deepwater Horizon* spill a Spill of National Significance, establishing a National Incident Commander to coordinate nationwide response (National Commission 2011: 136)<br>(Spill Response & Cleanup) Louisiana Governor Jindal declares State of Emergency in Louisiana (National Commission 2011: 138)<br>(Spill Response & Cleanup) Louisiana Governor announces creation of Vessels of Opportunity (VOO) Program which will hire local fishermen to help in oil clean up and landfall prevention (Office of the Governor of Louisiana 2010a) |
| 4/30/10 | (Commercial Fisheries) Louisiana Department of Wildlife and Fisheries (LDWF) begins closing state waters and oyster grounds to fisheries (National Commission 2011: 140)    (Spill Response & Cleanup) (Commercial Fisheries) Governor Jindal orders the opening of Mississippi River fresh water diversions to try to prevent oil from penetrating into coastal marshes. Fresh water causes 80% mortality in nearby oyster beds by July (Office of the Governor of Louisiana 2010b; Buskey 2010b) |
| 5/1/10 | (Spill Response & Cleanup) USCG Admiral Thad Allen designated National Incident Commander (Restore the Gulf 2010c) |

| Date | Event |
|------|-------|
| 5/2/10 | (Spill Response & Cleanup) President Obama visits Venice, LA in first trip to Gulf region during the spill (Restore the Gulf 2010d)<br>(Spill Response & Cleanup) BP begins drilling primary relief well (National Commission 2011: 132)<br>(Spill Response & Cleanup) First VOO task forces from Terrebonne and St. Bernard parishes, LA reported working (Houma Courier, 5/2/10; Times-Picayune, 5/2/10)<br>(Commercial Fisheries )NOAA Fisheries begins closing federal waters to fisheries, initially totaling 6,817 square miles, 3% of federal Gulf waters otherwise open to fishing (National Commission 2011: 140, NOAA 2010) |
| 5/5/10 | (Spill Response & Cleanup) BP announces the release of $25 million block grants to each affected state to implement spill response Area Contingency Plans (BP 2010a) |
| 5/6-7/10 | (Spill Response & Cleanup) A 125-ton containment dome is lowered over the broken riser and BOP to pipe leaking oil to the surface, but fails (National Commission 2011: 146)<br>(Economic Issues) SBA opens Business Recovery Centers in six southeast Louisiana parishes (SBA 2010a) |
| 5/10/10 | (Spill Response & Cleanup) EPA adopts testing protocol for subsea dispersant use, capping volume of dispersant to be used and requiring monitoring (National Commission 2011: 145)<br>(Economic Issues) SBA makes economic injury assistance available in more Louisiana parishes. SBA Economic Injury Disaster Loans become available in 34 Louisiana parishes and seven Mississippi counties (SBA 2010b) |
| 5/12/10 | (Offshore Drilling Moratorium / Suspension / Permitting) MMS inspection report of deepwater rigs in Gulf finds no major violations (Restore the Gulf 2010e) |
| 5/16/10 | (Spill Response & Cleanup) Riser Insertion Tube Tool begins channeling oil from riser on sea floor; operates for nine days (National Commission 2011: 146)<br>(Spill Response & Cleanup)(Public Health) OSHA issues directive on respirator and protective gear use by oil spill cleanup workers (Subra 2011: 15) |
| 5/17/10 | (Spill Response & Cleanup) BP begins drilling backup relief well (National Commission 2011: 132)<br>(Economic Issues) BP announces tourism grants to all four impacted Gulf states, $25 million to FL, and $15 million each to LA, MS and AL (BP 2010b) |
| 5/19/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Interior Secretary announces MMS will be restructured into three entities, the Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE), and Office of Natural Resource Revenue, effective October 1, 2011 (Secretary of the Interior 2010) |
| 5/24/10 | (Environmental Restoration) BP commits $500 million for research on ecosystem assessment, impacts, and recovery efforts through the Gulf of Mexico Research Initiative (GoMRI) over 10 years (Gulf of Mexico Research Initiative 2012)<br>(Spill Response & Cleanup) EPA instructs BP to scale back use of dispersants (National Commission 2011: 160) |
| 5/25/10 | (Commercial Fisheries) Federal Fishery Resource Disaster declared. NOAA Fisheries expands fishing closed area in Gulf of Mexico to 22% of Federal Gulf waters (Restore the Gulf 2010f) |
| 5/26/10 | (Spill Response & Cleanup) BP begins "Top Kill" attempt following Federal On-Scene Coordinator approval (National Commission 2011: 150)(Spill Response & Cleanup) EPA and Coast Guard formalize their May 23 order to reduce dispersant use by 75% from peak usage in a directive to BP (EPA 2010a)<br>(Spill Response & Cleanup) (Public Health) First reported Vessel of Opportunity Worker Exposure Incident (Restore the Gulf 2010g) |

| Date | Event |
|------|-------|
| 5/27/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Interior Secretary Salazar directs MMS to issue a six-month moratorium on all drilling at more than 500 ft. water depth in the Gulf of Mexico and Pacific Ocean (National Commission 2011: 152) |
| 5/28/10 | (Spill Response & Cleanup) President Obama makes second visit to Gulf region (National Commission 2011: 150) <br> (Spill Response & Cleanup) "Top Kill" fails to stop oil leak after several attempts over three days (National Commission 2011: 150, 157) |
| 5/30/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Deepwater moratorium takes effect through MMS Moratorium Notice to Lessees and Operators, NTL No. 2010-N04. Operations on 33 deepwater rigs are consequently halted (National Commission 2011: 152; GNO, Inc. 2011) |
| 6/1/10 | (Commercial Fisheries) Closure of portions of Mississippi state waters to commercial and recreational fishing (Mississippi Department of Environmental Quality (MDEQ) 2010) |
| 6/2/10 | (Commercial Fisheries) Federal fisheries closure area reaches peak at 37% of federal Gulf waters normally open to fisheries (National Commission 2011: 140; Restore the Gulf 2010h) |
| 6/3/10 | (Spill Response & Cleanup) BP begins flowing oil from the riser through its "top hat" collection device, increasing the amount of oil captured through the device over time (National Commission 2011: 159) |
| 6/4/10 | (Commercial Fisheries) NOAA reopens 16,000 square miles of the Gulf formerly closed to fishing (Restore the Gulf 2010i) |
| 6/8/10 | (Offshore Drilling Moratorium / Suspension / Permitting) MMS issues Notice NTL No. 2010-N05, promulgating new required safety measures for offshore drilling permitting (GNO, Inc. 2011) <br> (Public Health) Louisiana Office of Public Health reports 71 people have suffered health problems believed related to the oil spill [29 cleanup workers, 21 oil rig workers on two rigs reporting exposure to dispersants, and 21 on shore] (Buskey 2010a) |
| 6/13/10 | (Commercial Fisheries) The Florida Fish and Wildlife Conservation Commission announces partial closures of state waters to commercial and recreational fishing (FWC 2010a) |
| 6/16/10 | (Claims Process / Legal) Following agreement with federal government, BP announces $20 billion fund to pay individual and business claims, as well as judgments and settlements, natural resource damage costs, and state and local response costs (National Commission 2011: 185) |
| 6/18/10 | (Spill Response & Cleanup) 25,000 response and cleanup workers reported participating in response efforts, of which 21,000 are private contractors from a variety of local, national, and international companies (Yang 2010; Johnson 2010) |
| 6/21/10 | (Commercial Fisheries) NOAA re-expands closed fishing areas, which now approach 36% of Gulf federal waters (Restore the Gulf 2010j) <br> (Offshore Drilling Moratorium / Suspension / Permitting) MMS is renamed and reorganized as BOEMRE, Michael Bromwich sworn in as BOEMRE head (BOEMRE 2010b) |
| 6/22/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Judge Martin Feldman of the U.S. District Court in the Eastern District of Louisiana issues preliminary injunction against Administration's 6-month suspension of deepwater drilling (U.S. District Court for the Eastern District of Louisiana 2010) |
| 6/29/10 | (Public Health) Coast Guard and EPA require BP to test oil spill response waste for hazardous materials (National Commission 2011: 170) |

| Date | Event |
|------|-------|
| 6/30/10 | (Spill Response & Cleanup) Hurricane Alex temporarily halts spill containment and cleanup work at well site (Fountain 2010) |
| 7/5/10 | (Spill Response & Cleanup) Commercial fishermen in Bayou La Batre, AL hold demonstration calling for more commercial fishermen to be hired into the program, protesting transfer of local VOO program management to contractor related to town's mayor (Murtaugh 2010; Mobile Press-Register Editorial Board 2010) |
| 7/8/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Fifth Circuit Court of Appeals denies federal government's request to stay injunction against deepwater drilling suspension in Hornbeck v. Salazar (Fifth Circuit U.S. Court of Appeals 2010; National Commission 2011: 152) |
| 7/12/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Interior Secretary Salazar issues a revised drilling suspension in reaction to court injunction based not on water depth, but on the type of blowout prevention technology being used (National Commission 2011: 152)<br>(Commercial Fisheries) Commercial and recreational fisheries closures amount to 35% of the Gulf normally open to fishing (NOAA 2010b) |
| 7/14/10 | (Spill Response & Cleanup) (Public Health) BP prohibited from using dispersants entirely by EPA (National Commission 2011: 161) |
| 7/15/10 | (Spill Response & Cleanup) Leaking well is successfully shut in for the first time, stopping flow of oil into the Gulf; BP begins well integrity test to determine how well leak is capped before permanent sealing is attempted (National Commission 2011: 165) |
| 7/23/10 | (Spill Response & Cleanup) Tropical Storm Bonnie temporarily halts spill cleanup work and attempts at permanently killing well (Kaufman 2010) |
| 7/29/10 | (Offshore Drilling Moratorium / Suspension / Permitting)(Claims Process / Legal) Baton Rouge Area Foundation (BRAF) announces it will administer $100 million deepwater rig worker compensation fund from BP through its Gulf Coast Restoration and Protection Fund (BRAF 2010)<br>(Commercial Fisheries) Reopening of some Louisiana state waters to commercial fishing from the Mississippi River Delta to the Mississippi state line (LDWF 2010) |
| 7/31/10 | (Spill Response & Cleanup) (Public Health) EPA reports results of the second phase of dispersant testing on two Gulf of Mexico aquatic species, concluding that Corexit 9500A is generally no more or less toxic than seven available alternatives, but some tests inconclusive (EPA 2010b) |
| 8/3/10 | (Spill Response & Cleanup) BP succeeds in sealing the well with concrete through the "static kill" procedure before the relief well's completion (National Commission 2011: 167) |
| 8/4/10 | (Spill Response & Cleanup) Federal government issues report on Deepwater Horizon oil budget and environmental fates; one federal official reports 75% of spilled oil "is gone" (National Commission 2011: 167) |
| 8/6/10 | (Commercial Fisheries) Mississippi Department of Marine Resources (MDMR) and Mississippi Department of Environmental Quality (MDEQ) reopen state waters to finfish and shrimp fisheries (MDEQ 2010b) |
| 8/16/10 | (Economic Issues) Commerce Secretary Locke announces Restoration and Recovery Grants for Louisiana and other Gulf states and the deployment of 21 Assessment and Evaluation teams to communities affected by the oil spill (Restore the Gulf 2010k)<br>(Commercial Fisheries) Alabama Department of Conservation and Natural Resources Marine Resources Division (MRD) announce re-opening of all state waters closed to commercial and recreational fishing (Alabama MRD 2010)<br>(Commercial Fisheries) Florida Fish and Wildlife Conservation Commission (FWC) announces re- |

| Date | Event |
|------|-------|
| | opening of closed state waters to fishing (FWC 2010b) |
| 8/17/10 | (Public Health) NIEHS (National Institute of Environmental Health Sciences) presents preliminary plans for Gulf oil spill cleanup worker health study (Subra 2011: 18) |
| 8/20/10 | (Claims Process / Legal) Judicial Panel on Multi-District Litigation (MDL) transfers all Deepwater Horizon oil spill legal claims to the Eastern District of Louisiana and consolidates them under Judge Carl Barbier (Alliance for Justice 2011: 36) |
| 8/23/10 | (Claims Process / Legal) Gulf Coast Claims Facility (GCCF) officially takes over claims process from BP (GCCF 2010a) |
| 8/31/10 | (Spill Response & Cleanup) (Public Health) EPA updates its July 31 report confirming Corexit 9500A is less toxic than Louisiana Sweet Crude Oil alone and that a Corexit 9500A and Louisiana Sweet Crude mixture has the same toxicity as Louisiana Sweet Crude alone (EPA 2010c) |
| 9/10 | (Environmental Restoration) (Public Health) (Economic Issues) Navy Secretary Ray Mabus issues America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill, also known as the "Mabus Report". Report offers detailed plans for Gulf Coast Ecosystem Restoration Task Force, coordination of ongoing federal response efforts, NIEHS-led human health studies, economic recovery and health programming measures (Mabus 2010) |
| 9/1/10 | (Offshore Drilling Moratorium / Suspension / Permitting) (Claims Process / Legal) Application period opens for deepwater rig workers to apply for compensation from Gulf Coast Restoration and Protection Foundation / BRAF's $100 million fund (BRAF 2010) |
| 9/7/10 | (Environmental Restoration) (Commercial Fisheries) NOAA and EPA announce that no dead zones have been observed or are expected as part of BP Deepwater Horizon Oil Spill (Restore the Gulf 2010n) (Public Health)National Institutes of Health (NIH) announces a multi-year study to look at the potential mental and physical health effects from the oil spill in the Gulf region (Restore the Gulf 2010m) |
| 9/15/10 | (Spill Response & Cleanup) BP officially halts VOO program in FL, AL, and MS. In these three states, the program spent $500 million and hired 3,500 vessels (Kent 2010) |
| 9/18/10 | (Public Health) Louisiana Department of Health and Hospitals (LDHH) records 411 health complaints related to the BP oil spill from 4/25/10 to this date, of which 325 came from cleanup workers (LDHH 2010) |
| 9/19/10 | (Spill Response & Cleanup) Admiral Allen announces Deepwater Horizon leak is over after completion of relief well (National Commission 2011: 169) |
| 9/20/10 | (Claims Process / Legal) Judge Barbier groups legal claims from Deepwater Horizon into "bundles" based on category of damage under OPA 1990 provisions (Alliance for Justice 2011: 57) (Spill Response & Cleanup) BP's Alabama VOO contractor holds two-day workshop to assist processing VOO participants' invoices, promising all captains should be paid within a month (Ferrara 2010) |
| 9/23/10 | (Claims Process / Legal) (Spill Response & Cleanup) Feinberg announces GCCF will not deduct earnings from participation in VOO program from payments made to claimants, and refuses "to accept over 4,000 bogus claims for 'subsistence'" received in the past month (GCCF 2010b) |
| 9/25/10 | (Claims Process / Legal) GCCF announces it is implementing new and improved procedures to expedite claims processing (GCCF 2010c) |

| Date | Event |
|------|-------|
| 9/29/10 | (Environmental Restoration) A Notice of Intent to conduct restoration planning was published in the Federal Resister, marking the transition from the pre-assessment phase to the injury assessment and restoration phase of NRDA (USFWS 2011) |
| 9/30/10 | (Claims Process / Legal) (Offshore Drilling Moratorium / Suspension / Permitting) Application period closes for deepwater rig workers to apply for compensation from Gulf Coast Restoration and Protection Foundation's fund (BRAF 2010). Only 624 applications were received of which only 343 were compensated out of an estimated 7,590 eligible workers; deepwater drilling companies largely retain their skilled offshore workers through the suspension of drilling (GNO, Inc. 2011) (Offshore Drilling Moratorium / Suspension / Permitting) BOEMRE announces new regulations on offshore drilling, makes new regulations prerequisite for all shallow and deepwater offshore drilling permits (National Commission 2011: 152) |
| 10/1/10 | (Commercial Fisheries) NOAA reopens 5,628 square miles Gulf waters off Louisiana to fishing (Restore the Gulf 2010o)   (Spill Response & Cleanup)National Incident Command stands down (National Commission 2011: 170) |
| 10/4/10 | (Claims Process / Legal) (Economic Issues) GCCF Administrator Feinberg announces geographic proximity to the BP oil spill will no longer affect eligibility to collect for economic harm (GCCF 2010d) |
| 10/4-6/10 | (Public Health) (Environmental Restoration) Environmental justice groups meet for first time in Weeks Bay, Alabama, AL, draft the Weeks Bay Principles for Gulf Recovery and the slogan "The oil is still here and so are we." (Gulf Restoration Network 2010) |
| 10/12/10 | (Offshore Drilling Moratorium / Suspension / Permitting) Department of the Interior lifts suspension on deepwater drilling seven weeks ahead of scheduled expiration on November 30 (National Commission 2011: 152) |
| 10/22/10 | (Commercial Fisheries) NOAA reopens 7,037 square miles of Gulf waters south of the Florida panhandle to commercial and recreational fishing (Restore the Gulf 2010) |
| 10/23/10 | (Commercial Fisheries) BP announces $20 million in funding for seafood inspection and marketing to Florida state government (National Commission 2011: 169) |
| 10/29/10 | (Public Health) NOAA and FDA announce chemical tests for DOSS, component in dispersants used on Deepwater Horizon oil spill, detect levels below Level of Concern (FDA 2010) |
| 11/1/10 | (Offshore Drilling Moratorium / Suspension / Permitting) GNO, Inc. reports the de facto shallow water drilling moratorium ended by this date because the number of approved shallow water permits returned to historical average (GNO, Inc. 2011) (Economic Issues) (Commercial Fisheries) (Public Health) (Environmental Restoration) BP announces $218 million grant to Louisiana state government for seafood testing and promotion ($48 million), tourism promotion ($30 million), and coastal restoration ($140 million) (Office of the Governor of Louisiana 2010c) |
| 11/2/10 | (Public Health) Rally at Louisiana State Capitol to hold BP accountable for dispersant use, human health effects of oil spill (Jamail 2010) |
| 11/3/10 | (Spill Response & Cleanup) Some 11,000 cleanup workers, 1,000 VOO boats still actively working across the Gulf Coast (Robertson and Rudolf 2010) |
| 11/4/10 | (Offshore Drilling Moratorium / Suspension / Permitting) BOEMRE announces it will start work on a Supplemental Environmental Impact Statement (SEIS) for the remaining oil and gas lease sales in the Gulf scheduled in the 2007-2012 Outer Continental Shelf (OCS) Five-Year Plan, as part of assessment of environmental impact post-Deepwater Horizon (BOEMRE 2010c) |

| Date | Event |
|------|-------|
| 11/8/10 | (Commercial Fisheries) Mississippi Department of Marine Resources opens some public oyster beds to tonging with a 10 sack per vessel day limit (Dow 2010) |
| 11/10/10 | (Commercial Fisheries) Louisiana Department of Wildlife and Fisheries reopens 98% of state waters to commercial fisheries by this date (Rodriguez 2010) |
| 11/15/10 | (Commercial Fisheries) After harvesting on public oyster beds opened in October in Western Louisiana, harvesting reopens in Terrebonne and Lafourche parishes and most of Barataria Bay. Public oyster beds east of the Mississippi River in Louisiana remain closed (Buskey 2010c) |
| 11/19/10 | (Claims Process / Legal) Thomas Perrelli, Associate Attorney General of the United States, writes letter to GCCF Administrator Kenneth Feinberg saying claims processing too slow and must be accelerated (Perrelli 2010) |
| 11/20/10 | (Public Health) Rally for the Truth held on Grand Isle, Louisiana, LA by environmental justice activists concerned over seafood safety, human health impacts of BP oil spill (Buskey 2010d) |
| 11/22/10 | (Claims Process / Legal) Harvard Law School Professor John Goldberg issues report on liability for economic loss under OPA 1990 requested by Kenneth Feinberg, GCCF Administrator. Report narrowly construes the ability to recover damages to claimants who can prove their right and ability to put property or resources to commercial use has been hindered by the oil spill (Goldberg 2010) |
| 11/23/10 | (Claims Process / Legal) Deadline to file for Six-Month Emergency Advance Payments (EAPs) from GCCF; GCCF begins offering interim and final claims payments (Alliance for Justice 2011: 9) |
| 11/24/10 | (Commercial Fisheries) NOAA temporarily re-closes 4,000 square miles of deep Gulf waters to shrimping for Royal Red shrimp after oil is brought up by some trawls (Restore the Gulf 2010q) |
| 12/8/10 | (Claims Process / Legal) By this date GCCF has received 455,000 six-month emergency claims, of which 167,000 had been denied, 158,000 paid, and 80,000 under review or requiring more documentation (Mobile Press-Register 2010) |
| 12/13/10 | (Claims Process / Legal) GCCF opens Quick Pay Final Payment option for spill claimants (Alliance for Justice 2011: 53) |
| 12/15/10 | (Claims Process / Legal) United Louisiana Vietnamese American Fisherfolks hold press conference, publish White Paper on Loss of Subsistence Use of Natural Resources claims to GCCF (Alexander-Bloch 2010; United Louisiana Vietnamese American Fisherfolks 2010) |
| 1/3/11 | (Offshore Drilling Moratorium / Suspension / Permitting) BOEMRE notifies 13 oil companies they may resume previously approved exploration and production activities without submitting revised plans (GNO, Inc. 2011) |
| 1/27/11 | (Claims Process / Legal) GCCF Administrator Feinberg and Vietnamese-American fishermen claimants for loss of subsistence use, among others, testify in U.S. Senate Ad Hoc Subcommittee on Disaster Recovery hearing (Alliance for Justice 2011: 55) |
| 1/31/11 | (Claims Process / Legal) (Commercial Fisheries) GCCF releases Dr. John W. Tunnell's report, prepared for the Facility, on oil spill effects on fisheries and recovery timelines (Tunnell 2011) |
| 2/2/11 | (Commercial Fisheries) NOAA reopens the waters closed to Royal Red shrimping the previous November (Restore the Gulf 2011a)<br>(Claims Process / Legal) U.S. District Judge Carl Barbier rules that GCCF Administrator Feinberg is not independent from BP (Associated Press 2011) |

| Date | Event |
|------|-------|
| 2/18/11 | (Claims Process / Legal )GCCF releases Final Rules Governing Payment Options, Eligibility, and Substantiation Criteria and Final Payment Methodology (Alliance for Justice 2011: 53) |
| 2/28/11 | (Public Health) National Institutes of Health (NIH) announces Deepwater Horizon oil spill study on human health effects among oil spill cleanup workers; first letters of recruitment go out for study to Gulf Coast residents (Alliance for Justice 2011: 59; Buskey 2011)<br>(Offshore Drilling Moratorium / Suspension / Permitting) BOEMRE approves the first deepwater drilling permit since the Deepwater Horizon explosion and spill (BOEMRE 2011a) |
| 3/8/11 | (Economic Issues) BP awards Alabama a $16 million tourism promotion grant (Alabama Office of the Governor 2011) |
| 3/12-13/11 | (Public Health) (Environmental Restoration) Cherri Foytlin, environmental justice advocate and wife of offshore oil worker affected by deepwater moratorium and suspension, begins The Road to Washington American Walk for Accountability, eventually walking from New Orleans to Washington, D.C. by April 20. March preceded by 1 United Gulf Festival gathering of environmental justice activists in Westwego, Louisiana, LA (Marks Field notes, 2011) |
| 3/14/11 | (Claims Process / Legal) GCCF Administrator Kenneth Feinberg reports processing 54% of all claims received. Of the 138,874 claims processed thus far, 99,905 are Quick Final Payments (GCCF 2011a) |
| 3/16/11 | (Claims Process / Legal) Ministers affiliated with Southern Christian Leadership Conference (SCLC) hold protest at BP's facility near Houma, Louisiana over problems with claims process (DeSantis 2011a) |
| 3/17/11 | (Spill Response & Cleanup) VOO participants hold meeting in Orange Beach, AL over unpaid vessel damage claims to BP (Ferrara 2011) |
| 3/21/11 | (Offshore Drilling Moratorium / Suspension / Permitting) Interior Department approves first Gulf of Mexico deepwater exploration plan with Post-Deepwater Horizon environmental review (Department of Interior 2011) |
| 3/24/11 | (Commercial Fisheries) Louisiana Department of Wildlife and Fisheries holds meeting on crab mortalities reported in coastal Louisiana in recent months (DeSantis 2011b) |
| 3/29/11 | (Claims Process / Legal) (Environmental Restoration) Women of the Storm, organized originally around post-Katrina recovery advocacy, rally in Washington, D.C. and lobby Congress for the Restore Act, a bill to dedicate 80% of BP oil spill fines and penalties to Gulf Coast recovery and coastal restoration (Tilove 2011) |
| 4/9/11 | (Public Health) Meeting held in south Louisiana by environmental justice activists and people with illness claims about human health effects of Deepwater Horizon oil spill (King 2011) |
| 4/11/11 | (Commercial Fisheries) Louisiana Department of Wildlife and Fisheries orders reopening of commercial fishing in portions of state inside waters within the Mississippi River Delta that were previously closed due to impacts from the spill. Over 99% of state waters now open for fishing (LDWF 2011a)<br>(Economic Issues) BP awards $30 million tourism grant to Florida (CNN Travel 2011a) |
| 4/15/11 | (Economic Issues) BP awards $16 million tourism grant to Mississippi (CNN Travel 2011b) |
| 4/17/11 | (Offshore Drilling Moratorium / Suspension / Permitting) State of Louisiana reports 2,505 jobs lost to moratorium and suspension, several times fewer than estimates by state officials and economists in 2010 (Schmidt 2011) |

| Date | Event |
|------|-------|
| 4/18-23/11 | (Commercial Fisheries) Louisiana Department of Wildlife and Fisheries opens some state inshore waters for special early shrimp season (Louisiana Seafood News 2011) |
| 4/19/11 | (Commercial Fisheries) NOAA re-opens last federal Gulf Waters to fishing, those nearest to Deepwater Horizon site (Restore the Gulf 2011b) |
| 4/20/11 | (Claims Process / Legal) (Public Health) One-year anniversary of the Deepwater Horizon blowout and explosion. Rallies in remembrance and in protest of spill response, claims process, and health concerns held in Point-a-la-Hache, New Orleans, Grand Isle, Louisiana, and across the Mississippi Gulf Coast. Deadline for plaintiffs to join Transocean's Limitation Action, potentially capping its liability for damages under Admiralty law (Alliance for Justice 2011: 41; Marks Field notes, 2011) |
| 4/21/11 | (Environmental Restoration) The Natural Resource Trustees enter into an agreement whereby BP will provide $1 billion toward early restoration projects to address injuries to natural resources caused by the Deepwater Horizon oil spill (Deepwater Horizon Natural Resource Trustees 2011) |
| 5/18/11 | (Environmental Restoration) NOAA announces an end to the public scoping comment period on potential post-spill restoration projects (NOAA 2011) |
| 6/2/11 | (Commercial Fisheries) Oceana and other national environmental groups file notice to sue NOAA Fisheries for immediate closure of Gulf shrimp fishery because of concerns over large increases in sea turtle mortalities observed in the Gulf and claims of rising violations of Turtle Excluder Devices (TED) requirements on shrimp trawls (Oceana 2011) |
| 6/22/11 | (Commercial Fisheries) (Claims Process / Legal) Louisiana Shrimp Association hosts rally at Louisiana State Capitol over GCCF compensation issues and environmentalist threat to sue over TED regulations, claiming the spill, not themselves, are at fault (DeSantis 2011c) |
| 6/29/11 | (Social Services & NGOs) Community Foundation of South Alabama receives $500,000 in funding from national charity for oil spill-related social service programming (Andrews 2011) |
| 7/8/11 | (Claims Process / Legal) BP issues a federal court filing arguing that recovery of the Gulf Coast economy means very few claimants will incur future losses from the Deepwater Horizon oil spill (Robertson 2011) |
| 7/20/11 | (Social Services & NGOs) Greater New Orleans Foundation announces $1.1 million in grants to southeast Louisiana nonprofits for oil spill-related services (Alexander-Bloch 2011) |
| 8/3/11 | (Commercial Fisheries) NOAA denies last of three separate petitions from environmental groups requesting emergency closures or restrictions on shrimping because of the large number of sea turtle deaths in the Gulf (MSU Extension 2011) |
| 8/4/11 | (Claims Process / Legal) Reverend Art Rocker, minister serving on the board of the Southern Christian Leadership Conference (SCLC), Derek Gregory, and Police Chief of Pritchard, AL participate in delegation to London, England to meet with BP over unpaid oil spill claims of coastal residents (McClendon 2011) |
| 8/16/11 | (Claims Process / Legal) GCCF, citing evidence of Gulf Coast economic recovery, releases updated methodology for calculating Interim Payments in 2011, requiring claimants to demonstrate a 5% revenue and/or earnings growth rate over 2010 to qualify for future interim payments. GCCF also releases updated methodology for oyster leaseholders employing a "Future Risk Multiple" that pays higher amounts to leaseholders in certain geographic areas (GCCF 2011b) |
| 8/21/11 | (Environmental Restoration)NRDA Trustees announce $1 billion agreement with BP to fund early Gulf Coast restoration projects (Restore the Gulf 2011c) |

| Date | Event |
|------|-------|
| 8/22/11 | (Commercial Fisheries) LDWF opens Fall inshore shrimp season after a May inshore shrimp season of historically below-average total landings (Associated Press 2011b)<br>(Claims Process / Legal)GCCF issues one-year report on its operations, claiming it has largely succeeded in its primary objective, has paid more than $5 billion, has processed 97% of claims, and not one of 1,126 claims appealed to the USCG have been overturned (GCCF 2011c) |
| 9/1/11 | (Claims Process / Legal)GCCF closes satellite offices in Morgan City, Grand Isle and Lafitte, Louisiana and reduces service hours at all offices to five days per week (Alford 2011) |
| 9/9/11 | (Spill Response & Cleanup)Tropical Storm Lee reveals tar and oil mats on Fourchon Beach, LA (Schlefstein 2011) |
| 9/14/11 | (Spill Response & Cleanup)(Claims Process / Legal) Bureau of Ocean Energy, Management, and Enforcement (BOEMRE) / U.S. Coast Guard Joint Investigation Team (JIT) issues second, BOEMRE, volume of its final report on the Deepwater Horizon disaster (BOEMRE 2011c) |
| 9/26/11 | (Commercial Fisheries) Study published in the Proceedings of the National Academy of Sciences reports biological changes found in juvenile killifish exposed to BP spill oil could signify trouble for the reproduction of coastal fish populations (Whitehead et al. 2011) |
| 9/28/11 | (Claims Process / Legal) Orange Beach, AL officials reach a settlement with BP for a portion of tax revenues lost during summer 2010 (Ferrara 2011b) |
| 10/11 | (Commercial Fisheries) Gulf shrimpers report very poor white shrimp catches in Fall inshore season (Roberts 2011; Zullo 2011) |
| 10/5/11 | (Environmental Restoration) Gulf Coast Ecosystem Restoration Task Force (GRTF) releases their Gulf of Mexico Regional Ecosystem Restoration Strategy (GRTF 2011) |
| 10/7/11 | (Public Health)Gulfsource.org, a website operated by the Louisiana state government, comes online offering data on state and federal seafood, water, and soil testing for chemical contamination from the BP oil spill (Buskey 2011b) |
| 10/12/11 | (Public Health) Paper critical of FDA's seafood consumption risk assessment following BP spill published online in Environmental Health Perspectives (Rotkin-Ellman et al. 2011; Dickey 2011) |
| 10/15/11 | (Offshore Drilling Moratorium / Permitting) Anadarko Petroleum, a 25% stakeholder in the Macondo well, agrees to pay BP $4 billion as settlement of claims from Gulf of Mexico oil spill. Payment will be made directly into the victim compensation fund (Werdigier 2011) |
| 10/27/11 | (Environmental Restoration) NOAA finds Brucella bacteria to be the cause of death in five necropsied Gulf bottlenose dolphins (Schleifstein 2012) |
| 11/7/11 | (Claims Process / Legal) Plaintiffs' Steering Committee (PSC) involved in MDL oil spill case files request to Judge Barbier to receive 6% of the value of GCCF payments and 4% of government payments after this date to cover claimed legal costs (Schwartz 2011) |
| 11/15/11 | (Offshore Drilling Moratorium / Suspension / Permitting)Companies working in offshore waters under federal jurisdiction must achieve compliance with the Safety and Environmental Management System (SEMS), issued by the BOEM, by this date (BOEM 2012) |
| 11/30/11 | (Claims Process / Legal) GCCF announces commercial shrimpers, crabbers, and finfishermen will hereafter receive four times their documented 2010 losses in final claims payments; payments to previously paid to fishermen will not be retroactively increased from the former standard, double 2010 losses (GCCF 2011d) |

| Date | Event |
|------|-------|
| 12/1/11 | (Social Services & NGOs) Greater New Orleans Foundation grants another $1.3 million to southeast Louisiana non-profits, part of a $5 million granting requirement by year's end from the Foundation's $20 million oil spill recovery fund (Alexander-Bloch 2011b) |
| 12/1/11 | (Environmental Restoration) Coalition of environmental organizations publishes "Sunshine on the Gulf" report, arguing for more public input and involvement in selection and vetting of restoration projects funded with oil spill fines and NRDA payments (Gulf Future 2011) |
| 12/14/11 | (Offshore Drilling Moratorium / Suspension / Permitting) U.S. government auctions first offshore Gulf of Mexico oil and gas tracts since Deepwater Horizon disaster (Sayre 2011) <br> (Environmental Restoration) NRDA trustees release the Deepwater Horizon Draft Phase I Early Restoration Plan & Environmental Assessment (DERP/EA) for formal public comment. The DERP/EA describes the restoration projects that have been initially selected to receive funding through the $1 billion Early Restoration agreement (Buskey 2011c) <br> (Environmental Restoration) Mississippi, Alabama, Louisiana, and Florida are each allocated two early restoration projects through the NRDA process, totalling $57 million in all, $28 million of which are directed to Louisiana (Nelson 2011; Buskey 2011c) |
| 12/16/11 | (Claims Process / Legal) BP settles with Cameron International, manufacturer of the BOP on the Deepwater Horizon. In the agreement, the companies drop legal claims against the other, Cameron pays $250 million to BP for cleanup and claims payments, and is shielded from further cleanup liabilities (Burdeau 2011) |
| 12/29/11 | (Claims Process / Legal) Judge Barbier grants Plaintiff's Steering Committee's request to create reimbursal fund and assess 6% from payments to GCCF claimants after 11/7/11 (Mowbray 2011) |
| 1/3/12- 1/4/12 | (Claims Process / Legal) GCCF Administrator Ken Feinberg halts claims payments for one day while seeking clarification of Judge Barbier's 12/29 order (Associated Press 2012) |
| 1/6/12 | (Claims Process / Legal) Louisiana Attorney General "Buddy" Caldwell challenges the legality of the PSC's proposed compensation fund before the 5th Circuit U.S. Court of Appeals (Associated Press 2012b) |
| 1/3/12- 1/9/12 | (Economic Issues) (Commercial Fisheries) BP funds the "Gulf Coast Seafood and Tourism Bash" linked to the Sugar Bowl and BCS Championship football games in New Orleans, promoting Gulf Coast travel and seafood through nationwide advertising and local events (Burdeau 2012) |
| 1/16/12- 1/21/12 | (Environmental Restoration) Early Restoration public comment meetings are held in three Mississippi Gulf Coast locations to obtain feedback on proposed restoration projects (Kirgan 2012) |
| 1/18/12 | (Claims Process / Legal) Louisiana Attorney General reverses position on PSC 6% fund, dropping his opposition following Judge Barbier's appointing him Co-coordinating counsel for state interests in the MDL and removing environmental penalties from the 4% collection from government payments (Mowbray 2012a) |
| 1/24/12 | (Claims Process / Legal)  BP denies the town of Gulfport, Mississippi's claim for $11.8 million in lost tax revenues and community damages; the city was previously offered $76,000 by BP for tax losses (Associated Press 2012c) |
| 1/24/12 | (Economic Issues) (Commercial Fisheries) Louisiana Seafood Promotion and Marketing Board's Executive Director announces plan to buy naming rights to the New Orleans Arena, home of the New Orleans Hornets NBA team, with $5.2 million of the Board's $30 million in BP seafood promotion money. Plan is criticized by commercial fishermen, some Board members (Bayles 2012) |
| 1/29/12 | (Environmental Restoration) (Claims Process / Legal) The Restore Act, a bill to direct 80% of oil spill environmental fines to Gulf states for coastal restoration and other purposes, faces difficulties as some |

| Date | Event |
|------|-------|
| | Congress people seek offsets in other federal spending to cover funds lost to Federal treasury (Altman 2012) |
| 1/30/12 | (Economic Issues) (Offshore Drilling Moratorium / Suspension / Permitting) GNO, Inc. publishes report finding that many Gulf Coast small and medium oilfield service businesses were "hidden victims" of the offshore moratorium and suspension, losing revenues, cash reserves, and employees (GNO, Inc. 2012a) |
| 2/16/12 | (Claims Process / Legal) (Environmental Restoration) Smaller version of Restore Act advances in U.S. House as attachment to larger energy bill (Buskey 2012) |
| 2/17/12 | (Claims Process / Legal) (Environmental Restoration) MOEX Offshore, owner of 10% of the Macondo well, settles its liabilities with the Federal government for the Deepwater Horizon spill for $90 million; $65 million of which goes to Gulf states, $13.5 million for Louisiana environmental projects (Schleifstein 2012a) |
| 2/26-28/12 | (Public Health) (Claims Process / Legal) (Environmental Restoration) Gulf Gathering 2012 held in Alabama; Sponsored by a number of environmental non-profits, the gathering of regional environmental justice advocates addresses dedicating BP fines to coastal restoration, creating local employment through coastal restoration, and forming a Regional Citizens' Advisory Council to oversee the offshore oil and gas industry (Gulf Restoration Network 2012) |
| 3/2/12 | (Claims Process / Legal) (Public Health) BP and Plaintiffs' Steering Committee announces $7.8 billion uncapped settlement to cover outstanding individual and business claims, of which $2.3 is devoted to a capped fund for commercial fisheries economic claims. Trial beginning date postponed indefinitely; GCCF to be replaced by new claims process overseen by federal court wherein medical, subsistence use, VOO-related damages, and real property loss claims are promised to be paid (Schwartz 2012) |
| 3/5/12 | (Offshore Drilling Moratorium / Suspension / Permitting) 40 deepwater drilling rigs reported to be working in the Gulf of Mexico on this date, compared to 25 one year ago and 33 at the time of the Deepwater Horizon disaster (Krauss and Broder 2012) |
| 3/8/12 | (Claims Process / Legal) Judge Barbier approves BP / PSC agreement to transition claims process from GCCF; Ken Feinberg replaced by transition coordinator Lynn Greer, later to court-appointed claims administrator Patrick Juneau (Kunzelman 2012)<br>(Environmental Restoration) U.S. Senate approves Restore Act as part of larger transportation bill (Alpert 2012) |
| 3/23/12 | (Claims Process / Legal) Court-supervised claims administrator announces new claims process has paid 1,096 claimants $27 million since the changeover from GCCF, has made 897 new payment offers, made 1,918 requests for additional documentation and denied 2,506 claims (Hammer 2012a) |
| 3/31/12 | (Offshore Drilling Moratorium / Suspension / Permitting) Greater New Orleans, Inc. reports average federal offshore drilling permit approval time in February 2012, with the exception of one permit's very long lag time, returned to the average time in the year before the spill. In February 2012, shallow water drilling permit approvals were 41% above the pre-spill average and deepwater approvals 279% above that rate. In March, shallow water approvals were equal to the one year pre-spill average, deepwater approvals 17% below the average (GNO, Inc. 2012b) |
| 4/17/12 | (Offshore Drilling Moratorium / Suspension / Permitting) (Environmental Restoration) Former National Oil Spill Commissioners issue "report card" on regulatory reforms two years after beginning of BP oil disaster; Federal executive and oil industry given grades of B and C+, Congress given a D, primarily for failure to pass offshore industry regulatory legislation and Restore Act (Tilove 2012) |

| Date | Event |
|---|---|
| 4/18/12 | (Claims Process / Legal) (Commercial Fisheries) (Public Health) BP / PSC economic and medical claims settlements details filed with the court. Covering more than 1,000 pages, the proposed settlements detail what kind of people and businesses in what areas are covered and excluded from different levels of recovery, the amounts claimants may receive, evidentiary standards for claimants, and how multiple new settlement-funded health care and health monitoring programs will be implemented over as long as 21 years (New Orleans Times-Picayune 2012a) |
| 4/19/12 | (Claims Process / Legal) Executive summary of Justice Department-ordered audit of GCCF released. The investigation found more than 10,000 claimants were paid less than they deserved or were improperly denied, representing 4.5% of all unique paid GCCF claimants. Court-appointed claims administrator promises to pay some 7,300 claimants for whom correct claims numbers are available; 2,600 other claimants, despite being wrongly denied or underpaid, will get nothing more because they did not present sufficient documentation (Hammer 2012b) <br> (Environmental Restoration i) (Claims Process / Legal) (Public Health) (Social Services & NGOs) (Commercial Fisheries) Institute for Southern Studies publishes two year oil spill anniversary report detailing community non-profit initiatives, ongoing coastal land loss and lack of restoration funding, environmental health concerns following the spill including cleanup worker health issues, commercial fishers' experiences, and criticism of the proposed BP / PSC settlement (Sturgis and Kromm 2012) <br> (Environmental Restoration) Stop-gap federal transportation bill with Restore Act provisions passes the U.S. House and goes to conference committee to reconcile with Senate version (New Orleans Times-Picayune 2012b) |
| 4/20/12 | Two-year anniversary of the beginning of the Deepwater Horizon disaster; multiple commemorative events, protests, conferences and report releases held in several locations including Grand Isle, New Orleans, and Baton Rouge, Louisiana, Biloxi, Mississippi, and Tampa, Florida (Marks Field notes, 2012; Schliefstein 2012c) <br> (Public Health) Louisiana Environmental Action Network (LEAN) issues results of human health survey conducted primarily with clients of private detoxification clinic, finding that surveyed individuals report range of illnesses and symptoms and claim exposure to oil through cleanup work, residence near the coast, or swimming in the Gulf (Wold 2012) |

## 2.3. REFERENCES

Alabama Department of Conservation and Natural Resources Marine Resources Division. 2010 (Alabama MRD). All Alabama waters now open for fishing. August 16. Available at: http://www.outdooralabama.com/news/release.cfm?ID=833

Alabama Office of the Governor. 2011. Governor Bentley announces BP funds for Gulf Coast tourism promotion. Office of the Governor. March 8. Available at: http://governor.alabama.gov/news/news_detail.aspx?ID=4788

Alexander-Bloch, Benjamin. 2010. Vietnamese-American fishers fight for oil spill claim approval. New Orleans Times-Picayune. December 15.

Alexander-Bloch, Benjamin. 2011a. $1.1 million in grants will go to charities aiding families after spill. New Orleans Times-Picayune. July 20.

Alexander-Bloch, Benjamin. 2011b. About $2.5 million on its way to nonprofit groups aiding oil spill families. New Orleans Times-Picayune. December 1.

Alford, Jeremy. 2011. Oil-spill offices closing; claim woes continue. Houma Courier. May 24.

Alliance for Justice. 2011. Crude justice: One year after the oil spill is justice being served? Washington, DC: Alliance for Justice.

Alpert, Bruce. 2012. Senate approves amendment giving Gulf states 80 percent of BP spill fines. New Orleans Times-Picayune. March 8.

Altman, George. 2012. Oil spill fine bill: Offsets could be obstacles but lawmakers optimistic. Mobile Press-Register. January 29.

Andrews, Casandra. The Community Foundation of South Alabama gets $500K boost to help those affected by oil spill. Mobile Press-Register. June 29.

Associated Press. 2011a. U.S. judge: Spill claims czar not independent of BP. USA Today. February 3.

Associated Press. 2011b. Gulf Coast shrimp industry anticipates a challenging year. New Orleans Times-Picayune. August 5.

Associated Press. 2012a. BP oil spill payments resume after fee wrinkle. New Orleans Times-Picayune. January 4.

Associated Press. 2012b. La. AG challenges ruling in Gulf oil spill cases. New Orleans Times-Picayune. January 6.

Associated Press. 2012c. BP denies Gulfport's oil spill damages claim for $11.8 million. New Orleans Times-Picayune. January 24.

Baton Rouge Area Foundation (BRAF). 2010. Foundation managing $100 million rig relief program. July 29. Available at: http://www.gcrpf.org/Deepwater%20Rig%20assistance%20press%20release%201%20v2.pdf

Bayles, Cara. 2012. Seafood officials say naming-rights deal smells fishy. Houma Courier. January 28.

BP. 2010a. Update on Gulf of Mexico oil spill response – 5 May. BP. Available at: http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7061856

BP. 2010b. BP announces tourism grants to four Gulf states – 17 May. BP. May 17. Available at: http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7062187

BR053. 2011. Personal communication. Conversation with Grand Isle shrimping couple.  March 2.

Burdeau, Cain. 2011. BP settles with maker of failed blowout preventer. Associated Press. December 16.

Burdeau, Cain. 2012a. Amid BCS mania, BP pushes a feel-good Gulf story. Associated Press. January 9.

Burdeau, Cain. 2012b. BP settlement includes new health claims process. Associated Press. March 5.

Bureau of Ocean Energy Management (BOEM). 2012. Safety and Environmental Management System. BOEMRE. Available at: www.boemre.gov/semp/

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2010a. Fact sheet regarding halt on permits to drill new wells. Washington, DC: U.S. Department of the Interior. May 17. Available at: www.boemre.gov/ooc/pdfs/DOI_pressrelease/FactSheetonOCSOperations.pdf

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2010b. Salazar swears-in Michael R. Browmich to lead Bureau of Ocean Energy Management, Regulation and Enforcement. BOEMRE.  June 21. Available at: http://www.boemre.gov/ooc/press/2010/press0621.htm

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2010c. BOEMRE continues environmental reviews in Gulf of Mexico. BOEMRE. November 4. Available at: http://www.boemre.gov/ooc/press/2010/press1104.htm

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2011a. BOEMRE approves first deepwater drilling permit to meet important new safety standards in Gulf of Mexico. BOEMRE. February 28. Available at: http://www.boemre.gov/ooc/press/2011/press0228.htm

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2011b. Report regarding the causes of the April 20, 2010 Macondo Well blowout. Washington, DC: U.S. Department of the Interior. Available at: http://www.boemre.gov/pdfs/maps/DWHFINAL.pdf

Busby, Guy. 2012. Oil spill cleanup workers sought for long-term health study. Mobile Press-Register. March 27.

Buskey, Nikki. 2010a. Oil spill sickens 71 people so far. Houma Courier. June 9.

Buskey, Nikki. 2010b. Unleashing river to fight oil causes massive oyster kills. Houma Courier. July 24.

Buskey, Nikki. 2010c. Louisiana oyster season opens Monday with greatly diminished supply. Houma Courier. November 12.

Buskey, Nikki. 2010d. Grand Isle rally attendants question oil-spill reassurances. Houma Courier. November 17.

Buskey, Nikki. 2011a. Oil-spill health impact studied. Houma Courier. February 24.

Buskey, Nikki. 2011b. Seafood safety tests go online. Houma Courier. October 7.

Buskey, Nikki. 2011c. Oil-spill restoration work will start soon. Houma Courier. December 14.

Buskey, Nikki. 2011d. Study equates 2010 air quality to big-city pollution. Houma Courier. December 29.

Buskey, Nikki. 2012. Spill-fines bill advances in U.S. House. Houma Courier. February 16.

CNN Travel. 2011a. Florida tourism gets a $30 million boost from BP. CNN Travel. April 11. Available at: http://articles.cnn.com/2011-04-11/travel/florida.bp.grant_1_deepwater-horizon-oil-spill-bp-tourism-industry?_s=PM:TRAVEL

CNN Travel. 2011b. Mississippi gets $16 million from BP for tourism. CNN Travel. Available at: http://articles.cnn.com/2011-04-15/travel/mississippi.bp.grant_1_deepwater-horizon-tourism-industry-bp-america?_s=PM:TRAVEL

Crowe, J. D. 2011. BP VOO hoo-doo. Mobile Press-Register. March 15.

Curran, John. 2010. Short term, oil spill means mini job boom in Gulf. Houma Courier. May 26.

Deepwater Horizon Natural Resource Trustees. 2011. Deepwater Horizon oil spill Draft Phase I Early Restoration Plan and Environmental Assessment. Available at: http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/2011/12/Final-ERP-121311-print-version-update.pdf

Department of Interior. 2011. Interior approves first Gulf of Mexico Deepwater Exploration Plan with post-Deepwater Horizon environmental review. U.S. Department of Interior. Available at: http://www.doi.gov/news/pressreleases/Interior-Approves-First-Gulf-of-Mexico-Deepwater-Exploration-Plan-with-Post-Deepwater-Horizon-Environmental-Review.cfm

DeSantis, John. 2010a. Terrebonne armada prepares for battle. Houma Courier. May 2.

DeSantis, John. 2010b. Fishing families seek respirators. Houma Courier. May 28.

DeSantis, John. 2010c. Still no answer on what sickened workers. Houma Courier. June 1.

DeSantis, John. 2011a. BP protest: small crowd with multicultural message. Houma Courier. March 16.

DeSantis, John. 2011b. Meeting could yield answers in crab deaths. Houma Courier. March 24.

DeSantis, John. 2011c. Shrimpers to protest at the state Capitol. Houma Courier. June 19.

Dezember, Ryan. 2010. VOO-do or don't? BP disputes claims it will shut down Vessels of Opportunity soon. Mobile Press-Register. August 7.

Dickey, Robert. 2011. FDA risk assessment of seafood contamination after the BP oil spill. Environmental Health Perspectives. October 12. Available at: http://dx.doi.org/10.1289/ehp.1104539

Dow, Nicole. 2010. Mississippi limits oyster season to tongers. Biloxi Sun-Herald. November 9.

EPA. 2010a. Dispersant Monitoring and Assessment Directive – Addendum 3. EPA. May 26. Available at: http://www.epa.gov/bpspill/dispersants/directive-addendum3.pdf

EPA. 2010b. Comparative toxicity of Louisiana Sweet Crude oil (LSC) and chemically dispersed LSC to two Gulf of Mexico aquatic test species. U.S. EPA Office of Research and Development. July 31. Available at: http://www.epa.gov/bpspill/reports/phase2dispersant-toxtest.pdf

EPA. 2010c. Comparative toxicity of Louisiana Sweet Crude oil (LSC) and chemically dispersed LSC to two Gulf of Mexico aquatic test species. U.S. EPA Office of Research and

Development. August 31. Available at: http://www.epa.gov/bpspill/reports/updated-phase2dispersant-toxtest.pdf

FDA. 2010. NOAA and FDA announce chemical test for dispersant in Gulf seafood. U.S. Food and Drug Administration. Available at: http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm231653.htm

Ferrara, David. 2010. Vessels of Opportunity captains should be paid within a month, says BP official. Mobile Press-Register. September 22.

Ferrara, David. 2011a. Oil-spill vessel captains say damages still haven't been paid. Mobile Press-Register. March 17.

Ferrara, David. 2011b. Orange Beach officials reach settlement with BP for part of revenue lost because of oil spill. New Orleans Times-Picayune. September 28.

Fifth Circuit U.S. Court of Appeals. 2010. Ruling in Hornbeck v. Salazar., No. 10-30585. July 8.

Florida Fish and Wildlife Conservation Commission (FWC). 2010a. Oil forces partial fishing closure in Escambia County. June 13. Available at: http://www.floridafishandhunt.com/Florida-Fishing/Florida-Fishing-News/oil-forces-partial-fishing-closure-in-escambia-county.html

Florida Fish and Wildlife Conservation Commission (FWC). 2010b.Closed shrimp-harvesting area in Escambia Co. reopens. 16 August. Available at: http://myfwc.com/news/news-releases/2010/august/16/news_10_x_oilspill39/

Fountain, Henry. 2010. Winds from Gulf storm disrupt cleanup efforts. New York Times. June 30.

Goldberg, John. 2010. Liability for economic loss in connection with the Deepwater Horizon spill. November 22. Available at : http://www.gulfcoastclaimsfacility.com/Goldberg.Memorandum.of.Law.2010.pdf

Goldstein, Bernard, Howard Osofsky, and Maureen Lichtveld. 2011. The Gulf oil spill. The New England Journal of Medicine 364(14): 1334-48.

Greater New Orleans, Inc. (GNO, Inc.) 2011. A study of the economic impact of the Deepwater Horizon oil spill – Part two - Moratoria. New Orleans: GNO, Inc. January 13. Available at: http://gnoinc.org/wp-content/uploads/Economic_Impact_Study_Part_II_-_Moratoria_FINAL.pdf

Greater New Orleans, Inc. (GNO, Inc.) 2012a. The impact of decreased and delayed drilling permit approvals on Gulf of Mexico businesses. New Orleans: GNO, Inc. January 30. Available at: http://gnoinc.org/wp-content/uploads/The-Impact-of-Decreased-Drilling-

permit-Approvals-on-Gulf-of-Mexico-Businesses-GNO-Inc.-Re-released-2012.3.1-FINAL.pdf

Greater New Orleans, Inc. 2012b. (GNO, Inc.) GPI+ - Gulf Permit Index – as of March 31. New Orleans: GNO, Inc. March 31. Available at:
http://gnoinc.org/news/publications/press-release/gpi-gulf-permit-index-as-of-march-31/

Gulf Coast Claims Facility (GCCF). 2010a. Gulf Coast Claims Facility now processing oil spill claims. GCCF. August 23. Available at:
http://www.gulfcoastclaimsfacility.com/press1.php

Gulf Coast Claims Facility (GCCF). 2010b. Gulf Coast Claims Facility marks one-month anniversary. September 23. Available at:
http://www.gulfcoastclaimsfacility.com/press5.php

Gulf Coast Claims Facility (GCCF). 2010c. Feiberg announces faster and more generous payments from GCCF. September 25. Available at:
http://www.gulfcoastclaimsfacility.com/press6.php

Gulf Coast Claims Facility (GCCF). 2010d. Feiberg announces clarification regarding geographic proximity. October 4. Available at:
http://www.gulfcoastclaimsfacility.com/press7.php

Gulf Coast Claims Facility (GCCF). 2011a. Gulf Coast Claims Facility announces an important milestone: Over half of all interim and final claims submitted to the GCCF have been processed. March 14. Available at:
http://www.gulfcoastclaimsfacility.com/press18.php

Gulf Coast Claims Facility (GCCF). 2011b. Modification to final rules governing payment options, eligiblity and substantiation criteria, and final payment methodology. August 16. Available at:
http://www.gulfcoastclaimsfacility.com/METHODOLOGY_8162011.pdf

Gulf Coast Claims Facility (GCCF). 2011c. The Gulf Coast Claims Facility after its first year of operation. August 23. Available at:
http://www.gulfcoastclaimsfacility.com/ANNIVERSARY_REPORT_8.23.11.pdf

Gulf Coast Claims Facility (GCCF). 2011d. Second modification to final rules governing payment options, eligiblity and substantiation criteria, and final payment methodology. November 30. Available at:
http://www.gulfcoastclaimsfacility.com/METHODOLOGYC_11302011_v2.pdf

Gulf Coast Ecosystem Restoration Task Force (GRTF). 2011. Protecting America's Gulf Coast: The Gulf of Mexico Regional Ecosystem Restoration Strategy. GRTF. Available at:
http://www.epa.gov/gcertf/pdfs/gcertfenlishver.pdf

Gulf Future Coalition. 2011. Sunshine on the Gulf: The case for transparency in restoration project selection. Gulf Future. November 30. Available at: http://www.gulffuture.org/images/stories/Sunshine_on_the_Gulf.pdf

Gulf of Mexico Research Initiative. 2012. GoMRI history. GoMRI. Available at: http://www.gulfresearchinitiative.org/about-gomri/gri-history/

Gulf Restoration Network. 2010. Weeks Bay principles for Gulf Recovery. Available at: http://healthygulf.org/files_reports/BP_Drilling_Disaster/Weeks_Bay_Principles.pdf

Gulf Restoration Network. 2012. Gulf gathering 2012: A united response to the BP drilling disaster. Gulf Restoration Network. Available at: http://healthygulf.org/who-we-are/gulf-gathering/gulf-gathering-2012-a-united-response-to-the-bp-drilling-disaster

Hammer, David. 2012a. New Gulf oil spill claims administrator sends first payments. New Orleans Times-Picayune. March 23.

Hammer, David. 2012b. Feinberg made few mistakes, but 10,000 Gulf oil spill claimants shortchanged, audit says. New Orleans Times-Picayune. April 19.

Jamail, Dahr. 2010. Broad coalition rallies for BP accountability. IPS News Service. November 1. Available at: http://ipsnews.net/print.asp?idnews=53423

Johnson, Brad. 2010. BP's secret army of oil disaster contractors. Think Progress. June 18. Available at: http://thinkprogress.org/green/2010/06/18/174703/bp-contractor-army/

Juhasz, Antonia. 2011. Black tide: The devastating impact of the Gulf oil spill. Hoboken, NJ: John Wiley & Sons.

Kaufman, Marc. 2010. Tropical storm Bonnie 2010: Oil spill work on hold as system approaches. Washington Post. July 23.

Kaufman, Leslie and Campbell Robertson. 2010. Gulf Coast towns brace as huge oil slick nears marshes. New York Times. May 1.

Kent, Mark. 2010. BP ends Vessels of Opportunity program. Mobile Press-Register. September 15.

King, Naomi. 2010. Cocodrie is staging area for fight against oil spill. Houma Courier. May 28.

King, Naomi. 2011. Spill-related health concerns persist. Houma Courier. April 8.

Kirgan, Harlan. 2012. Jobs were on the mind of public commenting at Early Restoration meetings on the Coast. Mississippi Press. January 22.

Krauss, Clifford and John Broder. 2012. Deepwater oil drilling returns to Gulf and spreads. New York Times News Service. March 5.

Kunzelman, Michael. 2012. Court takes over oil spill claims from Feinberg. Associated Press. March 9.

Louisiana Department of Health and Hospitals (LDHH). 2010. LDHH oil spill health effect summary. September 18. Available at: http://www.dhh.louisiana.gov/reports.asp?ID=378&Detail=791

Louisiana Department of Wildlife and Fisheries (LDWF). 2010. L.D.W.F. announces reopening of commercial fishing areas. LDWF. July 29. Available at: http://www.wlf.louisiana.gov/news/32478

Louisiana Department of Wildlife and Fisheries (LDWF). 2011a. LDWF announces major commercial fishing reopening. April 11. Available at: http://www.wlf.louisiana.gov/news/33992

Louisiana Department of Wildlife and Fisheries (LDWF). 2011b. LDWF announces more fishing openings. April 26. Available at: http://www.wlf.louisiana.gov/news/34089

Louisiana Seafood News. 2011. Louisiana shrimp season to open April 18. Louisiana Seafood News. Available at: http://www.louisianaseafoodnews.com/2011/04/08/louisiana-shrimp-season-to-open-april-18/

Lubchenco, Jane, Marcia McNutt, Bill Lehr, Mark Sogge, Mark Miller, Stephen   Hammond, and William Conner. 2010. BP Deepwater Horizon oil budget: What happened to the oil? August 4. Available at: http://www.noaanews.noaa.gov/stories2010/PDFs/OilBudget_description_%2083final.pdf

Mabus, Ray. 2010. America's Gulf Coast: A long term recovery plan after the Deepwater Horizon oil spill. September 28. Available at: http://www.restorethegulf.gov/sites/default/files/documents/pdf/gulf-recovery-sep-2010.pdf

Markey, Edward. 2010. Markey study: Coast guard allowed BP, spill responders to excessively use dispersant. Office of Congressman Ed Markey of Massachusetts. Available at: http://markey.house.gov/press-release/aug-1-2010-markey-study-coast-guard-allowed-bp-spill-responders-excessively-use

McClendon, Robert. 2011. Delegation, Pritchard police chief, heads to London to protest BP treatment of minorities. Mobile Press-Register. August 4.

Mississippi Department of Environmental Quality (MDEQ). 2010a. Precautionary closure of portions of Mississippi marine waters to all commercial recreational fishing, effective immediately. June 1. Available at:

http://www.deq.state.ms.us/newweb/MDEQPres.nsf/67c62401c0604ea286256b29005aba
da/277db4ce8055a80f8625793400546d62?OpenDocument

Mississippi Department of Environmental Quality (MDEQ). 2010b. MDMR and MDEQ reopen
all Mississippi territorial waters to commercial and recreational finfish and shrimp
fishing. 6 August. Available at:
http://www.deq.state.ms.us/mdeq.nsf/pdf/Main_GulfOilSpillAugust62010PressRelease/$Fi
le/GulfOilSpillAUGUST062010.pdf?OpenElement

Mobile Press-Register. 2010. More than 100,000 emergency oil spill claims denied in 10 days.
Mobile Press-Register. December 8.

Mobile Press-Register Editorial Board. 2010. Editorial: Keeping the cleanup program clean.
Mobile Press-Register. July 7.

Mowbray, Rebecca. 2011. Fund will be created to reimburse plaintiff attorneys working on BP
litigation. New Orleans Times-Picayune. December 29.

Mowbray, Rebecca. 2012a. Attorney General says he now supports setting aside a portion of
settlements. New Orleans Times-Picayune. January 19.

Mowbray, Rebecca. 2012b. BP spill settlement promises fast payouts. New Orleans Times-
Picayune. March 4.

MSU Extension. 2011. Gulf Coast fisherman newsletter. September 1. Available at:
http://msucares.com/newsletters/gulf/201109.html

Murtaugh, Dan. 2010. Bayou La Batre protest. Mobile Press-Register. July 5. Available at:
http://videos.al.com/mobile-press-register/2010/07/bayou_la_batre_protest.html

Murtaugh, Dan. 2011. Vessels of Opportunity lawsuit: BP broke promises in oil spill program.
Mobile Press-Register. April 19.

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling. 2011. Deep
water: The Gulf oil disaster and the future of offshore drilling – Report to the President.
Washington, DC: National Commission on the BP Deepwater Horizon Oil Spill and
Offshore Drilling.

National Oceanic and Atmospheric Administration (NOAA).2010a. NOAA closes commercial
and recreational fishing in oil-affected portion of Gulf of Mexico. Washington, DC:
NOAA. Available at:
http://sero.nmfs.noaa.gov/media/pdfs/2010/NOAA_Fishing_Closure_Press_Release_050
210.pdf

National Oceanic and Atmospheric Administration (NOAA).2010b. NOAA expands fishing closed area in Gulf of Mexico. Washington, DC: NOAA. July 14. Available at: http://www.noaanews.noaa.gov/stories2010/20100714_closure.html

National Oceanic and Atmospheric Administration (NOAA). 2011. Deepwater BP oil spill: Programmatic Environmental Impact Statement. March. Available at: http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/2011/03/PEISNewsletter_Final.pdf

Nelson, Karen. 2010. 3,700 ready to respond to BP oil spill. Biloxi Sun Herald. May 26.

Nelson, Karen. 2011. Mississippi gets two of the eight early oil spill restoration projects. Biloxi Sun Herald. December 14.

Nelson, Lloyd. 2010. Fishermen demand cleanup jobs. Houma Courier. June 9.

New Orleans Times-Picayune. 2012a. Gulf oil spill award details revealed in filing. New Orleans Times Picayune April 18.

New Orleans Times-Picayune. 2012b. Restore Act may be threatened by amendments. New Orleans Times Picayune April 21.

Nuckols, Ben. 2010. BP's top-kill effort fails to plug Gulf oil leak. Associated Press. May 29.

Oceana. 2011. Oceana calls for immediate closure of Gulf shrimp fishery unless sea turtle protections are established and enforced. Oceana. June 2. Available at: http://oceana.org/en/news-media/press-center/press-releases/oceana-calls-for-immediate-closure-of-gulf-shrimp-fishery-unless-sea-turtle-protections-a

Office of the Governor of Louisiana. 2010a. Governor Jindal issues state declaration of emergency for oil leak. Office of the Governor. April 29. Available at: http://wwwprd.doa.louisiana.gov/LaNews/PublicPages/Dsp_PressRelease_Display.cfm?PressReleaseID=2460&Rec_ID=9

Office of the Governor of Louisiana. 2010b. Governor Jindal meets with federal officials, stresses need for requested federal support in oil response efforts. Office of the Governor. April 30. Available at: http://gov.louisiana.gov/index.cfm?md=newsroom&tmp=detail&catID=2&articleID=2143

Office of the Governor of Louisiana. 2010c. Governor Jindal announces agreement with BP for seafood safety, coastal restoration and tourism funding. Office of the Governor. November 1. Available at: htp://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=2550

Perrelli, Thomas. 2010. Letter to Kenneth Feinberg. November 19. Available at: http://www.justice.gov/asg/2010-11-19-perrelli-ltr-feinberg.pdf

Philips, Rena. 2010. Oil skimming was stalled by need to organize boats, says Thad Allen. Mobile Press-Register. July 9.

Pleasant, Matthew. 2010. BP sets up staging area in Pointe-aux-Chenes. Houma Courier. May 27.

Restore the Gulf. 2010a. Update 7: Unified command continues to respond to Deepwater Horizon. Restore the Gulf. April 25. Available at: http://www.restorethegulf.gov/release/2010/04/24/update-7-unified-command-continues-respond-deepwater-horizon

Restore the Gulf. 2010b. Update 11- Controlled burn scheduled to begin. Restore the Gulf. April 28. Available at: http://www.restorethegulf.gov/release/2010/04/27/update-11-controlled-burn-scheduled-begin

Restore the Gulf. 2010c. Coast Guard Commandant Admiral Thad Allen designated National Incident Commander for continued response to BP oil spill. Restore the Gulf. May 1. Available at: http://www.restorethegulf.gov/release/2010/05/01/coast-guard-commandant-admiral-thad-allen-designated-national-incident-commander-

Restore the Gulf. 2010d. President Obama visits Venice, La. Restore the Gulf. May 2. Available at: http://www.restorethegulf.gov/release/2010/05/02/president-obama-visits-venice-la

Restore the Gulf. 2010e. MMS inspection report of deepwater rigs in Gulf of Mexico. May 12. Available at: http://www.restorethegulf.gov/release/2010/05/12/mms-inspection-report-deepwater-rigs-gulf-mexico

Restore the Gulf. 2010f. NOAA expands fishing closed area in Gulf of Mexico. Restore the Gulf. May 25. Available at: http://www.restorethegulf.gov/release/2010/05/25/noaa-expands-fishing-closed-area-gulf-mexico

Restore the Gulf. 2010g. Vessel of Opportunity worker exposure incident on May 26, 2010. Restore the Gulf. May 26. Available at: http://www.restorethegulf.gov/release/2010/05/26/vessel-opportunity-worker-exposure-incident-may-26-2010

Restore the Gulf. 2010h. NOAA expands fishing closed area in Gulf of Mexico. Restore the Gulf. June 2. Available at: http://www.restorethegulf.gov/release/2010/06/02/noaa-expands-fishing-closed-area-gulf-mexico

Restore the Gulf. 2010i. National Oceanic and Atmospheric Administration opens 16,000 square miles of fishing closed area in Gulf of Mexico. Restore the Gulf. June 4. Available at:

http://www.restorethegulf.gov/release/2010/06/04/national-oceanic-and-atmospheric-administration-opens-16000-square-miles-fishing-

Restore the Gulf. 2010j. NOAA expands fishing closed area in Gulf of Mexico. Restore the Gulf. June 21. Available at: http://www.restorethegulf.gov/release/2010/06/21/noaa-expands-fishing-closed-area-gulf-mexico

Restore the Gulf. 2010k. Commerce Secretary Locke announces $31.3 million in restoration and recovery grants for Louisiana, Gulf. August 16. Available at: http://www.restorethegulf.gov/release/2010/08/16/commerce-secretary-locke-announces-313-million-restoration-and-recovery-grants-lo

Restore the Gulf. 2010l. Operations and ongoing response August 28, 2010. Restore the Gulf. August 28. Available at: http://www.restorethegulf.gov/release/2010/08/28/operations-and-ongoing-response-august-28-2010

Restore the Gulf. 2010m. NIH to launch Gulf oil spill health study. Restore the Gulf. September 7. Available at: http://www.restorethegulf.gov/release/2010/09/07/nih-launch-gulf-oil-spill-health-study

Restore the Gulf. 2010n. No dead zones observed or expected as part of Deepwater Horizon oil spill. Restore the Gulf. September 7. Available at: http://www.restorethegulf.gov/release/2010/09/07/nih-launch-gulf-oil-spill-health-study

Restore the Gulf. 2010o. NOAA reopens more than 5,000 square miles in the Gulf of Mexico to fishing. Restore the Gulf. October 1. Available at: http://www.restorethegulf.gov/release/2010/10/01/noaa-reopens-more-5000-square-miles-gulf-mexico-fishing

Restore the Gulf. 2010p. NOAA reopens more than 7,000 square miles in the Gulf of Mexico to fishing. Restore the Gulf. October 22. Available at: http://www.restorethegulf.gov/release/2010/10/22/noaa-reopens-more-7000-square-miles-gulf-mexico-fishing

Restore the Gulf. 2010q. NOAA closes 4,200 square miles of Gulf waters to royal red shrimping. Restore the Gulf. November 24. Available at: http://www.restorethegulf.gov/release/2010/11/24/noaa-closes-4200-square-miles-gulf-waters-royal-red-shrimping

Restore the Gulf. 2011a. NOAA reopens more than 4,000 square miles of Gulf waters to royal red shrimping. Restore the Gulf. February 2. Available at: http://www.restorethegulf.gov/release/2011/02/02/noaa-reopens-more-4000-square-miles-gulf-waters-royal-red-shrimping. Restore the Gulf. 2011b. Last fisheries re-opening today. Restore the Gulf. April 19. Available at: http://www.restorethegulf.gov/release/2011/04/19/last-fisheries-re-opening-today

Restore the Gulf. 2011c. NRDA trustees announce $1 billion agreement to fund early Gulf Coast restoration projects. Restore the Gulf. April 21. Available at: http://www.restorethegulf.gov/release/2011/04/21/nrda-trustees-announce-1-billion-agreement-fund-early-gulf-coast-restoration-proj

Roberts, Faimon. 2011. Harvesters dispirited by white shrimp catch. Baton Rouge Advocate. October 4.

Robertson, Campbell. 2010. Safety fears halt fishing in areas affected by spill. New York Times. May 2.

Robertson, Campbell. 2011. As Gulf tourism rebounds, BP seeks to lower payments. New York Times. July 15.

Robertson, Campbell and John Rudolf. 2010. 11,000 people and over 1,000 fishing boats still working on Gulf cleanup amid controversy over oil. Associated Press. November 3.

Rodriguez, Maya. 2010. More Louisiana waters reopened to crabbing but some processors are still relying on out-of-state imports. WWL-TV Channel 4 News, New Orleans. November 10.

Rotkin-Ellman, Miriam, Karen Wong, and Gina Solomon. 2011. Seafood contamination after the BP Gulf oil spill and risks to vulnerable populations: A critique of the FDA risk assessment. Environmental Health Perspectives. October 12. Available at: http://dx.doi.org/10.1289/ehp.1103695

Sayre, Alan. 2011. US auctions 1st offshore tracts since oil spill. Associated Press. December 14.

Schleifstein, Mark. 2011. Tropical Storm Lee surge reveals tar mats on Fourchon Beach. New Orleans Times-Picayune. September 9.

Schleifstein, Mark. 2012a. Gulf of Mexico oil spill partial settlement would give Louisiana $13.5 million. New Orleans Times-Picayune. February 17.

Schleifstein, Mark. 2012b. Dozens of dead marine mammals, turtles in Gulf this year, NOAA says. New Orleans Times-Picayune. February 27.

Schliefstein, Mark. 2012c. Gulf oil spill, Earth Day commemorations scheduled in New Orleans. New Orleans Times-Picayune. April 20.

Schmidt, Kathrine. 2011. Drilling ban: Crisis that never was? Houma Courier. April 17.

Schwartz, John. 2011. Plaintiffs' lawyers in a bitter dispute over fees in Gulf oil spill cases. New York Times. December 3.

Schwartz, John. 2012. BP deal opens a new phase, but case is far from closed. New York Times. March 3.

Secretary of the Interior. 2010. Order No. 3299. Washington, DC: Department of the Interior. Available at:
http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=32475

Small Business Administration (SBA). 2010a. SBA to open business recovery centers for small businesses economically affected by Deepwater BP oil spill. SBA. May 7. Available at:
http://archive.sba.gov/idc/groups/public/documents/sba_program_office/12163-02_la_pr.pdf

Small Business Administration (SBA). 2010b. SBA makes economic injury assistance available in more Louisiana parishes for small businesses affected by Deepwater BP oil spill. SBA. May 10. Available at:
http://archive.sba.gov/idc/groups/public/documents/sba_program_office/12163-03_la_pr.pdf

Smith, Vicki. 2010. Oil in the Gulf puts countless livelihoods in limbo. Houma Courier. May 2.

Sturgis, Sue and Chris Kromm. 2012. Troubled waters: Two years after the BP oil disaster, a struggling Gulf Coast calls for national leadership for recovery. Institute for Southern Studies. Available at:
http://www.southernstudies.org/sites/default/files/BPTroubledWatersWeb.pdf

Subra, Wilma. 2011. Making the connection – 2011: Human health and ecological effects of the BP Deepwater Horizon crude oil disaster. February 18. Available at:
http://leanweb.org/our-work/water/bp-oil-spill/making-the-connection-2011

Thomas, Danielle. 2010. Brawls break out at oil response job fair, police shut event down. WLOX-13 TV. June 16. Available at:
http://www.wlox.com/Global/story.asp?S=12658665

Tilove, Jonathan. 2011. Women of the Storm urge Congress to devote BP penalties to coastal restoration. New Orleans Times-Picayune. March 30.

Tilove, Jonathan. 2012. Congress' Gulf oil spill response given a 'D' by commissioners. New Orleans Times-Picayune. April 17.

Tunnell Jr., John W. 2011. An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill. Corpus Christi, TX: Harte Research Institute for Gulf of Mexico Studies at Texas A&M University Corpus Christi.

United Louisiana Vietnamese American Fisherfolks. 2010. Loss of subsistence use claim

framework & template. December 16. New Orleans: United Louisiana Vietnamese American Fisherfolks and MQVN CDC.

U.S. District Court for the Eastern District of Louisiana. 2010. Ruling in Hornbeck v. Salazar, Civil Action No. 10-1663. U.S. District Court for the Eastern District of Louisiana.

U.S. Fish and Wildlife Service (USFWS). 2011. NRDAR: How it works. Available at: http://www.fws.gov/home/dhoilspill/pdfs/NRDARHowItWorks.pdf

Wald, Matthew. 2010. Despite rule, BP used dispersant, panel finds. New York Times. July 31.

Warren, Bob. 2010. St. Bernard Parish fishers hit the coastline Sunday morning to fight spreading oil from Gulf spill. New Orleans Times-Picayune. May 2.

Werdigier, Julia. 2011. Ending dispute, well partner settles with BP for $4 billion. New York Times. October 17.

Whitehead, Andrew, Benjamin Dubansky, Charlotte Bodinier, Tzintzuni Garcia, Scott Miles, Chet Pilley, Vandana Raghunathan, Jennifer Roach, Nan Walker, Ronald Walter, Charles Rice, and Fernando Galvez. 2011. Genomic and physiological footprint of the Deepwater Horizon oil spill on resident marsh fishes. Proceedings of the National Academy of Sciences. September 26. Available at:
www.pnas.org/cgi/doi/10.1073/pnas.1109545108

Wold, Amy. 2012. Report: Oil ill health effects linger. Baton Rouge Advocate. April 21.

Yang, Jia L. 2010. Aftermath spawning profits for many contractors. Washington Post. June 12.

Zullo, Robert. 2011. Fishermen bemoan poor catches. Houma Courier. October 8.

# CHAPTER THREE: CONTEXT

Brian Marks, Tom McGuire, Diane Austin, and Ben McMahan

The Gulf Coast region is diverse, extending from Brownsville, Texas to the southern tip of Florida. The area most directly affected by the spill, and the focus of this study, includes coastal Louisiana, Mississippi, and Alabama, states that are smaller and slower growing than Texas and Florida (National Ocean Service 2011). While this coastal area is certainly part of the U.S. South and shares such demographic characteristics as relatively high poverty rates and low levels of educational attainment, this area is nevertheless distinct from counties and parishes in the northern parts of these states (Wallace et al. 2001). The coastal regions of Mississippi and Louisiana are more densely populated and, in all three states, Interstate 10 is considered a significant dividing line, with the region to the south better off economically, in large part due to the natural resources extracted from the coastal areas and offshore in the Gulf.

Despite what the Gulf states have in common, efforts to organize regional planning, economic development, and educational consortia have had limited success. Recent efforts include the Gulf of Mexico Alliance (GOMA), a partnership of all five U.S. Gulf states, initiated in 2004 to increase regional collaboration to enhance the ecological and economic health of the Gulf of Mexico (GOMA n.d.). The Gulf of Mexico States Accord (GOMSA) is an international cooperative agreement initiated in 1995 by the 11 states bordering the Gulf of Mexico, including the six Mexican states. The corresponding Gulf of Mexico States Partnership, Inc. was initiated as a private sector counterpart open to businesses, chambers of commerce, economic development organizations, and NGOs to advocate for government policies that promote the economic growth and development of the Gulf of Mexico states. The Partnership also supports the Gulf of Mexico Congressional Caucus in the creation of new regional initiatives in the areas of transportation, homeland security, energy, environment, economic development, education, and international trade in the Gulf region (Gulf of Mexico States Partnership, Inc. 2005).

The Gulf of Mexico itself supports marine industries – including commercial seafood, shipping, and petroleum–and tourism. According to 2010 data from the Bureau of Labor Statistics (cited in National Ocean Service 2011), average annual wages are highest in manufacturing ($45,471) and mining and natural resources ($43,447), while the lowest are in leisure and hospitality ($14,109). The petroleum industry generates employment in manufacturing and in mining and natural resources. The following section provides a brief introduction to the petroleum industry (see also Chapter 1, Volume II).

## 3.1. THE PETROLEUM INDUSTRY IN THE REGION

Tom McGuire and Diane Austin

The 1901 discovery of the huge Spindletop oilfield in east Texas, shortly followed by a field at Jennings, Louisiana, launched commercial oil production in the Gulf Coast region. The use of petroleum as fuel for military vehicles during World War I increased its strategic significance, and by the 1920s, oil development began moving into Louisiana's swamps, marshes, and inland lakes (see also Chapters 8 and 9 in this volume and Chapter 1 of Volume II). In 1921, the state of Louisiana issued its first coastal zone oil lease, and land development

companies began acquiring huge tracts of land in the coastal parishes. Petroleum exploration and production continued through the Great Depression, and by the latter part of the 1930s seismic crews had crisscrossed Louisiana's swamps and marshes and entered the waters of the Gulf of Mexico. Initially, the oil and gas industry attracted experienced oilfield workers, many from Texas, Oklahoma, and northern Louisiana, who were referred to locally as "Texiens." Promoters used meetings and public relations campaigns to generate support and built camps to house workers in remote locations such as Leeville and Venice. Amid tough economic times with few alternatives, many southern Louisiana residents were attracted to the petroleum industry by even the prospect of revenues and high-paying jobs. The French-speaking Cajuns had difficulty getting into the industry at first, but trappers, lumber workers, and others with knowledge of the woods, swamps, and marshes were soon hired to guide seismic crews, build roads, and carry equipment. They incorporated oil industry jobs into their diverse seasonal occupational patterns (Austin 2006a; see also Gramling 1989).

In 1937, Secretary of Interior Harold Ickes took steps to establish national control over the production of oil and gas, resulting in a congressional resolution that declared lands under the marginal seas of all the coastal states to be part of the national public domain. World War II further hastened the growth of the oil and gas industry as oil was once again recognized as critical to the war effort. Though activity in the Gulf was halted during the war, in the years immediately following petroleum development accelerated both onshore and off. By the late 1930s, oil wells were visible across southern Louisiana (Figure 3.1). Louisiana's oil and gas production peaked in the early 1970s, but the state's dependence on oil and gas for revenues, primarily from royalty payments and severance taxes, and for jobs has continued, albeit at a lower level than at the peak of production (Louisiana Public Square 2006).

The petroleum industry developed differently in Alabama. Natural gas was first discovered in northwest Alabama in the late 1880s and early 1900s, but these early discoveries received little attention and the industry had little impact until the first major oil discovery occurred in 1944. Eleven years later, the largest field east of the Mississippi River at the time was discovered in Mobile County. The industry did not move offshore, though, until more than two decades later. In 1968, Mobil Oil began investigating the potential for oil in Mobile Bay, setting off a stream of protests from environmentalists concerned about potential contamination of the bay. In 1978, with new environmental protections in place, Mobil drilled its first well in the bay and discovered the largest gas field east of the Mississippi. Offshore development prospered there and, as of 2007, had sent $2.1 billion worth of royalties to Alabama's Heritage Trust Fund, the interest from which is used to help pay for the state's education and infrastructure needs (Cockrell 2012).

The first major oil discovery in Mississippi occurred in 1939 in Yazoo County in the Delta region in the central part of the state (Hughes 1993). This was followed by numerous discoveries, and central Mississippi has remained an oil-producing region since then; by 2001, Wayne County alone had produced over three million barrels of oil and six billion cubic feet of gas (Mississippi Department of Environmental Quality 2002). Of the state's coastal counties, only Hancock has had significant oil production. In the 1970s, when the offshore petroleum industry experienced rapid growth and expansion, central Mississippi became an important source of labor and many residents in that region still work offshore (Prakash forthcoming).



Figure 3.1. Truck belonging to L.E. Daviet Lumber Co. in
Larose carrying mud and background.
Source: Dick Guidry, Offshore Oil and Gas
History Project. October 2001.

The movement of oil rigs and platforms into the Gulf of Mexico attracted the attention of both government and industry leaders. After a series of legal cases between the federal government and coastal states over ownership of offshore lands and their mineral resources, collectively known as the Tidelands cases, Congress enacted the Outer Continental Shelf Lands Act (OCSLA) in 1953. The legislation acknowledged federal ownership of lands outward from three miles off coastal states to the edge of the OCS and established policies and procedures for leasing and developing mineral resources on and below the ocean floor. Initial responsibility for regulating the fledgling development was given to two agencies within the Department of the Interior that already had experience in managing onshore oil and gas resources, the Bureau of Land Management (BLM) and the U.S. Geological Survey (USGS). As leasing activities expanded, a new agency within Interior, the Minerals Management Service (MMS), was established in 1982 to promote the exploitation of offshore resources, regulate their exploration and development, and collect revenues for the federal treasury.

The procedures for making offshore oil and gas resources available to production companies evolved over the years. The OCSLA stipulated that tracts of ocean bottom, no larger than 5,760 acres, be auctioned through competitive, sealed, bids. The legislation gave the option of some combination of cash bonuses and royalties on the extracted hydrocarbons. Following the practice of the State of Louisiana for its inshore oil leases, the federal government instituted a cash bonus/fixed royalty system. Winning bidders had, generally, five years to start drilling on their tracts, while paying an annual rental fee prior to bringing in wells. Once in production, royalties of 12.5% would kick in (Priest 2008a:95).

The initial lease sales occurred in 1954. Petroleum companies nominated tracts on the shelf they were interested in, and the Conservation Division of the USGS auctioned tracts off Louisiana and Texas, raising the royalty rate to 16.7% (roughly reflecting Louisiana's going rate) and assessing a $3 per acre rental fee. The initial sale garnered $129.5 million from 23 companies for 417,221 acres (Priest 2008a:97).

As the industry expanded into the Gulf, petroleum and oilfield service companies– including fabrication and shipyards; boat, helicopter, and trucking operations; and pipeline and wireline companies—rapidly came to dominate local economies, spreading both positive and negative impacts. Existing technologies had to be modified to be used over open water and in the path of hurricanes there (Pratt 2008). With oil prices high, the industry boomed in the 1970s, unemployment rates in the region were the lowest in the nation, and coastal state coffers filled. Under Section 8(g) of the 1978 amendments to OCSLA, the five Gulf Coast states, California, and Alaska began to receive from the federal government revenues generated from the leasing of lands within three miles of their seaward boundaries and containing one or more oil and gas pools or fields underlying both the state lands and the OCS. The state governments determined how they would spend their monies. Louisiana, for example, designated the funds be used for education.

Coupled with a national recession, the booming petroleum industry attracted people to the region. Increasingly, locals were hired as wage labor in the industry, though it was well into the 1970s before many residents were hired into supervisory positions or women and non-white residents could get offshore jobs (Austin 2006a). Offshore work was dangerous and cyclical, but workers accepted the risk in exchange for economic rewards and satisfying jobs (Austin, McGuire, and Higgins 2006). Though women across the region had actively taken part in trapping, fishing, and agricultural production for centuries, and had had significant roles in the offshore petroleum industry since World War II, they remained largely hidden in offices and clerical positions until this period when employers were forced by federal civil rights laws and guidelines to begin hiring them in offshore jobs (Austin 2006b). The relatively high-paying jobs lured young people from school and contributed to high dropout rates. A relatively permanent class of unskilled labor from urban areas, such as New Orleans, was used to fill the least desirable positions, such as tank cleaning and sandblasting, and was housed in labor camps established to serve the industry (Higgins 2005).

As exploration and production moved farther offshore, changes included the adoption of new technologies, new patterns of work scheduling (with shifts of 14 days on and 14 days off being most common), and recruitment of workers from greater distances. In the midst of the turmoil, in 1983, President Reagan's Interior Secretary introduced a significant change in leasing policy. The new "area-wide leasing", in which entire planning areas in the OCS were offered up for bid, left the existing practice of industry-initiated track nominations. The first area-wide Gulf lease sale in 1984 offered 37,867,762 acres. In 1975 the record number of acres offered in as single sale was 2,870,344 (Gramling 1996).

Despite the success of the first sale, the petroleum industry suffered a severe downturn in the mid-1980s; the Gulf of Mexico was called "the Dead Sea" by industry insiders, and cars in cities such as Lafayette and Morgan City sported bumper stickers reading, "Last one out, please turn out the lights." The industry responded to the downturn with consolidation and restructuring. Service companies of all types responded by downsizing, filing bankruptcy, and laying off workers. Employees recruited from outside the region and even many coastal residents left the region in search of jobs elsewhere. The population decline and decrease in state and local tax revenues led to other social problems (Gramling and Brabant 1984; Laska et al. 1993). States like Louisiana raised sales, corporate franchise, and gasoline taxes and lifted some exemptions for food, drugs, and utilities to make up for lost revenues, resulting in even more regressive tax structures (Richardson 1988; Davis 1988).

The industry began to rebound in the 1990s. The Deepwater Royalty Relief Act of 1995 (DWRRA), giving the Secretary of the Interior expanded authority to grant royalty relief for deepwater (more than 200 m) and shallow water deep gas wells (15,000 feet of vertical depth), was designed to spur work in these "frontier" areas, suspending royalties on variable quantities of oil and gas, depending on the depth of the wells. The Energy Policy Act of 2005 extended additional relief incentives to ultra-deep gas wells (Humphries 2008). As of 2010, of the revenues collected on the OCS, roughly half –the bonus bids to lease tracts, annual rentals until the well is producing, and royalties on the quantities of oil and gas produced–were headed directly to the U.S. Treasury. A quarter of the revenues were sent back to states along the OCS, and much of the balance was placed in the Land and Water Conservation Fund, distributed to states for land acquisition purposes (Humphries 2005). As industry activity accelerated, companies in all sectors faced labor shortages, reminiscent of the 1970s boom years, and devised strategies to attract employees. Few workers maintained loyalty to the industry, though, and many avoided it altogether, responding to ongoing cycles of layoffs, demotions, and cuts in hours and pay, along with increasing disparities between company profits and worker rewards (Austin, McGuire and Higgins 2006).

Lease Sale 206, in 2008, set a record for high bonus bids–the up-front price companies pay for the right to explore and produce–of $3,667,668,246. The royalty rate was raised to 18 ¾%, up from 16 2/3%, but all of the bids qualified for some degree of royalty relief. MMS director Randall Luthi attributed this activity to record oil prices, the potential of deepwater reserves, and the pending expiration of many inactive deepwater leases. Some $3.4 billion of the total bids were on tracts deeper than 400 m (1,312 ft). The deepest tract was at 10,092 feet (Paganie 2008). BP Exploration & Production Inc. put forward the highest number of accepted bids, 61 for $335,009,589 (MMS News Release 2008). The company labeled one of these the Macondo Prospect; it was located in *Block* 252 of Mississippi Canyon, 50 miles southeast of Venice, Louisiana, in 5,000 feet of water. Anadarko, a partner on a bid in Green Canyon that was the highest in Lease Sale 206 at $106 million, would buy a 25% interest in the Macondo effort.

BP, as the tract's operator, filed its initial exploration plan with the MMS in March, 2009. BP contracted the drilling work to Transocean, which spudded the well in October with its aging semisubmersible, *Marianas*. The rig had drilled 4,000 feet below mudline before being damaged by Hurricane Ida in November. Transocean then moved in a fifth-generation semisubmersible, built by Hyundai Heavy Industries Shipyard, Ulsan, South Korea, in 2000. *Deepwater Horizon*, designed to operate at water depths of 8,000 feet, resumed operations at Macondo in February 2010 (Cavner 2010). A series of human and technological failures led to the explosion of the rig on April 20 of that year.

## 3.2. HURRICANES

Ben McMahan

The explosion of *Deepwater Horizon* occurred in a region accustomed to disaster, but that familiarity was not uniformly beneficial in public and private response to the incident and its aftermath. Hurricanes are a seasonal reality for communities along the U.S. Gulf of Mexico, and every community must be prepared for them. This fuels the growth and development of various response capacities, especially in communities which have had repeated and recent experiences with them (McMahan 2012, 2013). The presence of the offshore oil and gas industry, along with support industries such as fabrication and shipbuilding, has led to an increased need and capacity for developing and implementing technologies that allow for continued safe operations within the hurricane region and despite the risk they pose (Pratt 2008), as well as general strategies for preparing for, and responding to, hurricanes and their aftermath (McMahan 2013). Along with the technologies that allow people to live and work in a hurricane region, weather prediction capabilities have advanced considerably. Threatening storms are identified early in their cycle, and possible paths are predicted based on probabilistic models and historical storm paths (Figure 3.2). This knowledge advances safety, but it also means that fear about possible threats, and consequences can form a prominent part of the local social landscape for most of the hurricane season as the buildup for one storm is likely to overlap with the wind-down for others. A related aspect of storms and their impact is what is termed locally, if not meteorologically, as the difference between the "clean" and "dirty" side of the storms. The counterclockwise rotation of hurricanes in the northern hemisphere means that wind speeds, rainfall levels, and storm surges are greater on the right hand or easterly side of the storm than on the left.



Figure 3.2. Cones of uncertainty associated with Hurricane Ike, 2008
Source: Ben McMahan

When a hurricane has struck, or when a storm is thought to pose a particular threat to a region, an emergency declaration may be used to release federal funding and assistance. According to the Federal Emergency Management Agency (FEMA), a disaster may be declared if a state is "immediately threatened with impact from an existing hurricane or typhoon" assuming that the state has requested such a declaration based on the requirements in 44 CFR 206.35 and that FEMA has determined three additional requirements are met:

1) The National Weather Service determines the state is threatened by landfall from a major hurricane

2) The governor has declared a state of emergency
   and

3) Mandatory evacuation orders have been issued for three or more counties/parishes (or any geographical area with a combined population of more than 100,000 residents) OR the declaration is necessary to provide federal assistance to meet emergency protection requirements before landfall that would overwhelm the capacity or capability of state resources (FEMA 2007).

Once this process is put in motion (i.e., the governor has determined that the scale of the disaster may exceed, or has exceeded, the capacity or capability of the state), FEMA determines the severity, magnitude, and impact of a disaster on which to base a recommendation to the president for supplemental disaster assistance. The primary factors in this assessment include:

- Amount and type of damage (number of homes destroyed or with major damage);
- Impact on the infrastructure of affected areas or critical facilities;
- Imminent threats to public health and safety;
- Impacts to essential government services and functions;
- Unique capability of the Federal government;
- Dispersion or concentration of damage;
- Level of insurance coverage in place for homeowners and public facilities;

70

- Assistance available from other sources (Federal, State, local, voluntary organizations);
- State and local resource commitments from previous, undeclared events; and
- Frequency of disaster events over recent time period (FEMA 2012).

Evacuations (mandatory and optional) also are frequently used to communicate the potential severity of a storm to a local population and encourage individuals to make plans for leaving in advance of landfall, which indirectly shifts the burden away from local police, ambulance, and general emergency response workers. The criteria for the implementation of evacuation orders can be somewhat nebulous, but they are typically declared on a local level, sometimes by county or parish emergency preparedness offices, sometimes by municipal or city officials, and often with the authority of the governor or the office of emergency preparedness.  The degree to which declarations are enforced varies by circumstances, but they are sometimes run in conjunction with curfews, which are enforced by local police and which promote stability within the community and prevent property crimes while residents are away en masse.

The U.S. Gulf Coast region has a long history with storms, but intensified media coverage and improved prediction technologies have drastically altered how information about storms is communicated and processed, especially with regard to the timeline associated with oncoming storms. Partly owing to the character of national media coverage and the scale of disaster that is often required to grab the public's attention, most hurricane coverage has focused their acute effects- on the immediate damages caused by hurricane force winds and storm surges. Less emphasis has been placed on the longer term and more regional environmental effects, including those directly linked to chronic environmental change, coastal erosion, and land loss (McMahan 2010, 2012b). Also, beyond the impacted region, scant attention is paid to the longer-term process of recovery which can continue for many years. Recent storms such as Katrina and Rita in 2005, and Ike and Gustav in 2008, serve as prominent examples of storms which have received considerable media attention regarding the acute and immediate effects of the storm, but which have long term social impacts that are given less attention. Social inequality, coastal landscape degradation and loss, and insurance and coastal zoning issues serve to amplify the impacts of hurricanes and their aftermath. These social effects highlight intersections among social, environmental, economic, and political factors that are unique to each particular regional context; and further emphasize that hurricanes and their impacts are not simply meteorological events, but have broad social implications as well (cf. McMahan, forthcoming). This confluence of many of these factors is not limited to hurricanes, as this report will illustrate.

As a result of these intersections, and to deal with hurricane effects that are amplified by coastal land loss, local communities engage in self-regulatory behavior in anticipation of future risks or zoning changes, often involving migration away from the coast in order to avoid the threat of storm surges or the problems of coastal land loss and wetland degradation that is exacerbated by these surges particularly in coastal Louisiana and portions of Texas. Residents and business owners choose to move for multiple reasons. Some make pragmatic decisions after homes and businesses are damaged and they rebuilding may not be justified in an at-risk area or to avoid future problems associated with living through such catastrophic damages. Other people have less of a say in the decision.  FEMA digital flood insurance rate maps (DFIRM maps) may change the zonal designation, requiring costly flood insurance prior to rebuilding; or changes to municipal, parish or county zoning designations may lead to cost prohibitive zoning regulations. In short, Gulf coast residents have been moving from some of the communities closest to the coast and most subject to storm surge impacts, coastal erosion, and land loss, and

have often settled in communities not much further out of harm's way,[2] but often communities that are larger, more centralized, and without as restrictive zoning requirements or as subject to increased insurance costs (cf. McMahan, forthcoming).

Communities also address the intersections among social, environmental, economic, and political factors through modification of the local environment through technological interventions that allow for continued existence in these at-risk environments. Changes in zoning designations, in conjunction with a recognition of the potential impact of storms, have resulted in significant infrastructural investments to protect homes (typically through elevation as new and existing homes are placed on pilings, which can run between $30,000 for a simple elevation to more than $200,000 to elevate a larger slab foundation home), transportation corridors (the elevation of LA-1 for example; see Chapter 7), and whole communities (as community levees demonstrate). Whether a household or business is migrating or remaining in place, insurance forms an integral part of the decision making process (cf. McMahan, 2012b). Beyond zoning regulations which may prohibit rebuilding a structure lost to a hurricane's storm surge or costs that may be prohibitive, maintaining insurance coverage can become increasingly difficult as the insurance pool is slimmed by people leaving and as insurers drop out or reduce coverage (Thevenot 2007).

The *Deepwater Horizon* disaster complicated fears about hurricanes.  As the spill continued, the worst case scenario became a storm entering the Gulf and threating to: (a) disrupt cleanup operations; (b) further damage oil extraction infrastructure; and with perhaps the greatest effects, (c) push spilled oil far inland as part of a storm surge.  As of time of this writing, Hurricane Isaac in 2012 had had substantial effects in Plaquemines Parish and had further complicated recovery and rebuilding efforts there, but the larger region has been spared any widespread hurricane effects similar to those seen in 2005 (Katrina and Rita) or 2008 (Gutave and Ike).

### 3.3. SOCIOECONOMIC IMPACTS OF OIL SPILLS AND OTHER TECHNOLOGICAL DISASTERS

Brian Marks

For centuries, residents of the Gulf Coast have faced natural disasters affecting where they live and how they earn a living. The industrialization of the Gulf Coast in the early 20th century compounded the hazards of river floods and tropical storms with new technological ones (Goldsteen 1992; Bea 1997; Roberts and Toffolon-Weiss 2001; Priest 2008b; Pritchard and Lacy 2011). Central to this industrialization was the nexus of oil production and transportation amid a complex of petrochemical plants. The 2010 explosion of the *Deepwater Horizon* showed a world audience how these hazards could become major disasters, but it was only one of a series of serious industrial accidents that had important socioeconomic consequences for coastal residents.

Observers have recognized for decades that modern, technologically complex and tightly linked systems are vulnerable to accidents caused by unanticipated interactions among their component parts (Perrow 1984). Such technological hazards have spurred sociopolitical efforts to regulate the uneven distribution of their associated risks (Beck 1999; Giddens 1999; Freudenburg 2000; Picou and Gill 2000). Worldwide, nuclear accidents, oil spills, chemical releases and mine collapses—disasters of modern technology, with massive impacts, and

---

2 One parish official discussed how 98% of the structures within a given parish were in the floodplain according to DFIRM maps.

implicatinginterlocking, powerful institutions–provoke fierce social contestation, legal disputes stretching out decades, and enormous difficulties assigning blame and liability, assessing harm, and providing restitution. Major technological disasters can alter public policy, reshape the limits of citizen, corporate and government power, and cost many billions of dollars.

Some social scientists argue that, in contrast to natural disasters whose character as "Acts of God" may reduce social conflict among affected parties and encourage collective, public responsibility for recovery, technological disasters tend to divide communities, corroding social cohesion through secondary harms emerging from the process of disaster response and recovery (Freudenburg 1997; Edelstein 1988; Kroll-Smith and Couch 1990; Shrivastava 1987; Couch and Kroll-Smith 1991; Baum et al. 1983; Picou and Gill 2004). Factors in post-disaster community corrosion include psychological stress and uncertainty among the potentially affected, divisions within communities about the proper course of response and the assignment of blame, and drawn-out processes of fact-finding, claiming damages, contesting scientific knowledge, litigation, settlements, and cleanup and mitigation (Picou and Gill 1996; Palinkas et al. 1993; Impact Assessment, Inc. 2001, 2010; Marshall et al. 2004; Gill 2008; Picou et al. 2009).

Past oil spills worldwide and industrial disasters in the Gulf show how response to technological hazards in the region has evolved over time and what salient elements have remained consistent in how industry, government, and affected residents have dealt with the disasters. Several case studies illustrate this evolution.

### 3.3.1. Case Studies

*The Texas City Disaster of 1947*

In 1947, Texas City, Texas, southeast of Houston, was among the new centers of petro-industrialization along the Gulf Coast; several newly-arrived industrial facilities dominated the town's landscape and its booming economy. On April 16, a ship loaded with ammonium nitrate fertilizer caught fire at the city's port, then exploded with enormous force felt 100 miles away. Hundreds were killed in the first explosion and just after as nearby refineries went up in secondary blasts. Hours later, a second fertilizer-laden ship in the harbor, set alight by the first blast, exploded too, killing many rescuers and devastating what remained of the docks and industrial zone. Five hundred eighty-one people are believed to have been killed and some 3,500-5,000 wounded, representing about 1/4 of the town's population, by the explosions which effectively destroyed 1/3 of the homes in Texas City and much of its industrial plant (MacKaye 1957; Stephens 1997; Minutaglio 2003).

The Texas City disaster also spawned years of litigation and an eventual Congressional claims process to compensate victims. Suing the federal government and numerous industrial concerns for negligence under the Federal Tort Claims Act, victims organized into a class action and won their initial case in Texas, but were overturned on appeal. The appellate court's judgment was upheld by the U.S. Supreme Court in 1953, deciding that the government could not be held liable for negligence in what the Court determined were discretionary governmental functions or duties. Following the litigation loss, in 1955 Congress voted $17 million in compensation to Texas City claimants, adjudicated by U.S. Army lawyers who eventually paid nearly 1,400 claims out of 1,755 filed (Minutaglio 2003).

*Ixtoc I Disaster of 1979*

In early June 1979, the offshore drilling rig Ixtoc I, operating in the shallow waters of the Bay of Campeche for the Mexican state-owned oil company PEMEX with a Mexican private partner and American rig operator, suffered a series of drilling mud circulation incidents. Rig owners decided to withdraw the drill string (the pipe and drill bit doing the drilling) and seal the problematic well, but on June 3rd, just as the last pipe lengths were being removed, two high pressure "kicks" caused a blowout. The large drill collar blocked the rig's blowout preventer (BOP) from sealing the well and the uncontrolled flow of gas and oil onto the rig set it afire, eventually destroying it. One hundred forty million gallons of oil flowed from the broken well on the sea floor between June 1979 and March of 1980, making Ixtoc I the world's largest oil spill at the time, as PEMEX, well control company Red Adair, and the U.S. Coast Guard attempted "junk shots" of steel balls, a "sombrero" containment dome, and two relief wells to kill the leak (Myer 1984; Jernelov and Linden 1981; Berger and Godoy 2010).

Ixtoc I oil flowed generally north and west, fouling coasts in the Mexican states of Tabasco, Veracruz and Tamaulipas and the Texas shore (Myer 1984: 15-6). In Mexico, 9,000 metric tons of chemical dispersants were sprayed on the slick and booms, and *in situ* burning and skimming operations were attempted, without much success, to contain or destroy the oil. An estimated 50% of the light crude evaporated while 25% sank to the Gulf bottom, 6% was mechanically recovered or burned, 12% degraded in the sea and 7% came ashore, 6% in Mexico and 1% in Texas (Jernelov and Linden 1981: 302-3).

The effects of the Ixtoc I spill were the subject of several ecological (Jernelov and Linden 1981; Teal and Howarth 1984; ERCO/Energy Resources 1982) and socioeconomic studies (Macdonald 1980; Myer 1984; Restrepo & Associates 1982). Claimed economic damages in Texas totaled some $400 million, inclusive of losses claimed by the tourism industry, commercial fishermen, and cleanup costs borne by the U.S. federal government and the State of Texas. Oil came ashore across broad areas of South Texas' barrier islands, harming beach tourism in places like South Padre Island. Local tourism operators claimed the harm caused by oiled beaches during their peak summer season was magnified by negative national media attention that scared away potential guests for longer than the actual situation warranted. The spill reduced tourism spending on South Padre Island by 25 to 30% in 1979 and in coastal South Texas as a whole by 8 to 10%, for a cumulative direct loss of just under $4 million and indirect losses reported in interviews to be much higher (Restrepo & Associates 1982: 75-77, 83-84). Texas commercial fisheries did not see large declines in landings or prices following Ixtoc (Restrepo & Associates 1982: 182), but area fishing closures and harm to the reputation of Gulf seafood were disruptive. Federal agencies attempted to address these problems by disseminating closure information to fishermen and implementing a seafood testing program (Myer 1984: 21). Damages in Mexico are more difficult to quantify, as few investigations were undertaken and their results were largely unpublished (Teal and Howarth 1984: 30-1; Schrope 2010). Mexican fishermen reported an oil "mousse" one foot thick clogged the shoreline and fisheries landings declined markedly in the year after the spill, and while tar mats are still found along the shore 30 years later, fisheries are reported to have generally recovered (Schrope 2010).

Months before the well was even capped, numerous lawsuits had been filed in U.S. District Court by fishermen, tourism businesses, the State of Texas, and the Federal government against the three companies involved in the Ixtoc well (Myer 1984: 27). PEMEX, the central defendant, claimed sovereign immunity as an entity of the Mexican government under the U.S.

Foreign Sovereign Immunities Act of 1976, an immunity upheld by the District court in a 1982 ruling. A year later, Sedco, the U.S.-based rig operator, offered to settle claims against the remaining defendants. The 1983 settlement paid $2 million to the U.S. government and $2.1 million to private plaintiffs (Myer 1984: 30).

*Other Gulf of Mexico Spills*

A number of other major blowouts took place on offshore drilling rigs in the Gulf of Mexico in the late 1950s and two more in 1970 and 1971 that resulted in spills, class action lawsuits, and safety fines (Priest 2008b: 142-6). Other Gulf oil spills include the *Burmah Agate* (Restrepo & Associates 1982) and *Mega Borg* (Associated Press 1990) tanker spills off Galveston in 1979 and 1990 and no fewer than 540 separate releases from shore facilities and offshore rigs during hurricanes Katrina and Rita in 2005 totaling 11 million gallons. This represented slightly more spilled oil than *Exxon Valdez* (Schleifstein 2010), although most of the oil was contained by existing berms surrounding industrial facilities and either recovered or evaporated in place (Anderson 2005). The collision of a tanker and barge in Port Arthur, Texas in January, 2010 spilled between 42,000–450,000 gallons of crude into the Sabine-Neches Waterway near the Gulf of Mexico (Gonzalez and Malik 2010).

*The Santa Barbara Oil Spill*

Outside the Gulf, large-scale oil spills have caused considerable environmental and economic damages to coastal regions and spawned numerous studies of spill socioeconomic impacts and legal precedents over compensation for those impacts. The 1969 Santa Barbara oil spill resulted from a rig blowout off the California coast that leaked 80–100,000 barrels of crude into the Pacific and onto adjoining beaches and rocky shores (Easton 1972). Images of the spill made the national public aware of the harm spills could do to scenery and wildlife, leading to tighter regulation of offshore drilling safety nationwide and initiating the process leading to the establishment of the California Coastal Commission which governs development in that state's coastal zone (Clarke and Hemphill 2002). Public cleanup costs amounted to $640,000 and direct property losses some $1.2 million; tourism in Santa Barbara declined and commercial fishermen were unable to work for months (Assaf et al. 1986: 227-31).

Lawsuits against Union Oil Company, the well's owner, sought compensation for these damages. The resulting case, *Union Oil v. Oppen,* decided by the Ninth Circuit Court in 1974, established precedent over who could claim losses for harm caused by oil spills into water. The earlier legal standard for relational economic losses from water pollution – harms not directly damaging one's property but still imposing a monetary loss, such as an oil spill hurting a hotel's business in a resort town with a public beach – came from *Robins Dry Dock & Repair Co. v. Flint* (1927), a ruling that held purely economic indirect losses without physical damage to one's property were unrecoverable in tort litigation. In *Union Oil v. Oppen* (1974), building on their earlier ruling in *Carbone v. Ursich* (1953) the Ninth Circuit generally upheld the *Robins* doctrine but made one crucial exception: commercial fishermen. The court differentiated fishermen from other claimants by arguing they possessed a special causal link between marine pollution and their economic harm despite not holding direct property rights over wild fish (Panoff 1998: 8-9; Perry 2011: 455). In the end, Union Oil paid the State of California and local governments $9.5 million for cleanup and public property damages in 1974 and in 1977 paid $7.8 million to private

claimants, most of that to owners of damaged coastal property and recreational vessels, of which $880,000 went to commercial fishermen's income losses (Assaf et al. 1986: 230; County of Santa Barbara Energy Division 2012).

*The Amoco Cadiz*

In 1978, the *Amoco Cadiz* spilled 220,000 metric tons of oil off Brittany, France (Bonnieux et al. 1980), leading to a massive cleanup operation and disruptions to the region's tourism and fishing industries. Assessments of the spill's costs varied widely depending on the methods used and what kinds of losses were included, issues that became highly contentious in the 13 years of litigation in U.S. courts that followed the disaster (Bonnieux and Rainelli 1993). Two socioeconomic damages assessment efforts, one American (NOAA 1983) and the other European (Bonnieux et al. 1980), came up with divergent results based on these methodological differences. Including non-market losses to recreation and damage to non-commercial marine life increased the total loss considerably, as did measures to account for the full cost of the cleanup and tourism losses (Grigalunas et al. 1986). Amoco's lawyers assessed tourism losses much more narrowly than the plaintiffs' and argued the French government's cleanup costs were excessive because they banned the use of chemical dispersants in shallow waters. The estimated loss period for commercial fishers and oyster cultivators and their market share of the French seafood market were also contested in court, resulting in further reductions in damages awarded (Bonnieux and Rainelli 1993: 176-85). In the eventual settlement, reached in 1992 after Amoco appealed lower court orders to the Seventh Circuit Court of Appeals, the company had to pay approximately $61 million to French claimants, $19.8 million to Shell Oil for loss of their cargo, plus an additional $148 million in interest accrued between the spill and the settlement (Maclean 1992; In re: *Amoco Cadiz* 1992), amounts French economists considered far lower than actual damages (Bonnieux and Rainelli 1993).

## 3.3.2. The *Exxon Valdez* Oil Spill

Studies of more recent oil spills in Europe and North America have contributed to understanding of the socioeconomic consequences of these disasters, such as methodologies for calculating economic damages (Grigalunas et al. 1998; Bonnieux and Rainelli 2004; Garcia Negro et al. 2009; Garza et al. 2009), the efficacy of claims processes (Loueiro et al. 2006) and spill preparedness and cleanup procedures (Kurtz 2008), affixing economic value to affected natural resources (Grigalunas and Opaluch 1993; Carson et al. 2003) and the effects of spills on the cohesion of local social networks (Omohundro 1982). Oil extraction and pollution by multinational companies in Nigeria and Ecuador has been the subject of major political conflicts and litigation lasting decades (Frynas 2000; Keefe 2012). But no oil spill before the 2010 BP disaster generated popular attention, legal ramifications, or scientific scrutiny akin to the 1989 *Exxon Valdez* tanker accident in Prince William Sound and the Gulf of Alaska

The development of Alaska's North Slope oilfields and the construction of the Trans-Alaska Pipeline brought large-scale marine transportation of crude oil to Alaska's coastal waters in the 1970s. From the Alyeska pipeline consortium's terminal at Port Valdez, tankers routinely navigated Prince William Sound *en route* to West Coast refineries. Before dawn on March 24, 1989, one of those tankers, the *Exxon Valdez*, ran aground on rocky Bligh Reef in the Sound,

breaching its hull and beginning to pour at least 10.8 million gallons of heavy crude (Ott 2005:4-7) into the sea. Before it was over, the spill had spread for 470 miles fouling shores in the Sound and along the Kenai and Alaskan Peninsulas (Ott 2005: xx; National Response Team 1989: 1, 26; Liszka 2010: 2).

In the chaotic early days of the spill response, the involved companies did not have all the equipment called for in their contingency plans to respond to a large spill. Equipment, personnel and vessels were frantically gathered, and the remaining oil onboard *Valdez* was transferred to other vessels. Within three weeks, almost 2,000 Exxon personnel, 500 federal workers, and thousands of contracted workers were responding in Alaska alongside about 1,000 boats (National Response Team 1989: 6-16; Picou et al. 1997; Exxon Valdez Trustee Council 2012). At the peak of this effort, more than 2,000 boats and 9,400 workers participated in the spill response and cleanup (Rodin et al. 1997: 196). The spill closed the herring season for commercial fishermen in the Sound. Many fishermen went to work in the cleanup, which some locals dubbed the "Money Spill" for the high wages paid by Exxon, while others criticized their neighbors for taking money from the spiller (Ott 2008: 49-55). Cleanup efforts included chemical dispersants and fertilizers sprayed from boats and the air, *in-situ* burns, booming and skimming operations, and shoreline cleaning. Shoreline cleaning often used high-pressure jets of hot water, a technique later criticized for its harmful environmental consequences (National Response Team 1989: 17-21; Alaska Department of Environmental Conservation 1993).

During the summer of 1989–the salmon fishing season–fisheries reopened in parts of the Sound but were temporarily closed again after several fishermen's nets came up fouled with crude. Following months of disagreements over the use of dispersant, fertilizer, and pressurized hot water, shoreline cleanup was scaled back in September 1989 but, in some places, the cleanup and associated controversy continued through the early 1990s (Ott 2008: 54; Alaska Department of Environmental Conservation 1993), by which time Exxon had spent more than $2 billion on the response. The cleanup was associated with the doubling of non-fishing earnings in southcentral Alaska for a few months following the spill (Cohen 1993), and with general social disruption as measured by a surge in demand for local government services, law enforcement calls, and psychological counseling (Rodin et al. 1997).

In southcentral Alaska, 1989 commercial fishing revenues were down nearly 50% under expected estimates, in 1990 around 20% below forecasts (Cohen 1999). In 1990 and 1991, good landings of salmon and herring were widely reported by Exxon as evidence of post-spill recovery, but the 1992 collapse of pink salmon landings in Prince William Sound and the 1993 collapse of the Sound's pink salmon and herring fisheries led to new demands for compensation and scientific investigation by local commercial fishermen, demands fishermen presented dramatically on August 20, 1993, through a blockade of the Sound using their vessels (Ott 2005: 275). Since the mid-1990s, salmon landings have recovered to pre-spill averages; salmon fisheries are defined by the *Exxon Valdez* Trustees as Recovered. The herring fishery, however, has never returned to its former productivity, and that fishery is defined by the Trustees as Not Recovering, with some recent research indicating the beginning of the herring collapse evident in 1993 coincided with the 1989 spill (*Exxon Valdez* Oil Spill Trustee Council 2010; Harwell and Gentile 2006; Thorne and Thomas 2008).

In an assessment of economic damages to tourism, the McDowell Group (1990) estimated 1989 losses to southcentral and southwest Alaska businesses at $19 million, with smaller but continuing effects on tourism in 1990. A report on the recreational fishing sector (Carson and Hanemann 1992) found significant losses in 1989 and 1990 in southcentral Alaska totaling $31 million.

In the years after the *Valdez* spill, the legal drama of civil and criminal charges, multiple trials, appeals, payments and denials became a principal socioeconomic effect of the disaster (Picou et al. 2004). Through 1990, the State of Alaska fought with the federal government and Exxon over the details of a settlement agreement that the State argued harmed its rights and those of private claimants. In early 1991, Alaska and the U.S. government announced a settlement for civil and criminal penalties, with Exxon paying $900 million for natural resources damages over 10 years and a criminal fine of $150 million; $125 million of the criminal fine was forgiven by the court and $100 million of the forgiven amount was transferred as criminal restitution to Alaska and the U.S. treasury, for a total of $1.025 billion in civil and criminal penalties (Piper 1999). The settlement, approved by the federal judge in December 1991, set up the Exxon Valdez Oil Spill Trustees and a timetable for restoration activities funded through the settlement.

The 1991 settlement only affected natural resources damages to publically owned resources, not the claims of private parties. Exxon's claims process for commercial fishermen and others paid out $303 million between 1989 and 1994 (Perry 2011: 457), but many of those who thought they had not been compensated sufficiently, were denied compensation, or whose claims were outside Exxon's categories of compensable damages sought redress in court. By 1992, 200+ lawsuits had been filed by dozens of law firms representing many thousands of private claimants seeking compensation for a variety of economic damages (Goldberg 1994). In 1991, Exxon began removing private claims against it from state to federal court, and had moved most cases to that venue by the time the first consolidated class action came to trial in November 1991. Using the precedent of *Robins Dry Dock*, Judge H. Russel Holland dismissed several potential classes from the consolidated lawsuit against Exxon, including seafood processors, cargo shippers, and tourism businesses (Perry 2011: 458). Commercial fishermen were also denied recovery for losses related to the value of their vessels and fishing permits, and Native Alaskans among others were denied for non-economic damages to lifestyle, culture, and lost passive use of natural resources (Hirsch 1999: 273-4; Jenkins and Kastner 1999; Jorgensen 1995; Panoff 1998; Carson et al. 2003). In 1993, attorneys for plaintiffs in the various class actions organized into a unified body and the Trans-Alaska pipeline's operator, Alyeska, settled outstanding claims separately from Exxon for $98 million (Hirsch 1999).

The class action trial against Exxon took place from May through September 1994. Phase I addressed the spill itself and Exxon's responsibility. Phase II assessed economic compensatory damages, and while the jury awarded $287 million to plaintiffs, it rejected several categories of claims, including $600 million in claimed losses to the market price of fish (Hirsch 1999: 284-5). Phase III addressed punitive damages, the jury hitting Exxon with a $5 billion punitive assessment that would be appealed all the way to the U.S. Supreme Court in 2008, 14 years after its awarding. Over this time, the award would be reduced to $4.5 billion, then to $2.5 billion, then, eventually, to the $507.5 million awarded by the Supreme Court on June 25, 2008. The Court's logic in finding for this award was based on a contemporary assessment of total economic losses due to the *Exxon Valdez* spill, paying punitive damages at a 1:1 ratio with economic losses (Perry 2011: 464; Liszka 2010). Phase IV claims, including personal injury cases, some Alaska Natives, and commercial fishermen not covered in Phase II, were settled before going to trial for just $3.5 million. Following motions by Exxon's lawyers to offset damage awards against it, the Phase II payment shrank to just $20 million in 1995 and Phase IV payments disappeared entirely (Hirsch 1999: 287).

Longer-term social science assessments of the 1989 Alaska oil spill (Picou et al. 2009) show cultural changes related to the loss of traditional natural resource harvesting activities (Dyer 1993), several years of depressed subsistence food harvests among Native Alaskans concerned about oil contamination (Field et al. 1999), and high levels of chronic stress among local residents facing an uncertain future (Palinkas et al. 1993; Gill and Picou 1998), especially among those involved in long-term litigation through the 1990s and 2000s (Picou et al. 2004; Gill 2008; Picou 2009b). The impacts of the spill on indigenous Alaskan culture became a particularly contentious point among social scientists as they were recruited into litigation over native cultural damages claims (Jorgensen 1995). Arguments that the spill had greatly harmed Alaskan Native subsistence culture (Stephen Braund & Associates 1993) were set against arguments that Native culture was already devastated by centuries of colonialism, was resilient and constantly changing, and the effects of the spill were relatively minor in historical context (Wooley 1995). Native Alaskans' cultural damages claims were dismissed in the 1994 trial which awarded $20 million to compensate for the economic value of subsistence foods lost but nothing specifically for cultural losses that Judge Holland ruled were inadmissible (Jorgensen 1995: 93; Panoff 1998). The secondary socioeconomic harms from lingering uncertainty and litigation stress following the Valdez spill led some social scientists to pursue applied research on coping mechanisms and cultural change, therapy, and alternative dispute resolution mechanisms like mediation (Picou 2000, 2009a, 2009b; Marshall et al. 2004; Gill et al. 2010).

## 3.4. LEGAL AND REGULATORY FRAMEWORK FOR RESPONDING TO OIL SPILLS

Brian Marks, Diane Austin, and Bethany Rogers

The development of coastal and offshore oilfields in south Louisiana in the 1930s and 1940s brought chronic oil releases from production and transportation. Oil spills and production-related discharges were frequent in the coastal zone in these early years (Sell and McGuire 2008) and it was not long before legal remedies were sought. For example, a serious decline in oyster populations coinciding with the expansion of coastal oil activity in the 1930s and 1940s led oyster harvesters to file multiple claims totaling nearly $40 million in damages against oil companies in Louisiana courts, alleging that produced water, a byproduct of petroleum

production, was killing the oysters. Following a legal victory for the oystermen in the Louisiana Supreme Court (Doucet *v.* Texas Company et al. 1944; Kuriloff 2005), a consortium of oil companies, Gulf Oil Corporation, Louisiana Wildlife and Fisheries Commission, and Freeport Sulphur Company each funded research programs that, in the end, concluded a new parasite and not oil or produced water was the cause of oyster mortality, causing the lawsuits to be dropped or settled for a small fraction of claimed damages (Schlesselman 1955; Ray 1996). Several large, more visible spills, however, such as those discussed in the previous section, led the federal government to establish a legal and regulatory framework for responding to oil spills.

### 3.4.1. The National Environmental Policy Act (NEPA)

In response to highly visible environmental disasters, including the Santa Barbara oil spill, the 1969 passage of the National Environmental Policy Act (NEPA) ushered in an era of U.S. federal regulation aimed at protecting the environment. Through NEPA, Congress directed all federal agencies to prepare, for any federal lands action deemed to have potentially significant environmental impacts, a detailed Environmental Impact Statement (EIS) of the adverse environmental effects of any proposed action, alternatives to that action, the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity, and irreversible and irretrievable commitments of resources involved in the implementation of the proposed action. The EIS also documents the impacts of federal agency actions on socioeconomic conditions and cultural resources. In 1978, the President's Council on Environmental Quality (CEQ), established under NEPA to oversee federal implementation of the environmental assessment process, promulgated regulations interpreting the procedural provisions of NEPA.

The purpose of NEPA, as described in the regulations, is "not to generate paperwork—even excellent paperwork—but to foster excellent action" [40 CFR 1500.1(c)]. Nevertheless, the Act's deceptively simple language has led to thousands of lawsuits and administrative decisions seeking to clarify its intent. The evolution of the EIS and the associated Social Impact Assessment (SIA) has followed a particular trajectory, due in part to its close ties to concerns about energy development, and that legacy continues to shape the those processes today (Luton and Austin n.d.).

Though offshore development in the Gulf of Mexico began decades before the passage of NEPA, the U.S. federal OCS leasing program expanded in the years afterward as potential petroleum reserves were identified off the coasts of south and central California, Alaska, and the north Atlantic. Consequently, under OCSLA, the Department of Interior initiated an environmental studies program (ESP) to "establish information needed for prediction, assessment, and management of impacts on the OCS and the nearshore area which may be affected" [43 CFR 3001.7]. When it was established, the MMS inherited the ESP and was given the responsibility for producing NEPA documents for all aspects of offshore energy development, beginning with an overarching Five-Year Leasing Program EIS and continuing through additional documents for energy lease sales, exploration, development, and production plan, (Bureau of Ocean Energy Management n.d.).

BP's development of the Macondo Well was governed by two levels of NEPA documents. According to Nancy Sutley, Chair of the CEQ, in her August 25, 2010 testimony before the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling:

[I]n April 2007, MMS prepared a broad "programmatic" EIS on the Outer Continental Shelf Oil and Gas Leasing Program, which includes the five-year lease plan for 2007-2012. Also, in April 2007, MMS prepared an EIS for the Gulf of Mexico OCS Oil and Gas Lease Sales in the Western and Central Planning Areas, the Multi-Sale; EIS. In October 2007, MMS completed another NEPA analysis, an Environmental Assessment (EA), tiered off the Multi-Sale EIS, for Central Gulf of Mexico Lease Sale 206. This is the sale in which the lease was issued for the location that includes the Macondo exploration well. After the lease was issued, BP submitted an initial Exploration Plan and a revised Exploration Plan for the proposed Macondo well in the Mississippi Canyon Block 252 of the Gulf of Mexico.  MMS approved BP's Exploration Plan following two Categorical Exclusion Reviews completed in April 2009. MMS approved BPs drilling permit applications under a Categorical Exclusion. Our report concluded that while MMS conducted numerous levels of extensive environmental reviews, its NEPA process could be improved in some areas (Sutley 2010).

Following the CEQ's review of the MMS procedures and recommendations, the reconfigured BOEM "committed to developing a new approach to NEPA compliance to improve the agency's decision-making process and provide useful, transparent information to the public about environmental impacts" (Sutley 2010). Beyond NEPA, several laws specifically address response to oil spills.

### 3.4.2. The Oil Pollution Act of 1990 (OPA 90) and Natural Resource Damage Assessment (NRDA)

Federal oil pollution laws in the United States date to the Rivers and Harbors Act of 1899, also known as the Refuse Act, and the 1924 passage of the first Oil Pollution Act. The former legislation established federal authority to regulate the dumping of solid waste, but not liquids like oil, into navigable waterways and set penalties for intentional dumping into those waterways, while the latter applied those sanctions against the intentional, but not accidental, dumping of oil from vessels (but not shore facilities) into navigable waters (Kovarik 2012; Kurtz 2004: 205; Martin 2011: 963). The 1924 law was only slightly modified by the 1961 Oil Pollution Act which ratified the 1954 international Convention for the Prevention of Pollution of the Sea by Oil to prevent ships from discharging oil into the coastal waters of foreign countries and by the Clean Water Restoration Act of 1966 which added civil law provisions against oil polluters to existing criminal law (Martin 2011: 963). The 1967 spill from the oil tanker *Torrey Canyon* off the coast of England spurred the United States to develop its National Oil and Hazardous Substances Pollution Contingency Plan (National Contingency Plan) to govern national response to oil spills and hazardous substance releases and promote overall coordination among responders. The Plan establishes a National Response Team, Regional Response Teams, and an On-Scene Coordinator to direct all federal, state, and private response activities.

Passed in the wake of the 1969 Santa Barbara oil spill, the Water Quality Improvement Act (WQIA) of 1970 (Murchison 2011: 919-20) repealed the 1924 Oil Pollution Act, set new civil and criminal penalties for oil spills, assigned limited financial liability for cleanup costs to owners and operators, exempted those limits where willful negligence could be demonstrated,

required the reporting of spills by responsible parties, and established federal planning and authority for cleanup activities. The WQIA was superseded by the 1972 Federal Water Pollution Control Act and 1977 Clean Water Act (CWA), laws that better defined what constituted an oil spill and revised civil and criminal penalties.

Other federal laws bearing centrally on oil pollution are the 1978 amendments to OCSLA and the 1980 Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The OCSLA amendments applied a strict liability regime for offshore facility owners and operators similar to that already existing for vessels (the 1970 WQIA first distinguished between vessels, offshore facilities, and shore facilities in oil spill liability) and set up a fund for offshore rig oil spill cleanup and damages costs (Martin 2011: 966; Murchison 2011: 922-5). CERCLA outlined the framework of Natural Resource Damage Assessment (NRDA), a process for assessing damages to and seeking compensation for the public for injuries to natural resources[3] (Kurtz 2004: 205-6). The NRDA also defines efforts to restore, rehabilitate, replace or acquire natural resources equivalent to those harmed.

Provisions of the CWA governing oil spill liability, response, damage assessment, and compensation were amended by the Oil Pollution Act of 1990, commonly referred to as OPA 90. The massive scale of the 1989 *Exxon Valdez* spill and the media attention it garnered drove Congress to overhaul oil spill legislation, especially after a series of additional spills in the summer of 1989 heightened public concern about oil pollution nationwide, not just in Alaska (Sump 2011: 1106-9). The inadequacy of existing law to respond to or compensate affected parties in the *Exxon Valdez* affair shaped the construction of OPA 90 (Sump 2011). Among its provisions, the act barred vessels that had spilled more than one million gallons of oil anywhere from entering Prince William Sound, the site of the disaster (Murchison 2011: 926); mandated the eventual adoption of double-hulled tankers for oil transport (Kim 2007); expanded the scope of oil spill liability; defined who responsible parties were and their responsibilities during and after spill events; framed federal, state, and tribal government roles in spill response and damage assessment; and spelled out the kinds of cleanup costs and recoverable economic damages public and private claimants could seek from responsible parties (EPA 2012a; EPA 2012b; Davis 2011; Allen 2011; Sump 2011; Murchison 2011; Martin 2011; Kurtz 2004; Kiern 2000, 2011). Both CERCLA and OPA 90 assign general responsibility for investigating and responding to contamination by hazardous substances or oil to the U.S. Coast Guard and the U.S. Environmental Protection Agency (EPA).

Under OPA 90, entities from which an oil discharge could reasonably be expected to cause "substantial harm" to the environment from a discharge to navigable waters of the United States or the adjoining shoreline have to produce Vessel and Facility Response Plans demonstrating their ability to respond to "worst-case" discharges and access necessary equipment for that response. Federal and local governments are required to develop Area Contingency Plans to deal with potential spills (Sump 2011: 1117-8; EPA 2012a, 2012b). On the basis of the National Contingency Plan (NCP) and Area Contingency Plans, OPA 90 directs the Federal government to take charge of responding to spills beyond the scope of local and state agencies alone. On-Scene Coordinators drawn from the U.S. Coast Guard and EPA direct spill response and, in a major spill designated a Spill of National Significance, are coordinated by an overall National Incident Commander. On-Scene Coordinators and the National Incident Commander work with the potentially responsible parties and local, state, and federal agencies

---

3 Both CERCLA and OPA define "natural resources" to include land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other resources.

through a Unified Command, or in spills federalized by executive order, act directly to stop and clean up the spill (OPA 90, Section 4201).

OPA 90 amended the Clean Water Act to set civil penalties for discharging oil at $25,000 per day per incident plus $1,000 per barrel, $4,300 per barrel if the responsible party is found guilty of "gross negligence" (Martin 2011: 961-967). Apart from these costs, the law limited the liability of responsible parties to the entire cost of removing the oil plus a varying amount depending on the size of the vessel or, in the case of offshore rigs, $75 million (Murchison 2011: 931). OPA 90 also created an Oil Spill Liability Trust Fund (OSLTF), consolidating existing smaller public oil spill funds and paying for it with a five-cent per barrel tax on oil. The OSLTF can spend up to $1 billion on any particular oil spill to pay for cleanup costs, cover the costs of performing natural resource damage assessments, and compensate private and public claimants for losses (Sump 2011: 1109-12). OPA 90 acknowledges three kinds of damages for which private claimants can seek compensation: damage to real or personal property; loss of subsistence use of natural resources; and the loss of profits and earning capacity. Governments can seek compensation under OPA 90 for the loss of government revenues and the increased cost of public services, and natural resource trustees–delegates from federal, state, and tribal governments who have management responsibility for the resources - can pursue compensation for damage to natural resources through the NRDA process (U.S. Coast Guard 2012; Davis 2011: 20; Murchison 2011: 929; Allen 2011).

The NRDA process proceeds in three major phases: pre-assessment; injury assessment and restoration planning; and restoration (see Table 2.1). To meet their responsibilities for restoring natural resources, trustees can: sue in court to obtain compensation for damages and the costs of assessment and restoration planning from the potentially responsible parties (PRPs); conduct assessments and restoration actions in accordance with standards specified by the Federal government and file a claim for reimbursement from the OSLTF; or participate in negotiations with PRPs to obtain PRP-financed or PRP-conducted assessments and restorations of natural resource damages. "Restoration actions are principally designed to return injured resources to baseline conditions, but may also compensate the public for the interim loss of injured resources from the onset of injury until baseline conditions are re-established" (EPA n.d.).

Table 2.1. Phases in The NRDA Process

| Phase | Action | Outcome |
| --- | --- | --- |
| Pre-Assessment | Trustees determine whether the incident of concern has caused, or is likely to cause, injury to natural resources,. | If yes, process moves to second phase. |
| Injury Assessment and Restoration Planning | Trustees assess specific types of impacts and develop plans for likely restoration projects. | Plans for restoration projects. |
| Restoration | Restoration projects are selected and implemented. | Implementation of restoration projects. |

OPA requires claimants to present their claims to the PRP or its designee for compensation before they may seek funds from the OSLTF or pursue litigation (Kiern 2000, 2011: 36-8). The 1996 amendments to OPA 90 require responsible parties to offer interim, short-term damages payments to claimants and pay interest on claims more than a month old. The

amendments also tweak some aspects of the operation of the OSLTF (Kiern 2011: 36-8; Murchison 2011: 933-6). Further federal legislation in 2002, 2004, 2005, 2006, 2008, and 2010 increased the Coast Guard's ability to access OSLTF funds during emergencies, refined liability rules for lenders to vessel and facility operators, attempted to improve the speed of compensation to commercial fishermen by offering loans through the OSLTF to affected harvesters, raised the cap on the OSLTF's reserves, and increased the rate of tax replenishing the Fund, among other provisions (Kiern 2011: 14-25).

Following the passage of the OPA 90 but before the *Deepwater Horizon* spill, U.S. government officials reported that the number and volume of oil spills fell considerably in American waters, despite increasing volumes of oil produced and transported offshore (Kiern 2011: 7-9). However, OPA 90 was criticized before the 2010 Gulf of Mexico disaster because its mandate to convert from single-hull to double-hull oil tankers paradoxically encouraged more use of single-hulled vessels in U.S. waters (Kim 2007), because its limited liability provisions would readily exceed both operators' limits and the OSLTF in the event of major spills (Kim 2010), and because of weaknesses in industry and government spill preparedness and response (Kurtz 2008) and damage compensation procedures (Kiern 2011) in post-OPA 90 spills.

The *Deepwater Horizon* spill was reported to the National Response Center, the sole federal point of contact for reporting all hazardous substances and oil spills, and NRDA teams were mobilized to begin pre-assessment. At the end of September 2010, the NRDA process moved to its second phase, and on April 21, 2011, the trustees entered into an agreement for early restoration (Deepwater Horizon Natural Resource Trustees 2011). The framework agreement stipulates that each candidate project must be negotiated with BP and an agreement reached on cost and natural resource damage offsets before any activities may proceed. A Draft Phase I Early Restoration Plan and Environmental Assessment was released in mid-December 2011 for public comment. BP and the other responsible parties can either execute this plan or provide the trustees with funding to implement the plan.

### 3.4.3. National Historic Preservation Act

The National Historic Preservation Act was passed in 1966, and amended in 1980 and 1992, to preserve historical and archaeological properties and cultural resources in the United States. In addition to the obvious historical and archaeological properties governed by the Act, one cultural resource category, Traditional Cultural Properties (TCPs), was developed by the National Park Service to identify land features or modest architectural sites that have minimal, if any, evidence of human occupation or use but that sustain the historic or cultural identity of communities (Parker and King 1998). The Act requires federal agencies to evaluate the impact of all federal actions and decisions on these properties and resources through the *Section 106* process. The 1992 amendments to the Act explicitly direct federal agencies to contact and consult with federally recognized Indian tribes in preservation-related activities and to maintain confidentiality in those proceedings. The Act, and others such as the Native American Graves Protection and Repatriation Act (NAGPRA), apply the concept of cultural affiliation, a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian Tribe and an identifiable earlier group, as the basis upon which tribes establish their authority to participate in decisions about non-reservation resources and remains. Since the early 1990s, tribes and those who work with them have moved beyond the narrow boundaries of an archaeological or historic preservation framework to incorporate the broader conception of cultural landscapes as a mechanism for capturing tribal perspectives on land and resources (e.g., Zedeño, Austin, and Stoffle 1998).

Section 106 of the Act requires that all sites located within a project area, both architectural and archeological, must be assessed before any federally-funded development project or undertaking is carried out, according to the eligibility criteria of the National Register of Historic Places. If, through Section 106 review, a site is determined to be eligible for nomination to the National Register, developers, which include federal agencies, are directed to attempt to "avoid, minimize, or mitigate" any "possible adverse effects" on the historic resource under consideration (King 2003). A 1997 programmatic agreement between the National Park Service, the Advisory Council on Historic Preservation (ACHP), and other federal agencies laid out Section 106 compliance exceptions for oil spills and hazardous substances releases under the National Oil and Hazardous Substances Pollution Contingency Plan (NCP).

Because the *Deepwater Horizon* disaster began on the federal OCS, and in light of the potential damage to historic and cultural resources along the Gulf Coast of both the oil and the cleanup activities following the spill, the Macondo well explosion was considered a federal action and triggered a Section 106 review. The review was administered by the National Park Service, the keeper of the National Register, and the State Historic Preservation Offices of Louisiana, Mississippi, Alabama, and Florida. Though "immediate rescue and salvage operations conducted to preserve life or property" are exempt from Section 106 requirements, the U.S. Coast Guard, home of the National Incident Commander, began developing cultural resources protocols to guide the identification and treatment of historic properties during the cleanup. The Section 106 review was underway by summer 2010 to identify regional historic resources that were damaged or left vulnerable by the release of oil or intensive cleanup operations (ACHP 2010; see NCPTT 2010 for publicly available maps of cultural resources in the potentially affected area).

The Section 106 review was led by a team of archeologists who generated an inventory of archeological resources, both previously recorded and newly identified archeological sites

(Austin Field notes May 30, 2011). Much of the land onto which the oil could potentially have flowed was under private ownership, and limited archaeological and cultural resource assessments had been completed prior to the spill. The inventory of archaeological resources included remains of former plantation properties, Native American mound burial grounds, and underwater sites, such as submerged historic watercraft. In order to mitigate damages to these sites already listed on or eligible for the National Register, the archeological resources were mapped and their condition was monitored by archeological teams working closely with the USCG to ensure that cleanup operations were not causing unneeded damage to the resources. A Geographic Information System (GIS) database was generated for the project to link reconnaissance and survey reports and archeological monitoring write-ups and was made available to certain participating parties through a collaborative software system.

Along with the archaeologists, a team of anthropologists generated an inventory of TCPs in the coastal communities impacted by the oil spill (Austin Field notes May 30, 2011). Potential TCPs, such as mom and pop seafood shops, sites of fishing piers, and community barrooms, which are significant components of the social and cultural life of Gulf Coast communities, were identified. As part of the review, Native Americans from federally recognized tribes in Oklahoma visited potentially affected sites in areas to which they hold cultural affiliation to share information about the sites and their connection to them. According to the terms of the programmatic agreement governing the cultural resources inventory, the raw data collected during the TCP review will be shared with the Native American tribes, coastal oil and fishing communities, and the State Historic Preservation Officers who participated in the Section 106 review process. Whether and how the architectural and cultural inventory will be shared with the public, and whether any damages to the identified TCPs will be mitigated, had not been determined when this study was being conducted.

## 3.5. REFERENCES

Advisory Council on Historic Preservation (ACHP). 2010. Question and answers: Consideration and treatment of historic properties during the response to the Deepwater Horizon oil spill. June. Available at: http://www.achp.gov/docs/OilQandA.pdf

Alaska Department of Environmental Conservation. 1993. The Exxon Valdez oil spill: Final report, State of Alaska response. Shoreline Treatment Techniques. Available at: http://www.evostc.state.ak.us/pdf/deccleanuptechniques.pdf

Allen, C. 2011. Proving natural resource damage under OPA 90: Out with the rebuttable presumption, in with APA-style judicial review? Tulane Law Review 85:1039-74.

Anderson, E. 2005. A quarter of oil spilled remains. New Orleans Times-Picayune. October 1.

Assaf, G., B. Kroetch, and S. Mathur. 1986. Nonmarket valuations of accidental oil spills – A survey of economic and legal principles. Marine Resource Economics 2(3):211-37.

Associated Press. 1990. Oil spilled in Gulf disappears. New York Times. June 28.

Austin, Diane E. 2006a. Coastal exploitation, land loss, and hurricanes: A recipe for disaster. American Anthropologist 108(4):671-691.

Austin, Diane E. 2006b. Women's work and lives in offshore oil. Research in Economic Anthropology 24:163-204.

Austin, Diane E., Thomas R. McGuire, and Rylan Higgins. 2006. Work and change in the Gulf of Mexico offshore petroleum industry. Research in Economic Anthropology 24:89-122.

Baum, A., R. Fleming, and J. Singer. 1983. Coping with victimization by technological disaster. Journal of Social Issues 39(2):117-38.

Bea, R. 1997. Human and organization errors in reliability of offshore structures. Journal of Offshore Mechanics and Arctic Engineering 119(1):46-53.

Beck, U. 1999. World risk society. Malden, MA: Blackwell.

Berger, M. and E. Godoy. 2010. Ixtoc disaster holds clues to evolution of an oil spill. IPS News Service. June 16.

Bonnieux, F., P. Daucé, and P. Rainelli. 1980. Impacts Socio-Economiques de la Marée Noire Provenant de l'Amoco Cadiz. Rennes, France: INRA (Institut national de la recherche agronomique) – UVLOE.

Bonnieux, F. and P. Rainelli. 1993. Learning from the Amoco Cadiz Oil Spill: damage valuation and the court's ruling. Organization & Environment 7(3):169-88.

Bonnieux, F., and P. Rainelli. 2004. Cost to recreation and amenities: the Erika spill perspectives. In: Prada, A., and M. Vázquez, eds. Economic, Social and Environmental Effects of the Prestige Oil Spill. Santiago de Compostela, Spain: Consello da Cultura Galega. Pp. 139–86.

Bureau of Ocean Energy Management. n.d. BOEM and the National Environmental Policy Act (NEPA). Available at: http://www.boem.gov/Environmental-Stewardship/Environmental-Assessment/NEPA/Index.aspx  Accessed April 13, 2012.

Carbone v. Ursich. 1953. 209 F.2d 178 (9th Circuit).

Carson, Richard and W. Michael Hanemann. 1992. A preliminary economic analysis of recreational fishing losses related to the Exxon Valdez oil spill. A report for the Attorney General of the State of Alaska.

Carson, Richard T., Robert C. Mitchell, Michael Hanemann, Raymond J. Kopp, Stanley Presser and Paul A. Ruud. 2003. Contingent valuation and lost passive use: Damages from the Exxon Valdez oil spill. Environmental and Resource Economics 25: 257-86.

Cavner, Bob. 2010. Disaster on the Horizon: High Stakes, High Risk, and the Story Behind the Deepwater Well Blowout. White river Junction, VT: Chelsea Green Publishing.

Clarke, K. and J. Hemphill. 2002. The Santa Barbara oil spill: A retrospective. Yearbook of the Association of Pacific Coast Geographers 64:157–62.

Cockrell, Alan. 2012. Oil and gas industry in Alabama. Encyclopedia of Alabama. Published June 16, 2008. Last updated February 20, 2012. Available at: http://www.encyclopediaofalabama.org/face/Article.jsp?id=h-1578

Cohen, Maurie J. 1993. Economic impact of an environmental accident: A time-series analysis of the Exxon Valdez oil spill in southcentral Alaska. Sociological Spectrum 13(1): 35-63.

Couch, Stephen and J. Kroll-Smith. 1991. Communities at risk: Collective responses to technological hazards. New York: Peter Lang.

County of Santa Barbara Energy Division. 2012. Blowout at Union Oil's Platform A. Available at: http://www.sbcountyplanning.org/energy/information/1969blowout.asp

Davis, Andrew B. 2011. Pure economic loss claims under the Oil Pollution Act: Combining policy and congressional intent. Columbia Journal of Law and Social Problems 45(5):1-44.

Davis, Donald W. 1988. Effects of the decline on higher institutions of learning. Ninth Annual Gulf of Mexico Information Transfer Meeting. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Deepwater Horizon Natural Resource Trustees. 2011. Framework for early restoration addressing injuries resulting from the Deepwater Horizon oil spill. Draft. Available at: http://www.restorethegulf.gov/sites/default/files/documents/pdf/framework-for-early-restoration-04212011.pdf

Doucet v. The Texas Company, et al. 1944. Supreme Court of Louisiana (205 La. 312; 17 So. Sd 340).

Dyer, Christopher. 1993. Tradition loss as secondary disaster: Long-term cultural impacts of the Exxon Valdez oil spill. Sociological Spectrum 13(1): 65-88.

Easton, R. 1972. Black tide: The Santa Barbara oil spill and its consequences. New York: Delacorte Press.

Edelstein, Michael. 1988. Contaminated communities: The social and psychological impacts of residential toxic exposure. Boulder, CO: Westview Press.

Environmental Protection Agency (EPA). n.d. Natural resource damages: A primer. Available at: http://www.epa.gov/superfund/programs/nrd/primer.htm  Accessed April 13, 2012.

Environmental Protection Agency (EPA). 2012a. Oil Pollution Act overview. Available at: http://www.epa.gov/emergencies/content/lawsregs/opaover.htm

Environmental Protection Agency (EPA). 2012b. Oil Pollution Prevention Regulation overview. Available at: http://www.epa.gov/osweroe1/content/lawsregs/opprover.htm

ERCO/Energy Resources Co. Inc. 1982. IXTOC oil spill assessment final report: Executive summary. Prepared for Bureau of Land Management Contract No. AA851-CTO-71. Cambridge, MA: ERCO/Energy Resources Company, Inc.

Exxon Valdez Oil Spill Trustee Council. 2010. Update on injured resources and services, 2010. Anchorage, AK: Exxon Valdez Oil Spill Trustee Council. Available at: http://www.evostc.state.ak.us/Universal/Documents/Publications/2010IRSUpdate. pdf

Exxon Valdez Oil Spill Trustee Council. 2012. Questions and answers. Available at: http://www.evostc.state.ak.us/facts/qanda.cfm

Federal Emergency Management Agency (FEMA). 2007. DAP-1001 – Pre-disaster emergency declaration requests. Available at: http://www.fema.gov/pdf/hazard/pre_disaster_requests.pdf

Federal Emergency Management Agency (FEMA). 2012. Declaration process fact sheet. Available at: http://www.fema.gov/media/fact_sheets/declaration_process.shtm

Field, L. Jay, James A. Fall, Thomas S. Nighswander, Nancy Peacock, and Usha Varanasi. 1999. Evaluating and communicating subsistence seafood safety in a cross-cultural context: Lessons learned from the Exxon Valdez oil spill. Pensacola, FL: Society for Environmental Toxicology and Chemistry (SETAC).

Freudenburg, William. 1997. Contamination, corrosion, and the social order: An overview. Current Sociology 45(3):19–40.

Freudenburg, William. 2000. The "risk society" reconsidered: Recreancy, the division of labor, and risk to the social fabric. In: Cohen, M.J., ed. Risk in the Modern Age: Social Theory, Science and Environmental Decision-Making. New York: St. Martin's Press.

Frynas, Jedrzej Georg. 2000. Oil in Nigeria: Conflict and litigation between oil companies and village communities. Hamburg: Lit Verlag Münster.

García Negro, M.C., S. Villasante, A. Carballo Penela, and G. Rodríguez Rodríguez. 2009. Estimating the economic impact of the Prestige oil spill on the Death coast (NW Spain) fisheries. Marine Policy 33(1): 8-23.

Garza, M., A. Prada, M. Varela, and M. Rodriguez. 2009. Indirect assessment of economic damages from the Prestige oil spill: consequences for liability and risk prevention.

Disasters 33(1): 95-109.

Giddens, A. 1999. Runaway world: How globalization is reshaping our lives. London: Profile.

Gill, Duane. 2008. Exxon Valdez oil spill litigation and community resilience. Natural Hazards Observer 33(2): 4-6.

Gill, Duane and J. Steven Picou. 1998. Technological disasters and chronic community stress. Society and Natural Resources 11: 795–815.

Gill, Duane, J. Steven Picou, and L. Ritchie. 2010. When the disaster is a crime: Legal issues and the Exxon Valdez oil spill. In: D. Harper and K. Frailing, eds. Crime and Criminal Justice in Disaster. Durham, NC: Carolina Academic Press. Pp. 61-82.

Goldberg, Victor. 1994. Recovery for loss following the Exxon "Valdez" oil spill. The Journal of Legal Studies 23(1): 1-39.

Goldsteen, J. 1992. Danger all around: Waste storage crisis on the Texas and Louisiana Gulf Coast. Austin: University of Texas Press.

Gonzalez, A. and N. Malik. 2010. Collision causes crude oil spill in Texas. Wall Street Journal. January 24.

Gramling, Robert. 1996. Oil on the edge: Offshore development, conflict, gridlock. New York: State University of New York Press.

Gramling, Robert B. 1989. Concentrated work scheduling: Enabling and constraining aspects. Sociological Perspectives 32(1):47–64.

Gramling, Robert B., and Sarah Brabant. 1984. The role of Outer Continental Shelf oil and gas activities in the growth and modification of Louisiana's coastal zone. Baton Rouge: U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Louisiana Department of Natural Resources.

Grigalunas, T., R. Anderson, G. Brown, Jr., R. Congar, N. Meade, and P. Sorensen. 1986. Estimating the cost of oil spills: lessons from the Amoco Cadiz incident. Marine Resource Economics 2(3):239–62.

Grigalunas, T., and J. Opaluch. 1993. Non-use value in natural resource damage assessments: the Nestucca oil spill. Proceedings of the 1993 International Oil Spill Conference. Washington, D.C. Pp. 689–95.

Grigalunas, T.A., J.J. Opaluch, J. Diamantides and M. Mazzotta. 1998. Liability for oil spill damages: issues, methods and examples. Coastal Management 26(2): 61–77.

Gulf of Mexico Alliance (GOMA). n.d. Your offficial gateway of the Gulf of Mexico Alliance. Available at: http://www.gulfofmexicoalliance.org/index.php  Accessed April 28, 2012.

Gulf of Mexico States Accord (GOMSA). n.d. Accord of the states of the Gulf of Mexico. Available at: http://www.gomsa.org/  Accessed April 28, 2012.

Gulf of Mexico States Partnership. 2005. Integrating the Gulf of Mexico region. Available at: http://www.gulfofmexicostatespartnership.com/about.html  Accessed April 28, 2012.

Harwell, M., and J. Gentile. 2006. Ecological significance of residual exposures and effects from the Exxon Valdez oil spill. Integrated Environmental Assessment and Management 2(3): 204-46.

Higgins, Rylan. 2005. Bodies for rent: Labor and marginality in southern Louisiana. Anthropology of Work Review 26(3):12–22.

Hirsch, William B. 1999. Justice delayed: Seven years later and no end in sight. In: Picou, J. Steven, Duane A. Gill, and Maurie J. Cohen, eds. The Exxon Valdez Disaster: Readings on a Modern Social Problem. Dubuque, IA: Kendall/Hunt. Pp. 271-308.

Hughes, Dudley J. 1993. Oil in the Deep South: A history of the oil business in Mississippi, Alabama, and Florida, 1859-1945. Jackson: University Press of Mississippi.

Humphries, Marc. 2005. Outer Continental Shelf: Debate over oil and gas leasing and revenue sharing. CRS Issue Brief for Congress, October 27, 2005

Humphries, Marc. 2008. Royalty relief for U.S. Deepwater oil and gas leases. CRS Report for Congress. September 18, 2008.

Impact Assessment, Inc. 2001. Exxon Valdez oil spill, cleanup and litigation: A collection of social impacts information and analysis, final report, Volume IV. Prepared for the Minerals Management Service. La Jolla, CA: Impact Assessment, Inc.

Impact Assessment, Inc. 2010. Social and economic assessment of major oil spill litigation settlement: Final baseline report. Prepared for Bureau of Ocean Energy Management, Regulation and Enforcement, U.S. Department of Interior, Contract No. 0103CT72619.

In re: Amoco Cadiz. 1992. In The Matter Of: Oil Spill by the Amoco Cadiz Off the Coast Of France On March 16, 1978. United States Court of Appeals for the Seventh Circuit (954 F.2d 1279).

Jenkins, Robert E. and Jill W. Kastner. 1999. Running aground in a sea of complex litigation: A case comment on the Exxon Valdez litigation. Journal of Environmental Law 18 :151-215.

Jernelov, A. and O. Linden. 1981. Ixtoc I: A case study of the world's largest oil spill. Ambio

10(6): 299-306.

Jorgensen, Joseph. 1995. Ethnicity, not culture? Obfuscating social science in the Exxon Valdez
    oil spill case. American Indian Culture and Research Journal 19(4): 1-124.

Keefe, Patrick R. 2012. Reversal of fortune. The New Yorker. January 9. Available at:
    http://www.newyorker.com/reporting/2012/01/09/120109fa_fact_keefe

Kiern, Lawrence L. 2000. Liability, compensation, and financial responsibility under the Oil
    Pollution Act of 1990: A review of the first decade. Tulane Maritime Law Journal
    24:481-590.

Kiern, Lawrence L. 2011. Liability, compensation, and financial responsibility under the Oil
    Pollution Act of 1990: A review of the second decade. Tulane Maritime Law Journal
    36:1-64.

Kim, Inho. 2007. "Milking" oil tankers: The paradoxical effect of the Oil Pollution Act of 1990.
    Natural Resources Journal 47(4):849-66.

Kim, Inho. 2010. Who bears the lion's share of a black pie of pollution costs? Ocean
    Development & International Law 41:55-76.

King, Thomas. 2003. Places that count: Traditional cultural properties in cultural resource
    management. Walnut Creek, CA: Altamira Press.

Kovarik, B. 2012. Oil pollution and the National Coast Anti-Pollution League. Available at:
    http://www.radford.edu/~wkovarik/envhist/coast.html

Kroll-Smith, J. and Stephen Couch. 1990. The real disaster is above ground: A mine fire and
    social conflict. Lexington: University Press of Kentucky.

Kuriloff, A. 2005. Justice on the half shell: Louisiana's oyster farmers get a raw deal in court.
    Available at:http://www.legalaffairs.org/issues/May-
    June2005/feature_kuriloff_mayjun05.msp

Kurtz, R. 2004. Coastal oil pollution: Spills, crisis, and policy change. Review of Policy
    Research 21(2):201-19.

Kurtz, R. 2008. Coastal oil spill preparedness and response: The Morris J. Berman incident.
    Review of Policy Research 25(5):473-86.

Laska, Shirley B., Vern K. Baxter, Ruth Seydlitz, Ralph E. Thayer, Sarah Barbant, and Craig
    J.Forsyth. 1993. Impact of offshore petroleum and production on the social institutions of
    coastal Louisiana. MMS 93–0007. New Orleans: U.S. Department of Interior, Minerals
    Management Service, Gulf of Mexico OCS Region.

Liszka, James. Lessons from the Exxon Valdez oil spill: A case study in retributive and corrective justice for harm to the environment. Ethics & the Environment 15(2):1-30.

Loueiro, Maria L. Alfonso Ribas, Edelmiro Lopez, and Elena Ojea. 2006. Estimated costs and admissable claims linked to the Prestige oil spill. Ecological Economics 59(1): 48-63.

Louisiana Public Square. 2006. Win or lose: Louisiana and the high cost of energy. January. Available at: http://beta.lpb.org/index.php/publicsquare/topic/01_06_-_win_or_lose_louisiana_and_the_high_cost_of_energy

Luton, Harry, and Diane Austin. n.d. Rethinking the assessment of social impacts of offshore petroleum development in the Gulf of Mexico. Unpublished paper.

Macdonald, W. 1980. Ixtox I: International and domestic remedies for transboundary pollution injury. Fordham Law Review 49(3):404-31.

MacKaye, Milton. 1957. Death on the water front. Saturday Evening Post. Date unknown.

Maclean, J. 1992. No appeal of Cadiz judgment. Chicago Tribune. April 25.

Marshall, B., J. Picou, and J. Schlichtmann. 2004. Technological disasters, litigation stress and the use of alternative dispute resolution mechanisms. Law and Policy 26(2):289-307.

Martin, P. 2011. The BP spill and the meaning of "Gross negligence or willful misconduct." Louisiana Law Review 71:957-1028.

McDowell Group. 1990. An assessment of the impact of the Exxon Valdez oil spill on the Alaska tourism industry - Phase I: Initial assessment August, 1990. Juneau: McDowell Group.

McMahan, Ben. 2010. Hurricanes - "Not if, but when?" - Sustainability and preparedness in the dynamic risk environment of the US Gulf Coast. Proceeding of the American Anthropological Association conference. New Orleans, LA. November 19.

McMahan, Ben. 2012. Rendered abstract: Neoliberal logics, post hurricane recovery and questions of responsibility and sustainability.  Presented at AAA meetings, San Francisco, Nov 15, 2012

McMahan, Ben. 2013. Cones of uncertainty: The nature of business in hurricane country. In: Tom McGuire, Diane Austin, and Drexel Woodson. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume III: Technical Papers. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

McMahan, Ben. Forthcoming. Shelter in place: Hurricane risk and community resilience on changing landscape of the U.S. Gulf Coast. Unpublished dissertation. University of Arizona.

McMahan, Ben and David Seibert. 2011. Dearth and deluge: Sustaining lives and livelihoods under threat. Anthropology News 52(4):8–10.

Minerals Management Service (MMS) News Release. 2008 Central Gulf of Mexico sale 206 nets $ 3.67 billion in high bids. August 4. Available at: http://www.boem.gov/BOEM-Newsroom/Press-Releases/2008/080804.aspx

Mississippi Department of Environmental Quality. 2002. Mississippi County oil and gas production index maps. Available at: http://geology.deq.ms.gov/energy/map.aspx

Minutaglio, Bill. 2003. City on fire: The explosion that devastated a Texas town and ignited a historic legal battle. New York: HarperCollins.

Murchison, K. 2011. Liability under the Oil Pollution Act: Current law and needed revisions. Louisiana Law Review 71:917-56.

Myer, P. 1984. IXTOC I: Case study of a major oil spill. University of Rhode Island Marine Affairs Program Theses and Major Papers, Paper 133. Available at: http://digitalcommons.uri.edu/ma_etds/133

National Center for Preservation Technology and Training (NCPTT). 2010. Gulf Coast cultural and natural resources. Available at: http://ncptt.nps.gov/gulf-coast-cultural-and-natural-resources/.

National Ocean Service. 2011. The Gulf of Mexico at a glance: A second glance. National Oceanic and Atmospheric Administration. Washington, DC: U.S. Department of Commerce. Available at: http://stateofthecoast.noaa.gov/NOAAs_Gulf_of_Mexico_at_a_Glance_report.pdf

National Oceanic and Atmospheric Administration (NOAA). 1983. Assessing the social costs of oil spill: the Amoco Cadiz case study. Washington, D.C.: United States Department of Commerce.

National Response Team. 1989. The EXXON VALDEZ oil spill – A report to the President. Washington, D.C.: The National Response Team.

Omohundro, John T. 1982. The Impacts of an oil spill. Human Organization 41 (1): 17-25.

Ott, Riki. 2005. Sound truth and corporate myth$: The legacy of the Exxon Valdez oil spill. Cordova, AK: Dragonfly Sisters Press.

Ott, Riki. 2008. Not one drop: Betrayal and courage in the wake of the Exxon Valdez oil spill. White River Junction, VT: Chelsea Green Publishing.

Paganie, David. 2008. OCS lease sale sets record; revenue sharing begins. Offshore. http://www.offshore-mag.com/articles/print/volume-68/issue-4/departments/gulf-of-mexico/gulf-of-mexico.html

Palinkas, L., M. Downs, J. Petterson, and J. Russell. 1993. Social, cultural, and psychological impacts of the Exxon Valdez oil spill. Human Organization 52(1):1-12.

Panoff, Christopher. 1998. In re: The Exxon Valdez Alaska Native Class v. Exxon Corp.: Cultural resources, subsistence living, and the special injury rule. Environmental Law 28:701-38.

Parker, Patricia and Thomas King. 1998. National Register Bulletin 38: Guidelines for evaluating and documenting traditional cultural properties. Washington DC: Department of the Interior National Park Service.

Perrow, Charles. 1984. Normal accidents: Living with high-risk technologies. New York: Basic Books.

Perry, Ronen. 2011. Economic loss, punitive damages, and the Exxon Valdez litigation. Georgia Law Review 45:409-87.

Picou, J. Steven. 2009a. Disaster recovery as translational applied sociology: Transforming chronic community distress. Humboldt Journal of Social Relations 32(1): 123-57.

Picou, J. Steven. 2009b. When the solution becomes the problem: The impacts of adversarial litigation on survivors of the Exxon Valdez oil spill. University of St. Thomas Law Journal 7(1): 68-88.

Picou, J. Steven, and Duane Gill. 1996. The Exxon Valdez oil spill and chronic psychological stress. In: Rice, S. et al., eds, Proceedings of the "Exxon Valdez" Oil Spill Symposium. American Fisheries Society Symposium #18. American Fisheries Society. Pp. 879-93.

Picou, J. Steven, and Duane Gill. 2000. The Exxon Valdez disaster as localized environmental catastrophe: dissimilarities to risk society theory. In: Cohen, M.J., ed. Risk in the Modern Age: Social Theory, Science and Environmental Decision-Making, New York: St. Martin's Press.

Picou, J., B. Marshall, and D. Gill. 2004. Disaster, litigation and the corrosive community. Social Forces 82(4): 1493-1522.

Picou, J., C. Formichella, B. Marshall, and C. Arata. 2009. Community impacts of the Exxon Valdez oil spill: A synthesis and elaboration of social science research. In: Braund, S. and J. Kruse, eds. Synthesis: Three Decades of Social Science Research on socioeconomic

effects related to offshore petroleum development in coastal Alaska. MMS OCS Study Number 2009-006. Anchorage, AK: Minerals Management Service, Alaska, OCS Region. Pp. 279-307.

Piper, Ernest. 1999. The Exxon Valdez oil spill: Government settlement and restoration activities. In: J. Steven Picou, Duane A. Gill, Maurie J. Cohen, eds. The Exxon Valdez Disaster: Readings on a Modern Social Problem. Dubuque, IA: Kendall/Hunt. Pp. 255-70.

Prakash, Preetam. Forthcoming. Oil and gas in central Mississippi. In: History of the Offshore Oil and Gas Industry during the Deepwater Era. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Pratt, Joseph. 2008. The brave and the foolhardy: Hurricanes and the early offshore oil industry. In: Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor, eds. History of the Offshore Oil and Gas Industry in southern Louisiana. Volume I: Papers on the Evolving Offshore Industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. Pp. 117-138.

Priest, Tyler. 2008a. Auctioning the ocean: The creation of the federal offshore leasing program, 1954-1962. In: Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor, eds. History of the Offshore Oil and Gas Industry in southern Louisiana. Volume I: Papers on the Evolving Offshore Industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. Pp. 93-116.

Priest, T. 2008b. Wake-up call: Accidents and safety provision in the Gulf of Mexico offshore industry. In: Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor, eds. History of the Offshore Oil and Gas Industry in southern Louisiana. Volume I: Papers on the Evolving Offshore Industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. Pp. 139-156.

Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor. 2008. History of the offshore oil and gas industry in southern Louisiana. Volume I: Papers on the evolving offshore industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Pritchard, D., and K. Lacy. 2011. Deepwater well complexity – The new domain. In: Deepwater Horizon Study Group, eds. The Macondo Blowout 3rd progress report. Berkeley: Center for Catastrophic Risk Management.

Ray, S. 1996. Historical perspective on Perkinsus marinus disease of oysters in the Gulf of Mexico. Journal of Shellfish Research 15(1)9-11.

Restrepo & Associates. 1982. IXTOC I oil spill economic impact study. Prepared for the Bureau of Land Management under Contract No. AA-851-CTO-65. New Orleans: Bureau of Land Management.

Richardson, James, editor. 1988. Louisiana's fiscal alternatives: Finding permanent solutions to recurring budget crises. Baton Rouge: Louisiana State University Press.

Roberts, J. and M. Toffolon-Weiss. 2001. Chronicles from the environmental justice frontline. New York: Cambridge University Press.

Robins Dry Dock & Repair Co. v. Flint. 1927. 275 U.S. 303, 309.

Rodin, Mari, Michael Downs, John Petterson, and John Russell. 1997. Community impacts of the Exxon Valdez oil spill. In: Picou, J. Steven, Duane A. Gill, Maurie J. Cohen, eds. The Exxon Valdez Disaster: Readings on a Modern Social Problem. Dubuque, IA: Kendall/Hunt. Pp. 193-210.

Schleifstein, M. 2010. Extent of oil spills from Hurricanes Katrina and Rita is still being assessed. New Orleans Times-Picayune. August 19.

Schlesselman, G. 1955. The Gulf Coast oyster industry of the United States. Geographical Review 45(4):531-41.

Schott, Timothy, Chris Landsea, Gene Hafele, Jeffrey Lorens, Arthur Taylor, Harvey Thurm, Bill Ward, Mark Willis, and Walt Zaleski. 2012. The Saffir-Simpson Hurricane Wind Scale. National Hurricane Center – NOAA. Available at: http://www.nhc.noaa.gov/pdf/sshws.pdf

Schrope, M. 2010. The lost legacy of the last great oil spill. Nature 466:304-5. Available at: http://www.nature.com/news/2010/100714/full/466304a.html

Sell, James L., and Tom McGuire. 2008. History of the offshore oil and gas industry in southern Louisiana. Volume IV: Terrebonne Parish. OCS Study MMS 2008-045. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Sheets, Robert C. 1990. The National Hurricane Center—Past, present, and future. Wea. Forecasting 5:185–232.

Shrivastava, P. 1987. Bhopal: an anatomy of a crisis. Cambridge: Harper and Row.

Simpson,Robert H. and H. Saffir. 1974. The hurricane disaster-potential scale. Weatherwise, American Meteorological Society 27(4):169.

SLOSH Model. 2012. Sea, lake and overland surges from hurricanes. Available at: http://www.nhc.noaa.gov/HAW2/english/surge/slosh.shtml

SSHWS Table. 2012. Saffir-Simpson Hurricane Wind Scale table. Available at: http://www.nhc.noaa.gov/pdf/sshws_table.pdf

Stephen R. Braund & Associates, with P.J. Usher Consulting Services. 1993. Effects of the Exxon Valdez oil spill on Alutiq culture and people. Anchorage, AK: Stephen R. Braund & Associates.

Stephens, Hugh. 1997. The Texas City disaster, 1947. Austin: University of Texas Press.

Sump, D. 2011. The Oil Pollution Act of 1990: A glance in the rearview mirror. Tulane Law Review 85:1101-19.

Sutley, Nancy. 2010. Testimony of Nancy Sutley, Chair of the White House Council on Environmental Quality, before the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling. Available at: http://www.whitehouse.gov/administration/eop/ceq/Press_Releases/August_25_2010

Teal, J. and R. Howarth. 1984. Oil spill studies: A review of ecological effects. Environmental Management 8(1):27-44.

Thevenot, Brian. 2007. Using loophole, Allstate insurance drops longtime customers. Times-Picayune. April 24.

Thorne, R., and G. Thomas. 2008. Herring and the "Exxon Valdez" oil spill: an investigation into historical data conflicts. ICES Journal of Marine Science 65: 44-50.

Union Oil Company v. Oppen. 1974. 501 F.2d 558 (9th Circuit).

U.S. Coast Guard. 2012. Oil Pollution Act of 1990 (OPA). Available at: http://www.uscg.mil/npfc/About_NPFC/opa.asp

U.S. Minerals Management Service (MMS). 2008. Central Gulf of Mexico sale 206 nets $3.67 billion in high bids. U.S. Department of the Interior, Minerals Management Sertvice, Office of Public Affairs

Wallace, Barbara, James Kirkley, Thomas R. McGuire, Diane Austin, and David Goldfield. 2001. Assessment of historical, social, and economic impacts of OCS development on Gulf Coast communities. Volume II: Narrative report. OCS Study MMS 2001-027. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Wooley, Christopher. Alutiiq culture before and after the Exxon Valdez oil spill. American Indian Culture and Research Journal 19(4): 125-53.

Zedeño, M.N., D.E. Austin, and R.W. Stoffle. 1998. Landmark and landscape: A contextual approach to the management of American Indian resources. Culture and Agriculture 19(3):123-129.

# CHAPTER FOUR: THE INTERPLAY OF MIGRATION, ETHNICITY, AND SOCIAL NETWORKS ALONG THE GULF COAST

Preetam Prakash, Brian Marks, and Diane Austin

Despite the risks and hazards associated with living along the Gulf of Mexico, its coastal counties and parishes are home to hundreds of thousands of people. The distinctive and highly varied communities that populate the contemporary Gulf Coast are the result of historical patterns of settlement and migration by a multitude of ethnic groups. Over time these groups have changed in their definition of themselves and their relations with others. They are sustained and transformed through webs of social ties, connections, and obligations related to work and livelihoods, religious and civic institutions, ethnic solidarity and racial divisions, extended family and friendships. Migration, ethnicity, and social networks do not act as discrete factors in community continuity and change, however. Rather, they interact dynamically in shaping the direction in which communities develop, reflecting the circumstances of each community within its larger regional and global context.

This section describes processes of migration that continue to shape the population of the Gulf Coast, the changing social status and residential patterns of ethnic groups in the region, and social networks, some of which are interwoven with ethnic identity and migratory flows, linking Gulf residents with common interests and practices across cities and around the world. Following this broad historical description, three prominent ethnic groups along the Gulf Coast–Native Americans, Vietnamese, and Hispanics–are discussed in more detail to illustrate how certain combinations of migratory experience, ethnic identification, and social network participation yield concrete consequences for coastal residents facing natural and technological disasters.

Migration is an expansive concept, but here it refers to international immigration to the United States and inter-regional and intra-regional relocation within the United States. Historical migrations that brought people to the Gulf Coast and shifted where they lived in the region are considered in this section, as are present-day migratory trends. This section also considers temporary labor migration to jobs within the region and outside it.

Ethnic groups can be defined numerous ways. In this report, ethnicity is understood in two: first, in the way that race and ethnicity are recorded by the U.S. Census Bureau in five broad racial/ethnic categories (White, Black or African American, American Indian and Alaska Native, Asian, and Native Hawaiian and Other Pacific Islander), as well as Hispanic or not; and, second, as defined by study participants themselves and recorded by project fieldworkers over the course of the study. The focus in this report is on groups, and attention is paid to both the racial/ethnic composition of Gulf Coast communities over time and to how group self-identification and others' descriptions of those groups have changed.

Social networks can be defined as a set of units, whether individuals or groups, that are united by a certain pattern, or patterns of interaction (Scott 2000). Social networks exist in every community and can be founded on any kind of interaction between people. This study considers social networks around the following relationships in Gulf Coast communities: employment and livelihood, family and friendship, religious and civic membership, and ethnic/racial identification.

A comprehensive assessment of migration, ethnicity, and social networks along the Gulf Coast is beyond the scope of this section and, indeed, would require its own dedicated volume. Rather, this section incorporates examples to give the reader an understanding of how these

factors in community life shape the conditions in which Gulf Coast residents live and the options available to them in responding to major events like the *Deepwater Horizon* oil spill and its aftermath.


## 4.1. MIGRATION

Preetam Prakash and Brian Marks

### 4.1.1. International Immigration

The era of French and Spanish colonialism in the 18th century saw the first significant international immigration into the Gulf Coast, principally from Europe and Africa, as colonies were established along the Gulf of Mexico and in the Lower Mississippi Valley (Powell 2012). The Trans-Atlantic slave trade forcibly brought many thousands of Africans from Senegambia, Angola, the Congo, and elsewhere to the region where they were crucial in the clearing of land, construction of infrastructure, feeding of the population, and production of exportable goods (Hall 1992; 2005). French and Spanish colonists and recruited German farmers (Yoes 2005), established Biloxi, Mobile, New Orleans and other towns. Other Europeans, too, came to the region, especially those recruited in the late 18th century by the Spanish Empire to cement its tenuous hold on the Gulf. Many Acadian refugees who were scattered around the Atlantic World following their expulsion from Atlantic Canada in 1755–1763 reunited in Louisiana between 1765 and 1785 to settle along the Mississippi, down Bayou Lafourche, and to the west of the Atchafalaya Basin. Collectively they came to be known as Cajuns (Brasseaux 1987). Canary islanders came to Louisiana in these decades, later becoming known in Saint Bernard Parish as Isleños (Din 1988; Perez 2011).

In the 19th and early 20th centuries, the Ports of New Orleans and Mobile brought tens of thousands more international immigrants to the Gulf Coast. Irish, Germans, Sicilians, Croatians, French, English, Chinese, Filipinos, and others came, finding employment dredging canals, building towns, farming, fishing, logging, operating boats and stevedoring on the docks (Campanella 2008: 167-92; Davis 2010; Boudreaux 2011; Durrenberger 1992; Vujnovich 1974). Some of these groups, like the Croatians, Chinese, Filipinos and Italians, settled along the Gulf Coast and took up oystering and fishing in lower Plaquemines and Jefferson parishes (Davis 2010: 325-55; Espina 1988). Today, people with Italian and Croatian surnames remain prominent in the commercial seafood industry of those parishes.

Among the most significant waves of international immigrants to the Gulf Coast in the late 20th century are the Southeast Asian refugees who arrived following the end of the Vietnam War (Starr 1981; Airress and Clawson 1991; Arden 1981; Bounds 2011; Durrenberger 1996: 47-68; Nash 1992; Ward and Gussow 1979; Juhasz 2011: 150-60). Vietnamese, Cambodians, and Laotians were settled in the region by government and religious institutions in the late 1970s and early 1980s and subsequently took their place in some of the Gulf Coast's prominent industries. For example, a sizeable Lao community in New Iberia, Louisiana works primarily as welders and in other shipbuilding and fabrication occupations tied to the offshore oil industry, as does a Vietnamese enclave in Amelia, just west of Houma (Austin and McGuire 2002; Marks Field notes, 2011). Cambodian, Lao, and Vietnamese ethnic communities grew up across the region in the 1980s and 1990s, adding to the ethnic mix of commercial fishing settlements like Bayou la Batre, Alabama, Biloxi, Mississippi, and Buras, Louisiana where Southeast Asian immigrants

and their children now own and operate many commercial fishing vessels and work in seafood processing plants.

Though Hispanic immigration to the central Gulf Coast dates back decades, during the 1990s and 2000s, and especially following the devastating hurricanes of 2005 and 2008, Hispanic immigrants from Mexico and Central America arrived along the Gulf Coast in significant numbers, working in the shipyard sector, seafood processing, and the post-hurricane reconstruction boom, and establishing a new presence the region's commercial landscape. Hispanic grocery stores, *taquerias*, and Spanish-language service providers appeared in strip malls alongside the Asian groceries, *phở* restaurants, and Vietnamese travel agencies that hd been established a generation before.

### 4.1.2. Inter-regional Migration

Alongside international flows of migrants to the Gulf Coast, many current residents can trace their ancestry back to migrants who came from other parts of the United States. For example, European expansion pushed the members of some Native American groups south into the bayou country of south Louisiana. Following the incorporation of the Gulf Coast states into the United States in the early 19th century, white Americans with English, Irish, and Scottish ancestry flooded into the region, as did a great many African-Americans who came through the internal lave trade from Upper South states to the expanding cotton and sugar frontier of the Deep South (Becnel 1989; Rothman 2005). In these same decades, major forced migrations of Native Americans out of the southeast to Oklahoma were perpetrated by the U.S. and state governments, leading some to seek and find refuge in the coastal wetlands.

The Gulf Coast, whose environment was generally not suitable for cotton plantations, experienced these broad processes differently than the northern parts of Alabama, Mississippi, and Louisiana. For example, the settlement of Anglo whites and enslaved African-Americans to establish plantations was not as rapid or pronounced in coastal Mississippi and Alabama. In the coastal parishes of Louisiana, on the limited areas of high ground where agriculture was possible, sugar rather than cotton was the cash crop, and the region attracted major investments in land reclamation, slaves, and sugar mills by out-of-state as well as local planters (Follett 2005).

After the Civil War and the near-collapse of the plantation economy, the Gulf Coast drew new interest from outside industrial interests seeking to develop land and to extract valuable natural resources. The harvest of cypress and pine from vast swathes of the coast quickly propped up new company sawmill towns and attracted migrant laborers from distant regions (Hahn and Schwab 1998). Most lumber towns disappeared just as quickly as the timber was exhausted, but some of the workers stayed. Railroads and canals also cut through the region, making land available to farmers from the Midwest, who created new settlements with names like Iowa, Louisiana (Post 1962; Davis 2010: 71-97). The development of seafood canneries and railway connections led to the expansion of commercial fisheries, attracting new migrants who found work hauling nets and shucking oysters. Immigrants from Central Europe and the Balkans, termed "Slavonians" and "Bohemians" at the time, moved from Baltimore to Biloxi and coastal Alabama in the late 19th century. Many followed the oyster trade with which they had become familiar in the Adriatic or Chesapeake Bay (Boudreaux 2011; Durrenberger 1992).

As noted above, perhaps the most momentous historical event affecting inter-regional migration to the Gulf Coast was the discovery and exploitation of oil and gas in the region after

1901 and the subsequent expansion of the industry to ever-deeper waters after 1938. The work opportunities available in drilling the wells; constructing vessels, facilities and refineries; fabricating parts; and laying pipelines drew to the Coast laborers from across the South. Initially, this included men from Texas, Oklahoma, and north Louisiana with experience working in established oilfields in those places (McGuire 2008; Sell and McGuire 2008; Davis 2010: 407-59). Following each new oil discovery, new waves of laborers descended on the region, often provoking cultural frictions between newcomers and natives, contributing to cultural change in the broader community, and, over time, altering the community's demographics as some workers settled permanently (see Chapter 8, this volume).

As in other parts of the South, the mid-20th century also saw a major out-migration from the Gulf Coast to the North and western United States. In this Second Great Migration, millions of southern African-Americans sought to access new industrial employment, better educational and housing opportunities and an escape from the overt racism and violence directed against them (Wilkerson 2010; Wall et al. 1997: 305, 321). It occurred in the same decades that the oil boom was drawing white workers to Gulf Coast communities. Discrimination in oilfield employment, as well as the steady decline in agricultural employment resulting from consolidation and mechanization in the plantation and sharecropping economy, also contributed to the out-migration of African-Americans from the Gulf Coast (Redher 1999; Wiegmann 1969; Hill 2004). The migration of Gulf Coast African-Americans is still evident today as in the thriving zydeco music scene in California's Bay Area, where many Louisianans migrated to work in shipbuilding and manufacturing in the 1940s (DeWitt 2008).

The Gulf Coast's oil boom, after surging with rising prices during the 1970s oil shocks, crashed in the mid-1980s following a glut of oil on the world market and steeply falling prices. Instead of drawing workers from the surrounding region as they had for a half-century, coastal communities facing high unemployment began losing residents (Pulsipher 2008). The Gulf Coast economic diaspora resulted in significant populations of Cajuns in southern cities such as Atlanta, Georgia, where Cajun clubs and music became established (Bernard 2003: 124). Hurricane Katrina in 2005 generated another wave of inter-regional migration as some displaced Gulf Coast residents were bussed and flown to cities around the country for temporary shelter and as others sought refuge with family and friends in distant states (Lewan 2005; Applebome and Blumenthal 2005).

### 4.1.3. Intra-regional Migration

Within the Gulf Coast region, communities have repeatedly relocated due to natural hazards, displacement by political and economic forces, and the attractions of better employment and improved livelihoods. Contrasting the experience of many southeast U.S. Native American tribes that were forcibly relocated from the region, many south Louisianan Native people remained in the region but moved, or were pushed, ever-southward towards the Gulf onto narrow and low-lying bayous on the physical and social margins of the region. Smallholding Cajun farmers experienced a somewhat less traumatic displacement from their initial settlements along the Mississippi and upper Bayou Lafourche. They were bought out by large plantation owners and moved out onto thinner ridges along smaller bayous in lower Lafourche and Terrebonne parishes; their communities remain today, though their residents are now primarily involved in oilfield work and commercial fisheries (Brasseaux 1992: 3-19).

Hurricanes, too, spurred movement. For example, after the 1893 and 1915 hurricanes the surviving residents of Cheniere Caminadaville, Louisiana, near Grand Isle, moved north and established new towns, remaining tied to the Gulf through fishing and oilfield work (Rogers 2003; Davis 2010: 257-272; see Chapter 8, this volume). Other major hurricanes, such as Betsy in 1965 and Camille in 1969, did enormous damage to places like Biloxi and Saint Bernard Parish, but residents did not abandon their communities there. Many who were displaced were attracted to return by good economic conditions and by the same social ties which facilitated community rebuilding (Boudreaux 2011: 91-99; Perez 2011).

Other forces acting on Gulf Coast populations were the draw of rural residents to urban areas and the selective labor recruitment of members of particular ethnic enclaves. Throughout the 20th century, as in much of rural America, the countryside of the Gulf Coast experienced out-migration to nearby towns and cities which had better facilities, more work, and what some perceived to be a higher quality of life (Kniffen and Hilliard 1988: 195). Shipyards, ports, chemical plants, and the growing beach tourism industry drew rural Mississippians and Alabamians to Biloxi, Pascagoula, and Mobile; south Louisianans moved from prairie and bayou communities to larger towns and cities for oilfield-related and other work. Rural African-American settlements in south Louisiana shrank with the dismantling of nearby sugar plantations and agricultural mechanization. Today, for example, in Terrebonne Parish, home to many former sugar operations, some rural black communities remain in place, while others, abandoned by their residents, are marked only by churches and the graveyards of their ancestors still maintained by congregants who now live in Houma or outside the parish (Marks Field notes, 2011).

As members of some ethnic groups left coastal communities following the decline of economic sectors, others were drawn in by labor demands. Most notable in this regard was the recruitment of Southeast Asian immigrants from regional cities to seafood processing plants in rural coastal communities in Louisiana, Mississippi, and Alabama. These recruits lessened plant owners' recurrent dilemma of finding enough available labor to do the repetitive, uncomfortable, low-paid and long-hours work (Durrenberger 1996; Moberg and Thomas 1993; see Section 4.5, this volume).

A surge of intra-regional migration accompanied the flooding and damage from hurricanes Katrina, Rita, Gustav and Ike in 2005 and 2008 across the affected parishes and counties of the Gulf Coast. In coastal Mississippi and Alabama, residents rebuilt further away from the beachfront, often in neighboring towns inland, and commercial businesses serving them often followed. In Saint Bernard, Plaquemines, Jefferson, Lafourche, and Terrebonne parishes in Louisiana, coastal communities lost population, too, as people moved further north and to higher ground, with many of those remaining elevating their houses above the flood line or living in mobile homes (Marks Field notes 2011; Dow 2011; Monroe 2012).

## 4.2. RACE AND ETHNICITY

Brian Marks

### 4.2.1. Racial and Ethnic Composition of Coastal Parishes and Counties

The Gulf Coast has a long and complicated history of ethnic settlement, evidenced by the above discussion of migration patterns, and this history has important implications for the ethnic makeup of the region's population today. Racial and ethnic relations were in some ways significantly different along the Gulf Coast than in other areas of the Deep South, and the ethnic and racial composition of coastal parishes and counties differs from other regions of their respective states. Table 4.1 displays the racial composition of the populations of the Gulf Coast states of Alabama, Mississippi, and Louisiana with respect to the population of the parishes and counties of Mobile, Harrison, Lafourche, Plaquemines, and Terrebonne, the political subdivisions of concern in this report's community descriptions. The table shows demographic differences between these counties and parishes and changes to their populations over time.

Table 4.1. Demographic Statistics for Selected Gulf Coast States and Counties/Parishes

| Area | Total population | % Black | % Asian | % Hispanic | % Native American | % White |
|---|---|---|---|---|---|---|
| **Alabama** | | | | | | |
| **2000** | **4,447,100** | **26.0** | **0.7** | **1.7** | **0.5** | **71.1** |
| **2010** | **4,779,736** | **26.2** | **1.1** | **3.9** | **0.6** | **68.5** |
| Mobile County: | | | | | | |
| 2000 | 399,843 | 33.4 | 1.4 | 1.2 | 0.7 | 63.1 |
| 2010 | 412,992 | 34.6 | 1.8 | 2.4 | 0.9 | 60.2 |
| **Mississippi:** | | | | | | |
| **2000** | **2,844,658** | **36.3** | **0.7** | **1.4** | **0.4** | **61.4** |
| **2010** | **2,967,297** | **37.0** | **0.9** | **2.7** | **0.5** | **59.1** |
| Harrison County: | | | | | | |
| 2000 | 189,601 | 21.1 | 2.6 | 2.6 | 0.5 | 73.2 |
| 2010 | 187,105 | 22.1 | 2.8 | 5.3 | 0.5 | 69.7 |
| **Louisiana:** | | | | | | |
| **2000** | **4,468,976** | **32.5** | **1.2** | **2.4** | **0.6** | **63.9** |
| **2010** | **4,533,372** | **32.0** | **1.5** | **4.2** | **0.7** | **62.6** |
| Lafourche Parish: | | | | | | |
| 2000 | 89,974 | 12.6 | 0.7 | 1.4 | 2.3 | 82.9 |
| 2010 | 96,318 | 13.2 | 0.7 | 3.8 | 2.8 | 79.4 |
| Plaquemines Parish: | | | | | | |
| 2000 | 26,757 | 24.0 | 2.6 | 0.6 | 2.1 | 69.8 |
| 2010 | 23,042 | 20.5 | 3.2 | 4.6 | 1.6 | 70.5 |
| Terrebonne Parish: | | | | | | |
| 2000 | 104,503 | 17.8 | 0.8 | 1.6 | 5.3 | 73.2 |
| 2010 | 111,860 | 18.9 | 1.0 | 4.0 | 5.7 | 70.3 |

Source: U.S. Census Bureau 2000; 2010

The effect of Hurricane Katrina can be seen in Harrison County and Plaquemines Parish, both hard hit by the storm and both losing population between 2000 and 2010. All other jurisdictions experienced population growth during the decade.

Population demographics vary considerably among these counties and parishes. Lafourche Parish, Louisiana, had the highest percentage of white residents in 2000 and 2010 and the lowest proportion of black residents. Terrebonne Parish had the highest proportion of Native American residents, reflecting the large Native American presence in the bayou communities of the parish. Harrison and Plaquemines had the largest percentage of Asian residents, including many commercial fishers in communities like Biloxi and Buras. Hispanic populations of all counties and parishes increased over the decade, growing especially rapidly in south Louisiana parishes. African Americans made up the largest share of the populations of Mobile and Plaquemines, remaining steady in the former but falling significantly in the latter during the 2000s, in part due to the heavy damage Plaquemines' rural black fishing communities suffered from Katrina (see Chapter 7, this volume).

Ancestry data from the Census, displayed in Table 4.2, reinforces but also complicates the racial categories recorded in the previous table. Residents of Mobile and Harrison counties reported similar ethnic ancestry to their states as a whole, primarily "American" (a category inclusive of un-hyphenated American, African American and Native American as well) and the peoples of the British Isles (i.e,. an Anglo American ancestry). The selected south Louisiana parishes are broadly reflective of the state's overall pattern, a marked cultural contrast from Mississippi and Alabama, with French and Italians more prominent than Anglos, but Lafourche, Plaquemines, and Terrebonne residents reported French and French Canadian ancestry in much higher numbers than Louisianans overall.

Table 4.2. Ancestry Statistics for Selected Gulf Coast States and Counties/Parishes

| Area | Three most common ancestries first reported by residents, 2009 | Three most common countries of birth for foreign-born residents, 2009 |
|---|---|---|
| **Alabama** | **American (24%), English (9%), Irish (8%)** | **Mexico (27%), Germany (8%), India (4.9%)** |
| Mobile County | American (19%), English (8%), Irish (7%) | Vietnam (15%), Germany (9%), Mexico (7%) |
| **Mississippi** | **American (20%), Irish (7%), English (7%)** | **Mexico (24%), Vietnam (8%), Germany (7%)** |
| Harrison County | American (15%), German (8%), Irish (8%) | Vietnam (24%), Philippines (9%), Mexico (7%) |
| **Louisiana** | **American (13%), French (12%), Italian (4%)** | **Vietnam (14%), Honduras (10%), Germany (4%)** |
| Lafourche Parish | French (25%), American (18%), French Canadian (14%) | Mexico (24%), Vietnam (8%), Peru (7%) |
| Plaquemines Parish | French (21%), American (15%), German (7%) | Vietnam (37%), Cambodia (16%), Other Eastern Europe (7%) |
| Terrebonne Parish | French (24%), American (16%), French Canadian (11%) | Mexico (19.4%), Vietnam (13.1%), India (7.1%) |

Source: U.S. Census Bureau 2009

Country of origin data from foreign-born residents show that the selected Mississippi and Alabama counties had disproportionately more Vietnamese immigrant residents and less Mexican immigrant residents than their states overall, while for the three selected Louisiana coastal parishes, Lafourche and Terrebonne, with their large offshore oil service and shipyard sectors, had more Mexican and Indian immigrants among their foreign born population while Plaquemines, with a different mix of industry and large immigrant fishing communities, had more Southeast Asians and still attracts some European immigrants, namely Croatians.

## 4.2.2. Race and Ethnicity in Gulf Coast History

In the first centuries of European settlement, the Gulf Coast's varied geography contributed to the uneven development of plantations and slavery across the region and resultant diversity in the racial composition of the population and social relations between residents. While slavery existed everywhere on the Gulf Coast before the Civil War, the unsuitability of the land for cash cropping outside of the alluvial ridges of south Louisiana meant large-scale plantations were not prevalent. Within these marginal spaces in the Deep South marked more by subsistence production and small producers than plantations, race relations in many coastal areas were less strictly defined than elsewhere in the South. While Louisiana was thoroughly embedded in the economics of slavery and the politics of white supremacy in the Antebellum period, the state was a place where free blacks and mixed-race Creoles were numerous and some worked as skilled artisans and owned land (Brasseaux, Fontenot, and Oubre 1994; Powell 2012).

The increasing adoption of Anglo-American racial ideology in Louisiana and the rest of the Gulf Coast over the 19th century, especially after the Civil War, led to increased rigidity in racial classification and violence against people of color. While French and Spanish racial hierarchies had generally presented a caste system which incorporated a multitude of racial and ethnic categories, Anglo-American perspectives were much more starkly divided between black and white. For example, under Spanish rule in Louisiana, "free people of color" were allowed to enter into the military and also possessed full rights to enter into business contracts and have recourse to courts (Brasseaux, Fontenot, and Oubre 1994; Allen and Hilton 2010; Powell 2012), rights which were gradually annulled or greatly weakened after the Louisiana Purchase and throughout the 19th century.

Following the Civil War, southern states installed and enforced legal and extra-legal codes of racial segregation and white supremacy (Lemann 2006; Packard 2002). In this regard, the Gulf Coast parishes and counties were no different. During Reconstruction in 1874, Terrebonne Parish sugar cane cutters narrowly avoided major violence in an attempted strike against the plantation owners, but 13 years later in the "Thibodaux Massacre" in neighboring Lafourche Parish, more than a hundred black strikers are believed to have been murdered in the streets of the town by a mob of strikebreakers, local white residents and hired guns (Rodrigue 2001a, Rodrigue 2001b).

In 1870, U.S. Census categories expanded from white, black, or mulatto to also include Indians, but individuals were assigned categories based on their features, so children born to the same parents were sometimes assigned to different groups (see also Powell 2004) and only in rare instances as Indian. In Terrebonne Parish, the enforcement of binary racial identification in the early 20th century not only erased Native Americans from legal existence but also kept them from receiving public education for decades. Parish education officials, insisting that there were

no Native Americans in the parish, recognizing only white and "colored" pupils, barred Native American children from white schools (see Section 4.4 and Chapter 9, this volume).

White ethnics who lived along the Gulf Coast, insofar as they represented cultural and lingustic minorities in the region, were subject to increasing discrimination in the 1920s with rising nativist and racist sentiment in the country and a drive for modernization in southern states. The Louisiana State Constitution of 1921 enforced both mandatory public education and an English-only policy in the schools, such that Cajuns, a people whose first language was French and who had heretofore lived largely in cultural isolation, were forcibly drafted into Anglophone society, their language and customs mocked, at the same time the economic revolution of oil and gas development was transforming many of their communities and introducing them to new neighbors (Bernard 2003; Henry and Bankston 2002). Economic modernization and cultural marginalization in the mid-20th century blurred many of the ethnic distinctions between Cajuns and Anglos, even as mutual cultural acculturation led to new hybrid forms of culture, from Cajun French songs played to Texas Swing rhythms and the paradoxical survival of Cajun communities through their participation in the global oil industry which made it possible for them to sustain cultural life in remote bayou communities with income earned from offshore in the Gulf of Mexico, the North Sea and the Middle East (Henry and Bankston 2002; Falgoux 2007). One Cajun man, whose father worked offshore in the North Sea oilfield and was born in the Netherlands, where he lived for much of his childhood, explained that he and his brother spoke Dutch as well as English as children and would upset their mother by speaking Dutch, which she couldn't understand, in front of her. Noting his family's return to Louisiana, he commented, "it's the people from this bayou that built the North Sea oil industry, they've built up the oilfield all around the world but they stay living right here on the bayou" (BM613b 2011).

While the white residents of the Gulf Coast had hardly been racially tolerant, the politics of the era of the Civil Rights Movement and its segregationist opposition heightened racial antagonism. Leander Perez, racist demagogue, *de facto* dictator of Plaquemines Parish, Louisiana for more than four decades, and national leader of State's Rights and segregationist causes, vaulted that tiny parish–one with a notably racially and ethnically diverse population, as described in the Plaquemines Parish community description (see Chapter 7, this volume)–to national prominence. Fueled by siphoning off profits from the parish's enormous reserves of oil, gas, and sulfur controlled by levee boards and other means, Perez zealously enforced white supremacy in Plaquemines. His influence extended to neighboring Saint Bernard, where many working class white New Orleanians, fleeing the city in the wake of school integration in the mid-1960s, relocated (Jeansonne 1995).

During the Civil Rights Movement, African Americans along the Gulf Coast devised and participated in several important demonstrations against segregation. The Biloxi Wade-Ins of 1959, 1960, and 1963, organized to protest white-only beaches along the Mississippi Gulf Coast, were notable among those initiatives (Pitt 2010; see Chapter 6, this volume). Likewise, responding to the failure of the southern states to integrate their schools, in 1963, African Americans in Mobile County, Alabama (*Birdie Mae Davis et al. v. Board of School Commissioners of Mobile County*, in the U.S. District Court, Southern District of Alabama, to end the operation of racially separate and dual schools for white and African American pupils within the county) and Native Americans in Terrebonne Parish, Louisiana (*Margie Willa Naquin, et al., v. Terrebonne Board of Education*, in the U.S. District Court, Eastern District of Louisiana, to end the public schools' discrimination against Native American students) used the courts to try to end segregation. By the 1970s, public accommodations and education were

desegregated and voting rights were secured, and racial and ethnic minorities gained new economic and political opportunities for social advancement. Employment and career advancement in the Gulf Coast's major industries like the oilfield became more accessible (Wallace et al. 2001) and minority officials were elected to public office for the first time since Reconstruction in many localities (Fairclough 1999).

Despite these advances toward racial equality, long-standing patterns of economic inequality and community vulnerability to hazards continued to correlate closely with race and ethnicity in the Gulf Coast states. Activists who came to be associated with the U.S. Environmental Justice movement strove to expose these connections as early as the 1970s and 1980s (Bullard 1988; Roberts and Toffolon-Weiss 2001).

Ethnicity also continues to shape affinities within and divisions among coastal social networks. Important aspects of ethnicity in many coastal communities include phenotype, shared language, histories of migration and settlement, employment, religious affiliation and practices. In many coastal communities there exist strong relations between ethnicity and particular work niches. There exist numerous "ethnic enclaves" weaving together shared economic activity, residence, and ethnicity along the Gulf Coast, from the Vietnamese shrimpers and small business operators of New Orleans East (Airress and Clawson 1991) to the Cajun offshore service vessel (OSV) captains and oilfield businessmen of South Lafourche (Falgoux 2007). However, such ties are oftentimes community-specific and are not necessarily consistent across the entirety, or even the majority, of the Gulf Coast, or for the whole ethnic community in one town. For example, African Americans along the Mississippi Gulf Coast participate to a very minor extent in the local commercial fishing industry. However, African American participation in the seafood industry, and in particular in small scale oystering, is very significant on the east bank of Plaquemines Parish.

In addition to the wage labor and other work which has come to performed in "enclave" settings, certain forms of business ownership, including grocery stores that feature items commonly used by specific ethnic groups, have come to be associated with particular ethnicities. For example, Hispanics from various countries and regions operate *tiendas* that generally seek to provide a broad range of culinary products and media popular throughout Mexico, Central and South America. Similarly, Vietnamese commonly operate "Oriental groceries" that offer a wide range of products common to East and Southeast Asia. Since many first generation migrants to the Gulf Coast are not highly proficient in English, "enclaves" of work and business ownership have the advantage of being able to function primarily in the proprietor's native language. Also, as stated earlier, work in industries such as commercial fishing often involves kinship groups, another example of members of particular ethnic groups working together in close proximity (Moberg and Thomas 1993).

Over the years some ethnic communities along the Gulf Coast have "formalized" their ethnic affiliations to various degrees, both regionally and locally. This has occurred through the creation of non-profit groups and participation in local festivals and events, and through forms of tourism which attempt to provide "ethnic experiences" and "authenticity." Local festivals and events which feature "ethnic performances" of various kinds as well as the expansion of a regional tourism industry based on "authenticity" have resulted in the formalization of ethnicity in different ways and on different scales, and can increase general awareness of various ethnic groups while, at the same time, limiting actual understanding of them. For example, since the 1980s, Cajun culture and identity has come increasingly to signify a subsistence fishing and trapping lifestyle that incorporates long-standing, intimate connections with the south Louisiana

wetland landscape (Bernard 2003; Wiley 2002). While historically valid, these connections are themselves relatively recent innovations in livelihood strategies related to the decline of agriculture and marginalization of poorer segments of Cajun society in the late 19th Century (Brasseaux 1992; Pitre 2003). Furthermore, this narrowed version of Cajun culture and identity can marginalize other, equally foundational aspects of Cajun history and contemporary experience. For example, Cajun participation in the offshore oil and gas industry had become, by the early 21st Century, as "traditional" a Cajun livelihood as were trapping or fishing (Gramling and Joubert 1977; Wallace et al. 2001; Austin et al. 2002; Henry and Bankston 2002; Falgoux 2007).

Race and ethnicity are tightly interwoven in Gulf Coast communities, with clear effects in the aftermath of disasters. For example, racial differentials in income and hazards vulnerability along the Gulf Coast were dramatically exposed by Hurricane Katrina in 2005 and the years of reconstruction that followed (Bullard and Wright 2009). Beyond the images broadcast from New Orleans following the storm, Native Americans living in south Louisiana rural communities were hard-pressed to rebuild due to pre-existing poverty, escalating building elevation requirements and insurance costs, and limited outside funds (Bayles 2011; Monroe 2012), especially among tribes lacking federal recognition (see Section 4.4, this volume). African-Americans and Vietnamese in coastal Mississippi witnessed casinos and shipyards rapidly rebuilt and reopened while their shattered neighborhoods were left untouched (Marks Field notes, 2011).

Community responses to the challenge of reconstruction were also marked by racial and ethnic differences, some rhetorical, others material. Time and again, Cajun, Anglo white, and Vietnamese respondents related to fieldworkers in this study a narrative of self-reliant hurricane recovery, and compared themselves, directly or more subtly, with African Americans whom they characterized as dependent on government programs and charity (Marks Field notes, 2011). In New Orleans East, Catholic Vietnamese parishioners of Mary Queen of Vietnam organized to successfully block the dumping of demolition debris in a landfill near their neighborhood (Chiang 2009). Out of that effort the Mary Queen of Vietnam Community Development Corporation (MQVN CDC) was formed, an organization that became an important resource for Vietnamese and other commercial fishermen who were living in the region following the BP oil spill. Political leaders in nearby in Saint Bernard, fearing an influx of African Americans from neighboring New Orleans into what had been a majority-white parish prior to the storm, mobilized public opposition to the construction of multi-family subsidized housing in the parish (New York Times 2011; Alexander-Bloch 2012).

The MQVN CDC is only one of a number of non-profit groups along the Gulf Coast who advocate for, and serve, the needs of particular ethnic communities. In some cases, the influence of such groups on local and regional decision making has become more pronounced since Hurricane Katrina. That hurricane and its aftermath resulted in a situation where non-profits focused on ethnic disparities in living conditions attempted to address the structural inequalities of various kinds and, on occasion, this helped some but put members of other ethnic minority groups at a marked disadvantage with respect to post-hurricane assistance and recovery. At times, such advocacy work resulted in growing lines of solidarity among ethnic group members in different areas of the Gulf, and sometimes, across ethnic communities. At times, it also resulted in a greater formalization of ethnic identity, in the sense of particular ethnic characteristics or attributes that came to be consistently presented to both ethnic group members and the broader public as being significant to that group's identity. The following section takes a closer look at the intersection of ethnicity and social networks.

## 4.3. SOCIAL NETWORKS

Preetam Prakash

Social networks are critical to life and work in the Gulf Coast region. This section focuses on how these networks influence the aspects of working and living the most affected residents in the wake of the *Deepwater Horizon* disaster.

### 4.3.1. Employment and livelihood

While much of the United States has transitioned to largely service-based economies and jobs, the Gulf Coast states retain a higher proportion of jobs in natural resources, construction and maintenance, and production (U.S. Census Bureau 2012). Employment in regional industries, such as oil and gas and fishing, has historically been characterized by a high degree of reliance on interpersonal, local social networks. For example, new employees in the oil and gas industry, in coastal shipyards and fabrication shops, and in the seafood industry have been and continue to be recruited through social networks based on family relationships, ethnic ties, and place of origin. Prior to the formalization of hiring practices that followed the passage of the Civil Rights Act of 1964, and especially the granting of litigation enforcement authority to the Equal Employment Opportunities Commission in 1972, key personnel within the petroleum industry, such as drillers and toolpushers, commonly exercised considerable control over the hiring and promotion of their crews. Crews were often composed on the basis of kinship, friendship, and shared hometown. While this practice persists in many of the smaller contractors involved in the industry, a series of lawsuits (cf. Roberts 1998), followed by major industry mergers and acquisitions in the 1990s and subsequent industry reorganization, ensured the formalization and centralization of hiring and promotions. Especially with respect to the major energy companies, human resources departments, commonly based in Houston, exercise considerable control over these processes. Nevertheless, informal social networks still play an important role in oil and gas industry employment, and personal recommendations by current industry workers often carry considerable weight.

Similarly, in the Gulf Coast's shipbuilding and fabrication industry, considerable differences exist with respect to the importance of informal social networks in obtaining training, employment, and promotions (McGuire, Austin, and Woodson 2013). In general, larger shipyards have formal hiring and promotion processes controlled by human resources departments, as well as formal training programs. On the other hand, in many of the smaller shipyards and fabrication shops which still dot areas of the Gulf Coast, training is still acquired on the job, and the recruitment of workers often depends on kinship networks, or the recommendations of current employees.  Though the number of young people seeking to enter this industry has declined as other options have opened up, many who work in Gulf Coast shipyards and fabrication shops of various sizes obtained their basic skills in welding and other crafts from older family members while still relatively young.

Employment in many facets of the commercial seafood industry is still largely based on informal social networks as well, often constituted along family and ethnic lines. Knowledge of fishing and fishing grounds is commonly passed down or exchanged within kinship groups and

circles of friendship. Fishing vessels, fishing equipment, and oyster leases all frequently are shared among family members or exchanged and sold among friends and acquaintances. While fishermen generally are not obligated to sell their catch at any particular location, many regularly unload at certain docks and processors out of familiarity and reciprocal flexibility over prices, credit, and marketing arrangements based on close relationships varying from mutual loyalty to economic dependence (Maril 1983; Durrenberger 1994; Pawlyk and Roberts 1986; Marks 2012).

As with work on fishing vessels, work in seafood processing plants and unloading docks is often structured by social networks based on ethnicity and family groups. Workers are often recruited by kinship groups and in many plants it is not uncommon to find multiple generations of a single family, or members of single ethnic group, working at one time (Juhasz 2011: 150-60). Seafood plant workers often maintain loose, continuing relationships with a number of local plant owners, since the seasonal and fluctuating nature of the work may result in their moving from plant to plant.

Networks among fishers and seafood processors are also important factors in the success of both. Seafood processors along the Gulf Coast, especially those outside of Louisiana, commonly draw a substantial amount of their product from outside of the local area in which they are based. For example, the total volume of seafood harvested by fishermen operating in the area around Bayou la Batre, Alabama, is relatively small. However, Bayou la Batre is one of the largest seafood processing centers along the Gulf Coast, and many of the medium and larger size processors there draw most of their seafood from Louisiana and Mississippi. This is also the case along the Mississippi Gulf Coast as well as in some areas in Louisiana, like Delcambre, which is home to many shrimp processors but few shrimpers (Marks Field notes, 2011). Processors in these coastal communities have established long-standing relationships with fishermen, unloading docks, other plants, and customers in order to maintain sufficient supply despite uncertain catches and steady demand despite market shifts. Furthermore, some large crab, fish, and shrimp processors also buy product from other regions of the world, although most explain they only handle imports during serious shortages of local raw material during off-seasons when their plants would otherwise be idle. Gulf Coast processors also establish intricate networks of customers to whom they sell product. These networks very commonly extend outside of the Gulf region, and their nature is dependent on the specific fishing sector in question and the interpersonal relations between that seller and their buyers based on product reputation built over time (Marks Field notes, 2011).

In many cases, there is substantial crossover among workers in commercial fishing, oil and gas, shipbuilding, and other industries along the Gulf Coast. While links between commercial fishing and oil and gas appear incongruent to many non-locals, commercial fishermen have a long history of participation in the oil and gas industry throughout the Gulf. Such connections are perhaps most pronounced in south Louisiana where commercial fishermen very commonly work in petroleum industry-related jobs when their vessels are at the dock, only to return to fishing when the next season opens. While less widespread, a number of commercial fishermen in Gulf Coast Mississippi and Alabama have also worked in the oil and gas industry over the years, frequently as OSV captains. Such movement between industries continues to this day, though changes in the nature and duration of oil and gas employment have restricted movement in some sectors (Austin Field notes, 2011).

The tourism industry also has a long history along the Gulf Coast. In areas such as Baldwin County, Alabama and Harrison County, Mississippi the industry has undergone considerable changes since the 1970s and the entrance of large corporate businesses into the

tourism market. Among the most dramatic examples of such change is found in Biloxi-Gulfport, Mississippi, where, since the early 1990s, the gaming industry has come to play a huge role in the local economy and nationally franchised hotels and casinos dominate much of the beachfront. Significant numbers of managers and workers at such businesses are non-locals and hiring is generally formally conducted through human resources departments, which has reduced the importance of local, more informal social networks. However, other important coastal tourism sub-sectors, such as charter fishing and ecotourism operations, continue to revolve mostly around independent operators and the social networks that they build up over the years. In coastal Mississippi and Alabama, most boat owners and workers in the charter fishing industry live in or very close to the communities out of which they operate. In Louisiana, the situation is sometimes different with many charter boat captains who operate out of the southern parishes residing in the New Orleans area. Still, in all of these areas, charter fishing is an industry which still mostly depends on the personal networks of clients which charter fishermen establish over the years.

Elsewhere in the United States, such as the "Rust Belt," labor unions have served as an important vehicle for social networking. Gulf Coast employers, however, and those in the offshore petroleum industry in particular, have worked actively to block organizing attempts (Austin et al. 2002). There are a few exceptions, for example Huntington Industries in Pascagoula, Mississippi, and the longshoremen in Gulfport, Mississippi, where the unions do play a role in social networking. Petroleum industry employers do participate in numerous industry associations, such as the National Ocean Industries Association and the Association for Diving Contractors, and those help establish and strengthen social networks among owners. A number of fishermen's associations exist along the coast, and they play a role in connecting and informing their members. Likewise, large national associations, to which many of the seafood plant owners along the coast belong, unite seafood processors.

Social networking in the Gulf Coast region can be challenging, due both to geography and the cyclical or seasonal nature of the primary industries (see also Volume II). Workers are often spread over land and water, and must be highly mobile, across both space and often employers, in order to maintain their livelihoods. It is not uncommon for shipyard welders to travel throughout the Gulf Coast, and sometimes beyond, working on various projects. Similarly, offshore captains commonly travel away from home, increasingly to overseas destinations. Commercial fishermen, especially those who own larger "offshore" vessels, regularly travel across much of the Gulf Coast and sometimes beyond. Many shrimpers will travel to various parts of the Gulf for different season openings, and will sometimes range as far as the East Coast when landings in the Gulf are low. As mentioned above, processing plant workers are also frequently mobile, although generally on a less geographically extensive level.

Such patterns of movement and migration can make it difficult for individuals to create and sustain social networks. Nevertheless, because workers frequently travel among Gulf Coast employers or venture into different industries and forms of manufacturing, but then often circle back to previous places of employment, they form and can later rely on their networks to find out where and when jobs are available. These networks frequently link occupation and ethnicity. For example, fishermen and oilfield workers in one Gulf Coast community develop acquaintances or friendships with peers in distant areas due to repeat fishing trips made over the years in response to seasonal patterns or to working together on rigs and platforms in the region and beyond. Members of some ethnic groups, perhaps especially more recent arrivals such as Southeast Asians and Hispanics, are often connected to ethnic social networks which stretch across

significant portions of the region. Some migrate temporarily to other areas of the Gulf for religious holidays or other important cultural occasions, or to work.

All the major industries of the Gulf region rely on low-paid, unskilled workers, and employers have historically recruited members of ethnic minorities, including recent immigrants, to fill those positions (see community descriptions and Volume II). Recently, to address labor shortages in even higher skilled position, employers in the tourism, retail, and shipbuilding industries have employed guestworkers, primarily on H-2B visas, in relatively high numbers. For some employers, these workers have come to constitute the majority of the workforce. To address the high levels of turnover accompanying the use of temporary workers, employers have sought to bring in the same workers year after year, thus creating long term employer-worker relationships (Austin and Crosthwait 2013).

## 4.3.2. Other Livelihood Strategies and Social Supports

Across the study area, and particularly among the various ethnic groups that dominate this region, extended kinship groups form the basis for household organization. It is not uncommon for multiple generations to share a single home, and social networks stemming from family relationships continue to have significant bearing on the various forms of work performed along the coast. These kinship networks are also relevant to the acquisition of food and other necessary material goods and services.

The cyclical and seasonal nature of the major industries of the Gulf Coast region, along with the abundance of potential food resources, have fostered a strong reliance on fishing and hunting and the bartering of seafood, meat, and homegrown fruits and vegetables to meet household food needs. These practices reveal another important dimension along which social networks along the Gulf Coast are constituted. Unlike many other areas in the United States, fishing and hunting to meet household food needs and for bartering is widespread throughout the region, particularly in south Louisiana, and not just among commercial fishermen. These activities are often carried out in groups, and the distribution of meat and seafood shapes and reinforces certain networks. Most commonly, game and seafood is dispensed among members of fishing or hunting parties, and among immediate and extended family members. These networks often extend to friends and casual acquaintances, where the products are traded for carpentry work or babysitting services.

Game and seafood also play important roles in many social occasions and events along the coast. For example, seafood boils provide a very common locus for community gatherings. Locally fished and hunted seafood and game also very frequently are important in more formal social occasions, for instance during religious holidays and local festivals. In some coastal communities such as New Orleans East, subsistence activities and their proceeds constitute a highly significant part of the local economy, with seafood often being exchanged for a range of commodities, such as gasoline, packaged food, and other services (United Vietnamese American Fisherfolks of Louisiana 2010).

Religion and religious institutions play a significant role in the creation and perpetuation of social networks along the Gulf Coast as well, and a diverse array of these institutions is found along the Coast, reflecting the region's lengthy and complicated history of migration and ethnic settlement. Catholicism has long historical roots in the region. Catholics were the first Christian denomination to become established in the region, and new waves of European immigration and

migration from the eastern United States brought a multitude of Protestant churches, particularly in the wake of the oil and gas industry (Austin et al. 2002). Religious affiliation at times has strengthened solidarity and collective action among adherents, as in the Civil Rights movement when African-American churches took a particularly active role in fostering social change. It has also served to divide communities around denominational differences which often overlap with ethnic identity and regional and national origins. Religious institutions have fostered the entry of new ethnic groups to the Gulf Coast, as when the Catholic Church sponsored many Southeast Asian immigrants in the 1970s and 1980s, helping to create new communities and congregations in the region. Actions like the sponsorship of migrants also brought about tensions among parishioners, such as Catholics who resented what they thought was favoritism towards Asian immigrants by the church receiving assistance in starting businesses (Marks Field notes, 2011).

The following four sections highlight the particular experiences of the three ethnic groups identified above in order to illustrate how the complex intersection of history, legal and political status, and social integration affect how members of those groups were situated to experience the *Deepwater Horizon* disaster.


## 4.4. NATIVE AMERICANS

Diane Austin

Though prehistoric evidence places humans within the study areas as early as 14,000 years ago, this section will address Native American[4] presence and migration from the historic period to the present, focusing on the 1940s onward. When Europeans first arrived in the southeastern United States, they found numerous groups of Native Americans living there (see Figure 4.1 for a 1967 depiction of the groups and their territories at contact).

Even before direct contact, the advancing spread of European diseases caused widespread illness and death within Native populations that had not previously been exposed. As the European and later Euroamerican settlers advanced into the region and claimed it as their own, they killed and displaced tens of thousands of Native Americans, with many of the survivors fleeing into more remote regions. During the late 1700s, for example, the Houma Indians migrated south, away from advancing settlers and, then, along the bayous of southern Louisiana. After the United States was established, the U.S. government developed various policies to ensure that its citizens would prevail (see Canby 1981 for review). Notably for this region, in 1830 President Andrew Jackson promoted and signed the Indian Removal Act, forcing Creek, Choctaw, Cherokee, and other groups from their homelands in Georgia, Alabama, Mississippi, and Florida and moving them west of the Mississippi River to what is now Oklahoma (cf. Remini 2001). During this period, too, as large numbers of Native American groups were relocated, some individuals and families remained hidden in remote areas and retained their identities as communities.

Indian removal failed to resolve conflicts between advancing white settlers and Native people, so the U.S. government began establishing reservations for tribes and groups of tribes. Later, as competition for Indian land accelerated and with the intent of assimilating Native people

---

4 The people whose tribes are indigenous to the United States are referred to in this report as Native Americans, American Indians, and Indians. The term Indian is inaccurate but has been used in this report because it is used in federal policies and other writing on native peoples and also is the one many natives use when talking about themselves.

into the larger U.S. society, the federal government dispossessed many reservation tribes of their lands; from 1887 to 1934, land controlled by Native Americans was reduced from 138 to 48 million acres. Then, with the Indian Reorganization Act of 1934 and in recognition that Indian people should be allowed to exist in their own communities, the federal government set out to help tribes that it had formally recognized to establish their own governments, laws, and policies modeled after the U.S. Constitution. These governments are referred to as IRA governments after the Act that established them. During the 1950s, the federal government reversed itself again and terminated a number of small tribes and, by the late-1960s, shifted the thrust of Indian policy again, this time aiming to support Indian self-determination with new laws passed to address Indian education, healthcare, and housing. For example, the Indian Education Act (today referred to as Title VII of the Elementary and Secondary Education Act) was passed in 1972 and provides for educational services to American Indians and Alaska Natives, whether or not those individuals are members of federally recognized tribes. As early as the 1950s, but especially in the past several decades, recognizing the limitations of IRA governments, many U.S. tribes began to rewrite their constitutions, seeking to adopt structures more aligned with their traditional forms of governance and better equipped to deal with the complexities of modern society (see, for example, American Indian Study Center n.d.).



Figure 4.1. Early Indian tribes, culture areas, and linguistic stocks,
        William C. Sturtevant, Smithsonian Institution 1967
        Source: Gerlach 1970

116

Indian tribes have achieved federal recognition status through treaties, acts of Congress, presidential executive orders and other federal administrative actions, and through federal court decisions. As tribes began to assert their rights in the era of self-determination, and many Indian communities sought status as tribes, the U.S. government moved to develop more consistent standards for federal recognition. In 1978, the Bureau of Indian Affairs published final rules establishing the seven criteria that any future groups had to meet to secure federal tribal acknowledgment. In 1994, Congress enacted the Federally Recognized Indian Tribe List Act (108 Stat. 4791, 4792), which formally established that an Indian group may become federally recognized either by an Act of Congress, the administrative procedures under the 1978 rules, or a decision of a U.S. court (Bureau of Indian Affairs 2012).

As of 2010, there were 565 federally recognized tribes in the United States. Many of these tribes have lands which are legally reserved for them under a treaty or other agreement with the United States, or executive order, federal statute or other administrative action. Due to earlier Indian removals, these lands are often distant from where tribe originated. The title to these lands is held in trust on behalf of the tribe by the federal government, and they are considered permanent tribal homelands.

The early arrival of Europeans in the southeastern region, the harsh Indian removal policies enforced there, and the failure to distinguish American Indians living there from the general population, for example, in U.S. Censuses prior to 1900 (National Archives n.d.), all contributed to the destruction of the region's Native American populations and to the challenges the remaining groups have faced in documenting their histories. There are only six federally recognized tribes in Louisiana, Mississippi, or Alabama. The Chitimacha sued the federal government in the mid 1800's and won confirmation of title to 1,062 acres of their land, though that was reduced to 260 acres in subsequent years by taxation and continued litigation (Sovereign Nation of the Chitimacha 2005). Still, the tribe was not recognized until 1917. The U.S. government extended services to the Coushatta and Jena Choctaw people in the 1930s, but, in 1953, discontinued services to both communities and proposed termination legislation for the entire state (Precht 2010). Though the legislation was not passed, the services to the Coushatta and Jena Choctaw communities were not restored. In 1945, the Mississippi Band of Choctaw Indians received federal recognition; the U.S. government holds in trust for the Choctaw over 35,000 acres in 10 counties in central Mississippi (Mississippi Band of Choctaw Indians n.d.). Federal recognition came decades later for Coushatta Tribe (1973) and the Jena Band of Choctaws (1980). Then, in 1981, the Tunica-Biloxi of Louisiana were recognized, followed in 1984 by the Poarch Band of Creek Indians in Alabama. None of these six tribes have reservations within the study area, though four are located nearby (see Figure 4.2).



Figure 4.2. Indian reservations near the study areas.
Source: Natonal Park Service n.d.

Several other tribes have been recognized by their state governments, a process that generally entails action by the state legislature and is unrelated to federal recognition. Three state-recognized tribes reside within the study areas and will be discussed here; all have petitioned for federal acknowledgment. The Indian identity of their members has been acknowledged at both the state and federal levels, but their status as tribes has been questioned, primarily due to the ongoing incorporation of members of different tribes and ethnic groups into their families and communities.

The first groups of Houma leaders to make official claims on behalf of their people did so in the early 1800s; the city of Houma, Louisiana was named after the tribe when it was founded in 1834; and through the early decades of the 1900s Houma people, anthropologists, and federal agents attempted to secure federal services for the Houmas (Campisi 2004, Ng-A-Fook 2006). In the early 1970s, first the Houma Tribe and then the Houma Alliance incorporated as not-for-profit organizations, and in 1977 both were recognized as Indian communities by the state of Louisiana. In 1979, the two groups joined as the United Houma Nation (UHN), forming a not-for-profit organization. The UHN established an IRA-style government and in 1985 filed its petition for federal recognition. In 1990, the state of Louisiana recognized the UHN as an Indian community. In 1981, the six federally recognized tribes and the UHN formed the Intertribal Council of Louisiana. That organization provides guidance and oversight to the Louisiana government in matters concerning Native Americans. The Louisiana Unmarked Human Burial Sites Preservation Act of 1992, for example, creates a Board to oversee the implementation of the act and stipulates that "One member appointed from a list of three persons nominated by the Louisiana Intertribal Council. The person appointed must belong to a tribe recognized by Louisiana but not by the federal government" (Louisiana Office of Cultural Development 1992).The UHN petition was denied in 1994, the UHN filed its rebuttal in 1996, and the tribe is still awaiting federal determination (United Houma Nation 2008a).

Facing seemingly insurmountable hurdles in the federal recognition process and asserting that they have closer ties to the Chitimacha, Acolapissa, Atakapas, and Biloxi peoples, in the mid-1990s some former members of the UHN established the Point-au-Chien Tribe, adopted a constitution, established a tribal council, and filed its Articles of Incorporation with the

Louisiana Secretary of State. In 1996, the tribe submitted a petition for federal acknowledgment with the Bureau of Indian Affairs; the tribe is preparing documentation to support its petition (Pointe-Au-Chien Tribe n.d.a). In 1996, another group of individuals who separated from the UHN and identify themselves as an amalgam of the Biloxi, Chitimacha, Choctaw, Acolapissa, and Atakapa people (Biloxi-Chitimacha-Choctaw of Louisiana n.d.-a) formed a tribal council and filed a petition for federal recognition as the Biloxi-Chitimacha Federation of Muskogees, Inc.; they, too, are awaiting determination (Biloxi-Chitimacha-Choctaw of Louisiana n.d.-b). In 2004, the Louisiana legislature acknowledged the Indian ancestry of members of both the Biloxi-Chitimacha Federation of Muskogees, and the Pointe-au-Chien Tribe so that those individuals would qualify for Indian education and health care benefits (Louisiana Senate Concurrent Resolution No. 105).

Tribal recognition is a legal and political process and does not define what it means to be a Native American. According to the U.S. Bureau of Indian Affairs, "No single federal or tribal criterion establishes a person's identity as an Indian. Tribal membership is determined by the enrollment criteria of the tribe from which Indian blood may be derived, and this varies with each tribe…. To be eligible for Bureau of Indian Affairs services, an Indian must (1) be a member of a tribe recognized by the federal government, (2) be of one-half or more Indian blood of tribes indigenous to the United States; or (3) must, for some purposes, be of one-fourth or more Indian ancestry…. The Bureau of the Census counts anyone an Indian who declares himself or herself to be an Indian. As of 2010, the U.S. Census estimated there were more than 2.9 million American Indians and Alaska Natives living in the United States" (Bureau of Indian Affairs 2012). Table 4.3 shows the number of American Indians living in the study communities in 2000.

Table 4.3. Number of Persons in the Study Communities Identifying as American Indian and Native Alaskan Alone in 2000

| 2000 | American Indian and Native Alaskan alone |
|---|---|
| Bayou la Batre | 9 (0.4%) |
| Biloxi | |
| Biloxi - 39530 Zip Code | |
| Dulac | 617 (42.2%) |
| Larose | 279 (3.8%) |
| Cutoff | 277 (4.6%) |
| Empire | |
| Pointe a la Hache (N/A) | 1 (0.5%) |
| Port Sulphur | 97 (5.5%) |

Source: U.S. Census Bureau 2000

As noted earlier, as one step in the process of applying for federal recognition, each of the tribes established an IRA-style government. The United Houma Nation reorganized its government in 2002 and is governed by a principal chief, 11-member tribal council, and sergeant-at-arms and maintains offices in Golden Meadow and Houma, Louisiana. Its tribal council has representatives from six parishes where most of the 17,000 tribal members live: Jefferson, Terrebonne, St. Mary, Lafourche, St. Bernard, and Plaquemines (United Houma Nation 2008b). Also in 2002, the UHN established a separate not-for-profit organization, the United Houma Nation Vocational Rehabilitation Services, with offices in Houma, Louisiana.

The approximately 680 members of the Pointe-au-Chien Tribe are concentrated along Bayou Pointe-au-Chien in Terrebonne Parish, and the tribe maintains a post office box in Montegut. The tribe is governed by a chairman, second chairman, and 8-member tribal council (Pointe-Au-Chien Tribe. n.d.-b). The Biloxi-Chitimacha tribal members are concentrated in lower Lafourche Parish and in Grand Caillou-Dulac and Isle de Jean Charles in Terrebonne Parish and formed a Grand Council with a chairman, vice-chairman, and secretary/treasurer, each representing one of the three tribal communities (Biloxi-Chitimacha-Choctaw of Louisiana n.d.-c). Though members of all three tribes have familial ties across tribal lines, the political separation has restricted both formal and informal communication and cooperation. Nevertheless, many individuals continue to interact regularly with their relatives, regardless of their tribal affiliation.

The Native Americans of southern Louisiana have traditionally fashioned their livelihoods from fishing, hunting, and trapping, living on their boats and moving from place to place in seasonal cycles. Recognized for their skill as trappers, some individuals found opportunities beyond their central communities in Lafourche and Terrebonne parishes and eventually settled on lands as far away as St. Bernard Parish. Women and children were frequently employed in the seafood processing plants. Though they interacted with the French and Cajun populations, and assimilated others into their communities, they remained distinct. Even at the end of the 20th century, for example, Houma tribal elders still spoke the conservative French dialect anthropologists had recorded at the beginning of the century, intermingled with Muskogean words, rather than the French or Cajun French of their neighbors (Wallace et al. 2001, Campisi 2004). Anthropologists noted, "The Houma are now the most conservative of all Louisiana French speakers" (Kniffen, Gregory, and Stokes 1987: 126). Many settlements were formed by the offspring of Indian and non-Indian unions wherein the residents retained Indian identity. Because of such intermarriages with blacks as well as whites, prominent Terrebonne Parish school officials denied that the Native Americans even existed (see "The So-Called Indians" in Bourgeois 1938). Unable to attend white schools and refusing to be classified as "Negroes," they were largely ignored by the school system.

> Sabine, that was the name they used to call Indian children. It was the lowest form of life there was. When we'd go to school, we'd have kids calling us names all the time. My mom worked all the time to make sure we had everything we needed to go to the white schools. One time when I was having trouble, my mom went and had a meeting with the principal. He called us in and looked me in the eye. He said, you're not having any problems are you? I was the type who went home and cried. My sister was the fighter. She never let anybody call us anything. [LA-DA-042; Houma educator] (quoted in Wallace 2001: 342).

> My parents sent me to the Catholic High School. The word was that as an Indian you would spend your life trawling and trapping. You only needed a little education. My principal was appalled that we could not go past the eighth grade. It was a priest that got me on in school.  I was in the hospital after a hunting accident. He had been on the bayou for 4 years but did not know we could not go to high school. He was sitting by my bed, making small talk. He asked me where I was going to high school. I told him, "Father, I can't go to high school." He asked why, and I told him Indians could not go past eighth grade. Here was this big old guy who had tears in his eyes. Then he got mad. He went to talk to the principal of the Catholic High School. Brother , he was the principal, on the

first day he announced over the speaker, "[...], an Indian, will be attending our school. We expect him to behave and for the rest of you to behave..." [LA-DA-053, Houma educator] (quoted in Wallace 2001: 347).

Like the African Americans of the region, Native Americans who were able to obtain an education generally had to leave to find job opportunities appropriate to their knowledge and skills. For those who remained, due to their lack of formal education, opportunities in the nascent petroleum industry were limited. Some Native Americans who left the area to serve in World War II did return to take jobs in the oilfield, though most continued working in seafood and trapping. As the oil industry reached farther into their communities, bringing fabrication and shipyards, tank farms, and boat docks, some of them began to work there. Due to their familiarity with the bayous and waterways and their skill with operating and maintaining boats, Native Americans also began working on offshore service vessels.

In the 1970s, following passage of the Indian Education Act, the Lafourche and Terrebonne parish school boards established Indian Education programs. These programs have provided tutoring, cultural activities, and other forms of support for Native American students in these districts. In the early years, because of the negative treatment Native Americans had received in the schools, the program leaders struggled to enroll youth in their programs (LA-DA-043 1997, LA-DA-053 1997, LA-DA-054 1997). In recent decades, however, increasing numbers of Gulf Coast residents have begun to express pride in being Native American and tribal events, youth camps, and programs are well attended. Tribal leaders have placed significant emphasis on education; many young people who have graduated from high school have either returned to the region to help their communities or provide support from a distance. Nevertheless, low levels of literacy and educational attainment are still a problem, especially for older tribal members. This translates to limited occupational mobility. Many men still shrimp, crab, trap, and work as handymen and laborers for oilfield service companies and government offices. Female tribal members still work in shrimp sheds, clean houses and offices, drive school buses, and perform basic clerical duties.

At the turn of the 21st century, tribes and their members were contending with many problems. With many of their communities located in the southern reaches of Terrebonne, Lafourche, and Plaquemines parishes, they experienced firsthand the negative effects of coastal erosion and land loss as even tropical storms flooded their communities. The 2005 and 2008 hurricanes had significant negative effects on these communities (see Chapter 9 this volume). Reaching out through their websites and other media outlets, though, the leaders of each of these groups solicited resources and became part of national dialogues on race, poverty, and disasters.

## 4.5. VIETNAMESE AND VIETNAMESE-AMERICANS

Brian Marks

Vietnamese-American communities exist around the United States, including along the Gulf of Mexico Coast. Two of the nation's largest Vietnamese urban communities are in the region. Metropolitan Houston has the 3rd largest Vietnamese population of any U.S. city, amounting to 1.7% of the population of the city and 1.5% of that of the Consolidated Metropolitan Statistical Area (CMSA). New Orleans is the 15th largest Vietnamese-American city with 1.5% of the residents of the city and 1.1% of the residents of New Orleans MSA

identifying as Vietnamese in the 2000 Census. Numerous Vietnamese enclaves are scattered along the coast from Texas across south Louisiana into Mississippi and Alabama. In Bayou La Batre, Alabama, no less than 23% of the 2000 population identified as Vietnamese, almost equal to the 22.5% in Amelia, Louisiana. Also in 2000, 11.6% of the people residing in New Orleans' westbank suburb of Avondale were Vietnamese, as were nearly 10% of the people in the Buras-Triumph area near the southern end of Plaquemines Parish, Louisiana (U.S. Census Bureau 2000a).

Like in other parts of the United States, Vietnamese settlement in the Gulf Coast began in the mid-1970s following the collapse of American-backed governments in South Vietnam, Cambodia and Laos and the exodus of what would eventually become millions of Indochinese refugees from those countries. The Indochina Migration and Refugee Assistance Act, passed in the U.S. Congress in 1975, began to address the post-war refugee crisis by granting some Indochinese immigrants special status in seeking U.S. citizenship and funding $405 million to the Indochinese Refugee Assistance Program (IRAP) between 1975 and 1979, providing education, housing, health, and employment assistance for immigrants (Smithsonian Asian Pacific American Program 2010; Rutledge 1992; Hein 1995; Vo 2000; Mumphrey and Wilson 1979).

Vietnamese immigrants to the Gulf Coast came in waves, with pulses of refugees fleeing Southeast Asia, and from resettlement and subsequent internal migration of immigrants already in the United States. While the first large influx of Vietnamese began arriving in 1975 just after the chaotic collapse of the South Vietnamese regime, many more came years later. The first were the so-called "boat people" of the late 1970s and 1980s, escaping poverty and political persecution in a reunified Vietnam. Some were Catholics who felt insecure in a Communist Vietnam; many of those were Northern Vietnamese who first fled south in 1954 and left their homes once again. Many Vietnamese of Chinese ancestry left after political tensions between Vietnam and China became extreme and the Vietnamese government expropriated the assets of Saigon's Chinese commercial class in 1978; others, veterans of the South Vietnamese Army and civil service, left after being released from detention; and still others got out to escape the chronic and escalating economic and political constraints they lived under in post-war Vietnam (Canh 1983; Kelly 1977; Hein 1995). The Vietnamese government and UN High Commission for Refugees' establishment of the Orderly Departure Program in 1982, which made it easier and much safer for people to emigrate than leaving surreptitiously at night in overloaded boats often attacked by pirates, also contributed to rising Vietnamese immigration to the U.S. in the 1980s that translated into ongoing growth of Vietnamese communities on the Gulf Coast (Kelly 1977; Montero 1979; Freeman 1995; Vo 2000). The Amerasian Homecoming Act of 1987 (GAO 1994; Migration and Refugee Services 1988) allowed children of American men and Vietnamese women, remaining in Vietnam and facing discrimination after the war (McKelvey 1999; Yarborough 2005), to immigrate to the U.S. with immediate family members. Following the normalization of diplomatic relations in 1993, other immigration programs such as the U.S.-Vietnam Humanitarian Resettlement Program began to assist certain categories of Vietnamese emigrants leave the country for the U.S. (U.S. Department of State 2005).

Since becoming established in the region, Gulf Coast Vietnamese have shifted where they reside and work and have experienced new waves of regional in-migration and out-migration, adjusting to changing economic conditions and natural disasters. Upon arrival to the Gulf Coast, some Vietnamese communities were distinguished by members' place of origin within Vietnam. Today, while some differences are still noticeable, intra-regional migration,

inter-marriage and acculturation across the generations has muted those contrasts. Contemporary Vietnamese-American communities on the Gulf are socioeconomically differentiated according to their employment base and vulnerability to coastal hazards. In some communities, employment is dominated by commercial fisheries and seafood processing, while in others, work is strongly linked to casino tourism or shipyards. In many places, Vietnamese-owned businesses and community institutions severely damaged by hurricanes in 2005 and 2008 have rebuilt (Leong et al. 2007), but out-migration of Vietnamese to places in the region they deem less vulnerable to storms or away from the Gulf Coast is common, especially among younger, second- and third-generation Vietnamese-Americans seeking lives and careers different than their immigrant parents and grandparents.

The Southeast Asian origins of Gulf Coast Vietnamese residents are quite varied, as are their often harrowing emigrant journeys across the Pacific to the U.S. and, often after many years, to the Gulf region. Some Vietnamese trace their families back to coastal villages in North Vietnam, places where fishing was a common livelihood and Catholicism the main religious affiliation, from whence their ancestors fled to South Vietnam in 1954 after the Communist victory over the French. Settling on Southern Vietnam's coastal fringe in the environs of Vũng Tàu southeast of Saigon and Phan Thiết further east, these Catholic fishing communities fled again in 1975 after the Communist victory in the South. A few elderly Vietnamese-Americans encountered in 2011 still spoke with North Vietnamese accents, and a larger number identified culturally as Northern, not Southern, Vietnamese despite living longer in South Vietnam. Other Vietnamese-Americans of Northern origin became urban professionals in Saigon after 1954, also fleeing the country after the fall of the Republic of Vietnam (Arden 1981). A couple who run a nail salon in suburban Jefferson Parish, for example, are Catholic Northern Vietnamese who came South in 1954 to Saigon where they became schoolteachers until 1975.

BM609, a pharmacist in east Texas, lived in Northern Vietnam his first 15 years until 1954, and then his family fled South where he lived for 21 more years. In the South, BM609 studied Western pharmacy and practiced pharmacy until 1975 before coming to the U.S. in 1985, at first living in Gretna near New Orleans. He studied English for three years before starting on another pharmacy degree which he eventually got from Xavier University, saying he had no choice but to take this long path - he had the professional skills but not the English, so he studied and supported himself doing odd jobs while he went to school.

Vietnamese-Americans with South Vietnamese ancestry came from many parts of the country, a few more prominently than others. Some people spoken with in 2011 were from Saigon, often government officials, teachers, and other professionals who left after the Communist takeover. A considerable number of Vietnamese-American people of Chinese ethnicity claimed origins in the Chợ Lớn section of Saigon, the Chinese commercial center of the city, or nearby towns nearer the South China Sea. Other people, especially those working in the commercial seafood industry, identified themselves as natives of coastal provinces in Central and Southern Vietnam, places like Nha Trang, Vũng Tàu, Bến Tre, and Rạch Gía. A few people contacted in 2011 were Vietnamese born in Cambodia but whose families fled violence there in 1970, later leaving again for America. Religious affiliations among Vietnamese-Americans from all regions of the country varied considerably, with an overall distribution primarily between Buddhist and Catholic faiths with smaller numbers of Protestant Christians (Marks Field notes, 2011). The family of one Louisiana shrimp dock owner, BM477, was involved in the seafood business in Vũng Tàu, a coastal port in South Vietnam, operating a landing and fuel dock there until 1975 when the entire family fled to the U.S. fleet waiting nearby offshore. The family of

her husband, a shrimp vessel captain, are from Nha Trang, a coastal city in Central Vietnam. After their marriage in Louisiana, BM477's father taught her husband how to shrimp. The neighboring shrimp dock, she explained, was all Nha Trang people's boats, in-laws in her husband's family (BM477).

The most common factor in the life history of Vietnamese-American immigrants was not so much religion, or region, or proximity to the coast, or familiarity with a fishing livelihood, but participation in the South Vietnamese Army and government. After 1975, with their livelihood options severely limited, many put in prison for a time and facing continuing political hostility from the victorious Communist regime, former South Vietnamese soldiers left the country when and however possible. Leaving Vietnam in dangerous, often disastrous, sea voyages on their own or with their families, Vietnamese lucky enough to arrive safely in the Philippines, Malaysia, Thailand and other receiving countries were placed in temporary refugee camps, sometimes for years, awaiting entry to the U.S. or other destinations. After moving through transit camps on Guam and receiving centers on four military bases in the continental U.S., new Vietnamese immigrants were resettled through the efforts of federal, state, and local governments, religious charities, and private sponsors who took responsibility for families. The U.S. government initially scattered Vietnamese immigrants widely across the country, seeking to prevent the formation of Vietnamese ghettos in major cities, but over their first years of life in America, as Vietnamese-Americans gained employment and adapted to life in their new country, they began reunifying their extended families and relocating to places with other Vietnamese from the same parts of Vietnam of the same faith (Kelly 1977; Rutledge 1992; Hein 1995; Vo 2000; Marks Field notes, 2011). Many people now residing in the Gulf Coast got there years after arrival in America, leaving the towns and cities where they were resettled for better paying work, a warmer climate, and proximity to family and other Vietnamese in newly established communities like Eastern New Orleans. One man, a shrimper in lower Plaquemines Parish, came to the U.S. in 1985 and was first resettled in Nebraska where he lived for five years doing welding work. Then, a friend of his told him about the better money he could make in commercial fisheries in south Louisiana (BM504 2011). Another Vietnamese man from Plaquemines parish (BM497a) described how he escaped Vietnam in 1984 in a boat designed only for river travel that took him all the way to Singapore. BM497a's brother, living in New Orleans already and working at the time in the offshore oil industry, sponsored him to the U.S. from an Indonesian refugee camp.

On the Gulf Coast, a large group of refugees were resettled in New Orleans starting in 1975. The city's Associated Catholic Charities sponsored 2,600 refugees, funded primarily with IRAP funding, and resettled them into apartments scattered across the city. The largest group of Vietnamese was resettled into several apartment complexes in New Orleans East that would eventually become the basis of the large Vietnamese community of Versailles (Airriess and Clawson 1991; Mumphrey and Wilson 1979). Apartment complexes on the westbank of the Mississippi River became the nexus of other Vietnamese neighborhoods that still exist today and now possess Catholic parishes and Buddhist temples. By 1978, over 7,000 Indochinese immigrants lived in Louisiana, with 5,500 in the New Orleans metro area, making Louisiana the state with the 4th largest Indochinese population in America behind California, Texas, and Pennsylvania. The influx of Vietnamese into subsidized housing and low-wage jobs in New Orleans led to charges of ethnic favoritism and discrimination from some African-Americans in the city (Mumphrey and Wilson 1979; Brown 1978; Urban League of New Orleans 1978).

These immigrants and their family and friends, drawn to the community from isolated resettlement sites in the northern United States, congregated together, established businesses, churches, temples, and civic associations, and contributed to the formation of other new Vietnamese neighborhoods around the Gulf Coast (Freeman 1995; Airriess 2002). Some people living in New Orleans had fishing experience, and soon got boats that they initially started working in lower Plaquemines Parish (Arden 1981; Starr 1981). Other Vietnamese resettled in small towns across south Louisiana, Alabama, and Texas began fishing, too, in the 1970s, eventually establishing clusters of Vietnamese fishing vessels in places like Intracoastal City, Dulac, Larose, Bayou La Batre, Port Arthur, and Barataria in lower Jefferson Parish (Marks Field notes, 2011). Hostility from established commercial fishermen to new Vietnamese entrants was serious and sometimes violent, although their reception varied depending on the place and the individual. A Creole man, seafood buyer and former commercial fisherman in south Louisiana conveyed a story from the early 1980s how local non-Vietnamese fishermen threatened to burn the first three Vietnamese fishers' boats on his bayou but were dissuaded when he told the Vietnamese to park next to his boat and admonished the others to let the newcomers fish (BM580 2011).

Vietnamese fishermen, facing continuing harassment and restrictions, left Plaquemines parish for a time (Arden 1981), although there is a Vietnamese fishing presence and residential community there, around the westbank town of Buras, today. The fishermen were tolerated elsewhere by seafood businessmen who wanted their catch and their labor for their processing plants (Durrenberger 1996). Biloxi's considerable Vietnamese community came into being in 1977 when a local oyster processor, lacking a stable and plentiful labor supply for the dull and strenuous work of shucking, tried bussing in Vietnamese workers from nearby New Orleans. Many Vietnamese began working in Biloxi, and shortly thereafter the processor helped some get into public housing nearby. Within a few years, the Point Cadet neighborhood on the east side of Biloxi was home to a large Vietnamese community, including many New Orleanians and some of the fishermen displaced from lower Plaquemines (PP454 2011; Arden 1981; Durrenberger 1996; Boudreaux 2011; Bounds 2011). Pooling the financial resources of kin and co-ethnics and with help from local shrimp processors, a number of Vietnamese began to own and operate shrimp boats, with the initial boat owners later financing their relatives to get their own boats (Marks 2012). After starting out in the 1980s with small wooden and fiberglass shrimp boats (Starr 1981), many Vietnamese captains expanded in the 1990s into larger, steel hulled Gulf trawlers equipped with on-board freezers that enabled month long trips. Such expansion of the Vietnamese presence in the shrimping industry was made possible through the use of household labor on fishing boats, the bulking of savings among extended family and friends to purchase boats, and credit that was available through government vessel construction loans and engine companies. A seafood dock owner and commercial fisherman shared their stories:

> My dad worked at first when he arrived in America at a slaughterhouse in Baton Rouge. There were nine kids in the family all together and our sponsor was an Italian-American man in Baton Rouge - he was Catholic, like our family. In 1976 my dad got a skiff and started shrimping. Around that time, the family moved to Abbeville from Baton Rouge. Bit by bit, like we Vietnamese do, he saved money, we help each other out and work really hard and borrow money from each other so he got bigger and bigger boats. And my mom, she started a po-boy shop in New Orleans, they've got three locations now and everybody in New Orleans knows them. (BM477 2011)

I came to the U.S. in 1981. At first I was living in Georgia. I worked at a chicken plant for about a year and then I went to Florida for a year before I moved to Mississippi in 1983. I've been here since. I started out working as a deckhand for 10 years before I got enough money to build my own boat - a small boat - in 1993. I built it right near here in East Biloxi. Then in 1996 me and a friend got this boat that I own now. We went in on it together; we'd work the newer boat and the older, smaller one in turns. In 1999 I got this boat for myself and I sold the little one. (BM450a 2011)

The convergence of relatively high shrimp prices and low diesel prices in the late 1990s pushed the investment boom in big steel hull shrimping vessels even faster, so that by 2000 many Vietnamese shrimpers had taken on debts in the hundreds of thousands of dollars for new Gulf shrimp freezer boats (Marks 2012; BM598). A Vietnamese shrimper in Port Arthur, Texas, first arrived in 1985 and has been a shrimper ever since. Originally from Đà Nẵng in Central Vietnam, he learned trawling from other Vietnamese in Texas. He used to have two boats, but sold one of them in 2006, keeping his current trawler to work himself with three deckhands. "I'd say about 40% of the boats in the fleet were lost during the 2000s because people couldn't afford them anymore, with shrimp prices so low and fuel so high. People like me and my deckhands, we're older now, when we came to the U.S. we didn't have an education so we had to get into a business like this to make a living and now we can't stop. We're too old and this is all we know how to do" (BM601a 2011).

In the Mobile area the Catholic Church and local seafood processors facilitated the settlement of Vietnamese as well as Laotians and Cambodians along the Alabama coast, particularly around Bayou La Batre. In both Bayou La Batre and Biloxi, over the 1980s and 1990s the gradual shift of Vietnamese men from initial jobs at seafood processing plants to working and later captaining shrimp boats resulted in the plants mostly employing women and younger Vietnamese. In those areas, Vietnamese women's entry into seafood processing work continues to earn them praise from processing plant owners for having "saved" the industry from its chronic labor recruitment problem (Moberg and Thomas 1993; PP936 2011).

In other areas, very different employment patterns emerged among Vietnamese immigrants. In towns like Amelia, Morgan City, and Harvey, Louisiana with oilfield-dependent economies, Vietnamese communities there followed broader patterns, primarily into entry-level jobs in shipyards and offshore fabrication where many men still work. Avondale shipyard, a military shipyard on the westbank of Jefferson Parish, attracted many Vietnamese workers from nearby neighborhoods. Still, unlike some other ethnic groups like Cajuns, Vietnamese on the Gulf Coast are not well represented in all stages of the offshore oil and gas industry; apart from shipyard, fabrication, and machine shop work in a few oilfield towns, Vietnamese-Americans contacted for this project did not work in the oilfield (Marks Field notes, 2011). One welder, who had lived in Pasadena, California, moved to Morgan City, Louisiana, because, he said, "the cost of living is much cheaper here than in California so you have more money to spend, you don't have to spend it all on rent" (BM490b 2011). This individual estimated that 90% of the Vietnamese men in Morgan City and its environs worked as welders, saying many like him moved from California seeking a cheaper cost of living and because they had extended family connections already in Louisiana. Another Vietnamese man working in the oilfield service sector in Morgan City had lived for 35 years in a neighborhood of the nearby town of Amelia, home to a small Vietnamese Catholic church and about 50 Vietnamese families. He said 80 to 85% of the

Vietnamese men in that community were welders or fitters in the nearby shipyards or worked in machine shops as he did (BM493 2011).

Elsewhere, the tourism industry provided sources of employment for Vietnamese women and men, especially in coastal Mississippi after the arrival of the casinos in the early 1990s. The 1990s and 2000s witnessed a movement by younger, better educated members of the community away from the commercial seafood industry. In those years, many now middle-aged first-generation Vietnamese also shifted their employment, from heavy occupations like shrimping, shucking oysters, picking crab, and welding in shipyards to open small retail enterprises across the Gulf Coast. Reinvesting profits from fisheries and wage labor, Vietnamese opened grocery stores, convenience and liquor stores, gas stations, dry cleaners and alteration shops, Vietnamese and Chinese restaurants, and especially nail salons (Tran 2008) which proliferated across the strip malls and shopping centers of Gulf Coast towns and cities. A convenience store owner in south Louisiana commented:

> My parents came to the U.S. in 1985. We lived at first in California, and my dad came to Louisiana soon after because he had family members doing fishing here. He'd work a few months every year fishing and the rest of the family stayed in California year-round. Back then you could make a lot of money shrimping because oil was a lot cheaper and shrimp was more expensive, so the margin was higher. When my family moved to Louisiana in the mid-1990s and my parents bought this store, my parents were getting older and they wanted to work on shore and bring the family together (BM466 2011).

Already by the 1980s, some wealthier Vietnamese began moving out of their original ethnic enclave communities into newer suburban homes and supported the construction of new structures, such as new Catholic churches and Buddhist temples, in Port Arthur, Versailles, and Biloxi (Marks Field notes, 2011). Vietnamese immigrants continued to arrive through family reunification and relatives and friends already in America continued to move to the Gulf Coast from other ethnic enclave communities, especially from California, seeking a lower cost of living and simpler lifestyle. Other Vietnamese living on the Gulf wanting faster-paced careers in bigger cities left for places like California, Houston, or northern Virginia where large Vietnamese communities also exist. One Vietnamese woman managing a Mississippi Gulf Coast motel at the time of this study first lived in Oregon after being resettled in the United States, then moved to New Orleans, on the westbank in Terrytown. In 1996, following a shooting that put a bullet through her front window, she left New Orleans for Mississippi, then had her entire house destroyed in Katrina in 2005, only collecting enough insurance money to rebuild further north away from the coast after years of lawsuits (BM446 2011). Her relatives in California and Oklahoma, she noted, had more prestigious jobs in high-tech industry, but the cost of living, especially in California, was prohibitive to her and she found the urban lifestyle unappealing.

In the 2000s, the sharp economic downturn of the commercial seafood industry and the disastrous hurricanes of 2005 and 2008 greatly affected Vietnamese people along with their neighbors on the Gulf Coast. After 2001, shrimpers were caught in a ruinous cost/price squeeze as a flood of cheap farmed shrimp imports cut shrimp prices more than 25% while diesel prices rose ever higher, more than tripling over the course of the decade (Marks 2012). The economic crisis harmed all commercial shrimpers, but Vietnamese shrimpers suffered especially during the 2000s given that they owned many large, expensive Gulf trawlers, recently financed with interest and insurance payments alone amounting to thousands of dollars a month. By 2005, after years

127

of ruinous prices, many Vietnamese shrimpers' boats had been repossessed and some younger fishermen, often the sons and nephews of first-generation immigrant shrimpers, were leaving the business for good. The situation worsened considerably when Hurricane Katrina struck the Gulf Coast in August 2005. In addition to the terrible wind damage and high flooding the storm inflicted on Vietnamese communities like Versailles in New Orleans and Point Cadet in east Biloxi, Katrina disabled a great deal of seafood industry's infrastructure and tossed many fishing vessels high onto shore. The disruption of life and business by Katrina pushed many more fishermen already facing financial difficulties into default on their boat notes. High diesel prices and low shrimp prices continued to plague the shrimp industry into the late 2000s. In 2010, with shrimp prices the highest seen in a decade and fuel prices considerably moderated from the highs reached in 2008, Vietnamese fishermen, like others in the seafood industry, recalled high hopes before the *Deepwater Horizon* explosion. The spill prevented these possibilities from being realized, compounding the crises facing Vietnamese and other Gulf of Mexico commercial fishers in the 2000s (Marks Field notes, 2011).

Along with residential and community structures Vietnamese-owned businesses, concentrated in ethnic enclave communities, were damaged by Katrina. In recent years, some of these businesses have built back, but the out-migration of residents to higher ground has reduced their customer base. A clerk at a family-run Asian grocery in New Orleans East described in mid-2011 the decline in business and community life following Katrina and then the BP oil spill:

> The people we see in the store are the old people, the young people aren't [living here] any more. The old people can't go anywhere, they have to stay here but the young ones are leaving to find jobs in other states and they only come back for holidays to visit when they buy a lot of here but only at those times.

> We haven't seen business improving or getting better this year so far but it should be better now because this is when the fishermen should be going out. Back before Katrina, this area was *booming*, you'd see so many people around and people would buy a lot [of groceries] at once, like once a week, but now they just buy a little at a time, just what they need that day. After Katrina around here in New Orleans East after 7:00pm this area is *dead*, nothing's open but it didn't used to be like that – we used to have a Wal-Mart, Methodist Hospital, that's why people are moving away and I just hope we don't have another hurricane this year because that might be it for us.

> My family opened this store back in 1986 ... For Katrina, we got 1 foot of water here and roof damage and it took us three years to reopen. The store is now smaller because so many people, especially young people, moved away after Katrina. After the storm we only have family working [at the store], before we had hired employees. And now the oil spill has reduced the business again, we're not able to hire anyone and we've lost about 50% of our business – the normal customers are still coming but not spending as much, especially the fishermen (BM563 2011).

Vietnamese churches, Buddhist temples, and civic groups also slowly rebuilt following Katrina, providing crucial material support to the community and a visible symbol of community solidarity and recovery (Leong et al. 2007). In New Orleans East, the Mary Queen of Vietnam Community Development Corporation (MQVN CDC) was founded following the successful

blocking of a demolition waste landfill next to the Versailles neighborhood (Eaton 2006; Chiang 2009). MQVN CDC became an important social service and advocacy organization for commercial fishermen, Vietnamese and not, after the BP oil spill (MQVN CDC 2011), as would Boat People SOS (BPSOS 2011), a national Vietnamese-American non-profit that opened offices in New Orleans, Biloxi, and Bayou La Batre, after Katrina demonstrated the severe need for assistance and advocacy in Southeast Asian communities in all those places (Juhasz 2011:155).

Many Vietnamese who are U.S. citizens or whose primary residence is in the United States still maintain ties with family and friends in Vietnam, often making visits to Vietnam and sending back remittances to family. It is particularly common for older Vietnamese men employed in the commercial fishing industry along the Gulf Coast to make long trips to Vietnam during the slow winter season. A shrimper in Buras, Louisana spoke with a project fieldworker while repairing his captain's boat in the Empire shipyard where he used to have a boat of his own, before that was destroyed by Katrina. He noted that he lived mostly on the boat during the shrimp season because he works in Louisiana half the year and returns to Vietnam, where his wife and child are year-round, the other half. He explained that he first lived in America in Minnesota but found the weather there too cold and fisheries work lucrative, so he moved his family back to Vietnam and has rotated between the Mekong and Mississippi Deltas yearly for the past dozen years (BM496 2011).

## 4.6. HISPANICS

Preetam Prakash

Large scale Hispanic migration to most communities in the study areas dates to the 1990s and 2000s. Though often referred to by residents and the media as "Mexicans," the coastal Hispanic population includes people from throughout Central and South America, as well as U.S. citizens with ancestors from those regions. Anthropologist Shana Walton (2008) refers to the population as Latino but notes: "This label is a problem, though, because it lumps together people from very different countries, continents and ethnic groups. For example, many Native Americans from Mexico, Central and South America become "Latinos" when they immigrate to the U.S., but they don't necessarily have Spanish ancestors or even speak Spanish as their first language!" When compared to some other ethnic groups in the region, Hispanic migration to the Gulf Coast has been more fragmented, occurring mostly in response to economic opportunities rather than stemming from particular large scale events, such as the military conflicts of the 1960s and 1970s which brought many Vietnamese, Lao, and Cambodians to the area. In some cases, Hispanics from Honduras, Nicaragua, and other Central American and South American countries have arrived in the United States with refugee status in response to similar broad events, but such migration has generally been limited.

There are a few well-established Hispanic populations in the study communities, perhaps most obviously in Orleans Parish. While Louisiana's Hispanic connection dates back hundreds of years due to years of Spanish control and trade with Latin America and the Caribbean, most Hispanics arrived more recently. Substantial numbers of Cubans and Hondurans began arriving in New Orleans in the late 1950s and early 1960s, and this continued throughout much of the 20th century. Cubans began coming in large numbers after 1959 and the end of the Cuban revolution. Many Hondurans arrived in New Orleans through employment in the United Fruit Company or Standard Fruit Company, both of which had extensive operations in Honduras. Hondurans still

make up the largest Hispanic group in the New Orleans metro area and Honduran grocery stores, restaurants, and other businesses and organizations abound in many New Orleans neighborhoods (Fussell 2007; Euraque 2004). In some areas of south Louisiana, Hispanics have worked in various sub-sectors of the commercial fishing industry and in fabrication and shipbuilding for several decades (Donato 2004).

Hispanic populations in areas of south Louisiana such as Houma and Morgan City grew during the 1990s as a result of labor demand within these industries. Hispanic migration to each community followed particular trajectories, with employers and informal networks of friends and family playing different roles in facilitating entry to these areas. Such in-migration brought changes in the demographics of individual communities and the region. Great community-level variation exists regarding the extent to which the Hispanics have become integrated into the broader society, thier living conditions, and the relationships between them and their employers (Donato 2004).

Hispanics who had lived in these areas prior to the 1990s commonly talked about being among the only Hispanics in the vicinity before the latter part of 2010. In places such as Biloxi and Gulfport, Mississippi, Hispanics arrived in relatively small numbers in the early to mid-1990s to do construction work related to the influx of the large, corporate-owned tourism businesses, including casinos, condominiums, and hotels. During the late 1990s, larger numbers of Hispanics began migrating to the study areas to work in seafood plants, and in shipyards and fabrication shops. A few large seafood plants began regularly bringing in Hispanic workers, mostly from Mexico, on guestworker visas around the late 1990s and early 2000s to address labor shortages tied to the departure of Southeast Asians from the industry. The gaming industry also brought in Hispanic guestworkers during the early 2000s.

The 2005 hurricanes prompted substantial Hispanic in-migration to affected areas for the construction and cleanup jobs which were widely available afterwards. Hispanic welders and other skilled workers also arrived for jobs in coastal shipyards and fabrication shops that were experiencing a typical post-hurricane "boom" after those storms (see Chapter 4, Volume II). In some areas, such as Pascagoula, Mississippi, large numbers of workers from Puerto Rico were hired to work on military vessels. Some scholars, such as Donato (2004) and Blue and Drever (2008) have documented how Hispanics arriving in various coastal locations could draw on specific networks based on a common place of origin and other factors to secure work. In some areas such as New Orleans, for example, the arrival of these new workers, many of Mexican background, into areas that had been home to relatively few Mexicans, shifted Hispanic demographics (Blue and Drever 2008).

Some activists and scholars argue that newly arrived Hispanic workers who were unfamiliar with the Gulf Coast, and often non-English proficient and undocumented, were particularly vulnerable in the post-hurricane labor environment (Donato and Hakimzadeh 2006; Lydersen 2005; Oxfam 2007). Following Hurricane Katrina in 2005, this situation led to the formation of a few non-profits in the study communities, particularly in Harrison County and Orleans Parish, which provided assistance to Hispanic workers with regard to labor disputes and other issues. Pre-existing non-profits and religious organizations sometimes also attempted to provide these types of services.

The availability of post-hurricane construction and cleanup work had largely declined in the region by 2007–2008. Some Hispanics who stayed in the area turned to work in local seafood plants, restaurants, casinos, and domestic service, and also continued to enter the shipbuilding industry. Others found work as deckhands on shrimping vessels. Very few Hispanics in the study

communities owned fishing vessels and none were reported to own unloading docks or seafood processing plants. Many shipyard and seafood plant owners in the study communities reported that they had begun to employ larger numbers of Hispanics following the hurricane and the dispersal of parts of their traditional workforce. As reported in others studies in the region that examine migration (Austin and Crosthwait 2013; Donato 2004; Moberg and Thomas 1993), business owners commonly voiced opinions about the specific abilities and work ethic of workers based on their ethnicity. Owners were generally positive about Hispanic workers, extolling their work ethic and their willingness to perform tasks which, the owners held, local whites and blacks would not do.

Seafood plant owners, in particular, also described the growing number of Hispanics in their workforces as a "normal" process; many communities in the region have a history of new migrant ethnic groups starting out in the local economy by working in the seafood plants and eventually moving out and being replaced by more recent arrivals. Seafood plant owners noted that the Hispanics had replaced Southeast Asian workers who had provided an important portion of their labor force since the 1970s but who were beginning to leave the plants in the 1990s and 2000s due to age, or who were finding other employment, particularly because of increased education among the younger generation.

Along with the decline of the post-hurricane cleanup and construction economy in 2007–2008, residents and business owners in several study areas noted a marked increase in the incidence and scale of immigration raids, both along the Gulf Coast and nationally, which often targeted Hispanic workers. A series of high profile raids in areas such as New Bedford, Connecticut, Postville, Iowa, and Laurel, Mississippi (Abraham 2007; Associated Press 2008; Nossiter 2008), were matched by less public raids at Port Fourchon and in Larose around the same time, and residents reported increased tensions between Hispanics and other local residents in the study communities (Austin, Field notes 2011). Also impacting Hispanics in the mid-late 2000s were the general increases in border enforcement and the strengthening of immigration laws and regulations following the 9/11 terrorist attacks (Nafziger 2009), as well as the specific implementation of new security measures, such as the Transportation Worker Identification Credential (TWIC), required of all workers requiring unescorted access to secure areas of facilities and vessels regulated under the Maritime Transportation Security Act (MTSA) of 2002.

In the years following Katrina, a substantial Hispanic business infrastructure developed in many coastal communities including Gulf Shores, Alabama, Biloxi, Mississippi, and Houma and Morgan City, Louisiana. Grocery stores and restaurants predominate, but businesses also include hair and beauty salons, legal and tax assistance, and translation services. Restaurants sometimes specialize in the cuisine of a particular region or country but, in general, Hispanic businesses market to this ethnic group as a whole. For example, grocery stores typically feature a range of goods from across Latin America. Grocery stores also generally provided cash transfer services, international calling cards, and other services commonly used by people with family members living outside the United States. In areas with a large number of seasonal Hispanic guestworkers who work in local seafood plants, shipyards, and tourism businesses, the customer base of these establishments can fluctuate significantly (Austin Field notes, 2011).

Despite the increasing visibility of Hispanics in the local economy, few religious institutions, non-profits, or other organizations are specifically dedicated to serving this community. No predominantly Hispanic churches exist in the study communities, though many Hispanics regularly attend services, and sometimes constitute significant portions of worshippers at majority Anglo or Cajun churches where Spanish language services are often provided on

certain days of the week. At the time of this study, no organizations or non-profits in the study area were centered exclusively on Hispanics from a particular place of origin. Of the few Hispanic-centered non-profits established following Katrina, some lasted only a few years and had largely stopped operating by 2010. Others continued to provide services but these operations were challenged by decreased budgets and a Hispanic population increasingly fearful in the face of growing anti-immigrant rhetoric and stricter law enforcement (Prakash Field notes, 2011). Although many study communities are ethnically diverse and receive undocumented migrants from many parts of the world, the media and even billboards served to reinforce the link Hispanics and undocumented migration.

## 4.7. REFERENCES

Abraham, Yvonne. 2007. Up to 350 in custody after New Bedford immigration raid. Boston Globe. March 6.

Airriess, C. 2002. Creating Vietnamese landscapes and place in New Orleans. In: Berry, K. and M. Henderson, eds. Geographical Identities of Ethnic America: Race, Space, and Place. Reno, NV: University of Nevada Press. Pp. 228-54.

Airriess, C. and D. Clawson. 1991.Versailles: A Vietnamese enclave in New Orleans, Louisiana. Journal of Cultural Geography 12(1): 1-13.

Alexander-Bloch, Benjamin. 2012. Department of Justice applies legal muscle to St. Bernard Parish fair housing battle. New Orleans Times-Picayune. January 31.

Allen, Gene and Sylvia Hilton, editors. 2010. Nexus of empire: Negotiating loyalty and identity in the revolutionary borderlands, 1760s-1820s. Gainesville, FL: University Press of Florida.

American Indian Studies Center. n.d. X. California tribal government administration. University of California at Los Angeles. Available at: http://www.aisc.ucla.edu/ca/Tribes10.htm

Applebome, P. and R. Blumenthal. 2005. With storms behind them, Gulf residents begin piecing their lives together. New York Times. September 27.

Arden, H. 1981. The wanderers from Vung Tau: Troubled odyssey of Vietnamese fishermen. National Geographic 160(3): 378-95.

Associated Press. 2008. Immigration raid the largest in US history. Associated Press. May 13.

Austin, Diane E., Karen Coelho, Andrew Gardner, Rylan Higgins, and Thomas R. McGuire. 2002. Social and economic impacts of OCS activities on individuals and families: Volume I: Final report. OCS Study MMS 2002-022. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Austin, Diane, and Rebecca Crosthwait. 2013. Labor in the Gulf of Mexico fabrication and shipbuilding industry. In: Tom McGuire, Diane Austin, and Drexel Woodson. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume III: Technical Papers. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Austin, Diane E. and Thomas R. McGuire, eds. 2002. Social and economic impacts of OCS activities on individuals and families: Volume II: Case studies of Morgan City and New Iberia, Louisiana. OCS Study MMS 2002-023. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Bayles, Cara. 2011. American Indian businesses in decline. Houma Courier. October 9.

Becnel, Thomas. 1989. The Barrow family and the Barataria and Lafourche Canal: The transportation revolution in Louisiana, 1829-1925. Baton Rouge, LA: Louisiana State University Press.

Bernard, Shane. 2003. The Cajuns: Americanization of a people. Jackson, MS: University Press of Mississippi.

Biloxi-Chitimacha-Choctaw of Louisiana. n.d.-a. Tribal communities of Biloxi-Chitimacha Confederation of Muskogees. Available at: http://www.biloxi-chitimacha.com/tribal_communities.htm Accessed March 13, 2012.

Biloxi-Chitimacha-Choctaw of Louisiana. n.d.-b. Recognition or acknowledgement as an Indian tribe. Available at: http://www.biloxi-chitimacha.com/recognition.htm Accessed March 13, 2012.

Biloxi-Chitimacha-Choctaw of Louisiana. n.d.-c. The governing body. http://www.biloxi-chitimacha.com/the_confederation.htm Accessed March 13, 2012.

Blue, S.A. and A.I. Drever. 2008. Subcontracting work via social networks: Migrant Latino Labour and the rebuilding of New Orleans. Population, Space, and Place 17:5.

BM446. 2011. Personal communication. Motel business, Hurricane Katrina, migration to different regions of the U.S., living conditions in those places. Discussion with Brian Marks. Motel owner. Biloxi, MS. March 4.

BM450a. 2011. Personal communication. Shrimping industry, personal history. Discussion with Brian Marks. Commercial fisherman. Biloxi, MS. March 10.

BM466. 2011. Personal communication. Retail business conditions, family history and business development. Discussion with Brian Marks. Small business owner. Houma, LA. April 6.

BM477. 2011. Personal communication. Upcoming shrimp season, last year's experiences, family history. Discussion with Brian Marks. Seafood dock owner. Vermillion Parish, LA. April 22.

BM490b. 2011. Personal communication. Welding work, nail salon business, local employment trends. Discussion with Brian Marks. Shipyard worker. Morgan City, LA. May 10.

BM493. 2011. Personal communication. Machine shop and oilfield economy, local Vietnamese community history. Discussion with Brian Marks. Machine opeator. Morgan City, LA. May 11.

BM496. 2011. Personal communication. Shrimp industry, expectations for this year, migration and family. Discussion with Brian Marks. Deckhand. Empire, LA. May 13.

BM497a. 2011. Personal communication. Local seafood economy, business at store, personal history. Discussion with Brian Marks. Small business owner. Buras, LA. May 13.

BM504. 2011. Personal communication. Shrimp season, life experiences, history in the commercial fishing industry. Discussion with Brian Marks. Commercial fisherman. Plaquemines Parish, LA. May 14.

BM535. 2011. Personal communication. Business conditions, family history, local churches. Discussion with Brian Marks. Nail salon owners. Harvey, LA. May 25.

BM563. 2011. Personal communication. Grocery business, changes since Katrina and oil spill, migration from community. Discussion with Brian Marks. Store clerk. New Orleans, LA. June 20.

BM580. 2011. Personal communication. History in the seafood industry, state of fisheries at present, ethnic groups that work in the industry. Discussion with Brian Marks. Seafood buyer. Saint Mary Parish, LA. June 25.

BM598. 2011. Personal communication. Circumstances of regional shrimp industry, Vietnamese history in the industry. Discussion with Brian Marks. Shrimping family member. Abbeville, LA. July 11.

BM601a. 2011. Personal communication. Shrimp industry, history of involvement in fisheries and current circumstances. Discussion with Brian Marks. Commercial fisherman. Port Arthur, TX. July 13.

BM609. 2011. Personal communication. Pharmacy business, local community, personal and family history. Discussion with Brian Marks. Pharmacist. Port Arthur, TX. July 15.

BM613b. 2011. Personal communication. Personal history, community event, state politics, and state of the oilfield. Discussion with Brian Marks. Oilfield service manager. Theriot, LA. October 23.

Boat People SOS (BPSOS). 2011. History and accomplishments. Available at: http://www.bpsos.org/mainsite/about-us/history-and-accomplishments.html

Boudreaux, Edmond. 2011. Seafood capital of the world: Biloxi's maritime history. Charleston, SC: The History Press.

Bounds, J. 2011. Vietnamese in Mississippi. Mississippi History Now. Available at: http://mshistory.k12.ms.us/articles/372/vietnamese-in-mississippi

Bourgeois, H. L. 1938 . Four decades of public education in Terrebonne Parish . M.A. Thesis, Louisiana State University, Baton Rouge.

Brasseaux, Carl. 1987. The founding of New Acadia: The beginnings of Acadian life in Louisiana, 1765-1803. Baton Rouge, LA: Louisiana State University Press.

Brasseaux, Carl. 1992. Acadian to Cajun: Transformation of a people, 1803-1877. Jackson, MS: University Press of Mississippi.

Brasseaux, Carl, Keith Fontenot, and Claude Oubre. 1994. Creoles of color in the bayou country. Jackson, MS: University Press of Mississippi.

Brown, C. 1978. A different War: Vietnamese refugees caught in black-white friction in New Orleans. Washington Post. July 18.

Bullard, Robert. 1990. Dumping in Dixie: Race, class, and environmental quality. Boulder, CO: Westview Press.

Bullard, Robert and Beverly Wright, eds. 2009. Race, place, and environmental justice after Hurricane Katrina: Struggles to reclaim, rebuild, and revitalize New Orleans and the Gulf Coast. Boulder, CO: Westview Press.

Bureau of Indian Affairs (BIA). 2012. Frequently asked questions. Available at: http://www.bia.gov/FAQs/index.htm

Campanella, Richard. 2008. Bienville's dilemma: A historical geography of Louisiana. Lafayette, LA: University of Louisiana at Lafayette Press.

Campisi, Jack. 2004. Houma. In: R. Fogelson and W. Sturtevant, eds. Handbook of North American Indians, Volume 14: Southeast. Pp. 632-641.

Canby, William C.,Jr. 1981. American Indian law in a nutshell. St Paul, MN: West Publihing Co.

Canh, N. 1983. Vietnam under communism, 1975–1982. Stanford, CA: The Hoover Institution.

Chiang, S. Leo. 2009. A village called Versailles. New Day Films. 67 minutes.

Davis, Donald. 2010. Washed away? The invisible peoples of Louisiana's wetlands. Lafayette, LA: University of Louisiana at Lafayette Press.

Dewitt, M. 2008. Cajun and Zydeco dance music in northern California: Modern pleasures in a postmodern world. Jackson, MS: University Press of Mississippi.

Din, Gilbert. 1988. The Canary Islanders of Louisiana. Baton Rouge, LA: Louisiana State University Press.

Donato, K. M. 2004. Labor migration and the deepwater oil industry. OCS Study MMS 2004-057. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Donato, Kathleen and Shirin Hakimzadeh. 2006. The changing face of the Gulf Coast: Immigration to Louisiana, Mississippi, and Alabama. Available at: http://www.migrationinformation.org/usfocus/print.cfm?ID=368

Dow, N. 2011. Vietnamese community scattered after Katrina. Biloxi Sun Herald. August 24.

Durrenberger, E. Paul. 1992. It's all politics: South Alabama's seafood industry. Urbana, IL: University of Illinois Press.

Durrenberger, E. Paul. 1996. Gulf Coast soundings: People and policy in the Mississippi shrimp industry. Lawrence, KS: The University Press of Kansas.

Eaton, L. 2006. A new landfill in New Orleans sets off a battle. New York Times. May 8.

Espina, Marina E. 1988. Filipinos in Louisiana. New Orleans: A.F. Laborde and Sons.

Euraque, Samantha. 2004. "Honduran memories": Identity, race, place, and memory in New Orleans, Louisiana. M.A. Thesis. Louisiana State University.

Fairclough, Adam. 1999. Race and democracy: The Civil Rights struggle in Louisiana 1915-1972. University of Georgia Press.

Falgoux, Woody. 2007. Rise of the Cajun mariners: The race for big oil. Thibodaux, LA: Stockard James.

Follett, R. 2005. The sugar masters: Planters and slaves in Louisiana's cane world, 1820-1860. Baton Rouge, LA: Louisiana State University Press.

Freeman, J. 1995. Changing identities: Vietnamese Americans 1975-1995. Needham Heights, MA: Allyn and Bacon.

Fussell E. 2007. Constructing New Orleans, constructing race: a population history of New Orleans. Journal of American History 94(3):846–855.

General Accounting Office. 1994. Vietnamese Amerasian resettlement: Education, employment, and family outcomes in the United States. Report GAO/PEMD-94-15. Washington, D.C.: GAO Program Evaluation and Methodology Division.

Gerlach, Arch C., ed. 1970. The national atlas of the United States of America. Washington, D.C.: U.S. Department of the Interior, Geological Survey. Accessed via the Perry Castañeda Library Map Collection, University of Texas Libraries. Available at: http://www.lib.utexas.edu/maps/histus.html

Gould, Virginia M. 1996. The free Creoles of the antebellum Gulf ports of Mobile and Pensacola: A struggle for the middle ground. In: Dormon, J.H., ed. Creoles of Color. Knoxville: The University of Tennessee Press.

Gramling, Robert B. 1989. Concentrated work scheduling: Enabling and constraining aspects. Sociological Perspectives 32(1):47–64.

Gramling, R.B. and E. Joubert. 1977. The impact of Outer Continental Shelf petroleum activity on social and cultural characteristics of Morgan City, Louisiana. In: Stallings, E.F., T.F. Reilly, R.B. Gramling, and D.P. Manual, eds. Outer Continental Shelf Impact, Morgan City, Louisiana. Baton Rouge: Louisiana Department of Transportation and Development. Pp. 106-143.

Hahn, T. and C. Schwab. 1998. Donner, Louisiana: Historical and archaeological investigations of an early twentieth-century sawmill community. Baton Rouge: Coastal Environments, Inc. Report prepared for the Office of Highways of the Louisiana Department of Transportation and Development.

Hall, Gwendolyn Midlo. 1992. Africans in colonial Louisiana: The development of Afro-Creole culture in the eighteenth century. Baton Rouge, LA: Louisiana State University Press.

Hall, Gwendolyn Midlo. 2005. Slavery and African ethnicities in the Americas: Restoring the links. Chapel Hill: University of North Carolina Press.

Hein, J. 1995. From Vietnam, Laos, and Cambodia: A refugee experience in the United States. New York: Twayne Publishers.

Henry, Jacques and Carl Bankston, III. 2002. Blue collar bayou: Louisiana Cajuns in the new economy of ethnicity. Westport, CT: Praeger.

Hill, L. 2004. The deacons for defense: Armed resistance and the Civil Rights Movement. Chapel Hill: The University of North Carolina Press.

Jeansonne, Glen. 1995. Leander Perez: Boss of the Delta. Second edition. Lafayette, LA: University of Southwestern Louisiana Press.

Juhasz, Antonia. 2011. Black tide: The devastating impact of the Gulf oil spill. Hoboken, NJ: John Wiley & Sons.

Kelly, G. 1977. From Vietnam to America: A chronicle of the Vietnamese immigration to the United States. Boulder, CO: Westview Press.

Kniffen, F.B ., H.F. Gregory, and G.A . Stokes. 1987. The historic Indian tribes of Louisiana from 1542 to the present. Baton Rouge: Louisiana State University Press.

Kniffen, Fred and Sam Hilliard. 1988. Louisiana: Its land and people. Second edition. Baton Rouge: Louisiana State University Press.

LA-DA-043. 1997. Personal communication. History of and experiences with Indian education. Discussion with Diane Austin. Educator. Lafourche Parish, LA. October 30.

LA-DA-053. 1997. Personal communication. History of and experiences with Indian education. Discussion with Diane Austin. Educator. Terrebonne Parish, LA. November 7.

LA-DA-054. 1997. Personal communication. History of and experiences with Indian education. Discussion with Diane Austin. Educator. Terrebonne Parish, LA. November 7.

Lemann, Nicholas. 2006. Redemption: The last battle of the Civil War. New York: Farrar, Straus and Giroux.

Leong, K., C. Airriess, W. Li, A. Chia-Chen Chen, and V. Keith. 2007. Resilient history and the rebuilding of a community: The Vietnamese American community in New Orleans East. Journal of American History 94: 770-9.

Lewan, T. 2005. States struggling with Katrina refugees. Associated Press. September 4.

Louisiana Senate Concurrent Resolution No. 105, 2004. Introduced by Senator Dupre. Available at: http://www.legis.state.la.us/leg_docs/04RS/CVT6/OUT/0000LPU6.PDF

Lydersen, Keri. 2005. Immigrants rebuilding Gulf Coast suffer Third World conditions.   New Standard. November 3.

Maril, Robert L. 1983. Texas shrimpers: Community, capitalism, and the sea. College Station: Texas A&M University Press.

Marks, Brian. 2012. The political economy of household commodity production in the Louisiana shrimp fishery. Journal of Agrarian Change 12(2-3):227-51.

Mary Queen of Vietnam Community Development Corporation (MQVN CDC). 2011. History and mission statement. Available at: http://www.mqvncdc.org/page.php?id=9

McKelvey, R. 1999. The dust of life: America's children abandoned in Vietnam. Seattle: University of Washington Press.

McGuire, Tom. 2008. History of the offshore oil and gas industry in southern Louisiana. Volume II: Bayou Lafourche – Oral histories of the oil and gas industry. OCS Study MMS 2008-043. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

McGuire, Tom, Diane Austin, and Drexel Woodson, eds. 2013. Gulf Coast communities and the fabrication and shipbuilding industry: A comparative community study. Volume III: Technical papers. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.
.
Migration and Refugee Services. 1988. To welcome the Amerasians: An MRS staff report. Migration and Refugee Services of the United States Catholic Conference. Available at: http://content.cdlib.org/view?docId=hb9b69p28b&chunk.id=ch02&brand=calisphere&doc.view=entire_text

Mississippi Band of Choctaw Indians. n.d. Welcome from the Tribal Chief of the Mississippi Band of Choctaw Indians. Available at: http://www.choctaw.org/  Accessed March 20, 2012.

Moberg, M. and S. Thomas. 1993. Class segmentation and divided labor: Asian workers in the Gulf of Mexico seafood industry. Ethnology 32(1): 87-99.

Monroe, Nate. 2012. American Indian population remains steady. Houma Courier. January 21.

Montero, D. 1979. Vietnamese-Americans: Patterns of resettlement and socio-economic adaptation in the United States. Boulder, CO: Westview Press.

Mumphrey, A. and C. Wilson. 1979. Report to the Mayor. New Orleans: City of New Orleans Indo-Chinese Refugee Resettlement Task Force.

Nafziger, James. 2009. Immigration and immigration law after 9/11: Getting it straight. Denver Journal of International Law and Policy 37(4):555-565.

Nash, J. 1992. Vietnamese Catholicism. Metarie, LA: Art Review Press.

National Archives. n.d. American Indians in the federal decennial census, 1790-1930. Available at: http://www.archives.gov/research/census/native-americans/1790-1930.html. Accessed March 4, 2012.

National Park Service. n.d. Indian reservations in the continental United States. Available at: http://www.nps.gov/nagpra/DOCUMENTS/ResMAP.HTM

New York Times. 2011. Time runs out for St. Bernard Parish. New York Times. March 29.

Ng-A-Fook, Nicholas A. 2006. Understanding an indigenous curriculum in Louisiana through listening to Houma oral histories. Unpublished dissertation. Louisiana State University.

Nossiter, Adam. 2008. Hundreds of workers held in immigrant raid. New York Times.August 25.

Oxfam America. 2007. Immigrant rights advocates secure $1 million in unpaid wages and claims. Available at: http://www.oxfamamerica.org/press/pressreleases/immigrant-rights-advocates-secure-1-million-in-unpaid-wages-and-claims

Packard, Jerrold. 2002. American nightmare: The history of Jim Crow. New York: St. Martin's Griffin.

Pawlyk, Perry W. and Kenneth J. Roberts. 1986. Products and markets for small Louisiana shrimp. Marine Fisheries Review 48(4):65-70.

Perez, S. 2011. The Isleños of Louisiana: On the water's edge. Charleston, SC: The History Press.

Pitt, Matthew. 2010. A civil rights watershed in Biloxi, Mississippi. Smithsonian Magazine. Available at: http://www.smithsonianmag.com/history-archaeology/A-Civil-Rights-Watershed-in-Biloxi-Mississippi.html

Pointe-Au-Chien Tribe. n.d.-a. History/background. Available at: http://pactribe.tripod.com/id2.html Accessed March 13, 2012.

Pointe-Au-Chien Tribe. n.d.-b. About us. Available at: http://pactribe.tripod.com/id1.html Accessed March 13, 2012.

Post, Lauren. 1962. Cajun sketches: From the prairies of Southwest Louisiana. Baton Rouge, LA: Louisiana State University Press.

Powell, Francis J. 2004. Assessing the identity of black Indians in Louisiana: A quantitative and qualitative analysis. Unpublished dissertation. Louisiana State University.

Powell, Lawrence. 2012. The accidental city: Improvising New Orleans. Cambridge, MA: Harvard University Press.

PP454. 2011. Personal communication. Experiences as a commercial fisherman, community history, current work in fisheries. Discussion with Preetam Prakash. Extension agent. Biloxi, MS. February 22.

PP936. Personal communication. Crab business, consequences of past disasters, labor issues, current conditions in the seafood industry. Discussion with Preetam Prakash. Crab processor. Bayou La Batre, AL. August 22.

Precht, Jay. 2010. Native Americans in twentieth-century Louisiana. KnowLA Encyclopedia of Louisiana. Available at: http://www.www.knowla.org/entry.php?rec=752

Pulsipher, A. 2008. Cumulative and transitory effects of offshore oil and gas development on personal income in Louisiana's coastal parishes: 1969 to 2000. In: Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor, eds. History of the Offshore Oil and Gas Industry in southern Louisiana. Volume I: Papers on the Evolving Offshore Industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. Pp. 219-264.

Rehder, J. 1999. Delta sugar: Louisiana's vanishing plantation landscape. Baltimore: Johns Hopkins University Press.

Remini, R. 2001. Andrew Jackson and his Indian Wars. New York: Viking.

Roberts, Bari-Ellen. 1998. Roberts vs. Texaco: A true story of race and corporate America. New York: Avon Books.

Roberts, J. and M. Toffolon-Weiss. 2001. Chronicles from the environmental justice frontline. New York: Cambridge University Press.

Rodrigue, John C. 2001a. Labor militancy and black grassroots political mobilization in the Louisiana sugar region, 1865–1868. Journal of Southern History 67(1):115–145.

Rodrigue, John. 2001b. Reconstruction in the cane fields: From slavery to free labor in Louisiana's sugar parishes 1862-1880. Baton Rouge: Louisiana State University Press.

Rogers, D. 2003. Retreat from the Gulf: Reminiscences of early settlers of lower Lafourche. In Uzee, P.D., ed. The Lafourche Country: The People and the Land. Thibodaux, LA: Lafourche Heritage Society. Pp. 97-107.

Rothman, A. 2005. Slave country: American expansion and the origins of the Deep South. Cambridge: Harvard University Press.

Rutledge, P. 1992. Out of the shadows: The Vietnamese experience in America. Bloomington: Indiana University Press.

Scott, John P. 2000. Social network analysis: A handbook (2nd edition). ThousandOaks, CA: Sage Publications.

Sell, James L., and Tom McGuire. 2008. History of the offshore oil and gas industry in southern Louisiana. Volume IV: Terrebonne Parish. OCS Study MMS 2008-045. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Smithsonian Asian Pacific American Program. 2010. Smithsonian Vietnamese American Heritage Project. Available at: http://vietam.si.edu/

Sovereign Nation of the Chitimacha. 2005. History. Available at: http://www.chitimacha.gov/tribal_about_history.htm

Starr, P. 1981. Vietnamese fisherfolk on America's Gulf Coast. International Migration Review 15(1): 226-38.

Tran, M-T. 2008. A mix of luck, polish. Los Angeles Times. May 5. Available at: http://www.nytimes.com/2011/04/20/science/earth/20vietnamese.html?_r=1&emc=eta1

United Houma Nation. 2008a. Federal recognition. Available at: http://www.unitedhoumanation.org/node/770. Accessed March 13, 2012.

United Houma Nation. 2008b. Tribal government. Available at: http://unitedhoumanation.org/node/16. Accessed March 13, 2012.

Urban League of New Orleans. 1978. Indo-China refugee issue: Urban League position paper. New Orleans: Urban League of New Orleans.

U.S. Census Bureau. 2000a. 2000 census data on population claiming Vietnamese ancestry by metropolitan statistical areas, cities and census-designated places. Available at: http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml

U.S. Census Bureau. 2000b. 2000 census profile of general demographic characteristics for Louisiana, Mississippi, Alabama, Mobile and Harrison Counties and Plaquemines, Lafourche, and Terrebonne parishes. Available at: http://censtats.census.gov/cgi-bin/pct/pctProfile.pl

U.S. Census Bureau. 2009. 2005-09 American Community Survey data on reported ancestry and countries of birth for foreign-born residents. Available at: http://www.census.gov/acs/www/

U.S. Census Bureau. 2010. 2010 census demographic profiles for Louisiana, Mississippi, Alabama, Mobile and Harrison Counties and Plaquemines, Lafourche, and Terrebonne parishes. Available at: http://2010.census.gov/2010census/popmap/

U.S. Census Bureau. 2012. Compendia: Table 617. Employed civilians by occupation – states: 2010. Available at
: http://www.census.gov/compendia/statab/2012/tables/12s0617.pdf

U.S. Department of State. 2005. Joint U.S. - Vietnamese announcement of humanitarian resettlement program. November 15. Available at: http://www.usvtc.org/us-vietnam/issues/hr/HumanitarianResettlement15Nov05.pdf

Vo, L. 2000. The Vietnamese American experience: From dispersion to the development of post-refugee communities. In: Wu, J. and M. Song, eds. Asian American Studies: A Reader. New Brunswick, NJ: Rutgers University Press. Pp. 290-305.

Vujnovich, M. 1974. Yugoslavs in Louisiana. Gretna, LA: Pelican Publishing Company.

Wall, B., L. Cummins, J. Schafer, E. Haas, and M. Kurtz. 1997. Louisiana: A history. Third edition. Wheeling, IL: Harlan Davidson, Inc.

Wallace, Barbara, James Kirkley, Thomas R. McGuire, Diane Austin, and David Goldfield. 2001. Assessment of historical, social, and economic impacts of OCS development on Gulf Coast communities. Volume II: Narrative report. OCS Study MMS 2001-027. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Walton, Shana. 2008. Sabor Latino: Central American folk traditions in New Orleans. Essay for the New Populations Project of the Louisiana Folklore Program. Available at: http://www.louisianafolklife.org/LT/Articles_Essays/latinos.html

Ward, M. and Z. Gussow. 1979. The Vietnamese in New Orleans: A preliminary report. In: Cooke, J., ed. Perspectives on Ethnicity in New Orleans. New Orleans: Committee on Ethnicity in New Orleans. Pp. 37-41.

Wiegmann, Fred. 1969. Agriculture in the Louisiana economy. In Beard, T., ed. The Louisiana Economy. Baton Rouge: Louisiana State University Press. Pp. 55-81.

Wiley, Eric. 2002. Wilderness theatre: Environmental tourism and Cajun swamp tours. The Drama Review 46(3):118-131.

Wilkerson, I. 2010. The warmth of other suns: The epic story of America's Great Migration. New York: Random House.

Yarborough, T. 2005. Surviving twice: Amerasian children of the Vietnam War. Dulles, VA: Potomac Books, Inc.

Yoes, H. 2005. Louisiana's German Coast: A history of St. Charles Parish. Lake Charles, LA: Racing Pigeon Digest Publishing Company.

Young, A. 1980. Vietnamese-Black interaction in New Orleans: A preliminary assessment. In: Cooke, J., ed. Perspectives on Ethnicity in New Orleans. New Orleans: Committee on Ethnicity.

Zhou, M. and C. Bankston III. 1998. Growing up American: How Vietnamese children adapt to life in the United States. New York: Russel Sage Foundation.

# CHAPTER FIVE: BAYOU LA BATRE AND MOBILE COUNTY, ALABAMA

Victoria Phaneuf and Preetam Prakash

Bayou La Batre, located in Mobile County on the Alabama Gulf Coast, has long been recognized for its fishing and shipbuilding industries (Figure 5.1). This chapter provides the historical context for this community and study area and the contemporary circumstances that influenced how the *Deepwater Horizon* disaster was experienced there.



Figure 5.1. Map showing Mobile County and Bayou La Batre, AL
Source: Ben McMahan

## 5.1. MOBILE COUNTY HISTORY

At the arrival of the first European explorers, the area that was to become Mobile County was inhabited by Creek and Chocktaw Indians, and the name Mobile itself is derived from a Native American word. Following exploration by the Spanish in the early 1500s, a French fort was founded at Mobile in 1702, laying the groundwork for Alabama's oldest city (Hamilton [1901] 1976).

145

From the early days of European settlement, the economy of northern Mobile County has been primarily agricultural, while proximity to the Gulf has given seafood and shipbuilding a significant role in the coastal economy. Mobile developed into a center of international sea trade and a focal point of local land-based commerce. A slave-based plantation economy did not develop in the area Mobile was incorporated into the United States following the War of 1812 (Thomason 2001). Mobile became an important cotton port and the largest slave-trading center in Alabama - the last ship carrying African slaves to the United States docked just north of the city in 1860 (Hudson 1976; Diouf 2007).

Following the post-Civil War stagnation of the plantation economy, the region developed strong timber and chemical industries. Northern Mobile County remained largely agricultural, but its coastal seafood industry became more integrated with distant markets ascanneries developed and railroad links allowed its produce, primarily oysters, to be marketed in northern cities (Durrenberger 1992). In the early decades of the 20th century, the City of Mobile saw significant growth of its population and its seaport, and developed into an industrial city.

World War I brought challenges by disrupting the international trade networks of which the city was part. Local shipbuilders received government contracts and new yards were created, but these activities were limited by labor shortages. Between 1918 and 1928, expansion of Mobile's port facilities and the establishment of new shipping companies increased trade and attracted industry to the area (Phaneuf et al. 2013). In south Mobile County, subsistence fishing was still widespread, small-scale commercial seafood production remained the primary source of income, and retail and entertainment outlets were few. The City began to draw increasing numbers of people from this area, both as employees and consumers, a situation which has continued into the present (McLaurin and Thomason 1981; Durrenberger 1992).

The Great Depression weakened trade and industrial opportunities but World War II brought economic revival and job growth. The war years witnessed the construction of Brookley Air Field, an upturn in military and civilian shipbuilding contracts, and increased metal processing for aircraft construction (Alabama Department of Archives 2009). The demand for labor opened employment opportunities to African Americans and white women, groups that had been excluded from industrial jobs until that time. These changes gave rise to tensions that culminated in a race riot at the Alabama Drydock and Shipbuilding Company yard in Mobile in 1943 (PBS 2009).

Following the war, many local businesses engaged in wartime construction experienced steep downturns but this was counterbalanced by growth in specific industries, such as the chemical industry, and development of the interstate highway system which improved access to markets for businesses in general. Shipbuilding grew from the 1950s to the 1970s, tied mostly to military and offshore oil contracts in the City of Mobile and initially to commercial fishing but increasingly to oil and gas in south Mobile. In the early 1980s, overexpansion of the shrimping fleet in conjunction with the subsequent oil industry downturn led to the closure, downsizing, repurposing, or diversification of many shipyards in the area.

 Following the collapse of the governments of South Vietnam, Cambodia, and Laos in 1975, hundreds of thousands of refugees fled those countries, some resettling in Mobile County in the late 1970s and early 1980s through the efforts of Catholic Charities and state and federal governments. Over the following years, these newcomers were joined by other Southeast Asian immigrants, including family members of those already in the area and people seeking entrance into maritime based occupations.

In the 1990s and 2000s, the City of Mobile became involved in the aerospace industry, increased its participation in the oil and gas industry, and developed its tourism sector. Efforts to attract industry included construction of a ThyssenKrupp steel processing facility in north Mobile County (ThyssenKrupp 2012; Underwood 2009). Shipyards throughout the county went through a period of expansion, and new yards were built. This growth was driven by contracts related to offshore oil and gas development, military construction, and the building of recreational and ferry boats.

As with other coastal locations, south Mobile County has weathered the powerful hurricanes and storms characteristic of the region. Most recently, Hurricane Katrina caused significant damage in Dauphin Island, Bayou La Batre, Coden, and other nearby areas. The City of Mobile experienced flooding and road closures. At the time of this study, the City had made an almost complete recovery and the majority of work in south Mobile County had been completed, although some rebuilding was still underway.

Mobile remains the largest city in the county and the center of its retail, medical, and educational services. County residents also travel east to Baldwin County and west to Biloxi and Pascagoula, Mississippi, for services and entertainment. Outside the City of Mobile, Mobile County is predominantly rural. Many towns in south Mobile County serve as bedroom communities for Mobile, the Theodore Ship Channel, and Pascagoula. However, Bayou La Batre and its surounds maintain a strong concentration of industry mainly revolving around commercial seafood and shipbuilding. This area has long depended on marine resources and maritime industry. In this sense, there exists considerable continuity between past and present in south Mobile County.

## 5.2. BAYOU LA BATRE AND ITS ENVIRONS

The city of Bayou La Batre and the unincorporated communities of Coden and Irvington are small, rural communities largely economically dependent on a mix of commercial fishing, seafood processing, and shipbuilding and marine fabrication. Bayou La Batre, in fact, is referred to by locals as the "Seafood Capital of Alabama" and its fishing vessels are known worldwide. Made famous by the movie *Forrest Gump*, Bayou La Batre was also involved with Hollywood when the local Steiner Shipyard built a pirate ship for Disney's *Pirates of the Caribbean: Curse of the Black Pearl*. Though Coden is unincorporated, its residents have a strong sense of civic identity and an active community center. Many local fishermen reside in Coden and many of the area's smaller seafood processing operations are located there. Irvington contains a mixture of agriculture and seafood processing activity. Several companies involved in the oil and gas industry are also located there. Many Southeast Asians, especially Lao, Cambodians, and Thai, live and have their places of worship in Irvington. In 2010, the Bayou La Batre CCD was home to just over 10,200 residents of which 2,558 lived in Bayou La Batre (U.S. Census Bureau 2010). These communities have average educational attainment and per capita income levels below the state average. Bayou La Batre is home to two clinics that offer primary health care, and one dental office. For more specialized procedures the nearest hospitals are located about 17 miles away in Mobile.The closest institutions of higher education are in Pascagoula, Mississippi.

The desire of residents to enter the locally dominant industries has changed over time. Prior to the 2000s, children of fishermen commonly dropped out of high school to work in the seafood business and help their families or to go into shipbuilding (Phaneuf et al. 2013). While

dropout rates in the area are still high, a weakened seafood industry and increased educational opportunities have made continued education and employment outside the area more attractive to many families and their children. Nevertheless, shrimping and fishing, in particular, are highly esteemed by some local residents because of the role these activities have played in the community's history, and because they allow an individual a great deal of personal freedom, and the opportunity to be self-employed and to work outside, with all the pleasures and challenges that these opportunities bring. The continued importance of these traditional forms of work is exemplified in the symbolic and cultural role that the seafood industry plays in local community life. For example, the annual Blessing of the Fleet ceremony marking the start of the brown shrimp season is among the area's largest public events. Held at the dock behind the Catholic church in downtown Bayou La Batre, the event draws a substantial crowd of locals and non-locals. However, some recount much larger crowds and assemblies of boats in decades past and see the ceremony as a sign of the industry's decline.

Historically, local social networks made for easy entry into the local shipyards and processing plants; workers and managers alike followed in their fathers' footsteps, or those of other family members. For example, Joseph Rodriguez (2008), a local shipbuilder, remembered entering the industry because of his father: "That was how we had the idea to build the first boat, he had more work than he could do, he owned a small piece of property and offered to my brother and I that we could build a boat that he had a contract for, it would be our boat, we got the profit, but he helped us get it set up and going." Shipbuilding is still considered to be a potentially profitable option, particularly for yard owners, but employers argue that younger generations avoid it, in part because they see it as dirty and dangerous.

Seafood processing offers an opportunity for people with limited skill sets, but it is not the first choice for those who can move into more economically rewarding and less strenuous positions. The growing service sector in Mobile offers more comfortable, if less profitable, options. Construction, offshore work, and work in the petrochemical industry are also plausible alternatives because they are seen by local residents as well paying, safer, and cleaner than the seafood or shipbuilding industries (Phaneuf et al. 2013). Higher gas prices since the late 2000s may have constrained employment options. Many local residents and employers have noted a decline in the distances that people are willing to commute although the scale and durability of this trend remains unclear. Alabama's "French Coast"-- Bayou La Batre, Coden, and Irvington-- is ethnically and religiously diverse. These communities are home to whites, African Americans, Southeast Asians, and Hispanics and to Catholics, Protestants, Buddhists, and Unification Church members. All these religious denominations have religious centers in the area. Of particularly importance to understanding this area is: the local reliance on maritime resources, Bayou La Batre's role in the regional maritime economy, the importance of social networks in resilience strategies, and relations between this rural area and urbanized Mobile in northern Mobile County. While the Alabama coastline may be small, the Bayou La Batre area is a center of Gulf Coast seafood processing (Figure 5.2). The community's reliance on seafood is expressed in an oft-told local joke about a school child informing his teacher that the four seasons of the year are "Oyster, crab, fish, and shrimp." Despite the area's low population and population density, its social networks are many and complex, resting on such foundations as kinship, ethnicity, occupation, religion, and non-profit organizations. Local residents take pride in their self-sufficiency and deep communal ties.



Figure 5.2. Map of southern Mobile County, compiled from ethnographers' notes
Source: Ben McMahan

## 5.2.1. Historical Narrative

Bayou La Batre was founded in 1786, making it the first permanent settlement in southern Mobile County. Nearby Coden Bayou was originally named "Coq d'Inde," the French word for turkey (Hamilton [1910] 1976). Shipbuilding developed early with locals building wooden boats for themselves, but it only achieved prominence as a local industry in the second half of the 20th century. During the late 1800s and early 1900s, Coden and Bayou La Batre

149

emerged as popular tourist destinations, catering to residents of Mobile who wished to engage in sport fishing and to stay at hotels along the coast. Some African Americans moved into the area to work in tourist-related jobs (VP019 2007). This changed in 1906 when a hurricane destroyed the community, its tourism infrastructure, and the railroad connection to Mobile. The area's tourism was soon limited to sport fishing which, itself, declined over time (Galliard et al. 2008:4). Bayou La Batre and Coden were home to a series of artist colonies between the 1930s and 1950s where artists sought inspiration from the seaside and bayou landscapes (McRoy and McRoy 2007).

Since the earliest European settlement, local families obtained food by fishing, shrimping, crabbing, oystering, and hunting and also cut and sold timber. Until the late 19th century, fishing was largely for subsistence, but seafood canning technology, the completion of the local railroad, and the introduction of ice manufacturing plants in the late 1800s created new business opportunities and jobs, and provided fishermen with a wider market (Seacat 2007:20). Seafood factories employed local and itinerant whites and African Americans and men, women, and children (Seacat 2007). During the 1920s and 1930s, particularly, some African Americans from sharecropping areas relocated to Coden seeking a better living (Galliard et al 2008).

In the 1950s, the shrimping industry in the Gulf of Mexico expanded (Durrenberger 1992). The switch to larger, steel shrimp vessels made possible year-round shrimping and a continuous supply for processing plants, though many fishermen continued to shrimp, oyster, fish, and crab only parts of the year. Often individuals in the seafood industry were connected by family or long association. Seafood brokers supplemented the local supply with catch brought from elsewhere for processing, ensuring year-round operations. This created a need for year-round employees in the processing houses with additional temporary hires during peak shrimp season. By 1988, Bayou La Batre was seventh in the nation for seafood landings, had 534 shrimp vessels operating out of its port, and local shrimp packing plants had 1,153 employees, more than the city's adult population that year (Graham et al 1988:5; Moberg and Thomas 1993; Thomas and Formichella 1987). Fishermen commonly spoke with considerable nostalgia about the 1970s and 1980s, which many described as a halcyon period for the industry. A commercial shrimper observed:

> [In] 1979 we had a pretty fair crop of shrimp, but the demand got to be really great, price got phenomenal for that year or for that time of year, that part of the century [Chuckles]. We'd never seen prices like that. Like, for instance, we got a 9-12 shrimp, which was large, in '78 we were getting two fifty a pound, '79, we got four dollar a pound… I'd say the latter '60s, through the '70s, through '85 was probably a real boon for the shrimping industry. And very few people got out of it at that time. Some, but very few. And then imports started taking its toll on the shrimpin' industry. (PP566 2010)

The growing use of large, steel hull vessels made it increasingly difficult for fishermen to build their own boats. Federal legislation such as the United States Fishing Fleet Improvement Act (P.L. 88-498) also made purchasing boats from U.S. shipyards more financially viable. In combination with contracts from the offshore oil and gas industry, this led to a boom for local shipyards in the 1960s and 1970s. Coinciding with the rising importance of the offshore oil industry in the area, some local fishermen began to diversify their earnings by working seasonally or occasionally as offshore vessel (OSV) captains and crew. Bayou La Batre and Coden reached a peak of over 30 shipyards in the late 1970s and early 1980s (Phaneuf et al.

2013). The shipyards were owned primarily by local whites, and workers were mostly locals as well, drawn from the pool of white and African American residents in and around Bayou La Batre, Mobile, and Pascagoula. Shipyards were also opened by seafood processing plant owners and the Unification Church, which purchased a number of properties in the area in 1977 (Reid and Starr 1982). When members of the Unification Church first purchased property and moved into Bayou La Batre, initial reactions to the new residents were negative. Over time, however, the church-owned businesses developed positive relations with local suppliers and employees, employing over 400 by the early 1980s, and church members were eventually accepted as productive members of the community.

In the late 1970s, Southeast Asian refugees from Vietnam, Laos, and Cambodia began arriving in Mobile County. Many were resettled by Catholic Social Services, and they were often moved into available public or subsidized housing near jobs which did not require English proficiency. Some Southeast Asian immigrants were resettled directly in Bayou La Batre and the surrounding area. Others were initially resettled elsewhere and moved to the community to join their extended family members, friends, and co-religionists. Southern Mobile County's Southeast Asian communities are distinctive by including several nationalities in considerable numbers: Vietnamese, Lao, Cambodians, and Thai, as well as many "Amerasians," the children of Southeast Asian women and American men who were born in Southeast Asia but, following the end of the Vietnam War, emigrated to the United States in large numbers.

At the time of this immigration, the area's seafood processing industry was experiencing labor shortages as blacks and white women, the traditional workers at these companies, were finding employment opportunities elsewhere (Moberg and Thomas 1993). In 1979, Bayou La Batre seafood plants began hiring Southeast Asian immigrants to fill this void and, since that time, Asian-American women have become the mainstay of this industry's workforce.  Their presence in the region and willingness to work the extremely long hours of repetitive labor that is characteristic of the industry has anchored Bayou La Batre as a center of seafood processing for the entire Gulf Coast.

While there were never violent altercations between local inhabitants and newly arrived Southeast Asians, relations have not always been easy, and there are tensions to this day between the communities (e.g. Sayre 2008b). On the whole, however, relations quickly improved following the initial arrival of Southeast Asians, particularly after it was generally acknowledged in the community that this population has brought economic growth to the region through their numbers and work ethic (Galliard et al 2008).

## 5.2.2. The Downturn of the 1980s to Hurricane Katrina

In the late 1970s, overcapitalization of the Gulf fishing fleet began to reduce demand for shipbuilding. With the 1980s oil crash, many shipyards went bankrupt or closed. During the 1980s and into the 1990s, those that remained shrank and diversified their operation, some moving exclusively into boat repair. Some shipyard workers took jobs at larger yards in Mobile, somey took advantage of union training programs at Ingalls Shipyard in Pascagoula and improved their skills, some moved into other kinds of employment.

In the decades following their arrival, Vietnamese, Lao, and Cambodians purchased several crab shops and one unloading dock. Vietnamese began moving into shrimping soon after their arrival, initially as deckhands under white captains and vessel owners but, over time, they

have come to own and operate a major portion of the large shrimping vessels in the area. The numbers of Lao and Cambodian crabbers have also increased over time. Oystering and fishing, however, continue to be dominated by white males. A few privately owned oyster leases still exist in the area.

The continuing settlement of Southeast Asians in southern Mobile County created distinctive ethnic neighborhoods, institutions, and businesses. Vietnamese, Lao, and Cambodian migrants established Buddhist temples and monasteries and Christian churches beginning in the 1980s and continuing through the 1990s and early 2000s. Temples commonly feature architectural styles and forms common to a group's place of origin, observe particular holidays, and support social functions. Christian Southeast Asians attend local churches, like the Catholic Church in Bayou La Batre, where a Vietnamese-language Mass is held weekly, or the Lao Baptist Church in Irvington. Significantly, the heavy reliance of local Southeast Asians on the seasonal commercial seafood and shipbuilding industries has facilitated the maintenance of links between these people and their places of origin. Many local Southeast Asians commonly take extended trips to their native countries during the slow season, which falls in late winter and early spring.

In contrast to the high density of shipyards and seafood operations in the area, there exist relatively few retailers, restaurants, and other businesses. The majority of such local businesses are owned by local whites. Some Vietnamese, Cambodians, and Lao own and operate convenience stores, gas stations, Asian groceries, restaurants, nail salons, billiard halls, and laundromats, both in Bayou La Batre and Irvington. There is one Thai-owned restaurant and two Hispanic-owned restaurants in the area. The few African American-owned retail businesses are concentrated in the personal care and food sectors.

Unlike Bayou La Batre and Coden, Irvington has historically been a strongly agricultural community. However, in recent years it has emerged as the site of several smaller seafood processing operations as well as the area's few offshore oil industry offices and facilities. Also, since the 1980s, a significant portion of local Southeast Asians as well as their retail businesses and places of worship have located in Irvington.

Throughout the 1980s and 1990s, some local fishermen acquired larger offshore shrimping vessels to facilitate longer voyages and many of these were built in Bayou La Batre. The 1990s was another period of transition that saw general economic improvement in the area.The late 1990s to early 2000s was also a time of particularly rapid vessel construction for both the fishing and offshore oil industries, spurred by relatively high shrimp prices, government programs facilitating commercial boat ownership, and the expansion of the offshore industry in the Gulf and globally. In the 2000s, though, many shrimpers were driven out of the industry by high diesel prices, low shrimp prices, a growing volume of cheaper imported shrimp, and new government regulations. Shrimp processors were also impacted and a few closed their doors during the 2000s. In 1999, Bayou La Batre, Mobile County, and other surrounding areas joined Project Impact, a Federal Emergency Management Act (FEMA) program aimed at increasing their post-hurricane resilience (FEMA 1999).

Whites, Vietnamese, Cambodians, Lao, and African Americans, primarily men, all work in the local shipbuilding and fabrication industry. In the late 1990s and early 2000s, many younger Southeast Asians were moving into other occupations, causing labor shortages in shipbuilding and fabrication and seafood processing industries, and leading some area companies to supplant their local and regional workforce with guestworkers hired on H-2B temporary visas (Phaneuf et al. 2013). Some owners established long term relationships with their H-2B workers,

who were largely from Mexico and Central America, hiring same employees year after year. Some experimented with the H-2B process and found it too costly and rigid to suit their needs. Speaking in 2011, an oyster plant owner discussed the bond which had developed between him and some of his H-2B workers:

> I travelled to Mexico with my family to visit some of my Mexican workers a few years ago. They asked us to come down. Some of the workers have been coming to the plant to work each season for many years and they are like family. My family and I travelled through Tabasco and other places along the eastern coast because a lot of our workers are from Tabasco (PP1010 2011).

A small number of Hispanics also began to work locally as deckhands on shrimpboats, and boat captains also occasionally have hired H-2B visa workers for these positions. When Hurricane Katrina hit the area, the local shrimping fleet had declined significantly from the late 1980s and was down to 300 boats (Mitchell 2009).

The early 2000s also saw the development of a plan to remake Bayou La Batre into a tourist destination revolving around the opportunities for sport fishing and pleasure boating. A non-local developer and some local residents were intent on building tourist infrastructure in the town, including waterfront condos and marinas. Some residents and business owners saw this potential economic change as positive, following the shift of some coastal towns in Florida and elsewhere away from commercial fishing and towards tourism. Others perceived the proposed development as a direct threat to their way of life and their businesses. As one local noted, "We don't want outside developers. The community should choose what goes where. This is a fishing village and it's not gonna change. We want improvement, not change of category" (VP019 2007). However, in 2005, before such conflicts could be resolved, Hurricane Katrina struck the Gulf Coast and put at least a temporary end to any prospects of tourism development.

### 5.2.3. Hurricane Katrina and the pre-*Deepwater Horizon* Disaster Social and Economic Landscape

Hurricane Katrina had a devastating impact on the study communities. The majority of historic downtown Bayou La Batre was destroyed during Katrina or condemned afterwards. As of 2007, an estimated half of the city's buildings had been or would have to be destroyed due to hurricane damage (Seacat 2007:29). This included the majority of the retail establishments and a local medical clinic. Some establishments had still not been rebuilt at the time of this study, though much of the commercial rebuilding and reconstruction had come to an end by 2008.

The hurricane destroyed 500 of the 769 houses in Bayou La Batre and the city suffered a significant out-migration (Sayre 2008a). Of those who remained, some were uninformed of available grants and other funds, or had difficulty filling out the necessary paperwork before established deadlines. As of 2010, some of these individuals remained in storm-damaged houses (McMahon 2011).  In 2011 most had not fully repaired or rebuilt (Equity and Inclusion 2011). Some individuals that did rebuild later discovered that their properties no longer met insurance requirements (Sayre 2008a). Bayou La Batre received an Alternative Housing Pilot Program (AHPP) grant to build a housing development for hurricane survivors.  Implementation began in 2007 (Abt Associates Inc. 2009) and by July, 2009, 100 houses built under the program were

occupied. At the time of this study, some locals continued to express concern that the location of the new housing development north of the city had diluted community ties, significantly altered its maritime character, weakened business client relations, and created commuting difficulties for people who worked along the bayou (see also Phaneuf et al. 2013). Many displaced residents found moving back to town difficult because of increases in insurance prices and housing elevation requirements (Phaneuf et al. 2013) which was reflected in the local real estate market: in 2008 housing rentals were in demand but the only waterfront property in high demand were lots that could be used to expand shipyards and seafood operations (VP012 2008).

Following Katrina, Bayou La Batre received FEMA and Department of Housing and Urban Development funds to assist in rebuilding, as well as volunteer aid. Unincorporated Coden lacked the necessary administrative capacity to apply for this funding, and the South Bay Communities Alliance was formed shortly after the storm to provide a voice for this community and for other unincorporated communities in the area. Hurricane Katrina and its aftermath resulted in a great increase of local, regional, and national non-profit and religious organization activity in the area. Many such groups, for example Providence Hospital and Lutheran Services, were based in Mobile, a situation that contributed to an often expressed concern that the storm had increased the dependency of south Mobile County on the City of Mobile. Irvington and areas further north of Bayou La Batre were largely spared the same level of destruction and the subsequent influx of social service providers.

The formal organization of the area's ethnic groups changed to some extent following Katrina. Boat People SOS, a national Vietnamese-American social service and political advocacy non-profit organization, established an office in Bayou La Batre following the storm. Between Katrina and 2011 when it closed, another non-profit also operated in the area, employing Lao and Khmer speaking caseworkers to provide assistance to low-income Lao and Cambodians. Post-Katrina, no formal organizations emerged in the focused on other ethnic groups. Due to low levels of English proficiency among many of the migrant groups, English-as-a-Second-Language (ESL) classes are provided at the local community center and regularly draw members from most local ethnic communities.

As in much of the Gulf region, workers in the area's principal private industries are not represented by labor unions. However, several organizations tied to local industry do exixt including the Shipbuilder's Consortium, the Organized Seafood Association of Alabama, and the United Seafood Association. These groups play several roles, for example, representing local business interests on state, regional, and national levels and advertising to promote local industry. Following Hurricane Katrina, fishermen's associations also interacted with federal government agencies to determine payments to local fishermen, and they played a role in facilitating various post-hurricane projects including the rebuilding of hurricane-damaged oyster reefs. While some locals were very active in these associations, others expressed doubts about their effectiveness and benevolence. On the whole, the local shipbuilding and seafood industries tend to rely more on informal than formal networks.

Several education and advocacy groups also operate in the area. One example, the Working Waterfront Coalition, is an alliance of local stakeholders interested in maintaining public access to waterfront space in the face of growing private ownership and post-Katrina shortages of public docks and other infrastructure (Petri 2008). Ongoing involvement of Mobile non-profits in south Mobile County has troubled some locals who feel that outsiders do not understand and cannot respond to their needs. Local dependence on Mobile for income, goods and services adds to such tensions. Some in the area argue that these dependencies increased

substantially after Katrina destroyed local businesses and infrastructure, while others welcome this non-local involvement and describe Hurricane Katrina as having made community residents aware, for the first time, of their rights as citizens to rebuilding assistance, healthcare, and other social services.

Shipyards suffered damage and delays in contracts due to Hurricane Katrina but such setbacks were not significant to cause yard closures. All shipyard owners reported that they had fully recovered by 2008 (Phaneuf et al. 2013). The hurricane also benefited shipbuilding industry to an extent since damaged vessels required repair. As of 2009, Bayou La Batre and Coden had 12 shipyards, two focused entirely on repair (Phaneuf et al. 2013). The yards remaining in construction had a number national and international client bases spanning the fishing, offshore oil and gas, brownwater transportation, and pleasure industries. Some focused on one type of client or industry while others were more diversified. In early 2008, all local yards were booked full, some for a number of years, but the dramatic increase in both steel and gas prices in the summer of 2008 had a significant impact on those yards without escalation clauses in their contracts.

The commercial seafood industry took longer to recover from Hurricane Katrina than did the yards (Table 5.1). One estimate counted the initial economic losses of the Alabama seafood industry at $112.25 million (Chang et al 2006). Processing plants suffered heavy material losses, and not all of the smaller plants were able to reopen. The shrimping industry continued to experience the negative impacts of high diesel prices, low shrimp prices, and the influx of cheap imports. The storm reduced the number of local boats in the shrimping industry from 300 to 200 (Mitchell 2009). Additionally, the loss of dock space limited local and regional landings sites (VP040; Chang et al 2006). The "Katrina Cut," a gap in nearby barrier islands that allowed saline water to pass into local waters, was said by many to have had a particularly pronounced impact on local oyster reefs. However, federal government funding to rebuild the reefs provided some work to local fishermen over 5 years (NOAA 2007). Those who managed to stay in the commercial seafood industry after the hurricane generally held that, each year, the industry had improved,  although they argued it had not recovered to pre-storm levels. They also thought that, without the storm, 2010 would have been shrimpers "comeback year."

Growth in the years following Katrina led both local shipyards and seafood plants to turn increasingly to Hispanic migrant and H-2B workers. At the time of this study, the seafood industry continued to be divided along ethnic lines, with local whites owning the majority of the plants and Hispanics and older Southeast Asians constituting the majority of the workforce. As in the past, the local processing plant workforce continues to be relatively mobile, with the majority of workers moving from one processor to another in accordance with the season and level of work available. H-2B workers, however, are under greater restrictions regarding their movement. While some Southeast Asians have moved into crab plant ownership, currently no seafood plants in the area are owned by Hispanics.

Compared to oystering, shrimping, and crabbing, the local fin fishing industry is relatively small. Between 30 and 40 fin fishermen operate out of the area and gill net fishing is still permitted in the state of Alabama. Local fin fishermen often noted that there were far more people in this sub-sector in the past, and attributed this decline mainly to additional state regulations on the conditions for holding fin-fishing licenses and its policy of "buying out" working fishermen. The first buyout took place in 2008, with a second considered in 2011 as a way to help fishermen exit the industry (Dute 2011a; Raines 2010).

Table 5.1. Landings in Bayou La Batre

| Year | Quantity (million pounds) | Value (million dollars) |
|------|---------------------------|-------------------------|
| 2011 | 21.6 | 43.1 |
| 2010 | 3.1 | 4.7 |
| 2009 | 21.0 | 30.0 |
| 2008 | 19.0 | 36.0 |
| 2007 | 23.0 | 39.0 |
| 2006 | 28.0 | 41.0 |
| 2005 | 17.3 | 28.4 |
| 2004 | 19.1 | 28.4 |
| 2003 | 18.5 | 30.8 |
| 2002 | 17.1 | 27.4 |
| 2001 | 18.0 | 38.9 |
| 2000 | 23.0 | 48.9 |
| 1999 | 17.8 | 40.0 |
| 1998 | 23.6 | 36.4 |
| 1997 | 12.1 | 25.8 |
| 1996 | 20.4 | 28.6 |
| 1995 | 22.1 | 37.5 |
| 1994 | 18.3 | 36.7 |
| 1993 | 16.0 | 24.3 |
| 1992 | 16.2 | 24.0 |
| 1991 | 14.9 | 24.6 |
| 1990 | 13.7 | 20.7 |
| 1989 | 14.9 | 24.7 |
| 1988 | 12.4 | 23.8 |
| 1987 | 15.1 | 29.8 |
| 1986 | 25.6 | 43.3 |
| 1985 | 21.0 | 30.4 |
| 1984 | 18.2 | 31.5 |
| 1983 | 13.6 | 28.5 |
| 1982 | 17.8 | 33.8 |
| 1981 | 25.0 | 31.4 |

Source: NMFS n.d.

Before the oil spill, 25 seafood processing plants were operating in Bayou La Batre, Coden, and Irvington. While local harvests are relatively small compared to regions of Louisiana and elsewhere, for much of the Gulf Coast Bayou La Batre holds considerable significance in its role as a processing center. This role was magnified by Katrina and the destruction of seafood processors elsewhere along the Gulf. For example, after the storm and the loss of local processing plants, many crabbers along the Mississippi Gulf Coast began selling their product to Bayou La Batre processors. All but the smallest processors in the Bayou La Batre area generally

draw a substantial quantity of product from outside of the local area and have long standing relationships with fishermen, docks, and other processors in Florida, Mississippi, Louisiana, and Texas. Some obtain product from the East Coast and foreign countries. Louisiana suppliers are particularly important for many area processors.

## 5.3. SPECIFIC EFFECTS OF THE SPILL

The oil spill heavily impacted the local area because of reliance on commercial seafood and the shipbuilding and fabrication industry (Table 5.1). The impacts on these industries also "trickled down" to the retail sector. While few physical impacts from the oil spill were reported in the local area, local business owners and workers reported that media coverage of the spill affected perceptions of local seafood and had a significantly negative impact on the local economy.

Many fishermen in the area have ties to other Gulf Coast areas, and impacts to the region's fisheries were felt locally. Shrimpers operating the smaller inshore vessels generally shrimp in Alabama and, occasionally, Mississippi waters, but captains of larger offshore shrimping vessels commonly range through Florida, Mississippi, Louisiana, Texas, and federal waters. These vessels will occasionally travel East Coast waters, particularly when Gulf landings are low. These long trips are, at times, facilitated by family connections along the coast, and create friendships and working relationships that can serve as a buffer against unforeseen problems. Local oystermen who use tongs generally remain in local oyster grounds near Heron Bay, but those with dredge boats operate both in local areas and rely on the oyster season in Pass Christian, Mississippi. Local crabbers mostly operate in Alabama and Mississippi waters. They generally do not venture west of Jackson County, Mississippi but occasionally go as far as Bayou Caddy. Local fin fishermen operate in Alabama waters. Local fishermen are also commonly connected to other social networks, for example those tied to the offshore oil industry.

Fishermen and seafood processing plant owners reported being hurt during the summer of 2010 by water closures due to the spill, and by negative media coverage. Because of the spill, many fishermen could not participate in the 2010 brown shrimp season and, instead, attempted to get hired into the Vessels of Opportunity (VOO) program. Following the summer of 2010, all local seafood processors reported low production. Some attributed this to the unwillingness of Gulf Coast fishermen, particularly shrimpers and crabbers, to go fish after the spill because they were working for BP or had claims pending with BP or the Gulf Coast Claims Facility (GCCF). Fishermen who did go out for white shrimp in fall 2010 reported generally low catches. Plant owners also commonly expressed a belief that many customers had been unsure or opposed to buying Gulf seafood during the summer and fall of 2010. While processers generally acknowledged that such attitudes had softened in 2011, customer uncertainty concerning Gulf seafood was still widely reported to be an issue affecting business. Most owners reported the loss of several long standing customers and worried about the difficulty of regaining customers who might have already transitioned to other steady domestic or international suppliers. A manager at a local crab processing plant discussed these issues:

> People still don't trust Gulf Coast seafood. We used to deal with six to seven wholesalers before the spill but now we deal with just three and the volume of business that we are doing with these wholesalers is way down. It could be that these people have

turned to imports. Last year when we and the other processors here on the coast couldn't get crabs these customers in other parts of the country had to get crabs from somewhere and lots of them turned to imports (PP936 2011).

The local public oyster reefs were closed throughout the 2010–2011 season. The reefs near Pass Christian, Mississippi were also closed to dredging and a 10-sack limit was imposed on tonging boats. This development hit many local oystermen hard because they generally head to Mississippi to dredge in the course of a normal season. Many oyster processors in the area, especially smaller processors, were closed during the 2010–2011 season due to a gulfwide shortage of oysters.

Due partly to the low number of operators, commercial fin fishermen and fin fish processing plants did not report the same levels of negative impacts as did other local seafood businesses. Fin fishermen and fish processing plant owners did report a degree of negative impacts from media coverage of the spill, although this was also not as pronounced as in other seafood sectors. Both fishermen and fish processing plant owners reported harvesting popular fin fish species at normal levels during 2010–2011.

Unlike in other areas of the Gulf, fishermen and processors did not report much, if any, concern with the Mississippi River floods of spring. In 2011, fishermen reported that the brown shrimp season was poor, but local processors generally attested that their businesses had picked up considerably from 2010. Crab processors reported low production and some processors reported having had to lay off substantial portions of their workforce because of the state of the industry in 2010-2011. In some cases, these developments were directly attributed to consequences from the oil spill. In May, for example, a crab plant owner in the area who employed large numbers of local Laotian residents expressed:

> This morning was the first time we processed crabs in 3 weeks. Normally this is a very busy time of the year and we would be working 80 to 90 hours a week, 6 days a week. Lots of my workers have gone back to Laos or they've gone somewhere else. I don't blame them, they need to find work. My workforce is substantially lower than in other years. The people in Louisiana that I get crabs from won't go out. They tell me that there are no crabs out there. Everyone in Plaquemines Parish was working on the VOO program so didn't want to go back out crabbing (PP844 2011).

Both processors and fishermen reported very low catches during the 2011 white shrimp season, with significant uncertainty about why the numbers were so low (see also Dute 2011b). People involved in the crabbing industry also reported decreased production in the summer and fall of 2011.

Following local oyster reef openings in October 2011, most oyster processors and oystermen reported a good season, with oyster prices fairly high. Several oyster processors who had not operated since the oil spill reopened after the reefs were opened. However, the future of the season was still uncertain because people in the industry were unsure how long the local reefs would support harvesting. Related to this was local disagreement on whether more stringent sack limits should be imposed in order to prolong the season. Adding to this uncertainty about the future, the reefs near Pass Christian were closed indefinitely very early on in the season, and Bayou La Batre area oystermen were again unable to oyster there.

Across the Gulf, controversy followed the VOO program concerning who was hired and how much they were paid. The VOO program in Bayou La Batre experienced these issues, compounded by locally specific and pre-existent tensions over favoritism in local government. Commercial fishermen, upset that VOO work was being assigned not to local fishers but to wealthy and well connected non-fishermen from outside the community, staged protests that resulted in arrests in the summer of 2010 (Murtaugh 2010; Altman 2010). The later transfer of the local VOO program oversight to a company connected to Bayou La Batre's mayor also provoked protest among residents and the press (*Mobile Press-Register* 2010). VOO officially ended in Alabama on September 15th, 2010, and very few boats in the area continued to work in any capacity after this.

Those employed as offshore service vessel (OSV) captains at the time of the spill reported heavy impacts following the spill, either because they were put on stand-by or had their shifts substantially reduced. One of two OSV contracting companies in the area also reported a heavy reduction in work following the oil spill. A resident of the area who worked as a boat captain for one of these companies said about this:

> I mean you can blame it on whoever you wanna blame it on. You can either blame it on BP, for havin' the spill and the government in putting the sanctions and shuttin' the Gulf down, which is affectin' ME. And eventually MY company's gonna have to lay off...they're holdin' on, thinkin' that they're gonna get these sanctions lifted, they're gonna get the permits, and we're gonna go back to work. That's what everybody's dependin' on. But it's happening, it's gonna be so slow that my company can't maintain. They can't keep payin' 150 people (PP675b 2011).

However, several local companies that operated as labor recruiters and contractors for the offshore oil industry reported being busy with VOO program-related work during the summer of 2010, and stated that business had picked up during 2011.

Local shipyards that focused on commercial fishing boat repair and construction for Gulf boats generally reported significant negative impacts during the summer and fall of 2010, although a few yards were able to get fabrication work related to the oil spill cleanup. During 2011, most local yards still reported low levels of business, although they generally attributed this to the poor national economic climate or the high price of steel and not to factors immediately related to the oil spill.

The moratorium on deepwater drilling was reported to have impacted local yards focused on construction for the offshore oil industry. However, yard owners were divided on the severity and duration of these impacts. Smaller yards with ties to the offshore oil industry reported difficulties obtaining contracts following the spill, often related to the fact that the spill occurred during a down cycle in this industry. The co-owner of a yard moving towards greater involvement in deepwater offshore work prior to the oil spill outlined his company's experience of the post-spill period:

> At the time of the oil spill we were planning on moving into deepwater. We were heading in the direction of large offshore related work. We had narrowed things down to one customer. It's like dating. You spend months weeding out different girls and then you settle on one. But then something happens, like the oil spill, and you decide that you need

to go back and talk to the other girls, but you've already told them all that you will busy for at least two years and so what kind of answer will you get from them (PP892b 2011)?

In contrast to this type of situation commonly faced by smaller yards and shops, larger yards were generally able to find new sources of work in other areas of the oil industry or other markets.

Local non-profit and social service activity increased substantially following the spill. Business Support Centers were established in Bayou La Batre and in neighboring Baldwin County. The Center in Bayou La Batre was providing assistance in English, Spanish, Lao, and Khmer at the time of fieldwork for this study. Tax preparation assistance for locals who received BP claims or worked on the oil spill cleanup or VOO program was provided by local accountants through the Center. The Center also assisted local residents with the claims process and registered people for training programs, held locally or in the Mobile area, and intended to provide options outside of the seafood industry. Welding, certified nursing assistant, and commercial truck driver certification were the three areas targeted by training programs, and transportation to program sites was provided. However, caseworkers at the Center reported considerable difficulty during 2010 and early 2011 in qualifying many local residents for available training programs. Caseworkers stated that these difficulties resulted from official qualification criteria which required proof of oil spill impacts, proof that many locals had trouble providing. Low levels of formal education among many impacted local residents, as well as a lack of English proficiency among many Southeast Asians and Hispanics, were also commonly described as impediments to post-spill recovery. For example, lack of a GED or English fluency disqualified local residents from some jobs for which training was available. In the late summer, early fall of 2011, caseworkers at the Center reported improvements in the numbers of local residents that they were able to approve for training programs.

Boat People SOS assisted local Vietnamese and members of other ethnic groups with the claims process and other post-spill processes, and also provided food aid, translation, and tax preparation assistance. In addition to service in Vietnamese, this non-profit began to employ Lao and Khmer speakers. Various non-profits established after the spill also provided crisis counseling in English, Vietnamese, Lao, and Khmer. Continuing operations include a food bank and basic healthcare service. As of 2011, there were no organizations focused specifically on the needs of other local groups, although in Pritchard, Alabama, a majority African-American town nearby, a minister affiliated with the Southern Christian Leadership Conference (SCLC) formed an advocacy organization for oil spill claimants that served many African Americans in Mobile County.

Following historical precedent, many social workers, counselors, and others operating in the area after the spill were based in Mobile. Mobile Baykeeper is an environmental non-profit with the mission of protecting the environment of Mobile Bay and its watershed. Following the spill, Mobile Baykeeper (2009) made practical information about the spill and spill-related programs available on its website, advocated for locals and the local environment with representatives of the national government, and established a Volunteer Field Observer Program to monitor impacts of the spill. Other environmental groups, such as the Mobile Bay National Estuary Program, also served to disseminate information about the spill and post-spill cleanup (Mobile Bay National Estuary Program 2012).

While certain types of social services, particularly psychological counseling, became more readily available following the spill and the influx of BP grant money, some area non-profits in operation prior to the spill reported a decline in funding and cited difficulties providing post-spill services under already strained budgets. One local non-profit that had assisted low-income Lao and Cambodians shut down in 2011 due to a lack of funding, and other local non-profits talked of impending closure. Addressing the needs specifically related to the spill, one individual who had directed a local non-profit since Hurricane Katrina said:

> As opposed to after Katrina, after the oil spill most donors have been reluctant to give any money. Most of them consider the oil spill to be BP's responsibility and say that BP should be the one taking care of it. BP themselves have not made any attempt nor shown any interest in working with or funding any of the local non-profits. However, even though new funding is not coming in, we still have to find 3 times the amount of food and supplies because of how many more people are coming in after the spill (PP1022 2011).

Despite these troubles, several non-profits, most non-locally based, continued to operate in the area and provide various services, including food assistance, legal counseling, and healthcare.

Residents in this area also faced problems due to the lack of access to locally-caught seafood. Many locals regularly harvest shrimp, oysters, fish, and crabs for their own consumption, as well as to distribute among family, friends, and other members of their social networks. This practice of subsistence fishing was sometimes described by locals as providing a basic safety net which had seen people in the area through the economic fluctuations common in the local seafood, shipbuilding, and offshore service vessel sectors. Following the spill, many residents were uncertain about, or fearful of, eating Gulf seafood, and this not only affected commercial sales, it also had impacts on local subsistence activities.

## 5.4. REFERENCES

Abt Associates Inc. 2009. Creating a safe harbor after Hurricane Katrina: A case study of the Bayou La Batre Alternative Housing Program. Available at: http://www.fema.gov/pdf/about/programs/ahpp/ahpp_al_case_study.pdf

Alabama Department of Archives and History. 2009. Alabama and World War II. Available at: http://www.alabamamoments.alabama.gov/sec50det.html

Altman, George. 2010. As Bayou La Batre fishermen protest oil cleanup program, volunteers give food to city residents. Mobile Press-Register. August 1.

Chang, Semoon, Chris Denson, and Kevin Anson. 2006. Economic impact of Hurricane Katrina on the Alabama seafood industry. CBER Research Report #63.

Diouf, Sylvane A. 2007. Dreams of Africa in Alabama: The slave ship Clotilda and the story of the last Africans brought to America. New York: Oxford University Press.

Durrenberger, E. 1992. It's all politics: South Alabama's seafood industry. Urbana: University of Illinois Press.

Dute, Jeff. 2011a. Gill-net buyout revived in Alabama. Press Register. April 5.

Dute, Jeff. 2011b. Uncertainty surrounds Alabama's white shrimp season. Press Register. October 21.

Equity and Inclusion Campaign. 2011. Down home: Alabama housing recovery in the aftermath of Katrina and implications for the tornados of 2011. Available at: http://www.equityandinclusion.org/Report/E&IReport.pdf

Federal Emergency Management Agency (FEMA). 1999. Baldwin/Mobile/FEMA sign Project Impact accord. Available at: http://www.fema.gov/news/newsrelease.fema?id=10424

Galliard, Frye, Sheila Hagler, and Peggy Denniston. 2008. In the path of the storms: Bayou La Batre, Coden, and the Alabama coast. Auburn: Pebble Hill.

Graham, J., E. Brown, and S. Rees. 1988. Feasibility report and environmental impact statement for navigation improvements at Bayou La Batre, Alabama. Mobile, AL: U.S. Army Corps of Engineers.

Hamilton, Peter J. 1976 [1910]. Colonial Mobile. Tuscaloosa: University of Alabama Press.

Hudson, Charles. 1976. The southeastern Indians. Knoxville: The University of Tennessee Press.

Louisiana Office of Cultural Development. 1992. Chapter 10-A. Louisiana Unmarked Human Burial Sites Preservation Act. Division of Archaeology. Available at: http://www.crt.state.la.us/archaeology/legislation/chapter_10.aspx

McMahon, Ada. 2011. Reeling from BP, Alabama residents still seek assistance to rebuild after Katrina. Bridge the Gulf. November 11. Available at: http://bridgethegulfproject.org/node/170

McLaurin, Melton and Michael Thomason. 1981. Mobile, the life and times of a great southern city: An illustrated history. Woodland Hills, CA: Windsor Publications.

McRoy, Arthur and Juanita. 2007. Personal communication. Oral history of the Bayou La Batre region. Discussion with Victoria Phaneuf. Members, Bayou La Batre Historical Society. Bayou La Batre, AL. June 9.

Moberg, M. and S. Thomas. 1993. Class segmentation and divided labor: Asian workers in the Gulf of Mexico seafood industry. Ethnology 32(1):87-99.

Mobile Baykeeper. 2009. About us. Available at: http://mobilebaykeeper.org/about-us

Mobile Bay National Estuary Program. 2012. DWH oil spill related. Available at: http://www.mobilebaynep.com/static/dwh_oil_spill

Mobile Press-Register. 2010. Editorial: Keeping the cleanup program clean. Mobile Press-Register. July 7.

Mitchell, Garry. 2009. Low tide: U.S. shrimp industry hit by rising imports, falling prices. Mobile Press-Register. June 21.

Murtaugh, Dan. 2010. Bayou La Batre protest. Mobile Press-Register. July 7.

National Marine Fisheries Service (NMFS). n.d. Total commercial fishery landings at an individual U.S. port for all years after 1980 – Biloxi, MS. Available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/lport_hist.html   Accessed April 28, 2012.

National Oceanic and Atmospheric Administration (NOAA). 2007. Report to congress on the impacts of Hurricanes Katrina, Rita, and Wilma on Alabama, Louisiana, Florida, Mississippi, and Texas fisheries. Available at: http://www.nmfs.noaa.gov/msa2007/docs/Fisheries_Report_Final.pdf

PBS. 2009. The War: Mobile, Alabama. Available at: http://www.pbs.org/thewar/the_witnesses_towns_mobile.htm

Petri, Chad. 2008. Working waterfronts get another look in Alabama. WKRG.com News 5. June 12. Available at: http://www2.wkrg.com/news/2008/jun/12/working_waterfronts_get_another_look_in_alabama-ar-2136949/

Phaneuf, Victoria, Preetam Prakash, Josh Stockley, John Lajaunie, and Paul Wilson. 2013. South Mobile County. In: Austin, Diane and Drexel Woodson, eds. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume II: Community Profiles. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

PP566. 2010. Personal communication. Shrimping industry history and oil spill impacts. Discussion with Preetam Prakash. Commercial shrimper. Coden, AL. Date unknown

PP675b. 2010. Personal communication. Offshore industry history and oil spill impacts.Discussion with Preetam Prakash. Offshore Oil Vessel Captain. Mobile County, AL. Date unknown.

PP844. 2011. Personal communication. Seafood industry history and oil spill impacts.Discussion with Preetam Prakash. Seafood Plant Owner. Mobile County, AL. May 18.

PP892b. 2011. Personal communication. Shipbuilding Industry History and Oil Spill Impacts. Discussion with Preetam Prakash. Shipyard Co-Owner. Bayou La Batre, AL. July 7.

PP936. 2011. Personal communication. Seafood industry history and oil spill impacts.Discussion with Preetam Prakash. Seafood plant manager. Bayou La Batre, AL.August 22.

PP1010. 2011. Personal communication. Seafood industry history and oil spill impacts.Discussion with Preetam Prakash. Seafood plant owner. Bayou La Batre, AL.November 30.

PP1022. 2011. Personal communication. Non-profit history and oil spill impacts. Discussion with Preetam Prakash. Non-profit Director. Mobile County, AL. June 22.

Raines, Ben. 2010. Alabama gill net fleet dwindling after passage of buyout bill. Press-Register. November 29.

Reid, P. Nelson and Paul D. Starr. 1982. The social impact of Unification Church investments in Bayou La Batre, Alabama. A Socio-Ecologic Study Prepared for the Mississippi-Alabama Sea Grant Consortium.

Rodriguez, Joseph. 2008. Personal communication. Shipbuilding and seafood in the Bayou La Batre region. Discussion with Victoria Phaneuf. Shipyard owner. Bayou La Batre, AL. May 22.

Sayre, Katherine. 2008a. Bayou faces task of elevating storm-damaged houses. Mobile Press-Register. May 18. Available at: http://www.al.com/news/press--register/index.ssf?/base/news/1211102193302870.xml&coll=3

Sayre, Katherine. 2008b. Feds to monitor election in Bayou La Batre. Mobile Press-Register. August 26. Available at: http://www.al.com/news/press-register/index.ssf?/base/news/1219742108217850.xml&coll=3

Seacat, Harriet L. Richardson. 2007. Surges in 'the Bayou': Twentieth-century economic and social development in Bayou La Batre, Alabama. Report Prepared for the City of Bayou La Batre.

Thomas, J. Stephen and C. Formichella. 1987. The shrimp processing industry in Bayou La Batre, Alabama. Research Report No. 11. Center for Business and Economic Research.

Thomason, Michael. 2001. Mobile: the new history of Alabama's first city. Tuscaloosa: University of Alabama Press.

ThyssenKrupp Steel USA. 2012. About us. Available at: http://thyssenkruppsteelusa.com/en/project/aboutus.aspx.

Underwood, Jerry. 2009. ThyssenKrupp will delay startup of steel plant in Alabama. The Birmingham News. January 23.

U.S. Census Bureau. 2010. AL - Bayou La Batre CCD. Available at: http://quickfacts.census.gov/cgi-bin/qfd/demolink?01

VP012. 2008. Personal communication. Local financial climate. Discussion with Victoria Phaneuf. Real Estate. Bayou La Batre, AL. June 9.

VP019. 2007. Personal communication. Local history and politics. Discussion with Victoria Phaneuf. Community leader. Coden, AL. July 18.

VP040. 2008. Personal communication. Local history. Discussion with Victoria Phaneuf. Retired. Pascagoula, MS. March 6.

# CHAPTER SIX: BILOXI AND HARRISON COUNTY, MISSISSIPPI

Kelly McLain and Preetam Prakash

The Mississippi Gulf Coast comprises three counties, with Harrison County directly in the center (Figure 6.1). This chapter provides the historical context for this region and the contemporary circumstances that influenced how the *Deepwater Horizon* disaster was experienced there.



Figure 6.1. Map showing Harrison County and Biloxi, MS
Source: Ben McMahan

## 6.1. HARRISON COUNTY HISTORY

With abundant resources, the Mississippi Gulf Coast has historically attracted many groups of people. Native Americans engaged in subsistence hunting and gathering on the Biloxi Peninsula over 14,000 years ago. Over time, various indigenous peoples settled in the area, living close enough to local waters to harvest fish and oysters but far enough inland to minimize risk from storms (Husley 1998). Sieur Lemoyne d'Iberville, a French-Canadian soldier under the commission of the King Louis XIV of France, arrived in 1699 and established the first French Louisiana colonial settlement, which derived its name from a local indigenous group, the Bylocchy, and was located on the site of modern day Ocean Springs. In hopes of stimulating commerce and increasing revenue, King Louis XIV of France instructed colonists "to breed the Buffalo at Biloxi; to seek for pearls; to examine the wild mulberry with the view to silk; the timber for ship-building and to seek for mines" (Claiborne 1880). Within 30 years, the indigenous groups in the area had been greatly reduced in number by interrupted migration and hunting patterns and harsh treatment at the hands of colonists (Claiborne 1880).

The colony struggled to survive in the early 18th century. Plans were made to transport more French immigrants and to establish an African slave trade, but the settlement's economy continued to decline (Claiborne 1880). New Biloxi, established in 1713, briefly served as the colony's capital before New Orleans assumed this role in 1722, leaving New Biloxi and the surrounding areas essentially abandoned. After passing under British and Spanish rule, the Mississippi Gulf Coast was incorporated into the Mississippi Territory in 1812 and then into the newly formed state of Mississippi in 1817 (Husley 1998). The Mississippi coastal region was subdivided into Hancock County, which included all of present-day Harrison County, and Jackson County. Between 1806 and 1820, Hancock County's population grew from 12 French-speaking families to a total of 1,594 people (Husley 1998). Despite these rapid changes, there remained a core population, mostly descendants of D'Iberville's followers, who preserved the French-Canadian dialect and cultural norms (Claiborne 1880). The inhabitants depended mostly on subsistence fishing and hunting, and agriculture was minimal (The Biloxi Daily Herald 1902). The area's sandy soil proved unsuitable for large scale plantation agriculture and animal husbandry, and throughout the pre-Civil War period the Mississippi coast had smaller slave populations than other areas of the South (Graham 1861).

The local economy was based on commercial fishing, ship building, timber, and tourism. In the 1820s, wealthy families from New Orleans began building summer homes and cottages along the beachfront. This brought new workers to the area to serve this nascent tourist population. Yellow fever outbreaks in New Orleans in the 1830s increased seasonal visitors to the Mississippi Gulf Coast. Business and political interests lead to the formation of Harrison County in 1841, which was carved out of both Hancock and Jackson counties (Husley 1998). Two different rail systems were in place before the turn of the century and had pronounced impacts on population and business growth. Partly as a result, seafood factories began opening in the 1880s and, by the 20th century, the seafood industry was central to the local economy and culture. Shipbuilding in the area grew in close relation to the seafood industry. During World War I, the area's shipbuilding industry experienced some additional demand from the U.S. military, which also accelerated timber production (Husley 1998). Tourism continued to be important to the area and gambling grew in Harrison County during the early 20th century

(Nuwer and O'Brien 2006). The Great Depression had precipitous effects on the area. Shrimp prices plummeted, deforestation significantly reduced lumber operations, and development projects came to a halt in the mid-1930s (Harrison County and Ohio State University 2008a). Later that decade, slot machines and gambling gained popularity, and gaming began to draw tourists and workers to Harrison County, although the legal status of the industry remained tenuous. This situation gave rise to conflicts between proponents and detractors of the gaming industry which would continue throughout the 20th century (Nuwer and O'Brien 2006).

The construction of Keesler Air Field in 1941 opened many new employment opportunities for civilians and expanded the local consumer base. Harrison County benefitted from federally funded post-World War II projects, including an expansion of U.S. Highway 90, the completion of the Gulf Intracoastal Waterway between Florida and Texas in 1949, and the construction of a seawall and the world's largest man made beach in the 1950s. These developments facilitated the growth of tourism and also promoted shipping and commerce. Rapid growth polluted local waters and led to the closure of once productive oyster beds as early as 1945. Programs were created to transport oysters from polluted to clean areas, resulting in the quadrupling of oyster production during the 1960s (Husley 1998). However, industrial runoff and other forms of pollution proved to be an ongoing problem and, outside of Pass Christian, no open oyster reefs remain in Harrison County.

When Hurricane Camille hit Mississippi in 1969, the coastline was crowded with antebellum homes, apartments, motels, resorts, restaurants, and retail outlets. The damage was catastrophic, and it took nearly two decades for Harrison County to recover (Husley 1998). While the immediate aftermath of Camille fostered a spirit of cooperation, the policies designed to mitigate future storm hazards were not enforced over the long term (Colton and Giancarlo 2011). During the 1970s and 1980s, the tourism industry attempted to market the area as a family-friendly destination by encouraging the development of non-gaming entertainment and attractions, including the Mississippi Gulf Coast Coliseum and Convention Center, which was opened in 1976. The Coliseum hosted the Miss USA Pageant each year from 1979 until 1982. Communities promoted historic preservation in the area, in part utilizing Urban Renewal Fund monies to restore old buildings (Nuwer and O'Brien 2006). Biloxi began hosting events in 1975 as part of historic preservation week. That same year, Biloxi also began inventorying its historic resources resulting in the first edition of *The Buildings of Biloxi: An Architectural Survey,* published in 1976 (City of Biloxi 2004). Despite such initiatives, the economy remained depressed.

The local seafood industry rebounded with the aid of low-interest government loan programs, although technological advances in refrigeration and transportation made it difficult for local factories without those technologies to compete. The seafood industry facilitated the settlement of Vietnamese refugees in the area during the late 1970s and 1980s, and these refugees came to provide the industry with a new source of labor. Unlike many other areas of the Gulf Coast, Harrison County was only minimally impacted by the growth of the offshore oil industry in the 1960s and 1970s. However, some commercial fishermen began working either seasonally or full time as offshore service vessel (OSV) captains during the 1970s, a pattern which has continued up until the present.

Generally poor economic circumstances led to the passage of the 1990 Mississippi Gaming Control Act, which legalized gambling in coastal counties based on voter approval there. The following year, Harrison County voters approved dockside gambling and casinos, attracting national casino developers and corporations to the area. Gaming was soon generating

millions of dollars in local tax revenues, and providing a major new source of employment. The industry began with riverboat casinos but rapidly evolved to more luxurious barge-based facilities. By the late 1990s, many casinos had built resorts featuring hotels, theaters, restaurants, and spas. The development of high rise condominiums and other tourism-related infrastructure and businesses accompanied casino development. These changes gave rise to local advocates and detractors.

Beachfront development continued at a brisk pace until Hurricane Katrina struck the Gulf Coast in 2005. The hurricane caused massive damage and substantially altered existing demographic and economic patterns in the area. For example, large numbers of Hispanics arrived to work on the recovery and cleanup and particularly strong concentrations of Hispanics and Hispanic businesses emerged in Biloxi and Gulfport. Also entering were volunteers and non-profit workers who often remained after their initial projects were completed, establishing Harrison County as an important center for non-profit activity along the Gulf Coast.

On the other hand, many left the area following the hurricane. While some relocated far away from the coast, others settled in areas nearby to the north, such as the town of D'Iberville. During the study period, many people in the area argued that post-Katrina beachfront development has been limited and that the area has remained a shadow of what it once was. Many locals reported that the area experienced steady economic growth for a few years following Katrina as a result of the presence of cleanup workers and personnel, but the departure of many of these people around 2008 marked an economic decline, which was further reinforced by the national recession and generally held to have only begun turning around in the early part of 2010.

The physical destruction of many prominent landmarks and sites during Katrina added to local concerns about culture loss which had been raised by the growth of the gaming industry. In some ways, the conflicts and compromises that casino development and the responses to Katrina have engendered are in keeping with historical patterns in the area in that local residents have long had to reconcile a number of economic and social interests and perspectives. The history of the city of Biloxi, the traditional heart of the area's seafood and tourism industries, encapsulates and sheds light on these and other issues.


## 6.2. BILOXI AND ITS ENVIRONS

### 6.2.1. Historical Narrative

Founded in 1699 on the site of current day Ocean Springs, Biloxi was one of the earliest French settlements along the Gulf Coast and, as such, held an important role in the trade networks of the colonial period. In the latter part of the 18th century, Biloxi fell under British and then Spanish possession. During this time, the inhabitants raised livestock and produced pitch and tar. After Biloxi was chartered as a town in 1838, it grew rapidly and was established as a popular resort over the following decades. While some roads were built, the vast majority of transportation was water based until after the Civil War (Husley 1998).

Civil War engagements were fought very near Biloxi and the conflict had impacts on the town and surrounding areas. For example, prisoners of war from New Orleans were held on Ship Island (Hollandsworth 2006). However, due to the absence of a slave-based agricultural system and also because of the quick return of tourists to the area following the conflict, the aftermath of

the Civil War was not as calamitous as in other areas of the South (Nuwer and O'Brien 2006). Also, importantly, Biloxi's residents had access to abundant local marine resources to see them through times of scarcity. The city acquired some fame following the war as the site of Jefferson Davis' retirement. His house, Beauvoir, remained a popular tourist attraction at the time of this study. By the end of Civil War, Biloxi's population included foreign nationals from across Europe, Canada, Mexico, and Russia. A quarter of the population consisted of migrants from 23 other U.S. states.

Railroad service through central Biloxi began in 1870. The railroad was a catalyst for the local seafood industry's growth; Biloxi's first seafood factory opened on the Back Bay in 1880. Shortly thereafter, the national market for oysters boomed and multiple plants opened in the Back Bay and Point Cadet neighborhoods (Dyer 1971; Husley 1998). Starting in the mid-1880s, technological advances in oyster harvesting and local production of artificial ice greatly benefitted the seafood industry. Seafood plant owners generally owned fleets of fishing vessels and, as the rising costs of boat ownership forced many independent operators to work for plant owners or leave the business, the plant owners came to exercise control over the industry from harvest to processing. This was the case with a small number of African Americans who worked as commercial fishermen in the late 19th and early 20th centuries. Around the turn of the century, seafood plant owners began using new sources of labor. The first were "Bohemian," or Polish migrant laborers, who soon started to arrive seasonally from Baltimore and continued to do so for several decades. Worker camps were built to house them. Next, Croatian immigrants from the Dalmatian Coast and Cajuns from south Louisiana settled in the area, mostly around the Point Cadet and Back Bay areas, respectively, and provided a new, constant source of labor for the seafood industry (Nuwer 2006). Local shipyards were often owned by plant owners or individuals whose family members were involved in the seafood industry and these thrived on building fishing vessels (Nuwer 2010). During World War I, local shipyards experienced some demand for military vessels, but much less than shipyards further east in Jackson County.

Opportunities opened up in the 1920s and 1930s for some factory workers to own boats collectively, although their wives and younger family members often continued to work in the seafood plants (Nuwer 2006). Increased numbers of fishermen led to overproduction and plummeting prices in Biloxi's shrimp market. Factory workers suffered reductions in wages, which lead to unrest. Hope for recovery seemed dim until, in the 1940s, quick freeze processes and the sale of frozen shrimp let to larger markets (Husley 1998).

During the 1920s and 1930s, Biloxi city officials attempted to mitigate the city's dependence on seafood by emphasizing tourism to the area. In 1928, despite criticisms decrying alterations to the waterfront, a 24-mile concrete seawall was completed, intended to provide protection for the new beachfront highway. As attractions, amenities, and infrastructure grew, Biloxi became a popular site for conventions (Husley 1998). Other infrastructure advancements during the earlier part of the 20th century included new highways and a trolley system connecting Biloxi with other coastal locations. This increased property values, although some wealthier community members expressed discontent with the trolley's proximity to their beachfront estates (Brooks, Jr. 2011).

City leaders also sought additional ways to amplify business and employment opportunities. Biloxi's relationship with the military played a significant role in the city's development over time. A U.S. Coast Guard station was built in 1925. Another initiative was the construction of the Biloxi Veteran's Administration complex which provided employment to hundreds of residents between its groundbreaking in February 1931 and its opening in August

1933 (Husley 1998). Still trying to recover from the Great Depression, city leaders solicited the U.S. Army Corps to install a training facility in Biloxi to prepare soldiers for World War II. When Keesler Air Field was established 1941, the city's population effectively doubled overnight (U.S. Air Force 2006). Construction of the air field employed over 10,000 builders. The facility was renamed Keesler Air Force Base after the war. While the Hurricane of 1947 nearly destroyed the seafood and tourism industries, Keesler survived with little damage and its personnel provided emergency aid across the city (Husley 1998).

Gambling in Biloxi expanded during and after World War II and provided new opportunities for tourism. Nightclubs along "The Strip" boasted appearances by popular celebrities. After the 1947 hurricane, some influential community leaders proposed to legalize slot machines in Biloxi. The proposition failed, despite the possibilities of increased revenues. The gaming industry occupied ambiguous legal ground during this time and would for several decades. There was pressure from lobbyists to curb the gaming industry with arguments that the state constitution already prohibited it. The city quickly learned that the substantial fines derived from violations of gaming laws were a benefit. Gambling never went away, but rather went into backrooms through the 1960s (Nuwer and O'Brien 2006).

In the 1940s and 1950s, Biloxi's ranking as a world seafood processor dropped, but the seafood industry remained crucial to the local economy. During this time, boat ownership largely passed from processing plant owners to fishermen. As some local fishermen purchased larger boats, their fishing patterns expanded from inshore harvesting in Biloxi Bay to offshore trips which could last a month and span much of the Gulf (Husley 1998).

Major employment opportunities for local African Americans during the 1950s and 1960s included the tourism industry, seafood plants, Ingalls Shipyard in Pascagoula, and the Port of Gulfport working as longshoremen. The military and its associated civil service jobs also brought many African Americans to Biloxi. While many service members came temporarily for training, it was not uncommon for them to return in retirement. As with many other areas of Mississippi and the South, overt racial tensions rose in Biloxi during the Civil Rights era of the late 1950s and 1960s. The most famous local event came on April 24th, 1960 during nonviolent beach wade-in protests organized desegregate Biloxi beaches.  Violence organized in retaliation escalated, leading the occasion be dubbed "Bloody Sunday" (Mason and Smith 2000). Overall, however, Biloxi was marked by less violence and tension during this period than were areas of Mississippi further north. During the 1950s and 1960s, much larger numbers of small African American owned businesses existed in Biloxi, particularly around Main Street, than existed at the time of this study. Such businesses included restaurants, grocery stores, and music venues. African American neighborhoods during this period are commonly described as having been "self-sufficient," and a major impetus for such entrepreneurship was due to segregation-era laws and social codes. During this study, local African Americans reported that, following the end of segregation in the 1960s, the condition and numbers of African American-owned businesses began to decline and a common reason given is that more blacks began to frequent white-owned businesses after segregation ended. The influx of department and chain stores to the area starting in the 1970s also seriously affected African American retailers. Recounting the state of integration in public spaces, one resident who relocated to Biloxi in 1971 explained:

It was separate- the thing was there were more black businesses. What happened, a lotta the black businesses went away. We had cleaners, black cleaners, we had stores that were owned by black people, dry good stores, when I say dry goods, I['m] talkin' [they]

sold shoes and clothing and stuff like that. And there were more people shopping within the confines of the local area. Now… you gotta drive to Walmart, or D'Iberville, or New Orleans, or Mobile to get some things that you really need. So I think we lost a lot with the community when we integrated (Crowell 2011).

The one business sector that local African Americans recall that remained successful into the 1970s was the social lounges and clubs.

During the 1960s, a secondary seawall was constructed in west Biloxi, creating greater space for tourism businesses to expand along the beachfront. However, in 1969, Hurricane Camille crippled the city and its seafood and tourism industries, and Biloxi began the 1970s still recovering. A beach replenishment program was completed in 1973, and low-interest government loan programs for individuals and small businesses helped to speed rebuilding, but Biloxi's tourism industry was still unable to effect a full recovery. Hurricane Camille had left visitors scared to travel to the area, and the worldwide energy crisis only compounded the decline (Husley 1998). Coastal tourism went into a decline and did not play a strong role in the local economy during the 1970s (Nuwer and O'Brien 2006).

While the tourism and retail sectors struggled during the 1970s, increased national demand for shrimp, relatively high shrimp prices, and low diesel prices created an economic climate that many local fishermen and plant owners still see as a "golden age" for the industry. During this time that Vietnamese refugees and immigrants began to work in large numbers in Biloxi's processing plants, following labor recruitment by Biloxi oyster and shrimp processors who bussed them in from New Orleans. During this time, some of the Croatians, Cajun, and African Americans who historically had provided labor for the plants were moving into other, less physically strenuous occupations, and Vietnamese workers soon constituted a substantial portion of the local plant workforce (Schmidt 1995). Croatian and Cajun descendants also were beginning to move out of their traditional neighborhoods of Point Cadet and Back Bay and into west Biloxi and other areas. After several years, the first Vietnamese settled permanently in Biloxi mostly around Point Cadet and Back Bay.

As elsewhere on the Gulf Coast, the 1970s were a good time for shipbuilding in Biloxi. The local boom in shipbuilding was largely fueled by the commercial fishing industry. Biloxi yards participated to a relatively minor degree in the offshore oil related work which was occupying shipyards in many areas of the Gulf. And, in contrast to neighboring Jackson County (Phaneuf et al. 2013), military related work never figured heavily in Biloxi shipbuilding.

## 6.2.2. The Downturn of the 1980s to Hurricane Katrina

The 1980s generally was a difficult decade for tourism and retail businesses in Biloxi. Towards the end of that decade, attempts were made to revitalize downtown Biloxi, but these were mostly unsuccessful. By the late 1980s, the entire state of Mississippi was facing unemployment of historical proportions, and manufacturing jobs that had supported middle class citizens were leaving. Biloxi's economic difficulties led to local government and economic development officials to open the way for the gaming industry (Von Herrmann 2006).

While the 1980s is recalled by many local shrimpers as having been a good time for the industry, Biloxi's commercial fishing landings declined in both volume and value in the latter part of this decade (NMFS n.d.; see Section 6.2.3). The mid-1980s saw some of the Vietnamese

who had arrived in the previous decade purchase small shrimp boats and move out of the processing plants. During this study, seafood processing plant owners were overwhelmingly positive about the contributions of Vietnamese plant workers and shrimpers to the commercial seafood industry. For example, a local plant owner said:

> Most of the blacks and whites in the area ended up going to the casinos. Now it is probably 90% Vietnamese in the plant. This changed long before the casinos came to the area. The Vietnamese were better workers. They were more prompt, they worked harder. Their work ethic was just better (PP554 2010).

However, the Vietnamese's refugee status and relatively quick movement into boat ownership gave rise to the continuing rumors among local, white fishermen about government assistance enabling the rise of Vietnamese in the shrimping industry. The gradual shift of Vietnamese men from processing plants to shrimp boats resulted, over time, in local plants mostly employing female and younger Vietnamese workers. As in other Gulf Coast communities, Vietnamese refugees and migrants continued to arrive throughout the 1980s and 1990s. Some new arrivals came to join family members or friends already in the area while others came to try their hand in the shrimping industry. Vietnamese came directly from Vietnam, from other foreign countries, and from other areas of the United States.

The community and the tourism industry were transformed by the arrival of casino barges in 1991 (Figure 6.2). The Mississippi State House of Representatives passed the Gaming Control Act on March 7, 1990. Without modification, the Senate passed the bill one week later. The bill was modeled after Nevada law. It included no restrictions on the number of casino licenses that could be issued, called for only nominal fees assessed for casino operator background checks, placed no limits for gamblers on bets or losses, and permitted casinos to accept wagers 24 hours a day, 7 days a week. The bill's sponsor, Rep. H.L. "Sonny" Meridith, made a last minute change to the bill prior to the vote, deleting the words "under way." Originally the bill was to allow casinos to cruise on waters outside the state's landmass. What may have appeared as only a slight change, in fact, created new opportunity for dockside gambling. Even Governor Mabus later stated he did not fully understand the gravity this legislation would have on the state (Nelson and Mason 2006). The expansion of the casino industry, the growth of retail businesses, condominium and apartment development, and rising real estate prices all contributed to the economic boom which the area experienced in the 1990s and early 2000s. Charter boat fishing was another facet of the local tourism industry which grew during this time. Advocates of casino development cited the revenues which gaming establishments brought while detractors complained of increasing crime rates and poverty levels. Some locals also opposed what they perceived as the gaming industry's destruction of traditional local industries and heritage. The waterfront along Point Cadet provided the most visible sign of the transition from an economy based largely on commercial fishing to an increasingly casino-based one as casinos came to occupy the waterfront spaces where seafood processors had traditionally been located.

The 1980s saw seafood processers begin to move away from oystering to an increasing focus on shrimp due to the introduction of new regulations and strict hygiene standards on oyster processing. By the 1990s, the fishing industry began to experience the negative impacts of the shrimp and crab imports that were entering the U.S. market in greater volume (see Chapter 2, Volume II). Furthermore, the casinos in the area offered alternative work opportunities to those previously in the commercial seafood business. However, until the 2000s, commercial fishing

generally remained profitable for plant owners and fishermen. In the 1990s, many Vietnamese came to own larger, steel hulled Gulf trawlers equipped with on-board freezers which were capable of going out for a month at a time. By the 1990s, the commercial and religious infrastructure of the Vietnamese community in Biloxi was well established, with a number of Vietnamese owned businesses including grocery stores, restaurants, and nail shops as well as a Catholic church and a Buddhist temple. The majority of these were located on and near to Oak Street, which borders Point Cadet. Seafood processing was devoted mostly to shrimp, and Vietnamese in the area made few inroads into dock or seafood plant ownership.



Figure 6.2. Map of the Mississippi Coast showing the locations of key industries, compiled from ethnographers' notes
Source: Ben McMahan

During the early 2000s, the local tourism industry, and gaming tourism in particular, continued to expand at a considerable rate. Casinos were built along the Biloxi and Gulfport beachfronts, and several more were slated for construction. As of 1999, nine casinos were fully operational in Biloxi, and two others were in neighboring Gulfport. Property values rose in tandem with this development and condominium and hotel construction escalated along the beachfront.

During this same time, the local seafood industry began to increasingly feel the negative impacts–rising boat diesel prices, falling shrimp prices, and increasing quantities of import shrimp in the U.S. domestic market. These problems peaked around 2002 and 2003, and many local white and Vietnamese shrimpers were forced to get out of the industry altogether, downgrade to smaller vessels, or sell their vessels and begin captaining boats owned by others.

Like others in the area, seafood processing plant owners were influenced to sell their land based on disadvantageous economic conditions and the very substantial amounts that casino developers were paying for beachfront property. Many locals who had been involved in the seafood history, and many who had not, often lamented these changes, although many also attested to the benefits that casino development had brought. Some regretted the loss of a traditional local industry; others contrasted what they regarded as unsanitary and backbreaking of work in the commercial seafood industry with work in the new service economy.

During this study, few participants involved in non-gaming tourism connected their business successes to the gaming industry. However, many did speak favorably about the 1990s and 2000s as generally good economic times for Biloxi and the Mississippi Coast. Some restaurant owners discussed how casino development had been positive for their business until the casinos became more all-inclusive and began to offer a range of restaurant and shopping options within their own walls. Beachfront business owners and charter boat captains, for example, spoke about what they characterized as the gaming industry's attempt to increasingly monopolize tourist business. A vending stand owner observed:

> The casinos ultimately killed this coast. They killed all the night club business 'cause the casinos are greedy. They want it all. They wanna keep people in those casinos. They don't want 'em goin' nowhere. That's why they put the night clubs, the restaurants, the retail shops in there. They don't want you to leave… We thought, "we got casinos. We're supposed to all get rich". NOT! (PP1015 2011).

### 6.2.3. Hurricane Katrina and the pre-*Deepwater Horizon* Disaster Social and Economic Landscape

Despite reservations about the changing relationship between tourism and the seafood industry, further large scale tourism development was ongoing when Hurricane Katrina hit Biloxi in August 2005. The hurricane destroyed or severely damaged a huge number of local businesses and residences, especially along Biloxi's beachfront. Local residents often sorrowfully recounted the loss of the majority of historic homes which had lined the beachfront prior to Katrina. Following the storm, business owners and home owners wishing to build or rebuild faced much higher insurance rates and more restrictive? building codes and regulations. Pparticularly along the beachfront these factors kept many locally owned, smaller-scale restaurants, hotels, amusement parks, and other businesses from rebuilding. However, the majority of casinos as well as a few nationally franchised restaurants and hotels were able to build back relatively quickly. For example, six out of the 12 casinos which existed in Biloxi-Gulfport prior to Katrina had rebuilt by summer 2006; two years later all of the casinos had been rebuilt. The few hotels, restaurants, and other businesses which survived through the hurricane generally reported doing good business in the years immediately following by serving the cleanup crews, volunteers, and others who arrived in the area, but this "boom" had largely faded

by 2008. Common complaints among those in tourism included high insurance rates and very strict building regulations, a perceived focus of local government support on casino development, an accompanying lack of interest in smaller scale forms of tourism, and the waste of FEMA and other post-hurricane funds on non-essential projects.

Some tourism operators, such as charter boat fishermen, who rely heavily on long term networks of clients, reported that they had difficulty recovering such clients following Katrina. The loss of the easily accessible, visually prominent Broadwater Marina was held by some charter fishermen to be a significant loss (see also Posadas 2010). Following Katrina, charter fishermen largely operated out of docks adjoining local casinos. Some of them expressed dissatisfaction with this situation, claiming that casino management preferred that visitors not leave for extended periods to take charter trips. While the development of new casinos has been slower in more recent years, one new establishment was being built in 2011.

Following Hurricane Katrina, there was a general movement of retailers and other businesses inland, north to North Biloxi and D'Iberville. The construction of the Promenade Parkway, a large shopping center immediately outside of D'Iberville off Interstate-10 was accompanied by the construction of a number of hotels.  Some who continued to operate retail and other businesses in Biloxi said Promenade's presence had further diminished the prospects of beachfront redevelopment since itleft people little economic reason to venture into town.

Like beachfront tourism, the local seafood industry suffered heavily from Katrina. Much of the seafood industry infrastructure and equipment was destroyed or severely damaged. For example, the large craft harbor on Biloxi's Back Bay is still in a state of disrepair more than six years after Katrina. The small craft harbor behind Biloxi's Hard Rock casino required several years of work to become fully functional, and Broadwater Marina, frequented by both shrimp boats and charter boats prior to the storm, was completely destroyed. Some fishing vessels were lost or damaged in the storm, although most fishermen agreed that those who fished for living knew how to protect their vessels in the event of storms (Posadas 2010).

The crabbing and oyster processing industries were particularly impacted. These operations were commonly smaller than the shrimp processing plants, and thus lacked access to capital and resources which facilitated rebuilding after the storm. While several crab processing facilities operated along the coast prior to Katrina, following the storm only one small crab processor remained opened in Bilox and one other in Bayou Caddy. This prompted many crabbers who had previously unloaded their catch at coastal Mississippi processing plants to travel further east to Bayou La Batre. Oyster processing also suffered a blow from the hurricane leaving only two oyster processing plants operating along the Mississippi Gulf Coast at the time of this study. In general, the large shrimp processing plants in Biloxi were also severely impacted. Several plants moved to new locations following the storm but all of the major processors in the area had resumed operations by 2006.  Biloxi continues as a major center for shrimp processing forthe Gulf Coast, including large volumes from Louisiana and Texas. At the time of this study, four large shrimp plants and one smaller crab processor were located in east Biloxi, three seafood processing plants were located across the bridge in D'Iberville, and another large oyster processor and a very small crab processor were located close by in Pass Christian. All but one small processing plant, which was under Vietnamese ownership, were owned by whites. Biloxi shrimp processing plant owners maintained relationships with fishermen, unloading docks, and processing plants ranging across the Gulf Coast as well as in other areas of the United States and other parts of the world.

Table 6.1. Landings in Biloxi

| Year | Quantity (million pounds) | Value (million dollars) |
|------|---------------------------|-------------------------|
| 2011 | 10.7 | 19.9 |
| 2010 | 6.0 | 13.0 |
| 2009 | 12.9 | 19.3 |
| 2008 | 24.5 | 18.6 |
| 2007 | 11.7 | 18.6 |
| 2006 | 9.6 | 12.8 |
| 2005 | 8.5 | 15.3 |
| 2004 | 16.3 | 26.2 |
| 2003 | 17.4 | 26.8 |
| 2002 | 14.8 | 26.9 |
| 2001 | 14.6 | 29.1 |
| 2000 | 14.2 | 35.5 |
| 1999 | 13.4 | 27.9 |
| 1998 | 14.1 | 30.1 |
| 1997 | 9.5 | 23.1 |
| 1996 | 9.2 | 18.2 |
| 1995 | 12.0 | 23.3 |
| 1994 | 7.5 | 18.2 |
| 1993 | 8.8 | 15.3 |
| 1992 | 8.9 | 16.6 |
| 1991 | 8.8 | 14.4 |
| 1990 | 14.6 | 18.7 |
| 1989 | 12.6 | 22.2 |
| 1988 | 42.3 | 29.5 |
| 1987 | 38.2 | 14.2 |
| 1986 | 46.7 | 15.2 |
| 1985 | 41.1 | 13.4 |
| 1984 | 50.8 | 20.7 |
| 1983 | 57.6 | 21.0 |

Source: NMFS n.d.

Some local shrimpers attested that the reduction of the shrimping fleet in the period before and after Katrina was a favorable development for those remaining in the industry. Harvests in the years following Katrina were commonly reported as having been fairly good, but the industry continued to be negatively affected by the high prices of diesel and relatively low prices of seafood. The Biloxi shrimping fleet continued to include considerable numbers of both inshore and offshore vessels. The offshore vessels were generally owned and operated by Vietnamese captains and deckhands, whereas a mix of white and Vietnamese captains and deckhands operated mid-sized vessels. Most smaller vessels belonged to and were run by white captains and deckhands. White men who continued to be involved in the shrimping industry are

often descended from Croatian and Cajun French families with a long history in commercial fishing.

Oystering in the area takes place in the waters off Pass Christian. A section of the Pass Christian reef is normally closed to dredging and open only to tonging. Unlike in Louisiana (see Chapter 7), private oyster leases in the area are limited and most available grounds are public and, therefore, subject to sack limits and other regulations established by the Department of Marine Resources. Following Katrina, several reef reconstruction projects attempted to assuage damage done to the reefs both by the hurricane and other environmental factors, but no oyster reefs in Biloxi were open for harvesting during the study period. Oystering remained a largely white male occupation, with few Vietnamese or other minority participants. There remained considerable overlap between shrimping and oystering in the area, with many inshore shrimpers converting their vessels to dredge for oysters during the winter and early spring.

Crabbing in the area is small scale compared to many areas in Louisiana and there were relatively few full time crabbers operating at the time of this study. Crabbers commonly go out of Pass Christian, Ocean Springs, Gautier, or further east in Jackson County and few go out of Biloxi itself.

Like seafood processing, shipyards and fabrication shops in the area suffered damages due their waterfront location. While shipbuilding had been on the decline for some time, Katrina spelled the end for several local shipyards, fabrication shops, and supply shops. Following Katrina two shipyards were left operating in Biloxi and one in D'Iberville.

In addition to its physical and economic destruction, Hurricane Katrina also had significant effects on social networks in Biloxi and on the demographic constitution of the area. For example, Oak Street and the neighboring area of Point Cadet suffered some of the worst hurricane damage along the Mississippi Coast due to their low elevation, and many Vietnamese businesses and residential properties in this area were wiped out. In the hurricane's aftermath, a few Vietnamese owned businesses, including a bakery, a boat mechanic, a jeweler, and an auto shop, opened or reopened, but at the time of this study the street did not approach its former density of businesses and residences. Mirroring the general movement of local business further north after the hurricane, many Vietnamese opened businesses in D'Iberville and often also moved their residence there, to Gautier, or to other areas some distance from the wate. Other Vietnamese left the area altogether, sometimes moving to Vietnamese centers such as Houston or Atlanta.

When Katrina hit, many Croatian and French descendants had moved away from the seafood and shipbuilding industries, and, in many cases, away from the Point Cadet and Back Bay neighborhoods altogether. However, several marine supply stores, general stores, and other Croatian and French descendent owned businesses were still operating there, and these were not only economically important, but also widely considered to be important aspects of local ethnic history. Most of these long standing businesses were destroyed in the hurricane and were not rebuilt, as they were usually owned and operated by older people nearing retirement age. After the hurricane, both the Slavonian Lodge and the Fleur de Lis Club rebuilt. Similarly, prior to the hurricane there remained a significant concentration of African American owned businesses on Main Street which included restaurants, bars, and small grocery stores. While local African Americans generally agreed that these businesses had declined since the 1970s, they also agreed that, until Katrina, these establishments, continued to maintain and serve a steady clientele. Several of these businesses shut down following Katrina and owners of those that did survive complained that business had declined considerably in the years following the storm. The owners

of small businesses in east Biloxi and along the Biloxi beachfront all commonly voiced that the area had undergone an unfavorable transition following Katrina, from one that included a diverse range of businesses and that appealed to many different types of people, to one that focused more exclusively on gaming. Such complaints extended to local utilization of community based block grants and other funds in the aftermath of Katrina. Some local residents attested that, instead of being used to facilitate the recovery of neighborhoods heavily impacted by the hurricane, post-Katrina funds had been used to boost the development of large, corporate tourism along the Biloxi beachfront.

At the time of the study, military presence continued to have significant impacts on retailers and other businesses in Biloxi. Retailers in west Biloxi also experienced substantial damages as a result of Hurricane Katrina. However, many proprietors in this area, especially those located along the stretch of Pass Road immediately abutting Keesler Air Force Base, reported that, in the years after Katrina, the constant military presence imbued their businesses with a degree of stability. Many businesses provided military discounts and arranged their schedules, work shifts, and specials around base schedules. Military presence acted as a buffer against economic fluctuations and seasonal cycles in commercial seafood and tourism. Similarly, the loss of military clientele can have dramatic negative impacts for local businesses as was experienced by some businesses in the years prior to this study when certain military base entrances were closed due to post-9/11 security concerns.

In addition to dispersing populations, Katrina also brought new people to the area, particularly large numbers of Hispanics. The first substantial group of Hispanic migrants to the Mississippi Coast came mostly for the casino construction jobs in the 1990s. Local casinos and other sub-sectors of the tourism industry had employed guestworkers from a variety of countries, including people from the Caribbean, Central Asia, and Latin America, for years, but the construction-related increase in Hispanics was noticeable to residents.

During the late 1990s and the early 2000s, several large seafood plants began meeting their labor demands by bringing in Hispanic workers, mostly from Mexico, on guestworker visas. Except for older workers, the Vietnamese workers who had provided a substantial portion of seafood plant workforces since the 1970s were generally said to be moving out of the industry by then. The Hispanic workers were commonly reported to favor working in the plants because it required little English proficiency or formal education, and also because the seasonality of the fishing industry permitted annual extended trips to Vietnam.

Still, the Hispanic population in the area remained relatively low until Hurricane Katrina prompted a substantial Hispanic in-migration for the construction and cleaning jobs which were widely available. The majority of Hispanics who came to the Biloxi area were from elsewhere in the United States or from Mexico, but people also came from Honduras, Guatemala, and Nicaragua. In the years following Katrina, a number of Hispanic businesses, mostly grocery stores and restaurants, opened to cater to this new ethnic group as well as to the general population. However, by early 2008 a drop in construction work resulted in considerable numbers of Hispanics leaving the Biloxi area. Some who stayed turned to work in the seafood plants, local casinos, restaurants, shipyards, and domestic service. A small number of Hispanics also found work as deckhands in the shrimping industry, though none were mentioned to be boat owners.

Importantly, the aftermath of Hurricane Katrina saw an influx of new non-profits and religious organizations to the area, and the expansion of non-profits which had existed prior to the storm. A wide range of non-profits had established themselves in the area, including ethnically centered non-profits, environmental organizations, and organizations providing health and social services. This considerable expansion of the non-profit sector following Katrina prompted a variety of responses from local residents. Most locals appreciated the important role that non-profits and religious organizations played in rebuilding process following the hurricane. Many additionally credited non-profits with imbuing local people with a new sense of citizenship and rights, and an increased knowledge of the basic services to which they are entitled. An individual who worked with a local non-profit described this process in terms of the local African American community in particular:

> One of the major change that [Katrina] brought about was people who didn't live in Mississippi came down and showed blacks how the game worked…For the first time in my memory, for the first time as far as I know, we got a chance to participate in the process. So- in fact, now I know several blacks who are executive director of non-profit organizations, I am in constant contact with people who are black and run organizations…And our attitude about finding available resources have changed. That has been the major impact…Even with the devastation and the loss of life, Katrina has been a plus for this area. Every municipality and most individuals are better off post-Katrina than pre-Katrina (PP666 2011).

However others, and sometimes even the same people who praised non-profit activity in the area, attested that the growth of the non-profit sector had created new dependencies of various kinds and had thus worn away at local work ethic and at the more informal social networks which traditionally provided support.

## 6.3. SPECIFIC EFFECTS OF THE SPILL

Because of Biloxi's diversified economy, the direct impacts of the BP oil spill are more difficult to parse out here than in Gulf Coast areas that are more dependent on a single industry such as commercial fishing. This said, during 2010-2011, many of the area's residents, businesses, non-profits, and government officials reported various impacts as having directly related to the oil spill.

Many people in the area remarked that the oil spill came at the worst time possible: the start of the summer season for both the commercial seafood and tourism industries in the area. In May 2010, soon after the spill, training for the Vessels of Opportunity (VOO) Program began at various sites along the Mississippi Coast, including Point Cadet in Biloxi. At the program's height, it deployed around 800 Mississippi fishermen (Kirgan 2010). The program in Biloxiended on September 16th, 2010, as it did across the Mississippi coast. After that time, a relatively small number of commercial and charter fishermen continued to work in various capacities on projects and research related to the oil spill. While many commercial and charter fishermen were eventually hired onto the VOO program during summer 2010, there were many complaints from both fishermen and other local residents that the program had not hired local

fishermen quickly enough, and that it had failed to screen out non-locals and non-commercial boat owners as thoroughly as it might have.

State and federal waters which Biloxi shrimpers and crabbers normally fished were often closed during summer 2010. Closures were unpredictable, and were reported by fishermen as having created a situation where planning for the future was difficult if not impossible. Those shrimpers who made it out for the 2010 white shrimp season generally reported a decent harvest but commonly expressed concern that this might have been due to the relatively low numbers of shrimpers operating during this time.

Due to the oil spill, many local seafood processors severely curtailed operations during the summer of 2010 and many local plant employees were laid off or had their hours severely cut. Companies relying on H-2B visa workers either canceled these visas or brought in workers later in the year, and in fewer numbers than was customary. In the Biloxi area, Southeast Asian or Hispanic immigrants, and especially those with limited English proficiency, were constrained in opportunities for finding other local employment.

For locals involved in tourism and retail, the possibilities for getting involved in the oil spill cleanup depended on the nature of their business. For example, deckhands and captains in charter fishing were frequently able to participate in the VOO program. Likewise, most hotels in Biloxi reported a sizable, albeit temporary, increase in clientele during summer 2010 due to large numbers of cleanup workers in town. A relatively small number of restaurants were contracted to cater for BP cleanup crews, although much of this work was reported to have gone to non-local catering companies. However, other retail and tourism oriented businesses in the area, such as souvenir shops or clothing stores, had few opportunities to offset any losses suffered from the spill by becoming involved in the cleanup.

In 2011, the brown shrimp season opened early, due to the Mississippi River floods which occurred in the spring. Brown shrimp landings during that season were generally described by local shrimpers and others knowledgeable about the industry as lower than normal, though not terrible. Shrimpers also commonly stated that the schools of shrimp were often not in areas where they would normally would have been found. Also frequently observed was that white shrimp began to be caught in good quantity earlier in the year than was usual. During the summer of 2011, shrimpers and processing plant owners expressed hopes for a good white shrimp season. However, the white shrimp season in fall-winter 2011 was overwhelmingly stated to be very poor, with many industry veterans adding that it was the worst that they could remember. Shrimp landings and prices were reported to be very low. A local shrimper commented on some of the lingering uncertainty about the oil spill as well as the white shrimp season.

> When I try to go to sleep at night I think about what if some woman miscarries in 10 years because she ate the shrimp that I'm selling… I spotted a huge patch of oil about 7 miles wide 2 weeks ago coming towards Venice… the season has been very tough thus far. We're getting 50–75 cents a pound for shrimp. Gas is $3.25 a gallon. It really isn't possible to get by (PP872 2011).

Biloxi fishers and processors reported that shrimp landings were very low throughout the Gulf, thus reducing the potential for large shrimp boats and shrimp processors to turn to new locations along the coast for shrimp. Throughout 2011, local shrimpers attributed low shrimp landings to the effects of the oil spill and dispersants, but also to the Mississippi River floods

and, less frequently, to longer term shrimp cycles. Those who believed the BP oil spill to be partly or wholly responsible for the low season also commonly bemoaned the difficulty of separating impacts of the oil and dispersants from other causes.

The oyster season generally begins around October and ends in April, so oystering had just recently come to an end at the time of the oil spill. During fall and winter 2010, following to the spill, the oyster reefs in Pass Christian had been closed to dredging and open only to tonging. Many local shrimpers who normally convert their boats to dredge for oysters in the winter were unable to work their vessels. These oystermen commonly mentioned the physical impacts of the oil spill and subsequent dispersant use on oyster beds as potential reasons that the beds had been closed to dredging. The oystermen who normally tonged, on the other hand, reported a fairly good season and prices in 2010 and 2011. The few oyster processors operating in the area reported that the cost of oysters had gone up substantially during the 2010-2011 season and that they were needing to bring in a greater number of oysters from areas such as Texas, which were not impacted by the oil spill. Oystering in the area was further impacted by the Mississippi River floods in the spring of 2011. Following the flooding, in the summer of 2011, high mortality rates for oyster reefs in Pass Christian were reported and the grounds were closed shortly after the season opening in fall 2011 (Dow 2011).

Unlike other areas of the Gulf Coast, including many Louisiana parishes, the moratorium and suspension of deepwater drilling had only minor impacts on Biloxi. Relatively few residents are directly employed for the oil industry on the oil rigs, though area smoke shops and convenience stores noted a drop in business from fewer workers traveling through the area to Louisiana to go work offshore. Those working as OSV captains and deckhands did report direct impacts from the moratorium, but relatively few of them live in the area. Furthermore, there are few shipyards and other businesses, such as labor contractors, with strong relationships with the offshore oil industry.

Most residents in the area agreed that relatively little oil washed up on the Biloxi beachfront. However, many operators in the tourism industry in Biloxi reported major impacts following the oil spill. The majority of those in tourism who reported economic impacts linked them to the regional and national perceptions of the spill they commonly stated were "created" by the media, rather than the physical oil impacts. A charter boat captain discussed this at length:

> When the spill happened, there was a lot of press media that was focused on this area and this event. This was what was happening nationwide and all of this definitely had a negative impact on business… The problem is that perception becomes reality. People saw things on the media like those pictures of birds covered in oil and they didn't want to come down any more. They thought fishing in the Gulf was finished. I was at a bar in San Francisco and I remember that when I mentioned that I was a charter boat captain out of Biloxi, the bartender there asked, "aren't the waters there totally ruined?" (PP733 2011).

The sub-sectors of tourism which reported the strongest impacts tied to the spill include beach vendors, barrier island excursion businesses, beachfront retail shops, charter fishermen, seafood restaurants, and those in ecotourism.

The gaming industry was the most prominent local sector which officially reported little impact from the spill and which posted increased profits during summer 2010 (Gulf Coast Business Research Council 2010). However, gaming industry employees staged protests later on in the year claiming that higher casino revenues did not necessarily mean higher or even equal

wages for workers. These employees described heavy losses in tips and hours worked following the spill (Pham-Bui 2010).

Importantly, the heavy military presence in the Biloxi area buffered some local businesses from losses incurred after the spill. Retail businesses and hotels located along particular corridors near the military base, such as Pass Road in west Biloxi or I-49 in Gulfport, often drew a substantial portion of their clientele from the military and thus reported suffering few direct impacts from the spill.

The summer 2011 tourism season was generally reported to be an improvement over the summer of 2010. However, many in the tourism industry expressed that the BP tourism grants given to Mississippi in May 2010 and in Spring 2011 could have been put to better and quicker use. Many complaints about the recovery, or perceived lack thereof, of the tourism industry in the Biloxi area concerned what many business owners saw as an overwhelming focus on gaming, and a disregard for the development of other forms of tourism. For example, a vending stand owner complained about what he described as a lack of concern for smaller, locally owned facets of the tourism industry following the spill:

> Nobody's ever said one word about, in the mic, how can you get all this millions of dollars to promote tourism and you haven't put one commercial out about the beach and jet-ski rentals. That's something that people would want to do, is come ride jet-skis and spend the day at the beach, or something like that… I've got family all over the place and they've never seen any commercials at the beach…I don't know what they're doing with the money. Besides paying for some hotel rooms (PP1014 2011).

This type of concern about the use of post-spill recovery funds and grants was not limited to the tourism industry but was in fact widespread among residents, business owners, and workers in the area.

Many non-profits in the Biloxi area reported various types of impacts following the spill. The nature and extent of impacts were dependent to a large degree on the main foci of these respective organizations. Food banks commonly reported having to serve increased numbers of people during and after the summer of 2010. Those involved reported this increase to be related to an influx of non-locals to the area for short lived oil spill cleanup work. The few homeless shelters in the area likewise reported substantial increases in the numbers that they were serving starting in the summer of 2010.

Local non-profits which focused on serving particular ethnic communities sometimes reported considerable changes in levels of activity and types of services provided following the oil spill. This was particularly the case with non-profits dedicated to serving the Vietnamese Americans in the area. Since this community was heavily involved in the shrimping industry, one of the industries arguably most impacted by the spill, and because of relatively low levels of English proficiency among many older community members, non-profits and individuals serving this community took on a variety of roles following the oil spill, including helping to establish a bilingual retraining program for displaced Vietnamese workers in the area. On the other hand, non-profits which served ethnic communities that were not so directly tied to industries widely acknowledged as having been impacted by the spill commonly reported less change in their day to day activities as well as long term goals. Employees at those non-profits commonly aggregated the impacts of the spill with various other ongoing factors, including the poor

national economy and the lingering effects of Hurricane Katrina, which they argued were still negatively impacting their respective communities.

One result of the spill was the grants and other funding that became available. Many non-profits in the area reported competing for the grants, although many expressed concern about the transparency and fairness of the processes through which such funds were distributed. Furthermore, the restricted nature of many of the grants, especially those stemming from the BP claims process (see Chapter 6, Volume II), and the relatively low level of funding available, especially compared to funds made available fro disasters such as hurricanes, led non-profit employees and directors to frequently voice the problem of having no clear way to be compensated for their considerable expenditure of resources following the spill**.**

Claims filed in the Biloxi area were processed at an office on Lemoyne Blvd. In addition to English, the office offered assistance in both Vietnamese and Spanish**.** Local fishermen and processing plant owners generally reported that the claims process had functioned more smoothly and fairly under the direct oversight of BP. Many in the seafood industry argued that Kenneth Feinberg and GCCF taking over the claims process was a negative development.

## 6.4. REFERENCES

The Biloxi Daily Herald, Biloxi, Miss. 1902. Twentieth century coast edition of the Biloxi Daily Herald ... historical and biographical. Geo W. Wilkes & Sons. Available at: http://ia600305.us.archive.org/11/items/twentiethcentury00bilo/twentiethcentury00bilo.pdf

Brooks, Jr. Frank A. 2011. Traveling by trolley in Mississippi: Gulfport-Biloxi. Preservation in Mississippi. Available at: http://misspreservation.com/2011/09/22/traveling-by-trolley-in-mississippi-gulfport-biloxi/

City of Biloxi. 2004. Preserve America community designation application. Available at: http://www.biloxi.ms.us/cityatwork/images/preserveamerica.pdf

Claiborne, John F.H. 1880. Mississippi, as a province, territory, and state: With biographical notices of eminent citizens, Volume 1. Power & Barksdale: Jackson, MS.

Colten, Craig E. and Alexandra Giancarlo. 2011. Losing resilience on the Gulf Coast: Hurricanes and social memory. Environment: Science and Policy for Sustainable Development. 53(4): 6-19.

Crowell III, James. 2011. Oral history of the African American community of Biloxi. Discussion with Preetam Prakash and Kelly McClain. Treasurer of the NAACP State Conference and member of the Board of Directors for the NAACP National conference. Biloxi, MS. October 5.

Dow, Nicole. 2011. DMR calls for early shut down of oyster season. The Sun Herald. October 27. Available at: http://www.sunherald.com/2011/10/27/3536393/dmr-calls-for-early-shut-down.html

Dyer, Charles Lawrence. 1971. Along the Gulf, an entertaining story of an outing among the beautiful resorts on the Mississippi Sound from New Orleans, La. to Mobile, Ala. being a complete description of the advantages which may be enjoyed during a vacation spent among the delightful seaside towns of the Mexican Gulf together with a detailed account of the thriving Mississippi cities of Waveland, Mississippi City, Scranton, Bay St. Louis, Handsboro, Pascagoula, Pass Christian, Biloxi, Moss Point, Longbeach, Ocean Springs, etc. Also a short sketch of the men who have made them prominent. [1894-1895] Gulfport, Mississippi: The Dixie Press.

Gulf Coast Business Council Research Foundation (2010) Mississippi Gulf Coast Regional Brief: 2nd Quarter 2010. Gulfport, MS.

Harrison County and Ohio State University. 2008a. 2030 Harrison County Comprehensive Plan. Available at: http://www.planharrisoncounty.org/

Hollandsworth, James G. 2006. Union soldiers on Ship Island during the Civil War. Mississippi History Now. January. Available at: http://mshistory.k12.ms.us/articles/211/union-soldiers-on-ship-island-during-the-civil-war

Husley, Val. 1998. Biloxi: 300 years. Virginia Beach: The Donning Company Publishers.

Kirgan, Harlan. 2010. BP official says 800 Vessels of Opportunity deployed in Mississippi. Mississippi Press.

Mason, Gilbert R. with James Patterson Smith. 2000. Beaches, blood and ballots: A black doctor's Civil Rights struggle. Jackson: University Press of Mississippi.

Graham, Henry S. 1861. Map showing the distribution of the slave population of the southern states of the United States. Compiled from the Census of 1860. Available at: http://www.census.gov/history/pdf/slavedensitymap.pdf

National Marine Fisheries Service (NMFS). n.d. Total commercial fishery landings at an individual U.S. port for all years after 1980 – Biloxi, MS. Available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/lport_hist.html  Accessed April 28, 2012.

Nelson, Michael and John Lyman Mason. 2006. Mississippi: The politics of casino gambling. In: von Herrmann, D., ed. Resorting to Casinos. Jackson: University Press of Mississippi.

Nuwer, Deanne Stephens 2010. Shipbuilding along the Mississippi Gulf Coast. Mississippi History Now. October. Available at: http://mshistory.k12.ms.us/articles/351/shipbuilding-along-the-mississippi-gulf-coast

Nuwer, Deanne Stephens. 2006. The seafood industry in Biloxi: Its early history, 1848-1930. Mississippi History Now. June. Available at: http://mshistory.k12.ms.us/articles/209/the-seafood-industry-in-biloxi-its-early-history-1848-1930

Nuwer, Deanne Stephens, and Greg O'Brien. 2006. Mississippi's oldest pastime. In: von Herrmann, D., ed. Resorting to Casinos. Jackson: University Press of Mississippi.

Pham-Bui, Trang. 2010. Casino workers stage protest, claim BP "lied and discriminated". WLOX. November 8.

Phaneuf, Victoria, Preetam Prakash, Josh Stockley, and John Lajaunie. 2013. Southeast Jackson County. In: Austin, Diane and Drexel Woodson, eds. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume II: Community Profiles. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Pitt, Matthew. 2010. A civil rights watershed in Biloxi, Mississippi. Smithsonian Magazine. April 20.

Posadas, Benedict C. 2010. Economic assessment of the impacts of Hurricane Katrina on coastal Mississippi charter boats for hire, marinas and livebait dealers. Mississippi Agricultural and Forestry Experiment Station Bulletin 1185, Mississippi State, Mississippi.

PP554. 2010. Personal Communication. Impacts of the oil spill. Discussion with Preetam Prakash. Seafood Processor. Biloxi, MS. December 16.

PP666. 2011. Personal Communication. Impacts of Hurricane Katrina on the African American community. Discussion with Preetam Prakash. Community Organizer. Biloxi, MS. January 15.

PP733. 2011. Personal Communication. Impacts of oil spill. Discussion with Preetam Prakash. Charter boat captain. Biloxi, MS. March 25.

PP872. 2011. Personal Communication. Impacts of the oil spill. Discussion with Preetam Prakash. Shrimper. Biloxi, MS. June 18.

PP1014. 2011. Personal Communication. Oil spill impacts on beachfront vendor stands. Discussion with Preetam Prakash. Beach vending stand owner, Gulfport, MS. November 16.

PP1015. 2011. Personal Communication. Oil spill impacts on beachfront vendor stands. Discussion with Preetam Prakash. Vending stand owner. Gulfport, MS. November 18.

Schmidt, Aimee. 1995. Down around Biloxi: Culture and identity in the Biloxi seafood industry. Mississippi Folklife 28:1.

U.S. Air Force. 2006. History of Keesler Air Force Base. Available at:
    http://www.keesler.af.mil/library/factsheets/factsheet.asp?id=4881

Von Herrmann, Denise. 2006. The casino resort solution to Mississippi's problems: An
    introduction. In: von Herrmann, Denise, ed. Resorting to Casinos. Jackson: University
    Press of Mississippi.

# CHAPTER SEVEN: POINTE-A-LA-HACHE, EMPIRE, PORT SULPHUR, AND PLAQUEMINES PARISH, LOUISIANA

Carolyn Ware

Louisiana's southernmost parish, Plaquemines, is rural and industrial with a small, scattered population and no incorporated communities (Figure 7.1). It has six census-designated places (CDPs) and dozens of small settlements or neighborhoods, many on former plantation sites. The Mississippi River cuts the parish into eastern and western halves, connected only by two ferry crossings. Geography and politics further divide Plaquemines' agricultural northern end from a fisheries-and-oilfield dominated southern region. Everything downriver of Bohemia on the east side, and Venice on the west, is accessible only by boat or aircraft.



Figure 7.1. Map showing Plaquemines Parish and study communities
    Source: Ben McMahan

Once part of the colonial Territory of Orleans, Plaquemines has attracted a diverse cultural mix over the last three centuries: French and Spanish colonists, Croatians, African-Americans, Creoles of Color, Native Americans, Anglo-Americans, Italians, and Vietnamese, leading one writer to call it a "melting pot on the bayou" (Evans 1963). In particular, the local prominence of Croatian oystermen and African-American and Creole fishermen distinguishes Plaquemines from other coastal parishes. Plaquemines is a major shipping port, a highly

productive area for seafood, the hub of the state's citrus industry, and a leading producer of oil and natural gas.

Because Plaquemines' communities are small, ethnically distinct, and largely undocumented, three sites were selected for study: Pointe a la Hache on the eastbank, Empire and Port Sulphur on the westbank. The general overview of Plaquemines history below is followed by specific discussion of each research site and the effects of the disaster there.

## 7.1. PLAQUEMINES PARISH HISTORY

Much of Plaquemines Parish's strategic and economic significance derives from its location at the juncture of the Mississippi River and the Gulf of Mexico. Native Americans farmed its natural highlands, navigated the lower river, harvested (and perhaps traded) clams and oysters from the Gulf, making implements from the shells (Kniffen 1936; Lincoln n.d.-a; Buras 2006). Many local place names are adaptations of Native American words, and the parish's name is based on a Mobilian word for persimmon.

Long before LaSalle claimed Louisiana for France in 1682, other European explorers crossed Plaquemines seeking the river's mouth. Control of the lower river meant control of the entire Mississippi River Valley. Following LaSalle, French Canadian brothers Bienville and Iberville arrived in 1699 to establish a French colony, and building a fort on the lower Mississippi was a first priority. An outpost called Fort de la Boulaye was completed on the river's eastbank in about 1700, but was abandoned within a few years because of flooding. Its replacement, *la Balize*, was a combination fortress, lighthouse, pilot's station, and warehouse on Southwest Pass near the mouth of the river. When the French decided in 1722 to move their capital from Mobile to the New Orleans (because New Orleans was on the river), the Balize and New Orleans became the colony's most strategically important settlements (Lincoln 2008; Buras 1996).

Plaquemines' alluvial soil was suited to agriculture, especially in the parish's northern half. European colonists' first crop was indigo, soon succeeded by sugar and rice, and later citrus and vegetables. French and Spanish land concessions were granted along both sides of the river, and a few pioneers had cleared land there by the mid-19[th] century. Gradually, a semicircle of plantations around New Orleans expanded into northern St. Bernard Parish and Plaquemines' eastbank. Early settlers included families of French and Swiss soldiers (the Burat family, now Buras); French-speaking Alsatians from Louisiana's German Coast (Engels, Hingles and Frederics); and French colonists named Martin, LaFrance, and Fontenelle, among others (Bourquard 1987; Meyer 1981; Stringfield 1989).

Colonial Plaquemines developed a slave-based economy very early, as settlers depended on slave labor to help dig drainage canals and clear cypress forests. Enslaved Africans with strong agricultural skills began arriving in the colony in the 1720s (Hall 1992). The parish's black population soon outnumbered white settlers, who constantly feared slave revolts (Sitterson 1953; Schweninger 1989, 1996). More substantial development of Plaquemines began at the turn of the 19th century with introduction of new industries, people of other nationalities, and better transportation. Sugar planting and processing became more profitable after invention of the de Boré process in 1795, and sugar became Plaquemines' economic foundation. The 1803 Louisiana Purchase brought an influx of Anglo Americans, some of whom became very successful and influential planters in Plaquemines. Few Acadians settled there, but Continental

French immigrants (*les français étrangés*) arrived throughout much of the 19th century to work as plantation managers or merchants (Knipmeyer 1956; LaChance 1992; Brasseaux 2005). Historian Carl Brasseaux suggests that the majority of the parish's French families are descendants of these 19th-century "foreign French" (Brasseaux 2008).

Another wave of Francophone immigration came from St. Domingue in the 1790s and early 1800s, when thousands of white planters, free people of color, and African slaves fled the Haitian Revolution. Some of these Caribbean refugees settled on Plaquemines plantations, enlarging the parish's population of free people of color and spurring growth of Louisiana's sugar industry (Sitterson 1953; Schweninger 1989, 1996; Whitten 1995). Labor-intensive sugar cultivation required frequent infusions of workers throughout antebellum times, and 19th-century planters began turning to Virginia and the Carolinas for new slaves (Follett 2005). The parish's long sugar history resulted in a large, deeply rooted, African-American population that represented 23% of parish residents in 2000 (U.S. Census Bureau 2000).

As in antebellum New Orleans, a three-tiered racial "caste" system of whites, free people of color, and (usually enslaved) blacks was firmly entrenched in Plaquemines. When Emancipation erased legal differences between African Americans and Creoles of Color (descendants of free people of color), strong social distinctions remained (Brasseaux, Fontenot, and Oubre 1994; Dormon 1996; Knill 1997). One legacy was the parish's "rainbow schools," separate schools for white, Creole, and African-American children during the Jim Crow years (Kammer 1941; Kane 1944; Barrois 1962). Three communities in Plaquemines—Pointe a la Hache, Davant, and Diamond—are registered Creole communities (Creole Heritage Foundation, n.d.).

Forts along the lower river played a prominent role in defense of 19th-century New Orleans. In the War of 1812, soldiers at Plaquemines' Fort St. Philip turned back British ships after a nine-day battle. Five decades later, the Civil War took a key turn when Union forces managed to defeat Confederates at forts St. Phillip and Jackson (built in 1822) and take control of New Orleans. (Privately-owned Fort Jackson and St. Philip are now national heritage sites. Legislators and a local historical association are lobbying for the National Park Service to purchase Fort Jackson and create a museum there.)

The Civil War destroyed Plaquemines' plantations and privately-owned river levees, worsening flood problems. Financially-drained French and Creole of Color planters sold their lands to northern investors as plantations shifted from single-family ownership to corporate ownership. Many sugar estates were subdivided into smaller farms. As rice production and the lumber industry gained importance, the parish moved from a one-crop model to a more diversified economy.

In the post-Civil War years, freedmen's settlements such as Bertrandville and Promised Land grew up around old plantation slave quarters. Hundreds of black sugar workers left the parish for New Orleans and other urban centers, or found employment in local sawmills, railroad construction, and river-related work. In response to a critical labor shortage on sugar plantations, labor agents recruited African-American field hands from the upper South (Sitterson 1953). Local planters also imported Sicilian peasants to work their fields, and many of these families settled in Plaquemines as truck farmers (Scarpacci 1991).

As Plaquemines' sugar economy faltered in the second half of the 19th century, other industries emerged. Commercial oyster fishing became a viable industry at mid-century with an influx of Croatian men from the impoverished Dalmatian coast. Expert fishermen and boat builders, Dalmatians soon dominated the local oyster industry, transforming it from a small,

seasonal occupation to year-round cultivation and harvesting (Lovrich 1967; Vujnovich 1974; Wicker 1979; Ware 1996; Riden 2003; McGuire 2006; Horst 2011). In Barataria Bay, a largely Filipino workforce at Chinese-owned fishing platforms harvested and dried shrimp for export to Asia, taking the industry to a new level (Espina 1988; Pilapil 1996; Davis 2010). Likewise, canneries in Myrtle Grove, Empire, Ostrica, and Oysterville expanded the market for local shrimp and oysters (Buras 1996; Davis 2010; Horst 2011). These factories primarily employed women and children for low pay, under often-deplorable working conditions, but they provided an economic foothold for minorities and new immigrants. Some Plaquemines shrimp and oyster factories still operated at mid-20th century.

Transportation, essential to commercial growth, improved dramatically in the 19th and early 20th centuries. The Mississippi River was the region's "highway," but navigation was plagued by shifting sandbars that blocked access to the river's mouth, delaying ship traffic indefinitely. As a result, the Port of New Orleans languished as ships chose alternative routes. Self-taught engineer Captain James Eads, however, convinced Congress to let him to build jetties to channel the river and force it to create a deeper channel (Buras 2006; Barry 1997; Davis 2010). Despite widespread skepticism, construction of the Eads jetties in 1875 succeeded in making New Orleans one of the busiest ports in the country (Barry 1997). Today Plaquemines Parish is the gateway to the Ports of New Orleans and Baton Rouge, and more than 5,000 vessels a year pass through it. The Port of Plaquemines has 12 anchorages and two of the country's largest coal loading terminals (Port of Plaquemines n.d.).

By the end of the 19th century, railways on both sides of the river offered faster, more efficient transport of seafood and other crops to New Orleans. The New Orleans, Fort Jackson, and Grand Isle Railroad, built in 1889, extended from Algiers to Buras; eastbank tracks ran from Elysian Fields to Pointe a la Hache. Railroads also encouraged tourism, as day excursions to Plaquemines Parish communities (accompanied by brass bands) became popular among New Orleanians (Koenig 1981).

The 20th century brought numerous events that reconfigured Plaquemines industry and community life: death of the local sugar industry, discovery of mineral wealth, a major population shift, the Civil Rights movement, and a string of catastrophic hurricanes. River flooding and crevasses wiped out surviving sugar plantations by the 1920s, around the time that commercial citrus production flourished in south Plaquemines. Citrus had been grown there as a supplemental crop since the 18th century but remained a "minor venture" until the late 19th and early 20th century (Kane 1944). The lower westbank communities of Nairn, Buras, and Triumph were Louisiana's most productive areas until severe freezes in 1962 and 1963, followed by hurricanes Betsy and Camille a few years later, destroyed groves there (Vujnovich 2000; Ware 1996). Cultivation of "Louisiana Sweet" oranges, grapefruit, and satsumas is still an active industry in the northern half of the parish, celebrated since 1947 by the Plaquemines Parish Orange Festival.

Mineral exploration in the 1920s and 1930s further diversified Plaquemines' economy. Sulfur became an economic force in 1932, when Texas-based Freeport Sulphur undertook the enormous challenge of building a mine in the marshes of Lake Grande Ecaille (Davis 2010). For a time, Grand Ecaille was the most valuable sulfur mine in the world, operating 24 hours a day and producing 1,200 tons of marketable sulfur daily (Davis 2010). In 1966, Jefferson Lake Sulphur Company began mining sulfur in Lake Hermitage. The parish's sulfur was largely depleted by the late 1970s, when Freeport shut down its Grand Ecaille mine (Davis 2010).

Local oil exploration began at about the same time as sulfur mining, with Texaco drilling its first Plaquemines well in 1929 (Davis 2010). Politics complicated early mineral development, as longtime district attorney and parish president Leander Perez held "practically absolute political and economic power" in Plaquemines for five decades (Barrois 1962:366). As parish historian Rod Lincoln notes, Plaquemines' political machine skillfully used mineral companies as extensions of their own power (Lincoln 2008, see also Conaway 1973 and Jeansonne 1977). Perez dictated which companies could do business in Plaquemines, as well as whom they could hire and fire. Outside workers were required to be fingerprinted, photographed, and registered with the parish to obtain—for a fee--a work permit. Few black applicants received these permits, and local people of color were rarely hired for sulfur and oil jobs (Zebrowski and Howard 2005). Suddenly, ability to prove undiluted white ancestry became crucial in the racially-mixed parish.

Most mineral leases were negotiated through the Delta Development Company and Louisiana Coastal, owned by Perez and his allies. These dummy organizations leased mineral-rich marshland from parish levee boards (controlled by Perez), then subleased it to oil and sulfur companies in return for an "over-riding royalty," a fixed percentage paid on extracted minerals. If a company balked at these terms, the parish could deny drilling, blasting, and pipeline permits or throw up other obstacles. Over time, Perez skimmed as much as $80 million in oil royalties (Conaway 1973; Parent 2004). Eventually, Texaco, Humble, Gulf, Shell, Tidewater, and California Oil all operated in the parish, importing Anglo-American workers from Oklahoma, Texas, and Mississippi and altering Plaquemines' predominantly Francophone culture. By the end of World War II, Plaquemines was producing more oil than any other Louisiana parish, about 18 million barrels a year, and by 1957 Plaquemines oil production had reached $184 million annually (Conaway 1973). With the rapid growth of offshore drilling in the 1950s, Venice became a major supply and transportation hub for the offshore industry, a boon for the local economy. Venice, according to an oilfield support company executive, was the "Fourchon of its day" until the early 1990s, when rigs moved into deeper waters. Venice lacked the required footprint and water depth for accommodating large supply boats, barges, and tankers for deepwater drilling and production. At the time of this study, locals reported that about 90% of oil companies were operating out of Port Fourchon, and Venice's economy had suffered (CW503 2011). The community was referred to by at least one parish resident as a "ghost town" (Turlich 2002).

The parish's military and economic importance was particularly evident during World War II. New Orleans was a wartime port for troops and supplies, and German submarines attempted to disrupt transport along the lower river (Kane 1944; Lincoln n.d.). The Grand Ecaille mine and Port Sulphur, prime targets because sulfur was used in munitions, were declared combat zones in 1942 (Lincoln n.d.). Guard towers, machine gun nests, and surveillance planes protected the lower coast, and two military bases were built at the river's mouth. German submarines attacked ships in the Gulf daily, and victims were brought upriver to Plaquemines communities for treatment or burial (Buras 2002; Lincoln n.d.).

World War II military service had a powerful impact on African-American soldiers stationed in racially-integrated European nations. Returning home, they were determined to resist Louisiana's oppressive Jim Crow laws, leading voter registration drives in the late 1940s, 1950s, and 1960s. Gains were slow, however, and the Civil Rights era was troubled and violent in Plaquemines. Leander Perez, a vocal arch-segregationist, ignored the archdiocese's orders to integrate Catholic schools, one of which was firebombed. He resisted federal mandates to integrate public schools until a court order forced the parish to comply. Plaquemines promptly

created private academies for white students, supported by public resources. Today schools are legally integrated but some, such as Lower Plaquemines High School in Port Sulphur, have predominantly black student bodies, while others are largely white.

Leander Perez died in 1969, not long after his retirement from public office. Son Chalin replaced him as parish council president, and Leander Jr. became district attorney, maintaining the political dynasty for 15 more years. In the early 1980s, the brothers' feuding led to legal battles and political defeats, opening the door for political opponents. For the first time, African-American representatives were elected to the parish council and school board, where they could address minority concerns—such as the Perez family's refusal to apply for federal anti-poverty funding (Conaway 1973; Jeansonne 1997; Parent 2004). These events are documented in the 1984 film *The Ends of the Earth.*

New immigrants and refugees continued to arrive in Plaquemines to seek work in its fisheries. In the early 1980s, after the fall of South Vietnam and Cambodia, Vietnamese and Cambodian refugees settled in the Empire, Buras, and Boothville-Venice areas. Arden (1981) records one early group of Vietnamese immigrant fishermen who left Plaquemines after facing discrimination before 1980; the longest-resident Vietnamese inhabitants of the parish contacted for this study arrived in 1985 (BM497a 2011; BM504 2011). Most became shrimpers and crab fishermen and, despite initial resentment from local fishermen, have generally been successful. Cambodian fishermen were still arriving in Plaquemines in the summer of 2011 when fieldwork was conducted; many in this small but growing Southeast Asian community in Lower Plaquemines came from either California or the Philiadelphia area; some are connected through extended family (BM499 2011, BM502 2011). A number of Vietnamese families became seafood processors, dock owners, and restaurant or store owners. Since Hurricane Katrina, many Vietnamese fishermen live in Plaquemines only during fishing season, and spend the rest of the year in larger Vietnamese communities. Latinos, the parish's newest immigrant group, work as deckhands on oyster and menhaden boats; as agricultural laborers; and as construction workers. The local documented population is still small but growing, particularly in the post-Katrina rebuilding boom. There are several Latino-owned restaurants and other businesses in Belle Chasse, and public libraries host English-as-a-Second-Language (ESL) classes for Spanish speakers.

Plaquemines' population has shifted significantly over the last century. The older eastbank gradually emptied as oil and sulfur brought more commerce to the west side. There was also a gradual migration (some call it a retreat) from rural south Plaquemines to the urbanized northern end. Belle Chasse, a former sugar plantation, was a small town in the 1930s (WPA of Louisiana, c.1930). In the postwar years, the town grew and merged into the greater New Orleans metropolitan sprawl. Its population and economy received a boost in 1957 when the Naval Air Station moved there from Lake Pontchartrain's south shore. The opening of the first span of the Greater New Orleans Bridge (now Crescent City Connection) in 1958 linked Belle Chasse to New Orleans, bringing new families to the area in the 1960s (Jeansonne 1977). Some white families fled Port Sulphur's newly-integrated schools for Belle Chasse in the 1960s as well (Turlich 2002). Two devastating hurricanes in four years–Betsy in 1965 and Camille (a Category Five storm) in 1969–caused extensive damage in southern and eastbank Plaquemines, contributing to this northward migration (Buras 1995; Zebrowski and Howard 2005). By 2000, Belle Chasse had an overwhelmingly white (92.12%) population of 9,848 residents, with a median household income of $47,271, making it Plaquemines' largest and most affluent—

though still unincorporated—community (U.S. Census Bureau 2000a, U.S. Census Bureau 2000b).

By 2010, Plaquemines Parish had regained 85% of its pre-Katrina population (Rioux 2010), but the majority had shifted northward. The hurricane's devastation of southern Plaquemines brought a surge of storm refugees to the relatively unscathed Belle Chasse area, spurring construction of new housing developments and commercial centers. Belle Chasse's population swelled to 12,679 in 2010 (U.S. Census Bureau 2010). Northward migrations in the wake of hurricanes and floods are a familiar pattern for Plaquemines, but most residents eventually return "down the road" to rebuild their communities. This time, however, the post-hurricane tilt may be permanent. Parish president Billy Nungesser estimates that three quarters of parish residents now live north of the Conoco Phillips refinery in Alliance (about 14 miles below Belle Chasse), while eastbank and lower westbank communities remain almost empty (Rioux 2010).

Many Plaquemines families have lived in the parish for generations and have strong family, economic, and cultural attachments. Residents are proud of their independence, resilience, willingness to help each other, and ability to live off the land and water. A local employer half-jokingly observed, "If something happened to the world, I think these are the people who would be left" (CW464 2011). Most are determined to stay there if they can.

The *Deepwater Horizon* oil spill had an immediate and profound impact on Plaquemines Parish, still struggling to recover from Hurricane Katrina. Plaquemines was the nearest land mass to the Macondo well, and its marshes were first to be breached by oil. Effects were most evident in ethnically-diverse south Plaquemines, whose economy rests mainly on the oilfield and fisheries. The oil spill's effects on commercial and sports fishing are discussed in the community descriptions below.

The drilling moratorium also affected Plaquemines' economy; as a local oysterman and oil company consultant commented, "Everything [in south Louisiana] is hinged on energy—mom and pop restaurants. The oil industry is everybody's livelihood. Everybody is impacted by it" (CW492b 2011). More specifically, the Boothville-Venice area may have lost an opportunity to reverse its post-1990s economic decline. According to an oilfield-supply executive, new petroleum development in the eastern Gulf was in the planning stages before the moratorium, with Venice poised to become a stop-off point to eastern leases:

> I think the whammy that's going to hit Plaquemines and Venice is [that] they were just about to start opening up more East Gulf deepwater leases before the spill. It was a political and administrative struggle to get drilling further east in the Gulf Coast approved, because moving the industry east brings in the people in Florida who don't want anything to endanger their beaches. . . . People in Florida and Alabama are going to be very vocal [in opposition to eastern leases], so God knows when that will ever come back. That's going to be the biggest problem for the plan to get Venice going again..... This was a big chance to bolster the economy, but it was stymied. (CW503 2011)

The parish also reaped some financial benefits post-spill. The Venice area became a hub for first responders and international media covering the event, and Myrtle Grove Marina, 50 miles up Highway 23, also housed visitors; in comparison, the parish's eastbank saw few visitors or benefits. One marina owner commented that the main benefit to his was rental of all their lodging and high sales in the marina's restaurant. On the marina side of the operation (their

marine supply store, bait shop, fish cleaning services, and fuel dock), business was down around 40% (BR158 2011). The majority of the workers were gone from the marina by February of 2011 (BR158 2011). BP aslso employed outside contractors and some local food service businesses to provide meals for workers, but some businesses decided that these subcontracts were too small and "weren't worth the trouble" (BR161 2011). A Buras restaurant owner explained:

> First of all, we only got a contract for 200 lunches, as opposed to some companies and restaurants not from here who got, like 5 or 10 times more. And then by the time we put in the different bits we were required to include, fruit, sandwich, whatever, we were only making $3 per lunch. And then . . . we found out the trucking company that was only hauling it 15 miles down the road was making $14 profit per lunch. Plus we had to put our name on the lunch, so we had to claim all potential liability, so it really wasn't worth it. We did those lunches for 16 days and quit… (BR161 2011).

Business owners who did enjoy a brief post-spill boom commented that their companies will suffer long-term if commercial and sports fishermen don't return at the levels they were present before the spill.

Local fishermen applied for cleanup employment through the Vessels of Opportunity (VOO) program, and some earned substantial amounts of money. Minority fishermen and small-boat owners, however, say they were generally excluded in favor of outside contractors, sports fishermen, and charter boat captains with larger, faster boats--a pattern also seen in other coastal communities (see Chapters 5 and 6, this volume). A newspaper employee summed up what many people in Plaquemines, with six years of distance from Katrina, have said:

> Katrina was better than the oil spill because you could find your boat, repair it, and get back to work. You knew what to do; you can prepare for a hurricane. The reason there were so few fatalities in Plaquemines Parish is that people were prepared; they knew what to do. Everyone of a certain age here has lost a house in a storm. Now you don't know what to do: the lawyer's telling you one thing, the state another, and Feinberg another (CW477 2011).

## 7.2. POINTE A LA HACHE AND ITS ENVIRONS: INTRODUCTION

The fishing village of Pointe a la Hache is named for an axe-shaped bend (*pointe* in French) on the eastbank of the Mississippi, about 45 miles downriver of New Orleans. Pointe a la Hache has been the official seat of parish government since 1807, when Plaquemines Parish was created from the larger Orleans Territory. Once a bustling agricultural and shipping center with a multinational population, the community--and the eastbank in general—has shrunk over the last century. Hurricane Katrina further scattered its residents, and by 2010 Pointe a la Hache had 336 residents, 303 of whom are black (U.S. Census Bureau 2010).

Plaquemines Parish is unusual because 22% of its commercial fishermen are African-American (Laska et al. 2005). Many live or harbor their boats in Pointe a la Hache, the heart of Louisiana's black fishing community (Goodman and Gonzales 2010; Powell 2008; Rodriguez 2011; Yeoman 2010). They are primarily oystermen who describe themselves as "little"

fishermen, in contrast to larger, more prosperous westbank oyster operations. Many families have lived there for generations and maintain extensive, reciprocal kinship networks; everyone is a cousin, as one resident said (CW401 2011).

The area also has a long tradition of activism against racial and economic inequities, bolstered by a strong religious faith--whether Catholic or Baptist. A pastor and community leader told reporters, "We're a self-determined community. . . .We're strong in our faith. We have all kind of disasters come our way, but because of a religious conviction, we say, you know, we walk by faith, not by sight" (Goodman and Gonzales 2010).

## 7. 2.1. Historical Narrative of Pointe a la Hache

Colonial settlement of Plaquemines' eastbank began in the 18th century, and by the 19th century the east side was described as "one of the richest fruit, truck farming, and rice districts in the state" (Buras 1991). Pointe a la Hache, one of Louisiana's oldest communities, was the center of the state's 19th-century rice industry; two of the parish's largest mills, the Socolo and Empire rice mills, were located there. 19th century Pointe a la Hache was "a very cosmopolitan community with residents from all over the world living and working there;" less than half of its 1850 population was Louisiana-born (Buras 1991). Its oldest families were descendants of French and German pioneers. French-speaking, Catholic free people of color (for example, the Barthelemy, Encalade, and St. Ann families) were established by the 1820s. African-American families named Griffin, Harvey, Riley, and Tinson settled a few miles upriver in Phoenix and other former plantation sites in the post-Civil War years. Italian immigrants settled there as truck farmers in the late 19th and early 20th centuries, and families such as the Ansardis, Ademas, and Lobranos became politically and financially prominent.

At the start of the 20th century, the Pointe a la Hache area had a population of 1,500 people, despite losing half of its residents in the Hurricane of 1893 (Buras 1991). The "Capital of Plaquemines" supported a variety of businesses--several fruit dealerships, grocery stores, taverns and coffeehouses, a hotel, and the *Plaquemines Protector* newspaper (Buras 1991). The Louisiana Southern train stopped there regularly, packet boats dropped off supplies at its wharf, and the village served as a shipping hub for the eastbank. St. Thomas Catholic Church, built in 1834, was the only church below New Orleans for years. (The church has been destroyed by storms and fires at various times, and the church building and cemetery moved from the eroding river bank in the first half of the 20th century.)

As parish seat, Pointe a la Hache's most important feature was its courthouse complex, an "unofficial town square and the center of life for residents of the town" (Buras 1991:9). All trials, voter registration, records searches, inquests, and other parish business (including at least one 19th-century execution) took place there, bringing a steady stream of customers to Pointe a la Hache businesses ("Indicator" 1850). The courthouse was the site of notorious political scandals and battles, including a 1943 takeover by the Louisiana State Guard (Conaway 1973).

The once-prosperous eastbank began a steady economic decline in the 20th century, as "hurricanes and labor problems killed the rice industry" (Buras 2002). Storms brought in salt water from the Gulf, killing crops, and higher river levees made it difficult to irrigate rice fields with fresh water. By the 1920s, Louisiana's rice industry had moved west to the prairies of southwest Louisiana. As the Mississippi encroached on Pointe a la Hache, buildings along the

riverfront had to be torn down, and the levee moved farther back (Buras 1991). Much of the town's earlier footprint has been swallowed by the river.

A key and still-controversial event was the Louisiana legislature's 1924 appropriation of 33,000 acres of land below Pointe a la Hache for the Bohemia Spillway, intended to safeguard New Orleans from flooding. Landowners in this tract were displaced, and access was cut off to all lands below Bohemia. Oil and gas were later discovered there and the parish levee board received mineral revenues for many years (Horne 2006). This prompted former landowners to speculate that the spillway was a ruse to grab mineral-rich lands. Years of litigation ensued before the state decided to return the tract to its former owners, and the issue still sparks resentment among locals.

A succession of levee breaks flooded local farmlands in the early 20th century, but the most destructive crevasse was manmade. In 1927, the Great Mississippi River Flood threatened communities all along the river. Powerful New Orleans businessmen convinced officials to protect the city by dynamiting the levee downriver at Caernarvon Plantation, near the border of Plaquemines and St. Bernard parishes. 10,000 small farmers, trappers, and fishermen from the two parishes "trudged out of the lower parishes as if leaving a war zone" (Barry 1997) and were evacuated to New Orleans and Gulfport. Engineers used numerous dynamite charges to create a 2,600-foot-wide channel to the Gulf, inundating homes and farms. The resulting damage was estimated at $5 million (Barry 1997). Oyster grounds in Breton Sound were flooded with freshwater from the crevasse and the Bohemia Spillway, destroying about a third of Louisiana's entire oyster crop. In 1928, there was no harvestable crop on oyster leases in this area (Davis 2010). Regional fishing grounds shifted, and the parish economy never fully recovered.

By the 1990s, Pointe a la Hache was described as a sleepy little village whose economy centered on fishing, a small furniture factory, and the courthouse (Buras 1991). Arsonists destroyed the courthouse in 2002, and Hurricane Katrina closed the furniture business in 2005. Loss of the courthouse and the financial traffic it created "devastated the economy on the East Bank and destroyed the icon many locals considered the symbol of home" (Buras 2002). The brick shell still stands, but the courthouse has not been rebuilt a decade later. Parish government moved temporarily to Belle Chasse, and westbank politicians have proposed making the change permanent. Parish president Billy Nungesser commented that moving the parish seat to Belle Chasse "would help safeguard our court records and move the courthouse closer to our population center" (Rioux 2010). However, voters recently rejected the proposed move for the third time, because there is no consensus on a new location. (Lower westbank residents do not want the parish seat in Belle Chasse, either). Pointe a la Hache residents believe that local businesses might revive if the courthouse were rebuilt and *used* as a courthouse, instead of becoming a museum as parish leaders have suggested. A Pointe a la Hache storeowner told a visiting journalist in 2010, "You could call this a dead town. It used to be pretty busy when you had people catching the ferry to go to court. But there's not really much reason for anyone to come over here" (Roosevelt 2010).

Since the early 20th century, the eastbank's population has been predominantly African-American and Creole. Katrina chased the few remaining white residents of Pointe a la Hache upriver, and now the parish is divided: communities north of the White Ditch River Diversion are primarily white; those below the diversion are African-American and Creole. Generations of black and Creole families there have made their livings through a seasonal cycle of fishing, trapping, gardening or farming, and carpentry or concrete work; women have contributed to the family income as seamstresses or teachers. One community member, whose family has lived

there since the early 19th century, describes Pointe a la Hache when he was growing up 50 years ago:

> This place here was a self-sustaining place. My grandfather and his brothers, not only did they have this piece….two-and-a-half acres wide, forty deep. And they farmed rice, everything. I mean even as kids we used to get behind the horses and the plow while my uncles would plow the rows all over back up in here and pick up the potatoes and pile them up and stuff. We had the pear trees when I came up, we had just about any fruit you could think of on this place…. (CW401b 2011)

Pointe la Hache offers fewer economic opportunities today. Some residents work for the parish or sheriff's department, others are employed at the coal transfer plant half a mile up the road in Davant, a few work at refineries or chemical plants. According to a pastor and community spokesperson, virtually none work offshore. He believes that the typical offshore schedules of 7 days offshore, followed by 7 days at home (or14-and-14) takes the men away from their families for too long; they prefer to fish in the bayou and be home at night (CW522 2011). One constant has been that, in hard times, local families could fall back on the bayou or the land for a living (CW401a 2011; Davis 2010; Horne 2006). A local activist told reporters:

> People here always had to be independent. Because of institutionalized racism and segregation in this parish, the African-American people were not allowed in the mainstream, so that means they had to be independent. Most of the African American people in this community survived… They created their own schools, their own institutions, their own churches, in order to survive. So you had villages, and you had like a communal kind of living taking place. And they've always been independent. (Goodman and Gonzales 2010).

.

Fishing is Pointe a la Hache's economic linchpin and for most residents, a family tradition. A generation or two ago there were hundreds of African-American fishermen working fulltime or part-time in the industry (Lee 2010; Yeoman 2010). An out-of-work oysterman told reporters after the oil spill, "Basically everyone's forefathers, grandfathers, that's what they did, and it was passed on from generation to generation. That's how we learned to do what we do" (Yeoman 2010). According to a local religious leader/spokesperson, an estimated 80% of lower eastbank residents make their living from commercial fishing, or fish to supplement other jobs (CW427 2011).

Oysters are the primary commercial harvest, as the village is close to productive natural reefs in Breton Sound. Many locals have no oyster leases of their own; they fish from public reefs during the allotted season, or work for leaseholders in return for a percentage of the crop. Fishing boats are generally small, and harvesters often "coon" oysters by hand in shallow water, or use hand-cranked dredges rather than mechanized ones. Many trawl for shrimp as well, selling to local seafood dealers at the dock. Reciprocal social networks require sharing much of their catch with relatives and neighbors. One local oysterman commented that when he goes shrimping, "If I bring in 2,000 pounds of shrimp, I'm happy if I sell 1,000 pounds" (CW401a 2011). The remainder goes into the family's freezer or is given away to relatives who depend on this food source.

The number of African-American fishermen has dropped steeply in recent decades. Minority fishermen on the eastbank comment that they are marginalized in an industry controlled by larger, politically influential oyster farmers who hold thousands of acres of leases. Oyster fishing policies, they point out, have typically favored larger operators, most of whom are white. Fearing that they are being squeezed out of business, these "little" oystermen periodically engage in legal battles against bigger oyster cultivators. In the 1970s, larger oyster farmers lobbied for a law banning hand dredges on oyster boats, used mainly by minority fishermen, on the grounds that they damaged water bottoms. A grassroots organization called Fishermen and Concerned Citizens (FCC), based largely in Pointe a la Hache, was created to fight that law and succeeded in getting it reversed (Yeoman 2010).

The opening of the Caernarvon River Diversion, one of the state's largest freshwater diversions, in the 1990s proved disastrous for eastbank oystermen. Salinity levels had climbed in Breton Sound's public and private oyster grounds, decreasing oyster reef productivity and encouraging predators (McGuire 2006). Oystermen worked with engineers to plan the Caernarvon diversion, touted as a fisheries enhancement project intended to restore healthy salinity levels. In August 1991, freshwater began being flowing into Breton Sound under a "modest flow regime" and productivity improved (McGuire 2006; Davis 2010). In 1993, however, the Louisiana Department of Natural Resources (LDNR) opened diversion gates full-bore, doubling the flow rate in an effort to hasten new land formation downriver (Davis 2010). This was devastating for minority oystermen whose leases fell within the "red line" of decreased salinity. High oyster mortality led to litigation against LDNR and the state for losses. Some westbank oyster farmers who suffered no oyster losses on their own leases joined the suit as plaintiffs. Although oyster leaseholders initially won the suit in local courts, the Louisiana Supreme Court overturned the judgment on appeal.

In the wake of litigation, LDNR placed a moratorium on issuing new oyster leases to replace damaged ones (McGuire 2006; CW401b 2011). The ongoing moratorium has severely impacted eastbank minority oystermen, who had smaller leases to begin with. Westbank oyster farmers, along with LDNR, approached Congress for funds to relocate oyster beds damaged by the Caernarvon diversion; they were granted $9 million to move to new leases (Horne 2006). Eastbank oystermen have also proposed moving their leases from damaged areas to new areas. A community activist commented, "Some oil companies are deeply affected by this [proposal] and we're negotiating with them. The oil spill threw another wrench in the works" (CW427 2011). Minority fishermen expressed the belief that oil industry lobbyists have played central roles in denial of new leases. An eastbank oysterman said:

> And they basically want the right to move around out here, without compensating the oyster farmers when they have to go across the oyster beds. In all fairness to them, there is a bad situation out there that does handcuff them in a way. But they should have been sitting down working with us to develop policies to protect them and us. Instead, they took this hardnosed stand and saying …. "Let's just get them out of our way and destroy them. We're going to use these freshwater diversions to our advantage." So I believe there are hidden agendas (CW401b 2011).

A local pastor emphasized the significance of commercial fishing for community members:

Once you kill the fishing industry, then you have devastated their whole life, because most of these people, that's how they survive. Their whole living depends on the water environment. That's all they know, every day. Some of these guys, you know, they fish every day—Sunday, Saturday—all day, because they own their own oyster beds. And so, right now, you're destroying their lives. (Goodman and Gonzales 2010)

## 7.2.2. Effects of Hurricane Katrina on Pointe a la Hache and Environs

Destructive hurricanes have always been a fact of life in Plaquemines. In 1965, Hurricane Betsy demolished more than 500 homes on the eastbank alone, buried the area in mud and debris, and dropped broken fishing boats all across the parish (Buras 1995). Forty years later, Katrina caused even more extensive damage. Homes and businesses on the lower eastbank were decimated, and the town's few remaining white residents moved upriver or to the westbank. Fishermen again lost their boats and oyster crops; Katrina killed as much as 70% of public oyster reefs east of the Mississippi (Lee 2010). Most black fishermen were already "on the margins of solvency" (Jeremy Stone in Lee 2010), making it difficult to replace lost boats and other equipment. Heavily-damaged St. Thomas Church, a community institution of almost two centuries, was closed by the archdiocese, perhaps permanently. Parishioners faced a choice between traveling 30 miles upriver to a traditionally white church where they felt unwelcome, or crossing the Mississippi to attend St. Patrick's Church in Port Sulphur. They petitioned insistently for their church's repair, and St. Thomas re-opened in 2009.

The parish was slow to repair many Katrina-related infrastructure problems, arguing that they "don't want to overbuild" for the eastbank's shrinking population (Powell 2008). Lower eastbank communities no longer have natural gas service or landline phone service, and the closest medical facilities are across the river in Port Sulphur. Pointe a la Hache currently has only two retail businesses: a small convenience store and bait shop at Beshel's Boat Launch, and DJ's One Stop, a store and lunch counter next to the burned-out courthouse. Both businesses depend on commercial fishermen and sports fishermen for much of their income.

In the years since Katrina, cramped FEMA trailers have been replaced by mobile or modular homes. A local clergyman points out that things might "look more normal from the outside" now, but three families or generations might share a doublewide home (CW427 2011). Louisiana's Road Home program, intended to provide compensation to homeowners for damages from hurricanes Katrina and Rita, was difficult for rural residents to navigate. Many lower Plaquemines individuals own their houses, but their land, passed down over many generations, belongs to the whole family. The pastor says:

And so, because of those dynamics, Road Home prevented a lot of community people from applying for the program, because you had to get all kind of documentation in order to prove that you own that land…. We saw how the government neglected the city of New Orleans, so we knew in Plaquemines Parish we wouldn't stand a chance [to] survive. So we came together as a community and started a program called the Zion Travelers Cooperative Center to rebuild our community. And we're saying we had very little government help in it (CW427 2011).

Local residents, he says, were "able to rebound after Katrina" because of a sense of "community unity … and understanding that we've got to work hard, because the federal government will never come in on a white horse to rescue us" (CW427 2011).

### 7.2.3. Specific Effects of the Spill on Pointe a la Hache

Pointe a la Hache's small African-American fishing operations experienced many of the same post-spill socioeconomic effects as other coastal fishing communities (see Chapters 5 and 6, this volume, for example.) Some factors, however, made the local impact particularly severe. The local economy is not diversified, and virtually everyone is dependent on the commercial oyster and shrimp industries in some way. Another factor is the location of their oyster beds, in the path of both oil contamination and major river diversions. Eastbank fishermen say that oil entered estuaries such as Spanish Bay and Bay Gardene, home to some of the state's most productive natural oyster reefs. A local oysterman explained:

> The oil came in… at the point at which salt water and river water meet And the river water was pushing the oil out of the bay. It did come in. But from Bay Crabe, Bay Gardene, to Spanish Bay was solid fresh water. The oil came in through the back, through Bay Gardene…. all up in the bayou back, straight back of here (CW401a 2011).

Freshwater pumped in from the Caernarvon, White Ditch, and Bohemia diversions pushed the oil out, they say, but killed their oyster beds.

The cooperative nature of small-scale oyster fishing and share cropping made it difficult to produce trip tickets and other documentation for compensation. The few locals who got hired for VOO were obligated to share this employment with captains and deckhands they regularly employ. As one oysterman commented, they know they're going to need these workers in the future.

Many minority fishermen had limited educational opportunities or dropped out of school to fish for a living; they have scant economic resources to fall back on (especially after Katrina) and few viable retraining opportunities. A long tradition of self-reliance and independence made the prospect of accepting financial aid such as food stamps very difficult for many, exacerbating the frustration and anxiety of the "BP drama" (CW427 2011). Stress is making people sick, but there are no medical facilities on the eastbank, and most people don't have health insurance. One multi-generational community member and local oysterman said:

> We believe in working, and [our parents] taught us that. They put those values inside of us. And just like my grandmother said, one thing she asked of all of us: "Do not be somebody that sits down and waits on the welfare check." …. We always pride ourselves on being a recession-proof community because we lived off the land and we've always made sure we had that to survive.… We have our pride, the pride our ancestors installed in us, and no, damn it, please for God's sake do not come in here thinking welfare is going to solve our problems. We don't want it, we don't need it, we have what we need, our ancestors made a way for us to make sure we are a self-sustaining community (CW401b 2011).

A number of fishermen commented that Feinberg and BP did not comprehend the degree to which local people depend on the bayou to feed their families and social networks. Subsistence fishing is crucial here, as well as in Native American and Vietnamese communities. Oysterman CW438 spoke of a distant relative now serving in the military and stationed elsewhere, who counted on CW432 to take care of his five children. It gets expensive to have to provide them with seafood—"I'm one and they're five"--but it's expected of kin (CW438 2011).

Pointe a la Hache's few retail businesses are stagnating because almost all of their customers are commercial or recreational fishermen. Sharon Domingue, who opened DJ's One-Stop with her husband in 2009, told a reporter that they remain open for the sake of their community: "It's not about me, it's about the people, especially the older people. If I close, there's no place for them to buy milk. There's no place for them to buy bread. I have to do this for my community" (Domingue in Rioux 2010).

Local residents reported that the oil spill compensation process was "mirroring" (CW401a 2011) the same problems that they saw in post-Katrina economic recovery efforts: the focus seems to be on big businesses, tourism, and casinos, to the exclusion of commercial fishermen. A religious leader said, "It went from being about fishermen being out of work to being about business and tourism—but what about the little fishermen? . . . When the state got the BP money, they pushed it on tourism, and the local government is looking at what they can do for coastal restoration" (CW427 2011). To the extent that legislators were paying attention to fishermen, a local activist said, they were focusing on large-scale oyster farmers who can file million-dollar claims against BP, not subsistence-level fishermen such as those in Pointe a la Hache (CW427 2011).

The community's response to the BP oil spill reflected its history of political organization and activism. Grassroots non-profit organizations such as Fishermen and Concerned Citizens, the Zion Travelers Co-op (formed after Katrina), and the newly created Go Fish (Gulf Organized Fisheries in Solidarity and Hope) held press conferences, forums, and other events to call attention to minority fishermen. Local fishermen and activists flew to London to protest the compensation process at BP's first annual post-spill shareholders' meeting, and met with legislators in Washington, D.C.

## 7.3. EMPIRE AND ITS ENVIRONS: INTRODUCTION

Empire, a small village on the lower westbank of the Mississippi, is an important gateway to Gulf fishing grounds on both sides of the river. The community, with a shipyard and marina, has always housed more boats than people. The Empire CDC, which includes neighboring settlements such as Nairn, had a 2000 population of 2,211 residents, of whom almost two thirds (60.79%) were white, a third African American (33.79%), and a small minority Asian (2.76%). Much of Empire's pre-Katrina population consisted of French, Croatian, and African-American families, but some Vietnamese shrimpers have worked and lived in the Empire area since the 1980s. (Many more Vietnamese and Cambodian fishermen dock there.) In the aftermath of Katrina, the population has dropped to 993 residents, but Empire remains home port to some 2,000 boats (Tesvich 2008). Many commercial fishermen who moved to Belle Chasse and other westbank communities commute regularly to their boats in Empire.

Empire's economy is based almost entirely on commercial and (to a smaller extent) sport fishing. With more oyster beds within a 30-mile radius than any other Louisiana community, the Empire area is one of the country's largest ports of oyster landings (Tesvich 2008). Many westbank oyster farmers have extensive oyster leases passed down for generations, in sharp contrast to most of the eastbank's "little" fishermen. Empire is also a primary landing for Gulf shrimp, and a menhaden fishing fleet and processing plant have operated there since the 1940. Delta Marina attracts a stream of recreational fishermen and charter boats, and holds annual tourist events such as tarpon rodeos.

## 7.3.1. Historical Narrative of Empire

For many years, Nairn Plantation, a sugar and rice plantation, was the most significant place in the Empire area (Stringfield 1989). The plantation was subdivided into smaller plots after the Civil War, and some of these lots became prolific citrus groves. Indeed, Croatian pioneers such as the Cognovich and Vidacovich families had begun growing oranges in the Nairn area as early as 1850, and by the late 19th century, and by the late 19th century, Nairn was the tip of lower Plaquemines' Orange Belt (Stringfield 1989). The Empire Post Office was established in 1878 along the last major bend of the Mississippi River, about four miles downriver of Nairn (German 1990). Its name probably derives from the term "Empire Parish," popular among Plaquemines planters by the mid-19th century (Stringfield 2012; Buras 1991). Most of Empire's 700 residents at the turn of the 20th century were French and Anglo-American, with surnames such as Buras, Stockfleth, and Cosse (U.S. Census 1900).

Oysters and Croatians have played prominent roles in Empire's history and economy. Men from Croatia's Dalmatian coast, then part of the Austrian Empire, began immigrating to south Plaquemines before the Civil War. Some, like the Cognoviches and Vidacoviches, became prosperous plantation owners or citrus growers (Vujnovich 1974; Stringfield 1989). Most, though, came specifically to fish oysters, an occupation they had learned in Dalmatia. Early Croatian immigrants discovered that wild oyster reefs, primarily located on the east side of the river, were overcrowded and produced small, skinny oysters. Luka Jurisich and other Croatian pioneers began taking seed oysters from the wild reefs, carrying them to the west side of the river, and re-planting or "bedding" them in areas with ideal salinity levels and few wild oysters. Their fat, salty-tasting cultivated oysters became famous at a time when consumption of raw oysters was skyrocketing in the New Orleans area (Davis 2010; Horst 2011). An 1892 newspaper articles makes it clear that Croatians (then called Austrians) dominated oyster farming in the Bayou Cook area, reporting that " bedding is done here almost exclusively by… sons of Austria" (Horst 2011:53-54). Later Dalmatian oystermen contributed other new techniques such as using dredges to harvest oysters.

Most 19th-century Croatian immigrants lived in camps on remote bayous such as Bayou Cook, Bayou La Chute, and Adams Bay. Bayous Cook and La Chute became substantial "villages in the marsh" by the late 1800s. Oystermen lived near their oyster beds but visited Empire, the nearest river settlement, to socialize, stock up on supplies, and deliver oysters to packet boats for delivery to New Orleans markets (Vujnovich 1974). By the early 1900s, Empire had a busy oyster cannery that expanded the market for local oysters (Davis 2010). Hurricanes in 1893 and 1915 wiped out the fishing camp settlements of Bayou Cook and La Chute, killing hundreds of people. Many survivors moved inland to Empire or to New Orleans. By 1920,

Croatian surnames such as Jurisich, Hihar, Cognevich, and Zuvich appear in the Empire area census (Stringfield 1993; USGenWebProject 2012a,; USGenWebProject 2012b).

Oyster cultivation took a large step forward in the early 1900s with construction of the Empire Lock on Doullut Canal. Until then, carrying seed oysters across the Mississippi River had been a time-consuming and dangerous task, particularly when oyster boats were heavily loaded and sitting low in the water. Fishermen used a maze of waterways to cross the river and reach natural oyster reefs in the Gulf. The privately-owned Empire Lock and its companion Ostrica Lock in the early 1900s provided a much faster and safer route across the river, and Empire became a key link in the seafood supply chain to New Orleans (Vujnovich 1974; Davis 2010). By the 1930s, more than 200 vessels used the navigational locks (Davis 2010). Fishermen paid a toll to use the locks until the state purchased them in 1932, and the U.S. Army Corps of Engineers rebuilt them. The Empire and Ostrica locks remain the only navigational locks downriver of New Orleans, and are heavily used by fishermen, oilfield crew boats, and pleasure boats.

The advent of sulfur and oil exploration in Plaquemines' marshes in the 1930s and 1940s led to clashes with oyster farmers already established there. There are stories of a local Croatian oysterman storming into an oil company office and frightening a worker by pounding his fist on her desk, then saying to an oil executive, "See? That's what your dynamite does to my oysters!" Oyster lease owners could and did sue oilfield companies for damages to their water bottoms (the basis for the 1990s lawsuit against the LDNR for oyster mortalities from the Caernarvon Diversion). But there were mutual benefits as well; mineral companies dug canals through the marshes that oystermen used as shortcuts, for example. Mineral companies also hired Croatian oyster farmers to help them navigate local waterways and oyster leases as they laid pipeline and moved drilling rigs (CW492b 2011). A wave of Croatian refugees fleeing Communist Yugoslavia arrived in Empire during the post-World War II years, joining Croatian families who had been farming oysters for several generations. These influxes continue as young men come to apprentice with Croatian-American uncles and cousins. Consequently, local Croatian culture and language are continually re-invigorated.

African Americans are an important but largely undocumented component of Empire's cultural mix and history. For many years, the Chicken Shack was a popular local dining and dancing spot for black parish residents; it was also the site of a 1960s police raid that led to civil rights protests. A number of African-American residents today are employed by the local menhaden industry, as are Creoles, Native Americans from Grand Bayou, and a number of Latinos (CW464 2011).

In addition to oysters and shrimp, Empire is one of the most important menhaden landings in the country, accounting for about a third of all Gulf pogy landings (Davis 2010; see Table 7.1 for total landings for Empire-Venice). Empire's first large pogy processing plant was built in 1949 by Wallace Quinn (Davis 2010). In the 1980s, the older company was joined by a competing Dutch-owned firm. The two companies merged in the early 1990s to create Daybrook Industries, the largest single employer in lower Plaquemines. Although relatively small compared to other menhaden businesses such as Omega Protein, Daybrook has a fleet of 11 250-foot pogy boats and eight Cessna planes, as well as a fishmeal processing plant in Empire. The planes track schools of fish from the air, and smaller vessels circle and trap the fish with large seine nets before transferring them to the large menhaden boats. At the dock, high-powered hoses move the fish from boat to processing plant, where they are ground into fish meal used in pet food and fertilizer (Davis 2010; CW 464 2011). Daybrook's 330 job pools include boat

captains, fishing crews, aircraft personnel, a fishnet-making department, a grinding plant and warehouse, and a repair and maintenance department. The menhaden fishery has grown into a major industry because fish oil and meal are very marketable, making Empire one of the most important landings in the country (Davis 2010). The Louisiana Wildlife and Fisheries Department estimates that the state's economy would lose almost $160 million if the Daybrook fishery and processing plant were to close (Davis 2010).

Table 7.1. Landings at Empire-Venice, LA

| Year | Millions of Pounds | Millions of Dollars |
|------|--------------------|---------------------|
| 2011 | 531.5 | 99.2 |
| 2010 | 353.5 | 59.4 |
| 2009 | 411.8 | 67.1 |
| 2008 | 353.2 | 62.9 |
| 2007 | 323.1 | 73.5 |
| 2006 | 285.7 | 41.1 |
| 2005 | 170.8 | 39.4 |
| 2004 | 379.0 | 60.2 |
| 2003 | 400.0 | 50.8 |
| 2002 | 398.9 | 54.3 |
| 2001 | 370.7 | 59.1 |
| 2000 | 396.2 | 61.6 |
| 1999 | 435.0 | 64.0 |
| 1998 | 328.0 | 38.3 |
| 1997 | 395.9 | 57.8 |
| 1996 | 316.5 | 45.4 |
| 1995 | 298.1 | 51.1 |
| 1994 | 431.7 | 60.1 |
| 1993 | 335.4 | 52.3 |
| 1992 | 276.5 | 58.7 |
| 1991 | 309.4 | 50.2 |
| 1990 | 244.2 | 46.3 |
| 1989 | 272.7 | 49.2 |
| 1988 | 297.2 | 67.7 |
| 1987 | 357.4 | 60.1 |
| 1986 | 317.6 | 47.1 |
| 1985 | 224.5 | 34.3 |
| 1984 | 383.5 | 41.6 |
| 1983 | 281.9 | 31.8 |
| 1982 | 267.3 | 36.4 |
| 1981 | 221.0 | 30.5 |

Source: NMFS n.d.

Sport fishing has also been a growing force in a parish long known for its excellent fishing; fishermen can fish inshore or offshore, and catch a wide variety of fish. (A local tourism slogan boasts, "You can fish anywhere, but you can *catch* fish in Plaquemines Parish.") In fact, the parish's tourism industry rests almost entirely on fishing. Though smaller than marinas in Venice, Empire's Delta Marina calls itself south Louisiana's "premier saltwater fishing attraction." Several charter boat captains operate out of Delta Marina, taking fishermen to nearby oil and gas platforms to fish for redfish and speckled trout. Some go farther offshore for tuna,

king mackerel, and red snapper. Empire, like other growing sports fishing centers, hosts periodic fishing tournaments and tarpon rodeos, and "Kayak Fishing Tour" events

### 7.3.2. Effects of Hurricane Katrina on Empire and Environs

Empire, like Pointe a la Hache, experienced massive destruction from Hurricane Betsy in 1965. Four years later, Hurricane Camille smashed the lower westbank, leaving the entire region below Port Sulphur flooded for months (Buras 1995). Most residents eventually returned and rebuilt their homes and businesses.

In August of 2005, Hurricane Katrina's eye passed over Empire, pouring a 22-foot wall of water onto it and obliterating most of its buildings and infrastructure. Homes and businesses were washed off their foundations, and wood-framed St. Ann's Catholic Church was turned sideways. The storm drove oyster luggers and shrimp boats on top of each other, and crushed docks and ice houses, effectively shutting down commercial fishing. Daybrook's menhaden plant was flooded with several feet of water, and its 11 boats beached (CW464 2011; Davis 2010). Armed deputies kept residents out of the area for weeks because of safety concerns. Bridges had washed out, and the storm surge had deposited live electrical wires, houses, and boats on Highway 23, the only land route into the parish. Iconic photos of post-Katrina Plaquemines Parish show two huge Daybrook Industries pogy boats stranded on top of the Empire highrise bridge (Figure 7.2).



Figure 7.2. Pogy boat stranded on the Empire bridge after
Hurricane Katrina
Source: NOAA 2005

Some fishing families who evacuated on their boats returned within a few days to survey damage, and their descriptions were apocalyptic–a drowned body on a wharf, and no recognizable landmarks because of floodwaters trapped between front and back levees. One Croatian-American woman and her oyster farmer husband returned two days after Katrina, and paddled from Empire to their home in Nairn in a borrowed pirogue. She wrote: "What we saw

was surreal. We had left a bustling fishing village two days earlier to come back to what looked like a scene from an atomic blast" (Cibilich 2005). Fishing boats remained buried in the mud of Empire shipyard for months.

An estimated half of all fishing boats were lost, destroyed, or seriously damaged. Shrimp boats, lighter than oyster boats, were especially vulnerable; it was reported that only 20% of the parish's 786 registered shrimp vessels were operational post-storm (Life Stream 2006). Although the Coast Guard initially agreed to salvage all 2,300 commercial boats beached or sunk by hurricanes Katrina and Rita, they later reversed this decision and said that many commercial fishing boats were outside their jurisdiction (Brown 2006). Boat owners were left with few resources for rescuing their grounded vessels. Cambodian and Vietnamese fishermen faced additional difficulties; they could not read English-language signs about Coast Guard assistance, and boat ownership agreements were often complicated (Brown 2006). Much of Empire's civic and public infrastructure has not yet been rebuilt. There is no grocery store, no gas station, no hardware store or civic center. Empire lost landmark businesses such as Tom's Place, opened by the Morovich family in 1950, when its owner moved to the Northshore after Katrina. The only remaining restaurant is in the renovated and re-opened Delta Marina. St. Ann's church was repaired and reopened in 2011. Moreover, the village remains essentially cut in half by the Empire Canal. Before Katrina, a small drawbridge over the canal connected the upper and lower parts of the settlement. Officials took down the damaged drawbridge after Katrina and have not replaced it. A local oysterman wrote in 2008, "By all accounts, the bridge was repairable, but the government people said they would build a new bridge. So far that hasn't happened, and locals have to drive three miles around on the Highway 23 high-rise bridge to get across the 150-foot navigation canal "(Tesvich 2008). The canal remained unbridged in 2012.

### 7.3.3 Specific Effects of the Spill on Empire

During the BP oil spill, seafood landings came to a halt, and oyster landings did not resume for a year. Oyster farmers in Plaquemines, just beginning to recover from Katrina in 2010, faced many of the same concerns as those in other coastal areas: major losses from fresh water diverted to push oil offshore, and few oyster spat after the spill. Peter Vujnovich Jr., a third-generation Croatian-American oyster farmer, docks his oyster luggers in Port Sulphur and farms oyster leases handed down from his grandfather. He lost 70% of the oysters on his leases, "all because of freshwater, not oil" (Horst 2011:50).The degree of loss depended on lease locations, but many westbank oystermen fared better than eastbank minority fishermen; their leases were more extensive and scattered, and many had some financial reserves. Some oyster-rich marshes off the Plaquemines' coast, particularly Bay Jimmy, were still visibly oiled and dying two years after the spill, and residents feared the damage was hastening marsh erosion (Schleifstein 2012). On the impact of the oil spill, a Croatian-American oyster farmer with beds near Empire said, "You hope for the best and expect the worst. I've seen a lot of good cleanup, but in Bay Jimmy I still see marshes soaked with oil" (CW492b 2011).

At the time fieldwork for this study ended, westbank oyster farmers were recovering from the spill although they would likely feel its impact for several more years. Pete Vujnovich, for example, estimated that it would take his beds three years to regain a normal production level, and five to reach peak production (Horst 2011). Oystermen's concern was focused on coastal restoration plans that proposed a major freshwater diversion at Empire, as well as a number of

new diversions in other parts of the parish (far more than any other parish was slated for) (CPRA Master plan 2012). Fishermen expected that this would permanently damage their livelihoods, and supporting businesses, by drastically altering the salinity in surrounding marshes (Tesvich 2008). Vujnovich commented, "My biggest fear is that they will build freshwater diversions so big that they destroy the oyster industry" (Horst 2011).

Empire's menhaden fishery was also impacted by the oil spill. According to a company executive it had "a devastating impact" on the company, whose plant is only 40 miles from the Macondo well (CW464 2011). The 2010 pogy season, which runs from April to October, had just begun when the oil well blew out and many coastal waters were shut down. The fleet had just one fishing day before the crisis began. Some waters opened on July 29, near the end of the season. Before the oil spill they were expecting their best season ever; instead they had their worst season ever (CW464 2011). The company did everything it could to help its employees through the crisis, the company officer said, but at the April 2011 Blessing of the Fleet, a "parade of fishermen" approached the priest to ask for additional blessings for themselves because they were so worried about the future (CW464 2011). Some longtime employees left the company to work on the oil spill cleanup. The parish newspaper reported that although the 2011 season was initially "uncertain as the parish continued its recovery from the BP spill," pogy plant workers "pressed on, and managed to have one of the biggest seasons on record" (Gonzales 2012).One employee was honored for his record catch of a billion fish in the 2011 season.

Charter boat captains had a mixed experience. They were unable to take clients fishing at all in the summer of 2010, but some say they started fishing, or could have, by that fall. Many were too busy working for the cleanup efforts, however. Charter boat captains were hired because they operate fast, relatively large boats and generally had good connections to marinas, where much of the activity was based (CW508a 2011). One local captain said:

> I have a fast boat, so I was running Coast Guard, media, and BP officials around the parish, either just transporting them or going out looking for oil. Yeah, I'd say there were 40 to 50 charter captains like me who were mostly local working the cleanup. (BR059 2011)

A fellow charter captain and friends who worked on the cleanup from June 2010 to early 2011 added:

> They hand-picked fast boats to do some high priority work. We were medic boats and we went back and forth between the marina and the barges. They liked us because we would go out on the water when no one else wanted to. (BR062 2011)

Some found that their charter business fell off afterwards, in part because of high river levels in spring of 2011. A charter captain who often works out of Venice, said in 2011:

> Well a few months ago I would've told you that fishing didn't seem to be as badly affected as I would've thought. Lots of my customers are repeat customers and they were all calling me last summer [2010] asking me to take them out on the water and I had to keep explaining that all the waters were closed….. I started taking bookings for next year around that time [mid-September, when some inshore areas opened] and it looked pretty good, probably around 50 to 60 days booked, but I guess those are my most faithful

customers because I've hardly gotten any more bookings and I average around 140 days on the water. And thing is I give other charter fishermen in the area, like [BR050], around 30 to 40 days of work, so they feel it when I'm slower too. (BR059 2011).

In addition, charter boats from Alabama and Florida got hired for VOO, and through that cleanup work discovered "how good the fishing is here and they're getting in on the game" (BR059 2011). Some out-of-state charter captains had begun offering fishing trips out of Venice, taking business away from locals. A local captain complained:

> It's not like I can just pick up my life and go do this somewhere else. The best fishing in the world is right here in Plaquemines Parish. I mean like the other charter fishermen who don't live here usually have other jobs and even the Croatians, the oystermen, they can go back home, but this is our home." (BR059 2011)

Even before the spill, a majority of charter boats operators (as many as two thirds, according to charter captain BR059) lived outside the parish. This makes it difficult to gage socioeconomic effects of a post-spill slowdown on local communities.

Although fin fishing is productive now, captains who worked in VOO are worried that oil and dispersant residue may affect spawning:

> I'm not worried about the big fish. It's how the babies are doing that worries me. Both trout and red fish lay their eggs on sandy bottoms in the bays around here. … But I know from working the cleanup that there's a lot of oil that has been sunk to the bottom of the bays because of the dispersant they used. I've seen tar balls come up to the surface that are as big as houses. No kidding. So if there's oil all on those sandy bottoms, the mamas can't lay their eggs this year and that's going to be really bad for us in a couple years. (BR060 2011)

## 7.4. PORT SULPHUR AND ENVIRONS

The largest of the three Plaquemines study sites, Port Sulphur is also the youngest. Built by Freeport Sulphur as a company town and transport hub in the 1930s, the town and its environs now incorporate older communities such as Homeplace, Orange Grove, Potash, and Happy Jack. Port Sulphur's sulfur-based economy declined when Freeport's operations slowed in the 1980s, and the company left Port Sulphur in 2000. Current industries include oilfield support businesses, commercial fishing docks, seafood processing, sports fishing charters, trucking, and construction, among others. Port Sulphur has the only medical facilities in lower Plaquemines.

The majority of the residents of this census-designated place are African-American, Creole, or French-Indian. Established family names include Riley, Carson, Harvey, Sylve, Ancar, Barthelemy, Denet, and Philips. A number of Croatian oyster farmers also lived in Port Sulphur before Katrina, and some have rebuilt homes there, or dock their boats in Port Sulphur and commute from Belle Chasse.

### 7.4.1. Historical Narrative of Port Sulphur and Environs

In 1932, Texas-based Freeport Sulphur Company acquired mineral rights to a sulfur dome in Lake Grand Ecaille, a productive oyster estuary. Mining the sulfur required construction of a "massive industrial city," including a power plant, on pilings in the marsh, and a ten-mile-long canal through the marsh to ferry lumber and steel to the mine (Davis 2010). Soon there were over 1,000 men working in the Grande Ecaille mine, many from Texas and other states. Transportation to and from the mine was difficult, so work crews were initially erried from Lafitte and lived onsite in houseboats.

The mine was tremendously productive, supplying more than half of Freeport's total sulfur in the 1930s (Conaway 1973). Its first months in Plaquemines were difficult, though. Badly underestimating political boss Leander Perez's power, Freeport "originally made the mistake of considering Plaquemines to be a one-company parish with itself as sole proprietor" (Conaway 1973:25). When Perez discovered minor errors in surveys of marshlands leased to mineral companies, he used them to question the validity of existing sulfur and oil leases. Freeport "soon found that it had three and a half million dollars invested in a mining operation on land of unknown ownership" (Conaway 1973:25). The company refused to pay royalties until the ownership question was resolved, and began laying off Plaquemines employees to hire outside workers. In response, Perez convinced the state to increase the severance tax on sulfur from 60 cents to $2 a long ton (Conaway 1973). Freeport had to concede defeat and made a settlement with Perez. They never challenged him again.

Although the company brought in its own engineers and other professionals, it employed local oystermen in low-level jobs. Burt Turlich described how his father, a Croatian-American fisherman, was hired in 1933, just as the Grand Ecaille mine was starting up (Turlich 2002). Burt followed his father into the company in 1955, and worked for Freeport until retiring in 1991. He had a number of jobs with the sulfur company, and also continued to do seasonal fishing. Turlich said:

> They had people workin' for oil companies, a lot of people…A lot of 'em was doing like I was doing, too. I was working for them and in my off time I was, you know, fishing, shrimping, and stuff like that. Back then you didn't have all that problem with the oyster fishing either, you know. You can lease now, but back then it was okay to go out and fish on your own and sell, you know. That was in the, '40s and '50s, but now everything is leased…. (Turlich 2002)

Freeport built Port Sulphur in 1933 for two purposes: to provide a comfortable home for its workers and their families, and to serve as a logistical facility for storing and shipping mined sulfur (Davis 2010). The company bought a marshy 1,100-acre tract, a former citrus grove on the westbank of the Mississippi, accessible by both railroad and Highway 23. Filling the low-lying site with dredged dirt, they began building the town. Designed to provide housing for 125 families, the townsite featured colonial-style houses with 27 different designs, and cul-de-sacs that kept traffic at a minimum (Davis 2010; Lincoln, n.d.-b). The most important employees lived near the river (Lincoln 2008). A boarding house housed single men, and a brick community lodge (now the Plaquemines government building) was built for dances and other special events. Freeport rented its houses to employees for a modest rent and provided municipal services such as sewers and water systems, garbage collection, and private security. The company also

performed all maintenance on the houses. According to Burt Turlich, "So all you did was rent it and they did all the work. You see, Freeport had a crew that'd do all the work. Any plumbing thing, any roofin', any windows bust, they do all the work… You were like a big family there, you know" (Turlich 2002). Resident Lois LeJeune told journalist Jere Longman, "If you needed a lightbulb changed, you called and they did it" (Longman 2008:42).

Freeport took pains to make their workers comfortable, building the parish's first hospital, recreational facilities such as a theater, library, baseball fields, two swimming pools, and a playground, and several Protestant churches. (It also donated money to the local Catholic church, St. Patrick's, founded in Homeplace in the 19th century.) The town, with its paved roads, concrete drainage ditches, sidewalks, was described as the "most completely up-to-date community in the state" in the late 1930s, despite the fine yellow sulfur dust that often coated the town and eroded automobiles (Davis 2010; Lincoln 2008). Independently owned grocery stores, drugstores, and other small businesses formed near the town site. By the late 1930s, Port Sulphur had 600 residents and had outgrown its original footprint. New, pre-fabricated homes were barged in to supplement the earlier houses (Lincoln n.d.) The expanding town had 1,200 presidents by 1950, comprising about 12% of the total parish population. In the 1950s and 1960s, Freeport began selling company homes to its employees, offering interest-free mortgage loans (Turlich 2002). Many homes were moved to new lots, and the town enveloped older communities such as Orange Grove, Potash, and Home Place (Lincoln 2008; Davis 2010).

The town began declining in the 1970s, particularly after Freeport closed the Grand Ecaille mine in 1978, and moved its engineers and other professionals to other locations (Longman 2008). As the price of sulfur dropped, and producing sulfur as a byproduct of oil refining became more cost effective, Freeport merged with McMoRan in 1981. Burt Turlich remembers the company changing then from a "family" to a corporation, as "everything was controlled out of New Orleans instead of on the property" (2002). The slowing of sulfur operations in the 1980s depressed Port Sulphur's economy, and employees and their families began moving elsewhere as town facilities deteriorated. According to Burt Turlich, "Everything fell apart….We had a hospital down here, but then, you know, that kind of fell apart" (2002).

With Freeport's ultimate departure in 2000, Port Sulphur "lost its economic ballast" and became a "dying town" (Longman 2008), although the 2000 population of the Port Sulphur Census Designated Place (CDP) then consisted of 3,115 people. Of those, 52.3% listed themselves as "black alone," 28.3%, "white alone," 15.5%, American Indian, and 3.9% Hispanic 3.9%. More than 20% lived below the poverty level. (These statistics represent the entire CDP, including small minority communities such as Grand Bayou and Diamond). Those who stayed were families with a long history and extended informal networks in the area. Theresita Ancar explained to author Jeré Longman, "It's peace of mind. We marry each other in these little places," stay close to their extended families, and feel safe without locking their doors (Longman 2008).

The Port Sulphur area is generally considered the beginning of lower Plaquemines, the region hardest hit by repeated hurricanes. Katrina destroyed most of Port Sulphur's homes and businesses, and armed sheriff's deputies guarded a roadblock in northern Port Sulphur for many months. When residents were allowed back in the parish, a FEMA trailer park was established in Diamond, and modular buildings were set up in Port Sulphur for the new, consolidated South Plaquemines High School. Slowly, a few restaurants and other retail businesses returned. Port Sulphur seems to have recovered from the hurricane more successfully than smaller villages downriver, such as Empire and Buras. Residents give Father Gerry Stapleton, the Irish pastor of

St. Patrick's Catholic Church, part of the credit for helping Port Sulphur return to some normalcy. He convinced the archdiocese to allow him to clean up and restore his church, which became a crucial community center in the aftermath; he also assisted low-income parishioners in locating financial and housing assistance. Still, like much of Plaquemines, Port Sulphur remains much smaller than before Katrina.


### 7.4.2. Specific Effects of the Spill on Port Sulphur

Port Sulphur has a more diverse economic base than either Pointe a la Hache or Empire, but it is still heavily dependent on fishing and felt the impact of the oil spill. Some local retail businesses lost employees to cleanup employment. For example, the first restaurant owner to re-open in Port Sulphur after Katrina had trouble finding people to work for her after the oil spill, because they all went to work on cleanup (CW505 2011). The boom also caused problems by tightening an already small rental housing market, particularly low-income housing. Affordable housing was already decimated by Katrina, and the post-oil spill rush by responders and media made things worse for low-income people trying to come home. The director of a charitable organization that locates rental housing for poor, elderly, and disabled people, said that after the spill, BP "sucked up" all of the available housing by paying owners far more than Section 8 housing vouchers could offer (CW502b 2011). The NGO, in turn, could not get grant funding it used to because they could not place as many clients in housing. Organization leaders reported that their plans to build a housing complex in Port Sulphur for poor and elderly residents, many of whom are African American, had met with some political resistance (CW502b 2011).

At the time of this study, several seafood processors worked in the Port Sulphur area and had oyster leases of their own. One family-owned oyster processing plant and wholesaler harvested most of the seafood the plant needed and bought from a few small, local minority fishermen. The oil spill shut them down for a whole year, and high river levels in the spring of 2011 further hurt their business. By August of 2011, they were still not getting as many orders as usual, because people are afraid to eat Gulf oysters. (They used to sell 2,000 to 2,500 sacks every three days, down to about 450 sacks every three says.) The son of the owners, said, "My dad got paid $5,000. He's got a multi-million dollar business—I guess it must be millions with everything. It costs him more than $5,000 a day to buy, shuck, and ship oysters" (CW520 2011). Like many other fishermen and processors, the oyster processors complained that there were many more out-of-state people (from Georgia, Texas, New York, and the Dominican Republic, among other places) hired for cleanup work than Plaquemines Parish fishermen. The son continued, "It's who you know, or who you pay" that determines whether you get hired. . Another employee of the processing plant commented that his boat blew an engine during the cleanup effort, costing him more money than he earned.

In summary, Plaquemines was deeply affected by the oil spill because of its proximity to the well, its economic dependence on commercial fishing and the oilfield, and the fact that that it is still recovering from Hurricane Katrina. Still, local residents seem determined to rebound. A parish priest commented:

> This is an area that's always going to work hard to survive, to pool its resources to survive. It's a good place because of that, but it's hard living here. Everything has to be in order. The gas and oil industry has to be doing well and the fishing has to be doing well. …. People have strong faith here, which has enabled them to survive all these storms and the challenges of the oil spill. (BR044 2011).

## 7.5. REFERENCES

Barrois, Etienne. 1962. King of the river people? Commonweal LXXVI(15):365-366.

Barry, John M. 1997. Rising tide: The great Mississippi flood of 1927 and how it changed America. New York: Touchstone Books.

Bourquard, Shirley Chaisson. 1987. Early settlers on the Delta: Families of St. Bernard, Plaquemines, and Orleans Parishes, Louisiana. Arabi, LA: S.C. Bourquard.

BM497a. 2011. Personal communication. Local seafood economy, business at store, and personal history. Discussion with Brian Marks. Small business owner. Buras, LA. May 13.

BM499. 2011. Personal communication. Shrimp prices, personal history, expectations for the new season. Commercial fisherman. Discussion with Brian Marks. Buras, LA. May 13.

BM502. 2011. Personal communication. Cambodian community, shrimping season, new boat motor, claims process. Commercial fisherman. Discussion with Brian Marks. Buras, LA. May 14.

BM504. 2011. Personal communication. Shrimp season, life experiences, history in the commercial fishing industry. Discussion with Brian Marks. Commercial fisherman. Plaquemines Parish, LA. May 14.

BR044. 2011. Personal communication. Effects of oil spill on lower Plaquemines. Discussion with Bethany Rogers. Religious leader, Port Sulphur, LA. February 24.

BR059. 2011. Personal communication. Sport fishing industry. Discussion with Bethany Rogers. Charter boat captain, Venice, LA. March 10.

BR060. 2011. Personal communication. Sport fishing industry. Discussion with Bethany Rogers. Charter boat captain, Venice, LA. March 10.

BR062. 2011. Personal communication. Sport fishing industry. Discussion with Bethany Rogers. Charter fisherman. Venice, LA. March 10.

BR158. 2011. Personal communication. Spill effects on marinas. Discussion with Bethany Rogers.  Marina owner and manager. Lower Plaquemines, LA. May 17.

BR161. 2011. Personal communication. Oil spill effects on restaurant business. Discussion with Bethany Rogers. Restaurant owner. Lower Plaquemines, LA. March 12.

Brasseaux, Carl A. 2005. French, Cajun, Creole, Houma: A primer on Francophone Louisiana. Baton Rouge: Louisiana State University Press.

Brasseaux, Carl. 2008. Personal communication. Louisiana history. Discussion with Carolyn Ware. Professor of History, University of Louisiana at Lafayette. Lafayette, LA. August 16.

Brasseaux, Carl A., Keith P. Fontenot, and Claude F. Oubre. 1994. Creoles of color in the bayou country. Jackson: University Press of Mississippi.

Brown, Matthew. 2006. Landlocked. New Orleans Times-Picayune. January 30.

Buras, Janice. 1991. Pointe a la Hache. Belle Chasse, LA: Down the Road Publishing.

Buras, Janice. 1995. Betsy and Camille: Sisters of destruction. Belle Chasse, LA: Down the Road Publishing.

Buras, Janice. 1996. Way down yonder in Plaquemines. Gretna, LA: Pelican Publishing Company.

Buras, Janice. 2002. Pointe a la Hache: Its name and history. Belle Chasse, LA: Down the Road Publishing.

Cibilich, Domenica. 2005. Personal communication. Effects of Katrina on Empire/Nairn. Discussion with Carolyn Ware. Third-generation oyster harvester. Empire, LA. January 27.

Coastal Protection and Restoration Authority (CPRA). 2012. Louisiana's 2012 Coastal Master Plan. Available at:  www.coastalmasterplan-louisiana-gov/2012/03/final-2012-coastal-master-plan-released

Conaway, James. 1973. Judge: The life and times of Leander Perez. New York: Alfred A. Knopf.

Creole Heritage Foundation. n.d. Brochure. Natchitoches, Louisiana: Creole Heritage Center, Northwestern State University.

CW401a 2011. Personal communication. Minority fishermen's issues. Discussion with Carolyn Ware. Commercial fisherman. Pointe a la Hache, LA. January 14.

CW401b. 2011. Personal communication. Minority fishermen's issues. Discussion with Carolyn Ware. Commercial fisherman. Pointe a la Hache, LA. January 14.

CW427. 2011. Personal communication. Effects of oil spill on minority Plaquemines residents. Discussion with Carolyn Ware and Cheryl Hogan. Pastor/community activist. Davant, LA. March 17.

CW438. 2011. Personal communication. Commercial fishing. Discussion with Carolyn Ware and Cheryl Hogan. Oysterman. Pointe a la Hache, LA. March 28.

CW464. 2011. Personal communication. Menhaden fishery. Discussion with Carolyn Ware. Fishing plant co-owner. New Orleans, LA. April 21.

CW477. 2011. Personal communication. Oil spill effects on newspaper and parish. Discussion with Carolyn Ware. Newspaper employee. Belle Chasse, LA. May 24.

CW492b. 2011. Personal communication. Croatians in Plaquemines Parish. Discussion with Carolyn Ware. Oyster farmer/oil company consultant. Belle Chasse, LA. June 16.

CW502b. 2011. Personal communication. Effects of Katrina and oil spill on NGOs and minority residents. Discussion with Carolyn Ware and Bethany Rogers. Charitable organization director and pastor. Belle Chasse, LA. July 15.

CW503. 2011. Personal communication. Drilling moratorium effects. Discussion with Carolyn Ware and Bethany Rogers. Oilfield support company executive. Belle Chasse, LA. July 18.

CW505. 2011. Personal communication. Oil spill effects on lower Plaquemines. Discussion with Carolyn Ware and Bethany Rogers. Insurance company owner. Belle Chasse, LA. July 18.

CW508a. 2011. Personal communication. Oil spill effects on minority residents. Discussion with Carolyn Ware and Cheryl Hogan. Councilman. Port Sulphur, LA. July 25.

CW520. 2011. Personal communication. Oil spill effects on seafood industry. Discussion with Carolyn Ware. Seafood processor. Port Sulphur, LA. August 4.

Davis, Donald W. 2010. Washed away? The invisible peoples of Louisiana's wetlands. Lafayette, LA: Center for Louisiana Studies.

Dilella, William. 2011. Daybrook Fisheries fleet set for season. Plaquemines Gazette. April 26.

Dormon, James H., ed. 1996. Creoles of color of the Gulf South. Knoxville: University of Tennessee Press.

Espina, Marina E. 1988. Filipinos in Louisiana. New Orleans: A.F. Laborde and Sons.

Evans, O. 1963. Melting pot in the bayous. American Heritage 15(1):30-41.

Follett, Richard. 2005. The sugar masters: Planters and slaves in Louisiana's cane world, 1820–1860. Baton Rouge: Louisiana State University Press.

German, John J. 1990. Louisiana post offices. Lake Grove, OR: The Depot.

Gonzales, Jessica. 2012. Spirits high as Daybrook kicks-off season. Plaquemines Gazette. April 24.

Goodman, Amy and Juan Gonzales. 2010. A daily independent global news hour. December 7. Available at:
www.democracynow.org/2010/still_impacted_by_katrina_African_Americans

Hall, Gwendolyn Midlo. 1992. Africans in colonial Louisiana: The development of Afro-Creole culture in the eighteenth century. Baton Rouge: Louisiana State University Press.

Horne, Jed. 2006. Breach of faith: Hurricane Katrina and the near death of a great American city. New York: Random House.

Horst, Jerrold and Glenda. 2011. The Louisiana seafood bible: Oysters. Gretna, LA: Pelican Publishing Company.

"Indicator." 1850. Letter from the Empire Parish. Daily Picayune. 3 July, p. 4.

Jeansonne, Glen. 1977. Leander Perez: Boss of the delta. Baton Rouge: Louisiana State University Press.

Kammer, Edward. 1941. A socio-economic survey of the marshdwellers of four southeastern Louisiana parishes. Unpublished dissertation. The Catholic University of America.

Kane, Harnett. 1944. Deep delta country. New York: Duell, Solan & Pearce.

Kniffen, Fred B. 1936. A preliminary report on the Indian mounds and middens of Plaquemines and St. Bernard parishes. P. 407422. Lower Mississippi River Delta: Reports on the geology of Plaquemines and St. Bernard parishes. New Orleans: State of Louisiana Department of Conservation, Louisiana Geological Survey.

Knill, Mary Katherine. 1997. Anatomy of an antebellum sugar parish: Plaquemines Parish, Louisiana 1850-1860. M.A. Thesis. Tulane University.

Knipmeyer, William B. 1956. Settlement succession in eastern French Louisiana. Unpublished dissertation. Louisiana State University.

Koenig, Karl. 1981. The Plantation Belt Brass Band and musicians. Second Line 33(fall):24-35.

LaChance, Paul F. 1992. The foreign French. In: Hirsch, A.R., and J. Logsden, eds. Creole New Orleans. Baton Rouge: Louisiana State University Press.

Laska, Shirley, George Wooddell, Ronald Hagelman, Robert Gramling and Monica Teets Farris. 2005. At risk: The human, community, and infrastructure resources of coastal Louisiana. Journal of Coastal Research 44:90-111.

Lee, Trymaine. 2010. Delta's black fishermen seeking cleanup work and clinging to hope. Available at: http://kathmanduk2.wordpress.com

Life Stream. 2006. BPSOS recovery plan for shrimping boats in Plaquemines Parish. Available at: http://www.machsong.org/english/modules.php?name=News&file=article&sid+254

Lincoln, Rod. n.d.-a. Plaquemines Parish history. Available at: www.southplaquemines.net/SP/History_files/Plaquemines%20/History.pdf

Lincoln, Rod.   n.d.-b.  World  War  II  in  Plaquemines  Parish.  Available  at: www.southplaquemines.net/SP/History_files/World%20WarII.pdf

Lincoln, Rod. 2008. Personal communication. Plaquemines Parish history. Interviewer unknown. Plaquemines Parish historian. Waggaman, LA. August 5.

Longman, Jeré. 2008. The Hurricanes: One high school team's homecoming after Katrina. New York: Public Affairs Books.

Lovrich, Frank. 1967. The Dalmatian Yugoslavs in Louisiana. Louisiana History 8:149-64.

McGuire, Tom. 2006. Louisiana's oysters, America's wetlands, and the storms of 2005. American Anthropologist 108(4):692-705.

Meyer, J. Ben. 1981. Plaquemines, the Empire Parish. Buras, LA: J.B. Meyer.

National Marine Fisheries Service (NMFS). n.d. Total commercial fishery landings at an individual U.S. port for all years after 1980–Biloxi, MS. Available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/lport_hist.html   Accessed April 28, 2012.

National Oceanic and Atmospheric Administration (NOAA). 2005. The aftermath of Katrina: Daybrook menhaden boat on the highway. NOAA Photo Library. Available at: http://www.photolib.noaa.gov/htmls/wea02706.htm October 23.

Parent, Wayne. 2004. Inside the carnival: Unmasking Louisiana politics. Baton Rouge: Louisiana State University Press.

Pilapil, Virgilio R. 1996. Remains, remnants and legacy of early Filipino settlements in southeastern Louisiana. Filipino American National Historical Journal 14:37-41.

Port of Plaquemines. n.d. Home page. Available at: www.portofplaquemines.com

Powell, Allen II. 2008. Shattered area faces slow recovery. Times-Picayune. July.Riden, Carl Marie. 2003. Staying In or Getting Out: Social Capital and Occupational Decision-Making among Louisiana's Croatian Oyster Harvesters. Unpublished dissertation. Louisiana State University.

Rioux, Paul. 2010. Plaquemines parish population shift after Katrina may be permanent. Times-Picayune. August 26.

Rodriguez, Maya. 2011. Oyster fishermen worried about problem along the coast. Eyewitness News. January 25.

Roosevelt, Margot. 2010. Gulf oil spill: Cambodian cleanup workers speak out. Los Angeles Times. June 8.

Scarpacci, Jean Ann. 1991. Immigrants to the new South: Italians in Louisiana's sugar parishes, 1880-1910. In: Pozzetta, G.E., ed. Immigrants on the Land: Agriculture, Rural Life, and Small Towns. Routledge.

Schleifstein, Mark. 2012. After two years, oil lingers on coast. New Orleans Times-Picayune. April 21.

Schweninger, Loren. 1989. Antebellum free persons of color in postbellum Louisiana. Louisiana History 30(4):345-64.

Schweninger, Loren. 1996. Socioeconomic dynamics among the Gulf Creole populations: The antebellum and Civil War years. In: Dormon, J.H., ed. Creoles of Color of the Gulf South.

Sitterson, J. Carlyle. 1953. Sugar country: The cane sugar industry in the South, 1753-1950. Lexington: University of Kentucky Press.

Stringfield, William R. 1989. The land of orange blossoms: A genealogical study of eight Creole families in Plaquemines Parish, Louisiana. Gretna: Pelican Publishing.

Stringfield. William R. 1993. U.S. Census, Plaquemines Parish, Louisiana. 1920. Greenville S.C.: Blossom Press.

Stringfield, William R. 2012. Personal communication. History of Empire, LA. Discussion with Carolyn Ware. Local historian. Belle Chasse, LA. March 3.

Tesvich, John. 2008. Louisiana's empire fights back, to fish again. Daily Yonder, February 4. www.dev.dailyyonder.com

Turlich, Burt. 2002. Personal communication. Freeport Sulphur and early Port Sulphur. Discussion with Diane Austin and Tom McGuire. Retired Freeport Sulphur employee. Port Sulphur, LA. March 11.

U.S. Census Bureau. 2000a. Profile of general demographic characteristics: 2000 – Belle Chasse, Louisiana. http://quickfacts.census.gov/qfd/states/22/2206120lk.html

U.S. Census Bureau. 2000b. Profile of selected economic characteristics: 2000 – Belle Chasse, Louisiana. http://quickfacts.census.gov/qfd/states/22/2206120lk.html

U.S. Census Bureau. 2010. Belle Chasse CDP, Louisiana. Available at: http://quickfacts.census.gov/qfd/states/22/2206120.html

USGenWebProject. 2012a. United States Census, Plaquemines Parish, 1900. Compiled by Gladys Stovall-Armstrong. www.usgwarchives.net/la/plaquemines/census.html

USGenWebProject. 2012b. United States Census, Plaquemines Parish, 1930. Compiled by Dee Beck.. www.usgwarchives.net/la/plaquemines/census.html

Vujnovich, Milos M. 1974. Yugoslavs in Louisiana. Gretna, La: Pelican Publishing.

Ware, Carolyn. 1996. Croatians in southeast Louisiana: An Overview. Louisiana Folklore Miscellany 11:67-86.

Whitten, David O. 1995. Andrew Durnford: A black sugar planter in the antebellum South. New Brunswick and London: Transaction Publishers.

Wicker, Karen M. 1979. The development of the Louisiana oyster industry in the 19th century. Unpublished dissertation. Louisiana State University.

WPA of Louisiana. c. 1930s. Belle Chasse document. State Library of Louisiana. Available at: http://www.state.lib.la.us.

Zebrowski, Ernest and Judith A. Howard. 2005. Category 5: The story of Camille, lessons unlearned from American's most violent hurricane. Ann Arbor: University of Michigan Press.

Yeoman, Barry. 2010. Louisiana oystermen: Out of work, out of options. On Earth Magazine, October 28.

# CHAPTER EIGHT: LAROSE, CUT OFF, AND LAFOURCHE PARISH, LOUISIANA

Diane Austin

Lafourche Parish is defined by its bayou, a 77-mile-long waterway that emerges from the Mississippi River and empties into the Gulf of Mexico (Figure 8.1). Until 1903, when it was dammed at Donaldsonville north of the parish, Bayou Lafourche was a tributary of the Mississippi River. After that time, low levels of freshwater down the bayou enabled saltwater to intrude in its lower reaches, and prohibited farming in the southernmost communities such as Leeville (Curole 2005). The bayou is flanked by state highways, LA 1 and Highway 308, and, until recently when LA 3235 was completed, these were the only overland routes into and out of southern reaches of the parish.

The parish is divided geographically and politically, with agriculture and service industries defining the north and maritime industries the south. Thibodaux, in the north, is the parish's largest city and the parish seat, reflecting sugar's historic prominence in the parish. Heading south, first farming and then fishing communities are situated along the banks of Bayou Lafourche. Water encroachment and periodic flooding limited farming in the lower reaches; fishing, hunting, and trapping were the primary activities there. Central Lafourche and parts of lower Lafourche are ringed by a hurricane protection levee system that, in addition to defending homes and businesses from flood waters, reclaimed large tracts of low land used for cattle ranching and, increasingly, for commercial and residential development. Onshore oil and gas extraction began in the 1930s and the parish remains a primary staging and support area for offshore oil and gas exploration and development. Port Fourchon, a shallow draft port at the mouth of Bayou Lafourche on the Gulf of Mexico, is the single largest oilfield support facility in the Gulf of Mexico. The port's rapid growth has been closely tied to the development of deepwater prospects. The general overview of Lafourche history below is followed by specific discussion of Larose-Cut Off and the effects of the disaster there.

## 8.1. LAFOURCHE PARISH HISTORY

The Lafourche delta, estimated to be about 1,700 to 700 years old, is the most recently abandoned Mississippi River distributary (Frazier 1967). Thus, while archaeologists have dated some Native American mounds, midden, and village sites in southern Louisiana to be at least 8,000 years old, the earliest archaeological sites dated within Lafourche and Terrebonne parishes are from the Tchula period (500 B.C. to 1 A.D.), during which time most of the land within the Lafourche region had been established (Weinstein and Gagliano 1985). When Europeans first arrived in the area, it was occupied by the Chitimacha, and by Washa and Chawasha Indians, who have been identified as Chitimacha-speaking people, but within a couple of decades warfare and disease had greatly reduced their numbers and most of the Chitimacha were living farther west on lower Bayou Teche and around Grand Lake (Galliano 1965). As the Europeans continued to move into and across the Gulf region, the remoteness of the coastal areas attracted people who were being driven out of other places as well as those who wished to profit off of the area's rich natural resources.

220



Figure 8.1. Map showing Lafourche Parish and Larose–Cut Off study community
          Source: Ben McMahan

Lafourche Parish experienced major changes in the early 1700s as French, Spanish, English, and German farmers settled there. Then, by the late 1700s, French Acadians (Cajuns), forced out of present-day Nova Scotia by the British, also moved into the area. Around the same time, new groups of Native Americans were pushed south into the region by the expansion of Europeans into their former territories. Anglo-American planters arrived in the 1800's, bringing large numbers of African slaves to work their plantations.

The Europeans established settlement patterns dictated, in large part, by the area's natural features, which vary from wetlands, lakes, and bayous in the coastal areas to flat agricultural lands in the north. Settlers were drawn to the high, arable land that formed the banks on either side of the bayous. The land was initially parceled by the French "arpent" or long-lot system (an arpent is 192 linear feet), whereby an owner would generally acquire a piece of land at least several arpents wide fronting the bayou and extending back 40 arpents to the marsh or backlands. Settlers were responsible for constructing and maintaining levees along the bayous well into the 1800s (Ditto 1980). The families lived and practiced small scale cultivation on the land; most gardened and obtained meat from small cattle herds, chickens, pigs, and other farm animals. They used small boats to transport produce to markets in New Orleans. Residents supplemented their food supplies and incomes by fishing, hunting, and trapping.

In 1822, Lafourche Parish was divided into Lafourche and Terrebonne parishes. Sugar brought planters to Lafourche in the 1800s, though small farmers outnumbered the sugar producers well into the 19th century. Until 1825, cotton, corn, rice and peas were the primary crops in Lafourche Parish (Ditto 1980). By the 1830s, some families had made their way as far south as Leeville, but marshland in the south precluded sugar cane farming and limited the size of settlements. "Larose was the last settlement on the bayou of any consequence in 1893. Golden Meadow had some six or seven farms and then immediately past these farms was an area of great oaks and wilderness" (Rogers 1985:98). Hurricanes, too, limited coastal settlement. Survivors of the 1893 hurricane that devastated Chenier Caminada moved north, many settling in Leeville and Golden Meadow but some going as far north as *Côte Blanche* (now in Cut Off). A 1909 hurricane inundated much of the Louisiana coast and killed about 350 people in Louisiana and Mississippi, leading residents of lower Terrebonne to move to the area below Golden Meadow (NOAA 1993, Westerman 2001). A 1915 hurricane pushed more people onto the ridges at Golden Meadow, offering greater protection from flooding while still allowing fishermen to access their fishing grounds (Rogers 1985).

Under the 1849 Swamp and Overflowed Lands Act, the U.S. federal government gave "overflowed" lands to the states. This did not include lands the government had already deeded to individuals as land grants. The State of Louisiana appropriated all swamp lands with no private ownership and created levee boards that took control over the land. Seeking to encourage settlers to the region, the levee boards used quit claims to transfer the land to private individuals.

For example, Edward Wisner acquired hundreds of thousands of acres of land in Lafourche and Terrebonne parishes from the levee boards in this manner. Part of his vision was to reclaim the land for farming, so he built levees and attempted to drain some areas (Derdak and Kepos 1993; Pitre 2001). In 1914, the Edward Wisner Donation was created from Wisner's estate to support local needs in the areas of beautification, education, recreation, and human services (City of New Orleans 1993). Wisner's levees were destroyed by the 1915 hurricane, his project faltered, and the foreclosures began. Henry Timken of Ohio organized a group of Midwesterners to take over the land, almost 600,000 coastal acres, hoping to lease it to fur

trappers. In 1926, speculator Edward Simms acquired Timken's shares in order to create a company that would explore for oil (International Directory of Company Histories 1993). That company was incorporated in Maryland in 1927, as the Louisiana Land and Exploration Company (LL&E), signed a contract with the Texas Company in 1928, and subsequently became one of the largest independent oil and gas exploration companies in the United States (Wallace et al. 2001). In 1998, LL&E was sold to Burlington Resources, making the merged company again one of the nation's largest independent oil producers.

Oil was discovered in Lafourche Parish, at Leeville, in 1931. "Successful use in 1934 of a submersible drilling barge marked the start of expanded drilling activity. To realize the floating unit's potential, the industry needed to dredge canals to exploratory and development sites" (Davis 1985:159). Though settlers had been dredging canals in the region since they arrived, for drainage and reclamation, transportation, trapping, and logging, the extent of dredging that accompanied the oil and gas industry was unprecedented (Davis 1973). Combined with the loss of sediments from the Mississippi River, which were funneled off the Outer Continental Shelf following the construction of a massive levee system following the 1927 flood, and subsidence of the deltaic region, the canals were a major factor in the significant land loss that continues to this day. To improve the efficiency of transportation within the United States, in the 1920s Congress authorized construction of an Intracoastal Waterway running from the Atlantic seaboard to the tip of Texas. The waterway was completed from the Atlantic to New Orleans in 1936 and then, by 1942, from New Orleans to Corpus Christi, Texas. While it did improve waterborne transportation, it also divided communities and exacerbated land loss.

Fishing, shrimping, and oystering, too, were long-standing practices, especially in the southern part of the parish where they were carried out with small boats and the settlers consumed and sold the seafood they caught. Improved preservation techniques made it possible to expand the markets for this seafood. By the early 1900s, for example, Golden Meadow was home to oyster canning factories. Commercial shrimping was stimulated in 1917 when the U.S. Bureau of Fisheries introduced the shrimp trawl. Improved boats and gasoline engines allowed shrimpers to use the trawls, haul ice into the bays and lakes, and return with larger catches, significantly boosting the shrimp industry of lower Lafourche (Butler 1985). Lafourche shrimpers continued to adapt their equipment to their resources and needs. In 1980, Lafourche Parish had 450 steel hull vessels, the largest such fleet in Louisiana, but its shrimping fleet still included all manner of boats, from small Lafitte skiffs operated by one or two persons who returned home daily to the 90-foot steel hulled vessels that could accommodate four or five persons and stay out several weeks at a time (Ditto 1980). Oyster farming remained important and was second only to shrimp in monetary value in the parish at the time.

The common muskrat was trapped commercially from the early 1900s, and then, in 1938, nutria, a large rodent imported from Argentina, was accidently introduced when animals were released from a pen on Avery Island during a hurricane. When the U.S. market for furs plunged in the mid-1980s due to nationwide protests against trapping and hunting animals for their furs, the value of the furs declined precipitously. Because of the damage nutria do to wetland vegetation, to encourage their removal, the state Wildlife and Fisheries department began to pay trappers for nutria tails.

Trapping and fishing practices were also affected by the consolidation of land ownership. At the time Wisner acquired thousands of acres of wetlands, they were considered and used as common property. Due to the challenges of delineating wetlands from arable land around them, disputes over whether land was already owned were common. As the presence of oil and gas

increased the value of the land, swamp land that had been available to all to use for trapping and fishing was taken by outsiders, through direct purchase and via unscrupulous intermediaries, who were intent on developing its petroleum resources (Wallace et al. 2001). Much land passed out of the hands of its Native American and Cajun owners, many who could not read or write. As time has passed, because Louisiana's civil law is based on the Napoleonic Code, with forced heirship a key feature, the land that did remain in the hands of local families has been divided up as it has been passed to successive generations. Some have retained access to the water and others have not. Because mineral rights can be severed from surface rights, among those who have retained their rights, some have both surface and mineral rights while others have retained only one or the other.

A significant portion of the arable land in Lafourche Parish is still devoted to farming (see Figure 8.2), but the discovery of oil and gas onshore and then in the Gulf of Mexico in the 1940s and 1950s led to a significant reshaping of the area's landscape and economy. As the oil industry burgeoned in the parish's southern marshes and lakes, local entrepreneurs seized opportunities to build businesses that supported this development. For example, Cajun mariners drew upon their knowledge of area waterways, and their expertise in boatbuilding, to develop specialized offshore service vessels, and several local companies grew to become massive global shipbuilding enterprises, bringing political leaders and foreign dignitaries into the bayou communities (Falgoux 2007; Campbell Field notes July 17, 2007). Farmers and shrimpers used the opportunity to work offshore to earn enough money to maintain and improve their farms and vessels (see also Gramling 1989). Much of the early growth was through family enterprises, with sons and nephews, uncles and cousins providing the workforce (c.f. Marks 2005). By the 1960's, manufacturing had become a major source of employment in the parish, tracking closely the rise and fall of the oil industry, with rapid increases in employment and wages in the 1970's and a dramatic fall in the 1980s (Campbell et al. 2013).

To support this new industry, in 1960, the state of Louisiana established the Greater Lafourche Port Commission. The following year, voters in Louisiana's Tenth Ward, which is south of the Intracoastal Waterway, approved a 5-mill property tax to fund development of Port Fouchon at the end of Bayou Lafourche. In 1963 LL&E and the Cailouets donated land to the Commission, but, other than a clamshell road being put in place, little happened until 1979 when Martin Fuel opened as the port's first major tenant (The Greater Lafourche Port Commission n.d.). In 1981, a consortium of five oil companies completed construction of the Louisiana Offshore Oil Port (LOOP), a superport located 18 miles offshore in the Gulf of Mexico, with Port Fourchon designated as its land base.

The 1980s downturn in the oil industry had far-reaching effects on the parish as thousands of experienced oilfield workers were either laid off or forced into early retirement. Although other factors such as smaller family size and greater options for young people are significant, many argue that the massive exodus of knowledge and expertise, and therefore of future mentors, remains a major factor in the lack of skilled workers within the oilfield in general and in vessel construction and repair in particular (Austin and Crosthwait 2013).

Following reorganization in the offshore industry, by the late 1990s Port Fourchon was undergoing rapid expansion. In 1999, for example, the port purchased 4,000 acres from Burlington Resources, and in 2000, the port acquired the South Lafourche Airport and 1,200 acres surrounding it. The port's earnings rose from $1 million in lease sales in 1987 to over $10 million in 2004. Its 2004 $27 million budget had grown to over $70 million in 2008 (The Greater Lafourche Port Commission n.d.), and it grew from 14 companies leasing 200 acres in 1994 to

250 companies leasing 1,700 acres in 2010 (AG409 2011). Though its major function is to serve the offshore petroleum industry, it has also provides water access for commercial and recreational fishers, is a foreign cargo shipping terminal, and is adjacent to a small beach.



Figure 8.2. Land cover and land use, Lafourche and Terrebonne parishes
Source: U.S. Geological Survey, 1990. Land use and land cover digital data, using data from Anderson et al. 1976. Map compiled by Huizhen Niu, LSU AgCenter.

As the offshore industry rebounded during the 1990s and 2000's, both employment and wages within Lafourche Parish's manufacturing sector improved steadily, with minor setbacks reflecting short term industry downturns (Campbell et al. 2013). Wages elsewhere in the offshore petroleum industry were also rising, drawing workers from local shipyards into higher paying and more lucrative offshore jobs. Vessel operators and labor contractors increased their recruiting and training efforts, trying to attract workers from across the United States and beyond. By the mid-1990s, some employers reported hiring large numbers of Hispanic workers, some of whom brought their families, and effects were felt not only on the yards and at the workplaces of those employers but also in the parish's schools and churches (Wallace et al. 2001).

Over the next decade, the composition of the onshore workforce underwent a dramatic shift, especially following Hurricane Katrina in 2005 when workers were pulled away to high-paying jobs in post-storm reconstruction at the same time that offshore repair work increased. Though local companies had been hiring immigrants and other non-local workers since the

1990s, both the numbers and origins of those workers increased significantly during this period. Area shipyards and labor contractors began hiring workers from countries as distant as Romania and the Philippines using nonimmigrant, H-2B visas. Some of the larger employers housed those workers on their yards and bused them to local big box stores to shop and send remittances home, creating very visible reminders of their presence in the communities (ship fab labor). New certifications and clearances required to work at ports and offshore, mandated by post-9-11 regulatory changes, went into effect as early as 2002, further exacerbating the split between those who could and could not work offshore.

By 2008, though, the global economic crisis, which slowed petroleum demand, had begun to be felt in Lafourche Parish. The huge influx of post-hurricane fabrication repair work was being completed and some of the pressure to find workers was relieved. Coupled with policy changes in Louisiana's Workforce Commission and workplace raids by the Department of Homeland Security, the slowdown prompted an abrupt drop in the number of foreign workers in area workplaces (Austin n.d.).

## 8.2. LAROSE-CUT OFF

Though distinct economically and socially, both Larose and Cut Off, two small communities of about 7,400 and 6,000 people, respectively, are combined as this study community (Figure 8.3). Located at the northern end of south Lafourche, in a transition zone between the plantations and sugar mills of the north and the fishing and oil centers of the south, Larose-Cut Off was also cattle country. From large property owners to sharecroppers, early residents kept cattle and other livestock for food. In 1910, in an attempt to create an agricultural community, a large polygon of marshland christened Delta Farms was surrounded by a four foot levee and drained. In addition to its cattle operations, through the 1950s Delta Farms employed residents from across southern Louisiana to cut sugarcane and pick cotton (Breaux 2001; Billiot 2005). A little farther south, in Cut Off, Clovelly Farms was pumped and leveed, originally for cotton and then later for sugar and oil.

In those same decades, many residents built and maintained their own fishing vessels along the banks of Bayou Lafourche and caught fish, shrimp, crabs, and oysters from the surrounding wetlands and bays for their own use and to sell. Some began to build for others and opened boat companies along the banks of the bayou. Residents also supplemented their incomes and their diets by raising crawfish, rabbits, and other animals and by hunting wild game in the wetlands and pastures surrounding their homes (Callais 2002). As the region's economy diversified, so, too, did that of its communities. By 1980, Ditto observed, "The bayou from the Intracoastal Canal south is home to net shops, engine shops, welding operations, dragline and dredging companies, barge lines, labor crew suppliers, workboat supply companies and the largest privately owned tugboat and towing company in the world" (1980:32). Despite the subsequent economic downturn, petroleum industry reorganization, and then massive storms, this pattern persisted at the time of this study.



Figure 8.3. Map of Larose-Cut Off as defined by local residents, compiled from ethnographers' notes
      Source: Ben McMahan

### 8.2.1. Historical Narrative

Larose got its name from an early pharmacist, Mr. Felicien Larose, who, in the 1880s, successfully acquired a post office for the community (Daviet 2007a). Cut Off was originally named La Coupe, French for "the cup." As noted above, Larose was the southernmost settlement in Lafourche Parish throughout the 19th century, and it initially drew much of its population from the north. It was connected to New Orleans by a canal dug by a resident in 1850 to transport oranges and potatoes to market. Though sugar cane farming was not as extensive as in the northern part of the parish, the Choctaw Plantation became a key feature in the area. Both Larose and Cut Off were populated primarily by Cajuns and French settlers, and the Catholic Church was key to the emergence and growth of both communities. Holy Rosary of Notre Dame was built in Larose on the east side of Bayou Lafourche in 1873 and became the center of the community; a private school was opened near the church in 1882, and by 1890 over 50 families had established homes and farms within two miles of the church (Daviet 2007b). In 1893, Sacred Heart began as a mission to serve the survivors of the devastating Cheniere Caminada hurricane who moved inland to *Côte Blanche* (Diocese of Houma-Thibodaux 2007), so named because the residents there used lime and water to paint the exterior of their houses, which lined the bayou, white.

Both communities grew during the ensuing decades. Mr. Elie Ducos built his estate in Cut Off in 1904, adjacent to the store he operated there (Ditto 1980). The year 1905 brought a yellow fever epidemic, the closure of the Choctaw sugar house, and the opening of Valentine Sugar. The waning timber industry led the Buckeye Stave Co. of Ohio to sell its land at Clovelly Farms in 1909; the new owners spent eight years reclaiming the land to create farmland, digging the first canal on the farm in 1915, and establishing a self-sufficient community of 50 families with a cotton gin, general store, and schoolhouse by 1935 (Adams 2007). The 1910 opening of Delta Farms, followed two years later by the sale of lots from part of the former Choctaw Plantation, also helped concentrate the population, attracting both people from the area and outsiders from as far away as Ohio (Defelice and Picou 2007). In 1914, Ludvine Sawmill, which had been a central feature in Larose, processing the timber that was being extracted from the region's cypress and bottomland hardwood forests, closed because almost all the available timber had been cut by that time (Daviet 2007a). Delta Farms expanded on several occasions over the next decades, serving not only the families who lived and had plots of land there but also sprouting a hotel and summer vacation homes.

Land tenure in the community changed dramatically between 1920 and 1940. LL&E acquired wetlands for oil exploration in the area in the late 1920s, many sharecroppers lost their farmland during the Great Depression, and oil was discovered first at Leeville and then farther up Bayou Lafourche around Golden Meadow and at Delta Farms. Oil companies began installing pipelines throughout the region, acquiring rights of way through eminent domain and purchase, often for meager amounts (Austin 2006). Residents who were able to retain their property and negotiate successfully with the oil companies got rich and began to acquire their neighbors' land as well. A 1938 blowout in Golden Meadow forced the evacuation of that community until the oil washed out of rooftop cisterns and residents could return; some of the evacuees stayed with family members in Larose and Cut Off while others went farther north as far as Thibodaux (Curole 2002).

Oil development also brought a new wave of outsiders. Mostly single men, many of the new arrivals came from far beyond the parish. Whether they were from north Louisiana, Texas, or elsewhere in the South, as they talked different than the local English accent and spoke no French, the locals called them all "Texiens." Many stayed, married locals, and raised their children in the area, acculturating themselves into Lafourche Parish life.

The Intracoastal Waterway reached the area in the early 1940s, running through the center of Larose and splitting the community. Vessels began towing oil through the community, and bridges had to be moved to accommodate the tow boats. A small pontoon bridge was constructed across the canal on each side of the bayou, but residents recall that travel from one side to the other could take up to an hour because of all the boat traffic (DA613 2012).

During World War II, Larose residents served overseas and in the area's shipyards, worked in the oilfields to supply fuel for the armed forces, grew corn and raised beef for the servicemen, and worked alongside German prisoners of war at Clovelly Farms (Penney 2008; Adams 2007). Immediately after World War II, housing developments were built to accommodate those coming home from the war as well as expanding Cajun and French families. For example, the Anthony Adams and Renis Cheramie Subdivision was created in Larose in 1947 (EZNotice 2011).

During the 1950s, Larose and Cut Off became sites for inland oil drilling and, at the same time, offshore oil extraction created demand for people, vessels, and other equipment. Local shipyards expanded with new demands for tow boats and fishing vessels, and new yards and towing companies opened. Farmers mechanized and locals adopted the sugarcane cutter. All of this activity provided new opportunities for residents and attracted workers and, in some cases, their families to the area. Larose's population jumped to over 1,200 people by 1950 (Daviet 2007a). Men moved between fishing and the oil industry, as opportunities arose. A local shrimper recalled:

> Daddy, in his youth, he did what he could to make a living, trapping, [etc.]. He was a tug boat captain. Then on his days off he worked as a carpenter, till he became a full time trawler. He could make more money trawling, and he was his own boss… [When he was working on the tugs,] he worked out of Louisiana, Texas, and even Mexico. I know he went to Mexico… When he was a kid, he worked on trawl boats with […]'s daddy. Then he got older, and -he had to support a family, and he went to trap. Then he worked on tugs. He worked 18 years with one company, then he went to work with another one. He bought him a little shrimp boat and worked on his days off. Then he took me one summer and we lived at the camp. After this he decided to go to fishing… He made enough money with his small boat to quit working on the tugs. Then he bought a bigger boat, then he bought two more. I started helping him…The families down here used to take their kids out of school to be there on opening day of the season… I started trawling and then I worked on barges as my winter job the last 6 or 7 years. My first real job was hauling, I worked in trucking. My daddy tied his boat up one winter and I went to work in the shipyard.. . It's 35 years I'm married; I started my first job in the shipyard way before then. I was 17 or 18 back then... I even worked on a tug boat one year. [Back then you didn't need a license to work on a tug.] Now you need a suitcase to carry all your papers [everyone laughs and concurs] and you have to get it renewed…. Working on the barges, I'm an engineer. I do maintenance. It's like working at your house, you do the plumbing,

you're the electrician. I guess you can say I'm a jack-of-all-trades. Some of us are like that. (DA461c 2010)

Even when parents tried to get their children to do something else, many returned to fishing. The shrimper continued:

> That was my dream for my wife to come. My wife used to love it. After my daddy quit, my mama came with me. Then my wife stayed home with the kids. They came when the kids got out of school… We let the kids finish [school]. My mama and daddy would come out till [the kids] got out, or her daddy would come. Her daddy would be the runner. We would come into the dock, he would bring groceries and take our dirty clothes, and we'd go back out. Some shrimp sheds had washers and dryers so you could wash your clothes, run get groceries, and go back out. The whole family would be on the boat. Like my son…He was raised in a playpen [on the boat]. That was with my daddy. I tried to dissuade him. He finished, graduated, got a job, but he didn't like it. Him and grandpa bought a skiff. He was supposed to work on his days off. Grandpa said we should have bought a bigger boat. That's what he does. (DA461c 2010)

And fishing has long been more than just a way to make a living. "Although crabs are caught commercially by more than seventy-five licensed fishermen, who fill moist wooden hampers with their bubbling catches, the occupation is one of the best sun-and-water therapies known to a Lafourchaise" (Ditto 1980: 39).

Yet, for all that stayed the same, by mid-century change was underway. In 1950, Larose and Cut Off were united, first in the opening of the Larose-Cut Off High School (Daviet 2007a) and then, in 1953, with the completion of a new pontoon bridge across Bayou Lafourche. In the early 1950s, residents received telephones, freshwater, natural gas pipelines, updated electricity, a volunteer fire department, and a VFW [Veterans of Foreign Wars] home. Highway 308 was paved and, in 1955, a freshwater distribution system was completed to replace the cisterns and tanks that to that point had provided residents with water. Hurricane Esther, in 1957, brought people from the lower bayou communities to Larose and the new high school gym served as the hurricane shelter. The influx of outsiders led to the 1958 establishment of the first Baptist church and education center in the area. By this time, Larose had two motels to serve travelers and tourists which also provided temporary housing for oilfield workers, some of whom eventually purchased property in the community (Wallace 2001; Daviet 2007a).

The Valentine paper mill was established in 1954 by sugarcane farmers looking to produce paper with bagasse, the principal byproduct of cane processing. By the mid-1950s, much oilfield work was offshore, so during the 1950s Tidelands dispute, when the oilfield practically shut down, many residents lost their jobs. Some left to work elsewhere in the oilfields and on boats servicing those other areas. Once the dispute was settled, activity picked back up, and many became wealthy. Though much of that wealth left the region, some reinvested it in the community. Charlie Wallace, an oilfield worker from Kinder, Louisiana, developed a mud scale and, in 1963, sold the patent for it. He used the money to buy land in Larose and subdivide it to create a housing development (Wallace 2001).

In 1960, construction of the high rise bridge on Highway 308 on the east side of Larose was finished; political wrangling over where the bridge would touch down ensued on the west side as local businessmen whose property would be bypassed protested. The Highway 1 lift

bridge was completed and local businesses suffered as larger stores were opened farther south. The oil and gas industry altered the economic landscape as well. Schlumberger opened its Larose office, and some of the small shipyards that lined Bayou Lafourche expanded or shifted their operations to build and repair offshore vessels.

Hurricane Hilda entered the Gulf of Mexico in September 1964, prompting the evacuation of over 2,000 personnel from offshore rigs and causing extensive damage to the offshore platforms there. On October 3, the day before she made landfall, Hilda spawned a tornado that struck down in Larose, killing 22 and injuring around 200 people (NOAA 1993). The tornado first hit northwest Larose and took out a big swath of homes and destroyed cars and buildings at the Schlumberger offices there, and then it jumped the bayou and wiped out Ludevine; the latter neighborhood was never rebuilt (DA613 2012). Residents and emergency vehicles were unable to move through the area due to downed telephone and electric poles, and an emergency makeshift hospital was set up at a Raceland agricultural center. Along with hurricanes Betsy (1965) and Camille (1969), the 1960s storms led to major changes in the design and construction of offshore rigs and platforms (Pratt 2008).

The 1965 Flood Control Act authorized construction of levees along Bayou Lafourche between Golden Meadow and Larose; the first funds were appropriated in 1972. In 1970, the Louisiana state legislature created the South Lafourche Tidal Water Control Levee District (renamed the South Lafourche Levee District in 1978). Hurricane protection levees were constructed to surround Cut Off and lower Larose in order to protect bayou communities from storm surge from the Gulf of Mexico Floodgates were constructed in the mid-1980s and a lock authorized in 2005 (CMI 2010; Figure 8.4). In 1971, for the second time in a decade, the levees surrounding Delta Farms failed, and the farmland was never again drained. "By that time oil production was bringing in more money than the farmland" (Defelice and Picou: 59). The area reverted to a lake and was leased for hunting, fishing, and alligator and nutria trapping.

Apart from the loss of Delta Farms, the 1970s were heady years for Larose and Cut Off. Both the seafood and petroleum industries were booming. High school students drove expensive cars to school and forewent higher education opportunities to take jobs in family businesses. As hurricanes and storms degraded the southernmost communities along Bayou Lafourche, families moved north to higher ground and inside the ring of hurricane protection levees surrounding the communities. More housing developments were built to accommodate these new residents who needed protection from flooding, and Larose-Cut Off became a bedroom community for those who worked in commercial fishing and the offshore oilfield, industries needing access to the region's waterways and the Gulf of Mexico.

As offshore oil boomed, large shipbuilders eyed the area for its large tracts of land fronting the bayou and the Intracoastal Waterway. Years before construction of the large shipyards began, preparations were made for this new growth. Long-time residents recall seeing maps and street signs showing "Industrial Road" crossing cattle pastures, though few questioned why. By the 1970s, construction of these new yards had begun, with North American Shipbuilding opening its yard in 1974 (Colton n.d.) and Bollinger's Larose yard opening in 1976. Larose had become home to a concentration of heavy industrial facilities serving the offshore oil industry and residential neighborhoods housing offshore workers and their onshore support staff.



Figure 8.4. Map of levees, flood gate, and floodwall in south Lafourche, LA
Source: South Lafourche Levee District n.d.

The growth during this period also supported investments in civic life. The Bayou Civic Club was incorporated in 1973 to "coordinate, support, encourage, and advance charitable cultural, educational, recreational, creative, and social activities contributing to the well being of the human race" (Larose Regional Park and Civic Center 2012). In 1979, the organization was successful in securing a $1.8 million grant for the construction of a civic center. The Larose Regional Park and Civic Center, opened in May 1981, houses the senior center, local branch of the public library, and a tourist center, and hosts a wide range of programs serving residents from youth to adults. The park has numerous sports fields and recreation areas. It also offers hookups for overnight parking of campers and motor homes and serves as the region's primary evacuation center. Funds for the facility come from grants, donations, and special events such as the French Food Festival, which is held at the park every fall.

When LOOP opened in 1981, the Clovelly Salt Dome, located in Cut Off 1,200 feet below the surface and extending over a mile in width, was excavated to serve as a semi-permanent oil storage facility. The salt dome is connected to LOOP via a 28-mile pipeline to the south, and to refining facilities in St. James Parish via a 52-mile line to the north. The construction of the pipeline required more canal dredging, most of which occurred in Lafourche Parish. "The man-made network extends as tenacious features across the landscape, producing extractive patterns covering from under 10 to more than 40,000 acres. In the process land-water ratios are changed. Land is lost. Lakes become bays, and the amount of open water increases" (Davis 1985:160).

Just as the economy of Larose-Cut Off has become more diverse over time, so, too, has its population. Until the 1970s, most residents of Larose-Cut Off traced their origins to Cajun and French settlers, with a small number of Texiens who arrived with the early oil industry (Campbell Field notes July 17, 2007). During the 1970s, with much of the United States in recession, the burgeoning offshore petroleum industry was a magnet for migrants looking for work. Residents recall men with backpacks who appeared in town headed south toward the offshore companies in search of employment.

Then, beginning in the mid-1970s and over the next decade, more than 50 Vietnamese families moved into Larose and Cut Off, most tied to the commercial shrimping industry. Initially they lived in public housing as they saved money and pooled their resources to buy shrimp boats and equipment. Like their U.S.-born neighbors, those who had gained helicopter experience during the Vietnam War were able to secure jobs with offshore helicopter companies. Though tensions did arise between the newcomers and long-time residents, Larose did not experience the violence and outright hostility of other coastal communities. Though many Vietnamese Catholics attended Mass at Thanh Gia, or Holy Family, in Amelia, in St. Mary Parish, an extended chapel was established in Larose. Also during this decade, Hispanic workers from the United States, Mexico, and Latin America were drawn in to work. North American Shipyards built apartments nearby to house the workers. Though many who came stayed only a short time, mirroring earlier patterns, others married and settled in the community. Many long-time residents took advantage of the opportunities that were opening up offshore where they could earn higher salaries than they could in onshore positions.

Already by the end of the 1970s, Lafourche's economy was beginning to falter. The Valentine sugar mill, located between Larose and Lockport, was the southernmost of the six sugar mills in the parish during the middle 20th century and served sugarcane farmers to the south. The mill shut down in 1979 (Ditto 1980), putting people out of work and forcing farmers

to send their sugar farther north. Shortly thereafter, during the extended downturn of the 1980s, with its population so closely tied to the oil and gas industry, Larose-Cut Off experienced significant changes. Many oilfield-related companies went bankrupt during this period, and shipyards lost contracts and worked far below their capacity (Campbell et al. 2013). Cut Off had not experienced the rapid growth that Larose had, and its population continued to grow at about the same rate it had the previous decade, going from 5,049 in 1980 to 5,325 in 1990. In both communities, many residents who lost oilfield jobs turned back to traditional occupations like commercial shrimping, and more young people looked to higher education. Despite the challenges, during this period, a small number of entrepreneurs created new businesses, venturing into new and niche markets for fabricated goods and even cattle (Prakash 2013; Triple Son Farms n.d.).

## 8.2.2. The Downturn of the 1980s, Hurricane Katrina and the pre-*Deepwater Horizon* Disaster Social and Economic Landscape

The development and deployment of 3-D seismic exploration in the 1990s spurred renewed attention to, and the reworking of, the region's onshore fields. The Louisiana Delta Oil Company, for example, operates 16 wells at Larose and nearby Delta Farms. Between 2005 and 2011, the company drilled 18 wells, 15 of which were successfully completed (Louisiana Delta Oil Company n.d.). As one long-time resident noted, "Then by the late 80s workers started coming in from Alabama, Mississippi, Texas, and Florida. And now, like for the last 10 years or something, it's probably more outsiders than locals" (BR050 2011).

The 1990s expansion of Port Fourchon had direct and indirect effects on Larose-Cut Off as truck traffic increased tremendously, residents found work at the port, and local companies opened offices there (Keithly 2001). LA 3235, referred to by locals as "the back road," was completed from LA 24 to lower Golden Meadow, spurring commercial and industrial development along its length. Several new hotels were constructed in and near Cut Off to accommodate offshore oilfield workers. More farmland was converted to subdivisions, and Larose experienced a 26% increase in population between 1990 and 2000, growing from 5,772 to 7,306 residents. As in earlier periods, some of the increase was due to people from outside the area moving in, but it also reflects the migration of people from "down the bayou," with many shrimpers maintaining their boats in the lower reaches while moving their homes and families north. Cut Off maintained its rate of increase, growing 6% from 5,325 to 5,635.

Environmental concerns received greater attention in the 1990s and early part of the 21st century. In 1990, the Barataria-Terrebonne estuarine complex became part of the National Estuary Program that had been established by Congress in 1987 through Section 320 of the Clean Water Act. BTNEP is a partnership of government, business, scientists, conservation organizations, agricultural interests, and individuals and operates under a Comprehensive Conservation Management Plan to conduct research and outreach and lead initiatives to preserve, protect, and restore the Barataria-Terrebonne estuary (BTNEP n.d.). Among other concerns, BTNEP and other groups worked to share concerns about the effects of the ongoing land loss, noting not only the increased hurricane risk and habitat destruction but also that oil and gas pipelines were being exposed in the bayous. Residents of nearby Grand Bois drew attention to the oilfield waste pits between their community and Larose, and, after being exposed to toxic chemicals released during the disposal of oilfield waste from the cleanup of an oilfield site in

Alabama, filed a lawsuit against the waste facility, its owner, and the oil company discharging waste at the time of their exposure (Austin 2001; Roberts and Toffolon-Weiss 2001). They also gathered information and received help from religious leaders, scientists, and policymakers in their efforts to educate themselves about oilfield waste and the laws governing it, and to change those laws. Women and children from the community participated in a yearlong study of the health effects of exposure to the oilfield waste facility. Given the pervasive presence of petroleum and substances associated with its production and use, and the small population which precludes statistical analysis, researchers were not able to trace health effects to any single source. They nevertheless reported that the people of Grand Bois had been exposed to toxic substances such as benzene and hydrogen sulfide and to heavy metals and argued for more appropriate environmental monitoring, an evaluation of a nearby shipyard, and five years of medical monitoring (Williams 1998). No follow up monitoring was conducted, the residents and their advocates were unsuccessful in their efforts to change the laws governing oilfield waste or to get the facility closed, and their lawsuit was settled out of court. Due to disagreements over the material to be used in the berms that were to be built between the community and the waste facility, the berms were never built.

Though the residents of Larose-Cut Off did not experience the flooding or other damage caused by hurricanes Katrina and Rita, the storms flattened sugar cane in the area and were particularly damaging to the infrastructure that supported the commercial fishermen. According to a local fisherman, "Down on this bayou we lost two ice houses, two fuel docks, one shrimp shed, and one shrimp shed/ice house… and two more shrimp sheds. Grand Isle's only got one shrimp shed left. They used to have two or three" (DA461c 2010; see also Chapter 2, Volume II). Hurricane Katrina also brought evacuees from New Orleans to the Larose Civic Center. The area shipyards, already busy due to an expanding offshore industry, responded to the post-Katrina boom and expanded their workforces. This time, in addition to Hispanic workers, they recruited and employed hundreds of foreign workers on H-2B visas and housed them in FEMA trailers, converted buildings, and in barracks constructed on company property (SC037 2008). By the end of the decade, though, the H-2B workers were gone (Austin and Crosthwait 2013; Austin n.d.).

Hurricanes Gustav and Ike brought problems as well. For example, in 2008, Hurricane Gustav left thousands of residents with foul-smelling drinking water for weeks, resulting in an emergency declaration to begin a long-awaited project to reconnect Bayou Lafourche to the Mississippi River at Donaldsonville. After failing to obtain other federal funds for the project, in July 2011, Governor Jindal announced that the state would dedicate monies from the Coastal Impact Assistance Program (CIAP). The CIAP was created by Congress in 2005 and managed (since 2011) by the Fish and Wildlife Service and sends a portion of money made from drilling in the Outer Continental Shelf back to Gulf Coast states for coastal projects. Between 2007 and 2010, Louisiana was awarded $495 million in CIAP dollars. (Buskey 2011).

The population continued to grow throughout the decade, with Cut Off continuing to grow at about 6%, to 5,976 in 2010, and Larose growing 1% from 7,306 to 7,400 reflecting again an influx of newcomers from the north as well as those moving up the bayou from the south; both communities over 40% of the residents claimed French or French Canadian ancestry in the 2010 Census. A number of large homes were built along the highways flanking Bayou Lafourche. At the same time, though, during this study residents reported that young people have left the community in search of better educational and work opportunities as commercial fishermen, shipbuilders, and oilfield workers discouraged their children from following in their

parents' footsteps (see also Austin and McGuire 2002; McGuire, Austin, and Woodson 2013). Responding to the increased security concerns prompted by the September 11 attacks on the World Trade Center, the U.S. government instituted several new security measures. Those affecting ports, particularly the institution of the Transportation Worker Identification Credential (TWIC) in 2002, prevented some workers from obtaining employment as merchant mariners and at Port Fourchon and offshore facilities.

By 2007, though, the post-Katrina boon was already beginning to wane. The Valentine Paper Mill closed its doors in late 2007 due to decreasing sales and other economic factors (Lundin 2007). The slowdown began to affect area shipbuilders by 2008, as they completed their post-storm contracts and found little petroleum-related work (see Chapters 1 and 4, Volume II). A 2009 crackdown on immigrant workers led to the outmigration of many Hispanics, made it more difficult for those remaining to find work, and reduced the clientele of local Mexican restaurants and grocery stores.

Struggling with high fuel costs and low shrimp prices, some Vietnamese fishermen were getting out of the business, and some were moving away. One fisherman noted that, of the six children in his family, three boys and three girls, the youngest born in 1979 and the oldest in 1968, one had gone to Tulane University on a scholarship and another owned a nail shop in Houma. Though his father-in-law still had a house in Larose, and his son-in-law's boat's homeport was still there, he had moved to Houma to live. When asked if any of his children would follow his footsteps, he responded, loudly and instantly, "NO. My kids don't want to get into commercial fisheries, what future is there in it [*the nao tuong lai?*]. Nevertheless, some remained. A Vietnamese resident of Amelia, noted that the people there were working in the oilfield or in seafood, like his mom, who picks crabs, sometimes working in Morgan City and other times over in Des Allemands. The company picks up the workers in a van to transport them to the plant. His uncles, though, live in Larose and own big freezer boats that go out for a month at a time.

In early 2010, though the shipyards were still dominant on the landscape and as employers (South Louisiana Economic Council n.d.), they were operating in the midst of cattle operations, oil and gas fields, commercial strip malls, and properties managed for hunting. More residents were employed in transportation and mining than any other industries, reflecting the large number of people working on the offshore service vessels and on the drilling rigs and platforms across the Gulf of Mexico and beyond.

## 8.3. Specific Effects of the Spill

Located 30 miles inland from Port Fourchon and the Gulf of Mexico, Larose-Cut Off was not physically affected by the Deepwater Horizon explosion and resulting release of oil. In many respects, this community represents a transition zone in terms of impacts of the spill. Similar to the people in communities even farther from the Gulf, due to their economic situation, some people were buffered from the spill's immediate effects. At the same time, because many individuals and small businesses work for others who are closer to the Gulf – in both oil and fishing – they experienced some of the conditions of those communities as well.

Throughout 2010 and 2011, some residents reported successful hunting and fishing trips on and near the inland lakes and bayous near their homes and continued to bring home crabs,

crawfish, and other food for their families and neighbors. However, the absence of oil in the nearby waterways did not mean that the people of this area escaped the effects of the disaster.

The spill caused concern to local officials who had argued that industrial development and environmental protection were both possible: "BP, with their one incident, ruined it" (AG409 2011). A hotel manager from south Lafourche noted that, "despite it all, she still wants the oil company to go back into business. Half of her family works in oil, and they need it to live" (Galeucia Field notes, 2011). A short time later, farther up the bayou, in Golden Meadow, a salesman reported "that business has been fine. He thinks that people are overreacting. The season was only closed for two months, and he went through the claims system and everything was fine" (Galeucia Field notes April 2, 2011).

However, response to the spill did not depend solely on geographic distance. Employment, family ties, and social networks connected bayou residents to what was happening in the Gulf. Initially, many expressed fear, anger, and concern about BP, raising questions about who was responsible for the disaster. Some blamed BP, some accused the MMS, and others pointed the finger at contractors such as Halliburton. During the summer of 2011, concerns the dispersants being used were as common, or moreso, than concerns about the oil. Discussion of whether to catch, sell, and eat the seafood popped up in most conversations. While few residents spoke outright of conspiracies, many expressed their distrust of BP, the federal government, and even their local officials. According to a shrimper whose boat worked the spill:

> [The guy from BP] said, "The dispersants that were used were just like Dawn detergent, no more harmful than Dawn detergent." … I told him I was insulted: "What, we have stupid written all over our foreheads?" He said, "We have scientists working for us. You want to talk to her?" First I said, "Yes," then "No. You have scientists working for you, you will tell her what to say." Everything he'd say, I'd come up with more of my distrust theories. I was furious. To think that they could come in there, they just came to pacify us. I said, "Nobody there knows any answers. Nobody can tell us the truth. I think you all bought off our parish council. I don't know how you did it." My boat was working, and I didn't care if I got fired. And I said, "That joke of decontaminating boats. That's a joke." You saw boats up and down our bayou full of oil, and that's where our drinking water comes from. There's so many, so many, so many-, We should not have seen the boats that were working the oil in our bayou. Not up by Larose (DA431a 2010).

A merchant noted that the worst was the dispersant spray in the middle of the night. "BP was here to skim the oil, but it was really a smokescreen. After they skimmed they sprayed the dispersants and sank it all to the bottom of the ocean, out of sight, out of mind" (AG422 2011).

The majority of community leaders, business owners, and oilfield workers, though, quickly shifted their attention, and their criticism, to what was referred to by some as "Obama's moratorium." The spill happened as offshore activity was picking up for the 2010 season. Offshore supply vessels servicing production platforms and inland rigs continued working, but the drop in drilling was noticed–where production platforms have long term contracts and fairly predictable workforce needs, drilling is more volatile and involves people and companies to provide a wide range of services. Some of those services, such as vessels, catering, and groceries, were needed in the cleanup, so the effects were delayed. Nonetheless, unsure of the duration of the spill or cleanup work, many boat owners were reluctant to commit too many of their vessels to the cleanup. Though few companies laid off workers, many reported that they were cutting back on hours. Contractors, such as welders and carpenters, who typically work for the larger companies were hard hit as the companies no longer called them.

Likewise, motels in and near the community that house production workers saw little, if any, change in their business while those housing rig workers noticed a significant drop in their regular customer base. Any motels in the vicinity were fully booked as long as BP and its contractors were actively working the cleanup, through spring 2011. Retailers, too, reported mixed outcomes (see Chapter 5, Volume II). When ask how business had been since the spill, a local auto dealer responded, that it was "not fair to say," because of all the changes that were taking place. He reported that although there were initially tax incentives for vehicles, those ended and his dealership was not doing the business they had done in the past. He noted that when the spill occurred, business went down. Then, when the cleanup workers came, business went up. By spring 2011, though, his business was down again (Galeucia Field notes, 2011)

Port Fourchon served as a primary staging area, with direct and indirect effects on the people living along Bayou Lafourche. Also, though offshore production continued through the suspension in drilling, many companies operating out of the port were affected; the port commission reduced the rent of tenants by as much as 30% by July 2010, renewing them at the low rate again in January 2011. According to a port official, "A couple of tenants asked for additional assistance beyond the 30%, which the board approved. These are the tenants who are caught in the quagmire, because they were relatively new renters and hadn't gotten their time in to get things off the ground yet. So the spill hit before they were even making money. Since they were new and still building, they lost a couple of potential clients, and now the market for new customers is gone" (AG409 2011).

Fourchon Beach, a nine-mile tract of coastline, and the fishing areas three miles out from Elmer's Island to the beach, were closed a month after the spill because oil began appearing there. The beach had been the focus of considerable controversy for several years prior to the spill, since the Caillouet Land Company and the Edward Wisner Donation, the owners of the land behind the beach, blocked access to it (Besson 2011; Monroe 2012). State law designates as public domain the shoreline up to the mean high-water mark during the winter months, but coastal erosion and the zigzagged shoreline have left much of the sand area that falls in that zone underwater during the summer. Restoration projects proposed for the area are under scrutiny; the Wisner Donation filed suit against BP for contamination and response costs and representatives do not want to see restoration activities commence until the property is returned to the condition it was in before the spill. Concerns include ongoing contamination, erosion from sediment removal that occurred during beach cleanups, and metal stakes that were used to hold snare and boom and have been left in the sand. The South Lafourche Beachfront Development District has

attempted to negotiate with both landowners to restore public access to the beach because of interest in making the beach a central feature of new tourism development (Besson 2011).

Though the Larose-Cut Off is not a regular tourist attraction, its restaurants and stores benefit from tourists passing through to Grand Isle and Fourchon, and the oil kept fishermen and beachgoers away through the summer of 2010. Summertime fishing rodeos were cancelled. Larose's main fall event, the French Food Festival, was held in October with the theme "Life is Still Good" prominently displayed on yard signs, bumper stickers, and banners. A variety of businesses sponsored the festival, including energy and oilfield service companies. At the festival, the chairman explained, "We didn't know if we'd have seafood or what the effects of the moratorium would be." (Austin Field notes, October 20, 2010). The parish did get what one individual called "spill tourists," as well as stars such as singer-songwriter Jason Mraz who came to promote awareness of the spill and stopped at a local restaurant for lunch. Still, the local chamber of commerce reported that overall sponsorship and attendance at events was lower in 2010 and into 2011 than it had been before the spill.

The Larose Civic Center was used for community and areawide meetings, attracting presentations by Kenneth Feinberg, the Louisiana Shrimper's Alliance, and the National Oceanic and Atmospheric Administration (NOAA), the latter in June 2011 to discuss proposed changes in the rules surrounding the use of turtle excluder devices (TEDs) when they suspected improper use of TEDs was the cause of turtle deaths.

As BP released boats that had worked the spill, some were able to return to fishing, but others were not. According to a shrimper who worked for BP,

> We had to be decontaminated. We had heard they were going to be decommissioning. They had a boat in the Houma Navigation Canal. If they seen a boat coming in with oil, it had to be decontaminated. The only time for me, at the bitter end, the oil never stuck to my boat, but they decommissioned us. We had to stay another four or five days at the dock after they took the supplies off. Then we were on stand by for three days. We got the call that we were dismissed. "Ya'll can go to your own port." They quit paying us. (DA461c 2010).

As the months wore on, anger, frustration, and despair grew. Where some individuals, families, and businesses were not affected as much as leaders and media outlets had expected, others were falling through the cracks with almost no one paying attention. At the end of 2010, researchers heard almost uniform reports that things would get worse in 2011 as the VOO payments, BP emergency payments (and, for many, final settlements), and other temporary sources of revenue dried up.

Winters are often slow in these communities - shrimpers pull up their nets and come home and offshore activity slows down as bad weather makes it difficult to work in the Gulf - and 2011 got off to a slow start. Reports of companies pulling their rigs from the Gulf continued (see Chapter 1, Volume II). Oilfield-related fabrication work was also down; those who worked on fishing vessels reported that business was slow because many of the shrimp boats had not worked the prior season and therefore were not coming in for repairs. Some of the yards that worked for larger vessel companies that had sufficient capital were doing some repair and maintenance work on the vessels without contracts. Though many service companies already had overseas contracts, and many oilfield workers had been working overseas for decades, the

slowdown did push some into new territories. Larose-Cut Off is home to many boat captains and others who went overseas, and their absence was notable at local banks, hair stylists, and such.

By February 2011, some of the oilfield service companies had begun reporting that they were laying off workers, and employees reported that they were working in jobs below their skill levels, taking what they could to keep working. Those who were not working had cut back on their spending, though the trickle-down effects were not uniform. How businesses were faring also depended on the conditions they were experiencing at the time of the explosion. Those who had come out of the 2005 and 2008 hurricanes with a lot of debt, had already taken out loans, or had faced other calamities such as fires struggled to deal with yet another crisis. One owner noted that is store had really been hit hard. Prior to the spill, of the 33 rigs that were operational in the Gulf his store had served 17, but at the point he talked with a researcher in 2011 he was serving only 3 of them. He had cut employee hours, trying not to let anyone go; all of his 11 employees had been working at the store for at least 8 years. The one advantage, he noted, was that because his shop was closing early each Friday, his employees were able to spend extra time with their families. Like many, at that point he was anticipating that permits would be issued and by June or July things would pick up (AG407 2011).

Into the spring months, the economy remained slow. Employers, merchants, and social service providers noted that the number of Hispanics in the community remained far below what it had been five years earlier. Community organizations conducted outreach about the spill through their regular activities; for example outreach workers took part in the UHN Sweethearts Dance held in Larose in February. Soon afterward, BP representatives started making the rounds to chambers of commerce and community centers throughout the region, allocating small grants to specific projects or programs. As this practice continued throughout the year, some become adept at asking for money.

Even in February, a number of retailers reported not being sure if they should file a claim. A florist, for example explained that she experienced delays between when her product goes out and the payment comes in, which made it hard to show the loss of business on paper before the deadlines for filing claims had passed. Much of her usual product was perishable, but with the uncertainty she had shifted to non-perishable items (Galeucia Field notes, 2011).

In April 2011, Port Fourchon was declared by one merchant to be "dead as a doornail" (DA491 2011). Merchants all along Bayou Lafourche complained that business had been particularly slow since the spill because BP did not buy locally, and the oilfield was not picking up. The fishermen had not returned either. The areas were not closed, but as the merchant observed, "They're just scared. It's a Saturday, and there's no one here" (DA491 2011).

Having been repeatedly challenged by outsiders who questioned how they could support and participate in the offshore petroleum industry, some local officials had become defensive. A port official, acknowledged that the industry had some negative effects, but he pointed out that people from the local communities need and want jobs in the area so they do not have to leave and move elsewhere for work. He noted that they "live here, work and play here. We don't want to leave, because this is home" (AG409 2011).

By spring, the disparities in who had and had not made money off the spill were more obvious and a regular topic of conversation. A former offshore worker and part-time fisherman talked about how he was riding with his cousin in his truck the day before when his cousin told him he paid $60,000 in taxes, meaning he had made about $350,000 from the spill. His cousin had a medium sized boat and worked through the whole cleanup. He had built himself a new house and had three new trucks in his yard. The worker also talked, though, about another

relative who had lost his job because his company had been bought out, even though his company was making lots of money. He speculated that the moratorium might have just been an excuse for the owners to sell out, commenting that "the companies have done this before, they did it in the 80s" (DA489a 2011).

One point of contention was how deckhands were counted and compensated, with some arguing that their neighbors had made extra money by claiming their children, nephews, and others, many of whom had never been on a boat. However, the question of who is and is not a deckhand proved challenging to answer. In late 2010, in response to the question, "How many deckhands do you have?" one shrimper responded, "Sometimes one, sometimes three, sometimes me, myself, and I. Sometimes I'm ready to go out and I can't find a deckhand. I get mad and get ready to go. My wife says, "You can't go by yourself." I say, "Go pack your clothes" (DA461a 2010).

A year after the spill, both fishermen and people whose work is directly involved in the offshore oil and gas industry, expressed concern about how they had been ignored. A shipbuilder reported,

It's dead, dead. We're half a million off in earnings. I have two yards. I was looking at what to expand. Usually, I work on shrimp boats, medium and smaller ones. Now it's just little stuff, personal stuff. There's not a market like that anymore. I'm down to two employees. I had eight or nine. I won't go broke keeping open. I'm sixty-three years old and will join in with the big guys if that happens. .. We didn't get nothing. Nobody helps us. We put a claim in with BP. They want all this paperwork. I don't want anybody to give me nothing. I'd rather had the work. You're going to give to some people that have no loss. It's sad, I don't know what it's going to become. ..They (the government) don't want to give leases and permits. You hear it all the way down the line. It's a no way out situation. ..But the questions remain. "Will it come back? Will it regenerate? Will it all go overseas? What we gonna do?"… Open up drilling again, take the permits off. Let the investors do their thing. There are a few good things they talked about doing like P and A (plug and abandonment) for the abandoned well. The thing would be, they say we'll give one trillion dollars for P and A, and it's good over 10 years. These big lump sums don't do anybody any good. I get repair on boats, may build a few more (DA497 2011).

The large shipyards were getting contracts outside the oil and gas industry. In April, for example, Bollinger launched the first of a series of eight Fast Response Cutters being built for the U.S. Coast Guard, and its Lockport yard was awarded a contract to build four more of the vessels. (Bollinger Shipyards, Inc. 2011).

Oilfield activity did pick up a bit in the summer of 2011, but it was short-lived. Most companies reported little change in their circumstances. At the end of the year, uncertainty still hung over this community. Despite the problems, though, many expressed relief that things had not been worse, relief that they had had no major storms in 2010 and had received no major effects from the 2011 storms. Community leaders and business owners expressed almost unanimous support for resuming offshore drilling at higher levels. As one retailer noted, "[We] sold our soul to oil a long time ago," and without the industry he anticipated there would be a lot of problems. (Galeucia Field Notes February 24, 2011). In March 2012, FEMA announced that, through its Hazard Mitigation Grant Program which aims to help communities implement long-term projects for protecting life and property, would provide more than **$1 million** in funding to

241

the state of Louisiana to improve the Golden Meadow floodwall in Lafourche Parish (FEMA 2012).

The long-term effects of the disaster, both economic and social, will not be known for years. Some reported that the spill made them "think about a whole different way of living" (AG422 2011). This merchant, for example, noted that there had always been tar balls on the beach when he was growing up, but he and his community had never experienced effects to this scale. He suggested that the government should replace a lost industry with a new industry –like wind turbines – noting that the old platforms could be wind turbines and that the oil workers could be re-educated to work with "air energy." For some, the spill brought up questions about moving, though at least as common as concern about health or environmental effects was the question of what they would do if the oil industry did not come back.

## 8.4. REFERENCES

Adams, Megan. 2007. Clovelly Farms. In: The Noah Project. What We Remember: A Story of Larose and its People. Larose, LA: Father Charles Tessier Knights of Columbus Council 8898.

AG407. 2011. Personal communication. Effects of the oil disaster on business and the community. Discussion with Annemarie Galeucia. Independent business owners, Cut Off, LA. February 24.

AG409. 2011. Personal communication. Effects of the *Deepwater Horizon* explosion on the offshore petroleum industry. Discussion with Annemarie Galeucia. Port official, Galliano, LA. March 4.

AG422. 2011. Personal communication. Effects of the oil disaster on business and the community. Discussion with Annemarie Galeucia. Small business owner, Larose, LA. March 18.

Anderson, J.R., Hardy, E.E. Roach, J.T. and Witmer, R.E. 1976. A land use and land cover classification system for use with remote sensor data. U.S. Geological Survey Professional Paper 964.

Austin, Diane. In Press. Guestworkers in the fabrication and shipbuilding industry along the Gulf of Mexico: An anomaly or a new source of labor? In Griffith, D., ed. Mismanaging Migration: Captive Workers in North American Labor Markets. Santa Fe: School for Advanced Research Press.

Austin, Diane. 2001. Oilfield waste, coastal erosion, and development in Louisiana. In: Austin, D., and T. McGuire, eds. Exploring Environmental Values and Policy in the United States: Case Studies in Arizona and Louisiana. A Report to the Carnegie Council on Ethics and International Affairs for the Project, Understanding Values: A Comparative Study of Values in Environmental Policy Making in China, India, Japan, and the United States. Tucson: University of Arizona, Bureau of Applied Research in Anthropology.

Austin, Diane E. 2006. Coastal exploitation, land loss, and hurricanes: A recipe for disaster. American Anthropologist 108(4):671-691.

Austin, Diane, and Rebecca Crosthwait. 2013. Labor in the Gulf of Mexico fabrication and shipbuilding industry. In: Tom McGuire, Diane Austin, and Drexel Woodson. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume III: Technical Papers. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Austin, Diane E. and Thomas R. McGuire. 2002. Social and economic impacts of OCS activities on individuals and families: Volume II: Case Studies of Morgan City and New Iberia, Louisiana. OCS Study MMS 2002-023. U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Barataria Terrebonne National Estuary Program (BTNEP). n.d. What is BTNEP?. Available at: http://btnep.org/BTNEP/about/whatisBTNEP.aspx. Accessed February 2, 2012.

Besson, Eric. 2011. Fourchon Beach access in question. Tri-Parish Times. August 17.

Billiot, Wenceslaus. 2005. Personal communication. Family and community history in southern Louisiana. Discussion with Betsy Plumb and Joanna Stone. Native American World War II veteran and offshore tugboat captain. Dulac, LA. January 19.

Bollinger Shipyards, Inc. 2011. News and resources: Contract option awarded for four more fast response cutters. September 2011. Available at: http://www.bollingershipyards.com/news-resources/Contract-Option-Awarded-for-Four-More-Fast-Response-Cutters

BR050. 2011. Personal communication. History of Lafourche. Discussion with Bethany Rogers. Fisherman and vessel operator, Thibodaux, LA. March 1.

Breaux, Numa. 2001. Personal communication. Family and community history in southern Louisiana. Discussion with Diane Austin. Oilfield production worker and foreman. Larose, LA. October 3.

Buskey, Nikki. 2011. Coastal projects get $60 million. The Daily Comet. July 21.

Butler, Joseph T., Jr. 1985. Bayou Lafourche boats. In: Uzee, P.D., ed. 1985. The Lafourche Country: The People and the Land. Lafayette: Center for Louisiana Studies, University of Southwestern Louisiana. Pp. 164-169.

Callais, Webber. 2002. Personal communication. Community and business history in southern Louisiana. Discussion with Tom McGuire. Netshop and offshore service vessel owner. Golden Meadow, LA. June 4.

Campbell, Jacob, Sarah Raskin, Joshua Stockley,John Lajaunie, Jason Theriot, and Paul Wilson. 2013. Lafourche and Terrebonne parishes. In: Austin, Diane and Drexel Woodson, eds. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume II: Community Profiles. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

City of New Orleans. 2011. Wisner Donation application. Available at: http://www.nola.gov/HOME/Mayors-Office/Wisner-Donation-Application

Colton. n.d. North American. Available at: http://shipbuildinghistory.com/history/shipyards/2large/active/northamerican.htm Accessed April 16, 2012.

Construction Materials International (CMI). 2010. Larose to Golden Meadow Hurricane Protection Project. Report for the U.S. Army Corps of Engineers (USACE) Lafourche Parish Levee District. Available at: http://www.cmisheetpiling.com/Applications/Flood-Protection-Walls/Project-Profiles/Larose-Golden-Meadows.aspx?sflang=en

Curole, Windell. 2005. The flood threat response in south Louisiana. Available at: http://slld.org/images/fldthrtrspns.pdf

Curole, Bernice. 2002. Personal communication. A 1938 oil well blowout on her father-in-law's property in Golden Meadow, LA. Discussion with Diane Austin. Lifelong Lafourche resident whose family relocated due to contamination from oil drilling. Larose, LA. January 21.

DA431a. 2010. Personal communication. Effects of the oil spill. Discussion with Diane Austin. Lifelong resident, fisherman's wife, community leader. Golden Meadow, LA. October 29.

DA461a. 2010. Personal communication. Effects of the oil spill. Discussion with Diane Austin. Lifelong resident, fisherman, and offshore worker, Larose, LA. December 16.

DA461c. 2010. Personal communication. Effects of the oil spill. Discussion with Diane Austin. Lifelong resident and shrimper, Larose, LA. December 16.

DA489a. 2011. Personal communication. Effects of the oil disaster on fishing and the community. Discussion with Diane Austin. Lifelong resident, fisherman, and offshore worker, Larose, LA. April 22.

DA491. 2011. Personal communication. Effects of the oil disaster on business. Discussion with Diane Austin. Merchant, Port Fourchon, LA. April 23.

DA497. 2011. Personal communication. Effects of the oil disaster on business and the community. Discussion with Diane Austin. Shipbuilder, Larose, LA. April 27.

DA613. 2012. Personal communication. Effects of canals in Larose. Discussion with Diane Austin. Longtime resident, Larose, LA. March 7.

Daviet, Juliette. 2007a. Early Larose history. In: The Noah Project. What We Remember: A Story of Larose and its People. Larose, LA: Father Charles Tessier Knights of Columbus Council 8898. Pp. 5-22

Daviet, Juliette. 2007b. Our Lady of the Rosary Catholic Church. In: The Noah Project. What We Remember: A Story of Larose and its People. Larose, LA: Father Charles Tessier Knights of Columbus Council 8898. Pp. 23-28.

Daviet, Louis, Jr. 2007. History of the schools (1882-1953). In: The Noah Project. What We Remember: A Story of Larose and its People. Larose, LA: Father Charles Tessier Knights of Columbus Council 8898. Pp. 35-38.

Davis, Don. 1973. Louisiana canals and their influence on wetland development. Unpublished dissertation. Louisiana State University.

Davis, Donald W. 1985. Canals of the Lafourche Country. In: Uzee, P.D., ed. 1985. The Lafourche Country: The People and the Land. Lafayette: Center for Louisiana Studies, University of Southwestern Louisiana. Pp. 150-164.

Defelice, Michael and Danté Picou. 2007. Louisiana Delta Farms. In: The Noah Project. What We Remember: A Story of Larose and its People. Larose, LA: Father Charles Tessier Knights of Columbus Council 8898. Pp. 49-60.

Derdak, Thomas and Paula Kepos. 1993. International directory of company histories. Volume 8. St. James Press. December 17.

Diocese of Houma-Thibodaux. 2007. Church parishes – Sacred Heart, cut-off. Available at: http://www.htdiocese.org/ChurchParishesSchools/tabid/67/Default.aspx . Accessed online March 13, 2012.

Ditto, Tanya. 1980. The longest street: A story of Lafourche Parish and Grand Isle. Baton Rouge: Moran Publishing Corp.

EZNotice. 2011. Public or legal notice #2767588. Available at: http://eznotice.com/notices/2767588 . Accessed online March 1, 2012.

Falgoux, Woody. 2007. Rise of the Cajun mariners: The race for big oil. Stockard James LLC.

Federal Emergency Management Agency (FEMA). 2012. Lafourche Parish floodwall will offer better protection with FEMA's funding. March 12. Available at: http://www.fema.gov/news/newsrelease.fema?id=61236 .

Frazier, D.E. 1967. Recent deltaic deposits of the Mississippi River, their development and chronology. Gulf Coast Association of Geological Societies, Transactions, XVII: 288. In: Uzee, P.D., ed. 1985. The Lafourche Country: The People and the Land. Lafayette: Center for Louisiana Studies, University of Southwestern Louisiana.

Galliano, Terry. 1965. A cultural history of Lafourche Parish: The Chitimacha Indians. Research paper prepared for Regional Science Fair. Nicholls State College.

Gramling, Robert B. 1989. Concentrated work scheduling: Enabling and constraining aspects. Sociological Perspectives 32(1):47–64.

International Directory of Company Histories. 1993. The Louisiana Land and Exploration Company. Available at: http://www.encyclopedia.com/doc/1G2-2841100091.html .

Keithly, Diane C. 2001. Lafourche Parish and Port Fourchon, Louisiana: Effects of the Outer Continental Shelf petroleum industry on the economy and public services, part 1. OCS Study MMS 2001-019. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Larose Regional Park and Civic Center. 2012. History. Available at: http://www.bayoucivicclub.org/history.htm.

Louisiana Delta Oil Company. n.d. About us. Available at: http://www.ladeltaoil.com  Accessed February 2, 2012.

Lundin, Ben. 2007. Valentine Paper Mill to close its doors Dec. 28. Daily Comet. October 30.

Marks, Brian Joseph. 2005. Effects of economic restructuring on household commodity production in the Louisiana shrimp fishery. M.A. Thesis. The University of Arizona.

McGuire, Tom, Diane Austin, and Drexel Woodson. 2013. Gulf Coast communities and the fabrication and shipbuilding industry: A comparative community study. Volume III: Technical papers. U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Monroe, Nate. 2012. Will Lafourche government acquire Fourchon Beach? Houma Today. January 28.

National Oceanic and Atmospheric Administration (NOAA). 1993. Memorable Gulf Coast hurricanes of the 20th century. Available at:
        http://www.aoml.noaa.gov/general/lib/mgch.html .

Penney, Lauren. 2008. In the wake of War: World War II and the offshore oil and gas industry. In: Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor, eds. History of the Offshore Oil and Gas Industry in southern Louisiana. Volume I: Papers on the Evolving Offshore Industry. OCS Study

MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. Pp. 37-66.

Pitre, Loulan. 2001. Personal communication. History of Cut Off and the petroleum industry. Discussion with Diane Austin and Tom McGuire. Lifelong Lafourche resident, World War II veteran, and long time oilfield worker. Cut Off, LA. September 24.

Prakash, Preetam. 2013. The business of fabrication and shipbuilding. In: Tom McGuire, Diane Austin, and Drexel Woodson. Gulf Coast Communities and the Fabrication and Shipbuilding Industry: A Comparative Community Study. Volume III: Technical Papers. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Pratt, Joseph. 2008. The brave and the foolhardy: Hurricanes and the early offshore oil industry. In: Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor, eds. History of the Offshore Oil and Gas Industry in southern Louisiana. Volume I: Papers on the Evolving Offshore Industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. Pp. 117-138.

Roberts, J. Timmons and Melissa M. Toffolon-Weiss. 2001 Media savvy Cajuns and Houma Indians: Fighting an oilfield waste dump in Grand Bois. In: Roberts, J.T., and M.M. Toffolon-Weiss, eds. Chronicles from the environmental justice frontline. New York: Cambridge University Press.

Rogers, Dale P. 1985. Retreat from the Gulf: Reminiscences of early settlers of Lower Lafourche. In: Uzee, P.D., ed. 1985. The Lafourche Country: The People and the Land. Lafayette: Center for Louisiana Studies, University of Southwestern Louisiana. Pp. 97-107.

SC037. 2008. Personal communication. Labor and management issues in southern Louisiana shipyards. Discussion with Diane Austin. Administrator for Lafourche Parish fabricator. Morgan City, LA. November 3.

South Lafourche Levee District. n.d. Map showing levees, flood gate, and flood wall in south Lafourche Parish, LA. Available at: http://www.slld.net/Maps/lvmap2.pdf .

South Louisiana Economic Council. n.d. Lafourche Parish – Major employers. Available at: http://www.bayouregion.com/lafourche . Accessed February 2, 2012.

The Greater Lafourche Port Commission. n.d. Fourchon: The Gulf's energy connection–History. Available at: http://www.portfourchon.com/explore.cfm/aboutus/history . Accessed March 13, 2012.

Triple Son Farms. n.d. About us. Available at: http://www.triplesonfarms.com/aboutus.php . Accessed February 3, 2012.

U.S. Geological Survey (USGS). 1990. Land use and land cover digital data from 1:250,000- and 1:100,000-scale maps. Data User Guide 4. Reston, VA.

Wallace, Barbara, James Kirkley, Thomas R. McGuire, Diane Austin, and David Goldfield., 2001. Assessment of historical, social, and economic impacts of OCS development on Gulf Coast communities. Volume II: Narrative report. OCS Study MMS 2001-027. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Wallace, Charles. 2001. Personal communication. The early oil industry in southern Louisiana and the Gulf of Mexico. Discussion with Diane Austin. World War II veteran, oilfield rig and production worker and foreman. Larose, LA. July 16

Weinstein, Richard A. and Sherwood M. Gagliano. 1985. The shifting deltaic coast of the Lafourche Country and its prehistoric settlement. In: Uzee, P.D., ed. 1985. The Lafourche Country: The People and the Land. Lafayette: Center for Louisiana Studies, University of Southwestern Louisiana. Pp. 122-149.

Westerman, Audrey B. 2001. The Indians of Terrebonne and Lafourche Parishes. Lafourche Heritage Society Seminar. Available at: http://biloxi-chitimacha.com/history.htm .

Williams, Patricia. 1998. Grand Bois community health assessment. Volume 2, Parts 1-5. Shreveport: Occupational Toxicology Outreach Program, Department of Medicine, Louisiana State University Medical Center.

# CHAPTER NINE: DULAC AND TERREBONNE PARISH, LOUISIANA

Justina Whalen and Diane Austin

For as long as they can remember, residents of Dulac have lived in the midst of challenges and have had to defend their community and way of life from natural events, such as hurricanes and floods, and outsiders who had specific ideas about how they should live and work (Figure 9.1). These contests extend back for several centuries, and this section provides the historical context within which they developed and the contemporary circumstances that influenced how the *Deepwater Horizon* disaster was experienced.



Figure 9.1. Map showing Terrebonne Parish and Dulac study community
Source: Ben McMahan

## 9.1. Terrebonne Parish History

Though evidence of Native American settlement in Terrebonne Parish dates back at least several thousand years, the people who occupy the region today trace their history to more recent periods. At the time of European contact, the region was home to Chitimacha-speaking peoples, and though the majority of those people were killed or had moved to the northwest of the region by the 1800s, some of their descendants remained (see Section 4.4). The city of Houma was named after the Houma Indians who had moved into the area in the late 1700s, settled on the high ground northwest of present-day downtown Houma, and later migrated farther south into the bayous where they hunted, fished, and trapped. Other settlers, too, made their way into this region, many by following the waterways of the Mississippi River and moving down the bayous. Spanish and Anglo settlers entered the area, but the most significant migrations involved French settlers who arrived after the transfer of Louisiana territory to Spanish control in 1762, and, around the same time, the Acadians (Cajuns) of Nova Scotia. The region was attractive to these groups because of isolation, minimum government control, fertile land, and an abundance of fish and wildlife. Members of the Native American and French populations interacted with one another, and assimilated others into their communities, but they remained distinct.

Louisiana returned to French control in 1802 and became a U.S. territory with the Louisiana Purchase of 1803. Terrebonne Parish was established in 1822, the second largest in the state, but one with very little high ground,[5] dominated by wetlands, low prairies, bayous, and lakes. By the mid-1800s, the region's economy was dependent on agriculture, seafood, the fur trade, and logging (see Austin 2006). Sugarcane cultivation was Terrebonne Parish's principal agricultural activity, and expansion of the sugar industry, in response to federal tariff protection and a growing national demand for sugar, led to large-scale environmental and social changes as planters intensified cultivation, enlarged production facilities, and modernized grinding equipment to maximize yields (Follett 2000, 2005). Along with the timber industry, sugar brought Anglo American outsiders to the region, seeking wealth and significantly altering the demographics of southern Louisiana. Although a few Cajuns became successful planters, most were small landholders who were largely displaced from the most valuable and productive land by mid-century (Dormon 1983). The first plantation in Terrebonne Parish was established in 1828, and by 1851 the parish had 110 plantations an 80 sugar houses. The sugar producers depended on large numbers of black slaves, which the planters imported, and as in neighboring parishes, the population of the parish became majority black (Highsmith 1955). By 1853, Louisiana planters produced one-fourth of the world's sugar and were among the South's wealthiest slaveholders (Rodrigue 2001).

The city of Houma was incorporated in 1848 and remains the only incorporated community in the parish. The Civil War, and particularly its end, brought major changes (see also Austin 2006). In September 1864, Louisiana's constitution was amended to formally abolish slavery, and two years later, freedmen became legally eligible to acquire and settle on public land. Though rife with problems, the implementation of the law, combined with the settlement of many former slaves on the plantations where they continued to work, contributed to the establishment of small black communities across southern Louisiana. Bayou residents had long

---

[5] Less than 1/18[th] by one estimate (see Wurzlow nd).

survived from the land, but during this period of economic hard times the stereotypical "Cajun" lifestyle came to dominate, wherein people survived through lumberjacking, trapping, hunting, moss gathering, and fishing, supplemented by small-scale agriculture. With the family as the primary social unit, large families were common and knowledge and skills were passed down from one generation to the next.

During the latter part of the 1800s, the railroad was completed to Houma and canals were dug throughout the parish to facilitate travel, and especially waterborne transport of sugar and timber, primarily on steamboats and barges. By the end of the century, the oyster shipping industry, too, was important due to Houma's proximity to the oyster beds located in parish waters, and the city was a principal shipping point for Gulf Coast oysters. Oysters were shipped across the United States and as far south as Mexico City; 25 million oysters were shipped from Houma in one season in the late 1890s (Wurzlow n.d.).

The 20th century brought many changes, stemming from the discovery of oil and gas in the parish in 1929. That same year, the Intracoastal Waterway was constructed through Houma. In the 1930s, large quantities of jumbo shrimp were discovered off Louisiana's coast, leading to the emergence of commercial shrimping as a major economic force. The onshore oil industry boomed in the 1940s, followed by the first successful offshore petroleum well completed in1947. In order to keep up with the demands of offshore drilling, oilfield service companies became concentrated in Houma and lower Terrebonne in the 1950s and 1960s. The Houma Navigation Canal opened in 1962, allowing service companies convenient access to the Gulf.

The 20th century saw the decline of the sugar and timber industries. The latter experienced several up and down cycles through the early 1900s as timber companies exhausted their supplies of lumber and then liquidated; by the early 1930s little more than 1% of the cypress forests remained in southern Louisiana, and the industry was almost completely gone (Norgress 1947). The Intracoastal Waterway and Houma Navigation Canal had positive effects on waterborne transportation but helped carve up the fragile wetlands, moving storm water inland and increasing the rate of coastal erosion (Good et al. 1995).

In the transition from sugar and timber to oil and gas, some land development companies obtained cutover cypress land at very low prices because the land was no longer generating enough income to cover the taxes on it, and some timber companies held onto their land to lease it for exploration. Some tracts of wetlands that had been undesirable for agriculture or timber removal acquired value for the oil that lay below the surface (Austin 2006). In the end, a few large landholders retained control of much of the land in the parish. Once they possessed the land, the oil companies also continued to generate resources from the animals that lived upon it, leasing land for hunting and trapping and hiring local Native Americans to trap furs on a piecemeal basis.

Due to their skill in trapping, some Native Americans were recruited to new regions, as far away as St. Bernard Parish, establishing Native American enclaves in those locations. In 1941, anthropologist Frank Speck (1941: 49) observed, "There are no Houma individuals or families of pure blood. The present population so classified comprises elements of other Indian descent (early historic Choctaw, Biloxi, Chitimacha), early Spanish, French and unspecified American, besides several recent accessions of Filipinos by marriage. Some families of Houma descent have intermarried with mulattoes, which circumstance has been cause for classification of the whole group as such by local partisans of racial segregation." Nevertheless, most of the Native Americans who live in Terrebonne Parish identified themselves as Houma through much of the 20th century. As noted by Burley (2007: 356): "For most Native Americans, their ethnicity is not

physically obvious. However, these Terrebonne respondents, mostly deriving from the Houma Tribe, strongly self-identify as Native American" (see also Section 4.4).

Due to its size and labor needs, the oil and gas industry attracted experienced oilfield workers. In the 1950s, Terrebonne Parish experienced a 40.5% increase in population and the beginning of a demographic shift toward younger residents. Like their neighbors to the east, many locals incorporated oil industry jobs into their seasonal occupational patterns (Austin 2006; Gramling 1989). As the oilfield continued to expand, companies looked for new pools of labor and, by the late 1960s, this demand, along with national policies aimed at desegregating schools and workplaces, facilitated the entry of blacks and Native Americans into the oil and gas industry. Lack of formal education and resistance to integration prevented the new workers from getting the best jobs, but labor shortages pushed many companies to hire non-white workers. Though high paying jobs initially served to deter young people from staying in school, this, too, changed as the oil industry required better educated employees. Terrebonne Parish graduate rates grew from 1.8% between 1931 and 1936, to 3.1% by the late 1950s (Hanley 1964). By 2010, 73% of people over the age of 25 were high school graduates (U.S. Census Bureau 2010).

As the petroleum industry matured, Terrebonne Parish became a focal point for the development of specialized service sectors comprised of fabrication and shipyards; boat, helicopter, and trucking operations; and pipeline and wireline companies. Onshore and offshore activity peaked by 1970 but continued at a high level into the 1980s. As the recession worsened across the United States in the late 1970s, unemployed workers flocked to the region. Vietnamese immigrants began moving into Terrebonne Parish in the late 1970s to the early 1980s, drawn there by work as captains and deckhands on large shrimp trawlers and tuna long-lining boats owned and operated by other Vietnamese.

The 1980s downturn had serious consequences for Terrebonne Parish. Many who could not find work left, triggering other effects. For example, H.M. Burgeois High School in Houma went from 1,387 students in 1980 to 900 in 1987 (Wallace et al. 2001); the parish cut teacher salaries and experienced a 41-day teachers' strike. Industry restructuring during the 1980s and 1990s reduced the number of workers at all levels and consolidated managerial and engineering functions in Houston, moving them away from the coastal parishes and even New Orleans.

Terrebonne Parish has also faced significant environmental problems and experienced some of the highest rates of land loss in the region. Challenged by its huge size, the lack of high ground, and resistance from private property owners, the parish failed to construct a levee system. During the 20th century, cypress forests that had survived the timber industry, because they were too remote or hard to reach, succumbed to saltwater intrusion. In the 1970s, responding to national policies of the decade, including requirements for coastal zone management, the Louisiana state legislature established a commission on coastal and marine resources, and the first comprehensive assessment of coastal erosion in Louisiana was undertaken. Yet, little action was taken until the late 1980s, when the oil and gas industry was suffering and wetlands loss was linked to increased hurricane threat and to the loss of important estuary functions (see also Section 8.2.2).

During the 1990s and into the 21st century, the oil and gas industry rebounded, but employment in petroleum-related jobs remained low (Deseran and Tobin 2003). As the industry moved farther offshore, into deepwater, new seismic technologies helped extend the life of onshore fields, but parish revenues did not return to earlier levels. Many service companies adapted to serve the expansion into the Gulf, and many began working overseas. Offshore

fabricators and large vessel owners sought deeper and wider channels, but concerns about ongoing erosion and flooding caused some to resist the demands.

As concerns proliferated around coastal erosion and hurricane protection, in 1992 the U.S. House of Representatives mandated a reconnaissance study for the Morganza to the Gulf Hurricane Protection Project, a lock, levee, and floodgate system designed to protect Lafourche and Terrebonne parishes from storm surge (see Figure 9.2). That study was completed in 1994, a feasibility study was completed in March 2002, and an engineering and design process is underway. The project includes eventual plans for a lock in the Houma Navigation Canal, a canal running from the city of Houma to the Gulf of Mexico; construction of a floodgate is expected to be completed in 2013 (USACE n.d.).



Figure 9.2. The Morganza to the Gulf Hurricane Protection Project
Source: USACE 2008

## 9.2. DULAC AND ITS ENVIRONS

Dulac sits 17 miles south of Houma surrounded by open water, grass, and marshland. Residents define Dulac as the area south from the Combon Bridge until Four Points Landing, everything west of the Houma Navigational Canal until Boudreaux's Lake, Lake Quitman, and Sweetwater Pond (Figure 9.3). The area's earliest settlers were the Native Americans who were primarily trappers and fishermen. They named the area Dulac, meaning "the land of the lake," in reference to Boudreaux's Lake (Dulac Community Center 2012). Today, the community still relies heavily on the fishing industry, though recent threats from foreign imports, high fuel prices, and negative perceptions of Gulf Coast seafood following the *Deepwater Horizon* disaster have further impacted and already-stressed industry. This bayou community exemplifies the

253

challenges to coastal communities following multiple hurricanes, the up and down turns in the oil and gas industry, and the oil spill disaster.



Figure 9.3. Map of Dulac as defined by local residents, compiled from ethnographers' notes
         Source: Ben McMahan

254

The people of Dulac express pride in their self-reliance and maintain a strong desire to remain in their community due to their historical connection to the land. Many residents reported that they had lived in the area their whole lives, as had their parents, and had no intention of leaving, "I been raised here, and I'm gonna die here" (DA522 2011). Many Cajun and Houma people over the age of 60 speak French as their first language. They reported that their community was characterized by strong values and loyalty to their families. "Cajun culture is all about family. They will work their fingers to the bone and get up the next day to do it again" (JW408a 2011). Yet, Dulac residents are aware of the challenges they face and expressed a desire for steady work, enough to feed and care for their family, and adequate flood protection. The decline in fishing has led some parents to encourage their children to focus on education instead of relying on the traditional fishing career. Younger residents often commute to Houma for greater employment opportunities. As a result, the population of the community has declined significantly since 2000 as residents have been forced to move due to repeated flooding, inability to get insurance, and a lack of local economic opportunities (Table 9.1).

Table 9.1. Change in Dulac Population, by Census-Designated Race

| Population | 2000 | 2010 |
| --- | --- | --- |
| Total | 2,458 | 1,463 |
| White | 1,327 | 709 |
| African American | 61 | 28 |
| Asian | 12 | 11 |
| American Indian | 969 | 617 |
| Other | 12 | 12 |
| Identified by two or more races | 77 | 86 |

Source: U.S. Census Bureau 2000, 2010: Population Finder

## 9.2.1. Historical Narrative

Dulac's history can be traced through cycles of natural resource extraction. Lumber production was at its peak between 1890 and 1925 in Louisiana (Connor and Toliver 1990), and the land around Dulac was recognized for the value of the timber growing on it. James Bowie, a southern hero killed at the Alamo, purchased much of Lafourche, Terrebonne, and St. Mary parishes and began harvesting cypress trees. Sugar cane was also a valuable commodity by this time. Bowie established a plantation in the northern part of the parish, and around 1929 sold land in the southern part to John Quitman, a politician from Mississippi. Others, too, purchased land and established plantations, and the area around Dulac soon became home to the Live Oaks, Woodlawn, and Eslee plantations. The timber industry had almost disappeared by the early 1930s owing to the Great Depression and the fact that less than 2% of cypress forests remained in southern Louisiana (Norgress 1947).

Local residents, too, rose to prominence. For example, Harry Bourg, a descendent of early French families to the region, was born on June 2, 1888 in Grand Caillou. He started shrimping with his father and brother as a young boy, was given his first boat when he was 19 years old, married Louise Samanie from Bayou Cane in 1908, and began to acquire more boats

and build his shrimping business. Around 1910, he built the first shrimp-drying platform in the area. He began to loan money to his relatives and neighbors who needed assistance, and when they were unable to repay him, he would take their land as compensation. By 1937, he owned 15,000 acres in the area. He donated money and land for the Catholic church, cemetery, and a school. In 1955, he formed the Harry Bourg Corporation in order to manage his property. Today that land is leased for fishing, hunting, residential homes, campsites, commercial dock space, cattle, and oil and gas exploration.

With easy access to both inland waters and the Gulf of Mexico, Dulac became a center for the shrimping industry, and numerous docks and factories soon lined the bayous and waterways leading into the community. In the 1930s, large quantities of jumbo shrimp were discovered off the Louisiana coast, creating a major economic boon for Dulac. In 1936, the Dulac Bridge was built next to the first store in Dulac (DA532 2011).

The discovery of oil and gas in the region also brought many changes to Dulac. In 1936, Foch Oil Company put in Dulac's first oil well and constructed Foch Canal. In July 1938, the deepest producing oil well at the time was discovered on Harry Bourg's property by Superior Oil Company, one of Bourg's longstanding lease partners. As onshore oil production boomed in the 1940s, so did the community as service companies and other profitable enterprises moved to Dulac. Residents recalled stores, as many as six to eight stores per mile, lining the road leading into the community.

Like its neighbors, Dulac's history has been strongly influenced by the churches that have been established there. The Holy Family Catholic Church was established along Bayou Grand Cailiou in 1952 (Diocese of Houma-Thibodaux 2007), with segregated pews for the whites and Native Americans. The Methodist Church began providing hurricane assistance to residents in the 1920s and, upon seeing the lack of schools for Native Americans in the community, a church educator convinced the church to acquire land for homes and a community center. In 1942, the church purchased a section of land between Grand Caillou and Little Caillou bayous and built the Dulac Community Center there in 1950. That same year, the Women's Division of Christian Service (WDCS), due to the efforts of Miss Ella Hooper, constructed a school consisting of three large classrooms and teacher living quarters built in ten-foot pilings. In 1951, the WDCS hired Bill and Renta Turner to oversee the Dulac Indian Mission, funding the school through community service projects. In 1952, the Turners convinced WDCS to hire a public health nurse to live and work at the Mission, adding a clinic and living quarters next to the garage below the school. The Turners and other community members began to pressure the school board to begin providing public schooling for the Indians, and in 1953 the parish built them a school across the road from the Dulac Indian Mission. In 1954, the remaining students at the Dulac Indian Mission were transferred to public schools and the Mission turned its focus to community service, offering kindergarten, adult literacy classes, religious instruction, dances, motion pictures, visitation, and teenage and craft programs. The community center served as a special "refuge" for the Native Americans, especially children, when they were not allowed at the Dulac Recreation Center located in the central part of the community (DA).

The development of the offshore petroleum industry and concentration of oilfield service companies in Houma and lower Terrebonne was hastened by the opening of the Houma Navigational Canal in 1962. The Canal offered tremendous economic opportunity for companies operating out of Houma, so construction ensued despite protest from Dulac residents who were concerned about saltwater intrusion. Following completion of the canal, several oilfield service companies, such as Halliburton and Baroid opened facilities in Dulac.

It became a great jumping off point for bringing in supplies, service equipment out to the rigs. It's one of the closest places you could get to. You could load in Houma, but then you had three hours to float it down the canal. Or a truck could drive 20 or 30 minutes to Dulac. It was economically feasible to start using Dulac as a jumping off point (DA535 2011).

Simultaneously, in the late 1950s and early '60s, Dulac had the largest shrimp landings in the United States, a status held by Morgan City in the 1930s, '40s, and early '50s.

The booming oil sector brought Anglo and Cajun immigrants to the community during this period. Residents reported that people from Tennessee, Mississippi, Alabama, Texas and Arkansas moved their families to the area seeking jobs. The newcomers contributed to the social and religious diversification of the area. Grand Caillou Baptist Church began as a chapel constructed on Grand Caillou Road in 1956 with support from the Georgia Barnett Home Missions Offerings, the Louisiana Baptist Convention, and other Southern Baptist churches and individuals (Grand Caillou Baptist Church 2011). The church was moved by truck to Dulac in 1976.

By the late 1950s and '60s, about 50 stores operated below Ashland, with three banks on Grand Calliou Road, seven or eight shrimp processors, several grocery stores, a shipyard, a movie theater (5 cents per show), two or three barbers, a drug store, and a clothing store (DA530a 2011). Taking advantage of the easy access to the Gulf from Dulac, the Coast Guard built a station in the late 1950s in order to assist with disaster relief and monitor fishing activities.

Hurricanes have also been an integral factor in Dulac's history and, due to ongoing land loss between the community and the Gulf of Mexico, the impacts of the storms have continued to grow. Hilda, in 1964, was responsible for the first major flooding that Dulac residents experienced, with water reaching the Bobtown Bridge for the first time that year; every year since the water has reached farther up the bayous and to a higher elevation (DA530a 2011). The Prayer for Hurricane Season, though composed by a priest from Cameron Parish and dedicated to the victims of Hurricane Audrey in 1957, is said at every mass during hurricane season. An excerpt from the prayer, which reminds all of the risks they face:

We live in the shadow of a danger over which we have no control: the Gulf, like a provoked and angry giant, can awake from its seeming lethargy, overstep its conventional boundaries, invade our land and spread chaos and disaster. During this hurricane season we turn to you, O Loving Father. Spare us from past tragedies whose memories are still so vivid and whose wounds seem to refuse to heal with the passing of time.

Over the years, Dulac-Chauvin has consistently ranked in the top 10 U.S. ports for value of fishing landings (Table 9.2). The petroleum and fishing industries brought economic opportunities for some residents, but Native Americans and others who had not completed high school did not reap the benefits because they were largely restricted to performing unskilled labor, working in maintenance, as deckhands, and in the shrimp factories. As the petroleum industry expanded, so too did opportunities for people of color, though Native Americans and blacks were hired into lower level jobs; it was in the 1970s that the first Native Americans in Dulac started working for a major oil company (SK001 2003). Those accustomed to working on

257

the water found employment on oilfield vessels while they remained involved in fishing and trapping (Austin 2006). A consequence of the increasing educational opportunities and integration of Dulac residents into oilfield jobs was the shift to English as the dominant language. Residents reported that, from the 1960s on, the French language was not passed down to the next generation. Thus, children born in the 1950s and '60s could understand French, but they had limited ability to speak it.

Table 9.2. Landings in Dulac-Chauvin

| Year | Quantity (million pounds) | Value (million dollars) |
|---|---|---|
| 2011 | 43.3 | 62.5 |
| 2010 | 32.8 | 45.1 |
| 2009 | 42.4 | 50.9 |
| 2008 | 35.6 | 48.9 |
| 2007 | 23.5 | 35.5 |
| 2006 | 30.8 | 35.7 |
| 2005 | 42.6 | 54.6 |
| 2004 | 40.4 | 42.8 |
| 2003 | 39.4 | 42.3 |
| 2002 | 42.7 | 46.2 |
| 2001 | 46.2 | 60.9 |
| 2000 | 48.2 | 68.1 |
| 1999 | 42.0 | 49.0 |
| 1998 | 30.5 | 38.7 |
| 1997 | 32.5 | 42.1 |
| 1996 | 38.3 | 45.2 |
| 1995 | 123.3 | 53.4 |
| 1994 | 217.0 | 55.0 |
| 1993 | 142.4 | 48.0 |
| 1992 | 66.0 | 52.8 |
| 1991 | 166.8 | 52.1 |
| 1990 | 164.4 | 52.7 |
| 1989 | 210.9 | 50.0 |
| 1988 | 244.1 | 56.5 |
| 1987 | 331.7 | 65.6 |
| 1986 | 294.6 | 71.0 |
| 1985 | 398.6 | 59.9 |
| 1984 | 327.2 | 59.7 |
| 1983 | 269.2 | 47.7 |
| 1982 | 265.6 | 51.7 |
| 1981 | 203.0 | 55.2 |

Source: NMFS n.d.

A few Vietnamese families moved into Dulac in the late 1970s to trawl. Some community members and shrimp dock owners created strong relationships with the Vietnamese. One dock owner learned the language and hired them to run boats out of his dock (DA522 2011). Today, almost all Vietnamese families have moved out of the community, largely due to hurricanes. However, the Vietnamese community still remains linked to Dulac through work in

the seafood industry, but their homes, churches, and temples are elsewhere, mostly in east Houma and New Orleans. Most often, they commute from those residential areas to the boat launches and shrimp docks of Dulac.

## 9.2.2. Entering the 21st Century, Hurricane Katrina and the pre-Deepwater Horizon Disaster Social and Economic Landscape

Dulac's location along the Houma Navigation Canal gave it particular advantages until the development of Port Fourchon, at the end of Bayou Lafourche, in 1990. Slowly, service companies like Baroid and Magnum Mud migrated to Fourchon. Most of Dulac's docks remain vacant, with only locals remembering companies such as Western, B&B, Louisiana Mud, Bayron, Enstein, and Halliburton.

Even with the decline in oilfield activity in the area, fishing and oil remained intertwined in the lives of Dulac residents. As offshore petroleum development expanded, salaries increased, and some residents abandoned the $2.00 per pound shrimping for a steady paycheck with one of the majors, or the companies they contracted with. An unintended consequence was increased challenges finding employees for the shrimp factories. When that happened, the factories began to close.

Despite its decline, at the time of this study, Dulac residents were participating in all aspects of the fishing industry. They own and operate their own boats, serve as deckhands on others' boats, own docks, and work in the processing sheds and restaurants that line the bayou running through their town. Fishermen often start out as deckhands on their father or relative's boat, learning the trade that will become their livelihood. Residents emphasized that, for them, fishing is not just a job but is a way of life. Often, it is a family affair where the wife and children will accompany the husband and crew on the vessel for a few days at a time. Fishing creates a partnership between husbands and wives; as in other study areas, in cases where the men cannot read or write, the women take care of the financial and insurance records. At the same time, some have argued that the industry has maintained economic inequality in the area: "The plantation mentality lies deeply within the fishing industry. People believe they can never grow to be anything more than what they are" (JW407 2011).

The fishing industry and oilfield are the two major driving economic forces for the area. However, falling shrimp prices, coupled with high fuel costs, have affected shrimpers in this area as well. Fishermen argued that they suffered at the mercy of the docks which were paying the lowest price for shrimp that they could remember (see Chapter 2, Volume II). In recent years, foreign imports have been the major source of competition for local fishermen, but allegations of price-fixing and mislabeling imported shrimp as Gulf shrimp have fallen on local processors (Hedlund 2009). Following the spill, shrimp docks and processors attributed the meager price to low market demand due to health concerns from the spill.

Dulac residents also entered the 21st century facing enormous long-term challenges, probably the most significant of which is land erosion. As many as 35 square miles of coastal land are lost annually in Louisiana due primarily to human-caused changes to the environment (Good et al. 1995). Levees along the Mississippi provide protection from flooding but also prevent sediment needed for natural land repair from descending to the lower bayou. Alongside the problems associated with levees have been the neglectful practices of petroleum companies. Coastal geologists have suggested that the extraction of gas and oil from the ground has caused

the land to sink (Burley et al, 2007). Local residents commonly cite oil and gas drilling as a cause of coastal land loss.

> When the oilfield came in and started booming, there were very little restrictions. Oil companies were drilling… They'd run through the marsh and drag boats. They would find the spot, drag a line, dig a slip, run a pipeline, and leave that canal there. More and more land became water. The storms came in. Before long it was all open water. They never came back and closed the canals. Back then it was mostly Texaco, and then Texaco and Superior Oil Companies sold their holdings after tearing up the parish… A few people got rich, but most got flooded (DA535 2011).

The Morganza to the Gulf Hurricane Protection Project includes a floodgate on the Houma Navigation Canal, but the plan originally placed the gate north of Dulac. In the planning process, various committees were formed and, through active participation, Dulac residents made their voices heard, getting assistance from the Louisiana Methodist Conference. A longtime resident stated, "If the levee district would have had it their way we would have been outside [the floodgate]" (DA526 2011).

The Dulac Community Center continued to serve as one of the central hubs for community activity, including being the site where emergency supplies are distributed. The community center has partnered with the United Houma Nation (UHN) and the Intertribal Council of Louisiana and with various non-profit organizations such as the Salvation Army, American Red Cross, and many church-affiliated humanitarian groups. In 1992, Hurricane Andrew flooded the facilities (Dulac Community Center n.d.). The UHN received a large grant from the U.S. Administration for Native Americans which was used to help tribal members across southern Louisiana rebuild after the storm, and many tribal members in Dulac received assistance. The United Methodist Committee on Relief and the Louisiana Conference reconstructed the community center building. The elevated administration building was again dedicated to the Hooper sisters. A woman in Dulac recalled being shocked by the one inch of water brought into her home from Andrew but she noted that residents soon realized that flooding would only intensify in the coming years (JW412 2011).

Storms and the migration of residents away from the coast prompted churches to move as well. Grand Caillou Baptist was constituted as a church in 1997. "In November of 2003, due to the migration of the community and changing ministry needs, Grand Caillou Baptist has moved to Ashland South. The 7 mile migration was necessary because of the northward migration of the population to escape flooding due to saltwater intrusion, coastal erosion, and continual storm surges (Grand Caillou Baptist Church 2011).

In 2000, the Dulac Community Center began bringing health services to Dulac. A grant to bring a Teche Action Clinic to the center was in sight, but after Hurricane Lily in 2002 flooded the community center officials opted to move the clinic up the bayou to a less flood-prone area. UHN tribal leaders organized to get assistance from private donors and international relief organizations to local residents and helped clean and restore the center.

Then, in 2005, Hurricane Katrina charged through the Gulf leaving mayhem in its wake. Though Dulac was not in the direct path of the storm, residents were affected by flooding and also by their awareness of what had happened elsewhere. At the time of this study, local attitudes toward hurricanes varied, but many people argued that it was their responsibility to repair their homes and community. In the words of one resident, "People in New Orleans were waiting for

the government to come clean out their houses. Down here, you get in there, clean up, and thank God you're alive" (JW412 2011). Less than two months later, Hurricane Rita hammered through the area leaving the highest water levels residents had ever seen. Residents confirmed that flood insurance became increasingly expensive after 2005 and building regulations required costly modifications. Several non-profit and government programs provide assistance with raising homes, but the process is slow and discouraging; at the time of this study some people had been waiting more than three years to have their homes raised, holding their breaths through each hurricane season.

The Dulac Community Center began hosting volunteers in the 1950s, and, at the time of the study, some groups had been sending representatives to Dulac to lead vacation Bible school for almost 30 years. After Katrina, the community center saw an influx of social services and gained partnerships with Bayou Grace, Bayou Interfaith Shared Community Organizing (BISCO), the Children's Coalition for the Bayou Region, and others. These partnerships allowed the center to network with other organizations, schools, and civil services. However, around 2008 most partnerships dissipated, due to reduced funding, leaving a void in the community (Austin Field notes, March 9, 2012). As partnerships dissolved and residents continually moved out of the area, the community center saw a decline in volunteerism from the community. Younger residents are not as tied to the community center as in the past when, lacking transportation, they had few options for entertainment and social gatherings.

Bayou residents' fears were confirmed when Hurricane Gustav brought water into Houma for the first time in 2008. Even before Gustav completely expended, Ike was brewing over the Cape Verde Islands. Hurricane Ike again caused major flood and wind damage to the area. A consequence of this repeated flooding, and residents' inability to get insurance, has been the steady out-migration to areas farther north in the parish. Although residents are hesitant to leave their homes, the fear of losing everything drives them north. According to U.S. Census data, between 2000 and 2010, Dulac lost 40% of its population. One resident explained,

> I built a house in 1980 on Shrimper's Row. It was eight inches above where FEMA told me to build. Over the next 20 years, the house flooded four times. FEMA told me we're not going to pay you anymore unless you raise it again. They bought me out. I moved eight miles further north, in Bobtown (DA535 2011).

The outmigration of residents has had major effects on the community as the dwindling population can no longer sustain basic services. Shrimp sheds now transport people in from Houma and Ashland to meet labor demands. Similarly, two family owned grocery stores in the area closed after the most recent storms due to extensive flood damage. The marinas tried to offer staple goods to pick up the slack, but people are traveling to Houma for most goods and services. Local restaurants cannot buy directly from fishermen due to health regulations, so even restaurant owners buy food in Houma. Some doubt that the community will ever rebound. According to one parish leader, "Some things you cannot fix. Look at the houses of people in Dulac. Those people are not getting 100,000 dollars a year. If you were in the oilfield, would you live there? They are moving into subdivisions further up. If you don't have people living down there, I can't expect the federal government to invest a lot of money revitalizing the area. It may have gone too far" (DA535 2011).

Increasing storm intensity has also affected the schools in Dulac. By Hurricane Ike, Grand Caillou Elementary School had been flooded five times. School district officials decided

to trade school locations and move Grand Caillou Middle School south to Dulac, so if there was an evacuation it would be less traumatic for older children. Also, there was no library in Dulac after 2005 because of multiple floods, but a new raised building was opened in October 2009.

Yet the residents who remain exhibit the same tenacity as their forebears. Despite the devastating damage hurricanes leave behind, the community pulls together to help rebuild. Multiple people recounted bringing supplies to neighbors and cleaning out homes. A marina owner said that 12 people came to help replace his roof after the recent storms, and a couple opened their home to feed and bathe 30 people (JW407 2011; DA525 2011; DA530a 2011). A few new businesses have moved into the area. A couple that began with a single boat now owns three vessels and two shrimp docks, and sells ice and fuel. And, although many people have moved north to avoid flooding, many church members return to Dulac weekly to attend service and maintain ties with the community. Residents explained that people want to preserve their relationship and sense of belonging to the community, though they recognize that the community is not what it once was. They also expressed hope that the levee system would put the town back on the map as a convenient location to access the Gulf. According to a longtime community leader, "I really believe that we do stand a chance to be in the middle of a lot of growth, not only in residences, but industry because the closer you are to the Gulf, the more industry is going to want to be close to you, to minimize their expenses" (DA526 2011). Remaining business include nine oilfield service companies, three marinas, one marine service company, one shipyard, three restaurants, around 10 seafood businesses (docks and processors), one hardware store, two gas stations, and Dollar General.

In the midst of all this change, many Dulac residents remain in fishing. They are sometimes criticized for their unwillingness to change and adopt new livelihood strategies. Yet, literacy levels remain low and many of the older residents, remembering negative experiences at school, are intimidated by the classroom. New certifications for offshore work require written tests and proficiency with computers. For some, current requirements are reminiscent of the 1970s when fishermen had to obtain fishing licenses and offshore mariners had to become licensed to operate vessels in the Gulf of Mexico. Residents also expressed pride in their self-reliance and how, until recently, they had not asked for help from outsiders or had a hard time finding a job. And fishing has played a major role. According to a lifelong resident and descendant of Harry Bourg, "Once the fishing industry dies so will the community of Dulac" (DA532 2011).

## 9.3. SPECIFIC EFFECTS OF THE SPILL

The *Deepwater Horizon* disaster left the parish, and the community of Dulac, in turmoil; while some immediately prepared their boats for cleanup response, others scrambled to file emergency claims with hopes of avoiding a massive financial hit. Prior to the spill, Terrebonne Parish had among the lowest unemployment rates in the state and was gearing up to expand drilling technology. Some argued that the spill drove away oilfield service companies because of the halt in drilling permits coupled with concerns about what would become of the drilling industry in the Gulf. The parish was about to break ground on a cold storage facility funded by a $4 million grant from the recovery of Katrina, Rita, Gustav, and Ike, but investors pulled out after the spill due to uncertainties about seafood (JW410b 2011).

As in other bayou communities, the moratorium on deepwater drilling and fishery closings were the most apparent repercussions residents faced after the disaster. As a Disaster Claims and Outreach Coordinator stated, "The biggest issues I'm seeing now are fear and uncertainty. Fishermen have worked side by side with the oilfield for years. Now there are economic setbacks that affect every business. It's a ripple effect" (JW410b 2011). Daily life, too, was affected in myriad ways. Even 15 months after the spill, a shrimper's wife noted that she could not take her grandchildren to the beach to go swimming, and the children were not being allowed to eat the fish they were catching in the bayou (JW406a 2011).

Social networks within the churches and community center were important as residents began to respond to the disaster. The United Houma Nation, also, served as an important vehicle for getting information into and out of the community.

In response to the spill, the Louisiana Department of Wildlife and Fisheries (LDWF) began restricting fishermen from entering designated fishing areas at the end of April 2010 just as the brown shrimp season was about to begin. The fishing closures continued throughout the year, which in turn hurt the entire industry. One of the main issues with the closures was that fishermen did not know which areas were open and which waters were off limits. LDWF would fax notifications of closures to marinas and post the information online, but not all fishermen launch from a marina or have Internet access. Fishermen's frustrations grew as information was ever changing and unclear and they faced rising financial insecurity. Both fishermen and seafood processors reported that the fishing industry had been looking up in the years prior to the spill, but that, due particularly to negative perceptions of seafood safety following the spill, the industry had been left in shambles.

In May 2010, BP dispatched hundreds of representatives to manage disaster relief offices and the Vessels of Opportunity (VOO) cleanup program. The nearest BP Central Operations Center for Response was located just under 20 miles north in Houma, and the main response site for VOO was about 14 miles south in Cocodrie. Terrebonne Parish officials noted that the effects of the spill were very uneven as BP relief monies helped a lot of the businesses but were unavailable to others. Small restaurants suffered because BP representatives had their meals catered, and their local customers in the bayou were being conservative with their money due to economic uncertainties. VOO served as a financial buffer for some fishermen who signed up early and were paid well, but the program lasted only through the fall and not everyone who signed up was hired. Some were reluctant to clean up what they considered to be BP's mess and did not participate.

Dulac residents were assisted by representatives from the local economic development office, who took on the responsibility of helping BP communicate to locals about VOO, sign people up, and schedule training sessions, as well as providing technical assistance regarding claims to local businesses. They created a catalog of eligible vessels in the area but, similar to the claims process, reports of lost paperwork raised concern about the integrity of the process and particularly that out-of-state boats were being hired over local boats. Those involved in the process also reported problems with communication between BP and the contractors and delays in payment on claims they filed to BP for compensation for their services.

Following the May 27 suspension of deepwater drilling, with fishing at a standstill and oilfield activity suspended, the people of Dulac reacted as their neighbors elsewhere in the Gulf region did: "They shut down the whole Gulf…When you get in a train wreck you don't shut down all trains" (DA525 2011). Employees of all economic sectors were affected, but a significant challenge lay in trying to prove what losses the spill caused directly. Fishermen were

the first to feel the effects of the spill, but they reported it was very difficult to measure their losses. Furthermore, truck drivers, service employees, and other oilfield workers were not initially included in the claims process because BP did not determine their losses as a direct impact of the spill, even though they were out of work because of the moratorium.

The moratorium was particularly devastating to commercial fishermen who relied on their oilfield income to sustain their vessels and equipment. Recreational fishermen, too, who worked in the oilfield, and had their hours cut, did not spend money on their boats, thereby affecting the marine supply stores and repair yards farther up the bayou toward Houma. At the same time, the loss of fishermen coming to the area affected the sale of ice, fuel, and other supplies at local gas stations and convenience stores.

Facing a grim economic climate even before the spill, many Dulac residents were living paycheck to paycheck and quickly entered the claims process to collect on their losses. Due to variation in when they filed, their circumstances at the time, and whether they chose to take the emergency payment or one-time settlement, Dulac residents and business owners reported significant differences in who received money and when. In some cases, people with lower incomes received more money than their superiors, and others with identical incomes received different amounts. For example, the owner of a seafood retail business stated, "We filed the 6 month emergency claim. We were battling with people we shouldn't have had to. They lost our documents twice. With the interim I disagree with their calculation . . . We've been doing paperwork for it since January and have yet to see any money" (JW416 2011). The differences were attributed to people filing false claims, the complex claims forms, and underreporting taxes in past years. A marina owner commented on a neighbor, "He has been a fisherman his whole life, but never did his taxes correctly. He's upset because he can't get any money from the claim, but he has no problem driving his truck on the roads that tax money pays for. You can't have it both ways" (JW419b 2011). Inevitably, the claims process had added to the stress of the disaster.

Those who received money from claims used the funds to finance their house or boat, raise and repair homes, or invest in new nets or engines for their boats. Still, stories about how *some* people were spending their money on new vehicles or recreational activities were common.

Subsistence claims presented another major challenge for residents following the spill. The original system, set up by the Gulf Coast Claims Facility (GCCF), did not recognize the cost of seafood consumed by a fishermen's family as a loss of income. This caused hardships for many because fishermen were not able to supply their family and possibly extended relatives with this food source. As discussed earlier, families are the strongest social unit for people in the area; so the effects on the fishing industry were felt throughout entire families. A parish official explained: "There is a lot of stress because people are not getting the money they need, but also the claims process does not recognize the family and social impacts" (JW410a 2011). In August 2011, the GCCF began to reevaluate subsistence claims, but affidavits are required and adjusters have a one on one meeting with individuals. According to a parish official, "They make it so difficult for people. You pretty much have to have a law degree to know how to answer some of the questions they ask on the claims" (JW410b 2011). In desperation, business owners, fishermen, and others turned to lawyers for assistance with the claims process, but local leaders expressed concern over the amount, as much as 20 to 40%, that some lawyers were taking of the settlement.

The Dulac Community Center partnered with BP briefly to host VOO trainings and a mobile claims office. The center hosted community meetings, dinners, and guest speakers. "The center has partners in Houma that use the facilities for a food bank for Bobtown on down. Last year the community center was assisting two to three families per month, and now they are serving two to three families per day. Since it is considered an emergency food bank people can only use the service once every six months" (DA546 2011).

The community center also helped local residents connect with resources being offered through private and public organizations such as Catholic Social Services and Louisiana Spirit. One particular concern raised in the community was that, after the spill, wives began working outside the home to compensate for their spouse's low earnings. Fishermen who were used to providing for their families faced lower household incomes and the shame of not being able to fulfill their traditional role. Similarly, fishermen who had been able to save some of their catch to freeze for their family and friends were having to sell the entire catch to cover the increasing overhead cost and low dock prices they were receiving (Austin Field notes March 9, 2012).

In short, adding to the effect of four hurricanes, an unreliable seafood market affected by foreign competitors, high fuel costs, flooding, increased insurance costs, the outmigration of a large proportion of the population, ongoing land loss, the *Deepwater Horizon* disaster presented Dulac residents with major challenges. Despite the daunting circumstances, most remaining residents were trying to find a way forward. Though some expressed hope that the fines resulting from the oil spill would be used to help restore the coast, others were not so confident. In the summer of 2011, a parish leader noted, "I sat with BP folks eight months ago. I said I need 12 billion dollars and permits from the federal government to allow that to happen, to rebuild our coast to where it was 50 years ago. That's the fix. BP is not going to accept the responsibility for what they and all the others have done over the years. The BP rep asked me, do you expect BP to pay for all that? I said, "You guys could get with all the others…" (DA535 2011).

## 9.4. REFERENCES

Austin, Diane E. 2006. Coastal exploitation, land loss, and hurricanes: A recipe for disaster. American Anthropologist 108(4):671-691.

Burley, David, Pam Jenkins, Shirley Laska and Traber Davis. 2007. Place attachment and environmental change in coastal Louisiana. Organization Environment 20(3):347-366.

Conner, W.H. and J. R. Toliver. 1990. Long-term trends in the bald-cypress (Taxiodium distichum) resource in Louisiana (U.S.A.). Ecological Management 33/34:543-557.

DA522. 2011. Personal communication. Effects of the oil spill on local businesses. Discussion with Diane Austin. Store clerk, Dulac, LA. June 3.

DA525. 2011. Personal communication. Effects of the oil spill on business and the community. Discussion with Diane Austin. Store clerk, Dulac, LA. June 3.

DA526. 2011. Personal communication. History and recent developments in Dulac. Discussion with Diane Austin. Lifelong resident and community leader, Dulac, LA. June 4.

DA530a. 2011. Personal communication. History of Dulac and effects of recent events. Discussion with Diane Austin. Lifelong resident and community leader, Dulac, LA. June 6.

DA532. 2011. Personal communication. History and recent developments in Dulac. Discussion with Diane Austin. Lifelong resident and community leader, Dulac, LA. June 7.

DA535. 2011. Personal communication. Effects of the oil spill on Dulac and Terrebonne Parish. Discussion with Diane Austin. Lifelong south Terrebonne resident and Parish leader, Houma, LA. June 9.

DA546. 2011. Personal communication. Effects of the oil spill on Dulac. Discussion with Diane Austin. Community center staff member, Dulac, LA. July 26.

Deseran, Forrest A., and Linda Tobin. 2003 Labor demand in the offshore oil and gas industry in the 1990's: The Louisiana case. OCS Study MMS 2003–022. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Diocese of Houma-Thibodaux. 2007. Church parishes – Holy Family. Available at: http://www.htdiocese.org/ChurchParishesSchools/tabid/67/Default.aspx . Accessed online March 13, 2012.

Dormon, James H.1983. The people called Cajuns: An introduction to an ethnohistory. Lafayette: University of Southwestern Louisiana.

Dulac Community Center. n.d. History. Available at: http://dulaccommunitycenter.org/index.php?option=com_content&view=article&id=4&Itemid=4 . Accessed March 13, 2012.

Follett, Richard. 2000. Slavery and plantation capitalism in Louisiana's sugar country. American Nineteenth Century History 1(3):1–27.

Follett, Richard. 2005. The sugar masters: Planters and slaves in Louisiana's cane world, 1820–1860. Baton Rouge: Louisiana State University Press.

Good, Bill, Jim Buchtel, Doug Meffert, John Radford, Kirk Rhinehart, and Rachel Wilson, eds. 1995. Louisiana's major coastal navigation channels. Baton Rouge: Louisiana Department of Natural Resources, Coastal Restoration Division.

Gramling, Robert B. 1989. Concentrated work scheduling: Enabling and constraining aspects. Sociological Perspectives 32(1):47–64.

Grand Caillou  Baptist Church. 2011. About us. Available at: http://grandcailloubaptist.com/aboutushistory.html .

Hanley, L.G. 1964. The public school system of Lafourche Parish: 1932 to 1962. Unpublished dissertation. Louisiana State University.

Hedlund, Steven. 2009. Taskforce to investigate low shrimp prices. Available at: http://www.seafoodsource.com/newsarticledetail.aspx?id=4294968183 .

Highsmith, William E. 1955 Louisiana landholding during war and reconstruction. Louisiana Historical Quarterly 38(1):39–54.

JW406a. 2011. Personal Communication. Effects of the oil spill on the community. Discussion with Justina Whalen. Shrimper's wife/homemaker, Dulac, LA. July 25.

JW407. 2011. Personal Communication. Effects of the oil spill on fishing and the community. Discussion with Justina Whalen. Shrimp dock owner, Dulac, LA., July 29.

JW408a. 2011. Personal Communication. Effects of the oil spill on local residents. Discussion with Justina Whalen. Mental health counselor, Dulac, LA. August 1.

JW410a and JW410b. 2011. Personal Communication. Effects of the oil spill on residents and the community. Discussion with Justina Whalen. Disaster Claims and Outreach Coordinator, Houma, LA. August 1.

JW412. 2011. Personal Communication. Effects of the oil spill on the community. Discussion with Justina Whalen. Church Education Coordinator, Dulac, LA. August 8.

JW416. 2011. Personal Communication. Effects of the oil spill on business and the community. Discussion with Justina Whalen. Seafood retail business owner, Chauvin, LA. August 10.

JW419b. 2011. Personal Communication. Effects of the oil spill on business and the community. Discussion with Justina Whalen. Marina Employee, Dulac, LA. August 11.

JW421. 2011. Personal Communication. Effects of the oil spill on fishing and the community. Discussion with Justina Whalen. Commercial Crabber, Dulac, LA. August 15.

National Marine Fisheries Service (NMFS). n.d. Total commercial fishery landings at an individual U.S. port for all years after 1980 – Dulac-Chauvin, LA. Available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/lport_hist.html . Accessed April 13, 2012.

Norgress, Rachael Edna. 1947. The history of the cypress lumber industry in Louisiana. The Louisiana Historical Quarterly 30(3):979–1059.

Rodrigue, John C. 2001. Labor militancy and black grassroots political mobilization in the Louisiana sugar region, 1865–1868. Journal of Southern History 67(1):115–145.

SK001. 2003. History and Evolving Dynamics of Dulac. Discussion with Scott Kennedy. Lifelong resident and community leader, Dulac, LA. July 13.

Speck, Frank G. 1941. A list of plant curatives obtained from the Houma Indians of Louisiana. Primitive Man 14(4):49-73.

U.S. Army Corps of Engineers (USACE). n.d. Fact sheet: Houma Navigation Canal deepening reevaluation study. Available at: http://www.mvn.usace.army.mil/pd/projectsList/home.asp?projectID=33 .

U.S. Army Corps of Engineers (USACE). 2008. Morganza to the Gulf Hurricane Protection Project. Project fact sheet. Updated 2008. Available at: http://www.mvn.usace.army.mil/prj/mtog/project_fact_sheet___morganza.asp.

U.S. Census Bureau. 2010. Terrebonne Parish, Louisiana. Available at: http://quickfacts.census.gov/qfd/states/22/22109.html .

Wallace, Barbara, James Kirkley, Thomas R. McGuire, Diane Austin, and David Goldfield. 2001. Assessment of historical, social, and economic impacts of OCS development on Gulf Coast communities. Volume II: Narrative report. OCS Study MMS 2001-027. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Wurzlow, E.C. n.d. A historical sketch of the Parish of Terrebonne for the 1897 directory. Available at: http://www.rootsweb.ancestry.com/~laterreb/1897dir.htm .





## The Department of the Interior Mission

As the Nation's principal conservation agency, the Department of the Interior has responsibility for most of our nationally owned public lands and natural resources.   This includes fostering the sound use of our land and water resources; protecting our fish, wildlife, and biological diversity; preserving the environmental and cultural values of our national parks and historical places; and providing for the enjoyment of life through outdoor recreation.      The Department assesses our energy and mineral resources and works to ensure that their development is in the best interests of all our people by encouraging stewardship and citizen participation in their care.  The Department also has a major responsibility for American Indian reservation communities and for people who live in island communities.

## The Bureau of Ocean Energy Management Mission

The Bureau of Ocean Energy Management (BOEM) works to manage the exploration and development of the nation's offshore resources in a way that appropriately balances economic development, energy independence, and environmental protection through oil and gas leases, renewable energy development and environmental reviews and studies.



OCS Study
BOEM 2014-618

# Offshore Oil and *Deepwater Horizon*: Social Effects on Gulf Coast Communities
# Volume II: Key Economic Sectors, NGOs, and Ethnic Groups



**U.S. Department of the Interior**
**Bureau of Ocean Energy Management**
**Gulf of Mexico OCS Region**



Ex 11923
**Worldwide
Court Reporters, Inc.**



BOEM
BUREAU OF OCEAN ENERGY MANAGEMENT

OCS Study
BOEM 2014-0618

# Offshore Oil and *Deepwater Horizon*: Social Effects on Gulf Coast Communities
# Volume II: Key economic Sectors, NGOs, and Ethnic Groups

Authors

Diane Austin
Shannon Dosemagen
Brian Marks
Tom McGuire
Preetam Prakash
Bethany Rogers

Prepared under BOEM Contract
M10AC20003
by
Bureau of Applied Research in Anthropology,
School of Anthropology, University of Arizona
1009 E. South Campus Dr.
Tucson, AZ 85721-0030

Published by

U.S. Department of the Interior
Bureau of Ocean Energy Management
Gulf of Mexico OCS Region

New Orleans, LA
June 2014

# DISCLAIMER

This report was prepared under contract between the Bureau of Ocean Energy Management (BOEM) and the University of Arizona, School of Anthropology's Bureau of Applied Research in Anthropology. This report has been technically reviewed by BOEM, and it has been approved for publication. Approval does not necessarily signify that the contents reflect the views and policies of BOEM, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

# REPORT AVAILABILITY

To download a PDF file of this Gulf of Mexico OCS Region report, go to the U.S. Department of the Interior, Bureau of Ocean Energy Management, Environmental Studies Program Information System website and search on OCS Study BOEM 2014-618.

This report can be viewed at select Federal Depository Libraries. It can also be obtained from the National Technical Information Service; the contact information is below.

U.S. Department of Commerce
National Technical Information Service
5301 Shawnee Rd.
Springfield, Virginia  22312
Phone:  (703) 605-6000, 1(800)553-6847
Fax:  (703) 605-6900
Website:  http://www.ntis.gov/

# CITATION

Austin, Diane; Dosemagen, S., Marks, B.; McGuire, T., Prakash, P., Rogers, B. 2014. Offshore oil and *Deepwater Horizon*: Social Effects on Gulf Coast Communities, Volume II: Key Economic Sectors, NGOs, and Ethnic Groups. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2014-0618.  207 pp.

## CONTENTS

List of Tables ...................................................................................................................... vii

List of Figures ……………………………………………………………………………………...viii

Preface.................................................................................................................................. ix

Chapter One: Oil and Gas ................................................................................................... 11
  1.1. Introduction ................................................................................................................ 11
  1.2. Methodology .............................................................................................................. 13
  1.3. A Brief History of the Offshore Oil and Gas Industry in the Gulf of Mexico............... 13
  1.4. The Explosion, Release of Oil into the Gulf, and Aftermath: Social Effects in 2010 ..... 18
  1.5. Social and Economic Effects of the Disaster on the Offshore Petroleum Industry in 2011
      ........................................................................................................................................ 23
  1.6. Summary .................................................................................................................... 26
  1.7. References .................................................................................................................. 27

Chapter Two: Commercial Fisheries ................................................................................... 31
  2.1. Introduction ................................................................................................................ 31
  2.2. Methodology: Multi-Sited Ethnography with Community Partners ............................ 32
  2.3. Background on the Gulf Coast Commercial Fishing Industry...................................... 33
      2.3.1. Shrimp .............................................................................................................. 33
      2.3.2. Oysters ............................................................................................................. 34
      2.3.3. Crabs ................................................................................................................ 35
      2.3.4. Finfish............................................................................................................... 36
  2.4. State of the Commercial Fishing Industry Prior to the 2010 Oil Spill........................... 38
  2.5. Immediate Oil Spill Impacts: Summer through Fall of 2010 ....................................... 43
  2.6. Ongoing Impacts: The 2011 Fishing Season ............................................................... 53
  2.7 Commercial fisheries in the claims process.................................................................. 56
  2.8 Oil spill and claims process effects on commercial seafood processors and docks ........ 58
  2.9. Summary..................................................................................................................... 62
  2.10. References ................................................................................................................. 63

Chapter Three: Tourism ..................................................................................................... 79
  3.1. Introduction ................................................................................................................ 79
  3.2. Methodology .............................................................................................................. 81
  3.3. A Brief History of Tourism in the Study Region......................................................... 81
      3.3.1. Hurricanes of the 2000s.................................................................................... 84
  3.4. Major Oil Spill Issues, Impacts, and Responses in 2010............................................. 85
  3.5. Major Oil Spill Impacts, Issues, and Responses in 2011 ............................................. 89
  3.6. Summary .................................................................................................................... 95
  3.7. References................................................................................................................... 96

Chapter Four: Shipbuilding and Repair ............................................................ 104
  4.1. Introduction................................................................................................ 104
  4.2. Methodology............................................................................................... 105
  4.3. Background on the Shipbuilding Industry in the Gulf of Mexico ............... 105
  4.4. Oil Spill and Aftermath in 2010................................................................. 107
  4.5. Oil Spill and Aftermath in 2011................................................................. 109
  4.6. Summary..................................................................................................... 111
  4.7. References .................................................................................................. 112

Chapter Five: Retailing ..................................................................................... 115
  5.1. Introduction................................................................................................ 115
  5.2. Methodology: The Drop-In Visit ............................................................... 117
  5.3. A Brief History of Retailing Development along the Gulf Coast................. 118
  5.4. Social and Economic Effects of the BP Oil Spill on Retailers in 2010 ...... 121
  5.5. Social and Economic Effects of the BP Oil Spill on Retailers in 2011 ...... 127
  5.6. Summary..................................................................................................... 130
  5.7. References .................................................................................................. 130

Chapter Six: Non-Governmental Organizations and the Disaster ................... 133
  6.1 Introduction to the Social Service NGOs in the Gulf Coast Region............ 135
  6.2 The Storms of 2005 and a New Regional NGO Network ............................ 139
  6.3 Implications of 2005 Gulf Coast Storms on the Region's NGO Network .... 141
  6.4 The 2010 Oil Spill and the NGO Response ................................................. 143
  6.5. Ongoing Issues for NGO Responders to the 2010 Spill and their Implications ........... 148
      6.5.1. Oil Spills and Issues of Mobilization and Funding ......................... 148
      6.5.2. Special Challenges Serving Gulf Coast Fishing Communities ........ 151
      6.5.3. Post-Spill NGO Successes............................................................... 152
  6.6 Summary...................................................................................................... 153
  6.7 References .................................................................................................... 154

Chapter Seven: The Claims Process ................................................................. 160
  7.1. The initial BP claims process (to 8/23/10)................................................. 161
  7.2. The transition to the Gulf Coast Claims Facility and six-month Emergency Advance
        Payments (to 11/22/10) ........................................................................... 163
  7.3. The GCCF, November 2010 to March 2012 .............................................. 166
  7.4. The contested moral economy of the claims process.................................. 173
  7.5. References ................................................................................................... 175

Chapter Eight: Ethnic Groups and the Spill...................................................... 182
  8.1. Introduction................................................................................................ 182
  8.2. Previous Research on Ethnic Enclaves, Ethnic Organization, and Disaster................. 184
  8.3. Oil Spill Impacts and Responses................................................................ 186
      8.3.1. Language and Post-Spill Exclusion................................................. 187
      8.3.2. Occupation and Post-Spill Vulnerability......................................... 189
      8.3.3. Disruption and Reorganization of Ethnicity-Based Social Networks ............. 192

8.4. Summary ............................................................................................ 195

8.5. References .......................................................................................... 197

Chapter Nine: Summary ............................................................................ 205

9.1. Summary of Major Findings to Date ........................................................ 205

9.2. The Ongoing Uncertainty ..................................................................... 209

## LIST OF TABLES

Table 2.1. Statistics on the Producer Economics of the Louisiana Shrimp Fishery, 1998-2011 .. 39

Table 2.2. Overall Gulf of Mexico Commercial Fishery Landings by State, 2009-2011. At left: Weight of Landings (thousands of pounds). Center: Value of Landings (Millions of $). Right: Average Price ($/lb.) ............................................. 51

Table 2.3. Overall Gulf of Mexico Commercial Shellfish Landings by State, 2009-11. At left: Weight of Landings (thousands of pounds). Center: Value of Landings (Millions of $). Right: Average Price ($/lb.) ................................................... 51

Table 2.4. Overall Gulf of Mexico Commercial Finfish Landings by State, 2009-11 . At left: Weight of Landings (thousands of pounds). Center: Value of Landings (Millions of $). Right: Average Price ($/lb.) ...................................................... 52

Table 5.1. Typology of Retail Business Sub-sectors as Presented in this Report ..................... 116

Table 6.1. Organizations Active in Research Study Communities by NGO Type .................... 137

Table 6.2. Registered Tax-Exempt Organizations in Alabama, Louisiana, and Mississippi 2004-2011* ............................................................................... 144

Table 7.1. General Data on GCCF Claims Over Time and By Type ......................................... 167

Table 7.2. Paid GCCF Lost Earnings or Profits Claims by Sector ............................................ 169

Table 7.3. GCCF Claims and Payments by Damage Category ................................................ 170

Table 7.4. GCCF Claims and Payments by Gulf Coast States Where Losses Were Claimed .... 171

Table 7.5. Data on GCCF Claims and Payments Parishes and Counties Detailed in This Report ............................................................................................. 172

# LIST OF FIGURES

Figure 1.1. Oil and gas platforms in the U.S. Gulf of Mexico; also depicted are the Louisiana Offshore Oil Port (LOOP) and Liquefied Natural Gas (LNG) terminals ................ 11

Figure 1.2. Gulf of Mexico crude oil production ........................................................ 12

Figure 1.3. Gulf of Mexico natural gas production ..................................................... 12

Figure 1.4. U.S. and world crude oil prices, 1947 to August 2009 .............................. 16

Figure 1.5. Unemployment rate in St. Mary Parish, Louisiana 1990 to mid 2011 ....................... 18

Figure 1.6. Offshore drilling activity in the U.S. Gulf of Mexico as reflected in jack-up fleet utilization. ............................................................................................. 24

Figure 2.1. New York City wholesale Gulf shrimp prices, 1998-2011 ........................................ 40

Figure 2.2. Price ratios of 41/50 Gulf Brown and imported shrimp in the New York City wholesale market, 1998-2011 ................................................................... 55

Figure 2.3. Price ratios of 21/25 Gulf Brown and imported shrimp in the New York City wholesale market, 1998-2011 ................................................................... 56

Figure 5.1. Total gross taxable sales reported for coastal Mississippi counties, FY 2000-10.... 120

Figure 5.2. Total gross taxable sales reported for selected coastal Louisiana parishes, FY 2006-09 ............................................................................................ 120

Figure 5.3. Monthly total gross taxable sales for Hancock, Harrison, and Jackson counties, Mississippi, Dec 2008  Jan 2012. ......................................................... 122

Figure 5.4. Monthly total gross taxable sales for Terrebonne Parish, Louisiana, Dec, 2008  Aug 2011. ......................................................................................... 122

Figure 5.5. Monthly total gross taxable lumber and building supplies and contractor sales for Hancock, Harrison, and Jackson Counties, Mississippi, Dec 2008    Jan 2012. .... 123

Figure 5.6. Monthly total gross taxable lumber and building supplies and contractor sales for Terrebonne Parish, Louisiana, Dec 2008    Aug 2011............................................. 123

Figure 5.7. Monthly total gross taxable automotive sales for Hancock, Harrison, and Jackson counties, Mississippi, Dec 2008    Jan 2012. ........................................................ 125

Figure 5.8. Monthly total gross taxable automotive sales for Terrebonne Parish, Louisiana, Dec 2008    Aug 2011. ........................................................................... 126

## PREFACE

"Through many decades, the United States has shown a persistent and remarkable ability to tolerate the costs of petroleum use, presumably because people feel the benefits are greater in the aggregate, or perhaps because of a disconnect between the benefits and costs" (Hultman 2010).

The *Deepwater Horizon* disaster officially began on April 20, 2010 with the blowout of the Macondo well in the U.S. Gulf of Mexico, though the circumstances that culminated in the explosion of the rig were based in earlier decisions and events. Likewise, when the disaster officially ended on August 3, 2010, with BP successfully sealing the well in concrete, many of its effects were only beginning to appear. The disaster caused the deaths of 11 people, physically injured 17 more, and released an estimated 4.9 million barrels of crude oil into the Gulf of Mexico more than 40 miles off the Louisiana coast. It occurred in a region accustomed to disasters, so some of its effects were mitigated by the expertise and mechanisms in place throughout the region to manage them. The spill's impacts were heightened, however, by the fact that the region was still recovering from recent, severe hurricanes and flooding. In short, this disaster, laid upon those prior experiences, created a new set of actors, resources, and responses.

The research on which this report is based began almost immediately after the rig exploded and continued over a 2-year period. At the time of the explosion, researchers from the Bureau of Applied Research in Anthropology (BARA) at the University of Arizona were finalizing a study of fabrication and shipbuilding along the Gulf of Mexico, and were gathering data for a study of the history of the deepwater era. The researchers in the field turned their attention to the disaster and began documenting its effects. Those in the BARA office began responding to calls from people within the affected region, and began working with the staff of what was at that time the U.S. Minerals Management Service (MMS) to plan this study. Given the uncertain and rapidly-evolving situation, the study was designed to allow for flexibility and so that research questions and analyses would address the concerns of the diverse groups living in the region; be appropriate for those being studied; and provide information and new understanding to local, state, and federal entities. BARA researchers contacted colleagues at coastal universities and developed a research partnership with anthropologists at Louisiana State University (LSU) and with local institutions, community-based organizations, and independent community researchers in Mississippi and Louisiana. Key local partners included the Katrina Research Center at the University of Southern Mississippi, the United Houma Nation, Bayou Grace Community Services of Chauvin, Louisiana, and the Dulac Community Center of Dulac, Louisiana.

Though some of the effects of this disaster were immediately obvious and readily documented, others emerged more slowly as the nature and scope of the event and its aftermath continued to unfold. The research approach was designed to capture this evolution and was focused in three areas: (1) coastal counties of Mississippi and Alabama; (2) Lafourche, Terrebonne, and east St. Mary parishes in Louisiana; and (3) Jefferson, Orleans, Plaquemines, and St. Bernard parishes in Louisiana. It focuses on the short-term effects, those that occurred in the first 20 months after the disaster began, and provides the context within which those effects were experienced.

The report is organized in two volumes. The first begins with a Summary of the major findings of the research. The summary includes references to sections throughout the report that contain information to support the findings. Next is a discussion of the approach and methodology of the study and the selection of the study communities. This is followed by a summary and then detailed timeline of key events in the unfolding disaster which triggered local effects. Specific dates and events are referred to throughout the report, but readers are encouraged to read the timeline to better understand the complicated and rapidly changing conditions under which people in the coastal communities were living and working during the study period. The next chapters establish the context within which this disaster occurred, and describe the communities that were the focus of the study, highlighting in each some of the locally-specific and synergistic effects of the disaster.

The second volume describes five key economic sectors in the region offshore oil and gas, fishing, tourism, shipbuilding and fabrication, and retail and summarizes how the disaster has impacted the people, businesses, and communities involved in each of those sectors. For each sector, readers will find a general introduction, a brief summary of the methodology used to gather the information upon which the analysis is based, and a brief history of the sector. These are followed by an outline of events that shaped that sector in the region, leading up to the explosion of *Deepwater Horizon* in April 2010, a summary of the immediate impacts, and a discussion of the issues that faced businesses and workers in the sector throughout 2011.The second volume also includes chapters that take a closer look at the impacts of the disaster on non-governmental organizations (NGOs), the claims process, and the differential effects of the disaster according to ethnicity. The volume ends with a discussion of the ongoing uncertainty associated with this disaster more than two years after it began, and key research questions to be addressed in the coming years.

This work could not have been done without the help and support of hundreds of individuals who live and work along the U.S. Gulf of Mexico, and it is to them that the authors offer our sincerest thanks. Though research reports cannot bring back loved ones or restore coastal wetlands, it is our hope that the findings of this study can help us all better understand what happened and what it has meant to the people and communities most directly affected by it.

## REFERENCE

Hultman, Nathan. 2010. Beyond petroleum: The broader effects of the Deepwater Horizon. The Brookings Institution. Available at:
http://www.brookings.edu/opinions/2010/0824_bp_oil_spill_hultman.aspx?p_1

# CHAPTER ONE: OIL AND GAS

Diane Austin

## 1.1. INTRODUCTION

The Gulf basin has produced substantial petroleum discoveries for more than nine decades. At the time of the explosion of the *Deepwater Horizon* drilling rig, more than 3,600 fixed petroleum structures were in place and producing oil and gas in the U.S. Gulf of Mexico in water depths ranging from a few to more than 8,000 feet and as far as 200 miles off of the coastlines of Texas, Louisiana, Mississippi, and Alabama (Figure 1.1). Offshore production in the Gulf of Mexico accounted for close to one-third of total U.S. crude oil production and 12% of total U.S. natural gas production (Energy Information Administration 2011a), a drop from recent years. Of note, total crude oil production on the outer continental shelf has fluctuated considerably since the late 1970s (Figure 1.2). After a period of growth in the 1990s, production began declining early in the 21st century, but then discoveries of giant fields in the deep waters off the outer continental shelf and in the submarine canyons closer to shore boosted that production.



Figure 1.1. Oil and gas platforms in the U.S. Gulf of Mexico; also depicted are the Louisiana Offshore Oil Port (LOOP) and Liquefied Natural Gas (LNG) terminals
Source: Energy Information Administration n.d.

In contrast to other major petroleum provinces of the world where hydrocarbons are clustered in a small number of world-class giant fields (with a known recovery of more than 500 million barrels of oil equivalent [boe]), the Gulf basin is characterized by thousands of smaller fields of less than 50 million boe and many fields of 50 to 500 million boe (Priest 2013). By the end of the 20th century, though, economic conditions and technological advancements had made it feasible for the major energy companies to find, drill, and produce oil and gas from the deepwater finds. In 2010, oil production in the Gulf of Mexico reached a record 1.64 million barrels a day. The 2011 production is expected to be lower, in part in response to price declines that began before the *Deepwater Horizon* explosion and in part in response to the drilling moratorium and regulatory changes resulting from the disaster. Total gas production has been in decline since the late 1990s (Figure 1.3). This section describes the offshore petroleum industry in the Gulf of Mexico region and the initial effects of the *Deepwater Horizon* explosion on that industry and the companies and people who constitute it.



Figure 1.2. Gulf of Mexico crude oil production
Source: Energy Information Administration 2004



Figure 1.3. Gulf of Mexico natural gas production
Source: BOEMRE 2011a

12

## 1.2. METHODOLOGY

Information on the oil and gas sector in the study areas was gathered by the research team through drop-in conversations at local companies involved in the industry; longer discussions with industrial and economic development specialists, company owners, workers, and their families; and reviews of industry publications. Due to the scope and short time frame for this study and the need for most local representatives of large corporations to gain permission from corporate offices outside the study areas to talk with researchers, no discussions were held with offshore operators or their major contractors.

## 1.3. A BRIEF HISTORY OF THE OFFSHORE OIL AND GAS INDUSTRY IN THE GULF OF MEXICO

The oil and gas industry on the Gulf Coast began with the Spindletop, Texas gusher in January, 1901. Within a few decades, oil and gas production had spread across the salt domes of coastal Texas and Louisiana. By the 1930s, this region was dotted with tank batteries and refineries and had already begun to be crisscrossed with pipelines. Because exploration and production moved from solid land across marshes and swamps and into bayous and lakes during this period, local shipyards began constructing the barges, tugboats, and oil tankers needed for transporting petroleum and petroleum products through the region's waterways. By the late 1930s, oil companies had begun moving offshore into the Gulf of Mexico, but that movement was slowed by World War II. Though exploration continued throughout the war, it was not until after the war, during the late 1940s and 1950s, that offshore petroleum emerged as an *industry* in the region (Priest 2013). Since that time, thousands of wells have been drilled and some 5,500 platforms have been installed in the U.S. Gulf of Mexico.

The growth and development of the industry began slowly. Oil and gas firms built upon the existing petroleum infrastructure and tapped into the region's human and technological expertise and the social and political environments there, stimulating the growth of unique kinds of businesses, contracting relationships, and technologies. By the 1960s, the industry began to grow more rapidly and evolved into a vast complex of companies, facilities, people, and infrastructure located predominantly in the Gulf Coast states, but which also increasingly extended into other parts of the United States and elsewhere around the world. Within the Gulf region, as the industry moved offshore, existing companies modified their crews and equipment to work there and new companies formed. For example, major shipbuilding and offshore fabrication operations grew and spread along the coast, providing mobility for exploratory drilling and fixed structures for oil and gas production in open water. The dispersed growth of the industry encouraged the formation of numerous local companies, some of which expanded to dominate particular industry sectors, at the same time it attracted corporate giants to the region. A major downturn in oil prices in the 1980s significantly affected the offshore industry in the Gulf, leading to consolidation, the introduction of low cost technologies, elimination of jobs, and deepening of outsourcing (Austin, McGuire, and Higgins 2006; Dutra and Cecchi 1998).

The evolution of the industry and its movement offshore was fundamental in shaping the geography, economy, and social structure of the Gulf region, and particular Louisiana and Texas during the 20th century. Impacts of the industry are not uniform as the location and extent of onshore impacts of offshore activity depend on a host of factors, from historical land use patterns to economic incentives offered to companies that establish facilities there. In the early years, cities like New Orleans and Lafayette hosted the headquarters and supply centers for major petroleum companies. Morgan City and Houma became recognized as fabrication centers and staging bases for the offshore rigs and platforms, and outposts such as Grand Isle and Venice became regional hubs for offshore activities. "In the often indeterminate edge between land and water, ports were built to access the Gulf. The envy of these now is Port Fourchon at the end of Highway 1 along Bayou Lafourche, supplying and servicing the newest expanse of deepwater exploration and production" (Priest 2013:7).

At the same time, the influence of the offshore oil and gas industry extends well beyond the shores of the Gulf Coast. The specialized human and technological needs of offshore exploration and production have linked oil and gas provinces and companies from places as distant as Brazil, Angola, and the North Sea. Even prior to the 1980s downturn, many corporations and businesses that got their start in the Gulf of Mexico region grew and expanded across the globe and began importing people and technologies developed in distant locations.

The downturn affected the management and oversight of the offshore petroleum industry as well. "By the mid-1980s, the traumatic reverberations of a severe economic downturn convinced many in MMS and particularly in the Gulf that, whatever the agency's reading of NEPA, the onshore socioeconomic effects of offshore oil were significant and should be more thoroughly addressed" (Luton and Austin n.d.:9). In May 1986, at the request of the MMS and solicited by President George H.W. Bush in response to coastal states' concerns, most notably of Florida and California, that the agency was proceeding with leases in the absence of quality science on potential impacts on the "human, marine, and coastal environments," as required under the 1978 OCSLA amendments, the National Research Council established a committee to review its outer continental shelf environmental studies program (ESP). The committee published its findings in a series of four reports between 1990 and 1992 (National Academies Press 1992 1994) and recommended that the ESP be supported, strengthened, and its scope expanded to meet its mandate of providing information to predict, assess, and manage the environmental, including socioeconomic, effects of OCS petroleum development. It also recommended that the ESP's modeling and field programs be better integrated to improve the longer-term assessment of the effects of exploration, development, production, and termination of OCS activities and that the program incorporate appropriate monitoring of postleasing impacts into its environmental studies.

In 1989, in the wake of the *Piper Alpha* disaster in the North Sea and the *Exxon Valdez* oil spill, the MMS requested that the National Research Council's Marine Board investigate alternative strategies for the inspection of OCS operations and that it recommend improvements in operational safety and environmental protection inspection practices (Transportation Review Board 2011). The Marine Board concluded in 1990 that the agency's prescriptive approach to regulating offshore operations had forced industry into a compliance mentality which did not foster the effective identification of all potential operational risks or the development of comprehensive accident mitigation and recommended that that the agency develop a more systematic approach to managing offshore operations (BOEMRE n.d.a). In response, the MMS first published Recommended Practice 75: Development of a Safety and Environmental

Management Program for Outer Continental Shelf Operations and Facilities in 1993. Over the next decade and a half, MMS then used a variety of strategies to promote voluntary compliance with the recommended practice.

Encouraged by the U.S. Outer Continental Shelf Deep Water Royalty Relief Act of 1995, which relieved eligible offshore leases from paying royalties on certain deepwater production, the industry expanded into deepwater, generally defined as deeper than 1,000 feet,[1] and even those companies without the resources to exploit the fields there benefitted. As the majors turned attention to deeper locations, many smaller independent producers acquired their shallow fields.

With expanding global markets, the demand for drilling rigs rose, and day rates soared accordingly. Charter rates for support vessels rose as well, and the myriad companies and workers associated with drilling, from manufacturing drill bits to supplying drilling muds, went to work. By mid-decade and shortly thereafter, a new boom was occurring across the Gulf region. That boom was short lived, however, and by 1998, world inventories outstripped world consumption and prices plummeted. To correct the oversupply, the Organization of Petroleum Exporting Countries (OPEC) began cutting production in March of 1998, and continued to do so until March 2000. Oil prices began to increase by the end of 1999, but the Gulf of Mexico was slow to rebound, with investments tempered by caution and the industry experiencing corporate mergers and megamergers (Austin and McGuire 2002).

Following the attacks of September 11, 2001, world oil prices climbed, peaking in 2008 (Figure 1.4). The U.S. Department of the Interior's Minerals Management Service (MMS), the federal bureau responsible for regulating and collecting revenue from offshore oil and gas operations, continued royalty relief for deepwater drilling into the 21st century. Even as interest in the Gulf of Mexico resumed, the number of rigs operating in the Gulf began declining, due primarily to demand for jack-up rigs for gas exploration and deepwater rigs in other provinces, especially off the coasts of Africa, the Middle East and China. Analysts feared this "rig exodus" would lead to a decline in production, putting upward pressure on U.S. energy prices (Spector 2006).

The oil and gas industry directly impacts state and local coffers through taxes, royalties, fees, salaries, and other money spent locally, and indirectly through the money spent by employees and by service companies which do business with oil and gas companies, and Gulf communities enjoyed the benefits of both onshore and offshore petroleum activity during this period. Still, local and state government officials, especially in Louisiana, have long argued that the economic benefits of offshore development do not sufficiently compensate for the environmental and infrastructure costs of that development, including increased need for production and support facilities, negative impacts to air and water quality, and greater demand for infrastructure and social systems due to an influx of workers. Their efforts to increase revenue sharing to the states affected by OCS development were rewarded in the Energy Policy Act of 2005, which established the Coastal Impact Assistance Program (CIAP) and authorized the Secretary of the Interior to distribute $250 million for each of the fiscal years 2007 through 2010 to Alabama, Alaska, California, Louisiana, Mississippi, and Texas and the coastal political subdivisions (The timeline for grant applications for the next round of CIAP funding was announced May 17, 2010).

---

1 Though Shell drilled the first successful well in water deeper than 1,000 ft. in 1979, and five more projects were drilled in deepwater in the 1980s, deepwater drilling really took off during the 1990s when 32 more deepwater projects were completed. The pace increased during the first decade of the 21st century, with 134 deepwater projects entering production (Brewton et al. 2009).

The hurricanes of 2005 caused significant damage to rigs and platforms and a drop in production, but the damage they caused provided a great deal of work for the region's fabrication and shipyards (Austin and Woodson 2013). MMS held its 2008 lease sale in the Central Gulf and netted a record $3.67 billion for the nation's treasury. The effects of the Great Recession, which began in late 2007, began to be reflected in oil prices by the end of 2008. Due to the region's heavy dependence on petroleum, Gulf Coast economies and businesses did not see the effects of the recession until 2009, when falling oil prices began to affect levels of oil and gas activity.



Figure 1.4. U.S. and world crude oil prices, 1947 to August 2009
Source: WTRG Economics 2009

The oil and gas industry permeates the communities along the Gulf of Mexico through a vast network of individuals and organizations working in numerous sectors responsible for exploration, fabrication, transportation, and production. It comprises small, specialized companies and large, integrated corporations and employs people at all skill levels. Drilling operations employ large numbers of people, from entry level workers who clean and paint and serve as general roustabouts, to riggers, floorhands, crane operators, dynamic positioning operators, welders, electricians, mechanics, motormen, oilers, engineers, derrickmen, warehousemen, medics, ballast controlmen, barge operators, barge engineers, rig managers, rig superintendents, drillers, and toolpushers. Drilling operations are supported by thousands of service companies, providing specialized personnel and equipment to help set up and maintain wells, move rigs from place to place, and solve problems when they arise. Fabrication shops and shipyards, not all of which are tied to oil and gas, range in size from a few people to thousands, with approximately two-thirds of the workforce working as fitters and welders. Transportation companies directly employ pilots and drivers or lease trucks and operators in a specialized

16

system designed to meet the needs of the offshore industry. Production platforms employ from a few to several hundred people, depending on the size of the field and its configuration, and can include the offshore operations engineer, offshore coordinator, dynamic positioning operator, mates, ballast control operator, crane operators, scaffolders, control room operators, catering crew, and maintenance and production technicians.

Just as the early industry learned to operate over open water, the long-time residents of the Gulf Coast and those who relocated to take jobs there integrated the industry into their livelihood strategies. Even as residents became reliant on the wages earned in the offshore oil and gas industry, informal economic activities buffered the fluctuating economy. And, those who fashioned their livelihoods from fishing relied on seasonal employment in the oil and gas industry to stabilize their incomes. Supply companies learned to modify their inventory in response to the needs of whatever industry was most lucrative. A manager of a national supply company observed:

> Our company has 12 bases, some in Florida, one in Mobile, several in Louisiana, same in Texas, one in California. Our clients are 99% oil and gas. We work supplying rigs, vessels that support rigs. We do very little with fishermen. They're a dying breed. How can I say this lightly? They're not dependable. It's tough on these guys, with the prices, etcetera. I've been in business 25 years, in this location since May 1996. My grandfather worked for MMS for 30 years. He did quite a bit of business with fishermen when they first came. [We] slowly got away from that. The last five to seven years has been mostly oil and gas (DA502 2011).

High labor demands within the industry caused companies to search for workers at ever more distant locations, and as exploration and production moved farther offshore, companies employed workers in shifts ranging from seven days at work and seven days off to 14 and 14 and even 28 and 28. As the time between work shifts increased, so too did the distance from which workers could travel, resulting in an offshore workforce that is spread far beyond the coastal communities of the Gulf.

Following the 2005 hurricanes, the lack of housing, the increase in demand for platform and rig repair, and competition with the rebuilding activities along the Gulf Coast led fabricators and ship builders to look even farther afield for workers. Companies increased their recruitment of guestworkers from overseas, and coastal communities became the temporary home of workers from India, the Philippines, and China, as well as Mexico and Central America. In 2008, hurricanes Gustav and Ike caused major damage to coastal communities, but their effects on the Gulf's offshore infrastructure were relatively minor. By late 2008, most of the post-hurricane work had been completed, and, as noted above, the sluggish economy was having measurable effects on industry activity in the Gulf. The demand for guestworkers plummeted (though other forces were also at work, see Austin n.d.) and, though the region's unemployment rates had not climbed to the levels common elsewhere in the country, negative impacts on the region's workforce were evident. Unemployment rates in St. Mary Parish, for example, which had stayed low during the start of the recession, began to rise rapidly by 2009 (Figure 1.5).

Despite the downturn, increasing demand for petroleum from Asia and a desire to meet U.S. demand and reduce the nation's reliance on oil imports generated sufficient political pressure to cause President Obama to announce at the end of March 2010 that he would lift congressional bans on offshore drilling off the Virginia coast and expand lease sales for oil and

gas exploration along the Atlantic coast to "sustain economic growth, produce jobs and keep our businesses competitive" (quoted in Tapper and Kahn 2010). At the same time, the discovery and successful exploitation of onshore oil fields was leading to an increase in domestic oil production. An increase in onshore gas production was predicted to more than offset the steep projected production declines in the Gulf of Mexico (Energy Information Administration 2011b).



Figure 1.5. Unemployment rate in St. Mary Parish, Louisiana 1990 to mid 2011
Source: Federal Reserve Bank of St. Louis 2012

## 1.4. THE EXPLOSION, RELEASE OF OIL INTO THE GULF, AND AFTERMATH: SOCIAL EFFECTS IN 2010

The explosion of the *Deepwater Horizon* and the loss of life that occurred on April 20, 2010 had immediate and ongoing effects on the people of the Gulf Coast, as well as the families and communities that have become tied to that region through the offshore petroleum industry. The 11 victims who died in the explosion came from communities across Louisiana, Mississippi, and Texas. Their deaths directly affected their immediate families and the communities in which they live, and also their co-workers, the motel clerks and waitresses who regularly served them when the rigs to which they were assigned were working off the Gulf Coast, and the myriad others who knew them or their families.

The explosion also led to the largest release of oil into U.S. waters in history, estimated by the U.S. Department of Energy at around 4.9 million barrels by the time the Macondo well was capped on July 15. In responding to the release, BP used over 1.8 million gallons of dispersants. Due to concern about the effects and toxicity of the oil and dispersants, on May 26 the EPA and Coast Guard issued a directive to BP limiting the amount of dispersant use to 15,000 gallons per day. As this report was being prepared, questions about the safety and persistence of dispersants in the Gulf environment continued to be raised by advocacy organizations and Gulf residents.

Because of their familiarity with oilfield contracting, many companies that operated vessels, sold protective gear and equipment, or provided other services needed during the cleanup were able to capitalize on the disaster. The following notes record a conversation with the owner of a tug company about his involvement in September:

> DA406a noted that lots of people are still working in cleanup, but BP is starting to weed them out. At first they had to pay everybody just to keep people quiet, but now that the well is capped, they can weed out those who don't do anything, who just ride around burning up gas all day. I asked about DA406a's business. He has tugs leased to a transportation company. That company has floating hotels which house over 600 people. They had to bring in somewhere for people to live while they were working on the cleanup. The rules at these floating hotels are very strict; the people living there are the contractors hired to help with the spill. They have routine drug tests. As part of the process of weeding out those who aren't working, when they come in they have to be checked in, they [someone from BP?] inspect what they have on their boats, and count how many oiled booms they have brought in. He said he expects they will keep working like this until May of 2011. I ask if he expects the work will continue at this level and he says not at this level for everyone. He then refers to his company, "we're top of the line, will still be working."… He said that he'd been out for 11 weeks on a tug, coming in for a few days at a time (Austin Field notes, September 9, 2010).

In the immediate aftermath of the explosion, access to platforms near the accident site was restricted, so some production was affected, and individuals who worked on those platforms were put out of work temporarily. Those platforms were back in operation within several months, but production had peaked in May 2010, reflecting both the drop in production anticipated in 2009 and policy changes. Indeed, two policy actions with immediate effects were (1) the moratorium on drilling in more than 500 feet of water in the Gulf that was ordered May 27, revoked by a federal judge, and then followed by a suspension of all deepwater drilling that was issued in July and kept in effect until October 12; and (2) the implementation of new safety and environmental standards beginning June 8, which significantly slowed the issuance of permits even for drilling in shallow water. Though distinct actions with different aims, these two policies have become linked in the minds of both national observers and Gulf residents, leading some to dub the new permitting policy a "permitorium."

The moratorium was aimed at rigs in the Gulf of Mexico that were exploring new reservoirs of oil and gas in water deeper than 500 feet. The Department of Interior released a list of 17 operators, responsible for 33 rigs operating at 1,000 feet or greater, that would receive notice to halt drilling (Brenner 2010). The moratorium, and the subsequent suspension of drilling, did not affect wells already in production, but with new drilling halted, production from new wells was not available to offset the natural decline in production that occurs in aging wells. Energy companies operating in the Gulf used various mechanisms, such as the notification of *force majeure*,[2] to terminate rig contracts, and the utilization of rigs to continue completion, workover, and other non-drilling activities on existing wells during the moratorium and suspension. Many had begun shifting operations to other offshore provinces and to onshore fields prior to 2010 and continued that trend. Drilling companies tried to renegotiate leases at lower

---

2 *Force majeure* clauses excuse a party from liability if some unforeseen event beyond the control of that party prevents it from performing its obligations under the contract.

rates to keep rigs under contract, sought work elsewhere, and reduced their employees' hours. Though fewer than a quarter of the affected rigs left the Gulf, the withdrawal of some rigs, along with the threat that others would leave, led to continued speculation and concern through the end of the year. Service and vessel companies picked up inland work, or shifted overseas to keep their employees working. An electric supply company representative noted:

> We haven't really seen a whole big drop in our work. We have been very lucky compared to other boat companies. They say they're not sure what's going to happen….Our work deals with a lot of repair to inland stuff. We do new constructions. A lot of people are building new supply boats. It's not good, the moratorium. I don't think it's fair to the drillers (DA410 2010).

In early June, Louisiana Governor Bobby Jindal asked the state's lieutenant governor, Scott Angelle, to create the Gulf Economic Survival Team, a coalition of operators, service companies, economic development offices, and city governments, to oppose the May 28 moratorium. The organization compiled letters on the economic effects of the moratorium and delivered them to Interior Secretary Salazar in June (Staff Report 2010). The group began operating out of the offices of the South Louisiana Economic Council on the Nicholls State University campus and expanded to include banks, cities, and even a local grocery chain (Gulf Economic Survival Team n.d.a). With the lifting of the suspension of drilling in October 2010, GEST took on the role of "facilitator between operators, state government, and the federal government to clarify new exploration and drilling plan and permit requirements, and as an advocate for the full return of economic activity and energy production in the Gulf region" (Gulf Economic Survival Team n.d.b).

Several other groups formed to analyze the disaster and its effects. Some, such as the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling established on May 21 by President Obama, were created by federal and state governments. Others, such as the Deepwater Horizon Study Group, were brought together by academic and industry organizations. They began publishing findings soon after the disaster occurred and continued to do so through 2011 (Deepwater Horizon Study Group 2010a, 2010b, 2010c, 2011; National Commission 2011).

The changes in the permitting process, which reduced the issuance of permits to a trickle for several months, affected many more rigs, companies, and workers. Although the moratorium and suspension were aimed at deepwater rigs, the federal government issued only 12 permits for drilling in shallow waters from April to October 2010, compared to the average of 12 per month before the Macondo well blowout. New standards for deepwater permits required applicants to demonstrate the capability for subsea containment of oil, and no permits were issued in 2010 (BOEMRE 2011b). Many rigs remained in the Gulf but were idled, leading to the removal of crews and equipment. The costs and challenges of operating in deepwater have favored majors, and consortia of majors, over small companies, and small operators expressed concern that the new permitting requirements, coupled with increased insurance costs, would further disadvantage them, making it "near impossible" for small companies to play a role in deepwater development (Jervis 2011).

The Macondo blowout also led to a restriction on the offshore areas within which drilling would be permitted. In late November, Interior Secretary Ken Salazar declared the eastern Gulf of Mexico and the entire Atlantic and Pacific coasts off-limits to drilling, reversing the

administration's earlier decision to attempt to open those areas. As of September 5, 2011, there were 617 manned platforms and 70 rigs operating in the Gulf (BOEMRE 2011c), but production had not reached pre-disaster levels. Consequently, some argued that the "permitorium" would be the most significant event in the Gulf of Mexico offshore industry since the 1980s bust in terms of its potential for causing major restructuring of the offshore petroleum industry.

The disaster also focused attention on the management and regulation of the offshore petroleum industry. Shortly after the explosion, the MMS was reorganized into the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). On October 1, 2011, BOEMRE was replaced by the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE). BOEM is responsible for managing the exploration and development of U.S. offshore resources and BSEE is responsible for enforcing federal safety and environmental regulations pertaining to offshore energy development. Given insufficient response to its efforts to encourage and promote voluntary compliance following its 1993 recommended practice for safety and environmental management systems (SEMS), in 2009 the agency had proposed rulemaking to require operators to develop and implement SEMS to address integrated management of OCS oil and gas operations. This was the first attempt by a federal agency to directly regulate the structure and core functions of the safety management system of an offshore operator (Bea 2010) and led to a public meeting in September 2009 and a new Transportation Review Board project to examine, among other things, changes in the inspection program and process since the Marine Board's 1990 study. A committee was established and met in December 2009 and March 2010, prior to the explosion, and continued its work in the aftermath (National Academies 2011). BOEMRE published the Final Rule on Safety and Environmental Management Systems in the *Federal Register* on October 15, 2010 (75 FR 63610), giving companies working in offshore federal waters one year to demonstrate that their plans met the new standards. The committee published its interim report in June 2011 (Transportation Review Board 2011).

The moratorium, drilling suspension, and slowdown in the issuance of permits had differential effects on workers, companies, and communities. As noted above, those working in production were affected little, if at all, as their platforms remained at, or quickly returned to, normal levels of operation. Those working directly for drilling companies, or for the service companies involved in drilling operations, saw an immediate drop in work. Companies that had already opened offices outside of the region were better able to shift equipment and employees than those who had not. In response to concerns for the rig workers who would be unable to work due to the stoppage and at the request of President Barack Obama, BP established, through the Baton Rouge Area Foundation, a $100 million grant program, the Rig Worker Assistance Fund, limited to people who worked on one of the 33 deepwater rigs operating in the Gulf of Mexico on May 6, 2010. BP determined that grants of $3,000 to $30,000 would be available to rig workers with amounts based on financial hardship determined by factors such as lost wages and expenses. The program accepted applications during the month of September 2010. Despite dire warnings from industry leaders and estimates that up to 9,000 people worked on deepwater rigs at that time, the fund was little used; fewer than 800 individuals applied and less than 350 received compensation during the initial time period.

One problem for the assistance fund was that few workers had been laid off right away. Instead, companies generally kept workers by cutting back hours or by transferring them to rigs working outside the Gulf region. Hourly employees who were used to making most of their

income through overtime pay were seriously affected, but they were ineligible for assistance.[3] On-call workers such as commercial divers were not laid off but, in contrast to many service vessel operators, were called out rarely, if at all. Louisiana officials expressed concern that companies that had held onto workers in the first months after the disaster would have to let them go after the monies were no longer available from the fund. They also noted that the funds were too narrowly targeted to those individuals who worked on the rigs, overlooking an estimated 25,000 to 35,000 workers who directly supported the rigs in providing transportation to and from shore and deliveries of food, equipment, and materials. Consequently, the Baton Rouge Area Foundation extended the deadline for applications and expanded eligibility for compensation from the fund to those whose work involved supplying the rigs.

During and after the oil disaster, small- and medium-sized service companies connected to the petroleum industry were generally hit hard, with the effects linked to the size and function of the equipment they provided or serviced, but they were largely ignored in the early discussions of compensation. These businesses had little access to external resources; those still paying back loans used for post-hurricane recovery were unable to put up collateral for more loans, or were reluctant to go into more debt. Larger companies operating in national and international markets had more resources upon which to draw and were able to shift their workforce to other locations, raising concern in some sectors that those workers will not return to the Gulf when activity does return to pre-disaster levels, exacerbating labor shortages in those sectors. As a result of the variability among companies and the number of strategies they employed, neither unemployment statistics nor requests for compensation reflected the early impacts of the slowdown. Many of the workers who were struggling the most were known only to proprietors of loan companies and pawn shops.

Other policy changes caused mixed effects. Initially, for example, citing shortage of vessels, concerns about lost income, and the shift of regulators' attention during the summer of 2010, offshore operators suspended or reduced their efforts to decommission wells and platforms in the Gulf, causing a loss of work for companies specializing in explosives, fabrication yards, barge companies, commercial divers, and others that rely on the fairly predictable flow of work associated with decommissioning. Then, in September 2010, BOEMRE issued a new decommissioning regulation giving operators three years to permanently or temporarily abandon any well that had not been used for five years, or to isolate the reservoir zones into which the well was drilled to control fluid flow from the reservoir. The regulation also requires that platforms and supporting infrastructure that had been idle for five years or more be removed within five years. When it was issued, the new regulation was expected to increase the demand for contractors with derrick barges and those who specialize in project management, cutting, civil engineering, and diving services, driving up operators' costs.

And, of course, companies and workers in some sectors, particularly those with their own vessels, made huge profits through the Vessels of Opportunity program or by supplying those working in that program. However, because of the short-term nature of the cleanup work, and the concern that their vessels nevertheless would be obligated to that program for long periods of time and unable to respond to demands elsewhere, many companies and vessel owners opted to forego participation in the program.

---

3 Note this is standard practice in many sectors, maximizing company flexibility and reducing the impact of low hourly wages.

Beyond its direct impacts, the explosion of the *Deepwater Horizon* created special problems for the communities with significant involvement in the offshore petroleum industry. As noted above and is typical during a recession, with rising oil and gas prices, prior to 2010 Gulf Coast communities had experienced lower unemployment rates than their counterparts elsewhere in the United States. They had therefore become attractive to unemployed workers from other parts of the country. Though their unemployment rates had begun to climb prior to the explosion, making them less attractive to potential job seekers, an almost immediate effect of the spill was an increase in the flow of people looking for cleanup work, many of them with few or no resources to support them until they found a job. Soon, though, as local fishermen and others in need of money took the jobs in the cleanup, many of the people from outside the area were unable to find jobs. Throughout the fall, and continuing through the spring of 2011, social service providers, pastors, and others noted that among the people they were serving at homeless shelters and in meal programs were those who had come looking for work after the spill and did not have sufficient resources to return to the communities from which they had come.

## 1.5. SOCIAL AND ECONOMIC EFFECTS OF THE DISASTER ON THE OFFSHORE PETROLEUM INDUSTRY IN 2011

Most companies and workers in the offshore petroleum industry expressed uncertainty and frustration as 2011 got underway. In February 2011, there were 125 drilling rigs in the Gulf, more than had been there when the *Deepwater Horizon* exploded in April of the previous year, but all but 34 of them were idle (Hammer 2011, citing ODS-Petrodata). The first deepwater permit was issued February 28, 2011, with 127 permits issued for 40 wells by early September (BOEMRE 2011b). Though day rates for rigs remained the same, new offshore drilling activity was slow throughout the winter and into the spring as companies waited on permits, and also because of bad weather in the Gulf (Figure 1.6). Almost every company involved in offshore drilling commented on the effects of the moratorium and suspension. The manager of a supply company described the combined effects of the hurricanes, the initial efforts to contain the spill, and moratorium in April 2011:

DA502: The spill slowed things down but the moratorium is the killer. Supposedly it's lifted, but there's not any new work. We had no decline before, it's all declining since Katrina. Katrina was a huge impact on our business. All businesses below the Intracoastal. Katrina made a lot of people rich, so did the spill. After the spill there was a short upturn and then the moratorium killed it. We helped with the cleanup after the spill. But then BP cut out the middlemen and started dealing directly with the factory. We sell absorbent pads and boom. We sold two to three trucks and called to order more. The supplier said hold off. They started buying directly from suppliers. After the spill, for two to three months, everybody was going crazy at first. It depleted the entire country of any type of environmental supplies. You couldn't find a single anchor anywhere in the country. With the oil booms depleted so far down, Chet Morrison came up with an idea to make booms out of pipe. They made six miles of steel booms. Can you imagine what that cost? Steel and then paint and blast? At Southwest Pass, they lined up pipe and barges to hold pipe in and drove beams to hold the pipe.

Researcher: What were you selling for the spill?

23

DA502: Odds and ends, for example we sold 500 hats for guys working on the beach (DA502 2011).

The manager of a commercial diving company that specialized in rig inspections noted that the guidelines requiring more inspections had not yet caused noticeable changes for his business:

[The disaster] had an indirect effect [on us]. Everybody just stopped, the drilling and production boom stopped. We're a service company, so we shut down when they shut down. The majority of our work now is inland shelf stuff. It's still not as affected as offshore. It still ain't picked up at all to where it was prior. During the incident, there were no vessels available. BP had everything on contract. We don't own vessels, we use third party everything. MMS changed. They came out with stricter guidelines, but it has not trickled down to our company... The whole time the spill was going on, nothing was available. Now boats are available but there's no work available. Everybody is still waiting. We have an inland job in Kentucky, coastal work... The stuff on the shelf is still controlled by major companies. They're watching their [bottom line] and not spending money. Watch the next year. We have to wait through hurricane season again... then we'll be busy in September and October (DA506a 2011).



Figure 1.6. Offshore drilling activity in the U.S. Gulf of Mexico as reflected in jack-up fleet utilization. Source: IHS 2012.

The permitting process began to accelerate in 2011, and by early September, 73 new shallow water well permits had been issued for the Gulf of Mexico, still considerably below the rate of issuance prior to the disaster. Day rates for rigs rose a bit by December and remained steady into 2012; fleet use was on the rise by then and reached almost 60% by April 2012

(Figure 1.6). The lack of activity was observed by workers in motels and restaurants who did not see a return of crews until late spring or early summer. Workers whose hours had been cut continued to struggle to make ends meet, though they remained largely invisible except at the loan offices, pawn shops, social service agencies, and other places where they turned for help. As has happened in prior industry downturns, because they were not laid off, these workers could not qualify for public assistance. Of particular concern to representatives from NGOs and others trying to meet the needs of those falling through the cracks were the families that typically supplemented income from fishing with oilfield work at a time when the latter jobs were few and far between (see Chapter 2).

The fact that the *Deepwater Horizon* explosion occurred in the midst of a downturn in the industry created particular problems for those seeking to use resources made available only for those affected by that event. For example, the affected coastal states received National Emergency Grants to provide employment-related assistance and retraining to support long-term training for individuals who lost their jobs because of the spill and would not be able to return to their previous lines of employment. Though the grants were awarded in 2010, the programs did not really get going until 2011, and program coordinators across the region reported that they were able to serve very few people. A key problem was that many people had first lost their jobs due to the industry downturn and then, because the disaster, the moratorium and suspension, and the changes in permitting further restricted employment opportunities, they were unable to find new ones. They were considered ineligible for training that was tied specifically to job *losses* from the spill. Thus, instead of being able to use the time they were out of work to upgrade their skills or develop new ones, they were excluded from the program.

Within the industry, the fear of large-scale layoffs was never realized. The expansion and extension of the Rig Worker Compensation Fund generated around 1,100 applications by the new mid-May 2011 deadline, with just over 400 people receiving money, but fell far short of expectations. Observers noted that oil exploration companies, drilling contractors, rig-supply vessel owners, and shipyards had maintained at least some contracts during the shutdown and avoided large layoffs. Consequently, by the end of the summer, most of the money remained in the fund: $11.4 million had been paid to workers and $6.5 million had gone to cover administrative costs. The Baton Rouge Area Foundation created a Future of the Gulf fund and, in September 2011, announced $18 million in grants, the bulk of which would go to Catholic Charities Archdiocese of New Orleans to continue its Spirit of Hope Collaborative, a group of 16 nonprofits providing mental-health services and career counseling in fishing communities after the spill.

The effects of the new SEMS standards were evident in the early fall as October 15, the date by which companies working in offshore federal waters had to demonstrate that their plans met the new standards, approached. Established companies that provided training and safety compliance checks were fully booked, offering workshops and consulting services to contractors in the region:

> The rules and guidelines have changed, and they needed to. What I see these guys doing [is] paying more attention to stuff that matters. It's not so much that's changed, but [they've] just cracked down on fire, training, SEMS. The majors always did, but now they're cracking down on the small companies. It's good for our business and the safety of people… I just hung up the phone with one of our biggest companies   they've been in business for 20 years and they're starting over from scratch… The service work has to be

done because the government says you have to have a third party to do inspections. Then we also do other work they could do but they don't want to do themselves. It's a liability issue … I'm hearing that SEMS is doing what we've always done   shooting for picking a standard and everyone following that (DA605b 2011).

Although the job losses associated with the BP disaster were not as great as predicted, not all companies were able to keep their personnel. Mid-sized companies in specialized sectors were particularly affected, including those who supplied commercial oilfield divers, oilfield supplies, and offshore service vessels. Both company managers and employees reported layoffs or significant reductions in hours. Because these companies often hire local workers, their layoffs also affected the small bayou communities where they are located. Those companies and personnel that were mobile continued to leave the Gulf, taking jobs in onshore oil and gas fields in other regions of the United States and in offshore fields across the globe. Company officials noted that many workers from the Gulf found themselves surrounded by their former co-workers in their new national and international work settings.

Other industry impacts include new oil spill prevention systems for oil and natural gas producers operating in the Gulf. The Macondo Well was one of 43 wells being drilled in the U.S. Gulf of Mexico at depths of over 5,000 feet (Deepwater Horizon Study Group 2010c; see BOEMRE n.d.b for tables of permanent platforms and bore holes drilled at depths of greater than 1,000 feet). Industry leaders recognized that companies working in deepwater "need to be better prepared in the event an operator lost complete control and subsequent containment of a well" (Marine Well Containment Company 2012). As a result, two industry consortia, the Helix Well Containment Group (n.d.) and the Marine Well Containment Company (2012), were formed to develop and make available well containment equipment and a deepwater containment response system.

The *Deepwater Horizon* incident also had ramifications for the entire offshore petroleum industry. For example, Norway's Petroleum Safety Authority identified three key areas organization and management, risk management, and barrier management which required changes to reduce major accident risk on the Norwegian Continental Shelf (Petroleum Safety Authority Norway 2012). The effects of the changes within the industry will be felt in years to come.

## 1.6. SUMMARY

The offshore oil and gas industry in the Gulf of Mexico had entered a downturn prior to the *Deepwater Horizon* rig explosion. At the same time, activity was expanding in the onshore oil and gas fields in U.S. states including northern Louisiana, Texas, North Dakota, and Pennsylvania as well as offshore fields off the coasts of countries including China, Africa, Brazil, and the Middle East. As a result, it is difficult to distinguish the effects of the *Deepwater Horizon* disaster and its aftermath from the other changes taking place within the petroleum industry. The moratorium and suspension of deepwater drilling, and regulatory changes implemented in the wake of the explosion, nevertheless affected companies and employees across the industry, and were perceived by some to have had greater effects than the release of oil into the Gulf. In addition, while some of the major indicators of the effects of the disaster, such as unemployment rates and demands on compensation funds, showed less change than

expected, many of the workers and companies most affected generally were beyond the public eye and the reach of the programs established to mitigate the loss associated with the disaster.

## 1.7. REFERENCES

Austin, Diane E. n.d. Guestworkers in the fabrication and shipbuilding industry along the Gulf of Mexico: An anomaly or a new source of labor? In: David Griffith and Diane Austin, eds. Managing and Mismanaging Migration: Captive Workers in North American Labor Markets. Santa Fe, NM: SAR Press.

Austin, Diane E. and Thomas R. McGuire. 2002. Social and economic impacts of OCS activities on individuals and families: volume II: Case studies of Morgan City and New Iberia, Louisiana. OCS Study MMS 2002-023. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Austin, Diane E., Thomas R. McGuire, and Rylan Higgins. 2006. Work and change in the Gulf of Mexico offshore petroleum industry. Research in Economic Anthropology 24:89-122.

Austin, Diane and Drexel Woodson, eds. 2013. Gulf Coast communities and the fabrication and shipbuilding industry: A comparative community study. Volume II: Community profiles. New Orleans: U.S. Department of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region.

Bea, Robert. 2010. Letter to the commissioners, national commission on the BP Deepwater Horizon oil spill and offshore drilling, on behalf of the Deepwater Horizon study group. November 24. Available at: http://www.scribd.com/doc/44312791/Letter-from-Deepwater-Horizon-Study-Group-to-Oil-Spill-Commission

Brenner, Noah. 2010. Interior sets list for Gulf drilling halt. Upstream: The International Oil and Gas News Source. Available at: http://www.upstreamonline.com/live/article216316.ece

Brewton, Asani, Richie Baud, Frank Yam, Lee Almasy, Theirry M. DeCort, Michelle Uli, Thomas Riches, Jr., Eric G. Kazanis, Angela G. Josey, and Roy Bongiovanni. 2009. Gulf of Mexico oil and gas production forecast, 2009-2018. OCS Study MMS 2009-12. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). n.d.a. Gulf of Mexico permanent deepwater structures. Available at: http://www.gomr.boemre.gov/homepg/offshore/deepwatr/dpstruct.html

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). n.d.b. Safety and Environmental Mangement Sytems (SEMS). Available at: http://www.boemre.gov/semp/. Accessed June 26, 2012.

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2011a. Gulf of Mexico OCS regional oil and gas production. Available at: http://www.boemre.gov/stats/xlsExcel/GOMRProductionAug2011.xls

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2011b. Status of drilling permits subject to enhanced safety and environmental requirements in the Gulf of Mexico. Available at: www.gomr.boemre.gov/homepg/offshore/safety/well_permits.html

Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). 2011c. BOEMRE Tropical Storm Lee activity statistics update: September 5, 2011. Available at: http://www.boemre.gov/ooc/press/2011/press0905.htm

DA410. 2010. Personal communication. Effects of the oil spill on the community. Discussion with Diane Austin. Representative, Electric Service Company. Morgan City, LA. September 14.

DA502. 2011. Personal communication. Effects of the oil spill on business and the community. Discussion with Diane Austin. Manager, Oilfield Supply Company. Galliano, LA. April 28.

DA506a. 2011. Personal communication. Effects of the oil spill and new safety standards on business. Discussion with Diane Austin. Manager, Oilfield Diving Company. Morgan City, LA. April 29.

DA605b. 2011. Personal communication. Effects of the oil spill and new safety standards post-spill. Discussion with Diane Austin. Manager, Safety Services Company. Lafourche Parish, LA. October 7.

Deepwater Horizon Study Group. 2010a. Progress report 1. Berkeley: Center for Catastrophic Risk Management, University of California.

Deepwater Horizon Study Group. 2010b. Progress report 2. Berkeley: Center for Catastrophic Risk Management, University of California. Available at: http://ccrm.berkeley.edu/pdfs_papers/bea_pdfs/DHSG_July_Report-Final.pdf

Deepwater Horizon Study Group. 2010c. 3rd Progress report. Berkeley: Center for Catastrophic Risk Management, University of California. Available at: http://www.eoearth.org/files/154601_154700/154664/dhsg_thirdprogressreportfinal.pdf

Deepwater Horizon Study Group. 2011. Final report on the investigation of the Macondo Well blowout. Berkeley: Center for Catastrophic Risk Management, University of California. Available at: http://ccrm.berkeley.edu/pdfs_papers/bea_pdfs/DHSGFinalReport-March2011-tag.pdf

Dutra, Luís Eduardo Duque., and José Cesário Cecchi. 1998. Petróleo, preços e tributos: experiência internacional e política energética nacional. (Oil, prices, and tariffs: International experience and national energy policy). Rio de Janeiro: Tama. In: Marcelo Figueiredo, Denise Alvarez, Milton Athayde, José Suarez, Renata Pereira, and Leonardo Soares, eds. 2008. Productive Reorganization, Outsourcing, and Work Relations in the Offshore Oil Industry in the Campos Basin, Rio de Janeiro. New Solutions 18(4):459-80.

Energy Information Administration. n.d. Gulf of Mexico fact sheet: Energy infrastructure map. Available at: http://205.254.135.24/special/gulf_of_mexico . Accessed March 2, 2012.

Energy Information Administration. 2012. Federal offshore    Gulf of Mexico production of crude oil. Available at: http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n_PET&s_MCRFP3FM2&f_A .

Energy Information Administration. 2011a. Gulf of Mexico fact sheet, energy infrastructure map. Available at: http://205.254.135.24/special/gulf_of_mexico/

Energy Information Administration. 2011b. Short-term energy and winter fuels outlook. Available at: http://www.eia.gov/emeu/steo/pub/contents.html

Federal Reserve Bank of St. Louis. 2012. Economic research: Unemployment rate in St. Mary Parish, LA (LASTMA5URN). Available at: http://research.stlouisfed.org/fred2/series/LASTMA5URN

Gulf Economic Survival Team. n.d.a. GEST supporters. Available at: http://www.gulfeconomicsurvival.org/supporters  Accessed April 4, 2012.

Gulf Economic Survival Team. n.d.b. About GEST. Available at: http://www.gulfeconomicsurvival.org. Accessed April 4, 2012.

Hammer, David. 2011. More oil drilling rigs are in Gulf of Mexico than before BP oil spill. The Times-Picayune. February 4.

Helix Well Containment Group. n.d. Ready to respond: Vision. Available at: http://www.hwcg.org/

IHS. 2012. Day Rate Index. Available at: http://www.ihs.com/products/oil-gas-information/drilling-data/day-rate-index.aspx?pu_1&rd_ods-petrodata_com

Jervis, Rick. 2011. Small oil drillers say new rules threaten wildcatters' survival. USA Today. April 8.

Luton, Harry, and Diane Austin. n.d. Rethinking the assessment of social impacts of offshore petroleum development in the Gulf of Mexico. Unpublished paper.

Marine Well Containment Company. 2012. Fact sheet. Available at:
http://www.marinewellcontainment.com/pdfs/MWCC-Fact-Sheet-Overview.pdf

National Academies. 2011. Project information - Effectiveness of safety and environmental
management systems for Outer Continental Shelf oil and gas operations, Original Title:
Committee on offshore oil and gas facility inspection program of the Minerals
Management Service: A review. TRB-SSP-09-03. Available at:
http://www8.nationalacademies.org/cp/projectview.aspx?key_49165

National Academies Press. 1992-1994. Assessment of the U.S. Outer Continental Shelf
Environmental Studies Program. National Resource Council. Available at:
http://www.nap.edu/openbook.php?record_id_2062&displayrelated_1

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (National
Commission). 2011. Deep water: The Gulf oil disaster and the future of offshore drilling.
Report to the President. Available at: http://www.oilspillcommission.gov/final-report

Petroleum Safety Authority Norway. 2012. Deepwater Horizon: Taking the lessons to heart.
Available at: http://www.ptil.no/news/deepwater-horizon-taking-the-lessons-to-heart-
article8344-79.html

Priest, Tyler. 2013. The history of Gulf Coast shipbuilding and offshore fabrication. In: Tyler
Priest and John Lajaunie, eds. Gulf Coast Communities and the Fabrication and
Shipbuilding Industry: A Comparative Community Study. Volume I: Historical Overview
and Statistical Model. U.S. Department of the Interior, Bureau of Ocean Energy
Management, Gulf of Mexico OCS Region.

Spector, Mike. 2006. Oil rigs stage exodus from Gulf of Mexico. Pittsburgh Post-Gazette. July 5.

Staff Report. 2010. Gulf Economic Survival Team calls for end to drilling moratorium.
CityBusiness. Available at: http://neworleanscitybusiness.com/blog/2010/06/09/gulf-
economic-survival-team-calls-for-end-to-drilling-moratorium/

Tapper, Jake, and Huma Kahn. 2010. Drill, baby, drill: Obama opens up offshore drilling and
exploration. ABC World News. Available at: http://abcnews.go.com/WN/Politics/obama-
opens-offshore-drilling-oil-gas-exploration/story?id_10249811

Transportation Review Board. 2011. Effectiveness of safety and environmental management
systems for outer continental shelf oil and gas operations: Interim report. Transportation
Review Board of the National Academies. Available at:
http://onlinepubs.trb.org/onlinepubs/sr/srSEMSInterimReport.pdf

WTRG Economics. 2009. Home page. Available at: http://www.wtrg.com

# CHAPTER TWO: COMMERCIAL FISHERIES

Brian Marks, Bethany Rogers, Preetam Prakash, and Shannon Dosemagen

## 2.1. INTRODUCTION

Commercial fisheries and seafood processing have a long history on the Gulf Coast. Despite being a far smaller industry in terms of formal employment and revenue than other prominent Gulf industries like tourism and offshore oil (Bourne 2010), commercial fishing is the most important economic driver in some coastal communities and the basis of livelihoods for thousands of people, including many who trace their residence on the Gulf Coast back to indigenous tribes, to early European settlers in the 1700s, and to more recent immigrants in the 19th and 20th centuries (Gramling and Hagelman 2005; Davis 2010). For many in the commercial seafood trade, involvement in the industry goes back multiple generations and the ownership and operation of boats, docks, and plants as well as business relationships in the Gulf seafood industry are still often organized along lines of kinship and co-ethnic identification (Roberts and Pawlyk 1986; Deseran 1997; Deseran and Riden 2000, 2003; Durrenberger 1992, 1996; Marks 2012). The region's fisheries have had to coexist with expansive economic development in the coastal zone such as intensive agriculture, urbanization and mass tourism, chemical manufacturing, bulk cargo shipping, and oil and gas exploration and extraction. Such development led to attendant environmental changes like salt water intrusion, coastal wetland loss, hypoxic zones, and underwater obstructions, as well as the effects of some coastal restoration projects, especially fresh water diversions from the Mississippi River that provoke opposition from oyster harvesters and other commercial fishers for claimed harms to fishery productivity (McGuire 2006). Despite major hardships in recent decades the BP oil spill being only the latest in a series of acute and chronic challenges ranging from major hurricanes, to tightening government regulations, to sharply falling prices simultaneous with rising expenses commercial fisheries remain an important element in the Gulf region's economic and cultural landscape and the personal and collective identity of many coastal residents (Margavio et al. 1996; Davis 2010; Deseran and Riden 2000; Fritchey 1993; Guillory et al. 2001; LDWF 2000; Marks 2012).

After the Pacific Northwest (including Alaska), the Gulf of Mexico is the country's most valuable and largest volume regional fishery (NOAA Fisheries 2011d). The Gulf Coast commercial fishing industry is comprised of four principal fisheries: shrimp, oysters, crabs, and finfish, with menhaden, grouper, red snapper, and yellowfin tuna making up a large proportion of the regional finfish catch. Of the Gulf states, Louisiana has the highest overall landings volume and revenue, 1.2 billion pounds in 2009 with an ex-vessel value of $297 million out of a Gulf-wide total of 1.6 billion pounds worth $644 million (NOAA Fisheries 2012).

The following sections address each of the fisheries for the major targeted species in the Gulf, and, where possible, the multiple actors in the commodity chain of those fisheries, from harvesters to docks to processors and distributors. Since the 2010 disaster, several peer-reviewed and grey literature studies have attempted to project the spill's potential economic impacts on the region's fishing industry (GNO, Inc. 2010; National Commission 2011b; Tunnell 2011; McCrea-Strub et al. 2011; Sumaila et al. 2012). This report supplements those studies, and the recent

31

journalism on prevailing socioeconomic conditions (Alexander-Bloch 2010, 2012a, 2012b; Alexander-Bloch and Anderson 2011; Amy 2011; Anderson 2011; Bayles 2012; Buskey 2010a, 2010b; DeSantis 2011a, 2011b, 2011c, 2011d; Jonsson 2012; Kaufman 2010; Robbins 2010; Roberts 2011; Robertson 2011a, 2011b; Rodriguez 2010; Satchfield 2010; Seafood.com 2010; Seafoodnews.com 2011; Skoloff and Weber 2011; White 2011; Zullo 2011), by situating the present condition of Gulf commercial fisheries in their historical and geographical context. This report incorporates ethnographic data gathered by this project's fieldworkers in 2010 and 2011 with existing accounts of the socioeconomic factors affecting the recovery of Gulf of Mexico fisheries.

## 2.2. METHODOLOGY: MULTI-SITED ETHNOGRAPHY WITH COMMUNITY PARTNERS

Data on commercial fisheries were generated through a multi-sited, one year ethnographic study of the social and economic impacts of the 2010 spill on Gulf Coast communities. At the time of the *Deepwater Horizon* incident, the lead academic researchers for this project had relationships with community members and organizations in some Gulf Coast fishing communities that had developed from community-based team ethnographic research in the region conducted prior to the disaster (Austin et al. 2008; Austin 2003). Out of these existing relationships and newly established ones, the academic researchers identified and hired community research partners to help identify and talk with residents in those communities about the impacts of the oil spill on their lives and businesses. This research collaboration strengthened access to fishing community residents, as well as led to the kinds of insights that developed as community research partners interacted with others with whom they have long-standing relationships. In addition to these discussions, community partners attended project team meetings and were encouraged to submit field notes of their observations of oil spill impacts on local economies and social dynamics. They also had focused conversations with the academic researchers at various points in the study in which they could reflect and share their personal experiences and insights.

The academic researchers on this project also spoke with people in all aspects of the commercial fishing industry. Using a matrix to guide their selection of participants, researchers talked with a range of fishers, business owners and workers in the region's four prominent fisheries across those fisheries' commodity chains. The exposure of the commercial fishing industry to the effects of the 2010 spill meant that conversations with people in the industry were a priority in the project; discussions with workers in the industry were often in-depth and digitally recorded or written in detail as field notes. The researchers also attended a range of events from industry conferences to public hearings to capture the broader economic and political context shaping the industry today, and participated in social and cultural events, such as local seafood festivals, Blessings of the Fleet, and church celebrations, in order to gain a better understanding of the political and socio-cultural aspects of Gulf Coast fisheries. Primary statistical data and secondary sources, including newspaper articles, agency and academic reports, are incorporated in this section to develop a historic context and a more comprehensive portrait of the commercial fishing industry in the region.

## 2.3. BACKGROUND ON THE GULF COAST COMMERCIAL FISHING INDUSTRY

### 2.3.1. Shrimp

Shrimping is the Gulf Coast's most economically valuable commercial fishery (NOAA Fisheries 2012) with a total value of $327 million in 2009 for landings totaling 251 million pounds. Shrimp are primarily landed in Texas and Louisiana. Brown (*Farfantepenaeus aztecus*) and white (*Litopenaeus setiferus*) shrimp are the two principal species harvested and processed in the region, with smaller harvests of rock shrimp (*Sicyonia brevirostris*), pink shrimp (*Farfantepenaeus duorarum*), seabobs (*Xiphopeneus kroyeri*), and royal red shrimp (*Hymenopenaeus robustus*). Shrimpers can trawl in open Gulf of Mexico waters regulated by state and federal authorities most of the year, while inshore marshes and bays under state regulation experience shorter open seasons intended to protect juvenile shrimp. Shrimp larvae mature to commercially harvestable sizes in brackish estuaries near the Gulf, where their harvest is restricted to varying minimum sizes by their respective state fishery management agencies. Louisiana's inshore shrimping seasons typically run from May to July for brown shrimp and from August to December for whites, with different openings and closures in other states and certain parts of federal waters (Louisiana Sea Grant 1999). The otter trawl is the most common fishing gear used to harvest shrimp in the Gulf, while skimmer nets have become prevalent in the past two decades among smaller shrimping boats working inshore waters (Hein and Meier 1995; Gramling and Hagelmen 2005; Davis 2010).

Shrimping is a traditional livelihood among many coastal families, both those resident to the region for many generations and recent immigrants. In south Louisiana, some shrimpers trawl inshore with small boats part-time in addition to working a shore job (Sass and Roberts 1979; Gramling 1984; Henry and Bankston 2002; Marks 2012). Shrimping communities dot the Gulf, with the largest concentration of licensed Louisiana commercial shrimpers in Terrebonne, Lafourche, Jefferson and Plaquemines parishes (LDWF 2012). Outside Louisiana, significant concentrations of shrimpers are found in Biloxi and Pass Christian, Mississippi and Bayou La Batre, Alabama (Durrenberger 1992, 1996; Boudreaux 2011). In Biloxi and Pass Christian, Croatian and French descendants are prominent in the shrimping industry. Native American shrimpers are prevalent in some south Louisiana parishes, as are Anglos, Cajuns, and Vietnamese and, in a few parishes, Cambodians, Croatians, African-Americans, and Isleños. Since the late 1970s Vietnamese-Americans have taken a prominent place in the Gulf of Mexico shrimp industry, today operating a large number of the fishery's steel-hulled freezer boats that work the open Gulf for a month at a time and shrimp buying docks in communities where Vietnamese shrimpers are numerous (Starr 1981; Durrenberger 1994; Marks 2012).

Gulf shrimp has been processed and distributed to regional and national markets for more than a century. The first shrimp canneries and open-air shrimp drying platforms opened on the Louisiana and Mississippi coast in the late 1800s (Becnel 1962; Davis 2010; Cenac and Joller 2011). In the early 20th century, some processors ran their own large shrimping schooners and others bought from businessmen operating ice boats shuttling chilled shrimp between harvesters and processors. By the mid-20th century, as shrimp boats evolved to have more storage space and more powerful engines and frozen shrimp replaced canned and dried products in the market, shrimpers came to sell directly to processors' landing docks or to onshore dockside dealers (Roberts and Pawlyk 1986; Becnel 1962; Marks 2012). The contemporary Gulf shrimp

33

commodity chain still generates the highest value of any fishery in the Gulf of Mexico, but crippling economic hardships in the industry since the 1980s have consolidated the number of shrimp processing plants (Keithly et al. 1994; Keithly et al. 2005) while the total volume caught and processed has remained fairly steady.

## 2.3.2. Oysters

Oysters are another of the Gulf Coast's iconic fisheries with a storied history (Durrenberger 1992; Davis 2010). Total Gulf of Mexico oyster landings in 2009 equaled 22.8 million pounds, worth $73.5 million in ex-vessel value, of which about 2/3rds were landed in Louisiana. While in recent years the eastern oyster (*Crassostrea virginica*) fishery has constituted a shrinking percentage of the Gulf's fishery revenues, oysters still make up about 15% of the region's annual income from commercial fishing (NOAA Fisheries 2012). Unlike other fishing sectors harvesting wild animals as a common property resource, many oyster fishermen cultivate oysters over a number of years on leased water bottoms. Raising oysters involves preparing a bed of an appropriate substrate for oysters to grow upon, setting spat, or oyster larvae, on the lease's beds, transferring smaller seed oysters onto suitable beds, and harvesting them once they reach market size (McGuire 2006). The Louisiana Department of Wildlife and Fisheries (LDWF) leases water bottoms for oyster cultivation to individuals and maintains public seed grounds, commons harvested for oysters for transfer to private leases or sold directly to the market (Deseran and Riden 2000). LDWF determines opening and closing dates for harvesting from public grounds, but oyster leaseholders can take from their beds year-round. Most present-day oyster harvesters in Louisiana use mechanical dredges but in African-American and Creole communities on the east bank of the Mississippi in Plaquemines Parish, oystermen sometimes use hand dredges or tongs because it is more practical for small-scale fishermen, a harvesting technique the African-American fishing community fought to legalize in the late 1970s. Some oystermen of limited means are "sharecroppers" who work the oyster leases of oyster leaseholders and receive a portion of the harvest, work for wages for oyster processors who own their own leases, or work public beds only, while others have leases they harvest from periodically when not working public areas (Mock 2010).

Mississippi and Alabama's smaller area of oyster beds are almost all state-owned and those that are private are leased by a small minority of fishers (Durrenberger 1992). As a result, the majority of oyster harvesters in Mississippi and Alabama harvest market oysters from the public beds. In those states, the public oyster reefs are limited in size and capacity too, so in some areas fishers are required by law to hand tong their oysters and are limited in the number of sacks they can harvest daily. Mississippi permits mechanical dredging in certain state beds and this physically less demanding and more productive dredging method has become increasingly prevalent in the state in recent years. Oyster harvesters in Alabama have recently been permitted by the state to use mechanical dredges in designated areas. This has sparked controversy in Alabama's oyster industry because of concerns over equal harvesting access among fishers and over environmental sustainability, since state reefs in Alabama have been less productive in recent years due to intensive harvesting and to other environmental factors (Durrenberger 1992; Raines 2010a, 2010b).

Larger-scale oyster harvesters with bigger boats and more leases tend to rely exclusively on oysters for income, while smaller-scale oystermen often work side jobs, most commonly in other commercial fisheries, when they are not oystering (Deseran and Riden 2000). In Louisiana, many licensed oyster harvesters live in Plaquemines and Saint Bernard parishes, historically in eastern St. Bernard and in lower Plaquemines, and in the parishes of Terrebonne, Calcasieu, and Cameron (LDWF 2012). The oyster fishing community in Plaquemines is distinguished by a Croatian immigrant legacy and many oystermen in that parish, especially those operating large vessels full-time, are second- and third-generation Croatian fishermen (Deseran and Riden 2000). The Croatian oystermen are credited with developing the harvesting gear and operations that revolutionized Gulf oystering in the early 20th century, making it more lucrative (Davis 2010). As already noted, there is also a significant community of African-American and Creole oyster harvesters on the east bank of the Mississippi and in Port Sulphur in lower Plaquemines Parish. Cajun oystermen are numerous on the lower bayous of Terrebonne Parish. Across the Gulf, many hired oyster fishers working large leaseholders' boats are Hispanic. Oyster fishing is also prominent in Pass Christian, Mississippi and Bayou La Batre, Alabama.

Oyster processing and distribution to distant markets dates back to the 19th century, when an oyster-eating craze and railroad links to northern U.S. cities brought Gulf oysters to Baltimore, New York, and elsewhere (Davis 2010). At that time, oysters were either shipped whole or shucked and canned, but today, due to increased health protection requirements and issues of consumer confidence, some processors use a pasteurization process to ensure the oysters have a longer shelf life and to minimize risks from eating raw oysters. Some of the largest oyster processors on the Gulf are located in Bayou La Batre (Durrenberger 1992), but processors of varying sizes and some fishers themselves in Louisiana and Mississippi also shuck and wholesale oysters. Obtaining labor for oyster shucking, crab picking, or shrimp processing, jobs that are repetitive, strenuous, seasonal and poorly paid, historically presented difficulties to processors. Processors turned to Southeast Asian immigrant women in the 1970s and 1980s (Moberg and Thomas 1993) and, increasingly, to Hispanic immigrants, some of them H-2B visa workers, in the 1990s and 2000s (Gagnet 2005; Preston 2011).

### 2.3.3. Crabs

Crabbing is a less prominent commercial fishery than shrimping or oystering, but possesses its own particular history of development and regional socioeconomic importance (Horst and Horst 2010; Keithly et al. 1988). While fishermen have harvested the blue swimming crab (*Callinectes sapidus*) from the Gulf with nets and trotlines for generations, the commercial growth of the industry in the region is relatively recent. It was not until the 1980s that the blue crab industry became as substantial in value terms as oysters and menhaden among the region's commercial fisheries (Keithly et al. 1988; Guillory et al. 2001; NOAA Fisheries 2012). Blue crabs are the most commercially important crab species harvested in the Gulf of Mexico and in 2009 constituted a $45 million fishery with 61 million pounds of landings, the large majority of which were landed in Louisiana (NOAA Fisheries 2012). The capitalization required to begin crabbing is less than some other Gulf fisheries (Guillory et al. 2001), such that the sector has attracted a considerable share of newcomers to commercial fishing. There are no seasonal closures in the crab fishery, so crabbing is an off-season pursuit for some shrimpers, oystermen and finfishermen in addition to full-time crabbers. Growing crabbing effort in the 1990s and

35

2000s has heightened competition for available crabs and raised the number of traps crabbers must run to earn a decent return (Davis 2010; Marks Field notes 2011). Most crabbers sell the animals live to buyers, but some crab fishermen and buyers shed crabs in on-shore tanks to produce more lucrative soft-shelled crabs (Horst 1992).

Crab fishing activity is concentrated in Waveland and Bayou Caddy in Mississippi and Bayou La Batre in Alabama but is spread across most of Louisiana's coastal parishes, with the largest number of licensed crabbers in 2010 in Terrebonne, Jefferson, and Saint Bernard (LDWF 2012). Southeast Asian immigrants, Vietnamese but also Lao, Cambodian, and Thai, have become prominent as crabbers as well as crab pickers in processing plants since the 1980s in Louisiana, Alabama, and Mississippi (Guillory et al. 2001; Juhasz 2011). The lower capitalization of small crab picking plants relative to shrimp peeling factories has also meant crab processing businesses are more easily invested in by recent immigrants. A few crab plants in the region are owned by first-generation Southeast Asian immigrants (Juhasz 2011), unlike the shrimping industry in which processors are more often owned by established Chinese-American businessmen (Marks Field notes 2011). The regional seat of crab processing and distribution is Bayou La Batre, with many small and a few large plants scattered across the Gulf Coast in places like Des Allemands and Slidell, Louisiana, and Biloxi, Mississippi. Smaller crabs and females are cooked and their meat picked in the region's processing plants, while larger male crabs fetch high prices on the live market for boiled crabs in restaurants in Gulf Coast states as well as in the Chesapeake Bay region.

## 2.3.4. Finfish

Finfishing is a diverse sub-sector in the regional fishing industry, constituting about one quarter of the Gulf seafood industry by value, compared to shellfish making up the other 75% (NOAA Fisheries 2012). The industrial fishery for Atlantic menhaden (*Brevoortia tyrannus*) is much larger in landings volume and considerably more lucrative than any other Gulf of Mexico finfishery. Menhaden, also known as pogey, were a nearly $70 million fishery with a huge annual volume of catch, over 1.1 billion pounds in 2009 or more than 2/3rds of the entire Gulf's fishery landings by weight. Louisiana lands about 4/5ths of the menhaden brought ashore from the Gulf, Mississippi almost all of the remainder (NOAA Fisheries 2012). Menhaden are a reduction fishery, ground up and cooked in processing factories and their meal and oils used to produce omega-3 fatty acids, livestock feed, pet food, and cosmetics. The purse-seine harvest technique used to corral and net large schools of menhaden developed over the 20th century to involve large off-shore vessels and smaller net-running launches coordinated by spotter planes (Smith 1991; Davis 2010). Because of the scale of investment involved and the specialized processing and harvesting equipment used, the menhaden industry is vertically integrated: Processors harvest, process, and distribute menhaden products. Menhaden fishermen, unlike almost all commercial fishermen in the Gulf, are wage laborers, part of a workforce of more than 200 employees per menhaden plant during the harvest season (CW464 2011; PP1001 2011). African-Americans, and in recent years Hispanics, are prevalent among these waged menhaden harvesters (Davis 2010; BM591 2011). The contemporary Gulf menhaden industry is highly concentrated, consisting of just two companies with four processing plants along the Gulf Coast, three of them in Louisiana and one in Mississippi (NOAA Fisheries 2011a).

Aside from menhaden, groupers (Serranidae), snappers (Latjanidae), and tunas (Scombridae) are the other principal finfish species caught commercially in the Gulf of Mexico. 5.8 million pounds of all species of grouper worth $14.5 million were landed in 2009, almost all from the West Coast of Florida, making up about 12% of the region's finfish landing revenues that year. Snapper, mainly the red snapper (Lutjanus campechanus) but also several other species, are also mainly a Floridian fishery, with significant catches in Louisiana and Texas as well. Gulf-wide, the snapper harvest totaled 8.6 million pounds worth $21.6 million in 2009. The Gulf of Mexico fishery for yellowfin (Thunnus albacares) and other tuna species, based in Louisiana and Florida, brought to shore 2.8 million pounds of fish worth $8.2 million in 2009 (NOAA Fisheries 2012).

Grouper and red snapper were long harvested in large quantities from the Gulf (Helies and Jamison 2010). Red snapper harvests declined after 1970 and by the mid-1980s, snapper were overfished to the brink of fishery failure, leading to the first cap on total red snapper catch from federal Gulf waters in 1990. Rebuilding the snapper population is projected to take several decades and is complicated by high juvenile snapper bycatch and mortality in shrimp trawls (Baker et al. 1998). A string of federal regulatory measures have been introduced since the early '90s to protect red snapper, and on January 1, 2007 NOAA instituted a reef fish permit and Individual Fishing Quota (IFQ) system, which limits the number of Gulf fishermen who can commercially catch red snapper and caps the amount of fish that can be taken (Baker et al. 1998; Gulf Council 2010, 2012). Grouper, which includes various shallow and deep-water varieties that are fished commercially, is the second important class of fish in the Gulf of Mexico's "reef fish" fishery. Cuban commercial fishermen historically took most of the grouper harvested from the Gulf, although following the exclusion of foreign fleets from U.S. waters in 1976, American vessels, primarily from Florida, make up the contemporary grouper fleet (Schirripa et al. 1999). As with snapper, federal and state grouper regulations were tightened progressively after 1990 following declining landings and overfishing. Grouper were incorporated into the NOAA individual quota system for Gulf reef fish in 2010 (Gulf Council 2012; Schirripa et al. 1999).

The tuna fishery in the Gulf of Mexico typically employs bottom long lines, a hook-and-line technique with a weighted and anchored line sitting in deeper water (Horst and Bankston 1987). Following the discovery of commercially valuable tuna schools in the Gulf in the 1950s, Japanese fishing vessels harvested tuna from the Gulf between 1957 and 1981 before being replaced by U.S. fishermen. Many of the U.S. fishermen initially targeted swordfish and only caught tuna as bycatch. In the mid-1980s, Gulf tuna landings increased dramatically as fishermen began targeting tuna specifically. A new tuna fleet was established in Louisiana, at first augmenting existing effort out of Florida (Wilson 1988) and eventually overtaking it (NOAA Fisheries 2012).

Other finfish harvested from the Gulf include striped mullet (*Mugil cephalus*), sheepshead (*Archosargus probatocephalus*), and black drum (*Pogonias cromis*), fished primarily in the coastal state waters of Louisiana and Texas using strike nets or set lines with multiple baited hooks. In 2009 about five million pounds of black drum were taken from the Gulf, most of that in Louisiana, worth $3.8 million (NOAA Fisheries 2012). There are a few docks and processors that specialize in finfish in the region, from the industrial menhaden concerns to small fish cutting houses. Other dockside dealers who primarily handle shrimp or crabs also buy, clean, and transport finfish as a secondary product line (BR119 2011; BM579a 2011; BM580 2011; BM582 2011).

## 2.4. STATE OF THE COMMERCIAL FISHING INDUSTRY PRIOR TO THE 2010 OIL SPILL

Gulf commercial fisheries generally grew in value, participation, and landings volume from 1945 to 1980. Profit margins in the region's principal fisheries peaked sometime between the late 1970s and mid-'90s, depending on the fishery (Guillory et al. 2001; LDWF 2000; Marks 2012). Declining economic conditions in the commercial fishing industry can be attributed to a number of factors, including rising production costs, downward pressure on prices and shrinking market share due to increasing seafood imports, increased government regulations, and a number of destructive hurricanes, particularly hurricanes Katrina and Rita in 2005 and Gustav and Ike in 2008.

The operating costs for commercial fishing vessels comprise several kinds of expenses, from ice and groceries to repairs and parts, but the largest single expense is usually fuel (Lafleur et al. 2004; Liese et al. 2009). High fuel prices in the 1970s and early 1980s cut into the profit margins of Gulf Coast fishermen (Durrenberger 1992), and the tripling of diesel fuel prices during the 2000s (U.S. Energy Information Agency 2012) did further harm to harvesters' margins. Mounting fishing expenses are one factor in declining shrimping effort in the federal waters of the Gulf (NOAA Fisheries 2009) and falling numbers of commercial fishermen (LDWF 2012) during the 2000s. Table 2.1 displays these trends in one of the Gulf's most important fisheries, the Louisiana shrimp fishery, showing the dramatic decline in shrimp prices and licensed resident commercial shrimpers after 2001 at the same time fuel prices increased. When adjusted for inflation (to the Consumer Price Index, in 2010 dollars), these trends become even more stark, with the price ratio of shrimp to fuel going from 0.72 pounds of shrimp   one gallon of diesel in 1998 to 2.57 pounds in 2008, a more than three-fold decline (Table 2.1).

A fast-growing volume of imported seafood in recent decades has trimmed the prices of Gulf seafood at the same time rising expenses have eaten at the fishing industry's margins. From 1980 to 2000, yearly seafood imports into the United States rose from 973,000 metric tons to 1,804,000 metric tons (USDC 2010). By 2009, imports accounted for 84% of the U.S. seafood market (NOAA Fisheries 2011c). Shrimp is the highest-valued seafood imported to the U.S. (NOAA Fisheries 2011d) and Thailand, Indonesia, and Ecuador are the largest shrimp exporting nations to the United States (NOAA Fisheries 2011c). Imports have been an issue for the Gulf shrimping industry since the 1960s (Becnel 1962) but have become the most serious economic challenge facing the sector in the past decade. Between 2001 and 2009 ex-vessel prices for Gulf shrimp fell, depending on size, between 25% and 50% (NOAA Fisheries 2012; NOAA Fisheries 2011e). Shrimp imports volume grew by nearly 50% from 2000 to 2003 alone, reducing the domestic shrimp industry's U.S. market share from 17.6% to 11.5% (NMFS 2004). Wholesale prices in the New York City market, one of the country's largest, for processed Gulf of Mexico brown shrimp show a generally declining trend from 1998 to 2009 under the price-cutting pressure of imports (Figure 2.1). Spot shortages and high demand on the international market pushed prices up to unsustainable levels in 1999 and 2000, then overproduction, the high value of the dollar, falling costs of shrimp aquaculture and some exporters' restricted access to the European and Japanese markets flooded the U.S. shrimp market after 2001 (Marks 2005). Prices for small peeled Gulf shrimp, such as five-pound boxes of 150/200 frozen shrimp per pound, saw a brief spike in late 2005 and early 2006 after hurricanes Katrina and Rita cut production and led to shortages further down the commodity chain. More important on 2008 prices than the brief impact of hurricanes Gustav and Ike were the extremely high fuel prices that increased prices

across all shrimp sizes in the NYC market. Rising expenses pushed Gulf shrimp prices much higher than their import competition in the national market, leading to price slashing by regional processors in 2009 seeking to regain their market share and move inventory. The economic pain imposed by this price cutting led some shrimpers to go on strike briefly that August season, and to attend a rally at the Louisiana State Capitol demanding an investigation of why Gulf shrimp prices were so low (Ballard 2009; Zullo 2009; Alford 2009).

Table 2.1. Statistics on the Producer Economics of the Louisiana Shrimp Fishery, 1998-2011

|  | Louisiana shrimp landings (thousands of lbs.)[1] | Landings value (millions of $)[1] | Nominal price ($/lb.) | Real price (Adj. to CPI, 2010=100)[2] | Number of licensed LA resident commercial shrimpers[3] | Nominal Gulf Coast #2 diesel price ($/gal.)[4] | Real #2 diesel price (Adj. to CPI, 2010=100)[2] | Real shrimp / diesel price ratio (Adj. to CPI, 2010 = 100) |
|---|---|---|---|---|---|---|---|---|
| 1998 | 112.0 | $159.2 | $1.42 | $1.90 | 8,826 | $1.02 | $1.36 | 0.72 |
| 1999 | 121.0 | $171.5 | $1.42 | $1.86 | 9,336 | $1.08 | $1.42 | 0.76 |
| 2000 | 145.4 | $253.0 | $1.74 | $2.20 | 9,988 | $1.44 | $1.82 | 0.83 |
| 2001 | 124.8 | $188.0 | $1.51 | $1.86 | 9.964 | $1.34 | $1.65 | 0.89 |
| 2002 | 107.8 | $141.2 | $1.31 | $1.59 | 9,558 | $1.28 | $1.54 | 0.97 |
| 2003 | 125.7 | $135.2 | $1.07 | $1.27 | 8,677 | $1.45 | $1.73 | 1.36 |
| 2004 | 133.4 | $138.5 | $1.04 | $1.20 | 7,679 | $1.75 | $2.01 | 1.68 |
| 2005 | 102.6 | $133.1 | $1.30 | $1.45 | 6,694 | $2.36 | $2.62 | 1.81 |
| 2006 | 137.8 | $147.7 | $1.07 | $1.16 | 5,775 | $2.64 | $2.87 | 2.46 |
| 2007 | 110.9 | $139.8 | $1.26 | $1.33 | 5,243 | $2.82 | $2.97 | 2.24 |
| 2008 | 89.3 | $130.6 | $1.46 | $1.48 | 5,101 | $3.76 | $3.80 | 2.57 |
| 2009 | 114.1 | $120.6 | $1.06 | $1.08 | 5,395 | $2.42 | $2.47 | 2.29 |
| 2010 | 75.6 | $107.4 | $1.42 | $1.42 | 5,839 | $2.94 | $2.94 | 2.07 |
| 2011 | 92.1 | $133.1 | $1.44 | $1.40 | 5,837 | $3.77 | $3.63 | 2.59 |

Source:    [1]NOAA Fisheries 2012
[2]Bureau of Labor Statistics 2012
[3]LDWF 2012
[4]U.S. Energy Information Agency 2012

The cost/price squeeze on shrimpers forced many out of the business during the 2000s and imposed severe financial hardships on surviving fishermen, docks, and processors. In 2004, following years of contentious organizing and legal action by Gulf Coast shrimpers and processors, anti-dumping tariffs were imposed on imported shrimp from six countries, raising prices modestly for a time and generating funds that were partially redirected back to the shrimp industry (Marks 2012; BM595 2011; BM619 2011). The tariff's boost to prices notwithstanding, the economics of the Gulf shrimp fishery remained severely stressed by imports and expenses through the rest of the decade. The Gulf blue crab industry has also been negatively impacted by cheaper imported crab meat from countries like Venezuela and Thailand. In 2009, crab was the eighth most valuable seafood imported to the U.S. (NOAA Fisheries 2011c).



Figure 2.1. New York City wholesale Gulf shrimp prices, 1998-2011
        Source: NOAA Fisheries 2011f

Government regulation in the commercial fishing industry has increased substantially in the last three decades. In the 1980s, concern over the incidental bycatch and death of endangered sea turtles in Gulf of Mexico shrimp trawls led to a years-long political battle between shrimpers, environmentalists, and regulators, after which shrimpers working in federal waters were required to use Turtle Excluder Devices (TEDs) in otter trawl nets (Margavio et al. 1996). TED regulations have come under renewed scrutiny by NOAA since the 2010 oil spill after concern about increased numbers of sea turtle deaths (Schleifstein 2012). In the 1990s the Federal Gulf of Mexico Fishery Management Council began requiring shrimpers to also use Bycatch Reduction Devices (BRDs) on their trawls (Samonte-Tan and Griffin 2001) and in 2005 imposed a shrimping permit moratorium in federal waters (Gulf Council 2005).

The oyster industry faces particular regulatory challenges. In the 1980s, concerns over health issues resulting from the consumption of raw oysters led to a U.S. Federal Drug Administration (FDA)-mandated shutdown of the entire Gulf industry in the summer of 1991 (Deseran and Riden 2000; McGuire 2006). In more recent years, mandates for refrigeration on oyster boats to prevent bacteria-related illnesses have affected the industry. In 2009, the FDA set pasteurization and refrigeration standards for the oyster industry that were criticized by Louisiana oyster interests and state government (Kirkham 2009; Alexander-Bloch 2012c). Oystermen and processors who have not made the investments to comply, which would have proven difficult for small operations under any circumstances but especially following the disasters of 2005, 2008, and 2010, do not typically get as many orders as those who have new refrigeration or pasteurization systems (Marks Field notes 2011). Another challenge to the oyster industry is a fluctuating supply of public oysters for sale and bedding onto private leases. In the 1980s, public oyster grounds saw a near-collapse in stocks, but in the early 1990s oyster

populations rapidly recovered. Despite a steady or rising volume of oysters harvested in Louisiana over the 1990s and 2000s, the stock of oysters on Louisiana's public seed grounds fell precipitously again after 2001. By 2009, public oyster stocks approached low levels of the late 1980s (LDWF 2010b).

In the 1990s the commercial fishery in Louisiana for red drum or redfish, a coastal finfish popular among recreational and commercial harvesters alike, was shut down by state regulatory action. Siding with a recreational fishing lobby against commercial harvesters, the state legislature reacted to a spike in redfish harvests by granting redfish permanent "gamefish" status, meaning that the fish henceforth could only be taken recreationally (Fritchey 1993). Some years later the Louisiana legislature adopted the Louisiana Marine Resources Conservation Act, effectively banning the use of gill nets by commercial finfishermen in state waters (Marshall 1996). The redfish and gill net bans greatly shrank the numbers of commercial finfishermen and commercial landings of coastal finfish in Louisiana, although small numbers of commercial fishermen still harvest mullet, black drum, catfish, and other minor species from the estuaries and coastal waters of the Gulf. Gill nets were also banned in Mississippi and in the mid-1990s the state of Alabama restricted the use of gill nets in coastal waters (Duff and Harrison 1997; Coastal Conservation Association 2012).

Two major hurricanes in each of the years 2005 and 2008 did significant damage to the Gulf Coast fishing industry (Alford 2005; Scharnberg 2005; Ratliff 2006; Jervis 2008; Buskey 2008). Estimated damages from hurricanes Katrina and Rita to commercial fishing vessels in Louisiana alone totaled over $153 million, plus $167 million in damages to docks and processors (Caffey et al. 2007). Mississippi commercial fishing losses from Katrina are estimated at over $35 million (Posadas 2008) and $101 million for the state's seafood buyers and processors (Posadas 2007). Along the Gulf Coast, fishermen and some docks facing extremely thin profit margins were either minimally insured or not insured at all. Posadas' (2007) assessment of the impacts of Hurricane Katrina on Mississippi seafood dealers and processors indicates that only about 15% of reported damages to facilities were covered by insurance. Caffey et al. (2007) found in Louisiana only 6% of reported 2005 hurricane damages to dockside dealers and 31% of reported damages to processors were covered by insurance. hurricanes Gustav and Ike in 2008 flooded and foundered many of the same fisheries firms still recovering from Katrina or Rita three years prior, mounting an additional $251 million in estimated damages to commercial fishing in Louisiana (Buskey 2008) and smaller damages in Mississippi (Posadas 2011) and Texas.

Many commercial fishing enterprises could not recover on their own given the scale of damages and their weak financial position before the storms due to their low revenues and under-insured condition. Public assistance to the industry included federal grants following the declaration of Commercial Fishery Resource Disasters and special loan programs through the Small Business Administration (SBA). Katrina and Rita commercial fishery assistance amounted to $238 million Gulf-wide, and was split between new research programs, public and private oyster bed rehabilitation, and direct aid to qualifying fishermen, docks, and processors (Upton 2010). Delays in appropriating the money and setting up a distribution program in the states meant that several years passed before any direct aid reached fishermen, though. In Louisiana, that state's Department of Wildlife and Fisheries did not begin its disaster assistance program for Katrina and Rita until May 2008. The initial distribution of funds was not completed before December of that year, months after two more hurricanes hit the same parishes victimized by the 2005 storms (LDWF 2010a). Another federal commercial fisheries disaster grant after Gustav

41

and Ike sent $47 million to the Gulf states in 2009 (Upton 2010; Louisiana Sea Grant 2009). Post-Katrina SBA loans and Community Development Block Grant (CDBG) small business assistance totaled more than $1.5 billion to all economic sectors, including commercial fisheries (GAO 2010). Federal grants and SBA loans helped many commercial seafood businesses recover from the hurricanes of the 2000s, but some fishermen and fisheries businesses complained the money came too late and came with too many strings attached, like the requirement to have increasingly unaffordable insurance on boats to qualify for SBA loans (Chu 2007; Buskey 2008).

Complicating post-hurricane commercial fisheries recovery was the displacement of fishing community residents. In some cases, post-storm relocation prevented fishers from easily getting home and tending to their damaged equipment or oyster beds. In addition, post-hurricane cleanup and construction contract work offered high hourly wages, attracting many returning residents and slowing the recovery of the commercial fishing industry. Coastal population loss seems to have particularly impacted seafood processing plants, which were not able to find enough workers to get up and running again. A prevalent concern among Louisiana processors and distributors was the loss of "old timer" skilled oyster shuckers who have been particularly difficult to replace (PP548 2010). Federal data indicates the number of seafood processing workers in Alabama, Louisiana, and Mississippi had declined by 25% between 2004 and 2008 (NOAA Fisheries 2011d). While the loss of infrastructure and workers significantly impacted the Gulf fishing industry, some of the region's commercial fishing species were also impacted by the storms, notably oysters, since oyster beds smothered in mud stirred up by the hurricanes required years of replanting to return to full productivity (Johnson 2008).

The major storms of 2005 and 2008 combined with increased expenses, a shrinking market and government regulations have prevented the commercial fishing industry from returning to any semblance of stability or prosperity. The generational and familial continuity in fishing livelihoods and the reciprocal ties among industry firms that once distinguished Gulf Coast commercial fisheries have, in turn, begun to dissolve as the industry shudders from crisis to crisis (Ratliff 2006; Marks 2012; Anderson 2011). Statistics show that employment in fishing-related industries in Alabama and Louisiana dropped by 50% from 2006 to 2009, while Mississippi saw a 25% drop over the same three year period (NOAA Fisheries 2006, 2011e). Those who reinvested and rebuilt to remain afloat through the turbulent 2000s believed 2010 would be a rare chance for recovery and renewal in commercial fisheries: Seafood prices were rising modestly, fuel costs had moderated considerably the year prior, and disaster recovery and tariff monies were helping some businesses to shore up their firms or make new investments. The *Deepwater Horizon* explosion and ensuing oil spill came just as the industry was gearing up for the opening of the 2010 fishing season, what many hoped would be their industry's first good year after a disastrous decade. It was not to be. A Louisiana crab fisherman said in a December 2011 conversation that:

> 2010 was supposed to be our comeback year. We had six [expletive] hurricanes in 10 years, that was rough! First in 2002, then in two in 2005, and then with those two storms in 2008....We was just getting back in 2010. We finally could get some money to get set up again. We had just gotten some money from the 2005 storm around when we got the 2008 storms, and we got some more after those storms so the fishermen could replace their traps, fix their boats, and recover. I invested my money in fixing up this dock, getting my other businesses in good shape. We were just about ready with all that when the spill happened (BM614 2011).

## 2.5. IMMEDIATE OIL SPILL IMPACTS: SUMMER THROUGH FALL OF 2010

The announcement of the *Deepwater Horizon* explosion on April 20, 2010 came at a time when many Gulf Coast commercial fishermen were finishing their preparations for the spring fishing season. Initially, the scale of the disaster was not apparent and the inability of BP to stop the leak was as yet unknown, so in the first days of the spill fishermen watched news reports with growing worry but hopes that the *Horizon* sinking might not disrupt their year. Unlike with hurricanes, most Gulf fishermen had little experience with major oil spills, and initial estimates of the amount of oil pouring from the Gulf floor were much smaller than the reality (Rainey 2010). In the last days of April, however, feelings went from worry to dread as the scale of the federal and state response surged and media attention grew following the failure to seal the well and the escalating estimates of the flow rate. The first contingents of fishermen had been drawn into the rapidly-evolving and chaotic response effort by May 1, hurriedly recruited by local agencies and BP sub-contractors, given safety trainings and briefings, and rushed into action from shore or on their fishing boats, newly-converted to skim oil or lay boom (DeSantis 2010; Warren 2010). By the end of the summer, several thousand commercial fishermen would work on the spill clean-up through the Vessels Of Opportunity (VOO) program, some for months, others for just days, while thousands more would be frustrated at their inability to get hired onto the lucrative program. By early May, out-of-work fishermen could also avail themselves of the economic claims offices BP had opened around the Gulf Coast. This first claims process, which ran until August 23 directly under BP's authority, focused primarily on paying commercial fisheries claimants, and wrote checks up to $5,000 a month based on presented registration documents, seafood sales receipts, and tax records (WDSU 2010; Anderson 2010).

Louisiana's governor declared a state of emergency on April 29, one day before he ordered an extraordinary opening of freshwater diversions from the Mississippi River in an attempt to prevent the influx of oil into coastal marshes (Buskey 2010a). On the 30th, that state's Department of Wildlife and Fisheries issued the first fisheries closure in the Gulf, covering waters east of the Mississippi River (Smith 2010) as surface oil slicks approached that part of Louisiana's shoreline. Federal fishery closures totaling 3% of federal Gulf waters normally open to fishing began on May 2 and would expand to 37% of the area one month later (National Commission 2011a). Fisheries closures would also be declared in all or portions of Mississippi, Alabama, and Florida state waters during the summer of 2010 (MDEQ 2010a; FWC 2010a; Alabama MRD 2010). Federal and state closures fluctuated with the movement of oil, making for constant frustration and confusion among commercial fishermen. Louisiana's May inshore shrimp season was thrown into chaos by the spill as Wildlife and Fisheries opened the season early, before many people's boats were ready, to allow fishermen to catch shrimp before the oil closed down the fishery, then closed it again days later as oil began coming ashore. Many fishermen went to work for BP contractors in the clean-up, others waited out the season and sought payments from BP, and still others tried to go fishing but were frequently moved around by shifting closed areas, fined by fisheries agents if they wandered over the line, thrown into unfamiliar but open waters where they competed with other remaining fishermen for space and catch, and stymied to find open seafood dealers who hadn't shut down for lack of product or willing buyers for Gulf seafood (Houma Courier 2010; McElroy 2010; Marks Field notes 2011). Keeping up with the closures and re-openings was nearly impossible. In Louisiana alone, no less than 55 separate fishing closures, modifications, amendments, re-openings, overturned re-openings, re-closures, and final re-openings were issued between April 29, 2010 and April 26,

2011, most of them between May and August of 2010 (LDWF 2011b). An inshore shrimp fisherman in south Louisiana said that:

> Last year we pretty much lost the May season because of all those closures    they'd open this area, then close that one, and close this again    you'd be dealing with panic, with mis-information, and dis-information, and *NO*-information, so people didn't know what to do (BM617 2011).

Fishermen who tried to keep fishing around the area closures had mixed results, with some doing fairly well, others poorly, and some encountering floating oil even in open areas. Most reported better catches in the latter months of 2010 after the closures had mostly been lifted, although by the time waters were reopened and fishermen were released from the VOO program many did not have the time, or had made enough money from VOO and/or the claims process, to go back fishing before the end of 2010:

> I shrimped last May season even though I had to move often because of the closures. They'd close this and that area and you'd have to move all over, but I found an open area to work in. I caught oil in my skimmers, too. It was too late before I saw this oil out in front of my boat to stop and pull up my nets, so I caught it. It was nasty stuff, thick like peanut butter, and you couldn't wash it out of the nets or shake it out, it would just stick to the nets when you'd shake them so I washed my nets in my wheelwash to get most of it out and then I laid out the nets when I got home and pressure-washed them to get all the oil out (BM481b 2011, Louisiana inshore shrimper).

> The oil spill happened April twenty-first. There was a bunch of worries amongst the fishing community as a whole because we really didn't know what was going to happen, if the oil was going to come here, this and that and there was all this going on where people were getting hired to go work for BP and making really good money. We kinda stuck around for that but then finally - we normally get started around the first of May - but with all this happening, the way they was opening and closing seasons, stuff was real wild. I finally ended up going to work about the end of May. The shrimp supply was real short and the price of shrimp was great. We was getting prices for shrimp that we were getting 10 years ago. And actually I made one trip toward the ends of May and we worked two days in Louisiana when they said they was opening up Mississippi so we run over and worked one day in Mississippi and we come in and we had a very good trip for the short amount of time because we were getting almost two dollars a pound for small shrimp. I was gonna go right back out and then I got called by BP and I did get to go work for them. So, I only got to make one trip that year and after I got laid off toward the end of August, I made about three trips, about three or four weeks I worked (PP443 2011, Mississippi shrimper).

Crabbers were seriously affected by the closures (PP523 2010). Not only were they unable to keep fishing, but crabbers who were unlucky enough to have hundreds of crab traps in the water in an area when it was declared off-limits were prevented from collecting their traps as well as landing any crabs. Some crabbers lost thousands of dollars and, for many crabbers, this was a permanent loss:

I was still crabbing in April 2010 when the spill happened. And they closed all the waters, just like that, so I couldn't get my traps. They wouldn't let you even go and get your traps, retrieve them, so I lost like 300 traps in Dog Lake, over there by the Gulf. They had two guys arrested for trying to get their traps. One guy, they made him throw out all his crabs into the bayou, and the other guy, they actually arrested him out on the water and made him throw out his crabs too - wouldn't let him pick up his traps. Now the judge, he threw the case out, but they still arrested him. So I lost all my traps [permanently] - if you don't go pick up your traps people will come and steal them, the current will move them and you'll lose track of them, or people will cut your lines. So I lost my traps and I haven't been back crabbing since then (BM620 2011, Louisiana crabber).

The closures did not only affect fishermen in the areas directly facing the oil slick. One Vietnamese-American captain of a Gulf shrimp trawler in east Texas explained:

Last year all of Louisiana was closed for a while - we have places we always go to shrimp every year but with the closures, we couldn't always go to those places. Also, because our English isn't so good, we didn't always know where it was closed and where it wasn't so we'd get tickets from the state people in Louisiana. All of us got at least one ticket last year - I myself got three tickets. What happened last year is that all these boats [in Texas] couldn't go east because of the closures, so they just went out trawling a short time before the spill happened and again later in the year when Texas' season opened (BM601a 2011).

The large cluster of Vietnamese-American operated Gulf shrimp trawlers in Intracoastal City, Louisiana faced the conundrum of being too far from the spill to get easy access to VOO work and too close to avoid fisheries closures, as explained by a local fisheries agent:

What happened with the oil spill is at first there was a lot of confusion and fishermen didn't know what was going on, we were out of the center of events here and things with the oil spill happened so fast, we had a lot of trainings here and meetings and such but people were disappointed because they didn't ever get called to the VOO. Boats that happened to be in Houma got to go [work for VOO] while others from Texas said their boats were from Houma or New Orleans and they got in   some people here were upset about that... The closures were real difficult because they'd be issued in Latitude/Longitude terms but the fishermen here know LORAN C, not Lat/Long, plus there were language barriers. Later last year, some boats did get to go shrimping but most didn't go at all because the season is a whole process lasting months. You can't make any money if you only go a short time, it's too expensive to get ready if you can't work that whole time. So some boats did, like, three trips last year instead of the normal six and others didn't go at all (BM598 2011).

A shrimp processor in western Louisiana said the 2010 shrimp season, for those boats that were able to go later in the year, was fair to good:

> Last year we couldn't run the peeling plant at full capacity because we couldn't get enough shrimp; most of the boats didn't work last year because they either worked for BP or else they shut down and got a check from BP. Now those boats that worked last year, they caught some shrimp; especially in the August season we had a lot of shrimp here, and big shrimp too, but there were very few boats to catch them. One guy made $85,000 from BP last year and he made another $80,000 catching shrimp. I don't know if that oil pushed the shrimp into Vermillion Bay or not, there was a lot of shrimp last fall but this year it's not good (BM587a 2011).

The oil leak was eventually stopped on July 15, 2010, and in the weeks and months to follow progressively larger areas of the Gulf of Mexico were reopened to fishing (MDEQ 2010b; FWC 2010b; LDWF 2012; LDWF 2011a; LDWF 2011b; Alabama MRD 2010; Gohlke et al. 2011; NOAA Fisheries 2011b). The huge amount of oil spilled and the volume of chemical dispersants sprayed onto the slick and below the surface raised fears among consumers (and some fishermen) that Gulf seafood would be unsafe to eat after the oil spill. Fishery reopenings and post-reopening testing were undertaken, and are still ongoing, to reassure consumers that Gulf seafood is safe (Gohlke et al. 2011; Buskey 2011). These tests have not found seafood with contamination higher than a "Level Of Concern" (LOC) for human consumption as defined by the FDA and calculated through a complex formula (Dickey 2011). However, the safety standards employed generated their own controversy. Area reopening decisions were based on standard sensory and chemical tests of samples of aquatic life from those respective areas beginning with a much-maligned "smell test" where seafood was looked over and sniffed by trained testers for evidence of petroleum "taint," and followed by chemical analysis for PAHs (Polycyclic Aromatic Hydrocarbons), molecules in crude oil with carcinogenic properties (National Commission 2011b; Juhasz 2011; Dickey 2011). Following criticism from Gulf residents and environmentalists over the lack of testing for dispersant residues in seafood, NOAA and the FDA announced on October 29, 2010 a new test for a chemical component in the dispersants used on the spill and reported that they found no samples above those agencies' LOC (NOAA 2010).

Paralleling the testing and reopening process, federal and state governments, the seafood industry, and BP contributed to a public relations campaign to assure consumers that Gulf seafood was safe to eat. After months of negotiations with Gulf Coast state governments, BP released tens of millions of dollars to fund seafood promotion and quality testing in late 2010 (Seafood.com 2010; National Commission 2011a; Associated Press 2010). The message that Gulf seafood was now the most tested in the world, that all samples had come back below LOCs, that seafood was available and waters were reopened beamed out nationwide through news stories, sponsored sports events and cultural festivals, and BP's TV and radio spots inviting people back to the Gulf Coast.

Such pronouncements that Gulf seafood was safe did little to quiet criticism from some quarters. Critiques of the post-spill fishery reopening process and seafood safety protocols centered on assumptions of the toxicity of the spilled oil and the length of exposure (Rotkin-Ellman et al. 2011), the cancer risk threshold employed [the *Exxon Valdez* assessment used a

one-in-1 million risk threshold; *Deepwater Horizon* one in 100,000, and more recent spills as high a threshold as one in 10,000] (Bolger and Carrington 1999; California Environmental Protection Agency 2007; Dickey 2011), and the amounts and types of seafood eaten by different kinds of consumers (Rotkin-Ellman et al. 2011; NRDC 2010). A 2010 survey (NRDC) found some Gulf Coast communities, especially Vietnamese-American and Native American fishing communities in Mississippi and Louisiana, ate between 3.6 and 12.1 times more shrimp and twice as much oysters and crabs than assumed in the federal risk assessment, based on the 90th percentile of seafood consumers nationally. Children, smaller people and pregnant women would also skew the safety criteria towards lower levels of acceptable contamination (Rotkin-Ellman et al. 2011).

On the Gulf Coast, fieldworkers encountered a range of opinions of the seafood safety question from residents, with many people, especially those with memories of chronic oiling on coastal beaches in prior decades from smaller offshore spills, expressing confidence this oil spill could not have harmed Gulf seafood because oil pollution hadn't in the past (BM630 2012; BM476b 2011) while others vocally advocated their neighbors cease eating local seafood (Buskey 2010d; Marks Field notes 2011).

Commercial fishermen not only overheard this controversy over seafood safety in the media, they directly experienced it through the decisions they made about feeding Gulf seafood to their families and selling it to consumers. The quantity of seafood consumption considered safe per federal guidelines (14 ounces of shrimp and crabs per month, equaling about four individual shrimp per meal - see Ball 2010) is much lower than what is eaten by many Gulf Coast coast residents and became a running joke among residents who ate several pounds of the crustaceans weekly (AG415b 2011). One south Louisiana shrimper reported:

> I'm worried about them saying 'the seafood is safe,' and they're saying 'you can eat four shrimp a week.' People here eat a lot more than that, so how did they come up with this figure that the seafood is safe? How was that calculated because you can make things show that it's safe or unsafe depending on how you figure it (BM617 2011).

Fishermen varied considerably in their seafood consumption practices following the spill, with some proud to report they still ate a portion of their catch and dismissive of any safety concerns, others expressing uncertainty about seafood safety but still eating some, and a number who completely stopped eating the seafood they caught. "Are you eating the seafood?" became a frequent conversation piece around Gulf Coast coffee tables after the oil spill, including in talks with fieldworkers for this project. A Louisiana commercial shrimping deckhand reported his decision to cease eating line-caught and bycatch fish while offshore or bringing any Gulf seafood home to his family came after cleaning abnormal fish on his first two shrimping trips taken since the spill in early 2011:

> Since we started fishing this spring, we've been catching fish to eat on the boat like usual but when we'd cut them open, all the fish were black inside with oil, they even felt oily and greasy inside. When I cut the first one open, I threw it over and didn't think any more about it but after the next one and the next one, they were all like that. They were all black inside on this last trip, too. So on this trip, we got on the radio and all the other boats said they found the same thing. I used to bring seafood home for my kids to eat but

I've stopped doing that. I love my children and I won't feed this to them. We're not eating seafood we catch on the boat any more, either (BM590b 2011).

Another offshore shrimper who captains boats from Texas and Alabama ports was concerned about eating Gulf seafood because of what he observed when he returned briefly to trawling in late 2010. He claimed the texture of the fish and crabs he ate at sea had changed. "The fish used to be firm when you ate it with chopsticks, but now it's very soft, and it has no taste, it's like cardboard. That includes flounders, drum, redfish, yahoo" (BM462a 2011). [4]

Apart from the portion of the harvest they retain for family consumption and gifts to friends and community institutions, most Gulf Coast commercial fishermen sell their catch wholesale to docks or processors. Among small-scale fishermen like inshore shrimpers operating small boats, informal retailing to local consumers is a traditional outlet for part of their catch and an increasingly important business in the past decade of economic crisis because directly-marketed seafood gets a higher price than at the dock (Marks 2012). These direct marketing fishermen encountered skepticism over seafood safety from their customers and lower sales volume after the spill. One Louisiana inshore shrimper and crabber said in late 2011:

> BM619: I'm still eating the shrimp. I don't know about you and how you feel about that, but me and my family, we never stopped, we're still eating the seafood. Now, I wouldn't eat shrimp that's from some area that I didn't feel okay about, somewhere there was oil, but I'm eating shrimp from areas on the inside [of the Gulf shoreline] here. But I've got people who won't buy [my] shrimp now, they're scared to eat them still.

> Researcher: You mean you sell retail to people, local people here and they're not buying anymore from you?

> BM619: Yeah, people right around here. I don't sell too far away, just to people in the area, and they're not buying from me anymore since the spill. They don't trust that it's safe. You have all this coming from the state and the federal government, saying 'the seafood is safe, come and eat our seafood,' and they're testing, but it's LSU doing it and where's LSU's money coming from? It's from BP, so do you think they're going to bite the hand that feeds them? Nah, they're not, so what can you do with that (BM619 2011)?

Three other inshore Louisiana shrimpers, one from southwest Louisiana (BM478 2011) and two from the southeast (BM481a 2011; BM481b 2011) faced challenges retailing seafood after the spill:

> Last year I found my retail customers were scared to buy shrimp   they'd still buy, but you'd have to tell them it was tested safe, that I eat it, so that was a difficulty. And the closures around here last year were a problem, we had to work around them but it wasn't bad like further east   we also had more boats working here because they couldn't work further east and they came here to shrimp (BM478 2011).

---

4 This study was not designed to measure the nature and extent of effects on the seafood. Fisheries scientists were continuing to investigate these effects as this study concluded, with some studies reporting higher rates of health problems among offshore Gulf finfish in the spill zone than in the Gulf overall, including gross symptoms akin to those mentioned by BM462a and BM590b (see Pittman 2012a, 2012b).

I lost money on shrimp last year. I only went out for the August season - they'd close and open different areas all the time during the May season. I got hired on with BP out of Cocodrie instead for the May season, I worked for them for three months laying and changing booms. Then I shrimped like normal for the August season; I did alright. I retail what shrimp I can but since last summer - since the last half of 2010 - the people I sell to in Houma don't want to buy shrimp, they're scared because of the oil. So I've had to sell it to the docks even though the prices are bad. They were up early in 2010 because they thought there wouldn't be any shrimp, but in August when fishermen went back out the price was way, way down (BM481a 2011).

I normally sell all my good [large] shrimp retail. I have customers all around, some are in Vacherie, that I sell to. But I haven't yet sold my first box of shrimp retail this year, just a few ice chests here and there. Retailing has been down ever since the oil spill. Last week I sold 98% of my shrimp to the dock because my telephone just isn't ringing anymore (BM481b 2011).

A part-time commercial fishing deckhand in Plaquemines Parish reported being paid for deckhand work with shrimp, oysters, and crabs before the spill, but since the spill had stopped eating local seafood out of fears for its safety (BR026 2011). "I'm used to having seafood in the freezer all the time ... I haven't bought crabs or shrimp since the spill, and I kind of want to try it, but I'm afraid to 'cause of the oil" (BR026 2011). A shrimper's wife on Grand Isle, Louisiana said her family's seafood consumption practices changed since the spill:

We used to eat shrimp at least twice a week, but now we don't have any seafood at all. And that might be good - I mean, should we really be eating the seafood? ... For one thing, I know how much seafood we normally eat and I know it's way more than the average diet. And anyway, it's one thing if my husband and I want to eat it and deal with the health consequences, because we're older, but should we let our kids eat it? I think there's more chemicals than they're telling us and it's one thing for me to be so at risk, but I really worry about our daughter. About all the kids (BR053b 2011).

The end of the oil leak and reopening closed areas to fishing began a slow transition back to the water for many commercial fishermen in late 2010. Charter fishing captains, who hire out their boats and guide tourists to recreational fishing, typically had boats well-suited for many cleanup operations. Charters also had existing relationships with many of the local marinas where cleanup operations were staged. As a result, charter captains were more consistently able to secure cleanup contract work and they were typically asked to stay on as cleanup sub-contractors longer than commercial fishermen. Also, in contrast to the benefits that accrued to recreational marinas that served as hubs of cleanup deployment along the Gulf, commercial fishing marinas and seafood wholesale docks saw fewer benefits from the 2010 cleanup, sometimes selling fuel or ice to contractors and possibly leasing the use of their facilities on limited terms. On the other hand, charter boat captains were less able to access compensation through the claims process as they were generally treated as tourist businesses, not commercial fishermen.

The VOO program rapidly wound down along with the rest of the clean-up effort. While some 3,500 VOO boats were in action at some point during the summer of 2010, only 1,000 remained by November (Robertson and Rudolf 2010). The BP claims process transitioned to the Gulf Coast Claims Facility (GCCF) on August 23, but leftover issues from the clean-up and new ones related to claims slowed down some fishermen from going back to work. Fishermen who worked for VOO for a significant amount of time built up a financial reserve they used to maintain their vessels, do repairs, or pay down debts, helping some return to fishing while others took the rest of 2010 off. For example, some Vietnamese-Americans who returned later than normal to Vietnam in late 2010 and stayed there longer than their usual off-season journeys, waiting to see how, or if, the Gulf's fisheries recovered (BM543 2011). Most fishermen did not get big payments from VOO. Of those that worked for the program, some claimed unpaid damages to their boats incurred while working for VOO, insufficient or slow decontamination of oil from their vessels, and overdue payment for days waiting on stand-by. Angry public meetings and lawsuits against BP and its sub-contractors followed in the wake of VOO (Ferrara 2010; Kirby 2010; Ferrara 2011). Claims money kept flowing into commercial fisheries after the switchover to GCCF, but many fishermen and seafood processors contacted for this study reported having their claims denied or being offered only a small fraction of their actual damages (Marks Field notes 2011). Others in the seafood industry complained of too much claims money. Seafood buyers and processors complained money from the claims process was keeping fishermen from going back to work, while fishermen expressed confusion if returning to fishing would help or harm their claims. Some reported going back to work out of necessity or an inclination to return to their profession while others waited to see the progress of their claims and the recovery of fisheries landings (Rodriguez 2010; Satchfield 2010).

Oystermen faced a particularly serious challenge to near-term recovery because torrents of fresh water pouring from Mississippi River diversions had killed huge numbers of the sessile creatures, especially east of the river in Louisiana and Mississippi (Buskey 2010a). Oysters on private leases, typically closer to fresh water sources than the public beds, suffered especially. In August 2010, 86% of private bed oysters and 56% on public seed grounds in Louisiana's eastern Breton Sound were dead (Banks 2011). When oyster harvesting from Louisiana and Mississippi public beds reopened in November, 2010, there was very little product to harvest (Buskey 2010b, 2010c). Mississippi authorities restricted the harvest to hand tonging only and to 10 sacks per day per vessel (Dow 2010; BM424 2011).

Christmas 2010 saw many Gulf Coast commercial fishermen seeking public assistance and charity, despite the assistance some were getting (and others were denied) through the claims process (Skoloff 2010). The foreshortened 2010 fishing season was marked by a poor volume of landings, but an overall value nearly equal to the year before the spill (Table 2.2). The smaller amount of seafood sold in 2010 for higher per-unit prices was due, in part, to supply shortages driving up prices on some products and, in part, to a trend towards higher seafood prices than 2009 already evident before the spill (Figure 2.1). Importantly, the location and value of seafood landings shifted with the oil spill; Texas and Florida had fewer area closures and saw greater total landings value in 2010, while Louisiana, Mississippi and Alabama experienced a loss in volume and value.

Shrimp landings fell Gulf-wide by more than 20% in 2010 - by more than half in Mississippi and Alabama (Table 2.3). Unit prices rose over the nadir of 2009 but the smaller catch meant shrimpers earned less than even in the previous year of rock-bottom prices. A third less blue crab was landed in 2010, earning a significantly higher price per pound but still paying crabbers in the

50

spill states of Louisiana, Mississippi, and Alabama about a third less in all. Oysters were hit hard in Louisiana and Mississippi, with Louisiana oystermen seeing less than half the production and value they earned in 2009, Mississippi about 1/3 less. Texas producers almost doubled oyster production, only partially compensating for the severe loss of supply to the Gulf oyster industry following the spill and freshwater damage in 2010.

Table 2.2. Overall Gulf of Mexico Commercial Fishery Landings by State, 2009-2011. At left: Weight of Landings (thousands of pounds). Center: Value of Landings (Millions of $). Right: Average Price ($/lb.)

| Overall landings | 2009 | 2010 | 2011 |
|---|---|---|---|
| Gulf-wide | 1,599,505 / $643.9 / $0.40 | 1,285,614 / $639.4 / $0.50 | 1,765,899 / $818.0 / $0.46 |
| Texas | 102,695 / $155.1 / $1.51 | 90,054 / $204.5 / $2.27 | 98,111 / $239.1 / $2.44 |
| Louisiana | 1,172,327 / $296.8 / $0.25 | 1,007,066 / $247.8 / $0.25 | 1,285,875 / $333.6 / $0.26 |
| Mississippi | 230,307 / $38.0 / $0.17 | 111,242 / $21.9 / $0.20 | 278,080 / $30.3 / $0.11 |
| Alabama | 28,825 / 38.9 / $1.35 | 14,661 / $27.7 / $1.89 | 26,145 / $50.9 / $1.95 |
| Gulf Coast Florida | 65,350 / $115.1 / $1.76 | 62,592 / $137.5 / $2.20 | 77,687 / $164.1 / $2.11 |

Source: NOAA Fisheries 2012.

Table 2.3. Overall Gulf of Mexico Commercial Shellfish Landings by State, 2009-11. At left: Weight of Landings (thousands of pounds). Center: Value of Landings (Millions of $). Right: Average Price ($/lb.)

| Shellfish | 2009 | 2010 | 2011 |
|---|---|---|---|
| Shrimp (all species) | | | |
| Gulf-wide | 251,290 / $327.2 / $1.30 | 178,853 / $339.8 / $1.90 | 219,961 / $438.5 / $1.99 |
| Texas | 92,943 / $135.6 / $1.46 | 77,064 / $174.2 / $2.26 | 87,006 / $214.9 / $2.47 |
| Louisiana | 114,727 / $121.5 / $1.06 | 75,641 / $107.4 / $1.42 | 92,093 / $133.1 / $1.44 |
| Mississippi | 10,107 / $12.7 / $1.26 | 4,148 / $8.3 / $2.00 | 10,053 / $18.5 / $1.84 |
| Alabama | 22,841 / $34.1 / $1.49 | 10,175 / $23.8 / $2.34 | 19,247 / $44.4 / $2.31 |
| Gulf Coast Florida | 10,673 / $23.3 / $2.18 | 11,825 / $26.1 / $2.20 | 11,562 / $27.6 / $2.38 |
| Blue crab | | | |
| Gulf-wide | 61,272 / $45.5 / $0.74 | 41,219 / $41.2 / $1.00 | 55,571 / $48.8 / $0.88 |
| Texas | 2,844 / $2.5 / $0.86 | 3,436 / $3.1 / $0.91 | 2,893 / $2.8 / $0.98 |
| Louisiana | 53,060 / $37.3 / $0.70 | 30,731 / $30.3 / $0.99 | 43,862 / $36.8 / $0.84 |
| Mississippi | 545 / $0.6 / $1.05 | 366 / $0.4 / $1.00 | 370 / $0.3 / $0.86 |
| Alabama | 1,459 / $1.0 / $0.66 | 927 / $0.7 / $0.79 | 1,614 / $1.1 / $0.70 |
| Gulf Coast Florida | 3,364 / $4.2 / $1.24 | 5,759 / $6.7 / $1.16 | 6,833 / $7.7 / $1.13 |
| Oysters | | | |
| Gulf-wide | 22,835 / $73.5 / $3.22 | 15,877 / $55.1 / $3.47 | 18,386 / $64.2 / $3.49 |
| Texas | 2,733 / $9.4 / $3.43 | 5,265 / $19.1 / $3.64 | 3,943 / $12.8 / $3.24 |

| Shellfish | 2009 | 2010 | 2011 |
|---|---|---|---|
| Louisiana | 15,010 / $50.6 / $3.39 | 6,874 / $25.0 / $3.63 | 11,135 / $41.6 / $3.73 |
| Mississippi | 2,192 / $6.1 / $2.78 | 1,453 / $4.3 / $2.94 | 247 / $0.9 / $3.75 |
| Alabama | 23 / $0.1 / $3.33 | 120 / $0.4 / $3.25 | 313 / $1.3 / $4.22 |
| Gulf Coast Florida | 2,877 / $7.0 / $2.42 | 2,165 / $6.3 / $2.91 | 2,746 / $7.6 / $2.77 |

Source: NOAA Fisheries 2012

Grouper and snapper landings, centered on Florida far from the spill's center, fell less steeply than some other fisheries in 2010 (Table 2.4), as did the menhaden fishery, many of whose vessels were able to relocate temporarily to western Louisiana during the summer to escape closed waters (NOAA Fisheries 2011a). Black drum landings fell slightly in 2010, the decline coming from Louisiana and Alabama waters. Tuna, a fishery whose harvesting waters in the Central Gulf overlapped with some of the longest fishery closures near the *Deepwater Horizon* site, experienced a very dramatic decline in 2010, losing more than half its landings and unlike almost any other fishery, also saw a decline in price by almost 1/3 for its catch, as the species composition of the remaining tuna harvested from the Gulf shifted from more expensive yellowfin to cheaper little tunny (NOAA Fisheries 2012).

Table 2.4. Overall Gulf of Mexico Commercial Finfish Landings by State, 2009-11 . At left: Weight of Landings (thousands of pounds). Center: Value of Landings (Millions of $). Right: Average Price ($/lb.)

| Finfish | 2009 | 2010 | 2011 |
|---|---|---|---|
| Tuna (all species) | | | |
| Gulf-wide | 2,836 / $8.2 / $2.88 | 1,322 / $2.7 / $2.03 | 1,588 / $5.5 / $3.47 |
| Texas | 45 / $0.1 / $3.08 | 1 / $0.0 / $3.19 | 1 / $0.0 / $1.82 |
| Louisiana | 2,009 / $6.4 / $3.16 | 490 / $1.6 / $3.37 | 932 / $3.4 / $3.62 |
| Mississippi | 0 / 0 / 0 | 0 / 0 / 0 | 0 / 0 / 0 |
| Alabama | 17 / $0.0 / $0.48 | 6 / $0.0 / $0.62 | 13 / $0.0 / $0.44 |
| Gulf Coast Florida | 765 / $1.7 / $2.21 | 825 / $1.0 / $1.25 | 642 / $2.1 / $3.33 |
| Grouper (all species) | | | |
| Gulf-wide | 5,785 / $14.5 / $2.50 | 4,286 / $11.5 / $2.68 | 6,614 / $18.2 / $2.76 |
| Texas | 208 / $0.6 / $3.07 | 139 / $0.3 / $2.48 | 189 / $0.5 / $2.89 |
| Louisiana | 150 / $0.4 / $2.73 | 109 / $0.3 / $2.69 | 183 / $0.5 / $2.68 |
| Mississippi | 0 / 0 / 0 | 0 / 0 / 0 | 0 / 0 / 0 |
| Alabama | 20 / $0.0 / $2.77 | 1 / $0.0 / $2.88 | 2 / $0.0 / $2.63 |
| Gulf Coast Florida | 5,406 / $13.4 / $2.47 | 4,036 / $10.8 / $2.68 | 6,240 / $17.2 / $2.75 |
| Snapper (all species) | | | |
| Gulf-wide | 8,633 / $21.6 / $2.50 | 7,277 / $20.1 / $2.76 | 8,930 / $25.6 / $2.87 |

| Finfish | 2009 | 2010 | 2011 |
|---|---|---|---|
| Texas | 1,429 / $3.7 / $2.58 | 1,579 / $4.4 / $2.77 | 1,424 / $4.6 / $3.20 |
| Louisiana | 1,126 / $3.1 / $2.72 | 1,106 / $2.7 / $2.67 | 1,199 / $2.9 / $2.39 |
| Mississippi | 59 / $0.2 / $2.74 | 0.4 / $0.0 / $1.78 | 88 / $0.2 / $1.96 |
| Alabama | 415 / $1.1 / $2.68 | 232 / $0.7 / $3.08 | 300 / $0.9 / $3.10 |
| Gulf Coast Florida | 5,605 / $13.6 / $2.42 | 4,449 / $12.3 / $2.77 | 5,918 / $17.1 / $2.89 |
| Menhaden | | | |
| Gulf-wide | 1,165,948 / $69.5 / $0.06 | 967,025 / $66.0 / $0.07 | 1,374,298 / $103.5 / $0.08 |
| Texas | 0 / 0 / 0 | 0 / 0 / 0 | 0 / 0 / 0 |
| Louisiana | 948,944 / $51.4 / $0.05 | 862,114 / $57.6 / $0.07 | 1,106,931 / $93.5 / $0.08 |
| Mississippi | 216,709 / $18.0 / $0.08 | 104,729 / $8.4 / $0.08 | 266,774 / $9.9 / $0.04 |
| Alabama | 190 / $0.0 / $0.22 | 81 / $0.0 / $0.18 | 364 / $0.1 / $0.16 |
| Gulf Coast Florida | 106 / $0.0 / $0.20 | 70 / $0.0 / $0.37 | 230 / $0.0 / $0.20 |
| Black drum | | | |
| Gulf-wide | 4,971 / $3.8 / $0.77 | 4,585 / $3.9 / $0.86 | 5,297 / $4.0 / $0.76 |
| Texas | 1,610 / $1.4 / $0.86 | 1,729 / $1.6 / $0.91 | 1,795 / $1.4 / $0.81 |
| Louisiana | 3,176 / $2.4 / $0.76 | 2,794 / $2.3 / $0.83 | 3,385 / $2.5 / $0.75 |
| Mississippi | 10 / $0.0 / $0.30 | 11 / $0.0 / $0.36 | 9 / $0.0 / $0.31 |
| Alabama | 162 / $0.0 / $0.18 | 35 / $0.0 / $0.36 | 98 / $0.0 / $0.25 |
| Gulf Coast Florida | 14 / $0.0 / $0.53 | 15 / $0.0 / $0.62 | 9/ $0.0 / $0.66 |

Source: NOAA Fisheries 2012

## 2.6. ONGOING IMPACTS: THE 2011 FISHING SEASON

The 2011 fishery season saw varying levels of recovery in commercial fisheries landings and revenues, with considerable differences in the pace of recovery dependent on species and area of harvest. In 2011, total Gulf seafood landings volume and value increased compared to 2010. For most species in most states, landings and income increased over the prior year, while price per pound declined overall and in many specific fisheries as spill-related shortages and panic buying receded (Table 2.2).

Depending on the geographic area, range of species, and time scales considered, different Gulf of Mexico fisheries can be viewed as recovering, holding on, or declining further in 2011. For the Gulf as a whole, oyster landings in 2011 were higher than 2010 but not recovered to their 2009 pre-spill level (Table 2.3). While oyster landings from east Texas to western Florida were higher than in 2010, the 2011 catch was still considerably lower than the three year average before the oil spill. 2011 oyster landings were 38% less than the 2007-09 average (Hammer

2012). Zooming in still further, the 2011 oyster harvest in eastern Louisiana's Pontchartrain basin was just 35% of its four-year (2006-09) pre-spill average, an already low baseline given damage from the 2005 hurricanes (Waltzer 2012).

Gulf shrimp landings in 2011 were higher overall compared to 2010 (Table 2.3), but they have not regained the long-term norm seen in the 2000s. Across the Northern Gulf from east Texas to western Florida, shrimp landings volume was higher in 2011 than 2010 and total shrimp value was 11% higher in 2011 than the 2007-09 average (Hammer 2012). Louisiana's 92.1 million pound shrimp harvest in 2011 was smaller than every year since 1998, save the spill year of 2010 and 2008, when many shrimpers stayed at the dock because of extremely high fuel prices and hurricanes Gustav and Ike disrupted the season (Table 2.1). Louisiana's 2011 shrimp landings volume was 77% of its 2006-09 average (Waltzer 2012).

Shrimp landings recovery significantly differed according to place and also to species, with brown shrimp recovering better than white shrimp. Before the start of the 2011 May shrimp season, shipyards were reportedly doing record amounts of repair work on shrimp boats as many captains reinvested their VOO and claims earnings into the vessels (BM495a 2011). While brown shrimp were numerous in the spring, so numerous they led one processor to "throw in the towel" and temporarily stop buying more than the factory could peel (BM509 2011), white shrimp landings were disappointing in 2011 (Alexander-Bloch 2012b). At least 37.7 million pounds of brown shrimp were landed in Louisiana in 2011, more than double 2010's harvest and more than any year since 2007 (Alexander-Bloch 2012a). By contrast, less white shrimp were harvested in Louisiana 2011 than in 2010, with the 2011 statewide white shrimp harvest about 2/3rds of the 2006-09 average (Waltzer 2012).

Some highly productive Gulf coast shrimping grounds saw landings decline in 2011 compared to 2010. The 2011 white shrimp harvest from the central Louisiana coast's Atchafalaya and Terrebonne basins was nominal at 97% and 93% of their 2006-09 average. By contrast, declines in 2011 shrimp landings were pronounced in southeast Louisiana's Pontchartrain and Barataria basins bordering Saint Bernard, Plaquemines, and Jefferson parishes where the white shrimp catch was, respectively, just 57% and 61% of the four year pre-spill average (Waltzer 2012). Some of this discrepancy by species and location may be due to the Mississippi River flood of Spring 2011, when huge amounts of fresh water entered Gulf waters around the river's mouth. As these same areas were also the most proximate coasts to the *Deepwater Horizon* and experienced significant oil landfalls onto beaches and marshes, the role of the oil spill versus other factors in the size of the 2011 shrimp harvest is hard to discern (Alexander-Bloch 2012a; 2012b).

In 2011, prices for large Gulf shrimp rose dramatically in the New York wholesale market, reflecting poor catches of large shrimp reported by fishermen and docks. For medium and small size shrimp, wholesale prices fell after the opening of the May inshore season, for some very small shrimp to levels approaching the worst years of the 2000s (Figure 2.1). Meanwhile, diesel prices in 2011 averaged just under the record amounts seen in 2008 (Table 2.1). In terms of competitiveness, large Gulf shrimp became more expensive relative to their imported competition in 2011, nearing the highs observed in 2010 when closures and panic buying pushed up domestic prices relative to imports (Figure 2.2). For more plentiful medium count shrimp, Gulf product approached price parity with imports in 2011, much closer to meeting import competition than during almost any period since the late 1990s with the exception of the drastic price slashing of 2009 (Figure 2.3).

Numerous shrimpers and crabbers contacted for this study reported poor catches in 2011; crabbers in the early and middle part of the year, shrimpers especially during the white shrimp season in the last months of 2011. Competition reportedly increased significantly in the crabbing industry in 2011 as more crabbers bought boats and traps with oil spill claims and clean-up earnings (Marks Field notes 2011). May 2011 blue crab landings in Louisiana's Terrebonne basin were about ½ their May 2010 total, despite the lifting of all area closures that affected the fishery just after the spill (DeSantis 2011d). Through early and mid-2011, numerous crabbers and crab buyers in eastern and central Louisiana reported poor catches and landed crabs dying prematurely (DeSantis 2011c; DeSantis 2011d). 2011 Louisiana blue crab landings were 11% below the average harvest in 2006-09, 26% below the norm in the Terrebonne basin, 29% less in the Pontchartrain basin (Waltzer 2012). Into early 2012, crabbers continued reporting low catch volumes in this part of Louisiana (Bayles 2012).



Figure 2.2. Price ratios of 41/50 Gulf Brown and imported shrimp in the New York City wholesale
market, 1998-2011
Source: NOAA Fisheries 2011f



Figure 2.3. Price ratios of 21/25 Gulf Brown and imported shrimp in the New York City wholesale market, 1998-2011
Source: NOAA Fisheries 2011f

Crab processors and buyers reported seeing generally better landings than they'd seen in 2010, but were still off from their expected volume of catch across Louisiana, Mississippi, and Alabama (PP936 2011; PP953 2011; BM578 2011). NOAA Fisheries data showed the total value of 2011 blue crab landings from east Texas to western Florida was 2% higher than the three year pre-spill average, finfish landings total value still 13% lower (Hammer 2012). Gulf-wide in 2011, blue crab landings rebounded from 2010's poor landings but still fell behind their 2009 total (Table 2.3). For the entire Gulf of Mexico, the recovery of finfish landings in 2011 differed significantly depending on the fishery. Tuna landings only recovered modestly in 2011, still far below 2009's catch volume, while grouper, snapper, menhaden, and black drum landings were all higher than 2009 (Table 2.4).

## 2.7 COMMERCIAL FISHERIES IN THE CLAIMS PROCESS

Addressing the multiple claims processes resulting from the BP oil spill could easily make up an entire volume (see this Volume, Chapter Seven, for a more general treatment on the subject). The enormous number of critical and positive comments fieldworkers heard on the Gulf Coast Claims Facility (GCCF) and its Administrator Ken Feinberg, both in private conversations and at the always raucous public gatherings featuring Mr. Feinberg in early 2011, can likewise hardly be summarized here (Marks Field notes 2010, 2011). The statistical and ethnographic data that follows is provided to sketch out some of the range of experiences reported by study participants with the claims process in 2010 and 2011 and contextualize the seafood industry's claims and payments with numbers for the claims process overall.

The GCCF sought to compensate claimants with proven damages resulting from the BP oil spill, under the guidelines set out in OPA 90. Feinberg acted with considerable discretion in how those guidelines were enacted, helping fuel a myriad of criticisms of the GCCF's

procedures (Mullenix 2011). Initially, the GCCF paid commercial fishermen Six-Month Emergency Advance Payments (EAPs). The GCCF paid 17,572 individual and business commercial fishing claimants just over $500 million by December 14, 2010, when the application period for EAPs ended and final payments first became available (GCCF 2012). An additional 5,596 seafood processing and distribution claimants, both individuals and businesses, were paid $139.5 million during this period, for a seafood industry total of 23,168 paid claimants receiving $639.5 million in emergency payments. Seafood industry claimants represented 13.9% of all paid EAP claimants on December 14, 2010 and 25.9% of the total amount paid in EAPs by that date (GCCF 2012).

From December 15, 2010 through March 14, 2012, the last date consulted for this analysis, the GCCF paid an additional 12,988 payments to commercial fishing claimants totaling $244.4 million, for an average payment of $18,814 per claimant, down from the average commercial fisheries EAP payment of $28,469. During the same period, GCCF paid an additional 5,407 seafood processing and distribution claimants $216.3 million for an average payment of $40,005, up from the average seafood processor EAP payment of $24,394 (GCCF 2012). Overall, on March 14, 2012 paid commercial fisheries claimants represented 7.6% of all paid GCCF claimants and 12.7% of the total amount paid by GCCF, while seafood processing and distribution claimants represented 2.8% of all claimants and 6.1% of total payments, for a seafood industry total of 10.4% of all GCCF claimants and 18.8% of all payments from the facility (GCCF 2012).

Study participants' experiences with the claims process varied considerably, with some praising their experience with the GCCF and others strongly denouncing their payment, or lack of payment, from the facility. One Gulf shrimp trawler captain from Texas explained in April 2011 that he had lost about half his normal income of $80-90,000/year even after participating in the VOO program and collecting BP and GCCF claims money (BM462a 2011). After cleaning oil for which he earned $200 / day, totaling $14,000, the VOO kept booms on his boat for 90 days for which he wasn't paid. BP's claims process paid him $32,000 for four months, and GCCF paid him a $20,000 six-month emergency payment. After taxes, he reported a take-home income of about $45,000 for 2010. He also explained that because he was paid cash under the table for part of his normal captain's wages, his 1099 tax forms underreported his income and shrank his compensation (BM462a 2011).

A south Louisiana crabber, described how a simple error reporting his claim and the loss of his fishing gear caused him to lose one claims payment and accept a smaller amount on another out of frustration:

> You see, I couldn't collect on my lost traps. My CPA, he messed me up. He used my Social Security number, not my [IT]IN number, on my BP [GCCF] claim, and the regulations say you can only pay one claim per social security number, but not on one IN number, so I had to only file for my crab trap business, not on my crabbing. That's all from filing on the wrong number. And I took the quick payment, [$25,000] on my business, because I got tired of all that. They wouldn't pay me on my crabbing because they said, 'hey, you didn't have a loss in 2010,' but that's because I lost all my traps! I lost my traps, so how could I go crabbing? I didn't show a loss of income because I had no more crab income, I was at $0, so they said 'you gave up, you quit.' But I didn't have crab traps to keep crabbing. That's stupid, you know! So I got tired of all that and took [the quick final payment] (BM620 2011).

A Louisiana tax preparer and seafood dock worker explained how she helped 25 local fishermen filed GCCF emergency claims (BM479a 2011). While 20 of them were paid amounts close to their reported losses, another five were paid only a small fraction of what she and they expected, as little as $4,200 on a claimed $100,000 loss. She could not understand these differences because the claimants had equivalent documentation, similar business conditions and income, and worked with the same claims preparer (BM479a 2011).

## 2.8 OIL SPILL AND CLAIMS PROCESS EFFECTS ON COMMERCIAL SEAFOOD PROCESSORS AND DOCKS

Fishermen faced particular issues in returning to normal after the oil spill, as did commercial docks and processors. In summer 2010, seafood landing docks located in harbors taken over by spill clean-up activities had to shut down, and many others outside those areas stopped operations because the fishermen who normally sold to them ceased fishing because of area closures, getting work in the VOO program, and being paid BP claims money. Most docks were themselves paid money through the initial claims process, so that only a few unloading docks remained open through the summer (Marks Field notes 2011). Processors, in the first weeks of the disaster, had wholesalers "panic buy" much of their leftover 2009 inventory out of fears no more Gulf seafood would be available for the foreseeable future. Many seafood processing workers lost their jobs as the majority of Gulf Coast processors shut down or ran at a fraction of their capacity in 2010 Some workers moved out of the region which later posed serious labor recruitment problems for processors in 2011 (PP548 2010; PP1011 2010; PP937 2011). Processors who owned or effectively controlled fishing boats debated whether or not to participate in VOO, with some releasing their fishermen to try joining the program and others having no choice as their hired fishermen quit to seek employment in the clean-up (PP756 2011; PP799 2011). The remaining processors in production in 2010 scrambled to accumulate enough raw material to work in their plants, often from unfamiliar sellers and from areas they hadn't bought from before.

From late 2010 through 2011, more and more docks and processors came back online to face a seafood market that looked deceptively normal but proved to be markedly changed. With fewer commercial fishermen back at work, fisheries like oysters (Alexander-Bloch 2012c; Pham-Bui 2010), white shrimp (Alexander-Bloch 2012a, 2012b), and blue crabs on the central Louisiana coast saw lower landings than the norm (DeSantis 2011c, 2011d; Hammer 2012) and, as 2011 progressed, ever-higher fuel prices. Some seafood buyers continued struggling to get enough product to meet their customers' demand. Shrimp prices, while still higher than the disastrous levels seen in 2009, could not go down further without destroying the thin margins harvesters gained after paying their high operating costs. This price floor meant Gulf shrimp, especially larger sizes, remained uncompetitive with the imported competition (NOAA Fisheries 2011f; Figure 2.2, 2.3).

A tuna and shrimp processor in Louisiana explained his company's situation in April, 2011:

The tuna boats haven't gone out even once since April 20 last year, we haven't unloaded one tuna since then. Almost all the tuna boats went out on the VOO and they made good money, so they're not working in part for that reason. A lot of the tuna fishermen made money on VOO and they went back to Vietnam early and they haven't come back to the U.S. yet. So there might be fish to catch but we don't know if there will be anybody to go catch them this year.

For shrimp, our factory did about 1 million lbs. less finished product last year compared to prior years, about 51% less volume and 67% less income compared to the year before. Right now this factory only has 40,000 lbs. of white shrimp inventory left over from last year, this time of year we should have more like 400,000 lbs. of inventory but people didn't shrimp as much last year. I don't know yet if the boats will go out or not, among the shrimpers some went out with VOO and they made big money, but those that didn't get on VOO and waited but didn't shrimp either, they lost a lot. They were already falling behind on those big boats with high fuel prices, low shrimp prices and storms, so some without VOO money have sold their boats, gone out of business, while some with VOO money have reinvested in their boats, they didn't waste their money on frivolous things and they got ahead on their bills and their debts on their boat. This is all happening since last year and the spill.

With the GCCF, this company got about 14-16% of its claim paid by GCCF, that's typical of seafood processors and I know of some processors who've gotten as little as 8% of their claim. GCCF said they'd make the processors whole so that they'd in turn be able to make their employees whole that way every employee wouldn't be filing individual claims and clogging up the system. But GCCF didn't pay processors much, they told this company it made more in May 2010 than in May 2009 but that was due to panic buying of shrimp inventory so now everybody is filing individual claims and that's clogged the system further.

Initially buyers were just not buying Gulf seafood of any kind they were even saying "we don't serve Gulf products." Now it's gradually changing, they're coming back, but we only had an 8% market share (domestic shrimp) to begin with. We also don't know yet if we'll have enough product to sell this year and if we do (if it's a good year), if anyone will buy it, which means we'll have to drop the price in order to sell it (BM484 2011).

A Louisiana crab buyer gave a similar explanation for the ills facing that market:

The crab market is really bad, before the spill #1s were $2/lb. and now they're $1.40. Let me explain how this happened: Half the U.S. restaurants only serve imports or mainly imports but the other half are loyal to the American fishermen. What the oil spill did was to make the 50% of loyal restaurants have to go to the imports for some of their business; they 'got on the Google' and found another seller. And now that the spill is over they're still buying some imports, it's like a habit, you know? Well what the spill did is break the habit of how people bought seafood. So now we can still move the crabs, but for less

money: The peeler crabs market has been just *killed* by BP; they can't compete with the meat from Venezuela now (BM580 2011).

Modestly good prices masked the structural weakness of a Gulf seafood industry still operating at a low volume because of weak demand and supply shortages. While processors, like fishermen, worried about a post-spill Gulf with less seafood to harvest, they also worried about having more seafood than they could market profitably to a still-shaky consuming public and wholesale buyers whose loyalties were lost in the months of the spill. Well-publicized consumer fears of eating Gulf seafood were one factor in the slow recovery of the commercial seafood industry, but processors described a related, but distinctively different problem selling Gulf seafood to their old customers: Food service buyers switched seafood suppliers during the long months when almost no Gulf seafood was available, prices for what remained climbed, and consumers became fearful of eating the product. Despite more Gulf seafood coming available and subsiding consumer fears, buyers who had switched to imported substitutes in 2010 now preferred to stay with their new suppliers of a cheaper product, and the only way back into those markets was to drop prices to compete, which high fuel costs made difficult to pass along to fishermen. This is how one shrimp processor put the conundrum:

> We've lost so much market share and we can't go down on price to make up for it now. Here's how it works: You're a retailer and you used to buy domestic shrimp, but now you get used to buying 40/50s for $3.25/lb. that you had to buy because of the oil spill disruption. So now, after four months, you've gotten used to the imports and that price, and the only way I can get back my market share is by cutting my price but we can't do that yet because of fuel prices, our prices aren't low enough and our inventory is priced too high    If I sell a bunch of my inventory now I'd lose a bunch of money on every pound, I paid more for it then than I'm selling it for now. I've got $1.5 million in inventory, 300,000 lbs. worth, that I wish was 30% cheaper. My margin is down to about 3%, if you told somebody you'd run a business with a seven-figure investment on a 3% margin they'd say you were crazy! But all my machines, all my forklifts and trucks, all that is paid for    if you were working on a line of credit you'd be eaten up by now. The market's so volatile there's some highlights    I made about 5% on some 10/15 white shrimp recently but whenever two guys get a product the price drops instantly so overall my margin's just 3% now from only 10% gross margins normally in this business.

> I'm selling to people I'm not making any money on, but I want to keep my customers. The independent restaurants are devastated, even in south Louisiana people are scared to eat seafood ... And when any processor loses a big customer, it hurts the entire industry because we're all competing to move the same amount of shrimp to fewer customers and the competition gets worse (BM595 2011).

In short, in 2011 processors reported the Gulf seafood sector could not ramp up production to pre-spill levels without cutting prices to overcome their loss of consumer confidence and market share during the spill. At the same time, processors reported every loss of a buying contract somewhere in the industry jeopardized their ability to find markets for what production they did have. Processors focused on servicing their remaining contracts, finding supply wherever possible and doing deals more to keep or regain customers than to turn a profit.

The oyster industry faced particularly serious challenges still of rebuilding production in 2011 with greatly diminished supply coming in. According to an oysterman:

BM621: When the oil spill happened, that shut us down completely for about seven months. We only got back to work, and very slowly, in November-December of 2010. We were shut down for so long because of the closures - the DHH had to check everything and we were just waiting and watching for months. If I'd known it was going to be such a long, drawn-out thing, I would've gone with my family to the Grand Canyon, things like that, spent more time with them instead of keeping everything ready to get back at it and waiting and waiting, because they tried to seal the leak, like how many times?, 10 or something times with this 'try' and that, and then that didn't work - just to stop the oil from coming out, to stop the spill! And then they had to reopen everything. I did get to spend the summer with my kids, so that was good, and our workers, BP took good care of them, I can't complain at all about that, BP paid them so that when we did get back to work, we didn't have them going off to other jobs so we could bring them back easily and get back [harvesting and shucking] again. BP paid our shuckers, we employ about 40 shuckers at our plant and they paid our fishermen too. We employ way more fishermen than shuckers, actually. But us, the company, that's another story. They paid us some initially, but with all that [claims issues], I turned all that over to a lawyer, I told them, 'just call me when it's over with, I don't even want to hear about it.' They [BP/GCCF] lost our paperwork like two, three times already, and our company is documented better than anybody, everything is down to a T. We've got CPAs, everything we do is crystal-clear in black and white, but we still haven't gotten paid. And we can't wait for that [money], we got started again and we're doing, I'd say, about 75% of what we were before the spill. There's some [shucking] shops…they still haven't opened back up again since the spill, they're waiting on that money, thinking they'll get some [by waiting] but we're not doing like that. They say, 'if you get back to work, then they'll subtract the money you're making from what would be getting' from [GCCF], but you can't live based on that, because you might not get paid, and who knows?

Researcher: How's the market for oysters? Are people buying them again?

BM621: Our market is still weak - not so much our local market, Louisiana, the Gulf Coast, and that - but more to the north, and to the west, people are still worried to eat anything 'Gulf seafood' because of everything they see on the TV and media about the oil. That's hurt our demand, plus there's the national economy. If people don't have money to spend then they're not going to be buying oysters. You see, we only sell to distributors    we don't sell to any restaurants directly    and our distributors out-of-state are telling us their customers [the restaurants] are telling them the public is still concerned about eating Gulf seafood, and they're not buying as much from us because they're taking oysters off the menu. And once they take us off the menu, it's real, real hard to get back on the menu. It's a lot easier to get off the menu than back on it. We're worried about that weakness because if we do finally get back to normal [volume], get our production back up, then where are we going to sell the product to? Plus, when these other shops reopen, then we're going to have more product to compete with and not the

same [size] market to sell it to, so we worry about that. Last year, when you couldn't get any oysters, we had the imported oysters come in

Researcher: You mean fresh oysters?

BM621: No, frozen. They were frozen oysters from Korea. And they were so cheap, they would kill us if they'd worked out. We couldn't compete with them on price, our cost of shucking them, if we had to compete with them. But they didn't taste good, people didn't accept them. And they turned the cooking oil black when you fried them, so they [restaurants] backed away from them.

Researcher: And how are the oysters themselves?

BM621: Here in Terrebonne Parish, there's very little public beds at all. And we didn't have oil get into the oysters, and we didn't have the problems they had out to the east of the Mississippi river where they let all the fresh water out…Where it's really bad is in Plaquemines Parish, east of the river, where they're [the oysters] just dead - everything's just shut down over there. What that's done is now, normally this time of year we'd be buying oysters from the east [of the river] to shuck and kind've letting our oysters rest now, and come later next year they'd be full of oysters. But because there's nothing to buy right now from there, we're fishing our beds real hard right now, so by the summer, they're gonna be cleaned out, there's gonna be nothing left (BM621 2011).

## 2.9. SUMMARY

Uncertainty pervades the Gulf Coast since the spill, and commercial fishermen worry that ecological problems from the spill will resurface in the Gulf in the years to come. Aside from the worry over the long-term impact of the spill on the region's prominent commercial species, this research indicates that many of the factors contributing to the decline of commercial fishing along the Gulf in recent years, such as rising expenses, increasing imports, and slipping market share only intensified in 2010 and 2011. The generational ties and social networks making up the commercial seafood industry has permitted the sector to endure great hardships historically, but the spill has further undermined those foundations, already shaky from decades of buffeting economic and ecological change. Participating in the cleanup effort and claims process have made good the losses of many commercial fishermen and seafood businesses but have been unsatisfactory to compensate for the losses others sustained during the spill and still suffer from. Eroding market share through the loss of traditional marketing outlets during the supply disruptions of 2010 and ongoing perception issues cannot be readily fixed through shifting prices downward because high costs give producers nowhere to cut. 2010 may mark a significant transition in the nature of the Gulf seafood sector, but how the industry will change and what the consequences will be in the longer term for the livelihoods of those dependent on it remains unknown.

## 2.10. REFERENCES

AG415b. 2011. Personal communication. Seafood safety, commercial fisheries and the claims process. Discussion with Annemarie Galeucia. Wife of marine supply business owner. Lafourche Parish. March 3.

Alabama Department of Conservation and Natural Resources Marine Resources Division. 2010. All Alabama waters now open for fishing. Available at: http://www.outdooralabama.com/news/release.cfm?ID_833

Alexander-Bloch, Benjamin. 2010. Vietnamese-American fishers fight for oil spill claim approval. New Orleans Times-Picayune. December 15.

Alexander-Bloch, Benjamin. 2012a. Long-term effects of Gulf oil spill on shrimp, other species is still unknown. New Orleans Times-Picayune. January 30.

Alexander-Bloch, Benjamin. 2012b. Gulf shrimp harvest numbers are eagerly awaited. New Orleans Times-Picayune. January 30.

Alexander-Bloch, Benjamin. 2012c. Oyster safety is focus of regulators. New Orleans Times-Picayune. April 3.

Alexander-Bloch, Benjamin and Brett Anderson. 2011. Gulf seafood industry sputters back to life a year after oil spill. New Orleans Times-Picayune. April 18.

Alford, Jeremy. 2005. Fishermen struggle to rebound from back-to-back storms. Houma Courier. December 18.

Alford, Jeremy. 2009. Animosity boils over amid efforts to save shrimping. Houma Courier. September 29.

Alliance for Justice. 2011. Crude justice: One year after the Gulf oil spill: Is justice being served? Washington, D.C.: Alliance for Justice.

Amy, Jeff. 2011. Seafood processors struggle to regain customers. Mobile Press-Register. September 14.

Anderson, Brett. 2010. BP oil spill threatens a Lafourche oysterman's way of life. New Orleans Times-Picayune. May 30.

Anderson, Brett. 2011. One year after Gulf of Mexico oil spill, Collins family tries to hang onto 90-year-old oyster business. New Orleans Times-Picayune. June 26.

Associated Press. 2010. Mississippi negotiating with BP for funds to promote the safety of Gulf seafood. Associated Press. November 10.

Austin, Diane. 2003. Community-based collaborative team ethnography: A community-university-agency partnership. Human Organization 62(2):143-52.

Austin, Diane E., Tyler Priest, Lauren Penney, Joseph Pratt, Alan G. Pulsipher, Joseph Abel and Jennifer Taylor. 2008. History of the offshore oil and gas industry in southern Louisiana. Volume I: Papers on the evolving offshore industry. OCS Study MMS 2008-042. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Baker, Pamela, Felix Cox, and Peter Emerson. 1998. Managing the Gulf of Mexico commercial red snapper fishery. Paper presented to Committee to Review Individual Fishing Quotas of the Oceans Studies Board of the National Research Council. Available at: https://www.law.stanford.edu/program/centers/enrlp/casestudies/collection/redsnapper2_ex.pdf

Ball, Jeffrey. 2010. Gulf's catch put to sniff test after spill. Wall Street Journal. November 2. Available at: http://online.wsj.com/article/SB10001424052702304915104575572200109584056.html

Ballard, Mark. 2009. Fishermen protest low shrimp prices. Baton Rouge Daily Advocate. August 18.

Banks, Patrick. 2011. 2010 Oyster mortality study. Baton Rouge: LDWF.

Bayles, Cara. 2012. Local crabbers lament scant catches. Houma Courier. March 26.

Becnel, Thomas. 1962. A history of the Louisiana shrimp industry, 1867-1961. Unpublished M.A. Thesis. Department of History, Louisiana State University.

BM424. 2011. Personal communication. New oyster season. Discussion with Brian Marks. Oysterman. Pass Christian, MS. February 22.

BM462a. 2011. Personal communication. Shrimping and cleanup experiences in 2010 and 2011, claims process. Discussion with Brian Marks. Shrimp boat captain. Gretna, LA. April 1.

BM476b. 2011. Personal communication. The 2010 and 2011 shrimp seasons and direct marketing experiences. Discussion with Brian Marks. Shrimper. Delcambre, LA. April 22.

BM478. 2011. Personal communication. The 2010 and 2011 shrimp seasons. Discussion with Brian Marks. Shrimper. Vermillion Parish, LA. April 22.

BM479a. 2011. Personal communication. Seafood buying and the new shrimp season, claims process. Discussion with Brian Marks. Seafood dock worker. Terrebonne Parish. April 27.

BM481a. 2011. Personal communication. Preparations for new shrimp season and last year's experiences. Discussion with Brian Marks. Commercial fisherman. Terrebonne Parish, LA. April 25.

BM481b. 2011. Personal communication. The 2010 and 2011 shrimp seasons. Discussion with Brian Marks. Commercial fisherman. Terrebonne Parish, LA. April 25.

BM484. 2011. Personal communication. Tuna and shrimp industries and market recovery, claims process. Discussion with Brian Marks. Seafood processor. Terrebonne Parish. April 28.

BM495a. 2011. Personal communication. Business at repair shipyard, new shrimp season. Discussion with Brian Marks. Shipyard supervisor. Plaquemines Parish, LA. May 13.

BM509. 2011. Personal communication. Shrimp processing in new season. Discussion with Brian Marks. Seafood processor. Terrebonne Parish. May 17.

BM543. 2011. Personal communication. Travel business and Vietnamese travel trends in past year. Discussion with Brian Marks. Travel agent. Jefferson Parish, LA. May 26.

BM578. 2011. Personal communication. Crab business, trends in crab landings, seafood safety. Discussion with Brian Marks. Crab dock owner. Saint Mary Parish, LA. June 23.

BM579a. 2011. Personal communication. Business history and commercial fisheries in 2010 and 2011. Discussion with Brian Marks. Fish and shrimp dock owner. Saint Mary Parish, LA. June 24.

BM580. 2011. Personal communication. Crab business and personal history. Discussion with Brian Marks. Crab dock owner. Saint Mary Parish, LA. June 25.

BM582. 2011. Personal communication. Family history, shrimp season, direct marketing. Discussion with Brian Marks. Shrimp dock owner. Saint Mary Parish, LA. June 25.

BM587a. 2011. Personal communication. Shrimp business, market issues and landings in the region. Discussion with Brian Marks. Shrimp processor. Delcambre, LA. July 8.

BM590b. 2011. Personal communication. Returning to fisheries in 2011 season. Discussion with Brian Marks. Shrimping deckhand. Vermillion Parish, LA. July 8.

BM591. 2011. Personal communication. Effects of the oil spill, primary customer base. Discussion with Brian Marks. Grocery store co-owner. Vermilion Parish, LA. July 8.

BM595. 2011. Personal communication. Price and market share issues in the shrimp industry. Discussion with Brian Marks. Shrimp processor. Delcambre, LA. July 11.

BM598. 2011. Personal communication. Fishery issues in 2010 and 2011. Discussion with Brian Marks. Extension agent. Abbeville, LA. July 11.

BM601a. 2011. Personal communication. Fishery closures and experiences in fisheries in 2010 and 2011. Discussion with Brian Marks. Shrimp boat captain. Port Arthur, TX. July 13.

BM614. 2011. Personal communication. Past hurricanes, current crab season, and future of fishery. Discussion with Brian Marks. Crab fisherman. Terrebonne Parish. December 16.

BM617. 2011. Personal communication. The 2010 and 2011 shrimp seasons, seafood safety. Discussion with Brian Marks. Shrimper. Terrebonne Parish. December 17.

BM619. 2011. Personal communication. Crab and shrimp seasons in past year and 2010, claims process. Discussion with Brian Marks. Crabber and shrimper. Dulac, LA. December 20.

BM620. 2011. Personal communication. Crabbing business in 2010 and 2011. Discussion with Brian Marks. Crabber and trap maker. South Louisiana. December 21.

BM621. 2011. Personal communication. Oyster business, closures, and reopening of business. Discussion with Brian Marks. Oyster processor. Terrebonne Parish, LA. December 21.

BM630. 2012. Personal communication. Christmas shopping season, oil spill and moratorium effects. Discussion with Brian Marks. Sporting goods store owner. South Louisiana. January 17.

Bolger, Michael and Clark Carrington. 1999. Hazard and risk assessment of crude oil in subsistence seafood samples from Prince William Sound: Lessons learned from the Exxon Valdez. In: L. Jay Field, James Fall, Thomas Nighswander, Nancy Peacock, and Usha Varanasi, eds. Evaluating and Communicating Subsistence Safety in a Cross Cultural Context: Lessons Learned from the Exxon Valdez Oil Spill. Pensacola, FL: SETAC Press.

Boudreaux, E. 2011. The seafood capital of the world: Biloxi's maritime history. Charleston, SC: The History Press.

Bourne, Joel. 2010. The deep dilemma. National Geographic 218(4):40-53.

BR026. 2011. Personal communication. Seafood safety, commercial fishing work and public works employment. Discussion with Bethany Rogers. Part-time deckhand. Plaquemines Parish. February 14.

BR053b. 2011. Personal communication. Seafood business, potential health risks, oil spill cleanup, and claims process. Discussion with Bethany Rogers. Shrimper's wife. Grand Isle, LA. March 2.

BR119. 2011. Personal communication. Historical changes and family history in the seafood industry, 2011 shrimping season, oil spill cleanup and the claims process. Discussion with Bethany Rogers. Seafood business owner. Jefferson Parish, LA. April 22.

Bureau of Labor Statistics. 2012. CPI inflation calculator. Available at:
    http://www.bls.gov/data/inflation_calculator.htm

Buskey, Nikki. 2008. Local fisheries take huge hit. Houma Courier. October 1.

Buskey, Nikki. 2010a. Unleashing river to fight oil causes massive oyster kills. Houma Courier.
    July 24.

Buskey, Nikki. 2010b. Louisiana oystermen say oil-spill claims process unclear. Houma Courier.
    November 8.

Buskey, Nikki. 2010c. Louisiana oyster season opens Monday with greatly diminished supply.
    Houma Courier. November 12.

Buskey, Nikki. 2010d. Grand Isle rally attendants question oil-spill reassurances. Houma
    Courier. November 17.

Buskey, Nikki. 2011. Seafood safety tests go online. Houma Courier. October 7.

Caffey, Rex, R. Kazmierczak, H. Diop, and W. Keithly. 2007. Estimating the economic damage
    of hurricanes Katrina and Rita on commercial and recreational fishing industries. Paper
    presented at the American Agricultural Economics Association Annual Meeting,
    Portland, OR, July 29  August 1.

California Environmental Protection Agency. 2007. Report on the safety of consuming fish and
    shellfish from areas impacted by the M/V *Cosco Busan* oil spill in San Francisco Bay,
    California. Sacramento, CA: CEPA.

Cenac, Christopher and Claire Joller. 2011. Eyes of an eagle: Jean-Pierre Cenac, patriarch: An
    illustrated history of early Houma-Terrebonne. Jackson: University Press of Mississippi.

Chu, Kathy. 2007. Fishermen take risks after Katrina as many go without insurance. USA Today.
    March 28.

Coastal Conservation Association. 2012. Accomplishments. Available at:
    http://www.joincca.org/Accomplishments.html

CW464. 2011. Personal communication. Seafood industry and experience with the oil spill.
    Discussion with Carolyn Ware. Seafood processor. Empire, LA. April 21.

Davis, Donald. 2010. Washed away? The invisible peoples of Louisiana's wetlands. Lafayette:
    University of Louisiana at Lafayette Press.

DeSantis, John. 2010. Terrebonne armada prepares for battle. Houma Courier. May 2.

DeSantis, John. 2011a. Some signs of normalcy return for shrimpers. Houma Courier. February 17.

DeSantis, John. 2011b. Seafood safety: To eat or not to eat? Houma Courier. February 23.

DeSantis, John. 2011c. Crabbers distressed by what they're harvesting. Houma Courier. March 15.

DeSantis, John. 2011d. Crab fishermen, dealers still struggling. Houma Courier. July 31.

Deseran, Forest. 1997. Louisiana shrimp fishermen and local economies: A survey. Baton Rouge: Louisiana State University and the Louisiana Sea Grant Program.

Deseran, Forest and Carl Riden. 2000. Louisiana oystermen: Surviving in a troubled industry. Baton Rouge: Louisiana State University and the Louisiana Sea Grant Program.

Deseran, Forrest and Carl Riden. 2003. Troubled waters or business as usual? Ethnicity, social capital, and community in the Louisiana oyster fishery. In: William Faulk, Michael Schulman, and Ann Tickamyer, eds. Communities of Work: Rural Restructuring in Local and Global Contexts. Athens: Ohio University Press.

Dickey, Robert. 2011. FDA risk assessment of seafood contamination after the BP oil spill. Environmental health perspectives. Available at: http://dx.doi.org/10.1289/ehp.1104539

Dow, Nicole. 2010. Mississippi limits oyster season to tongers. Biloxi Sun-Herald. November 9.

Duff, John and William Harrison. 1997. The law, policy, and politics of gillnet restrictions in state waters of the Gulf of Mexico. Saint Thomas Law Review 9:389-417.

Durrenberger, E. Paul. 1992. It's all politics: South Alabama's seafood industry. Urbana: University of Illinois Press.

Durrenberger, E. Paul. 1994. Shrimpers, processors, and common property in Mississippi. Human Organization 53(1):74-82.

Durrenberger, E. Paul. 1996. Gulf coast soundings: people and policy in the Mississippi shrimp industry. Lawrence: University Press of Kansas.

Ferrara, David. 2010. Vessels of Opportunity captains should be paid within a month, says BP official. Mobile Press-Register. September 22.

Ferrara, D. 2011. Oil-spill vessel captains say damages still haven't been paid. Mobile Press Register. March 17.

Florida Fish and Wildlife Conservation Commission. 2010a. Oil forces partial fishing closure in Escambia County. Available at: http://www.floridafishandhunt.com/Florida-

Fishing/Florida-Fishing-News/oil-forces-partial-fishing-closure-in-escambia-county.html

Florida Fish and Wildlife Conservation Commission. 2010b.Closed shrimp-harvesting area in Escambia Co. reopens. Available at: http://mfwc.com/news/news-releases/2010/august/16/news_10_x_oilspill39/

Fritchey, Robert. 1993. Wetland riders. New Orleans: New Moon Press.

Gagnet, Kayla. 2005. Seafood lovers could feel pinch from rules on migrant workers. Lafayette Daily Advertiser. March 20.

Gohlke, Julia, Dzigbodi Doke, Meghan Tipre, Mark Leader, and Timothy Fitzgerald. 2011. A review of seafood safety after the Deepwater Horizon blowout. Environmental Health Perspectives 119(8):1062-9.

Government Accountability Office. 2010. Hurricanes Katrina and Rita: Federally funded programs have helped to address the needs of Gulf Coast small businesses, but agency data on subcontracting are incomplete. Report GAO-10-723. Washington, D.C.: U.S. Government Accountability Office.

Gramling, Robert. 1984. OCS activities and their relationship to occupational shifts in the coastal zone parishes. In: Robert Gramling and Sarah Brabant, eds. The Role of Outer Continental Shelf Oil and Gas Activities in the Growth and Modification of Louisiana's Coastal Zone. U.S. Department of Commerce, NOAA and Louisiana Department of Natural Resources.

Gramling, Robert and Ronald Hagelman. 2005. A working coast: People in the Louisiana wetlands. Journal of Coastal Research 44:112-33.

Greater New Orleans, Inc. (GNO, Inc.) 2010. A study of the economic impact of the Deepwater Horizon oil spill   Part one   Fisheries. Available at: http://www.uflib.ufl.edu/docs/Economic%20Impact%20Study,%20Part%20I%20-%20Full%20Report.pdf

Guillory, Vince et al. 2001. The blue crab fishery of the Gulf of Mexico, United States: A regional management plan. Ocean Springs, MS: Gulf States Marine Fisheries Commission.

Gulf Coast Claims Facility (GCCF). 2012. Overall GCCF program statistics. Available at: http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf

Gulf of Mexico Fishery Management Council (Gulf Council). 2005. Amendment number 13 to the management plan for the shrimp fishery of the Gulf of Mexico. Tampa, FL: Gulf Council.

Gulf of Mexico Regional Fishery Management Council (Gulf Council). 2010. Gulf of Mexico

red snapper frequently asked questions March 2010. Available at:
http://sero.nmfs.noaa.gov/sf/pdfs/red%20snapper%20general%20FAQs%20032410.pdf

Gulf of Mexico Regional Fishery Management Council (Gulf Council). 2012. Reef fish
management plans. Available at:
http://www.gulfcouncil.org/fishery_management_plans/reef_fish_management.php

Hammer, David. 2012. Seafood sales loss after Gulf oil spill presented in court. New Orleans
Times-Picayune. April 26.

Hein, Stephen and Paul Meier. 1995. Skimmers: Their development and use in coastal Louisiana.
Marine Fisheries Review 57(1):17-24.

Helies, Frank and Judy Jamison. 2010. A continuation of catch characterization and discards
within the snapper-grouper vertical hook-and-line fishery of the South Atlantic United
States. Tampa, FL: Gulf and South Atlantic Fisheries Foundation Inc.

Henry, Jacques and Carl Bankston III. 2002. Blue collar bayou: Louisana Cajuns in the new
economy of ethnicity. Westport, CT: Praeger.

Horst, Jerald. 1992. Soft-shelled crab production: Options and opportunities. Baton Rouge:
Louisiana Sea Grant College Program.

Horst, Jerald and David Bankston. 1987. Bottom long line fishing off Louisiana's coast. Baton
Rouge: Louisiana Cooperative Extension Service, Louisiana State University.

Horst, Jerald and Glenda Horst. 2010. The Louisiana seafood bible: Crabs. Gretna, LA: Pelican
Publishing.

Houma Courier. 2010. More fishing areas closed, others reopened. Houma Courier. May 28.

Jervis, Rick. 2008. Fishing industry hurting in La. USA Today. September 30.

Johnson, Allen. 2008. Hurricanes hamper oyster farming. Baton Rouge Advocate. December 11.

Jonsson, Patrik. 2012. With BP oil spill billions at stake, why did Gulf fishermen suddenly
settle? Christian Science Monitor. March 3.

Juhasz, Antonia. 2011. Black Tide: The devastating impact of the Gulf oil spill. Hoboken, NJ:
John Wiley and Sons, Inc.

Kaufman, Leslie. 2010. Concerns up and down the food chain. New York Times. May 4.

Keithly, Walter, Kenneth Roberts, and Andrea Liebzeit. 1988. Louisiana blue crab production,
processing, and markets. Baton Rouge: Louisiana Sea Grant College Program.

Keithly, Walter, Kenneth Roberts, and Hope Eyster-Kearney. 1994. Structural changes in the southeast U.S. shrimp processing industry. Proceedings of the Gulf and Caribbean Fisheries Institute 46:207-25.

Keithly, W., H. Diop, R. Kazmierczak and M. Travis. 2005. An economic analysis of the southeast U.S. shrimp processing industry responses to an increasing import base. Proceedings of the Gulf and Caribbean Fisheries Institute 56:133 50.

Kirby, Brendan. 2010. Vessels of Opportunity boat owners sue BP over payment dispute. Mobile Press-Register. November 9.

Kirkham, Chris. 2009. Louisiana blasts new FDA rule requiring oysters to be sterilized to prevent rare bacterial illness. New Orleans Times-Picayune. October 28.

LaFleur, Elizabeth, Diane Yeates, and Angelina Aysen. 2004. Estimating the economic impact of the wild shrimp, Penaeus sp., Fishery: A study of Terrebonne Parish, Louisiana. Marine Fisheries Review 67(1):28-42.

Liese, C., M. Travis, D. Pina and J. Waters. 2009. The annual economic survey of federal Gulf shrimp permit holders: Report on the design, implementation, and descriptive results for 2006. Miami, FL: Southeast Fisheries Science Center.

Louisiana Department of Wildlife and Fisheries. 2000. The Louisiana shrimp industry: A preliminary analysis of the industry's sectors. Baton Rouge: LDWF.

Louisiana Department of Wildlife and Fisheries. 2010a. Fisheries disaster assistance program. Available at: http://www.wlf.louisiana.gov/fisheries-disaster-assistance-progr

Louisiana Department of Wildlife and Fisheries. 2010b. Oyster stock assessment report. Oyster Data Report Series No. 16. Baton Rouge: LDWF.

Louisiana Department of Wildlife and Fisheries. 2011a. LDWF announces major commercial fishing reopening. April 11. Available at: http://www.wlf.louisiana.gov/news/33992

Louisiana Department of Wildlife and Fisheries. 2011b. Oil spill news releases. Available at: http://www.wlf.louisiana.gov/news/oilspill

Louisiana Department of Wildlife and Fisheries. 2012. Commercial license sales by parish/state. Available at: http://www.wlf.louisiana.gov/licenses/statistics

Louisiana Sea Grant. 1999. Shrimping in Louisiana. Baton Rouge: Louisiana Sea Grant.

Louisiana Sea Grant. 2009. State of Louisiana announces $30 million assistance program to aid fishermen affected by hurricanes Gustav and Ike. Available at: http://www.laseagrant.org/comm/2009/assistance.htm

Margavio, Anthony, Craig Forsyth, Shirley Laska, and J. Mason. 1996. Caught in the net: The conflict between shrimpers and conservationists. College Station: Texas A&M University Press.

Marks, Brian. 2005. Effects of economic restructuring on household commodity production in the Louisiana shrimp fishery. Unpublished M.A. thesis. Department of Geography and Regional Development, University of Arizona.

Marks, Brian. 2012. The political economy of household commodity production in the Louisiana shrimp fishery. Journal of Agrarian Change 12(2-3):227-51.

Marshall, Bob. 1996. Power shifts to sport fishing. New Orleans Times-Picayune. March 29.

McCrea-Strub, A., K. Kleisner, U. Sumaila, W. Swartz, R. Watson, D. Zeller, and D. Pauly. 2011. Potential impact of the Deepwater Horizon oil spill on commercial fisheries in the Gulf of Mexico. Fisheries 36(7):332-6.

McElroy, Kelly. 2010. Fishing is day-to-day with oil spill. Houma Courier. May 27.

McGuire, Tom. 2006. Louisiana's oysters, America's wetlands, and the storms of 2005. American Anthropologist 108(4):692-705.

Mississippi Department of Environmental Quality. 2010a. Precautionary closure of portions of Mississippi marine waters to all commercial recreational fishing, effective immediately. Available at:
http://www.deq.state.ms.us/newweb/MDEQPres.nsf/67c62401c0604ea286256b29005aba da/277db4ce8055a80f8625793400546d62?OpenDocument

Mississippi Department of Environmental Quality. 2010b. MDMR and MDEQ reopen all Mississippi territorial waters to commercial and recreational finfish and shrimp fishing. Available at:
http://www.deq.state.ms.us/mdeq.nsf/pdf/Main_GulfOilSpillAugust62010PressRelease/$ File/GulfOilSpillAUGUST062010.pdf?OpenElement

Moberg, Mark and Stephen Thomas. 1993. Class segmentation and divided labor: Asian workers in the Gulf of Mexico seafood industry. Ethnology 32(1):87-99.

Mock, Brentin. 2010. Black gulf fishers face a murky future. Available at:
http://ourtimepress.com/tag/black-fishers/

Mullenix, Linda. 2011. Prometheus unbound: The gulf coast claims facility as a means for resolving mass tort claims   A fund too far. Louisiana Law Review 71:820-916.

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (National Commission). 2011a. Deep water: The Gulf oil disaster and the future of offshore drilling

Report to the President. Washington, D.C.: National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling.

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (National Commission). 2011b. Rebuilding an appetite for Gulf seafood after Deepwater Horizon. Staff Working Paper No. 16. Available at: http://www.oilspillcommission.gov/sites/default/files/documents/Rebuilding%20an%20Appetite%20for%20Gulf%20Seafood%20after%20Deepwater%20Horizon_0.pdf

National Marine Fisheries Service (NMFS). 2004. Fisheries of the United States, 2003. Silver Spring, MD: National Oceanic and Atmospheric Administration.

National Oceanic and Atmospheric Administration (NOAA). 2010. NOAA and FDA announce chemical test for dispersant in gulf seafood; all samples test within safety threshold. Available at: http://www.noaanews.noaa.gov/stories2010/20101029_seafood.html

Natural Resources Defense Council. 2010. Gulf Coast Seafood Consumption Survey. Washington, D.C: NRDC.

NOAA Fisheries. 2006. Fisheries of the United States, 2005. Silver Spring, MD: National Oceanic and Atmospheric Administration.

NOAA Fisheries. 2009. Gulf of Mexico offshore shrimp effort. Available at: http://sero.nmfs.noaa.gov/sf/pdfs/shrimpeffort09.pdf

NOAA Fisheries. 2011a. Forecast for the 2011 Gulf and Atlantic menhaden purse-seine fisheries and review of the 2010 fishing season. Beaufort, NC: Sustainable Fisheries Branch, NMFS Beaufort.

NOAA Fisheries. 2011b. Last fisheries re-opening today. Restore the Gulf. Available at: http://www.restorethegulf.gov/release/2011/04/19/last-fisheries-re-opening-today

NOAA Fisheries. 2011c. Fishwatch: US seafood facts, Trade 2010. Available at: http://www.nmfs.noaa.gov/fishwatch/trade_and_aquaculture.htm

NOAA Fisheries. 2011d. Fisheries of the United States, 2009. Silver Spring, MD: National Oceanic and Atmospheric Administration.

NOAA Fisheries. 2011e. Weekly ex-vessel gulf fresh shrimp prices and landings. Available at: http://www.st.nmfs.noaa.gov/st1/market_news/doc42.txt

NOAA Fisheries. 2011f. Weekly New York frozen seafood prices. Available at: http://www.st.nmfs.noaa.gov/st1/market_news/doc22.txt

NOAA Fisheries. 2012. Annual commercial landing statistics. Available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html

Pham-Bui, Trang. 2010. Pass Christian, Mississippi oyster plant, closed since June 23, reopens. WLOX-TV News, Biloxi, MS. November 4.

Pittman, Craig. 2012a. USF study finds more sick fish in oil spill area than rest of Gulf of Mexico. Tampa Bay Times. January 14.

Pittman, Craig. 2012b. Oil from Deepwater Horizon spill still causing damage in gulf 2 years later, scientists find. Tampa Bay Times. April 15.

Posadas, Benedict. 2007. Economic assessment of the impacts of Hurricane Katrina on Mississippi seafood processors and dealers. Biloxi: Mississippi State University Coastal Research and Extension Center.

Posadas, Benedict. 2008. Economic assessment of the impacts of Hurricane Katrina on the Mississippi commercial fishing fleet. Biloxi: Mississippi State University Coastal Research and Extension Center.

Posadas, Benedict. 2011. Economic damages of Hurricane Gustav to seafood processors and dealers, marinas, and livebait dealers in coastal Mississippi. Biloxi: Mississippi State University Coastal Research and Extension Center.

PP443. 2011. Personal communication. Shrimping season and consequences of oil spill on fisheries. Discussion with Preetam Prakash. Shrimper. Harrison County, MS. October 26.

PP523. 2010. Personal communication. Crab business, Southeast Asian community, oil spill recovery programming. Discussion with Preetam Prakash. Crabber. Irvington, AL. December 15.

PP548. 2010. Personal communication. Trends in the seafood industry and effects of the oil spill. Discussion with Preetam Prakash. Seafood processor. Irvington, AL. December 15.

PP756. 2011. Personal communication. Effects of the oil spill on the oyster business. Discussion with Preetam Prakash. Oyster processor. Bayou La Batre, AL. February 23.

PP799. 2011. Personal communication. Trends in the seafood industry and effects of the oil spill Discussion with Preetam Prakash. Seafood buyer. Waveland, MS. April 27.

PP936. 2011. Personal communication. The Gulf Coast crab industry and effects of the spill. Discussion with Preetam Prakash. Crab processor. Bayou La Batre, AL. August 22.

PP937. 2011. Personal communication. The Gulf Coast seafood industry and market conditions. Discussion with Preetam Prakash. Seafood processor. Bayou La Batre, AL. August 22.

PP953. 2011. Personal communication. The Gulf Coast crab industry and effects of the spill. Discussion with Preetam Prakash. Seafood processor. New Orleans, LA. August 16.

PP1001. 2011. Personal communication. Seafood processing industry and experiences during the oil spill. Discussion with Preetam Prakash. Seafood processor. Biloxi, MS. December 2.

PP1011. 2011. Personal communication. Seafood industry, post-spill decline in shrimp landings, claims process experience, and advertising. Discussion with Preetam Prakash. Seafood processor. Biloxi, MS. November 29.

Preston, Julia. 2011. La. business owners sue over new rules for guest workers. New York Times. September 11.

Raines, Ben. 2010a. White House oyster reef to open to dredgers; oyster tongers object. Mobile Press Register. October 16.

Raines, Ben. 2010b. Alabama to limit oyster harvesting, hoping to preserve fading reefs. Mobile Press-Register. October 21.

Rainey, Richard. 2010. President Barack Obama talks to Louisiana fishers about Gulf oil spill disaster. New Orleans Times-Picayune. May 3.

Ratliff, Bob. 2006. Good crop, lots of obstacles for Gulf Coast shrimpers. Mississippi Landmarks 2(3):6-7.

Robbins, Liz. 2010. Seafood industry fights public perception. New York Times. May 1.

Roberts, Faimon. 2011. Harvesters dispirited by white shrimp catch. Baton Rouge Advocate. October 4.

Roberts, K., and P. Pawlyk. 1986. Louisiana shrimp marketing with reference to small shrimp. Baton Rouge, LA: Louisiana Sea Grant.

Robertson, Campbell. 2010. Safety fears halt fishing in areas affected by spill. New York Times. May 2.

Robertson, Campbell. 2011a. A year spent wrestling with paperwork, not nets. New York Times. April 19.

Robertson, Campbell. 2011b. Gulf shrimp are scarce this season; answers, too. The New York Times, October 10.

Robertson, C. and J. Rudolf. 2010. 11,000 people and over 1,000 fishing boats still working on Gulf clean-up amid controversy over oil. Associated Press. November 3.

Rodriguez, Maya. 2010. More Louisiana waters reopened to crabbing but some processors are still relying on out-of-state imports. WWL-TV Channel 4 News, New Orleans. November 10.

Rotkin-Ellman, Miriam, Karen Wong, and Gina Solomon. 2011. Seafood contamination after the BP Gulf oil spill and risks to vulnerable populations: A critique of the FDA risk assessment. Environmental Health Perspectives. Available at: http://dx.doi.org/10.1289/ehp.1103695

Samonte-Tan, G., and W. Griffin. 2001. Bycatch reduction impacts on the shrimp harvesting and consumer sectors in the Gulf of Mexico. Society and Natural Resources 14:223 37.

Sass, M., and K. Roberts, 1979. Characteristics of the Louisiana Shrimp Fleet, 1978. Baton Rouge, LA: Louisiana Sea Grant.

Satchfield, Scott. 2010. Some Gulf fishermen fear getting back on the water could hurt their claims earnings. WWL-TV Channel 4 News, New Orleans. November 12.

Scharnberg, Kirsten. 2005. Louisiana's $3 billion seafood industry left crippled after hurricane. Chicago Tribune. September 24.

Schirripa, Michael, Christopher Legault, and Mauricio Ortiz. 1999. The red grouper fishery of the Gulf of Mexico: Assessment 3.0. Miami, FL: Sustainable Fisheries Science Center. Sustainable Fisheries Division Contribution No. SFD-98/99-56. Available at: http://www.gulfcouncil.org/beta/gmfmcweb/downloads/RG99ass.pdf

Schleifstein, Mark. 2012. Dozens of dead marine mammals, turtles in Gulf this year, NOAA says. New Orleans Times-Picayune. February 27.

Seafood.com. 2010. Jindal announces Louisiana seafood, restaurant and tourism industries to get $218 million from BP. Available at: www.seafood.com

Seafoodnews.com. 2011. American shrimp processors say they are being hurt by weakness in demand for Gulf shrimp. Available at: www.seafoodnews.com

Skoloff, Brian. 2010. For many Gulf of Mexico oil spill victims, a glum Christmas. Associated Press. December 23.

Skoloff, Brian and Harry Weber. 2011. BP oil spill czar says recovery in 3 years. Associated Press. February 2.

Smith, Joseph. 1991. The atlantic and Gulf Menhaden purse seine fisheries: Origins, harvesting technologies, biostatistical monitoring, recent trends in fisheries statistics, and forecasting. Marine Fisheries Review 53(4):28-41.

Smith, Vicki. 2010. Oil in the Gulf puts countless livelihoods in limbo. Associated Press. May 2.

Starr, P. 1981. Vietnamese fisherfolk on America's Gulf Coast. International Migration Review 15(1):226-38.

Sumaila, U., A. Cisneros-Montemayor, A. Dyck, L. Huang, W. Cheung, J. Jacquet, K. Kleisner, V. Lam, A. McCrea-Strub, W. Swartz, R. Watson, D. Zeller and D. Pauly. 2012. Impact of the Deepwater Horizon well blowout on the economics of US Gulf fisheries. Canadian Journal of Fisheries and Aquatic Sciences 69:499-510.

Tunnell Jr., John W. 2011. An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill. Corpus Christi, TX: Harte Research Institute for Gulf of Mexico Studies at Texas A&M University-Corpus Christi.

United States Department of Commerce (USDC). 2010. Imports and exports of fishery products annual summary, 2010. Available at:
    http://www.st.nmfs.noaa.gov/st1/trade/documents/TRADE2010.pdf

Upton, Harold. 2010. Commercial fishery disaster assistance. Report RL34209. Washington, D.C.: Congressional Research Service.

U.S. Energy Information Agency. 2012. Weekly Gulf Coast no 2 diesel retail prices. Available at:
    http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n_PET&s_EMD_EPD2D_PTE_R30_DPG&f_W

Waltzer, Joel. 2012. Unpublished Louisiana Department of Wildlife and Fisheries data on commercial fisheries harvests by species and basin. Presented at GO FISH conference, Westwego, LA, August 3.

Warren, Bob. 2010. St. Bernard Parish fishers hit the coastline Sunday morning to fight spreading oil from Gulf spill. New Orleans Times-Picayune. May 2.

WDSU-TV. 2010. Fishermen line up for BP payouts. WDSU-TV Channel 6, New Orleans. Available at: http://www.wdsu.com/news/23525146/detail.html

White, Jaquetta. 2011. Appetite for Louisiana seafood takes a hit, 18 restaurant owners say. New Orleans Times-Picayune. March 29.

Wilson, Charles. 1988. Longlining for yellowfin tuna in the Gulf of Mexico. Baton Rouge: Louisiana Sea Grant College Program.

Zullo, Robert. 2009. Striking shrimpers protest. Houma Courier. August 22.

Zullo, Robert. 2011. Fishermen bemoan poor catches. Houma Courier. October 8.

# CHAPTER THREE: TOURISM

Preetam Prakash

## 3.1. INTRODUCTION

The U.S. Gulf Coast is home to a wide range of businesses dependent on tourism. The tourism industry's growth in the area and its significance to the regional economy is in some ways similar to other regions of the United States. The tourism economy in the U.S. as a whole grew steadily throughout the 1980s and 1990s and in 2011 the U.S. led the world in Travel and Tourism GDP (World Travel and Tourism Council 2012). However, the 2000s presented a number of challenges for the U.S. tourism industry. One of the results of the September 11 attacks was that both Americans and citizens of other countries cut down heavily on travel, especially air travel. After several very slow years tourism to the U.S. picked back up during the middle of the decade, with 2007 and 2008 being excellent years for the industry nationwide (Randall Travel Marketing 2008; U.S. Department of Commerce 2010). The global and national recessions had sharp negative impacts on tourism in 2009 with the industry nationally generating $100 billion less output than in 2008 (U.S. Department of Commerce 2010). However, the U.S. tourism industry once again experienced an upturn in 2010, with the numbers of overseas visitors up 11% from the previous year (U.S. Department of Commerce 2011a). July 2011 saw this trend continue, with the country up 5% when compared with the same period from 2010 (U.S. Department of Commerce 2011b).

While Gulf Coast tourism shares to some degree in these more general national trends it also differs in a number of ways. Differentiating factors include the area still largely being a drive-in market, a fact that spared it from some of the economic consequences of the post-9/11 drop in air travel; the impacts that the hurricanes of the mid-late 2000s had on the Gulf Coast and its tourism industry (see below); and most recently, the effects of *Deepwater Horizon* rig explosion and resultant oil spill on the industry in 2010 and 2011. This section attempts to articulate some of the impacts of the oil spill on the coastal tourism industry by drawing on ethnographic research conducted by team researchers as well as by referring to economic reports, newspaper articles, and other salient sources which address this issue.

Analysis of the tourism industry post-oil spill is complicated by the fact that much of the existent economic data referenced here does not clearly distinguish between business that is and is not tied to tourism. In many coastal communities, large numbers of retailers who sell to non-tourists are also involved in the tourism industry to varying extents. Thus, two businesses that are classified as tourist businesses may experience very different volumes of tourist traffic. Sales and tax data related to the tourism industry falls under a range of categories, including food and beverage, lodging, retail trade, and transportation and attractions/entertainment/recreation, which also include non-tourism-related business (Mississippi Development Authority/Tourism Division 2011). Charter and recreational fishing businesses, hotels, restaurants, souvenir shops, and casinos are some of the tourism related businesses which are included under these categories. Additionally, economic analyses often do not differentiate between tourism and other forms of travel. This can lead to a degree of conflation in some Gulf Coast communities, which

experience high volumes of traffic from contract workers and other groups travelling for non-tourist purposes. Definitions of travel and tourism also vary slightly across reports.[5]

Keeping these limits in mind, it is still possible to say that the tourism industry is a significant economic force in Louisiana, Mississippi, and Alabama, and in our study areas within these states. In 2010, of a total 182,100 non-agricultural jobs, 35,704 people were directly employed by the tourism industry in Mobile and Baldwin counties, Alabama (Alabama Tourism Department 2010;[6] Mobile Area Chamber of Commerce 2010). Tourism directly employed 22,600 in the three coastal Mississippi counties in 2010 (Mississippi Development Authority 2010[7]). In the eight Louisiana parishes that were the focus of this study, 58,920 people were employed in tourism in 2009: the majority of these jobs were located in Orleans Parish, followed by Jefferson and St. Mary parishes (U.S. Travel Association 2010[8]). In 2009, tourism employment constituted 7.37%, 8.55%, and 6.69% of all jobs in Alabama, Mississippi, and Louisiana respectively (Gordon et al. 2011). In Mississippi, tourism contributed $354 million in 2010 to the state's General Fund Revenues. In Louisiana, tourism generated $372.2 million in tax revenue for the state in 2009, and in Alabama, it produced around $472 million in tax revenue in 2010 (Alabama Tourism Department 2010; Mississippi Development Authority 2010; U.S. Travel Association 2010). Despite heavy impacts of the 2005 hurricanes on tourism in the Gulf Coast region, and the national recession that began in late 2007, the industry remained crucial to many Gulf Coast communities and to the region as a whole.

While the nation as a whole was experiencing an upturn in tourism in 2010 and 2011, many tourist-centered areas on the Gulf Coast were dealing with the aftermath of the BP oil spill. This section considers some of the spill's impacts on these types of tourism: beach tourism, recreational fishing/charter boat tourism, nature based tourism /environmental education, casino tourism, and tourism centering on local festivals and other major events. Many tourism-related businesses and attractions along the Gulf Coast revolve around and often directly utilize local marshes, seafood, and beaches. Both the direct physical impacts of the BP oil spill on some coastal areas as well as the more widespread effects of extended media coverage on public perceptions of the region have had important consequences for many associated with the tourism industry.

---

5 Calculating travel-generated payroll impacts is imperfect because the wages of those who work in businesses experiencing tourist traffic are reported as travel generated payroll impacts. However, tourist traffic from one business to another can vary considerably.

[6] The annual reports put out by the Alabama Tourism Department do not separate tourism from other forms of travel, such as business related travel. The reports draw on "state lodging tax revenues, Smith Travel Research data on hotel occupancy rates, and field intercept surveys conducted in previous years". The reports do not indicate how tourism retail business is separated from more general retail business.

[7] The "Methods" section of the 2010 annual report states, "purpose of this report was to estimate Travel and Tourism's FY 2010 statewide economic contribution in terms of Total Value Added, jobs (direct and indirect & induced), payroll (labor income), sales (expenditures), capital investment, and State tax revenue—including the General Fund portion—plus local level (city/county) indicators". Here too, tourism and other forms of travel are not clearly separated. The reports used NAICS codes to estimate travel and tourism's economic contributions, but in many cases these codes do not provide a way to separate tourism related from more general business.

[8] The annual reports put out by the Louisiana Office of Tourism use the TEIM economic model to calculate tourism and travel impacts. The latest report states that "the TEIM combines the activity levels for trips to places within the U.S. with the appropriate average costs of each unit of travel activity, (e.g., cost per mile by mode of transport, cost per night by type of accommodation), to produce estimates of the total amount spent on each of 16 categories of travel-related goods and services". However, it is unclear to what degree, for example, this model separates tourist expenditures on recreational fishing from the expenditures of local residents on recreational fishing.

## 3.2. METHODOLOGY

Academic and community researchers conducted participant observation in coastal Louisiana, Mississippi and Alabama between September 2010 and September 2011. They also spoke with business owners and employees in the tourism industry, members of local chambers of commerce and tourism boards, and members of local non-profits that advocate for or are otherwise related to the tourism industry. They participated in both shorter "drop-in" conversations that generally lasted five to 15 minutes as well as more extended discussions. The drop-in conversations with local business owners and employees allowed the researchers to quickly ascertain the impacts of the oil spill on businesses and local communities. Extended discussions also centered on oil spill impacts but also covered other relevant issues, for example the history of particular businesses and of tourism development in certain areas. As mentioned above, it is difficult to easily separate businesses tied to tourism from retail businesses more generally speaking. Team ethnographers relied on participants' self-identification as being involved in the tourism sector.

Researchers participated in local festivals, concerts, and other occasions which drew significant numbers of visitors to local areas. The purpose of this participant observation was to enable the collection of information that would have been difficult to obtain through other methods. Such data include local event demographics and attendance levels, the themes around which events were focused, and the perspectives of organizers and other participants. For example, many festivals across the Gulf Coast feature the seafood industry and by attending such events ethnographers were able to document changing attitudes and practices concerning local seafood, both on the part of locals and visitors. Participant observation was especially important in the case of the tourism industry because the funding of festivals, concerts, and other events intended to draw visitors was an important aspect of post oil spill recovery efforts in many communities.

## 3.3. A BRIEF HISTORY OF TOURISM IN THE STUDY REGION

Gulf Coast tourism dates back to the 19th century in areas such as Biloxi, Mississippi, Dauphin Island, Alabama, and Grand Isle, Louisiana (Stielow 1982; Taylor 1998). Similar to other U.S. regions, tourism businesses along the Gulf Coast initially catered mainly to the upper classes, but eventually began to market to a broader range of society (Myer-Arendt 1995). The tourism of the 19th century centered on coastal beaches and recreational fishing, which proved to be important attractions for populations further inland. Mirroring nationwide trends, the number of visitors to many Gulf Coast communities, including Grand Isle, Louisiana and Biloxi, Mississippi began to expand considerably following World War II. The proliferation of the automobile and the rising development of regional and national highways and other infrastructure made tourist destinations increasingly accessible to large numbers of people (Myer-Arendt 1995; Husley 1998; Sullivan and Powell 1999). These processes gained speed and impetus during the 1970s and onwards, with further investments in transportation infrastructure and the extensive development of local, especially waterfront, real estate (Husley 1998; Taylor 1998; Jackson 2010). New hotels, high rise condominiums, fishing lodges, and other housing and lodging aimed at capturing the rising numbers of tourists sprang up during the 1980s and 1990s

81

in communities such as Orange Beach and Gulf Shores, Alabama and Biloxi, Mississippi, substantially increasing land values in the process (Jackson 2010; MS DMR 2005).

Gulf Coast businesses related to tourism have always had to contend with environmental and social factors specific to the area. Perhaps foremost among environmental challenges are the tropical storms and hurricanes which distinctly mark life across the Gulf Coast and which damage or destroy tourism-related businesses and accommodations as well as other forms of commerce, housing, and infrastructure. Hurricanes have dealt heavy and sometimes fatal blows to tourist enterprises in certain communities. For example, both Grand Isle, Louisiana and Bayou La Batre, Alabama were severely impacted by powerful hurricanes in the late 19th and early 20th century (Stielow 1982; Gaillard et al. 2008). In both cases it would take decades before tourism to these communities began to recover. In other areas tourist businesses and infrastructure have been more rapidly and frequently rebuilt following the damage caused by various storms (Husley 1998). As investments in tourism infrastructure, real estate development, and the numbers of yearly visitors to many Gulf Coast communities have grown, the potential dangers posed by hurricanes to lives and property have likewise expanded in scope (NOAA 2008).

The heavily industrialized landscape of much of the Gulf Coast sets it apart from many other popular U.S. tourist destinations and presents unique obstacles. Plaquemines Parish, Louisiana, for instance, ranks among the premier recreational fishing destinations in the country, but is also one of the regional centers for the oil and gas industry. Pollution, wetland loss, and other issues tied to industrial presence and development have had important implications for tourism and have generated conflicts among local and non-local actors favoring alternative models of development. Such disagreements have occasionally found some resolution, for example in the utilization of active and abandoned oil rig sites as prime fishing grounds by the recreational fishing industry (Dauterive 2000; Jorgenson 2009), or the establishment of the "Mr. Charlie" oil rig as a popular tourism site in Morgan City, Louisiana (International Petroleum Museum 2011). Other issues, such as the impacts of industrial runoff on the marsh environments and fish populations vital to Gulf Coast tourism, continue to be heavily debated. Wetland loss is a major ongoing problem with which coastal residents have to contend (Caffey and Schexnayder 2003; Dean 2006; Burley et al. 2007). With respect to coastal tourism, wetland loss and saltwater intrusion pose particularly pressing dilemmas for nature tourism and environmental education programs and for the recreational fishing industry.

The growth of nature-based tourism and environmental education in recent years has fueled further discussion and argument about the nature of development in the area. Local leaders in Louisiana, Mississippi, and parts of Alabama tout their "working coasts" while simultaneously promoting forms of tourism which are dependent on local waters and marshes. Nature-based tourism and environmental education have been slow to develop on the Gulf Coast, but over the past decade or so, tourism emphasizing local landscapes, cultures, and "authenticity" has gained more local and regional support (Stuart 2001; GulfBase 2004; Ruddiman 2011). Aside from hunting and fishing, wildlife viewing, "swamp tours", and national parks all serve as popular attractions. Nature-based tourism and environmental education are often linked to "cultural tourism", especially in southern Louisiana where an industry has sprung up around various formulations of Cajun culture and "Cajunness" (Wiley 2002). In south Louisiana and along the Gulf Coast, annual festivals and celebrations, for example Blessing of the Fleet ceremonies in fishing communities, food festivals featuring French and Cajun cuisine, and various music festivals, are among the most tangible manifestations of "local culture" and often attract large numbers of tourists. These festivals and celebrations commonly integrate aspects of

local landscape, traditional livelihoods, and food. The Louisiana Association of Fairs and Festivals (2012) website lists over 150 annual festivals in this state alone.

While tourism has had to contend with the ongoing industrialization of the Gulf, the tourism industry has itself had considerable impacts on local environments, lifestyles, and patterns of work in many coastal communities. For example, in areas like Lower Plaquemines Parish, Louisiana, and coastal Alabama, the rapid, extensive development of charter and recreational fishing industries have at times brought the operators of such businesses into conflict with commercial fishermen. Many commercial fishermen negatively associate the development of charter and recreational fishing to growing competition for limited resources, including fishing grounds and dock space (Louisiana SeaGrant 2008). Commercial and recreational fishermen compete directly for certain species of fin fish, as well as for other marine life. The designation of particular fish, for example redfish (see above), as "game fish" and the introduction of new state and federal regulations on fishing grounds can affect various aspects of commercial fishing, including how and when fish can be harvested. The development of such regulations over the years has at times inflamed tensions amongst commercial, charter, and recreational fishermen. The shortage of dock space in particular, was exacerbated following the hurricanes of the 2000s (see below).

Other tourism-driven industries have also sometimes come into conflict with certain local interests. For example, large scale casino development in Biloxi began in the early 1990s in an effort to create new sources of revenue for the area in the midst of an economic downturn (Sullivan and Powell 1999; Nuwer and O'Brien 2006; Hashimoto et al. 2011). The gaming industry has expanded dramatically since then, both in Biloxi and in other towns along the Mississippi Gulf Coast, and has transformed the beachfront and other aspects of local landscapes. Many credit gaming with creating a huge number of relatively well-paying new jobs and generally raising local employment standards. Despite the impacts of Hurricane Katrina and the more recent economic recession, coastal Mississippi casinos and hotels continued to employ 11,453 during the second quarter of 2010 out of a total tourism workforce of 22,600 (Mississippi Development Authority; Phillips 2011). However, opponents and detractors often blame casino development for the loss of traditional local culture, the disintegration of established social networks, and increased crime and poverty (Sullivan and Powell 1999; MS DMR 2005).

Sub-sectors of the tourism industry draw their workforce from different sources. Smaller retail businesses such as non-franchise restaurants and gift and souvenir shops generally employ local residents. In most cases, the charter and recreational fishing industries are also composed of local residents. Plaquemines and St. Bernard parishes, Louisiana are exceptions to this in that many charter fishermen working in these areas reside for the most part in other areas of south Louisiana although they commonly maintain fishing camps in these two parishes as well. Historically, African Americans provided much of the labor needed to maintain and staff larger hotels and tourist resorts in study areas with larger populations and more developed infrastructure such as Biloxi, Mississippi and Orange Beach, Alabama. More recently such businesses, along with other large tourism businesses such as nationally franchised retailers and casinos, have drawn significant portions of their workforce from newer immigrants to local areas. For example in Biloxi, Vietnamese and Hispanics constitute a large part of the workforce in local casinos. The gaming industry and other larger businesses have also begun to employ foreign guest workers. Guest workers often perform domestic cleaning and maintenance duties in casino and resort hotels (Urbina 2005).

The nature and extent of the tourism industry's presence varies considerably across coastal communities, reflecting different histories of development, and social and economic conditions. Some areas focus overwhelmingly on particular forms of tourism, for example charter boat fishing, whereas others possess highly diversified tourism sectors incorporating a wide range of businesses, such as recreational fishing, gaming, and ecotourism. Furthermore, the relationships amongst various sub-sectors of the tourism industry as well as those amongst tourism and other local industries are often quite disparate from one area to another.

### 3.3.1. Hurricanes of the 2000s

The tourism industry, like nearly every other Gulf Coast economic sector, was powerfully impacted by the hurricanes of the 2000s, especially Hurricane Katrina. Katrina destroyed huge numbers of tourism businesses and related infrastructure across our study areas, including in Grand Isle, Louisiana, Dauphin Island, Alabama and Biloxi, Mississippi (Economics and Statistics Administration 2005; U.S. Travel and Tourism Advisory Board 2006). The rebuilding of tourism infrastructure and businesses following Katrina has been uneven, both across communities and with respect to particular tourism sub-sectors. Where reconstruction did occur it played an important role in attracting large numbers of skilled and unskilled laborers to many coastal communities. In some areas, such as Harrison County, Mississippi and Baldwin County, Alabama this in-migration substantially altered local demographics as Hispanics constituted a high percentage of this post-Katrina workforce (Donato and Hakimzadeh 2006; Redwood 2008). Some Hispanic workers, as well as others who worked on cleanup and reconstruction, began to work in the tourism industry once this work had died down.

Certain businesses, such as the majority of casinos as well as some nationally franchised restaurants along the Mississippi Gulf Coast, rebuilt very soon after Katrina (Cords 2011; Hashimoto et al. 2011) and quickly regained large portions of their market share (Economics and Statistics Administration 2006). However, other less well capitalized businesses, including many locally owned restaurants, hotels, bait shops, and small scale family attractions, failed to rebuild or reopen (Rowley 2008; Scurfield 2008). Specialized sectors such as charter boat fishing, which rely heavily on personal relationships with clients, had difficulties recovering some long-standing customers following the storm.

The impacts of Hurricane Katrina varied across study communities. Damage was particularly extensive in Plaquemines and St. Bernard parishes, the Mississippi Gulf Coast, and South Mobile County. The fishing industry experienced very heavy losses, with Katrina destroying 80% of recreational and commercial fishing related businesses and infrastructure in Mississippi and 90% in eastern Louisiana (Economics and Statistics Administration 2006; Posadas 2010). In Louisiana tourism industry employment dropped 9.2%, with over 10,000 tourism jobs lost in 2005 (U.S. Travel and Tourism Advisory Board 2006). 15,600 jobs in the leisure and hospitality sector along the Mississippi coast were estimated to be lost following the storm (Phillips et al. 2006).

While all regions of our study area suffered damages from Katrina, the effects of this hurricane were relatively minor in Baldwin County, Alabama and in portions of southern Louisiana including Terrebonne, Lafourche, and St. Mary parishes, Louisiana when compared to the impacts of other storms which struck these areas during the same decade. Homes did flood in Terrebonne and Lafourche parishes during Katrina and Rita in 2005 but the area was damaged

more severely when hurricanes Gustav and Ike hit the Louisiana coast in 2008. Similarly, Baldwin County, Alabama suffered more extensive negative impacts from Hurricane Ivan in 2004 than from Katrina in 2005. The tourism industry in this area was very heavily affected, with charter boat trips between September and October 2004 falling to 25% of 2002 and 2003 levels. Additionally, the destruction caused by Ivan prompted many dock and marina owners in the area to sell their property to condominium developers, aggravating the ongoing concerns of local commercial and charter boat fishermen about the lack of dock space in the area (Chang et al. 2006).

All of the major storms of the 2000s, and particularly Katrina, were followed by an influx of federal money and agencies, non-profits, contract workers, and volunteers into affected areas, although the extent to which this occurred varied by community. Many tourism-related businesses which managed to open back up after Katrina experienced a surge in business, due to the arrival of relief workers and the fact that local business competition was substantially reduced after the hurricane. However, the absence of lodging was a serious factor limiting long distance tourism for several years following Katrina. In 2010 the number of hotel rooms along the Mississippi Gulf Coast was still around 24% lower than pre-Katrina figures. Hotel rooms were particularly scarce in the Biloxi and Gulfport area, where numbers were approximately 45% lower than before Katrina, and the beachfront area was considerably underdeveloped compared to the situation prior to the hurricane (Gulf Coast Business Council 2011a).

In some cases the situation after the storm gave rise to innovations on the part of tourism business owner and operators which have had lasting impacts. For example, because damaged hotels and motels were slow to be repaired or rebuilt in Plaquemines and St. Bernard parishes, charter boat captains sometimes converted fishing camps to fishing lodges to house their customers. This new all-inclusive twist to the charter fishing experience proved popular in these communities. The post-Katrina "boom" came to an end around 2007-2008, coinciding with the national recession and with the departure of many cleanup workers (Gulf Coast Business Council 2008). Economic indicators were looking up around the end of 2009 and the beginning of 2010, and people in the tourism industry, similar to those in many other sectors, reported having entertained high hopes for 2010 as the "come back year" for their communities and the coast.

## 3.4. MAJOR OIL SPILL ISSUES, IMPACTS, AND RESPONSES IN 2010

All of the types of tourism considered in this section suffered negative impacts across the five study areas in the immediate aftermath of the oil spill (The Knowland Group 2010; Mackey 2010; Phillips 2011; Gulf Coast Business Research Council 2011a). While some impacts were specific to particular tourism sub-sectors, or to tourism in certain communities, the Gulf Coast tourism industry as a whole shared common experiences and concerns following the spill.

The unremitting media coverage of the spill during summer and fall 2010 figured prominently among such more generally relevant issues. Media attention focusing on the oil spill proved to be a major concern in areas that actually received oil and those which did not. Like many other coastal residents, those involved in the tourism industry often attested that the physical extent of the spill had been limited to a few areas and that a lack of specificity on the part of the media was responsible for widespread public perceptions of oil covering the entire Gulf Coast. Across study areas, tourism businesses reported receiving high volumes of calls during summer 2010 inquiring about the presence and impacts of oil and dispersants. Tourism-

related businesses which normally take reservations experienced very high cancelation rates following the oil spill and a heavy loss of business during 2010 (The Knowland Group 2010; Mayock 2010; International Property Journal 2010). This, combined with the availability of BP related cleanup work, sometimes resulted in these businesses losing employees who frequently stood to earn more money working on the oil spill cleanup. As with the commercial fishing industry, people in the tourism industry frequently mentioned to researchers that the effects of the oil spill on tourism had been particularly pronounced because the spill had occurred at the onset of the summer season, by far the most important time for tourism along the Gulf Coast.

The impacts of the spill on tourism stretched beyond issues of image and perception. Within the study area, local governments closed beaches on Grand Isle and Port Fourchon, Louisiana throughout much of 2010 following the oil spill. Some beach areas on Grand Isle reopened in August 2010 while Fourchon Beach remained closed through the end of the year. Beaches in Gulf Coast Mississippi and Alabama were never officially closed but received oil spill advisory warnings from state marine resources departments at various times during summer and fall 2010 (National Resources Defense Council (NRDC) 2011).

During summer 2010 both federal and state waters were opened and closed multiple times to recreational and commercial fishing, sometimes within very short periods (Louisiana Wildlife and Fisheries 2010; MDEQ 2010; NOAA 2010). The extent and duration of closures varied by geographic area (see Part One). At times certain types of activity, for example finfishing, were permitted while others, such as crabbing, were prohibited. In many cases, operators in the tourism industry reported an almost complete stoppage in business during summer 2010. However, those who continued to operate complained about the lack of advance notice and information regarding beach, water, and marsh closures. This was especially the case among inshore and offshore charter boat fishermen, whose businesses often depended on access to a range of waters. Water closures also impacted nature tourism as well as local marinas and docks. The fear of impending water closures sometimes prompted recreational boat owners to leave marinas located in communities which had received or stood to receive oil, and to take their vessels elsewhere. Marina owners who had suffered such losses reported that such customers were difficult, if not impossible, to regain since in many cases they had found new places to dock in other states. A marina owner in Coden, Alabama discussed these types of impacts on his business:

Since the oil spill we've lost most of the boats that generally dock here. When the boom was put up in the summer [2010], people that had their boats here got scared of being boomed in. The sailboat [owners] in particular were afraid because they depend on the winds. Then people started discussing the possibility of an oyster shell dam across the mouth of the river to keep the oil out…They said that they were going to leave a gap until the oil came and then they were going to close it. When people heard this, everyone left (PP506 2011).

Many coastal restaurants catering to tourists prominently feature Gulf seafood on their menus. In addition to dealing with the fears surrounding Gulf seafood following the spill, these restaurants also had to deal with substantial increases in the prices of local seafood as well as scarcity in supply resulting from water closures and few active commercial fishing vessels. In general, restaurant suppliers could compensate to an extent for the declines in supply of Gulf shrimp, fish, and crabs by turning to other domestic and foreign sources. The majority of oysters

consumed in the U.S., however, originate in the Gulf and there was no easy way for restaurants to adequately increase their supply. A number of restaurants temporarily took oysters off the menu in 2010, a decision that in some cases stretched into 2011. A restaurant owner in Ocean Springs, Mississippi discussed some of the issues that he and others in the business faced following the spill:

> We had to take oysters temporarily off the menu at our other restaurant following the spill. We could not easily get oysters the previous summer and those that we found were very expensive…We are getting oysters from TX now. We generally got them from Pass Christian. Some of the best oysters in the world came from Pass Christian, but the waters around Pass Christian weren't open for dredging this past [2010-2011] season (PP1017 2011).

Some in the tourism industry were able to partially or fully compensate for lost business, most commonly by becoming involved in the oil spill cleanup effort in various ways. For example the owners of marinas which were well situated to serve as staging points for cleanup work were able to lease or rent parts of their property to BP, and sold fuel and other supplies to boats working on the VOO program. Charter boat captains and deckhands, and those involved in water-based nature tourism often went to work for the VOO program or provided water transport for researchers and media personnel. Some restaurants which normally depended on tourist customers were able to formally cater for BP and cleanup contractors. Hotels along the coast hosted BP officials and cleanup workers (See Section 2.5 below).

Those who were able to obtain work tied to the cleanup effort generally reported being well compensated. Indeed, some stopped serving their usual tourist clientele altogether and focused exclusively on their work for BP. One major complaint by marina and restaurant owners was that formal catering and service contracts with BP were generally limited to a few, better-capitalized businesses in each community. In some areas, especially in early summer 2010, non-local contractors held the majority of such contracts, something which drew strong criticism from restaurant owners and employees. Later on in the course of the cleanup, catering was still largely carried out by a few restaurants in each community, and establishments which had not managed to secure official contracts commonly reported that their business had not witnessed much of an upturn from incoming workers. Of those who *had* managed to obtain BP-related work, a few expressed dissatisfaction with the ways in which they had been forced to alter their business operations to suit clean-up effort. A marina and restaurant owner in Orange Beach, Alabama, voiced this type of opinion:

> During summer 2010 our marina had served as a staging site for the VOO program. Normally this marina and the adjoining restaurant are the hub of the local waterways since we have 70 slips, way more than any other place around here…The people working on the VOO were not the type of crowd we wanted. They looked for the cheapest thing on the menu and they were rough. This restaurant is a family restaurant and while we want to have one or two characters in the place, it was hard dealing with a whole restaurant full of them…we had to reduce the prices on many items since the people working on the VOO refused to pay the normal prices (PP1018 2011).

The impacts of cleanup workers on local economies were generally more constrained and limited than that of regular tourists. As stated in the most recent report by the Alabama Tourism Department (2010), oil spill workers who stayed in coastal communities for cleanup work during summer and fall 2010 likely did not spend the same amounts as regular tourists and did not access the same range of facilities and attractions. Furthermore, while businesses had often diverted significant resources and energy into shifting to cleanup work, such work generally lasted for a far shorter period of time than most had expected.

Work on the Vessels of Opportunity (VOO) program was more widely dispersed than catering and marina contracts, but those who operated businesses tied to the water expressed anger about the program's employment of both local and non-local people unaffiliated with the commercial or recreational fishing industry. A very common complaint voiced by those involved in the VOO program concerned the unpredictability and sporadic nature of their employment, with many being put on "stand-by" for varying periods of time both prior to and after having been hired, and then having their employment terminated with little warning. BP officially halted the VOO program in Florida, Alabama, and Mississippi on September 16, 2010 but continued on with the program in certain areas of Louisiana, including Plaquemines and Jefferson parishes (BP 2010).

People involved in the tourism industry commonly disagreed about who had been "really" impacted by the spill. While the great majority of those in tourism acknowledged that the commercial fishing industry had been impacted by the spill, a few people insisted that the impacts on tourism had in fact been worse. There was also disagreement as to who within the tourism industry itself had actually been impacted. Like commercial fishermen, people involved in charter boat fishing and in other tourism businesses which relied on local waters and seafood often stated that those who made their living from the water should be compensated before souvenir shops, restaurants, and other tourism retail businesses. Furthermore, some in the tourism business argued that those people in tourism and other industries who had could not provide adequate documentation did not deserve to receive claims payments. A charter fisherman operating out of Plaquemines Parish expressed such an opinion:

> The people that are pissed about the claims process are people that never declared any of their income before and were never in the system. So for once, it pays to be a good guy… I went in person [to the claims office] because I had three inches of paperwork of documentation (BR030 2011).

In contrast to other coastal tourism sectors, the gaming industry along the Mississippi Gulf Coast actually posted slight increases in revenues during the last three quarters of 2010 relative to these same quarters in 2009 (MS Department of Revenue 2010). This reversed a downward trend of seven consecutive quarterly declines since 2008. However, casino employees from both Mississippi and Louisiana staged a protest in Biloxi, Mississippi in December 2010 which was intended to draw attention to the losses they claimed were suffered by casino workers in the aftermath of the oil spill (Pham-Bui 2010). Workers as well as members of local gaming associations expressed that general increases in casino revenues did not accurately reflect the situation of casino employees, many of whom rely heavily on tips (Jervis 2010). Kenneth Feinberg met with local casino officials later on that same day and stated that GCCF would reexamine casino worker claims (Wilkinson 2010).

While the majority of people in the tourism industry fell into the same general claims process as others filing claims, GCCF established a special $60 million fund for those in the real estate business who had been affected by the oil spill. However, initially only those in the real estate business who had suffered a loss in rentals following the spill could file a claim. Those who had suffered a loss in sales were not eligible.

On May 17, 2010 BP announced that it was allocating grants specifically intended to promote tourism to the coastal areas of all four states. Florida received $25 million and the other three states each received $15 million. The way in which funds were portioned out and put to use differed across states. In Louisiana, for example, the funds were evenly divided by the lieutenant governor amongst three broad initiatives intended to promote tourism to coastal parishes, to the Greater New Orleans Area, and to the state of Louisiana as a whole (State of Louisiana 2010). A portion of BP funds went to assist the formation of the Louisiana Tourism Coastal Coalition, a new organization intended to promote the Louisiana coast as a tourist destination (Visit Louisiana Coast 2010).

Annual festivals and other public events constitute an important part of the tourism season in many Gulf Coast communities and frequently suffered considerable losses following the spill (Breed 2010). For example, fishing rodeos are key attractions and sources of revenue for coastal communities, and many were cancelled in 2010. BP tourism funds often went towards sponsoring established local festivals and events as well as putting on new public events, such as concerts, specifically intended to draw tourists to the area. A common reservation among those in the tourism industry about these events was that the crowds they brought to the area were only temporary and that public perceptions of coastal areas remained very sensitive to future media representations of the area as well as to the results of ongoing scientific testing of waters and marine life.

## 3.5. MAJOR OIL SPILL IMPACTS, ISSUES, AND RESPONSES IN 2011

For many in the tourism industry early 2011 was a time of considerable ambiguity. BP contracts, huge numbers of cleanup workers, and other sources of revenue related to the oil spill had largely played out by fall 2010. Many tourism-related businesses, including hotels, real estate rental agencies, and charter fishermen, expressed concern about a lack of advance reservations for summer 2011 and reported that the absence of reservations was very unusual and at least partially the result of continued uncertainty surrounding the oil spill and its long-term impacts. A charter boat fisherman from Plaquemines Parish lamented the low and uncertain state of his business in spring 2011:

I only have a hand full of bookings for this year. I'm taking my first trip out in two weeks, but I should've had something at least every weekend this month. It's definitely not enough to survive on. And with the start of spring of 2010, I was ready to have my best year since Katrina. I'd say I had around 100 bookings, but I also get trips from some of my other friends who are fishing guides and need more than one boat to take out a group on the water (BR060 2011).

Many in tourism feared that new mentions of the oil spill and dispersant use in media outlets during spring 2011 would renew or increase public concern about water and seafood safety.

The Mississippi River flooding of spring 2011, which affected St. Mary, Assumption, Terrebonne, Plaquemines, and Jefferson parishes, was an event which captured national attention. Much of the Gulf Coast, including the Mississippi and Alabama Gulf Coasts, as well as parts of south Louisiana, suffered little or no physical damage from the flooding aside from impacts to local oyster beds. However, motel owners and charter boat captains in unaffected areas nevertheless reported cancellations from clients based on media reports describing widespread flooding throughout the region. Among tourism business operators, those involved in charter and recreational fishing held the most immediate concerns about the short- and long-term impacts of flooding on fishery populations in various regions of the Gulf. Nevertheless, following the flood charter fishermen, marinas, and bait shops reported few lasting impacts resulting from this event.

High gas prices and the national recession were two other major factors affecting the Gulf Coast tourism economy in 2011 (Gulf Coast Business Council 2011b). Tourism businesses in the area have come to rely on customers spanning much of the southeastern United States and other parts of the country, but a significant portion of the industry is still dependent on drive-in customers, a segment which clearly stood to be directly impacted by the rise in gas prices.

Sections of beach remained closed in Port Fourchon, Louisiana throughout summer 2011. In Grand Isle, Louisiana major sections of beach were opened for public use in May 2011, in time for Memorial Day Weekend. However, late in summer 2011, beaches on Grand Isle were again issued advisories after Tropical Storm Lee in August 2011. The storm deposited tar balls along a broad span of the Gulf Coast beaches, including on Fourchon Beach, and in Orange Beach and Gulf Shore, Alabama. The sight of new tar balls and cleanup crews prompted fresh concern about the continuing economic and environmental impacts of the spill.

NOAA opened all federal Gulf waters to recreational and commercial fishing on April 19, 2011. A few state areas in Plaquemines and Jefferson parishes remained closed to commercial fishing, but were open to recreational activity (Louisiana Wildlife and Fisheries 2011). In a very few cases marinas and docks in these parishes were still serving as staging sites for cleanup in summer 2011. Likewise, some charter fishermen in these areas, as well as a very small number of fishermen in Mississippi and Alabama, were still involved in working on the oil spill cleanup, either for contractors or directly for BP.

The majority of businesses related to tourism resumed regular operations in 2011 and most agreed that despite its late start, summer 2011 nevertheless ended up being a fairly good season. Those in the charter and recreational fishing industries often commented that fish and other marine life were particularly abundant this year because of the low numbers of people who had fished recreationally and commercially during 2010. However a few species, for example speckled trout, was reported by the majority of charter boat captains as being considerably down in number during summer 2011. Regulations on fishing, bad weather, and high fuel prices were the main reasons given for the 2011 fishing season getting off to a slow start. Fishing tournaments, sometimes partly sponsored by BP, generally had a fair to good turnout. Fishing tournaments began to be held once again off the coast of Grand Isle, Louisiana which had experienced some of the most extensive and long standing beach and water closures following the oil spill. The first such tournament to be held, the Swollfest Fishing Rodeo which was cancelled due to the spill in 2010, drew around 600, which was nearly twice as many as

registered in 2009 (Braxton 2011). Registration for the Grand Isle Tarpon Rodeo, the largest tournament held on the island, was reported to be up 20% over recent years (Rioux 2011). In Dauphin Island, Alabama the annual Alabama Deep Sea Fishing Rodeo set a world record for largest fishing tournament (Petri 2011).

Retail business catering mostly to tourists was generally much better than in 2010 and in some cases was reported to approach pre-spill levels. However, there was a broad consensus among those in the hospitality business, charter boat fishing, and other tourism sub-sectors which took reservations that businesses were relying much more in 2011 on short notice and even on walk in customers, which made planning ahead difficult. Even those in the tourism industry who reported having a relatively good summer 2011 season complained that long term planning had been much more difficult this year. This was the case with this real estate agent based in Dauphin Island, Alabama:

> We did all right in 2011. We saw lots of "new faces" during the summer 2011 season, although we lost clientele as well. The amount of time that people stay in the area has gone down a bit. Generally people stay for a week, but this year they have been staying for three or four days…the lack of reservations before and during the season was a problem. It made it hard for us to plan or budget ahead (PP1020 2011).

The majority of those in tourism discussed how they continued to receive inquiries from tourists and potential tourists about the safety of local waters and seafood and the presence of oil and dispersants. Those few people in tourism who still worked for BP had additional worries about retaining customers, as their work on the cleanup generally kept them from serving their regular clientele. Businesses featuring Gulf seafood continued to suffer in 2011 from a combination of factors, including sporadic availability of product, higher prices, and the continuing fears of customers. Toward the end of the summer many in the tourism industry expressed considerable uncertainty about the future of their businesses. A charter fisherman operating out of Plaquemines Parish expressed:

> I'm not worried about the big fish. It's how the babies are doing that worries me. Both trout and red fish lay their eggs on sandy bottoms in the bays around here…I know from working the clean-up that there's a lot of oil that has been sunk to the bottom of the bays because of the dispersant they used. I've seen tar balls come up to the surface that are as big as houses. No kidding. So if there's oil all on those sandy bottoms, the mamas can't lay their eggs this year and that's going to be really bad for us in a couple years…It can take a red fish 20 years to get that big, so if we lose a whole year or two of babies, we could be waiting a long time to get a red fish breeding stock back again (BR059 2011).

Others, including one beach vending employee in Biloxi, were less concerned about the physical safety of the water and seafood; rather, they were more preoccupied with the oil spill and subsequent media coverage prompting visitors and potential visitors to remain suspicious of everyday realities of life along the coast, such as muddy or brackish water (PP1014 2011).

Some in the tourism industry feared that dolphin deaths, tarballs, and other phenomena would be uncritically linked to the oil spill in the months and years to come and would continue to prompt potential tourists to reconsider or cancel their trips far into the future.

In 2011, the gaming industry along the Mississippi Gulf Coast continued to post slight increases in revenue relative to 2010. By the second quarter of 2011 the coastal gaming industry had posted revenue increases over five consecutive quarters (Gulf Coast Business Council 2011a). In March 2011, GCCF announced that it would soon start processing 2,500 claims from casino workers along the Gulf Coast (Associated Press 2011).

In February 2011 the GCCF expanded its claims process for the real estate industry to include the possibility of claims on losses suffered on residential transactions. In the spring of 2011, BP announced a second round of tourism grants to affected states. The grants were slated to be dispensed and spent over three years. Florida received $30 million to be divided between seven coastal counties. In March 2011 Louisiana received $30 million with the Greater New Orleans Area set to receive $6 million and with $2.2 million set to issue to Jefferson, Terrebonne, Lafourche, St. Bernard, Plaquemines, and St. Tammany parishes. The remainder will go to the State Department for Culture, Recreation, and Tourism to fund general tourism advertisement and marketing for the state and will be divided among the other Louisiana parishes according to extent of oil spill impacts they each suffered. Dispersal of the funds are being overseen by the lieutenant governor's office and channeled through the Community Foundation of Acadiana (Office of Lt. Governor State of Louisiana 2011). The Louisiana Tourism Coastal Coalition will also be involved in how these funds are utilized in the coastal parishes (Visit Louisiana Coast 2011). The state introduced a new marketing campaign centered around the theme "Pick your Passion." Some of the areas on which the campaign focuses include local festivals, recreational fishing, and promotion of lesser-known regions of south Louisiana as tourist destinations. As with Alabama and Mississippi, the state of Louisiana was also attempting to aim a portion of BP funded advertising at non-traditional markets (Viator 2011).

Biloxi/Gulf Port, MS and Orange Beach and Gulf Shores, Alabama present two broadly different approaches to post-spill recovery. While both areas rely heavily on tourism, Biloxi/Gulfport has a large commercial fishing industry as well as one of the largest concentrations of gaming establishments in the United States. Furthermore, Biloxi/Gulfport has a long history with the military, and this has significant impacts on the local economy. In contrast, Orange Beach and Gulf Shores are much more singularly focused on beach tourism. As one local south Baldwin County official put it, "Here, the beach and the white sand are the only reason for the business community to exist. Gulf Shores started developing in the 1950s because of the beach. If it had been farmland to the south instead of beach, then there would be nothing here" (PP1016a 2011). Both Biloxi/Gulfport and Orange Beach/Gulf Shores figure as the most important tourist destinations in their respective states in terms of tourism revenues, but the areas differ with respect to the forms of tourism on which they focus. The beachfront is the major "attraction" drawing tourists to Orange Beach/Gulf Shores. While the beach also figures as an important tourist attraction in Biloxi/Gulfport, rebuilding along the beachfront has been uneven since Hurricane Katrina, and the beachfront is mostly dominated by large corporate gaming establishments and nationally franchised restaurants and hotels.

Following the oil spill, Alabama and Mississippi were both awarded $15 million BP grants. Mississippi received an additional $3 million in tourism grant money from BP in August 2010. In 2011, Alabama was awarded a $16 million grant, which was intended to focus on coastal Mobile and Baldwin counties. The grant was overseen by the Alabama Tourism Department and the Alabama Coastal Recovery Commission. Mississippi also received a $16 million grant, which will be portioned out under the newly formed Mississippi Coast Regional

Tourism Partnership. The ways in which coastal Alabama and Mississippi have utilized and plan to employ BP grant money have in some ways varied considerably.

In Orange Beach and Gulf Shores, major recovery projects and initiatives have focused largely on the beachfront. To this end, a "Concerts for the Coast" series was staged using BP tourism grant money during summer and fall 2010 and brought a number of big name entertainers to perform on the beaches in both Orange Beach and Gulf Shores. Beach concerts featuring Jimmy Buffett, Brad Paisley, and Bon Jovi were each reported to have drawn more than 30,000 visitors, although countywide gross lodging revenues were still down 33.2% for summer 2010 (CBS News 2011). Additionally, BP tourism grant money was also used to increase and develop new forms of advertising and to sponsor research intended to benefit tourism. In 2011, Orange Beach and Gulf Shores continued to host concerts, including the three-day-long Hangout Music Festival in May, which were intended to draw visitors to the area, and specifically, to the beachfront. The festival was reported to have brought more than 30,000 visitors to the coast. The area posting record lodging numbers from March-May 2011 and several more concerts and other events were scheduled for 2012 (Viator 2011).

In Biloxi/Gulfport, these types of large-scale events specifically centering on drawing tourist visitors to the beachfront were largely absent during summer 2010. In this area, the initiatives funded with BP tourism grants in the area did not center on special events around the beachfront or on other particular locations. Instead, grant money was utilized on an advertising campaign, as well as on local promotional efforts in Biloxi/Gulfport and in nearby communities such as Bay St. Louis. For example the Hancock County Tourism Development Bureau devised a program where tourists were provided with free transportation to Bay St. Louis, Mississippi as well as $100 in "Magnolia Money", which could be spent at participating businesses in the local area. The program was applauded by some local businesses for greatly stimulating the economy after a very slow summer season. The Mississippi Gulf Coast Golf Association featured another similar program that rewarded golfers booking three day/three night golf package deals with a $100 reward card that could be spent at participating coastal seafood restaurants (Drum 2010). Many of these initiatives were part of the Mississippi Tourism Development Authority's Tourism Division general "Wish You Were Here" advertising campaign, designed to aid post-spill recovery (Mississippi Gulf Coast 2010). As part of this effort, BP tourism grant money was used to partially fund pre-existing Mississippi Coast events including fishing tournaments, seafood festivals, and the annual Cruisin' the Coast car show (Bowman 2010).

In 2011, the three tourism agencies which had previously separately promoted each of the Mississippi coastal counties were merged together under the newly formed Gulf Coast Regional Tourism Partnership. Proponents of the organization cited its formation as a major event for the area, and as an important step towards post-spill recovery and in promoting future tourism by marketing the entire Mississippi coast as a single tourism destination. Others involved in the local tourism industry argued that the formation of the Partnership was occupying time and resources which would be better spent funding projects and events which stood to more immediately boost tourism. The organization started to accept grant proposals in September 2011 and has stated that it will continue to accept proposals until December 2011. The types of projects and items eligible for funding included advertising efforts outside of the six Mississippi coastal counties, event production, and economic research (MS Gulf Coast Regional Tourism Partnership 2011). 2011 saw few major events specifically intended to spur post-spill recovery staged in Biloxi/Gulfport and along the Mississippi Gulf Coast generally speaking. However, a number of regularly-held annual events, including the Blessing of the Fleet ceremony, Christmas

in the Pass, as well as several fishing tournaments and boat races were partially sponsored with BP funds (BP 2011). Furthermore, following its formation, the Gulf Coast Regional Tourism Partnership invested in research focusing on obtaining information about tourist visitors to the Mississippi Gulf Coast and their perspectives on the area.

At the end of the 2011, Alabama's tourism numbers were reported to be up 51% since the previous year, while Mississippi was up 7% over 2010 (Keating 2011). In South Baldwin County, residents, business owners, and workers expressed fewer disagreements over the utilization of BP tourism grant money than in many other study communities. This was due to a number of factors including the absence of much economic activity outside of the tourism sector, the relative uniformity of the tourism sector in terms of its concentration on the local beachfront and waterways, and continuing local business ownership. In this area the tourism sector did not have to reconcile the interests of highly divergent sub-sectors within the tourism industry, nor did it have to deal with strong local interests representing other industries, such as commercial fishing. Many business owners and employees in the South Baldwin County tourism industry expressed satisfaction with local governments' post-spill efforts and expressed that summer 2011 had been a good season, although they still voiced uncertainty about the future.

In Biloxi/Gulfport there was more disagreement about the way in which BP tourism grant money had been utilized and how recovery had played out. Those in tourism who depended on the beachfront and local waters commonly expressed that the presence of the gaming industry had marginalized the concerns of those involved in other forms of tourism in the area. For example, a vending stand owner in Biloxi stated:

> Most of the shops and restaurants and other businesses which used to exist along the beach did not come back after Katrina…there are very few places for people to stay if they want to come to the beach. Not everyone can afford to pay $250-500/night for a room at the casinos…The problem is that the city looks at it like these are just vendor stands and they're not a big deal. They don't see that if the people come to the beaches they will go to the stands, but they will also go to the restaurants and other businesses nearby. Some people don't want to just go to the casinos (PP1019 2011).

The aftermath of the oil spill was thus held to be in line with a particular, local vision of development which dated back to Katrina, and which was held to favor the development of the gaming industry and other large, corporate business at the expense of smaller scale tourism businesses in the area. Many local residents as well as business owners and employees involved in non-gaming tourism stated that gaming tourists would continue to come to the area regardless of the condition of the local environment, whereas the majority of other tourism businesses in the area were highly dependent on the state of local waterways and beachfront. Many in the tourism industry in the Biloxi/Gulfport area spoke directly about the need for concerts and other events of the kind staged in South Baldwin County and other areas of the coast after the spill. The diversity of the economy across the three Mississippi coastal counties, divisions within the tourism sector itself, as well as a heavy presence of non-locally owned businesses were are all factors which complicated post spill recovery efforts for the tourism industry in Biloxi/Gulfport.

## 3.6. SUMMARY

All of the sub-sectors of the tourism industry discussed in this section were impacted to some degree by the BP oil spill. Negative media attention was the most common impact reported by owners and employees across these sub-sectors, as well as tourism industry advocates and officials. Renewed negative media attention on the area in 2011 and beyond was also among the most widespread fears of people in tourism. In this respect, the experiences of tourism industry along the Gulf Coast in 2010-2011 were similar to the experiences of those involved in tourism in Alaska following the Exxon Valdez oil spill. There too, actual physical impacts often had little correlation to declines in tourism business, which were heavily influenced by extensive media coverage (Greenberg 1990). The success of various tourism marketing initiatives along the Gulf Coast, as well as media coverage and the results of continued scientific testing will all play important roles in how well the coastal tourism industry can recover over the coming years.

Aside from these more overarching concerns, different types of tourism also face more individual problems. For example, continued testing of seafood arguably has more potential to impact seafood restaurants and those in the charter and recreational fishing business than those in other sub-sectors of the tourism industry. For beach vendors and others concentrating specifically on beach tourism, the potential for future storms and hurricanes to deposit tar balls and other residue on local beaches is a continuing source of worry. This was confirmed to an extent by Tropical Storm Lee in fall 2011. However, this storm certainly did not present a worst-case scenario by the standards of the region, and tourism in 2011 benefited from an absence of the truly devastating hurricanes so common to the area.

As demonstrated in this section's discussion of the post-spill period in Orange Beach and Gulf Shores, Alabama and Biloxi/Gulfport, Mississippi, impacts and recovery also varied across communities and depended on various factors, including the types of tourism present in a given area, the community's ability to obtain BP tourism grant money, as well as the diversity of local tourism and the more general economy. For example, in an area such as Biloxi/Gulfport, at least some of the businesses that normally depended on tourist customers managed to draw upon military and corporate customers to a greater extent following the spill. However, in other tourism-based coastal communities that lacked such military or corporate presence, such a shift was not possible. At the same time, the presence of economic diversity sometimes complicated the division of post-spill grants and other resources. Residents and business owners of smaller, lesser-known tourism destinations such as Dauphin Island, Alabama often complained that larger communities, with greater tax revenues, political leverage, and access to media had been much more successful at obtaining available BP grants and funds. Control and allocation of BP grant funds at the state rather than local level, and portions of grants being directed towards statewide tourism rather than coastal tourism specifically, drew general criticism among residents in coastal communities, both those involved in the tourism industry and others.

Some aspects of post-spill recovery have more to do with broader economic conditions. High fuel prices, for instance, stand to have negative impacts on all sectors within the tourism industry. Continued high national unemployment will also clearly not bode well for tourism along the Gulf Coast. Regional and national developments in tourism also have bearing on the future of the tourism industry in particular Gulf Coast communities. For example, the Mississippi coast gaming industry stands to be impacted by the possible development of new casinos in Florida and other nearby states.

As in other economic sectors, some of those involved in the tourism industry were able to at least partially compensate for their losses following the oil spill by becoming involved in the cleanup effort in various ways. However, such work had been long finished for the majority of the tourism industry at the time of this report. Many in the tourism industry are currently involved in the claims process and are waiting on their final settlements from BP. They often expressed worries about the prospect of drawn-out legal battles over spill-related settlements and about the prospect of accepting final settlements when the long-term implications of the spill remained unclear.

As discussed above, the four affected Gulf Coast states have been the recipients of several BP tourism grants since May 2010. To date BP has awarded $30 million in tourism grants to Louisiana, $20 million to Mississippi, $32 million to Alabama, and $52 million to Florida (BP 2011). The long-term effects of such funding is unclear. In some areas, for example in Louisiana and the Mississippi Gulf Coast, BP tourism grants have already facilitated the formation of new tourism organizations and new visions for tourism development. Similarly, in areas of south Louisiana, the influx of BP funds and the promise of more money over the coming years has raised hopes among some groups of promoting new forms of employment, for example in ecotourism and environmental education, in areas which have traditionally relied heavily on work in the oil and gas industry. At the same time, those in tourism expressed trepidation about the new bureaucracies and "red tape" forming around the oil spill recovery process, tourism grants, and the dispensation of recovery funds (Wilkinson 2011). Many of the initiatives based on these monetary sources are still in their infancy and it is difficult to tell to what extent they will be successful and what types of impacts they will have. People in the tourism business continued to hold fears that the positive impacts of BP funded events and initiatives would be fleeting and that the real consequences of the oil spill on coastal areas would not be known for several years.

## 3.7. REFERENCES

Alabama Tourism Department. 2010. Alabama travel economic impact 2010. Available at: http://www.alabama.travel/media/media_room/Report/2010%20Tourism%20Economic%20Report.pdf

Associated Press. 2011. Mississippi casino workers may get oil spill claims money. Mobile Press-Register. March 4.

Bowman, Jessica. 2010. BP awards $3 million to coastal tourism. WLOX. Available at: http://www.wlox.com/global/story.asp?s_13046634

BP. 2010. Mississippi Gulf response. Available at: http://www.mississippigulfresponse.com/go/doc/3055/899595/Termination-of-the-Vessels-of-Opportunity-VoO-Program-Q-A

BP. 2011. Gulf of Mexico restoration. Available at: http://www.bp.com/sectionbodycopy.do?categoryId_41&contentId_7067505

BR030. 2011. Personal communication. Effects of the oil spill on business and area hunting. Discussion with Bethany Rogers. Plaquemines Parish charter fisherman. Saint Bernard Parish, LA. February 18.

BR059. 2011. Personal communication. Fishing industry history and oil spill cleanup. Discussion with Bethany Rogers. Charter fisherman. Plaquemines Parish, LA. March 10.

BR060. 2011. Personal communication. Fishing industry history and oil spill cleanup. Discussion with Bethany Rogers. Charter fisherman. Plaquemines Parish, LA. March 10.

Braxton, Allison. 2011. Grand Isle hosts first fishing rodeo since oil spill. Fox 8 News. Available at:  http://www.fox8live.com/news/local/story/Grand-Isle-hosts-first-fishing-rodeo-since-oil/6mpihQR26021ltPXHvpadA.cspx

Breed, Allen. 2010. Gulf oil spill makes blessing of boats a sad task this year. USA Today. May 4.

Burley, David, Pam Jenkins, Shirley Laska, and Traber Davis. 2007. Place attachment and environmental change in south Louisiana. Organization and Technology 20(3):347-366.

Caffey, Rex H. and Mark Schexnayder. 2003. Coastal Louisiana and south Florida: A comparative wetland inventory. Interpretative topic series in coastal wetland restoration in Louisiana. National SeaGrant Library. Available at:  http://lacoast.gov/new/Data/Reports/ITS/Florida.pdf

CBS News. 2011. Getting around rising airfares. Available at:  http://www.cbsnews.com/2100-500174_162-7211617.html

Chang, Semoon, Chris Denson, and Kevin Anson. 2006. Economic impact of Hurricane Katrina on Alabama seafood industry. NOAA Fisheries. Available at:  http://www.southalabama.edu/mcob/cber/reports/RR63.pdf

Cords, Sarah. 2011. Rebuilding gaming and tourism on the Gulf Coast. Casino Enterprise Management. Available at:  http://www.casinoenterprisemanagement.com/articles/july-2011/rebuilding-gaming-and-tourism-gulf-coast

Dauterive, Les. 2000. Rigs to reef policy, progress, and perspective. OCS Report MMS 2000-073. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Dean, Robert. 2006. New Orleans and the wetlands of southern Louisiana. The Bridge 36(1):35-42.

Donato, Katharine, and Shirin Hakimzadeh. 2006. The changing face of the Gulf Coast: immigration to Louisiana, Mississippi, and Alabama. Migration Policy Institute. Available at: http://www.migrationinformation.org/usfocus/print.cfm?ID_368

Drum, Kevin. 2010. The coast golf tourism partnership given grant by BP for 'Golf for the Gulf' promotion this fall. Golf Coast Mississippi. Available at: http://www.golfcoast.com/news/the-coast-golf-tourism-partnership-given-grant-by-bp-for-%E2%80%9Cgolf-for-the-gulf%E2%80%9D-promotion-this-fall-1812/

Economics and Statistics Administration. 2005. Hurricane Katrina: Economic impacts 3 ½ months after landfall. U.S. Department of Commerce. Available at: http://www.esa.doc.gov/sites/default/files/reports/documents/dec2005.pdf

Economics and Statistics Administration. 2006. Gulf Coast recovery: 7 months after the hurricane. US Department of Commerce. Available at: http://www.esa.doc.gov/sites/default/files/reports/documents/april2006.pdf

Gaillard, Frye, Sheila Hagler, and Peggy Denniston. 2008. In the path of the storms: Bayou La Batre, Coden, and the Alabama Coast. Auburn, AL: Pebble Hill Books/Auburn University.

Gordon, Kate, Jeffrey Buchanan, Phillip Singerman, Jorge Madrid and Sarah Busch. 2011. Beyond recovery: Moving the Gulf Coast to a sustainable future. Center for American Progress and Oxfam America. Available at: http://www.americanprogress.org/issues/2011/02/pdf/beyond_recovery.pdf

Greenberg, Peter. 1990. Visitors begin to return to Alaska after spill. LA Times. June 17.

GulfBase. 2004. Tourism. Available at: http://www.gulfbase.org/issue/view.php?iid_ecotourism

Gulf Coast Business Council Research Foundation. 2008. Mississippi Gulf Coast 3.0: Three years after Katrina. Available at: http://www.mississippirenewal.com/documents/ThreeYearReport.pdf

Gulf Coast Business Council Research Foundation. 2011a. Mississippi Gulf Coast regional brief: 2nd quarter 2011. Available at: http://www.msgcbc.org/docmsgcbc/Regional%20Brief%20-%202Q%202011.pdf

Gulf Coast Business Council Research Foundation. 2011b. Mississippi Gulf Coast regional brief: 4th quarter 2010. Available at: http://www.msgcbc.org/docmsgcbc/Regional%20Brief%20-%204Q%202010.pdf

Hashimoto, Kathryn, Jeffrey D. Schaffer, and George G. Fenich. 2011. The effects of Hurricane Katrina on Gulf Coast gaming. Gaming Law Review and Economics 15(4):197-206.

Husley, Val. 1998. Biloxi: 300 years. Virginia Beach, VA: Donning.

International Petroleum Museum and Exposition. 2011. Home page. Available at: http://www.rigmuseum.com/

International Property Journal. 2010. Losses may total $4.3 billion from Louisiana to Florida. International Property Journal. Available at: http://internationalpropertyjournal.com/us-property-news/102-losses-may-total-43-billion-from-louisiana-to-florida.html

Jackson, Harvey H. 2010. The rise and decline of the Redneck Riviera: The northern rim of the Gulf Coast since World War II. Southern Cultures 16(1):7-30.

Jervis, Rick. 2010. Casino workers' claims denied for BP funds. USA Today. December 26.

Jørgenson, Dolly. 2009. An oasis in a watery desert? Discourses on an industrial ecosystem in the Gulf of Mexico Rigs-to-Reefs program. History and Technology 25(4):343-364.

Keating, Phil 2011. Gulf Coast sees record tourism rebound. Fox News. Available at: http://coastalnewstoday.com/gulf-coast-sees-record-tourism-rebound-fox-news/

The Knowland Group. 2010. The Gulf Coast oil spill and the hospitality industry. McLean, Virginia: The Knowland Group.

Louisiana Association of Fairs and Festivals. 2012. Fairs and festivals: Listings by name. Available at: http://www.laffnet.org/fairs_and_festivals.htm

Louisiana SeaGrant. 2008. Report on the Louisiana Stakeholder's Association Forum on Offshore Aquaculture. Baton Rouge, LA: Louisiana Sea Grant College Program.

Louisiana Wildlife and Fisheries. 2010. Various news releases related to the oil spill and response. Available at: http://www.wlf.louisiana.gov/news/oilspill

Louisiana Wildlife and Fisheries. 2011. Various news releases related to the oil spill and response. Available at: http://www.wlf.louisiana.gov/news/oilspill

Mackey, Maureen. 2010. BP oil spill: Gulf tourism takes a huge hit. The Fiscal Times. June 24.

Mayock, Patrick. 2010. New hotel data supports oil spill claims. Available at: http://www.hotelnewsnow.com/Articles.aspx/4297/New-hotel-data-supports-oil-spill-claims

Mississippi Department of Environmental Quality (MDEQ). 2010. Gulf oil spill June 1, 2010 precautionary closure of portions of Mississippi marine waters. Available at: http://www.deq.state.ms.us/MDEQ.nsf/page/Main_GulfOilSpillJune12010?OpenDocument

Mississippi Department of Marine Resources. 2005. Mississippi Gulf Coast national heritage area management plan. Available at: http://www.dmr.state.ms.us/cmp/crmp/pdfs/final-MGCNHAMP.pdf

Mississippi Department of Revenue. 2010. Casino gross gaming revenues. Available at: http://www.mgc.state.ms.us/

Mississippi Development Authority. 2010. Fiscal Year 2010 economic contribution of travel and tourism in Mississippi. Available at: http://www.visitmississippi.org/uploads/docs/reports_statistics/Economic%20Contribution%20Report%20FY%202010.pdf

Mississippi Development Authority/Tourism Division. 2011. Fiscal Year 2010 economic contribution of travel and tourism in Mississippi. Available at: http://www.visitmississippi.org/uploads/docs/reports_statistics/Economic%20Contribution%20Report%20FY%202010.pdf

Mississippi Gulf Coast. 2010. Mississippi Gulf Coast visitors buy two nights get a $100 MasterCard. Available at: http://www.visitmscoast.org/mississippi-gulf-coast-visitors-buy-two-nights-get-a-100-mastercard-2/

Mississippi Gulf Coast Regional Tourism Partnership. 2011. 2011 and first quarter 2012 tourism grant guidelines. Available at: http://www.visitmscoast.org/wp-content/uploads/2012/02/Event-Application-Guidelines-2011-12.pdf

Mobile Area Chamber of Commerce. 2010. Mobile Bay: On the water. On the move. Economic Overview. Available at: http://mobilebayregion.com/files/Economic%20regional%20overview.pdf

Myer-Arendt, Klaus J. 1995. Beach and nearshore sediment budget of Harrison County, Mississippi: A historical analysis. Jackson: Mississippi Office of Geology.

National Oceanic and Atmospheric Administration (NOAA). 2008. Final evaluation findings: Alabama coastal area management program, December 2003 through November 2007. Available at: http://coastalmanagement.noaa.gov/mystate/docs/alabamacmp2008.pdf

National Oceanic and Atmospheric Administration (NOAA). 2010. NOAA closes commercial and recreational fishing in oil-affected portion of Gulf of Mexico. Available at: http://www.noaanews.noaa.gov/stories2010/20100502_fisheries.html

National Resources Defense Council. 2011. Testing the waters: A guide to water quality at vacation beaches. Beach closures, advisories, and notices due to the BP oil disaster. Available at: http://www.nrdc.org/water/oceans/ttw/gulf.pdf

Nuwer, Deanne S., and Greg O'Brien. 2006. Mississippi's oldest pastime. In: Herrmann, von Denise ed. Resorting to Casinos: Mississippi's Gambling Industry. Jackson: University Press of Mississippi.

Office of the Lieutenant Governor, State of Louisiana. 2011. Lt. Governor announces receipt of BP tourism funds.

Petri, Chad. 2011. Alabama deep sea fishing rodeo world's biggest. Available at: http://www2.wkrg.com/news/2011/jul/18/alabama-deep-sea-fishing-rodeo-worlds-biggest-ar-2246775/

Pham-Bui, Trang. 2010. Casino workers stage protest, claim BP 'lied and discriminated'. Available at: http://www.wlox.com/Global/story.asp?S_13466812

Phillips, Judith. 2011. The casino industry in Mississippi: An overview for decision-makers. John C. Stennis Institute of Government, Mississippi State University. Available at: http://www.sig.msstate.edu/modules/cms/images/thumb/357.pdf

Phillips, Judith, Jeffrey Markham, and Denise Keller. 2006. The impact of Katrina: An initial report from interviews conducted in Coastal Mississippi, preliminary analysis. The John C. Stennis Institute for Government. Available at: http://www.sig.msstate.edu/modules/cms/images/thumb/222.pdf

Posadas, Benedict. 2010. Economic assessment of the impacts of Hurricane Katrina on Mississippi charter boats for hire, marinas, and livebait dealers. Mississippi Forestry and Agricultural Experiment Station. Available at: http://msucares.com/pubs/bulletins/b1185.pdf

PP506. 2011. Personal communication. History of shipyard and dock history in the area and oil spill impacts. Discussion with Preetam Prakash. Shipyard and dock owner. Bayou La Batre, AL. October 21.

PP1014. 2011. Personal communication. Beach-front business, tourism and impacts of the oil spill. Discussion with Preetam Prakash. Beach vendor. Gulfport, MS. November 16.

PP1016a. 2011. Personal communication. History of economic and real estate development in area and impacts of oil spill on community. Discussion with Preetam Prakash. Public Official. Gulf Shores, AL. November 21.

PP1017. 2011. Personal communication. History of restaurant and seafood industry in the area and oil spill impacts on these industries. Discussion with Preetam Prakash. Restaurant Owner. Ocean Springs, MS. November 28.

PP1018. 2011. Personal communication. History of restaurant and marina and impacts of oil spill on these businesses. Discussion with Preetam Prakash. CFO. Orange Beach, AL. November 22.

PP1019. 2011. Personal communication. History of vending stand businesses along Mississippi Coast and impacts on these businesses post oil spill. Discussion with Preetam Prakash. Vending Stand Owner. Biloxi, MS. August 14.

PP1020. 2011. Personal communication. History of real estate business on Dauphin Island and impacts of oil spill on this industry. Discussion with Preetam Prakash. Real Estate Agent. Dauphin Island, AL. November 30.

Randall Travel Marketing. 2008. Top ten travel and tourism trends for 2008-2009. Available at: http://www.rtmnet.com/Portals/1/2008%20and%202009%20Top%2010%20Travel%20Trends%20-%20July%202008.pdf

Redwood, Loren. 2008. Strong arming exploitable labor: The state and immigrant labor in Post-Katrina Gulf Coast. Social Justice: a Journal of Crime, Conflict and World Order 35(4):33.

Rioux, Paul. 2011. Grand Isle roars back to life, but not without fresh scars. Times Picayune. July 23.

Rowley, Karen. 2008. GulfGov reports: Three years after Katrina and Rita, challenges remain. Public Affairs Research Council of Louisiana. Available at: http://www.la-par.org/Publications/PDF/Gulf_Gov_Dec2008.pdf

Ruddiman, Susan. 2011. Jackson County tourism continues to grow (Outlook 2011). The Mississippi Press. April 24.

Scurfield, Ray. 2008. Post-Katrina storm disorder and recovery in Mississippi more than 2 years later. Traumatology 14(2):88-106.

State of Louisiana. 2010. Lieutenant Governor Angelle announces spending plan for the $15 million BP grant for tourism. Available at: http://www.crt.state.la.us/press/2010/BPTourismGrantPlan.pdf

Stielow, Frederick. 1982. Grand Isle, Louisiana, and the "new" leisure, 1866-1893. Louisiana History 23(3):239-257.

Stuart, Elizabeth. 2001. Ecotourism industry growing in Louisiana. The Houma Courier. October 26.

Sullivan, Charles L., and Murella Hebert Powell. 1999. The Mississippi Gulf Coast: Portrait of a people. Sun Valley, California: American Historical Press.

Taylor, Jeffrey. 1998. Mississippi coastal beaches: Treasures to be improved and protected. In: Lawrence A. Klein, ed. Marine Resources and History of the Mississippi Gulf Coast Vol.

II: Mississippi's Coastal Environment. Biloxi: Mississippi Department of Marine Resources.

Urbina, Ian. 2005. Foreign workers are caught in a double trap. New York Times. September 6.

U.S. Department of Commerce. 2010. U.S. travel and tourism industries: A year in review, 2009. Washington, DC. Available at: http://tinet.ita.doc.gov/pdf/2009-year-in-review.pdf

U.S. Department of Commerce. 2011a. U.S. travel and tourism industries: A year in review, 2010. Washington, DC. Available at: http://tinet.ita.doc.gov/pdf/2010-year-in-review.pdf

U.S. Department of Commerce. 2011b. International visitation up six percent in july 2011 and up five percent July YTD 2011. Available at:
http://tinet.ita.doc.gov/tinews/archive/tinews2011/20111006.html

U.S. Travel and Tourism Advisory Board. 2006. Reviving travel and tourism in the Gulf Coast region: A report by the U.S. travel and tourism advisory board. Available at: http://tinet.ita.doc.gov/ttab/Recommendations.html

U.S. Travel Association. 2010. The economic impacts of travel on Louisiana parishes, 2009. Washington, DC. Available at:
http://www.crt.state.la.us/tourism/research/Documents/2010-11/2009EconomicImpactofLouisianaParishesReport.pdf

Viator, Ray. 2011. Back to the beach. BP Magazine (3):19-22.

Visit Louisiana Coast. 2010. About us. Visit Louisiana coast. Available at:
http://visitlouisianacoast.com/.

Visit Louisiana Coast. 2011. History of the coalition. Louisiana Tourism Coastal Coalition. Available at:
http://www.visitlouisianacoast.com/sites/default/files/LTCC_Media_KitDownload.pdf

Wiley, Eric. 2002. Wilderness theatre: Environmental tourism and Cajun swamp tours. The Drama Review 46(3):118-131.

Wilkinson, Kaija. 2010. Ken Feinberg meets with casino industry reps following protest rally in Biloxi. Mobile Press-Register. November 9.

Wilkinson, Kaija. 2011. Gulf coast regional tourism partnership calls for grant applications. Mississippi Press. September 10.

World Travel and Tourism Council. 2011. Travel and tourism economic impact 2012: United States. London, England. Available at:
http://www.wttc.org/site_media/uploads/downloads/united_states2012.pdf

# CHAPTER FOUR: SHIPBUILDING AND REPAIR

Tom McGuire and Preetam Prakash

## 4.1. INTRODUCTION

Shipyards and shops along the Gulf Coast build, modify, and repair boats for a large array of customers. Clients include commercial and recreational domestic fishermen, foreign fishing operations, domestic and foreign military services, oil and gas producers and service companies, cruise lines, bulk commodity transporters, and municipal ferry operators. Shipyard activity responds to a range of economic and socio-political forces. Shipyards vary in size, in capabilities, in financial assets, and in the diversity of clients they service. They vary in their ability to attract a skilled work force and to retain those workers through cyclical and event-related changes in work orders. To isolate the *Deepwater Horizon* consequences on shipbuilding and repair along the Gulf is thus difficult. This catastrophic event needs to be set in the context of several pre-existing factors and issues significant to the industry.

First, a substantial portion of the remaining newbuild activity in U.S. shipyards is buoyed by the provisions of the Merchant Marine Act of 1920 (the Jones Act) governing "cabotage" coastal shipping. Transport of goods between U.S destinations, including oil and gas rigs and platforms, must be conducted on U.S. built and manned vessels. There are exceptions, and continual attacks on the act by domestic and foreign vessel builders and operators, but many argue that much of the tug, barge, and offshore service and supply work along the Gulf owes its existence to this enduring legislation. Second, naval warships and support vessels are constructed in the handful of remaining private domestic facilities capable of meeting complex construction and security requirements. Several of these are located along the Gulf Coast. And, with the increasing concern for coastal protection in the aftermath of terrorist attacks, Coast Guard patrol activities have increased, bringing significant work to modest-sized domestic ship builders.

However, dampening trends and negative economic cycles must be considered alongside these variables which have increased or at least sustained demand. Fishing fleets expanded with the declaration of the Exclusive Economic Zone in 1976, but have subsequently declined due to overfishing, foreign imports, and rising costs of fuels and other inputs. The demand for new commercial fishing boats has thus softened, although in certain shipbuilding areas there have been subsequent spurts of growth, for example in the late 1990s and early 2000s. Much of the offshore oil service fleet was built in the expansionary decade of the 1970s, and replaced in the late 1990s and early 2000s. The subsequent and enduring recession beginning in late 2007 slowed further newbuild activity, largely through restricted access to financing. Within this context, the spill, the cleanup process, and the moratorium, suspension, and "permitorium" on new offshore drilling have had diverse consequences for shipbuilding and repair along the coast.

## 4.2. Methodology

Researchers gathered information on the shipbuilding and repair industry in the study areas through drop-in conversations at local yards and shops involved in the industry; longer discussions with company owners and employees; and reviews of industry publications. Many of the study participants had taken part in a recent study of fabrication and shipbuilding conducted by several team members for the BOEM, and their longer-term perspectives were particularly valuable in helping put the *Deepwater Horizon* disaster and its aftermath in context. Team members talked mostly with owners and employees of the small and medium-sized yards that build and repair vessels and gathered information about the larger yards, particularly those involved solely or primarily in military contracting, from trade journals and company reports.

## 4.3. Background on the Shipbuilding Industry in the Gulf of Mexico

The shipbuilding industry has a long, prominent history along the Gulf Coast. In many areas the industry came into existence in the 18th and 19th centuries in conjunction with the growth in river trade and local seafood industries (Cangelosi and Ford 1998; Ziglar 1974). However, it was World War I and World War II and the accompanying need in both cases for the rapid construction of large numbers of military vessels which provided the impetus for shipbuilding's massive expansion (Couch 1964; Ziglar 1974; Gutierrez 1987). In some areas, such as Jackson County, Mississippi, this dependence on military-related work has continued up until the present.

Following both world wars, the shipbuilding industry along the coast experienced significant downturns linked to sharp decreases in military demand, but starting in the 1950s and onward the development of the offshore oil industry in the Gulf came to provide a significant new customer base for shipyards in the region (Workboat 1950; Offshore Operations 1954). Though many of the military-focused yards only began to build offshore service vessels (OSVs) and structures to weather slow periods, some existing yards diversified to serve the needs of the offshore oil industry while others opened specifically to cater to this industry. Offshore oil-related work proved especially attractive for many yards and shops during the "boom" of the 1970s with many yards which had previously focused on other sectors, for example commercial fishing, moving increasingly in the direction of offshore related work (Colton n.d.).

The downturn in oil prices in the early 1980s resulted in difficult times for a shipbuilding industry which had become increasingly dependent on the oil industry. A number of yards and shops shut down during this decade. Some yards, such as Ingalls in Pascagoula, which focused more on government and military work, made it through this time more easily than others, benefitting from President Ronald Reagan's call for a 600-ship Navy (Baylis 1989).

In the 1990s, with the fall of the Berlin Wall and the disintegration of the Soviet Union, reductions in warship work prompted yards and shops across the Gulf to once again turn to a revived offshore oil industry for work (The Times-Picayune 1997). As contracts for the new construction of platforms and rigs for the industry moved overseas to locations such as Singapore and South Korea, Gulf Coast yards and shops came to depend more on repair, refurbishing, and component fabrication. The move to deepwater drove up the size of OSVs, reflected in more than a fourfold increase in length and an increase in both the size and number of onboard

engines, exceeding the capacity of small to mid-size yards. Companies without sufficient space had to acquire more property or subcontract to yards elsewhere for the fabrication and even modular assembly of the large vessels (Anonymous 2009; Pearson 2010). Newbuild work for the commercial fishing industry had also decreased considerably from the 1970s, and through the 1980s, and yards in places like Bayou La Batre, Alabama that specialized in fishing vessels began to take on more offshore construction. A small recreational vessel construction and repair sector along the coast in the study areas and has tended to stay distinct from the other shipyard activity. Some yards that deal with recreational vessels mostly perform haul outs and provide space for people working on vessels and refrain from doing much of the actual repair and maintenance work themselves. Other yards do engage in such work at times. But, overall, specialized recreational vessel construction is a very small niche market and recreational vessel-related work constitutes a relatively small portion of the shipbuilding and repair industry.

Throughout its history, the shipbuilding and repair industry has been highly cyclical and subject to dramatic fluctuations. Such cycles frequently coincide with the powerful storms and hurricanes common to the Gulf. The most recent industry upturn followed Hurricane Katrina in 2005. Those who work on offshore business generally acknowledged that hurricanes result in substantial increases in activity due to the widespread damage and destruction of platforms, rigs, and vessels. The aftermath of Katrina was no exception, and yards and shops subsequently attempted to recruit both domestic and foreign labor to meet demand (Tortorano 2007). This demand had declined in most regions along the Gulf by 2008 to 2009.

The impact of the "Great Recession" of 2008 into 2010 can be captured by two commentaries. Larry Pearson, writing for the *Professional Mariner* magazine in December, 2007, observed that:

> In the 30 years that I have been covering the offshore industry, I have never seen shipyards so busy with supply boat construction. The yards that typically build these vessels are booked to 2009 and beyond, and the business is so good that owners who want a boat with a normal lead time have only two options: to go to a shipyard that can, but seldom does, build supply boats, or to wait for up to three years for their favorite Gulf Coast yard to build it (Pearson 2007).

Ken Hocke of *Workboat* was telling a different story in March, 2010:

> Just over two years ago, Gulf Coast shipyards literally had a waiting list for its [sic] precious construction slots. Since then, new contracts have dried up as Gulf yards have been hit hard by the recession, with many scrambling to keep workforces busy enough to avoid further layoffs...it's a tough financial market, even for those with lots of credit and a sterling credit rating (Hocke 2010a:33).

With the slowdown in newbuild construction, some yards concentrated on repair work, and vessel operators used the slowdown in oil demand and drilling activity during the recession to refurbish existing fleets. Some yards focused on foreign customers, while several existing yards took the opportunity to acquire failing facilities (Hocke 2010a). Military shipbuilding continued through the recession, providing work for the major warship yards in New Orleans and Pascagoula, as well as yards in Louisiana and Alabama. These smaller facilities received lucrative contracts for constructing runs of smaller Navy and Coast Guard vessels.

By May, Hocke of *Workboat* was seeing indications of recovery for the vessel industry:

> There are signs that more newbuild contracts for offshore service vessels could be on the horizon. For starters, the Gulf is beginning to show signs of life. Between mid-November 2009 and the end of February, 15 working jackup rigs have been added to the 24 already working in the Gulf of Mexico and the Minerals Management Service's Central Gulf lease sale in mid-March was a strong one. And looking to the future, President Obama announced a plan to open up new areas for oil and gas exploration and development (Hocke 2010b:24).

He further observed that:

> The offshore energy market appears to have bottomed out, and operators and shipyards are sounding and acting like they are ready for business to take off (Hocke 2010b:24).

By August of 2010, after the *Deepwater Horizon* explosion and the subsequent suspension of drilling, things had once again changed and *Workboat*'s coverage of the Gulf featured the headline, "American Idle" (DuPont and Hocke 2010:24).

## 4.4. OIL SPILL AND AFTERMATH IN 2010

Study participants frequently reported that the moratorium on deepwater exploration was the most harmful consequence of the oil spill for shipbuilders. They commonly used the term "moratorium" to refer to both the official period of the moratorium as well as the later suspension of drilling. In addition to closing off sections of the Gulf of Mexico to drilling, the moratorium was described as having introduced a great deal of uncertainty into an industry which was already in a downturn, about the future and about the new regulatory environment that would come out of the tragedy. Such uncertainty was held by some yard and shop owners as having directly led to the loss of pending contracts. This situation also dissuaded OSV fleet operators from considering newbuilds. Such widespread uncertainty combined with a drop in demand was reported to have led in some cases to heavy reductions in the workforce. Moreover, those workboats delivered by Gulf Coast yards in the year following the *Deepwater Horizon* explosion were overwhelmingly from contracts signed before the event (Hocke 2011). The official lifting of the drilling suspension in October 2010 was widely held to have had little actual impact and the first new exploration permits were not issued until the spring of 2011.

The moratorium and suspension were not entirely negative for everyone in the industry. Beyond those companies that had contracts which kept them busy, a few yards which had pre-existing relationships with larger offshore oil service companies benefited from increased work following the moratorium. Such work resulted from rig and vessel owners taking advantage of the slowdown following the spill to have Coast Guard mandated repairs and maintenance work done. Oil spill cleanup operations were another albeit short-lived source of work for a few yards and shops. These businesses were able to become involved in cleanup operations by fabricating oil boom and other necessary equipment. Several yards mobilized quickly to build specially-

designed skimmer vessels for the cleanup. For example, a yard owner in Bayou La Batre, AL said regarding his business in fall 2010:

> The effect for us has been mostly good so far. We've been doing work for BP ever since the oil spill…We're just doing whatever they need. We're fabricating the anchors to hold the booms in place. We had a contract to make a number of oil skimmers that they were using earlier on in the summer (PP434 2010).

As with many other sectors of the coastal economy, the number of businesses in shipbuilding that could get involved in post-spill cleanup work was limited, and many owners commonly reported that work on commercial fishing vessels had suffered following the spill. The drop in business was reported by yard and shop owners as being both the direct result of fisheries closures as well as the pervasive climate of uncertainty over seafood safety (see Section 2.2). Furthermore, a number of commercial fishermen were employed with the VOO program during the summer and fall of 2010 and thus did not bring their boats in for repair during this time. However several yards that dealt with commercial fishing boats stated that business had picked up substantially towards the end 2010 with fishermen reported to be coming in considerable numbers during this time to spend money they had received from working on the VOO program or as part of the BP claims process on boat repairs. Such was the story told by the yard owner from Galliano, LA:

> Things picked up as soon as [the oil spill cleanup] was over…with the money from BP people were able to buy things. Everyone got new trucks but they were also able to repair what they had been putting off. The boats that had gone out started coming back and getting repairs, coming up on the drydock for painting and blasting (DA499 2011).

The relatively small number of yards and shops that normally dealt with recreational boats reported a decrease in this business during summer 2010, as did marine hardware suppliers (see Section 2.5). Yard and shop owners who dealt with recreational boats said that it had made little sense for owners to invest money in boat repairs and maintenance given constantly shifting water closures and general uncertainty about the future of the Gulf during the summer of 2010. However, in a few cases yard owners hauled out greater than normal numbers of boats due to the fears that boat owners had about oil in the water. Others, such as this recreational boat repair shop manager from Gulf Shores, AL, also commented on how the VOO program had resulted in a temporary increase in business:

> When people started working on the VOO program we got some of this work… when the VOO was underway people were digging in their garages for whatever types of boat engines and parts they could find so that they could go to work. We ended up selling a lot of boat engines over summer 2010 and doing lots of repair work, but this still didn't make up for the losses in our business (PP1021 2011).

A builder of luxury motor yachts on the Gulf Coast continued to find worldwide clients, and also helped construct belt skimmers for the state of Mississippi, but the few yards that dealt with recreational vessel construction reported a drop in contracts; most personal recreational vessels are manufactured in factories, not constructed in boat yards. As with commercial fishing

related business, yards and shops dealing with recreational boats generally reported at least small increases in this side of their business towards the latter part 2010, with many boat owners spending money earned in the VOO program or received through the claims process on boat repair and maintenance.

Despite the impacts to many yards, some yards in the region reported that their business was little changed by the spill. Perhaps most prominent among these are yards whose major focus lies outside of the offshore oil, seafood, and recreational fishing industries. Such yards saw construction opportunities in LNG (liquefied natural gas) tugs, articulated tug barges, ferries, and specialized lightering service boats (Crowley 2010). Yards dependent on government and military contracts likewise were little impacted by the oil spill; if anything, some saw an increase in construction or repair of Coast Guard vessels. Other yards, while impacted by the spill and moratorium, were insulated from its impacts to some extent because they had contracts with customers in other areas of the United States or overseas or because of their involvement with the regional inland waterway traffic market. As in other sectors, some shipyard and shop owners who managed to get through the oil spill period relatively unscathed commented unfavorably on the behavior of others in the industry after the oil spill and on the potential consequences of such actions.

By the end of 2010, Meredith observed, "Builders of rigs and support vessels stand to benefit from tighter controls, particularly if build-American provisions are extended to deepwater drilling" (2010).

## 4.5. Oil Spill and Aftermath in 2011

There was relatively little change in the situation of most shipyards and shops tied to the offshore oil industry during the early part of 2011, due to little positive development in the issuing of offshore oil contracts. Yard and shop owners commonly observed that the lifting of the drilling suspension in October 2010 failed to result in new drilling permits. In February 2011, a yard owner in Bayou La Batre, Alabama commented:

> The moratorium being lifted was just symbolic. The actual number of permits being issued is way lower than it was before the moratorium was put into place. Also, the permits that are being issued differ in kind from the type that were issued before. The permits being issued now are not the kind which put a lot of boats and people to work. I don't know of anyone who has gotten any big contracts related to offshore since the moratorium was lifted (PP641 2011).

However, towards the middle of 2011, shipyards began to report a rise in the number of estimates being requested on offshore oil-related projects. By summer 2011, a few larger yards along the coast had already obtained new offshore related contracts. For example, shipbuilders in Louisiana reported newbuilds of supply vessels, anchor handlers, double-hulled tank barges, and aluminum crewboats (Crowley 2011). And several yards continued with facility upgrades and expansions (Hocke 2010c). But the majority of yards and shops still reported relatively little change in the number of projects actually being financed (cf. Hocke 2010b).

Small yards and shops alleged that larger companies possessing substantial amounts of capital were in a much better position to weather the slow times and to obtain what new contracts might arise while smaller operations that lived from contract to contract were having much more difficulty. For example, this yard owner from Bayou La Batre, Alabama attested that the oil spill and moratorium had resulted in a situation where the smallest operators were the most vulnerable:

> The impacts of the moratorium impacted the entire offshore industry. What you have is a situation where each person bumps off the next person down. So the nice, well-appointed offshore boats bump off the smaller boats, and these boats bump off the inshore boats and so on. The same thing happens with shipyards and everyone starts doing work that they might not have otherwise (PP745 2011).

A yard owner based in Larose, Louisiana concurred articulate another reason for smaller yards and shops facing hard times in 2011 when he discussed his inability to handle work of the scale that was beginning to open up that summer:

> The bigger stuff, it's working, but I can't handle it. I'm not big enough. I don't know where we're going. We don't know. We just take it day to day, that's all. It's frustrating to hear what they want to give money to… Normally we stay with [vessels] below 80 tons. From tugs to shrimp boats, approximately 70 foot, 65 foot, on down. That's what this facility is able to handle. Now the way the business is, you have to be able to do 300 to 400 tons. You can't make a living with little bitty boats. All the little boats up and down the bayou can't pay insurance and workman's comp. Everything is bigger… The middle sized boats are not working. They're tied up (DA497 2011).

Contributing in significant measure to the poor situation of many yards in 2011 was the fact that many of these yards were at low points in contract cycles when the oil spill began and the ensuing climate of uncertainty and caution was not conducive to their acquiring new contracts. There was a general consensus that things were looking a bit better than in 2010 and early 2011, but yard owners were still uncertain about when significant numbers of new contracts would actually begin to flow in from the offshore oil industry.

Yards that dealt mostly with the commercial fishing industry reported being moderately busy with repair work during the early months of 2011. This work was said to be a continuation of the trend which had begun in late 2010 of commercial fishermen opting to use some of the money they had earned working for BP or through the claims process to repair their boats. In addition, some fishermen invested their money in new boats, benefitting the yards engaged in the construction of these vessels. Owners whose business was still relatively slow attributed this as much to exterior factors such as the low price of seafood and high fuel prices as they did to any lasting impacts of the oil spill. During the summer of 2011, the number of commercial fishermen utilizing yards and their services had risen to levels that most yard owners considered normal.

Recreational boat owners were reported to be coming in for repair and maintenance work in lower-than-usual numbers during the spring of 2011. However by the middle of the summer the numbers of recreational boat owners bringing their vessels in for repairs had again picked up. Some owners even reported that owners of recreational vessels were especially eager to go out because they had missed the previous season. Those yards where recreational boat related

business was still slow mostly attributed this to high gas prices and the bad economy. A few yard and shop owners who dealt with commercial and recreational fishing vessels reported having placed an increased emphasis on secondary aspects of their business, such as providing drydock services to people wishing to store or repair their own vessels in an effort to make up for business which had been lost following the spill.

Toward the end of the summer of 2011, business had leveled out and become fairly stable at the majority of small and medium sized yards and shops the ethnographers visited. Business was still frequently reported as being lower than prior to the spill but owners almost all concurred that a wide range of factors contributed to this. Reflecting the long-standing ties between the shipbuilding sector and oil and gas along the Gulf Coast, some connected to the shipbuilding industry, such as the following manager of a vessel leasing company in Cut Off, Louisiana, were openly hostile to the idea that BP and the oil spill bore any continuing responsibility for the generally low state of the industry in 2011:

> In the past they had oil in marshes... The oil that BP spilled is not a quarter of the oil that was already out there. They had oil on boats. It's not the oil that causes that. The blisters were probably there before. There's a fungus that grows in fiberglass. They just want money from BP. They think [the money from BP] is going to last forever and ever and ever, but it's not. BP paid them. It's done (DA500 2011).

A few owners were successfully attempting to diversify their business in various ways. For example, a yard owner in Bayou La Batre, Alabama had decided to increasingly focus on the oyster reef restoration work which was slated to pick up, partly in relation to oil spill recovery, over the coming years. However, the majority of owners spoke disparagingly about the possibilities of diversification. While owners often recounted having performed a great variety of work and being capable of taking on "anything" they also reported that their ability to find new lines of work was limited by the relatively narrow social networks that have come to characterize the industry niches. Thus for example, those who had been engaged in fishing vessel construction for a number of years often found it difficult to begin, or in some cases reassume, building push boats or Coast Guard vessels.

## 4.6. SUMMARY

The great majority of the study participants in the shipbuilding and repair industry reported the moratorium/drilling suspension and de facto "permitorium" (see Section 2.1, above) on deepwater drilling had a much a greater impact on business than the oil spill itself. The oil spill occurred during an industry down cycle, when many yards and shops were reaching the end of existing contracts, so yards and shops often could not rely on pre-existing contracts to see them through the months following the spill.

The diversity of reported impacts is a testament to the complexity and diversity of the shipbuilding and repair industry. Smaller yards and shops specializing in fabrication and repair for the offshore oil industry generally were the hardest hit by the oil spill and its aftermath. Most yards concentrating on offshore oil-related work experienced sharp downturns in business during the summer and fall of 2010. However, due to their often possessing greater capital and a more expansive customer base, larger yards were better able to weather this period and maintain their

workforce. Yards that mostly did work for the commercial fishing industry generally reported sharp downturns during the summer and fall of 2010. While business was still slow in summer, 2011, most of these yards attributed this downturn to exterior factors and reported that business had stabilized somewhat.

Yard owners expressed significantly different opinions as to the long-term consequences of the oil spill, moratorium, and suspension of drilling. Owners of smaller facilities sometimes reported having been stretched to the breaking point by the oil spill and its aftermath. They often invoked the shift of shipbuilding and fabrication work overseas during the past two decades and described the oil spill as further pushing business to foreign countries. Those who dealt with the offshore oil industry in particular discussed the potential movement of large numbers of oil rigs abroad and subsequent long-term loss of work. Other owners of large and small yards regarded the spill, moratorium, and suspension in terms of the cycles so common to the industry. While sometimes having been impacted by these events, these owners were more confident that the industry would eventually recover from these impacts as it had recovered from previous downturns. Most of them acknowledged that the industry was currently hampered by a number of other factors including very tight constraints on financing, high material costs, and a slowly recovering national economy. Some also commented on the historically close ties between hurricanes and upturns in business, and on the relative lack of storms in recent years. Yard and shop owners were mostly united in expressing that any turnaround in the industry would not come overnight but were hopeful that 2012 would prove to be a better year than 2010 and 2011.

## 4.7. REFERENCES

Anonymous. 2009. Candies shipbuilding delivers huge supply boats. Available at:
    http://powerservices.lakho.com/2009/09/24/candies-shipbuilding-delivers-huge-supply-boats/

Baylis, John R. 1989. The six-hundred ship navy and merchant marine doldrums (1981-1988). In: Randolph W. King, ed. Naval Engineering and American Seapower. Baltimore: The Nautical and Aviation Publishing Company of America, Inc.

Cangelosi, Robert J., Jr. and Liz Ford. 1998. History, art and culture of the Mississippi Gulf Coast. In: Lawrence A. Klein, Mary Landry, and Joe E. Seward, eds. Marine Resources and History of the Mississippi Gulf Coast. Jackson: Mississippi Department of Marine Resources.

Colton, Tim. n.d. Shipyard index: Walker shipyards, Pascagoula, MS. Available at:
    http://shipbuildinghistory.com/history/shipyards/5small/inactive/walker.htm

Couch, Robert F. 1964. The Ingalls story in Mississippi, 1938-1958. The Journal of Mississippi History 26(3):192-200.

Crowley, Michael. 2010. Sluggish year for boatbuilders. WorkBoat. December.

Crowley, Michael. 2011. Boatbuilding bits. Workboat. July.

DA497. 2011. Personal communication. Effects of the oil spill on business and the community. Discussion with Diane Austin. Shipyard owner. Larose, LA. April 27.

DA499. 2011. Personal communication. Effects of the oil spill on local businesses. Discussion with Diane Austin. Shipyard owner. Galliano, LA. April 27.

DA500. 2011. Personal communication. Effects of the oil spill on the community. Discussion with Diane Austin. Parish official. Cut Off, LA. April 27.

DuPont, Dale K., and Ken Hocke. 2010. American idle: Drilling moratorium jeopardizes businesses and workers. Workboat. August 1.

Gutierrez, C. Paige. 1987. The Mississippi Coast and its people: A history for students. Book VIII: Marine discovery series. Available at: http://www.dmr.state.ms.us/Coastal-Ecology/educational/pdf-booklets/mississippi-coast-book-viii.pdf

Hocke, Ken. 2010a. Deal time? Shipyards are working hard to fill construction slots. Workboat. March 1.

Hocke, Ken. 2010b. Hope floats: Newbuild OSV contracts have started to pick up. Workboat. May 1.

Hocke, Ken. 2010c. Yard work: Gulf shipyards are spending millions to upgrade and expand their facilities. Workboat. October 1.

Hocke, Ken. 2011. Building moratorium: Contracts have slowed for new OSV construction. Workboat. May 20.

Meredith, Peter. 2010. Looking beyond the blowout. Professional Mariner (141).

Offshore Operations. 1954. Designed for offshore duty. Offshore Operations. September.

Pearson, Larry. 2007. Supply boats: No room at the yard. Professional Mariner (109).

Pearson, Larry. 2010. Ross candies: A new force in the Gulf. Professional Mariner (141).

PP434. 2010. Personal communication. History of local shipyards and impacts of oil spill on shipbuilding industry. Discussion with Preetam Prakash. Shipyard owner. Bayou la Batre, AL. October 12.

PP641. 2011. Personal communication. History of shipbuilding in the area and impacts of oil spill on this industry. Discussion with Preetam Prakash. Shipyard owner. Bayou la Batre, AL. February 2.

PP745. 2011. Personal communication. History of shipbuilding and shrimping industries and impacts of oil spill on these industries. Discussion with Preetam Prakash. Shipyard owner. Bayou la Batre, AL. March 16.

PP1021. 2011. Personal communication. History of boat repair business and impacts of oil spill on this business. Discussion with Preetam Prakash. Boat repair shop manager. Gulf Shores, AL. November 22.

The Times-Picayune. 1997. Miss. Shipyard expanding amid boom. The Times-Picayune. August 6.

Tortorano Commissioned Publications. 2007. Mississippi Gulf Coast shipbuilding corridor. Available at:
http://www.mscoastshipbuilding.com/files/shipbuilding_corridor_guts_031207.pdf

Workboat. 1950. Southern construction in 1950. Workboat. Annual review.

Ziglar, William L. 1974. Shipbuilding on the Pascagoula River. Journal of Mississippi History 36(1):2-8.

# CHAPTER FIVE: RETAILING

Brian Marks

## 5.1. INTRODUCTION

The retailing sector is at once the most ubiquitous and the least distinctive economic sector in the Gulf Coast region. The wide array of retail store fronts lining the region's small town avenues and big city highways, corporate big box chains and mom and pop operations selling everything from used cars to dry cleaning, motel rooms to fast food, are superficially not so different than the commercial landscape gracing any other part of the United States. Yet the history of retail business development across the region cannot be separated from the Gulf Coast's more prominent sectors of commercial fisheries, tourism, and oil and gas. The fortunes of retailing have followed regional trends of economic expansion and decline, loss and recovery from disasters, and continuity and transition in coastal residents' livelihoods and the population of coastal counties and parishes. Accordingly, the retailing sector and its workers and business owners were not spared the consequences of the BP oil spill; rather, the social and economic effects of the disaster on retailers have been extensive, but also vary widely depending on the business, its location, and its customer base.

Retail business sector includes many different kinds of businesses. For our purposes, retailers are businesses that sell final goods and services directly to consumers and that cannot be grouped neatly within any other economic sector under consideration in this report. For example, commercial fishermen and seafood docks that sell direct to the public are excluded because commercial fisheries are treated separately, but the region's hotels and motels, which serve both the oil and gas and tourism sectors, are included here. Within the retail sector, we have grouped businesses around four sub-sector typologies: (1) *Discretionary*-nail salons, florists, hair salons, video stores, gift shops, liquor stores, coffee shops, antique dealers, secondhand stores/pawn shops, and dry cleaners / alteration / tailor's shops; (2) *Necessities*-grocery stores, "mom and pop" food stores, meat markets, bakeries, convenience stores and gas stations, hardware and auto parts stores, office supply and furniture stores, laundromats, computer stores, and appliance retailers; (3) *Hospitality*-hotels / motels, restaurants, beach and tourist souvenir shops, car rental businesses, and bars; and (4) *Big Ticket*-new and used car dealers, boat dealers, jewelers, travel agents, and realtors (Table 5.1).

Table 5.1. Typology of Retail Business Sub-sectors as Presented in this Report

| Discretionary retailers | Necessities retailers | Hospitality retailers | Big Ticket retailers |
|---|---|---|---|
| Nail salons, Hair salons, Florists, Video stores, Gift shops, Liquor stores, Coffee shops, Antique dealers, Secondhand stores / pawn shops, Dry cleaners / alteration / tailor's shops | Grocery stores, Bakeries, Computers, Laundromats Meat markets, Appliances "Mom and pop" food stores, Convenience stores / gas stations, Hardware / auto parts, Office supply / furniture | Hotels / motels, Restaurants, Beach / souvenir shops, Car rental businesses, Bars | New / used car dealers, Boat dealers, Jewelers, Travel agents, Realtors |

Employing community-based social science methodologies to understand retailers' experiences with the spill yields several important findings. Retailers provide a general measure of economic activity and social connections in a community, acting as a sort of "barometer" of overall socioeconomic conditions in Gulf Coast communities. The diversity of retailers in specific communities and the various social groups and economic sectors they do business with give details about social and economic difference within particular communities and differential impacts of the oil spill on those people and the retailers they patronize. Qualitative research with retailers provides information that is not collected or shared in standard economic reporting of data such as county-wide sales tax revenues. In a given community, what social groups and economic sectors are retail businesses most dependent on? After the oil spill, are those retail businesses seeing a shift in whom they do business with? Are some retailers seeing disproportionate increases or declines in business, and if so, to what parts of their customer base? Do retail business conditions change over time and between places, and if so, what does that say about the social and economic effects of the BP oil spill on Gulf Coast communities?

The economic impacts of the BP oil spill on retailers have become an especially important question for several reasons. Regional economic recovery from the spill is being measured in considerable part through sales tax receipts, largely the result of retail business activity, and assessments of spending at hospitality retailers (Schmidt 2011; Robertson 2011; APRC 2011a, 2011b). Primarily serving the tourism industry, one of the Gulf Coast's largest economic drivers, hospitality retailers have to date received the majority of claims money through the Gulf Coast Claims Facility (GCCF)[9] (GCCF 2012). Employees and the self-employed in retailing sectors have received the largest share of GCCF payments to individuals, slightly more than 2/3rds of that total. At public meetings on the claims process, retailers have been frequently held up by commercial fishermen and other critics of the process as not directly affected by the oil spill and, thus, less deserving of claims money. The results presented here demonstrate that many Gulf Coast retailing businesses were impacted socially and economically by the BP oil spill and continue to be impacted, however much those impacts may vary by retail business sector, by community, and among individual retailers.

---

[15] $1.60 billion had been paid by GCCF as of March 14, 2012 to individuals in the food, beverage and lodging and retail, sales and service sectors out of a total $2.32 billion to all individuals. $1.82 billion was paid by GCCF on that date to businesses in those same sectors out of $3.77 billion paid to all businesses, for an overall total of $3.42 billion paid to the food, beverage and lodging and retail, sales and service sectors out of $6.09 billion paid to all sectors.

Officials in the claims process, BP, and coastal residents continue to argue over the extent and limitations of the spill's effects, and over what distinguishes a direct impact from an indirect one using different conceptions of impact, recovery, causality, liability, and distributional justice (Goldberg 2010; GCCF 2011; Robertson 2011) This research speaks to those concerns with retailers' own understandings of when and how they were affected by the spill, how they distinguished (if at all) the direct effects of the spill from indirect ones, and how they distinguished the spill's consequences from unassociated economic trends affecting their businesses. Ethnographic research with retailers also provides insight into the prevailing social and economic conditions in the communities where they do business and how retailers understand their customers were impacted by the spill and its continuing aftermath.

## 5.2. Methodology: The Drop-In Visit

The research team gathered information from retailers primarily through the use of "drop-in" visits, during which the researcher would explain the study to the retailer and record any observations the individual made about his or her business. To achieve both breadth and depth, researchers determined the most important types of retailers and the minimum number of such businesses to visit in each community and attempted drop-in visits with several retailers in each of those categories in every study area and, where feasible, with every retailer in each category in each study area. For those retailing businesses more numerous than could be feasibly visited by the research team, convenience and snowball sampling were used to select a subset of those retailers. The research team prioritized drop-in visits with retailers serving ethnic groups and enclaves most directly affected by the spill or owned and operated by people in those groups. Retailers with strong ties to other economic sectors affected by the oil spill, such as motels serving oil and gas and tourist clients and marine hardware stores serving commercial fisheries, were also prioritized for drop-ins.

The format for drop-in visits was open-ended and sought to quickly assess prevailing business patterns at that retailer before the oil spill and following the spill. Ethnographers sought from business owners and employees examples that illustrated how their business had changed, if at all, following the spill and to what causes they ascribed those patterns. While basic drop-in visits lasted between five and 15 minutes, when participants chose to speak at length, the researchers would continue the conversation for as much as an hour or more, expanding into the general themes of inquiry of the study on economic and social change in study communities and following up on participants' statements about their particular business' conditions and those of their customers.

## 5.3. A BRIEF HISTORY OF RETAILING DEVELOPMENT ALONG THE GULF COAST

The history of retail business development along the Gulf Coast parallels that of its primary industries. Marked underdevelopment of retailing, exemplified by company stores and scrip payment, was common in the late 19th and early 20th centuries in the agricultural and fisheries sectors (Woodman 1997; Davis 2010). This gave way in the post-World War II decades as industrialization, rising incomes, the in-migration of population, and urbanization (Beard 1969) brought new chain grocery stores and shopping centers to every large town and city. At the same time, established retail centers like downtown New Orleans declined as retailing decentralized into booming suburbs (Shulman 1994; Lewis 2003; Hirsch 2005). New motels, gas stations, and eateries grew up alongside an expanding highway system, competing for regional consumers' growing discretionary spending with retailers like jewelers, hair salons and florists in their hometowns.

Natural disasters like hurricanes Betsy in 1965 and Camille in 1969 closed or relocated specific retailers in affected areas like Saint Bernard Parish and the Mississippi Gulf Coast but sustained economic growth saw the overall mix of retail businesses return to those places fairly quickly. The 1970s oil boom increased the purchasing power of many workers throughout the Gulf Coast, improving retailers' business performance, but the 1980s oil bust depressed the regional economy and did great harm to retailers, especially in highly oil-dependent communities like Morgan City, Lafayette, and Houma. The revival of offshore exploration and the move to deepwater production in the 1990s and 2000s saw a new wave of retail construction and strong sales in Louisiana's oil patch, evidenced by major new commercial developments completed in these years in Houma, Galliano, Marrero, and elsewhere. Following the regional recession of the 1980s, tourism-driven development in the casino gambling and construction sectors accelerated retail spending in coastal Mississippi in the 1990s and 2000s. In southern Alabama, Baldwin County saw an increase in tourism and real estate development in Gulf Shores and Orange Beach after 1980, with many beach properties getting a facelift following Hurricane Frederic in 1979, while economic development in southern Mobile County remained dependent on commercial fisheries, seafood processing, and shipyards. Retail development followed the two coastal Alabama counties' divergent economic development trends with more high-end, tourism-oriented retailing in Baldwin and more modest development in Mobile, especially in the rural south of the county.

Following nationwide trends, national and regional chains expanded their presence along the Gulf Coast through big box developments, especially in retailing necessities, while small, locally-owned-and-operated shops continued to dominate the discretionary sector, and big ticket and hospitality retailers showed mixed patterns, as in the coexistence of national chain motels with independents and the articulation of local car dealers and realtors with multi-national manufacturers and finance companies. Retail business development tracked the establishment and evolution of ethnic enclaves and groups along the Gulf Coast. Asian-American enclaves in New Orleans East, the west bank of Jefferson Parish, East Biloxi, Mobile and Bayou La Batre established in the 1970s and 1980s were soon accompanied by clusters of Asian groceries, music and video stores, restaurants, travel agencies, jewelers, bars and billiard halls, and marine hardware stores serving an Asian-American customer base employed primarily in commercial fisheries and seafood processing. Those retail clusters, and others in rural commercial fishing-

dependent communities in Louisiana, Mississippi, and Alabama where various proportions of Cajuns, Vietnamese, Native Americans, African Americans, Croatians, Anglos, Cambodians, Laotians and Isleños predominated, were negatively affected by the sharp economic downturn in the shrimp industry after 2001 due to rising fuel costs and collapsing shrimp prices (Marks 2012).

The storms of 2004, 2005 and 2008 were by far the most important transitional events mentioned by the retailers who participated in this study. In 2004, Hurricane Ivan did great damage to coastal Alabama. Hurricane Katrina was the defining event for retailers in New Orleans East, Saint Bernard and Plaquemines parishes, and coastal Mississippi and Alabama, where that storm's damage was most severe. Hurricane Rita in 2005 and Gustav and Ike in 2008 were similarly disruptive for communities and their retailers in Lower Terrebonne Parish and the coastal area of southwest Louisiana and east Texas. Almost all retailers in these communities suffered significant damage to their property from wind and/or water and their reopening, for those that did eventually reopen, was often one, two, or even three years after the storm. Reopenings were often accompanied by a relocation away from the coast or into a smaller building to serve the less numerous clientele who returned and rebuilt. With the relocating population, retailers shifted from lower Plaquemines and eastern Saint Bernard parishes to Belle Chasse and Chalmette; from New Orleans East to the Westbank or out of state; from south Terrebonne to Houma; from Biloxi and Gulfport to D'Iberville; from southern Mobile County into Irvington, Tillman's Corner and Mobile; from Port Arthur into Groves, Nederland, or the Houston area. New retail patterns came with the changing ethnic composition of the Gulf Coast following Katrina. Hispanic groceries, convenience stores, *carnicerias*, bars and *taquerias* opened in recovering communities where work in shipyards and reconstruction attracted greater numbers of Hispanic workers after 2005. In the years after the storm many Vietnamese business owners moved away from severely damaged ethnic enclave communities and divested from commercial fisheries to operate small retail businesses, especially nail salons and dry cleaning / tailoring shops, in suburban shopping centers throughout the Gulf Coast.

Even as Katrina did great harm to many coastal retailers and the communities they served, the surge of post-Katrina recovery and reconstruction spending temporarily boosted retail sales in coastal parishes and counties above pre-storm levels (Mississippi Department of Revenue 2011; Louisiana Department of Revenue 2011). In coastal Mississippi total gross taxable sales[10] increased by 73% in Hancock County, 54% in Harrison and nearly 60% in Jackson between FY2005, ending just before Katrina, and FY2007, the first full fiscal year after the storm (Mississippi Department of Revenue 2011). The reconstruction boom peaked in FY2007, however, and a decline in tourism-related to rising energy prices, falling housing prices and economic recession led to falling total taxable gross sales in all three coastal Mississippi counties in FY2008 and FY2009 (Figure 5.1). Louisiana's coastal parishes also saw a rising volume of commerce in the years after Katrina, in part related to storm recovery spending (Figure 5.2), although for five of the six parishes included in this study, total gross taxable sales peaked not in FY2007 but in FY2008 or 2009. These differences were driven in part by southeast Louisiana's greater involvement in the offshore oil and gas industry which benefitted from very high prices in 2008 and, possibly, by recovery spending from hurricanes Gustav and Ike in 2008. Nonetheless, in coastal Mississippi and Louisiana, the overall trend in retailing was downward from mid-2008 to the oil spill in April 2010.

---

10 Gross taxable sales includes not only retail but also wholesale sales.

119



Figure 5.1. Total gross taxable sales reported for coastal Mississippi counties, FY 2000-10
       Source: Mississippi Department of Revenue 2011



Figure 5.2. Total gross taxable sales reported for selected coastal Louisiana parishes, FY 2006-09
       Source: Louisiana Department of Revenue 2011

## 5.4. SOCIAL AND ECONOMIC EFFECTS OF THE BP OIL SPILL ON RETAILERS IN 2010

The consequences of the *Deepwater Horizon* oil spill varied greatly between different kinds of retailers across the Gulf Coast and changed considerably over time, from the peak of the spill and drilling moratorium in the summer of 2010 through the end of the year, to 2011 and into the summer as a new commercial fishing and tourism season opened and offshore oil activity increased. Sectoral, geographical, and chronological diversity marks retailers' experiences with the spill more than any single pattern. This diversity can be understood as an effect of retailers picking up on the differential impacts of the spill on particular social groups and economic activities in the places they operate, combined with social and economic changes unrelated to the spill occurring in the region and nation.

Monthly data on total gross taxable sales, incorporating both wholesale and retail sales, was obtained from the three coastal Mississippi counties and Terrebonne Parish, Louisiana, from December 2008 to January 2012 in the former cases, through August 2011 in the latter.[11] This data shows a generally declining trend in total sales in 2009, punctuated by a spike in sales in the four months following the *Deepwater Horizon* disaster when major clean-up efforts were ongoing, and a slower rate of decline or modest recovery in late 2010 and 2011 (Figures 5.3 and 5.4). Much of the post-spill jump in sales is attributable to an increase in lumber and building supplies and contractor services spending tied to the clean-up, especially in Mississippi where summer 2010 saw such spending rise temporarily by nearly half before resuming a slower decline after August, 2010 (Figure 5.5). Terrebonne Parish, while it also witnessed a small boost to contractor and building spending during the clean-up, experienced a modest but sustained increase through 2011 (Figure 5.6).

---

11 Total gross taxable sales data was requested from all parishes and counties in all study areas for this project but was only successfully obtained from the above-listed jurisdictions.



Figure 5.3. Monthly total gross taxable sales for Hancock, Harrison, and Jackson counties, Mississippi, Dec 2008–Jan 2012.
Source: Mississippi Department of Revenue 2012



Figure 5.4. Monthly total gross taxable sales for Terrebonne Parish, Louisiana, Dec, 2008 – Aug 2011.
Source: Terrebonne Parish Consolidated Government Sales and Use Department 2011



Figure 5.5. Monthly total gross taxable lumber and building supplies and contractor sales for Hancock, Harrison, and Jackson Counties, Mississippi, Dec 2008 – Jan 2012. Source: Mississippi Department of Revenue 2012



Figure 5.6. Monthly total gross taxable lumber and building supplies and contractor sales for Terrebonne Parish, Louisiana, Dec 2008 – Aug 2011. Source: Terrebonne Parish Consolidated Government Sales and Use Department 2011

Ethnographic data coincides generally with the trends picked up in sales data, but provides a greater degree of resolution on how specific kinds of retailers and their customers fared after the spill. In the months following the explosion of the *Deepwater Horizon*, grocers, restaurants and convenience stores located near centers of cleanup work like Lower Plaquemines Parish, Grand Isle and Cocodrie gained business supplying the needs of cleanup workers either through walk-ins or sub-contracts with BP contractors for fuel, box lunches, and other goods and services. However, retailers in the broader Gulf Coast region did not gain much from cleanup work because that effort was primarily supplied through outside contractors, not local businesses. As one store owner in Plaquemines Parish explained, "Since BP was feeding everybody and getting their supplies from sub-contractors, we were just left with the crumbs, mostly business

off beer and fuel" (BR163 2011). In part due to criticism over the prevalence of contractors in supplying cleanup efforts, as the cleanup efforts went on, more work was offered to local retailers, such as in supplying box lunches for cleanup workers. Yet, some business owners chose not to take this work due to strict contract requirements and the small amounts of work available to individual businesses, and all retailers involved in catering to cleanup workers indicated this work had largely dried up by November 2010.

Among the retailers who did draw considerable business from the cleanup across much of the Gulf Coast were hotels and motels that filled with thousands of cleanup workers in summer 2010. Many motels were able to temporarily offset their loss of tourist and oilfield clients due to the spill, moratorium, and suspension by providing housing for the cleanup (Bayles 2011). Following the capping of the well and the marked reduction in the number of cleanup workers by winter 2010-11, motels largely lost that source of clients while experiencing a normal seasonal tourist slowdown compounded by a weak national economy. Motels near offshore oil and gas ports, which historically relied on offshore workers for most of their business, lost exploration workers following to the drilling moratorium and suspension in summer 2010 but sustained some oil and gas business through the year with offshore production workers not sidelined by the moratorium, suspension, or reduction in drilling permits. These motels normally experience a decline in offshore clients during the winter when offshore work slows down, so while the loss of many offshore workers in 2010 was harmful to business, offshore-oriented motels expected and were able to accommodate the seasonal slowdown experienced in late 2010 and early 2011.

Another factor in hotel and motel operators' ability to survive the loss to traditional clients in 2010 was the claims process. By the end of 2010 the GCCF began delivering substantial amounts of money to motels and other hospitality retailers, especially after rules limiting claims based on geographic proximity to the spill were relaxed in October by the GCCF following strong criticism by State of Florida officials and the tourism industry in that state (GCCF 2010).

Boat dealers and marine hardware stores did strong business in May and June 2010 serving the demand for engines, used boats, and safety equipment created by the Vessels Of Opportunity (VOO) program, part of the spill response effort. Used boat dealers and boat repair shops did better in summer 2010 than dealers in new recreational boats who lost their normal business to the spill. Despite the standing down of the vast majority of VOO boats by the fall, the VOO program helped marine equipment retailers survive the winter of 2010-11 in the face of the hit to tourism and greatly reduced fishing activities brought on by the closure of a huge area of federal and state waters to commercial and recreational fishing in the summer. Another countervailing factor that supported marine equipment retailers despite the fishery closures of 2010 was business with fishermen reinvesting profits from the VOO program. Many fishermen reinvested the income they earned with VOO in the summer into boat repairs, upgrades, and new purchases with those retailers.

Jewelers reported widely varying business conditions in 2010. Those that observed a decline in sales said business fell off in summer 2010 and remained down thereafter, while other jewelers found no change in their business at any time after the spill. Jewelers reporting a decline in business were in towns with many offshore oil workers and in fishing communities, but jewelers with a similar clientele in other communities had no losses following the spill.

124

That cleanup workers, VOO participants, and claims recipients spent their earnings on expensive new cars is one of the most often repeated stories emerging from the spill. New and used car dealers who participated in this study did report a temporary spike in sales in summer 2010, a spike they attributed to oil spill-related claims payments and clean-up earnings, but like with other retailers, new and used car dealers reported the temporary increase in sales had ceased by the fall and winter of 2010. Used car dealers reported a drop in business following the winding down of the cleanup and an increase in customers making late payments or having cars repossessed. Automotive gross taxable sales data gives some support to these assertions. Auto sales in the three coastal Mississippi counties recovered and surpassed their 2009 average level after the oil spill, following a temporary decline in late 2010[12,] then experienced a slight decline in winter 2010-11 before rebounding again in the spring and summer of 2011 (Figure 5.7). In Terrebonne Parish, automotive sales jumped markedly right after the spill to nearly double the low level they attained in winter 2009, subsequently falling back nearer to their 2008-2011 average by December 2010 (Figure 5.8).



Figure 5.7. Monthly total gross taxable automotive sales for Hancock, Harrison, and Jackson counties, Mississippi, Dec 2008 – Jan 2012.
Source: Mississippi Department of Revenue 2012

12 The "Cash for Clunkers" or Car Allowance Rebate System incentive program of July-August 2009 (Bunkley 2009) ended before the 2010 BP oil spill, although its temporary effect on auto sales may be captured in the spike in sales recorded in Mississippi counties in August and September 2009 and the fall-off in sales those counties and Terrebonne in late 2009.



Figure 5.8. Monthly total gross taxable automotive sales for Terrebonne Parish, Louisiana, Dec 2008 – Aug 2011.
Source: Terrebonne Parish Consolidated Government Sales and Use Department 2011

Discretionary and necessities retailers had widely varying experiences following the oil spill. In both retailing sub-sectors, a considerable number of retailers reported no noticeable change in their business in 2010 or 2011 compared to prior patterns. A large number also reported significant, sometimes massive, declines in their business after the *Deepwater Horizon* spill. The most important factors common to retailers experiencing little or no effect from the spill were neither their proximity to the spill or the coast, nor their offering a particular good or service, but the composition of their customer base and what share of those customers' business they enjoyed. Retailers selling primarily to customers employed in offshore oil and related industries like shipbuilding and fabrication, to tourism workers and directly to tourists, and especially to those employed in commercial fisheries and seafood processing    all sectors whose workers were directly impacted by the spill and its consequences    experienced larger losses, more consistently, than those with a more diversified customer base or concentrated in other economic sectors. In communities whose economies suffered large negative effects from the spill, businesses that sold to wealthier customers or very poor customers saw smaller losses, or no change in business at all, while those with middle-class clients saw greater business declines.

Even in the superficially innocuous and unrelated field of nail salons, a business done almost exclusively by Vietnamese-American women on the Gulf Coast and marked by segmentation among shops according to socioeconomic class, race and ethnicity, and employment sector, these differential effects were observed. In towns like Morgan City and Houma, across the New Orleans Metro Area, and along the Gulf Coast of Mississippi and Alabama, nail shops with a wealthier, majority-white customer base in suburban, high-end shopping centers were less likely to report business declines over any period since the spill than those shops serving white, African American, and Asian American middle-class customers. Especially hard-hit were nail shops serving customers who worked in nearby seafood processing plants and shipyards, like a number on the Westbank in suburban Jefferson Parish who attributed the change to reduced commercial seafood landings and seafood processing in the area and the looming closure of Avondale Shipyard (unrelated to the *Deepwater Horizon* and moratorium,

126

this shipyard builds vessels primarily for the U.S. military). Nail shops in Gulf Coast Mississippi associated their losses in 2010 with the near-total loss of tourist customers, their primary client base.

Nail shop owners who said they were significantly affected reported declines in customers and income between 25-50% compared to before the oil spill, the migration of steady customers out of the region, and the lengthening of average time between visits by their remaining customers. The most common consequences for those business owners were, apart from reduced income, cutting between one-third and one-half of their employees and increasing their own hours in the shop. Across the diversity of small independent discretionary and hospitality retailers like bars, florists, hair salons, liquor stores and video stores, those reporting the greatest and most sustained negative economic impacts from the oil spill also reported the strongest dependence on customers employed in heavily impacted economic sectors.

Grocers and other necessities retailers reported similar experiences to nail salons and other discretionary retailers. Many grocers reported no significant impact from the spill or attributed any decline in 2010-11 to the general state of the economy, but a significant number with specific ties to certain heavily affected social groups and economic sectors reported large negative changes to their business. Grocery stores in Lafourche and Terrebonne parishes that did much business supplying offshore rigs lost much of this trade in 2010. Grocers who sold large amounts of provisions to commercial fishermen said they had lost much of that business when fishermen did not go out to sea in 2010. Food stores in communities like Amelia, Louisiana and Bayou La Batre, Alabama, who did much of their business with welders and fitters working in nearby shipyards and fabrication yards, noted a decline in business in 2010 following the oil spill, moratorium, and drilling suspension, although some also noted they began seeing this decline in 2009 coincident with a slowdown in shipbuilding that began that year (See Shipyard/Fabrication section for more on the post-Katrina boom and 2009 decline in the shipyard sector). Grocers who had little competition in serving those highly-affected groups were the most seriously impacted, such as solitary Asian grocers serving Vietnamese and Cambodian commercial fishermen and Filipino offshore workers. Hispanic food stores that sell primarily to Mexicans and Central Americans experienced declines as growing numbers left the region following several high profile immigration raids and declining employment opportunities in shipbuilding after 2009, fisheries closures in mid-2010 following the spill, and the closing out of most oil spill cleanup work in late 2010.

## 5.5. SOCIAL AND ECONOMIC EFFECTS OF THE BP OIL SPILL ON RETAILERS IN 2011

The normal seasonal downturn of offshore oil and gas, fisheries, and tourism activity meant that retailers who reported improving conditions in 2011 after a difficult 2010 generally waited through a long, slow winter and spring before seeing stronger sales. And, for some retailers, 2011 was worse for business than 2010 was, especially for retailers with strong ties to commercial fisheries and oil and gas customers who have yet to return to pre-spill conditions (GNO, Inc. 2012). Retailers described a wide and diverging range of conditions and directions of change from the beginning of 2011 to July 30. While some retailers reported improvement over 2010, others found no change or even further decline in their sales. In April and May of 2011 a number of businesses, from nail salons to grocers to florists and others across the region, began

seeing a shift in the amount of traffic in their stores, but the direction of this shift was not consistent. Some retailers reported an increase in business, most often related by owners to rebounding tourism with the coming summer, preparations for the new commercial fishing season, optimism that offshore oil and gas activity would pick up during the spring and summer of 2011 and preparations for that, or greater consumer confidence that the local economy was improving. Others reported a further decline in business around this time, which was attributed variously to customers' fears over the national economy, local people running down their savings following a year of limited earnings after the spill, the loss of oilfield workers who had left the region to take jobs elsewhere, or the slow progress of the claims process and the exhaustion of emergency claims money by its recipients. Local journalism echoed these ambiguous trends, reporting continuing slow retail sales but generally fair or improving conditions (Bayles 2012a, 2012b).

Retailers that reported little or no change in 2011 can be grouped into two categories: those that felt little or no impact in 2010 and continued reporting no change, and those who were impacted but saw no improvement the following year. Businesses were or were not affected by the spill in 2011 for the same reasons given in 2010. Retailers who reported no effects on their business from the oil spill or strong and rapid recovery of business were those with a more diversified customer base, with wealthier clients, and who did business primarily with customers outside the commercial fisheries, oil and gas, and tourism sectors. Businesses that had experienced little or no recovery or saw further declines in 2011 related those declines to the lack of recovery among their customers. For instance, grocers reported their commercial fishermen customers had not gone back out to sea yet or were only working sporadically due to poor catches and limited profits. In spring 2011, commercial fisheries-dependent grocers in Louisiana, Alabama, and Mississippi reported sales remained below pre-spill levels by one-third, with some grocers still seeing as much as 75% less business than their norm. Auto parts stores and car repair shops said local people of limited means did not have money to keep up their vehicles like before the spill. Florists and nail salons conveyed that customers did not spend as much money with them because they had no surplus income from shipyard and seafood work that remained stagnant.

Retailers who noted a significant rebound in business by mid-2011 accounted for this change as the result of broader regional economic recovery and specific improvements in their customers' economic conditions. In coastal Mississippi, the new tourist season in summer 2011 contributed to better sales among hospitality retailers, but opinions among retailers as to the magnitude of improvement were notably mixed; few considered their tourist-related business to have recovered to pre-spill levels. In communities whose economies are dominated by shipyard and fabrication, grocers and other necessaries retailers saw small but significant improvement in the first half of 2011 related to the acquisition of several large marine construction projects by local yards.

Two ethnographic conversations with retail business owners in 2011 convey the range of conditions retailers are facing with the ongoing effects of the oil spill and other ongoing trends bearing on their business. In June 2011, a Vietnamese-American nail salon owner, formerly a shipyard welder and grocery store worker, in an urban community on the west bank of Jefferson Parish, Louisiana, said his business was down about 50% compared to before the oil spill. He attributed the decline to three distinct reasons: first and most important, the overall down economy, the second the BP spill, and the third and least important, competition among a growing number of nail salons opened in recent years:

Normally on a Friday like this we'd be full of customers and I wouldn't have time to talk with you like this but look at how it is now [only one customer was in the shop at the time, the owner's wife the only other worker] .... I used to have another employee before the oil spill but I let her go afterwards. She moved away to Dallas. I'd say BP is responsible for 50-60% of my business decline. The people who worked in the seafood plants or in shipyards or in fishing are losing their jobs because of the oil spill, so people don't have money to get their nails done. That's true especially among the Vietnamese community here, but all the people living in this neighborhood are linked to the seafood economy, either to fishing or processing plants or shipyards, so the spill affected everybody, but especially the Vietnamese who've been heavily affected (BM551 2011).

A Cajun sporting goods entrepreneur and former oilfield worker in south Louisiana said in January 2012 that his business had declined in 2010 due to the oil spill. He attributed this decline as much to the deepwater drilling moratorium and suspension drying up oilfield workers' discretionary spending power as to direct effects of the spill restricting access to the Gulf. BP clean-up purchases from the business and economic loss payments to customers helped this business get through 2010. Recovering oil and gas activity was reflected in more hunting sales during the busy winter months of late 2011, when deer and duck seasons were open in south Louisiana:

BM630: [Around] here, people really love their fishing and hunting. A 'Coonass' will go without but when hunting season comes around, he's going to go hunting, if he's got money to spend or not, he's gonna go! So we didn't see much difference in our sales for hunting season last year [2010] and this Christmas [2011] has been good, *really good*, it's because things are kind've coming back now [in the oilfield]. They're going back to work now, they're letting them drill again, so it's like it's coming back to us, they have that money and they're spending it on hunting   your shotguns, your decoys, clothes, like that.

Researcher: So, how were your fishing sales last year and the year before, in 2010? Did the oil spill affect things?

BM630: Yes, when the spill happened, well, they closed all the waters around here. You see, we're kind've to the west of where it happened, but we were right on the edge, and they closed all our waters and the marinas, they were taken over by the clean-up so you couldn't go fishing [in summer 2010]. That hurt us because, like this oilman's fishing rodeo, they'd buy guns, boots, rods and reels, ice chests [for their raffle] from us but that year they had to cancel the rodeo because nobody could go fishing. Now, BP bought from me, and they paid me too! They bought all kinds of stuff from me, and that helped. BP bought a lot from here *and they paid me*. And I got [claims payment] money from BP   I don't have anything bad to say about them, they paid me twice what I claimed were my losses.

What hurt us more than the oil spill, I'll tell you, it was the '*merit*-orium' [moratorium/suspension] that they did. You know, before 2010, down here it was like we were bulletproof. 2006, 2007, 2008, 2009, we did real well. 2005 was amazing here because of Katrina in New Orleans. All those people, they lost their guns, their boats, everything, so

we were getting orders from them   they'd call and leave a credit card number and say 'hold it in the store, I'm coming down to get it right now'   we'd have special orders like that, things were selling that fast. Because they lost everything they had and we were the closest sporting goods to New Orleans then. In 2010, we had a kind've slow Christmas for hunting season because those oilfield guys, they didn't have the same amount of money they'd normally have. But this year, it's been coming back to normal, and they're going out again. And we had a good duck season last winter and this winter, that was good too. We had more effect from the moratorium than from the spill on our business (BM630 2012).

## 5.6. SUMMARY

Retail businesses, despite their unremarkable appearance in relation to the Gulf Coast region's characteristic economic structure, developed in close relation to the region's more distinctive seafood, energy, and travel industries. Retailers were and remain affected by the BP oil spill of 2010, although from April 2010 to summer 2011 different retailers' experiences demonstrated strongly contrasting patterns of change. More than geographical proximity to the spill or the products sold, the composition of a retailer's customer base had the strongest influence on whether retailers were affected by the spill and for how long. Retailers highly dependent on customers directly impacted by the spill, moratorium, and suspension were the most heavily impacted economically for the longest period of time.

## 5.7. REFERENCES

APRC. 2011a. Measures of the effects of the Gulf Oil spill on individuals and businesses and proposed compensation schema. Report to the Gulf Coast Claims Facility and Exhibit C of the Gulf Coast Claims Facility's 'Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology.' Available at: http://www.gulfcoastclaimsfacility.com/exhibit_c.pdf

APRC. 2011b. APRC Methodology for Calculating Interim Payments for 2011 Losses Due to the Oil Spill. Report to the Gulf Coast Claims Facility and Attachment A of the Gulf Coast Claims Facility's 'Modification to Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology.' Available at: http://www.gulfcoastclaimsfacility.com/ATTACHMENT_A.pdf

Bayles, Cara. 2011. Houma's hospitality industry grows. Houma Courier. November 2.

Bayles, Cara. 2012a. Business holds steady for beauty shops during recession. Houma Courier. January 7.

Bayles, Cara. 2012b. Pawn shops thrive in good, bad economies. Houma Courier. January 25.

Beard, Thomas. 1969. The Louisiana economy. Baton Rouge: Louisiana State University Press.

BM551. 2011. Personal communication. Business conditions and changes observed over time. Discussion with Brian Marks. Nail Salon owner. Westbank Jefferson Parish, LA. June 10.

BM630. 2012. Personal communication. Christmas shopping season, comparison with past years, effects of moratorium and spill on outdoor spending. Discussion with Brian Marks. Sporting goods store owner. South Louisiana. January 17.

BR163. 2011. Personal communication. Oil spill impacts on business. Discussion with Bethany Rogers. Store owner. Plaquemines Parish, LA. March 18.

Bunkley, Nick. 2009. Government will end clunker program early. New York Times. August 20.

Davis, Donald. 2010. Washed away? The invisible peoples of Louisiana's wetlands. Lafayette: University of Louisiana at Lafayette Press.

Goldberg, J. 2010. Liability for economic loss in connection with the Deepwater Horizon spill. Available at:
http://www.gulfcoastclaimsfacility.com/Goldberg.Memorandum.of.Law.2010.pdf

Greater New Orleans, Inc. 2012. The impact of decreased and delayed drilling permit approvals on Gulf of Mexico businesses. Available at
: http://media.nola.com/2010_gulf_oil_spill/other/GNOinc_Jan2012_study.pdf

Gulf Coast Claims Facility (GCCF). 2010. Feinberg announces clarification regarding geographic proximity. Available at:
http://www.gulfcoastclaimsfacility.com/press7.php

Gulf Coast Claims Facility (GCCF). 2011. Modification to final rules governing payment options, eligibility and substantiation criteria, and final payment methodology. Available at: http://www.gulfcoastclaimsfacility.com/METHODOLOGY_8162011.pdf

Gulf Coast Claims Facility (GCCF). 2012. Overall program statistics (status report as of March 14, 2012). Available at:
http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf

Hirsch, Arnold. 2005. New Orleans: Sunbelt in the swamp. In: Samuel Shepard, Jr., ed. New Orleans and Urban Louisiana, Part C: 1920 to Present. Volume XIV of The Louisiana Purchase Bicentennial Series in Louisiana History. Lafayette, LA: Center for Louisiana Studies.

Lewis, Pierce F. 2003. New Orleans: The making of an urban landscape. Santa Fe: Center for American Places.

Louisiana Department of Revenue. 2011. Departmental annual reports, fiscal years 2006-2009. Available at: http://rev.louisiana.gov/sections/Publications/ar.aspx

Marks, Brian. 2012. The political economy of household commodity production in the Louisiana shrimp fishery. Journal of Agrarian Change 12(2-3):227-51.

Mississippi Department of Revenue. 2011. Departmental annual reports, fiscal years 2006-2009. Available at: http://www.dor.ms.gov/info/stats/main.html.

Mississippi Department of Revenue. 2012. Sales indicated by gross sales tax collections, reported by county, city and industry. Available at: http://www.dor.ms.gov/info/stats/salestaxcol.html

Robertson, Campbell. 2011. No vacancies, but some reservations as gulf tourism rebounds. New York Times. July 15.

Schmidt, Katharine. 2011. Sales-tax collections continue to rise. Houma Courier. May 29.

Shulman, Bruce J. 1994. From cotton belt to sunbelt. Durham: Duke University Press.

Terrebonne Parish Consolidated Government Sales and Use Tax Department. 2011. Parish of Terrebonne - Recap of taxable sales by major business group. Data file in possession of authors.

Woodman, Harold. 1997. Credit and labor relations in the postbellum agricultural South. In: Thomas Becnel, ed. Agriculture and Economic Development in Louisiana, Volume XVI of The Louisiana Purchase Bicentennial Series in Louisiana History. Lafayette: Center for Louisiana Studies.

**CHAPTER SIX: NON-GOVERNMENTAL ORGANIZATIONS AND THE DISASTER**

Bethany Rogers and Diane Austin

As noted throughout this volume, the *Deepwater Horizon* disaster had significant effects on individuals, households, and communities. For the non-profit institutions and organizations operating within the region, the effects were both acute and chronic, obvious and subtle. Many of these effects were still unfolding at the time of this study, and many will only be understood in retrospect, as staff and members reflect on how the event affected both their immediate, day-to-day operations and the nature and extent of those operations over time. This chapter focuses on the non-governmental organizations (NGOs) that played a role in disaster response during the months that oil was gushing into the Gulf and in the first year afterward. Since then, some of these groups have become involved in activities and programs that emerged from the disaster, including the ongoing claims process (see Chapter 7, this volume) and environmental remediation. Such ongoing activities will be addressed in future reports.

The April 20th blowout of the Macondo well initiated an array of responses by local, state, and federal government officials. Within six days of the incident, the U.S. Department of Homeland Security and the Department of the Interior began a joint investigation of the *Deepwater Horizon* explosion and sinking, and the associated loss of life, to determine the events, decisions, and actions related to the disaster. The joint investigation was conducted by the U.S. Coast Guard (USCG) and the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE).

The explosion and subsequent release of oil into the Gulf was unprecedented in the United States (see Volume I). Given the depth of the water in which the well was drilled and the magnitude of the release, the *Deepwater Horizon* disaster presented a major technical challenge. For the federal government, given the global visibility of the disaster, especially in light of proposals to expand offshore drilling beyond the Gulf of Mexico, it also presented a serious political challenge. The federal government, through agencies and departments as varied as the USCG, the National Park Service, and the Small Business Administration, responded to the disaster (see The White House n.d.). However, due to laws such as the Oil Pollution Act of 1990 (OPA 90) which govern federal response to oil spills and the lack of a presidential major disaster declaration, the Federal Emergency Management Agency (FEMA) had no significant role[13] in providing assistance to individuals and businesses. That role was assumed by state and local governments, by BP and its surrogates, and by NGOs.

This event occurred in an active hurricane region where the government and NGO disaster response apparatus is extensive and well-practiced, particularly following the 2005 and 2008 hurricanes. While this experience was an advantage, in many respects this disaster was unlike a major hurricane. The speed with which it unfolded and its duration were atypical. At least from the perspective of those unfamiliar with what was taking place at the Macondo well, in contrast to a hurricane and the warnings that precede its landfall, the disaster began with no warning. Then, unlike storms that move across the region over a period of days, the release of oil into the Gulf continued for months and no one could predict when the leak would be stopped.

---

13 Early in the response, Homeland Security Secretary Janet Napolitano announced plans to send senior FEMA officials to Louisiana to oversee the BP claims process, but that announcement was met with local concern (Shaban 2010).

The structure of the response to this disaster was also different — most officials had not experienced a disaster in which a private entity played such a central and key role. A review of Perry's (1991) list of six generic functions carried out in all disasters — warnings, evacuation, sheltering, emergency medical care, search and rescue, and protection of property — makes it clear how different this disaster was.

With regard to disaster response and recovery, the relationship of the federal government to state and local governments and the NGO community had to be defined. A key responsibility of local governments is to protect citizens and property. The spill continued for months after the explosion and no one knew where or when the oil would come ashore, especially because the explosion occurred just before hurricane season began and continued well into the season. Thus, no one could be certain where and how to direct recovery resources to address a constantly shifting and indefinitely prolonged crisis. Even while federal and state officials were directing operations, local governments were trying various options like installing booms to keep oil out of bayous and other waterways. In addition, local officials had to modify existing operations and make personnel and other resources available to manage the increased workload resulting from the spill. For example, emergency response directors had to update their hurricane plans to take into account the possibility that oil would come ashore during a storm event. Even when government offices were able to hire new employees, those people had to be oriented and trained, requiring time and energy from staff who were already facing greater-than-usual workloads. The disaster became an international spectacle, and, because local officials generally play a key role in informing Gulf residents about hazards, they also had regular interactions with reporters, editors, and others trying to find out what was happening. As time passed, local governments also played a role in providing employment services and small business support. Nevertheless, much of the responsibility for providing direct services to residents affected by the spill fell on NGOs.

It is not surprising that much of the social work carried out in response to the explosion and spill was done by NGOs. The end of the 20th Century witnessed a broad shift in the organization of many social programs as the federal government passed to the states the responsibility for activities such as job assessment, training, and placement and family support programs. As part of this shift the states, in turn, "have typically devolved the task to their counties, and the counties in turn have contracted for-profit and nonprofit organizations to deliver … reform and, in some cases, to serve as managing contractor for the entire effort" (Kettl 2000:492). Here, an NGO is defined as an independent (non-governmental), not-for-profit, professionalized organization whose aim is to promote common goals at the local, regional, national, or international level (see Martens 2002 for an elaborate discussion about defining nongovernmental organizations at the national and international level).

In general, NGOs and volunteers play major roles in disaster relief in the United States and abroad, and their involvement has drawn both admiration and critique. Dynes et al. (1981) have identified two kinds of needs or demands that must be addressed in disaster response, those that result directly from the event and those that result from the efforts to respond to it, what they term a "mass assault" by individuals and organizations responding to the disaster (Dynes et al. 1981:48). One problem that frequently surfaces in post-disaster response is that volunteers, even those with potentially useful skills and resources, often prove not to be helpful when no one is making critical decisions about who will supervise them and where, how, and when they will be used. Without such decision making, by NGOs or governments, large numbers of volunteers become another disaster management problem.

This chapter explores the effects of the disaster and its aftermath on NGOs, highlighting key issues such as how the context of a post-Katrina Gulf Coast exacerbated or mitigated those effects. The chapter focuses on NGOs that provided disaster relief and/or social services to residents of the study communities and their response to the *Deepwater Horizon* disaster. The chapter first introduces these organizations and assesses the growth of region's NGO network after the 2005 Gulf Coast hurricanes. The structures put in place after the storms, but prior to the oil disaster, to provide NGOs with organizational, financial, and other support shaped NGO responses to the spill. The chapter ends with a discussion of issues that NGOs faced in responding to the *Deepwater Horizon* disaster and their implications for future responses to oil spills or other major environmental disasters.

## 6.1 INTRODUCTION TO THE SOCIAL SERVICE NGOS IN THE GULF COAST REGION

Although the Gulf Coast region is vulnerable to tropical storms and hurricanes (see Volume I), it had relatively few disaster preparation or response non-profits organizations prior to hurricanes Katrina and Rita in 2005 (Fagnoni 2006). The extensive damage wrought by the storms, the widespread media coverage of them, and concerns about the process of rebuilding drew considerable attention to the region. For example, arguing that Katrina "raised basic social science questions and created an urgent need for social science knowledge to inform public action" (Calhoun and Erikson 2006), the Social Science Research Council established a Task Force on Katrina and Rebuilding the Gulf Coast to help connect social scientists working on Hurricane Katrina and its aftermath to one another and to policymakers. One product of that task force was the *Hurricane Katrina Research Bibliography* which, as of July of that year, included 99 pages of references covering topics ranging from children and schools to health and healthcare (Erikson and Peek 2011).

Among the issues explored by both researchers and activists after Katrina was the condition of the social services sector in the region at the time of the storms. The Hauser Center for Nonprofit Organizations of the Urban Institute devoted an issue in its Emerging Issues in Philanthropy Seminar Series to the topic (Boris and Steuerle 2006). In the introduction to his contribution to that volume, Steven Rathgeb Smith, director of the Nancy Bell Evans Center on Nonprofits and Philanthropy at the University of Washington, observed, "The tragedy wrought by Hurricane Katrina has exposed weaknesses in the social safety net and in the ability of social welfare agencies to respond to profound human and economic devastation" (Smith 2006:5). Smith concluded that, compared to other U.S. states of similar size, Alabama, Louisiana, and Mississippi had an underdeveloped and underfunded NGO sector with lower rates of government support, less philanthropic giving, and lower overall numbers of NGOs. He also concluded that, compared to other regions, the Gulf Coast had a weaker network of community- and regionally-based social service non-profit agencies and corresponding infrastructure, including government support, community-based foundations, volunteer intake organizations, and other supplementary institutions and avenues of fiscal support (Smith 2006). Assessments by Smith and by researchers at the Urban Institute (Auer and Lampkin 2006) indicate that large multiservice agencies affiliated with national organizations had been significant providers of social services in the region before the 2005 storms and that churches had historically been significant providers of local social services; the latter emerged as important responders after hurricanes Katrina and Rita as well.

Gulf Coast residents, too, assessed the post-Katrina disaster response. In part because so many viewed the government's response to be slow and inadequate, many perceived the volunteer and non-profit sector as the region's recovery impetus, despite its relative weakness (Lawrence et al. 2007; Simo and Bies 2007; Smith 2006). Because of the extent of the need and response, as well as the duration of the recovery process, a larger NGO network emerged in the Gulf region in the immediate years after the 2005 storms. Consequently, when the *Deepwater Horizon* oil rig exploded in April 2010, a more sophisticated NGO network was in place to help address the disaster recovery needs of Gulf Coast residents and communities.

Several types of NGOs provided key services in the aftermath of the 2010 disaster (Table 6.1). Multi-service non-profit agencies like Catholic Charities, Boat People SOS, and the Greater New Orleans Foundation provided many resources and coordinated the distribution of others. Numerous smaller community-based NGOs, including individual churches and temples, also played a role in delivering aid and providing referrals to, and operating programs for, larger agencies. Disaster recovery and volunteer organizations that came to the region following the 2005 storms and were still there in the summer of 2010 shifted to address the new crisis. Although their capacity to respond to the spill was often limited, they were present in some of the most dramatically impacted communities. In addition, an assortment of specialized regional NGOs responded to particular recovery needs of coastal residents after the spill. These included legal aid organizations offering claims assistance, medical NGOs providing health screenings and monitoring, and economic development NGOs offering business planning services and loans. Environmental NGOs were responders to the 2010 oil spill and these groups played a role in the disaster as media intermediaries and "watchdogs" of the uncapped well, the dispersal of the oil in the Gulf, and the progress of the clean-up. Because Gulf Coast commercial fishing communities were heavily impacted by the spill, fishermen's associations served as important conduits for information on the situation on the water and as advocates for recovery funding and programming supporting the seafood industry and fisheries-dependent communities. Non-profits that serve the region's Southeast Asian and Latino populations, who constitute a significant portion of its commercial fishing and seafood processing workforce, were significant in delivering aid, advocating for affected people, and providing translation and counseling to residents (see Chapter 2, this volume). Nevertheless, many Gulf Coast residents impacted by the spill believed their concerns surrounding the spill were inadequately addressed. Thus, independent activism about the spill emerged in the spring of 2010, generated by local, regional, and national figures attempting to direct media attention, services, and compensation to those impacted by the spill, centering prominently on issues of public health.

Table 6.1. Organizations Active in Research Study Communities by NGO Type

**Coalition Groups**
  Community Action
  Greater New Orleans Disaster Recovery Partnership (GNODRP)
  Steps Coalition, Biloxi, MS

**Community and Regional Foundations**
  Baton Rouge Area Foundation
  Community Foundation of Acadiana
  Community Foundation of South Alabama
  Greater New Orleans Foundation
  Gulf Coast Fund

**Community-Based NGOs**
  Back Bay Mission
  Bayou Interfaith Shared Community Organizing (BISCO)
  Community Center of Saint Bernard
  Dulac Community Center
  Hope Community and Development Agency, Biloxi, MS
  Mercy Housing and Development
  Saint Bernard Battered Women's Program
  Saint Bernard Project's Center for Wellness and Mental Health
  Second Harvest Food Bank
  Zion Travelers, Braithwaite, LA

**Environmental and Environmental Justice NGOs (National, Regional, and Local)**
  Advocates for Environmental Human Rights
  Audubon Institute, New Orleans, LA
  Bayou Grace Community Services
  Coastal Women for Change
  Deep South Center for Environmental Justice, Dillard University
  Guardians of the Gulf
  Global Green
  Gulf Restoration Network, New Orleans, LA
  Lake Pontchartrain Basin Foundation, Metairie, LA
  Louisiana Bayoukeepers, Barataria, LA
  Louisiana Bucket Brigade, New Orleans, LA
  Louisiana Environmental Action Network (LEAN), Baton Rouge, LA
  Mobile Baykeepers, Mobile, AL
  Moving Forward Gulf Coast
  National Resource Defense Council (NRDC), Washington D.C. & temporary office in Buras, LA
  Sierra Club
  Turkey Creek
  Waterkeepers Alliance, Mobile, AL

**Fishing and Seafood Associations**
  Association of Family Fishermen
  Fishermen and Concerned Citizens Association
  Gulf Organized Fisheries in Solidarity and Hope (GO FISH), New Orleans, LA
  Ladies of Lafourche Shrimpers, Cut Off

  Louisiana Oystermen Association, Pointe a La Hache
  Louisiana Shrimp Association
  Mississippi Coalition for Vietnamese American Fisherfolk and Families
  Southeast Asian Fisherfolk Association
  United Commercial Fishermen's Association, Baton Rouge, LA

**Grassroots Advocacy Organizations**
  Bridge the Gulf
  Emergency Committee to Stop the Oil Disaster
  Project Gulf Impact
  Public Laboratory
  Coastal Heritage Society of Louisiana
  Women of Coastal Heritage Society

**Legal Service NGOs**
  Mississippi Justice Center
  Louisiana Justice Institute
  Southeast Legal Services

**Long-Term Disaster Recovery and Volunteer Organizations**
  Gulf Coast Oil Spill Volunteers
  Hands-On
  Lutheran Disaster Services
  Mennonite Disaster Services
  National Recovery Network (NRN)
  Operation Hope
  Red Cross
  United Way

**Medical NGOs**
  Daughters of Charity, Mobile
  Providence Outreach Guadalupe Center & Mobile Medical Center, Mobile
  Saint Anna's Episcopal Church Mobile Medical Center, New Orleans

**Minority, Immigrant, Refugee NGOs**
  Asian-Americans for Change, Biloxi, MS
  Boat People SOS, Bayou La Batre, AL and Biloxi, MS
  Coastal Communities Consulting, New Orleans, LA
  Mary Queen of Vietnam Community Development Corporation, New Orleans, LA
  Mississippi Immigrants' Rights Alliance, Biloxi, MS
  United Louisiana Vietnamese American Fisherfolk
  VAYLA, New Orleans East

**Multi-Service NGOs**
  Catholic Social Services – MS/AL
  Catholic Charities Archdiocese of New Orleans (CCANO)
  Catholic Charities Archdiocese Houma-Thibodaux

137

Episcopal Community Services                          United Way
St. Vincent DePaul Society
Salvation Army
United Houma Nation Vocational Rehabilitation Program

Typically, the NGO sector does not provide medical or public health services, but where mental and physical health were included in the work of NGO spill responders, they are discussed in this chapter. Native Americans constitute a sizeable portion of the population of several coastal communities, especially in south Louisiana. The region's state recognized tribes are represented by organizations recognized as non-profits (501C3) by the U.S. Internal Revenue Code (see Chapter 4, Volume I), but only those organizations that were explicitly established to provide social services for tribal communities, such as the United Houma Nation's Vocational Rehabilitation Program, are included in this chapter.

The Gulf region has had an active environmental justice movement for several decades, but this movement has tended to focus on communities outside the coastal zone, particularly those in the infamous "cancer alley" located along the Mississippi River and adjacent areas where intensive industrial development has taken place (e.g., Lerner 2005). The Louisiana towns of Homer, Convent, Norco and Mossville, for example, all have faced threats from industrial expansion and pollution and, in the 1990s, protests organized by residents against proposed facilities played a role in defining the national environmental justice movement (Bullard 2005). NGOs such as the Louisiana Environmental Action Network and the Louisiana Bucket Brigade as well as university centers like the Deep South Center for Environmental Justice at Dillard University have typically been oriented toward the "downstream" impacts of petroleum refineries and associated chemical plants rather than the "upstream" activities of exploration and production. The *Deepwater Horizon* disaster led several of Louisiana's environmental justice organizations to focus more attention on coastal communities; their activities including the provision of supplies, conducting surveys among residents, independent environmental sampling, and organizing forums and workshops to share information.

The NGOs discussed in this chapter have particular histories, are organized in different ways, work at various scales     local, regional, and national     and embody a range of organizational missions. The specific issues these NGOs faced during and after the oil spill derive in part from those contexts, but NGOs also shared the common experience of severe restrictions on their ability to garner resources and offer needed recovery programming for a disaster unfamiliar to their experience in an uncertain funding environment. At the same time, those limitations led in some cases to the emergence of new kinds of non-profit organizations and approaches to handling community needs after disasters. Gulf Coast NGOs' experiences have important implications for groups responding to disasters of similar scale and magnitude.

## 6.2 THE STORMS OF 2005 AND A NEW REGIONAL NGO NETWORK

As noted above, hurricanes Katrina and Rita had a profound effect on the NGO network of the Gulf Coast region. Study participants described the region's recovery, as "volunteer" or "non-profit" driven. Following the property loss and population displacement from the hurricanes, some local governments made major shifts in the types of services they provided residents, and, in some cases, NGOs served to "fill the gap" where governments were not directing resources. At the same time, loss of staff and damages to facilities and equipment forced other NGOs to shut down completely and others to drastically curtail services (Simo and Bies 2007, Smith 2006, Tuhus 2006). Those organizations that managed to function in the immediate wake of the storms struggled to locate clients, identify needs, and dispense services (Smith 2006). In light of these challenges for existing NGOs, a number of non-profits were established or expanded to bolster the region's recovery.

When the Federal Emergency Management Agency (FEMA), the U.S. federal government's disaster response coordination agency, mobilizes in response to a disaster anywhere in the United States, it accesses a network of about 40 national disaster response and long-term recovery groups, requesting their supplemental services for everything from food distribution to medical assistance to business recovery planning (Fagnoni 2006). This network of NGOs works under the organizational umbrella of the Voluntary Organizations Active in Disaster (VOAD), and both FEMA and state disaster agencies have direct points of contact with VOAD to request relief and recovery services. Due to the extensive physical damage wrought by the 2005 storms, as well as the struggle to repopulate communities and rebuild businesses, FEMA and state governments requested help from a number of long-term recovery organizations (Fagnoni 2006). Some organizations, such as Operation Hope, an emergency financial recovery organization, and Mennonite Disaster Service, a faith-based long-term disaster recovery non-profit with the administrative and volunteer capacity to help rebuild homes, established new operation centers in Gulf Coast communities struck hard by the storms. The arrival of these groups and other long-term recovery non-profits quickly expanded the number of organizations offering disaster aid to communities along the Gulf, at the same time that existing VOAD organizations, such as Catholic Charities and Catholic Social Services, expanded their operations. Some of these larger multi-service NGOs provided direct recovery assistance such as food or rental subsidies, but also helped families develop recovery plans focused on longer-term recovery needs including mental health treatment and job training and placement.

In addition to disaster response organizations, other organizations established or expanded their presence in the region after Katrina. Boat People SOS is an international organization established over 30 years ago in San Diego, California to provide social services to Vietnamese immigrants in the United States. In 2005, working with other NGOs, Boat People SOS spearheaded the Katrina Aid Today (KAT) program, establishing for the first time branches along the Gulf Coast in Bayou La Batre, Alabama and Biloxi, Mississippi in order to provide Asian fishing communities in those areas the assistance, translation services, and legal counsel necessary to navigate recovery and mitigation processes after Hurricane Katrina (BPSOS n.d., Norman 2006). Some chapters or service centers of national NGOs had a regional presence before the storm and, with the backing of their national organizations, expanded outreach efforts. For example, Seedco Financial increased its offering of small business lending and training programs in southeast Louisiana. In 2008, Seedco established the Fisheries Assistance Center,

the state's first business resource center for the commercial fishing industry (Alexander-Bloch 2012, Seedco n.d.).

In the wake of the 2005 storms, especially Hurricane Katrina, national non-profits also directed funding to the region, and many community-based organizations received unsolicited funding, administrative help, or volunteer labor to bolster their programming and outreach. A number of local non-profits received grants from foundations and national charitable organizations targeting the region (Tuhus 2006). Following Katrina, Bayou Grace Community Services, a faith-based community development organization in Terrebonne Parish, Louisiana, was established with directed funding from major faith-based donors such as the Evangelical Lutheran Church in America (Bayou Grace n.d.). Other faith-based NGOs already operating in southern Louisiana parishes included Bayou Interfaith Shared Community Organizing (BISCO) and the Dulac Community Center (BISCO n.d., Dulac Community Center n.d.; see also Chapter 9, Volume I). Many of these community-based organizations were "re-granted" funds from larger organizations such as churches, large multi-service NGOs, and corporate foundations directing donations to the region, and some local NGOs were dedicated monies from national organizations that received federal funds, permitting them to expand their recovery operations (Auer and Lampkin 2006, Lawrence et al. 2007).

Other local social service NGOs were established after the storms to fulfill community recovery needs. Some non-profits were founded by residents or recovery volunteers moved by the need to start or sustain effective recovery programming. In New Orleans East, for example, the Vietnamese Catholic community founded Mary Queen of Vietnam Community Development Corporation, Inc. (MQVN CDC) in 2005 to engender participatory neighborhood planning and rebuilding. Focusing its efforts in New Orleans East, one of the most flood-damaged portions of the city, MQVN CDC has also advocated for accessible health care, affordable housing, business incubation, and cultural programming (Faciane 2007, Nolan 2006). In Saint Bernard Parish, Louisiana, Liz McCartney and Zack Rosenbug first arrived in the parish as volunteers in the winter of 2006. They found the demands for gutting, renovation, and re-construction of flood-damaged homes in the area so great that they started one of the region's largest rebuilding non-profits, which also grew to include a mental health facility to address the accompanying emotional issues of displacement and loss in the community (Faciane 2006). Also in Saint Bernard Parish following Hurricane Katrina, two temporary volunteers established the Community Center of Saint Bernard (CCSTB) to provide essential services, such as laundry facilities, a clothing bank, a computer center with internet access, and a food pantry, to poor and working-class residents. The CCSTB advocated to reinstate the parish's food stamp program and, at the time of this study, housed that program, as well as provided space for neighborhood gatherings, performances, and support groups (CCSTB n.d.).

## 6.3 IMPLICATIONS OF 2005 GULF COAST STORMS ON THE REGION'S NGO NETWORK

The expanded capacity and increased numbers of non-profits following hurricanes Katrina and Rita produced a new NGO arena along the Gulf Coast. The growth in agencies and services raised additional issues - competition for long-term funding, an increase in re-granting and the political power of regional foundations, new NGO alliances and collaborations, better housing and intake procedures for volunteers, and more sophisticated organization and outreach. These shifts in the regional NGO landscape shaped how those NGOs were poised and equipped to respond to the 2010 disaster.

Study participants almost universally agreed that the influx of people and organizations broadened both ideas and specific services within the region. Fieldwork data indicate that, in some communities, social services like affordable housing and food assistance were put in place through the NGO incentives and programming. According to a regional NGO director,

> It [Katrina] brought a lot of new people and ideas into the area that hadn't been here before the storms. There were the organizations dedicated to providing housing and food. Just the basic human rights stuff…. And some people in the government around here didn't want these things. The mayor here, he never wanted the homeless shelter down here and now, since the old one has burnt down, he still hasn't replaced it (PP514 2010).

Many Gulf Coast NGOs received funding from foundations or government agencies in the immediate wake of the storms. Not only did many national foundations dedicate monies to a range of recovery and rebuilding initiatives, but many of them expedited their funding processes (Tuhus 2006). In a national environmental magazine, Anne Rolfes, the Executive Director of the Louisiana Bucket Brigade, explained that "it was a rare event before Katrina that a funder would call and say we have money we want to give you without us having pursued them" (quoted in Tuhus 2006:15). After Katrina, several foundations offered unsolicited funding to Rolfes and the Bucket Brigade (Tuhus 2006). This, according to study participants, held true for a number of regional NGOs.

During this post-storm funding surge, many NGOs were under duress. In many cases, organizations were short-staffed and working space or equipment had been severely damaged or destroyed (Smith 2006). Client contact networks were disrupted because of dislocation and loss of communication services. NGO directors noted it had been difficult to successfully carry out organizational missions as they struggled to re-establish their client base and programming in the aftermath of the disasters. With the influx of outside money and expertise and the restoration of public services, NGOs were able to gradually re-establish a foothold in the communities they served (Wallace 2010).

By 2007-2008, just as many Gulf Coast NGOs were reaching full administrative and programming capacity, the funding channels available to them after the storms shrank because of the economic recession and what some termed "disaster fatigue" among philanthropists (see also Rogers 2010; Wallace 2010). As a result, some non-profits along the Gulf Coast closed their doors, while the majority had to respond creatively to dramatic losses in revenue (NCCS n.d.; Wallace 2010). Gulf Coast NGOs benefitted from increased funding for several years after the storms, but by 2010, as one disaster assistance expert noted, "when you actually have very effective and efficient organizations, the money has basically dried up" (quoted in Wallace 2010: 14).

Corresponding to the shrinkage of resources, particularly with the number of charitable organizations growing and the funding pool diminishing, conflict over funding and "turf" emerged among some NGOs several years after the Gulf Coast storms (Renz 2009). Reports by the Foundation Center indicate that the bulk of philanthropic giving for Gulf Coast hurricane recovery happened by the summer of 2007 (Lawrence et al. 2007; Renz 2009) and most private and corporate giving had been focused on immediate recovery needs like emergency shelter, food, and housing reconstruction (Lawrence et al. 2007; Moore 2006). As NGO programming shifted to longer-term recovery, the objectives of donors and NGOs become more difficult to reconcile with projects that were increasingly costly to carry out, resulting in conflict among non-profits, foundations, and donors over how to dedicate available resources (Moore 2006).

The majority of foundations that funneled money to the Gulf Coast to aid in reconstruction and redevelopment after the Gulf Coast storms were located outside the region (BondGraham 2011; Lawrence et al. 2007). Many regionally-based foundations, however, were allocated funding by national foundations, so they served as funding intermediaries in a process commonly referred to as "re-granting" (Lawrence et al. 2007; Renz 2009). Regional and community-based foundations became significant political players in the Gulf Coast NGO network several years after the storms because they became the principal funding source for programs related to longer-term regional recovery, particularly as other sources ran dry (BondGraham 2011; Renz 2009). Some NGO leaders who participated in this study indicated that it was difficult for grassroots and advocacy organizations to access funding dollars from foundations dedicated to larger and longer-term recovery projects.

While in some cases diminished funding increased competition among NGOs, in others it promoted new types of collaboration among regional non-profits. The increase in NGO numbers and capacity regionally meant organizations were encouraged to develop specialized missions to address particular recovery needs (Smith 2006). On the one hand, this often translated into a more restricted funding and resource pool for an organization, but, on the other, it also resulted in a number of organizations offering related, but complementary, services for communities. In combination with more sophisticated NGO networks in the region, this resulted in new partnerships, coalitions, and shared workspaces (Wallace 2010). One non-profit leader in southern Mississippi described this process of collaboration and consolidation post-Katrina:

> There was a desire to work together on the part of a lot of groups after Katrina. This ended up in a lot of the infrastructure of various groups being consolidated. The groups in our office used to have separate offices, but we came together in one building after Katrina. The goal is to have people from the different communities work together but to preserve local identity as well (PP446 2010).

A number of non-profit coalitions were formed in the region after the storms to provide space and convene volunteer and community organizations in order to minimize organizational and expenses and, more profoundly, to facilitate coordination and collaboration for garnering grant monies and donations and for maximizing outreach efforts.

Another shift in the Gulf Coast NGO arena after the 2005 storms was the arrival of a significant temporary volunteer labor force. Alongside an array of professionals, tens of thousands of volunteers without specialized skills came to offer their services in the early years after the storms (Wallace 2010). In order to capitalize on this labor, a volunteer intake and housing infrastructure was created or reconstructed. Few non-profits had volunteer intake capabilities prior to the 2005 storms, so NGOs quickly expanded that aspect of their operations, and several volunteer-centered organizations were established in the region. These volunteer organizations became critical to the region's post-storm recovery because, without them, many NGOs would have been unable to use the volunteer labor and in-kind donations they were offered. Volunteer organizations were particularly important for smaller NGOs that had no intake capacity or that only had intermittent, project-based needs for volunteer help (Wallace 2010). Participants in this study noted that some non-profits teamed up with churches and used their facilities as housing and gathering spaces or, in other instances, local governments permitted volunteer groups to use trailer camps or schools to stage project-based outreach efforts.

The influx of funding and volunteer professional support offered to non-profits after the storms shaped how some NGOs went about their operations (Wallace 2010). Some study participants noted that these NGOs became important points of contact and information for the media in the wake of the storms. Colleagues advised executive directors and NGO management staff how to handle these demands and capitalize on opportunities to get their organization's message to larger audiences. The Executive Director of a newly-established rebuilding NGO in Louisiana discussed this topic: "There was so much media with Katrina that with help and practice we learned how to be intentional with our message" (BR028 2011). Many NGO leaders were coached on the value of social media for connecting with potential clients, since many were displaced and phone service was slow to be restored, as well as with funders or supporters of their work.

## 6.4 The 2010 Oil Spill and the NGO Response

When the *Deepwater Horizon* exploded in April 2010, a number of circumstances shaped how NGOs responded to the disaster. Perhaps most significantly, this was a new kind of disaster for regional NGOs, for which they had no template for how to respond. How could they respond to a situation that demanded responders with specialized skills and certifications? How could they deliver needed services to address indefinite impacts? Because the responsible party was a major international corporation, there were limited avenues for NGOs to obtain funding to provide social services and environmental restoration programming after the spill (see Section 6.5 below). Statewide, the number of tax-exempt organizations in Alabama, Louisiana, and Mississippi had continued to grow since the storms (Table 6.2)  However, study participants reported that, in the months prior to the spill, the number of NGOs in the region had dropped because of a variety of factors including the withdrawal of some NGOs that had established temporary operations after the 2005 Gulf Coast storms and the economic recession which had led to lower rates of philanthropic giving (Rogers Field notes, 2011). As a result, the spill posed

serious challenges to regional NGOs. This section provides examples of some of the social service providers and environmental justice organizations that responded to the oil spill, and particularly those that targeted fishers and fishing communities, to illustrate how these organizations addressed the demands and unique circumstances of the 2010 oil spill (see also Chapter 8).

Table 6.2. Registered Tax-Exempt Organizations in Alabama, Louisiana, and Mississippi 2004-2011*

| Year | Alabama | Louisiana | Mississippi |
|------|---------|-----------|-------------|
| 2004 | 18,301 | 18,721 | 10,860 |
| 2005 | 18,425 | 18,776 | 11,003 |
| 2006 | 18,820 | 19,140 | 11,285 |
| 2007 | 19,451 | 19,519 | 11,698 |
| 2008 | 19,783 | 19,391 | 12,280 |
| 2009 | 21,201 | 20,070 | 12,815 |
| 2010 | 22,007 | 20,789 | 13,738 |
| 2011 | 20,373 | 18,388 | 12,632 |

*Data compiled through the National Center for Charitable Statistics online data analysis table wizard. These statistics indicate the total number of organizations in each state by year that filed form 990 through the Internal Revenue Service.

The explosion of the *Deepwater Horizon* and resulting release of oil into the Gulf had affected people across the study area, but many in the NGO community, especially those outside coastal communities, initially failed to see a connection between their work and the disaster. The closing prayer at one NGO networking meeting held shortly after the spill ended with a special plea for fishermen, seafood processing workers, and seafood restaurant staff (DA Field notes, 2010), illustrating the early tendency of many to assume the spill's impacts would be restricted and, therefore, of little consequence for those outside the seafood industry. Representatives of coastal NGOs, however, were persistent in their efforts to raise awareness within such networks, and coalitions such as the Equity and Inclusion campaign, which became established after the 2005 storms, soon began drafting policy statements related to the disaster (Equity and Inclusion Campaign n.d.).

Commercial fishing was, perhaps, the economic sector most immediately and significantly impacted by the 2010 spill (see Chapter 2). Many fishing families were in need of immediate relief and case management assistance to develop long-term recovery plans. Fishermen's associations played an important role during and after the spill and will continue to be active in policy processes, gathering and sharing information, and advocating for fishers. Groups such as Louisiana Oystermen Association of Pointe a la Hache, Louisiana and the Ladies of Lafourche Shrimpers in Cut Off, Louisiana provided direct services for their members, helping raise money for fishermen and their families. In addition, new coalitions, such as GO FISH (Gulf Organized Fisheries in Solidarity & Hope) formed after the spill "to advocate for the rights of fishermen, restoring the fisheries, and preserving fishing community culture" (GO FISH n.d.).

The Seedco Financial Southeast Louisiana Fisheries Center in Plaquemines Parish, which touts itself as "the first comprehensive one-stop facility for technical, business and financial assistance for fisheries in the United States" is an example of a social service NGO explicitly dedicated to helping fishers recover from the hurricanes of 2005 and 2008 and then the 2010 oil

spill (Seedco n.d.). The Fisheries Center offers business loans and financial literacy training for fisheries-related business owners in the region, but, in the fall of 2010, fishers began looking to the center for claims assistance. Technical guidance on the Gulf Coast Claims Facility (GCCF) claims process was the most significant form of aid offered to fishing families by the Fisheries Center through most of 2011.[14] At the end of 2011, the Fisheries Center relocated to a new space in Belle Chasse that will be shared by other NGOs and government agencies, such as Southeast Legal Services, Oxfam, and the Louisiana Small Business Development Council (Alexander-Bloch 2012).

Other NGOs, especially those serving minority and ethnic populations, came to serve fishers in their recovery from the spill simply because their communities are made up primarily of fishing families. Boat People SOS grew to offer services to other immigrant and refugee populations including Cambodians, Laotians, and Hispanics. These refugee and immigrant communities constitute a significant portion of workers in both the commercial fishing and seafood processing industries along the Gulf. Boat People SOS provided crucial translation services and clinics to help fishers enlist in the Vessels of Opportunity (VOO) program (see Chapter 3, Volume I), and to inform seafood workers how to fill out claims forms (Phan 2010). Similarly, at the time of the study, many of MQVN CDC's clients were fishermen, and the organization offered bilingual legal and technical assistance with the GCCF claims process and administered legal clinics for fishers impacted by the spill, some in partnership with Boat People SOS (Alexander-Bloch 2010). Other non-profits that provided assistance specifically to fishers from the region's minority and ethnic groups after the spill include Asian Americans for Change, based in Ocean Springs, Mississippi; the Immigrants' Rights Alliance also out of Biloxi; Coastal Communities Consulting out of Gretna, Louisiana; the Dulac Community Center in Dulac, Louisiana; and the United Houma Nation Vocational Rehabilitation Program in Houma, Louisiana.

Other Gulf Coast community-based NGOs served fishing families. Within the study area, examples from southern Louisiana include Bayou Grace Community Services in Chauvin, Bayou Interfaith Shared Community Organizing (BISCO) in Thibodaux, and the Community Center of Saint Bernard Parish (CCSTB). Alabama residents were served by the South Bay Communities Alliance in Coden. The NGOs that constitute the STEPS Coalition in Biloxi, Mississippi, a coalition that developed post-Katrina, also serve families who work in the commercial fishing industry. STEPS provided outreach to impacted families after the spill by sponsoring resource and claims fairs and bringing together representatives from BP, GCCF, and the federal government during a claims assistance open house (Brunt 2010, Coleman 2010).[15]

Regional multi-service agencies played prominent roles in post-spill social service work. In Louisiana, Catholic Charities Archdiocese of New Orleans (CCANO) was the biggest player in coordinating and offering recovery services to affected communities. This faith-based non-profit had a case management system in place and a considerable endowment (Green et al. 2011), allowing CCANO to set up oil spill relief centers in five southeast Louisiana fishing

---

14 A number of legal aid NGOs in Louisiana, Mississippi, and Alabama were funded by BP to offer legal counsel to GCCF applicants on the technicalities and bureaucratic procedures of the claims process.

15 A significant activist movement emerged after the spill, constituted by national and local figures advocating for long term monitoring and recovery concerns. While much of this activism was centered on issues of public health and environmental sustainability, some of it was geared toward social services. Cultural societies, such as the Coastal Heritage Society of Louisiana (CHSL) in Plaquemines Parish, founded by women residents in the parish, helped fishers fill out forms for their BP claims, collected toys and school supplies for impacted families, and maintained a webpage with updates on rainfall and water quality testing during the oil spill clean up (CHSL n.d., Dalton Beninato 2010).

communities by May 2010. The organization also campaigned for oil spill recovery funding, approaching BP, the State of Louisiana, federal agencies, local governments, and its member and donor network. In May 2010, CCANO, along with the Greater New Orleans Second Harvest Food Bank, was directly awarded monies by BP to offer emergency food and food vouchers, direct financial assistance, and crisis counseling to fishing communities (Alexander-Bloch 2011). In August, CCANO became the fiscal agent for a $6.7 million dollar grant from BP to the State of Louisiana for mental health services (Nolan 2010). Catholic Charities then re-granted to community-based NGOs, including MQVN CDC, the Saint Bernard Project's Center for Wellness and Mental Health, Bayou Grace Community Services, and Boat People SOS. In September 2011, the Baton Rouge Area Foundation offered Catholic Charities $15 million dollars to expand their Spirit of Hope programming, including mental health and case management (Hammer 2011b; see also Chapter 1). [16]

Because the oil spilled in the Gulf directly affected fish habitats in the Gulf and in coastal and inland waters, fishers' concerns overlapped with those of environmental organizations and activists. As the spill grew from a local event into one of national and international consequence, environmental NGOs were among the disaster responders. For example, Gulf Restoration Network (GRN), a local nonprofit which had advocated for the natural resources of the Gulf Coast region since 1994, dedicated staff time and resources to monitoring environmental conditions in the Gulf and to corresponding with media to provide an independent perspective on the spill (Favre 2011, GRN 2010). GRN used a variety of media to share the findings of their monitoring work with a national audience (GRN n.d.a, GRN n.d.b). GRN also served as a prominent "go-to" organization for the media, as well as scientists and celebrities, who looked to the non-profit for information and access to impacted areas and people. Like other local organizations, GRN had to bring on additional staff and expand its operations in 2010 to meet the demand for monitoring and for the media trips to impacted areas to interview residents and spokespeople. In 2011, GRN turned its attention to wetlands restoration and remediation as part of longer-term recovery concerns, and the documentation and media generated by the non-profit since the spill began to be integrated into its advocacy work (Favre 2011).

After the spill, a number of national NGOs without a prior presence in the Gulf Coast established temporary operations in the region. Some of the national NGOs concentrated on the use of media to generate their own advocacy campaigns. Groups such as the Natural Resources Defense Council (NRDC) viewed the spill as an opportunity to address oil and gas issues and ocean and marine conservation in the Gulf and other regions. The NRDC established the Gulf Resource Center in Buras, Louisiana, initially intended to be a computer and communications resource center for media, other NGOs, and local residents (Lehner 2010). The non-profit used the Center to collect stories and distribute them to a national audience, sustaining a full-time presence in Lower Plaquemines until early 2011; several other national NGOs and press with temporary operations in the Gulf left the region soon after the well was capped in 2010.

---

[16] Following the 2010 spill, the Gulf Coast Restoration and Protection Foundation, a Baton Rouge Area Foundation (BRAF) affiliate, received $100 million dollars from BP to support Gulf Coast rig workers who were affected by the six month federal drilling suspension after the *Deepwater Horizon* explosion (see Chapter 1). In the fall of 2011, BRAF was permitted to direct the BP funds that were not paid to workers toward regional recovery. The foundation directly allotted $15 million in programming dollars to Catholic Charities Archdiocese of New Orleans (CCANO), by far the most significant grant awarded in that round of giving (Hammer 2011b). At the time of this study, the BRAF funds were under scrutiny by Feinberg and the GCCF because they claimed the foundation had not properly compensated oil field workers who filed for compensation for lost wages under the foundation or GCCF (Hammer 2011a).

Throughout 2011, one staff member who was based in Buras remained responsible for blogging about the spill (Kistner n.d.).

Several grassroots environmental NGOs that turned their attention to the spill emerged as significant advocates for coastal communities, using new technologies and media to monitor the impacts of the spill. In the months after the *Deepwater Horizon* exploded, mobile oil-tracking applications were developed and launched and new media was upheld as a way for locals to monitor the disaster. As an example, the Louisiana Bucket Brigade partnered with students from Tulane University to utilize a crisis mapping system that was originally developed by Kenyan bloggers to monitor post-election violence. The objective of the Louisiana Bucket Brigade in developing the Oil Spill Crisis Map was to give Gulf Coast residents a means to report spill impacts on their lives. The Public Laboratory for Open Technology and Science, a grassroots community research initiative, came about through a civic science project called Grassroots Mapping, which was the first effort at developing a complete aerial map of the oil spill through "do-it-yourself" satellite imagery using balloons and kites (Public Laboratory n.d.).

NGOs of all sizes found themselves devoting significant time and energy responding to the media. Many local people became skeptical not only of reporters but of documentary filmmakers and others who claimed to be coming into the region to hear firsthand accounts but were perceived as hearing and reporting only the parts of stories that fit their preconceived notions. Leaders of community-based NGOs, and especially those working with Native Americans, noted that they received very specific requests from people wanting to see oiled beaches and wildlife and "traditional" fishermen. Responding to efforts to portray the fishing and petroleum industries in conflict with one another, some local organizations developed campaigns aimed at educating others, especially those outside the region, about the co-existence of fishing and oil within families, communities, and the Gulf. For example, Bridge the Gulf (2010), a "citizen journalism and new-media initiative," was developed after Hurricane Katrina to help Gulf Coast residents who believed their stories had been "overlooked or misrepresented… convey their stories and their vision for a just, healthy and sustainable future." The group launched its website in the summer of 2010, and that became a site where residents could express their concerns about the spill. One September 11, 2010 post by Cherri Foytlin captured the sentiment of many. Foytlin, along with grassroots NGOs and Gulf Coast activists, organized rallies, marches, and other events to draw attention to the spill and the failure of BP and the government to respond effectively to the disaster (Bridge the Gulf 2010, Dirty Cajuns 2010):

> The story never told about south Louisiana is that the fishermen, crabbers, oystermen and oil workers are the same. Many of our fishermen work the season doing what they love, then go back to the oil fields to make a living. All of us live to serve, and be served, from the Gulf of Mexico. You won't find an oil worker who doesn't love the bayou, and you won't find a fisherman who doesn't profit - in some way, from the oil field (Foytlin 2010).

NGOs addressed a range of issues facing fishers and fishing communities following the oil spill. These organizations' responses were affected by the nature of the disaster, limited funding channels, and the existing regional NGO structure. These circumstances and the responses by national, regional, and local non-profits to this disaster have important implications for effective NGO response to oil spills and similar disasters, but they also speak more broadly to issues of disaster recovery and preparation, which will be explored in the following section.

## 6.5. ONGOING ISSUES FOR NGO RESPONDERS TO THE 2010 SPILL AND THEIR IMPLICATIONS

The NGO response to the 2010 oil spill has important implications for non-profits and grassroots organizations, as well as government agencies and for-profit entities responding to similar disasters. This section examines the challenges NGOs faced in responding to the spill and how they circumvented some of these issues. The section first examines how the nature of this disaster made it hard to mobilize volunteer labor, develop effective programming, and garner funding. Second, it discusses characteristics common to fishing communities generating issues NGOs had to address. The final section outlines ways NGOs successfully responded to the spill, building on their post-Katrina and Rita experiences, developing new tactics and alliances, and using new technologies.

### 6.5.1. Oil Spills and Issues of Mobilization and Funding

The Gulf oil spill was a new kind of disaster for the region. Gulf Coast communities endure hurricanes regularly, and federal and state agencies have developed elaborate systems of hurricane disaster response. NGOs have developed a corresponding network for responding to storms. With the 2010 oil spill, NGOs were called upon by residents and onlookers to provide relief, but organizations were unsure what help would be effective because the duration and scope of the disaster were unknown. As one volunteer explained, "People can go through a hurricane every other day and be happy. An oil spill, we don't ever want to go through again. After a hurricane, you come back and you know what you faced. But after an oil spill, you don't" (DA418 2011). The ongoing uncertainty associated with the spill created stress for non-profit leaders too. According to one director:

> I was part of scheduling some community meetings with some fishermen. At that point in time we were really anticipating that we were gonna' have fishermen that were gonna' really not be able to work long term, you know, because right after the spill they opened the fisheries in Lafourche and Terrebonne for just a couple a weeks. Early, ahead of everything else, to give people an opportunity while they could before all the oil started coming in closer to the coast. But then after that anything offshore closed and it was a game of opening and closing. So you know, you may have started the day and the season was open and then by the time you got in the afternoon, that's a common thing fishermen would tell us, is when they would get in in the afternoon, Wildlife and Fisheries is waiting for them and telling them the water were closed and they had to dump their catch. So [it created] a lot of frustration and that was the hardest thing for us, just trying to stay on top of what is happening in the communities (DA597 2011).

Throughout this study, NGO leaders reported that it was difficult to assess the damage from the spill, and, as a result, it was hard for them to generate concern from parties not directly impacted by the disaster, including coastal residents not as severely affected.

A related challenge some NGO leaders noted was that, following Katrina, the media put "a face" to the disaster, but after the spill it was much more difficult to convey who needed assistance to recover. The indefinite impacts of the disaster made it difficult for NGOs, not only to generate lasting concern and support, but also to determine an effective course of action.

In addition to these issues, the oil spill posed challenges for NGOs because it precluded the volunteer involvement in clean-up operations. As one environmental NGO leader explained,

> This was a unique environmental disaster. First of all you needed HAZWOPER [Hazardous Waste Operations and Emergency Response] certification. Not only was it required, but it was necessary because people can get very ill handling oil and that dispersant. But of course that meant that volunteers had really limited access. The same was true for those wanting to help with saving wildlife. You have to have specialized skills to not hurt the animals or yourself" (BR174 2011).

These circumstances dictated a different level of involvement from voluntary organizations after the spill than after other kinds of disaster. After the 2005 storms, volunteers were a major force in rebuilding the Gulf Coast. These volunteers, even without specialized skills, accomplished significant rebuilding projects like gutting houses or restoring public parks, work that kept voluntary organizations engaged in storm recovery for years. While the rise in "voluntourism" on the Gulf posed challenges for NGOs with no intake capabilities, its net result was positive.

Following the spill, however, study participants indicated Gulf Coast NGOs of all sizes were challenged to accommodate volunteer groups requesting opportunities to serve in the region (see also Reid 2010). Given the proximity to the 2005 and 2008 storms, and the connections forged across the United States with regional non-profits through prior volunteerism, several NGOs reported that they were inundated with calls and emails from would-be volunteers. Responding to media images of oiled birds, many people wanted only to participate in direct cleanup efforts. Others, especially those with prior relationships in the region, provided short-term NGO staffing and helped with coastal restoration projects such as wetland planting and oyster reef building, in place of spill clean-up.

Compensation for loss due to the oil spill is governed by the Oil Pollution Act of 1990 (OPA 90). OPA 90 defines three kinds of damages for which private claimants can seek compensation: damage to real or personal property; loss of subsistence use of natural resources; and the loss of profits and earning capacity (see Section 2.4.2, Volume I). For individuals and businesses, the principal means for recouping losses and receiving aid was through the claims process (see Chapter 7). Governments, too, can seek compensation under OPA 90 for the loss of government revenues and the increased cost of public services, but there is no mechanism for non-profit organizations to receive compensation under the OPA. NGOs were hampered by their inability to generate sufficient funds to meet the demand for services after the spill. In addition, because the NGOs were not experienced working with a disaster characterized by indefinite impacts, it was at times difficult for them to determine what kind of services to provide. In many cases, residents in fishing communities wanted immediate relief in the form of food, food stamps, rent or mortgage assistance. Other than those few NGOs able to garner external funding to provide direct assistance, the most common service most provided was claims assistance.

Because of significant gaps in who was compensated by the claims process, a number of NGO leaders who participated in this study argued that it was important for them to begin shifting their aid and programming away from disaster relief and claims counseling to programming to address the long-term impacts of the oil spill, such as comprehensive mental health services or job training. And yet these leaders also indicated to researchers in late 2011 that some affected residents were still seeking immediate financial relief and claims assistance, particularly consultation concerning final payments. One NGO leader working closely with Gulf Coast fishers explained: "We're looking into diversification of our future programming and strategies for bolstering the commercial fishing industry in the region, but people are still worried about the immediate future and they're not able to think about the long-term future of their businesses" (BR259 2011). Addressing the immediate impacts to and longer-terms recovery needs of communities impacted by the spill will remain a major programmatic challenge for Gulf Coast NGOs for years to come.

While the elusive nature of the disaster posed particular problems for NGOs, at the same time, there was one major responsible party    BP    and this had significant bearing on the related issue of limited NGO funding after the disaster. In conversations with study researchers, some NGO directors indicated that the funders they approached for assistance were of the view that BP should be footing the bill for any needed emergency aid and long-term programming in the region. Potential donors who contributed to hurricane relief were reluctant to provide funds to Gulf Coast NGOs to pay for corporate wrongdoing. "For storms, we have help. For BP, nobody wants to get involved. They think BP should pay," explained a community volunteer in Terrebonne Parish, Louisiana (DA418 2011). In addition, a leader of a multi-service agency explained how, following disasters such as hurricanes, the allocation of funds for social services is outlined explicitly in the Stafford Act, establishing a mechanism to help non-profit organizations respond as needed, but "(t)here is no such mechanism in place for human recovery under OPA, and this is a massive structural policy issue" (BR077 2011).

Several NGO leaders who participated in this study indicated that the disaster also posed additional challenges for soliciting donations or applying for grants. The elusive nature of the disaster made it difficult for NGOs to garner support for their recovery efforts, but so also did the unknown impacts. As one supervisor of a community center in Saint Bernard Parish, Louisiana shared, "Our needs are indefinite and funders don't like to support such services, because they can't see or show that their dollars are creating documented change" (BR066 2011). NGO leaders also pointed out many Gulf Coast residents in need after the spill worked in the commercial fishing industry, ranging on average from 20 to 60 years old, and were mostly men. Such a group is not targeted for funding by major donors that other groups, such as are the elderly, disabled, or children. Thus, the demographics of the affected population presented another hurdle for non-profits trying to garner funding for post-spill recovery.

In the midst of the ongoing uncertainty and competition for resources, criticism was bound to surface. Some local NGOs were critical of the influx of certain national NGOs in the region after the spill, viewing their temporary presence as motivated by the opportunity to become involved in a major national event and as diverting funds away from the local organizations that were bearing much of the responsibility to respond to community needs. Because some of the largest sums for this disaster came through national philanthropic organizations, established national NGOs had existing relationships in place to receive gifts from these foundations. The leader of a local environmental NGO conveyed her frustration at this dynamic, arguing the dollars dedicated to national NGOs with temporary operations would not

420 of 479

achieve capacity building or programming with lasting impact for the Gulf. Only a few NGOs emerged as principal grantees and fundraisers in this disaster, and some of those who did spent much of their time in Washington, D.C. on media trips, not working directly with affected residents. Some of those NGOs were reported to have reallocated some of their funds directly to people most impacted by the spill, working through smaller NGOs or community leaders to distribute the monies. However, often the money re-granted down to community non-profits from foundations was insufficient to cover the additional staff time needed to effectively distribute the funds. For some small organizations, funders' requirements to collect and share data on recipients and meet daunting reporting requirements prevented those non-profits from applying for or accepting funds.

## 6.5.2. Special Challenges Serving Gulf Coast Fishing Communities

A number of NGOs on the Gulf Coast primarily serve minority, immigrant, or refugee communities who make up a significant portion of commercial fishers and the seafood processing workforce in the Gulf. Leaders of these organizations reported there was a large need for their translation and technical services to navigate the VOO program and the claims process. Hispanic workers, who typically work in processing plants, needed help to generate the proper accounting to file loss claims through GCCF, a need further complicated by the fact that many workers were on guestworker or temporary work visas and some are paid cash. Organizations working with Southeast Asian residents who fish or work in seafood plants noted their clients needed help securing their right to enroll in the VOO program and developing the necessary paperwork to file spill claims. A few non-profit leaders indicated that Asian fishers and seafood workers commonly became victims of fraud by translators and lawyers, so their organizations served as safe sources of counsel on legal and economic rights. Several of non-profit employees serving refugee and immigrant groups noted increased demand for English and computer classes and citizenship training programs following the spill. As one leader explained:

Lots of people in the area who have been in the seafood industry their whole life are starting to realize how volatile the industry is. People saw this after Katrina too, but then they got complacent after having a few good seasons, but now people are seeing that this may have much more long-term consequences and so there is much more interest in English classes. People also saw how important it is to know English in the process of dealing with the government and other groups after the oil spill (PP400 2010).

Issues of cultural difference and access also related to NGO struggles to provide mental health services to affected coastal residents after the spill. Talking about the fishing families he serves, an NGO leader working in southern Alabama explained, "Parents go out for a month or two on the boats, but now everyone is stuck in the house all day and the bills are piling up so it makes for a tense situation…. We've been working with clinics in town, but there is a huge stigma in the Asian community about speaking about mental health" (PP400 2010). Study participants noted the need for agency employees to "be culturally sensitive to notice these things taking place," how their clients "just won't come out and tell you about it" (PP407 2010).

151

Concerns about accessing mental health services were not restricted to minority communities. NGO workers explained that, as a rule, it had been very hard for fishermen to seek mental health assistance for themselves or their families after the spill. As one NGO director offered, "There are lots of men who are used to being productive and to having a job and now they are drinking. They feel like they're less of a man because they can't help their families" (PP514 2010). NGOs providing mental health services attempted to develop programming that provided emotional support in ways that would be comfortable and accessible, such as employing community members as "peer counselors," hosting community dinners, and developing programmatic relationships with medical institutions, sometimes viewed as a more legitimate venue for getting help with stress-related concerns. Some community leaders with intimate understandings of their communities, however, argued that the crux of this issue lay in the difference between handing out disaster aid and offering ways for people of coastal communities, who pride themselves on their ability to subsist, to provide for themselves. A local church leader in Lower Plaquemines Parish insisted, "A Red Cross truck bringing in food each day and thinking it solved locals' problems insulted the self-sufficient, independent people; it was dehumanizing" (CW247 2011). Similar views prompted a few NGO leaders to advocate for temporary work or job creation in coastal communities as the most effective means to address mental health concerns after the spill.

### 6.5.3. Post-Spill NGO Successes

Despite the challenges NGOs faced in mobilizing in the wake of the oil spill, non-profit organizations responded creatively to the disaster. Within a few months, many NGOs had an established client base and were effectively reaching out to residents affected by the spill. One NGO leader working with the Asian community in Alabama was asked about the difference in his organization's response to the oil spill compared to Katrina. He responded: "I think the response to the oil spill has been a bit better. The important thing is this time the organizations that were operating in the area knew there was an Asian community here. So the Alabama Department of Human Resources got in touch with us and we opened up a food stamp office here and they also contacted us for help with translation work" (PP400 2010).

Some Gulf Coast NGOs also had ongoing relationships with organizational advisers, volunteers, and donors to seek assistance after the spill. One participant used the services of Asian-American bar associations to hold legal aid clinics for the claims process. These associations volunteered their services after the storms of 2005 to help Asian-American homeowners resolve building disputes, so the NGO benefitted from relationships built during the aftermath of those storms. A legal aid program director who partnered with several community-based and multi-service agencies to provide claims assistance noted how the accumulated experience of this non-profit and its collaborators benefitted clients because of parallels in filing storm damage claims with government agencies and relief organizations and the oil spill claims process:

> We do have a specific GCCF contact that we touch base with on a regular basis…but more than back door channels, I'd say it's our experience that is helping clients. We've done this for months now and we can tell what the problems are. We know the types of information they want, the buzz words. This is actually similar to some of the lessons we

152

learned with Katrina, which was figuring out the buzz words that disaster relief organizations need to hear to compensate claimants (BR108 2011).

The predominance of a few NGOs in providing recovery services after the spill prompted other non-profits to develop creative means for supporting affected communities. The use of digital and media technologies was the principal arena within which non-profit groups exercised independence and innovation to gain support for their efforts. Smaller, community-based NGOs used social media to drive discussions about impacts of the oil spill on their communities. The use of platforms such as Facebook and Twitter not only created a discussion forum with a feedback loop, they also encouraged extended networks of support for their efforts to develop outside of the Gulf Coast region. Some smaller NGOs developed public relations tactics and new media outlets and were able to provide impacted residents some monitoring of environmental conditions and guidance on available social services. Data collected during this study indicate, however, that these smaller NGOs were typically not able to attract major funding through these outlets.

Non-profits of all sizes and with various missions used digital technologies, from social media to blogs to computer mapping, to "put a face" on the disaster - convey to a larger audience how people's lives and the region's environment were affected. Due to the elusive nature of the disaster, these new kinds of technologies emerged as valuable tools for making the impacts of the spill better understood.

## 6.6 SUMMARY

This chapter has examined the NGO response to the 2010 oil spill. When compared to other regions in the United States, the Gulf Coast has been characterized by an under-developed NGO network (Smith 2006). The destruction and displacement along the Gulf Coast caused by hurricanes Katrina and Rita in 2005, however, attracted an unprecedented number of NGOs and philanthropic dollars in the region, and a more sophisticated NGO network emerged. Despite the growth in the region's non-profit landscape, at the time of the *Deepwater Horizon* explosion, NGOs were struggling with a significant funding downturn. The unique circumstances of the disaster permitted a small number of non-profit organizations to emerge as social service providers and environmental responders.

The dynamics that emerged after the 2010 oil spill among impacted communities, non-profits, and potential funders, including BP and federal agencies, have important implications for disaster preparation and response in the Gulf and the rest of the country. Structural issues complicated the work of NGOs to provide social services, namely funding restrictions under OPA 90 as opposed to the Stafford Act. Other programming and organizational issues non-profit organizations faced in the response to this disaster included disaster monitoring and damage assessment, volunteer intake, equitable allocation of aid, and the development of programs to address both immediate and long-term needs.

Regional and community characteristics help determine the types of NGOs needed to respond to disasters and the kind of services they should provide. Some NGO successes after the oil spill point to promising courses of action for groups responding to similar disasters. Successful efforts after the spill built upon post-Katrina and Rita experiences and structures, but non-profits also used digital and media technologies and creative institutional alliances to cross-

cut the boundaries that have traditionally shaped non-profit responses to major social and environmental disasters.

The *Deepwater Horizon* disaster was divisive in many ways, but it also fostered new alliances As the region prepares to address significant questions regarding its future, particularly coastal restoration and the use of the fines associated with this disaster, long-standing conflicts, such as between environmental organizations and fishers, are likely to re-emerge. Further study will be needed to more fully understand the effects of this disaster on NGOs.

## 6.7 REFERENCES

Alexander-Bloch, Benjamin. 2010. Vietnamese fishers blast claims process    Lack of receipts in barter system compounds issues. The Times-Picayune December 16: A1.

Alexander-Bloch, Benjamin. 2011. $1.1 million in grants will go to charities aiding families after spill. The Times-Picayune. January 20: B3.

Alexander-Bloch, Benjamin. 2012. Fisheries assistance center opens in Belle Chasse. The Times-Picayune January 20: B3.

Auer, Jennifer Claire and Linda Lampkin. 2006. Open and operating? An assessment of Louisiana non-profit health and human services after hurricanes Katrina and Rita. In: After Katrina: Nonprofits Respond and Rebuild. Washington DC: The Urban Institute.

Bayou Grace Community Services. n.d. Bayou Grace community services: Providing hope and sustainability for the 5 bayous. Available at:http://bayougrace.wordpress.com/

Bayou Interfaith Shared Community Organizing (BISCO). n.d. Bayou interfaith shared community organizing. Available at: http://www.bisco-la.org/home

Boat People SOS (BPSOS) Gulf Coast. n.d. BPSOS Gulf Coast. Available at: http://www.bpsos.org/en/branches/gulf-coast

BondGraham, Darwin. 2011. Building the new New Orleans: Foundation and NGO power. The Review of Black Political Economy 38:279-309.

BR028. 2011. Personal communication. The effects of the oil spill in the context of Gulf hurricanes. Discussion with Bethany Rogers and Helen Regis. Director, Rebuilding NGO. Saint Bernard Parish, LA. February 15.

BR066. 2011. Personal communication. NGOs and disasters in the Gulf. Discussion with Bethany Rogers and Helen Regis. Development Director, Community-Based NGO. Saint Bernard Parish, LA. March 16.

BR077. 2011. Personal communication. The effects of the oil spill on NGOs and the community. Discussion with Bethany Rogers and Helen Regis. Administrator, Multi-service NGO. New Orleans, LA. March 21.

BR108. 2011. Personal communication. NGO mobilization post-Katrina and post-spill. Discussion with Bethany Rogers. Program Manager, Legal Aid NGO. New Orleans, LA. April 15.

BR174. 2011. Personal communication. The effects of the *Deepwater Horizon* on the Gulf Coast and its people. Discussion with Bethany Rogers. Field Organizer, Environmental NGO. New Orleans, LA. May 26.

BR259. 2011. Personal communication. Post-spill NGO response for the long term. Discussion with Bethany Rogers. Intake Coordinator, Regional Social Service NGO. New Orleans, LA. November 14.

Bridge the Gulf. 2010. Momentum builds at Rally, as Gulf Coast residents stand up for the truth. Available at: http://bridgethegulfproject.org/node/185

Brunt, Julian. 2010. Vietnamese community struggles with effects of oil spill. Sun Herald. June 29: A6.

Bullard, Robert. 2005. Introduction. In the quest for environmental justice: Human rights and the politics of pollution. San Francisco, CA: Sierra Club Books.

Calhoun, Craig, and Kai Erikson. 2006. SSRC Task Force reports on Hurricane Katrina and rebuilding the Gulf Coast. Footnotes. Available at: http://www.asanet.org/footnotes/julyaugust06/fn7.html

Catholic Charities Archdiocese of New Orleans (CCANO). 2008. The proof is in the people: 2008 annual report.

Catholic Charities Archdiocese of New Orleans (CCANO). 2011. The first anniversary of the Gulf of Mexico oil spill [press release]. Available at: http://www.ccano.org/the-first-anniversary-of-the-gulf-of-mexico-oil-spill/#more-1732

Coastal Heritage Society of Louisiana (CHSL). n.d. Coastal heritage society of Louisiana: Protecting and promoting the culture and heritage of coastal Louisiana. Available at: http://chsl.webs.com/  Last accessed January 21, 2012.

Coleman, Leigh. 2010. Anxious coast residents wait for call from BP. Sun Herald. June 22: A6.

Community Center of Saint Bernard (CCSTB). n.d. Community Center of Saint Bernard. Available at: January 28, 2012 from http://www.ccstb.org/

CW247. 2011. Personal communication. Post-spill recovery. Discussion with Carolyn Ware and Cheryl Hogan. Pastor, local church. Plaquemines Parish, LA. March 17.

DA418. 2011. Personal communication. Effects of the disaster on NGOs and the community. Discussion with Diane Austin. Volunteer, Community-Based NGO. Chauvin, LA, 8 February.

DA597. 2011. Personal communication. Effects of the disaster on the NGO. Discussion with Diane Austin. Director, Community-Based NGO. Houma, LA. 1 October.

Dalton-Beninato, Karen. 2010. Women of coastal heritage society give back. Louisiana Seafood News. Available at:http://www.louisianaseafoodnews.com/2010/10/13/women-of-coastal-heritage-society-of-louisiana-give-back/

Dirty Cajuns. 2010. Gulf Change Rally Saturday Oct 30   Gulf coast citizens address the public and face the media. Available at: http://www.dirtycajuns.com/2010/10/gulf-change-rally-oct-30-gulf-coast-citizens-face-the-media-video-of-oil/

Dulac Community Center. n.d. Dulac community center. Available at: http://dulaccommunitycenter.org/

Dynes,Russell R., E. L. Quarantelli, and Gary Kreps. 1981 (3rd edition). A perspective on disaster planning. Columbus: Disaster Research Center, The Ohio State University

Equity and Inclusion Campaign. n.d. News events of April 26, May 3, May 10, May 21, and June 3, 2010. Available at: http://www.equityandinclusion.org/web/page/673/interior.html

Erikson, Kai, and Lori Peek. 2011. Hurricane Katrina research bibliography. Social Science Research Council, Task Force on Katrina and Rebuilding the Gulf Coast. July.

Faciane, Valerie. 2006. Project puts residents back in St. Bernard homes - United Way aiding the rebuilding group. The Times-Picayune October 9: B1.

Faciane, Valerie. 2007. Vietnamese community thriving in eastern N.O. - With well-honed survival skills most came back to rebuild. The Times-Picayune April 23: A1.

Fagnoni, Cynthia. 2006. Observations on charities' response to hurricanes Katrina and Rita. In: Boris, Elizabeth and Eugene Steuerle, eds. After Katrina: Public Expectations and Charities' Response. Cambridge, MA: Urban Institute.

Favre, Dan. 2011. GRN responds to BP's drilling disaster. Available at: http://healthygulf.org/201104011632/our-work/bp-s-oil-drilling-disaster-in-the-gulf-of-mexico/bps-oil-drilling-disaster-in-the-gulf-of-mexico

Foytlin, Cherri. 2010. Bridge the Gulf blog. Cited in Oilfield workers join forces with fishermen on 9/11. Bridge the Gulf Project. Available at:

156

http://www.bridgethegulfproject.org/node/117?page 1

GO FISH. n.d. Gulf Organized Fisheries in Solidarity and Hope: Mission statement. Available at: http://gofishcoalition.com/

Green, Rodney, Tiffany Hamelin, Kiera Zitelman. 2011. NGOs address structural racism: After the storm in New Orleans. The Review of Black Political Economy 38(4):311-325.

Greater New Orleans Foundation (GNOF). 2011. Greater New Orleans foundation awards over $1.3 million to six regional nonprofit organizations [press release]. Available at: http://www.gnof.org/press-releases/greater-new-orleans-foundation-awards-over-1-3m-to-six-regional-nonprofit-organizations/

Gulf Restoration Network (GRN). 2009. Gulf restoration network responds to BP oil drilling disaster and inadequate clean-up efforts [press release]. Available at: http://healthygulf.org/201004291228/media/press-releases/gulf-restoration-network-responds-to-bp-oil-drilling-disaster-and-inadequate-clean-up-efforts

Gulf Restoration Network (GRN). n.d. a. Blogging for a healthy gulf. Available at: http://healthygulf.org/blog/

Gulf Restoration Network (GRN). n.d. b. Healthy gulf YouTube channel. Available at: http://healthygulf.org/media/multimedia/youtube-channel

Hammer, David. 2011a. Feinberg asks BP to pay oil firms Moratorium claims in dispute. The Times Picayune November 1: A1.

Hammer, David. 2011b. Fund for offshore workers goes surprisingly untapped money shifted to others. The Times Picayune September 8: A1.

Kettl, Donald F. 2000. The transformation of governance: Globalization, devolution, and the role of government. Public Administration Review 60(6):488-497.

Lawrence, Steven et al. 2007. Giving in the aftermath of the Gulf Coast hurricanes: Updates on the Foundation and corporate response. The Foundation Center.

Kistner, Rocky. n.d. Switchboard: National Resources Defense Council staff blog. Available at: http://switchboard.nrdc.org/blogs/rkistner/

Lehner, Peter. 2010. NRDC opens gulf resource center to help residents make their voices heard. Available at:http://switchboard.nrdc.org/blogs/plehner/nrdc_opens_gulf_resource_cente.html

Lerner, Steve. 2005. Diamond: A struggle for environmental justice in Louisiana's chemical corridor. Cambridge, MA: The MIT Press.

Martens, Kerstin. 2002. Mission impossible? Defining nongovernmental organizations. Voluntas: International Journal of Voluntary and Nonprofit Organizations 13(3):271-85.

Moore, Mark H. 2006. Disaster and the voluntary sector: Reflections on the social response to Hurricane Katrina. In: Boris, Elizabeth and Eugene Steuerle, eds. After Katrina: Public Expectations and Charities' Response. Cambridge, MA: Urban Institute.

Nance, Earthea. 2009. Making the case for community-based laboratories: A new strategy for environmental justice. In: Bullard, R. and B. Wright, eds. Race, Place and Environmental Justice After Hurricane Katrina. Boulder, CO: Westview Press.

National Center for Charitable Statistics (NCCS). n.d. NCCS all registered nonprofits table wizard. Available at: http://nccsdataweb.urban.org/tablewiz/tw_bmf.php

Nolan, Bruce. 2006. Making all things new   Churches find a way to rebuild homes, communities, lives. The Times-Picayune June 11: A12.

Nolan, Bruce. 2010. BP's $15 million to pay for mental health services   money still needed for food and rent. The Times-Picayune August 17: A8.

Norman, Joshua. 2006. The language of help/groups bridge communication gap. Sun Herald March 29: A1.

Ososky, Hari M et al. Forthcoming. Environmental justice and the BP Deepwater Horizon oil spill. The New York Environmental Law Journal.

Perry, Ronald W. 1991. Managing disaster response operations. In: Drabek, Thomas E. and Hoetmer, G. eds. Emergency Management. Washington, DC: International City/County Management Association. Pp. 201-23

Phan, Shandon. 2010. BPSOS provides direct services, community education, and legal assistance to oil spill victims [press release]. Available at: http://www.bpsos.org/en/media-room/press-releases/378-bpsos-provides-direct-services-community-education-and-legal-assistance-to-oil-spill-victims

PP400. 2010. Personal communication. NGO mobilization post-Katrina and post-spill. Discussion with Preetam Prakash. Administrator, NGO. Bayou La Batre, AL. September 20.

PP407. 2010. Personal communication. Claims process, Vessels of Opportunity program, and job retraining. Discussion with Preetam Prakash. Office Manager, NGO. Biloxi, MS. September 23.

PP514. 2010. Personal communication. NGO mobilization post-Katrina and post-spill. Discussion with Preetam Prakash. Director, Community Development NGO. Biloxi, MS. October 27.

Public Laboratory. n.d. Public laboratory for open technology and science. Available at: http://publiclaboratory.org/home

Reid, Molly. 2010. No place for volunteers   Many want to help ease the crisis along the coast, but there's little they can do. The Times-Picayune June 28: A3.

Renz, Lauren. 2009. Giving in the aftermath of the 2005 Gulf Coast hurricanes: Profile of the ongoing Foundation and corporate response (2007-2009). The Foundation Center.

Rogers, Kate. 2010. Fatigue is hampering efforts. The NonProfit Times July 1: 1, 7, 17.

Seedco. n.d. Gulf coast fisheries initiative. Available at: http://www.seedcofinancial.org/gulf-coast-fisheries-initiative-la/

Shaban, Bigad. 2010. Could FEMA oversee BP claims process? Available at: http://www.wwltv.com/news/gulf-oil-spill/BP-Claims-Process-96194449.html#

Simo, Gloria and Angela Bies. 2007. The role of nonprofits in disaster response: An expanded model of cross-sector collaboration. Public Administration Review Special Issue:125-142.

Smith, Steven Rathgeb. 2006. Rebuilding social welfare services after Katrina: Challenges and opportunities. In: Boris, Elizabeth and Eugene Steuerle, eds. After Katrina: Public Expectations and Charities' Response. Cambridge, MA: Urban Institute.

STEPS Coalition. n.d. About. Available at: http://www.stepscoalition.org/?page_id_4

Tuhus, Melinda. 2006. Flooding the grassroots: Gulf green groups assess the damage   and make some modest gains. E Magazine July/August:14-15.

Wallace, Nicole. 2010. The legacy of Katrina for Gulf Coast charities. Chronicle of philanthropy 22(16):14.

The White House. n.d. Deepwater BP oil spill. Available at: http://www.whitehouse.gov/deepwater-bp-oil-spill

# CHAPTER SEVEN: THE CLAIMS PROCESS

Brian Marks

The numerous processes for claiming and receiving compensation for economic and medical damages from the *Deepwater Horizon* oil spill represent one of the largest socioeconomic impacts of the spill. These claims processes have unintended and complex consequences and, in this sense, were similar to other major processes and programs that emerged in the wake of the spill such as the Vessels of Opportunity (VOO) program, grant making through NGOs, marketing campaigns promoting tourism and seafood consumption, and the reworking of offshore drilling and permitting regulations. Intended to mitigate harms stemming from the spill, the claims processes have generated negative as well as positive socioeconomic effects, and will continue to have mixed consequences for years to come. These claims processes have had strongly divergent effects depending on the claims program, the specific iteration of rapidly-evolving claims processes claimants dealt with, the economic sector of the claimants and where they lived, and how claimants, lawyers, claims adjusters, and administrators negotiated these processes.

Beyond their economic effects on claimants, localities, and business sectors, the post-spill claims processes have also generated social impacts, affecting claimants' level of trust in government and the legal system and increasing their frustration and stress. Claims processes have also affected social relationships beyond those directly involved in making or responding to claims, contributing to tensions between employees and employers and among neighbors. These tensions center on how fairly claims payments were distributed and on differing accounts of who was and was not affected by the spill.

These socioeconomic impacts result not only from the legal framework of the Oil Pollution Act of 1990 (OPA 90), other relevant laws, and the prevailing political situation following the BP spill; they also result from the historical and geographical context of the Gulf Coast. This context includes differentials of power between individuals and groups and residents' differing moral economies, that is, their conceptions of distributional justice, honesty and fraud, and hard work and indolence. Such differences existed before the spill and were brought to bear in how residents interpreted their experience of the claims process and compared it to their neighbors' experiences.

This chapter section addresses only some claims processes covering spill damages to individuals and businesses    the BP claims process from April 2010 through August 23rd of that year and the Gulf Coast Claims Facility (GCCF) or 'Feinberg process' from that date through March 2nd, 2012. It does not address the transitional claims process between March and June, 2012 which yielded the Deepwater Horizon Claims Center (DHCC) for Economic and Property Claims and the Deepwater Horizon Medical Benefits Claims Administrator (collectively and colloquially known as 'the settlement' or 'the court-appointed process') which inherited and expanded upon the GCCF's duties on June 4th, 2012. It also does not discuss the $100 million Rig Worker Assistance Fund (covered in Section 1.1 of Volume I) and rental property claims under the BP, GCCF, and DHCC processes. This is due to limited ethnographic data collected from claimants in these processes.  Finally, this section does not address economic claims from state and local governments for lost tax revenues and increased social services spending or civil and criminal penalties resulting from the spill. Again, this is due to the limited data collected to date from local governments regarding their claims with BP. The framework for damage claims

for public trust natural resources under the Natural Resources Damage Assessment (NRDA) is outlined in Section 2.4.2 of Volume I of this report.

The chapter provides an historical narrative of the claims processes as they unfolded from April 2010 up to early 2012, incorporating data from three sources. The first is publically available statistical data from the GCCF on claims, claimants, and payments. The second data source is secondary materials such as journalistic articles on claims and analytical materials generated by claims facilities, NGOs, and government bodies. The last source is ethnographic, drawn from contacts made by fieldworkers for this study with Gulf Coast residents, a great many of whom shared information about their experiences with the claims processes, and those of their neighbors.

The information presented here cannot, and does not, address the legal validity or economic sufficiency of any claim or group of claims. What this ethnographic assessment of the claims process does provide, however, is an understanding of how the claims process worked that goes beyond the aggregate numbers released by claims administrators and the stories of claimants as captured in media reports. Ethnography speaks to several patterns of socioeconomic effects encountered in coastal communities related to claims processes. Claimants experience diverging outcomes in experience diverging outcomes in dealing with their claims. Claimants make various decisions about what actions to take. Multiple, clashing narratives circulate through Gulf Coast communities over the propriety of not only claims administrators' and adjustors' actions, but also how moral or deserving they and their neighbors are in getting what colloquially became known as "BP money."

## 7.1. THE INITIAL BP CLAIMS PROCESS (TO 8/23/10)

Shortly after the sinking of the *Deepwater Horizon*, BP initiated a claims process for affected parties under the requirements of the Oil Pollution Act of 1990. This initial process, run by BP with a number of sub-contracted adjuster firms that staffed offices around the Gulf Coast, ran until August 23, 2010. Over this period it paid $399 million to 127,000 claimants and 27,000 other filed claims were still pending (CNN 2010). The BP claims process had ramped up abruptly after the disaster. Claims workers were hired and trained hurriedly to begin processing claims and writing checks in May 2010. One former claims employee described to fieldworkers:

> I got hired, let's see, right after it happened ... I got a call from them and started working right away. It was so chaotic. I had one day's training on this computer program [to process claims] and the next day I had to train 70 people on how to use it. And we were working seven days a week, 10 to 12 hours a day, for months. I think I had maybe two weeks off from May 2010 to early 2011 (BM634 2012).

By May 26, BP reported receiving 25,000 claims and paying $29 million to 12,000 claimants, denying no claimant by that date (Anderson 2010). Claimants could get up to $5,000 a month through the process, and were not required to waive their right to sue for future damages. Commercial fishermen, shut down by area closures resulting from the spill, made up a major part of the claimants during the BP process (WDSU-TV 2010), as claims offices began regularizing what became monthly payments as the spill stretched through the summer of 2010.

At first, in those first few weeks, we'd just go driving around down the bayou and if we'd find a group of fishermen we'd write them a check    write them a $5,000 check. We were authorized to write up to $5,000 checks to individuals. You'd get paid, under BP, every month and you had to come back [to the office] and show your losses every month and you'd get paid. At first we were just handing out checks to people - to fishermen only - but by, say, June-July, we were more organized and it was less crazy. We were processing their claims every month (BM634 2012).

Feelings on the initial BP claims process varied considerably among claimants with whom fieldworkers spoken during this study. Some commercial fishermen with smaller individual claims were paid $4,000 to 5,000 a month for two to six months and reported that adjusters were more flexible in the kind and completeness of documentation they accepted than under the subsequent GCCF process, which was more strict and required more complete paperwork (BM443b 2011; BM462a 2011; BM 464 2011; BM465b 2011; PP949 2011; PP860 2011). Some claimants still faced serious challenges in proving their claims during the BP claims process, with one reporting he had to make a scene in a claims office before being paid for two months' losses (PP910 2011). Business owners with large claims, however, had problems with the initial BP process and subsequent processes (BM484 2011; DA427b 2010). This was conveyed by one Louisiana public agency official mediating between seafood businesses and claims adjusters in mid-2010:

We were the piloter for the large claims process because we have the largest concentration of processors, ice houses, and docks. We worked with [three claims adjusters], a BP subcontractor with that program. We worked with the state. They had the same problem. The BP rep and [companies #1 and #2], they had big issues. They had an account and said they sent a check to a processor. I sent a text message to the processor. He hadn't received anything. I passed the text message around and showed them. They lit into [the one responsible for sending the checks]. With the large claims [program], it was underwriter roulette. If the underwriter understands what we do down here, that fisheries is a unique sector, then there are no problems. If they don't, then… They went into a stall tactic. "We can't find your paperwork." That creates anger. You gave them your private information and they can't find it (DA427b 2010)?

A similar sentiment was expressed by the former GCCF claims adjuster:

It was your big companies, your $250,000, $500,000 in income, those claims, I never saw them get paid, it was like they couldn't get paid. There was something wrong with how our formulas worked, if you were a business above this size, it just didn't work right and you couldn't get paid it seemed. This was your seafood processors, your other kinds of companies in seafood. I had this one lady ... a big oyster processor, one of the biggest in the state. And she had all her paperwork together, she had a claim and we fought and fought with the attorneys who got brought in [by GCCF] but we never could get her paid. Her claim just sat on the computer, we watched it for six months, just stuck with the forensic accountants, 'pending review' (BM634 2012).

## 7.2. THE TRANSITION TO THE GULF COAST CLAIMS FACILITY AND SIX-MONTH EMERGENCY ADVANCE PAYMENTS (TO 11/22/10)

A June 16, 2010 agreement between the Obama administration and BP (New Orleans *Times-Picayune* 2010) led to BP establishing a $20 billion fund and transitioning its claims program to a new entity that would become the Gulf Coast Claims Facility (GCCF). This was headed by Kenneth Feinberg, a New York attorney with experience administering major compensatory funds including the 9/11 fund and the Agent Orange settlement, and as acting as the Wall Street 'Pay Czar' after the 2008 financial bailout (Feinberg 2012). In its first three months of operation, the GCCF accepted claims for Emergency Advance Payments (EAPs), also known as "six month emergency payments," receiving 455,203 claims by the filing deadline of November 22. Of the more than 500,000 EAP claims eventually received by GCCF, only about one-third were ever paid, resulting in just over $2.5 billion in payments to all claimants. The large majority of these were issued before the end of 2010 (see Section 7.3 below). More than four times the number of claimants filed for EAPs than made claims to BP's program, but of those claimants, a much smaller percentage received any claims payment from GCCF.

The overall payout of GCCF EAPs was about eight times larger than the amount paid during BP's claims process. The reasons for these differences are several. While claimants from all economic sectors could equally make claims to BP and the GCCF, Feinberg publicized the Facility's openness to consider claims from sectors like tourism, restaurants and retailing in addition to commercial fisheries. This served to expand the number and diversity of claimants. However, according to many study participants, much more documentation was required by the GCCF's adjusters than under BP's management of the claims process. Also, rather than coming month-to-month, EAPs were [on average] larger checks paid in advance for the next six months of projected losses. The flood of new claimants from disparate economic sectors and localities, the more stringent paperwork requirements, and the method of calculating losses based on comparing May December 2010 income to income in those same months in 2008 and 2009, meant many EAP claims were denied or held up due to incomplete documentation.

GCCF Administrator Feinberg made several important decisions in the Facility's first three months. On its first day, Feinberg announced fully-documented individual claimants would have EAP checks mailed to them from GCCF within 48 hours, and business within seven days. This created unrealized expectations of quick action among many claimants (GCCF 2010a; Feinberg 2012). One month later, as the GCCF process continued ramping up along with criticism of delays in processing claims, GCCF made two more public announcements. On September 23rd, Feinberg declared VOO earnings would not be deducted from fishermen's EAP payments, increasing those claimants' possible claims payouts. In the same release, the GCCF claimed it refused "...to accept over 4,000 bogus claims for 'subsistence' with handwritten and 'fill-in-the-blank' letters attached and no additional supporting documentation" (GCCF 2010b). Loss of subsistence use of natural resources claims, one of the recoverable categories of damages under OPA 90, are those due to seafood or other natural resources that claimants harvested not for sale but for personal or family consumption, as gifts, or to barter, and could no longer harvest due to the oil spill. There was a surge in subsistence claims to GCCF in the fall of 2010, many arriving with form letters signed by local government officials and little else to substantiate them. GCCF declared these claims 'bogus,' but the informal and unmonetized nature of subsistence harvest meant few, if any, written records existed to document subsistence claims. In 2010, GCCF had not yet developed an affidavit-based process to authenticate subsistence

claims and it was overwhelmed by the flood of emergency claims of all kinds in 2010. At this time, almost all subsistence claims, regardless of their provenance, were delayed or denied and GCCF continued to deny them throughout its existence. A former GCCF claims adjuster recalled:

> What happened when Feinberg took over was that he opened up the claims to anybody, and then what *really* got things out of control is when he did the subsistence saying 'if you lived off the land' you should file a claim - and we had just *thousands* of people coming through ... We were going through thousands of claimants every day in those offices during the 'subsistence days'. You had people lined up for the whole block to file claims (BM634 2012).

On September 25, the GCCF announced it was accelerating claims processing to keep up with the enormous number of EAP claims coming in and to get payments out by the 23rd of November, the deadline to file for EAPs (GCCF 2010c). On October 4th, GCCF declared geographic proximity to the oil spill would no longer affect a claimant's eligibility to collect for economic damages (GCCF 2010d), a challenge many claimants in Florida, Texas and inland parishes and counties faced before that date. On November 22nd the GCCF released a report it commissioned from Harvard Law School Professor John Goldberg on liability for economic loss under OPA 90. The report narrowly construed the ability to recover damages to claimants who can prove their right and ability to put property or resources to commercial use had been hindered by an oil spill (Goldberg 2010).

Respondents frequently reported several issues in their dealings with the GCCF. One of the more prevalent was the claimed loss of their documents by the Facility, sometimes three or four times (PP954 2011; BM441 2011; BM443 2011; PP564 2011; DA427b 2010). Numerous people conveyed to fieldworkers their concern that claims adjusters made multiple, new requests for additional financial documents, stretching over weeks and months (AG402b 2011; BM519a 2011; BM531 2011; BM555 2011; BM560d 2011). Two seafood businesses in Louisiana, one a shrimp buyer (BM479a 2011), the other a crab and oyster processor (BM560d 2011), expressed concern about GCCF requests for financial data on fishermen they buy from. In one of these cases, a private investigator working for GCCF was observed on the premises requesting trip ticket data for certain fishermen from the seafood buyer, causing the person concern over releasing those fishermen's data without their consent. Claimants in Texas and western Louisiana reported being denied, or their payments reduced or delayed from GCCF, because their ZIP codes were considered too far from the spill to qualify (Alliance for Justice 2011:21; BM576 2011). One Port Arthur, TX shrimp boat owner and captain said in July, 2011:

> Last year I didn't go out [shrimping] until August; we couldn't go out before because Louisiana was closed and people here [in Texas] are still having problems getting money from GCCF because they were saying 'you're from Texas,' looking at your ZIP code and we are considered more distant [from the oil spill] but we spend much of our time working in Louisiana, even in Mississippi and Alabama because we follow the shrimp. We catch 80-90% of our shrimp in Louisiana because that's where the lakes and marshes are that the shrimp come from (BM602 2011).

Business claimants whose businesses opened just before the oil spill described being denied for lacking documentation of past years' revenues when no such documents existed (BM514 2011; PP433 2010; Prakash Field notes, 2011). Some individual claimants, especially those in commercial fisheries and seafood processing, explained their claims to GCCF were denied or much smaller than their real losses because they were paid in cash, income unreported on their tax returns and thus inadmissible in the claims process (AG448 2011; BM462a 2011). A south Louisiana local government official said:

> [Commercial fishermen] didn't pay taxes so they can't apply for unemployment. BP said, 'Show us your [income] records.' Guys here don't have no records. Go to a guy you're fishing with, you think he's going to give you a paper saying he paid you $20,000 (CW488 2011)?

The former claims adjuster said:

> The people who really got screwed were the deckhands and the [seafood] processing plant workers. You see, they get paid a lot of cash, right? And it's really hard to track cash, to document cash, and we couldn't show a loss for them. Now, we'd work with them in the office, we'd tweak their claim, you can always make the numbers work somehow, but we had some fishermen who we couldn't show a loss for, relative to their 2008 or 2009 numbers. And they didn't get anything, they got nothing. For the deckhands, it's their captains that pay their taxes, but their tax returns didn't show this supplemental pay that they paid their deckhands, so I'd tell the captains, 'you know, if you say this [that you pay your deckhand cash], then it's coming out of your claims check,' then they wouldn't do that and we couldn't pay the deckhand (BM634 2012).

Other fishermen, despite paying taxes on all their income, faced obstacles in processing their claims because of limited record-keeping (BM460d 2011). One non-profit claims preparer said in June 2011: "It's not uncommon for a fisher to come to me with a garbage bag full of receipts" to process into spreadsheets of profit and loss statements to present to GCCF. Even these efforts were not always successful because "[the] documentation goal posts are always changing ... making the process very frustrating" (BR189 2011).

Claimants explained how their expectations about the claims process affected their decision about when and how to return to work after the spill. Some fishermen considered possible deductions from their GCCF payments sufficient reason to delay returning to the water for months because they considered any income earned would count against their claims (DA461c 2010; BM407 2011). Their concerns turned out to be warranted, as fishing income in 2010 counted as mitigation of losses against EAP claims. By contrast, commercial fishermen who stopped fishing to participate in the VOO program would not have those earnings deducted from their EAP payments. However, during the height of the VOO program in summer 2010, no one knew that VOO earnings would not be deducted because GCCF Administrator Feinberg did not announce this until September 23rd, 2010, after the VOO had already shrunk markedly (GCCF 2010b).

Gulf Coast residents' knowledge of the 1989 *Exxon Valdez* spill's consequences affected some resident's decisions about how they handled the claims process in this spill. One Biloxi, Mississippi shrimper explained his decision to settle with the GCCF for a final payment stemmed

from the twenty-year wait Alaskans faced in getting a settlement. He didn't want to contest his unsatisfactory GCCF claim with the help of a law firm because of how long it took *Exxon Valdez* plaintiffs to get paid (PP773 2011). This sentiment was echoed by a commercial fishing deckhand who said, despite being frustrated about being asked by the GCCF five times for more documentation and having his Quick Pay settlement dropped from $5,000 to $3,800, he would not sue BP because in Alaska "a lot of people there didn't get paid until years after. Some even died before they got any money" (PP806 2011). Others took from the Alaska precedent the opposite lesson, finding reasons to not take a final payment with GCCF. One claimant in the commercial seafood industry cited conversations with Alaskan fishermen who came to the Gulf Coast during the spill to provide response training as reason to reject the GCCF's formula for compensating for two years of seafood business losses. This respondent said the Alaskans warned him the effects of *Valdez* were not apparent until years after the event (PP911 2011). The Exxon *Valdez* spill was employed by one law firm representative in a public meeting for commercial fishing claimants.  He argued that Alaskans' past experience with spills showed Gulf shrimpers could get fairly compensated through the GCCF, but must organize and negotiate with the GCCF through his firm (PP652 2011).

## 7.3. THE GCCF, NOVEMBER 2010 TO MARCH 2012

Following the deadline for filing Emergency Advance Payments on November 23rd 2010, the GCCF began taking claims for full review final payments. Taking a final payment required recipients to waive their rights to sue BP for further damages or to receive future claims payments, in contrast to interim payments that were paid quarterly and for which no waivers were required. On December 13th, GCCF announced another payment option, Quick Pay Final Payments. 'Quick Pays' meant anyone granted an EAP could, with minimal additional paperwork, get a final payment of $5,000 for individuals and $25,000 for businesses in return for signing a covenant not to sue (Alliance for Justice 2011:53). The GCCF's failure to pay subsistence use claims drew new attention in December 2010 when a local NGO published a white paper on subsistence use outlining a draft methodology for processing such claims and held a press conference with subsistence claimants (United Vietnamese American Fisherfolks and MQVN CDC 2010). As of December 14, 2010, only 5 of 36,179 loss of subsistence use claims filed with GCCF had been paid. This, and local news coverage of the subsistence issue in the Vietnamese-American community, led to subsistence claimants appearing before a U.S. Senate subcommittee hearing on the GCCF on January 27, 2011 (Alliance for Justice 2011:55).

Feinberg's presence at a series of raucous public meetings along the Gulf Coast in January and February of 2011, negative press reports, and legal filings and rulings all slammed the GCCF in early 2011. On February 2, Federal Judge Carl Barbier issued a ruling that Feinberg was not independent of BP. That same day, Louisiana and Mississippi officials went to court to prevent the GCCF from requiring waivers from final payment recipients.

On January 31, a report solicited by GCCF from Dr. John W. Tunnell on Gulf of Mexico fisheries recovery was released by the Facility (Tunnell 2011). Tunnell's report was ambivalent in its conclusions about when the Gulf's fisheries would recover, but its contents were cited by GCCF in its announcement on February 2 that final payment compensation to commercial fisheries (other than oysters) would be based on a recovery period of three years (GCCF 2011a). On February 18, 2011, the GCCF (GCCF 2011b) released its Final Rules and Final Payment

Methodology based on the GCCF's interpretation of the Tunnell report. The Final Rules set multipliers for payments to shrimpers, crabbers, and finfishermen at double their documented 2010 losses, four times those losses for oystermen (Alliance for Justice 2011:53).

A flood of final and interim claims were filed with the GCCF in late 2010 and early 2011, more than 200,000 by the end of January 2011. The number would ultimately reach nearly 400,000 by the time the GCCF was replaced in March 2012 (Table 7.1). Final and interim (or Phase II) claims would eventually result in an additional $3.5 billion being issued by the GCCF and a higher overall rate of payment than with Phase I claims, just over 60%. However, the success of final and interim claimants differed significantly depending on the kind of claims they filed.

Table 7.1. General Data on GCCF Claims Over Time and By Type

| Date | 9/21/10 | 10/27/10 | 11/22/10 | 12/14/10 | 1/29/11 | 2/16/12 | 3/14/12 |
|---|---|---|---|---|---|---|---|
| Overall Claims | | | | | | | |
| # of claimants | 66,931 | 293,350 | 423,973 | 466,074 | 484,437 | 572,270 | 575,469 |
| % of claimants paid | 35.0 | 29.7 | 29.2 | 35.7 | 34.8 | 38.5 | 38.5 |
| Amount paid to all unique claimants ($ millions) | 293.8 | 1,576 | 1,944 | 2,469 | 3,323 | 5,996 | 6,088 |
| % of claimants represented by counsel | N/A | 2.2% | 2.3% | 2.8% | 2.8% | 15.7% | 16.3% |
| Phase I Claims | | | | | | | |
| # of claims | 65,903 | 311,871 | 455,203 | 502,114 | No data | No data | No data |
| % of claims paid | 35.6 | 27.9 | 27.2 | 33.2 | N/A | N/A | N/A |
| Amount paid to all claimants ($ millions) | 293.8 | 1,576 | 1,944 | 2,469 | 2,565 | 2,584 | 2,584 |
| Phase II Claims | | | | | | | |
| Total # of claimants | 6,137 | 8,886 | 28,469 | 71,968 | 218,833 | 378,595 | 383,348 |
| % of claimants paid | 0 | 0 | 0 | 0 | 37.4 | 60.3 | 60.2 |
| Amount paid to all claimants ($ millions) | 0 | 0 | 0 | 0 | 758.0 | 3,412 | 3,504 |
| Quick Pay Final Claims | | | | | | | |
| % of Phase II claimants | No data | No data | No data | No data | 38.5 | 31.2 | 30.8 |
| % of claimants paid | No data | No data | No data | No data | 95.6 | 98.3 | 98.4 |
| Full Review Final Claims | | | | | | | |
| % of Phase II claimants | No data | No data | No data | No data | 40.8 | 37.5 | 37.9 |
| % of claimants paid | No data | No data | No data | No data | 0.0 | 42.1 | 42.0 |
| Interim Claims | | | | | | | |
| % of Phase II claimants | No data | No data | No data | No data | 18.9 | 31.3 | 31.3 |
| % of claimants paid | No data | No data | No data | No data | 0.0 | 26.7 | 26.7 |

Source: GCCF n.d.

More than 98% of Quick Pay claimants, representing 30.8% of all Phase II claimants, were paid. However, only 42% of those with Full Review Final Claims, the largest body of claimants, were paid. Interim claimants, whose proportion in the GCCF's pool of claimants rose over time to nearly 1/3 of all claimants, were the least successful in getting paid. Just over 25% got at least one interim payment before the GCCF closed. Growing frustrations with the claims process among those still dealing with the GCCF at the time are evident in the escalating percentage of claimants represented by attorneys; this jumped from under 3% in early 2011 to over 15% by early 2012 (Table 7.1).

GCCF updated its payments methodology on August 16, 2011, introducing a Future Risk Multiple for oyster leaseholders that varied geographically depending on how much damage certain oyster beds suffered (GCCF 2011c). On August 22, the one year anniversary of the GCCF, the Facility announced it had processed 97% of claims filed, had paid some $5 billion to claimants, and none of its 1,126 claims judgments appealed to the U.S. Coast Guard had been overturned (GCCF 2011d). The GCCF's methodology would be updated again on November 30, 2011, when the Facility announced all commercial fishermen (but not charter boat fishermen) would henceforth get four times their 2010 losses in final payments. Fishermen who'd already accepted final payments would not be retroactively paid more (GCCF 2011e). In late 2011 and early 2012, the GCCF was involved in a legal controversy between lawyers for the Plaintiff's Steering Committee (PSC), the Louisiana Governor and Louisiana Attorney General over a holdback fund to compensate PSC lawyers out of GCCF payments and BP payments to governments. Feinberg briefly halted GCCF payments on January 3, 2012 before receiving clarification on the holdback payments, which eventually were decided to include 6% of private GCCF claimants' payments made after January 30, 2011 (Mowbray and Hammer 2012). Following the announcement of the twin settlements between BP and the PSC on March 2, 2012, the GCCF stood down on March 8, replaced by a transitional claims process to the new DHCC and medical claims facilities.

GCCF claims and payments were filed according to economic sector, category of damages claimed, and location, allowing for further analysis of the distribution of claims and flows of money. Table 7.2 presents the sectoral distribution of GCCF's paid Lost Earnings or Profits claims. The largest number of claims, indeed the large majority of all paid claims, were paid to individuals and businesses in the food, beverage and lodging, and retail, sales and service industries, as was the considerable majority of GCCF payment dollars. However, paid fishing and seafood processing claims got larger payments on average than other sectors. Echoing the concerns fieldworkers heard from seafood processors in 2010 and 2011 about being systematically underpaid on their claims (BM484 2011; BM621 2011), average paid claims amounts in the seafood processing and distribution sector jumped 50% between early 2011 and 2012, reflecting higher payments by GCCF to these firms late in the Facility's tenure, during a time when other economic sectors saw average payments remain flat.

Table 7.3 arrays statistics on the number of claims submitted, the total amount paid, and the percentage of submitted claims that were paid by GCCF for five kinds of damages recoverable by individuals and businesses under OPA 90. These data show that the vast majority of claims submitted were for lost earnings or profits, and that this damage category was the most likely to be compensated for by GCCF. By contrast, effectively no one was able to collect on the second-most common damage claim to GCCF, the loss of subsistence use of natural resources. Of at least 36,179 subsistence use claims filed with GCCF, only 102 had been paid before the Facility closed, paying all subsistence claimants just a quarter million dollars. Low rates of

168

payment were also seen in removal and cleanup costs claims, real or personal property claims, and physical injury/death claims, although a small number of very high payments to injury/death claimants were made by 2012 resulting in total payments of nearly $200 million in this category.

Table 7.2. Paid GCCF Lost Earnings or Profits Claims by Sector

| Date | 9/21/10 | 10/27/10 | 11/22/10 | 12/14/10 | 1/29/11 | 2/16/12 | 3/14/12 |
|---|---|---|---|---|---|---|---|
| Fishing Industry | | | | | | | |
| Total # of paid claims | 7,269 | 14,768 | 16,155 | 17,572 | 21,915 | 30,441 | 30,560 |
| Total amount paid ($ millions) | 119.4 | 447.0 | 473.5 | 500.3 | 572.3 | 740.5 | 744.6 |
| Average amount paid per paid claim | 16,431 | 30,266 | 29,311 | 28,469 | 26,114 | 24,324 | 24,366 |
| Food, Beverage and Lodging Industry | | | | | | | |
| Total # of paid claims | 7,413 | 36,677 | 52,019 | 69,293 | 106,401 | 159,123 | 159,825 |
| Total amount paid ($ millions) | 74.5 | 445.7 | 565.0 | 735.8 | 966.4 | 1,576 | 1,593 |
| Average amount paid per paid claim | 10,047 | 12,152 | 10,862 | 10,618 | 9,083 | 9,903 | 9,964 |
| Retail, Sales and Service Industry | | | | | | | |
| Total # of paid claims | 1,806 | 19,479 | 36,780 | 56,848 | 90,712 | 121,753 | 122,307 |
| Total amount paid ($ millions) | 30.4 | 391.5 | 573.4 | 845.4 | 1,218 | 1,872 | 1,889 |
| Average amount paid per paid claim | 16,807 | 20,097 | 15,590 | 14,872 | 13,426 | 15,372 | 15,446 |
| Seafood Processing and Distribution Industry | | | | | | | |
| Total # of paid claims | 2,456 | 4,533 | 5,067 | 5,596 | 7,268 | 10,957 | 11,003 |
| Total amount paid ($ millions) | 33.0 | 111.7 | 123.4 | 139.5 | 169.3 | 343.6 | 355.8 |
| Average amount paid per paid claim | 13,428 | 24,634 | 24,349 | 24,934 | 23,289 | 31,356 | 32,340 |
| Tourism and Recreation Industry | | | | | | | |
| Total # of paid claims | 399 | 1,353 | 1,914 | 2,732 | 4,143 | 8,970 | 9,025 |
| Total amount paid ($ millions) | 5.5 | 34.3 | 42.5 | 54.4 | 71.9 | 144.9 | 148.5 |
| Average amount paid per paid claim | 13,693 | 25,325 | 22,219 | 19,909 | 17,354 | 16,159 | 16,458 |

Source: GCCF n.d.

Tables 7.3 and 7.4 address the geographic distribution of GCCF claims and payments. Table 7.4 displays the number of claims claiming loss in each of the five Gulf Coast states, the percentage of claims paid claiming loss in that state, and the total amount paid to those claimants. The data show that, on a statewide basis, after initially leading the number of claims and amount of payments, Louisiana eventually was overtaken by Florida as the state with the most claims and the highest amount of GCCF payments. Florida also has the highest likelihood, all other things being equal, that a claim for loss in that state would be paid. By contrast, claims

in Mississippi, and especially Texas, were particularly difficult to get paid, although GCCF sent hundreds of millions of dollars to each of the Gulf states.

Table 7.3. GCCF Claims and Payments by Damage Category

| Date | 9/21/10 | 10/27/10 | 11/22/10 | 12/14/10 | 1/29/11 | 2/16/12 | 3/14/12 |
|---|---|---|---|---|---|---|---|
| Removal and Clean Up Costs | | | | | | | |
| Total # of submitted claims | 638 | 2,360 | 3,226 | 3,747 | No data | No data | No data |
| # of claims paid | 0 | 0 | 0 | 0 | 69 | 122 | 122 |
| % of claims paid | 0.0 | 0.0 | 0.0 | 0.0 | N/A | N/A | N/A |
| Total amount paid ($ millions) | 0 | 0 | 0 | 0 | 0.78 | 2.65 | 2.65 |
| Real or Personal Property Claims | | | | | | | |
| Total # of submitted claims | 2,705 | 6,622 | 9,612 | 11,917 | No data | No data | No data |
| # of claims paid | 2 | 54 | 96 | 157 | 228 | 376 | 378 |
| % of claims paid | 0.1 | 0.8 | 1.0 | 1.3 | N/A | N/A | N/A |
| Total amount paid ($ millions) | 0.04 | 0.30 | 0.76 | 1.47 | 1.93 | 5.78 | 6.40 |
| Lost Earnings or Profits Claims | | | | | | | |
| Total # of submitted claims | 60,647 | 284,666 | 431,447 | 511,931 | No data | No data | No data |
| # of claims paid | 23,448 | 87,107 | 123,817 | 166,306 | 250,247 | 397,404 | 399,765 |
| % of claims paid | 38.7 | 30.6 | 28.7 | 32.5 | N/A | N/A | N/A |
| Total amount paid ($ millions) | 293.8 | 1,575 | 1,944 | 2,467 | 3,320 | 5,795 | 5,880 |
| Loss of Subsistence Use of Natural Resources Claims | | | | | | | |
| Total # of submitted claims | 7,041 | 20,218 | 30,447 | 36,179 | No data | No data | No data |
| # of claims paid | 5 | 5 | 5 | 5 | 15 | 97 | 102 |
| % of claims paid | 0.1 | 0.0 | 0.0 | 0.0 | N/A | N/A | N/A |
| Total amount paid ($ millions) | 0.01 | 0.01 | 0.01 | 0.01 | 0.08 | 0.24 | 0.25 |
| Physical Injury / Death Claims | | | | | | | |
| Total # of submitted claims | 1,009 | 6,871 | 8,940 | 10,308 | No data | No data | No data |
| # of claims paid | 3 | 4 | 18 | 49 | 69 | 137 | 140 |
| % of claims paid | 0.3 | 0.1 | 0.2 | 0.5 | N/A | N/A | N/A |
| Total amount paid ($ millions) | 0.001 | 0.003 | 0.01 | 0.06 | 0.16 | 192.1 | 198.4 |

Source: GCCF n.d.

Table 7.5 gives greater spatial resolution to the geographical distribution of GCCF claims and claims money, focusing on the five counties and parishes detailed in this report's community descriptions (see Volume I). In addition to listing the number of paid claims and total amount paid by GCCF to all claimants in these jurisdictions, the per capita amount of GCCF money paid in each place was derived by dividing the total amount paid by the parish or county population reported in the 2010 Census. Mobile County, Alabama, saw the largest amount of GCCF claims paid and highest total amount paid, but also the smallest amount paid per capita. Many oil spill claimants in this majority-urban county were concentrated in its rural, southern part in and

around Bayou Le Batre. All three examined Louisiana parishes are home to many commercial fishermen and seafood processors, helping to explain their high average paid claim amount, and this can be seen particularly in Plaquemines, a parish with a small population heavily dependent on seafood production. Plaquemines had the highest per capita GCCF claims income of any locality among the study areas, more than four times the second-highest, Harrison County, Mississippi.

Table 7.4. GCCF Claims and Payments by Gulf Coast States Where Losses Were Claimed

| Date | 9/21/10 | 10/27/10 | 11/22/10 | 12/14/10 | 1/29/11 | 2/16/12 | 3/14/12 |
|---|---|---|---|---|---|---|---|
| Louisiana | | | | | | | |
| Total # of claims claiming loss in state | N/A | 58,081 | 101,649 | 131,709 | 166,749 | 250,077 | 252,172 |
| % of claims paid claiming loss in state | N/A | 48.4 | 43.1 | 44.0 | 53.3 | 48.6 | 48.4 |
| Total amount paid to claims claiming loss in state ($ millions) | N/A | 567.0 | 705.3 | 861.1 | 1,122 | 1,731 | 1,745 |
| Mississippi | | | | | | | |
| Total # of claims claiming loss in state | N/A | 18,194 | 28,821 | 35,192 | 43,125 | 76,657 | 77,935 |
| % of claims paid claiming loss in state | N/A | 40.5 | 37.7 | 38.9 | 48.7 | 42.5 | 42.0 |
| Total amount paid to claims claiming loss in state ($ millions) | N/A | 133.2 | 164.6 | 202.9 | 267.8 | 437.3 | 446.0 |
| Alabama | | | | | | | |
| Total # of claims claiming loss in state | N/A | 26,331 | 39,771 | 52,255 | 67,115 | 109,497 | 110,535 |
| % of claims paid claiming loss in state | N/A | 62.8 | 53.7 | 50.8 | 58.4 | 52.3 | 52.1 |
| Total amount paid to claims claiming loss in state ($ millions) | N/A | 307.3 | 364.3 | 433.9 | 586.3 | 966.6 | 984.7 |
| Florida | | | | | | | |
| Total # of claims claiming loss in state | N/A | 54,456 | 94,962 | 127,969 | 163,908 | 322,773 | 327,570 |
| % of claims paid claiming loss in state | N/A | 61.6 | 48.7 | 51.8 | 60.3 | 54.5 | 54.2 |
| Total amount paid to claims claiming loss in state ($ millions) | N/A | 530.7 | 668.3 | 919.1 | 1,275 | 2,451 | 2,496 |
| Texas | | | | | | | |
| Total # of claims claiming loss in state | N/A | 2,619 | 3,943 | 5,229 | 5,549 | 12,858 | 13,715 |
| % of claims paid claiming loss in state | N/A | 49.0 | 36.7 | 32.7 | 36.4 | 32.5 | 30.9 |
| Total amount paid to claims claiming loss in state ($ millions) | N/A | 32.9 | 36.6 | 44.2 | 61.7 | 233.0 | 238.4 |

Source: GCCF n.d.

Table 7.5. Data on GCCF Claims and Payments Parishes and Counties Detailed in This Report

| Date | 9/21/10 | 10/27/10 | 11/22/10 | 12/14/10 | 1/29/11 | 2/16/12 | 3/14/12 |
|---|---|---|---|---|---|---|---|
| Mobile County, Alabama | | | | | | | |
| Total amount paid ($ millions) | 20.2 | 108.3 | 138.1 | 175.7 | 180.9 | 383.6 | 388.1 |
| Total number of claims paid | 1,842 | 6,081 | 8,969 | 12,063 | 12,224 | 26,159 | 26,296 |
| Average amount paid per claim | 10,871 | 17,802 | 15,402 | 14,561 | 14,796 | 14,665 | 14,758 |
| Amount paid per capita in the county | 48 | 262 | 334 | 425 | 438 | 929 | 940 |
| Harrison County, Mississippi | | | | | | | |
| Total amount paid ($ millions) | 14.1 | 85.9 | 107.4 | 133.5 | 138.6 | 296.3 | 303.9 |
| Total number of claims paid | 1,124 | 5,353 | 7,867 | 9,822 | 9,936 | 23,843 | 23,982 |
| Average amount paid per claim | 12,544 | 16,050 | 13,655 | 13,595 | 13,954 | 12,429 | 12,673 |
| Amount paid per capita in the county | 75 | 459 | 574 | 714 | 741 | 1,584 | 1,624 |
| Plaquemines Parish, Louisiana | | | | | | | |
| Total amount paid ($ millions) | 27.9 | 81.7 | 86.0 | 90.2 | 91.8 | 152.2 | 153.7 |
| Total number of claims paid | 645 | 1,808 | 2,081 | 2,348 | 2,376 | 4,318 | 4,365 |
| Average amount paid per claim | 43,190 | 45,161 | 41,326 | 38,406 | 38,628 | 35,258 | 35,212 |
| Amount paid per capita in the parish | 1,209 | 3,544 | 3,732 | 3,914 | 3,983 | 6,607 | 6,671 |
| Lafourche Parish, Louisiana | | | | | | | |
| Total amount paid ($ millions) | 7.1 | 41.7 | 46.5 | 52.3 | 53.4 | 96.6 | 97.2 |
| Total number of claims paid | 522 | 1,425 | 1,758 | 2,133 | 2,170 | 4,175 | 4,197 |
| Average amount paid per claim | 13,568 | 29,293 | 26,462 | 24,532 | 24,585 | 23,140 | 23,158 |
| Amount paid per capita in the parish | 74 | 433 | 483 | 543 | 554 | 1,003 | 1,009 |
| Terrebonne Parish, Louisiana | | | | | | | |
| Total amount paid ($ millions) | 14.8 | 66.9 | 74.0 | 83.6 | 88.4 | 170.2 | 173.7 |
| Total number of claims paid | 1,183 | 2,520 | 3,045 | 3,696 | 3,771 | 7,233 | 7,299 |
| Average amount paid per claim | 12,528 | 26,531 | 24,300 | 22,614 | 23,433 | 23,526 | 23,792 |
| Amount paid per capita in the parish | 132 | 598 | 661 | 747 | 790 | 1,521 | 1,552 |

Source: GCCF n.d.

## 7.4. THE CONTESTED MORAL ECONOMY OF THE CLAIMS PROCESS

Apart from the issues claimants faced and the money claims payments brought to Gulf Coast communities, the most salient socioeconomic impact of the claims process is its effect on social relationships. This effect is expressed in diverging, sometimes clashing, moral economies  how people interpret the just or unjust distribution of resources, the worthiness of claims of harm, and the causation of their own and others' socioeconomic condition. The claims process brought to light the moral economic sensibilities of residents, how appropriate they judged their treatment in the claims process compared to that of their neighbors. Very often, these discussions revolved around who was deserving or undeserving of claims money  who got too little, who got too much, and on what the speaker based his or her evaluation. One narrative emerging from ethnographic fieldwork is the destructive moral consequence of recovery from recent hurricanes. One respondent in South Louisiana explained that people learned they had to exaggerate their claims in order to get anything out of post-hurricane relief efforts and that they had now carried this over to the oil spill: "The hurricanes taught our people to lie" (DA460b 2011). In Bayou Le Batre, Alabama, a seafood processor, reported that people became dependent on government handouts following Hurricane Katrina such that some were "just keeping their fingers crossed waiting for a disaster to happen" (PP565 2011). Some respondents offered a variant on this narrative of government dependence, echoing messages from contemporary national politics about welfare dependency. For example, a crab buyer (BM597 2011) and a sporting goods dealer (BM630 2011) expressed this view, questioning others' claims of harm from the spill and emphasizing their own self-reliance by contrast:

You see, that oil spill, it didn't hurt the Gulf, the Gulf is so big  Look, you see me, when I was young and went to Grand Isle, you could walk and see all the 'tar balls' all over the beach  you'd have to clean your feet from all that tar that would get on them, and you'd have to throw away your clothes after playing on the beach. And with all that, it didn't hurt anything back then, I never got sick from it, so how did this [2010 spill] hurt the Gulf? You see these people on the TV, 'oh, I got hurt,' 'oh, I'm sick,' that just wants some money, that's what's wrong with this country  The guy who never did anything is just take-take-take, but the guy like me, that put-put-put, they want to take away my Social Security and tell me I gotta work longer, to 67  you can't run a country like that where the guy who puts in don't get and the other one gets for nothing (BM630 2011).

The ones who are affected are the processors like me, I haven't been compensated for my losses. I lost $100,000 last year and I've got $80,000 in inventory that I can't sell because it cost me more than I can sell it for now, plus people aren't buying crab. A fisherman can wave his arms and get money but the processors can't get anything. I've got a guy who works a boat I own and he got $60,000 but he's at home smoking crack, I can't get my money from him ... Instead of giving money to people they should do an SBA loan with low interest, the worst thing to do is give people money, that's what's wrong with America. They gave the fishermen money last year and I couldn't get no crabs because nobody was working. I was the only crab dock still working here, BP paid the other crab docks so they all shut down but I kept going (BM597 2011).

Several people noted the differential financial consequences of the claims process (and the VOO program) led to not only greater socioeconomic differences between people in their community, but a breakdown in amicable social relations based on similar socioeconomic status. Again, some saw the hurricanes of the 2000s as precursors to this trend. A resident of Lafourche Parish, Louisiana, argued that the lack of government response to the spill, like with the hurricanes, meant people in the community had to fight each other to get resources, make claims, and obtain work, saying they "made us fight amongst ourselves. For me, this is absolutely unforgivable" (AG415c 2011). A Cambodian-American shrimper, on being asked what the social effect of the spill was, said:

> The social effect was that some people got work with BP and made a lot of money and others didn't, whereas before the spill people were together and would cooperate like in the [2009] shrimp strike, now people will say, 'well you got BP money and I didn't,' so they're further divided. Fishermen are always so divided against themselves, we need a strong leader to get behind, to be united (BM499 2011).

In Abbeville, Louisiana, a fisheries agent saw a similar process of social estrangement and withdrawal resulting from the wide disparities in VOO and claims income among commercial fishermen:

> The spill caused some of our community leaders - we have some leaders in the Vietnamese communities that are very outgoing and very proud    withdraw from leadership. Some people got compensated very well, others too well, and others didn't [get compensated], for whatever reason their paperwork would never go through or what have you. So they didn't get compensation and this caused some people to withdraw, to stop talking with each other, some people couldn't face their family when they could see others making three to five thousand dollars daily with VOO and they couldn't get any income. It caused friction between people, people weren't united like they otherwise might have been. I saw fishermen withdraw, it changed people, they were almost scared to talk or to see you where before they were proud, open people (BM598 2011).

Time and time again, fieldworkers asking about claims were told stories of people in similar economic circumstances receiving very different amounts through the claims process, or people in socially subordinate positions getting more in claims than their superiors, be it boat captains getting less than deckhands or businesses getting less than employees (BM407 2011; BM479a 2011; BM597 2011; Prakash Field notes,10/15/10).Tied in with narratives of fraudulent and undeserving claims and wide differences seemingly without merit among similar claims, new 'dually' trucks and sports cars, four-wheelers, travel, and trips to casinos became evidence for some residents of their neighbors' nefarious oil spill claims (PP780 2011; DA461c 2010; BM613b 2011). This fieldworker observed a drunken scuffle at a church fair in late 2011, after which one of the fair attendees explained the fracas by saying one of the fighters was "... a spillionaire. He was an oyster fisherman. He's got a Trans-Am now, I see it go up and down the bayou. Before long it'll be on blocks or wrecked or he'll run out of money to drive it" (BM613b 2011).

One of the major narratives the moral economy of the claims process turns on the idea of deserving economic sectors versus underserving ones. Some commercial fishermen repeatedly decried land-based businesses and workers for getting larger claims than they had (Prakash Field notes, 11/24/10, 5/19/11; PP773 2011; PP779 2011; PP844 2011; BM465b 2011; PP948 2011), singling out service sector businesses like nail salons, hairdressers, and laundromats, as well as tourism-oriented workers, including Bourbon Street strippers whose supposed oil spill claims earnings became almost legendary among fishermen and seafood businessmen. A south Louisiana crab buyer put the argument succinctly: "How can whores who dance on a pole, nails people - people who do nails, you know? - and people up in Baton Rouge be getting money if people in Lafayette [with a seafood business] can't" (BM576 2011)? At the same time, seafood processors and buyers and marine suppliers and boat builders often decried commercial fishermen who expressed dissatisfaction with the claims process as greedy, complaining too much, and overreacting to the spill, pointing out that many didn't pay their taxes (Prakash Field notes, 11/10/2010; PP616 2011). For their part, owners of nail salons and other retailing businesses, many of whom had all their claims denied or only received minimal amounts (BM485a 2011; BM555 2011; BM543 2011; BM483a 2011; BM441 2011; PP843 2011), were more defensive, explaining how they felt they had been affected despite not being directly tied to the Gulf and expressing concern that BP passed their business over because they were not seafood-related (PP843 2011).

As noted in the introduction to this chapter, the claims process related to the *Deepwater Horizon* disaster continues to evolve and unfold. Those who "settled" their claims in one way or another and those who gave up trying are no longer direct participants in the process. Others have elected to enter the third phase, transferring their claims to the Deepwater Horizon Claims Center (DHCC) for Economic and Property Claims and the Deepwater Horizon Medical Benefits Claims Administrator, or else participating in the upcoming litigation against BP et al. in 2013. The indirect effects of the ongoing uncertainty, expectations of payments, and actual payouts will touch all who live and work in the communities and industries affected by the disaster and will require further study.

## 7.5. REFERENCES

AG402b. 2011. Personal communication. GCCF, claims process and water closures. Discussion with Annemarie Galeucia and John Silver. Shrimper. Dulac, LA. February 5.

AG415c. 2011. Personal communication. GCCF, claims process, impacts of oil spill on wildlife, and unmarked wells cause damage to boats. Discussion with Annemarie Galeucia. Community center employee. Lafourche Parish, LA. March 3.

AG448. 2011. Personal communication. GCCF, claims process, impacts of oil spill on wildlife, and unmarked wells cause damage to boats. Discussion with Annemarie Galeucia. Life-long resident. Cutoff, LA. June 14.

Alliance for Justice. 2011. Crude justice: One year after the Gulf oil spill: Is justice being served? Washington, D.C.: Alliance for Justice.

175

Anderson, Kurt. 2010. BP says it has paid $29M in oil spill claims. Houma Courier. May 26.

BM407. 2011. Personal communication. Claims process and compensation. Discussion with Brian Marks. Boat captain. New Orleans, LA. February 12.

BM441. 2011. Personal communication. Oil spill impacts on business, claims process, personal and business history. Discussion with Brian Marks. Grocery store owner. D'Iberville, MS. March 2.

BM443b. 2011. Personal communication. Personal and family experiences with the claims process. Discussion with Brian Marks. Nail salon worker, D'Iberville, MS. March 3.

BM460d. 2011. Personal communication. GCCF methodology and required documentation. Discussion at shrimper's general membership meeting. Community activist and fisherman's wife. Lafitte, LA. March 26.

BM462a. 2011. Personal communication. Personal history, shrimp industry, 2010 season, and claims process. Discussion with Brian Marks. Commercial shrimp boat captain. Gretna, LA. April 1.

BM464. 2011. Personal communication. Fishing and claims process. Discussion with Brian Marks. Morgan City, LA. Shrimper. April 5.

BM465b. 2011. Personal communication. Business activity, change over time, and claims process experience. Discussion with Brian Marks. Houma, LA. Grocery store owner. April 7.

BM479a. 2011. Personal communication. Seafood buying and the new shrimp season, claims process experience. Discussion with Brian Marks. Seafood dock worker. Terrebonne Parish, LA. April 27.

BM483a. 2011. Personal communication. Business performance and claims process experience. Discussion with Brian Marks. Nail salon owner. Houma, LA. April 26.

BM484. 2011. Personal communication. Tuna and shrimp industries and market recovery, and claims process experience. Discussion with Brian Marks. Seafood processor. Terrebonne Parish, LA. April 28.

BM485a. 2011. Personal communication. Family history, business performance, and claims process experience. Discussion with Brian Marks. Nail salon manager. Houma, LA. April 28.

BM514. 2011. Personal communication. Family history, oil spill impacts on fishing, and claims process experience. Discussion with Brian Marks. Commercial fisherman. Dulac. LA. May 17.

BM519a. 2011. Personal communication. Family history and GCCF claims process experience. Discussion with Brian Marks. Nail salon owner. Marrero, LA. May 19.

BM531. 2011. Personal communication. Oil spill impacts on business performance and GCCF claims process experience. Discussion with Brian Marks. Grocery store owner. Jefferson Parish, LA. May 24.

BM543. 2011. Personal communication. Travel business and Vietnamese travel trends in past year. Discussion with Brian Marks. Travel agent. Jefferson parish, LA. May 26.

BM555. 2011. Personal communication. Oil spill impacts on business performance and claims process experience. Discussion with Brian Marks. Nail supply store owner. New Orleans, LA. June 13.

BM560d. 2011. Personal communication. Personal history, perceptions of seafood safety, oil spill impacts on business performance, and claims process experience. Discussion with Brian Marks. Oyster and crab processing plant owner. Jefferson Parish, LA. June 16.

BM576. 2011. Personal communication. Oil spill impacts on business performance, and claims process experience. Discussion with Brian Marks. Crab processing plant owner. Saint Mary Parish, LA. June 23.

BM597. 2011. Personal communication. Crab business and business performance. Discussion with Brian Marks. Crab processing plant owner. Vermilion Parish, LA. July 11.

BM598. 2011. Personal communication. Fishery issues in 2010 and 2011. Discussion with Brian Marks. Extension agent. Abbeville, LA. July 11.

BM602. 2011. Personal communication. Oil spill impacts on business performance and claims process experience. Discussion with Brian Marks. Shrimp boat owner and captain. Port Arthur, TX. July 13.

BM613b. 2011. Personal communication. International oilfield workers and the post-spill moratorium. Discussion with Brian Marks. Fair attendee. Houma, LA. October 23.

BM621. 2011. Personal communication. Oyster business, closures, and reopening of business. Discussion with Brian Marks. Oyster processor. Terrebonne Parish, LA. December 21.

BM630. 2012. Personal communication. Christmas shopping season, oil spill and moratorium effects. Discussion with Brian Marks. Sporting goods store owner. South Louisiana. January 17.

BM634. 2012. Personal communication. Experience as an oil spill claims adjuster. Discussion with Brian Marks. Claims adjuster. Tucson, AZ. January 28.

BR189. 2011. Personal communication. Claims assistance, required claims documentation, and environmental activists creating divisions in the fishing community. Discussion with Bethany Rogers. Economic development NGO employee. Belle Chasse, LA. June 14.

CNN. 2010. BP says it has paid $399 million as it hands over claims process. CNN. Available at: http://articles.cnn.com/2010-08-23/us/gulf.oil.disaster_1_deepwater-horizon-gulf-coast-claims-facility-gulf-oil-disaster?_s  PM:US

CW488. 2011. Personal communication. Family history, career, and spill impacts. Discussion with Carolyn Ware. Local government official. Plaquemines Parish, LA. June 6.

DA427b. 2010. Personal communication. Oil spill response programming, claims process. Discussion with Diane Austin. Local economic development official. Terrebonne Parish. October 27.

DA460b. 2011. Personal communication. Effects of the oil spill on fishermen and others who eat seafood. Discussion with Diane Austin. Life-long resident. Lafourche Parish, LA. February 1.

DA461c. 2010. Personal communication. Personal history, shrimping industry, work in Vessels of Opportunity program. Discussion with Diane Austin. Fisherman. December 16.

Feinberg, Kenneth. 2012. Who gets what: Fair compensation after tragedy and financial upheaval. New York: PublicAffairs.

Goldberg, John C. 2010. Liability for economic loss in connection with the Deepwater Horizon spill. Available at: http://www.gulfcoastclaimsfacility.com/Goldberg.Memorandum.of.Law.2010.pdf

Gulf Coast Claims Facility (GCCF). n.d. Overall GCCF program statistics. Available at: http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf

Gulf Coast Claims Facility (GCCF). 2010a. Gulf Coast Claims Facility now processing oil spill claims. August 23.

Gulf Coast Claims Facility (GCCF). 2010b. Gulf Coast Claims Facility marks one-month anniversary. September 23.

Gulf Coast Claims Facility (GCCF). 2010c. Feinberg announces faster and more generous payments from GCCF. September 25.

Gulf Coast Claims Facility (GCCF). 2010d. Feinberg announces clarification regarding geographic proximity. October 4.

Gulf Coast Claims Facility (GCCF). 2011a. Gulf Coast Claims Facility announcement of payment options, eligibility and substantiation criteria, and final payment methodology.

February 2. Available at: http://media.nola.com/2010_gulf_oil_spill/other/ken-feinberg-calculation-methodology.pdf

Gulf Coast Claims Facility (GCCF). 2011b. Final rules governing payment options, eligibility and substantiation criteria, and final payment methodology. GCCF. February 18.

Gulf Coast Claims Facility (GCCF). 2011c. Modification to final rules governing payment options, eligibility and substantiation criteria, and final payment methodology. GCCF. August 16.

Gulf Coast Claims Facility (GCCF). 2011d. The Gulf Coast Claims Facility after its first year of operation (August 23, 2010 – August 22, 2011). GCCF. August 23.

Gulf Coast Claims Facility (GCCF). 2011e. Second modification to final rules governing payment options, eligibility and substantiation criteria, and final payment methodology. GCCF. November 30.

Mowbray, Rebecca, and David Hammer. 2012. BP oil spill payments resume after fee wrinkle. New Orleans Times-Picayune. January 4.

New Orleans Times-Picayune. 2010. Obama administration releases fund agreement with BP in Gulf oil spill. New Orleans Times-Picayune. August 11.

Perry, Ronen. 2011. Economic loss, punitive damages, and the Exxon Valdez litigation. Georgia Law Review 45:409-87.

PP433. 2010. Personal communication. Claims process, Vessels of Opportunity program, and oil spill impacts. Discussion with Preetam Prakash. Bait store owner. Bayou La Batre, AL. October 15.

PP564. 2011. Personal communication. The seafood industry and impacts of oil spill. Discussion with Preetam Prakash. Processing plant co-owner. Coden, AL. January 12.

PP565. 2011. Personal communication. The seafood industry and impacts of oil spill. Discussion with Preetam Prakash. Processing plant co-owner. Coden, AL. January 12.

PP616. 2011. Personal communication. Vietnamese entry into local fishing industry, industry changes since the 1970s, and oil spill claims. Boat yard employee. Biloxi, MS. February 11.

PP652. 2011. Personal communication. Speaker at Vietnamese Community Legal Counsel meeting, GCCF claims process, settlements, and benefits of negotiating settlements with legal representation. Attorney. Biloxi, MS. January 13.

PP773. 2011. Personal communication. GCCF claims process and impacts of oil spill. Discussion with Preetam Prakash. Shrimp boat captain. Biloxi, MS. April 19.

PP779. 2011. Personal communication. GCCF claims process, impacts of oil spill, extension of oyster season, and seafood consumption concerns. Discussion with Preetam Prakash. Unloading dock owner. Pass Christian, MS. April 22.

PP780. 2011. Personal communication. Post-Katrina recovery, operational costs, Vessels of Opportunity program, and claims process. Discussion with Preetam Prakash. Oysterman. Bayou Caddy, MS. April 22.

PP806. 2011. Personal communication. Changes in shrimping industry, GCCF claims process. Discussion with Preetam Prakash. Shrimp boat deckhand. Pascagoula, MS. May 5.

PP843. 2011. Personal communication. Impacts of oil spill on non-seafood related businesses and the claims process. Discussion with Preetam Prakash. Animal clinic and boarding facility employee. Biloxi, MS. May 20.

PP844. 2011. Personal communication. Seafood industry history and oil spill impacts. Discussion with Preetam Prakash. Seafood plant owner. Mobile County, AL. May 18.

PP860. 2011. Personal communication. Business activity and the claims process. Discussion with Preetam Prakash. Marine supply business owner. Bayou La Batre, AL. May 25.

PP910. 2011. Personal communication. Business activity and claims process experiences. Discussion with Preetam Prakash. Retail business owner. Biloxi, MS. July15.

PP911. 2011. Personal communication. Post-Katrina recovery, shrimp size and uncertainty of availability, importing shrimp, claims and settlements on losses, perceptions of seafood consumption safety, post-spill decline in tourism. Seafood market owner. Biloxi, MS. July 14.

PP948. 2011. Personal communication. Vessels of Opportunity and non-locals, and business history and activity. Discussion with Preetam Prakash. Marine supply store owner. Moss Point, MS. August 15.

PP949. 2011. Personal communication. Business conditions and the claims process. Discussion with Preetam Prakash. Marine supply store owner. Ocean Springs, MS. August 15.

PP954. 2011. Personal communication. History of local oystering and crabbing and claims process experience. Discussion with Preetam Prakash. Commercial fisherman. New Orleans, LA. August 16.

Tunnell Jr., John W. 2011. An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill. Corpus Christi, TX: Harte Research Institute for Gulf of Mexico Studies at Texas A&M University-Corpus Christi.

United Louisiana Vietnamese American Fisherfolks and MQVN Community Development Corporation. 2010. Loss of subsistence use claim framework and template for Louisiana Vietnamese American fisherfolks and other Louisiana fisherfolks. December 16.

WDSU-TV. 2010. Fishermen line up for BP payouts. WDSU-TV Channel 6. Available at: http://www.wdsu.com/news/23525146/detail.html.

# CHAPTER EIGHT: ETHNIC GROUPS AND THE SPILL

Preetam Prakash

## 8.1. INTRODUCTION

Many of the impacts of the 2010 BP oil spill affected residents of the Gulf Coast because of their geographic location (Volume I) or their participation in particular economic sectors (Chapters 1 through 5, this volume), but certain impacts were unique to certain ethnic groups and ethnic enclaves, or intensified by ethnic affiliation. There is an extensive literature on ethnic identity, inter-ethnic relations, and ethnic enclaves both in the United States and in many other areas of the world. A number of scholars have also examined the implications of minority ethnic group affiliation in the aftermath of natural and man-made disasters across the United States and other world regions. This chapter draws on this previous research in  analyzing some of the major impacts of the BP oil spill on members of minority ethnic groups along the Gulf Coast.

 Ethnicity as a concept has been continually examined and reinterpreted since its widespread diffusion as an academic and popular concept in the 19th century. In the 19th and early part of the 20th century, biological conceptions of race were often conflated with ethnicity, and ethnic traits or characteristics were often treated as a set of pre-determined, inherent attributes that are distributed consistently across a given population (Aguilar 2005; Cross 1978; Jenkins 1996; Kirk-Greene 1980; Mason 1996). In the latter part of the 20th and in the early 21st century, scholars across a variety of disciplines redefined ethnicity in ways which emphasized its active, social construction (Barth 1969; Bond and Gibson 2002; Erikson 1993; Geertz 1973; Greene 1996; Rodriguez 2000). Over the past few decades, ethnicity has come to be commonly understood among anthropologists, sociologists, geographers, historians, and other social scientists as based in forms of identification and differentiation which generally take a shared place of origin as their primary reference and which are continually negotiated and constructed in relation to broader social contexts (Erikson 1993, Gabbert 2001). According to more recent understandings, ethnicity is highly fluid and constituted by a range of performative and embodied possibilities which are situationally deployed or elicited (Anthias 1998; Fong and Chang 2004; Rodriguez 2000). Thus, individuals classified as belonging to one ethnic group may exhibit highly disparate sociocultural traits and behaviors across contexts. Taking this understanding of ethnicity as a starting point, it is necessary to recognize that the Gulf Coast study communities present unique social and economic contexts with respect to other U.S. regions. Furthermore, as described in Volume I of this report, the formation, representation, and enactment of ethnicity can vary significantly across study communities themselves, which have disparate histories of ethnic migration, settlement, and relations.

Shared histories of migration and settlement often play important roles in creating bonds and networks and can factor significantly into conceptualizations and experiences of ethnicity and ethnic identity. However, while a recent history of migration frequently results in a group being labeled "ethnic," not all minority ethnic groups are recent migrants. Nor does a shared history of migration always play a role in ethnic identity. For example, Native American groups along the Gulf Coast certainly cannot be considered recent migrants and may not conceive of their place of origin as existing anywhere other than where they currently reside. Rather, for

many Native Americans shared histories of inhabiting a particular area rather than a shared history of migration serve as the basis for ethnic identity. However, most scholars and residents of the region would consider Native Americans to be members of minority ethnic groups. Indeed, while all Native Americans might be grouped into a single category for purposes of certain educational and social policies, they comprise a wide variety of groups of varying sizes (see Section 4.4 of Volume I).

When shared histories of migration and ties to "elsewhere" do factor into ethnic identity, these can vary significantly in terms of their degree of specificity, the strength of links between migrant groups and their places of origin, and the persistence of such connections over time. For instance, many African Americans along the Gulf Coast, as in other areas of the country, identify with a shared narrative of slavery-driven migration to the United States. However, for the most part, due to practices of slave traders who purposefully severed the slaves' ties with their communities of origin, African Americans do not trace their place of origin to one specific country or region or maintain economic or other types of links with such places. Furthermore, African American settlement along the Gulf Coast has involved many different waves of migration over a long period of time.

It is also important to note that the persistence of ethnic identification may be shaped and constrained by various factors, perhaps most obviously phenotype and language. While members of some ethnic groups may not wish to actively identify with their group, they may nevertheless continue to be so identified due to their appearance or other characteristics. In the United States, phenotypically "white" individuals may find it much easier to choose for themselves whether or not they wish to be identified as members of a particular ethnic group and to rid themselves more quickly of unwanted associations than individuals who are dark-skinned or have facial features or body types associated with non-whites (Topp 2003). Thus, a continuing relationship to "elsewhere" may not always be a matter of choice, but rather something which is imposed on individuals and groups by the biases and norms of the broader society.

Of course, the term "minority" is highly relative and dependent on the context and scale being considered. Ethnicity operates on many different scales, and groups that are perceived as minorities on one scale might not be regarded as such on another. For example, while Cajuns and African Americans in the Gulf Coast region may in fact constitute majorities in certain ethnic "enclave" neighborhoods and areas, they are minorities on a regional and national level, and their minority status on these scales has had considerable impacts on their historical experiences in coastal communities (Dyson 2006; Levitt and Whitaker 2009). Thus, to consider the experiences of members of different ethnic groups following the BP spill and in other post-disaster contexts and situations, this chapter will attend to the varying levels on which ethnicity is represented, experienced, and perceived. Ethnic enclaves commonly entail the physical concentration of individuals of a particular ethnicity and coincidently, certain forms of economic specialization, the performance and reproduction of specific cultural forms, and the maintenance and reproduction of native language (Kaplan and Wei 2006). More recently there has also been an increased concentration on articulating the concept of "ethnic enclave" in ways that transcend traditional ideas of communities rooted in a particular locality to describe broader communities which span larger geographic areas, or "virtual" communities which are linked by the internet or other modern media forms. Such use of technology and the growing ease and accessibility of transportation for at least some segments of the world's population have led many scholars to focus on what they perceive as the increased fluidity, and geographically dispersed nature of ethnic identity (Massey 1998; Sassen 1990; Smith 2001).

## 8.2. PREVIOUS RESEARCH ON ETHNIC ENCLAVES, ETHNIC ORGANIZATION, AND DISASTER

Before the 1960s, many sociologists and anthropologists utilized assimilation theory to discuss the interactions of migrant and minority groups with broader society (Gleason 1980). This approach generally considered ethnic enclaves as temporary creations which facilitated the entry of first generation migrants into a new country or other geographic context, such as a new city or region, but which would cease to exist with successful assimilation into the dominant culture (Dunn 1998). Since the 1960s, in some areas of the United States as well as other Western countries, there has come to be more tolerance for the continued persistence of ethnic enclaves beyond the first generation, and more of an emphasis in the academic literature on the potentially positive aspects of ethnic enclaves, including the support they provide to elderly community members, their role in cultural reproduction, and their functions as sites of economic and political mobilization and the assertion of minority rights (cf. Valtnonen 2002).

At the same time, some scholars have more recently begun to analyze the potential downsides of these ostensibly positive aspects of ethnic enclaves. For example, Chang (2010), questions the differential use of "ethnic enclave" and "ghetto" in discussions about particular ethnic groups. She specifically argues that the use of "ethnic enclave" to describe some Asian American communities can obscure the poverty, low levels of education, and other structural inequalities that these spaces share with "ghettos." In such situations, notions of "culture" can come to act as a veil that cover up real issues and problems faced by many who live in ethnic enclaves. Ethnic enclaves along the Gulf Coast, like those in other parts of the world, therefore cannot be conceived solely in the relatively positive sense of a "cultural community," but must also be analyzed with respect to the economic and social realities of the region and individual areas which lead to the creation and maintenance of such enclaves. Disasters and their aftermath can often highlight the structural factors which underlie and are sometimes perpetuated by the formation of enclaves.

The ethnic enclave concept can also easily lead to mistaken conceptions of a given ethnic population as somehow unitary, and neatly tied together by a shared, consistent set of beliefs, economic activities, and social relations. While strong ties do exist on various levels within ethnic enclaves, there are commonly very significant differences in experiences within ethnic minority populations along the Gulf Coast along the lines of gender, age, time of residence in the United States, occupation, income levels, religion, English proficiency, and other factors (Duc Do 1999). Interestingly, strong identifications with particular aspects of ethnic identity can arise even within communities where there exists considerable variation. For example, Vietnamese who have settled along the Gulf Coast were engaged in a wide range of occupations prior to their coming to area and continue to do so following their settlement (see Section 4.5. in Volume I). Despite this diversity, many Vietnamese, as well as residents of study communities more generally, overwhelmingly associate Gulf Coast Vietnamese with commercial fisheries.

In the United States, formal organization around ethnicity dates back to at least the 19th century. However, such organization has become much more widespread, and more socially permissible especially in urban centers, since the 1960s. Various types of ethnic associations have proliferated in many areas of the country. Such associations include cultural organizations, ethnic work-based associations, and groups centered on social justice causes concerning members of particular ethnic groups, and these have accompanied the growing public recognition of many minority ethnic groups in U.S. society (Fox 1996; Halter 2000; Meagher

2000; Rudrappa 2004). All of these kinds of groups exist in the study communities, although not all types exist in every community, nor are all ethnic groups equally represented by such groups.

While individual minority ethnic groups vary considerably across the study areas, certain broad ties, such as religious practices and occupations, incorporate local ethnic communities into broader regional networks. Of course, some individuals who are perceived as being members of a particular ethnic group may in fact have very little interaction with other members of that group and may share very little in common with other group members in terms of occupation, religious beliefs, or migration history. Phenotype, occupation, language, histories of migration and settlement, and religious practices are among the most important factors in the construction and perception of ethnic identity in many study communities

In many of the study communities, strong ties between ethnicity and particular work niches continue to exist, while other areas along the coast these ties have weakened. For example, in coastal Mississippi, Croatian and French Americans used to be very strongly associated with the seafood industry (Schmidt 1995). However, over the course of time, members of these ethnic groups have moved into a variety of other occupations. Today, Croatian and French organizations in the area are largely cultural groups focused on promoting various aspects of each group's history and heritage. However, in other areas of the Gulf, ethnic organizations remain closely tied to advocating for ethnic group members involved in particular forms of work. Recent events, in particular the hurricanes of the mid-2000s, have given rise to more social justice-centered ethnic associations (see also Chapter 6). Following Hurricane Katrina, several groups were formed, or opened offices along the Gulf Coast, particularly in the New Orleans area, which focused on advocating for different minority ethnic groups. Organizations that already existed in coastal areas, for example religious institutions, also sometimes became involved in such efforts. The presence of organizations varied by study community and with respect to different ethnic groups. These groups were differentially positioned and possessed of varying abilities to respond to the impacts of the spill.

Anthropologists, sociologists, public health professionals, and urban planners have addressed iniquities related to ethnic affiliation before, during, and after disasters (Klinenberg 2002; Turner et al. 1980). Researchers have recognized the role that ethnicity can play in how groups and individuals are exposed to unique or heightened negative impacts of both natural and man-made disasters (Been and Gupta 1997; Bolin 1993; Cutter, Boruff, and Shirley 2003; Pastor, Sadd, and Hipp 2001; Peguero 2006). Many of these researchers stress the importance of recognizing and understanding how pre-disaster structural inequalities, such as varying levels of access to education, health-care, and land, can shape post-disaster outcomes. For example, in his analysis of deaths resulting from Chicago's 1995 heat wave, Klinenberg (2002) drew attention to the pre-existing patterns of neighborhood settlement and use, as well as disparities in the availability of services and infrastructure which might have made it more difficult for many African Americans to obtain medical assistance and other help during this period. Similarly, in his research on the impacts of the 2004 Indian Ocean Tsunami on different ethnic groups in eastern Sri Lanka, Amarasiri de Silva (2009) focused on disparities in settlement patterns, political power, and other factors which had strong bearing on the post-tsunami division of humanitarian aid and other resources and services. Other scholars have also drawn links between the existence of ethnic enclaves and vulnerabilities following disasters, arguing, for example, that enclaves are often established on sites that are geographically vulnerable to events such as hurricanes or earthquakes, and that following disasters the segregation of ethnic enclaves can allow powerful groups to more easily divert and monopolize resources (cf. Yeo and Blong 2010).

With respect to ethnic groups composed of recent migrants in particular, researchers have documented how such groups might be at greater risk in disaster contexts due to their unfamiliarity with local methods of disaster preparation, and their lack of knowledge on how to access aid after such events. Yeo and Blong (2010), for example, analyze a historic flood to discuss how the lack of familiarity of recently-arrived Indian migrant farmers with flood prone areas in Fiji may have resulted in greatly increased casualties among this population. Similarly, other scholars have pointed out minority ethnic group members' lack of proficiency in the dominant language as an important issue in other post-disaster contexts and have pointed to the difficulties that this may entail in attaining accurate and timely information about disaster events, following established disaster protocols, and accessing post-disaster services (e.g., Peguero 2006). Some authors have also discussed how inequalities in post-disaster recovery can exacerbate pre-existing ethnic divisions and conflicts (Amarasiri de Silva 2009).

The Gulf Coast region's history of catastrophic hurricanes has also stimulated a substantial literature examining the potentially negative consequences of minority ethnic group affiliation following disasters. Hurricane Katrina, in particular, attracted a great deal of both popular and academic attention to the post-disaster experiences of members of minority ethnic groups. This post-Katrina literature demonstrates how even disasters with very widespread impacts across a region and its overall population can still have unique and disproportionate impacts on members of particular ethnic groups (Delp et al. 2009; Dickerson 2010; Hirsch 2007; Lewis 2009; Walloo 2010**)**. Post-Katrina research in the area spans a range of ethnic groups, and includes topics such as the post Katrina migration and settlement, labor conditions, and differential access to resources (Allen 2007; Sharkey 2007; Vinck 2009; Vu et al 2009). The post-Katrina literature also discusses aspects of historically entrenched regional and local systems of ethnic and racial relations and analyzes the consequences they had on the experiences of members of different ethnic groups after Katrina. However, much of this work focuses on the New Orleans area, and there exists only a relatively small body of research articulating the post-disaster experiences of minority ethnic groups in less populated areas of the Gulf Coast. The following section focuses on the areas away from the urban core.

## 8.3. OIL SPILL IMPACTS AND RESPONSES

Some of the major challenges and issues faced by minority ethnic groups following the BP oil spill stem from lack of English language proficiency, social and political exclusion in the post-spill cleanup and recovery processes, the disproportionate presence and the particular forms of involvement of some minority ethnic groups in economic sectors and sub-sectors that were especially vulnerable post-spill, and the general disruption and reorganization of ethnicity-based networks. These issues are in many ways interrelated. They were not necessarily of ubiquitous importance across minority ethnic groups and communities. A lack of English language proficiency, for example, was not a particular concern for African Americans or Cajuns following the oil spill.

The situation of minority ethnic communities post-spill should not be considered solely in terms of impacts, but also in terms of responses. For example, some ethnic non-profits which focus on work-related or social justice issues reorganized or expanded their services and networks following the spill, at times playing important roles in advocating for these communities and channeling resources following the spill (see Chapter 6) Members of minority ethnic groups were not simply acted upon following the spill, but actively responded in various ways to the event and its aftermath.

## 8.3.1. Language and Post-Spill Exclusion

Across study communities, many first-generation immigrants have low levels of English proficiency. In some areas characterized by isolation and lack of educational access, limited English proficiency and low levels of literacy remain challenges for some Native Americans as well (see section 4.4 of Volume I). Following Katrina, one prominent criticism of local, regional, and national government policies and efforts concerned the lack of services and assistance available in languages other than English (Blazer and Murphy 2008).

Various aspects of Gulf Coast society and economy, including the importance of the commercial seafood industry and the more general persistence in the region of various forms of skilled and unskilled manual work, have facilitated the entrance and participation of non-English-speaking or non-English proficient populations into local economies. For example, many Southeast Asians and Hispanics describe how the low level of formal education and English proficiency required by many facets of work in commercial fishing and shipbuilding were important factors motivating their entrance into these occupations (Truong 2010). This lack of formal credentials and English skills serves to constrain employment mobility and advancement among such workers, and contributes to their marked disadvantage in accessing services and assistance following disasters like the oil spill and their ability to participate in activities like cleanup work and retraining.

The translation services and other non-English assistance available after the spill varied across study communities. This was true both with respect to the services and assistance provided in claims offices and by BP contractors as well as by local non-profits. In some study communities, no non-profits provided such services whereas in other communities there were several non-profits providing translation and other services in one or more languages. Immediately after the oil spill, some older Vietnamese, Lao, Thai, and Cambodians found it difficult to participate in the Vessels of Opportunity program since translators were not provided in some study communities (Sahagun 2010). Some Southeast Asian fishermen also reported financial losses during summer 2010 due to being unable to understand announcements concerning water closures. Some Lao, Thai, and Cambodians in the crabbing industry lost traps when water closures were imposed, while some Vietnamese shrimpers were repeatedly fined and/or forced to dump their catch when they accidently strayed into closed waters. Adding to these difficulties was the fact that fisheries closures were commonly announced via internet even though many fishermen, even those who speak English, lacked the skills or resources to access this medium. While this was an issue for many Gulf fishermen in general following the spill, its effects were heightened for some minority fishermen due to their lack of English proficiency.

Spanish, Vietnamese, and Khmer translators were eventually provided for the VOO program. Similarly, though translation assistance was lacking in BP/GCCF claims offices (Nolan 2010) for months after the *Deepwater Horizon* rig explosion, some offices in study areas provided translation services in Vietnamese and Spanish, and sometimes in Khmer. The availability of such services differed through time, with facilities which offered service in a particular language during summer 2010 sometimes not offering these services at later dates and vice versa (BP 2010; GCCF 2012). Non-profits and other organizations such as the Southeast Louisiana Fisheries Assistance Center also offered translation services in various languages at different times (WWL-TV 2012). However, even after translation services became available in the study areas, some individuals who were not proficient in English expressed dissatisfaction with the services provided, often alleging that translators were not fluent in the language, that they spoke dialects which were not easily comprehensible to the majority of residents, or that they were not familiar with cultural norms and rules. In some study communities Hispanic workers who filed claims, as well as Hispanic business owners and other residents who interacted frequently with Hispanic workers, complained translators employed in claims offices actively attempted to dissuade Hispanics from filing claims, and threatened those filing with reporting their legal status to police or immigration authorities.

Other ethnic groups whose members included large numbers of non-English speakers frequently did not receive translation assistance at BP claims offices. Similar to many first-generation Vietnamese, many older Lao and Cambodians work in the seafood industry or in other occupations such as welding, which require little in the way of English skills. These populations have formed enclave neighborhoods in areas such as New Iberia and Bayou La Batre. However, Lao and Cambodians are not as widely recognized across the region, both in general and in terms of their participation in the seafood industry, and this may have contributed to the inconsistent availability of translation services, even in communities such as Bayou La Batre with large populations of these groups. With translation assistance in Lao and Khmer unavailable in most claims offices, older members of these ethnic groups relied on younger family members fluent in English or did not engage in the process. Eventually, in some areas such as Bayou La Batre, non-profit organizations began to offer translation services and claims assistance in Lao and Khmer.

The activities of law firms and their agents in study communities following the spill presented another source of concern for minority ethnic group members who were not proficient in English. Community residents and activists reported that legal firms sometimes attempted to coerce residents to sign up for post-spill legal representation without providing accurate translations or clearly articulating what might be the benefits of such representation (Robertson and Swartz 2011). Additionally, like many other residents of oil spill-affected areas, minority ethnic group members commonly received notices in the mail from legal firms who claimed they already had power of attorney and rights to a percentage of any settlement. As with other post-spill issues, these situations were more difficult to navigate for individuals who lacked English proficiency.

Issues related to English proficiency continued beyond the immediate post-spill period. They have also had bearing on the ability of some minority ethnic group members, and particularly older members, to participate in workforce training, education, and other programs established for workers dislocated by the spill. Gulf-wide, few post-spill retraining or educational programs were established to target non-English-speaking individuals or offered non-English assistance. The Biloxi-Gulfport area presents one of the few instances where such a program has

been established (WLOX 2012; see below and Chapter 6, Volume I). In a few communities, such as Bayou La Batre, a variety of post-spill services and programs, such as claims and tax preparation assistance, psychological counseling, and translation assistance for retraining programs, were made available to members of some minority ethnic groups following the oil spill, through the offering of services in native languages and through efforts, such as focus groups and door to door visits by community leaders and non-profit workers, to elicit and facilitate the participation of ethnic group members (Elliot and Penaloza 2010). However, even some community leaders and activists themselves pointed out that low levels of formal education and English among many older members of ethnic minority groups would likely constrain them from easily shifting to a new industry and obtaining employment even if they passed through re-training programs. While English as a Second Language (ESL) programs were available in some study communities with large non-English proficient populations, many older minority ethnic group members had become accustomed to working in occupations where little or no English was needed and were reluctant to begin learning a new language later on in life.

Another issue for some minority ethnic groups following the spill was a lack of healthcare assistance addressing spill-related issues in their native languages. Like others who worked on the spill cleanup and VOO program, some members of minority ethnic groups expressed concerns about the inhalation of dispersant and oil fumes and other hazards they might have encountered while working. In many study communities, members of minority ethnic groups, like the broader population, voiced uncertainty about the health consequences of participation in post-spill cleanup work and about a lack of healthcare options to specifically address these concerns. Furthermore, community leaders, activists, mental health professionals, and others who worked closely with Southeast Asians and Hispanics often mentioned the strong "cultural barriers" and stigmas preventing many people from using mental health services, even when such services were available in study communities (Elliot and Penaloza 2010). While a lack of English proficiency added to the difficulties of accessing healthcare, even some members of native English-speaking groups, such as African Americans, expressed similar preoccupations. For many members of minority groups along the Gulf Coast accessing healthcare presents ongoing problems in normal times. However, the sudden, increased need for such services following the oil spill with respect to specific spill-related health issues such as exposure to oil or dispersants made this situation particularly difficult.

## 8.3.2. Occupation and Post-Spill Vulnerability

Substantial research in the United States and elsewhere has focused on the role and importance of ethnicity-based social networks with respect to labor issues (cf. Bean and Bell Rose 1999). Many anthropological and sociological accounts of such processes in the United States focus on the exploitation of recently-arrived minority ethnic groups as unskilled or semi-skilled labor in low wage, often dangerous work. For example, much of the recent literature on Hispanic migration to the U.S. Southeast is focused on the role that migrants often play at or near the bottom of local agricultural economies. Previous chapters in this volume provide examples of specialization along ethnic lines in many of the economic sectors that are crucial to the study communities. There are ample cases on the Gulf Coast, for example in many seafood plants, which in fact do mirror this broader situation. Southeast Asians and Hispanics constitute a large portion of the seafood processing plant workforce (Moberg and Thomas 1993). Such

employment presented some particular complications following the spill. The seafood plants often utilize temporary laborers who are paid on a piecework basis. These workers almost always move among different plants in an area in search of work, resulting, for many, in a lack of documentation for earnings, which proved problematic for those filing claims with GCCF (see Chapter 2, this volume).

However, in important ways, economic specialization along ethnic lines in study communities differs from these typical accounts.  For example, the regional commercial fishing industry, offshore oil and gas, as well as different manufacturing sectors, including shipbuilding, have also allowed the entrance of some minority ethnic groups into relatively higher wage jobs and positions that allow for considerable autonomy (Austin and McGuire 2002; Donato 2004). For example, Donato (2004) discusses how the majority of Hispanic and Lao workers in three south Louisiana communities were semi- and highly-skilled blue collar workers. The Gulf Coast's continued reliance on manufacturing, fishing, and extractive industries such as offshore oil have resulted in a situation where formal language and education requirements are lower than many other U.S. areas and which more easily allow the entrance of newly arrived migrants.

Vietnamese participation in the commercial seafood industry is one good example of the complex interactions between ethnicity and economy along the coast. Many Vietnamese involved in the commercial seafood industry still do piece work for relatively low wages in seafood processing plants. However, a substantial number of Vietnamese have also established themselves as shrimp vessel owners and captains, while others have purchased and operate processing plants, unloading docks, trucking services, and other seafood-related businesses (Schmidt 1995). Like other Gulf Coast fishing vessel captains, Vietnamese shrimp boat captains generally choose their own deckhands, often family members, and schedule their own trips, while Vietnamese seafood plant and unloading dock owners control not only who they hire but also exercise control over production levels and, thus, a measure of control over the price of local seafood.

Many factors have kept many Vietnamese, especially older, first generation migrants, in the regional shrimping industry over time. These include the success of Vietnamese in the industry, resulting in positive feelings toward aspects of this work; the relative autonomy the industry provides, its seasonality which permits annual trips to Vietnam, and the lack of need for English proficiency. In some cases, these factors have also led Vietnamese owners to invest large amounts of capital into larger shrimping vessels, unloading docks, processing plants, and other acquisitions. Aside from these pragmatic reasons for involvement in the industry, many Vietnamese shrimpers also express contentment with the nature of fishing work, a characteristic they share with many groups who make their living on the water. Such concentrated involvement in the fishing industry has allowed Vietnamese participants to establish tight ethnically-based networks which serve to increase access to capital, facilitate the entry of new Vietnamese into the industry, and allow for the establishment of relationships among individuals at different levels of the supply chain. However, the density and extent of this involvement in fishing also proved potentially detrimental to Vietnamese in study communities following the oil spill since financial investment in large shrimp vessels, unloading docks, and other expensive equipment and infrastructure prevent many of them from easily transitioning out of this industry.

While the involvement of Lao, Cambodians, and Thai in the seafood industry is not as large scale or as widely recognized as that of Vietnamese, in some study communities such as Bayou La Batre and Lower Plaquemines Parish, members of these groups have also moved into ownership of fishing vessels, processing plants, and other seafood-related businesses. Similar to

Vietnamese owners, members of these ethnic groups entered and have remained in the commercial seafood industry because of low formal education and English requirements, the possibilities for upward mobility, and in some cases, prior experience as fishermen in their countries of origin. Many members of these groups also found themselves facing difficulties similar to those faced by Vietnamese fishermen and plant owners with respect to recovery, retraining, and possibly transitioning out of the industry after the spill (Sayre 2011).

Another population, the Cajuns of south Louisiana, have a long history of involvement in local seafood, shipbuilding, and offshore oil and gas. With respect to offshore oil and gas, Cajuns started out working menial jobs in this industry at a time when they were widely discriminated against as an ethnic group. However, since the 1950s, Cajuns have risen to occupy high positions in every facet of this industry, from work on the oil rigs to shipyard ownership. Historically, there existed a close relationship between fishing and offshore oil work, with many Cajuns working offshore during the fishing offseason. Many Cajuns in south Louisiana study communities continue to rely on a combination of offshore oil, fishing, and shipyard work (Austin and McGuire 2002). While this combination of occupations may appear strange to many non-locals, it has become an important aspect of work strategies for many Cajuns in south Louisiana parishes as well as an important aspect of local culture as exemplified in the annual Morgan City Shrimp and Petroleum festival. Local Cajuns commonly describe how they, or friends and family members, historically survived downturns in the offshore oil industry by turning to commercial fishing, and vice versa. The aftermath of the oil spill posed a substantial shock by threatening both of these industries at once. While many Cajuns in south Louisiana can commonly draw upon ethnic and family ties to facilitate movement among different facets of the commercial seafood and offshore oil industries, having both these industries experiencing downturns for an uncertain period of time eroded the efficacy of many traditional ethnicity-based networks, and many Cajuns in study communities spoke about the unprecedented nature of this situation. Cajuns positioned at particular levels of these industries were sometimes especially vulnerable. For example, Cajun owners of small and mid-sized shipyards which fabricate for local vessel operators reported especially heavy impacts from the spill and more pronounced difficulties with recovery or with shifting to other types of work than were experienced by the larger companies that had work overseas or could take on large military contracts (see Chapters 1 and 4, this volume).

While many Vietnamese and Cajuns are concentrated in the commercial seafood industry across study communities, the participation of individuals from these and other ethnic groups in various economic sectors often varies considerably across study communities. For example, African Americans participate in very small numbers in the commercial seafood industry along the Mississippi and Alabama Gulf Coast, but African American participation in the oyster industry on the East Bank of Plaquemines Parish is substantial and has a long historical precedent. African American oystermen in this area have historically faced considerable discrimination and marginalization, including struggles over proposed bans on the hand dredges used by many African Americans in the area and the loss of oyster grounds following federal government-mandated freshwater diversions in the 1990s (CW524 2011; Davis 2010). Compared to other oystermen in the area, African Americans run relatively small-scale operations, either operating on smaller leases or oystering for larger leaseholders (Mock 2010). Thus, while fishermen in the Plaquemines area generally suffered heavy losses following the spill, African American oystermen were in a more vulnerable situation. Their relatively small lease holdings meant that they had less ability to move to areas unaffected by the spill, less

191

lobbying power to attract attention and resources, and generally less financial resources upon which they could draw. Furthermore, as with fishermen across study communities, African American fishermen in this area often rely heavily on subsistence fishing to feed themselves, family, and friends, an ability that was also impacted considerably after the spill. The low levels of formal education which affected fishing communities in other coastal areas also proved a substantial hurdle for African American fishermen from this area who sought retraining or access to other post-spill programs.

Since the 2005 storms, many Hispanics have begun working in larger numbers in the commercial seafood, tourism, and shipbuilding industries, but their participation in these sectors is not widely recognized at a regional level. Unlike other members of minority ethnic groups such as Cajuns and Vietnamese, who have resided along the Gulf Coast for longer periods, Hispanics have not established themselves in management or ownership-level positions in shipbuilding, fishing, or other important coastal sectors that were impacted by the spill. Unlike others who have a long-standing presence in many study communities, the Hispanic presence in many study communities is fairly recent and the Hispanic population is more transitory than many better-established groups, with many people regularly moving in and out. The participation of Hispanics in the seafood industry is also often not readily visible, since the great majority of Hispanics in this industry are workers in the processing plants and not fishermen. Furthermore, the participation of Hispanics in the coastal economy is very diverse and, as with African Americans, residents of study communities do not generally recognize Hispanics as particularly involved with any one line of work. Due to all of these factors, there was little broad recognition in study communities of Hispanics as a group particularly impacted by the spill despite the fact that many Hispanics work in industries that suffered heavy effects.

Some minority ethnic businesses in the region, such as ethnic grocery stores and restaurants, depend to a large degree on ethnic community members, due to their physical location in ethnic enclave neighborhoods or to the types of services and goods they provide, such as international money transfers or foods that are largely consumed by members of a particular minority ethnic group. When ethnic communities suffered heavy economic and social impacts following the spill, the businesses catering to them were, in turn, also affected. Some business owners were themselves not proficient in English. This, combined with their investment in serving a particular clientele, made it difficult for them to diversify their businesses along new lines. Some of these businesses have also come to rely on foreign guestworkers who regularly come to study communities to work in local seafood plants, shipyards, tourism businesses, or other industries. Following the spill, such guestworkers were brought into communities in lower than usual numbers, if at all, and this also had negative impacts on local ethnic businesses.

### 8.3.3. Disruption and Reorganization of Ethnicity-Based Social Networks

Business owner-client relations were among those ethnicity-based social networks disrupted by the spill. The oil spill also had some impact on the networks that existed between members of some ethnic groups and their places of origin. Many prior studies have examined the dense and complex ties which often persist in these circumstances, and the social and economic importance of such networks for communities in both the sending and receiving countries (Werbner 2002). In the study communities, such networks are more common among Vietnamese, Lao, Cambodians, Hispanics, and other groups who are more recent arrivals to the

region. Members of these ethnic groups commonly visit their countries of origin and often provide remittances and other resources to extended family in these countries. Members of these ethnic groups who reside on the coast also serve as important sources of jobs, information, and support for new arrivals to the area. For example, business owners commonly employ newly-arrived extended family members in their businesses and workers often refer fellow ethnic group members for employment. Following the spill, individuals and families sometimes lacked the funds to make trips to their places of origin, or were too uncertain about the future of their particular industry and the general economic climate in their community. A number of grocery and convenience store owners who provided money transfer services reported that the amount of remittances sent back by coastal residents had decreased dramatically following the spill. In some cases, owners reported that the post-spill period actually saw families in the place of origin sending money to family members living in Gulf Coast study communities. With the poor state of the economy in most coastal economic sectors following the spill, business owners were largely unable to hire new employees and were often forced to lay off existing ones. Likewise, in this economic climate, ethnic social networks often proved less effective for those seeking to obtain work.

The aftermath of Hurricane Katrina saw the widespread dispersal of Southeast Asians and African Americans from many study communities (Bounds 2011; Li et al. 2010). Such out-migration was rarely reported by members of these ethnic groups following the oil spill. Hispanics reported more such movement after the spill, reflecting the more recent settlement of Hispanics in coastal communities and the transient nature of a substantial portion of the Hispanic workforce there. Hispanics in study communities commonly stated that people would 'go where the work was.' They reported the destinations of those who had left study communities as including other regions of the United States as well as their places of origin. This out-migration of Hispanics also coincided with what many Hispanics and others have reported as increased anti-immigrant sentiment and stricter law enforcement in the post-spill era. While undocumented immigration spans various ethnic groups, many residents in study communities, as in rest of the country, focus on "illegal" Hispanics. Hispanic business owners and workers alike commented on how increased police and immigration authority presence had made it difficult to search for work and to commute to jobs if work was actually found. While these developments had begun prior to the spill and were not directly connected to it, some Hispanics workers and business owners asserted that this uncertain social and political climate added to the difficulties for Hispanics trying to navigate the spill's aftermath and the progressively worsening economic situation in many study communities following the spill.  In 2011, laws similar to Arizona's SB-1070 legislation were considered in both Mississippi and Alabama, and passed in the latter state (Reid 2011). As in other areas of Alabama, the passage of this legislation was reported by Hispanic and Anglo business owners, as well as Hispanic workers, to have resulted in the out-migration of substantial numbers of Hispanics from coastal Mobile and Baldwin counties.

In some cases, the aftermath of the spill led to the reorganization or the creation of new ethnicity-based networks. Following the spill, non-profits like Boat People SOS, Mary Queen of Vietnam CDC, NAVASA, and Asian Americans for Change advocating for the Vietnamese in different coastal communities achieved a degree of solidarity among members of this ethnic group around a common identity referencing their background in Vietnam, a common history of migration beginning in the 1970s, participation in the Gulf Coast commercial fishing industry, and a lifestyle heavily dependent on marine resources. Importantly, Vietnamese were broadly recognized by non-Vietnamese across study communities as closely tied to the commercial

fishing industry and, thus, heavily impacted by the oil spill. In the aftermath of the oil spill Vietnamese non-profits staged a number of meetings, protests, legal clinics, and other events that sometimes brought together fishermen, activists and advocates, professionals, and others from different Gulf Coast areas. This public advocacy work and accompanying broad recognition of the impacts of the spill on Vietnamese communities along the Gulf Coast eventually led Kenneth Feinberg to nominate former Congressman Joseph Cao to act as a liaison with the Vietnamese community (Alexander-Bloch 2011). Non-profits focusing on assisting Vietnamese also played a role in fighting for the GCCF's recognition of loss of subsistence use claims.

African Americans, in a few areas such as Plaquemines Parish, engaged in various forms of advocacy attempting to draw attention to their situation following the oil spill (see Chapter 7, Volume I). Fishermen and Concerned Citizens is an organization based in the area that advocates mainly for local African American fishermen. After the spill, this organization was involved in organizing several post-spill media events and forums that were intended to draw attention to the situation of African American fishermen. This organization has included local Vietnamese fishermen in the past and made efforts following the spill to reach out to and include Vietnamese in their actions. However, in many other study communities, non-profits, churches, and other organizations that served African Americans did not directly address the oil spill. Community leaders, activists, and non-profit workers in such communities generally acknowledged that the spill had impacted many African Americans, but commonly considered the spill as one among the many issues affecting members of this ethnic group and not as one that demanded special attention. Importantly, there is little widespread recognition among African Americans or others, of non-African Americans as being concentrated in types of work that were especially impacted by the spill. Thus, a variety of factors contributed to the relative success that non-profits and other individuals and groups had in organizing and advocating for the Vietnamese in study communities following the spill.

While Cajuns have historically been, and continue to be, concentrated in industries heavily impacted by the oil spill, Cajun cultural organizations played little part in directly advocating for this community following the spill. In this way, they were similar to organizations representing other groups, like Croatian and French cultural associations along the Mississippi Coast. However, while these types of cultural associations generally did not respond directly to the spill, they functioned as important sources of emotional support for fishermen of these ethnicities who were impacted by the spill. For example, the Croatian American Society in Plaquemines is a group organized around the promotion and celebration of Croatian heritage. This group did not specifically address the impacts of the spill, but its meetings and events provided an important forum for Croatian fishermen and others impacted by the spill to voice their concerns and problems.

Although Cajuns in south Louisiana have practiced subsistence for generations and many Cajuns continue to be involved in industries heavily impacted by the spill, some Cajuns in study communities complained that Cajuns were not widely recognized following the spill as having been particularly impacted. As with Croatians along the Mississippi Gulf Coast, the decades-long movement of many Cajuns into vocations outside of fishing and oil and gas has resulted in substantial numbers of this group being less directly associated with sectors particularly hard-hit by the spill. However, in some lower Terrebonne Parish fishing communities, Cajun fishers predominate. Organizations such as Bayou Grace Community Services and Bayou Interfaith Share Community Organizing (BISCO) became involved in gathering information about local needs, hosting workshops and meetings to get information to residents, and participating in local

and regional networks. The Ladies of Lafourche Shrimpers, an organization that formed in 2003 to assist local shrimping families, also served important networking functions.

Several non-profit associations, such as the Mississippi Immigrant Rights Alliance, Puentes New Orleans, and El Pueblo,  began operating in coastal communities following the hurricanes of the mid 2000s (PP406 2010; PP515 2010; Puentes New Orleans 2008). These organizations largely aimed to provide assistance to Hispanic workers with respect to labor abuses, immigration debates, and other issues following the hurricane. Religious organizations such as Catholic Charities sometimes also attempted to provide these types of services (PP902 2011; Puentes New Orleans 2008). However, a number of Hispanic non-profit organizations were organized at a state or regional rather than local level. In recent years, many of these groups have shifted to focusing more on the issues surrounding labor and migration in the central and northern sections of the Gulf Coast states. For those groups who continued to advocate for Hispanics along the coast, issues surrounding legal status and the transitory nature of much of this population were important concerns in organizing Hispanic workers impacted by the spill. Several non-profit workers and activists who worked with Hispanics in the study communities attested that, following the spill, many were unwilling to engage in protests or other activities that would draw further attention to them. The temporary visas under which many Hispanics in the region work meant that when jobs and hours were cut significantly due to the spill, an exodus occurred as many went search of work elsewhere in the U.S. or returned to their home countries. Furthermore, while many Hispanics in the study communities worked in the seafood, shipbuilding, and tourism industries, all of which were impacted by the spill, they did not self-identify with, nor are they strongly identified with, one particular industry.  The exodus and lack of identification made it more difficult for Hispanic community advocates and activists to organize workers in the spill's aftermath.

## 8.4. SUMMARY

This chapter has described some general problems and issues confronting various minority ethnic groups in the study communities following the spill. In doing so, it has tried to illustrate that ethnicity cannot simply be perceived as one more "variable" to be taken into account post-disaster. Being a member of a minority ethnic group post-spill did not result in a shared set of easily generalized effects. Instead, different minority groups along the coast have their own histories of migration, settlement, occupation, and organization, and these, too, differ from place to place, and all these differences must be taken into account to understand the impact of disasters on these populations.

In some ways, the impacts of the BP oil spill on minority ethnic groups in study communities are similar to those reported by scholars who have examined prior disasters. Following the BP oil spill, pre-existing structural factors affecting minority ethnic groups in study communities, such as low levels of literacy and English language proficiency, proved important constraints for these groups accessing retraining and education programs, filing claims, getting health care, and generally inhibited the movement of these groups into other economic sectors and professions. A lack of English proficiency also sometimes resulted in greater financial losses for commercial fishermen.

The spill generally disrupted ethnicity-based social networks, potentially depriving group members of potential sources of assistance, as well as affecting the links that members of some

ethnic groups commonly maintain with their places of origin. For Hispanics, the spill was reported to have contributed significantly to the departure of many group members from study communities. In some cases, the reorganization of ethnic groups was more positive, with members of different ethnic groups that have historically had little interaction forming new associations. Such, for example, was the case with Vietnamese non-profits in communities such as Bayou La Batre that began to advocate for and assist members of other ethnic groups following the spill (see Chapter 5, Volume I). In other areas, such as Plaquemines Parish, minority ethnic groups, in this case African Americans, Cambodians, and Vietnamese, solidified pre-existing connections through collective action in fishermen's associations.

As with many disasters, the ways in which members of minority ethnic groups were involved in local and regional economies bore strongly on their experiences after the spill. Many ethnic minority groups, such as Vietnamese, Lao, Cambodians, and Hispanics, have considerable presence in the seafood and shipbuilding industries in study communities. These industries, especially seafood, suffered pronounced impacts following the spill, and these people were impacted in turn. However, unlike in many areas of the country, minority ethnic group members along the Gulf Coast are often involved in semi-skilled and highly skilled work (Austin, McGuire, and Higgins 2006; Austin and McGuire 2002; Donato 2004). Thus, the negative impacts that were experienced by these individuals often resulted from high levels of investment in industries such as commercial fishing and offshore oil and gas, and not necessarily because of low-skilled positions in a given industry.

Some factors that have been important in minority group experiences following previous disasters in the Gulf and elsewhere did not figure heavily into the aftermath of the oil spill. For example, scholars analyzing various natural and human-made disasters have pointed to the geographic location of groups as significant for disaster impacts (Dixon and Ramutsindela 2006; Smith 2006). This is certainly the case with hurricanes, a frequent threat to Gulf Coast communities. A number of scholars have documented how, along the Gulf Coast, minority group affiliation frequently coincides with residence in low-lying neighborhoods, a fact that had tragic consequences in Hurricane Katrina (Bullard and Wright 2009; Campanella 2006; Dyson 2006). In the case of the oil spill, however, while communities may have suffered drastically different impacts, residence in a particular neighborhood had little bearing.

The oil spill also differed from the hurricanes in terms of impacts on the local economy and demographics. Besides dispersing large numbers of coastal residents, Hurricane Katrina and other mid-2000s hurricanes altered regional demographics by bringing large numbers of Hispanic workers into many study communities in response to available cleanup and construction work (Blue and Drever 2008; Donato and Hakimzadeh 2006; Lydersen 2005). Such work required little formal education or English language proficiency and was widely reported to be easily available both to locals and non-locals. Furthermore, the shipbuilding and fabrication industry and other industries in the region typically experience an upturn following hurricanes, doing repairs and other work on storm damaged vessels and equipment. While the hurricanes brought large numbers of migrants from across the United States to look for work, with some remaining in the study communities after cleanup had ended, similar in-migration did not occur following the spill. Compared to post-hurricane cleanup and construction work, the amount of work available following the oil spill was limited and short term. Thus, after Hurricane Katrina, many minority ethnic group members were able to obtain work related to cleanup and construction that at least partially offset damages suffered; such was not the case following the spill.

Scholars, such as Yeo and Blong (2010) and Zoraster (2010), have discussed how a lack of familiarity with disaster preparation can predispose recently-arrived ethnic groups to more severe disaster impacts, especially when combined with such factors as a lack of proficiency in the dominant language. This was the case following Hurricane Katrina with more recently-arrived Hispanics, for example, who lacked knowledge on how to prepare and respond to hurricanes (Kao 2006). However, long term residence and experience played less of a role in the spill, since the area had never experienced anything like it. Indeed, long term local residents very often voiced feelings of frustration and helplessness about the oil spill, and compared it "unfavorably" to hurricanes, which they were well accustomed to dealing with. Similarly, the importance of effectively communicating disaster mitigation strategies to minority ethnic communities which scholars such as Bolger (2003) suggest as significant in disaster situations, was perhaps less crucial in the case of the oil spill, given the unprecedented nature of the event and the widespread uncertainty on how to best deal with it.

Like the more general population of the Gulf Coast, members of minority ethnic groups face considerable uncertainty and a generally poor economic climate as they attempt to recover from the impacts of the oil spill. However, minority ethnic groups commonly face a number of additional challenges that are not experienced by Gulf Coast residents at large.

## 8.5. REFERENCES

Aguilar, Filomeno. 2005. Tracing origins: Ilustrado nationalism and the racial science of migration waves. Journal of Asian Studies 64:3.

Alexander-Bloch, Benjamin. 2011. Kenneth Feinberg tells frustrated crowd in Jean Lafitte that Gulf Coast Claims Facility is doing its best. Times-Picayune. January 11.

Allen, T.D. 2007. Katrina: Race, class, and poverty: Reflections and analysis. Journal of Black Studies 37:4.

Amarasiri de Silva, M.W. 2009. Ethnicity, politics and inequality: Post-tsunami humanitarian aid delivery in Ampara District, Sri Lanka. Disasters 33:2.

Anthias, Floya. 1998. 'Evaluating diaspora': Beyond ethnicity. Sociology 32:3.

Austin, Diane E. and Thomas R. McGuire. 2002. Social and economic impacts of OCS activities on individuals and families: Volume II: Case studies of Morgan City and New Iberia, Louisiana. OCS Study MMS 2002-023. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Austin, Diane E., Thomas R. McGuire, and Rylan Higgins. 2006. Work and change in the Gulf of Mexico offshore petroleum industry. Research in Economic Anthropology 24:89-122.

Barth, Frederik. 1969. 1969 Ethnic groups and boundaries: The social organisation of culture difference. Oslo: Universitetsforlaget.

Bean, Frank D. and Stephanie Bell-Rose. 1999. Immigration and opportunity: Race, ethnicity, and employment in the United States. New York: Russell Sage Foundation.

Been, V. and F. Gupta. 1997. Coming to the nuisance or going to the barrios? A longitudinal analysis of environmental justice claims. Ecology Law Quarterly 24:1.

Blazer, Jonathon and Brett Murphy. 2008.  Addressing the needs of immigrants and limited English communities in disaster planning and relief: Lessons for government, disaster relief agencies, and community-based organizations. Los Angeles: National Immigration Law Center.

Blue, S.A. and A.I. Drever. 2008. Subcontracting work via social networks: Migrant Latino labour and the rebuilding of New Orleans. Population, Space, and Place 17:5.

Bolger, L. 2003. Scared or prepared? Disaster planning makes the difference. Information Outlook 7:7.

Bolin, R. 1993. Household and community recovery after earthquakes. Boulder, CO: Institute of Behavioral Science, University of Colorado.

Bond, George and Nigel Gibson. 2002. Contested terrains and constructed categories: Contemporary Africa in focus. Oxford: Westview Press.

Bounds, Jamie. 2011. Vietnamese in Mississippi. Mississippi History Now. Available at: http://mshistory.k12.ms.us/articles/372/vietnamese-in-mississippi.

BP. 2010. Frequently asked questions about the claims process. Available at: http://www.bp.com/liveassets/bp_internet/globalbp/globalbp_uk_english/incident_response/STAGING/local_assets/downloads_pdfs/FAQs_about_the_BP_Claims_Process.pdf

Bullard, Robert D. and Beverly Wright. 2009. Race, Place, and Environmental Justice After Hurricane Katrina: Struggles to Reclaim, Rebuild, and Revitalize New Orleans and the Gulf Coast. Boulder, CO: Westview Press.

Campanella, Richard. 2006. Geographies of New Orleans: Urban fabrics before the storm. Lafayette, LA: Center for Louisiana Studies.

Chang, Yoonmee. 2010. Writing the ghetto: Class, authorship, and the Asian American ethnic enclave. New Brunswick, NJ: Rutgers University Press.

Cross, Malcolm. 1978. Colonialism and ethnicity: A theoretical and comparative case study. Ethnic and Racial Studies 1:1.

Cutter, S. L., B.J. Boruff and W.L. Shirley. 2003. Social vulnerability to environmental hazards. Social Science Quarterly 84:2.

CW524. 2011. Personal communication. African Americans in the oyster industry Discussion with Carolyn Ware. Oysterman. Plaquemines Parish, LA. August 12.

Davis, Donald W. 2010. Washed away? The invisible peoples of Louisiana's wetlands. Lafayette, LA: Center for Louisiana Studies.

Delp, Linda, Laura Podolsky and Tomas Aguilar. 2009. Risk amid recovery: Occupational health and safety of Latino day laborers in the aftermath of the Gulf Coast hurricanes. Organization & Environment 22:4.

Dickerson, Niki. 2010. The Katrina diaspora: Dislocation and the reproduction of segregation and employment inequality. In: Wailoo, Keith, Karen M. O'Neill, Jeffrey Dowd, and Roland Anglin, eds. Katrina's Imprint: Race and Vulnerability in America. New Brunswick, NJ: Rutgers University Press.

Dixon, Jacqueline and Maano Ramutsindela. 2006. Urban resettlement and environmental justice in Cape Town. Cities 23(2):129-139.

Donato, Kathrine. 2004. Labor migration and the deepwater oil industry. OCS Study MMS 2004-057. New Orleans: U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region.

Donato, Kathleen and Shirin Hakimzadeh. 2006. The changing face of the Gulf Coast: Immigration to Louisiana, Mississippi, and Alabama. Migration Policy Institute. Available at: http://www.migrationinformation.org/usfocus/print.cfm?ID_368

Duc Do, Hien. 1999. The Vietnamese Americans. Westport, CN: Greenwood Press.

Dunn, Kevin. 1998. Rethinking ethnic concentration: The case of Cabramatta, Sydney. Urban Studies 35:3.

Dyson, Michael Eric. 2006. Come hell or high water: Hurricane Katrina and the color of disaster. New York: Basic Civitas Books.

Elliot, Debbie and Maria Penaloza. 2010. Southeast Asian immigrants flounder after the oil spill. Available at: http://www.npr.org/2010/12/23/131935432/southeast-asian-refugees-flounder-after-gulf-spill

Erikson, Thomas H. 1993. Ethnicity and nationalism: Anthropological perspectives. London: Pluto.

Fong, Mary and Rueyling Chuang. 2004. Communicating ethnic and cultural identity. Lanham, MD: Rowan and Littlefield Publishers.

Fox, Geoffrey. 1996. Hispanic nation: Culture, politics, and the construction of identity. NJ: Seacaucus.

Gabbert, Wolfgang. 2001. Social categories, ethnicity, and the state. Journal of Latin American Studies 33:3.

GCCF. 2012. General information about the Gulf Coast Claims Facility. Available at: http://www.gulfcoastclaimsfacility.com/faq

Geertz, Clifford. 1973. The interpretation of cultures: Selected essays. New York: Basic Books.

Gleason, Philip. 1980. American identity and Americanization. In: Stephan Thernstrom, ed. Harvard Encyclopedia of American Ethnic Groups. Cambridge, MA: Belknap.

Greene, Sandra. 1996. Gender, ethnicity, and social change on the upper Slave Coast: A history of the Anlo-Ewe. Portsmouth, NH: Heinemann Publishing.

Halter, Marilyn. 2000. Shopping for identity: The marketing of ethnicity. New York: Schocken.

Hirsch, Arnold. 2007. Fade to black: Hurricane Katrina and the disappearance of Creole New Orleans. Journal of American History 94:3.

Jenkins, Richard. 1996. Ethnicity etcetera: Social anthropological points of view. Ethnic and Racial Studies 19:4.

Kao, Grace. 2006. Where are the Asian and Hispanic victims of Katrina?: A metaphor for invisible minorities in contemporary racial discourse. Dubois Review 3:1.

Kaplan, David and Wei Li. 2006. Introduction. In: Kaplan, David and Wei Li, eds. Landscapes of the Ethnic Economy. Lanham, MD: Rowman and Littlefield Publishers.

Kirk-Greene, Anthony H.M. 1980. Damnosa hereditas: Ethnic races and the martial races imperatives in Africa. Ethnic and Racial Studies 3:4.

Klinenberg, Erik. 2002. Heat wave: A social autopsy of disaster in Chicago. Chicago: University of Chicago Press.

Levitt, Jeremy and Matthew Whitaker. 2009. Hurricane Katrina: American's unnatural disaster. Lincoln: University of Nebraska Press.

Lewis, Hope. 2009. Race, class, and Katrina: Human rights and (un) natural disaster. In: Filomina Choma Steady ed. Environmental Justice in the New Millennium: Global Perspectives on Race, Ethnicity, and Human Rights. Hampshire, UK: Palgrave MacMillan.

Li, Wei, Christopher Airriess, Angela Chia-Chen Chen, Karen Leong and Keith Verna. 2010. Katrina and migration: Evacuation and return by African Americans and Vietnamese Americans in an eastern New Orleans suburb. The Professional Geographer 62:1.

Lydersen, Kari. 2005. Immigrants rebuilding Gulf Coast suffer third world conditions new standard. Available at: http://newstandardnews.net/content/index.cfm/items/2559

Mason, David. 1996. Themes and issues in the teaching of race and ethnicity in sociology. Ethnic and Racial Studies 19:4.

Massey, Douglas S. 1998. Worlds in motion: Understanding international migration towards the end of the millennium. Oxford, England: Clarendon Press.

Meagher, Timothy. 2000. Race and ethnic relations in America 1965-2000. In: Ronald Bayor, ed. Race and Ethnicity in America: A Concise History. New York: Colombia University Press.

Moberg, Mark and J. Stephen Thomas. 1993. Class segmentation and divided labor: Asian workers in the Gulf of Mexico seafood industry. Ethnology 32:1.

Mock, Brentin. 2010. Black Gulf fishers face a murky future. Louisiana Oysterman's Association. Available at: http://www.theroot.com/views/invisible-fishermen-oil-spill

Nolan, Bruce. 2010. Many Vietnamese fishers isolated by language from oil spill aid. Times-Picayune. May 7.

Pastor, M., Jim Sadd and John Hipp. 2001. Which came first? Toxic facilities, minority move-in, and environmental justice. Journal of Urban Affairs 23:1.

Peguero, Anthony A. 2006. Latino disaster vulnerability: The dissemination of hurricane mitigation information among Florida's homeowners. Hispanic Journal of Behavioral Sciences 28:5.

PP406. 2010. Personal communication. NGOs and the history of the Hispanic community in Gulf Coast Mississippi. Discussion with Preetam Prakash. Non-profit manager. Biloxi, MS. September 23.

PP515. 2010. Personal communication. The Hispanic community in Gulf Coast Mississippi. Discussion with Preetam Prakash. Non-profit caseworker. Biloxi, MS. November 9.

PP902 2011. Personal communication. Employment opportunities for Hispanics, documentation requirements for oil spill loss claims, outreach programs, stigmas surrounding mental health treatment, and ESL classes. Discussion with Preetam Prakash and Helen Regis. Latino community NGO employee. New Orleans, LA. June 20.

Puentes New Orleans. 2008. About us. Available at: http://www.puentesno.org/about-us.html.

Reid, Chip. 2011. Consequences of Alabama immigration law set in. Available at: http://www.cbsnews.com/8301-18563_162-57330809/consequences-of-alabama-immigration-law-set-in/

Robertson, Campbell and John Schwartz. 2011. Many hit by spill now feel caught by claims process. New York Times. April 18.

Rodriguez, Clara. 2000. Changing race: Latinos, the census, and the history of ethnicity in the United States. New York: New York University Press.

Rudrappa, Sharmila. 2004. Ethnic routes to becoming American: Indian Americans and the cultures of citizenship. New Brunswick, NJ: Rutgers University Press.

Sahagun, Louis. 2010. Oil spill takes toll on Vietnamese, Cambodian fishermen. Los Angeles Times. May 7.

Sassen, Saskia. 1990. Economic restructuring and the American city. Annual Review of Sociology 16.

Sayre, Katherine. 2011. Bayou la Batre seafood workers consider new careers in the wake of oil spill. Mobile Press-Register. October 24.

Schmidt, Aimee. 1995. Down around Biloxi: Culture and identity in the Biloxi seafood industry. Mississippi Folklife 28:1.

Sharkey, Patrick. 2007. Survival and death in New Orleans. Journal of Black Studies 37:4.

Smith, Michael. 2001. Transnational urbanism: Locating globalization. London: Blackwell Publishers.

Smith, N. 2006. There's no such thing as a natural disaster. Understanding Katrina: Perspectives from the Social Sciences. Available at: http://understandingkatrina.ssrc.org/Smith/

Topp, Michael M. 2003. Racial and ethnic identity in the United States 1837-1877. In: Ronald Bayor, ed. Race and Ethnicity in America: A Concise History. New York: Colombia University Press.

Truong, Tranh. 2010. Vietnamese American shrimpers fear spill's toll. Available at: http://usnews.msnbc.msn.com/_news/2010/04/30/4377178-vietnamese-american-shrimpers-fear-spills-toll

Turner, R.H., J.M. Nigg, D.H. Paz and B.S. Young. 1980. Community response to earthquake threat in southern California. Los Angeles: Institute for Social Science Research, University of California.

Valtonen, Kathleen. 2002. The ethnic neighborhood: A locus of empowerment for elderly immigrants. International Social Work 45:315.

Vinck, Patrick. 2009. Inequalities and prospects: Ethnicity and legal status in the  construction labor force after Hurricane Katrina. Organization & Environment 22:4.

Vu, Lung, Mark J. Van Landingham, Mai Do, and Carl L Bankston III. 2009. Evacuation and return of Vietnamese New Orleanians affected by Hurricane Katrina. Organization & Environment 22:4.

Walloo, Keith. 2010. Katrina's imprint: Race and vulnerability in America. New Brunswick, NJ: Rutgers University Press.

Werbner, Pnina. 2002. Imagined diasporas among Manchester Muslims. Santa Fe, NM: SAR Press.

WLOX. 2012. Vietnamese fishermen catch opportunity in vocational program. Available at: http://www.wlox.com/story/17036866/oil-impacted-fishermen-learn-new-skills.

WWL-TV. 2012. Center opens to help fishermen deal with claims from BP oil spill. Available at: http://www.wwltv.com/news/local/plaquemines/Center--137664973.html

Yeo, S.W. and R.J. Blong. 2010. Fiji's worst natural disaster: The 1931 hurricane and flood. Disasters 34:3.

Zoraster, R.M. 2010. Vulnerable populations: Hurricane Katrina as a case study. Prehospital and Disaster Medicine 25:1.

# CHAPTER NINE: SUMMARY

Diane Austin

## 9.1. SUMMARY OF MAJOR FINDINGS TO DATE

The *Deepwater Horizon* disaster officially began on April 20, 2010 with the blowout of the Macondo well, though the circumstances that culminated in the explosion of the rig were based in earlier decisions and events. Likewise, the disaster officially ended on August 3, when BP succeeded in sealing the well in concrete, but many of its effects were only beginning to appear at that time. This report has focused on the social and economic effects of the disaster on the people and communities of coastal Alabama, Mississippi, and Louisiana. It has focused on the short-term effects, those that occurred in the first 20 months after the disaster began, and it has provided the context within which those effects were experienced. The *Deepwater Horizon* disaster occurred in a region that is accustomed to disasters, so some of its effects were mitigated by the expertise and mechanisms in place throughout the region to manage them. The spill's impacts were heightened, however, by the fact that the region was still recovering from recent, severe hurricanes and flooding. This disaster, overlaid upon those foundations, created a new set of actors, resources, and responses.

This disaster also occurred in a region marked by significant economic disparity; all five Gulf Coast states rank in the top 10 in income inequality in the United States. As demonstrated in this report, the social and economic effects of this disaster have ranged from the loss of livelihoods for some individuals to an infusion of cash that generated enormous revenues for others. In the weeks and months following the explosion, a disaster industry began to emerge, drawing upon some of the companies and people who are poised to mobilize following hurricanes but also incorporating oilfield supplier and contractor networks and spawning new entities as well. The explosion and resultant oil spill was not declared a major federal disaster. This meant that the provisions of the Stafford Act, which establishes that resources such as legal services, relocation assistance, and distribution of food coupons and unemployment assistance can be made available to local populations, did not apply. However, as in post-hurricane response, large sums of money flowed to major corporate entities and people from outside the region, creating tensions locally. Some Gulf Coast businesses, such as vessel contractors and hotels, received lucrative contracts and made lots of money. Many others, though, were not so fortunate. Still, because of the money that was put into the region in the short term, the initial economic impacts were not as great as expected; additional impacts will unfold over time and become more apparent once that money has been used up.

A significant challenge in tracking and understanding the impacts of this disaster is that it began in the Gulf of Mexico about 40 miles from shore, far enough to make its shoreline impacts impossible to predict but close enough for those impacts to start showing up quickly. The timing of the explosion was a critical factor in how the disaster was experienced. Coming almost five years after hurricanes Katrina and Rita, but less than two years after Gustav and Ike, the disaster occurred in a region within which public discourse and private conversations highlight distrust and critique of government. At the same time, it began during what many individuals and businesses believed was a positive turning point for the region. Though the effects of the four storms were still evident in some places, many people were anticipating a prosperous 2010

season. However, the disaster began in the late spring, when activity in the offshore petroleum industry was picking up for the season and just prior to the start of the fishing and tourist seasons. Consequently, three of the region's major industries were affected immediately, affecting in turn the many people, businesses, and communities that depend on those industries. For those households and communities who had not recovered from the storms, many of whom have long faced barriers to education and employment and who still lack basic services such as grocery stores and health clinics, the disaster was one more stressor.

The disaster also began just prior to hurricane season and continued through the 2010 season, leaving open the possibility that its effects could get worse at any point, though it was unknown if and where those effects would occur. It overtook the lives of many local residents and leaders and also drew in people from other regions of the United States and from across the globe, attracting international attention back to a region that had been under the spotlight for months following Hurricane Katrina and its aftermath in 2005. And, because many people had been displaced by the storms but continued to work and operate their businesses along the coast, the disaster affected people and communities beyond those immediately adjacent to the Gulf. Response to the disaster required incident command centers, vessels, staging areas, decontamination facilities, hurricane trackers, and much more.

The disaster encompassed hundreds of communities and hundreds of thousands of people, and its effects were far from uniform. The nature and extent of community-level impacts were influenced by many factors, including whether or not the oil came onshore there; the social and political dynamics in the community; the mix of industries upon which people and businesses in the community depended at the time; the role of members of the community in the cleanup; the community's connections to regional, state, and national resources; the community's experience with the 2005 and 2008 hurricanes; the political and legal status of the community (e.g., within a particular state, unincorporated) and its residents (e.g., Native American, undocumented immigrant); and more. At the individual and household level, early impacts were influenced by the livelihood strategies in place prior to the explosion; flexibility of employers and employees in downsizing and in moving from one sector or location to another; age of the household members; their access to education and training opportunities; and the knowledge, skills, resources, and social networks that could be mobilized to participate in the response efforts or to seek compensation for loss. Many coastal residents are part of dense social networks and combine formal and informal work across sectors and industries. Their ability to take advantage of resources coming into their communities depended in large part on the particular configuration of livelihood strategies in which they and other members of their networks participated.

The primary industries upon which many Gulf Coast communities depend are influenced to a large extent by people, and events that take place, outside the region. The offshore petroleum industry responds to global demand and pricing and the comparative advantages or disadvantages of extracting oil and gas from one location or another. The seafood industry depends on perceptions of the quality and value of Gulf seafood, fuel prices, the prices others are willing to pay, and competition from other parts of the United States and international imports. The tourism industry relies on the attractiveness of the region and its beaches, wetlands, cuisine, music and entertainment, opportunities for fishing and hunting, and more. Thus, an immediate tension concerned how community and state leaders would talk about what was happening. Leaders wanted others to know about the problems they were facing     and wanted help addressing them     but they did not want to scare off potential consumers. Some residents saw

efforts to promote the region as attempts to cover up the negative effects of the spill. In some areas not immediately impacted by oil coming ashore, for example, locals argued that the spill ended when the well was capped and that its impacts had been greatly exaggerated, even as others in their communities were suffering from economic loss and uncertainty. The infusion by BP of tens of millions of dollars to promote the region's tourism and seafood, and portray the company's response to the disaster in a favorable light, also meant that people across the country, and within the affected communities, were bombarded with images and messages that all was well, though oil still was coming ashore in some places.

Residents and leaders also were concerned about external critique of the petroleum industry and their ties to it, especially when it came from people with little or no knowledge of the industry or region and who nevertheless depended on petroleum in their own lives. At the same time, local concerns about the effects of the petroleum industry on their communities, the social and economic dependence of the region on that industry, and the fear some people have of repercussions should they speak out, muted local critique of the industry.

The Gulf of Mexico oil and gas fields exist under high pressure, and "kicks" are common, and relatively routinely checked; those which are not controlled evolve into blowouts. Yet, this was the first disaster of this scale and magnitude to occur in the Gulf, and much was unknown. Thus, the time during which this study was being conducted was one of ongoing learning and experimentation. The ideas and outcomes of the technological experiments to shut down the well and stop the flow of oil were widely publicized on international media. The social experiments received less attention outside the region, but these, too, were taking place. Those responsible for compensation were initially ignorant of the varied configurations of formal and informal household and community economies and the role of subsistence and barter activities among coastal residents, and this resulted in the underestimation of what many had lost. For instance, almost all claims related to loss of subsistence use were delayed or denied. In addition, claims process officials, attorneys, and media representatives generally identified only Native American and Vietnamese individuals with subsistence use and exacerbated intra-community tensions. Likewise, the initial restrictive definition of rig workers who qualified for compensation for job losses failed to recognize even fundamental aspects of the structure of and employment within the offshore petroleum industry. Policy changes, inconsistencies in how these were implemented, and insufficient communication about what was going on contributed to questions about who was in charge and concerns that those in charge were incompetent or were only interested in protecting BP and the federal government. Frustration and anger increasingly focused on key figures such as National Incident Commander Thad Allen, Gulf Coast Claims Facility (GCCF) Administrator Kenneth Feinberg, and President Barack Obama.

Many residents and leaders experienced the *Deepwater Horizon* disaster as more debilitating and the cause of greater stress and anxiety than a hurricane because its effects were unknown, and as facts on the disaster and related response efforts  continued to emerge it created even more negative feelings. Unlike hurricane response, which creates lots of opportunities for locals and sympathetic outsiders to busy themselves with cleaning up and repairing damage, and which can be organized at multiple levels from the household or neighborhood to the entire community, the response to the spill was almost completely top-down. Locally organized efforts to install boom were only partially supported and individuals were expressly prohibited from participating in other activities, such cleaning oiled birds and mammals. Volunteers from outside the region did arrive during the initial phases of the disaster, but community-based organizations struggled to figure out what to do with them due to constraints regarding who could work on

what aspect of the oil spill cleanup. Many people could do little but wait and worry, faced with uncertainly and lack of clarity at local, state, and federal levels about who would be responsible for what.

The nature and form of this disaster, and the mechanisms for responding and compensating individuals for it, also differentiated it from hurricanes. Few resources for social services were channeled to local governments or the non-governmental organizations that help mediate between residents and the systems established to respond to disasters. A few months after the explosion, in the summer of 2010, local officials and social service providers were already predicting when and how key effects would show up and were expressing concern that, once they did appear, the resources to mitigate those effects would be insufficient. In the fall of 2010, following the summer fishing, tourism, and hurricane seasons, the impacts of the disaster were not as great as expected. Less oil had appeared on beaches and in coastal wetlands than had been predicted; no hurricanes had struck the United States that year, and only one tropical storm had moved through the area where the Macondo well blowout had occurred. The monetary inputs that individuals and companies received in exchange for participation in clean-up efforts and payment of initial emergency claims helped reduce the immediate economic effects of the disaster. Throughout 2011, though, specific individuals and groups experienced impacts. The effects included the late winter and early spring struggles of individuals and businesses who had not made enough money during 2010 to weather the slow season and prepare for the late spring/summer season. They also included the challenges facing shrimpers who caught little during the May and August seasons, or could not get a good price for what they did catch, and oilfield workers who had been laid off or whose hours had been cut back and had not been restored. Also during 2011, some individuals received claims money from BP and for a period did not need to take low-wage hourly work. Employers who relied on low-skilled laborers, such as deckhands and roustabouts, complained that, as a result, they could not take advantage of the economic opportunities that were available.

Because of its magnitude and reach, as well as the lack of clear villains and heroes, the disaster was used by many, both within the region and beyond, to reinforce their particular beliefs and perspectives. Whether to attack corporate greed, U.S. dependence on petroleum, or offshore drilling, individuals and organizations traveled to the Gulf region, or used their internet and mail campaigns, to denounce the petroleum industry, government regulators, and people who support the industry. They used the experience of other disasters, most commonly the *Exxon Valdez* oil spill of 1989, to warn residents and leaders of what was to come. Some scientists and activists proposed simplistic models of contamination, exposure, and health effects, failing to take into account the size and complexity of the Gulf ecosystem, the nature and extent of petroleum already in the Gulf, and the interconnectedness of the people and industries there. Later, when initial seafood and health studies showed no effects of the petroleum and dispersants or reported inconclusive results, debates ensued about their accuracy or integrity, further eroding any trust in public officials or scientists and adding to the confusion and worry. Also, global media and communication raised the general awareness of the disaster, and highlighted concerns about contaminated beaches and other negative effects, but then paid little attention to specifics. This led to perceptions that oil was everywhere or that solutions appropriate in places such as Alaska would also work in the Gulf. In the midst of it all were attorneys, some who had practiced within the region for decades and had specific experience helping oilfield workers or fishermen file claims against petroleum companies and others who set up offices within coastal communities to help file claims against BP. Some barraged residents with mailers, billboards,

and television ads, announcing deadlines for filing claims and offering their services. Though local government and non-profit organizations also tried to provide information about the claims process, individuals and businesses expressed confusion over uncertain and often conflicting information they were receiving.

## 9.2. THE ONGOING UNCERTAINTY

As noted throughout this report and in the paragraphs above, a key source of social and economic effects of the *Deepwater Horizon* disaster has been the ongoing uncertainty. Lacking a clear, agreed-upon authority or expert to whom to turn, each individual, household, organization, and community has been forced to sort out for itself who and what to believe, and to adopt a perspective and then justify or legitimize it. Questions about whether or not to eat seafood or invest in a local business persist and have the potential to create conflict and increase divisiveness at every level. This authority gap also opened the doors to many new people and perspectives. During the first year or so after the explosion, the cacophony of voices coming from every direction    from petroleum and seafood suppliers to international environmental organizations and attorneys    was overwhelming for many and added to the stresses of this event. Over time, as the global media shifted its attention elsewhere, quieter, more moderate voices could be heard. Still, much is unknown. The effects of the oil, dispersants, change in economic activity, redirection of community-based and non-governmental organizations, and other such disruptions will continue to play out. Major questions remain about human health and mental health effects, the claims process, the condition of major Gulf fisheries, the fate of deepwater petroleum exploration and production, whether oilfield workers who found jobs elsewhere will return to the Gulf as activity there picks up, and more.

Though many individuals and businesses, and even some local governments, have settled their claims, many very large private and public entities have not. Efforts to dedicate settlement funds to coastal restoration have set the stage for long and protracted discussions and processes regarding what to restore, where, how, and by whom. In addition, federal and state government agencies and academic institutions have devoted resources to investigating the effects of this disaster; BP has dedicated $500 million to fund studies of the environmental and public health effects of oil spills over a 10-year period.

Consequently, Gulf Coast communities and their residents and visitors will continue to live with uncertainty. This uncertainty further exacerbates challenges in communicating what is going on, both within and beyond the region. Key concerns regarding transparency, consistency, and relevance of information will continue to matter as claims processes transition and expire; litigation and legislation advance, are stalled, and change direction; restoration activities get underway; research is carried out; and other programs are implemented. New training and education initiatives, aimed at increasing economic opportunities for locals, will be judged in part on their ability to enable all, particularly those who may lack basic skills or credentials, to participate in these new activities and programs. The process of creating legitimate authorities is still underway and leaders will be accepted because people trust them as much as because of what they know. At the same time, those in positions of responsibility, at the household, organization, and community level, will continue to be required to make decisions about and to act on issues they fail to fully understand.

209





## The Department of the Interior Mission

As the Nation's principal conservation agency, the Department of the Interior has responsibility for most of our nationally owned public lands and natural resources.   This includes fostering the sound use of our land and water resources; protecting our fish, wildlife, and biological diversity; preserving the environmental and cultural values of our national parks and historical places; and providing for the enjoyment of life through outdoor recreation.    The Department assesses our energy and mineral resources and works to ensure that their development is in the best interests of all our people by encouraging stewardship and citizen participation in their care.  The Department also has a major responsibility for American Indian reservation communities and for people who live in island communities.

## The Bureau of Ocean Energy Management Mission

The Bureau of Ocean Energy Management (BOEM) works to manage the exploration and development of the nation's offshore resources in a way that appropriately balances economic development, energy independence, and environmental protection through oil and gas leases, renewable energy development and environmental reviews and studies.