# Exhibit B

01-46044
LC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL
## PENALTY PHASE
## EXPERTS

### *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Mark Van Haverbeke

### October 31, 2014

## *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group • Court Reporting • Video Production • Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    Round 2 report the only reasons that you offer for disagreeing

2    with Captain Paskewich's opinion that the DEEPWATER HORIZON

3    response was extraordinarily effective?

4        A.   Yes.

5        Q.   There are no other bases for your disagreement with

6    Captain Paskewich's opinions about the effectiveness of the

7    Unified Command's response efforts other than those set out on

8    pages 4 and 5, correct?

9               MR. ROBERS:   Object to form.

10       A.   Correct.

11       Q.   (BY MS. JAKOLA) Now, I'd like to ask you some

12   questions about your reasons for disagreeing with Captain

13   Paskewich.  I'm looking at page 5 of your report.  In the

14   paragraph beginning third, in the second sentence, you write,

15   In situ burning and chemically dispersing oil accounted for

16   13 percent of the total oil discharged, while direct recovery,

17   skimming, only amounted to an unremarkable 3 percent of the

18   4.9 million barrels of oil discharged.

19               Do you see that, sir?

20       A.   Yes.

21       Q.   What is the basis for your opinion that 13 percent

22   of the total oil discharged was burned and chemically

23   dispersed?

24       A.   I was using the older oil budget, which has since

25   been amended.

1      Q.    In support of your opinion that 13 percent of the

2  oil from the spill was burned or chemically dispersed, you

3  cite in footnote 29 the oil budget calculator, correct?

4      A.    Correct.

5      Q.    What is the oil budget calculator?

6      A.    Essentially it was an inner-agency group that was

7  directed to put their heads together and come up with a best

8  estimate of what happened to the oil that came out; what was

9  chemically dispersed, what was naturally dispersed, what

10  was -- what evaporated, what was skimmed, what was burned.

11      Q.    Do you consider the oil budget calculator to be a

12  reliable source of information for determining the amount of

13  oil that was skimmed, chemically dispersed, and burned during

14  the response?

15      A.    Yes.

16      Q.    You believe that the oil budget calculator supports

17  your opinions that 13 percent of the oil discharged during the

18  spill was burned and chemically dispersed?

19                MR. ROBERS:   Object to form.

20      A.    As I said earlier, I -- I used the older version.

21  When you re-correct it, the numbers come out differently.

22      Q.    (BY MS. JAKOLA) Why did you use the older version of

23  the oil budget calculator to determine the amounts in your

24  expert report?

25      A.    Simply an error on my part when I was grabbing stuff

1    to do the arithmetic.

2        Q.    You agree that the opinion expressed in your Round 2

3    report, that in situ burning and chemically dispersing oil

4    accounted for 13 percent of the total oil discharged, while

5    direct recovery skimming amounted to an only unremarkable

6    3 percent of the 4.9 million barrels of oil discharged is, in

7    fact, erroneous?

8        A.    Yeah.  I went back and looked at it.  It should be

9    more like 4 -- I mean, 3.8 percent or something.  I don't have

10   the exact numbers in front of me.  It's still below 4 percent.

11   It's still unremarkable.  So looking at the correct oil budget

12   figures, it doesn't change my opinion on the overall response

13   effectiveness.

14       Q.    The statement in your expert report that in situ

15   burning and dispersing oil during the DEEPWATER HORIZON

16   response accounted for only 13 percent of the total oil

17   discharged is, in fact, erroneous, correct?

18                    MR. ROBERS:  Object to form.

19       A.    Yes, based on the revised oil budget.

20       Q.    (BY MS. JAKOLA) The statement in your expert report

21   that burning and chemically dispersing oil accounted for 13

22   percent of the total oil discharged was based on outdated

23   information, true?

24                    MR. ROBERS:  Object to form.

25       A.    Correct.

1    A.   So the numbers, if -- the numbers, as Captain

2  Paskewich pointed out, I got the numbers wrong.

3    Q.   You agree that Captain Paskewich's analysis of the

4  effectiveness of the skimming, in situ burning, and chemically

5  dispersing operations in the DEEPWATER HORIZON response are,

6  in fact, correct?

7         MR. ROBERS:  Object to form.

8    A.   No.

9    Q.   (BY MS. JAKOLA) Do you disagree with the mathematical

10  accuracy of Captain Paskewich's calculations regarding the

11  effectiveness of skimming, burning, and chemical dispersing

12  during the DEEPWATER HORIZON response?

13         MR. ROBERS:  Object to form.

14    A.   No.

15    Q.   (BY MS. JAKOLA) You agree that Captain Paskewich has

16  accurately calculated the effectiveness of skimming, burning,

17  and chemical dispersing operations in the DEEPWATER HORIZON

18  response, true?

19         MR. ROBERS:  Object to form.

20    A.   Yes.

21    Q.   (BY MS. JAKOLA) You also agree that Captain Paskewich

22  has accurately calculated the effectiveness of skimming,

23  burning, and chemical dispersing operations in the other spill

24  responses shown in his expert report, correct?

25         MR. ROBERS:  Object to form.

```
 1        A.    Yes.

 2        Q.    (BY MS. JAKOLA) You also agree that your expert

 3   report inaccurately calculates the effectiveness of the

 4   burning, skimming, and chemical dispersing operations in the

 5   DEEPWATER HORIZON response, true?

 6                    MR. ROBERS:   Object to form.

 7        A.    The calculations were incorrect, but going back and

 8   looking at the arithmetic, using the upper value, I still

 9   stand by my position.

10        Q.    (BY MS. JAKOLA) I'd like to focus on what's in your

11   expert report.  Your expert report contains calculations of

12   the effectiveness of skimming, chemical dispersing, and

13   burning operations in the response, correct?

14                    MR. ROBERS:   Object to form.

15        A.    Correct.

16        Q.    (BY MS. JAKOLA) And you agree that those calculations

17   are incorrect?

18        A.    Yes.

19        Q.    You also agree that those calculations are based on

20   outdated information, true?

21        A.    Yes.

22        Q.    Nowhere in your expert reports do you present an

23   accurate calculation of the effectiveness of the DEEPWATER

24   HORIZON response operations, correct?

25                    MR. ROBERS:   Object to form.
```

1      A.    Based on those wrong numbers, yes.

2      Q.    You used the wrong numbers for your calculations,

3   correct?

4      A.    Correct.

5      Q.    Now, nowhere in your report -- strike that.

6            Nowhere in any of your reports do you present

7   accurate calculations of the effectiveness of the DEEPWATER

8   HORIZON response operations, true?

9            MR. ROBERS:  Object to form.

10     A.    No, because I wasn't aware of it until Captain

11  Paskewich pointed it out in his Round 3 report.

12     Q.    (BY MS. JAKOLA) Well, you were responding, correct,

13  to Captain Paskewich's Round 1 report, right?

14     A.    Correct.

15     Q.    And in Captain Paskewich's Round 1 report, he cites

16  to the accurate information, correct?

17           MR. ROBERS:  Object to form.

18     A.    He does bring up accurate numbers, yes.

19     Q.    (BY MS. JAKOLA) He also cites to source materials

20  that provide the accurate numbers, right?

21           MR. ROBERS:  Object to form.

22     A.    Yes.

23     Q.    (BY MS. JAKOLA) And you had access to that

24  information before you prepared your Round 2 and Round 3

25  reports, correct?

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**

```
 1        A.    Yes.

 2        Q.    And nowhere in any of your three expert reports do

 3   you present the accurate calculations of the effectiveness of

 4   the response operations in the DEEPWATER HORIZON response,

 5   correct?

 6               MR. ROBERS:   Object to form.

 7        A.    Again, I -- I included my calculations in my Round 2

 8   report and did not have the error pointed out until the

 9   Round 3 reports were posted.  So at that point I had no

10   opportunity to go back and correct the numbers.

11        Q.  (BY MS. JAKOLA) Okay.  Well, let's start first and I

12   just want to make sure I'm clear on this:  There is no nowhere

13   in any of your three expert reports where you present accurate

14   mathematical calculations reflecting the effectiveness of

15   operations in the DEEPWATER HORIZON response, correct?

16               MR. ROBERS:   Object to form.

17        A.    Correct.

18        Q.  (BY MS. JAKOLA) Now, looking back at the oil budget

19   calculator which you cited in your Round 2 report, we were

20   looking at page 39.  Do you believe that these are the numbers

21   that you used in determining that 13 percent of the total oil

22   discharged was chemically dispersed and burned during the

23   response?

24        A.    No.  As I said earlier, I think what I did -- and

25   I'm -- if I recall, it does not show in this third -- or
```

1   chemically dispersed and burned, correct?

2              MR. ROBERS:  Object to form.

3       A.   I -- I think I did, but I'm not sure.

4       Q.  (BY MS. JAKOLA) As you sit here today, you can't

5   recall consulting any other sources other than that pie chart,

6   correct?

7       A.   I consulted two sources, which were the two

8   calculators.  When I actually sat down and wrote the report,

9   trying to pull it together, I may have grabbed the pie chart

10  simply because I had it handy and quoted those numbers.  But

11  I don't have the pie chart in front of me to go back and

12  check.

13      Q.   You did not perform any of your own independent

14  calculations to arrive at the conclusion in your report that

15  13 percent of the total oil discharged was chemically

16  dispersed and burned, correct?

17      A.   I --

18              MR. ROBERS:  Object to form.

19      A.   -- I took what I think was this page, the page 39

20  and I -- and marked it up, did the math, made sure I

21  understood where his numbers came from.  But when I actually

22  wrote my report, the thing that was handy, and I'm sorry I was

23  pressed for time -- instead of going back and consulting this,

24  I -- thinking that the other -- the pie chart was the same

25  data, I might have grabbed the numbers off of that.  I'd have

1   to go back and look at my pie chart and see if that's the, in

2   fact, where they came from.

3       Q.  (BY MS. JAKOLA) In any event, sir, you do acknowledge

4   that on page 40 of the oil budget calculator, it shows

5   percentages for the amount of oil that was removed in various

6   ways, correct?

7       A.  Yes, it does.

8       Q.  And if you consult the next page, to the page that

9   you cite in your report, you can see that, in fact, even

10  according to the government's oil budget calculator, it shows

11  that 21 percent of the oil was chemically dispersed and

12  burned, correct?

13              MR. ROBERS:  Object to form.

14      A.  Yes.

15      Q.  (BY MS. JAKOLA) And these percentages we've been

16  talking about, in terms of the amount of oil that was

17  dispersed and burned and skimmed during the response as a

18  percentage of spill volume, all relate to the government's

19  estimate of the spill volume, correct?

20      A.  That's correct.

21      Q.  You're aware that there's a dispute about how much

22  oil was actually spilled, correct?

23      A.  I'm aware of that, yes.

24      Q.  You agree, sir, that using even the government's

25  spill volume estimates, the analysis in your expert report

1  underestimates the effectiveness of the response operations in

2  the DEEPWATER HORIZON spill response, true?

3                    MR. ROBERS:   Object to form.

4       A.   It underestimates the amount of oil that was

5  dispersed and burnt.

6       Q.  (BY MS. JAKOLA) You agree that even using the

7  government's own estimates, the analysis in your expert report

8  of the amount of oil that was burned and chemically

9  dispersed -- strike that.

10                   You agree that even using the government's own

11  estimates, your expert report underestimates the amount of oil

12  that was chemically dispersed and burned during the DEEPWATER

13  HORIZON response, true?

14      A.   I agree that my report underestimated how much was

15  dispersed and burned, yes.

16      Q.   It also underestimates -- strike that.

17                   Your expert report also underestimates the

18  amount of oil that was skimmed during the DEEPWATER HORIZON

19  response, true?

20      A.   Yes, but the change there is marginal.

21      Q.   How much more -- how much -- strike that.

22                   How many barrels of oil was skimmed during the

23  DEEPWATER HORIZON response, in your opinion?

24      A.   I don't have -- I could look up the amount that was

25  skimmed, but it was around 3.8 percent.  I have a hard time

1     Q.   Comparing the outdated information that you relied

2  on for your expert report to the current information that the

3  government estimates was chemically dispersed, burned, and

4  skimmed in the response, do you see that the government

5  currently estimates that roughly 400,000 more barrels were

6  removed through those response efforts as compared to the old

7  version that you used?

8                MR. ROBERS:  Object to form.

9     A.   No, because I don't agree that dispersing oil, which

10  is where the biggest difference is in these two charts, is

11  removing the oil.

12     Q.  (BY MS. JAKOLA) Well, I'm going to not focus on the

13  removal, the word -- the use of the word "removal."  I want to

14  ask you about just the figures now.

15          The current version of the oil budget

16  calculator estimates that approximately 400,000 more barrels

17  of oil was chemically dispersed, burned, and skimmed as

18  compared to the outdated information that you used for your

19  expert report, correct?

20     A.   That's correct.  But before you said removed, which

21  is not correct.  It's just -- just to make sure we're --

22     Q.   And so I clarified my question.  So let me just ask

23  it again so that the record is clear.

24          The current version of the oil budget

25  calculator estimates that approximately 400,000 more barrels

1   of oil was chemically dispersed, burned, and skimmed as

2   compared to outdated information that you used for your expert

3   report, correct?

4       A.   Yes.

5       Q.   Sir, can you please turn to Tab 76 of your binder?

6       A.   Which binder?

7       Q.   The volume 4?

8       A.   This one goes to 75.

9              MS. JAKOLA:  And counsel, can we please mark

10  this one as Exhibit 13522?

11             (Exhibit No. 13522 marked for identification.)

12             MS. JAKOLA:  For the record, 13522 is the

13  United States Third Supplemental Response to Defendant's First

14  Set of Discovery Requests to the United States of America

15  Relating to the Clean Water Act Penalty Phase.

16      Q.   (BY MS. JAKOLA) Captain VanHaverbeke, have you seen

17  Exhibit 13522 before?

18      A.   Yes.

19      Q.   Did you see Exhibit 13522 before you submitted your

20  expert reports in this case?

21      A.   I remember reading a couple of these supplementals,

22  I think this one may have been one of them.  I don't -- this

23  is -- so I -- I don't remember if I actually looked at this

24  one in detail or not.

25      Q.   Turning to page 5 of Exhibit 13522, do you see that

 1    to an even 5 million barrels as opposed to 4.9.

 2        Q.  (BY MS. JAKOLA) You agree that the amount of oil that

 3    the United States contends was chemically dispersed, burned,

 4    and skimmed in their third supplemental response to

 5    defendants' interrogatory corresponds with the amount of oil

 6    that the current version of the oil budget calculator reflects

 7    was dispersed, burned, and skimmed, correct?

 8        A.   Yes, I think the difference, just quickly looking at

 9    it, is the amount recovered via RIT and TOP HAT.

10        Q.   The amounts shown for chemical dispersion, burning,

11    and skimming in the United States third supplemental

12    interrogatory request corresponds to the amounts for those

13    same measures as shown in the current version of the oil

14    budget calculator?

15        A.   Yes.

16        Q.   Okay.  Captain VanHaverbeke, I'd like to turn back

17    to Captain Paskewich's expert report.  The portion to which

18    you're responding is in Tab 4 of your binder, page 19 and 20

19    of his report, sir.

20            Do you see on page 20 of Captain Paskewich's

21    Round 1 expert report that Captain Paskewich cites several

22    times the United States third supplemental interrogatory

23    response to support his calculations about the effectiveness

24    of the DEEPWATER HORIZON response measures, correct?

25        A.   Correct.

1      Q.   You had -- Captain Paskewich's Round 1 report when

2  you prepared your Round 2 report, correct?

3      A.   Correct.

4      Q.   Sir, we've been talking about, back to your Round 2

5  report in Tab 2, page 5, we've been talking about the

6  statement that in situ burning and chemically dispersing oil

7  accounted for 13 percent of the total oil discharge, correct?

8      A.   Correct.

9      Q.   And we've established that that assertion in your

10  expert report is incorrect and based on outdated information,

11  true?

12      A.   That's correct.

13           MR. ROBERS:   Object to form.

14      A.   That's correct.

15      Q.   (BY MS. JAKOLA) Now, in the remaining portion of that

16  sentence, you also state that 4.9 million barrels of oil was

17  discharged.   Do you see that, sir?

18      A.   Yes.

19      Q.   Do you believe that the United States, in this case,

20  contends that a total of 4.9 million barrels of oil was

21  discharged?

22      A.   No.

23      Q.   How much oil do you understand the United States

24  contends was discharged during the spill?

25      A.   Something on the order of 4.1 million barrels.   When

```
 1  spill volume estimate in calculating the effectiveness of

 2  efforts by the Unified Command to respond to the spill,

 3  correct?

 4              MR. ROBERS:  Object to form.

 5      A.   I used it in calculating the amount of oil that was

 6  dispersed or burned, put into the environment and not removed.

 7      Q.   (BY MS. JAKOLA) And you agree -- and you agree that

 8  you used an incorrect spill volume estimate in performing

 9  those calculations, true?

10      A.   That's correct.

11      Q.   The effect of -- strike that.

12              Now, earlier in that paragraph, sir, you write

13  that measuring against oil available for recovery ignores the

14  67 percent of the oil discharged and deemed unrecoverable.

15              Do you see that, sir?

16      A.   Yes.

17      Q.   And that's another criticism that you have of

18  Captain Paskewich's analysis?

19      A.   That's correct.

20      Q.   What is the basis for your assertion that 67 percent

21  of the oil discharged was deemed unrecoverable?

22      A.   Again, I would have to go back probably to that pie

23  chart.  That might have been showing 67 percent.

24      Q.   So again, your statement that Captain Paskewich was

25  wrong in his analysis is based on the outdated oil budget
```

1      Q.   (BY MS. JAKOLA) But you agree that your statement

2   that 67 percent of the oil was deemed unrecoverable is based

3   on the old version of the oil budget calculator?

4      A.   I agree with that, yes.

5      Q.   And you agree that the information in the oil budget

6   calculator -- strike -- you -- strike that.

7            You agree that the information in the old oil

8   budget calculator is outdated, correct?

9      A.   Yes.

10     Q.   You also agree, then, that the statement that

11  67 percent of the oil that was discharged is deemed

12  unrecoverable is no longer correct and is outdated, right?

13            MR. ROBERS:   Object to form.

14     A.   I agree that that number is probably off.  I haven't

15  figured out what the correct number is.

16     Q.   (BY MS. JAKOLA) Sir, you could calculate the amount

17  of oil that the United States currently contends was

18  unavailable for recovery by using the figures in the

19  government's third supplemental interrogatory, correct?

20     A.   Yes, I think it's got the detail in there.

21     Q.   And sitting here today, do you have any reason to

22  disagree that according to the United States third

23  supplemental interrogatory response, in fact, roughly

24  53 percent of the oil was deemed unrecoverable?

25     A.   I haven't done the math, but --

1      Q.   Okay.

2      A.   -- if that's what the math comes out to, I'm willing

3   to stipulate that.

4      Q.   Now, and assuming that's the case, you would then

5   agree that the statement in your report, that 67 percent of

6   the oil discharged was deemed unrecoverable is incorrect?

7      A.   Yes.

8      Q.   Now, we've identified several errors in the

9   calculations in your report.  Are there any other errors in

10  your expert reports?

11           MR. ROBERS:  Object to form.

12     A.   I don't know.

13     Q.   (BY MS. JAKOLA) I would like to ask you about the

14  statement on page 9 of your Round 2 report.

15     A.   Page --

16     Q.   The very last sentence of your Round 2 report, sir,

17  you write, Despite the extraordinary effort of the Unified

18  Command, only one third of the oil discharged from the well

19  was chemically dispersed, burned, skimmed, or directly

20  recovered from the wellhead.

21           Do you see that?

22     A.   Yes.

23     Q.   Again, that statement is incorrect, right?

24     A.   I'd have to go back and --

25           MR. ROBERS:  Object to form.

1   chemically dispersed, burned, skimmed, or directly recovered

2   from the wellhead during the DEEPWATER HORIZON response, true?

3            MR. ROBERS:  Object to form.

4       A.   I have -- I have not gone back and redone my

5   calculations.

6       Q.   (BY MS. JAKOLA) Before moving back to Captain

7   Paskewich's analysis, I want to make sure I've got this right.

8   In your expert report you miscalculate the total effectiveness

9   of the response measures that the Unified Command used in the

10  response, true?

11           MR. ROBERS:  Object to form.

12      A.   No, I miscalculated the amounts of oil that were

13  burned, dispersed, or collected.

14      Q.   (BY MS. JAKOLA) In your expert report, you

15  miscalculated the total amounts of oil that was burned,

16  dispersed, and skimmed during the DEEPWATER HORIZON response

17  true?

18           MR. ROBERS:  Object to form.

19      A.   Yes.

20      Q.   (BY MS. JAKOLA) You used outdated and incorrect

21  information in calculating the amount of oil that was burned,

22  skimmed, and chemically dispersed, correct?

23           MR. ROBERS:  Object to form.

24      A.   Yes.

25      Q.   (BY MS. JAKOLA) You used outdated and incorrect

1  information about the amount of oil that the U.S. claims was

2  spilled during the response, correct?

3      A.   I -- yes, I used the wrong numbers.

4      Q.   You used outdated and incorrect information about

5  the amount of oil that the U.S. claims was consumed due to

6  natural processes, correct?

7              MR. ROBERS:  Object to form.

8      A.   Yes, it looks like those numbers are off as well.

9      Q.  (BY MS. JAKOLA) You did not adjust the spill volume

10  figure that you used to account for the 810,000 barrels of oil

11  that was collected from the source, true?

12      A.   When I wrote this, I was looking at the graph with

13  the percentages, I think.  Again, I'd have to go back and

14  confirm that, which I don't -- I don't recall.  I think it had

15  a separate breakout for the amount directly recovered.

16      Q.   Correct.  And so as percentage, when you were

17  calculating the effectiveness of skimming, burning, and

18  dispersing, you did not reduce or adjust the spill volume to

19  reflect the 810,000 barrels of oil that was recovered --

20      A.   I'm not sure.

21      Q.   -- from the source --

22              MR. ROBERS:  Object to form.

23      A.   -- I'm not sure.  I would have to go back and look.

24  I think that -- I think that pie chart might have had a

25  segment for direct recovery, but I don't remember.

1    you disagree with Captain Paskewich's opinion that the EPA

2    acted in a manner that was inconsistent with the National

3    Contingency Plan in connection with dispersant applications

4    during the DEEPWATER HORIZON response, true?

5         A.    That's true.

6         Q.    Do you believe that the EPA acted appropriately in

7    connection with the issuance of addenda 2 and 3 during the

8    response?

9         A.    Yes.

10        Q.    You set forth five different reasons as your bases

11   for disagreeing with Captain Paskewich in your report.  Do you

12   see that, sir?

13        A.    Yes.

14        Q.    And you do that on pages 6 through pages 8 of your

15   Round 2 report, correct?

16        A.    Yes.

17        Q.    Do the five reasons that you've specified in your

18   Round 2 report at pages 6 through 8 reflect all of your bases

19   for disagreeing with Captain Paskewich?

20             MR. ROBERS:  Object to form.

21        A.    Upon further reflection, I -- I think, if I had to

22   write this over again, I would take a step back and rather

23   than focusing on his positions, focus more on the

24   responsibility of the president under OPA 90 and the

25   administrator of the EPA under -- maybe OPA 90, but certainly

Q.   And those minutes don't reflect any kind of
recommendation that addendum 3 should be signed, correct?

A.   I don't recall seeing any, but I'd have to go back
and confirm.

Q.   In fact, the advice that was coming to Admiral
Landry to sign addendum 3 was coming from senior EPA
officials, correct?

MR. ROBERS:   Object to form.

A.   I think the advice was coming from the EPA where
they have a responsibility to help direct a major event.

Q.   (BY MS. JAKOLA) Now, in forming your opinions in this
case, you did not rely on the contemporaneous correspondence
that was exchanged between EPA officials and Admiral Landry on
May 25th and May 26th, leading up to the issuance of
addendum 3, true?

A.   You mean the series of Emails?

Q.   Correct.

A.   No.  I relied more directly on my conversation with
Admiral Landry.

Q.   You did not consider the contemporaneous
communications between Admiral Landry and EPA and other Coast
Guard officials in forming your opinions, true?

A.   Not specifically, no.

Q.   Now, let's take a look at some of those
communications.  Please turn to Tab 52 of your binder.

1   later at 10:44 a.m., do you see that, right above --

2       A.   Yes.

3       Q.   And Admiral Landry writes, I know you two are trying

4   to help me, but this is a tough one and we'll have a bit of a

5   ripple with EPA.  I have not signed the directive.  I was not

6   going to because I was focused on TOP KILL and I was letting

7   them go back and forth.  Had no intention of letting it

8   distract me.

9               Do you see that?

10      A.   I see that's what she says here, yes.

11      Q.   And is it fair to say as of 10:44 a.m. on

12  May 26th, Admiral Landry had not signed the directive and

13  had not -- and had no intention of signing the directive?

14              MR. ROBERS:  Object to form.

15      A.   I -- I don't think that's what she was saying.

16  Again, the questions are lacking -- these whole discussion

17  lacks the context that, going all the way back to April, when

18  the use of subsea dispersants was first suggested.  The idea

19  was maybe instead of putting as much dispersant down as we are

20  doing, there's a better way of doing this, which was go

21  subsea, which would allow a reduction in surface dispersant,

22  and that's -- what my point was, all this lacks that context.

23      Q.   (BY MS. JAKOLA) What is your basis for your

24  understanding of that context, these particular Emails?

25      A.   Discussion with Admiral Landry.

1      Q.   Your interview of Admiral Landry?

2      A.   Yes.

3      Q.   Do you have any other basis other than the interview

4  you conducted of Admiral Landry in connection with your expert

5  work in this case for that context?

6      A.   I --

7            MR. ROBERS:  Object to form.

8      A.   -- I'd have to go back and confirm it, but I know

9  there were some discussions mentioned in the commission to

10 look at the DEEPWATER HORIZON oil spill.  I think

11 Administrator Lisa Jackson of the EPA and maybe even Admiral

12 Allen mentioned that the discussions have been going on.

13     Q.   (BY MS. JAKOLA) Other than the National Commission

14 testimony that you've mentioned and the interview you

15 conducted of Admiral Landry, do you have any other basis for

16 your context about these Emails?

17           MR. ROBERS:  Object to form.

18     A.   For the -- I'm not sure -- would you repeat the

19 question?

20     Q.   (BY MS. JAKOLA) Other than -- other than your

21 interview of Admiral Landry and the materials you've mentioned

22 in connection with the National Commission work, do you have

23 any other basis for the context around the way in which

24 dispersant decisions were made in the DEEPWATER HORIZON

25 response?

1              MR. ROBERS:  Object to form.

2      A.   No.

3      Q.   (BY MS. JAKOLA) Now, at the top of Exhibit 13531 at

4  10:56 a.m., do you see that Admiral Landry writes, again, to

5  Captain Hanzalik that she is not going stop dispersants?

6              MR. ROBERS:  Object to form.

7      A.   Yes.

8      Q.   (BY MS. JAKOLA) Please turn to Tab 60, and let's mark

9  this as Exhibit 13532.

10             (Exhibit No. 13532 marked for identification.)

11             MS. JAKOLA:  For the record, Exhibit 13532 is a

12  May 26th, 2010, Email from Admiral Landry at 10:59 a.m.

13  forwarding an Email from Ms. Tulis at 10:45 a.m. on May 26.

14     Q.   (BY MS. JAKOLA) Sir, have you seen Exhibit 13532

15  before?

16     A.   Yes.

17     Q.   Now, in this Email, Admiral Landry writes to

18  Ms. Tulis, Mr. Coleman, Captain Lloyd, Captain Hanzalik and

19  others to say that she is standing by and ready to sign the

20  directive, correct?

21     A.   Correct.

22     Q.   And this Email is sent just three minutes after she

23  Emails Captain Hanzalik and said she is not stopping

24  dispersants, correct?

25             MR. ROBERS:  Object to form.

1    13535.

2                    (Exhibit No. 13535 marked for identification.)

3                    MS. JAKOLA:   For the record, 13535 are

4    handwritten notes Bates labeled US-PP-MDH 004121 through 23.

5         Q.   (BY MS. JAKOLA) Sir, have you seen Exhibit 13535

6    before?

7         A.   Yes.

8         Q.   What is it?

9         A.   It's my notes from my telephone conference with

10   Admiral Landry.

11        Q.   When did you interview Admiral Landry?

12        A.   I don't recall the date.

13        Q.   There seems to be a notation on the top of the page?

14        A.   Oh, there it is, yes.   Okay.

15        Q.   Does that help refresh your recollection?

16        A.   It looks like 2 September 2004.

17        Q.   On September 2nd, 2014 you interviewed Admiral

18   Landry?

19        A.   Yes.

20        Q.   Now, who was present at that meeting?

21        A.   Gordon Young, Brandon Robers, Brian Judge, and I

22   wrote down Matt, I don't recall who Matt was.

23        Q.   Was this a Nat -- was this a in-person meeting or a

24   telephone meeting?

25        A.   Telephone.

```
 1      Q.   How many times did you interview Admiral Landry?

 2      A.   Once.

 3      Q.   Have you -- strike that.

 4           Did someone suggest to you that you should

 5  interview Admiral Landry?

 6      A.   I think the offer was made to set up an interview

 7  and I agreed to it.

 8      Q.   Do these notes accurately reflect the conversation

 9  that you had with Admiral Landry?

10      A.   Yes.

11      Q.   Did you --

12      A.   To the extent -- I don't know if you know Admiral

13  Landry.  I can't write as fast as she talks, and I certainly

14  can't write the volume she talks.  So, if you look at these,

15  you'll even -- I suspect you'll see there's places where I was

16  scribbling so fast I can't read my own writing and there's

17  probably some hanging sentences because she was already three

18  ideas ahead of me.

19      Q.   Now, you tried your best to write down the important

20  points from your conversation; is that right?

21      A.   I tried to capture her key points, yes.

22      Q.   Did Admiral Landry tell you anything noteworthy

23  during the interview as it relates to your opinions in this

24  case that did you not record on your notes?

25      A.   It looks like I got it all.
```

1      Q.   Now, did you discuss addendum 3 with Admiral Landry?

2      A.   Yes, we discussed the signing of it.

3      Q.   Did Admiral Landry tell you that she thought

4 addendum 3 was a good idea?

5      A.   She told me in the greater context she agreed with

6 the concept, yes.

7      Q.   Now, what did Admiral Landry tell you about

8 addendum 3 and why she signed it?

9      A.   Basically it started with their discussions in April

10 regarding the use of subsea dispersants, and by the time they

11 got to late May and had gone into full-time use of subsea

12 dispersants, reducing the amount of oil on the surface, then

13 in order to reduce the total amount of dispersants they were

14 putting down, which would reduce the total amount of oil going

15 into the water column, then they -- a decision was the

16 dispersant should be the third tool out of the tool box, if

17 you will.

18      Q.   Did Admiral Landry specifically say who they were?

19      A.   She mentioned Lisa Jackson, NOAA, and I -- I can't

20 frankly read my -- a third name, and I think there was

21 somebody else.  Basically she ripped off a bunch of names and

22 just in my shorthand that's what I captured.

23      Q.   Now, did Admiral Landry tell you anything else about

24 the signing of addendum 3?

25                MR. ROBERS:   Object to form.

1       A.   She told me -- she told me essentially what I

2  captured in here.

3       Q.   (BY MS. JAKOLA) Now, at this meeting -- strike that.

4            During this telephone conference with Admiral

5  Landry, there was no one from BP on the phone, correct?

6       A.   Correct.

7       Q.   As far as you know, no one from BP was invited to

8  join this telephone conference, correct?

9       A.   Correct.

10      Q.   Now, looking at the first page of Exhibit 13535 in

11  your handwritten notes, the second paragraph from the bottom,

12  seems to write, Hanzalik made it sound like White House

13  directed.

14            Do you see that?

15      A.   Yes.

16      Q.   Do you understand that to be a reference to Captain

17  James Hanzalik?

18      A.   Yes.

19      Q.   And she said Hanzalik made it sound like White House

20  directed.  Is that something she told you?

21            MR. ROBERS:   Object to form.

22      A.   Yes.

23      Q.   (BY MS. JAKOLA) Did Admiral Landry review a copy of

24  Captain Hanzalik's deposition transcript in this case?

25      A.   I don't know.

```
 1        A.    Yes.

 2        Q.    Did Admiral Landry review a copy of Captain

 3   Paskewich's expert reports in this case?

 4        A.    I think so, yes.

 5        Q.    She provided comments to you about Captain

 6   Paskewich's reports?

 7        A.    These comments here.

 8        Q.    What did she tell you about Captain Paskewich's

 9   expert reports?

10        A.    These comments here.

11        Q.    Can you please summarize the substance of your

12   conversation with Admiral Landry about Captain Paskewich's

13   expert reports?

14        A.    Well, she said two comments; one was the issue about

15   Anderson Cooper, and as I recall, there was a cove or

16   something that he was going back to time and again that looked

17   like we weren't doing anything.  The Coast Guard was ready and

18   willing to clean it up.  But the locals wouldn't tell us where

19   it was.  So, it was kind of a -- I don't know how you would

20   put it, but basic, obviously, the locals were playing some

21   gamemanship by maintaining this oily spot so they could host

22   Anderson Cooper.

23        Q.    You understand that Admiral Landry reviewed Captain

24   Paskewich's expert reports in this case and provided comment

25   on those reports to you when you interviewed her on
```

1    September 2nd, 2014?

2         A.   Yes.

3         Q.   And in particular, she's referring here with respect

4    to the incident with Anderson Cooper, to something described

5    in one of Captain Paskewich's reports, correct?

6         A.   I -- yeah, I think Captain Paskewich -- I would have

7    to go back and check.  Frankly, I've seen so much stuff in the

8    last couple of weeks, it boggles my mind.  But somewhere in

9    there the reference is made to Billy Nungesser and Anderson

10   Cooper and whether that was Captain Paskewich's report,

11   I don't know.  But she was trying to give me some context.

12   And it wasn't like we were trying to dodge it.  We just

13   couldn't find it.

14             And the second comment in there was the -- this

15   was not a BP response.  It was a unified effort with the Coast

16   Guard and other federal agencies and that it really became a

17   team effort.  And she gave as an example, the National Weather

18   Service, which Captain Paskewich hadn't mentioned, but they

19   were -- while they were small perhaps in terms of the close to

20   100,000 people that were out there, they did provide a

21   critical role in this.

22        Q.   Now, in Captain Paskewich's expert reports, there's

23   a description about the circumstances in which addendum 3 was

24   signed, correct?

25        A.   Yes.

1      Q.   And your understanding is that Admiral Landry

2   reviewed that discussion and provided comments to you,

3   reactions to you about that discussion, correct?

4      A.   Yes.

5      Q.   Did she tell you that on May 26th, she was

6   directed by senior administrators in the White House and the

7   EPA to sign addendum 3?

8      A.   No.  What she told me was what's in the last

9   paragraph, clearly understood that federal on-scene

10  coordinator could do what she needed to do for safety.  There

11  were -- there were negotiations, but in the course of the

12  protocol development.

13     Q.   Did Admiral -- strike that.

14              Your notes in Exhibit 13535 are your

15  handwritten notes, correct?

16     A.   Correct.

17     Q.   And as you mentioned, you, while you did your best

18  to transcribe what was being said to you, you may not have

19  recorded everything she said during that interview, correct?

20     A.   Correct.

21     Q.   Now, I'd like to turn to the FOSC report, which is

22  Tab 7 in your first binder, page 38.

23     A.   In the first binder?

24     Q.   In the first binder, Tab 8.  But before I ask you

25  about this particular graph on page -- if you could turn to