# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL BY  THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | *  MDL NO. 2179<br>*<br>*  SECTION J<br>* |
| This document relates to:<br><br>   No. 10-4536 | *<br>*  HONORABLE CARL J. BARBIER<br>*<br>*  MAGISTRATE JUDGE SHUSHAN<br>* |

## BPXP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY REGARDING SPECULATIVE ENVIRONMENTAL HARM

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Elissa J. Preheim
Eric A. Rey
ARNOLD & PORTER LLP
555 12th St., N.W.
Washington D.C. 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-59999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
 Facsimile: (504) 556-4108

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*

**TABLE OF CONTENTS**

Page

**INTRODUCTION** .................................................................................................................. 1

**LEGAL STANDARD** ............................................................................................................. 3

**ARGUMENT** .......................................................................................................................... 4

I.     THE SPECULATIVE ENVIRONMENTAL OPINIONS MUST BE EXCLUDED .. 6

       A.    **Speculative Harm to Fish and Shellfish Populations** ......................................... 7

       B.    **Speculative Harm to Oysters** .............................................................................. 9

       C.    **Speculative Harm to Organisms on the Seabed** ................................................. 9

       D.    **Speculative Harm Related to Fish Lesions** ...................................................... 10

       E.    **Speculative Harm to Deep-Sea Planktonic and Swimming Organisms** .......... 10

       F.    **Speculative Harm to Bird Populations** ............................................................. 11

       G.    **Speculative Harm to Turtle Populations** .......................................................... 11

II.    THE UNITED STATES WILL HAVE AN OPPORTUNITY TO PROVE
       ENVIRONMENTAL IMPACT LATER IN THE NATURAL RESOURCE
       DAMAGES LITIGATION ........................................................................................... 12

III.   THE UNITED STATES CANNOT CIRCUMVENT THE RULES OF
       EVIDENCE IN ORDER TO SPECULATE ABOUT POTENTIAL
       ENVIRONMENTAL HARM ....................................................................................... 13

**CONCLUSION** .................................................................................................................... 15

## INTRODUCTION

BPXP's environmental experts reviewed real-world data to evaluate the actual and potential environmental impacts from the *Deepwater Horizon* oil spill. For example, Dr. Damian Shea, a nationally-renowned toxicologist, analyzed over 18,000 water samples and 8,000 sediment samples and concluded, based upon the U.S. Environmental Protection Agency's ("EPA's") own toxicity thresholds, that "[t]he few areas where there was *potentially* harmful exposure to chemicals were limited in space and time, mostly in the area very close to the wellhead during the summer of 2010."[1] Similarly, Dr. John W. Tunnell, an ecologist and biologist who has studied the Gulf for 40 years, compared fisheries and wildlife populations to pre-Spill trends (in addition to evaluating other publicly available data and literature), and concluded that, "there were no significant adverse impacts to fish, shellfish, and bird populations in the northern Gulf of Mexico as a result of the *Deepwater Horizon* oil spill, nor is there any evidence of significant or large-scale impacts to deep-sea corals, sea turtles, or dolphins."[2]

In contrast, the United States' environmental experts Dr. Donald Boesch and Dr. Stanley Rice have speculated repeatedly about what types of environmental impact *might* have occurred, admitting freely that "it is easy to speculate" about certain environmental harms.[3] With respect to one theory of potential environmental harm (phototoxicity), Dr. Rice admitted: "Is it

---

[1]  Dr. Shea's Round 1 Report at 3 (Aug. 15, 2014) (Exhibit A) ("Ex. A, Shea Round 1 Rpt.").

[2]  Dr. Tunnell's Round 2 Report at 1 (Sept. 12, 2014) (Exhibit B) ("Ex. B, Tunnell Round 2 Rpt."). Also, BPXP's shoreline expert, Dr. Elliott Taylor, a Ph.D. environmental scientist with over 30 years of experience responding to oil spills, evaluated extensive shoreline vegetation data and concluded that the marshes and wetlands impacted by the spill recovered quickly in nearly all areas. Dr. Taylor's Round 1 Report at 1-2 (Aug. 15, 2014) (Exhibit C) ("Ex. C, Taylor Round 1 Rpt.").

[3]  Dr. Rice's Round 3 Report at 15-16 (Sept. 26, 2014) (Exhibit D) ( "Ex. D, Rice Round 3 Rpt.").

1

speculative?  Yes, I suppose it is."[4]  In most of these cases, the U.S. experts did not look for, much less analyze, actual data collected as part of the *Deepwater Horizon* environmental investigation.[5]  This is especially egregious where, as here, nearly all of the data are publicly available, and the United States itself has led the environmental investigation.[6]  Incredibly, when asked if he looked for certain environmental data available even on public websites, Dr. Rice admitted that "[i]t's not my strong suit."[7]  Over and over again, the United States' experts ignored actual data and elected instead to merely speculate about possible environmental harm.

Applying the most charitable interpretation, the U.S. experts' speculation about possible harm amounts to nothing more than scientific hypotheses.  But a scientist's hypothesis is not evidence of actual, or even potential, environmental harm.  A scientific hypothesis is just a theory that may or may not require additional investigation, and may or may not turn out to be correct.  A scientific hypothesis is not, and should not be, the basis for assessing a civil penalty.

Accordingly, pursuant to Federal Rule of Evidence 702 ("FRE 702"), BPXP moves to exclude those opinions of U.S. experts Dr. Boesch and Dr. Rice that speculate regarding the extent of environmental harm resulting from the Spill.  If the United States eventually comes to believe as part of its NRDA investigation that environmental harm of the type now speculated

---

[4]  Dep. of Dr. Stanley Rice, *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010* at 270:2-3 (Oct. 30, 2014) (Exhibit E) ( "Ex. E, Rice Dep.").

[5]  *E.g.*, *id.* at 291:14 - 294:2  ("Q.  But did you look for public data related to birds from the DEEPWATER HORIZON?  A.  No. . . . Q.  Did you look on the government's data -- website for bird data?  A.  No. . . .").

[6]  The United States has made clear that it will seek substantial additional money from BPXP based on its natural resource damages ("NRD") legal claim.  All of the Parties agree that the Penalty Phase is not an NRD trial.  However, the fact that there is a future proceeding regarding the formal quantification of natural resource damages does not give the United States free reign to ignore environmental data available to it now (especially where they seek to penalize BPXP based upon alleged potential environmental harm), nor does it provide the United States a license to supplant evidence with speculation.

[7]  Ex. E, Rice Dep. at 291:14-23.

about has *in fact* occurred, it can present proof of such harm as part of its NRD claim.  But having chosen to proceed with its civil penalty lawsuit now, it cannot rely on speculation rather than data to support its claim for a Clean Water Act ("CWA") penalty.

## LEGAL STANDARD

FRE 702 governs the admissibility of expert witness testimony and requires in part that the opinion testimony be based on "***more than subjective belief or unsupported speculation***" in order to be admissible.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-590 (1993) (emphasis added).[8]  In other words, unsubstantiated scientific hypotheses are not appropriate evidence in a courtroom:

> [T]here are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory.  Scientific conclusions are subject to perpetual revision.  Law, on the other hand, must resolve disputes finally and quickly. . . . Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past.

*Id.* at 596-97.  "In short, [FRE 702's] requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590.

"[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and therefore, are reliable."  *Moore*, 151 F.3d at 276.  The cornerstone of reliable, admissible expert opinion testimony is that it must be based on the then-available data.  *See id.* ("[T]he law cannot wait for future scientific investigation and research.  We must resolve cases in our courts on the basis of

---

[8] *See also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) *(en banc)* ("'[U]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.'") (citation omitted); *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) ("'[I]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.'") (citation omitted).

3

scientific knowledge that is currently available."); *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 381 n.33 (5th Cir. 2010) ("Law lags science; it does not lead it." (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996))).

Indeed, courts have repeatedly refused to admit the testimony of experts who have attempted to use speculation to bridge the divide between the available data and their opinions. *See, e.g.*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). For example, in *Johnson v. Arkema, Inc.*, the Fifth Circuit affirmed the district court's exclusion of an expert's testimony in a toxic tort case when the expert "failed to come forth with any scientific data to support" his opinion and actually "acknowledged that there is scant scientific evidence" that supported his opinion. 685 F.3d 452, 463 (5th Cir. 2012).

In sum, "the whole point of *Daubert* is that experts can't 'speculate.'" *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (reversing the admission of an expert's speculative testimony when the district court believed that "'as an expert, he can speculate'").

## ARGUMENT

The United States has designated both Dr. Boesch and Dr. Rice (collectively, "U.S. Experts") as experts who may testify in the Penalty Phase regarding the extent of the Spill's environmental harm. Review of their expert reports and deposition testimony reveals, however, that the U.S. Experts, time and again, have speculated about types of environmental harm that *might* have occurred, in defiance of FRE 702. For example, the U.S. Experts offer the following speculative opinions of environmental harm (collectively, "Speculative Environmental Opinions"):

4

(1) ***Population Effects on Fisheries*** -- Drs. Boesch and Rice both agree that is it "premature" to reach conclusions about whether there were impacts to fish and shellfish populations from the Spill; over and over again, Dr. Rice says that any hypothesis of major population impacts would be mere speculation.

(2) ***Oysters*** -- Dr. Boesch says that he is "concerned" about potential impacts to oysters while nonetheless admitting that he is aware of "no evidence" suggesting that oysters were in fact harmed by oil. Dr. Rice also has no such evidence.

(3) ***Seabed Organisms*** -- Despite his opinion in his expert report that there is "potential harm to organisms living on the seabed," Dr. Boesch himself admits that it is "*premature to speculate* about the extent and duration of hydrocarbon contamination of continental shelf sediments and the actual harm that resulted."

(4) ***Fish Lesions*** -- As revealed in his deposition, Dr. Boesch's assertion of potential harm related to fish lesions contradicted the express conclusions of the lone study he relied upon and is based upon nothing more than his "judgment."

(5) ***Deep-sea Organisms*** -- Dr. Boesch acknowledges that his opinion of "potential harm" to "planktonic and swimming organisms living at the depths of the deep-sea…" cannot be supported by the available data.

(6) ***Birds*** -- Dr. Rice freely admits that, in order to reach his assertion of harm caused by modeled impacts to bird populations, he reaches beyond the actual data, preferring to speculate as to the extent of harm (and why not, as, in his own words, "it is easy to speculate" about environmental harm).

(7) ***Turtle Populations --*** Dr. Boesch speculated in his expert report that the Spill was one of the "[p]ossible reasons" for the increased turtle standings from 2011 - 2013 compared to historical trends, but conceded in his deposition that he has never seen any evidence of direct harm to sea turtles or their nests.

(8) ***Phototoxicity*** -- In his reports, Dr. Rice discussed a possible increase in oil toxicity resulting from sunlight, and criticized BPXP's expert for not considering such theoretical effects.[9] In his deposition, however, Dr. Rice admitted with regard to phototoxicity in the Gulf: "Is it speculative? Yes, I suppose it is."[10]

---

[9] Dr. Rice's Round 1 Report at 17-18 (Aug. 15, 2014) (Exhibit F) ("Ex. F, Rice Round 1 Rpt."); Ex. D, Rice Round 3 Rpt. at 7.

[10] Ex. E, Rice Dep. at 270:2-3.

5

## I.     THE SPECULATIVE ENVIRONMENTAL OPINIONS MUST BE EXCLUDED

The Speculative Environmental Opinions are precisely the type of "subjective belief or unsupported speculation" that must be excluded under FRE 702.  *Daubert*, 509 U.S. at 589-90.

First, the U.S. Experts themselves *admit* that there is no basis in the data to support these opinions or that it is premature to reach any conclusions, rendering the opinions inadmissible under FRE 702.  *See, e.g.*, FRE 702(b) (requiring expert testimony to be "based on sufficient facts or data").  These admissions are remarkably similar to the expert's admission in *Johnson v. Arkema, Inc.* "that there [was] scant scientific evidence" to support his conclusion—an admission the Fifth Circuit relied upon to exclude the expert's testimony.  685 F.3d at 463.

Moreover, much of the Speculative Environmental Opinions lack the hallmarks of scientifically reliable opinions, including being testable and verifiable.  *See, e.g.*, *Moore*, 151 F.3d at 275 (noting that the *Daubert* reliability factors include "whether the expert's theory can be or has been tested" and "the known or potential rate of error of a technique or theory when applied").  Instead, in many cases, the U.S. Experts merely assert the existence of various "potential" environmental harms and ask the Court to accept their existence because they say so.  As the Fifth Circuit recently underscored, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Brown v. Illinois Cent. R.R. Co.*, 705 F.3d 531, 537 (5th Cir. 2013) (internal quotation marks and citation omitted).[11]

The U.S. Experts' supposition that further study, including the NRD assessment, might reveal information to support their opinions does not save these opinions from exclusion under

---

[11]   *See also Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("'[N]o matter how good' experts' 'credentials' may be, they are 'not permitted to speculate.'" (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.,* 215 F.3d 1083, 1088 (10th Cir. 2000)).

FRE 702. *See Moore*, 151 F.3d at 276 ("[T]he law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available."); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 677-78 (6th Cir. 2010) ("This is an imperfect system, to be sure. . . . But the alternative route—allowing the law to get ahead of science—would be just as unfair. . . . Rule 702 at all events has drawn the line for us, and we must enforce it."). If further NRD investigation were to result in data supporting a claim of actual harm, that data can be presented, and experts can opine on it, during the trial of the NRD claim. But the United States should not be allowed to speculate about such harm now, especially where the United States has chosen to pursue its civil penalty claim in advance of its NRD claim.

For these reasons and those set forth below, the Court should exclude the U.S. Experts' speculative testimony of actual or potential environmental harm, including the following:

### A. Speculative Harm to Fish and Shellfish Populations

There is extensive publicly-available, government data that demonstrates there was no meaningful, adverse impact to Gulf fish and shellfish populations as a result of the *Deepwater Horizon* oil spill.[12] Despite this government data (which was conveniently ignored or disregarded by the U.S. Experts), Dr. Boesch speculates freely about "possible harm to fish populations" that, in his words, "could result" from exposure to oil.[13] But this is not evidence. And indeed, the United States' own biologist, Dr. Rice, *repeatedly admitted* during his deposition that any hypothesis of various adverse impacts to fish and shellfish populations would be speculation. For example:

---

[12] Ex. B, Tunnell Round 2 Rpt. at 10.

[13] Dr. Boesch's Round 1 Report at 35-37, 40-41 (Aug. 15, 2014) (Exhibit G) ("Ex. G, Boesch Round 1 Rpt.").

7

1. **Menhaden**: "Q. [I]n fact, any hypothesis of a menhaden collapse resulting from the DEEPWATER HORIZON oil spill would just be speculation at this stage of the environmental investigation, correct?

   A. Yeah. Without something to peer-review or review a peer-reviewed product, yeah."[14]

2. **Shrimp**: "Q. Similarly with shrimp, any hypothesis of a shrimp collapse resulting from the DEEPWATER HORIZON oil spill would be speculation at this stage, correct?

   A. Correct."[15]

3. **Tuna**: "Q. [A]ny hypothesis about an impact to the tuna population resulting from the DEEPWATER HORIZON oil spill would be speculation?

   A. Well, by me, it certainly would be, yes."[16]

4. **Red Snapper**: "Q. And, similarly, any hypothesis of an effect on the red snapper population resulting from the DEEPWATER HORIZON oil spill would be speculation at this stage?

   A. Until damage assessment-type -- assessments come out and are transparent and are visible and peer-reviewed, yes."[17]

Similarly, Dr. Boesch's opinion that oil "*could have* reduced the larval recruitment into the 2010 year class for" bluefin tuna should be excluded as inadmissible speculation.[18] Dr. Boesch provides no data to support his conclusion, but rather speculates that: (1) bluefin tuna larvae *could have* encountered oil from the Spill; and (2) as a result, the larvae *could have* been impacted such that fewer matured into adults.[19] Dr. Boesch's similar speculation of harm to

---

[14] Ex. E, Rice Dep. at 229:12-18 (objection omitted).

[15] *Id.* at 230:9-15 (objection omitted).

[16] *Id.* at 231:23 - 232:2 (objection omitted).

[17] *Id.* at 232:3-10 (objection omitted). Dr. Rice stated similar opinions with respect to population level harms to: (1) blue crab, *id.* at 230:16 - 231:7; (2) sea trout, *id.* at 232:11-17; other fish and shellfish species, *id.* at 232:18 - 233:14.

[18] Ex. G, Boesch's Round 1 Report at 29 (emphasis added).

[19] *Id.*

8

mahi-mahi suffers from the same infirmity.[20] Accordingly, based upon the U.S. Experts' own admissions and their inability to produce real-world data to support their theories, the Court should exclude their opinions regarding potential population-level effects to fish and shellfish.

### B. Speculative Harm to Oysters

Dr. Boesch opines that "[t]here was potential harm to oyster stocks due to oil,"[21] but he provides no data to support such opinions and instead improperly bases his opinion on the prospect that future research and investigation might reveal evidence of harm, acknowledging:

> I am unaware of any reports, scientific or otherwise, of Macondo oil directly killing oysters. There was no evidence in published literature of elevated levels of PAHs in oyster tissue in Mississippi Sound during and after the spill.[22]

Similarly, Dr. Rice testified that he is aware of no data indicating that there has been an effect on oyster populations from oil from the *Deepwater Horizon* oil spill.[23]

### C. Speculative Harm to Organisms on the Seabed

Dr. Boesch claims that "[t]here is potential harm to organisms living on the seabed of the continental shelf"[24] but provides no data to support this claim. Instead, Dr. Boesch admits that:

---

[20] *Id.*

[21] *Id.* at 36.

[22] *Id.*; *accord* Dep. of Dr. Donald Boesch, *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010* at 247:16-24 (Oct. 28, 2014) (Exhibit H) ("Ex. H, Boesch Dep.") ("Q. Okay. I just want to confirm that you continue to be unaware of any reports, scientific or otherwise, of Macondo oil directly killing oysters, correct? . . . . A. I'm not -- I'm not aware -- I --where there -- it was clear evidence that there was oil on oysters -- oysters and that caused mortality, correct").

[23] Ex. E, Rice Dep. at 234:10-15. Dr. Boesch similarly speculates that "[t]here was potential harm to oyster stocks" due to the State of Louisiana's diversions of the Mississippi River in 2010. (Ex. G, Boesch Round 1 Rpt.at 36-37). Dr. Boesch provides no data to support this assertion, and in any event, any harm caused by the Mississippi River diversions cannot be attributable to BPXP. The United States' Rule 30(b)(6) witness on actions taken outside of the Unified Command-led response agreed that the diversions "were not removal activities" that were authorized or approved by the Unified Command. (Dep. of Captain Larry Hewett, *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010* at 68:11-18 (June 29, 2014) (Exhibit K) ("Ex. K, Hewett Dep.")).

9

(1) "there have been few published studies that evaluated sediment contamination or biological effects on bottom-dwelling organisms;" and (2) "it is *premature to speculate* about the extent and duration of hydrocarbon contamination of continental shelf sediments and the actual harm that resulted" until the NRDA is completed.[25]  Dr. Rice admitted that he did not look at sediment data, though he conceded: "I -- I know it exists."[26]

### D. Speculative Harm Related to Fish Lesions

Dr. Boesch's report also identifies fish lesions as a possible harm of the Spill because he believes there was a "suggest[ion] that development of lesions was in some way connected to exposure or uptake of PAHs or other hydrocarbons."[27]  But, in his deposition, Dr. Boesch conceded that the authors of the only study that he cited to support this proposition did not "draw the -- the final conclusion that [the Spill] actually was the cause of the lesions."[28]  Despite this study's express refusal to conclude that the lesions were caused by the Spill, Dr. Boesch explained in his deposition that he relied on his "judgment . . . that it potentially occurred" to assert the contrary[29] and that he did so without reviewing the underlying data.[30]

### E. Speculative Harm to Deep-Sea Planktonic and Swimming Organisms

Dr. Boesch claims that there could be harm to "planktonic and swimming organisms living at the depths of the deep-sea plume."[31]  Here too, however, Dr. Boesch freely admits that

---

Footnote continued from previous page
[24]   Ex. G, Boesch Round 1 Rpt. at 27.
[25]   *Id.* (emphasis added).
[26]   Ex. E, Rice Dep. at 271:1-23.
[27]   Ex. G, Boesch Round 1 Rpt. at 29.
[28]   Ex. H, Boesch Dep. at 213:8-22.
[29]   *Id.*
[30]   *Id.* at 214:15-18
[31]   Ex. G, Boesch Round 1 Rpt. at 16-17.

10

his speculation cannot be supported by the available data: "To my knowledge no results from research on the effects of the plume hydrocarbons on planktonic and swimming organisms living at depth of the deep-sea plume have been published . . . ."[32] In other words, Dr. Boesch freely asserts the potential existence of harm but admits there is no published literature and no data to support his opinion.

### F. Speculative Harm to Bird Populations

Dr. Rice admits that his opinion regarding off-shore bird population impacts is based on his speculation, including that, in light of the numbers of off-shore birds assumed to have died, "*it is easy to speculate* that . . . [there was] a significant ecosystem effect."[33] Dr. Rice does not even bother to substantiate these conjectures and—much like Dr. Boesch—instead improperly expects the Court to accept these hypotheses based on his assertion alone. When asked if he looked for relevant publicly available data, Dr. Rice responded that "it's not my strong suit."[34]

### G. Speculative Harm to Turtle Populations

Dr. Boesch noted in his report that there was an increase of observed turtle standings from 2011 to 2013 compared to historical trends and that "[p]ossible reasons for the increased strandings under investigation include . . . impacts from the Macondo well blowout."[35] However, during his deposition, Dr. Boesch revealed that the basis for this opinion is that he has "seen evidence where there's -- there's longer-term anomalies in -- in strandings that are un- --

---

[32] *Id.*

[33] Ex. D, Rice Round 3 Rpt. at 15-16 (emphasis added).

[34] Ex. E, Rice Dep. at 291:14-22.

[35] Ex. G, Boesch Round 1 Rpt. at 19.

un- -- undiagnosed at this point."[36] In short, Dr. Boesch asserts that the Spill possibly caused increase turtle strandings because the scientific community has yet to explain an alleged anomaly. This assertion is pure speculation that Dr. Boesch does not even attempt to support by actual data and thus is inadmissible under FRE 702. *E.g.*, *Johnson*, 685 F.3d at 463.

## II. THE UNITED STATES WILL HAVE AN OPPORTUNITY TO PROVE ENVIRONMENTAL IMPACT LATER IN THE NATURAL RESOURCE DAMAGES LITIGATION

The United States will not be prejudiced by excluding speculative environmental opinions from the CWA proceeding; it (along with its co-Trustees) will have an opportunity to prove environmental harms as part of its future NRD claim. Conversely, BPXP could be severely prejudiced if the Court were to base a penalty, even in part, in reliance upon the U.S. Experts' speculation, only to establish in future litigation that such speculation was not, in fact, supported by the data or even reasonable.

Even more fundamentally, the United States' attempt to use the ongoing NRDA process as both a sword (*i.e.*, environmental harm can be based on not only actual, but also potential, harm that is currently being investigated as part of the NRDA) and a shield (*i.e.*, actual evidence of the extent of harm must be disregarded as premature)[37] is fundamentally unfair and, if endorsed by this Court, would severely prejudice BPXP's ability to defend itself from the United States' allegations of environmental harm. Otherwise, at every turn and regardless of what

---

[36] Ex. H, Boesch Dep. at 256:19-22. Dr. Boesch also was not aware of impacts to turtle nesting sites. *Id.* at 256:23 - 257:1 ("Q. Have you seen, as you sit here today, any evidence of oiling of sea turtle nests? A. I'm -- I'm not aware.").

[37] Indeed, in rebuttal, the U.S. Experts commented repeatedly on "the extensive NRDA and research studies that are still underway." Drs. Boesch and Rice's Joint Round 2 Report at 6 & 14 (Sept. 12, 2014) (Exhibit I) ("Ex. I, Boesch & Rice Round 2 Rpt."). The U.S. Experts also argued that "[t]he extent and consequences of [the Spill's] harm will become better resolved through the Natural Resource Damage Assessment and the remaining years of the BP-sponsored Gulf of Mexico Research Initiative." *Id.* at 28.

actual data BPXP presents, the United States could attempt to play the "trump card" that the NRDA is still ongoing and therefore BPXP experts' opinions based on currently available data must be disregarded in favor of speculative hypothesis of unproven harm.

Moreover, the United States decided to pursue its claims for civil penalties in 2010, while the NRDA was only in its nascent stages and well before the U.S. was compelled to do so by the CWA's three-year statute of limitations. 33 U.S.C. § 2717(f)(1)(A). When BPXP sought to stay the trial of the civil penalty claim so that it could be joined with the future NRD claim, the United States resisted and argued that the civil penalty claim was ripe to proceed. To allow the United States to base its penalty claim on speculative environmental assertions simply because the NRD assessment is still in progress would allow the United States to take advantage of an exigency of its own creation. Alternatively, if the United States now thinks that the high-quality, publicly-available environmental data are insufficient for use in this Penalty Phase, it should ask the Court to defer resolution of the penalty claim (which would not delay compensation to anyone) until the NRDA is complete.

### III. THE UNITED STATES CANNOT CIRCUMVENT THE RULES OF EVIDENCE IN ORDER TO SPECULATE ABOUT POTENTIAL ENVIRONMENTAL HARM

BPXP anticipates that the United States will contend that its speculative environmental opinions are all permissible because, as the Court has stated, the potential for catastrophic damage that is avoided due to good fortune does not mean that the violation is not extremely serious.[38] BPXP does not contend by this motion that the Court should exclude evidence of potential environmental harm, or lack thereof. In fact, BPXP's own expert, Dr. Damian Shea, evaluated *potential* harm from the Spill when he conclude—after comparing 18,000 publicly-

---

[38] Transcript of Status Conference Re: Penalty Phase, March 21, 2014, at 84:18-22 (Exhibit J) ("Ex. J, 3/21/14 Tr. of Status Conf.").

13

available water samples and 8,000 publicly-available sediment samples to the EPA's own toxicity thresholds—that the potential for environmental harm from the *Deepwater Horizon* oil spill was very limited in space and time.

However, potential harm is not the same as speculation, and an evaluation of potential environmental harm is not an invitation to ignore the Federal Rules of Evidence. Indeed, courts that have considered potential environmental harm still have adhered to the Federal Rules of Evidence, including by excluding expert testimony under FRE 702 when the testimony was "not based upon any specific rationale" and "appears to be based solely upon [the expert's] subjective opinion and unsupported conjecture, rather than on concrete objective technical knowledge."[39]

Here, the U.S. Experts have repeatedly elected to disregard hundreds of millions of dollars worth of high-quality, publicly-available environmental data, choosing instead to speculate about things that might have occurred. Our justice system demands more. An expert's opinion related to potential environmental harm must be firmly grounded in sound science, not mere hypothesis and speculation.

The United States' efforts to overreach in violation of the Federal Rules of Evidence are evident in Dr. Boesch's initial report. Dr. Boesch defined "potential harm" as those circumstances "when evidence *suggests* that there *might be* actual harm but does not yet conclusively demonstrate it."[40] This definition borders on the tautological, offering neither this

---

[39] *See Cameron v. Peach Cnty., Ga*, No. 5:02-CV-41-1(CAR), 2004 WL 5520003, at *3-4 (M.D. Ga. June 28, 2004) (granting motion in limine under FRE 702 to exclude certain speculative expert testimony regarding whether potential harm existed in order to demonstrate an imminent or substantial endangerment under RCRA); *see also Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1157-58 (D. Idaho 2012) (applying FRE 701 and 702 when evaluating whether potential harm exists for purpose of imposing an injunction under the CWA).

[40] Ex. G, Boesch Round 1 Rpt. at 42 (emphases added); *accord* Ex. H, Boesch Dep. at 53:3-9 ("Q. Are you claiming…that there were food chain consequences? A. There are -- there are -

Court nor BPXP an indication of what amount or type of evidence is needed to create a "suggestion" of harm sufficient for Dr. Boesch to assert an opinion of potential harm, and rendering it impossible for anyone to replicate Dr. Boesch's results. Moreover, Dr. Boesch and the United States make no effort to explain from where Dr. Boesch divined any of these definitions, much less whether any of them are appropriate. The consequences of this amorphous definition of "potential harm" defy basic FRE 702 and *Daubert* principles, including empowering Dr. Boesch to rely on his "judgment" alone to reach a conclusion contrary to the underlying studies upon which he purports to rely and the extensive, high-quality data from which he shields his glance.

## CONCLUSION

The U.S. Experts chose to speculate and hypothesize about things that *could* have occurred. The U.S. Experts often do not even opine that many of their hypotheses are probable, merely that they are possible. Indeed, they admit that many of their opinions are unsupported by data and that it would be "premature" to reach any conclusion.

To the extent that the speculative opinions expressed now by the U.S. Experts—four and a half years after the Spill—are in fact real, the United States will have an opportunity to demonstrate those impacts as part of the future NRD proceeding. In the meantime, if the United States wants to introduce evidence in court regarding the seriousness of the Spill's environmental harm, it must do so in accordance with the Federal Rules of Evidence, including FRE 702.

---

Footnote continued from previous page
- some suggestion. I certainly wouldn't claim that as an actual harm. I -- I would put that more in the area of potential harm. But there are suggestions . . . .").

15

Date: December 5, 2014                    Respectfully submitted,


                                                /s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Elissa J. Preheim
Eric A. Rey
ARNOLD & PORTER LLP
55 12th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-59999
***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of December, 2014.

                                                                      /s/ Don K. Haycraft
                                                                      Don K. Haycraft