# Exhibit H

01-46077
DG/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )     MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )     SECTION: J
APRIL 20, 2010 )
                           )     JUDGE BARBIER
                           )
                           )     MAG. JUDGE SHUSHAN

## CONFIDENTIAL
## PENALTY PHASE
## EXPERTS

### *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Dr. Donald Boesch

**October 28, 2014**

## *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

53

1   they're -- when you change the base of the food,

2   it affects the food chain.

3       Q.  Are you claiming that as a consequence of

4   this spill, that there were food chain

5   consequences?

6       A.  There are -- there are -- some suggestion.

7   I certainly wouldn't claim that as an actual harm.

8   I -- I would put that more in the area of

9   potential harm.  But there are suggestions, both

10  in terms of the effects of grazers -- of effects

11  of grazers on -- on -- on bacteria that grow.

12  And, as well as -- as well as evidence for

13  incorporation of the carbon coming from -- organic

14  carbon coming from hydrocarbons into higher levels

15  in the food chain that suggest that there are, you

16  know, ripple effects that -- that occur within

17  the -- within the food chains.  Although, I -- I

18  don't think anyone has gotten to the point where

19  they can -- they can determine what the

20  consequences to the broader ecosystem are at this

21  point.

22      Q.  So at this point, no one has determined

23  the consequences to the broader ecosystem of

24  biodegradation connected to this spill; is that

25  correct?

1  apparently had some exposure.  I don't even think

2  that they drew the conclusion that those lesions

3  were necessarily caused by -- by the oil exposure,

4  but they were pointing to the potential of that --

5  that those lesions, manifestation of biological

6  harm, were related to exposure as deduced from

7  bio- -- concentrations of metabolites and bio.

8      Q.  So it's your opinion that there is a

9  potential that the lesions referred to in your

10 report were caused by oil exposure, but that it

11 has not been established; is that correct?

12     A.  That's --

13              MS. ANDRE:  Objection to form.

14     A.  That's what I think I just said.  And that

15 I would defer to what the investigators con- --

16 actually concluded.  But my judgment is that it

17 was -- it was evidence that it was -- that it

18 potentially occurred, but that the authors

19 themselves were not ready to draw the -- the final

20 conclusion that actually was the cause of the

21 lesions.  But it suggested that -- it might have

22 been and merited further evaluation.

23     Q.  (BY MS. BRANSCOME)  Okay.  So you would

24 agree that further investigation is required to

25 determine whether or not the lesions that were

```
 1   observed were actually caused by oil exposure; is

 2   that right?

 3               MS. ANDRE:  Objection to form.

 4       A.  I think that there -- there is further

 5   investigation that has been done and is ongoing.

 6       Q.  (BY MS. BRANSCOME)  Okay.  Now, you say to

 7   an article by Murawski in your report --

 8       A.  Correct.

 9       Q.  It's Footnote 78, if -- if you'd like to

10   look at the records.

11       A.  On the --

12       Q.  Report 1?

13       A.  Yeah, I'm familiar with the paper.

14   Uh-huh.

15       Q.  And -- and my only question for you is:

16   Did you independently review the histopathology

17   data that Murawski discusses in his paper?

18       A.  No, I did not.

19       Q.  Okay.  Are you aware of a 2011 Powers and

20   Shipp study on fish lesons -- lesions?

21       A.  I am.  I did see it.

22       Q.  Okay.  So I'd like to turn you to Tab 37.

23       A.  Uh-huh.  The very last one here.

24               MS. ANDRE:  13285.

25               (Marked Exhibit No. 13285.)
```

1    question.

2        A.  I told you what I did in terms of what

3    I -- the literature I assessed.  My task here was

4    not to do my own independent studies, sample --

5    going out and sampling and that sort of thing, or

6    to reanalyze individual's data.  It's to take the

7    literature that we have before us, the evidence

8    that we have before us, and draw conclusions.

9            My approach to this was to be, first

10   of all, impressed by the quality of the Fodrie and

11   Heck article; but also to notice that it -- it --

12   if they were -- they could -- they could be

13   overextending the results because they dealt with

14   certain areas that were not particularly heavily

15   oiled.

16       Q.  Okay.  I just want to confirm that you

17   continue to be unaware of any reports, scientific

18   or otherwise, of Macondo oil directly killing

19   oysters, correct?

20           MS. ANDRE:  Objection to form.

21       A.  I'm not -- I'm not aware -- I -- where

22   there -- it was clear evidence that there was oil

23   on oysters -- oysters and that caused mortality,

24   correct.

25       Q.  (BY MS. BRANSCOME)  Okay.  You agree that

1  detail.  One of the challenges we have with

2  these -- all three of these vertebrates --

3  air-breathing vertebrates is that very little of

4  the information that's been collected is

5  publicly -- I mean, raw data available, but no

6  interpretations are available in the public domain

7  because it's all wrapped up in the natural

8  resources damage assessment.  So composed to --

9  compared to a lot of other things where there's

10  now abundant peer-reviewed literature, there's

11  very little in this field.  So I have to -- had to

12  rely on tables like this in some -- and a -- and a

13  small amount of literature that is available.

14     Q.  (BY MS. BRANSCOME)  So based on what you

15  know as of today, you have never seen evidence of

16  direct harm to sea turtles as a result of the oil

17  spill after 2010, correct?

18          MS. ANDRE:  Objection to form.

19     A.  I've seen evidence where there's --

20  there's longer-term anomalies in -- in strandings

21  that are un- -- un- -- undiagnosed at this point.

22  So I would not -- I would not go that far.

23     Q.  (BY MS. BRANSCOME)  Have you seen, as you

24  sit here today, any evidence of oiling of sea

25  turtle nests?

1      A.  I'm -- I'm not aware.  I think there might

2  be something in the various government reports,

3  but I don't remember what they were.

4      Q.  So as you sit here today, you cannot

5  identify any evidence --

6      A.  No, I can't.

7      Q.  -- of oiling of sea turtles nests,

8  correct?

9      A.  I cannot.

10          MS. ANDRE:  Let her finish.

11      Q.  (BY MS. BRANSCOME)  Now, in your Round 3

12  report, you claim that 14,000 sea turtle

13  hatchlings that were relocated from the Gulf of

14  Mexico to the Atlantic represented a net loss of

15  those hatchlings from the Gulf of Mexico sea

16  turtles stocks; is that correct?

17      A.  That's correct.

18      Q.  Okay.  Are you aware that prior to that

19  relocation, the sea turtles eggs were allowed to

20  incubate on their natal beaches for approximately

21  50 days --

22      A.  Uh-huh.

23      Q.  -- in order to allow the location of that

24  natal beach to imprint on the sea turtles?

25          MS. ANDRE:  Objection to form.

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**