# Exhibit I

**EXPERT REPORT**
U.S. v. BP Exploration & Production, Inc. et al.

# RESPONSES TO BP EXPERT REPORTS
Submitted on Behalf of the United States

**Prepared by: Donald F. Boesch (Ph.D.) and Stanley D. Rice (Ph.D.)**

_____              _____
      Donald F. Boesch (Ph.D.)                        Stanley D. Rice (Ph.D.)

September 12, 2014

1

scientific literature.  In contrast, our expert reports rely, almost exclusively, on published analyses that have been peer reviewed.

**2.4. The reports do not rely on, or even consider, important peer-reviewed literature germane to actual or potential harm to ecosystems and resources.**

As they mainly present the experts' own analysis and interpretation, the reports rely very little on the voluminous literature on the fate and effects of the Macondo well blowout.  Furthermore, it appears from the lists of information and sources considered, these experts eschewed consideration of important literature germane to understanding the effects of the release of Macondo well oil—in microbiology and toxicology and concerning plankton, fish, birds and mammals, for example.  Key literature that was not considered is identified in the discussion of each of the expert reports in Sections 3, 4, and 5.  This is highly unusual, at least for objective scientific discussion, wherein it is generally expected that one must discuss how and why one's findings differ from those already reported in the literature.

**2.5. The reports attempt to circumvent or prejudge the ongoing Natural Resources Damage Assessment.**

We based our own expert reports on the already published literature and were very cautious in drawing definitive, quantitative conclusions.  However, in different ways the BP expert reports attempt to circumvent or prejudge the ongoing Natural Resources Damage Assessment by drawing very broad and definitive conclusions.  This is particularly the case in Dr. Shea's report, which presents analyses of extensive NRDA data.  In spite of the fact that the NRDA is still ongoing and Dr. Shea only considered limited parts of the currently available data, he is ready to conclude: "with a reasonable degree of scientific certainty" that "there was no harmful exposure of oil-related chemicals or dispersants in the vast majority of the area investigated."[7]  Similarly, Dr. Tunnell, who analyzed no NRDA data, concludes: "to a reasonable degree of scientific certainty that the environmental harm from the Deepwater Horizon oil spill was limited and the Gulf has largely recovered," and "the oil spill did not cause any significant adverse effects to fish, shellfish or bird populations, and I do not expect to see any such effects in the future."[8]  As will be discussed in the following sections, drawing such sweeping conclusions from their analyses is not scientifically supported.  But, at a minimum, such conclusions are premature given the extensive NRDA and research studies that are still underway.

**3.   EXPERT REPORT OF DR. JOHN W. TUNNELL, JR.**

**3.1. The analyses focus on species populations not extensively exposed to Macondo well oil.**

---

[7] Shea D (2014) Expert Report: In Re. Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.  BP Exploration and Production Inc. United States District Court, Eastern District of Louisiana, MDL  No. 2179, Section J, New Orleans, LA, p. 3

[8] Tunnell JW (2014) Expert Report: In Re. Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.  BP Exploration and Production Inc. United States District Court, Eastern District of Louisiana, MDL No. 2179, Section J, New Orleans, LA p. 66

6

**3.5. Emphasis on the implied resilience of Gulf of Mexico ecosystems is gratuitous without any absolute or comparative measure of resilience.**

The claim that Gulf of Mexico ecosystems are exceptionally resilient is made to suggest that they would not be harmed by a hydrocarbon blowout, even one as massive as from the Macondo well. Dr. Tunnell's evidence for this resilience is based entirely on the observation that the Gulf of Mexico produces the second highest seafood catch in the U.S., notwithstanding the many natural and anthropogenic impacts that have affected the habitats and species of the northern Gulf over the past 50-60 years.[27] These impacts include loss of 25% of coastal wetlands in Louisiana, 20-100% of seagrass beds depending on location, and 50% of oyster reefs; invasions of nonnative species; and creation of large dead zones. This is a specious argument, not based on any estimation of what the production of seafood would be absent those impacts. Nor is the claim founded on comparisons with any other ecosystems: resilient compared to what? A more compelling conclusion founded on contemporary ecological theory might be that because of these multiple stressors, the resilience of the Gulf of Mexico is compromised such that additional stressors, even if minor by comparison, might be synergistic rather than simply additive. For example, scientists have posited that feedbacks and synergistic effects occur between hypoxia (harmfully low oxygen concentrations) characteristic of dead zones and other pollutants.[28]

**3.6. Definitive conclusions related to harm are unsupported, highly speculative and premature.**

The expert report by Dr. Tunnell claims to draw the conclusion that the Macondo well blowout did not result in significant adverse effects on populations of fish, shellfish and birds with a reasonable degree of scientific certainty. To arrive at this conclusion he relied on analyses based on: species populations that experienced little exposure, average abundances over areas far greater than the area that was impacted, and inappropriate statistical methods. Simply put, to accept his approach one would have to concede that significant harm would only occur only if inshore populations of fish, shellfish and birds had been decimated throughout the entire Gulf of Mexico. Furthermore, he attempts to draw a definitive conclusion from inappropriate data analysis, while the much more detailed Natural Resource Damage Assessment and Gulf of Mexico Research Initiative are still pursuing rigorous quantification of effects. Even from a most generous perspective, Dr. Tunnell's conclusions must be regarded as highly speculative and premature.

---

[27] Tunnell JW (2014) Expert Report: In Re. Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010. BP Exploration and Production Inc. United States District Court, Eastern District of Louisiana, MDL No. 2179, Section J, New Orleans, LA, p. 11

[28] Hall J, Diaz RJ, Gruber N, Wilhelmison D (2013) Impacts of multiple stressors. In: Noone KJ, Sumaila UR, Diaz RJ (eds) Managing Ocean Ecosystems in a Changing Climate: Sustainability and Economic Perspectives. Elsevier, Burlington, MA

There are glaring omissions in consideration of the growing body of knowledge on effects of the Macondo well blowout, notably of publications that document or strongly suggest biological effects. Many of these publications result from NRDA or BP-sponsored GoMRI studies. For example, little or no mention is given to the effects on floating *Sargassum* communities; deepwater benthic communities, including cold-water corals; fish embryos and larvae; bottom-dwelling adult fishes; and marine mammals and sea turtles.

**6.3. Sweeping conclusions are drawn based on flawed analyses of selective data.**

As we have pointed out, the various expert reports over-extend conclusions based on data that the experts have chosen without fully disclosing critical assumptions and limitations (e.g., limited power and complicating factors in detecting change in fisheries survey and landings data; over-interpretation of shoreline response surveys (SCAT) in determination of environmental effects; and reliance on bioassays that reflect only narcotic effects and not specific toxicity). Furthermore, the use of some of the tools used in data analysis (e.g. linear regression for change detection) is seriously flawed.

**6.4. The extent of harm is concealed or diminished by presenting results in the context of large regions not affected by oil contamination.**

Essentially, the reports, each in their own way, posited the "straw man" that for harm to be serious it would have to extend over virtually the whole of the U.S. Gulf of Mexico and be dramatically obvious: fishery landings for the whole region would have to crash; most of 4,000 miles of shoreline surveyed wound have to be oiled; toxic concentrations would have to be observed throughout the water column and hundreds of kilometers away. This, then, is an easy straw man to knock down, but it is one divorced from the reality of the scope of this blowout, which while enormous by any comparative oil-spill standard, still extended over just a portion of the vast Gulf of Mexico. The supposition that the effects would to be so extensive and obvious is inconsistent with what we know about the effects of oil spills and is as outrageous as the apocalyptic fears and claims of those on the other side.

**6.5. For these reasons, the BP expert reports in no way demonstrate that actual and potential harm was not serious or long-term.**

The matter before us in the Penalty Phase in this trial, as we understand it, is whether the actual or potential harm was serious. For the reasons detailed throughout our response and summarized in the above four points, the BP expert reports fall far short of establishing that the environmental harm was other than very serious. The broader body of knowledge, which is still evolving, demonstrates that some of the Gulf's ecosystems and biological resources were seriously harmed and that, in some cases, that harm continues to this day. The extent and consequences of this harm will become better resolved through the Natural Resources Damage Assessment and the remaining years of the BP-sponsored Gulf of Mexico Research Initiative.