# Exhibit A

01-45956
LC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010

MDL NO. 2179

SECTION: J

JUDGE BARBIER

MAG. JUDGE SHUSHAN

# CONFIDENTIAL PENALTY PHASE EXPERTS

**WorldwideVIEW™**
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Fredric Quivik

**October 14, 2014**

***COPY***




*Systems Technology for the Litigation World*

Litigation Group • Court Reporting • Video Production • Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

Q. Then you -- you obtained a Bachelor of Environmental Design in Minnesota?

A. University of Minnesota, in the Architecture School.

Q. And then any further degrees after your Bachelor of Arts and Bachelor of Environmental Design?

A. You mean further undergraduate degrees or further degrees?

Q. Any further degrees?

A. Okay. Yes. I -- I then went to Columbia University and earned a Master of Science in Historic Preservation from the Graduate School of Architecture and Planning, and then worked for about a decade and a half before going back to graduate school and earning a Ph.D. in History and Sociology of Science from the University of Pennsylvania.

Q. And the Ph.D. was obtained in what year?

A. The degree year is 1998.

Q. But you are a historian, correct?

A. Yes.

Q. And you are an industrial archeologist?

A. Yes.

Q. Your specialty is industrial history?

A. Yes.

Q. You have expertise in historic preservation?

A. Yes.

Q. You also have expertise in architectural history?

A. Yes.

Q. You are a member of the Society for Industrial Archeology?

A. Yes.

Q. And you're one of the founders of the Society of Montana Chapter?

A. Yes.

Q. Are there any -- you are also a historian generally, correct?

A. Yes, but like all historians, generally, I do have areas in which I specialize.

Q. Are there any areas of history where you would not be qualified to do an historical analysis?

A. For instance, I would not consider myself a diplomatic historian.

Q. Okay. And what do you mean by a diplomatic historian?

A. One who studies the history of diplomatic relations between or among nations.

Q. Are there any area of business where you would consider yourself not qualified to do a historical analysis?

A. I don't understand the question.

Q. If somebody came -- came to you and engaged you to do an historical analysis and it was a topic that was business-related, would you consider yourself qualified to do

involved contamination that occurred mainly during this century?

A. The 21st century?

Q. Yes.

A. Setting aside the fact that in some of the cases there has been expert testimony about the ongoing nature of the contamination in this century, that would be true of all of them other than this particular case.

Q. Okay. In all of the other cases you've testified in, the initial contamination occurred in a prior century?

A. Yes.

Q. Have you ever been admitted as an expert in a case involving contamination that began at some point during the last ten years?

A. No.

Q. Now, in -- in this case you reviewed a number of depositions, correct?

A. Yes.

Q. And also a -- a number of documents, correct?

A. Yes.

Q. Would you agree with me that the -- the percentage of source material in this case, that is depositions as opposed to documents, is higher than generally has been in other cases you've testified?

A. If you mean very narrowly speaking, depositions,

that would be the case. There are a couple of other cases in which I've testified where I did make ample use of trial testimony. So I -- and those are transcripts, and so it's testimony similar to the transcripts of depositions that I've read.

Q. But that trial testimony was for a case, for example, in 1911, correct?

A. In that -- in that ballpark, yeah. What I was doing was characterizing the kind of documentary evidence that I'm using, reading a deposition testimony or a trial testimony.

Q. Okay. So when you've looked at deposition or trial testimony in prior cases, it's been mainly from prior centuries?

A. Yes.

Q. Now -- now, in this case, in -- in contrast to the prior cases you've testified in, the vast majority of the witnesses have not passed away, correct?

A. Yes, that's correct.

Q. And in the -- in the other cases you've testified in in the past, the vast majority of the witnesses to the original contamination have passed away, correct?

A. Yes.

Q. If you look back at Exhibit 13209, the last full paragraph beginning with, My current research?

A. Yes.

Q. If you look at the fourth sentence, it says, I have used an empirical historical method to draw conclusions about the facts leading to and in response to the Macondo blowout.

Do you see that?

A. I know I wrote that, but I don't see it yet. Okay. Oh, there it is. Okay. I see it.

Q. And then that's what you did in connection with your reports, you drew conclusions about facts leading to and in response to the Macondo blowout?

A. Yes.

Q. And in particular, you drew conclusions about what BPXP did and did not do in managing the Gulf of Mexico, and what other BP entities did in managing operations in the Gulf, correct?

A. Yes.

MR. NOMELLINI: Okay. So, Richard, we'll be going back and forth on these reports. If it's okay with you and it's okay with Professor Quivik, I would suggest that it might be most efficient time-wise if we leave them in the binder.

MR. GLADSTEIN: That's fine.

MR. NOMELLINI: Is that okay with you, Professor?

MR. MCNULTY: That's fine.

THE WITNESS: Okay.

Q. Okay. And -- and how did you select what materials to include among your reliance materials?

A. I selected those materials that provided information that was useful to me in describing this set of relationships that I present in -- in my expert report.

Q. And were those provided to you by DOJ?

A. Yes.

Q. Any materials you obtained that were not provided to you by DOJ?

A. The secondary materials were sources that I obtained myself through the library at Michigan Tech.

Q. Okay. Those are sources describing primarily the early history of BP?

A. Yes.

Q. You would agree that the -- the significant majority of the pages in your report relate to events at BP from the past ten years?

A. Yes.

Q. You didn't talk to any of the witnesses in this case, correct?

A. That's correct.

Q. What -- what expertise did you rely on in forming your opinions in this case?

A. The same expertise that I used in developing opinions in, for instance, the Newmont case and the Lava Cap

Q. Okay. But your opinions are contained in your report, correct?

A. Yes. Yes.

Q. And your opinions have not changed since you wrote your report, correct?

A. Correct.

Q. If you look at Exhibit 13210, your opening report, page 6, the first full paragraph, third sentence -- second sentence, excuse me, says -- it's referring to the historical method. It says, The historical method allows historians to ask questions about the past which spring from our concerns in the present. The purpose of the historical method is to allow a historian to reconstruct as reliably as possible a truthful rendition of occurrences in the past. It involves developing questions to guide research, finding sources of information that allow one to answer those questions, evaluating the authenticity and credibility of the information, and then using the information to create a coherent and verifiable narrative recitation of the past.

Did I read that correctly?

A. Yes.

Q. What -- what were the questions that you set out to ask in your -- in this case?

A. They can be summarized briefly by the question, who was managing various facets of the operations at the Macondo

Well? And then that breaks down into different individuals, organizations I thought might be participating in that activity. And I investigated further to see the extent to which I saw management activity.

Q. Okay. And the answer to that question that you asked, who was managing various facets of the operations at the Macondo Well, that's a factual answer, correct?

A. Yes.

Q. One of the things that a historian does is to evaluate the credibility of information, correct?

A. Yes.

Q. What do you mean by credible?

A. There will be documents in the record that make some statement, and one of the things that I have to do as an historian is ascertain whether that statement is accurate or not, truthful or not, credible or not.

Q. Okay. So you look at -- one of the things you do as a historian, you look at truthfulness, correct?

A. Yes.

Q. And another thing you do as a historian, you evaluate accuracy, correct?

A. Yes.

Q. And you also evaluate the authenticity of information, correct?

A. Yes.

Q. And when you use the word "authenticity," what do you mean by that?

A. In that case, for instance, a document may purport to come from a particular source, and I try to verify whether it comes from that source or -- or not, whether it's authentic.

Q. And is one of the things that you did in this case to evaluate the credibility of documents and testimony?

A. Yes.

Q. Are there any witnesses whose depositions you reviewed who you found not -- to be not credible?

A. Not that I can think of.

Q. Well, let's go down the list. Did you find Steven Bray to be credible?

A. I should say that I'm not evaluating his overall credibility, but for the questions that he was addressing that were of interest to me in my research questions, I found him to be credible, yes.

Q. For the questions that you were researching, did you find David Bucknall to be credible?

A. Yes.

Q. For the questions you were researching, did you find Brett Cocales' testimony to be credible?

A. As I recall, he was one of the witnesses who took -- used his rights under the Fifth Amendment not to testify.