# EXHIBIT D

1                  UNITED STATES DISTRICT COURT

                   EASTERN DISTRICT OF LOUISIANA

2

3    IN RE:  OIL SPILL          )   MDL NO. 2179

     BY THE OIL RIG             )

4    "DEEPWATER HORIZON" IN     )   SECTION "J"

     THE GULF OF MEXICO, ON     )

5    APRIL 20, 2010             )   JUDGE BARBIER

                                )   MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17               * * * * * * * * * * * * * * * * * *

                         VOLUME 1

18               * * * * * * * * * * * * * * * * * *

19

20

21       Deposition of DR. RICHARD CLAPP, taken at

22   Pan-American Building, 601 Poydras Street, 11th

23   Floor, New Orleans, Louisiana, 70130, on the 31st

24   day of October, 2014.

25

1      Q.  And you're not a medical doctor, are you,

2  Dr. Clapp?

3      A.  I am not.

4      Q.  And you're not board certified in any

5  medical specialty, correct?

6      A.  Correct.

7      Q.  You're not board certified in anything,

8  correct?

9      A.  Correct.

10      Q.  Have you ever diagnosed a patient with a

11  medical condition?

12      A.  I was a medic, and I would call it -- I

13  was working under the supervision of a physician

14  and was seeing patients at one point.  I'm not

15  sure it would rise to the level of being a

16  diagnosis.

17      Q.  When were you a medic?

18      A.  I was working in the Massachusetts prisons

19  in the prison health project.  I was deputy

20  director, and I functioned as a medic on several

21  occasions.

22      Q.  And when was that?

23      A.  1973.

24      Q.  All right.  But you've never diagnosed a

25  patient with a medical condition as a medical

1  the so-called wet bulb method of determining

2  excessive heat.

3      Q.  Have you ever taught regarding

4  heat-related illnesses?

5      A.  Not that I can recall.

6      Q.  You're not a psychologist, are you?

7      A.  No.

8      Q.  And you do not hold yourself out as an

9  expert in psychology, correct?

10      A.  Correct.  I understand the Court

11  determines who's an expert, but I don't hold

12  myself out as an expert in psychology to answer

13  your question.

14      Q.  You don't hold yourself to be an expert in

15  psychology, correct?

16      A.  I've taken courses in psychiatry and I

17  certainly have -- I've also taken courses in

18  psychology over my previous academic training, but

19  I'm not saying that I'm an expert in it.

20      Q.  Okay.  So you don't consider yourself to

21  be an expert in psychology, correct?

22          MS. PENCAK:  Objection, asked and

23  answered.

24      A.  I, again, think it's the Court that

25  determines that.  I don't hold myself out as an

1    expert in psychology.

2         Q.  (BY MS. DESANTIS)  Okay.  And you're not a

3    psychiatrist, correct?

4         A.  I am not.

5         Q.  And you don't hold yourself out as an

6    expert in psychiatry, correct?

7         A.  Correct.

8         Q.  And you're not an expert in mental health

9    generally, correct?

10        A.  Correct.

11        Q.  And you've never diagnosed a patient with

12   a mental health condition, correct?

13              MS. PENCAK:  Object to form.

14        A.  Not as a professional, no.

15        Q.  (BY MS. DESANTIS)  Okay.  Have you studied

16   the mental healthcare system in the United States?

17        A.  Yes.

18        Q.  Have you studied the mental healthcare

19   system in Mississippi?

20        A.  No.

21        Q.  Have you studied the mental healthcare

22   system in Louisiana?

23        A.  No.

24        Q.  Have you studied the mental healthcare

25   system in Alabama?

 1      Q.   Well --

 2      A.   -- after the exposure.

 3      Q.   -- you're not offering any opinions

 4  regarding potential oral exposures to oil or

 5  dispersants by ingestion, are you?

 6      A.   No, not as I sit here.

 7      Q.   Okay.  And you are not offering opinions

 8  regarding potential oral exposure to oil or

 9  dispersants through seafood consumption, correct?

10      A.   Correct.

11      Q.   Now, Doctor, you did not intend to offer

12  any opinions that constitute causal conclusions

13  about observed symptoms, correct?

14      A.   Correct.

15      Q.   And, in fact, you stated that several

16  times in your September 26th report, correct?

17      A.   Correct.

18      Q.   All right.  You are not offering any

19  opinions concerning any causal link between

20  symptoms reported by cleanup workers and potential

21  exposures to oil or constituents, correct?

22      A.   Correct.

23      Q.   And you are not offering any opinions

24  concerning any causal link between symptoms

25  reported by any cleanup workers and potential

1    and then talked about differences and ratios of

2    symptoms for populations.  And those were

3    reporting associations.

4        Q.  (BY MS. DESANTIS)  Okay.  Let's focus on

5    causation, though, Dr. Clapp.  You have no

6    information or data that any short-term health

7    effects for any population were, in fact, caused

8    by exposure to any toxin or chemical associated

9    with the DWH incident, correct?

10       A.  Correct.

11       Q.  And you have no information or data

12   demonstrating any long-term health effects in any

13   individual as a result of exposure to any toxin or

14   chemical associated with the DW- -- DWH incident,

15   correct?

16            MS. PENCAK:  Object to form.

17       A.  Correct as -- correct as of this moment,

18   yes.

19       Q.  (BY MS. DESANTIS)  And you have no

20   information or data demonstrating any long-term

21   health effects in any population as a result of

22   exposure to any toxin or chemical associated with

23   the DWH incident, correct?

24       A.  Correct.

25       Q.  (BY MS. DESANTIS)  And you have no data or

```
 1   information confirming any long-term health
 2   effects at all related to the DWH incident,
 3   correct?
 4                MS. PENCAK:  Object to form.
 5        A.  Could you tell me what you mean by
 6   "long-term"?
 7        Q.  (BY MS. DESANTIS)  I'm -- I'm using
 8   long-term as you use long-term health effects in
 9   your report.  You have no data or information
10   con- -- confirming any long-term -- not actual,
11   long-term health effects related to the DWH
12   incident, correct?
13                MS. PENCAK:  Object to form.
14        A.  My definition of "long-term" would be five
15   years or more, and we have that much time.  It's
16   not fully elapsed.
17        Q.  (BY MS. DESANTIS)  All right.  So you have
18   no data or information confirming long-term health
19   effects related to the DWH incident, correct?
20        A.  Not as of --
21                MS. PENCAK:  Object to form, asked
22   and answered.
23        A.  Not as of this time.
24        Q.  (BY MS. DESANTIS)  And at this point in
25   time, there is no evidence of any cancer caused as
```

1        A.   Correct, as far as I'm aware.

2        Q.   (BY MS. DESANTIS)  And at this point in

3   time, there is no evidence of any other long-term

4   health disorders associated with exposure to

5   chemicals or toxins associated with the DWH

6   incident, correct?

7                MS. PENCAK:  Object to form.

8        A.   I think your phrase was "any other"?  Is

9   that correct?

10       Q.   (BY MS. DESANTIS)  Yes.

11       A.   Well, again, in terms of five years or

12   more in duration or taking five years or more to

13   occur, none that I'm aware of.

14       Q.   And, Doctor, given the levels of exposure

15   that were seen in connection with the DWH

16   incident, is it your opinion that we will see

17   long-term health effects as a result of exposures

18   to chemicals or toxins associated with the DWH

19   incident?

20                MS. PENCAK:  Object to form.

21       A.   No.  I use the term "may see" in my

22   reports.

23       Q.   (BY MS. DESANTIS)  All right.  So it is

24   your opinion that we may see long-term health

25   effects as a result of exposure to chemicals or

1  toxins associated with the DWH incident, correct?

2      A.  Correct.

3      Q.  It is not your opinion that we will see

4  long-term health effects as a result of exposure

5  to chemicals or toxins associated with the DWH

6  incident, correct?

7      A.  Correct.

8      Q.  All right.  And keeping your report

9  notebook in front of you, if you could look at

10  Page 1 of your August 15th report, behind Tab 1.

11      A.  I have it.

12      Q.  You state in your August 15th report that:

13  "Health effects include acute respiratory,

14  dermatologic and neurologic effects and

15  potentially endocrine disrupting, psychological

16  and carcinogenic effects," colon, "the latter may

17  become manifest in future years."

18              Did I read that correctly?

19      A.  Yes.

20      Q.  All right.  You'll agree that you're not

21  intending to draw a causal link between the

22  volatile organic compound PAH and dispersant

23  exposures that you mention in the preceding

24  sentence to be acute respiratory, dermatologic and

25  neurologic effects mentioned in this sentence,

1    report -- correct that, August 15th report.  But

2    on Page 9, I have personal sample results for

3    benzene, in particular, for populations.

4        Q.  (BY MS. DESANTIS)  Okay.  So you are

5    offering -- you are telling me that you are

6    offering opinions regarding exposures to benzene

7    by worker population, correct?

8        A.  Yes.

9        Q.  All right.  And your opinion is that

10   workers were exposed to benzene at levels to cause

11   harm, correct?

12       A.  Correct.

13              MS. PENCAK:  Object to form.

14       Q.  (BY MS. DESANTIS)  But you are not

15   offering opinions that any workers were, in fact,

16   harmed by exposure to levels of benzene, correct?

17              MS. PENCAK:  Object to form.

18       A.  Correct.

19       Q.  (BY MS. DESANTIS)  And you are also not

20   offering any opinions that any workers were harmed

21   by exposures to naphthalene, correct?

22       A.  Correct.  No individuals that I know of

23   that I could identify were.

24       Q.  And you're -- are also not giving an

25   opinion or providing an opinion that any broader

1   population was harmed by exposure to benzene at

2   any level, correct?

3              MS. PENCAK:  Object to form.

4       A.  Could you tell me what you mean by

5   "broader population"?

6       Q.  (BY MS. DESANTIS)  You're not giving an

7   opinion or providing an opinion that Gulf Coast

8   residents were harmed by exposure to benzene at

9   any level, correct?

10             MS. PENCAK:  Object to form.

11      A.  Correct, as I sit here today.

12      Q.  (BY MS. DESANTIS)  And you're not giving

13  an opinion that any Gulf Coast residents were

14  harmed by exposure to naphthalene at any level,

15  correct?

16      A.  Same answer, not as I sit here.

17      Q.  All right.  And you're not giving any

18  opinion that response workers as a group were

19  harmed by exposure to benzene at any level,

20  correct?

21             MS. PENCAK:  Object to form.

22      A.  Not at the present time.

23      Q.  (BY MS. DESANTIS)  And you're not giving

24  any opinion that any response -- that response

25  workers as a group were harmed by exposure to

1    naphthalene at any level, correct?

2                    MS. PENCAK:  Object to form.

3        A.  Not at the present time.

4        Q.  (BY MS. DESANTIS)  And you're not giving

5    an opinion that any Gulf Coast residents were

6    harmed by exposure to any toxin or chemical

7    associated with the DWH incident at any level,

8    correct?

9                    MS. PENCAK:  Object to form.

10       A.  Correct, as I sit here.

11       Q.  (BY MS. DESANTIS)  And you're not giving

12   any opinion that any response workers as a group

13   were harmed by exposure to any toxin or chemical

14   associated with the DWH incident at any level,

15   correct?

16                   MS. PENCAK:  Object to form.  And

17   objection, asked and answered.

18       A.  There are response workers summarized by

19   symptom category in NIOSH reports and at least one

20   published journal article that describes excess

21   symptoms as a group, and these are especially in

22   bird cleanup workers.

23       Q.  (BY MS. DESANTIS)  Okay.  Other than

24   symptoms that might have been reported by a group

25   of bird cleanup -- cleanup workers, you are not

```
 1        A.  Yes.

 2              MS. PENCAK:  Object to form.

 3        Q.  (BY MS. DESANTIS)  And with respect to the

 4   causes of those respiratory, dermatologic, and

 5   neurologic effects, isn't it true that these

 6   effects could have been caused by a variety of

 7   factors?

 8        A.  It's a very broad term, "a variety of

 9   factors."

10        Q.  For example, acute respiratory effects

11   could be caused by heat, correct?

12        A.  Yes.

13        Q.  And acute respiratory effects could be

14   caused by stress, correct?

15        A.  Yes.  In a --

16        Q.  And --

17        A.  -- susceptible person, yes.

18        Q.  And acute respiratory effects could be

19   caused by exposure to fumes, correct?

20        A.  Yes.  Correct.

21        Q.  And acute respiratory effects could be

22   caused by factors other than by exposure to oil or

23   constituents, correct?

24        A.  Correct.

25        Q.  And acute respiratory effects could be
```

1    caused by factors other than by exposure to

2    dispersants or dispersant constituents, correct?

3         A.  Correct.

4         Q.  And acute dermatologic effects could be

5    caused by exposure to heat, correct?

6         A.  Correct.

7         Q.  And acute dermatologic effects could be

8    caused by exposure to toxins other than oil and

9    its constituents, correct?

10        A.  Correct.

11        Q.  And acute dermatologic effects could be

12   caused by exposure to toxins other than

13   dispersants or dispersant constituents, correct?

14        A.  Correct.

15        Q.  And acute neurologic effects could be

16   caused by exposure to heat, correct?

17        A.  I'm trying to think of what those might

18   be.  Yes, I think those might be true -- that

19   might be true.

20        Q.  And, in fact, acute neurologic effects can

21   be caused by exposure to substances other than oil

22   and its constituents, correct?

23        A.  Correct.

24        Q.  And acute neurologic effects can be caused

25   by exposure to substances other than dispersants

1    Q.   (BY MS. DESANTIS)   Nonspecific symptoms

2  can derive from multiple causes, correct?

3    A.   Yes.   I mean, it would be better if we

4  could talk about a specific nonspecific health --

5  or symptom.

6    Q.   For example, nasal congestion can be a

7  nonspecific symptom, correct?

8    A.   It can be, yes.

9    Q.   And nasal congestion can derive from a

10  number of different causes, correct?

11    A.   More than one cause, yes.

12    Q.   And coughs, for example, are nonspecific

13  symptoms that can derive from more than one cause,

14  correct?

15    A.   Correct.

16    Q.   And sinus pain is a nonspecific symptom

17  that can derive from more than one cause, correct?

18    A.   Correct.

19    Q.   And shortness of breath is a nonspecific

20  symptom that can derive from more than one cause,

21  correct?

22    A.   Correct.

23    Q.   And redness on the skin is a nonspecific

24  symptom that can derive from more than one cause,

25  correct?

1      A.   Correct.

2      Q.   And itching is a nonspecific symptom that

3  can derive from more than one cause, correct?

4      A.   Correct.

5      Q.   And swelling is a nonspecific symptom that

6  can derive from more than one cause, correct?

7      A.   Correct.

8      Q.   And nausea is a nonspecific symptom that

9  can derive from more than one cause, correct?

10      A.   Correct.

11      Q.   And diarrhea is a nonspecific symptom that

12  can derive from more than one cause, correct?

13      A.   Correct.

14      Q.   And abdominal pain is a nonspecific

15  symptom that can derive from more than one cause,

16  correct?

17      A.   Correct.

18      Q.   And vomiting is a nonspecific symptom that

19  can derive from more than one cause, correct?

20      A.   Yes.

21      Q.   And it's fair to say that most people have

22  experienced nonspecific symptoms at some point in

23  their lives, correct?

24      A.   I think that's true, yes.

25      Q.   And the nonspecific symptoms that we had

1  just covered can be symptoms that derive from

2  causes other than exposure to oil, its

3  constituents, or dispersants and their

4  constituents, correct?

5      A.  Correct.  And they can also -- many of

6  those can occur as a result of exposure to oil and

7  its constituents.

8      Q.  But all of those symptoms that we have

9  just discussed can occur as a result of exposure

10  to substances other than oil or its constituents

11  or dispersants and their constituents, right?

12      A.  Yes.  I think I've already answered that

13  multiple times.

14      Q.  You're aware of the medical benefits class

15  action settlement entered into in this -- in this

16  matter, are you not?

17      A.  Yes.

18      Q.  And will you know what I refer to -- what

19  I mean if I refer to it as "the medical

20  settlement"?

21      A.  Yes.

22      Q.  All right.  You did not participate in the

23  medical settlement negotiations, correct?

24      A.  Correct.

25      Q.  And prior to the medical settlement, you

1    correct?

2       A.   Yes, that was the question that you asked.

3    And now I have looked at my report -- my

4    August 12th, 2014, report at Page 4, and I don't

5    see "hives" on the -- on the list.  So I'm not

6    sure if I can answer your question "yes" or "no"

7    as to the list that you just gave me.

8               MS. PENCAK:  Just to correct, you

9    mean your September 12th report.

10              THE WITNESS:  Sorry.

11              MS. PENCAK:  That's okay.

12      Q.   (BY MS. DESANTIS)  On Page 4 of your

13   September 12th report, you note that the matrix

14   included conditions such as acute rhinosinusitis,

15   correct?

16      A.   Yes.

17      Q.   Acute bronchitis, correct?

18      A.   Correct.

19      Q.   Acute contact dermatitis, correct?

20      A.   Yes.  You skipped a few.  But, yes, that's

21   on there.

22      Q.   Contact irritant -- contact dermatitis,

23   correct?

24      A.   Yes.

25      Q.   Headache, correct?

```
1      A.  Correct.

2      Q.  Dizziness, correct?

3      A.  Correct.

4      Q.  Nausea, correct?

5      A.  Correct.

6      Q.  Diarrhea, correct?

7      A.  Correct.

8      Q.  Vomiting, correct?

9      A.  Correct.

10      Q.  Abdominal cramps, correct?

11      A.  Correct.

12      Q.  And with respect to these symptoms or

13 health conditions, they are nonspecific symptoms

14 that we've discussed earlier, correct?

15      A.  They can be.  But in this context, they're

16 within 72 hours of exposure, was part of the

17 matrix requirement.

18      Q.  Regardless of whether or not these

19 conditions with -- occurred within 72 hours of

20 exposure, they could be caused by a number of --

21 of con- -- of factors, correct?

22      A.  Correct, as we've discussed earlier.

23      Q.  And these health conditions, regardless of

24 whether or not they occurred within 72 hours of

25 any exposure to oil, its constituents, or
```

1  dispersants or their constituents could be caused

2  by factors other than exposure to oil or

3  dispersants, correct?

4      A.  Correct.

5      Q.  And do you understand that inclusion of

6  these conditions on the matrix is not an admission

7  by BP that the condition of any individual was, in

8  fact, caused by exposure to oil or dispersants or

9  their constituents?

10              MS. PENCAK:  Object to form.

11      A.  I think we -- or you asked me something

12  like this before, and I haven't seen what the

13  conditions were of BP's agreement and whether that

14  language is in there or not.

15      Q.  (BY MS. DESANTIS)  All right.  You have

16  reviewed the medical encounters database as part

17  of your work for the penalty phase of this case,

18  correct?

19      A.  Correct.

20      Q.  And will you know when I refer to -- if I

21  refer to it as "the ME database"?

22      A.  Yes.

23      Q.  You analyzed the ME database to support

24  your opinions regarding human health effects to

25  cleanup workers, correct?