UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, ON APRIL 20, 2010 | * | SECTION: J |
| | * | JUDGE BARBIER |
| This document relates to: | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| No. 10-4536 | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BPXP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. STANLEY RICE**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Elissa J. Preheim
Brett E. Marston
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.***

**TABLE OF CONTENTS**

**CONTENTS**

**INTRODUCTION** ............................................................................................................................ 1

**LEGAL STANDARD** ..................................................................................................................... 1

**ARGUMENT** .................................................................................................................................... 2

**I.   DR. RICE'S OPINIONS RELATED TO TOXICITY RESEARCH AND WATER CHEMISTRY DATA ARE UNRELIABLE AND MUST BE EXCLUDED** ............................ 3

   **A.   Dr. Rice's Toxicity Presentation is Replete with Errors That He Could Not Explain** ........................................................................................................................................ 3

   **B.   Dr. Rice's Depiction of Water Chemistry Data Is Replete with Errors and Inconsistencies That He Could Not Explain** .......................................................................... 9

**CONCLUSION** ............................................................................................................................. 11

## INTRODUCTION

The United States' environmental expert, Dr. Stanley Rice, advances a novel theory of environmental toxicology -- one that he himself alternatively calls a new "oil spill paradigm" and an "imperfect" research approach -- that is replete with errors and misstatements.[1]  Moreover, the toxicity studies upon which he relies utilize unconventional methods such as high-speed blenders to overstate toxicity, have not and cannot be replicated, and contain fundamental flaws, such as lost samples.  Dr. Rice also admitted at his deposition that his depiction of water chemistry data contained numerous errors.  For these reasons, the United States' reliance upon Dr. Rice's toxicity theories and his depiction of water chemistry data should not be allowed in this Clean Water Act proceeding.

## LEGAL STANDARD

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993), the trial court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *See also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) ("[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore are reliable.  This requires some objective, independent validation of the expert's methodology.").  Federal Rule of Evidence 702 ("Fed. R. Evid. 702") states that an expert witness may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

---

[1] *See* 8/15/2014 Rice Report at 17 (describing a changed "oil spill paradigm" that includes a "significant lowering of the dose required to affect embryos (from ppm to ppb)") (Exhibit A) ("Ex. A, Rice Round 1 Rpt."); 9/26/2014 Rice Report at 5 (describing the "research approach" as a "developing science" that is "imperfect") (Exhibit B) ("Ex. B, Rice Round 3 Rpt.").

1

expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert*, 509 U.S. at 589.[2]

Opinions that rest on erroneous assumptions may justifiably be excluded by courts as unreliable. *See, e.g.*, *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2007) (finding district court did not err in excluding expert report and testimony was "unreliable because it was based on erroneous information."). Likewise, expert opinions such as Dr. Rice's that are "replete with so many obvious errors as to be of no value to the trier of fact" are properly excluded. *See, e.g.*, *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) (excluding expert opinions "replete with so many obvious errors as to be of no value to the trier of fact") (quotations omitted); *see also Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) ("The district court's responsibility is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.") (internal quotation omitted).

## ARGUMENT

The United States has designated Dr. Rice -- who is, in his words, a professional government biologist -- as an expert who may testify in the Penalty Phase regarding the extent of the Spill's environmental harm. Dr. Rice relies on a handful of laboratory toxicity studies for his assertions that fish were exposed to harmful levels of oil in 2010. Dr. Rice's presentation, however, is full of errors and misstatements, as he admitted in his deposition. Moreover, the studies upon which Dr. Rice relies use non-standard methods that have not been replicated. Dr.

---

[2] Although the current version of Fed. R. Evid. 702 was amended after the Supreme Court's landmark decision in *Daubert*, the amendment was consistent with *Daubert*, and courts continue to rely upon *Daubert* and its progeny, *see, e.g.*, *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Rice further admitted that his depictions of water chemistry data suffered from numerous defects including inappropriate and misleading statistical methods. For all of these reasons, BPXP asks the Court to preclude the United States from presenting opinions that rely upon or cite to: (a) Appendix C of Dr. Rice's Round 3 report and each of the laboratory studies cited therein; and (b) Appendix A of Dr. Rice's Round 2 Report or Appendix B of his Round 3 report (water chemistry).

**I.   DR. RICE'S OPINIONS RELATED TO TOXICITY RESEARCH AND WATER CHEMISTRY DATA ARE UNRELIABLE AND MUST BE EXCLUDED**

To be admissible, an expert must employ a reliable methodology in rendering opinions. *Daubert*, 509 U.S. at 592-93. The methodology must also be reliably applied to the facts at issue. *Id.*; *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007). *See also Moore*, 151 F.3d at 279 (upholding exclusion based in part where the "analytical gap" between an expert opinion and available data was too wide).

**A.   Dr. Rice's Toxicity Presentation is Replete with Errors That He Could Not Explain**

Based upon his "imperfect" research method, Dr. Rice posits certain toxic effects to early life stages of aquatic organisms at very low concentrations.[3] Dr. Rice's general theory of oil toxicity is not based upon field data or observations in the environment. Rather, Dr. Rice's research approach is based upon non-standard laboratory methods that he and others at his lab developed. Based upon these studies and other laboratory studies that similarly employ novel

---

[3] *See* Ex. A, Rice Round 1 Rpt. at 23-24 (citing studies allegedly "demonstrating embryo toxicity at low part-per-billion (μg/L) aqueous total PAH concentrations"); Ex. B, Rice Round 3 Rpt. at 5 (describing the "research approach" as a "developing science" that is "imperfect"). Importantly, the potential for toxicity from lower concentrations of PAH has long been understood and is already incorporated into the U.S. Environmental Protection Agency's ("EPA's") standard toxicity benchmarks. Dr. Rice's research method is novel and unreliable because it utilizes non-standard laboratory techniques (such as high-speed blenders) that go well beyond the approach used by the EPA for decades. *See* 9/12/2014 Shea Report at 10-18 (Exhibit E) ("Ex. E, Shea Round 2 Rpt.").

methods with unproven assumptions and numerous flaws as detailed below, Dr. Rice wants the Court to assume that there was widespread toxicity to aquatic organisms in the Gulf of Mexico, even at very low concentrations.[4]  To support this view, Dr. Rice included several appendices in his Round 2 and 3 reports, including one list of results from various laboratory toxicity studies.[5]  However, Dr. Rice's list of results -- and the studies cited therein -- are so replete with errors and mischaracterizations that they are not reliable and should be excluded.  For example:

**(1) Wrong Tuna Species Identified.**  On six different occasions in his Appendix C, Dr. Rice reported toxicity to a Gulf species -- Atlantic bluefin tuna.  However, the laboratory study upon which Dr. Rice relies did not test Atlantic bluefin tuna; rather, it tested an Australian species called southern bluefin tuna.  When asked about this error, Dr. Rice stated:  "It appeared to be a mistake on our part."[6]  Dr. Rice agrees that the southern bluefin tuna does not reside in the Gulf of Mexico.[7]  Most importantly, Dr. Rice agreed that "different species can have different responses to the same exposure of the same chemicals in the same dose."[8]

**(2) Wrong Amberjack Species Identified.**  On nine different occasions in his Appendix C, Dr. Rice reported toxicity to greater amberjack (an iconic species caught commercially and recreationally in the Gulf of Mexico) when the actual underlying study did not in fact test greater amberjack but tested a species called yellowtail amberjack.  Dr. Rice's only explanation was:

---

[4]  *See* Ex. A, Rice Round 1 Rpt. at 22 ("The PAH concentration was ≥ 0.5 ppb in about half of the oiled water samples (NRDA publically available data), hence many of these samples approach the threshold concentrations that may harm developing fish embryos.").

[5]  Ex. B, Rice Round 3 Rpt. at App. C.

[6]  Dep. of Dr. Stanley Rice, *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010* at 34:3 - 6 (Oct. 30, 2014) (Exhibit C) ("Ex. C, Rice Dep.").

[7]  *Id.* at 35:10 - 13.

[8]  *Id.* at 117:9 - 13 ("Q: And you agree, as you testified earlier, that different species can have different responses to the same exposure of the same chemicals in the same dose, correct?  A: Correct.").

"You're right.  We've screwed up the taxonomy again."[9]  Dr. Rice was unable to explain the importance of this error, stating only, "I'm not a species expert . . . . [t]hey all look the same to me."[10]

      **(3)  Critical Samples Lost.**  BPXP's expert, Dr. Damian Shea, relied upon standard toxicity testing methods used by the U.S. Environmental Protection Agency and other governmental agencies, including in this Spill.[11]  Dr. Rice, on the other hand, relied upon several studies that use a non-standard, high-energy blender to mix oil and water, thereby -- by his own admission -- biasing the results toward what he considers to be the more toxic compounds.[12]  In defense of this non-standard method, Dr. Rice stated that, "Dr. Shea's emphasis on standardized mixing methods is not warranted because the composition and concentration of individual PAHs can be determined with high quality analytical chemistries . . . ."[13]  In other words, the non-standard, high-energy methods Dr. Rice relies upon are purportedly acceptable because, according to him, we "have chemistry abilities to analyze those solutions now in order to

---

[9] *Id.* at 117:1 - 2.

[10] *Id.* at 117:20 - 25.

[11] *See, e.g.,* 8/15/2014 Shea Report at 7-9 (Exhibit F) ("Ex. F, Shea Round 1 Rpt.") (applying the EPA acute and chronic benchmarks for PAHs to analyze samples collected in the *Deepwater Horizon* oil spill); Operational Science Advisory Team Gulf Coast Incident Management Team: Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection (July 8, 2011), *available at* http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf (applying the EPA acute and chronic benchmarks for PAHs to analyze samples collected in the *Deepwater Horizon* oil spill); U.S. EPA, Water Quality Benchmarks for Aquatic Life, http://www.epa.gov/bpspill/water-benchmarks.html (last accessed Dec. 5, 2014) (describing the acute and chronic benchmarks for chemicals including PAHs).

[12] Ex. B, Rice Round 3 Rpt. at 10 ("high energy mixing has the energy to entrain dispersed small dispersed droplets into the water which promotes some of the heavier (and more toxic compounds) into solution").

[13] Ex. C, Rice Dep. at 61:1 - 9.

5

document what is in solution. And so that lowers the need for a standardized procedure that Dr. Shea was pushing."[14]

However, one of Dr. Rice's primary sources for this non-standardized procedure lacks the very information that he believes is necessary when departing from standardized procedures. Specifically, in a study on which Dr. Rice heavily relies, "PAHs were measured in only the highest concentration and control samples *because of sample loss during shipping between Australia and the United States*."[15] That is, the NOAA scientists lost their own samples and therefore could not conduct the actual chemistry analysis that Dr. Rice says is necessary. After realizing this fact, apparently for the first time, in his deposition, Dr. Rice agreed that absent the samples it would not be possible to conduct the analytical chemistry that he underscored is so important for non-standard testing methods.[16] Specifically, Dr. Rice agreed that, without actual analytical chemistry, the underlying studies could only *estimate* exposure levels.[17] Accordingly, the entire premise for Dr. Rice's reliance upon a non-standardized method -- namely, the ability to conduct precise chemistry -- did not exist in the laboratory test that Dr. Rice relies upon to set the lowest levels at which PAHs are allegedly harmful to fish embryos.

**(4) Laboratory Studies Not Replicated.** Dr. Rice agrees that it is important for scientists to be able to replicate laboratory toxicity experiments, stating that is "how science operates."[18] Notwithstanding this important feature of good science, Dr. Rice admitted that the tuna studies reported in his Appendix C have not been replicated.[19] He also was not aware of

---

[14] *Id.* at 65:4 - 8.

[15] *Id.* at 68:9 - 69:4 (emphasis added).

[16] *Id.* at 69:25 - 70:23.

[17] *Id.* at 70:11 - 12.

[18] *Id.* at 18:7 - 19.

[19] *Id.* at 32:5 - 11.

any other studies (other than the flawed studies he relied upon) that had reported edema or cardiac effects on fish embryos and larvae at levels less than 10 parts per billion.[20] With regard to an *Exxon Valdez* study conducted by Dr. Rice and Dr. Carls finding toxicity to Pacific herring at very low levels,[21] Dr. Rice admitted that the research had not been replicated even though the study was published over 15 years ago.[22] In actuality, published literature has reported serious difficulties with studies relied on by Dr. Rice and performed at his lab in Auke Bay, Alaska, including an inability to replicate the effects levels reported in those studies.[23]

After acknowledging this problem, Dr. Rice further admitted that the values in Appendix C were not intended to be a definitive account of the levels at which fish species may experience adverse effects:

> Q. Where in your report do you alert the Judge that other scientists were unable to replicate the toxicity thresholds at very low levels reported in Appendix C?
>
> MS. FIDLER: Object to form.
>
> A. What we're attempting to do here in Appendix C is just give a quick and dirty summary, so to speak, of the literature. It's not -- we don't attempt to evaluate all the -- as a matter of fact, an example: You said how many studies were looking at edema. Well, Pearson had edema in it, and another paper had edema in it. I forgot to mention.

---

[20] *Id.* at 56:10 - 18.

[21] As Dr. Rice admits, the species studied in Carls et al. 1999 -- pacific herring and pink salmon -- are not found in the Gulf of Mexico, and the studies were not designed to replicate any conditions in the Gulf of Mexico. *See* Ex. C, Rice Dep. at 77:12 - 78:19.

[22] *See, e.g.*, *id.* at 76:20 - 24 ("Q: Are you aware of any other scientist who has been able to replicate the toxicity threshold of .4 parts per billion utilizing the oil/gravel column method? A: It's not a widely used method.").

[23] *See* Page et al., *A Perspective on the Toxicity of Low Concentrations of Petroleum-Derived Polycyclic Aromatic Hydrocarbons to Early Life Stages of Herring and Salmon* at 230 (2012) (Dep. Ex. 13336) ("the evidence produced by these studies does not support the conclusions that weathered oil is toxic at low μg/LTPAH concentrations or that oil toxicity increases with weathering."); Brannon et al., *Toxicity of Weathered* Exxon Valdez *Crude Oil to Pink Salmon Embryos* (2006) (Dep. Ex. 13335).

> But this -- this is just a -- this is places, citations to go look at for more detail, and you obviously did. It's not meant to be a definitive -- either the dose level or the species, et cetera, it's not meant to be all encompassing. Maybe that's not the right word, but...[24]

**(5) Too Many Unanswered Questions.** An additional reason for excluding Dr. Rice's Appendix C (and all references to the underlying studies identified on Appendix C) is that Dr. Rice did not create the list and was unable to answer basic questions related to the criteria utilized for creating the list or the methods deployed in the underlying studies. As Dr. Rice stated at his deposition, he asked Dr. Mark Carls (another NOAA employee) to put together the table.[25] Dr. Rice admitted that he was unfamiliar with numerous aspects of Appendix C or was unable to answer other questions about it, including: how it was organized[26]; why the table did not list studies finding toxicity at exposures above 20 parts per billion[27]; and why results from certain studies were reported as a range rather than as point estimates.[28] In addition, Dr. Rice was unfamiliar with critical aspects of the underlying studies in his Appendix C and he was simply unable to answer basic questions related to those studies.[29]

---

[24] Ex. C, Rice Dep. at 87:12 - 88:6.

[25] *Id.* at 22:2-7.

[26] *Id.* at 22:21 - 24 ("**I guess I don't know how it's organized.**") (emphasis added).

[27] *Id.* at 24:9 - 13 ("**I -- I don't have a reason**. I mean, we -- how long do you want to make this, I think, in part.") (emphasis added).

[28] *Id.* at 109:11 - 18 ("Q. Okay. Why did you report on Appendix C of your Round 3 report Dr. Incardona's findings of edema as a range? A. **I do not know**.") (emphasis added).

[29] *See, e.g., id.* at 120:10 - 15 (because of the possibility that different container sizes could impact the toxicity results, Dr. Rice was asked if he was aware that Dr. Incardona, another NOAA scientist, exposed yellowtail amberjacks to PAHs to measure heart rates in both one-liter beakers and ten-liter buckets. Dr. Rice responded: "**I don't remember that level of detail.**"); *Id.* at 126:5 - 9 (because ammonia has been found to impact swimming performance of fish, Dr. Rice was asked whether he was aware that Dr. Mager, the author of another study that Dr. Rice replied upon, also reported measurable ammonia levels in their study, to which Dr. Rice replied: "**I do not remember that fine level of -- fine scale level of detail.**"); *Id.* at 125:6 - 21 (when asked if Dr. Mager used a geometric or arithmetic mean when computing concentration, Dr. Rice responded: "**I guess I don't know that right now.**"); *Id.* at 57:10 - 18 (when asked about the percent edema that Dr. Incardona observed in his experimental controls, Dr. Rice replied: "**I -- I**

Finally, Dr. Rice admits that he does not have sufficient information about the laboratory studies to determine what levels would have been necessary to cause adverse effects to fish populations in the Gulf of Mexico.[30]  In applying toxicological studies and data to particular circumstances, the details of the application matter a great deal.  In *Moore*, the Fifth Circuit upheld the exclusion of an expert report that purported to apply several toxicological studies to the symptoms of a plaintiff who claimed exposure to toluene, a PAH.  The *Moore* court found that the expert in question admitted that he "had no information on the level of exposure necessary for a person to sustain the injuries" described by the plaintiff.  *Moore*, 151 F.3d at 278.  Such vagueness is unlikely to assist the Court in performing its task of determining a potential penalty under the Clean Water Act.

In sum, Dr. Rice's toxicity presentation -- including his Appendix C and the studies relied upon therein -- is so riddled with errors, mischaracterizations and unanswered questions as to be unreliable.

### B. Dr. Rice's Depiction of Water Chemistry Data Is Replete with Errors and Inconsistencies That He Could Not Explain

As with his opinions related to toxicity, Dr. Rice admitted that his presentation of water chemistry data has several errors.  These errors make Dr. Rice's opinions about water chemistry data unreliable under *Daubert*.  In addition, over and over again, Dr. Rice was unable to answer basic questions about his presentation of water chemistry data.

---

Footnote continued from previous page
**don't remember that**."); *Id.* at 128:9 - 17 (when asked whether he was aware that the authors of Dr. Mager's study did not observe gross malformations that would typify more severe oil injury, Dr. Rice responded:  "**I'm not aware of that level of detail here.**").

[30] *Id.* at 109:19 - 110:7 (agreeing that the laboratory studies Dr. Rice relies upon provide no data as to whether there were impacts to yellowfin populations in the Gulf of Mexico); *see also id.* at 233:5 - 16 (agreeing that any hypothesis of population effects to fish or shellfish from the *Deepwater Horizon* oil spill would be "speculation").

9

**(1) Misleading Statistics Utilized.** Dr. Rice presents average concentrations of PAHs for different months and parts of the Gulf of Mexico. By his own admission, however, Dr. Rice used the wrong averaging technique, thereby grossly misrepresenting the dataset. For example, Dr. Rice presented the average concentration of PAHs in the water during the month of May 2010 as above 1000 parts per billion. Upon closer examination, it became apparent that of the over 150 data points, **only 4** were above 1000.[31] Accordingly, these 4 samples (which were collected at the riser) were skewing the entire analysis presented by Dr. Rice. If these anomalous samples were either removed or weighted appropriately, the average PAH concentration in the water during the month of May would have dropped from 1000 parts per billion to under 0.5 parts per billion. The proper averaging technique for skewed data is called a "geometric mean" versus an "arithmetic mean" that is used for datasets that do not have skewed data. Dr. Rice was initially confused about the distinction between these two methods of averaging data,[32] but he eventually agreed that it would have been "more appropriate" to present these data using a geometric mean.[33] As Dr. Rice acknowledged, such techniques are more appropriate where, as here, a handful of very high values improperly skew the average upward, creating the false impression that the entire dataset is sufficiently characterized by high values.

**(2) Numerous Errors in Presentation of Water Chemistry Data.** Dr. Rice presented in his Round 2 and Round 3 reports an analysis of the water chemistry data collected as part of the *Deepwater Horizon* environmental investigation.[34] However, as Dr. Rice admitted in his

---

[31] *Id.* at 159:15 - 161:4, 163:2 - 166:2.

[32] *Id.* at 125:16 - 21.

[33] *Id.* at 321:2 - 5.

[34] *See* 9/12/2014 Boesch & Rice Rpt. at 24-25 (referring to "our analyses of the NRDA database" and concluding that "we judge samples from the plume and from the upper surface waters to be harmful" when compared to the "measured threshold of 0.5 ppb PAH as harmful to bluefin tuna embryos") (Exhibit D) ("Ex. D, Boesch & Rice Round 2 Rpt."); Ex. B, Rice Round 3 Rpt. at 4

deposition, the depiction of water chemistry data is replete with errors and inconsistencies.[35] Moreover, Dr. Rice was unable to answer basic questions about the water chemistry data.[36] In addition, Dr. Rice conceded that he had **no knowledge** about how water chemistry samples were collected ("I have no knowledge of collection of samples") or anything about the water chemistry database except that "it's large and has [PAH] numbers [in] it."[37] Dr. Rice admitted that BPXP would have to ask Dr. Carls (another NOAA employee) if it wanted to understand the reason for the numerous inconsistencies and errors in the presentation of water chemistry data in the Round Two and Three Reports.[38]

## CONCLUSION

For the foregoing reasons, the United States should be precluded from relying upon those opinions in Dr. Rice's reports that rest on admitted errors and flaws related to his analysis of toxicology studies and water chemistry data. Specifically, the United States should not be permitted to present opinions that rely upon (a) Appendix C of Dr. Rice's Round 3 report and the

---

Footnote continued from previous page
(citing to Appendix containing analyses of water chemistry and stating "[o]ur conclusions regarding the impacts from that data -- namely that samples from the plume and the upper surface to waters [were] harmful -- have not changed") (quotation and citation omitted); Ex. D, Boesch & Rice Round 2 Rpt. at App. A, (analyzing and depicting water chemistry data); Ex. B, Rice Round 3 Rep. at App. C (same).

[35] Ex. C, Rice Dep. at 147:1 - 10 ("Q. And this -- you have this -- the depiction of data -- water chemistry data is intended to be identical in Round -- in Round 2 report as your Round 3 report, correct? . . . A. Well, yeah. **We found errors because this is done with a short time line. And so the Round 3 is a, quote, "corrected version," although it looks like it needs another level of editing and correction.**").

[36] *Id.* at 142:13- 143:15 (Q: You didn't perform any of the analysis yourself of the water chemistry data in your Round 2 and Round 3 report, correct? A: I did not.)

[37] *Id.* at 161:1 - 21 (further conceding again that if BPXP wanted to know more about the utilization of data in his expert report, Dr. Carls is the person to ask).

[38] For example: depiction of nearshore water chemistry in May 2010, *id.* at 149:18 - 150:6; depiction of nearshore water chemistry in September, October, and November 2010, *id.* at 150:18 - 152:7; discrepancy in numbers of samples depicted, *id.* at 323:9 - 16). Apparently during the deposition, Dr. Rice called Dr. Carls to get answers to some of the questions regarding the presentation of water chemistry data, but questioning by the United States only addressed a few minor points such as the data sources. *Id.* at 314:12 - 316:19.

laboratory studies cited therein; and (b) Appendix A of Dr. Rice's Round 2 Report or Appendix B of his Round 3 report (water chemistry).

Date: December 5, 2014                              Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Elissa J. Preheim
Brett E. Marston
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-59999
***Attorneys for BP Exploration & Production Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of December, 2014.

/s/ Don K. Haycraft
Don K. Haycraft