# Exhibit F

# IN RE OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA
## MDL NO. 2179, SECTION J
## JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

# EXPERT REPORT OF DR. DAMIAN SHEA

## AUGUST 15, 2014

# I.   INTRODUCTION

The *Deepwater Horizon* oil spill was a significant environmental event from many perspectives. However, from the perspective of evaluating the potential environmental impact of oil and dispersants, the incident was not entirely new or novel. This is because oil and oil-related chemicals continuously enter our environment every day from both natural and human sources. As a result, we have a very well developed scientific and regulatory framework in which to understand the potential impact from this spill. I have relied upon this scientific and regulatory framework to describe the impact of the *Deepwater Horizon* oil spill on the Gulf of Mexico.

Of course, as we all know from pictures and reports in 2010, oil released from the *Deepwater Horizon* spill impacted the environment and some animals in certain areas. However, it is my opinion that any scientific, objective discussion of the environmental harm caused -- or not caused -- by the *Deepwater Horizon* oil spill must rely upon the actual environmental data collected in the aftermath of the accident. This is exactly what I have set out to do in this report.

In total, I have reviewed data from nearly 18,000 water samples, over 8,000 sediment samples, and over 900 laboratory toxicity tests collected or undertaken as part of the environmental investigations following the *Deepwater Horizon* oil spill. Based upon this review, I have reached the following opinions to a reasonable degree of scientific certainty:

**A massive quantity of high-quality environmental data was collected to help understand the environmental impact of the *Deepwater Horizon* oil spill in the northern Gulf of Mexico. This data collection – completed by governmental agencies, BP, and academics – represents the largest environmental investigation of an oil spill ever undertaken.**

> To help understand the environmental impact of the oil spill, almost 18,000 water samples and over 8,000 sediment samples were collected in federal and state waters and analyzed for oil-related chemicals and/or dispersants. Measurements of the toxicity of the oil and dispersants were conducted in over 900 separate toxicity tests.

> All of the water and sediment samples and data relied upon in forming my opinions were collected under well-designed quality assurance (QA) plans, following strict chain-of-custody and other quality assurance/quality control (QA/QC) procedures.

**As demonstrated by these data, and using conservative assumptions, there was no harmful exposure to oil-related chemicals or dispersants in the vast majority of the area investigated. The few areas where there was *potentially* harmful exposure to chemicals were limited in space and time, mostly in the area very close to the wellhead during the summer of 2010. For example:**

> *Water:* Less than 2% of the nearly 18,000 water samples showed concentrations of oil-related chemicals that exceeded the U.S. Environmental Protection Agency's (EPA) water toxicity benchmarks. The relatively few samples that exceeded these benchmarks were largely limited to the area very close in distance to the wellhead and the time period of the release. Over 8,000 water samples were collected for dispersant chemicals and only 16 of those (0.3%) exceeded the EPA or other appropriate benchmarks.

*Sediment*: Fewer than 2% of sediment samples collected in the areas investigated exceeded EPA sediment toxicity benchmarks. As with the water data, the relatively few samples that exceeded these benchmarks were largely limited to the area very close in distance to the wellhead.

*Toxicity Tests*: In addition to comparing water and sediment results to EPA benchmarks, I have reviewed over 900 laboratory toxicity tests undertaken as part of the *Deepwater Horizon* environmental investigation. These laboratory tests confirm that any potentially harmful effects of the oil spill were largely limited to exposures that occurred during the release of oil and close in distance to the wellhead.

**The results above are not at all surprising given the location of the spill, the environmental conditions in the Gulf of Mexico, and the expected and actual behavior of oil in the environment. Much of the oil released from the Macondo wellhead was rendered harmless very quickly through biodegradation, evaporation, dilution, weathering, and other processes. For example:**

For eons, the bottom of the Gulf has released oil through natural seeps. The oil from these seeps sustains great populations of oil-consuming bacteria in a hydrocarbon-rich ecological system. During the spill, these bacteria quickly consumed oil and oil constituents, just as they have naturally for thousands of years. This process, called biodegradation, naturally and safely removed Macondo oil from the environment.

At every step of the oil's pathway through the water, oil was dissolving and dissipating via dilution. Oil is composed of many chemicals, some slightly soluble in water (meaning that they can dissolve) and others very insoluble (meaning that they do not dissolve easily). Most of the soluble chemicals dissolved and dissipated along the path from the wellhead to the surface, leaving only the least-soluble chemicals to form the slick.

Once at the surface, the droplets coalesced into slicks, evaporated, biodegraded, photo-degraded, dispersed, and were subject to response actions.

*Interpretation of Water and Sediment Chemistry Data*

Field samples collected from the water during and after the spill provide the best possible information regarding concentrations of chemicals that aquatic organisms were potentially exposed to and what harm, if any, they encountered. These samples provide timely, accurate information regarding actual conditions in the environment during and after the spill. Therefore, these measurements form the primary basis of my opinions.

As part of the environmental investigation of this oil spill, the chemicals of most concern are the following:

    (1)     Polycyclic Aromatic Hydrocarbons (PAHs);

    (2)     **B**enzene, **T**oluene, **E**thylbenzene, and **X**ylenes (referred to as **BTEX**); and

    (3)     Dispersant constituents

Of the oil-related chemicals, PAHs and BTEX are the best indicator of potential toxicity of spilled oil to aquatic life. For these chemicals, the EPA has developed a benchmark chemical concentration defined by the EPA as "…a chemical concentration specific to either water or sediment, above which there is the possibility of harm or risk to the humans or animals in the environment."[9,10] These EPA benchmarks have undergone rigorous development and review over the past 15 years, and I use them as prescribed by the EPA[11] in my analysis.

Following the guidelines set by the EPA,[12] I have compared measured chemical concentrations in the Gulf of Mexico to these EPA benchmarks in order to determine potential environmental harm caused by the *Deepwater Horizon* oil spill.[13] This method (comparing chemistry results to EPA benchmarks) is the same basic method relied upon by the Operational Science Advisory Team (OSAT), a team chartered by the *Deepwater Horizon* Federal On-Scene Coordinator to

---

[9] U.S. EPA. Water Quality Benchmarks for Aquatic Life, *available at* http://www.epa.gov/bpspill/water-benchmarks.html#gen2.

[10] My analysis compares water and sediment chemistry data to EPA toxicity benchmarks for aquatic life. Any possibility of harm or risk to humans is beyond the scope of this report.

[11] U.S. EPA. Water Quality Benchmarks for Aquatic Life, *available at* http://www.epa.gov/bpspill/water-benchmarks.html#gen2.

[12] U.S. EPA. 2010. Explanation of PAH benchmark calculations using EPA PAH ESB approach, *available at* http://www.epa.gov/bpspill/water/explanation-of-pah-benchmark-calculations-20100622.pdf.

[13] See Appendix F for a more detailed discussion of interpreting chemistry data.

determine the presence or absence of subsurface oil and dispersants amenable to removal actions.[14]

Oil Chemicals and Toxic Units (TUs). For PAHs and BTEX, the benchmarking procedure requires the calculation of *Toxic Units (TU)*.[15] TUs are benchmarks developed by the EPA to assess the toxicity of complicated mixtures of chemicals like oil. Each of the chemicals in oil has a different toxicity, and each chemical individually may add to the potential toxicity of the water or sediment sample in which it is found. The sum of all of these toxicities is added into a single TU value, representing the total toxicity of that chemical mixture in the sample of interest. Thus, all else being equal, any two samples with the same TU should have the same toxicity, even though they might have a different collection of chemicals.

Following EPA protocols, any sample with a TU ≥ 1.0 may potentially be harmful to sensitive aquatic organisms, while samples where TU < 1.0 are considered safe[16] for aquatic life. This TU method applies to both water and sediment, although they are calculated in slightly different ways.[17]

The scientific basis supporting use of the TU approach is rigorous and robust. Many hundreds of toxicity tests were performed over several decades to create the toxicity database needed to apply this approach. These underlying tests were performed on many different species at various life stages and under a wide range of conditions to represent what occurs in the real world. Due to these robust underpinnings, the TU benchmark approach is widely accepted by both the scientific and regulatory community. This EPA TU approach has been used previously by the EPA, the National Oceanic and Atmospheric Administration (NOAA), and the U.S. Geological Survey (USGS) to assess toxicity of PAHs and BTEX to aquatic life resulting from the *Deepwater Horizon* oil spill.[18,19,20]

---

[14] Operational Science Advisory Team Gulf Coast Incident Management Team: Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection (July 8, 2011), 35 pp and Appendices (OSAT-1).

[15] The EPA TU approach applies only to EPA toxicity benchmarks for aquatic life; it does not apply to human health.

[16] For purposes of this report, I refer to a concentration as "safe" if it is less than the benchmark value because no adverse health effects are expected as a result of exposure. It is important to note that an exceedance of a benchmark (or TU > 1) does not necessarily mean that adverse effects will occur.

[17] See Appendix F for an explanation of the EPA benchmark approach and TU.

[18] U.S. EPA. Water Quality Benchmarks for Aquatic Life, *available at* http://www.epa.gov/bpspill/water-benchmarks.html#gen2.

[19] Bejarano, A.C., Levine, E., and Mearns, A.J. 2013. Effectiveness and potential ecological effects of offshore surface dispersant use during the Deepwater Horizon oil spill: a retrospective analysis of monitoring data. Environmental Monitoring and Assessment 185:10281-10295.

[20] Nowell, L.H., Ludtke, A.S., Mueller, D.K., and Scott, J.C. 2011. In: U.S. Geological Survey (Ed.), Organic Contaminants, Trace and Major Elements, and Nutrients in Water and Sediment Sampled in Response to the Deepwater Horizon Oil Spill. U.S. Department of the Interior, Reston, Virginia, p. 128. Open-File Report 2011-1271.

<u>Dispersants</u>.  EPA protocols for dispersants are somewhat different.  For dispersants, the EPA simply uses benchmark values from toxicity testing of each chemical.[21]  The dispersant benchmarks are expressed in terms of the specific dispersant chemical; they are not added together like the PAH chemicals or the BTEX chemicals.  Additional dispersant toxicity data were used to augment this analysis.[22]

<u>Acute and Chronic Benchmarks</u>.  For both oil and dispersants, I used two kinds of benchmarks:

    (1)    EPA *acute* benchmarks for short-term toxicity; and

    (2)    EPA *chronic* benchmarks for longer-term toxicity.

*Acute* benchmarks are related to the chemical concentration above which there is the possibility of harm after exposure to the chemical for a short amount of time.  Thus, a chemical concentration that exceeds an acute benchmark has the potential to cause lethal effects to aquatic organisms exposed for a short amount of time.  *Chronic* benchmarks are related to the chemical concentration above which there is the possibility of harm only after exposure to the chemical for a prolonged amount of time.  Thus, a chemical concentration that exceeds a chronic benchmark has the potential to cause both lethal and sub-lethal effects to aquatic organisms exposed for a prolonged amount of time.

I have evaluated each water sample for <u>both</u> its *acute* and *chronic* toxicity.  For example, a particular area might not be acutely toxic (acute TU<1), but it still might be toxic over the long term (chronic TU>1).  Thus, in that example, it is safe for a fish to spend three consecutive days or less in an area with this concentration of oil.  If the same fish spent a week or more in an area with this concentration of oil, however, the exposure is potentially harmful.[23]

---

[21] The EPA summarized toxicity information for dispersant chemicals at U.S. EPA, Methods for Detecting Dispersants in Water, *available at* http://www.epa.gov/bpspill/dispersant-methods.html.

[22] The EPA published toxicity data for numerous dispersants including the Corexit 9500A that was used in this spill (Judson, R.S., et al.  2010.  Analysis of Eight Oil Spill Dispersants Using Rapid, In Vitro Tests for Endocrine and Other Biological Activity.  Environmental Science & Technology 44:5979-5985.).

[23] See Appendix F for explanation of the EPA benchmark approach and TU.