# EXHIBIT 2

824 F.Supp. 713
United States District Court, E.D.
Michigan, Southern Division.

UNITED STATES of America, Plaintiff,

v.

MIDWEST SUSPENSION AND BRAKE, Defendant.

No. 91–CV–70141–DT.  |  June 16, 1993.

Government brought civil action under Clean Air Act against business involved in rehabilitation of brake shoes for violations of national emission standards governing asbestos as well as terms of administrative order. Following bench trial, the District Court, Zatkoff, J., held that: (1) EPA reasonably concluded that emission standards' definition of "fabricating" included process of relining brake shoes; (2) asbestos fibers themselves did not have to be visually detectable to establish visible emission; (3) evidence established four violations of emission standards and 16 violations of administrative order; (4) maximum civil penalty of $500,000 had to be reduced by $450,000 due to economic impact maximum fine would have on business; and (5) government was not entitled to affirmative injunctive relief requiring business' future compliance with order.

Ordered accordingly.

**Attorneys and Law Firms**

 **\*715** Peter E. Jaffe, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Thomas J. Budzynski, Clinton Twp., MI, for defendant.

### *\*716 MEMORANDUM OPINION AND ORDER*

ZATKOFF, District Judge.

#### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

### I. INTRODUCTION

This matter is before the Court on the United States of America's ("the government's") civil action against defendant Midwest Suspension and Brake ("defendant" or "Midwest") under § 113 of the Clean Air Act, 42 U.S.C. § 7413,[1] for alleged violations of § 112 of the Clean Air Act, 42 U.S.C. § 7412, the National Emission Standards for Hazardous Air Pollutants for Asbestos, 40 C.F.R. Part 61, Subpart M ("Asbestos NESHAP"), as well as alleged violations of an Administrative Order on Consent ("AO"), which Midwest and the government entered into pursuant to § 113(a)(3) of the Clean Air Act, 42 U.S.C. § 7413(a)(3). In this action, the government seeks civil penalties and injunctive relief against defendant. The Court presided over the bench trial in this matter from April 1, 1993—April 6, 1993 ("the trial"). Upon the Court's request at the close of the trial, both parties filed post-trial proposed findings of fact and conclusions of law.

During the bench trial, the Court had an opportunity to consider, and did consider, each witness's ability and opportunity to observe the facts and the events to which he and she testified; each witness's memory and manner while testifying; each witness's interest, bias, or prejudice; and the reasonableness of each witness's testimony considered in light of all the evidence admitted. Based upon the testimony produced during the trial, the exhibits admitted into evidence at trial, and the post-trial briefs that the parties have submitted to the Court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court sets forth below its findings of fact and conclusions of law.

### II. FINDINGS OF FACT

Midwest stipulated to the admissibility of all of the government's exhibits in this case (some 139 exhibits plus an additional 35 demonstrative exhibits), save for objections under Rules 401, 402, and 403 of the Federal Rules of Evidence. Accordingly, the Court admitted all of the government's exhibits into evidence. April 1, 1993, Tr. at 32–34. At the beginning of the trial, the government dropped one of its claims for violation against defendant, specifically the claimed violation of June 29, 1988, for an alleged visible emission[2] to the outside air. April 1, 1993, Tr. at 9.

Midwest is incorporated under the laws of the State of Michigan with its principal place of business located at 3411 West Fort Street, Detroit, Michigan ("the facility" or "Midwest facility"). Stipulation No. 4, Final Pretrial Order of February 8, 1993 ("Stip. No. ——"). As part of its business at the facility, Midwest delines and relines brake shoes and accepts used brake shoes for refurbishing. Stip. Nos. 4 & 24.

Midwest only works on heavy equipment brake shoes, that is, any vehicle from a medium-sized delivery truck on up. Testimony of Mr. Ciupak, April 1, 1993, Tr. at 50. Midwest receives used brake shoes from regular customers, as well as from infrequent customers. Stip. No. 30. Some of the used brake shoes contain asbestos. Stip. No. 32. Midwest inspects the used brake shoes to determine whether the used brake shoes are dimensionally correct to the manufacturer's specifications. Stip. No. 25; Ciupak's deposition **\*717** at 10.[3] Midwest does not inspect, however, the used brake shoes or worn brake block to determine whether they contain asbestos. Stip. No. 32. Midwest is unable to determine the material contained in the used brake shoes or block it receives. *Id.*

Prior to 1991, Midwest used a deriveting/delining machine ("delining machine") to separate the brake shoe from the brake table. Testimony of Mr. Ciupak, April 1, 1993, Tr. at 51–52. The delining machine gripped the entire brake shoe and rotated it into a plow/blade that was positioned between the table and the brake block. The plow/blade severed the rivets which held the brake shoe to the brake table, allowing the brake block to fall free from the brake table. The angle of the plow/blade was tangent to the brake table so that the plow/blade gouged neither the brake table nor the back of the brake pad. Testimony of Mr. Ciupak, April, 1, 1993, Tr. at 51–52; Testimony of Mr. Lins, April 1, 1993, Tr. at 154; Testimony of Mr. Mauzy, April 2, 1993, Tr. at 315; Government's Exs. 40 & 52.

The delining machine, by forcing its plow/blade between the brake table and the brake pad or lining, caused the brake pad or lining to fracture into small pieces and dust. Testimony of Mr. Ciupak, April 1, 1993, Tr. at 53; Testimony of Mr. Lins, April 1, 1993, Tr. at 154, 160; Testimony of Mr. Mauzy, April 2, 1993, Tr. at 315; Testimony of Mr. Anderson, April 5, 1993, Tr. at 16–17; Government's Ex. 25. If the brake shoe was not correct to specifications, the worn brake pad or lining was removed on the delining machine and the used brake table was broken and scrapped. Stip. No. 26; Mr. Ciupak's Deposition at 10. If the brake shoe was correct to specifications, the worn brake pad or lining was removed on the delining machine. Stip. No. 27; Mr. Ciupak's Deposition at 10, 15–16; Testimony of Mr. Ciupak, April 1, 1993, Tr. at 51–52.

Due to the position of the delining machine's plow/blade, a certain amount of rust and asbestos fiber bundles remained bonded to the brake shoe after the delining machine had

severed the brake pad or lining from the brake table. Testimony of Mr. Anderson, April 5, 1993, Tr. at 17. After the brake shoes have gone through the delining machine, the brake shoes are sent to a washer where they are cleaned. Testimony of Mr. Ciupak, April 1, 1993, Tr. at 54.

After the cleaning operation is concluded, the brake shoes are sandblasted.[4] Mr. Ciupak testified that:

> In the sandblaster the shoe is bombarded with high-speed particles to remove rust and bring the shoe back to a non-painted, non rustic condition. It's bare metal when it comes out. After it comes out of the sandblaster, we put it into a dip tank and dip it in a black rust preventative paint. We allow it to air dry.
>
> . . . . .
>
> Once it's dried, we have a tendency to separate the shoes into common shoes so that we have pallets and dollies filled with shoes that are the same configuration. Those, in turn, are moved over to our relining area where the shoes are examined to make sure that they're still to manufacturer's specification.
>
> . . . . .

Testimony of Mr. Ciupak, April 1, 1993, Tr. at 54–55.

Arnold Anderson testified at trial to the effects that sandblasting has on the brake shoe:

> When they [the sand particles] strike the rust layer [on the shoe], the brittle material cannot resist that type of impact and it shatters in the form of very fine particulate, iron dust. The friction materials, asbestos, the asbestos crude that are encapsulated within the rust are then impacted by this same shot and will be broken into very fine airborne fibers which, hopefully, are swept away in some form of baghouse.

 **\*718**  Testimony of Mr. Anderson, April 5, 1993, Tr. at 23.

Mr. Anderson also testified that asbestos fibers and fibrils are major components in the sandblast dust, along with iron oxide, which is a rust color. *Id.* at 23. Mr. Anderson went on to testify, however, that after the sandblast dust is dumped

out, and the emission settles to the ground, that one would find iron oxide. One would be unlikely to find, however, asbestos in the dust that has settled to the ground, because asbestos fibers settle very slowly. Therefore, if there is a slight breeze present it would be unlikely that the asbestos fibers would settle anywhere near the site from which they were released. Testimony of Mr. Anderson, April, 5, 1993, Tr. at 24. Moreover, Mr. Stiner, the biology team leader at the United States Environmental Protection Agency's ("EPA") Central Regional Laboratory, testified that asbestos material can only be detected through the use of an instrument, such as a microscope. Testimony of Mr. Stiner, April 2, 1993, Tr. at 324, 335–36.

The final step in the brake shoe delining/relining process occurs when Midwest rivets new brake linings or pads onto the refurbished brake shoes. Stip. No. 27; Testimony of Mr. Ciupak, April 1, 1993, Tr. at 55; Government's Ex. 47. The new brake shoes are pre-cut with pre-drilled holes in which the new rivets are placed.

The parties stipulated that:

> For certain application for which Midwest performs lining and delining of brake shoes, only brake linings containing asbestos are available. Midwest periodically performs lining or delining of such brake shoes. Therefore, from time to time, Midwest purchases new brake block containing asbestos, maintains an inventory of such brake block, and uses asbestos-containing brake block when performing these operations.

Stip. No. 33. [5]

The parties also entered to following relevant stipulations:

34. On or about August 1, 1985, U.S. EPA inspector Kenneth E. Radtke performed a NESHAP compliance inspection of the Midwest facility. In the presence of Mr. Radtke, Midwest employees dumped a small waste hopper containing floor sweepings and fragmented linings from the brake stripping operation into a large waste bin outside of the facility.

35. Mr. Radtke took a sample of the material in the small waste hopper during the August 1, 1985 inspection prior to the dumping of it into the waste bin. This sample was analyzed and found to contain one to two percent (1–2%) chrysotile asbestos. It is stipulated by the parties that the sample analyzed is the same sample taken by Mr. Radtke on August 1, 1985, that the test results accurately reflect the amount of asbestos in that sample, and that the laboratory report relating to this sample is admissible in evidence.

36. On July 2, 1986, David Kee, Director, Air Management Division, U.S. EPA, Region V, issued a Finding of Violations ("FOV") to Midwest for, *inter alia,* violations of 40 C.F.R. § 61.152(b).

37. On September 24, 1986, U.S. EPA inspector Lawrence J. Lins performed a NESHAP compliance inspection of the Midwest facility. During this inspection a sample was taken from the "porta-dumpster," a small waste hopper used in the disposal of delining waste, which was analyzed and found to contain two to five (2–5%) chrysotile asbestos. It is stipulated by the parties that the sample analyzed is the same sample taken by Mr. Lins on September 24, 1986, that the test results accurately reflect the amount of asbestos in that sample, and the laboratory report is admissible in evidence. This stipulation relates to the sample taken on September 24, 1986.

38. On or about January 8, 1987, Midwest agreed to resolve its alleged noncompliance with the [Asbestos] NESHAP by entering into Administrative Consent **\*719** Order No. EPA–5–87–113(A)a–2 (hereinafter "AO"). The AO requires, *inter alia,* that Midwest achieve and maintain continuous compliance with the Act and with the "no visible emissions" standard in 40 C.F.R. § 61.152(b)....

Stip. Nos. 34–38.

The AO provided in part as follows:

IT IS ORDERED AND AGREED THAT:

A. On or before January 15, 1987, Michigan Truck Spring Service, Inc., [6] shall achieve and thereafter maintain continuous compliance with Section 112 of the [Clean Air] Act and the "no visible emission" standard of 40 C.F.R. 61.152(b) for the collection, procession, packaging, transporting, and deposition of any asbestos-containing waste material. Michigan Truck Spring Service, Inc., shall implement the following procedures to prevent any visible emissions of asbestos to the outside air:

1) Containerize all asbestos-containing waste material as described below. Asbestos-containing waste at the Detroit facility includes, but is not limited to, delining waste, shot [sand] blast waste, and vacuum bag filters which contain floor sweepings (see below).

   a. *For Delining Waste:* Perform delining so that delining waste (stripped linings, broken rivets, rust, dust) falls into a sturdy cardboard box. Securely close the box, seal it in shrink-wrapped plastic, and place asbestos warning labels on the outside.

   b. *For Shot Blast Waste:* Carefully empty dust from the hopper of the shot blast baghouse into a 6–mil (or 6–mil composite) plastic bag. Securely seal the bag and place asbestos warning labels on the bag.

   c. *For Floor Sweepings:* Vacuum the brake relining area (instead of sweeping) to pick up asbestos-containing material from the floor. The vacuum exhaust must be directed so as not to disturb residual dust on the floor. Dispose of vacuumed residue and the vacuum bag filters in a 6–mil (or 6–mil composite) plastic bag. Securely seal the bag and place warning labels on the bag.

2) Segregate containerized asbestos-containing waste material from all other non-asbestos containing plant trash. Asbestos-containing waste material is not to be compacted prior to deposition at the landfill.

3) Haul asbestos-containing waste in a non-compacting vehicle to a landfill prepared to handle asbestos-containing waste in a manner complaint with 40 CFR 61.156.

The parties further stipulated that "Robert Ciupak, general manager of Midwest, was hired after Midwest had entered into the AO. He had no knowledge of the AO at the time he was hired, nor was he made aware of it until after ... July 1, 1988...." Stip. No. 62.

On June 12, 1987, U.S. EPA inspector Lawrence Lins and Van Mauzy from the Wayne County Health Department, Air Pollution Control Division, performed a NESHAP compliance inspection of the Midwest facility. Stip. No. 46; Testimony of Mr. Lins, April 2, 1993, Tr. at 176; Testimony of Mr. Mauzy, April 2, 1993, Tr. at 311. Mr. Lins testified that during this June 12, 1987 inspection, debris from the delining machine was on the floor. Testimony of Mr. Lins, April 2, 1993, Tr. at 185. Mr. Lins identified this debris in Government's Exhibit No. 31 (photograph of the floor in the

delining area of the facility) as the debris located on the floor in front of the open boxes on the right side of the photograph. *Id.*

The parties also stipulated that during the June 12, 1987 inspection, "in the presence of Mr. Lins, a Midwest employee dumped a can of dust from the delining operation into the compactor chute [of the dumpster designated for non-asbestos containing material] outside the building." Stip. No. 47. Mr. Mauzy testified at trial that this dumpster was designated for non-asbestos material ("the non-dedicated dumpster"). Testimony of Mr. Mauzy, April 2, 1993, Tr. at 313. During the trial, Mr. Lins testified that he observed a plume of dust when the can was dumped into the chute of the non-dedicated dumpster. **\*720** Testimony of Mr. Lins, April 2, 1993, Tr. at 183–84. Mr. Mauzy also testified that he saw the employee dump the same can into the non-dedicated dumpster. Testimony of Mr. Mauzy, April 2, 1993, Tr. at 313. This testimony is consistent with Mr. Mauzy's and Mr. Lins' written reports regarding this inspection. *See* Government's Exs. 21 & 22.

In addition, the parties stipulated that during the June 12, 1987 inspection, that:

   48. Mr. Lins inspected Midwest's dumpster which is dedicated to disposal of stripped brake pads, baghouse dust, and dust from the vacuum cleaner used in the delining area ("the dedicated dumpster"). Loose, exposed material was present on the slats of a box in the dedicated dumpster.

   49. On June 12, 1987, Mr. Lins took samples of the exposed material in the dedicated dumpster. The sample was found to contain twenty-seven percent (27%) chrysotile asbestos. It is stipulated by the parties that the sample analyzed is the same sample taken by Mr. Lins on June 12, 1987, that the test results accurately reflect the amount of asbestos in that sample, and that the laboratory report relating to this sample is admissible in evidence.

Stip. Nos. 48 & 49.

Mr. Lins and Mr. Mauzy also testified regarding the presence of the material in the dedicated dumpster. Testimony of Mr. Lins, April 2, 1993, Tr. at 193; Testimony of Mr. Mauzy, April 2, 1993, Tr. at 312. Furthermore, Mr. Lins' written report and Mr. Mauzy's written report of the inspection reflect the same findings. Government's Exs. 21 & 22. Additionally, the photograph of the dedicated dumpster also showed the existence of the material. Government's Ex. 29.

Case 2:10-md-02179-CJB-DPC  Document 13811-2  Filed 12/09/14  Page 6 of 23
U.S. v. Midwest Suspension and Brake, 824 F.Supp. 713 (1993)
37 ERC 1054

Finally, during the June 12, 1987 inspection, the parties stipulated that "Mr. Lins observed the dedicated dumpster's loading and transportation to the City Sand and Gravel Landfill in Sumpter Township. Mr. Lins also observed the dumping of the dedicated dumpster at the landfill. During the dumping, certain boxes from the dedicated dumpster broke open." Stip. No. 50. Mr. Lins's and Mr. Mauzy's testimony at trial was consistent with this stipulation, as were Mr. Lins' and Mr. Mauzy's written reports regarding the June 12, 1987 inspection and the photograph of the dedicated dumpster being unload. Testimony of Mr. Lins, April 2, 1993, Tr. at 195; Testimony of Mr. Mauzy, April 2, 1993, Tr. at 317–18; Government's Exs. 21, 22, & 27. In addition, Mr. Lins testified that while he was observing the dedicated dumpster being unloaded at the landfill, that "[i]mmediately prior to [the photograph marked as Government's Ex.] 28 being taken a plume at the point of deposition where the ro-ro [the dedicated dumpster] was leaning over and the material from Midwest was sliding off the tail of it [the dedicated dumpster] at the point where the load was impacted I observed a VE [visible emission]."[7] Testimony of Mr. Lins, April 2, 1993, Tr. at 202–03. *See also id.* at 203–204. Mr. Lins took a sample of this emission, after it had settled on top of a box, to see if it contained asbestos; the test result was negative for asbestos. *Id.* at 204.

On June 29, 1988, Lee Murchison, an inspector for the Wayne County Health Department, Air Pollution Control Division, inspected the Midwest facility. Stip. No. 51. The parties stipulated that:

> 58. On ... June 29, 1988, Midwest used cardboard boxes which were not lined with plastic bags to dispose of waste from the delining process, including the delining table and the shot/sandblaster areas.

Stip. No. 58.

Mr. Murchison testified at trial that, during the June 29, 1988, inspection, he observed three (3) boxes located in the dedicated dumpster which were neither shrink-wrapped nor labeled with asbestos warning stickers. Testimony of Mr. Murchison, April 2, 1993, Tr. at 276; Tr. at 303–304. The written report which Mr. Murchison prepared following his June 29, 1988 inspection, is consistent with his testimony. Government's  **\*721** Ex. 36. Furthermore, the parties stipulated as follows:

56. At the time of the June 29, 1988 inspection, conducted by Mr. [Murchison],[8] three unwrapped, unlabeled boxes containing delining waste were on the ground outside of Midwest's facility.

Stip. No. 56.

In addition, the parties stipulated that "[d]uring the June 29, 1988 inspection, in the presence of Mr. Murchison, a Midwest employee used a broom to sweep brake delining waste on the floor of the brake relining area." Stip. No. 54. During the trial, Mr. Murchison testified regarding the same. Testimony of Mr. Murchison, April 2, 1993, Tr. at 273. Once again, Mr. Murchison's written report with respect to the June 29, 1988 inspection, is consistent with the above-noted evidence. Government's Ex. 36.

Finally, as to the June 29, 1988 inspection, the parties entered into the following stipulation: "During the June 29, 1988 inspection, in the presence of Mr. Murchison, Midwest employees manually removed rivets from used brake shoes allowing the linings to fall to the floor." Stip. No. 52. Mr. Murchison testified during the trial to the same effect. Testimony of Mr. Murchison, April 2, 1993, Tr. at 272–73. Likewise, Mr. Murchison's written report noted that a Midwest employee "manually remov[ed] rivets from brake shoes ... letting the linings fall on the floor." Government's Ex. 36.

The parties also entered in the following stipulations which are relevant:

63. On or about July 13, 1988, Midwest submitted a sample of waste from its facility's delining area and from the vacuum cleaner bag to Clayton Environmental Consultants, Inc. ("Clayton Environmental"), which Midwest engaged for the purpose of analyzing these samples to determine whether they contained asbestos.

64. Results of the tests performed by Clayton Environmental on the samples submitted on or about July 13, 1988 found the waste from the delining area contained eighteen (18%) chrysotile, a form of asbestos fibers. Tests performed by Clayton Environmental on the vacuum cleaner waste showed that this sample contained approximately one percent (1%) chrysotile asbestos. It is stipulated by the parties that the samples analyzed are

the same samples taken by Midwest and submitted to Clayton Environmental on July 13, 1988, that the test results accurately reflect the amount of asbestos in those samples, and that the laboratory report relating to this sample is admissible in evidence.

65. On July 20, 1988, Mr. Murchison and Steve Drielick of Wayne County Health Department conducted an inspection of the Midwest facility. During this inspection, Mr. Drielick obtained a brake shoe from the bin in the facility where all brake shoes are placed after the linings have been removed and immediately before shot blasting. Adhered to the shoe was residual brake lining material that would be removed by shot blasting. This sample was analyzed and found to contain 10–20% chrysotile asbestos. It is stipulated by the parties that the sample analyzed is the same sample taken by Mr. Drielick on July 20, 1988, that the test results accurately reflect the amount of asbestos in the sample, and that the laboratory report relating to this sample is admissible in evidence.

Stip. Nos. 63–65.

On August 3, 1989, Mr. Murchison again visited the Midwest facility. Testimony of Mr. Murchison, April 2, 1993, Tr. at 280–81. The parties stipulated that:

> 66. On August 3, 1989, Mr. Murchison conducted another NESHAP compliance inspection of the Midwest facility. During the inspection there were pieces of brake delining waste on the floor of the dedicated dumpster and other pieces of brake delining waste on the ground near the dedicated dumpster....

Stip. No. 66.

During the trial, Mr. Murchison testified regarding the presence of brake delining waste on the floor of the dedicated dumpster **\*722** and on the ground of the dedicated dumpster. Testimony of Mr. Murchison, April 2, 1993, Tr. at 281–82. Likewise, Mr. Murchison's written report regarding his August 3, 1989 inspection, is consistent with the above-noted evidence. Government's Ex. 42. Pursuant to this inspection, Wayne County issued a Notice of Violation. Government's Ex. 43.

The parties further stipulated that:

> 66. On August 3, 1989, Mr. Murchison conducted another NESHAP compliance inspection of the Midwest facility.... There was also a box of delining waste which was not covered with shrink-wrapped plastic, leaving its contents exposed. Several boxes of delining waste were not labeled.

Stip. No. 66. In addition, Mr. Murchison testified at trial that "there were only a few boxes in the ro-ro [the dedicated dumpster], but they were not, they were not wrapped as required. They were not labelled as required." Testimony of Mr. Murchison, April 2, 1993, Tr. at 281. *See also id.* at 282. Mr. Murchison's written report also reflects this finding. Government's Ex. 42. As a result of Mr. Murchison's August 3, 1989 inspection, Wayne County issued a Notice of Violation to Midwest. Government's Ex. 43; Stip. No. 68.

On October 12 and 13, 1989, Mr. Lins inspected the Midwest facility. Testimony of Mr. Lins, April 2, 1993, Tr. at 205. The parties stipulated that:

> 72. On October 13, 1989, Mr. Lins observed the dedicated dumpster being loaded onto a City Disposal Company truck and transported to the City Sand [and Gravel] Landfill. Mr. Lins observed the dumping of the load from the dedicated dumpster. Also in the presence of Mr. Lins, several boxes of stripped brake block from the load open during the dumping.

Stip. No. 72. Mr. Lins' written report regarding the October 13, 1989 unloading of the dedicated dumpster is consistent with Stipulation 72. Government's Ex. 47, at 3.

The parties also stipulated, with respect to the October 13, 1989 inspection, that:

> 73. On October 13, 1989, Mr. Lins took a sample of the material which had spilled from the box of delining waste during the dumping. This sample was analyzed and found to contain five to ten percent (5–10%) chrysotile asbestos. It is stipulated by the parties that the sample analyzed

is the same sample taken by Mr. Lins on October 13, 1989, that the test results accurately reflect the amount of asbestos in the sample, and that the laboratory report relating to this sample is admissible in evidence.

Stip. No. 73. In his written report regarding the October 13, 1989 unloading of the dedicated dumpster, Mr. Lins noted that "[w]hen the box [dedicated dumpster] was dumped ... a dust plume of approximately 25%–35% opacity was visible for several [sic] seconds. It appeared that several boxes of sheared [brake] block had broken open and caused the plume." Government's Ex. 47, at 3. Mr. Lins took two (2) samples of the material which had spilled from a box of delining waster. One of the samples was for the EPA and the other sample was for Wayne County Health Department. *Id.;* Testimony of Mr. Lins, April 2, 1993, Tr. at 209. As noted in the above stipulation, the sample taken for the EPA tested positive for asbestos. *See* Stip. No. 73. The sample taken for the Wayne County Health Department tested, however, negative for asbestos. Government's Ex. 47, at 3.

The last inspection of the Midwest facility occurred on February 27, 1990. On this date, Mr. Mauzy conducted the inspection. Testimony of Mr. Mauzy, April 2, 1993, Tr. at 316. Mr. Mauzy testified at trial that on this date he observed the dedicated dumpster at the Midwest facility. Inside the dedicated dumpster, Mr. Mauzy observed that all of the packages were properly sealed with shrink-wrapped plastic and that the asbestos warning labels were on each package. Mr. Mauzy then followed the dedicated dumpster to the landfill. Mr. Mauzy testified as follows:

A: I ... positioned myself properly to observe the dumping, meaning that I had positioned myself with the sun behind me in a position perpendicular to the dumping and also taking into consideration the wind **\*723** direction so that I would not be down wind of the dump.

Q: What did you see?

A: Well, as they began dumping the load into a hole that had been dug, the first couple of pallets that slid out of the back of the ro-ro [the dedicated dumpster] went down into the hole, generated a visible emission and two subsequent additional groups of material came out after that which both of those also generated other subsequent visible emissions which indicated the discharge of material from the boxes.

Q: Can you describe the visible emissions?

A: Yes. It was kind of rust-colored emission that gave the appears of the shot blast material, ranged in opacity from, say, 5 to 20 percent, and I guess each emission lasted, you know, 10 or 15 seconds.

Q: How many emissions were there?

A: Three

Q: Did you take a sample from the source material?

A: No, I didn't. Just prior to the, the dumping of this material into this hole, a, a sludge vehicle, I believe, which had waste, sewer-type material in it dumped this soupy wet material down into this hole, and this is where they were dumping the asbestos, and I didn't feel it was a safe situation for me to climb down into the hole without another individual there to aid me, in the event that I was injured or got, or fell or got hurt or anything like that.

Testimony of Mr. Mauzy, April 2, 1993, Tr. at 317–319.

The government also introduced evidence with respect to how the EPA interprets the word "fabricating" under the Asbestos NESHAP. Ms. Rebecca Frye ("Ms. Frye"), an environmental engineer with the Air Compliance Branch of the U.S. EPA between 1984 and 1989, testified that, as the lead coordinator of enforcement efforts against friction product fabricators in EPA Region V,[9] to her knowledge the only operations covered by the Asbestos NESHAP standards for friction product fabricators were brake reliners and clutch reliners. Testimony of Ms. Frye, April 1, 1993, Tr. at 98. In addition, Mr. Frye testified that approximately twenty (20) other brake reliners within the jurisdiction of EPA Region V also were issued Administrative Orders on Consent pursuant to the fabricating standards of the Asbestos NESHAP. *Id.* at 98–99. Mr. George Czerniak, Chief of the Air Enforcement Branch at U.S. EPA, Region V, also testified that asbestos fabricators mainly were companies in the brake relining business. Testimony of Mr. Czerniak, April 5, 1993, Tr. at 36–37. Finally, the government introduced the following October 26, 1982 written applicability determination from U.S. EPA Headquarters, from the Director of the Stationary Compliance Division, which states in pertinent part that:

This is in response to an October 1, 1982 telephone request ... for an applicability determination regarding the asbestos NESHAPs standard, 40 CFR 61, Subpart B.[10] Two sources ... both replace worn asbestos pads with new

ones. The worn pads are stripped and the new ones riveted into place. Attaching the new pads involves no grinding, cutting or other altering; they are precut and consist of 20% encased asbestos. Stripping the old pads does result in asbestos emissions, and you want to know whether this is considered fabrication which would subject the two sources to the provisions of § 61.22(h). [11]

Fabricating is defined at § 61.21(s) [12] as "any processing of a manufactured product containing commercial asbestos, with the exception of processing at temporary sites *724 for the construction or restoration buildings, structures, facilities, or installations." The stripping or debonding of the old pads and the bonding of new ones is considered the processing of a manufactured product containing commercial asbestos. The *Control Techniques Document for Asbestos Air Pollutants* (AP–117, February 1973, pp. 3–29 to 3–36), a part of the asbestos standard public record, discusses bonding and debonding at length in the section dealing with the processing, emissions and control of friction material. This discussion makes clear that debonding or stripping is considered part of friction product processing, and as such, its emissions are covered under § 61.22(h) of the standard. Although the bonding of asbestos friction material on motor vehicles is exempted at § 61.22(h)(2) from the fabrication provisions, no such exemption is allowed for the debonding or stripping of such materials.

Government's Ex. 1, at 1. [13]

The government also introduced evidence regarding the percentage of asbestos containing brake linings for heavy duty trucks. Mr. Anderson testified that in 1987, seventy-two percent (72%) of truck brake linings to be delined contained asbestos; that in 1988 that percentage was sixty percent (60%); that in 1989 that percentage was forty-eight percent (48%); and that in 1990 that percentage was thirty-seven percent (37%). Testimony of Mr. Anderson, April 5, 1993, Tr. at 32. *See also* Government's Demonstrative Ex. 12.

Finally, the government called Ann Heller to testify as to defendant's ability to pay a civil penalty which this Court would have to impose on defendant if this Court determines that defendant violated the Clean Air Act, the AO, or the Asbestos NESHAP. Ms. Heller testified that she had reviewed defendant's financial statements for the fiscal years ending September 30th of the years 1987 through 1992. Testimony of Ms. Heller, April 5, 1993, Tr. at 49. Based on her review of defendant's financial statements, Ms. Heller concluded that

defendant could withstand a penalty in excess of $600,000.00. *Id.*

Ms. Heller based her conclusion on two factors. First, Ms. Heller testified that

> "as of the end of September 1992's financial statement [Midwest] had recently entered into a line of credit arrangement with Michigan National Bank and the approved *725 line of credit, based on the bank's review, was for 2.5 million dollars. As of the end of 1992, the financial statements indicate that the firm had tapped into or accessed approximately 1.85 million dollars of that line of credit, so my calculation is that additional line of credit is still accessible."

*Id.* at 50.

Second, Ms. Heller testified that for the last fiscal year Midwest had allowed its accounts receivable balance to increase by approximately $334,000.00 from the previous year and, in her opinion, if Midwest had continued to maintain their past collection practices the accounts receivable could be turned into cash. *Id.* [14] In addition, Ms. Heller testified that out of the 1.6 million dollars in "outstanding accounts receivable, approximately $36,000.00 of that 1.6 million dollars was deemed uncollectable." *Id.* at 53–54. In addition, in response to this Court's questions, Ms. Heller indicated that Midwest had a gross revenue of 10.819 million dollars for 1992 with a net income of approximately $214,000.00.

Ms. Heller also testified that Midwest "has come through reasonable cash tough periods, is now profitable and is generating positive cash flow." *Id.* at 55. Finally, Ms. Heller stated that she could not state an opinion on what effect a fine in excess of $600,000.00 would have on Midwest, because the information provided to her was incomplete. *Id.* 54 & 56.

### III. CONCLUSIONS OF LAWS

#### A. PROCEDURAL ISSUES

[1]  [2]  The Court has subject matter jurisdiction over this action pursuant to § 113(b) of the Clean Air Act, 42 U.S.C. §

7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355. The Court has personal jurisdiction over the parties, because defendant did not object to the Court's exercise of personal jurisdiction in this matter. Fed.R.Civ.P. 12(h)(1). Venue is proper in the Court pursuant to § 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. § 1391(b), because the site where the alleged violations occurred is within the Eastern District of Michigan, Southern Division. *See* 28 U.S.C. § 102(a)(1). The government gave that State of Michigan a "notice of the commencement" of this action pursuant to § 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b).

## B. APPLICATION OF THE ASBESTOS NESHAP TO MIDWEST'S REHABILITATION OF BRAKE SHOES

[3]   [4]   As this Court previously held, in order to establish liability under the Asbestos NESHAP, the government must establish that (1) the Clean Air Act and the Asbestos NESHAP apply to Midwest and (2) that Midwest failed to comply with the requisite requirements. *United States v. Midwest Suspension and Brake,* 796 F.Supp. 260, 263 (E.D.Mich.1992) (Zatkoff, J.). *See also United States v. Sealtite Corp.,* 739 F.Supp. 464, 468 (E.D.Mo.1990). Where civil violations are alleged, a defendant is strictly liable under the Asbestos NESHAP. *Sealtite Corp.,* 739 F.Supp. at 468; *United States v. Hugo Key and Son, Inc.,* 731 F.Supp. 1135, 1140 (D.R.I.1989).

### 1. Application of the Clean Air Act and Asbestos NESHAP to Midwest.

As part of an attempt to protect and enhance the Nation's air resources, Section 112 of the Clean Air Act, 42 U.S.C. § 7412, authorizes the Administrator of EPA to publish a list of "hazardous air pollutants" and to determine emission standards "at a level to provide an 'ample margin' of safety for public health." *United States v. Hugo Key and Son, Inc.,* 731 F.Supp. 1135, 1140 (D.R.I.1989) (citing 42 U.S.C. § 7412(b) (1)(B)). As is evident from the findings of fact, this case involves the Asbestos NESHAP.

*726   As this Court stated in an earlier opinion in this case:

> To establish the first element of its case (i.e., that the Asbestos NESHAP and the [Clean Air] Act apply to Midwest), the government

> must show that Midwest is (1) an owner or operator of (2) a fabricating operation using commercial asbestos in the fabrication of friction products, and (3) Midwest does not *primarily* install such friction material in motor vehicles. 40 C.F.R. §§ 61.149 and 61.152.

*Midwest Suspension and Brake,* 796 F.Supp. at 263 (emphasis in original). [15] Here, the parties have stipulated that "Midwest is an 'owner or operator' within the meaning of Sections 111(a)(5) and 112(a)(3) of the [Clean Air] Act, 42 U.S.C. §§ 7411(a)(5) and 7412(a)(3), 40 C.F.R. §§ 61.02 and 61.141." Stip. No. 23. Accordingly, the government has met its burden on this issue.

[5]   With respect to whether Midwest's rehabilitation of brake shoes constitutes "fabrication of friction products," the government has met its burden of proof on this element as well. During the time period of the alleged violations, the Asbestos NESHAP defined fabricating as:

> any processing of a manufactured product that contains commercial asbestos, with the exception of processing at temporary sites for the construction or restoration of facilities.

40 C.F.R. § 61.141 (1987).

While the Asbestos NESHAP did not define the word "processing," as this Court previously noted in an early opinion, the EPA has stated that:

> The definition of "manufacturing" is added to clarify that the regulation [asbestos NESHAP] applies to only those sources within the specified categories of affected manufacturing facilities that process commercial asbestos into a product. *Operations which process (cut, shape, assemble, mix, or otherwise alter) a manufactured product that contains commercial asbestos at a separate location are not intended to be covered by the regulation* [pertaining to manufacturing], *and are classified as*

*fabricating rather than manufacturing operations....*

*United States v. Midwest Suspension and Brake,* 803 F.Supp. 1267, 1270 (E.D.Mich.1992) (citing 39 Fed.Reg. 15397 (1974)) (emphasis added in original opinion) (Zatkoff, J.). Based on this, it is clear that the EPA's interpretation of the word "process" includes any method that cuts, shapes, assembles, mixes, or otherwise alters a manufactured product that contains commercial asbestos.[16] The government introduced ample evidence at trial that U.S. EPA interprets the regulation to cover Midwest's business. First, the government introduced an applicability determination from EPA headquarters which addresses the precise issue at hand, namely, the situation where:

[W]orn pads are stripped and the new ones riveted into place. Attaching the new pads involves no grinding, cutting or other altering; they are precut and consist of 20% encased asbestos. Stripping the old pads does result in asbestos emissions, and you want to know whether this is considered fabrication....

Government's Ex. 1, at 1.

This 1982 applicability determination involved the interpretation of the definition of the word "fabricating" that is at issue in this case, that is, "any processing of a manufactured product containing commercial asbestos...." The EPA stated that such a brake shoe operation falls within the meaning of fabrication, as defined in the Asbestos NESHAP for friction products. In addition, two witnesses for the government, Ms. Frye and Mr. Czerinak, testified that, as EPA employees, they interpreted the definition of **\*727** fabricating to cover brake relining businesses, such as Midwest's brake relining business. It is well settled that when the situation involves:

an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

*Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). *See also Arkansas*

*v. Oklahoma,* 503 U.S. 91, ——, 112 S.Ct. 1046, 1058–60, 117 L.Ed.2d 239 (1992); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.") (citing *Bowles, supra* ); *First Nat'l Bank v. Sanders,* 946 F.2d 1185, 1190 (6th Cir.1990) (citing *Udall, supra,* and *Compton v. Tennessee Dep't of Pub. Welfare,* 532 F.2d 561 (6th Cir.1976)). Accordingly, the EPA's interpretation of the definition of "fabricating" to include the process of relining brake shoes is given controlling weight, unless it is either plainly erroneous or inconsistent with the regulation.

Here, the Court finds that the EPA's interpretation neither is plainly erroneous nor inconsistent with the regulation. As the EPA stated in 1973, processing includes cutting, shaping, mixing, or otherwise altering a manufactured product containing asbestos. In the case at bar, as the evidence at trial showed, some of the used brake shoes contained asbestos and by putting the used brake shoes through the delining machine that used a plow/blade to separate the brake lining from the brake table, it is clear that defendant cut or otherwise altered a manufactured product containing asbestos. The use of the sandblasting machine to rid the brake shoe of rust, in which asbestos fibers were encapsulated, also otherwise altered a manufactured product containing asbestos.

Moreover, in 1973, the EPA conducted an extensive investigation of fabricating facilities and concluded that facilities which process brake shoe linings generated significant amounts of asbestos dust, and thus the EPA determined that these facilities should be regulated. 39 Fed.Reg. 38064, 38065 (October 25, 1974);[17] EPA Background Information on National Emission Standards for Hazardous Air Pollutants 23, 26 (October 1974) ("BID").[18] It was for this reason that, in 1975, the EPA amended the Asbestos NESHAP to include the fabricating standard which regulates facilities that fabricate friction products. 40 Fed.Reg. 48292 (October 14, 1975); 39 Fed.Reg. 38064, 38064–65 (October 25, 1975).

**\*728** Based on the above evidence, this Court concludes that the EPA's interpretation of the definition of fabricating, as that term is defined in the Asbestos NESHAP, must be given controlling weight, because the interpretation neither is plainly erroneous nor inconsistent with the regulation. Indeed, the regulation was promulgated to cover this exact situation. Accordingly, this Court finds that the government has met its

burden of proving that Midwest's rehabilitation of brake shoes constitutes fabricating as that word is defined in the Asbestos NESHAP.

Finally, as this Court has already ruled on numerous occasions, [19] Midwest admitted in its Answer to the government's Complaint, as well as its Amended Answer to the government's Complaint, that Midwest did not primarily install such friction products on motor vehicles. Accordingly, this Court holds that the Asbestos NESHAP apply to Midwest's rehabilitation of brake shoes.

### 2. Midwest's Compliance with the Asbestos NESHAP.

The Asbestos NESHAP provide in pertinent part as follows:

(b) *Standard.* Each owner or operator of any of the fabricating operations to which this section applies shall either:

(1) Discharge no visible emissions to the outside air from any building or structure in which they are conducted; or

(2) Use the methods specified by § 61.154 to clean emissions containing particulate asbestos material before they escape to, or are vented to, the outside air.

40 C.F.R. § 61.149(b)(1)–(2) (1987). The Asbestos NESHAP also provide that:

Each owner or operator of any source covered under the provisions of § ... 61.149 shall:

(a) Deposit all asbestos-containing waste material at waste disposal sites operated in accordance with the provisions of § 61.156; and

(b) Discharge no visible emissions to the outside air during the collection, processing (including incineration), packaging, transporting, or deposition of any asbestos-containing waste material generated by the source....

40 C.F.R. § 152(a) & (b) (1987).

Midwest has not claimed that it used the methods set forth in § 61.154 to meet the Asbestos NESHAP standards set forth in § 61.149(b). The government alleges that Midwest violated the "no visible emission" standard found in §§ 61.149 and 61.152 on four (4) separate occasions. Before reaching the merits of the government's argument, the following discussion is necessary.

[6]    The Asbestos NESHAP state as follows:

*Visible emissions* means any emissions containing particulate asbestos material that are visually detectable without the aid of instruments. This does not include condensed uncombined water vapor.

*Particulate asbestos material* means finely divided particles of asbestos material.

40 C.F.R. § 61.141 (1987). In an earlier opinion, this Court indicated that under the definition of visible emissions that the particulate asbestos material itself must be visible without the aid of an instrument. *See United States v. Midwest Suspension and Brake,* 803 F.Supp. at 1270–71. The government introduced, however, evidence at trial supporting the conclusion that the asbestos fibers at issue cannot be seen by the naked eye, and that one way the asbestos fibers may be detected is by the use of microscopes. During the trial, this Court stated on the record that:

> With respect to the visible emissions, I agree with the Government's position as contained in their trial brief, that the visible emissions definition does not require that the asbestos content of the emission be visible, only that the emission itself be    **\*729** visually detectable with[out] the aid of instruments.

April 6, 1993, Tr. at 8. Accordingly, the government does not have to prove that the asbestos fibers themselves are visually detectable without the aid of instruments. All the government must prove, by a preponderance of the evidence, is that an emission, which was detectable without the aid of instruments, occurred and that the emission contained asbestos. Of course, under the Asbestos NESHAP all such visible emission must occur in the "outside air." *See* 40 C.F.R. §§ 61.149(b)(1) and 61.152(b) (1987). The Asbestos NESHAP defines "outside air" as "the air outside buildings and structures." 40 C.F.R. § 61.141 (1987).

[7]    As to the claimed visible emissions occurring on June 12, 1987, and on October 13, 1989, at the City Sand and Gravel Landfill, the government as met its burden of proving these violations. First, with respect to the October 13, 1989 alleged violation, the government presented testimony of witnesses that they observed a plume being discharged as the dedicated dumpster was being unloaded at the landfill. Thus,

these plumes were emissions that were visually detectable without the aid of instruments. Furthermore, on October 13, 1989, Mr. Lins, after this emission had come to rest on top of a box, obtained a small sample of the emission. This sample tested positive for asbestos. [20] Therefore, the October 13, 1989 emission, which was visually detectable without the aid of an instrument, contained particulate asbestos material. Accordingly, under the Asbestos NESHAP, a visible emission occurred in the outside air during the deposition of asbestos-containing waste material, in violation of 40 C.F.R. § 61.152(c). A violation of the Asbestos NESHAP is a violation of the Clean Air Act itself. 42 U.S.C. § 7413(c).

[8]   As to the visible emission which the government contends occurred on June 12, 1987, at the landfill, the government presented evidence that on the day in question, Mr. Lins obtained a sample of material that was lying loose in the dedicated dumpster, prior to the dumpster being transported to the landfill. This sample tested positive for asbestos. Mr. Lins testified that he followed the dedicated dumpster to the City Sand and Gravel Landfill and that he observed a plume discharge from the dedicated dumpster as it was being unloaded. While Mr. Lins did not test this plume that was discharged, it reasonably may be inferred that the plume came from the loose material, which included dust, that was lying in the dedicated dumpster. Because this material tested positive for asbestos, this Court concludes that the government has met its burden of proving that a visible emission occurred at the landfill on June 12, 1987, in violation of the Asbestos NESHAP, 40 C.F.R. § 61.152(c) (1987). As noted above, a violation of the Asbestos NESHAP constitutes a violation of the Clean Air Act.

[9]   With respect to the visible emission that allegedly occurred on June 12, 1987, when an employee of Midwest dumped a can of dust from the delining operation into the compactor chute of the non-dedicated dumpster, the government also has met its burden of proving that this constitutes a visible emission, despite the fact that the sample taken of this dust tested negative for asbestos. First, Midwest stipulated that it had no way of knowing if the brake shoes it received to be rehabilitated contained asbestos and that some brake shoes it received for delining did contain asbestos. Second, in 1987, approximately seventy-two (72%) of heavy duty truck brake shoes to be delined contained asbestos. Third, the delining waste from Midwest's brake rehabilitation business had in the past contained asbestos, and on the day in question, loose pieces of material found in the dedicated

dumpster tested positive for asbestos. Fourth, Midwest agreed in the AO to put all of the delining waste into the dedicated dumpster, because such waste constitutes asbestos-containing waste material.

***730** Finally, Mr. Anderson testified at trial that due to the fact that even a slight breeze may cause the asbestos fibers to come to rest at a place far away from where the rest of the emission settles, that it would be likely that a sample of the emission, after it has come to rest on the ground, or elsewhere, would not contain asbestos, even though the original emission did contain asbestos. This testimony was support by the event which transpired on June 12, 1987, at the landfill, where Mr. Lins obtained two samples from a plume after it had settled on top of a box. These samples were taken as duplicates of one another. Yet, only one of these samples tested positive for asbestos.

While a positive test result for asbestos in the dust dumped into the compactor chute would prove beyond a reasonable doubt that the dust contained asbestos, a negative test result does not mean that the government, based on circumstantial evidence, cannot prove, by a preponderance of the evidence, that the dust contained asbestos. Here, for the reasons set forth in the preceding paragraph, the Court finds that based on the evidence adduced at trial the government has met its burden of proving the presence of asbestos in the dust which was dumped into the compactor chute. Because this compactor chute was located outside of the Midwest facility, the emission occurred in the outside air. Accordingly, the government has proven that a visible emission, in violation of 40 C.F.R. § 61.152(c), occurred when an employee dumped a can of delining waste into the compactor chute on June 12, 1987. [21]   As noted above, a violation of the Asbestos NESHAP is a violation of the Clean Air Act.

[10]   The last visible emission which the government seeks relief on allegedly occurred on February 27, 1990, when Mr. Mauzy observed three plumes being discharged from the dedicated dumpster as it was being dumped at the landfill. Mr. Mauzy did not take a sample of the emissions after they had settled to the ground. Mr. Mauzy testified that the plumes were rust colored, which suggests that one significant component of the emission was shot blast waste. Mr. Anderson testified that sandblast waste usually contains asbestos, because of the fact that asbestos fibers are encapsulated in the rust which is being removed during the sandblast operation. In addition, Midwest stipulated that some of the brake shoes it received contained asbestos and

that Midwest did not have the ability to determine which brake shoes contained asbestos and which brake shoes did not contain asbestos. Finally, the dumpster being unloaded was the dumpster which Midwest had dedicated for the disposal of asbestos-containing waste material. Based on all of this evidence, this Court finds that the government has proven, by circumstantial evidence, that the rust colored plume discharged on February 27, 1990, at the landfill was a visible emission under the Asbestos NESHAP and in violation of 40 C.F.R. § 61.152(c). [22] Once again, a violation of the Asbestos NESHAP constitutes a violation of the Clean Air Act.

### C. THE ADMINISTRATIVE ORDER

#### 1. The Legal Import of the Administrative Order

[11] As noted above, on February 6, 1987, the AO between the government and Midwest became effective. The parties stipulated that the AO operates as a contract between Midwest and the government and that the AO is still in effect. In addition, the parties stipulated that each violation of the AO renders Midwest subject to injunctive **\*731** relief and civil penalties of up to $25,000 per day for each violation pursuant to § 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b). In *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), the Supreme Court, after reviewing its earlier cases, [23] stated that:

since consent decrees and *orders* have many of the attributes of ordinary contracts,[ ] they should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation.

....

Since a consent decree or *order* is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree....

420 U.S. at 236–37, 238, 95 S.Ct. at 934–35 (emphasis added) (footnote omitted). Accordingly, the AO in the case

before this Court must be treated as a contract between the government and Midwest.

#### 2. Midwest's Violations of the Administrative Order

[12] The government alleges that Midwest violated the AO on twenty-two (22) separate occasions. Each of these violations will be separately discussed below. The first violation of the AO is alleged to have occurred on June 12, 1987, when pieces of delining waste were found on the floor by the delining machine in the Midwest facility. These pieces were loose and not in a box. The government produced testimony supporting this allegation, as well as a photograph of the pieces of delining waste on the floor. This Court finds that this above-noted evidence supports a finding that Midwest violated ¶ A(1)(a) of the AO (delining waste must fall into sturdy cardboard box).

The government also alleges that on June 12, 1987, Midwest violated the AO by allowing loose, exposed pieces of delining waste to be present in the dedicated dumpster. The government introduced sufficient evidence, in the form of Mr. Lins' testimony and a photograph, to support this allegation. As previously noted in this Opinion, this delining waste tested positive for asbestos. Based on the above evidence, this Court finds that Midwest violated ¶ A(1)(a) of the AO (delining waste must fall into sturdy cardboard box, box must be securely closed, and sealed in shrink-wrapped plastic) (hereinafter "failure to containerize").

In addition, the government alleges that on June 12, 1987, an employee of Midwest dumped a can of dust from the delining operation into a compactor chute, and this amounts to two (2) separate violations of the AO. As noted above, Midwest, in the AO, stipulated that the delining waste is asbestos-containing waste. By allowing its employee to dump this asbestos-containing waste into the compactor chute of the non-dedicated dumpster, Midwest violated ¶ A(2) of the AO (Midwest must segregate asbestos-containing waste material from all other non-asbestos containing trash) (hereinafter "failure to segregate") and ¶ A(1)(a) of the AO (failure to containerize). [24]

Finally, for the date of June 12, 1987, the government alleges that three (3) separate violations of the AO occurred when the dedicated dumpster was unload at the landfill resulting in at least three (3) boxes being broken open and, in addition, several boxes were not wrapped in shrink-wrapped plastic. As to the boxes braking open during the deposition, the parties

stipulated that this was a violation of the AO. Stip. No. 50. In addition, this Court finds that the testimony of Mr. Lins and the photographs taken at the *732 landfill on June 12, 1987, support a finding that some of the boxes were not sealed in shrink-wrapped plastic. Failure to seal the boxes in shrink-wrapped plastic constitutes a violation of the AO.

Accordingly, based on the above evidence, this Court finds that two (2) violations of the AO occurred on June 12, 1987, when the dedicated dumpster was unloaded at the landfill. That is, Midwest violated the AO by using boxes that broke upon when they were unloaded at the landfill and Midwest violated the AO by not sealing the boxes in shrink-wrapped plastic. This Court is not persuaded, however, by the government's argument that because three (3) boxes broke open that this amounts to three separate violations of the AO. To accept the government's position would mean that for every piece of delining waste that fell to the floor, as opposed to falling into a sturdy cardboard box, there would be a separate violation of the AO. For example, if the government discovered five (5) pieces of delining waste on the floor of the Midwest facility, the government, according to its own argument, could seek at $25,000 penalty for each piece of delining waste that was on the floor.[25] Such a position is untenable in light of the significant civil penalty imposed for each violation. Therefore, as noted above, this Court concludes that two (2) violations occurred on June 12, 1987, when the dedicated dumpster was unloaded at the landfill.

On June 29, 1988, the government contends that six (6) separate violations of the AO occurred. First, the government argues that an employee, by manually removing rivets from old brake shoes and allowing the linings and waste to fall to the floor, violated the AO's requirement that all delining waste fall directly into a sturdy cardboard box. The parties stipulated that this amounts to a violation of the AO. Stip. No. 53. In addition, this Court finds that the testimony presented at trial supports the government's allegation, and thus this Court finds that the above-described action by a Midwest employee violates ¶ A(1)(a) of the AO. The second violation which the government alleges occurred on June 29, 1988, was that an employee used a broom to sweep delining waste which was present on the floor of the delining area. The government presented sufficient testimony to support this allegation, and thus this Court finds that the employee's action of using a broom to sweep the delining waste is a violation of the AO's provision requiring that Midwest "[v]acuum the brake relining area (instead of sweeping) to pick up asbestos-containing material from the floor." ¶ A(1)(c) of the AO.

Furthermore, the parties stipulated that this is a violation of the AO. Stip. No. 55.

The parties also stipulated that Midwest used cardboard boxes which were not lined with plastic bags to dispose of waste from the delining process, including the delining table and the shot/sandblaster areas and that such action violated the AO's requirement that such waste be placed into plastic bags. Stip. Nos. 58 & 59. Based on the above stipulations, this Court finds that such action, as it relates to the sandblasting operation, violates ¶ A(1)(b) of the AO.

Finally, for the date of June 29, 1988, the government contends that three (3) separate violations of the AO occurred when Mr. Murchison observed three (3) boxes of delining waste that were not closed tightly as required and the three (3) boxes were neither sealed in shrink-wrapped plastic nor labeled with asbestos warning labels. Mr. Murchison observed these boxes outside of the Midwest facility. The Court finds that the government introduced sufficient testimony at trial to support these allegations. In addition, the parties stipulated that on June 29, 1988, "three unwrapped, unlabeled boxes containing delining waste were on the ground outside of Midwest's facility," that these boxes were not securely closed, and thus the AO was violated. Stip. Nos. 56 & 57. This Court finds, however, that these actions constitute two (2) violations of the AO. One (1) violation of the AO's requirement that the boxes be securely closed and sealed in *733 shrink-wrapped plastic[26] and one (1) violation of the AO's requirement that the boxes have asbestos warning labels placed on them.

Next, the government contends that an additional six (6) violations of the AO occurred on August 3, 1989. These alleged violations can be summarized as follows: (1) loose pieces of delining waste on the floor of the dedicated dumpster; (2) loose pieces of delining waste on the ground outside of the dedicated dumpster; (3) several boxes containing delining waste did not have the proper asbestos warning labels on them (2 violations); and (4) at least 2 boxes in the dedicated dumpster were not properly wrapped in shrink-wrapped plastic (2 violations). This Court finds that the testimony of Mr. Murchison supports the government's allegations that these violations occurred. In addition, the parties also stipulated that all of these alleged violations did occur on August 3, 1989. Stip. Nos. 66 & 67. This Court finds, however, that these events amount to three (3) violations of the AO, instead of the six (6) violations which the government seeks to have this Court find. The first violation occurring

when Midwest did not properly containerize the waste as was evidenced by the loose pieces of delining waste located both inside and dedicated dumpster and outside the dedicated dumpster on the ground. The second violation occurring when Midwest failed to properly label two (2) boxes and the third violation occurring when Midwest failed to properly seal the boxes in shrink-wrapped plastic.

In addition, the government alleges that on October 13, 1989, two (2) separate violations of the AO occurred when several boxes of delining waste broke open during the unloading of the dedicated dumpster at the landfill. The parties entered into a stipulation that on October 13, 1989, "several boxes of stripped brake block from the load broke open during the dumping." Stip. No. 72. The testimony of Lins also bears this out to be true. The boxes breaking open violates ¶ A(1)(a) of AO (failure to properly containerize). For the reasons stated previously in this opinion, this Court holds that while two (2) boxes broke open, that this constitutes only one (1) violation of the AO.

Finally, the government alleges that on February 27, 1990, one (1) violation of the AO occurred when boxes or bags of delining or sand blast waste broke open during the unloading of the dedicated dumpster at the landfill. The testimony of Mr. Mauzy sufficiently supports this allegation. Accordingly, this Court finds that on February 27, 1990, Midwest violated ¶ A(1)(a) of the AO.

Accordingly, the government has produced sufficient evidence for this Court to find that Midwest violated the AO sixteen (16) times.

### D. CIVIL PENALTIES

#### 1. The Applicable Law

[13]  [14]  As noted above, Midwest violated the AO sixteen (16) times, and Midwest caused four (4) visible emissions to occur in the case at bar. Accordingly, there are twenty (20) violations which are subject to the civil penalty provision of the Clean Air Act, Section 113(b) of the Clean Air Act, as amended by the 1990 Clean Air Act Amendments. [27] Section 113 provides, in part, that:

#### *734  (b) Civil judicial enforcement

The Administrator shall, as appropriate, in the case of any person which is the owner or operator of an affected source, a major emitting facility, or a major stationary source, and *may, in the case of any other person,* commence a civil action ... to assess and recover civil penalty of not more than $25,000 per day for each violation. [28]

... in any of the following instances:

....

(2) Whenever such person has violated ... any other requirement or prohibition of this subchapter ... including, but not limited to, a requirement or prohibition of any rule, order ... promulgated, issued, or approved under this chapter....

....

#### *735  (e) Penalty assessment criteria

(1) In determining the amount of any penalty to be assessed under this section ... the court ... shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation....

42 U.S.C. §§ 7413(b)(2) & (e)(1) (West Supp.1993) (emphasis added). [29]

Finally, this Court holds that, in calculating the amount of civil penalties to be imposed on defendant, this Court must start with the statutory maximum and make any downward adjustments based on the evidence adduced at trial. While this Court has not been directed to any cases decided under § 7413(e) of the Clean Air Act, the Sixth Circuit has held that "[t]he Clean Air and Clean Waters Acts are in *pari materia* with one another." *United States v. Stauffer Chemical Co.,* 684 F.2d 1174, 1187 (6th Cir.1982), *aff'd on other grounds,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984) (citations omitted). The United States Court of Appeals for the Eleventh Circuit has held that, under the penalty provision of the Clean Water Act, "the point of departure for the district court should

be the maximum fines for such violations permitted by the Clean Water Act." *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1137 (11th Cir.1990). *See also A.A. Metal Constr. Co.,* 22 Envtl.L.Rep. at 21201. Based on the fact that the Clean Air Act and the Clean Water Act are in *pari materia* with one another, this Court finds the reasoning of *Tyson Foods* persuasive, and thus this Court will calculate the civil penalties to be imposed on defendant by starting with the statutory maximum of $25,000.00 per day for each violation, which equals $500,000.00 (twenty (20) violations multiplied by $25,000.00), and examining the requisite penalty assessment criteria to determine if any downward departure is required. [30]

### 2. Section 7413(e) Penalty Assessment Criteria

 [15]  With respect to the size of defendant's business, the evidence adduced at trial showed that Midwest delines between 30,000 and 32,000 brake shoes per year. In addition, Midwest stipulated that some of the brake shoes which Midwest rehabilitates contained asbestos. Based on this evidence, the government argues that this Court should find that the size of Midwest's business, with respect to brake shoe rehabilitation, is significant. No evidence was introduced, however, which would allow this Court to compare the size of Midwest's brake shoe rehabilitation business with other businesses involved in brake shoe rehabilitation. Therefore, this Court is unable to determine whether Midwest's business is significant. On the other hand, there was no evidence adduced at trial **\*736** which indicated that Midwest's brake shoe rehabilitation business was small when compared to others in the business. Accordingly, this factor does not warrant a reduction in the maximum statutory penalty.

As to the economic impact of the penalty on defendant's business, this Court, for the reasons which follow, concludes that this factor warrants a significant reduction in the maximum statutory penalty. The government's witness at trial could not render an opinion with respect to what type of impact a $650,000.00 civil penalty would have on defendant's business. [31] The government's witness did testify, however, that, in her opinion, defendant could withstand a penalty in excess of $600,000.00, although the precise amount over $600,000.00 was not clarified. The government's witness also testified that defendant: (1) had accessed only 1.85 million dollars of the 2.5 million dollar line of credit with Michigan National Bank; (2) had allowed its accounts receivable to increase approximately $334,000.00 from the previous year and that out of the 1.6 million dollars in accounts receivable

defendant only deemed $36,000.00 as uncollectible; (3) had a gross income of 10.819 million dollars for 1992; (4) had a net income of approximately $214,000.00 for 1992; and (5) had come through reasonably tough periods financially and that now Midwest is profitable and is generating positive case flow.

Based on the above, this Court finds that a reduction in the amount of $450,000.00 is warranted under this factor. First, while the government's witness testified that in 1992 Midwest had allowed its account receivable to increase by over $300,000.00, because defendant had not spent as much on turning its accounts receivable into cash as it had in 1991, this Court finds this testimony not persuasive. In light of the fact that in 1991 defendant spent $20,162.00 on credit and collection and that in 1992 defendant spent $19,130.00 on credit and collection, a difference of $1,032.00, this Court concludes that, in 1992, defendant attempted to turn its accounts receivable into cash with the same effort it used in the past, and thus the existence of a large amount of accounts receivable does not warrant this Court finding that the civil penalty in this case should not be decreased.

Second, the fact that defendant can access a line of credit to pay the civil penalty is entitled to little weight, because defendant has secured this line of credit for reasons other than paying a civil penalty in this case. This Court finds that the most relevant information regarding defendant's ability to pay a civil penalty is found in the uncontested evidence that in 1992 defendant had gross sales above 10 million dollars and a net income of more than $200,000.00. This net income occurring after Midwest, according to the government's witness, had come through tough financial periods. Therefore, based on the above evidence, it is the opinion of this Court that the civil penalty against defendant should be reduced by $450,000.00 based on this statutory factor. This leaves the civil penalty in the amount of $50,000.00. An amount which represents 25% of defendant's net income for 1992. And thus an amount that is sufficient to deter Midwest from allowing future violations to occur and is sufficient to punish Midwest for its past violations.

 [16]  Regarding the next factor, namely, defendant's full compliance history and good faith efforts to comply, the Court finds that this factor mitigates in favor of not allowing a reduction in the maximum penalty. The government presented sufficient evidence that defendant had regularly violated the Asbestos NESHAP and the AO over a number of years. In addition, defendant did not introduce any evidence

with respect to its good faith efforts to comply with the Clean Air Act, the Asbestos NESHAP, or the AO. Accordingly, this factors weighs in favor of not reducing the statutory maximum penalty.

With respect to the duration of the violations as established by any credible evidence, this Court concludes that this factor does not warrant a reduction in the penalty to be imposed on defendant. As noted above, the government introduced ample evidence that **\*737** the violations lasted from 1985 through 1991. Therefore, this factor does not weigh in favor of reducing the statutory maximum penalty.

The next factor, payment by defendant of penalties previously assessed for the same violations, is not implicated by the facts in this case, because there was no evidence adduced at trial that defendant previously paid a penalty for any of these violations. This brings the Court to the sixth factor, namely, the economic benefit of noncompliance. In *Tyson Foods, supra,* the Eleventh Circuit stated that "[i]nsuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are successfully to deter violations." 897 F.2d at 1141. In addition, in *A.A. Mactal Constr. Co., supra,* the court noted "that the recovery of economic benefit is essential and that economic benefit should serve as the floor below which the maximum civil penalty should not be mitigated." 22 Envtl.L.Rep. at 21,201. Here, there was no evidence introduced at trial as to the exact amount of economic benefit defendant received through its noncompliance with the Clean Air Act. [32] This Court recognizes, however, that based on the evidence presented at trial, defendant received very little economic benefit from the violations. This case did not involve a defendant that intentionally buried asbestos-containing waste material in the ground or intentionally released asbestos-containing waste into the air in an effort to dispose of the waste. Here, defendant attempted to comply with all of the requirements. There is, however, no doubt in this Court's opinion that defendant did not handle the asbestos-containing waste material in a professional manner and that defendant failed to pay close enough attention to the details of the Asbestos NESHAP and the AO. Therefore, the Court finds that this factor neither establishes a floor below which the maximum civil penalty should not be reduced nor mitigates in favor of reducing the maximum civil penalty.

[17] As to the last factor which this Court must address, that is, the seriousness of the violation, this Court finds that this factor does not require any downward adjustment in the amount of the penalty to be imposed on defendant. First, defendant does not dispute the fact that medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed to the fibers. Therefore, as a matter of law, due to the fact that this case involves asbestos, this Court finds that the violations are very serious.

In addition, this case involves numerous violations of the AO. The AO was consented to by Midwest and was not unilaterally imposed on Midwest by the EPA. Midwest received a number of substantial benefits by entering into the AO, including but not limited to, the government not instituting an action in federal court seeking a substantial civil penalty and being able to negotiate with the EPA on the precise waste handling methods which Midwest would use at the facility. Notwithstanding these substantial benefits, Midwest failed to live up to its end of the bargain with respect to the AO. Consequently, the violations of the AO also are very serious violations.

Finally, this Court has one final comment before imposing the civil penalty on defendant. This Court is compelled to point out that defendant entered into numerous stipulations with the government in this case. Some stipulations involved facts and circumstances which there could have been a dispute over. Defendant decided, however, to stipulate to these facts, and thus allowed the government to present its case over the course of a few days, instead of over a course of a few weeks. While this, in and of itself, may not warrant a reduction in the amount of the civil penalty imposed in the case at bar, this Court wishes to acknowledge these actions.

Accordingly, after a through review of the relevant penalty assessment criteria set forth in 42 U.S.C. § 7413(e), the Court concludes **\*738** that a civil penalty in the amount of $50,000.00 against defendant is proper. This amounts to $2,500.00 for each violation, which is a sufficient sum to deter defendant from future violations, as well as to penalize defendant for its past actions.

### E. INJUNCTIVE RELIEF

[18] The government seeks to have this Court affirmatively enjoin Midwest so that Midwest performs its rehabilitation of brake shoes at its Detroit facility in compliance with the key terms of the AO. In addition, the government proposes

that the injunction could be terminated under the following conditions:

> With at least thirty days prior, written notice to the United States, Midwest may petition the Court to lift this injunction upon certification to the Court either of the following:

> (1) Midwest has complied continuously with this Court's injunction for at least twelve consecutive months subsequent to the date on which the Court's injunction was issued; or

> (2) Midwest can certify specifically and affirmatively that it has not had on its facility—for any consecutive, eighteen-month period following entry of the injunction—any brake lining, new or used, that contained any asbestos, and further that Midwest warrants it will not allow on its premises any asbestos-containing brake lining, new or used, at any time in the future. The United States shall have no less than 30 days after Midwest files any such petition to evaluate its merit and, if appropriate, oppose it.

[19]   It is axiomatic under federal law "that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (injunctive relief under the Federal Water Pollution Control Act). Moreover, whether injunctive relief should be issued in within the equitable discretion of the court. *Id.* at 320, 102 S.Ct. at 1807.

Here, while this Court agrees with the government that its proposed injunction is reasonable, this Court declines to grant such injunctive relief. First, as the government emphasized in its post-trial brief, the primary goal of the civil penalty assessed against defendant under the Clean Air Act is deterrence. This Court has ordered defendant to pay a $50,000.00 civil penalty in this case. This is a significant penalty and it should be sufficient to deter defendant from future violations. Second, at this point in time, it cannot be said that the government is without adequate legal remedies; a requisite finding before an injunction can be issued. If defendant violates the AO in the future the government may bring a civil suit against defendant seeking an addition civil penalty. Indeed, if the government were forced to bring a civil suit in the future against defendant, then this Court may be more inclined to grant the government's request for injunctive relief based on the fact that the civil penalty assessed in the instant case had failed to deter defendant from violating the AO and the Asbestos NESHAP. Accordingly, the government's request for injunctive relief is DENIED.

### IV. CONCLUSION

For all of the aforementioned reasons this Court concludes that defendant, Midwest Suspension and Brake, has violated the Administrative Order sixteen (16) times and has violated the Asbestos NESHAP on four (4) occasions. The Court ORDERS defendant to pay a civil penalty in the amount of $50,000.00 to the United States Treasury. Finally, the government's request for injunctive relief enjoining defendant from future violation of the Administrative Order is DENIED. [33]

IT IS SO ORDERED.

**Parallel Citations**

37 ERC 1054

Footnotes

1   The Clean Air Act Amendments of 1990, Pub.L. No. 101–549, 104 Stat. 2399 (1990), amended the Clean Air Act, which is codified at 42 U.S.C. § 7401 *et seq..* Excepted as otherwise specifically noted in the Memorandum Opinion and Order, all cites are to the Clean Air Act prior to the enactment of the 1990 Clean Air Act Amendments.

2   The term "visible emission" is a term of art employed in the Asbestos NESHAP, which defines visible emissions as follows:
      *Visible emissions* means emissions containing particulate asbestos material that are visually detectable without the aid of instruments. This does not include condensed uncombined water vapor.
      40 C.F.R. § 61.141 (1987).

3   Mr. Ciupak's deposition was one of the government's exhibits which defendant stipulated to be admitted into evidence. Government's Ex. 70.

4   The testimony of some of the witnesses, as well as some of the stipulations which the parties entered into, refer to the sandblasting operation as "shotblasting." This Opinion will employ the term "sandblasting."

5   To the extent that Mr. Ciupak testified at trial that "we take it [the repainted brake shoe] over to another station where we re-rivet the non-asbestos lining to the shoe," such testimony is refuted by Stipulation 33 entered into by the parties. Testimony of Ciupak, April 1, 1993, Tr. at 55.

6   At the time the AO was entered into by the parties, defendant was known as Michigan Truck Spring Service, Inc.. Subsequently, defendant changed its name to Midwest Suspension and Brake.

7   Mr. Lins' testimony that he observed a visible emission does not mean that a visible emission under the Asbestos NESHAP occurred. All that Mr. Lins' testimony means is that he observed a plume of dust and/or material emerge during the unloading of the dedicated dumpster.

8   During the trial, the parties stipulated on the record that this stipulation should have read "by Mr. Murchison," instead of "by Mr. Lins." April 2, 1993, Tr. at 289.

9   Region V covers the states of Minnesota, Wisconsin, Illinois, Indiana, Ohio, and Michigan. Testimony of Frye, April 1, 1993, Tr. at 74.

10  The Asbestos NESHAP were originally codified at 40 C.F.R. 61, Subpart B. In 1984, the EPA moved the Asbestos NESHAP to 40 C.F.R. 61, Subpart M. *See* 49 Fed.Reg. 13658, 13661 (April 5, 1984).

11  Section 61.22(h) is now codified at 40 C.F.R. § 61.149.

12  Section 61.21(s) is now codified at 40 C.F.R. § 61.141.

13  Defendant, at trial, cross-examined Ms. Frye with respect to whether she was aware that the EPA had defined processing as "the preparation of a chemical substance or mixture after its manufacture, for distribution in commerce." Ms. Frye stated that she was not aware of such a definition with respect to the Asbestos NESHAP. Based on this exchange, defendant, in its post-trial brief, argues that this Court should conclude that the word "processing," found in the definition of "fabricating" under the Asbestos NESHAP requires "the preparation of a chemical substance or mixture after its manufacture, for distribution in commerce." Defendant's post-trial brief at 2. Defendant did not inform this Court exactly where defendant had found this definition of fabricating.

This Court's own research reveals that the precise definition of processing which defendant cites to is not found anywhere in the Code of Federal Regulations. There are similar definitions in the Code of Federal Regulations, specifically, in Title 40, Chapter I, Subchapter R, which contains EPA regulations promulgated under the Toxic Substances Control Act, 15 U.S.C. §§ 2601–2692 (West 1982 & Supp.1993). *See* 40 C.F.R. §§ 704.3; 710.2; 712.3; 716.3; 717.3; 720.3; 721.3; 761.3; and 763.63 (1992). Out of these provision, only one is even arguably relevant and that is the provision found at 40 C.F.R. § 763.63. Section 763.63 is located in the part of the regulations relating to the reporting requirements with respect to commercial and industrial use of asbestos. Section 763.63(k) provides as follows:

*Process for commercial purpose* means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce with the purpose of obtaining an immediate or eventual commercial advantage for the processor. Processing of any amount of a chemical substance or mixture is included. If a chemical or mixture containing impurities is processed for commercial purposes, then those impurities are also processed for commercial purposes.

40 C.F.R. § 763.63(k) (1992).

As noted above in this footnote, this provision was promulgated under the Toxic Substances Control Act. In the instant case, the government has not alleged that defendant has violated the Toxic Substances Control Act. Instead, the government alleges that defendant has violated the Clean Air Act and the regulations promulgated under the Clean Air Act. Accordingly, how the word "process" is defined in the regulations adopted under the Toxic Substances Control Act has no relevance to the meaning of "process" as defined in the Asbestos NESHAP promulgated under the Clean Air Act.

14  The exact amounts which Midwest expended on "credit and collection," as set forth in Midwest's financial statements, are as follows:

| Year Ending: | Amount Expended: |
| --- | --- |
| 9/30/87 | $19,805.00 |
| 9/30/88 | $23,287.00 |
| 9/30/89 | $20,170.00 |
| 9/30/90 | $22,153.00 |
| 9/30/91 | $20,162.00 |
| 9/30/92 | $19,130.00 |

Government's Exs. 58(a) at 29; 58(b) at 32; & 58(d) at 44.

15  The Asbestos NESHAP provides in relevant part that:

Standard for fabricating.

(a) *Applicability.* This section applies to the following fabricating operations using commercial asbestos:

....

(2) The fabrication of friction products, except those operations that primarily install asbestos friction materials on motor vehicles.

Case 2:10-md-02179-CJB-DPC   Document 13811-2   Filed 12/09/14   Page 21 of 23
U.S. v. Midwest Suspension and Brake, 824 F.Supp. 713 (1993)
37 ERC 1054

40 C.F.R. § 61.149(a)(2) (1987).

16  The Asbestos NESHAP define commercial asbestos has "any asbestos that is extracted from asbestos ore." 40 C.F.R. § 61.141 (1987).

17  On the basis of information obtained during investigation of the various fabrication operations involving asbestos products, the Administrator [of the EPA] has determined that fabrication of the following materials in central fabricating shops is a major source of asbestos emissions ... (3) asbestos friction products.... Asbestos friction products include brake linings and clutch facings for motor vehicles. Enforcement of the asbestos standard revealed the existence of facilities which fabricate automotive brake shoe linings but do not manufacture the linings as that term is defined in the promulgated regulations, and therefore are not covered by the standard. The fabrication operations performed at these facilities are similar to those at asbestos friction product manufacturing plants. The proposed amendment extends coverage of the asbestos standard to these fabrication operations, but does not apply to brake shoe radius-grinding which is sometimes performed during brake shoe replacement on automobiles to ensure good braking immediately after installation.

39 Fed.Reg. 38064–65 (October 25, 1974).

18  Enforcement of the asbestos standard revealed the existence of facilities that fabricate large quantities of automotive brake shoe linings, but do not manufacture the linings. These fabrication sources are not covered by the standard because the Agency was not aware of them at the time of promulgation. The fabricating operations performed at these facilities are similar to those performed at asbestos friction product manufacturing plants, which are covered as major sources of asbestos emissions by the asbestos standard.... Because the operations are also similar in quantity of asbestos emissions generated, the Agency is proposing that the asbestos standard be amended to include these fabrication operations.

BID at 26.

19  *See United States v. Midwest Suspension and Brake,* Case No. 91–CV–70141–DT, Memorandum Opinion and Order of March 16, 1993, at 3–5 (denying defendant's motion for leave to amend its answer); *United States v. Midwest Suspension and Brake,* 803 F.Supp. 1267, 1269 (E.D.Mich.1992); and *United States v. Midwest Suspension and Brake,* 796 F.Supp. 260, 263 (E.D.Mich.1992).

20  While it is true that Mr. Lins took a second sample of the emission on October 13, 1989, and the Wayne County Health Department had this second sample analyzed and the sample tested negative for asbestos, this, in and of itself, does not refute the government's evidence that the visible emission contained some particulate asbestos material.

21  Because the nondedicated dumpster, as well as its compactor chute, were located outside of the facility, the visible emission occurred in the "outside air," that is, in the air outside of the building. *See* 40 C.F.R. § 61.141.

22  At trial, the defendant emphasized the point, on cross-examination of Mr. Mauzy, that the dedicated dumpster was unloaded into a hole approximately fifteen (15) feet deep, indicating that Midwest had complied with the Asbestos NESHAP and that the landfill had caused the release of this rust colored plum. Midwest is responsible, however, for the manner in which it disposes of its asbestos-containing waste material. Here, Midwest voluntarily has chosen to use a large roll-on roll-off dumpster to dispose of the asbestos-containing waste material. In using such a means of disposal, Midwest has accepted the risks associated with such large dumpster, including the risk that the dumpster will be unloaded into a large hole at a landfill.

23  *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *United States v. Atlantic Refining Co.,* 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); and *Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952).

24  Defendant's argument that there is no nexus between what was dumped and the alleged violation of the AO simply is not well taken in light of above evidence, including the stipulation which Midwest voluntarily entered into.

25  This Court notes that in the instant case the government has not sought such penalties. However, under the position taken by the government with respect to the number of violations being equal to the number of boxes which broke open and the number of boxes not properly sealed in shrink-wrapped plastic, in a future case the government could take such position.

26  While the AO states that Midwest had to "[s]ecurely close the box [containing delining waste], seal it in shrink-wrapped plastic, and place asbestos warning labels on the outside [of the box]," this Court concludes that a box cannot be securely closed, *i.e.,* closed in a fashion that does not permit asbestos fibers to escape from the confines of the box, unless the box is sealed in shrink-wrapped plastic. Therefore, this Court finds that securely closing the box and sealing it in shrink-wrapped plastic is a single requirement of the AO, and thus a box that was neither securely closed nor sealed in shrink-wrapped plastic amounts to only one (1) violation of the AO.

27  The 1990 Amendments to the Clean Air Act govern the issue of civil penalties in this case. Section 711(b) of the 1990 Amendments to the Clean Air Act states as follows:

(1) Except as otherwise expressly provided, the amendments made by this Act shall be effective on the day of enactment of this Act [Nov. 15, 1990].

(2) The Administrator's authority to assess civil penalties under section 205(c) of the Clean Air Act, as amended by this Act [42 U.S.C. § 7424(c) (West Supp.1993) ], shall apply to violations that occur or continue on or after the date of enactment of this Act. Civil penalties for violations that occur prior to such date and do not continue after such date shall be assessed in accordance with the provisions of the Clean Air Act in effect immediately prior to the date of enactment of this Act.

(3) The civil penalties prescribed under sections 205(a) and 211(d)(1) of the Clean Air Act, as amended by this Act [42 U.S.C. §§ 7542(a) and 7545(d)(1) (West Supp.1993) ], shall apply to violations that occur on or after the date of enactment of this Act. Violations that occur prior to such date shall be subject to the civil penalty provisions prescribed in sections 205(a) and 211(d) [42 U.S.C. §§ 7542(a) and 7545(d) (West Supp.1993) ] in effect immediately prior to the enactment of this Act. The injunctive authority prescribed under section 211(d)(2) of the Clean Air Act, as amended by this Act [42 U.S.C. § 7545(d)(2) ], shall apply to violations that occur or continue on or after the date of enactment of this Act.

(4) For purposes of paragraph (2) and (3), where the date of violation cannot be determined it will be assumed to be the date on which the violation is discovered.

Pub.L. 101–549, Title VII, § 711(b), Nov. 15, 1990, 104 Stat. 2684 (1990), 42 U.S.C. § 7401, note following section (West Supp.1993).

Notably, § 711(b) of the 1990 Amendments to the Clean Air Act does not expressly provide for the civil penalty provisions provided for in § 113 of the Clean Air Act, as amended, 42 U.S.C. § 7413 (West Supp.1993), to be effective on a date different than November 15, 1990, even where the violations occurred before the 1990 Amendments to the Clean Air Act went into effect. In *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Supreme Court addressed the issue of whether the post judgment interest statute applied retroactively in an anti-trust action. The *Kaiser Aluminum* Court held that "where the congressional intent is clear [in the statute], it governs." *Kaiser Aluminum,* 494 U.S. at 837, 110 S.Ct. at 1576 (citations omitted). This Court finds that the congressional intent to have 1990 Amendments to the civil penalty provisions found in § 113 to apply retroactively, irrespective of when the violations occurred, is clear from the language of the statute. Accordingly, this Court will employ § 113 of the Clean Air Act, as amended by the 1990 Amendments to the Clean Air Act, in deciding the issue of penalties in this case. *Accord United States v. A.A. Mactal Constr. Co.,* 22 Envtl.L.Rep. 21200 (D.Kan. March 31, 1992) (applying penalty assessment criteria found in the 1990 Amendments to the Clean Air Act to Asbestos NESHAP violations that occurred in 1988 and 1989).

In addition, even if it were determined that the civil penalty provisions found in the 1990 Amendments to the Clean Air Act do not apply retroactively, this Court still would apply the criteria found in the 1990 Amendments. Prior to the 1990 Amendments, § 7413(b) provided in part that "[i]n determining the amount of any civil penalty to be assessed under this subsection, the courts shall take into consideration (*in addition to other factors* ) the size of the business, the economic impact of the penalty on the business, and the seriousness of the violation." 42 U.S.C. § 7413(b) (West 1983) (emphasis added). This Court would consider "other factors" such as defendant's full compliance history and good faith efforts to comply, the duration of the violation, payment by defendant of penalties previously assessed for the same violation, and the economic benefit of noncompliance. Therefore, under either § 7413(b) of the Clean Air Act prior to being amended or § 7413(e) of the Clean Air Act as amended by the 1990 Amendments, this Court would utilize the same factors in determining the appropriate amount of civil penalties to be assessed against defendant.

28    It is clear that under the 1990 Amendments to the Clean Air Act that Congress intended "that the maximum statutory penalty may be assessed for each day of each violation...." S.Rep. No. 228, 101st Cong., (1990), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3748. However, it is not as clear whether under § 7413(b), prior to being amended, a penalty can be assessed against defendant for more than one violation per day, because § 7413(b) provided that the Administrator may "recover a civil penalty of not more than $25,000 per day of violation...." 42 U.S.C. § 7413(b) (West 1983). As note in above, *supra* note 27, this Court finds that the 1990 Amendments to the Clean Air Act's penalty provisions governs this case. In the event that the 1990 Amendments do not govern this case, this Court holds that, while the language found in § 7413(b) is ambiguous, civil penalties against defendant for each violation, even if the violations occur on the same day, is warranted under § 7413(b). *See Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1138–40 (11th Cir.1990).

29    During the trial, the government dropped its claim of continuing violations, which, if proved, would lead to an increase in the number of days the violations would have been deemed to have occurred. *See* 42 U.S.C. § 7413(e)(2) (West Supp.1993).

30    The government, in its post-trial brief, urged this Court to adopt a rule of law that would require defendant to have the burden of presenting evidence to support a reduction from the statutory maximum penalty, and if defendant did not introduce any evidence, as was the situation in the case at bar, that the maximum penalty should be assessed against defendant. The rationale underpinning this argument is that "the Court can have no basis for reducing the maximum civil penalty," because defendant failed to introduce evidence on this point. Government Post–Trial Brief at 52. This Court refuses to adopt such a rule of law. If this Court were to adopted such a rule, this Court would have to ignore the penalty assessment criteria set forth in § 7413(e); factors which Congress has mandated courts to consider. Therefore, there is no basis in law for this Court to adopted the rule of law proposed by the government. This Court concludes that the inquiry mandated under § 7413(e) is for this Court to evaluate the penalty assessment criteria in light of all of the evidence introduced at trial, not merely the evidence a defendant introduces at trial.

31    The $650,000.00 amount is derived from this Court's finding a total of twenty-six (26) violations in the case at bar. As noted above, this Court has found only twenty (20) violations in this matter.

32    *Cf. A.A. Mactal Constr. Co.,* 22 Envtl.L.Rep. at 21,201 ("The government presented credible evidence at trial that defendant Mactal enjoyed an economic benefit of $126,000 from his noncompliance with the Asbestos NESHAP regulations.").

33    The government shall submit to this Court, within ten (10) days of this opinion, an order of judgment which conforms to this Court's opinion.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.