# EXHIBIT 3

929 F.Supp. 800
United States District Court,
M.D. Pennsylvania.

UNITED STATES of America, Plaintiff,
v.
The MUNICIPAL AUTHORITY OF UNION TOWNSHIP; and Dean Dairy Products Company, Inc. d/b/a Fairmont Products, Defendants.

Civil Action No. 1:CV-94-0621. | July 10, 1996.

Following trial on issue of appropriate penalty for violations of Clean Water Act (CWA), the District Court, Rambo, Chief Judge, held that civil penalty in amount of $4,031,000 was warranted.

Ordered accordingly.

**Attorneys and Law Firms**

*802 Lynn Penman Dodge, Environmental Enforcement Section, United States Department of Justice, Washington, DC, Lois J. Schiffer, Acting Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, Robert R. Long, Jr., U.S. Attorney's Office, Harrisburg, PA, for U.S.

Joseph E. Sikorsky, Lewistown, PA, Gary Cohen, Washington, DC, for Municipal Authority of Union Township.

James H. Geary, Kalamazoo, MI, Gary A. Peters, Bloomfield Hills, MI, Steven C. Kohl, Howard and Howard, Bloomfield Hills, MI, Laura A. Talt, Howard and Howard, Bloomfield Hills, MI, for Dean Dairy Products Company, Inc.

### MEMORANDUM

RAMBO, Chief Judge.

### I. *Introduction*

On December 14, 1995, the court awarded summary judgment to the United States on the question of Fairmont Products' liability under the Federal Water Pollution Control Act ("the Clean Water Act" or "the Act"), 33 U.S.C. § 1251 *et seq.*, for 1,754 violations of its Industrial User Wastewater Discharge permit ("IU permit"), and 79 instances of interference with the Municipal Authority of Union Township's Publicly Owned Treatment Works ("POTW"). The United States seeks the imposition of a civil penalty under 33 U.S.C. § 1319(d) for Fairmont's violations of the Act. Section 1319(d) provides that the violator of a permit issued pursuant to the Act shall be subject to a civil penalty not to exceed $25,000 per day for each violation. This penalty provision further states that in assessing the penalty, the court shall consider the following factors:

> [T]he seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, and history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d).

The court conducted a trial on the penalty issue on January 29 to 31, 1996. The parties have submitted extensive post-trial proposed findings of fact, and the issue is now ripe for disposition. Also ripe for disposition are motions *in limine* filed by both Fairmont and the United States.

### II. *Factual Determinations*

#### A. *Background*

Dean Foods, Inc. ("Dean Foods") is a national corporation in the business of processing and distributing dairy and other food products, and is the largest fluid milk processor in the United States. On June 7, 1987, Dean Foods purchased Fairmont Products through a 100% stock purchase, and in so doing it acquired Fairmont's dairy plant located in Belleville, Pennsylvania. In April 1992, Dean Foods merged the Fairmont plant with Dean Foods of Pennsylvania. The newly formed entity, Dean Dairy Products, Inc. ("Dean Dairy"), is a wholly owned subsidiary of Dean Foods, and includes the Fairmont plant and another dairy plant located in Sharpsville, Pennsylvania.

Robert Horton, who was assistant plant manager at Fairmont prior to the stock purchase, was made plant manager shortly after Dean Foods acquired Fairmont. Horton was the Fairmont plant manager until approximately October 1991, when Dave Koontz, a Dean Foods employee since 1981,

was made plant manager. Koontz remains Fairmont's plant manager.

In 1974, the predecessor company to Fairmont, Abbott's dairy, entered into an agreement with Union Township to construct a POTW to be used by the dairy plant for wastewater treatment. Pursuant to the agreement, the plant owner would pay a monthly user fee to the POTW based upon the level of flow, Biological Oxygen Demand ("BOD") and Total Suspended Solids ("TSS") discharged into the POTW. The wastewater stream from the plant discharged into the POTW resulted from equipment rinsing, product spills and sewage at the plant. Fairmont *803 continued this use of the POTW after Dean Foods acquired it.

In 1983, the United States Environmental Protection Agency ("EPA") required Union Township to develop a pretreatment program to regulate the discharge of industrial users of the POTW, including the Fairmont plant. The EPA approved Union Township's pretreatment program in October 1984. In June 1989, pursuant to the pretreatment program, Union Township issued an IU permit to the Fairmont plant. The IU permit limits the BOD, TSS, pH and flow which Fairmont can discharge into the POTW; the permit has monthly average limits and daily maximum limits for TSS and BOD. The IU permit requires Fairmont to submit discharge monitoring reports to Union Township on a monthly basis.

### B. *History And Seriousness Of Violations*

The court has ruled that Fairmont is liable for 1,754 violations of its IU permit and 79 instances of interference with Union Township's POTW between July 1989 and April 1994, when this suit was filed. Fairmont continued to violate its IU permit even after this action was commenced, however. When all of Fairmont's IU permit violations are aggregated between July 1989 and April 1995, at which point Fairmont brought its wastewater problems under control, Fairmont committed approximately 2,360 violations.

Between July 1989 and February 1995, Fairmont violated its IU permit with respect to either BOD or TSS monthly average limits in 54 of 68 months. And, in virtually all months in which there was no monthly average TSS or BOD violation, Fairmont still violated daily maximum limits. On average, the violations for which the court has found Fairmont liable exceeded its IU permit limit by roughly the following percentages: 30% over monthly average TSS limit; 34% over daily maximum TSS limit; 21% over monthly average BOD limit; 23% over daily maximum BOD limit. In eight months Fairmont exceeded its monthly average TSS limit by over 100%.

BOD and TSS are "conventional" and not "toxic" pollutants. While Union Township's POTW was designed to treat these pollutants, among others, excessive quantities of BOD and TSS can cause interference with a POTW and can damage waterways.

Union Township's POTW discharges into the Kishacoquillas Creek ("the Creek"). As of 1984, it was evident that the POTW was degrading the Creek, and by 1990, poor substrate conditions resulting from solids deposition and bacterial growths were directly affecting the benthic community, resulting in greater numbers of pollution-tolerant taxa. In 1992, the Creek was found to be further degraded by solids deposition, nutrient enrichment and organic overloading. The organic overloading and the substrate degradation was limiting the diversity of the benthic community and increasing the density of a few pollution-tolerant taxa. This degradation was caused by the discharge from Union Township's POTW. Because of this environmental damage to the Creek, the Pennsylvania Fish and Boat Commission ceased stocking the Creek in the vicinity of the POTW's discharge point. The cessation of the fish stocking program in 1993 removed 3,200 trout from 3.8 miles of the Creek.

When the court held Fairmont liable for 79 instances of interference with Union's POTW, that determination entailed a finding that in each instance Fairmont inhibited or disrupted Union Township's POTW and in so doing contributed to a violation of the POTW's National Pollutant Discharge Elimination System ("NPDES") permit. Because Union Township's NPDES permit violations resulted in the discharge of excess pollutants into the Creek, Fairmont contributed to the degradation of the Creek by contributing to the NPDES permit violations. However, neither party presented evidence which permits an approximation of the degree of Fairmont's responsibility for the degradation of the Creek.

### C. *Good Faith Efforts To Comply*

Because the IU permit requires that Dean submit monitoring reports to the POTW on a monthly basis, Fairmont was aware of its violations from the time of its first monitoring *804 report in July 1989. Mr. Koontz, Fairmont's plant manager since October 1991, acknowledged that the plant manager who preceded him at Fairmont "did not address the violations seriously." The record supports Koontz' observation that

during the first two years and three months of the violations no meaningful action was taken by Fairmont to remedy the situation. Indeed, during this period Fairmont showed no concern whatsoever with its chronic violation of the Clean Water Act.

Fairmont's first significant effort to address some of its permit exceedance problems was to install a flow equalization tank and reroute certain piping into the tank. In November 1991, almost immediately after Mr. Koontz was made plant manager, he asked Dean Foods officials to approve funds for the flow equalization tank in Fairmont's capital budget for the fiscal year beginning June 1992. Funding for the project was approved by Dean Foods in March 1992. Construction started in June 1992 and was competed in October 1992 at a cost of approximately $86,000. Thus, Fairmont's first serious response to its wastewater problems became effective approximately three years and three months after Fairmont learned of the problem.

It is clear that the flow equalization tank was intended principally to address Fairmont's flow violations, which were persistent prior to installation of the tank. While it was believed by certain individuals at Fairmont that the tank may cause reductions in BOD and TSS, there was not a serious expectation by Fairmont that the tank would resolve its BOD and TSS permit exceedances. This is not surprising with respect to BOD since Fairmont's violations of its monthly average BOD limit did not begin until February 1992, after Koontz had requested funding for the flow equalization tank. However, the TSS violations were a consistent problem beginning in June 1989, and, as of October 1992, when the flow equalization tank came on line, Fairmont still did not have a specific plan to ensure compliance with their IU permit with respect to either BOD or TSS. The flow equalization tank resolved Fairmont's flow violations, as it was intended to do, but it did not contribute to any reduction in BOD or TSS exceedances.

Between February and April 1993, Fairmont retained several consulting companies to analyze its IU permit exceedances and recommend remedial action. Fairmont implemented some but not all of the consultants' recommendations. The most significant recommendation implemented was the diversion into a storage tank of certain materials which had previously been discharged to the POTW; this material was sold to farmers for use as hog feed. The implementation of the consultants' recommendations did not reduce Fairmont's BOD and TSS levels.

Between 1991 and 1994, Fairmont made the following additional efforts to address its BOD and TSS violations: (1) reduced water usage in several of its cleaning systems; (2) educated employees regarding potential sources of BOD and TSS in the plant and the need to eliminate these sources, and requested employee participation in addressing the problem; (3) attempted to reduce product leaks and spills wherever possible, and to encourage reporting of product spills; (4) looked for equipment, which it considered economically feasible, to reduce solids and BOD loadings in the waste drains. These efforts did not reduce Fairmont's BOD and TSS exceedances.

The final step taken by Fairmont to address its BOD and TSS violations, and the one which proved to be successful, was to install a pretreatment system. Fairmont began to consider installing a pretreatment system sometime prior to January 1992. The court believes that it was evident to Fairmont by this time that a pretreatment system was an option very likely to resolve its IU permit violations-but it was also far more costly than any of Fairmont's efforts described above. After much deliberation, Fairmont reached a final decision to install a pretreatment system in approximately March or April of 1994. It started construction immediately and the facility became operational in April 1995. Since that time Fairmont has been in compliance with its IU permit with only a few exceptions.

Some of Fairmont's delay in committing to the installation of the pretreatment system **\*805** resulted from its uncertainty about whether it wished to participate in a planned expansion of Union Township's POTW, and about how such an expansion would affect its ability to comply with its IU permit. However, it is clear that the principal and overriding cause of the passage of several years between the time that Fairmont began to consider pretreatment and when it firmly and finally decided to commit to it was the system's high cost. The pretreatment facility was installed at a cost of approximately $865,000.

During the nearly six year period in which the violations occurred, Fairmont could have achieved compliance with its IU permit by reducing its production volume, and it was aware of this fact. Instead, while Fairmont delayed committing itself to a serious solution to its violations, it continued to produce at a volume which it recognized was very likely to generate levels of BOD and TSS beyond that allowed by its IU permit. Fairmont chose not to

reduce production volume because it viewed the concomitant reduction in earnings as too high a price to pay for compliance with the Clean Water Act. Fairmont vacillated between operating at a profit and operating at a loss during the period of the violations and Mr. Koontz claims to have believed that Dean Foods would close the plant if he reduced volume and profits in order to achieve compliance with the IU permit.

**D.** *Economic Benefit To Violator*

The parties stipulate that Fairmont did not realize any economic benefit from delaying the capital investments necessary to achieve compliance with its IU permit. Fairmont did, however, realize an economic benefit during the period of the violations by producing at a volume above that which would have allowed it to operate within its IU permit. Fairmont itself concluded, in assessing its wastewater treatment options, that to comply with its IU permit by reducing volume would have caused a reduction in earnings of $417,000 in its 1994 fiscal year. Production volume at Fairmont was higher in each year from 1989 to 1993 than it was in 1994, and, therefore, it is reasonable to believe that Fairmont gained at least $417,000 in earnings annually during the period of its violations. On this basis, the court concludes that between July 1989 and April 1994, Fairmont gained approximately $2,015,500 by violating its IU permit.

**E.** *Economic Impact Of Penalty*

[1]   As will be explained in the legal discussion below, Dean Foods is the corporate entity whose assets should be examined to determine the economic impact of the penalty on the violator. The following factual findings support this conclusion.

Dean Dairy is a wholly owned subsidiary of Dean Foods. Dean Foods receives the profits of its subsidiaries, such as Dean Dairy and its Fairmont plant. Dean Foods then provides its subsidiaries with funding for expenses through annual capital budgets. Therefore, Dean Foods retains the ultimate decision making authority regarding whether and when capital investments will be made for equipment necessary to allow Fairmont to operate within its IU permit. For example, the expenditures for the equalization tank, the repiping and the pretreatment system all required approval and appropriations from Dean Foods through the capital budget process. Dean Foods listed expenditures for the pretreatment system as a major capital improvement in its 10(k) report for its 1995 fiscal year.

Dean Foods was closely involved with Fairmont in considering the alternatives available to address Fairmont's wastewater problems. This involvement extended to the point of Dean Foods officials attending numerous Union Township meetings on the issue. It was abundantly clear to both Mr. Koontz and Dean Foods officials that Dean Foods would make the final decision of whether Fairmont would participate in Union Township's plans to expand its POTW, and, if so, to what degree, and whether Fairmont would install a pretreatment facility. Mr. Koontz has acknowledged the fact that he was taking instruction from his superiors at Dean Foods on this matter. Dean Foods had complete control over whether and when Fairmont would come into compliance with its IU permit.

*806  For its 1995 fiscal year, Dean Foods reported approximately $519,000,000 in assets and $304,000,000 in liabilities. Dean Foods' assets therefore exceed its liabilities for this period by approximately $215,000,000. The magnitude of fine which the court believes to be warranted in this case can be easily absorbed by Dean Foods without threatening its solvency.

**III.** *Conclusions Of Law*

**A.** *General Framework*

[2]   The Clean Water Act's penalty provision is aimed at deterrence with respect to both the violator's future conduct (specific deterrence) and the general population regulated by the Act (general deterrence). *Student Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 19 Envtl.L.Rep. 20903, 20904, 1989 WL 159629, *3 (D.N.J. April 6, 1989) (citing *Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 611 F.Supp. 1542, 1557 (E.D.Va.1985) (subsequent history omitted)). The goal of deterrence requires that a penalty have two components. First, it must encompass the economic benefit of noncompliance to ensure that the violator does not profit from its violation of the law. Second, the penalty must include a punitive component in the form of a sum in addition to economic benefit which accounts for the degree of seriousness and/or willfulness of the violations. Without the second component, those regulated by the Clean Water Act would understand that they have nothing to lose by violating it. *Id.* The court will apply this framework to the findings of fact set forth above.

[3]   In adopting this approach, the court rejects the United States' contention that the proper methodology for arriving at a penalty requires that the court begin at the statutory

maximum ($45,825,000 in this case), and move down from that figure to the degree warranted by mitigating factors. The United States relies upon *Atlantic States Legal Foundation v. Tyson Foods,* 897 F.2d 1128, 1142 (11th Cir.1990), as support for this contention. While the court agrees with United States' reading of *Tyson,* it disagrees with *Tyson,* and prefers instead to begin with economic gain and add a sum to that figure guided by the other § 1319(d) factors and the need for punishment and deterrence. This method of calculating the civil penalty in a Clear Water Act case is clearly the majority view. *See supra Hercules* and *Gwaltney; see also Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 40 ERC 1917, 1995 WL 461252, *16 (D.N.J. March 9, 1995) (economic benefit is the "starting point" and the other § 1319(d) factors are used to increase that amount); *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Company,* 18 Envtl.L.Rep. 20999, 1988 WL 156691, *16 (D.N.J. March 24, 1988) (specifically rejecting the "top down" method).

**B.** *Economic Benefit*

[4] [5] As stated above, the court estimates that Fairmont benefited by $2,015,500 as a result of its violations of the Act. Fairmont insists, however, that this figure is not an acceptable measure of economic benefit because: (1) it is speculative; (2) the EPA's Clean Water Act Settlement Policy does not recognize this theory of economic benefit; and (3) it represents a potential reduction in "revenue" and not "profit."

[6] [7] The court rejects all three arguments. First, if a violator of the Act can achieve compliance with the Act by reducing production volume, it is incumbent upon the violator to do so. *Tyson Foods,* 897 F.2d at 1141-42. While the court acknowledges that its determination of Fairmont's economic benefit is somewhat speculative, it is in the nature of this factor that its qualification will be imprecise. *Hercules,* 19 Envtl.L.Rep. at 20905, 1989 WL 159629 at *5 (citing *Gwaltney,* 611 F.Supp. at 1558). Nevertheless, the court must endeavor to reach a " 'rational estimate of [the violator's] economic benefit, *resolving uncertainties in favor of a higher estimate.*' " *Id.* (quoting *Gwaltney,* 611 F.Supp. at 1558) (emphasis added). The estimate "must encompass *every* benefit that defendants received from violation of the law." *United States v. Mac's Muffler Shop, Inc.,* 25 ERC 1369, 1986 WL 15443, *8 (N.D.Ga. Nov. 4, 1986) (emphasis added). It would eviscerate the Act to allow violators to *807 escape civil penalties on the ground that such penalties cannot be calculated with precision. Moreover, Fairmont itself produced the figure which the court is relying upon to estimate economic gain when it weighed the option of reducing production volume as a means of complying with its IU permit. This fact mitigates the uncertainty in calculating economic benefit in this case.

The court is also unpersuaded by the fact that the EPA's settlement policy does not specifically recognize this theory of economic benefit. The court believes that its approach is faithful to the plain meaning of § 1319(d) and is consistent with the authority cited above. The court is, of course, not bound by EPA settlement policy.

Finally, Defendant asserts, in conclusory fashion, that the $417,000 figure represents a potential annual loss in "revenue" and not "profit" and therefore is not an appropriate basis for measuring economic gain. In fact, the Fairmont document at issue states that the "plant effect" of reducing volume to achieve compliance with the Act would be a reduction in "projected earnings" of $417,000. This appears to the court to be a sensible basis to estimate Fairmont's net economic gain from noncompliance and Defendant proposes no reason to believe otherwise.

**C.** *Seriousness And History Of Violations*

[8] [9] [10] In evaluating the seriousness and history of Fairmont's violations, the court will first consider the number, frequency and degree of the violations. *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Company,* 18 Envtl.L.Rep. 20999, 1988 WL 156691, *15 (D.N.J. March 24, 1988). In doing so, the court may weigh all of Fairmont's violations in the record, not just those regarding which liability has been determined. *Hercules,* 19 Envtl.L.Rep. at 20904, 1989 WL 159629 at *4; *Mac's Muffler Shop,* 25 ERC 1369, 1986 WL 15443 at *11 n. 1.[1] In addition, the court must consider the harm to the environment caused by the violations. *Hercules,* 19 Envtl.L.Rep. at 20905, 1989 WL 159629 at *6-7. It must be emphasized, however, that because actual harm to the environment is by nature difficult and sometimes impossible to demonstrate, it need not be proven to establish that substantial penalties are appropriate in a Clean Water Act case. *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 40 ERC 1917, 1995 WL 461252, *17 (D.N.J. March 9, 1995) (collecting cases).

[11] The instant case involves a very large number of violations-the court has ruled that Fairmont is liable for 1,754 violations of its IU permit with respect to BOD and

TSS, and has found that Fairmont committed a total of approximately 2,360 violations of its IU permit between July 1989 and April 1995. These violations were essentially continuous for nearly six years. In view of the large number of Fairmont's IU permit exceedances, and their continuity over such a lengthy period, the court considers the violations to be serious. This seriousness is magnified by the fact that the violations contributed to tangible degradation of Kishacoquillas Creek.[2]

[12] The court acknowledges, at the same time, that this case is not among the most egregious when compared with reported Clean Water Act cases. It involves conventional and not toxic pollutants. While conventional pollutants such as TSS and BOD *808 are regulated by the Act and can cause serious damage to waterways, it is appropriate to consider the toxic/conventional pollutant distinction when weighing the seriousness of a permit violation. See, e.g., PIRG v. Powell Duffryn Terminals, Inc., 720 F.Supp. 1158, 1161 (D.N.J.1989). Toxic pollutants generally pose a greater threat to human life. Id.

Furthermore, the degree of the exceedances in this case-30% over monthly average TSS limit and 21% over monthly average BOD limit-appear to be lower than in many cases cited by the parties. See, e.g., Duffryn, 720 F.Supp. at 1161 (majority of violations exceeded permit by over 200%; approximately # of violations exceeded permit by 400%; substantial number of violations exceeded permit by over 1000%); Hercules, 19 Envtl.L.Rep. at 20906, 1989 WL 159629 at *8 (majority of violations exceeded permit by over 140%; approximately ¼ of violations exceeded permit by over 300%). The court does not intend to minimize the degree of Fairmont's violations, and notes, again, that in eight months Fairmont exceeded its monthly average TSS limit by over 100%. The court nonetheless believes that the appropriate penalty is this case will be lower than if, for example, Fairmont's average violations for both TSS and BOD were over 100%.

D. *Good Faith/Willfulness Of Violations*

For a period of approximately two years and three months following the issuance of Fairmont's IU permit in July 1989, Fairmont knowingly exceeded its IU permit limits and was essentially indifferent to its violations of the Clean Water Act. After Mr. Koontz arrived at Fairmont in October 1991, Fairmont engaged in investigation, deliberation, planning and piecemeal efforts to deal with the problem for approximately another two and one-half years before it undertook the costly course of action necessary to come to terms with the violations-that is, the installation of a pretreatment facility. While Fairmont delayed committing itself to a serious solution to its violations, it continued to produce at a volume which it recognized was very likely to generate levels of BOD and TSS beyond that allowed by its IU permit. Although Mr. Koontz may have believed that reducing production volume could threaten the viability of Fairmont, the observance of laws duly enacted by Congress is not left to the discretion of a regulated entity, after consultation with its accountant. Fairmont's lengthy delay in meaningfully confronting its IU permit violations, and its unwillingness to reduce production volume until its wastewater problem was under control, do not speak highly of its good faith in this matter.

E. *Economic Impact On The Violator*

[13] In assessing the economic impact of the penalty, the court will look to the finances of Dean Foods because it is so closely interconnected with Fairmont for purposes of the instant suit that the two should be treated as a single entity. *Public Interest Research Group of New Jersey, Inc. v. Top Notch Metal Finishing Co., Inc.,* 29 ERC 1022, 1988 WL 156725, *7 (D.N.J. Dec. 23, 1988); see also *Magnesium Elektron,* 40 ERC 1917, 1995 WL 461252 at *17 (court looked to assets of parent corporation of violator to determine economic impact of penalty when economic benefit of noncompliance was transferred to parent corporation). "[T]he piercing of the corporate veil ... is a 'tool of equity that is appropriately utilized when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from public liability for a crime.' " *Carpenters Health and Welfare Fund of Philadelphia and Vicinity v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir.1983) (quoting *Publicker Industries, Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1069 (3d Cir.1979)) (brackets and internal quotations omitted). Here, Dean Foods was closely involved with Fairmont in evaluating the options for resolving Fairmont's wastewater problems, and it had complete control over whether and when Fairmont would achieve compliance with its IU permit. At the same time, Dean Foods was siphoning off profits from Fairmont. It would constitute a serious injustice to allow Dean Foods to profit from Fairmont's violations of the Act, which occurred while Dean Foods retained control over Fairmont's wastewater problem and failed to take timely remedial action, and at the same allow Dean Foods to escape *809 liability for the violations. Judicial sanction of such an

arrangement would surely encourage violation of the Clean Water Act.[3]

### F. *Aggregate Penalty*

When determining what sum should be added to the violator's economic gain to serve the function of punishment and general deterrence, the court must bear in mind that "[i]f the regulated community perceives that violations of the law are treated lightly, the government's regulatory program is subverted." *Mac's Muffler Shop,* 25 ERC 1369, 1986 WL 15443 at *10. The penalty must be " 'high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business.' " *Natural Resources Defense Council v. Texaco,* 800 F.Supp. 1, 27 (D.Del.1992) (quoting *Duffryn,* 720 F.Supp. at 1166). This judgment must be made on a case by case basis. Under the particular circumstances of this case, the court believes that the ends of punishment and deterrence will be served if the penalty for noncompliance, in addition to the loss of economic benefit, is an additional sum equal to the economic benefit from noncompliance. With this approach it is hoped that the potential economic gain which would tempt a regulated entity to violate the Clean Water Act, when converted into a potential economic loss of the same magnitude, will inspire fidelity to the law.[4]

Accordingly, the court will impose a civil penalty of $4,031,000. An appropriate order will be issued.

### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1. The Clerk of Court is directed to enter judgment for the United States and against Fairmont in the amount of $4,031,000.

2. Fairmont's motion *in limine* to exclude evidence of its IU permit violations after April 1994 is denied.

3. Fairmont's motion *in limine* to exclude all evidence of damage to the Kishacoquillas Creek is denied.

4. Fairmont's motion *in limine* to exclude evidence of Dean Foods' financial condition is denied.

5. The parties' motions *in limine* are otherwise deemed irrelevant and dismissed.

6. The Clerk of Court is directed to close the file.

---

Footnotes

1  Accordingly, the court will deny Fairmont's motion *in limine* to exclude evidence of its IU permit violations after April 1994.

2  Fairmont has made a motion *in limine* to exclude evidence that discharge from the POTW damaged the Creek. Fairmont argues that: (1) any damage to the Creek resulting from Union Township's violation of its NPDES permit has already been resolved by a settlement between Union Township and the Pennsylvania Department of Environmental Protection ("PDEP"); and (2) the United States failed to produce certain evidence of the condition of the Creek within the discovery deadline. With respect to the first argument, the court finds the settlement between Union Township and PDEP to be irrelevant to Fairmont's liability. With respect to the second argument, it is inconsequential because there is sufficient evidence in the record which was timely produced to support the court's conclusion that discharge from Union Township's POTW degraded the Creek. Accordingly, the first part of the motion *in limine* will be denied and the second part will be deemed irrelevant and dismissed.

3  Accordingly, Fairmont's motion *in limine* to exclude evidence of Dean Foods' financial condition will be denied.

4  Of course, in cases in which the violator receives little or no economic benefit from noncompliance, this approach to assessing the civil penalty will be inappropriate.

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.