# EXHIBIT 4

Case 2:10-md-02179-CJB-DPC Document 13811-4 Filed 12/09/14 Page 2 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

1996 WL 477053
United States District Court, C.D. California.

UNITED STATES of America, Plaintiff,
v.
VISTA PAINT CORPORATION, Defendant.

No. EDCV 94–0127 RT.  |  April 16, 1996.

**Attorneys and Law Firms**

Donald C. Smaltz, William F. Fahey and Leland A. Wahl, Smaltz, Anderson & Fahey, Los Angeles, CA, William M. Smiland, Smiland & Khachigian, Los Angeles, CA, for defendant.

Jennifer Bremer and Frank D. Kortum, Assistant United States Attorneys, Los Angeles, CA, Letitia F. Moore and Kenneth G. Long, Regional Counsel, United States Environmental Protection Agency, San Francisco, CA, for plaintiff.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TIMLIN, District Judge.

*1 The matter came on regularly for trial, United States District Judge Robert J. Timlin presiding. After having heard the arguments of counsel and examined the evidence presented, the Court makes the following findings of fact and conclusions of law:

**I.**

*FINDINGS OF FACT*

**A.** *Amended Findings of Uncontroverted Facts and Conclusions of Law.*
The following Findings of Fact are conclusively established by the Amended Findings of Uncontroverted Facts and Conclusions of Law, filed February 11, 1992 ("Amended Findings"), and the Amended Pretrial Order, filed January 3, 1993 ("1/3/94 Court Order"):

1. In 1984, as part of the State Implementation Plan ("SIP") for California to limit the VOC content of paint, the South Coast Air Quality Management District ("SCAQMD") and the San Diego County Air Pollution Control District ("SDCAPCD") adopted SIP Rules 113 and 67.0. These rules regulate non-flat architectural coatings, otherwise known as gloss or semi-gloss paints, which are commonly used to paint structures, mobile homes or pavement. In order to control air pollution from the manufacture and application of these coatings, the rules limit their VOC content to no more than 250 grams of VOC per liter of coating ("250 g/l VOC"), and forbid the sale, offer for sale, or application of any such paint exceeding these VOC limitations ("non-compliant coatings").

2. As background, local and regional government authorities under California law have primary responsibility for control of air pollution. Cal.Health & Safety Code § 40000 *et seq.* Two of these local authorities are the SCAQMD, which includes Los Angeles and Orange Counties, and the SDCAPCD, which includes San Diego County. These districts are empowered to adopt rules governing air pollution and to independently enforce them as state law. *Id.* at § 40001. As for the federal government, the Clean Air Act ("CAA") provides the EPA with independent authority to enforce federally approved air pollution control laws. Section 110 of the Act, 42 U.S.C. § 7410 (Section 7410), requires among other things that each state submit rules for emission limitations to be incorporated into the SIP, and enforced as federal law by the EPA. *See* 42 U.S.C. § 7413.

3. In 1985, the U.S. Environmental Protection Agency ("EPA"), pursuant to the CAA, approved SCAQMD Rule 113 and SDCAPCD Rule 67.0 as part of the SIP for California, to be enforced as federal law. 50 Fed.Reg. 3338 (January 24, 1985).

4. Vista's president was aware of these rules and their purpose in the time period between 1985 to 1987, to control VOC emissions. Vista was both a long-time manufacturer and seller of non-compliant coatings, having produced its "Trim–Kote" and "Proformer" brands with VOC's in excess of 250 g/l for over ten years. Vista offered these non-compliant coatings for sale for the five-year period preceding February 1987.

5. EPA met with industry trade associations in 1987, including the National Paint & Coatings Association and the Southern California Paint & Coatings Association, regarding its strategy for taking enforcement action against companies violating the 1985 VOC limitations set by law. EPA informed the industry that it would, as a matter of enforcement discretion, prioritize enforcement against

Case 2:10-md-02179-CJB-DPC   Document 13811-4   Filed 12/09/14   Page 3 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

those companies that did not cease the manufacture of non-compliant coatings by July 1, 1987, *and* who did not cease their sale of non-compliant coatings by September 1, 1987. Thus, while EPA retained the discretion to prosecute any company that violated the VOC limitation after January 24, 1985, EPA announced that those companies that persisted longest in their continuing violations of the Clean Air Act would be the first to be prosecuted.

*\*2* 6. On March 19, 1987, in order to determine the compliance status of the paint industry with the VOC limitations of federal law, EPA issued a request for information to a number of paint manufacturers, including Vista, pursuant to Section 114 of the CAA, 42 U.S.C. § 7414 ("Section 114 Request"). EPA required that each company report the volume of each non-architectural coating that it manufactured from February to May 1987, and the VOC content of each coating. Each company was given until April 7, 1987, to submit their first reports, and warned that non-compliance would subject them to civil penalties.

7. Vista did not respond to EPA's March 19, 1987 request. Vista's president cannot recall why Vista did not respond. Faced with Vista's recalcitrance, EPA subsequently issued an Administrative Order against Vista pursuant to Section 113(a)(3) of the CAA, finding that Vista had violated Section 114 of the CAA in failing to provide the requested information to EPA. 42 U.S.C. §§ 7413(A)(3), 7414. Per its Order, EPA directed Vista to disclose by no later than April 16, 1987, the VOC content of the architectural coatings that it manufactured or distributed from February through May 1987.

8. Vista only partially complied with EPA's Administrative Order, responding in a letter postmarked April 20, 1987, by disclosing the VOC content of the architectural coatings it manufactured in February and March 1987 only. Vista's letter disclosed that its monthly paint production was approximately 25,000 gallons of coatings, with 55 percent by volume of the identified coatings exceeding the 250 g/l VOC limitation of federal law. Vista did not respond to EPA's Order regarding its coatings manufactured in April and May 1987, and did not provide the requested information.

9. EPA subsequently sought more specific information from the paint manufacturers regarding the trade name, volume and VOC content of each non-compliant coating sold in each California air quality district in March, April and May 1987. On May 15, 1987, EPA sent Vista a modified request for more specific information to supplant its initial request for information. Alternatively, EPA specified that the paint manufacturer could stipulate that it sold and/or offered for sale coatings in violation of the 250 g/l VOC limitation, and the month and location where the non-compliant paint was sold. Vista was advised that a failure to provide the requested information would subject Vista to an enforcement action for civil penalties of $25,000 per day of violation.

10. Vista responded by a letter dated June 12, 1987. Without disclosing the months in which it sold non-compliant coatings, Vista admitted to selling non-compliant coatings in the SCAQMD and the SDCAPCD. Vista's president also confirmed Vista's prior admissions in his sworn deposition testimony. Yet the information regarding the volume of each such non-compliant Vista coating sold and the location of their sale was available to Vista in March, April and May of 1987.

*\*3* 11. Based upon Vista's admission, EPA issued a Notice of Violation to Vista on June 19, 1987, pursuant to Section 113(a)(1) of the CAA.

12. EPA, in its continuing effort to compel Vista to comply with the law, sent Vista a second Section 114 request on June 19, 1987, requesting documentation of any quantities of Vista non-compliant coatings manufactured and sold in the subsequent July–October 1987 period. This request required Vista to (1) establish and maintain records regarding their non-compliant coatings; (2) report the volume of non-compliant coatings sold in August through October 1987 and their location of sale; (3) report the name and VOC content of the coatings sold; and (4) report the identity of coatings manufactured by Vista from July through October 1987.

13. The information requested by EPA's June 19, 1987, Section 114 request was available to Vista at the time of EPA's request. EPA again warned Vista at that time of the $25,000 per day penalty if the requested information was not received.

14. In an effort to further accommodate the paint industry and Vista, EPA by its letter dated July 22, 1987, modified its second Section 114 request with a strictly tailored condition. In this letter, EPA stipulated that if Vista would commit to (1) the cessation of the manufacture of non-compliant coatings by July 1, 1987, (2) the cessation of all sales of non-compliant coatings by September 1, 1987

Case 2:10-md-02179-CJB-DPC   Document 13811-4   Filed 12/09/14   Page 4 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

(a condition never fulfilled by Vista, see below), and (3) disclose the time and location of sales of non-compliant paint in August 1987 (another condition never fulfilled by Vista), that Vista would be relieved of its obligation to provide the other information requested by EPA in its prior June 1987 letter. Vista was still required to maintain all relevant records of its manufacture and sale of non-compliant coatings. EPA was explicit, however, that all conditions must be strictly complied with if Vista was to be relieved of any of its reporting obligations.

15. Vista continued to manufacture, sell and offer for sale its non-compliant coatings throughout April to October 1987, but did not provide any reports to EPA. Vista continued to manufacture non-compliant coatings in April, May and June of 1987, and continued to sell and offer for sale its non-compliant coatings in the Los Angeles and San Diego areas throughout June, July, August and September 1987. Although Vista continued to sell non-compliant coatings, Vista submitted no report of its August sales as requested in EPA's July 22, 1987, letter and no report as required by EPA's June 19, 1987, letter. EPA, per the CAA Section 113, 42 U.S.C. § 7413, gave notice to the appropriate state air pollution control agency of this enforcement action.

16. On August 19, 1987, Vista's president, Eddie R. Fischer, telephoned William Wruble of EPA Region IX to ask for more time to sell his non-compliant coatings. After discussing Vista's situation, Mr. Fischer stated that "he had no choice but to sell the [non-compliant] paint past September 1, and was planning to do so." Mr. Fischer then stated that "he would (could) litigate if he had to, since the option was to go out of business."

*4 17. Mr. Wruble denied Vista's request for additional time to sell its non-compliant coatings, and explained that Vista's failure to take EPA's enforcement authority seriously was not a reason to grant it additional time to sell non-compliant coatings. Mr. Fischer then said that he "didn't think it was our [EPA's] intention to put him in jail, although he'd be willing to pay a 'reasonable' fine to be able to continue to sell his violating coatings."

18. Vista was also warned by the local SDCAPCD to cease its sale of non-compliant coatings by September 1, 1987, a warning Vista received at least by July 28, 1987. Vista, however, continued to sell non-compliant coatings throughout September 1987. Vista admits that such non-compliant coatings remained offered for sale throughout Vista's San Diego stores in September 1987. Vista also continued its refusal to respond to EPA's request for information.

19. Further evidence that Vista sold non-compliant coatings after September 1, 1987, is provided where inspectors from the SDCAPCD purchased the Vista-brand "Trim–Kote" coating, a non-compliant coating, from Vista's retail outlet on Kearney Villa Road in San Diego, California, on September 2, 1987. The SDCAPCD's laboratory analysis revealed that the purchased paint had a VOC concentration of 387 g/l, well above the permissible 250 g/l permitted by SDCAPCD Rule 67.

20. The SDCAPCD inspectors purchased a second gallon of non-compliant coating, a Vista paint under the brand name "Proformer," from the same Vista San Diego store on September 22, 1987. The SDCAPCD laboratory analysis revealed that the purchased paint had a VOC concentration of 381 g/l, well above the permissible 250 g/l permitted by SDCAPCD Rule 67.

21. Both Vista's records and its president corroborate these violations. Vista's April 16, 1987, report to EPA identifies that its "Trim–Kote" and "Proformer" paints as non-compliant coatings, have a VOC concentration of 340 and 380 g/l, respectively. Vista's president confirmed that Vista's "Trim–Kote" and "Proformer" paints purchased by the SDCAPCD inspectors would be expected to have VOC concentrations in excess of 250 g/l. Mr. Fischer further admits that non-compliant coatings were sold in San Diego on September 2, 1987. Based upon these illegal sales, the SDCAPCD cited Vista with two misdemeanor Notices of Violation for its violations of SDCAPCD Rule 67. Cal.Health & Safety Code § 42400.

22. Faced in September 1987 with enforcement action from the SDCAPCD (EPA had not yet taken its enforcement action against Vista), Vista sought a variance from the SDCAPCD Hearing Board.

23. As background, the variance procedure is a creation of the California Health & Safety Code §§ 42350 *et seq.*, and provides the applicant with a procedure to obtain relief from a *local* rule (not a federal rule) under certain strictly limited conditions. Cal.Health & Safety Code § 42350. In part, an applicant cannot obtain a variance unless the applicant attests that it "is, or will be, in violation of Section 41701 or of any rule, regulation, or order of the district." Cal.Health & Safety Code § 42352(a). Thus, by applying for a variance, Vista further admitted that it was in violation

of SDCAPCD Rule 67 and/or its intent to violate that rule for the express purpose of selling the remainder of Vista's non-compliant paints within the next 90 days.

*5 24. Vista was subsequently unable to persuade a majority of the SDCAPCD Hearing Board at its September 24, 1987, hearing that a variance was warranted, and Vista obtained no variance relief at any time from the SDCAPCD. Vista applied to the SDCAPCD Hearing Board for reconsideration, then dropped its request. Vista represented instead that it had removed its non-compliant paint from its San Diego stores as of October 12, 1987, but after the September 24, 1987, variance hearing. Vista's president explains that he removed the non-compliant coating from his San Diego stores because those coatings were not selling well. Vista subsequently paid a fine to the SDCAPCD for its violations of their local rules.

25. The VOC's emitted by Vista's paint are a primary precursor of ozone, or smog, which the EPA has designated as a major air pollutant. 42 U.S.C. §§ 7408, 7450, 7451; 40 C.F.R. ¶¶ 50.1, 50.9. The 13,000 gallons of coating offered for sale in September 1987 in San Diego by Vista would release approximately eight tons of VOC hydrocarbons.

26. Ozone pollution causes serious adverse health effects, including coughing, reduced lung capacity, respiratory infection and possible permanent lung damage. There is also evidence that the young, the elderly, and those persons with respiratory ailments (such as asthmatics) are among those who are particularly susceptible to the adverse effects of ozone. At certain concentration levels, ozone irritates the respiratory system and causes coughing, wheezing, chest tightness and headaches. Due to its irritation nature, ozone can aggravate asthma, bronchitis and emphysema. Some studies indicate that chronic exposure to fairly low levels of ozone may reduce resistance to infection and alter blood chemistry or chromosome structure. At higher concentrations [of ozone], hospitalization becomes a possibility.

27. Ozone also causes significant damage to the environment, where ozone can destroy vegetation, reduce crop yield, and damage exposed materials by causing cracking, fading and weathering. Moreover, clear evidence shows that ozone damages economically, ecologically and aesthetically important plants. When exposed to ozone, major annual crops produce reduced yields. Some tree species suffer injury to needles or leaves, lowered productivity and, in severe cases, individual trees can die.

28. EPA has through the federal Clean Air Act attempted to control and regulate VOC emissions from a variety of sources, including paint manufacturers. In 1987, EPA found that 40 paint companies, including Vista, were in violation of the federal CAA's limitation on VOC concentrations in their coatings. All 40 paint companies received a Notice of Violation, and 38 announced their intent to cease non-compliant paint sales. Only one company announced its intent to continue to violate the VOC restrictions, to intentionally violate the law despite repeated warnings from the regulatory agencies, and to disregard the effects of its violations on human health and the environment: that company was Vista.

*6 29. After EPA referred this matter to the U.S. Justice Department for enforcement action, Vista for the first time produced a letter it purportedly prepared on or about August 4, 1987, and sent to EPA, that represented that Vista had ceased its manufacture of non-compliant coatings on June 30, 1987, and "will not offer for sale any non-compliant coatings after September 1, 1987."

30. This representation has in fact proven to be false. Vista's president admits that sales of such coatings continued well after September 1, 1987. In addition, there is no copy of the letter in EPA's files or any other indication that it was received by EPA prior to the date it was produced to the U.S. Department of Justice in 1989. Vista's president testified that he cannot recall ever seeing the purported Vista August 4, 1987, letter before 1989, when it was first produced to the U.S. Department of Justice.

31. Vista appears to have had no intention of ceasing its sale of non-compliant coatings in August 1987, where Vista's president announced to EPA at precisely the same time that Vista would continue its sales of non-compliant paint after September 1, 1987, and Vista in fact did so. Vista's president said that Vista would go bankrupt if it could not sell its non-compliant paint, a statement that again cannot be reconciled with Vista's purported August 1987 letter.

32. The United States propounded interrogatories and requests for production of documents on May 1, 1991, seeking this identical information requested by EPA in 1987. Vista responded with groundless objections with no legal basis, and flatly refused to provide the information or produce the relevant documents. The United States then brought a motion to compel Vista to comply with its discovery requests. As a result, this Court ordered that Vista (1) specifically identify by September 27, 1991, the

quantity of its non-compliant coatings manufactured and sold in 1987, and (2) produce the requested documents at the U.S. Attorney's Office by no later than October 25, 1991, again mirroring the information requested by EPA in 1987.

33. Vista did not identify its non-compliant coatings with a verified response per this Court's Order, and as required by Section 114 of the CAA, but instead directed the United States to look through unidentified documents at its warehouse. Moreover, Vista has refused to make those documents available for inspection until October 25, 1991.

34. Vista has already provided its sworn response stating unequivocally that no documents exist regarding its sale or offer for sale of non-compliant coatings prior to August 30, 1987. See Vista's "Supplemental" Responses No. 2 and 3. This unexplained disappearance of Vista's documents is directly contrary to EPA's Section 114 requirement that Vista retain those documents.

35. Vista's sworn responses to the United States' Requests for Admission ("RFA") cannot be reconciled with the deposition testimony of Vista's president, where he admits precisely the same facts that Vista denies in its RFA responses. For example, Vista's president admits that he knew that Vista was selling non-compliant coatings in September 1987. Fischer Depo. p. 188. *But see* Vista RFA No. 27. There are numerous other examples. *See* Vista RFA Nos. 1, 2, 3, 5, 6 and 7. *See* especially Vista's evasive response to RFA No. 13 and 14.

B. *Memorandum of the Ninth Circuit Court of Appeals (Court of Appeals).*

*7 The following Findings of Fact are conclusively established by the Memorandum in *United States v. Vista Paint Corp.,* No. 92–55160 (9th Cir., Sept. 24, 1992) ("Memorandum"), and the "1/3/94 Court Order."

1. Vista had ample opportunity to submit comments on the inclusion of the local rules in the California State Implementation Plan ("SIP") pursuant to Section 307(d) of the CAA, and to challenge EPA's approval of the inclusion of those rules in the SIP pursuant to Section 307(b)(1) of the CAA.

2. Vista admits that it did not halt the sale of non-complying paint by September 1, 1987.

3. Vista was manufacturing, selling and offering for sale non-complying coatings in 1985, when the volatile organic compounds ("VOC") limit became effective.

4. In June 1987, Vista told EPA that it was selling non-complying paint in the SCAQMD and the SDCAPCD.

5. Vista's president, Eddie Fischer, admitted that Vista had been violating the rules since 1985 and was doing so before and after September 1, 1987.

6. Vista also admitted that these violations in the SDCAPCD continued until October 12, 1987.

7. Fischer expressly testified in his deposition that non-complying paint was offered for sale after September 1, 1987, in San Diego.

8. EPA's second information request required Vista to establish and maintain certain records and to submit certain reports. Vista's president admitted that the kind of information EPA sought was available when EPA requested it.

9. If Vista had stopped offering for sale and selling non-complying paint by September 1, 1987, it would have been relieved of some of the requirements in this request. However, Vista continued to sell such paint after September 1, 1987. Vista's president understood that the requirements of the second request were waived only if Vista stopped selling non-complying paint by September 1, 1987. Although Vista admittedly continued to sell non-complying paint after September 1, 1987, it never provided the information requested by EPA.

10. Vista [has a] history of full compliance.

11. The duration of violation [is settled].

12. SDCAPCD previously assessed a $500 penalty.

13. The $500 Vista paid to the SDCAPCD [was] on a fine originally set at $2,000.

14. Vista obtained a "significant economic benefit" that supported a "substantial penalty."

15. Vista has improperly failed to disclose information which it has or had in its exclusive possession to assess the precise economic benefit to it due to its illegal offer for sale and sale of non-compliant coatings.

Case 2:10-md-02179-CJB-DPC   Document 13811-4   Filed 12/09/14   Page 7 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

16. Vista failed to submit admissible evidence to controvert the U.S.A.'s showing of Vista's significant economic benefit.

17. EPA's ability to gather information on potential violations is vital to enforcement of the CAA. It is irrelevant that no ozone was formed from Vista's failure to supply the information.

18. Vista's president was told by EPA and the San Diego District that, if it did not stop selling non-complying paint by September 1, 1987, enforcement would follow. There was nothing unusual or perplexing in these instructions to Vista.

C. *Findings of Fact After Trial.*

*8 The following Findings of Fact are established by the evidence at the trial on certain remanded civil penalty issues.

1. Vista is a company whose primary operation consists of manufacturing and selling at retail paint and paint products. It is the largest manufacturer, distributor and retail seller of paint in Orange County, California. Vista manufactures approximately 25,000 gallons of paint each month for sale at its stores in California. It has 28 retail locations in Southern California, including San Diego County. Its total sales in 1990, 1991 and 1992 exceeded $44,000,000 in each year, and its total sales in 1993 approximated $47,000,000. Its general office and sole paint manufacturing plant are located in Fullerton, California. It has 400 employees.

2. In 1994, Vista's net worth was approximately $12,000,000 and its net current assets were approximately $8,553,000.

3. Eddie Fischer is the sole owner and president of Vista. Mr. Fischer has ultimate control of all operational, financial and managerial decisions of Vista. Vista is a Subchapter S corporation for federal tax purposes, which causes all taxable income of Vista to be allocated to Mr. Fischer and is taxed at the appropriate individual tax rates.

4. For the years following the filing of this lawsuit for which Vista has filed income tax returns, Vista's gross profits have remained relatively steady: $20,063,000 for 1990; $19,543,000 for 1991; and $19,596,000 for 1992. Because of certain transactions between Vista and Mr. Eddie Fischer, its sole equity owner, Vista's reportable net income since this lawsuit was filed has been drastically reduced: $2,241,000 in 1990; $582,000 in 1991; and a net loss of $464,000 in 1992.

5. By reason of certain transactions between Vista and Mr. Eddie Fischer, the total shareholder equity in Vista is $2.9 million.

6. However, Vista's purported financial condition of only $2.9 million in stockholder equity has not precluded Vista's ability to obtain a $3 million dollar letter of credit from Bank of America posted with the District Court. *See* Vista's motion for release of Rule 62(d) security, filed on March 2, 1993. In its financial analysis of Vista, exhibit 107, Bank of America partly concludes at page 2 that Vista lowered its retained equity because of the instant action:

> "In June 1991, Mr. Fischer was advised that it would be advantageous for him to withdraw $7,950M in retained earnings from Vista. This represented the Sub chapter S earnings upon which he has paid income taxes, since Vista became a Sub S corp. in 1986. This amount was lent to the company and subordinated to the Bank. *This accounting action was also taken to lower the retained earnings because of the EPA suit.*" (Emphasis added).

7. On March 10, 1992, Vista posted with this Court a Standby Letter of Credit from Bank of America in the amount of $3,176,723 to secure the summary judgment in the amount of $3,020,000 entered against Vista by Judge Real.

*9 8. Bank of America concluded that Vista is easily capable of financing a $3.02 million dollar judgment against it:

> "Judge Manuel Real of the US District Court imposed a $3MM fine ... even if the total fine would be levied Vista Paint could put together the financing to repay the fine over a relatively short period of time."

9. The Court of Appeals on page 10 of its Memorandum discussed the seriousness of the violation factor as one of the seven criteria provided in 42 U.S.C. 7413(e) for consideration by the Court in determining the amount of

Case 2:10-md-02179-CJB-DPC   Document 13811-4   Filed 12/09/14   Page 8 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

penalty to be assessed. It stated that as to the application of that factor to the Section 110 violation (selling or offering for sale in violation of SIP) there was a triable issue of material fact regarding how many gallons of non-compliant coatings Vista was offering for sale during September 1987 in San Diego County. The Court finds that Vista offered for sale at least 13,000 gallons of non-compliant coatings in San Diego in September 1987. It also finds that Vista sold at least 70 gallons of non-compliant coatings in San Diego during the period September 1, 1987 to October 12, 1987.

10. In August 1985, SCAQMD amended Rule 1113 to extend to 1989 California paint companies' ability to sell non-compliant paint up to 380 g/1 VOC. SCAQMD's decision was known to Vista.

11. In January 1986, SDCAPCD amended its Rule 67.0 to extend to September 1, 1986, California paint companies' ability to sell non-compliant paint up to 380 g/l VOC in San Diego. SDCAPCD's decision was known to Vista.

12. Both districts subsequently submitted their new time extension revisions to EPA as revisions to the federal SIP. These proposed revisions to extend the time for compliance with their local rules which imposed a 250 g/l VOC deadline under state law, did not constitute federal law.

13. The SDCAPCD revision proposed to extend the deadline for compliance with the 250 g/l VOC limitation to September 1, 1986. The revision was submitted to the California Air Resources Board ("CARB"), then to EPA on August 12, 1986, with less than one month remaining before September 1, 1986, when the proposed local rule extension would expire by its own terms. Because of the short time remaining before it became a moot proposal, EPA did not act on SDCAPCD's proposed extension of the federal SIP as to non-compliant coatings. At all times, the federal SIP remained in effect and required compliance with the 250 g/l VOC limitation by all members of the coatings industry, including Vista.

14. The SCAQMD proposed revision to Rule 1113 was submitted to EPA and formally disapproved by EPA in 1989. See 54 Fed.Reg. 5236 (February 2, 1989).

15. Vista's violations continued in both the SCAQMD and the SDCAPCD (in violation of the SDCAPCD rule) throughout 1986 and a portion of 1987, in violation of the federal SIP.

16. The Court finds that the August 4, 1987, letter by Vista, addressed to EPA (Exhibit 13) as a response to EPA's information request of July 22, 1987 (Exhibit 12), was not sent or delivered to EPA.

*10 To the extent that any of the foregoing Findings of Fact are deemed to be Conclusions of Law, they are incorporated into the following Conclusions of Law stated in II.B below.

II.

CONCLUSIONS OF LAW

A. The following Conclusions of Law are the law of the case by reason of the Conclusions of Law made in the Amended Findings and the 1/3/94 Court Order.

1. Vista illegally offered for sale and sold non-compliant coatings with a VOC content in excess of 250 g/l during the time period between and including December 3, 1985, through October 12, 1987, in violation of the SIP rules identified as SCAQMD Rule 1113 and SDCAPCD Rule 67, and continued to violate those rules more than 30 days after having received a Notice of Violation from EPA on June 24, 1987.

2. Vista has, therefore, violated Section 110 and 113 of the Clean Air Act, 42 U.S.C. §§ 7410, 7414, from December 3, 1985, to October 12, 1987, a total of 578 (sic) days of violations and there being no genuine issue of material fact remaining, the United States is entitled to summary judgment thereon.

3. Vista illegally and unreasonably failed to respond to EPA's June 19, 1987, request for relevant information in violation of Sections 113 and 114 of the CAA, 42 U.S.C. §§ 7413, 7414, by its failure to (a) establish and maintain records regarding their non-compliant coatings, (b) report the volume of non-compliant coatings sold in August through October 1987 and their location of sale; (c) report the name and VOC content of the coatings sold; and (d) report the identity of coatings manufactured by Vista from July through October 1987.

4. Vista has, therefore, violated Sections 113 and 114 of the Clean Air Act from August 26, 1987, to November 18, 1991, a total of 1177 (sic) days of violations and,

there being no genuine issue of material fact remaining, the United States is entitled to summary judgment thereon.

5. Section 113 of the CAA, 42 U.S.C. § 7413(b), provides for imposition of a civil penalty against Vista of not more than $25,000 per day of violation for (1) the sale or offer for sale of non-compliant VOC paint in violation of CAA Section 110, and (2) for the failure to respond to EPA's request for information in violation of CAA Section 114. 42 U.S.C. § 7413(b)(2), (4). For purposes of computing the appropriate civil penalty, the penalty period begins when the source first commits the violation and not later when the NOV is issued. This Court will first determine the maximum penalty allowable and then consider any mitigating circumstances.

6. Vista's failure to respond to EPA's request for information is equally serious. More than four years after the information was requested by EPA, then by the U.S. Department of Justice in this lawsuit, Vista has not yet responded to EPA's request that Vista specify the quantity of non-compliant paint manufactured and sold in the summer of 1987.

7. There is injury to the public when responsible parties such as Vista do not respond to official inquiries pertaining to its Clean Air Act compliance and liability. EPA must expend a significant portion of its limited monies to prosecute these actions, and the violator escapes effective regulation of its pollution by hiding its violation and challenging EPA to find the information on its own, if it can. Where the regulatory program is designed to protect public health, as with the Clean Air Act, it is even more important to deter violators.

*11 B. The following Conclusions of Law supplement the Conclusions of Law stated in II.A above, and are applicable to all of the foregoing Findings of Facts.

1. *Jurisdiction and Venue.*

a. This Court has subject matter jurisdiction over this action pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1331, 1345 and 1355, and personal jurisdiction over the parties.

b. Venue in this district is proper pursuant to 42 U.S.C. 7413 and 28 U.S.C. § 1391(c).

c. Vista is a corporation covered by the CAA, 42 U.S.C. § 7602(e).

d. EPA satisfied the requirement that notice of this action be given to the proper state air pollution control agency pursuant to the CAA, 42 U.S.C. 5.7413(b).

2. *Generally Applicable Law Regarding Issues Remanded For Trial.*

a. The penalty criteria are set forth in CAA Section 113(e)(1), 42 U.S.C. § 7413(e)(1) (Section 7413(e)(1). In assessing civil penalties, CAA Section 113(e)(1) provides that the Court shall consider the following factors: (1) the size of the business and the economic impact of the penalty on the business; (2) the seriousness of the violation; (3) the violator's full compliance history; (4) good faith efforts to comply; (5) the duration of the violation as established by any credible evidence; (6) payment by the violator of penalties previously assessed for the same violation; (7) the economic benefit of noncompliance, and such other factors as justice may require.

b. Neither statutory nor case law (which the Court could find) dictates that the Court in weighing such factors must give more weight to any one factor than to any of the other factors.

c. Under Section 7413(e), civil penalties are awardable for violations of Sections 7410 and 7414 on days which precede the date a Notice of Violation is served by EPA on the violator. *U.S. v. SCM Corp.,* 667 Fed.Supp. 1110, 1122–1123 (D.Md.1987).

d. The general purposes of a civil penalty are three fold: (1) retribution, (2) deterrence, and (3) restitution. *Tull v. U.S.,* 481 U.S. 412, 422 (1987).

e. In determining the civil penalty, the Court "should give effect to the major purpose of a civil penalty: deterrence." *United States v. T & S Brass and Bronze Works Inc.,* 681 F.Supp. 314, 322 (D.S.C.1988), *aff'd. in relevant part,* 865 F.2d 1261 (4th Cir.1988), 28 ERC, 19 Envtl.L.Rep. 20, 857.

f. The Court of Appeals in its Memorandum remanded this action for trial only as to the application of certain Section 7413(e)(1) factors and then for a determination of the civil penalty under Section 7413(b).

3. *Penalty Factors Remanded For Trial.*

Case 2:10-md-02179-CJB-DPC Document 13811-4 Filed 12/09/14 Page 10 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

The following three statutory penalty factors were remanded for trial: (1) economic impact/size of business; (2) good-faith efforts to comply; and (3) seriousness of violation. In addition, the interest of justice non-statutory factor of government delay remained as an unresolved issue of fact.

a. *Size Of Business/Economic Impact.*

**\*12** Regarding the Court's consideration of the first two criteria of Section 7413(e)(1): size of the business and the economic impact of civil penalties on Vista's business (sometimes characterized collectively as the "ability to pay"), the Court, based on the facts and applicable law, considers them inextricably interrelated in their application to Vista.

Vista is an expanding business with increasing annual gross sales revenues in the range of 45 to 47 million dollars annually. It has a healthy financial structure with considerable assets and net worth, annual net income (see Findings of Fact I C 1 and 2 above). Its earning capacity and borrowing capacity are such that the total civil penalties the Court adjudicates against it in this case will not undermine its financial structure and place it in jeopardy of "going out-of-business." Vista is capable of paying the penalties which will be ordered by the Court. The Court concludes that those two factors do not support a non substantial civil penalty. [1]

b. *Vista's Good Faith Efforts To Comply.*

(i) *Section 7410 Violations.*

Although Vista had received on June 24, 1987, a Notice of Violation from EPA regarding sales of non-compliant coatings in violation of the architectural coatings rules contained in the California federally approved State Implementation Plan ("SIP") (Exhibit 10), it proceeded to sell such non-compliant coatings into November 1987. Vista's president admitted that in September 1987, it offered for sale in San Diego County 13,000 gallons of such coatings and sold 35 to 70 gallons of those coatings in that county.

Vista knowingly and intentionally violated federal law from at least December 3, 1985, to October 12, 1987, ignoring during that period repeated warnings by EPA and the June 1987 Notice of Violation. Vista made a considered decision to offer to sell and sell non-compliant coatings in violation of Section 7310 and risk penalties rather than obey the law.

During this time period, Vista knew of the federal law regulating the VOC content of its coatings and prohibiting its offering for sale and selling non-compliant coatings.

(ii) *Section 7414 Violations.*

Vista made no real good faith effort to comply with Section 7414 and respond to EPA's information requests. It did not respond to the March 19, 1987, request. Vista submitted incomplete responses to EPA's April 20, 1987, administrative order and transmitted inadequate responses to EPA's information requests of June 19, 1987, and July 22, 1987, in part by not providing the required reports. Vista never responded to those portions of the information requests asking for specific quantities of non-compliant paint manufactured and sold in the summer of 1987.

Vista advised the EPA that it would litigate if it had to and would continue to sell its non-compliant coatings regardless of the law, even if it had to pay a "reasonable" fine for doing so.

The Court of Appeals at page 7 of its Memorandum pointed to Mr. Fischer's statement that Vista's employees spent three days attempting to compile the information sought by EPA's Section 114 information request and this is evidence of good faith. In fact, the documents which Vista's employees purportedly used to compile the information sought by EPA are Vista's sales receipts and such were inspected by the United States. But, these receipts were not responsive to the information requested.

**\*13** Vista's corporate state of mind was to engage in a pattern of continued non-cooperation with Vista's enforcement efforts by withholding the documentation of its violations or by providing incomplete information regarding such while it continued to sell and offer to sell non-compliant coatings after the Notice of Violation. The Court concludes that such non good faith conduct supports a substantial penalty.

c. *Seriousness of Vista's Violations.*

(i) *Section 7410 Violations.*

The unlawful emissions of VOC's into the atmosphere of the SCAQMD and SDCAPCD from the application of non-compliant coatings sold by Vista between 1985 and 1987, estimated to be 13 tons per month, exacerbated the ozone problem in both districts. This calculation is based on an estimate of Vista's sale of 11,300 gallons of such coatings each month. The government was not able to ascertain the actual amount because Vista failed to comply with EPA's information requests for the actual volumes of such coatings sold or offered for sale during that period.

Findings of Facts I A 25 through 27 above describe the effects of ozone on human health and the environment. Vista's non-compliant coatings as sold and applied by its customers, contributed appreciably to the ozone content in the two districts. If Vista had complied with Section 7410, there would have been a major reduction in atmospheric pollutants in SCAQMD and SDCAPCD.

Based on the uncontradicted testimony of doctors C. Shepard Burton, Ph.d., and Jack D. Hackney, M.D., the VOC emissions from the application of Vista's non-compliant coatings, however, would have no measurable negative impact on human health and the environment of the SCAQMD and SDCAPCD. Therefore, the seriousness of Vista's 7410 violations support a moderate penalty.

(ii) *Section 7414 Violations.*

Based on Conclusion of Law II A 7 above, and CAA's statutory scheme which makes its effectiveness depend in large part on the members of the regulated industries maintaining and keeping required records of their operations and then submitting complete, accurate and timely reports regarding such to EPA when requested, the seriousness of the 7314 violations supports a moderate to substantial penalty.

d. *Government Delay As An Interest of Justice Mitigating Factor.*

(i) *EPA Delays In Reviewing Proposed SIP Provisions.*

The period of time consumed by EPA in reviewing and making its decision on the proposed revisions by SCAQMD and SDCAPCD to extend the time to comply with SIP as to manufacturing, offering to sell and selling non-compliant coatings was not unreasonable. *See General Motors Corp. v. U.S.,* 496 U.S. 530, 541 n. 4, 110 L.Ed.2d 480, 110 S.Ct. 2528 (1990).

As to the proposed revision to Rule 113, SCAQMD submitted it to EPA on November 12, 1985, and it was disapproved on February 2, 1989. In the period 1985 through 1989, EPA's delay in processing and acting on proposed revisions to SIP by local districts was attributable to statutory ambiguities, policy issues not resolved on a national basis, adverse court decisions affecting EPA's ability to process certain types of revisions and lack of resources. (*See* deposition testimony of Mr. Howekamp).

**\*14** Another important factor was whether the proposed revision was controversial. The proposed revision to Rule 113 was very controversial because it provided for a four year relaxation period before it became effective. Many issues regarding this proposed revision were being discussed in the coatings industry and in the governmental agencies having regulatory authority over pollutants emitted into the atmosphere. Further, the SCAQMD had not provided enough information to support its request. Consequently, EPA had to do its own investigative work to clarify some of these issues. This slowed down the review process. (See deposition testimony of Mr. John Ungvarsky.) Additionally, as required by law, EPA submitted the proposed Rule 113 revision and its recommended disapproval to the Office of Management and Budget ("OMB") on December 12, 1986, and OMB did not report its concurrence until May 14, 1988.

Regarding SDCAPCD's proposed revision to Rule 67.0, there was no unreasonable delay by EPA in reviewing it. The revision was submitted to EPA on August 12, 1986. Because the revision became moot less than one month after it was submitted to EPA, EPA did not act on it.

Case 2:10-md-02179-CJB-DPC Document 13811-4 Filed 12/09/14 Page 12 of 13

U.S. v. Vista Paint Corp., Not Reported in F.Supp. (1996)
42 ERC 2020

In any event, even if there were unreasonable delays in acting on the proposed rule revisions, Vista was not prejudiced by them because Vista violated federal law before and after the rule revisions were submitted to EPA. Vista's violations continued in both the SCAQMD and the SDCAPCD (in violation of the SDCAPCD rule) throughout 1986 and 1987. The effect of the local rule relaxation in the SCAQMD had no effect on Vista's violations of federal law in the SCAQMD by virtue of 42 U.S.C. § 7416, and no effect on Vista's violations of both federal and local law in the SDCAPCD.

Further, Vista was aware as early as 1985 that EPA was not inclined to allow the extensions as proposed by the districts.

Therefore, having concluded that the delays by EPA in reviewing the proposed SIP revisions were reasonable, such delays do not mitigate the amount of the civil penalties to be imposed.

(ii) *EPA/Department of Justice ("DOJ") Delay In Initiating Civil Prosecutorial Action.*

EPA's delay in taking enforcement action against Vista for its Sections 7410 violations during the period 1985 to October 12, 1987, was reasonable because during that period EPA was collecting and evaluating a great amount of information, including input from the coatings industry, and was engaged in lengthy discussions with the local districts regarding enforcement policy. Only in the Fall of 1987, did EPA refer the matter to the Department of Justice for prosecutorial consideration. Such delay caused no prejudice to Vista. See Conclusions in II 3 d(i) above.

As to the Section 7414 violations, the prosecutorial delay was unreasonable from June 21, 1989 through January 18, 1991. On June 21, 1989, the EPA and DOJ announced in a press release that on that date the DOJ was going to file a civil penalty enforcement action against Vista in U.S. District Court (Exhibit 638). But, DOJ did not do so until December 5, 1990.

\*15 Vista was prejudiced by such delay because from June 21, 1989 to January 18, 1991, DOJ knew that Vista was maintaining the legal position that it had complied with Section 7314 by timely and complete responses to EPA's information requests. See the letter from Joseph J. Armao, Vista's attorney, to Gerald F. George, attorney, Enforcement Section, Department of Justice. Such delay supports a moderate reduction in the penalty for the period June 21, 1989 to January 18, 1991.

4. *Penalty Factors Not Remanded For Trial.*

a. *Vista's Full Compliance History.*

Although Vista had no history of non-compliance with the CAA before its violations of Sections 7410 and 7414, the extent and degree of such knowing and intentional violations demonstrate a history of *non-full* compliance. The application of this factor supports a substantial penalty.

b. *Duration of Vista's Violations.*

Vista's violations of Sections 7410 and/or 7414 spanned a period of almost six years. Such duration of violations supports a substantial penalty.

c. *Vista's Payment of Penalties Previously Assessed For The Same Violations.*

Vista was assessed by SDCAPCD $2,000.00 in penalties for two separate sales of non-compliant paints in that district after September 1, 1987, in violation of its Rule 67.0. Vista paid only $500.00 towards the fine.

The fact that Vista paid $500.00 as a penalty to SACAPCD in regards to two sales, which this Court has found also constitute violations by Vista of Section 7410, is considered by this Court as a slightly mitigating factor respecting the penalty to be assessed against Vista for violation of Section 7410.

d. *Economic Benefit To Vista From Non–Compliance.*

Vista received significant economic benefit from its violations of Section 7410 by avoiding the cost of eliminating the sale of non-compliant coatings, including nonsalability of any inventory of non-compliant paint in stock. It also avoided the manufacturing and marketing costs of switching certain of its brands to a compliant coating status.

Although many of Vista's competitors also were selling non-compliant coatings in the SCAQMD and SDCAPCD during the period December 3, 1985 to September 1, 1987, in violation of Section 7410 and, therefore, Vista had no competitive advantage over them, other coatings manufacturers and retailers were in compliance. As to the latter group, Vista derived an economic benefit from its non-compliance with Section 7410.

Further, Vista's failure to comply with Section 7414 and provide the information and records sought by EPA's information requests preclude the Court from determining the actual economic benefit to it from violating Section 7410. The Court infers from such non-disclosure that the records, which were in the exclusive possession of Vista, would confirm this Court's conclusion that Vista obtained significant economic benefit from its offering to sell and selling non-compliant paints during December 3, 1985 to October 12, 1987, in violation of Section 7410.

*16 The application of this factor supports a substantial penalty.

5. *Civil Penalty.*

The Court has weighed all those factors in Section 7413(e)(1), as applied to the facts determined after trial and to the facts previously adjudicated by Judge Real's summary judgment and affirmed by the Court of Appeals. It concludes:

a. Regarding Vista's Section 7410 violations, the Court assesses a civil penalty of $500.00 per day for each of Vista's 568 days of violations from December 3, 1985, to June 24, 1987 (the date Vista received its Notice of Violation from EPA),[2] and $2500.00 per day for each of Vista's 110 days of violation from June 24, 1987, to October 12, 1987, a total of 678 days. The total Section 7410 civil penalty is $559,000.00.

b. Regarding Vista's Section 7414 violations, the Court assesses a civil penalty of $500.00 for each of Vista's 665 days of violations from August 26, 1987, through June 21, 1989 (the date of the EPA/DOJ's press release), and $250.00 per day for each of Vista's 879 days of violation from June 21, 1989, through November 18, 1991, a total of 1544 days.[3] The total Section 7414 civil penalty is $552,250.00.

To the extent that any of the foregoing Conclusions of Law are deemed to be Findings of Fact, they are incorporated into the Findings of Fact, as stated in I.C above.

**Parallel Citations**

42 ERC 2020

Footnotes

1   This conclusion is made notwithstanding certain financial transactions since 1990 between Vista and Mr. Eddie Fischer which cause Vista to appear on financial statements to be less financially stable than it is.
2   Judge Real's Amended Findings calculated the days covered by such period to be 468 days.
3   Judge Real's Amended Findings calculated the total days to be 1177 days.

End of Document © 2014 Thomson Reuters. No claim to original U.S. Government Works.