# EXHIBIT 5

Case 2:10-md-02179-CJB-DPC Document 13811-5 Filed 12/09/14 Page 2 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

1996 WL 479533
United States District Court, M.D. Florida.

UNITED STATES of America Plaintiff,
v.
AVATAR HOLDINGS, INC., and Florida Cities Water Company, Defendants.

No. 93–281–CIV–FTM–21.  |  Aug. 20, 1996.

**Attorneys and Law Firms**

Daniel S. Jacobs, T. Anthony Quinn, Robert R. Homiak, Washington, DC, for Department of Justice Environmental Enforcement Section.

Baise & Miller, P.C., Gary H. Baise, Alexander M. Bullock, Lance W. High, Washington, DC, and Gabeler, Battocchi, & Griggs, LLP., Don G. Scroggin, McLean, VA, for Florida Cities Water Co.

Weil, Gotshal, & Manges, LLP., David B. Hird, Joanne M. Tsotsos, Washington, DC, for Avatar Holdings Inc.

*MEMORANDUM ORDER*

NIMMONS

\*1 This is an action by the United States of America ("Plaintiff") against Florida Cities Water Company ("Florida Cities"), a private utility company, and its parent company, Avatar Holdings, Inc. ("Avatar Holdings"), brought pursuant to the civil penalty provisions of the Clean Water Act (CWA), 33 U.S.C. § 1319(b). The action was tried to the Court sitting without a jury. Upon due consideration of the testimony and evidence presented herein, the arguments of counsel, and the proposed findings submitted by the parties, the Court issues the following opinion as its findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

*PROCEDURAL BACKGROUND*

Prior to trial, the Court decided summary judgment motions of all three parties. The Court granted Plaintiff summary judgment on liability against Florida Cities on the Plaintiff's claims for National Pollutant Discharge System (NPDES) permit violations at Barefoot Bay and Carrollwood and claims for unpermitted discharges, discharges to an unpermitted location and NPDES permit violations at Waterway Estates. The Court granted Florida Cities summary judgment on the allegations in paragraphs 16–23 and 30 of the Second Amended Complaint, which consisted of a claim for discharge from Barefoot Bay without an NPDES permit, claims for violations of Administrative Order (AO) 90–106 for discharging without a permit from Barefoot Bay, and a claim for discharge without an NPDES permit from Carrollwood. The Court also granted Avatar Holdings partial judgment on the pleadings as to all allegations against Avatar Holdings that date back more than five years due to the five year statute of limitations, 28 U.S.C. § 2462. The remaining issues at trial were the amount of civil penalty to be assessed against Florida Cities [1], the liability of Avatar Holdings as Florida Cities' parent company, and the amount of civil penalty to be assessed against Avatar Holdings if it is found to be liable. The parties have filed their proposed findings of fact and conclusions of law and post-trial briefs, and Avatar Holdings has additionally filed a memorandum of law in support of judgment as a matter of law and Plaintiff has filed a memorandum in opposition thereto.

*FINDINGS OF FACT—FLORIDA CITIES:* [2]

Florida Cities is a utility company, which owns and operates the three wastewater treatment plants that are involved in this case: Barefoot Bay, Carrollwood, which is no longer in operation, and Waterway Estates. In order for a company to discharge to surface waters of the United States, it must obtain an NPDES permit issued from the Environmental Protection Agency (EPA) or by a state to which the EPA has delegated NPDES permitting authority. Prior to May 1, 1995, Florida was a "non-delegated" state under the CWA such that dischargers in Florida were required to be permitted by both the EPA and the Florida Department of Environmental Protection (FDEP) [3].

**I.** *Barefoot Bay*

\*2 The Barefoot Bay plant is located in Brevard County, Florida, and it discharges treated effluent into an agricultural drainage canal which leads to the Sebastian River. Barefoot Bay utilizes two percolation ponds. Barefoot Bay provides secondary wastewater treatment to a residential community and is currently undergoing a plant modification to provide advanced wastewater treatment. On November 1, 1991, NPDES permit FL0042293 became effective. The permit

Case 2:10-md-02179-CJB-DPC Document 13811-5 Filed 12/09/14 Page 3 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

required Florida Cities to report to EPA total residual chlorine (TRC) levels, toxicity test results, and biochemical oxygen demand (BOD) levels. The 269 Clean Water Act violations pertaining to Barefoot Bay in this case are the following exceedances of NPDES permit FL0042293: 182 violations of the TRC limitation between September 1992 and March 1993; 3 chronic toxicity test failures in September–October 1992, May 1993, and February 1994; and 79 violations for failure to report BOD on a weekly basis between November 1991 and June 1993 and twice in November 1993.

In September 1992, Barefoot Bay purchased and put into use a new Hach DPD DR–100 chlorine tester, which is an EPA approved method for testing chlorine limits of 0.01 milligrams per liter. However, the EPA guidance materials acknowledge that the DPD DR–100 colorimeter is inaccurate below levels of 0.1 milligrams per liter. Thus, the EPA guidance materials allow dischargers who test for TRC with the DPD DR–100 colorimeter to report measurements below 0.1 milligrams per liter as non-detectable. Between September 1992 and March 1993, Florida Cities reported chlorine residuals at or below 0.1 milligrams per liter. Had Florida Cities reported the chlorine as non-detectable rather than as an actual number, Florida Cities would have been deemed to be in compliance with chlorine limits under the Clean Water Act. In any event, after reporting the chlorine residuals at Barefoot Bay, Florida Cities constructed, permitted and placed into service by March 3, 1993 an amperometric titrator and a sulfur dioxide feed, which eliminates chlorine through the combination of sulfur dioxide with the chlorine residual.

With respect to the chronic toxicity test violations, the testimony presented at trial established that the most common cause of chronic toxicity failures is the presence of ammonia in the effluent. Ammonia is made of nitrogen and hydrogen ($NH_3$). Although advanced wastewater treatment provides for nutrient removal from effluent, secondary treatment does not provide for removal of nutrients such as nitrogen or phosphorus. Thus, Barefoot Bay, a secondary treatment plant, was not designed to remove the nitrogen which resulted in the chronic toxicity test violations.

With respect to the BOD violations, Florida Cities had been reporting carbonaceous biochemical oxygen demand (CBOD) rather than BOD as required in the permit. The BOD test measures the oxygen demand exerted by treated effluent on the receiving system. In October 1993, Barefoot Bay applied to EPA for a modification of NPDES permit FL0042293 to allow monitoring for CBOD instead of BOD, and EPA granted the modification request with no change in the actual limit. The testimony at trial showed that BOD levels can be extrapolated with a reasonable degree of accuracy from CBOD levels. Thus, even though Barefoot Bay improperly reported CBOD levels, the effluent would have complied with the applicable permit limits.

## II. *Carrollwood*

*3 Until it was closed on January 6, 1992, the Carrollwood plant was located in Hillsborough County, Florida, and provided secondary wastewater treatment to a residential community. Between 1975 and January 1992, Carrollwood discharged secondarily treated I effluent into the Sweetwater Creek pursuant to a series of FDEP permits and consent orders. In May 1991, the EPA issued NPDES permit FL0029319, which imposed advanced wastewater treatment standards. The 234 Clean Water Act violations pertaining to Carrollwood in this case are exceedances of the NPDES permit limitations for phosphorus, CBOD, nitrogen, TRC, Total Suspended Solids (TSS), and fecal coliform between July 1991 and January 1992.

In 1979, the FDEP determined that there should be no discharge into Sweetwater Creek, which leads to Tampa Bay, in order to reduce the amount of pollution going to Tampa Bay. In 1984, the EPA denied Florida Cities' NPDES renewal application to discharge into the Sweetwater Creek. In April 1988, FDEP issued Carrollwood an operating permit to the Carrollwood facility requiring Florida Cities to connect to the Hillsborough County system or to construct an advanced wastewater treatment facility by October 1, 1990. In the summer of 1990, Florida Cities applied to the FDEP for another operation permit and the permit application was denied. However, Florida Cities and FDEP entered into a consent order in January 1991 reincorporating the effluent limitations of the April 1988 operating permit and extending until April 1992 the construction deadline for interconnection to Hillsborough County or completion of advanced wastewater treatment. The consent order also required Florida Cities to continue to operate the wastewater treatment plant in accordance with the 1988 effluent limitations.

Since late 1990, Carrollwood also operated under EPA AO 90–100, which imposed secondary treatment limits. No violations of secondary treatments were recorded between July 1, 1991 and January 6, 1992, and Florida Cities met the effluent limitations and monitoring requirements of the

Case 2:10-md-02179-CJB-DPC   Document 13811-5   Filed 12/09/14   Page 4 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

active administrative orders. In May 1991, the EPA issued the NPDES permit with advanced wastewater treatment limits. The level of treatment required by the NPDES permit reflected increased treatment requirements for phosphorous and nitrogen which were unattainable by the secondary treatment plant.

In 1991, Florida Cities simultaneously pursued two remedial options: connection to the Hillsborough County system and construction of an advanced wastewater treatment. Hillsborough County did not have capacity to accept effluent until the second quarter of 1991. After Hillsborough County agreed to waive a $5.5 million capacity fee, an agreement was signed on June 5, 1991 to interconnect the two facilities by January 1992. Florida Cities then abandoned plans to construct an advanced wastewater facility. Both before and after the agreement with Hillsborough County, Florida Cities requested that the EPA allow secondary interim limits and relief from the advanced wastewater treatment requirements. The EPA never revoked AO 90–100, which authorized secondary treatment, until March 1992, two months after the interconnection with Hillsborough County was completed. In 1991, the EPA assessed a $15,000 penalty ($13.51/day) under the CWA for discharges without an NPDES permit between June 1987 and July 1990 at Carrollwood.

### III. *Waterway Estates*

*4 The Waterway Estates plant is located in Lee County, Florida. Since April 1992, Waterway Estates has provided advanced wastewater treatment, and prior to that time, it provided secondary wastewater treatment. Waterway Estates has discharged treated effluent into the Caloosahatchee River since July 14, 1991, and prior to July 14, 1991, it discharged treated effluent into a canal which led to the Caloosahatchee River. The Waterway Estates plant exceeded NPDES permit FL0030325, which imposed advanced wastewater treatment standards, for a total of 1038 Clean Water Act violations consisting of: 396 violations for discharge without an NPDES permit between October 1, 1988 and October 31, 1989; 621 violations for discharging into a canal, instead of to the 6–foot contour line of the Caloosahatchee River between November 1, 1989 and July 14, 1991; 18 violations of total nitrogen loading and concentration; and 3 toxicity test violations.

In 1975, Florida Cities received a wasteload allocation and an NPDES permit which authorized Waterway Estates to discharge secondarily treated effluent to a canal leading to the Caloosahatchee River. The EPA renewed the permit in 1981 and 1983, and on May 9, 1986, Florida Cities applied to EPA Region IV for a routine renewal of its NPDES permit. At that time, permit writer Connie Kagey denied the application. Ms. Kagey based her denial on her review of the cover page and page 17 of the January 1981 Caloosahatchee River Wasteload Allocation Documentation, which is a preliminary planning document drafted as guidance by FDEP regional offices making permitting decisions. Based on her review of the planning document, Ms. Kagey determined that Waterway Estates had no wasteload allocation. However, Florida Cities was given opportunities to bring any errors to the EPA's attention at several occasions: after receiving the letter indicating that there would be a public notice period, during the public notice period, and after the issuance of the permit decision when Florida Cities could have requested a hearing under 40 C.F.R. §§ 124.74 or 124.114.

Once the existing NPDES permit expired in 1987, the EPA issued AO 87–085, whereby the EPA authorized Waterway Estates to continue discharging effluent under the terms of the 1981 NPDES permit and directed that the facility cease its discharges by September 30, 1988. Florida Cities then decided to construct an advanced wastewater treatment facility and hired Source, Inc. in early 1988 to design the upgrade. In August 1988, the EPA amended its 1987 administrative order to require Waterway Estates to complete construction and meet final effluent requirements by November 1, 1990. The FDEP also issued a temporary operating permit requiring compliance with effluent limitations by November 1, 1990. The temporary permit allowed secondary discharges to the canal until November 1, 1990, and the EPA did not challenge or comment on the issuance of this permit.

On September 26, 1989, the EPA issued AO 89–109, which contained a construction schedule for the advanced wastewater treatment upgrade, a construction schedule for the relocation of the outfall to the 6–foot contour line of the Caloosahatchee River, and interim secondary treatment effluent limitations from the 1981 NPDES permit until the advanced wastewater treatment construction was completed. Additionally, on September 29, 1989, the EPA issued NPDES permit No. FL0030325, which contained effluent limitations for an advanced wastewater treatment facility. The FDEP also issued a construction permit which provided an extension of time for the advanced wastewater treatment upgrade and relocation of the outfall to September 1992. Florida Cities requested that the EPA extend AO 89–109 to match the September 1992 construction deadline set by the FDEP, but the EPA did not respond to the request. Florida Cities then

completed the advanced wastewater treatment upgrade in April 1992, ahead of the FDEP's schedule, but failed to meet the deadline set in AO 89–109 for October 1, 1991. The outfall to the six-foot contour line of the Caloosahatchee River was operational on July 14, 1991, ahead of the deadlines established in the state construction permit and EPA AO 89–109.

### CONCLUSIONS OF LAW—FLORIDA CITIES

*5 The penalty provisions of the Clean Water Act are set forth in 33 U.S.C. § 1319(d), which provides in pertinent part:

> Any person who violates [specified sections of the Act] shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

The Clean Water Act was intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49, 52 (1987)(quoting Section 101(a) of the Act). In *Atlantic States Legal Foundation. Inc. v. Tyson Foods. Inc.,* the Eleventh Circuit stated that in determining penalties under the Clean Water Act, "the point of departure for the district court should be the maximum frees for such violations permitted by the Clean Water Act." 897 F.2d 1128, 1137 (11th Cir.1990). The Court further stated that if the district court chooses not to impose the maximum fine, "it must reduce the fine in accordance with the factors spelled out in section 1319(d), clearly indicating the weight it gives to each of the factors in the statute and the factual findings that support its conclusions." *Id.* at 1142. The Court also noted that in *Tull v. United States,* 481 U.S. 412, 422–425 (1987), "the Supreme Court made clear that economic gain and restoration of the status quo is not the only basis on which penalties should be awarded under the Clean Water Act. In addition, the penalties are designed to punish violators for their non-compliance and to serve the goal of retribution." *Id.* at 1141.

The statutory maximum for the violations at issue is calculated by multiplying daily violations by $25,000. In order to calculate the statutory maximum for monthly violations, the number of monthly violations is multiplied by the number of days in the month they occurred and that number is multiplied by $25,000. Thus, the Court's computation of the statutory maximum is as follows: $6,600,000 (264 x 25,000) for the Barefoot Bay violations, $14,675,000 (587[4] x 25,000) for the Carrollwood violations, and $32,025,000 (1281[5] x 25,000) for the Waterway Estates violations. The total is $53,300,000. In accordance with *TysonFoods,* this statutory maximum is the Court's departure point, and the Court will consider Defendants' arguments to reduce the penalty in accordance with the factors in § 1319(d). The Plaintiff argues that the penalty should only be reduced to $4,861,500.

Florida Cities maintains that the penalty should be de minimis —no more than $48,000. Florida Cities points out that trial courts have broad discretion when deciding the appropriate civil penalty amount in Clean Water Act enforcement actions, citing *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368, 1395 (D.Haw.1993). Florida Cities points out that in *Hawaii's Thousand Friends,* the court found that mitigation in the amount of 99.71% of the maximum statutory penalty was within its "sound discretion," even though the discharges failed to meet secondary treatment standards, discharges of raw sewage were numerous and unreported, and the court found a lack of good faith efforts to comply with the NPDES permit or avoid other violations. The courts' determination of the penalty under the Clean Water Act has been characterized as "highly discretionary." *Tull v. United States,* 481 U.S. 412, 413 (1987), *Sierra Club v. Cedar Point Oil Co.,* 73 F.2d 546, 575 (5th Cir.1996).

*6 Florida Cities asserts that the Court should use its discretion to find that a penalty of up to $1,000 per violation is appropriate for the following violations in which mitigation is less: 18 nitrogen violations and 3 toxicity violations at Waterway Estates and 3 toxicity violations at Barefoot Bay (a total of 24 violations), which amounts to a penalty of $24,000. For the remaining 1512 violations, Florida Cities says that the EPA's own valuation of discharge without a permit violations at Carrollwood is instructive in setting a standard for the remaining violations. In AO 90–100 for Carrollwood, the EPA found that 37 months of discharge without a permit

between June 1987 and July 1990 was worth $15,000 or $13.51 per day. Thus, Florida Cities suggests that, for the remaining 1512 violations, the Court should assess a penalty of no more than $20,428 (1512 x 13.51) for all remaining violations.

### I. Seriousness of the Violations

In evaluating the seriousness of the violations at issue in this case, the Court considers the number, duration and degree of the violations as well as the actual or potential harm to human health and environment. *United States v. Dean Dairy Products Co.,* CV–94–0621, p. 16 (M.D.Penn., July 10, 1996), *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368, 1383 (D. Hawaii 1993). A substantial reduction in the maximum statutory penalty is warranted where the violations caused minimal environmental damage. *Id.* at 1397, *Atlantic States Legal Foundation. Inc. v. Universal Tool & Stamping Co., Inc.,* 786 F.Supp. 743, 753 (N.D.Ind.1992). In the instant case, the Court finds that most of the violations of total residual chlorine (TRC), toxicity violations and BOD at Barefoot Bay are not serious. First, although Plaintiff concedes no harm, it asserts that a "particularized showing of harm" is not required and that proof of overall risk of pollutants is sufficient, relying upon *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminal, Inc.,* 913 F.2d 64, 79 (3rd Cir.1990), *cert. denied,* 111 S.Ct. 1018 (1990); *Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 611 F.Supp. 1542, 1560 (E.D.Va.1985), *aff'd,* 791 F.2d 304 (4th Cir.1986), *cert. denied,* 479 U.S. 1029 (1987); *Dean Dairy, supra* at p. 16. Plaintiff's expert Mark Klingenstein, pointed out that a potential risk of harm exists, as the discharge from Barefoot Bay proceeds to the Sebastian River and the Indian River Lagoon, which water bodies have been identified as a habitat for fish, wildlife, and the wood stork, an endangered species. Klingenstein also pointed out that those water bodies have been identified as "threatened water bodies that were being negatively impacted by nutrient load" in the Surface Water Improvement and Management Act. The Court notes, however, that, with respect to all of the violations, Plaintiff has not in any way quantified the risk of environmental harm.

*7 Further, although the number of violations is relatively high (182 TRC, 3 chronic toxicity, 79 BOD) and the duration of the violations is considerable,[6] the degree of the violations lessens the seriousness of the violations. The TRC violations occurred because Florida Cities was unaware that the test method approved by the EPA did not provide precise results and that the levels measured could have been reported as "not detectable," such that Florida Cities would have been deemed to be in compliance with the NPDES permit. Further, the Plaintiff has acknowledged that the BOD violations are not serious, as they occurred simply because Florida Cities mistakenly reported CBOD instead of BOD. Douglas Smith's testimony established that a conversion of the CBOD test results was possible, and that such conversion showed that none of the CBOD data would have been a violation of BOD effluent limitations. With respect to the chronic toxicity test failures, which occur as a result of nitrogen present in the effluent, the Court notes that Barefoot Bay's secondary treatment facility was not designed to remove nitrogen, and the EPA did not include nitrogen limits in the NPDES permit for Barefoot Bay. Thus, there appears to be an inconsistency between allowing nitrogen in the effluent while limiting the consequent toxicity. Upon consideration of the foregoing evidence, the Court finds that the TRC and BOD violations at Barefoot Bay are not serious, and that the toxicity test violations are somewhat serious.

Second, the Court finds that the NPDES violations at Carrollwood are not serious. First, the Plaintiff admits that it has no evidence of environmental damage from these violations. Although Klingenstein testified that there is a potential risk of harm to the Sweetwater Creek and Tampa Bay due to the nature of the water bodies, the evidence does not demonstrate a quantifiable risk of environmental harm. Further, Smith testified that the Carrollwood plant was providing better than secondary treatment during the period in question and that the environmental impact of BOD and TSS was very small or essentially not measurable. The Court also notes that it is appropriate for the Court to consider the toxic/conventional pollutant distinction when weighing the seriousness of a violation and for the Court to consider that conventional pollutants such as TSS and BOD are not among the most egregious pollutants. *Dean Dairy, supra,* p. 17,*citing PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158, 1161 (D.N.J.1989). Additionally, although the total number of NPDES violations is high (234), the duration was not extended (between July 1991 and January 1992). The Court also finds that the degree of the violations was not substantial because the EPA kept AO 90–100 in effect, thereby authorizing Carrollwood to discharge secondarily treated effluent into Sweetwater Creek. The violations at Carrollwood are violations of the advanced wastewater treatment standards in the July 1991 NPDES permit, not violations of the secondary standards in AO 90–

100. The FDEP also permitted Carrollwood to discharge secondarily treated effluent to Sweetwater Creek, which further demonstrates that the degree of the violations was not substantial.

*8 Third, the Court finds that most of the violations at Waterway Estates are not serious. Plaintiff has conceded that there is no evidence of environmental damage as a result of discharges from Waterway Estates. However, Klingenstein testified that to avoid localized impacts pollutant discharges, the Caloosahatchee River was best protected if such discharges were at the six-foot contour line of the River itself. Klingenstein further testified that the permit violations had the potential to cause environmental harm due to the nature of the water bodies. The Court notes, however, that Plaintiff has not demonstrated a quantifiable risk of environmental harm. Rather, as Klingenstein acknowledged on cross-examination, his opinion that the discharges from Waterway Estates had a negative impact upon the canal and the Caloosahatchee River was based upon two studies consisting of computer models of assumed scenarios. Further, Klingenstein admitted that he had not reviewed in detail the actual data concerning the canal and the Caloosahatchee River but indicated that he believed that certain characteristics indicated by the model were useful. Next, the Court notes that the number of violations at Waterway Estates (1038) is sizable and the duration of the violations is somewhat extended.[7] However, the Court finds that the degree of most of the violations is not substantial. The EPA issued two administrative orders that authorized Florida Cities to continue to discharge secondarily treated, effluent from Waterway Estates and to meet the effluent limitations in the 1981 NPDES permit between January 1987 and October 1991. Thus, the secondary discharge from Waterway Estates was continuously authorized at all relevant times by both EPA administrative orders and by FDEP permits and consent orders. Further, the EPA did not require Waterway Estates to reduce the volume of its discharge. Additionally, the discharges to an unpermitted location violations are somewhat mitigated by the fact that the canal was a previously approved discharge location.

## II. *Economic Benefit*

The Court finds that the consideration of whether Florida Cities enjoyed an economic benefit as a result of the violations does not weigh in favor of mitigation of the penalties. Florida Cities argues that when a capital improvement, such as an upgrade in a wastewater treatment plant, is approved by the Florida Public Service Commission (PSC) as "used and useful," the utility can include the cost of the capital improvement in the rate base and thereby benefit economically, such that Florida Cities can realize an economic benefit only from investing, not from deferring investment. Mr. Keith Cardey testified, based on the assumption that the Florida PSC's rate increase is in effect as soon as the advanced wastewater treatment plants begin service, that Florida Cities did not enjoy an economic benefit as a result of its violations at any of the three facilities at issue in this case.[8] However, as Plaintiff points out, any investment that was subsequently not approved by the PSC could not have been recouped. Further, Florida Cities has not established that the cost of the capital improvement would be immediately approved and included in the rate base. Thus, the Court disagrees with Florida Cities' contention that it can only realize an economic benefit from investing, not deferring investment.

## III. *History of Violations*

*9 The Court has considered the history of violations at the three facilities at issue and finds that this factor supports some mitigation of the penalties. With respect to Barefoot Bay, Florida Cities admits that prior to November 1, 1991, it did not have an NPDES permit to discharge effluent from Barefoot Bay and that it has paid penalties for discharge without a permit. Further, the Court notes that Barefoot Bay exceeded AO 90–106 from September 26, 1990 to October 31, 1991. However, Florida Cities points out that it entered into a Consent Order with the FDEP which permitted discharges until a feasible alternative could be found. Additionally, the Court notes that there is no history of violations for TRC, toxicity, or misreporting of BOD measurements at Barefoot Bay. At Carrollwood, Florida Cities discharged without a permit from November 1, 1984 to June 30, 1991. However, the FDEP issued permits effective June 1980 through May 1985 and April 1988 through October 1990 for Carrollwood. In September 1990, the EPA issued AO 90–100, which provided effluent guidelines and limitations. Further, the Court notes that there is no history of violations of advanced wastewater treatment standards at Carrollwood prior to the issuance of the NPDES permit containing advanced wastewater treatment standards in 1991. At Waterway Estates, the Court again finds no history of violations which support imposition of maximum penalties. Although Waterway Estates discharged without a permit from January 1987, after the EPA's denial of the NPDES permit took effect, until October 1, 1988, Waterway

Case 2:10-md-02179-CJB-DPC   Document 13811-5   Filed 12/09/14   Page 8 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

Estates consistently met its secondary wastewater treatment requirements during all relevant periods.

### IV. Good Faith Efforts to Comply with Requirements

The Court has considered Florida Cities' efforts to comply with its various requirements and finds that the efforts to comply in some instances support a small mitigation of the penalties. First, with respect to Barefoot Bay, Plaintiff points out that it is located in a rural area of Brevard County, where there are approximately 3,000 acres of orange groves within 1.5 miles which could have been used to build additional percolation ponds, spray irrigation, or a deep well. Although the evidence at trial shows that these options were considered since the mid–1980s, and that Florida Cities purchased a 40 acre site in December 1985, the alternatives were rejected due to cost and effectiveness concerns. Klingenstein gave his opinion that these alternatives were feasible and would have eliminated the violations at Barefoot Bay. Further, Plaintiff maintains that Florida Cities could have invested earlier in a sulfur dioxide unit and an advanced wastewater treatment plant in order to meet permit limits for toxicity and TRC. The Court agrees that Florida Cities' efforts to comply with the applicable requirements of the Clean Water Act were prolonged, and decisions were made slowly over the course of several years due to much concern regarding the cost of the options, such that Florida Cities did not purchase the 316 acres of the H & S groves for spray irrigation until July 1995. Nevertheless, the Court gives due weight to Florida Cities' efforts in investigating means to comply with the requirements, and the Court notes that some delays were caused by third parties outside of Florida Cities' control, such as delays caused by challengers to the construction permit for a spray field system on a 300–acre spray field site, which led to administrative proceedings and hearings. Further, the Court notes that Florida Cities acted promptly to solve the TRC exceedances and misreporting of CBOD.

*10 With respect to Carrollwood, Plaintiff points out that Florida Cities could have connected with the City of Tampa's plant, which had available capacity, or could have built an advanced wastewater treatment plant after the Grizzle–Figg legislation took effect in 1987, in order to prevent unpermitted discharges in the years 1984 through 1991 and permit violations after July 1991.[9] Rather, Florida Cities waited until the Hillsborough County system had capacity to treat the Carrollwood wastewater in 1992 due to the perceived high costs of connecting to the Tampa wastewater treatment plant, which involved the construction of a force main of between 10,000 and 15,000 feet. The Court agrees that Florida Cities was dilatory in proceeding in its efforts and making its decisions to correct the violations at Carrollwood. However, the Court also gives due weight to Florida Cities' efforts to comply with the requirements of the EPA. Florida Cities complied at all times with the requirements of AO 90–100, which the EPA kept active during the time in which the secondary treatment facility could not meet the NPDES permit's advanced wastewater treatment limits.

With respect to Waterway Estates, Plaintiff points out that Defendants knew or should have known that they needed to consider alternative arrangements for Waterway Estates due to the 1981 study which indicated that the discharge to the canal could not continue. Plaintiff also points out that Florida Cities had interconnection and advanced wastewater treatment upgrade options which would have prevented the violations. From February 1987 through February 1990, North Fort Myers Utilities discussed the possibility of providing wastewater treatment service to Waterway Estates, but Florida Cities rejected this option for reasons of cost and concern that the PSC may not approve such connection. Plaintiff asserts that this option was a particularly attractive one from an environmental standpoint because the North Fort Myers plant uses deep well injection and spray irrigation to dispose of its treated effluent without any surface water discharge. In 1986 Florida Cities applied for a renewal of its NPDES permit, which was denied in January 1987. In December 1987, having decided to upgrade its plant and move the outfall, Florida Cities applied for a wasteload allocation. In November 1989, Florida Cities' new NPDES permit became effective. Due to contractor disputes and delays, the design and construction process for the upgrade was delayed, and Defendants failed to comply with its NPDES permit until 1992. Additionally, in its efforts to prevent discharges to an unpermitted location, Florida Cities did not begin the construction of the outfall extension until December 1990, and the new outfall was not completed until July 1991. The Court again finds that Florida Cities' efforts and decisions proceeded slowly such that the violations were not eliminated expeditiously. However, the Court gives due weight to the efforts of Florida Cities to construct its advanced wastewater treatment plant within a reasonable time despite the delays caused by third parties. The Court also notes that Florida Cities had explored alternatives to surface water discharge, including public access spray irrigation, restricted access irrigation, percolation ponds, and deep well injection.

Case 2:10-md-02179-CJB-DPC  Document 13811-5  Filed 12/09/14  Page 9 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

### V. *Economic Impact of the Penalty*

**\*11** The Court finds that Florida Cities does not have the ability to pay the statutory maximum penalty and that the economic impact of the penalty on Florida Cities constitutes a mitigating factor. The Court notes that Eileen Zimmer testified for the Plaintiff that Florida Cities can afford to pay a penalty up to of $7.5 million (if the penalty is paid over the course of five years) without a material adverse affect on the company. Ms. Zimmer indicated that she analyzed publicly available materials, SEC filings, and financial statements of Florida Cities, and in her report she stated that she considered "the stable nature of the business the company is in, its historical ability to generate income and its dividend payment history." Ms. Zimmer suggested that Florida Cities could borrow the $7.5 million to pay for the penalty; however, she acknowledged that the only source likely for a loan would be Avatar Holdings, who Zimmer conceded lost money in each of the last five years. Further, Zimmer conceded that Florida Cities' liquidity as represented by its current equity to debt ratio and working capital is poor and that long term debt has increased somewhat and remains at moderate levels. At trial, she also stated that short term liabilities increased between 1993 an 1994 by about $4.3 million. Further, the record shows that Florida Cities is obligated to pay Allstate Insurance Company preferred stock redemption obligations every year between 1997 and 2001. Additionally, the Court finds significant the testimony of Charles McNairy [10] that Florida Cities and Avatar Utilities, Inc. have approximately $17 million of planned capital expenditures for enhancements, improvements, and expansions to the existing water treatment plants which will exhaust the available lines of credit. Finally, as a utility being regulated by the PSC, Florida Cities cannot simply raise its rates to cover a penalty, and the payment of the penalty is not tax deductible.

### VI. *Other Matters as Justice May Require*

Florida Cities argues that the Court should consider several facts pertaining to each of the facilities at issue in this case. The Court finds that the facts noted by Florida Cities, such as Barefoot Bay's compliance with the directives and authorizations of the FDEP, Carrollwood's inability to meet the NPDES requirements which were beyond the physical capacity of the plant, and Waterway Estates' possession of a wasteload allocation to discharge secondarily treated effluent when Kagey denied the permit renewal based upon her review of a planning document, have already been considered by this Court in connection with the above five factors. Florida Cities does raise a new argument, however, that the Plaintiff raised the violations pertaining to Carrollwood for the first time when it amended the Complaint in 1995 and should not be allowed to recover millions of dollars in penalties by including those violations. Nevertheless, the Court finds the above five factors to be determinative of the mitigation of the penalty to be assessed.

### VII. *Penalties*

**\*12** Having considered the factors discussed above, the Court finds that the statutory maximum should be mitigated as set forth herein. First, the 79 violations of BOD at Barefoot Bay will be penalized in the amount of $10 per day of each violation. The 182 TRC violations will be penalized at $10 per day of each violation. The three (3) chronic toxicity test violations will be penalized in the amount of $1,000 per day of each violation. With respect to the 234 Carrollwood NPDES permit violations, the penalty will be in the amount of $25 per day of each violation. The 18 nitrogen and three (3) chronic toxicity test violations at Waterway Estates will be penalized in the amount of $1,000 per day. The 621 days of discharges to an unpermitted location will be penalized in the amount of $25 per day. Finally, the 396 days of unpermitted discharges from Waterway Estates will be penalized in the amount of $25 per day.

### FINDINGS OF FACT—AVATAR HOLDINGS

Avatar Holdings is a diversified company which has more than 60 direct and indirect subsidiaries engaged in a variety of business operations including home construction, vacation ownership, resort operations, retail land sales, property management, commercial and industrial development, and water and wastewater utilities operations. Avatar Holdings places its principal emphasis on the real estate operations. Avatar Utilities, Inc. ("Avatar Utilities") is a subsidiary of Avatar Holdings and is the parent for all of Avatar Holdings' utility subsidiaries. Until 1993, Avatar Utilities was the parent of numerous utility companies which operated approximately 37 water supply companies and 13 wastewater plants. In late 1993, Avatar Utilities downsized through the sale of 29 plants.

Case 2:10-md-02179-CJB-DPC   Document 13811-5   Filed 12/09/14   Page 10 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

The formal relationship between Avatar Holdings and Florida Cities is as follows: Avatar Holdings is the parent of Avatar Utilities; Avatar Utilities is the parent of Consolidated Water Company; Consolidated Water Company is the parent of Florida Cities Water Company Holdings, Inc.; and Florida Cities Water Company Holdings, Inc. is the parent of Florida Cities. However, the evidence in this case has shown the involvement of employees of only three of these entities: Avatar Holdings, Avatar Utilities, and Florida Cities. Further, the evidence established that Avatar Holdings does not control any of Florida Cities' individual plants on a daily basis. The utilities subsidiaries make decisions concerning plant operation, not Avatar Holdings. When Florida Cities chooses a contractor for a particular project involving a capital expenditure exceeding $75,000, it seeks contract award ("conward") approval form Avatar Holdings. Avatar Holdings has never rejected a conward request from Florida Cities or Avatar Utilities relating to the operation of plant facilities or environmental compliance.

Further, Avatar Holdings officers and directors generally held utility operations review meetings once a year to discuss financial matters, budget performance, and future budget plans. With respect to the three facilities at issue in this case, Avatar Holdings officers and directors discussed and sent memoranda concerning planning matters. As for Barefoot Bay, the Plaintiff introduced evidence at trial showing that in 1983, "Avatar" management meetings included discussion of land areas needed "for future construction to accommodate the complete build-out of Barefoot Bay." Further, in February 1984, Lawrence Wilkov, former President of Avatar Holdings, wrote a file memorandum which noted the cost to acquire and build ponds, stated that a way should be found to have the utility fund the entire amount, and stated that the situation requires immediate action as increased capacity should be "on line" by November 1984. In June 1984, Peter Sharp, former Chief Executive Officer of Avatar Holdings, wrote to Wilkov, John Sladkus,[11] and Robert Gordon[12] that they "must be sure that the cost of the percolation pond and related construction end up 100% as part of Barefoot Bay's rate base on which rates can be charged to customers from day one." Further, in 1985 Gordon informed Wilkov of cost estimates of percolation ponds for Barefoot Bay and Sharp gave his opinions to Gordon regarding Gordon's efforts in acquiring land for percolation ponds. In 1986, Gordon sent Sladkus status reports on the Barefoot Bay plant. In January 1987, Sladkus informed Sharp and Wilkov by memorandum that the ponds were not functioning and suggested the possibility of spray irrigation. In 1988, Sladkus gave Sharp another report on Barefoot Bay attaching a file memorandum written by Gordon concerning Gordon's meeting with the FDEP, and Sladkus also sent Sharp a memorandum recommending the retention of a particular engineering company. The Plaintiff also points to memoranda between Sladkus, Wilkov, Dennis Getman[13] and Sharp indicating their awareness of or involvement in the deep well project or alternatives to deep well injection, such as spray irrigation, at Barefoot Bay.

*13 With respect to Carrollwood, Sladkus was informed by two memos in December 1988 and by participation in a meeting at Avatar Utilities in January 1989 of the status and schedules pertaining to Carrollwood projects. Further, Sharp was concerned with cost, flow, recovery of costs through the rate base, and construction completion time. However, Paul Bradtmiller, Executive Vice–President of Florida Cites, who was involved in the advanced wastewater treatment construction process and was the principal negotiator on behalf of Florida Cities with respect to connection to Hillsborough County, testified that he never discussed the advanced wastewater treatment process or the negotiations with Hillsborough County with any officials of Avatar Holdings. Further, the testimony of William Shafer, Head of Planning for the Sanitary Sewer Department of the City of Tampa, who was involved in negotiations with Florida Cities regarding possible connection to Tampa in the 1980s, did not show any involvement by Avatar Holdings in the negotiation process.

With respect to Waterway Estates, in January 1987, Sladkus reported to Sharp and Wilkov that the plant either needed to apply for a wasteload allocation and upgrade to advanced wastewater treatment or connect to North Fort Myers Utilities. In June 1987, Gordon forwarded to Sladkus a copy of the EPA's compliance order for Waterway Estates. In August 1987, Gordon forwarded to Sladkus a copy of an engineering report on the feasibility of disposing of the Waterway Estates wastewater, noting that due to the recommended cost of treatment and disposal, additional work would be necessary. In November 1987, Gordon again wrote to Sladkus attaching a memorandum outlining various options regarding upgrading Waterway Estates. On October 3, 1988, Gordon wrote Sharp and Wilkov a memorandum stating that County Commissioner Bigelow indicated that he wanted the County Commission to get out of the water and wastewater day-to-day operations and felt that could only be accomplished through privatization or establishment of a water/sewer authority which would take over the direction

Case 2:10-md-02179-CJB-DPC Document 13811-5 Filed 12/09/14 Page 11 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

and operation of the utility systems. On October 7, 1988, Sharp wrote to Gordon that Florida Cities' "long term objective should be to own the entire Lee County system—that is, the County's facilities as well as the City's."

Further, Sladkus was informed by two memos in December 1988 and by participation in a meeting at Avatar Utilities in January 1989 of the status and schedules pertaining to Waterway Estates projects. Sladkus also informed Sharp of the budgeted items for Waterway Estates. In October 1989, Sharp wrote Sladkus that "[w]e must have assurance from Bob Gordon that the entire cost of the upgrade and expansion of this plant will be included as used and useful." In July 1991, when it became clear that the Waterway Estates advanced wastewater treatment improvements were behind schedule, Gerald Allen, President of Florida Cities and formerly Vice–President of Avatar Utilities, wrote a memorandum to Sharp with copies to Getman, Gordon, and Wilkov updating them on the status of the project.

*14 However, Allen and Patrick Lehman[14], who were involved in the selection of discharge alternatives at Waterway Estates, stated at trial that it was not Avatar Holdings, but rather Florida Cities and Avatar Utilities, that made the decisions regarding the alternatives. Further, Lehman testified that the alternatives were not discussed with Avatar Holdings. Additionally, in a memorandum to Sladkus on June 5, 1990, Allen requested approval of a conward to upgrade the Waterway Estates facility. When Sladkus responded with a recommendation that the project be rebid because the price appeared high, Allen informed him of the disadvantages of rebidding the project. Sladkus then did not seek to have Florida Cities rebid the contract, and the contract was approved with the original bidder.

In the fall of 1988, Avatar Utilities developed an Environmental Assurance Program. This was not an Avatar Holdings' program. Allen did not make any reports to the full Avatar Holdings Board of Directors regarding audits performed under the Environmental Assurance Program, but did report to the Avatar Holdings Audit Committee. Allen's reports provided the progressive status as to whether a field audit, draft audit, or final audit report had been completed. Allen did not provide the reports of field audits themselves or describe the findings of the field audit reports to the Avatar Holdings Audit Committee. Allen did not describe for the Avatar Holdings Audit Committee the alleged violations at Barefoot Bay, Carrollwood, or Waterway Estates.

### CONCLUSIONS OF LAW—AVATAR HOLDINGS

This Court previously determined in its November 22, 1995 Order that, in determining whether Avatar Holdings is liable as a parent corporation under the Clean Water Act, the standard of liability in § 107 of the Comprehensive Environmental Response and Liability Act (CERCLA) does not apply. Under that standard, a parent corporation is liable as an "operator" under CERCLA if it "directly and pervasively controlled" the actions of the subsidiary "to the extent of actually involving itself in the daily operations of the subsidiary." *Jacksonville Electric Authority v. Bernuth Corp.*, 996 F.2d 1107, 1110 (11th Cir.1993). This Court stated in its Order that, under the Clean Water Act, "the mere fact of being a parent exercising control over a violating subsidiary does not properly subject the parent company to liability." Although the Court indicated that it would consider evidence showing "actual and pervasive control of Florida Cities to the extent of actually being involved in the daily operations of Florida Cities," the various portions of the Court's opinion show that the Court intended the standard for Avatar Holdings' liability as a parent corporation to be based on a stricter standard of "directing or causing" the violations in such a way that it may be considered a "person who violates" under § 309(d) of the Clean Water Act. To the extent the Court's language in the November 22, 1995 Order broadened this intended standard, the Court recedes from that portion of its November 22, 1995 opinion.

*15 The Court finds that the evidence adduced at trial does not establish that Avatar Holdings directed or caused any of the violations of the Clean Water Act at issue in this case. Thus, the Court finds that Avatar Holdings is not a "person who violates" under section 309(d) of the Clean Water Act. The evidence as a whole shows that Avatar Holdings' role in the operations of the three Florida Cities' facilities was limited to overall financial review and long term strategic planning, as Avatar Holdings' officers were concerned with large costs and budgetary planning. The fact that Avatar Holdings officials were informed of environmental compliance issues and discussed the costs of large projects that would eventually eliminate violations does not amount to the type of action or direction for which liability arises under the Clean Water Act. Further, the evidence shows that Avatar Holdings did not make the type of operational decisions that amount to directing or causing the violations in this case. Additionally, there is no legal basis under the Clean Water Act for holding Avatar Holdings liable for any failure to act because it was

Case 2:10-md-02179-CJB-DPC Document 13811-5 Filed 12/09/14 Page 12 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

not the entity responsible for decisions regarding operations and environmental compliance.

With respect to Barefoot Bay, the evidence does not establish that Avatar Holdings caused or directed the violations of TRC, toxicity test failures, and failure to monitor BOD. First, there is no evidence that Avatar Holdings' officials were aware of these violations or that they ever discussed these violations. Further, there is no evidence that Avatar Holdings had any involvement in the measurements of these tests or knowledge or control regarding how the measurements of these tests are conducted or how such measurements are reported to the EPA. Although the Plaintiff argues that Avatar Holdings caused the Barefoot Bay violations because of an alleged profit motive in having its indirect subsidiary, Barefoot Bay Development Corporation, develop a mobile home community at Barefoot Bay, the evidence does not establish any link between the development of the mobile home community and the Barefoot Bay NPDES violations. Further, the evidence regarding Avatar Holdings' concern for costs and long-term planning of large projects such as percolation ponds or alternative discharge options does not establish that Avatar Holdings controlled the discharge options at Barefoot Bay such that it could have directed or caused the Barefoot Bay violations.

With respect to Carrollwood, the evidence again does not establish that Avatar Holdings caused or directed the violations of TSS, phosphorus, nitrogen, CBOD, TRC, or fecal coliform. Although the Plaintiff argued that Avatar Holdings caused the violations because it was not willing to connect to Hillsborough County sooner or build an advanced wastewater treatment plant sooner, the evidence does not establish any link between Avatar Holdings' actions and statements and the Carrollwood violations. Rather, the evidence shows that the utilities subsidiaries devised and considered the alternatives and made the decision to proceed with the Hillsborough County connection. Additionally, there is no evidence that Avatar Holdings' officials were aware of the Carrollwood NPDES violations or that they ever discussed these violations. There is also no evidence that Avatar Holdings had any involvement in the measurements of these tests or knowledge or control regarding how the measurements of these tests are conducted or how such measurements are reported to the EPA. Moreover, the evidence regarding Avatar Holdings' concern for costs and long-term planning of large projects does not establish that Avatar Holdings controlled the discharge options at Barefoot Bay Carrollwood such that it could have directed or caused the Carrollwood violations.

*16 With respect to Waterway Estates, the evidence again does not establish that Avatar Holdings caused or directed the violations of alleged discharges into an unpermitted location during the period of May 5, 1990 through July 14, 1991 or the NPDES permit violations relating to nitrogen levels and toxicity test failures. [15] First, although the Plaintiff argues that Avatar Holdings caused the delays in upgrading Waterway Estates to an advanced wastewater facility, the evidence does not show that Avatar Holdings was involved in the selection of alternatives or the construction of the advanced wastewater treatment plant. Further, the fact that Sharp expressed his opinion that the long term objective should be to own the entire Lee County system does not amount to a strategy on the part of Sharp to do so, and there is no evidence that Avatar Holdings took steps to acquire the entire Lee County system. Moreover, both Allen and Lehman testified at trial that they were unaware of any plan by Avatar Holdings to acquire the Lee County system. Additionally, the evidence shows that the delays in the construction of the advanced wastewater treatment plant involved difficulties in the permitting process, and the evidence shows that Avatar Holdings was not involved in the permitting process. The evidence does not establish that Avatar Holdings delayed construction; rather, it shows that Avatar Holdings approved a conward to upgrade the Waterway Estates facility without a rebidding for the project. Finally, the evidence regarding Avatar Holdings' concern for costs and knowledge of the alternatives and the status and schedules of the projects does not amount to an exercise of control, decision-making or other activity that caused or directed the violations at Waterway Estates.

## CONCLUSION

Upon consideration of the foregoing, it is hereby ORDERED and ADJUDGED that:

1. The Clerk is DIRECTED to enter judgment in favor of Plaintiff and against Florida Cities. The amount of civil penalties to be assessed against Florida Cities for the violations at the three wastewater treatment plants are as follows:

$ 5,610.00

Case 2:10-md-02179-CJB-DPC   Document 13811-5   Filed 12/09/14   Page 13 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

| | |
|---|---|
| Carrollwood | $ 14,675.00 |
| Waterway Estates | $289.425.00 |
| **TOTAL** | **$309,710.00** |

2. The Clerk is DIRECTED to enter judgment in favor of Defendant Avatar Holdings and against Plaintiff on Plaintiff's claims against it.

3. Avatar Holding's Rule 52(c) Motion for Judgment as a Matter of Law is DENIED as moot.

DONE AND ORDERED, at Tampa, Florida, this 20th day of August, 1996.

**Parallel Citations**

43 ERC 1262

Footnotes

1  In accordance with the Pretrial Order (Dkt.248), the trial of this case proceeded upon the Revised Joint Pretrial Statement (Dkt.264), and said pretrial statement is controlling. In the pretrial statement, the parties indicated that the only issue to be tried with respect to Florida Cities was the amount of the civil penalty to be assessed. Therefore, the Court will base the amount of penalties on the number of violations determined in the Court's prior Orders in this case.

2  Additional findings of fact are incorporated into the Court's discussion of the six factors to consider in assessing the amount of the civil penalty, as is required by the Eleventh Circuit in *Atlantic States Let, al Foundation. Inc. v. Tyson Foods. Inc.*, 897 F.2d 1128, 1142 (11th Cir.1990)(stating that in determining the amount of penalty, the district court must indicate the weight it gives to factors in the applicable statute and the factual findings that support its conclusions).

3  The Florida Department of Environmental Protection (FDEP) was formerly known as the Florida Department of Environmental Regulation (FDER). Throughout this Memorandum Order, FDEP should be read to mean either FDEP or its predecessor agency, FDER, depending on the relevant time period.

4  The Carrollwood violations consist of violations of the following parameters, several of which are monthly violations: (1) Phosphorus from July–November 1991, the equivalent of 153 days of violations; (2) Carbonaceous Biological Oxygen Demand (CBOD) in October 1991, the equivalent of 31 days of violations; (3) Nitrogen in July 1991 and from September–November 1991, the equivalent of 122 days of violations; (4) Total Residual Chlorine, amounting to 184 violations; (5) Total Suspended Solids from October–December 1991, the equivalent of 92 days of violations; and (6) Focal Coliform, amounting to 5 violations. The sum of these violations is 587.

5  The Waterway Estates violations consist of the following: 396 days of unpermitted discharges; 621 days of discharges to an unpermitted location; Nitrogen violations between July 1991—March 1992, the equivalent of 261 separate days of violations; and 3 chronic toxicity test violations. The sum of these violations is 1281.

6  The 182 total residual chlorine violations occurred between September 1992 and March 1993; the 3 chronic toxicity test failures occurred in September–October 1992, May 1993, and February 1994; and the 79 violations for failure to report biochemical oxygen demand occurred on a weekly basis between November 1991 and June 1993, and twice in November 1993.

7  The 396 violations for discharge without an NPDES permit occurred between October 1, 1988 and October 31, 1989, and the 621 violations for discharging into a canal, instead of to the 6–foot contour line of the Caloosahatchee River, occurred between November 1, 1989 and July 14, 1991.

8  With respect to Barefoot Bay, Cardey testified that if Florida Cities had constructed the advanced wastewater treatment plant and had it in service by April 1, 1990, Florida Cities would have generated $803.000 more than they advanced wastewater treatment plant and had it in service by November 1, 1984, the operation would have generated actually experienced. With respect to Carrollwood, Cardey testified that if Florida Cities had constructed the would have generated $1,997,000 more than they actually experienced.

9  Klingenstein's report also indicates the opinion that spray irrigation, percolation ponds, and deep well injection were other options.

10  Charles McNairy testified that he is currently the Executive Vice–President, treasurer, and Chief Financial Officer of Avatar Holdings, Inc.

11  John Sladkus was Avatar Holdings' Executive Vice President.

12  Robert Gordon is President of Avatar Utilities.

Case 2:10-md-02179-CJB-DPC Document 13811-5 Filed 12/09/14 Page 14 of 14

U.S. v. Avatar Holdings, Inc., Not Reported in F.Supp. (1996)
1996 WL 479533, 43 ERC 1262

13   Dennis Getman is Avatar Holdings' Executive Vice–President, and he is also General Counsel for Avatar Holdings, Avatar Utilities and Florida Cities.

14   Patrick Lehman was employed at Florida Cities between June 1984 and April 1989, initially as an Operations Manager and later as Vice–President of Operations.

15   The Court's November 22, 1995 Order barred certain claims against Avatar Holdings based on the statute of limitations, 28 U.S.C. § 2462. Thus, with respect to Waterway Estates, Avatar Holdings is potentially subject to liability only for the violations of discharges to an unpermitted location during the period of May 5, 1990 through July 14, 1991 and the NPDES violations at Waterway Estates.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.