# EXHIBIT 6

972 F.Supp. 338
United States District Court,
E.D. Virginia,
Norfolk Division.

UNITED STATES of America, Plaintiff,
v.
SMITHFIELD FOODS, INC., Smithfield Packing Company, Inc., and Gwaltney of Smithfield, Ltd., Defendants.

Civ. A. No. 2:96CV1204.  |  Aug. 8, 1997.

United States brought Clean Water Act (CWA) action against packing company and other defendants for CWA permit violations. After grant of summary judgment as to liability, the District Court, Rebecca Beach Smith, J., held that: (1) maximum penalty could exceed $25,000 per day, and (2) appropriate penalty for permit violations was $12,600,000.

So ordered.

**Attorneys and Law Firms**

*339 Susan Lynn Watt, Assistant U.S. Atty, Norfolk, VA, Lois J. Schiffer, Washington, DC, Sarah D. Himmelhoch, Michael D. Goodstein, Richard Hong, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, Yvette C. Roundtree, Assistant Regional Counsel, U.S. Environmental Protection Agency, Office of Regional Counsel, Philadelphia, PA, Nadine Steinberg, U.S. Environmental Protection Agency, Washington, DC, for Plaintiff.

Anthony F. Troy, John K. Burke, Jr., James S. Crockett, Jr., James Edward Ryan, Jr., Mays & Valentine, Richmond, VA, Patrick M. Raher, Sten A. Jensen, Hogan & Hartson, L.L.P., Washington, DC, for Defendants.

**OPINION**

REBECCA BEACH SMITH, District Judge.

This matter is before the court on the issue of the amount of civil penalties to be assessed against defendants for violations of the Clean Water Act ("Act") § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), as alleged in *340 Counts I through VII of the Complaint. On May 30, 1997, the court granted partial summary judgment to the United States on Counts I through V. The court found defendants liable for 164 days of violation for Count V, late reporting, but deferred calculating the days of violation for Counts I through IV, the effluent violations of defendants' Permit No. VA0059005 ("Permit"). On July 18, 1997, the court granted partial summary judgment to the United States on Counts VI and VII. With regard to Count VI, submission of false discharge monitoring reports ("DMRs"), defendants stipulated to fifteen (15) days of violation. Since the court has already found defendants liable on Counts I through VII, the court must now determine (1) the days of violation for Counts I–IV and VII, (2) defendants' maximum liability for the violations, and (3) the appropriate civil penalty for those violations under Section 309(d) of the Act. The parties presented evidence and arguments on these remaining issues at a bench trial held from July 21, 1997, through July 25, 1997.

*I. Days of Violation*

*A. Counts I–IV*
Defendants' Permit imposes limits on the amount of pollutants that can be discharged from defendants' facilities into the Pagan River. Not only are there several different pollutants regulated by the Permit, but the Permit also contains different types of limits: daily maximum limits, monthly average loading limits,[1] and monthly average concentration limits. Daily maximum limits are designed to protect the environment from acute effects of pollutants discharged into the water. The monthly average concentration and loading limits are designed to protect against the chronic effects of pollutants in the wastewater. The monthly average concentration controls the concentration of an effluent in the waste stream, while the monthly average loading controls the total amount of pounds of effluent discharged per day. The concentration limits are designed to encourage a facility to operate its plant efficiently at all times by ensuring that facilities cannot cut back on their treatment efficiency to discharge at a high concentration while maintaining compliance with the loading limits.

Under the Permit, defendants may sample their effluent as often as necessary to ensure that the reported monthly average values are representative of the discharges throughout all days of the month, and not just the result of a few days of violation of the daily maximum limit. Since the daily maximum limit is set at double the monthly average limit, it is possible to

exceed a daily maximum limit without exceeding the monthly average limit for the same pollutant, and vice versa. It is also possible for a discharger to violate the monthly average concentration limit without violating the monthly average loading limit, and vice versa.

[1] In accordance with the clear holding of the Fourth Circuit Court of Appeals in *Chesapeake Bay Foundation. Inc. v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304, 314–15 (4th Cir.1986) (each violation of a monthly average limit shall be treated as a violation for every day in the month in which the violation occurred, rather than as a single violation for that month), *rev'd on other grounds,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), *remanded,* 844 F.2d 170 (4th Cir.), *judgment reinstated,* 688 F.Supp. 1078 (E.D.Va.1988), *aff'd in part. rev'd in part on other grounds, and remanded,* 890 F.2d 690 (4th Cir.1989), this court will count each violation of a monthly average concentration or loading limit as a violation for every day of the month in which the violation occurred.[2] Furthermore, if multiple violations of the Permit occur on the same day, defendants are liable for a separate day for each violation of the Permit, including the daily maximum, monthly average concentration, and monthly average loading limits for each pollutant. This determination is consistent *341 with Section 309(d) of the Act, which specifically provides for a "civil penalty not to exceed $25,000 *per day for each violation* " (emphasis added), rather than a statutory maximum of $25,000 *per day*. The different pollutants, and their daily maximum, monthly average concentration, and monthly average loading limits, are included in the Permit for different reasons. Each limit is a separate, distinct requirement in the Permit which can be violated. Accordingly, where multiple violations of defendants' Permit occur on one day, the maximum penalty on that day may exceed $25,000.[3]

The court's approach to calculating the days of violation gives sufficient flexibility to assess penalties suitable to the particular circumstances of the case. For example, a permittee who violates one pollutant limit of a permit on a single day is less culpable and causes less harm to the environment than a permittee who violates the limits of several different pollutants on that day. Similarly, a permittee who violates a monthly average concentration limit in a certain month is less culpable and causes less harm to the environment than a permittee who violates daily maximum, monthly average concentration, and monthly average loading limits in that month. If the court found that the maximum penalty for any single day was $25,000, there would be no incentive for a permittee to comply with other pollutant limitations in the permit, once one limitation in the permit was violated on that day. Thus, consistent with the language of Section 309(d), and the different effluent requirements in the Permit, the court will treat *each* violation of the Permit as a separate and distinct day of violation in assessing a civil penalty under the statute.

Finally, based on the credible testimony of Lorraine H. Reynolds, an environmental scientist with the Environmental Protection Agency ("EPA"), and in light of the court's determination regarding the calculation of the days of violation, the court FINDS that defendants reported in the DMRs the following days of violation of their Permit effluent *342 limits: 5,112 for phosphorus, 459 for ammonia, 200 for total Kjeldahl nitrogen ("TKN"), 72 for fecal coliform, 63 for total suspended solids ("TSS"), 4 for ph,[4] 4 for cyanide, 4 for chlorine, and 1 for oil and grease. Accordingly, for Counts I through IV, defendants are liable for a total of 5,919 days of violation of the effluent limitations in the Permit.

**B. Count VII**

[2] The record-keeping requirements of the Permit include the requirement that defendants maintain three years of records of the collection and analysis of samples used in generating the DMRs, such as laboratory analysis records and bench sheets. At trial, it was established that defendants' records covering the period up to December, 1993, were destroyed on or around July 21, 1994, by Terry Rettig, chief operator of defendants' wastewater treatment plants. Thereafter, defendants did not have the correct amount of records, as they only had seven months of records, from January, 1994, through July, 1994, instead of three years of records. Since defendants did not have three years of records until December 31, 1996, they were in violation of the record-keeping requirements in the Permit for two years and five months, or 884 days, from August 1, 1994, until December 31, 1996.

At trial, defendants argued they should only be assessed one day of violation for the record-keeping requirement violations. They claim the records were maintained for those 884 days, and were only destroyed on a single day in July, 1994, by Rettig, in direct contravention of company policy and an order from his immediate superior to find and produce the records for the inspectors from the Department of Environmental Quality ("DEQ").[5] The court declines to treat these 884 days of missing records as a single day of violation. First, defendants' explanation for the missing records is

irrelevant with regard to the number of days of violation,[6] as the Clean Water Act is a strict liability statute. *See Stoddard v. Western Carolina Reg'l Sewer Auth.,* 784 F.2d 1200, 1208 (4th Cir.1986). Second, treating destruction of records as a single violation would create a terrible incentive to destroy records covering a certain time period to get one single day of violation, rather than submitting the records which might reflect a larger number of days of violation. Thus, for Count VII, the court FINDS there are 884 days of violation of the record-keeping requirements in the Permit for defendants' failure to maintain or destruction of records.

### C. Summary of Total Days of Violation

For Counts I through IV, there is a total of 5,919 days of violation of the effluent limitations in the Permit.[7] For Count V there are 164 days of violation for late reporting, as found by the court on May 30, 1997. For Count VI, defendants have stipulated there are 15 days of violation for submission of inaccurate DMRs. For Count VII, defendants are liable for 884 days of violation of the reporting requirements for their failure to maintain or destruction of records. Thus, there is a total of 6,982 days of violation of the Permit by defendants.[8]

**\*343 II. Statutory Maximum Penalty**

Section 309(d) of the Act provides that defendants "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." Thus, for defendants' 5,919 days of violation in Counts I through IV (effluent limit violations), the statutory maximum is $147,975,000. For defendants' 164 days of violation in Count V (late reporting), the statutory maximum is $4,100,000. For defendants' 15 days of violation in Count VI (submission of inaccurate DMRs), the statutory maximum is $375,000. For defendants' 884 days of violation in Count VII (failure to maintain or destruction of records), the statutory maximum is $22,100,000. Accordingly, the total statutory maximum penalty for defendants' 6,982 total days of violation of their Permit is $174,550,000, or $174.55 million. However, before assessing any penalty, the court must first review the facts of the case in light of certain factors set forth in Section 309(d).

**III. Appropriate Civil Penalty for Defendants' Violations**

### A. Section 309(d) Factors

Section 309(d) of the Act provides that "[i]n determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." The court will address each of these Section 309(d) factors in turn.

### 1. Seriousness of Violations

[3] In determining the seriousness of defendants' violations, the court will consider the frequency and severity of the violations, and the effect of the violations on the environment and the public. *See United States v. Avatar Holdings, Inc.,* No. CIV.FTM.93–281–21, 1996 WL 479533, at *6 (M.D.Fla. Aug.20, 1996) (unpublished) (the seriousness of the violations is determined by considering "the number, duration and degree of the violations as well as the actual or potential harm to human health and the environment"; "[a] substantial reduction in the maximum statutory penalty is warranted where the violations caused minimal environmental damage"); *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,* 956 F.Supp. 588, 602 (D.S.C.1997) ("presence or absence of environmental harm is relevant" to the penalty assessment).

### a. Counts I–IV: Effluent Limit Violations

#### i. Frequency and Severity of the Violations

With regard to frequency, the phosphorus limit violations were very frequent in this case, and the TKN and ammonia limit violations were frequent enough to cause concern. Between December, 1991, and February, 1997, defendants exceeded their phosphorus limits in at least 69% of all months for Outfall 001 and 76% of the months for Outfall 002.[9] Defendants also exceeded TKN limits in at least 41% of the months for Outfall 001 and 13% of the months for Outfall 002, and ammonia limits in at least 25% of the months for Outfall 001 and 5% of the months for Outfall 002.

Based on the credible testimony and evidence, most of defendants' violations were severe. With regard to the severity of the violations, some courts consider the extent to which a violator's discharges exceed the permit limits to assess the seriousness of the *\*344 violation. *See, e.g., Public*

Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 720 F.Supp. 1158, 1161, 1163, 1166 (D.N.J.1989), aff'd in part, rev'd on other grounds, 913 F.2d 64 (3d Cir.1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). In this case, the credible evidence was that most of defendants' effluent limit violations extensively exceeded the Permit limits. On average, defendants exceeded the phosphorus limits by 1,055%, fecal coliform limits by 1,365%, ammonia limits by 97%, cyanide limits by 168%, oil and grease limit by 114%, and the TSS limit by 63.5%. The only exceedances that were slightly above the limits were TKN discharges, which exceeded the limits by 35%, and chlorine discharges, which exceeded the limits by 8%. Thus, defendants' effluent violations were frequent and severe.

### ii. Impact on the Environment and the Public

[4] The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect. Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc., 800 F.Supp. 1, 21 (D.Del.1992); United States v. Roll Coater, Inc., 21 Envtl.L.Rep. 21073, 21075 (S.D.Ind.1991) (also noting that lack of damage is a mitigating factor).

Defendants' wastewater treatment plants, Outfalls 001 and 002 (Gwaltney), are located on the Pagan River at approximately river kilometer 9 and at approximately river kilometer 6, respectively. Outfall 001 discharges into a marshy area. Upstream of Outfall 001, the Pagan River is sparsely developed.

The watershed for the Pagan River is approximately 50% forest. The river is a relatively shallow estuary, most of which is surrounded by marsh. Direct harvesting of shellfish in the Pagan is prohibited. However, the river is used by the public for recreational boating, fishing, crabbing, hunting, and swimming. The Pagan is of moderate salinity (mesohaline) from kilometer 0, which is at the confluence with the James River, to kilometer 10 or 11. After approximately kilometer 10 or 11, the Pagan is of lower salinity (oligohaline).

On average, defendants' discharges accounted for approximately 10% of the freshwater flow into the Pagan River, and as much as 50% of freshwater flow during low flow periods. It is during low flow periods that water quality can most exacerbate biological effects. Based on the EPA's "Fraction of Freshwater Flow" model based on salinity, and historic modeling efforts used to describe the particular tidal flushing characteristics of the river, the credible evidence is that pollutants introduced at Outfalls 001 and 002 will peak near, or just upstream of, Outfall 001.

### (a) Nutrients

Phosphorus and nitrogen are nutrients.[10] Nutrients do enable living organisms to grow, but they can be harmful in large quantities. Excessive nutrient loadings,[11] or nutrient enrichment, in the Pagan River cause eutrophication and are a primary cause of the absence of submerged aquatic vegetation ("SAV") in the Pagan River. Eutrophication is the over stimulation or overproduction of organic carbon in an estuary. Excessive nutrient loadings stimulate productivity of algae, which decreases sunlight to plants, and causes increased algae growth on plants and increased turbidity. Eutrophication is likely to cause changes in phytoplankton, zooplankton, and benthos, which can affect fish. To limit eutrophication, the Chesapeake Bay Program has established SAV restoration goals of .02 mg/l for phosphorus in bodies of water with low salinity, and .01 mg/l in waters with moderate salinity.

*345 SAV is a critical component of the ecosystem. It has tremendous habitat value, as there are generally more fish, crabs, and benthic (bottom-dwelling) organisms in habitats with SAV than in habitats without SAV. The Chesapeake Bay Foundation has directed major efforts towards reducing nutrient loadings to the Chesapeake Bay and encouraging SAV restoration. Nutrient loadings discharged into the Pagan River contribute to nutrient loadings in the James River, and ultimately the Chesapeake Bay. Accordingly, any excess discharges into the Pagan River may affect both the James River and the Chesapeake Bay, and would hinder the efforts of several states and the federal government to reduce nutrient loadings into the Chesapeake Bay.

### (1) Phosphorus

Phosphorus is discharged into the Pagan River from point sources, such as wastewater treatment plants and storm water drains, and nonpoint sources, such as run-off from fertilized fields, septic systems, and marinas. Phosphorus also comes from sources within the Pagan River, such as decomposed

oyster shells, plants, and the soil. Defendants' total loadings from Permit exceedances for phosphorus from December, 1991, through February, 1997, were approximately 79% of the phosphorus entering the Pagan River.[12] During that same period, phosphorus loadings from nonpoint sources were approximately 11.1% of the phosphorus entering the Pagan River. The Town of Smithfield Wastewater Treatment Plant, the only other major point source at the time, had phosphorus loadings comprising approximately 1.4% of the phosphorus entering the Pagan. The loadings were not significant from other minor point sources. For the James River, phosphorus loadings attributable to defendants' Permit exceedances accounted for approximately 9% of total point-source phosphorus loadings to the James River.

The Chesapeake Bay Program has designated the Pagan River and lower James River as severely stressed with regard to phosphorus. Clearly defendants have contributed to this condition, since 79% of the phosphorus loadings to the Pagan River are a result of defendants' Permit exceedances. Throughout the Pagan River, phosphorus concentrations in the river exceed the .01 and .02 phosphorous goals for SAV restoration established by the Chesapeake Bay Program. Data for phosphorus concentrations show, however, that the phosphorus concentrations increase as one approaches Outfall 002 from the mouth of the river and peak in the vicinity of Outfall 001. As phosphorus causes eutrophication, particularly in lower salinity areas of the river where defendants were discharging, defendants' Permit exceedances for phosphorus potentially stimulated *more* primary productivity when they added *more* phosphorus to the river. Based on loadings estimates and water quality data, water quality concentrations in the Pagan River are therefore strongly influenced by discharges from defendants' Outfalls, and peak concentrations of phosphorus in the Pagan River are attributable to defendants' Permit exceedances. Thus, defendants' phosphorus violations had a detrimental ecological effect on the river, as they significantly contributed to the large phosphorus concentrations in the Pagan River, and these concentrations exceed the goals for SAV restoration.

### (2) TKN and Ammonia

The total nitrogen concentrations in the river exceed the .15 nitrogen goal for SAV restoration established by the Chesapeake Bay Program throughout the river. From December, 1991, through February, 1997, defendants' ammonia and TKN violations resulted in a minimum of 1% additional nitrogen entering the Pagan River.[13] Since the TKN and ammonia violations contributed excess nitrogen to the Pagan River, they contributed *346 in part to the eutrophication of the river. Furthermore, the ammonia violations create a potential for toxicity, and the TKN violations can be an indicator of problems at a wastewater plant. Based on the STORET data presented at trial,[14] concentrations of nitrogen increase near Outfall 002 and peak in the vicinity of Outfall 001, just like the phosphorus concentrations. Accordingly, there is sufficient evidence that defendants' ammonia and TKN violations contributed to the high nitrogen concentrations in the Pagan River, which exceed the nitrogen goal for SAV restoration established by the Chesapeake Bay Program.

### (3) Impact of Nutrient Discharges

The Pagan River and neighboring rivers and streams exceed SAV restoration goals, and the entire Chesapeake Bay Basin has been designated an SAV-impacted area by the Chesapeake Bay Program. However, according to the STORET data comparison of the Pagan River and neighboring estuaries during December, 1991, through February, 1997, the concentrations of nutrients, such as phosphorus and nitrogen, and of fecal coliform, are higher in the Pagan River than the neighboring estuaries. There is evidence that the Pagan River is eutrophic. First, the STORET water quality data and the eutrophication index prepared for the EPA's Office of Research and Development show that the Pagan River scores a 5 on a scale of 1 to 5, with 5 being the most eutrophic. Second, Dr. Jeffrey B. Frithsen and Dr. William A. Richkus, the United States' experts at trial in estuarine ecology and fisheries biology, respectively, presented credible testimony that the Pagan River is eutrophic, as evidenced in part by the fact that there was no SAV in the Pagan River and the benthic communities showed eutrophication.[15]

In light of the STORET data's pattern of concentrations in the Pagan River for phosphorus and nitrogen, and defendants' excessive loadings reported in their DMRs, it is clear that defendants' Outfalls are the major source of nutrients in the river from December, 1991, through February, 1997, particularly phosphorus. Although it is unclear whether there would be no eutrophication and restoration of SAV in the Pagan River, if defendants were in compliance with

the phosphorus and nitrogen limitations in their Permit, defendants' compliance would bring the Pagan River closer to meeting the goals for SAV restoration set by the Chesapeake Bay Program.

Defendants are not the sole cause of the degradation and eutrophication to the river, but their exceedances of the phosphorus, TKN, and ammonia limits clearly contributed to the degradation and eutrophication of the Pagan River and connected waters, such as the James River. The Pagan River would have been less eutrophic from December, 1991, through February, 1997, had defendants met their Permit limits for these nutrients. Defendants' pollutant loadings affected water quality and impaired biological resources, including SAV and benthic communities, which participate in metabolic activities of the estuaries and serve as food for fish. No significant stands of SAV were present in the Pagan River, and this is primarily caused by nutrient enrichment. There is limited fish spawning in the river, and commercial and recreational fishing, crabbing, and shellfish harvesting are also limited in the Pagan River. Accordingly, both the overall environment and human use have been affected by the eutrophication and degradation of the river, to which defendants significantly contributed with their Permit violations.

### (b) Fecal Coliform

Fecal coliform is an easily measurable organism which serves as an indicator of possible *347 disease-carrying pathogens in a body of water. The purpose of the fecal coliform standard is to prevent public illness from waterborne diseases, such as intestinal infections, and water-washed diseases, such as skin, ear, and eye infections, caused by swimming in contaminated water. Although fecal coliform levels in the Pagan River indicate a public health risk, they are not entirely accurate indicators of pathogens present in the river, as some pathogens die quicker than fecal coliform, and a few may survive longer than fecal coliform. From December, 1991, through February, 1997, microbiological pollution based on fecal coliform levels in the Pagan River was severe in the upper reaches of the river, and moderate in the lower reaches of the river. When microbiological pollution exists, and fecal coliform concentrations are high, there is a risk of illness for people who come in contact with the river during contact recreation, such as swimming and water skiing, and for those who eat foods in contact with the water, such as shellfish. Due to the fecal coliform contamination of the Pagan River, direct harvesting of oysters is prohibited in the river, and direct contact recreation is discouraged.

Defendants' effluent included fecal matter from hogs, as well as humans, namely the approximately 3,000 employees working at the plants each day. Defendants' exceedances for the total maximum daily limit for fecal coliform were in many cases substantially over the limit. Although defendants suggest the other major point source in the area, the Town of Smithfield's wastewater treatment plant, is a more significant source of fecal coliform, combined flows from Outfalls 001 and 002 averaged over 2.5 million gallons per day, while the flows of the Town of Smithfield averaged less than .5 million gallons per day. In addition, based on flow, fecal coliform levels coming from defendants were five times the levels coming from the Town of Smithfield. Unlike defendants, the Town of Smithfield did not violate its permit limits for fecal coliform from December, 1991, through February, 1997. Furthermore, since extensive expanses of marsh and forest bordering most of the Pagan serve as buffers and filters between nonpoint sources and the river, the court also does not find nonpoint sources to be significant sources of fecal coliform, when compared to defendants' fecal coliform discharges from December, 1991, through February, 1997. Nonsource polluters, such as the housing and commercial units in the Town of Smithfield, were also not major polluters because 94% were on public sewer service.

Although they are unquantifiable, loadings of fecal coliform from defendants' violations are significant. Dr. Wesley O. Pipes, the United States' trial expert in environmental microbiology, concluded that several of defendants' fecal coliform violations were caused by their failure to disinfect properly their effluent. Data for fecal coliform concentrations in the Pagan River follow the same general pattern as the nutrients, as the concentrations increase near Outfall 002 and peak in the vicinity of Outfall 001. Although defendants are not the only source of fecal coliform in the Pagan River, their Permit exceedances significantly contributed to the microbiological contamination of the Pagan River, and further delayed direct harvesting of shellfish and safe direct contact recreation in the river.

### (c) Other Effluents

With regard to the other effluent violations of the Permit, the evidence showed there were potential toxic effects from defendants' chlorine and cyanide violations, and

defendants' oil and grease violation. Defendants' TSS violations potentially affected water clarity, which shields sea grasses and other primary producers from sunlight. Such violations also make the river less appealing to humans. Defendants' pH violations potentially caused acidic or alkaline conditions, which would affect the toxicity of the effluent.

### iii. Conclusion

In conclusion, based on the credible testimony and evidence presented at trial, most of defendants' Permit discharge exceedances clearly had a severe and significant impact on the water quality of the Pagan River, in light of their frequency and severity. The harm to the environment and the risk to human *348 health caused by defendants' numerous effluent limit violations are serious, and will be considered by this court when assessing the appropriate penalty.

### Counts V–VII: Records and Reporting Violations

Although 164 days of violation for untimely reports, 15 days of violation for submission of false reports, and 884 days of violation for failure to maintain or destruction of records, may not be considered "serious" violations by some courts, since they were not done by defendants in "bad faith," see *Laidlaw Envtl. Serv.*, 956 F.Supp. at 603 ("monitoring violations ... not considered serious unless they are found to have been in bad faith"), or because they did not directly harm the environment, *id.* ("Reporting deficiencies do not produce the type of direct environmental impact which is the primary purpose behind the [Act].") (citations omitted), such violations do impact the effectiveness of the self-reporting scheme set up by the Act.

When a permittee falsifies DMRs, fails to maintain supporting records, or destroys records, the permittee may be covering up serious violations of effluent limitations. Thus, the court cannot assume that violations of monitoring and reporting requirements in a permit are trivial. Since the Clean Water Act relies on self-reporting of permittees, such violations undermine the Act and are considered serious by this court, despite the fact that they are not discharge violations. With regard to the late reports, the violations are not as serious as the other violations of the reporting requirements, but they are still problematic.

### 2. Economic Benefit (if any) Resulting from Violations

[5] [6] Clearly, "[v]iolators should not be able to obtain an economic benefit vis-a-vis their competitors due to their noncompliance with environmental laws." *Powell Duffryn*, 913 F.2d at 80. Courts use economic benefit analysis to level the economic playing field and prevent violators from gaining an unfair competitive advantage. The analysis provides an approximation of the amount of money a company has gained over its competitors by failing to comply with the law. Since it is difficult to prove the precise economic benefit to a polluter, a reasonable approximation of economic benefit is sufficient. *Id.*

For their phosphorus discharges, defendants did not have a treatment system at either plant that could remove phosphorus, but they could have achieved compliance in 1992 by installing a chemical addition system at the dissolved air flotation system, with a second chemical addition point for ferric chloride at the final clarifier, and by instituting source control within the plant. Such treatment systems were installed four years later at Smithfield Packing in January, 1996, in anticipation of defendants' connection to the Hampton Roads Sanitation District ("HRSD") system. Although similar treatment systems were never installed at Gwaltney, it is likely they would be more expensive at Gwaltney, based on an estimate prepared by defendants' consultant, CH2M Hill, and a prior estimate by defendants' own expert, J. Willis Sneed, an engineer with Wells Engineering Environmental, Inc. In both estimates, the installation cost was higher for Gwaltney than for Smithfield Packing. Nonetheless, the annual operation and maintenance of the Gwaltney system would have resulted in a profit for defendants each year, had defendants installed the treatment system at Gwaltney. The installation of such equipment for treatment of phosphorus was not inconsistent with the hookup to HRSD, as it could have been used as part of an effective pre-treatment system upon connection to HRSD. Garry E. Stigall, the United States' expert in sanitary engineering, admitted that his estimates of the cost of compliance were minimum estimates, based on installing just enough equipment to get by, and that actual costs would likely exceed his estimates.[16]

*349 The credible testimony and evidence was that defendants also had insufficient oxygenation in the aerobic lagoons. This lack of aeration most likely caused defendants' violations of the ammonia and TKN limits, and the pH and fecal coliform limit violations in 1994. Since there was also

testimony that defendants could not have been consistently meeting their TKN or fecal coliform limits between 1991 and 1994, they should have installed additional aeration capacity at both plants in October, 1991. Although some aerators were installed at both plants in 1994, more aerators were required at Smithfield Packing to ensure compliance with the ammonia limit.

[7] The court acknowledges there are various methods for calculating defendants' economic benefit gained from noncompliance. However, based on the credible testimony,[17] the court finds the avoided and/or delayed cost of compliance, and the weighted average cost of capital (WACC)[18] as a discount/interest rate in the economic benefit calculation, to be both the best and the appropriate method to determine how much money defendants made on the funds they did not spend for compliance. When a company delays or avoids certain costs of capital and operations and maintenance necessary for compliance, the company is able to use those funds for other income-producing activities, such as investing that money in their own company.

Robert Harris was called as an expert in financial analysis by the United States. Using Harris' WACC rate of approximately 11.83% to 12.49% for Smithfield Packing and Gwaltney of Smithfield, the court agrees with Harris' conclusion that defendants gained an economic benefit of approximately $4,253,070, or $4.2 million, from avoided and delayed compliance.[19] Thus, it is clear that defendants saved a substantial amount of money by delaying the construction of equipment, or avoiding the purchase and installation of equipment, that would have allowed them to comply with their Permit and the Clean Water Act.

*3. History of Such Violations*

[8] In determining the "history of such violations," courts consider the duration of defendants' current violations, whether defendants have committed similar violations in the past, and the duration and nature of all of the violations, including whether the violations are perpetual or sporadic. See *United States v. City of San Diego,* No. CIV. 88–1101–B, 1991 WL 163747 (S.D.Cal. Apr.18, 1991); *Student Publ. Interest Reasearch Group of New Jersey, Inc. v. Hercules, Inc.,* 19 Envtl.L.Rep. 20903, 20906 (D.N.J.1989). The Permit violations in this case, especially the effluent limit violations, are of significant duration and are perpetual. There were violations of the effluent limits and the monitoring and reporting requirements throughout the six-year period covered by this lawsuit, from 1991 through 1997. Furthermore, this is not the first time defendants have been sued for violations under the Clean Water Act. See *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield,* 611 F.Supp. 1542 (E.D.Va.1985) (lengthy four-year subsequent history omitted). Accordingly, defendants have a history of violations, which will be taken into account in determining the appropriate penalty.

*4. Good-faith Efforts to Comply with Applicable Requirements*

[9] Whether defendants took any actions to decrease the number of violations or made *350 efforts to mitigate the impact of their violations on the environment must be also considered when the court is determining the appropriate penalty for permit violations. See, e.g., *Atlantic States Legal Found., Inc. v. Universal Tool & Stamping Co., Inc.,* 786 F.Supp. 743, 752 (N.D.Ind.1992); *Roll Coater,* 21 Envtl. L. Rep. at 21076–77.

*a. Counts I–IV: Effluent Limit Violations*

In their favor, defendants will soon fully connect to the HRSD system in 1997,[20] with the result that defendants will have zero discharge into the Pagan River in the *future*. Thus, defendants do get some credit for their steps, although slow, that they have taken to eliminate their *future* effluent violations, regardless of whether they elected to connect to HRSD for environmental or economic reasons, or both.[21] But cf. *Powell Duffryn,* 913 F.2d at 81 (reversing district court's reduction of penalty on basis that defendant attempted to comply with state, and holding that defendant's actions did not rise "to the level of good faith"). See generally *Universal Tool,* 786 F.Supp. at 752 (consideration given to record showing that defendant worked diligently with the state department).

However, the court must also consider whether there were any other good-faith efforts by defendants to comply with the applicable requirements in the Permit from 1991 until the HRSD connection. Although defendants did agree on July 15, 1991, to connect to HRSD soon after it became available, there was little to no evidence at trial that defendants made any efforts to facilitate their connection to HRSD, or to treat their wastewater and/or decrease their discharge of pollutants in the interim. Defendants were granted two extensions to decide whether to connect to HRSD. The HRSD connection

was further delayed when the sewer line was relocated closer to defendants' facilities. It is undisputed that defendants have spent a considerable amount of money to connect to HRSD, but in this document-intensive case, defendants could not point to any document indicating *they* took any steps to facilitate or speed the connection with HRSD.[22]

Defendants could have curtailed production to achieve compliance with the effluent limits in the interim, as they had done prior to 1991. After 1991, however, defendants reduced the number of times they cut back production. By 1995, they were no longer cutting back on production to achieve compliance. Defendants apparently had an incentive to maintain or increase the level of production, and their discharge of pollutants, until the HRSD connection. According to defendants, the Commonwealth's Special Orders took precedence over their Permit, and they were in compliance, if they agreed to connect to the HRSD system within three months of availability, regardless of the date the connection became available or the amount of phosphorus, carbonaceous biological oxygen demand ("CBOD"), ammonia-nitrogen, and cyanide they discharged.[23] Other **\*351** than agreeing to the HRSD connection, defendants did not attempt to comply in the interim with the phosphorus, CBOD, ammonia, and cyanide limits in the Permit, such as by a facility upgrade or a decrease in production, since they apparently believed they could discharge as much and as frequently as they wanted into the Pagan River under the terms of the Special Orders.

Defendants also claim they acted in good faith since they often engaged consultants, such as in the fall of 1994. However, this expert advice was often ignored and the implementation of suggestions was often delayed. For example, serious deficiencies in the operation and maintenance of the treatment plant identified by Larry Lively in his internal "audit" of defendants' wastewater treatment plants in 1990,[24] were not completely remedied by defendants. Moreover, in 1991, although HRSD, the DEQ, and defendants' consultant informed defendants that there was insufficient oxygen in the aeration lagoons to remove nitrogen, defendants did not regularly record the oxygen levels in the aeration lagoons. Insufficient oxygen was supplied to defendants' aerobic lagoon as early as March, 1991, with the result that defendants violated their TKN and ammonia limits in the Permit.

Defendants' insufficient and inadequate efforts at compliance are also evidenced by the credible testimony and evidence that defendants' wastewater treatment plants were not properly operated and maintained. When Lively was acting as defendants' director of environmental affairs, Terry Rettig was the chief operator of defendants' wastewater treatment plants. Lively decided to allow Rettig to run the treatment plant "on his own," with little supervision by Lively. From 1990 until Rettig was transferred out of the plant, Lively and Carl Wood, a vice president of Smithfield Foods, allowed Rettig to perform work for several outside wastewater treatment plants, even though he was the only licensed operator at defendants' plants. By 1993, Rettig was often absent from defendants' plants. His absence was exacerbated in 1993 by defendants' decision to cut costs by leaving the wastewater treatment plant unsupervised for one shift a day, from 4 p.m. to 6 a m. During 1992 and 1993, when Lively began to spend significantly less time at defendants' facilities, there was no one other than Rettig supervising the wastewater treatment plants. Although Lively provided the second signature on each of the DMRs prepared and signed by Rettig, Lively never spot-checked the bench sheets from which the information in the DMRs was drawn.

Defendants were notified in May, 1994, that the DEQ was investigating Rettig with regard to his outside activities at the other facilities, and his use of defendants' laboratory to perform work for outside clients. When an interview with the DEQ was scheduled in June, 1994, to discuss the allegations, Rettig failed to attend. Despite these facts, defendants did not conduct any investigation of Rettig or of their own laboratory records. At a second meeting held on July 21, 1994, Rettig could not locate the pre–1994 records requested by the DEQ, which were held in boxes in a storage room to which only Rettig, Diane Carson (then the chief of the wastewater treatment laboratory), and another employee, Henry Morris, had keys. Neither Lively nor Wood asked Carson or Morris if they knew the location of the records, and Carson declined to inform defendants that she saw Rettig dumping several boxes, which may have contained the records, into a dumpster at defendants' plant in the summer of 1994. When bench sheets for the 1992–1993 time frame were recovered by Carson in August, 1995, they showed that the DMRs submitted by defendants to the DEQ were falsified by Rettig for certain months. **\*352** Thereafter, Rettig was asked to resign, and this information was turned over to the DEQ. Although Rettig's destruction of the documents was against company policy and in direct contravention of Lively's order to get the documents, defendants did not take all of the necessary steps to investigate the disappearance of the documents, or prevent such destruction in the future. Even after it was discovered

that Rettig falsified data on the DMRs, defendants did not require spot-checks of bench sheets or laboratory reports. Defendants have submitted at least three inaccurate DMRs since Rettig's departure from the company.

Inadequate training of wastewater treatment plant employees was another problem at defendants' plants, which likely contributed to their Permit violations. For example, problems at the plant, such as solids not being removed by the skimmer at the dissolved air flotation unit at Smithfield Packing, and the ferric chloride addition tank running out of ferric chloride, were likely attributable to inadequately trained or supervised staff, or short-staffing. When Rettig was the chief operator of defendants' plants, he was the only treatment plant or laboratory employee who knew the Permit limits. In August, 1994, Carson succeeded Rettig, and was made operations manager for the wastewater treatment plant, despite the fact that she did not have the correct license to operate the plant and had never supervised the operation of such a plant before. Despite Carson's lack of proper qualifications, she did take steps to ensure that defendants' employees were made aware of the Permit limits after August, 1994. Carson instituted several policies and procedures to facilitate compliance and the reporting of Permit violations. She developed "flag sheets," which identified potential violations, and "problem sheets," for use by employees in addressing specific problems at the plants. It was not until April, 1997, however, that defendants issued a policy on reporting Permit violations.

#### b. Counts V–VII: Records and Reporting Violations

Although there is no evidence of bad faith on the part of defendants with regard to the monitoring and reporting requirements in Counts V through VII,[25] or that anyone other than Rettig was involved in the falsification and destruction of documents, defendants' efforts at compliance could have been more vigorous. They should have had safeguards to prevent delays in reporting, falsifications, or destruction of records. To prevent delays, defendants could have employed another plant operator or supervisor who could perform the record-keeping and reporting requirements in the absence of Lively, or the person normally in charge of the records. To prevent falsification, defendants could have instituted random spot-checking of reports. To prevent the problem of missing records from destruction of such, defendants could have retained copies of these documents and placed them in a different and secure location. Accordingly, defendants are entitled to some credit for their lack of bad faith for these violations, but they are not blameless, as they failed to institute proper safeguards to ensure compliance with the Permit in this regard.

#### 5. Economic Impact of the Penalty on the Violator

[10]    Penalties are not limited to the economic benefit derived from noncompliance, as such a penalty would make the violator no worse off than complying in a timely manner. *Hercules,* 19 Envtl.L.Rep. at 20904 (citing *Gwaltney,* 611 F.Supp. at 1557); *Tull v. United States,* 481 U.S. 412, 422–23, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987) (economic gain and restoration of the status quo not the only basis on which penalties should be awarded under the Clean Water Act; penalties are designed to punish violators for their noncompliance and serve the goals of retribution and deterrence). The main purpose of the penalty is to deter the violator and others from committing future violations.

*353 In accordance with these principles, the court is required to consider the economic impact of the penalty on the violator. In doing so, the court may consider appropriate economic indicators of a company's financial status. One such indicator is the stockholder's equity, which is the net of a company's total assets minus total liabilities, and which gives a good indication of the size of the company. Based on its financial statements from 1992 through 1996, Smithfield Foods is a large and financially healthy company, as its total stockholders' equity is over $240 million. As presented by the United States at trial, the $4.2 million of economic benefit represents only 1.7% of defendants' stockholders' equity; and a $16 million penalty, representing 6.4% of defendants' stockholders' equity, would have a more material, but not detrimental, effect on the company's financial condition.[26] Accordingly, the government asks for a penalty of $20 million.

#### 6. Other Matters as Justice May Require

[11]    For this factor of Section 309(d), courts may either increase or decrease the penalty in light of other matters, such as bad-faith conduct of the violator, a violator's attitude toward achieving compliance, and the violator's ability to comply with the Act. *See Powell Duffryn,* 720 F.Supp. at 1167, *aff'd in part, rev'd in part on other grounds,* 913 F.2d 64; *United States v. Velsicol,* 8 Envtl.L.Rep. 20745, 20748 (W.D.Tenn.1978); *Gwaltney,* 611 F.Supp. at 1561. The court has already commented on defendants' attitude;[27] and the court has found no bad faith.[28] Thus, these two factors seem

to cancel each other out. Furthermore, the court is of the opinion that defendants could have complied by reducing production or updating equipment.[29]

One factor the court has not addressed is defendants' assistance to the Town of Smithfield to connect to the HRSD system. The Town may not have been able to connect to HRSD, if defendants had not elected to connect to HRSD, and given assurances of their continued business presence in the town. The court will also consider the fact that certain DEQ reports showed that defendants' facilities were in compliance, and thus defendants thought they were in compliance, at least with state requirements.

### B. Penalty Calculation

For the 6,982 total days of violation of defendants' Permit, the court's penalty may not exceed the statutory maximum, $174.55 million. However, after calculating the statutory maximum penalty,[30] the court must then determine the methodology to use in assessing an appropriate civil penalty, after consideration of the Section 309(d) factors. Some courts use the "top-down" method of penalty calculation, in which the court begins the penalty calculation at the statutory maximum, and adjusts downward considering the Section 309(d) factors. *See, e.g., Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1142 (11th Cir.1990); *Avatar Holdings,* 1996 WL 479533, at *5; *Hawaii's Thousand Friends v. City & County of Honolulu,* 821 F.Supp. 1368, 1395 (D.Haw.1993); *Universal Tool,* 786 F.Supp. at 746; *Roll Coater,* 21 Envtl.L.Rep. 21073. Other courts use the "bottom-up" method of penalty calculation, in which the court begins the penalty calculation using defendants' economic benefit of noncompliance, and adjusts upward or downward considering the Section 309(d) factors. *See, e.g., Laidlaw Envtl. Serv.,* 956 F.Supp. at 603; *United States v. Municipal Authority of Union Township,* 929 F.Supp. 800, 806 (M.D.Pa.1996); *354 Student Pub. Interest Group of New Jersey, Inc. v. Monsanto Co.,* No. CIV.A.83–2040, 1988 WL 156691, at *16 (D.N.J. Mar.24, 1988); *Gwaltney,* 611 F.Supp. at 1557. As the statute does not require either the "top-down" or the "bottom-up" method, the court exercises its discretion and elects to use the "bottom-up" method when calculating the appropriate penalty for defendants' violations of their Permit.

In accordance with the "bottom-up" method of penalty calculation, the court will start at defendants' estimated economic benefit of noncompliance, $4.2 million, and will adjust upward or downward considering the other factors set forth in Section 309(d), as already detailed and reviewed in this Opinion, namely: seriousness of the violations; history of violations; good-faith efforts to comply with the Permit; economic impact of penalty on defendants; and other matters as justice may require. The economic impact of the penalty on defendants and other matters as justice may require apply equally to all counts. The seriousness of the violations, history of violations, and good-faith efforts to comply, however, apply in different degrees with regard to the counts.

In summary, there are 5,919 days of violation in Counts I through IV for defendants' effluent limit violations. Most of defendants' violations were both frequent and severe, and had a significant impact on the environment and the public, and thus in total their violations of the effluent limits were extremely serious. Defendants also have a lengthy and a persistent history of effluent violations. While there were some good-faith efforts made by defendants to eliminate their discharges *in the future* by connecting to HRSD, and they indicated they believed they were in compliance with some of the effluent limits once they agreed to connect to HRSD, clearly defendants could have done more to facilitate the HRSD connection or reduce their discharges in the interim.

Defendants' had 164 days of violation in Count V for late reporting, which included a toxic management report that was 106 days late, and a missing number for average loading of TKN on a September, 1994 DMR turned in 58 days late. These violations are moderately serious, but were not made in bad faith. However, defendants should have instituted safeguards to prevent such violations.

For defendants' 15 days of violation in Count VI for submission of inaccurate DMRs, the violations are extremely serious. While Rettig falsified the reports, both he and Lively signed them, stating they were accurate. Defendants are commended for turning the altered records over to the DEQ, once the falsifications were discovered. Nonetheless, defendants' efforts to comply here were insufficient; defendants could have instituted safeguards, such as using bench sheets or laboratory reports to spot-check DMRs.

There are 884 days of violation in Count VII for failure to maintain or destruction of records. These violations are also extremely serious. Although there could be effluent limit or other violations reflected in these documents, the contents of all of the destroyed documents will never be known. Rettig alone destroyed the documents, in direct contravention of

company policy and an order from his immediate supervisor to find and produce the records. Although there is no evidence of bad faith by defendants, sufficient good-faith efforts were not made by defendants, as they did not have adequate safeguards to prevent such destruction.

[12] Accordingly, the court FINDS that the appropriate civil penalty for defendants' Permit violations is $12,600,000. Defendants are jointly and severally liable for this penalty. The Clerk shall enter judgment in this amount for plaintiff. Further, plaintiff shall submit to the court, within thirty (30) days, a proposal for the allocation of this penalty, with a specific focus on the feasibility of directing all, or part of, the penalty toward the restoration of the Chesapeake Bay and its tributaries, namely the James and the Pagan Rivers. The court retains limited jurisdiction of this matter in regard to such proposal.

The Clerk is DIRECTED to send a copy of this Opinion to counsel for the parties.

It is so ORDERED.

**Parallel Citations**

45 ERC 1387

## Footnotes

1. These limits have been referred to as monthly average mass limits and monthly average loading limits. The court will use the latter term herein.
2. *See Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1139–40 (11th Cir.1990) (following *Gwaltney* ); *Atlantic States Legal Found., Inc. v. Universal Tool & Stamping Co., Inc.*, 786 F.Supp. 743, 747 (N.D.Ind.1992) (same).
3. Although there is no Fourth Circuit precedent on this issue, *see Gwaltney*, 791 F.2d at 307–08 n. 8 (declining to "address the question whether multiple violations attributable to a single day may give rise to a maximum penalty in excess of $10,000 [, the statutory maximum at the time,] for that day"), several courts in other circuits have held that a violation under every permit limitation for each effluent and each type of effluent limitation constitutes a separate and distinct violation. *See, e.g., Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 77–78 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991) (rejecting contention that a discharge which violated more than one permit parameter should be counted as a single violation, and holding that violation calculations should be undertaken "on a parameter by parameter basis"; with regard to the different types of limitations, holding that each type of limit is "clearly separate" and there is "no reason why [a defendant] should not be penalized separately for violating each limitation"); *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 800 F.Supp. 1, 20–21 (D.Del.1992) ("separate exceedances of weight and concentration limits can constitute separate violations"), *aff'd in part, rev'd in part on other grounds,* 2 F.3d 493 (3d Cir.1993); *Student Pub. Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, No. CIV.A.83–2040, 1988 WL 156691, at *11 (D.N.J. Mar.24, 1988) (Since "[e]ach violation of any express limitation in the permit may, of course, be treated as a separate violation for the purposes of assessing a penalty," the total penalty for any given day may exceed the statutory maximum.); *United States v. Amoco Oil Co.*, 580 F.Supp. 1042, 1047 n. 1 (W.D.Mo.1984) (in dicta, construing the language in Section 1319(d) to allow for separate penalties for violations of the daily limit for two or more different pollutants); *cf. Tyson Foods,* 897 F.2d at 1138–40 (With regard to violations of different pollutants, the court found that the only reasonable interpretation of "$25,000 per day of each violation" in Section 309(d) was that "the daily maximum penalty applies separately to each violation of an express limitation," and thus there is no daily cap, as each excessive discharge of a pollutant on a given day will subject the polluter to the $25,000 maximum fine. However, the court refused to count the daily maximum violation separately from monthly average violations for the same pollutant (which were counted as a daily violation for each day of the month), because the court found this "may result in imposing two fines for the same illegal act.") *But see Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield,* 611 F.Supp. 1542, 1554–55 (E.D.Va.1985) (subsequent history omitted) (In spite of the fact that there were many "days of violation" on which multiple violations were found to have occurred, the district court declined to set the maximum penalty for a given day at more than $10,000 (the maximum), regardless of whether more than one violation occurred for several substances on that day.) (citing *United States v. Detrex Chem. Indus., Inc.,* 393 F.Supp. 735 (N.D.Ohio 1975)).
4. pH is "a measure of the acidity or the alkalinity of the water. Very low pH would be acidic, and acidic waters are also toxic as are very alkaline waters." Tr. at 158.
5. The DEQ was formed in 1993, pursuant to a state statute passed in 1992. The DEQ then encompassed its predecessor, the State Water Control Board.
6. Defendants' explanation may be relevant, however, with regard to the appropriate penalty for these days of violation. See *infra* Part III.A.4.b.

7   Defendants' contention that they are entitled to an "upset defense" under Section 309(d), because, in the fall of 1994, they suffered a single operational plant upset, caused in part by warm weather, is unsupported by the evidence. Their reliance on a state DEQ report, defense exhibit 61, is insufficient. Thus, this "upset defense" does not merit any further discussion. The court does note that this claim technically is not an affirmative defense, as apparently presented by defendants, but rather a limiting factor on the calculation of the number of days of violation under Section 309(d). In any event, the evidence and facts of this case do not warrant such a limitation.

8   During the entire trial, defendants' approach to their Permit violations was rather cavalier. They repeatedly argued there was no real harm caused by their numerous violations, and stressed that the Pagan River would still be environmentally damaged, and unsafe for swimming and shellfish harvesting, even if defendants complied with their Permit. Such arguments miss the mark. As the United States pointed out in closing argument:

> The goal of the Clean Water Act is bit by bit to clean up the waters of the United States.... The defendants cannot evade their responsibility for their part in the damage to the Chesapeake Bay through the discharge of phosphorus [and other effluents] into the Chesapeake Bay by saying, "If you took ours out, it wouldn't make any difference" because everybody contributing to the Bay bears a responsibility for what went into the Bay.

> Tr. at 970. A violator cannot escape liability or penalties for Permit violations simply by pointing to the violations of others. Each must do its part to clean up the environment. Only then will the goals of the Clean Water Act be achieved.

9   Defendants operate two wastewater treatment plants located on the Pagan River, Outfall 001 and Outfall 002.

10  While there was no limit in defendants' Permit for total nitrogen, nitrogen was measured by TKN limits before May 13, 1994, and by ammonia limits after May 13, 1994. TKN includes ammonia and a measure of organic nitrogen, which can break down into ammonia and subsequently consume oxygen. In the river, when oxygen is consumed, ammonia may be converted into nitrite or nitrate.

11  As noted previously, the monthly average loading limits in defendants' Permit control the total pounds of effluent discharged per day into the Pagan River.

12  Defendants' total loadings (including allowed discharges and violations) were approximately 87% of phosphorus entering the Pagan River during this time period. Although the phosphorus limit in the Permit did not take effect until January 3, 1992, it is unlikely this fact would change the percentage of phosphorus entering the Pagan River due to defendants' exceedances of their Permit.

13  Defendants' nitrogen loadings comprised approximately 63% of the nitrogen entering the Pagan River during this time period.

14  The STORET is a water quality database that the EPA maintains and to which states submit information.

15  Defendants' water quality expert, Edwin L. Barnhart, primarily dealt with freshwater systems, and he is not an expert in marine ecology, fisheries biology, or environmental microbiology. The court finds the United States' experts more credible regarding the effects of defendants' phosphorus, ammonia, and TKN violations on the Pagan River, James River, and the Chesapeake Bay. Defendants' Permit exceedances increased loadings, which resulted in increased concentration of nutrients in the Pagan River, which contributed to eutrophication.

16  Defendants do not get credit for past or future money spent on HRSD user fees, sewer surcharges, or other equipment installed at Gwaltney to enable them to connect to HRSD, as the court finds based on the credible evidence and testimony, that the user fees and surcharges are neither avoided or delayed costs, and such equipment was not necessary for a facility upgrade to bring defendants into compliance.

17  The court was more persuaded by the testimony of the United States' economic benefit expert, Robert Harris. The court rejects in most part the testimony of defendants' experts Robert H. Furhman and A. Lawrence Kolbe, and particularly the risk-free rate analysis.

18  The WACC is the average return a company expects to make for its investors, in order to maintain its current level of investors and its current level of business operations. Tr. at 366–67.

19  Even if the errors identified by defendants in Harris' calculations were remedied (other than his failure to use the risk-free rate), there is only a slight decrease in his estimate of defendants' economic benefit of noncompliance. This difference, of approximately 4%, is not significant.

20  At the time of trial, defendants had not yet completed their HRSD connection. However, such full connection apparently is imminent. In any event, the court reiterates that the liability and resulting penalty in this case are for *past* discharges, pre-dating the HRSD connection.

21  In May, 1991, defendants' consultant CH2M Hill advised defendants to connect to HRSD, finding that "the overall most cost-effective alternative for Smithfield Foods, when considering both plants together, is to discharge to HRSD." Pl.Ex. 21 at SF403218. Also, the State Water Control Board advised defendants that the HRSD connection would aid the Town of Smithfield with its sewer problems, provide sewage service to Isle of Wight County, and result in a much-needed upgrade of the Nansemond Wastewater Treatment Plant. *See* Tr. at 491–92.

22  At trial, the only document to which defendants pointed was defense exhibit 50, a letter dated May 23, 1996, from James R. Borberg, General Manager of HRSD, to W. Bidgood Wall, Jr., of the state board, regarding HRSD's request for lost revenue from the DEQ due to the delay in the Smithfield Foods–HRSD connection. In the letter, HRSD attributes the delay to the DEQ's failure to enforce

| | |
|---|---|
| | its consent order with Smithfield regarding the HRSD connection. Matters between the HRSD and the state board are not relevant, as defendants must show that *they—not HRSD—objected to the delay* and that they *took steps to facilitate the connection.* No such documents exist in the record of this case. |
| 23 | In its May 30, 1997 Opinion, the court held the Special Orders did not take precedence over the Permit. At trial, Richard Burton, the former Director of the State Water Control Board and then the DEQ, testified that the Commonwealth did not intend the consent order to be a modification of the Permit, and he acknowledged the express language in the May, 1991 Special Order that "nothing herein shall be construed as altering, modifying, or amending any term or condition contained" in defendants' Permit. Tr. at 495–96. Moreover, Burton testified that "the order speaks for the Commonwealth"—he did not maintain that it spoke for or bound the EPA. Tr. at 504. |
| 24 | At this time, Lively was a project engineer at defendants' Kinston, North Carolina plant. He was later transferred to work at defendants' wastewater treatment plants in Smithfield, Virginia, as a director of environmental affairs. |
| 25 | For example, with regard to the document destruction alleged in Count VII, defendants contend there were good-faith efforts to comply, as Lively ordered Rettig to retrieve the records from storage on July 21, 1994, and Rettig's destruction of those documents was in direct contravention of defendants' records retention policy. |
| 26 | These figures and conclusions derive from the credible expert testimony of Robert Harris. *See* Tr. at 389–90. Although the court refused the evidence regarding the $16 million in economic benefit gained by defendants from "wrongful profits," because this opinion had not been properly given to defendants during pre-trial discovery, the court agrees that a $16 million penalty would have a material, but not detrimental, financial effect on defendants. However, the court itself makes this conclusion based upon defendants' financial statements and other evidence in the case. |
| 27 | *See supra* note 8. |
| 28 | *See supra* Part III.A.4.b. |
| 29 | *See supra* Part III.A.2. and III.A.4.a. |
| 30 | *See supra* Part II. |

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.