# EXHIBIT 7

14 F.Supp.2d 854
United States District Court,
S.D. Mississippi,
Southern Division.

UNITED STATES of America, Plaintiff,
v.
GULF PARK WATER COMPANY, INC.,
Johnson Properties, Inc., Glenn Johnson
and Michael Johnson, Defendants.

No. CIV.A.1:93–CV–622(Br)
(R).   |   March 11, 1998.

United States brought action against owners and operators of wastewater treatment facility for violations of Clean Water Act (CWA) in connection with discharge of pollutants into waters of United States without required National Pollutant Discharge Elimination System (NPDES) permit. After grant of partial summary judgment as to liability, 972 F.Supp. 1056, the District Court, Bramlette, J., held that: (1) daily CWA violations for over 12 years were "serious" for purposes of CWA penalty determination; (2) amount of $600,000 was reasonable approximation of economic benefit that owners and operators received through noncompliance with CWA; (3) owners and operators were not entitled to any mitigation of penalty based on history of violations; (4) owners and operators were entitled to slight mitigation of penalty for efforts to comply with applicable requirements; (5) owners and operators failed to sustain burden of proving that penalty would have "ruinous" impact on their business; and (6) imposition of $1,500,000 penalty was appropriate.

So ordered.

**Attorneys and Law Firms**

 *857 Henderson Crockett Lindsey, U.S. Attorney's Office, Southern District of Mississippi, Biloxi, William A. Weinischke, Lori Jonas, U.S. Department of Justice, Washington, DC, for U.S.

Gerald H. Blessey, Gerald Blessey & Associates, Biloxi, MS, for Gulf Park Water Company, Inc., Johnson Properties, Inc., defendants.

Gerald H. Blessey, Gerald Blessey & Associates, Biloxi, C. Frank Holthaus, Degravelles, Palmintier & Holthaus, Baton Rouge, LA, for Glenn Johnson, Michael Johnson, defendants.

*MEMORANDUM OPINION AND ORDER*

BRAMLETTE, District Judge.

This cause is before the Court on the issue of the amount of civil penalty to be assessed against the defendants for violations of the Clean Water Act ("the Act"), Sections 309(b) and (d) (33 U.S.C. § 1319(b) and (d)), as alleged in the complaint. Also before the Court are the plaintiff's motion for reconsideration of appointment of special master **[docket entry no. 166]**; the plaintiff's motion for reconsideration of motion to exclude defendants' evidence **[docket entry no. 167]**; and the plaintiff's response and objection to the report of the special master **[docket entry no. 178]**.

On April 21, 1997, this Court, in a Memorandum Opinion and Order, granted partial summary judgment to the United States. 972 F.Supp. 1056 (S.D.Miss.1997). The Court found that Gulf Park Water Company, Johnson Properties, Inc., Glenn K. Johnson and Michael Johnson ("the defendants") are owners and operators of a wastewater treatment facility which discharges wastewater directly into waters of the United States. The Court further held that the defendants were liable for violating the Act by virtue of their discharge of pollutants into waters of the United States without the required National Pollutant Elimination System ("NPDES") permit.

Trial of this matter, on the issue of the civil penalty to be assessed, was held May 13 through May 15, 1997. At the time of trial, the defendants continued to discharge wastewater into waters of the United States without a permit. On July 2, 1997, by order of this Court, the defendants were required to immediately pay the necessary deposit required for connection of their wastewater system to the Gulf Coast Regional Wastewater Authority ("the Regional system"). On July 10, 1997, the United States moved to have the defendants held in contempt of court for failure to pay the deposit. The defendants ultimately complied with the order on July 23, 1997, and are now connected to the Regional system. Certain matters regarding the civil penalty were referred by the Court to a Special Master for factual findings and a report, which was issued October 22, 1997. The Court now has the report and all the evidence in the case before it, and makes the following findings of fact and conclusions of law:

The defendants have been illegally discharging pollutants from the Gulf Park Water Company facility in Ocean Springs, Mississippi, since 1985 when they were ordered by the Chancery Court of Jackson County, Mississippi, to cease these discharges and to find a lawful alternative outlet for their wastewater. Applying a five year statute of limitations for calculating the number of violations, the minimum number of violations of the Act committed by the defendants is 1,825. [1] As stated in this Court's April 21, 1997, Memorandum Opinion and Order, based on this number of violations, the maximum penalty which could be imposed in this case is $25,000 per day per violation, or $46,062,500.

Since the Court has already found the defendants liable, and the number of violations *858 is readily calculated by simply counting the number of days of illegal discharges, the Court must now determine the appropriate penalty for those violations under Section 309(d) of the Act, 33 U.S.C. § 1319.

### *Statutory Maximum Penalty*

Section 309(d) of the Clean Water Act mandates civil penalties for each violation of the Act. 33 U.S.C. § 1319(d). It states that the violator "*shall* be subject to a civil penalty not to exceed $25,000 per day for each violation." *Id.* [2]

The Fifth Circuit, in the recent case of *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir.1996), noted that when imposing penalties under the environmental laws, courts often begin by calculating the maximum penalty. *Id.* at 1337 (citing *Atlantic States Legal Foundation v. Tyson Foods, Inc.*, 897 F.2d 1128, 1137 (11th Cir.1990) and *United States v. B & W Investment Properties*, 38 F.3d 362, 368 (7th Cir.1994)); *see also United States v. Midwest Suspension and Brake*, 824 F.Supp. 713, 734 (E.D.Mich.1993) (employing same analysis under Clean Air Act), *aff'd*, 49 F.3d 1197 (6th Cir.1995).

The courts are split, however, on which methodology to use in assessing an appropriate civil penalty. Some courts use the "top-down" method of penalty calculation, in which the court begins the penalty calculation at the statutory maximum, and adjusts downward considering the Section 309(d) factors. *See, e.g., Tyson Foods*, 897 F.2d 1128, 1142 (11th Cir.1990); *United States v. Avatar Holdings, Inc.*, 1996 WL 479533, at *5 (M.D.Fla.1996); *Hawaii's Thousand Friends v. City & County of Honolulu*, 821 F.Supp. 1368, 1395 (D.Haw.1993); *Atlantic States Legal Found., Inc. v. Universal Tool & Stamping Co., Inc.*, 786 F.Supp. 743, 746 (N.D.Ind.1992); *United States v. Roll Coater, Inc.*, 21 Envtl.L .Rep. 21073 (S.D.Ind.1991). Other courts use the "bottom-up" method of penalty calculation, in which the court begins the penalty calculation using the defendants' economic benefit of noncompliance, and adjusts upward or downward considering the Section 309(d) factors. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 956 F.Supp. 588, 603 (D.S.C.1997); *United States v. Municipal Authority of Union Township*, 929 F.Supp. 800, 806 (M.D.Pa.1996); *Student Pub. Interest Group of New Jersey, Inc. v. Monsanto Co.*, 1988 WL 156691, at *16 (D.N.J.1988); *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield*, 611 F.Supp. 1542, 1557 (E.D.Va.1985).

[1]   While the Fifth Circuit has not clearly indicated a preference, *Marine Shale* would tend to weigh in favor of the "top-down" method. *See also Weber v. Trinity Meadows Raceway, Inc.*, 1996 WL 477049, at *15 (N.D.Tex.1996) (following *Hawaii's Thousand Friends* and *Tyson Foods* in applying the "top-down" method). Inasmuch as the statute does not require either method, this Court exercises its discretion and elects to use the "top-down" method when calculating the appropriate penalty for the defendants' violations.

In *Tyson Foods*, the Eleventh Circuit held that a penalty must be assessed for each violation of the Clean Water Act and that, in calculating a penalty, the district court must start with the maximum statutory penalty. 897 F.2d at 1138, 1140–42. "In deciding upon the penalty to be assessed against a defendant who has violated its NPDES permit, the point of departure for the district court should be the maximum fines for such violations permitted by the Clean Water Act." *Id.* at 1137.

If a court chooses not to impose the maximum penalty, the Eleventh Circuit ruled that "it must reduce the fine in accordance with the factors spelled out in section 1319(d), clearly indicating the weight it gives to each of the factors in the statute and the factual findings that support its conclusions." *859 897 F.2d at 1142. [3]

### *Appropriate Civil Penalty*

Section 309(d) of the Act provides that "[i]n determining the amount of a civil penalty the court shall consider" the following factors:

(1) seriousness of the violation or violations,

(2) the economic benefit (if any) resulting from the violation,

(3) any history of such violations,

(4) any good faith efforts to comply with the applicable requirements,

(5) the economic impact of the penalty on the violator, and

(6) such other matters as justice may require.

See 33 U.S.C. § 1319(d). The Court will address each of these Section 309(d) factors in turn.

**1. *Seriousness of the Violations***

[2] In determining the seriousness of the violations, "the court looks to several factors, including, but not limited to: (1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment." *Hawaii's Thousand Friends,* 821 F.Supp. at 1383 (citing EPA, "Clean Water Act Penalty Policy," Feb. 11, 1985, at 3–5).

[3] This Court has found that the defendants' violations occurred daily and uninterrupted for over twelve (12) years and that the defendants refused to connect their system to the Regional Wastewater Authority, a lawful alternative to discharging to the Mississippi Sound. In *Marine Shale,* the Fifth Circuit, noting the frequency and duration of the unpermitted discharges, found that the violations were serious even though there was little, if any, evidence of actual environmental harm. 81 F.3d at 1336–37.[4] Similarly, Gulf Park's discharge is serious solely by virtue of its duration.

*Marine Shale* provides further support for characterizing the defendants' violations as serious. Because the discharges of pollutants by Marine Shale were willful and flagrant, the court held that the violations were serious. In finding the violations willful and flagrant, the court stated that Marine Shale "knew that it needed an NPDES permit ... and simply decided to operate without one." *Id.* at 1336. The defendants in the case *sub judice* have done the same thing. They cannot plead ignorance about the requirement to connect to the Regional system. The permit that was issued to Gulf Park in 1978 expressly provided that the discharge would have to be connected to a regional wastewater system when it became available. (Pl.Exh. 2). The system's 1983 permit contained the same provision. (Pl.Exh. 3). Moreover, the defendants were ordered by the Chancery Court of Jackson County to cease the illegal discharges into the Mississippi Sound by July 1, 1985. (Pl.Exh. 4.) The defendants chose to simply ignore that court's order.

[4] [5] The defendants argue that their violations of the Clean Water Act were not serious, because there are other sources of pollution on the Gulf Coast. This same argument has been rejected by other courts. *See, e.g.,* **\*860** *Public Interest Research Group v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158, 1167 (D.N.J.1989). Moreover, the defendants' argument is at odds with the evidence presented at trial. The United States is not required to establish that environmental harm resulted from the defendants' discharges or that the public health has been impacted due to the discharges, in order for this Court to find the discharges "serious;" nevertheless, the evidence at trial showed that the defendants' discharges constituted both an actual and a potential threat to the public health and the environment.[5] Under the law, the United States does not have the burden of quantifying the harm caused to the environment by the defendants. As the district court recognized in *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.,* 800 F.Supp. 1 (D.Del.1992):

> Congress has stated that the objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The EPA itself recognizes that all pollutants create some harm or risk and that it is hard to quantify precisely that harm or risk. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158, 1167 (D.N.J.1989) (citing EPA Civil Penalty Policy), *rev'd on other grounds,* 913 F.2d 64 (3d Cir.1990).

> If we were to accept Texaco's view and require the plaintiffs to collect field data (a task that is, as we shall discuss, arguably Texaco's), citizens would be greatly deterred from bringing suit against violators. What is more, *if we required specific proof that particular violating discharges caused discrete, identifiable harms, we would encourage a permittee to ignore the requirements of its permit "with impunity so long as it discharged into already polluted waters." Id.* (Emphasis added)

*Id.* at 24; *see also PIRG of New Jersey v. CP Chemicals,* 26 ERC 2017, 2020 (D.N.J.1987) (rejecting defendants' argument that the court should consider whether waters into which defendants were discharging were already polluted); *Student Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 1989 WL 159629, 29 Env't Rep.(BNA) 1417, 1421 (D.N.J.1989) (recognizing that it is usually impossible to determine the precise effect of a violation on ambient water quality.)

[6] The defendants also contend that the discharge from Gulf Park had no more impact on the receiving waters than the discharge from the Regional Wastewater Authority to which Gulf Park was required to connect. No evidence of actual impact was presented by the defendants. Their contention that their discharge had the same impact as the Regional Wastewater Authority's is based solely upon the fact that the permit that Gulf Park previously held and the one that it later applied for had the same numerical discharge parameters as the permit held by the Regional Authority. (Trans.P. 36, P. 93–96).

However, the permit that Gulf Park held in the early 1980's was a "no discharge" permit (as was the permit they later applied for). (Trans.P. 89). The permit allowed for no discharge of pollutants into waters of the United States; the discharge was to be onto land. By contrast, the Regional Authority's permit is for discharge to water. Thus, Gulf Park cannot logically compare the impact of the discharges on receiving water under the two permits.

Furthermore, the evidence at trial showed that the Regional Wastewater Authority is more than ten miles from the Mississippi Sound. The evidence further established that such a distance makes a substantial difference in the impact on the receiving waters.[6] James Palmer, Executive Director of the Mississippi Department of Environmental Quality, testified that "the location of *861 a discharging system is as important if not more so than what comes out of the pipe." (Trans.P. 66–67). Mr. Palmer also testified that the objective of long-term planning efforts (under Sections 201 and 208 of the Clean Water Act) for the Gulf Coast was to capture as many point sources of pollution as possible and consolidate them into large systems located where the effluent can be handled in a more manageable way. "So a lot of little bitty systems discharging is not as desirable as one big system with only one point hopefully in the right place that you can control." (Trans.P. 67); *see also* Pl. Exh. 1. In view of this evidence, the Court finds the defendants' argument that Gulf Park is "doing virtually the same thing" as the Regional system to be without merit.

Finally, the defendants cannot argue that they were discharging essentially the same quality effluent as the Regional system in light of the undisputed evidence regarding the condition and operation of the Gulf Park plant. Greg Jackson, an environmental engineer with the Mississippi DEQ, testified that the Regional plant to which Gulf Park was supposed to be connected was well run. Specifically, he noted that there was no odor and the effluent was clear. (Trans.P. 271–72). He contrasted it with the poor condition of the Gulf Park plant, describing sewage sludge in the receiving stream at the point of the Gulf Park discharge. (Trans.P. 271–72). John Williams, an inspector for the United States Environmental Protection Agency's NPDES Program, testified that he had inspected over 400 treatment plants. He inspected the Gulf Park Plant in early 1997. He noted the presence of solids leaving the plant, debris floating in the effluent, excessive residual chlorine, and broken and malfunctioning equipment. Mr. Williams testified that Gulf Park was one of the two worst plants he had ever inspected. (Trans.P. 123–28).

There is also evidence that bypasses (the discharge of raw sewage) occurred from the Gulf Park facility. (Trans.P. 115–17). Dr. Roland Ferry, a biologist with EPA and an expert in marine biology, testified that the discharge of raw sewage greatly exacerbated the risk to human health. (Trans.P. 392–93). In contrast, there was no evidence presented that the Regional system ever experienced discharges of raw sewage.

There is evidence in the record to show that the defendants' actions have had a serious public health impact. The Chancery Court of Jackson County in 1992 found that: "A direct, proximate result of Gulf Park discharging sewage effluent into Mississippi Sound was the closing by the state of oyster beds along the shore from Ocean Springs to Pascagoula for public health reasons." (Pl.Exh. 16).

The Court also finds that there was credible evidence presented by the plaintiff that Gulf Park's discharges constituted a significant threat to human health and the environment. As the court in *Municipal Authority of Union Township, supra,* noted, "because actual harm to the environment is by nature difficult and sometimes impossible to demonstrate, it need not be proven to establish that substantial penalties are appropriate in a Clean Water Act case." 929 F.Supp. at 807; *see also United States v. Smithfield*

*Foods, Inc.,* 972 F.Supp. 338, 344 (E.D.Va.1997) ("The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect."). The evidence at trial showed that Gulf Park's discharges were to waters characterized by the State as one of its most sensitive due to their recreational use and the presence of shellfish. (Trans.P. 64–65).

The United States also presented unrebutted expert testimony of Dr. Ferry on the threat posed by discharges of wastewater. One of Dr. Ferry's responsibilities as a scientist for the Environmental Protection Agency is to make determinations of whether discharges of pollutants will cause any significant impact to the marine environment. (Trans.P. 383). He visited the defendants' facility and the area in proximity to the discharge of pollutants from that facility. He noted the presence of recreational facilities within 1,000 meters of the discharge (Trans.P. 386), and testified that reliable maps showed the presence of oysters in the vicinity of the discharges. (Trans.P. 390).

 *862 Dr. Ferry discussed the threat to human health posed by the discharge of wastewater, noting that even properly treated wastewater poses a risk to human health. Specifically, he noted that simple contact through bathing in marine waters contaminated with sewage effluent can cause gastrointestinal-type illnesses, respiratory illnesses, skin infections and infections of the eyes, ears, nose, mouth and throat. (Trans.P. 391). The fact that there was evidence of raw sewage discharges, according to Dr. Ferry, greatly exacerbated the risks to human health and the environment. He also noted that people who consume contaminated oysters run the risk of serious illness and possibly even death. (Trans.P. 391). He testified that commercial shellfish harvesting in the Mississippi Sound is closed due to fecal coliform levels. (Trans.P. 402). The Gulf Park plant is one contributor of fecal coliform to this water body. (Trans.P. 403).

Dr. R.D. Ellender, an expert in the fields of wastewater microbiology and environmental microbiology at the University of Southern Mississippi, testified about the potential for enteric (intestinal) diseases associated with the discharge of wastewater. (Trans.P. 233). He noted that there were over 115 viruses that can be transmitted through wastewater. Dr. Ellender also visited the plant and the areas in the vicinity of the discharge from the plant. He observed people using waters in the vicinity of the Gulf Park plant recreationally and stated that, from a microbiologist's point of view, their usage of those waters caused him concern. (Trans.P. 239). Like Dr. Ferry, Dr. Ellender testified that the presence of oysters in the vicinity would pose an opportunity for people to consume those oysters. This opinion was also shared by the defendants' witness, Dr. Edwin Cake, in whose opinion "it only takes one virus particle to give you infectious hepatitis. So you could have a very small effluent and still affect the area." (Trans. P. 631).

The defendants offered evidence of other sources of pollution to the Sound including septic tanks and other wastewater treatment plants. However, the existence of other sources of pollution does not mitigate the potential harm caused by this discharge. *See Powell Duffryn,* 720 F.Supp. at 1167.

Although no evidence was presented of actual harm, the evidence was more than ample to establish that the violations committed by these defendants over a period of more than twelve years were serious. There is undisputed evidence of the potential harm to the public health and the environment posed by the discharges of pollutants by the defendants. *See Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.,* 800 F.Supp. 1, 21 (D.Del.1992) (court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect). Thus, the Court declines to mitigate the penalty based on a lack of actual harm.

**2. *Economic Benefit (if any) Resulting from Violations***
The purpose of this component of section 1319(d) is obvious. A defendant should not be placed in a better position, due to its failure to comply with the law, than it would be in if it had made the necessary expenditures to comply with the law. Clearly, to allow the defendants to pay a penalty which is less than, or the same as, the money they earned due to their noncompliance is unfair to parties who do comply with the law. Moreover, there would be no would be no deterrent to polluters if they were able to profit from their pollution. In *Tyson Foods,* the Eleventh Circuit stated: "Insuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are successfully to deter violations." 897 F.2d at 1141.

 [7] In order for the penalty to serve the purpose of deterrence, it should exceed the economic benefit enjoyed by the defendants. *See Student PIRG of N.J. v. Monsanto,* 29 Env't Rep. Cas. (BNA), 1078, 1090 (D.N.J.1988) (some additional penalty over and beyond the economic benefit

should be imposed to discourage other and future violations). In *Municipal Authority of Union Township,* 929 F.Supp. at 806, the court noted that without imposing a penalty exceeding economic **\*863** benefit, "those regulated by the Clean Water Act would understand that they have nothing to lose by violating it." [7]

James Fagan, the plaintiff's expert in calculating economic benefit, opined that the defendants enjoyed an economic benefit of roughly $1.2 million, based on the fact that the defendants delayed and/or avoided spending money to come into compliance and had the benefit of that money until they eventually spent it to come into compliance.

Specifically, Mr. Fagan considered the delayed cost of constructing the connection between the Gulf Park facility and the Regional Wastewater Authority. He assumed that Gulf Park should have incurred this cost ($407,000) in July of 1985 when it was ordered to connect to the Ocean Springs system. He also considered the avoided annual operation and maintenance costs of $12,000 per year. By calculating a 10% rate of return on delayed expenditures and then adding avoided costs, he calculated a total economic benefit to the defendants of $1,193,000.

In *Gwaltney,* 611 F.Supp. at 1558, the district court recognized at least three distinct types of economic benefit:

> First, by delaying the expenditure of funds on compliance, a violator obtains the use of the money for other purposes in the meantime. Second, a violator may also avoid some costs altogether—for example, the costs of maintaining and operating the pollution control system until it is implemented. Third, a violator may, in addition, obtain a competitive advantage as a result of its violation —for example, it may be able to offer goods at a lower price, thereby possibly increasing its sales and profits.

[8] The determination of economic benefit does not require an elaborate evidentiary showing. A reasonable approximation of the economic benefit reaped from the defendants' noncompliance is sufficient. *See Powell Duffryn,* 913 F.2d at 80; *Tyson Foods,* 897 F.2d at 1141; *Municipal Authority of Union Township,* 929 F.Supp. at 806 (economic benefit calculations are necessarily imprecise). Keeping this in mind, the Court finds that there are several assumptions made by the plaintiff's expert that should be adjusted.

First, the witness's calculations are based upon the premise that Gulf Park, in 1985, would have been required to expend $200,000 to lay the necessary line to connect to the Regional system. In the 1997 contract, the line had been laid at the expense of the Regional Authority, not the defendants. The witness opined that, at least in 1985, the parties contemplated this expense being born by the defendants. While the cost itself appears realistic, determining the responsible party is problematic; therefore, this aspect of the calculations, in the opinion of the Court, is questionable. Moreover, the witness acknowledged that he did not consider such factors as the cost Gulf Park would have incurred in closing down its plant in order to make the connection to the Regional Authority, the cost of operating its plant if there was no hookup, the fact that all or a portion of the construction and connection costs would be passed on to the consumer as a "postage stamp" charge, and the fact that the treasury bill average rate during this period of time was only 5.8%.

On cross-examination the witness attempted to invoke the competitive advantage analysis in an effort to make his thesis more palatable, but this analysis is flawed, at least in part, for the reason that the defendants have a monopoly in the area which is one of the main reasons utilities, this one included, are regulated by the Public Service Commission. Essentially, the witness's testimony was discredited by defense counsel, who pointed out that many offsetting expenses were not considered.

[9] [10] However, there is no doubt that the defendants have enjoyed an economic benefit in not having expended the funds necessary to connect to the Regional system in 1985, in 1989 or in 1991. Any figure employed by the Court in determining the defendants' economic benefit is somewhat speculative, as

**\*864** it is in the nature of this factor that its qualification will be imprecise. *Student Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 19 Envtl.L.Rep. 20903, 20904, 1989 WL 159629, \*5 (D.N.J. April 6, 1989) (citing *Gwaltney,* 611 F.Supp. at 1558). Nevertheless, the Court must endeavor to reach a " 'rational estimate of [the violator's] economic benefit, *resolving uncertainties in favor of a higher estimate.*' " *Id.* (quoting *Gwaltney,* 611 F.Supp. at 1558) (emphasis added). The estimate "must

encompass *every* benefit that defendants received from violation of the law." *United States v. Mac's Muffler Shop, Inc.,* 25 ERC 1369, 1986 WL 15443, *8 (N.D.Ga. Nov.4, 1986) (emphasis added). It would eviscerate the Act to allow violators to escape civil penalties on the ground that such penalties cannot be calculated with precision.

*Municipal Authority of Union Township,* 929 F.Supp. at 806–07.

[11] The parameters are broad, and the contingencies are many, but the Court finds that $600,000 is a reasonable approximation of the economic benefit, having subtracted from Mr. Fagan's formula the $200,000 figure, and having applied offsetting factors and expenses which the defendants incurred as a result of not having made the connection. Obviously, the defendants have benefited economically by their violations. As a result, this second statutory factor is not mitigating. However, the amount of benefit will be taken into account in the overall assessment of a penalty.

### 3. *History of Such Violations*

In determining the "history of such violations," courts consider the duration of defendants' current violations, whether defendants have committed similar violations in the past, and the duration and nature of all such violations, including whether the violations are perpetual or sporadic. *Smithfield Foods,* 972 F.Supp. at 349.

As far back as August 1985, the Chancery Court and the Mississippi Department of Environmental Quality endeavored to get the defendants to cease their illegal discharge of pollutants into the Mississippi Sound. Barry Royals, Chief of the Water Division of the Mississippi DEQ, testified that in his 21 years at DEQ this was the only case his office had to refer to the United States for civil enforcement. (Trans.P. 203).

The defendants continued to violate the Clean Water Act after the complaint was filed in this action on December 30, 1993. In fact, they did not even enter into a contract with the Regional Authority until December of 1996, three years after the lawsuit was filed, and only achieved compliance after the United States filed a Motion for an Order of Contempt in July of 1997. The defendants' illegal discharge ceased the day prior to the hearing on the United States' contempt motion. This is analogous to the situation in *Tyson Foods,* in which the Eleventh Circuit noted the significance of violations continuing even after the complaint was filed. 897 F.2d at 1141.

Other courts have considered the length of the period of violations to be significant. *See Atlantic States Legal Foundation, Inc. v. Universal Tool & Stamping Co., Inc.,* 786 F.Supp. 743 (N.D.Ind.1992) (court refused to mitigate penalty, finding that violations had stretched over a seventeen-year period); *Monsanto,* 29 Env't Rep. Cas. (BNA) at 1091 (penalty should not be reduced where the defendant had been sued before, or where it had prior notice of the problems giving rise to the case and failed to take action). Courts have also considered prior lawsuits against the same defendants for violations of the Act. *See Smithfield Foods,* 972 F.Supp. at 349.

[12] There is no dispute over the fact that the defendants have a long history of violating the Clean Water Act. These violations have continued uninterrupted for more than twelve years, despite efforts by all the agencies committed to regulating Gulf Park to bring the defendants into compliance with the law. The defendants, therefore, are not entitled to any mitigation under this component of section 1319(d).

### 4. *Any Good Faith Efforts to Comply with the Law*

The evidence shows that the defendants' reaction to the July 1, 1985 deadline for **\*865** ceasing their illegal discharge was to seek an extension from the Chancery Court. Because the defendants were unable to provide justification for an extension, that motion was denied. (Pl.Exh. 8). The defendants occasionally professed an interest in connecting to the Regional Authority, but failed to actually do so.

Until the spring of 1997, with trial of this case imminent, the defendants did nothing to achieve compliance with the Chancery Court's February 25, 1985 Order. In fact, the defendants did not pay the necessary deposit for connection to the Regional system until July 23, 1997. The defendants argue that they tried to comply by spending approximately $200,000 on a spray system, and applying for a permit to spray the effluent on land. However, by the time defendants made application for a permit for such a system (December 11, 1989), the Mississippi Gulf Coast Regional Authority had agreed to spend its own money to bring the connection line to Gulf Park. (Trans.P. 302). Furthermore, the defendants' permit application was denied more than seven years ago, on April 24, 1990, and their illegal discharge of pollutants continued uninterrupted to the eve of the hearing on the United States' contempt motion.

In a June 23, 1992, Opinion and Judgment, the Chancery Court of Jackson County stated that "it was evident as far back as 1985 that the ultimate answer to Gulf Park's effluent disposal would be connection to a public system such as Ocean Springs or Gulf Coast Regional Wastewater Authority." (Pl.Exh. 16). In its ruling on the DEQ's contempt motion, the Chancery Court noted that "Gulf Park has not acted promptly, has not acted reasonably, and has not acted in good faith to the public, to the Commission or this court." In *United States v. Key West Towers, Inc.,* 720 F.Supp. 963, 965–66 (S.D.Fla.1989), the district court held that there was no good faith effort to comply with the law where the defendant had violated earlier administrative orders to stop filling wetlands.

The evidence shows repeated efforts by regulatory agencies, as well as the Jackson County Chancery Court, to bring the defendants into compliance with the law. Those efforts date back to 1985. State court records offer no explanation as to why the state court orders were not enforced. A reasonable inference is that an execution upon the order in the form of a takeover or shutdown of the plant would adversely impact the residents of Gulf Park Subdivision. The Department of Environmental Quality under its Director, James Palmer, was persistent in its efforts to bring these matters to closure, and although there are orders emanating from the Chancery Court of Jackson County, this Court can offer only the foregoing conjecture as to why more punitive measures were not taken. Under the circumstances, perhaps the best course was taken by the various authorities for the good of the public but, as said, the conduct of the defendants has been one of defiance toward the orders of the state court as well as the Clean Water Act. The necessary permit was not secured, and the violation is obvious as well as acknowledged.

[13] The Court finds that notwithstanding the inexcusable conduct of the defendants, there are mitigating circumstances which must be taken into account. Unexplained to the satisfaction of this Court is the decision of the Mississippi Gulf Coast Regional Wastewater Authority to impose a 10% surcharge upon the defendants in addition to the normal rates applicable to the treatment of waste. This surcharge, according to the evidence, was imposed upon these defendants with no such charge being required of other operators and owners who utilized the regional facility. Curtis Miller, with the Mississippi Gulf Coast Regional Wastewater Authority, testified, "I have no explanation as to the 10% surcharge." In addition, a connection fee, in an amount that has varied over time, has been required of the defendants, with the final amount being $44,000. While these factors cannot excuse the defendants' conduct, this Court considers the targeting of these defendants for additional requirements not imposed upon other plant owners a factor to be considered. The Court cannot find that the defendants made sufficient good faith efforts to comply with the applicable requirements, but taken as a whole, the evidence indicates that at least some efforts were made. Thus, the defendants ***866** are entitled to a slight mitigation of the penalty under this component of Section 309(d).

**5.** *Economic Impact of the Penalty on the Violator*
Certified Public Accountants testified for both the United States and the defendants. Robert Harris, the plaintiff's expert, was qualified and allowed to give opinion testimony regarding the defendants' ability to pay. This witness was knowledgeable and candid, with a professional approach toward the subject and without any apparent prejudice toward the result. Mr. Harris testified that the defendants have the ability to pay a penalty of $5,300,000, without impairing their ability to continue the business of Johnson Properties. He approached the issue from the standpoint of assets, less liabilities, which could be liquidated or sold to gain revenue for a penalty payment.

Mr. Harris conceded that the borrowing power of the defendants, while once substantial, is now virtually non-existent. It is undisputed that there are conflicting financial statements and tax returns for Johnson Properties, Glenn Johnson and Michael Johnson. The financial documentation provided to various banks showed that Johnson Properties had the capacity to borrow approximately $2.5 million, while the information they provided Mr. Barrios revealed a dramatically different financial condition. Because of recent problems incurred by the defendants, including this suit, an investigation by authorities, and related matters which adversely impact upon their ability to borrow, and because the lending institutions are now cognizant that other financial statements and tax returns exist which are substantially different from the ones they relied upon, Mr. Harris opined that the banks would likely be reluctant to loan them money. (Trans.P. 545). Since the defendants refused to explain the discrepancies in the financial documents, and there is no way to determine which sets of financial documents are accurate, Mr. Harris based his analysis of the defendants' ability to pay a penalty on assets owned by the defendants that could be liquidated.

Peter Barrios, who testified on behalf of the defendants, based his opinion on the ability to pay a penalty on the cash flow of Johnson Properties, Inc. Based upon that cash flow, Barrios testified that the defendants could not pay a penalty. The testimony of Mr. Barrios is highly suspect. Most of his conclusions were reached on the basis of information supplied to him by Montell Watkins and Glenn Johnson, both of whom refused to answer questions about their financial circumstances. It is not the truth and veracity of this witness that the Court questions, rather it is the scant information made available to him on which he formed his conclusions. This is compounded by the inability of the plaintiff to gather essential information from corporate officials and defendants who have invoked their constitutional right to remain silent. [8]

Prior to trial, the plaintiff moved to have certain of the defendants' evidence excluded because of their refusal to answer any questions about their financial condition. The defendants were allowed, over the plaintiff's objections, to put on evidence through Mr. Barrios, which the plaintiff again moves to exclude. The Court finds that the better approach is to leave the record undisturbed, and to instead view the evidence in light of all the circumstances, as hereinafter set forth.

[14] The cross-examination of Mr. Barrios revealed inconsistencies, misstatements, mistakes, erroneous figures and huge discrepancies. This witness acknowledged that much of the information presented to him by plaintiff's counsel at deposition was previously unknown, causing him to revise his conclusions. He candidly admitted that an audit of his clients with the records currently available would be virtually an impossible undertaking. Given the condition of the defendants' financial records, or lack thereof, and *867 the unexplained discrepancies in those records, the Court questions whether anyone can determine if either set is in fact accurate. Thus, Mr. Harris' reliance on the liquidation of assets approach in determining ability to pay is justified. The Court cannot accept at face value Mr. Barrios' opinion regarding the defendants' ability to pay. Although the testimony of this witness is not discounted entirely, the Court has given it little weight.

At the conclusion of trial, the Court, in an effort to shed further light on the financial evidence presented, appointed a Special Master to study the ability to pay issue in light of the trial evidence. On October 22, 1997, the Special Master issued her report. The Court adopts in part and rejects in part her findings, as explained below.

Mr. Harris testified that Glenn Johnson had several assets that could be liquidated to pay a penalty. These included stock, art and guns. (Trans.P. 521–23). The total value of these assets net of taxes was estimated to be $478,000. (Trans.P. 538). The Special Master appointed by the Court made a similar finding. She found Glenn Johnson could contribute $450,000 to a civil penalty. [9]

Mr. Harris further testified that Johnson Properties could liquidate certain non-operating assets valued at $600,000. He calculated the amount owed to banks on these properties and found the net proceeds to be worth $360,000. (Trans.P. 525–27). The Special Master concluded these assets would be worth approximately $400,000. The evidence showed that the non-operating assets that could be liquidated are not associated with the business enterprise of Johnson Properties. (Trans.P. 524–25).

Mr. Harris next considered appraisals of operating assets, such as sewer systems. He testified that Johnson Properties could sell certain of these assets, pay off corresponding loans, and be left with $6,109,737. He then calculated the tax liability associated with these sales. The net remaining after taxes was $5,045,000.

Although Mr. Barrios raised concerns about the appraisals relied upon by Mr. Harris, he had no appraisals of his own of the various physical assets, including plant property, houses and other real estate. He criticized the appraisals submitted by the plaintiff, but he offered none in rebuttal and explained this deficiency by saying appraisals were too expensive to obtain.

Mr. Barrios testified that he did not disagree with the methodology used by the appraiser. (Trans.P. 702). Rather, he stated that the appraisals had not been updated, and that he "couldn't think of a buyer who would buy these things" subject to the conditions now existing. (Trans.P. 701). Yet the defendants did not provide any evidence that property values have depreciated or that there is no market for the assets owned by the defendants. Mr. Barrios' criticism consists of mere speculation. The Court draws an inference that the properties would likely have value higher than the defendants wish to concede. Otherwise, appraisals would certainly have been in their best interest.

Mr. Barrios also testified that cross-collateralization clauses would prevent the realization of any profit from the liquidation of assets. The Special Master reached the same

conclusion, based on Mr. Barrios' testimony. However, Mr. Barrios conceded that he did not do any analysis of liquidation of assets in forming his opinion on ability to pay. (Trans.P. 702). The burden was on the defendants to provide evidence of the status of each property with regard to cross-collateralization clauses. While some assets may be cross-collateralized, the Court finds insufficient evidence to support the defendants' contention. Therefore, the testimony of Mr. Barrios is suspect, and this aspect of the Special Master's report is not adopted.

Given the nature of the business of Johnson Properties and its 80 or 90 plants, the liquidation of operating properties is a possibility which even Mr. Barrios admitted. The fundamental disagreement between Mr. Harris and Mr. Barrios is whether the liquidation of some assets would have a "ruinous effect" on the defendants' business operations.

*868 [15] Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under Section 309(d) will not reduce the penalty. *Gwaltney,* 611 F.Supp. at 1562; *see also Powell Duffryn,* 720 F.Supp. at 1165 ("Defendant has failed to demonstrate that assessing a severe penalty would jeopardize defendant's continued operation.").

[16] [17] The defendants have the burden of showing that the impact of a penalty would be ruinous or otherwise disabling. *See Texaco Refining,* 800 F.Supp. at 26 (court found no adverse impact because defendant did not so demonstrate). In *Gwaltney, supra,* the court stated that it was unpersuaded that any penalty warranted by the defendant's violations would jeopardize its continued operation. *See also Powell Duffryn,* 720 F.Supp. at 1166 (defendant failed to demonstrate that assessing a severe penalty would jeopardize the defendant's continued operations; defendant's claims that it was in a relatively poor economic position were not persuasive). Other than mere conjecture, the defendants have failed to sustain their burden of proof of showing that a penalty would have a "ruinous" impact on their business.

The defendants speculate that selling off assets would result in a loss to Johnson Properties, but Mr. Barrios provided little evidence to support that opinion. In fact, the defendants' own financial information relied upon by Mr. Barrios undermines his opinion. He conceded that, according to his own report, as the company got bigger and increased its sales, it lost more money. (Trans.P. 710). Indeed, Mr. Harris, using the reports prepared by Mr. Barrios, showed that the defendants' "economies of scale" argument does not apply to Johnson Properties. The Special Master concurred that Johnson Properties has not achieved "economies of scale" as it has grown. The reports prepared by Mr. Barrios show that as Johnson Properties increased in size and sales, the costs greatly exceeded the increase in sales. For example, sales increased from $1.8 million in 1993 to $6 million in 1994, roughly three times. Yet compensation for salaries increased during the same period of time from $360,000 to $2.3 million, roughly six (6) times. (Trans.P. 581–82).

Notwithstanding Mr. Harris' testimony, it is difficult to assess the defendants' ability to pay. The witness's report, as well as his testimony, encompasses both operating as well as nonoperating assets, including real property in the case of Johnson Properties, Inc., and stock owned by Glen Johnson. But the figures are subject to question not only because some of the appraisals are dated, but, more importantly, because the resale values of the assets, including the sewer treatment plants as well as the closely held stock by Glen Johnson, are suspect. The valuation of these assets is one thing, but finding a purchaser is quite another, and it is the finding of the Court that these values must be discounted by the nature of the assets, i.e., wastewater facilities and closely held stock. Again, the Court cannot judge the net worth (or the income producing potential) of these defendants, with certainty. It is the opinion of the Court that the truth lies somewhere between Mr. Barrios' dire prediction of financial ruin, and what the Court considers an overly optimistic picture offered by Mr. Harris.

Since Mr. Barrios failed to undertake any effort to determine what assets existed and could be liquidated or even explain why he did not include such an analysis in his evaluation of ability to pay, the Court is left with only Mr. Harris' detailed and essentially unchallenged testimony on ability to pay. The plaintiff goes so far as to suggest that liquidation of certain properties could make Johnson Properties more profitable, but there is no need for the Court to venture into such speculation. The evidence shows that liquidation of some assets would not have a ruinous effect on the defendants, and the Court estimates that Johnson Properties has an ability to raise in excess of $1,000,000.

*Conclusion*

The Court can conceive of no mathematical formula which can be applied to the overall effort of assessing a fair penalty. Each case must be decided on its own facts. While the

experts offered calculations on the ability to pay as well as the economic benefit, to these *869 findings there must be applied a degree of reason and common sense without the benefit of precise mathematical equations.

[18] "To achieve the goal of deterrence, a penalty must be high enough so that the discharger cannot 'write it off' as an acceptable environmental trade-off for doing business.' " *Hawaii's Thousand Friends,* 821 F.Supp. at 1394 (*citing Powell Duffryn,* 720 F.Supp. at 1166 ("A civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business.")).

[19] In view of the duration of the violations and the protracted period of disregard for the authority of the agencies charged with enforcing the Clean Water Act, the penalty must be substantial. *See Municipal Authority of Union Township,* 929 F.Supp. at 809 ("when determining what sum should be added to the violator's economic gain to serve the function of punishment and general deterrence, the court must bear in mind that if the regulated community perceives that violations of the law are treated lightly, the government's regulatory program is subverted.") (internal quotations omitted); *see also, Smithfield Foods, Inc.,* 972 F.Supp. at 353 (assessing penalty of $12.6 million because of seriousness and history of violations).

After careful consideration of all of the Section 309(d) factors in light of the evidence presented at trial, however, the Court finds that the fifth statutory factor weighs in favor of a significant reduction in the amount of the penalty, and that the maximum possible penalty should be reduced.

[20] The Court is convinced that although Johnson Properties has a cash flow problem, Johnson Properties and Glenn Johnson have substantial assets. These defendants can pay a substantial penalty beyond the amount of benefit gained from their violations. In consideration of all the evidence pertaining to the defendants' ability to pay, the Court believes that the imposition of a $1,500,000 penalty is appropriate. Although this Court has previously held all defendants liable for violations of the Act, the Court takes into account the ability of each defendant to pay, and assesses the penalty accordingly;

IT IS HEREBY ORDERED that the appropriate civil penalty for the defendants' violations of the Clean Water Act is $1,500,000, and this amount is assessed against the defendants Glenn Johnson and Johnson Properties, Inc.;

FURTHER ORDERED that Glenn Johnson shall contribute $450,000 and Johnson Properties, Inc., shall contribute $1,050,000 toward payment of the civil penalty;

FURTHER ORDERED that the plaintiff shall submit a final judgment in conformance with this Memorandum Opinion and Order within five (5) days from the date of entry hereof;

FURTHER ORDERED that the plaintiff's motion for reconsideration of appointment of special master **[docket entry no. 166]**, and motion for reconsideration of motion to exclude defendants' evidence **[docket entry no. 167]** are DENIED for the reasons stated hereinabove;

FURTHER ORDERED that the plaintiff's response and objection to the report of the special master **[docket entry no. 178]** is GRANTED IN PART AND DENIED IN PART as set forth hereinabove.

Footnotes

1. This Court does not address the issue of whether the United States could seek multiple penalties for each day of violation based upon the fact that any permit issued to defendants would have contained multiple parameters and conditions. Without conceding this legal point, the United States has limited its demand to one violation per day.
2. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 101–410, enacted October 5, 1990, 104 Stat. 890), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Public Law 104–134, enacted April 26, 1996; 110 Stat. 1321), the statutory maximum penalty for violations of the Clean Water Act was increased to $27,500 per day per violation for violations occurring after January 30, 1997.
3. The penalty factors in the Act are intended to further a number of important public policy goals. As the Supreme Court has noted: "The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. 123 Cong.Rec. 39191 (1977) (remarks of Sen. Muskie citing Environmental Protection Agency (EPA) memorandum outlining enforcement policy). A court can require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant

| | |
|---|---|
| | requirements." *Id.* It may also seek to deter future violations by basing the penalty on its economic impact. *Id.*; *Tull v. United States,* 481 U.S. 412, 423, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). |
| 4 | Marine Shale discharged non-contact cooling water at high temperatures into waters of the United States and exceeded its permit limits for oil, grease and chemical oxygen demand. *Id.* at 1336. |
| 5 | The United States presented the testimony of two experts, Dr. R.D. Ellender and Dr. Roland Ferry, that discharges of treated and untreated wastewater constitute a public health threat and a threat to the environment. The defendants offered no expert testimony to refute this evidence. |
| 6 | The evidence at trial also showed that the Mississippi Environmental Quality Permit Board has had a long-standing policy of not approving direct discharges along the Mississippi Gulf Coast. (Trans. at 69). Gulf Park's discharge was directly into the Mississippi Sound and this would not be permitted under this policy. |
| 7 | In that case, the district court found economic benefit of $2,015,000 and assessed a total penalty of $4,031,000. |
| 8 | The Court notes that both accountants agree that *if* the financial information relied upon by Mr. Barrios is truthful, the defendants would have difficulty paying a penalty from cash flow or going to a bank to borrow money. However, this Court cannot know whether that information is accurate. |
| 9 | Harris also concluded that Michael Johnson had only a nominal ability to contribute to a penalty. (Trans. at 521). The Special Master concurred, and the Court adopts this finding. |

**End of Document**                                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.