# EXHIBIT 12

2009 WL 1491224
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Norfolk Division.

UNITED STATES of America, Plaintiff,
v.
Cody BEDFORD and Bedford
Tree Service, Inc., Defendants.

Civil Action No. 2:07cv491.  |  May 22, 2009.

**Attorneys and Law Firms**

Austin David Saylor, Kent Edmund Hanson, U.S. Department of Justice, Washington, VA, Craig Paul Wittman, Joel Eric Wilson, United States Attorney's Office, Norfolk, VA, for Plaintiff.

Cody Bedford, Gulfport, MS, pro se.

**FINAL ORDER**

REBECCA BEACH SMITH, District Judge.

*1 On October 30, 2007, the United States filed a complaint seeking injunctive relief and civil penalties against Cody Bedford and his company, Bedford Tree Service, Inc., for unauthorized discharge of pollutants into waters of the United States, in violation of the Clean Water Act. *See* 33 U.S.C. §§ 1311, 1344. The case was referred on October 10, 2008, to United States Magistrate Judge Tommy E. Miller to conduct an evidentiary hearing and to submit a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B) and (C); Fed. R. Civ. Pro. 72(b); E.D. Va. Loc. Civ. R. 72. The Magistrate Judge held an evidentiary hearing on October 22, 2009, at which defendants did not appear.

On February 12, 2009, the Magistrate Judge submitted a report and recommendations ("R & R"). The R & R advised the parties of their right to file written objections. Although defendants filed no objections, the government filed a motion to modify the R & R on March 2, 2009. In an order dated March 23, 2009, the court stated that it viewed the government's motion to modify as an objection, to be addressed in this Final Order.

Other than the government's objection, which the court **SUSTAINS**,[1] the court **ADOPTS AND APPROVES** the R & R submitted by the Magistrate Judge on February 12, 2009. Thus, the Clerk shall enter default judgment against defendants under Federal Rule of Civil Procedure 55(b), and shall enter judgment for the United States in the amount of $90,000 against defendants jointly and severally.

*I. Revision to Footnote 3*

Having examined the government's objection to the law stated in Footnote 3 on page 15 of the R & R, and having made *de novo* findings as to this issue, the court **SUSTAINS** the government's objection. Accordingly, the court **REVISES** Footnote 3 as follows:

> The Seventh and Ninth Circuit Courts have concluded that waters that satisfy Justice Kennedy's standard in *Rapanos* are within the scope of the Clean Water Act. *See United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir.2006); *N. California Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir.2007). The First Circuit has held that the United States can prove jurisdiction by meeting either the plurality's or Justice Kennedy's standard in *Rapanos*. *See United States v. Johnson*, 467 F.3d 56, 66 (1st Cir.2006). However, the Eleventh Circuit held in *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir.2007), that only the Kennedy standard can be used to establish Clean Water Act jurisdiction. The Fifth and Sixth Circuits declined to decide which standard controlled Clean Water Act jurisdiction because the waters at issue in those cases met both Justice Kennedy's and the plurality's standards. *United States v. Lucas*, 516 F.3d 316, 327 (5th Cir.2008); *United States v. Cundiff*, 555 F.3d 200, 210–13 (6th Cir.2009).

*II. Imposition of a Deed Restriction*

The Magistrate Judge recommended that the court "create a conservation easement or deed restriction ensuring preservation of the southernmost twenty-four acres of wetlands on the Bedford Site."[2] (R & R 27). On March 2, 2009, the government asked the court for time to complete negotiations with Jack Taylor, who holds the mortgage to the Bedford Site, and to recommend whether the court should impose a conservation easement or a deed restriction. On March 23, 2009, the court granted the government 30 days to complete its negotiations and 45 days to make its recommendation to the court.

*2 On May 7, 2009, the government filed a motion describing the result of its negotiations and recommending that the court impose a deed restriction on the wetlands area of the Bedford Site.[3] Defendants did not respond to the government's motion. After reviewing the government's recommendation, the court **FINDS** that the imposition of a deed restriction, together with the existing subordination agreement,[4] will ensure that these wetlands are protected in perpetuity. Accordingly, the court **ORDERS** the imposition of a deed restriction on the southernmost 24 acres of wetlands ("the Protected Area") of the Bedford Site. Specifically, the court **ORDERS**:

A. *Restrictions:* All activities that alter or destroy the natural state of the Protected Area are prohibited. These prohibited activities include, but are not limited, to:

1. *General:* Destruction, filling, excavation, or alteration of the Protected Area;

2. *Structures:* The construction of man-made structures on, in, over, or above the ground or any water body, including—but not limited to—the construction, removal, placement, preservation, maintenance, alteration, or decoration of any buildings, fences, roads, utility lines, or billboards or other advertising;

3. *Soils:* The removing, excavating, disturbing, or dredging of soil, sand, peat, gravel, or aggregate material of any kind; or any change in the topography of the land, including any discharging of dredged or fill material, ditching, extracting, drilling, pile driving, mining, or excavating of any kind;

4. *Drainage:* Ditching, draining, diking, damming, filling, excavating, grading, plowing, flooding, ponding, mining, drilling, or removing/adding topsoil, sand, or other materials;

5. *Hydrology:* Modifications to the hydrology of the Protected Area, either directly or indirectly, that would allow more water onto, or that would drain water away from, the Protected Area. Prohibited modifications include, but are not limited to: ditching, changing any water-control structures, repairing drainage tiles, or altering any naturally occurring structures;

6. *Wastes or Debris:* The storing, dumping, depositing, abandoning, discharging, or releasing of any gaseous, liquid, solid, or hazardous waste substance, material, trash, or debris, whether on, in, over, or under the ground, or into surface or ground water;

7. *Non–Native Species:* The planting or introducing of non-native species;

8. *Removal of Vegetation:* Cultivating, harvesting, cutting, mowing, removing, destroying, logging, planting, pruning of trees and plants, except as the United States Army Corps of Engineers ("Corps") finds necessary to control invasive species that threaten the natural character of the Protected Area;

9. *Herbicides. Insecticides, and Pesticides:* The use of insecticides, pesticides, herbicides, or other chemicals (including fertilizers), except as the Corps finds necessary to control invasive species that threaten the natural character of the Protected Area. State-approved municipal application programs needed to protect the public health and welfare are excluded from this prohibition;

*3 10. *Agricultural, Livestock, and Other Activities:* Conversion of, or expansion into, any portion of the Protected Area for agricultural, horticultural, aquacultural, silvicultural, livestock production, or grazing activities;

11. *Motorized Vehicles:* Operation of construction machinery, snowmobiles, dune buggies, motorcycles, all-terrain vehicles, or any other types of motorized vehicles;

12. *Other Material Impairment:* Other acts, uses, or discharges that adversely affect fish or wildlife

habitat or the preservation of lands, wetlands, or water areas in the Protected Area;

B. *Inspection, Enforcement, and Access Rights:* The Corps, the United States Environmental Protection Agency ("EPA"), and their authorized agents shall have the right to enter and go upon the Protected Area at reasonable times to enforce and monitor compliance with this deed restriction. When practicable, the property owner shall receive prior reasonable notice of entry. The Corps and the EPA shall have the right to enforce this deed restriction by legal, equitable, and administrative proceedings to prevent any activity on or use of the Protected Area that is inconsistent with this deed restriction, and to require the restoration of any areas or features of the Protected Area that may be damaged by inconsistent activity or use. Failure by the Corps or any owner to enforce any of these restrictions shall not waive the right to later do so;

C. *Duration:* This deed restriction shall run with the land in perpetuity; and

D. *Transfer:* The terms and conditions of this deed restriction shall be both explicitly included in any transfer, conveyance, or encumbrance of the Protected Area or any part of it, and any instrument of transfer, conveyance, or encumbrance affecting all or any part of the Protected Area shall set forth the terms and conditions of this deed restriction.

The Clerk is **DIRECTED** to forward a copy of this Final Order to the Assistant United States Attorney, and to Cody Bedford at the address on file with the court.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

TOMMY E. MILLER, United States Magistrate Judge.

This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference entered October 10, 2008.

This case was referred for a Report and Recommendation recommending disposition of the matter following an evidentiary hearing. Accordingly, an evidentiary hearing was held October 22, 2008. The United States was represented by Mary Anne Zivnuska, Esq. Defendants made no appearance. The Official Court Reporter was Paul McManus. On November 14, 2008, The United States filed a closing argument. The Court recommends that the District Judge adopt the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

*4 1. Cody Bedford ("Mr.Bedford") is the owner of a 33–acre parcel of land in Virginia Beach, Virginia, GPIN 23197926290000 (hereinafter "Bedford Site" or "Site."). (Exhibit 3 to Deposition of Jack Taylor, Sr., taken September 12, 2008, "Taylor Depo."—Deed.)

2. The parcel is located off of Mill Landing Road at the terminus of a side street between 1315 and 1317 Mill Landing Road, known locally as "Wood Duck Lane." (Transcript of Evidentiary Hearing held October 22, 2008, "Tr." 30:17–25; Evidentiary Hearing Exhibit "Ex." 34.)

3. Mr. Bedford used the Site to store heavy equipment belonging to Bedford Tree Service, Inc. (Deposition of Cody Bedford taken August 21, 2008, "Bedford Depo." 105:16–106:12, 138:25–139:25; Ex. 37 at DEZ000098.) [1]

4. Almost the entire Site is wetlands, and has been mapped as wetlands on the National Wetland Inventory map. (Tr. 12:22–13:13; 47:20–48:9, 49:3–15; Ex. 1.)

5. Wetlands on the Site drain from north to south or southeast across the property into an unnamed tidal tributary, which bisects the southern portion of the Site, and is referred to herein as the "Southern Tributary." (Tr. 17:17–19, 54:7–15; Ex. 9—identifying property boundaries; Ex. 12—identifying unnamed tributary.)

6. The wetlands on the Site have a direct hydrologic surface connection to the Southern Tributary. (Tr. 75:3–10.)

7. The Southern Tributary is navigable by rowboat or canoe, and is influenced by the wind and tide. (Taylor Depo. 14:2–9; Tr. 61:2–14, 74:7–18.)

8. The Southern Tributary flows east and north into Nawney Creek near the confluence of Nawney Creek and Back Bay. (Tr. 54:13–19, 55:6–14; Ex. 12.)

9. The navigability of the Southern Tributary into Nawney Creek is only restricted by a culvert where Mill Landing Road passes over the Southern Tributary. (Tr. 74:7–18; Ex 12.)

10. Nawney Creek hosts "piers and recreational structures" along its banks, from which boaters launch vessels that can be navigated into Back Bay and out into the Atlantic Ocean. (Tr. 74:19–75:2.) [2]

11. Nawney Creek flows into Back Bay about 1000 feet from the Bedford Site. (Tr. 55:12–14.)

12. The waters of Back Bay extend south into North Carolina and become Knotts Island Bay, Currituck Sound, Albermarle Sound, and Pamlico Sound, eventually connecting with the Atlantic Ocean at Oregon Inlet. (Tr. 58:10–14, 74:22–75:2; Ex. 15.)

13. Aerial photographs show the property prior to Defendants' filling and clearing activities as largely undeveloped and mostly forested and scrub-shrub wetlands. (Tr. 23:24–24:4; Ex. 4–2002 photo; Ex. 6–2003 photo.)

14. Aerial photographs taken after Mr. Bedford purchased the Site in April 2004, show extensive clearing, filling and grading activity. (Tr. 22:18–23:10, 23:16–23; Ex. 7—Sept.2004 photo; Ex. 8–2005 photo.) This activity is the subject of the present action.

### History of Ownership and Activity at the Bedford Site

15. Mr. Jack Taylor ("Taylor") owned the Bedford Site from 1975 until 2004, when he sold the property to Mr. Bedford. (Taylor Depo. Ex. 3.)

*5 16. In 1976, Mr. Taylor filled three areas to accommodate the creation of three small roads. (Taylor Depo. 9:18–23; 10:22–11:12; 18:11–21; 145:16–21.) Mr. Taylor identified the location of these roads on a 1977 aerial photograph as the shadowed area extending from Wood Duck Lane to about halfway through the Site, and then two shadowed areas extending south off of the first road. (Taylor Depo. 21:1–11; Taylor Depo. Ex. 1.)

17. In 1976, Mr. Taylor had his contractor clear trees from an area to the south of these roads. (Taylor Depo. 9:18–19; Taylor Depo. Ex. 1.) Mr. Taylor did not fill the this clearing, although some sand may have been placed there when the roads were filled. (Taylor Depo. 18:17–21, 19:11–19.)

18. In 1983, Mr. Taylor contracted to have the Site logged. (Taylor Depo. 19:1–8, 24:17.) About 25 to 30 feet southwest of the entrance to the property, the loggers built a large mound which was five to six feet high and twelve feet wide where they placed their crane and a ramp to access the mound. (Taylor Depo. 19:1–8, 40:10–21; Taylor Depo. Ex. 2.)

19. Mr. Taylor applied to the City of Virginia Beach for a sewer disposal system construction permit in 1989. (Taylor Depo. 52:20–53:14.) Mr. Taylor abandoned his permit application when he learned that the property would not drain, and that the property was not high enough above sea level for his permit application to be received favorably by the permitting authority. (Taylor Depo. 55:3–5, 55:18–56:3.)

20. Mr. Bedford entered into a purchase agreement on November 25, 2003, to purchase the Site from Mr. Taylor. (Taylor Depo. 44:19–21; Taylor Depo. Ex. 4.)

21. On December 4, 2003, Dr. Willem Jan Briede, a wetland scientist with Miller Stephenson and Associates ("MSA"), visited the Site and performed a wetland assessment to determine the feasibility of developing the Site. (Tr. 108:3–20; Ex. 31.)

22. Dr. Briede advised Mr. Bedford not to buy the property since he found it to be positively wetland, and relatively useless. (Tr. 110: 11–18; Ex. 31 pp. 2–3.) Dr. Briede explained to Mr. Bedford that to develop the Site without a permit would have grave consequences. (Ex. 31 p. 3.)

23. Despite this advice, Mr. Bedford purchased the Site from Mr. Taylor on April 6, 2004, for the contract price of $98,000. (Taylor Depo. 46:1–4, 18–20; Taylor Depo. Ex. 3–Deed.)

24. Mr. Bedford paid $15,000 as a down payment on the property (Taylor Depo. 47:2–4), and agreed to pay Mr. Taylor about $2,000 a month for the term of the mortgage. (Taylor Depo. 47:9–12.) Mr. Taylor holds Mr. Bedford's mortgage. (Taylor Depo. 47:13–15.)

25. On July 23, 2004, Brandon Herbert, with the Virginia Department of Environmental Quality ("DEQ"), responded

to a citizen's complaint by visiting the Site. (Tr. 102:19–21; Ex. 33.)

26. When Mr. Herbert arrived at the Site, Mr. Bedford was on a bulldozer, which was running. (Tr. 104:19–24.) Mr. Herbert described Mr. Bedford's attitude as "fairly belligerent." (Tr. 105:10–13.)

*6 27. Mr. Herbert was not allowed onto the property, but from the cul-de-sac, could see that approximately one acre had been cleared and filled with sand material and tree mulch. (Tr. 104:9–15.) He also observed "some low areas that looked to be wet," and wetland vegetation. (Tr. 104:11–17.)

28. Mr. Bedford stated that he owned the property and was performing the work on the property. (Ex. 33.)

29. Mr. Herbert instructed Mr. Bedford to stop whatever work he was doing on the Site until the U.S. Army Corps of Engineers ("Corps") could determine whether wetlands were present. (Tr. 105:19–25.)

30. In October and November 2004, Mr. Bedford contracted with Bonney Bright to deliver 564 cubic yards of sand and 10 cubic yards of fill dirt. (Tr. 131:17–24, 134:22–135:4; Exs. 27–27k.) This material, which totaled approximately 49 dump-truck loads, was discharged on the Bedford Site between October 6, 2004, and November 11, 2004. *Id.*

31. In January 2005, Randy Steffey, with the Corps, had a telephone conversation with Mr. Bedford where Mr. Bedford admitted to broadcasting fill material on the Site, but stated he was doing so within the confines of the area previously filled by Mr. Taylor. (Tr. 77:4–7, 18–23.) Mr. Steffey recommended that Mr. Bedford cease work at the Site until he obtained a permit. (Tr. 78:6–16.)

32. The Corps followed up with a letter on January 21, 2005, advising Mr. Bedford that failure to obtain a Section 404 permit was a violation of the Clean Water Act, and instructing him to stop all work in wetlands until he obtained a permit. (Ex. 18.)

33. On or about January 28, 2005, Mr. Bedford received 330 cubic yards of fill sand and 160 tons of crush-and-run from Salmons Farms. (Exs.26, 56.) This material, which totaled approximately 30 dump-truck loads, was discharged on the Bedford Site. (Ex. 56.)

34. During his deposition, Mr. Bedford acknowledged "cleaning" on the Site for "almost a month straight" with an E–70 excavator in the beginning of 2005. (Bedford Depo. 138:19–24, 139:15–18.)

35. Kirsten Shacochis–Brown with DEQ viewed the Site on February 2, 2005, from a neighbor's property, and took several pictures depicting recent clearing, filling, and ditch digging on the Site. (Ex. 34.)

36. On February 7, 2005, Randy Steffey, as well as two other Corps staff, had a meeting with Mr. Bedford at the Site. (Tr. 81:5–8; Ex. 44.)

37. Mr. Steffey was able to document wetlands on the Site (Tr. 81:17–23; Ex. 43) as well as document discharges onto those wetlands through mechanized land clearing, excavation and filling (Tr. 81:23–82:2, 84:20–87:22; Ex. 2 pp. 3–15—diagram and photographs). Trees were flush cut, ditches were excavated, piles of excavated material including tree mulch were present, and fill material was spread in some areas to a depth of 1.5 to 2 feet. *Id.*

38. On February 9, 2005, Ms. Shacoshis–Brown entered the Site with Mr. Bedford, and observed that clearing, grading and filling had taken place since her visit to the Site seven days earlier. (Tr. 120:9–21, 123:5–16, 125:10–11; Ex. 37.)

*7 39. Ms. Shacochis–Brown noted that Site was drier than during the earlier visit, and it appeared that the elevation had been raised about two feet. (Tr. 120:12–21; Ex. 37.) When she augered into the soil, she found "a lot of sand material within the first few layers ."(Tr. 120:15–17.)

40. Ms. Shacoshis–Brown warned Mr. Bedford that his conduct was in violation of the law, and that he needed to work with DEQ on a resolution. (Tr. 125:12–126:9.)

41. Mr. Bedford never made an effort to comply with DEQ. (Tr. 127:14–17.) When Mr. Bedford ignored repeated warnings to stop the filling activity, his file was referred to the Enforcement division of DEQ. (Tr. 126:7–127:2; Ex. 55.)

42. On February 14, 2005, the Corps sent Mr. Bedford a letter informing him that the Site visit confirmed wetlands were being impacted, and ordering Mr. Bedford to cease and desist unauthorized discharges of dredged or fill material into wetlands or other waters of the United States on the Bedford

Site. (Ex. 19.) A second Cease and Desist Order was sent to Mr. Bedford on March 28, 2005. (Ex. 21 .)

43. On March 21, 2005, DEQ sent Mr. Bedford a Notice of Violation advising Mr. Bedford that administrative or judicial enforcement action may be instituted as a result of land clearing, filling and excavation in wetlands on the Site without a permit, and requesting that Mr. Bedford work with DEQ on a resolution. (Ex. 20.)

44. Due to Mr. Bedford's refusal to cooperate with the Corps, the case was referred to the U.S. Environmental Protection Agency ("EPA") in April 2005. (Tr. 96:1–8; Ex. 22.)

45. A joint site visit was made by the EPA, the DEQ, and the Corps on May 31, 2005. (Tr. 96:24–25; Ex. 25.) Mr. Bedford was represented by Ms. Julie Steele with Environmental Specialties Group, Inc. (Ex. 25.)

46. Clearing, grading and filling had taken place at the Site since the February visits. (Tr. 98:3–17, 100:3–11; Ex. 25.) Areas that had previously been "rutted and churned" were now "leveled, graded and seeded with fescue."(Ex. 25 at US000330.) The texture and color of the soils were now a bright sandy loam, suggesting that additional material was placed over the original soil. (Tr. 98:7–17 .)

47. During his deposition, Mr. Bedford acknowledged hauling concrete scrap from a refuse pit in his dump truck to the Site prior to the joint visit. (Bedford Depo. 154:13–19, 155:8–13.)

48. In July 2005, Aegean Pools delivered four eight-yard loads of dirt to the Site. (Bedford Depo. 182:3–17.)

49. On October 19, 2005, DEQ obtained a warrant and made another Site visit in which they performed "soil borings" in seven different locations on the Site, and performed a wetland delineation confirming wetlands as well as clearing, grading and filling in the wetlands. (Exs.35, 36, 36a.)

50. In 2005, Mr. Bedford contacted Dr. Briede with MSA about representation, and told Dr. Briede he was in trouble with the Corps and DEQ. (Tr. 112:13–113:10.)

*8 51. Dr. Briede informed Mr. Bedford that the penalties for knowingly filling wetlands could be $20,000 per violation per day plus potential jail time. (Tr. 113:20–114:1.) Mr. Bedford responded that he would rather move to Mexico than endure those penalties. (Tr. 114:2–3.)

52. At no time from 2004 through 2007 did Defendants apply for or obtain a permit under CWA section 404 for the discharge of dredged or fill material onto the Bedford Site. (Tr. 79:18–80:6.)

53. On April 4, 2007, the EPA and the Corps entered the Site with a search warrant, and dug several soil pits at various locations across the Site. (Tr. 31:1–4, 32:19–33:9; Ex. 52–52*l*.)

54. The data collected by Jeffrey Lapp, previously the Lead Environmental Scientist for EPA Region III's Wetlands Group, and qualified as an expert in wetland identification (Tr. 28:11–18; 30:11–14; Ex. 29), and Randy Steffey, an environmental scientist with the Corps (Tr. 44:23–25), demonstrated the existence of wetlands on the Site that meet all three of the necessary criteria for wetlands under the Corps Manual: the presence of (a) hydric soils; (b) hydrophytic vegetation; and (c) wetland hydrology. (Tr. [Lapp] 31:19–32:1; 34:14–35:11; 43:6–25; [Steffey] 48:16–49:1; 56:15–57:3.)

55. Mr. Lapp and Mr. Steffey found that in addition to sand and dirt, spoil material from excavation of wetlands had been used to fill portions of the property. (Tr. 38:9–39:6; Exs. 2 photo 10, 52E .) At one location, hydric soil had been deposited on top of the natural soil profile to a depth of 20 inches. (Tr. 39:7–11; Ex. 52E.)

56. From the data collected, the EPA and the Corps determined that most of the Site was comprised of wetlands (Tr. 47:20–48:9), and filling from a depth of 3.5 to 21 inches had occurred over at least 1.27 acres of the Site (Tr. 36:3–7, 39:12–14; Ex. 52–52*l*), which were previously wetlands (Tr. 42:22–43:2, 49:3–15).

57. In addition, Defendants discharged fill material into approximately 0.7 acre of wetlands on which fill material may have previously been discharged when Mr. Taylor owned the Site. (Tr. 25:17–26:6; Ex. 10.)

58. The United States filed the current action against Defendants on October 30, 2007, seeking injunctive relief and civil penalties for the unauthorized discharge of pollutants into waters of the United States in violation of CWA § 301(a), 33 U.S.C. § 1311(a).

59. Bedford Tree Service is in default, having never entered an appearance in the case.

## II. *FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO LIABILITY*

60. Congress enacted the Clean Water Act in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."33 U.S.C. § 1251(a) (2009). To accomplish this goal, the CWA prohibits "the discharge of any pollutant by any person" into "navigable waters" unless authorized by a permit or specific exception under the CWA. 33 U.S.C. §§ 1311(a), 1362(7) & (12) (2009).

**\*9** 61. The "CWA creates a regime of strict liability for violations of its standards."*Am. Canoe Ass'n v. Murphy Farms,* 412 F.3d 536, 540 (4th Cir.2005).*See*33 U.S.C. § 1311(a) (2009) ("Except as in compliance with [inapplicable exemptions], the discharge of any pollutant by any person shall be unlawful.").

62. To establish a prima facie violation under Clean Water Act Sections 301(a) and 404(a), 33 U.S.C. §§ 1311(a) & 1344(a), the United States must show that (1) Defendants are persons who controlled, performed, or were otherwise responsible for the activities at issue; (2) Defendants discharged pollutants; (3) from a point source; (4) into streams or wetlands that qualify as jurisdictional "waters of the United States;" (5) without a permit or other statutory authorization for such discharge, or in violation of a permit issued under CWA section 404. *See*33 U.S.C. §§ 1311(a), 1344(a), 1362 (2009) (definitions); *Avoyelles Sportsman's League, Inc. v. Marsh,* 715 F.2d 897, 922 (5th Cir.1983); *United States v. Lambert,* 915 F.Supp. 797, 802 (S.D.W.Va.1996).*See also United States v. Schallom,* 998 F.2d 196, 198 (4th Cir.1993) (discussing elements where criminal penalties were sought).

63. **Element 1–Persons**—"[P]erson[s]" subject to the CWA include individuals, partnerships, and corporations, 33 U.S.C. § 1362(5), and the Act applies to both the party who actually performed the work that causes a discharge and to the party with responsibility for or control over performance of the work. *See Lambert,* 915 F.Supp. at 802.

64. Defendants, Cody Bedford, an individual, and Bedford Tree Service, Inc., a corporation with a principal place of business in Virginia Beach, Virginia, are both "persons" within the meaning of the CWA section 502(5).

65. Defendants had responsibility for and control over the discharges of pollutants. Mr. Bedford owned the land, purchased or ordered materials used to fill the Site, and controlled, directed or performed the work. (Ex. 42—Deed; Exs. 26 and 56—fill material from Salmons Farms; Exs. 27–27k—fill material invoices from Bonney Bright Sand Co.; Ex. 33—Mr. Bedford acknowledges he was the one performing the work on the Site; Bedford Depo. 138:19–24, 139:15–18—acknowledging "cleaning" on his property for a month in 2005 using an E–70 excavator; 182:7–17—acknowledging receipt of dirt.) Bedford Tree Service owned equipment used on the Site (Ex. 37 p. 1), and was invoiced for fill materials by Bonney Brights Sand Co. (Exs.27–27k).

66. **Element 2–Discharge of Pollutants**—"Discharge of a pollutant" is defined broadly as "any addition of any pollutant to navigable waters from any point source."33 U.S.C. § 1362(12)(A) (2009).

67. CWA section 502(6) defines "pollutant[s]" to include fill materials such as "dredged spoil ... biological materials, ... rock, sand, [and] cellar dirt."33 U.S.C. § 1362(6) (2009). "Fill material" means any pollutant which replaces portions of a "water of the United States with dry land" or which "chang[es] the bottom elevation of a water of the United States."33 C.F.R. § 323.2(e) (2009).

**\*10** 68. Ditch-digging with attendant sidecasting, spreading of soils, mechanized land clearing, and depositing fill materials into wetlands all constitute the "addition" of pollutants into waters of the United States within the meaning of CWA section 502(12), 33 U .S.C. § 1362(12).*See United States v. Deaton,* 209 F.3d 331, 337 (4th Cir.2000); *Avoyelles,* 715 F.2d at 922;*Borden Ranch P'ship v. U.S. Army Corps of Eng'rs,* 261 F.3d 810, 815 (9th Cir.2001), *aff'd,*537 U.S. 99, 123 S.Ct. 599, 154 L.Ed.2d 508 (2002).

69. Defendants deposited at least 83 truckloads of fill material onto the Site, including forty-nine truckloads of sand and fill dirt from Bonney Bright Sand Co. (Tr. 134:22–24), thirty truckloads of sand and gravel from Salmons Farms (Ex. 56), four truckloads of dirt from Aegean Pools (Bedford Depo. 182:3–17), and an undisclosed amount of concrete scrap from a refuse pit (Bedford Depo. 154:14–19, 155:8–13). Each load of materials constituted an illegal discharge of a pollutant.

70. In addition, Defendants conducted mechanized clearing of trees and other vegetation, dug ditches, deposited spoil material, and graded the land, all resulting in the discharge of pollutants. (Tr. 81:22–82:2, 123:5–16; Ex. 2 pp. 4–15; Ex. 9; Ex. 34.)

71. **Element 3–From a Point Source**—The CWA defines a "point source" as "any discernible, confined and discrete conveyance."33 U.S.C. § 1362(14) (2009). The concept of a point source embraces "the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States."*United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979).

72. Courts have consistently held that dump trucks, backhoes, bulldozers, tractors, and other equipment used for mechanized land clearing and filling are all point sources under the CWA. *United States v. Tull,* 615 F.Supp. 610, 622 (E.D.Va.1983), *aff'd,*769 F.2d 182 (4th Cir.1985), *rev'd on other grounds,*481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *Borden Ranch,* 261 F.3d at 815;*United States v. Pozsgai,* 999 F.2d 719, 726 n. 6 (3d Cir.1993); *United States v. Huebner,* 752 F.2d 1235, 1243 (7th Cir.1985); *Avoyelles,* 715 F.2d at 922.

73. Defendants contracted for dump trucks to bring at least 83 dump truck loads of material onto the Site, totaling over 904 cubic yards of fill. (Tr. 134:1–6; Exs. 26, 27–27k, 56; Bedford Depo. 182:7–17.)

74. Given the large volume of fill material delivered to the Site, which was spread out over 1.27 acres of wetlands (Tr. 36:5–7), at a depth of 3.5 to 21 inches (Tr. 39:12–14), Defendants necessarily used a variety of mechanized equipment stored on Site to deliver and spread fill material across the wetlands, including but not limited to excavators or backhoes, bulldozers, and other equipment. (Tr. 115:3–18, 104:18–24; Ex. 33; Ex. 34 at DEZ000167.) Mr. Bedford admitted using an excavator to "clean" the Site (Bedford Depo. 138:19–24, 139:15–18), and he was sitting on a running bulldozer when Mr. Herbert with DEQ visited the Site (Tr. 104:19–24).

*11 75. The dump trucks and other pieces of equipment are all "point sources" within the meaning of the CWA section 502(14), 33 U.S.C. § 1362(14).

76. **Element 4–Jurisdictional "Waters of the United States**—"Under the CWA, the Corps and EPA have jurisdiction over all "navigable waters," and CWA section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" to encompass all "waters of the United States." 33 U.S.C. § 1362(7) (2009).

77. In *Rapanos v. United States,* 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), the Supreme Court issued a split decision interpreting "waters of the United States" as regulated by the CWA.

78. The plurality concluded the phrase "waters of the United States" includes "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams, ... oceans, rivers, [and] lakes.' " *Id.* at 739,*citing* Webster's Second 2882..

79. Moreover, "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id.* at 742.

80. Justice Kennedy concurred in the judgment, but rejected the plurality's findings, instead concluding that CWA jurisdiction extends to wetlands that possess a "significant nexus" to "navigable waters in the traditional sense."*Id.* at 779.

81. Justice Kennedy found that where wetlands are "adjacent to navigable-in-fact waters, [the United States] may rely on adjacency to establish its jurisdiction."*Id.* at 782.Where wetlands are adjacent to nonnavigable tributaries, "[a]bsent more specific regulations ... [the United States] must establish a significant nexus on a case-by-case basis."*Id.* Justice Kennedy further found that wetlands "possess the requisite nexus" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' " *Id.* at 780.

82. Justice Stevens' dissent, which was joined by three other justices, found CWA jurisdiction to extend to "wetlands adjacent to navigable waters or their tributaries."*Id.* at 808.The dissent concluded that "all four Justices who have joined this opinion would uphold the Corps' jurisdiction ... in all other cases in which either the plurality's or Justice Kennedy's test is satisfied...."*Id.* at 810.[3]

83. The Bedford Site meets both the plurality's and Justice Kennedy's tests for jurisdiction.

84. Before Defendants performed clearing and filling activities, the Bedford Site contained approximately 33 acres of wetlands, as defined in 33 C.F.R. § 328.3(c). (Tr. 47:20–48:9.)

85. "Wetlands" are "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions" and generally include "swamps, marshes, bogs, and similar areas."33 C.F.R. § 328.3(b) (2009).

*12 86. The wetlands on the Bedford Site satisfied each of the three criteria for wetlands under the Corps' 1987 Wetland Delineation Manual: the presence of (a) hydric soils, (b) hydrophytic vegetation, and (c) wetland hydrology. (Tr. 48:24–49:1, 31:23–32:1.) The majority of the Site still contains wetlands. (Tr. 49:3–15, 47:24–48:9.)

87. The wetlands on the Bedford Site meet the plurality's jurisdictional test because there is a continuous surface connection between the wetlands on the Bedford Site and the Southern Tributary (which flows along the southern border of the Bedford Site); specifically, the wetlands are adjacent to, contiguous with, directly abut, and drain into the Southern Tributary, and there is no clear demarcation between the wetlands at the Site and the Southern Tributary. (Tr. 75:3–10, 54:7–19.)

88. Further, the Southern Tributary is a perennial stream which carries flows of water throughout the year, and is a "relatively, permanent, standing or continuously flowing bod[y] of water,"*Rapanos,* 547 U.S. at 739, (Tr. 74:7–18), connected to traditional interstate navigable waters. *Id.* at 742.The Southern Tributary flows into Nawney Creek (approximately 800 feet from the Site (Tr. 55:3–9)), which flows into Back Bay (approximately 1000 feet from the Site (Tr. 54:13–19, 55:3–14)), and eventually flows into the Atlantic Ocean at Oregon Inlet, off of the Outer Banks of North Carolina. (Tr. 58:10–14, 74:19–75:2; Ex. 15.)

89. Therefore, the Southern Tributary is a water of the United States, and the adjacent wetlands are covered by the CWA under the plurality's test. *Rapanos* at 742.

90. The wetlands on the Bedford Site also satisfy Justice Kennedy's standard because they are adjacent to the Southern Tributary, which is navigable-in-fact (Taylor Depo. 14:2–9; Tr. 61:5–14, 74:7–18). [4]

91. Even if the Court were to find the Southern Tributary is not navigable-in-fact, the wetlands at the Site pass Justice Kennedy's significant nexus test. The wetlands on the Site have a direct hydrological surface connection to Nawney Creek, Back Bay, and other downstream navigable-in-fact waters. (Tr. 54:13–19.) Further, the proximity of these wetlands, within 1000 feet of both Nawney Creek and Back Bay, establishes that these wetlands, along with "similarly situated [wet]lands in the region, significantly affect the chemical, physical, and biological integrity" of navigable waters. *Rapanos,* 547 U.S. at 780–81.

92. Under either the plurality's or Justice Kennedy's jurisdictional tests, wetlands on the Bedford Site constitute "waters of the United States" regulated by the CWA.

93. **Element 5–Without a permit**—CWA section 404 specifically authorizes the Corps to issue permits allowing the discharge of "dredged or fill material" into waters of the United States. 33 U.S.C. § 1344(a) (2009)."[A]ny discharge of dredged or fill material into 'navigable waters'—defined as the 'waters of the United States'—is forbidden unless authorized by a permit issued by the Corps of Engineers pursuant to section 404, 33 U.S.C. § 1344."*United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 123, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Deaton,* 209 F.3d at 334.

*13 94. The Defendants did not apply for or obtain a permit from the Corps or receive any other authorization under CWA section 404 for the discharge of dredged or fill material to wetlands on the Bedford Site. (Tr. 79:18–25.)

95. Therefore, the Defendants' filling, clearing, and excavating activities at the Bedford Site without a permit resulted in a discharge of pollutants into waters of the United States and violated the CWA, 33 U.S.C. § 1311(a).

96. This illegal filling has real consequences for the local environment as wetlands provide important functions for the environment, such as "water quality treatment, flood storage, as well as habitat for flora and fauna."(Tr. 72:11–14.)

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO REMEDY

97. In furtherance of the CWA's goal "to restore and maintain the chemical, physical and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), the CWA authorizes the United States to seek "appropriate relief, including a permanent or temporary injunction," for violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1319(a)(3) (2009).

98. The United States seeks a permanent injunction ensuring the preservation of twenty-four acres of wetlands that remain on the Bedford Site through a conservation easement or deed restriction.[5] (Closing Argument at 10.)

99. In order to receive a permanent injunction, the United States must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MerchExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

100. The Supreme Court has found that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

101. Wetlands "constitute a productive and valuable resource, the unnecessary destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1) (2009).

102. The CWA does not provide for an award of damages, and no monetary award could restore the benefits of these wetlands destroyed by the Defendants.

103. Further, Defendants' repeated noncompliance with the CWA and refusal to cooperate with the Corps and DEQ forclose any equitable argument against injunctive relief which would serve the public interest. *See Pozgai,* 999 F.2d at 736.

104. Therefore, the United States has satisfied the four-factor *eBay* test, and is entitled to appropriate injunctive relief under 33 U.S.C. § 1319(b).

*14 105. The Court must evaluate the United States' remediation proposal considering the following three factors:

> (1) whether the proposal "would confer maximum environmental benefits," (2) whether it is "achievable as a practical matter," and (3) whether it bears "an equitable relationship to the degree and kind of wrong it is intended to remedy."

*Deaton,* 332 F.3d at 714, citing *United States v. Cumberland Farms of Conn., Inc.,* 826 F.2d 1151, 1164 (1st Cir.1987).

106. CWA violations may be remediated in a variety of ways, but restoration of a violation site to its pre-violation condition is the preferred remedy. *See Cumberland Farms,* 826 F.2d at 1161–65.

107. Other forms of remediation are compensatory mitigation, such as purchasing credits at a mitigation bank to accomplish off-site creation of wetlands (Tr. 63:6–8; 63:21–25), or ensuring the preservation of existing wetlands (Tr. 63:25–64:2, 65:9–12).

108. In this case, restoration is not achievable as a practical matter. Mr. Bedford's actions to date show it is very unlikely that he will comply with Court orders which require his action or cooperation.[6]

109. Mr. Bedford has repeatedly demonstrated his contempt for legal authority.

110. Bert Parolari, the DEQ Environmental Manager who became involved with the Bedford Site violations when the complaint escalated to an adversarial point, stated Mr. Bedford is "probably the least cooperative individual [he has]

ever dealt with in [his] State career."(Tr. 3:9–4:8; 129:23–130:4.)

111. Mr. Bedford refused to cooperate with DEQ when Kristen Shacochis–Brown attempted to address the Bedford Site violations from January 2005 through the Fall of 2005. (Tr. 127:14–17.)

112. Army Corps Field Investigator Randy Steffey noted that Mr. Bedford never applied for a permit, despite multiple warnings and two cease and desist orders from the Corps. (Tr. 79:18–80:6.)

113. Mr. Bedford resides in Mississippi and has indicated his intent to remain beyond this Court's jurisdiction, informing the United States Attorney that he did not intend to come to Virginia for fear of being arrested. (Tr. 3:23–4:5.)

114. Mr. Bedford told Dr. Briede that he would rather move to Mexico than be subject to the consequences of failing to comply with the CWA. (Tr. 114:2–3.)

115. Mr. Bedford failed to attend the Final Pre-trial Conference held on October 10, 2008, and the evidentiary hearing held October 22, 2008.

116. Mr. Bedford filed a Chapter 13 bankruptcy case in the Southern District of Mississippi (Ex. 39, 40), which was dismissed July 17, 2008, due to Mr. Bedford's failure to comply with the Court's orders (Ex. 41).

117. Consequently, a conservation easement or deed restriction preserving wetlands on the Site is the most achievable plan as a practical matter, and when done in an appropriate ratio confers significant long-term net benefits to offset the harm caused by the violation. (Tr. 64:23–65:3, 67:20–68:21.)

*15 118. Were no restriction placed on the remaining Bedford Site wetlands, Defendants could have the Site logged, or could potentially obtain a permit for further impact to the Site. (Tr. 69:3–13.)

119. Unregulated activities such as logging could harm or destroy the character of the wetlands. (Tr. 69:8–70:8.) Logging removes trees, which act as sponges in forested wetlands, soaking up water. *Id.* Without its trees, a forested wetland could become wetter, resulting in a change in the character of the wetlands and a loss of habitat. *Id.*

120. Mr. Steffey, the Army Corps field investigator and environmental scientist who investigated the violations on the Bedford Site, and an expert in the field of wetland restoration and mitigation (Tr. 65:13–15), opined that a twenty-to-one ratio for preservation is an appropriate remedy for the violations at the Bedford Site. (Tr. 68:22–70:8.) In other words, twenty-four acres of existing wetlands would need to be preserved in order to off-set the damage caused when the Defendants cleared and filled 1.277 acres of wetlands. (Tr. 71:6–13.)

121. Mr. Steffey opined that preserving the acreage surrounding the Southern Tributary would best benefit the environment, as it would preserve a "contiguous block" of wetland territory closest to the tributary. (Tr. 72:1–14.)

122. Mr. Steffey indicated on Exhibit 10 the approximate boundary of the twenty-four acres for which the United States is requesting the conservation easement or deed restriction. (Tr. 139:6–13; Ex. 10.)

123. This easement or deed restriction bears an equitable relationship to the degree and kind of wrong committed by Defendants at the Site. Mr. Bedford's intentional, unlawful clearing, grading and filling activities continued after the Corps and DEQ attempted to gain Mr. Bedford's cooperation in complying with the law, and no mitigating evidence has been presented in favor of Defendants.

124. Accordingly, the most appropriate remedy for the Defendants' CWA violations is the creation of a conservation easement or deed restriction ensuring preservation of twenty-four acres of wetlands on the Bedford Site.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO CIVIL PENALTIES

125. The Clean Water Act expressly provides "[a]ny person who violates [sections 301, 402, or 404] ... shall be subject to a civil penalty not to exceed $25,000 per day for each violation."33 U.S.C. § 1319(d). EPA regulations have adjusted the amount to $32,500 per day to account for inflation. 69 Fed.Reg. 7121, 7125 (Feb. 13, 2004).

126. "The main purpose of the penalty is to deter the violator and others from committing future violations."*United States v. Smithfield Foods, Inc.,* 972 F.Supp. 338, 352

(E.D.Va.1997), *aff'd in part, rev'd in part on other grounds,* 191 F.3d 576 (4th Cir.1999); *see also Tull v. United States,* 481 U.S. 412, 422, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

127. The statute sets out six factors intended to assist the Court in determining the appropriate civil penalty amount: "[1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good-faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] such other matters as justice may require." 33 U.S.C. § 1319(d) (2009).

*16 128. The Court may calculate the amount of civil penalty through either a "top-down" or "bottom-up" approach. *See Smithfield Foods,* 191 F.3d at 528 (describing the two approaches).

129. Under the "top-down" approach, the court begins by determining the statutory maximum penalty amount. *Id.* (citing cases applying the "top-down" approach). Then, it adjusts that figure downward based on evaluation of the factors set forth in section 309(d), 33 U.S.C. § 1319(d). *Id.*

130. The maximum statutory penalty is $32,500 per day per violation for the period when the violations occurred. 69 Fed.Reg. at 7125; 40 C.F.R. § 194, Table 1 (2006).

131. The number of violations committed by Defendants is calculated based on the number of individual discharges of pollutants to waters of the United States. *See, e.g., Borden Ranch,* 261 F.3d at 816–18. Defendants discharged at least 83 truckloads of fill material onto the Site.[7]

132. For violations of CWA sections 301 and 404 that involve filling wetlands, each day that the fill material remains in the wetlands constitutes a separate day of violation. *See, e.g., Sasser v. EPA,* 990 F.2d 127, 129 (4th Cir.1993). Given that the Defendants have made no effort to remove the fill or restore the wetlands, the number of days in which Defendants have remained in violation should reflect the entire time period from July 2004, when the unauthorized discharges of dredged or fill material began, to the date of the evidentiary hearing—approximately 1550 days.

133. Therefore, a conservative estimate of the maximum statutory penalty is $53,072,500 ((83[8] + 1,550) x $32,500).

134. Under the circumstances of this case, the Court finds a calculation using the bottom-up approach to be more useful as a practical matter.

135. Under the "bottom-up" approach, the court begins with the violator's estimated economic benefit and them adjusts up or down based on the other 309(d) factors, as well as the goals of retribution and deterrence. *See Smithfield Foods,* 191 F.3d at 528. The precise economic benefit gained by violating the CWA may be difficult to prove, so "reasonable approximations of economic benefit will suffice." *Id.* at 529 (citations omitted).

136. Mr. Bedford testified that he had paid over $10,000 in fines to the City of Virginia Beach for parking violations, and avoiding these fines was his reason for purchasing the Site. (Bedford Depo. 111:2–7.) Based on this, the Court estimates the economic benefit Defendants gained from filling activities at the Site to be $45,000, or approximately $10,000 per year since the violations began in July 2004.

137. Next, the Court will consider the evidence supporting an adjustment of the fine under the Section 309(d) factors.

138. **Seriousness of the violations:** In determining the seriousness of the violations, the Court will consider the number, frequency and duration of the violations, as well as the impact on the environment and the public. *See Smithfield Foods,* 972 F.Supp. at 343.

*17 139. Defendants discharged over 83 truckloads of fill material from July 2004 to July 2005, in addition to clearing and excavating activities, effectively filling at least 1.277 acres of wetlands (Tr. 36:5–7) to a depth of 3.5 to 21 inches. (Tr. 39:12–14.)

140. The value of wetlands to humans and the environment, and the damage that filling those wetlands can cause, is well recognized. *See Deaton,* 209 F.3d at 336. *See also Riverside Bayview,* 474 U.S. at 133–135.

141. This illegal filling has real consequences for the local environment as wetlands provide important functions for the environment, such as "water quality treatment, flood storage, as well as habitat for flora and fauna." (Tr. 72:9–14.)

142. **History of violations:** "In determining the 'history of such violations,' courts consider the duration of Defendants' current violations, whether Defendants have committed

similar violations in the past, and the duration and nature of all of the violations, including whether the violations are perpetual or sporadic." *Smithfield Foods,* 972 F.Supp. at 349.

143. While this is the first CWA violation by the Defendants of which the United States is aware (Pl's. Closing Argument at 26), Defendants flagrantly violated the CWA for approximately one year after having been instructed to cease work until a permit had been obtained.

144. ***Good-faith efforts to comply with the applicable requirements:*** Defendants have made no "good faith" effort to comply with the CWA permit process, no effort to decrease the number of their violations, and no effort to mitigate the impact of their activities on the wetlands on the Bedford Site.

145. Based on discussions with wetlands consultants, as well as with State and Federal regulatory officials, Mr. Bedford was aware of the permit requirements of section 404 of the CWA, and was aware that his property contained wetlands. Yet, Defendants continued filling the Site through at least July 2005 without applying for the necessary permit, or filing an administrative appeal pursuant to 33 C.F.R. pt. 331 to the Corps jurisdiction over the Site.

146. ***Economic impact of the penalty on the violator:*** To serve a deterrent function, the amount of a civil penalty must be "high enough so that the discharger cannot 'write it off' as an acceptable environmental trade-off for doing business." *United States v. Gulf Park Water,* 14 F.Supp.2d 854, 869 (S.D.Miss.1998).

147. Mr. Bedford disregarded the United States' discovery requests, including a request for tax information dating to 2002 (Doc. 47—Motion for Sanctions based on Mr. Bedford's failure to produce discovery including tax information), and disregarded the Court's July 28, 2008 Order that he fully answer discovery requests by August 11, 2008 (Doc. 41). As a result, Defendants produced no financial data which would establish that they are unable to pay a penalty otherwise required by law.

148. Included in The United States's exhibits are bankruptcy schedules filed in Mr. Bedford's Chapter 13 bankruptcy case in Mississippi on April 10, 2007, which show a monthly income of $4,329 .47. (Ex. 40.) [9]

*18 149. In summary, it is impossible to determine with any precision the environmental impact caused by Defendants' filling, clearing, and excavating activities at the Bedford Site from July 2004 through July 2005. However, Defendants' flagrant disregard for the admonitions of state and federal environmental agencies, and refusal to participate in any of the administrative procedures designed to protect both the environment and the rights of property owners, weighs in favor of a significant civil penalty.

150. Accordingly, the Court recommends that the appropriate civil penalty for Defendants' CWA violations at the Bedford Site is $$90,000 which is double the economic benefit to the Defendants.

151. Mr. Bedford orchestrated the CWA violations individually and through his company, Bedford Tree Services, Inc. Therefore, Defendants are jointly and severally liable for this penalty.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that judgment by default be entered in favor of the United States and against Defendants pursuant to Rule 55(b) of the Federal Rules of Civil Procedure. The Court should create a conservation easement or deed restriction ensuring preservation of the southernmost twenty-four acres of wetlands on the Bedford Site. The Court should enter judgment in the amount of $90,000 for the United States against Defendants jointly and severally.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.

*Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Carr v. Hutto,* 737 F.2d 433 (4th Cir.1984), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

Footnotes

1    *See infra* Part I.
2    The Bedford Site is a 33–acre parcel of land owned by Cody Bedford. It is located between 1315 and 1317 Mill Landing Road, Virginia Beach, Virginia, and identified as GPIN 2319792629000. (R & R 2.)
3    The government recommends a deed restriction on 23.25 acres—rather than 24 acres—of wetlands on the Bedford Site. The Magistrate Judge recommended a 24–acre deed restriction or conservation easement based on expert testimony "that a twenty-to-one ratio is an appropriate remedy for the violations at the Bedford Site," requiring preservation of "twenty-four acres of existing wetlands ... to off-set the damage caused when the Defendants cleared and filled 1.277 acres of wetlands."(R & R 21.)As the government did not timely object to the Magistrate Judge's recommendation of preserving 24 acres, this issue does not require the court's *de novo* review. Moreover, the subordination agreement between the United States and Jack Taylor provides for a deed restriction that "does not exceed 24 acres," showing that the mortgagee has agreed to a abide by the terms of a deed restriction on a full 24 acres of the Bedford Site. (Mot. to Impose a Deed Restriction Ex. A.)
4    On April 20, 2009, the United States entered into a subordination agreement with Jack Taylor ("Taylor"), who holds the mortgage to the Bedford Site. (Mot. to Impose a Deed Restriction 2; Ex. A.) The subordination agreement ensures protection of these wetlands if Taylor forecloses on the mortgage. *Id.* In the event of foreclosure, Taylor must place a conservation easement on the Bedford Site that is coextensive or more protective of the property than the court's deed restriction, or Taylor's interest in the Bedford Site will be subordinated to this Final Order. *Id.*
1    Portions of Mr. Bedford's deposition taken August 21, 2008, were entered into evidence at the evidentiary hearing due to Mr. Bedford's failure to appear at the hearing. (Tr. 135:21–24.)
2    The deed to the Site transfers an easement to a 25–foot strip of land accessing Nawney Creek for the purposes of docking a boat. (Ex. 42 at US000034.)
3    The Seventh and Ninth Circuit Courts interpreting *Rapanos* have applied Justice Kennedy's test to find CWA jurisdiction. *See United States v. Gerke Excavating, Inc.,* 464 F.3d 723, 724 (7th Cir.2006); *N. California River Watch v. City of Heraldsburg,* 496 F.3d 993, 999–1000 (9th Cir.2007). The First and Eleventh Circuit Courts have found that the United States can prove jurisdiction by meeting either the plurality's or Justice Kennedy's standard as laid out in *Rapanos.See United States v. Johnson,* 467 F.3d 56, 66 (1st Cir.2006); *United States v. Robison,* 521 F.3d 1319 (11th Cir.2008).
4    Mr. Steffey testified that the Southern Tributary is navigable; however, navigating into Nawney Creek is restricted by a culvert system where Mill Landing Road crosses the Southern Tributary (Tr. 74:7–18; Ex. 12). The Court finds that this culvert system does not preclude a finding that the Southern Tributary is navigable-in-fact. *See Rapanos,* 547 U.S. at 779–82 (discussing navigable-in-fact waters).
5    The Bedford Site is approximately 33 acres. (Taylor Depo. Ex. 3–Deed "33.5514 Acres"; Ex. 42 at US000030–31–Settlement Statement "32 Acre".) The entire Site, with the exception of a. 1 acre knoll near the Site's cul-du-sac and the 1.277 acres Defendants filled, are wetlands. (Tr. 47:20–48:13.)
6    An outside contractor would likely charge $27,500 to restore each half-acre filled by the Defendants (Tr. 65:24), or $69,850 to restore the 1.277 acres the Defendants filled. Further, if the Court were to order Defendants to buy mitigation bank credits to create wetlands off-site, it would cost $95,775 to acquire 3.83 acres of wetlands to reach a three-to-one ratio, the appropriate ratio for off-site mitigation. (Tr. 67:5–68:21.)
7    Forty-nine loads were delivered to the Site from Bonney Bright Sand Co. (Tr. 134:24; Ex. 27–27k), 30 loads from Salmons Farms (Ex. 56), four loads from Aegean pools (Bedford Depo. 182:7–17), and an undisclosed amount of concrete from a refuse pit (Bedford Depo. 154:16–19).
8    This estimate of the number of violations is very conservative. *See, e.g., Borden Ranch,* 261 F.3d at 816–18 (each pass of a bulldozer through waters constituted a separate violation).

9   A separate bankruptcy schedule also dated April 10, 2007, shows a monthly income of $5,759.58. (Ex. 39.)

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.