# EXHIBIT 16

2011 WL 797673
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.

Patricia STEPHENS, et al.
v.
CITY OF MORRISTOWN, TENNESSEE.

No. 2:08–CV–96. | March 1, 2011.

**Attorneys and Law Firms**

Gary A. Davis, James S. Whitlock, Gary A. Davis & Associates, Hot Springs, NC, for Patricia Stephens, et al.

Jon G. Roach, Dan R. Pilkington, Robert H. Watson, Jr., Watson, Roach, Batson, Rowell & Lauderback PLC, Knoxville, TN, Richard C. Jessee, Bacon, Jessee & Perkins, Morristown, TN, for City of Morristown, Tennessee.

## *MEMORANDUM OPINION AND ORDER*

J. RONNIE GREER, District Judge.

**\*1** This matter is before the Court to assess civil penalties against the City for its violations of the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA"), 33 U.S.C. § 1251–1387 (2011). Specifically, the jury found that the City violated its NPDES permit by "failing to enforce the [IUP] for Koch Foods or by failing to prevent prohibited discharges from Koch Foods into the Morristown Sewer System," and the Court found the City violated the CWA via the July 19, 2007 overflow.[1] As a result, this Court must decide the issue of civil penalties for the CWA violations.

A more detailed account of this case's procedural background is adequately set forth in this Court's August 31, 2010 Memorandum Opinion and Order. *See* [Doc. 306, pages 1–4]. In that Opinion, the Court denied the City's Rules 50(b) and 59 motion. On February 18, 2011, this Court entered an Enforcement Order based on the City's CWA violations. The findings regarding the July 19, 2007 overflow are set forth in this Court's August 24, 2010 Memorandum Opinion and Order. Further analysis of the jury's verdict regarding the CWA violation is set forth in the August 31, 2010 Memorandum Opinion and Order. In addition to these findings, after hearing all of the evidence at trial and at the post-trial hearing, the Court finds the following:[2]

The United States Environmental Protection Agency ("EPA"), under the CWA, issued the City a National Pollutant Discharge Elimination System permit ("NPDES permit"), No. TN 0023507, via the Tennessee Department of Environment and Conservation ("TDEC"). The NPDES permit authorizes the Morristown Sewer Treatment Plant to discharge treated municipal wastewater into the Holston River at Mile 75. According to the permit, the City is a "control authority" for enforcing general pretreatment regulations. The City contracted Veolia Water North America ("Veolia") for the operation of the Morristown sewer system. Under the NPDES Permit and the Morristown Water Pollution Control Ordinance ("City Ordinance"), the City issues Industrial User permits to industrial facilities. These permits authorize the discharge of wastewater into the Morristown sewer system under certain conditions.

More specifically, the permit states that the City "shall implement and enforce the Industrial Pretreatment Program in accordance with Section 403(b)(8) of the Clean Water Act, the Federal Pretreatment Regulations 40 CFR 403, Tennessee Water Quality Control Act Part 63–3–123 through 63–3–128 ...." The City is required to do the following, in pertinent part:

> a. Carry out inspection, surveillance, and monitoring procedures which will determine, independent of information supplied by the Industrial user (IU), whether the IU is in compliance with the pretreatment standards;
>
> b. Require development, as necessary, of compliance schedules for each IU for the installation of control technologies to meet applicable pretreatment standards;
>
> **\*2** c. Require all industrial users to comply with all applicable monitoring and reporting requirements outlined in the approved pretreatment program and IU permit; [and]
>
> d. Maintain and update, as necessary, records identifying the nature and character of industrial user discharges, and retain such records for a minimum of three (3) years[.]
>
> ....

In addition, the NPDES permit requires the City to "enforce 40 CFR 403.5 prohibited discharges." The permit also states that the City "shall at all time properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the [City] to achieve compliance with the terms and conditions

of [the] permit." Finally, regarding overflows and upsets, the permits states, "Overflows are prohibited." An overflow "means the discharge to land or water of wastes from any portion of the collection, transmission, or treatment systems other than through permitted outfalls." An upset "means an exceptional incident in which there is unintentional and temporary noncompliance with technology-based effluent limitations because of factors beyond the reasonable control of the [City]." Additionally,

> "An upset shall constitute an affirmative defense to an action brought for noncompliance with such technology-based permit effluent limitations if the [City] demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:
>
> i. An upset occurred and that the [City] can identify the cause(s) of the upset;
>
> ii. The permitted facility was at the time being operated in a prudent and workmanlike manner and in compliance with proper operation and maintenance procedures;
>
> iii. The [City] submitted information required under "Reporting of Noncompliance" within 24–hours of becoming aware of the upset (if this information is provided orally, a written submission must be provided within five days); and
>
> iv. The [City] complied with any remedial measures required under "Adverse Impact."

Koch Foods operates a poultry debone plant ("Plant 2") at 1620 Progress Parkway in the East Tennessee Progress Center Industrial Park ("ETPC"), Morristown, Tennessee. Plant 2 processes chickens by cutting the meat for breasts, wings, and tenders. The chickens are supplied by a separate Koch Foods facility in Morristown. After processing, the meat is taken to other Koch Foods facilities for cooking or further processing. The operations conducted at Plant 2 were once conducted at another Koch Foods facility ("Plant 1") located at 4901 East Morris Boulevard in Morristown. The operations were transferred in February 2005.

Prior to the transfer of the operations, on April 30, 2003, the City issued an Industrial User permit ("IU permit"), No. 1017, to Koch Foods, Plant 1, and the IUP was subsequently transferred to Plant 2.[3] The permit regulates Koch Foods' discharges into the City's sewer system, including the amount of effluent of compatible pollutants from the outfall.

*3 Also, Part five, section B, condition two stated, "The permittee must comply with all conditions of this permit. Failure to comply with the requirements of this permit may be grounds for administrative action, or enforcement proceedings including civil or criminal penalties, injunctive relief, and summary abatements." Condition five stated that the permit may be terminated for "failure to meet effluent limitations." Condition eleven stated the "General Prohibitive Standards," which included in pertinent part:

> The permittee shall not discharge wastewater into the public sewer, POTW [publicly owned treatment works], or any receiving stream any of the following described pollutants:
>
> ....
>
> c. Solid of viscous substances such as ashes, cinders, sand, mud, straw, shavings, metal, glass, rags, feathers, tar, plastics, woods, paunch, or manure capable of causing obstructions or other interference with the proper operation of the treatment plant:
>
> d. Any pollutant, including BOD and COD pollutants, released at a flow rate and/or pollutant concentration that either alone, or in interaction with other substances, will cause interference with the treatment plant or constitute an adverse environmental impact;
>
> ....
>
> g. Pollutants which contain noxious, malodorous gases or substances in quantities that would constitute a public nuisance or hazard to life, or that might result in the creation of toxic gases, vapors, or fumes with the POTW;
>
> ....
>
> p. Wastewater containing any element or compound known to act as a lacrimator, known to cause nausea, or known to cause odors constituting a public nuisance.

Part six stated the following:

> The City may accept waste for treatment at the POTW that contains excessive quantities of compatible pollutants. In the event the City elects to accept such waste for treatment, a surcharge shall be charged based upon the strength of the discharge up to the

maximum levels established herein. Wastes that exceed the maximum levels established herein shall be deemed noncompatible, and shall not be accepted for treatment by the POTW except as specified herein. The surcharge for compatible pollutants shall be calculated as established in Appendix B "Surcharge Fees."

The permit does not include a list of the maximum levels. Appendix B lists a formula for calculating the surcharge and listed the price per pound for BOD, TSS, and FOG.

City Ordinance section 18–403(2) subsections (q) and (t) define BOD, TSS, and FOG as compatible pollutants and conventional pollutants. The ordinance also defines industrial surcharge as "[a] cost recovery system establishing a fee to be collected from industrial and commercial users that contribute excessive amounts of compatible pollutants into the POTW."

Basically, the City funds the wastewater collection and treatment system through an enterprise fund in which the operational expenses are funded by revenues generated by wastewater collection and treatment operations— wastewater treatment and pretreatment fees.[4] These include any surcharge fees assessed against an industrial user whose wastewater exceeds the numeric limits set forth in the user's IUP.[5]

*4 Koch Foods Plant 2 began operating in February 2005 and began discharging wastewater into the Witt sewer line. The City installed and operates (via Veolia) the Witt sewer line. The line includes four pump stations—Witt 1, Witt 2, Witt 3, and a station inside the ETPC. The sewer line runs from the ETPC through the Witt and Roe Junction Communities to the Morristown Sewer Treatment Plant.

Shortly after operations began at Plant 2, the City started receiving complaints from residents of the Witt and Roe Junction area alleging that foul odors emanated from manholes and pump stations in the Witt and Roe Junction communities.

The following is a list of actions taken by the City up to the time of trial as a result of Koch Foods' discharges:

1. September 27, 2005–Notice of Violation Interference POTW and Issuance of Compliance Order 05–002;[6]

2. July 18, 2006–Notice of Violation of Compliance Order 05–002;

3. November 10, 2006–Notice of Administrative Hearing 06–001;

4. December 20, 2006–Issuance of Administrative Order 06–001;

5. February 5, 2007–Notice of Violation: pH violation 11–15–06;

6. February 6, 2007–Notice of Violation: Accidental Polymer Discharge 01–22–07;

7. March 6, 2007–Notice of Violation: pH violation 01–30–07;

8. March 13, 2007–Notice of Violation: pH violation 02–28–07;

9. April 3, 2007–Notice of Violation: pH violation 03–19–07;

10. April 4, 2007–Notice of Violation: pH violation 03–28–07;

11. April 27, 2007–Compliance Schedule included in IU Permit 1017 effective May 1, 2007;

12. December 31, 2007–Notice of Violation: pH violation 10–31–07; and

13. August 20, 2008–Notice of Violation of Administrative Order 06–001 and Notice of Administrative Hearing 08–001.[7]

The City has also reported 14 overflows on the Witt sewer line to the Tennessee Department of Environment and Conservation ("TDEC") from July 9, 2005, to June 26, 2008. These include:

1. Dry weather overflow on the Witt 2 Lift Station on July 9, 2005 due to loss of control power;

2. Dry weather overflow of the collection system at a manhole located near 2805 Sulphur Springs Road on December 16, 2005, due to a leaking air release valve;

3. Overflow of the collection system occurred at the inlet manhole to the Witt 3 Lift Station on July 13, 2006, due to loss of electrical power;

Case 2:10-md-02179-CJB-DPC   Document 13811-16   Filed 12/09/14   Page 5 of 8
Stephens v. City of Morristown, Tenn., Not Reported in F.Supp.2d (2011)
2011 WL 797673

4. Dry weather overflow of the collection system occurred at a manhole located at 1025 Sulphur Springs Road on August 31, 2006;

5. A leak was observed at the Witt 2 Lift Station causing wastewater to be released intermittently on March 6, 2007;

6. Power was interrupted at Witt 3 Lift Station located at Claude Collins Road on May 3, 2007 due to lightening damaged an electrical transformer. It is estimated that 5,000 gallons bypassed the system;

7. Dry weather overflow of the collection system occurred at the Witt 2 Lift Station on June 20, 2007;

8. Dry weather overflow of the collection system occurred at the Witt 2 Lift Station on July 12, 2007, due to inoperable pump;

*5 9. Overflow on July 19, 2007 due to power outage at Witt 3 Lift Station;

10. Overflow on August 2, 2007 due to power outage at Witt 3 Lift Station;

11. Wet soils were discovered at 890 Old Witt Road directly west of Witt 2 Lift Station on January 7, 2008. It was determined that the wastewater originated from the Witt 2 force main beneath Old Witt Road;

12. Dry weather overflow of the collection system occurred at a clean out located at 2175 Sulphur Springs Road on January 11, 2008, due to an undetermined blockage;

13. Overflow of the collection system occurred at the Witt 2 Lift Station on January 26, 2008; and

14. Dry weather overflow of the collection system occurred at the Witt 2 lift station on June 26, 2008.

The July 19, 2007 overflow, which is the only one properly before the Court, resulted in 10,000 gallons of raw sewage which bypassed the collection system. The raw sewage flowed from the manhole into the street and the surrounding area where a creek is located nearby.

At the post-trial hearing, the City presented witnesses regarding steps the City had taken since trial to improve the Witt sewer line. The City has attempted to control hydrogen sulfide, issued purchase orders for the fabrication of aluminum covers for the wet wells, and initiated other improvements recommended by Lamar Dunn. The City represented at the hearing that these improvements would be finished by June 30, 2011. In addition, the City has purchased a wastewater treatment plant in the Lowland Community in order to provide service to the southern portion of Hamblen County. Moreoever, the City is under TDEC orders to perform certain actions. If the specified actions are not taken, then the City is subject to penalties. The odor complaints from the community have declined, but they have not been eliminated.

Finally, at the hearing, the City offered evidence regarding the pretreatment program's fees and the City's budget. The pretreatment program is funded by permit fees and reimbursement of analytical costs by industries and surcharge fees. "The total surcharge fees collected for the entire system was $122,219.00 for Fiscal 2006, $190,005.00 in Fiscal 2007, $195,324.00 in Fiscal 2008 and $253,661.00 in Fiscal 2009. For Fiscal 2010, the total surcharge fees were $195,106.00." *See* [Doc. 303, pg. 14] (citing Krebs, May 11, 2010, p. 48–49). Furthermore, "[t]he Koch Foods Debone Plant in Fiscal 2006 paid surcharges of $11,595.00, in Fiscal 2007, $8,508.00, in Fiscal 2008, $30,497.00, in Fiscal 2009, $3,514.00, and in Fiscal 2010 through April, $1,235.00."*Id.* (citing Krebs, May 11, 2010, p. 49–50).

As to the City's budget, the Court adopts several paragraphs from the City's Proposed Findings of Fact and Conclusions of Law, [Doc. 303]:

> 149. The City operates out of two types of funds. There are enterprise funds and the general fund. (Brian Janish, May 11, 2010, p. 115).
>
> 150. The enterprise funds are funded by revenues from the service provided by the City. The sewer fund is an enterprise fund. (Brian Janish, May 11, 2010, p. 115).
>
> *6 151. The remaining services, such as police and fire protection, public work, sanitation, zoning, planning, inspections and so forth are funded by sales tax, property tax, state shared taxes. (Brian Janish, May 11, 2010, pp. 115–116).
>
> 152. The City's budget for Fiscal 2010 is Exhibit 407. (Brian Janish, May 11, 2010, p. 116).
>
> 153. The audit report for the City of Morristown for the period ending June 30, 2009 is Exhibit 408. These two documents are reflective of the current status of the City's finances. (Brian Janish, May 11, 2010, p. 117).

154. The City's FY 2010 budget was adjusted in November of 2009 as a result of a deteriorating economic picture. (Brian Janish, May 11, 2010, p. 118).

155. The City's sales tax revenues declined by six percent (6%) in 2010 after having dropped seven percent (7%) in Fiscal 2009. (Brian Janish, May 11, 2010, p. 118).

156. As a result of declining revenues, the City of Morristown cut one million dollars ($1,000,000) out of their budget, part of which was reductions in employee's pay (an hour and a half's pay per week), as well as operating expenses. (Brian Janish, May 11, 2010, p. 118–119).

157. Approximately one-third of the City's general fund revenue comes from sales tax. (Brian Janish, May 11, 2010, p. 120).

158. The other major source of revenue for the general fund is the property tax, which has shown little or no growth, and the number of people paying their taxes on time has gone down. (Brian Janish, May 11, 2010, p. 120).

159. The City's sewer fund has suffered a decrease in net assets of $886,542.00 for the Fiscal Year 2009 (June 30, 2009). (Brian Janish, May 11, 2010, p. 121).

160. The unemployment rate for the City of Morristown has increased from 7.8% in 2008 to over 12% by November 2009. (Brian Janish, May 11, 2010, p. 121).

161. The City has undertaken steps to increase its sewer revenues by enacting an 8% rate increase. (Brian Janish, May 11, 2010, p. 122).

162. In spite of the 8% rate increase, the revenues are only up approximately 4%. (Brian Janish, May 11, 2010, p. 122).

163. It is anticipated that there will be another net negative change in net assets for the fiscal year ending June 30, 2010 on top of the negative change of $886,542.00 in Fiscal Year 2009. (Brian Janish, May 11, 2010, p. 123).

....

165. The City forecasts that another rate increase of approximately 25% will be necessary in order to make ends meet for Fiscal 2011. (Brian Janish, May 11, 2010, p. 124).

Now, this Court must decide the amount of civil penalties, if any. Contrary to the City's contention that no civil penalty should be assessed because it is a municipality and the burden would essentially be on the taxpayers, the plain language of the statute seems to mandate some sort of penalty. It states:

> Any person who violates section 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator, or by a State, or in a permit issued under section 1344 of this title by a State, or any requirement imposed in a pretreatment program approved under section 1342(a)(3) or 1342(b)(8) of this title, and any person who violates any order issued by the Administrator under subsection (a) of this section, **shall be subject to a civil penalty not to exceed $25,000 per day for each violation.** In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require. For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation.

*7 33 U.S.C. § 1319(d) (2011) (emphasis added).[8] It is also clear that the Court shall consider six different factors in deciding the appropriate penalty. *Id.* In making the determination, if the Court so decides it shall impose a penalty, the City argues that the Court should just consider the factors and not follow a top-down or a bottom-up approach. It also emphasizes that the Court should consider its good faith reliance on TDEC. The plaintiffs argue that the Sixth Circuit has approved the top-down approach.

The plaintiffs are correct in that a United States District Court in the Eastern District of Michigan utilized a top-down approach in a Clean Air Act case, which is in

*pari materia* with the Clean Water Act. *United States v. Midwest Suspension and Brake,* 824 F.Supp. 713, 735 (E.D.Mich.1993). The Sixth Circuit did not specifically approve of the top-down approach on appeal, but it did hold that the court did not abuse its discretion in the amount awarded in civil penalties. 49 F.3d 1197 (6th Cir.1995). The City is correct, however, that the Sixth Circuit approved an award of $100 per day in civil penalties against a municipality for violating the CWA because that court considered all of the factors and did not abuse its discretion. *Tamaska v. City of Bluff City, Tennessee,* 2002 WL 22003 (6th Cir.2002). There was no mention in the case as to what approach was utilized.

Basically, the Sixth Circuit has not specifically ruled that the Court must use the top-down approach. What is clear is that the Court must consider all the factors set forth in the statute. Nonetheless, without specifically holding that this Court must use the top-down approach, this Court will employ that method as a useful starting place for its analysis of the statutory factors.

First, this Court must consider the seriousness of the violations. The jury found that the City violated its NPDES permit by failing to enforce the [IUP] for Koch Foods or by failing to prevent prohibited discharges from Koch Foods into the Morristown Sewer System. This failure helped cause and contribute to the odors which the plaintiffs testified to at trial. While this Court recognizes the unpleasantness and frustration of the plaintiffs having to experience such odors for many years, these particular violations do not necessarily put the members of the community at risk. This is not a situation where their water is being poisoned by substances, which is causing major illnesses. According to the plaintiffs, the problem with these violations is their inability to fully enjoy their property at times. Thus, the seriousness of these violations causes this Court to depart downward significantly.

The seriousness of the July 19, 2007 overflow, however, is more significant. Again, it is not of the worst violations this Court can fathom. Nonetheless, 10,000 gallons of raw sewage running down the street and into the surrounding area where there is a creek nearby is serious. There are potential health risks from this violation, not to mention consequences for the environment. As such, this Court will depart downward, but not as significantly as with the other 72 violations.

*8 Second, this Court must consider the economic benefit resulting from the violations. It is true that the City received significant sewer use fees from Koch Foods for discharging above its effluent limits. It is also true that the City did not expend large amounts on repairs or upgrades prior to the lawsuit to prevent overflows. However, the evidence shows that the City did not actually profit from the violations. Sewer revenues have been declining despite rate increases. Therefore, the Court will depart downward when considering this factor.

Third, the Court will consider the history of the violations. This factor does not weigh in favor of either party. This Court is not impressed with the City's attempts at enforcement concerning Koch Foods. The City's efforts have amounted to little more than sending letters and holding hearings. On the other hand, the City has had few actual violations. While the number of overflows is significant, the fact is that overflows sometimes occur. The result of the Enforcement Order entered by the Court should help to eliminate this and other problems. Therefore, this factor does not weigh in favor of either party.

Fourth, this Court must consider any good-faith efforts to comply with the applicable requirements. This factor, too, does not weigh in favor of either party. The City has the obligation of meeting all the requirements of its NPDES permit. Further, it behooves the City to work with TDEC to comply with all regulations. All that being said, the Court rejects the argument that the main reason why these violations occurred is because the City relied on the advice of TDEC. Still, this factor neither weighs in favor nor against either party.

Fifth, the economic impact of a penalty weighs heavily in favor of the City. The City's sewer system is funded exclusively by fees from the user. The City has been losing revenues despite rate increases. Ultimately, the impact will be felt by the taxpayers in the City. In addition, no one can dispute that our country faces tough economic times during the recession. The federal, state and city governments face unbelievable deficit problems. For all of these reasons, the Court will depart downward significantly due to this factor.

Finally, this Court must consider other matters as justice may require. Deterrence is an important consideration. *See Tull v. United States,* 481 U.S. 412, 422–23, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Little was done by the City despite numerous complaints of the members of the Witt and Roe Junction communities. It took a lawsuit to compel action. Cities must be concerned about the well being and complaints of their citizenry. Responsive efforts by the City

which amounted to sending letters and holding hearings were not enough to protect the well being of the members of the community, especially in terms of overflows. Nonetheless, a large penalty does not necessarily deter because ultimately the cost would be absorbed by the taxpayer. As such, this is not a major factor.

*9 Weighing the factors and the amount of the departure from the maximum daily penalty, this Court concludes that for the 72 violations found by the jury, the City shall pay $1,250.00 per day for a total of $90,000.00. Mainly because the overflow was a more serious violation, the City shall pay $15,000.00 for this violation. The total civil penalties assessed, therefore, is $105,000.00.

So ordered.

Footnotes

1   See Verdict Form, [Doc. 238, question 4]; see also the Court's Memorandum Opinion and Order, [Doc. 304] (holding that the evidence at trial did not raise a genuine issue of fact with respect to the July 19, 2007 overflow and that the plaintiffs are entitled to judgment as a matter of law, notwithstanding the jury's verdict, on that issue).
2   Some of these facts were gleaned from the record in relation to the summary judgment motions, and they were stated in this Court's October 13, 2009 Memorandum Opinion. [Doc. 178]. These same facts were testified to at the trial, and some were testified to at the post-trial hearing. Additional facts from the trial and the post-trial hearing have also been added.
3   This permit has been revised and updated over the years for various reasons.
4   A more detailed accounting will be set forth below.
5   This Court previously determined, due to the plain language of Koch Foods' permit at the time in question, that Koch Foods had violated the CWA for exceeding the compatible pollutant limits set by the City in Koch Foods' IUP.
6   The plaintiffs contend that another Compliance Order, which set out a Compliance Schedule, was issued on November 29, 2005. The City argues that this was related to the September 27, 2005 Notice of Violation and separate Show Cause hearing. This Court need not decide this factual dispute, for it is not dispositive of the issue at hand.
7   Post-trial, the record reflects that the City Council heard testimony regarding Koch Foods' appeal of Administrative Order 10–001. In addition, on May 1, 2010, the IUP was reissued with all conditions set forth in Compliance Order 05–002 remaining in effect. Also, at the time of the May 11, 2010 hearing, Ms. Krebs testified that some of Koch Foods' appeals of orders from the City are still pending and other enforcement action against Koch Foods is not complete.
8   The plaintiffs adjusted the amount of civil penalties claimed per day for violations occurring between March 15, 2004, and January 12, 2009, in accordance with the Civil Penalty Inflation Adjustment Rule, 74 Fed.Reg. 626–629. They seek $32,500 per day.

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.