# EXHIBIT 17

2011 WL 8144393
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

UNITED STATES of America, Plaintiff,
v.
EGAN MARINE CORPORATION, Defendant.

No. 08 C 3160.   |   Oct. 13, 2011.

**Attorneys and Law Firms**

Stephen R. Campbell, Robert Emmett Kelly, United States Department of Justice, Douglas Morgan Hottle, United States Department of Justice Aviation and Admiralty, Washington, DC, AUSA, Eric S. Pruitt, United States Attorney's Office, Chicago, IL, for Plaintiff.

Warren J. Marwedel, Stephanie A. Espinoza, William Phillip Ryan, Marwedel, Minichello & Reeb, P.C., John P. O'Malley, Schuyler Roche & Crisham, P.C., Christopher Howard White, Thomas William Mulcahy, Chicago, IL, Christopher Alan Abel, David Harlan Sump, Norfolk, VA, David Ralph Anderson, Attorney at Law, Lemont, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

HARRY D. LEINENWEBER, District Judge.

*1 Before the Court for decision are the trial record and post-trial briefing of both parties. For the reasons stated herein, the Court finds for Defendant Egan Marine Corporation on Counts I and II, awards the United States the sum of $100,000 in civil penalties under Count III, and finds that the United States has waived its claims for relief under Count IV.

The Court enters the following Findings of Fact and Conclusions of Law pursuant to FED. R. CIV. P. 52(a)(1).

### *I. FACTUAL BACKGROUND*

On January 19, 2005, the barge EMC 423 exploded on the Chicago Sanitary and Ship Canal (the "Canal") near the Cicero Avenue Bridge. At the time, it was being transported by the tugboat Lisa E., which is owned by Egan Marine Corporation ("EMC") and staffed by its employees. It was carrying a load of Clarified Slurry Oil ("CSO"), which gives off flammable vapors. On this trip, those vapors ignited, exploded, and sunk the EMC 423; the explosion caused oil and oil solids to leak into the canal. At the time of the explosion, EMC employee Alex Oliva ("Oliva") was on board the barge; he died. Much of the dispute in this case revolves Oliva's actions and whereabouts at the time of the explosion.

The United States (the "Government") alleges that the explosion happened because Oliva used a propane torch to thaw out a cargo pump that had frozen in the cold weather. The Government contends that the barge's thermal fluid heat trace system, which is used to keep barge works warm so that CSO will not solidify inside them, was inoperable or not connected to the cargo pump. If CSO solidified inside the cargo pump, it would have to be heated before the pump could run. Rather than doing this safely, the Government contends, the crew chose to heat the pump with a propane torch. Under the Government's theory, a pipe near the cargo pump was open, creating an open-air access point to Storage Tank 4 underneath the deck. The flame of the propane torch allegedly ignited the flammable vapors emanating from the standpipe and caused the explosion. EMC disputes each of these facts. The parties agree, however, that for such an explosion to occur, the open flame or incandescent spark would have had to be, at the very least, very near to the top of the standpipe.

The sinking of the EMC 423 obstructed the Canal and resulted in the discharge of considerable oil and oil solids into the water. The Government undertook substantial efforts from January 19 until June 7, 2005, to remedy the situation. It also, through the National Pollution Funds Center (the "NPFC"), compensated several companies which were adversely affected by the explosion and related restrictions on the Canal. EMC has several claims pending before the NPFC, which will not be adjudicated until at least the end of this proceeding.

### *II. PROCEDURAL BACKGROUND*

In the aftermath of the explosion, the Coast Guard held hearings on the incident. Several of those who testified at this trial also testified before the Coast Guard. Among those witnesses was Dennis Michael Egan, who was the master of the EMC 423 at the time of the incident, and who relied on his Fifth Amendment privilege against self-incrimination to limit his testimony at trial.

*2 In July 2005, EMC initiated a Limitation Proceeding to require anyone with a claim relating to the explosion and spill to bring their claims. The Government filed a variety of claims in that proceeding. However, in December of 2005 it sought and received dismissal from the Limitation Proceeding, in order to file this claim. The United States then filed this action, followed by an Amended Complaint on July 24, 2008. Count V of the Complaint (under general maritime law) was dismissed by the Memorandum Order of Judge David Coar on March 30, 2009. The parties proceeded to trial on the remaining four counts beginning on September 12, 2011. The Court heard testimony from eyewitnesses, EMC employees, and a variety of experts regarding the sequence of events on January 19, 2005.

### III. DISCUSSION

Pursuant to the Oil Protection Act of 1990 (the "OPA"), responsible parties (or RPs, here, EMC) are liable to the United States for removal costs, damages, and/or disbursements relating to any spill the RP causes. Here, the Government claims such costs—mostly, removal costs and compensation that the NPFC has paid to harmed third parties. The Government seeks to recapture those costs, as well as to obtain civil penalties. The OPA, however, also contains a limitation of liability for responsible parties who are not grossly negligent and do not cause the oil spill by their own unsafe actions. That limitation on liability is the chief source of contention in this case.

#### A. Counts I and II—OPA Claims and Subrogation of Rights Under the OPA

The parties have stipulated, in effect, that EMC is liable for the Government's removal costs and damages under the OPA. Specifically, the parties have stipulated that EMC 423 was a vessel belonging to EMC at the time, that EMC is the responsible party, and that the explosion discharged oil into the navigable waters of the United States.

It appears to be undisputed that EMC has paid out at least $2 million in containment, recovery and compensation expenses in the wake of the spill. At trial, the Government established that the Coast Guard and the National Pollution Fund Center have paid out, in cleanup and other payments, well in excess of $3.5 million.

The parties disagree, however, as to whether EMC is eligible for the OPA's limitation on liability. Because the Government has not proved by a preponderance of the evidence that the spill was proximately caused by EMC's gross negligence or the violation of a safety regulation, this Court concludes that the limitation of liability does apply, and the Government is not entitled to any additional recovery under 33 U.S.C. § 2704.

#### 1. Findings of Fact

The EMC 423 was a tank vessel of approximately 1,397 gross tons. On January 19, 2005, the EMC 423 was traveling on the Canal under the power of the tug Lisa E., carrying a cargo of roughly 14,000 barrels of CSO. CSO is a very viscous substance that becomes solid when it is not kept sufficiently hot.

*3 At some time during the January 19, 2005 voyage, flammable vapors accrued in the head space of the EMC 423's Storage Tanks 3 and 4 in a sufficient concentration to be dangerous. At or around 4:40 p.m. on January 19, 2005, the vapors in Tank 4 ignited, setting off the deflagration event which then ignited vapors in Tank 3. The explosion resulted in the discharge of substantial CSO into the Canal (4,817 gallons of oil and 32 tons of oil solids) and the sinking of the EMC 423.

Under the command of the Federal On–Scene Coordinator (the "FOSC") Capt. David Fish, the United States undertook substantial recovery and containment efforts to mitigate the damage to the canal and surrounding businesses caused by the sinking of the EMC 423. EMC expended more than $2 million in related efforts to salvage the EMC 423, and to clean up the damage that the incident caused.

The Government adduced some evidence that there was a propane torch on board the EMC 423 on the day of the incident. They also introduced some evidence that the crew of the Lisa E./EMC 423 told investigators that crew members had used such a torch on the barge in the past. However, in light of all the evidence and testimony presented, including eyewitness testimony and photographs, the Government did not prove, by a preponderance of the evidence, that Alex Oliva was using a propane torch on the cargo pump of the EMC 423 at the time of the incident.

Similarly, the Government has adduced some evidence that Alex Oliva was a smoker, and could have been lighting a cigarette on the EMC 423 at the time of the explosion. However, the Government has not proved, by a preponderance of the evidence, that Alex Oliva was using an open flame to light a cigarette on board the EMC 423 at the time of the incident.

This Court concludes that only an open flame or incandescent spark would have been competent to set off the deflagration of the EMC 423, and not merely any energy source of greater than quarter of a millijoule. However, the Court does not find the Government's experts credible to the extent that they claim, based on their relatively limited investigations, to have proved that a propane torch caused the explosion.

Both DeHaan and Malooly have significant experience with explosion investigations. However, both relied on questionable law enforcement reports and/or on evidence that was excluded as unreliable at trial when they assumed or concluded that the standpipe was open and a propane torch was used. Furthermore, neither conducted substantial outside research, modeling, calculations, or experimentation to support their opinions. Finally, both experts conceded that it is not unusual for explosions to have undetermined causes. Based on their relatively limited analyses and the questionable facts on which they relied, this Court cannot credit their opinions that a propane torch must be to blame.

The Government's theory of liability is predicated on there being an open flame, operated by Alex Oliva, very close to an open standpipe. (The standpipe lead directly into Tank 4, and if open, would have provided an avenue for a flame to travel into the tank.) The Government has also not proved that the standpipe was open. The standpipe was recovered in the open position and may have been without a cap before the EMC 423 embarked. However, there is significant evidence in the record that an open standpipe would have produced visible smoke or steam, and witnesses and photographic evidence prior to the explosion showed no evidence of visible steam or smoke. Because the Government has proved neither that a propane torch was being used nor the standpipe was open this Court cannot accept the Government's theory of the cause of the explosion.

### 2. Conclusions of Law

*4 Egan Marine was a responsible party within the meaning of the Oil Pollution Act of 1990, 33 U.S.C. § 2701(32). The explosion led to a discharge of oil within 33 U.S.C. § 2701(7) into the navigable waters of the United States.

The Government has proved that it has paid or lost in excess of $3.5 million in the aftermath of the incident, including more than $500,000 in personnel costs. Absent any limitation, EMC is liable for that full amount.

Any limitation of liability depends on the size of the EMC 423. Because the EMC 423 was a tank vessel of less than 3,000 gross tons, EMC's liability is limited to $2,000,000 unless the Government proved by a preponderance of evidence that EMC's gross negligence or violation of a safety regulation proximately caused the spill. 33 U.S.C. § 2704(a)(1)(B)(ii) (2005); 33 U.S.C. § 2704(c)(1) (2005).

As noted above, the Government has not proved that any violation of a safety regulation was the proximate cause of the explosion. The record shows that EMC employees may have violated Coast Guard regulations during the barge's final run. For example, Tankerman PIC Andrew Chanda testified that he was not present when crew members began loading CSO onto the barge on the night before the explosion. Loading CSO without a tankerman present would appear to violate 46 C.F.R. § 35.35–1 (moving cargo without the supervision of a licensed tankerman).

However, the Government did not prove its contention that Alex Oliva was impermissibly moving cargo at the time of the explosion. In weighing the conflicting testimony of the Government and EMC's experts, this Court concludes that even if Oliva was "bumping the clutch" prior to the explosion, he was not substantially moving the CSO in violation of 46 C.F.R. § 35.35–1. In any event, neither of the alleged violations of the tankerman regulations (nor any other alleged violation of a safety regulation) was shown by a preponderance of the evidence to be the proximate cause of the explosion.

The Government also has not proved that EMC or its employees were grossly negligent on the day of the incident. The Government's safety expert identified several objections to safety practices on the barge. However, those opinions largely presumed facts that, as described above, the Government was unable to prove at trial. They are thus unhelpful to the Court. Additional objections, like Oliva's not wearing a life jacket, do identify some unwise practices by

EMC or its employees. They likely do not establish gross negligence; even if they did, no one has contended that the lack of a life jacket proximately caused the explosion.

Thus, because the Government was unable to prove that the explosion was proximately caused by EMC's gross negligence or the violation of a safety regulation, the limitation of liability *does* apply in this case, and the Government is not entitled to recover additional funds from EMC.

### B. Count III: Civil Penalties for Discharge

#### 1. Findings of Fact

*5 The Parties have stipulated to the following:

1. The discharge of cargo from the EMC 423 met the definition of "discharge" per OPA, 33 U.S.C. § 1321(a) 2).

2. The cargo carried on board the EMC 423 in its cargo holds met the definition of "oil" per OPA, 33 U.S.C. § 1321(a)(a).

3. The deflagration event on the EMC 423 caused the barge to sink and discharge 4,718 gallons of oil into the canal.

4. The deflagration event led to a discharge within the meaning of 33 U.S.C. § 1321(a)(2).

5. EMC meets the definition of "person" under 33 U.S.C. § 1321(b)(3).

As noted above, this Court also finds that the Government has paid out or expended more than $3.5 million in clean-up and containment efforts, in addition to the money expended by EMC in similar efforts. The Court also finds that the Government's containment and cleanup efforts of the Government lasted from January 19, 2005 to June 7, 2005.

#### 2. Conclusions of Law

For the reasons discussed above, and based on the stipulations of the parties, this Court thus concludes that the barge explosion resulted in a "discharge of oil or hazardous substance ... [into] the navigable waters of the United States ... in such quantities as may be harmful[.]"33 U.S.C. § 1321(b) (3).*See also*40 C.F.R. § 110.1 *et seq.* (interpreting "harmful" quantity).

Under 33 U.S.C. § 1321(b)(7)(D), where an unlawful discharge of oil "was the result of gross negligence or willful misconduct ... the person [responsible] shall be subject to a civil penalty of not less than $100,000, and not more than $3,000 per barrel of oil or unit of reportable quantity of hazardous substance discharged."However, as noted above, the Government did not prove gross negligence or willful misconduct on the part of EMC, and so cannot recover under this provision.

Liability under 33 U.S.C. § 1321(b)(7)(A), however, is strict. It provides that "[a]ny person who is the owner ... of any vessel ... from which oil or a hazardous substance is discharged in violation of [§ 1321(b)(3) ], shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil[.]" Based on the facts stipulated to by the parties, the explosion of the EMC 423 made EMC liable under this section.

EMC asks this Court to find that the civil penalty provision of 33 U.S.C. § 1321(b)(7) is not mandatory, apparently because it only provides that violators "shall be subject to" rather than "shall pay" the penalty. As they concede, however, a majority of the circuits to consider similar language elsewhere in the Clean Water Act have found civil penalties to be mandatory. *See Leslie Salt Co. v. United States,* 55 F.3d 1388, 1397 (9th Cir.1995) (construing 33 U.S.C. § 1319(d)); *Atlantic States Legal Found. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1142 (11th Cir.1990) (same)); *Stoddard v. North Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208 (4th Cir.1986) (same). The remaining courts have concluded that whether to impose a penalty lies within the discretion of the district court. *See, e.g., United States v. Winchester Municipal Utilities,* 944 F.2d 301, 306 (6th Cir.1991) (court was "inclined to believe" that district courts retained discretion not to impose penalty, but government was substantially justified in arguing otherwise). The Seventh Circuit does not appear to have ruled on the issue directly. *Cf. United States v. Marathon Pipe Line Co.,* 589 F.2d 1305, 1306 (7th Cir.1978) (under a prior version of § 1321(b)(6), no abuse of discretion in administrative civil penalty award against faultless owner, because liability is absolute).

*6 This Court is inclined to follow the approach of the Fourth, Ninth, and Eleventh Circuits and conclude that the civil penalty is mandatory. The Court finds the

reasoning in *Leslie Salt* particularly persuasive. Even if it were discretionary, however, this Court concludes that some penalty would be appropriate in this case.

Under 33 U.S.C. § 1321(b)(8), in determining the amount of civil penalty under Subsection 7, this Court is to consider:

[a] the seriousness of the violation or violations[;]

[b] the economic benefit to the violator, if any, resulting from the violation[;]

[c] the degree of culpability involved[;]

[d] any other penalty for the same incident[;]

[e] any history of prior violations[;]

[f] the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge[;]

[g] the economic impact of the penalty on the violator[;] and

[h] any other matters as justice may require.

Courts appear to have taken two main approaches to calculating civil penalties under the Clean Water Act ("CWA"). The "top-down" approach starts with the maximum applicable penalty, and deducts based on the mitigating factors. The "bottom-up" approach starts at the economic benefit of a violator, and adjusts up or down based on the other five factors. Courts appear to have discretion in determining which method to adopt. *United States v. Municipal Authority of Union Tp.*, 150 F.3d 259, 265 (3d Cir.1998). In this case, no one appears to contend that EMC stood to gain significantly from this explosion or even from any of the lax safety practices alleged by the Government. Accordingly, the "bottom-up" approach seems inapposite.

Regarding the maximum penalty from which to start in this case, the Government in its Complaint averred that this Court should enter up to $25,000 per day for each of the 139 days that the cleanup effort continued (from January 19, 2006 to June 7, 2007). This would impose a maximum penalty of $3,475,000. However, the Court is unwilling to adopt this approach. Under § 1321(b)(7)(D), if the Government had proved gross negligence it could have recovered between $100,000 and $336,000 total (up to $3,000 per barrel spilled —the 4,718 gallons spilled equal roughly 112 barrels).*See*33 U.S.C. § 2702(2)). Therefore, on this record, a baseline penalty of $3 million is uncalled for.

Because this case is based on a discharge that resulted from an explosion and not a prolonged spill, this Court finds the most useful penalty metric to be $1,000 per barrel, rather than $25,000 per day. Accordingly, this Court will use $112,000 as its maximum available penalty. This per-barrel calculation likely underestimates the impact of this spill. Capt. Fish determined that 32 tons of oily solids were discharged into the water alongside the oil. Accordingly, this Court finds it appropriate to assess a penalty near the top of the range described above. However, because the Government was unable to prove gross negligence or willful misconduct, this Court will not assess a greater penalty under Subsection (A) than the Government might have received under Subsection (D). Accordingly, it will not award a civil penalty of above $100,000.

*7 A penalty of $100,000 is appropriate, considering all other factors set forth in 33 U.S.C. § 1321(b)(8). The violation is undoubtedly serious, as evidenced by the extent of the cleanup efforts and the compensation that both parties have paid out as a result. This weighs in favor of a substantial penalty. On the other hand, the stipulated testimony of Capt. David Fish supports EMC's claim that it complied with its legal obligations to aid in the cleanup, which cuts in favor of EMC. Neither party directs the Court to evidence regarding EMC's past compliance history, and so the Court will neither enhance nor reduce the penalties on that basis. As noted above, the degree of culpability shown at trial has prompted this Court to reduce the penalty from $112,000 to $100,000. As noted below, this Court concludes that the Government has waived its claims to penalties under the Rivers and Harbors Act, so there is no reason to reduce the civil penalty to account for duplicate penalties.

Finally, neither party offered significant evidence as to the economic impact a civil penalty would have on EMC. However, in light of the substantial money at stake in this litigation, and the fact that EMC's liability has been limited by the Court's conclusion in Section A above, it seems unlikely that a penalty of $100,000 will constitute an excessive burden on EMC. Accordingly, the Court finds that on the facts of this case, it is appropriate to impose a civil penalty of $100,000 on Egan Marine for its violation of the strict liability provisions of the Clean Water Act, as amended by the Oil Pollution Act of 1990.

### C. Count IV Rivers and Harbors Act

EMC seeks a finding that the Rivers and Harbors Act (the "RHA"), 33 U.S.C. § 403 *et seq.* is preempted by the Oil Pollution Act (the "OPA"). Effectively, they ask this Court to reconsider the opinion of Judge David Coar on March 30, 2009, which specifically rejected that claim. This the Court declines to do. In that opinion, Judge Coar specifically concluded that "[s]hould Plaintiff be limited from recovering its full measure of damages under the OPA, it may seek to recover damages under the RHA" and this Court sees no reason to depart from that reasoning. Mem. Opn. at 6.

However, apart from its recital of stipulated facts, the Government has failed to address its RHA claims in its post-trial briefing. While the stipulated facts may have established liability under the strict liability of the RHA, *United States v. Central Soya, Inc.,* 697 F.2d 165, 168 (7th Cir.1982), the Government has failed to tell the Court what "costs, damages, and/or disbursements" it believes it is entitled to under the RHA. Am. Compl. ¶ 47. Accordingly, this Court concludes that the Government has opted not to pursue its claim under the RHA, and deems it waived.

### IV. *CONCLUSION*

For the reasons stated herein, the Court finds as follows:

1. For Egan Marine on Counts I and II of the Complaint;

**\*8** 2. That a civil penalty of $100,000 is appropriate under Count III of the Complaint; and

3. That the Government has effectively waived its claims in Count IV by its failure to address them meaningfully in its post-trial briefing.

**IT IS SO ORDERED.**

---

**End of Document**         © 2014 Thomson Reuters. No claim to original U.S. Government Works.