# EXHIBIT 23

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA; the STATE OF WEST VIRGINIA by and through the WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION; the PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION; and the COMMONWEALTH OF KENTUCKY by and through the KENTUCKY ENERGY AND ENVIRONMENT CABINET | ) ) ) ) ) ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) ) |  |
|  | ) |  |
| v. | ) ) | Civ. No. 2:14-CV-11609 |
|  | ) |  |
| ALPHA NATURAL RESOURCES, INC.; ALPHA APPALACHIA HOLDINGS, INC.; ALEX ENERGY, INC.; ALPHA PA COAL TERMINAL, LLC; AMFIRE MINING COMPANY, LLC; ARACOMA COAL CO., INC.; BANDMILL COAL CORP.; BELFRY COAL CORP.; BIG BEAR MINING CO.; BROOKS RUN MINING COMPANY, LLC; BROOKS RUN SOUTH MINING LLC; CLEAR FORK COAL CO.; CUMBERLAND COAL RESOURCES, LP; DELBARTON MINING CO.; DICKENSON-RUSSELL COAL COMPANY, LLC; DUCHESS COAL CO.; EAGLE ENERGY, INC.; ELK RUN COAL CO., INC.; EMERALD COAL RESOURCES, LP; ENTERPRISE MINING COMPANY, LLC; GOALS COAL CO.; GREYEAGLE COAL CO.; HARLAN RECLAMATION SERVICES LLC; HERNDON PROCESSING CO., LLC; HIGHLAND MINING CO.; INDEPENDENCE COAL COMPANY, INC.; JACKS BRANCH COAL CO.; KANAWHA ENERGY CO.; KEPLER PROCESSING CO., LLC; KINGSTON MINING, INC.; KINGWOOD MINING CO., LLC; KNOX CREEK COAL CORP.; LITWAR PROCESSING CO., LLC; MARFORK COAL CO.; MARTIN COUNTY COAL CORP.; NEW RIDGE MINING CO.; OMAR MINING CO.; PARAMONT COAL COMPANY VIRGINIA, LLC; PAYNTER BRANCH MINING, INC.; PEERLESS EAGLE COAL CO.; PERFORMANCE COAL CO.; PETER CAVE MINING; PIGEON CREEK PROCESSING CORP.; PIONEER FUEL CORP.; POWER MOUNTAIN COAL CO.; PREMIUM ENERGY, LLC; RAWL SALES & PROCESSING CO.; RESOURCE DEVELOPMENT, LLC; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CONSENT DECREE |

RESOURCE LAND CO.; RIVERSIDE ENERGY CO., LLC;  )
ROAD FORK DEVELOPMENT CO.; ROCKSPRING  )
DEVELOPMENT, INC.; RUM CREEK COAL SALES, INC.;  )
SIDNEY COAL CO.; SPARTAN MINING CO.; STIRRAT  )
COAL CO.; SYCAMORE FUELS INC.; TENNESSEE  )
CONSOLIDATED COAL COMPANY; TRACE CREEK  )
COAL CO.; and TWIN STAR MINING, INC.  )
                                                                                  )
                              Defendants.                              )

## TABLE OF CONTENTS

I. BACKGROUND ........................................................................................... 1

II. JURISDICTION AND VENUE ................................................................... 5

III. APPLICABILITY ...................................................................................... 5

IV. DEFINITIONS ........................................................................................... 7

V. CIVIL PENALTY ...................................................................................... 19

VI. GENERAL COMPLIANCE REQUIREMENTS ........................................ 21

VII. INJUNCTIVE RELIEF ............................................................................ 24

VIII. SELENIUM INJUNCTIVE RELIEF ....................................................... 50

IX. OSMOTIC PRESSURE INJUNCTIVE RELIEF ....................................... 54

X. REPORTING REQUIREMENTS ............................................................. 58

XI. STIPULATED PENALTIES ..................................................................... 63

XII. FORCE MAJEURE .................................................................................. 68

XIII. DISPUTE RESOLUTION ....................................................................... 70

XIV. INFORMATION COLLECTION AND RETENTION .............................. 73

XV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ................... 75

XVI. COSTS ................................................................................................... 77

XVII. NOTICES .............................................................................................. 78

XVIII. RETENTION OF JURISDICTION ....................................................... 80

XIX. MODIFICATION .................................................................................... 80

XX. TERMINATION ...................................................................................... 81

XXI. PUBLIC PARTICIPATION .................................................................... 82

XXII.  SIGNATORIES/SERVICE ................................................................ 83

XXIII.  INTEGRATION ........................................................................... 83

XXIV.  FINAL JUDGMENT ..................................................................... 84

XXV.  APPENDICES .............................................................................. 84

# I. BACKGROUND

A.     On May 10, 2007, the United States filed a complaint against Massey Energy Company and 27 subsidiaries for violations of the Clean Water Act. (S.D.W.Va., 2:07-cv-0299). On January 17, 2008, the United States lodged a Consent Decree with the Southern District of West Virginia to resolve the violations alleged in the complaint through the date of lodging. On April 9, 2008, the Court approved and entered the Consent Decree ("Massey CD"). The United States alleges that, since entry of the Massey CD, Massey Energy Company and its subsidiaries have continued to discharge pollutants in violation of the conditions and limitations in their National Pollutant Discharge Elimination System ("NPDES") permits.

B.     On June 1, 2011, Alpha Natural Resources, Inc. acquired Massey Energy Company in its entirety. Massey Energy Company is now known as Alpha Appalachia Holdings, Inc. The United States alleges that, prior to the acquisition of Massey Energy Company, Alpha Natural Resources, Inc. and its subsidiaries discharged pollutants in violation of the conditions and limitations in their NPDES permits, and that these companies continue to discharge pollutants in violation of the conditions and limitations in their NPDES permits.

C.     Prior to lodging of this Consent Decree, certain Defendants entered into settlements relating to violations of NPDES permit limits for selenium:

i.     On December 5, 2011, the Circuit Court of McDowell County, West Virginia entered a Consent Decree between West Virginia Department of Environmental Protection and Defendant Riverside Energy Company, LLC in Civil Action No. 10-C-109-S (the "Riverside Consent Decree"). Among other violations, the Riverside Consent Decree resolves alleged violations of selenium limits for NPDES permit WV1018876, Outlets 001 and 007 (the "Riverside

1

Consent Decree Outlets"), and prescribes injunctive relief for bringing those Outlets into compliance with selenium limits.

   ii.   On January 24, 2012, the Southern District of West Virginia entered a Consent Decree between Ohio Valley Environmental Coalition, Inc., et al. and Defendants Independence Coal Company, Inc. and Jacks Branch Coal Company in Civil Action No. 3:10-cv-0836 (the "Independence Consent Decree"). The Independence Consent Decree resolves alleged violations of selenium limits for NPDES permits WV0093912, Outlets 004, 005, 007, 012, 022, 033, and 034; WV1016890, Outlets 008 and 015; and WV1017152, Outlets 029, 031, 037, 042, and 046 (the "Independence Consent Decree Outlets") and prescribes injunctive relief for bringing those Outlets into compliance with selenium limits.

   iii.   On July 23, 2012, the Circuit Court of Raleigh County, West Virginia entered a Consent Decree between West Virginia Department of Environmental Protection and Defendant Pioneer Fuel Corporation in Civil Action No. 10-C-462-H (the "Pioneer Consent Decree"). Among other violations, the Pioneer Consent Decree resolves alleged violations of selenium limits for NPDES permit WV1021664, Outlets 004, 008, 009, 011, 012, and 013 (the "Pioneer Consent Decree Outlets"), and prescribes injunctive relief for bringing those Outlets into compliance with selenium limits.

   iv.   On December 5, 2012, the Circuit Court of Wyoming County, West Virginia entered a Consent Decree between West Virginia Department of Environmental Protection and Defendant Paynter Branch Mining, Inc. in Civil Action No. 10-C-97 (the "Paynter Consent Decree"). Among other violations, the Paynter Consent Decree resolves alleged violations of selenium limits for NPDES permits WV1016440, Outlets 019 and 020, and WV1018906, Outlets

2

001 and 002 (the "Paynter Consent Decree Outlets"), and prescribes injunctive relief for bringing those Outlets into compliance with selenium limits.

D.  Concurrent with the lodging of this Consent Decree, Plaintiffs, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), the State of West Virginia by and through the West Virginia Department of Environmental Protection, the Pennsylvania Department of Environmental Protection, and the Commonwealth of Kentucky, by and through the Kentucky Energy and Environment Cabinet, have filed a Complaint in this action against Alpha Natural Resources, Inc., Alpha Appalachia Holdings, Inc., and certain subsidiaries with operations in Kentucky, Pennsylvania, Tennessee, Virginia, and West Virginia[1] (the "Complaint Defendants").

E.  The Complaint alleges that the Complaint Defendants violated Sections 301 and 402 of the Federal Water Pollution Control Act as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 ("CWA" or the "Act"), 33 U.S.C. §§ 1311 and 1342; the West Virginia Water Pollution Control Act ("WPCA"), W. Va. Code § 22-11-8; Sections 301, 307, 315 and 601 of the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.301, 691.307, 691.315 and 691.601; and Kentucky Revised Statutes § 224.70-100, et seq.  Specifically, the Complaint alleges that the

---

[1]    Alex Energy, Inc.; Alpha PA Coal Terminal, LLC; Amfire Mining Company, LLC; Aracoma Coal Co., Inc.; Bandmill Coal Corp.; Belfry Coal Corp.; Big Bear Mining Co.; Brooks Run Mining Company, LLC; Brooks Run South Mining LLC; Clear Fork Coal Co.; Cumberland Coal Resources, LP; Delbarton Mining Co.; Dickenson-Russell Coal Company, LLC; Duchess Coal Co.; Eagle Energy, Inc.; Elk Run Coal Co., Inc.; Emerald Coal Resources, LP; Enterprise Mining Company, LLC; Goals Coal Co.; Greyeagle Coal Co.; Harlan Reclamation Services LLC; Herndon Processing Co., LLC; Highland Mining Co.; Independence Coal Company, Inc.; Jacks Branch Coal Co.; Kanawha Energy Co.; Kepler Processing Co., LLC; Kingston Mining, Inc.; Kingwood Mining Co., LLC; Knox Creek Coal Corp.; Litwar Processing Co., LLC; Marfork Coal Co.; Martin County Coal Corp.; New Ridge Mining Co.; Omar Mining Co.; Paramont Coal Company Virginia, LLC; Paynter Branch Mining, Inc.; Peerless Eagle Coal Co.; Performance Coal Co.; Peter Cave Mining; Pigeon Creek Processing Corp.; Pioneer Fuel Corp.; Power Mountain Coal Co.; Premium Energy, LLC; Rawl Sales & Processing Co.; Resource Development, LLC; Resource Land Co.; Riverside Energy Co., LLC; Road Fork Development Co.; Rockspring Development, Inc.; Rum Creek Coal Sales, Inc.; Sidney Coal Co.; Spartan Mining Co.; Stirrat Coal Co.; Sycamore Fuels Inc.; Tennessee

Complaint Defendants violated Section 301 of the Act by discharging pollutants in violation of the conditions and limitations of NPDES permits issued to those defendants pursuant to Section 402 of the Act, 33 U.S.C. § 1342; Section 8 of the WPCA, W. Va. Code § 22-11-8; Sections 301, 307 and 315 of the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.301, 691.307, 691.315; and Kentucky Revised Statutes § 224.70-110, *et seq.* Altogether, the Complaint alleges violations at nearly 800 outfalls permitted in more than 330 NPDES permits held by 62 separate subsidiaries. The Complaint also alleges that Alpha Natural Resources, Inc. and Cumberland Coal Resources, LP violated Section 301 of the Act, 33 U.S.C. § 1311, and Section 301 of the Pennsylvania Clean Streams Law, 35 P.S. § 691.301, by discharging and continuing to discharge pollutants into state waters and waters of the United States without complying with the requirements for obtaining an NPDES permit.

        F.      Complaint Defendants do not admit any liability to the United States or the States arising out of the transactions or occurrences alleged in the Complaint nor do Complaint Defendants admit any fact or legal conclusion alleged in the Complaint.

        G.      The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

        NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

---

Consolidated Coal Co.; Trace Creek Coal Co.; and Twin Star Mining, Inc.

## II. **JURISDICTION AND VENUE**

1.  This Court has jurisdiction over the Parties and over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367; 28 U.S.C. § 1651; Fed. R. Civ. Proc. 19(a); and Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

2.  Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), as well as Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), because it is the judicial district in which Defendants are located, reside, and/or are doing business, and/or in which a substantial part of the violations alleged in the Complaint occurred.

3.  For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree and consent to venue in this judicial district.

4.  For purposes of this Decree, Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342, West Virginia Code § 22-11-1, *et seq*.; Sections 301, 307, 315 and 601 of the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.301, 691.307, 691.315 and 691.601; and Kentucky Revised Statutes § 224.70-100, *et seq*.

## III. **APPLICABILITY**

5.  The obligations of this Consent Decree apply to and are binding upon the United States and the States, and upon Defendants and any successors, assigns, or other entities, or persons otherwise bound by law.

6.  The provisions of this Consent Decree shall apply to Facilities and Future Facilities located in Kentucky, Pennsylvania, Tennessee, Virginia, and West Virginia.

5

7.     To avoid inconsistent injunctive relief for addressing selenium violations at certain Alpha Facilities, the provisions of this Consent Decree do not apply to violations of selenium limits for the Riverside, Independence, Pioneer, or Paynter Consent Decree Outlets referenced in Paragraph C of Section I (Background). Notwithstanding, the United States and West Virginia reserve all rights and claims with respect to those selenium violations in accordance with Paragraphs 147 and 148.

8.     Defendants hereby agree that they shall be bound to perform duties scheduled to occur by this Consent Decree prior to the Effective Date. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter this Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

9.     No transfer of ownership or operation of any Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant(s) of their obligation to ensure that the terms of Sections VIII (Selenium Injunctive Relief) and IX (Osmotic Pressure Injunctive Relief) and related obligations of the Decree are implemented. At least 30 Days prior to the transfer of any Facility with obligations under Sections VIII or IX, the applicable Defendant(s) shall provide a copy of this Consent Decree to the proposed transferee and simultaneously provide written notice of the prospective transfer, together with a copy of the provisions of the proposed written agreement pertaining to the successor entity's assumption of responsibilities relating to Sections VIII and IX under this Consent Decree, to EPA Regions 3 and 4, the States, and the United States Department of Justice ("DOJ"), in accordance with Section XVII of this Decree (Notices). Any attempt to transfer

ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

10.     Defendants shall not transfer ownership or operation of any Facility in order to alleviate responsibility under any terms of this Decree. The terms, conditions, and obligations of this Consent Decree shall survive any reorganization of Defendants' corporate structure and shall be fully binding on any entity or organization which is affiliated with Defendants. This Consent Decree, however, is not intended to restrict the lawful and legitimate sale of a Facility to a bona fide purchaser, and any such purchaser would not be subject to the terms of this Decree except as provided under law or otherwise provided under Paragraph 9.

11.     In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.  DEFINITIONS

12.     Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "Active Biological Treatment" shall mean a wastewater treatment technology with demonstrated success in full-scale applications that uses an attached growth media bioreactor to achieve compliance with the Selenium Limits, such as ABMet or similar process demonstrated to achieve compliance with the Selenium Limits.

7

     b.    "Alternative Cumberland and Emerald Compliance Plan" or "Alternative C&E Plan" shall mean the Osmotic Pressure Defendants' alternative method or methods for ensuring that the Cumberland and Emerald Discharges comply with the Osmotic Pressure Limits by the Cumberland and Emerald Compliance Deadline, which meets the requirements of Paragraph 96 and has been reviewed and approved by EPA, after consultation with Pennsylvania.

     c.    "Alternative Selenium Compliance Plan" or "Alternative SCP" shall mean the Selenium Defendants' alternative plan for achieving compliance at each Selenium Outlet using Active Biological Treatment, Reverse Osmosis, a Biochemical Reactor, or another technology or process approved pursuant to Paragraph 87, which meets the requirements of Paragraphs 85 and 86 and has been reviewed and approved by EPA, after consultation with West Virginia.

     d.    "Alternative Selenium Treatment System" or "Alternative STS" shall mean the particular alternative selenium treatment system identified for each Selenium Outlet in the approved Alternative Selenium Compliance Plan.

     e.    "Audit Database" shall mean the electronic database created and maintained pursuant to Paragraph 55 of this Consent Decree to track the results of each of the audits and inspections conducted pursuant to Paragraphs 43-53.

     f.    "Audit Database Evaluations" shall mean evaluations of the Audit Database to assess whether the Audit Database is capable of collecting, maintaining, and disseminating information from audits and inspections as required by this Consent Decree, and has performed such functions accurately and completely. Audit Database Evaluations shall be conducted pursuant to Paragraphs 56-60 of this Consent Decree.

8

g.      "Biochemical Reactor" or "BCR" shall mean an active or passive wastewater treatment technology with demonstrated success in full-scale applications that uses biological and/or chemical processes such as oxidation-reduction reactions, precipitation, or sorption to remove selenium and achieve compliance with the Selenium Limits.

h.      "Category 1 Daily Violation" shall mean any non-consecutive Daily Violation, and any Daily Violation at the same Outlet for the same pollutant parameter occurring within 48 hours of notification of a non-consecutive Daily Violation.

i.      "Category 1 Monthly Violation" shall mean any non-consecutive Monthly Violation.

j.      "Category 2 Daily Violation" shall mean all consecutive Daily Violations for a particular parameter at an Outlet subsequent to a Category 1 Daily Violation.

k.      "Category 2 Monthly Violation" shall mean all consecutive Monthly Violations for a particular parameter at an Outlet subsequent to a Category 1 Monthly Violation.

l.      "Complaint" shall mean the complaint filed by the United States and the States in this action concurrent with the lodging of this Decree.

m.      "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXV).

n.      "Cumberland and Emerald Compliance Deadline" shall mean the deadline for achieving compliance with the Osmotic Pressure Limits and any other NPDES permit limits applicable to any discharge from the Cumberland and Emerald Treatment System, which shall be September 30, 2016, or sooner if possible based on an approved Alternative C&E Plan.

9

o. "Cumberland and Emerald Discharges" shall mean the wastewater streams which are permitted for discharge as of the date of lodging by any NPDES Permit associated with discharges from or connected to the Cumberland Mine or Emerald Mine, including, without limitation, NPDES Permit Nos. PA 0213438, PA 0215724, PA 0215201, PA 0013511, PA 0235440, and PA 0033511.

p. "Cumberland and Emerald Treatment System" or "C&E Treatment System" shall mean the wastewater collection and treatment system installed pursuant to Paragraphs 90-95 of this Consent Decree for treatment of the Cumberland and Emerald Discharges.

q. "Cumberland and Emerald Treatment System Evaluation Report" or "C&E Treatment System Evaluation Report" shall mean the report evaluating the effectiveness of the C&E Treatment System, meeting the requirements of Paragraph 95 of this Consent Decree.

r. "Daily Violation" shall mean (i) any exceedance of a maximum daily discharge limitation for any parameters set forth in Defendants' NPDES permits, as determined by a Discharge Monitoring Report ("DMR") Sample, or (ii) any failure to attain a minimum daily discharge limitation for pH set forth in Defendants' NPDES permits, as determined by a DMR Sample. Exceedances of any daily maximum Selenium Limit and exceedances of any daily maximum discharge limitation for osmotic pressure by the Cumberland and Emerald Discharges are excluded from this definition.

s. "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

10

    t.    "Defendants" shall mean Alpha Natural Resources, Inc.; Alpha Appalachia Holdings, Inc.; Alex Energy, Inc.; Alpha PA Coal Terminal, LLC; Amfire Mining Company, LLC; Aracoma Coal Co., Inc.; Bandmill Coal Corp.; Belfry Coal Corp.; Big Bear Mining Co.; Black Castle Mining Company, Inc.; Black Mountain Resources LLC; Brooks Run Mining Company, LLC; Brooks Run South Mining LLC; Clear Fork Coal Co.; Cumberland Coal Resources, LP; Delbarton Mining Co.; Dickenson-Russell Coal Company, LLC; Duchess Coal Co.; Eagle Energy, Inc.; Elk Run Coal Co., Inc.; Emerald Coal Resources, LP; Enterprise Mining Company, LLC; Goals Coal Co.; Greyeagle Coal Co.; Harlan Reclamation Services LLC; Herndon Processing Co., LLC; Highland Mining Co.; Independence Coal Company, Inc.; Jacks Branch Coal Co.; Kanawha Energy Co.; Kepler Processing Co., LLC; Kingston Mining, Inc.; Kingwood Mining Co., LLC; Knox Creek Coal Corp.; Litwar Processing Co., LLC; Long Fork Coal Company, Inc.; Lynn Branch Coal Company, Inc.; Mammoth Coal Co.; Marfork Coal Co.; Martin County Coal Corp.; Mill Branch Coal Corp.; New Ridge Mining Co.; Omar Mining Co.; Paramont Coal Company Virginia, LLC; Paynter Branch Mining, Inc.; Peerless Eagle Coal Co.; Performance Coal Co.; Peter Cave Mining; Pigeon Creek Processing Corp.; Pioneer Fuel Corp.; Power Mountain Coal Co.; Premium Energy, LLC; Rawl Sales & Processing Co.; Republic Energy, Inc.; Resource Development, LLC; Resource Land Co.; Riverside Energy Co., LLC; Road Fork Development Co.; Rockspring Development, Inc.; Rum Creek Coal Sales, Inc.; Sidney Coal Co.; Solomons Mining Company; Spartan Mining Co.; Stirrat Coal Co.; Sycamore Fuels Inc.; Tennessee Consolidated Coal Company; Trace Creek Coal Co.; and Twin Star Mining, Inc.

    u.    "Diagnostic Sampling" shall mean sampling to determine necessary treatment measures and/or to evaluate the effectiveness of response actions taken. Such sampling of

11

discharges need not occur at the location designated for required sampling pursuant to the respective permit or be taken in accordance with approved test procedures under 40 C.F.R. Part 136.

   v.  "Discharge Monitoring Report Sample" or "DMR Sample" shall mean any sample taken in accordance with approved test procedures under 40 C.F.R. Part 136.

   w.  "Effective Date" shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

   x.  "Effluent Limit Violation" shall mean a Daily Violation or a Monthly Violation.

   y.  "Environmental Management System" or "EMS" shall mean a management system providing the structure by which specific activities related to environmental protection and compliance can be effectively and efficiently carried out by the Defendants, which shall be developed by Defendants with assistance from the EMS Consultant pursuant to Paragraph 36 of this Consent Decree and shall address, at a minimum, the requirements of this Consent Decree and the 12 key elements in Appendix A.

   z.  "EMS Audit" shall mean the audit conducted by the EMS Auditor pursuant to Paragraph 41 of this Consent Decree.

   aa.  "EMS Auditor" shall mean the independent third party meeting the requirements of Paragraph 40 who is approved by EPA, in consultation with the States, and contracted by the Defendants to perform the duties set forth in Paragraph 41, including an evaluation of the adequacy of EMS implementation relative to the EMS Manual.

bb.    "EMS Audit Findings" shall mean a written summary of all instances of noncompliance with the EMS Manual noted during the EMS Audit, and all areas of concern identified during the course of that audit which, in the EMS Auditor's judgment, merit further review or evaluation for potential EMS, environmental, or regulatory impacts.

cc.    "EMS Audit Report" shall mean a report setting forth the EMS Audit Findings resulting from the EMS Audit, which meets all of the requirements of Paragraph 41(b).

dd.    "EMS Audit Response and Action Plan" shall mean a comprehensive plan for bringing the Facilities into full compliance with the EMS Manual and fully addressing all EMS Audit Findings identified in the EMS Audit Report.

ee.    "EMS Consultant" shall mean the independent third party meeting the requirements of Paragraph 35 who is approved by EPA, in consultation with the States, and contracted by the Defendants to perform the duties set forth in Paragraph 36, including assisting Defendants in the development of an EMS and EMS Manual.

ff.    "EMS Manual" shall mean the document created by the Defendants and the EMS Consultant pursuant to Paragraph 36 that is approved by EPA, in consultation with the States, which describes and documents the integrated EMS developed by the Defendants and contains an EMS implementation schedule.

gg.    "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

hh.    "Facility" or "Facilities" shall mean mining operations (including but not limited to, surface and underground mines, coal processing and preparation plants, coal refuse facilities, coal transportation facilities, Reclaimed Sites, and all associated operations subject to the

13

Surface Mining Control and Reclamation Act ("SMCRA") and the Clean Water Act) that are owned, permitted, or otherwise operated by Defendants or their direct or indirect subsidiaries during the term of this Decree. Facilities that are operated by Defendants or their direct or indirect subsidiaries under contract to an unaffiliated third party are excluded from this definition, provided that the facility is not owned by or permitted to any entity subject to this Decree.

ii.    "Future Facilities" shall mean any Facilities that are not acquired, permitted, or otherwise operated by Defendants or their direct or indirect subsidiaries until after the date of lodging of the Consent Decree.

jj.    "Initial Review and Evaluation" shall mean an evaluation of Defendants' existing environmental management practices and documents to identify where existing systems or subsystems have not been adequately developed or implemented, or need to be enhanced, or new management systems or subsystems need to be developed, to adequately address all requirements under this Consent Decree and the EMS elements set forth in Appendix A.

kk.    "Internal Environmental Audit" shall mean an audit of each Facility conducted pursuant to the requirements of Paragraph 51 of this Consent Decree.

ll.    "Kentucky" shall mean the Commonwealth of Kentucky, by and through the Kentucky Energy and Environment Cabinet.

mm.    "Massey CD" shall mean the consent decree between the United States and Massey Energy Company, et al., entered by the Southern District of West Virginia on April 9, 2008 in case number 2:07-cv-0299.

nn.    "Monthly Violation" shall mean any exceedance of a monthly average discharge limitation for any parameters set forth in Defendants' NPDES permits, as determined by a

14

DMR Sample. Exceedances of any monthly average Selenium Limit and exceedances of any monthly average discharge limitation for osmotic pressure by the Cumberland and Emerald Discharges are excluded from this definition.

oo. "NOVs" shall mean notices of violation under the West Virginia Surface Coal Mining and Reclamation Act, W.Va. Code § 22-3-17 (2004); notices of noncompliance under the Kentucky Surface Mining Act, Ky. Rev. Stat. Ann. § 350.130 (Michie 2004); notices of violation under the Pennsylvania Surface Mining Control and Reclamation Act, 52 P.S. §§ 1396.1-1396.31; and/or notices of violation under the Virginia Coal Surface Mining Control and Reclamation Act, Va. Code Ann. § 45.1-245. "NOVs" shall also include any notice of violation or noncompliance under applicable state water quality laws and associated regulations, including Kentucky Revised Statute Chapter 224, Ky. Rev. Stat. Ann. § 224.10, and Tennessee Water Quality Control Act, Tenn. Code Ann. § 69-3-101.

pp. "NPDES Permit" shall mean a state-issued or federal-issued permit pursuant to the National Pollutant Discharge Elimination System as defined in 40 C.F.R. § 122.2.

qq. "Osmotic Pressure Defendants" shall mean Alpha Natural Resources, Inc., Cumberland Coal Resources, LP, and Emerald Coal Resources, LP.

rr. "Osmotic Pressure Limits" shall mean any instantaneous maximum, maximum daily, and/or monthly average discharge limitation for osmotic pressure set forth in NPDES Permit Nos. PA 0213438, PA 0215724, PA 0215201, PA 0013511, PA 0235440, and PA 0033511 and in any other NPDES permit applicable to any discharge from the C&E Treatment System.

15

ss.    "Outlet" shall mean an NPDES permitted discharge point, excluding newly permitted discharge points that have not begun to discharge.

tt.    "Outlet Inspection" shall mean the field evaluation of conditions at an Outlet conducted pursuant to the requirements of Paragraph 50 of this Consent Decree.

uu.    "Outlet Inspection Checklist" shall mean the checklist created by Defendants to be completed during Outlet Inspections pursuant to Paragraph 50 of this Consent Decree.

vv.    "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

ww.    "Parties" shall mean the United States, West Virginia, Pennsylvania, Kentucky, and Defendants.

xx.    "Pennsylvania" shall mean the Pennsylvania Department of Environmental Protection or "PADEP."

yy.    "Persistent Noncompliance Issues" shall mean three or more Effluent Limit Violations of a particular parameter at an Outlet permitted to or operated by Defendants within any 12-month period.

zz.    "Reclaimed Sites" shall mean Facilities that have been regraded to "Phase I" bond release standards under SMCRA, 30 U.S.C. § 1201, *et seq*.

aaa.    "Reverse Osmosis" shall mean a technology with demonstrated success in full-scale applications that uses a semi-permeable membrane system under pressure to achieve compliance with the Selenium Limits.

bbb.    "Section" shall mean a portion of this Decree identified by a Roman numeral.

16

ccc.    "Selenium Compliance Deadlines" shall mean the deadlines for achieving compliance with the Selenium Limits set forth in Appendix B.

ddd.    "Selenium Compliance Plans" shall mean the Plans for achieving compliance with the Selenium Limits by the Selenium Compliance Deadlines as set forth in Appendix B, which have been reviewed and approved by EPA, after consultation with West Virginia.

eee.    "Selenium Compliance Plan Evaluation Report" or "SCP Report" shall mean the report evaluating implementation of the Selenium Compliance Plan or Alternative SCP meeting the requirements of Paragraphs 82 and 83.

fff.    "Selenium Defendants" shall mean Alpha Natural Resources, Inc., Alpha Appalachia Holdings, Inc., Elk Run Coal Co., Independence Coal Co., Jacks Branch Coal Co., and Riverside Energy Company, LLC.

ggg.    "Selenium Limit(s)" shall mean any maximum daily discharge limitation for selenium and/or maximum monthly average discharge limitation for selenium set forth in: (i) the applicable NPDES permits for the Selenium Outlets and/or (ii) any NPDES permit applicable to any discharge from a Selenium Treatment System or water management system identified in Appendix B.

hhh.    "Selenium Outlets" are the following NPDES permitted discharge points identified in the following NPDES Permits:

i.      WV0066770, Outlet 031;
ii.     WV0093912, Outlets 013, 014, 018, 030, 031, 036;
iii.    WV0093929, Outlets 004, 005, 014, 015, 017, 040;
iv.     WV1003887, Outlets 004, 012;
v.      WV1004328, Outlet 001;
vi.     WV1012452, Outlets 002, 009, 011, 014;
vii.    WV1016890, Outlets 002, 004;
viii.   WV1017152, Outlets 013, 014, 019;

17

      ix.     WV1019228, Outlet 019;

      x.      WV1027668, Outlet 006; and

      xi.    WV1029711, Outlet 001.

iii.     "Selenium Treatment System" or "STS" shall mean the active or passive treatment systems identified in Appendix B2, B4, B5, or B11.

jjj.     "States" shall mean West Virginia, Pennsylvania, and Kentucky.

kkk.    "Third Party Environmental Audit" shall mean an annual audit conducted at each Facility by a third-party consultant, pursuant to the requirements of Paragraphs 52-53 of this Consent Decree.

lll.     "Treatment System Audit" shall mean an audit of the treatment systems for each Outlet to determine whether the treatment systems in place are adequate to ensure and maintain environmental compliance, which shall be conducted by a Treatment System Auditor.

mmm. "Treatment System Auditor(s)" shall mean the person(s) meeting the requirements of Paragraph 44 who perform(s) the Treatment System Audits and associated duties required by Paragraphs 43, 46, 47, and 49.

nnn.    "United States" shall mean the United States of America, acting on behalf of EPA.

ooo.    "Violations Database" shall mean the electronic database created and maintained pursuant to Paragraphs 61-64 of this Consent Decree to track information regarding Effluent Limit Violations and other Clean Water Act violations for each Facility.

ppp.    "Violations Database Evaluations" shall mean evaluations of the Violations Database to assess whether the Violations Database is capable of collecting, maintaining, and disseminating information on CWA violations as required by this Consent Decree and has performed

18

such functions accurately and completely, which shall be conducted pursuant to Paragraphs 66-70 of this Consent Decree.

qqq.    "West Virginia" shall mean the State of West Virginia by and through the West Virginia Department of Environmental Protection.

## V.  CIVIL PENALTY

13.    Within 30 Days after the Effective Date of this Consent Decree, Defendants shall pay a total of $27,500,000 as a civil penalty.

14.    $13,750,000 of the civil penalty under this Section shall be paid to the United States; $8,937,500 shall be paid to West Virginia; $4,125,000 shall be paid to Pennsylvania; and $687,500 shall be paid to Kentucky.

15.    Defendants shall make payment to the United States under this Section by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Defendants, following entry of this Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the Southern District of West Virginia, U.S. Courthouse, 300 Virginia St. S.E., Charleston, WV 25301, 304-345-2200. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to this Consent Decree in *United States, et al. v. Alpha Natural Resources, Inc., et al.*, and shall reference the DOJ case number, 90-5-1-1-08470/1, to the United States in accordance with Section XVII of this Decree (Notices); by email to acctsreceivable.CINWD@epa.gov; and by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

16.    Defendants shall make payment to West Virginia under this Section by certified or cashier's check to the WVDEP. Payment shall be mailed to:

Chief Inspector, Environmental Enforcement
West Virginia Department of Environmental Protection
601 57th Street, SE, Charleston, WV 25304.

All payments made to West Virginia under this Consent Decree shall be deposited by West Virginia as follows: 50.35% in the Mining and Reclamation Operating Fund, 44.05% in the Water Quality Management Fund, and 5.6% in the Operator Permit/Fees Fund.

17.    Defendants shall make payment to Pennsylvania under this Section by certified or cashier's check to the Commonwealth of Pennsylvania, Clean Water Fund and mailed to:

Deputy Secretary
Active and Abandoned Mining Operations
Pa. Department of Environmental Protection
Rachel Carson State Office Building
400 Market Street, 16th Floor
Harrisburg, PA 17101

18.    Defendants shall make payment to Kentucky under this Section by certified or cashier's check made payable to the Kentucky State Treasurer. Payments shall reference the civil action number, and be mailed to:

Michael Haines, General Counsel
Energy and Environment Cabinet
500 Mero Street, 12th Floor
Frankfort, KY 40601

19.    Defendants shall not deduct any penalties paid under this Decree pursuant to this Section or Section XI (Stipulated Penalties) in calculating its federal or state or local income tax.

20

## VI.  GENERAL COMPLIANCE REQUIREMENTS

20.    This Consent Decree in no way affects or relieves Defendants of their responsibility to comply with applicable federal, state, and local laws, regulations, and permits.

21.    At all times, Defendants shall operate the Facilities to achieve compliance with applicable NPDES permits.

22.    Defendants shall perform the work required by this Consent Decree in compliance with the requirements of all applicable federal, state, and local laws, regulations, and permits.  This Consent Decree should not be considered as a permit issued pursuant to any federal, state, or local statute or regulation.

23.    Approval of Deliverables.  After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with the relevant States, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder, with explanation; or (d) disapprove the submission, with explanation.

24.    If the submission is approved pursuant to Paragraph 23(a), Defendants shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 23(b) or 23(c), Defendants shall, upon written direction from EPA, after consultation with the States, take all actions required by the approved plan, report, or other item that EPA, after consultation with the States, determines are technically severable from any disapproved portions.

21

25.     If the submission is disapproved in whole or in part pursuant to Paragraph 23(c) or 23(d), Defendants shall, within 45 Days of receipt of disapproval or such other time as the Parties agree to in writing, revise and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with the preceding Paragraph.

26.     Any stipulated penalties applicable to the original submission, as provided in Section XI of this Decree (Stipulated Penalties), shall accrue during the 45-Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendants' obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

27.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with the States, may again require Defendants to revise and resubmit the item, in accordance with the preceding Paragraphs, subject to Defendants' right to invoke Dispute Resolution under Section XIII and the right of EPA to seek stipulated penalties as provided in the preceding Paragraph.

28.     <u>Permits</u>. Where any compliance obligation under this Section requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely and substantially complete applications and take all other actions necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have

22

submitted timely and complete applications and have taken all other actions necessary to obtain all such permits or approvals.

29. <u>Consultants</u>. Third-party consultants selected by Defendants to perform the duties set forth in Paragraphs 36 (EMS), 41 (EMS Audit), 43-49 (Treatment System Audits), 52-53 (Third Party Environmental Audits), 56-60 (Audit Database Evaluations), 66-70 (Violations Database Evaluations), 71(a)(ii) (Category 2 Daily Violation Response), and 71(b)(ii) (Category 2 Monthly Violation Response) of this Consent Decree shall have no direct financial stake in the outcome of the audit(s), inspection(s), or evaluation(s) conducted under the terms of this Decree.

30. Defendants shall provide a copy of this Consent Decree to all employees with environmental responsibilities. The copy may be provided at the semi-annual training required in Paragraph 74.

31. <u>Contractors</u>. Within 15 Days of the Effective Date, Defendants shall provide a copy of the Decree to each entity contracted by Defendants to fulfill responsibilities under this Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree. Within 15 Days of the Effective Date, Defendants shall develop protocols for all contractors with responsibilities relating to Outlet Inspections under Paragraph 50 of this Decree and Electronic Transmittal of Sample Results and Notification under Paragraph 61 of this Decree. Within 30 Days of the approval of the EMS Manual pursuant to Paragraph 36(c), Defendants shall refine such protocols and develop additional contractor protocols for the remaining responsibilities under the EMS Manual.

32. <u>Implementation of Consent Decree Requirements at Future Facilities</u>. For Future Facilities, Defendant(s)' obligation to comply with the requirements for Outlet Inspections, Audit

and Violations Databases, electronic notification of violations, and Effluent Limit Violation Response shall begin 60 Days from the initiation of operations by Defendant(s). Defendant(s) shall conduct an Initial Treatment System Audit at Future Facilities within 60 Days of the initiation of operations by Defendant(s) for Outlets with three or more effluent limit violations within the previous 12-month period, and within 90 Days of the initiation of operations by Defendant(s) for all other Outlets. Defendant(s)' obligation to comply with Reporting Requirements, Internal Environmental Audits, Third Party Audits, and training requirements pursuant to Section X and Paragraphs 51, 52-53, and 74-76 with respect to Future Facilities shall begin the second quarter after the initiation of operations by Defendant(s). Defendant(s) shall implement the Environmental Management System at Future Facilities within 9 months of the initiation of operations by Defendant(s).

## VII.  INJUNCTIVE RELIEF

### Environmental Management System

33.  Defendants shall, with the assistance of an EMS Consultant, develop an integrated Environmental Management System that addresses, at a minimum, the requirements of this Consent Decree and the 12 key elements in Appendix A.

34.  Defendants have retained and EPA, after consultation with the States, has approved an EMS Consultant to complete an Initial Review and Evaluation and to assist Defendants in the development and implementation of the EMS in accordance with this Consent Decree. Defendants shall bear all costs associated with the EMS Consultant, cooperate fully with the EMS Consultant, and provide the EMS Consultant with access to all records, employees, contractors, and Facilities

24

that the EMS Consultant deems reasonably necessary to effectively perform the duties described in Paragraph 36.

35.     Selection of Replacement EMS Consultant. If at any time Defendants seek to replace the EMS Consultant, Defendants shall submit to EPA and the States a list of two or more proposed consultants to serve as EMS Consultant, along with the name, affiliation, and address of the proposed consultants; information demonstrating how each proposed consultant satisfies the EMS auditor qualification requirements of Table 1 in ISO 19011 (First edition, 2002-10-01) and has experience in developing and implementing an EMS; information demonstrating that the team proposed to conduct the Initial Review and Evaluation, in composite, has a working process knowledge of the Facilities or similar operations, and has a working knowledge of federal and state environmental requirements which apply to the Facilities; and descriptions of any previous work, contracts, or financial relationships with Defendants.

        a.     EPA, in consultation with the States, shall notify Defendants of whether it approves any consultant(s) on the list. If EPA, after consultation with the States, does not approve any of the proposed consultants on Defendants' list, then Defendants shall submit another list of proposed consultants to EPA and the States within 30 Days of receipt of EPA's written notice. If after Defendants have submitted a third list of consultants, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the consultants on Defendants' second list, the Parties are unable to agree on an EMS Consultant, the Parties agree to resolve the selection of the EMS Consultant through the Dispute Resolution process in Section XIII.

        b.     Within 10 Days after receipt of EPA's approval, Defendants shall select one consultant from those approved by EPA and shall enter into a contract with the consultant to perform

25

all duties described in Paragraph 36. In the event the consultant(s) approved by EPA are no longer available or willing to accept the work described in Paragraph 36 when notified of their selection by Defendants, then Defendants shall, within 30 Days after receipt of EPA's approval pursuant to Paragraph 35(a), select another consultant approved by EPA and enter into the contract to perform all duties described in Paragraph 36.

36.     <u>Duties of the EMS Consultant</u>. Defendants' contract with the EMS Consultant shall require the EMS Consultant to perform the following duties:

a.     Conduct and complete an Initial Review and Evaluation for all Defendants, prepare a report of the results, and provide such report to Defendants within 90 Days of the date of lodging. This report shall also be provided to EPA and the States, upon request;

b.     Based on the Initial Review and Evaluation results and any other relevant information, assist Defendants in development of an integrated EMS that addresses, at a minimum, the requirements of this Consent Decree and the 12 key elements in Appendix A;

c.     Within 6 months of the date of lodging, draft and submit to EPA and the States for review and approval an EMS Manual which describes and documents the integrated EMS developed by the Defendants with assistance from the EMS Consultant pursuant to Paragraph 36(b). The EMS Manual shall contain a schedule for each of the described systems and subsystems not already fully implemented and a final deadline to fully implement the EMS. The EMS Manual shall (i) describe or contain, as appropriate, overarching policies, procedures, and programs that comprise the EMS framework, and respective management systems, subsystems, and tasks for the elements listed in Appendix A, and (ii) describe specific procedures for implementing the requirements of this Consent Decree set forth in Paragraphs 43-105.

26

37. Upon Defendants' receipt of EPA's approval of the EMS Manual, Defendants, assisted by the EMS Consultant, shall commence implementation of the EMS in accordance with the schedule contained in the EMS Manual. Managers responsible for environmental compliance at each Facility shall thereafter include a certification of compliance with the approved EMS Manual in Quarterly Reports submitted pursuant to Section X, or, for any noncompliance, shall submit in the Quarterly Reports an explanation of the cause of the noncompliance, remedial steps to be taken, and a date for achieving compliance.

38. Revisions of the EMS Manual. Any revisions to the EMS Manual subsequent to its initial approval must be submitted to EPA as a separate written submission for review. Material revisions must be approved by EPA. EPA shall notify Defendants within 30 Days of its receipt of the proposed revisions whether approval of those revisions will be required.

### Audit of EMS Implementation

39. Defendants have retained and EPA, after consultation with the States, has approved an EMS Auditor to conduct an EMS Audit pursuant to Paragraph 41. Defendants shall bear all costs associated with the EMS Auditor, cooperate fully with the EMS Auditor, and provide the EMS Auditor with access to all records, employees, contractors, and Facilities that the EMS Auditor deems reasonably necessary to effectively perform the duties described in Paragraph 41.

40. Selection of Replacement EMS Auditor. If at any time Defendants seek to replace the EMS Auditor, Defendants shall propose to EPA and the States for approval the selection of two or more proposed auditors to serve as EMS Auditors, along with the name, affiliation, and address of the proposed auditor; certification that the individual was not involved in the Initial Review and

27

Evaluation to develop the integrated EMS; information demonstrating how each proposed auditor satisfies the EMS auditor qualification requirements of Table 1 in ISO 19011 (First edition, 2002-10-01); information demonstrating expertise and competence in the relevant regulatory programs under federal and state environmental laws; and a description of any previous work, contracts, or financial relationships with Defendants.

    a.    EPA, in consultation with the States, shall notify Defendants of whether it approves any auditor(s) on the list. If EPA, after consultation with the States, does not approve any of the proposed EMS Auditors on Defendants' list, then Defendants shall submit another list of proposed EMS Auditors to EPA and the States within 30 Days of receipt of EPA's written notice. If after Defendants have submitted a third list of proposed EMS Auditors, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the auditors on Defendants' second list, the Parties are unable to agree on an EMS Auditor, the Parties agree to resolve the selection of the EMS Auditor through the Dispute Resolution process in Section XIII.

    b.    Within 10 Days after receipt of EPA's approval, Defendants shall select one auditor from those approved by EPA and shall enter into a contract with the auditor to perform all duties described in Paragraph 41. In the event the auditor(s) approved by EPA are no longer available or willing to accept the work described in Paragraph 41 when notified of their selection by Defendants, then Defendants shall, within 30 Days after receipt of EPA's approval pursuant to Paragraph 40(a), select another auditor approved by EPA and enter into the contract to perform all duties described in Paragraph 41.

    41.    <u>Duties of the EMS Auditor</u>. Defendants' contract with the EMS Auditor shall require the EMS Auditor to perform the following duties:

a.      Within 11 months of approval of the EMS Manual, the EMS Auditor shall perform an audit of Defendants' EMS (the "EMS Audit"). The EMS Audit shall evaluate the adequacy of EMS implementation relative to the EMS Manual and identify areas of concern, from top management down, throughout each major organizational unit with responsibilities under the EMS Manual. The EMS Audit shall be conducted in accordance with ISO 19011 (First edition, 2002-10-01), and shall determine the following:

(i)      Whether there is a defined system, subsystem, program, or planned task for the respective EMS element;

(ii)     To what extent the system, subsystem, program, or task has been implemented, and is being maintained;

(iii)    The adequacy of each Facility's internal self-assessment procedures for programs and tasks comprising the EMS;

(iv)     Whether Defendants are effectively communicating environmental requirements to affected parts of the organization, or those working on behalf of the organization;

(v)      Whether further improvements should be made to the EMS and EMS Manual; and

(vi)     Whether there are deviations from Defendants' written requirements or procedures.

b.      Within 30 Days following the completion of the EMS Audit, the EMS Auditor shall develop and concurrently submit an EMS Audit Report to Defendants, EPA, and the States. The EMS Audit Report shall contain: a summary of the audit process, including any obstacles encountered; detailed EMS Audit Findings, including the basis for each finding and each area of

29

concern identified; identification of any EMS Audit Findings corrected or areas of concern addressed during the audit; recommendations for resolving any area of concern or otherwise achieving full implementation of the EMS Manual; and certification that the EMS Audit was conducted in accordance with the provisions of this Decree.

42.     Follow-Up Corrective Measures.   Within 60 Days of receiving the EMS Audit Report, Defendants shall submit an EMS Audit Response and Action Plan to EPA and the States for review and approval in accordance with the procedures set forth in Paragraphs 23-27 of this Decree, except that Defendants shall submit any required revisions to the EMS Audit Response and Action Plan to EPA within 30 Days of receipt of EPA's comments.  The EMS Audit Response and Action Plan shall respond to the EMS Audit Findings and areas of concern identified in the EMS Audit Report and provide an action plan for expeditiously coming into full compliance with the provisions in the EMS Manual.  The EMS Audit Response and Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule for the identified actions and measures, including those that may have already been completed. Immediately upon approval of a final EMS Audit Response and Action Plan, Defendants shall implement the final EMS Audit Response and Action Plan in accordance with the schedules set forth therein.

### Audits and Inspections

43.     Treatment System Audits.  Defendants shall conduct audits of the treatment systems for each Outlet at all Facilities to evaluate whether the treatment systems in place are adequate to

30

ensure and maintain environmental compliance. Treatment System Audits shall be conducted according to the schedule and requirements set forth in Paragraphs 44-49.

44.     Treatment System Auditors. Initial and Subsequent Treatment System Audits shall be conducted by the following individuals:

a.     For all Outlets with Persistent Noncompliance Issues, Treatment System Audits shall be conducted by third-party consultants with at least five years of experience with the requirements of NPDES permits and SMCRA permits and with treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits.

(i)     Defendants have retained and EPA, after consultation with the States, has approved Treatment System Auditors to conduct the Treatment System Audits pursuant to Paragraphs 46-49 for Outlets with Persistent Noncompliance Issues.

(ii)     If at any time Defendants seek to replace such Treatment System Auditors, Defendants shall, at least 60 Days prior to any applicable deadline for conducting the Treatment System Audits, propose to EPA and the States for approval the selection of two or more proposed consultants to serve as the Treatment System Auditors, along with the name, affiliation, and address of the proposed consultant; information demonstrating how each proposed consultant has the requisite expertise and competence in the relevant regulatory programs under federal and state environmental laws; and a description of any previous work, contracts, or financial relationships with Defendants.

(iii)     EPA, in consultation with the States, shall notify Defendants of whether it approves any auditor(s) on the list. If EPA, after consultation with the States, does not approve any of the proposed Treatment System Auditors on Defendants' list, then Defendants shall

31

submit another list of proposed Treatment System Auditors to EPA and the States within 30 Days of receipt of EPA's written notice. If after Defendants have submitted a third list of proposed Treatment System Auditors, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the auditors on Defendants' second list, the Parties are unable to agree on a Treatment System Auditor, the Parties agree to resolve the selection of the Treatment System Auditor through the Dispute Resolution process in Section XIII.

      b. For all remaining Outlets, i.e. any Outlets without Persistent Noncompliance Issues, all Treatment System Audits shall be conducted by individual(s) with experience with the requirements of NPDES permits and SMCRA permits and with treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits, who do not have regular responsibilities at the Facility where the Treatment System Audit is to be conducted.

45. Defendants shall cooperate fully with the Treatment System Auditor(s) and provide access to all records, employees, contractors, and Facilities that the Treatment System Auditor(s) deem reasonably necessary to effectively perform the Treatment System Audits.

46. Initial Treatment System Audits. The first round of Treatment System Audits shall be conducted according to the following schedule:

      a. Within 60 Days of the Effective Date, Defendants shall audit all Outlets with Persistent Noncompliance Issues. For the purposes of this Paragraph, Outlets with Persistent Noncompliance Issues shall be determined based on the 12-month period prior to the Effective Date.

      b. Within 120 Days of the Effective Date, Defendants shall audit all remaining Outlets with one or more Effluent Limit Violations in the 24-month period prior to the first day of the month in which the Effective Date falls.

32

47.     Within 30 Days of completion of the Initial Treatment System Audit for a particular Outlet, the Treatment System Auditor shall produce a report providing the results of the Initial Treatment System Audit for that Outlet and identifying any alterations, maintenance, or other measures to the associated treatment systems necessary to achieve and maintain environmental compliance. Defendants shall implement all such measures within the time period recommended by the Treatment System Auditor, and in no event longer than 90 Days from completion of the Initial Treatment System Audit report, unless a permit approval is necessary to implement the measures. If a permit approval is required, Defendants shall submit the permit application as soon as possible but no later than 45 Days after the Initial Treatment System Audit report, and shall implement the measures recommended by the Treatment System Auditor within the time period recommended by the Treatment System Auditor, and in no event longer than 90 Days from the receipt of permit approval. Deadlines for implementation of recommended measures pursuant to this Paragraph may be extended in writing by EPA.

48.     Within 120 Days of completion of the Initial Treatment System Audits, Defendants shall submit a status report to EPA and the States. Such report shall include all findings from the Initial Treatment System Audits, including the Treatment System Auditor(s)' recommended measures for achieving and maintaining environmental compliance, and shall confirm implementation of all such measures pursuant to Paragraph 47.

49.     Subsequent Treatment System Audits. Starting with the first full quarter after the completion of the Initial Treatment System Audits, Defendants shall conduct Treatment System Audits at Outlets with Persistent Noncompliance Issues on a quarterly basis. If an Outlet is audited pursuant to this Paragraph, Defendants shall continue to conduct Treatment System Audits at that

Outlet on a quarterly basis until twelve consecutive months of compliance with applicable effluent limits.

50.     Outlet Inspections.   Starting with the first full month after the Effective Date, Defendants shall conduct Outlet Inspections at the time of DMR Sampling, but not more than twice a month.  Outlet Inspections shall be conducted pursuant to an Outlet Inspection Checklist created by Defendants, which shall include entries for whether: (a) the Outlet is accessible; (b) the Outlet is unobstructed; (c) discharge markers are visible at the Outlet; (d) there is any water flow at the Outlet; (e) there are any visual indications of overtopping of the pond or other drainage system; (f) there is a buildup of sediment at the Outlet or any other location in the pond or other drainage system; (g) there is any indication of erosion or other damage to the embankment of the pond or other drainage system; (h) baffles and retention curtains are in place; (i) chemical treatment systems are appropriately stocked with chemicals and fully operational; and (j) required lock boxes are in place on chemical treatment valves.  The Outlet Inspection Checklist shall be completed at the time of each Outlet Inspection and signed by the individual completing the Outlet Inspection (electronic signatures are acceptable).

51.     Internal Environmental Audits.   Defendants shall conduct Internal Environmental Audits at each Facility, which shall be conducted by individual(s) with experience with the requirements of NPDES permits and SMCRA permits and with treatment systems for and control of relevant effluent limit parameters in Defendants' NPDES permits.

        a.      The Internal Environmental Audits shall include, but not be limited to: (i) visual inspections to assess the structural integrity of all slurry pipes; (ii) an evaluation of septic systems for proper operation and maintenance; and (iii) an assessment of sediment control structures

34

and haul roads, including any associated surface runoff pathways, drainage, or sediment ditches, to identify any maintenance or other measures required to address erosion and/or structural damage issues.

        b.     Internal Environmental Audits shall be conducted at each Reclaimed Site on an annual basis, and shall include all elements of Paragraph 51(a), as applicable. Internal Environmental Audits shall be conducted at all other Facilities on a quarterly basis, and shall include all elements of Paragraph 51(a).

        c.     Reports detailing the results of the Internal Environmental Audits shall be generated no later than 30 Days after completion of the Internal Environmental Audits.

    52.    <u>Third Party Environmental Audits</u>. Defendants shall hire a third-party consultant to conduct environmental audits at all Facilities, with the exception of Reclaimed Sites, pursuant to the schedule set forth in Paragraph 53. The third-party consultant must have expertise and competence in the relevant regulatory programs under federal and state environmental laws, and at least five years of experience with the requirements of NPDES permits and SMCRA permits. Third Party Environmental Audits under this Paragraph shall evaluate compliance with this Consent Decree and with the following federal statutes and equivalent state laws: Clean Air Act; Clean Water Act; Comprehensive Environmental Response, Compensation and Liability Act; Emergency Planning and Community Right to Know Act; Resource Conservation and Recovery Act; Safe Drinking Water Act; Toxic Substances Control Act; and SMCRA. The third-party consultant shall submit to Defendants a report detailing the results of the Third Party Environmental Audit no later than 30 Days after completion of the Third Party Environmental Audit.

53.     Defendants shall conduct a Third Party Environmental Audit at all Facilities, with the exception of Reclaimed Sites, no later than December 31, 2014. Subsequent Third Party Environmental Audits shall be conducted on the following schedule:

a.     Preparation plant and coal refuse Facilities shall be audited on an annual basis.

b.     All other Facilities with the exception of Reclaimed Sites, including active surface and underground mines and associated operations, shall be audited every two years, with one-half of such mines and associated operations being audited each year.

54.     Responses to any noncompliances or areas of concern identified by an audit or inspection conducted pursuant to Paragraphs 49-53 shall be completed as expeditiously as possible, and in no event shall take longer than 45 Days to complete after the applicable inspection or audit report, unless a permit approval is required. If a permit approval is required, Defendants shall submit the permit application as soon as possible but no later than 45 Days after the applicable inspection or audit report, and shall implement the appropriate response no later than 45 Days from the receipt of permit approval. Deadlines for implementation of response measures pursuant to this Paragraph may be extended in writing by EPA.

55.     Audit Database. Defendants shall maintain an electronic Audit Database to track audit and inspection information relating to each Facility as required under this Consent Decree.

a.     The results of the Outlet Inspections conducted pursuant to Paragraph 50 shall be entered into the Audit Database within 48 hours of completion. The results of the audits conducted pursuant to Paragraphs 43-49 and 51-53 shall be entered into the Audit Database within 48 hours of completion of the audit report.

36

b.      The Audit Database shall include: the date and time of the audit/inspection; the names of the individuals conducting the audit/inspection; a description of any noncompliances or other areas of concern; any applicable NPDES permit number and Outlet; any applicable SMCRA permit number; and the planned response to any noncompliances or areas of concern in order to return to compliance, the individuals responsible for the response, the deadline for the response, and the date of completion of the response. Responses that are not completed by the deadline initially assigned in the Audit Database shall be reported as part of the Quarterly Report required by Section X, unless EPA has granted a written extension of time.

c.      Defendants may combine this database with the Violations Database required by Paragraph 62.

d.      Defendants shall provide access to the Audit Database to EPA and the States upon request. In addition, Defendants shall produce any requested information from the Audit Database to EPA and the States within 10 Days of the request.

56.     Audit Database Evaluations. Defendants shall conduct evaluations of the Audit Database to assess whether the Audit Database is capable of collecting, maintaining, and disseminating information from audits and inspections as required by this Consent Decree and has performed such functions accurately and completely.

57.     The Audit Database Evaluations shall be conducted by a third-party consultant with expertise in management of environmental data; database design development, implementation, and support; proficiency with Standard Query Language ("SQL"); database administrator experience with tasks such as quality control requirements, backup, recovery, security, monitoring space usage, managing transactions, performance tuning, and installing upgrades; and at least five years

experience working with relational databases such as SQL Server, Oracle, and Access. Defendants shall cooperate fully with the third-party consultant and provide access to all records, employees, contractors, and Facilities that the consultant deems reasonably necessary to effectively perform the duties in Paragraphs 58-60.

58. <u>Initial Audit Database Evaluation.</u> Within 30 Days of the Effective Date, Defendants shall conduct an evaluation of the Audit Database to assess the database structure and functionality, specifically the capability to accurately and timely track all audits and inspections required by this Consent Decree.

a. Within 30 Days of completing the Initial Audit Database Evaluation, the third-party consultant shall submit to Defendants, EPA, and the States a report of findings, including (i) any structural deficiencies in the operation system; (ii) any functional deficiencies in the capability of the database to track all audits and inspections required by this Consent Decree; and (iii) any recommended measures to address any deficiencies identified as a result of the Initial Audit Database Evaluation.

b. Within 30 Days of the third-party consultant's report, Defendants shall correct any deficiencies with the Audit Database by implementing any measures recommended by the third-party consultant.

59. <u>Subsequent Audit Database Evaluations</u>. Within 8 months of the Effective Date, Defendants shall conduct an evaluation of the Audit Database to determine the accuracy and completeness of audit and inspection information.

a. Within 30 Days of completing the Subsequent Audit Database Evaluation, the third-party consultant shall submit to Defendants, EPA, and the States a report of findings, including

38

(i) any failure to conduct a required audit or inspection; (ii) any failure to document an audit or inspection according to the requirements of Paragraph 55; (iii) any failure to properly document an audit or inspection based on a comparison of information from the respective audit or inspection to information in the Audit Database; and (iv) any recommended measures to address data tracking errors identified by the third-party consultant. The report shall also include an assessment, by percentage, of data tracking accuracy, based on the number of audits or inspections with any failure(s) identified under this Paragraph as compared to the number of total audits or inspections conducted.

      b.      Within 30 Days of the third-party consultant's report, Defendants shall fix any data errors in the Audit Database and implement any measures recommended by the third-party consultant to achieve and maintain accurate and complete data tracking.

      60.     Additional Audit Database Evaluations pursuant to the requirements of Paragraph 59 shall be conducted for any data errors previously identified and any new information entered into the Audit Database since the preceding Audit Database Evaluation, on the following schedule:

      a.      Where the preceding Audit Database Evaluation identifies a data tracking accuracy of 0-90%, the subsequent Audit Database Evaluation shall be conducted 6 months after completion of the preceding Audit Database Evaluation;

      b.      Where the preceding Audit Database Evaluation identifies a data tracking accuracy of above 90% to 99%, the subsequent Audit Database Evaluation shall be conducted 12 months after completion of the preceding Audit Database Evaluation; and

c.       Where the preceding Audit Database Evaluation identifies a data tracking accuracy of above 99%, the subsequent Audit Database Evaluation shall be conducted on a bi-annual basis.


**DMR Sample Notification and Violation Tracking**

61.     Electronic Transmittal of Sample Results and Notification.  Upon the Effective Date, Defendants shall require laboratories to provide electronic transmittal of all DMR Sample results to the Violations Database within 48 hours of completion of analysis.  Upon receipt of DMR Sample results, Defendants shall provide immediate electronic notification of any violation of an applicable effluent limit to managers responsible for environmental compliance at the relevant Facilities.  The electronic notification shall identify the Outlet, the relevant DMR Sample result(s), and date when the violation occurred.  Defendants shall also submit DMR Sample results electronically to the relevant regulatory authority if that regulatory authority has the capability to receive DMRs electronically via a Cross Media Electronic Reporting Regulation ("CROMERR") compliant electronic reporting system.

62.     Violations Database.  Defendants shall maintain an electronic Violations Database to track Clean Water Act violations data relating to each Facility.  The Violations Database shall include the following information for each violation of an applicable effluent limit at each Outlet for one year immediately preceding the Effective Date:

a.       Identification of Outlet by NPDES and SMCRA permit numbers, permittee, and latitude and longitude;

b.       Dates of DMR Samples and DMR Sample results (including units);

40

c.      NPDES effluent limit that was exceeded;

d.      Percentage by which the limit was exceeded;

e.      Number of consecutive violations for the same pollutant parameter;

f.      Number of violations for that particular pollutant parameter over the preceding 12 months; and

g.      Total number of violations at that particular Outlet over the preceding 12 months.

63.     Within two business days of receipt of DMR Sample results pursuant to Paragraph 61, Defendants shall update the Violations Database to include the information identified in Paragraph 62(a)-62(g) and any applicable stipulated penalties.  In addition, Defendants shall update the Violations Database to include the following information for each violation of an applicable effluent limit for each Outlet as soon as the information becomes available:

a.      A description of the cause of the violation and the planned response, taking into account any applicable information in the Audit Database and any required actions under Paragraph 71 (Effluent Limit Violation Response);

b.      Date of receipt of the third-party consultant corrective action plan pursuant to Paragraph 71(a)(ii) or 71(b)(ii) (if applicable);

c.      Date of implementation of the third-party consultant corrective action plan pursuant to Paragraph 71(a)(ii) or 71(b)(ii) (if applicable); and

d.      Date that violation ended (if applicable).

41

64.     The Violations Database shall also include entries for any additional CWA violations that occur subsequent to the Effective Date, including NOVs or unauthorized discharges, along with the following information:

      a.     Permit number;

      b.     Description of violation;

      c.     Date of violation;

      d.     Cause of violation and planned response, taking into account any applicable information in the Audit Database;

      e.     Date that noncompliance ended (if applicable); and

      f.     Any state-issued order and/or penalties associated with the violation.

65.     Defendants shall provide access to the Violations Database to EPA and the States upon request. In addition, Defendants shall produce any requested information from the Violations Database to EPA and the States within 10 Days of the request.

66.     Violations Database Evaluations. Defendants shall conduct evaluations of the Violations Database to assess whether the Violations Database is capable of collecting, maintaining, and disseminating information on CWA violations as required by this Consent Decree and has performed such functions accurately and completely.

67.     The Violations Database Evaluations shall be conducted by a third-party consultant with expertise in management of environmental data; database design development, implementation, and support; proficiency with SQL; database administrator experience with tasks such as quality control requirements, backup, recovery, security, monitoring space usage, managing transactions, performance tuning, and installing upgrades; and at least five years experience working with

relational databases such as SQL Server, Oracle, and Access. Defendants shall cooperate fully with the third-party consultant and provide access to all records, employees, contractors, and Facilities that the third-party consultant deems reasonably necessary to effectively perform the duties described in Paragraphs 68-70.

68. <u>Initial Violations Database Evaluation.</u> Within 30 Days of lodging, Defendants shall conduct an evaluation of the Violations Database to assess the database structure and functionality, specifically the capability to accurately and timely track all CWA violations as required by this Consent Decree.

a. Within 30 Days of completing the Initial Violations Database Evaluation, the third-party consultant shall submit to Defendants, EPA, and the States a report of findings, including (i) any structural deficiencies in the operation system; (ii) any functional deficiencies in the capability of the database to track all CWA violations as required by this Consent Decree; and (iii) any recommended measures to address any deficiencies identified as a result of the Initial Violations Database Evaluation.

b. Within 30 Days of the third-party consultant's report, Defendants shall correct any deficiencies with the Violations Database by implementing any measures recommended by the third-party consultant.

69. <u>Subsequent Violations Database Evaluations.</u> Within 8 months of the Effective Date, Defendants shall conduct a complete review and evaluation of the Violations Database to determine the accuracy and completeness of reporting of Clean Water Act violations, including an investigation into the cause of any discrepancies between original data, data in the Violations Database, and data reported to the applicable state in Discharge Monitoring Reports.

43

      a.     Within 30 Days of the Subsequent Violations Database Evaluation, the third-party consultant shall submit to Defendants, EPA, and the States a report of its findings, including (i) verification that all Clean Water Act violations from all Facilities are entered into the Violations Database; (ii) verification of Clean Water Act violations reported in the Violations Database against original data from the laboratory and/or contractor, such as laboratory bench sheets and/or field data collections; (iii) verification of NPDES permit limits in the Violations Database against applicable NPDES permits; (iv) verification of Clean Water Act violations reported in the Violations Database as a result of DMR Sampling against the respective state DMR database(s); (v) verification of any other Clean Water Act violation results reported in the Violations Database against original data, such as the state-issued NOVs; (vi) any failure to document information according to the requirements under Paragraphs 61-64; and (vii) any recommended measures to address data tracking errors identified by the third-party consultant.  The report shall also include an assessment, by percentage, of data tracking accuracy, based on the number of Clean Water Act violations with errors identified under this Paragraph as compared to the total number of Clean Water Act violations.

      b.     Within 30 Days of the third-party consultant's report, Defendants shall fix any data errors in the Violations Database and implement measures recommended by the third-party consultant to achieve and maintain accurate and complete data tracking.

70.     Additional Violations Database Evaluations pursuant to the requirements of Paragraph 69 shall be conducted for any data errors previously identified and new information entered into the Violations Database since the preceding Violations Database Evaluation, on the following schedule:

44

a.      Where the preceding Violations Database Evaluation identifies a data tracking accuracy of 0-90%, the subsequent Violations Database Evaluation shall be conducted 6 months after completion of the preceding Violations Database Evaluation;

b.      Where the preceding Violations Database Evaluation identifies a data tracking accuracy of above 90% to 99%, the subsequent Violations Database Evaluation shall be conducted 12 months after completion of the preceding Violations Database Evaluation; and

c.      Where the preceding Violations Database Evaluation identifies a data tracking accuracy of above 99%, the subsequent Violations Database Evaluation shall be conducted on a bi-annual basis.

## Effluent Limit Violation Response

71.     Upon the Effective Date, Defendants shall implement a response plan for Effluent Limit Violations, which shall provide for investigation of Effluent Limit Violations and implementation of actions necessary to achieve compliance with the applicable NPDES permit limits. This response plan shall, at a minimum, provide for the following response actions at all Outlets in addition to the requirements of Paragraph 63:

a.      Daily Violation Response

(i)     Category 1 Daily Violation. Upon notification of a Category 1 Daily Violation, Defendants shall immediately begin daily monitoring of conditions, Diagnostic Sampling, and implementing corrective measures at the Outlet. Defendants shall continue daily monitoring, Diagnostic Sampling, and corrective measures until one compliant DMR Sample result for that parameter is achieved at the Outlet. If a compliant DMR Sample result for the same pollutant

45

parameter is not achieved at the Outlet within 48 hours of notification of the Daily Violation, Defendants shall also consult with an individual with substantial expertise in Clean Water Act compliance and in treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits, and implement any additional measures recommended by that individual. Days with no flow conditions shall not be counted in determining whether expert consultation is required under this Subparagraph.

(ii)     Category 2 Daily Violation.  Upon notification of a Category 2 Violation, Defendants shall continue daily monitoring of conditions, Diagnostic Sampling, and implementing corrective measures at the Outlet until two consecutive compliant DMR Sample results for that parameter, which must include results from two separate days, are achieved at the Outlet.  Defendants shall also hire a third-party consultant to conduct a complete review and evaluation of the problem.  The consultant must have at least five years of experience with the requirements of NPDES permits for mining operations and with treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits.  The consultant shall prepare a report detailing the cause of the continuing violations and a corrective action plan to return the Outlet to compliance as soon as possible.  The consultant's recommended corrective action plan shall be based on all available data, including all information in the Audit Database and/or Violations Database for the respective Outlet, and shall describe whether this approach has worked in other similar situations to resolve noncompliance.  If the consultant recommends an approach previously implemented unsuccessfully by that consultant for the same parameter at any Outlet, the consultant must provide thorough justification for why the recommended approach will achieve compliance in this instance. Defendants shall implement the proposed corrective action plan according to the consultant's

46

recommendations within 30 Days of receipt of the consultant's report, unless a written extension of time is granted by EPA. The consultant's report and any documentation of actions taken shall be submitted in the Quarterly Report required by Section X.

      b.    <u>Monthly Violation Response</u>

        (i)    Category 1 Monthly Violation. Upon notification of a Category 1 Monthly Violation, Defendants shall immediately begin daily monitoring of conditions, Diagnostic Sampling, and implementing corrective measures at the Outlet. Defendants shall continue daily monitoring, Diagnostic Sampling, and corrective measures until the Outlet meets the monthly average effluent limit. Defendants shall also consult with an individual with substantial expertise in Clean Water Act compliance and in treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits, and implement any additional measures recommended by that individual.

        (ii)    Category 2 Monthly Violation. Upon notification of the second and any subsequent consecutive Monthly Violation of the same parameter at the same Outlet, Defendants shall continue daily monitoring of conditions, Diagnostic Sampling, and implementing corrective measures at the Outlet until the Outlet meets the monthly average effluent limit for that parameter for two consecutive months. Defendants shall also hire a third-party consultant to conduct a complete review and evaluation of the problem. The consultant must have at least five years of experience with the requirements of NPDES permits for mining operations and with treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits. The consultant shall prepare a report detailing the cause of the continuing violations and a corrective action plan to return the Outlet to compliance as soon as possible. The consultant's recommended corrective action plan shall

47

be based on all available data, including all information in the Audit Database and/or Violations Database for the respective Outlet, and shall describe whether this approach has worked in other similar situations to resolve noncompliance. If the consultant recommends an approach previously implemented unsuccessfully by that consultant for the same parameter at any Outlet, the consultant must provide thorough justification for why the recommended approach will achieve compliance in this instance. Defendants shall implement the proposed corrective action plan according to the consultant's recommendations within 30 Days of receipt of the consultant's report, unless a written extension of time is granted by EPA. The consultant's report and any documentation of actions taken shall be submitted in the Quarterly Report required by Section X.

72.    If an Outlet has three or more Effluent Limit Violations for the same pollutant parameter within any 12-month period and is not otherwise subject to the requirements of Paragraph 71(a)(ii) or 71(b)(ii), then Defendants shall conduct the response actions identified in Paragraph 71(a)(ii) or 71(b)(ii).

73.    During any violation response sequence pursuant to Paragraphs 71 or 72, if a Defendant is not able to collect a sample due to no flow conditions on four consecutive days, daily monitoring and sampling may be suspended. Corrective measures, expert consultation, and implementation of corrective action plans must continue as required under Paragraphs 71 or 72. If an Effluent Limit Violation occurs during the next sampling event for that Outlet, the violation response sequence resumes as if there were no suspension of daily monitoring and sampling.

## Training

74.     Defendants shall provide and require semi-annual formal training for all employees with environmental responsibilities on relevant environmental subject matters including, but not limited to: (a) Clean Water Act compliance; (b) compliance with environmental provisions of SMCRA, including sediment control technologies; (c) mine wastewater treatment technologies and practices; (d) site-specific training as necessary to fulfill environmental responsibilities; (e) requirements in the EMS Manual; and (f) obligations in this Consent Decree.

75.     Defendants shall provide formal training for all independent contractors and laboratory personnel with responsibilities under this Consent Decree and/or the EMS Manual. The training shall cover any applicable requirements under this Consent Decree and/or any applicable requirements in the EMS Manual. The training shall be conducted no later than 90 Days after the date of lodging of this Decree. For contractors hired subsequent to lodging, training shall be conducted no later than 30 Days after the date of execution of the contract, but in any event should be conducted sufficiently in advance of implementation of the contractor's duties. After the initial training by Defendants, Defendants shall require contractors to provide equivalent semi-annual formal training for the contractor's employees with responsibilities under this Consent Decree and/or the EMS Manual.

76.     All training under Paragraphs 74 and 75 shall be documented with the date of training, signatures of attendees, a summary of training topics, and copies of training materials. Such documentation shall be included in Quarterly Reports following the training session(s).