# Exhibit C

01-45973
TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG      )        MDL NO.  2179
"DEEPWATER HORIZON" in the          )
GULF OF MEXICO,  on                 )        SECTION: J
APRIL 20, 2010                      )
                                    )        JUDGE BARBIER
                                    )
                                    )        MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*
## *PENALTY PHASE*
## *EXPERTS*

### *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert Daines

### October 31, 2014

# *COPY*



Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

```
 1   statement.
 2        A.     Okay.
 3        Q.     Do you believe that it's a true
 4   statement that liability has never been
 5   absolutely limited?
 6        A.     That sounds correct to me.
 7        Q.     Now, let's turn to the second
 8   paragraph where they state:  We argue to the
 9   contrary that economic analysis, in
10   particular the theory of the firm and the
11   economics of insurance, explains the legal
12   treatment of limited liability.  Both the
13   rules and the exceptions serve valuable
14   functions.
15             Do you agree that both the rules
16   and exceptions to limited liability serve
17   valuable economic functions?
18        MR. PINSKY:  Object to form.
19        A.      In broad strokes, that's a
20   helpful way to think about the policy
21   advanced by the law.  That is, economic
22   reasoning is useful in explaining.  It
23   doesn't always agree, you know.
24             Sometimes economic analysis
25   might suggest one way and the law might go
```

```
 1    another, but I think that's generally true

 2    that -- that at least many of the rules and

 3    some of the exceptions make sense.

 4          Q.     Economically?

 5          A.     And are valuable.  Yes.  It

 6    doesn't mean every one, every case, but in

 7    general that's useful.

 8          Q.     Okay.  Let's look at -- at your

 9    Page 16 of your Round 1 report.

10          A.     (Witness complies.)

11          Q.     Section 5, topic sentence.

12          A.     I'm sorry.  You're faster than I

13    am.

14          Q.     No, no.

15          A.     Okay.

16          Q.     Okay.  You -- you state in the

17    topic sentence of Section 5 of your report,

18    citing to Jensen the Theory of the Firm,

19    which is your Footnote 50, that a corporation

20    is a connected series of contracts between

21    customers, workers, managers, investors and

22    suppliers (of raw materials or services),

23    correct?

24          A.     That is correct.

25          Q.     Now, if you would look back at
```

1      Q.     Now let's turn to Page 109,

2   please.

3      A.     (Witness complies.)

4      Q.     Roman Numeral 4, called Piercing

5   the Corporate Veil.  The author states:

6   Courts have allowed creditors in some

7   situations to reach the assets of

8   shareholders.

9             You agree with that statement,

10  correct?

11     MR. PINSKY:  Object to the form.

12     A.     Do I agree that courts sometimes

13  allow creditors --

14     Q.     Yes.

15     A.     -- to reach the assets?

16     Q.     Yes.

17     A.     I agree they do.

18     Q.     Okay.  And looking at the second

19  to the last sentence in that paragraph -- and

20  again, feel free to read the entire

21  paragraph -- there's a statement, courts are

22  more likely --

23     A.     I'm sorry.  Just -- I'm sorry.

24  Where are we again?  We're skipping around a

25  lot.  I'm just trying to keep track of where

1   you are.
2        Q.      I apologize.  So would you
3   please read the -- the paragraph that has the
4   topic sentence that I just asked you about?
5        A.      Which is?
6        Q.      The courts have allowed
7   creditors in some situations to reach the
8   assets of shareholders.
9        A.      Okay.
10       Q.      Please read that paragraph and
11  let me know when you're done, and I'm going
12  to ask you about the second-to-last sentence
13  in that paragraph.
14       A.      Okay.  Okay.
15       Q.      Okay.  Do you agree with the
16  authors that, quote, courts are more likely
17  to allow creditors to reach the assets of
18  shareholders where limited liability
19  provides --
20       A.      Wait.
21       Q.      No?  You with me?
22       A.      You said -- I'm supposed to read
23  the first paragraph under Roman Numeral 4?
24       Q.      Yes.
25       A.      Okay.

1      Q.     Yeah.  Okay.  The second to the
2  last sentence of that paragraph.
3      A.     Starts, moreover?  Yeah.  You're
4  down in the second paragraph.
5      Q.     Oh.  Okay.  I'm talking about
6  the first full paragraph, the one underneath
7  piercing the corporate veil.
8      A.     The one that starts, court have
9  allowed?
10     Q.     Yeah.  Yeah.  Yeah.
11     A.     Okay.  The sentence you're
12  reading is not in that paragraph.  It's in
13  the next paragraph.
14     Q.     Oh, you're right.  I apologize.
15  Excuse me.  So please -- please look at
16  that -- the paragraph that starts with, we
17  conclude, however.
18     A.     Okay.
19     Q.     Okay.  So my question is:  Do
20  you agree with the authors that, quote,
21  courts are more likely to allow creditors to
22  reach the assets of shareholders where
23  limited liability provides minimal gains from
24  improved liquidity and diversification, while
25  creating a high probability that a firm will

1    engage in a socially excessive level of risk

2    taking?

3          MR. PINSKY:   Object to the form.

4          A.    I think that's a more debatable

5    point.  As a normative matter, that is, is

6    what should happen.  I understand the role

7    that that plays in the argument, and that

8    might be a good thing, but as to whether it

9    actually describes courts' actions and the

10   law as it's actually applied, there is more

11   debate.

12         Q.    Okay.

13         A.    There's some broad outlines -- I

14   mean, there's some simple sentence in which

15   people would agree on the parameters in that

16   question, but there's a -- there's a lot of

17   debate about what courts actually do.

18         Q.    Okay.  Thank you.

19               Looking on Page 110 at the end

20   of the first full paragraph right before the

21   B section.  There's a sentence, piercing the

22   veil, especially in favor of trade and tort

23   creditors who cannot negotiate with the firm,

24   reduces the extent to which third parties

25   bear these costs.

1          Do you agree with that

2  statement?

3       MR. PINSKY:  Object to the form.

4       A.    That can be true.  It need not

5  be every case, but it might be true.

6       Q.    Okay.  So I believe that one of

7  the -- the -- the references in your

8  report -- or at least one of your

9  publications that you reference is the New

10  Palgrave Dictionary of Economics.

11          You made a contribution to that;

12  is that correct?

13       A.    That's correct.

14       Q.    Okay.  So let's turn to -- and

15  we're going to come back to the Easter Fisch

16  article, but for now let's turn to Tab 13.

17  And we'll mark that as our next exhibit.

18          What is that exhibit number?

19       (Exhibit Number 13421 marked.)

20       A.    13421.

21       Q.    Thank you.

22          So is this the contribution to

23  the new Palgrave Dictionary of Economics that

24  you referenced in your report?

25       A.    Yes.

```
 1          Q.      So I'd ask you to turn to
 2   Page 262 of that contribution, please.  First
 3   full paragraph.
 4          A.      (Witness complies.)
 5          Q.      And could you please read that
 6   -- that paragraph to yourself and let me know
 7   when you finish that?
 8          A.      Okay.  I've read it.
 9          Q.      So in that contribution, you
10   recognize the distinction between voluntary
11   and involuntary creditors with respect to --
12   to limited liability; is that right?
13          MR. PINSKY:  Object to the form.
14          A.      That's correct.
15          Q.      You state:  The rule of limited
16   liability makes sense for contract creditors
17   who can negotiate their own protection from
18   default or charge an interest rate that
19   compensates for the risk.
20              Tort creditors, however, are
21   different.  Those owed compensation for, say,
22   a firm's pollution emissions will not have
23   had the opportunity to negotiate with the
24   firm ex ante to address the possibility that
25   it will not have sufficient net assets to pay
```

```
1   them.
2               That's a reasonable distinction,
3   correct?
4       MR. PINSKY:  Object to the form.
5       A.      Which is a reasonable
6   distinction?
7       Q.      Between voluntary and
8   involuntary creditors with respect to limited
9   liability.
10      A.      That's a reasonable distinction.
11      Q.      Okay.  So let's go back to -- to
12  the Easter Fisch article, please.
13      A.      (Witness complies.)
14      Q.      On Page 110, Section B is called
15  Corporate Versus Personal Shareholders.  The
16  authors state:  The other major category of
17  piercing cases involves parent-subsidiary
18  combinations where creditors of the
19  subsidiary attempt to reach assets of the
20  parent.
21              I read that correctly, right?
22      A.      Yes.
23      Q.      Now, the next sentence says,
24  quote, courts' greater willingness to allow
25  creditors to reach the assets of corporate as
```

91

1   opposed to personal shareholders is, again,

2   consistent with economic principles.

3              Do you agree with this statement

4   in the Easter Fisch article?

5        MR. PINSKY:  Object to the form.

6        A.    I think that's a closer call;

7   that is, of the piercing to a corporate

8   instead of a personal shareholder fits fewer

9   of the advantages that they list that we

10  reviewed earlier.  But -- so it's going to be

11  consistent with those economic principles but

12  it will still be inconsistent with other

13  economic principles that they refer to and

14  that other commentators commonly point out.

15             So I think for their article I

16  understand the point, and it makes -- I

17  understand the distinction they're making.

18       Q.    So they're saying that the

19  policy reasons, one through six that we went

20  through earlier that would apply to a public

21  firm, you're saying -- and what they're

22  saying is that those don't apply necessarily

23  to a parent-subsidiary relationship, correct?

24       MR. PINSKY:  Object to the form.

25       A.    Some do and some don't.

1      Q.     So let's continue with the

2  second -- with the first full paragraph on

3  Page 111.

4            The -- in the first topic

5  sentence, the authors state --

6      A.     I'm sorry.  Which paragraph?

7      Q.     First full paragraph --

8      A.     Okay.

9      Q.     -- on Page 111 the authors

10  state, quote, allowing creditors to reach the

11  assets of parent corporations does not create

12  unlimited liability for any people.

13            You would agree with that

14  statement, correct?

15      MR. PINSKY:  Object to the form.

16      A.     Yeah.  If I understand it

17  correctly, I think he's saying that

18  individual shareholders, mom-and-pop, don't

19  have unlimited liability if the piercing is

20  just to the partner corporation.

21      Q.     Okay.  Thank you.

22            The second sentence says, Thus,

23  the benefits of diversification, liquidity

24  and monitoring by the capital market are

25  unaffected.

```
 1                    You would agree with that
 2   statement, correct?
 3        MR. PINSKY:  Object to the form.
 4        A.     I'd have to -- I have to think
 5   about that.  That is -- it's not clear to me
 6   that that's always right.
 7        Q.     It's not true -- it's true in
 8   the broad sense, correct, that the benefits
 9   of diversification, liquidity and monitoring
10   that the authors talked about earlier by the
11   capital markets are not going to be affected
12   in the -- in the parent-subsidiary situation;
13   isn't that right?
14        MR. PINSKY:  Object to the form.
15        A.     I think some may and some may
16   not.
17        Q.     Okay.  Let's go to the next
18   sentence.  It says, Moreover, the moral
19   hazard problem is probably greater in
20   parent-subsidiary situations because
21   subsidiaries have less incentive to insure.
22                    Do you agree with that
23   statement?
24        MR. PINSKY:  Object to the form.
25        A.     I have to think about that one.
```

1    Let me just read the whole paragraph.

2              So I understand the distinction

3    he's making about managerial risk aversion

4    and I can see that it -- that it is true in

5    the example as he outlines it in this

6    paragraph.  I don't know whether it's

7    generally true.  That is, is seems to me that

8    there are costs that even the manager of a

9    subsidiary would bear and that these may be

10   significant.

11             So I understand that he's -- I

12   understand the point about job loss and risk

13   aversion, but as to whether it's easily

14   generalized to all subsidiaries, it seems to

15   me that sometimes it would and sometimes it

16   wouldn't.

17        Q.    Okay.  Well, I appreciate

18   your -- your general answer.  I'm sorry I'm

19   being so detailed.  I'm going to go through

20   some more of these sentences.

21        A.    Okay.

22        Q.    So on the -- the question that I

23   asked you, the sentence, Moreover, the moral

24   hazard problem is probably greater in

25   parent-subsidiary situations because

1   subsidiaries have less incentive to insure.

2          Do you agree with that

3   statement?

4       MR. PINSKY:  Object to the form.

5       A.     Well, I -- I think I -- I just

6   tried to give you my answer to that.

7       Q.     Uh-huh.

8       A.     And so I would probably just

9   give you the same answer now.

10      Q.     Well, all right.  So you gave me

11  a -- a general answer, and I'm trying to be

12  specific here.  I mean, you may have told me

13  what the answer was, but I didn't really

14  understand it.  So I guess what I'm asking

15  you is, when the authors say the moral hazard

16  problem is probably greater in

17  parent-subsidiary situations because

18  subsidiaries have less incentive to insure,

19  do you agree with that statement?

20      MR. PINSKY:  Object to the form.

21      A.     So I'm -- in my prior answer I

22  tried to say he gives an example.  He,

23  meaning Easterbrook and Fischel, give an

24  example where the manager of the subsidiary

25  is not risk averse and contrasts it to an

```
 1   example where a manager would be risk averse
 2   because of the -- the threat of job loss.
 3        Q.    In the public corporation?
 4        A.    In the -- well, yeah, it could
 5   be a private corporation or it could be --
 6        Q.    The parent?
 7        A.    Yeah.  It could be.  Right.
 8              And so with -- within this
 9   context, if that's accurate, then the
10   managerial risk aversion provides another
11   reason to buy insurance.  And I'm -- and I'm
12   saying, I guess, two things.  One is it -- it
13   may not be that that difference runs in that
14   direction all the time and it may not be an
15   important magnitude.  And it may not be in
16   shareholders' interests because managerial
17   risk aversion may lead them to do things that
18   the shareholders don't like.
19              So the answer is within the
20   context of this particular example that he's
21   using, I understand and would agree with the
22   point.  But if we want to generalize beyond
23   that to something about the world, then there
24   are those caveats that I just mentioned.
25        Q.    So I'll proceed to the next
```

1   sentence and we'll see.

2              He stays -- or they say, quote,

3   in publicly held corporations, the inability

4   of managers to diversify their firm-specific

5   investments in human capital creates

6   incentives to insure.

7              Do you agree with that?

8        MR. PINSKY:  Object to the form.

9        A.     That's what I was -- that

10  sentence is included in the answer I just

11  gave; that is, that's the managerial risk

12  aversion point.

13       Q.     He then says, The same is not

14  true for managers of subsidiaries if, as

15  often will be the case, these people are also

16  managers of the parent.

17             Do you agree with that

18  statement?

19       MR. PINSKY:  Object to the form.

20       A.     This may or may not be true;

21  that is, if you posit that they are not risk

22  averse, then that might be true.  What's

23  unclear to me is whether that's an

24  empirically accurate statement in a

25  meaningful way.

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**

98

1   Q.   You're saying --

2   A.   As a general principle.

3   Q.   You're saying you're not -- it

4   depends upon whether or not they're also

5   managers.  Whether the managers are the same

6   for the parent and the subsidiary, you're

7   saying that's an assumption in this sentence?

8   A.   No.  I'm saying it depends on

9   whether the manager is risk averse.

10  Q.   Uh-huh.  And what he seems to be

11  saying is that it's less likely for him to

12  be -- or her -- to be risk averse because the

13  manager is -- if the manager is also a

14  manager of the parent; is that correct?

15  MR. PINSKY:  Object to the form.

16  A.   Yes.  Well, he's talking about a

17  manager who is risk averse and comparing him

18  to a manager who is not risk averse.  And if

19  the manager of the subsidiary is not risk

20  averse, then they would not have the same

21  incentives to buy insurance.

22       But what's unclear to me is

23  whether that would be left up to them,

24  anyway, and whether in an important case, the

25  relevant inquiry is not the risk aversion of

```
 1    the subsidiary's managers but the risk
 2    aversion of the parent managers who might be
 3    setting policy for the entire group.
 4              That's the reason that I'm not
 5    sure it's true.
 6         Q.    And you're saying this is an
 7    empirical question?
 8         MR. PINSKY:  Object to the form.
 9         A.    It's -- it's an important
10    distinction, right.  It would depend on the
11    case.
12         Q.    It's a question of fact?
13         MR. PINSKY:  Object to the form.
14         Q.    It depends on the case?
15         A.    Yes.  Well, the distinction
16    depends on whether or not the manager is risk
17    averse and whether they are the ones setting
18    the policy.
19         Q.    Yeah.  So it's a factual
20    question?
21         A.    Yeah.  In the hypothetical -- in
22    this hypothetical, it's a factual question.
23         Q.    Yeah.  He continues, Bankruptcy
24    of the subsidiary will not cause them to lose
25    their positions in the parent or suffer any
```

```
 1   other loss of firm-specific human capital

 2   (though it might impose a reputational loss

 3   on them).

 4              Do you agree with that

 5   statement?

 6        MR. PINSKY:  Object to the form.

 7        A.    No, I don't.  But as it seems

 8   pretty general that the bankruptcy of the

 9   subsidiary will not cause them to lose their

10   position in the parent.  It might.

11        Q.    Again, it's a factual question,

12   right?

13        MR. PINSKY:  Object to the form.

14        A.    Well, we're talking about a

15   hypothetical, so it's...

16        Q.    It depends?

17        A.    Yeah.  It depends in this

18   hypothetical whether it would or wouldn't.

19   And that depends on the costs and the

20   particular -- it depends on other facts we

21   might need to assume.

22        Q.    Okay.  He then continues -- or

23   they then continue, quote, if limited

24   liability is absolute, a parent can form a

25   subsidiary with minimal capitalization for
```

1   the purpose of engaging in risky activities.

2   If things go well, the parent captures the

3   benefits; if things go poorly, the subsidiary

4   declares bankruptcy and the parent creates

5   another with the same managers to engage in

6   the same activities.

7                    Do you agree with that

8   statement?

9        MR. PINSKY:  Object to the form.

10       A.     Well, I understand the dynamic

11  he's talking about, and that's the

12  theoretical possibility they're exploring.

13  Whether in any case -- any particular case

14  this is -- potential is a different question.

15                   As -- as Easterbrook and Fischel

16  note later, there are often regulations and

17  minimal capital requirements or -- that

18  require more than minimal capitalization and

19  that that may, therefore, eliminate the risk.

20                   There are also particular

21  industries where just given the practical

22  requirements of the industry, that company

23  cannot start off with minimal capitalization.

24                   So it's certainly true that

25  that's a possibility.  Whether or not that's

1   solved by other institutions or rules is a --

2   is a separate question.  Excuse me.

3        Q.     Thank you.

4               And then the -- the paragraph

5   concludes, quote, this asymmetry between

6   benefits and costs, if limited liability were

7   absolute, would create incentives to engage

8   in a socially excessive amount of risky

9   activities.

10              Do you agree with that

11  statement?

12       MR. PINSKY:  Object to the form.

13       A.     Is it -- it's true as a general

14  matter if parties didn't have to bear cost,

15  that they may engage in too much of that

16  activity.  I would just add what we just

17  described, is that there are other rules or

18  institutions that might solve that problem.

19       Q.     Okay.  Thank you.

20       A.     Including -- anyway, we've

21  already gone over some of them.

22       Q.     Uh-huh.  All right.  Now, I'd

23  ask you to turn to your report, your Round 1

24  report, Page 41.

25       A.     Page -- okay.  Sorry.