UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY  THE OIL RIG  "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to:<br><br>    No. 10-4536 | * * * * * | HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**MEMORANDUM IN SUPPORT OF BPXP'S MOTION IN LIMINE
TO EXCLUDE EVIDENCE RELATING TO THE ECONOMIC IMPACT OF A
CLEAN WATER ACT PENALTY ON BP GROUP ENTITIES OTHER THAN BPXP,
AND TO EXCLUDE FINANCIAL INFORMATION RELATING TO
BP GROUP ENTITIES OTHER THAN BPXP**

One of the factors that courts consider when assessing a Clean Water Act ("CWA") penalty is "the economic impact of the penalty *on the violator*."  33 U.S.C. § 1321(b)(8) (emphasis added).  The only alleged "violator" in the BP Group is BP Exploration & Production Inc. ("BPXP").[1]  Also, the United States has expressly declared that it does not seek to pierce BPXP's corporate veil.  Accordingly, BPXP respectfully requests that the Court enter an order excluding evidence relating to the economic impact of a CWA penalty on BP Group entities other than BPXP, and excluding financial information relating to those non-BPXP entities.

**INTRODUCTION AND BACKGROUND ON BPXP AND THE BP GROUP**

Ignoring the statutory language in the CWA regarding the "economic impact of the penalty *on the violator*," 33 U.S.C. § 1321(b)(8) (emphasis added), the United States on February 14, 2014, filed a motion asking the Court to rule as a matter of law that the financial

---

[1] BPXP continues to reserve all of its rights to maintain its CWA liability appeal in Fifth Circuit Case No. 12-30883 and its rights to seek appeal of this Court's September 4, 2014 and November 13, 2014 orders.  9/4/14 Findings of Fact and Conclusions of Law, Phase One Trial, Rec. Doc. 13355; Rec. Doc. 13644 (Nov. 13, 2014) (order denying BPXP's motion for a new trial).

wherewithal of the entire BP Group must be considered in assessing the "economic impact" of a CWA penalty on BPXP.[2]  After a hearing on March 21, 2014, the Court denied the United States' requested relief, instead allowing "limited" discovery about the relationship between BPXP and other BP Group entities.[3]  That discovery has now been completed, and it confirms that there is no basis for the United States' attempt to circumvent the plain language of the CWA.

BPXP is the only BP Group entity named as a defendant in this case.  Also, BPXP is the only BP Group entity that could be held liable for a discharge.  (*See* 12/15/10 Complaint of the United States of America, Civ. A. No. 2:10-cv-04536, Rec. Doc. 1 (hereinafter "U.S. Complaint")); *see also* 2/14/14 Motion at 1 (BPXP is alleged as "the liable party in this proceeding.")).  BPXP is the entity that bid for and obtained the MC 252 leasehold in 2008. (Agreed Stipulations No. 96, Rec. Doc. 5927).  Further, BPXP was the sole BP Group entity that

---

[2] 2/14/14 Mem. in Supp. of Pl. US's Mot. in Limine to Permit Relevant Evidence Concerning BP plc and other BP Affiliates ("2/14/14 Motion"), Rec. Doc. 12355-1.

[3] The following exchange between the Court and counsel for the United States occurred at the March 21, 2014 hearing:

> THE UNITED STATES:  If you rule on our motion in our favor, that means that most of that discovery goes away, the things like the board minutes that they explained about.  We asked about the board minutes so we could provide evidence on the legal relationship as they suggested that we need to do.
>
> THE COURT:  I have to tell you the longer you speak the more confused I'm getting about your position.  Because I thought the government filed a motion in limine asking me to permit additional discovery or evidence and it sounds like you're saying if I rule in your favor you don't need any future discovery.
>
> MS. HANKEY:  It's not that we don't need further discovery, it will be far less.  For example, we won't need to establish that the affiliates are relevant and that they accounted together?
>
> THE COURT:  What ruling do you want me to make?
>
> MS. HANKEY:  If you ***grant our motion that the affiliates are relevant***, then we do not need to produce a witness to explain to you why they're relevant.  That's our point.  That the Phase One record already told you enough to know that they're relevant.
>
> THE COURT:  ***Well, I'm not going to make that ruling here today***, but I am going to rule in your favor to the extent that ***I'm going to allow you, if you wish, to get discovery from BP with respect to the relationship between the entities, between BPXP, BP America, BP plc, and I guess any other entity that's in their direct line.***

(Ex. 1, 3/21/14 Hearing, at 54) (emphasis added); *see also* Rec. Doc. 12592 (permitting "limited discovery" of relationship between BPXP and BP Group entities).

2

the United States named as a "Responsible Party" on April 28, 2010, under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, and BPXP accepted that designation on May 3, 2010.[4]

As the United States' industrial history expert Professor Fredric Quivik testified, BPXP is a separate corporate entity from BP p.l.c. and the rest of the BP Group.[5] BPXP is an indirect subsidiary of BP p.l.c., with five intermediate parents between itself and BP p.l.c. (Ex. 5, Corporate Organizational Chart). BPXP "conducts exploration and production operations in the Gulf of Mexico." (Ex. 4, Quivik Dep. 169; Ex. 6, BP Annual Report and Form 20-F 2013, Dep. Ex. 12303A at 39). With hundreds of leases, BPXP holds the most federal deepwater lease acreage of any company in the Gulf and is one of the industry's leading producers of oil and gas in the Gulf region.[6] BPXP's operations are overseen by a board of six directors.[7]

The Chairman of BPXP's Board of Directors, Richard Morrison, testified regarding his board responsibilities:

> Q. What are your responsibilities as chairman of the board of BPXP?
>
> A. It is to oversee that the processes and the systems and the governance and the—and the resources applied to our Gulf of Mexico operations are adequate, are—are complete, are in place, are—are working. I use the BPX&P board membership as folks that can look into BP—BP Gulf of Mexico operations from the outside and ask questions that help me in my role as regional president.[8]

Professor Quivik, the United States' expert, was not aware of a single board—in the world—of a wholly owned subsidiary that is more active than BPXP's board. (Ex.4, Quivik Dep. at 82-83).

---

[4] (Ex. 2, 4/28/10 U.S. Coast Guard Letter to BPXP, at HCG374-019497; Ex. 3, 5/3/10 BPXP Letter to U.S. Coast Guard, at BP-HZN-2179MDL08952414).

[5] (Ex. 4, Quivik Dep. at 61:2-4 ("Q. So—so you agree that BPXP is a distinct corporate entity? A. Yes.")).

[6] (Ex. 7, BP Present Responsibility Presentation to the U.S. EPA, July 16, 2012, at BP-HZN-2179MDL08945281).

[7] (Ex. 8, Appointment History Form, at BP-HZN-2179MDL07817761).

[8] (Ex. 9, Morrison Dep. at 27).

In conducting its operations, BPXP relies on certain payrolled employees of BP America Production Company ("BPAPC"), a separate legal entity incorporated in Delaware. BPAPC's provision of employees and resources to BPXP is governed by a Services and Agency Agreement between BPXP and BPAPC.[9] (Ex. 10, Services and Agency Agreement, at BP-HZN-2179MDL07817979). Accordingly, while BPXP itself maintains no payrolled employees, BPXP is charged, and BPAPC credited, for personnel costs associated with the work performed on BPXP's Gulf of Mexico assets by approximately 2,000 employees.[10] Mr. Morrison, BPXP's Chairman, testified:

> Q. Around 2,300 employees of other BP entities whose time is billed to BPXP?
>
> A. Those are employees that are working on behalf of BPX&P in the Gulf of Mexico, yes, ma'am.[11]

BPXP has historically maintained an electronic accounting system containing all financial records for BPXP and from which finance personnel could generate a trial balance that shows BPXP's financial position and tracks BPXP's transactions with other BP Group affiliates.[12] In 2011, accountant Mike Robertson—whose time is charged to BPXP—began to prepare hard-copy financial statements for BPXP on a quarterly basis.[13]

---

[9] Professor Quivik testified that he was not aware of any multinational companies that did *not* have a Services Agreement like the one between BPXP and BPAPC. (Ex. 4, Quivik Dep. at 179).

[10] (*See* Ex. 9, Morrison Dep. at 92; Ex. 11, Robertson Dep. at 181).

[11] (Ex. 9, Morrison Dep. at 92).

[12] (Ex. 11, Robertson Dep. at 19-20, 77-78, 84-85, 204.)

[13] (Ex. 11, Robertson Dep. at 20, 203-04; Ex. 12, BP Exploration and Production Inc. Consolidated Financial Statements 3Q 2011 (Un-Audited), BP-HZN-2179MDL07817691).

██████████████████████████████████████████ Although BPXP generates revenue from its ordinary operations, to meet these Macondo-related liabilities together with its ordinary business liabilities, BPXP has received capital from its then-parent and from a BP Group in-house bank. This capital included: ██████████████████████████████████████████ These capital injections facilitated BPXP's response to the Incident as the sole BP Group responsible party. Professor Quivik testified that "one of the ways" in which it is "typical" for a company to receive capital is from its shareholders:

> Q. And so, to the extent it did need capital, the capital came from the shareholders, correct?
>
> A. Yes, yes.[16]
>
> ***
>
> Q. And that's typical for a company, correct, the capital comes from shareholders?
>
> A. That's one of the ways, yes.[17]

---

[14] A more detailed chart of these liabilities is included at Ex. 13, 2Q14 Provision Continuity Schedule, BP-HZN-2179MDL09099961.

[15] (Ex. 14, ██████████████████████; Ex.15, Smith Dep. at 51, 53-54).

[16] Professor Quivik was testifying about his experience as a shareholder of Renewable Technologies Incorporated, a historic preservation company. (*See* Ex. 4, Quivik Dep. at 14).

[17] (Ex. 4, Quivik Dep. at 14).

Moreover, Professor Quivik has no opinion that there is anything "improper" or "deficient" or "abnormal" "with respect to the relationship between BPXP and the BP Group."[18]

## ARGUMENT

### I.     BPXP Is the Sole Alleged "Violator" Within the BP Group in this Proceeding.

This Court is required to consider "the economic impact of the penalty *on the violator*" when assessing a CWA penalty against a defendant.  *See* 33 U.S.C. § 1321(b)(8) (emphasis added).  It is undisputed that the only alleged "violator" within the BP Group in this CWA proceeding is BPXP.  As this Court has stated, "BP Exploration & Production, Inc. is . . . the only BP entity that was sued by the United States."  (9/4/14 Findings of Fact and Conclusions of Law, Phase One Trial, Rec. Doc. 13355 at 9).

Further, the United States has itself acknowledged that it is seeking to hold liable only BPXP—and no other BP Group entity, either directly as a named defendant or indirectly through a veil-piercing theory.  With respect to direct liability, the United States has stated that BPXP is "the liable party in this proceeding."[19]  As to veil-piercing, "Pat Casey and Richard Gladstein [of the Department of Justice] each indicated, in discussions on April 16 and 23 [2014], respectively, that the United States is not seeking to pursue a legal theory in this case that involves any attempt to pierce the corporate veil of defendant BPXP."  (Ex. 16, 5/6/14 Letter from M. Nomellini to N. Flickinger, at 5).[20]

---

[18] (Ex. 4, Quivik Dep. at 47-48).

[19] Rec. Doc. 12355-1 at 1.

[20] Nor could the United States argue that veil piercing is appropriate.  As the Fifth Circuit has explained, "Undercapitalization is often critical in alter ego analysis."  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006).  Relevant here, the United States economic impact expert Ian Ratner has admitted that BPXP is "not undercapitalized."  (Ex. 29, Ratner Dep. at 41-42).

**II.     Financial Evidence Relating to BP Group Entities Other Than BPXP Is Not Relevant and Thus Not Admissible.**

Because BPXP is the alleged "violator" in this proceeding, financial evidence relevant to "the economic impact of the penalty on the violator" must relate to BPXP. Examples of such evidence include: BPXP's quarterly financial statements; documents relating to the valuation of BPXP's assets; projections of BPXP's oil and gas production; schedules reflecting amounts spent by BPXP in response to the *Deepwater Horizon* incident, as well remaining payables; documents relating to BPXP's contingent liabilities; and evidence of financial transfers and agreements between BPXP and third parties, including other BP Group entities; and oil-price data.

By contrast, financial evidence relating solely to BP Group entities other than BPXP is not relevant to "the economic impact of the penalty on the violator." Such evidence includes:

- financial statements, securities filings, earnings projections, and tax returns of, and other financial information concerning, BPXP's direct and indirect parent companies and affiliates—i.e., BP Products North America Inc., BP Company North America Inc., BP America Inc., BP America Ltd., BP Holdings North America Ltd., and BP p.l.c.;

- financial information concerning BPXP's other affiliates within the BP Group— e.g., BPAPC and NAFCO;

- statements about the financial wherewithal of the BP Group as a whole; and

- any fact or expert witness testimony about any of the above evidence.

   A.     *Financial Evidence Relating to BP Group Entities Other Than BPXP Is Not Relevant to "the Economic Impact of the Penalty on the Violator."*

Financial evidence relating solely to BP Group entities other than BPXP is not relevant to the "economic impact of the penalty ***on the violator***" and thus is not admissible at trial. To be relevant, evidence must have a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Evidence that is not relevant is not admissible. Fed. R. Evid. 402.

As the United States has stated, under the "economic impact" factor, the CWA penalty should be reduced if it would have a "significant impact" on BPXP. (3/10/14 U.S. Mem. on the Burden of Proof for the Penalty Factors In Section 311(b) of the Clean Water Act, Rec. Doc. 12479 at 8-9 ("The burden of proof is on a violator who seeks a reduction of its penalty based on the economic impact of the penalty on its operations, and the Defendant must show a significant impact.") (summarizing cases). Thus, the "relevant" facts are those that will assist the Court in determining whether the economic impact on BPXP of the penalty sought by the United States would be "significant." Evidence that has a tendency to show that it is "more probable or less probable" that the penalty will have a "significant" economic impact on BPXP is therefore relevant. Conversely, evidence that does not have a tendency to show that it is "more probable or less probable" that the penalty will have a "significant" economic impact on BPXP is not relevant and therefore not admissible.

Because BPXP—and no other BP Group entity—is the "violator" in this case, financial evidence relating to BP Group entities other than BPXP has no bearing on BPXP's post-penalty financial condition and thus is not relevant. Indeed, to consider such evidence when examining "the economic impact of the penalty on the violator" would effectively transfer liability from BPXP to other entities in the BP Group, which would violate not only the text of the CWA but also the bedrock principles of limited liability and corporate separateness. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."); *Bridas*, 447 F.3d at 416 ("A bedrock principle of corporate law is that 'a parent corporation . . . is not liable' for actions taken by its subsidiaries.") (quoting *Bestfoods*, 524 U.S. at 61).

Limited liability has been the prevailing rule in the United States for over a century. As the Supreme Court has explained:

> Normally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose. *Elenkrieg v. Siebrecht*, 238 N.Y. 254, 144 N.E. 519, 34 A.L.R. 592. *See* 7 Harv. Bus. Rev. 496. ***Limited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted.***

*Anderson v. Abbott*, 321 U.S. 349, 361-62 (1944) (emphasis added).[21] The rule of limited liability means that corporate parent shareholders do not risk losing more than the amount they invest.[22] Thus, a corporate parent that invests "$100 of equity into a subsidiary risks that $100, but no more."[23] Absent veil-piercing—which the United States is not pursuing here—a corporate parent is not required to invest additional capital to meet its subsidiary's obligations. Rather, the choice whether to make further investments is within the parent's discretion based on the expected returns.[24] The United States' position—that the Court should assume as a matter of law that the BP Group must invest more capital into BPXP to cover any penalty—"is inconsistent with the very notion of limited liability—limitation of the risk of loss from an investment." *See White Rosebay Shipping*, 2012 WL 6858239, at *7.

---

[21] In *Anderson*, the Supreme Court held that "double liability" for both the corporation and its shareholders was provided for by statute. 321 U.S. at 353, 357. No such "double liability" statute exists here. *See also* Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 89 (1985) ("The increased availability of funds for projects with positive net value is the real benefit of limited liability.").

[22] *See, e.g.*, *White Rosebay Shipping S.A. v. HNA Grp. Co.*, C.A. No. C-12-096, 2012 WL 6858239, at *7 (S.D. Tex. Dec. 5, 2012) ("Plaintiff's position that a parent corporation must continue supporting a doomed subsidiary with regular cash transfusions, however, is inconsistent with the very notion of limited liability-limitation of the risk of loss from an investment.").

[23] Ex. 17, 8/15/14 Daines Rpt. at 24.

[24] *Id.*

> B.   Absent Circumstances Not Present Here, Courts Have Refused to Consider Financial Evidence from Non-Defendant Corporate Affiliates When Setting Civil Monetary Penalties and Punitive Awards.

Courts tasked with setting civil monetary penalties under federal environmental laws and in deciding punitive damages have recognized that parent corporations are not liable for the actions of their subsidiaries. Accordingly, absent circumstances not present here, those courts have refused to consider financial evidence from corporate affiliates that are not themselves named defendants in the pending suit.

For example, in *United States v. Dico, Inc.*, 4 F. Supp. 3d 1047 (S.D. Iowa 2014), a recent case examining the amount of civil penalties to be assessed against Dico, Inc., a subsidiary of Titan International, Inc., under CERCLA, the court "decline[d] to consider the assets of Titan International when evaluating Dico's ability to pay" the penalty. *Id.* at 1064-65 & n.43. The court explained:

> [T]he proposition of considering the assets of the parent company, which is not a party to the lawsuit, when assessing civil penalties against a subsidiary is ***somewhat at odds with the basic principle of corporate law that each incorporated business entity enjoys a separate legal existence***. [S]ee also United States v. Bestfoods et al., 524 U.S. 51, 61-62, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998) ('[I]t is hornbook law that the exercise of the control which stock ownership give to the stockholders . . . will not create liability beyond the assets of the subsidiary . . . [and] nothing in CERCLA purports to reject this bedrock principle . . . .' (internal citations and quotation marks omitted)).

*Id.* (citation omitted).[25]   In *Dico*, as here, the United States made clear that it was not seeking to hold the defendant liable nor to pierce the corporate veil.[26]

---

[25] Although the *Dico* court examined this issue under CERCLA and not under the CWA, there is similarly nothing in the CWA "that purports to reject th[e] bedrock principle" relied upon by the *Dico* court.

[26] *See* Ex. 18, Defendant Dico, Inc.'s Post-Trial Brief, *United States v. Dico, Inc.*, 4 F. Supp. 3d 1047 (S.D. Iowa 2014), Rec. Doc. 197 at 41 ("Nor does the government seek to pierce the corporate veil. (See TT 702:24-703:5 ('[GOVERNMENT COUNSEL]: I want to be very clear that we are not seeking to pierce the veil . . . We're not arguing that the parent is directly liable.')").

Courts have also honored the fundamental rule of limited parent/shareholder liability in the punitive damages context. For example, in *United Technologies Corp. v. American Home Assurance Company*, 118 F. Supp. 2d 174 (D. Conn. 2000), the court—citing to *Bestfoods* just as the *Dico* court did—explained that "[the parent] is not a party to this lawsuit, and the Court therefore finds it improper to use [the parent's] value as a measure of exemplary damages." *Id.* at 180 (citing *Bestfoods*, 524 U.S. at 61).[27] In reaching its holding, the court also noted that the plaintiff had not overcome "the due process concerns inherent in assessing penalties against a non-party." *Id.* at 181. Nor can the United States here.

> C. *The Cases in Which Courts Have Considered Financial Evidence from Non-Defendant Corporate Affiliates Are Distinguishable from the Case before this Court.*

As the *Dico* court noted, some courts have considered the assets of a parent when setting civil monetary penalties against the parent's subsidiary. *Dico*, 4 F. Supp. 3d at 1065 n.43. But those cases are distinguishable. For example, the United States has previously cited *United States v. Municipal Auth. of Union Twp. ("Dean Dairy")*, 929 F. Supp. 800 (M.D. Pa. 1996), where the district court ruled that it would "look to the finances of [the non-defendant parent]" when examining the economic impact of a CWA penalty on the defendant subsidiary.[28] *Id.* at 808. The facts of *Dean Dairy*, however, are very different from those here.

---

[27] *See also Ramada Hotel Operating Co. v. Shaffer*, 576 N.E.2d 1264, 1268 (Ind. Ct. App.), *decision clarified on reh'g*, 580 N.E.2d 306 (Ind. Ct. App. 1991) (reversing for new trial on punitive damages when trial judge wrongly considered the parent corporation's finances).

[28] As an initial matter, the Third Circuit's decision in *Dean Dairy* (affirming the district court) was decided only six weeks after *Bestfoods*, but it fails to mention the Supreme Court's reaffirmation of the "bedrock principle" that a parent is not liable for actions taken by its subsidiaries. *Bestfoods*, 524 U.S. at 61; *see also United States v. Magnesium Corp. of Am.*, No. 2:01-CV-00040, 2006 WL 1699608, at *3 (D. Utah Jun. 14, 2006) ("Indeed, *Union Township*, the United States' primary case, was decided just six weeks after *Bestfoods*, and fails to mention *Bestfoods*.").

11

First, in *Dean Dairy*, the violator's equity value (assets minus liabilities) exceeded $20 million, more than enough to cover the penalty of approximately $4 million.[29]  Because of the recent drop in the oil price (under $65 per barrel for WTI at the time of filing), In this respect, the present case is similar to *Dico*—and unlike *Dean Dairy*. See *Dico*, 4 F. Supp. 3d at 1057, 1064-65, 1068 (Plaintiff proposed a penalty of $2,216,000, but the court found that Dico's ability to pay—ignoring its parent's finances—mitigated in favor of a lower penalty of $1,620,000).

Second, the *Dean Dairy* court noted that—unlike in this case—the parent "was siphoning off profits from [the subsidiary]." *Dean Dairy*, 929 F. Supp. at 808. The court thus recognized that "[i]t would constitute a serious injustice to allow [the parent] to profit from [the

---

[29] *See* Ex. 19, Reply Brief of Defendant-Appellant Dean Dairy Products Company, D/B/A Fairmont Foods, in *United States v. Municipal Auth. of Union Twp.*, No. 97-7115 (3rd Cir.) (filed Dec. 18, 1997) at 17, n.5 (noting that Dean Dairy (the subsidiary) had equity of $20,636,403).

subsidiary]'s violations of the [CWA] . . . and at the same [time] allow [the parent] to escape liability for the violations." *Id.* at 808-09.[35] Here, by contrast, no parent of BPXP is "siphoning off [BPXP's] profits."

D. *Penalizing the BP Group for Providing Capital to BPXP Would Be Bad Public Policy.*



But increasing a penalty because of assistance provided by an alleged violator's affiliates after a *Deepwater Horizon*-type

---

[35] On appeal, the Third Circuit also focused on the fact that the parent had siphoned off the subsidiary's profits, explaining, "If the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial resources are highly relevant." *United States v. Municipal Auth. of Union Twp.*, 150 F.3d 259, 268 (3d Cir. 1998).

13

incident would be bad public policy, because it would discourage corporate parents and affiliates from voluntarily providing assistance in similar circumstances in the future. As explained by Stanford Professor Robert Daines, BPXP's corporate governance expert:

> If the BP Group's involvement in the response were now used to justify a higher penalty on BPXP, corporate parents would have less reason to respond to future spills by committing the full resources of their group. This would be counterproductive when the parents have expertise or additional resources that can reduce the harm from an incident and when parental involvement in subsidiary response actions should therefore be encouraged.

(Ex. 28, 9/12/14 Daines Rpt. at 26). As Professor Daines further explained, considering a corporate parent's assets in calculating a penalty would discourage investment by well-capitalized parents:

> Well-capitalized parent shareholders may be reluctant to invest if their subsidiaries face higher penalties because the parent group is well-capitalized. In such circumstances, well-capitalized companies would face higher expected penalties than thinly-capitalized companies, other things equal. As a result, thinly-capitalized companies would be more likely than well-capitalized firms to invest in activities with a risk of such penalties (like deepwater drilling) because they would have lower costs due to lower expected penalties in the event of an incident.

(*Id*. at 25). Because the United States' legal-entity-blurring approach would discourage investment by well-capitalized parents, "it would become more difficult to achieve oil spill response, mitigation, and compensation and payments, of the type achieved in connection with the *Deepwater Horizon* incident—all of which required an enormous amount of capital to be deployed over a short period of time." (Ex. 17, 8/15/14 Daines Rpt. at 41-42).

Accordingly, BPXP respectfully requests that the Court exclude financial evidence that relates solely to BP Group entities other than BPXP. This evidence includes:

- financial statements, securities filings, earnings projections, and tax returns of, and other financial information concerning, BPXP's direct and indirect parent companies and affiliates—i.e., BP Products North America Inc., BP Company

14

North America Inc., BP America Inc., BP America Ltd., BP Holdings North America Ltd., and BP p.l.c.;

- financial information concerning BPXP's other affiliates within the BP Group— e.g., BPAPC and NAFCO;

- statements about the financial wherewithal of the BP Group as a whole; and

- any fact or expert witness testimony about any of the above evidence.

All of the above evidence is irrelevant to "the economic impact of the penalty on the violator" and therefore should be excluded.

## CONCLUSION

For the foregoing reasons, BPXP respectfully requests that the Court exclude evidence relating to the economic impact of a CWA penalty on BP Group entities other than BPXP, as well as financial information relating to BP Group entities other than BPXP.

Dated: December 9, 2014

Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

15

         Richard C. Godfrey, P.C.
         J. Andrew Langan, P.C.
         Hariklia ("Carrie") Karis, P.C.
         Matthew T. Regan, P.C.
         Kirkland & Ellis LLP
         300 North LaSalle Street
         Chicago, Illinois  60654
         Telephone: (312) 862-2000

         ***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of December, 2014.

/s/ Don K. Haycraft