# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 4:10-cv-00503 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DICO, INC. and TITAN TIRE | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DICO, INC.'S POST-TRIAL BRIEF

### Table of Contents

**Introduction**................................................................................................4

**Statement of Facts**.........................................................................................6

**I. HISTORY OF THE DICO SITE**.................................................................6

    A.    The History of the Dico Site Involves Far More Than PCBs, and Dico Has Spent Considerable Time and Money Remediating and Maintaining the Site Over the Last Twenty Years....................................6

    B.    The 1994 Building Unilateral Administrative Order and Subsequent Remedial Actions. ..............................................7

    C.    Dico's History of Compliance with EPA................................................9

**II. DICO'S SALE OF CERTAIN BUILDINGS TO SIM IN 2007.**................................10

    A.    Dico Discussed Building Removal With EPA on Multiple Occasions Between 2003 and 2007. ....................................10

    B.    Transactions with SIM in 2007.........................................................11

    C.    Dico Undertook Good Faith Inquiry to Determine Whether There Were Any Environmental Restrictions on the Sale or Removal of the Buildings. ..............................................13

D.    The Line of Inquiry From Campbell to Brown to Mills to Barrentine Clearly Occurred. ...............................................................16

E.    Dico Made No Attempt to Conceal the Removal of the Buildings From EPA. .........................................................................................18

F.    EPA's Tepid Reaction to Discovery of the Removal of the Buildings, and Later Admissions Regarding Absence of Injury to the Public. ....................................................................................18

**III.    ABSENCE OF INJURY TO THE PUBLIC AT THE SIM SITE.** ..............................21

**IV.    DICO'S RESPONSE TO THE UNILATERAL ORDER ISSUED BY EPA FOR CLEANUP AT THE SIM SITE.** ....................................................22

**V.    ABSENCE OF ANY MEANINGFUL BENEFIT TO DICO FROM THE SALE OF THE BUILDINGS.** ....................................................................23

A.    Dico Did Not Intend the Sale of Buildings to SIM to Serve as a Method for Avoiding Cleanup and Disposal Costs Associated With Building Removal, Nor Were Most of Those Costs Avoided Anyway. ............................................................................................23

B.    Dico Incurred More than $537,000 in Cleanup Costs Relating to the SIM Site and Has Negative Net Worth. .......................................25

**Argument** ....................................................................................................................26

**I.    TRIAL EVIDENCE CONFIRMED THAT DICO'S VIOLATION OF THE 1994 BUILDING UAO WAS A ONE-TIME EVENT FOR WHICH ONLY ONE DAY OF PER DIEM PENALTIES MAY BE IMPOSED.** ...................................................................................................26

**II.    THE COURT SHOULD APPLY A "BOTTOM UP" APPROACH TO DETERMINING THE APPROPRIATE CIVIL PENALTY.** .....................................29

**III.    THE ABSENCE OF ANY WILLFUL CONDUCT BY DICO STRONGLY SUPPORTS THE IMPOSITION OF NO OR MINIMAL PENALTIES AND STANDS IN STARK CONTRAST TO THE CASES IN WHICH PENALTIES WERE IMPOSED AT OR NEAR THE AMOUNTS SOUGHT BY THE GOVERNMENT HERE.** ...........................................................................................................30

**IV.    THE FIVE FACTORS WEIGH STRONGLY IN FAVOR OF IMPOSING NO, OR MINIMAL, PENALTIES ON DICO AND NO PUNITIVE DAMAGES.** ....................................................................................33

A.    Dico Acted in Good Faith and Without Any Intention or Desire to
      Violate an EPA Order. ........................................................................... 33

B.    The Sale and Dismantling of the Buildings Did Not Cause Any
      Actual or Threatened Injury to the Public. ............................................ 34

      1.    *EPA Admits the Absence of Injury at the Dico and SIM
            Sites.* ............................................................................................ 34

      2.    *When Looked at in the Proper Context, the Level of PCBs
            at the Dico and SIM Sites Was Low and Did Not Cause or
            Even Threaten Significant Harm to the Public.* ........................... 35

C.    The Minimal Benefit to Dico From Selling the Buildings Has Been
      More Than Offset by the Cleanup Costs. ............................................... 37

D.    Dico Has No Ability to Pay Civil Penalties or Punitive Damages. ....... 40

      1.    *Dico Has No Assets or Revenues to Use to Pay a Judgment.* ..... 40

      2.    *Titan International Is Not a Party to the Case and
            Therefore Its Assets Should Not Be Considered in the
            "Ability to Pay" Analysis.* .......................................................... 41

      3.    *Even the Government's Own Case Does Not Support Its
            Position that the Mortgage Between Titan International
            and Dico Should Be Given Any Weight in Determining
            Dico's Ability to Pay.* ................................................................. 44

E.    There Is No Need to Vindicate the Authority of the EPA In Light
      of Dico's Long History of Compliance With EPA Orders and
      Directives. ............................................................................................. 47

**Conclusion** ........................................................................................................... 48

## **Introduction**

For more than twenty years, Dico, Inc. ("Dico") has consistently performed expensive environmental cleanup and remediation work at its property near downtown Des Moines (the "Dico Site"). Dico installed a comprehensive groundwater extraction and treatment system; encapsulated the soil with an asphalt cap covering most of the property; performed remedial activities inside and around certain buildings; and continues to this day to handle maintenance, monitoring, and reporting activities relating to the groundwater system and asphalt cap. During the twenty years Dico has performed this work (at millions of dollars of expense), the government has only once alleged a violation of an EPA order – this case.

The violation found by the Court arose out of Dico's failure to notify EPA prior to the sale of dormant buildings in 2007 to Southern Iowa Mechanical ("SIM"). Trial evidence established that the failure to provide notice was an inadvertent, one-time event resulting from turnover among Dico's environmental consultants. The evidence showed (and the government essentially conceded) that the individuals acting on Dico's behalf had no desire or intention to violate an EPA order at the time of the sale of the buildings. To the contrary, they made good-faith inquiries (even if imperfect in hindsight) prior to the sale into possible environmental restrictions on the removal of the buildings and made no attempt to hide the transactions from EPA. Indeed, Dico sold the buildings the very summer it knew EPA would be at the property for a five-year review—timing which would make no sense if Dico was knowingly violating an EPA order.

The sale and removal of the buildings caused no injury to the public or the environment and resulted in the release of, at most, only small quantities of PCBs at SIM's property in Ottumwa, Iowa. Indeed, Dr. Ronald Hammerschmidt, the Director of the Environmental

4

Services Division for EPA-Region 7, recognized in April 18, 2008 that "there does not appear to be much chance for exposure" as a result of the removal of the buildings because "the PCB material is associated with glue on the solid backing [of the building insulation]." The alleged release was so small that SIM would not even have been required to notify EPA that a release occurred. Nonetheless, consistent with its track record, Dico promptly and thoroughly complied with EPA's directive to perform cleanup work at the SIM property at an ultimate expense of more than $537,000.

Under these circumstances – an inadvertent violation by a party with a long history of compliance, who subsequently remedies the violation – relevant case law shows that the imposition of penalties and punitive damages in the amounts requested by the government would be unprecedented. Perhaps recognizing this, the government attempts to establish bad faith or willfulness through a variety of arguments that stretch beyond any logical or reasonable inferences that might be drawn from the evidence. Dico respectfully submits that there is no evidence to support the government's allegations of bad faith or willfulness, and the Court should therefore resolve the matter by imposing no, or minimal, civil penalties and no punitive damages.

## Statement of Facts[1]

I.  **HISTORY OF THE DICO SITE**

   A.  <u>The History of the Dico Site Involves Far More Than PCBs, and Dico Has Spent Considerable Time and Money Remediating and Maintaining the Site Over the Last Twenty Years.</u>

EPA first took interest in the Dico Site as a result of possible trichloroethylene ("TCE") contamination in the groundwater. (TT 34, 124.)  In the mid-1980s, Operable Unit 1 ("OU1") established a groundwater extraction, treatment, and monitoring system designed to address the TCE contamination. (TT 34, 35; Pretrial Order Stipulated Facts § I, ¶ 4.)  Dico has performed the groundwater treatment and monitoring required of it by the Administrative Order and associated Operations and Maintenance Plan for OU1.  (Pretrial Order, Stipulated Facts, § I, ¶ 29.)  Dico continues to this day to monitor dozens of wells, maintain an air stripper, perform weekly and monthly groundwater testing and sampling, and submit lengthy monthly and annual reports to EPA in connection with OU1.  (TT 419-22, 427, 431-32; Trial Exh. 2086.)

OU2 was designed to identify and address the sources of groundwater contamination at issue in OU1.  (TT 36.)  Investigation of OU2 revealed, however, pesticide and herbicide contamination in soils adjacent to several buildings on the Dico Site.  (TT 36; 124.)  EPA therefore divided OU2 into two separate operable units: revised OU2, which continued to address the sources of VOC contamination in the groundwater; and OU4, which intended to

---

[1] The Court indicated that it did not necessarily expect the parties to submit formal proposed findings of fact and conclusions of law.  *See* TT 793-94 ("Whatever form you want to do it.  If you want to do proposed findings and conclusions, you can do that, although it's not necessary. You can just submit a memorandum.").  For the most part, Dico has drafted this section in a manner similar to traditional "Proposed Findings of Fact," albeit without numbered paragraphs. However, consistent with the Court's flexibility (which Dico appreciates), Dico will intersperse argument in this section in a few places where the government and Dico appear to disagree on the facts.

focus on those portions of the Dico Site and other adjoining properties believed to be contaminated with pesticides. (Trial Exh. 7 at ¶ 9; Pretrial Order Stipulated Facts § I, ¶ 6.) Investigation of OU4 revealed the presence of pesticide and herbicide contaminants aldrin, dieldrin, heptachlor, chlordane, 2, 4-D, 2, 4, 5-T, and 2, 3, 7, 8 tetrachlorodibenzo-p-dioxin ("TCDD") in various places on the interior surfaces of some buildings on the Dico Site, concrete floors of those buildings, and surface and subsurface soils outside of those buildings. (Trial Exh. 7 at ¶¶11-14.) These contaminants are different from and unrelated to PCBs. (*Id.*; TT 430.)

During the investigation of OU4, PCBs were discovered in certain sections of building insulation in some of the buildings on the Dico property. (Trial Exh. 162, p. 6.) Testing determined that PCBs were located only in some of the adhesive backing within the panels of insulation. (Trial Exh. 228, p 2-14; *see also* TT 615.) Dico was not the source of the PCBs in the buildings. (Trial Exh. 228, p. 2-3.) In any event, PCBs are ubiquitous in the environment, and small amounts of PCBs can be found in almost all outdoor and indoor air, soil, sediments, surface water, and animals, as well as many foods consumed regularly by humans. (TT 614-15; 619-20.)

B.   The 1994 Building Unilateral Administrative Order and Subsequent Remedial Actions.

In March 1994, EPA issued a Unilateral Administrative Order (the "1994 Building UAO") relating to OU4. (Trial Exh. 7.) Consistent with the history of the Dico Site, PCBs were not the primary focus of the 1994 Building UAO. (Id.) Rather, PCBs are mentioned in the 1994 Building UAO only after discussion of pesticide and herbicide contaminants aldrin, dieldrin, heptachlor, chlordane, 2, 4-D, 2,4,5-T, and TCDD, which were detected on the walls, floors, and surface and subsurface soils in and around certain buildings on the Dico Site. (Id. ¶¶ 9-15.) The 1994 Building UAO called for Dico to perform considerable remediation work, most of which

related to contaminants other than PCBs. (Id. ¶ 29.) In accordance with Paragraph 31 of the 1994

Building UAO, Dico prepared and revised an Operation and Maintenance ("O & M") Plan and

submitted the revised O & M Plan to EPA for approval on June 10, 1994. (Trial Exh. 162;

Pretrial Order Stipulated Facts § I, ¶ 12.) EPA approved the June 10, 1994 O & M Plan on

February 5, 1997. (Pretrial Order Stipulated Facts § I, ¶ 13.)

Dico performed all remediation work required by the 1994 Building UAO and O & M

Plan and submitted a final report to EPA on April 11, 1997 (the "1997 Final Report"). (Pretrial

Order Stipulated Facts § I, ¶ 9; Trial Exh. 10.)  Mary Peterson, EPA's project manager for the

Dico Site, reviewed and approved the 1997 Final Report. (Pretrial Order Stipulated Facts § I,

¶ 10.)  On May 8, 1997, EPA issued a notice of completion approving the 1997 Report. (Pretrial

Order Stipulated Facts § I, ¶ 11; Trial Exh. 12.)  Until 2007, Dico performed all obligations

required of it under the 1994 Building UAO. (Pretrial Order Stipulated Facts § I, ¶ 9; TT 135.)

By 2001, Dico had ceased manufacturing operations and no longer occupied the

buildings covered by the 1994 Building UAO on a routine basis. (Trial Exh. 310.)  By letter

dated July 2, 2003, and in compliance with paragraph 68 of the 1994 Building UAO, Dico

submitted to EPA a work plan for proposed modifications to the requirements of the 1994

Building UAO and the O&M Plan. (Pretrial Order Stipulated Facts § I, ¶ 15; Trial Exh. 165.)

The work plan proposed to discontinue the requirements of the O&M Plan and to replace

existing reporting requirements with more limited reporting requirements. (Trial Exh. 165.)  EPA

approved Dico's July 2, 2003 work plan for proposed modifications by letter dated September 3,

2003. (Trial Exh. 166.)  According to Mary Peterson, the result of this correspondence was that

Dico no longer needed to perform inspections or testing inside the buildings unless the buildings

were to go back into operation. (TT 51; 56.)  Similarly, "if operations resume inside the

buildings, Dico will notify EPA of its intentions prior to resuming operations, and resume the O & M requirements of the 1994 O & M Plan." (TT 56; Trial Exh. 165.)

  C. <u>Dico's History of Compliance with EPA.</u>

  Setting aside the present controversy, Dico has a long history of compliance with EPA orders and directives.  From 1994 to 2007, Dico performed all cleanup and remediation required under the 1994 Building UAO.  (Pretrial Order Stipulated Facts § I, ¶ 9; TT 135.).  Following the removal of the buildings, Dico complied with the unilateral administrative order relating to the SIM Site. (TT 121.)   Peterson testified that Dico has generally been responsive to EPA's requests. (TT 119.)  She said Dico has complied with monthly and annual reporting requirements since the early 1990s, with the exception of a few annual reports that were submitted late. (TT 122.)  She said Dico has provided EPA with the information necessary to do its job and properly regulate the site. (TT 123-24.)   Dico has never ignored EPA's requests for information. (TT 119.)  Dico's relationship with EPA has been professional and cordial. (TT 124.)

  Even after the removal of the buildings in 2007, EPA acknowledged that "the remedies [on the Dico Site] continue to be protective and are functioning as designed and in accordance with the RODs . . . Specifically, the groundwater extraction and treatment system continues to successfully control migration of the plume and provides the necessary protection of the public water supply."  (Trial Exh. 30 at p. v.)  In addition, EPA noted that the asphalt cap – which Dico still monitors and maintains to this day (TT 430-31) – has achieved "a significant amount of risk reduction." (Trial Exh. 30 at p. vi.)  Brian Mills, a consultant for Dico and Titan Tire, visits the Dico Site on a weekly basis to perform testing and monitoring responsibilities, as well as to arrange for any maintenance or repair that needs to be done to the groundwater extraction system. (TT 419-22, 427, 431-32; Trial Exh. 2086.)  Dico submits monthly and annual reports to

EPA regarding the groundwater system and maintains the asphalt cap, including, when necessary, arranging and paying for repairs. (TT 421, 430-31; Trial Exh. 2086.))

## II.      DICO'S SALE OF CERTAIN BUILDINGS TO SIM IN 2007.

### A.      Dico Discussed Building Removal With EPA on Multiple Occasions Between 2003 and 2007.

On multiple occasions between 2003 and 2007, Dico discussed with EPA the possibility that Dico would sell and remove buildings on the Dico Site as part of an effort to redevelop the property. (TT 147.)    For example, in the July 2, 2003, letter from Dico to EPA seeking modification of the O & M Plan, Dico expressly stated its intention to demolish or dismantle the buildings regulated by the 1994 Building UAO. (TT 56; Trial Exh. 165.)    In its September 3, 2003 letter approving Dico's work plan for proposed modifications, Mary Peterson responded that EPA "does not necessarily object to demolition of the buildings, but urges Dico to coordinate any plans for demolition of the buildings with EPA." (Trial Exh. 166.)    Peterson's letter further stated that certain disposal requirements "may" apply for building debris. (Trial Exh. 166.)    While the letter did "urge" Dico to provide notice prior to building removal, it did not *require* advance notice, nor did it suggest in any way that the removal of buildings without advance notice to EPA would constitute a violation of the 1994 Building UAO. (Trial Exh. 166.) Peterson testified that she regrets not using more forceful language. (TT 143.)    She said she did not feel it necessary to be extremely precise with her language in light of the good relationship between EPA and Dico. (TT 143.).    In any event, Dico responded with a letter from Dan Buttars dated September 23, 2003, stating that Dico would provide notice prior to building removal. (Trial Exh. 167.)

The topic of sale or removal of the buildings came up again in late 2006 at a meeting between Dico, EPA, and others in Kansas City to discuss redevelopment of the Dico Site.

(Barrentine Dep. 72:17-73:5.)  In March 2007, EPA assisted in the preparation of a Reuse and Reassessment Report in which an entire page was devoted to options for demolishing or dismantling the buildings.  (Trial Exh. 178, p. 21.)

The topic of possible building removal also came up in an email exchange between Mary Peterson and Quintin Macdonald, an outside consultant for Dico based in Tennessee, in late 2005. (Trial Exh. 203.)  Macdonald told Peterson he had *not* talked to Dico about the subject of building removal and that he was reaching out to her solely of his own accord. (Trial Exhs. 202, 203; TT 545-46.)  Peterson acknowledged that "[p]resumably, almost any sort of redevelopment [of the Dico Site] would require the demolition of the buildings." (Trial Exh. 203.)  Her email mentioned nothing about PCBs in the buildings, but did state that redevelopment might require "cleanup measures [that] could include removal of pesticide contaminated soil beneath the [asphalt] cap." (Trial Exh. 203).  Macdonald did not thereafter communicate Peterson's statements regarding protective measures inside the building to Dico. (TT 546-47.)

B.    Transactions with SIM in 2007.

In 2006 or 2007, Bill Campbell, the President of Titan Tire, was approached about the possibility of selling some of the buildings on the Dico Site. (TT 373, 505.)  The prospective buyer was not interested in buying all the buildings on the property, but rather just certain "butler-style" buildings – that is, buildings made of steel siding and roofing and supported by steel beams. (TT 370-71, 504-06.)  Butler-style buildings are portable and easily constructed. (TT 370.)  As of 2007, the Dico Site had five buildings that were either partly or wholly Butler-style construction: the Maintenance Building, the Production Building, Building 4, Building 5,

and the annex to Building 3.[2] (TT 373-74, 505-06.)  The Production Building was not part of OU4 and was never subject to any environmental restrictions. (Pretrial Order, Stipulated Facts, § I, ¶ 8; TT 131.)  Negotiations with the prospective buyer failed to result in a sale. (TT 506.)

Eventually, Jim Hughes, the President of Southern Iowa Mechanical ("SIM"), expressed interest in the butler-style buildings. (TT 373, 506.)  Hughes had purchased a *different* butler-style building from the Dico Site in 2004, disassembled it, moved it to SIM's property in Ottumwa, Iowa, and reassembled it there. (TT 319-20; 322; 372-73; 375-76; Trial Exh. 2.)  The building, known as the "Weld Shop," was not part of OU4 and was never subject to any environmental restrictions. (Pretrial Order, Stipulated Facts, § I, ¶ 8; TT 131.)  Hughes had worked with Bill Campbell in that 2004 transaction. (TT 368-69.)

Hughes and Campbell (with the assistance of former Dico employee Don Brown) negotiated a purchase price of $1 per square foot and executed agreements for the sale and removal of the additional buildings in 2007. (TT 320, 376, 381; Trial Exhs. 2049, 2064, 1028.)  Campbell understood that Hughes intended to dismantle the buildings, move them to Ottumwa, and reassemble them, just as he had done with the Weld Shop. (TT 375.)  Hughes confirmed, under oath, that this was his intention. (Trial Exh. 2.)  Hughes described his actions to Mary Peterson as "purchas[ing] the buildings," which Peterson recognized is different than "a traditional contractor who got paid to demolish the buildings." (Trial Exh. 47.)

---

[2] For ease of reference, this Statement of Facts adopts the building labels used by EPA to describe the buildings on the Dico Site.  Dico personnel, however, used different terminology to describe the buildings.  For example, Don Brown, the longtime plant manager of the Dico facility, knew "Building 3" as the "Truck Garage."  (TT 506.)  Similarly, Bill Campbell was not familiar with the label "Buildings 4 and 5" for the large building on the southeast edge of the Dico Site.  (TT 373-74.)

C.    Dico Undertook Good Faith Inquiry to Determine Whether There Were Any Environmental Restrictions on the Sale or Removal of the Buildings.

Bill Campbell had no knowledge of any environmental restrictions or issues relating to the sale of the buildings to SIM, other than the need to maintain the integrity of the asphalt cap on the Dico Site during building removal. (TT 384-86.)[3]  Nonetheless, in an abundance of caution, he directed Don Brown to consult with Dico's local environmental consultant, Brian Mills, to find out whether there were any other environmental issues that needed to be addressed. (TT 386-88; 509-10.)  Campbell had no desire or intention to violate an EPA order in connection with the sale and removal of the buildings, nor did anyone else at Dico or Titan Tire. (TT 390-91; 392-93.)  Campbell was the highest-ranking corporate official involved in the sale of the buildings. (TT 386.)[4]

Mills has performed environmental consulting work on the Dico Site since August 2005. (TT 430-31.)  He replaced Brian Mersch in performing that work on the Dico Site; Mersch, in turn, had replaced Dan Buttars. (TT 118, 451.)  Mills began working on the Dico Site nearly two years after the modification of the O & M Plan removed all testing and monitoring obligations relating to the buildings. (Trial Exhs. 166-167; TT 430-31.)  Accordingly, Mills' work at the Dico Site consisted solely of testing, monitoring, and reporting relating to *groundwater*. (TT

---

[3] Campbell warned Hughes not to breach the integrity of the asphalt cap on the Dico Site.  (TT 389.)  Hughes admits to having been informed that he could not damage the asphalt cap.  (TT 331.)

[4] During closing argument, the government devoted considerable attention to the alleged scope of Cheri Holley's knowledge about environmental restrictions affecting the buildings. (TT 715-19.)  The government offered no evidence, however, that Ms. Holley was involved with or consulted on the sale of the buildings in 2007.  Indeed, Bill Campbell affirmed his deposition testimony that he did not have any discussions with Ms. Holley prior to the transactions with SIM. (TT 406.)  Ms. Holley's awareness (or lack thereof) is therefore irrelevant and should not be considered by the Court.

419-22; 427; 431-33; Trial Exh. 2086.)  He made over 80 trips to the Dico Site between August

2005 and May 2007, yet never once did any testing, sampling, or reporting relating to the

buildings. (TT 435, 452-53.)[5]  Thus, at the time Don Brown reached out to him in 2007, Mills

had no knowledge of any environmental restrictions on the buildings, nor was he aware of the

September 23, 2003 letter from Buttars to EPA stating that Dico would provide notice in advance

of removing the buildings. (TT 433, 435-36, 451.)[6]

Nonetheless, in his own abundance of caution, Mills reached out to Louis Barrentine, an

outside environmental consultant for Dico whose office was in Tennessee. (TT 436.)  Mills knew

that Barrentine's company, Environmental Management & Engineering ("EME"), had a longer

history with the Dico Site than Mills. (TT 438.)   Moreover, Mills had been instructed to

communicate any issues involving Dico through EME. (TT 437-38.)  Barrentine communicated

to Mills that he was unaware of any restrictions on the sale or removal of the buildings. (TT

440.)  Mills passed this message along to Don Brown and Bill Campbell.  (TT 441.)

Don Brown was copied on the September 23, 2003 letter from Buttars to EPA. (Trial

Exh. 167.)  However, at the time of the transactions with SIM in 2007, Brown did not remember

that letter and did not mention it to Campbell or Mills. (TT 513, 533-34.)[7]  Brown has never been

---

[5] Mary Peterson admits that she has no recollection of any conversations with Brian Mills regarding building issues prior to Spring 2007.  (TT 150.)

[6] In hindsight, Mills had certain documents in his file that reflected Dico's commitment to provide notice to EPA prior to removing buildings. (Trial Exh. 2010.)  At the time of the inquiry from Brown, however, Mills felt EME was the best resource regarding building issues and had no reason to believe there were documents in his file relating to regulation of the buildings. (TT 437-38, 449, 452.)

[7] At trial, the government tried to impeach Brown by highlighting a question and answer from his deposition in which he said he did not tell Mills or Campbell about the September 23, 2003 letter because he "assumed that [Mills] was in the circle with any conversation that came from or

trained in environmental matters; does not have any environmental expertise; has never had responsibility for environmental matters at Dico or Titan Tire; and has never been solicited for input on environmental matters at Dico or Titan Tire.  (TT 502.)  He did not have any interaction with Mary Peterson.  (Trial Exh. 47, TT 146.)

A different Dico consultant, Dr. Gazi George, *was* aware in 2007 of Dico's commitment to EPA to provide notice prior to dismantling the regulated buildings on the Dico Site.  (George Dep. 160:8-20; 165:21-166:8.)  However, Dr. George had no involvement at the Dico Site at the time the decision was made to sell the buildings in 2007, nor was he consulted on that decision.  (George Dep. 173:3-11, 185:1-16.)  He did not learn of the removal of the buildings until September 2007, at which point he informed the other Dico consultants for the first time that EPA should have been notified prior to removal of the buildings.[8]  (George Dep. 176:15-18; 185:1-16; Trial Exh. 1000).  He instructed Mills and Barrentine to disclose the identity of the purchaser of the buildings to Mary Peterson if she requested that information.  (Trial Exh. 1000.)

---

to the EPA.  That was his position there, so I didn't question it." (TT 525 (discussing pages 160 and 162 of the deposition transcript).)  The government declined to show Brown the question and answer from page 116 of the deposition transcript (some 45 pages *earlier*) in which Brown clearly stated that he did *not* remember receiving the September 23, 2003 letter. (TT 530-31, 533-34.)  The portion of the deposition cited by the government for impeachment purposes does not make sense in light of Brown's earlier testimony from the same deposition that he did not remember the September 23, 2003 letter. (TT 530-31.)  Indeed, how could Brown in 2007 have suddenly remembered a letter that he did not remember receiving in 2003, only to later forget the letter again?

[8] The government offered evidence that Dr. George has a felony conviction stemming from an environmental matter unrelated to Dico or Titan Tire.  (Trial Exhs 1129, 1130.; George Dep. 50:16-21.) Ironically, however, Dr. George has made it abundantly clear that he would have notified EPA prior to the sale of the buildings in 2007 had he been consulted.  (George Dep. 187:1-7; 210:21-211:5; 212:12-18. Trial Exh. 1000.)  In addition, like the rest of the people involved on Dico's behalf, he cooperated with EPA to gather information regarding the disposal of materials from the buildings and perform remediation work under the UAO issued by EPA for cleanup of the SIM Site.  (TT 121; Pretrial Order, Stipulated Facts, § I, ¶¶ 27, 28.)

D.     The Line of Inquiry From Campbell to Brown to Mills to Barrentine Clearly
       Occurred.

At trial, and much to Dico's surprise, the government argued that Dico witnesses might

have fabricated their testimony that Bill Campbell had Don Brown ask Brian Mills whether there

were any environmental issues associated with the sale of the buildings prior to the transactions

with SIM in 2007. (TT 746.)  The government's own exhibit – Exhibit 200 – contradicts its

argument. (Exh. 200; *see also* Pretrial Order at § II.A.1 ("Plaintiff's Exhibits.").) Exhibit 200 is a

logbook maintained by Louis Barrentine. (Barrentine Dep., 223:3-12.)  It is a contemporaneous

record of conversations between Barrentine and others in connection with his environmental

consulting responsibilities. (Barrentine Dep. 33:24-34:24.).  The government identified Exhibit

200 as *its* exhibit, and, in an apparent attempt to ensure its admissibility, designated the sections

of the Barrentine deposition in which Barrentine authenticated and laid foundation for the

admissibility of the logbook under the business records exception to the hearsay rule.  (Pretrial

Order § II.A.1 ("Plaintiff's Exhibits"); Barrentine Dep. 33:24-35:21; 223:3-12 (government

designations)).).

Barrentine's logbook shows that Brian Mills called him on May 2, 2007, regarding the

possible sale of the Maintenance Building. (Trial Exh. 200; TT 440.)  This call occurred four

weeks prior to the first contract between Dico and SIM (*see* Trial Exh. 2049) and thus perfectly

corroborates the testimony of Brown and Campbell that environmental inquiries were made *prior

to* the sale of the buildings. (TT 388-89; 509-10.)  Barrentine's logbook further shows that Mills

called him again on July 11, 2007, regarding the sale of Buildings 4 and 5. (Trial Exh. 200.)

This call was approximately two weeks before the contract between Dico and SIM for the sale of

those buildings (Trial Exh. 1028), and thus again corroborates Dico's position that inquires were

made in advance of the buildings being removed. (TT 388-89; 509-10.)

The government alternatively argued at trial that even if a conversation did occur between Mills and Barrentine prior to the sale of the buildings, the conversation did not include Mills asking Barrentine whether there were any environmental restrictions that might affect such a sale. (TT 785.)  The basis for the government's argument is that Barrentine did not specifically remember Mills asking him that question during the May 2 or July 11, 2007, conversations, nor does his logbook specifically mention such a question. (TT 785.)  Barrentine testified, however, that he does not deny that Mills asked him during the May 2 conversation whether there were any environmental restrictions on the sale of the buildings. (Barrentine Dep. 243:14-244:6.)  Meanwhile, Mills clearly recalls asking Barrentine during the May 2 call about whether there were any environmental issues with the sale of the buildings.  (TT 440.)

Moreover, the May 2 entry in Barrentine's logbook is obviously incomplete and, in fact, cuts off in mid-sentence:



(Trial Exh. 200; Barrentine Dep. 243:14-244:1.)  Clearly, Mills said or asked something else after informing Barrentine of the possible sale of the buildings. (Trial Exh. 200; Barrentine Dep. 243:14-244:1.)  It is difficult to imagine what else it would have been other than a question about environmental issues. (*See also* TT 440 "[MILLS:] I just recall asking him if there was any environmental issues with selling the building, and he responded he did not believe there was any environmental issues with selling the buildings.").  After all, prior to May 2, 2007, Mills had "no reason" to call Barrentine about the buildings on the Dico Site and instead usually discussed groundwater issues with him. (TT 484, 482.)  It follows that Mills must have made that unique

phone call on May 2, 2007, for the purpose of obtaining input from Barrentine about the building issue. (TT 440.)

E.    Dico Made No Attempt to Conceal the Removal of the Buildings From EPA.

Mary Peterson, EPA's Project Manager for the Dico Site, planned to visit the Dico Site in Summer 2007 for the statutorily-required five-year review. (Trial Exh. 39.)  The visit was contemplated for as early as August 6, 2007, but was moved to September 19, 2007, at Peterson's request. (TT 71, 152; Trial Exh. 39.)  Dico did not attempt to reschedule the five-year review even after realizing that notice should have been provided to EPA prior to removal of the buildings. (TT 454-55; Trial Exh. 1000.)  Dico did not attempt to prevent Ms. Peterson from accessing the site or seeing the status of the buildings. (TT 455.)  The removal of the buildings was obvious to Peterson when she arrived on the site for her five-year review, and was the first thing she mentioned to the Dico representatives. (TT 73-74; 153-54.)

The government alleges that Dico "knowingly" or "willfully" violated the 1994 Building UAO by selling the buildings to SIM, but has provided no compelling reason why Dico would knowingly or willfully violate an order the very summer it knew an EPA official with longtime responsibility for the Site would be present to witness the allegedly improper activity.  At trial, the government stated that it was not taking the position that the individuals involved in the transactions with SIM knew they were violating an EPA order. (TT 782.)

F.    EPA's Tepid Reaction to Discovery of the Removal of the Buildings, and Later Admissions Regarding Absence of Injury to the Public.

When Mary Peterson witnessed the buildings in mid-removal on September 19, 2007, neither she nor anyone else at EPA instructed Dico to stop the removal process. (TT 74-75; 156.)  Her only comment to the Dico representatives was, "didn't you think you should have notified me about the buildings?" (TT 74; 443.)  Ms. Peterson did not say anything else regarding the

dismantling of the buildings. (TT 74-75 ("Q. Other than asking the Dico representatives whether they thought they should have notified you before the demolition, did you say or do anything else regarding the demolition of the buildings that day? A. Not other than take some photos. I did take some photographs."); TT 444.) Ms. Peterson did not say anything to indicate that the removal of the buildings was an ongoing violation of EPA orders or requirements. (TT 74-75; 444.)

According to the government's witness, Jim Hughes, there were SIM workers on the Dico Site on the day of the five-year review. (TT 329-30.) The SIM workers were available for conversation and "anybody could have talked to them." (TT 330.) Ms. Peterson did not speak to them. (TT 329.)

Paragraph 47 of the 1994 Building UAO gives the EPA project manager the authority to "halt, conduct, or direct any work required by this order." (Trial Exh. 7.) If the government considered maintaining the encapsulation inside the buildings to be "work required by this order," EPA clearly would have had the authority to order Dico to stop the building removal activity during the site visit on September 19, 2007. (Trial Exh. 7.) However, Ms. Peterson testified that she did *not* have authority to halt the dismantling work on September 19, 2007:

> Q.   Is it your reading of paragraph 47 that you did not have the authority to order Dico to halt the work on that day, is that your reading?
>
> A.   That is my reading.

(TT 182-83.)

Neither Ms. Peterson nor anyone else at EPA went to court to seek an injunction to stop the removal of the buildings. (TT 162). Nor did Ms. Peterson say anything to indicate that building removal was forbidden under the 1994 Building UAO or any other EPA order. (TT 74-75.) In short, neither Peterson nor EPA gave Dico any reason to believe the removal of the

19

buildings should be stopped, created an unsafe situation, or warranted an emergency reaction. (TT 160-64.)  The removal process therefore continued with EPA's knowledge and acquiescence, and numerous beams ended up being transported to the SIM Site that never would have reached the SIM Site had EPA simply ordered the dismantling to stop on September 19, 2007.

More than seven weeks passed from the date of the site visit before EPA even sent a *letter* regarding the buildings at the Dico Site. (Trial Exh. TT 161, 444-45, Exh. 190.)  EPA learned in January 2008 that the buildings had been sold to SIM and moved to its property in Ottumwa, yet did not send anyone out to conduct testing on the SIM property until nearly four months later. (TT 164-65; Trial Exh. 65.)  In the meantime, on February 26, 2008, EPA prepared a Fourth Five-Year Review stating: "EPA does not believe the demolition of the building will affect the long-term integrity of the building encapsulation action [at the Dico Site]." (Trial Exh. 30 at p. vii).  Similarly, on April 18, 2008, Dr. Ronald Hammerschmidt, Director of the Environmental Services Division for EPA Region 7, determined that "there does not appear to be much chance for exposure since the PCB material is associated with glue on the solid backing [of the insulation]." (Trial Exh. 29.)  EPA did not prepare a report from the SIM Site inspection until December 2008.  (TT 166; Trial Exh. 65.)

EPA admits that there is no data or other evidence that indicates a release of PCBs on the Dico property as a result of the dismantling of the buildings by SIM. (TT 170.)  There is no evidence that anyone was injured or that anyone's health was impaired as a result of exposure to PCBs in any of the Dico buildings. (TT 170.)

## III.    ABSENCE OF INJURY TO THE PUBLIC AT THE SIM SITE.

EPA conducted "biased sampling" at the SIM Site in May 2008—meaning, EPA investigators identified and tested areas of the property that they believed were most likely to contain PCBs, rather than choosing areas at random to determine composite levels. (Trial Exh. 65 at p.3.)  Even with this biased sampling, the SIM Site contained only a very small level of PCBs. (TT 633.)  Over 1,600 pounds of scarification waste was created from the cleaning of the steel beams. (TT 635.)  Only 0.04 pounds of PCBs were estimated to be present in that scarified waste. (TT 635.)  Only 0.001 pounds of PCB were estimated to be present in the insulation found on the SIM Site. (TT 637.)

Consistent with Dr. Hammerschmidt's conclusion in April 2008 that chances of PCB exposure were low (Trial Exh. 29), the quantity of PCBs present on the SIM Site was well below the "reportable quantity" thresholds under both CERCLA and TSCA. (TT 645.)  The "reportable quantity" under both CERCLA and TSCA is one pound. (TT 645; *see also* 40 C.F.R. § 302.4 at Table 302.4.)[9]  The total quantity of PCBs on the SIM Site was 0.041 pounds – some 95% below the reportable quantity threshold. (TT 635, 637, 645.)  In other words, had the beams and insulation that ended up on the SIM Site not come from a Superfund Site, the level of PCBs was so low that *it would not even have been necessary to notify EPA about their presence*. (TT 645-46.)

_____

[9] At trial, the government objected to testimony of Dico's expert, Dr. Remy Hennet, regarding the "reportable quantity" of PCBs under CERCLA. (TT 648-49.)   The Court took the motion under advisement. (TT 648.)  Whether the motion to strike is granted or not, the Court clearly is permitted to review 40 C.F.R. § 302.4 for itself to determine the "reportable quantity" threshold under CERCLA.

## IV.  DICO'S RESPONSE TO THE UNILATERAL ORDER ISSUED BY EPA FOR CLEANUP AT THE SIM SITE.

Despite the conclusion of EPA's own expert that the risk to public health from PCB exposure was low, EPA issued a unilateral administrative order effective January 23, 2009, to Dico and Titan Tire for a removal action at the SIM Site in Ottumwa. (Trial Exh. 80; TT 89.) The order required Dico to clean beams containing insulation residue by scarification and to characterize and excavate soil containing greater than one part per million PCBs. (Trial Exh. 80 at ¶ 29; TT 90, 94.)  EPA applied standards from the Toxic Substances Control Act ("TSCA") in the unilateral administrative order. (TT 91.)  EPA required Dico to satisfy clean-up standards for "high occupancy" areas even though the SIM Site is located in a rural, low density industrial area and the nearest building is roughly 750 feet away. (TT 91-92; 317; Trial Exh. 2125.)  The SIM Site is seven and one-half acres in size and contains scrap and recycled materials such as ladders, electrical panels, pipes "all over the place," insulated panels, carbon steel piping, fans, and trailers. (TT 317, 321-24; Trial Exh. 2087).  Dico complied with its obligations under the SIM Site unilateral administrative order. (TT 121.)

At the time SIM dismantled the buildings in 2007, certain insulation was taken to the homes of SIM employees for their personal use. (TT 314-15).  Dico retrieved that insulation and disposed of it in Spring 2008 at a specialized TSCA facility. (TT 447, 639; Trial Exh. 174 at pp. 8, 10, 14.)  As of Spring 2008, EPA was taking the position that the insulation from the Dico Site was PCB Remediation Waste that had to be disposed of at the specialized facility. (TT 589-92.) Disposing of the insulation in this manner was considerably more expensive than if EPA had permitted Dico to treat the insulation as Bulk Product Waste, which can go to a municipal

landfill. (TT 589, 639; Trial Exh. 174 at p. 8.)[10]  EPA persisted with its position that the

insulation waste was Bulk Remediation Waste despite being encouraged by the Iowa Department

of Natural Resources ("IDNR") to treat the waste as Bulk Product Waste. (TT 589-92; Trial Exh.

24.)  EPA eventually relented in January 2009 and allowed Dico to treat the insulation from the

SIM Site as Bulk Product Waste (Trial Exh. 80); however, Dico had already incurred the extra

expense of treating the earlier insulation as Bulk Remediation Waste and having it incinerated at

a specialized TSCA facility. (TT 639; Trial Exh. 174 at p 8.)

## V.   ABSENCE OF ANY MEANINGFUL BENEFIT TO DICO FROM THE SALE OF THE BUILDINGS.

   A.   Dico Did Not Intend the Sale of Buildings to SIM to Serve as a Method for Avoiding Cleanup and Disposal Costs Associated With Building Removal, Nor Were Most of Those Costs Avoided Anyway.

Dico did not sell the buildings to SIM for the purpose of preparing the site for

redevelopment without incurring environmental cleanup and remediation costs. (TT 392-93.)

The transactions were not designed to get rid of all the buildings on the Dico Site. (TT 395.)

Four buildings remain on the Dico Site to this day. (TT 394.)  The concrete foundations beneath

the buildings (including the buildings that were sold) also remain on the Dico Site to this day, as

does the asphalt cap covering more than half of the property. (TT 395, 429-30.)

The government offered no evidence from a demolition expert regarding how much

money, if any, Dico saved by having SIM remove the buildings.  The government did offer

testimony of an appraiser, Patrick Schulte, regarding his opinion on the increase in land value

Dico allegedly enjoyed as a result of the sale and removal of the buildings. (*See generally*

---

[10] PCB Bulk Remediation Waste is PCB-contaminated waste that results from cleanup of a spill of liquid PCBs. (TT 591, 641.)  PCB Bulk Product Waste is waste derived from manufactured products containing PCBs in a non-liquid form. (TT 588; 640-42.)

Schulte Testimony.)   Mr. Schulte has virtually no experience or training with respect to the appraisal of contaminated properties and did not seek the assistance of an appraiser with such experience. (TT 193, 287.)   His failure to seek professional assistance from an appraiser with experience on contaminated properties is inconsistent with the guide notes to the Standards of Professional Appraisal Practice of the Appraisal Institute. (TT 286.)   The only contaminated property Mr. Schulte has ever evaluated did not sell until after all environmental issues were resolved. (TT 244, 257-58, 288.)   The other properties he used as comparable sales were not contaminated. (TT 257-58.)

Schulte only spoke with one demolition contractor regarding the cost of removing PCB-contaminated buildings. (TT 271.)   The contractor, Apex Demolition Contractors, indicated that it needed more information regarding the extent of the contamination before it could provide an estimate. (TT 271-72.)   Schulte declined to provide that information or obtain additional analysis from Apex. (TT 273.)   Instead, he simply estimated how he believed a buyer would value the cost of removing PCB-contaminated buildings and came up with a market value of the Dico Site with and without the buildings. (TT 273.)   Schulte defined "market value" as a situation in which "buyer and seller are both working in their individual best interests, they're both knowledgeable of all aspects of the property, [and] they're knowledgeable about the positive and negative attributes of the property." (TT 207-08.)   Schulte did not explain why a buyer who declines to obtain information from a contractor about the cost of demolishing buildings contaminated with PCBs nonetheless would be considered "knowledgeable of all aspects of the property."

In calculating how a hypothetical buyer would estimate the demolition cost of the buildings, Schulte apparently assumed the insulation waste was Bulk Remediation Waste that would need to be disposed in a specialized facility. (TT 290.)   EPA now admits that insulation

contaminated with PCB waste is Bulk Product Waste that can be taken to a municipal landfill. (Trial Exh. 80; 40 C.F.R. § 761.62; *see also* EPA Notice concerning recycling materials containing PCBs, 79 Fed. Reg. 20640, 20642 (April 5, 2013).) Accordingly, Schulte's testimony overstates the cost that a "knowledgeable" buyer would assume for the removal of buildings with PCB in the insulation.

In contrast to Schulte's opinion, the Polk County Assessor concluded that the sale of the buildings caused the value of the Dico Site to *decrease*. (TT 281, 284; Trial Exh. 251.) On July 16, 2007, the Polk County Assessor valued the property at $792,980 – with the land being valued at $176,000 and the buildings on the property at $616,980. (TT 680; Trial Exh. 251.) On May 30, 2008, the Polk County Assessor valued the property at $445,900 – based on a land valuation of $223,300 and the remaining buildings' valuation of $222,600. (TT 680; Trial Exh. 251.) In short, according to the Polk County Assessor, the Dico property value decreased by 44% after the buildings were disassembled and removed by SIM. (Trial Exh. 251.)

 B.   Dico Incurred More than $537,000 in Cleanup Costs Relating to the SIM Site and Has Negative Net Worth.

The only benefit Dico received from the sale of the buildings to SIM was the purchase price of $165,754 paid by SIM. (TT 685.) SIM purchased the maintenance building for $12,000; the western annex of Building 3 for $5,000; and Buildings 4 and 5 and the northern portion of the Production Building for $148,754. (Trial Exhs. 2049, 2064, and 1028.) SIM paid $31,320 of the purchase price in cash and the rest via in-kind labor. (TT 683-84; Trial Exhs. 2065-67, 2070, 2071, 2073.) Meanwhile, Dico has incurred more than $537,000 in cleanup costs relating to work performed at the SIM Site. (TT 686, Trial Exh. 2058 at p.18.).

As reflected in its December 31, 2012 financial statement, Dico has no liquid or current assets; has total liabilities of nearly $6.9 million; and has a net worth of negative $5.156 million.

(Trial Exh. 2062.)  Dico has no ability to satisfy a large civil penalty or punitive damage award.
(TT 673.)

## Argument

I. **TRIAL EVIDENCE CONFIRMED THAT DICO'S VIOLATION OF THE 1994 BUILDING UAO WAS A ONE-TIME EVENT FOR WHICH ONLY ONE DAY OF PER DIEM PENALTIES MAY BE IMPOSED.**

Paragraph 47 of the 1994 Building UAO gives the EPA project manager the authority to "halt, conduct, or direct any work required by this order." Exh. 7.  If the government considered maintaining the encapsulation inside the buildings to be "work required by this order," EPA clearly would have had the authority to order Dico to stop the building removal activity during the site visit on September 19, 2007.  *Id.*  However, at trial, Ms. Peterson testified that she did *not* have authority to halt the dismantling work on September 19, 2007.  *See* TT 182-83.  Thus, the government agrees that the building removal activities were not prohibited by the UAO.  At most, Dico's violation was its failure to give notice to EPA.  The question, then, is what penalty can be imposed for this notice violation.

*United States v. Trident Seafood Corp.*, 60 F.3d 556, 559 (9th Cir. 1995) establishes that, at most, only one day of *per diem* penalties may be imposed against Dico in these circumstances. In *Trident Seafood*, the defendant failed to notify EPA of its intent to remove asbestos from a building.  The defendant hired an unlicensed asbestos remover to dispose of 5.24 tons of bagged asbestos at the landfill and did not notify regulatory officials until 44 days had passed.  The question before the Court was whether a failure to give notice was a one-time, one-day violation or a continuing violation for 44 days.  The Ninth Circuit concluded that the failure to give notice was a one-time event for which only one day of penalties could be imposed:

> Trident's only obligation under the language of the regulation then in effect was to notify EPA before renovation began.  This could reasonably be interpreted to

mean that the only 'day of violation' occurred on the day before Trident
commenced renovation.

*Id.* at 558.  The court therefore reversed the district court's finding that the violation continued
each day until notice was given.

The government (and district court) in *Trident Seafoods* made the same argument the
government apparently intends to make here regarding why the removal of contaminated
materials without notice should constitute an ongoing violation.  *Compare* TT 57 ("[MARY
PETERSON]: But with regard to the buildings, it was important that they notify EPA prior to
demolishing or dismantling the buildings because EPA would need to be involved in that process
to identify whether disposal--what the disposal requirements might be."); *with Trident Seafoods*,
60 F.3d at 558-59 ("[T]he self-evident purpose of notification is to enable the enforcement
agency to monitor asbestos removal and assure effective compliance with work rules") (internal
punctuation omitted).  The Ninth Circuit rejected the argument that this is a sufficient basis for
treating the failure to provide notice as an "ongoing" violation:

> [N]otwithstanding policy concerns, the agency had both the opportunity and the
> obligation to state clearly in its regulations either that there is a continuous duty to
> notify or that a failure to notify gives rise to a penalty based on the length of time
> that the breach exists. We have reasoned that when "violation of a regulation
> subjects private parties to criminal or civil sanctions, a regulation cannot be
> construed to mean what an agency intended but did not adequately express."
> Phelps Dodge Corp. v. Federal Mine Safety and Health Review Comm'n, 681
> F.2d 1189, 1193 (9th Cir.1982) (internal quotation omitted). Thus, "[t]he
> responsibility to promulgate clear and unambiguous standards is on the [agency].
> The test is not what [the agency] might possibly have intended, but what [was]
> said. If the language is faulty, the [agency] had the means and obligation to
> amend." Marshall v. Anaconda Co., 596 F.2d 370, 377 n. 6 (9th Cir.1979)
> (internal quotation omitted). Thus, reliance on policies underlying a statute cannot
> be treated as a substitute for the agency's duty to promulgate clear and definitive
> regulations.

*Id.*

This logic applies with even greater force in the situation where, as here, EPA actually wrote the 1994 Building UAO. But in the crucial September 3, 2003, letter to Dico, EPA merely "urge[d] Dico to coordinate any plans for demolition of the buildings with EPA." Trial Exh. 166. This language certainly does not indicate that failure to give notice would subject the company to ongoing daily penalties, and EPA should be estopped from asserting otherwise.

The Eighth Circuit is among several courts of appeal to have adopted the distinction in *Trident Seafoods* between operating violations and one-time notice or permit violations. In a series of cases related to violations of Prevention of Significant Deterioration (PSD) standards under the Clean Air Act, defendants failed to undertake PSD analysis prior to construction of emission equipment needed for a Title V permit. Years (and sometimes decades) later, environmental regulators determined that the regulated entity had failed to undertake the PSD analysis and therefore had been emitting pollutants for many years without the operating limits that would have been imposed had the analysis been done properly in the first instance. In each case, the court found that the failure to undertake the PSD analysis was a one-time event that would support only a single day of civil money penalties. *See Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1015 (8th Cir. 2010); *United States v. EME Homer City, L.P.*, 727 F.3d 274, 284-85 (3d Cir. 2013); *United States v. Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013); *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 502 F.3d 1316, 1323 (11th Cir. 2007). In these cases, the years of unpermitted emissions resulting from the failure to conduct a PSD analysis far exceeds any releases that could have been caused by Dico, yet each court found that only a single day of penalties could be assessed.

The same conclusion is required here. The EPA project manager testified that she lacked the authority to order Dico to halt the building removal activities on September 19, 2007. It

follows that Dico was not engaged in an ongoing violation of an EPA order on that date and thus that the removal of the buildings without notice subjects Dico, at most, to a one-time, one-day penalty in an amount not to exceed $32,500.[11]

## II. THE COURT SHOULD APPLY A "BOTTOM UP" APPROACH TO DETERMINING THE APPROPRIATE CIVIL PENALTY.

The government wrongly suggests that this Court must employ a "top down" approach in determining what, if any, civil penalty to impose against Dico, which would make the starting point for any civil penalty the statutory maximum of $32,500 per day. Contrary to the government's contention, the law does not require, or even necessarily support, such an approach. Recently, a district court in Idaho, in a Clean Water Act ("CWA") case, concluded that a "bottom up" approach is much more practical. *See Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1166 (D. Idaho 2012). There, the plaintiffs asked the court to impose the maximum penalty for 2,004 separate violations of the CWA. *Id.* The court commented that if it were to apply the "top down" approach as espoused by the plaintiffs, its starting point would be a $75,150,500 penalty, which the court refused to consider. *Id.*

Similarly, in *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Company*, 1988 WL 156691 (D. N.J. 1988), an enforcement action for violation of the defendant's National Pollutant Discharge Elimination System permit, the government asked the district court to apply a "top down" approach in imposing a penalty. The district court rejected that suggestion, stating, "In assessing a penalty … I expressly reject plaintiff's argument that, in setting a penalty, the court should place the burden on the defendant to establish facts justifying

---

[11] Even if the violation could somehow be deemed "continuing," the penalty period should not extend beyond September 19, 2007—the date EPA was put on notice of the building removal.

some amount less than the maximum allowed by law. That would, in my view, be a novel and wholly untenable principle to apply to any civil penalty statute." *Id.* at *16.

In *United States v. Bedford*, 2009 WL 1491224 (E.D. Va. 2009), after determining that the defendant had violated the Clean Water Act by depositing 83 truckloads of fill material into wetlands without first obtaining a permit, the district court analyzed whether it needed to decide whether to use the "top down" or "bottom up" methodology in assessing a penalty. 2009 WL 1491224, *10. Under the "top down approach," the starting point would have been $53,072,500, which according to the court was not practical. *Id.* Instead, the court used the "bottom up" method, under which a court starts with the violator's economic benefit derived and adjusts upward or downward based on additional factors under the CWA (akin to the factors this Court must consider in the CERCLA context), including: the seriousness of the violation or violations, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require. *Id.*; *see also United States v. Smithfield Foods*, 972 F. Supp. 338 (E.D. Va. 1997) (employing a "bottom up" method for calculating penalties under the Clean Water Act).

### III. THE ABSENCE OF ANY WILLFUL CONDUCT BY DICO STRONGLY SUPPORTS THE IMPOSITION OF NO OR MINIMAL PENALTIES AND STANDS IN STARK CONTRAST TO THE CASES IN WHICH PENALTIES WERE IMPOSED AT OR NEAR THE AMOUNTS SOUGHT BY THE GOVERNMENT HERE.

At the summary judgment stage, the government did not argue that Dico had willfully violated the UAO. Rather, the government focused on the "fails or refuses to comply" prong of the statute. *See* 42 U.S.C. § 9606(b)(1) ("Any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any [EPA] order … may … be fined not more than [$32,500] for each day in which such violation occurs or such failure to comply continues.")

(emphasis added). The government now seems to be arguing that the violation was willful, which is inconsistent with its prior position. *Compare* Dkt. No. 128 (3/6/13 Order) at 33-39 (focusing on the "fails or refuses to comply" prong) with Trial Tr. 712:3-21 (arguing Dico's actions amounted to "willful concealment."). For example, at closing argument, the government curiously focused on Dico's general counsel, who was not even involved in the transactions at issue.[12] Despite the absence of any evidence of a connection between general counsel and the sale of the buildings to SIM, the government argued general counsel and others "absolutely knew with certainty that those buildings were contaminated and they absolutely knew that EPA should have been notified, and they did nothing with that knowledge. They didn't tell SIM, they didn't tell the EPA, and at critical moments in this case, both at the time of the transaction and after, they knowingly concealed what they knew." Trial Tr. 712:15-21.

The evidence does not support the government's position. Moreover, a failure to comply with the 1994 Building UAO, which is what the Court found, is much different in scope and degree than a *willful* failure to comply, and should be punished, if at all, much more leniently. In fact, as the reported case law summarized in the chart and subsequent discussion below establishes, not even the most egregious cases, involving misrepresentations and outright refusals

---

[12] At closing argument, the government attempted to "connect the dots" to Dico's general counsel (Cheri Holley) through an email, Trial Exh. 1006, which was an internal communication between two outside consultants from Environmental Management and Engineering (Quintin MacDonald and Louis Barrentine), relating to a proposed <u>draft</u> communication to Ms. Holley's legal assistant (i.e., not even to Ms. Holley herself). Trial Tr. 556, 573-74. The Court should afford Exhibit 1006 no weight. There is no evidence in the record that Ms. Holley was involved, in any way, in the discussions leading to the sale and removal of the buildings, and there is no evidence in the record that the draft email in Exhibit 1006 was ever sent or delivered to, or read by, Ms. Holley's assistant, much less Ms. Holley herself. *Id.* Exhibit 1006 is irrelevant to the issues before the Court.

to comply with EPA orders, neither of which are present here, have warranted penalties or punitive damages at or near the levels sought by the government in this case.

## WILLFUL VIOLATION CASES

| Case | Relevant Facts | Relevant Findings | Penalty Imposed |
|---|---|---|---|
| *United States v. Carolina Transformer Co., Inc.*, 739 F.Supp. 1030 (E.D.N.C 1989) | Defendants (company and its principals) <u>refused</u> to respond to UAO requiring cleanup of site | "Carolina Transformer was ordered by the EPA to clean up the site, and it refused. Kenneth and Dewey Strother personally made that decision." | Treble damages; no civil penalties. |
| *United States v. M. Genzale Plating, Inc.*, 807 F. Supp. 937 (E.D.N.Y. 1992) | Defendants <u>deliberately violated</u> an EPA Unilateral Administrative Order by <u>refusing to allow</u> the EPA access to their facility. | District Court found that the defendants acted in bad faith and concluded they should pay a significant penalty tailored to their ability to pay. | $40,000 total in civil penalties ($2,000 per day); no punitive damages. |
| *United States v. Lecarreaux*, 1991 WL 341191 (D. N.J. 1991) and 1992 WL 108816 (D. N.J. 1992) | EPA issued UAO requiring parties to undertake immediate corrective action at site, including removal of containerized waste and obvious surface and soil contamination. Defendants <u>completely refused</u> to comply with the UAO. | Court expressed discomfort with "draconian nature" of CERCLA penalties but ultimately determined the defendants' <u>intentional noncompliance</u> warranted full treble damages; "neither defendant <u>ever</u> responded despite EPA's continued effort to inform them that they were still liable." | $5,000 per day in civil penalties plus treble damages of $228,336.81. |
| *United States v. Barkman*, 1998 WL 962018 (E.D. Pa. 1998) | Defendant <u>refused to comply</u> with EPA Unilateral Administrative Order, requiring him to remove materials from site and made <u>false representations</u> to EPA about activities at site | Court concluded the defendant <u>willfully refused to comply</u> with Removal Order and <u>actively misled</u> the EPA into believing he was clearing the site, when he had no intention doing so. | $100 per day in civil penalties; no punitive damages |
| *United States v. Gurley*, 235 F. Supp. 2d 797 (W.D. Tenn. 2002) | EPA issued an information request to defendant under CERCLA, attempted to deliver it via various means on multiple occasions, and finally enlisted the U.S. Marshal's Service to deliver it to the defendant<br><br>Gurley sent the EPA a letter | Court found Gurley engaged in <u>evasive and willful</u> efforts to avoid responding to the information requests over a nearly 7 year period. Court found Gurley demonstrated bad faith from the inception of EPA's efforts to obtain information. His actions "border[ed] on [the] | Total = $1,908,000, split into components of $2,000, $1,000, and $500 per day depending on severity of conduct. |

| | refusing to answer questions in his individual capacity | egregious" and "evince[d] systematic, continual bad faith."<br><br>Court found Gurley's bankruptcy estate had nearly $23 million available for distribution. | |

## IV.   THE FIVE FACTORS WEIGH STRONGLY IN FAVOR OF IMPOSING NO, OR MINIMAL, PENALTIES ON DICO AND NO PUNITIVE DAMAGES.

### A.   Dico Acted in Good Faith and Without Any Intention or Desire to Violate an EPA Order.

The evidence at trial, in particular the testimony of William Campbell, Don Brown and Brian Mills, clearly established this was not a situation where those acting on Dico's behalf – which should be the focus of the Court's analysis of Dico's good faith – refused to comply with an EPA order.   Rather, Campbell, Brown and Mills acted in good faith and without actual knowledge of any obligation to notify EPA prior to removal of buildings.   They made reasonable and logical inquiries into the possible existence of environmental restrictions on the sale or removal of buildings and proceeded with the transactions only after determining that no restrictions existed.   The actions taken by these witnesses undermine any claim of bad faith, and stand in stark contrast to the outright, and egregious, disobedience highlighted in the cases summarized in the chart above.   Neither Campbell, nor Brown, nor Mills refused to respond to a UAO issued by the EPA for the cleanup of the Dico site.   *Compare United States v. Carolina Transformer Co., Inc.*, 739 F. Supp. 1030 (E.D.N.C 1989) and *United States v. Lecarreaux*, 1991 WL 341191   (D. N.J. 1991) and 1992 WL 108816 (D. N.J. 1992).   Nor did any of them deliberately violate an EPA order by refusing to allow the EPA access to the Dico site.   *Compare United States v. M. Genzale Plating, Inc.*, 807 F.Supp. 937 (E.D. N.Y. 1992).   Nor did any of them, in addition to refusing to comply with an EPA cleanup order, actively mislead the EPA.

*Compare United States v. Barkman*, 1998 WL 962018 (E.D. Pa. 1998). Nor did any of them

engage in a willful and evasive plot to avoid responding to EPA requests for nearly seven years.

*Compare United States v. Gurley*, 235 F. Supp. 2d 797 (W.D. Tenn. 2002).

Despite the dissimilarities between Dico's conduct and the egregious conduct exhibited

by the defendants in the cases highlighted above, the government asks this Court to impose

unprecedented penalties against Dico, penalties which would far and away exceed the penalties

imposed in those cases where the defendants truly flaunted the EPA's authority. Whether

Campbell, Mills, or Brown should have done more does not equate to a willful violation of the

UAO, and is not akin to those cases where defendants have been severely penalized – albeit at

levels still well below the penalties sought by the government here – for refusing to comply with

an order they knew to exist. This Court should consider this difference in degree when deciding

what, if any, civil penalty or punitive damages to impose.

      B.    <u>The Sale and Dismantling of the Buildings Did Not Cause Any Actual or Threatened Injury to the Public.</u>

          *1.*    *EPA Admits the Absence of Injury at the Dico and SIM Sites.*

EPA admits there is no data or other evidence indicating a release of PCBs on the Dico

property as a result of the dismantling of the buildings by SIM. *See* TT 170. Similarly, EPA

admits there is no evidence that anyone at the Dico or SIM Site was injured or that anyone's

health was impaired as a result of exposure to PCBs in any of the Dico buildings. *See id.* In its

Fourth Five-Year Review Report dated February 26, 2008, EPA stated: "EPA does not believe

the demolition of the building will affect the long-term integrity of the building encapsulation

action [at the Dico Site]." (Trial Exh. 30 at p. vii). On April 18, 2008, Ronald Hammerschmidt,

Director of the Environmental Services Division for EPA Region 7, determined that "there does

not appear to be much chance for exposure [from the removal of the buildings] since the PCB

material is associated with glue on the solid backing [of the insulation]." (Trial Exh. 29.)

> 2. *When Looked at in the Proper Context, the Level of PCBs at the Dico and SIM Sites Was Low and Did Not Cause or Even Threaten Significant Harm to the Public.*

In the absence of evidence of actual injury, the government is left to argue that Dico's

actions caused a *threat* of injury. The government focuses, in particular, on the presence of high

concentrations of PCBs in a few, isolated places on the SIM Site. However, those isolated

instances of high concentration are not representative of the overall level of PCB contamination

in the buildings or at the SIM Site. Indeed, they are clearly the exception rather than the rule.

The overall quantity of PCBs on the SIM Site was low—so low, in fact, that the owner of the

Site would not even have been obligated to notify EPA about their presence on the property. The

PCBs therefore presented no meaningful risk of harm to the public or the environment.

The benchmark for determining the extent of the threat to the public is EPA's own

published requirements. To trigger review by EPA of a contamination event, there must be a

release of a "Reportable Quantity" of a hazardous substance. *See* 40 C.F.R. § 302.4. "CERCLA

vests the EPA with authority to determine what constitutes the RQ of any given hazardous

substance and thereby enables the EPA to determine what releases must be reported." *Fertilizer

Inst. v. U.S. E.P.A.*, 935 F.2d 1303, 1307 (D.C. Cir. 1991). For purposes of emergency release

notification, Reportable Quantities are "quantities the discharge of which 'may be harmful to the

public health or welfare of the United States.'" *Natural Resources Defense Council, Inc. v. U.S.

E.P.A.*, 966 F.2d 1292, 1306 & n.15 (9th Cir. 1992) (quoting the Clean Water Act but noting that

CERCLA also contains Reportable Quantity thresholds). Naturally, EPA sets the Reportable

Quantities at a level that ensures its resources are focused on releases that could have some

impact on human health or the environment. *See Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 723 (W.D. Ky. 2003) (purpose of reporting requirements is to "provide emergency reporting in the event of health-threatening releases"). With respect to PCBs, the Reportable Quantity under both TSCA and CERCLA is one pound; meaning, a release of more than one pound of PCBs over a 24-hour period triggers a notification requirement and could have an adverse effect on human health and the environment. *See* 40 C.F.R. § 302.4 at Table 302.4.

Trial evidence established that the total quantity of PCBs on the SIM Site was nowhere near the Reportable Quantity threshold. Dr. Remy Hennet provided unrebutted testimony that the cleaning of beams on the SIM Site produced only 0.04 pounds of PCBs. *See* TT 635. Only 0.001 pounds of PCBs were present in the insulation found on the SIM Site. *See* TT 637. The total quantity of PCBs was therefore a tiny fraction of the Reportable Quantity threshold established by EPA itself, and clearly insufficient to constitute a meaningful threat to human health or the environment.[13] This is consistent with the conclusion of Dr. Hammerschmidt, EPA's Director of the Environmental Services Division for Region 7, that "there does not appear to be much chance for exposure since the PCB material is associated with glue on the solid backing [of the insulation]." (Trial Exh. 29.)

EPA's actions following the removal of the Dico buildings reinforce the absence of any meaningful risk of harm to the public. EPA learned of the ongoing removal of the buildings on September 19, 2007, yet did not even send a follow-up letter to Dico until 45 days later. *See* TT 161, 444-45, Exh. 190. EPA learned in January 2008 that the buildings had been sold to SIM

---

[13] Against this evidence, the government does nothing but point back to the isolated instances of high concentration. But this is the equivalent of arguing that because a candle is lit in one room, the Court should assume the whole house is on fire. CERCLA provides no support for such a position.

and moved to its property in Ottumwa, yet did not send anyone out to conduct testing on the SIM
property until nearly four months passed. *See* TT 164-65; Trial Exh. 65. It then took EPA seven
more months to prepare a report from the SIM Site inspection. *See* TT 166; Trial Exh. 65. In
short, at the time of the alleged threat to the public, EPA did not act with any urgency
whatsoever, much less a level of urgency that would support the government's current position
that the removal of the buildings constituted a serious threat to the safety of the public. The
"injury to the public" factor therefore weighs strongly in favor of no, or minimal, penalties.

C. The Minimal Benefit to Dico From Selling the Buildings Has Been More Than
Offset by the Cleanup Costs.

At trial, Dico established that the only benefit it derived from the sale and disassembly of
the buildings to SIM was the purchase price paid by SIM for the buildings, totaling
approximately $165,000 – a benefit quickly eliminated by the significant expenses Dico incurred
satisfying the cleanup costs at the SIM site. SIM purchased the maintenance building for
$12,000; the western annex of Building 3 for $5,000; and Buildings 4 and 5 and the northern
portion of the production building for $148,754. *See* Trial Exhs. 1026-1033; 2049; 2064. Of the
total purchase price for these buildings, Dico received only $31,320 in cash. The remaining
balance was satisfied by in-kind services provided by SIM, the charges for which were credited
to SIM on Dico's books. *See* TT 681-685; Trial Exh. 2065-2067; 2070-2071; 2073. The
minimal benefit that Dico derived from its sale of the buildings in 2007 was more than offset by
the $537,266.96 in expenses that Dico incurred cleaning up the SIM site subsequent to the sale of
the buildings. *See* TT 685-16; Trial Exh. 2058.

The government has taken the position that, in addition to the $165,000 purchase price
for the buildings, Dico realized an increase in its property value of approximately $800,000 by
having the buildings removed. This is an unreliable estimate formulated by the government's

proffered real estate appraisal expert, Patrick Schulte. It is premised on the erroneous notion that the Dico property is a salable piece of property to begin with, and that there is a willing buyer for a Superfund site with ongoing, and seemingly indefinite, environmental liabilities. The Polk County Assessor, who has a statutory duty (as opposed to a financial incentive) to appraise the real property at its fair and reasonable market value, and who Mr. Schulte himself agreed is competent to perform that duty, appraised the property for $347,000 <u>less</u> after the buildings were removed in 2007. *See* TT 281-285; 678-680; Trial Exh. 251.

Mr. Schulte's opinions should be offered little weight by this Court. He is a certified general real estate appraiser; however, he has virtually no experience or training with respect to the appraisal of contaminated properties. *See* TT 193; 257. The one property he appraised that he believed *might* have been a Superfund site, the Pittsburgh-Des Moines site in the Riverpoint neighborhood in Des Moines, actually is not. The EPA's own records establish that the Pittsburgh-Des Moines site was never a Superfund site. *See* http://www.epa.gov/region7/cleanup/npl_files/index.htm and http://cumulis.epa.gov/supercpad/cursites/srchrslt.cfm?start=1&CFID=12158797&CFTOKEN=54575198&jsessionid=e030206f5d59391e35244e1a6e712c4c337b (showing search results for prior Superfund sites in Iowa, using the term "Pittsburgh," and yielding no hits) (both sites last visited on January 9, 2014). Moreover, although he used the Pittsburgh-Des Moines site as a comparable sale in his analysis, that site did not sell until <u>after</u> all environmental contamination issues were resolved on the property. *See* TT 244; 257-258; 288. None of the properties Mr. Schulte used as comparable sales in arriving at his opinions were contaminated at the time they were sold. *See* TT 257-258.

Compounding this error is his demolition cost estimate, which he formulated in an attempt to compare the value of the property with the removed buildings to the value without them. Mr. Schulte inexplicably declined to obtain an estimate from a demolition company with actual experience in demolishing property contaminated with PCBs, and instead simply came up with his own estimate for how a buyer would measure the cost of demolition. Nor did Mr. Schulte deem it necessary to consult with other appraisers who had actual experience appraising Superfund sites. *See* TT 279-80; 285-87.

The evidence establishes that the Dico Site, in its current condition, is not salable and has no willing buyer. The property sits in a flood zone. Tr. 673:20-675:2. Despite redevelopment in the surrounding neighborhood, the Dico Site remains vacant. Dico is unable to sell the property as long as the environmental liabilities remain with it – not even to the City of Des Moines for one dollar. Tr. 686-87. Mr. Schulte's opinion as to the value of the property – with or without the buildings removed in 2007 – is based on the supposition that the property is salable. It is not. Mr. Schulte's opinion that the Dico Site increased in value nearly $800,000 after the buildings were removed – more than the entire amount the Polk County Assessor determined the property was worth in 2007 – is unrealistic. It was, and remains, a Superfund site, with little to no value, a position Dico has consistently taken with the Polk County Assessor over the years. Tr. 677-680. Dico did not realize any increase in property value as a result of the transactions with SIM and, if at all, benefitted by only the purchase price for the buildings. That benefit was later more than offset by the cost of cleanup at the SIM Site.

D.    Dico Has No Ability to Pay Civil Penalties or Punitive Damages.

     *1.    Dico Has No Assets or Revenues to Use to Pay a Judgment.*

It is undisputed that Dico has a negative net worth, no meaningful assets other than the Dico Site (which the company has been unable to sell), and has not generated any revenue from manufacturing operations since the mid-1990s. *See*, *e.g.*, TT 662-63, 667, 671-73. Indeed, the trial evidence established that Dico does no business and for many years has been doing nothing other than cleaning and maintaining the Dico Site. *See* TT 667 ("[GARY SCHUSTER:] [T]hat's the only purpose of this balance sheet, is to go through and continue to pay for the cleanup and remediation of the EPA site."). Dico has performed its environmental obligations over the years at a total cost of more than $4.2 million, which has been paid for via a loan secured by a mortgage on its single asset, the Dico Site. *See* Pretrial Order § 1, ¶ 29; TT 672; Trial Exh. 2061. Based on this evidence, Dico has no ability to pay civil penalties or punitive damages.[14]

---

[14] During trial, the Court asked about a judgment from a prior case involving Dico and whether the fact that the docket reflects the judgment as being unpaid is relevant to Dico's good or bad faith. *See* TT 704. Dico believes the prior judgment is relevant only to the "ability to pay" factor and that it confirms Dico's inability to satisfy a judgment.

In any event, the earlier case needs to be considered in the proper context. Dico did not violate any EPA orders in that case, nor was it ordered to pay any civil penalties or punitive damages. To the contrary, as the Eighth Circuit recognized, "[t]he EPA designated Dico as a potentially responsible party [for groundwater contamination] under CERCLA and issued a cleanup order to Dico. Dico complied, thereby incurring response costs." *United States v. Dico*, 266 F.3d 864, 868 (8th Cir. 2001). The Court held that Dico was *also* liable for costs attributable to EPA's efforts to remediate groundwater contamination, *id.* at 876, but this additional liability arose from CERCLA's strict liability scheme and not from any finding of bad faith or willfulness. *See United States v. Dico, Inc.*, 979 F. Supp. 1255 (S.D. Iowa 1997); *see also* 42 U.S.C. § 9607. Thus, the question is whether Dico should be punished for not having the ability to pay a prior judgment arising from a situation in which it did not violate any EPA orders or directives, but rather complied with EPA orders at considerable expense to itself. Dico submits that the answer is clearly "no."

2.    *Titan International Is Not a Party to the Case and Therefore Its Assets Should Not Be Considered in the "Ability to Pay" Analysis.*

Recognizing that Dico has no ability to pay a judgment, the government turned its attention at trial to the assets of Titan International, an indirect parent of Dico.[15]  However, Titan International is not, and never has been, a party to this action.  Titan International was not named in the petition or represented at trial.  Nor does the government seek to pierce the corporate veil.  (*See* TT 702:24-703:5 ("[GOVERNMENT COUNSEL]: I want to be very clear that we are not seeking to pierce the veil . . . We're not arguing that the parent is directly liable.").

The facts and law support the government's decision not to attempt to pierce the corporate veil.  Titan International has not in any way abused the corporate form in connection with Dico, and "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.'" *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884 (1998) (quoting, in part, Douglas & Shanks, "Insulation from Liability Through Subsidiary Corporations," 39 Yale L.J. 193 (1929)).

In *Bestfoods*, the United States Supreme Court held that a parent corporation is not liable under CERCLA for the environmental liabilities of its subsidiary unless the corporate veil is pierced. 524 U.S. at 63.[16]  Because Titan International is not a party to the action and no attempt

_____

[15] Dico's parent is Dyneer.  Dyneer's parent is Titan International.  *See* TT 660-61.

[16] The Supreme Court also recognized that a parent might be held directly liable under certain circumstances, including, for example, if the parent directly operated the facility.  The government does not allege, nor would the facts support, such a theory of liability against Titan International here.  *See id.* at 61-62 ("[I]t is hornbook law that 'the exercise of the 'control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary" (quoting Douglas & Shanks)).

was made to pierce the corporate veil, Titan International cannot be held liable for any punitive damages or civil penalties imposed against Dico. *Id.* Nonetheless, in its search for a deep pocket, the government argues that the assets of Titan International and existence of a mortgage between Titan International and Dico are somehow relevant to determining Dico's ability to pay civil penalties and punitive damages. In short, the government seeks to use the "ability to pay" factor to make an end-run around *Bestfoods*.

The government's argument fails. Titan International's assets are relevant to Dico's ability to pay only if one expects Titan International to foot the bill for any civil penalties or punitive damages imposed against Dico. Indeed, the government makes no secret that this is its expectation. *See* TT at 740-42 (government counsel arguing that Dico can draw on Titan International's assets and resources to pay for civil penalties or punitive damages). But *Bestfoods* unequivocally establishes that Titan International *cannot* be forced to pay Dico's environmental liabilities, and thus the government's argument asks the Court to assume what *Bestfoods* forbids—that the parent will have to pay the environmental liability of its subsidiary. Indeed, the government's argument, when stripped to its core, is essentially an act of sophistry: even though the Court cannot *order* Titan International to pay civil penalties or punitive damages, it should nonetheless operate from the assumption that Titan International *will have to pay* the civil penalties or punitive damages for purposes of determining Dico's ability to pay.

Courts have frequently held in analogous circumstances that the financial condition of a parent corporation may *not* be taken into account when determining the appropriate level of punitive damages to award against a subsidiary, absent piercing of the corporate veil. *See United Techs. v. Am. Home Assurance Co.*, 118 F. Supp. 2d 174, 180-81 (D. Conn. 2000) (refusing to assess punitive damages based on the net worth of defendant insurance company's parent

corporation); *George Grubbs Enters., Inc. v. Bien*, 900 S.W.2d 337, 339 (Tex. 1995) ("Awarding exemplary damages against one defendant according to the wealth of a separate entity substantially increases the risk of unjust punishment."); *Tomaselli v. Transamerica Ins. Co.*, 31 Cal. Rptr. 2d 433, 441-42 (Ct. App. 1994) (reversing punitive damage award against subsidiary based on financial condition of the parent); *Cont'l Trend Res., Inc. v. Oxy USA, Inc.*, 810 F. Supp. 1520, 1533 (W.D. Okla. 1992) ("The financial worth of a parent corporation is generally irrelevant in assessing punitive damages on a subsidiary unless the corporate veil is pierced…"); *Ramada Hotel Operating Co. v. Shaffer*, 576 N.E.2d 1264, 1268-71 (Ind. Ct. App. 1991); *Liberty Fin. Mgmt. Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 51-53 (Mo. Ct. App. 1984); *Walker v. Dominick's Finer Foods, Inc.*, 92 Ill. App. 3d 645, 649-50, 415 N.E.2d 1213, 1217 (1980); *Herman v. Hess Oil V. I. Corp.*, 379 F. Supp. 1268, 1276 (D. V.I. 1974).

Against this weight of authority, the government relies primarily on *United States v. Municipal Authority of Union Township.*, 929 F. Supp. 800, 805-06 (M.D. Pa. 1996), *aff'd* 150 F.3d 259 (3d Cir. 1998) for the proposition that a parent's assets may be considered. The fatal flaw in the *Union Township* decision was best described in *United States v. Magnesium Corp. of America,* 2:01-CV-00040-DB, 2006 WL 1699608, at *3 (D. Utah, June 14, 2006):

> The United States contends that another line of cases makes clear that the financial resources of the parent are highly relevant to the subsidiary's ability to pay, whether or not the parents themselves are liable. In particular, the United States relies on *United States v. Municipal Authority of Union Township* in which the Third Circuit upheld the district court's consideration of a corporate parent's finances in assessing a penalty on its subsidiary. As Defendants point out, however, most of the cases cited by the United States were decided before the Supreme Court's decision in *Bestfoods,* and those that were decided after *Bestfoods* do not make any reference to *Bestfoods.* Indeed, *Union Township,* the United States' primary case, was decided just six weeks after *Bestfoods,* and fails to mention *Bestfoods.* Other courts have held, in the context of assessing punitive

damages, that a parent's resources may not be considered in determining the
amount of punitive damages to be imposed against a subsidiary.

*Id.*, (footnotes omitted). The other case cited by the government, *Idaho Conserv. League v.
Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1170 (D. Idaho 2012), is equally unpersuasive.
*Atlanta Gold* incorrectly stated that courts have "uniformly" looked at the assets of the parent in
determining the subsidiary's ability to pay. *See Magnesium Corp., 2006 WL 1699608* at *3
(rejecting this approach). More importantly, as in *Union Township,* the court in *Atlanta Gold*
made no attempt to reconcile its holding with *Bestfoods*.

Even if *Union Township* could somehow be reconciled with *Bestfoods*, it still has no
application here. The Third Circuit stated in *Union Township* that a parent's financial resources
are relevant "[i]f the subsidiary does not retain its revenues." 150 F.3d at 268. The argument
under those circumstances is that it would be unfair or inappropriate for a parent corporation to
siphon off revenues from a subsidiary while leaving the environmental liabilities behind. Here,
*Dico has no revenues,* and thus Titan International clearly is not siphoning revenues or otherwise
manipulating the corporate form in a fraudulent manner. Thus, again, Titan International's assets
are not relevant to determining Dico's ability to pay.

    *3.    Even the Government's Own Case Does Not Support Its Position that the
    Mortgage Between Titan International and Dico Should Be Given Any
    Weight in Determining Dico's Ability to Pay.*

The government also attempts to argue that the existence of a mortgage between Dico
and Titan International is evidence of Dico's "ability to pay." The government relies on *United
States v. Midwest Suspension & Brake*, 824 F. Supp. 713, 736 (E.D. Mich. 1993), *aff'd* 49 F.3d
1197 (6th Cir. 1995) for the proposition that access to a line of credit is evidence of a company's
ability to pay. *Midwest Suspension*, however, stands for the opposite conclusion from the one
the government asks the Court to reach. The government in *Midwest Suspension* argued that a

line of credit available to the defendant helped demonstrate the defendant's ability to pay a

substantial civil penalty. *Id.*, 824 F. Supp. at 736. The court disagreed:

> [T]he fact that defendant can access a line of credit to pay the civil penalty is
> entitled to little weight, because defendant has secured this line of credit for
> reasons other than paying a civil penalty in this case. The Court finds that the
> most relevant information regarding defendant's ability to pay a civil penalty is
> found in the uncontested evidence that in 1992 defendant had gross sales above
> 10 million dollars and a net income of more than $200,000.

*Id.* The *Midwest Suspension* analysis, if applied to Dico's situation, would warrant the

conclusion that Dico has *no* ability to pay a civil penalty because whatever "little weight" might

be given to the company's ability to obtain financing is dwarfed by the "more relevant

information" that Dico has no gross sales, no revenue, and negative net income. *See generally*

TT 667, 671-73; Trial Exh. 2061. The government has flipped the holding of *Midwest*

*Suspension* on its head.

Other cases confirm that a line of credit is not an "asset." In the admiralty context, for

example, *Oceanfocus Shipping Ltd. v. Naviera Humbolt, S.A.*, 962 F. Supp. 1481, 1485-86 (S.D.

Fla. 1996) held that a line of credit available to the defendant "is not an asset subject to

attachment under the admiralty rules." In fact, the court concluded that a line of credit is

"precisely the opposite" of an asset because any draw that might be taken on such a line would

create a corresponding debt for the defendant. *Id.* Moreover, "[l]ike funds available under an

open letter of credit or funds awaiting an electronic transfer, funds available under a line of credit

do not belong to the defendant unless and until certain conditions are satisfied or certain discrete

events occur." *Id.* at 1485; *see also United States v. Ocala Live Stock Market, Inc.*, 861 F. Supp.

2d 1328, 1335 & fn. 10 (M.D. Fla. 2012) ("GIPSA did not include the unused portion of the line

of credit as a current asset because Ocala Livestock did not actually have the cash at hand—the

company would have had to borrow the cash from the line of credit (which would have merely

increased current liabilities).”); *Sears, Roebuck & Co. v. Romano*, 196 N.J. Super. 229, 236-37, 482 A.2d 50, 53-54 (Ch. Div. 1984) (holding that funds available to a debtor under an advance loan agreement are not “rights” or “credits” subject to levy).  Because a line of credit is not an asset, it cannot be used when determining whether Dico has the ability to pay a judgment.

The government’s reliance on *Midwest Suspension* fails for an additional reason.  The government characterizes the $11 million mortgage between Dico and Titan International as a “line of credit.”  But no witness used that terminology to describe the lending relationship between Titan International and Dico, and there is nothing in the mortgage itself indicating that Dico is automatically entitled to funds upon request, without regard to the purpose for which the funds are sought.  *See* Exhibit 1010.  The mortgage states only that Titan International “will make additional advances to [Dico] for cleanup, remediation and maintenance of, and providing security for, the [Dico Site] and related expenditures.”  *Id.* at Recital B.  “Punitive damages” and “civil penalties” are not mentioned anywhere, and Gary Schuster provided unrebutted testimony that the mortgage is not intended to provide funding for such penalties or punitive damages.  TT 673 (“There’s nothing in there stating that [Titan International] would loan money for any punitive damages, or anything of that nature.”).  Thus, even if *Midwest Suspension* somehow did support the government’s position that access to a line of credit is entitled to meaningful weight in the “ability to pay” analysis (which it does not), the government has failed to establish that the secured loan between Titan International and Dico is a “line of credit” or that Dico has the right to draw upon it to pay for civil penalties or punitive damages.  Just as in *Midwest Suspension*, Dico has “secured this line of credit for reasons other than paying a civil penalty in this case.” 824 F. Supp. at 736.  Thus, the mortgage does not support Dico’s ability to pay.

Based upon the great weight of authority, the Court must consider only Dico's ability to pay without regard, in any manner, to the financial position of Titan International. When that is done, and based on the evidence presented at trial, Dico simply does not have any ability to pay a judgment.

E.   There Is No Need to Vindicate the Authority of the EPA In Light of Dico's Long History of Compliance With EPA Orders and Directives.

Courts have historically relied heavily on the vindication of EPA's enforcement authority factor in instances of blatant and intentional disregard for Agency authority. Here, however, vindication should not receive weighty consideration except in Dico's favor. First, the Court has now heard and seen first-hand the facts and evidence reflecting Dico's lengthy history of cooperation, cordiality and compliance with EPA on the Dico Site. EPA's long-time Project Manager, Mary Peterson confirmed this history, which is also corroborated by stipulated facts and exhibits. Second, Dico only sold the buildings after those involved made logical and reasonable inquiries concerning whether restrictions existed on doing so. Third, when Mary Peterson, EPA's long-time Project Manager for the Dico Site visited the property on September 19, 2007 for a five-year review, Dico met with her and took no steps to deny her access, reschedule or mislead her.

Finally, and of great significance, despite Ms. Peterson having the opportunity to tell Dico to immediately cease dismantling buildings, whether on the spot, or if refused, by proceeding to court, Ms. Peterson and EPA showed no tendency or urgency to do so, and thus EPA's authority was not challenged. Rather, despite her first-hand knowledge of the buildings' disassembly, EPA's February 2008 Five Year Report noted that Dico had conducted appropriate O & M activities since the prior five-year review.

When EPA finally took steps to investigate the the disposition of the buildings materials, Dico promptly and cooperatively undertook investigative activities to track down, retrieve, and dispose of the materials, including the insulation panels for which EPA arguably imposed unnecessarily onerous and costly disposal requirements.

These facts firmly establish an attitude and atmosphere of cooperation and compliance rather than the blatant "stick in the eye" behaviors reflected in the intentional disregard cases.

## Conclusion

After a long history of compliance with EPA orders and directives, Dico was found to have committed a one-time violation of a portion of an order as a result of the sale in 2007 of unused buildings on the Dico Site. Trial evidence established that the violation was inadvertent, did not harm the public, and involved virtually none of characteristics that have caused courts in the past to impose substantial penalties or punitive damages. Dico therefore respectfully requests that the Court decline the government's request for an unprecedented financial penalty, and instead enter an order imposing no penalties or punitive damages.

BELIN McCORMICK, P.C.

By /s/ Stephen H. Locher _____
    Mark McCormick              AT0005111
    Stephen H. Locher          AT0010383

666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone:  (515) 283-4610
Facsimile: (515) 558-0610
E-mail: mmccormick@belinmccormick.com
        shlocher@belinmccormick.com

HINSHAW & CULBERTSON LLP

By /s/ Thomas D. Lupo _____

Thomas D. Lupo, admitted *pro hac vice*
Sergio E. Acosta, admitted *pro hac vice*

222 N LaSalle Street, Suite 300
Chicago, IL 60601
Telephone: (312) 704-3472
Facsimile: (312) 704-3001
E-mail: TLupo@hinshawlaw.com
        SAcosta@hinshawlaw.com


HINSHAW & CULBERTSON LLP


By*/s/ Michael F. Iasparro* _
    Michael F. Iasparro, admitted *pro hac vice*

100 Park Avenue
Rockford, IL 61101
Telephone: (815) 490-4900
Facsimile: (815) 490-4901
E-mail: miasparro@hinshawlaw.com

ATTORNEYS FOR DEFENDANTS


PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon the parties to this action by serving a copy upon each of the attorneys listed below on January 15, 2014 by

☐ U.S. Mail             ☐ FAX

☐ Hand Delivered        ☐ Electronic Mail

☐ FedEx/ Overnight Carrier    X CM/ECF

Eric C. Albert
Sara C. Colangelo
Sarah D. Himmelhoch
Loren A. Remsberg
US Dept of Justice
PO Box 7611 Ben Franklin Station
Washington, DC 20044

Attorneys for Plaintiff

Signature: _/s/ Stephen H. Locher_