# EXHIBIT 19

*motion in house we file*

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### CASE NO. 97-7115

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

THE MUNICIPAL AUTHORITY OF
UNION TOWNSHIP,

and

DEAN DAIRY PRODUCTS COMPANY, INC.,
d/b/a FAIRMONT PRODUCTS, INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Middle District of Pennsylvania
Case No. 1:94-CV-0621

## REPLY BRIEF OF DEFENDANT-APPELLANT DEAN DAIRY
## PRODUCTS COMPANY, D/B/A FAIRMONT PRODUCTS

HOWARD & HOWARD ATTORNEYS, P.C.
Gary A. Peters
Steven C. Kohl
James P. Geary
1400 N. Woodward Avenue, Suite 101
Bloomfield Hills, Michigan 48304-2856
*Attorneys for Defendant-Appellant Dean
Dairy Products Company d/b/a Fairmont Products*

RECEIVED AND FILED

12/19/97

P. DOUGLAS SISK,
CLERK

**TABLE OF CONTENTS**

PAGE

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE TRIAL COURT ERRED IN CALCULATING FAIRMONT'S "ECONOMIC
        BENEFIT" UNDER THE CLEAN WATER ACT CIVIL PENALTY STANDARD
        AS PROJECTED EARNINGS WHILE MAINTAINING PRODUCTION
        LEVELS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.   The District Court Departed from the Well-Established Methodology for
             Determining Penalties Under the Clean Water Act . . . . . . . . . . . . . . . . . 1

        B.   The Parties Stipulated That Fairmont Did Not Derive Any Economic
             Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        C.   The Government's Citation of Cases Interpreting Non-CWA Penalties is
             Not Applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        D.   Fairmont Conducts a Lawful Business and Paid for Treatment of All of its
             Wastewater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        E.   The District Court's Decision Does Not Provide Consistency For CWA
             Penalties and Does Not Achieve the Compliance Goals of the CWA . . . . . 5

        F.   The United States' Claim That Wastewater Treatment Equipment May Not
             Have Been Available in 1989 Was Not Raised Below and is Not True . . . . 6

II.     THE UNITED STATES' FAILURE TO SPECIFICALLY DISCLOSE ITS
        "WRONGFUL PROFITS" THEORY DURING DISCOVERY AND ITS
        FAILURE TO PRESENT EVIDENCE TO SUPPORT ITS THEORY AT TRIAL
        JUSTIFIES A REMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.   The Government Sandbagged Fairmont by its Failure to Disclose its Novel
             Economic Benefit Theory Prior to Trial . . . . . . . . . . . . . . . . . . . . 8

        B.   The United States Failed to Disclose its Novel "Wrongful Profits" Theory
             Prior to Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.   The United States Failed to Carry its Burden of Proof on its "Wrongful
             Profits" Theory of Economic Benefit . . . . . . . . . . . . . . . . . . . . . 11

i

**PAGE**

D.   The Court Failed to Properly Calculate the Economic Benefit, Even Under a "Wrongful Profits" Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

III.   THE TRIAL COURT ERRED IN CONSIDERING THE FINANCIAL CONDITION OF NON-PARTY DEAN FOODS COMPANY TO DETERMINE THE IMPACT OF THE PENALTY ON THE VIOLATOR, FAIRMONT PRODUCTS, A DIVISION OF DEAN DAIRY PRODUCTS COMPANY . . . . .   14

A.   Utilizing Fairmont's Parent's Financial Condition to Set a Civil Penalty Violates Corporate Veil Piercing Principles . . . . . . . . . . . . . . . . . . .   14

B.   The United States Never Sought to Join Dean Foods to the Action . . . . .   16

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

# TABLE OF AUTHORITIES

PAGE

**Cases**

*American Bell, Inc. v. Federation of Telephone
      Workers of Pennsylvania*, 736 F.2d 879 (3d Cir. 1984) . . . . . . . . . . . . . . . . . 14

*Atlantic States Legal Foundation v.
      Universal Tool & Stamping Co., Inc.*,
      786 F. Supp. 743 (N.D. Ind. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chesapeake Bay Foundation v. Gwaltney of Smithfield*,
      611 F. Supp. 1542 (E.D. Va. 1985),
      *aff'd*, 791 F.2d 304 (4th Cir. 1986),
      *cert. granted*, 479 U.S. 1029 (1987),
      *vacated on other grounds*, 484 U.S. 49 (1987) . . . . . . . . . . . . . . . . . . . . . . . 1

*Louis Vuitton S.A. v. Spencer Handbags Corp.*,
      765 F.2d 966 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*PIRG v. Magnesium Electron, Inc.*,
      40 Env't Rep. Cas. 1917 (D.N.J. 1995),
      *vacated and remanded*, 45 Env't Rep. Cas. 1001 (3d Cir. 1997) . . . . . . . . . 14, 15

*PIRG v. Powell Duffryn*,
      720 F. Supp. 1158 (D.N.J. 1989), *aff'd in part*,
      *reversed on other grounds*, 913 F.2d 64 (3d Cir. 1990),
      *cert. denied* 498 U.S. 1109 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*U.S. v. Avatar Holdings*,
      93-281-Civ-FTM-21 (M.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Smithfield Foods*,
      972 F. Supp. 338 (E.D. Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Mac's Muffler Shop, Inc.*,
      25 Env. Rptr. Case 1369 (N.D. Ga. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Reserve Mining Co.*,
      412 F. Supp. 705 (D. Minn. 1976),
      *aff'd on penalties and remanded on injunctive relief*,
      543 F.2d 1210 (8th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**PAGE**

*United States v. Tull,*
        615 F. Supp. (E.D. Va. 1983),
        *aff'd,* 769 F.2d 182 (4th Cir. 1985),
        *cert. granted,* 476 U.S. 1139 (1986),
        *rev'd and remanded on other grounds,* 481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . 3


**Rules and Statutes**

33 U.S.C. § 1319(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 5, 14

Fed. R. Civ. Pro. 26(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## ARGUMENT

I.  **THE TRIAL COURT ERRED IN CALCULATING FAIRMONT'S "ECONOMIC BENEFIT" UNDER THE CLEAN WATER ACT CIVIL PENALTY STANDARD AS PROJECTED EARNINGS WHILE MAINTAINING PRODUCTION LEVELS**

   A.  **The District Court Departed from the Well-Established Methodology for Determining Penalties Under the Clean Water Act**

Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d) (CWA) has a long statutory and precedential history of how penalties should be determined.  The 1987 Amendments to Section 309(d) of the CWA requires courts to consider six factors in determining penalties, including ". . . the economic benefit (if any) resulting from the violation . . . ."  Through the 1987 amendments, Congress incorporated within the statute, the elements contained in EPA's civil penalty policy.  *See* Fairmont Br. at 14-16 and *Chesapeake Bay Foundation v. Gwaltney of Smithfield*, 611 F. Supp. 1542, 1557 (E.D. Va. 1985), *aff'd*, 791 F.2d 304 (4th Cir. 1986), *cert. granted*, 479 U.S. 1029 (1987), *vacated on other grounds*, 484 U.S. 49 (1987).  As articulated in U.S. EPA's clean water settlement penalty policy (the "Policy"), "[t]he objective of the economic benefit calculation is to place violators in the same financial position as they would have been if they had complied on time.  Persons that violate the Clean Water Act are likely to have obtained an economic benefit as a result of delayed or completely avoided pollution control expenditures during the period of non-compliance."  (App. at 244).  The Policy discusses the calculation of economic benefit through the "avoided or delayed compliance expenditure" model.  The Policy recognizes that economic benefit under this model can be zero or negative.  (App. at 245).

Enactment of the six penalty factors was a clear direction from Congress to courts to consider specific information when assessing a civil penalty under the CWA.  No CWA decision

(save for the decision of the district court below) has attempted to determine the economic benefit (if any) resulting from a violation of a permit except in accordance with a "delayed or avoided expenditures" theory of economic benefit. This economic theory has been deemed the best and most appropriate method to determine economic benefit and to remove or neutralize the economic incentive to violate a CWA permit. *See United States v. Smithfield Foods,* 972 F. Supp. 338 (E.D. Va. 1997).

**B.     The Parties Stipulated That Fairmont Did Not Derive Any Economic Benefit**

As stipulated by the parties at trial, the economic benefit to Fairmont under the "avoided or delayed expenditure" model was zero. (App. at 2-11). An economic benefit of zero is entirely consistent with the Section 309(d) factor regarding "economic benefit (*if any*)" (emphasis added) and the Policy. Despite the parties' stipulation, the trial court adopted a novel "wrongful profits" theory to find economic benefit. The district court is the only court to analyze economic benefit as "wrongful profits" in setting a penalty for violation of a permit under the CWA.

**C.     The Government's Citation of Cases Interpreting Non-CWA Penalties is Not Applicable**

The United States Brief on Appeal cites various non-CWA cases to support the district court's unprecedented finding and its own position. The authorities relied on by the United States are inapposite. None relate to the interpretation or application of Section 309(d) of the CWA under the 1987 amendments. The United States does not and cannot find support for its position in the plethora of CWA cases cited in Defendant-Appellant's initial brief.

*United States v. Mac's Muffler Shop, Inc.*, 25 Env. Rptr. Case 1369 (N.D. Ga. 1986), was a Clean Air Act case. *Mac's Muffler* approved a "wrongful profits" approach in a different context and under the different penalty provisions of the Clean Air Act. Mac's Muffler illegally

2

removed catalytic converters from cars.  No expenditure and no investment in plant or equipment could have resulted in Mac's Muffler being able to engage in the business of removing the converters lawfully.    In contrast, Fairmont's business was legal.  It made food.  Its violations related solely to the wastewater for which it paid the POTW for treatment.  (Memorandum  p. 3).

United States v. Tull, 615 F. Supp. (E.D. Va. 1983), *aff'd*, 769 F.2d 182 (4th Cir. 1985), *cert. granted*, 476 U.S. 1139 (1986), *rev'd and remanded on other grounds*, 481 U.S. 412 (1987) is also distinguishable.  It was not a case involving the violation of a permit.  No "delayed expenditures" would have cured the violation.  The defendant in *Tull* engaged in the illegal filling of wetlands and the sale of the filled wetlands for profit.

United States v. Reserve Mining Co., 412 F. Supp. 705 (D. Minn. 1976), *aff'd on penalties and remanded on injunctive relief*, 543 F.2d 1210 (8th Cir. 1976), involved the State of Minnesota's request for an order imposing penalties on defendant for violating the State of Minnesota's pollution control laws and regulations.  *Id.* at 706-07.  The violations at issue in *Reserve Mining* were the daily dumping of 67,000 tons of carcinogenic waste into Lake Superior, polluting public water supplies in violation of its state discharge permit.  *Id.* at 708.  *Reserve Mining* made no mention of the Clean Water Act civil penalty standard.  There is nothing in that opinion reflecting any effort by the court to make specific findings concerning any profits earned from the production creating the waste, but only a general recognition that the dumping activity giving rise to the violations resulted in the violator having lower costs of operation than its competitors who paid a fee for landfilling their waste.  This is a recognition of avoided costs of

3

compliance and not "wrongful profits" derived from the underlying business activity. If anything, the decision is supportive of Fairmont's position that the correct measure of the economic benefit is the avoided or delayed cost of compliance.

The remaining authorities relied upon by the United States relate to penalties imposed for violation of securities laws or banking laws. These cases do not provide guidance on the appropriate interpretation of the economic benefit factor under Section 309(d) of the CWA. They only serve to demonstrate that the government is unable to produce caselaw under the CWA to support its position.

### D.   Fairmont Conducts a Lawful Business and Paid for Treatment of All of its Wastewater

Fairmont produces food, i.e., cultured dairy products. The production of dairy products is not a prohibited activity. The discharge of wastewater in excess of Fairmont's permit limitations, not the production of dairy products, violated the CWA. Any economic benefit derived by Fairmont from the exceedances of its permit was not the economic benefit derived from conducting the underlying lawful business activity but, arguably, the benefit of not complying with the CWA, i.e., delaying the capital investment necessary to bring its wastewater discharges into conformance with its permit limits.

Fairmont paid Union Township for treating all wastewater discharged to its POTW. Although Fairmont achieved compliance with its permit and the CWA by installing a nearly $1 million treatment system (Memorandum, p. 9), the economic benefit of delaying that remedy was stipulated to be zero (App. at 2-11). The district court recognized there was no direct economic benefit to Fairmont derived from delaying expenditures necessary to bring its discharges into compliance with its permit. (Memorandum, p. 10). It was only then that the district court

4

departed from established precedent and looked to "profits" earned during the period of non-compliance and not the direct benefit derived from not making the expenditures necessary for compliance.

### E.     The District Court's Decision Does Not Provide Consistency For CWA Penalties and Does Not Achieve the Compliance Goals of the CWA

Congress' clear intent in articulating six factors for courts to consider in assessing penalties for violations under Section 309(d) was to provide consistency in penalties imposed by courts for similar violations of the Act. The economic benefit factor incorporated into the statute by Congress was an effort to level the playing field between what would otherwise be similarly situated parties but for one party's noncompliance with the Act. Imposing a penalty on a violator based on the economic benefit derived by that party by delaying or avoiding costs associated with coming into compliance places the violator on economic par with its competitors. Every CWA court decision identified by either party which has considered the economic benefit derived from non-compliance with permit limitations has measured the economic benefit resulting from the violations through reference to the "avoided or delayed expenditure" theory.

Although Fairmont did not obtain an economic benefit under this analysis, it does not mean that Fairmont is not subject to a penalty for its violations. Five other factors under Section 309(d) remain for a court to assess an adequate penalty which addresses the objectives of deterrence and retribution. The correct application of the economic benefit factor should have been to treat that factor as neutral.

If this court were to uphold the government's position, it would negate ten years of decisional law under Section 309(d) addressing the economic benefit derived from a permit violation. If this court accepts the "wrongful profits" theory, the government will always argue

that the economic benefit is the "wrongful profit" earned by violators which operated during a period of non-compliance, regardless of the economic benefit, if any, of postponing improvements to come into compliance. If "profits" earned during a period of non-compliance are "wrongful" and subject to confiscation by the government, violators will be exposed to penalties well beyond what Congress intended when it directed the courts to consider the "economic benefit (if any) resulting from the violation." If Congress intended that courts undertake the forfeiture of "wrongful profits", it would have said so in the CWA.

In penalizing Fairmont by forcing it to pay its alleged "wrongful profits" (when it actually suffered losses), the district court confused the difference between applying the "economic benefit" factor in the CWA and achieving a general penalty goal of punishment and deterrence. It punished a company that had already complied, at an expense of nearly $1 million, by seizing improperly calculated "wrongful profits." It did so even though there was a stipulation that there was no economic benefit derived from the violations under the established approach. Ironically, Fairmont would have been better off to stipulate that it realized a delayed expenditure economic benefit of $100,000, even though it was actually zero. Presumably, the court would then have followed the established approach and Fairmont's penalty would have been lower. Surely Congress did not intend that those violators which operate efficiently and realize a larger profit should be penalized more than a violator which is less profitable, where the cost of compliance for both is the same. Use of a "wrongful profits" approach, however, yields this result.

F.   **The United States' Claim That Wastewater Treatment Equipment May Not Have Been Available in 1989 Was Not Raised Below and is Not True**

The United States raises new allegations for the first time in its response brief. Both in its Statement of Issues (United States Br. at 6 n.4) and Argument (United States Br. at 29), the

6

United States asserts that the "avoided or delayed expenditure" model for determining economic benefit was inapplicable because "there is evidence in the record that, at least through late 1989, there was no pretreatment technology available" to Fairmont to treat its wastewater, citing App. at 344; App. at 346; App. at 713.  This statement is not true and not supported by the evidence. Each of the government's citations refer to internal filtering or other methods "short of an entire [wastewater] treatment facility." (App. at 346).  Wastewater treatment systems that would have treated Fairmont's discharge to Union's POTW were available.  If technology was not available, the United States would not have had any basis for entering into its stipulation that the delayed and/or avoided costs of compliance to Fairmont was zero.  The United States' newly concocted "facts" to the contrary are specious.

## II.    THE UNITED STATES' FAILURE TO SPECIFICALLY DISCLOSE ITS "WRONGFUL PROFITS" THEORY DURING DISCOVERY AND ITS FAILURE TO PRESENT EVIDENCE TO SUPPORT ITS THEORY AT TRIAL JUSTIFIES A REMAND

The United States concedes that it did *not* disclose its "wrongful profits" theory of economic benefit in its discovery responses (United States Br. at 21 n.8).  It rationalizes its failure by blaming Fairmont; it asserts that its non-disclosure of its "wrongful profits" theory was justified because Fairmont "never pursued anything but a delayed capital expenditure analysis in Interrogatory No. 22."  This assertion misrepresents the scope of Interrogatory No. 22, which requested a list of "*each item* that plaintiff is including, or is considering including, in its analysis of *any alleged economic benefit* obtained by Fairmont through its alleged delay in compliance with its IU permit and/or the Act" (emphasis added).  (App. at 64-65).  The breadth of this request was not limited, as the United States implies.  The United States had a duty to respond to Interrogatory No. 22 by disclosing *each* item it would rely upon as an element of economic

7

benefit, not just those that related to delayed capital expenditures.[1]   Further, follow-up
Interrogatories 23-26 provided the government notice of the all-encompassing nature of
Fairmont's inquiry regarding its economic benefits analysis.  (App. at 65-66).

### A.   The Government Sandbagged Fairmont by its Failure to Disclose its Novel Economic Benefit Theory Prior to Trial

Even if the government was not considering any items other than delayed capital
expenditures at the time it responded to the interrogatories, it was obligated to supplement its
response once it became aware that the response was incomplete in light of its novel theory of
economic benefit:

> A party is under a duty seasonably to amend a prior response to an
> interrogatory, request for production, or request for admission if the party learns
> that *the response is in some material respect incomplete* or incorrect and if the
> additional or corrective information has not otherwise been made known to the
> other parties during the discovery process or in writing.   Fed. R. Civ. Pro.
> 26(e)(2)(emphasis added).

The reason for this mandatory supplementation is self-evident -- parties are not entitled to
sandbag their opponents with last-minute changes in strategy, and hide behind discovery responses
that are no longer adequate.

The United States also rationalizes its failure to answer Interrogatory No. 42. (App. at
214).  Interrogatory No. 42 sought all evidence the United States intended to utilize to support
the statutory elements it would offer the court to consider in determining the amount of the

---

[1]   The United States initial response was "[t]o be supplied" (App. at 65).  The United States
eventually responded to the interrogatories only by providing four reports prepared by its
expert, James W. Fagan, which were each entitled "Analysis of Economic Benefit of
Delayed Compliance, Dean Dairy Products Company." (*See* App. at 61-62).  No written
response was made regarding other items of economic benefit, such as those in connection
with production levels or profits, nor were any documents identified as supporting the
government's "wrongful profits" economic benefit theory.

penalty.  The government objected to that Interrogatory arguing that Fairmont bore the burden of introducing evidence on those elements.  The government disingenuously asserts that Fairmont must have agreed with the objection because it never filed a motion to compel. On August 16, 1995, Fairmont's counsel wrote to the United States attorney in Harrisburg, and requested that the government respond to Interrogatory No. 42 if it was going to present any evidence on those elements at trial. (App. at 215-219).  Receiving no response from the United States, Fairmont fairly believed that the United States abandoned its right to introduce additional evidence on this issue.  There was no reason for Fairmont to file a motion to compel production of evidence not intended to be introduced at trial.  The United States never responded further to Interrogatory No. 42.

**B.      The United States Failed to Disclose its Novel "Wrongful Profits" Theory Prior to Trial**

To avoid the obvious prejudicial effect of its non-disclosure in its discovery responses, the United States now argues that isolated and vague statements in its pre-trial briefing, opening and closing statements gave Fairmont specific and sufficient notice of its newly-concocted "wrongful profits" economic benefit argument.  None of these statements rectified the prejudice of the United States' failure to make adequate discovery responses.  The Pre-Trial Memorandum filed after the closure of discovery discussed in general "the value of the operation of the violating facility to the overall business".  Yet, the United States' Pre-Trial Memorandum also stated that Mr. James Fagan would provide expert testimony concerning the economic benefit derived by Fairmont.  (App. at 739).  Mr. Fagan did not testify at trial.  Most significantly, the United States' Pre-Trial Memorandum specifically stated that "economic benefit is the monetary gain or profit the discharger obtains from its failure to install and operate effective pollution

control or treatment equipment *on a timely basis*." (emphasis added) (App. at 746).  While it also stated that the government would establish that the "Fairmont plant operated at a percentage over capacity, thus increasing its profits at the expense of violating the Clean Water Act," (App. at 747-48), the United States did not identify the evidence it would rely upon to prove this over-capacity theory, nor did it supplement its discovery responses to provide this information.  The United States never presented such evidence at trial.

The United States Trial Brief, *filed the morning of trial*, asserted that it would establish that Fairmont failed to decrease or halt production to achieve compliance with the CWA, and stated that it would "glean" the increased revenue "from the annual percentage of Dean's exceedences applied to Dean's *revenues* for the Fairmont plant." (emphasis added) (App. at 768.)  The United States, however, did not attempt to support its theory by introducing evidence that related permit exceedences to Fairmont "revenues."

*Not until its opening statement*, and then only indirectly, did the government apparently refer to its newly concocted "wrongful profits" theory of economic benefit, stating: "[t]he United States will present evidence showing what Dean itself estimated as the amount of *revenue* it would lose if it decreased production to levels that would comply with its permit." (emphasis added) (App. at 733-734).  This one indirect reference, pulled out of all of the pages of discovery and testimony, only discusses *revenues*, not "wrongful profits."  This statement also forms the basis for the United States assertion that Fairmont should have had its trial witnesses and experts prepared and ready to testify in opposition to the United States use of Bates No. 378 (App. at

10

18).[2]  This argument completely ignores the purpose of pre-trial discovery and the right of the parties under modern discovery practices to prepare a defense *before*, and not *during*, trial.  It also ignores the fact that the government has the burden of proof to establish both liability and damages (or in this case, appropriate penalty).  The lack of meaningful discovery is particularly egregious here.   The entire evidentiary support for the court's $2 million economic benefit calculation is one page of one exhibit (out of numerous 4" binders filled with exhibits), and less than two pages of trial testimony from a witness who had not prepared the document and could not testify to its meaning or underlying assumptions.  (App. at 275-277).

C.     **The United States Failed to Carry its Burden of Proof on its "Wrongful Profits" Theory of Economic Benefit**

The United States has done little but argue that Fairmont had the burden of disproving "wrongful profits" to justify its own failure to adequately disclose and support its economic theory with evidence.   The United States provides no meaningful response to Fairmont's argument that Bates No. 378  was insufficient evidence, on its own, to meet the government's burden of establishing the economic benefit, if any, resulting from the violations.   It simply asserts that Bates No. 378 "reflected the economic benefit gained by Fairmont in not reducing production to a level that would allow it to meet its IU Permit levels." (United States Br. at 23). This assertion does not address any of the numerous factual deficiencies previously cited by Fairmont with regard to Bates No. 378 (Fairmont Br. at 28-30).  The United States brands as

---

[2]   The government's allegation that Fairmont witnesses Ron Crock and Dr. Ken Wise were at trial and could have testified is wrong. (U.S. Br. at 9, 23 and 28).  Dr. Wise never left his office in Boston during the trial in Harrisburg.  Further, while the U.S. subpoenaed Fairmont's Controller, Ron Crock, the government never called him at trial and he never left Sharpsville, Pennsylvania (approximately a six-hour drive from Harrisburg).

11

"beyond cavil" Fairmont's argument that there was no evidence establishing the link between the Penn-Maid projected revenue and the permit violations. However, the government makes no attempt to refute the only direct evidence in the record -- which was that production levels were *not* directly related to the washing requirements which created the wastewater discharge. (*See* Fairmont Br. at 8).

The United States contends that Fairmont had the obligation to introduce evidence to refute the government's reliance on Bates No. 378, citing *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966 (2d Cir. 1985). This case provides no support for a shifting of the burden from the United States to Fairmont. It involved a claim for damages for trademark infringement, which were to be measured by the profits made by the defendants from the sale of infringing products. The trial court there imposed the burden of the uncertainty of the existence and amount of profits on the defendants because the defendants denied the sales and refused to produce any records. *Id.* at 972. This shifting of the burden was based on the "well-known and ancient doctrine" that "doubts about actual damages will be resolved against [the] party who evades ascertainment of actual damages." *Id.* at 973 (citations omitted). Fairmont did not "evade" the ascertainment of economic benefit. It turned over records of its financial activities. (App. at 300-309; Tr. at 483-492).

The United States could have introduced expert testimony to assist the court in determining alleged economic benefit or examined Fairmont's controller about the financial records and his development of Bates No. 378. It did neither.[3] Fairmont invites and encourages

---

[3]   Fairmont's Controller, Ron Crock, submitted a post-trial affidavit, as the author of the calculations contained on Bates No. 378, disputing the district court's interpretation of and use of the figures on Bates No. 378. (App. at 23). While the U.S. subpoenaed Mr. Crock

this court to carefully read the only testimony at trial related to Bates No. 378.  (App. at 275-277; Tr. at 172 l. 11 to 174 l. 9).  Any fair reading of that scant testimony, from an individual who was not the author of the document, cannot constitute sufficient evidence to support the United States position.  It strains credulity to believe that Bates No. 378, without any substantive testimony as to its development, the author's qualifications or other evidence as to its accuracy, would satisfy the government's burden to establish economic benefit.

**D.      The Court Failed to Properly Calculate the Economic Benefit, Even Under a "Wrongful Profits" Analysis**

The evidence was inadequate to support the district court's calculation of a $2 million economic benefit.  There was no basis in Bates No. 378 for the court to conclude that $417,000 was the actual (rather than projected) amount of increased profits (rather than "earnings" or "revenue") in FY 1994, or that Bates No. 378 was anything more than a rough attempt by a non-expert to outline possibilities for Fairmont's directors' or officers' consideration.  Nor did the court give any reason for ignoring the remaining information contained within Bates No. 378 that the $417,000 decrease in earnings would be offset by the approximately $100,000 reduction in POTW charges.  (See Fairmont Br. at 29 n.7).  Even assuming, *arguendo*, that the court could have properly relied on Bates No. 378 in calculating economic benefit, the proper calculation would have shown reduced "earnings" as $1,585,000.00 over the five-year period.  The United States never even addresses this miscalculation.

---

to testify at trial, it chose not to call him.

**III.** **THE TRIAL COURT ERRED IN CONSIDERING THE FINANCIAL CONDITION OF NON-PARTY DEAN FOODS COMPANY TO DETERMINE THE IMPACT OF THE PENALTY ON THE VIOLATOR, FAIRMONT PRODUCTS, A DIVISION OF DEAN DAIRY PRODUCTS COMPANY**

This court has stated, "[a] court may not disregard at will the formal differences between affiliated corporations, and in fact the requirements of corporate veil piercing, although rather imprecise in their various formulations, are demanding ones." *American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania*, 736 F.2d 879 (3d Cir. 1984). The United States seeks to depart from this universally recognized principle of law, and create a new body of corporate law applicable to the assessment of penalties under Section 309(d) of the CWA and, by extension, to assessment of penalties under any other federal statutory scheme. This new body of corporate law would stand for the proposition that a federal court, in assessing a penalty against a corporate entity, may at will disregard the corporate form and consider any circumstances which the court deems relevant relating to the shareholders of such corporation or affiliated entities.

**A.** **Utilizing Fairmont's Parent's Financial Condition to Set a Civil Penalty Violates Corporate Veil Piercing Principles**

The United States cites three district court decisions in support of its proposition that the Court should look to the assets of Fairmont's parent, Dean Foods, without piercing the corporate veil: *PIRG v. Magnesium Electron, Inc.*, 40 Env't Rep. Cas. 1917 (D.N.J. 1995), *vacated and remanded*, 45 Env't Rep. Cas. 1001 (3d Cir. 1997); *PIRG v. Powell Duffryn*, 720 F. Supp. 1158 (D.N.J. 1989), *aff'd in part, reversed on other grounds*, 913 F.2d 64 (3d Cir. 1990), *cert. denied* 498 U.S. 1109 (1991); and *Atlantic States Legal Foundation v. Universal Tool & Stamping Co., Inc.*, 786 F. Supp. 743 (N.D. Ind. 1992). As set forth in Fairmont's Principle Brief, *Magnesium*

14

*Electron* was vacated by the Third Circuit, depriving that opinion of any precedential effect. (*See* Fairmont Br. at 40-41).

Although the two remaining cases consider the financial circumstances of a parent corporation in assessing a penalty under the CWA, each is devoid of any legal rationale for ignoring distinctions between the entity adjudicated to have been a violator under the Act and its immediate or ultimate parent. It does not appear that the defendants in either of these cases challenged directly the appropriateness of ignoring corporate distinctions for the purposes of assessing a penalty. Neither of the decisions rely upon any precedent for the proposition that a federal court, in assessing a penalty against a corporate entity, may consider the circumstances of a related non-party in the absence of a formal application of corporate veil or alter ego doctrines.

The United States asserts that corporate veil piercing doctrines have no application here because it did not seek to hold Fairmont's parent liable as the "violator" and the judgment entered applies to Fairmont alone. This ignores the obvious implication of the trial court's holding, i.e. that Fairmont's parent would pay part or all of the penalty if Fairmont could not. The extension of the United States argument is obvious. Even where a parent corporation is not adjudicated liable as a violator under a piercing the corporate veil theory, a district court still could consider circumstances relevant to the parent for purposes of assessing the penalty against the subsidiary. This is incongruous. *U.S. v. Avatar Holdings*, 93-281-Civ-FTM-21 (M.D. Fla. 1996) (App. at 93) rejected this view and the government has not adequately distinguished it. There is nothing in the CWA indicating that Congress intended to abolish the traditional concept of recognizing corporations as distinct entities.

15

When articulating why it was appropriate for the district court to consider circumstances relating to Fairmont's parent corporation, the United States relies upon traditional indicia for piercing of a corporate veil. The district court clearly employed a corporate veil piercing analysis and assessed a penalty as if the parent corporation, Dean Foods, was the defendant before it, concluding, "[i]t would constitute a serious injustice to allow Dean Foods to profit from Fairmont's violations of the Act, which occurred while Dean Foods retained control over Fairmont's wastewater problem and failed to take timely remedial action, and at the same [sic] allow Dean Foods to escape liability for the violations" (Memorandum at 20).[4]  The trial court, and the United States, seek to have this court sanction the imposition of a *de facto* penalty against a non-party, corporate parent for violations of the CWA committed by its subsidiary, without giving the separate parent corporation its day in court.

### B.      The United States Never Sought to Join Dean Foods to the Action

The United States never made an effort to join Dean Foods as a defendant, either initially or following discovery. Nevertheless, the United States was allowed to proceed, over Fairmont's objection (App. at 715; Tr. at 66 ll. 1-2), to inject into evidence information relating to Dean Foods as a basis for heightening the penalty to be extracted from Fairmont. The United States rationalizes the appropriateness of looking to Dean Foods to justify the penalty imposed upon Fairmont by reference to indicia for piercing the corporate veil. The United States concludes its brief to this court by stating that, "[b]ased upon the dependency in this case of the subsidiary on the parent, and the subsidiary's inability to take any steps toward compliance without the approval

---

[4]    Following trial, the court denied Fairmont's motion *in limine* to exclude evidence relating to Dean Foods. (Memorandum at 20 n.3).

of the parent, and based on the parent's syphoning of profits from the subsidiary, the District Court found that it would be appropriate to look into the financial status of the parent when assessing the economic impact of the penalty on the violator.   The clear message is that a company (Dean Foods) cannot use its subsidiary's under capitalization to determine that it had an inability to pay the penalty."[5]   (United States Br. at 31-32).   Despite the government's protestation to the contrary, it clearly sought to have the district court pierce Dean Foods' corporate veil without joining the parent as a party.   The simple fact of the matter is that the United States, by bringing its enforcement action solely against Dean Dairy and Fairmont, did not place at issue the character of the relationship between the Fairmont subsidiary and its parent and should not have been allowed to impose a penalty as if it had.

---

[5]   The United States noted that Dean Dairy had equity of $20,636,403 (*See* United States Br. at 27 n.11).   There was no evidence in the record that Dean Dairy was undercapitalized and this was not a matter in issue before the District Court.

IV.   **CONCLUSION**

Based on all of the foregoing, Fairmont requests that this court reverse and remand the Memorandum and Order of the district court with directions to calculate the proper civil penalty, beginning with an economic benefit of zero and without considering Dean Foods' financial condition or relationship to Fairmont.

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS, P.C.

Date:   December 17, 1997

GARY A. PETERS
STEVEN C. KOHL
JAMES H. GEARY
Attorneys for Defendant-Appellee
The Pinehurst Office Center
1400 North Woodward, Suite 101
Bloomfield Hills, MI  48304-2856
(248) 723-0344

b340\gap.cor\fairmont\reply.brf

## CERTIFICATE OF SERVICE

Lori K. Holland, being an employee of the law firm of Howard & Howard Attorneys, P.C., states that on the 17th day of December, 1997, she served one (1) copy of the corrected **Reply Brief of Defendant-Appellant Dean Dairy Products Company, d/b/a Fairmont Products** by depositing same in the U.S. Mail in a secure envelope in Bloomfield Hills, Michigan addressed to:

Lynn Dodge, Esq.
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
Ben Franklin Station
Post Office Box 7611
Washington, D.C.  20044

Kathy Bailey, Esq.
Chadbourne & Park
1101 Vermont Avenue, N.W.
Washington, D.C.  20005

John G. Roberts, Jr., Esq.
Hogan & Hartson
555 13th Street, N.W.
Washington,D.C.  20004

Paul Wallach, Esq.
Hale and Dorr, LLP
1455 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

I declare that the statements above are true to the best of my information, knowledge and belief.

*Lori K. Holland*
Lori K. Holland

Dated:   December 17, 1997