UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: 10-4536 ……………………………………………………... | : : | Honorable CARL J. BARBIER Magistrate Judge SHUSHAN |

<u>**CLEAN WATER ACT – PENALTY PHASE**</u>

**THE UNITED STATES' OPPOSITION TO BP'S MOTION TO EXCLUDE
DR. DIANE AUSTIN'S OPINIONS AND TESTIMONY**

**I.     Introduction**

Asserting flawed bases, BP seeks to escape the testimony of an anthropologist, Dr. Diane Austin, who (i) has studied the effect of the oil and gas industry on the communities of the Gulf of Mexico for eighteen years and (ii) led a team of expert anthropologists in a fifteen month study into the range of the effects of the Deepwater Horizon disaster on the society and culture of the Gulf of Mexico.[1]  Doc. No. 13772-3, Vol. 1 at 20; US Ex. 11 at 289:16-289:19; Doc. No. 13772-2 at 3. Dr. Austin and her team interviewed over 1,300 individuals, attended hundreds of meetings, festivals, and cultural events, and reviewed the media and publicly available literature distributed during the response.  Doc. No. 13772-2 at 18; US Ex. 11 at 243:12-243:18; Doc. No. 13772-3, Vol. 1 at 20-21. Dr. Austin and her team used this extensive field work to complete case studies on five communities selected to represent the various social, economic, and ethnic groups most likely to be affected by the disaster.  Doc. No. 13772-2 at 7. Based on this systematic field work and using established standards within the discipline of anthropology, Dr.

---

[1] BP's own expert has acknowledged that the Defendants' violations constitute a "disaster."  US Ex. 12 at 69:13-69:19.

Austin's team produced a two-volume study of the effects of the disaster for use by the Bureau of Ocean Energy Management ("BOEM") in meeting its duties.  *See* Doc. No. 13772-3; US Ex. 1 at 27:01-27:04; 27:06-27:24.

For her testimony in this case, Dr. Austin relied upon the findings and information contained in the two-volume BOEM study to determine whether the disaster caused harm to the society or culture of the Gulf of Mexico communities. She concluded that, in fact, the disaster caused serious sociocultural effects including the loss of eleven individuals from "tight-knit communities – both geographic and occupational", debilitating injuries to the rig survivors and their families, concerns regarding long-term health impacts, and losses of multi-generational family businesses.  As she states in her report:  "Though difficult to properly value and not eligible for compensation, these harms are no less real or substantial than the economic damages of the *Deepwater Horizon* disaster."  Doc. No. 13772-2 at 46-47.

By distorting Dr. Austin's opinion, BP claims that she is not qualified to offer the findings from this detailed study because she is neither a treating psychiatrist nor an economist. Dr. Austin, however, is eminently qualified to use standard anthropological techniques to conduct an anthropological study and thereby reach conclusions regarding sociocultural patterns. Similarly, BP's claim that her opinion cannot shed light on whether certain harms continue today fails in light of her testimony that where conditions persist, her methodology allows her to predict that the harm persists as well.  BP's claim that her opinions must be limited geographically also fails in light of Dr. Austin's testimony that the case study locations were chosen for the purposes of identifying trends that would be applicable across a wider geographic area than specifically studied by the BOEM team.  Further, BP's claim that there is no way to "scientifically" challenge Dr. Austin without access to the original handwritten notes prepared by

the team doing the BOEM study is belied by BP's own expert's testimony that access to those notes is unnecessary to evaluate the study and that the reason the notes have not been produced – to protect the privacy of the research subjects – is a well-established principle when conducting studies involving human subjects.  Finally, Dr. Austin's discussion of the effects of the disaster on the social fabric of the Gulf Communities differs from the economic analyses performed by Dr. Mason or the medical opinions offered by Dr. Cox.  For all of these reasons, BP's motion should be denied and the Court should be permitted to hear all aspects of the harm caused by Defendants' violations of the Clean Water Act, including harm to the social and cultural fabric of the Gulf region.

## II.     Dr. Austin is Qualified to Offer Opinions Regarding Sociocultural Effects Developed Using Standard Anthropological Methods

Dr. Austin's opinions are based upon an ethnographic study – an anthropological method that uses embedded researchers, direct interviews with research subjects, and observation of the community to "identify patterns, describe relationships and social networks, and reveal understandings and meanings that people attribute to places and events in their lives, and to contextualize all these in broader context."   Doc. No. 13772-2 at 6. Dr. Bonanno, BP's expert, has recognized that ethnography is an accepted anthropological technique for conducting research.  In particular, he testified that:  "Ethnographic research is not useless, and I don't consider eth <sic>– ethnographic research a poor method."  US Ex. 12 at 131:10-131:12.

BP does not and cannot offer any evidence showing Dr. Austin is unqualified to conduct anthropological studies.  Dr. Austin is a research professor and director of the School of Anthropology at the University of Arizona.  Doc. No. 13772-2 at 54. She holds a multi-disciplinary social science Ph.D. that included four subareas:  sociocultural anthropology, environmental sociology, environmental psychology, and environmental policy.  US Ex. 11 at

3

37:4-37:8. She has spent eighteen years studying the sociocultural effects of the oil and gas industry on the communities of the Gulf of Mexico. *Id*. at 289:16-289:19; Doc. No. 13772-2 at 3. Therefore, there is no question that Dr. Austin is qualified to conduct the ethnographic research she did.

Nor BP contend that Dr. Austin and her team of trained anthropologist failed to conform to standard and accepted anthropological research techniques in the BOEM study. Once again, BP's expert testified: "I don't take any issue that – that what she did was not a valid ethnographic approach." *See* US Ex. 12 at 139:16-139:18.

Anthropologists often use ethnographic methods to assess beliefs and emotional reactions to disasters within the cultural context. *See, e.g.,* US Ex. 2 at 257, 371;[2] US Ex. 4 at 11 ("In addition to the use of ethnographic and other observational methods in some classic psychology studies, there are also many examples of ethnographic studies in related disciplines that nevertheless address issues of relevance for psychology.").[3] For instance the author of one paper cited by Dr. Austin, uses ethnographic techniques to "analyze particular manifestations of distress in relation to personal and cultural meaning complexes . . . ." US Ex. 5 at 379. In other words, when Dr. Austin's ethnographic study identified patterns of distress and put those patterns into the cultural context to determine whether the society or culture of the Gulf communities had been harmed by the disaster her study conformed to the methods, standards, and purposes for which ethnography is used outside of the context of litigation.

Similarly, economic data is often used by anthropologists to assist in evaluating sociocultural effects of disasters and other incidents. *See, e.g.,* US Ex. 6 at 1 ("Ethnographers

---

[2] Dr. Bonanno cites this source for other purposes. *See* US Ex. 3 at 5 n.3.
[3] Dr. Bonanno cites this source for other purposes. *See* US Ex. 3 at 10 n.28.

look for patterns . . . . They also contextualize these in wider contexts (*e.g.*, the wider economy, government policies, etc.).").  Once again, when Dr. Austin identified patterns of economic effects on the Gulf communities' society and culture she was doing so using standards, purposes, and methods recognized in anthropology outside the context of litigation.

Not only are such studies generally accepted within the field of anthropology, Dr. Austin herself has established a track record – outside of litigation -- of using ethnography to look for patterns of human reactions to off-shore oil and gas exploration in the Gulf of Mexico.  *See* http://www.boem.gov/Gulf-of-Mexico-OCS-Region-Publications/) (last visited Dec. 13, 2014).  These studies are part of BOEM's decision making pursuant to the Outer Continental Shelf Lands Act, which requires an evaluation of the impact of drilling on the "human environment." 43 U.S.C. § 1334(a)(1)(B). That Act defines the "human environment", as including "the physical, social, and economic components, conditions, and factors which interactively determine the state, condition, and quality of living conditions, employment, and health of those affected, directly or indirectly, by activities occurring on the Outer Continental Shelf . . . ." 43 U.S.C. § 1333.

As this Court is well aware, the analysis of whether expert opinion using well-established methodologies is admissible under *Daubert* and its progeny is focused on whether the expert conducted herself and her analysis in a manner consistent with the norms and standards of her own profession.  As the Fifth Circuit has stated:

> [W]hether an expert's testimony is based on 'scientific, technical or other specialized knowledge,' *Daubert* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of [the] discipline.'

*Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir. 1997) (quoting *Daubert,* 509 U.S. at 592); *accord Cummins v. Lyle Indus.*, 93 F.3d 362, 366-71 (7th Cir. 1996) (experts must "adhere to the same standards of intellectual rigor that are demanded in their professional work.").

Contrary to BP's contention (Doc. No. 13772-1 at 10-13), an expert should not be judged by the standards of other disciplines. Rather, the question focuses on whether the opinion has "a reliable basis in the knowledge and experience of [the relevant] discipline." *McKay v. Novartis Pharm. Corp.,* 984 F. Supp.2d 647, 652 (W.D. Tex. 2012) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)). In other words, BP's focus on Dr. Austin's psychiatric and economic qualifications is misplaced when evaluating her work performed as an anthropologist. Dr. Austin's work that revealed the significant mental health concerns, increased stress and anxiety, and lack of mental health services was performed using a recognized technique in anthropology designed to reveal *patterns* of human behavior and reaction. The fact she is not qualified to diagnose any single individual as having a particular mental illness does not undermine her ability to identify a pattern of reactions reported by subjects of a properly conducted ethnographic study. Similarly, BP suggests that Dr. Austin has conceded that she has no ability to use economic data and therefore is not qualified to offer opinions regarding the patterns of economic issues reported during her field study. Doc. 13772-1 at 10-13.[4] Again, Dr. Austin is not performing an economic analysis. She is performing an ethnographic identification of patterns of responses to the spill.

---

[4] In its brief, BP exaggerates Dr. Austin's statements by claiming that Dr. Austin "believes that an analysis of economic data is outside her area of expertise." Doc. No. 13772-1 at 13. In fact, Dr. Austin acknowledged only that she could not analyze such data *as an economist would*, not that she was unqualified to analyze economic data for ethnographic analysis. *See* US Ex. 11 at 66:1-66:2 ("I did not consider myself qualified to analyze it in the approach that an economist uses.").

BP also tries to disqualify Dr. Austin by asserting that she cannot testify regarding information within the ken of the average lay person. Rec. Doc. Doc. 13772-1 at 12. Again, BP mischaracterizes Dr. Austin's work. She is not simply saying "some people were depressed" as a lay person would. Instead, as demonstrated above, she is using a recognized, scientific discipline to identify *patterns* of reaction to the spill. For all of these reasons, BP's contentions about Dr. Austin's qualifications must be rejected.

### III. Dr. Austin Can Generalize Her Opinions Both Temporally and Geographically

Ignoring the literature allowing generalizability of qualitative research, BP argues that Dr. Austin's opinions cannot be admitted because they rest on the five specific communities that were the subject of the study and to the short term effects of the Defendants' violations. Doc. No. 13772-1 at 4-7. At the outset, even if Dr. Austin's opinions were only accurate as to the short-term effects in the five communities identified as part of the case studies the opinions would be admissible as evidence that the Court could consider in evaluating the seriousness of Defendants' violations. To hold otherwise would be to hold that an expert can only testify if that testimony addresses all aspects of a particular issue – a contention that fails as a matter of logic.

In making its generalization arguments, BP also asks the Court to ignore Dr. Austin's testimony that findings from qualitative research can be generalized from one location to another or across time "as long as the conditions are the same." US Ex. 11. at 299:14-299:25. As Dr. Austin testified, though the case studies focused on five communities, data collection included individuals from other areas including major metropolitan areas such as New Orleans. US Ex. 11 at 90:23-91:13. Moreover, these communities were selected to represent "the region's diversity in terms of economic sectors, industries, occupations, and ethnic groups." Doc. No. 13772-3 Vol. 1 at 17. By focusing on communities that included conditions representative of

those one would expect to be affected by the spill, the BOEM study, Dr. Austin's expert report was designed to allow generalizability of the study across geographic regions.

Similarly, by asking Dr. Austin a series of questions regarding economic issues, BP believes it has foreclosed any generalizability of Dr. Austin's opinions across time. Doc. 13772-1 at 5 n.3. However, Dr. Austin's opinion goes beyond the question of quantifiable economic issues – it addresses the lasting effects based on conditions that have not changed. For instance, her report points out how each family that lost a multi-generational fishing business suffered a "loss of a way of life." Doc. No. 13772-2 at 47. BP offers no evidence that these business have sprung back into existence since the conclusion of the BOEM study and, therefore, the conditions that gave rise to this harm identified by Dr. Austin in her expert report likely continue. A perusal of Dr. Austin's expert report provides a myriad of examples of other conditions that persist today, such as: the uncertainty regarding the long term health effects, the loss of the eleven men on the rig, and the persistent injuries to other workers on the rig. Hence, Dr. Austin has provided a sound basis for generalizing *some* of the harm to the present and into the future.[5]

BP, nonetheless, contends that such generalizability is not possible unless the study both relied upon statistical methods to select a random portion of the population (as in quantitative studies) and specifies the exact number of individuals falling into each category of harms. Doc. No. 13772-1 at 7. In doing so, BP offers no rebuttal to the literature that recognizes the scientific validity of generalizing qualitative research. *See, e.g.,* US Ex. 10 at 2 ("Of course, qualitative research is generalizable. Criterion for determining generalizability, however, differs from quantitative inquiry.").

---

[5] Other harms, of course, have passed as conditions have changed – a fact that Dr. Austin freely admits. US Ex. 11. at 138:4-138:10.

**IV. BP Can Test Dr. Austin's Report and Other Testimony Without Access to the BOEM Researchers Notes and Matrices and Public Policy Stands in Favor of Protecting Subjects' Identities**

BP also claims it cannot "scientifically challenge" Dr. Austin's opinions when the United States has refused to produce the handwritten notes of the original BOEM researchers, which contain information that would reveal the identity of the research subjects. Doc. No. 13772-1 at 7-10. BP is correct when it states that the United States did not provide the original research notes of the team that performed the BOEM study. BP is incorrect, however, in contending that the original notes are necessary in order to "scientifically" challenge Dr. Austin's opinions. BP also completely ignores the sound policy reasons for not producing the original notes.

**A. BP's Own Expert Disputes BP's Need for the Original Handwritten Notes**

BP's own expert rejected the notion that access to the original handwritten notes is necessary to challenge Dr. Austin's opinion. *See* US Ex. 12 at 60:2-60:13. In fact, Dr. Bonanno felt capable of challenging Dr. Austin's report without even having read the original BOEM studies, much less the code reports containing the substance of the handwritten notes. *See* US Ex. 12 at 151:3-151:13.

BP has offered no evidence to dispute Dr. Austin's sworn testimony that the only difference between the original handwritten notes and the code reports that were provided to BP is the lack of personally identifying information. US Ex. 11 at 73:5-73:11. Rather BP implies that there could have changes to the information contained in the notes during the transcription procedure. *See* Doc. No. 13772-1 at 8. Such an allegation presumes a conspiracy by the researchers to provide a report helpful to the United States in litigation. Such a conspiracy cannot be presumed, particularly when the BOEM report was "absolutely not" prepared for purposes of litigation. US Ex. 1 at 43:04 to 43:10.

9

Moreover, the design of the BOEM study minimized the impact of any transcription errors through the application of "triangulation" – *i.e.* ensuring that data is collected from numerous sources and using different methods. Doc. No. 13772-2 at 22-23. Triangulation "as a form of cross-checking research findings ha[s] become a widely accepted means of ensuring validity." US Ex. 7 at 53.[6] The use of triangulation would have substantially reduced if not eliminated the effects of any errors in transcription of the notes.[7]

### B. Federal Regulations and Sound Policy Restrict the Release of Information Related to Human Subjects

Dr. Bonanno also recognizes the need to protect the identity of human research subjects, such as the interviewees in Dr. Austin's study. His testimony regarding the protection of personal identity in social science research reveals the propriety of withholding those identities from BP, just as that information is withheld from BOEM and everyone else:

> Q. Would the availability of the names or other identifying information of the subjects of her research have assisted you in performing the task you set yourself in reviewing Dr. Austin's report?
>
> A. I evaluated Dr. Austin's report as . . . an expert in research methodology and -- and mental health and loss and trauma disaster, et cetera. In -- in those roles, we don't see the names of participants or particularly what they said, so that -- that's not -- that -- that's not -- that would -- that's not normally the purview. And I don't know what confidentiality agreements Dr. Austin has. . . I don't know what her IRB agreements were.
>
> Q. So I think you're saying that knowing the identity of the names or other identifying information of the subjects of her research would not have assisted you in performing the review that you conducted of Dr. Austin's report?
>
> A. . . . I'm not sure what you mean by "identity." Do you mean personal identity?

---

[6] Dr. Bonanno cited this source for other purposes. *See* US Ex. 3 at 9 n.26.

[7] BP also ignores the substantial question as to whether these notes are within the possession, custody or control of the United States. Dr. Austin testified that "according to our contracts with the agency for who we do work, . . . those notes are never transmitted in their raw form to the government." US Ex. 11 at 217:2-217:9.

Q. Yes.

A. Well, this is something that I -- I never see in evaluating any research. . . .

US Ex. 12 at 60:23-62:4.

Dr. Bonanno referenced the "IRB" or Institutional Review Board – a standard and required feature of social science research. Pursuant to a group of federal regulations, IRBs review any research that involves human subjects to ensure that any risk to the subjects has been minimized. *See, e.g.,* 45 C.F.R. Part 690; US Ex. 8 at 1-3; US Ex. 12 at 50:4-52:1. Minimization of risk includes informed consent, including a commitment regarding the extent to which individual identity will be identified. US Ex. 8 at 10-11. As Dr. Bonanno testified, "a major IRB concern" is the protection of individual identity. US Ex. 12 at 53:2-53:6; *see also id.* 53:16-53:23. Once a commitment is made to the IRB regarding the protection of confidentiality, Dr. Bonanno agrees that the researcher *must* abide by that agreement. US Ex. 12 at 58:10-58:14.

The submission to the IRB regarding the BOEM study included several informed consent forms that assured the subjects that their personally identifying information will be kept confidential. *See, e.g.,* US Ex. 9 at 2. As signified by the stamp on the front of the informed consent form, this assurance was part of the proposal approved by the IRB and, therefore, in Dr. Bonanno's words, protection of the subjects' identities was what Dr. Austin "is required to do; and there is no -- there are no exceptions . . . ." US Ex. 12 at 58:10-58:12. Accordingly, *no* outside researcher would have had access to the individual identifying information contained in the original handwritten notes. As such, BP's claim that this information is necessary to "scientifically challenge" the BOEM study or Dr. Austin's expert opinion must fail.

### V. Dr. Austin's Opinions do not Require Consideration of Demographic Data

BP's premise that demographic information is necessary to a proper ethnographic study is unsupported by any evidence.[8]  *See* Doc. No. 13772-1 at 8-9.  While Dr. Bonanno indicated that demographic data are routinely collected in social science studies, he also acknowledged that the data that are collected in any particular study are determined by the question that is being studied.  US Ex. 12 at 230:18-231:9; 48:20-48:25.

BP also seems to contend that Dr. Austin could not detect a pattern of increased stress in the communities in question unless she collected detailed information regarding the mental health of each individual interviewee.  Again, BP seeks to conflate a medical diagnosis of mental illness – which does require such detailed information on the individual level – with a study designed to detect patterns.

### VI. Dr. Austin's Opinions are not Cumulative of Other Evidence

BP argues that Dr. Austin's opinions are cumulative of those of Drs. Clapp and Mason as well of the BOEM report.  Doc. No. 13772-1 at 13-15.  A simple comparison shows that each of these experts opines about a different kind of harm caused by Defendants' violations.  Dr. Austin, as demonstrated above is discussing the sociocultural effects of the disaster.  Dr. Clapp is offering an analysis from an epidemiological perspective and Dr. Mason, an economic analysis.

BP also asserts that Dr. Austin's report is simply cumulative of the BOEM report and therefore cannot be admitted under *In re Prempro Products Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008), *aff'd in part, rev'd in part*, 586 F.3d 547 (8th Cir. 2009) and *S.E.C. v.*

---

[8] Arguably, BP's search for demographic data is a disguised way of getting at the identifying information it knows is prevented by the IRB approval.  In communities as tightly-knit as those that were studied, providing the age, occupation, and economic status of an individual may actually be all that is required to identify the individual.  *See, e.g.,* US Ex. 11 at 57:2-57:7 (noting that providing the identity of the location at which BP employees refused to speak with researchers would be specific enough to identify the individuals who were interviewed).

12

*Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998).  Without conceding that the use of an expert to summarize or explain complex evidence is improper, it is clear that, unlike the experts in *Lipson* and *Prempro*, Dr. Austin is not testifying about the credibility of a document or summarizing exhibits prepared by other individuals, she is testifying about a study using a methodology that requires specialized expertise and knowledge.  Accordingly, with respect to Dr. Austin these cases are inapposite.

In addition, taking BP's argument to its logical extension, since all of the expert's reports are coming into evidence, providing live testimony by any expert witness would be cumulative.  Obviously, giving the Court an opportunity to ask any questions it may have and an opportunity to evaluate credibility both on direct and under cross-examination is the preferred method of receiving expert opinions.  For all these reasons, BP's arguments regarding the cumulative nature of Dr. Austin's opinions must fail.

**VII.    Conclusion**

Dr. Austin's qualifications as an anthropologist are uncontested.  BP's expert admits that ethnography is a legitimate form of anthropological research and that Dr. Austin's study conformed to the standards for ethnographic research.  BP's expert, moreover, acknowledged that the protection of personal identity is a practice firmly established in social science and, therefore, has validated the reason why BP has not had access to the raw handwritten notes.  These facts alone establish that Dr. Austin's testimony is reliable pursuant to *Daubert*.  Moreover, her testimony regarding the serious social and cultural effects of the Defendants' violations a topic not addressed by any other expert witness proffered by the United States.  For all of these reasons, BP's motion to exclude the testimony of Dr. Austin should be denied.

                                                Respectfully submitted,

| | |
|---|---|
| JOYCE BRANDA | SAM HIRSCH |
| Acting Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| PETER FROST | SARAH HIMMELHOCH |
| Director, Torts Branch, Civil Division | Senior Level E-Discovery Coordinator |
| Admiralty and Aviation | MICHAEL MCNULTY |
| SHARON SHUTLER | Senior Counsel |
| MALINDA LAWRENCE | NANCY FLICKINGER |
| LAURA MAYBERRY | Senior Attorney |
| Trial Attorneys | PATRICK CASEY |
| R. MICHAEL UNDERHILL, T.A | RICHARD GLADSTEIN |
| Attorney in Charge, West Coast Office | DANIEL S. SMITH |
| | Senior Counsel |
| | ABIGAIL ANDRE |
| | A. NATHANIEL CHAKERES |
| | RACHEL HANKEY |
| | JUDY HARVEY |
| | RACHEL KING |
| | ERICA PENCAK |
| | BRANDON ROBERS |
| | GORDON YOUNG |
| | Trial Attorneys |

                                                /s/ Sarah D. Himmelhoch
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:   202-514-2583
E-mail:  steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of December 2014.

                                                 /s/ Sarah D. Himmelhoch