UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater* | : | MDL No. 2179 |
| *Horizon*" in the Gulf of Mexico, on | : | SECTION: J |
| April 20, 2010 | : | |
| | : | JUDGE BARBIER |
| This Document Relates to: 10-4536 | : | MAG. JUDGE SHUSHAN |

………………………………………………...

# CLEAN WATER ACT – PENALTY PHASE

# OPPOSITION OF THE UNITED STATES TO:
# BPXP'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. STANLEY RICE

i

**Table of Contents**

INTRODUCTION ...........................................................................................................................1

LEGAL STANDARD......................................................................................................................1

ARGUMENT: BP HAS PROVIDED NO BASIS FOR THE
       EXCLUSION OF DR. RICE'S OPINIONS................................................................2

I.     BP's Effort to Exclude Sections of Dr. Rice's Reports Relies on
       Mischaracterizations of Dr. Rice's Qualifications and Methodologies ..............................2

II.    BP's Effort to Preclude Appendix C is Really an Effort to Preclude Consideration
       of Peer-Reviewed Literature on Oil Toxicity Effects...........................................................5

       A.     BP's "Error" Arguments Make Much Ado About Very Little ................................5

       B.     BP's "Lost Samples" Arguments are a Red Herring ...............................................5

       C.     BP's "Replication" Arguments are Unsupported ....................................................8

       D.     BP's "Too Many Questions" Assertion is Wrong ....................................................9

III.   BP's Objections to Dr. Rice's Water Chemistry Opinions Are Overstated ......................10

CONCLUSION ..............................................................................................................................11

# INTRODUCTION

BP has moved to exclude certain opinions of Dr. Stanley Rice, a former NOAA scientist with over 40 years of experience conducting oil spill toxicological research. BP attacks Dr. Rice's opinions with modifiers ("novel," "unreliable," "replete with errors") unsupported by facts. (Rec. Doc. 13784). These misleading characterizations obscure critical information so as to trivialize the actual and potential harm of the Deepwater Horizon oil spill. None of BP's arguments regarding Dr. Rice, his scientific methodologies, or the reliability of his opinions in this case warrant exclusion of Dr. Rice's opinions.

# LEGAL STANDARD

The relevant standards for determining whether expert testimony is admissible in a bench trial are well known to the Court and will be stated here only briefly. Pursuant to Federal Rule of Evidence 702, the court must make a preliminary inquiry to ensure the testimony is both relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006). Notwithstanding *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm.'s Note (2000). The purpose of *Daubert* motions is to ensure that only reliable and relevant expert testimony is presented to the jury, and the *Daubert* safeguards are not as essential in a case where the factfinder is the district court judge and not a jury, *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000), and "a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *Thompson v. Rowan Companies, Inc.*, No. 06-3218, 2007 WL 724646, at *1 (E.D. La. March 6, 2007) (Barbier, J.) (citing *SmithKline Beecham Corp. v. Apotex Corps.*, 247 F. Supp. 2d 1011, 1042 (N.D.Ill. 2003)).

**ARGUMENT: BP HAS PROVIDED NO BASIS
FOR THE EXCLUSION OF DR. RICE'S OPINIONS**

BP has moved the Court to preclude Dr. Rice from relying on "admitted errors and flaws related to his analysis of toxicology studies and water chemistry data," specifically seeking to preclude opinions that rely on: (1) Appendix C of Dr. Rice's Round 3 report; (2) the laboratory studies cited therein; (3) Appendix A of Dr. Rice's Round 2 report; and (4) Appendix B of his Round 3 report. BP Mot. at 11-12. BP's challenges to Dr. Rice's opinions rely on mischaracterizations of Dr. Rice's qualifications and the methodologies he used in generating his opinions, and makes mountains a few small – and since corrected – errors made in generating graphic examples designed to aid the Court in better understanding his scientifically sound and well-substantiated opinion that there was serious potential toxicological harm to the Gulf of Mexico as a result of the *Deepwater Horizon* spill.

I.  **BP's Effort to Exclude Sections of Dr. Rice's Reports Relies on Mischaracterizations of Dr. Rice's Qualifications and Methodologies**

Because it is clear from Dr. Rice's curriculum vitae that he is eminently qualified to discuss the potential toxicological effects relating to the BP oil spill, BP attempts to indirectly exclude his opinions by alleging that his appendices are so riddled with errors as to be unreliable. However, it is important to note at the outset that the appendices include what amounts to a bibliography of sources considered and graphical depictions of the actual water chemistry samples taken in the Gulf. BP's motion to exclude these appendices and any reliance upon them[1]

---

[1] Although BP superficially appears to be asking solely for removal of three appendices, they are also asking for preclusion "from relying on those opinions in Dr. Rice's reports that rest on admitted errors and flaws related" to these appendices, so even though it is the United States' position that the appendices in question are actually a reflection of Dr. Rice's opinions and not vice versa, it is clear that BP seeks to exclude both.

2

relies upon repeated distortions of the work Dr. Rice has done in this case, as well as the place of that work in the field of toxicological science.

BP concedes that Dr. Rice "is a professional government biologist . . . ." BP Mot. at 2. His professional qualifications rest on an extensive and distinguished forty-year career conducting oil spill toxicological research. He has published over 130 peer-reviewed studies, was NOAA's principal investigator for conducting research relating to the Exxon Valdez spill's Natural Resource Damage Assessment, and has been part of National Research Council committees writing definitive treatises on the effects of oil spills. Rice Round 1 Rep., App. B. Dr. Rice's expert opinions in this matter are a natural outgrowth of the research he conducted independent of this litigation, during his long career at NOAA. *See* Fed. R. Evid. 702 Advisory Committee Note (2000) (one factor relevant to reliability of expert testimony is whether "experts are proposing to testify about matters growing naturally and directly out of research they have **conducted** independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying").

BP misstates Dr. Rice's "general theory of oil toxicity" and findings of potential harm to fish in the Gulf as involving "a handful of laboratory toxicity studies" and "not [being] based on field data or observations in the environment." BP Mot. at 2-3. This allegation is belied by Dr. Rice's 40 years of conducting laboratory studies and working with field data and observations in the environment, as reflected both on page 16 of his Round 1 Report (wherein he explains field studies he conducted with pink salmon, killer whales, and sea otters) and in his CV (listing his numerous publications reflecting his extensive work in both the laboratory and the field). Rice Report Round 1 (Exhibit 1 hereto), Apps. B and C. BP also implies that Dr. Rice has not considered field data or observations in the environment for the Deepwater Horizon Spill

3

specifically, which is curious since he also reviewed the same water chemistry data (*i.e.*, field data) that BP's expert, Dr. Shea, relies on, as well as peer-reviewed articles discussing that data. Rice Round 1 Report (Exh. 1) at 5, 19, 20-22, 27-29; Rice Round 2 Report (Exh. 2) at 23-26; Rice Round 3 Report (Exh. 3) at 10-11, 13-14; Rice Dep. (Exh. 4) at 140:16-25 and 141:1-2.

BP also mischaracterizes Dr. Rice's opinion as asserting, for example, "widespread toxicity to aquatic organisms in the Gulf of Mexico, even at very low concentrations." BP Mot. at 4. In fact, Dr. Rice asserted no such thing. Dr. Rice's actual opinion is that there was significant *potential* for toxicity damage to marine life from the DWH spill." Rice Round 1 Report at 5. In this respect, BP is apparently not seeking to exclude Dr. Rice's reports or testimony as irrelevant or unreliable under *Daubert*. Instead, BP is seeking to preclude consideration of *potential* harm and require the Court to try a NRD case at this phase of trial. As set forth more fully in the Opposition of the United States to BPXP's Motion to Exclude Opinions and Testimony of Drs. Boesch and Rice, potential harm to the environment relates to the "seriousness" factor and may justify a significant penalty. U.S. Opp. § II.

Although BP emphasizes Dr. Rice's recognition that research examining effects other than acute mortality (including other toxicity mechanisms and endpoints) is a "developing science, and as such is imperfect" (Rice Round 3 Report at 5), this admission is a simply an honest description of the scientific method, which involves testing hypotheses and advancing scientific knowledge. As the *Daubert* court recognized, "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert* at 593 (citations omitted).

4

**II.     BP's Effort to Preclude Appendix C is Really an Effort to Preclude Consideration of Peer-Reviewed Literature on Oil Toxicity Effects**

At its essence, BP's effort to exclude anything relating to Appendix C[2] of Dr. Rice's Round 3 Report is actually an attack on the use of peer-reviewed science in the guise of an attack on insignificant mistakes made by Dr. Rice in what amounts to the proper organization of a bibliography. BP characterizes Dr. Rice's entire methodology as relying on a "handful" of toxicology studies, using an "imperfect" research method, and not based on field data or observations in the environment. These criticisms are incorrect.

**A.     BP's "Error" Arguments Make Much Ado About Very Little**

BP describes Dr. Rice's opinions related to toxicology research listed in Appendix C as "replete with errors," making much ado out of the fact that Dr. Rice named wrong tuna species and wrong amberjack species in Appendix C. First, both of these errors were corrected on December 5, 2014. *See* United States' Errata Sheet for the Round 3 Expert Reports of Stanley Rice, Mark VanHaverbeke, and Ian Ratner (Exh. 5). Second, as stated in the errata, the corrections do not change the substance of any of Dr. Rice's opinions that there was significant potential for toxic impact to marine life from the DWH spill. *Id.* at 1-2. Indeed, as Dr. Rice stated during his deposition, "[s]o the effects are going to be – are going to transcend – transcend the species even though the amount that causes those may be slightly different from one species to the next." Rice Dep. at 119:15-18.

**B.     BP's "Lost Samples" Arguments are a Red Herring**

In one study relied upon by Dr. Rice (and cited in Appendix C), certain chemistry samples for one set of tests were lost. BP seizes on this fact (which was fully disclosed in the

---

[2] Round 3 Report, Appendix C is labeled "Toxicity research demonstrating embryo responses at concentrations ≤ 20 μg/L."

5

published study[3]) to claim that Dr. Rice's opinions are unreliable. As explained further below, BP's motion fails to explain whether the sample loss was critical (it was not), and also fails to acknowledge that BP relied on the same type of chemistry data for the majority of its own toxicity tests.

A short background explanation of how toxicity tests are conducted will illuminate the substantive shortcomings of BP's arguments. First, oil is mixed into water and then allowed to settle. Then samples of the water portion of the stabilized solution are drawn off. This is known as a "water-accommodated fraction," or WAF. The toxicology lab dilutes the WAF to various levels to conduct the actual toxicity tests[4] – some subjects may be exposed to 50% of the WAF (meaning the WAF is diluted by half), others may be exposed to 25% of the WAF (meaning one part WAF is mixed with three parts water), *etc*. Researchers have two options for keeping track of the concentrations in the various tests: (1) estimating the concentrations by starting with the known concentration of the undiluted full WAF and reducing it by the percentage dilution; or (2) sending sample to a lab for chemical analysis.

In the case of the sample loss, the toxicology lab not only sent split samples for chemical analysis of the highest concentration WAF, but also sent split samples of the various diluted water samples. Due to damage during shipping, the researchers were unable to obtain chemical analysis of the diluted samples. However, the researchers *did* have successful chemistry results for the highest concentration sample. Thus, the researchers had a full understanding of the hydrocarbon composition and concentrations resulting from the laboratory methods BP is

---

[3] TREX-13333 at 8: "For the Bluefin tuna exposure, PAHs were measured in only the highest concentration and control samples because of sample loss during shipping between Australia and the United States."

[4] *See* TREX-13333 at 7 ("HEWAF stocks (1:1000) dilutions of oil) and further dilutions for exposure incubations were prepared in high-quality seawater used for culture purposes at each facility supplying fertilized eggs.")

6

---

criticizing.[5] This information allowed for easy estimation of the concentration in diluted sampesl – for example, had some subjects been exposed to a 50% WAF, the researchers would have simply assumed that at the outset of the test the hydrocarbon concentration would be at 50% the concentration of the undiluted full WAF. What the researchers did *not* have was separate lab results confirming these estimated concentrations for each lower exposure level.

There is nothing unreliable or dubious about this assumption. In fact, for the majority of its own laboratory toxicity tests, *BP has done the very same thing*. BP has not even attempted to measure the chemistry of each diluted water sample. Instead, it has reported the results of its toxicity tests as showing effects at a certain percentage of the full WAF. Shea Dep. at 197:5-198:4 (Exh. 6). It has only provided chemistry results for the full WAF. And in analyzing its toxicity tests, BP reports effects at percentages of the full WAF. Shea Dep. at 201:18-202:22. Thus, BP's researchers have routinely made the exact same assumption that BP now argues is a basis for excluding Dr. Rice's opinions – that, for example, the initial hydrocarbon concentration of a 50% WAF is likely to be 50% of the hydrocarbon concentration of the full WAF.

On a related issue, BP also criticizes Dr. Rice for relying on studies that use high-energy water accommodated fraction of oil (HEWAF) mixing methods. BP criticizes HEWAF as "non-standard" but as Dr. Rice has explained, "[d]ifferent mixing methods, with strong supporting chemistries can be designed to meet the needs of the test, to emulate specific conditions of a spill situations [sic], for adults and embryos." Rice Round 3 Report at 10. The studies using HEWAF are particularly relevant here, where actual field conditions involved high energy mixing of DWH oil at the riser pipe as well as energetic mixing by wind and waves of surface slicks. *Id*. As Dr. Rice explained:

---

[5] This data is displayed in the article at TREX-13333 at 3, Figure 1A.

> "But the point is that at the wellhead, there is obviously a lot of pressure. I don't remember how much, but a lot. And it was physically violent, as seen in the videos. And they're adding some dispersant. Whether it was effective or not is maybe debatable; I don't know. But the point is it made a lot of small droplets, and that's basically what the high energy WAF does; it makes a lot of small droplets that encourages the movement of high molecular weight PAH into the water. So it's just an example to indicate that."

Rice Dep. at 259:6-17.

### C. BP's "Replication" Arguments are Unsupported

BP attempts to discredit tuna studies reported in Appendix C by asserting that they have not been "replicated." Its attacks on this front are unsupported.

For instance, BP alleges that "published literature has reported serious difficulties with studies relied on by Dr. Rice and performed at his lab in Auke Bay, Alaska, including an inability to replicate the effects levels reported in those studies." BP Mot. at 9. As support for its argument, BP cites to an article by Brannon et al. that tried to replicate certain Auke Bay laboratory studies conducted on pink salmon. BP Mot. at 9, fn. 23. During his deposition, however, Dr. Rice explained that the study performed by Dr. Brannon, an ExxonMobil contractor, in fact did support the earlier studies conducted by Dr. Rice's research team: "I believe they did replicate it close enough. In some – in some respects, they were able to find in effect what we calculate out from his data to be about 7 parts per billion. We did not see that as significantly different from some of our studies." Rice Dep. at 85: 9-14.[6]

BP also criticizes the February 2014 tuna studies for failing to be replicated. But the research underlying these studies takes months or years to conduct, validate, analyze, draft, send

---

[6] As reported at page 3 of Appendix C to Dr. Rice's Round 3 Report, the study that Brannon was attempting to replicate, by Heintz et al. in 2000, found effects at 5.4 parts per billion. Rice Dep. at 83:15-20; 92:20-22 ("I believe it is supportive. We're finding edema at probably around 5.")

8

to peer review, incorporate peer review comments, and publish reports.[7] More importantly, however, BP fails to note that these 2014 tuna studies are very much in line with the 25 years of research summarized in Appendix C (and throughout Dr. Rice's Round 1 and Round 2 Reports) that support the finding of harm from oil to embryos in low concentrations. Thus the 2014 tuna studies are not wholly new methodologies generating wholly unexpected results; rather, the studies in Appendix C are more appropriately viewed as a line of scientific inquiry that has been increasingly confirmed and reconfirmed with each study. Appendix C is a list of peer-reviewed articles over the last 25 years where the researchers found significant toxic effects to early life stages of fish at below 20 ppb total PAH, with several different researchers finding very similar results using very similar methods – the 2014 tuna studies are just the latest in that line of research. BP's argument on replication is also yet another attempt to require the Court to try a NRD case at this phase of trial. Whether these 2014 tuna studies have been replicated yet misses two important points: Those studies confirm and support and existing body of science and this evidence is offered to prove potential harm rather than actual damage.

### D.     BP's "Too Many Questions" Assertion is Wrong

BP's assertion that there are "too many unanswered questions" regarding Appendix C is patently false: most of the questions raised by BP were actually answered in Dr. Rice's deposition. Answers to others are obvious on the face of the document. BP would like to bury an

---

[7] For example, the Brannon *et al*. article discussed above was conducted in response to studies conducted by the ABL research team on pink salmon from 1999-2001; the research by Brannon's team was conducted from 2001 to 2003 and the article wasn't published until 2006 (Dep. Ex. 13335 at BP-HZN-2179MDL09308928). Similarly, BP bases its claim that later studies were unable to replicate the results of a peer-reviewed article Dr. Rice co-authored with his colleague Mark Carls that was published in 1999. BP Mot. At 7. BP's support for its claim "inability to replicate the effects levels reported in [herring] studies" rests on an article by Page et al. (Rice Dep. Ex. 13336) that wasn't published until 2012. That article (funded by ExxonMobil Corporation) can hardly be said to evidence a failure to replicate the results of the herring study, since the authors in no way attempt to recreate the herring tests, but simply criticize the methodologies and results used in the Pacific herring study. *Id*.

9

important and undisputable point – that there are several other studies that have replicated Dr. Rice's work demonstrating that early fish life stages suffer serious toxic effects from exposure to low levels of PAHs – in a sea of meaningless criticisms about how that list was organized. Dr. Rice testified that he asked his assistant, Mark Carls, to draft the list and did not make the decisions on how to present the data. Rice Dep. 21:13-22:15. But the *presentation* is not what is important in Appendix C, it is the *content* of Appendix C that matters, and this is something that BP cannot avoid since it is little more than a bibliography of public peer-reviewed studies.

### III.     BP's Objections to Dr. Rice's Water Chemistry Opinions Are Overstated

As with Appendix C, it is important to clarify that Appendix B[8] of Dr. Rice's Round 3 Report is also a sort of bibliography – in this case, it is a graphic depiction of the water chemistry samples taken as part of the response and initial NRD investigation. Appendix B was generated by Dr. Rice as a response to Dr. Shea's allegation that the water chemistry samples did not indicate toxic levels, and challenges to Dr. Rice's determination in his Round 1 and 2 reports that they did. Rice Round 2 Report at 13, App. A at 2-3; Rice Round 3 Report, App. B at 2-3.

BP's accusation that the averaging techniques used in Appendix B are a misleading use of statistics is itself misleading. BP. Mot. at 10. Dr. Rice did not concede that his use of arithmetic averaging was an inappropriate technique. He agreed that there are several ways one could analyze the data, including use of a geometric mean or using a median and that each type involves a level of bias ("It's kind of how far…you want to bend the data."). Rice Dep. 320:12-321:9. Indeed, BP's own expert Dr. Shea also uses arithmetic averaging and includes the very same samples that BP now argues create "the false impression that the entire dataset is

---

[8] Appendix B was initially submitted as Appendix A in Dr. Rice's Round 2 Report, but was updated in his Round 3 Report to align the water chemistry samples considered to mirror those used by Dr. Shea. Rice Round 3 Report, App. B at 2.

10

sufficiently characterized by high values" to conclude that the dataset showed there was very little potential toxicity in Gulf waters. *See, e.g.,* Shea Round 1 Report at 20-25.

BP's criticism that Dr. Rice "had no knowledge about how water samples were collected" is not meaningful. Neither Dr. Rice (nor Dr. Shea, who relied on the same samples) were on the boats collecting water samples. However, Dr. Rice (like Dr. Shea) had access to the sampling plans on how samples were to be collected; BP points to no defect or error in the sampling plans.

As for its criticism of the inaccuracies in Dr. Rice's presentation of the chemistry data itself, Dr. Rice only learned of the errors during his deposition. United States' Errata Sheet for the Round 3 Expert Reports of Stanley Rice, Mark VanHaverbeke, and Ian Ratner at 1-2 (Exh. 5) at 3. Upon further discussion with his assistant, Mark Carls, Dr. Rice determined that there had been a coding error in the filtering of the toxicity samples and, as the errata filed on December 5 explained, the depth coding used during the original analysis was scrambled, possibly by a sorting error in Excel. *Id.* These errors were corrected in the errata. However, as explained in the errata these corrections do not change the total number of toxic samples; they change only the distribution among location and depth categories, resulting in the need to adjust the figures relating to toxicity in those locations and depths accordingly. *Id.* Most importantly, these corrections do not affect the conclusions in Dr. Rice's report. *Id.*

## CONCLUSION

For the foregoing reasons, BP's Motion to Exclude Certain Opinions of Dr. Rice (Rec. Doc. 13784) should be denied.

Respectfully submitted,

JOYCE BRANDA  
Acting Assistant Attorney General  
Civil Division

ROBERT G. DREHER  
Acting Assistant Attorney General  
Environment & Natural Resources Division

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys

R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
RICHARD GLADSTEIN
PATRICK CASEY
MICHAEL ZEVENBERGEN
Senior Counsel
A. NATHANIEL CHAKERES
JUDY HARVEY
RACHEL KING
ERICA PENCAK
ABIGAIL ANDRE
RACHEL HANKEY
BRANDON ROBERS
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611, Washington, D.C. 20044
Telephone: 202-514-2779
E-mail: steve.o'rourke@usdoj.gov

KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana

SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Telephone: (504) 680-3000
E-mail: sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing documents have been served on all counsel by electronically uploading the same to *Lexis Nexis* File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  December 15, 2014.                                       /s/ Steve O'Rourke
                                                                U.S. Department of Justice