UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates to: 10-4536 …………………………………………………... | : : | Honorable CARL J. BARBIER Magistrate JUDGE SHUSHAN |

<u>**CLEAN WATER ACT – PENALTY PHASE**</u>

<u>**OPPOSITION OF THE UNITED STATES TO:
BPXP'S MOTION TO EXCLUDE OPIONONS AND TESTIMONY OF
DRS. BOESCH AND RICE**</u>

<u>**INTRODUCTION**</u>

The primary failing of BP's Motion to Exclude Expert Opinions and Testimony Regarding Speculative Environmental Harm, (Rec. Doc. 13779, "BP Motion"), is that it devotes much space to repudiating speculation in general but lacks any detailed demonstration that Drs. Boesch or Rice base their opinions on speculation. For each allegedly speculative opinion, BP's motion does not include the stated bases of those opinions. Instead, BP quotes a few lines from a deposition or a report and omits cited evidence and analysis. Sometimes BP does more than just abbreviate and misstates either the opinions given or the reasons in support. These failings are addressed below with a fuller discussion of the experts' opinions, analyses, and evidence that BP omits.

Second, BP's argument suggests that expert testimony about potential environmental harm is necessarily "speculation" unless the expert also draws conclusions about actual harm. Accepting this suggestion would preclude the Court from considering evidence of potential harm. This is contrary to the prevailing Clean Water Act case law and this Court's determinations at the March 2014 status conference, which recognize the relevance of potential

- 1 -

harm in a penalty proceeding.  BP should not be allowed to do in a Rule 702 motion what it previously failed to do in the Clean Water Act "seriousness" factor motion: eliminate consideration of potential harm and effectively require the Court to try a premature and skeletal Natural Resource Damage Assessment (NRDA) case in this penalty proceeding.

## ARGUMENT

### I. DRS. BOESCH AND RICE APPLIED SOUND SCIENTIFIC METHODS AND RELIED UPON APPROPRIATE INFORMATION TO REACH THEIR CONCLUSIONS OF HARM.

A Rule 702 motion cannot be evaluated rationally without an explanation of the information reviewed by the expert and the methods used to evaluate that information.  BP's motion does not supply this information.  BP's omission of this information is sufficient reason, without more, for the Court to deny BP's motion.  However, in order to demonstrate that the opinions of Drs. Boesch and Rice were developed using appropriate methods and information, this section first explains the general methods used by Drs. Boesch and Rice in forming their conclusions.  Next, this section addresses the particular information and rationale given by Drs. Boesch and Rice for the opinions that BP argues are "speculation."

    A.  **The U.S. Experts' General Methods**.

        **1.  Dr. Boesch's General Methods And Conclusions.**

Dr. Boesch organized his Round 1 Report according to ecosystems.  Boesch Round 1 Rpt. § 2.2 at 5-6 (US Ex. 1).  He begins by briefly discussing the toxicity of hydrocarbons, then generally surveys the release, transport, and fate of Macondo hydrocarbons.  *Id*. §§ 3-4 at 8-15.  The report then discusses, ecosystem by ecosystem, actual and potential effects of the spill, to the extent they are known today.  *Id*. §§ 5-6 at 15-41.  Dr. Boesch concludes that the spill caused both actual and potential environmental harm.  He finds actual harm to at least (a) plankton and

floating seaweed communities; (b) deep sea biota, including cold-water coral communities; (c) moderately and heavily-oiled marsh and mangrove habitats; and (d) birds, sea turtles, and dolphins exposed to oil slicks.  He finds potential harm to at least (a) bottom fishes where hydrocarbons contaminated sediments; (b) open-ocean fishes with larvae that develop near the sea surface; (c) biota in continental shelf seabeds in the vicinity of substantial floating oil; and (d) oysters in areas affected by oil and responses to the spill (*i.e*., fresh water releases).  *Id*. § 1 at 4.  Dr. Boesch also puts limits on his conclusions, stating that these impacts are not the "wholesale 'collapse'" of ecosystems that some feared, but they are "profound and extensive." *Id*. § 7.2 at 42.

As part of a larger section describing his overall approach, Dr. Boesch included a sub-section that explains the type of information he reviewed and relied on, the types of information he did not review or rely on, and why.  *Id.* § 2.3 at 6-8.  He primarily relied on formal scientific literature, especially peer-reviewed journal articles, with relatively little reliance on other sources.  *Id*. at 6-7.  He also decided not to perform his own analysis of the vast body of NRDA data, explaining that such work is best performed by the specialists in each particular field, that non-specialists who attempt to analyze such extensive data in a short period of time run a significant risk of misinterpreting the data, and that the NRDA is ongoing.  *Id*. at 7.  The fact that Dr. Boesch did not perform his own analysis on the mountain of available NRDA data was a deliberate and well-grounded decision, not an oversight.  It is entirely appropriate for experts in forming their opinions to rely on peer-reviewed studies performed by others.  *See, e.g., In Re Celexa and Lexapro Products Liability Litigation,* 927 F. Supp. 2d 758, 764 (E.D. Mo. 2013); *Sanderson v. Int'l Flavors and Fragrances, Inc.*, 950 F. Supp. 981, 994 (C.D. Cal. 1996).

### 2. Dr. Rice's General Methods and Conclusions.

In his Round 1 Report, Dr. Rice first provides an overview of oil chemistry and ecological toxicity of oil and dispersants. Rice Round 1 Rpt. § IV at 6-14 (US Ex. 2). Second, he describes scientific lessons learned from pre-DWH oil spills, such as post-Exxon Valdez spill studies showing adverse effects on early fish-life stages, even at very low levels of poly-aromatic hydrocarbons (PAHs) exposure, which provide the foundation for evaluating potential harms from the DWH spill. *Id.* § V.A at 15-17. Third, Dr. Rice discusses post-DWH spill studies that document key criteria used to establish the potential for evaluating toxicity damage, including a detailed discussion of embryo toxicity studies. *Id.* § VI.F-G at 23-28. Dr. Rice concludes that there are compelling reasons to believe there was significant potential for toxicity damage from the DWH spill. *Id.* §§ VI.H & VII at 28-31.

Dr. Rice based his opinions on an extensive review of pre-DWH spill peer-reviewed, published literature, some of which he was personally involved in, as well as studies and literature generated after the spill. *Id.* § I at 4-5. Dr. Rice also examined data provided to and by BP as part of the NRDA and the DWH litigation. However, like Dr. Boesch, Dr. Rice made a deliberate decision not to rely heavily on NRDA data in his Round 1 Report (although Dr. Rice's later reports do include some analysis of NRDA data in rebuttal to BP's Dr. Shea), given that they are incomplete, and have not been analyzed and summarized into a format and volume conducive to review. *Id.* at 5. Also like Dr. Boesch, Dr. Rice's decisions regarding use and analysis of the vast NRDA data were deliberate and well-grounded, not oversights.

B. **Drs. Boesch and Rice Provided Well-Grounded Bases for the Opinions BP Incorrectly Deems "Speculation."**

BP characterizes certain opinions of Drs. Boesch and Rice regarding harm as "speculative." BP Motion at 2. The following discussion shows the actual bases for those

opinions that BP failed to provide in its Motion, or in some cases shows that the opinions were never actually offered by Drs. Boesch or Rice.

### 1. Harm To Fish and Shellfish.

Dr. Boesch found harm to fish and shellfish in two different ecosystems: nearshore habitats and offshore habitats. In nearshore waters, which oil "passed through" as it reached the coast, killifish showed genomic effects near heavily oiled marshes as compared to unoiled marshes. US Ex. 1 at 35-36. Other species of fish in oiled areas contained elevated concentrations of PAHs and a higher incidence of lesions.[1] *Id.* at 29. Shrimp showed substantially lower growth rates in beds adjacent to heavily oiled areas versus unoiled areas. *Id.* at 35. Regarding offshore areas, studies showed that oil impaired cardiac development and function in tuna and swimming performance in Mahi-Mahi. *Id.* at 28-29. And sampling in those offshore areas showed the presence of oil near the surface at potentially harmful concentrations. *Id.* at 20 (*citing* US Ex. 2 at 21-22). In light of all this information, Dr. Boesch concluded that there was actual harm to individual fish. US Ex. 1 at 36. However, he more cautiously determined that, as of today, it is only possible to speak of potential harm to fish populations, not actual harm to populations. *Id*. at 36, 40. These opinions are not speculative. They are based on the toxicity of oil, exposure to oil of fish and shellfish, and peer-reviewed studies that support findings of harm to those resources.

BP's citations to Dr. Rice's opinions on fish and shellfish are incomplete and misleading to a similar degree. Dr. Rice's opinion, in sum, is that in light of the release of a large volume of

---

[1] BP argues that Dr. Boesch's discussion of fish lesions "contradicted the express conclusions of the long study he relied upon." BP Motion at 5. BP's assertion is inaccurate. The authors of the study did not conclusively determine whether the higher incidence of lesions in oiled areas was caused by the spill, but they identified that possibility. Similarly, Dr. Boesch did not determine *actual* harm based on increased incidence of lesions; instead he used that information, along with information about elevated concentration in of contaminants in liver and bile, to conclude *potential* harm. US Ex. 1 at 29.

oil over a lengthy period of time into the Gulf, the potential for significant toxicity damage is expected and likely. US Ex. 2 at 4. This potential likelihood is documented in studies of oil exposure in the deep water, in the water column, on the surface, and on shorelines. *Id.* at 30-31. Further, as the NRD assessment continues, the potential to find other toxic effects of the release of hydrocarbons from the Macondo well on marine life in the Gulf is likely to be similar to toxic effects observed from exposure to crude oil from other spills. *Id.* at 31.

Dr. Rice's testimony indicates that he is not opining or postulating regarding whether or not there were actual population-level effects on the species he was asked about. But that is very different from saying that there were not *potential* effects on population. In fact, Dr. Rice opined that there were such potential effects. *Id.* at 30; Rice Round 3 Rpt. at 16, 21 (US Ex. 3).

### 2. Harm To Oysters.

Dr. Boesch explains that the literature, to date, does not demonstrate direct mortality of oysters due to oil exposure. US Ex. 1 at 36-37. But his analysis does not stop there, because the question of oyster impacts is not that simple. Data indicates "extensive reductions" since 2010 in oyster recruitment in areas that were heavily oiled and also subject to fresh water diversions in response to the spill. There are other potential causes of these declines, but the geographic nexus with oil and fresh water diversions are on objective basis for considering the decline a "potential" impact of the spill. *Id*. at 37 (*citing* Louisiana Department of Wildlife & Fisheries (2013) Oyster Stock Assessment Report of the Public Oyster Seed Areas of Louisiana Seed grounds and Seed Reservations. Oyster Data Report Series, No. 19, Baton Rouge, LA).

### 3. Harm To Continental Shelf Organisms.

Dr. Boesch's discussion of potential harm to organisms living on the continental shelf seabed immediately follows his explanation of actual harm to cold water corals and other

animals living in the deep seabed around the wellhead. The deep seabed impacts included "severe reductions in abundance and diversity of populations" in an area about 9 square miles around the wellhead, with a zone of "moderate effects" covering about 57 square miles. US Ex. 1 at 24.

Unlike the actual harm in deepwater seabeds, which are "among the best documented harmful and longest lasting impacts resulting from the Macondo well blowout at this time," for continental shelf seabeds, "thus far there have been few published studies that evaluated sediment contamination or biological effects on bottom dwelling organisms." *Id.* at 27. However, Dr. Boesch explained that "the same processes that resulted in deposition of surface hydrocarbons in deep Gulf of Mexico ecosystems were likely also in operation as oil slicks moved over the continental shelf." *Id.* For that reason, Dr. Boesch characterizes the harm to these communities as potential rather than actual. He also notes some evidence for the presence of oil in sediments in July 2010 in the form of an anomaly in the hypoxic zone near Grand Isle, which had exposure to floating oil. This anomaly was not found in 2011 or 2012, suggesting there was not sufficient oil remaining to affect bottom oxygen depletion. *Id.* at 27-28 & n.73. Thus, BP's claim that Dr. Boesch uses "no data to support this claim" of potential harm, (BP Motion at 9), is inaccurate.

### 4. Harm To Deep Sea Planktonic and Swimming Organisms.

BP's "speculation" argument regarding deep sea planktonic and swimming organisms consists almost entirely of quoting out of context Dr. Boesch's statement that "no results from research on the effects of the plume hydrocarbons on planktonic and swimming organisms living at depth of the deep-sea plume have been published." BP Mot. at 11. BP omits remainder of the sentence in Dr. Boesch's Round 1 Report, which reads, "however, there was at least potential

harm to this component of the ecosystem." US Ex. 1 at 17. The bases for that conclusion are explained by Dr. Boesch.

The relevant portions of Dr. Boesch's Round 1 Report begin with a discussion of a very large deepwater plume of hydrocarbons that was detectable up to 300 nautical miles from the wellhead, 1,100 to 1,300 meters below the surface. US Ex. 1 at 11-12. There were several other subsurface plumes identified at lesser depths. *Id*. at 12. Hydrocarbons in the plume included methane, mono-aromatic hydrocarbons such as toluene and benzene, and PAHs. *Id.* at 16. Based on concentrations found in the plume, Dr. Rice concluded that toxicity damage was likely. *Id*; US Ex. 2 at §§ VI.H.4 at 29. Considering all of the above information, which BP's motion omits, Dr. Boesch's conclusion of potential harm, rather than actual harm, is reasonable and cautious.

### 5. Harm To Off-Shore Birds.

BP's "speculative" argument regarding bird populations is especially surprising, since BP's own expert, Dr. Tunnell, admits that the thousands of birds killed by the oil spill had an impact to bird populations; he then argues that those impacts were temporary. Tunnell Round 1 Rpt. at 60 (US Ex. 4). BP misuses statements by Dr. Rice, which and obscures the fact that Dr. Rice is discussing not *whether* there were actual impacts to bird populations, but *the extent* of those impacts. US Ex. 3 at 15. Both Drs. Rice and Boesch point out the scientific view that given the spill's location and the distance for oiled carcasses to travel, the already-established population impacts are a floor and not a ceiling, and that peer-reviewed and published modeling based on the NRDA data have estimates of bird mortalities that are much higher. *See* US Ex. 1 at 38; Boesch Round 2 Rpt. at 9 (US Ex. 5); US Ex. 3 at 15.[2]

---

[2] BP's argument that Dr. Rice stated that "look[ing] for relevant publicly available data" was "not my strong suit" (BP Mot. at 11) is an example of BP's selective editing of the deposition transcript. Immediately following that

The opinions Drs. Boesch and Rice offer regarding harm to off-shore birds are not speculative. In his Round 1 Report, Dr. Rice notes that "because the numbers [of bird mortalities] are large (hundreds of thousands killed), it is easy to speculate that the predator load was considerably reduced in the northern Gulf of Mexico, possibly having a significant ecosystem effect." US Ex. 3 at 16. Dr. Boesch also cites to a peer-reviewed study discussing the potential for ecosystem effects from such large bird mortalities in the Gulf to travel as far as "upland prairie and subarctic regions." US Ex. 1 at 38-39.

### 6. Harm To Turtles.

Several bases for actual harm to turtles are identified in Dr. Boesch's reports. The first is the oiling of, and mortality to, an important floating brown algae community known as sargassum, which among other things "provides important habitat for juvenile sea turtles." US Ex. 1 at 18. A study on sargassum abundance showed that 2011 and 2012 levels were four times that found in 2010, "suggesting that while the impact of the Macondo well blowout on this important habitat was particularly acute, it might not have been long-lasting." *Id*. at 18-19 & n.45. Dr. Boesch explained that in 2010, turtles in sargassum could have been affected either through the toxic effects of the oil itself or through loss of habitat as the sargassum died and sank. *Id*. The habitat loss was significant enough "that the effects on sea turtle hatchling and juvenile turtles could contribute to year-class failure." *Id*. at 19 & n.45.

A second basis for actual turtle harm is the greatly increased number of turtle strandings in 2010 (*i.e.*, dead turtles found on shore). *Id.* at 19-20. Dr. Boesch identified several potential causes of increased turtle mortality, including the oil spill. *Id*. at 19. Dr. Boesch and BP's expert, Dr. Tunnell, disagree about whether oil is a likely cause of these stranding, with each

---

quote, Dr. Rice explained that he was focused on finding peer reviewed papers, and that he conducted the relevant literature search for such peer-reviewed papers (Rice Dep. at 291:24-292:19 (US Ex. 10)).

expert presenting their reasons. Boesch Round 3 Report at 7-9 (US Ex. 6); Tunnell Round 2 Rpt. at 3-5 (US Ex. 7). Each expert gives reasons for believing that more, or less, of the stranded turtle mortality is due to oiling, but this is a classic "battle of the experts" based on available information, not speculation. (Note: BP's Dr. Tunnell does not address Dr. Boesch's discussion of turtle mortality due to oiling in or loss of sargassum habitat).

A third basis for harm to turtles is demonstrated by the capture and release of live turtles. Over 400 live turtles were captured, 85% of which were visibly oiled. However,

> "[R]escue efforts were constrained and covered only a small portion of the overall footprint and duration of floating oil. The survival of carefully rehabilitated turtles says nothing about the survival of the substantially greater number of offshore turtles that encountered oil and were not rescued and rehabilitated. Indeed, the fact that several hundred oiled turtles were captured for rehabilitation strongly suggests that a much larger number of turtles were oiled given the very large spatial and temporal extent of surface oiling."

Boesch Round 3 Rpt. at 7. In addition, approximately 14,000 sea turtle hatchlings were collected from the Gulf Coast and released to the Atlantic Ocean in order to avoid exposure to oil, which represents a loss to Gulf of Mexico turtle stocks. *Id*. at 7-8.

BP explains none of this in its motion. Instead, it relies entirely on one short snippet from Dr. Boesch's deposition. BP Motion at 11-12. But BP completely changes the meaning of Dr. Boesch's quoted answer by omitting the question, which asked about "direct harm to sea turtles . . . *after 2010.*" Boesch Dep. at 256:14-17 (emphasis added) (US Ex. 8). As the above discussion of Dr. Boesch's reports – also omitted by BP – makes clear, Dr. Boesch's opinions about actual harm to turtles are for harms in 2010, not *after* 2010. That is why his answer about post-2010 harms recognized much more uncertainty, consistent with his approach that this is properly analyzed as part of the NRD assessment.

### 7. Phototoxicity.

Dr. Rice discusses phototoxicity in his Round 1 Report, explaining that "direct sunlight (UV) increases toxicity by changing ('activating') multi-wringed PAH structures, and is more of a problem to organisms that are less pigmented and transparent (such as fish embryos and larvae), because the UV can penetrate into cells with absorbed PAHs within them." US Ex. 2 at § V.B at 18. This is not a speculative theory, but one that has been observed in studies such as the investigation of impacts to herring from the 2007 Cosco Busan Spill. *Id.* Indeed, BP's own expert, Dr. Shea, admits that UV light has been reported to increase the toxicity of some PAHs. Shea Round 1 Rpt. at 44 (US Ex. 9).

To support its "speculation" argument relating to phototoxicity, BP quotes only portions of Dr. Rice's deposition on this topic, ("Is it speculative? Yes, I suppose it is." BP Motion at 5), and fails to acknowledge Dr. Rice's more detailed preceding discussion regarding the potential for phototoxicity, given the existence of certain factors:

> "Well, I think that – here would be the factors that you need: You need to have a transparent – you need to absorb those heavy polycyclic aromatic hydrocarbons, phenanthrene and chrysenes and those sorts of compounds. You need to absorb them into the tissue. You need to be clear. So, all right, we just eliminated the pigment in adults and things like that, so now we're at the embryos that are often very, very transparent or at least translucent. We're talking about larvae, and they can absorb these compounds in literally seconds, okay. So you get those compounds into a tissue and then you expose it to UV light, meaning you need to be in the upper meter probably, maybe 2 meters, depending on the clarity of the water. And when you mix those factors together, then the likelihood that phototoxicity is – is an issue or a factor."

US Ex. 10 at 269:3-20. Not only does BP fail to fully quote Dr. Rice when describing his opinion on the potential for phototoxicity as "speculative," in doing so BP contradicts its own expert.

- 11 -

## II. EVIDENCE OF POTENTIAL HARM IS AN ESSENTIAL PART OF THE SERIOUSNESS FACTOR INQUIRY.

In several places, BP implies that conclusions of potential harm without a determination of actual harm (or the absence thereof) are either scientifically suspect or unhelpful to the factfinder. *See, eg.,* BP Motion at 2-3 and 7 (suggesting that presentations of potential harm are premature and inappropriate prior to determinations of actual harm in the NRDA process) and 13-14 (evidence of potential harm allowable where conclusions of limited actual harm also reached). We dispute these assertions as a matter of law.[3]

Potential harm to the environment relates to the "seriousness" factor and may justify a significant penalty. *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 344 (E.D. Va. 1997) ("The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect."). There are sound reasons for this view. First, courts have recognized that proof of potential harm is particularly appropriate in cases where the information needed to determine the extent of environmental harm is incomplete, as it is at present in this case. *United States v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 432 (W.D. Pa. 2002) (internal citations omitted). Second, the nature of a penalty proceeding is not to determine damage, but rather to impose an appropriate penalty to deter the offending conduct in the future. *Tull v. United States,* 481 U.S. 412, 422–23 (1987). As such, it is appropriate to consider not simply what harms actually resulted from the violation, but what harms could have resulted from the violation. *See, e.g.*, *United States v. Marine Shale Processors,* 81 F.3d 1329, 1336 (5th Cir. 1996) (CWA violations

---

[3] BP similarly argues that Dr. Boesch's definition of potential harm is a tautology, "making it impossible for anyone to replicate Dr. Boesch's results." BP Motion at 13-14. BP's notion of replicating results is out of place here – because Dr. Boesch did not conduct his own field studies or analyses of field data, there are no "results" to be "replicated" in the conventional scientific sense. But the bases of Dr. Boesch's opinions are clearly set forth in his reports, *supra* at 2-11, making it possible for this Court to assess the soundness of Dr. Boesch's conclusions.

were "serious" even though there was little, if any, evidence of actual harm); *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 344 (E.D. Va. 1997); March 21, 2014 Transcript at 83 (The Court: "You can have an extremely serious violation that results in little or no damage, but it could have potential to do catastrophic damage, but it could be good fortune that it doesn't do extensive damage. It doesn't mean it's not an extremely serious violation.").

As a result, under the CWA, the United States is not required to *quantify damages* caused by defendants to establish seriousness. *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 859-60 (S.D. Miss. 1998); *see also Sierra Club v. El Paso Gold Mines, Inc.*, No. 01 PC 2163 OES, 2003 WL 25265873, at *8 (D. Colo. Feb. 10, 2003) ("actual harm to the environment…need not be proven to establish that substantial penalties are appropriate in a Clean Water Act case."). *See generally* U.S. Motion About the Seriousness Factor (No. 12373-2-4) at U.S. Reply About the Seriousness Factor (No. 12511) at 3-4 (arguments not reproduced here for brevity).

Respectfully submitted,

JOYCE BRANDA
Acting Assistant Attorney General
Civil Division

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys

SAM HIRSCH
Acting Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
RICHARD GLADSTEIN
PATRICK CASEY
MICHAEL ZEVENBERGEN
Senior Counsel
A. NATHANIEL CHAKERES
JUDY HARVEY
RACHEL KING
ERICA PENCAK
ABIGAIL ANDRE
RACHEL HANKEY

- 14 -

|  |  |
|---|---|
| R. MICHAEL UNDERHILL, T.A.<br>Attorney in Charge, West Coast Office<br>Torts Branch, Civil Division<br>U.S. Department of Justice<br>7-5395 Federal Bldg., Box 36028<br>450 Golden Gate Avenue<br>San Francisco, CA 94102-3463<br>Telephone: 415-436-6648<br>Facsimile: 415-436-6632<br>E-mail: mike.underhill@usdoj.gov | BRANDON ROBERS<br>Trial Attorneys<br><br>/s/ Steven O'Rourke<br>STEVEN O'ROURKE<br>Senior Attorney<br>Environmental Enforcement Section<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044<br>Telephone: 202-514-2779<br>Facsimile:  202-514-2583<br>E-mail: steve.o'rourke@usdoj.gov<br><br>KENNETH A. POLITE, JR.<br>United States Attorney<br>Eastern District of Louisiana<br>SHARON D. SMITH<br>Assistant United States Attorney<br>Eastern District of Louisiana<br>650 Poydras Street, Suite 1600<br>New Orleans, LA 70130<br>Telephone: (504) 680-3000<br>Facsimile: (504) 680-3184<br>E-mail: sharon.d.smith@usdoj.gov |

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of December 2014.

                                                          /s/ Sarah D. Himmelhoch