**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to: 12-970. | * * | |
| | * | Honorable CARL J. BARBIER |
| | * | |
| | * | Magistrate Judge SHUSHAN |
| | * | |
| | * | |
| | * | |

---

**BP EXPLORATION & PRODUCTION INC.;**
**BP AMERICA PRODUCTION COMPANY;**
**AND BP P.L.C.'S MEMORANDUM IN SUPPORT OF THEIR**
**MOTION SEEKING PRODUCTION OF THE MCGLADREY LLP WORK PAPERS**
**AND RELATED RELIEF**

Richard C. Godfrey, P.C.
Wendy Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000

Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.;*
*BP AMERICA PRODUCTION COMPANY; AND BP P.L.C.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

I.   THE PARTIES SHOULD BE PROVIDED WITH THE INTERIM REPORTS
     AND WORK PAPERS GENERATED DURING MCGLADREY'S AUDIT OF
     THE CSSP. ................................................................................. 4

     A.   ███████████████████████████████ the Interim Reports
          and Associated Work Papers. ................................................ 6

     B.   Because the Public as Well as the Parties and the Court All Have an
          Interest in the Fair and Efficient Administration of the CSSP, Providing
          Access to McGladrey's Work Papers Is Appropriate. ........................... 7

     C.   The Final McGladrey Report Warrants Providing the McGladrey Work
          Papers to the Court, BP, and Class Counsel. .............................. 8

II.  THE FINAL MCGLADREY REPORT IDENTIFIES SEVERAL AREAS IN
     WHICH IMPROVEMENTS CAN BE MADE IN CSSP OPERATIONS ..................... 10

     A.   The Final Report Identifies Documentation Requirement Issues That
          Should Be Addressed. ..................................................... 10

     B.   McGladrey Describes the Claim Processing Error Rate in Ways That
          Might be Misinterpreted. ................................................. 12

     C.   McGladrey Did Not Complete its Audit of the CSSP. ...................... 16

CONCLUSION ................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Amer. Sugar Refinery*,
  342 So. 2d 1268 (La. App. 4th Cir. 1977) .................................................................. 3

*Crowley v. Hermitage Health & Life Ins. Co.*,
  391 So. 2d 53 (La. App. 3d Cir. 1980) ...................................................................... 7

*In re Vioxx Prods. Liab. Litig.*,
  574 F. Supp. 2d 606 (E.D. La. 2008) ........................................................................ 7

*In re Zyprexa Prods. Liab. Litig.*,
  424 F. Supp. 2d 488 (E.D.N.Y. 2006) ...................................................................... 8

*Logan v. Hollier*,
  424 So. 2d 1279 (La. App. 3d Cir. 1982) .................................................................. 7

*United States v. Sajare Interests, Ltd.*,
  663 F. Supp. 937 (E.D. La. 1987) ............................................................................. 7

**Statutes**

Louisiana Civil Code Article 1981 ................................................................................. 7

Louisiana Civil Code Article 1978 ................................................................................. 7

**INTRODUCTION**

The Claims Administrator of the Court Supervised Settlement Program ("CSSP") engaged the national firm McGladrey LLP to audit the CSSP. *See* Ex. D to Rec. Doc. 13497-6 at 38 (Oct. 15, 2014). McGladrey spent $14-plus million of BP's money in the 13-month period that it worked to produce this audit of the CSSP (exceeding initial estimates of both cost and timing of completion). *See* Rec. Doc. 13530 at 5 (Oct. 20, 2014). To enhance transparency and efficiency, the Motion seeks two forms of relief related to the audit: (1) the release of work paper documents generated during the audit — work papers that McGladrey has indicated it is awaiting Court instructions as to whether to provide; and (2) improvements to the CSSP based on the conclusions that McGladrey reached during the audit (these are described below but include requiring the CSSP to enforce the Settlement Agreement's documentation requirements).

***Release of Work Papers.*** Several provisions of the Court-approved Settlement Agreement ██████████████████████████████████████████████████ ████████████████████████████████████████████████ give Class Counsel and BP the right to obtain a copy of the McGladrey audit's interim and final reports and associated work papers. The Settlement Agreement provides that "BP and Class Counsel shall have access to ***all*** . . . Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose ***including, without limitation, . . . reviewing and auditing the Settlement Program . . . .***" Settlement Agreement, Rec. Doc. 6430-1 (May 3, 2012) § 4.4.14 (emphasis added). ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

1

████████████████████████████████████████████████████████████

███████████   ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████[1]

Access to McGladrey's final and interim audit reports and associated work papers being important to the overall workings of the CSSP, BP respectfully requested in a motion dated October 24, 2014 the production of those materials.  *See* Rec. Doc. 13553 (Oct. 24, 2014).  On October 31 the Court denied BP's request because it was anticipated to become moot by November 14, 2014, when the Claims Administrator would be sharing the final report with the Court and the Audit Committee.  *See* Rec. Doc. 13587 at 7 (Oct. 31, 2014).  "Thereafter," the Court stated it would "instruct [the Claims Administrator] regarding further distribution of the report and any work papers."  *Id*.  McGladrey delivered its final report to the Claims Administrator on November 7, *see* Rec. Doc. 13716-1 (Nov. 25, 2014) ("McGladrey Report Cover Letter"), which the Claims Administrator submitted to the Court on November 17.  *See* Rec Doc. 13709 (Nov. 25, 2014).  On November 25, the Court ordered the Claims Administrator to first obtain permission from McGladrey and then file the final report into the docket.  *Id*.  The Claims Administrator did so and the final report became part of the record.  *See* Rec. Doc. 13716 (Nov. 25, 2014) ("McGladrey Report").

The Court's November 25 Order, however, did not provide instructions concerning the "work papers" referenced in its October 31 Order.  Since, █████████████   the Settlement Agreement that this Court supervises, ██████████████████████████████   BP

---

[1] Contemporaneously with this Motion, BP is moving to unseal the McGladrey Contract, which BP previously filed under seal only out of an abundance of caution.  Previously, the Court granted BP's motion to file that contract under seal.  *See* Rec. Doc. 13615 at 1 (Nov. 4, 2014).

sent a letter to McGladrey on December 3, 2014, requesting McGladrey's interim audit reports, associated work papers, and other materials [referred to in the remainder of this brief as the "McGladrey work papers," broadly defined]. *See* Exhibit 1. McGladrey responded to BP's letter on December 9. McGladrey referenced the Court Order of October 31 and stated its view that it is "necessary and appropriate to await the Court's direction before taking [BP's] requests under further consideration." Exhibit 2. Directing release of the work papers is thus now fully ripe.

        ***<u>Improvements to the CSSP and Completion of the Audit.</u>*** As described in further detail below, the McGladrey Report revealed a number of areas in which the administration of the CSSP could be improved. For instance, McGladrey concluded that the CSSP is, in many instances, not enforcing documentation requirements. BP's position is that this is not in accord with the basic duties the Settlement Agreement imposes on the CSSP, and also gives rise to the risk of improper or even fraudulent claims.[2] In addition, BP bargained for the documentation requirements; they are not discretionary, but instead are part of the deal BP negotiated and this Court approved.

        At this point, it appears that requesting the CSSP to take corrective steps based on the McGladrey Report would be futile. *See, e.g.*, *Bailey v. Am. Sugar Refinery*, 342 So. 2d 1268, 1271 (La. App. 4th Cir. 1977) (explaining that ███████████ need not be exhausted where doing so would be futile or vain). The CSSP through the Claims Administrator already has issued a rebuttal to McGladrey's final reports that contains only a vague statement that the Claims Administrator will consult with the parties about imposing additional internal controls.

---

[2] Fraudulent claims continue to be uncovered. Last week, the Special Master sought the return of payments by a shrimp boat captain based on tax returns he never filed with the IRS. *See* Rec. Doc. 13821 (Dec. 10, 2014).

*Compare* Notice of Filing, Rec. Doc. 13717-1 at 1-6 *with id.* at 7 (Nov. 25, 2014). This near-simultaneous public release of the final report accompanied by the Claims Administrator's response indicates that the CSSP is satisfied with the report's conclusions (as supplemented by the points set out in the CSSP's response). *See, e.g.*, *id.* at 1 ("McGladrey's Report reveals that the CSSP is processing and paying claims accurately.").

Accordingly, BP respectfully requests that the Court direct appropriate relief against the CSSP based on the audit. The requested relief is described below. *See* Part II.

**I.    THE PARTIES SHOULD BE PROVIDED WITH THE INTERIM REPORTS AND WORK PAPERS GENERATED DURING MCGLADREY'S AUDIT OF THE CSSP.**

The Court denied BP's October 24, 2014 Motion requesting access to McGladrey's final audit reports together with all interim reports and work papers on October 31 based on the Court's anticipation that BP's motion would soon become moot. *See* Rec. Doc. 13586 (Oct. 31, 2014). The Court later ordered the Claims Administrator to file the final McGladrey Report into the record on November 25, which the Claims Administrator did. *See* Rec. Docs. 13709 and 13716. The Court, however, has not addressed the disposition of interim reports or work papers. *See* Rec. Doc. 13586 at 7 ("the Court will instruct Mr. Juneau regarding further distribution of the report ***and any work papers***") (emphasis added).

The Parties (Class Counsel and BP) should be provided — under ▮▮ the Settlement Agreement ▮▮▮▮▮▮▮▮▮▮ — access to the interim reports and associated work papers. Moreover, BP's access to the McGladrey Report is particularly appropriate because BP cannot effectively exercise its rights under ▮▮▮ agreement without access to these materials. BP thus respectfully requests that the Court instruct the CSSP to produce to both BP and Class Counsel the following:

4

1. any ad hoc reports as referred to in ██████████████████████████ ;

2. the weekly status reports also referred to in ████████

3. any interim, preliminary, or draft reports (including thirty-day written reports);

4. the CSSP's Task Orders to McGladrey LLP, ██████████████████████

5. any separate Key Performance Indicators, ████████████

6. any correspondence to or from the CSSP or its agents to McGladrey in connection with the foregoing items;[3] and

7. all accounting/accountant work papers of any other kind generated by McGladrey LLP at any time █████████████████████, including those used to produce (a) the reports filed into the public record on November 25, 2014 and/or (b) any of the materials referenced above.

BP's contractual rights to review the effectiveness and efficiency of ████████████

██ the CSSP depend more on BP's access to interim reports and associated work papers than

to its access to the finished McGladrey Report:

> Maintaining detailed work papers is critical for any audit review as the work papers document not only the design and testing procedures, findings, comments and relevant discussions held with management (CSSP) that could impact the results of the audit, but more importantly, the work papers provide insight to the underlying basis for the review …. Based on my experience, the documentation contained in the work paper files provides much more detailed and insightful information and should address any scope issues and discrepancies in findings or approach that might otherwise exist or appear to be unexplained.

Exhibit 3 (Hutchins Decl.) at ¶ 6; *see also* Exhibit 4 (Hanhan Decl.) at ¶ 6 ("Work papers can

provide a detailed view into the proceedings of the audit that are not always reflected in the

final report.").  BP cannot exercise its contract rights without reviewing the interim reports

and associated work papers.  And given various statements in the Final Report, Class Counsel

---

[3] *See, e.g.*, McGladrey Report at 4 ("Held numerous meetings with the Program to discuss the facts surrounding each potential instance of non-compliance in order to determine the appropriateness of reporting the instance as a finding.").

also should have an interest in understanding the basis for and areas of necessary improvement. *See, e.g.*, McGladrey Report at 7.  This is particularly true in a context where the Final Report itself, for instance, recounts numerous instances of missing documentation and "manual overrides within the claims processing system" that the management simply could not explain, *see* McGladrey Report at 31-34, 57.

A.    ████████████████████████████████ the Interim Reports and Associated Work Papers.

In addition to the Settlement Agreement provisions granting BP to access the McGladrey Reports (*see* BP's October 24 Motion), ██████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  █████████████████████

███████ ██ ███ ████████  ██████ ██ █  ██ ███████ █████████  ████████

████████████████████████████████████████  █████████

████████████████  █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Moreover, in recognition of the fact that BP is a real party in interest concerning the benefits that would accrue to all parties from the best and most efficient CSSP operations, ███

████████████████████████████████  ██████████████ After all, any operational cost savings at the CSSP inure to BP; and any improvements in overall CSSP

efficiency accrue to the benefit of the Class as well. ██████████████████████████

██████████████████████ the Court's assistance under the Settlement Agreement to

protect its interests (particularly given that improvements in the CSSP from efficiency will

also benefit the Class). █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████▌

        BP, therefore, respectfully requests that BP and the Class be granted access to

McGladrey's interim reports and associated work papers.

> ### B.     Because the Public as Well as the Parties and the Court All Have an Interest in the Fair and Efficient Administration of the CSSP, Providing Access to McGladrey's Work Papers Is Appropriate.

        In light of the public interest in an efficient — as well as fair — administration of

massive settlement programs such as the CSSP, the Court has the inherent equitable authority

to oversee the administration of the CSSP.  *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 574 F.

Supp. 2d 606, 611-14 (E.D. La. 2008).  Settlement programs — particularly those involving a

"large number of plaintiffs subject to the same settlement matrix approved by the court; the

utilization of special masters appointed by the court to control discovery and to assist in

-------------------------------------------

▌██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

reaching and administering a settlement; the court's order for a huge escrow fund; and other interventions by the court" — are subject to the Court's "imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses." *Id.* at 611 *quoting In re Zyprexa Prods. Liab. Litig.,* 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006). Without access to the interim reports and work papers, not only BP, but all parties are limited in their ability to assess their "fair treatment" in the course of CSSP administration "regarding fees and expenses," including such charges filed by McGladrey for the very purpose of auditing the CSSP's effectiveness. Transparency and equity warrant BP's (and Class Counsel's as well as the Court's) access to the work papers so that all may be sufficiently well-informed of CSSP operations and able to determine how best to improve the CSSP.[5]

### C.     The Final McGladrey Report Warrants Providing the McGladrey Work Papers to the Court, BP, and Class Counsel.

The primary objective of the McGladrey audit and ensuing reports was "evaluating the level to which the claims processed by the Program comply with the Settlement Agreement." McGladrey Report Cover Letter; *see also* McGladrey Report at 2 ("the objective of our review focused on compliance with the Settlement Agreement"). The Settlement Agreement — compliance with which the audit was commissioned to promote and indeed ensure — states clearly that "BP and Class Counsel shall have access to all . . . Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose including, without limitation . . . . reviewing and auditing the Settlement Program . . . ." *See* Settlement

---

[5] In the same vein, BP renews the points raised in its October 24 Motion regarding the Settlement Agreement's guarantee of CSSP transparency and BP's related right to obtain information concerning the CSSP's operations. *See* Rec. Doc. 13553-1. For that reason, BP incorporates pages 3 to 6 of Rec. Doc. 13553-1 into this brief by reference.

Agreement § 4.4.14 (emphasis added). This, we submit, necessarily should include access to interim reports and accounting work papers. Accordingly, the Court should order release of those materials to Class Counsel and BP, as well as for its own consideration.

Significantly, the McGladrey Report itself conveys the importance of the interim reports and work papers generated over the course of the audit to evaluating the CSSP's compliance with the Settlement Agreement. *See, e.g.*, McGladrey Report at 7 ("Throughout our fieldwork, we provided DHECC with interim reports. Each interim report included those observations that had been identified via supporting documentation and discussion with relevant CSSP personnel. As part of this process, recommendations were provided to, and management responses were received from, DHECC management."). Clearly, much "claims-related data transferred to or generated in the Settlement Program," for the precise purpose of "reviewing and auditing the Settlement Program," was conveyed to management in interim reports. By virtue of this fact alone, the parties and the Court should be provided these interim reports. Moreover, no one knows whether a "number of observations and recommendations related to process improvements, internal controls, and other matters which have been discussed with management" made by McGladrey "[d]uring the course of [its] review," *see id.* at 55, were ultimately reflected in the Final Report — yet all of this information directly impacts the CSSP's efficiency, as well as the parties' and the Court's ability to "review[] and audit[] the Settlement Program" and, therefore, it should be made available.

II.   **THE FINAL MCGLADREY REPORT IDENTIFIES SEVERAL AREAS IN WHICH IMPROVEMENTS CAN BE MADE IN CSSP OPERATIONS.**

A.   **The Final Report Identifies Documentation Requirement Issues That Should Be Addressed.**

The McGladrey Report includes five substantive subdivisions, one of which is dedicated to what it describes as "specific documentation deficiencies."  McGladrey Report Cover Letter; Exhibit 3 (Hutchins Decl.) at ¶ 3.  For over 20 pages, this report details ways in which the CSSP has not required the documentation called for in the Settlement Agreement. McGladrey Report at 31-52.  The failures in this area are significant, and warrant a direction from the Court requiring CSSP compliance with the Settlement Agreement's terms.

The McGladrey Report "noted instances where required documentation was either missing from the files or did not meet prescribed requirements."  *Id.* at 31.  Across all categories, document deficiencies appeared in 8.2% of the claims analyzed.  Rec. Doc. 13717-1 at 4 (Audit Committee acknowledging this error rate).  While certain categories turned up no documentation issues (*e.g.,* subsistence claims), high-value categories like Business Economic Loss ("BEL") claims included documentation deficiencies in ***20.5% of such claims***.  McGladrey Report at 35; Ex. 3 at ¶ 18.  Moreover, the CSSP's failure to demand sufficient documentation is apparently not confined to an isolated misunderstanding; according to the McGladrey Report, it permeates every aspect of the Settlement Agreement. *See, e.g.,* McGladrey Report at 33 (failing to require oyster leaseholders to establish that they had rights to the beds underlying their claims); 35 (inadequate profit and loss statements for BEL claims); 45 (vessel "owners" failing to establish ownership of the vessel at issue); 47 (missing spousal release for damages coastal property).  BP bargained painstakingly for each of the documentation requirements embodied in the Settlement Agreement.  They are not

optional, and without adequate documentation being required before claims can be paid, BP loses the benefit of its bargain in entering into the Settlement Agreement. A missing release from one spouse owning coastal real estate, for example, leaves BP vulnerable to double recoveries. Likewise, as this Court and the Fifth Circuit well understand, the BEL program often involves large claims, so reliable profit and loss statements, tax returns, and other forms of documentation are essential.

Because McGladrey assumed that the CSSP was properly implementing the Agreement, it did not consider CSSP policies that impermissibly lower documentation thresholds. *See, e.g.*, Policy 333 (acknowledging that "Exhibit 8A to the Settlement Agreement requires that Category I, II, and III claimants who do not receive a presumption of causation must provide an Employer Sworn Written Statement attributing the claimant's loss of income during the Compensation Period to the DWH Spill," but amending that provision to allow a Claimant Sworn Written Statement where, for example, an employer "refuses to sign . . . any sworn written statement"). The magnitude of erroneous overpayments resulting from these sorts of policies is unknown because McGladrey simply assumed that the CSSP was properly implementing the Settlement. As a result, while McGladrey's findings concerning documentation deficiencies are troubling on their own terms, once one understands the ways in which McGladrey limited the scope of its review, it becomes very likely that the actual documentation error rate is even higher than McGladrey found.

For the CSSP to properly implement the Settlement Agreement, BP submits that the Court should direct the CSSP to correct both the documentation errors that McGladrey found and for it to reevaluate in consultation with the Parties the impact of weakening or not enforcing the Settlement Agreement's documentation requirements.

**B.      McGladrey Describes the Claim Processing Error Rate in Ways That Might be Misinterpreted.**

Mark Hutchins, a Managing Partner of the internationally recognized audit, tax, and advisory firm KPMG LLP, has reviewed the McGladrey Reports and observed that McGladrey did not fulfill its obligations in certain important respects.  *See* Ex. 3.  He points out that McGladrey calculated the CSSP's claim processing error rate based on the dollar value of faulty claims instead of the actual number of faulty claims processed.  Ex. 3 at ¶¶ 7, 16.[6]  In the Report, McGladrey explains that it examined a sample of 1,852 claims totaling $741 million, of which 122 claims totaling $2.1 million had calculation errors.  McGladrey Report at 8-9.  From that evaluation, McGladrey concludes that the error rate was approximately 0.3%.  *Id.*  Extrapolated across the entire claims population, this figure increases slightly to 0.5%.  But this error rate is not correct given the undisputed facts known by the parties based on their actual experience in claims processing under this Settlement — which provides yet another reason to grant BP and Class Counsel access to the work papers and interim reports.   Ex. 3 at ¶ 20.

*First*, McGladrey calculated this error rate without determining the validity of the data used by the CSSP to process payments.  If claimants submit inaccurate or erroneous data, and the CSSP uses that faulty data to process a payment for the claimant, then McGladrey did not categorize this transaction as a "calculation error" so long as the CSSP did the arithmetic correctly.  Rec. Doc. 13717-1 at 1; *see also* Ex. 3 at ¶ 14. ("Thus, if the Claims Administrator did the mechanical calculations correctly based on the data submitted by a claimant (whether

---

[6] Curiously, McGladrey does not refer to its calculation regarding the frequency of errors as an "error rate." Instead, McGladrey uses the term "Award Calculation Findings."  *See, e.g.,* McGladrey Report at 6.  However, the Audit Committee does use the term "error rate."  *See* Rec. Doc. 13718-1 at 9.  *See also id.* at 4 (equating "Award Calculation Findings" with "errors").

accurate or inaccurate), McGladrey would have logged this transaction as correct."). Checking the math for computational errors is easy; but reviewing the CSSP's process to see if it is properly reviewing data inputs for accuracy is the most important first step that is necessary to assess the performance of the CSSP's claims operations.  As Mr. Hutchins put it, "*when you put the wrong numbers into an equation, your ensuing calculation may be correct, but your answer is still going to be wrong.*"  Ex. 3 at ¶ 12.  No audit by McGladrey was necessary to check the math; the parties could have checked on their own the CSSP's math as to determined claims.  Math checking was not the main purpose of the exercise.

*Second*, the 0.5% error rate — while ordinarily good news if true — unfortunately is meaningless here because it is based on a simple math-checking exercise.  In addition, it is based on the extrapolation of the net dollar difference in claim determinations — another unilluminating exercise.  Ex. 3 at ¶ 15.  Thus, McGladrey divides the total dollar amount of the claims it reviewed ($741 million) by the total dollar amount of those claims with calculation errors ($2.1 million) to reach the low error rate it reports.  The resulting error rate only reveals "*how wrong* the CSSP's errors were, on a net basis."  *Id.* (emphasis in original). As Mr. Hutchins explains, "under McGladrey's net dollar-value approach, two errors of $1,000, each in opposite directions, would net to $0, and thus appear to suggest perfection in the CSSP's processing, even though the opposite is true.  This example illustrates the flaws in focusing on net dollar values rather than on the number of actual errors."  Ex. 3 at ¶ 16. "Alternatively, McGladrey could have calculated the absolute value of all errors when summed together.  Instead, McGladrey decided to net overpayments and underpayments together, which understates the true error rate."  *Id.*

*Third*, more relevant is the *actual number of claims* identified with calculation errors.

13

If one performs that analysis — dividing 122 errors by 1,852 claims results in a 6.6% error rate.  Ex. 3 at ¶ 15.  This calculation reveals "***how often*** the CSSP improperly paid a claimant [even without knowing the accuracy of the data inputs.]  An auditor should answer [this] question first.  Only after identifying improper payments can the auditor determine and assess the magnitude of their impact and derive a meaningful error rate."  *Id.* (emphasis in original). By focusing on the net dollar difference in claim determinations rather than the actual number of claims with calculation mistakes, the McGladrey Report can mistakenly be read to portray the CSSP as near-perfect — when the known data demonstrates to the contrary.

**Fourth**, in calculating the CSSP's claims processing error rate, McGladrey inexplicably disregarded thousands of errors totaling hundreds of millions of dollars. Specifically, it is known and cannot be reasonably disputed that BP or the plaintiffs for that matter have appealed hundreds of CSSP awards.  In those appeals, the facts are that the Appeals Panel (and parties) have uncovered a large body of errors, including errors in many cases confessed to by claimants.  Jeffrey Hanhan, a Finance Operations Manager at BP familiar with the claims process, reviewed the McGladrey Report and identified the conspicuous absence of any reference to the multitude of CSSP errors noticed and awards reversed by the Appeals Panel.  Exhibit 4 (Hanhan Decl.) at ¶ 5.  Mr. Hanhan explains that "the findings of error to date are far from negligible and have resulted in far more than $17 million in overstated awards."  Ex. 4 at ¶ 8.

In addition, the CSSP committed thousands of errors involving hundreds of millions of dollars by erroneously failing to require claimants to match variable expenses and revenue, as the Fifth Circuit held.  But McGladrey did not account for any of this oversight in its error rate calculations.  Ex. 4 at ¶ 11.  The CSSP "has returned approximately 1,400 previously

granted awards for application of Policy 495 because the CSSP failed to properly match the claimant financial data.  The total value of these awards was almost $800 million." Ex. 4 at ¶ 9.  Mr. Hanhan makes clear that "[i]f the McGladrey Report is intended to be a comprehensive review of the CSSP, it does not provide a full and fair picture as it fails to note any of the thousands of errors — adding up to hundreds of millions of dollars — uncovered by the Appeals Panel, acknowledged by claimants and/or associated with claims that have been remanded for re-calculation pursuant to Policy 495." Ex. 4 at ¶ 11.

*Finally*, the suggestion that the CSSP's calculations have been 99.5% correct ignores the large number of routine "Documentation Deficiencies" identified by McGladrey.  In fact, 8.2% of the claims McGladrey reviewed had document deficiencies.[7]  Taken together, McGladrey's calculations of how often the CSSP incorrectly processed a claim (6.6%) and how many claims had a Documentation Deficiency (8.2%) reveal that as many as 14.8% of the claims were determined incorrectly — and that does not even account for the lack of any quality control review of the accuracy of the input data, as noted above.  *See* Ex. 3 at ¶ 20.[8]

The documentation errors identified are also highly financially significant.  McGladrey acknowledges that the documentation errors they identified totaled to *$538 million in* "*over-determinations.*"  Ex. 3 at ¶ 19.  Yet McGladrey occasionally minimizes the significance of claimants approaching the CSSP with faulty documentation, "draw[ing] no

---

[7] McGladrey defines as Documentation Deficiencies "instances where required documentation was either *missing from the files or did not meet prescribed requirements*."  McGladrey Report at 6-7 (emphasis added).  Notwithstanding missing or deficient documentation, "McGladrey's process resulted in the full value of the claim being assigned to the majority of claims for which it found a Documentation Deficiency."  Rec. Doc. 13717-1 at 4.

[8] Although the actual total may be lower because of overlap, "McGladrey has not provided BP the information necessary to calculate the true total of those two types of errors" and thus draw a more precise conclusion.  Ex. 3 at ¶ 20.

conclusion as to whether a Documentation Deficiency had any impact on the amount of the award." McGladrey Report at 7.

### C.     McGladrey Did Not Complete its Audit of the CSSP.

McGladrey, unfortunately, did not complete the full scope of the audit ████████

████████████ *See* Ex. 3 at ¶¶ 23-25. ████████████████

██████████████████████ BP requests that this Court direct McGladrey to fully satisfy the agreed-upon scope of the audit for which it already has been paid. ████████████

One important area of CSSP operations that the McGladrey Report did not address is the risk of fraud. *See* Ex. 3 at ¶¶ 23-26. ████████████████

████████████████████████████

██████████████████████ Arguably one of the most fundamental risks that arises in claim processing is approval of fraudulent claims. *See* Ex. 3 at ¶ 24.  But the McGladrey Report does not address this issue, leaving BP, Class Counsel, and the Court without a reasonable understanding of all that the CSSP is or is not doing to mitigate the risk of fraud. *See* Ex. 3 at ¶ 23.

Nor does the McGladrey Report address whether the CSSP has properly adhered to the terms of the Settlement Agreement. One of the primary objectives of McGladrey's audit was

██████████████████████████████

██████████████████████████████

████ ██ ████ ███ ███ ██████ ███ ████ ██ ████

████ ████████████ McGladrey, however, focused its efforts on reporting only the mechanical math-checking exercise, ignoring the underlying issue of



whether the claim determinations were calculated in accordance with the agreed-upon Settlement terms. *See* Ex. 3 at ¶¶ 12, 14. For example, McGladrey appears to have accepted without question the claims data as reported by claimants; from there, McGladrey simply determined whether the CSSP correctly added up that data in its claims calculations. As Mr. Hutchins explains, this creates a substantial misimpression that the CSSP's error rate is lower than it truly is. However, even though McGladrey's math was correct, its preliminary use of unconfirmed data renders its final conclusion potentially unreliable. *See* Ex. 3 at ¶ 14. The McGladrey Report, in short, reflects little more than an exercise in mathematical compliance (what Mr. Hutchins calls a "mere 'tick-and-tie' exercise," *see id.*), leaving unaddressed the important question of whether the data used by the CSSP is actually appropriate.

It also should be observed that ████████████████████████████ ██████████████████████████████████████████████████ ██████████████████ In fact, the CSSP and/or Claims Administrator clearly had discussions with McGladrey to review McGladrey's findings and and perhaps to determine which of those findings would be included in the final reports. *See, e.g.*, McGladrey Report at 2 ("In those instances where we determined that a matter of interpretation of the Settlement Agreement was necessary in order for us to properly evaluate a potential finding, interpretive guidance was requested of, and provided by, the CAO [Claims Administrator's Office]." As a result, KPMG's Hutchins concluded that McGladrey was not operating in a truly independent fashion. *See* Ex. 3 at ¶ 4. The purpose of the McGladrey Report was to audit the CSSP, not to take its representations as a given.

McGladrey should be directed to satisfy the full scope of the audit that it contracted to complete. ██████████████████████ McGladrey should be required to assess both the

17

appropriateness of the anti-fraud measures the CSSP put in place and the CSSP's compliance with the terms of the Settlement Agreement.

## CONCLUSION

For the foregoing reasons, BP requests that

**(A)** The Court direct the CSSP and McGladrey to produce to Class Counsel, the Court, and BP the following materials:

1. any ad hoc reports as referred to in ████████████████████████

2. the weekly status reports also referred to in ███████████

3. any interim, preliminary, or draft reports (including thirty-day written reports);

4. the CSSP's Task Orders to McGladrey LLP, █████████████████████

5. any separate Key Performance Indicators, █████████████

6. any correspondence to or from the CSSP or its agents to McGladrey in connection with any of the foregoing items; and

7. all accounting/accountant work papers of any other kind generated by McGladrey LLP at any time ███████████████████ including those used to produce (a) the reports filed into the public record on November 25, 2014 and/or (b) any of the materials referenced above.

**(B)** The Court should also (1) direct the CSSP to strictly comply with each of the Settlement's documentation requirements; (2) require McGladrey to recalculate and/or restate all appropriate error rates, including those stemming from documentation errors and misinterpreting the text of the Settlement Agreement; and (3) order McGladrey to complete the full scope of its audit and produce the results of same to the Court, the CSSP, BP, and Class Counsel simultaneously.

**(C)** Finally, the Court should direct the CSSP to implement the corrective actions and other reforms counseled by McGladrey in its audit. *See* McGladrey Report at 55-72.

December 16, 2014

Respectfully submitted,

 /s/ Don K. Haycraft

Richard C. Godfrey, P.C.
Wendy Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.;***
***BP AMERICA PRODUCTION COMPANY; AND BP P.L.C.***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of December, 2014.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft