# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * MDL NO. 2179 <br> * <br> * <br> * <br> * SECTION J <br> * <br> * |
| This document relates to: 12-970. | * HONORABLE CARL J. BARBIER <br> * <br> MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF MARK HUTCHINS

I, Mark Hutchins, am over the age of 18 and the opinions, statements, and conclusions expressed in this declaration are my own.

### Background

1. I am the Managing Partner of the Los Angeles office of KPMG LLP ("KPMG"), and I serve on KPMG's board of directors. As an Audit Partner, I started the KPMG Internal Audit practice in the Western Region. I was a Chartered Accountant, am a Certified Public Accountant in the State of California, and have more than 30 years of experience providing risk management and advisory services to companies. I hold a Bachelor's degree in Business and Economics from University College of Cardiff, Wales. A copy of my current Curriculum Vitae is attached hereto as Exhibit A.

### Scope

2. I have been retained by BP America, Inc. ("BP") to provide my analysis of the McGladrey LLP ("McGladrey") process audit reports' review of various functions within the

Deepwater Horizon Economic Claims Center ("DHECC") and across the Court Supervised Settlement Program ("CSSP"). I previously submitted a Declaration in this case and provided opinions about the Claims Administrator's operation of the CSSP. *See* Rec. Docs. 13347-38 (Sept. 2, 2014), 13370-41 (Sept. 8, 2014).

3. In order to reach my opinions, I reviewed and considered materials including the following: (a) the five McGladrey process audit reports dated November 7, 2014, pertaining to the following functions: Claims Review, Vendor Compliance, Financial Controls, CSSP Management and Design, and Vendor Governance and Oversight (collectively, the "McGladrey Report" or "Reports"); (b) the McGladrey Engagement Letter dated October 16, 2013 ("Engagement Letter"); (c) the McGladrey Agreement to Provide Claims Administration Staffing Services executed December 13, 2013 ("McGladrey Contract");[1] and (d) the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement").

4. McGladrey was engaged for the examination and review of certain processes and claims-related activities of the CSSP.[2] This was a consulting engagement directed by the Claims Administrator and the process reports were prepared for and delivered to the Claims Administrator among others.[3] Throughout the review, the CSSP held numerous discussions with McGladrey to review non-compliance issues and ultimately determine which findings would be included in the

---

[1] I recognize that the McGladrey Contract has been filed under seal. I have kept the Contract on a close-hold basis inside KPMG and will, of course, continue to observe its under-seal status as long as the document remains under seal.

[2] McGladrey Engagement Letter dated October 16, 2013 at 1.

[3] McGladrey Report – Claims Processing Review Report ("McGladrey Report - Claims Processing"), Rec. Doc. 13716-1 at 2, 5-6 (Nov. 25, 2014).

final McGladrey Reports.[4] To my knowledge, BP has never been made aware of the particular contents of these discussions between McGladrey and the CSSP, and thus the contents of these discussions were not available for my review. Based on the engagement structure and communication between McGladrey and the DHECC, the conclusions presented in the Reports are accordingly not the results of an independent review. *See* Audit Committee Report, Rec. Doc. 13718-1 at 2 (Nov. 25, 2014) (emphasizing that McGladrey proceeded according to "consulting standards").

5. McGladrey provided the DHECC with interim reports that summarized observations identified and provided the Claims Administrator with an opportunity to address non-compliance issues prior to the final McGladrey Report. Without the review of these interim reports, one is unable to identify all the issues of concern occurring at the CSSP. McGladrey had several discussions with management regarding all non-compliance instances and selectively determined which issues would be reported. Thus, the McGladrey interim reports may contain valuable information not contained/reported in the final Reports. Such interim reports were apparently only provided to the DHECC and therefore not available for my review.

6. In addition to the McGladrey interim reports, another source of documentation that would provide insight would be the supporting work papers. Generally, all audit reports are supported by a set of work papers that describe the procedures performed during the audit and contain the documentation necessary to link the work performed with the final conclusions of the

---

[4] *Id.* at 7 ("Held numerous meetings with the [CSSP] to discuss the facts surrounding each potential instance of non-compliance in order to determine the appropriateness of reporting the instance as a finding.").

audit report. Maintaining detailed work papers is critical for any audit review as the work papers document the design of the audit, and testing procedures, findings, comments and relevant discussions held with management (in this case, the CSSP) that could impact the results of the audit. Moreover, work papers provide insight into the underlying basis for the audit review and reflect on the reliability and quality of the work performed. Based on my experience, the documentation contained in the work paper files provides much more detailed and insightful information and should address any scope issues and discrepancies in findings or approach that might otherwise exist or appear to be unexplained.

### *Summary of Observations*

7.      The McGladrey Report concluded that "on an aggregate basis, the claims award calculations are 99.5% correct."[5] Accordingly, the McGladrey Report suggests that the CSSP is currently processing claims at a 0.5% error rate; however, this is a misleading calculation for several reasons. First, this purported error rate focuses on the net dollar value of faulty claims rather than the actual number of faulty claims processed. The latter approach generates an error rate over 6.6%. Based on the information provided in the Reports, it is unclear how McGladrey calculated the error rate as they did and why other deficiencies which, if addressed, would have led to a higher error rate, were not considered in this calculation. It is important to note that a 0.5% error rate as framed by McGladrey does not translate to claims being processed correctly 99.5% of the time. In fact, and as discussed below, even the data in McGladrey's Report indicates a significantly higher error rate without consideration of other factors that are relevant to

---

[5] *Id.* at 81.

determining the accuracy of claims determinations, including whether the Claims Administrator properly applied the terms of the Settlement Agreement and whether fraudulent claims were paid.

8. Even after reviewing the McGladrey Report, I cannot reach my conclusions with sufficient certainty because I did not have access to critical information such as the interim reports and work papers. Without reviewing the interim reports and work papers generated during an audit such as McGladrey's, it is difficult for any subsequent reviewer to fully understand the methods, approach, and procedures behind the initial audit.

9. The McGladrey Report not only fails to review the potential for fraudulent claims and whether the Claims Administrator properly applied the terms of the Settlement Agreement, it also fails to incorporate the significant documentation and computer system deficiencies important to evaluating the error rate related to claims processing. Accordingly, I believe this 0.5% is not an accurate representation of the actual error rate.

10. In fact, in my opinion, the Reports do not support McGladrey's overall conclusions. Based on my review and analysis of the referenced materials, I have made the following observations:

  A. The McGladrey process audit failed to review all aspects of claims processing, and accordingly, McGladrey's conclusions should not be taken as a comprehensive reflection of the true state of the CSSP processing program.
     i. The 0.5% error rate does not appropriately represent how accurately the CSSP is processing claims.
     ii. The McGladrey Report failed to independently review whether claims were processed in accord with the terms of the Settlement Agreement.
     iii. The McGladrey Report failed to examine the CSSP's capacity to detect fraud — a significant and problematic risk in claims processing.
  B. McGladrey identified numerous IT and internal control deficiencies which confirm the existence of ongoing problems with the operation of the Settlement Program.

C. The McGladrey Report does not address the significant issues about the CSSP raised in my prior Declaration.

*Basis for Observations*

11.     The McGladrey Report noted many deficiencies of the CSSP throughout its five underlying Reports, but ultimately determined that claim award calculations were 99.5% correct. (The McGladrey Report concludes that this supposed 0.5% error is "low by objective measure.") This purported, but not supported, high level of accuracy is inconsistent with the Report's other findings. Furthermore, the McGladrey Report disregarded a critical factor of claim accuracy by failing to test for data authenticity and the prevalence of fraud.

12.     The McGladrey Report fails to evaluate whether the Claims Administrator actually applied the terms of the Settlement Agreement properly to the audited claims. Instead, it appears that all McGladrey did to support their conclusion that the claims are supposedly 99.5% accurate is determine whether the Claims Administrator correctly added up the claims data reported by the claimants and on that basis reached the right payout figure. It is as simple as this: *when you put the wrong numbers into an equation, your ensuing calculation may be correct, but your answer is still going to be wrong.* It is therefore unclear how one could assert, based only on the information contained in the McGladrey Report, such a high level of accuracy or draw any concrete conclusions. Indeed, even McGladrey's own findings show that the error rate is significantly higher than 0.5%.

### A. The McGladrey process audit failed to review all aspects of claims processing, and accordingly, McGladrey's conclusions should not be taken as a comprehensive reflection of the true state of the CSSP processing program.

13. In my experience, an adequate audit of the claims process review would, at a minimum, include a focus on the following areas:

  i. Review to test the mechanical computation of claims;
  ii. Evaluation of the claims files to ensure all documentation requirements are satisfied;
  iii. All claims to determine whether they were processed in accordance with the terms of the Settlement Agreement; and
  iv. All claims for any indications of fraud.

A claims audit process review lacking any one of these components would be inadequate and would lead to incomplete and inaccurate conclusions. After McGladrey completed the first step, it stopped and formulated its conclusions. McGladrey instead should have proceeded in accordance with this methodical, step-by-step process to determine whether claims are being processed correctly.

### i. Mathematical review of the claims process

14. Judging by the McGladrey Report, McGladrey focused its claim review audit on the accuracy of the mechanical calculations of claim determinations, rather than on whether the CSSP properly applied the terms of the Settlement Agreement. The McGladrey review is therefore merely a compliance exercise to determine whether the CSSP "added up" the claim information correctly (what I would refer to as a mere "tick-and-tie" exercise). In other words, it was a checklist review performed according to the Claims Administrator's interpretation of the Settlement Agreement and without questioning whether some claims information was tainted by fraud. As a result, the purported error rate calculated by McGladrey only represents whether the

claim information was computed properly by the Claims Administrator, *according to the Claims Administrator's reading of the Settlement Agreement,* and does not support McGladrey's unqualified conclusion that the CSSP is 99.5% accurate. Thus, if the Claims Administrator did the mechanical calculations correctly based on the data submitted by a claimant (whether accurate or inaccurate), McGladrey would have logged this transaction as correct. However, this approach completely ignores both the fact that the data being relied on for purposes of the Claims Administrator's calculations could have been erroneous (or even fraudulent) in some situations and the prospect that in certain cases the Claims Administrator could be misinterpreting the Settlement Agreement.

15.  The calculation of a 0.5% error rate in claim calculation is misleading because it is based on the extrapolation of the *net dollar difference* in claim determinations. More salient is the actual *number of claims* identified as having calculation errors – a striking 6.6%.[6] These two different error rates answer different questions. The dollar difference between what the CSSP paid and what it should have paid (without correcting underlying flaws like documentation deficiencies) answers *how wrong* the CSSP's errors were, on a net basis. By contrast, the 6.6% figure answers *how often* the CSSP improperly paid a claimant. An auditor should answer the latter question first. Only after identifying improper payments can the auditor determine and assess the magnitude of their impact and derive a meaningful error rate.

16.  It is unclear why the McGladrey Report focused on the net dollar extrapolation as opposed to the actual number of faulty calculation findings. The information contained in interim

---

[6] McGladrey Report – Claim Processing at 11.

reports, work papers generated during the audit, and any records of DHECC and McGladrey discussions would provide some clarity. I am uncertain why this approach was selected because identifying the number of claims with calculation errors would be the preferred and better approach. If the purpose of the review is to determine whether claims are being calculated correctly, any dollar value discrepancy is a calculation error. But under McGladrey's net dollar-value approach, two errors of $1,000, each in opposite directions, would net to $0, and thus appear to suggest perfection in the CSSP's processing, even though the opposite is true. This example illustrates the flaws in focusing on net dollar values rather than on the number of actual errors. Alternatively, McGladrey could have calculated the absolute value of all errors when summed together. Instead, McGladrey decided to net overpayments and underpayments together, which understates the true error rate.

17. As such, McGladrey's 99.5% figure does not properly reflect the CSSP's computation accuracy and 6.6% is a more relevant and accurate representation of the computation results, even based on, as noted above, the flawed approach. Again, however, even a 6.6% error rate only factors in computational errors — it does not include any evaluation of fraudulent claim submissions or misinterpretations of the Settlement Agreement. If an overall comprehensive total error rate were being produced, the CSSP's operations would be exceeding even the 6.6% error rate applicable to computational errors alone.

    ii.    **Documentation requirements**

18. McGladrey also reviewed claim information to determine whether claims provided sufficient documentation to comply with the terms of the Settlement Agreement. Yet McGladrey's

0.5% error rate calculation does not factor in the Documentation Deficiencies, which McGladrey characterized as "instances where required documentation was either missing from the files or did not meet prescribed requirements."[7] Clearly, the Claims Administrator could err not just in number-crunching calculation exercises but also by (a) inputting suspect, fraudulent, or inaccurate data; (b) using incomplete data; and/or (c) misinterpreting and/or misapplying the terms of the Settlement Agreement methodology to the actual claims calculation. The Claims Administrator's reversal by the Fifth Circuit in October 2013 as to the revenue/expense matching issue is the most prominent example of category error, and that error alone affected thousands of BEL claims, which tend to involve a larger quantity of higher dollar-value claims than many other types of claims processed by the claims facility.

19. McGladrey reports that 8.2% of the sampled *paid* claims contained Document Deficiencies.[8] Based on the sample results, this translates to approximately $538 million[9] of total claim amounts in what McGladrey characterizes as over-determinations.[10] Providing proper documentation is integral to determine claimant eligibility and understanding the underlying basis for the claim determination. McGladrey identified instances where claims lacking the required documentation were approved and paid. The observation that the CSSP approved over $530 million for claims that do not satisfy the Settlement Agreement document requirements does not

---

[7] *Id.* at 9-10.

[8] *Id.* at 34.

[9] *Id.* at 35.

[10] According to the McGladrey Report, "[b]y Definition, Document Deficiencies are over-determinations and cannot be less than the total value of findings identified in our sample." McGladrey Claim Review Process Report at 32.

support a 0.5% error rate in claim determinations. The 8.2% of claims with document deficiencies must be considered when reviewing the accuracy of this claims process.

20.  Both the computation analysis and document deficiency review were calculated based on the underlying assumption that the claim documentation was correct and reliable. Thus, using McGladrey's own reported data, as many as 14.8% (6.6% calculation errors + 8.2% document deficiencies) of the claims were not determined correctly. I recognize that the real total of both types of errors is likely lower because there may be claims with both a document deficiency and a calculation error. However, McGladrey has not provided BP the information necessary to calculate the true total of those two types of errors. In order to make such a determination I would need to review the McGladrey interim reports and supporting work papers.

iii.  **Issues pertaining to the Claim Administrator's application of the terms of the Settlement Agreement**

21.  McGladrey excluded discussion of interpretive issues of the Settlement Agreement from its analysis and simply relied upon the interpretive guidance by the Claims Administrator. Deferring to the interpretive guidance of the Claims Administrator does not provide any insight as to whether the claims were actually processed and paid appropriately. This approach only confirms that the claims processed are consistent with the Claims Administrator's application of the terms of Settlement Agreement, which is most likely the methodology the CSSP applied. In order to validate any of the claim review results, one must first understand the interpretive guidance provided by the Claims Administrator — however, this information was not provided in the Reports. Without knowing how McGladrey applied the terms of the Settlement Agreement, it is impossible to conclude whether the procedures were performed correctly and whether the results

obtained are consequently valid. This further evidences that McGladrey just performed the mathematical, tick-and-tie compliance audit I described above.

22. I would expect to find information shedding light on these questions in the interim reports, supporting work papers, and other communications between McGladrey and the Claims Administrator. Given that the Claims Administrator has misinterpreted the Settlement Agreement in the past — most notably the BEL misinterpretation discussed above — it is my opinion that any evaluation of the accuracy of claims processing must include whether the Claims Administrator correctly applied the terms of the Settlement Agreement. If the Claims Administrator is not doing so, then he would also be paying out in error any claim determined through such misinterpretation. And an error rate based on misinterpretations of that nature should have been calculated.

iv.  **Fraud detection and prevention**

23. The scope examined by the McGladrey Report pertaining to claims review is inconsistent with █████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████ ██████████████████
████████████████████████████████████████
████████████████████████████████████████

▪ ██████████████████████████████████████

▪ ████

███████████████████████████████████████████████████████████ The Reports therefore omitted an integral fraud assessment ███████████████████████████████ ██████████████████

24.     A significant risk for a claims processor is the existence of fraudulent claims attributable to falsified documents or fictitious information. Review for fraud is critical to any claim review process. The claim review process performed by McGladrey did not examine the CSSP's ability to detect errors and fraud, and it did not scrutinize the Settlement Program's fraud prevention procedures. For example, claims were processed and approved based on tax returns that were not filed with the IRS,[13] a clear indication that fraud procedures were not adequately implemented by the Claims Administrator. A simple verification process would have identified this deficiency, a potential indicia of fraud. Since the McGladrey Report did not evaluate this significant risk, any type of assessment to determine if the claims were processed correctly was incomplete. Accordingly, any conclusions drawn from McGladrey's partial review must recognize that the Reports did not account for intentional fraud or even accidental misreporting by claimants.

25.     ████████████████████████████████████████████ ████████████████████████████████████████ Even though the McGladrey Report did not adequately evaluate all aspects of the claims processing ████████████ █████████, the CSSP nevertheless elected to rely on the results and disregard the failure of the Report ██████████████████████████████████████. In order to sufficiently review for claim

---

[13] McGladrey Report – Claim Processing at 63.

█████████████████████████████████████
██.

accuracy, the results of a fraud review must be considered. Until such review is performed and completed, any judgment as to an overall error rate is premature.

26. Based on my review of the McGladrey Report, the 99.5% accuracy calculation does not reflect the true state of the claims review process because it does not include known document deficiencies, is unable to capture the element of fraud, and does not address itself to the Claims Administrator's potential misinterpretation of the Settlement Agreement (particularly given the large volume of matching errors the Claims Administrator was ordered to correct). As McGladrey stated, document deficiencies by definition are over-determinations. *See supra* n.10. They therefore reflect a claim determination error, and should be appropriately included in an adequately conducted review for claim accuracy. The 0.5% error rate only represents a calculation review and, standing alone, is a highly flawed, misleading, and incomplete measure of CSSP accuracy. As discussed above, looking solely at McGladrey's own data on claims calculation errors and document deficiencies (but not factoring in fraud and proper application of Settlement Agreement terms), the actual error rate could be as high as 14.8%. The true comprehensive error rate could thus be significantly higher than approximately 15%. An error rate of that magnitude entirely contradicts the Claims Administrator's assertion in the response he provided to the audit that "McGladrey's Report reveals that the CSSP is processing and paying claims correctly."[15]

### B. McGladrey identified numerous IT and internal control deficiencies which confirm the existence of ongoing problems with the operation of the Settlement Program.

27. Notwithstanding many vendor and process deficiencies indicating a weak internal control environment and data integrity concerns, McGladrey concluded that the CSSP program is

---

[15] Rec. Doc. 13717-1 at 1.

"well-designed and appropriate."[16] Several of the vendor and process observations adverse to the CSSP presented in the McGladrey Report are consistent with the findings of prior internal and external reviews.[17] Based on the observations provided in the McGladrey Report, it is therefore unclear how McGladrey concluded that the CSSP program is "well-designed" or "appropriate." Without reviewing McGladrey's interim reports and work papers, I am unable to ascertain what was discussed with the Claims Administrator to resolve the numerous high and moderate risks identified by McGladrey. Also, it is unclear whether the DHECC reported all non-compliance issues in the Reports.

28.   According to the McGladrey Report, the CSSP claim system continues to exhibit serious security and claim processing problems. McGladrey initially requested claim information as of September 30, 2013. However, the CSSP was unable to provide the information as of September 30, 2013, because the data was not retained. This indicates a clear problem with data extraction from the computer system. In addition, McGladrey observed, among many other issues, (1) the ability to manually override the claim system, (2) a lack of audit trail for change control, (3) system access issues with the claims portal, and (4) the inability to monitor the end-to-end claim review process. Most importantly, McGladrey identified an inability to reconcile paid claim-data, which McGladrey classified as a high-risk area.[18] Reconciling claims information is a fundamental requirement for proper claims processing. When the various systems reflect different

---

[16] McGladrey Report – Management and Design – CSSP Operations, at 2.

[17] Prior reports include: CliftonLarsonAllen Financial Audit and Process Reports; Claims Administrator Interim File Review Quarterly Reports and the IBM Claims Management System Assessment Report dated December 20, 2013.

[18] McGladrey Report – Process Review Financial Controls, Rec. Doc. 13716-3 at 8.

claims data and the systems are not reconciling the information, the risk of incomplete or inaccurate information increases. A properly functioning and secure IT system is critical for operating a claims processing facility. Processing claims with a system with so many known issues could affect the accuracy of claim information and ultimately claim determination.

29. The CSSP also failed to implement a standard quality assurance (QA) and quality control (QC) report. McGladrey discussed in two of the five reports a lack of a formal QA/QC report that is prepared on a periodic basis.[19] These procedures are required by the vendors pursuant to the vendor service agreements. QA/QC steps test whether claims are being processed properly; however, without a routine QA/QC assessment and documentation of the results, it is unclear if these procedures were performed. The lack of a QA/QC process reflects weak internal controls and lack of vendor compliance. Based on my experience, it would be expected for a "well-designed" claim processor to implement a periodic QA/QC process that is documented and tested to ensure all identified control issues are resolved in a timely manner — however, this was not performed by the CSSP here.

### C. The McGladrey Report does not address the significant and problematic issues about the CSSP raised in my prior Declaration.

30. In September 2014, I submitted a declaration with my key concerns regarding the issues at the CSSP, yet the McGladrey Report does not satisfy my concerns. In fact, *none* of my

---

[19] McGladrey Report – Process Review Vendor Compliance, Rec. Doc. 13716-2 at 20 and Process Review Vendor Oversight and Governance, Rec. Doc. 13716-5 at 6.

prior opinions about the issues at the CSSP have been alleviated by the McGladrey Report.[20] These include:

    a) The Claims Administrator failed to establish an adequate internal control structure utilizing a widely accepted internal control framework.

    b) The Claims Administrator failed to conduct even a basic risk assessment. As a result of this failure, the Claims Administrator did not identify the high risk areas to address and monitor.

    c) The Claims Administrator failed to implement an effective internal audit function, which includes an adequate process audit, and failed to obtain a form of systematic assurance that the Vendors' control environment met expectations.

    d) The Claims Administrator failed to implement an information technology ("IT") system with appropriate or adequate security and controls. The poor internal control environment surrounding the IT system results in a higher risk of fraudulent and inflated claim determinations as demonstrated in the IBM and Freeh Reports.

    e) The Claims Administrator failed to require the Vendors to perform the tasks outlined by their respective service agreements. No evidence indicates that control and performance indicator procedures were completed by the Vendors and/or required by the Claims Administrator. This precluded the Claims Administrator from determining whether the Vendors operated efficiently or in compliance with the terms of their agreements.

The McGladrey Report only reaffirms my concerns about the CSSP. A private enterprise faced with problems of this magnitude would move to correct them expeditiously.

## *Conclusion*

31. Based on my review of the McGladrey Report, it would be premature to draw any final claims processing conclusions without a complete understanding of procedures performed through a review of interim reports and work papers. The current Reports fail to review the element of fraud or incorporate the significant document and system deficiencies when evaluating the error rate related to claims processing.

---

[20] Rec. Docs. 13347-38, 13370-41.

32. The deficiencies identified in the McGladrey Report confirm my opinions set forth in my previous declaration submitted in September 2014 (ordered to be filed under seal, *see* Rec. Doc. 13432 (Sept. 24, 2014)). The information provided by McGladrey does not dispute or negate any of the problems I previously identified. The Claims Administrator therefore failed to establish an adequate internal control structure, failed to implement proper IT system security and control, and continues to struggle with monitoring vendor performance and compliance.

I declare under penalties of perjury that the foregoing is a true and correct statement of my findings, observations and opinions.

By,

*/s/ Mark Hutchins*

Mark Hutchins
As of December 16, 2014