# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to: 12-970. | * * * | HONORABLE CARL J. BARBIER <br> MAGISTRATE JUDGE SHUSHAN |

### DECLARATION OF JEFFREY W. HANHAN

I, Jeffrey W. Hanhan, am over the age of 18 and the opinions, statements, and conclusions expressed in this declaration are my own.

*Background*

1. I am a Finance Operations Manager at BP America. Before that I was a manager in the Advisory Practice of KPMG LLP ("KPMG"), an audit, tax, and advisory firm. I have ten years of experience. I hold a Bachelor's degree in Finance and Accounting from Texas A&M University's May Business School. And I hold an MBA with specializations in corporate finance and global business from New York University's Leonard N. Stern School of Business. Since August 2010, I have been engaged exclusively in the claims evaluation and management process stemming from the *Deepwater Horizon* incident. My current role includes oversight and management of BP's internal process to review and appeal claims determinations awarded under the Court Supervised Settlement Program ("CSSP").

*Scope*

2. In this declaration I provide my analysis of the McGladrey LLP ("McGladrey") process audit reports' review of various functions within the Deepwater Horizon Economic Claims Center ("DHECC") and across the CSSP. I previously submitted a Declaration (dated Nov. 21, 2012) in this case regarding objections filed in relation to the Economic and Property Damages Class Action Settlement. *See* Rec. Docs. 7998-3 (Nov. 23, 2012) & 8001-1 (Nov. 26, 2012).

3. To reach my opinions, I reviewed and considered materials including the following: (a) the five McGladrey process audit reports dated November 7, 2014 pertaining to the following functions: Claims Review, Vendor Compliance, Financial Controls, CSSP Management and Design, and Vendor Governance and Oversight (collectively, the "McGladrey Report" or "Reports"); (b) the McGladrey Engagement Letter dated October 16, 2013 ("Engagement Letter"); (c) the McGladrey Agreement to Provide Claims Administration Staffing Services executed December 13, 2013 ("McGladrey Contract");[1] (d) the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"); and (e) many decisions and findings of the Appeals Panel with respect to the CSSP's processing of claims.

4. I was not able to review the interim reports McGladrey provided the DHECC throughout the course of the review and the supporting work papers. I could not review these documents because none of them have been made available to BP; hence, none of them were made available to me.

---

[1] I know that the McGladrey Contract is currently under seal and I have and will continue to treat it accordingly.

5. McGladrey provided the DHECC with interim reports that summarized observations identified and provided the Claims Administrator with an opportunity to address non-compliance issues prior to the final McGladrey Report. *See* McGladrey LLP Claims Processing Review Report, Rec. Doc. 13716-1 at 7 (Nov. 25, 2014); *see e.g., id.* at 2, 5, 7, 55-56. These interim reports appear to have only been provided to the DHECC. Without the review of these interim reports and associated papers, I cannot determine with certainty whether McGladrey ever considered the decisions and findings of the Appeals Panel and other findings of CSSP error when reaching its conclusions regarding the CSSP's accuracy, though the final McGladrey Report does not indicate that such issues were considered.

6. Audit reports, such as the McGladrey Report, are typically supported by a set of work papers that describe the procedures performed and contain the documentation necessary to link the work performed with the final conclusions of the audit report. Work papers are a critical part of any audit review because they reveal the mechanics of the audit. Generally, work papers document the audit's design and testing procedures and findings, as well as relevant discussions between the auditor and management that could affect audit results. Work papers also reflect the reliability and level of independence of the work performed. Work papers can provide a detailed view into the proceedings of the audit that are not always reflected in the final report.

*Observations*

7. The McGladrey Report concludes that the CSSP's claims processing has been 99.5% correct — an error rate of only 0.5%. Accordingly, based on extrapolation, the McGladrey Report concludes that there have been only $17 million in overpayments. This

conclusion does not provide the full picture for a variety of reasons, including the fact that it does not appear to take into account the large volume and magnitude of errors in claims processing that have been identified to date.[2]

8. The findings of error to date are far from negligible and have resulted in far more than $17 million in overstated awards. In fact, the Appeals Panel has found and other experience has revealed that the CSSP has committed thousands of errors in processing claims, well in excess of $17 million. The following are several examples of CSSP errors which, in their entirety, reveal problems far greater than suggested in the final report :

a. The En Banc Appeals Panel held that the Settlement Program issued more than $44 million in erroneous awards to a single wetlands claimant and therefore reversed the awards in their entirety. The En Banc Appeals Panel found that the claimant is excluded from the Settlement and thus not entitled to any compensation under the Settlement Agreement.

b. One claimant voluntarily agreed to a more than $8 million reduction in light of substantial evidence in the record that the claimant was an excluded defense contractor. [XXX75]

c. The Appeals Panel reversed or remanded more than $3.6 million in erroneous awards to the developer of a condominium building under the Coastal Real Property Damage framework. The award that was remanded was ultimately found to be non-payable by the Administrator, meaning that the entire $3.6 million awarded by the

---

[2] Rec. Doc. 13716-1 at 81 n.1 ("This cited error rate addresses the processing of claims at the stage *prior to the settlement program's appeals process.*") (emphasis added).

CSSP was ultimately determined to be in error. The developer did not own the units in question and therefore was not eligible for any compensation. [XXX60 & XXX97]

d. The Appeals Panel held that the Claims Administrator erred in his calculation of a start-up BEL award, resulting in an overstatement of the award by $1.6 million. [XXX64]

e. The Appeals Panel reversed an award of more than $1.4 million to a company that cleans refinery tanks because the claimant was excluded from the Settlement Agreement. [XXX77]

f. One claimant agreed to a $1.1 million reduction in its oyster leasehold award in light of the Settlement Program's failure to deduct prior payments. [XX29]

g. The Appeals Panel ordered an $850,000 reduction in a BEL award granted to a claimant in light of the Settlement Program's misclassification of multiple expenses. [XXX29]

h. The Appeals Panel held that the Claims Administrator's misclassification of a transportation company's maintenance-of-way expenses resulted in an award that was overstated by $775,000. [XXXX49]

i. One claimant agreed to a more than $700,000 reduction in its seafood claim due to the Settlement Program's failure to deduct prior payments. [XX52]

j. The Appeals Panel held that the Claims Administrator incorrectly designated a claimant as a "Zone A" claimant rather than a "Zone D" claimant, thereby improperly overstating the award by more than $500,000. [XXX15]

k. The Claims Administrator overstated one claimant's award by more than $400,000 by erroneously utilizing financial records that had already been used in the calculation of one of the claimant's other claims. [XXX50]

l. The Claims Administrator made multiple errors in calculating one IEL award, leading to a more than $200,000 reduction in the award. [XX55]

m. One claimant acknowledged that the Settlement Program mishandled bad debt entries and misclassified certain expenses, resulting in a $190,000 overstatement of the BEL award. [XXXX02]

n. The Appeals Panel ordered a more than $150,000 reduction in the calculation of one claimant's BEL award due the misclassification of certain expenses. [XXX86]

o. The Appeals Panel ordered a more than $115,000 reduction to one claimant's BEL award due to the Settlement Program's failure to account for VoO expenses as required by the Settlement Agreement. [XXX10]

p. The Appeals Panel reversed in its entirety a $112,000 award to a subsistence claimant, who worked as a full-time welder earning more than $90,000 per year, because the Panel found the claimant's allegations "incredible." [XXXX79]

q. The Appeals Panel reversed in its entirety a $62,000 BEL award, finding that the claimant was an excluded real estate developer. [XXXX72]

9.  *Furthermore, the CSSP committed errors in thousands of awards by failing to require the matching of revenue and variable expenses.*

a. The Settlement Program has returned approximately 1,400 previously granted awards for application of Policy 495 because the CSSP failed to properly match the claimant financial data. The total value of these awards was almost $800 million.

b. Prior to the Fifth Circuit's October 2, 2013 decision, the Settlement Program erroneously issued and paid more than 1,100 awards worth an aggregate value of more than $700 million without requiring sufficiently matched financial data.

10. *Moreover, the Appeals Panel has remanded more than ten million dollars in awards for further evaluation due to errors by the Settlement Program.* Examples include:

a. The Appeals Panel held that the Settlement Program had erred in its handling of a $5.6 million award to a construction company, and remanded for further evaluation. Specifically, the Appeals Panel found that the evidence indicated that the claimant operated numerous out-of-zone facilities that should have been — but were not — excluded from the BEL calculation. The Appeals Panel instructed the CSSP to explain in detail why the claimant was not a multi-facility business. [XX77]

b. The Appeals Panel remanded a $1.2 million award granted to a joint venture established solely to bid on contracts from the Army Corp of Engineers, which is part of the Department of Defense. The Panel found that the record evidence suggests that the claimant appears to be excluded from the Settlement

under the defense contractor exclusion, and remanded for a definitive determination on the issue. [XXX40]

c. The Appeals Panel remanded a BEL award of more than $400,000, finding that the Settlement Program had erroneously used the data of a related party rather than the claimant's own data. Furthermore, despite the fact that the CSSP used the exact same data to calculate awards to the claimant and related party, the Settlement Program arrived at two different award amounts, clearly indicating that the Claims Administrator does not consistently apply the Settlement Agreement methodologies. [XXX38]

d. The Appeals Panel remanded a BEL award of more than $350,000 because the Settlement Program erroneously included the financial results of out-of-zone facilities. [XXX27]

*Conclusion*

11. In calculating the CSSP's claims processing error rate, it appears McGladrey failed to account for the large volume and magnitude of errors that have been identified to date. If the McGladrey Report is intended to be a comprehensive review of the CSSP, it does not provide a full and fair picture as it fails to note any of the thousands of errors — adding up to hundreds of millions of dollars — uncovered by the Appeals Panel, acknowledged by claimants and/or associated with claims that have been remanded for re-calculation pursuant to Policy 495.

12. With access to McGladrey's interim reports and work papers, I could better assess the reasons why McGladrey reached a $17 million extrapolated overpayment amount that is not

in line with the aggregate dollar values of errors found by the Appeals Panel or acknowledged by claimants.

I declare under penalties of perjury that the foregoing is a true and correct statement of my findings, observations and opinions.

By,

_____

Jeffrey W. Hanhan

As of December 16, 2014