UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: 10-4536 | : | JUDGE BARBIER |
| | : | |
| | : | MAGISTRATE JUDGE SHUSHAN |

_____

## CLEAN WATER ACT – PENALTY PHASE

## PRE-TRIAL STATEMENT OF THE UNITED STATES REGARDING THE

## APPROPRIATE CIVIL PENALTY FOR BPXP

**Table of Contents**

I.      Introduction: BP Should Pay a Civil Penalty of $16 to $18 Billion ....................................1

II.     The Court Should Use a "Top-Down" Approach ................................................................2

III.    The Relevance of Other BP Entities ..................................................................................2

IV.     Most of the Eight Factors Do Not Merit Any Deduction from the Maximum, and Only a
        Modest Reduction Would be Appropriate for Factors that Arguably Do Favor BP ...........3

        Factor 1.      The "seriousness of the violation or violations." .........................................3

        Factor 2.      The "economic benefit to the violator, if any, resulting from the
                       violation."......................................................................................................4

        Factor 3:      "Degree of culpability." ................................................................................4

        Factor 4.      "Any other penalty for the same incident." ...................................................5

        Factor 5.      "History of prior violations." ........................................................................5

        Factor 6.      The "nature, extent, and degree of success of any efforts of the
                       violator to minimize or mitigate the effects of the discharge."...................6

        Factor 7.      The "economic impact of the penalty on the violator." ..............................9

        Factor 8.      "Other matters as justice may require." ......................................................10

V.      Conclusion .........................................................................................................................10

**List of Exhibits**

| Exh. | Description |
|---|---|
| 1 | Penalty calculation |
| 2 | BP expenses "beyond those required by the Unified Command" |

## I.      Introduction: BP Should Pay a Civil Penalty of $16 to $18 Billion.

The statutory maximum penalty for BPXP is $18 billion.[1] Given the enormity of this spill and its toll on individuals, society, and the environment, and given BP's egregious behavior, the Court should only reduce the penalty if BPXP presents valid reasons to do so, using the factors set out in the statute. But most of the factors do not call for any reduction from the maximum amount. Thus, the United States will largely adduce evidence to contradict positions that BPXP will take when seeking to reduce its penalty. For example, BPXP will argue that the violation is not "serious" because the environment was not harmed as much as had been feared. But our evidence will show that there was and is significant potential for environmental harm. Similarly, the United States will refute BPXP's claim that it is indispensable to the Gulf economy, and BPXP's contention that the Court should give BPXP "credit" for response actions funded by the BP Group, but simultaneously ignore the Group's financial resources to pay the penalty, and ignore the Group's history of risky behavior.

If ever there was a case that merits the statutory maximum, this is it. But if the Court chooses to impose less than the maximum, two factors arguably do favor BPXP at least in part: payment of a criminal fine; and expenses to mitigate the effects of the spill – above and beyond those expenses that were required by law. Notably, these actions were only taken *after* the blowout, they were actually funded by money from the BP *Group* rather than BPXP itself, and BP had its own economic motivations for taking these actions. Even generously deducting for those two factors, while deducting nothing for the other factors, should yield a penalty of more than $16 billion. *See* Exh. 1. The maximum would be appropriate; but no amount smaller than $16 billion suffices for this disastrous violation of law.

---

[1] Using $4,300 (*See* Doc. 13654) times 4.2 million barrels discharged (the number advocated by the United States in Phase Two) yields $18.06 billion, which rounds to $18 billion for ease of presentation.

## II.     The Court Should Use a "Top-Down" Approach.

To fulfill the twin purposes of CWA penalties – punishment and deterrence, *see Tull v. United States*, 481 U.S. 412, 422-24 (1987) – courts within the Fifth Circuit often use the "top-down" approach when setting the appropriate civil penalties for environmental violations.[2] Under the top-down approach, courts "begin by calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1337 (5th Cir. 1996). Here, the alternative – or "bottom-up" – approach would be inappropriate:

> The "top-down" approach starts with the maximum applicable penalty, and deducts based on the mitigating factors. The "bottom-up" approach starts at the economic benefit of a violator, and adjusts up or down based on the other … factors. Courts appear to have discretion in determining which method to adopt. In this case, no one appears to contend that [the defendant] stood to gain significantly from this explosion or even from any of the lax safety practice alleged by the Government. Accordingly, the "bottom-up" approach seems inapposite.

*United States v. Egan Marine Corp.*, No. 08-3160, 2011 WL 8144393, at *6 (N.D. Ill. Oct. 13, 2011).[3] Given BPXP's willful misconduct, the enormity of this spill and its impacts, and the comparatively miniscule economic benefit, the top-down approach clearly is the correct one here. But even if the Court chose to start at zero dollars, the first factor – the seriousness of the violations – would jump the penalty amount back up to the maximum anyway.

## III.    The Relevance of Other BP Entities.

The defendant is BPXP, and the United States neither needs nor intends to prove any sort of veil-piercing case against any of BPXP's parent corporations; yet the entire BP Group is

---

[2] *See* Rec. Docs. 12479, 12567; *see also* Rec. Docs. 12533, 12532. For an example of a top-down penalty determination, *see, e.g.*, *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 573 (5th Cir. 1996).

[3] *Egan Marine* and *United States v. Citgo Petroleum Corp.*, 723 F.3d 547, 552 (5th Cir. 2013), are the only two cases to have issued a Section 311(b)(7) judicial penalty based on the penalty factors listed in Section 311(b)(8).

*relevant* to the Court's analysis of BPXP's penalty amount. BPXP itself argues that the activities of the Group as a whole are relevant. For example, in Phase One, BPXP relied extensively on the "Group Defined Practices" to support its claim of having a good process-safety system in place. Similarly, in this Phase, BPXP will ask the Court to give credit for all response actions, which were of course funded by the Group, not by BPXP itself. BPXP also has touted its "lessons learned" from the spill, and its various promises to "never do this again." But that story – often told by the BP Group entities – played out at the Group level, not at the BPXP level.

Early in this Phase, the United States asked the Court to rule that there was already sufficient evidence of the interrelationships among the various BP entities such that the issue was established. [Rec. Doc. 12355]. Because BP opposed that motion, we will present evidence in this Phase regarding BPXP's relationships to other BP entities, not to pierce the veil, but to demonstrate that the information is relevant to the Court's consideration of BPXP's penalty. Specifically, **Fred Quivik** will opine that BPXP was treated as part of the Group, and indeed had no employees to either drill the well or respond to the spill. **Ian Ratner** will demonstrate that BPXP is operationally inextricable from the BP Group, ████████████████████████████ ████████████████████████████████████████████ ████████████████ Finally, a handful of exhibits (without a witness) will demonstrate the BP family's history of major environmental violations.

## IV.    Most of the Eight Factors Do Not Merit Any Deduction from the Maximum, and Only a Modest Reduction Would Be Appropriate for Factors that Arguably Do Favor BP.

**Factor 1 (The "seriousness of the violation or violations").** The United States has briefed this factor several times. *See* Rec. Docs. 12373 & 13728. As explained in those filings, under the CWA, the mere presence of *potential* harm can establish seriousness, and a showing of

3

*actual* harm is not required. Thus, the United States will present testimony demonstrating actual, known, and potential adverse impacts of the spill, including: **Dr. Richard Clapp** (human health); **Dr. Diane Austin** (societal impacts); **Dr. Charles Mason** (private economic interests); **Drs. Don Boesch and Stanley Rice** (environmental), and **Adm. Meredith Austin** (governmental). These experts will refute BP's claim that there has been a full recovery with no future risks and will document extremely serious harms to the physical and human environment – all of which clearly refute BP's argument for a downward departure from the maximum penalty. The United States asks the Court not to make definitive findings quantifying future harms, however, as those issues delve quickly into the assessment of natural resource damages ("NRD").

> **Factor 2 (The "economic benefit to the violator, if any, resulting from the violation").** The Court's Phase One Findings discuss BP's cost-cutting decisions (*e.g.*, saving money by not conducting the cement-bond log). Therefore, the United States will present no additional evidence on this factor during the Penalty Phase trial. In our post-trial papers, we can point the Court to BP's specific cost-cutting errors. As the Court well knows, had BP not sought to scrimp on safety and save a relatively tiny amount of money, the entire disaster might have been averted. As explained above (at page 2, quoting *Egan Marine*), because this is not a case in which the civil penalty is primarily a device for forcing a defendant to disgorge its ill-gotten gains, the Court should apply the "top down" approach and look to the other factors in setting the penalty amounts here.

> **Factor 3 ("Degree of culpability").** The United States will present no new evidence on BP's culpability for the Macondo blowout and oil spill. The existing Phase One Findings and the

Phase Two record robustly demonstrate BP's culpability.[4]

      **Factor 4 ("Any other penalty for the same incident").** BP might argue that the entirety of its $1.256 billion criminal fine should be deducted from the civil penalty, but that result is not appropriate. First, as Judge Haik ruled, the Court must "consider" the criminal fines, but is not required to offset the civil penalty by the exact amount of the criminal fine. *United States v. Citgo Petroleum Corp.*, 697 F. Supp. 2d 670, 673 (W.D. La. 2010). Second, of the $1.256 billion fine, $500,000 was to resolve an obstruction-of-justice charge for BPXP's cover-up of the flow rate, which is a distinct violation from the actual discharge of oil and thus should not be considered as a prior penalty for the "same incident."[5]

      Third and most important, a dollar-for-dollar offset would effectively mean that BPXP never paid any criminal fine.[6]

      However, the Court need not entirely ignore the payment of the criminal fine when setting the civil penalty. Under the top-down approach, the court has significant discretion to determine a deduction of less than $1,255,500,000, as reflected in Exhibit 1 to this Pretrial Statement.

      **Factor 5 ("History of prior violations.").** As Judge Vance stated when approving

---

[4] Evidence of "prior violations" under factor 5, however, will bolster the Court's findings of culpability.

[5] The Court also should consider BP's post-spill lack of candor as an aggravating factor that diminishes any penalty reductions. During the spill response, the amount of oil daily discharging from the wellhead was a very important and uncertain issue. In addition, BP's internal investigation into the cause of the spill omitted the most critical conversation between BP's Vidrine and Hafle, just before the blowout occurred. As a litigant, BP is entitled to argue the facts to its best advantage. However, BP was not entitled to submit to this Court a "patently false" investigation report on this critical point, nor was it entitled to provide "untenable" explanations for the falsehoods in the report. Phase One Findings of Fact (Rec. Doc. 13355) at 71-72. BP's public statements that it has "learned its lesson" and "changed its ways" cannot be squared with its conduct during the same post-spill period calculated to paint a false impression of the spill's severity and cause.

[6] Other payments, largely for environmental restoration (not NRD), were required under a remedial order, but the plea agreement expressly prohibits BP from asking this Court to deduct those amounts from its CWA civil penalty. TREX 52673 (Plea Agreement) at 7.

BPXP's criminal plea, "The BP Family of companies has a history of deficient safety management." "Reasons for Accepting Plea Agreement," *United States v. BPXP*, 12-292, Rec. Doc. 65 at 5 (January 30, 2013) (discussing the Texas City and Alaska violations). The Court has allowed the United States to offer a handful of exhibits (without a witness) that relate to the BP Group's history of major environmental violations at Endicott Island, Grangemouth, Texas City, and Prudhoe Bay. Rec. Doc. 13867. Evidence of these four prior violations is essential at this point in the trial because the Penalty Phase, unlike the first two phases, focuses on fixing a penalty that punishes the wrongdoer and deters future misconduct. Facts that were not specifically related to the Deepwater Horizon events, but reflect on behavior that is blameworthy should be considered, to ensure that the penalty achieves its purposes of punishment and deterrence.[7] BPXP may argue that it had no prior Section 311(b) violations in the Gulf of Mexico. But based on the Group's history of violations and culpable behavior, there is no good reason to *reduce* the penalty here for this factor.

**Factor 6 (The "nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge").** As far as "efforts of the violator to minimize . . . the effects of the discharge," the Court has already held the Phase Two Source Control Track trial, related to BP's attempt to "minimize" the 87-day oil discharge. While no *new* evidence is needed to prove these points, to the extent the Court finds that BP's activities fell short – regardless of whether such shortcomings rise to the level of negligence, gross negligence, or any standard required for punitive damages under Fifth Circuit law – such findings will be relevant to factor 6 in the Penalty Phase.

As for the remainder of BP's response actions (*i.e.*, those not aimed at source control),

---

[7] The same evidence also might be relevant to factors 3 and 8.

the United States does not intend to put on an affirmative case that BP's response actions were inadequate (though **Capt. Mark VanHaverbeke** will testify that BPXP's evaluation of the response inflates its effectiveness). Rather, it is BP that hopes to prove that it did a good job of mitigating the spill. Indeed, BPXP will go so far as to paint the government as the "bad guy" in the case, arguing that decisions by the FOSC, State or local governments, or private landowners slowed the response or worsened the spill's impacts. This theme, a collateral side-show, is in keeping with BP's position in Phases One and Two: "It was someone else's fault." Here, BP tries to blame the government for response actions that arose as a direct result of the spill. But all of these arguments about whether the Federal or State responders slowed down the response are irrelevant, because the entire response was necessitated by BP to begin with, and it is only to be expected that various "stakeholders" will have differing, valid concerns during a response of this magnitude. Indeed, **Capt. Mark VanHaverbeke** will testify that a variety of stakeholders made contributions that helped optimize the response. BP's argument also ignores the language of Section 311(b)(8), which focuses on the effort of the *violator* to mitigate the effects of the discharge, and nowhere suggests that the actions of other parties are relevant to the *violator's* penalty.

Congress, in passing OPA (which amended the CWA), required the responsible parties to pay all clean-up costs, all compensatory damages, and all NRD – and then also required civil penalties on top of those amounts. Nevertheless, BP will likely ask the Court to consider every dollar it spent in the wake of the spill.[8] BP posits that it will spend over $40 billion; but the vast majority of those dollars were required to be spent by law. For example, BP spent $14 billion on

---

[8] For purposes of this paragraph, we set aside the issue of whether BPXP can get credit for money spent and work done by other BP entities, explained in Part III above, other than to note that the express statutory language puts at issue only the efforts "of the violator." 33 U.S.C. § 1321(b)(8).

7

spill response actions. *See, e.g.*, Report of Den Uyl (TREX 13153) at 7. Billions more have been spent paying legitimate claims under the class-action settlements and various other claims facilities – again, to cover BP's legal liabilities. There is no reason that BP should get a reduced civil penalty merely for funding response actions required by law, and paying claims authorized by law.[9]

On the other hand, BP did pay for some items that were not required by law. The evidence for these numbers is set forth in the report of BP's expert, Frank Paskewich. TREX 13132 at 73-74 (enumerating expenses incurred "beyond those required by the Unified Command"). Setting aside payments for NRD-related matters,[10] Capt. Paskewich sets out about $846,200,000 in expenses that BP paid for the GoMRI ($500M), tourism promotion ($70M), seafood promotion and testing ($153.2M), rig-worker support ($100M), and a donation for environmental restoration projects (not NRD projects) ($23M) (these are summarized in Exhibit 2). The United States concedes that those expenses were incurred and were beyond the expenses "required by the Unified Command." There is of course no requirement that the Court deduct at all – and certainly not on a dollar-for-dollar basis. These expenses likely have great tax benefits to the BP Group.[11] But if the Court chooses to reduce the penalty for this factor, Exhibit 1 sets

---

[9] Had BP *not* fully performed its duties as a Responsible Party, it would have been subject to *additional* fines under Section 311(b)(7)(B) for "Failure to remove or comply."

[10] NRD and costs of assessing NRD are recoverable under OPA; these payments are required by law. BP pre-paid some, but not all, NRD assessment costs and funded some "early" restoration. The Court can consider this good behavior (along with setting up the claims funds and class actions for other OPA damages claimants) in assessing the penalty. However, because BP's early payments and claims funds reduced larger payments otherwise required by law and/or settled claims, BP's credit for paying some of these costs early should be slight.

[11] BP should not be allowed to "double dip" with these expenses. First, BP is seeking a set-off from State OPA economic-damages claims for some of the expenses enumerated by Paskewich. *See, e.g.*, Rec. Doc. 13616 (BP opposing Alabama's motion to dismiss set-off defenses). BP also presented the items and costs enumerated by Paskewich to Judge Vance, as mitigating behavior to justify approval of its criminal plea.

out the largest deduction that the Court should consider.

**Factor 7 (The "economic impact of the penalty on the violator").** The Supreme Court held that a court may "seek to deter future violations by basing the penalty on its economic impact" on the violator. *Tull,* 481 U.S. at 423. A "civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business." *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1166 (D.N.J. 1989), *rev'd in part on other grounds*, 913 F.2d 64 (3d Cir. 1990). Indeed, where a violator cannot prove that a penalty will have a "ruinous effect," the economic-impact factor (under Section 309(d)) should not reduce the penalty. *U.S. v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 868 (S.D. Miss. 1998); *Powell Duffryn*, 720 F. Supp. at 1166; *Chesapeake Bay Foundation v. Gwaltney*, 611 F. Supp. 1542, 1562 (E.D. Va. 1985).

**Ian Ratner** will inform the Court that BP is the fifth largest public company in the world (by revenues) and could pay the maximum penalty out of existing cash on hand, as its cash balances totaled $27.5 billion as of June 30, 2014. BP projects its total cash flows to be about $35 billion annually for 2014 to 2016.

BPXP will argue that BP's finances are not relevant, but (as discussed in Part III above) that position is not legitimate given the way the BP Group operates. Moreover, CWA case law demonstrates that the Court should look to the available finances of the corporate affiliates when assessing the penalty on a particular subsidiary. *See, e.g.*, *U.S. v. Municipal Authority of Union Township*, 150 F.3d 259, 268-69 (3rd Cir. 1998) ("If the subsidiary does not retain its revenues … then its parent's financial resources are highly relevant. …Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of

---

*See* Joint Memorandum in Support of Proposed Guilty Plea, No. 12-cr-292, Doc. 49, 1/16/13 (TREX 232931), at 33-40. Here, BP seeks a reduced penalty for the very same acts.

the penalty on the violator...."); *see also Powell Duffryn*, 720 F. Supp. at 1166 (considering defendant's relationship with its large international parent company and rejecting defendant's claim that the penalty's economic impact on the subsidiary would be excessive). Thus, under this factor, it is appropriate for a court to consider BP's parent's vast wealth, revenues, assets, and earning capacity. Because BPXP can readily access equity, capital, or borrowing from BP, it can pay the maximum penalty and there is no reason to reduce the penalty for this factor.

**Factor 8 ("Other matters as justice may require").**[12] BPXP will seek to prove that it contributes to the Gulf region economy through jobs and spending. But **Dr. Charles Mason** will explain that BPXP's share of the Gulf oil industry is generally 12% to 18%, and that the same jobs and spending would be created by any other company developing the hydrocarbon resources currently developed by BPXP. Similarly, **Capt. Mark VanHaverbeke** will testify that BP's claims are overstated when it seeks credit for various "advances" in response technology.

## V.     Conclusion

The United States requests that the Court, based on the totality of circumstances as considered through the lens of the CWA's eight factors, impose on BPXP a civil penalty of significantly more than $16 billion but not more than $18.06 billion.

Respectfully submitted,

JOYCE R. BRANDA                          SAM HIRSCH
Acting Deputy Assistant Attorney General  Acting Assistant Attorney General
Civil Division                            Environment & Natural Resources Division

PETER FROST                              SARAH HIMMELHOCH
Director, Torts Branch, Civil Division    Senior Litigation Counsel for E-Discovery
Admiralty and Aviation                    MICHAEL MCNULTY
SHARON SHUTLER                           Senior Counsel

---

[12] This factor is a catch-all for any facts that might not fit into the other seven factors, and the United States reserves the right to argue that any given evidence already in the record, or to be adduced in the Penalty Phase, falls into this category.

MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

NANCY FLICKINGER
Senior Attorney
PATRICK CASEY
RICHARD GLADSTEIN
DANIEL S. SMITH
Senior Counsel
ABIGAIL ANDRE
A. NATHANIEL CHAKERES
ANNA CROSS
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Steve O'Rourke
STEVEN O'ROURKE
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611, Washington, D.C. 20044
Telephone:  202-514-2779
E-mail:  steve.o'rourke@usdoj.gov

KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis-Nexis File & Serve in accordance with Pretrial Order #12, and the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2719, on this 19th day of December, 2014.

/s/ Steve O'Rourke
U.S. Department of Justice

11

**Exhibit 1:**

**Penalty Calculation for BPXP**

| Penalty Factors | | Any Reason for Potential Deduction? If So, Why? | Range to Consider for Reducing the Penalty |
|---|---|---|---|
| 1 | Seriousness of the violations | No | 0 |
| 2 | Economic Benefit | No | 0 |
| 3 | Degree of culpability | No | 0 |
| 4 | Any other penalty for same incident | Yes:  Criminal CWA Fine[13] | Significantly less than $1,255,500,000 |
| 5 | History of prior violations | No | 0 |
| 6 | Efforts to mitigate the discharge | Yes:  GoMRI, seafood, tourism, charity, etc.[14] | Significantly less than $846,200,000 |
| 7 | Economic impact on the violator | No | 0 |
| 8 | Other matters that justice may require | No | 0 |
| Total | | | Significantly less than $2,101,700,000. |

| | | | |
|---|---|---|---|
| **Maximum Penalty** | (4.2 million bbl @ $4,300) | $18,060,000,000 |
| **Highest end of range of potential deductions based on totality of penalty factors** | (From table above) | Significantly less than $2,101,700,000 |
| **Lowest Penalty for BPXP** | | Significantly more than $15,958,300,000 (which is rounded to $16 billion in the brief, for shorthand). |

[13] TREX 52673.

[14] Report of BP's Expert Paskewich at 73-74; *see also* Exhibit 2.

1

**Exhibit 2:**

**BP Expenses for Claims, for Damages, and for Actions
"Beyond those required by the Unified Command"
Incurred After the Blowout**

| Item | Should this be considered for penalty deduction? | How much? |
|---|---|---|
| Actions required by Unified command | No. | None |
| Payment of private claims required by OPA (*e.g.*, class settlements) | No. | None |
| Payments for NRDA and early NRD | No. | None |
| Payments "beyond those required by the Unified Command." | Yes. | Not more than $846,200.[15] |

---

[15] Report of BP's Expert Paskewich at 73-74.