**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | * | **MDL NO. 2179** |
| | * | **SECTION J** |
| **This document relates to:** | * | |
| | * | **Judge Barbier** |
| ***All Cases*** | * | **Magistrate Judge Shushan** |
| | * | |

**BPXP'S AND ANADARKO'S PRETRIAL MEMORANDUM**
**FOR THE PENALTY PHASE TRIAL**


James J. Dragna
Morgan, Lewis & Bockius LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone: (213) 680-6436

Ky E. Kirby
Thomas R. Lotterman
David B. Salmons
Bryan M. Killian
Randall M. Levine
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, DC 20006-1806
Telephone: (202) 373-6000

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
Janika Polk (La. Bar No. 27608)
Robert Guidry (La. Bar No. 28064)
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone: (504) 592-0691

***Attorneys for Anadarko Petroleum Corporation***

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia (Carrie) Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

***Attorneys for BP Exploration & Production Inc.***

# TABLE OF CONTENTS

**Page**

**BPXP'S PRETRIAL STATEMENT....................................................................................1**

**ANADARKO'S PRETRIAL STATEMENT....................................................................10**

**BPXP'S PRETRIAL STATEMENT**

The Clean Water Act (CWA) penalty provision has two primary purposes—to deter behavior that might lead to environmental harm and to incentivize the most effective response possible should environmental harm occur. Assessing a per-barrel penalty against BPXP for the *Deepwater Horizon* oil spill at the lower end of the statutory range accomplishes both purposes.

Immediately following the spill, BPXP, working with the U.S. and others, mounted the largest and most effective response in history. BPXP spared no expense and placed no limits on the massive resources it provided. BPXP's unprecedented efforts had their intended effect. Despite initially dire predictions regarding the spill's impact, more than four years of data show that the Gulf has made a significant recovery due in large part to the massive response and cleanup effort. Many Gulf beaches were left cleaner than they had been in years, seafood landings data shows levels that are now consistent with those pre-spill, and tourism records have been broken. BPXP's efforts continue today and warrant significant credit.

BPXP has already incurred enormous liabilities sufficient to deter any potential violator from engaging in behavior likely to result in a future release. Indeed, to date, BPXP has incurred over $42 billion in liabilities from the spill—a staggering amount by any measure—of which over $14 billion was spent to mount an effective response and clean-up. To fund these efforts—many taken voluntarily—BPXP has divested numerous assets to raise capital. BPXP has operated at a loss since the spill, and even then, only with assistance from a corporate parent that is not legally obligated to assist. Numerous contingent liabilities may result in additional financial obligations. Moreover, the penalty sought by the U.S. would have a very significant negative economic impact on BPXP, particularly in an economic environment in which the price of oil has dropped approximately 45% (from $96/bbl on August 15 when Round 1 expert reports

were issued to $54/bbl yesterday (WTI)) in just over four months. Plus, it is uncontested that BPXP did not obtain any economic benefit from this incident. As such, especially given the $42 billion in liabilities already incurred and the substantial contingent liabilities, a per-barrel penalty at the lower end of the statutory range would satisfy the goals of the CWA.

## I. LEGAL STANDARD: THE EIGHT STATUTORY CWA PENALTY FACTORS

Under the CWA, the imposition of a civil penalty is guided by the eight factors found in 33 U.S.C. § 821(b)(8). Of the eight factors, "economic benefit serves as the starting point for calculating the civil penalty…. Regardless of how the district court then exercises its discretion, within a top-down, a bottom-up or some other analytical framework, the economic benefit factor creates a nearly indispensable reference point." *United States v. CITGO Petroleum Corp.,* 723 F.3d 547, 551, 554 (5th Cir. 2013). Here, as the Court has acknowledged, "all agree that there was no economic benefit to either BP or Anadarko." (*See* 4/17/14 Hrg. Tr at 4; *see also* 3/21/14 Hrg. Tr. 26-27). Thus, the "reasonable approximation of economic benefit" to BPXP required by *CITGO* should be set at zero. 723 F.3d at 551.

Even in cases involving serious environmental harm or highly culpable conduct, courts frequently affirm CWA penalties that are a small percentage of the statutory maximum.[1] The penalty the U.S. seeks is a gross outlier compared to penalties in ***any other*** case or settlement.

## II. BPXP'S RESPONSE EFFORTS WERE EXTRAORDINARY AND EFFECTIVE.

BPXP's proactive and successful response efforts are properly considered as mitigating factors. The Coast Guard concluded that "The *Deepwater Horizon* oil spill response was ultimately successful, due to the unity of effort and perseverance of the more than 1000

[1] *See United States v. Marine Shale Processors,* 81 F.3d 1329, 1336 (5th Cir. 1996) (approving CWA penalty at 7% of the statutory maximum, despite "willful and flagrant" violations); *see also* BPXP's Request for Judicial Notice (Rec. Doc. 13811) (citing cases where courts assessed or approved CWA or Clean Air Act fines, all well below the statutory maximums, with most below 10% of the statutory maximum, and several fines below 1% of the maximum).

organizations that contributed to this unprecedented response." (FOSC Rpt., TREX 9105 at xiv). There is no dispute that BPXP was an essential part of the effort to provide people and resources to sustain the massive efforts of the Unified Command.

### A. Mitigation Is a Primary Objective of the Clean Water Act.

"A fundamental objective of the CWA is to 'ensure effective and immediate removal of a discharge… of oil....'" *In re Deepwater Horizon*, 2012 WL 5960192, at *13 (Nov. 28, 2012). To that end, "[i]n determining the amount of a civil penalty, particular weight should be given to the rapidity and effectiveness of the response actions by the responsible party." Conf. Rep. on H.R. 1465, H. Rep. 101-653, at 153-54 (Aug. 1, 1990). Accordingly, a company's efforts to respond to and mitigate the effects of a spill warrant a reduced CWA penalty.

In *CITGO*, the Fifth Circuit affirmed the trial court's holding that CITGO was entitled to a reduced penalty based on its mitigation efforts. 723 F.3d at 554. The trial court considered the resources that CITGO used and its "full force effort to minimize the damage from the spill." *U.S. v. CITGO Petroleum Corp.*, 2011 WL 10723934 (W.D. La. Sept. 29, 2011). There, CITGO'S "well executed clean-up effort" effectively mitigated damage from the spill and resulted in strong environmental recovery. *Id.*[2] This Court should similarly award a penalty at the lower end of the statutory penalty range against BPXP in light of its robust and effective response.

### B. BP Rapidly Mobilized Critical Resources and Spared No Expense.

Immediately after the blowout, BPXP worked with the Unified Command to mobilize the largest environmental emergency response operation in the nation's history. As the U.S. has recognized, "BP was very proactive and placed no limits on what was needed to make this

---

2 *See also United States v. Egan Marine Corp.*, 2011 WL 8144393, at *7 (N.D. Ill. Oct. 13, 2011) (defendant's clean-up effort "cuts in favor" of reduced CWA penalty).

response successful." (ISPR TREX 9124 at 102); *see also* Hanzalik Dep. at 31-32, 41 (BP proactively assisted the Coast Guard "in whatever way possible" and "spared no expense" in "rapidly mobiliz[ing] personnel, equipment, and other resources that were needed.").

The response grew to include more than 100,000 responders, 9,700 vessels, 127 aircraft, and 13.5 million feet of boom. Approximately 82,000 of the 100,000 responders worked on BPXP's behalf and devoted over 70 million hours responding to the spill. This mobilization was unprecedented, dwarfing responses to *Exxon Valdez* and other spills. BPXP has spent more than $14 billion on these activities.

### C. BPXP's Response and Clean-Up Efforts Significantly Mitigated the Impact of the Spill and Resulted in Strong Environmental and Economic Recovery.

BPXP and others in the Unified Command implemented a broad range of response measures, including skimming, controlled in situ burning, dispersant application, booming and shoreline assessment and cleanup. BPXP procured thousands of vessels, which were operated by a network of professional response companies as well as a fleet of locally contracted vessels. In addition, under the oversight of Unified Command, BPXP created the Vessels of Opportunity ("VoO") program to establish a core fleet of local mariners who conducted on-water oil recovery and removal operations while capitalizing on local knowledge. The VoO program mobilized more than 9,000 vessels and benefited local communities by compensating mariners whose livelihoods were impacted by the spill.

These response efforts were extraordinarily effective. As Houma Incident Commander Rear Admiral Meredith Austin observed, "we've managed to keep over 90% of the oil from hitting the shore, which is amazing." (TREX 12484 at 1). For the oil that did reach the shore, Unified Command deployed a massive effort to survey, assess, and make treatment recommendations based on the well-established Shoreline Cleanup and Assessment Technique

("SCAT"). The SCAT Program and shoreline cleanup operations ensured that thousands of miles of shoreline were properly assessed and cleaned up. Depending on whether government or BPXP's spill volume estimates are used, these efforts achieved a removal rate anywhere from 29% to 49% of the oil that was released—a rate roughly ***two to five times greater*** than in a typical spill response.

The U.S. has acknowledged that this unprecedented commitment paid off. As the U.S. Coast Guard concluded:

> The shoreline protection tactics, techniques, and procedures … helped minimize the environmental impacts of oiling along the Gulf Coast. The protection plans and actions were made possible through cooperation between federal, state, and local officials, the RP [BP], and environmental experts. These plans and actions minimized not only the threat, but also the actual impact of oil in the marshes and on the beaches. (FOSC Rpt. TREX 9105 at 59).

The U.S.'s own witnesses have agreed that BPXP's contributions were essential to the response's success. (*See* Hanzalik Dep. at 248:20-25) And ***every single*** Coast Guard witness deposed in this phase has agreed that BPXP worked collaboratively to achieve the best and most efficient response possible. (*See* 9/12/14 Paskewich 2 Rpt. at 12-13 (listing citations)).

### D. BPXP Voluntarily Undertook Numerous Key Initiatives That Were Extraordinarily Effective in Minimizing the Effects of the Spill.

BPXP undertook numerous voluntary initiatives, including establishing community outreach centers throughout the Gulf, waiving the OPA liability cap and proactively funding the response by pre-funding the Oil Spill Liability Trust Fund, advancing block grants to state and local governments, and paying response costs directly. BPXP's funding approach was a "novel" undertaking, without which the scale and magnitude of the response efforts could not have been maintained. As the Coast Guard stated, "***The outcome of the response to this spill could have been very different had the RP [BP] not been able to fund the extraordinary expenses involved***…." (emphasis added) (FOSC Rpt. TREX 9105 at 161).

BPXP also voluntarily engaged in ongoing, unparalleled environmental efforts. For example, BPXP has incurred over $1 billion to analyze environmental data and has committed another $1 billion to fund early restoration projects. BPXP also committed up to $500 million over ten years to support independent research by the Gulf of Mexico Research Initiative to study potential environmental and health impacts of hydrocarbon releases and to develop improved spill mitigation technologies. Finally, even though the active cleanup has ended, BPXP remains committed and has resources in place to respond quickly at the Coast Guard's direction if the removal of any MC-252 oil is required.

BPXP also took an aggressive approach toward mitigating adverse economic effects of the spill. BPXP spent hundreds of millions of dollars on seafood testing and promotion and tourism promotion and employed local fishermen and vessel owners following the spill. BPXP also paid billions of dollars in claims, beginning within weeks of the explosion and continuing today. BPXP incurred costs of more than $17 billion in 2010 alone providing early and substantial spending, payments, employment and grants, all of which helped to prevent significant long-term adverse economic effects. The data prove that in industries important to the Gulf economy, there was no negative economic impact in most areas of the Gulf, and, where there were negative effects, the economy recovered quickly in part because of BPXP's post-spill spending and its substantial efforts to mitigate potential economic impact.

The U.S. incorrectly asserts that because BPXP is the Responsible Party, no credit is deserved. Trivializing these valiant efforts misses the mark, is contrary to this Court's prior conclusion and to Congress's intent, and is bad public policy. If the U.S.'s position is adopted here, future violators would have a disincentive to engage in a robust response like BPXP's.

## III. THE SPILL'S ENVIRONMENTAL IMPACT WAS SIGNIFICANTLY LESS THAN INITIALLY FEARED.

While BPXP does not deny that there were environmental impacts caused by this serious event, it is also now clear—four years later—that the impacts were far less than feared and that the Gulf has largely recovered. This recovery is due to many factors, including natural biodegradation of oil and heroic efforts by response workers. Instead of celebrating this recovery, the U.S. has chosen to hypothesize about "potential" environmental catastrophes that "could be" lurking. Such hyperbole is unsupported by the data. While this CWA proceeding is neither the time nor place for a quantification of natural resource damages, to the extent that the U.S. seeks to allege environmental harm as part of its penalty case, it should not be allowed to ignore its own voluminous data.

Based upon the government's own data, and data collected by BPXP and academics, the harm caused by the spill was far less than many feared. For example:

> ***Fisheries***: Data indicate no long-term effects from the spill to fish and shellfish populations. Seafood safety testing (over 10,000 samples) consistently shows exposure levels that are 100 to 1000 times *less* than health thresholds. Even the U.S. environmental expert agrees it would be mere speculation to state otherwise. *See, e.g.,* Rice Dep. at 229.
>
> ***Birds:*** The government's portrait of devastation to the bird populations is pure hyperbole, ignoring its own data showing that of over 500,000 birds observed during the spill, over 99% had no visible oiling. *See* Higgins Dep. at 170-74. In addition, independent data demonstrates that there have been no significant adverse impacts to bird populations. *See* 8/19/14 Tunnell Rpt. at 59-66
>
> ***Shoreline***: Of the 4,300 miles of Gulf shoreline surveyed during the response, about 75% of the segments had no oiling at all and of those that did, the oil was limited to the marsh edge and the majority was light or trace. As of April 2014, all of the impacted Gulf states had achieved "No Further Treatment" status.

The U.S. experts opine extensively about speculative "potential harm" that could have occurred by ignoring actual data about what actually happened and instead relying on flawed

studies that do not even purport to offer conclusions about impacts to Gulf populations.[3]

## IV. THE ECONOMIC IMPACT OF A LARGE PENALTY ON BPXP, IN ADDITION TO THE $42 BILLION ALREADY INCURRED, WILL BE SIGNIFICANT.

Any CWA penalty must also take into account "the economic impact of the penalty ***on the violator***." 33 U.S.C. §1321(b)(8) (emphasis added). The U.S. has stated that it is not seeking to pierce BPXP's corporate veil to reach its parent and that the penalty should be reduced if it would have a "significant impact" on BPXP. Whether a CWA penalty would have a "significant impact" on BPXP should be evaluated in the light of BPXP's already-weakened position as a result of its approximately $42 billion in Macondo-related liabilities[4] and the recent substantial drop in oil price. A CWA penalty in excess of [REDACTED] would exhaust BPXP's available funds in 2015 and result in a funding shortfall.

After the spill, BPXP was authorized to spend the funds necessary to combat the spill. Those costs averaged $100 million per day for the second half of 2010, far in excess of BPXP's own capacity. Without legal obligation, other BP Group entities voluntarily provided capital to BPXP to enable it to meet its Macondo-related obligations and satisfy its ordinary liabilities. The U.S. incorrectly seeks to capitalize on this voluntary assistance from the BP Group by arguing that future assistance should be assumed. *First*, increasing a penalty because a violator obtained past assistance from an affiliate would discourage corporate parents from funding effective responses. *Second*, the U.S.'s position "is inconsistent with the very notion of limited liability—limitation of the risk of loss from an investment." *White Rosebay Shipping S.A. v. HNA Grp. Co.*, 2012 WL 6858239, at *7 (S.D. Tex. Dec. 5, 2012). Even the U.S.'s industrial

[3] *E.g.*, 8/15/14 Boesch Rpt. at 19 (speculating as to "possible" impacts on turtles), 27 (speculating as to "potential harm" to seabed organisms), 29 (speculating that blue fin tuna larvae "could have" encountered oil), 35–37, 40–41 (speculating as to "possible harm to fish populations" and "potential harm" to oyster stocks).

[4] BPXP and the U.S have stipulated to the prior penalties for the same incident (Rec. Doc. 13725), including BPXP's criminal fine of $1.256 billion and other penalties.

historian expert does not claim that there is anything "improper," "deficient" or "abnormal" "with respect to the relationship between BPXP and the BP Group." (Quivik Dep. at 47-48) *Third*, any potential future investor in BPXP would have to consider whether such an investment would make economic sense in light of BPXP's present equity value, the recent drop in oil prices, any CWA penalty, and other contingent liabilities.

The only expert in this case to determine BPXP's equity value was BPXP expert Bruce Den Uyl, who assessed it as [redacted] in August 2014, ***before*** the assessment of the CWA penalty or other contingent liabilities such as NRD and OPA. Moreover, because of the drastic drop in world oil price since August 2014 (from $96/bbl on 8/15/14 when Round 1 expert reports were issued to $54/bbl on 12/18/14 (WTI), this [redacted] valuation has decreased considerably. In support of its argument that BPXP can pay any penalty, the U.S. relies in part on data regarding the financial condition of BPXP and the BP Group from a time of much higher oil prices. The U.S.'s economic impact case is out of date.

## V. "OTHER FACTORS AS JUSTICE MAY REQUIRE" SUPPORT A REDUCED PENALTY.

### A. BPXP's Positive Impact on the Gulf Economies Warrants a Reduced Penalty

The violator's economic impact on the local economy and community may be considered under the "any other matters as justice may require" penalty factor. *See CITGO*, 2011 WL 10723934. BPXP has had a significant positive economic impact in the Gulf region, including, over the past five years: (i) BPXP has spent over $22 billion on capital and operational expenditures in the Gulf region; (ii) BPXP has employed approximately 2,300 persons a year and engaged approximately 4,000 different vendors, and over 95% of the employees and over 65% of the vendors are located in the Gulf region; (iii) BPXP has spent approximately $2.1 billion on

compensation and over $16 billion on vendors; and (iv) BPXP has approximately 650 leaseholds and is a leading producer of hydrocarbons in the Gulf.

**B. BPXP Advanced Spill Response Innovations and Shared Initiatives.**

BPXP collaborated with others to develop an array of spill response innovations that were important to the response and provided valuable learning for use in future spill responses. The federal government, industry groups, and others have recognized the importance of these advancements. For example, Dr. Jane Lubchenco, while head of NOAA, concluded that the "[r]esponse to future deep spills globally will benefit from the many scientific breakthroughs applied to DWH." (TREX 12500 at 6).

**Conclusion**

For the foregoing reasons, only a penalty at the lower end of the statutory range is warranted for BPXP.

**ANADARKO'S PRETRIAL STATEMENT**

Defendant Anadarko Petroleum Corporation has an undisputed fact and legal ruling that no other defendant in this phase can lay claim to: (i) it was a non-operating investor in the Macondo lease and exploratory well; and (ii) this Court has ruled it was not culpable. Consequently, Anadarko will be offering only one fact witness and two expert witnesses at trial. Their testimony will show that no CWA penalty is warranted against Anadarko because it bears no fault for the discharge, it has already paid more than $4 billion in damages, and there is no reasonable justification for any punishment.

**A. The CWA §311 Factors Do Not Justify Penalizing Anadarko.**

Anadarko's evidence at trial will be limited because most of the factors in CWA §311(b)(8) are either undisputed and favor Anadarko, or not relevant to Anadarko:

Seriousness of the Violation: Anadarko admits that the discharge was extremely "serious" when it occurred, but this evidence has limited relevance to Anadarko because it is not culpable for the violation and was not responsible for the drilling operations that led to it.

Economic Benefit to the Violator, If Any, Resulting From the Violation: The Government has conceded that Anadarko obtained no "economic benefit" from the alleged violations, and any potential savings to BPXP was "background noise."[5] This factor, which the Fifth Circuit has called the "starting point" of any penalty analysis, weighs strongly in Anadarko's favor. *U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013).

Degree of Defendant's Culpability: This Court has already ruled that Anadarko was not culpable and was not responsible for the drilling operations on the rig.[6] This is the most critical factor in assessing a CWA penalty in this case, and should be determinative here.

Any Other Penalty for the Same Incident: The parties have stipulated that others have paid or will pay substantial penalties for the same incident.[7]

History of Prior Violations: Anadarko and the Government have stipulated to Anadarko's "history of prior violations."[8] Those stipulations show a remarkable and commendable record by Anadarko for its operations in the Gulf of Mexico. From 2004 to 2010,

---

5 Tr. of Status Conference Re: Penalty Phase on March 21, 2014 at 26-27.

6 Hr'g Tr., March 21, 2014 at 43:3-14; 44:19 to 45:2.

7 Stipulations and Order Related to the "Any Other Penalty for the Same Incident" Factor Concerning Prior Settlements and Criminal Plea in Connection with the Penalty Phase of United States v. BPXP et al., 10-4536, Rec. Doc. 13725, Nov. 26, 2014 (TREX-280,105).

8 Stipulated Facts Concerning Anadarko's History of Prior Violations, Rec. Doc. 13808, Dec. 9, 2014 (TREX-280,134).

Anadarko paid a mere $12,834 in civil penalties for nine alleged CWA violations related to its Gulf of Mexico operations. The penalties ranged from $250 to $5,334.

Nature, Extent, and Degree of Success of any Efforts of the Violator to Minimize or Mitigate the Effects of the Discharge: Anadarko will present uncontroverted evidence through its one fact witness, Darrell Hollek, that the company (i) extended offers to Secretary of the Interior Salazar and to BP to assist in any way needed in source control, and (ii) provided important resources and personnel with technical expertise to assist in the spill response efforts to the extent permitted. Mr. Hollek will also testify about Anadarko's other efforts to mitigate the damage from the *Deepwater Horizon* spill, including (i) paying $4.0 billion in settlement to BP, which requires every dollar to be used to compensate people who suffered injuries and damages from the incident; and (ii) funding a $21.855 million grant to establish the Gulf Coast Community Fund to support organizations assisting those who have suffered as a result of the spill.[9]

Economic Impact of the Penalty on the Violator: Anadarko admits it could pay the maximum penalty under CWA §311 without suffering ruinous business consequences, but notes that any penalty would obviously have an economic impact on the Company, particularly given the rapid fall of oil prices in recent months. Moreover, monies expended to satisfy penalty liability could not be used for Anadarko's operations or reinvested into activities like exploration and development necessary to the Company's financial health.

Considering these factors, any significant penalty against Anadarko would be manifestly unjust and unfair.

---

9 Grant Agreement With Rockefeller Philanthropy Advisors, Inc. to Establish and Manage a Special Project Fund, Jan. 6, 2011 (TREX-280005).

**B. Imposing A Substantial Penalty On Anadarko Would Serve No Rational Purpose.**

What remains for this Court to consider and decide is whether *any* penalty should be imposed upon Anadarko, considering that Anadarko was a faultless, non-operating investor. The Government has repeatedly acknowledged that "'[c]ivil penalties under the Clean Water Act are intended to *punish culpable individuals* and deter future'" discharges. Rec. Doc. 4840 at 7 (quoting *Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir. 2000)) (emphasis added). So the trial must address what purpose, if any, would be served by penalizing Anadarko. The Government has never before this case sought to impose CWA §311 penalties (or any other penalties) on a non-operating, non-culpable investor in a deepwater well. To address this unprecedented situation, Anadarko will adduce the testimony of two expert witnesses who will opine that assessing a penalty against Anadarko would actually subvert the goals of the CWA and could be counterproductive to offshore safety.

Kenneth E. Arnold, PE, NAE: Mr. Arnold is an expert in offshore safety and safety regulations. He will testify that holding non-operating investors responsible for the actions of an operator would have negative implications for safety. Operational safety in the drilling industry requires a safety culture where the people who are actually performing the work make the right choices—no matter how much time or funding they have, or whether regulators or others are looking over their shoulders. The *only* party capable of implementing that safety culture is the operator, who is in control and on the rig. According to the National Academy of Engineering and National Research Council of the National Academies, "[t]he operating leaseholder company

is the *only entity* involved in offshore drilling that is positioned to manage the overall system safety of well drilling and rig operations."[10]

Mr. Arnold also will testify that forcing a non-operator to take a more active role and intercede in operations would lead to unsafe practices. Non-operators do not have the same information about operations as the operator, and they cannot make the kinds of decisions essential to safety, let alone critical on-the-spot decisions. Thus, "incentivizing" non-operators to interfere with operators' decisions would confuse lines of authority, delay critical decisions, and be counterproductive to safety. This testimony will directly rebut the Government's expert, Gardner Walkup, who argues that incentivizing active participation by non-operators through a substantial penalty against Anadarko would purportedly deter future violations.

<u>Professor David L. Sunding</u>: Dr. Sunding is an expert in, among other areas, environmental economics, econometric analyses, and CWA penalties. He will testify that an optimal level of deterrence can be achieved in this case without imposing a civil penalty on Anadarko, since Anadarko has already paid $4 billion to compensate for harm caused by the spill. Any penalty beyond what Anadarko has already paid would, as a matter of economics, be "over-deterrence" and would skew the economic incentives for future non-operator investment. Dr. Sunding also will testify that there has been a significant economic impact on the offshore energy industry as a result of the Government's attempts here to obtain massive penalties from non-culpable, non-operating investors for the first time in the industry's history. Finally, Dr. Sunding will show that imposing a substantial penalty on a non-culpable, non-operating party would disrupt the capital markets for new energy projects.

---

[10] National Academy of Engineering and National Research Council of the National Academies, Macondo Well - *Deepwater Horizon* Blowout: Lessons for Improving Offshore Drilling Safety 101 (2011).

**C. The Government's Efforts To Create New Duties and Regulatory Incentives Should Be Rejected.**

There is good reason why the Government has never before brought a CWA §311 penalty case against a non-operating, non-culpable investor in a deepwater well. The Government has repeatedly acknowledged that CWA penalties must be specifically tailored to an individual party's "degree of culpability," because the culpability factor is designed to protect "relatively blameless violators from a penalty that is disproportionate to their . . . culpability." Rec. Doc. 4840 at 7, 17. That concession should doom the Government's case against Anadarko, because *any penalty* would be grossly disproportionate.

Nor should the Government be allowed to pursue and punish Anadarko as a means of creating an "incentive" for non-operating investors to act where no obligation exists under the law or regulations. Since the Macondo Incident in April 2010, BSEE and other federal agencies have implemented a host of new rules for OCS operations. None has created new obligations or duties for non-operating investors like Anadarko. If new laws or regulations are needed, they should be crafted in the halls of Congress or through formal agency rulemaking; not retroactively in judicial proceedings.

Date: December 19, 2014

Respectfully submitted,

/s/ James J. Dragna
James J. Dragna
Morgan, Lewis & Bockius LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone: (213) 680-6436
Facsimile: (213) 680-8636

Ky E. Kirby
Thomas R. Lotterman
David B. Salmons
Bryan M. Killian
Randall M. Levine
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, DC 20006-1806
Telephone: (202) 373-6000
Facsimile: (202) 373-6001

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
Janika Polk (La. Bar No. 27608)
Robert Guidry (La. Bar No. 28064)
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone: (504) 592-0691
Facsimile: (504) 592-0696

***Attorneys for Anadarko Petroleum Corporation***

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia (Carrie) Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of December, 2014.

/s/ Don K. Haycraft
Don K. Haycraft