UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| DEEPWATER HORIZON IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| This Document Relates To: | : | JUDGE BARBIER |
| | : | |
| 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

......................................................................................................................................................

## CLEAN WATER ACT – PENALTY PHASE

## UNITED STATES' MEMORANDUM IN OPPOSITION TO BPXP'S MOTION TO EXCLUDE THE REPORTS AND TESTIMONY OF DR. FREDRIC QUIVIK

# Table of Contents

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

ARGUMENT .................................................................................................................. 4

    A.      Applicable Legal Standard...................................................................... 4

    B.      Dr. Quivik's Specialized Knowledge Will Help the Court to Understand Relevant Evidence ................................................................................... 5

    C.      Dr. Quivik's Reports and Expected Testimony Are Based on Sufficient Facts or Data, the Product of Reliable Principles and Methods; and the Reliable Application of Those Principles and Methods to the Facts of this Case .............. 12

    D.      Dr. Quivik's Testimony Should Not Be Excluded Because He Allegedly Improperly Evaluated the Credibility of Witnesses and Documents................14

CONCLUSION............................................................................................................... 15

## Table of Authorities

**Cases**

*Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705 (2d Cir. 1989) ........................................... 8

*Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113n.12
(E.D. La. 1986) ................................................................................................................. 2, 13

*Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003) ................................. 3

*Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999) ..................................... 4

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993) ................ 2, 4, 5, 12

*Deville v. Comar Marine Corp.*, No. 08-4104, 2009 WL 1870896
(E.D. La. June 25, 2009) ................................................................................................... 5

*Gibbs v. Gibbs*, 210 F.3d 491 (5th Cir. 2000) ................................................................ 5

*Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................ 8, 14

*Hodges v. Mack Trucks Inc.*, 474 F.3d 188 (5th Cir. 2006) ........................................... 4

*In re Cudd Pressure Control, Inc.*, No. 98-585, 1999 WL 756439
(E.D. La. Sept. 24, 1999) ................................................................................................. 4

*In re Fosamax Products Liab. Litig.*, 654 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................ 8

*In re Katrina Canal Breaches Consol. Litig.*, No. 10-866, 2012 WL 4328354
(E.D. La. Sept. 20, 2012) ................................................................................................. 4

*In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................ 1, 8

*In re Tasch, Inc.*, 97-15901 JAB, 1999 WL 596261 (E.D. La. Aug. 5, 1999) ............................. 8

*Kumbo Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................... 4

*LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 WL 1585551
(S.D.N.Y. July 16, 2002) .................................................................................................. 8

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ................................................. 1, 2

*Matheny v. Tetra Technologies, Inc.*, No. 07-1556, 2008 WL 2178091
(E.D. La. May 22, 2008) ................................................................................................... 4

*Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002) ...................................................... 4

*McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266 (6th Cir. 1988) ................................... 8

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95-3901, 1999 WL 946354
(S.D.N.Y. Oct. 19, 1999) ...................................................................................................... 8

*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003) ............................... 4

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ............................................. 14

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010) ........................... 2, 13

*Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037 (D. Ariz. 2005) ................... 3

*Poiencot v. GlobalSanteFe Drilling Co.*, No. 06-10793, 2008 WL 5429645
(E.D. La. Aug. 6, 2008) ......................................................................................................... 4

*Runnels v. Texas Children's Hosp. Select Plan*, 167 F. App'x 377 (5th Cir. 2006)........................ 4

*Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496 (5th Cir. 1999) ................................... 5

*Sch. Bd. of Parish of St. Charles v. Shell Oil Co.*, No. 04-2511, 2007 WL 756458
(E.D. La. Mar. 8, 2007)........................................................................................................... 4

*Schmidt v. MTD Products, Inc.*, No. 04-3412, 2006 WL 5127539
(E.D. La. July 5, 2006)............................................................................................................ 4

*Siegal v. Warner Bros. Entm't,* No. 04-08400, 2009 WL 2014161 (C.D. Cal. July 8, 2009)....... 13

*SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011(N.D. Ill. 2003) .................... 5

*Taylor v. Evans*, No. 94-8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ................................... 8

*Thompson v. Rowan Companies, Inc.*, No. 06-3218, 2007 WL 724646
(E.D. La. Mar. 6, 2007)....................................................................................................... 4, 5

*U.S. Marine, Inc. v. United States*, No. 08-2571, 2009 WL 3480979
(E.D. La. Oct. 26, 2009)...................................................................................................... 4, 5

*United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*,
80 F.3d 1074 (5th Cir. 1996) ................................................................................................. 5

*United States v. Asarco Inc.*, 392 F. Supp. 2d 1197 (D. Idaho 2005)............................. 3

*United States v. City of Euclid*, 580 F. Supp. 2d 584 (N.D. Ohio 2008) .................................. 2, 13

*United States v. Hitt*, 473 F.3d 146 (5th Cir. 2006) ........................................................ 4

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ............................................... 14

*United States v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800 (M.D. Pa. 1996) .......................... 6

*United States v. Newmont USA Ltd.*, No. 05-020, 2007 WL 4856859
(E.D. Wash. Nov. 16, 2007)......................................................................... 3, 6, 7

*United States v. Newmont USA Ltd.*, No. 05-020, 2008 WL 4621566
(E.D. Wash. Oct. 17, 2008)........................................................................... 3, 6

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988)...................................................... 14

 *United States v. Sterling Centrecorp, Inc.*, No. 2:08-CV-02556, 2013 WL 3166585
(E.D. Cal. June 20, 2013)........................................................................... 2, 3, 7

*Veasley v. Perry*, No. 13-CV-00193, 2014 WL 5090258 (S.D. Tex. Oct. 9, 2014) ................ 2, 12

*Wilson v. Am. Sec. Ins. Co.*, No. 07-5984, 2008 WL 2704522 (E.D. La. July 3, 2008)................ 4

*Young v. BP Exploration & Prod. Inc.*, No. 11-1003, 2012 WL 2087405
(E.D. La. June 8, 2012) ............................................................................... 4

**Statutes**

33 U.S.C. § 1321(b)(8) ............................................................................... 1, 5

42 U.S.C. § 9601 ....................................................................................... 3

**Federal Rules**

Fed. R. Evid. 702 ..................................................................................... 4, 12

## INTRODUCTION

Defendant BP Exploration and Production, Inc. ("BPXP") has filed a motion to exclude the reports and testimony of Dr. Fredric Quivik, an industrial historian with particular expertise in the operational relationships between parent and subsidiary corporations, whose testimony has been consistently admitted and relied by courts in a number of environmental cases.  The defendant has cherry picked sound bites from Dr. Quivik's expert reports and deposition testimony in an effort to distort, degrade, and exclude his testimony.

Contrary to the defendant's assertions, Dr. Quivik will not only testify to what the BP Group and BPXP did or did not do.  He will provide an "organizational analysis" that is directly relevant to several penalty factors that the Court must consider under Section 113(b)(8) of the Clean Water Act, including the economic impact of a penalty on the violator.  33 U.S.C. § 1321(b)(8).  Dr. Quivik's specialized knowledge will help the Court to understand how the BP Group controlled the operations at the Macondo well and the response actions in the Gulf of Mexico, and how the BP Group, including BPXP, functioned as single entity throughout all of relevant events.[1]

The case of *In re Rezulin*, 309 F. Supp. 2d 531, 554 (S.D.N.Y. 2004) is inapposite.  Dr. Quivik does not offer opinions as to "the intent or motives that underlay" as yet undetermined conduct or "merely a narrative" as the non-historian experts in that jury case.  *Id.*  Nor does the case of *Marvel Characters, Inc. v. Kirby*, 726 F. 3d 119,  135-136 (2d Cir. 2013) support the defendant's argument.  As the Second Circuit recognized in *Marvel Characters,* the "specialized knowledge" of a historian can aid a trier of fact to "help to identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson."

___

[1]"BP, BP Group, or the group" is defined as "BP p.l.c. and its subsidiaries."  *See* Exhibit 1 (TREX-06033, Excerpt from BP Annual Report and Form 20-F for 2010, p. 3).

Unlike the expert at issue in *Marvel Characters,* Dr. Quivik's expert reports are not "by and large undergirded by hearsay statements made . . . in both formal and informal settings." *Id.* At 135.  Instead, Dr. Quivik has relied on the testimony of numerous BP and other witnesses under oath and voluminous business records produced by the defendant.

Contrary to the defendant's assertions, courts not only have allowed historians to identify and interpret evidence involving events from decades ago where many of the witnesses are deceased.  Courts have admitted and relied on expert historian testimony, including from Dr. Quivik, related to events that extend from distant to contemporary times, and cases where key witnesses are not deceased.  *See* e.g. *United States v. Sterling Centrecorp, Inc.*, No. 08-2556, 2013 WL 3166585, at *2, 11, 52, 54-55 (E.D. Cal. June 20, 2013) (admitting Dr. Quivik's expert testimony in an environmental case involving three lay witnesses all of whom were alive, and two of whom had testified by deposition before trial).[2]

Although BPXP filed its motion to exclude as a *Daubert* motion, the defendant does not seek to exclude Dr. Quivik's reports or testimony as irrelevant or unreliable under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Dr. Quivik is eminently qualified to render the opinions disclosed in his expert reports.  His opinions are based on sufficient facts or data - an extensive review of thousands of pages of complex documents produced, exhibits entered, and testimony presented in this litigation.  His testimony is the product of reliable principles and methods; and he has reliably applied those principles and methods to the facts of this case.  Dr. Quivik's testimony will be particularly useful to the Court because it analyzes the role of the BP Group in the operation of the Macondo well in light of the undisputed facts that BPXP has no

---

[2] *See* Veasley *v. Perry*, No. 13-00193, 2014 WL 5090258, at *2 (S.D. Tex. Oct. 9, 2014), *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 933, 937, 940-941 (N.D. Cal. 2010), *United States v. City of Euclid*, 580 F. Supp. 2d 584, 606  (N.D. Ohio 2008); *Citizens for a Better Gretna v. City of Gretna, Louisiana,* 636 F. Supp. 1113, 1118, 1119 n.12 (E.D. La. 1986).

employees, and the BPXP Board does not guide or direct business plans or strategy.  BPXP's motion should be denied.

## BACKGROUND

Dr. Quivik has submitted Round 1, 2 and 3 expert reports in the penalty phase of this case. *See* BPXP's Motion, Exhibits B, C and D.  As Dr. Quivik stated in his expert report, he is a Professor of History at Michigan Technological University who received his Ph.D. in the History and Sociology of Science from the University of Pennsylvania.  He is academically trained in the history of technology, and has extensive experience in the field of industrial history, both in the context of litigation and in academic and other applications.  A particular focus of much of his work has been on the ways that large extractive enterprises organize themselves in order to manage their operations.

As BPXP has conceded, Dr. Quivik has been admitted to testify as an expert historian regarding in various environmental cases, primarily under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  42 U.S.C. § 9601 *et seq.  See* BPXP Brief at 7; *e.g. United States v. Sterling Centrecorp, Inc.*, No. 08-2556, 2013 WL 3166585; *United States v. Newmont USA Limited*, No. 05-020, 2008 WL 4621566 (E.D. Wash. Oct. 17, 2008), *United States v. Newmont USA Limited*, No. 05-020, 2007 WL 4856859 (E.D. Wash. Nov. 16, 2007); *Pinal Creek Group v. Newmont Mining Corp.,* 352 F. Supp. 2d 1037 (D. Ariz. 2005), *Pinal Creek Group v. Newmont Mining Corp.,* No. 91-1764, Order and Motion, June 23, 26, 2006 (D. Ariz.) (Rec. Docs. 1786 & 1807);[3] *United States v. Asarco Inc.*, 392 F. Supp. 2d 1197 (D. Idaho 2005); *Coeur D'Alene Tribe v. Asarco*, 280 F. Supp. 2d 1094, 1104 (D. Idaho 2003).

---

[3] *See* Exhibit 2 (*Pinal Creek Group v. Newmont Mining Corp.,* No. 91-1764, Order and Motion, June 23, 26, 2006 (D. Ariz.) (Rec. Docs. 1786 & 1807).

## ARGUMENT

### A.  Applicable Legal Standard

Rule 702 of the Federal Rule of Evidence governs the admissibility of expert witness

testimony.  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 588; *United States v. Hitt*, 473 F.3d 146, 158

(5th Cir. 2006).  Before expert testimony can be admitted under this rule, the court must make a

preliminary examination to ensure that the testimony is both relevant and reliable.  *See Kumbo*

*Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-151, 153 (1999).[4]  Notwithstanding *Daubert* and

its progeny, "the rejection of expert testimony is the exception rather than the rule."  Fed. R.

Evid. 702, Advisory Comm.'s Note (2000).  Courts generally should avoid resolving disputed

issues of fact at the *Daubert* stage.  Fed. R. Evid. 702, Advisory Comm.'s Note (2000).  *See*

*Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1392 (Fed. Cir. 2003); *In re Katrina Canal*

*Breaches Consol. Litig.,* Nos. 05-4182, 10-866, 2012 WL 4328354, at *1 (E.D.La. Sept. 20,

2012) (Duval, J.); *In re Matter of Cudd Pressure Control, Inc.,* No. 98-585, 1999 WL 756439

(E.D.La. Sept. 24, 1999) (Barbier, J.).

This Court has issued many rulings over the years denying *Daubert* motions to exclude

expert testimony in bench trials.[5]  In fact, in the Court's Order Regarding Amended Penalty

Phase Schedule, the Court "reminded [the parties] that this is a bench trial and they should use

great caution in filing *Daubert* motions." Rec. Doc. 13428.  As this Court held in *Thompson v.*

---

[4] *See Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed. Appx. 377, 381 (5th Cir. 2006); *Hodges v. Mack Trucks, Inc*., 474 F.3d 188, 194 (5th Cir. 2006); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002)*; Curtis v. M&S Petroleum, Inc.* 174 F.3d 661, 672 (5th Cir. 1999); *Schmidt v. MTD Prod., Inc.*, No. 04-3412, 2006 WL 5127539, at *2 (E.D. La., July 5, 2006) (Barbier, J.).

[5]*See e.g. Young v. BP Exploration & Prod., Inc. et al,* No. 11-1003, 2012 WL 2087405 (E.D.La. June 8, 2012) (Barbier, J.); *United States Marine, Inc. v. United States,* No. 08-2571, 2009 WL 3480979 (E.D.La. Oct. 26, 2009) (Barbier, J.); *Poiencot v. Globalsantefe Drilling Co. et al.,* No. 06-10793, 2008 WL 5429645 (E.D.La. Aug. 6, 2008) (Barbier, J.); *Wilson v. American Sec. Ins. Co.,* No. 07-5984, 2008 WL 2704522 (E.D.La. July 3, 2008) (Barbier, J.); *Matheny v. Tetra Techs., Inc.,* No. 07-1556, 2008 WL 2178091 (E.D.La. May 22, 2008) (Barbier, J.); and *School Bd. Of the Parish of St. Charles v. Shell Oil Co.,*No. 04-2511, 2007 WL 756458 (E.D.La. March 8, 2007) (Barbier, J.).

*Rowan Cos., Inc.*, No. 06-3218, 2007 WL 724646 *1 (E.D. La. Mar. 6, 2007) (Barbier, J.):

> ... the purpose of [a] *Daubert* motion is "to ensure that only reliable and relevant expert testimony is presented to the jury." *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999) (superseded by rule on other grounds), *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."  *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).  "*Daubert* requires a binary choice – admit or exclude – and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves."  *SmithKline Beecham Corp. v. Apotex Corps.*, 247 F. Supp. 2d 1011, 1042 (N.D.Ill. 2003).

Given that the Penalty Phase of "this case is a bench trial, and thus that the objectives of *Daubert,* upon which BP's motion" is premised, "are no longer implicated, the Court" should find that "the motion [in limine] to exclude expert testimony should be denied."  *Deville v. Comar Marine Corp.*, No. 08-4104, 2009 WL 1870896, at *1 (E.D. La. June 25, 2009) (Barbier, J.), (quoting *Daubert*, 509 U.S. at 596; *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.,* 80 F.3d 1074, 1078 (5th Cir. 1996)).

## B.  Dr. Quivik's Specialized Knowledge Will Help the Court to Understand Relevant Evidence

In determining the amount of a civil penalty, this Court must consider the eight factors set forth in Section 113(b)(8) of the Clean Water Act, including "any history of prior violations" and "the economic impact of the penalty on the violator."  33 U.S.C. § 1321(b)(8).  Dr. Quivik's expert reports and anticipated testimony concern the relationship between the BP Group and BPXP, particularly with regard to the pollution of the Gulf of Mexico from the Macondo well.[6]

---

[6] Dr. Quivik's reports also provide a description of the centralized common processes, management and financial systems that apply to the entire BP Group.  *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 69-75 filed under seal).

In its motion to exclude Dr. Quivik, the defendant has not claimed that this testimony is irrelevant to the Court's consideration of the penalty factors.[7]  *See e.g. United States v. Municipal Authority of Union Township* ("*Dean Dairy*"), 929 F. Supp. 800 (M.D. Pa. 1996), *aff'd,* 150 F.3d 259 (3rd Cir. 1998) (affirming that the assets of the defendant's parent corporation could be examined in determining the economic impact of the penalty on the violator, reasoning that the "[t]he consideration of a parent's financial condition in assessing a penalty on a subsidiary is a far cry from piercing the corporate veil and holding the parent liable for the actions of its subsidiary; here the penalty was assessed against the subsidiary alone. . . . The court simply undertook a fact-specific assessment that examined the role of the parent in the operations of the subsidiary, particularly with regard to the issue of pollution of the nearby waters and actions that could have resolved it."  *Id.* at 268-269.[8]

In the *Newmont* litigation, a case involving the liability under CERCLA of a parent company for its role in operation of a mine owned by a subsidiary, Dr. Quivik testified as to the historical relationship between the defendant and its subsidiary.  The court recognized Dr. Quivik as an expert in his field, found his testimony to be helpful, and cited Dr. Quivik's testimony dozens of times in its opinion finding the defendant liable under CERCLA.  *United States v. Newmont USA Limited*, 2008 WL 4621566.

Prior to the *Newmont* trial, the court denied the defendants' motion to exclude Dr. Quivik's expert opinions reasoning:

---

[7] The United States will provide a detailed response to the Defendant's Motion to Exclude Evidence Relating to the Economic Impact of a Clean Water Act Penalty on the BP Group (Rec. Doc. 13813) by December 19, 2014, as required by the Court's Order Regarding Amended Penalty Phase Schedule.  Rec. Doc. 13428.

[8] As the United States repeated has stated, and will reiterate in its Response to another Motion *in Limine* filed by the defendant, it is not asking this Court to pierce the corporate veil and hold BP p.l.c. liable in this litigation.

> The fact that Dr. Quivik's opinion is based on a narrative of facts based upon his own review of documentary evidence already in the record does not make it inadmissible. Historians are trained to recover 'facts' and, through selecting certain facts from the universe of available facts, construct narratives that explain a historical issue.  Through the application of his expertise as a historian Dr. Quivik may be able to assist the court as a 'summary' or 'aggregating' witness 1) by testifying as to what evidence, in his opinion, exists in the record showing the relative roles of the parties; and 2) by providing historical context to the evidence.

*United States v. Newmont USA Limited*, 2007 WL 4856859, at *3.  The greater number of years of documentary evidence that Dr. Quivik was required to review in the *Newmont* case does not distinguish it from the instant action.  In both cases, the parties have submitted "mountains or [sic] correspondence and innumerable depositions" and other evidence.  *Id.* at *3.

Similarly, in the *Sterling Centrecorp,* Dr. Quivik testified regarding the relationship between a parent and subsidiary corporation, and the court relied on Dr. Quivik's expert opinions to hold the parent company liable for its role in operation of a mine owned by its subsidiary under CERCLA.  *United States v. Sterling Centrecorp, Inc.*, 2013 WL 3166585, at *2, 54-55.  Again, the court rejected defendant's motion to exclude Dr. Quivik, following reasoning very similar to that set forth by the court in the *Newmont* case.  *Id.* at *2 n.4.

Contrary to the defendant's claims, Dr. Quivik's reports do not merely "regurgitate" the evidence "to construct a factual narrative of the record evidence." Defendant's Brief at 2.  As stated in his reports and at his deposition, he has analyzed the facts to reach his opinions. The summary section Dr. Quivik's Round One report states:

> The purpose of this report is to provide a detailed organizational analysis of BP p.l.c. (a legal entity incorporated in the United Kingdom), of BP's operations in the Gulf of Mexico (including the drilling of the Macondo well), of BP Exploration and Production Inc. (BPXP, a Delaware corporation), and of the corporate and organizational relationships between BPXP and the operations in the Gulf, on the one hand, and BP p.l.c. and its global enterprise, on the other.[9]

---

[9] *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 2-3, filed under seal).

When asked at his deposition, whether he was expressing an opinion "on whether somebody is acting on behalf of a company in any sense," he stated:

> Well, I'll repeat what I said, that I've researched numerous instances in which people have been, as individuals, taking actions and doing so on behalf of companies. And I've researched those episodes, if you will, written about them, and those episodes have been part of my **analysis**. So that there would be instances in which I would say in my narrative that a company did something. When we look at the record we see that it was an individual who did that, took that action on behalf of the company. [Emphasis added][10]

In response to a further question, Dr. Quivik responded:

> It's based on my personal experience with lay people as well as my professional understanding as an historian, that that's one of the roles that we play, is to perform this very thorough **analysis** of information from the past in order to create a reliable account of that past.[11]  [Emphasis added]

Dr. Quivik's reports provide "a detailed organizational analysis" that will help the Court to understand the relationship between the BP Group and BPXP, a relationship that the evidence shows even some of BP's highest ranking officials did not understand.  While the Macondo disaster occurred less than five years ago, the volume and complexity of the documentary evidence and testimony at issue is greater than for many events that occurred in the distant past. Dr. Quivik's reports do not "simply repeat and summarize deposition testimony."  Defendant's Brief at 2.[12]

---

[10] *See* Exhibit 3 (Deposition of Fredrik Quivik, at 33).

[11] *See* Exhibit 3 (Deposition of Fredrik Quivik, at 75).

[12] The defendant has cited a host of cases some of which were relied on unsuccessfully by the defendants in the *Newmont* litigation.  None of these cases involved bench trials or expert historians. *See Andrews v. Metro North Commuter Railroad Co*., 882 F. 2d 705 (2d Cir. 1989); *McGowan v. Cooper Industries, Inc.*, 863 F.2d 1266 (6th Cir. 1989); *In re Fosamax Products Liability Litigation*, 654 F. Supp. 2d 164 (S.D.N.Y. 2009); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008); *In re Rezulin Products*,  309 F. Supp. 2d 531 (S.D.N.Y. 2005); *LinkCo v. Fujitsu Ltd.*, No. 00-7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002); *Media Sport & Arts v. Kinney Shoe Corp.*, No. 95-3901, 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999); *In re Tasch, Inc.*, Nos. 97-15901 & 98-3746, 1999 WL 596261 (E.D. La. Aug. 5, 1999); *Taylor v. Evans*, No. 94-8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997).

Here, in his expert reports, Dr. Quivik has clearly presented and explained the relationship between the BP Group and BPXP, and the role of the BP Group in the direction of the operations at the Macondo well and the response to the disaster.  Dr. Quivik's central expert opinion is that not only BPXP, but the BP Group conducted and managed the operations at the Macondo well and the response to the blowout.  This is not a legal conclusion, but rather an expert opinion that will be helpful to the court in its examination under the *Dean Dairy* line of cases of the role the BP Group played in the operations of BPXP, particularly with regard to the pollution of the Gulf of Mexico from the Macondo well.

The complexity of the relationship between the BP group and BPXP is well-illustrated by the testimony of Douglas Suttles.  At the time of the disaster, Mr. Suttles was the Chief Operating Officer ("COO") of BP plc's global Exploration and Production business segment. The morning after the blowout, Tony Hayward, the Chief Executive Officer ("CEO") of BP plc appointed Mr. Suttles to lead and manage BP's response to the blowout.[13] When asked at his deposition, Mr. Suttles testified that he was not familiar with the legal entity, BP Exploration and Production, Inc.:

> Q. Who are the affiliates of BP Exploration & Production, the organizational unit you were COO of?
>
> A.  Given that – I don't – I don't know if BP Exploration & Production was a legal entity, so I don't know if it had a-a direct affiliate.  As you can imagine, a global corporation like BP is a – has a complex legal entity structure, and I'm not an expert in that.  I just – these are – there are issues I relied on others.
> . . . .
> Q. Inc.? Is this the company you worked for, BP Exploration & Production, Inc.?
>
> A.  As – as I described earlier, I worked for the organizational entity called BP Exploration and Production.  I'm just not familiar with the - the – the legal entity structure.[14]

---

[13] *See* Exhibit 4 (Deposition of Suttles, May 19-20, 201, at 22, 41-43, 585, 210, 224, 495, 553-556).

[14]*See* Exhibit 4 (Deposition of Suttles, May 19-20, 201, at 803, 817-818).

Dr. Quivik will clearly explain the relationship between BP plc's global Exploration and Production business segment, BP Group operating units, such as the Gulf of Mexico Strategic Performance Unit ("SPU"), and BP's legal entities, such as BPXP.  As Dr. Quivik stated in his expert reports, delegations of authority and direction in BP's organizational structure for managing BP's operations generally function without reference to the legal entities BP owns. Delegations of authority to BP's Gulf of Mexico operations pass from the top of BP's global organizational hierarchy to operations in the United States, which likewise exist in an extra-legal fashion distinct from BP's array of global subsidiaries.[15]

Dr. Quivik uses each of the allegedly "minor details about various employees and corporate entities" cited by the defendant to support his central conclusion that not only BPXP, but the BP Group conducted and managed the operations at the Macondo well and the response to the blowout.

- The defendant attacks Dr. Quivik's description of the physical layout of the well team leaders and drilling engineers working at BP's Houston office facility.  But BPXP fails to mention the context, which was Dr. Quivik's description of the expressed rationale for the "April 2010 Reorganization of BP's Drilling & Completion Organization."   As Dr. Quivik noted, "Rich testified that the reorganization was part of a global undertaking within the BP enterprise to shift from being an asset-based structure to a function based structure."[16]

- As Dr. Quivik emphasized in his Round Two report, no one in the Drillings and Completions ("D&C") hierarchy, from Kevin Lacy and Patrick O'Bryan, the Vice Presidents of D&C, to Mark Hafle, the drilling engineer, or Donald Vidrine , the well site leader, were employees or officers of BPXP. [17]

---

[15] *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 2-3, filed under seal)

[16] *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 60-62, filed under seal).

[17] *See* Defendant's Brief, Exhibit D (Response Expert Report of Fredrik Quivik, at 12-16, filed under seal).

- The defendant quotes Dr. Quivik's description of the role of James Dupree whose title was regional president for the Gulf of Mexico Strategic Performance Unit ("SPU") at the time of the disaster. But BPXP does not quote Dr. Quivik's analysis of those facts set forth in the next and concluding sentence of the paragraph: "As with Neil Shaw, Dupree's lack of awareness of BPXP's role in the Gulf is not surprising because, as BP documents make clear, the organization for managing operations, of which Dupree was a key part, was the organization through which his delegation of authority flowed. He did not need to be aware of the legal structure of the BP group, because that was the responsibility of BP tax, BP treasury, etc."[18]

- Based on the testimony of James Dupree and numerous other BP witnesses, one of Dr. Quivik's key interpretations of the evidence and opinions is that BP's "operations are managed by an organizational structure that makes little if any reference to BP's legal subsidiaries in the U.S. but rather references the kinds of extra-legal organizational units that BP has established and standardized throughout its global enterprise."[19]

- The defendant attacks Dr. Quivik's description of David Sims, the D&C operations manager. Yet BPXP fails to mention that such description was in the context of Dr. Quivik *analysis* of "BP's Management Structure for Operations in the Gulf of Mexico."[20]

- As Dr. Quivik indicated in that section of his report: "Regarding the irrelevance of BP's parent/subsidiary structure to the management structure for BP's operations, even more telling is the fact that none of the employees whose deposition testimonies I have reviewed knew the role that BPXP played in the Gulf, even if they thought they had heard of the company. There is no suggestion in the testimony of these BP employees or in the organizational charts provided by BP that they understood that they were working for BPXP, even if technically employed by BPAPC. Moreover, in their descriptions of who was ultimately responsible for directing their activities (i.e., who was the operator) at the Macondo well, there is no suggestion that they understood that BPXP was a part of the chain of command."[21]

---

[18] *See* Defendant's Brief, Exhibit D (Response Expert Report of Fredrik Quivik, at 12, filed under seal).

[19] *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 2, filed under seal).

[20] *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 52-56, filed under seal).

[21] *See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 56, filed under seal).

- 11 -

Dr. Quivik can clearly and accurately help the Court to understand this complex relationship between the BP Group and BPXP.

### C.  Dr. Quivik's Reports and Expected Testimony Are Based on Sufficient Facts or Data, the Product of Reliable Principles and Methods; and the Reliable <u>Application of Those Principles and Methods to the Facts of this Case</u>

BPXP repeatedly complains that "no reported decision has allowed a 'historian' to testify in a case involving environmental contamination that occurred within five years of the trial." BPXP Brief at 3, 11.  This is not a key issue under FRE 702 or *Daubert*.  What is key is whether Dr. Quivik's testimony is based on sufficient facts or data, the product of reliable principles and methods, and whether he has reliably applied those principles and methods to the facts of this case.  Clearly, Dr. Quivik has done so.

Dr. Quivik has applied the same historical method in his analysis of the complex myriad of facts and documents in this case that he has applied in his lifetime of academic research and peer reviewed publications, and in the various other cases where he has been admitted to testify as an expert at trial.[22]  He has used that same method in his analysis of very recent documents (e.g. the Penalty phase deposition testimony), those that were created at the time of the Macondo blowout (e.g. correspondence informing Andrew Inglis, BP p.l.c.'s CEO of global exploration and production, of difficulties at the Macondo well), and those that were created decades ago (e.g. documents concerning the incorporation of BPXP and other BP subsidiaries).

In a number of major cases where the courts have relied on expert historians, those historians have applied their expertise not only to events that have occurred in the distant past but to contemporary events with living witnesses as well.  For instance, in *Veasley v. Perry*, No. 13-00193, 2014 WL 5090258, at *2 (S.D. Tex. Oct. 9, 2014), the court relied on an expert historian

---

[22]*See* Defendant's Brief, Exhibit C (Expert Report of Fredrik Quivik, at 6, filed under seal); Defendant's Brief, Exhibit A (Quivik Deposition, at 67).

who "testified about the use in Texas of various election devices to suppress minority voting from the early days of Texas through today," holding that Texas legislation created an unconstitutional burden on the right to vote for Hispanics and African-Americans.  In *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 933, 937, 940-941 (N.D. Cal. 2010), the court relied on two expert historians who testified regarding the development of marriage in California and the relationship between Proposition 8 and earlier campaigns targeting gays and lesbians, holding that the California voter-enacted constitutional amendment banning gay marriage violated the due process and equal protection clauses of the Fourteenth Amendment.  *See United States v. City of Euclid*, 580 F. Supp. 2d 584, 606-607 (N.D. Ohio 2008) (relying on an expert historian who analyzed racial segregation based on census data from 1990 and 2000, the court held that the city's method of electing its city council resulted in the dilution of African-American voting strength in violation of the Voting Rights Act.); *Citizens for a Better Gretna v. City of Gretna, Louisiana,* 636 F. Supp. 1113, 1118, 1119 n.12 (E.D. La. 1986) (relying on plaintiffs' expert historian who testified regarding racial segregation in the Jefferson Parish school system and present views "that the apparent right to freely arrest makes the chief and the police organization especially fearsome to the black community," the court held that the at-large election system diluted the political strength of minority group, in violation of the Voting Rights Act.).[23]

The defendant cannot have it both ways.  BPXP seeks to exclude Dr. Quivik's testimony both for being based on events that are allegedly too recent and too distant in time.  *See* Defendant's Brief at 6-9.  Dr. Quivik has appropriately summarized BP's evolution as a global enterprise beginning

---

[23]*See also Siegal v. Warner Bros. Entertainment*, No. 04-08400, 2009 WL 2014164, at *5, 13 (C.D. Cal. July 8, 2009) (the court found the testimony of plaintiffs' expert historian "credible and persuasive" not only about Iron Man's role in Marvel's pantheon of superheroes in the past, but his "current popularity and heightened public awareness brought about in large measure by the successful release of the *Iron Man* film in 2008. . . .")

in the mid-19[th] century to provide a broad historical context within which to view the current relationship between the BP Group and BPXP.  The defendant has not pointed to any of Dr. Quivik's description of the relationship between the BP Group and BPXP that is unreliable or inaccurate.

### D.  Dr. Quivik's Testimony Should Not Be Excluded Because He Allegedly Improperly Evaluated the Credibility of Witnesses and Documents

The defendant's complaint that Dr. Quivik evaluated the credibility of documents and witnesses in this case is another red herring.  Instead, using the historical method, Dr. Quivik has reliably analyzed the statements of a number of key employees, officers and managers of other BP entities in order to answer "the question, who was managing various facets of operations at the Macondo well?"  As Dr. Quivik testified at his deposition, he did not find the testimony of any of the BP witnesses whose depositions he relied to be not credible.[24]  Unlike the cases cited by the defendant, Dr. Quivik has not examined conflicting versions of the same events or opined that one witness's version of events or facts is more believable than another's.  Unlike the instant action, each of the cases cited by the defendant are jury cases where experts have interjected their views of credibility in the face of conflicting evidence.[25]

Rather, in the instant case, the defendant's corporate governance expert, Professor Daines has not disputed any of the key evidence identified and analyzed by Dr. Quivik.  For instance, Professor Daines admits that:

---

[24] *See* Defendant's Brief, Exhibit A (Quivik Deposition, at 67-69).

[25] *See Nimely v. City of New York* , 414 F.3d 381 (2d Cir. 2005) (any probative value of pathologist's testimony regarding police officers' credibility was substantially outweighed by prejudice to arrestee and by confusion and misleading jury); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (expert's proposed testimony in a criminal case would have confused the jury's assessment of the police officer's credibility); *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) (expert's proposed testimony in a criminal case as to the trustworthiness of the government witnesses invaded the province of the jury); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (expert's fact narrative, which included speculations as to the states of mind and motivations of parties, was inadmissible as unhelpful to the jury).

- BPXP issued $16.4 billion in dividends to its corporate parents before the Macondo blowout;[26]

- The BP Group has provided more than $22 billion in financing to BPXP after the blowout in the form of capital injections and loans;[27]

- The BPXP board does not guide business plans and strategy, set performance objectives for the Gulf of Mexico business unit, oversee capital expenditures, or oversee acquisitions and divestitures;[28]

- BPXP has no employees;[29] and

- More than 2000 BP Group employees have conducted and directed BP operations in the Gulf of Mexico, including at the Macondo well.[30]

Again, BPXP has not pointed to any of Dr. Quivik's descriptions or analyses of the facts that are inaccurate or unreliable.

## **CONCLUSION**

For the forgoing reasons, the BPXP's Motion to exclude the reports and testimony of Professor Quivik should be denied.

---

[26] Exhibit 5 (Excerpts from Expert Report of Robert Daines, August 15, 2014, at 23-24); Exhibit 6 (Deposition of Daines, at 160-182).

[27] Exhibit 5 (Daines Report, at 14-16, 33; Exhibit 6 (Daines Deposition, at 182-187).

[28] *See* Exhibit 5 (Daines Report at 32-33); Exhibit 6 (Daines Deposition, at 158-159).

[29] *See* Exhibit 5 (Daines Report, at 32); Exhibit 7 (Daines Response Report, September 12, 2014, at 6);

[30] *See* Exhibit 5 (Daines Report, at 32, 38-39); Exhibit 7 (Daines Response Report, at 5-6); Exhibit 6 (Daines Deposition at 196-239).

Respectfully submitted,

JOYCE BRANDA                                          SAM HIRSCH
Acting Deputy Assistant Attorney General             Acting Assistant Attorney General
Civil Division                                       Environment & Natural Resources Division
PETER FROST                                          SARAH HIMMELHOCH
Director, Torts Branch, Civil Division               Senior Litigation Counsel for E-Discovery
Admiralty and Aviation                               MICHAEL MCNULTY
SHARON SHUTLER                                       Senior Counsel
MALINDA LAWRENCE                                     NANCY FLICKINGER
LAURA MAYBERRY                                       Senior Attorney
Trial Attorneys                                      PATRICK CASEY
R. MICHAEL UNDERHILL, T.A                            RICHARD GLADSTEIN
Attorney in Charge, West Coast Office                DANIEL S. SMITH
                                                     Senior Counsel
                                                     ABIGAIL ANDRE
                                                     A. NATHANIEL CHAKERES
                                                     ANNA CROSS
                                                     RACHEL HANKEY
                                                     JUDY HARVEY
                                                     RACHEL KING
                                                     ERICA PENCAK
                                                     BRANDON ROBERS
                                                     GORDON YOUNG
                                                     Trial Attorneys

                                                     /s/ Richard Gladstein
                                                     _____
                                                     STEVEN O'ROURKE
                                                     Senior Attorney
                                                     Environmental Enforcement Section
                                                     U.S. Department of Justice
                                                     P.O. Box 7611
                                                     Washington, D.C. 20044
                                                     Telephone:  202-514-2779
                                                     Facsimile:   202-514-2583
                                                     E-mail:  steve.o'rourke@usdoj.gov
                                                     KENNETH A. POLITE, JR.
                                                     United States Attorney
                                                     Eastern District of Louisiana
                                                     SHARON D. SMITH
                                                     Assistant United States Attorney
                                                     Eastern District of Louisiana

- 16 -

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis-Nexis File & Serve in accordance with Pretrial Order #12, and the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2719, on this 15th day of December, 2014.

/s/ Richard Gladstein
U.S. Department of Justice

- 17 -