# EXHIBIT 1

## to

**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE LEGAL OPINION TESTIMONY OF DAVID SUNDING**

01-45971
TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG ) MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on ) SECTION: J
APRIL 20, 2010 )
) JUDGE BARBIER
)
) MAG. JUDGE SHUSHAN

## *CONFIDENTIAL PENALTY PHASE EXPERTS*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## David Sunding

**October 30, 2014**

*COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1            VIDEOGRAPHER:  The date is October the
 2   30th, 2014.  The time is 8:24 a.m. This is
 3   the video deposition of David Sunding in
 4   regards to the oil spill by the oil rig
 5   DEEPWATER HORIZON in the Gulf of Mexico on
 6   April 20th, 2010.
 7                 DAVID SUNDING,
 8   having been first duly sworn, testified as
 9   follows:
10                   EXAMINATION
11   BY MS. HARVEY:
12        Q.    Good morning, Dr. Sunding.  My
13   name is Judy Harvey.  I'm with the Department
14   of Justice.  This is my colleague, Nancy
15   Flickinger, and Rachel king.  And you met
16   Mr. Mason.
17              And I just wanted to start off
18   with a few instructions.  Just remember for
19   the court reporter to give verbal answers to
20   the questions.  And let's try not to
21   interrupt each other through the -- through
22   the deposition.  I tend to talk pretty
23   quickly.  So if, for some reason, you've
24   misheard what I said or you don't understand
25   the question, please ask me to rephrase.  If
```

```
 1        Q.     All right.  You mention in your
 2   report your work on the SAB Panel, right?
 3        A.     Yes.
 4        Q.     Okay.  And as part of that work,
 5   you said you received briefings from EPA on
 6   certain penalty cases; is that right?
 7        A.     Yes.
 8        Q.     Okay.  But you said none of
 9   those cases involved oil spill matters?
10        A.     I don't really remember one way
11   or another.  I would be surprised if they
12   involved an oil spill.  They might have.
13        Q.     Okay.  Did they involve matters
14   of strict liability, accessing a penalty in a
15   case of strict liability where there's no
16   culpability?
17        A.     No.  Cases where there's no
18   culpability, no.
19        Q.     How do you define culpability?
20        A.     Well, I'm not a -- I'm not a --
21   a lawyer, so I'll give you, you know, my
22   economist's definition of culpability.
23               I think culpability is very
24   close to responsibility.  You know, if an
25   entity is culpable, they're responsible for
```

```
 1  the violation.
 2       Q.    All right.  You also mention
 3  your panel on the water resources -- a panel
 4  on water resources convened by the National
 5  Academy of Sciences.  What did that work
 6  involve?
 7       A.    That was not -- that was work
 8  that had more to do with the economics of
 9  water use.
10       Q.    Okay.
11       A.    So it was more about waters and
12  input into production processes.  It wasn't
13  about environmental enforcement.
14       Q.    You also mention work on --
15  for -- for wetlands permits.  And then the
16  focus of that work, you were quantifying the
17  costs of obtaining a wetlands permit; is that
18  right?
19       MR. LOTTERMAN:  Object to form.
20       A.    I certainly have written on that
21  question, the -- what we economists would
22  call the transaction costs of obtaining a
23  Section 404 permit.
24       Q.    Okay.  And that's the work you
25  referred to that was cited in the Rapanos
```

1  case?
2      A.    Yes.  Yes.  I mean, there --
3  there was more to it than just that, but that
4  was certainly part of the paper that was
5  cited in Rapanos.
6      Q.    In that paper, is there anything
7  having to do with the economics of
8  deterrence?
9      A.    Not -- not per se.
10     Q.    Nothing to do with penalties?
11     A.    No.  That was about -- that was
12 about permitting.  So it wasn't by violations
13 of permit conditions.
14     Q.    You also discuss your work on
15 the Arch Coal case and the incentive --
16 incentive effects of EPA's use of its ex post
17 veto authority.  This is a white paper that
18 you did, commissioned by the Chamber of
19 Commerce; is that right?
20     A.    Yes, that's correct.
21     Q.    Okay.  And the Chamber of
22 Commerce took the position that EPA had no
23 authority to issue the ex post veto permits?
24     A.    You know, I would probably not
25 be the best person to opine on what their

1  position was.  I'm not sure exactly, and I
2  wasn't involved in any of the legal briefs.
3       Q.    Did they take a position adverse
4  to EPA?
5       A.    I think they did, yes.  I'm
6  pretty sure that's correct.
7       Q.    And that paper also had to do
8  with permitting, correct?
9       A.    Yes.  So that -- that paper, in
10 particular, had to do with the incentive
11 effects of -- of permitting or -- or removal
12 of -- removal of a permit, or ex post veto.
13      Q.    But not anything having to do
14 with the economic effects of deterrence?
15      A.    Well, I'm not sure I would agree
16 with that.  I mean, the -- the point of the
17 paper I wrote was about the deterrent effect
18 of EPA exercising its ex post veto
19 authority --
20      Q.    Well, that's -- okay.
21      A.    -- in the sense that it -- in
22 the sense that it deters capital investment.
23      Q.    Okay.  I'm talking about
24 deterrence and the effect that it improves
25 safety.  It had nothing to do with that,

```
 1  right?
 2        A.    That -- that it reduces the
 3  likelihood of a violation, that's correct.
 4        Q.    Okay.  You also mentioned your
 5  work on -- your expert report -- or, excuse
 6  me.  You also mentioned expert work on Clean
 7  Water Act penalty issues.  Can you describe
 8  that work?
 9        A.    Sure.  I've been involved in a
10  few cases involving civil penalties and --
11  and particular application of the BEN and
12  ABEL models.
13        Q.    Okay.  And is one of these
14  reports work that you did for the Hilmar
15  Cheese Company?
16        A.    That's interesting.  I'm trying
17  to remember if -- I haven't thought about
18  that case for a little while.  I actually
19  don't remember.  I would have to look.
20        Q.    All right.  What other cases,
21  then, are you referring to?
22        A.    There were -- there was a case
23  in -- another case in California, in Southern
24  California, that involved a civil penalty for
25  -- it was an agricultural activity.  I can't
```

1  remember exactly what they did.  But the
2  government had a BEN model analysis of
3  economic benefit that they had -- that they
4  had proffered.
5       Q.     And what was your opinion in
6  that case?
7       MR. LOTTERMAN:  Object to form.
8       A.     Yeah.  That case, it ended up
9  settling before it got too far.  I don't
10 think I had a deposition in that case.
11      Q.     Okay.
12      A.     It settled before then.
13      Q.     Did you have an opinion in that
14 case?
15      A.     I really don't remember what it
16 was.  I remember we were -- you know, like
17 you normally do in a BEN model analysis, we
18 were looking at discounted cash flows or
19 future, you know, growing cash flows back to
20 some present value.  But I -- I don't
21 remember the specifics.
22      Q.     Other than BEN modeling, was
23 there any other aspect of penalties that you
24 were opining on in that case?
25      MR. LOTTERMAN:  Object to form.

```
 1        A.     I think that case, as I
 2   remember, also involved some ability-to-pay
 3   analysis.  But -- but I don't -- I don't
 4   remember too many of the specifics.
 5        Q.     But you weren't looking into any
 6   deterrent effects from the perspective of
 7   safety?
 8        A.     No.  Those were more, you know,
 9   what I would characterize as sort of normal
10   work-a-day penalty cases involving
11   calculation of economic benefit.
12        Q.     Okay.  Other than the case in
13   Southern California, can you identify any
14   other cases regarding Clean Water Act civil
15   penalties that you worked on?
16        A.     Yeah.  There were a few others.
17   There are a couple of partners at Brattle who
18   do work occasionally in Clean Water Act civil
19   penalty cases.  I may have been involved
20   through them.  But, frankly, normally,
21   somebody like me doesn't have to get involved
22   in these cases.  They're so formulaic.  You
23   know, in the sense that the -- the BEN model,
24   which I would characterize as being the
25   workhorse in civil penalty cases that I've
```

1  been involved in, it's nothing more than a
2  discounted cash flow calculation.  It's
3  pretty -- pretty simple and I think normally
4  is implemented by accountants.
5         Q.     Okay.  So you're not relying on
6  the work that you participated in on the
7  civil penalty cases in Southern California
8  and for work that you've done for Brattle in
9  forming the opinions that you render in this
10 case on economic deterrence?
11        MR. LOTTERMAN:  Object to form.
12        A.     Not with respect to economic
13 deterrence.  I think it forms some important
14 perspective that I have about how these cases
15 are normally approached.
16        Q.     And what perspective is that?
17        A.     Well, I mean, there are a number
18 of things about this case I find remarkable,
19 but -- but one thing is that there's no
20 apparent assertion of economic benefit,
21 which, to my way of thinking, is normally the
22 starting point in a Clean Water Act penalty
23 case.  And, in fact, from what I've learned,
24 the -- the Government has essentially
25 admitted that there is no economic benefit,

```
 1  or economic benefit is minimal; Anadarko's
 2  economic benefit resulting from the violation
 3  is minimal in this case.
 4       Q.    Okay.  In any of those other
 5  cases that informed your thinking in this
 6  matter, was the harm even close to, as
 7  massive, as it was in the DEEPWATER HORIZON?
 8       MR. LOTTERMAN:  Object to form.
 9       A.    No, certainly not.
10       Q.    Can you -- in any of the other
11  cases that you looked, was the harm from the
12  violation greater than the economic benefit?
13       A.    Well, you know, I can't answer
14  that because there wasn't actually -- and, in
15  fact, there almost never is a quantification
16  of the environmental harm from the violation,
17  you know, where one would actually go out and
18  monetize an environmental or external impact.
19  That's not normally done in Clean Water Act
20  penalty cases.  The perspective is usually
21  different --
22       Q.    Okay.
23       A.    -- where the Government would
24  start with a calculation of economic benefit,
25  the theory being that the violator should be
```

```
 1        Q.     And you state that environmental
 2   damages will be determined and assessed,
 3   correct?
 4        A.     Yes.
 5        Q.     Okay.  You're aware, though,
 6   that environmental harms can be difficult to
 7   measure?
 8        A.     Yes.  That's a large part of
 9   environmental economics, dealing with that
10   very question.
11        Q.     Okay.  And the Government in
12   this case has not filed a claim specifying
13   the amount of environmental damage that it
14   alleges, correct?
15        A.     That's correct.
16        Q.     Okay.  And it's certainly
17   possible, due to difficulties in measuring
18   harm, that full compensation for the
19   environmental harm that happened as a result
20   of the spill won't actually occur?
21        A.     That's certainly possible.  But
22   at this point, I have faith in the process.
23        Q.     Okay.  But you haven't
24   considered it -- you've -- you've assumed in
25   forming your opinion that the environmental
```

1    Is the probability that behavior
2    leading to an oil spill that will be detected
3    equal to one when we're talking about in the
4    optimal deterrence formulation?
5        A.    No, it couldn't be.
6        Q.    Right.  And you have done no
7    analysis to determine how much less than one
8    that probability could be, correct?
9        A.    It's not knowable.
10       Q.    So it could be .25 or it could
11   be .75?  You don't know?
12       A.    I -- I'm having a little trouble
13   answering.  It's really not a well-composed
14   question to an environmental economist.
15       Q.    Well, I'm not an environmental
16   economist.  I'm sorry.
17       A.    I -- I -- I understand, but I
18   am.  So I -- I hear your questions.  I filter
19   them through my environmental economist's
20   lens.
21       Q.    Let's move on.
22             All right.  Going back to your
23   formula for optimal deterrence.  What you say
24   is equal to the level of deterrence achieved
25   when the total amount charged for an offense