# EXHIBIT 3

**to**

**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO
EXCLUDE LEGAL OPINION TESTIMONY OF DAVID SUNDING**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
v. ) Civil No. 2:96CV1204
)
SMITHFIELD FOODS, INC., )
SMITHFIELD PACKING COMPANY, INC. )
and GWALTNEY OF SMITHFIELD, LTD., )
)
    Defendants. )
)

## UNITED STATES OF AMERICA'S PROPOSED FINDINGS OF FACT

1. Discharges from the Defendants' facilities are governed by a permit issued by the Commonwealth of Virginia, VPDES Permit No. VA0059005 ("the Permit"). (Pl. Ex. 2, 3).

2. The Permit imposes limits on the amount of pollutants that can be discharged from the Defendants' facilities into the Pagan River. The Permit imposes both daily maximum and monthly average limits, as well as both mass and concentration limits for certain parameters. (Tr. p. 28, l 14-16, p. 33, l. 18-25; Pl. Ex. 3).

3. Daily maximum limits are designed to protect the environment from acute effects of pollutants that are discharged in the wastewater. The monthly average limit is designed to protect against chronic effects of pollutants in the wastewater. (Tr. p. 28, l. 19-23).

4. It is possible to exceed a daily maximum limit without exceeding the monthly average limit for the same parameter, since the daily maximum is set at double the monthly average. (Tr. p. 28, l. 24 - p. 29, l. 3; p. 32, l. 7-14, 20-24).

5. The Permit requires that the reported value for the monthly average limit be representative of the Defendants' discharges for each day in that month. The Permit also allows the Defendants to sample as often as necessary to ensure that the monthly average value reported

flushing characteristics of the Pagan River. (Tr. p. 182, l. 23 - p. 183, l. 24, Pl. Ex. 112; p. 183, l. 25 - p. 184, l. 2-8, 23-25, p. 186, l. 7-20, p. 187, l. 9-15, Pl. Ex. 112)

22. Based on a comparison using STORET data, the concentrations of nutrients and fecal coliforms are higher in the Pagan than neighboring estuaries during December 1991 to February 1997 indicating that Defendants' discharges and permit exceedances for phosphorous, ammonia, TKN and fecal coliform had a significant impact on the water quality of the Pagan River. (Tr. p. 203, l. 19 to p. 205, l. 25, Pl. Ex. 115, 116, 117, 118)

23. Dr. Jeffrey Frithsen, Ph.D Oceanography, with over 18 years of experience in estuarine ecology was received by the Court as an expert in Marine Ecology. According to Dr. Frithsen, Defendants' violations were very severe and significant from an ecological perspective based on their frequency and magnitude; Defendants' discharges contributed most of the nutrients to the estuary during December 1991 to February 1997; pollutant loadings from Defendants affected water quality and impaired biological resources, including submerged aquatic vegetation ("SAV"), and benthic (bottom dwelling) communities. (Tr. p. 143, l. 2-14, 24-25; p. 155, l. 4-21, Pl. Ex. 82, 90).

24. By using concentration and flow reporting in DMRs, minimum mass loadings from Defendants' discharges and permit violations can be calculated. Evidence of erroneous data on concentration and flow indicate that loadings calculated this way may be underestimated. (Tr. p. 168, l. 1-10).

25. Total loadings of phosphorus from Defendants during December 1991 to February 1997 were approximately 87% of phosphorus entering the Pagan River. Total loadings from Defendants' permit exceedances for phosphorus during this period were approximately 79%. Mr. Barnhart, defendant's water quality expert, concurred with these loading calculations. (Tr. p. 169, l. 1-22, Pl. Ex. 94, p. 571, l. 1-5)

26. Total loadings of phosphorus from non-point sources was only approximately 11.1% of the phosphorous entering the River. The Town of Smithfield Wastewater Treatment Plant, the only other major point source on the Pagan River during this period, contributed only approximately 1.4% of the phosphorous loadings. Combined flows from minor point sources on the Pagan River were approximately .02 to .006 million gallons per day, and were not a significant source of phosphorous. (Tr. p. 170, l. 1-22, Pl. Ex. 94)

27. The Pagan River is primarily oligohaline and mesohaline salinity environments. In these environments, phosphorous is the most limiting nutrient for eutrophication. It therefore can be concluded that the additional 79% of phosphorous entering the river due to Defendants' permit exceedances had a significant ecological effect on the river, even though the precise effect on phytoplankton cannot be measured. (Tr. p. 176, l. 14-24)

28. Data for phosphorous concentrations shows that phosphorous concentrations increase as you approach Outfall 002 from the mouth of the river and peak in the vicinity of, or just upstream of Outfall 001. Phosphorous concentrations exceed the .01 and .02 phosphorous goals for SAV restoration established by the Chesapeake Bay Program throughout the river. (Tr. p. 179, l. 5-20, Pl. Ex. 96)

29. Based on loadings estimates and water quality data, water quality concentrations in the Pagan River are strongly influenced by discharges from Defendants' outfalls, and peak concentrations for phosphorous in the Pagan River are attributable to Defendants' permit exceedances. (Tr. p. 188, l. 5-18, Pl. Ex. 96 )

30. Defendants' phosphorous violations added to phosphorous available to cause eutrophication particularly in the lower salinity areas of the river where Defendants were discharging. Every additional amount of phosphorus added to the river has the potential to stimulate more primary productivity. (Tr. p. 158, l. 15-18, p. 168, l. 13-19, Pl. Ex. 90).

31. The Pagan River is eutrophic based on the STORET water quality data and on a eutrophication index prepared for the EPA's Office of Research and Development. The Pagan River scores 5 on the eutrophication index of 1 to 5, with 5 being the most eutrophic. Defendants' permit violations for phosphorous, ammonia and TKN contributed to this eutrophication. The Pagan River would have been much less eutrophic during December 1991 to February 1997 if Defendants had met their permit limits for phosphorous, ammonia and TKN. (Tr. p. 190, l. 17 - p. 191, l. 8, p. 224, l. 23 - p. 225, l. 18, p. 226, l. 7-9).

32. Eutrophication is the overstimulation or overproduction of organic carbon in an estuary caused by excessive nutrient (phosphorus and nitrogen) loading. Excessive nutrient loading stimulates phytoplankton growth, causing increased turbidity, reducing light penetration. Sea grasses are affected by reduced sunlight and increased algae growth on the plants themselves (epiphytic growth). (Tr. p. 158, l. 20 - p. 159, 6-17, p. 159, l. 18 to p. 160, l. 25; Pl. Ex. 104).

33. Dr. Frithsen based his conclusions that the Pagan River is eutrophic in part on information regarding benthic (bottom dwelling) communities which showed eutrophication. Benthic communities participate in metabolic activities of the estuaries and serve as fish food. (Tr. p. 191, l. 9-21)

34. Defendants' phosphorous violations caused phosphate concentrations in the Pagan River to exceed the goal for SAV restoration. (Tr. p. 190, l. 4-6, Pl. Ex. 96)

35. Phosphorous loadings to the Pagan River contributed to by 79% as a result of Defendants' permit exceedances, contributed to the designation of the Pagan River and Lower James River as severely stressed as to phosphorous by the Chesapeake Bay Program. (Tr. p. 333, l. 3 - p. 334, l. 10, Pl. Ex. 132)

36. Defendants' water quality expert, Mr. Barnhart, conceded that Defendants' permit

violations for phosphorous contributed to phosphorous loadings to the James River and Chesapeake Bay. (Tr. p. 581, l. 1- 8)

37.  Phosphorous loadings attributable to Defendants' permit exceedances accounted for approximately 9% of total point source phosphorous loadings to the James River. This impacts fish and shellfish and has consequences for all the other elements of the Chesapeake Bay system. The excess loadings were contrary to the effort and resources spent by states and the federal government to reduce nutrient loading to the Chesapeake Bay by 40%. (Tr. p. 336, l. 10 - p. 337, l. 3, p. 338, l. 6 - p. 339, l. 1, p. 339 l. 10-14)

38.  Defendants' ammonia and TKN violations contributed excess nitrogen to the Pagan River and, as such, contributed to its eutrophication. Their ammonia violations also had the potential for toxicity. According to Defendants' own expert, TKN violations can also be an indicator of problems with the wastewater treatment plant. (Tr. p. 158, l. 10 -15, Pl. Ex. 90, p. 179 l. 22 - p. 180, l. 8, p. 327, l. 22 - p. 328, l. 2, p. 579, l. 17-25)

39.  Nitrogen measured as ammonia and TKN in Defendants' discharges can be converted to several different forms of nitrogen by phytoplankton in the Pagan River, including ammonia, nitrite and nitrate. (Tr. p. 278, l. 18 - p. 280, l. 21)

40.  Nitrogen loadings from Defendants as calculated from ammonia and TKN reporting on DMRs comprised approximately 63% of the nitrogen entering the Pagan River during December 1991 to February 1997. (Tr. p. 174, l. 18-22)

41.  Defendants' ammonia and TKN violations contributed excess nitrogen to the Pagan River. The DMRs show a minimum of 1% additional nitrogen but this may be an underestimate due to false reporting. (Tr. p. 174, l. 23 - p. 175, l. 12); see infra ¶ 81.

42.  STORET data for concentrations of the different forms of nitrogen show that nitrogen concentrations increase as you approach Outfall 002 from the mouth of the Pagan River

and peak in the vicinity of Outfall 001. Nitrogen concentrations exceed the .15 nitrogen goal for SAV restoration established by the Chesapeake Bay Program throughout the river. (Tr. p. 179, l. 22 - p. 181, l. 2, Pl. Ex. 98, 99, 100, 101)

43. Defendants' ammonia and TKN violations contributed to the Dissolved Inorganic Nitrogen concentrations in the Pagan River exceeding the nitrogen goal for SAV restoration established by the Chesapeake Bay Program. (Tr. p. 190, l. 6-14, Pl. Ex. 98)

44. Dr. William Richkus, Ph.D. in Oceanography, with at least 23 years of experience in fisheries biology, was received by the Court as an expert in Fisheries Biology. Dr. Richkus has years of experience in the Chesapeake Bay area as a fisheries biologist and has been involved extensively with the Chesapeake Bay Program including managing monitoring programs, and authoring publications regarding the status of living resources of the Chesapeake Bay, and the habitat requirements of key species of the Bay, such as benthos, fish, crab, shellfish and SAV. (Tr. p. 322, l. 7 - p. 323 l. 22; Pl. Ex. 120)

45. Dr. Richkus testified that Defendants' permit violations contributed to degradation of the Pagan River as well as to waters into which the Pagan River flows, such as the James River. The degradation, mainly due to nutrient enrichment, has impacted resources and precluded the use of resources by man. With regard to resource status in the Pagan River, Dr. Richkus concluded that no significant stands of SAV were present. There is limited commercial and recreational fishing, crabbing and shellfishing in the Pagan River. There is limited fish spawning in the river.

46. Dr. Richkus concluded that nutrient enrichment, substantially attributable to Defendants' discharges, is the primary cause of the absence of SAV in the Pagan River. Nutrient enrichment, which causes eutrophication, enhances productivity of algae which decreases light to the plants and causes algae growth on the plants. SAV is a critical component of the ecosystem. The Chesapeake Bay Program has directed major efforts towards reducing nutrient loadings to the

Bay and encouraging SAV restoration. SAV has tremendous habitat value. Density of crabs in SAV habitat has been found to be as much as 10 times higher than crab densities in adjacent marshes. Density of crabs in SAV have been found to be as much as 5 times higher than in areas outside of SAV beds. Density of benthic organisms in SAV beds have been found to be 2 to 4 times higher than outside of SAV beds. Without SAV, habitat capability to support fish and crabs is substantially reduced. (Tr. p. 328, l. 8 - p. 329, l. 23)

47. The STORET data shows a pattern of concentrations in the Pagan River for phosphorous and nitrogen that when combined with loadings information shows that Defendants' outfalls are the major sources of nutrients in the river. The pattern of concentrations in the river are a direct result of discharges from Defendants. Particularly for phosphorous, the data shows that if they complied with their permit, the concentrations might be reduced by approximately 80%, which, using a rough estimate, would allow the goal for SAV restoration for phosphorous to have been met in at least some portions of the river. (Tr. p. 182, l. 1-20, Pl. Ex. 96)

48. The Pagan River has been targeted for SAV restoration by the Chesapeake Bay Program. This indicates that with control of nutrient inputs SAV could return to the Pagan River. (Tr. p. 330, l. 2 - p. 331, l. 23, Pl. Ex. 137)

49. Eutrophication, contributed to by Defendants' permit exceedances for phosphorous, ammonia and TKN, is likely to have caused changes in phytoplankton, zooplankton, and benthos which can affect fish. (Tr. p. 332, l. 1- 18)

50. Nutrient loading to the Pagan River contributed to by Defendants' permit exceedances for phosphorous, ammonia and TKN have contributed to the nutrient loadings to the James River. (Tr. p. 332, l. 19 - p. 334 l. 2)

51. Mr. Barnhart, defendants' water quality expert, has primarily dealt with freshwater systems. He is not an expert in marine ecology, fisheries biology, or environmental microbiology

and was not offered as an expert in any biological discipline. His opinions regarding the lack of effects of Defendants' phosphorous, ammonia and TKN violations were not credible in light of the body of information presented by plaintiff's experts from the available data, and their own knowledge and experience, as well as Chesapeake Bay Program sources. The greater weight of the evidence shows that phosphorous, ammonia and TKN violations increased the loadings of nutrients to the Pagan River, James River and Chesapeake Bay. The increased loadings contributed to the increased concentrations in the Pagan River. The increased concentrations in the Pagan River contributed to the causes of eutrophication. ( (Tr. p. 516, l. 3-4, Defendants' Ex. 195, p. 531, l. 15-23, p. 571, l. 22 - p. 572, l. 4)

52. Defendants' reported permit exceedances for Total Maximum Daily Limit for Fecal Coliform were in many cases substantially over the limit. (Tr. p. 166, l. 1-16, Pl. Ex. 91)

53. Combined flows from outfall 001 and 002 averaged over 2.5 million gallons per day, while Town of Smithfield flows averaged less than .5 million gallons per day. Fecal coliform levels coming from Defendants were 5 times that coming from Town of Smithfield based on flow. (Tr. p. 170, l. 9-15, p. 240, l. 11-17, p. 258, l. 11-18)

54. Loadings of fecal coliform from Defendants' violations are significant but cannot be quantified. (Tr. p. 175, l. 15- p. 176, l. 11, p. 240, l. 18 - p. 241, l. 16, p. 209, l. 7-12)

55. Data for fecal coliform concentrations follow the same general pattern as the nutrients. Concentrations increase as you approach Outfall 002 from the mouth of the river and peak in the vicinity of, or just upstream of Outfall 001. (Tr. p. 181, l. 1-12, Pl. Ex. 102)

56. Fecal coliform concentrations evidence a risk to public health and impair use of the river because they exceed contact recreation standards and standards for direct harvest of shellfish. (Tr. p. 181, l. 14-23)

57. The Pagan River has extensive expanses of marsh and forest bordering its shores

which serve as buffers and filters for non-point sources of fecal coliforms which to some extent associate with particles. Non-point sources of fecal coliforms are not as significant as Defendants' discharges in affecting fecal coliform levels in the Pagan River during December 1991 to February 1997. There is no data available on quantitative loadings from non-point sources (Tr. p. 195, l. 5 - p. 196, l. 15; Pl. Ex. 114)

58.  Virginia Department of Health Division of Shellfish Sanitation surveys of the Pagan River watershed in 1992 and 1996 identify many potential sources of fecal coliform which are separated from the river by marsh and forest buffers. These buffers are likely to reduce the fecal coliforms entering the river from these non-point sources. A number of the non-point sources identified by the surveys have been corrected. No quantitative estimates of loadings from these sources are available. Dr. Frithsen concludes they are not as significant a source of fecal coliforms to the river as Defendants' discharges. Defendants' permit exceedances for fecal coliform worked at cross purposes with Virginia's efforts to control sources of fecal coliform to the Pagan River and delayed the recovery of the river. The permit exceedances may have further delayed the reopening of the river to direct harvest of shellfish. The permit exceedances also may have delayed the time when the river throughout its length will be safe for direct contact recreation. (Tr. p. 196, l. 6- 19, Defendants' Ex. 226)

59.  Housing and commercial units in the Town of Smithfield were not a major source of non-point source pollution during December 1991 to February 1997 because approximately 94% of these units were on public sewer service. p. 196, l. 20 - p. 197, l. 21, Pl. Ex. 108)

60.  Dr. Wesley Pipes, Ph.D. Engineering, with 38 years of experience in environmental microbiology, was received as an expert by the Court in the field of Environmental Microbiology. He concluded that at certain times, Defendants were not properly disinfecting their effluent, causing fecal coliform violations. These violations increased public health risk for anybody who

might have had contact with Pagan River water contaminated from Defendants' effluent. Any time there is improper disinfection of wastewater there is an increased risk to public health. (Tr. p. 289, l. 7-25, Pl. Ex. 140, p. 299, l. 3 - 18, p. 315, l. 23, p. 321, l. 3-6)

61. If Defendants had met their permit limits for fecal coliform, portions of the Lower Pagan River probably would have met the standards for direct contact recreation. The Town of Smithfield wastewater treatment plant did not violate its permit limits for fecal coliform during December 1991 to February 1997. (Tr. p. 175, l. 15- p. 176, l. 11, p. 240, l. 18 - p. 241, l. 16, p. 209, l. 7-12)

62. Microbiological pollution based on fecal coliform levels in the Pagan River was severe in the upper reaches of the river during December 1991 to February 1997. Microbial pollution in the lower reaches of the river during this period was moderate. Defendants' exceedances had a substantial impact on this pollution. (Tr. p. 290, l. 8-13, p. 298, l. 6 - p. 299, l. 2).

63. The microbiological pollution of the Pagan River indicated that there was a risk of illness for people who came in contact with the River during contact recreation, such as swimming, water skiing, or eating foods which were in contact with the water, such as shellfish. There is continued interest in oystering in the Pagan River. There are still numerous commercial oyster bed leases maintained in the Pagan River, particularly in the lower River. Direct harvest of oysters, however, is precluded due to fecal coliform contamination. Defendants' fecal coliform exceedances contributed to this restriction on direct harvest of oysters, negatively impacting this important use of the River. (Tr. p. 290, l. 14-19, p. 326, l. 11 - p. 327, l. 8; Pl. Ex. 121)

64. The types of illnesses associated with microbiological pollution are water-washed and waterborne diseases. Waterborne diseases are intestinal infections. The water-washed diseases are skin and eye and ear infections, which are contracted by swimming and bathing in water.

65. Waterborne diseases can be transmitted by bacteria, viruses, and protozoa, from human to human or animal to human. Waterborne diseases include diseases that can be transferred to humans from hogs, including, camphylobacter. Microorganisms causing waterborne disease include: vibrio cholera, causing cholera; shigella, causing dysentery; salmonella, causing enterocolitis, and numerous other types of infections; salmonella typhi, which causes typhoid fever; giardia, causing giardiasis, an intestinal illness; and chryptosporidium, which can cause illness in individuals with compromised immune systems. Viruses, such as hepatitis A, rotavirus and norwalk agent may survive longer than fecal coliforms. Salmonellosis, or enterocolitis, is one of the most common waterborne infections. Pseudeomonas, which causes ear infections, seems to be a particular problem associated with pigs and there is a good deal of concern about the transmission of that disease from pigs to human beings. Balantidium coli, causing balantidiasis, can also be transmitted from pigs to humans. (Tr. p. 290, l. 20 - p. 291, l. 7, p. 294, l. 12 - p. 295, l. 15, p. 296, l. 18 - p. 297, l. 13, p. 307, l. 1 - p. 308, l. 16, p. 313, l. 11 - 19, p. 313, l. 22 - p. 314, l. 3, p. 314, l. 13 - 25, Plaintiff's Exs. 141 and 142).

66. The purpose of the fecal coliform standard is to prevent illness from waterborne and water-washed diseases for people using receiving waters. Fecal coliform levels in the Pagan River indicate public health risk. People use the Pagan River for contact recreation, including swimming. (Tr. p. 297, l. 14 - p. 298, l. 5, p. 316, l. 20 - p. 317, l. 2)

67. Defendants' effluent included fecal matter from pigs as well as human fecal matter from the approximately 3,000 employees working at the plants each day. (Tr. p. 299, l. 3 - 18, p. 315, l. 23).

68. Certain pathogens last longer than fecal coliforms. Defendants' expert, Mr. Barnhart, conceded this point. Some forms of protozoa parasites associated with improperly disinfected wastewaters can last in the environment for years. For example, clostridium, a

protozoa, can last in the sediments of receiving waters for years, and can cause illnesses, such as tetanus and botulism. (Tr. p. 306, l. 14-22, p. 319, l. 9-18, p. 320, l. 4-10, p. 579, l. 10-13)

69. With regard to Mr. Barnhart's opinions regarding the lack of effects of fecal coliform violations, he spoke to no one who actually operated the Defendants' treatment plants during the period in question. He had no information as to aeration or chlorination from day to day at the plants. He had no direct measure of pathogens in the wastewater from Defendants. Mr. Barnhart also did not consider the false reporting that occurred at the plants. The greater weight of the evidence demonstrates that Defendants' permit violations for fecal coliform contributed substantially to the microbiological contamination of the Pagan River. (Tr. p. 573, l. 10-12, p. 574, l. 4-14, p. 575, l. 23 - p. 576, l. 5, p. 579, l. 14-16)

70. Defendants' oil and grease violation had a potential toxic effect. (Tr. p. 157, l. 18 - 22; Pl. Ex. 90)

71. Defendants' chlorine violations had potential toxic effects. (Tr. p. 157, l. 21-22, Pl. Ex. 90, p. 327, l. 22 - p. 328, l. 2). Defendants' expert, Mr. Barnhart, concluded that some of the chlorine violations caused toxic effects in the vicinity of the outfall. (Tr. p. 580, l. 22-25)

72. Defendants' total suspended solids violations had the potential to affect water clarity. This shields sea grasses and other primary producers from sunlight and can make an estuary less appealing to humans. (Tr. p. 157, l. 22 - p. 158, l. 3, Pl. Ex. 90)

73. Defendants' pH violations had potential to cause acidic or alkaline conditions affecting toxicity of the effluent. (Tr. p. 158, l. 4-9, Pl. Ex. 90)

74. Smithfield fecal coliform violations contributed excess bacterial pollution to the Pagan River. (Tr. p. 158, l. 10, Ex. 90)

75. Defendants' cyanide violations had potential toxic effects. (Tr. p. 158, l. 11-12, p. 327, l. 22 - p. 328, l. 2, Pl. Ex. 90)

115. Based upon a report prepared by Defendants' consultants, CH2M Hill, Mr. Stigall estimated that the cost of installing this equipment at the Gwaltney plant would be approximately $2,634,914. The annual operation and maintenance of this system would have resulted in a profit of $183,180 per year for Defendants. (Tr. p. 108, l. 9 - p. 109, l. 16).

116. Defendants presented the testimony of Mr. Willis Sneed, an engineer with Wells Engineers Environmental, Inc., to challenge Mr. Stigall's testimony that the chemical addition system at Gwaltney would cost more than the system installed at Smithfield Packing. Mr. Sneed acknowledged, however, that in 1990 he participated in a report prepared for Defendants in which he estimated the costs of various systems for treating phosphorus at the Defendants' wastewater treatment plants. In that study, he concluded that a system that would treat only to 17 mg/l would cost $3.9 million at one plant and $2.4 million at the other plant. (Tr. p. 454, l. 10-15).

117. Mr. Sneed also challenged Mr. Stigall's failure to give the Defendants credit for a little over $470,000 spent at the Gwaltney plant to connect to HRSD. Mr. Sneed contended that this equipment would have been installed if the chemical pretreatment system had been installed in 1993 at Gwaltney. Mr. Sneed, however, ignored the fact that the items he identified as required for the chemical pretreatment system were not items installed at Smithfield Packing Company nor were they identified as required elements in the CH2M Hill Report relied upon by Mr. Stigall to estimate the costs necessary to install the equipment at Gwaltney. (Tr. p. 449, l. 21 - p. 451, l. 25; Pl. Ex. 72 at SF403623-SF403627; Pl. Ex. 23).

118. Mr. Sneed also claimed that Mr. Stigall underestimated the profit the Defendants would have made off the installation of the dissolved air flotation system at Gwaltney. Specifically, Mr. Sneed testified that the figure relied upon by Mr. Stigall, which was drawn from the Defendants' own documents, was not applicable to the dissolved air flotation system that would have been installed. Mr. Sneed, however, ignored the plain language of the cost document relied

24

upon by Mr. Stigall, which states that "[w]astewater pre-treatment facilities similar to those at Smithfield Packing Company are proposed." (Pl. Ex. 76 at SF407307).

119. In fact, Mr. Stigall testified that his estimate was a "minimum" estimate based on installing just enough equipment to get by. He specifically testified, unrefuted, that there was some probability associated with his estimate that the actual costs would exceed the estimate. (Tr. p. 140, l. 2-11).

120. The Defendants have not installed the chemical addition equipment at the Gwaltney plant and, having connected to the HRSD, are unlikely to do so now. (Tr. p. 109, l. 17-25).

121. Mr. Stigall testified, unrebutted, that the installation of the equipment for treatment of phosphorus was not inconsistent with the hook up to HRSD. In fact, this equipment could have been used as part of an effective pre-treatment system for the Defendants upon connection. (Tr. p. 119, l. 6-11).

122. The Defendants' violations of the ammonia and TKN limits were caused by insufficient oxygen in the aerobic lagoons. In addition, the Defendants' own documents acknowledge that the lack of aeration was the cause of violations of the pH and fecal coliform limits in 1994. (Pl. Ex. 47 at SF502136).

123. Because the plant could not have been meeting its TKN limits or its fecal coliform limits on a consistent basis between 1991 and 1994, the Defendants should have installed additional aeration capacity at both plants in October 1991. (Tr. p. 115, l. 21 - p. 119, l. 5).

124. The Defendants did install additional aerators at the plants in 1994, at a total cost of $23,225 at Smithfield Packing and $46,450 at Gwaltney. In addition, to ensure complete compliance with the ammonia limit, the Defendants need to install another $85,275 worth of aerators at Smithfield Packing. (Tr. p. 115, l. 21 - p. 119, l. 5; Pl. Ex. 78).

125. Robert L. Harris, CPA, partner at Denbo Harris & Company, of Birmingham,

Alabama, with wide-ranging experience in economic and financial analyses and business matters, testified as an expert in economic benefit analysis as related to environmental cases. In particular, Mr. Harris was qualified to address the Defendants' economic benefit, if any, resulting from their avoided and delayed compliance with the Clean Water Act and the economic impact of the penalty on the Defendants. (Tr. p. 357, l. 11 - p. 362, l. 23).

126. The purpose of economic benefit is to help level the economic playing field, preventing violators from gaining an unfair competitive advantage. Economic benefit analysis calculates how much a company has gained over its competitors by not complying with the law. In this case, the economic benefit analysis provides the amount by which Smithfield Foods gained over its competitors. (Tr. p. 363, l. 15-23; see also In re: B. J. Carney Indus., Inc., 1997 WL 323716, at ** 26-29 (Environmental Appeals Board 1997)).

127. Economic benefit may be calculated in a number of ways. One method is to examine from the perspective of economic benefit gained from avoided and/or delayed compliance. For economic benefit gained through avoided/delayed costs, a company is able to delay or avoid certain capital costs and operations and maintenance costs that are necessary to be in compliance, and is able to use those funds for other income-producing activities. In this case, Smithfield Foods was able to avoid or delay costs and, in effect, invested that money in its own company. (Tr. p. 364, l. 1-5, p. 365, l. 17-23).

128. A weighted average cost of capital (WACC) is the average return a company expects to make for its investors, if it needs to maintain the current level of investors it has and its current level of operating business. (Tr. p. 366, l. 22 - p. 367, l. 3).

129. Smithfield Foods must gain a greater than a 30-day short term Treasury bond rate (the risk-free rate) in its investments to stay in business. (Tr. p. 619, l. 12-16).

130. WACC is used as a discount/interest rate in the economic benefit calculation to

determine how much a company made on the funds that it did not spend for compliance. (Tr. p. 364, l. 8-12).

131. Upon reviewing Smithfield Foods' annual financial statements, Mr. Harris determined that the WACCs (for discount/interest rates) for Smithfield Packing/Gwaltney of Smithfield were from 11.83% to 12.49%. (Tr. p. 379, l. 22 - p. 380, l. 7).

132. In the last 20 years, Smithfield Foods had an average annual return of 33.3 percent, and over the last four years, 1992 to 1995, had an annual rate of return of 14 percent. A four-year period is representative, according to Smithfield Foods. (Tr. p. 407, l. 10-22).

133. Mr. Harris reviewed the economic benefit gained by Smithfield Packing Company and Gwaltney of Smithfield, Ltd. He reviewed the delay scenario and on-time scenario for Smithfield Packing and Gwaltney. For each, Mr. Harris calculated what Smithfield Packing/Gwaltney did in avoiding or delaying costs necessary to come into compliance, then determined the relevant time periods of avoidance/delay (noncompliance dates and payment date), and then computed the net present value of the cash flows from each of the scenarios at each company's WACC. (Tr. p. 365, l. 24 - p. 368, l. 24; Pl. Ex. 148-158).

134. While there are other methodologies in calculating the cost of capital, Mr. Harris' use of the WACC methodology for calculating economic benefit generates a reasonable "middle of the road" result. (Tr. p. 381, l. 8-12). It also takes into account the realistic scenario of what a company does with the money that it did not spend for compliance, instead of looking at the value of money "in a vacuum." (Tr. p. 625, l. 10-16).

135. Smithfield Foods gained an economic benefit of at least $4,253,070 from avoided and delayed compliance. (Tr. p. 373, l. 22-24, Pl. Ex. 148).

136. Even if Mr. Harris' calculations contained some minor errors as contended by the Defendants, the evidence is unrefuted that bottom line would decrease by approximately 4%, or

27

$160,000, in total. (Tr. p. 398, l. 22 - p. 399, l. 23).

137. While Smithfield Foods has paid surcharges for the sewer for Gwaltney, it is inappropriate to include such costs in the economic benefit calculation, as these surcharges are neither avoided nor delayed costs. (Tr. p. 411, l. 23 - p. 412, l. 22).

## V. Economic Impact of the Penalty on Defendants

138. Stockholder's equity is the net of a company's total assets minus total liabilities, and gives a good indication of the size of the company. Based on its annual financial statements of 1992 to 1996, Smithfield Foods is a large company that is very healthy financially. Smithfield Foods' total stockholder's equity is over $240 million. (Tr. p. 387, l. 22 - p. 388, l. 3; p. 375, l. 18-23; Ex. 159-163).

139. Defendants' economic benefit of more than $4.2 million represents only 1.7 percent of its stockholder's equity. A penalty award for this amount of economic benefit would be clearly immaterial to their financial condition. (Tr. p. 375, l. 11-15; p. 390, l. 1-3; Pl. Ex. 159-163).

140. A $16 million penalty from an economic standpoint would not have a detrimental effect on the company. (Tr. p. 390, l. 9-21; Pl. Ex. 159-163).

141. A $20 million penalty, therefore, is the appropriate amount.

## VI. Such Other Factors as Justice May Require

142. Defendants have offered some limited evidence that their connection to the HRSD sewer line ensured that the Town of Smithfield was able to connect. That evidence, however, goes to the Defendants' future compliance activities and does not relate to their past violations. Moreover, that evidence is not unrefuted. In fact, the former Director of the State Water Control

Board and member of the Virginia Resources Authority testified that he had no opinion as to whether the sewer line would have been extended to the Town without Defendants' financial contribution. (Tr., Testimony of James Chapman passim; Tr. p. 492, l. 4-14; p. 501, l. 13 - p. 502, l. 1).

                                        Respectfully submitted,

                                        LOIS J. SCHIFFER
                                        Assistant Attorney General
                                        Environment & Natural Resources Division

                                        SARAH D. HIMMELHOCH
                                        RICHARD HONG
                                        MICHAEL D. GOODSTEIN
                                        Trial Attorneys
                                        Environmental Enforcement Section
                                        Environment & Natural Resources Division
                                        U.S. Department of Justice
                                        P.O. Box 7611, Ben Franklin Station
                                        Washington, DC  20044
                                        202-514-0180

                                        HELEN F. FAHEY
                                        United States Attorney
                                        Eastern District of Virginia

                                        SUSAN WATT
                                        Virginia Bar No. 17733
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        101 W. Main Street, Suite 8000
                                        Norfolk, VA  23510
                                        757-441-6331

OF COUNSEL

Yvette C. Roundtree
Assistant Regional Counsel
Office of Regional Counsel
Region III (3RC13)
U.S. Environmental Protection Agency
841 Chestnut Building
Philadelphia, PA  19107
215-566-2685

Nadine Steinberg
Attorney Advisor
Lee Okster
Office of Regulatory Enforcement
Office of Enforcement & Compliance Assurance, U.S. EPA
401 M Street, SW, Mail Code 2243-A
Washington, DC  20460

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of July, 1997 I caused to be served the foregoing United States' Proposed Findings of Fact by facsimile upon Patrick Raher, Esq. and by U.S. Mail, postage prepaid upon the following counsel:

| | |
|---|---|
| John Burke, Esq. | Patrick Raher, Esq. |
| Jim Crockett, Esq. | Jim Banks, Esq. |
| Mays & Valentine | Hogan & Hartson |
| 1111 East Main Street, P.O. Box 1122 | 555 13th Street, NW, Columbia Square |
| Richmond, Virginia  23218-1122 | Washington, DC  20004-1109 |

Sarah D. Himmelhoch, Trial Attorney for the United States