UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to: | * * | |
| No. 10-4536 | * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

**BPXP'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
THE REPORTS AND TESTIMONY OF PROFESSOR FREDRIC QUIVIK**

The United States' response does not dispute that, were Professor Quivik admitted as an expert here, it would be the first case ever (in federal or state court) in which a "historian" was permitted to testify where a contamination occurred within five years of the trial and the vast majority of witnesses to the contamination are still alive. (*See* Ex. A, Quivik Dep. at 24-25).

When are historians permitted to testify in place of live witnesses? Professor Quivik provides the answer to that question on his own webpage—*i.e.*, that historians testify when there are "few, if any, living witnesses":

> Because there are often few, if any, living witnesses to the causes of environmental harm in past decades, the courts and both sides in the litigation typically rely on expert historians to research and draw conclusions (called expert opinions in legal parlance) about past events. (Ex. B, Deposition Exhibit 13209).

Professor Quivik has testified in numerous cases involving environmental contamination from the nineteenth and early twentieth centuries because there are few or no living witnesses who can testify. The United States relies heavily upon *United States v. Sterling Centrecorp*, *Inc.*, No. 2:08-cv-02556-MCE-JFM, 2013 WL 3166585 (E.D. Cal. Jun. 20, 2013), and argues that in that case there were "three" living witnesses. (U.S. Mem. in Opp'n to BPXP's Mot. to Exclude the Reports and Test. of Prof. Fredric Quivik, Rec. Doc. 13858 at 2 [hereinafter "U.S. Mem."]).

Professor Quivik's testimony in that case related to mining activities between 1934 and 1943. 2013 WL 3166585, at *2.  Even more importantly, in *Sterling*, as well as in every other case in which Professor Quivik has been admitted to testify, the "vast majority" of witnesses were deceased.  (Ex. A, Quivik Dep. at 25) ("Q.  [I]n the other cases you've testified in in the past, the vast majority of the witnesses to the original contamination have passed away, correct? A. Yes.").

Moreover, as the United States concedes, Professor Quivik's testimony was admitted in *Sterling* (and in *United States v. Newmont USA Ltd.*, No. CV-05-020-JLQ, 2008 WL 4621566 (E.D. Wash. Oct. 17, 2008)) because it was relevant to the question of direct operator "liability" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  (U.S. Mem. at 6-7) ("In the *Newmont* litigation, a case involving liability under CERCLA of a parent company for its role in operation of a mine owned by a subsidiary, Professor Quivik testified as to the historical relationship between the defendant and its subsidiary.  The court recognized Professor Quivik as an expert in his field, found his testimony to be helpful, and cited Professor Quivik's testimony dozens of times in its opinion finding the defendant liable under CERCLA.").  Here, the Court decided the liability of BPXP in Phase One of the trial, and the United States does not claim that any other BP Group entities are liable for a CWA penalty.  Thus, the prior cases in which Professor Quivik's testimony has been admitted are distinguishable in that they involved both:  (1) circumstances in which the "vast majority" of the witnesses were deceased; and (2) issues concerning the liability of a parent corporation.[1]

---

[1] The United States also cites a number of other cases where courts have admitted the testimony of expert historians, but those cases likewise involved expert testimony regarding issues or events that occurred many decades before the litigation.  *See, e.g.*, *Veasey v. Perry*, No. 13-CV-00193, 2014 WL 5090258, at *2 (S.D. Tex. Oct. 9, 2014) (racial discrimination in Texas voting laws:  "Dr. Burton testified about the use in Texas of various election devices to suppress

2

### A.     "Organizational Analysis" Is A Convoluted Way of Restating Professor Quivik's Testimony That He Is Offering "Conclusions About the Facts" Regarding What Corporations "Did And Did Not Do."

The United States says in its response brief that Professor Quivik provides an "organizational analysis." (U.S. Mem. at 1). What does this mean? Professor Quivik provides the answer in his final report, wherein he sums up his work as an "expert industrial historian":

> Prof. Daines' Responsive Expert Report repeatedly offers a mistaken view of the purpose of my August 2014 Expert Report. He suggests that my report is criticizing BPXP actions, contracts, or performance. *That is not my role as an expert industrial historian*. I have used an empirical historical method to *draw conclusions about the facts* leading to and in response to the Macondo blowout. In particular, *I draw conclusions about what BPXP did and did not do* in managing operations in the Gulf of Mexico and *what other BP entities did* in managing operations in the Gulf.

(BPXP's Mem. in Supp. of Its Mot. to Exclude the Rpts. and Test. of Prof. Fredric Quivik, Rec. Doc. 13780 [hereinafter "BPXP Mem."], Ex. B. 9/26/14 Quivik Rpt. at 5) (emphasis added).

What does it mean to "draw conclusions about the facts" about "what BPXP did and did not do"? As an example (out of 100-plus pages of such "facts" in his reports), Professor Quivik notes that the *Deepwater Horizon* Transocean contract was executed by BP America Production Company ("BPAPC"), and not by BPXP. (BPXP Mem., Ex. C, 8/15/14 Quivik Rpt. at 66) ("For

---

minority voting *from the early days of Texas* through today.") (emphasis added); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 940 (N.D. Cal. 2010) (public institution of marriage: "Nancy Cott, a historian, . . . testified that marriage has always been a secular institution in the United States, . . . and that marriage in the United States has undergone a series of *transformations since the country was founded*.") (emphasis added); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 587, 611 (N.D. Ohio 2008) (racial discrimination and segregation: "*During the first half of the twentieth century*, the City of Euclid was a predominantly white suburb of Cleveland. . . .  As late as 1975 the only African-Americans employed by the City were in the Solid Waste Division, a unit that was not only all-black, but consigned to locker and toilet facilities which were both racially segregated and sub-standard.") (emphasis added); *Citizens for a Better Gretna v. City of Gretna, Louisiana*, 636 F. Supp. 1113, 1116 (E.D. La. 1986) (racial discrimination and disenfranchisement:  "Plaintiffs' expert, historian Dr. Raphael Cassimere, has traced that history very clearly and cogently to its genesis—slavery. Disenfranchisement of blacks as an acknowledged state policy *pre-dates the Civil War*.") (emphasis added).

3

the contracts with Transocean, however, BPXP is not the legal entity representing the BP group; BPAPC is.").

If it is "organizational analysis" to point out that the Transocean contract was with BPAPC instead of BPXP, it is nonetheless purely factual, and this point has already come into evidence through fact witnesses. In any event, whether it is called "organizational analysis" or "the facts," this is certainly not expert testimony.

Professor Quivik himself made clear that he is a "historian," and not an expert on corporate governance matters:

> Q. [Y]ou are a historian, correct?
>
> A. Yes.
>
> Q. Your specialty is industrial history?
>
> A. Yes.
>
> . . . .
>
> Q. You're not an expert in corporate governance, correct?
>
> A. That's correct. (Ex. A, Quivik Dep. at 9, 27)

Underscoring his lack of corporate organizational expertise, Professor Quivik did not know whether a subsidiary such as BPXP is required to have a board of directors:

> Q. You don't know whether subsidiaries are required to have boards of directors, correct?
>
> A. I'm not, no. (Ex. A, Quivik Dep. at 183)

**B.      The United States Does Not Dispute That Professor Quivik's Opinions Rely On Credibility Determinations.**

The United States does not dispute that Professor Quivik's opinions are based on credibility determinations. Nor could the United States dispute this in light of Professor Quivik's testimony:

4

> Q. And is one of the things that you did in this case to evaluate the credibility of documents and testimony?
>
> A. Yes.  (Ex. A, Quivik Dep. at 69).

The United States has not cited a single case in which a court allowed an expert to base his opinion on credibility determinations.  This would be the first.

Instead, the United States contends that Professor Quivik may base his expert testimony on credibility determinations because this case does not involve conflicting versions of the same events.  That assertion is incorrect.  Professor Quivik not only rehashes deposition testimony, but he also testifies regarding what he believes was on the "mind" of witnesses.

For example, James Dupree was both the Chairman of BPXP's Board and head of the Gulf of Mexico business.  At his deposition, Mr. Dupree was not asked about his BPXP role.  Nonetheless, Professor Quivik testified:  "I point out that [James Dupree] did not mention any role that BPXP might have had or any role that he might have had with BPXP.  It's true, as I recall, [Dupree] was not asked [about his BPXP role in his deposition] . . . but all I'm describing is that that was not on his mind that he was performing that role" for BPXP.  (Ex. A, Quivik Dep. at 141).  Professor Quivik's testimony about what he speculates was on witnesses' minds—with regard to questions they were "not asked"—is unreliable and unhelpful.  The Court can read the same depositions and draw its own inferences about what was "on [the witnesses'] mind."[2]

## CONCLUSION

For the foregoing reasons, BPXP respectfully requests that the Court enter an order excluding Professor Quivik's expert reports and deposition testimony.

---

[2] Rule 702 applies in a bench trial.  The text of the rule itself speaks to "the trier of fact" as opposed to "the jury."  Numerous courts have held that *Daubert* bars the admission of unreliable and irrelevant expert testimony regardless of whether such testimony is being presented to a judge or a jury.  *See, e.g.*, *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1784 (U.S. 2011).

Date: December 22, 2014                          Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
And

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of December, 2014.

/s/ Don K. Haycraft
Don K. Haycraft