# EXHIBIT A

01-45956
LC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*
## *PENALTY PHASE*
## *EXPERTS*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Fredric Quivik

**October 14, 2014**

*COPY*



*Systems Technology for the Litigation World*

Litigation Group ♦ Court Reporting ♦ Video Production ♦ Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

     IN RE: OIL SPILL by the       ) MDL NO. 2179
 3   OIL RIG "DEEPWATER HORIZON"   )
     in the GULF OF MEXICO, on     ) SECTION: J
 4   APRIL 20, 2010                )
                                   ) JUDGE BARBIER
 5                                 )
                                   ) MAG. JUDGE SUSHAN
 6
 7
 8
 9              ORAL VIDEOTAPED DEPOSITION OF
10                  FREDRIC L. QUIVIK, PhD
11                     OCTOBER 14, 2014
12
13      ORAL VIDEOTAPED DEPOSITION OF FREDRIC L. QUIVIK, PhD,
14   taken in the above-styled and numbered cause on the 14th day
15   of October, 2014, from 8:37 a.m. to 5:35 p.m., before Lisa A.
16   Cloutier, Certified Shorthand Reporter in and for the State of
17   Texas, reported by computerized stenotype machine at the
18   Pan-American Building, 601 Poydras, 11th Floor, New Orleans,
19   Louisiana, 70130.
20
21
22
23
24
25
```

```
 1        Q.   Then you -- you obtained a Bachelor of Environmental
 2   Design in Minnesota?
 3        A.   University of Minnesota, in the Architecture School.
 4        Q.   And then any further degrees after your Bachelor of
 5   Arts and Bachelor of Environmental Design?
 6        A.   You mean further undergraduate degrees or further
 7   degrees?
 8        Q.   Any further degrees?
 9        A.   Okay.  Yes.  I -- I then went to Columbia University
10   and earned a Master of Science in Historic Preservation from
11   the Graduate School of Architecture and Planning, and then
12   worked for about a decade and a half before going back to
13   graduate school and earning a Ph.D. in History and Sociology
14   of Science from the University of Pennsylvania.
15        Q.   And the Ph.D. was obtained in what year?
16        A.   The degree year is 1998.
17        Q.   But you are a historian, correct?
18        A.   Yes.
19        Q.   And you are an industrial archeologist?
20        A.   Yes.
21        Q.   Your specialty is industrial history?
22        A.   Yes.
23        Q.   You have expertise in historic preservation?
24        A.   Yes.
25        Q.   You also have expertise in architectural history?
```

1  involved contamination that occurred mainly during this
2  century?
3       A.   The 21st century?
4       Q.   Yes.
5       A.   Setting aside the fact that in some of the cases
6  there has been expert testimony about the ongoing nature of
7  the contamination in this century, that would be true of all
8  of them other than this particular case.
9       Q.   Okay.  In all of the other cases you've testified
10 in, the initial contamination occurred in a prior century?
11      A.   Yes.
12      Q.   Have you ever been admitted as an expert in a case
13 involving contamination that began at some point during the
14 last ten years?
15      A.   No.
16      Q.   Now, in -- in this case you reviewed a number of
17 depositions, correct?
18      A.   Yes.
19      Q.   And also a -- a number of documents, correct?
20      A.   Yes.
21      Q.   Would you agree with me that the -- the percentage
22 of source material in this case, that is depositions as
23 opposed to documents, is higher than generally has been in
24 other cases you've testified?
25      A.   If you mean very narrowly speaking, depositions,

```
 1  that would be the case.  There are a couple of other cases in
 2  which I've testified where I did make ample use of trial
 3  testimony.  So I -- and those are transcripts, and so it's
 4  testimony similar to the transcripts of depositions that I've
 5  read.
 6       Q.   But that trial testimony was for a case, for
 7  example, in 1911, correct?
 8       A.   In that -- in that ballpark, yeah.  What I was doing
 9  was characterizing the kind of documentary evidence that I'm
10  using, reading a deposition testimony or a trial testimony.
11       Q.   Okay.  So when you've looked at deposition or trial
12  testimony in prior cases, it's been mainly from prior
13  centuries?
14       A.   Yes.
15       Q.   Now -- now, in this case, in -- in contrast to the
16  prior cases you've testified in, the vast majority of the
17  witnesses have not passed away, correct?
18       A.   Yes, that's correct.
19       Q.   And in the -- in the other cases you've testified in
20  in the past, the vast majority of the witnesses to the
21  original contamination have passed away, correct?
22       A.   Yes.
23       Q.   If you look back at Exhibit 13209, the last full
24  paragraph beginning with, My current research?
25       A.   Yes.
```

```
 1  Fork Superfund case; and I have published some articles and
 2  chapters that derive in part from portions of those expert
 3  reports.  And I hope eventually to convert my dissertation,
 4  which as I said, is based on my expert report research, into a
 5  book on that case as well.
 6       Q.   Are you -- are you permitted to reframe the expert
 7  work in -- you're doing in this case so that you can publish
 8  it at a later date?
 9       A.   As -- as I understand it, all of this information
10  that I have had access to is highly confidential and is not
11  available to use for that kind of a purpose.
12       Q.   Okay.  So you will not be publishing any information
13  from your work on this case in the future?
14       A.   I have no plans to do so.  I don't know what the
15  final outcome after trial is of this information; but I have
16  no plans to violate that confidentiality.
17       Q.   You're -- you're not an expert in corporate
18  governance, correct?
19       A.   That's correct.
20       Q.   You're not an expert in boards or the operation of
21  boards, correct?
22       A.   As I answered in one of your similar earlier
23  questions, I would not invite someone to come to me for advice
24  on how to do that; but I'm very familiar with the ways that
25  boards have functioned historically.  So I feel that using --
```

```
 1      Q.   And when you use the word "authenticity," what do
 2   you mean by that?
 3      A.   In that case, for instance, a document may purport
 4   to come from a particular source, and I try to verify whether
 5   it comes from that source or -- or not, whether it's
 6   authentic.
 7      Q.   And is one of the things that you did in this case
 8   to evaluate the credibility of documents and testimony?
 9      A.   Yes.
10      Q.   Are there any witnesses whose depositions you
11   reviewed who you found not -- to be not credible?
12      A.   Not that I can think of.
13      Q.   Well, let's go down the list.  Did you find Steven
14   Bray to be credible?
15      A.   I should say that I'm not evaluating his overall
16   credibility, but for the questions that he was addressing that
17   were of interest to me in my research questions, I found him
18   to be credible, yes.
19      Q.   For the questions that you were researching, did you
20   find David Bucknall to be credible?
21      A.   Yes.
22      Q.   For the questions you were researching, did you find
23   Brett Cocales' testimony to be credible?
24      A.   As I recall, he was one of the witnesses who took --
25   used his rights under the Fifth Amendment not to testify.
```

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**

1  asked?

2      A.   Yes.

3      Q.   So, am I correct that you -- you do not have an
4  opinion one way or the other about whether James Dupree was
5  acting in his role as BPXP officer when he was working on GoM
6  assets in 2010 and 2011?

7      A.   He is an individual who -- whose time was charged to
8  BPXP.  So, to that extent, he was working on behalf of BPXP.
9  He's an individual who described his work in the Gulf of
10 Mexico organization and always described it in terms of this
11 other organizational structure that I've described extensively
12 in my expert report.  And so, I point out that he did not
13 mention any role that BPXP might have had or any role that he
14 might have had with BPXP.  It's true, as I recall, he was not
15 asked, but all I'm describing is that that was not on his mind
16 that he was performing that role.

17     Q.   Okay.  But -- but what's on his mind and the
18 responses that he gives depends on the questions that he's
19 asked, correct?

20     A.   Yes.

21     Q.   Okay.

22          THE VIDEOGRAPHER:  Excuse me.

23     Q.   (BY MR. NOMELLINI) And -- and you're not going to be
24 opining that James Dupree was not acting in a role as BPXP
25 officer in working on GoM assets in 2010 and 2011?


1  asked?

2      A.   Yes.

3      Q.   So, am I correct that you -- you do not have an
4  opinion one way or the other about whether James Dupree was
5  acting in his role as BPXP officer when he was working on GoM
6  assets in 2010 and 2011?

7      A.   He is an individual who -- whose time was charged to
8  BPXP.  So, to that extent, he was working on behalf of BPXP.
9  He's an individual who described his work in the Gulf of
10 Mexico organization and always described it in terms of this
11 other organizational structure that I've described extensively
12 in my expert report.  And so, I point out that he did not
13 mention any role that BPXP might have had or any role that he
14 might have had with BPXP.  It's true, as I recall, he was not
15 asked, but all I'm describing is that that was not on his mind
16 that he was performing that role.

17     Q.   Okay.  But -- but what's on his mind and the
18 responses that he gives depends on the questions that he's
19 asked, correct?

20     A.   Yes.

21     Q.   Okay.

22              THE VIDEOGRAPHER:  Excuse me.

23     Q.   (BY MR. NOMELLINI) And -- and you're not going to be
24 opining that James Dupree was not acting in a role as BPXP
25 officer in working on GoM assets in 2010 and 2011?

1   would have been at least one; but if that's the case, I'm not
2   in a position to argue with you.
3       Q.   Okay.  You don't know whether subsidiaries are
4   required to have boards of directors, correct?
5       A.   I'm not, no.
6       Q.   Okay.  Look at page 7 of this document.
7       A.   Okay.
8       Q.   13242.  Last -- last two lines.  Such boards of the
9   subsidiaries did not perform --
10      A.   Oops, there.  Okay.  Yeah, uh-huh.
11      Q.   Such boards of the subsidiaries did not perform
12  significant governance activities other than what is legally
13  required of them.  Do you see that?
14      A.   I do.
15              (Mr. Brock out of deposition.)
16      Q.   (BY MR. NOMELLINI) And do you know whether it's
17  common for subsidiaries to only perform those governance
18  activities that are legally required of them?
19      A.   I haven't conducted a study of that question --
20      Q.   And you're not going to --
21      A.   -- so I don't know.
22      Q.   You're not going to be testifying on that at trial?
23      A.   Correct.
24      Q.   If you look at page 10 of this document, it says on
25  the first sentence -- again, this is Exhibit 13242, For