# EXHIBIT A

01-46044
LC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179  SECTION: J  JUDGE BARBIER  MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*
## *PENALTY PHASE*
## *EXPERTS*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Mark Van Haverbeke

**October 31, 2014**

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

```
 1        A.   Yes.
 2        Q.   (BY MS. JAKOLA) You also agree that your expert
 3   report inaccurately calculates the effectiveness of the
 4   burning, skimming, and chemical dispersing operations in the
 5   DEEPWATER HORIZON response, true?
 6             MR. ROBERS:  Object to form.
 7        A.   The calculations were incorrect, but going back and
 8   looking at the arithmetic, using the upper value, I still
 9   stand by my position.
10        Q.   (BY MS. JAKOLA) I'd like to focus on what's in your
11   expert report.  Your expert report contains calculations of
12   the effectiveness of skimming, chemical dispersing, and
13   burning operations in the response, correct?
14             MR. ROBERS:  Object to form.
15        A.   Correct.
16        Q.   (BY MS. JAKOLA) And you agree that those calculations
17   are incorrect?
18        A.   Yes.
19        Q.   You also agree that those calculations are based on
20   outdated information, true?
21        A.   Yes.
22        Q.   Nowhere in your expert reports do you present an
23   accurate calculation of the effectiveness of the DEEPWATER
24   HORIZON response operations, correct?
25             MR. ROBERS:  Object to form.
```

1  A.  Yes.

2  Q.  And nowhere in any of your three expert reports do
3  you present the accurate calculations of the effectiveness of
4  the response operations in the DEEPWATER HORIZON response,
5  correct?

6       MR. ROBERS:  Object to form.

7  A.  Again, I -- I included my calculations in my Round 2
8  report and did not have the error pointed out until the
9  Round 3 reports were posted.  So at that point I had no
10 opportunity to go back and correct the numbers.

11 Q.  (BY MS. JAKOLA) Okay.  Well, let's start first and I
12 just want to make sure I'm clear on this:  There is no nowhere
13 in any of your three expert reports where you present accurate
14 mathematical calculations reflecting the effectiveness of
15 operations in the DEEPWATER HORIZON response, correct?

16      MR. ROBERS:  Object to form.

17 A.  Correct.

18 Q.  (BY MS. JAKOLA) Now, looking back at the oil budget
19 calculator which you cited in your Round 2 report, we were
20 looking at page 39.  Do you believe that these are the numbers
21 that you used in determining that 13 percent of the total oil
22 discharged was chemically dispersed and burned during the
23 response?

24 A.  No.  As I said earlier, I think what I did -- and
25 I'm -- if I recall, it does not show in this third -- or

```
 1      Q.   And those minutes don't reflect any kind of
 2   recommendation that addendum 3 should be signed, correct?
 3      A.   I don't recall seeing any, but I'd have to go back
 4   and confirm.
 5      Q.   In fact, the advice that was coming to Admiral
 6   Landry to sign addendum 3 was coming from senior EPA
 7   officials, correct?
 8              MR. ROBERS:  Object to form.
 9      A.   I think the advice was coming from the EPA where
10   they have a responsibility to help direct a major event.
11      Q.   (BY MS. JAKOLA) Now, in forming your opinions in this
12   case, you did not rely on the contemporaneous correspondence
13   that was exchanged between EPA officials and Admiral Landry on
14   May 25th and May 26th, leading up to the issuance of
15   addendum 3, true?
16      A.   You mean the series of Emails?
17      Q.   Correct.
18      A.   No.  I relied more directly on my conversation with
19   Admiral Landry.
20      Q.   You did not consider the contemporaneous
21   communications between Admiral Landry and EPA and other Coast
22   Guard officials in forming your opinions, true?
23      A.   Not specifically, no.
24      Q.   Now, let's take a look at some of those
25   communications.  Please turn to Tab 52 of your binder.
```

```
 1   later at 10:44 a.m., do you see that, right above --
 2       A.   Yes.
 3       Q.   And Admiral Landry writes, I know you two are trying
 4   to help me, but this is a tough one and we'll have a bit of a
 5   ripple with EPA.  I have not signed the directive.  I was not
 6   going to because I was focused on TOP KILL and I was letting
 7   them go back and forth.  Had no intention of letting it
 8   distract me.
 9                 Do you see that?
10       A.   I see that's what she says here, yes.
11       Q.   And is it fair to say as of 10:44 a.m. on
12   May 26th, Admiral Landry had not signed the directive and
13   had not -- and had no intention of signing the directive?
14                 MR. ROBERS:  Object to form.
15       A.   I -- I don't think that's what she was saying.
16   Again, the questions are lacking -- these whole discussion
17   lacks the context that, going all the way back to April, when
18   the use of subsea dispersants was first suggested.  The idea
19   was maybe instead of putting as much dispersant down as we are
20   doing, there's a better way of doing this, which was go
21   subsea, which would allow a reduction in surface dispersant,
22   and that's -- what my point was, all this lacks that context.
23       Q.   (BY MS. JAKOLA) What is your basis for your
24   understanding of that context, these particular Emails?
25       A.   Discussion with Admiral Landry.
```

1    Q.    Your interview of Admiral Landry?
2    A.    Yes.
3    Q.    Do you have any other basis other than the interview
4 you conducted of Admiral Landry in connection with your expert
5 work in this case for that context?
6    A.    I --
7          MR. ROBERS:  Object to form.
8    A.    -- I'd have to go back and confirm it, but I know
9 there were some discussions mentioned in the commission to
10 look at the DEEPWATER HORIZON oil spill.  I think
11 Administrator Lisa Jackson of the EPA and maybe even Admiral
12 Allen mentioned that the discussions have been going on.
13   Q.    (BY MS. JAKOLA) Other than the National Commission
14 testimony that you've mentioned and the interview you
15 conducted of Admiral Landry, do you have any other basis for
16 your context about these Emails?
17         MR. ROBERS:  Object to form.
18   A.    For the -- I'm not sure -- would you repeat the
19 question?
20   Q.    (BY MS. JAKOLA) Other than -- other than your
21 interview of Admiral Landry and the materials you've mentioned
22 in connection with the National Commission work, do you have
23 any other basis for the context around the way in which
24 dispersant decisions were made in the DEEPWATER HORIZON
25 response?

1          MR. ROBERS:  Object to form.
2      A.    No.
3      Q.    (BY MS. JAKOLA) Now, at the top of Exhibit 13531 at
4  10:56 a.m., do you see that Admiral Landry writes, again, to
5  Captain Hanzalik that she is not going stop dispersants?
6          MR. ROBERS:  Object to form.
7      A.    Yes.
8      Q.    (BY MS. JAKOLA) Please turn to Tab 60, and let's mark
9  this as Exhibit 13532.
10             (Exhibit No. 13532 marked for identification.)
11             MS. JAKOLA:  For the record, Exhibit 13532 is a
12  May 26th, 2010, Email from Admiral Landry at 10:59 a.m.
13  forwarding an Email from Ms. Tulis at 10:45 a.m. on May 26.
14      Q.    (BY MS. JAKOLA) Sir, have you seen Exhibit 13532
15  before?
16      A.    Yes.
17      Q.    Now, in this Email, Admiral Landry writes to
18  Ms. Tulis, Mr. Coleman, Captain Lloyd, Captain Hanzalik and
19  others to say that she is standing by and ready to sign the
20  directive, correct?
21      A.    Correct.
22      Q.    And this Email is sent just three minutes after she
23  Emails Captain Hanzalik and said she is not stopping
24  dispersants, correct?
25             MR. ROBERS:  Object to form.

```
 1   responders used to set the 15,000-gallon limit.
 2              Do you see that, sir?
 3        A.   Yes.
 4        Q.   (BY MS. JAKOLA) Do you have any reason to disagree
 5   with the conclusion of the EPA, OIG that it was unclear what
 6   scientific basis responders used to set the 15,000-gallon
 7   limit?
 8        A.   Yes.
 9        Q.   You do have a reason to disagree with that, sir?
10        A.   Yes.  The reason they set it at 15,000 gallons was
11   because the stated flow rate at that point was 5,000 barrels
12   per day.  The application rate of dispersant is about 10 to 1.
13   And if you do the math, it turns out that that is about
14   15,000 gallons of dispersant per day.
15        Q.   What is -- I'm sorry.  Are you finished your answer?
16        A.   Yes.
17        Q.   What is your basis for that understanding?
18        A.   Admiral Landry.
19        Q.   Your basis for the understanding behind the --
20   strike that.  Your basis for your understanding of why there
21   was a 15,000-gallon limit per day set for subsea dispersant
22   use during the response is your interview of Admiral Landry?
23        A.   Yes.
24        Q.   Is that your only basis for that understanding?
25        A.   I went back and did the math to understand what she
```

```
 1  told me, but yes.
 2       Q.   Okay.  Now, can you please turn the page, and look
 3  at page 19 of the report?  Do you see that the OIG report
 4  concludes that the involvement of senior EPA officials created
 5  confusion and delays in dispersant applications?
 6       A.   Where are you reading?
 7       Q.   In the section full paragraph on page 19?
 8       A.   Down here?
 9       Q.   Yes, sir.
10       A.   And your question again?
11       Q.   And also let me -- while you've got that page, let
12  me ask you to flip back to page 18, at the bottom of that
13  page, read that last paragraph and then I'll ask you a
14  question.
15       A.   Okay.
16       Q.   Sir, do you see that in this report, in
17  Exhibit 13533, the OIG determined that the dispersant
18  decision-making process was politically motivated and delayed
19  decisions?
20       A.   No.  I --
21                MR. ROBERS:  Object to form.
22       A.   -- I think what it says is one Region 6 response
23  official described the process as very political.
24       Q.   (BY MS. JAKOLA) Do you agree -- do you see that the
25  OIG concluded that the involvement of senior EPA officials in
```

1  Q.  How many times did you interview Admiral Landry?
2  A.  Once.
3  Q.  Have you -- strike that.
4      Did someone suggest to you that you should
5  interview Admiral Landry?
6  A.  I think the offer was made to set up an interview
7  and I agreed to it.
8  Q.  Do these notes accurately reflect the conversation
9  that you had with Admiral Landry?
10 A.  Yes.
11 Q.  Did you --
12 A.  To the extent -- I don't know if you know Admiral
13 Landry.  I can't write as fast as she talks, and I certainly
14 can't write the volume she talks.  So, if you look at these,
15 you'll even -- I suspect you'll see there's places where I was
16 scribbling so fast I can't read my own writing and there's
17 probably some hanging sentences because she was already three
18 ideas ahead of me.
19 Q.  Now, you tried your best to write down the important
20 points from your conversation; is that right?
21 A.  I tried to capture her key points, yes.
22 Q.  Did Admiral Landry tell you anything noteworthy
23 during the interview as it relates to your opinions in this
24 case that did you not record on your notes?
25 A.  It looks like I got it all.

```
 1      A.   She told me -- she told me essentially what I
 2 captured in here.
 3      Q.   (BY MS. JAKOLA) Now, at this meeting -- strike that.
 4           During this telephone conference with Admiral
 5 Landry, there was no one from BP on the phone, correct?
 6      A.   Correct.
 7      Q.   As far as you know, no one from BP was invited to
 8 join this telephone conference, correct?
 9      A.   Correct.
10      Q.   Now, looking at the first page of Exhibit 13535 in
11 your handwritten notes, the second paragraph from the bottom,
12 seems to write, Hanzalik made it sound like White House
13 directed.
14           Do you see that?
15      A.   Yes.
16      Q.   Do you understand that to be a reference to Captain
17 James Hanzalik?
18      A.   Yes.
19      Q.   And she said Hanzalik made it sound like White House
20 directed.  Is that something she told you?
21           MR. ROBERS:  Object to form.
22      A.   Yes.
23      Q.   (BY MS. JAKOLA) Did Admiral Landry review a copy of
24 Captain Hanzalik's deposition transcript in this case?
25      A.   I don't know.
```

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**

```
 1  page 38, Tab 8?
 2       A.   You said Tab 8, right?
 3       Q.   I'm sorry, Tab 7, excuse me.  Page 38.  That's the
 4  FOSC report, page 38.
 5       A.   There's that graph.
 6       Q.   And before I ask you questions about the specific
 7  graph, I want to go back to something you testified about
 8  earlier.  You said that you believed that additional context
 9  would be helpful in the FOSC report, specifically as it
10  relates to the discussion of dispersants, correct?
11       A.   Correct.
12       Q.   And I'd like to ask you about that.  Is the
13  additional context that you believe would be helpful this same
14  context that Admiral Landry provided to you in your interview?
15       A.   Yes.
16       Q.   Is there any other additional context that you were
17  referring to when you said that you thought additional context
18  would be helpful?
19       A.   No.  At that time we were talking about the --
20  whether or not they limited dispersants.
21       Q.   Now, with respect to the graph that appears on page
22  38 of the FOSC report, do you see that -- that there is a
23  figure here, figure 3.7 that shows shoreline impact compared
24  to aerial dispersant use over time?
25       A.   Yes.
```