UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY  THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to: | * * | |
| No. 10-4536 | * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

**BPXP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE THE UNITED STATES' UNTIMELY SUPPLEMENTS TO THE EXPERT REPORTS OF DR. STANLEY RICE, CAPT. MARK VANHAVERBEKE, AND MR. IAN RATNER**

On December 5, 2014 — more than *two months* after the parties' Round 3 expert reports were due, more than *one month* after the completion of all expert depositions, and *the same day* that the parties' *Daubert* motions were to be filed — the United States served supplements substantially revising the reports of three of its experts:  Dr. Stanley Rice (its environmental expert), Captain Mark VanHaverbeke (its spill response expert) and Mr. Ian Ratner (its economic impact expert).  The supplements — which the United States coined "errata" — reveal new opinions and analyses that in several instances, materially differ from those set forth in any of the experts' original reports.

While contending that the so-called "errata" were intended to "correct and clarify" numerous "apparent errors" in its experts' analyses that were explored during their depositions, the United States has offered no explanation whatsoever for (1) why its experts did not perform the correct analyses at the time they prepared their reports, given that they had access to all of the information they needed to do so at that time; (2) why the United States delayed supplementing its experts' analyses for anywhere from *6 to 10 weeks* after admittedly learning of the errors; or

(3) why the United States finally chose to supplement its expert reports 15 minutes before the close of business on the day that *Daubert* motions were due.[1]

The Fifth Circuit has made clear that striking untimely expert disclosures "is particularly appropriate" where, as here, the proffering party has "failed to provide an adequate explanation" for its delay. *1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1289 (5th Cir. 1991). Allowing the United States' untimely disclosures would prejudice BPXP, which has not had an opportunity to obtain discovery or question the United States' experts about their new analyses, or have its experts respond. BPXP therefore respectfully requests that the Court strike the untimely supplements to the expert reports of Dr. Rice, Captain VanHaverbeke, and Mr. Ratner.[2]

## LEGAL BACKGROUND

Federal Rule of Civil Procedure 26 requires parties to make expert "disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Adherence to Rule 26 and the Court's scheduling orders is not aspirational but rather is "critical in maintaining the integrity of judicial proceedings." *1488, Inc.*, 939 F.2d at 1289. A party does not have "unfettered freedom to rely on supplements produced after a court-imposed deadline." *Reid v. Lockhead Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001). Rather, a party must supplement its disclosures "in a timely manner" as the party learns of new or corrective information. Fed. R. Civ. P. 26(e).

Federal Rule of Civil Procedure 26 is intended to prevent "unfair surprise" with respect to an expert's testimony. *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994). As

---

[1] The United States first mentioned that it intended to supplement unspecified expert reports during the December 4, 2014 status hearing. It served the supplement at issue the following day, December 5, the day that *Daubert* motions were due. (*See* 12/4/14 Status Conf. Try. 10:24-11:3).

[2] The Court has permitted the United States to serve on January 6, 2015 a supplemental two-page report from Mr. Ratner addressing recent developments in oil prices; that supplement is not impacted by this motion.

2

such, "[d]istrict courts are given broad discretion in determining whether to exclude expert testimony when a party has failed to designate such witnesses in accordance with pretrial orders." *1488, Inc.*, 939 F.2d at 1288 (citing *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990)). Exclusion is appropriate "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts consider the following four factors when determining whether to strike an untimely expert disclosure: (1) the explanation for the failure to [submit a complete record on time]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) (alteration in original) (quoting *Geiserman*, 893 F.2d at 791).

Exclusion of an untimely expert disclosure "is particularly appropriate" where the proffering party fails to provide "adequate explanation" for the delay, such as where the new opinions are based on information that was available at the time the expert's initial report was due. *1488, Inc.*, 939 F.2d at 1289; *Buston v. Lil' Drug Store Prods., Inc.*, No. 02 cv 178KS-MTP, 2007 WL 2254492, at *5 (S.D. Miss. Aug. 1, 2007) ("Courts "routinely rejected untimely 'supplemental' expert testimony where the opinions are based on information available prior to the missed deadline for service of initial disclosures"), *aff'd* 294 F. App'x 92 (5th Cir. 2008); *Salgado v. Gen'l Motors Corp.,* 150 F.3d 735, 741-43 (7th Cir. 1998).

**ARGUMENT**

I. **DR. RICE'S SUPPLEMENTAL REPORT SHOULD BE STRICKEN BECAUSE IT IS UNTIMELY, PRESENTS NEW OPINIONS, AND IS PREJUDICIAL.**

On December 5, 2014 — 10 weeks after issuing his final Round 3 expert report — Dr. Rice supplemented his report purportedly to correct numerous mistakes and miscalculations in two critical components of his report; namely, his analysis and presentation of water chemistry

3

data (Ex. A, US Supplement at Ex. 1) and his presentation of toxicity thresholds (Ex. A, US Supplement at Ex. 2).[3]  However, Dr. Rice's supposed corrections, besides being untimely, constitute new opinions and new presentations of data.  Moreover, as set forth below, and as affirmed by Dr. Damian Shea, many of Dr. Rice's analyses are impossible to replicate or even understand.[4]  Accordingly, BPXP will be severely prejudiced by the United States' inappropriate "fourth bite at the apple" and Dr. Rice's supplemental report should be stricken.

Compounding the prejudice to BPXP, on December 16, 2014, Dr. Rice submitted substantive changes to his deposition transcript that seek to substitute these new opinions for his October 30, 2014 deposition testimony (Ex. C, Rice Witness Corrections and Signature Page). Specifically, Dr. Rice seeks to revise his testimony at lines 315:25-316:19 and 317:12 based on "[s]ubsequent discussion and investigation of the issue" with Dr. Carls regarding the water chemistry data.  Because these revisions are based upon the new opinions revealed for the first time on December 5 in Dr. Rice's Supplement, BPXP also requests that the Court strike these revisions as improper and prejudicial.

*First*, Dr. Rice has materially changed his opinion related to toxicity.[5]  In his Round 3 Expert Report, for example, Dr. Rice opined that ***less than 20 percent*** of the surface water samples were toxic in the month of June, 2010.[6]  Now, in his new, supplemental report, Dr. Rice opines that ***nearly 75 percent*** of those samples were toxic.  This new opinion is a dramatic

---

[3]   Exhibit 1 to the United States' Supplement corresponds to Appendix A in Dr. Rice's Round 2 Report and Appendix B in Dr. Rice's Round 3 Report.  Exhibit 2 corresponds to Appendix C in Dr. Rice's Report.

[4]   Ex. B, Shea Decl. at ¶ 9 ("I was unable to replicate or confirm many of the results or methodologies utilized by Dr. Rice in his supplemental materials.").

[5]   *See, e.g.*, Ex. B, Shea Decl. at ¶ 7 ("The data analysis results and opinions presented in the US Supplement are materially different than the data analysis results and opinions presented in Dr. Rice's Round 3 Report.").

[6]   Dr. Rice's definition of "toxic" is deeply flawed and unreliable for several reasons, including those set forth in BPXP's Motion to Exclude Certain Opinions of Dr. Stanley J. Rice ("Motion") (Rec. Doc. 13784).

4

change for an ecological habitat (the surface water of the Gulf of Mexico) that the United States will contend was harmed by the oil spill.  Similarly, for the month of May 2010, Dr. Rice changed his view of toxicity from 43% to 60%.[7]  For the month of July, 2010, Dr. Rice changed his view of toxicity from 13% to 34%.  The two figures below, taken from Dr. Rice's reports, highlight the change (note the different vertical axis):

**Figure 5 from the Round 3 Report:**



**Figure 5 from the US Supplement (note difference in scale on the y axis):**

---

[7]  The United States may argue that the increase in purported toxicity resulted from Dr. Carls' misclassification of water depths.  Yet, the percent of surface water samples considered toxic in May changed by approximately 50% in Dr. Rice's new report despite the fact that the number of surface samples was essentially unchanged (129 versus 128).



The United States did not highlight these remarkable, substantive changes in its submission to the Court. The United States only stated that Dr. Carls (who was never disclosed as an expert by the U.S. and has never been deposed) made an error in his analysis of the data and that "some of the values in the figures change as a result of these corrections." (Ex. A, US Supplement at 1) But these changes are significant and cannot be sprung upon BPXP months after the completion of expert discovery in this case. Additional substantive changes in Dr. Rice's new presentation of water chemistry results include his Figure 2, where he more than doubles the percentage of water samples (all depths) that are allegedly toxic in the month of June, 2010, using the U.S. EPA benchmarks. *See* Ex. B, Shea Decl. at ¶ 8.b. Dr. Rice's analysis is also materially different in Figures 3a, 3b, 3c and 3d of his supplemental report. *Id*. at ¶ 8.c ("The percentage of samples that allegedly exceeded certain other threshold concentrations in Figures 3a, 3b, 3c, and 3d (at all depths combined) also increased in the US Supplement as compared to the Round 3 Report.").

***Second***, Dr. Rice's new report is impossible to understand or replicate. Dr. Shea, BPXP's toxicology expert, attempted to replicate many of Dr. Rice's opinions as set forth in the

United States' new supplement. As Dr. Shea states in his Declaration, "I was unable to replicate or confirm many of the results or methodologies utilized by Dr. Rice in his supplemental materials." (Ex. B, Shea Decl. at ¶ 9) For example, Dr. Rice divides samples into nearshore and offshore, but provides no definition of those terms, nor does Dr. Rice provide identification of which samples were placed into each category. *Id.* As another example, Dr. Rice inexplicably excluded samples that are "west of the primary slick boundary" but again provides no explanation as to which samples were excluded or why. *Id.* Moreover, Dr. Rice employs — again without explanation — different definitions of the Gulf surface, in some cases calling it the top 2 meters (*see* Figures 3, 5 and 6), and elsewhere the top 50 meters (*see* Figure 4).[8]

***Third***, over five weeks after apparently learning that he incorrectly reported results for Gulf species instead of the actual species tested, Dr. Rice has substantively altered his bibliography of toxicity studies to address these and other flaws. (Ex. A, US Supplement at Ex. 2) In his original report, Dr. Rice incorrectly represented *15 times* that toxicity tests were conducted on important Gulf species when in fact they were not. Now, two and a half months later, Dr. Rice seeks to correct these errors, as well as other errors related to the species listed. On 20 different occasions in his supplemental report, Dr. Rice modified or changed the species tested (nearly half of all toxicity tests presented). (Ex. B, Shea Decl. at ¶ 10.a). In addition, Dr. Rice on two occasions changed his reliance materials, again without explanation or even

---

[8] At his deposition, Dr. Rice testified that he was unable to explain how Figures 4 and 6 were created because the analysis was done by Dr. Carls. *See, e.g.*, Ex. D, Rice Dep. at 234:16 - 236:2. The U.S. Supplement carries forward and exacerbates this unfairness by significantly changing the number of samples now characterized by Dr. Rice as surface (all based on Dr. Carls' analysis). In Dr. Rice's Round 3 report, he identified over 3000 samples as "surface." In his new, supplemental report, Dr. Rice only identified 1503 samples as surface. *See* Ex. B, Shea Decl. at ¶ 9.c. In other words, the United States is now asserting **half** of the samples it presented as surface samples in Round 3 are not, in fact, surface samples. BPXP has no way of knowing whether the U.S. has correctly classified the samples.

notification.[9]  Finally, in his new, supplemental report, Dr. Rice removed the title of the Appendix which had made clear that his bibliography included tests that did not find toxicity except at relatively higher levels.  *See id.* at ¶ 10.c ("Because many of the studies cited by Dr. Rice show effects only at higher levels (below 20 ppb but above 5 ppb), the removal of the header by Dr. Rice appears to me to be substantive change in his report.")

*Fourth*, in all of the above instances, the United States fails to provide an adequate or satisfactory explanation for its untimely supplemental report.  The data and materials relied upon by Dr. Rice were available to the United States months, if not years, prior to this phase of the litigation.  Now, on the eve of trial, and months after expert reports were due, the United States seeks to change fundamental aspects of Dr. Rice's opinions.   BPXP has no way of replicating the analyses conducted in Dr. Rice's new supplemental report.  Further, BPXP never had an opportunity to depose Dr. Rice on his new opinions.  Accordingly, the Court should strike Dr. Rice's supplemental report as untimely and prejudicial.

## II. CAPTAIN VANHAVERBEKE'S SUPPLEMENTAL REPORT SHOULD BE STRICKEN BECAUSE IT IS UNTIMELY, CONTAINS NEW ANALYSES, AND IS PREJUDICIAL TO BPXP.

On December 5, 2014 — nearly three months after issuing his Round 2 report — Captain VanHaverbeke supplemented his report to disclose new calculations of the effectiveness of the *Deepwater Horizon* Response, including skimming, in situ burning, and dispersing operations. In his deposition, Captain VanHaverbeke conceded that his analysis of the effectiveness of those response measures, as reflected in his Round 2 expert report, is "erroneous," is based on "outdated and incorrect information," and "underestimates" the effectiveness of the response

---

[9]  Given that it was Dr. Carls, not Dr. Rice, who apparently wrote this Appendix, it is interesting that both of these "corrections" were references to Dr. Carls' own publications.  Both entries related to species (pink salmon and pacific herring) that are not even found in the Gulf of Mexico.

operations. (Ex. E, VanHaverbeke Dep. at 136:14-19, 150:10-20, 167:12-68:8) Nevertheless, without any explanation for the delay, the United States waited until December 5, 2014 — ***10 weeks*** after learning of Captain VanHaverbeke's erroneous analysis — to disclose his new calculations of the effectiveness of the Response. Like Dr. Rice, Captain VanHaverbeke discloses new analyses that materially change the opinions he expressed in his original expert report. The United States' delay is inexcusable and prejudicial to BPXP, and Captain VanHaverbeke's untimely supplement should be stricken.

*First*, the United States has made no attempt to justify its nearly three-month delay in attempting to supplement Captain VanHaverbeke's Round 2 report. Pursuant to this Court's April 21 Scheduling Order, Captain VanHaverbeke submitted his Round 2 report on September 12. In that report, Captain VanHaverbeke attempted to rebut opinions offered by BPXP's spill response expert, Captain Frank Paskewich, regarding the effectiveness of the *Deepwater Horizon* Response. In his opening expert report, Captain Paskewich calculated the percentages of oil that were skimmed, burned, and chemically dispersed during the *Deepwater Horizon* Response and compared those percentages to similar data from other oil spill responses. (Ex. F, 8/15/14 Paskewich Rpt. at 19; Ex. E, VanHaverbeke Dep. at 142:15-143:1, 157:20-25) He determined that BPXP and others in the Unified Command "skimmed, burned, and chemically dispersed anywhere from 29% to 49% of the oil that was spilled in the *Deepwater Horizon* Incident— roughly two to five times greater than the removal rate achieved in a typical spill response." Captain Paskewich concluded that these efforts "were extraordinarily effective in minimizing the effects of the spill." (Ex. F, 8/15/14 Paskewich Rpt. at 19)

Captain VanHaverbeke responded to Captain Paskewich's analysis in his September 12 Round 2 report by presenting his own calculations of the amount of oil that was burned,

skimmed, and chemically dispersed during the Response.  (Ex. G, 9/12/14 VanHaverbeke Rpt. at 4-5)  Based on this analysis, Captain VanHaverbeke concluded that he "disagree[d]" with Captain Paskewich's conclusion that the *Deepwater Horizon* Response was "extraordinarily effective and achieved a removal rate that greatly surpassed the norm for open ocean spill response."  (*Id.* at 4; Ex. E, VanHaverbeke Dep. at 133:14-134:10)  Significantly, Captain Paskewich submitted a Round 3 report on September 26, pointing out multiple errors in Captain VanHaverbeke's analysis.

At his October 31 deposition, Captain VanHaverbeke admitted that his "calculations of the effectiveness of skimming, chemical dispersing, and burning operations" were, in fact, "incorrect," based on "outdated information," and "understate[d]" the effectiveness of the Response.  (Ex. E, VanHaverbeke Dep. at 143:10-21, 170:14-171:10)  He acknowledged that "***nowhere* in *any* of [his] three expert reports**" did he "present ***accurate mathematical calculations reflecting the effectiveness of operations in the Deepwater Horizon Response***."  (*Id.* at 146:12-17 (emphasis added))

Captain VanHaverbeke further conceded that he had access to all of the information he needed to perform an accurate analysis at the time he submitted his Round 2 report.  (*Id.* at 145:23-146:1, 157:20-158:3; Ex. H, Dep. Ex. 13522)  He also admitted that, unlike himself, Captain Paskewich had accurately calculated the effectiveness of the Response operations.  Asked why he used incorrect and outdated information, Captain VanHaverbeke testified: "Simply an error on my part when I was grabbing stuff to do the arithmetic," adding "I'm sorry I was pressed for time."  (Ex. E, VanHaverbeke Dep. at 135:22-136:1; 148:13-149:2)

Nevertheless, for reasons that remain unclear, Captain VanHaverbeke did not attempt to correct his analysis either shortly after Captain Paskewich pointed out the errors in his Round 3

report on September 26, or after the errors were explored at length during his deposition on October 31.  (*See* Ex. E, VanHaverbeke Dep. at 145:6-11; Ex. I, 9/26/14 Paskewich Rpt. at 8) Instead, the United States waited to disclose Captain VanHaverbeke's new analysis for the first time on December, 5, 2014 — nearly three months after his Round 2 report was due and the same day that *Daubert* motions were filed.  (*See* Ex. A, US Supplement at Ex. 3)

Nowhere in its proposed supplement to Captain VanHaverbeke's report does the United States mention, much less attempt to justify, its delay.  Nor could it.  There is no dispute that, prior to submitting his Round 2 report, Captain VanHaverbeke had access to all the information necessary to accurately analyze the effectiveness of the Response.  (Ex. E, VanHaverbeke Dep. at 151:4-153:2, 155:5-157:15) Nor is there any reasonable explanation for why the United States would wait months before attempting to supplement Captain VanHaverbeke's analysis, especially given that the errors in his original analysis had been brought to its attention no later than September 26, when Captain Paskewich submitted his Round 3 report.  The United States should not be permitted to wait until the day that *Daubert* motions are due to disclose new expert opinions in an attempt to cure the admittedly unreliable analysis in its expert's report and stave off a *Daubert* motion that it surely anticipated.  The United States' unreasonable and unexplained delay warrants exclusion of Captain VanHaverbeke's supplemental report.  *See, e.g.*, *Barnes v. BTN, Inc.*, 555 F. App'x 281, 285 (5th Cir. 2014) (affirming exclusion of expert testimony where party "offered no explanation" as to why she failed to comply with discovery deadlines); *1488, Inc.*, 939 F.2d at 1289 (affirming exclusion of untimely expert disclosure where party failed to provide "adequate explanation" for delay); *Reliance Ins. Co.*, 110 F.3d at 257 (same); *Baden Sports, Inc. v. Molten*, No. C06-210MJP, 2007 WL 2220215, at *2 (W.D.

11

Wash. Aug. 1, 2007) (striking supplemental expert report because "delay of over three months is not justifiable").

*Second*, allowing Captain VanHaverbeke to supplement his report would prejudice BPXP. In the proposed supplement, the United States contends that Captain VanHaverbeke's new calculations "do[] not alter any of the opinions or conclusions offered in his report" regarding the effectiveness of the Response. (Ex. A, US Supplement at Ex. 3) But this assertion is discredited by even a cursory review of the new opinions in Captain VanHaverbeke's supplemental report, which reflect material changes from those disclosed in his original report:

**VANHAVERBEKE'S NEW SPILL RESPONSE EFFECTIVENESS OPINIONS[10]**

| OPINION | 9/12/14 REPORT | 12/5/14 SUPPLEMENT |
|---|---|---|
| Amount of oil spilled | **4.9 million barrels** | **4.2 million barrels** |
| Oil deemed unrecoverable | **67%** | **44%** |
| Oil chemically dispersed, burned, or skimmed | **16%** | **28%** |
| Recoverable oil that was chemically dispersed, burned, or skimmed | **40%** | **50%** |

Because the period for expert depositions ended almost two months ago, BPXP has had no opportunity to examine Captain VanHaverbeke about his new calculations or have its own spill response expert, Captain Paskewich, respond. For example, BPXP has not been able to question Captain VanHaverbeke about why a removal rate of 50% of recoverable oil should not be considered an exemplary result.

---

[10] Percentages show amount of oil removed as a percentage of oil discharged during the spill according to government estimates, except where indicated.

***Third***, in contrast to the prejudice that BPXP would face if Captain VanHaverbeke's new analysis is permitted, the United States admittedly would not be prejudiced if it was stricken. In its Opposition to BPXP's *Daubert* motion, the United States asserted that Captain VanHaverbeke's new effectiveness calculations are "immaterial" to his assessment of the Response because "the exact percentages of oil burned, dispersed or skimmed do not change Captain VanHaverbeke's opinion that burning and dispersing do not remove oil from the environment." (US Br., Rec. Doc. 13860, at 5-6) If that's right, then striking Captain VanHaverbeke's new analysis would not hamper any presentation of his opinions at trial.

The United States also conceded that BPXP's expert, Captain Paskewich, has accurately calculated the amount of oil that was skimmed, burned, and chemically dispersed during the Response. (*Id.* at 7) As a result, Captain VanHaverbeke's untimely effectiveness analysis is not only unimportant to the United States' case — it is entirely unnecessary and should be excluded. *Cf. Briley v. Aquarius Boat Corp.*, No. 05-5711, 2007 WL 4532240, at *1 (E.D. La. Feb. 22, 2007) (An expert's disclosures are important under Rule 37 when they are "crucial to a fair disposition of th[e] matter."); *Neff v. Ford*, No. 96-3627, 1997 WL 465286, at *3 (E.D. La. Aug. 11, 1997), *aff'd* 163 F.3d 1354 (5th Cir. 1998).

### III. THE SUPPLEMENT TO MR. RATNER'S REPORTS SHOULD BE STRICKEN BECAUSE IT IS UNTIMELY AND PREJUDICIAL TO BPXP.

Under the guise of providing "errata" to the expert reports of Ian Ratner, its economic impact expert, the United States has attempted to make several changes that affect the substantive opinions and analysis in his reports. This supplement is untimely, prejudicial, and should be stricken.

While some of the United States' proposed revisions to Mr. Ratner's reports correct typographical or scrivener's errors, a number of the changes (identified by the United States as

"clarifications") substantively alter the opinions expressed in his reports. ***First***, Mr. Ratner's August 15, 2014 report made clear that his assessment of the financial ability of BPXP to fund a penalty and of BPXP's financial and operating position was derivative of his assessment regarding non-defendant BP p.l.c.: "It is my opinion that **BP, and thus BPXP,** has the financial ability to fund the payment of the maximum penalty of $18.06 billion without incurring a long-term negative economic impact on its operations." (Ex. J, 8/15/14 Ratner Rpt. at ¶ 150 (emphasis added); *see also id.* at ¶ 153 ("**BP's, and thus BPXP's**, financial and operational position is sufficiently strong so that, irrespective of the financing option(s) used to fund payment of the Penalty, neither BP nor BPXP would sustain a long-term negative economic impact on its operations.")). At deposition, Ratner attempted to offer an opinion that "there's a lot of indications that BPXP could pay the penalty" itself. (Ex. K, Ratner Dep. at 43:13-18 ("First, we're saying — we're looking at BPXP, and we're saying there's a lot of indications that BPXP could pay the penalty; and then we're saying also, clearly BP PLC could fund the payment, either on behalf of BPXP or on their own.")). Ratner, however, admitted that this testimony was contradicted by the opinion in his report:

> Q. You would agree, Mr. Ratner, that the sentences in your report in Paragraphs 150 and 153, say the opposite of the answer you just gave?
>
> A. Yeah, I know. . . .

(*Id.* at 43:21-25). In its supplement, the United States now seeks to delete from Mr. Ratner's report the phrase "and thus BPXP's," substantively changing the meaning of Mr. Ratner's report and obscuring the analytical process undertaken by Mr. Ratner.

***Second***, in paragraphs 3(f) and 189(d) of his August 15, 2014 report, Mr. Ratner purported to identify the sources from which BPXP could fund or finance a CWA penalty. (Ex. J, 8/15/14 Ratner Rpt. at ¶¶ 3(f), 189(d)). Those paragraphs made no reference to raising funds

14

by issuing equity.  In its supplement, however, the United States seeks to add "the issuance of equity, either internally or externally" to these paragraphs as a new funding source.  This is not a correction, but a new addition to Mr. Ratner's list of purported funding sources.

*Finally*, Mr. Ratner admitted that he erred in calculating a leverage ratio in his August 15, 2014 report with respect to Anadarko.  (Ex. K, Ratner Dep. at 307:25-308:9 ("Q. You would agree as presented, Table 7 is inaccurate, needs to be corrected, correct? As presented, right? [Objection]  A. Yeah. I mean, I think you could make the calculation more refined.")).  Rather than correct this calculation to show an accurate number less supportive of Mr. Ratner's opinions, however, the United States' supplement simply deletes the relevant portion of the table in which this analysis appears.

The errors by Mr. Ratner that the United States' supplement purports to correct are not merely administrative or typographical; they are analytic and conceptual, and they serve to illustrate the deficiencies in Mr. Ratner's analysis, many of which he confirmed in his deposition.  The United States has not offered any justification for providing this supplement.  The simple fact is that Mr. Ratner wants to change his report after being examined about his own opinions and realizing the implications.  He cannot now "cure" those problems by simply changing his report after being deposed.  Mr. Ratner can explain in open court on his direct examination why the report he submitted under the Court's schedule states opinions that Mr. Ratner now does not support.

## CONCLUSION

For the reasons discussed above, the Court should strike the United States' untimely supplements to the expert reports of Dr. Rice, Capt. VanHaverbeke, and Mr. Ratner.

Date: December 24, 2014

Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. ("Mike") Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Elissa J. Preheim
Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004
Telephone: (202) 942-6546
Facsimile: (202) 942-5999

***Attorneys for BP Exploration & Production Inc.***

16

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of December, 2014.

                                                  /s/ Don K. Haycraft