# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION: J JUDGE BARBIER |
| This document relates to: | * | MAGISTRATE JUDGE SHUSHAN |
| No. 10-4536 | * * * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DECLARATION OF DAMIAN SHEA

1.      I, Damian Shea, Ph.D., submit this declaration in support of BPXP's motion to strike the United States' expert report supplement and deposition errata for Dr. Stanley Rice.

2.      I am a professor of environmental toxicology at North Carolina State University. I received my Ph.D. in Environmental Chemistry from the University of Maryland in 1985. I have over 30 years' experience in environmental/analytical chemistry and applied toxicology with primary research interests in the detection, sources, behavior, and effects of chemicals in the aquatic environment. I have published over 70 peer-reviewed publications, over 100 technical reports, several book chapters, and over 200 abstracts of scientific presentations -- almost all related to the detection, fate, effects, and risks associated with chemicals in the environment.

3.      I have been retained by BP Exploration and Production, Inc. ("BPXP") for the purpose of providing expert witness testimony on the environmental impact of oil- and dispersant-related chemicals in offshore waters and sediments of the Gulf of Mexico following the *Deepwater Horizon* incident.

4.      I have reviewed all the publicly available chemistry data collected from the waters and sediments of the Gulf of Mexico as part of the *Deepwater Horizon* response and

environmental investigation. I have analyzed these data and compared the measured chemical concentrations to the United States Environmental Protection Agency's (EPA'a) toxicity benchmarks for the protection of aquatic life. This analysis and my opinions regarding the environmental impact of oil- and dispersant-related chemicals are summarized in my August 15, 2014 Expert Report (TREX-242553).

5.  I have reviewed the expert reports of Dr. Stanley Rice (TREX-231625; TREX-231638; TREX-013332), the Deposition of Dr. Stanley Rice, and the United States' Errata Sheet for the Round 3 Expert Report of Stanley Rice ("US Supplement" BP Mot. to Strike at Ex. A).

6.  The US Supplement purports to correct errors in Appendix B and Appendix C of Dr. Rice's September 26, 2014 Report (TREX-13332, BP Mot. to Strike at Ex. L). ("Round 3 Report").

7.  The data analysis, results and opinions presented in the US Supplement are materially different than the data analysis results and opinions presented in Dr. Rice's Round 3 Report.

8.  For example, with regard to Appendix B of Dr. Rice's report:

    a.  The percentage of May samples that exceeded 0.3 parts per billion (ppb) in Figure 5 (a level at which Dr. Rice contends toxic impacts could potentially occur) has increased from 43% in the Round 3 Report, to 60% in the US Supplement. The percentage of June samples that exceeded 0.3 parts per billion (ppb) in Figure 5 has increased from 19% in the Round 3 Report, to 74% in the US Supplement. The percentage of July samples that exceeded 0.3 parts per billion (ppb) in Figure 5 has increased from 13% in the Round 3 Report, to 34% in the US Supplement.

2

The material change to the US Supplement version of the figure is apparent in a side by side comparison of the two versions of the figure:

**Figure 5 from the Round 3 Report:**



**Figure 5 from the US Supplement (note difference in scale on the y axis):**



3

b. In Figure 2, the total percentage of May samples that are alleged to exceed the EPA chronic toxicity benchmark (at all depths combined) has increased from 47% in the Round 3 Report to 53% in the US Supplement. The total percentage of June samples that are alleged to exceed the EPA chronic toxicity benchmark (at all depths combined) has increased from 11% in the Round 3 Report to 25% in the US Supplement. The material change to the US Supplement version of the figure is apparent in a side by side comparison of the two versions of the figure:

**Excerpted Figure 2 from the Round 3 Report:**



**Excerpted Figure 2 from the US Supplement (note difference in scale on the y axis):**



5

   c. The percentage of samples that allegedly exceeded certain other threshold concentrations in Figures 3a, 3b, 3c, and 3d (at all depths combined) also increased in the US Supplement as compared to the Round 3 Report.

9. The US Supplement contains analyses and graphs that I have not been able to replicate. The US Supplement includes a description of how chemistry data was downloaded, assembled and analyzed. I attempted to follow the steps identified by Dr. Rice in the U.S. Supplement. However, I was unable to replicate or confirm many of the results or methodologies utilized by Dr. Rice in his supplemental materials. For example:

   a. Figures 1 - 3 divide samples into six zones: "Surface, offshore;" "Intermediate, offshore;" "Deep, offshore;" "Surface, nearshore;" "Intermediate, nearshore;" and "Deep, nearshore." While Fig. 1 does define "surface," "deep" and "intermediate," I was unable to locate in the US Supplement a definition of "nearshore" and "offshore" or a list of which samples are included in each of the two categories.

   b. Fig. 4 purports to exclude "[s]amples to the west of the primary slick boundary." I was unable to locate in the US Supplement a definition of "slick boundary" or a list of which samples were excluded from this figure.

   c. The table on page 4 of Exhibit 1 of the US Supplement shows that from May-December of 2010, there were 1,503 samples collected in the "surface," whereas the same table in the Round 3 Report shows that during the same time period, there were 3,097 samples collected in the "surface." Both tables purport to define "surface" as the "upper 2 m" of the water column. It is

6

unclear how or why almost 1,600 fewer samples are assigned to the top 2 meters in the US Supplement than in the Round 3 Report.

  d. Adding even more confusion, Dr. Rice utilizes an entirely different definition of "surface" in Figure 4 of the US Supplement, defining "Surface samples" as the "upper 50m." The two definitions of "surface" in the US Supplement, the top 2 meters and the top 50 meters, are both contrary to what Dr. Donald Boesch, the United States' biology expert, asserts is the most environmentally relevant portion of the surface waters of the Gulf, the top 150 meters.[1]

  e. The U.S. Supplement indicates that the data relied upon by Dr. Rice in his Round 3 Report had become "scrambled or unlinked to the rest of the data" and that therefore, "the depth classifications [in his Round 3 Report] did not correspond to the correct samples." Based upon my review of Dr. Rice's deposition, I know that Dr. Rice also incorrectly presented the data in his Round 2 Report.[2] The U.S. Supplement does not include any data spreadsheet or other material that would allow me to confirm whether Dr. Rice correctly characterized the depth and location of the samples he presented.

---

[1] 8/15/2014 Boesch Report at 18 (TREX-013183, BP Mot. to Strike at Ex. M) ("The waters within 150 meters of the surface of the Gulf of Mexico are particularly biologically important as this is where there is sufficient light to promote photosynthetic production of organic material").

[2] Rice Dep. at 147:6-10 (BP Mot. to Strike at Ex. D) (referring to the summary of water chemistry in his Round 2 Report, "We found errors because this is done with a short time line. And so the Round 3 is a, quote, 'corrected version,' although it looks like it needs another level of editing and revision.").

10. Finally, the U.S. Supplement includes several changes to Appendix C, that is a list of toxicity results from various laboratory experiments (shown in Exhibit 2 of the U.S. Supplement). For example:

   a. On twenty occasions, Dr. Rice changed or corrected the name of the test species listed in Appendix C.

   b. On two occasions, Dr. Rice changed his citation to different publications.

   c. Dr. Rice removed the header of his Appendix C in the U.S. Supplement. The original header correctly indicated that his list reported toxicity studies that show embryo responses below 20 parts per billion (ppb). Because many of the studies cited by Dr. Rice show effects only at higher levels (below 20 ppb but above 5 ppb), the removal of the header by Dr. Rice appears to me to be a substantive change in his report.

11. I am continuing to review the U.S. Supplement and reserve my right to modify or update any of my conclusions and statements set forth above.

12. I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 24 December 2014

_____

Damian Shea

8