# EXHIBIT G

# In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL NO. 2179, SECTION J
JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

## Response Report of Mark G. VanHaverbeke

Captain, United States Coast Guard (Retired)
Research Engineer
United States Coast Guard Research and Development Center
New London, Connecticut

*/s/ Mark G. VanHaverbeke*
Mark G. VanHaverbeke

September 12, 2014

Captain Paskewich offers a great deal of criticism concerning media outreach, yet some of the failures of media outreach can be attributed to BP. For example, Captain Laferriere noted that BP failed to incorporate the principles of risk communication into its media outreach from the start. BP only added a risk communication expert at the insistence of Captain Laferriere, but that was over a month into the response and too late to be effective.[14] Moreover, Captain Paskewich does not allege that these media outreach issues prevented the removal of oil or the protection of human health or the environment during the response. Rather, he concludes that, "the Coast Guard and BP continued to mount an effective Response despite these media challenges."[15]

### 2. Dispersion and Burning are Not the Same as Removing Oil from the Environment

In subsection V.B. of his report, Captain Paskewich opines that BP's efforts were extraordinarily effective and achieved a removal rate that greatly surpassed the norm for open ocean spill response.[16] I disagree for the following reasons.

First, it is important to remember that dispersants do not remove oil pollution from the marine environment.[17] Instead, oil is dispersed throughout the water column.[18] The use of dispersants represents a trade-off between limiting the potential for harm on the water surface and shorelines while increasing the potential for harm throughout the water column.[19] Similarly, in situ burning alters the composition of spilled oil and transfers a portion into the atmosphere as soot and gaseous emissions.[20] The transfer of byproducts to the atmosphere is recognized as a trade-off that, in many situations, poses less environmental threat than leaving the oil on the water surface.[21]

Second, the length of the discharge (87 days)[22] gave BP the opportunity to marshal and deploy forces and to adapt different ideas in a manner that is not possible with an instantaneous spill event. BP, under the Unified Command, began mustering people early, but the response effort did not reach its peak until July.[23] Additionally, burning and dispersing oil are most

---

[14] Laferriere Dep. at 276, 281, 299-301.
[15] Expert Report of Frank M. Paskewich at 59-60.
[16] Expert Report of Frank M. Paskewich at 18-19.
[17] FOSC Report (TREX-009105) at 33-34.
[18] *Id*.
[19] *Id.* at 34, 40.
[20] RRT VI In-Situ Burn Plan Part I (Operations Section) at I-1 (HCD020-013902).
[21] U.S. Coast Guard, Oil Spill Response Offshore, In-situ Burn Operations Manual (2003) at 6 (N7J007-004792).
[22] FOSC Report (TREX-009105) at 21, 23, 33, 151.
[23] Expert Report of Frank M. Paskewich at 14.

effective when the oil is relatively fresh, often hours to a few days in the case of dispersants and within 24 to 36 hours in the case of burning, depending on how quickly the oil evaporates or emulsifies.[24]  As the *Deepwater Horizon* spill represented a continuous discharge, burning and dispersing remained viable options because a source of fresh oil was present until after the well was shut on July 15.[25]  The final burn operation occurred on July 19.[26] In total, BP had a window of 90 days (April 20-July 19) in which options to burn or disperse oil were available.  For comparison, during the *Exxon Valdez* spill response, dispersant application only occurred during the first few days following the ship's grounding until a storm system moved in on the evening of the third day, making dispersants no longer effective.[27]  Responders conducted a successful trial in situ burn early in that response, but there were questions about the impact of residual smoke on local residents ashore.  Those questions were still unresolved when, again, the storm system on the evening of the third day made conditions unfavorable for another burn.[28]

Third, measuring against "Oil Available for Recovery" ignores the 67 percent of the oil discharged and deemed unrecoverable.  In situ burning and chemically dispersing oil accounted for thirteen percent of the total oil discharged, while direct recovery (skimming) only amounted to an unremarkable three percent of the 4.9 million barrels of oil discharged.[29]  This rate is on par or below rates Captain Paskewich cites for other spills in Figure 7 of his report. During the *Exxon Valdez* response, during which responders' use of dispersants and in situ burning was severely limited, Captain Paskewich shows an eight percent recovery rate.[30]

---

[24] National Research Council, Oil Spill Dispersants Efficacy and Effects (2005) at 3, 24, 29 (ANA-MDL-000264448); U.S. Coast Guard, Oil Spill Response Offshore, In-situ Burn Operations Manual at 24, 25 (N7J007-004792).

[25] The well was capped on July 15, 2010 (*see* FOSC Report, TREX-009105, at 44). Aerial dispersants were applied from April 22, 2010 (*see* FOSC Report, TREX-009105, at 34) until July 19, 2010 (*see* FOSC Report, TREX-009105, at 37, 44).  Between April 28 and July 19, 2010, 411 burns were conducted offshore, removing five percent of the 4.9 million barrels of discharged oil. (*see* FOSC Report, TREX-009105 at 45).

[26] *Id*. at 212.

[27] National Research Council, Oil spill Dispersants Efficacy and Effects (2005) at 69 (ANA-MDL-000264448).

[28] National Response Team, The EXXON VALDEZ Oil Spill, A Report to the President (May 1989) at 19 (C2U004-000946).

[29] The Federal Interagency Solutions Group, Oil Budget Calculator Science and Engineering Team, Oil Spill Calculator, (2010) at 39 (BP-HZN-2179MDL09219786).

[30] Expert Report of Frank M. Paskewich at 19 fig.7.