# EXHIBIT A

01-45956
LC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )     MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )     SECTION: J
APRIL 20, 2010 )
)     JUDGE BARBIER
)
)     MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*
## *PENALTY PHASE*
## *EXPERTS*

### *WorldwideVIEW*™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# **Fredric Quivik**

**October 14, 2014**

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
IN RE: OIL SPILL by the      ) MDL NO. 2179
OIL RIG "DEEPWATER HORIZON"  )
in the GULF OF MEXICO, on    ) SECTION: J
APRIL 20, 2010               )
                             ) JUDGE BARBIER
                             )
                             ) MAG. JUDGE SUSHAN
```

ORAL VIDEOTAPED DEPOSITION OF

FREDRIC L. QUIVIK, PhD

OCTOBER 14, 2014

ORAL VIDEOTAPED DEPOSITION OF FREDRIC L. QUIVIK, PhD, taken in the above-styled and numbered cause on the 14th day of October, 2014, from 8:37 a.m. to 5:35 p.m., before Lisa A. Cloutier, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the Pan-American Building, 601 Poydras, 11th Floor, New Orleans, Louisiana, 70130.

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**
**Worldwide Court Reporters, Inc. (800)-745 1101**

 1      A.    Yes.

 2      Q.    Okay.  So using it how you use it in your report,

 3 are there any entities other than the Upstream Segment and the

 4 Drilling and Completions Unit that you contend were operators

 5 of the Macondo Well?

 6      A.    Another organization would be the Exploration Unit,

 7 which is a unit that's on a -- an organizational level along

 8 with Drilling and Completions.

 9      Q.    Okay.  Other than the Upstream Segment, the Drilling

10 Completions Unit and the Exploration Unit, are there any other

11 entities that you contend were operators of the Macondo Well?

12      A.    Again, recognizing that this is not a legal opinion,

13 but what I would consider a practical, historical rendition of

14 the facts, another legal entity would be BP America

15 Production -- I always forget if it's Company or Corporation,

16 but BPAPC, which was the employing entity of many of the

17 people who worked at the Macondo Well, and also was the BP

18 entity that entered the contract with Transocean for the two

19 drilling rigs that operated at the Macondo Well.

20      Q.    Okay.  And does that complete your list of entities

21 and organizations?

22      A.    Well, if we want to be encompassing, we would have

23 to look at BP's Upstream Segment and the other components that

24 played roles in that operation.

25      Q.    Okay.

1    people.  And it was also the contracting entity with

2    Transocean for the two drilling rigs, the MARIANAS and the

3    DEEPWATER HORIZON.

4        Q.   Any -- any historical texts or periodicals that

5    you're aware of that lay out the factors to consider with

6    respect to whether an entity is an operator of a well?

7        A.   I have -- for -- for purposes of this kind of

8    historical research, read the description that we get from

9    Best Foods, for instance, what an operator is.  And so that

10   informs me of the kinds of factors to look for in the

11   historical record so that I can develop opinions about the

12   facts from which the judge or other people can draw legal

13   conclusions.

14       Q.   Okay.  So your -- your opinion of BPAPC as an

15   operator is informed by the Best Foods decision?

16       A.   Yes, as well as the way that term is used in the

17   historical literature, in the industrial literature, et

18   cetera.

19       Q.   Okay.  And what about the Best Foods decision

20   informs you as to whether BPAPC is an operator?

21       A.   I can't quote it.  I'm not in a position to quote

22   it, but there is the -- the language that describes playing a

23   role in managing day-to-day operations.  So I look for facets

24   of the history that seem to address that particular role of

25   operator, operating -- being an operator.

 1        A.   I'm not opining that they're different or that

 2   they're the same.   I'm not drawing a comparison.

 3        Q.   And in connection with your -- your expert work in

 4   this case, you haven't evaluated the operations of any other

 5   subsidiary board to compare it to BPXP, correct?

 6        A.   That is correct, yes.

 7        Q.   All right.   Are you aware of any other subsidiary

 8   board in the world that is more active than BPXP's?

 9        A.   And by active, you mean?

10        Q.   Just the plain old meaning of active.

11        A.   And you mean wholly-owned subsidiary?

12        Q.   Wholly-owned subsidiary.   Are you aware of any other

13   wholly-owned subsidiary in the world -- strike that.

14             Are you aware of the board -- of any board of

15   any wholly-owned subsidiary in the world that is more active

16   than BPXP's board?

17             MR. GLADSTEIN:   Objection as to form.

18             MR. NOMELLINI:   Richard, what's the objection?

19             MR. GLADSTEIN:   Assumes facts not in evidence.

20   It assumes that there's activity in the BPXP board.

21             MR. NOMELLINI:   Well --

22        Q.   (BY MR. NOMELLINI) The BPXP board has engaged in

23   resolutions, correct?   They have added resolutions?

24        A.   Yes.

25        Q.   So are you aware of any board in the world of any

```
 1   wholly-owned subsidiary that is more active than BPXP's board?

 2       A.   I don't know.  I'm not aware of -- I haven't

 3   investigated that -- that question --

 4       Q.   Okay.

 5       A.   -- so I just don't know.  I can't speak to it.

 6       Q.   And you're not aware of any such subsidiary board as

 7   you sit here today, correct?

 8       A.   That I could draw that kind of comparison, not that

 9   I can think of, no.

10       Q.   You haven't looked at -- you haven't evaluated the

11   board of -- the subsidiary boards within Chevron, correct?

12       A.   That's correct.

13       Q.   You haven't evaluated the parent or subsidiary

14   boards of Exxon?

15       A.   That's correct.

16       Q.   You haven't evaluated the parent or subsidiary

17   boards of Total or Shell?

18       A.   Correct.

19       Q.   You haven't looked at the minutes of any board

20   meetings of any multi-national companies other than BP?

21       A.   For this case?

22       Q.   Let's start -- let's start generally.  Have you --

23   have you evaluated the minutes of meetings of multi-national

24   companies, either the parent companies or the subsidiaries?

25       A.   I'm trying to remember in the Clark Fork case and in
```

1   outside the rationale of veil piercing, but again that's --

2   those are legal arguments and I don't have an opinion on that.

3   I try to understand that kind of thinking, but it's only to

4   inform myself of one of the sets of parameters within which

5   industrial actors act.

6       Q.   You're not opining that there's anything wrong with

7   a wholly-owned subsidiary board being less active than a

8   public company board, correct?

9       A.   That's correct.

10      Q.   Okay.  In fact, that's expected that a wholly-owned

11  subsidiary board would be less active than a public company

12  board, in your experience, right?

13      A.   I would say not surprising, yeah.

14      Q.   And why is that not surprising?

15      A.   Because the board of directors -- one reason is,

16  I've read the board of directors would not have a reason to be

17  protecting multiple stockholder interests.

18      Q.   And because in that context, the wholly-owned

19  subsidiary, it's relatively easy to communicate with the

20  stockholder and determine what the interests of the

21  stockholder are, fair?

22      A.   Yes, yes.  Can you repeat that question again,

23  please?

24               MR. NOMELLINI:  Can you read that back?

25               THE WITNESS:  The initial question.  I think it

1      A.    It may be that it was represented to me by one of

2   the DOJ attorneys.

3      Q.    So you have some recollection of an order limiting

4   BP's obligations to produce minutes and resolutions not

5   involving dividends, correct?

6      A.    Yes.

7      Q.    And the date -- as far as you recall, the best of

8   your recollection, was 2009; that is, no obligation to produce

9   prior to 2009?

10     A.    That's the one I don't remember and you've

11  represented that to me --

12     Q.    Yeah.

13     A.    -- and I have no reason to object.  I do remember

14  the 2005 for the -- for the dividends.

15     Q.    You would agree with me that BP undertook -- BPXP's

16  board undertook additional activities after the incident

17  relating to Macondo?

18                 MR. GLADSTEIN:  Objection as to form.

19     A.    The BPXP board undertook additional activities --

20     Q.    (BY MR. NOMELLINI) Yes.

21     A.    -- you said?  After the incident, and do you mean at

22  any time after --

23     Q.    Yes.

24     A.    -- the incident?

25     Q.    Yes.

1       A.   The documentation I've seen -- well, first of all,

2   it indicates that the board did not meet or engage in

3   resolutions in lieu of meeting or pass resolutions by giving

4   consent in lieu of meeting for the rest of 2010.  And the next

5   time the board met, as I recall, was -- we could look, but I'm

6   recalling perhaps February 2011.

7       Q.   Okay.  So -- so you're saying -- for the rest of

8   2010, you're saying you're -- the documentation you've seen

9   indicates the board did not meet or engage in resolutions from

10  April 20th, 2010 to December 31st, 2010, correct?

11      A.   Correct.

12      Q.   But you're not -- you're not testifying that there

13  was no -- there were no resolutions in March 2010, correct?

14      A.   In March?  Before the incident?

15      Q.   Yes.

16      A.   I believe that was the last dividend that was

17  distributed in March of 2010.

18      Q.   You would agree that some of the issues BP -- the

19  BPXP board faced after the incident differed from issues it

20  faced before the incident?

21      A.   It had a new set of issues to --

22      Q.   Right.

23      A.   -- face, yes.

24      Q.   For example, BPXP was a party to a criminal plea in

25  2012 involving approximately $4 billion?

1    A.   I'm not aware of all of the other legal actions.  I

2   remember reviewing that a number of them were discussed at

3   board meetings, but I don't recall all of them.

4    Q.   Okay.

5    A.   So, if that's one --

6    Q.   There was a --

7    A.   I will take your word for it.

8    Q.   There was a -- there was an Anadarko and MOEX

9   settlement?

10    A.   I remember that one, yes.

11    Q.   And the BPXP board reviewed those?

12    A.   I remember that, yes.

13    Q.   And the BPXP board also reviewed a Cameron

14   settlement, correct?

15    A.   That name doesn't ring a bell, but if you say so.

16    Q.   And the BPXP board also received reports regarding

17   compliance with the plea agreement, correct?

18    A.   I don't recall that detail.

19    Q.   And the BPXP board also reviewed materials related

20   to the DEEPWATER HORIZON trust agreement entered into in 2010

21   providing for a 20 billion-dollar trust?

22    A.   I recall that.

23    Q.   So the BPXP board had -- because of the incident,

24   had the number of obligations after the incident that it did

25   not have before the incident, correct?

```
 1        A.    Yes.

 2        Q.    And let's -- and let's take a look at some of those.

 3   Tab 16.

 4        A.    Mark it?

 5        Q.    Yep.

 6              This is minutes of a BPXP board meeting dated

 7   April 29, 2013.  And if you look at page 3, there's a report

 8   provided by Michael Robertson, with an update on BPXP's

 9   financial condition.  Do you see that?  Third -- third item?

10        A.    Third item, Financial Update, yes, I see it.

11        Q.    Okay.  And was that a -- was that a appropriate

12   activity for the BPXP board to be engaged in, the review of

13   financial materials?

14        A.    I would say so.

15        Q.    Now, as -- as far as you're aware, prior to the

16   incident BPXP was in a positive net asset position, right?

17        A.    Before the incident?

18        Q.    Yes.

19        A.    Yes.

20        Q.    Okay.  And there was a new issue that arose after

21   the incident, which is that there was a question as to whether

22   BPXP was in a positive or -- or negative net asset position,

23   correct?

24        A.    I believe that's true, yes.

25              (Exhibit No. 13221 marked for identification.)
```

1      Q.  (BY MR. NOMELLINI) And by the way, this is Exhibit

2  13221 that we're looking at, the April 29th, 2013 meeting

3  minutes.

4      A.  Yes.

5      Q.  So, the BPXP board had a -- had a new reason to

6  review financial statements after the incident that it didn't

7  have before the incident, which is to determine if BPXP was in

8  a positive -- indeed, in a negative net asset position,

9  correct?

10     A.  That would be a new reason, you said?

11     Q.  Yes.

12     A.  Yes.

13     Q.  And you're aware from review -- you reviewed

14  Mr. Robertson's testimony, correct?

15     A.  Yes.

16     Q.  And you're aware that a BPXP board member, Randy

17  Latta, asked Mike Robertson to prepare financial statements in

18  2011?

19     A.  I do not recall that detail.

20             (Exhibit No. 13222 marked for identification.)

21     Q.  (BY MR. NOMELLINI) Let's look at Tab 10.  We'll mark

22  it as Exhibit 13222, the deposition of Mike Robertson.  This

23  is one of the documents you reviewed?

24     A.  Yes.

25     Q.  If you look at page 208, lines 3 through 9.  And who

1    made the decision to start preparing standalone statements for

2    BPXP, who made the decision?

3                    Answer:  I don't know.  I don't know who made

4    the decision.  I was requested by Randy Latta.

5                    Do you see that?

6        A.    Yes.

7        Q.    Randy Latta is a board member of BPXP?

8        A.    Yes.

9        Q.    And was that, in your view, an appropriate action

10   for Mr. Latta to take as a board member, to ask that financial

11   statements be prepared for BPXP?

12       A.    Yes.

13                   (Exhibit No. 13223 marked for identification.)

14       Q.   (BY MR. NOMELLINI) Look at Tab 18, which we'll mark

15   as Exhibit 13223.  These are minutes of a BPXP board meeting

16   dated February 7, 2012?

17       A.    Yes.

18       Q.    And if you look at page 3, the statement, Following

19   a discussion with the board, Shah, Latta, and Bray noted that

20   in light of these factors, they had recommended to the company

21   stockholders that a capital contribution be made the company

22   and that the process to consider, approve, and execute this

23   recommendation was underway.

24                   Do you see that?

25       A.    Yes.

1    Q.   Okay.  And you are aware that BPXP's board members

2  made a -- requested a contribution, capital contribution from

3  its parent, BPAPC?

4    A.   Yes.

5    Q.   And that a capital contribution was provided?

6    A.   I believe so, yes.

7    Q.   Yeah.  And was that an appropriate action for Shah,

8  Latta, and Bray to undertake as board members of BPXP, that

9  is, to request a capital contribution from their parent?

10   A.   Yes.

11             (Exhibit No. 13224 marked for identification.)

12   Q.  (BY MR. NOMELLINI) Let's look at Exhibit 13224, which

13  is Tab 19.  Minutes of board meeting dated December 10th,

14  2013.  BPXP board.  And you see that there's a discussion on

15  page 2 of a proposed agreement between BPXP and the North

16  American -- North America Funding Company regarding a

17  3.1 billion-dollar loan.  Do you see that?

18   A.   Yes.

19   Q.   And it was resolved that the officers of the company

20  were empowered to enter into the loan agreement?

21   A.   Yes.

22   Q.   And you're aware that Steve Bray entered into that

23  loan agreement on behalf of BPXP?

24   A.   I did not recall that he was the one who did that,

25  but if you represent that that's the case, I have no reason to

1    not believe you.

2        Q.    Okay.   Would -- would that be an appropriate action

3    for B -- for Steve Bray to engage in as a BPXP officer, that

4    is, to execute a loan agreement on behalf of BPXP when he had

5    been authorized to do so by the board?

6        A.    Yes.

7        Q.    So, with the -- with the plea agreement that

8    occurred after the incident, one of the -- one of the

9    functions that the BPXP board engaged in after the incident

10   was monitoring compliance with the plea agreement, correct?

11       A.    I recall that, yes.

12              (Exhibit No. 13225 marked for identification.)

13       Q.    (BY MR. NOMELLINI) So, if we look at the next tab,

14   which is 13225, minutes of a meeting dated February 14th,

15   2013?

16       A.    Okay.

17       Q.    You look at page 2, Mr. Gabe Cuadra gave a report on

18   compliance with the plea agreement?   Do you see that?

19       A.    Am I on the right one here?

20       Q.    Are you on Tab 25, Mr. Quivik?

21       A.    Oh, I thought you said 20.   Sorry.   No.   I'm not.

22   Okay.   25 and the date?

23       Q.    The date of these minutes is BPXP board meeting

24   dated February 14th, 2013.

25       A.    Okay.

1      Q.    And --

2      A.    Okay.  I see that name now.

3      Q.    Okay.  If you look at page 2, there's a report of a

4   presentation made by Gabe Cuadra relating to efforts to comply

5   with the plea agreement, correct?

6      A.    Yes.

7      Q.    And if you look down, at the bottom of that

8   paragraph under Compliance Update it says, Members of the

9   board then provided Mr. Cuadra with comments and feedback on

10  the format of the report to apply to future reports indicating

11  the more detail regarding the compliance risk faced and

12  mitigation efforts related to the compliance risk faced would

13  be appreciated.  The board then asked Mr. Bray and Mr. Cuadra

14  to incorporate their comments and feedback into the report for

15  next report to be delivered to the board.  And Mr. Cuadra and

16  Mr. Bray indicated that they would do so.

17             Do you see that?

18     A.    Yes.

19     Q.    Is that appropriate activity for the BPXP board to

20  be engaged in, to hear the presentation in compliance with the

21  plea agreement and then to provide feedback to the presenter

22  on what additional information they needed?

23     A.    Yes.

24             (Exhibit No. 13226 marked for identification.)

25     Q.    (BY MR. NOMELLINI) Okay.  Let's look at Tab 26, which

1   we'll mark as Exhibit 13226, which is a January 29th, 2014

2   meeting of the BPXP board.  There's a presentation on BP -- on

3   ethics and compliance on page 2?

4        A.   I see it.

5        Q.   Given by Eve Mitchell.  Do you see that?

6        A.   Yes.

7        Q.   And the last sentence of that paragraph says, The

8   chairman of the BPXP board, which is Richard Morrison,

9   requested that Mr. Mitchell perform further analysis regarding

10  the shortcomings in training compliance identified and bring

11  back a remediation plan for the board to review as soon as

12  possible.

13            Do you see that?

14       A.   Yes.

15       Q.   And so, to the board -- the BPXP board is directing

16  here that a remediation plan be provided, correct?

17       A.   Yes.

18       Q.   And that -- that's an appropriate activity of -- of

19  a board, to direct that a remediation plan be provided with

20  respect to shortcomings in training compliance?

21       A.   Yes.

22       Q.   Let's mark Tabs 29 through 34.

23            (Exhibit Nos. 13227-13231 marked for

24            identification.)

25       Q.   (BY MR. NOMELLINI) Okay.  Tab 29 is minutes of a BPXP

```
 1                    (Exhibit No. 13233 marked for identification.)

 2        Q.  (BY MR. NOMELLINI) 13233.

 3        A.   Can I mark it?

 4        Q.   Yes.  And that is the 2014 deposition testimony of

 5   Richard Morrison which you reviewed, correct?

 6        A.   Correct.

 7        Q.   Go to page 92.

 8        A.   Okay.

 9        Q.   The testimony, lines 5 to 9.  Question:  Around 2300

10   employees of BP entities whose time is billed to BPXP.

11                    Answer:  Those are employees who are working on

12   behalf of BPXP in the Gulf of Mexico, yes, ma'am.

13                    Do you see that?

14        A.   Yes.

15        Q.   And you're not going to be opining that

16   Mr. Morrison's testimony that there are 2300 employees of

17   other BP entities who work on behalf of BPXP in the Gulf of

18   Mexico is inaccurate, correct?

19        A.   It's not inaccurate.  I would say that it doesn't

20   describe the whole situation.

21        Q.   Okay.

22        A.   And the other thing I would point out is that

23   they're working on behalf of these non-legal entities and

24   organizations that I've testified about.

25        Q.   Okay.  But just to take the first piece, the piece
```

1    that there are 2300 employees of other -- of other entities

2    whose time is billed to BPXP working on behalf of BPXP in the

3    Gulf of Mexico, that -- that part is true, correct?

4        A.   Yes.

5        Q.   And now you were testifying that they may also work,

6    in addition to working on behalf of BPXP, they may also work

7    on behalf of other entities or units?

8        A.   In the BP group.

9        Q.   In the BP group?

10       A.   Yes, correct.

11       Q.   So, for example, in addition to working on behalf of

12   BPXP, the 2300 employees whose time is billed to BPXP also

13   work on behalf of the GoM Business Unit, correct?

14       A.   Yes.

15       Q.   And, in fact, there's over 80 percent overlap

16   between BPXP and the GoM Business Unit, correct?

17            MR. GLADSTEIN:  Objection as to form.

18       Q.   (BY MR. NOMELLINI) Let me put it this way:  Over

19   80 percent of the GoM assets are owned by BPXP, correct?

20       A.   That's correct.

21       Q.   And if you look at page 93 and 94, for Morrison,

22   again this is Exhibit 13233.  Question, on page 93:  Are there

23   other employees who work in the Gulf of Mexico region who are

24   not supporting BPXP and who are not accounted for through BPXP

25   books?

1      A.   Yes.

2      Q.   And -- and you're not going to be offering an

3   opinion at trial that Mr. Morrison did not do the things he

4   testified to as chairman of BPXP; that is, oversee the

5   process -- oversee that the processes and the systems and the

6   governance and the resources applied to Gulf of Mexico

7   operations are adequate, are complete, are in place, and are

8   working, correct?

9      A.   I'm not going to testify that he was not doing those

10   things.

11      Q.   And you're not going to be testifying that part of

12   what Mr. Morrison does on behalf of BPXP is to oversee the

13   2,000 or so GoM employees whose time is charged to BPX&P,

14   correct?

15      A.   What do you mean by oversee in this case?  And in

16   what capacity?

17      Q.   Okay.  I'm just referring to his testimony about

18   overseeing the resources, overseeing a variety of things, and

19   involving the -- including the resources.  Do you see that?

20      A.   Yes, uh-huh.

21      Q.   Okay.  And so, you're not going to be offering an

22   opinion at trial that one of the things that -- strike that.

23          You're not going to be offering an opinion at

24   trial that Mr. Morrison does not oversee the 2000 or so

25   employees whose -- who work on GoM assets and whose time is

```
1       A.   Correct.

2       Q.   And Exxon has 229 subsidiaries, correct?

3       A.   Correct.

4       Q.   Chevron has 164?

5       A.   Correct.

6       Q.   Total has 244?

7       A.   Correct.

8       Q.   Conoco has 134?

9       A.   Correct.

10      Q.   So it's not unusual for BPXP -- for -- strike that.

11                It's not unusual for the BP group to have

12   hundreds of subsidiaries, correct?

13      A.   Correct.

14      Q.   And all of the -- the oil companies we just went

15   through have a number of reportable segments, right?

16      A.   Yes.

17      Q.   And the number of segments is much less in each case

18   than the number of subsidiaries.  For each of these peer oil

19   companies, the number of segments is less than ten, and the

20   number of subsidiaries is above 100, correct?

21      A.   Correct.

22      Q.   So, there's nothing unusual about there not being a

23   one-to-one match between segments and subsidiaries, correct?

24      A.   I haven't studied the way these other companies may

25   or may not draw those relationships, but in general, I see
```

1      A.    Yes.

2      Q.    Outside of your work with respect to BP, right?

3      A.    Correct.

4      Q.    Do you know of any public companies where there is a

5 match between the business entities or segments in the company

6 and the legal entities in the company?

7      A.    No.

8      Q.    Okay.  Looking back at Exhibit 12303A in Tab 68,

9 page 39 of Exhibit 12303A, which is the 20F, says -- there's a

10 parenthetical under the Civil Claims heading.  Do you see

11 that?  It says, BPXP is a BP group company that conducts

12 exploration and production operations in the Gulf of Mexico.

13      A.    Yes, I see that.

14      Q.    And that's a true statement, correct?

15      A.    Yes.

16      Q.    BPXP has entered into hundreds of leases, correct?

17      A.    I believe that's true, yes.

18            (Exhibit No. 13241 marked for identification.)

19      Q.    (BY MR. NOMELLINI) And if you look at Tab 67, which

20 we'll mark as 13241, these are the BPXP consolidated financial

21 reports for 4-2-2013?

22      A.    Yes.

23      Q.    You've reviewed this document before, right?

24      A.    I have.

25      Q.    And if you look at page -- the Bates labeled at the