UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY  THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to: | * * | |
| No. 10-4536 | * * * | HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**BPXP'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO THE ECONOMIC IMPACT OF A CLEAN WATER ACT PENALTY ON BP GROUP ENTITIES OTHER THAN BPXP, AND TO EXCLUDE FINANCIAL INFORMATION RELATING TO
<u>BP GROUP ENTITIES OTHER THAN BPXP</u>**

The United States' response argues about evidence that BPXP does not seek to exclude, while ignoring evidence that BPXP does seek to exclude.  The United States repeatedly quotes a passage from the March 21, 2014 status conference:

> THE COURT:  It's a question of what can that entity afford to pay, but considering the *various financial relationships and back and forth* and all of that.
>
> MR. LANGAN:  Right.  That's correct. (U.S. Mem. in Opp'n to BPXP's Mot. in Limine to Exclude Evidence Relating to the Econ. Impact of the CWA Penalty on BP Group Entities Other Than BPXP, and to Exclude Fin. Info. Relating to the BP Group Entities Other Than BPXP [hereinafter "U.S. Mem."], Rec. Doc. 13884, Ex. 2) (emphasis added).

The United States then incorrectly suggests that BPXP is seeking to exclude the evidence italicized above: "the various financial relationships and back and forth."  But in its opening brief, BPXP provided a list of what it is ***not*** seeking to exclude, including "evidence of financial transfers and agreements between BPXP and third parties, including other BP Group entities"— precisely the "back and forth" referenced at the status conference. (Rec. Doc. 13813-1, at 7).

For example, BPXP is not seeking to exclude evidence of loan agreements between BPXP and its affiliates. The evidence will show ████████████████████████ ████████████████████████████████████ In fact, BPXP's own expert Bruce Den Uyl will testify about the evidence reflecting "various financial relationships back and forth" between BPXP and other entities, ████████████████████████████████ ████████████████████████████████████████ The United States claims that, if a parent or shareholder has had such "back and forth" with a company or provided capital in the past, it should be assumed as a matter of law that such capital will be provided in the future regardless of the circumstances. But the United States provides no legal support for that argument, which runs directly contrary to the fundamental principle of limited liability for shareholders. *See United States v. Dico, Inc.*, 4 F. Supp. 3d 1047, 1065 n.43 (S.D. Iowa 2014).

What evidence *does* BPXP's motion seek to exclude? Again, the specifics are set forth in detail in BPXP's initial motion, (Rec. Doc. 13813-1. at 7), but ignored by the United States in its response. In terms of volume of documents, most of the evidence sought to be excluded consists of financial statements and tax returns from BP Group entities other than BPXP. (*See, e.g.*, Ex. 3, Dep. Ex. 12768, at 1-2, and Ex. 4, Dep. Ex. 12309A). Depositions consisted of hours of DOJ attorneys asking witnesses to read numbers in scores of non-BPXP financial documents:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

The presentation of such non-BPXP financial statements and tax returns is a waste of time and irrelevant to the Penalty Phase trial. United States expert Ian Ratner agreed that when investors (including entities within the BP Group) decide whether to provide capital to BPXP to pay a penalty, they will act as rational economic actors. (Ex. 7, Ratner Dep. at 137). Acting as a

rational actor means considering the return on an investment, and an expected return depends on BPXP's financial statements, as well as the magnitude of the CWA penalty and other contingent liabilities (such as NRD and certain governmental and individual OPA claims). The expected return has nothing to do with the *investor's* financial statements. (Ex. 8, Den Uyl Dep. at 271).

According to the United States' logic, if a defendant had a credit agreement with a bank, then not only the credit agreement and history of transactions with the bank, but also the bank's financial statements, would be relevant to the defendant's ability to pay. BPXP agrees that such a defendant's credit agreements and history of transactions with banks would be relevant, just as BPXP's agreements and transactions with its affiliates are relevant. But the bank's financial statements are irrelevant, just as the financial statements of non-BPXP entities are irrelevant. Nor does the United States explain how the result would change if the bank owned 1% of the debtor, or 51% of the debtor. The fundamental principle of limited liability (discussed in Section II below) would still limit the bank's losses to the extent of its investment.

I.  **The United States Does Not Dispute That the Relationship Between BPXP and Its Affiliates Is Normal and Appropriate For a Wholly Owned Subsidiary.**

United States expert Professor Quivik testified that he does not claim that there is anything "improper," "deficient," or "abnormal" "with respect to the relationship between BPXP and the BP Group." (Ex. 9, Quivik Dep. at 48-49). The United States' experts have conceded:

- *There is nothing abnormal about a parent controlling a subsidiary*. Professor Quivik agrees that "the purpose of a wholly-owned subsidiary is so that the shareholder parent could control it." (Ex. 9, Quivik Dep. at 95). Delaware law defines a subsidiary as an entity controlled by its parent. (Ex. 10, 8/15/14 Daines Rpt. at 6).

- 

- *It is "not surprising" for the board of a wholly-owned subsidiary to be less active than the board of a public company.* (Ex. 9, Quivik Dep. at 97); *see also* Rec. Doc. 13952, at 4-5.

3

The United States' contention that the BPXP Board did not take certain actions such as creating or guiding business strategy, setting performance objectives for the Gulf of Mexico business unit, overseeing capital expenditures, or overseeing acquisitions and divestitures is irrelevant and unpersuasive. As Professor Daines makes clear in the next sentence of the report from the one cited by the United States, "these are ordinary course decisions, and ordinary course decisions are appropriately made by *management*." (Ex. 10, 8/15/14 Daines Rpt. at 32-33; *see also* Ex. 11, Bray Dep. at 317:24-318:23 (management made these decisions)).

The United States next incorrectly contends that BPXP has conceded that "work performed on BPXP assets by *a number of* key individuals was [not] charged to BPXP." (U.S. Mem. at 6-7) (emphasis added). According to the United States' expert, the number of individuals who *are* paid for by BPXP to do its work in the Gulf of Mexico is over 2,300. (Ex. 9, Quivik Dep. at 132-33). The "number" of individuals whose time is allegedly *not* charged to BPXP is six. (Ex. 12, 9/12/14 Quivik Rpt. at 9). BPXP is separately charged for overhead not associated with specific individuals. (Ex. 13, Morrison Dep. at 93-94).

**II.     The United States' Argument Leads to the Faulty Conclusion That, Even if a Corporate Parent Engages in Normal Practices, a Penalty Assessed Against a Subsidiary Will Be Based On Parental Funds *Not* Invested in That Subsidiary.**

None of the cases cited by the United States address circumstances where, .[1] The government's position

---

[1] The United States also argues that, under *Dean Dairy*, "[i]f the subsidiary does not retain its revenues" and "the parent [plays a role] in the operations of the subsidiary," consideration of the parent's assets is appropriate. (U.S. Mem. at 13 (quoting *United States v. Mun. Auth. of Union of Twp. ("Dean Dairy 2")*, 150 F.3d 259, 268 (3d Cir. 1998)). But these characteristics were relevant in *Dean Dairy* only because the parent "was siphoning off [its] subsidiary's] profits" and thus "profit[ing] from [the subsidiary's] violations of the [CWA]." *United States v. Mun. Auth. of Union Twp. ("Dean Dairy")*, 929 F. Supp. 800, 808 (M.D. Pa 1996). Here, BPXP did not "siphon" any profits. The other cases cited by the United States are also

4

contradicts the bedrock principle of limited liability, whereby a shareholder (including a corporate parent shareholder) who invests $100 risks only $100. On this principle, "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted," *Anderson v. Abbott*, 321 U.S. 349, 357-58 (1944), because shareholders (including corporate parents) understand they are *not* putting at risk money *not* invested in the subsidiary.

But according to the United States, if a corporate parent has $100 billion, yet invests only $100 in a subsidiary and the remaining $99,999,999,900 in other subsidiaries around the world for various projects, while at the same time engaging in typical intercompany financial practices such as those described above (which the United States does not even claim to be abnormal or inappropriate), then any penalty against the subsidiary will be based on the $100 billion in parental assets. Such a subsidiary worth $100 could be ordered to pay a $10 billion penalty if it engages in typical practices such as paying dividends, receiving capital investments from its parent, and paying corporate affiliates for employee services. According to the United States' position, such a penalty would be proper even where, as here, the United States does not allege that the parent has engaged in *any* actionable conduct, and does not allege that the intercompany transactions or relationships are in any way abnormal or inappropriate. Besides being contrary to the principle of limited liability, the United States' position will also discourage well-capitalized parents from investing, because they will know that their subsidiaries will face larger penalties than competitor subsidiaries of less well-capitalized parents. (Ex. 14, 9/12 Daines Rpt. at 24-27).

---

distinguishable: one court found that the parent benefited from the violation, *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, No. 89-3193, 1995 WL 461252, at *19 (D.N.J. Mar. 9, 1995); one court found an "unusual financial" relationship between the defendant and an affiliated company, *In re: Carroll Oil Co.*, 10 E.A.D. 635, 26 (EAB 2002); one court applied a policy not applicable to the CWA, *In re: New Waterbury, Ltd.*, 5 E.A.D 529 (EAB 1994); two courts were not confronted squarely with the issue because the subsidiaries could afford to pay the penalties, *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1170 (D. Idaho 2012), *Atl. States Legal Found. v. Universal Tool*, 786 F. Supp. 743, 753 (N.D. Ind. 1992); and one court denied a motion to exclude financial evidence but ultimately chose not to rely on that evidence in setting the penalty, *United States v. Mountain State Carbon, LLC*, 2014 WL 3548662, at *37 (N.D. W. Va. July 17, 2014).

Date: December 29, 2014               Respectfully submitted,

          /s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
And

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 29th day of December, 2014.

      /s/ Don K. Haycraft
      Don K. Haycraft