UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010** | : | **MDL NO. 2179** |
| | : | **SECTION J** |
| This Document Relates To: | : | **JUDGE BARBIER** |
| **10-4536** | : | **MAGISTRATE JUDGE SHUSHAN** |

.....................................................................................................................................

**CLEAN WATER ACT – PENALTY PHASE**

**UNITED STATES' MEMORANDUM IN OPPOSITION TO BPXP'S MOTION IN LIMINE TO EXCLUDE EVIDENCE RELATING TO THE ECONOMIC IMPACT OF A CLEAN WATER ACT PENALTY ON BP GROUP ENTITIES OTHER THAN BPXP, AND TO EXCLUDE FINANCIAL INFORMATION RELATING TO BP GROUP ENTITIES OTHER THAN BPXP**

# Table of Contents

INTRODUCTION AND BACKGROUND ON BPXP AND THE BP GROUP…………………1

A. The BP Group Conducted and Directed the Operation of the Macondo Well and Response to the Blowout, Not Only BPXP………………………………………...3

1. BP's Parallel Organizational Structure of Operating Units and Legal Entities.......3

2. The Contrast Between the Oversight and Activities of the BP p.l.c and the BPXP boards of directors, especially before the Macondo Disaster………........5

3. The BP Group, Not Only BPXP, Conducted and Managed Operations at the Macondo Well and the Response to the Blowout…………………………………6

B. BPXP Paid Significant Dividends to its Corporate Parents Before the Disaster…......7

C. The BP Group Has Provided Significant Financing to BPXP……………………..….8

ARGUMENT…………………………………………………………………………….10

A. The Court May Consider BP Group Assets in Assessing a Penalty Against BPXP…10

B. Financial Evidence Relating to the BP Group Entities Is Relevant and Thus Admissible……………………………………………………………11

C. The Cases in Which Courts Have Considered Financial Evidence from Non-Defendant Affiliates Are Similar to the Instant Case………………………………..12

D. Considering BP Group Assets in Assessing a CWA Penalty Is Good Public Policy…………………………………………………………………….... . . . 15

CONCLUSION……………………………………………………………………………..15

**Table of Authorities**

Cases

*Atlantic States Legal Found., Inc. v. Universal Tool & Stamping Co., Inc.* 786 F. Supp. 743 (N.D. Ind. 1992) .................... 13

*Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148 (D. Idaho 2012) .................... 10, 11, 13

*In re Carroll Oil Company*, No. 8-99-05, 2002 WL 1773052 (E.P.A. July 31, 2002) .................... 11

*In re: new Waterbury, Ltd*, No. 93-2, 1994 WL 615377 (E.P.A. Oct. 20, 1994) .................... 11

*PIRG v. Powell Duffryn*, 720 F. Supp. 1158 (D.N.J. 1989, *reversed in part on other grounds*, 913 F.2d 64 (3rd Cir. 1990) .................... 13

*Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.*, No. 89-3193, 1995 WL 461252 (D.N.J. March 9, 1995) .................... 11

*Tull v. United States*, 481 U.S. 412 (1987) .................... 10

*United States v. Citgo Petroleum Corp.*, No. 08-893, 2011 WL 10723934 (W.D. Sept. 29, 2011), *vacated and remanded*, 723 F.3d 547 (5th Cir. 2013) .................... 10

*United States v. Dico, Inc.*, 4 F. Supp. 3d 1047 (S.D. Iowa 2014) .................... 14

*United States v. Mountain State Carbon, LLC*, No. 12-19, 2014 WL 3548662 (N.D.W.Va. July 17, 2014) .................... 10

*United States v. Municipal Authority of Union Township* ("*Dean Dairy*"), 929 F. Supp. 800 (M.D. Pa. 1996), *aff'd*, 150 F.3d 259 (3rd Cir. 1998) .................... 1, 12

Statutes

33 U.S.C. 1321(b)(1) .................... 15

33 U.S.C. § 1321(b)(8) .................... 1, 10

## INTRODUCTION AND BACKGROUND ON BPXP AND THE BP GROUP

At the Penalty Phase trial, the Court will hear evidence regarding "the economic impact of the penalty on the violator." 33 U.S.C. § 1321(b)(8). The United States asks this Court to exercise its broad discretion to hear evidence that will show that the impact of a penalty on BP Exploration and Production Inc. ("BPXP") cannot be considered without recognizing that BPXP is completely integrated into the BP Group.[1] Six months of discovery has provided substantial additional evidence that: (1) the BP Group conducted and directed the operations at the Macondo well and the response to the disaster, not only BPXP; (2) [REDACTED] and (3) the BP Group provided substantial financing to BPXP after the blowout. Accordingly, it is appropriate, as numerous courts have done under similar circumstances, that this Court consider evidence regarding the assets of the BP Group when assessing the impact of a penalty on BPXP.

The United States is not asking the Court to "pierce the corporate veil" to establish that BP p.l.c. is liable or consider the economic impact of a penalty on other BP Group entities. Rather, the United States simply asks the Court to undertake, in accordance with the relevant case law, a fact-specific assessment of the role that the BP Group has played in the operations and finances of BPXP, particularly with regard to the pollution of the Gulf of Mexico from the Macondo well and the BP Group's response to the disaster. *See e.g. United States v. Mun. Authority of Union Twp.* ("*Dean Dairy*"), 929 F. Supp. 800 (M.D. Pa. 1996), *aff'd*, 150 F.3d 259, 268-269 (3rd Cir. 1998) (parent's assets were considered in assessing a penalty against a subsidiary under the Clean Water Act ("CWA") where the parent was closely involved with the polluting activities and siphoned profits from the subsidiary). Accordingly, defendant's motion

[1] BP, BP Group, or the group" is defined as "BP p.l.c. and its subsidiaries." *See* Exhibit 1 (TREX-006033, Excerpt from BP Annual Report and Form 20-F for 2010, p. 3).

should be denied.

Contrary to BPXP's assertions, the United States has not ignored the statutory language in the CWA regarding the "economic impact of the penalty on the violator. 33 U.S.C. § 1321(b)(8). In response to the United States' Motion *in Limine* to Permit Relevant Evidence Concerning BP p.l.c. and other BP Affiliates (Rec. Doc.12355-1), the defendant admitted that evidence relating to the BP Group may be relevant to the economic impact of a penalty on BPXP. Rec. Doc. 12465 at 2, 14. At the March 21, 2014, status conference, counsel for BPXP conceded and the Court recognized the relevance of the financial relationships between the BP Group and BPXP:

> MR. LANGAN: . . . .We've never said that there's no relevance to the group finances. We've said that BPXP is a defendant, the violator, they're the ones that they moved for summary judgment against and that's where the focus should be.
>
> THE COURT: It's a question of what can that entity afford to pay, but considering the various financial relationships and back and forth and all of that.

MR. LANGAN: Right. That's correct. . . . [2]

Thereafter, the Court issued a Minute Entry, stating in relevant part that the "United States is entitled to limited discovery regarding the relationship between BP p.l.c., BPXP, and other BP affiliates." Minute Entry (Rec. Doc. 12592 at 2). Both pre-trial discovery and the defendant's own representations confirm that the Court should hear evidence "regarding the relationship between BP p.l.c., BPXP, and other affiliates" at trial.

Although BPXP was the lease holder and registered well operator with the Minerals Management Service ("MMS"), multiple BP entities were involved in the drilling and operation of the well. For example, BP Corporation North America Inc. ("BPCNA") was registered with

[2] *See* Exhibit 2 (Excerpts from Transcript of Status Conference, March 21, 2014, at 48-51).

MMS as the Areawide Guarantor for BPXP.[3] BP America Production Company ("BPAPC") was the party that entered the drilling contract with Transocean for the Deepwater Horizon to drill the Macondo Well.[4] BP America, Inc., not BPXP, submitted the Oil Spill Response Plan relied upon in the Macondo well permit.[5]

### A. The BP Group Conducted and Directed the Operation of the Macondo Well and Response to the Blowout, Not Only BPXP

#### 1. BP's Parallel Organizational Structure of Operating Units and Legal Entities

The United States' expert Dr. Fredric Quivik opines that there are two distinct organizational structures within the BP Group, one legal, consisting of parents and subsidiaries, and the other operational, that functions without regard to legal entities. The two operate side by side and coordinate as necessary, but a key feature of the BP organizational system is that actual operations are not managed through a corporate structure of parents and subsidiaries. That is true globally, and it is true within the United States.[6] The defendant's expert Professor Robert Daines does not dispute this.

In 2010, BP's interests and activities fell into two main business segments, "Exploration & Production" (upstream) and "Refining & Marketing" (downstream).[7] BP's Annual Reports

---

[3] *See* Exhibit 3 (Ex. 12757, Self-Insurance or Indemnity Information, BP Corporation North America on behalf of BPXP and BPAPC, Form MMS-1018 signed 22 April 2009); Exhibit 4 (Ex. 12758, Self-Insurance or Indemnity Information, BP Corporation North America on behalf of BPXP and BPAPC, Form MMS-1018 signed 19 April 2010); Exhibit 5 (Ex. 12662, Third Party Indemnity Agreement between BP Corporation North America and Mineral Management Service dated 10 May 2010).

[4] *See* Exhibit 6 (TREX-036480, Drilling Contract between BPAPC and Transocean for "Transocean Marianas," February 3, 2006; Exhibit 7 (TREX-051269, Deepwater Horizon Drilling Contract between BPAPC and Transocean, various dates).

[5] *See* Exhibit 8 (TREX-000768, p. 98, Initial Exploration Plan). This includes BP America, Inc. being the party, not BPXP, to oil response contracts.

[6] *See* Exhibit 9 (Expert Report of Fredric Quivik ("Quivik Report"), at 2-3, 11, 21, 24 passim).

[7] *See* Exhibit 1 (TREX-006033, Excerpt from BP Annual Report and Form 20-F for 2010, p. 14).

and organization charts show that authority was delegated from the BP p.l.c. board of directors to the Chief Executive Officer of the BP Group, Anthony Hayward; to the CEO of the global Exploration & Production segment, Andy Inglis; to the presidents of various Strategic Performance Units ("SPUs"), including the Gulf of Mexico SPU; to the Vice Presidents of Drillings and Completions ("D&C") in the Gulf of Mexico: all without any reference to BPXP.[8]

Key BP executives and documents have acknowledged this parallel relationship between operating units and legal entities. For instance, when testifying in deposition about the nature of BP's global exploration and production operations, Mr. Inglis stated:

> [BP] included structures, which are to do [sic] with the legal entities of companies. That is a different structure to the way in which the — the operations would be undertaken. So the operations that I was responsible for were those things to do with the — the upstream business. They would have in it [sic] different companies, different legal structures. There was no legal structure to do with the upstream.[9]

Likewise, Lamar McKay, the President and Chairman of BP America, Inc., testified at his deposition:

> [O]ur businesses are run in the division and segment setting that go exploration, production, with business heads in London; refining and marketing, business head in London; alternative energy, business head in London.
> . . . .
> BP Exploration and Production, Incorporated, that subsidiary does not manage the assets. It owns the assets.[10]

---

[8] *See* Exhibit 10 (Draft BP Org Chart for 10 April 2010, updated to 27 May 2011, (TREX-002557)); Exhibit 1 (BP, Annual Report and Form 20-F, 2010, pp 84-87 (TREX-006033)); Exhibit 11 (Exploration and Production organizational chart, Ex. 231259 (TREX-021722.009)); Exhibit 12 (Gulf of Mexico Strategic Performance Unit organizational chart, Ex. 231260 (TREX-021722.010)); Exhibit 13 (BP Organizational Chart, Ex. 231261 (TREX-021722.001)); Exhibit 14 (Group Operating Risk Committee organizational chart, Ex. 231266 (TREX-021722.006)); Exhibit 15 (Board of Directors organizational chart, Ex. 231264; Exhibit 16 (Safety, Environment, & Ethics Assurance Committee organizational chart, Ex. 231263); Exhibit 17 (Executive Management organizational chart, Ex. 231265); Exhibit 18 (BP, GoM Drilling & Completions organizational chart, August 2008 (TREX-002517); Exhibit 19 (BP, DW D&C Organizational Chart, January 7, 2010 (TREX-002516); Exhibit 20 (BP, Drilling & Completions organizational chart, April 2010 (TREX-002515)).

[9] *See* Exhibit 9 (Quivik Report, at 11, filed under seal); Exhibit 21 (Deposition of Andrew Inglis, July 21, 2011, at 276-277).

[10] *See* Exhibit 9 (Quivik Report, at 11, filed under seal); Exhibit 22 (Deposition of Lamar McKay, at 331, 336-337).

**2. The Contrast Between the Oversight and Activities of the BP p.l.c and the BPXP boards of directors, especially before the Macondo Disaster**.

The virtually complete control exercised by the BP Group over the operations of BPXP is evidenced by the contrast between the activity of the BP p.l.c. board of directors and the lack of activity by the BPXP board of directors, especially prior to the Macondo disaster. As set forth in the BP p.l.c. Annual Reports, and as shown in the BP p.l.c. board of director and board of director committee minutes and resolutions produced by BP, the BP p.l.c. board of directors is responsible for the direction and oversight of the BP Group and for the conduct of its businesses and operations. BP's top executive officers are responsible for the day-to-day management of BP's global operations. This includes BP's operations in response to the Macondo blowout, which the BP p.l.c. board oversees by means of its Gulf of Mexico Committee.[11] In 2010, the BP p.l.c. board met twenty-five times after the blowout to deliberate on matters in response to the disaster.[12]

In contrast, *the BPXP board did not meet once in 2010.*[13]

[11] Exhibit 1 (BP, Annual Report and Form 20-F 2010, pp 32, 90, 92 (TREX-006033); Exhibit 23 (BP, Annual Report and Form 20-F 2013, pp 2-3, 71, 78-79 (Ex. 12303 A).

[12] *See* Exhibit 1 (BP, Annual Report and Form 20-F 2010, p 90 (TREX-006033)).

[13] *See* Exhibit 24 (Deposition of Steven Bray ("Bray Deposition"), July 16, 2014, at 197-198).

[redacted] He also admitted that to the best of his knowledge from 2005 through 2010, the BPXP board of directors did not create or guide business strategy, major plans of action, annual budgets, set performance objectives, or oversee capital expenditures, acquisitions, or divestments for the BP Gulf of Mexico SPU.[14]

Defendant's corporate governance expert, Robert Daines, has conceded that the BPXP board does not guide business plans and strategy, set performance objectives for the Gulf of Mexico business unit, oversee capital expenditures, or oversee acquisitions and divestitures.[15]

### 3. The BP Group, Not Only BPXP, Conducted and Managed Operations at the Macondo Well and the Response to the Blowout

Professor Daines admits that BPXP has no employees, and BP Group employees have conducted and directed BP's operations in the Gulf of Mexico, including at the Macondo well.[16]

Under the General Services Agreement between BPXP and BPAPC, BPAPC provides employees, and engineering, project investigation and development, commercial, marketing, environmental, legal, tax, banking, treasury, investment, financial, accounting, administrative and other services required by BPXP.[17] Although the defendant contends that BPXP reimburses BPAPC and other BP entities for the time BPAPC and other BP Group employees spend

---

[14] *See* Exhibit 24 (Bray Deposition, at 174-188, 197-209). At his deposition, Mr. Bray testified that when he became a member of the BPXP board he talked with "those directors about the sorts of activities that they were engaged in and – and had – you know, my role was being transitioned from some of those individuals who served as the board of directors, so I had numerous discussions with them." *Id.* at 319-320.

[15] *See* Defendant's Brief (Exhibit 17, Daines Report at 32-33); Exhibit 25 (Deposition of Robert Daines ("Daines Deposition"), at 158-159).

[16] *See* Defendant's Brief (Exhibit 17, Daines Report, at 32, 38-39); Defendant's Brief (Exhibit 28, Daines Response Report, September 12, 2014, at 5-6); Exhibit 25 (Daines Deposition at 196-239).

[17] *See* Exhibit 26 (General Services Agreement between BPXP and BPAPC, December 31, 2001, paragraph 1.1 (Ex. 11964, BP-HZN-2179MDL07817979-7987); Exhibit 26 (Amended General Services Agreement between BPXP and BPAPC, December 31, 2005, paragraph 1.1 (Ex. 11964, BP-HZN-2179MDL07817988-7998)).

working on Gulf of Mexico assets, the defendant has admitted that it cannot show that personnel costs associated with work performed on BPXP assets by a number of key individuals was charged to BPXP.[18]

In deposition, almost none of the BPAPC and other BP Group employees who worked on Gulf of Mexico assets identified BPXP as his or her employer. Additionally, a number of individuals who were appointed officers of BPXP were not even aware of their appointments.[19] For example, Richard Morrison was named a BPXP Vice President in January 2010 and BPXP President in October 2013. Yet at his deposition he admitted he was unaware of his appointments.[20] Finally, and perhaps most importantly, none of the Vice Presidents of the D&C organization for the Gulf of Mexico SPU (Henry Thierens, Kevin Lacy, or Patrick O'Bryan) or their reports were ever appointed as officers or managers of BPXP.[21]

**B. BPXP Paid Significant Dividends to its Corporate Parents Before the Disaster**

[redacted]

---

[18] *See* Exhibit 27 (BPXP's First Supplemental Discovery Responses, response to interrogatory #2, June 12, 2014, p 25 (Ex. 11981)). These individuals include Tony Hayward (CEO of BP group for BP p.l.c.), Robert Dudley (CEO of GCRO), Andrew Inglis (CEO of the Exploration & Production segment for BP p.l.c.), Lamar McKay (president and chairman of BP America, Inc.), Douglas Suttles (COO of the Exploration & Production segment for BP p.l.c.), David Rainey (vice president of Exploration for the Gulf of Mexico SPU) and Kevin Lacy (vice president of Drilling & Completions for the Gulf of Mexico SPU). Moreover, despite the agreement requiring invoices they are not sent. *See* Exhibit 28 (Deposition of Michael Robertson ("Robertson Deposition"), July 10, 2014, at 26, 61); Exhibit 26 (General Services Agreement between BPXP and BPAPC, para. 4.1).

[19] *See* Exhibit 9 (Quivik Report, at 49-69).

[20] *See* Exhibit 29 (Deposition of Richard Morrison, June 20, 2014, at 24-26).

[21] *See* Exhibit 9 (Quivik Report, at 52-69); Exhibit 30 (Round Two Expert Report of Quivik, at 10-16); Exhibit 31 (BPXP, "Appointment History (From 4/20/2010 to the Present) (Ex. 11959, BP-HZN-2179MDL07817761)).

[redacted]

The BPXP board resolutions show that BPXP issued these dividends based on consent actions in lieu of meetings on a quarterly basis (the Board met only once in that time) between December 18, 2006, and March 24, 2010, less than one month before the disaster. Those resolutions show that the BPXP board met on only once to consider the issuance of a dividend during this entire time period.[23]

**C. The BP Group Has Provided Significant Financing to BPXP**

The BP Group operates a centralized treasury system. Several BP financial witnesses testified including: BP Group Treasurer David Bucknall; Michael Robertson, Director of Finance for the Gulf Coast Restoration Organization ("GCRO"); and Brian Smith, Vice President for Structured Finance in the Western Hemisphere for the BP Group. Each explained that it was much more efficient for BP's global operations to have a single treasury system both for financial and accounting purposes.[24] [redacted]

---

[22] *See* Exhibit 32 (BP, Organizational Chart – Main US Subsidiaries, as of 3 February 2014 (Ex. 11963, BP-HZN-2179MDL07817329)). In 2010, BPXP was a tier-seven subsidiary, wholly-owned by BPAPC. There were five layers of intermediate parents between BPXP and BP p.l.c. In January 2014, BPXP's common stock was transferred from BPAPC to BP Company North America, Inc. ("BPCNA"). Although the corporation that owns BPXP's common stock has changed, BPPNA, the same corporation that owned the Texas City refinery at the time that disaster, continues to be a preferred stockholder of BPXP. At present, BPXP is directly owned by BPCNA, which is owned by BP Corporation North America Inc., which is owned by BP America Inc. ("BPA"), which is owned by BP America Limited, which is owned by BP Holdings North America Ltd., which is owned by BP p.l.c.; Exhibit 33 (Letter re MDL 2179 – Notice of Corporate Reorganization, January 2, 2014).

[23] *See* Exhibit 34 (Ex. 12792 [redacted]; Exhibit 35 (Exs. 12825, 12738-12752); Exhibit 24 (Bray Deposition, at 169-177, 183-187); Exhibit 9 (Quivik Report, at 33-37).

[24] *See* Exhibit 36 (Deposition of David Bucknall, July 2, 2014, at 15, 29-34, 36-40, 99-106, 226-240, 255); Exhibit 28 (Robertson Deposition, at 16-18, 23-25, 37-38, 60-62, 68, 95-96, 109. 149-154, 186-191); Exhibit 37 (Deposition of Brian Smith ("Smith Deposition"), July 11, 2014, at 25, 29, 89-90).

[25] *See* Exhibit 27 (Ex. 11981, BPXP's First Supplemental Discovery Responses, at 4, June 6, 2014).

[redacted] All of BPXP's financing is managed by employees and officers of other BP Group entities.[27]

The evidence developed in discovery shows that the BP Group, not BPXP, decides whether, and, if so, how to invest in and provide financing to BPXP. [redacted]

[redacted]

- [redacted]
- [redacted]

---

[redacted]

## ARGUMENT

### A. The Court May Consider BP Group Assets in Assessing a Penalty Against BPXP

This Court has broad discretion to hear evidence and assess penalties under the CWA. *See Tull v. United States*, 481 U.S. 412, 427 (1987); *United States v. Citgo Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013). In determining the amount of a civil penalty, the Court must consider the eight factors set forth in Section 113(b)(8) of the Clean Water Act, including "the economic impact of the penalty on the violator." 33 U.S.C. § 1321(b)(8). The defendant has not disputed that numerous courts have considered evidence regarding the assets of a defendant's parent company as a matter of discretion in applying the penalty factors under the Clean Water Act. *See e.g. United States v. Citgo Petroleum Corp.*, No. 08-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011).[34] Nonetheless, BPXP contends that the Court should not consider evidence

[34] In analyzing the economic impact of the penalty on the violator, the court stated that it "recognizes that Citgo is a multi-billion dollar, international company." *Citgo Petroleum,* 2011 WL 10723934, at 4. *See also United States v. Mountain State Carbon, LLC*, No. 12-19, 2014 WL 3548662, at *35 (N.D.W.Va. July 17, 2014) ("[c]ases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of the parent's assets is one factor, among many, that is appropriate in a Clean Water Act case.") (quoting *Idaho Conservation League v.*

related to other BP Group entities because only BPXP is the violator. As the United States has indicated repeatedly, it does not seek to hold BP p.l.c. or any other BP Group entities liable or impose a penalty against such entities under the CWA.

**B. Financial Evidence Relating to the BP Group Is Relevant and Thus Admissible**

Contrary to BPXP's assertions, the financial and other evidence that the United States asks the Court to consider is related to BPXP. As BP's financial witnesses, Messrs. Bucknall, Robertson and Smith have admitted, the financial statements, securities filings, earnings projections, tax returns, and other financial information concerning BPXP's direct and indirect parent companies and affiliates are related to BPXP because the BP Group functions as a single global enterprise for financial purposes. The evidence shows that BP's global Tax and Treasury functions control BP's investments in and financing of BPXP. [REDACTED]

[REDACTED] Statements about the financial wherewithal of the BP Group also are relevant because the financial condition of the BP Group may bear on the likelihood that the Group will continue to invest resources as it has consistently done in the past in BPXP. Finally, any fact or expert witness testimony about any of the above evidence is relevant to the extent it provides information as to financial conditions that may impact BPXP.

The defendant incorrectly argues that the "rule" of limited liability prohibits the Court

---

*Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1170 (D. Idaho 2012)); *Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.*, No. 89-3193, 1995 WL 461252, at *19 (D.N.J. March 9, 1995); *In re Carroll Oil Company*, No. 8-99-05, 2002 WL 1773052 (E.P.A. July 31, 2002); *In re: new Waterbury, Ltd*, No. 93-2, 1994 WL 615377 (E.P.A. Oct. 20, 1994).

from considering BPXP's relationship with the BP Group and Group assets.[35] The United States does not seek to "effectively transfer liability from BPXP to other entities in the BP Group," and has not asked this Court to *require* the BP Group to invest additional capital to meet BPXP's obligations or to cover a penalty. [REDACTED] The BP Group has ensured that BPXP has met its obligations to the Group's employees, lease partners, and contractors. As the defendant indicates, "BPXP holds the most federal deepwater lease acreage of any company in the Gulf and is one of the industry's leading producers of oil and gas in the Gulf region." *See* Defendant's Brief at 3. Given the BP Group's history and ongoing investments in BPXP, the BP Group clearly expects additional returns and is likely to continue to make additional investments in BPXP.

### C. The Cases in Which Courts Have Considered Financial Evidence from Non-Defendant Affiliates Are Similar to the Instant Case

Many courts have appropriately considered the assets of corporate parents in assessing civil penalties. In *Dean Dairy, supra*, following trial a district court issued a civil penalty of $4,031,000 for violations of the CWA, stating that it could look to the finances of the defendant's parent as part of its analysis. On appeal, the Third Circuit affirmed, *inter alia,* that the assets of the defendant's parent corporation could be examined in determining the economic impact of the penalty on the violator. The defendant contended that the district court erred in considering the finances of its parent because the parent corporation had not been sued, did not violate the CWA, and there was insufficient information to pierce the corporate veil.

The *Dean Dairy* appellate court rejected the defendant's contention, stating that it was

[35] Much like BPXP's business partners and contractors consider the assets of the BP Group and the relationships between BPXP and the BP in deciding whether to enter into an operating partnership or contract for services with BPXP, a "rule" of limited liability does not prevent this Court from simply the *considering* Group's assets and relationships in assessing a penalty.

not the parent, but the violator who was penalized. The Court reasoned that "[i]f the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial resources are highly relevant. Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on a violator, *see Universal Tool*, 786 F. Supp. at 753; *PIRG v. Powell Duffryn*, 720 F. Supp. 1158, 1166 (D.N.J. 1989, *reversed in part on other grounds*, 913 F. 2d 64 (3rd Cir. 1990), and we see nothing improper in the same action here." *Id*. at 268-269.

The Third Circuit explained that the "[t]he consideration of a parent's financial condition in assessing a penalty on a subsidiary is a far cry from piercing the corporate veil and holding the parent liable for the actions of its subsidiary; here the penalty was assessed against the subsidiary alone. . . . The court simply undertook a fact-specific assessment that examined the role of the parent in the operations of the subsidiary, particularly with regard to the issue of pollution of the nearby waters and actions that could have resolved it." *Dean Dairy*, at 268-269.

In *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d at 1170, another civil penalty action under the CWA, the court stated that the "[c]ases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of a parent's assets is one factor, among many, that is appropriate in a Clean Water Act case." *Id.* at 1170. There, like here, the subsidiary and its parent filed joint annual reports which refer to "the Company" without making any distinction between the two entities. As here, the subsidiary also frequently raised money from its parent through "cash calls" that were recorded as intercompany loans. The court concluded that "[w]here AGC is a wholly owned subsidiary of Atlanta Gold Inc., and where the parent company has provided AGC with a steady source of financing, consideration of AGI's assets is appropriate." *Id.*

In the instant case, the BP Group conducted and directed BP's operation at the Macondo

well and response to the disaster, not only BPXP. [redacted] The defendant's expert Professor Daines has admitted that:

- [redacted]
- [redacted]
- The BPXP board does not guide business plans and strategy, set performance objectives for the Gulf of Mexico business unit, oversee capital expenditures, or oversee acquisitions and divestitures;[38]
- BPXP has no employees; and more than 2000 BP Group employees have conducted and directed BP operations in the Gulf of Mexico, including at the Macondo well.[39]

Since the BP Group conducted and directed the operation at the Macondo well and the response to the disaster, not only BPXP, [redacted] the Court should exercise its discretion to hear evidence regarding the relationship between the BP Group and BPXP as part of its consideration of the economic impact of a civil penalty on BPXP.[40]

---

[36] Exhibit 25 (Daines Deposition, at 160-182).

[37] Exhibit 42 (Expert Report of Robert Daines ("Daines Report"), August 15, 2014, at 14-16, 33); Exhibit 25 (Daines Deposition, at 182-187).

[38] *See* Exhibit 42 (Daines Report at 32-33); Exhibit 25 (Daines Deposition, at 158-159).

[39] *See* Exhibit 42 (Daines Report, at 32, 38-39); Exhibit 43 (Daines Response Report, September 12, 2014, at 5-6); Exhibit 25 (Daines Deposition at 196-239).

[40] This case is distinguishable from *United States v. Dico, Inc.*, 4 F. Supp. 3d 1047 (S.D. Iowa 2014), relied on by BPXP. The defendant in *Dico* "generate[d] no revenue, ha[d] only a few assets and liabilities, and 'the only real activity that [was] run through it [was] relating to the remediation and cleanup of the EPA site here in Des Moines.'" *Id.* at 1055. In contrast, "BPXP holds the most federal deepwater lease acreage of any company in the Gulf." Def. Brief at 3. Despite Dico's insolvency, the court awarded a civil penalty of $1,620,000, finding such a penalty "warranted by Dico's reprehensible conduct and also sufficient to carry out the main purpose of CERCLA civil penalties – deterrence." The court also imposed an additional $1,477,788 in punitive damages. *Id.* at 1067.

**D. Considering BP Group Assets in Assessing a CWA Penalty Is Good Public Policy**

It is good public policy to prevent oil spills. 33 U.S.C. § 1321(b)(1). The BP Group and BPXP failed to prevent the *Deepwater Horizon* oil spill. Consideration of the BP Group's assets will increase the likelihood of preventing future oil spills by incentivizing the BP Group to ensure that BPXP's board provides the required direction and oversight to prevent future spills, and that employees and managers responsible for BPXP's assets carry out those mandates.

BP incorrectly argues that the United States seeks to increase its penalty "because of assistance" the BP Group provided during the response. Rather, the Court should consider the BP Group's assets in assessing a penalty against BPXP because long before the blowout, the BP Group conducted and managed operations at the Macondo well, not only BPXP.

The defendant's argument, based on Professor Daines' opinion, that considering a corporate parent's assets in calculating a penalty would discourage investment by well-capitalized parents is unavailing and contradicted by BPXP's own expert R. Bruce Den Uyl. [redacted] Professor Daines admits he has not done an empirical study of post-Macondo oil company investments in the Gulf. He also admits that the externalization of risk that can result from an absolute rule of limited liability imposes social costs that are undesirable, and provides "a common justification for regulation."[42]

**CONCLUSION**

For the forgoing reasons, the BPXP's motion should be denied.

---

[41] *See* Defendant's Brief, Rec. Doc. 13813 (Exhibit 22, Expert Report of Bruce Den Uyl, August 15, 2014, at 10).

[42] *See* Exhibit 25 (Daines Deposition, at 76-102, 253-264, quote at 80).

Respectfully submitted,

JOYCE R. BRANDA
Acting Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

SAM HIRSCH
Acting Assistant Attorney General
Environment & Natural Resources Division
SARAH HIMMELHOCH
Senior Litigation Counsel for E-Discovery
MICHAEL MCNULTY
Senior Counsel
NANCY FLICKINGER
Senior Attorney
PATRICK CASEY
RICHARD GLADSTEIN
DANIEL S. SMITH
Senior Counsel
ABIGAIL ANDRE
A. NATHANIEL CHAKERES
ANNA CROSS
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Richard Gladstein
________________________________
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis-Nexis File & Serve in accordance with Pretrial Order #12, and the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2719, on this 19th day of December, 2014.

/s/ Richard Gladstein
U.S. Department of Justice