# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 12-30883

_____

D.C. Docket No. 2:10-MD-2179
D.C. Docket No. 2:10-CV-4536

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2014

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

_____

UNITED STATES OF AMERICA,

                Plaintiff - Appellee

v.

B.P. EXPLORATION & PRODUCTION , INCORPORATED; ANADARKO
PETROLEUM CORPORATION,

                Defendants - Appellants

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
affirmed.

IT IS FURTHER ORDERED that defendants-appellants pay to plaintiff-appellee the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE:



**Certified as a true copy and issued
as the mandate on Jan 09, 2015**

**Attest:**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

**A True Copy**
            **Attest**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

**By:** _____
                    **Deputy**

**New Orleans, Louisiana**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 12-30883

IN RE: DEEPWATER HORIZON

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

B.P. EXPLORATION & PRODUCTION, INCORPORATED; ANADARKO
PETROLEUM CORPORATION,

Defendants – Appellants

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2014

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Eastern District of Louisiana

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Before the Court is the federal government's civil enforcement action for Clean Water Act violations associated with the 2010 *Deepwater Horizon* oil spill in the Gulf of Mexico. Defendants BP Exploration & Production, Inc. ("BP") and Anadarko Petroleum Corporation ("Anadarko") appeal summary judgment in favor of the government on the question of their liability for civil penalties under 33 U.S.C. § 1321(b)(7)(A) (2006), which imposes mandatory penalties upon the owners of facilities "from which oil or a hazardous substance is discharged." The district court held that discharge is the point where "uncontrolled movement" begins. *In re Oil Spill by the Oil Rig "Deepwater*

No. 12-30883

*Horizon" in the Gulf of Mexico, on April 20, 2010*, 844 F. Supp. 2d 746, 758 (E.D. La. 2012).  Applying this standard, the court concluded that oil flowing from the well through the *Deepwater Horizon*'s riser was a discharge from the well.  *Id.* at 761.  The court then entered summary judgment on the issue of BP's and Anadarko's liability as co-owners of that well.  *Id.* at 762.  Because we agree that there is no dispute of material fact regarding the discharge of oil from the well, we affirm.

## I.

The Macondo Well ("the well") was an exploratory well located about fifty miles off the Louisiana coast in the Gulf of Mexico.  Anadarko and BP (together, "the defendants" or "the well owners") were co-owners of the well and co-lessees of the continental shelf block in which the well was located.[1]  The well itself was drilled by the *Deepwater Horizon*, a mobile offshore drilling vessel owned and operated by several Transocean entities.[2]  The *Deepwater Horizon* was connected to the well by a riser.  At the junction of the well and the riser was a blowout preventer that could be used automatically or manually to interrupt an impending blowout.   Both the blowout preventer and riser were appurtenances of the *Deepwater Horizon.*

The blowout occurred on April 20, 2010, while the *Deepwater Horizon* was preparing to depart from the site in anticipation of the permanent extraction operation.  As part of this preparation, the well had been lined and sealed with cement.  Before the *Deepwater Horizon* departed, this cement failed, resulting in the high-pressure release of gas, oil, and other fluids.  The

---

[1] The well was also co-owned by MOEX Offshore 2007, LLC, which has settled with the government and is not party to this appeal.

[2] The vessel was owned or operated by various Transocean entities, including Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings, LLC, and Triton Asset Leasing GmbH (collectively "Transocean").  These entities were originally named as defendants, but have settled with the government.

2

No. 12-30883

blowout preventer also failed, thus allowing these fluids to burst from the well, flowing up through the riser and onto the deck of the *Deepwater Horizon*. The oil and gas subsequently caught fire, and the ensuing blaze capsized the *Deepwater Horizon*, which was still connected to the well via the riser. The strain from the sinking vessel severed the riser, and for nearly three months oil flowed continuously through the broken riser and into the Gulf of Mexico. Authorities eventually installed a cap over what remained of the riser, and oil continued to leak for two days, with the well finally sealed on July 15, 2010.

Following the incident, the federal government filed the present action, seeking civil penalties under § 311 of the Clean Water Act, which mandates the assessment of fines on the owners or operators of any vessel or facility "from which oil or a hazardous substance is discharged."[3] The government then moved for summary judgment on several issues, including the well owners' civil-penalty liability for any "subsurface" discharge of oil. Anadarko filed a cross-motion for summary judgment on the same issue, arguing that the subsurface discharge emanated from the riser owned by Transocean, and thus that the oil was not discharged from any facility owned or operated by Anadarko or BP. Holding that discharge is the point where "uncontrolled movement" begins, the court concluded that the oil released from the well via the third party's broken riser was a discharge from the well. *In re Oil Spill*, 844 F. Supp. 2d at 758, 761. Because Anadarko and BP did not contest their ownership of the well, the district court then entered summary judgment in favor of the Government. *Id.* at 762. Anadarko and BP filed a timely appeal.

---

[3] 33 U.S.C. § 1321(a)(7)(A). All statutory references are to the 2006 edition of the U.S. Code. The government named a total of eight defendants and also sought reimbursement for clean-up costs pursuant to the Oil Pollution Act, 33 U.S.C. § 2702. These other parties and claims are not presently at bar.

3

No. 12-30883

## II.

We review summary judgment *de novo*, applying the same standard as the district court. *Bd. of Miss. Levee Comm'rs v. United States EPA*, 674 F.3d 409, 417 (5th Cir. 2012); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the pleadings and other materials on file indicate that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). We are not bound by the district court's analysis, and are free to affirm on any basis raised below and supported by the record. *United States v. Ho*, 311 F.3d 589, 602 n.12 (5th Cir. 2002).

## III.

The Clean Water Act is "not a model of clarity."[4] In its current form, the Act is the result of over a century of successive statutory schemes and amendments.[5] Yet it is, in some respects, not overly complex. The legislation attempts to eliminate the introduction of any kind of pollutant—everything from paint and pesticides to rocks and dirt—into the waters of the United States. 33 U.S.C. §§ 1251(a), 1362(6). The Act does so by creating a regulatory framework and then prohibiting any discharge in violation of the regulations. *See* 33 U.S.C. §§ 1252, 1311–1313, 1316–17, 1319, 1329, 1342. Because of the heightened potential for "environmental disaster" resulting from the release of oil or hazardous waste, 33 U.S.C. § 1321 establishes increased fines for the discharge of these pollutants. *See* S. Rep. No. 92-414 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3732 (referring to possible disaster).

---

[4] *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1137 (11th Cir. 1990); *accord Platte Pipe Line Co. v. United States*, 846 F.2d 610, 611 (10th Cir. 1988).

[5] Discharge into U.S. waters was first prohibited by the Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1121 (codified as amended at 33 U.S.C. § 401, *et seq.*).

No. 12-30883

Specifically, the section prohibits the "discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . in such quantities as may be harmful," except under circumstances not implicated by the present case. 33 U.S.C. § 1321(b)(3). The section further provides that:

> Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of [33 U.S.C. § 1321(b)(3)] shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

*Id*. § 1321(b)(7)(A); *see also* 33 C.F.R. § 27.3 (2006) (indicating dollar amounts as increased by regulation). In the instant case, no one denies that there has been a discharge of harmful quantities of oil into navigable waters. Anadarko and BP further stipulate that the well is an offshore facility, and that they are the owners of that facility.[6] The only question, then, is whether it is beyond factual dispute that the well is a facility "from which" the harmful quantity of oil was discharged. We find no dispute as to the question.

Discharge is not defined for the purposes of this section, but is instead illustrated by a list of examples. Discharge "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping[.]" 33 U.S.C. § 1321(a)(2). Each of these statutory examples denotes the loss of controlled confinement. Similarly, the ordinary use of "discharge" refers to a fluid "flow[ing] out from where it has been confined."[7] Accordingly, a vessel or

---

[6] The government argues that BP was also an operator of the *Deepwater Horizon*. BP disagrees. Because we find Anadarko and BP liable as owners of the well, we do not reach this question.

[7] *Discharge*, Oxford Dictionaries Online, U.S. Edition, http://www.oxforddictionaries.com/us/definition/american_english/discharge (last visited Feb. 24, 2014). We further note that Congress intended for the section to apply to "classic spill" situations, 124 Cong. Rec. 37502 (1978), and dictionaries generally define a spill in

No. 12-30883

facility is a point "from which oil or a hazardous substance is discharged" if it is a point at which controlled confinement is lost. Turning to the facts, we find no dispute as to whether the well is such a facility. The parties stipulate that cement had been deposited at the well. There is no genuine dispute that controlled confinement was lost when this cement failed—the defendants do not contest the cement's failure, and they concede that oil then "escaped" and "flowed freely" from the well and ultimately into navigable waters. And although the defendants argue that the blowout preventer should have engaged and prevented the progression of the blowout, the need for this intervention only underscores the extent to which the oil was already unconfined and flowing freely. Accordingly, we find that the well is a facility from which oil was discharged in violation of 33 U.S.C. § 1321(b)(3).

It is immaterial that the oil flowed through parts of the vessel before entering the Gulf of Mexico. Anadarko argues that discharge is the point at which oil "enters the marine environment."[8] Yet Anadarko provides no relevant legal authority in support of the proffered interpretation. Nor does our research reveal any. On the contrary, it seems well settled that the section proscribes any discharge of oil that ultimately flows "into or upon . . . navigable waters," irrespective of the path traversed by the discharged oil.[9] For example,

---

terms of a loss or exit from a container. *See, e.g.*, *Spill*, Oxford English Dictionary Online, http://www.oed.com/view/Entry/186634 (subscription required) (last visited February 20, 2014) ("to allow or cause (a liquid) to fall, pour, or run out (esp. over the edge of the containing vessel)"); *Spill*, Merriam-Webster Online, http://www.merriam-webster.com/dictionary/spill (last visited February 24, 2014) ("to cause or allow (something) to fall, flow, or run over the edge of a container").

[8] Counsel used this phrase at oral argument. Similarly, the briefs argue that discharge denotes "direct" or "immediate" release into water. None of these proposed standards is consistent with existing law.

[9] 33 U.S.C. § 1321(b)(3); *see also Pepperell Assocs. v. United States EPA*, 246 F.3d 15 (1st Cir. 2001) (administrative penalties under 33 U.S.C. § 1321) (oil traversed third-party culvert); *Union Petroleum Corp. v. United States*, 651 F.2d 734 (Ct. Cl. 1981) (reimbursement provision under 33 U.S.C. § 1321) (oil ran across third-party rail line); *Pryor Oil Co., Inc. v.*

No. 12-30883

a discharge of oil violates the section even where the oil flows over a rail yard or hillside before reaching water. *See generally Union Petroleum Corp. v. United States*, 651 F.2d 734 (Ct. Cl. 1981); *Pryor Oil Co., Inc. v. United States*, 299 F. Supp. 2d 804 (E.D. Tenn. 2003). Similarly, the Environmental Protection Agency fined a factory owner for oil that spilled from a boiler gasket, into an industrial drain, through a conduit, and eventually into a creek. *See generally Pepperell Assocs. v. United States EPA*, 246 F.3d 15 (1st Cir. 2001). The First Circuit ultimately denied review of the case, finding the agency's decision reasonable. *Id*. at 30. So oil need not flow from a facility directly into navigable waters to give rise to civil-penalty liability under 33 U.S.C. § 1321.

Nor is liability precluded by the fact that the property traversed by the oil was owned by a third party. The *Pepperell* factory owner was held liable for his facility's discharge even though the oil had traveled through a third party's conduit before reaching water. *Id*. at 20. Likewise, when spilled oil subsequently traverses municipal sewers or ditches, liability is imposed upon the owner of the facility where the oil was first discharged, and not on the owner of the municipal facilities. *See generally In re D&L Energy, Inc*., V-W-13 C-006 (EPA ALJ Feb. 27, 2013) (unpublished). In one recent incident, EPA authorities discovered that oil and brine were being released from an oil exploration site. *In re D&L Energy, Inc*., V-W-13 C-006, at 2. Authorities found that a nearby river was polluted with oil and that a tributary was "impacted with oil at least a foot deep." *Id*. Upon further investigation, they realized that fluids from the drilling site were flowing through a municipal

---

*United States*, 299 F. Supp. 2d 804 (E.D. Tenn. 2003) (action under 33 U.S.C. § 1321(c)) (oil "ran down hillside"); *In re D&L Energy, Inc*., V-W-13 C-006 (EPA ALJ Feb. 27, 2013) (administrative penalties under 33 U.S.C. § 1321) (unpublished) (pollutant traversed storm sewer); *In re Philadelphia Macaroni Co*., CWA-III-187 (EPA ALJ May 28, 1998) (administrative penalties under 33 U.S.C. § 1321) (unpublished) (oil traversed field and ran into unnamed creek).

No. 12-30883

sewer, into a creek, and eventually to the Mahoning River. *Id*. The agency found the drilling site's owner liable, notwithstanding the fact that the oil flowed through third-party facilities before reaching water. *Id*. Indeed, we are aware of no case in which a court or administrative agency exempted a defendant from liability on account of the path traversed by discharged oil. The well owners' liability is thus unaffected by the fact that the oil traversed part of Transocean's vessel before entering the Gulf of Mexico.

We recognize that the aforementioned incidents involved blameless third parties, whereas here the owner or operator of the *Deepwater Horizon* might have contributed to the discharge. By all accounts, if the vessel's blowout preventer had functioned properly, the oil would not have entered navigable waters in violation of the Clean Water Act. The defendants therefore reason that liability is properly imposed upon the owner or operator of the *Deepwater Horizon*. Yet it is well established that this section of the Clean Water Act leaves no room for civil-penalty defendants to shift liability via allegations of third-party fault. *See United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1314 (7th Cir. 1978) (holding defendant liable for penalty notwithstanding fault of a third party). Early in the implementation of the Act's regulatory framework, there was some uncertainty as to where and how the law should apply. It was not uncommon for defendants to argue that the statute should not apply where a pollutant is accidentally discharged, or where a third party causes the discharge. *See Sierra Club v. Abston Const. Co., Inc.*, 620 F.2d 41, 45 (5th Cir. 1980) (summarizing early cases). Courts, however, now acknowledge that civil-penalty liability under 33 U.S.C. § 1321 arises irrespective of knowledge, intent, or fault.[10] In fact, courts have consistently rejected attempts to shift

---

[10] *Kelly v. United States EPA*, 203 F.3d 519, 522 (7th Cir. 2000) ("Civil liability under the Clean Water Act, therefore, is strict."); *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir. Unit A Apr. 1981) (referring to civil penalties in what is

No. 12-30883

liability on the basis of shared fault, instead choosing to consider any contributing cause as a mitigating factor at penalty calculation.[11]  This Court, in particular, recognizes the section as "an absolute liability system with limited exceptions, which are to be narrowly construed."  *United States v. W. of Eng. Ship Owner's Mut. Prot. & Indem.*, 872 F.2d 1192, 1196 (5th Cir. 1989). And although 33 U.S.C. § 1321 includes a third-party-fault exception for removal-cost liability, it includes no such exception for civil-penalty liability.[12] That being the case, any culpability on the part of the *Deepwater Horizon*'s operators does not exempt the well owners from the liability at issue here.

After reviewing the record and the law, we find no genuine dispute as to the defendants' liability for civil penalties pursuant to § 311 of the Clean Water Act.  As explained herein, it is undisputed that the well's cement failed, resulting in the loss of controlled confinement of oil such that the oil ultimately entered navigable waters.  The well is therefore a facility "from which oil or a hazardous substance was discharged" "into or upon the navigable waters of the United States."  33 U.S.C. §§ 1321(a)(2), (b)(3), (b)(7)(A).  Anadarko and BP do not dispute their ownership of the well.  Therefore, by the express terms of the statute, Anadarko and BP "shall be subject to a civil penalty" calculated in

---

now 33 U.S.C. § 1321(b)(6), which uses the same liability standard as § 1321(b)(7)); *Sierra Club, Mineral Policy Ctr. v. El Paso Gold Mines, Inc.*, No. A. 01 PC 2163 OES, 2002 WL 33932715, at *11 (D. Colo. Nov. 15, 2002) (rejecting argument that a defendant must "actively" contribute to a spill before liability may be imposed).

[11] *E.g.*, *Coastal States Crude*, 643 F.2d at 1128 (reducing penalty in enforcement order due to lack of fault); *United States v. Egan Marine Corp.*, No. 08 C 3160, 2011 WL 8144393, at *5–6 (N.D. Ill. Oct. 13, 2011) (explaining that the majority of circuits have concluded that the imposition of penalties is mandatory); *United States v. General Motors Corp.*, 403 F. Supp. 1151, 1165 (D. Conn. 1975) (finding that liability was mandatory but fine of $1 was appropriate where no fault shown); *cf. United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *6 (S.D. Tex. Feb. 26 2009) (imposing fine of $65,000 where over $1 million was authorized by statute).

[12] *Compare* 33 U.S.C. § 1321(g) (allowing subrogation of removal costs where discharge was "caused solely by an act or omission of a third party"), *with id.* § 1321(b) (making no mention that such an option is available vis-à-vis civil-penalty liability).

No. 12-30883

accordance with statutory and regulatory guidelines. *Id*. § 1321(b)(7)(A). This liability is unaffected by the path traversed by the discharged oil. Nor is liability precluded by any culpability on the part of the vessel's owner or operator.

## IV.

For the reasons stated, we AFFIRM the grant of partial summary judgment with respect to the well owners' liability for civil penalties pursuant to 33 U.S.C. § 1321(b)(7)(A).[13]

---

[13] We do not adopt the district court's interpretation of § 1321(b)(7)(A) to the extent that such an interpretation differs from our own. Further, we express no opinion as to any other issues addressed in the district court's order.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 12-30883

---

United States Court of Appeals
Fifth Circuit

**FILED**

November 5, 2014

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

B.P. EXPLORATION & PRODUCTION, INCORPORATED; ANADARKO
PETROLEUM CORPORATION,

Defendants - Appellants

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:

Appellants B.P. Exploration & Production, Inc. ("BP") and Anadarko Petroleum Corporation ("Anadarko") have filed petitions for en banc rehearing of our judgment affirming the lower court's grant of partial summary judgment. The en banc petitions remain pending. Although the parties have not filed separate petitions for panel rehearing, BP has "request[ed] that the panel reconsider its analysis." BP Pet. Reh'g 9. We have done so, and we have also considered the arguments raised by Anadarko, which contends, *inter alia*, that the panel opinion is "likely to sow error in the ongoing trial below."

No. 12-30883

Anadarko Pet. Reh'g 13.  We disagree with this characterization of our opinion, but, for the sake of clarity, we address some of the arguments raised in the petitions for rehearing en banc.  For the reasons discussed below, Appellants' arguments fail to persuade us that we erred or need to alter our decision to affirm the district court's grant of partial summary judgment.

This case involves the federal government's civil enforcement action under Section 311 of the Clean Water Act (CWA), 33 U.S.C. § 1321(b)(7)(A), stemming from the 2010 *Deepwater Horizon* oil spill in the Gulf of Mexico. Section 311, a strict liability provision, mandates the assessment of fines on the owners or operators of any vessel or facility "from which oil or a hazardous substance is discharged." *Id.*  In the panel opinion, we affirmed summary judgment on the issue of Appellants' liability under that provision. Interpreting the CWA according to its plain terms, we held that "a vessel or facility is a point 'from which oil or a hazardous substance is discharged' if it is a point at which controlled confinement is lost." *In re Deepwater Horizon*, 753 F.3d 570, 573 (5th Cir. 2014) (quoting 33 U.S.C. § 1321(b)(7)(A)).  We further determined that BP and Anadarko, as co-owners of the Macondo Well (the "well"), are liable under Section 311 because there was no dispute of material fact that controlled confinement of oil was lost in the well.

Appellants' various arguments challenging this holding can be grouped into two categories: those based on purported factual errors in the panel opinion, and those based on purported errors in the panel opinion's legal analysis.  We address each in turn.

## I.    Purported Factual Errors in the Panel Opinion

Anadarko first contends that the panel opinion was premised on a mistake of fact, pointing to the following sentence in the opinion's statement of facts: "As part of this preparation [for the *Deepwater Horizon*'s departure from the well site], the well had been lined and sealed with cement." *In re Deepwater*

No. 12-30883

*Horizon*, 753 F.3d at 573.  Anadarko argues that, "[c]ontrary to the assumption of the Panel, all parties to this appeal agree that the cement never sealed off the well from the oil and gas in the rock formation beneath it."  Anadarko Pet. Reh'g 2.  Anadarko further contends that this purported factual error has created, and will continue to create, issues in the proceedings before the lower court.  Anadarko Pet. Reh'g 13.

We are doubtful that the panel opinion has created any confusion on this issue.  Nevertheless, we here clarify that the above statement was not intended to imply that the cement created a *successful* seal in the well.  Anadarko is correct that all parties agree—and the record is clear—that the cement job failed to prevent hydrocarbons—*e.g.*, oil—from migrating into the wellbore. Indeed, in the sentence following the one at issue, we stated that, "[b]efore the *Deepwater Horizon* departed, this cement failed, resulting in the high-pressure release of gas, oil, and other fluids."  *In re Deepwater Horizon*, 753 F.3d at 571. In any event, this issue is a red herring.  Whether the cement initially sealed the well was immaterial to the panel opinion's holding.  As discussed in more detail below, it is only the fact that the cement in the well ultimately failed to stop the flow of oil (regardless of whether the cement at any prior point functioned as expected), and that control was therefore lost in the well, that prompted our determination that the well was a point "from which oil or a hazardous substance [was] discharged."  33 U.S.C. § 1321(b)(7)(A).

Anadarko also argues that the panel's holding has effectively denied it its Seventh Amendment right to a jury trial, as Anadarko was not permitted to put forward evidence regarding where controlled confinement was lost. However, the lower court placed no limit on the admissible evidence Anadarko could put forward in opposition to the Government's motion for summary judgment, and in support of its cross-motion for summary judgment, on the issue of Anadarko's Section 311 liability.  Moreover, in its summary judgment

3

No. 12-30883

briefing, Anadarko conceded that there were no disputes of material fact with respect to this issue. *See* No. 2:10-MD-2179, Doc. 5113-2.[1] Undoubtedly aware of this concession, Anadarko now contends that it could not have anticipated either the lower court's or the panel's "unprecedented" interpretations of Section 311—finding liability based on where "the uncontrolled movement of oil began," *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 844 F. Supp. 2d 746, 758 (E.D. La. 2012), and where "controlled confinement [was] lost," *In re Deepwater Horizon*, 753 F.3d at 573, respectively. But in its summary judgment briefing before the lower court, Anadarko was aware that "control" of the oil might be at issue. In support of its argument that the oil was discharged from the *Deepwater Horizon*, Anadarko stated, "the owners and operators of the vessel . . . failed to *maintain control* of the Macondo Well, and as a result of that failure, hydrocarbons discharged from the vessel and its appurtenances into the Gulf of Mexico." No. 2:10-MD-2179, Doc. 5113-2, at 4 (emphasis added).[2]

In any event, there are no additional facts that would alter our conclusion that controlled confinement was lost in the well. As we stated in the panel opinion, the only facts material to this analysis are undisputed. First, there is no question that Anadarko and BP are co-owners of the well. Nor do Appellants dispute that, as a result of the cement's failure, oil flowed into the well and, eventually, into the Gulf of Mexico. Before the lower court, in their responses to the Government's statement of undisputed facts, Appellants conceded for the purposes of summary judgment that "the cement

---

[1] Anadarko did note that there may be disputed facts warranting a jury trial regarding the issue of whether Anadarko is an "owner, operator or person in charge" under 33 U.S.C. § 1321(b)(7)(A). *See* No. 2:10-MD-2179, Doc. 5113-2, at 2 n.2; Doc. 5280, at 10 n.7. But that issue was never before us.

[2] Indeed, Anadarko deemed this "factor . . . crucial to the resolution of these motions [for summary judgment]." No. 2:10-MD-2179, Doc. 5113-2, at 4.

job failed to prevent hydrocarbons in the formation from migrating into the wellbore."  No. 2:10-MD-2179, Doc. 5113-3, at 5–6; *see also* Doc. 5124-1, at 2. Appellants further conceded that "[t]he Macondo well cement job was critical for maintaining *well control*."  No. 2:10-MD-2179, Doc. 5124-1, at 2 (emphasis added); *see also* Doc. 5113-3, at 5 (stating that the "cement job was a means of maintaining well control").[3]  Even in their petitions for rehearing, Appellants do not dispute these facts.  However, Anadarko now argues that, because the cement never properly sealed the well, the well "could not have been the 'point at which controlled confinement' of oil was 'lost' because oil was never confined in the well to start."[4]  Anadarko Suppl. Br. in Supp. of Pet. Reh'g 7.  But that the cement—undisputedly placed in the well—failed to perform its function as a barrier to the flow of oil only underscores that controlled confinement was lost in the well.[5]

Both BP and Anadarko attempt to shift the focus to the *Deepwater Horizon* and its appurtenances (owned by the Transocean entities), arguing that control was lost either (1) when the blowout preventer failed, or (2) when the drilling mud (which Anadarko contends is an appurtenance of the Transocean vessel) was displaced with seawater, causing oil to enter the well. But, as discussed in more detail below, our determination that controlled confinement was lost in the well does not preclude the possibility that

---

[3] We note that federal regulations not at issue here, but addressed in subsequent proceedings in this case, require that well owners "take necessary precautions to keep wells under control at all times."  30 C.F.R. § 250.401; *see also* 30 C.F.R. § 250.420(a) (requiring that well owners' "casing and cementing programs . . . [p]revent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters").

[4] It is worth noting that this argument would foreclose Appellants' separate argument, discussed below, that the blowout preventer—which also failed to perform its function of containing oil in the well—was a point at which controlled confinement was lost.

[5] Although Anadarko argues that "[a]t the temporary abandonment stage of a well, the well is not intended to 'control' or 'confine' oil," Anadarko Suppl. Br. in Supp. of Reh'g 6, it is nonetheless undisputed that the cement placed in the well was intended to do so.

No. 12-30883

controlled confinement was also lost elsewhere, an issue that we did not need to rule on. Further, with respect to the drilling mud, there is no dispute that its removal "allowed oil to escape from the formation" and *into the well*. Anadarko Suppl. Br. in Supp. of Pet. Reh'g 7. Again, the focus is on the well, and we come back to the loss of controlled confinement in the well. Moreover, the blowout preventer was not the first and only barrier to the discharge of oil. Rather, in BP's own words, "a [blowout preventer] . . . 'operates as a failsafe device designed to stop a blowout from *progressing* and, *in the event of loss of control*, seal the well and stop the flow of oil.'" BP Blue Br. 11–12 (emphasis added) (quoting *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 230–31 (S.D.N.Y. 2012)). Thus, as BP implies, a blowout preventer becomes necessary only when control of the oil has already been lost. Indeed, by contending that the court erred in determining "that controlled confinement of oil was *irretrievably* lost in the well," BP Suppl. Br. in Supp. of Pet. Reh'g 8, BP appears to concede that controlled confinement was *initially* lost in the well.

Therefore, Appellants' contention that controlled confinement was not lost in the well is belied by the undisputed facts in the record and by Appellants' own admissions.

## II.    Purported Legal Errors in the Panel's Opinion

Appellants also challenge the panel's legal conclusion that "a vessel or facility is a point 'from which oil or a hazardous substance is discharged' if it is a point at which controlled confinement is lost." *In re Deepwater Horizon*, 753 F.3d at 573 (quoting 33 U.S.C. § 1321(b)(7)(A)).

As an initial matter, BP suggests that the panel "realized" that "only one instrumentality can bear [CWA] liability for a discharge of a given quantum of oil," BP Pet. Reh'g 10, and that the opinion's "logic . . . suggests that Transocean . . . could not be held liable at all," BP Pet. Reh'g 2. Although Appellants would

6

No. 12-30883

perhaps have preferred that the court adopt its "single instrumentality" theory, we did no such thing. *See In re Deepwater Horizon*, 753 F.3d at 573 ("[A] vessel or facility is *a* point 'from which oil or a hazardous substance is discharged' if it is *a* point at which controlled confinement is lost" (emphasis added)). The opinion makes clear that "any culpability on the part of the *Deepwater Horizon*'s operators does not exempt the well owners from the liability at issue here." *Id.* at 575. Because the Transocean entities settled, we did not need to consider whether the oil discharged from the well might also have constituted a "discharge" from the *Deepwater Horizon*. Nor did we need to decide for purposes of other hypothetical scenarios not at issue here precisely under what circumstances civil penalty liability attaches for the owners and operators of vessels or facilities "upstream" and "downstream" from the facility or vessel at which controlled confinement was lost.

Appellants also attempt to distinguish the cases we relied upon in support of our holding. Anadarko points to the fact that there is "no reported decision in which the owner of a facility has been held liable for penalties after a discharge from a vessel connected to the facility." Anadarko Pet. Reh'g 7. BP similarly argues that "the cases on which the panel relied . . . . address the different situation where oil is discharged from a *single* instrumentality into the environment and it simply happens to flow across property owned by third parties (who bear no coequal legal responsibility as rig owners and operators to keep the oil confined) before reaching water." BP Pet. Reh'g 11. These arguments may be true so far as they go,[6] but only because no prior reported

---

[6] Some of the cases cited in the panel opinion may very well have involved instances in which oil discharged from one facility traversed through a second facility, both of which could have been subject to liability under Section 311. For example, in *Pepperell Associates v. EPA*, 246 F.3d 15 (1st Cir. 2001), which involved oil that spilled from a factory, through a sewer, and ultimately into a creek, *id.* at 20, the sewer, in addition to the factory, may have been considered an "onshore facility," *see* 33 U.S.C. § 1321(a)(10) (defining "onshore facility"

7

No. 12-30883

cases have presented facts that are directly analogous to those in the present case.  Moreover, Appellants' attempt to distinguish these cases is rooted in an assumption that only one instrumentality may be held liable for a given discharge, an issue that we explicitly did not reach.  *See* BP Pet. Reh'g 11 ("[T]he cases on which the panel relied . . . do not speak at all to the real problem of assigning [CWA] liability between one of two mutually exclusive instrumentalities.").

As explained in the panel opinion, our holding is consistent both with the caselaw interpreting Section 311 and with its history of enforcement.  The panel opinion points to several cases and agency decisions where owners of facilities received fines under Section 311 for oil that was released from their facility, even though that oil subsequently flowed through conduits or over property owned by third parties before entering navigable water.  *See Pepperell Assocs. v. EPA*, 246 F.3d 15, 20 (1st Cir. 2001); *Pryor Oil Co., Inc. v. United States*, 299 F. Supp. 2d 804, 806 (E.D. Tenn. 2003); *Union Petroleum Corp. v. United States*, 651 F.2d 734, 56, 61–62 (Ct. Cl. 1981); *In re D & L Energy, Inc.*, V–W–13 C–006 (EPA ALJ Feb. 27, 2013); *In re Phila. Macaroni Co.*, CWA–III–187 (EPA ALJ May 28, 1998).[7]  Anadarko argues that these cases do not involve penalties under Section 311(b).  This contention may be technically true, but it is of little consequence.  Although *Pepperell* involved an appeal from an administrative determination that an onshore facility failed to prepare a

---

broadly as "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land").

[7] Anadarko challenges the panel opinion's citation to the two EPA administrative orders which, according to Anadarko, are "inapposite and [have] no precedential significance."  Anadarko Pet. Reh'g 9, 10 n.4.  But the panel never contended that these decisions were binding precedent.  Rather, they were cited as *relevant* to rebut Appellants' argument that their Section 311 liability was precluded by the fact that the property traversed by the oil was owned by a third party.  *See In re Deepwater Horizon*, 753 F.3d at 574.  Anadarko cites no authority rendering a statute's administrative enforcement irrelevant in this context.

No. 12-30883

spill response plan under Section 311(j), the ALJ had also previously
determined that the facility violated Section 311(b)(3), the provision at issue
in this case. 246 F.3d at 20–22. Similarly, while *Union Petroleum* concerned
cleanup costs under Section 311(i), rather than civil penalties under Section
311(b)(3), *see* 651 F.2d at 741, Section 311(i) applies "where an owner or
operator of a vessel or an onshore facility or an offshore facility *from which oil
or a hazardous substance is discharged in violation of subsection (b)(3)* of this
section acts to remove such oil or substance," 33 U.S.C. § 1321(i) (emphasis
added).

BP also argues that the court failed to address BP's argument "that the
location of the discharge depends on the instrumentality from which oil *escapes
confinement*." BP Pet. Reh'g 8. According to BP, "when oil simply moves from
one confined instrumentality to another without escaping, no Clean Water Act
violation can possibly occur." BP Pet. Reh'g 9. Along those same lines,
Anadarko asserts that "[c]ommonsense dictates that the movement of oil from
a facility into a vessel does not retroactively become a 'discharge' within the
meaning of Section 311(b)(7) because the oil later exits the vessel's confinement
into the environment." Anadarko Pet. Reh'g 6; *see also* Anadarko Suppl. Br. in
Supp. of Pet Reh'g 5. This argument—which, prior to the petitions for
rehearing, was raised in a single sentence in BP's opening brief, *see* BP Blue
Br. 61[8]—lacks merit. The opinion nowhere suggests that the mere act of
moving oil from a facility into a vessel constitutes a discharge. Such an act
does not result in oil entering navigable waters and does not necessarily denote
a loss of controlled confinement. But it does not follow from this that when the

---

[8] The sentence reads: "It is undisputed that the only oil ever to escape confinement
and reach water escaped from the *Deepwater Horizon* and its appurtenances and that only
oil that reaches water is capable of . . . trigger[ing] Section 1321(b)(7) liability." BP Blue Br.
61.

No. 12-30883

controlled confinement of oil in a facility is lost such that it enters a vessel and then navigable waters, only the vessel is liable.   Neither the CWA nor "commonsense" dictate otherwise.

Appellants further argue that it was improper for the Panel to include a "control" element in defining a "discharge" under the CWA.   Anadarko asserts that, "[i]n its transitive form, the verb 'discharge' is defined as '[t]o release, as from confinement . . . .' [and i]n its intransitive form, the verb 'discharge' is defined, in part, as '[t]o pour forth, emit, or release contents.'"   Anadarko Pet. Reh'g 5 n.1 (quoting The American Heritage Dictionary of the English Language 530 (3d ed. 1992)).   But as Anadarko's own definitions suggest, the term "discharge" focuses not only on a loss of confinement but on the act of "releas[ing]."   This connotes a loss of control.   BP argues that inclusion of a "control" element to the test improperly "smuggles [into the case] negligence concepts" inconsistent with "the statute's strict liability, locational test."   BP Suppl. Br. in Supp. of Pet. Reh'g 6–10.   However, the inquiry the panel engaged in—determining whether the well was a point at which controlled confinement was lost (without regard to which party, if any, was responsible for the loss of control)—is entirely consistent with such a test.   Anadarko contends that including a control element is also problematic because it would mean that "controlled discharges would not be prohibited" by Section 311.   Anadarko Pet. Reh'g 5.   This argument is unpersuasive.   It appears that Anadarko is arguing that the control element would preclude CWA liability in situations when a party *intended* to discharge oil and other hazardous substances.   But this confuses the terms "control" and "intent."   There is no reason, under our construction of discharge, why a party would not be liable when it intentionally gives up control of oil that had been confined within a facility or vessel that it owned or operated.

10

No. 12-30883

Anadarko also attacks the panel opinion's standard for determining the point from which oil is discharged as "unworkable." Anadarko hypothesizes "a system where 24 separately owned and operated wells connect to a vessel, which connects to a pipeline, which connects to a floating platform, which interconnects with an interstate pipeline, which interconnects with an onshore facility dozens of miles away," and asks: "How could a fact-finder find the precise point where 'controlled confinement is lost' within that system?" Anadarko Pet. Reh'g 8. Anadarko, however, fails to give any reasons explaining why it would be difficult to determine where controlled confinement is lost in an interconnected system. In this case, for instance, it was not difficult to determine that the controlled confinement of oil was lost in the well. Second, Anadarko's hypothetical again assumes that there may only be a single point at which controlled confinement is lost, an issue we did not rule on.

Both BP and Anadarko also contend that the panel should have applied the rule of lenity or the anti-penalty canon to construe Section 311 narrowly so as not to apply to them. However, such presumptions are warranted only "if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal citation and quotation marks omitted). Here, because the text of Section 311, and the history of its application, clearly demonstrate that a vessel or facility is a point "from which oil or a hazardous substance is discharged," 33 U.S.C. § 1321(b)(7)(A), if it is a point at which controlled confinement is lost, we decline Appellants' appeals to the rule of lenity and the anti-penalty canon.

Finally, BP argues that it is not, "as the panel thought, attempting to introduce concepts of 'third-party fault' into the strict-liability scheme of the

No. 12-30883

[CWA].'"  BP Pet. Reh'g 14.  But this argument is contradicted by Appellants'
briefing in this case, both before the panel and before the lower court.  At
multiple times in the course of this litigation, Appellants have attempted to
shift liability to Transocean on the grounds that they were not at fault for the
spill, but that Transocean was at fault.

### III.    Conclusion

For the reasons given in the panel opinion, as supplemented hereby, the
panel continues to hold that the district court judgment was correct.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

January 09, 2015

Mr. William W. Blevins
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

          No. 12-30883    In Re: Deepwater Horizon
                          USDC No. 2:10-MD-2179
                          USDC No. 2:10-CV-4536

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinions.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Joseph M. Armato, Deputy Clerk

cc:
     Mr. Aditya Bamzai
     Mr. Brad D. Brian
     Mr. Jeffrey Bossert Clark Sr.
     Ms. Michelle Terry Delemarre
     Mr. James Joseph Dragna
     Ms. Ellen J. Durkee
     Mr. Kenneth G. Engerrand I
     Mr. Robert R. Gasaway
     Mr. Richard Cartier Godfrey
     Mr. John David Gunter II
     Ms. Judy B. Harvey
     Mr. Don Keller Haycraft
     Mr. Stephen Jay Herman
     Mr. Brian D. Israel
     Mr. Bryan Michael Killian

Mr. David Andrew Kirby
Mr. Ky E. Kirby
Mrs. Deborah DeRoche Kuchler
Mr. James Andrew Langan
Mr. Aaron Llyod Nielson
Mr. Steven O'Rourke
Mr. David Joseph Pfeffer
Mr. James Parkerson Roy
Mr. David Bruce Salmons
Mr. Stephen Sidney Schwartz
Ms. Sharon Denise Smith
Mr. R. Michael Underhill