# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION: J |
| | * * | HONORABLE CARL J. BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class, | * * * * | NO. 12-CV-968<br><br>SECTION: J |
| Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*, | * * * * | HONORABLE CARL J. BARBIER |
| Defendants. | * * * * * * | MAGISTRATE JUDGE SHUSHAN |

## STATUS REPORT FROM THE *DEEPWATER HORIZON* MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, submits the following report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between August 9, 2014 and December 31, 2014 (the "Reporting Period").[1]  As the Effective Date of the Medical Benefits Class Action Settlement

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the Medical Settlement Agreement.

(the "Settlement") was February 12, 2014, this will serve as the Claims Administrator's 2014 Annual Report.  The Claims Administrator intends to file quarterly status reports in 2015.

This status report provides:

- an executive summary of claims processed in 2014;

- a summary of claims for Specified Physical Conditions and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program;

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program and the operations of the Gulf Region Health Outreach Program Library.

## I.  <u>EXECUTIVE SUMMARY</u>

Within the first ten months of claims processing under the Settlement, the most significant challenge has been the very high rate of claims requiring one or more Requests for Additional Information or receiving a Notice of Defect.  More than sixty-five (65) percent of claims have fallen into one of these two categories, which unavoidably adds months of additional processing time before moving them to final action.[2]  Therefore, the rate of claims advancing to the point where they can be compensated or denied has been slower than anticipated.

Additionally, after a claim has reached the approved determination stage, it must still clear the healthcare lien resolution process (i.e., the process for resolving reimbursement obligations owed to Medicare, Medicaid, and others for medical care and/or treatment, etc.) and

---

[2] Claimants or Medical Benefits Settlement Class Members ("Class Members") receiving a Request for Additional Information ("RAI") and/or a Notice of Defect have sixty (60) days or 120 days to respond, respectively.  See Section II.B for greater detail.

the payment complication process (i.e., the process for resolving conflicting representation, bankruptcy, probate, etc.) before being paid. Given the time required to obtain responses from potential lienholders, several additional months can be added to the processing time before a Class Member is compensated in full.

Sound progress has been made in recent months, however, and the rate of claims moving to determination[3] or clearing lien resolution increased significantly in December. That trend is continuing in January, and we expect it will continue to increase going forward. At this increased rate, we anticipate having approximately fifty (50) percent of the 12,144 claims filed before December 31, 2014, (hereinafter "2014 Claims")[4] finalized by determination, including both approval and denial, by the end of April 2015. We further anticipate finalizing the remaining balance of 2014 Claims at a rate of approximately seven (7) percent per month from April through October, thereby completing the processing of all 2014 Claims by the end of October 2015.

Specific key measures regarding 2014 Claims contained in this 2014 Annual Report include:

- Six (6) percent of 2014 Claims reached the Notice of Determination (approved for compensation for a Specified Physical Condition) stage, and the majority of those claims will be paid by the end of January 2015;

- Seven (7) percent[5] of 2014 Claims are pending Declaration Review or RAI processing;

---

[3] Claims Administrator's Notices of Determination include correspondence both (a) approving a claim for compensation and (b) denying a claim for compensation where claimants (i) fail to meet minimum class requirements, (ii) previously filed a valid opt out, or (iii) fail to claim or prove a compensable condition.

[4] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014. While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement. Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

[5] As the Executive Summary notes, over sixty-five (65) percent of 2014 Claims have received at least one RAI and/or Notice of Defect. The summary later notes that many responses to these are now being received and processed. Therefore, the respective seven (7) percent and twenty-five (25) percent reflected for Declaration Review/Request for Additional Information and Notice of Defect indicate the total claims that are scheduled to

- Eight (8) percent of 2014 Class Members did not seek the Specific Physical Condition ("SPC") compensation benefit and instead claimed the Periodic Medical Consultation Program ("PMCP") benefit;

- Twenty-five (25) percent[6] of the 2014 Claims have already received or are scheduled to receive a Notice of Defect and will need to submit additional information;

- Twenty-two (22) percent of 2014 Claims have been denied because they (a) could not prove Class Membership, (b) filed a valid opt-out, or (c) did not claim or prove a compensable condition; and

- Thirty-two (32) percent of the 2014 Claims are actively in the Medical Record Review process, and of those claims, more than seventy (70) percent are identified to receive a Notice of Defect.[7]

The activity shown in this Annual Report reflects the results of the significant time and effort involved in identifying the high rate of deficiencies and defects in the majority of 2014 Claims received and then providing the Class Member with the opportunity to cure. The cure period for deficiencies noted in a RAI is sixty (60) days, whereas the cure period for defects identified in a Notice of Defect is 120 days. With responses to those issues now being received, we were able to significantly increase determinations in December and will continue to do so going forward. Lastly, we also anticipate that new claims received in 2015 will not have as many issues to resolve and will be processed more quickly.

## II.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

### A.   Claimed Benefits and Compensation Level

During the Reporting Period, the Claims Administrator received 1,844 Proof of Claim Forms ("POCFs"). Since the Court's approval of the Settlement, the Claims Administrator has

---

receive such correspondence or pending an open response period and/or review of their response and have not moved to a later processing stage as of the filing of this Report.

[6] See footnote 5.

[7] Then, Class Members have 120 days to cure identified Defects before a Notice of Determination, approving or denying SPC compensation, will be issued.

received a total of 12,444 POCFs.  Of the 1,844 POCFs filed during the Reporting Period, 1,768 sought compensation for an SPC and participation in the PMCP, seventy-five (75) sought only participation in the PMCP, and one (1) did not select any benefits.[8]

| TABLE 1: POCF FILINGS | | |
|---|---|---|
| | Reporting Period | Total |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 1,768 | 11,164 |
| Claims for PMCP Only | 75 | 1225 |
| No Benefits Selected | 1 | 55 |
| | | |
| **Total POCF Filings** | **1,844** | **12,444** |

| TABLE 2: CLAIMED COMPENSATION LEVEL | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Unclassified | PMCP Only | Total |
| Total Claims | 3,241 | 1,027 | 663 | 300 | 1,812 | 4,687 | 714 | 12,444 |

### B.      Claims Requiring RAI and/or Notice of Defect

As highlighted in the Executive Summary, the vast majority of claims have received a RAI and/or a Notice of Defect.  During the Reporting Period, the Claims Administrator sent 913 Requests for Additional Information and 2,188 Notices of Defect. Since the inception of the Settlement, the Claims Administrator sent 8,982 Requests for Additional Information and 2,957 Notices of Defect. As noted above, the cure period for deficiencies noted in a RAI is sixty (60) days, whereas the cure period for defects identified in a Notice of Defect is 120 days.

---

[8] If a claimant does not select any benefits but qualifies as a Class Member based on his or her POCF, the Claims Administrator will enroll the Class Member in the PMCP. Additionally, if the Class Member indicates that he or she is requesting compensation for an SPC by completing Sections VII and/or VIII of the POCF or by submitting supporting documentation, such as a declaration or medical records, the Claims Administrator will infer that the Class Member is claiming that benefit.

| TABLE 3: RAIs AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 913 | 8,982 |
| Responses to RAIs Received | 766 | 5,553 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 2,188 | 2,957 |
| Defect Cure Materials Received | 861 | 1,348 |

1.    Requests for Additional Information

Under the party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant responds to that request and still has deficiencies within the first-party injury declaration, the claimant may receive a second RAI, an RAI-Incomplete.  An RAI-Incomplete is issued for deficiencies, such as omissions of timeframes or routes of exposure, associated with the symptom or condition declared.

For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  Of the 8,982 RAIs sent in 2014, fifty (50) percent were RAI-Missing,[9] and fifty (50) percent were RAI-Incomplete.[10]  Fifty-two (52) percent were sent to unrepresented claimants, whereas forty-eight (48) percent were sent to claimants represented by counsel.  Because the Parties agreed to initiate the RAI process prior to the Effective Date of the Settlement, RAIs are sent to claimants prior to or while their membership in the class is being confirmed.  Therefore, a claimant having submitted a timely RAI response curing any deficiencies in a first-party injury

---

[9] RAI-Missing correspondence is sent to a claimant or Class Member when the individual has failed to submit a first-party injury declaration in support of the conditions the individual claimed in Section VIII of the POCF. Individuals are only eligible to receive one (1) RAI-Missing.  The same individual may receive an RAI-Incomplete if deficiencies exist within their declaration response to RAI-Missing for a maximum of two (2) RAIs.

[10] RAI-Incomplete correspondence is sent to a claimant or Class Member when the individual has deficiencies, such as missing timeframe or route of exposure, within a first-party injury declaration.  Individuals are only eligible to receive one (1) RAI-Incomplete.

declaration may still receive a Notice of Defect or a Notice of Denial based on his or her failure to prove class membership as a Clean-Up Worker or Zone Resident.

- **More than sixty-three (63) percent of the 2014 Claims have required at least one (1) RAI, and over twelve (12) percent have required the maximum of two (2) RAIs.**

- **More than thirteen (13) percent of the 2014 Claims having received an RAI had either a subsequently defective or denied class membership status.  Despite their responses and cures to the RAI(s), these claimants are or may be ineligible to participate in the Settlement because they are <u>not</u> able to prove they are Class Members.**

- **The overall response rate to RAIs was fifty-nine (59) percent, with claimants represented by counsel responding at a slightly higher rate (sixty-six (66) percent) than unrepresented claimants (fifty-two (52) percent).**

- **The overall cure rate for those responding to RAIs is approximately sixty (60) percent.**

It is important to note that failure to respond to an RAI-Missing within the sixty-(60)-day response period will not result in an automatic determination denying the claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the Specified Physical Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect.  The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, it is important to note that failure to (a) respond to or (b) cure all deficiencies identified within an RAI-Incomplete will not result in an automatic determination denying the claim.  This occurs because a claimant may declare multiple conditions within Section VIII of the POCF and first-party injury declaration.  Whereas some of those conditions may be deficient and therefore require an RAI-Incomplete, other conditions may already be valid under the SPC

Matrix.[11]   These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.   A copy of this FAQ is included with each RAI sent from the Claims Administrator.

### 2.   Notices of Defect

As set forth in Section V of the MSA, the Claims Administrator is responsible for reviewing each POCF "to determine the sufficiency and completeness of the information contained therein" and sending a Class Member a Notice of Defect for each POCF it rejects, which must identify each Defect and provide a recommendation on how to cure it.   MSA §§ V.D-E.   Notices of Defect can be sent both to claimants who have yet to prove class membership and to Class Members who have already proved class membership.[12]   For each Notice of Defect sent, the claimant or Class Member has 120 days to respond.   Of the 2,957 Notices of Defect sent in 2014, sixty-four (64) percent were sent to unrepresented claimants or Class Members, whereas thirty-six (36) percent were sent to claimants or Class Members represented by counsel.   More than eighty-two (82) percent were sent to Class Members claiming to be or approved as Clean-Up Workers.   Approximately seventy-three (73) percent of the Notices of Defect sent listed multiple Defects.   **More specifically, forty-seven (47) percent had identified two (2) through five (5) Defects, nineteen (19) percent identified six (6) through ten (10) Defects, and seven (7) percent identified more than ten (10) Defects.**

---

[11] As discussed previously, please note that a declaration with "valid" conditions does not equate to an approved determination for compensation.   To be eligible for receipt of compensation for an SPC, the claimant must also (a) prove class membership as a Clean-Up Worker or Zone Resident, and (b) may require additional supporting documentation, such a third-party declaration, extrinsic evidence, or medical records, as outlined in the SPC Matrix.

[12] A Claimant who has a Defect in his or her claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.   Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.   See Section IV for more detail on Class Members eligible for this benefit.

As of the end of the Reporting Period, the response period had expired for 1,611 (fifty-five (55) percent) of claims having received a Notice of Defect.  The overall response rate was fifty-three (53) percent.  The response rate for *pro se* claimants or Class Members was forty-six (46) percent, whereas the response rate for represented claimants or Class Members was sixty-two (62) percent.  The five (5) most common material defects identified for the population whose response period has expired are:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Completion of a required form (Appendix B – HIPAA) is needed to complete POCF Review"; and

- "Incomplete/Missing claimant signature on the signature page of the POCF."

### C.   Claims Processed Through Each Stage of Claims Review

As noted in the Executive Summary and detailed above, a significant percentage of the POCFs submitted have contained one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time that it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process claims. The Claims Administrator must wait and then process responses to RAIs and Notices of Defect over or following the respective sixty-(60)-day and 120-day cure periods.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 4: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[13] | 2,057 | 2,142 |
| Declaration Review Process[14] | 2,215 | 13,089 |
| RAI Process[15] | 913 | 8,982 |
| Medical Record Review Process[16] | 1337 | 3682 |
| Notice of Defect Gate Two Process[17] | 236 | 236 |

The Claims Administrator completed another 1,337 Medical Record Reviews during the Reporting Period, bringing the total initial reviews completed since inception to 3,682.  The complexity of the 2014 Claims, involving an average of 4.2 conditions claimed with up to a maximum of thirty (30) per claim, directly increased the time associated with the medical record review process.  As highlighted in the Executive Summary, however, the Claims Administrator anticipates that claims submitted in 2015 will have fewer issues, allowing the time required for each medical record review to decrease in the next reporting period and throughout 2015.

**D.      Claims Sent Dispositive Correspondence – Determination, Approved or Denied, for Specified Physical Condition**

As stated in the Executive Summary, the number of claims reaching an approved determination in 2014 was low, due in large part to the high rate of deficiencies and Defects for the 2014 Claims.  During the Reporting Period, the Claims Administrator sent SPC Notices of Determination to 576 Class Members.  Since the inception of the settlement, the total number of

---

[13] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to medical record review.
[14] Total claims for which an injury declaration review was completed.
[15] Total claims requiring an RAI that received a RAI.
[16] Total claims that were reviewed by Claims Administrators medical record review staff.
[17] Total claims that have completed medical record review with remaining Defects preventing final determination.

Class Members receiving an SPC Notice of Determination is 724. The total compensation for the 576 Class Members approved for SPC compensation during the Reporting Period is $1,109,200. Since the inception of the Settlement, the total compensation for the 724 Class Members approved for SPC compensation is $1,352,250.

The Claims Administrator sent 764 Notices of Denial during the Reporting Period, for a total of 2,137 Notices of Denial from the inception of the Settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

| TABLE 5: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent | 576 | 724 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent | 764 | 2,137 |

| TABLE 6: APPROVED CLAIMS FOR SPCS | | | | | | |
|---|---|---|---|---|---|---|
| **SPC** | **Reporting Period Number Approved** | **Total Number Approved to Date** | **Reporting Period Amount Approved** | **Total Amount Approved to Date** | **Reporting Period Amount Paid** | **Total Amount Paid to Date** |
| A1 | 537 | 680 | $697,700 | $883,600 | $153,000 | $253,100 |
| A2 | 17 | 18 | $124,850 | $132,600 | $15,500 | $15,500 |
| A3 | 20 | 24 | $247,000 | $296,400 | $37,050 | $37,050 |
| A4 | 1 | 1 | $2,700 | $2,700 | $0 | $0 |
| B1 | 1 | 1 | $36,950 | $36,950 | $25,939 | $25,939 |
| | | | | | | |
| **Total** | **576** | **724** | **$1,109,200** | **$1,352,250** | **$231,489** | **$331,589** |

As reflected in the Executive Summary, we anticipate the progress of cases moving to determination, both approved and denied, to increase in 2015. With fifty (50) percent of the

remaining active 2014 Claims moving to determination by April 2015, and the remainder moving to determination by October 2015, the Claims Administrator anticipates that the total claims eligible for SPC compensation will increase.   In addition to the claims eligible for payment increasing, the total amounts paid to Class Members eligible for SPC compensation will also increase as payment complications are resolved.

       1.   Payments for Class Members Determined Eligible for SPC Compensation

Again, as stated in the Executive Summary, Class Members can only be paid once potential obligations to third-party lienholders are resolved.  This process is dependent upon the responsiveness of both governmental agencies and private interests to reply to the Claims Administrator's requests for information and resolution.  As shown in Table 6, above, during the Reporting Period, the Claims Administrator paid $231,489 to Class Members, for a total of $331,589 in SPC payments to date.  The table below shows the approvals and payments for all claims for SPCs, broken down by compensation level.

Of the 724 Class Members who received an SPC Notice of Determination, 523 have payment complications that, per Section XXIX of the MSA, prevent the Claims Administrator from paying some or all of their awards.  Of the 523, 108 have omitted information in their POCF (mainly omissions in Section IX) that must be completed prior to release of funds.  The remaining 415 have other payment complications described in detail in the table below.

| TABLE 7: PAYMENT COMPLICATIONS | |
| --- | --- |
| **Payment Complication** | **Percentage of Population Impacted** |
| Pending Healthcare Lien Resolution Only | 53% |
| Pending Healthcare Lien Resolution Plus at Least One Other Payment Complication Listed Below | 13% |
| Pending at Least One Non-Healthcare Lien Resolution Complication, Such as Bankruptcy, Dual Legal Representation, Probate, Third-Party/Child Support, and/or Audit | 34% |

Healthcare lien resolution involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid.  The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury,[18] and (4) final resolution.  Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare.  The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members.  Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim.[19]  Additionally, most state Medicaid agencies agreed to a twenty (20) percent cap on and up to a thirty-five (35) percent offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending.[20]  Processing times for Medicaid-entitled Class Members eligible for payment will vary.  Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.[21]

---

[18] A Class Member must only reimburse the agency or plan for claims related to the Class Member's compensable injury.

[19] As of the end of the Reporting Period, the Claims Administrator sent a proposed agreement to twenty-six (26) state agencies asking them to (a) waive their reimbursement rights on A1 claims and (b) cap their reimbursement rights on all other claims.   Of the twenty-six (26), Texas was the only Medicaid agency that did not agree to the waiver.  As of the end of the Reporting Period, at least eighteen (18) Class Members' claims require the Claims Administrator to obtain claims from the agency, and audit and potentially dispute those claims, before final resolution can be reached and funds can be released.

[20] Two (2) of the twenty-six (26) state agencies agreed to a cap of twenty-five (25) to thirty-five (35) percent.

[21] While the Claims Administrator works directly with the state agencies to streamline processing, timelines for resolution for some states have increased due to the increased involvement of managed care organizations.

Once the payment complication(s) affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.   The Claims Administrator more than doubled the total number of payments, from 79 to 201, made since the last Reporting Period.   Additionally, the Claims Administrator is on pace to again double the number of payments made with the first two months of the new Reporting Period.[22]

### E.   The Court's July 23, 2014 Order

On July 23, 2014, the Court entered its Order Regarding Medical Benefits Settlement — Policy Statement on Classification of Chronic Physical Conditions First Diagnosed After Aril 16, 2012 (Rec. doc. 12862) (the "Order"), affirming that all physical conditions first diagnosed after April 16, 2012 shall be classified as Later-Manifested Physical Conditions, regardless of whether any such conditions are of the type listed in the Specified Physical Conditions Matrix and otherwise meet the manifestation requirements set forth in the matrix.   On August 20, 2014, Medical Benefits Class Counsel and certain claimants' counsel filed motions asking the Court to reconsider its Order.

On November 26, 2014, the Court entered an order denying the motions for reconsideration and affirming its July 23, 2014 order.   Rec. doc. 13733.   The Court also directed the Claims Administrator to review the "release issue," as described in the November 26, 2014 order, and to issue a policy statement within twenty-one (21) days of the order.   *Id.* at 6-8.   The Claims Administrator filed the policy statement which was adopted in full by the Court on January 27, 2015.   Rec. doc 14078.

---

[22] By end of month January, over 150 additional payments to Class Members eligible for SPC compensation will be made.

**F.**     **Claims Yet to Be Received: Data Disclosure Form Submissions and Results**

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields and other documentary evidence provided by BP to the Claims Administrator.  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation of a Specified Physical Condition.  *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 3,469 Data Disclosure Forms, for a total of 21,774 Data Disclosure Forms since the approval of the MSA.  The Claims Administrator responded to 5,130 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 23,323 since the approval of the MSA.  Of the 21,744 Data Disclosure Forms Received, 17,788 were related to unique claimants, while 3,986 were Data Disclosure Forms with additional information filed by same claimants.  Among the unique claimants filing Data Disclosure Forms, seventy-eight (78) percent are confirmed as Clean-Up Workers by finding a match in at least one employer database, such as the "Badged Workers" database, beyond the "Training" database.  Twelve (12) percent of those unique claimants are matched in the "Medical Encounters" database, while thirteen (13) percent are matched in a medically relevant database, such as the "Traction" or "Injury/Illness" databases.

During the Reporting Period, only twenty-five (25) percent of claimants having filed a Data Disclosure Form also filed a POCF.  By comparing the high percentage of claimants who have confirmed their class membership as Clean-Up Workers (seventy-eight (78) percent) with the percentage of claimants who have concurrently or subsequently filed POCFs (twenty-five

(25) percent), the Claims Administrator anticipates that over 15,000 POCFs have yet to be filed and believes the number could be as great as 20,000 additional POCFs yet to be filed.[23]

## III.   CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist Class Members and their attorneys with filing their claims.  During the Reporting Period, the Class Member Services Center received 15,932 telephone calls.  Since opening, the Class Member Services Center has received a total of 76,031 telephone calls.  The Class Member Services Center handled an average of 265 calls per day.  The average length of each telephone call was seven minutes and forty seconds, with an average wait time of eighteen seconds.  The Class Member Services Center also received 204 emails during the Reporting Period, and 111 individuals visited the Class Member Services Center in person.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 15,932 | 76,031 |
| Average Length of Call (min:sec) | 7:40 | 6:34 |
| Average Wait Time (min:sec) | 0:18 | 0:14 |
| Emails Received | 204 | 2007 |
| Walk-Ins | 111 | 520 |

---

[23] *See also* MOTION TO ENLARGE THE TIME TO FILE PROOF OF CLAIM FORMS FROM FEBRUARY 12, 2015 TO AUGUST 12, 2015 OR LATER AS EQUITY REQUIRES (Rec. Doc 14071), filed on January 26, 2015.

## IV.  PERIODIC MEDICAL CONSULTATION PROGRAM

### A.  Class Members Eligible for the PMCP Benefit

During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to 1,216 Class Members.  Since the inception of the settlement, the total number of Class Members receiving a PMCP Notice of Determination is 8,411.

| TABLE 9: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| PMCP Notices of Determination Sent | 1,216 | 8,411 |
| PMCP Only – Defective – Process[24] | 149 | 209 |

### B.  Provider Network

During the Reporting Period, the Claims Administrator added five (5) medical provider organizations, with forty-seven (47) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the Periodic Medical Consultation Program, bringing the total number of medical provider organizations to twenty-three (23).  These medical provider organizations represent 111 service delivery sites.  As a result of these additions, seventy-nine (79) percent of eligible Class Members resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### C.  Class Member Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 1,329 claims for participation in the PMCP and mailed 1,216 PMCP Notices of Determination.  The Claims

---

[24] Total PMCP Only claims receiving a Notice of Defect for failure to prove Class Membership.

Administrator received requests for and scheduled 249 physician visits during the Reporting Period, and Class Members attended 343 appointments in the Reporting Period.

| TABLE 10: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Approved to Receive Physician Visits[25] | 1,329 | 8,752 |
| PMCP Notices of Determination Sent | 1,216 | 8,411 |
| Physician Visits Requested and Scheduled | 249 | 632 |
| Appointments Attended by Class Members | 343 | 580 |

## V.      BACK-END LITIGATION OPTION

During the Reporting Period, thirty-three (33) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 182 Class Members to date.  Of the 33 Notices of Intent to Sue filed in the Reporting Period, four (4) were approved, twenty (20) contained deficiencies that could be corrected by the Class Member, and nine (9) were denied.

| TABLE 11: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 33 | 182 |
| Notices of Intent to Sue Approved | 4 | 9 |
| Notices of Intent to Sue Denied | 9 | 87 |
| Notices of Intent to Sue Deficient | 20 | 86 |

Out of the nine (9) approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims.  During the Reporting Period, four (4) Class Members became eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to five (5).

---

[25] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

| TABLE 12: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 4 | 9 |
| | | |
| **TOTAL:** | **4** | **9** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 4 | 9 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[26] | **4** | **5** |

## VI.    GULF REGION HEALTH OUTREACH PROGRAM

### A.    Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program was established in May 2012 to expand capacity for and access to high quality, sustainable,

---

[26] The total eligible for BELO within 2014 was 9. However, of the 9, only 5 are currently eligible for BELO. The other 4 have surpassed the 6-month period for properly and timely filing a Back-End Litigation Option lawsuit.

community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  The program consists of five (5) integrated projects: the Primary Care Capacity Project, Community Involvement, the Mental and Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Project.  As of the end of the Reporting Period, the Claims Administrator disbursed $79,081,738 to the projects, as detailed in the chart below.

| TABLE 13: GULF REGION HEALTH OUTREACH PROGRAM | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $38,660,578 |
| Community Involvement | $1,733,321 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $10,683,758 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $6,143,159 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $6,143,162 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $3,739,315 |
| Environmental Health Capacity and Literacy Project | $9,024,161 |
| Community Health Workers Training Project | $2,954,284 |
| | |
| **TOTAL:** | **$79,081,738** |

Two additional disbursements are scheduled for May 2015 and May 2016, which will bring the total funding of the Gulf Region Health Outreach Program to $105 million.

The Gulf Region Health Outreach Program is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as biweekly conference calls.  These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and

collaborate with their partners to work through issues that affect the Gulf Region Health Outreach Program as a whole.

The Claims Administrator held a quarterly meeting on November 14, 2014 in New Orleans, Louisiana, which encompassed discussion on a variety of topics, including but not limited to, continuing and increasing community involvement throughout the projects, opportunities for collaboration and evaluation between the projects, and sustainability amongst the projects.   Discussions also revolved around the five (5) Gulf Region Health Outreach Program subcommittees — the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee — formed during the July 31, 2014 quarterly meeting. These subcommittees work to increase collaboration and effectiveness of the projects, as well as assure positive impacts and sustainability within the communities which the Gulf Region Health Outreach Program affects.[27]   Though not specifically mandated by the MSA, the biweekly conference calls are also held to promote open conversation between projects regarding updates, progression, and collaboration.

The Coordinating Committee also requested the Claims Administrator to establish a Gulf Region Health Outreach Program website.   This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the Gulf Region Health Outreach Program Coordinating Committee, news/events, and publications.   The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

---

[27] The Claims Administrator held its first quarterly meeting of 2015 on January 16, 2015, in New Orleans, Louisiana. The Claims Administrator will report on that meeting in further detail in its next quarterly report.

B.     **Gulf Region Health Outreach Program Project Updates**

Each Gulf Region Health Outreach Program ("GRHOP") project has made substantial progress in achieving the goals set forth in their respective Grant Proposals.   Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute, which has:

  o Invested focal funding directly to Community Health Centers ("CHCs"): Provided funds to thirteen Federally Qualified Health Centers ("FQHCs") and FQHC Look-alikes located within the seventeen (17) coastal counties and parishes covered by the settlement program;

    ▪ Teche Action Clinic was left with a gap in core operation funding for startup of services after receiving an HRSA capital investment funding. With PCCP funds, FQHC sites are now available to serve Lafourche Parish for the first time: the new Teche Galliano site opened on September 8, and the new Teche Thibodaux site opened on September 15, 2014.

    ▪ Initiated the assessment and relationship building process with newly engaged communities in the southern part of Plaquemines Parish (Plaquemines Parish Medical Center) and Cameron Parish (West Calcasieu Parish Hospital).

  o Delivered technical assistance: offered technical assistance and individual coaching to CHCs and partners within various topic areas.[28] Uptake of technical assistance offerings is decided by the clinic, given their current capacity and priorities. Via the Regional Care Collaborative, the PCCP team, along with GRHOP partners, is facilitating collective technical assistance events and fostering peer-to-peer learning opportunities to improve quality and effectiveness of healthcare services, increase organizational capacity, and improve sustainability of community health centers in the gulf region.  On September 5, 2014, the RCC hosted a webinar session entitled "Care Teams for Care Planning." The Primary Care Development Corporation presented content about the care planning process and Judy Mitchell from the Franklin Primary Health Center provided specific case examples from the Franklin experience with care teams and the value of a multilayered care coordination system.

  o Invested **Systems Funding** that impact multiple Community Health Centers: made systems investments in the 504HealthNet (Shared Services for twenty-one (21) organizations in Greater New Orleans Area), PATH (Administrator of the Greater New Orleans Area Health Information Exchange), Health Center Controlled Network

---

[28] Quality Improvement Strategies (including Patient Centered Medical Homes Model), Electronic Health Record Implementation and Optimization, Transitions of Care and Care Coordination, Health Informatics, Mental/Behavioral Health Integration, Improving Clinic Operational Efficiency and Financial Performance, Public Relations, Telemedicine, Emergency Preparedness, Clinic Monitoring and Evaluation, and Business Processes.

within Alabama (Interface connections to administer project led by the Alabama Primary Health Care Association) and C-Change Patient Navigator Project (Mississippi Patient Navigators dedicated to Cancer Prevention administered by CommonHealth Action);

o Worked towards developing a special subproject, in partnership with the Prevention Institute, that will fund CHC demonstration projects to support and incentivize CHCs to implement the Community-Centered Health Home model;

o Completed Phase One Close-Out activities for the first round of eleven (11) cooperative agreements with Community Health Centers ("CHCs"). Implementing Phase Two, the PCCP Team developed thirteen (13) Phase Two Cooperative Agreements with CHCs across Louisiana, Mississippi, Alabama, and Florida;

o Completed clinic assessments for the newly engaged communities in the southern part of Plaquemines Parish (Plaquemines Medical Center) and Cameron Parish (West Calcasieu Cameron Parish Hospital) and is planning Cooperative Agreement Negotiations Meetings for next quarter;

o Facilitated further development around direct systems investments across the Gulf region, which include investments that improve access and quality of care in these primary care practices. There is also a prospect of fourth year funding to those currently funded CHCs;

o Developed a quality initiative project, in partnership with the Prevention Institute that will fund CHC demonstration projects to support and incentivize CHCs to implement the Community-Centered Health Home ("CCHH") model. After announcing the funding opportunity to eligible CHCs within the GRHOP jurisdiction and hosting an informational webinar, nine (9) applications were received and are currently under review. Announcement of awards will be made next quarter; and

o As part of the Regional Care Collaborative, (1) a webinar was held for all partners and CHCs around Emergency Preparedness with the Escambia Community Clinic as the main presenter, and (2) a Key Informant Emergency Preparedness Meeting was held with representation from the primary care associations in Louisiana, Mississippi, Alabama, and Florida.

- **Alliance Institute**'s outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, has:

   o Identified and executed contracts with Community-Based Organizations ("CBOs") in Louisiana, Mississippi, and Alabama – including Vietnamese Initiatives in Economic

23

Training and Bayou Interfaith Shared Community Organizing in Louisiana, Steps Coalition in Mississippi, and Boat People SOS in Alabama;

o   Led a symposium on how the implementation of the Affordable Care Act will impact Gulf State communities in Louisiana, Mississippi, Alabama, and Florida;

o   Identified participants for focus groups for community health assessments and key informant interviews;

o   Provided technical skills assistance to the CBOs in the areas of financial infrastructure, outreach methodologies, leadership development,  and alternative fund stream development;

o   Begun the process of building State Health Coalitions via meetings with the CBOs, Gulf Region Health Outreach Program partners, participating health centers, as well as in-state partners and strategic allies;

o   Provided capacity building services to our partner CBOs has resulted in directly reaching over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida, increasing usage of services at local health centers and increasing resident participation in GRHOP partner programs; exposure to national experts on fundraising, program development, and Community Centered Healthy Homes programs and the social determinants of health.

o   Set regularly scheduled meetings with community and coalition partners resulting in deeper relationships between CBOs and health centers (i.e., making health center space available for community meetings); consideration of CBO representatives to health center Board of Directors, and collaborative fundraising and community improvement efforts.

o   Continued to work towards establishing an outreach partner for Florida.

- The **Environmental Health Capacity and Literacy Project**, with its grantee being Tulane University, has achieved the following:

   o   Environmental Health Education and Referral Program

   - Issued two Requests for Proposals for the development of continuing medical education modules on the possible health effects of dispersants and on taking an environmental history with an emphasis on issues related to the Gulf Coast; and

   - Provided occupational and environmental health ("OEH") care services to thirty-three (33) patients through an OEH medical referral network that EHCLP established at health clinics in the four-state region through September 2014.

- o Community Environmental Health Wellness Program

    - ▪ Hosted a two-(2)-day professional development workshop for community health workers placed by EHCLP and their supervisors at community-based organizations and health clinics. Twenty-eight (28) attendees from the four (4) states participated in sessions on seafood safety, air quality, chronic disease, collaborative leadership and evaluation.

    - ▪ Served at least eighty (80) families from July through December 2014 through the Fussy Baby Network New Orleans and Gulf Coast ("FBNNOGC"), a preventive intervention program that supports southeast Louisiana families with children under twelve (12) months of age.

- o Environmental Health Literacy Program: enrolled twenty-four (24) Gulf Coast high school students in the Emerging Scholars Environmental Health Sciences Academy during the summer months at Tulane University, the University of South Alabama, the University of West Florida, and the University of Southern Mississippi;

- o Collaborated with the Association of Occupational and Environmental Clinics ("AOEC") to sponsor a full-day educational session titled, "*Building OEH Capacity in the Gulf Coast and Southern Region: The Gulf Oil Spill and Beyond*," which was attended by forty-six (46) individuals.  The session, held in New Orleans, Louisiana, was implemented in partnership with the American Public Health Association and provided continuing education credits to health professionals;

- o AOEC made awards for the development of two new Environmental Health online educational modules. The University of California, San Francisco will create a module on taking an environmental history, while Yale University will complete one on possible health effects of dispersants;

- o FBNNOGC received three (3) years of grant funding from the Institute of Mental Hygiene, which will allow the program to increase the number of vulnerable infants and families served in Orleans Parish;

- o Implemented five (5) community engagement events in October around breast cancer education and awareness for 124 participants;

- o Hosted a retreat in October 2014 for all personnel involved in implementing Emergency Scholars Programs and Science Teacher Workshops at the four (4) universities in Louisiana, Mississippi, Alabama, and Florida. Agenda topics covered accomplishments of the past year, lessons learned, and future collaborations; and

- o Released evaluation data from the first year of the CHW Placement Program, which revealed that most CHWs are satisfied with their employment; 83.3 percent strongly agreed with the statement, "I find pleasure in my job."

- • The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center, has:

o  Trained forty-nine (49) Community Health Workers through two (2) training sessions held in New Orleans, Louisiana, and Mobile, Alabama between August to October;

o  Developed a volunteer Peer Health Advocate training program, graduating eighty-five (85) trainees in 2014;

o  Scheduled  numerous additional training sessions for Community Health Workers, Peer Health Advocates, and Chronic Disease Management for 2015;

o  Built and maintained a highly trafficked website (www.coastalresourcecenter.org) and Facebook page providing information, continuing education, and networking capabilities to trainees.

o  Conducted a Peer Health Advocate training session in Destin, Florida, for twenty-eight (28) participants from Florida and Alabama. The training went smoothly and was well-received by participants.

o  Scheduled additional training sessions for 2015: Community Health Workers Training (one (1) session); Peer Health Advocate Training (four (4) sessions); Chronic Disease Management (two (2) sessions);

o  Continue to attend workshops and webinars, making presentations at professional conferences, and write for publication in academic journals;

o  Continue to expand and update CHWTP website, which recently includes photos from PHA training, as well as schedules and application materials for future training sessions; and

o  Leveraging all GRHOP activities with additional grant funds from the Baton Rouge Area Foundation and the Gulf of Mexico Research Initiative.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four academic institutions (Louisiana State University Health Sciences Center, the University of Southern Mississippi, the University of South Alabama, and the University of West Florida):

  o  MBHCP-LA has:

    ▪ Continued to expand services in FQHCs and primary care clinics;

    ▪ Improved and increased access to care in clinical and community programs including FQHCs, community clinics, and schools. In evaluating the effectiveness and satisfaction with services, both adult and child clients in clinics demonstrated improvements in behavioral and physical health symptoms, as well as high satisfaction with the behavioral health services provided. There has also been improvement in stress-related symptoms and increases in students' self-efficacy.

- Hired a senior project coordinator who, together with their team, collaborated with PCCP, clinics being serviced, and Louisiana Primary Care Association and will continue to explore opportunities to integrate mental and behavioral health into the electronic medical records in the clinics, which will contribute to accessibility of records and improved clinical care.

- Made considerable progress in improving the care continuity and research tracking aspects of the program by developing customized, HIPAA compliant, patient registry and call tracking system, which will provide more efficient clinical care for patients and improve the evaluation.

- Worked with state associations to establish principles for psychiatrists and psychologists who provide telepsychiatry services to primary care populations.

- Expanded child and adolescent services including a young child program providing increased consultations, trainings, and services for parents and young children, zero (0) to five (5) years, in FQHCs, primary care clinics, schools and Head Start centers in designated parishes; and

- Worked with MBHCP-FL to offer collaborative training in Child-Parent Psychotherapy (for children zero (0) to five (5) years) for mental health providers in designated counties in Florida.

o MBHCP-MS has:

- Accepted ten (10) second-year MSW students that will be trained in the provision of integrated health services;

- Formed an evaluation team to develop protocols that will assist the FQHC with identifying service gaps and measuring program outcomes;

- Increased their M-IHDP presence in eight (8) coastal clinics – increasing the total by three (3) clinics;

- Hired two (2) new licensed social workers.  One will focus on developing home-based/community-based services for the care coordination program that targets patients with chronic illnesses.  The other will focus on developing the care coordination program at Moss Point;

- Developed a child obesity program in Bay St. Louis;

- Developed a hypertension curriculum to be implemented in 2015;

- Extended relationships with nutrition faculty with plans for creating diet/nutritional plans;

- Modified the electronic data collection system ("Dagger") for M-IHDP to support the plans of the statisticians for enhanced analysis; and

- Established a MS-HIN advisory group with representation from state agencies and hospital CEOs and CIOs;

o MBHCP-AL has:

- Participated in engagement in establishing integrated health;

  ➢ Engaged with the overall primary care provider group at the Mobile County Health Department, and made presentations at multiple provider meetings, which resulted in provider-wide vote to adopt an all-clinic policy regarding universal screening, implement the BH work flow plan recommended by this project, and utilize BH screening and referral process designed by BH providers.

  ➢ Engaged in numerous notable activities – the Mobile Advisory Board, NIH/NIHS resiliency for clinician courses, enhancement of plans for the JROTC STEM academy, and contributed to the Bayou La'Batre initiative for the Public-Private-Philanthropic Partnership.

- Embedded the model with each FQHC's unique structure and workflow processes; and

  ➢ Delineated and disseminated indicators of additional screening necessity regarding the Mobile County Health Department's recently accepted policy for PHQ9 screening;

  ➢ Incorporated BH providers into many previously established FQHC programs and clinics.

- Created enduring integrated health practices that will continue after the completion of the MBHCP-AL project.

  ➢ Continued funding, utilization, and training of graduate students in the Clinical Counseling Ph.D. program, creating enduring impact on the mental and behavioral health capacity of Lower Alabama;

  ➢ Presented GRHOP related information in numerous venues/regional and national conferences; and

  ➢ Worked in conjunction with MBHCP-FL and other community partners and organized and sponsored the second annual Generational Resilience Conference as part of the project's goal of establishing an enduring regional annual event that addresses population resiliency. The goal of the two-day conference was to highlight the confluence of physical and mental health on overall resiliency.

- o MBHCP-FL has:

    - Worked to find other high-population Medicaid clinics to further expand services;

    - Effectively place a clinician in a local pediatric clinic associated with Sacred Heart Hospital;

    - Created two (2) permanent, full-time positions within primary care clinics for mental/behavioral health clinicians (PanCare and ECC-Lanza Pediatrics), thus increasing sustainability; and

    - Continues to collaborate with other GRHOP partners in both Florida and across the states on opportunities to leverage funds to meet GRHOP grant goals and objectives, while providing high quality services and training within the communities.

## VII.  GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

As of the end of the Reporting Period, the Library housed over 103,690 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA.  The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
       Matthew L. Garretson

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 30th day of January, 2015.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson