UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION
SECTION "J"

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

JUDGE BARBIER
MAG. JUDGE SHUSHAN

Sworn Statement of VERNON ERNEST ALFONSO, JR., [redacted], reported on Wednesday, January 21, 2015 beginning at 8:53 p.m.

APPEARANCES:

FAEGRE, BAKER & DANIELS, LLC
(BY: CRAIG COLEMAN, ESQUIRE)
2200 WELLS FARGO CENTER
MINNEAPOLIS, MINNESOTA 55402
612.766.6981
craig.coleman&faegrebd.com
ATTORNEYS FOR VERNON ERNEST ALFONSO, JR.

PEPPER HAMILTON, LLP
(BY: ALEJANDRO SALICRUP, ESQUIRE
MARIA A. FEELEY, ESQUIRE)
3000 TWO LOGAN SQUARE
EIGHTEENTH AND ARCH STREETS
PHILADELPHIA, PENNSYLVANIA 19103-2799
215.981.4418
salicrupa@pepperlaw.com
feeleym@pepperlaw.com
ATTORNEYS ON BEHALF OF SPECIAL MASTER

ALSO PRESENT:
LLOYD DAY, INVESTIGATOR

REPORTED BY:
DIANE TEWIS CLARK, RPR, RMR, CRR
CERTIFIED COURT REPORTER
LOUISIANA CERTIFICATE #73005
ARKANSAS CERTIFICATE #672

* * *

EXAMINATION INDEX

Page
EXAMINATION BY MR. SALICRUP ...........6
EXAMINATION BY MR. COLEMAN ..........194

* * *

INDEX OF EXHIBITS

Page

Exhibit No. 1 .......................22
Subpoena to Testify at a Deposition in a Civil Action with Attachment A

Exhibit No. 2 .......................57
Gulf Coast Bank MasterCards with numbers ending in [redacted] (LLC) and [redacted] (Checking)

Exhibit No. 3 .......................73
Seafood Compensation Plan Sworn Written Statement for Sufficient Documentation of Benchmark Revenue

Exhibit No. 4 .......................96
Gulf Coast Claims Facility Vernon Ernest Alfonso, Jr. Supporting Documentation for a Claim

Exhibit No. 5 ......................103
Vernon and Mary Alfonso 2008 U.S. Individual Income Tax Return

Exhibit No. 6 ......................109
Boat registration for the CAPTAIN DYLAN and the PRINCESS BRANDI

Exhibit No. 7 ......................110
Gulf Coast Claims Facility, Vernon Ernest Alfonso, Jr. Supporting Documentation for a claim

Exhibit No. 8 ......................115
2009 U.S. Individual Income Tax Return, Vernon E. Alfonso and Mary Alfonso

Exhibit No. 9 ......................119
Line 1 (Sch C (1040)) - Gross Receipts or Sales

Exhibit No. 10 .....................125
Island Seafood Summary by Fisherman, 01/01/2009 through 12/31/2009

Exhibit No. 11 .....................140
Set of documents ALFONSO 000001 through ALFONSO 000482

Exhibit No. 12 .....................155
Bank records for three accounts for 2007

Exhibit No. 13 .....................155
Bank records for three accounts for 2008



Exhibit No. 14 .....................155
Bank records for three accounts for 2009

Exhibit No. 15 .....................155
Bank records for three accounts for 2010

Exhibit No. 16 .....................163
Gulf Coast Bank & Trust Company, Vernon Alfonso, Jr., [redacted] [redacted] statement



* * *

VERNON ERNEST ALFONSO, JR., after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MR. SALICRUP:

Q. Mr. Alfonso, good morning, my name is Alejandro Salicrup. This is my colleague, Maria Feeley. We're here on behalf of the Office of the Special Master who was appointed by the court to look at certain aspects of BP claims.

We're here today to take your interview. Before we begin, I'm going to give you some instructions. The court reporter is taking everything down as we speak, so only one person should speak at a time. Please wait until I finish asking my question before you respond. You must also respond verbally. That means no head nods.

Do you understand?

A. Yes, sir.

Q. If I ask a question and you respond, I will assume you understood the question.



Do you understand?

A. Yes.

Q. If I speak too fast or you don't understand what I say, please let me know and I will repeat or rephrase the question.

Do you understand?

A. Yes.

Q. You must answer everything truthfully.

Do you understand?

A. Yes.

Q. You're under oath and because you are under oath, that means you have an obligation to tell the truth. Because we are appointed by the court, it is as if you were sitting before the court today.

Do you understand?

A. Yes.

Q. Because you are under oath, the questions asked and answers given may ultimately be used in a court hearing or other proceeding.

Do you understand?

A. Yes.

Q. Is there any reason you would be



unable to tell the truth today?

A. No.

Q. Is there any reason you would be unable to remember things today?

A. No.

Q. Are you taking any medications or substances that would make you unable to tell the truth today?

A. No.

Q. Are you taking any medications or substances that would make you unable to remember things today?

A. No.

Q. Please answer my questions fully and to the best of your knowledge. If you don't know the answer, please do not guess.

Do you understand?

A. Yes.

Q. Have you been deposed before?

A. I'm sorry?

Q. Have you been part of an interview before?

A. Once -- you mean in a BP investigation?

Q. Have you been deposed in a



Page 9

separate case and have you been interviewed as part of the BP process for its claims?
A. No.
Q. So if I understand correctly, you've never been deposed?
A. No.
Q. You have never been interviewed for any BP claims?
A. No.
Q. Have you and I spoken before today?
A. No.
Q. Have you and Maria Feeley spoken before today?
A. No.
Q. This is a confidential investigation and we ask that you hold this interview in confidence. Do you understand?
A. Yes.
Q. Can you state your full name, please?
A. Vernon Ernest Alfonso, Jr.
Q. Do you have any other names?
A. No.
Q. Do you have any nicknames?

Page 10

A. No.
Q. What is your date of birth?
A. [redacted]
Q. What is your place of birth?
A. New Orleans.
Q. Can you state the state?
A. Oh, Louisiana.
Q. Thank you. What is your Social Security number?
A. [redacted]
Q. Can you please provide your home address?
A. It's [redacted]
Q. How long have you lived there?
A. Probably right after Katrina, probably, I guess, since '06, '07. I'm not positive -- I know it was right after Katrina.
Q. I think Katrina was in 2005.
A. It was '05, so it was either '06 or '07, when I bought that property.
Q. Are you considering a move from that location?
A. No, not at the moment.

Page 11

Q. Have you made any plans to move from your current address?
A. Not at the moment.
Q. Can you walk me through your educational background?
A. I attended St. Bernard High School, graduated from St. Bernard.
Q. Where is St. Bernard?
A. It's down in -- below New Orleans, about 20, 30 miles.
Q. Is it part of New Orleans?
A. I wouldn't say it's part of New Orleans. St. Bernard Parish, it's a different parish.
Q. What was your education after high school?
A. That was it.
Q. That was it. Can you walk me through your employment history?
A. Basically commercial fishing and whatever else I had to do, but, basically, that's what I started out, commercial fishing.
Q. You started being a commercial fisherman in high school?

Page 12

A. Probably before high school. I was born into -- my dad was a commercial fisherman and his dad was a commercial fisherman.
Q. A long line of fisherman?
A. Yeah, yeah. I started with my grandpa probably when I was 12 years old or something.
Q. And do you work other jobs besides being a commercial fisherman?
A. Sometimes.
Q. Can you tell me what those jobs are?
A. I did construction work, I did some like seismograph work, stuff like that.
Q. When you mean seismographic work, can you explain that a little bit?
A. In the oilfield industry, you know, companies would go and, you know, look for oil and stuff and --
Q. Are you a seismographer, what is your role?
A. No. I would be more like a crewman. I would use my boat and bring people around.



Page 13

Q. So you kind of just help the people get to where they needed to go --
A. Right.
Q. -- with your boat?
A. Right.
Q. Did you always use your boat when you were working seismographic?
A. Most of the time, yeah. I mean -- I mean, we -- yeah, sometimes I ran other people's boats, but most of the time it was my boat.
Q. And then when did you start doing that kind of work?
A. That would be hard to pinpoint, but I would say probably in the '90s, like '92, '93.
Q. And do you still do that work today?
A. No.
Q. Do you do that work every year since '93, I would say?
A. No. We had a little -- we had a -- it had a run for a little while, as far as -- you know, the oil industry and that kind of faded out probably -- probably by

Page 14

the end of the '90s, I would suppose.
Q. You said "we." What did you mean by we?
A. Well, they had other people that worked the jobs with us, you know, as far as --
Q. Who are those people?
A. Just cousins and friends and different people.
Q. Family members?
A. Yeah.
Q. Did you engage in seismographic work in 2007?
A. In '7? I don't think so, no. Not that I can remember, no.
Q. What about 2008?
A. I don't remember. I'm not sure if we did -- I did do -- I probably did a little -- moved an oil rig maybe in '7 or '8. I can't pinpoint it exactly, what year it was. I know it was around that time, you know, that I can remember. I escorted a drilling rig.
Q. Okay. And that was in 2007, 2008?
A. I can't say for sure. I'm just --

Page 15

no, I can't say for sure.
Q. Do you watch baseball? I think 2007 the Phillies won the World Series, was it that year? A very important year.
A. I can't tell you that.
MR. COLEMAN:
That was memorable.
THE WITNESS:
I can't tell you that. I'm not a big baseball fan, more football.
EXAMINATION BY MR. SALICRUP:
Q. Besides your seismographic work, do you do other kinds of work or have you done other kinds of work?
A. Construction, that's about it.
Q. Construction. When did you start working on construction?
A. That started after Katrina.
Q. And what year was that?
A. That was in -- Katrina was in '05.
Q. Okay.
A. So it probably started the end of 05.
Q. So, let's say, November 2005 approximately?

Page 16

A. Probably.
Q. Around that time?
A. Yeah, around.
Q. And how long did you work in construction?
A. I worked probably till -- probably the end of '09, I would say, sometime in '09.
Q. So if I understand correctly, you worked from, let's say, November 2005, give or take a month, through the end of 2009, you worked in construction, correct?
A. Yes. Not totally, but, yes. I did shrimping, too. I didn't --
Q. You did shrimping as well?
A. Yes. I did construction work, because my boat was damaged in Katrina, and so, you know, the little bit I could use it, I used it.
Q. Okay. And you said you've been a commercial fisherman basically all your life, before high school?
A. Yes.
Q. Maybe even middle school you were helping your relatives engaging in



Page 17

commercial fishing. Have you done that every year to the present day?
A. That I can remember.
Q. So it's accurate to say that you were a commercial fisherman in 2007, correct?
A. 2007? I'm not sure. I'm really not sure. I can't remember back that far. If I did commercial -- I think I did, but I'm not sure.
Q. Mr. Alfonso, did you prepare for this interview today?
A. Did I prepare how? In what way like?
Q. What way do you think I mean?
A. I really don't know. I mean, I just --
Q. Did you use any documents to refresh your recollection today?
A. No, not really.
Q. Could you -- is it no or not really?
A. Well, I'm not -- no.
Q. You did not look at any documents?
A. No -- I'm not sure what I looked

Page 18

at. I'm not sure. I'm trying -- I might have looked at my -- no, I don't know what I looked at. I'm not sure.
Q. But you looked at something?
A. Yeah.
Q. You looked at something. Can you try to tell me what you looked at?
A. I might have looked at -- I'm not sure what I looked at. I really don't know.
MR. COLEMAN:
So --
THE WITNESS:
I mean, I looked at my bank statements.
MR. COLEMAN:
Yeah, go ahead, if you want to finish your answer. I don't want to interrupt.
THE WITNESS:
I know I looked at my bank statements. I know that.
EXAMINATION BY MR. SALICRUP:
Q. You looked at your bank statements?
A. Yes.

Page 19

Q. Are you referring to the bank statements that you provided --
A. That I provided.
Q. -- that you provided us this morning?
A. Yes.
Q. Did you look at any other bank statements that you did not provide us this morning?
A. No. I provided everything I had.
Q. And did you look at any other documents to refresh your recollection?
A. No, not that I remember. I mean, I may have looked at something. I may have looked at --
Q. I'm going to have to ask you that, the conversation is between you and me.
A. I'm sorry.
MR. COLEMAN:
Well, I just want to make sure he's clear on privilege. I don't know if you're struggling with that or not.
We did meet with him yesterday and if you want to establish that, that's fine. If he asked you about what we talked about,

Page 20

I would consider that subject to attorney-client privilege and you shouldn't answer. If he asks you if we looked at any documents, that's not provided by privilege, you should go ahead and answer. If you remember.
THE WITNESS:
Oh, okay. Well, no, I didn't.
MR. COLEMAN:
Go ahead.
EXAMINATION BY MR. SALICRUP:
Q. No, you didn't what?
A. I didn't look at any other documents as far as --
Q. And just like your counsel said, you're under oath today.
A. Okay.
Q. I won't ask if what you discussed with your attorney, because that is protected, I can't go there. But I can ask you about what documents you looked at.
So besides those bank documents, did you look at any other documents today?
A. No.
Q. Did you look at any of the



documents that were produced today?
A. No.
Q. No?
A. (Nods head negatively).
Q. Please answer verbally.
A. No.
Q. Just for the record, not because I want you to.
Did you do anything else to prepare for the interview?
A. No. The only thing I did was meet with my attorney.
Q. Did you make any notes?
A. No.
Q. Did you speak or meet with anyone to prepare for this interview?
A. Other than my attorney, no.
Q. And when did you meet with your attorney?
A. Yesterday evening.
Q. Yesterday evening. How long did you meet with your attorney?
A. I imagine an hour or two.
Q. Closer to two?
A. Maybe two.

Q. Two, more than two?
A. No, no more than two, two.
Q. Two. Was anyone else present?
A. My wife.
Q. Your wife was present?
A. Yes.
Q. Is your wife represented by Mr. Coleman?
A. No.
Q. And have you kept any files on this claim?
A. Other than my taxes, that's about it. My taxes and maybe trip tickets, trip tickets.
Q. Do you have any other diaries or calendars that you may have used, faxes, relating to this claim?
A. No.
MR. SALICRUP:
I'm now going to show you the subpoena with attachment A, I'm going to ask the court reporter to mark this as Exhibit 1.
(Exhibit No. 1 marked for identification.)

EXAMINATION BY MR. SALICRUP:
Q. Please review Exhibit 1 and let me know when you're finished, okay?
A. Okay. (Reading).
MR. COLEMAN:
You know what, you don't have to read all of that.
THE WITNESS:
Okay.
EXAMINATION BY MR. SALICRUP:
Q. Is Exhibit 1 a copy of the subpoena and attachment that you received to appear for this interview here today?
A. Yes.
Q. Can you please turn to attachment A which would be the last page?
A. Last page, okay.
Q. Have you seen the document request attached as attachment A to the subpoena before?
A. Yes, I think I did see this.
Q. Let's walk through attachment A. Can you please read Paragraph A?
A. "Any and all records or documents including electronically stored information

which support or relate in any way to shrimp boat captain's claim or shrimp vessel's owner claim made by Vernon Alfonso, Jr."
Q. Did you provide all the documents requested by heading A or the attachment A to the subpoena?
A. Yes.
Q. Can you please -- and that includes any electronically stored information you may have on your computer, correct?
A. Right. Yes.
Q. What about Paragraph B, can you read that, please?
A. For the period of time from January 1st, 2007 to December 31st, 2010, any and all records or documents including electronically stored information.
Q. Just read Paragraph 1.
A. Relating to bank account utilized on behalf of Vernon Alfonso, Jr., including but not limited to banking records.
Q. Have you provided all of the information requested by Paragraph B and heading 1 of attachment A to Exhibit 1?



Page 25

A. Yes.
Q. I know that you provided some information to us regarding your bank accounts this morning.
A. Yes.
Q. Do you have any other bank accounts?
A. No.
Q. Can you tell me how many bank accounts you have?
A. Three.
Q. Are they in different banks or the same bank?
A. The same bank.
Q. What bank is that?
A. That's Gulf Coast Bank.
Q. How long have you been at Gulf Coast Bank, how long have you banked with them?
A. Since -- since '06, I would say.
MS. FEELEY:
Off the record.
(Whereupon, an off-the-record discussion was held.)
THE WITNESS:

Page 26

'06.
MR. SALICRUP:
Court reporter, you got his response of '06, correct?
THE REPORTER:
Yes.
(Whereupon, an off-the-record discussion was held.)
MR. SALICRUP:
Court reporter, can you remind me what the last question asked was?
(Whereupon, the requested testimony was read by the Court Reporter)
"Q How long have you been at Gulf Coast Bank, how long have you banked with them?"
EXAMINATION BY MR. SALICRUP:
Q. And are you still banking at Gulf Coast Bank?
A. Yes.
Q. And if I'm understanding you, you banked with Gulf Coast Bank between -- from 2006 to the present?
A. To the present.
Q. Uninterrupted?

Page 27

A. Yes.
Q. And you said you had three accounts. Can you tell me what kind of accounts they are?
A. I have a savings account, I have a house checking account and I have a personal account that I use for my boat expenses and things like that.
Q. And are you the only person authorized on those three accounts?
A. No.
Q. Who else?
A. My wife Mary Ann Alfonso.
Q. Anybody else?
A. No.
Q. What do you use your savings account for?
A. Just to put in savings for, you know -- just a savings account really. If we need the money, we take it out and pay bills.
Q. You pay bills out of your savings account and use it for day-to-day expenses, is that fair to say?
A. Yes.

Page 28

Q. And your second account, correct me if I'm wrong, it's a checking account?
A. Yes.
Q. What do you use your checking account for?
A. My checking account is mainly for the boat expenses.
Q. When you say mainly for the boat expenses, what do you mean by that?
A. Well, fuel costs, or any kind of breakdowns or anything I need, equipment.
Q. What kind of equipment do you need for your boat?
A. Nets, sometimes we will buy, you know, any kind of supplies, grocery supplies.
Q. Any other necessities for your boat that you need?
A. Just repairs or stuff like that, repairs and fuel.
Q. And when you say mainly, do you use that checking account for other things?
A. Yes.
Q. What kind of other things?
A. I mean, as far as fuel for the



truck sometimes.
Q. For the truck?
A. Yeah, my pickup truck.
Q. Is your truck related to your fishing operation?
A. Yes.
Q. What do you use your truck for? I don't know anything about fishing, let's get that very clear. So just walk me through what you need it for.
A. Okay. Just to haul nets or haul shrimp or any kind of equipment.
Q. Okay.
A. Back and forth. I live about 25 minutes from the boat, traveling.
Q. What is the size of your boat?
A. The size?
Q. Yes.
A. It's 37 foot.
Q. And is that an ice or freeze --
A. Ice boat.
Q. Ice boat. What was the third account that you mentioned?
A. The house account.
Q. The house account. And what do

you use the house account for?
A. To pay bills. You know, electric, water.
Q. Anything else?
A. I imagine my wife spends groceries, stuff like that.
Q. Do you manage any of these accounts?
A. No.
Q. What deposits are made into your savings account?
A. Paychecks, whatever I earn or whatever. When I collect, I usually give my wife the check and she deposits it in an account.
Q. Okay. When you say I get paid or whatever, what do you mean by that?
A. Like if -- when I collect it at the end of the week from shrimping, something like that, I will give her the check and she will deposit money in my account if I need money for fuel.
Q. When you say my account, what do you mean by that?
A. My boating account.

Q. Okay. Right now we're talking about your savings account.
A. Okay.
Q. What deposits are made into the savings account?
A. That's at my wife's discretion, what she feels she can save.
Q. Okay.
A. And what she needs for bills.
Q. And what deposits are made into your checking account?
A. Whatever -- if I ask her to deposit money in there for fuel and expenses.
Q. So walk me through. You get up, I imagine, God knows what time, before the sun rises, you get on your boat --
A. Yes.
Q. -- you take your boat out?
A. (Nodding head affirmatively).
Q. What happens after that?
A. I usually go out for three to four days, depending on how the shrimp is running, and when I come in, we will unload, and, you know, I don't collect it as soon as

I come in. It might be the end of the week or the end of next week.
Q. I didn't understand that. Run it by me again.
A. I'm sorry.
Q. No, no, no. It's not you, it's me. Like I said, I don't know anything about fishing. So just explain it like you would explain it to a seven year old.
A. Okay, I'm sorry. We -- when we come in at the end of the trip, we unload and -- at the shrimp dock and they will -- usually, it's like the end of the week or the end of the following week, whenever you get paid.
Q. Who pays you?
A. The dealer, the shrimp dealer that we sell to at the dock.
Q. Who do you sell to at the dock?
A. I sell to -- now I sell to Tino Seafood, Tino Mones Seafood. That's my shrimp dealer now.
Q. Can you spell that name?
A. T-I-N-O.
Q. And you said something I didn't



Page 33

understand.
A. Mones.
Q. How do you spell that?
A. M-O-N-E-S.
Q. Seafood?
A. Seafood.
Q. And where -- is that a name, is it Mr. Mones or --
A. Yes.
Q. Where is Mr. Mones based?
A. He's at Delacroix, Delacroix Island.
Q. Near where you live?
A. Yes.
Q. Before Mr. Mones, who did you sell to?
A. I sold to Island Seafood.
Q. Island?
A. Island Seafood.
Q. Who is the owner of Island Seafood?
A. That would be Curtis Morales.
Q. Did you sell to Island Seafood in 2007?
A. Yes.

Page 34

Q. Did you sell to Island Seafood in 2008?
A. Yes.
Q. What about 2009, did you sell to Island Seafood?
A. Yes.
Q. Did you sell to anybody else?
A. Probably. I can't remember who, but he was my main dealer, my main shrimp dock. Because we -- sometimes we travel, we go in different areas, and we might sell a local dock in that area.
Q. When you say "we," what does that mean?
A. I'm sorry, it's my expression that I say all the time. I don't know why, it's just habit.
Q. No, it's fine. I just want to make sure.
A. My wife says the same thing.
Q. You're not saying anything wrong, I'm making sure that I understand what you're saying.
A. It's just habit.
Q. Got you. So in 2009, you sold

Page 35

your seafood to Island Seafood, correct?
A. Yes.
Q. And so you get to --
A. Yes.
Q. -- the dock, right?
A. Yes.
Q. Let's bring a little clarity to what happens when you get to the dock with your haul of shrimp. Is a dealer waiting for you there?
A. Yes.
Q. And what happens?
A. We -- we unload the boat. Usually he has a crew, you know, a boat and unload the catch and lay it out.
Q. Okay.
A. And he will ice it, re-ice it and either put it on the truck to be delivered or put it in his cooler.
Q. Who does the shrimp count?
A. The dealer.
Q. Does he do that when he gets on the boat?
A. He does that when the shrimp come off the boat.

Page 36

Q. Okay. And does he pay you in advance at that point?
A. No.
Q. No?
A. No.
Q. So you bring in, I don't know, how much would you say is a good haul of shrimp?
A. 3,000 pounds.
Q. That will fit in a 37-foot vessel?
A. Yes.
Q. So you bring in 3,000 pounds of shrimp in. Mr. -- the Island Seafood owner is there, he comes onto your vessel, he measures the shrimp, tells you the count, doesn't pay you and leaves?
A. That's correct.
Q. And then you get paid the next week?
A. Yes.
Q. How do you get paid?
A. By check.
Q. By check?
A. Yes.
Q. Is that check -- do you go to the dealer's office? Did you go to Island



Seafood's office to pick up the check?
A. Yes.
Q. He never mailed them?
A. No, he don't mail them. We pick them up.
Q. You pick up the check and then what do you do with it?
A. Usually, I will bring the check home, I will sign it.
Q. What do you mean you sign it?
A. I will sign the back of it, and give it to my wife and she will sign and she deposits it in accounts she needs to deposit it in.
Q. It sounds like your wife is the chief financial officer of your home, is that correct?
A. Yes, I suppose so.
Q. So you -- so you don't know where the money is deposited once you give your wife the check?
A. Usually, I will tell her the specific amount to put in my account and then she will -- she decides on the rest, what she can save and what she needs for

bills.
Q. Run that by me one more time.
A. Usually, she will deposit a certain amount in my checking account for my boat.
Q. Okay.
A. And the rest, she uses at her discretion on what she needs for bills and what she can put in the savings account.
Q. So around 2009, what would be a good price for 3,000 pound of shrimp?
A. I don't remember the prices. I know they wasn't good, but I really don't remember the prices.
Q. Okay. Let's just say that you got $2,000 for it, I don't know if that's accurate for market value, but let's assume that, and you hand your wife a check for $2,000, and you endorse it. You stated that your wife will then put it in your checking account that you to use for your boat expenses. She will put an amount there, who determines that amount?
A. Me.
Q. So you tell your wife I need 1500

in my checking account?
A. If that's what I need.
Q. And then the remaining 500, where do they go?
A. She will decide -- if she has bills to pay, she will put it in her checking account to pay bills.
Q. So you just tell her how much is going to your checking account and the rest is distributed as she sees fit?
A. Right.
Q. And who determines how much is placed into the savings account?
A. Her.
Q. Her?
A. Yes.
Q. So she determines how much -- you determine the amount going to the checking account, she determines the amount going to savings and who determines the amount going to the house account?
A. Her.
Q. Her being your wife?
A. Yeah, my wife, I'm sorry.
Q. And you don't use any other type

of alternative banking methods or anything like that?
A. No, I mean, occasionally if I need cash, I will tell her to save me X amount of dollars in cash.
Q. Good. You don't buy bitcoins or something like that, do you?
A. No.
Q. Can we go to Paragraph 2 of Attachment A -- excuse me, B2 of Paragraph A?
A. (Reading) okay, it says: "Relating to the employment, income revenue contracted or employment of Vernon Alfonso, Jr., including, but not limited to canceled checks or paystubs."
Q. Okay. Just a clarification, the first portion of B2 says: "Relating to the payment, income revenue, contracting or employment."
Did you provide all these documents?
A. Yes.
Q. Did you look -- where did you look to find this information?



Page 41

A. The -- through my records.
Q. What records were those?
A. The bank statements and anything I had relating to these years that you requested.
Q. What are these years that I requested?
A. '07 to '10.
Q. Okay. So you searched through your banking records. Where do you keep those?
A. In the file cabinet.
Q. The file cabinet in your house?
A. Yes.
Q. Do you have an office?
A. Yes.
Q. Is the filing cabinet in -- is the office in your house?
A. Yes.
Q. Did you look anywhere else?
A. No.
Q. What about the information relating to B1, the banking records, where did you look for that information?
A. In my records, in my office.

Page 42

Q. In the same filing cabinet?
A. Yes.
Q. In a different drawer?
A. I -- my wife takes care of that.
Q. Okay. So did you look for them or did your wife look for them?
A. My wife looked for them.
Q. Okay. She looked for them --
A. Right.
Q. -- because she's the one that manages this, your accounts?
A. Right.
Q. Did your wife look anywhere else?
A. Not through my account, no.
Q. Did you ask your wife if she looked anywhere else?
A. I asked her to look through the records that she had and pull out all the bank statements.
Q. Did you show her Attachment A to the subpoena?
A. No, I don't think I did. I think I just asked her to pull out any records she had relating to '07 to '10.
Q. Did you tell her '07 to '10 for

Page 43

banking records or did you just say, 2007 through 2010?
A. I'm not exactly sure how I told her. I just told her -- I know I told her we needed all the banking records from '07 to '10.
Q. Is it possible that there could be other banking records that, because she's the one that manages the accounts, she did not give you?
A. She gave me everything she had. I know that.
Q. Can you read Paragraph B3, please?
A. "Concerning services or work by Vernon Alfonso, Jr., including dates and types of services rendered or work performed."
Q. Did you provide all the documents covered by Paragraph B3?
A. Yes.
Q. Where did you look for those records?
A. That would be in my filing cabinet, any records I have.
Q. Is it the same filing cabinet that

Page 44

you referenced a second ago?
A. Yes.
Q. And was it a similar situation, did you tell your wife that you needed records for 2007 through 2010 and she looked them up?
A. Yes.
Q. Is there anywhere else that you or your wife looked for these records?
A. No. Everything we have would be in that filing cabinet.
Q. And is there -- because your wife looked for the records, is it possible that she didn't include some documents that were responsive to Paragraph B3?
A. No. She would have included everything we have.
Q. Please read B4.
A. No. 4?
Q. Yes, sir.
A. "Including Internal Revenue Service, IRS forms 1099 or other IRS documents relating to or received by, sent to, issued to, or prepared by, for or on behalf of Vernon Alfonso."

Q. Sir, did you provide all the documents requested by Paragraph B4?
A. Yes.
Q. And where did you obtain these documents?
A. In my filing cabinet.
Q. Did you look anywhere else?
A. No.
Q. Did you look for them or did your wife look for them?
A. My wife.
Q. And you communicated to your wife that you needed what exactly?
A. That I needed any IRS forms that we had.
Q. And is it possible that your wife, because she didn't read Attachment A, may have left out some documents?
A. No, she would have submitted everything.
Q. Can you read Paragraph B5?
A. Sure.
"Relating to any relationship, communications and employment, contracting or payments between Vernon Alfonso, Jr., and

Frank & Sons."
Q. Did you provide all the information relating to this request?
A. Yes.
Q. Where did you look for that information?
A. In my filing cabinet.
Q. Did you look anywhere else?
A. No.
Q. Is there anywhere else that you might have documents or other information that is responsive to Paragraph B5?
A. No.
Q. Did you look for it or did your wife look for it?
A. My wife.
Q. Is it possible because you wife didn't read Attachment A, she may not have included certain documents?
A. No. I asked her -- I told her we must submit all the documents we had.
Q. Please read paragraph B6.
A. "Relating to any communications between Vernon Alfonso, Jr. and persons or entity that assisted Vernon Alfonso, Jr.

with or prepared tax forms for him."
MR. SALICRUP:
Court reporter, could you just read back where Mr. Alfonso read to make sure that we check for the accuracy. I didn't have a chance.
(Whereupon, the requested testimony was read by the Court Reporter)
"Q Relating to any communications between Vernon Alfonso, Jr. and persons or entity that assisted Vernon Alfonso, Jr. with or prepared tax forms for him."
EXAMINATION BY MR. SALICRUP:
Q. Paragraph B6 states: "Relating to any communications between Vernon Alfonso, Jr. and any person or entity that assisted Vernon Alfonso, Jr. with or prepared tax forms for him."
Sir, did you provide all the documents responsive to Paragraph B6?
A. Yes.
Q. Where did you look for those documents?
A. In my filing cabinet, where all --

with the -- all my -- all my other documents.
Q. Did you look anywhere else?
A. No.
Q. Did you ever e-mail your tax preparer?
A. No.
Q. Do you have an e-mail address?
A. Just recently I got one, probably -- I might have an e-mail address -- maybe a year.
Q. Is that gmail, what do you use?
A. Ymail.
Q. I don't know that, sir. But you did not have e-mail in 2007?
A. No.
Q. 2008?
A. No.
Q. 2009?
A. No.
Q. And do you have a computer in your home?
A. Yes.
Q. Is it a laptop or a desk top?
A. I recently have a laptop. I do



Page 49

have a desk top.
Q. Do you have -- what kind of computer did you have from 2007 through 2009?
A. Probably just a home computer, not a laptop, a regular desktop.
Q. What did you use that computer for?
A. My wife used it. I'm not sure. I don't think she stores a whole lot on it.
Q. Do you --
A. I'm not too good with computers so I'm not --
Q. I hear you and I understand better than you think.
What does your wife use the computer for?
A. I'm not sure. I imagine -- I know she plays a lot of games.
Q. Do you know what kind of games?
A. No. Cards mostly.
Q. I'm sorry?
A. Cards, card games.
Q. Oh, really?
A. Yeah.

Page 50

Q. And does she have -- do you know what software is kept on the computer?
A. No, not really. Windows.
Q. Do you know if you have Excel?
A. No, I'm not sure, I couldn't say.
Q. Do you know if you have Quicken?
A. No.
Q. Does your wife, since she's the one that manages the money, ever work with that information on the computer?
A. No.
Q. She never types up a budget for the house and says, you know, Vernon, this is how much we can spend this month and prints it out for you to take on the boat?
A. No.
Q. Does she ever print any financial information out?
A. No, she don't like banking or anything on the computer.
Q. How do you pay your bills?
A. Check.
Q. Check?
A. (Nodding head affirmatively).
Q. Never online?

Page 51

A. No. I think she has insurance that -- electronically draws the money out of the account.
Q. Okay.
A. I think she has that.
Q. What about your power bills? You can pay that stuff electronically.
A. Yeah, but she pays everything with checks.
Q. Water?
A. Water, lights.
Q. Got you. And what about statements from the bank? You can get those electronically.
A. She -- I think she receives them in the mail.
Q. She always does?
A. Yes.
Q. Are there any other documents that are responsive to Attachment A of Exhibit 1 in your possession?
A. No.
Q. Are there any other documents that are responsive to Attachment A of Exhibit 1 in any one else's possession that you are

Page 52

aware of?
A. No -- no.
Q. Have you destroyed any documents?
A. No.
Q. How far back does your wife keep statements and bills?
A. I'm not sure. I really don't know.
Q. Okay. Do you know if she, you know, goes through the files and destroys or tosses documents out?
A. No.
Q. It's possible?
A. Not that I'm aware of. I never seen her destroy documents or throw any out.
Q. And this filing cabinet, how tall is it?
A. Probably 5 foot.
Q. So this is essentially the vault where you keep everything?
A. Yes.
Q. Do you have an ATM card for your checking account?
A. Yes.
Q. Does your wife have an ATM card



for your checking account?
A. She -- for my checking account?
Q. Uh-huh (indicating affirmatively).
A. My boat account?
Q. Uh-huh (indicating affirmatively).
A. No.
Q. And do you know the number of your checking account?
A. No.
Q. Do you know your number for any of the accounts?
A. No.
Q. Do you have that ATM card with you?
A. Yes.
Q. May I see it?
A. Uh-huh (indicating affirmatively).
Q. Do you have an ATM card for the savings account or the house account?
A. I have another card. I don't use it. And I -- yeah -- I forgot about that account. That is my business account.
Q. This is a fourth account?
A. It's an account that we -- that I opened after the BP spill. This would

probably be in 2011 or 2010. I'm not sure. I don't really use it.
MR. COLEMAN:
Can you just do something to identify for the record what he's given you so that the transcript reflects it?
MR. SALICRUP:
Sure, for the record, Mr. Alfonso has provided me with an ATM debit Master Card from Gulf Bank.
THE WITNESS:
Gulf Coast Bank.
MR. SALICRUP:
I'm sorry, Gulf Coast Bank, one card ending in [redacted], which he identified as the ATM for his checking account. And he provided a second ATM card from Gulf Coast Bank which is a Master Card, with numbers ending in [redacted], which he identified as a business account.
EXAMINATION BY MR. SALICRUP:
Q. Approximately created in --
A. It's an LLC account.
Q. It's an LLC account?
A. Yes.

Q. When was the account created?
A. I would say it was after the BP spill, probably 2011.
Q. 2011. Did you have a similar account around 2007 --
A. No.
Q. -- that you may have opened and --
A. No.
Q. -- you know, after the BP spill, you just didn't need it and you said, hey, let's close it?
A. No.
Q. Aside from these four accounts, do you have any other accounts with Gulf Coast Bank or anywhere else?
A. No.
Q. Do you have lines of credit anywhere else?
A. No.
Q. What about Island Seafood?
A. Island Seafood --
Q. Do you have a line of credit?
A. No.
Q. Gas station where you fuel up, where you get your supplies?

A. No. No. I pay everything with either cash or check, cash or check or my debit card.
Q. Do you have a line of credit with Tino Mones Seafood?
A. No.
MR. SALICRUP:
Can we go off the record a second.
(Whereupon, a brief recess was taken.)
MR. SALICRUP:
Court reporter, could we enter in copies of the Gulf Coast Bank master cards for Mr. Alfonso's business account, and his checking -- correct me if I'm wrong.
EXAMINATION BY MR. SALICRUP:
Q. Is this your checking or savings?
A. That's my checking.
Q. The number ending [redacted], is that your business?
A. I have to look at the card.
Q. Why don't you just pull it out.
A. I'm sorry. Yeah, business card.
Q. So the top card --
A. That's the checking account.



Q. Ending in [redacted] is your --
A. Checking account, that's a checking account.
Q. Checking account for the boat?
A. That's a business account. This is an LLC account.
Q. [redacted] is the LLC account?
A. Yes.
Q. And the card on the bottom [redacted] is the checking account for the boat?
A. Correct.
Q. Thank you.
MR. SALICRUP:
Court reporter, could we enter copies of the business and checking account as Exhibit 2? Thank you.
(Exhibit No. 2 marked for identification.)
EXAMINATION BY MR. SALICRUP:
Q. You want to take a look at this, Exhibit 2?
A. (Reading).
Q. Can you confirm that those are the cards that you just showed me which we're now entering as Exhibit 2?

A. Yes.
Q. Mr. Alfonso, you filed a shrimp boat captain claim with the DEEPWATER HORIZON claim center, is that correct?
A. Yes.
Q. Can you walk me through that claim?
A. What I remember of it, yes.
Q. Please do so.
A. I went to the claims office and -- to file a claim and they told me the documents I needed to submit, trip tickets and tax returns and so I brought them trip tickets and tax returns and they told me I needed trip tickets from the wildlife.
Q. What do you mean by wildlife?
A. Wildlife & Fisheries Department.
Q. For which state or states?
A. Louisiana.
Q. Did you need information from any Wildlife & Fisheries Department from any other state in the Gulf Coast area?
A. No, just Louisiana.
Q. Please proceed.
A. So when I received that, I

submitted it, the trip tickets.
Q. Okay.
A. And then they requested my tax return. They told me that my tax return was my Schedule C, I believe they said, showed everything combined, construction and commercial fishing, and they asked me to have my accountant separate the two. So I had to separate it.
Q. Who is your accountant?
A. Peggy Flowers.
Q. And you requested that Peggy Flowers separate your Schedule C information?
A. I asked if she could do it, because I don't really know much about taxes. I asked if she could separate them. She said it was no problem.
Q. Did anyone at the DEEPWATER HORIZON Economic Claims Center, I'm just going to refer to them as the DHECC for ease of communication here. Did the DHECC request that you separate your Schedule Cs for any other years?
MR. COLEMAN:

I'm just going to interject one thing. Just to be clear, I think he's talking about the claim he filed on his own with GCCF, before the creation of the settlement program.
THE WITNESS:
I am.
MR. COLEMAN:
When you're referring to DHECC, that would be an entity that was created after the settlement that we dealt with.
MR. SALICRUP:
Okay.
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, right now I'm asking you about your claim with the DHECC. The DEEPWATER HORIZON Economic Claim Center. Do you know what that is?
A. I know they changed, it was GCCF, right?
Q. Do you know what GCCF stands for?
A. Gulf Coast Claim -- I'm not sure. I know I seen it before, but I don't remember exactly.
MR. COLEMAN:



Page 61

I think it's Facility or --
EXAMINATION BY MR. SALICRUP:
Q. But you are aware --
A. Oh, okay.
Q. What is the GCCF, what did they do?
A. That was the one that did the claims in the beginning.
Q. What do you mean by "did the claims in the beginning?" And I just want to make sure that you understood what the GCCF -- it was.
A. I know it was a claims center where you went to file a claim.
Q. File a claim for what?
A. For the spill, for the BP spill.
Q. Explain it to me like I was your seven-year-old kid. What is the GCCF? Why did you go there and why did they give you money?
A. We go there to file a claim for our seafood claim for losses.
Q. For losses?
A. Yes.
Q. Caused by the oil spill?

Page 62

A. Right.
Q. You went to the GCCF and you filed a boat captain claim?
A. I filed a commercial fishing claim.
Q. You filed a commercial fishing claim?
A. Yes.
Q. And the GCCF told you that you needed to split your Schedule C?
A. Right.
Q. As you stated earlier, because it had income from construction and from commercial fishing?
A. Right, it was combined.
Q. Did it have income from other sources?
A. Not that I'm aware of.
Q. Did the GCCF request that you split any other tax information?
A. I'm sorry? Could you --
Q. You stated that the GCCF asked you to redo the Schedule Cs for your 2009 return.
A. Right. Yes.

Page 63

Q. What happened then?
A. I -- I called Ms. Peggy Flowers and asked her if she could -- if she could do that, if that was possible to separate the incomes and she said, yes.
Q. Okay, and just walk me through how this process happened.
A. And I just told her, asked her to separate them and she separated it. And I submitted it to the GCCF.
Q. Did the GCCF request anything else from you?
A. They requested -- not that I remember. Just trip tickets and my tax return.
Q. For which years?
A. From '7 to '9.
Q. And the request you received was for you to -- was for 2009 or for all years?
A. I don't remember. It was -- I don't remember.
Q. Do you remember what you provided the GCCF?
A. No. I know I provided what they asked for, but I'm not sure.

Page 64

Q. Do you remember what you asked Ms. Peggy Flowers to do?
A. I just asked her to separate the fishing from the construction.
Q. For which year?
A. I don't recall.
Q. Did you work in construction in 2007?
A. Yes.
Q. Did you ask her to separate fishing income from construction income in 2007?
A. I don't remember if it was '7, '8, or '9, or if it was all of them, I don't recall.
Q. You have no recollection?
A. No.
Q. And then what happened?
A. I submitted the documents to the GCCF.
Q. And then what happened?
A. And I still don't remember because I know -- no, I don't remember.
Q. So you submitted documents to the GCCF, something must have happened --



Page 65

A. I know we was back and forth, you would go to the claim center. Every time you went, you would see somebody different and you would get different answers.
Q. Uh-huh (indicating affirmatively).
A. But the details, I don't remember.
Q. Were you going to the GCCF or was someone going to the GCCF for you?
A. I was.
Q. Did you have an attorney working for you?
A. Not at that time.
Q. And what time was this?
A. That was at the beginning. I'm not sure exactly what --
Q. Was it the year of the oil spill?
A. It was the year of the oil spill.
Q. So it was 2010?
A. 2010.
Q. Were you represented in 2010 by any attorney?
A. In 2010 -- no --
Q. I'm not referring exclusively to Mr. Coleman, I'm talking about any attorney that may have represented you.

Page 66

A. I'm not sure when I hired an attorney. I'm not exactly sure. I know during the process, I did hire an attorney, but I'm not sure exactly when it was.
Q. Did the GCCF accept the documents that you sent them?
A. To my knowledge, yes.
Q. Did they tell you anything?
A. I don't recall.
Q. Did you get paid by the GCCF?
A. I -- I got paid at the beginning, we got -- they gave us -- emergency payments, I think they called it.
Q. Okay.
A. They gave us like 5,000 for the first -- for a few payments and then that was it.
Q. So what -- how many payments did you receive?
A. I'm not exactly sure.
Q. Did you receive more than one payment?
A. Yes.
Q. Did you receive more than five payments?

Page 67

A. No. I don't think so, no.
Q. So it was between one and five?
A. Yes.
Q. Was it three?
A. Three would probably be in the area. I'm not exactly sure, but I know it was in that area.
Q. Each payment was about 5,000?
A. Around 5,000.
Q. You received around $15,000, give or take a thousand?
A. Give or take a few thousand, because I'm not exactly sure.
Q. We're not exactly sure, so we don't know how many thousands to take off. We could take one or two, who knows, but it was in the ballpark of fifteen?
A. Yes.
Q. And you received these payments in 2010?
A. No.
Q. When were the payments received?
A. This was at the beginning of the spill, probably in the beginning of 2010, right after the spill.

Page 68

Q. So you did receive them in 2010?
A. Yes.
Q. Aside from the approximate 15,000 that you received in 2010, what other payments did you receive from GCCF?
A. I don't remember any payments.
Q. So to your knowledge, you only received 15,000 from GCCF?
A. That I can remember, I received emergency payments that I can remember.
Q. Okay. And what happened then, how did -- how did we come -- how did we end up here today? You filed for GCCF, you got approximately $15,000, you gave -- they requested that you provide certain information, you went to your accountant?
A. Yes.
Q. You requested what from your accountant?
A. I just asked her to separate the fishing income and the construction income.
Q. And did she send that to you or did she send it to the GCCF?
A. She sent it to me.
Q. And then you sent it on to the



Page 69

GCCF?
A. Yes.
Q. And then what happened?
A. And then I submitted my paperwork and basically that was it.
Q. You were going to say something?
A. Yeah, I was just going to say that, you know, you didn't really get a lot of answers at the GCCF, you went there and you see somebody and the next time you go, you see someone else.
Q. Did the GCCF transition into another entity?
A. Yes, as far as I know, the DEEPWATER HORIZON.
Q. Do you know the name of the entity?
A. No.
Q. The DEEPWATER HORIZON Economic Claims Center, is that what you were referring to?
A. Yes.
Q. Is that the DHECC, are you familiar with that name?
A. No.

Page 70

Q. When I say DHECC, do you understand that I'm referring to the DEEPWATER HORIZON --
A. Yeah.
Q. -- Economic Claims Center?
A. Yes.
Q. Do you know what the DHECC did or does?
A. I just know that they took over the GCCF.
Q. Okay. When you started the process with the DHECC, you filed a shrimp boat captain claim, is that correct?
A. With the DH --
Q. DHECC?
A. I'm not sure if I had an attorney when they changed over or not.
Q. Okay. Did you have more than one attorney through this process?
A. Yes.
Q. Do you know their names?
A. The first attorney I had? No, I don't.
Q. Okay. Did you have more than one attorney?

Page 71

A. Yes.
Q. Do you know the names of any attorney that represented you?
A. Faegre, Baker, Daniels, the attorney I have now.
Q. Do you know when you began working with Faegre, Baker, Daniels?
A. I don't remember now.
Q. Were they representing you when you filed your claim at the DHECC?
A. Yes, I'm pretty sure -- I'm not --
MR. COLEMAN:
Just do it to the best of your recollection. We can clear up facts later if there are any issues.
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, your attorney is there, but forget he's there.
A. Okay.
Q. He's going to get an opportunity at the end. This is our interview. It's between you and me.
A. Okay.
Q. He will get an opportunity when I'm done.

Page 72

A. I'm not -- remembering dates and events and things that happened at a certain time, I mean, my memory is not --
Q. This is not trigonometry in the 11th grade. If you don't know, just tell me that.
A. Okay.
Q. I will accept that, but I want you to tell the truth.
A. Right, yes.
Q. Were you being represented when the GCCF transitioned to the DHECC?
A. I don't remember.
Q. Do you know what claims you filed with the DHECC?
A. I filed a commercial fishing claim.
Q. A commercial fishing claim?
A. Yes.
Q. And do you know what documents you filed in support of that claim?
A. Tax returns and trip tickets, as far as --
Q. Anything else?
A. Not that I remember.

Q. Did you file a sworn statement stating how much your fishing income was?
A. Possibly.
Q. I'm going to refer to it as a SWS1. Did you file an SWS1?
A. Yes. I remember writing one, but I don't remember exactly what I wrote or anything like that. But I remember --
Q. When you say remember writing one --
A. I remember -- I don't know if it was requested or not, but I remember writing one. I don't know if it was submitted or not, but I remember writing something about my losses.
MR. SALICRUP:
I'm going to ask the court reporter -- can we mark this as Exhibit 3.
(Exhibit No. 3 marked for identification.)
EXAMINATION BY MR. SALICRUP:
Q. Please review this document.
A. Okay.
Q. Let me know when you're done.
A. (Reading) okay.

Q. Can you identify this document for me?
A. As far as I know, it was -- this was -- I mean, I can't identify it exactly what it is, but it's my claim.
Q. I'm going to represent to you that that is your sworn written statement.
A. Okay.
Q. Also known as the SWS1, which is how I'm going to refer to it for the record. Did you write up this document -- earlier, you stated, I wrote up a statement that --
A. I remember hand writing something, that's all I remember.
Q. Is this the document you're referring to?
A. No, this is not it.
Q. Have you seen this document before?
A. Yeah. This was a document submitted by my attorney.
Q. Who was your attorney at that time?
A. Faegre, Baker, Daniels.
Q. What was the name of your

attorney?
A. Steven Crowder at the time.
Q. Steven Crowder. Anybody else from Faegre, Baker, Daniels?
A. Yes, well, the team attorneys.
Q. Do you know their names?
A. Craig Coleman and -- I'm trying to think of other ones. Mr. Nolting, yeah, he's one, and I can't remember all of them.
Q. You knew Mr. Nolting at that time, I think Mr. Nolting unfortunately has passed on. But at that time, he was your attorney, is that correct?
A. Yes.
Q. You worked with him on your claim?
A. Yes.
Q. And did you prepare this document or did he prepare this document?
A. He prepared this document for me.
Q. Did you tell him the -- did you provide the information included in this document?
A. Yes.
Q. Can you please turn to Page 2?
A. (Complying) yes.

Q. Can you state what Page 2 is?
A. Page 2 looks like a -- something -- my shrimp claim, my document on the amount.
Q. The amount of what?
A. The amount of seafood.
Q. The amount of seafood that what?
A. That was caught in '09, from what I can read here.
Q. If I understand you correctly, you're saying that this document states the amount of money that you earned?
A. Yes.
Q. For seafood that you caught in 2009, is that correct?
A. Yes.
Q. Does this document state that you landed any shrimp in the GCA? Do you know what the GCA is?
A. No, I'm not sure.
Q. GCA refers to the Gulf Coast Areas.
A. Okay.
Q. Do you know what the Gulf Coast Areas are?



Page 77

A. I'm not -- yeah, I know the Gulf Coast, where we shrimp at, yeah.
Q. Do you know what the Gulf Coast Areas means within the definitions of the DEEPWATER HORIZON BP settlement agreement?
A. No.
Q. Was that explained to you by your attorney?
A. I don't remember.
MR. COLEMAN:
I going to object to that. It's bating attorney-client privilege.
EXAMINATION BY MR. SALICRUP:
Q. Did you ever read the settlement agreement?
A. I don't remember.
Q. Have you ever seen the settlement agreement?
A. I'm not sure.
Q. Okay. Let's review this document line by line.
A. Okay.
Q. The Gulf Coast Areas, I'm going to represent to you are the areas covered by the settlement agreement.

Page 78

A. Okay.
Q. For compensation for fishermen. According to this document, how much shrimp did you land in the GCA or what was your income from shrimp landed in the GCA in 2007?
A. In 2007?
Q. Yes, sir.
A. I don't have anything here. I'm pretty sure I had, but I don't see it here.
Q. We're talking about this document.
A. Okay.
Q. What does this document state?
A. Zero.
Q. According to this document, how much income did you generate from shrimp landed in the GCA in 2008?
A. Zero.
Q. According to this document, how much shrimp was landed in the GCA in 2009?
A. 46,434.
Q. Is that $46,434?
A. Yes.
Q. According to this document, how much did you earn in income in 2007 for

Page 79

oysters landed in the GCA?
A. Zero.
Q. How much did you earn in 2008 for oysters landed in the GCA?
A. Zero.
Q. How much did you earn for oysters landed in 2009 in the GCA?
A. Zero.
Q. How much did you earn in 2007 for finfish landed in the GCA in 2007?
A. Zero.
Q. How much did you earn in 2008 for finfish landed in the GCA?
A. Zero.
Q. How much did you land (sic) in 2009 for finfish landed in the GCA?
A. Zero.
Q. How much did you earn in 2007 for blue crab landed in the GCA?
A. Zero.
Q. How much did you earn in 2008 for blue crab landed in the GCA?
A. Zero.
Q. How much did you earn in 2009 for blue crab landed in the GCA?

Page 80

A. Zero.
Q. How much did you land (sic) for other seafood landed in the GCA in 2007?
A. Zero.
Q. How much did you earn in 2008 for seafood landed -- I'm sorry, I'm going to restate that question.
How much did you earn in 2008 for other seafood landed in the GCA?
A. Zero.
Q. How much did you earn in 2009 for other seafood landed in the GCA?
A. Zero.
Q. If I understand correctly, this document states that in 2009, you only landed shrimp in the GCA, is that correct?
A. Yes.
Q. According to this document, how much did you land in 2007 outside of the GCA?
A. Zero.
Q. According to this document, how much shrimp did you land in 2008 outside of the GCA?
A. Zero.



Page 81

Q. According to this document, how much shrimp did you land outside of the GCA in 2009?
A. Zero.
Q. Does this document state that you landed any oysters, finfish, blue crab or other seafood outside the GCA for 2007, 2008, or 2009?
A. Zero.
Q. So for 2007, 2008, and 2009, you earned no income for landings outside the GCA for oyster, finfish, blue crab or other seafood?
A. Right, yes.
Q. Okay. Can you please turn to Page 2?
A. Okay.
Q. Please state the date of this document?
A. 8/16/2012.
Q. Do you remember having a conversation with your attorney about this document? Don't tell me what the conversation was. I don't want to know what he told you or you told him, I want you to

Page 82

tell me if you had a conversation.
A. I don't remember.
Q. Did he show you this document?
A. I don't remember.
Q. Did you sign this document?
A. I gave my attorney the power to sign it -- power of attorney to sign the document.
Q. So you authorized your attorney to sign this document?
A. Yes.
Q. Would your attorney sign this document -- well, were you consulted before you gave him the power of attorney?
A. Yes.
Q. Were you consulted specifically about this document?
MR. COLEMAN:
I'm going to object to that.
MR. SALICRUP:
I'm not asking about the content, I'm asking whether he was consulted.
MR. COLEMAN:
Well, I mean, you asked him if he had conversations with his attorney about

Page 83

the document and he said he didn't remember. And -- go ahead, if you want to ask the question again, if you remember any conversations at any point.
MR. SALICRUP:
Counsel, you will get your opportunity at the end. For now, I don't -- we're not --
MR. COLEMAN:
I object to the question on the record. So if you --
MR. SALICRUP:
Is that a speaking objection?
MR. COLEMAN:
No. It's -- I'm instructing him not to answer the question that you asked.
MR. SALICRUP:
Well --
MS. FEELEY:
Let's read back from what the question was.
(Whereupon, the requested testimony was read by the Court Reporter)
"Q Were you consulted specifically about this document?"

Page 84

MR. COLEMAN:
And I guess I'm fine with you giving a yes, no answer to that, or I don't recall, but I'm not okay --
EXAMINATION BY MR. SALICRUP:
Q. Please answer.
MR. COLEMAN:
No, I'm going to advise my client about attorney-client privilege.
MR. SALICRUP:
Counsel, you have done that.
MR. COLEMAN:
Well, I'm going to do it again; otherwise, I'm just going to instruct him not to answer the question.
MR. SALICRUP:
Counsel, you have already in this conversation instructed him about attorney-client privilege.
MR. COLEMAN:
Well, then, I'm just going to instruct him not to answer, if you're not okay having me advise him -- you're talking over me.
MS. FEELEY:



Please let him tell about the attorney-client privilege again. That's fine.

MR. COLEMAN:
Please.
MS. FEELEY:
That's fine.
MR. COLEMAN:
It's okay for you to answer whether -- yes or no or I don't recall as to whether you had a conversation with your attorney about this document. I don't want you going in and discussing the substance of a conversation that you had with your attorney in response to this question or any other.
So if you can answer that, the pending question, that way it's fine.
THE WITNESS:
I don't recall.
EXAMINATION BY MR. SALICRUP:
Q. Thank you for your answer. Hopefully, we can move on.
You mentioned Peggy Flowers earlier. How did you meet Peggy Flowers?

A. Ms. Peggy's probably been doing my taxes for a number of years now.
Q. Can you describe your relationship with Peggy Flowers?
A. Tax accountant, just tax accountant that takes care of my --
Q. Is it a business only relationship?
A. Mainly, yeah.
Q. When you say mainly, yeah, what do you mean by that?
A. Well, if I have a question or something, I can call on her about my tax purposes or anything like that, but that's about it.
Q. Do you ever socialize with Ms. Flowers?
A. No, not really. If -- when I go to do my taxes or something, we might ask how she's doing as far as her family standpoint or anything like that, but other than that, I don't talk to her during the year.
Q. I apologize, I'm going to ask you to repeat yourself because I didn't quite

understand.
A. Okay. I mean, when I go to file my taxes over there, I may ask her how her family is doing or, you know, something like that. That's about it. But as far as conversation during the year, not unless I have a tax question.
Q. Can you confirm for me Ms. Flowers' full-time occupation?
A. Tax accountant.
Q. When did she first start filing your taxes?
A. I'm not sure what year. It's been a while.
Q. It's been a while, so would you go back to 2008?
A. Yes.
Q. Before 2008?
A. Yes.
Q. How far back would you go? And you don't need to give a specific number if you don't recall. If you do recall, please do so.
A. I don't recall.
Q. What about 10 years before 2008?

A. I would say before '05.
Q. Before '05?
A. Yeah.
Q. Before Katrina?
A. Yeah, before Katrina.
Q. So since 2000 more or less?
A. I couldn't say.
Q. You're not sure?
A. No, I'm not sure.
Q. How much does Ms. Flowers charge you?
A. She's -- different. I'm not sure. Usually -- I couldn't be specific on the amount.
Q. You're not sure how much Ms. Flowers charges you for taxes?
A. No. It's usually different year to year.
Q. Approximately -- does she charge you approximately the same amount every year?
A. It's usually in the same range. It may be four to five hundred maybe.
Q. I'm sorry?
A. You see, I shouldn't be doing

Page 89

that.
Q. No, I just didn't --
A. I'm just guessing. Four to five hundred, I couldn't be specific.
Q. I didn't know if you said 4500 or four to five hundred, so I just wanted to make sure that I understood you.
Do you provide Peggy Flowers with records or documentation?
A. Yes.
Q. What do you provide her with?
A. I provide her with -- usually income and deductions like fuel and expenses.
Q. Do you provide her with anything else?
A. No. That's it.
Q. 1099s?
A. 1099s.
Q. W2s?
A. Yes.
Q. Anything else?
A. Insurance statements or anything like that that's required.
Q. What -- do you know the name of

Page 90

Ms. Flowers' business?
A. It's -- I can't remember.
Q. Is the name KF&L?
A. Yes, that's it.
Q. Is Ms. Flowers the only person that works at KF&L?
A. Yes, and as far as I know, her sister is like a secretary.
Q. Her sister?
A. Her sister.
Q. In 2007, was someone else besides her sister working at KF&L?
A. I don't know.
Q. Do you know, was there someone else besides Ms. Flowers' sister working at KF&L in 2008?
A. I don't know.
Q. Do you know if there was someone else besides her, Ms. Flower's sister, working at KF&L in 2009?
A. I don't know.
Q. When you worked -- not worked, when you provided information to KF&L, did you speak to anyone else besides Peggy Flowers?

Page 91

A. No.
Q. Did you ever speak with Ms. Flowers' sister?
A. Just to make an appointment.
Q. Any other relatives of Ms. Flowers that you may have spoken with?
A. No.
Q. Just Ms. Flowers?
A. (Nodding head affirmatively).
Q. You responded verbally --
A. I was belching.
MR. COLEMAN:
There is a pending question he wants an answer to.
THE WITNESS:
Oh, I'm sorry, can you repeat that?
MR. SALICRUP:
Court reporter. can you repeat the last question?
(Whereupon, the requested testimony was read by the Court Reporter)
"Q Any other relatives of Ms. Flowers that you may have spoken with?"
THE WITNESS:

Page 92

No.
EXAMINATION BY MR. SALICRUP:
Q. Did anyone else provide Peggy Flowers with records on your behalf?
A. Not that I'm aware of, no.
Q. Can you -- does your wife speak with Peggy Flowers?
A. Yes.
Q. Socially?
A. No, not unless -- to file taxes or something like that.
Q. Does your wife provide Peggy Flowers with any records?
A. It's my wife and me -- my wife and me go together to file our taxes.
Q. Okay. Does your wife ever speak to Peggy Flowers without you?
A. Occasionally she might.
Q. Do you know if she did in 2007?
A. Not that I'm aware of, no.
Q. Do you know if your wife spoke with Ms. Flowers without you being present in 2008?
A. Not that I'm aware of.
Q. Do you know if your wife spoke

without you being present in 2009?
A. Not that I'm aware of, no.
Q. Can you please describe your relationship with Frank & Sons?
A. Frank & Sons, it's a company that my aunt and my uncle own.
Q. What are the names of your aunt and uncle?
A. It's Joyce Lopez and Frank Lopez.
Q. Do you know the full name of that company?
A. Frank & Son Boat Rentals.
Q. Is that a boat rental business?
A. Yes.
Q. What else do they do?
A. As far as I know, it's just -- as far as what we did anyway, it was seismograph working.
Q. When you say "what we did," what do you mean by that?
A. My uncle and me and some of my cousins and friends, under the business, anyway.
Q. Did you do any other kind of work besides seismographic work which you earlier

described as driving people -- correct me if I'm wrong -- driving people around on your boat so that they could do something scientific and measure seismographic movement?
A. Yes. We did rig movements, and survey work, as far as like surveying different things, waterways and stuff like that.
Q. Besides the seismographic work, did you do any other work for Frank & Sons?
A. Not that I remember.
Q. When did you first start working at Frank & Sons?
A. Probably in the early '90s, '95, maybe -- I'm not sure, '93.
Q. '93, '95?
A. Yes, on that area.
Q. I would tell you who won the World Series then, but I don't think that's going to get us anywhere.
Do you still work for Frank & Sons?
A. No.
Q. Why?

A. There's no work.
Q. Does Frank & Sons still work? Is it still an operating business?
A. Yes.
Q. But they have no work for you?
A. No.
Q. When you work for Frank & Sons, do they provide you with a vessel?
A. No.
Q. How do you drive a boat?
A. My boat usually.
Q. Okay. What's the name of that boat?
A. PRINCESS BRANDI.
Q. Is that the 37-foot ice vessel that you described earlier?
A. Yes.
Q. Has it always been named PRINCESS BRANDI?
A. Yes.
Q. Is it named [redacted]?
A. [redacted].
Q. Did anyone from Frank & Sons provide you with any information regarding your tax returns?

A. Any years or certain years or -- if I worked for them, yes, then I would get a 1099.
Q. You would get a 1099?
A. Yes.
MR. SALICRUP:
Mr. Alfonso, I'm going to show you a document that I'm going to ask the court reporter to mark as Exhibit 4. Please take a second to review it and let me know when you're done.
(Exhibit No. 4 marked for identification.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, I just showed you a document. Let me know when you're done looking at it.
A. (Reading).
MS. FEELEY:
Off the record.
(Whereupon, an off-the-record discussion was held.)
EXAMINATION BY MR. SALICRUP:
Q. Are you done, sir?
A. Yes.



Q. Can you identify this document?
A. As far as I can tell, this is my '09 taxes.
Q. Please turn to Page 22, which I already -- they don't have page numbers, but use the first blue flag.
A. Okay.
Q. Can you identify that document?
A. All I know, it's an '08 tax copy.
Q. Is this your 2008 tax return?
A. Yes.
Q. Who prepared this document, sir?
A. Ms. Peggy.
Q. Ms. Peggy?
A. Ms. Peggy Flowers.
Q. Is that her signature on the -- turn to the second page of 2008 -- right there at the bottom?
A. Yes.
Q. Do you know Ms. Flowers' preparer tax identification number?
A. No, I don't.
Q. Do you see a tax preparer's tax identification number on the second page where I just indicated?

A. I'm not sure what's her number. Is this it, the EIN number?
Q. It's the PTIN number. It's okay if you can't find it.
A. Okay. Oh, okay. I see it now. P00183688.
Q. Can you walk me through the process of how this document was prepared?
A. Not really, no.
Q. Do you know when it was prepared?
A. In '08. It's '08 taxes, so probably the beginning of '09.
Q. Does the document have a date?
A. 3/28/09.
Q. Do you know if the document was prepared on that date?
A. I would assume. I mean, that's the date, and the signature.
Q. Do you know if this document was filed with the IRS?
A. Yes.
Q. Do you know when it was filed with the IRS?
A. No.
Q. Do you know who filed it with the

IRS?
A. Ms. Peggy.
Q. How do you know that it was filed with the IRS?
A. She electronically files for me.
Q. And if you don't know when it was filed, how do you know it was actually filed?
A. I trust her to file it.
Q. Did she tell you that she files her tax returns?
A. Yes, she sends it electronically, that's all I know.
Q. And then does she send you a copy electronically?
A. She gives me a copy.
Q. She prints it out?
A. Yes.
Q. She doesn't e-mail it to your wife?
A. No.
Q. Do you provide Ms. Flowers with the information included in that tax return?
A. I provide her with it, yes.
Q. Do you provide her with trip

tickets?
A. I just provide her with an income amount and expenses.
Q. Can you define for the record, what trip tickets are?
A. Trip tickets is the seafood catch, the amount of seafood, call it net year.
Q. And that is recorded by the Louisiana Department of Wildlife & Fisheries, is that right?
A. Yes.
Q. And you said that you don't provide Ms. Flowers with the trip tickets, you add them yourself?
A. Yes.
Q. What were your sources of income in 2008, sir?
A. In 2008, fishing and construction.
Q. Did you have any other sources of income?
A. I don't remember.
Q. Did anyone else provide Ms. Flowers with the information included in your 2008 return?
A. Me and my wife, that's it.



Q. That's it. Do you have any work papers or notes that you used in the preparation of your 2008 returns?
A. No.
Q. Thank you, sir. Can you tell me what information you provided Ms. Flowers regarding your 2008 return? What did you, Vernon Alfonso, provide specifically, not your wife, just you?
A. My wife is the one that totals the income and the receipts. She's the one that provides --
Q. When you say she's the one that totals the income and the receipts --
A. Well, she will add up my income and my expenses. And we go together to Ms. Peggy and file our taxes.
Q. When you receive a 1099, do you provide it to Ms. Flowers?
A. Me and my wife together.
Q. So if the 1099 comes in the mail, you open it, you take it with your wife together?
A. Yes.
Q. Who adds the trip tickets that you

provide to Ms. Flowers?
A. My wife will add up my trip tickets and my income.
Q. Do you always add your trip tickets with your wife?
A. I would say sometimes she will add them. I might not be there, if I'm working or something, she will do it.
Q. How do you add them?
A. She will total them up.
Q. And write it down where?
A. I guess she just writes it in her notes.
Q. And she keeps those notes?
A. Not that I'm aware of.
Q. And what about when you add them, what do you do?
A. She adds them usually. If I add them, I might assist her with adding them sometimes, but she will add them up.
Q. Okay. And then you both go together and provide Peggy Flowers with that information, correct?
A. Yes.
Q. Are you related to Ms. Flowers?

A. Uh-uh (indicating negatively).
MR. COLEMAN:
Is that a no?
THE WITNESS:
No. I'm sorry.
MR. SALICRUP:
Mr. Alfonso, I'm going to provide you with some documents, I'm going to ask the court reporter to mark them as Exhibit 5. Please review them and let me know when you're done.
(Exhibit No. 5 marked for identification.)
THE WITNESS:
(Reading) okay.
EXAMINATION BY MR. SALICRUP:
Q. Can I have that for a second?
A. (Handing).
MR. SALICRUP:
I'm going to change this sticker to the next page.
EXAMINATION BY MR. SALICRUP:
Q. Can you identify this document for me, Mr. Alfonso?
A. It looks like my '08 tax return,

2008 tax return.
Q. Did you prepare this document?
A. No.
Q. Do you know who prepared this document?
A. Ms. Peggy Flowers.
Q. And you provided Ms. Flowers with the information contained in this document, correct?
A. Yes.
Q. Can you please turn to the page I've previously marked for you?
A. (Complying) okay.
Q. Which is titled Line 1, Schedule C, 1040 gross receipts or sales?
A. Yes.
Q. Can you read for me what your fishing income is according to this page?
A. 24,759.
Q. Can you read for me what your income is from Frank & Sons on this page?
A. $3,000.
Q. Can you read for me what your income was from Seedco Taxable Grant?
A. 3,000 -- sorry, 9,388.



Q. Can you read for me what your income was on the LA Wildlife Taxable Grant?
A. 11,010.
Q. Can you read for me what the total was?
A. 48,157.
Q. Did you provide Ms. Flowers with this information?
A. Yes.
Q. Can you turn to Page 4 of this document?
A. That would be --
Q. Start at the beginning, sir.
A. Oh, okay.
Q. My apologies, I meant Page 3, you're on it now.
A. Okay.
Q. This is a Schedule C for 2008, correct?
A. Yes.
Q. Can you tell me what your gross income was, according to this document, sir?
A. I'm not too sure. I don't do my taxes, so I really don't know what -- let's see, Line 1, it says gross receipts, sales,

48,157.
Q. Thank you, sir. Does this match the number that you previously read to me?
A. Yes.
Q. So we can conclude that your Frank & Son income for that year was included in your commercial fisherman's Schedule C, correct?
A. Yes.
Q. Thank you.
MR. SALICRUP:
Off the record.
(Whereupon, an off-the-record discussion was held.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, do you own any other vessels in addition to the PRINCESS BRANDI?
A. Yes, I do.
Q. How many?
A. I own one.
Q. Own one other vessel?
A. Yes, one other vessel.
Q. What's the name of that vessel?
A. The CAPTAIN DYLAN.
Q. CAPTAIN DYLAN?

A. I named i[REDACTED].
Q. Spel[REDACTED] .
A. [REDACTED].
Q. What is the size of that vessel?
A. 25 foot.
Q. What do you use that vessel for?
A. I use it for fishing crab and stuff like that.
Q. Can you elaborate on that?
A. I built it in -- probably before Katrina, Hurricane Katrina, and I used to use it for crab fishing.
Q. You used it for crab fishing -- what kind of crab?
A. Blue crab.
Q. Any other crab? Excuse me, any other crab?
A. No, blue crab.
Q. Any other seafood?
A. No, not that I'm aware of, not that I remember.
Q. Do you trawl with that vessel?
A. No.
Q. Did you file a BP claim regarding the CAPTAIN DYLAN?

A. No.
Q. Do you know the vessel ID for the CAPTAIN DYLAN?
A. Let me look. Registration number would be good?
MR. SALICRUP:
Let the record show that Mr. Alfonso pulled out two cards.
THE WITNESS:
Yeah, this is the PRINCESS BRANDI and that's the CAPTAIN DYLAN.
That's for boat registration.
MR. SALICRUP:
Let the record show that Mr. Alfonso pulled out the boat registration card for the PRINCESS BRANDI, a 37-foot vessel and the CAPTAIN DYLAN, a 25-foot vessel, decal No. 052810-14 -- oh, and the registration number, here it is, LA6048FG, Frank Gary.
Off the record.
(Whereupon, an off-the-record discussion was held.)
MR. SALICRUP:
Court reporter, could we introduce



the boat registration cards provided by Mr. Alfonso for the CAPTAIN DYLAN, the 25-foot vessel and the PRINCESS BRANDI, the 37-foot vessel as exhibit 6?

(Exhibit No. 6 marked for identification.)

EXAMINATION BY MR. SALICRUP:

Q. Mr. Alfonso, can you just look at that document?

A. Okay.

Q. Identify it for me that it's an exact copy of what you provided?

A. Yes.

Q. Can we turn briefly back to Exhibit 3?

A. (Complying).

Q. And can you please just review the document one more time?

A. Okay.

Q. Did you provide the information contained in this document, in Exhibit 3, regarding your 2009 income?

A. Yes.

Q. Do you fish for nutria, too, on that 25 foot?

A. Nutria? No.

Q. I've heard people fish for nutria as well.

A. Yeah, it's a nuisance.

Q. Can you eat it?

A. I think people tried it. I never have.

MS. FEELEY:

Off the record.

(Whereupon, an off-the-record discussion was held.)

MR. SALICRUP:

Mr. Alfonso, I'm going to introduce some documents that I will ask the court reporter to mark as Exhibit 7. Please take a moment to review them and let me know when you're done.

(Exhibit No. 7 marked for identification.)

THE WITNESS:

Okay.

EXAMINATION BY MR. SALICRUP:

Q. Can you please identify this for me?

A. It appears to be a copy of my '09

tax return.

Q. Have you -- who prepared this document?

A. Ms. Flowers.

Q. And did you provide her with the information contained in this document?

A. Yes.

Q. Is that Ms. Flowers' signature on Page 7?

A. It appears to be Ms. Flowers, yes.

Q. I'm going to ask you to turn to Page 2 of the 1040 document. Please keep flipping until you get to the 1040 form.

A. (Complying).

Q. Please turn to Page 2 of that document, the next page.

A. The next page?

Q. Yeah. Is that Ms. Flowers' signature?

A. Yes.

Q. Can you state what the preparer tax identification number is on that document?

A. P00107326.

Q. Do you know who the number belongs

to?

A. Ms. Flowers.

Q. Can you please turn to Page 5 of the document. Start from the beginning, sir.

A. Okay.

Q. Page 5, which starts with Louisiana at the top, it's an LA484453 form.

A. Yes.

Q. Is that Ms. Flowers' signature at the bottom of that document?

A. Yes.

Q. Can you state the preparer tax identification number at the bottom of this document?

A. P00183688.

Q. Do you know who that number belongs to?

A. I would assume Ms. Peggy Flowers.

Q. And when was this document prepared?

A. It states right here, 2/19/2010.

Q. Can you walk me through the process of how this document was prepared?

A. Not really, no. I don't even know



what the document -- I know it's part of the tax return. That's all I know.
Q. I mean, the entire document.
A. Oh, okay.
Q. Your 2009 return. Can you walk me through how this document was prepared?
A. I write my -- I submit my income and my expenses to Ms. Peggy and she prepares it.
Q. So you prepare and give it to her in hard copy?
A. All I do is tell her what my income is. I sit down with her and tell her what my income is and my expenses and she takes care of that.
Q. Thank you. Was this document filed with the IRS? The entire document, not just the page you're looking at.
A. Yes.
Q. Do you know when it was filed?
A. I would have to assume the day that she prepared it. I couldn't tell you a specific date.
Q. Do you know if the -- the date when it was prepared?

A. 2/19/2010.
Q. Can you tell me what your sources of income were in 2009?
A. Construction and commercial fishing.
Q. Do you have any other sources?
A. Not that I'm aware of.
Q. Starting from the beginning of the document, can you please turn to Page 10?
A. (Complying) this one?
Q. Is this -- are you on the document that states Schedule C, profit or loss from business for your return in 2009?
A. Yes.
Q. Can you tell me what your gross income was in 2009, as listed on Line 1 of this document?
A. Gross receipts, it says 73,000.
Q. Is that all it says?
A. Oh, I'm sorry, $73,064.
Q. Is there another Schedule C in the document that you're holding?
A. No.
MR. SALICRUP:
Now I'm going to ask you to review

a document which I will ask the court reporter to mark as Exhibit 8.
EXAMINATION BY MR. SALICRUP:
Q. Please review it and let me know when you're done.
(Exhibit No. 8 marked for identification.)
THE WITNESS:
Okay.
EXAMINATION BY MR. SALICRUP:
Q. Can you identify that document for me, please?
A. It appears to be my '09 tax return.
Q. And this document contains two Schedule Cs instead of one, is that correct?
A. Yes. Yes.
Q. Can you please turn to the first Schedule C.
A. Okay.
Q. I believe I marked them with flags for your ease -- well, maybe not.
A. Okay.
Q. What is this first Schedule C for, sir?

A. It says commercial fishing.
Q. Okay. And what is -- what was your gross income, Line 1 state?
A. 46,434.
Q. And could you turn to the second Schedule C, please?
A. It says 26,630.
Q. What says 26,000?
A. The Line 1, the gross receipts and sales.
Q. Do you know -- why was this document prepared?
A. This was prepared for the GCCF request.
Q. And the information in this document is identical to Exhibit 7 which I previously showed you?
A. Identical?
Q. Let me rephrase.
A. Okay.
Q. Is your gross income the same total amount in Exhibit 7 as it is in Exhibit 8?
A. I would have to add them because it's two different Schedule Cs.



Page 117

Q. You can take a second to add them.
A. My tax accountant prepared this, so I would assume it's the same. I don't know.
Q. I'm just going to represent to you that they are the same, the same total amount.
A. All right.
Q. Did anyone else provide Ms. Flowers with the information included in Exhibit 8?
A. No.
Q. Do you know if Exhibit 8 was filed with the IRS?
A. Not that I'm aware of.
Q. When did you request that Peggy Flowers prepare the second return for 2009?
A. When the GCCF requested it.
Q. And when was that?
A. I'm not sure of the date. I don't know.
Q. Was it in 2010, the year of the spill?
A. Yes, I would assume.
Q. Was the second 2010 return

Page 118

provided for any other reason other than your BP claim?
A. No.
Q. And did you pay Ms. Flowers for preparation of the 2009 return?
A. Yes.
Q. Did you pay Ms. Flowers for the preparation of Exhibit 8?
A. No. I paid her for my original tax return.
Q. You paid her for the preparation of Exhibit 7?
A. Yes.
Q. And the preparation of Exhibit 8 was free?
A. When I pay Ms. Peggy my -- to file my taxes, it is for -- it's for the year.
Q. I see.
A. When anything else that comes up or anything like that, she --
Q. And you provided all the information in Exhibit 7, correct?
A. Yes.
Q. And you provided all the information in Exhibit 8, correct?

Page 119

A. I provided her with all that information in this one.
Q. Which one is "this one"?
A. Exhibit 7.
Q. And who provided the information included in Exhibit 8?
A. She took that off of my Exhibit 7.
Q. She copied the information that you provided onto Exhibit 8, is that what you're saying?
A. I would -- I don't know how to answer that. I asked her to separate my Schedule Cs.
Q. Based on the information you --
A. Based on the information that she had.
Q. Based on the information you had provided her?
A. Yes.
MR. SALICRUP:
Mr. Alfonso, I'm going to show you two pages that I will ask the court reporter to mark as Exhibit 9.
(Exhibit No. 9 marked for identification.)

Page 120

EXAMINATION BY MR. SALICRUP:
Q. Please review them and let me know when you're done.
A. Okay.
Q. Mr. Alfonso, can you identify this document for me?
A. This, I never have seen.
Q. Okay. Are you referring to the first and second page or only the first page?
A. Yeah, either one. I don't remember seeing this. I know this is a receipt from Mr. Peggy, but I don't remember seeing it.
Q. Again, I'm going to represent to you that this is a document that Ms. Flowers utilized in preparing your returns.
A. Okay.
Q. Can you please tell me what your fishing income is according to this document?
A. 24,184.
Q. Can you please tell me what your income is from Frank & Son according to this document?



Page 121

A. 22,250.
Q. Can you please tell me what the total of these two numbers is according to this document?
A. 46,434.
Q. Can you please go to miscellaneous income Line 2 and tell me what amount is listed for R&M Construction of Louisiana?
A. 26,630.
Q. Is it correct to say that you provided Ms. Flowers with this information?
A. Not in this way. I provided her with the amounts.
Q. So you provided her -- okay, thank you.
A. Total income.
Q. Does the total gross receipt of forty six four hundred and thirty four match the total gross receipts in Exhibit 8? That would be the Line 1 that was premarked. I think it has a flag, sir.
A. Yes.
Q. The total amount in Exhibit 9 of twenty six six hundred and thirty, does that

Page 122

match the amount for construction in your second Schedule C, in Exhibit 8?
A. Yes.
Q. So according to this document, which Ms. Flowers prepared with your information, you had income from Frank & Sons of the $22,250, correct?
A. According to this, yes.
Q. In 2009?
A. In 2009.
Q. Do you have any reason to believe why this information is wrong, if this information is wrong?
A. I don't know anything about that. I don't remember anything about this.
Q. You stated that you provided this information to Ms. Flowers.
A. I provided my income, my total income and my --
Q. Sources of income, correct?
A. Yeah -- well, my total of income.
Q. You told --
A. I will supply her with my income.
Q. What do you mean by income, sir?
A. I will supply her with my 1099s,

Page 123

and my income and shrimp or anything -- any kind of other earnings, besides the 1099s, I just give it to her all together.
Q. Correct me if I'm wrong, you provided Ms. Flowers with the information that she put on this page, correct?
A. Yeah. Not like this, though.
Q. You provided it in a different format. You provided -- you represented to Ms. Flowers that in 2009, you earned 22,250 from Frank & Son, correct?
A. No.
Q. You did not tell her that?
A. No.
Q. Did you work for Frank & Son in 2009?
A. No.
Q. Did you earn $24,184 from fishing in 2009?
A. I would have to check. Yes.
Q. Do you know who you sold fish to in 2009?
A. In 2009? Island Seafood.
Q. Island Seafood. That was your exclusive dealer in 2009?

Page 124

A. That was probably the main one. I could have sold other places, but my main dealer was-- the main shrimp buyer for me that year was Island Seafood.
Q. What do you mean by "main"?
A. It's the local dock. When we go to other places, we sell other docks.
Q. We're getting out of my realm of expertise. I don't even know what you mean by local dock. I want to make sure I get it.
A. The port that I work out of.
Q. What port is that?
A. Delacroix.
Q. Okay.
A. That would be the dealer that I was dealing with in my main port.
Q. So that dealer bought 95 percent of your shrimp?
A. He bought a lot of it, yes. I wouldn't say 95 percent, but he bought most of it.
Q. Not all, but most?
A. I couldn't specify exactly how much because I really don't know unless I



went through trip tickets.

MR. SALICRUP:

Okay. Mr. Alfonso, I'm going to provide you with some documents that I'm going to ask the court reporter to mark as exhibit 10.

(Exhibit No. 10 marked for identification.)

EXAMINATION BY MR. SALICRUP:

Q. Please review them and let me know when you're finished.

A. Okay.

Q. Okay. I'm going to represent to you that this is a summary for yourself, Vernon Alfonso, Jr. for the year of 2009, from January 1st through December 31st of that year, stating all of the shrimp that you sold to Island Seafood.

A. Okay.

Q. Can you please turn to the second page?

A. Okay.

Q. Can you tell me what your total paid amount was?

A. 24,183.65.

Q. Now, please turn to where we were earlier in Exhibit 9. According to that document, what was your fishing income in 2009?

A. 24,184.

Q. These numbers are nearly identical, correct?

A. Yes.

Q. So we can conclude that your total fishing income for 2009 was $24,000 approximately?

A. From Island Seafood, yes.

Q. And they bought, as you stated, most of your seafood, correct?

A. A lot of it. I can't say exactly, but, yes.

Q. So where did the $22,250 listed for Frank & Son come from?

A. I don't know. I don't remember.

Q. When you worked for Frank & Sons, how did they pay you?

A. They paid me with a check.

Q. Do they pay you with a check every time?

A. Yes.

Q. Are you ever paid in cash?

A. No.

Q. In 2009, were you ever paid in cash for Frank & Sons?

A. No.

Q. How do they pay you, weekly?

A. I didn't work for Frank & Son in '09.

Q. When you do work for Frank & Sons, how do they pay you?

A. They pay me by the invoice.

Q. Is that sent in weekly, daily, by the hour?

A. It depends on the company we work for.

Q. Please explain that.

A. If we worked for a seismograph company that required us to submit an invoice monthly, we did it monthly. If they wanted it weekly, we did it weekly.

Q. But who paid you, the company or Frank & Sons?

A. The company would pay Frank & Son and then Frank & Son would pay me.

Q. If the company had -- walk me

through an example. If the company had a contract with a company, how would that work?

A. I'm sorry?

Q. How would the payment work? Walk me through an example. You're working for Frank & Sons doing seismographic work for a month, getting paid and depositing the money. Track the money, how does that flow?

A. I would submit an invoice.

Q. To who, sir?

A. To the company that I work for.

Q. To which company is that?

A. It depends on which company I worked for. I think we worked for Western Geophysical at one point and I would submit an invoice to them and after that, I couldn't tell you because Frank & Son would get paid and then they would pay me.

Q. Would you ever get paid by the company directly?

A. No.

Q. Never?

A. No.

MR. SALICRUP:



It's almost noon. Off the record.
(Whereupon, an off-the-record discussion was held.)
EXAMINATION BY MR. SALICRUP:
Q. What was the range of payment amounts that you received from Frank & Sons?
A. I couldn't tell you.
Q. You received payments from Frank & Sons?
A. Yes, when I worked for -- when I did seismic work -- when I did work pertaining to Frank & Sons, yes, I did receive payments.
Q. And when they would pay you, you would look at that payment?
A. Not always.
Q. Can you explain? Please elaborate.
A. Because a lot of the -- if we worked away from home, I might be gone for three months and if any checks were sent, my wife would take care of that.
Q. You would hand over a check without looking at it to your wife?
A. I trust her that much.

MR. COLEMAN:
You got to give a verbal answer.
THE WITNESS:
Yes.
EXAMINATION BY MR. SALICRUP:
Q. Your answer is yes?
A. Yes.
Q. Approximately what was -- how much was each check for?
A. I couldn't say approximately.
Q. When you worked for Frank & Sons, did you sign a contract for the engagement?
A. No.
Q. How did you get placed with Frank & Sons?
A. If a job came up where they needed a boat, I would -- or they need somebody to do some work, I would go and do it.
Q. How would you find out about it?
A. Frank & Son would tell me.
Q. How would they tell you?
A. They would tell me, you know, just say, Western Geophysical needs a boat.
Q. Did you receive a letter?
A. No. He would call and tell me.

Q. You would receive a phone call?
A. Yes.
Q. You would go into the Frank & Son office?
A. No.
Q. Where would you go to work?
A. Wherever work may be, it may be -- like it could be in a different part of the state, you know. It could be in Houma.
Q. And you would drive there in your boat?
A. In my boat.
Q. And before you got on your boat and went to the project, wherever that was, would you agree to a payment amount with Frank & Sons?
A. Usually. I'm not exactly sure. I wouldn't say exactly a payment amount. We would know what they would pay the boat -- what the boat would earn.
Q. When you say the boat, you mean your boat, the PRINCESS BRANDI?
A. Yes. If a boat earned -- I mean, sometimes they might have two or three boats working there, and if the rate was $350 a

day, I knew what the rate was when I went.
Q. So you knew how much you were going to get when you were assigned to a project?
A. Yes.
Q. And that was communicated verbally?
A. Verbally.
Q. Was that ever put in writing?
A. Not that I'm aware of.
Q. When you said they had two or three boats, was the CAPTAIN DYLAN ever hired?
A. No.
Q. And so, give me a general example, your average engagement for Frank & Sons, how long did it last?
A. It depended on the job.
Q. Okay.
A. Sometimes a job may be three months, sometimes the job might be a month.
Q. What was the most common that you would say?
A. Usually one month to three months is common.



Q. The range is one month to three months?
A. Yes.
Q. What was the most common daily rate for a boat?
A. At that time --
Q. What do you mean by "at that time"?
A. It's just like everything else, prices change.
Q. 2008.
A. I would say probably -- maybe -- 2008, maybe four fifty.
Q. Four fifty a day for a boat?
A. Yes.
Q. Would you work seven days a week?
A. It if that's what the job required.
Q. What was the most common, five days a week, seven days a week?
A. Seven days.
Q. So a common engagement was more or less seven days for a month for three -- between one to three months at a rate of four fifty?

A. (Nodding head affirmatively)).
Q. Is that correct?
A. Yes.
Q. The checks that you would receive from Frank & Son in those kind of engagements, would come every week?
A. No.
Q. They would come every month?
A. They would come when the invoice was paid. Different companies pay different times. Some take longer periods and some shorter periods.
Q. Would checks from Frank & Son usually be over a thousand dollars?
A. Yes.
Q. Did Frank & Sons pay for the fuel?
A. No.
Q. Who paid for the fuel?
A. The company that we worked for.
Q. How did you get reimbursed for that?
A. The company would pay fuel, the fuel was supplied.
Q. Did you have to fill out fuel tickets of some sort?

A. Sometimes.
Q. Generally, what was the common business practice for these types of engagements, you go to a fueling station and you fill what out?
A. Sometimes they would -- if the company would -- if there wasn't a fuel dock close by, they would supply us with a barge with diesel, and we would get our fuel off of a fuel barge and if there was a fuel dock close by, the company we worked for might have an account and we would go there and fuel up and sign your name.
Q. You would sign your name or the boat's name?
A. It depended on what they wanted.
Q. What did you usually do?
A. I can't remember that.
Q. Is that general business practice in this kind of work? I don't know, you tell me.
A. Sometimes they make out a ticket with the boat name on it and you sign your name.
Q. Usually the boat name is on it?

A. Usually.
Q. Is usually your name on it, too?
A. Usually.
Q. Would checks from Frank & Son usually be more than $2,000?
A. Probably.
Q. Would they be more than $10,000?
A. That much I can't say. I imagine occasionally, maybe.
Q. Generally checks from Frank & Son were around $5,000?
A. It depends on the amount of the invoice.
Q. Understood. But generally?
A. I couldn't say.
Q. Would it be fair to say that it was between two and $5,000?
A. I still couldn't say. It's been a while since I worked for Frank & Sons.
Q. But a $5,000 check you would recall?
A. Maybe.
Q. So as I understand it -- do you want to take that 20-minute break off the record?



MR. COLEMAN:
Sure.
(Whereupon, a recess was taken for lunch.)
MR. SALICRUP:
Mr. Lloyd Day, investigator for the Special Master is here. I asked him to sit in.
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, I have some questions. You provided us with a set of bank statements for 2007, 2008 and 2009 as well as 2010.
A. Yes.
Q. Do you provide these to Ms. Peggy Flowers when she prepares her returns?
A. No.
Q. Do you show her any bank documentation?
A. The only thing I would -- the only thing we would show is interest earned on the savings or checking or something that's required.
Q. And I'm going to show you a document that you produced this morning as

Alfonso -- Bates stamped Alfonso 102 through 108. Will you please look at this document. It's a schedule for 2010.
A. Uh-huh (indicating affirmatively).
Q. Do you have a similar breakdown for 2009, something along those lines?
A. I'm sorry?
Q. Do you have a similar breakdown for your income in 2009?
A. No. This is -- this is when we started working for the oil spill. That's what this -- yeah, this is a printout from the parish, St. Bernard Parish.
Q. What does that mean, a printout from the parish?
A. When he started working for the VoO program, it went through the St. Bernard Parish.
Q. Can you identify the document you're looking at?
A. The only thing I can identify -- the only thing I can say about it is that was a printout from St. Bernard Parish that I can see. Yeah, this is what they paid us.
Q. Who is "they," the parish?

A. The parish.
Q. Anyone else?
A. No.
Q. What did they pay you for?
A. They paid us for the VoO program, working on the spill.
Q. Whose handwriting is it on that document?
A. Right here?
Q. Yes, sir.
A. This would be my wife's.
Q. Can you look through the rest of the documents?
A. My wife's handwriting.
Q. And can you identify what the handwritten document is?
A. My wife's -- probably keeping track of the days I worked, I would think, to check to see if it coincided with what the parish paid us.
Q. And does she do something similar for 2009?
A. No.
Q. How does she know which dates you worked?

A. She kept track what days I went to work.
Q. Did you tell her which days you went to work?
A. She knew what days I went to work.
Q. Because you told her?
A. Because she knew when I went to work, when I left the house, I was going to work.
Q. Fair enough.
A. I mean.
MR. SALICRUP:
Okay. I'm going to introduce the set that was produced this morning including the document we just discussed as Exhibit 11.
(Exhibit No. 11 marked for identification.).
MR. SALICRUP:
Off the record.
(Whereupon, an off-the-record discussion was held.)
MR. COLEMAN:
What's the last Bates number on there?



MR. SALICRUP:
First Bates is Alfonso 1, last Bates being Alfonso 482.
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, can you walk me through a year in your working life and by that, I mean what periods of the year do you work in construction?
A. I haven't worked construction since '09.
Q. Okay. So in 2009, do you recall what you were working on?
A. No, I really can't. I know I did -- we built -- some daiquiri shops we rebuilt, you know, constructed.
Q. You constructed?
A. New Orleans Daiquirs and stuff like that. We did that kind of work.
MR. COLEMAN:
You said daiquiri shops?
THE WITNESS:
Yeah.
MR. SALICRUP:
What's a daiquiri shop? I don't know what that is.

MR. COLEMAN:
Fair question, I wondered that myself driving around Louisiana.
THE WITNESS:
It's a frozen mixed drink.
MR. SALICRUP:
Oh, really.
MR. COLEMAN:
That's legal here, to sell daiquiris.
THE WITNESS:
It's a drive-through.
EXAMINATION BY MR. SALICRUP:
Q. And you stated you're a shrimper, correct?
A. Yes.
Q. When is the shrimp season?
A. Shrimp season is year round, but inshore waters is basically, usually around, say, like the end of May on.
Q. When does it start?
A. There's not a specific date set. The date kind of sets itself by the size of the shrimp.
Q. But the department of -- Louisiana

Wildlife & Fisheries --
A. Announce the opening day.
Q. So there is a start to the season?
A. Yes.
Q. And generally when is the starting -- when does the season start?
A. Usually between the middle and the end of May.
Q. Okay. And when does it end?
A. It will end usually around December sometime. Most of the time it's around Christmas.
Q. So shrimping season was only from May to December?
A. The inshore waters.
Q. The inshore waters?
A. Yes.
Q. Is there another shrimp season?
A. No. There's an area called Breton Sound that we shrimp. I guess it's considered offshore waters.
Q. Uh-huh (indicating affirmatively).
A. And most of the time that will stay open year round.
Q. Okay. And do you shrimp offshore?

A. Yes.
Q. Do you shrimp offshore year round?
A. Not year round, no.
Q. What kind of shrimp do you catch offshore? Is that different from inshore?
A. It's basically the same shrimp.
Q. Aren't some brown and some white?
A. It's considered two different seasons, the brown shrimp and the white shrimp.
Q. Do the white shrimp live inshore?
A. Both live inshore and move offshore as they grow.
Q. When they go offshore, do they turn brown? I don't know.
A. It's a different species.
Q. It's a different species. So you can catch brown shrimp inshore or offshore?
A. Yes.
Q. And do you shrimp in inshore waters?
A. Yes.
Q. Do you -- do you shrimp when you're working construction?
A. Yes.



Page 145

Q. How do you manage that?
A. It depends on the job. If there's a job close by, sometimes we will shrimp on the days that we're off.
Q. What about when you're working for R&M?
A. When I worked for R&M, yes, I shrimped.
Q. Would you wake up in the morning and shrimp?
A. No, it just depend on the job. If there was a job -- like if we worked, say, Monday through Friday, I might do it on weekends.
Q. What kind of work did you do for R&M?
A. That was construction work.
Q. And which dates did you work for them?
A. I couldn't remember the specific dates. I know I worked for them in '09, '7, '8 and '9.
Q. You worked for R&M in '7, '8 and '9?
A. Yes.

Page 146

Q. Did you work for them before the summer or after the summer?
A. After Hurricane Katrina, I worked for them.
Q. Hurricane Katrina?
A. '05.
Q. Was -- okay, so in 2009 did you work for R&M Construction before the summer or after the Summer?
A. Before.
Q. Before the summer?
A. Before.
Q. Did you work for R&M Construction after the summer?
A. No. I can't remember the dates.
Q. So how -- I'm a little confused. Can you explain, if you go out shrimping for four days at a time, how can you do that at the same time you're working construction?
A. It's not always four days at a time.
Q. Okay.
A. Sometimes we make -- it depends on the shrimp, too.
Q. I don't know what that means.

Page 147

A. If I can leave today and go out and catch my limit in one day, I'm back in. Sometimes it might take three days or four days or sometimes we could just make a one-day trip.
Q. What's the longest you've stayed out?
A. Four days.
Q. Generally, do you pack your boat for a four-day trip?
A. Most times, yes.
Q. On average, what is the length of most trips?
A. That's hard to say. I mean, average, probably two to three days.
Q. And in 2009, you were working construction before the summer, correct?
A. Yes.
Q. And you were shrimping at the same time?
A. Yes. I can't remember the dates. That's what got me. I don't remember the dates.
Q. For what?
A. You know, exactly what days I did

Page 148

construction on, what days I shrimped, I can't remember.
Q. Would you sign in at R&M when you went to work?
A. No.
Q. How did that -- how -- what was your day like at R&M?
A. If we had a job to do, my boss would tell me where the job was or what we was doing and that's what I did. I would get up in the morning and go to work.
Q. What is the name of your boss?
A. Ronald Doane.
Q. Doane?
A. Doane, D-O-A-N-E.
Q. And would they notify you the same day?
A. Most of the time he would let me know if a job was coming up, if he had a -- when he had it scheduled, he would let me know.
Q. With how much lead time?
A. I couldn't say.
Q. On average?
A. Maybe a week sometimes.



Page 149

Q. You did a substantial amount of work for R&M in 2009, correct?
A. I'm not sure.
Q. Approximately?
A. I don't remember.
Q. $26,000 worth?
A. Probably.
Q. How long would it take you to earn that much?
A. I would have to say probably -- I'm not even sure, three or four months maybe.
Q. Three or four months?
A. I would have to figure it out. I couldn't tell you.
Q. Three or four months working every day?
A. Not every day.
Q. When you worked for R&M, how did you get paid?
A. With a check.
Q. By the hour?
A. By -- sometimes by the day, sometimes by the hour, depending on what job was up and what he was doing.

Page 150

Q. What was your position at R&M?
A. I started out as mainly construction and then I was supervisor.
Q. Is a supervisor like a foreman?
A. Superintendent, yeah, I ran the job.
Q. What does a superintendent generally earn?
A. I don't know. I know what they paid me.
Q. How much did you earn as a superintendent?
A. Anywhere from -- I think it was like two hundred a day sometimes.
Q. And a superintendent has to be there every day, right? Because if the boss doesn't show up, the people don't work.
A. It depends. If a job was going on and I had a crew that was working, I didn't have to be on top of them all the time.
Q. When you were supervising a crew, were you required to be there?
A. Yes.
Q. What about Frank & Sons, did you shrimp when you were working for Frank & Sons?
A. I'm not sure. That was a long time ago.
Q. What time of the year did you usually work for Frank & Sons?
A. I couldn't say that either because that depends on the job.
Q. How much lead time would you be told about an upcoming job?
A. Sometimes I might have been told a week ahead, sometimes I might have been told the day before.
Q. And I say this with all due respect because balancing three jobs sounds hard. How did you manage all of this construction, shrimping, Frank & Sons if people were just telling you the next day?
A. I work, that's all I do.
Q. But you do not recall when you worked for Frank & Sons?
A. No.
Q. Was it generally in the fall?
A. We worked, like I said, it depended on the job, if the job was in the fall, it was in the fall, if it was in the winter, it was in the winter.
Q. In 2008, did you work for Frank & Sons?
A. I don't recall.
Q. And all the income that you earned for your shrimping, construction, be it from R&M or otherwise and for Frank & Sons, is deposited into the four bank accounts that you provided this morning?
A. Yes.
Q. You provided records for three of them, correct?
A. Correct.
Q. We don't have records for the fourth LLC account.
A. Right.
Q. Which we will receive, I believe.
A. As soon as I can get it.
MR. COLEMAN:
I'm not sure if it's in response because the account didn't exist.
EXAMINATION BY MR. SALICRUP:
Q. When was the account created?
A. I think it was in '11, either late 2010, or '11.

Page 151

Page 152



Page 153

MR. COLEMAN:
Put that way, if you want it, we will give it to you.
MR. SALICRUP:
Okay.
EXAMINATION BY MR. SALICRUP:
Q. We also had some difficulty copying all these. We're going to, if it's all right with you, keep these, make copies and return the originals to you.
MR. COLEMAN:
I'm guessing that makes you a little nervous, but --
THE WITNESS:
It makes me nervous because of my wife --
EXAMINATION BY MR. SALICRUP:
Q. We will take good care of them, while going through them we noticed that we don't have January and February of --
A. That's the one she's -- this morning when I handed them to you, I told you we didn't have, that she didn't find, so she was getting them today.
Q. She's getting them today?

Page 154

A. Yes.
Q. We will be receiving those?
A. Yes.
Q. We reserve the right to continue your sworn statement once we get those.
MR. COLEMAN:
I guess, whatever, but as far as taking the deposition, lawyers are good at handling documents, I recommend that you just go ahead and leave them with them and Mr. Salicrup will do his absolute best to ensure that they get back to you.
EXAMINATION BY MR. SALICRUP:
Q. We will take care of them and they will be organized.
A. Okay.
MR. SALICRUP:
Can we go ahead and introduce these? Exhibit 12 will be 2007, bank records for three accounts for 2007. We will introduce the records for three accounts for 2008 as Exhibit 13. We will introduce bank records for three accounts for 2009 as Exhibit 14. And the bank records for three accounts for 2010 as

Page 155

Exhibit 15.
(Exhibit Nos. 12, 13, 14 and 15 marked for identification.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, these accounts reflect all of your revenue for 2007, 2008, 2009 and 2010, correct?
A. Yes.
Q. And that includes all of your income for yourself and your wife, correct?
A. Yes.
Q. And you agree that your 2009 return reflects a total revenue of $105,646, correct?
A. I don't know.
Q. Would you like to review your 2009 return which was entered as an exhibit?
A. Okay, because I'm not sure --
MR. COLEMAN:
That number doesn't sound right to me either.
MR. SALICRUP:
Let's take a look then.
MR. COLEMAN:
Okay.

Page 156

THE WITNESS:
Which one was --
MR. COLEMAN:
I think that's the amended. So you need Exhibit 7.
THE WITNESS:
7? I don't know what I'm looking at.
MR. SALICRUP:
You want to go off the record?
MR. COLEMAN:
No, we can do this on the record. Are you referring to his Line 1 from 1040?
MR. DAY:
No, total revenue.
MR. SALICRUP:
Lloyd, that would be line --
MR. DAY:
Adjusted gross income is on line 37.
MR. COLEMAN:
Okay. I'm going to start by pointing him to --
MR. DAY:
Total income is on line 22. We



Page 157

have got a disconnect because we're looking at the 2009 return and it says negative 5,000 on line 22.
MR. SALICRUP:
I think we're referring to line 37.
MR. DAY:
Do you want to specifically ask him about the one-oh-five?
MR. SALICRUP:
Yeah. We're still on the record.
EXAMINATION BY MR. SALICRUP:
Q. And your wife's salary in 2009?
MR. DAY:
That's the total of his W2s and 1099s?
EXAMINATION BY MR. SALICRUP:
Q. Adding up your W2s and 1099s, your wife's salary in 2009 was 31,781, is that correct?
A. I'm really lost here because I don't know nothing about tax forms or filling them out or --
MR. COLEMAN:
Off the record.

Page 158

(Whereupon, an off-the-record discussion was held.)
MR. SALICRUP:
On the record, Exhibit 8 --
MR. COLEMAN:
Exhibit 8 is the amended two Schedule Cs.
MR. SALICRUP:
Exactly, that is the 2009 return that you submitted to the GCCF.
THE WITNESS:
Okay.
EXAMINATION BY MR. SALICRUP:
Q. On Page 1 of that return, on line 7.
A. Okay.
Q. Can you state the amount there?
A. 31,791.
Q. And that is your wife's salary as a teacher, correct?
A. I couldn't tell you.
Q. Do you know?
A. I don't know.
Q. You don't know, okay.
MR. DAY:

Page 159

I can help on that, two W2s, one from Lynn Oaks School and another one, W2, from Kevin Smith Construction and if you total those two you get the 31,791.
EXAMINATION BY MR. SALICRUP:
Q. I will represent to you that that 31,791 is income generated by the Lynn Oaks School W2.
A. That's my wife, yes.
Q. Does your wife work for the Lynn Oaks School?
A. Not anymore.
Q. She did in 2009?
A. Yes.
Q. And you worked for Kevin J. Smith Construction in 2009, correct?
A. Yes.
Q. When we add the amounts in those two W2s, it comes up to 31,791.
A. Okay.
Q. And that is what Line 7 is. Can you please turn to Line 8A?
A. (Complying).
Q. It's right underneath 7.
A. 801?

Page 160

Q. 801. That is money earned on interest. Is that amount correct?
A. I couldn't tell you.
Q. Is this what you submitted to the DHECC or the GCCF?
A. If this is my original tax return, yes, this is what I submitted.
Q. Please go to Page 3, Schedule C.
A. Schedule C, okay.
Q. Can you read, please, Line 1?
A. 46,434.
Q. And that is your Schedule C for commercial fishing, correct?
A. Yes.
Q. Please turn to Page 5.
A. (Complying) okay.
Q. Can you state what Line 1 lists as your construction income in 2009?
A. 26,630.
Q. When we add these numbers together, it gives us approximately $105,646. That is the total revenue listed in your 2009 return, with two Schedule Cs that were submitted to the DHECC, is that correct?



A. I never added it up, but I will take your word for it, yes.
Q. I will represent to you that it is. If you would like to take an opportunity to add it up, by all means --
A. No, that's okay.
Q. Did you have any other sources of income in 2009?
A. Not that I can remember. I mean -- no, not that I remember.
Q. And as I mentioned earlier, the 2009 bank records are incomplete and you stated that we will be receiving those. But when we add the deposits in these three accounts for 2009 --
A. Uh-huh (indicating affirmatively).
Q. -- we came up on a total of 76,481 --
A. Okay.
Q. -- for your joint account, 53,261 for your business account, and 8,000 for your Chase account.
A. Okay.
Q. I'm going to represent to you that that adds up approximately to 137,742 in

total deposits. If you disagree, please add it up and if you would like to take a look at the exhibits, please do. When we subtract the deposits in your 2009 bank account from your total revenue in your 2009 return with two Schedule Cs, there is a difference of $33,000, not accounting for the month of January and February that are missing. In other words, you have a total revenue of -- you have some unaccounted revenue of 33,000 for 2009 that is not in your return, can you explain that?
A. No, I can't.
MR. COLEMAN:
I'm going to object to the form of the question. It assumes facts not in evidence, but go ahead and answer if you can.
EXAMINATION BY MR. SALICRUP:
Q. Please answer.
A. No, I can't.
Q. And all of the income you and your wife earned in 2009 was deposited in the three accounts which records you provided to the Special Master as contained in

Exhibit 14, correct?
A. I'm not sure. I can't answer that. I don't know.
Q. I will ask another way. Did you have any other income that you did not deposit in these three accounts in 2009 for you and your wife?
A. Not that I remember. I don't remember.
Q. Would you like to take a look through the documents?
A. No -- no.
Q. I would also like to show you an additional document.
MR. SALICRUP:
I'm going to ask the court reporter to mark this as Exhibit 16.
(Exhibit No. 16 marked for identification.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, please take a second -- take your time in reviewing the document.
MS. FEELEY:
We can go off the record.

(Whereupon, an off-the-record discussion was held.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, can you identify Exhibit 16?
A. This looks like something from the bank in one of my checking accounts.
Q. Okay. That is -- I'm going to represent to you Exhibit 16 is the statement from Gulf Coast Bank --
A. Okay.
Q. -- that you provided to us this morning. That statement shows a wire transfer on August 28th in the amount of $50,570.
A. Okay.
Q. Can you explain that?
A. Yeah, I think I can. This is Road Home.
Q. What does that mean?
A. Road Home -- it was -- explain Road Home. It was -- after the storm.
Q. Which storm, sir?
A. After Hurricane Katrina.
Q. Uh-huh (indicating affirmatively).



A. They -- I don't even know how the process went, I don't know if it was through the state or whatever it was through, they gave you money to rebuild, like a grant -- like a loan or a grant, something like that.
Q. Am I correct, am I understanding you that you're saying that $50,000 was a loan?
A. It's either a loan or a grant, I don't understand -- I think it was more like a grant. You had to rebuild within so many years for it to be forgiven. I guess it would be a grant.
Q. And is that grant reflected in your returns?
A. Not unless it was required. If it was required, yeah, but if it wasn't, no.
Q. How do you know that?
A. I mean, all we would do is ask if it had to be submitted as income or -- I mean, I can't remember back when I received it if it was required or not, I can't remember that.
Q. When you say ask, who would you ask?

A. I would have asked Ms. Flowers if it was required or I would have asked the people that -- the Road Home Corporation or whatever it was.
Q. Is -- is that a federal grant program, Road Home? I'm not familiar with it.
A. I'm not sure. I'm not sure if it was federal or state. I thought it was state -- the state was handling it. I'm not sure how it all works.
Q. Did you build a new home with that grant?
A. I'm in the process. I'm almost done.
Q. Who applied for that, you did?
A. Me, yes.
Q. I'm going to try to ask you a question that I asked you earlier and we had some difficulty. Hopefully this rephrasing will help.
If we add your income for R&M --
A. Okay.
Q. -- your income for W2 wages, your income for interest, and this deposit of

$50,570, which you've told us is a grant, that still leaves us with a discrepancy regarding the information you provided in your 2009 bank records, Exhibit 14, and the 2009 return with two schedule Cs which you submitted as Exhibit A. In order to fill up that difference, you would have needed to have made 28,119 -- $28,019 initially, but we've established here today that you sold your seafood to Island Seafood for less than that.
Can you explain the differences in income?
A. No.
Q. Okay. Moving on, we have established that the shrimp season is from May to December. What did you do for income in -- from January to April of 2009?
A. I'm not sure. I can't remember dates on when they ran or what. If I did construction or --
Q. I'm not looking for a precise date. You can tell me the months.
A. I couldn't even tell you the months.

Q. Start with January, do you know what you did in January?
A. No.
Q. Did you work?
A. Probably.
Q. Did you shrimp in January 2009?
A. I don't know.
Q. Did you work for R&M in January 2009?
A. I don't know.
Q. What about February 2009?
A. I don't know. I don't know -- I don't know -- I know I did work for R&M and I know I did shrimping, but I couldn't tell you exactly what month I did what. I really couldn't.
Q. According to the information that you have provided, you have trip tickets starting in late May 2009 going through mid-October 2009?
A. Yes.
Q. Which means you weren't shrimping in January 2009?
A. According to this, yes.
Q. And your wife worked for a school



Page 169

and how often does she get paid? She worked for a school in 2009, how often did she get paid?
A. I couldn't tell you. I don't know.
Q. Do you know how much she earned?
A. No.
Q. Did she earn $10,000 a month?
A. I couldn't tell you.
Q. Did she earn $1,000 a month?
A. All I can tell you, one year she earned 18,000 for the year.
Q. For the year?
A. That's all I can tell you and I don't know what year.
MS. FEELEY:
Let's go off the record.
(Whereupon, an off-the-record discussion was held.)
EXAMINATION BY MR. SALICRUP:
Q. And for the record, Mr. Alfonso, I'm going to show you some deposits in your account on various dates and I will ask you some questions about them. And this is exhibit for -- bank records for 2009, that

Page 170

was Exhibit 14. Please look at this page of Exhibit 14. On 3/24/2009, you have a deposit in your account of $500.
A. Uh-huh, (indicating affirmatively), yes.
Q. Can you explain where that deposit came from?
A. No.
Q. We've established it's not shrimping income. Was that income from R&M Construction?
A. I don't know.
Q. Was that income from your wife?
A. I don't know.
Q. You have no idea?
A. No idea.
Q. May I see that document for a second?
A. (Handing).
Q. You turned -- the same document, there's a deposit in your account on 4/06/09 of $2,000. Do you know what that deposit is for?
A. No.
Q. We've established it's not

Page 171

shrimping income. Was that income for construction work?
A. I don't know.
Q. Was that income for your wife?
A. I don't know.
Q. Was that income for working at Frank & Sons?
A. I don't know.
Q. I'm going to show you a different document.
A. I didn't work for Frank & Sons in '09.
Q. 4/13/2009. You show a deposit in your account of $3,200.
A. Okay.
Q. Can you see it?
A. Yeah.
Q. Do you know what that deposit was for?
A. No.
Q. Was that deposit for working at R&M Construction?
A. No.
Q. Was that deposit for doing any other construction work?

Page 172

A. I don't know.
Q. Was that deposit for your wife?
A. I don't know.
Q. And was that deposit for any other unexplained source of income you may have?
A. I don't know.
Q. But we know it's not shrimping income, correct?
A. I don't know that either.
Q. On 4/20/2009, you also have another deposit in your account totaling $500.
A. 4/20?
Q. Yes, sir. Can you see it?
A. Uh-huh (indicating affirmatively).
Q. Is that deposit income generated working for R&M Construction?
A. I don't know.
Q. Is that deposit income generated by your wife?
A. I don't know.
Q. Is that deposit generated by any other source of income you haven't reported?
A. I don't know.
Q. Mr. Alfonso, I'm going to show you

another bank statement that you provided to us as exhibit -- as part of Exhibit 14 this morning. Can you please review this document?
A. (Complying) okay.
Q. Can you identify this document for me?
A. Bank's statement.
Q. From which bank?
A. From Gulf Coast.
Q. Can you see on that statement, a deposit made in your account on 7/13/2009 totaling 4,500?
A. I see 4,000 on the 3rd.
Q. Do you see a deposit made in your account totaling $4,000?
A. Yes.
Q. And was that income generated by working at R&M Construction?
A. I don't know.
Q. Was that income generated by your wife?
A. I don't know.
Q. Was that income generated by you?
A. I don't know.

Q. Was that income generated by any other source of income?
A. I don't know.
Q. Thank you, sir. What was the source of the funds that we've just discussed represented in the bank records that I presented to you as Exhibit 14?
A. The source of income --
Q. For all the numbers that we discussed?
A. Whatever -- I mean, the source would have been whatever jobs I worked that year, whatever shrimping I did that year or my wife's income or --
Q. Did your wife have any other sources of income other than working at the school in 2009?
A. No.
Q. Do your children work?
A. My children? I have one that works now, but back then, no.
Q. At that time?
A. No.
Q. Did you know that Ms. Peggy Flowers was interviewed yesterday and gave

her sworn statement to the Office of the Special Master?
A. I know she was supposed to, I didn't know what date.
Q. How did you know, sir?
A. Just -- I think Ms. Peggy had called me.
Q. When did Ms. Peggy call you, Ms. Flowers?
A. Ms. Flowers, probably -- I would assume it was last week.
Q. Do you recall which day last week?
A. No.
Q. Was is it towards the end of the week?
A. I couldn't remember.
Q. Was it on Sunday?
A. I don't know.
Q. Do you go to church?
A. No. Not too often, every now and then.
Q. Did you watch football last Sunday?
A. Not enough.
Q. I hear you. Did you watch

football last Sunday?
A. I caught the end of the Packers game, that was it.
Q. Did you speak to Ms. Flowers on that day?
A. I don't recall. I don't remember what day it was.
Q. And how did you communicate with Ms. Flowers?
A. By telephone. That was it, by telephone.
Q. Did you write her an e-mail?
A. No.
Q. Did you write her a letter?
A. No.
Q. Did you call her?
A. No.
Q. She called you?
A. Uh-huh (indicating affirmatively).
Q. What did she tell you?
A. She just told me that -- she told me that she had to do -- give a statement or something. That's all she said. That's all I remember her saying.
Q. She called and said, "I have to



give a statement." That's it?
A. Yeah, she had to give a statement and I told her I had no problem with it.
Q. Did she tell you who she had to give a statement to?
A. No.
Q. Did she tell you why she had to give a statement?
A. No. She just said it was about my taxes, I assume.
Q. What about your taxes?
A. Well, I guess it was about -- my tax accountant.
Q. Can you just elaborate on that?
A. I don't know how to elaborate on that.
Q. Just do your best.
A. Okay. I assumed it was all my taxes, because I know you were investigating my claim.
Q. Did you assume that or did she tell you?
A. No, I just assumed that. She told me she had to give a statement.
Q. Did she tell you when the

statement was?
A. No.
Q. Did you speak with Ms. Flowers yesterday?
A. No.
Q. Did you speak with Ms. Flowers this morning?
A. No.
Q. Do you know if you spoke with Ms. Flowers last Wednesday, January 14th?
A. I couldn't tell you.
Q. Do you know if you spoke with her last Tuesday, January 20th?
A. I couldn't tell you.
Q. Do you know if your attorney communicated with Peggy Flowers?
A. As far as I know, she talked to him. I couldn't tell you what day, but as far as I know, she spoke with him.
Q. Do you know when she spoke with him?
A. No.
Q. Did she speak with him more than once?
A. I don't know. That I couldn't

tell you.
Q. Do you know if they spoke in person?
A. I don't know.
Q. Do you know if they communicated via e-mail?
A. I don't know.
Q. Do you know if they spoke on the phone?
A. I don't know.
Q. When Ms. Flowers called you last week, did she call your cell phone?
A. Yes.
Q. Does Ms. Flowers usually call your cell phone?
A. Yes, that's the number I gave her to contact me.
Q. Do you have a land line?
A. Yeah.
Q. Does she call you on the land line?
A. No.
Q. So whenever there are any issues, Ms. Flowers contacts you, not your wife, correct?

A. No. Sometimes she will contact my wife -- no, I can't really say.
Q. If she were to contact your wife, how would she do that?
A. By her cell phone.
Q. Whose cell phone?
A. My wife's.
Q. Your wife has a cell phone and Ms. Flowers has it?
A. I couldn't say because I know she has my phone number. I know that.
Q. Do you know if your attorney spoke with Ms. Flowers yesterday?
A. I don't know.
Q. Do you know if your attorney spoke with Ms. Flowers this morning?
A. I don't know.
Q. You live in close proximity to the Doanes, is that correct?
A. Yes.
Q. Are the Doanes the same owners of R&M Construction --
A. Yes.
Q. -- that you mentioned earlier? How did you first meet him?



Page 181

A. I met him after Hurricane Katrina.
Q. How did you meet?
A. Just by chance. I was looking at a house in the area.
Q. What area was that?
A. I[redacted].
Q. Your current residence?
A. Yes.
Q. Walk me through how you met him.
A. He was across the street fixing his house and I was in the neighborhood looking for houses and just stopped and talked to him.
Q. And do you socialize with Mr. or Mrs. Doane?
A. Not so much any more, but I used to a little bit.
Q. When did you socialize with Mr. or Mrs. Doane?
A. When I worked for him.
Q. When was that?
A. After Hurricane Katrina.
Q. Did you work for them -- did you socialize with them in 2008?
A. Probably, yes.

Page 182

Q. Did you socialize with them in 2009?
A. Probably a little, yeah.
Q. Do they have kids?
A. They have three kids.
Q. Are they the same age as your kids?
A. Yeah, I think his girls are close to my girls.
Q. Do you do family-type events together?
A. No, not really.
Q. Barbecues?
A. No.
Q. Pools?
A. No.
Q. Do you socializes with Joyce Lopez or Frank Lopez?
A. Family get-togethers or something like that.
Q. How often is that, sir?
A. We used to do Christmas together, but that's been a while.
Q. Am I correct, actually, Joyce Lopez is your mother's twin sister, is that

Page 183

correct?
A. Yes.
Q. Was Ms. Joyce Lopez the one who approached you to do work for Frank & Sons?
A. It was probably my uncle.
Q. Who is that, sir?
A. Frank.
Q. Frank approached you?
A. It's kind of hard to say approached. I mean, if a job came up or something, we might have talked about it. But as far as coming to look for me to go do a job or something like that, it might have been just something that we talked about.
Q. Did you receive any additional wires, transfers, payment or grants, Road Home, in addition to the 50,000, the approximately $50,000 that you received?
A. I don't remember.
Q. Did you receive more than one payment?
A. I don't remember that either.
Q. How much did it cost you to build your house?
A. I think we have -- we are

Page 184

keeping -- my wife is keeping track. I'm not sure. I'm building it myself.
Q. If you're building it yourself, you must buy the materials, correct?
A. Yes.
Q. You must hire the guys to work on it?
A. Most of the work I do.
Q. So you do the work by yourself?
A. Yeah. I had friends come help me frame it.
Q. It's fair to say if you buy the materials, you should have an idea how much was spent on building the house?
A. I been doing this a few years, so I don't keep track. I couldn't tell you offhand.
Q. Ballpark?
A. I couldn't tell you.
Q. Less than 500,000?
A. Yes.
Q. More than 250,000?
A. No.
Q. Less than 100,000?
A. Yes.



Q. Less than 75,000?
A. Yes.
Q. Less than 50,000?
A. You're getting close, so I really couldn't tell you.
Q. So is it accurate then that the Road Home grant paid for most of the materials you purchased to build your home?
A. It paid for -- I don't know how much I paid for it. I really couldn't tell you. I don't know how it works. I don't understand the system of how it works.
Q. Let's assume that you received $50,000, which is what is shown in the records you provided and you're telling me that you spent approximately $50,000 in material?
A. I would have to add it up. I couldn't tell you.
Q. Did you apply to any other grants?
A. Not that I remember.
Q. Do you have any other loans --
A. Any other loans -- I might have a car loan.
Q. On your truck?

A. No, on my son's car.
Q. What kind of car is that, sir?
A. Dodge Dart, I think it was.
Q. What's the model?
A. I'm not even sure.
Q. Have you ever been convicted of a criminal offense involving dishonesty, sir?
A. No.
Q. Have you plead guilty?
A. No.
Q. I just want to clarify before we move on. The claims with the GCCF and the DHECC are your claims, correct?
A. Yes.
Q. You are the one that worked with the attorneys in getting that filed, correct?
A. Yes.
Q. And you're the one that dealt with Peggy Flowers in obtaining the 2009 return with two Schedule Cs, correct?
A. Yes.
Q. Did you work with anyone else?
A. I didn't, no.
Q. And your wife did not work with

the attorneys in your GCCF or DHECC claim?
A. No.
Q. And she did not work with Ms. Peggy Flowers on your 2009 return with two Schedule Cs, correct?
A. No.
Q. Did she work with anyone else?
A. No.
Q. Does your wife know Kim Flowers?
A. Is that Ms. Peggy's sister?
Q. I believe that's Peggy's daughter.
A. I don't think I've met her.
Q. Do you know if your wife has?
A. No.
MR. SALICRUP:
We're going to go off the record for a second.
(Whereupon, a brief recess was taken.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, I'm going to rephrase a question I asked earlier. Actually, I'm going to rephrase -- I'm going to start with a different question before I rephrase.
Based on the documents that you

have provided from your bank account for 2009, you have deposits starting in March 2009 through May 2009, one in 3/24/2009, in the amount of $500, one in 4/06/09, in the amount of $2,000, one in 4/13/2009 in the amount of $3,200, one in 4/20/2009 in the amount of $500, one in 5/5/2009 in the amount of $300.
Do you know what the source of this income was?
A. No.
Q. Was that income generated by your work at R&M Construction?
A. I don't know.
Q. Was that income generated by your wife?
A. I don't know.
Q. The same set of documents has a series of deposits starting 7/13/2009 through 8/10/2009, totaling $4,500, $300, $450, $500, $500 again and $600.
Do you know the source of income for these deposits?
A. No.
Q. Do you now if your wife was --



Page 189

generated this income?
A. I don't know.
Q. Were these deposits related to your work at R&M Construction?
A. I don't know.
Q. Pardon me?
A. I don't know.
Q. Do you know the source of the income in any of the March statements?
A. No.
Q. Do you know the source of the income for the April statement in 2009?
A. No.
Q. For example, the one that I just mentioned for 4/13/2009 totaling $3,200?
A. I don't know.
Q. Do you know the source of the income for the deposits I listed from July 13, 2009 through August 10, 2009?
A. I don't know.
Q. Do you know the source of income for a deposit in 12/30/2009, totaling $400 contained in the documents that you provided to us?
A. No, I don't know.

Page 190

Q. I'm going to rephrase a question that I asked earlier. And I think we had some communication difficulty. I will do my best to be clear, if you don't understand, tell me, please.
A. Okay.
Q. According to the 10 months of bank statements that you have provided in your 2009 bank records, your deposits total $137,742.
A. Okay.
Q. Do you understand?
A. Yes.
Q. You confirmed that you had a deposit of $50,000 -- 500 -- $50,570 from Road Home?
A. 50,877 cents (sic).
Q. 50,570, do you understand?
A. Yes.
Q. When we subtract 137,742 from the 50,570, that gives us a total of $87,172 in gross income. Do you understand?
A. Yes.
Q. According to the 2009 tax returns that you submitted to the GCCA -- GCCF

Page 191

and/or the DHECC, you and your wife in 2009 had an income of $31,791 from W2-related work. Do you understand?
A. Yes.
Q. I'm going to represent to you that that number is accurate. According to the documentation that you provided, you had additional income in 2009 of 26,620 from R&M Construction in 2009, do you agree?
A. Yes.
Q. When we subtract the 87,172 in gross income that I just mentioned from the income reported in your W2 and the income in your R&M Construction --
MS. FEELEY:
Just so we're clear, you're doing it backwards.
You're going to subtract those from the gross income.
MR. SALICRUP:
Sorry, excuse me.
EXAMINATION BY MR. SALICRUP:
Q. Like I said, 87,172 minus the income on the W2, minus the income from R&M Construction gives us $28,761.

Page 192

Do you understand?
A. Yes.
MR. COLEMAN:
I'm sorry, start with one thirty seven, subtract 50K from Road Home, that gives us 87,000, and then your next calculation was to subtract --
MR. SALICRUP:
Eighty-seven minus thirty-one seven nine one.
MR. COLEMAN:
That would be the wages?
MR. SALICRUP:
Yes. Minus twenty-six six twenty from R&M totals twenty-eight seven six one.
MR. COLEMAN:
28,000.
MR. SALICRUP:
Yeah.
MR. COLEMAN:
Got it.
THE WITNESS:
Yes.
EXAMINATION BY MR. SALICRUP:
Q. That number does not match the

$46,434 included in your 2009 return that you list as fishing income.
How do you account for that difference?
A. I can't. I don't remember what the income was from.
Q. And that $46,434 listed in your 2009 return with two Schedule Cs, is the same amount you've included in your SWS1, is that correct?
A. Yes.
Q. Earlier you stated you presented that information to your counsel. How do you explain the differences in income from your bank account to the income you told the DHECC and the SWS1?
A. I can't. I don't know.
MR. SALICRUP:
I think we're done.
Are you going to need 10 minutes or what's your --
MR. COLEMAN:
I don't think so.
We just had a break. Are you good to go?

THE WITNESS:
I'm good.
MR. COLEMAN:
Off the record.
(Whereupon, an off-the-record discussion was held.)
EXAMINATION BY MR. SALICRUP:
Q. Mr. Alfonso, one final question. The information included in your 2009 returns was -- you reported those amounts to Peggy Flowers, correct?
A. Yes.
Q. Thank you.
MR. SALICRUP:
We're done.
If you would like 10 minutes.
MR. COLEMAN:
No, no, that's fine.
EXAMINATION BY MR. COLEMAN:
Q. Did you work for Frank & Sons in 2009?
A. No.
Q. And in -- after hearing about the Special Master's investigation regarding your claim and the forms submitted on your

behalf, did you make your best effort to investigate whether you worked for Frank & Sons or otherwise received income from Frank & Sons in 2009?
A. Yes, sir, I did.
Q. What was the result of your best effort at investigating that question?
A. That I did not work for Frank & Son in '09.
Q. Did you receive a 1099 from Frank & Sons in -- for 2009?
A. No.
Q. Did you receive or do you have any other paperwork for 2009 reflecting income from Frank & Sons?
A. No.
Q. I'm going to refer you to the first time when you met with Ms. Flowers to prepare your original 2009 return. I believe that -- we established in the deposition that that was early 2010.
A. Right.
Q. Are you with me?
A. Yes.
Q. At this point, do you recall any

correspondence or communication with Ms. Flowers about income from Frank & Sons in 2009?
A. No.
Q. You now know, I believe, or you were shown Exhibit 9, which is a document from -- I don't know, let's pause here and pull out Exhibit 9.
MR. SALICRUP:
You want to go off the record?
MR. COLEMAN:
No, we're good.
EXAMINATION BY MR. COLEMAN:
Q. I put in front of you Exhibit 9, which was represented by Mr. Salicrup to be an accounting worksheet or spreadsheet obtained from Ms. Flowers. Do you recall looking at this document?
A. No. This is the first time I seen it.
Q. But you recall Mr. Salicrup presenting it to you?
A. Yes.
Q. And looking at this document, there's a line item for Frank & Sons income



Page 197

and it says $22,250. Do you see that?
A. Yes.
Q. Do you have any idea how that income, that $22,000 -- $22,250 was recorded?
A. No.
Q. I want to turn to the -- when you -- your second go round with Ms. Flowers on your tax returns for 2009 and I believe you testified, and correct me if I'm wrong, that you returned to Ms. Flowers later in 2010 after meeting with the GCCF, do you recall that?
A. Yeah, I called on the phone.
Q. Is that how you communicated with Ms. Flowers about the need to amend your Schedule Cs?
A. Yes.
Q. And what exactly did you tell Ms. Flowers that you needed done on your Schedule Cs?
A. I asked her if she could separate the fishing from the construction.
Q. Did you ever instruct Ms. Flowers to include Frank & Sons income on your

Page 198

fishing revenue?
A. No.
Q. And how did you receive the amended Schedule Cs back from Ms. Flowers?
A. I'm not positive, but I think it was via fax.
Q. Do you know whether you met with Ms. Flowers to review the amended Cs?
A. No.
Q. Did you have -- did you know that Ms. Flowers had included Frank & Son's income on the amended Schedule C that reported your commercial fishing income?
A. No.
Q. Do you recall reviewing the amounts that were recorded on the amended Schedule Cs?
A. I don't recall. If I did, I wouldn't have known -- I wouldn't have knew the difference because I don't know what I'm looking at as far as tax papers.
Q. At the time you submitted the document to GCCF, were you aware that the Frank & Son's income was recorded on the amended Schedule C?

Page 199

A. No.
Q. I think you had told Mr. Salicrup that you did not file the amended Schedule Cs with the IRS. Do you recall saying that?
A. Yes.
Q. Why didn't you file the amended Schedule Cs?
A. My tax accountant said it wasn't necessary. It didn't change the numbers or something to that effect.
Q. When you were advocating on your own behalf with GCCF, to get some compensation related to the spill, was it your -- were you intending to rely on 2009 taxes to support that claim?
A. No. I was depending on what they asked me to submit, '7, '8 and '9.
Q. At some point, you learned that Miss -- that the Special Master had presented Ms. Flowers with a subpoena for documents, right?
A. Yes.
Q. Did you talk to Ms. Flowers after she had received that subpoena?
A. I think I spoke with her before

Page 200

she had received it.
Q. Did you have a conversation with her about responding to the Special Master's investigation?
A. She told me -- she told me that they was going -- they was going to review my files.
Q. And what were your instructions, if any, to Ms. Flowers regarding her cooperation with the investigations?
A. I told her it was no problem, that they have exactly what I filed on my taxes.
Q. Do you feel like you have anything to hide in connection with this investigation?
A. No.
Q. Do you feel like you've done anything wrong here in connection with your claim?
A. No.
Q. Have you ever intentionally tried to inflate your reported income from commercial fishing?
A. No.
Q. Did you specifically know or



Page 201

intend that your commercial fishing income for 2009 was inflated?

A. No.

MR. COLEMAN:

I have no further questions.

(Whereupon the sworn statement was concluded at 2:37 p.m.)

* * *

Page 202

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Diane Clark, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that VERNON ERNEST ALFOFNSO, JR., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 201 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

__________________________________

DIANE CLARK, RPR, RMR, CRR
CERTIFIED COURT REPORTER

