UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM
IN SUPPORT OF MOTION OF THE DHECC
FOR RETURN OF PAYMENT MADE TO VISION DESIGN MANAGEMENT

Claims Administrator Patrick Juneau and Special Master Louis J. Freeh move to have claimant Vision Design Management, Inc. ("Vision Design") and its members, Barbara J. Stokes ("Stokes") and Scott B. Stokes, return the payment of $2,168,967.71 made by the Deepwater Horizon Economic Claims Center ("DHECC").  In support of its Business Economic Loss claim, Vision Design provided the DHECC with monthly profit and loss statements and bank statements that claimed to support $819,708 in August and September 2009 consulting revenue.  In fact, these deposits were not from consulting revenue of Vision Design, but rather were mostly loan proceeds intended to pay contractors for work on a housing project.  Relying on Vision Design's misrepresentations, the DHECC paid the company $2,168,967.71.

The DHECC seeks a judgment requiring Vision Design and its members to return money paid on this claim, less the amount former counsel for Vision Design has agreed to repay to the DHECC.  On March 17, 2015, the lawyers withdrew from further representation of Vision Design and agreed to repay the legal fees received from the claim.

#### A. *Background*

The Court directed the Special Master to investigate and seek repayment of fraudulent claims submitted to the DHECC. The Court retains continuing and exclusive jurisdiction over the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement"). *See* Settlement Agreement at ¶¶ 4.3.2, 4.3.10, 4.4.7 and 18.1. Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court. *Id*. at ¶ 18.1.

#### B. *The DHECC Claim*

Stokes and her husband, Scott B. Stokes, residents of Alabama, were the only members of Vision Design, a Florida limited liability company.[1] As Vision Design's authorized representative, Stokes filed a Business Economic Loss ("BEL") claim with the DHECC, asking to have the claim paid on Vision Design's historical income as reported in its monthly profit and loss statements ("P&L"), federal tax returns, and bank statements. Stokes said Vision Design was a construction consulting firm in Santa Rosa Beach, Florida.

1. General Requirements for Business Economic Loss Claims

The Settlement Agreement requires business claimants to provide the DHECC with, among other documents, federal tax returns and monthly P&Ls for the selected Benchmark Period, 2010, and, at times, 2011. *See* Settlement Agreement Ex. 4A at ¶¶ 3-4. Business claimants located in Zone A, such as Vision Design, are generally not required to "provide any evidence of causation." *See* Settlement Agreement Ex. 4B at ¶ I.

---

[1] According to Florida Department of State records, Vision Design was formed as a corporation, and later converted to a limited liability company. Both corporate structures are the same entity and will be referred to here as Vision Design.

2

The BEL compensation framework consists of two steps.  The first step compensates claimants for certain reductions in their variable profits, by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period.  The second step compensates claimants for the incremental profits they might have generated in the absence of the oil spill relative to revenue from a Benchmark Period.  Total compensation is comprised of the lost variable profit from steps one and two.   Claimants also receive a risk transfer premium.  The DHECC calculates the compensation using data provided by the claimant.

2.     Business Economic Loss Documentation

Vision Design initially filed a claim with the Gulf Coast Claims Facility ("GCCF").  *See* Ex. A.  Vision Design's GCCF claim form, as well as the supporting financial statements and tax returns, were prepared by the accounting firm Carr, Riggs & Ingram, LLC ("CRI").  The financial statements provided were for April 30 to November 16, 2009 and 2010.  Tax returns for 2007, 2008, and 2009 all had been signed by CRI and Stokes on November 16, 2010, several days before submission to the GCCF.  *See* Exs. B & C.  The GCCF denied the claim for lack of sufficient supporting documentation.

On July 16, 2012, Vision Design filed its BEL claim and provided the DHECC with monthly and annual financial data for 2007 – 2010 prepared by the accounting firm Hagen, Streiff, Newton & Oshiro, Accountants, PC ("HSNO").  *See* Ex. D.  The documents were stamped "PRELIMINARY."  *Id*.  The annual revenue reported on the HSNO-prepared financials matched the annual revenue shown on the CRI-prepared financials and federal tax returns: $368,629 (2007), $632,000 (2008), $821,463 (2009), and $5,719 (2010).

3

In November 2012, the DHECC asked Vision Design for its 2010 tax return.  Vision Design responded with a 2010 return prepared by a different accountant and signed by Stokes on December 14, 2012.  *See* Ex. E.  In January 2013, the DHECC asked Vision Design to provide contemporaneously-prepared monthly P&Ls.  Vision Design responded with new monthly P&Ls prepared by HSNO.  *See* Ex. F.  The annual revenue for 2007 – 2010 remained the same, but changes had been made to the 2009 monthly amounts.  The monthly P&Ls first provided to the DHECC showed all revenue ($821,462.98) recorded in November 2009.  *See* Ex. D at 5.  Vision Design's final P&Ls showed the same total revenue, but allocated the revenue to August ($471,140.07), September ($348,568.00), October ($1,720.00), and November 2009 ($34.93).  *See* Ex. F at 45, 47, 49, and 51.

On March 4, 2013, the DHECC accountant reviewing the claim emailed counsel for Vision Design:

> 1.  I noticed that revenues were only recognized in March of 2008 and a significant revenue spike in August-September 2009.  Can you please provide an explanation and support (e.g. bank statements) to support these numbers?
>
> . . .
>
> 3.  For much of 2009 and 2010 there is no activity.  Can you please provide an explanation as to why there are no revenues/expenses in many of the months?

On March 7, 2013, counsel for Vision Design responded:

> Vision Design was a management/consulting company.  After and during a managing job Vision Design Management got paid and deposited money.  VDM worked each month but billing and statements were paid upon milestones or agreed upon by both parties.
>
> Bank statements in support of the revenue have been submitted previously to the DH[E]CC on 7/16/2012. . . .  These should be sufficient to corroborate the P&Ls.

4

3.     DHECC Calculation and Payment

Relying on data from Vision Design, the DHECC used May – December 2009 as the Benchmark Period, finding that the company had $821,463 in revenue with no variable expenses in this time.  For 2010, Vision Design had $5,743.52 of revenue and $16,292.52 in variable expenses.  The DHECC set Vision Design's compensation as $2,121,103.15.  On August 8, 2013, the DHECC paid Vision Design $2,168,967.71, including accounting fees and other adjustments.

The former legal counsel for Vision Design received attorney's fees and costs of $558,656.68 for the claim filed with the DHECC.  On March 17, 2015, former counsel agreed to repay the fees to the DHECC and withdrew from further representation of Vision Design.

C. *Evidence of the Fraudulent Claim*

The totality of the record shows there is no genuine issue as to any material fact and that the DHECC is entitled to a judgment as a matter of law.  *See* Order & Reasons on Special Master's Motion for Return of Payment at 19 (Doc. Rec. 12794) ("Order & Reasons").

Vision Design told the DHECC that deposits on its 2009 monthly bank statements were consulting revenue, explaining an August and September 2009 revenue spike with the claim that "Vision Design was a management/ consulting company.  After and during a managing job Vision Design Management got paid and deposited money."  *See* Ex. G.

Bank records and other documents, however, show that the deposits in August and September 2009 were not revenue paid to Vision Design for a "managing job."  The deposits match the $819,708.07 in revenue claimed by Vision Design in the monthly P&Ls for August and September 2009 provided to the DHECC.  But $773,443.77 of the deposits came from checks drawn on the account of Summerplace LLC ("Summerplace"), another

Stokes-owned entity, in the exact amounts of draw requests made against a construction loan intended to pay contractors for specific work to finish a town home project. The remaining $46,264.30 came from some checks over six months old — "stale" checks under the Uniform Commercial Code — and some payable to entities other than Vision Design. As detailed below, none of these deposits were revenue to Vision Design.[2]

1. <u>Deposits from Related Party Summerplace LLC Were Not Revenue</u>.

On three days in August and September 2009, Vision Design deposited five checks totaling $773,443.77, all signed by Stokes and drawn on a bank account for Summerplace, as follows and as shown at Exhibit H:

| Check Deposits from Summerplace LLC - August & September 2009 | | | |
|---|---|---|---|
| **August 3, 2009 Deposit** | | | |
| Check Date | Payor | Payee | Amount |
| 7/31/09 | Summerplace LLC | VDM, LLC | $232,880.00 |
| | | **Deposit Total** | $232,880.00 |
| **August 28, 2009 Deposit** | | | |
| Check Date | Payor | Payee | Amount |
| 8/29/09 | Summerplace LLC | VDM, Inc. | $5,342.14 |
| 8/29/09 | Summerplace LLC | VDM, Inc. | $9,716.63 |
| 8/29/09 | Summerplace LLC | VDM, Inc. | $177,797.00 |
| | | **Deposit Total** | $192,855.77 |
| **September 11, 2009 Deposit** | | | |
| Check Date | Payor | Payee | Amount |
| 9/05/09 | Summerplace LLC | VDM, Inc. | $347,708.00 |
| | | **Deposit Total** | $347,708.00 |
| | | **Total Summerplace LLC Deposits** | **$773,443.77** |

The three largest checks exactly match funds released to Summerplace in this same period under a construction loan and intended to pay contractors for approved work on a town home project. No fee for Vision Design was included in these approved expenses. Specifically, Summerplace obtained a loan from First Citizens Bank of Georgia ("First Citizens") in 2007 to refinance land in Santa Rosa Beach, Florida and build a 14-unit

---

[2] Vision Design's settlement award was affirmed on appeal at the DHECC. But the DHECC appeal panel did not have access to the deposit details allegedly supporting Vision Design's consulting revenue contained in this motion, which were obtained during the course of the clawback investigation of the claim.

6

project. *See* Ex. I.  Summerplace hired a general contractor to supervise the construction. To ensure proper use of funds, First Citizens hired DAG Architects, Inc. ("DAG") to manage the draw process and inspect the project work before funds were released.

The project used draw requests to pay the general contractor based upon levels of completion of approved contract items.  For each draw request, DAG received an Application and Certification for Payment ("Application") from the general contractor listing the project's total budget, the amount and description of work performed to date, and the amount of funds requested.  DAG reviewed each Application and prepared an Architect's Field Report ("Field Report") describing the work status and recommending whether to permit a draw.

Work stopped on the project in June 2008.  First Citizens agreed to a forbearance on any default based on Summerplace's assurance that the project could be completed with a new general contractor and a detailed $836,837 budget.  *See* Ex. J at 4, 10, 24.  Execution and supervision of the project was entrusted to a new general contractor.  The budget included no management fees for Vision Design.

As before, First Citizens relied upon Applications provided by the general contractor and DAG's Field Reports to approve draw requests on the loan.  During July, August and September 2009, DAG approved $758,385 in draw requests in the amounts of $232,880, $177,797, and $347,708 — the exact amounts of three of the five checks written from Summerplace to Vision Design and part of the "consulting" revenue Vision Design claimed to the DHECC.[3]  *See* Ex. J at 52-53. [4]  Vision Design, however, was not entitled to any of these

---

[3] The construction loan was the only money available to Summerplace at this time.  In fact, from June 2008 when the first general contractor stopped work on the project through August 3, 2009, the Summerplace bank account had only one $500 transaction and had an ending account balance of $36.52.  *See* Ex. K.

7

monies, which were intended to pay the contractors for the approved work that had been completed, such as roofing work and installation of cabinets, exterior siding, wiring and granite counter tops. *See, e.g.*, Ex. J at 42-43. None of the Applications or Field Reports included any payment for "consulting" costs to Vision Design, Barbara Stokes or anyone else. *See* Ex. J at 25-56. The full $836,837 budget was expended on approved projects.

On November 12, 2014, the Special Master's investigators interviewed DAG Construction Administration Director Kenneth Bell, who was responsible for the Field Reports and review of the Applications for the Summerplace town home project. Bell confirmed that the purpose of the 2009 construction draws was to pay the contractors who provided the goods and services listed on the Applications. Bell had no knowledge of any consulting fees for Vision Design, Barbara Stokes or anyone else on the project.

In sum, the $773,443 in approved construction costs for the Summerplace project that were transferred to the Vision Design bank account in August and September 2009 were not "revenue" for the company, but rather were simply a pass through of payments for scheduled expenses paid for completion of the Summerplace construction.

2.  <u>Deposit of Checks Made Payable to Others Was Not Vision Design Revenue.</u>

On two days in August and September 2009, Vision Design deposited seven checks into its bank account, as follows and as shown at Exhibit H:

---

[4] The other two checks Stokes wrote from Summerplace to Vision Design were for payment of general liability and property insurance for Summerplace. *See* Ex. J at 39-40. Vision Design had not paid this vendor, and thus was not entitled to the money.

8

| Check Deposits for Other Payees – August & September 2009 | | | |
|---|---|---|---|
| August 27, 2009 Deposit | | | |
| Check Date | Payor | Payee | Amount |
| 7/31/09 | Auto-Owners Insurance | Serenity at Dune Allen HOA | $202.94 |
| 1/27/09 | GSH of Alabama Inc | GSH of Alabama Inc | $1,980.62 |
| 1/27/09 | Stokes Development LLC | Stokes Development LLC | $10,264.00 |
| 1/28/09 | Hopping Green & Sams, P.A. | Carrabelle Landing, LLC | $5,101.23 |
| 1/27/09 | Coastal Dunes LLC | Coastal Dunes LLC | $27,855.51 |
| | | Deposit Total | $45,404.30 |
| September 3, 2009 Deposit | | | |
| Check Date | Payor | Payee | Amount |
| 9/01/09 | John B Stokes | Scott Stokes | $660.00 |
| 9/01/09 | Amalgamated Business Systems | Scott Stokes | $200.00 |
| | | Deposit Total | $860.00 |
| | | Total Other Payee Deposits | $46,264.30 |

None of these seven checks were payable to Vision Design, and three checks were written to and from the bank accounts of other Stokes-owned entities. Four of the checks deposited in August 2009 were dated from January 2009. Yet all of the $46,264 from these checks was included as "consulting" revenue in support of Vision Design's DHECC claim.

The staleness of most of these checks and the fact that each check required a third-party endorsement to be paid to Vision Design raise a serious question as to whether any of these checks represent consulting revenue or support the claim that "[a]fter and during a managing job Vision Design Management got paid and deposited money."

### D. *Legal Analysis*

1. Vision Design Should Return All Funds Received
   from the DHECC Because Its Claim Was Fraudulent.

The Court's power to order equitable remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944) (affirming judicial power to set aside fraudulently begotten judgments as such cases present "a wrong against the institutions set up to protect and

9

safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society"); Order & Reasons at 21.

Here, the record shows that Vision Design presented false information to the Court-supervised DHECC to obtain $2,168,967.71.  Vision Design claimed to have earned over $800,000 in Benchmark Period revenue, which it supported with monthly bank statements and several years of federal tax returns that all had been created after the oil spill and near the time when they were submitted to the GCCF and DHECC.  A review of the details of the bank deposits, however, revealed that the purported revenue was in fact comprised of $773,443 from a bank loan intended to pay for construction costs incurred by another Stokes-owned entity.  Another $45,404 in checks were made payable to entities other than Vision Design, many of the checks were stale, and several involved transactions among related entities.  *See* Exs. H, I, and J; DHECC Policy 328 v.2.  In combination, these facts demonstrate that Vision Design's claim was based on false information.

In light of the evidence, the DHECC seeks an order compelling Vision Design to return the payment made on its DHECC claim.  The return of the payment will make the DHECC whole, deprive Vision Design of an unjust enrichment and deter others from engaging in similar misconduct.  *See* Order & Reasons at 22.

2. Vision Design's Members Should be Held
   <u>Personally Liable for Return of All Funds.</u>

Stokes and her husband, as the sole members of Vision Design, should be held liable personally for the fraudulent payment made to Vision Design by the DHECC.  Based on their conduct, Stokes and her husband are not entitled to the legal protection normally available to a legitimate corporate entity.

For example, Stokes and her husband ignored certain corporate formalities and only maintained proper records with the Florida Department of State when needed to pursue claims arising from the oil spill. Vision Design did not file the required annual reports with the Department of State from 2008 to 2010. As a result, Vision Design was administratively dissolved and was not permitted to conduct business in the state until the administrative dissolution had been remedied. *See* Fla. Stat. § 607.1420(1)(a); Fla. Stat. § 607.1421(3).[5]

In 2013, a federal court in the Northern District of Alabama addressed a similar issue with Stokes and her husband in a suit involving default on other loans. When the court discovered that Vision Design had received a DHECC claim payment but the Stokes did not use the funds to satisfy the judgment, the court held the Stokes in contempt and said: "the creation and use by Barbara Stokes and Scott Stokes . . . of [Vision Design], is and has been a mere sham and subterfuge to avoid paying the judgment in this case to the judgment creditor plaintiff." *See* Ex. L.

Additionally, Stokes had the federal tax returns submitted to the GCCF and DHECC prepared solely for the purpose of filing claims. *See* Exs. C and E.[6] She also wrote and signed checks from Vision Design's bank account that appear personal in nature. *See* Ex. M.

For these reasons, Stokes and her husband should be required to make restitution of monies fraudulently received by their company from the DHECC. *See Patin v. Thoroughbred Power Boats*, 249 F.3d 640, 647-49 (5th Cir. 2002) (holding owner of two corporations

---

[5] On June 8, 2011, only after hiring counsel to pursue claims in the *Deepwater Horizon* matter, did Vision Design file the requisite paperwork to have the company reinstated as a Florida corporation.

[6] There is also no evidence that Vision Design actually filed these federal tax returns with the IRS. The DHECC has requested authorization from the company to obtain its federal tax return transcripts, but the company has not responded.

11

personally liable for debts because the corporations were his "alter ego" and had been used for "improper conduct," such as avoiding liability in the case before the court).

### E. *Conclusion*

For the reasons stated, the DHECC seeks entry of a judgment requiring Vision Design and its members Barbara J. Stokes and Scott B. Stokes to make restitution to the DHECC for $2,168,967.71, less the amount former counsel for Vision Design has agreed to repay to the DHECC.

Respectfully submitted,

\_\_\_\_/s/  Patrick Juneau_____
Patrick Juneau
Claims Administrator

\_\_\_\_/s/  Louis J. Freeh_____
Louis J. Freeh
Special Master

Dated:  March 18, 2015