

June 22, 2007

Don and Jennifer Boggus
Barbara and Scott Stokes



Dear Sir or Madam:

It is a pleasure to work with you on how The First Citizens Bank of Georgia can assist in re-financing the land loan and funding the construction of the 14 town home units located at the intersection of Highway 30A and Highway 393 in Santa Rosa Beach, Florida known as Summer Place, LLC.

We have reviewed the information that you provided and submit the following loan commitment for your consideration:

| | |
|---|---|
| Borrower: | Summer Place, LLC |
| Loan purpose: | To re-finance the land and fund the construction of 14 town home units located at the intersection of Hwy 30A and Hwy 393, Santa Rosa Beach, Florida. |
| Loan amount: | $7,500,000. |
| Repayment terms: | Interest Only Payable Monthly Construction Line of Credit. |
| Maturity date: | 24 months from closing date of the loan. |
| Interest rate: | Prime Rate + .50% floating daily for term of the loan. |
| Loan commitment fee: | .50 % of the loan amount committed ($37,500.00) |
| Guarantors: | J. Donald Boggus Jr.<br>Jennifer S. Boggus<br>Barbara Stokes<br>Scott Stokes |

Summer Place, LLC
6/22/07

P.O. Box 809       Dawsonville, GA 30534       Ph: 706-216-5900       Fax: 706-216-5913

Page 2 of 5

| | |
|---|---|
| Collateral: | First Deed to Secure Debt on the real estate and improvements located at the intersection of Hwy 30A and Hwy 393, Santa Rosa Beach, Florida, which will be more specifically described in the loan and security documents. |

Closing costs:

Any costs of closing the loan contemplated herein, including, but not limited to, fees of Lender's legal counsel, appraisal costs, environmental surveys, Architectural Engineer contracted for inspections, will be paid by Borrower.

Financial statements:

The Borrower and guarantors shall provide financial information as requested by First Citizens Bank of Georgia, from time to time, which shall include, but not limited to:

- Annual balance sheet, profit and loss statement and tax return for Borrower;
- Annual personal financial statement and tax returns for individual guarantors.

Prepayment penalty:

None

Change of business:

Borrower shall not reorganize or change its name or form of organization without the prior written consent of First Citizens Bank of Georgia. Failure to obtain prior written consent shall constitute an event of default and authorizes Lender to declare all or any part of the indebtedness due and payable.

Deposit relationships:

Borrower and or Guarantor will maintain a non-interest bearing operating account related to this entity with First Citizens Bank of Georgia.

Right to inspect:

Lender reserves the right to inspect, audit, verify, and check its collateral, at any reasonable time, at its sole discretion.

Summer Place, LLC
6/22/07

Page 3 of 5

Non-Assignment:                    Neither this Commitment nor any of the proceeds of
                                   the Loan shall be assignable by Borrower without
                                   the prior written consent of Lender.

Voidability:                       This Commitment shall be voidable, at the option of
                                   the Lender, if any of the following events occur:
                                   (1) Borrower or any Guarantor commits an act of
                                       Bankruptcy.
                                   (2) Proceeding is commenced by or against
                                       Borrower or any Guarantor under any
                                       bankruptcy or insolvency law.
                                   (3) Borrower's business is discontinued or
                                       suspended for any reason.
                                   (4) There is a material adverse change in
                                       Borrower's or any Guarantor's financial
                                       condition.
                                   (5) Borrower or any Guarantor defaults on any
                                       other obligations it may have to the Lender.
                                   (6) Any other action by the Borrower or any
                                       Guarantor, which would, in the reasonable
                                       opinion of the Lender, endanger the security,
                                       completion, or repayment of the loan
                                       contemplated herein.
                                   (7) Death of any Guarantor.

Representations:                   The validity of this Commitment is subject to the
                                   accuracy of all information, representations, and
                                   materials submitted by the Borrower and/or
                                   Guarantors, with or in support of the application for
                                   the loan contemplated herein; and the failure of the
                                   accuracy thereof, or any material changers therein,
                                   shall, at the option of the Lender, operate to
                                   terminate this commitment and all of the Lender's
                                   obligations hereunder.

Consequential Damages:             In no event shall the Lender be liable to the
                                   Borrower or any Guarantor for any indirect, special,
                                   or consequential damages, including the loss of
                                   anticipated profits, which may arise out of, or are in
                                   any way, connected to the issuance of this
                                   Commitment.

Summer Place, LLC
6/22/07

Page 4 of 5

Modifications or Amendments:      No changes in the provisions of this Commitment shall be binding unless in writing and executed in the name of and by an Officer of Lender.

Other Conditions:      Borrower shall maintain a financial condition reasonably satisfactory to Lender.

The loan documentation for this loan must be prepared and closed by the Lender's attorney, at its sole discretion.

Proper hazard, liability, and flood insurance coverage shall be maintained on the property at all times.

Bank will require that Environmental reports acceptable to the Bank be prepared. Additionally, Borrower will provide at closing an environmental affidavit and indemnity acceptable to the Bank.

At completion of town homes and upon sale of said homes, 100% of net sales proceeds must be applied to reduce the total aggregate debt to First Citizens Bank of Georgia.

**CONDITIONS PRECEDENT:** Prior to the closing of the loan all items listed and described below must be satisfied:

1. Proof of Hazard and Flood Insurance.
2. Bonding of project is required.
3. Borrower will inject the required cash of approximately $800,000 at the time of re-financing the land loan.
4. At lender's discretion, Lender will engage a qualified engineer to manage the draw process and inspections at borrower expense.
5. This loan is contingent upon Lender securing banks willing to participate in approximately $5.5 million of the total debt of $7.5 million.
6. Borrower will furnish any and all other information or documentation Lender or Lender's Counsel may request.

Time:      Time is of the essence of this Commitment.

Applicable law:      This Commitment shall be interpreted, construed, enforced and governed by the laws of the state of Georgia.

Summer Place, LLC
6/22/07

Page 5 of 5

Survival:                              This Commitment and all the terms and provisions
                                       hereof shall survive the closing of the loan
                                       contemplated herein.

Lender shall be furnished with such security and credit instruments as Lender shall deem
necessary for its protection.

If the terms and conditions of the loan meet your approval, please indicate your
acceptance by signing this letter and returning to my attention.

This Commitment shall be null and void if not accepted by July 2, 2007 and if the loan is
not closed by July 31, 2007. This commitment shall supersede any and all commitments
conveyed either verbally or in writing.

Thank you for your consideration. We look forward to moving forward with you on this
project.

Sincerely,

Michael T. Underwood
Executive Vice President


This commitment accepted this ___26th___ day of ___June___, 2007.


Summer Place, LLC                            GUARANTOR

By:_____                  _____
   J. Donald Boggus Jr.                       J. Donald Boggus Jr.


GUARANTOR                                    GUARANTOR

_____                     _____
Jennifer S. Boggus                           Barbara Stokes

GUARANTOR


_____
Scott Stokes


Summer Place, LLC
6/22/07

Page 5 of 5

Survival:                              This Commitment and all the terms and provisions
                                       hereof shall survive the closing of the loan
                                       contemplated herein.

Lender shall be furnished with such security and credit instruments as Lender shall deem
necessary for its protection.

If the terms and conditions of the loan meet your approval, please indicate your
acceptance by signing this letter and returning to my attention.

This Commitment shall be null and void if not accepted by July 2, 2007 and if the loan is
not closed by July 31, 2007.  This commitment shall supersede any and all commitments
conveyed either verbally or in writing.

Thank you for your consideration.  We look forward to moving forward with you on this
project.

Sincerely,


Michael T. Underwood
Executive Vice President

This commitment accepted this __2__ day of _____, 2007.


Summer Place, LLC                          GUARANTOR

By:_____           _____
    J. Donald Boggus Jr.                   J. Donald Boggus Jr.


GUARANTOR                                  GUARANTOR

_____              _____
Jennifer S. Boggus                         Barbara Stokes                6/25/07

GUARANTOR

_____
Scott Stokes


Summer Place, LLC
6/22/07

# REAL ESTATE NOTE

July 30, 2007

$7,500,000.00

Dawsonville, Georgia

**FOR VALUE RECEIVED**, the undersigned, SUMMER PLACE, LLC, a Florida Limited Liability Company (the "Borrower"), promises to pay to the order of FIRST CITIZENS BANK OF GEORGIA, (herein the "Lender" and, along with each subsequent holder of this Note, referred to as the "Holder"), the principal sum of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.00), or, if less, so much thereof as has been advanced and is then outstanding hereunder, with interest on the outstanding principal balance of this Note from the date hereof until fully paid as hereinafter provided. Such advances shall be endorsed from time to time on the Schedule of Advances attached hereto, but the failure to make such notations shall not affect the validity of the Borrower's obligation to repay unpaid principal and interest hereunder.

The Borrower shall pay interest on the daily outstanding principal balance of this Note at a simple interest rate per annum equal to the sum of (a) the Interest Rate in effect from time to time plus (b) One Half (.50) percentage points.

"Interest Rate" shall mean the floating and fluctuating rate per annum equal to the Wall Street Journal Prime Rate as published in the *Wall Street Journal* (the "Prime Rate"). The Prime Rate in effect as of the close of business of each day shall be the applicable Prime Rate for that day and for each succeeding non-business day of the Lender in determining the applicable Interest Rate. If the Prime Rate is discontinued as a standard or becomes unascertainable, the Holder shall designate in writing to the Borrower a comparable reference rate.

The Interest Rate in effect on the date of execution and delivery of this Note is EIGHT AND THREE QUARTERS percent (8.75%) per annum. After such date, the rate of interest borne by this Note shall be subject to fluctuation as hereinabove provided. During the term of this loan, the applicable annual interest rate will not be more than SIXTEEN percent (16.00) or less than FOUR percent (4.00).

Interest shall be calculated on the basis of three hundred and sixty (360) days per year for the actual number of days elapsed.

Interest, to the extent accrued, shall be paid by the Borrower monthly on the 5th day of each month, commencing on September 5, 2007, and continuing on the 5th day of each successive month until the principal amount of this Note has been paid in full. The entire principal amount hereof, together with all accrued and unpaid interest hereon, shall be due and payable on the Maturity Date (as hereinafter defined), or upon the acceleration of this Note following the occurrence of an Event of Default as that term is defined in that certain Construction Loan Agreement of even date herewith (the "Agreement") or the Mortgage of even date herewith by and between the Borrower and the Holder. Should any installment of interest not be paid when due, or upon the occurrence of any other Event of Default, the Holder shall have the right to declare the unpaid principal of and interest on this Note to be forthwith due and payable. Any payment of principal or interest which is not paid when due shall bear interest until paid at a simple interest rate per annum which is ONE (1.00) percentage points in excess of the rate that would otherwise be in effect.

The term "Maturity Date," as used herein, shall mean August 5, 2009

Page 1

F:\First Citizens Bank of Georgia\Real Estate Note, Summer Place, Revised.wpd




The principal hereof and interest hereon shall be payable in lawful money of the United States of America, at the Lender's principal office in P. O. Box 809, Dawsonville, Ga. 30534, or at such other place as the Holder hereof may designate in writing to the Borrower. The Borrower may prepay this Note in full or in part at any time and from time to time without notice, penalty, prepayment fee, or payment of unearned interest. All payments hereunder received from the Borrower by the Holder shall be applied first to interest to the extent then accrued and then to principal.

If any principal or interest is not paid when due, the Borrower agrees to pay a late charge of FIVE percent (5.00) of any monthly installment which is not paid when due within FIFTEEN (15) days after the applicable due date, to help defray the added expense incurred by the Holder in handling said delinquent payment, provided that in no event shall interest be due or payable in excess of the maximum interest permitted by applicable law.

This Note is secured by a mortgage and security agreement of even date herewith executed by the Borrower in favor of the Holder conveying real and personal property lying and being in Walton County, Florida

All parties liable for the payment of this Note agree to pay the Holder hereof reasonable attorneys' fees for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal, or otherwise, and to indemnity and hold the Holder harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this transaction.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by the Borrower or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless the Borrower shall notify the Holder, in writing, that the Borrower elects to have such excess sum returned to it forthwith. It is the express intent hereof that the Borrower not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Borrower under applicable law.

The remedies of the Holder as provided herein and in any other documents governing or securing repayment hereof shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.

No act of omission or commission of the Holder, including specifically (but without limitation) any failure to exercise any right, remedy, or recourse, shall be effective unless set forth in a written document executed by the Holder, and then only to the extent specifically recited therein. A waiver or release with reference to one event shall not be construed as continuing, as a bar to, or as a waiver or release of any subsequent right, remedy, or recourse as to any subsequent event.

The Borrower and all sureties, endorsers, and guarantors of this Note hereby (a) waive demand, presentment of payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note, or in enforcing any of its rights under any guaranties securing the repayment hereof; (b) agree to any substitution, addition, or release of any collateral or any party or person primarily or secondarily liable hereon; © agree that the Holder shall not be required first to institute any suit, or to exhaust his, their, or its remedies against the Borrower or any other person or party to become liable hereunder, or against any collateral in order to enforce

F:\First Citizens Bank of Georgia\Real Estate Note, Summer Place, Revised.wpd




payment of this Note; (d) consent to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to any of them; and (e) agree that, notwithstanding the occurrence of any of the foregoing (except with the express written release by the Holder or any such person), they shall be and remain jointly and severally, directly and primarily, liable for all sums due under this Note.

Whenever used in this Note, the words "Borrower" and "Holder" shall be deemed to include the Borrower and the Holder named in the opening paragraph of this Note, and their respective heirs, executors, administrators, legal representatives, successors, and assigns. It is expressly understood and agreed that the Holder shall never be construed for any purpose as a partner, joint venturer, co-principal, or associate of the Borrower, or of any person or party claiming by, through, or under the Borrower in the conduct of their respective businesses.

Time is of the essence of this Note.

This Note shall be construed and enforced in accordance with the laws of the State of Florida.

The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.

All of the terms and conditions of the Loan commitment letter dated June 22, 2007, including all release provision are hereby incorporated into the Note, construction Loan Agreement and Mortgage.

IN WITNESS WHEREOF, the undersigned Borrower has executed this instrument under seal as of the day and year first above written.

Summer Place, LLC, a Florida Limited Liability Company

By: Barbara Stokes, as Manager

By: J. Donald Boggus, as Manager

MORTGAGE PREPARED BY
AND TO BE RETURNED TO:

Title Works
12273 Emerald Coast Pkwy
Suite 107
Destin, FL 32550

INST # # 1006308
OR BK 2769 Pages 2176 - 2183
RECORDED 08/01/07 14:28:44
MAR `HA INGLE, WALTON COUNTY
CLER K OF COURT
DOC STMP-M: $26250.00
INT TAX: $15000.00
DEPUTY CLERK S KELLEY
#1

## MORTGAGE
## FUTURE ADVANCES

**MAXIMUM LIEN.** The total amount of indebtedness secured by this Mortgage may decrease or increase from time to time, but the maximum amount of principal indebtedness which may be outstanding at any one time shall not exceed **EIGHT MILLION FIVE HUNDRED THOUSAND AND 00/100 ($8,500,000.00)**, plus interest, and amounts expended or advanced by Lender for the payment of taxes, levies or insurance on the Property, and interest on such amounts.

**THIS MORTGAGE** dated July 30, 2007, is made and executed between **Summerplace, LLC, a Florida Limited Liability Company**, whose address is 4800 Whitesburg Drive, Suite 30-351, Huntsville, AL  35802 (referred to below as "Grantor") and **First Citizens Bank of Georgia**, whose address is 1797 Highway 400 South, Dawsonville, GA 30534 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the **"Real Property"**) located in Walton County, State of Florida:

**ALL OF SUMMER PLACE, according to the Plat thereof as recorded in Plat Book 17, Page(s) 38, of the Public Records of Walton County, Florida, more particularly described in Exhibit A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.**

**CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**FUTURE ADVANCES.** In addition to the Note, this Mortgage secures all future advances made by Lender to Grantor whether or not the advances are pursuant to a commitment. Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Borrower within twenty (20) years of the date of this Mortgage, together with all interest thereon.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE IN THE ORIGINAL PRINCIPAL AMOUNT OF SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100, ($7,500,000.00), THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all  Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.



**MORTGAGE**
(Continued)

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such improvements with improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Subsequent Liens.** Grantor shall not allow any subsequent liens or mortgages on all or any portion of the Property without the prior written consent of Lender.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sum secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Florida law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:



2



**MORTGAGE**
(Continued)

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insured in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days prior written notice to Lender and not containing any disclaimer of the insured's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within forty five (45) days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's Interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Lender shall deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceedings or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage including without limitation all intangible personal property taxes, documentary stamp taxes, fees, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax, including without limitation an intangible personal property tax, upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type

3





**MORTGAGE**
(Continued)

of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower pays all the indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any related document.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death,

4





**MORTGAGE**
(Continued)

Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender personally, or by Lender's agents or attorneys, may enter into and upon all or any part of the Property, and may exclude Grantor, Grantor's agents and servants wholly from the Property. Lender may use, operate, manage and control the Property. Lender shall be entitled to collect and receive all earnings, revenues, rents, issues, profits and income of the Property and every part thereof, all of which shall for all purposes constitute property of Grantor. After deducting the expenses of conducting the business thereof, and of all maintenance, repairs, renewals, replacements, alterations, additions, betterments and improvements and amounts necessary to pay for taxes, assessments, insurance and prior or other property charges upon the Property or any part thereof, as well as just and reasonable compensation for the services of Lender. Lender shall apply such monies first to the payment of the principal of the Note, and the interest thereon, when and as the same shall become payable and second to the payment of any other sums required to be paid by Grantor under this Mortgage.

**Appoint Receiver.** In the event of a suit being instituted to foreclose this Mortgage, Lender shall be entitled to apply at any time pending such foreclosure suit to the court having jurisdiction thereof for the appointment of a receiver of any or all of the Property, and of all rents, incomes, profits, issues and revenues thereof, from whatsoever source. The parties agree that the court shall forthwith appoint such receiver with the usual powers and duties of receivers in like cases. Such appointment shall be made by the court as a matter of strict right to Lender and without notice to Grantor, and without reference to the adequacy or inadequacy of the value of the Property, or to Grantor's solvency or any other party defendant to such suit. Grantor hereby specifically waives the right to object to the appointment of a receiver and agrees that such appointment shall be made as an admitted equity and as a matter of absolute right to Lender, and consents to the appointment of any officer or employee of Lender as receiver. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any Court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any Party may change its address for notices under this Mortgage by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

5





**MORTGAGE**
(Continued)

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Florida without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Florida.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Mortgage. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage. .

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Summerplace, LLC., a Florida Limited Liability Company and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means Summerplace, LLC, a Florida Limited Liability Company.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

6







**MORTGAGE**
(Continued)

---

**Lender.** The word "Lender" means First Citizens Bank of Georgia, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated July 27, 2007, in the original principal amount of $7,500,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The final maturity date of the Note is August 5, 2009 .

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property. Property. The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.**

WITNESSES:

Printed Name: _Nicole Barnette_

Printed Name: _Sam Smith_

Printed Name: _Jennifer M. Bowling_

Printed Name: _Pamela A Hale_

GRANTOR:

Summerplace, LLC, a Florida Limited Liability Company

Barbara Stokes, Managing Member

J. Donald Boggus, Managing Member

STATE OF _Alabama_
COUNTY OF _Madison_

The foregoing instrument was acknowledged before me this _25_ day of _July_ 2007 by Barbara Stokes as Managing Member of Summerplace, LLC, a Florida Limited Liability Company who is/are personally known to me or who has/have produced _____ as identification.

Notary Public
Print Name: _Aaron Sullivan_
My Commission Expires: _8-16-2010_

(seal)

STATE OF _Georgia_
COUNTY OF _Newson_

The foregoing instrument was acknowledged before me this _30_ day of _July_, 2007 by J. Donald Boggus as Managing Member of Summerplace, LLC, a Florida Limited Liability Company who is/are personally known to me or who has/have produced _____ as identification.

Notary Public
Print Name: _____
My Commission Expires: _____

(seal)

7



**MORTGAGE**
(Continued)

EXHIBIT "A"

A PARCEL OF LAND SITUATED IN SECTION 2, TOWNSHIP 3 SOUTH, RANGE 20 WEST, WALTON COUNTY, FLORIDA, BEING A PORTION OF GOVERNMENT LOT 47 AND GOVERNMENT LOT 48, TOWNSHIP 3 SOUTH, RANGE 20 WEST OF THE TALLAHASSEE MERIDIAN, FLORIDA, DEPENDENT RESURVEY AND SUBDIVISION OF THE FRACTIONAL SOUTHWEST QUARTER OF SECTION 2, UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE EXISTING GOVERNMENT LAND OFFICE MONUMENT MARKING THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 2; THENCE PROCEED N87°52'05"W ALONG THE SOUTH LINE THEREOF A DISTANCE OF 1998.63 FEET TO THE NORTHEAST CORNER OF GOVERNMENT LOT 41 OF SAID SUBDIVISION OF THE FRACTIONAL SOUTHWEST QUARTER OF SECTION 2; THENCE DEPARTING SAID SOUTH LINE OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 2 PROCEED S02°46'10"W ALONG THE EAST BOUNDARY LINE OF SAID GOVERNMENT LOT 41 A DISTANCE OF 329.86 FEET TO THE SOUTHEAST CORNER THEREOF; THENCE DEPARTING SAID EAST BOUNDARY LINE PROCEED N87°33'39"W ALONG THE SOUTH BOUNDARY LINE OF SAID GOVERNMENT LOT 41 A DISTANCE OF 83.79 FEET TO THE <u>POINT OF BEGINNING</u>; THENCE DEPARTING SAID SOUTH BOUNDARY LINE OF GOVERNMENT LOT 41 PROCEED S02°47'36"W A DISTANCE OF 330.43 FEET TO THE SOUTH BOUNDARY LINE OF SAID GOVERNMENT LOT 48 (SAID POINT ALSO BEING THE CENTERLINE OF WALTON COUNTY ROAD NUMBER 30-A, EXISTING 66.00 FOOT WIDE PUBLIC RIGHT-OF-WAY); THENCE PROCEED N87°47'48"W ALONG SAID SOUTH BOUNDARY LINE AND CENTERLINE A DISTANCE OF 166.89 FEET; THENCE DEPARTING SAID SOUTH BOUNDARY LINE AND CENTERLINE PROCEED THE FOLLOWING FOUR (4) COURSES: (1) N02°53'41"E A DISTANCE OF 184.98 FEET; (2) N87°51'31"W A DISTANCE OF 8.76 FEET; (3) N03°03'48"E A DISTANCE OF 145.07 FEET; (4) N87°49'54"W A DISTANCE OF 75.00 FEET TO THE WEST BOUNDARY LINE OF GOVERNMENT LOT 47, SUBDIVISION OF THE FRACTIONAL SOUTHWEST QUARTER OF SECTION 2; THENCE PROCEED N02°53'56"E A DISTANCE OF 19.48 FEET TO THE NORTHWEST CORNER THEREOF; THENCE PROCEED S88°14'52"E ALONG THE NORTH BOUNDARY LINE OF SAID GOVERNMENT LOT 47 A DISTANCE OF 166.59 FEET TO THE NORTHEAST CORNER THEREOF AND THE NORTHWEST CORNER OF AFORESAID GOVERNMENT LOT 48; THENCE PROCEED S87°33'39"E ALONG THE AFORESAID NORTH BOUNDARY LINE OF GOVERNMENT LOT 48 A DISTANCE OF 83.00 FEET TO THE POINT OF BEGINNING.



# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made as of this 30th day of July, 2007, by SUMMER PLACE, LLC, a Florida Limited Liability company, (the "Pledgor"), in favor of FIRST CITIZENS BANK OF GEORGIA, (the "Lender"), witnesseth:

## RECITALS

**WHEREAS,** the Lender has agreed to make a loan (the "Loan") of up SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.00) to the Pledgor pursuant to the terms and conditions of a Construction Loan Agreement of even date herewith (the "Loan Agreement") between the Lender and the Pledgor; and

**WHEREAS,** the Loan is evidenced by a Real Estate Note of even date herewith from the Pledgor and payable to the order of the Lender in the face amount of $7,500,000.00 (the "Note"); and

**WHEREAS,** the proceeds of the Loan are to be used by the Pledgor for the purpose(s) of constructing a residential townhouse development; and

**WHEREAS,** the Lender has required, as a condition to extending such financial accommodations, the execution and delivery of this Agreement by the Pledgor;

**NOW, THEREFORE,** in order to secure the prompt payment of all past, present, and future indebtedness, liabilities, and obligations of the Pledgor to the Lender of any nature whatsoever in connection with the Loan , together with all obligations of the Pledgor to the Lender hereunder and under any note, any loan agreement, all contracts of suretyship, guaranty, or accommodation, and all other obligations of the Pledgor to the Lender, however and wherever created, arising, or evidenced, whether direct or indirect, absolute, contingent, or otherwise, now or hereafter existing or due or to become due, (collectively, the "Pledgor's Liabilities"), and the performance by the Pledgor of all of the terms, conditions, and provisions of this Agreement and of any other loan document previously, simultaneously, or hereafter executed and delivered by the Pledgor and/or any other person, singly or jointly with another person or persons, evidencing, securing, guarantying, or in connection with any of the Pledgor's Liabilities (the "Loan Documents"), the Pledgor agrees with the Lender as follows:

1. Collateral. To secure the payment and performance of the Pledgor's Liabilities and the Pledgor's performance of its obligations under the Loan Documents, the Pledgor hereby grants to the Lender a security interest in, and security title to, the following property of the Pledgor:

A. Inventory. All of the Pledgor's inventory of every description which is held by the Pledgor for sale or lease or is furnished by the Pledgor under any contract of service or is held by the Pledgor as raw materials, work in process, or materials used or consumed in a business, whether now owned or hereafter acquired, wherever located, and as the same may now and hereafter from time to rime be constituted, together with all cash and non-cash proceeds and products thereof (the "Inventory").

B. Accounts. All of the Pledgor's accounts (including, without limitation, all notes, notes receivable, drafts, acceptances, and similar instruments and documents) whether now owned or hereafter acquired, together with (i) all cash and non-cash proceeds thereof and (ii) all returned,

F:\First Citizens Bank of Georgia\Security Agreement, Summer Place, Revised.wpd




rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to an account, and all cash and non-cash proceeds and products of all such goods (the "Accounts").

C. General Intangibles. All of the Pledgor's general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), patents, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, literary rights, rights to performance, rights under licenses, choices-inaction, claims, information contained in computer media (such as data bases, source and object codes, and information therein) things in action, trademarks and trademarks applied for (together with the goodwill associated therewith) and derivatives thereof, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, and permits, licenses, certifications, authorizations and approvals, and the rights of the Debtor thereunder, issued by any governmental, regulatory, or private authority, agency, or entity whether now owned or hereafter acquired, together with all cash and noncash proceeds and products thereof.

D. Chattel Paper. All of the Pledgor's chattel paper, whether now owned or hereafter existing, acquired, or created, together with (I) all moneys due and to become due thereafter, (ii) all cash and non-cash proceeds thereof, and (iii) all returned, rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to chattel paper, and all cash and non-cash proceeds and products of all such goods. Additionally, the Pledgor assigns and grants to the Lender a security interest in all property and goods both now owned and hereafter acquired by the Pledgor which are sold, leased, secured, are the subject of, or otherwise covered by, the Pledgor's chattel paper, together with all rights incident to such property and goods and all cash and non-cash proceeds thereof (the "Chattel Paper").

E. All Equipment and Fixtures. All of the Pledgor's equipment (including all motor vehicles) and fixtures, whether now owned or hereafter acquired, together with (I) all additions, parts, fittings, accessories, special tools, attachments, and accessions now and hereafter affixed thereto and/or used in connection therewith, (ii) all replacements thereof and substitutions therefor, and (iii) all cash and non-cash proceeds and products thereof. All such fixtures are or will be attached to the real property described in Exhibit A attached hereto, which is owned by the record owner of such real property, which is also described in Exhibit A (the "Equipment").

The term "Collateral" as used herein means each and all of the items of Collateral described above, and the term "proceeds" as used herein includes, without limitation, the proceeds of all insurance policies covering all or any part of such items of Collateral.

2. Title to Collateral. The Pledgor warrants and represents that (I) it is the lawful owner of the Collateral, and has the full right, power, and authority to convey, transfer, and grant the security title and security interest in the Collateral granted herein to the Lender; (ii) all licenses relating to the Collateral are fully paid and freely assignable to Lender, and, upon the occurrence of an Event of Default and foreclosure by the Lender, the Lender shall have all rights of the Pledgor to any Collateral licensed to the Pledgor or licensed by the Pledgor; (iii) the Collateral is not, and so long as this Agreement is in effect will not be, subject to any liens, claims, security interests, encumbrances, taxes, or assessments, however described or denominated, except as set forth on Exhibit ^ hereto; (iv) no financing statement, mortgage, notice of lien, deed of trust, deed to secure debt, security agreement, or any other agreement or instrument creating an encumbrance, lien, or charge against any of the Collateral is in existence or on file in any public office, other than financing statements (or other appropriate security documentation) filed on behalf of the Lender or disclosed on Exhibit ^ hereto; and (v) all information with respect to the Collateral and the Pledgor's Liabilities, or any of them, set forth in any written schedule, certificate, or other document at any time heretofore or hereafter furnished by the Pledgor to the Lender, and all other written information



heretofore or hereafter furnished by the Pledgor to the Lender, is and will be true and correct in all material respects as of the date furnished.

3. Further Assurances. The Pledgor will defend its title to the Collateral against all persons and will, upon request of the Lender, (a) furnish such further assurances of title as may be required by the Lender, (b) deliver and execute or cause to be delivered and executed, in form and content satisfactory to the Lender, any financing statements, notices, certificates of title, and other documents and pay the cost of filing or recording the same in all public offices deemed necessary by the Lender, as well as any recordation, documentary, or transfer tax required by law to be paid in connection with such filing or recording, and c do such other acts as the Lender may request in order to perfect, preserve, maintain, or continue the perfection of the Lender's security interest in the Collateral and/or its priority.

4. Accounts, etc. Until such time as the Lender shall notify the Pledgor in writing of the revocation of such power and authority, the Pledgor, as agent for the Lender, will, at its own expense, diligently collect, as and when due, all amounts owing under the Accounts, including the taking of such action with respect to such collection as the Lender may request from time to time, and to hold in trust and segregate for the Lender all funds received from the Accounts; provided, however, that until an Event of Default shall occur or would occur but for the passage of time, or giving of notice, or both, the Pledgor may use or consume in the ordinary course of its business any such collections on the Accounts in any lawful manner not inconsistent with this Agreement and the other Loan Documents. The Lender, however, may after an Event of Default shall occur and upon notice to the Pledgor revoke such power and authority and in any event shall have the authority and right to notify any parties obligated on any of the Accounts to make payment to the Lender of any amounts due or to become due thereunder, and enforce collection of performance under any of the Accounts by suit or otherwise, and surrender, release, or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. After an Event of Default or [and] upon request of the Lender, the Pledgor will, at its own expense, notify any parties obligated on any of the Accounts to make payments to the Lender and will hold in trust and immediately forward to the Lender all payments received by the Pledgor in the form received, with all necessary endorsements thereon for collection by the Lender.

5. Transfer and Other Liens. The Pledgor will not sell, lease, transfer, exchange, or otherwise dispose of the Collateral, or any part thereof, without the prior written consent of the Lender and will not permit any lien, security interest, or other encumbrance to attach to the Collateral, or any part thereof, other than those in favor of the Lender or those permitted by the Lender in writing, except that the Pledgor may, in the ordinary course of its business and in the absence of an Event of Default hereunder or notice by the Lender to the Pledgor under Section 6 hereof, collect its Accounts and Chattel Paper and sell its Inventory.

6. Financial Statements, Books, and Records. The Pledgor will (a) at all times maintain, in accordance with generally accepted accounting principles consistently applied, accurate and complete books and records pertaining to the operation, business affairs, and financial condition of the Pledgor and pertaining to the Collateral and any contracts and collections relating to the Collateral, (b) furnish to the Lender promptly upon request, certified by an officer of the Pledgor and in the form and content and at the intervals specified by the Lender, such financial statements, reports, schedules, and other information with respect to the operation, business affairs, and financial condition of the Pledgor as the Lender may from time to time require, c at all reasonable times, and without hindrance or delay, permit the Lender or any person designated by the Lender to enter any place of business of the Pledgor or any other premises where any books, records, and other data

F:\First Citizens Bank of Georgia\Security Agreement, Summer Place, Revised.wpd




concerning the Pledgor and/or the Collateral may be kept and to examine, audit, inspect, and make extracts from and photocopies of any such books, records, and other data, (d) furnish to the Lender promptly upon request, certified by an officer of the Pledgor and in the form and content specified by the Lender, lists of purchasers of inventory, aging of accounts, aggregate cost or wholesale market value of inventory, schedules of equipment, and other data concerning the Collateral as the Lender may from time to time specify, and (e) mark its books and records in a manner satisfactory to the Lender so that the Lender's rights in and to the Collateral will be shown.

7. Name of Pledgor, Place(s) of Business, and Location of Collateral. The Pledgor represents and warrants that its correct legal name is as specified on the signature lines of this Agreement, and each legal or trade name of the Pledgor for the previous five (5) years (if different from the Pledgor's current legal name) is as specified below the signature lines of this Agreement. Without the prior written consent of the Lender, the Pledgor will not change its name, dissolve, merge, or consolidate with any other person. The Pledgor warrants that the address of the Pledgor's chief executive office and the address of each other place of business of the Pledgor are as specified below the signature lines of this Agreement. Except for mobile equipment and motor vehicles, the Collateral and all books and records pertaining to the Collateral have been, are, and will be located at the Pledgor's chief executive office specified below or at any other place of business which may be specified below. Without the prior written consent of the Lender, the Pledgor will not open any new place of business or change the location of any Collateral to any place not specified below. The Pledgor will immediately advise the Lender in writing of the opening of any new place of business and of any change in the location of the places where the Collateral or any part thereof, or the books and records concerning the Collateral or any part thereof, are kept.

8. Care of Collateral. The Pledgor will maintain the Collateral in first-class condition excepting any loss, damage, or destruction which is frilly covered by proceeds of insurance and will not do or permit anything to be done to the Collateral that may impair its value or that may violate the terms of any insurance covering the Collateral or any part thereof. The Lender shall have no duty to, and the Pledgor hereby releases the Lender from all claims for loss or damage caused by the failure to, collect or enforce any Account or Chattel Paper or to preserve rights against prior parties to the Collateral. The Pledgor will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances, and regulations.

9. Insurance. The Pledgor will insure such of the Collateral as specified by the Lender against such casualties and risks in such form and amount and with such companies as may from time to time be required by the Lender. All insurance proceeds shall be payable to the Lender as its interests may appear (upon a New York standard mortgagee clause [long form]), and such policies or certificates thereon or duplicates thereof shall immediately be deposited with the Lender. The Pledgor will pay all premiums due or to become due for such insurance and hereby assigns to the Lender any returned or unearned premiums which may be due upon cancellation of insurance coverage. The Lender is hereby irrevocably (a) appointed the Pledgor's attorney-in-fact (which appointment is coupled with an interest and is irrevocable) to endorse any draft or check which may be payable to the Pledgor in order to collect such returned or unearned premiums or the proceeds of insurance and (b) authorized to apply such insurance proceeds for payment of the Pledgor's Liabilities, whether or not due, in such order of application as the Lender may determine.

10. Taxes. The Pledgor will pay as and when due and payable all taxes, levies, license fees, assessments, and other impositions levied on the Collateral or any part thereof or for its use and operation.

Page 4




11. Specific Assignments. Promptly upon request by the Lender, the Pledgor will execute and deliver to the Lender written assignments, endorsements, and/or schedules, in form and content satisfactory to the Lender, of specific Chattel Paper and Accounts or groups of Accounts or Chattel Paper, but the security interest of the Lender hereunder shall not be limited in any way by such assignments.

12. Delivery of Chattel Paper. The Pledgor will promptly upon request by the Lender deliver, assign, and endorse to the Lender all Chattel Paper and all other documents held by the Pledgor in connection therewith.

13. Government Contracts. If any Account or Chattel Paper arises out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof, the Pledgor shall immediately notify the Lender thereof in writing and execute any instruments or take any steps required by the Lender in order that all moneys due or to become due under such contract or contracts shall be assigned to the Lender and notice thereof given under the Federal Assignment of Claims Act or other applicable law.

14. Collateral Account. If all or any part of the Collateral at any time consists of Inventory, Accounts, or Chattel Paper, the Pledgor will, upon the request of the Lender at any time and from time to time both prior to and after the occurrence of an Event of Default hereunder, deposit or cause to be deposited to a bank account designated by the Lender and from which the Lender alone has power of access and withdrawal (the "Collateral Account") all checks, drafts, cash, and other remittances in payment or on account of payment of such Inventory, Accounts, or Chattel Paper and the cash proceeds of any returned goods, the sale or lease of which gave rise to an Account or Chattel Paper (all of the foregoing herein collectively referred to as "Items of Payment"). The Pledgor shall deposit the Items of Payment for credit to the Collateral Account within two (2) business days of the receipt thereof, and in precisely the form received, except for the endorsement of the Pledgor where necessary to permit the collection of the Items of Payment, which endorsement the Pledgor hereby agrees to make. Pending such deposit, the Pledgor will not commingle any of the Items of Payment with any of its other funds or property but will hold them separate and apart. The Lender may at any time and from time to time apply the whole or any part of the collected funds credited to the Collateral Account against the Pledgor's Liabilities or credit such collected funds to a banking account of the Pledgor with the Lender, the order and method of such application to be in the sole discretion of the Lender.

15. Rights of Lender and Duties of Pledgor. If all or any part of the Collateral at any time consists of Inventory, Accounts, or Chattel Paper, the Lender may at any time and from time to time both prior to and after the occurrence of an Event of Default hereunder (a) notify the account debtors obligated on any of the Collateral to make payments thereon directly to the Lender, and to take control of the cash and non-cash proceeds of any such Collateral; (b) charge to any banking account of the Pledgor with the Lender any Item of Payment credited to the Collateral Account which is dishonored by the drawee or maker thereof; c compromise, extend, or renew any of the Collateral or deal with the same as it may deem advisable; (d) release, make exchanges or substitutions for, or surrender all or any part of the Collateral; (e) remove from the Pledgor's place of business all books, records, ledger sheets, correspondence, invoices, and documents relating to or evidencing any of the Collateral or, without cost or expense to the Lender, make such use of the Pledgor's place(s) of business as may be reasonably necessary to administer, control, and collect the Collateral; (f) repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any account debtor; (g) demand, collect, receipt for, and give renewals, extensions, discharges, and releases of any of the Collateral; (h) institute and prosecute legal and equitable proceedings to enforce collection of, or realize upon, any of the Collateral; (I) settle, renew, extend, compromise,

F:\First Citizens Bank of Georgia\Security Agreement, Summer Place, Revised.wpd




compound, exchange, or adjust claims with respect to any of the Collateral or any legal proceedings brought with respect thereto; (j) endorse the name of the Pledgor upon any Items of Payment relating to the Collateral or upon any proof of claim in bankruptcy against an account debtor; and (k) receive and open all mail addressed to the Pledgor and, if an Event of Default exists hereunder, notify postal authorities to change the address for the delivery of mail to the Pledgor to such address as the Lender may designate; and for purposes of taking the actions described in Subsections (a) through (k) the Pledgor hereby irrevocably appoints the Lender as its attorney-in-fact (which appointment being coupled with an interest is irrevocable while any of Pledgor's Liabilities remain unpaid), with power of substitution, in the name of the Lender or in the name of the Pledgor or otherwise, for the use and benefit of the Lender, but at the cost and expense of the Pledgor and without notice to the Pledgor. The Pledgor will (a) make no material change to the terms of any sale or lease of Inventory or of any Account or Chattel Paper without the prior written permission of the Lender; (b) on demand, make available in form acceptable to the Lender shipping documents and delivery receipts evidencing the shipment of goods which gave rise to the sale or lease of Inventory or of an Account or Chattel Paper, completion certificate, or other proof of the satisfactory performance of services which gave rise to the sale or lease of Inventory or of an Account or Chattel Paper, copies of the invoices arising out of the sale or lease of Inventory or for an Account, and the Pledgor's copy of any written contract or order from which the sale or lease of Inventory, an Account, or Chattel Paper arose; and c [when requested, or] regularly advise the Lender whenever an account debtor returns or refuses to retain any goods, the sale or lease of which gave rise to an Account or Chattel Paper, and will comply with any instructions which the Lender may give regarding the sale or other disposition of such returns.

16. Performance by Lender. If the Pledgor fails to perform, observe, or comply with any of the conditions, terms, or covenants contained in this Agreement, the Lender, without notice to or demand upon the Pledgor and without waiving or releasing any of the Pledgor's Liabilities or any Event of Default, may (but shall be under no obligation to) at any time thereafter perform such conditions, terms, or covenants for the account and at the expense of the Pledgor, and may enter upon any place of business or other premises of the Pledgor for that purpose and take all such action thereon as the Lender may consider necessary or appropriate for such purpose. All sums paid or advanced by the Lender in connection with the foregoing and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection therewith (collectively, the "Expense Payments") together with interest thereon at a simple per annum rate of interest which is equal to the then highest rate of interest charged on the principal of any of the Pledgor's Liabilities, plus one percent (1%) per annum (but in no event higher than the maximum interest rate permitted by applicable law), from the date of payment until repaid in full, shall be paid by the Pledgor to the Lender on demand and shall constitute and become a part of the Pledgor's Liabilities secured hereby.

17. Default. The occurrence of any one or more of the following events shall constitute an event of default (an "Event of Default") under this Agreement: (a) failure of the Pledgor to pay any of the Pledgor's Liabilities as and when due and payable, after giving effect to any applicable grace period; (b) failure of the Pledgor to perform, observe, or comply with any of the provisions of this Agreement or of any of the other Loan Documents, after giving effect to any applicable grace period; c the occurrence of an Event of Default (as defined therein) under any of the other Loan Documents; (d) any information contained in any financial statement, application, schedule, report, or any other document given by the Pledgor or by any other person in connection with the Pledgor's Liabilities, with the Collateral, or with any of the Loan Documents is not in all respects true and accurate or the Pledgor or such other person omitted to state any material fact or any fact necessary to make such information not misleading; (e) the Pledgor is generally not paying debts as such debts become due; (f) the filing of any petition for relief under any provision of the Federal Bankruptcy Code or any similar state law is brought by or against the Pledgor; (g) an application for the appointment of a

F:\First Citizens Bank of Georgia\Security Agreement, Summer Place, Revised.wpd




receiver for, the making of a general assignment for the benefit of creditors by or the insolvency of, the Pledgor; (h) the dissolution, merger, consolidation, or reorganization of the Pledgor; (I) suspension of the operation of the Pledgor's present business; (j) transfer of a substantial part (determined by market value) of the Pledgor's property; (k) sale, transfer, or exchange, either directly or indirectly, of a controlling stock [partnership] interest of the Pledgor; (l) termination or withdrawal of any guaranty for the Pledgor's Liabilities; (m) the Pension Benefit Guaranty Corporation commences proceedings under Section 4042 of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, to terminate any employee pension benefit plan of the Pledgor; (n) the determination in good faith by the Lender that a material adverse change has occurred in the financial condition of the Pledgor from the condition set forth in the most recent financial statement of the Pledgor heretofore furnished to the Lender, or from the financial condition of the Pledgor as heretofore most recently disclosed to the Lender in any other manner; or (o) the determination in good faith by the Lender that the prospect of payment of any of the Pledgor's Liabilities is impaired for any reason.

18. **Rights and Remedies upon Default.** Upon the occurrence of an Event of Default hereunder (and in addition to all of its other rights, powers, and remedies under this Agreement), the Lender may, at its option, and without notice to the Pledgor, declare the unpaid balance of the Pledgor's Liabilities to be immediately due and payable. The occurrence or non-occurrence of an Event of Default shall in no manner impair the ability of the Lender to demand payment of any portion of the Pledgor's Liabilities which are payable on demand. The Lender shall have all of the rights and remedies of a secured party under the Uniform Commercial Code and other applicable law in the State of Florida. Upon the occurrence of an Event of Default hereunder, the Pledgor, upon demand by the Lender, shall assemble the Collateral and make it available to the Lender at a place designated by the Lender which is mutually convenient to both parties. Upon the occurrence of an Event of Default hereunder, the Lender or its agents may enter upon the Pledgor's premises to take possession of the Collateral, to remove it, to render it unusable, or to sell or otherwise dispose of it, all without judicial process or proceedings.

Any written notice of the sale, disposition, or other intended action by the Lender with respect to the Collateral which is required by applicable laws and is sent by certified mail, postage prepaid, to the Pledgor at the address of the Pledgor's chief executive office specified below, or such other address of the Pledgor which may from time to time be shown on the Lender's records, at least five (5) days prior to such sale, disposition, or other action, shall constitute reasonable notice to the Pledgor. The Pledgor shall pay on demand all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred by or on behalf of the Lender (a) in enforcing the Pledgor's Liabilities, and (b) in connection with the taking, holding, preparing for sale or other disposition, selling, managing, collecting, or otherwise disposing of the Collateral. All of such costs and expenses (collectively, the "Liquidation Costs") together with interest thereon at a simple per annum rate of interest which is equal to the then highest rate of interest charged on the principal of any of the Pledgor's Liabilities, plus one percent (1 %) per annum (but in no event higher than the maximum interest rate permitted by law), from the date of payment until repaid in full, shall be paid by the Pledgor to the Lender on demand and shall constitute and become a part of the Pledgor's Liabilities secured hereby. Any proceeds of sale or other disposition of the Collateral will be applied by the Lender to the payment of Liquidation Costs and Expense Payments, and any balance of such proceeds will be applied by the Lender to the payment of the remaining Pledgor's Liabilities in such order and manner of application as the Lender may from time to time in its sole discretion determine.

19. **Remedies Cumulative.** Each right, power, and remedy of the Lender as provided for in this Agreement or in the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other

F:\First Citizens Bank of Georgia\Security Agreement, Summer Place, Revised.wpd




right, power, or remedy provided for in this Agreement or in the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the Lender or any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Lender of any or all such other rights, powers, or remedies.

20. Waiver. No failure or delay by the Lender to insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement or of the other Loan Documents, or to exercise any right, power, or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant, or agreement or of any such breach, or preclude the Lender from exercising any such right, power, or remedy at any later time or times. By accepting payment after the due date of any of the Pledgor's Liabilities, the Lender shall not be deemed to have waived the right either to require payment when due of all other Pledgor's Liabilities or to declare an Event of Default for failure to effect such payment of any such other Pledgor's Liabilities. The Pledgor waives presentment, notice of dishonor, and notice of non-payment with respect to Accounts and Chattel Paper.

THE PLEDGOR HEREBY ACKNOWLEDGES THAT THE LIABILITIES AROSE OUT OF A "COMMERCIAL TRANSACTION" AS THIS TERM IS DEFINED IN OCGA §44-14-260(1) CONCERNING FORECLOSURE OF MORTGAGES ON PERSONALTY, AND AGREES THAT IN THE EVENT OF ANY DEFAULT, THE LENDER SHALL HAVE THE RIGHT TO AN IMMEDIATE WRIT OF POSSESSION WITHOUT NOTICE OF HEARING AND KNOWINGLY AND INTELLIGENTLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO ANY NOTICE AND POSTING OF A BOND BY THE LENDER PRIOR TO SEIZURE BY THE LENDER, ITS TRANSFEREES, ASSIGNS, OR SUCCESSORS IN INTEREST, OF THE COLLATERAL OR ANY PORTION THEREOF. THIS IS INTENDED BY THE PLEDGOR AS A "WAIVER" AS THIS TERM IS DEFINED IN OCGA §44-14-260(3) RELATING TO FORECLOSURE OF MORTGAGES ON PERSONALTY.

21. Miscellaneous. Time is of the essence of this Agreement. The section headings of this Agreement are for convenience only and shall not limit or otherwise affect any of the terms hereof. Neither this Agreement nor any term, condition, covenant, or agreement hereof may be changed, waived, discharged, or terminated orally but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought. This Agreement shall be governed by the laws of the State of Florida and shall be binding upon the Pledgor and its heirs, executors, administrators, legal representatives, successors, and assigns, and shall inure to the benefit of the Lender and its successors and assigns. As used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders, as the context may require, and the term "person" shall include an individual, a corporation, an association, a partnership, a trust, and an organization. Invalidation of any one or more of the provisions of this Agreement shall in no way affect any of the other provisions hereof, which shall remain in full force and effect. All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time. Unless varied by this Agreement, all terms used herein which are defined by the Florida Uniform Commercial Code shall have the same meanings hereunder as assigned to them by the Florida Uniform Commercial Code.

IN WITNESS WHEREOF, the Pledgor has caused its duly authorized officers to execute this Agreement and to affix its corporate seal hereto, as of the day and year first written above.

Page 8




PLEDGOR:

SUMMER PLACE, LLC, a Florida Limited Liability Company

By: Barbara Stokes, as Manager

By: J. Donald Boggus, as Manager

F:\First Citizens Bank of Georgia\Security Agreement, Summer Place, Revised.wpd

# APPLICATION AND CERTIFICATION FOR PAYMENT

*AIA DOCUMENT G702*     PAGE ONE OF   2   PAGES

TO: Summer Place, LLC
4800 Whitesburg Drive
Suite 30 - 351
Huntsville, AL 35802

FROM: Grant Builders Group, Inc.
981 Hwy 98 East, Suite 3 #416
Destin, FL 32541

PROJECT: Summer Place Town Homes
Hwy 30-A
Santa Rosa Beach, FL

VIA ARCHITECT:

APPLICATION NO: 1

PERIOD TO: 07/10/07

PROJECT NOS:

PERMIT DATE: TBD

Distribution to:
[x] OWNER
[x] ARCHITECT
[x] CONTRACTOR

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | |
|---|---|
| 1. ORIGINAL CONTRACT SUM | $3,990,070.00 |
| 2. NET CHANGE BY CHANGE ORDER | $0.00 |
| 3. CONTRACT SUM TO DATE (Line 1 +2) | $3,990,070.00 |
| 4. TOTAL COMPLETED & STORED TO DATE | $159,602.80 |
| 5. TOTAL EARNED | $159,602.80 |
| 6. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 5 from prior Certificate) | $0.00 |
| 7. CURRENT PAYMENT DUE | $159,602.80 |
| 8. BALANCE TO FINISH (Line 5 less Line 5) | $3,830,467.20 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | $0.00 |
| Total approved this Month | | $0.00 |
| TOTALS | | $0.00 |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: Grant Builders Group, Inc.

By: _____ Date: 7-10-07

State of: Florida County of: Oakloosa
Subscribed and sworn to before me this 10 day of July
Notary Public: Joy Meredith Poole (Notary Seal)
My Commission Expires:

Notary Public State of Florida
Joy Meredith Poole
My Commission DD416245
Expires 04/07/2009

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . $   $159,602.80

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*
ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702   APPLICATION AND CERTIFICATION FOR PAYMENT   1992 EDITION   AIA®  © 1992
Users may obtain validation of this document by requesting a completed AIA Document D401 - Certification of Document's Authenticity from the Licensee.

THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292

Grant Builders Group, Inc.
Summer Place T. H.
Contract Amount - $3,990,070

**Application for Payment**
Schedule of Values

July 10, 2007

08:45 07/09/08GMT-05 Pg 04-10

Fm:Grant Builders Group, Inc. (17062165971)

| Description of Activity | % of Contract | Value | % Complete | Previous Billed | Completed This Month | Completed to Date | Remaining | % This month | Total % of Contract |
|---|---|---|---|---|---|---|---|---|---|
| Pre-Construction Draw | 4% | $159,602.80 | 100.00% | $0.00 | $159,602.80 | $159,602.80 | $0.00 | 0.0000% | 4.0000% |
| Lot Clearing, footing and piers | 6% | $239,404.20 | | $0.00 | $0.00 | $0.00 | $239,404.20 | 0.0000% | 0.0000% |
| First Floor System | 6% | $239,404.20 | | $0.00 | $0.00 | $0.00 | $239,404.20 | 0.0000% | 0.0000% |
| Wall Framing | 9% | $359,106.30 | | $0.00 | $0.00 | $0.00 | $359,106.30 | 0.0000% | 0.0000% |
| Roof decking - Dry in | 6% | $239,404.20 | | $0.00 | $0.00 | $0.00 | $239,404.20 | 0.0000% | 0.0000% |
| Sophit, cornice and gables | 4% | $159,602.80 | | $0.00 | $0.00 | $0.00 | $159,602.80 | 0.0000% | 0.0000% |
| Exterior siding | 8% | $319,205.60 | | $0.00 | $0.00 | $0.00 | $319,205.60 | 0.0000% | 0.0000% |
| Windows and exterior doors | 4% | $159,602.80 | | $0.00 | $0.00 | $0.00 | $159,602.80 | 0.0000% | 0.0000% |
| Heating & A/C duct | 1% | $39,900.70 | | $0.00 | $0.00 | $0.00 | $39,900.70 | 0.0000% | 0.0000% |
| Plumbing rough in, stack out | 3% | $119,702.10 | | $0.00 | $0.00 | $0.00 | $119,702.10 | 0.0000% | 0.0000% |
| Plumbing Fixtures | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Wiring rough in | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Metal roofing | 4% | $159,602.80 | | $0.00 | $0.00 | $0.00 | $159,602.80 | 0.0000% | 0.0000% |
| Exterior primed and caulked | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Walls insulated | 1% | $39,900.70 | | $0.00 | $0.00 | $0.00 | $39,900.70 | 0.0000% | 0.0000% |
| Sheetrock hung | 5% | $199,503.50 | | $0.00 | $0.00 | $0.00 | $199,503.50 | 0.0000% | 0.0000% |
| Cabinets | 4% | $159,602.80 | | $0.00 | $0.00 | $0.00 | $159,602.80 | 0.0000% | 0.0000% |
| Interior trim | 6% | $239,404.20 | | $0.00 | $0.00 | $0.00 | $239,404.20 | 0.0000% | 0.0000% |
| Interior paint | 4% | $159,602.80 | | $0.00 | $0.00 | $0.00 | $159,602.80 | 0.0000% | 0.0000% |
| Exterior paint completd | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Electrical Fixtures | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Appliances | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| HVAC installed | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Brick pavers | 1% | $39,900.70 | | $0.00 | $0.00 | $0.00 | $39,900.70 | 0.0000% | 0.0000% |
| Landscaping | 2% | $79,801.40 | | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Floor coverings | 5% | $199,503.50 | | $0.00 | $0.00 | $0.00 | $199,503.50 | 0.0000% | 0.0000% |
| Final draw - miscellaneous | 3% | $119,702.10 | | $0.00 | $0.00 | $0.00 | $119,702.10 | 0.0000% | 0.0000% |
| Subtotal | 100% | $3,990,070.00 | | $0.00 | $159,602.80 | $159,602.80 | $3,830,467.20 | 0.0000% | 0.00% |
| | | | | | | $0.00 | $0.00 | | |
| | | $3,990,070.00 | | | $159,602.80 | $159,602.80 | $3,830,467.20 | | |



DAG Architects Inc.
1223 Airport Road
Destin, Florida 32541
P 850-837-8152 F 850-654-4276
www.dagarchitects.com

## Architect's Field Report

**Project Name**: Summer Place

**Project No: 07074**                    **Date:** 08-08-07

**Time: 3:30PM**     **Temp. Range**: 95     **Weather: Sunny**

**Present at Site**: No worker present

**Work in Progress**: Slab foundation work on Building A (Southwest).
Building B (North) Framing To start this week. Building C (Southeast) The
framing ready to start this week.

**Observations:  The site was neat and orderly. No electrical meter were
set yet at any sites. Looks like they are running on generator at this
time.**
**Building A (Southwest corner) The Slab work is on going and looks like
there ready to pour the slab this week.**
**Building B (North)  the slab has been poured and the framing lumber is
on site. The contractor should start framing any day now.**

**Building C (Southeast) The slab work poured and is ready for framing
to start.**

**Items to Verify:**  Review of foundation survey.

**Information or Action Required**: Upon review of the Grant Builders Group
Application #1 and percentage of work in place on site we take no exception to

the payment of the invoice amount. Also I take no exception to the other invoices submitted by Stokes Development.

**Attachments: See pictures**

**Copies To:**  Micheal Underwood
Barbara Stokes

With Enclosures:

**Report By**: Kenny Bell

# APPLICATION AND CERTIFICATION FOR PAYMENT

*AIA DOCUMENT G702*  ᴾAGE ONE OF  2  PAGES

| | | |
|---|---|---|
| TO: Summer Place, LLC<br>4800 Whitesburg Drive<br>Suite 30 - 351<br>Huntsville, AL  35802 | PROJECT: Summer Place Town Homes<br>Hwy 30-A<br>Santa Rosa Beach, FL | APPLICATION NO:  11 |

VIA ARCHITECT:

FROM: Grant Builders Group, Inc.
981 Hwy 98 East, Suite 3 #416
Destin, FL 32541

PERIOD TO:  06/20/08

PROJECT NOS:

PERMIT DATE:  July 23, 2007

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | |
|---|---|
| 1. ORIGINAL CONTRACT SUM | $3,990,070.00 |
| 2. NET CHANGE BY CHANGE ORDER | $163,599.00 |
| 3. CONTRACT SUM TO DATE (Line 1 + 2) | $4,153,669.00 |
| 4. TOTAL COMPLETED & STORED TO DATE | $3,763,081.97 |
| 5. TOTAL EARNED | $3,763,081.97 |
| 6. LESS PREVIOUS CERTIFICATES FOR PAYMENT<br>(Line 5 from prior Certificate) | $3,607,766.97 |
| 7. CURRENT PAYMENT DUE | $155,315.00 |
| 8. BALANCE TO FINISH<br>(Line 3 less Line 5) | $390,587.03 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved<br>in previous months by Owner | $133,709.00 | $0.00 |
| Total approved this Month | $29,890.00 | $0.00 |
| TOTALS | $163,599.00 | $0.00 |
| NET CHANGES by Change Order | $163,599.00 | |

AIA DOCUMENT G702 · APPLICATION AND CERTIFICATION FOR PAYMENT · 1992 EDITION · AIA® · © 1992
Users may obtain validation of this document by requesting a completed AIA Document D401 · Certification of Document's Authenticity from the Licensee.

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been paid by
the Contractor for Work for which previous Certificates for Payment were issued and
payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: Grant Builders Group, Inc.

By: _____  Date: 6-20-08

State of: Florida         County of: Okaloosa
Subscribed and sworn to before me this 20th day of JUNE 2008

Notary Public: Joy Meredith Dale  (Notary Seal)
My Commission Expires:

*(notary stamp:)* Notary Public-State of Florida
Joy Meredith Poole
My Commission DD416245
Expires 04/07/2009

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data
comprising the application, the Architect certifies to the Owner that to the best of the
Architect's knowledge, information and belief the Work has progressed as indicated,
the quality of the Work is in accordance with the Contract Documents, and the Contractor
is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . . . . $  $155,315.00

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this
Application and on the Continuation Sheet that are changed to conform with the amount certified.)*
ARCHITECT:

By: _____  Date: _____

This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the
Contractor named herein. Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292

08:45 07/09/08 GMT-05 Pg 09-10

Fm: Grant Builders Group, Inc.  (17062165971)

Grant Builders Group, Inc.
Summer Place T. H.
Contract Amount - $3,990,070

**Application for Payment**
Schedule of Values

June 20, 2007

| Description of Activity | % of Contract | Value | % Complete | Previous Billed | Completed This Month | Completed to Date | Remaining | % This month | Total % of Contract |
|---|---|---|---|---|---|---|---|---|---|
| Pre-Construction Draw | 4% | $159,602.80 | 100.00% | $159,602.80 | $0.00 | $159,602.80 | $0.00 | 0.0000% | 4.0000% |
| Lot Clearing, footing and piers | 6% | $239,404.20 | 100.00% | $239,404.20 | $0.00 | $239,404.20 | $0.00 | 0.0000% | 6.0000% |
| First Floor System | 6% | $239,404.20 | 100.00% | $239,404.20 | $0.00 | $239,404.20 | $0.00 | 0.0000% | 6.0000% |
| Wall Framing | 9% | $359,106.30 | 100.00% | $359,106.30 | $0.00 | $359,106.30 | $0.00 | 0.0000% | 9.0000% |
| Roof decking - Dry in | 6% | $239,404.20 | 100.00% | $239,404.20 | $0.00 | $239,404.20 | $0.00 | 0.0000% | 6.0000% |
| Sophit, cornice and gables | 4% | $159,602.80 | 100.00% | $159,602.80 | $0.00 | $159,602.80 | $0.00 | 18.0000% | 4.0000% |
| Exterior siding | 8% | $319,205.60 | 100.00% | $319,205.60 | $0.00 | $319,205.60 | $0.00 | 25.0000% | 8.0000% |
| Windows and exterior doors | 4% | $159,602.80 | 92.00% | $159,602.80 | $0.00 | $159,602.80 | $0.00 | 0.0000% | 4.0000% |
| Heating & A/C duct | 1% | $39,900.70 | 100.00% | $39,900.70 | $0.00 | $39,900.70 | $0.00 | 0.0000% | 1.0000% |
| Plumbing rough in, stack out | 3% | $119,702.10 | 100.00% | $119,702.10 | $0.00 | $119,702.10 | $0.00 | 0.0000% | 3.0000% |
| Plumbing Fixtures | 2% | $79,801.40 | 86.46% | $39,000.00 | $30,000.00 | $69,000.00 | $10,801.40 | 0.0000% | 1.7293% |
| Wiring rough in | 2% | $79,801.40 | 100.00% | $79,801.40 | $0.00 | $79,801.40 | $0.00 | 0.0000% | 2.0000% |
| Metal roofing | 4% | $159,602.80 | 100.00% | $159,602.80 | $0.00 | $159,602.80 | $0.00 | 0.0000% | 4.0000% |
| Exterior primed and caulked | 2% | $79,801.40 | 100.00% | $79,801.40 | $0.00 | $79,801.40 | $0.00 | 14.2800% | 2.0000% |
| Walls insulated | 1% | $39,900.70 | 100.00% | $39,900.70 | $0.00 | $39,900.70 | $0.00 | 0.0000% | 1.0000% |
| Sheetrock hung | 5% | $199,503.50 | 100.00% | $199,503.50 | $0.00 | $199,503.50 | $0.00 | 0.0000% | 5.0000% |
| Cabinets | 4% | $159,602.80 | 76.63% | $22,300.00 | $100,000.00 | $122,300.00 | $37,302.80 | 76.6277% | 3.0651% |
| Interior trim | 6% | $239,404.20 | 97.66% | $233,802.40 | $0.00 | $233,802.40 | $5,601.80 | 0.0000% | 5.8596% |
| Interior paint | 4% | $159,602.80 | 86.84% | $138,601.86 | $0.00 | $138,601.86 | $21,000.94 | 0.0000% | 3.4737% |
| Exterior paint completd | 2% | $79,801.40 | 81.20% | $64,801.40 | $0.00 | $64,801.40 | $15,000.00 | 0.0000% | 1.6241% |
| Electrical Fixtures | 2% | $79,801.40 | 93.73% | $74,801.21 | $0.00 | $74,801.21 | $5,000.19 | 0.0000% | 1.8747% |
| Appliances | 2% | $79,801.40 | 0.00% | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| HVAC installed | 2% | $79,801.40 | 100.00% | $79,801.40 | $0.00 | $79,801.40 | $0.00 | 0.0000% | 2.0000% |
| Brick pavers | 1% | $39,900.70 | 100.00% | $39,900.70 | $0.00 | $39,900.70 | $0.00 | 0.0000% | 1.0000% |
| Landscaping | 2% | $79,801.40 | 0.00% | $0.00 | $0.00 | $0.00 | $79,801.40 | 0.0000% | 0.0000% |
| Floor coverings | 5% | $199,503.50 | 93.99% | $187,503.50 | $0.00 | $187,503.50 | $12,000.00 | 0.0000% | 4.6993% |
| Final draw - miscellaneous | 3% | $119,702.10 | 0.00% | $0.00 | $0.00 | $0.00 | $119,702.10 | 0.0000% | 0.0000% |
| Subtotal | 100% | $3,990,070.00 | | $3,474,057.97 | $130,000.00 | $3,604,057.97 | $386,012.03 | | 90.33% |
| Change Order Number - 1 | | $125,189.00 | 100.00% | $125,189.00 | $0.00 | $125,189.00 | $0.00 | | |
| Change Order Number - 2 | | $2,500.00 | 100.00% | $2,500.00 | $0.00 | $2,500.00 | $0.00 | | |
| Change Order Number - 3 | | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Change Order Number - 4 | | $6,020.00 | 100.00% | $6,020.00 | $0.00 | $6,020.00 | $0.00 | | |
| Change Order Number - 5 | | $29,890.00 | 84.69% | $0.00 | $25,315.00 | $25,315.00 | $4,575.00 | | |
| Total | | $4,153,669.00 | | $3,607,766.97 | $155,315.00 | $3,763,081.97 | $390,587.03 | | |



**GRANT**
BUILDERS GROUP

981 Hwy 98 East, Suite 3 – 416
O: 850-502-4151  F: 866-348-6656
Destin, FL  32541

June 26, 2008

VIA EMAIL TRANSMISSION AND CERTIFIED MAIL

Barbara Stokes
Summer Place, LLC
4800 Whitesburg Dr., Suite 30-351
Huntsville, AL 35802

**Re:**  Construction Contract dated 5/09/07 ("Contract") by and between Summer Place, LLC ("Summer Place") and Grant Builders Group, Inc. ("Grant")

Dear Barbara:

We hereby notify you that Summer Place has breached its obligation to make timely payment for the Summer Place Town home project (the "Project") in accordance with the Contract, as amended by those certain change orders one through five (the "Contract"). Further, we hereby notify Summer Place that their attempt to make the progress payments for this project contingent upon Grant's acceptance of the "Economic Sharing Agreement" for the Summer Place project is another breach of the Contract. Per the Contract, payments will not, and cannot, be made contingent upon any other agreements.

Summer Place was advised of change orders one through five beginning on October 23, 2007, and Summer Place acknowledged those change orders on each pay application since October 2007. Summer Place made no attempt to dispute any of the change orders submitted but instead made selections, decisions, and even payments for those change orders. Summer Place had a fiduciary responsibility to timely inform Grant if any of the change orders were disputed, but again, they did not. Summer Place's assertion that liquidated damages would apply due to Grant's failure to make the contractual scheduled completion date does not take into account the allowable time delays from the change orders. When just the change order time extensions for change orders one through five are added to the contract time the damages would not apply until May 27, 2008. When the time extensions for future change orders for delay due to non payment to the date of this letter are added to the contract time, the damages would not apply at least until August 27, 2008. Furthermore, Summer Places' failure to make timely payments under the Contract are a material breach of the Contract that occurred prior to the scheduled completion date and therefore would nullify any claim by Summer Place for delay damages.

Grant hereby provides notice that Summer Place is currently in default of its obligations under the Contract. Grant demands that Summer Place immediately take all measures necessary to make all payments past due within seven days of this notice. Please know that, should full payment not be achieved within seven days, Grant shall have no alternative but to hold Summer Place in material breach of or default under the Contract and may exercise all legal rights and remedies including, without limitation, recovery of its damages.

Grant continues to expressly reserve all rights.

Very truly yours,

Thomas Grant
President

cc:     Bill Howell, P.A.
        Jeffery Stephens, P.A.

WARNING!

THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LIEN HAS BEEN PLACED ON
THE REAL PROPERTY LISTED HEREIN. UNLESS THE OWNER OF SUCH PROPERTY TAKES
ACTION TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR
FROM THE DATE OF RECORDING, AND SHALL EXPIRE AND BECOME NULL AND VOID
THEREAFTER UNLESS LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR
TO DISCHARGE THIS LIEN.

# CLAIM OF LIEN

State of Florida
County of Walton

BEFORE ME, the undersigned notary public, personally appeared Grant Builders Group, Inc., who was
duly sworn and says that she or he is the lienor herein, whose address is 981 Hwy 98 East, Suite 3-416,
Destin, FL, 32541; and that in accordance with a contract with Summer Place, LLC, a Florida limited
liability company, whose address is 4800 Whitesburg Drive, Suite 30-351, Huntsville, AL, 35802, lienor
furnished labor, services, and/or materials on the real property in located in Walton County, Florida,
described as follows:

**Summer Place Town Homes**
**Summer Place Lane**
**Santa Rosa Beach, FL 32459**

**02-3S-20-34160-000-0473**

Summer Place, LLC is the owner of such property. This contract was for a value of $4,123,809.00, of
which Grant Builders Group, Inc. conducted $3,763,081.97 worth of labor, services and/or materials, of
which there remains unpaid $409,925.63, and furnished the first of the labor, services and/or materials on
or about July 23, 2007; and the last of the labor, services and/or materials on or about June 24, 2008.

Witness:

Witness:

Grant Builders Group, Inc.

By:

President

Sworn to and subscribed before me on this 24th day of June , 2008 , by the affiant, Grant
Builders Group, Inc., who is personally known to me or produced identification and who did take an oath.

Personally Known   X   OR Produced Identification _____

Type of Identification Produced_____

NOTARY PUBLIC

MY COMMISSION EXPIRES: 04|07|2009

Notary Public State of Florida
Joy Meredith Poole
My Commission DD116245
Expires 04/07/2009

INSTR # 1043930
OR BK 2795 Pages 4333 - 4333
RECORDED 06/26/08 08:20:26
MARTHA INGLE, WALTON COUNTY
CLERK OF COURT
DEPUTY CLERK S BARBER
#3



DAG Architects Inc.
1223 Airport Road
Destin, Florida 32541
P 850-837-8152 F 850-654-4276
www.dagarchitects.com

## Architect's Field Report

**Project Name:** Summer Place

**Project No: 07074**

**Date:** 6-30-08

**Time: 11:30AM**          **Temp. 85**          **Weather: Sunny**

**Present at Site**: No worker peasant

**Work in Progress**: None at this time

**Observations:**

**The Site: Some of the fencing was down at the south side of the project. There is a large trash dumpster on site and one conex box for storage. There is a Lull Tractor on site. There are miss. material around the site. There is a large pile of dirt next to the retention pond. Around the building there seems to be erosion from the rain and from the gutters. There are a lot of weeds on site. The columns at the entrance have been damaged.**

**Building A (Southwest corner) These units have the floors finished and are ready for the cabinet to be installed. All the bath cabinets were on site. None of the kitchen cabinets have been set. The contractor lacks finishing the hand rails, interior and exterior painting, door hardware, Cabinets, Stairs and the landing for the roof access, shoe molding.**

**Building B (North) These units have had the floors 2ⁿᵈ coated but 2 of the units do not have the wood installed on the stairs. The kitchen cabinets have not been set. These units are abut the same as the A**

units with a little more trim missing and there is a few more dry wall repairs needed. One unit on the west end had water standing on the 1st floor.

**Building C (Southeast)**   These units are ready for touch up paint. The cabinet are 40% set and hand rail installed as well as door hardware. The shelving has not been installed in any units. Also the wood treads have not been installed on the stairs to the roof.  One of the windows in the south unit was hanging out and plastic was in the hole.

**Note:** I talked to Mr. Grant and he said had the Job stopped because of none payment.

**Note:** exception taken on the amount for Cabinets. The installation and the cost of the granite counter tops cost seems to be over billed. A break down of cost is needed.

**Note:** I do not see a line item for clean up but there is a lot to be done.

**Note:** the interior trim is over billed for the amount of work needed for stairs and railing. A cost break down is needed.

**Items to Verify**:  The change Order was not signed by the owner.

**Information or Action Required**: Upon review of the Grant Builders Group Application #11 and percentage of work in place on site we take exception to the payment of the invoice amount. The contractor should provide a lien waiver.

**Attachments: See pictures**

**Copies To:**  Micheal Underwood
                        Barbara Stokes

With Enclosures:

**Report By**: Kenny Bell