**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| *Civ. No.* 10-4536 | : | MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

<u>CLEAN WATER ACT – PENALTY PHASE</u>

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**FOR THE PENALTY PHASE TRIAL**

## OVERVIEW OF PROPOSED FINDINGS OF FACT

Detailed Table of Contents ............................................................................................... ii
List of Figures ................................................................................................................... xiii
List of Tables .................................................................................................................... xvii

I.      THE SERIOUSNESS OF THE VIOLATION OR VIOLATIONS .................................. 1

II.     ECONOMIC BENEFIT ................................................................................................ 158

III.    THE DEGREE OF CULPABILITY INVOLVED .......................................................... 160

IV.     ANY OTHER PENALTY FOR THE SAME INCIDENT ............................................. 161

V.      ANY HISTORY OF PRIOR VIOLATIONS ................................................................. 164

VI.     THE NATURE, EXTENT, AND DEGREE OF SUCCESS OF ANY EFFORTS OF
        THE VIOLATOR TO MINIMIZE OR MITIGATE THE EFFECTS OF THE
        DISCHARGE ............................................................................................................... 176

VII.    THE ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR ................... 208

VIII.   ANY OTHER MATTERS AS JUSTICE MAY REQUIRE ........................................... 283

i

## DETAILED TABLE OF CONTENTS

**LIST OF FIGURES** ........................................................................................ xiii

**LIST OF TABLES** ........................................................................................ xvii

**CITATION STYLE, WITNESS BACKGROUND, AND TERMINOLOGY** .................... xvii

**I.    THE SERIOUSNESS OF THE VIOLATION OR VIOLATIONS** ............................... 1

    **A.    Defendants Have Admitted that the Violations Were Serious** ........................ 2

    **B.    BPXP Now Seeks to Minimize the Seriousness of the Violations** .................... 4

    **C.    The Defendants' Violations Resulted in the Largest Oil Spill in American Waters** ........................................................................................ 7

    **D.    The Disaster Seriously Harmed the Health of Human Beings** ........................ 9

        **i.    People Died and Were Physically Injured on the Rig** ........................ 9

        **ii.    Response Workers Were Injured, Became Ill, and Were Put at Risk** ........................................................................................ 20

        **iii.    Response Workers and Gulf Communities Were and Are at Risk of Health Impacts from Chemical Exposure** ................................... 26

            **a)    Constituents of Crude Oil and Dispersants as well as Compounds Created from the Combustion of Crude Oil are Toxic to Humans** ........................................................... 26

            **b)    People Displayed Symptoms of Exposure to these Chemicals** ........................................................................... 28

            **c)    Claims for Exposure-Related Injuries Were Paid Under the Medical Benefits Settlement** ....................................... 32

            **d)    BPXP's Challenges to the Evidence of Exposure and Therefore Risk of Long-Term Harm Are Unsupported** ........ 35

                **i)    BPXP Overstates the Importance of Benchmarks** ....... 35

                **ii)    BPXP Overstates the Completeness of Exposure Characterization for Response Workers** ..................... 38

                    **(a)    Dermal Exposures Were Barely Characterized** ....................................... 38

(b)    **Characterization of Inhalation Exposures Was Limited Given the Number of Response Workers and Locations** ..................... 40

(c)    **Weathering of Oil Does Not Make it Innocuous** .............................................. 43

e)    **Personal Protective Equipment Was an Imperfect Guard against Exposure** ........................ 47

f)    **Risk of Long-Term Human Health Effects Remains** .............. 49

iv.    **The Disaster Caused Risk of and Actual Psychological Harm** ........... 51

a)    **Disasters Cause Serious Individual Psychological Harm** ........ 51

b)    **The Survivors Suffered Psychological Harm** ........................ 54

c)    **The Families of the Dead Suffered Psychological Harm** ........ 55

d)    **Response Workers Experienced Psychological Harm** ............ 56

e)    **The Population Was at Risk for Psychological Harm** ............ 57

E.    **The Disaster Harmed the Social Fabric of the Gulf Coast** ............................ 59

i.    **Ethnography Was the Right Methodology to Determine Sociocultural Effects** .................................... 61

ii.    **Dr. Austin's Method Adequately Protected against Bias** ................... 64

iii.    **The Context Within Which the Disaster Occurred Contributed to the Seriousness** ............................... 65

iv.    **The Disaster Disrupted Livelihoods and Patterns of Daily Living** ..... 66

v.    **The Disaster Exacerbated Social and Economic Inequality** ............. 69

vi.    **The Disaster Challenged Individual and Collective Identity** ............. 71

vii.    **The Disaster Fostered Conflict and Divisiveness** ................................ 73

viii.    **The Disaster Disempowered Local Governments and Non-Governmental Organizations** ................................ 75

ix.    **BP's Challenge to the Generalizability of Dr. Austin's Study Is Unsupported** ..................... 76

x.    **Contrary to BPXP's Contentions, Dr. Bonanno's Research Supports Rather than Undermines Dr. Austin's Study** ..................... 77

xi.    **BPXP's Witnesses Use Narrow Definitions of Harm and Averages to Inappropriately Dismiss Dr. Austin's Results** ................ 78

iii

**F.      The Spill Caused Serious Economic Harm to the Gulf Coast Communities** ............................................................................................ 79

    **i.      The Claims Process Recognized Damage across Five States** ............. 79

    **ii.     The Claims Process Provides a Good Estimate of the Economic Harms** ............................................................................................... 83

    **iii.    BPXP's Witnesses Acknowledge There Was Serious Economic Harm** ................................................................................................. 84

    **iv.     Dr. Scott's Claims of Recovery in the Tourism Industry are Incorrect** ............................................................................................. 85

    **v.      Dr. Scott Ignores Impacts Outside of the Tourism and Fisheries Industries** .......................................................................................... 87

    **vi.     Dr. Scott Improperly Aggregates Effects in Order to Mask Them** .... 88

**G.      Defendants' Violations Imposed a Significant Burden on the United States** ................................................................................................... 89

    **i.      The Largest and Most Complex Response in American History** ....... 89

        **a)      The Governance and Organization Was Complex** ................. 89

        **b)      The Number of Response Workers Was Staggering** .............. 96

        **c)      The Resources Required Were Also Staggering** ..................... 97

    **ii.     The Response Burdened the United States in Many Ways** ............... 100

**H.      Defendants' Violations Caused Risks outside the Gulf Coast Communities** .......................................................................................... 102

**I.      The Defendants' Violations Caused Serious Environmental Harm** ............ 104

    **i.      Chemical and Natural Dispersion of the Oil Enhanced its Toxicity** ............................................................................................ 108

    **ii.     Actual Harm Occurred in Deep Gulf Waters** .................................. 109

        **a)      Marine Snow Formed as a Result of the Defendants' Violations** .................................................................................. 110

        **b)      Rare Cold-Water Corals Were Injured** ................................. 110

        **c)      Other Deep Sea Organisms Were Also Injured** ..................... 112

    **iii.    Actual Harm Occurred in the Gulf's Near-Surface Waters** ............. 113

    **iv.     Actual Harm Occurred at the Surface of the Gulf** ........................... 114

        **a)      Sea Turtles were actually and potentially Harmed** ............... 115

iv

|   |   | b) | Dolphins Were Actually and Potentially Harmed | 116 |
|   |   |   | i) | Dolphins Were Harmed | 116 |
|   |   |   | ii) | BPXP's Criticisms of this Evidence Are Erroneous | 117 |
|   |   | c) | Birds were Actually and Potentially Harmed by the Defendants' Violations | 120 |
|   |   |   | i) | Birds Were Harmed | 120 |
|   |   |   | ii) | BPXP's Criticisms of this Evidence Are Unsupported | 121 |
|   | v. | Fish Were Actually and Potentially Harmed | 122 |
|   |   | a) | Pelagic Fish Were Actually Harmed | 122 |
|   |   | b) | Bottom Dwelling Fish Suffered Potential Harm | 129 |
|   |   | c) | Dr. Tunnell Addresses Only Catastrophic Impacts | 130 |
|   |   | d) | Dr. Shea Fails to Successfully Challenge the Proof of Actual and Potential Harm to Fish and Shellfish | 133 |
|   | vi. | The Shoreline and Its Inhabitants Was Actually and Potentially Harmed | 145 |
|   |   | a) | SCAT Surveys Recorded Extensive Visible Oiling on the Gulf Shoreline | 146 |
|   |   | b) | SCAT Surveys Did Not Detect All of the Shoreline Oiling | 148 |
|   |   | c) | The Disaster Harmed Beaches | 150 |
|   |   | d) | The Disaster Harmed Marshes and their Inhabitants | 151 |
|   |   |   | i) | The Marshes themselves were Harmed | 151 |
|   |   |   | ii) | Defendants' Oil Harmed Marsh Creatures | 155 |
|   |   |   | iii) | Dr. Taylor's Analysis of Marsh Recovery Omits Important Data | 157 |

II. ECONOMIC BENEFIT ... 158

III. THE DEGREE OF CULPABILITY INVOLVED ... 160

IV. ANY OTHER PENALTY FOR THE SAME INCIDENT ... 161

V. ANY HISTORY OF PRIOR VIOLATIONS ... 164

    A. The BP Group's History of Past Violations Shows a Consistent Pattern of Placing Profit over the Safety of Its Workers and Communities ... 164

i.  BP Exploration Alaska Committed in a Criminal Plea to Improve the Safety and Operations of the Entire BP Group ........................... 165

ii.  The Grangemouth Guilty Plea Shows the BP Group Had Not Gotten the HSE Message ..................................................... 167

iii.  The Texas City Guilty Plea Proves that the BP Group Still Was Not Addressing HSE Adequately ........................................ 168

iv.  The Prudhoe Bay Guilty Plea Proves Texas City Did Not Change the Practices of the BP Group .......................................... 171

v.  The BP Group's History is Replete with Deficient Safety Management Practices ....................................................... 172

vi.  BPXP's Contentions at Trial Also Show it Has Not Learned its Lesson .......................................................................... 174

B.  Anadarko, Too, Has a History of Past Violations ........................................... 175

VI.  THE NATURE, EXTENT, AND DEGREE OF SUCCESS OF ANY EFFORTS OF THE VIOLATOR TO MINIMIZE OR MITIGATE THE EFFECTS OF THE DISCHARGE .................................................................... 176

A.  The BP Group's Efforts to Minimize the Discharge Were Inadequate ....... 176

B.  The BP Group Was Inaccurate and then Lied about the Flow Rate, Creating Mistrust by the Public that Complicated the Response ................ 177

C.  As a Responsible Party BPXP Was Required to Perform the Response Actions .................................................................... 178

D.  Even Were BPXP Entitled to Credit for the Response Action, It Has Exaggerated Its Success ........................................................ 180

i.  Judging the Success of a Response Requires Consideration of Many Factors .................................................................... 181

ii.  The BP Group Made Some Mistakes During the Response ............ 182

iii.  BPXP's Assertion that it Removed Thirty-Seven Percent of the Oil is Unsupported by the Evidence ...................................... 185

a)  BPXP Compares Responses that Relied Predominantly on Skimming to a Response that Used Unprecedented *In Situ* Burns and Dispersants ............................................. 186

b)  BP Treats Burned and Dispersed Oil as "Removed" from the Environment ...................................................... 187

c) Without a Daily Flow Rate, BPXP's Calculations are Unsupported ................................................................ 189

d) The Comparison to Oil Available for Recovery Is Irrelevant ...................................................................... 190

iv. The Reduction of Dispersant Use Was Sound Policy ....................... 191

a) The Dispersant Directives Were Generated by the Unprecedented Volume of the Spill ......................................... 191

b) BPXP's Procedural Challenges to the Directive to Decrease Dispersant Use are Unfounded .............................. 196

c) BPXP's Claims that the Dispersant Directive Interfered with the Effectiveness of the Response are Unsupported ...... 197

v. Allegations of "Political" Interference by Local Officials Do Not Demonstrate Any Interference with the Effectiveness of the Response ............................................................................................ 200

vi. The Barrier Island Project and the Mississippi River Diversions Did Not Interfere with *BPXP*'s Efforts to Mitigate or Minimize the Effect of Its Violations ................................................................. 202

vii. The BP Group was Protecting its Own Private Economic Interests When Conducting the Response .......................................... 203

a) BPXP's Ability to Continue to do Business was on the Line ................................................................................... 203

b) Early Restoration Earns BPXP Credit Toward Future NRD Claims ........................................................................ 204

E. Anadarko's Mitigation Efforts Do Not Warrant a Reduction in the Penalty ............................................................................................... 205

VII. THE ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR ................ 208

A. BPXP and BP Have the Ability to Pay the Maximum Clean Water Act Penalty ............................................................................................... 208

i. BPXP is Operationally and Financially Inextricable from the BP Group ................................................................................................. 209

a) The BP Group Operates Through Segments and Functions that Make Decisions and Provide Services across the Group .................................................................... 210

b) BPXP Finances Are Managed by the BP Group .................. 215

vii

c) **Investment Decisions Are Made by the BP Group, Not Legal Entities, Through Structured Finance Notes** .............. 218

d) **BPXP Financial Statements Reflect Decisions Made by the BP Group** .................................................................................. 219

e) **BPXP Board Functions are Very Limited** ............................. 221

f) **BPXP Does Not Have Employees** ............................................ 224

g) **The BP Group Does Not Distinguish Between Subsidiaries and the Group** ............................................................................ 225

h) **The BP Group Managed and Financed BPXP's Response to the Disaster** ............................................................................ 229

i) **The BP Group Regularly Provided Financing to BPXP** ....... 234

j) **Other BP Group Entities Made Commitments and Took Actions on Behalf of the BP Group's Interests in the Gulf Before and After the Incident** ................................................ 237

k) **BPXP Increased Spending Since the Spill Instead of Creating Any Reserve for Penalties.** ..................................... 238

ii. **Imposition of the Statutory Maximum Would Not Have a Long-Term Negative Impact on the Operations of BP p.l.c. or the BP Group** ............................................................................................. 239

a) **BP p.l.c. and the BP Group Are Enormous, Have Been Very Stable, and Expanded 2009-2013** ................................... 239

i) **BP p.l.c.'s Balance Sheet is Stronger Today than it Was Prior to the Defendants' Disaster** ........................ 240

ii) **BP p.l.c.'s Standard Measure of Oil and Gas Includes Only a Portion of BP p.l.c.'s Reserves** ......... 243

iii) **The BP Group's American Companies Are Substantial in Their Own Right** .................................. 245

iv) **BP p.l.c. Has Implemented a Stock Buyback Program and Has Issued Substantial Dividends Since 2009** ................................................................... 247

v) **BP p.l.c. has Extensive Credit Lines and Can Issue Debt** ................................................................................ 248

vi) **Third Party Credit Agencies Have Favorable Views of BP p.l.c.** ........................................................ 249

**iii.** **Imposition of the Statutory Maximum Would Not Have a Long-Term Negative Impact on the Operations of BPXP** ........................ 250

    **a)** **The Gulf of Mexico is one of BP's Four Key Areas in the Coming Years** .................................................................. 251

        **i)** **BPXP Holds Eighty-Nine Percent of the BP Group's Activities in the Gulf of Mexico** ................... 251

        **ii)** **BPXP's Lower Tertiary Leases and Other Unproved Reserves Hold Future Potential** ................ 251

        **iii)** **The 2013 Gulf of Mexico SMOG Identifies Only Proven Reserves** .................................................. 252

    **b)** **BPXP Has Substantial Assets** .................................................. 253

    **c)** **BPXP Paid Over Sixteen Billion Dollars in Dividends to Other BP Entities in 2007-2010** ................................................. 254

    **d)** **The BP Group Projects Substantial Future Operating Cash Flows for the Gulf of Mexico Region** ............................ 254

    **e)** **BPXP and BP Have Many Options to Pay a Penalty, but Have Made no Specific Plans** .................................................... 257

    **f)** **BPXP's Evaluation of Its Ability to Pay is Fatally Flawed** ... 258

        **i)** **BPXP's "Valuation" is not Reliable** ............................ 258

            **(a)** **BPXP's Witness is Not Qualified and Did Not Follow Standards for Business Valuations** ............................................. 260

            **(b)** **BPXP's Witness Did Not Perform Due Diligence in Preparing his "Valuation" of BPXP** .................................................. 261

            **(c)** **BPXP's Witness Did Not Include All of BPXP's Assets in his Valuation** ..................... 264

            **(d)** **BPXP's Witness Made an Unsupported $7.8 Billion Adjustment to Projected Operating Costs** ............................................................ 265

        **ii)** **BP p.l.c. and BPXP Are Well Positioned to Deal with Current Oil Prices** ............................................ 268

        **iii)** **BPXP Improperly Limits its Ability to Pay to its Current Internal Credit Line** ...................................... 271

g)    No Evidence Suggests that Considering BP p.l.c.'s Finances in Determining BPXP's Penalty Will Discourage Well-Capitalized Companies from Investing ........................ 273

B.    Anadarko Can Pay a Substantial Penalty ........................................ 273

i.    Anadarko is a Global Public Oil and Gas Exploration and Production Company ................................................................ 274

ii.    Anadarko is a Financially Strong Company with Positive Revenue Growth and Cash Flows ........................................... 276

iii.    Anadarko is Well-positioned to Deal with Current Oil Prices ......... 280

iv.    Anadarko Claims That it Needs Capital to Reinvest, but this Penalty Factor Requires Consideration of the Impact on Existing Operations, Not on Plans for Future Growth. ................... 282

VIII.  ANY OTHER MATTERS AS JUSTICE MAY REQUIRE ..................................... 283

A.    BP Did Not Revolutionize Spill Response ...................................... 283

i.    Oil Spill Research and Development is a Continuous Government and Private Sector Effort ................................................ 283

ii.    Changes in Technique Were Not Innovations but Instead Up-scaling of Classic Methods, Driven by the Size of the Defendants' Spill ................................................................................ 285

iii.    Any Innovation in the Response was not BP's Alone ....................... 286

iv.    Every Spill is Unique and Requires Changes in Well-Established Techniques – Giving Credit for that is Giving Credit for Having Caused the Spill .............................................................. 288

B.    Both Defendants' Claims regarding their Importance to the Gulf Economy Are Exaggerated and Do Not Support Mitigation of the Penalty ............................................................................. 290

i.    BPXP Is Modestly Important to the Gulf Economy ........................ 291

ii.    Anadarko, Too, Is Modestly Important to the Gulf Economy ......... 293

iii.    Defendants' Role in the Gulf Economy Can and Would Be Filled by Others ........................................................................... 294

C.    Anadarko's Claim that a Penalty Will Drive Non-Operators Out of the Gulf is Not Supported by the Evidence ........................................... 295

i.    Dr. Sunding's Entry-Exit Analysis is Fatally Flawed ...................... 296

x

ii.     Dr. Sunding's Lease Concentration Analysis is Also Flawed ........... 299

D.  **Anadarko's Claims Regarding the Role of Non-Operators Are Unsupported and Do Not Warrant Reduction in the Civil Penalty** ............ 302

   i.     **Using Stage-Gate Decision-Making Non-Operators Actively Participate in Design Decisions** ................................................ 304

   ii.    **Mr. Walkup Correctly Defines the Distinction between Design and Operational Decisions** .................................................. 305

   iii.   **Non-Operators' Active Participation Encompasses Many Forms and Activities** ................................................................... 307

   iv.    **Various Drivers Counsel Active Participation** ................................... 309

   v.     **Examples of Active Participation Abound** ......................................... 311

   vi.    **The Oil and Gas Industry Developed the Model JOA to Save Transaction Costs** ................................................................... 312

   vii.   **The Model JOA Gives Non-Operators Leverage at Critical Junctures** ............................................................................. 313

   viii.  **The JOA Gives Non-Operators Leverage Regarding Drilling to Objective Depth and Subsequent Operations** ................................. 314

   ix.    **The JOA Provides Leverage to Non-Operators by the Requiring Authorizations for Expenditure** .................................................. 316

   x.     **The JOA Gives Non-Operators a Role in HSE** ................................... 316

   xi.    **Non-Operators Receive Extensive Information Concerning Operations and Have a Right to Access to all Facilities** .................... 317

   xii.   **Anadarko's Witnesses Agree that Non-Operators Can Positively Influence HSE** .................................................................... 319

   xiii.  **Mr. Arnold's Attempt to Limit Effect of Non-Operators on HSE to the Development Phase is Unsupported and Irrelevant** .............. 321

   xiv.   **Mr. Arnold's Attempt to Limit Non-Operator Decisions to Strategic Issues is Unsupported** .......................................... 323

   xv.    **Mr. Arnold Construes the Design Phase Too Narrowly** ................... 325

E.  **Anadarko's Argument that there Is no Deterrence Value in a Penalty for Anadarko Is Not Supported by the Evidence** ............................ 326

   i.     **Dr. Sunding Fails to Recognize that the Statute and Public Policy Requires Damages and Penalties to be Treated Differently** ............ 327

**ii.** **Dr. Sunding Lacks a Firm Basis for Asserting that $4 Billion Represents Sufficient Deterrence** ........................................................ 328

**iii.** **Dr. Sunding Misapplies The Formula for Optimal Deterrence** ....... 330

**iv.** **Dr. Sunding Ignores the Difference between Punitive Damages and Clean Water Act Penalties** ............................................... 331

**v.** **Dr. Sunding Minimizes the Risk of Under-Deterrence** .................... 332

**vi.** **Dr. Sunding's Absolute Deterrence Argument Ignores the Clean Water Act Penalty Factors** ................................................ 332

**vii.** **Dr. Sunding's Opinions on Efficient Deterrence are Unfounded** ..... 334

**F.** **Anadarko's Miscellaneous "Other Factors" Seek Credit for Things that Are Legally Required or Done for Its Own Business Reasons** .................... 336

**APPENDIX A: FINDINGS OF FACT CONTAINING HIGHLY CONFIDENTIAL INFORMATION (FILED UNDER SEAL)** ................................ 340

**APPENDIX B: GLOSSARY OF TERMS AND ABBREVIATIONS** ................................ 341

**APPENDIX C: BIOGRAPHICAL INFORMATION AND QUALIFICATIONS OF THE LIVE AND DEPOSITION WITNESSES** ........................................ 346

## LIST OF FIGURES

Figure 1: The Events Comprising the Defendants' disaster (D-33308) ........................................ 1

Figure 2: Tony Hayward on CNN (TREX-233619) ................................................................... 2

Figure 3: Oil Trapped on Fourchon Beach (TREX-011826.112) ............................................... 4

Figure 4: View of the Spill from a Satellite (TREX-012067.001) ............................................. 6

Figure 5: Surface Oil Slick (TREX-009124.041) ..................................................................... 7

Figure 6: Eleven Men Who Lost Their Lives (D-006587) ......................................................... 9

Figure 7: Douglas Brown, Joshua Kritzer, James Mansfield, Paul Meinhart, Buddy Trahan,
Wyman W. Wheeler, and Michael Keith Williams – Seven of the Seventeen
People Injured on the Rig (From their Deposition Videos) ........................................... 9

Figure 8: The Deepwater Horizon on Fire (TREX-000001.120) ............................................... 17

Figure 9: Coast Guard Officer Checking Heat Index for Safety (TREX-009105.106) ............... 20

Figure 10: The BP Group's Identification of Risk Categories for Response Workers
(TREX-012014.016) ............................................................................................... 21

Figure 11: Workers Working with Boom on Ship Deck (TREX-009105.001) ........................... 24

Figure 12: In Situ Burn off Venice, Louisiana (TREX-009105.065) ........................................ 30

Figure 13: Demonstration of Limitations of Benchmarks for Sensitive Populations
(TREX-232520.150) ............................................................................................... 37

Figure 14: Relationship of Hydrocarbon Size to Toxicity (D-32609) ...................................... 44

Figure 15: Workers wearing PPE incorrectly (TREX-012621) ................................................ 47

Figure 16: Response Worker on Beach (TREX-009105.003) .................................................... 48

Figure 17: Trajectories of Psychological Impacts of Disasters (TREX-013370.004) ................ 51

Figure 18: Dr. Austin's Eighteen Years of Study in the Gulf ................................................... 59

Figure 19: Dr. Austin's Study Communities .......................................................................... 61

Figure 20: A Closed Oyster Shop (TREX-013112.028) ........................................................... 66

Figure 21: A Vessel of Opportunity (Shrimp Boat) Carrying Boom (TREX-13112.029) .......... 69

Figure 22: Oil on the Beach (TREX-013112.044) .................................................................. 71

Figure 23: Wall Art Depicting Conflicting Views (D-33310) .................................................. 74

Figure 24: Total Paid to GCCF Claimants by County (D-33512) ............................................ 82

Figure 25: Hotel Revenue Data Showing Ongoing Harm (D-33519; TREX-013318) ............... 86

Figure 26: Overview of Organization of Government's Response Structure
(TREX-009105.027) ............................................................................................... 90

Figure 27: The Regional Response Teams (TREX-009105.031) .............................................. 93

Figure 28: A Briefing Session at the Unified Area Command (TREX-009105.209) .................. 96

Figure 29: Screenshot from ERMA (TREX-013249) .............................................................. 98

Figure 30: Vessel Decontamination Locations (TREX-009105.148) ........................................ 103

Figure 31: Dispersion of Oil Increases Bioavailability (D-32612A) ........................................ 107

Figure 32: Cold-Water Coral Covered by Brown Flocculent (TREX-013183.026) ................... 111

xiii

Figure 33: A Sea Turtle Swims Under a Raft of *Sargassum* Entrained in Oil (TREX-230986) .................................................................................................. 114

Figure 34: Oiled Sea Turtle (TREX-230959) ................................................... 115

Figure 35: Dolphin Swimming in Oily Water (TREX-231481.001)................... 116

Figure 36: Oiled Pelican and Boom (TREX-230999) ...................................... 120

Figure 37: Pericardial Effects in Yellowfin Tuna (TREX-233611) .................. 125

Figure 38: Example of Persistent Oiling Conditions – Heavily Oiled Wrack and Vegetation Mat in Bay Jimmy in October 2010 (TREX-013015.018) ........................................ 147

Figure 39: Response Equipment on the Beach (D-34331) ................................ 150

Figure 40: Oil Pooling in a Marsh (TREX-013015.019)................................... 154

Figure 41: Oiled Oysters (TREX-013112.031) ................................................ 156

Figure 42: Chronology of BP's Prior Violations (D-32017A) ......................... 164

Figure 43: Smoke Plume from an In Situ Burn (TREX-009124.004)................ 187

Figure 44: Comparison of "Effectiveness" of Responses (D-34006A.1) ......... 189

Figure 45: Purported Correlation between Shoreline Impact and the Absence of Dispersant Usage (TREX-011850) ........................................................................ 197

Figure 46: Dispersant Data Missing from BP's Witness's Analysis ................. 198

Figure 47: Lines of Delegation and Accountability within the BP Group (D-32904.2)............. 212

Figure 48: BP Proven v. Unproven Reserves (TREX-013123R.012) ............... 244

Figure 49: Handwritten Change to Cash Flow Projection in Gulf of Mexico Group Plan Template (TREX-012430.3.1.US) ........................................................ 256

Figure 50: BP's Shareholder Presentation on the Volatility of Oil Prices (TREX-233865.008) .............................................................................. 268

Figure 51: Anadarko's Portfolio (TREX-012391.005)..................................... 274

Figure 52: Anadarko's Capital Allocation for Sustained Growth and Value (TREX-012391.017) ........................................................................................... 281

Figure 53: Oil Spill Response Projects Initiated by DOI since 2001 (TREX-013153.009). ...... 284

Figure 54: Deepwater Horizon ART Program (TREX-013515.007) ................ 289

Figure 55: Comparison of Combined Oil and Gas Royalties to those of BPXP and Anadarko (TREX-013317. 021) ................................................................ 291

Figure 56: Gulf of Mexico Oil Industry is Unconcentrated (D-33533)........... 300

Figure 57: Stage-Gate Decision-Making (TREX-232848.10.1.US).................. 304

Figure 58: Spectrum of Relationships for Operators and Non-Operators (D-33165) ............... 307

Figure 59: Drivers for Non-Operator's Focused Active Participation (D-33155).................... 309

Figure 60: Thad Allen ...................................................................................... 346

Figure 61: Kenneth Arnold ............................................................................... 346

Figure 62: Diane Austin ................................................................................... 347

Figure 63: Meredith Austin............................................................................... 347

Figure 64: Nicholas Bamfield........................................................................... 348

Figure 65: Mace Barron ........................................................................................................ 349

Figure 66: Michael Beirne .................................................................................................... 349

Figure 67: Robert Bodek ...................................................................................................... 350

Figure 68: Donald Boesch .................................................................................................... 350

Figure 69: George Bonanno .................................................................................................. 351

Figure 70: Steven Bray ........................................................................................................ 351

Figure 71: Douglas Brown .................................................................................................... 352

Figure 72: David Bucknall .................................................................................................... 352

Figure 73: Drew Casey ........................................................................................................ 353

Figure 74: Richard Clapp ...................................................................................................... 353

Figure 75: Robyn Conmy ...................................................................................................... 355

Figure 76: Robert Cox .......................................................................................................... 356

Figure 77: Iris Cross ............................................................................................................ 356

Figure 78: Robert Daines ...................................................................................................... 357

Figure 79: Bruce Den Uyl ...................................................................................................... 357

Figure 80: Cathy Douglas ...................................................................................................... 358

Figure 81: James Dupree ...................................................................................................... 358

Figure 82: Laura Folse .......................................................................................................... 359

Figure 83: Robert Gwin ........................................................................................................ 359

Figure 84: James Hanzalik .................................................................................................... 361

Figure 85: Julia Hein ............................................................................................................ 361

Figure 86: Richard Heron ...................................................................................................... 362

Figure 87: Larry Hewett ........................................................................................................ 362

Figure 88: Damian Higgins .................................................................................................... 363

Figure 89: Darrell Hollek ...................................................................................................... 363

Figure 90: John Howard ........................................................................................................ 364

Figure 91: Nick Huch ............................................................................................................ 364

Figure 92: Mark Huston ........................................................................................................ 364

Figure 93: Frank Kulesa ........................................................................................................ 365

Figure 94: Roger Laferriere .................................................................................................... 366

Figure 95: Mary Landry ........................................................................................................ 366

Figure 96: Jane Lubchenco .................................................................................................... 367

Figure 97: Harry Luton .......................................................................................................... 367

Figure 98: Richard Lynch ...................................................................................................... 368

Figure 99: Charles Mason ...................................................................................................... 368

Figure 100: Stephen McCleary .............................................................................................. 369

Figure 101: Sara McNulty ...................................................................................................... 369

Figure 102: Paul Meinhart .................................................................................................... 370

Figure 103: Amy Merten ........................................................................................................ 370

Figure 104: Jacqui Michel ............................................................................................ 371
Figure 105: Mark Miller ............................................................................................... 371
Figure 106: Richard Morrison ...................................................................................... 372
Figure 107: Alan O'Donnell ......................................................................................... 372
Figure 108: Frank Paskewich ....................................................................................... 373
Figure 109: Robert Quitzau .......................................................................................... 373
Figure 110: Fredric Quivik .......................................................................................... 374
Figure 111: Dave Rainey .............................................................................................. 374
Figure 112: Ian Ratner ................................................................................................. 375
Figure 113: Stanley Rice .............................................................................................. 375
Figure 114: Mike Robertson ........................................................................................ 376
Figure 115: Marshall Rose ........................................................................................... 377
Figure 116: Michael Saucier ........................................................................................ 378
Figure 117: Loren Scott ............................................................................................... 378
Figure 118: Damian Shea ............................................................................................. 379
Figure 119: Brian Smith ............................................................................................... 379
Figure 120: David Sunding .......................................................................................... 381
Figure 121: Douglas Suttles ......................................................................................... 381
Figure 122: Elliott Taylor ............................................................................................ 382
Figure 123: John Tunnell ............................................................................................. 382
Figure 124: Mike Utsler ............................................................................................... 383
Figure 125: Mark Van Haverbeke ................................................................................ 383
Figure 126: Gardner Walkup ........................................................................................ 384
Figure 127: Kirk Wardlaw ........................................................................................... 385
Figure 128: James Watson ........................................................................................... 385
Figure 129: Nick Watson .............................................................................................. 386
Figure 130: Curtis Whitson .......................................................................................... 386
Figure 131: Aaron Zick ................................................................................................ 386

## LIST OF TABLES

**Table 1: Some of the Symptoms and Risks Associated with Components of Crude Oil**...... 26
**Table 2: Small Sample of Federal Agencies' Contributions to the Response** ...................... 94
**Table 3: Numbers of Oiled Animals Collected**........................................................................ 115
**Table 4: Beach Habitat Still Visibly Oiled as of June 22, 2013** ........................................... 148
**Table 5: Anadarko's Prior Violations**..................................................................................... 176
**Table 6: BPXP Increases in Expenditures since Defendants' Disaster (in billions of dollars)**........................................................................................................................ 238
**Table 7: BP p.l.c.'s Improved Condition Since the Defendants' Disaster**........................... 240
**Table 8: BP America's Income and Tax Payments 2009-2012** ............................................. 246
**Table 9: Differences between BP Group Plan Template and Wood Mackenzie Estimates of Operating Costs**.................................................................................... 266
**Table 10: Wood Mackenzie Figures for Capital and Operating Expenditures (in billions of dollars)**........................................................................................................ 267

## CITATION STYLE, WITNESS BACKGROUND, AND TERMINOLOGY

For purposes of these Proposed Findings of Fact, the United States has adopted the following nomenclature: "BPXP" refers directly to the named defendant, "BP Group" refers to BP p.l.c. and its subsidiaries including BPXP, and "BP p.l.c." refers to the parent corporation. TREX-006033.005. The Anadarko Petroleum Corporation is referred to as "Anadarko."

References to witnesses do not include a description of their employment or background except where necessary for context.  The qualifications and background of each witness, as well as a photograph of each witness, can be found in Appendix C.

Acronyms are spelled out for the first time in the text, but are also collected for the Court's convenience in Appendix B.

Citations to Trial Transcripts are provided by identifying the phase of trial – Phase 1 (P1), Phase 2 (P2), or Penalty Phase (PP) – and then citing line and page number.

Citations to deposition bundles are provided by identifying the last name of the witness, or if two witnesses share a last name first initial and last name. If there is no phase designated, the deposition bundle was submitted in the Penalty Phase of the trial. Bundles submitted in Phase 1 are identified with the designation P1 and bundles submitted in Phase 2 are identified with the designation P2.

xvii

Exhibits are cited using their TREX numbers, regardless of whether they were submitted in open Court or as part of a deposition bundle.

In determining the amount of a civil penalty under paragraphs (6) and (7), the Administrator, Secretary, or the court, as the case may be, shall consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8)

## I.   THE SERIOUSNESS OF THE VIOLATION OR VIOLATIONS

1.      The Defendants' discharge represents the largest oil spill in American history and, on April 29, 2010, was declared a Spill of National Significance. Rec. Doc. 14021 at 12 ¶ 55; TREX-009100.008. A spill of national significance is one that "due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge." 40 C.F.R. § 300.5.



Figure 1: The Events Comprising the Defendants' disaster (D-33308)

2.     The Defendants' actions resulted in a disaster that included the following elements: (a) the blowout of the well and its aftermath including the death of eleven people; (b) the oil spill; (c) the response efforts to clean up the oil which continue today; (d) the various accident investigations; (e) the moratorium and suspension of drilling and the changes to the permitting of drilling in the Gulf of Mexico and (f) the claims processes and lawsuits. PP Tr. at 171:21-172:24.

3.     From the very onset of this spill, the Coast Guard recognized that "[t]his event had the potential to affect every species in the gulf. We were fighting to save an ecosystem and a way of life that were at stake." TREX-007802.007; *see also* TREX-012418.

4.     The States too recognized the seriousness of the event. Alabama, Louisiana, Florida, and Mississippi each declared a state of emergency. Cross Dep. at 116:01-116:06; TREX-009105.224.

5.     As demonstrated below, the evidence established that the Defendants' violations caused: (1) actual harms, (2) risks of harms that fortunately never came to pass, and (3) risks of harms that may yet come to pass or have already come to pass but have not yet been fully detected.

**A.     Defendants Have Admitted that the Violations Were Serious**

6.     During the event itself, BP's CEO Tony Hayward acknowledged that the violations were extremely serious: "This is clearly an environmental catastrophe. There's no two ways about it." TREX-233619 at Segment 1.



Figure 2: Tony Hayward on CNN (TREX-233619)

7.      BPXP's own counsel has also acknowledged the disaster was extremely serious:

> THE COURT: Can BP not admit that this was an extremely serious
> environmental violation?
> MR. LANGAN: Your Honor, it was a serious event.
> THE COURT: Extremely serious?
> MR. LANGAN: I think we could say that.

Status Conf. Tr. at 68:03-68:07 (Mar. 21, 2014).

8.      BPXP's counsel made a similar admission in opening statements: "Let's turn quickly to environmental impact. On this issue, I want to be clear now that there was significant impact to the Gulf region. No one disputes that." PP Tr. at 51:01-51:05.

9.      BPXP's witnesses have also admitted that the disaster was serious. *See* PP Tr. at 1252:07-1252:22, 1293:15-1293:17, (Captain Paskewich (ret'd) acknowledging that "the spill was a serious spill."), 1298:13-1298:18, 1331:23-1332:07, 1364:23-1365:07 (Ms. Folse acknowledging the environmental impacts were serious); PP Tr. at 1496:07-1496:11 (Dr. Cox admitting that there were significant adverse impacts on human health); PP Tr. at 1813:20-1814:04 (Dr. Taylor testifying that this was the largest spill he had ever worked on and that it was serious); PP Tr. at 2083:06-2083:18; 2113:17-2113:23 (Dr. Scott testifying that economic losses resulting from the spill were very serious and significant).

10.      During the sentencing hearing for its criminal conviction, BPXP's representative acknowledged again that there was harm to humans and the environment as a result of its violations: "Our guilty plea makes clear BP <sic> understands and acknowledges its role in [this] tragedy, and we apologize. . . . BP is also sorry for the harm to the environment that resulted from the spill, and we apologize to the individuals and communities who were injured." *US v.*

*BP Exploration & Prod.*, No. 2:12-cr-00292-SSV-DEK, Rec. Doc. 67 at 21 (E.D. La. Jan. 29, 2013).

11.     Anadarko has admitted the spill was "extremely serious when it occurred." Rec. Doc. 13903 at 13.  Anadarko offered no evidence relating to the "seriousness" factor during the Penalty Phase Trial. *See* PP Tr. at 65:18-71:15; PP Tr. at 236:24-237:01; PP Tr. at 602:06-602:10; PP Tr. at 787:21-803:15; PP Tr. at 856:23-898:07; PP Tr. at 1087:22-1107:12; PP Tr. at 2140:09-2324:12; *see also* Rec. Doc. 12459 at 1 ("Anadarko agrees that no new discovery or evidence regarding the 'seriousness' factor is warranted under Section 311(b)(8) of the Clean Water Act, 33 U.S.C. § 1321(b)(8).").

**B.     BPXP Now Seeks to Minimize the Seriousness of the Violations**



Figure 3: Oil Trapped on Fourchon Beach (TREX-011826.112)

12.     Despite its admission that its violations were serious, BPXP spent much of its time at trial trying to minimize the harm caused by its violations. There were three thematic differences that appeared between the United States' presentation and that of BPXP.

13.     First, BPXP's witnesses persistently asked the Court to look at average effects, to take the longer view, and to view issues in comparison to how bad "it could have been." *See, e.g.,* PP Tr. at 355:20-356:18 (comparing the amount of oiled shoreline to the total shoreline of the Gulf of Mexico); PP Tr. at 357:25-358:11, 378:07-378:19 (focusing on population level impacts); TREX-013184.009; TREX-013184.007; PP Tr. at 358:18-359:10 (including samples taken far from the oil footprint to conclude that only a small percentage of water samples collected during the spill were toxic); PP Tr. 1487:02-1487:20 (discounting the injuries of nearly 1,000 response workers that required medical care beyond first aid or resulted in restricted duty or days away from work by comparing the number of such workers to the total number of response workers); TREX-013184.023-.025; PP Tr. at 1298:01-1298:18 (claiming minimal impact on the shoreline simply because it could have been worse). By contrast, the United States' witnesses elaborated on individual harms that both indicated broader harm and were sufficiently serious *in and of themselves* to demonstrate that the Defendants' violations were extremely serious. *See, e.g.,* TREX-013112; TREX-013346; TREX-013183; TREX-013330.

14.     Second, BPXP relied on benchmarks in evaluating both the human health and ecological risks and harms. *See, e.g.,* TREX-240110; TREX-013444. As the United States demonstrated at trial, BPXP used these benchmarks for purposes other than those intended by their creators and overstated the value of the benchmarks in assessing actual and potential harms. *See, e.g.,* TREX-013347.008-.011; PP Tr. at 515:03-517:10.

15.     Third, BPXP presented data from the response as if it was a thorough evaluation of the extent and nature of all of the actual and potential harm created by the Defendants' violations. *See, e.g.,* PP Tr. at 1511:19-1516:21; PP Tr. at 1645:21-1645:25. As the United States

5

demonstrated, however, SCAT and other response actions were not designed to identify or address the full extent of the harm. *See, e.g.,* TREX-009105.005 ("The FOSC is responsible for directing and coordinating actions to remove the oil from the environment. Restoration and recovery action taken to repair damage caused by the spill are outside the scope of the FOSC's responsibility . . ."); PP Tr. at 1512:21-1512:25. As this Court recognized early in this Phase of litigation, there is an ongoing Natural Resource Damages Assessment ("NRDA") that is examining the full extent of the environmental impact and, as referenced below, there are ongoing studies of the long-term human health impacts to response workers. Tr. of Status Conf. at 66:14-67:03.

16.     A full NRDA is not necessary to determine the level of seriousness of harm presented by Defendants' violation for purposes of assessing a Clean Water Act penalty, as sufficiently reliable evidence was presented by BPXP and the US regarding actual and potential harms from the disaster.



Figure 4: View of the Spill from a Satellite (TREX-012067.001)

### C.   The Defendants' Violations Resulted in the Largest Oil Spill in American Waters

17.     The sheer magnitude of the spill demonstrates the seriousness of the Defendants' violations. This Court has already found that the Defendants' well discharged approximately four million barrels of oil, 3.19 million of which reached the waters of the Gulf of Mexico. Rec. Doc. 14021 at 43-44 ¶ 273. For every stock tank barrel that was discharged from the Defendants' well, approximately 2,000 cubic feet of gas were also discharged. PP Tr. at 360:03-360:11. By way of comparison, the *Exxon Valdez* spilled almost eleven million *gallons* of heavy crude – approximately 257,000 barrels. TREX-009627.003; TREX-011922.075-.076.

18.     As the ninth largest water body in the world, the Gulf of Mexico is a rich ecosystem that provides the economic lifeblood of the communities that it borders. Rec. Doc. 7114-22 at 3; *See, e.g.,* TREX-011922.010, .063; TREX-011923.011, .031, .079, .104.

19.     The disaster really constituted "a new major oil spill every day for 87 days" and



Figure 5: Surface Oil Slick (TREX-009124.041)

created "hundreds of thousands of patches of oil that threatened simultaneously five states." The spill covered between 45,000 square miles and 68,000 square miles of the surface waters of the Gulf. PP Tr. at 78:22-79:07; Allen Dep. at 73:08-74:06; TREX-009100.005; PP Tr. at 353:05-353:16; TREX-013183.004; TREX-013249.

20.     The Unified Command applied 43,884 barrels of dispersant – an amount so large that if it was accidentally discharged it would constitute one of the largest chemical spills in American waters. TREX-009182.033, .036.

7

21.     The Unified Command also conducted 411 separate *in situ* burns that involved eleven million gallons of oil, which represented the first time in history that the Coast Guard had engaged in "large-scale offshore in-situ burns." TREX-009100.007; Hein Dep. at 45:08-45:21, 46:06-46:23. Put differently, in the course of the response, the Unified Command burned more oil than had been spilled by the *Exxon Valdez*. Laferriere Dep. at 209:22-210:04.

22.     Defendants' oil remains in the environment and continues to affect the shoreline. PP Tr. at 1364:19-1364:21 (tar balls continue to wash up); TREX-013246.056-.057 ¶¶ 117, 119 (discussing residual oiling); PP Tr. at 402:06-403:10, 404:24-406:06; TREX-013183.030; TREX-231539.001 (noting oil sheens and the smell of volatile organic compounds ("VOCs") remained in coastal Louisiana three years after the spill); PP Tr. at 354:21-355:15, 436:25-437:03, 464:20-464:24; PP Tr. at 637:11-639:20; PP Tr. at 1305:13-1306:18 (dispersed and burnt oil remains in the environment).

23.     In response to the Defendants' disaster, recreational and commercial fishing grounds were closed. Rec. Doc. 7114-22 at 9-10. At the peak of the closures, commercial and recreational fishing was prevented in an area that amounted to 88,552 square miles – roughly fifteen percent of Gulf waters and thirty percent of the Gulf waters traditionally open to fishing. Rec. Doc. 7114-22 at 9-10; Rec. Doc. 6453 at 179; TREX-013112.028.

24.     The Defendants' oil spill was so large that nearly five years later the response has not yet concluded. Even today, the Coast Guard and the BP Group both continue to provide responders and management oversight to respond to the re-oiling incidents. The spill still requires a spill-specific FOSC. PP Tr. at 135:18-136:11; PP Tr. at 1351:28-1353:10.

### D.    The Disaster Seriously Harmed the Health of Human Beings

#### i.    People Died and Were Physically Injured on the Rig



Figure 6: Eleven Men Who Lost Their Lives (D-006587)

25.     Eleven men lost their lives in the fire and explosion on the rig: Jason Anderson, Aaron Dale "Bubba" Burkeen, Donald Clark, Stephen Ray Curtis, Gordon Jones, Roy Wyatt Kemp, Karl Kleppinger, Jr., Keith Blair Manuel, Dewey A. Revette, Shane M. Roshto, and Adam Weise. TREX-052673.015; TREX-004702.001-.002; D-006587; PP Tr. at 248:18-20; D-33601; TREX-012259.006.



Figure 7: Douglas Brown, Joshua Kritzer, James Mansfield, Paul Meinhart, Buddy Trahan, Wyman W. Wheeler, and Michael Keith Williams – Seven of the Seventeen People Injured on the Rig (From their Deposition Videos)

26.     At least seventeen people were seriously injured in the explosion and its immediate aftermath: Douglas Harold Brown, Brett W. Guillory, Robert Heam, Matthew Huston

Hughes, Cole Tyler Jones, Joshua C. Kritzer, Phillip (Bill) Lynch, James Brent Mansfield, Paul James Meinhart, Darrell Reed, Kenneth Roberts, Virginia Stevens, William Wilton Stoner, Buddy Joseph Trahan, Paula Walker, Wyman W. Wheeler, and Michael Keith Williams. TREX-004702.001-.002.

27.    The chaotic circumstances on the rig were described in some detail during the Phase 1 trial. Some detail must be considered here as well because these circumstances show how even the onset of Defendants' violations was serious. The first explosion was preceded by what felt like a rain shower of drilling mud spraying all over the floor. N. Watson Dep. at 78:10-78:15. The "fluid shooting from the side of the rig" was a certain sign of a blowout. TREX-231279.001; *see also* Williams Dep. P1 at 69:16-70:09.

28.    Michael Williams heard one of the stabilizing engines "start to increase in speed . . . and was going faster and faster and faster . . ." Williams Dep. P1 at 70:19-70:22.

29.    Moments later, "lights were exploding, TV screens and computer screens were blowing . . . exploding." Brown Dep. at 70:08-70:15. About five to ten seconds later, "the whole world erupted . . . . The ECR just blew in . . . ." Brown Dep. at 72:15-73:13. The floor collapsed beneath him and Douglas Brown "heard cries for help. I heard some screams of I'm hurt, I'm bleeding." Brown Dep. at 73:22-73:24, 75:02-75:09.

30.    Nick Watson describes that elsewhere on the rig there was a blackout immediately followed by a "blast [that] knocked me down, shook me up. I mean, I had to get myself together. Once I got myself together, I got up, disoriented, looked around. People were running past getting – you know, stuff falling down." N. Watson Dep. at 80:02-80:09.

10

31.     In the ET shop where Mike Williams was working, he too saw the lights pop: "the bulbs themselves physically exploded. Glass [was] flying everywhere." He heard the engine still racing, determined that it was "real obvious that something bad is going wrong," and decided that he needed to "get out." Williams Dep. P1 at 70:23-71:12. As soon as he reached for the door handle "a big whoosh noise, and . . . a huge percussion and explosion that hit [him] with the door, [he] and the door ended up on the other side of the shop." Williams Dep. P1 at 72:02-72:05.

32.     For Buddy Trahan, the first explosion "blew down the hallway and knocked [him] off [his] feet." TREX-231279.001-002.

33.     By this point, Mr. Williams was "having a very hard time breathing" and his left leg, ankle and arm were "not wanting to work." He couldn't see and he began to try to escape to get some outside air. Williams Dep. P1 at 73:02-73:09.

34.     As the rig workers got their bearings, they became aware of their own peril and that of their colleagues and friends. As Nick Watson described with respect to his good friend, "I looked for Dale [Burkeen]. I looked and Dale was trying to – trying to get out of the crane because fire – the – the blast came out – the heat, which I thought engulfed me because I felt it on my neck, I thought was coming my way. I thought I was burned up. . . . But where Dale was, where that force was, it shot up like an inferno toward him, and I was just hollering, Dale, get out of there, get out of there." N. Watson Dep. at 80:10-80:20. Later, Chief Mate David Young heard that Mr. Burkeen had gone down on the deck, and Mr. Young "made his way to the starboard side where he was," through "a lot of fire in the immediate area" and "debris flying around." Mr. Burkeen looked to be dead. Unable to move Mr. Burkeen's body on his own, Mr. Young ran to

11

get help and started putting on fire gear to go back to get Mr. Burkeen. The fire had spread and

Mr. Young recalled:

> Mike Mayfield basically pulled me back and threw me on the deck and basically
> pointed out to me that I couldn't get there. I kind of had tunnel vision because I
> thought I was still going to get to him; but, once I saw what Mike Mayfield was
> seeing, there was no way we were going to get back there.

P1 Tr. at 5716:09-5718:17.

35.     Just as Douglas Brown had struggled to his knees from the first explosion, "the

second explosion took place." He was propelled backwards in the pitch black. Brown Dep. at

75:09-76:03. He again heard cries for help – "I'm hurt. I'm hurt. I got to get out of here." Brown

Dep. at 78:01-78:06.

36.     Mr. Williams was blown down the corridor by the second explosion and hit by

another door. Williams Dep. P1 at 73:11-73:20.

37.     The second explosion also caused further injury and confusion for Buddy Trahan:

> When I regained consciousness, I was on my hands and knees and felt intense
> heat. Disoriented, I realized that I was on fire and discovered that my shirt had
> literally burnt off my back. Without time to react, a second explosion hurled me
> approximately thirty feet down the hallway. I landed on my back and was covered
> in debris. I could not move. 1 tried calling for help. I could see a small light
> through the debris and I could hear alarms and people screaming for their lives. I
> then began to pray out loud, "God Please Help Me!" "God Please Help Me!" All I
> could see was my wife and kids, especially my youngest daughter crying, "Daddy
> Don't Leave Me!" "Daddy Don't Leave Me!" . . . .

TREX-231279.002.

38.     Mr. Brown began crawling toward safety, but it "was like trying to crawl over

broken metal wreckage in a dump yard." Brown Dep. at 79:06-10; *accord* Williams Dep. P1 at

74:05-74:17. By this time, Mr. Brown was scared and feared he was going to die. Each breath

became a "laborious chore" as the air was filled with smoke. Brown Dep. at 79:11-79:19.

12

39.     Mr. Brown, along with Willy Stoner and Mike Williams, began to crawl toward the "only light source that [they] could see, which was the back aft section, which goes outside on to the back lifeboat deck." Brown Dep. at 80:02-80:24; Williams Dep. P1 at 74:18-74:21. The confusion at this point was so great that Mr. Williams "didn't know [if there were other people around], other than the one that was on top of me." Williams Dep. P1 at 74:22-75:04.

40.     When they reached the aft deck, Mr. Williams "almost walked off into the water" because the handrail and "all the things associated directly aft of Engine No. 3 were no longer attached to the rig", including the aft lifeboats. Williams Dep. P1 at 75:06-75:14; Brown Dep. at 81:19-81:23. "[T]here was a lot of panic. Mike – Mike [Williams] was bleeding down a cut in his forehead and . . . he just kept repeating, 'We got to get out of here. We got to get out of here. We're going to die. We have to escape. We have to go forward.'" Brown Dep. at 82:15-82:23.

41.     On the bridge, as the events unfolded there was "[c]haos, mayhem." Brown Dep. at 90:03-90:07. Ten people were trying to talk to the Captain at the same time and the Senior DPO was examining an engine manual and trying to restart the engines. Williams Dep. P1 at 77:14-77:25.

42.     Meanwhile, Randy Ezell, "after digging himself out of debris in what had been the accommodations area of the rig . . . found Wyman Wheeler and Buddy Trahan, both of whom were partially buried in debris and seriously injured. Mr. Ezell uncovered both men. Other crewmates soon arrived with a stretcher and evacuated Mr. Trahan, whose injuries were the most serious." Mr. Trahan left in that lifeboat. Rec. Doc. 13381-1 at 108 ¶ 455; TREX-231279.002.

43.     After freeing Mr. Trahan, "Mr. Ezell tried to lift Mr. Wheeler and walk him out by himself, but [Mr.] Wheeler was too injured to be moved without a stretcher. [Mr.] Wheeler

told [Mr.] Ezell to leave him behind, but [Mr.] Ezell refused and instead waited with his crewmate for another stretcher to arrive, all while the rig burned about them. Eventually another stretcher appeared and [Mr.] Wheeler was evacuated." Rec. Doc. 13381-1 at 108 ¶ 455.

44.     The fire was so severe that no significant attempts were made to fight it – rather the focus of the people on the rig was to get to the lifeboats and escape with their lives. Brown Dep. at 84:25-85:03, 85:15-85:19; N. Watson Dep. at 81:06-81:12; TREX-231279.002.

45.     "Even though half of the HORIZON's lifeboats and life rafts could not be accessed due to the fire, the overwhelming majority of evacuees were able to escape the rig via the two forward lifeboats. The . . . lifeboats waited as long as reasonably possible before deploying, which gave many the opportunity to board." Rec. Doc. 13381-1 at 109 ¶ 457.

46.     The wait must have seemed interminable, however, to those waiting to escape via the lifeboats. "The personnel responsible for mustering were confused and panicked." N. Watson Dep. at 81:13-81:21; Brown Dep. at 95:15-97:05; N. Watson Dep. at 81:13-81:21.

47.     In the confusion, the crew were first ordered to load the lifeboats, then to disembark, and then to load again. N. Watson Dep. at 81:13-81:21; Brown Dep. at 100:20-101:03. People waiting to board the lifeboats were in a "[p]anic, fearful, screaming they were going to die. We were going to sink. We were going to blow up again. Everyone was on the verge of panic." Brown Dep. at 95:08-95:14.

48.     Meanwhile, the wait continued for those immobilized by their injuries. Buddy Trahan describes the wait to be loaded onto the lifeboats:

> As I lay on the stretcher, I began slipping in and out of consciousness. The noise was so loud; it was unlike anything I had ever experienced and terrifying at the same time. Unable to move, delirious from the pain and disoriented by the noise, I began to believe that I had been left on the deck–that all the lifeboats were gone

14

and that in all the madness I had been forgotten. I began screaming hysterically for help. I was ultimately reassured that I had not been abandoned. But, despite those reassurances, I continue to suffer from that nightmare today.

TREX-231279.002.

49.     Eventually, as the "explosion was just getting closer and closer" the order was given to launch the boats. The people on board "prayed. We lowered the boat. We disconnected and made sure the D-ring wasn't attached, and we headed out." N. Watson Dep. at 81:22-82:17.

50.     The journey in the lifeboats to the *Damon Bankston* was yet another harrowing experience. In one lifeboat, there was concern about whether the lifeboat had detached, difficulty starting the engine, and difficulty seeing the *Damon Bankston* because the only window was covered in oil. Brown Dep. at 103:20-104:09, 106:09-107:07, 107:15-108:11. When they opened the hatches to see whether the lifeboat had detached, the crew "saw the whole underneath side of the rig and the water directly below it was another inferno." Brown Dep. at 104:10-105:10. The crew on the lifeboat were "realizing we needed to get out of there and get out of there now. . . . Because fire on the water can only spread. And there was oil on the water all around us, thick, thick oil." Brown Dep. at 105:11-105:18. This oil caused concern that the fire "was going to start spreading and engulf us." Brown Dep. at 105:18-105:20. For one lifeboat, the journey from the rig to the *Damon Bankston* took thirty minutes. Brown Dep. at 109:09-109:16.

51.     Meanwhile, Mr. Williams and others, having seen both of the forward lifeboats launch, went in search of a life raft. They found a canistered life raft and, using a pair of wire cutters fortuitously in Mr. Williams' pocket cut the life raft free. Williams Dep. P1 at 83:22-84:20. The raft launched at a "terrible angle" and then there was "confusion as to how [they] were going to get the injured person on the gurney [Wyman Wheeler] into the life raft because of

15

the precarious angle . . . ." Williams Dep. P1 at 84:21-85:21. "Two people . . . got on either side of [Wyman Wheeler]. They one, two, three, shoved him in." Williams Dep. P1 at 85:22-86:01.

52.     The terror created by the fire and explosions, as well as the confusion in the mustering process, was so great that "[f]our people jumped roughly 75 feet into the sea." Rec. Doc. 13381-1 at 109 ¶ 458; Williams Dep. P1 at 87:11-88:23; Brown Dep. at 98:01-98:11, 101:04-101:12.

53.     "Captain Kuchta and Yancy Kepling were the two last people on board the HORIZON, and they evacuated by jumping into the water." Rec. Doc. 13381-1 at 109 ¶ 460.

54.     At some point, Mike Williams found himself in the water and felt "[i]nstant burning all over." Once he realized he was not actually on fire and that the sensation was caused by "a sludge of something floating in the water," he saw that the oil under the rig was on fire and he, like Mr. Brown, became concerned that "the fire's coming to me and I'm going to burn up anyway." In pain and with limited movement as a result of his injuries, Mr. Williams swam until he heard someone calling him to safety and was eventually pulled onto to a boat. Williams Dep. P1 at 88:24-90:25.

55.     A fast rescue boat from the *Damon Bankston* was picking up people who were in the water when it noticed that the life raft was still very close to the *Deepwater Horizon*. The rescue boat attempted to help by attaching a rope to the life raft and tow it to safety. As the rescue boat began pulling away from the rig "we heard people screaming in front of us and we looked and the life raft was tilting at about a 45 degree angle" and some people jumped into the water to swim away from the intense heat." Williams Dep. P1 at 91:12-92:11; *see also* P1 Tr. at 5723:08-5723:21.

56.     It turned out that "the life raft remained tied to the rig by a painter (rope). . . .

Captain Kuchta swam to the fast rescue boat, retrieved a knife, swam back to the raft, and cut it

free so the raft and those in it could be towed to safety." Rec. Doc. 13381-1 at 109 ¶ 459;

Williams Dep. P1 at 92:12-92:23; P1 Tr. at 5723:08-5723:24.

57.     Once each lifeboat or raft reached the *Damon Bankston,* the disembarkation was

difficult for some:

> We finally attached to the BANKSTON. It took forever. We was just bamming
> against it. The seas were calm, but they were just – I don't know if the
> BANKSTON just – you know, we were just bouncing against it and finally locked
> up.

> We had injured people onboard. Us – people – you know, there were – it was so
> much – it was so tight in there. You know, I'm sure people were being – you
> know, just hurting because you had to try to move them around. You know, I
> know they were just hurting, you know.

> * * *

> There was an elderly woman. She worked with the catering crew. She was hurt.
> She asked me – you know, she said she couldn't walk, so I helped her off. Helped
> her up the net to climb that ladder to get up to that boat. It's kind of high, she
> couldn't do it.

N. Watson Dep. at 82:18-85:01.



Figure 8: The Deepwater Horizon on Fire (TREX-000001.120)

58.     Even having reached the safety of the *Damon Bankston*, however, the crew could feel the heat of the fire and hear the roar of the burning oil. Brown Dep. at 113:02-113:16.

59.     The crew also began to realize the death and injury toll. Nick Watson had believed Dale Burkeen had made it to safety, "that's the only reason I went down, because I thought he just made it safe." Once on the *Damon Bankston* the chief mate told Mr. Watson that he had seen Mr. Burkeen on the deck, dead. Nick Watson expressed his regret: "I said, I wish I had known. I would have tried to help you." N. Watson Dep. at 82:18-85:01; Brown Dep. at 114:09-114:20; *see also* TREX-231279.002 ("The sorrow for friends who I had seen only hours before burning to death was pulsating through my mind."); Williams Dep. P1 at 92:24-93:03 ("I seen people that were in really bad shape.").

60.     Approximately forty-five minutes later, the Coast Guard arrived and began triaging the injured people. Brown Dep. at 115:01-115:17; N. Watson Dep. at 85:02-85:14.

61.     Those who were injured continued their harrowing journey:

> At this point I couldn't stand on [my injured leg] anymore, so they ushered me to a bench where I sat until the Coast Guard personnel was lowered down from a hovering helicopter . . . . And then he came and told me that I was going to be the first to go up into the helicopter.

* * *

> Scary. They put me in a little basket and – underneath the hovering helicopter and gave the signal, and then I was hauled up alone in the basket up to the helicopter above.

Brown Dep. at 115:07-117:20.

62.     Buddy Trahan, too, found the journey from the *Damon Bankston* long and terrifying: "After lying several hours on the supply boat bleeding and burned, the Coast Guard transferred me by helicopter to a platform to await further rescue. . . . . I waited, lying on a

18

stretcher, for nearly eight hours before I was transported to a hospital in Mobile, Alabama."

TREX-231279.002.

63. As of the date of their depositions both Douglas Brown and Nicholas Watson had been unable to work since the explosion and fire. N. Watson Dep. at 22:07-22:23; Brown Dep. at 127:01-127:22. Buddy Trahan poignantly described the lasting effects of the injuries sustained on the rig:

> My immediate post-explosion recovery was extremely painful. I spent over a month in hospitals including 3 weeks in burn units in Mobile and Houston undergoing burn treatments. No one deserved that kind of torture. Eventually, I was released home in a hospital bed and assigned nurses. With time, I learned to get around with the assistance of a wheelchair and have spent countless hours in physical therapy. Despite hard work, l am permanently disabled. I have a permanent limp, occasionally require the use of a cane, and can no longer – walk long distances, walk up/down stairs, swim, hike, throw a football, play volleyball, snow ski or participate in a number of activities l routinely did with family and friends before the explosion.

> I had my 11th surgical procedure in December [2012] and my doctors tell me to expect several more. In addition to the surgeries, I sustained numerous injuries including 16 scars, 9 deep lacerations (including one 9-inch bone deep laceration on my left thigh and a fist size hole in my neck), 12 broken bones (including two broken legs), burns over 25% of my body, crushed knee, closed head injury, ringing in the ears, and permanent nerve damage in my right shoulder/neck area, left leg and left foot.

TREX-231279.002-.003.

64. BPXP's witness on the human health impact of the spill only mentioned the rig worker deaths and injuries to note that the scope of his work excluded "any assessment of the human health impact resulting from the explosion and fire on the DWH oil rig … and the resulting rig worker deaths and injuries." TREX-240110.006 n. 3.

19

### ii.    Response Workers Were Injured, Became Ill, and Were Put at Risk



Figure 9: Coast Guard Officer Checking Heat Index for Safety (TREX-009105.106)

65.    There is no dispute that the Unified Command, including the BP Group and the Coast Guard, placed a premium on response worker safety. *See, e.g.,* TREX-009105.090; TREX-012539; Laferriere Dep. at 89:12-89:23, 90:05-90:11, 90:13-92:21.

66.    BPXP's witness Captain Paskewich (ret'd) emphasized that safety was a high priority in the response. PP Tr. at 1302:01-1302:09. He focused only on the safety efforts, however, and did not examine the effectiveness of those efforts or the actual injury rate during the response. PP Tr. at 1302:10-1304:08.

67.    Oil spill response actions, however, are inherently dangerous. PP Tr. at 82:08-82:11. The dangers include illnesses arising from contact with the constituents of crude oil and other toxins, physical hazards including falls and broken limbs, risks from dangerous wildlife, and stress from the weather conditions – including heat. PP Tr. at 82:12-82:22; TREX-012013.016.

68.    BPXP has acknowledged the "daunting set of challenges" facing the Unified Command in trying to protect the safety of "approximately 48,000 workers, the population of a medium-sized town, spread over an area that involved five states." TREX-012013.007; Rec. Doc. 8217 at 2.

69.    These challenges came in part from the weather. Response workers operated in storms at sea and in high heat on the land. TREX-012013.007. BPXP also recognized there were risks to workers at the source (*i.e.*, above the well), on the vessels of opportunity, in de-

20

contamination, and even in the Incident Command Posts. TREX-012013.013. Risks were posed

by biological, chemical, human, and physical hazards. TREX-012014.016; J. Watson Dep. at

122:23-123:19, 202:18-203:19, 391:18-392:05, 392:08-392:13 (discussing risks due to emissions

and vessel crowding at the source); Dupree Dep. P1 at 235:11-235:21; TREX-240164.001-.002.

    70.    The Occupational Safety and Health

Administration ("OSHA") and the National Institute of for

Occupational Safety and Health ("NIOSH") cautioned that

"[d]isaster workers often work longer shifts and more

consecutive shifts than the typical 40-hour work week.

Working longer hours may increase the risk of work

injuries and accidents and can contribute to poor health."

TREX-012220.006.

    71.    Response workers actually did work long

hours, twelve to sixteen hours a day, sometimes without a

day off for weeks. PP Tr. at 93:16-94:01;

TREX-012257.020. The hours were so long that out of

concern for the health of its personnel, the Commandant of

the Coast Guard actually had to order its personnel to take



Figure 10: The BP Group's Identification of Risk Categories for Response Workers (TREX-012014.016)

at least one day off a week. PP Tr. at 94:02-94:07; *see also* TREX-012257.022 (contract

response workers "were working long hours for many consecutive days due to concern of being

laid off if they took leave for rest and recuperation."); PP Tr. at 1393:11-1394:08.

72.     BPXP emphasized that given the magnitude of the response, there was a "remarkably low injury rate." TREX-009105.009. While the injury *rate* may have been low, however, the numbers of response workers for whom those risks were realized were not. Thousands of injuries and illnesses were documented amongst cleanup workers and volunteers during the response to the Defendants' oil spill. PP Tr. at 248:20-248:23; 250:03-252:19; D-33601; TREX-013347.03; TREX-013346.09; TREX-009495.081, .091, .098, .265, .273.

73.     As BPXP's witness eventually admitted on cross-examination, workers suffered significant injuries during the response. PP Tr. at 1496:07-1496:11 ("there were some injuries that I do feel were significant"). The BP Group's Vice President of Health and Chief Medical Officer for the response, Dr. Heron, said "there were people who were working the response who had injuries and illnesses, that's for sure," and such accidents constituted an impact on human health. Heron Dep. at 229:17-229:18, 229:20-230:05.

74.     In August 2010, NIOSH produced a report compiling injury and illness data for the period April 23-July 27, 2010. TREX-012228; *see also* TREX-240110.066.

a.      This report documented 1,136 injuries and 994 illnesses, a total of 2130 incidents. TREX-012228.004; TREX-240110.066. Of those incidents, 281 "led to missed day of work, restricted duty, or required medical treatment beyond first aid," and a further forty were listed as "Missed or Restricted Duty cases." TREX-012228.004, .005.

b.      The NIOSH report was not intended to be a final accounting of illnesses and injuries reported during the response. TREX-012228.003; *see also* TREX-012017.001 ("[t]his week's report [transmitted 9/3/2010] includes an influx of about 1,100 incidents from June and July that had previously not been reported.").

75.     The BP Group also recorded descriptions of response worker injuries in the "Deepwater Horizon Incident Response Recordable Injury & Illness Data" reports. Heron Dep. at 90:07-90:23, 91:10-91:16, 92:12-92:14, 93:09-93:10, 93:12-93:15, 93:17-93:18, 95:02-95:25, 96:12-96:17, 101:02-101:16, 102:10-102:18; TREX-012016; TREX-012017; TREX-012018; TREX-012019; TREX-012020.

76.     The BP Group's report of "Deepwater Horizon Incident Response Recordable Injury & Illness Data" covering the period April 22 to December 3, 2010 ("Injury and Illness Data Report") listed a total of 5,986 injuries and illnesses during that period. TREX-012020.004; PP Tr. at 1485:21-1486:15; PP Tr. at 1303:05-1303:14. Of those, 920 injuries and illnesses required medical treatment beyond first aid, resulted in days away from work, or resulted in restricted duty. TREX-012020.004; PP Tr. at 1485:21-1486:15; see also TREX-012013.021.

77.     It is unclear whether the Injury and Illness Data Report, TREX-012020, is the final such log BPXP created. BPXP declined to produce a version that included all injury and illness data through the end of the response. Rec. Doc. 12958-1 at 4; Rec. Doc. 12958-2 at 3; Rec. Doc. 12998.

78.     Incomplete or not, BPXP's Injury and Illness Data Report documents hundreds of instances in which response workers were transported to the hospital due to their injuries or illnesses. TREX-012020 (throughout). It also documents incidents in which response workers suffered severed fingers and broken bones. PP Tr. at 1489:14-1489:19; TREX-012020.007, .025, .053, .064 (documenting severed or amputated fingers); TREX-012020.007, .009, .014, .016, .022, .023, .024, .025, .026, .032, .035, .036, .037, .039, .040, .041, .046, .053, .056, .058, .061, .070 (documenting fractured or broken bones).

23



Figure 11: Workers Working with Boom on Ship Deck (TREX-009105.001)

79.   Many injuries reported in the Injury and Illness Data Report resulted from working in a marine environment. *See, e.g.,* TREX-012020.041 ("Worker slipped and fell on oil-covered stern of vessel; pain in left arm and back."); TREX-012020.011 ("While transferring from barge to skiff, wave knocked skiff out from under worker; barge struck worker in ribs several times."); TREX-012020.026 ("Pliers slipped when wave hit vessel, cutting right thumb."); TREX-012020.066 ("While cutting rope on boom, wave hit boat; knife slipped and stabbed worker in arm."); TREX-012020.049 ("While driving along the shoreline, sand gave way, causing UTV to roll onto passenger side; worker dislocated shoulder."); TREX-012020.024 ("Worker stepped in soft sand, twisted ankle.").

80.   The Injury and Illness Data Report also documents injuries that resulted from working with response-related equipment. *See e.g.,* TREX-012020.013 ("Decon spray got on worker, skin irritation on ears, eyes, arms."); TREX-012020.070 ("IP was checking spray nozzles on airplane, sprayed in face with dispersant when he took a nozzle off the boom under pressure."); TREX-012020.009 ("Worker walked into pressure spray; right calf puncture wound."); TREX-012020.068 ("While lifting boom, worker's shoulder was dislocated."); TREX-012020.067 ("While offloading bags of contaminated beach material into dumpster, bag slipped back and hit worker on shoulder; worker fell to the ground, hitting his head on the dumpster; back and neck pain."); TREX-012020.054 ("While pressure-washing the deck, water pierced worker's boot, causing a burn/puncture wound to left foot.").

81.     Response workers also suffered numerous instances of heat-related illnesses. *See, e.g.,* TREX-013027.004 ("many succumbed to heat stress attacks on a daily basis"); TREX-012020.041 ("Worker was pulling boom in full Tyvek. Rapid progression of heat-related illness, clammy, chills, disoriented"; "Worker was driving ATV as runner during beach ops and had sunburned arms & hands. Worker continued to work and did not advise anyone, 2nd degree burn"; "Heat stress, nausea, vomiting, dehydration"; "Dehydrated, heat exhaustion"; and "Worker was walking shoreline, complained of being hot & dizzy. Worker fell to the ground & began to have a seizure."); TREX-012020.035 ("Worker was performing beach cleanup & felt overheated, symptoms of nausea & quit sweating."); TREX-012020.037 ("Overheated, fainted, heat stress" and "[h]eat stress, exhaustion."); TREX-012020.042 ("Worker was loading sausage boom on boat. Became overheated"; "Worker was pressure washing. Had heat stress"; "Worker got too much sun exposure while conducting field survey of beached birds on Petit Bois Island. Worker experienced lip swelling"; "Worker fainted; heat exhaustion, nausea, vomiting, weakness, headache."); Laferriere Dep. at 132:03-133:25.

82.     NIOSH reviewed the hospital records of ten response workers who were hospitalized in May and June 2010. TREX-12254.010-.015; PP Tr. at 252:16-252:19. Five of those workers reported they had been working in hot conditions. TREX-12254.011. All five of those workers exhibited evidence of dehydration or a diagnosis of heat exhaustion or possible heat stroke, and all five showed at least one complication of heat illness: rhabdomyolysis (breakdown of skeletal muscle); neurological symptoms such as drowsiness, slurred speech, or possible seizure; no urine output; or abnormal heart rhythm and rate. TREX-012254.011, .015.

### iii.   Response Workers and Gulf Communities Were and Are at Risk of Health Impacts from Chemical Exposure

#### a)   Constituents of Crude Oil and Dispersants as well as Compounds Created from the Combustion of Crude Oil are Toxic to Humans

83.     Symptoms associated with human exposure to crude oil include dermal effects, such as redness, swelling, irritation, and rash; ocular effects such as redness, soreness, watering, and itching of the eyes; respiratory effects such as cough, shortness of breath, and wheezing; and neurological effects, including nausea, vomiting, headache, dizziness, confusion, and weakness in extremities. PP Tr. at 254:18-255:12; D-33604; TREX-013346.008; *see also* TREX-012259.005.

84.     The crude oil released from Defendants' well contained (among other toxic chemicals) benzene, toluene, ethyl benzene, hexane, naphthalene, and coal tar pitch volatiles. TREX-240110.013, .032, .033; PP Tr. at 1500:15-1500:17, 1501:05-1501:07.

85.     Table 1 lists the symptoms of exposures to some components of crude oil.

| Table 1: Some of the Symptoms and Risks Associated with Components of Crude Oil | | |
|---|---|---|
| **Chemical** | **Symptoms and Risks** | **Source** |
| Benzene | Nausea, dizziness, skin irritation or dermatitis, eye irritation | PP Tr. at 1500:08-1502:12; TREX-246904 |
| Toluene | Dizziness, skin irritation or dermatitis, eye irritation | PP Tr. 1501:21-1502:12; TREX-246906 |
| Hexane | Nausea, headache, dizziness, skin irritation or dermatitis, eye irritation | PP Tr. 1501:21-1502:12; TREX-246907 |
| Naphthalene | Nausea, headache | PP Tr. 1501:21-1502:04 |
| Ethyl benzene | Headache, skin irritation or dermatitis, eye irritation | PP Tr. 1501:21-1502:04; TREX-246905 |

86.     Benzene is classified as a known carcinogen, PP Tr. at 1463:09-1463:11; PP Tr. at 271:06-271:13; TREX-013108.002; TREX-246904.

87.     Coal tar pitch volatiles are potential occupational carcinogens. PP Tr. at 1504:21-1504:23.

88.     The BP Group's Material Safety Data Sheet ("MSDS") for Mississippi Canyon 252 Weathered Crude Oil states: "From skin-painting studies in laboratory animals, it has been concluded that most, if not all, petroleum crudes, regardless of source, possess carcinogenic activity to some degree." TREX-013110.004.

89.     The burning of crude oil produces compounds including dioxins and furans. TREX-240110.019, .035; TREX-013347.008, .012. Dioxins and furans are toxic to humans and are acknowledged carcinogens and endocrine disruptors. TREX-013347.008-.009, .012; *see also* TREX-240110.035.

90.     As Dr. Clapp, the United States' human health expert, noted, the MSDS for Corexit 9500 and 9527A warns that prolonged or repeated exposure can cause skin, eye, and respiratory tract irritation. TREX-013346.009.

91.     After the spill, NIOSH scientists conducted a number of peer-reviewed studies of the effect of dispersant on rats and found "COREXIT 9500A was identified as an irritant and tested positive for allergic contact sensitization . . . . The active ingredient in COREXIT 9500A, DSS, also tested positive for irritancy and sensitization potential. . . ." TREX-012264.011; TREX-013347.024; Howard Dep. at 292:03-292:11, 292:15-292:21, 292:23-293:10; TREX-012261; TREX-012262; TREX-012263; TREX-012264; TREX-012265. According to the Red Book, which BPXP's witness cites as the basis for his risk assessment methodology, "[t]he inference that results from animal experience are applicable to humans is fundamental to

toxicology research; this premise underlies much of experimental biology and medicine . . . ." TREX-240332.036.

92.     The impetus of the NIOSH studies was the DWH oil spill, but the NIOSH scientists noted that an active ingredient in these dispersants – dioctyl sodium sulfosuccinate or DSS – was "a common ingredient in numerous consumer products, including . . . stool softener[s] . . . [and] cosmetic creams." TREX-012264.010. Dr. Cox mentioned this point in order to downplay the risks involved with exposure to DSS. TREX-240110.015. By contrast, the fact that DSS is commonly found in consumer products caused the NIOSH scientists to note that their findings "suggest[ed] implications for workers and the general public beyond those involved in the Gulf oil spill . . . ." TREX-012264.002, .010, .011.

**b)     People Displayed Symptoms of Exposure to these Chemicals**

93.     Several lines of evidence demonstrate that people were exposed to the constituents of oil and dispersants. For instance, on May 26, 2010, crewmembers from three vessels reported experiencing nausea, dizziness, headaches, and chest pain. Seven crewmembers were hospitalized and the Unified Command recalled 125 vessels from the vessels of opportunity program that had been working in the same area. TREX-009627.001.

94.     NIOSH reviewed the hospital records of ten other response workers who were hospitalized for periods of one to six days and whose conditions were more serious than the seven response workers hospitalized on May 26, 2010. TREX-012231.005-.006; TREX-012254.010-.015; PP Tr. at 252:16-252:19. One hospitalized worker was given a diagnosis of probable respiratory toxicity, which was based on reported exposures and symptoms that had cleared by the time of the hospitalization. TREX-012254.011, .013.

95.     As of August 10, 2010 a five-person medical team from the National Disaster Medical System and U.S. Public Health Service, which staffed a mobile medical unit in Venice, Louisiana, had seen 577 patients, 38% for respiratory conditions (including acute respiratory conditions and exacerbations of chronic conditions), 16% for skin conditions, 5% for eye related injuries, and 8% for gastrointestinal conditions. TREX-011926.001.

96.     The BP Group also reported response workers with symptoms associated with exposure to crude oil in the Injury and Illness Data Report and the Medical Encounters Database. PP Tr. at 255:13-22, 264:11-264:19; PP Tr. at 1498:24-1499:14; TREX-012020; TREX-230437NR; *see also* TREX-012259.005; TREX-013027.004.

97.     The Injury and Illness Data Report documents response workers exhibiting symptoms associated with exposure to crude oil. *See, e.g.,* TREX-012020.009 ("Upper respiratory irritation and headache, from oil fumes."); TREX-012020.066 ("Worker noticed rash on both arms and neck after completing beach cleanup."); TREX-012020.058 ("Worker said odor overwhelmed him; headache, dizziness, vomiting."); TREX-012020.061 ("Worker exposed to heavy vapors while onboard NOAA vessel on 6/3/10; been having chest pains and headaches since."); TREX-012020.008 ("Lightheaded, dizziness, numbness in left arm, nausea."); TREX-012020.030 ("Throat irritation, lightheaded, nausea, vomit blood."); TREX-012020.031 ("Dizziness, headache, tingling fingers, hyperventilating."); TREX-012020.041 ("Burning & irritation in left eye."); TREX-012020.009 ("Worker drank from water bottle that had fallen in contaminated water; nausea, vomiting.") TREX-012020.042 ("Worker suddenly felt dizzy, weak, & vomited. Too weak & needed assistance into transport vehicle.").

98.     More evidence of exposure comes from BP's Medical Encounters Database, a register of visits to health clinics that were set up at various sites throughout the Defendants' oil spill response area. PP Tr. at 1496:18-1496:21; TREX-240110.066. The database shows 750 entries for the terms "nausea," "stomach ache," "stomach pain," and "upset stomach"; hundreds of entries for "headache," hundreds of entries for "dizzy" or "dizziness;" hundreds of entries for "dermatitis," "rash," or "skin irritation" and hundreds of entries for eye irritation not specifically attributed to foreign bodies in the eyes. TREX-230437NR; *see also* PP Tr. at 1498:24-1499:14.

99.     In his Round 1 Report, Dr. Cox counted and cited to the number of entries in the Medical Encounters Database for suspected heat-related illnesses, but he did not cite to the number of entries for symptoms associated with exposure to crude oil or its constituents, including, inter alia, nausea, headache, dizziness, skin irritation, or eye irritation. PP Tr. at 1496:22-1499:14; TREX-240110.066.



Figure 12: In Situ Burn off Venice, Louisiana (TREX-009105.065)

100.     Symptoms reported in a NIOSH the health symptom survey of both offshore and onshore workers were similar to those reported in the other studies and included "headaches, upper respiratory symptoms, and symptoms consistent with heat stress," "itching eyes, exhaustion, musculoskeletal pain, and feelings of 'work pressure,'" "upper respiratory symptoms and constitutional symptoms", and "scrapes and cuts . . . itchy or red skin or rash … symptoms of headache or feeling faint, dizzy, or fatigued . . . [and h]and, shoulder or back pain." TREX-012223.012-.013; PP Tr. at 252:04-252:10; D-33603; *see also*

TREX-012231.021; TREX-012250.006, .031; TREX-012251.038; TREX-012252.027, .058;

TREX-012253.009; TREX-012254.006; TREX-012255.013; TREX-012256.031;

TREX-012257.015; TREX-012259.011.

101.    NIOSH compared the number of symptoms reported by response workers who

also reported exposure to oil or dispersants to the number of symptoms reported by response

workers who did not report exposure to oil or dispersants. In a number of instances, NIOSH

found that symptoms were reported more frequently in those who reported exposure than in

those who did not report exposure. TREX-012223.012-.013.

102.    For instance, workers involved in in situ burns on the Sea Fox and Premier

Explorer reported a higher frequency of symptoms, including: upper respiratory symptoms;

headache; and feeling faint, dizzy, fatigued, or weak, than did the comparison group of workers

who reported they had not worked on boats and had no exposures to oil, dispersant, cleaner or

other chemicals. TREX-012250.017, .031.

103.    Workers involved in shoreline cleanup wildlife cleaning at onshore wildlife

rehabilitation centers reported a higher frequency of symptoms (such as headache, faintness,

dizziness, fatigue, weakness, itchy eyes, nose irritation, sinus problems, sore throat, nausea,

vomiting, itchy skin, red skin or rash) than did the comparison group of workers who reported

they had no exposures to oil, dispersant, cleaner or other chemicals. TREX-012253.011;

TREX-012255.013.

104.    In a comparison of 826 response workers assigned to the Plaquemines Branch

Incident Command System, NIOSH found a statistically significant greater prevalence of upper

respiratory symptoms, cough, lower respiratory symptoms, and skin irritation among those

response workers who reported exposure to oil than among those response workers who reported they were not exposed to oil. NIOSH also found a significantly greater prevalence of upper respiratory symptoms, cough, and lower respiratory symptoms among those response workers who reported exposure to dispersant than among those response workers who reported they were not exposed to dispersant. TREX-012257.013, .016; D-33605; PP Tr. at 257:07-258:07.

105.    Additionally, off-shore response workers who reported exposure to oil or dispersant showed a significantly greater prevalence of upper respiratory symptoms, cough, and skin irritation among those response workers who reported exposure to oil than those response workers who reported they were not exposed to oil, and also found a significantly greater prevalence of upper respiratory symptoms and cough among those response workers reporting exposure to dispersant than among those response workers reporting they were not exposed to dispersant. TREX-012254.006, .009; TREX-013346.010.

### c)    Claims for Exposure-Related Injuries Were Paid Under the Medical Benefits Settlement

106.    In 2013, the Court granted final approval of the Medical Benefits Class Action Settlement ("Medical Benefits Settlement"), which resolved the claims of "thousands of individuals asserting bodily and/or personal-injury claims from alleged exposure to oil and/or dispersants arising from the Deepwater Horizon Incident, including Response Activities." Rec. Doc. 8217 at 4.

107.    The Medical Benefits Settlement includes a Matrix that provides a framework under which class members who were response workers will be compensated "for conditions for which there is a medical basis to conclude that they could be caused by exposure to oil and/or dispersants at sufficient levels." Rec. Doc. 8217 at 9. Those conditions include the types of

conditions that were reported by response workers and are the types of conditions that are consistent with exposure to crude oil. Rec. Doc. 8217 at 9; PP Tr. at 254:14-255:12; D-33604; TREX-013346.008; TREX-12259.005. Finally, the settlement provides compensation for members of the class that are or were Gulf Coast Residents for certain acute conditions. Rec. Doc. 8217 at 10.

108.     In approving the Medical Benefits Settlement, the Court found that "the conditions on the Matrix 'reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants.'" Rec. Doc. 8217 at 9 (quoting a declaration submitted in support of the Medical Benefits Settlement).

109.     In order to recover, a class member must have manifested the condition within a time period ranging from twenty-four to seventy-two hours after the class member was exposed to oil or dispersants. Rec. Doc. 8217 at 9.

110.     In order to recover on a claim at the lowest level of compensation, response workers must file a "long and complex" twenty-nine-page proof of claim form, Rec. Doc. 13320 at 2, and provide a sworn declaration that their condition manifested within the applicable timeframe and that also identifies "the route, circumstances, and date or approximate date" of exposure. Rec. Doc. 8217 at 10. In order to qualify for a higher level compensation, the class member must also submit supporting medical records. Rec. Doc. 8217 at 10. Finally, in order to qualify for an even higher level of compensation, the claim must be corroborated by the Medical Encounters Database (TREX-230437NR) or another qualifying source of information that contemporaneously documented medical information during the response. Rec. Doc. 8217 at 10.

111.     In approving the Medical Benefits Settlement, the Court noted that Class Counsel

had presented evidence that "given the nature of Clean-Up Workers' responsibilities, they could

have been exposed to petroleum or petroleum-based products either through direct dermal

contact or via inhalation of airborne chemicals," and that "exposure at sufficient levels to oil and

petroleum-based products (such as the dispersants used during the Deepwater Horizon Incident)

can cause adverse health effects." Rec. Doc. 8217 at 28, 29. The Court made this finding

notwithstanding the fact that BP – in part through Dr. Cox – made many of the same arguments

in its submissions regarding the Medical Benefits Settlement that it made during the Penalty

Phase, pointing to measured levels of exposure that BP argued were not "levels that would be

expected to result in significant or widespread health effects," and that the oil was significantly

"scrubbed" of harmful constituents as it travelled from the ocean floor to the surface of the Gulf.

Rec. Doc. 8217 at 31-33.

112.     In its January 30, 2015, Status Report to the Court, the Medical Benefits Claims

Administrator explained that "[w]ithin the first ten months of claims processing under the

[Medical Benefits] Settlement," there had been a higher than expected percentage of claims –

sixty-five percent – that were lacking necessary information in order for the claims to be

processed. Rec. Doc. 14092 at 2. Accordingly, "the rate of claims advancing to the point where

they can be compensated or denied has been slower than anticipated." Rec. Doc. 14092 at 2.

Even still, as of the Claims Administrators' first status report after the Medical Benefits

Settlement became effective, 148 claims for specified physical conditions were approved. Rec.

Doc. 13320 at 8. Further, as of January 30, 2015, 724 claims for specified physical conditions

were approved, including forty-two at two of the two higher levels of compensation (categories A2 and A3). Rec. Doc. 14092 at 11.

> **d)** **BPXP's Challenges to the Evidence of Exposure and Therefore Risk of Long-Term Harm Are Unsupported**

113.    BPXP's witness, Dr. Cox, admitted there were exposure-related adverse health effects of the Defendants' oil spill, but argued that such effects were not significant or long-term. PP Tr. at 1489:24-1490:05. He referred to the exposure-related health effects of the spill to as "irritant effects," and compared them to someone's eyes burning or coughing when they walk into a bar filled with cigarette smoke, noting that "the thing is with irritant symptoms is it gets better when you get away from it. So it might affect me the next few hours. The next morning, I feel fine." PP Tr. at 1468:23-1469:10.

114.    Dr. Cox did not mention that irritation is only one effect of cigarette smoke, the others being long-term effects, including cancer. TREX-012223.018. Similarly, exposure to certain constituents of crude oil can cause both irritant effects and long-term effects. *See, e.g.,* TREX-246904; TREX-246906. Long-term effects, by their very nature, would not be reported during the response and may take decades to become apparent. *See, e.g.,* PP Tr. at 1520:06-1520:16.

> **i)** **BPXP Overstates the Importance of Benchmarks**

115.    Dr. Cox premised his conclusions regarding exposure-related health effects on the use of benchmarks as thresholds, stating that a benchmark is a level below which "*no* adverse health effects should be expected." PP Tr. at 1456:16-1456:18 (emphasis added), 1462:01-1462:23; TREX-240110.021. On cross-examination, Dr. Cox reconsidered his absolute position

and acknowledged the risk of adverse health effects at levels below the benchmarks, albeit a "very low" risk. PP Tr. at 1502:13-1502:21.

116.    As Dr. Clapp testified, Dr. Cox's reliance on benchmarks is inappropriate because he ignores the fact that for some substances, *any* level of exposure poses a risk to human health.

a.    There is no safe level of exposure to benzene. In other words, exposure to benzene at any level carries with it the risk of an adverse health effect. PP Tr. at 271:02-272:08; TREX-013346.011; TREX-013348.012; TREX-233329.010; TREX-013108.011; *see also* PP Tr. at 1520:17-1520:19. In fact, there is some evidence that benzene may present an even greater risk at very low doses. TREX-233329.010.

b.    Fine particulate matter, such as that emitted from evaporating oil and during *in situ* burns, also may not have a safe level of exposure. TREX-232520.150, .170-.171; TREX-013346.011.

c.    Endocrine disruptors, such as dioxin emitted during *in situ* burns can be toxic at "exquisitely low levels." TREX-013347.008-.009, .012-.013.

d.    There is evidence that coal tar pitch volatiles, such as those found in crude oil, "has a genotoxic mechanism of action," and therefore "is capable of causing genetic damage to cells at any dose above zero." TREX-013347.013.

117.    Dr. Clapp also pointed out that BPXP's approach of using a benchmark as a "bright line" also fails to take into account susceptible subgroups. PP Tr. at 271:02-271:09; TREX-013347.008; TREX-232520.027-028, .157-.158. Susceptible subgroups can be at greater risk when exposed to a harmful substance because of their age, sex, genetics, predisposition to diseases and other medical conditions (such as obesity), socioeconomic status, lifestyle, stress,

36

and other exposures to the same harmful substance or exposures to other harmful substances (such as through smoking). TREX-232520.116, .128, .154.

118.    For example, as shown in Figure 12, an unhealthy person who is also exposed through other sources may have an even greater risk of an adverse health effect when they are exposed to the substance at the given level. TREX-232520.148, .150.



Figure 13: Demonstration of Limitations of Benchmarks for Sensitive Populations (TREX-232520.150)

119.    There is evidence that responders may have been members of a susceptible subgroup for numerous reasons. Dr. Cox himself noted that there are many different ways in which responders could be exposed to some of the same harmful components of crude oil from other sources of exposure in their daily lives, through smoking, diet, and exposure to typical indoor and outdoor pollution. TREX-240110.012-.014. NIOSH noted with concern "extensive use of cigarettes and smokeless tobacco amongst response workers" and the uncertainty regarding "the role exposure to tobacco products and cigarette smoke may play in an additive or synergistic manner with exposure to other chemical or physical hazards that may be present in emergency responses." TREX-012223.018; *see also* TREX-012252.024-.025. Dr. Cox also

testified that Mississippi is the unhealthiest state in the country, closely followed by Louisiana and Alabama. PP Tr. at 1518:12-1518:19.

120.    It is also worth noting that Dr. Cox used out of date benchmarks, such as OSHA's Permissible Exposure Limits. TREX-012221.007; TREX-204110.020.

**ii)      BPXP Overstates the Completeness of Exposure
Characterization for Response Workers**

**(a)      Dermal Exposures Were Barely Characterized**

121.    "The primary exposure hazard of weathered crude is by physical contact with the skin." PP Tr. 1511:03-1511:18; TREX-013110.001.

122.    During the response, however, assessment of exposures resulting from physical contact between oil or dispersants and the skin (dermal exposure) was limited to "observational exposure characterization." No measurements were taken that could quantitatively characterize dermal exposure to oil or dispersants. TREX-012223.016; PP Tr. at 1472:02-1472:05. Accordingly, Dr. Cox could not perform a risk assessment to evaluate the risk of adverse human health effects due to dermal exposure. PP Tr. at 1472:02-1472:05.

123.    In particular, the Unified Command did not conduct bio-monitoring through blood or urine samples from response workers, even though such data would have improved the understanding of actual exposures, particularly dermal exposure which cannot be evaluated using air monitoring. Howard Dep. at 197:17-197:20, 197:22-198:04, 198:06-198:21, 201:01-201:04, 201:06-201:20, 240:13-240:15, 282:25-284:08, 287:12-287:21; Heron Dep. at 135:11-135:25, 137:24-138:06; TREX-012026; TREX-012025; TREX-013347.015-.016; TREX-012260; TREX-012027. During the spill response, Dr. Howard, the director of NIOSH, was concerned that, without bio-monitoring, "we may not have a comprehensive approach to exposure

38

monitoring for Gulf workers," and that "exposure monitoring by means of air sampling is subject to several limitations when used episodically in an outdoor, dynamic environment." TREX-012026; TREX-012025; Howard Dep. at 282:25-284:08, 287:12-287:21.

124.    One response contractor conducted a very limited amount of bio-monitoring on its employees who were working on source control vessels. That bio-monitoring indicated that its workers were exposed to benzene, as the bio-monitoring showed "slightly elevated levels" of benzene metabolites in the workers, "even correcting for smoking." TREX-012024.001; TREX-013347.017.

125.    The only quantitative data that Dr. Cox reviewed in his dermal exposure characterization was that found in two response-related reports – OSAT-1 and OSAT-2 – and fifty-three samples of weathered oil. PP Tr. at 1412:13-1412:16.

126.    The purpose of OSAT-1 was to assess the presence or absence of subsurface oil and/or dispersants to determine if ongoing removal actions were necessary; the purpose was not to assess risks to response workers due to dermal exposure to oil. PP Tr. at 1512:17-1512:25. No conclusion regarding human health impacts was presented in OSAT-1.

127.    The purpose of OSAT-2 was to conduct a Net Environmental Benefit Analysis to determine whether or not to remove oil residue that remained after massive shoreline cleanup efforts removed much of the residue or leave it in place. TREX-013008.002. OSAT-2 was not designed to assess potential dermal exposure risk to cleanup workers. PP Tr. at 1513:08-1513:10. OSAT-2 reviewed twenty-two samples taken between October 2010 and January 2011 to assess the threat of residual oil residue to beachgoers. TREX-013008.023.

**(b)** **Characterization of Inhalation Exposures Was Limited Given the Number of Response Workers and Locations**

128.     Dr. Cox referred to the occupational air sampling data collected by OSHA, NIOSH, and BP during the response as "robust" and "tremendous." PP Tr. at 1503:06-1503:17; D-35270. The United States' expert, Dr. Clapp, disagreed, testifying that the air monitoring data, for instance, was "not comprehensive." PP Tr. at 252:21-253:05.

129.     Dr. Clapp's opinion is supported by the contemporaneous evidence. In NIOSH's words, as of July 26, 2010, the response lacked a "coordinated, comprehensive and routine air sampling plan for all response worksites." TREX-012220.003.

130.     NIOSH acknowledged the limitations of its quantitative and qualitative data gathering during the response, noting in particular that they did not visit every job site: "Deepwater Horizon response work was stretched over an extremely large geographical area, making the evaluation of all worksites infeasible," and even with respect to the job sites NIOSH did visit, "[r]esponse work activities and exposures were quite dynamic throughout the response, so conditions at one point in time may not fully represent all conditions encountered by workers." TREX-012223.018. For instance, there were "roughly 5,800" vessels of opportunity involved in the response, Rec. Doc. 8217 at 2. NIOSH only conducted site visits on six vessels of opportunity. TREX-012252.006.

131.     BPXP emphasized that OSHA, NIOSH, and BPXP collected approximately 30,000 occupational air monitoring samples, over 28,000 of which were collected by BPXP. TREX-240110.031, .034; PP Tr. at 1503:18-1503:25. Notably, however, the sampling started after the response had begun and involved only a limited number of days. The BP Group's

occupational air sampling did not begin until April 27, 2010; OSHA's did not begin until May 27, 2010; NIOSH's did not begin until June 4, 2010. TREX-240110.028; PP Tr. at 1505:25-1506:06, 1507:04-1507:07. NIOSH only collected air samples on twelve days in June 2010 and one day in August 2010. TREX-012258; Howard Dep. at 262:02-262:03, 262:08-262:11, 262:16-262:20, 263:09-263:21, 263:23-264:04, 264:06-264:14, 264:16-264:21.

132.    Dr. Cox considers naphthalene to be one of the components of crude oil that are of greatest concern from a human toxicology perspective, if inhaled at significant concentrations. PP Tr. at 1504:01-1504:08; TREX-240110.013. Yet, his review of samples for naphthalene was extremely limited:

a.    He did not identify any BP Group occupational air sampling results for naphthalene. PP Tr. at 1504:09-1504:12; TREX-240110.034; TREX-240383.

b.    He reviewed only two OSHA sample results for naphthalene. TREX-240110.032; PP Tr. at 1506:15-1506:17.

c.    He reviewed only 115 NIOSH sample results for naphthalene; NIOSH detected naphthalene in fifty-seven percent of those samples. TREX-240110.033; PP Tr. at 1507:18-1507:20.

133.    Dr. Cox also considers hexane to be one of the components of crude oil that are of greatest concern from a human toxicology perspective, if inhaled at significant concentrations. PP Tr. at 1504:01-1504:08; TREX-240110.013. Again, however, Dr. Cox did not review or include in his reports significant analysis of hexane:

a.    He did not identify any BP Group or OSHA occupational air sampling results for hexane. PP Tr. at 1506:18-1506:22; TREX-240110.032; TREX-240392; TREX-240383.

41

b.      He reviewed only seventeen NIOSH sample results for hexane; NIOSH detected

hexane in seventy-six percent of those samples. TREX-240110.033; PP Tr. at 1507:24-

1508:03.

134.    Coal tar pitch volatiles are classified by NIOSH as a potential occupational

carcinogen. PP Tr. at 1504:21-1504:23. Once again, Dr. Cox's review for this chemical was

severely limited:

a.      He did not review any BP Group occupational sampling results for coal tar pitch

volatiles; instead he indicated he did not believe that there were any coal tar pitch volatile

sample results in the BP dataset. PP Tr. at 1504:09-1504:20; TREX-240110.034;

TREX-240383.

b.      He reviewed only twenty-four OSHA sample results for coal tar pitch volatiles.

PP Tr. at 1506:23-1506:25. TREX-240110.032. Those samples were collected starting

about a month after the well was capped. PP Tr. 1507:01-1507:03; TREX-240392.

Twenty-one percent of those sample results were above the OSHA permissible exposure

limit ("PEL") for coal tar pitch volatiles. TREX-240110.032.

c.      Dr. Cox reviewed only thirty-seven NIOSH sample results for coal tar pitch

volatiles. PP Tr. at 1508:11-1508:13; TREX-240110.033. Because the required analysis

was not performed, he could not compare the OSHA and NIOSH sample results to the

NIOSH recommended exposure level, which is more stringent that the OSHA permissible

exposure level. PP Tr. at 1508:14-1508:24. TREX-240110.021, .032, .033.

135.    BPXP selectively cites to quotes from federal agencies to support its argument

that there were not and will not be significant or long-term exposure-related adverse health

42

effects from the spill, but fails to put those quotes into context. For instance, BPXP points to the following quote from a CDC webpage: "Working separately, EPA and CDC came to the same conclusion – the agencies found no direct exposures to these substances at levels high enough to be expected to cause harm." D-35106; D-35016.1; PP Tr. 1441:03-1441:14. BPXP fails to mention that the statement was made in August 2010, long before the response ended, and that this CDC webpage was only discussing the agency's review of "nearly 400 packages of data taken from environmental samples collected on the Gulf Coast," TREX-240215.002, .003. The statement BPXP points to is not based on a review of all environmental samples and all occupational samples taken during the response. BPXP also fails to mention the sentence directly following the one that they quote: "As a precaution, both agencies recommend minimized contact with any waste oil product." TREX-240215.002.

### (c)      Weathering of Oil Does Not Make it Innocuous

136.    BPXP's witnesses sought to downplay the human and ecological health risks posed by the oil spewing from the Defendants' well by claiming that the oil had weathered and that weathered crude oil presents a lower risk of exposure-related health effects than pure crude oil. Heron Dep. at 53:10-53:20, 61:07-63:04; TREX-012013.008.

137.    BPXP's claims, however, are not supported by the evidence. Both OSHA and NIOSH caution that "weathered crude oil still contains harmful chemicals which can cause skin irritation and other irritant reactions." TREX-012220.002; *accord* TREX-013110.004. The BP Group's MSDS for *weathered* MC-252 oil warns of dermal effects of exposure to weathered crude. TREX-013110.001.



Figure 14: Relationship of Hydrocarbon Size to Toxicity (D-32609)

138. The crude oil that the Defendants discharged contains hundreds of chemicals, including volatile organic compounds like benzene and polycyclic aromatic hydrocarbons or PAHs. PP Tr. at 480:15-481:06; D-32607A. As the size of the hydrocarbon goes up, from the volatile organic compounds to the PAHs, the toxicity and persistence of the hydrocarbon goes up as well. PP Tr. at 481:13-482:13; TREX-013330.006-.007, .010.

139. "Weathering" refers to the changes in chemical composition of oil as a result of various natural processes that start immediately upon release of oil into the environment, such as dissolution into the water column, evaporation into the air, and degradation by microbes. The rate at which a compound dissolves, evaporates, or degrades is dependent upon its structure: VOCs weather more quickly; larger PAHs weather more slowly. As oil weathers, the overall mass is reduced, but the remaining oil has a higher proportion of larger, more toxic PAHs that are more persistent in the environment. PP Tr. at 484:09-485:21; TREX-013330.007; D-32611.

140. Various hydrocarbons also have varying rates of bio-availability – *i.e.*, availability to be taken up by an organism. For all of the hydrocarbons, however, it is true that once they get into the water or air column, they become more bio-available. PP Tr. at 482:14-482:18.

141. Weathering increases the bio-availability of the heavier hydrocarbons, and use of chemical dispersants can speed up the weathering process and increase the bioavailability of heavy PAHs. PP Tr. at 483:03-483:13, 484:09-484:19; D-32612A.

142.     Thus, while weathering reduces acute toxicity as the lighter hydrocarbons are released from the oil quickly, weathered oil contains a higher concentration of heavier, more toxic PAHs. PP Tr. at 483:14-485:21; TREX-013330.010; D-32611.

143.     BPXP's argument about weathering of oil before it reached the surface is really just a reprise of its flawed "oceanic separation" model offered through its witness Curtis Whitson during the Quantification Segment of the Phase 2 Trial. *See* Rec. Doc. 12048-1 at 203-218 ¶¶ 549-598. In essence, among other things, BPXP is continuing to argue that dissolution of the lighter constituents of oil eliminates them from the environment. As the evidence in Phase 2 of this trial demonstrates, the dissolution of hydrocarbons does not remove them from the ocean water. P2 Tr. at 2351:05-2352:06; TREX-011574N.004, .006.

144.     Modifying this unsupported dissolution argument, BP now argues that the lighter hydrocarbons disappear *after* the oil reached the surface of the Gulf through evaporation and other weathering processes. TREX-240110.011.

145.     Evaporation of the lighter hydrocarbons means that they are liberated from the oil phase and therefore available to be inhaled, *not* that they disappear and pose no threat. In the air, these hydrocarbons were available for inhalation by the thousands of response workers were working off-shore during the response, many of them involved in source-control activities at or near the spill site. TREX-240164.006; TREX-009105.006-.007, .011, .022, .042-.043, .065.

146.     In fact, an article upon which BPXP relies stated that when oil evaporates or is combusted through *in situ* burning, "a small but significant percentage is converted into aerosol particles smaller than 1 μm [micrometer] in diameter. These particles can penetrate into the lungs

with potential health effects." TREX-240164.003, .005. BPXP's witness agrees that these small particles pose a threat to human health. TREX-240110.018.

147.    By modeling the transport of these aerosol particles from the spill site toward the Gulf Coast on dates that the Gulf Coast was downwind of the spill site, and comparing those models with measurements taken along the Gulf Coast, researchers were able to conclude that "these particles potentially had a measureable effect on ambient levels of aerosol particles in coastal communities directly downwind of the spill," and that some measured increases in aerosol particle concentrations along the Gulf Coast "were likely due to the DWH spill." TREX-240164.004.

148.    In addition, the hydrocarbons evaporating from the oil near the spill site combined with nitrogen oxides, which were emitted from the flaring of natural gas during collection operations and from the exhaust of source control and response vessels, to form ozone and peroxyacetyl nitrate. TREX-240164.001, .004. Peroxyacetyl nitrate is a lung and eye irritant and "[i]nhalation of ozone can cause a number of respiratory symptoms, including coughing, throat irritation, and exacerbation of pre-existing respiratory conditions. TREX-240110.018; TREX-240164.004. Dr. Cox did not include any occupational air sampling results for ozone or peroxyacetyl nitrate, in his expert reports, so he did not characterize the exposure risk of off-shore response workers to these pollutants.

### e) Personal Protective Equipment Was an Imperfect Guard against Exposure

149. BPXP's opinion that there were no serious illness resulting from exposure to the oil was premised on Dr. Cox's assumption that all response workers properly used personal protective equipment ("PPE") correctly. *See, e.g.,* TREX-240110.009, .011, .031, .051.



Figure 15: Workers wearing PPE incorrectly (TREX-012621)

150. "PPE was not always used as directed." TREX-012223.016-.017.

151. The limited bio-monitoring (*see supra* ¶¶ 123-124) conducted by one contractor showed that the worker who showed the highest levels of benzene metabolites had "consistently" removed his PPE improperly, and after this was corrected, his benzene metabolite levels "f[e]ll back in line." TREX-013347.017.

152. Additionally, BP's own publicity materials recognized that the use of PPE had to be "carefully considered" and weighed against other health risks, including the dangers of heat-related illness. TREX-012013.017; Heron Dep. at 74:20-75:08; *see also* TREX-012223.015-.016 (NIOSH stating that "[b]alancing the need to protect workers from potential exposures without creating unnecessary hazards for workers from too high a level of PPE is critical."); TREX-012254.013; TREX-012220.005; TREX-012221.003-.004; s*ee also* TREX-013346.007-.008; TREX-013347.022-.023; TREX-013348.007-.008.

153.    For example, temperatures on the beaches "often exceeded 90-100 degrees Fahrenheit, with high relative humidity, creating conditions for severe heat strain." Proper PPE for beach workers included full body coveralls and protective gloves and boots. TREX-012223.015.



Figure 16: Response Worker on Beach (TREX-009105.003)

154.    Accordingly, amongst beach cleanup workers, "NIOSH investigators observed that the range of required protection tended to be relaxed as the local heat index increased." TREX-012255.007. In the end, "[m]any Deepwater Horizon response workers did not – did not wear personal protective equipment because of the heat stress issue …." Howard Dep. at 146:24-147:02; TREX-240110.056; TREX-013347.021.

155.    In late June, NIOSH investigators noticed two PPE issues requiring corrective action on the source control vessels *DDII* and *Discoverer Enterprise*: (1) only one manufacturer's line of respirators was being used, which "presented the possibility that proper fit might not be attained for some workers," and as NIOSH noted, OSHA guidance states that providing respirators from only one manufacture is a "questionable practice," and (2) some

workers "had facial hair that could interfere with the proper seal of a respirator." TREX-012252.037, .039.

156. Dr. John Howard, director of NIOSH, testified that NIOSH did not conduct any PPE compliance monitoring and never issued a Final Guidance on PPE, although an Interim Guidance was issued on July 26, 2010. *See* TREX-012220; Howard Dep. at 276:19-279:07; Heron Dep. at 142:15-142:19 (admitting as BPXP's Rule 30(b)(6) witness that he was unaware of any formal monitoring of PPE compliance).

157. Accordingly, there was potential for dermal exposure to the components of crude oil and dispersants for cleanup workers. Howard Dep. at 186:05-186:08, 186:10-186:16.

### f)    Risk of Long-Term Human Health Effects Remains

158. Chronic adverse health effects to response workers that resulted from exposure to oil or constituents may take years to manifest. Howard Dep. at 188:23-189:01, 189:03-189:05. Only a long-term study could answer the question of whether or not there will be any significant long-term health effects to response workers from exposure to oil or oil constituents or dispersants or dispersant constituents. Howard Dep. at 189:24-190:02, 190:04-190:10, 190:12-190:14.

159. The National Institute of Environmental Health Science ("NIEHS"), with the BP Group's Gulf of Mexico Research Initiative ("GOMRI") funding, has initiated a ten year study of response workers to determine the effect of "exposure to oil and dispersant products and potential health consequences such as respiratory, neurobehavioral, carcinogenic, and immunological conditions." Heron Dep. at 202:12-203:02, 203:08-204:01, 208:14-209:22. Dr.

49

Cox was not aware that public health was one of the research areas of GOMRI. PP Tr. at 1519:09-1519:12.

160.    NIEHS and GOMRI are not the only entities who think the ten year study is important. NIOSH described the NIEHS long-term study in its Health Hazard Evaluation and noted that "NIOSH encourages response workers to participate in the NIH study when they are contacted. This study will describe the health status of response workers and may lead to a better understanding of exposures during oil spill disasters and their potential health effects." TREX-012257.013.

161.    The BP Group's own Dr. Heron could not "form a judgment" on whether or not it is possible to determine at this point in time whether or not the spill will have any long-term effects on mental health, noting that it is "quite difficult . . . to fully understand that issue at this point in time." Heron Dep. at 212:14-212:25. He also noted that some preliminary information presented with respect to behavioral health suggested that there had been effects on responders, but that other preliminary information indicated that those effects were returning to normal. Heron Dep. at 252:18-252:23, 252:25-254:02. Dr. Clapp testified that it is premature to draw conclusions about the long-term impact of the spill on human health and that long-term impacts may be found in on-going studies. After all, NIEHS is only five years into a ten year study. PP Tr. at 268:09-269:02, 269:14-270:02; D-33601; TREX-013346.013.

162.    Unlike the United States' expert Dr. Clapp, BPXP's witness testified that he had not reviewed preliminary observations from the NIEHS study indicating that response workers were about thirty percent more likely to have moderate to severe depression than Gulf Coast

residents who did not do oil spill response work. PP Tr. at 1517:23-1518:08, 1518:20-1519:01; TREX-231743.001.

163.    Dr. Cox was not familiar with an ongoing study of the effects of the spill on reproductive-age women, or an ongoing study of the long-term effects of Gulf seafood consumption, but he acknowledged that there is research being conducted "all over the United States" about the human health impacts of the spill." He, however, was "not claiming that [he knows] what studies are going on throughout the country. PP Tr. at 1519:13-1520:01.

### iv.    The Disaster Caused Risk of and Actual Psychological Harm

### a)    Disasters Cause Serious Individual Psychological Harm

164.    An expert retained (but not called) by BPXP, George Bonanno, has argued in numerous papers and in deposition that disasters cause different people to react to disasters in different ways as depicted in Figure 16. Dr. Bonanno refers to these different types of reaction as "trajectories." *See generally* TREX-013365; TREX-013370; TREX-233241R at 95:14-95:19, 173:04-173:17. Dr. Bonanno agrees this event was a disaster, though he emphasizes that the



Figure 17: Trajectories of Psychological Impacts of Disasters (TREX-013370.004)

definition of a disaster includes events with a "potential" for harm, as well as events that cause actual harm. TREX-233241R at 239:16-240:06.

165.     Dr. Bonanno argues that the most common psychological reaction to a disaster is "resilience" – "a stable pattern of positive adjustment and health over time." TREX-013370.004; TREX-233241R at 95:20-96:12. Even resilient individuals, however, will suffer "at least some distress" during or immediately after a disaster. TREX-013370.004.

166.     Dr. Bonanno's research shows "across a lot of studies," however, that "[d]isasters cause serious psychological harm in a minority of exposed individuals" that "can persist for years after the event . . . ." TREX-013365.001; TREX-013370.005; TREX-233241R at 68:04-69:04. In other words, some "[p]eople exposed to disasters show myriad psychological problems, including post-traumatic stress disorder ("PTSD"), grief, depression, anxiety, stress-related health costs, substance abuse, and suicidal ideation." TREX-013365.001. These individuals fall within the chronic trajectory. *See* TREX-233241R at 176:10-176:18. Dr. Bonanno has found that the chronic trajectory usually represents roughly five to fifteen percent of the exposed population. TREX-233241R at 69:05-69:12; TREX-013370.004.

167.     In addition to the chronic trajectory, some individuals exposed to a disaster fall within the recovery trajectory and "experience elevated symptoms and distress for longer periods of time [than those who exhibit resilience], for a number of months, and they gradually return to what would be a baseline within a year or two after." TREX-233241R at 174:15-174:23. The recovery trajectory typically represents approximately fifteen to twenty-five percent of the population exposed to the disaster. TREX-233241R at 174:12-174:14.

168.    The delayed trajectory, up to fifteen percent of the population exposed to the disaster, includes individuals who experience "an initial struggle with a moderate or sub-threshold level of symptoms that gradually worsens over time." TREX-013370.005; TREX-233241R at 175:02-176:06.

169.    Dr. Bonanno identified other trajectories, including the "pre-existing" category of individuals who were doing poorly both before and after the event. TREX-233241R at 176:23-177:07; TREX-013370.004. Though individuals in the chronic and pre-existing trajectory are sometimes difficult to differentiate, one would expect to see both chronic and preexisting trajectories in an exposed population. TREX-233241R at 177:01-177:12.

170.    Dr. Bonanno wrote a paper in 2012 discussing the application of these trajectories to individual psychological responses in those exposed to oil spill disasters and found that the patterns are "likely to observed and in similar proportions to those seen in other disaster studies." TREX-013370.005; TREX-233241R at 178:25-180:02.

171.    Dr. Bonanno has not studied the Defendants' disaster and he, therefore, could not state that these trajectories applied in the exact percentages described in his 2012 paper. TREX-233241R at 70:23-71:11, 74:07-74:18, 75:15-75:23, 179:21-180:16, 184:10-184:18. His testimony, however, demonstrates that there was at least some serious psychological harm from the disaster:

> Q. Well, let me ask you this: In the 20-some-odd years that you've been studying disasters and their potential effect on – on the psychological health of individuals, have you ever seen a disaster that had no psychological impact on any of the exposed individuals?
>
> A. It would be extremely surprising to find a disas- – an event that – that quote – that broadly categorizes – is qualified as a disaster that had no psychological harm. And I – I don't anticipate no psychological harm.

* * *

Q. Have you ever studied a disaster in which there was nobody who suffered serious psychological harm?

A. No. And I – I don't think I would ever claim that such a – such an outcome would be likely.

TREX-233241R at 75:24-76:23.

### b)        The Survivors Suffered Psychological Harm

172.    The more closely an individual is exposed to a disaster, for instance through

property damage, participation in the cleanup, or direct contact with the oil spill, the more likely

that individual is to fall within Dr. Bonanno's chronic trajectory. TREX-013365.005; *see also*

TREX-013365.012 (finding that PTSD prevalence in the New York City population generally

was six percent in the months following the 9/11 attacks, while it was a little over twelve percent

in those who witnessed the attack in person and about twenty-five percent in those who were in

the World Trade Center at the time of the attack); *accord* TREX-233241R at 92:15-92:24.

173.    As described *supra* § I.D.i., the men and women who escaped the rig with their

lives could not have received a greater exposure to the onset of the disaster. In fact, at least one

survivor has been diagnosed with PTSD:

> My PTSD is sometimes overwhelming. It controls how I think and how I feel. I
> feel anxiety and a loss of control over every aspect of my life. Unless you have
> experienced a horrific event, it is difficult to understand how devastating and
> debilitating PTSD can be. My ability to cope with daily life situations has been
> impaired as a result of the inevitable happening to me.

* * *

> Through the grace of God I survived, and for that, I am thankful. But, my life,
> body and mind will never be what they were before the explosion. I have no idea
> how I could support my family because drilling rigs is all I know.

TREX-231279.003.

### c)       The Families of the Dead Suffered Psychological Harm

174.     The victim impact statements submitted during BPXP's sentencing hearing

provide a sad reminder of what it means to lose a loved one, whatever the cause. The mother of

one of the victims provides a good description of the personal impact of these losses:

> Gordon Jones is my son, and was killed on the Deepwater Horizon on the night of
> April 20, 2010. . . . Not a day goes by when I do not wake up thinking about him
> and all that I lost that fateful day in April. I have lost a precious son whom I loved
> dearly, and no one or anything can ever replace that. As Gordon's mother, it pains
> me to know that his sons will never have the privilege of having him attend one of
> their ballgames or tuck them into bed at night. Michelle, his wife, lost her soul
> mate. I, as his mother, will not have him here to humor and comfort me as I grow
> older, and it is with a broken heart that I have to face the fact that I will live the
> rest of my days in a world without Gordon in it. I still, after two and a half years,
> cannot visualize my life without him, but yet, I must because that is my reality.
> My life, as is my family's, is forever changed because of the negligence of others
> who made decisions on that fateful night.

TREX-231282.001.

175.     The families of the eleven men killed on the rig faced not only real grief and loss,

but also a risk of serious psychological effects. Dr. Bonanno studied the effect on family

members of sudden violent deaths of a loved one and concluded that "[v]iolent death was found

to predict PTSD symptoms and the persistence of depression following spousal loss, whereas

sudden death from natural causes (*e.g.,* a heart attack) was unrelated to these same outcome

measures." TREX-013367.012; TREX-233241R at 102:11-102:18.

176.     Dr. Bonanno acknowledged that the deaths of the eleven people on the rig were

violent deaths: "if they died, they were probably violent deaths." TREX-233241R at 104:06-

104:15.

### d)   Response Workers Experienced Psychological Harm

177.   The long work hours and other stressors during the response action generated increased levels of stress and hostility among response workers. *See, e.g.,* TREX-009495.064, .266; TREX-012221.006 (OSHA observing that there was inconsistent implementation of safety measures including a lack of plans for addressing workplace violence); TREX-007802.004 ("[t]oo many people were letting their exhaustion and emotions show . . . .").

178.   NIOSH began surveying response workers in June 2010 for mental health symptoms and found across working groups a range of one to twenty-four percent reported one or more of these symptoms: feeling worried or stressed, pressured, depressed or hopeless, short tempered, or experiencing frequent changes in mood. TREX-012257.017.

179.   In a focus group study of response workers who were safety professionals, NIOSH identified mental health stressors for response workers including the hot working conditions, lack of access to nutritious and palatable food, "crowded living quarters with limited personal space or privacy, which affected quality of sleep," and job insecurity. TREX-012257.020. Participants indicated to NIOSH that "workers were laid off with little warning, so people were uncertain if they would have a job the next day." TREX-012257.020. In addition, because "it was clear that workers were easily replaceable, given the number of people looking for work," response workers did not want to take any time off to recuperate, even after working consecutive twelve hour (or longer) days. TREX-012257.020.

180.   The stressful conditions for response workers led to some violent outbursts:

> With so many workers living in cramped and close quarters, participants reported tension and frequent confrontations among workers. Some participants reported the presence of workers with criminal backgrounds who were hired without a background check and knives and "shanks" (homemade knives) at the work site.

> Several participants said there was at least one instance where one person pulled a
> gun on another person during an argument.

TREX-012557.020; *see also* TREX-012257.024 (reporting impression that the BP Group treated the workers better when the media was paying attention).

181.    To cope with the stress, some response workers drank alcohol, smoked cigarettes, or took prescription drugs. TREX-012257.021. The risky behavior driven by the stress led to some tragic consequences, as the one of the Houma Incident Commanders testified: "[W]e had a 20-year old kid that was killed in a car accident and a 40-year old man died in a pool. I can't consider that a success after attending the funerals of both. We could have done better." Laferriere Dep. at 124:04-124:18; *see also* TREX-240110.007 n.3 (Dr. Cox excluding the four individuals who died while not performing response actions from his assessment).

### e)    The Population Was at Risk for Psychological Harm

182.    Importantly, the disaster arising from the Defendants' violations was a "technological disaster", *i.e.,* it was caused by human action or inaction. TREX-233241R at 240:07-240:22.

183.    As Dr. Bonanno's paper found, the reality for communities affected by technological disasters is "that of erosion sense of community. Terms such as *toxic* or *corrosive* are frequently used to describe the interpersonal and communal dynamics of human-induced disasters." TREX-013365.027; TREX-233241R at 184:24-185:10; *see also* TREX-011922.071-.078; Cross Dep. at 199:04-199:15 (recognizing that people in the community were angry).

184.    Moreover, as demonstrated *supra* ¶ 172, the affected population subject to the various trajectories identified by Dr. Bonanno – including the chronic trajectory – include not only people on the rig, but individuals who were exposed through property damage, participation

in the response, etc. TREX-013365.005. As discussed below, many people in the Gulf Coast area suffered direct impacts from the Defendants' disaster and therefore were also at risk for the psychological harm identified by Dr. Bonanno.

185.    There is evidence this risk was realized for at least some. A July 2010 telephone survey determined that self-rated stress had more than doubled since the oil spill: sixty percent of people reported being worried almost constantly in the week prior to interview because of spill; eight in ten were worried how their family would make ends meet because of the spill; seven in ten worried about having to move. Because of worry over the spill forty percent felt sick to their stomach at least some of the time, thirty-eight experienced migraines some of the time, thirty-four percent experienced aches and pains, forty-six percent were prevented from getting a good night's sleep and taking care of their family as well as they would like, forty-three percent from being able to focus on work, and forty percent from taking care of their daily chores. TREX-012363.005; TREX-012359.006.

186.    In addition, the affected population exhibited early signs of developing substance abuse and dependence, psychiatric disorders, suicide, and familial breakdown, including domestic violence and child abuse. TREX-012359.003. NIOSH began surveying response workers in June 2010 for mental health symptoms and found across working groups a range of one to twenty-four percent reported one or more of these symptoms: feeling worried or stressed, pressured, depressed or hopeless, short tempered, or experiencing frequent changes in mood. TREX-012257.017.

187.    Charities providing spill related assistance under a grant from Anadarko reported a twenty-five percent increase in clinical diagnoses of depression post-spill for Gulf-facing

counties, as compared to slightly more than two percent decrease in inland counties.

TREX-012915.007; PP Tr. at 2187:11-2188:01.

### E.   The Disaster Harmed the Social Fabric of the Gulf Coast

188.   The Defendants' disaster "caused serious and widespread sociocultural harm to the coastal communities of the Gulf of Mexico . . . from Louisiana through Alabama." PP Tr. at 159:16-160:11. Proof of this harm was introduced through the testimony of an anthropologist – Dr. Diane Austin – who has worked for eighteen years studying the effects of the offshore oil and gas industry in the Gulf. PP Tr. at 149:01-149:10, 148:04-148:06, 150:12-150:19, 154:03-155:18.



Figure 18: Dr. Austin's Eighteen Years of Study in the Gulf

189.   On April 20, 2010, Dr. Austin's research team was in the Gulf of Mexico conducting a study of the history of the deepwater era. When the explosion occurred "one of [her] researchers was working in one of the communities that was the hometown of one of the men who was killed on the rig." PP Tr. at 157:15-157:24.

190.   As a result, Dr. Austin became aware of the disaster very quickly and immediately began an anthropological study of the effects of the explosion and the after effects.

PP Tr. at 157:15-158:05; TREX-011923.009 ("The research on which this report is based began almost immediately after the rig exploded . . . .").

191.    The Bureau of Ocean Energy Management ("BOEM") asked Dr. Austin and her team to design studies of the short, medium, and long-term effects of the disaster. Dr. Austin served as the principal investigator for this study. At the trial, she presented the results of her study of the short-term effects – focusing on effects from April 2010 through March 2012 – the only study completed at the time. PP Tr. at 158:04-158:10, 159:06-159:13, 199:07-199:19; TREX-011923.009.

192.    The study looked at "homes and business and communities" to understand changes or effects on the patterns of daily living, on social networks, relationships, livelihoods, and livelihood strategies. PP Tr. at 161:09-161:14.

193.    The purpose of the study was not to identify the degree of any particular sociocultural effect, but rather to identify the "range of effects" of the disaster on the communities. PP Tr. at 170:07-170:12.

194.    The two-volume peer-reviewed report on the study (aka the "Social Effects Study") was "absolutely" not done for purposes of litigation. Rather the study was commissioned to assist BOEM in meeting its obligation to evaluate the effects of its leasing program on the people and environment of the Gulf Coast. Luton Dep. at 18:24-19:23, 19:25-19:25, 21:06-21:14, 43:04-43:10; PP Tr. at 158:16-158:18, 171:04-171:09; *see* TREX-011922.079-.080.

195.    Though the Social Effects Study was a major basis for her testimony, Dr. Austin also relied upon her eighteen years of prior studies of the Gulf of Mexico communities, as well as her personal observations while in the Gulf after the spill. PP Tr. at 197:18-197:22.

### i.    Ethnography Was the Right Methodology to Determine Sociocultural Effects

196.    To conduct the Social Effects Study, Dr. Austin used a research methodology known as ethnography – "a scientific research approach that embeds researchers in the communities under study so that they might hear, experience, and talk to people about the phenomenon that they are experiencing." PP Tr. at 151:10-151:19, 161:18-161:21; D-33301. Ethnography is a research technique that is commonly used in corporate product development and governmental policy decision making. PP Tr. at 152:04-153:12. Fundamentally, the purpose of ethnography is to put the phenomenon under study into "the historical, economic, social, and political context." PP Tr. at 152:12-152:15.

197.    Anthropologists have an array of qualitative and quantitative methods they can use to study questions such as that under consideration in the Social Effects Study. Qualitative methods, such as ethnography, are particularly appropriate when very little is known about the phenomenon while quantitative methods are more appropriate when there is a specific hypothesis



Figure 19: Dr. Austin's Study Communities

to be tested or one is trying to measure the degree of a particular effect. PP Tr. at 162:02-162:14. Because the Defendants' disaster was "unprecedented" in terms of size and depth and potential effects, Dr. Austin chose qualitative research and specifically ethnography to conduct the study. PP Tr. at 162:15-162:20.

198.    Rather than spread her team too thinly in trying to study every single Gulf Coast community in detail, based on her experience in the Gulf, Dr. Austin and her team selected five

61

communities that represented the relevant economic sectors, ethnic groups, and livelihood strategies of the entire Gulf Coast between Louisiana through Alabama. The team conducted a "case study" on: Bayou La Batre, Alabama, East Biloxi, Mississippi; central Plaquemines Parish, Louisiana; Larose, Louisiana; and Dulac, Louisiana. PP Tr. at 163:07-163:23. These communities served as a focal point from which the team spread into other communities, including urban areas, seats of government, and other areas so as to obtain a better understanding of the effects of the disaster. PP Tr. at 164:18-165:01.

199.    Her team conducted numerous interviews, of two different types. First, they conducted "drop-in" interviews, which were short and often repeated interviews where the interviewer attempts to get a snapshot of what is happening in a business, office, or agency. PP Tr. at 165:05-165:13. For example, they conducted short interviews of florists who could report not only on their own economic status, but could also report on the types of orders they were receiving. Florists reported "they were not receiving any orders for floral blankets for funerals, which is a very common practice in these communities" and that most of their orders were internet orders coming from outside the community. These drop-in interviews therefore provided both a specific and a broad picture of the conditions in the community. PP Tr. at 165:14-166:02.

200.    Second, Dr. Austin and her team conducted lengthy interviews aimed at people in particular economic sectors – such as fishing – and at people who had an overview of such sectors – such as people who provide loans to fishermen. PP Tr. at 166:03-166:08.

201.    The interview subjects were identified using a method known as "purposive sampling," which consists of identifying a matrix of the economic sectors that need to be covered, as well as the various types of entities that are important in the communities. PP Tr. at

166:14-167:01; TREX-013112.007. From there, the researchers used a number of methods to identify "local knowledgeable people" in the various sectors and entities. Because of her long research career in the Gulf, Dr. Austin knew a lot of people who provided a starting place for identifying interviewees. PP Tr. at 167:02-167:12; Luton Dep. at 33:03-33:24, 34:20-36:10, 36:16-37:03. In short, the study method included a "systematic" program of information gathering. Luton Dep. at 46:14-46:22.

202.     Further, in addition to one-on-one interviews, "researchers participated in, and observed, local and regional meetings and festivals. They took photos of highway billboards and community activities, visited workplaces and homes, lived with local residents, and monitored local media output." TREX-011922.019. The team also tracked other available documentation such as information sheets, industry publications, court filings, and other documents. PP Tr. at 166:09-166:13.

203.     In all, Dr. Austin's team conducted formal interviews with over 1,300 individuals, some of whom were interviewed more than once. When informal conversations are taken into account, Dr. Austin's team spoke with over 2,000 people. PP Tr. at 169:14-170:04. In addition, the team attended hundreds of meetings. TREX-013112.008.

204.     As may be obvious from the number of interviews and meetings, the Social Effects Study involved extensive field work. Dr. Austin herself spent a cumulative total of six months in the Gulf of Mexico between May 2010 and January 2012. PP Tr. at 158:11-158:13.

205.     Although the study was focused on five communities for the immediate aftermath of the spill, the results are generalizable across the Gulf of Mexico and across time wherever the conditions were the same. PP Tr. at 170:22-171:03; *see infra* § I.E.ix.

### ii.        Dr. Austin's Method Adequately Protected against Bias

206.    Dr. Austin's research team took a number of steps to protect against bias in the results of her study. First, her research was staffed by a well-qualified team of nineteen researchers, including university professors, all of whom had either worked on prior projects with Dr. Austin or had performed ethnographic research before. PP Tr. at 167:21-168:02; TREX-013113.024-.025.

207.    Second, Dr. Austin's team used a well-established method of protecting against bias known as "triangulation" in which a research question is approached from a number of different directions. PP Tr. at 168:03-168:08. Examples of triangulation include: the use of a variety of data sources, use of several different researchers, use of multiple perspectives to interpret the results, and the use of multiple methods to study a research problem. TREX-013113.022-.023. The Social Effects Study used all these various methods of triangulation. PP Tr. at 168:03-168:08; TREX-013113.022-.023.

208.    Third, Dr. Austin's team developed research protocols, systematic coding of field and interview notes, and held regular team meetings. Each of these measures protected against bias by ensuring that the researchers were "seeking out opposing viewpoints to identify and describe all the effects, the positive and negative." PP Tr. at 168:09-168:12; TREX-013113.023.

209.    In combination, these measures ensured that "the results or findings from any one interview or any one observation would not bias the findings from the entire study." PP Tr. at 168:22-169:01. In essence, whenever an interview, meeting, or other data source revealed something that contradicted the patterns suggested by the data collected to date, the researchers

followed up to understand whether this was either a misunderstanding of the data *or* a new viewpoint or pattern that required further investigation. PP Tr. at 169:02-169:10.

210.    Because the goal of the study was to identify the range of effects, Dr. Austin and her team would follow a thread of interviews, meetings, and other data sources until they were "hearing the same information over and over again from people in a particular or people in a particular sector." At that point, the research team would move on to another sector or another topic. PP Tr. at 170:05-170:12.

> ### iii.    The Context Within Which the Disaster Occurred Contributed to the Seriousness

211.    Context is an essential element of analyzing a problem using ethnographic research. Context "affects the way that any event is experienced and the way that it is either mediated or exacerbated." PP Tr. at 173:02-173:09; TREX-013112.008; Luton Dep. at 58:25-59:13.

212.    In April 2010, the region was still recovering from Hurricanes Katrina, Rita, Gustav, and Ike and the national recession that began in 2007, a contextual factor Dr. Austin considered. PP Tr. at 173:09-173:14; Luton Dep. at 58:25-59:13, 64:04-64:18.

213.    Rather than treat these events as "pre-existing conditions" that should be teased out and evaluated separately, as BPXP contended she should, Dr. Austin recognized that the spill occurred just as the region was expecting to recover from the recession and the hurricanes, which provided important context in evaluating the effects of the Defendants' violations. PP Tr. at 173:15-173:22, 191:13-192:13; TREX-013113.027-.028.

214.    In addition, this "region suffers from very high levels of social and economic inequality." PP Tr. at 173:23-174:01. The five Gulf States rank in the top ten in income

inequality in the United States. TREX-013112.010. In addition, despite advances toward racial equality, "long-standing patterns of economic inequality and community vulnerability to hazards continued to correlate closely with race and ethnicity in the Gulf Coast states." TREX-011922.108.

215.     These pre-existing inequalities made the Gulf Coast region particularly vulnerable to the impacts of the oil spill – especially the increasing of social and community divisions discussed below. *See infra* § I.E.v.

### iv.     The Disaster Disrupted Livelihoods and Patterns of Daily Living

216.     As discussed below (*see infra* § I.F.), the "disaster caused widespread disruption across all of the economic sectors that [were] studied and including their commodity chains." PP Tr. at 174:19-174:24. As a result, Gulf Coast residents' livelihoods and patterns of daily living were disrupted. PP Tr. at 176:20-180:01; D-33303; D-33311; *see also* TREX-013376.007.

217.     In this region, people's work and recreation are both tied to the Gulf of Mexico. When people are out of work and also precluded from engaging in their most common pastimes, their daily lives are disrupted. PP Tr. at 175:01-175:06.



Figure 20: A Closed Oyster Shop (TREX-013112.028)

218.  In addition, the economic impacts disrupted the livelihood strategies of Gulf residents. As Dr. Austin indicated, the region is "very accustomed to both seasonal and cyclical fluctuations" in the main industries such as fishing, tourism, oil and gas, and the industries that service them. Accordingly, Gulf residents

66

have "developed livelihood strategies to move from one sector to another or to work across these sectors." PP Tr. at 175:05-175:15. When all of the primary economic sectors – fishing, tourism, and oil – were closed at once, however, Gulf residents were not able to adapt using their accustomed livelihood strategies. PP Tr. at 175:15-175:18.

219.    The fisheries closures disrupted lives in numerous ways, including the following:

a.    The closure locations changed frequently, which created confusion and disruption in daily lives. For the crabbers, if they had put their pots out and then the area was closed, they were unable to retrieve their pots and move them to another area. PP Tr. at 177:01-177:07.

b.    There was also increased competition in the open fishing areas when fishermen who traditionally fished in the closed areas moved to the remaining open grounds.  This increased competition was disruptive for both categories of fishermen. PP Tr. at 177:08-177:12.

c.    Subsistence fishermen also were precluded from fishing, which was disruptive in a region where subsistence fishing is used in the region not only to feed families but also as a barter system. PP Tr. at 177:13-177:18; TREX-011922.108-.109, .113, .160.

220.    The Defendants' spill and resulting moratorium therefore disrupted livelihoods and livelihood strategies were also disrupted in the oil and gas sector. TREX-011922.193; PP Tr. at 177:19-178:02.  For instance, companies in the industry strove not to lay off workers, but many of the strategies to avoid layoffs were disruptive in their own right. Some companies relocated their entire workforce to other regions to exploit shale gas or sent their workers to other countries such as Brazil. Clearly, such relocations were disruptive. PP Tr. at 177:19-178:09.

67

221.     Yet another example comes from the tourism industry, where business owners were in a "state of flux." The uncertainty about how far the oil had spread and where it was at any given time led to widespread cancellations of hotel reservations and fishing charters. "[T]he businesses that operated in that industry were left to try to go from day to day, trying to figure out what to do. Many small businesses were simply forced to close because they didn't have the capital to withstand this" uncertainty. PP Tr. at 179:23-180:09.

222.     A final example of the sociocultural disruption from the Defendants' disaster comes from the "unique" industry of fabrication and shipbuilding. In the Gulf region, this industry has evolved to service the oil and gas and fishing industries. For these companies, contracts were canceled and new contracts did not come in because of the uncertainty regarding the return of both the fishing and deepwater drilling industries. This downturn often hit the smaller yards the hardest. These small yards serve an important role in the communities because they hire local workers and often serve as a resident's first employers. The impacts on these shipyards, therefore, disrupted the livelihoods of the population. PP Tr. at 179:15-179:21.

223.     BPXP's witnesses claimed that the fact that all of the industries were closed at once should not be considered as part of the seriousness of the Defendants' violations because two of the industries – fishing and oil and gas – were closed as a result of government decisions. For instance, Dr. Scott argued that the moratorium and permit slowdown and their effects should not be considered when evaluating the seriousness of the Defendants' violations because "those were the federal government's decisions." PP Tr. at 2109:03-2109:13.

224.     Of course, the question is not whether a particular effect was "BP's decision" but whether it was caused by the Defendants' violations. The United States would not have issued

68

the moratorium but for the Defendants' violations. *See* NTL No. 2010-N04 at 1

(http://www.doi.gov/news/pressreleases/Interior-Issues-Directive-to-Guide-Safe-Six-Month-

Moratorium-on-Deepwater-Drilling.cfm). Even BPXP's witness, Dr. Scott, acknowledges that

the "moratorium would not, I think, under other circumstances would not have occurred in the

way that it occurred." PP Tr. at 2110:05-2110:17.

225.    Similarly, there is no dispute that the fisheries were closed because of the

presence of Defendants' oil in the Gulf of Mexico. *See, e.g.,* 75 Fed. Reg. 24822 (May 6, 2010)

("NMFS issues this emergency rule to close a portion of the Gulf of Mexico (Gulf) exclusive

economic zone (EEZ) to all fishing, in response to the *Deepwater Horizon* oil spill.")

### v.    The Disaster Exacerbated Social and Economic Inequality

226.    There is no dispute that BP undertook certain efforts to mitigate the economic

impacts of its violations, including instituting the vessels of opportunity program, making

tourism grants, and instituting a claims process. TREX-013112.029. There is also no dispute that

for some recipients of the funds the BP Group provided, the funds did mitigate the impacts and

were, in BPXP's words, "a good thing." PP Tr.

182:05-182:16, 211:22-213:04.

227.    Nonetheless, Dr. Austin's research

also showed that the Defendants' violations

exacerbated the social and economic inequality in

the Gulf Coast communities. PP Tr. at 179:22-

180:01. For example, the hiring for the response



Figure 21: A Vessel of Opportunity (Shrimp Boat) Carrying Boom (TREX-13112.029)

exacerbated inequality because individuals doing economically better tended to have faster and

69

larger boats that enabled them to enter the vessels of opportunity program and earn large sums of money. PP Tr. at 180:02-180:05. By contrast, some individuals could not qualify for the vessels of opportunity program for various reasons including that they did not have a boat, and others made no money because they were never called out. PP Tr. at 180:05-180:09. Similarly, well-connected individuals were more likely to be hired for beach cleanup work. PP Tr. at 180:10-180:13; *accord* TREX-011922.262 (smaller businesses were less able to participate in services provided to the response: "[s]mall restaurants suffered because BP representatives had their meals catered, and local customers were being conservative with their money due to economic uncertainties.").

228.     Recent immigrant and other ethnic communities were also at a disadvantage in the response. Vietnamese fishermen were initially challenged by the lack of information available in languages they understood, which hampered their ability to take advantage of the vessels of opportunity program at its outset because training initially was made available only in English and Spanish. TREX-009495.040. Further, the historical ethnic divides within the communities also track (to some extent) the economic divides. Therefore, the communities of African American oyster fishermen and harvesters often had fewer assets, such as boats, than the Croatian oyster harvesters who tend to have larger operations. Accordingly, access to the vessels of opportunity program was also divided somewhat along racial or ethnic lines. PP Tr. at 183:02-183:14.

229.     BP's claims process also had unequal benefits, thereby exacerbating economic and social inequality. At the outset, the claims process did not recognize "just how complex the livelihood strategies of people in this region are" and therefore required the type of

documentation that just did not exist. PP Tr. at 180:14-180:23; Cross Dep. at 197:05-197:23;

TREX-012324; TREX-012359; TREX-012360; TREX-012362; TREX-012363. As a result of

these complexities, "people who had access to resources, those people who could get help filling

out forms and understanding the process were better able to get help." PP Tr. at 180:24-181:02.

230.    Another example of the exacerbation of inequality is found in the tourism grants.

While the BP Group did provide grants to assist the tourism industry, those "communities where



oil was still coming ashore, they were hit twice." Not only did they suffer from the effects of the oil, they also could not take advantage of the grants provided to advertise that there was no oil in their communities. PP Tr. at 181:03-181:12.

Figure 22: Oil on the Beach (TREX-013112.044)

231.    Further, just as an individual's ability to access resources depends in part on that individual's economic and social

capital, the same is true of communities and their political capital. Accordingly, those

communities that were the most disadvantaged were most often the communities that could not

get help. PP Tr. at 182:19-183:01.

### vi.    The Disaster Challenged Individual and Collective Identity

232.    As a result of the economic disruptions caused by the disaster, people in the Gulf

region required assistance. Catholic charities, for example, reported as of June 30, 2010 it had

served an estimated 9,819 people (3,283 families) with emergency assistance, including direct

aid, food assistance, crisis counseling, and case management. They reported pressing need for case management and direct assistance with food, rent, and utilities. TREX-012360.002-.003. The food banks working under Catholic Charities reported a fifteen to twenty-five percent increase in the number of new people seeking emergency food assistance in just the first few weeks of the spill. TREX-012361.001; TREX-012362.007; TREX-012916.005.1.US.

233.    The need for assistance challenged the residents' individual identities. Many Gulf residents "are proud of their independence, resilience, willingness to help each other, and ability to live off the land and water." TREX-011922.193, .261, .200 ("A long tradition of self-reliance and independence made the prospect of accepting financial aid such as food stamps very difficult for many, exacerbating the frustration and anxiety of the 'BP drama'"); PP Tr. at 181:19-182:04.

234.    This challenge was particularly difficult because this is a region in which people "have experienced disaster" and are used to addressing the disaster themselves, be it by repairing their roofs, cleaning out after a flood or even raising their homes in response to coastal erosion. For this spill, however, "most people were simply not able to respond to help themselves." PP Tr. at 185:16-186:25.

235.    In addition, the region is culturally tied to the Gulf of Mexico: "The Gulf inspires artists and people." The harm to this resource challenged the cultural and personal identities of residents who treasured the places and wildlife being oiled. PP Tr. at 183:18-184:01.

236.    Similarly, personal identities are closely tied to occupations. For those who worked in the offshore oil and gas industry, they carried the pride of knowing they worked in the birthplace of the industry and the importance of the energy sector to the country. As a result of

the Defendants' violations, these workers now faced criticism for working in the industry. PP Tr. at 184:08-184:14.

237.    The disaster also undermined efforts to establish personal and industrial identities. For example, the Gulf fisheries industry has been struggling against international competition. In response, the industry had begun to develop niche marketing such as "wild-caught Alabama shrimp" and "Louisiana seafood." Just as these efforts were gaining ground, the oil spill caused people outside the region to identify these brands as "tainted with oil." PP Tr. 184:18-185:03.

238.    Also, many of the smaller businesses that were decimated by the oil spill were family businesses. These "losses to the multi-generational fishing families, losses that include not only their family businesses, but their way of life" are challenges to individual, family, and even community identities. TREX-013112.046-.047; PP Tr. at 185:04-185:09.

### vii.    The Disaster Fostered Conflict and Divisiveness

239.    The disaster created divisiveness within households as well as within communities. For instance, not only were the deaths on the rig tragic for the surviving families, friends, and co-workers, the Gulf is a region in which the oil and gas industry is prevalent and "many people work offshore." PP Tr. at 174:06-174:11. When the men died on the rig, concerns and divisions within families about the risks and benefits of off-shore work were renewed. PP Tr. at 174:12-174:17.

240.    High levels of uncertainty pervaded this disaster. This uncertainty included the extent and duration of the disaster, whether a hurricane would exacerbate the disaster, where the oil would end up, the effects of exposure to the oil and dispersants, exposure to seafood, how

long fisheries would be closed, how long the moratorium would last, and "who to trust, who to turn to, where to get information about what was happening." PP Tr. at 175:19-176:12.

241.    In the midst of all of this uncertainty, decisions had to be made.  The uncertainty fostered conflict within families, businesses, and communities – any level at which decisions about responding to the disaster had to be made. PP Tr. at 186:12-186:17.

242.    In addition, people were receiving conflicting information about the disaster from BP (*see* § VI.B.) and the media (*See, e.g.,* PP Tr. at 109:11-109:20). As a result, there was "pervasive stress and anxiety, which then fosters conflict." PP Tr. at 186:18-186:22.

243.    The disparate effects discussed above also fostered conflict. *See supra* § I.E.vii.; PP Tr. at 186:25-187:10.

244.    Further, the typical means of resolving the conflicts, such as pursuing hobbies and attending community events and festivals, were largely unavailable or hampered because they were linked to industries impacted by the spill. PP Tr. at 187:12-187:25.

245.    Similarly, the Gulf Coast region "works very carefully to balance" between commercial fishing, offshore oil and gas, and tourism. The Defendants' violations disrupted the tenuous balance the region had achieved for many years. PP Tr. at 184:15-184:18.


Figure 23: Wall Art Depicting Conflicting Views (D-33310)

246.    Moreover, promises by BP that it would "make everyone whole" led to expectations that were not always met, thereby

fostering conflict between those whose claims were paid quickly, those whose claims were rejected, those still waiting for their claims to be paid, and those who thought people were not entitled to reimbursement. TREX-009495.086 ("BP will make everyone whole."); TREX-231279.004 (expressing a sense of injustice and noting: "My state court lawsuit has been entangled in the MDL for more than 2 years."); PP Tr. 187:02-187:10.

### viii.   The Disaster Disempowered Local Governments and Non-Governmental Organizations

247.    As one study of the Defendants' disaster found:

The distribution of massive sums of money through emergency programs redirect local efforts from restoring their own economies toward securing external funds. In effect, this process can contribute to an unraveling of local kin and social networks that have been central to community resilience in the past and fostering complacency at the local level.

TREX-013376.008. Dr. Austin's study confirmed the applicability of this finding to the Defendants' disaster.

248.    Traditionally in this region, local governments and non-governmental organizations ("NGOs") provide a lot of the assistance to the people and communities. PP Tr. at 188:04-188:07. For the Defendants' disaster, however, because of the need to superimpose the oil spill response structure upon normal hurricane planning and other emergency response efforts, people were uncertain about who to turn to for help. This uncertainty affected not only individuals, but the organizations that typically provide assistance in disasters. PP Tr. at 188:09-188:21.

249.    Further, unlike the aftermath of a hurricane – where it is fairly obvious who needs help because you can see the blue tarps on the roofs and see whose homes were damaged – in the

midst of the Defendants' disaster, it was not always clear who needed help or how to help. PP Tr. at 188:22-189:09.

250.    NGOs were further disempowered by the fact that donations did not come in as they would in response to a natural disaster because the general public recognized that BP, as the responsible party, was required to pay damages. PP Tr. at 189:21-190:02. Local officials and NGO leaders had to modify existing operations to handle the increased workload relating to the spill without compensation until well into the disaster, and were often unable to expand their staffs to meet the rising demand.  TREX-013112.043.

### ix.    BP's Challenge to the Generalizability of Dr. Austin's Study Is Unsupported

251.    Through cross-examination, BPXP attempted to show that the results of Dr. Austin's study could not be applied anywhere but the five case study communities or for any time other than the study period. *See* PP Tr. at 198:22-199:03, 199:14-207:18.

252.    Even were BPXP correct that the report was so limited, as discussed in the preceding sections, Dr. Austin's study shows serious sociocultural effects for *two full years* in *five* separate communities. This alone is sufficient to demonstrate that the Defendants' violations were serious.

253.    Moreover, Dr. Austin used mechanisms to allow generalization of her results across locations and across time. For instance, the study relied upon methods and techniques that ensured that the researchers understood the relationship between the communities in the case studies and other places within the Gulf region. One such technique was to follow commodity chains from beginning to end, which required interviews and investigations outside the case study communities. PP Tr. 190:16-191:08.

254.    On cross-examination, BPXP challenged Dr. Austin on the generalizability specifically because, for the results to be generalizable, conditions that are being compared must be the same in the other location or time period to which one is attempting to generalize. PP Tr. at 203:19-208:12. BP's attempt failed, however, because it established only that "conditions in the tourism industry" (for example) changed. As demonstrated on redirect, *every* condition does not need to be the same in the tourism industry for the results of Dr. Austin's study to be generalizable over time. Rather, the *relevant* conditions must be the same. *Cf.* PP Tr. at 238:15-238:20.

### x.    Contrary to BPXP's Contentions, Dr. Bonanno's Research Supports Rather than Undermines Dr. Austin's Study

255.    Dr. Bonanno's research is dedicated to demonstrating that, in evaluating the effects of disasters, the use of averages is inappropriate. As he himself stated "average-level comparisons provide relatively little information about the distribution of responses . . . . Indeed, averaged responses are potentially misleading because they often bear little resemblance to the actual outcome patterns that are typically observed." TREX-013370.003; TREX-233241R at 169:19-169:25, 173:04-173:15.

256.    Therefore, the concept of resilience does not undercut Dr. Austin's conclusion that, in fact, the disaster caused sociocultural harm. Individual resilience is only one outcome and Dr. Bonanno's own research demonstrates that on the order of up to thirty-five percent of people in an affected community are not resilient. PP Tr. at 192:14-193:06.

257.    Moreover, the effort to extend the concept of resilience to a community level is hotly debated within the social science community. The concept, as it applies to communities, is ill defined. While some papers have found that community-level resilience can be increased in

77

response to events like hurricanes, the body of disaster-specific research has found the opposite to be true in the case of technological disasters such as this one, as was further demonstrated by Dr. Austin's research. PP Tr. at 193:07-193:21; TREX-011922.072-.073.

258.    BPXP also argued that Dr. Austin was not qualified to diagnose psychiatric disorders and therefore could not establish impacts of the Defendants' spill on the communities of the Gulf Coast. In so arguing, BPXP was assuming that the only relevant question in determining whether there was harm was whether an individual could be placed in a particular diagnostic category. *See* Rec. Doc. 13772-1; *see also* Rec. Doc. 13856 (the United States' opposition to BP's arguments). Moreover, as shown above, Dr. Bonanno's research shows that a researcher qualified to diagnose mental illness, such as himself, would expect to find the very conditions Dr. Austin reported.

### xi.    BPXP's Witnesses Use Narrow Definitions of Harm and Averages to Inappropriately Dismiss Dr. Austin's Results

259.    BPXP's witnesses like Dr. Scott used narrow definitions of harm to claim that Dr. Austin's study should be ignored. As Dr. Luton recognized, Dr. Austin's methodology was designed to answer a different question than that answered by economic methods and, therefore, her study provided a different (rather than contradictory) answer than that provided by economic methods. Luton Dep. at 45:15-46:12.

260.    In particular, economic analyses are necessarily focused on losses that can be monetized. Dr. Austin's analysis of sociocultural effects is able to capture effects that are not able to be monetized – no amount of money can "erase the disruption of lives and livelihoods, the fracturing of social relationships" and damages "cannot bring back the lives of the people who were lost in this disaster or erase the suffering of their loved ones." PP Tr. at 194:06-194:18.

78

261.    As discussed below, Dr. Scott used average data on tourism and fisheries to claim that *overall* the economic impact of the spill was not harmful. *See infra* § I.F.iv. The use of macroeconomic analyses to examine average effects causes the researcher to lose track of "patterns of losses and gains" – or in the Court's words "winners and losers." PP Tr. at 194:01-194:07; PP Tr. at 2083:01-2083:05; TREX-013113.026-.027.

262.    In short, even BPXP's efforts to mitigate the economic damages were unsuccessful because:

> And so BP did invest resources and respond to the spill. Many people benefited, many people did not. It is that disparity that generates sociocultural harms.
>
> And among those who did not benefit from this disaster were some of the individuals, businesses, and communities that could least afford another blow.

PP Tr. at 239:01-239:06.

## F.    The Spill Caused Serious Economic Harm to the Gulf Coast Communities

263.    The Defendants' disaster caused extremely severe economic harm based on the magnitude of total claim payments, the number of claimants, the geographic scope of harm, and the range of industries impacted. PP Tr. at 694:13-695:17; TREX-013317.006; D-33530; Rec. Doc. 6419 at 2; Rec. Doc. 6266-1 at 2.

### i.    The Claims Process Recognized Damage across Five States

264.    After April 20, 2010, as required by the Oil Pollution Act, the BP Group established a claims process. Rec. Doc. 4907 at 3; Rec. Doc. 6453 at 8-9; Rec. Doc. 2075 at 16; TREX-012340; TREX-012341; Cross Dep. at 154:24-155:11, 157:03-159:10; *see also* 33 U.S.C. § 2714.

265.     During the initial claims process, nearly $400 million in claims for damages to individuals and businesses were paid by the BP Group. Rec. Doc. 4907 at 2; Rec. Doc. 6453 at 8-9.

266.     On August 23, 2010, the claims process was transitioned to the BP created Gulf Coast Claims Facility ("GCCF") from which more than $6.3 billion has been paid for damages to individuals and businesses. Rec. Doc. 6453.

267.     On December 12, 2012, the Court granted final approval of the Plaintiffs' Steering Committee and BP's Economic and Property Damage Class Action Settlement ("Economic Settlement"). Rec. Doc. 8138.

268.     The class of persons eligible for compensation under the Economic Settlement ("Economic Class") consists of individuals who or businesses that have lived, worked, owned property, leased property, etc., in Louisiana, Mississippi, Alabama, and certain coastal counties in eastern Texas and western Florida, as well as specified adjacent Gulf waters, bays, etc. Rec. Doc. 6418 at 4-6; Rec. Doc. 6269-2.

269.     The structure and definition of the Economic Class was determined by the scope and nature of the Defendants' disaster: it consists of more than one-hundred thousand individuals and businesses dispersed across the Gulf Coast that either (1) have already filed short-form joinders; (2) have claims pending before the GCCF; (3) filed a separate lawsuit; or (4) were harmed by the Defendants' spill but have not filed a claim. Rec. Doc. 6418.

270.     The Economic Class includes a wide array of individuals and businesses, all of which were disrupted, in varying degrees, by the Defendants' oil spill and response. Rec. Doc. 6418; Rec. Doc. 6276-1.

271.    Economic Class representatives include a seafood merchant, realtor, restaurant owner, dolphin tour operator, charter boat operator, property owner, commercial & subsistence use fisherman, shrimper, land developer, owners of vessels used during the response through the vessels of opportunity program and an oyster leaseholder. Rec. Doc. 8138 at 27-28.

272.    Under the Economic Settlement, Economic Class members can submit multiple claims for compensation for the following types of harm arising from the Defendants' violations: Economic Loss (individual loss of wages, business economic loss, multi-facility business economic loss, start-up business economic loss, failed business economic loss, failed start up economic loss); Property Damage (loss of use/enjoyment of real property; coastal real property damage, wetlands real property damage, realized real property sales loss); Vessels of Opportunity Charter Payment; Vessel Physical Damage; Subsistence Damage; Seafood Compensation Program. Rec. Doc. 6418; Rec. Doc. 6276-1; Rec. Doc. 6269-2 at 2.

273.    As of December 31, 2014, 292,566 Claim Forms and 231,219 Registration Forms have been submitted to the Settlement Program. 12,141 additional Claims Forms have been started but not yet fully completed or submitted. As of December 31, 2014, the Settlement Program has made $4.35 billion payments on 74,278 claims. Rec. Doc. 14101 at 2-3, 14; *see also* Cross Dep. at 164:16-164:24, 166:19-167:14, 168:14-168:23; TREX-012346; TREX-012347.

274.    Claim payments relating to economic harms total approximately ten billion dollars; this total represents a rough estimate of a subset of the economic harm caused by the oil spill. TREX-013317.006, .042-.045; D-33504.

275.    Economic harms that are not included in the ten billion dollar estimate include natural resource damages, damages suffered by the states, damages suffered by individuals who

did not file claims or whose claims are still under review, and harms that were excluded from the court supervised settlement program such as losses suffered in the oil and gas industry, the real estate development industry, the banking, financial, and insurance industry, and the gaming industry. PP Tr. at 710:22-712:14; TREX-013317.042-.044; D-33511.

276.     As of July 2014, 86,000 claims had not yet been reviewed, representing thirty-one percent of all claims that had been filed in the Court Supervised Settlement Program. PP Tr. at 712:01-713:11; TREX-013317.043-.044; D-33510.

277.     Economic harm caused by the oil spill stretched across a wide geographic region. As shown in Figure 23, counties and parishes in which more than $100 million was paid through the GCCF are depicted below in the darkest red color. PP Tr. at 694:19-695:12; D-33512. BP received claims from more than six different states. Cross Dep. at 108:09-108:23; TREX-012324.



Figure 24: Total Paid to GCCF Claimants by County (D-33512)

278.    The oil spill impacted a wide range of economic activities, and ripple effects "reach[ed] out into the fabric of the entire Gulf Coast region and economy." PP Tr. at 697:21-698:25; TREX-013317.037.

### ii.    The Claims Process Provides a Good Estimate of the Economic Harms

279.    Claim payments are a reliable source of information for determining the severity of economic harm. PP Tr. at 699:01-699:04; D-33537.

280.    The benchmark period technique used by the claims administrators, *e.g.,* comparing a business's profits after the spill to its profits before the spill, is widely accepted in economics. PP Tr. at 699:05-699:22; D-33537.

281.    The dataset of claims payments is at or above the level of rigor and vetting that would appear in the average economics dataset because claimants were required to provide documentation such as tax records, photographic evidence, and pay stubs, and these records were evaluated by trained assessors. PP Tr. at 699:23-700:14; D-33537; TREX-230308.005.

282.    The BP Group was involved in establishing claims protocols and reviewing claims paid in all three claims programs. TREX-013317.033-.034. For instance, the BP Group reviewed and commented on GCCF methodology as well as special claims paid by the GCCF. TREX-230442.003. Similarly, the BP Group had the ability to appeal eligible claims paid under the Court Supervised Settlement Program, and as of July 2014 it had appealed more than twenty percent of these claims. PP Tr. at 701:19-703:10; TREX-231876.019.

283.    A portion of claims payments under the GCCF and Court Supervised Settlement Program compensated claimants for losses they had not yet experienced at the time of their claim. PP Tr. at 703:11-703:20.

284.     It is valid to rely on the total claims paid in analyzing economic harm from the oil spill even though some of these claims payments included a payment for prospective losses for two reasons. PP Tr. at 704:14-704:17. First, expert economists were consulted in determining how future losses should be calculated. TREX-013319.009; PP Tr. at 703:21-703:25, 704:14-704:20. Second, economists routinely reduce a stream of future losses to a present value. PP Tr. at 704:14-705:01.

     **iii.**    **BPXP's Witnesses Acknowledge There Was Serious Economic Harm**

285.     BPXP's witness Dr. Scott concedes that the oil spill caused negative economic effects in the fishing and tourism industries. PP Tr. at 2035:02-2035:06, 2036:12-2036:16.

286.     Dr. Scott acknowledges that in the immediate aftermath of the spill, the public voiced concerns that the spill would impact the quality of seafood harvested from the Gulf. TREX-013067.007.

287.     Dr. Scott agrees that in Alabama's primary tourism destinations of Orange Beach, Gulf Shores, and Fort Morgan, the revenue per available room ("RevPAR") for May 2010 was down nearly nine percent relative to May 2009, and in June through August 2010 it was off by a third compared to comparable months in 2009. PP Tr. at 2050:20-2052:03; D-34787.1; TREX-013067.027. In these communities, the sole industry is tourism. PP Tr. at 2050:20-2052:03.

288.     In the Florida Panhandle, where the two important industries are tourism and military, RevPAR was down thirteen percent during the summer of 2010 as compared to 2009. PP Tr. at 2053:13-2054:11; D-34787.2.

289.    The summer months are the peak season at Florida panhandle and Alabama beaches, and tourism businesses in these areas earn a significant portion of their revenues in the summer months. It was during these summer months that "these areas took a hit." PP Tr. at 2113:01-2113:23.

290.    For the non-Panhandle Florida Gulf counties there was a statistically significant decline in the RevPAR of just over eighteen percent in 2010. TREX-013073.023.

291.    There was a drop in volumes harvested across finfish, shrimp, oysters, and crab in 2010. PP Tr. at 2073:11-2074:11; TREX-013067.040; TREX-013069.066; D-34802.

292.    Dr. Scott finds that the total documented loss of commercial fishing industry revenue in 2010 compared to the 2007-2009 average annual revenue was $111.8 million. TREX-013069.064. He compares this lost 2010 revenue to payments BP provided or promised to fishermen, but can only say in the aggregate that the payments exceeded his calculated loss, he cannot say whether all fishermen were in fact compensated. PP Tr. at 2082:09-2083:05; D-34798.1.

293.    Dr. Scott compares the 2010 loss in commercial fishing industry revenue to the $2.3 billion seafood compensation fund. D-34798.1. The $2.3 billion, however, was not paid out in 2010. As the Court noted at trial, as of 2015 only half of that $2.3 billion fund has been paid out. PP Tr. at 2071:10-2072:19.

iv.    **Dr. Scott's Claims of Recovery in the Tourism Industry are Incorrect**

294.    Dr. Scott asserts that claims payments for harm experienced in 2011 and 2012 are unsupported by evidence that economic harm from the oil spill persisted through those dates. TREX-013069.017. There is evidence, however, that economic harm continued in those years; in

85

particular, portions of the real estate and tourism sectors experienced economic harm caused by the oil spill through 2012. PP Tr. at 705:02-705:08; TREX-013319.011-.016.

295.    Increased tourism revenues in 2010 or 2011 as compared to 2009 do not demonstrate recovery from the oil spill because those revenues would have been increasing nationwide as part of the recovery from the national recession. PP Tr. at 743:21-745:11; TREX-013067.024-.039; D-34786.1; D-34787; D-34788; D-34789.1; TREX-013318.013-.014; TREX-013319.010-.016.

296.    One can isolate effects of the spill as opposed to the recession by comparing growth in counties severely affected by the spill versus growth in counties less affected or unaffected by the spill. TREX-013318.015; TREX-013319.010-.016.

297.    Due to the oil spill, real estate income in Florida panhandle counties and Florida Gulf Coast counties did not grow as quickly as real estate income in Atlantic coast counties in the period from 2010 to 2012. PP Tr. at 705:09-707:15; TREX-013319.015; D-33520.

298.    As shown in Figure 24, due to the oil spill, hotel revenues in the Florida panhandle and Mississippi gulf coast did not grow as quickly as hotel revenues on the Florida



Figure 25: Hotel Revenue Data Showing Ongoing Harm (D-33519; TREX-013318)

Atlantic coast, or Mississippi inland counties, respectively in the period 2011 through 2013. TREX-013319.012-.013; PP Tr. at 708:01-709:17. The ongoing harm to these two regions' tourism sectors was statistically significant. PP Tr. at 710:14-710:21; TREX-013319.013; D-33519.

299.    To the extent that BP's spending in the wake of the oil spill reduced economic harm, that spending reduced claim payments. Therefore, Dr. Mason's analysis reflects economic harm that occurred despite BP's prophylactic expenditures. PP Tr. at 713:21-714:05; TREX-013319.016-.017.

### v.    Dr. Scott Ignores Impacts Outside of the Tourism and Fisheries Industries

300.    Dr. Scott's opinion regarding economic harm from the oil spill is limited to fisheries and tourism. PP Tr. at 2107:25-2108:16. Dr. Scott did not analyze data from any other industry such as any data regarding the oil spill's impacts upon the real estate industry, the shipbuilding industry, or air travel. PP Tr. at 2112:09-2112:25.

301.    The evidence establishes economic effects outside the tourism and fisheries industry. In 2011, Dr. Scott prepared a report entitled "The Energy Sector: Still a Giant Economic Engine for the Louisiana Economy." TREX-013070. In that report, Dr. Scott notes that "One of the sectors that was hardest hit by the after-effects of the oil spill was the oil and gas extraction sector." D-33581; TREX-013070.054. However, Dr. Scott did not include in his reports any information regarding harm to the oil and gas industry from the oil spill. PP Tr. at 2110:19-2110:21.

302.    The oil spill reduced governmental revenues in Alabama, including revenues from taxes, revenues from individuals visiting state parks on the Gulf coast, and revenues from

saltwater fishing licenses. One effect of reduced tax revenues was reduced funding to the state's K-12 education programs. Rec. Doc. 13512-5 at 4-6.

303.    Louisiana charter businesses reported to the FOSC that April to July represented seventy-three percent of their yearly income. TREX-009495.085.

### vi.    Dr. Scott Improperly Aggregates Effects in Order to Mask Them

304.    Dr. Scott's analysis of finfish aggregated hundreds of species together. If a particular species of finfish was affected by the oil spill, thereby impacting fishermen who specialize in that species, his data would not reflect those impacts. PP Tr. at 2117:12-2118:19; D-33594.

305.    Dr. Scott relies upon a paper by Dr. Joseph Aldy. TREX-013069.008-.010; TREX-013118. Dr. Aldy's report finds no net employment effects from the oil spill in 2010, but Dr. Aldy's report includes no data on employment effects after 2010 when response workers were no longer offsetting employment effects from the spill. PP Tr. at 805:07-805:21; PP Tr. at 2047:24-2048:04, 2118:24-2119:01.

306.    Dr. Aldy's report finds no net employment effects in 2010 when all areas of the gulf are aggregated together. But when the regions are separated out, Florida experienced significant employment harm in 2010. Specifically, Dr. Aldy concludes that there were 50,000 fewer jobs in the Florida coastal counties in 2010 because tourists believed that oil was going to impact the Florida gulf coast but there were no response workers in the area. PP Tr. at 2119:18-2120:22; TREX-013118.012.

### G.    Defendants' Violations Imposed a Significant Burden on the United States

#### i.    The Largest and Most Complex Response in American History

307.    The response to Defendants' disaster was one of the largest response efforts undertaken by the Coast Guard. In terms of effect on the Coast Guard, this spill is comparable only to responses such as those to the September 11, 2001 attacks and Hurricane Katrina. PP Tr. at 103:09-103:19. Without diminishing the significantly greater loss of life in the September 11, 2011 attacks, it is worth noting that the response to that event, unlike the *Deepwater Horizon* response, was managed out of the home districts and, therefore, the responders could go home to their families at the end of the day. PP Tr. at 103:20-104:06. While the response to Hurricane Katrina did call on resources from around the country, it too differed from the *Deepwater Horizon* response because the large deployment only lasted for a couple of weeks. PP Tr. at 103:20-104:06.

308.    In the words of the National Incident Commander, the spill was "more analogous to the challenges posed by Apollo 13 than the *Exxon Valdez* spill of 1989." TREX-009100.005.

#### a)    The Governance and Organization Was Complex

309.    Oil spill response under the National Contingency Plan is governed by what is known as the Incident Command System ("ICS"). The ICS is a way to manage responses to ensure that resources and personnel are used efficiently. PP Tr. at 75:06-75:09. One of the principles of the ICS is to ensure appropriate span of control – *i.e.*, ensure that any one supervisor's span of responsibility does not exceed his or her ability to track and manage. PP Tr. at 75:09-75:13.



Figure 26: Overview of Organization of Government's Response Structure (TREX-009105.027)

310.    The response to the Defendants' violations required the most complex application of the ICS used in oil spill response in American history. PP Tr. at 77:06-77:08; TREX-009105.023 ("Because of the size and scope of the spill, the response organization required to combat it was unique in many respects."); TREX-013021.001 ("In the words of a nationally recognized ICS expert, Mr. Charles Mills, President of Emergency Management Systems Incorporated, 'This was the most complex incident managed with ICS in the history of its use.'"); Laferriere Dep. at 77:08-77:14.

311.    Within the ICS, the response included several levels of governance. First, there was the National Incident Command or NIC, located in Washington, D.C. The NIC coordinated the "whole of government" response and was responsible for representing the Secretary of Homeland Security (who is responsible for national incidents under Homeland Security Policy Directive 5), consulting on high-level issues at the cabinet level, and dealing with national level

issues (legal, economic, policy, etc.), thereby freeing the FOSC to focus on more spill-specific issues. TREX-009105.023; TREX-007802.002; PP Tr. at 77:22-78:02. This was the first time that the United States instituted a National Incident Command. TREX-007802.002; TREX-009100.008, .009; PP Tr. at 77:09-77:14; TREX-009105.023. Admiral Allen was designated the National Incident Commander on May 1, 2010. Rec. Doc. 14021 at 12 ¶ 56; PP Tr. at 78:03-78:05; TREX-009105.024.

312.    Second, there was the Unified Area Command which was located in New Orleans, Louisiana (after a short period in Roberts, Louisiana) and oversaw operational activities across the entire Gulf Region. TREX-009105.023; *see* Rec. Doc. 14021 at 12 ¶ 58. The Unified Command included the Coast Guard, BPXP as the responsible party, and the affected states. PP Tr. at 105:20-105:24; TREX-009105.025; Allen Dep. at 190:23-192:15. The Unified Area Command served to broker critical resources across the five states and serve as a conduit for information. This Command was strategically focused – *i.e.*, looking at the larger picture. PP Tr. at 78:06-78:21. The Unified Area Commander also served as the Federal On-Scene Coordinator ("FOSC"). PP Tr. at 76:17-76:20; TREX-009105.024.

313.    Third, there were five Incident Command Posts, one in each of the Gulf States, established to coordinate operations with local and regional elected officials, the two largest and most active of which were in Houma and Mobile. TREX-009105.023. The Incident Command Posts focused on tactical issues – addressing the particular mission of the post. For Mobile that meant the oil reaching the shore, for Houma that meant offshore surface oil and oil reaching the shore in Louisiana, and for Houston, that meant source control. PP Tr. at 78:13-78:21. The Incident Commanders at each ICP were delegated certain decision making authority, particularly

with respect to spending, by the FOSC, making each Incident Commander an FOSC Representative. PP Tr. at 76:14-76:16, 77:01-77:05; TREX-009105.023.

314.    Fourth, there were branches and staging areas established to coordinate the efficient and effective distribution and use of critical resources across regional boundaries. TREX-009105.023. For instance, in Louisiana there were nine branches (also known as forward operating bases) that were set up to ensure appropriate span of control, some of which were large enough to be incident command posts themselves. PP Tr. at 77:15-77:21. In addition, by May 17, 2010, the Unified Command had established "17 staging areas [that were ] in place and ready to protect sensitive shorelines," including: Dauphin Island, Alabama, Orange Beach, Alabama, Theodore, Alabama, Panama City, Florida, Pensacola, Florida, Port St. Joe, Florida, St. Marks, Florida, Amelia, Louisiana, Cocodrie, Louisiana, Grand Isle, Louisiana, Shell Beach, Louisiana, Slidell, Louisiana, St. Mary, Louisiana; Venice, Louisiana, Biloxi, Mississippi, Pascagoula, Mississippi, and Pass Christian, Mississippi. TREX-009627.009; TREX-013514.004.

315.    In addition to the formal governance by the Unified Command, other federal agencies had representatives within the ICS. For instance, the Environmental Protection Agency ("EPA") had a representative at the Unified Command and participated in the sampling used to evaluate safety measures. Cross Dep. at 102:16-103:02, 106:16-106:25; TREX-012322; PP Tr. at 90:18-90:22.

316.    Similarly, NOAA had responsibility for providing scientific support to the On-Scene Coordinator, monitoring and determining where the oil was and where it was going based on weather forecasts and oceanographic models, determining whether and where to close or open

federal waters in the Gulf to fishing, and lead the natural resource damage assessment process. Lubchenco Dep. at 46:02-46:25, 47:04-47:16.

317.    In addition to the ICS command structure, the response involved both the National Response Team and the Regional Response Teams. TREX-009105.024. The Regional Response Teams are co-chaired by EPA and the Coast Guard. PP Tr. at 90:13-90:17.

318.    The Regional Response Teams develop the regional contingency plans that guide response actions and "can advise the Federal On-Scene Coordinator, or any member for that matter of the incident command, incident management team, on how to proceed forward with the response." Laferriere Dep. at 63:22-64:08. The Teams serve as a "force multiplier" – *i.e.,* an organization that can quickly provide resources needed for a response. Laferriere Dep. at 65:02-65:12.



Figure 27: The Regional Response Teams (TREX-009105.031)

319.    The Regional Response Teams also serve "great resource" for an FOSC, acting as a sounding board and advisor when the FOSC is faced with a decision that "might be subject to some scrutiny, congressionally or publicly." Laferriere Dep. at 66:02-66:13.

320.    The national implications of the spill required high-level attention from the Regional Response Team, National Response Team, and Cabinet Secretaries who ultimately became involved in every "consequential decision" or "major adjustment in the direction provided to" the BP Group. Allen Dep. at 634:24-634:25, 635:02-635:12.

321.    The unique scientific questions raised by the nature of Defendants' violations required unprecedented contributions from the United States' science agencies. The National Incident Command established an Interagency Solutions Group or IASG that had representatives from twenty federal agencies and departments. TREX-009105.028-.029. In addition, the Departments of Energy ("DOE") and Interior ("DOI") provided over two hundred scientists from the National Laboratories and the U.S. Geological Survey. TREX-009105.046.

322.    In addition to the substantial response by the Coast Guard, many other federal agencies contributed to the response. *See* PP Tr. at 1294:03-1294:12 (recognizing the government provided vessels and personnel to the response). For example, Table 2 identifies at least some of the roles played by other federal agencies.

| Table 2: Small Sample of Federal Agencies' Contributions to the Response | |
|---|---|
| Agency | Role |
| Air Force | The Air Force, among other things, provided the Aviation Coordination Center complete with trained air traffic controllers and flew sorties for the response. |
| Department of Homeland Security, including the Coast Guard, CBP, FEMA and Secret Service | The Coast Guard's role is discussed at length elsewhere, but other components of DHS provided response actions. Customs and Border Protection provided air interception aircraft to provide air traffic control. |
| DOE, including the National Laboratories | DOE provided nearly two hundred scientists to the source control and flow rate efforts. |
| DOI, including MMS, FWS, USGS, and NPS | DOI had a central role in the response. FWS alone provided seventeen of its workforce to provide wildlife monitoring and other response actions. USGS scientists joined the team of 200 scientists working to cap the well. |
| DOJ, including the U.S. Marshal's Service | DOJ provided public affairs specialists to the response. |
| NASA | NASA provided storage facilities for the equipment recovered from the ocean floor, computing resources to store response data, and provided Stennis Center resources for the launching of dispersant sorties, imagery by satellite, and U-2 overflights |

| Table 2: Small Sample of Federal Agencies' Contributions to the Response | |
|---|---|
| **Agency** | **Role** |
| HHS, including CDC, FDA, and NIOSH | HHS and its components undertook "actions to prevent injury, illness and exposure to hazardous substances among response personnel and the general public, monitor the short- and long-term potential health impacts of oil and dispersants, and ensure the safety of seafood from areas affected by the oil disaster." The FDA participated in the efforts to ensure seafood safety after fisheries were re-opened. |
| National Guard | Approximately 17,500 National Guardsmen participated in the response providing everything from flight support to laying sand bags |
| Navy | The Navy provided ships, including an airship, to the response and also provided mooring and aircraft facilities at Naval Station Pensacola |
| NOAA, including NMFS, NWS, and OSR | NOAA provided more than 12,000 employees, nearly seventeen percent of its workforce, to the response who performed myriad functions including scientific support, weather tracking, wildlife monitoring and rehabilitation. The National Weather Service ("NWS") provided critical day-to-day planning and reports necessary to the response and deployed personnel to the response even though the BP Group initially said NWS was not needed. |
| OSHA | OSHA served as an advisor to the FOSC on worker safety and conducted monitoring of worker safety issues |
| USDA, including NRCS, FNS | The National Resource Conservation Service assisted in securing additional habitat to diminish the impacts on migratory birds. In addition, some people who were unemployed as a result of the spill required food assistance from USDA's SNAP program. |
| Sources: TREX-009100.006; TREX-009105.012, .013, .046, .099, .103, .109, .158, .164, .166, .220, .236, .237; PP Tr. at 1295:01-1295:03; PP Tr. at 97:10-97:17; PP Tr. at 1294:17-1294:25; TREX-012013.014; TREX-011926.001; TREX-012013.014; TREX-009495.045; Cross Dep. at 96:19-96:24, 99:11-99:13, 199:04-199:15; TREX-012319; TREX-012322; Lubchenco Dep. at 27:08-28:07; TREX-012013.014; TREX-012324; TREX-012359; TREX-012360; TREX-012362; TREX-012363; TREX-011926.001; TREX-009495.045. | |

323.    The states also played large roles. For example, the Louisiana governor had an emergency center where BP Group had representatives and routinely met with the governor's staff. Cross Dep. at 111:02-111:10, 111:15-112:21, 178:22-179:19, 180:06-180:11; TREX-012351; TREX-012353.

324.     NGOs also played a role, especially in community outreach and cleaning beaches. Cross Dep. at 94:18-95:12.

325.     Twenty-eight different countries volunteered assistance. PP Tr. at 1552:02-1552:22; TREX-012319; TREX-012320; TREX-012322; Cross Dep. at 98:13-98:20.

326.     BP's competitors also contributed significantly to the response. BPXP relied on emergency response facilities that had been built by its competitor Shell. PP Tr. at 1542:12-1543:15. Similarly, Chevron leased space to BP America Inc. for the response for a single dollar. TREX-230370. Exxon, Shell, and Chevron all also loaned expertise and equipment where necessary. PP Tr. at 1552:02-1552:22; TREX-012319; TREX-012320; TREX-012322; Cross Dep. at 95:16-95:25, 98:13-98:20.

327.     In all, more than a ninety different organizations assisted in the response, including regulatory, academic, military, and other oil companies. Cross Dep. at 95:16-25.

### b)     The Number of Response Workers Was Staggering

328.     The massive response also required thousands of responders. At the peak of the response, 2,900 Coast Guard employees were involved. PP Tr. at 94:08-94:10; TREX-012321; Cross Dep. at 103:20-104:03, 107:02-107:04. In the first year alone, 8,000 Coast Guard personnel rotated through the response. PP Tr. at 94:12-94:14. By contrast, only 300 Coast Guard personnel were required for the response to the oil spills resulting from Hurricane Katrina. PP Tr. at 94:15-94:20.



Figure 28: A Briefing Session at the Unified Area Command (TREX-009105.209)

329.    In total, the Coast Guard deployed roughly fourteen percent of its personnel to respond to the spill at the peak. PP Tr. at 96:09-96:16.

330.    Agencies not usually involved in oil spill response also provided significant numbers of response workers. For instance, more than three hundred public affairs officers from more than nine agencies helped staff the external affairs function during the response. TREX-009105.220.

331.    As of September 15, 2010, "[m]ore than 19,000 people from the BP Group staff, contractors, governmental and industry employees and volunteers [were] at sites providing ongoing response." TREX-012023.004. Notably, only about 2000 of these people were employees from BP, only 2.5% of its workforce. Cross Dep. at 103:20-104:03, 107:02-107:04; TREX-012321; TREX-012023.004; TREX-006033.

332.    As of July 1, 2010 there were also 20,570 volunteers trained and working on the response, and hundreds of thousands of calls were received from people offering to help. Cross Dep. at 92:10-25, 93:14-93:21, 94:09-94:17; TREX-012319.020.

### c)    The Resources Required Were Also Staggering

333.    The Defendants' disaster demanded resources, so much so that the Admiral did not "remember ever saying, okay, we've got enough." J. Watson Dep. at 78:04-78:11, 419:06-420:10. In fact, as the Admiral testified "throughout [the Coast Guard] wanted more resources, more skimmers, more assets as close to the source as possible because that's where the oil was the most readily available for recovery before it started to emulsify . . . and string out over miles and miles of Gulf of Mexico." J. Watson Dep. at 387:09-388:01, 388:03-388:10, 388:12-388:13.

334.    The response required the use of over 6,300 vessels including Coast Guard cutters. In other words, the response used more vessels than were used in the D-Day invasion. TREX-009100.005-.007.

335.    The amount of air traffic required to address the response required the establishment of an Aviation Coordination Center at Tyndall Air Force Base in Florida. This center allowed the Unified Command to control, de-conflict, and monitor the air space over the affected offshore waters and coastline. More than 120 airplanes flew under the air traffic control of the Center. TREX-009100.006.

336.    The amount of boom required was unprecedented: "The Unified Area Command established new supply chains for boom, skimmers, dispersants, and scores of other equipment. We identified every foot of fire boom in the world. We procured boom from all domestic manufacturers, and mobilized all East and Gulf Coast offshore skimming vessels. As a result of demand, we procured nearly all nationally produced snare, containment, and fire boom, and engaged every domestic boom supplier to boost manufacture from a few thousand feet per week



Figure 29: Screenshot from ERMA (TREX-013249)

before the spill to over a quarter-million feet of boom per week at the height of the response."
TREX-009100.007.

337.     The information technology needs for the response were also monumental. The
Unified Command needed to establish an entire infrastructure and server system for the response.
In addition, the Unified Command established a website "to push information out on what the
response organization was doing." TREX-007802.002, .006; *see also* TREX-009105.128-.129
(More than 1,000 laptops, 25 servers, hundreds of back-up tapes, hundreds of mobile phones,
several desktop computer towers, external hard drives, and several cameras were shipped to the
Central Archive" as they were no longer needed for the response).

338.     In addition, tracking the large number of workers and locations, as well as the
large amount of sampling and other environmental information, required coordination. The
Unified Command therefore used a computerized system to create the "common operating
picture" to make sure that everyone involved in the response was "operating off the same sheet
of music." PP Tr. at 79:08-79:25. This computerized system, known as ERMA, gave all the
decision makers access to critical information such as resources at risk, where skimmers were,
and other such information. PP Tr. at 80:01-80:22.

339.     The Unified Command also undertook other coordination efforts including the
issuance of Incident Action Plans, initially on a daily basis and then as the response wore on for
different operating periods. There were also daily calls with the branches, the Governor's Office
of Homeland Security and Environmental and Emergency Preparedness to keep track of
emerging issues, daily meetings regarding source control, daily meetings of the Incident

Commanders, and many other regularly scheduled coordination points. PP Tr. at 79:12-79:18;

Rec. Doc. 14021 at 12-13 ¶¶ 60-66; Laferriere Dep. at 77:25-78:08, 78:10-78:11.

### ii.      The Response Burdened the United States in Many Ways

340.    This whole-of-government response strained the resources of all participating

agencies:

> Sustaining the number of people required to direct response operations for a spill
> of this size and long duration, proved difficult for every government agency.
> Agencies that regularly participate in oil spill response have a cadre of highly
> trained people experienced in spill response work. The response soon outgrew the
> number of those people in almost every agency, including the Coast Guard. This
> posed two interrelated challenges. The first was simply staffing the response
> itself, given that all the agencies that participated had other missions to fulfill.
> Finding personnel to support the response effort while still maintaining enough
> staff to enable agencies to carry out their other missions proved difficult. Second,
> the number of people required exceeded the number with significant training and
> experience in spill response. Thus these agencies, including the Coast Guard, had
> to develop just-in-time training methods to bring in the numbers or personnel
> required to oversee operations and provide them with the training necessary to
> perform their functions.

TREX-009105.013.

341.    At the outset of the spill, pursuant to Coast Guard doctrine, Admiral Landry

"tapped into the Incident Management Assist Team (IMAT), and began pulling in people from

outside the impacted District to help. They did not pull from any gulf coast sectors, in case they

were to become part of the incident." Care had to be taken, however, because each "sector

needed to ensure they could fulfill their mission requirements." TREX-007802.001.

342.    While oil spill response and search and rescue are the Coast Guard missions

discussed in the trial of this case, when considering the effect of removing fourteen percent of

Coast Guard personnel from their regular duty stations, one must note that the Coast Guard has

100

other critical missions including drug interdiction, migrant operations, vessel inspection, and aids to navigation. PP Tr. at 96:01-96:08; Laferriere Dep. at 22:11-22:18.

343.    Unlike many military organizations, the Coast Guard does not have surge forces other than its reserve personnel. Therefore, when Coast Guard personnel were deployed to the response, those who were not deployed had to take on additional duties to make up for the reduction in personnel. PP Tr. at 95:11-95:20. This issue rose to the top of the Coast Guard: To fill the function of National Incident Commander, the Commandant of the Coast Guard, Admiral Allen, had to leave the management of the Coast Guard in the hands of his Deputy. TREX-007802.002.

344.    Moreover, the spill occurred at the peak of transfer season. At the time the spill began, about one-third of the active duty personnel in the Coast Guard were preparing to transfer to new duty stations. This season typically creates a temporary personnel gap as people are moving and being trained in their new duties. PP Tr. at 96:17-96:25. As a result, when deployments began to drain personnel from the Sectors, those deployments aggravated existing personnel shortages. PP Tr. at 97:01-97:09.

345.    NOAA provides scientific support coordinators for each spill, who serve as advisors to the Coast Guard on scientific issues during oil spill responses. These coordinators are geographically stationed around the country, and in order to meet response needs, NOAA cycled every single active scientific support coordinator through the response and even had to call some back from retirement. PP Tr. at 98:14-98:20.

### H.    Defendants' Violations Caused Risks outside the Gulf Coast Communities

346.    There was not enough equipment in the Gulf of Mexico to respond to the Defendants' oil spill. Allen Dep. at 157:25-158:06, 158:14-159:23. As a result, the EPA and the Coast Guard issued an emergency rule "that relaxed the requirements for vessel and facility operators to have a certain number of or certain amount of oil spill response equipment at the ready in the case they had a spill." PP Tr. at 99:01-99:15.

347.    Pursuant to the emergency rule offshore skimmers and other skimming vessels were allowed to leave where they were stationed around the country and go down to the Gulf. PP Tr. at 99:17-99:20.

348.    The Coast Guard received opposition to allowing oil spill response equipment to leave stations to go to the Gulf. For instance, the State of New Jersey "had great objections to . . . having the equipment leave." PP Tr. at 100:03-100:07. The State was concerned that "the loop current would capture some of the oil and . . . bring it up the east coast and foul New Jersey beaches" and "there were also concerns had there been another spill somewhere along [the New Jersey] border." PP Tr. at 100:08-100:15.

349.    The response also created risks because the Coast Guard had to activate fifty percent of its reserve forces to meet the demands of the spill. PP Tr. at 95:03-95:05. When Coast Guard reservists are involuntarily activated, they cannot be re-activated again for another two years. PP Tr. at 94:24-95:02; TREX-009105.013. Accordingly, fifty percent of the Coast Guard's reserve forces would not be available if there was another large natural or man-made disaster in the two years following the spill. PP Tr. at 95:06-95:10.

350.    The nation's attention was turned to the oil spill, but the Department of Homeland Security had to focus on the spill and maintain vigilance on its other critical missions. For instance, on the evening the NIC was appointed, there was an attempted terrorist attack in New York City. There were other critical events occurring across the nation, including flooding in Nashville, Tennessee. TREX-007802.002, .005.

351.    The spill further created a risk to other waters:

a.    Ships passing through the Gulf could be coated in oil which would be carried to other locations. TREX-009495.180 ("Safety Zone – MTSRU – notice on how shipping can travel through oil – Gary Lagrange etc. not to impede commerce.").

b.    Second, the spill occurred at the beginning of hurricane season. This created the risk that a storm could carry water, particularly into the loop current and transfer the spilled oil outside the Gulf of Mexico. PP Tr. at 175:23-176:01; PP Tr. at 100:08-100:15. In mid-May, a tail of oil actually entered the northern part of the loop current, which



Figure 30: Vessel Decontamination Locations (TREX-009105.148)

"created a potential pathway for oil to be transported to the Florida Keys, Cuba, or the Bahamas." TREX-009105.049.

**I.      The Defendants' Violations Caused Serious Environmental Harm**

352.    The Defendants' violations did result in serious actual and potential harm to a number of components of both offshore and coastal systems. Everywhere the oil went, it created harm. PP Tr. at 341:17-341:24; TREX-013183.004.

353.    "Actual harm" to the Gulf ecosystem occurred where there was a demonstrated effect that altered the natural functions and populations in an ecosystem. PP Tr. at 342:11-342:20; TREX-013183.007.

354.    "Potential harm" to the Gulf ecosystem occurred where the evidence suggests harm was probable, but it cannot be unambiguously demonstrated that it actually occurred. For example, in light of the toxic levels of PAH exposure in Gulf waters and initial research on the Defendants' disaster, harm to Gulf fish embryos is expected. PP Tr. at 342:23-325:10; TREX-013183.007-.008; TREX-013330.030.

355.    "Potential harm" may be proven to be actual harm over time. Similarly, possible harm not rising to the level of "potential" may rise to the level of "potential" or "actual" in the future PP Tr. at 343:11-344:04; TREX-013183.008; TREX-013183.042.

356.    Oil toxicity to marine organisms follows the same general processes discussed *supra* § I.D.iii.c., however the exposure pathways and animal sensitivity can differ. PP Tr. at 486:02-486:07, 487:21-488:06.

357.    Animals and other biota exposed to oil from the spill suffered acute harm as well as chronic or sublethal harm. Acute harm involves rapid disruption of neural and respiratory

systems, leading to rapid state of narcosis followed by death. PP Tr. at 486:21-487:20; TREX-013330.011; D-32614. Chronic harm involves cellular, tissue, and organ damage (*e.g.,* growth deformities, skin lesions, edema, DNA changes, and cancers) that negatively affect the survival of an individual organism over a longer period of time – either through delayed death due directly to exposure or decreased likelihood of survival from impairments to growth, abilities to forage and avoid predators, or reproductive fitness – which may ultimately result in population level impacts. Impacts beyond acute harm are challenging to detect, take time to play out, and may go undetected even though the population is affected over time. PP Tr. at 346:19-347:23; TREX-013183.009; PP Tr. at 486:21-487:20; TREX-013330.011; D-32614.

358.    Life stage has a huge impact on the sensitivity of a marine organism to chemical toxicity. Early life stages (embryos, larvae) are the most sensitive: for example, fish embryos are two and three orders of magnitude more sensitive than their adult counterparts and be significantly impacted by exposures of as little as 1 part per billion (ppb) PAH. Uptake of PAHs at this stage is rapid, often occurring within minutes. Early life stages have many sensitive tissues and developmental processes that can be impacted and repair mechanisms (such as livers to process toxins) are poorly developed, but the ultimate toxic effects may not show up until after the organism has more fully developed. PP Tr. at 487:21-488:06, 489:05-489:17; TREX-013330.012, .025.

359.    Early life stages, especially transparent embryos and larvae floating in the upper meter of the water are vulnerable to "phototoxicity," where UV sunlight strikes an absorbed PAH and enhances its toxicity by one or more orders of magnitude. PP Tr. at 488:08-488:22; TREX-013330.018.

360.    Bioassays are lab studies conducted on marine life to examine what dose of a chemical causes a particular type of toxic effect (*e.g.,* narcosis, edema, DNA changes, etc.). PP Tr. at 509:07-509:17; TREX-013330.012-.013. Bioassay results are often summarized by a number indicating the chemical concentration that induced a toxic mechanism response in a significant percentage (twenty percent or greater) of the tested subjects. For example, a lethal concentration is referred to as an "LC" and is used in determining acute toxicity thresholds looking at narcosis (mortality) as an end point. An effective concentration, or "EC," is the concentration at which a sublethal or chronic type of effect, such as an edema or lesion, is observed. Bioassays generally report concentrations that cause an LC or EC at a given percentage of the exposed population; for example an "LC50 of 10ppb tPAH" would indicate that exposure to 10 parts per billion of total PAH caused mortality in fifty percent of the exposed subjects and an "EC30 of 1ppb tPAH" would indicate that exposure to 1 part per billion of total PAH caused a negative effect in 30% of the exposed subjects. PP Tr. at 509:07-509:17, 590:08-596:01; TREX-013330.012.

361.    When assessing environmental effects, one is looking for what exposure levels are safe versus those that are harmful. This means focusing on the EC value more than the LC value, since acute mortality is not a protective end point. It also means focusing on the level at which effects are first observed, rather than the EC50 or LC50. PP Tr. at 509:14-509:17, 592:14-594:12, 595:13-596:01; TREX-013330.014-.017.

362.    Bioassay results likely overstate the expected survival rates of exposed organisms in the wild and studies have found that exposed organisms released in the wild have lower

survival potential than what was predicted from the laboratory bioassay results alone. PP Tr. at 513:25-514:10; TREX-013330.014.

363.    The spill occurred at unprecedented depths, exposing a broad ecosystem to potential harm including surface, near-surface, deep water, sediments, and shorelines. PP Tr. at 361:10-361:25; TREX-013183.010; TREX-013183.011-.012.

364.    The Defendants' disaster exposed significant geographic areas of the northern Gulf of Mexico to hydrocarbons, especially surface and deep waters, sediments, and shorelines. PP Tr. at 477:22-478:02, 490:03-490:08; TREX-013330.020-.021; D-32604.

365.    The studies of *Exxon Valdez* spill have documented oil persistence and biological damage for over twenty years. TREX-013330.019, .030.

366.    The Defendants' spill continued for an unusually long period of time (87 days) and the volume released per day was greater than for any spill that continued for a week or more. The protracted release time and volume of the spill increased the spatial and temporal extent to which marine organisms were exposed to the Defendants' oil. TREX-013330.019; D-32604.



Figure 31: Dispersion of Oil Increases Bioavailability (D-32612A)

i.      **Chemical and Natural Dispersion of the Oil Enhanced its Toxicity**

367.    Dispersion is simply the breaking of the oil into smaller droplets and forcing it into the water column. PP Tr. at 355:11-355:16; TREX-009182.033.

368.    Dispersion can be accomplished through natural processes, such as wave action, and chemically. PP Tr. at 483:23-484:08; TREX-013330.008-.009; D-32612A.

369.    Dispersion, whether chemical or physical, speeds natural processes to break up the oil and render the oil constituents, including PAHs more bio-available. PP Tr. at 484:04-484:08; Dupree Dep. at 235:11-235:21; PP Tr. at 1730:14-1730:24; Conmy Dep. at 32:14-32:22, 34:03-34:05, 92:15-95:17, 92:19-92:20; TREX-013330.023; TREX-013332.017. By design, dispersants put more oil in the water and as a result it takes less of the aqueous phase to kill organisms. Barron Dep. at 213:09-213:11, 213:13-214:02.

370.    Because the oil was released 1500 meters below the sea surface, the oil and gas entered cold seawater under high pressure and was hot, creating ideal conditions for physical dispersion of oil. TREX-013330.020. Oil retention at depth was unprecedented in this spill, particularly at the scale observed, and the small droplets of the deep sea plume increased the bioavailability of PAHs. PP Tr. at 477:22-478:01; TREX-013330.020; D-32604.

371.    As discussed above, the Unified Command applied approximately 1.8 million gallons of chemical dispersant subsea and at the surface to enhance dispersion. TREX-013330.019.

372.    For a variety of reasons, there was very limited sampling during and immediately after dispersant applications. A special monitoring mission conducted to analyze the effectiveness of vessel application of dispersants, however, did indicate an increase in

bioavailability of PAHs in the water column due to natural and chemical dispersion. Screening samples taken at one meter depth after effective chemical dispersant applications indicated TPAH levels that were acutely toxic to marine organisms. TREX-242576.003, .005-.006.

373.    Several sources of data have demonstrated the presence of elevated levels of aromatic hydrocarbons from the Defendants' well in waters and sediments of the Gulf of Mexico, including government reports, peer-reviewed publications, and water and sediment chemistry results collected during the response and NRDA. PP Tr. at 490:09-490:13; D-32615; TREX-013330.020-.022; TREX-013332E.003-.016; TREX-233140; TREX-242621; TREX-242677; TREX-242678; TREX-013249; TREX-232045; TREX-231375; TREX-232664; TREX-242689; TREX-232041.

## ii.    Actual Harm Occurred in Deep Gulf Waters

374.    Approximately two million barrels of the Defendants' oil and a significant amount of gas remained in the deep Gulf after it was discharged from the Defendants' well. PP Tr. at 344:17-345:03, 360:03-360:11; TREX-013330.020. This combination of oil and gas mixed at high velocities with sea water as it came from the wellhead, which resulted in the formation of a deep sea plume. PP Tr. at 360:03-360:18; TREX-013183.014-.015. The deep sea plume was trapped in the deep Gulf at a depth of 1,100 -1,300 meters, and was detected as far as 300 nautical miles from the wellhead: over the Louisiana shelf to the southwest and up into DeSoto Canyon off the coast of Destin, Florida to the northeast. PP Tr. at 360:03-361:09; TREX-013183.014-.015; TREX-013183.017.

375.    Water chemistry results demonstrated toxic levels of PAHs in intermediate and deeper waters. TREX-013332E.010-.014. Given the high concentrations of PAH detected in the

deep sea plumes, the area covered by the plume, and the length of exposure from the plumes, toxicity damage is very likely. TREX-013330.029.

a)      **Marine Snow Formed as a Result of the Defendants' Violations**

376.    This deep sea plume provided an abundance of food for the naturally occurring oil eating bacteria in the Gulf. These bacteria eat lighter components of oil and partially consume, but then excrete heavier compounds. The excreted compounds can bind with other organic matter and sink through the water column. This process is called biodeposition or marine snow. PP Tr. at 362:16-363:06; TREX-013183.027; TREX-013183.043.

377.    The Defendants' spill and the subsequent formation of a deep sea plume caused an overgrowth of oil eating bacteria. This overgrowth resulted in the formation of marine snow. PP Tr. at 362:16-363:06; TREX-013183.027; TREX-013183.043.

378.    Marine snow created by the Defendants' oil spill fell down and coated the Gulf seabed with patches of thick oily residue. PP Tr. at 362:16-363:06; TREX-013183.027; TREX-013183.043.

b)      **Rare Cold-Water Corals Were Injured**

379.    Cold-water corals are unique biota and a rare occurrence in the Gulf of Mexico. The coral grow on outcrops in the deep water and some have been carbon dated to be more than four hundred years old. These organisms are so rare that the Department of the Interior has requirements that limit oil and gas drilling activities anywhere near cold-water coral outcroppings. PP Tr. at 364:19-365:02, 367:06-367:21; TREX-013183.025; TREX-013185R.007.

380.    These rare cold water corals were actually harmed by marine snow created by the Defendants' oil. PP Tr. at 364:19-365:20, 367:16-21; TREX-013183.026.

381.    To date, harm to three of these cold water coral colonies has been documented, as

far as twenty-three kilometers from the wellhead.

PP Tr. at 366:16-366:25; TREX-013183.026.

382.    Marine snow smothered these

corals and exposed them to potentially toxic

levels of PAHs. PP Tr. at 362:16-363:14.

383.    The coral's exposure to marine

snow caused tissue death, resulting in the death of



Figure 32: Cold-Water Coral Covered by Brown Flocculent (TREX-013183.026)

individual coral polyps and leaving only a skeleton of the impacted coral. PP Tr. at 365:15-

365:20; TREX-013183.025-.027.

384.    Before the coral tissue could regrow (a lengthy process), marine organisms called

hydroids occupied the space where the dead coral polyps used to live. These hydroids inhibit the

recovery of impacted corals and persist in some areas. PP Tr. at 366:07-366:15; TREX-

231509.001, .011.

385.    While colonies with less than twenty percent coverage may have recovered by

March 2012, corals with greater coverage are likely to have lasting damage and secondary

colonization by hydroids by March 2012. PP Tr. at 366:21-366:15.

386.    Because cold-water corals are slow-growing with low metabolic rates, it is likely

to be many years before one can detect any sub-acute effects on the coral of the oil spill.

TREX-231509.011.

387.    Contrary to BPXP's contentions, it is unlikely that natural seeps caused this damage to corals, because the corals have grown next to natural seeps for many years. PP Tr. at 368:23-369:11; TREX-013185R.007.

388.    BPXP's suggestion that natural seeps caused other damage in the Gulf observed following the spill is not supported and inflates the impact seeps may have on the spill area by citing numbers of seeps present in the entire Gulf of Mexico. PP Tr. at 369:12-371:15; *see also* TREX-231375.002; TREX-232045.041.

389.    Discharges from natural seeps in the entire Gulf of Mexico in one day is less than five percent what the Defendants' well discharged daily. PP Tr. at 369:12-369:21.

### c)    Other Deep Sea Organisms Were Also Injured

390.    Worms, mollusks, crustaceans, and other organisms living in deep sea sediment also were blanketed in marine snow, also exposing them to toxic chemicals in the oil and interfering with the organisms' ability to feed and maintain themselves. PP Tr. at 362:05-364:14; PP Tr. at 344:17-345:03, 362:05-364:14; TREX-013183.004, .027, .043.

391.    Deep sea organisms died, causing a decrease in populations and a reduction of their abundance and diversity. PP Tr. at 362:05-364:14; TREX-232041.001. Deep sea communities are slow to recolonize clean sediments necessary to support population diversity, and harms to impacted areas are expected to take decades or longer. TREX-232041.008.

392.    Deep sea organisms also serve as the base of the food chain in the deep sea region, because they engage in microbial processes on the seabed that regulate the processes by which organic matter is degraded and nutrients are recycled into the water. PP Tr. at 363:15-364:04; TREX-013183.025. Disruption of microbial processes performed by deep sea organisms

results in oxygen depletion on the sea floor, which prevented the decomposition of the oil that had settled there. PP Tr. at 363:15-364:04; TREX-013183.025. This harm to these organisms impacted the food web. PP Tr. at 364:05-364:14.

393.     Harm to deep sea organisms extended over at least fifty-seven square miles centered on the wellhead. PP Tr. at 362:13-362:15; TREX-013183.024-.025; TREX-013183.027; TREX-013183.043.

   iii.     **Actual Harm Occurred in the Gulf's Near-Surface Waters**

394.     As oil floated on the Gulf surface, it was entrained again into the water column by waves and dispersant application. PP Tr. at 345:12-345:14.

395.     Oil entrained in near-surface waters harmed jellyfish, small planktonic crustaceans, protozoans, plankton, phytoplankton, and microbes (collectively, "near surface organisms"), which constitute the base of the food web in the top ten meters of the Gulf. PP Tr. at 345:12-345:16, 372:06-373:02; TREX-013183.018; TREX-013183.022; TREX-013183.004.

396.     These near surface organisms were exposed to toxic concentrations of PAHs, which resulted in death and bioaccumulation. PP Tr. at 373:03-373:22; TREX-013183.018; TREX-013183.022.

397.     Bioaccumulation of PAHs in near surface organisms likely provided another path for introduction of PAHs into the Gulf food chain (*e.g.,* through consumption by oceanic fish larvae). PP Tr. at 373:03-374:07; TREX-013183.018.

### iv.    Actual Harm Occurred at the Surface of the Gulf

398.    Thick, dense mats of oil formed slicks on the Gulf surface. PP Tr. at 345:05.



Figure 33: A Sea Turtle Swims Under a Raft of *Sargassum* Entrained in Oil (TREX-230986)

399.  Surface oiling harmed large swaths of floating seaweed communities, including *sargassum* communities, which serve as an important habitat for a variety of organisms as well as refuge and nourishment for swimming animals. PP Tr. at 345:05-345:07, 382:14-383:07, 383:18-383:25; TREX-013183.004, .018-.019.

400.    The death of *sargassum* resulted in the loss of habitat of the animals that live on and around the floating seaweed, including sea schooling fish and juvenile turtles. PP Tr. at 382:14-384:03; TREX-013183.018-.019. *Sargassum* deaths were documented in the areas from the Chandeleur Islands to the Florida panhandle in 2010. PP Tr. at 384:04-384:08; TREX-013183.018-.019.

401.    In addition, air-breathing animals such as sea turtles, dolphins, birds that inhabit the sea surface to breathe, travel, or feed were exposed and harmed by surface oiling. PP Tr. at 345:08-10; 385:01-05; TREX-013183.004; TREX-013183.019; TREX-013183.037-.040. Table 3 identifies the numbers of animals collected as of April 14, 2011.

| Table 3: Numbers of Oiled Animals Collected | | | |
|---|---|---|---|
| Number | Type | Number | Condition |
| 613 | sea turtles | 18 | dead, visibly oiled |
| 536 | sea turtles | 456 | live, visibly oiled |
| 157 | dolphins | 10 | dead, visibly oiled |
| 13 | dolphins | 2 | live, visibly oiled |
| 6,147 | birds | 2,303 | dead, visibly oiled |
| 3,046 | birds | 2,086 | live, visibly oiled |
| Sources: TREX-231360; TREX-013183.037-.038; PP Tr. at 386:23-347:11, 390:01-390:06 | | | |

402.     Numbers compiled on the Fish and Wildlife Services chart do not represent a complete summary of every turtle, dolphin, or bird injured by the Defendants' spill, because it is likely many died that were never recovered and because this data only includes data through April 2011. PP Tr. at 385:24-386:19; TREX-013183.037-.038.

### a)     Sea Turtles were actually and potentially Harmed

403.     Species of turtles impacted by the spill are all either threatened or endangered, which means their populations are already depressed. Species impacted include Loggerhead, Kemp's Ridley, Green, Leatherback, and Hawksbill. PP Tr. at 386:23-347:05; TREX-013183.037-.038.


Figure 34: Oiled Sea Turtle (TREX-230959)

404.     Turtle stranding rates increased substantially during and after the spill: an eight-fold increase was recorded during the months of the spill and a five-fold increase in the remainder of 2010. PP Tr. at 388:25-389:14. Though some of these increased numbers may have been a result of the presence of large number of response workers, this factor alone does not explain as large an increase as was observed. PP Tr. at 388:25-389:14; TREX-013183.037-.038; TREX-013185R.008-.009. Rather, it is likely that

115

more turtles were impacted than were found during the response. PP Tr. at 389:15-389:18;

TREX-013185R.008-.009.

405.    In addition to the strandings, almost 15,000 hatchlings were relocated during the

response from Gulf coast beaches to Florida beaches along the Atlantic coast. This resulted in

losses of turtle populations in the Gulf, though the precise number cannot be quantified at this

time. PP Tr. at 387:12-387:18; TREX-013183.037-.038.

406.    Juvenile turtles suffered harm as a result of lost habitat due to injured *sargassum*

communities. PP Tr. at 387:19-388:25; TREX-013183.018-.019.

### b)      Dolphins Were Actually and Potentially Harmed

### i)      Dolphins Were Harmed

407.    Harm to dolphins was observed from Southeast Louisiana to the Florida

panhandle. PP Tr. at 391:23-391:25.  In the months

following the oil spill, dolphins were observed in

oiled waters, at times swimming through surface

oil and with oil adhering to their skin. Dolphins



Figure 35: Dolphin Swimming in Oily Water
(TREX-231481.001)

were thus potentially exposed to ingestion and

inhalation of oil compounds.  TREX-231481.001.

408.    There was a four- to five-fold increase in dolphin strandings following the spill.

PP Tr. at 391:12-391:15; TREX-013183.039-.040; TREX-013185R.010.

409.    A study of a resident population of bottlenose dolphins in heavily-oiled Barataria

Bay revealed severe health problems in the dolphins. One health problem was adrenal toxicity,

production of hormones that dolphins need for normal function. The second problem, detected

116

using ultrasound, was anomalies in their lungs. PP Tr. at 390:07-390:18; TREX-013183.039-.040; TREX-231481.004-.005.

410.   Both illnesses identified in the studies of Barataria Bay dolphins are consistent with previous information about the effects of oil on mammals. PP Tr. at 390:14-391:04; TREX-013183.039-.040; TREX-231481.007.

411.   For example, impacts on dolphins from previous spills include interference with ability to breathe, negative impact on lung condition, harm to adrenal processes, and harmful hormonal effects. PP Tr. at 392:01-392:15; TREX-013183.039; TREX-231481.

412.   The severity of disease, poor body condition, and high prevalence of abnormalities seen in Barataria Bay dolphins is in stark contrast with the overall health status of dolphins from the control group from the study, as well as with health conditions previously documented in bottlenose dolphins from other United States coastal sites. TREX-231481.

413.   It is also possible that the oil spill was a contributing factor to the Unexplained Mortality Event (UME) that started in the winter of 2010. While the UME began before the spill, a UME can have more than one cause and NOAA is investigating whether the spill is one of the causes of the current dolphin UME. PP Tr. at 1957:14-1957:22. A reasonable fact finder would conclude that the oil spill resulted in an additional stressor to exposed dolphins in the Gulf region.

### ii)   BPXP's Criticisms of this Evidence Are Erroneous

414.   BPXP's witness, Dr. Tunnell, dismisses these strandings as unrelated to the oil spill because some necropsies done on dolphins stranded after the spill did not conclude that oil was the cause of death. PP Tr. at 1964:11-1965:22.

117

415.    Necropsies, however, are unlikely to detect oil as the cause of death of a dolphin because the types of effects oil exposure cause would not necessarily be evidenced in a necropsy. PP Tr. at 391:23-391:25; 393:13-393:17; TREX-013185R.010. It would be rare that a necropsy would show a dolphin to have lungs full of oil or a stomach full of oil because neither sign is a typical symptom of oil exposure in dolphins. PP Tr. at 392:01-392:15.

416.    Further, Dr. Tunnell had little basis for drawing conclusions from the necropsies as he was unaware of the necropsy methodologies, including whether the veterinarians performing the necropsies were trying to identify the causes of the diseases they identified as the causes of death. PP Tr. at 1964:11-1965:22.

417.    In addition, the listed cause of death for some of the dolphin necropsies was indeterminate. PP Tr. at 1963:24-1964:01.

418.    Dr. Tunnell's challenge to the Barataria Bay study is also unfounded. First, he cites an article criticizing the study without considering or addressing the published response to that article which demonstrated the criticism were unfounded. PP Tr. at 394:14-395:12; TREX-013183.039-.040; TREX-231481.

419.    Dr. Tunnell dismisses this study and attributes the ill state of the Barataria Bay dolphins to an unexplained mortality (UME) event for dolphins in the Gulf of Mexico that began in February 2010, before the spill. TREX-013183.039-.040; TREX-013185R.010; PP Tr. at 1957:06-1957:13.

420.    Moreover, Dr. Tunnell made a number of concessions that destroy the basis for his criticism of the Barataria Bay study:

a.      While Dr. Tunnell claimed that Barataria Bay was more contaminated by toxins other than hydrocarbons than Sarasota Bay, he acknowledged there was "not much" difference in non-hydrocarbon contaminant levels between Barataria Bay and Sarasota Bay. PP Tr. at 1958:21-1959:08.

b.      The dolphin study performed by the team led by Dr. Schwacke has found "severe disease" in Barataria Bay dolphins, severity so great that it calls into question the survival of the population in the short term and the long term. PP Tr. at 1960:03-1960:21; TREX-231481.009.

c.      He is not in a position to dispute the veterinary findings of the Schwacke study as to the health of observed dolphins. PP Tr. at 1961:20-1961:24.

d.      The study found strong evidence linking the spill to the adverse health effect of the dolphins, although Dr. Tunnell claims other stressors could also be involved. PP Tr. at 1962:23-1963:13; TREX-231482.002.

e.      He relied on a deposition he had not fully read to assert there was an "important discrepancy," but did not know that the witness, Dr. Amy Merten, had no role in the dolphin study or that she did not know a lot about dolphins. PP Tr. at 1965:25-1968:05, 1969:14-1970:02.

f.      Regarding that alleged "discrepancy" he did not know how dolphin health was judged in the field health assessment and he had previously testified that knowing that could be important in comparing conclusions in the field assessment to conclusions in the Barataria Bay study. PP Tr. at 1970:03-1971:20, 1970:17-1971:20.

c)     **Birds were Actually and Potentially Harmed by the Defendants' Violations**

i)     **Birds Were Harmed**

421.     Thousands of birds were oiled by the Defendants' spill, including protected migratory birds. Many species of birds were impacted by the spill, but those put most at risk include brown pelicans, laughing gulls, royal terns, and northern gannets. PP Tr. at 395:16-395:20; TREX-013183.038; *see also* TREX-052673.016.

422.     Birds were actually harmed by the spill in at least two ways. First, when a bird is covered with oil, the feathers hold onto the oil and the bird loses its ability to float on the water and to thermoregulate. Fouled birds can die because of lost body temperature. PP Tr. at 395:21-396:09.


Figure 36: Oiled Pelican and Boom (TREX-230999)

423.     Second, birds could be affected by toxicity. Birds naturally will tend to preen the oil while they try to remove the oil from their feathers and in the process, ingest oil. PP Tr. at 395:21-396:09.

424.     Many more birds were killed than recovered – anywhere from ten to one hundred times – based on the distance of the spill from shore and the fact that it is unlikely birds marred with oil would have survived without intervention from response workers. As a result of these factors, many more birds oiled at sea likely sank or were eaten than were stranded on the shoreline. PP Tr. at 396:23-398:09; TREX-013183.038; TREX-246253.001.

**ii)      BPXP's Criticisms of this Evidence Are Unsupported**

425.     Dr. Tunnell minimized impacts to birds in oiled areas by including data from areas where no oil was ever observed and relying on land-based surveys that would not include Gulf birds who spend significant time off shore. PP Tr. at 400:10-401:05; TREX-013184.009.

426.     The purpose of Dr. Tunnell's bird population data graphs was to compare post-spill information with pre-spill trends, yet he did not determine how big an effect from the spill would be required for the post-spill data to fall below pre-spill trends. PP Tr. at 1935:16-1936:09, 1978:06-1979:09.

427.     Despite the fact that bird populations fluctuate widely from year to year, Dr. Tunnell did no analysis to quantify either the extent of variability in the bird populations or error rates in the bird population data he used. PP Tr. at 1937:02-1937:04, 1938:07-1938:15.

428.     There is a body of literature that discusses techniques for estimating changes in bird populations, including papers discussing use of Christmas Bird Count and Breeding Bird Survey data. PP Tr. at 1938:25-1939:07. Dr. Tunnell did not review any of this literature in preparing his reports. PP Tr. at 1939:08-1939:22; PP Tr. at 1939:25-1940:09.

429.     One such article is titled "Estimating Population Change from Count Data: Application to the North American Breeding Bird Survey." PP Tr. at 1939:23-1940:09; TREX-013169. This article was written by scientists at the center that runs the Breeding Bird Survey. PP Tr. at 1940:10-1940:18. Dr. Tunnell acknowledged that the authors of this article have more particularized experience and expertise in the use of the Breeding Bird Survey data than Dr. Tunnell does. PP Tr. at 1943:02-1943:05.

430. The "Conclusions" section of the article states in part, "Thus, analysis of count data requires a delicate interaction among statistical modeling, biological intuition and familiarity with the methods of the surveys producing the counts." TREX-013169.010.

431. When asked whether he performed any statistical modeling as part of his analysis of bird count data as recommended by the article, Dr. Tunnell avoided the question. PP Tr. at 1942:11-1943:01.

432. Analysis of count data should begin with the frank acknowledgment that counts are not necessarily very good surrogates for population sizes. TREX-013169.010.

433. Dr. Tunnell's was not seeking to determine the number of birds killed by the Defendants' oil spill. PP Tr. at 1947:06-1947:09. His presentation at trial excluded the thousands of dead birds that were found. PP Tr. at 1948:22-1949:21; D-34956.

434. As to live birds, there is variability in the ability of viewers to observe oil on the birds. For example, there is variability in the ability of observers to see oil on birds with dark plumage. PP Tr. at 1949:24-1950:03, 1950:05-1950:10. Therefore, the percentage of oiled live birds could be higher than what was reported in the study Dr. Tunnell cited, although Dr. Tunnell could not say how much higher. PP Tr. at 1950:18-1951:11.

### v.    Fish Were Actually and Potentially Harmed

#### a)    Pelagic Fish Were Actually Harmed

435. The Defendants' spill occurred during the spawning window for ecologically and commercially important pelagic fish species such as Bluefin and Yellowfin Tunas, Mahi Mahi, king and Spanish mackerels, greater and lesser amberjack, sailfish, blue marlin, and cobia. TREX-013333.001; PP Tr. at 374:11-374:18; TREX-013183.040.

436.    Early life-history stages (*e.g.,* embryo, larvae, juvenile) of fish are often disproportionately susceptible to physiological stressors and have, therefore, been a primary focus of attention in previous spills. TREX-231543.001.

437.    Oil concentrations that can be harmful to sensitive life stages were present in the upper 50 meters of the water column, over a wide geographic area, from May through July 2010. These upper surface waters are home to many marine organisms and are especially important spawning habitat for fish. TREX-013330.021-.022; TREX-013332E.014.

438.    The direct oiling of eggs, embryos, or larvae in locations where surface slicks persisted or came ashore in the northern Gulf of Mexico could have killed animals through smothering of gas- and ion-exchange surfaces, ingestion of toxicants, or the loss of the epithelial mucus that protects fish from infections. TREX-231543.001.

439.    As part of the oil spill response and NRDA, extensive water sampling in the Gulf of Mexico was conducted, and nearly 18,000 water chemistry samples were collected between May 2010 and July 2012. Analysis of the water chemistry results demonstrates that the highest levels of PAHs were present in the water column between May and July 2010, but still indicated some presence of oil through December 2010. TREX-013332E.008-.012.

440.    Although extensive, the substantial majority of samples did not capture areas where hydrocarbons were ultimately present, namely in the deep sea plume, within the near surface waters, at the seabed where oil was deposited, and in intertidal zones and shallow water habitats along the coast where oil was stranded. TREX-013331.023. Much of the sampling was done specifically to find non-detects as a means of confirming where oil stopped (especially with regard to the deep sea plume) and to collect baseline information in areas not yet – and

123

ultimately not ever oiled, such as Texas or Florida. Further sampling did not often occur in areas where dispersant applications were occurring and bioavailable oil would be expected to be elevated. As a result, the water chemistry results are likely to be under-representative of portions of the Gulf receiving the most oil. TREX-013331.023-.024.

441.    The distribution of oily water from the Defendants' spill in the upper surface waters was uneven, but substantial, with multiple opportunities for developing embryos and larvae to encounter oil in their spawning habitat. Small embryos and larvae have extremely fast equilibrium times to absorb PAHs and thus the uneven patchiness is not as important as the geographical spread of the oily water which determines the number of opportunities to encounter PAHs. TREX-013330.022; PP Tr. at 346:11-346:16, 374:11-374:18; TREX-013183.004; TREX-013183.027; TREX-013183.040.

442.    Given the extensive actual and potential exposure to PAHs throughout the Gulf of Mexico and toxicological research regarding the effects of oil exposure, the potential for toxicity damage to marine organisms from the spill was expected. PP Tr. at 482:21-483:03; TREX-013330.023, .031.

443.    Toxicology studies published over the last two decades – including studies related to the *Exxon Valdez*, *Cosco Busan*, and other spills – have documented the extreme sensitivity of fish embryos to PAHs. That embryo damage takes place at low concentrations of PAH was demonstrated during the study of the *Exxon Valdez* spill, initially with observations of elevated embryo mortalities in wild pink salmon in 1996 and 1998 and later confirmed by a series of research studies with controlled laboratory exposures at low ppb concentrations that created the same embryo mortalities. TREX-013330.023-024; TREX-231543.001. Additional research

confirmed that PAHs could persist in the field for several years and that low environmental doses could cause embryo toxicity to pink salmon as well as other species. TREX-013330.024; TREX-013332.013; TREX-013332E.018-.023.



Figure 37: Pericardial Effects in Yellowfin Tuna (TREX-233611)

444.    Many studies conducted since the *Exxon Valdez* spill have found that PAHs cause pericardial edema (a swelling around the heart), which later leads to anatomical malformations and functional defects. Cardiac function develops early in the embryo, and is especially important because the heart is circulating the nutrients that are in the yolk sac and oxygen to the rest of the tissues and organs that are developing. Thus, damage to the heart can have significant consequences for later development that lower the chance for survival. PP Tr. at 494:14-496:08; TREX-013330.024.

445.    Several peer-reviewed studies of the Defendants' spill have built on this scientific foundation, and have demonstrated actual and potential toxicity impacts to marine organisms in

the Gulf of Mexico at depth, in the water column, at the surface, and along the shoreline. PP Tr. at 492:22-493:03; TREX-013330.023, .031.

446.    Oil pollution may also affect fishes indirectly, through food-web alterations or multiple-stressor syndromes. TREX-231543.002; PP Tr. at 379:15-381:09.

447.    Two peer-reviewed studies have demonstrated that extremely low concentrations of PAH exposures from the Defendants' oil caused cardiotoxic effects to Gulf fish species. TREX-013330.025; TREX-013333; TREX-013338.

448.    One of those studies observed toxic effects, including pericardial edema, slow heart rate, and arrhythmia, on the developing hearts of Bluefin Tuna, Yellowfin Tuna, and amberjack when embryos were exposed to MC252 oil with PAH concentrations and compositional profiles that closely matched water samples collected in the Gulf from May through July 2010. PP Tr. at 494:08-498:01; TREX-013333.001-.002, .003 Fig. 3; TREX-233611; D-32617; D-32618A; D-32620A.

    a.    Pericardial edema began appearing at PAH levels from 0.3 ppb-0.6 for Bluefin Tuna, 0.5-1.3 ppb for Yellowfin Tuna, and 1-6 ppb for amberjack, with EC50 levels of 0.8 ppb, 2.3 ppb, and 12.4 ppb, respectively. TREX-013333.004, .006 Table 2; PP Tr. at 497:20-497:25.

    b.    Arrhythmia was found at threshold PAH concentrations of .03-.13 ppb for Yellowfin Tuna, and 0.3-1 ppb for amberjack, with doses that were toxic to half of exposed organisms at 2.6 ppb and 8.6 ppb, respectively. TREX-013333.006.

    c.    The study noted that nearly one third of the water samples collected from May to July 2010 in the pelagic zone of the northern Gulf of Mexico had PAH concentrations

126

above these thresholds for arrhythmia, although this may be a low approximation "given the limited sampling in areas with high surface oiling because of worker health and safety concerns and other vessel access restrictions." TREX-013333.006. The embryos in the highest exposure group were also examined for gross morphological defects, and all three species showed abnormalities in fin and spine development. PP Tr. at 497:02-499:01; TREX-013333.003-.004; D-32618A.

449.    Another study observed similar effects to Mahi Mahi exposed to 1.2 ppb TPAH from MC252 oil for 48 hours.

a.      Exposed embryos experienced a 4.5 fold increase in rates of pericardial edema.

b.      When raised for approximately thirty days to the small juvenile life stage, the exposed embryo's swimming performance was reduced by thirty-seven percent. Fast swimming speeds are critical for foraging and avoiding predators – "the ones that can't swim as fast – they're called prey."

PP Tr. at 498:02-499:03; TREX-013330.-026; TREX-013338.004-.005; D-32618A.

450.    When comparing the toxic levels reported in these two studies to the water chemistry analysis conducted as part of the NRDA, it is clear that there is significant potential for toxicological harm as a result of the Defendants' spill. Especially when looking at the most relevant locations and times (i.e., the sampling conducted within the footprint of the oil coming to the surface during the time when the well was flowing (i.e., May – July 2010) and limiting it to the top few meters where fish embryos are most likely to be found), the water chemistry analyses establish that nearly sixty percent of the samples in May, over seventy percent of the samples in June, and over thirty percent of the samples in July were at or above the threshold

found to cause pericardial edema in Bluefin Tuna (0.3 – 0.6 ppb) or arrhythmia in Yellowfin Tuna (0.03-.13 ppb) or amberjack (.03-1 ppb). Looking at the threshold range of pericardial edema for Yellowfin Tuna (0.5-1 ppb) shows water chemistry levels of nearly fifty percent in May, approximately sixty-five percent in June, and approximately twenty-five percent in July. Levels exceeding toxicity thresholds for pericardial edema and swimming speed reduction in Mahi Mahi (1.2 ppb) occurred over thirty percent of the time in May and June, and ten percent in July, and levels exceeding thresholds for pericardial edema for amberjack are also demonstrated by the water chemistry. PP Tr. at 502:05-503:18; TREX-013332E.015; D-32620A.  As discussed above, it is likely that these results are actually underrepresentative of potential toxic exposure.

451.   Two additional peer-reviewed NRDA studies on Defendants' spill effects have demonstrated actual harm to killifish exposed to marsh sediments contaminated with MC252 oil. The first is a study of killifish exposed to heavily oiled marshes in Grand-Terre, Louisiana. These marshes are prime forage habitat for killifish. Adult killifish in 2010 after the marsh was oiled had elevated enzyme levels and changes in gene regulation compared to fish living in unoiled Louisiana marshes. These changes are indications of exposure to oil and suggest that survival or fitness is decreased, that is suggested. PP Tr. at 504:06-505:01; TREX-013330.027; TREX-231426; D-32622. Additionally, the Grand Terre fish also had elevated hyperplasia in gill tissues, which is a condition where gill tissues become inflamed and grow together, making it hard for the fish to breath, thereby reducing fitness of the fish. This is evidence of actual harm to Gulf killifish from Defendants' oil. PP Tr. at 504:20-505:17; *see also* PP Tr. at: 412:01-412:05; TREX 013183.035.

452.    This study was repeated and expanded in a second study of killifish in Grand Terre in 2011. This second study found the same effects, indicating continuing exposure to killifish from contaminated sediments. PP Tr. at 505:18-505:21; TREX-231494; TREX-013330.027. In addition to studying the adults, the second study exposed killifish embryos in the laboratory to sediments from Grand Terre and found pericardial edema, decreased heart rate, and decreased hatching success in exposed organisms. It also demonstrated that even one year post-spill, contaminated sediments contained enough PAHs to impair embryo development. PP Tr. at 505:25-507:18; TREX-013330.027; TREX-231494.

**b)     Bottom Dwelling Fish Suffered Potential Harm**

453.    Bottom-dwelling fish potentially suffered sub-lethal or chronic harm as a result of exposure to oil entrained in sediments on the bottom on the outer shelf. PP Tr. at 346:03-346:09. TREX-013183.004; TREX-013183.000027; TREX-231516.002.

454.    Species potentially impacted include red snapper, tilefish, and northern hake. PP Tr. at 374:23-375:11; TREX-013183.029; TREX-231516.002.

455.    Water chemistry results demonstrated toxic levels of PAHs in intermediate and deeper waters. TREX-013332E-.010-.014. Given the high concentrations of PAH detected in the deep sea plumes, the area covered by the plume, and the length of exposure from the plumes, toxicity damage to these species is very likely. TREX-013330.029.

456.    Potential harms suffered by bottom dwelling fish include skin lesions and high levels of PAH concentrations in the liver and bile. Though the cause of these harms has not been definitively linked to the spill, available evidence suggests the spill as a likely cause. PP Tr. at 374:19-374:22, 441:18-442:07; TREX-013183.040; TREX-231516.

457.    The incidence of skin lesions in 2011 sampling was most frequent in some bottom-dwelling species along the continental shelf edge north of the Deepwater Horizon site. TREX-231516.002.

458.    In light of the potential for exposure and the types of toxicological harm found so far, as research into the NRD assessment continues, it is very likely that additional toxic effects of the Defendants' oil will be identified. TREX-013330.031.

c)    <b>Dr. Tunnell Addresses Only Catastrophic Impacts</b>

459.    When Dr. Tunnell concluded that there were no "significant" impacts to fish, shellfish, bird, dolphin, or turtle populations, he was looking for impacts such as a "collapse," a "crash," or a "total drop" in those populations. PP Tr. at 1862:07-1862:25.

460.    Dr. Tunnell did no statistical power analysis on the fish and shellfish population data he used to conclude there were no significant impacts to those populations. PP Tr. at 1920:13-1921:08. Nor did he attempt to calculate how large an effect on fish and shellfish populations there could have been, and yet have those populations not show a significant adverse effect. PP Tr. at 1922:01-1922:06. Dr. Tunnell did not make any such calculations for any of the fish and shellfish population data graphs he developed, including long-terms graphs of SEAMAP and Louisiana Department of Wildlife and Fisheries ("LDWF") data, Ten-Year Trend Line graphs of SEAMAP and LDWF data, and graphs of commercial and recreational landings. PP Tr. at 1924:17-1924:23, 1925:24-1926:04, 1928:21-1929:02, 1929:09-1929:20, 1934:16-1935:15.

461.    Dr. Tunnell acknowledged that actual populations for species of fish and shellfish in the Gulf are highly variable through time. PP Tr. at 1922:10-1922:18, 1926:07-1926:20.

130

462.    The year-to-year variability in fish and shellfish populations is caused by a number of factors, both natural and man-made, including pollution from an oil spill. PP Tr. at 1922:14-1922:24. In any given year, some of these factors might cause populations to increase, while other factors could cause populations to decrease. PP Tr. at 1923:22-1924:14. Dr. Tunnell did not seek to determine which cause or causes were contributing to the year to year population changes for fish and shellfish. PP Tr. at 1923:15-1924:14.

463.    Variability in the LDWF and SEAMAP reflect both variations in the populations themselves and also the error rate built into the data that is collected. PP Tr. at 1928:08-1928:20.

464.    Dr. Tunnell did not perform a statistical analysis to analyze the combined effect of the variability in fish and shellfish populations themselves and the error rates in the SEAMAP and LDWF data. PP Tr. at 1928:14-1928:13.

465.    Dr. Tunnell used his Ten-Year Trend Line graphs to compare post-spill fish and shellfish data to pre-spill trends. PP Tr. at 1890:15-1890:24, 1933:01-1933:05. His "Ten-Year Trend Line" graph, however, does not show the pre-spill trend line, because it is calculated using data from six pre-spill years, the spill year, and three post-spill years. PP Tr. at 1930:12-1930:17.

466.    The choice of which years to include when calculating the trend line affects the slope of the trend line. PP Tr. at 1932:07-1932:10. For example, excluding the post-spill years from the calculation of the trend line for white shrimp shows that the pre-spill trend was increasing, rather than the flat trend line shown in Dr. Tunnell's graph. PP Tr. at 1931:12-1932:25; TREX-013184.012.

467.    Dr. Tunnell's analysis aggregated data from wide areas. For instance, his analysis of SEAMAP fish and shellfish population data aggregated that data for the entire northern Gulf

of Mexico (about twenty-five percent of the Gulf). PP Tr. at 1873:02-1873:10. Similarly, his LDWF fish and shellfish population data aggregated that data. He first aggregated the data from all seven Coastal Study Areas (CSAs), then later aggregated the data from CSAs 1-4. Dr. Tunnell did not examine data from any individual CSA. PP Tr. at 1875:22-1876:21, 1978:06-1979:09.

468.    Dr. Tunnell concluded that there was not widespread exposure of fish and shellfish to harmful PAHs, based on compilations of water column sampling data and levels of PAHs in tissues taken for seafood sampling purposes. PP Tr. at 1894:25-1895:18. However, Dr. Tunnell made concessions about his lack of toxicology expertise, and the nature of certain studies he relied upon, that undermine those conclusions:

a.    Dr. Tunnell is not offering an opinion as to whether the benchmarks in the OSAT 1 report, or any other benchmark, is the appropriate benchmark to use in determining injuries to aquatic life. PP Tr. at 1952:01-1952:17.

b.    Dr. Tunnell referred to a quote from Dr. Terry Wade showing only .7% of water samples exceeded 10 parts per billion PAHs because it indicated a low degree of exposure to harmful levels of PAHs. However, Dr. Tunnell is not opining on whether the 10 parts per billion level used by Dr. Wade is the correct level. PP Tr. at 1953:10-1954:04, 1954:11-1954:13.

c.    One paper cited by Dr. Tunnell found that concentrations of PAHs increased in fish tissues during the period of the spill and then diminished over time. However, the concentrations of PAHs in fish and shellfish tissues cannot be extrapolated to determine the concentrations of PAHs to which the fish and shellfish were exposed. PP Tr. at 1955:07-1956:15.

132

d.      Dr. Tunnell acknowledged that his work was not a Natural Resource Damage

Assessment (NRDA) analysis, which is quantitative. PP Tr. at 1859:16-1859:22.

469.     Dr. Tunnell's use of fish and shellfish population data are not up to standard in

contemporary fisheries science and would not survive peer review in a quality journal.  A

statistical power analysis is generally required to determine the kinds of effects that can and

cannot be detected given the variability in the data.  Dr. Tunnell did not perform such an

analysis, nor did he attempt to account for the other factors that affect these populations.  In

addition, Dr. Tunnell's use of post-spill data to compute a pre-spill regression trend line is also

inappropriate.  PP Tr. at 379:15-380:25.

470.     From an ecological point of view, there could very well be meaningful effects in

the populations Dr. Tunnell examines, but those effects are obscured due to the failings in his

statistical methods.  PP Tr. at 381:01-381:09.

### d)      Dr. Shea Fails to Successfully Challenge the Proof of Actual and Potential Harm to Fish and Shellfish

471.     Despite admitting the seriousness of the spill and working from the same set of

water chemistry results, BPXP's witness Dr. Shea argues that there is little or no potential for

toxicological harm. He does this primarily by: (a) inappropriately using water quality

benchmarks established for screening and response purposes as a basis for assessing potential

harm from the spill; (b) rejecting the peer-reviewed science on PAH toxicity to early life stages;

(c) rejecting site- and species-specific studies of the DWH spill; and (d) using summarizing

statistics and unsupported assertions to dilute toxic chemistry results. TREX-013331.020-.027;

D-32624.

133

472.     Dr. Shea bases his findings of limited or no potential harm in Gulf waters and sediments entirely on comparing the water and sediment chemistry results to EPA Water Quality Benchmarks and his own personal review of the NRDA species-specific bioassays, while specifically rejecting the last two decades of peer-reviewed scientific advancement coming out of other major oil spill assessments of harm. PP Tr. at 508:10-508:17; TREX-013331.026.

473.     Disregarding the numerous peer-reviewed, published studies showing toxicity of PAHs to marine life in concentration levels below 20 parts per *billion*, D-32619; TREX-013332E.018-23; PP Tr. at 499:04-500:05, Dr. Shea testified that, "It may be counterintuitive for those who don't study oil like I have for so long, but oil is actually not that toxic of a substance." PP Tr. at 1690:02-1690:04.

474.     The EPA Water Quality Benchmarks for Aquatic Life reflect chemical concentrations that are derived from scientific guidance published by EPA in 2003 for managing sediments potentially contaminated with PAHs during dredging or site remediation. TREX-013331.020; TREX-013340.

475.     The benchmarks employed by Dr. Shea were derived by the EPA in 2003. PP Tr. at 1711:22-1711:25. They have not been updated since their initial publication. PP Tr. at 1727:22-1727:25.

476.     Dr. Shea employed two sets of benchmarks that had been derived by the EPA: a set of acute toxicity benchmarks and a set of chronic toxicity benchmarks. PP Tr. at 1712:09-1712:14.

477.    The acute toxicity benchmarks were based on acute narcosis as the assumed mechanism of toxicity. PP Tr. at 1712:15-1712:18. Dr. Shea used the chronic benchmarks as a catch-all for all other mechanisms of toxicity and types of effects. PP Tr. at 1713:22-1714:01.

478.    The chronic benchmarks were derived simply by multiplying the acute benchmarks by an "acute to chronic ratio." PP Tr. at 1713:17-1713:21.

479.    The "acute to chronic ratio" was calculated by comparing acute and chronic toxicity tests in a very small subset of species – just six species were used in its calculation. PP Tr. at 1714:02-1714:06; TREX-013340.046-.049. Of those six species, just two were saltwater species. PP Tr. at 1714:08-1714:15; TREX-013340.046-.049. The chronic toxicity tests used in deriving the chronic benchmarks also included data from tests using just *five* PAHs. PP Tr. at 1714:22-1714:25; TREX-013340.046-.049. Dr. Shea wasn't even sure how many of those tests were on embryos, which is a particularly sensitive life stage. PP Tr. at 1715:01-1715:05. In the derivation of the chronic benchmarks, there were *no* studies on important Gulf species like Tuna, blue crab, menhaden, killifish, or mahi-mahi. PP Tr. at 1715:16-1716:05.

480.    Because the benchmarks are based primarily on bioassays that assess acute narcotic effects affecting primarily adult freshwater fish and because other mechanisms, such as embryo toxicity, site- or species-specific mechanisms, photoxicity, or chronic effects are either significantly underrepresented or are not even included, there is significant uncertainty as to the accuracy of the benchmarks as applied to non-narcotic methods of toxicity. EPA has acknowledged that the model may be underprotective in such situations. PP Tr. at 516:06-517:10; TREX-013331.021, .044. As a result, Dr. Shea's assertions that the toxicity unit model is

conservative and appropriate model for determining potential harm from the spill, and that a toxicity unit of 1 is safe in this context lack support.

481.    For example, the EPA Guidance document that explained the derivation of the benchmarks specifically warns users that, the benchmarks may be underprotective against photo toxicity and "can increase the toxicity of certain PAHs by one to four orders of magnitude over that caused by narcosis." TREX-013340.097-98; TREX-013340.098.1.US; PP Tr. at 488:07-489:04.

482.    Although Dr. Shea describes the benchmarks he employs as the "prescribed" approach to estimating potential harm from a spill and asserts that it is "the gold standard", he provides no basis for such assertions and has no professional experience conducting crude oil bioassays or published papers on analyzing potential or actual harm to embryos or larvae from crude oil exposure. In fact, Dr. Shea has never actually published a peer reviewed paper regarding the laboratory exposure of crude oil to aquatic life, other than one effort related to freshwater mussels. PP Tr. at 1733:04-1733:16. EPA has cautioned against overreliance on the benchmarks as a threshold for potential harm assessment from a spill itself, stating "in spill situations, where chemical equilibrium between water and sediments has not yet been reached, sediment chemical concentrations less than an ESB may pose risks to benthic organisms." TREX-013331.021; TREX-013340.020.

483.    Dr. Shea misleadingly suggests in his reports that the benchmarks have been validated as protective against chronic or sublethal effects based on a larger number of studies. TREX-013446.002-.003; D-34888A; PP Tr. at 1728:18-1729:04. In fact, however, the validation study he cited was for a different set of benchmarks that were developed in 2009, based on a

different methodology, and additional data that was not available when the EPA benchmarks were developed in 2003, so it cannot be cited as "validation" for the benchmarks used by Dr. Shea. PP Tr. at 1729:05-1729:12; TREX-013457.1.1.US. Those newer benchmarks are actually more protective of aquatic life than the benchmarks used by Dr. Shea for most PAHs. PP Tr. at 1729:20-1730:03.

484.    Dr. Shea candidly admitted that, without reviewing species-specific data, he could not say for sure whether the benchmarks he employed would be protective of mahi-mahi at its most sensitive life stages: "Whether it is specifically protective of mahi-mahi, we do not know for that particular organism . . . ." PP Tr. at 1716:10-1717:02.

485.    The benchmarks utilized by Dr. Shea were calibrated to be protective for 95 percent of species for which EPA had data. PP Tr. at 1721:03-1721:07. Thus, they are *not* protective of the most sensitive species – as pointed out in the EPA Guidance explaining the benchmarks, which showed that the most sensitive two genera in the EPA data set were not protected by the benchmarks. TREX-013340.57.1.US; PP Tr. at 1721:13-1721:25.

486.    As Dr. Shea recognizes, there have been many toxicity studies that have been conducted on gulf species in the aftermath of the Defendants' oil spill. Dr. Shea praised most of these studies as being very high quality. PP Tr. at 1682:19-25. However, other than looking in a "general way" at whether the toxicity tests seemed to be consistent with the benchmarks he employed, Dr. Shea never actually adjusted his benchmarks to take into account the data collected in these studies. Dr. Rice identified multiple instances where toxicity studies indicated significant toxic effects at levels below the benchmark values employed by Dr. Shea. PP Tr. at 517:11-519:09; D-32630A; TREX-013332.006, .025-.029.

137

487.    Dr. Shea actually admits in his report that NOAA toxicity testing indicated that "there were other more sensitive species [besides oysters] and life stages, but most of those still required the equivalent of at least 5 ug/L total PAH to cause meaningful harmful effects in the laboratory", yet still concludes that "[o]verall, the data from the NOAA laboratory toxicity tests are consistent with the benchmark analysis. . . ." TREX-013444.043. Dr. Shea, however, never defines what he considers to be "meaningful harmful effects," nor does he ever provide any of his analyses or the data underlying them. Similarly, he admits that the BP Group's toxicity testing showed chronic toxicity effects to early life stages at "lower PAH concentrations", again never defines which species showed what kind of effects at what kind of thresholds, nor does he provide the underlying analysis or data for his conclusion that these results are also still consistent with the EPA benchmark. TREX-013444.044-.045. Dr. Shea makes similar assertions with the same underlying lack of analyses or data for his review of the sediment testing. TREX-013444.046-.047.

488.    Dr. Shea, like BPXP's other witnesses, assesses the data "in aggregate" to conclude that it supports his conclusions, while hiding any "winners and losers." For example, despite never having specifically discussed pompano toxicity testing results in any of his expert reports and being directed by the Court to discuss such data only if he had expressed an opinion on it earlier, Dr. Shea attempted to rebut Dr. Rice's analysis demonstrating that the BP Group's own toxicity testing on pompano indicated that the EPA benchmark would be underprotective by testifying that "if you look at all 10 of those pompano data and aggregate them together, a few of those tests were indeterminate, meaning some of the chemistry was not quite right in order to be able to interpret properly. But in aggregate, if you look at all of those pompano tests, they were

consistent with my EPA benchmark approach and the analysis that I had conducted in terms of where you would expect toxicity to occur." PP Tr. at 1696:10-1696:13, 1697:08-1697:17; *cf.,* PP Tr. 517:24-518:19; TREX-013332.006, .026-.027. Not only does Dr. Shea attempt to hide evidence explicitly undermining his use of the benchmark method by aggregating data, but as in his expert reports generally, similarly failed to provide any underlying data or analysis supporting that opinion, nor was there explanation of what he considered "few," "indeterminate," or "not quite right."

489.    Aside from the toxicity testing performed by the BP Group and the United States following the oil spill, there have been numerous studies published by other researchers in the aftermath of the spill. Dr. Shea chose not to adjust the benchmarks he was using in any way based on any of that data. PP Tr. at 1717:01-1717:15, 1718:06-13.

490.    Amazingly, Dr. Shea concluded that there has been no research since 2003 that he would deem sufficiently relevant and reliable to adjust the benchmarks: "Q: So there's no studies since 2003, in your opinion, that are sufficiently relevant and reliable to adjust the benchmarks? A: That is correct." PP Tr. at 1728:11-1728:14.

491.    Dr. Shea either outright rejects or fails to take into account the DWH site- and species-specific peer-reviewed toxicity studies. His failure to do so goes against general scientific principles as well as the actual requirements of the EPA Guidance, which explained that the benchmarks are not meant to be used as stand-alone, pass or fail criteria for all applications, and should instead be adjusted to account for further data or site-specific conditions. PP Tr. at 1717:16-1718:15; TREX-013340.015 ("publication of these documents does not imply the use of [the benchmarks] as a stand-alone, pass-fail criteria for all applications;

rather, [benchmark] exceedances could be used to trigger the collection of additional assessment data."); TREX-013340.020 ("It is recognized that these [benchmark values] may need to be adjusted to account for future data. They may also need to be adjusted because of site-specific considerations."); PP Tr. at 517:15-519:09; TREX-013331.020-.021, .026.

492.     Dr. Shea's attacks on the use of total PAHs to assess toxicity mischaracterizes such research as ignoring the actual chemistry in the field and failing to recognize that composition and concentration of PAHs is important. TREX-013332.010. The research approach used by Dr. Rice relies on direct measurements of actual total PAH in the lab or field – as well as its composition and concentration – and comparing the results to a wide body of bioassay literature to assess impacts on a wide swath of toxicity mechanisms (including acute narcosis as well as all the other possible mechanisms), to get a better understanding of the possible impacts on different species and different life stages, in specific exposure environments. TREX-013332.004-.005.

493.     Dr. Shea's attack on the high-energy water accommodated fraction ("HEWAF") and other "non-standard" mixing methodologies also mischaracterizes both the regulatory status of mixing methodologies and the goal of using any given type. There is no regulatory requirement for how mixing methods are to be conducted in bioassay research. PP Tr. 511:11-511:13, 1732:19-1732:25. Nor is there a set industry standard. Different mixing methods achieve different goals. Slow stir methods like those advocated by Dr. Shea will bias the resulting PAH concentration toward the monoaromatic and light PAHs, as it will lack sufficient energy to drive larger PAHs into solution. A HEWAF uses high energy to simulate intense energy that is sufficient to drive large PAHs into solution. PP Tr. 510:18-513:15; TREX-013332.010. The

140

mixing method itself is not important, whether it is a slow stir, a HEWAF or an oiled rock column what matters is whether the resulting concentration of PAHs represents conditions found in the field, a point Dr. Shea recognizes. PP Tr. 511:19-512:02; TREX-013332.010; TREX-013444.095. This is now accomplished by analyzing all water accommodated fractions with a mass spectrometer to get the PAH concentration and composition of the water accommodated fraction solutions. These solutions are then compared with water chemistry in the field to determine whether the tested solution is environmentally relevant (*i.e.,* matches field conditions). PP Tr. 512:16-513:15.

494.    Dr. Shea asserts that slow-stir and chemically-enhanced methods are industry standard and rejects the use of HEWAF because it is "new and novel." TREX-013444.096, .098. Dr. Shea's assertions regarding the "industry standard" for mixing methods, however, is based on citation to four sources, each a decade or more old, and before HEWAF existed. TREX-013444.096.

495.    The 2005 National Academy of Sciences treatise on oil spills cited by Dr. Shea discussed the efforts to standardize research methodology under the Chemical Response to Oil Spills: Ecological Effects Research Forum and noted that while the Forum's effort to promote certain oil testing methods was generally successful, refinements to the protocols "may be warranted for future toxicity testing of dispersants and dispersed oil" for reasons such as better adapting methods to site-specific risk analysis purposes, "including changes in [water accommodated fraction] preparation" and analytical chemistry. TREX-230012.217, .219. The National Academies also recommended moving toward better exposure quantification in testing protocols, including analysis of PAHs. TREX-230012.223. As noted by Dr. Rice, the HEWAF

method was developed specifically to generate WAFs containing some of the larger PAHs in order to match the site-specific samples taken in the Gulf of Mexico, and that the slow-stir WAF preparations Dr. Shea discussed would not have been able to generate such WAFs. PP Tr. at 512:03-513:05.

496.     Dr. Shea's criticism of the HEWAF mixing method is particularly inappropriate with regard to Dr. Incardona's research, which has demonstrated that the WAF preparations are representative of actual conditions in the field. PP Tr. 512:08-512:15; TREX-013333.002-.003 Fig. 3.

497.     Similarly, given that Dr. Shea clearly analyzed the PAH composition and concentration of the field samples, his decision to ignore two-thirds of the toxicity testing by NOAA and others by the BP Group for the sole reason that the tests used HEWAF mixing methods, without having even examined or explained whether the tests' exposure solutions were environmentally relevant, is similarly unjustified. TREX-013444.042-.043.

498.     Dr. Shea's analysis is not a natural resource damages assessment, nor a quantification of injury or damage. PP Tr. at 1637:17-1638:05. Similarly, the OSAT reports on which Dr. Shea and BPXP more generally rely so heavily were done for purposes of deciding whether responders should continue efforts to locate and remove oil, rather than for a damage assessment of ongoing future risks. PP Tr. at 1365:05-1365:13.

499.     Dr. Shea also misapplied the benchmarks in that he did not account for all of the PAHs that were detected in the Gulf of Mexico. He only employed benchmarks for 34 PAHs, effectively assigning zero toxicity to the other PAHs that were present. PP Tr. at 1722:03-1722:18. The EPA Guidance specifically directs users to apply benchmarks for *all* PAHs that are

measured in field samples (in this case, there were approximately 50 PAHs measured). TREX-013340.022; PP Tr. at 1722:10-1722:13. The EPA Guidance document explains that because the model underlying the benchmark approach assumes that PAH toxicity is additive, failure to consider the toxicity of all PAHs for which data is available would be under-protective: "Importantly, because . . . [PAH] toxicities in water tissues, or sediments are additive or nearly additive, their combined toxicities must be considered so that the benchmark is appropriately protective." TREX-013340.015.

500.    Dr. Shea explained his failure to include all PAHs in his analysis as follows: after he reviewed "a few hundred" of the nearly 18,000 samples, he concluded that the missing PAHs would not have made a "significant difference" because many of them were present at very low levels. PP Tr. at 1722:19-1723:09. Dr. Shea did not support this assertion with any data. In fact, as Dr. Incardona's paper reported, actual field samples showed significant concentrations of some of those missing PAHs (namely, dibenzothiophenes). D-32500; PP Tr. at 1724:06-1724:16, 1727:02-1727:10; TREX-013333.003.

501.    Dr. Shea admitted that chemical dispersion of oil increases the bioavailability of PAHs. His own laboratory work has demonstrated it. PP Tr. at 1730:14-1730:24.

502.    Dr. Shea admitted that in the field, it was sometimes difficult to sample the water column immediately following aerial dispersant application, both due to safety concerns (sampling teams could not be too close when aerial dispersants were being sprayed) and due to the wide area over which dispersants were being applied. PP Tr. at 1732:03-1732:18.

503.    Dr. Shea's chemistry analysis also dilutes toxicity by averaging all 18,000 water samples taken across time, space and depth. For example, even though no oil was expected to be

143

found in the water column after December 2010, he includes all samples taken until July 2012. With regard to space, even though no oil was found along the Atlantic Coast of Florida or much of the southern Gulf coast or the coast of Texas, all of the samples taken in those areas (and all of the other samples deliberately taken to establish background concentrations) are included in Dr. Shea's analysis. He also includes samples taken at all depths, even though many of the intermediate depths were not expected to and did not find oil, despite his own report showing that the greatest levels of PAHs were found in the top 1 meter of the water column. The effect of including all of these zeros, instead of focusing on where the oil was, when it was there, is to dilute the apparent percentage of the Gulf that is harmed. PP Tr. at 519:10-520:20; D-32632; TREX-013444.25.1.US.

504.    Dr. Shea purported to focus on the area of greatest concern – the surface waters during May 2010 – with a "kriging" analysis. This analysis was just as misleading as Dr. Shea's other analyses. Dr. Shea's kriging contour map purported to show the areas with a fifty percent probability of toxic levels of PAHs in the surface 200 meters in May 2010 as a "worst case scenario." PP Tr. at 1735:06-1736:06. He failed to display any contours for probabilities less than fifty percent, which would have shown a larger area of potential concern (a more typical kriging map, such as the one shown in Dr. Rice's Round 1 Report from a paper in the published literature, shows a range of probability contours.) TREX-013330.044; PP Tr. at 1736:07-1736:20.

505.    Dr. Shea's contour map was misleading for a more significant reason – he classified the "surface" layer as the top 200 meters of the water. PP Tr. at 1736:21-1737:03; D-32633.2A; PP Tr. at 520:24-521:22. He testified that for each sample taken right at the surface

of the water, there may have been multiple additional samples that were taken at lower depths at the same location. All of those samples down to 200 meters were included in the kriging analysis. PP Tr. at 1737:04-1737:17. However, Dr. Shea knew (and wrote in his expert report) that, based on the benchmarks he applied, a majority of the toxic exceedances were in the upper 1 meter. TREX-013444.25.1.US; PP Tr. at 1722:03-1722:18. Thus, in any areas where a surface sample was taken along with multiple subsurface samples, the overall probability of that location having toxic levels of PAHs would, under Shea's analysis, would likely be low, even if the sample from the surface 1 meter was at toxic levels. D-32633.2A; PP Tr. at 520:24-521:22. The effect of choosing to include samples all the way down to 200 meters masked the toxic samples that were present in the upper surface waters.

       **vi.**    **The Shoreline and Its Inhabitants Was Actually and Potentially Harmed**

506.    Oil first made landfall in Louisiana beaches at Port Fourchon 11 May 2010, and on Raccoon Island on 13 May 2010. TREX-231539.001. As the oil moved ashore, it harmed the coast, shorelines, and marsh and mangrove in particular. PP Tr. at: 345:17-345:19; TREX-013183.004.

507.    Approximately 430.5 miles of Louisiana's wetlands were oiled, 55.9 miles were categorized as heavily oiled. TREX-013246.011 ¶ 25, .046 ¶ 102. Approximately 560 miles of sandy beaches were oiled, 170 of which were categorized as moderately or heavily oiled. TREX-013246.044 ¶ 98.

508.    Even after response activities attempted to address oiled segments of the beach, time revealed continued presence of buried oil in many places. TREX-013115.002 ("In September 2012, Hurricane Isaac severely eroded some shorelines in Louisiana's barrier islands

and uncovered residual oil that had been buried under layers of sand deposited by tropical storms in 2010 and 2011.").

**a)**  **SCAT Surveys Recorded Extensive Visible Oiling on the Gulf Shoreline**

509.    The response used the Shoreline Cleanup Assessment Technique ("SCAT") to assess the shoreline and determine where response actions were appropriate. In total, the SCAT teams assessed more than 4,300 miles of the shoreline in the Gulf, from Wakulla County, Florida, through Louisiana. Rec. Doc.7114-20 at 8; PP Tr. at 1807:14-1807:16. In order to determine the scope of response actions, the SCAT surveys included areas where no oil had been observed. PP Tr. at 1807:07-1808:09.

510.    At least 1,100 miles of the coast were visibly oiled by the Defendants' Oil. Rec. Doc. 7114-20; PP Tr. at 1775:22-1775:25; PP Tr. at 354:02-354:06; TREX-013183.004; TREX-013183.012; TREX-013183.030; PP Tr. at 1297:18-1297:25; PP Tr. at 1364:06-1364:09.

511.    According to the SCAT surveys, of the shorelines with any documented oiling 60.6% were in Louisiana, 16.1% were in Florida, 14.6% in Mississippi, and 8.7% in Alabama. TREX-012199.004; TREX-013247.003.

512.    While the Texas coast was not surveyed by the SCAT teams, other surveys found trace oiling along thirty-six miles of the Texas coast. TREX-013182.012.

146

513.    One year after the spill, approximately fifty miles were still classified as heavy or moderately oiled, and more than 99% of the heavy and moderate areas of oiling were located in Louisiana. TREX-012199.004.



Figure 38: Example of Persistent Oiling Conditions – Heavily Oiled Wrack and Vegetation Mat in Bay Jimmy in October 2010 (TREX-013015.018)

514.    Approximately 220 miles were categorized as heavy oiled and 140 miles were moderately oiled at the peak of shoreline oiling. PP Tr. at 1804:22-1805:09; PP Tr. at 1364:11-1364:12.

515.    Approximately 560 miles of sandy beaches were visibly oiled, 170 of which were categorized as moderately or heavily oiled. TREX-013246.044.

516.    Approximately 430 miles of Louisiana wetlands were visibly oiled, and fifty-five of those were categorized as heavily oiled. PP Tr. at 1812:19-1812:25.

517.    Table 4 shows the stretches of beach habitat still visibly oiled as of June 22, 2013.

| Table 4: Beach Habitat Still Visibly Oiled as of June 22, 2013 | |
|---|---|
| **Distance** | **Location** |
| 116.6 miles | Louisiana beach habitat |
| 86 miles | Louisiana marshes |
| 68.6 miles | Mississippi beach habitat |
| 59.9 miles | Florida beach habitat |
| 46 miles | Alabama beach habitat |
| Sources: TREX-013246.073-.074; PP Tr. at 1813:01-1813:07 | |

518.    Even as late as May 2014, 393 miles of shoreline were still visibly oiled to some

degree, and 14 of those were categorized as moderately or heavily oiled. PP Tr. at 1804:22-

1805:09, 1806:03-1806:11; PP Tr. at 402:06-403:10.

519.    BPXP's witness Dr. Taylor dismisses this unprecedented level of shoreline oiling

by comparing the total miles oiled against irrelevant distances such as the total miles of shoreline

surveyed by SCAT (4,300 miles) or the length of the shoreline between Galveston, Texas, and

Tampa, Florida. PP Tr. at 1809:18-1810:21.

520.    Dr. Taylor also confines his assessment to visual observations of oiling from

SCAT surveys and ignores lengths of shoreline oiling detected by other surveys as well as

chemical observations of oil. PP Tr. at 1812:08-1812:14, 1818:18-1819:01; PP Tr. at: 402:06-

403:10; TREX-013183.030.

### b)    SCAT Surveys Did Not Detect All of the Shoreline Oiling

521.    SCAT is a generalized, minimal estimate of total linear shoreline oiled by the

Defendants' oil designed only to provide information for the response and *not* to characterize the

full extent of oiling. PP Tr. at 403:14-404:20; TREX-013183.012-.013; TREX-013184.017;

Michel Dep. at 80:04-80:06, 80:08-81:17.

522.     SCAT is based only on visual observation of oil and not on samples or analysis for the presence of oil that could not be detected by the eyes. PP Tr. at 1817:22-1818:01, 1806:12-1806:18; PP Tr. at: 403:14-404:06; TREX-013183.012; TREX-013184.017. In other words, the SCAT category NOO means "no oil *observed*." It does not mean no oil *present*. PP Tr. at 1810:23-1811:22; Michel Dep. at 107:18-107:22.

523.     In fact, SCAT categorization has not correlated well with oil levels found in samples taken after the spill, suggesting that oil was present in marshes even when not visible. TREX-231539.006-.007; TREX-012199.004 (Drs. Taylor and Michel stating that SCAT descriptors are not adequate by themselves to develop cleanup strategies and goals for each habitat type or shoreline segment).

524.     The limits of SCAT were proven during the response. In 2014, the FOSC asked the SCAT program to go out and re-survey shoreline segments that had been observed as being oiled by other non-SCAT groups. This re-survey included areas never previously surveyed by any SCAT team. Oil was found during this re-survey process. Michel Dep. at 80:08-81:17.

525.     The auguring program implemented to identify deeply buried oil was only partially effective. Michel Dep. at 84:25-85:04, 85:06-85:18.

526.     SCAT surveys represent oiling only during the time and location of surveys, and cannot provide a complete picture of what oiling conditions were. Michel Dep. at 111:02-111:14. There are still unsurveyed segments along the Louisiana shoreline that have never been inspected. Michel Dep. at 143:01-143:05.

527.     Louisiana's coast was difficult to access and survey adequately and almost all initial surveys of marsh in Louisiana were done by boat. Michel Dep. at 153:10-154:20, 232:04-

232:15. No transects or measurements were taken in the marsh. Instead, surveys were done in an airboat going along the end of the marsh, based on what surveyors could see from the boat. These surveys resulted in estimates of average width of marsh oiling in the summer of 2010. Michel Dep. at 267:12-267:16, 267:18-268:03.

528.    Even later in the SCAT survey process, teams were not supposed to walk on the marsh excessively, so marsh surveys consisted of spot inspections. As a result, marsh surveys were difficult to do in a comprehensive manner. Michel Dep. at 278:18-279:17.

529.    Oiling in a marsh does not stop suddenly at the edge of heavy, or "bulk" oiling. There is a transition zone, a gradient from heavier to lighter oil, in all environments. Michel Dep. at 283:25-284:04, 284:06-284:11. SCAT teams did not get into the oiled marsh to document lighter oil beyond what bulk oiling was visible from the boat. Michel Dep. at 281:01-281:07.

### c)    The Disaster Harmed Beaches

530.    Substantial quantities of oil were found on the beaches. On Pensacola Beach, Florida on April 5, 2013, approximately 450 pounds of oiled material was recovered. TREX-013246.041. In 2012-2013, 6 million pounds of mixed material (*e.g.,* oil and sand) was removed from Louisiana. TREX-013246.042.



Figure 39: Response Equipment on the Beach (D-34331)

531.    In addition, efforts to clean up the oiling harmed the beaches. Trucks riding on beaches and the scraping and sieving of oiled

beaches changed the texture of the beach and the sand and shell mixture. These alterations to the beach changed the habitat in which beach creatures live, carrying the potential to harm the beach ecosystem. PP Tr. at 405:20-406:06; TREX-013183.030-.031.

532.    Tropical Storm Lee and Hurricane Isaac (the largest storms in the area between May 2010 and January 2013) caused extensive beach erosion and re-mobilization of oil residues on beaches. TREX-012199.006-.007.

533.    Removal of deeply buried oil residues has required extensive mechanical and manual excavation and sieving. TREX-012199.006-.007.

### d)    The Disaster Harmed Marshes and their Inhabitants

### i)    The Marshes themselves were Harmed

534.    The Defendants' oil penetrated mat, soil, roots and burrows of the marsh. PP Tr. at 406:10-408:11; TREX-013183.030-.034; TREX-013183.032-.034.

535.    A large majority of the oiled marsh was saltwater marsh. PP Tr. at 1972:16-1972:18.

536.    Saltwater marsh is one of the three key estuarine habitats for commercially important species in the Gulf – a "nursery ground area." PP Tr. at 1972:19-1972:23.

537.    Saltwater marshes and mangroves are both particularly sensitive to damage from oil. The Environmental Sensitivity Index (ESI), used to rank habitats for sensitivity to oils spills, ranks saltwater marsh and mangroves as a ten on a scale of one to ten. PP Tr. at 1973:01-1973:13.

538.    This oiling harmed common salt marsh cordgrass, black needlerush, common reed, and mangroves. PP Tr. at 406:10-408:11; TREX-013183.030-.032; TREX-013183.044.

151

539.    Oiling also resulted in severe erosion in the marsh. In heavily oiled areas, oiling in the soil was heavy enough to kill not only the surface vegetation, the blades of grass, but also the roots and rhizomes, the death of that plant tissue resulted in the disintegration of the soil texture. About a half meter of soil was just lifted up and eroded away. PP Tr. at 406:10-408:11, 410:16-411:01; TREX-013183.032-.034; TREX-013247.011; TREX-231455; PP Tr. at 1826:05-1826:23.

540.    Even where vegetation regrew there remains a long-term question as to whether the fabric of the soil has been weakened to the point that these areas are more susceptible to erosion. PP Tr. at 406:10-408:11; TREX-013183.032-.034. In addition effects of oiling might combine with other influences to aggravate other causes of harm to the marshes. TREX-231539.001.

541.    Marshes that erode away, either initially or subsequently because of weak root structure, do not regrow without intervention by man, such as pumping dredge sediment or river sediment diversions. PP Tr. at 406:10-408:11; TREX-013183.032-.034.

542.    The heaviest marsh oiling occurred in Barataria Bay, including portions of Bay Jimmy, Bay Batiste, Wilkinson Bay, and St. Mary's Point, Terrebonne-Timbalier Bays including Casse Tete Island, the outer islands of Biloxi Marsh such as Keel Boat Pass Island, as well as in the Mississippi Delta such as in Pass a Loutre. TREX-012199.007; TREX-013015.009.

543.    In Northern Barataria Bay alone thirty-one miles of marsh shorelines were heavily oiled during the worst periods of oiling. TREX-013015.009.

544.     In the fall of 2010, much of the heavily oiled layer on marsh platforms averaged two to three centimeters thick and did not appear to have significantly weathered or naturally degraded. PP Tr. at 1816:10-1816:16; TREX-012199.008; TREX-013015.009.

545.     Along most of the marshes, the oil stranded along the marsh edge and bulk oiling usually spread into the marsh 10-15 meters perpendicular to the shoreline. TREX-012199.008; PP Tr. at 1823:24-1824:05, 1824:18-1824:25; TREX-012199.008. This depth of marsh penetration could have occurred along any marsh fringe that had open communication with water, not just the edge of the marsh that abuts the Gulf of Mexico directly. PP Tr. at 1824:18-1824:25.

546.     The oil that eventually stranded on the shoreline was in the form of a thick, viscous emulsion, containing up to sixty percent water, as opposed to fresh, liquid oil. TREX-012199.002; TREX-013015.016.

547.     Heavily oiled fringe salt marshes caused almost complete mortality to two dominant saltmarsh plants in selected areas of northern Barataria Bay, Louisiana. Rec. Doc. 7114-22 at 6.

548.     Marsh mats are above-ground vegetation that lie on top of the vegetation and are dead, but still rooted. These mats are important because they eventually break down and form marsh soil. PP Tr. at 1822:09-1822:16.

549.    Heavy and persistent oiling conditions in marshes included heavy oiling of these mats and wrack lines that in many cases overlaid a thick layer of emulsified oil on the marsh substrate. TREX-012199.007.



Figure 40: Oil Pooling in a Marsh (TREX-013015.019)

550.    Liquid oil was observed under marsh mats, sitting on the marsh soil throughout 2010 and into 2011. PP Tr. at 1822:24-1823:17; TREX-013015.019.

551.    At least five tropical storms and hurricanes have struck the Gulf region since April 2010. TREX-231539.006. These storms caused re-oiling and aggravated erosion in marshes damaged by the Defendants' oil. PP Tr. at 1822:24-1823:17; PP Tr. at: 464:06-464:19; TREX-013015.011, .051; TREX-012199.006; TREX-231539.001-.002.

552.    NOAA conducted a review of salt marsh oiling conditions in Northern Barataria Bay. Citing surveys conducted in that area in September 2010, NOAA described a "complex oiling zone of roughly 1 kilometer (km) long and 5 m wide with 65-85% oil distribution." TREX-013015.016. Observers described heavily oiled vegetation and mat overlaying a layer of

154

mousse oil on the marsh sediment was trapped under the tarry oiled vegetation mat and wrack, with limited exposure to tidal flushing, sunlight, air circulation, rainfall, etc. This mousse appeared relatively "fresh" and similar to the oil that first came ashore in late May and early June 2010, three to four months prior. TREX-013015.016.

553.     Concentrations of PAHs in marsh soil samples taken from Louisiana marshes show levels of PAHs more than 100 times higher than samples taken before the spill. TREX-231455.002, .005; PP Tr. at 408:16-411:01; TREX-013184.015; TREX-013184.019; TREX-231539.005-.006, .010.

554.     The concentrations of PAHs in collected soil samples from marshes in Louisiana are declining so slowly that oiled wetlands may take decades to recover to the pre-spill conditions. TREX-231539.008; TREX-231539.009; TREX-231455.001; PP Tr. at 408:16-411:01.

### ii)        Defendants' Oil Harmed Marsh Creatures

555.     Creatures that dwell in marshes were also harmed by the oil. For example, exposure to nonlethal concentrations of petroleum hydrocarbons can reduce growth rates of juvenile penaeid shrimps. In a study done after the spill, brown shrimp grew more slowly (less than half the rate) at heavily oiled sites than sites that were only lightly oiled or which were characterized as NOO. TREX-013176.001, .009.

556.     Brown shrimp may be particularly susceptible to oil-laden sediments because this species is a prodigious burrower and, while burrowed, would be in close contact with contaminated sediments. TREX-013176.010.

557.     In addition, there is a potential that shrimp were also harmed by food web changes caused by the Defendants' oil. TREX-013176.009.

558.     Fiddler crab and terrestrial arthropod (insects and spiders) populations were also suppressed in oiled marshes, even though the plants in these marshes appeared unaffected by the oil. TREX-013176.002.



Figure 41: Oiled Oysters (TREX-013112.031)

559.     Research continues on the impacts of the oil spill to oysters and oyster habitat. During Louisiana annual stock assessment sampling, no direct oiling of sampled reefs was noted. Persistent oil sheens and oiled marsh shorelines were present in and around many areas of the public oyster grounds such as Half-Moon Island, Bay Gardene, and Hackberry Bay, however. TREX-230585.008; PP Tr. at 412:06-412:19, 346:15-346:18; TREX-013183.004, .027, .035, .036-.037.

560.     Defendants' oil penetrated and harmed mangrove areas in lower Barataria Bay and thus also harmed both the brown pelicans and spoonbills, species that nest in those very locations. TREX-013183.033-.034; PP Tr. at 395:16-396:09, 411:06-411:12.

561.     Organisms living in the marsh, including shrimp, insects, spiders, and crustaceans were subject to the exposure of long-term oil contamination. PP Tr. at 411:20-411:24; TREX-013183.034; Rec. Doc. 7114-22 at 5; TREX-013183.035.

562.     BPXP's witness, Dr. Tunnell, acknowledged that the heavily oiled marshes in Louisiana are important residual effects from the Defendants' spill. PP Tr. at 1972:12-1972:15.

### iii)     Dr. Taylor's Analysis of Marsh Recovery Omits Important Data

563.     Though he recognizes that soil samples can be useful to understand a marsh's overall health, Dr. Taylor did not consider any chemistry data and based his claim that the marshes had recovered solely on visual observations. PP Tr. at 408:16-411:01; PP Tr. at 1820:18-1821:05; TREX-013184.019.

564.     The presence of aboveground vegetation alone may is not an appropriate indicator of recovery. TREX-231455.001; PP Tr. at 411:06-412:19; TREX-013184.015; TREX-013184.019.

565.     Dr. Taylor also ignores the effect of storms on the marshes. For instance, Dr. Taylor does not account for the fact that there was a six-fold increase in the average concentration of PAHs found in soil samples taken from Port Sulphur, Louisiana immediately after the passage of Hurricane Isaac on 28 September, 2011. TREX-231539.009.

566.     Finally, Dr. Taylor did not assess the impacts of marsh oiling on animals or other biota, but admits that many species are reliant on marshes at all life stages. PP Tr. at 1827:23-1828:15.

## II.     ECONOMIC BENEFIT

567.    The United States has acknowledged that, compared to "the severity of this spill, the harms of this spill, the other factors[,] the statutory maximum, the economic benefit is not a driving factor in the Court's analysis of this penalty." PP Tr. at 34:12-15.

568.    Nonetheless, as shown in this section, this Court has made findings that demonstrate that this disaster was caused in part by cost-cutting and cost-saving measures taken by the Defendants – the essence of economic benefit. The following findings from the Court's Phase 1 decision reveal that the Defendants obtained an economic benefit.

569.    The Court found that BPXP made the decision "to drill another 100 feet to ensure that the well was through the entire primary reservoir package and to be able to conduct wireline evaluation operations and completion procedures." However, as the BP's Geological Operations Coordinator observed, drilling further meant it would be drilling with "minimal, if any, drilling margin." Rec. Doc. 13381-1 at 18-19 ¶¶ 60-65. As a result of these actions, the drilling margin was unsafe – "one of the most dangerous things [an expert] had ever seen in [his] 20 years' experience" and "totally unsafe." Rec. Doc. 13381-1 at 19 ¶ 65. This decision to drill the extra 100 feet "was the initial link in a chain that concluded with the blowout, explosion, and oil spill" and was "motivated by profit." Rec. Doc. 13381-1 at 19-20 ¶¶ 65, 71.

570.    The Court has also found that BPXP was drilling "faster than its geologists could analyze the data from the well" and that this reckless speed was driven by the fact that for "each additional day the HORIZON remained at the Macondo well, BP lost approximately another $1 million. Moreover, the HORIZON was under pressure to get to the Nile well, and then to the

Kaskida well, which BP needed to spud by May 16th or face losing the lease." Rec. Doc. 13381-1 at 18 ¶ 60, 20 ¶ 72.

571.     In the words of one witness, by April 20, 2010, there was "always" pressure to speed up operations: "Just a general consensus around the rig was that the – the bonus was, you know – the well bonus was out the window. We were way far behind. We had been stuck real bad in the – in the middle of this well and lost, you know, several million dollars in fluid and equipment. You know, we had already started conducting training for the next wells that we were going to, which was Kaskida. Our Sunday Safety Meetings were already starting to focus on that. So it – it just seemed like, you know, they were in a real big hurry to get out of here and get to the next one." Williams Dep. P1 at 51:13-52:04. The pressure was coming from BP because it was "costing them a half a million dollars a day to operate this rig in a well that's completely out of control." Williams Dep. P1 at 52:25-53:11.

572.     Running the cement bond log would have taken approximately 10-12 hours and would have cost between $200,000 and $500,000. Rec. Doc. 13381-1 at 50 ¶ 195 n. 74.

573.     The cement that failed was left over from the Kodiak project and BPXP's decision to use that cement was based on financial incentives for the BP Group. Rec. Doc. 13381-1 at 52-53 ¶¶ 209-211.

574.     Further, the Court found that BPXP decided "unreasonably" to use left-over lost circulation material as a spacer between the mud and seawater during the displacement and negative pressure test. Rec. Doc. 13381-1 at 75 ¶ 292. The decision was made to avoid costs associated with transporting and disposing of the lost circulation material and making a new spacer. Once again, the decision was made to "save time and money." Rec. Doc. 13381-1 at 76

¶ 298. Using the LCM as a spacer for the displacement and negative pressure test was a "negligent act that caused the blowout, explosion, and oil spill." Rec. Doc. 13381-1 at 129 ¶ 519.

575.    The Court found that had the BP Group's contractor, Transocean, chosen to upgrade the control system on the Deepwater Horizon to the Mark III system, "the depleted battery [on the BOP] would have been detected and presumably changed." Rec. Doc. 13381-1 at 99 ¶ 413. This decision resulted in a cost savings in the low millions. McWhorter Dep. P1 at 96:15-97:06.

576.    Anadarko also benefited from cost savings for the well. As twenty-five percent owner of the Defendants' well, Anadarko reimbursed BPXP for expenditures pursuant to their contractual agreements. TREX-001943.005; TREX-280000.001, .039; Rec. Doc. 5930 at 2a.

577.    This evidence alone establishes that the Defendants obtained an economic benefit of hundreds of thousands to somewhere in the low millions of dollars.

## III.    THE DEGREE OF CULPABILITY INVOLVED

578.    BPXP's culpability for the violations has already been established. As this Court found, "BP Exploration & Production, Inc. ("BPXP") is subject to enhanced civil penalties under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7)(D), as the discharge of oil was the result of BPXP's gross negligence and BPXP's willful misconduct." Rec. Doc. 13381-1 at 152 ¶ 611.

579.    At the March 21, 2014, Status Conference regarding the Penalty Phase, the Court granted Anadarko's Motion in *Limine* to Exclude All Evidence Regarding Anadarko's Culpability. Rec Doc. 12592 at 2; *see also* Rec. Doc. 12343. Accordingly, the United States did not present any evidence regarding Anadarko's culpability during the Penalty Phase of the trial. The United States did make an offer of proof of such evidence, *see* Rec. Doc. 12965.

## IV.    ANY OTHER PENALTY FOR THE SAME INCIDENT

580.    On January 29, 2013, Judge Vance entered BPXP's guilty plea resolving criminal charges under the Clean Water Act, Seaman's Manslaughter, and the Migratory Bird Treaty Act. Pursuant to the Plea Agreement entered by Judge Vance on January 29, 2013, BPXP will pay a fine of $1.15 billion for its Clean Water Act crimes, $5.5 million for its eleven manslaughter counts, and $500,000 for the crime of obstructing Congress. Rec. Doc. 13725 at 1-2 ¶ 1.

581.    As to other payments made under that Plea Agreement, the agreement provides that "payments made pursuant to paragraph 4(c)(viii) [providing for entry of the order that was agreed to in connection with the Plea Agreement and that was subsequently entered on January 29, 2013] above shall have no effect on, and shall not be argued by the defendant, BP plc, or any other BP plc entity, to reduce in any way, any civil claims by any party arising out of the Deepwater Horizon blowout, explosion, oil spill and response, including but not limited to natural resource damage claims." The payments made pursuant to paragraph 4(c)(viii) of the Plea Agreement include, *inter alia,* the $350 million to the National Academy of Sciences and $2.394 billion ($2,394,000,000.00) to the National Fish and Wildlife Foundation. BPXP's payment of criminal fines totaling $1.256 billion ($1,256,000,000) under the terms of the Plea Agreement is not a payment made pursuant to paragraph 4(c)(viii) of the Plea Agreement. Rec. Doc. 13725 at 2 ¶ 3.

582.    On February 19, 2013, this Court entered a consent decree between the United States and Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (collectively, "Transocean"). The decree resolved the United States' claims against Transocean for civil penalties under the Clean

Water Act arising from the Defendants' disaster, oil spill, and response. Transocean agreed to pay $1 billion in civil penalties to resolve alleged violations of the Clean Water Act resulting from the spill. On February 19, 2013, this Court approved the settlement in a partial consent decree. Rec. Doc. 13725 at 3 ¶ 6.

583.    On January 3, 2013, the United States and Transocean Deepwater Inc. also entered into a Plea Agreement in the United States' criminal case filed against Transocean Deepwater, Inc. in connection with the Defendants' disaster. Pursuant to that Plea Agreement and the subsequent judgment entered on February 14, 2013, Transocean will pay a fine of $100 million for the Clean Water Act violations. Transocean also will pay an additional $150 million to the National Academy of Sciences for the purpose of oil spill prevention response in the Gulf of Mexico and $150 million to the National Fish and Wildlife Federation. The settlement includes various court-enforceable strictures regarding Transocean's drilling operations. Rec. Doc. 13725 at 3-4 ¶ 7.

584.    On June 18, 2012, this Court entered a consent decree between the United States and MOEX, resolving the United States' claims against MOEX for civil penalties under the Clean Water Act arising from the Deepwater Horizon blowout, oil spill, and response. According to the terms of the settlement, MOEX agreed to pay $45 million in civil penalties to the United States to resolve alleged violations of the Clean Water Act resulting from the spill, as well as $25 million in civil penalties to the five Gulf States. In addition, MOEX agreed to implement supplemental environmental projects at a cost of at least twenty million dollars. Rec. Doc. 13725 at 3 ¶ 5; Rec. Doc. 5743-1. This consent decree was agreed to on or around February 20, 2012,

after the Court had dismissed claims that MOEX was negligent for the Deepwater Horizon incident. Rec. Doc. 13725 at 3 ¶ 5; Rec. Doc. 3830.

585.     MOEX settled with BPXP on May 20, 2011. TREX-050444. It paid BPXP $1,065,000,000 and in consideration obtained BPXP's release of all claims arising from the Defendants' disaster and its contract with BPXP. MOEX relinquished its claims as to BPXP, including an agreement that it would not assert claims of gross negligence against BPXP, and also transferred its interest in the Macondo Prospect to BPXP. TREX-050444.004-.006. Under the Agreement, BPXP agreed to indemnify MOEX from claims asserted against it, including for liability for natural resource damages. TREX-050444.007. BP Corporation North America was a guarantor. TREX-050444.016.

586.     Defendants also pointed out two other penalties that have been entered against parties related to post-incident fraud or other misconduct:

a.     On July 25, 2013, Halliburton Energy Services Inc. entered into a plea agreement in which it agreed to pay a $200,000 criminal fine as part of the criminal investigation into matters related to the *Deepwater Horizon* incident. This agreement is not relevant here, however, because it involves the destruction of records generated after the Defendants' blowout. Rec. Doc. 13725 at 4 ¶ 8.

b.     On or about November 15, 2012, the Securities and Exchange Commission ("SEC") and BP p.l.c. entered into a civil settlement and consent to final judgment for violations of Sections 10(b) and 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78 m(a),10 which was entered on December 10, 2012. Pursuant to the Final

Judgment, BP p.l.c. will pay a civil penalty of $525 million to the SEC. Rec. Doc. 13725 at 2 ¶ 4.

These two additional penalties, however, are not relevant to the determination of the appropriate penalty for the Defendants' violations of the Clean Water Act because they involve conduct unrelated to the cause of the incident.

587.    Anadarko has not paid any penalties for the Deepwater Horizon Incident.



Figure 42: Chronology of BP's Prior Violations (D-32017A)

# V.    ANY HISTORY OF PRIOR VIOLATIONS

### A.    The BP Group's History of Past Violations Shows a Consistent Pattern of Placing Profit over the Safety of Its Workers and Communities

588.    As will be demonstrated in the following paragraphs, the BP Group polluted the land, air, or sea, and admitted doing so by pleading guilty to significant violations of environmental law. In the interests of judicial economy, the United States restricts its

presentation of past violations by the BP Group to four serious criminal violations, ignoring all of the other violations. *See, e.g.,* TREX-007153 (listing other oil spills and incidents).

### i.   BP Exploration Alaska Committed in a Criminal Plea to Improve the Safety and Operations of the Entire BP Group

589.   In 1999, BP Exploration Alaska Inc. ("BPXA") pled guilty to knowingly failing to immediately report a hazardous release in violation of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9603(a), at its Endicott Island facility. TREX-022394.

590.   The government, as part of the plea agreement in recognition of the corrective measures and cooperation, agreed to forego charging in an information or indictment criminal violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(2). TREX-022394.016 ¶ 3.

591.   BPXA was the majority owner and operator of the Endicott Island facility, which consisted of two man-made Islands offshore in Alaska, constructed to facilitate oil exploration and production. The drilling rig was provided and operated by BPXA's contractor. Over a period of several years, from 1993 to 1995, BPXA's contractor discharged waste oil and hazardous substances down the outer annuli of the producing wells at the Endicott Island facility. The contractor managers reported that they believed this disposal practice was known and endorsed by BPXA supervisors, those BPXA supervisors denied this. TREX-022394.021-.025.

592.   As part of its plea agreement, BPXA acknowledged that it exercised inadequate oversight and supervision of the Health, Safety and Environmental ("HSE") functions of its contractors; that inadequate audits and audit protocols of BPXA HSE functions were in place; that inadequate resources were dedicated to ensuring appropriate environmental planning,

oversight, and self- policing; and that there was inadequate coordination within the BPXA business organization on HSE matters. TREX-022394.025-.026.

593.    In addition, the BP Group – not just BPXA − agreed to implement and maintain a program of nationwide corrective measures in an Environmental Management System, including all BP Amoco Group facilities engaged in the exploration, drilling and/or production of oil, both onshore and offshore including explicitly the Gulf of Mexico business unit. This program was to be consistent with environmental best practices in order to effectively protect workers, the public and the environment, and to comply with all statutory and regulatory requirements. The BP Group agreed to implement policies and procedures designed to ensure the environmental performance of contractors were adequately supervised. TREX-022394.009-.011.

594.    BP America Inc., the parent corporation, agreed to guarantee funding and the performance of the BPXA and BP Exploration & Oil, and cooperate fully in the development, implementation and maintenance of these nationwide measures. TREX-022394.010.

595.    BP Amoco Corporation, the parent corporation, agreed to guarantee performance of Amoco Production Company to the agreement. TREX-022394.010-.011.

596.    Each of the corporations – not just BPXA – agreed to guarantee the obligations for these corrective measures and to extend them to any new business units. TREX-022394.011, .032.

597.    The BP Group was required to ensure that its operations (including those of contractors), would identify all environmental and related operational risks, such risks are being appropriately managed and potential risks are avoided; all federal, state and local environmental laws, regulations and permits are being adhered to; appropriate policies, programs and

166

procedures are in place; organizational responsibilities clearly defined, understood and implemented; quality controls assurance and verifications are in place, as determined by self-policing and third party audits. TREX-022394.019, .031-.046.

598.    The BP Group also agreed to ensure that incentive bonus and shared savings programs offered to employees, contractors and agents do not encourage behavior which results in operational risks or environmental harm. The BP Group further agreed to ensure that all incentive bonus and shared savings programs would be regularly evaluated to ensure that their existence does not cause additional environmental risks. TREX-022394.014, .020.

### ii.    The Grangemouth Guilty Plea Shows the BP Group Had Not Gotten the HSE Message

599.    During the two week period between May 29 and June 10, 2000, three incidents occurred at the BP Grangemouth Petrochemical Complex in Scotland. The incidents included a power distribution failure, a steam main rupture and a fire in the fluidized catalytic cracker unit. TREX-233876.001-.003.

600.    BP Oil Grangemouth Refinery Limited and BP Chemical Ltd. were indicted and pled guilty to failing to conduct work in such a way as to ensure that persons not in your employment who might be affected were not exposed to risks to their health and safety contrary to Sections 2(1) and 33(1)(a) of the Health and Safety at Work etc. Act 1974; as well as failing to ensure the health, safety and welfare of employees by failing to provide and maintain as far as was reasonably practicable plant systems that were safe in violation of Sections 3(1) and 33(1) of the Health and Safety at Work etc. Act 1974. TREX-233876.001-.003.

601.    The failures to conduct work in such a way to ensure no exposure to health and safety risks included failing to (a) ensure the operation of the pipeline and its status was known

to responsible operators; (b) follow relevant management of change procedures; (c) adequately investigate an incident (system upset); (d) take action to make the system safe following the incident by ensuring the system was not damaged; (e) adequately considering the effect of action on the safety of the system; (f) ensure adequate pipe work support; (g) adequately review the effect and safety implications of numerous plant startups and provide such information to employees operating as necessary to ensure mechanical integrity. TREX-233876.001-.003.

602.     Thus these incidents at Grangemouth involved failure to adequately identify and manage risk, as well as the failing to follow policies and procedures. TREX-233876.001-.003.

### iii.     The Texas City Guilty Plea Proves that the BP Group Still Was Not Addressing HSE Adequately

603.     Five years later, on March 23, 2005, and only months after its probationary period ended under its Endicott plea, an explosion at the BP Group's Texas City Refinery Complex left fifteen dead and more than 170 injured. TREX-233864.056-.057.

604.     BP Products North America Inc. pled guilty in 2007 to a felony for knowing violations of Section 112(r)(7) of the Clean Air Act, 42 U.S.C. § 7413(c)(1); 40 C.F.R. Part 68, Sections 73(b), 87(b)(2). TREX-233864.

605.     Section 112(r)(7) was enacted in 1990, in the wake of the disaster at the Union Carbide plant in Bhopal, India, to "prevent the accidental releases of regulated substances." 42 U.S.C. § 7412(r)(7). Pursuant to this provision, EPA promulgated the Risk Management Plan regulations that codify requirements for process safety information systems, which companies are required to implement to prevent chemical and petrochemical plant releases. *US v. BP Prods. N. Am., Inc.*, 610 F. Supp.2d 655, 662-663 (S.D. Tex. 2009); 40 C.F.R. Part 68.

606.   The disaster began during the start-up of an isomerization unit on the refinery complex that increases the octane in a chemical component of gasoline. The isomerization unit had several process components including a raffinate splitter and a blowdown stack through which hydrocarbon vapors could be directed. TREX-233864.059-.067.

607.   BP Products North America Inc. had not performed a study since at least 1999 to determine whether the blowdown stack had the capacity to release hydrocarbons safely. Furthermore, the blowdown stack and isomerization unit had been in poor operating condition since at least 2003, and critical alarms had not been inspected. TREX-233864.059-.067.

608.   The isomerization unit was down for repairs, and on March 23, 2005 the raffinate splitter was restarted – the most dangerous phase of operating the ISOM because of the reintroduction of hydrocarbons in the presence of elevated temperature and pressure. Although regulations required written procedures to ensure systems operate correctly, on March 23, 2005 some safeguards important to safety startup had not been established through written procedures and for some others the written procedures were not being followed. TREX-233864.059-.067.

609.   During startup of the isomerization unit, hydrocarbon vapors and liquids were released from the raffinate splitter into the blowdown stack exceeding the capacity, hydrocarbon vapors were released ignited causing an explosion and fire. Fifteen contractors located in temporary building near the stack died, and scores more were injured. TREX-233864.059-.067.

610.   Knowing violations of the safety regulations and risk management practices included 1) failing to notify nonessential employees and contractors based in locations close to the splitter that the startup was going to occur; 2) a common practice of violating written procedures for levels in raffinate splitter; 3) control instruments in the tower were showing that

hydrocarbon feeds were decreasing when they were increasing, the required instrument checks were not performed before startup despite knowledge that there was question about whether the control instruments were functioning properly; 4) alarms failed to function or were ignored and BP Products North America Inc. knew the alarms had not been inspected but allowed startup to proceed; 5) the blowdown stack rather than a flare was being used, despite it being unauthorized but common practice; 6) failing to treat an overfill of the raffinate splitter as a credible threat and perform proper risk study; 7) failing to perform a risk valve study to determine whether the isomerization unit had the capacity to release excess hydrocarbons safely; 8) using the blowdown stack despite known deficiencies; failing to notify contractors of the risk of potential fire and explosion at the blowdown stack and follow required procedures for management of change for the placement of temporary buildings including ensuring process safety risks were considered. TREX-233864.061-.067.

611.    At the time the plea agreement was signed, it was the first company convicted of knowing violations of the Risk Management Plan regulations of the Clean Air Act and the criminal fine of $50 million was the largest imposed on a single corporation under the Clean Air Act and the largest criminal fine imposed for a fatal industrial accident. *US v. BP Prods. N. Am., Inc.*, 610 F. Supp.2d 655, 660-661 (S.D. Tex. 2009).

612.    The seriousness of the Texas City offenses cannot be overstated, the explosion and deaths would not have occurred had BP Products North America Inc. complied with the regulatory requirements in testing and operating the raffinate splitter in the isomerization unit and in warning the contractors in the trailers prior to startup. *US v. BP Prods. N. Am., Inc.*, 610 F. Supp. 2d 655, 666-667, 728 (S.D. Tex. 2009).

170

613.   The record also shows BP Products North America Inc. had a history of inadequate and deficient process safety management at the Texas City refinery and elsewhere. Reports emphasized that BP Products North America Inc.'s parent company, headquartered in London, had implemented budget cuts that adversely affected the Texas City Refinery including its process safety management system. The plant was aging and in decline, rather than committing resources to repair equipment and address safety problems that had been identified in audits and investigations, the parent implemented budget cuts. *US v. BP Prods. N. Am., Inc.*, 610 F. Supp. 2d 655, 666-667, 728 (S.D. Tex. 2009).

614.   Like those at Grangemouth, these violations at Texas City involved: the failure to properly identify and manage risk, as well as the failure to follow policies and procedures.

### iv.   The Prudhoe Bay Guilty Plea Proves Texas City Did Not Change the Practices of the BP Group

615.   Just one year after Texas City, the BP Group's Prudhoe Bay pipeline in Alaska leaked 200,000 gallons of oil onto the Alaska tundra (the largest spill on the tundra to date) leading to a 2007 guilty plea by BPXA for violation of 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) of the Clean Water Act for the negligent discharge of oil. This is the same statute to which BPXP pled guilty for the Defendants' spill. TREX-233863.

616.   BPXA operated the Greater Prudhoe Bay oil and gas field comprised of approximately 1,600 miles of pipeline.

617.   On March 3, 2006, an oil spill was discovered between two flow stations in the oil transit lines in the Western Operating Area of Greater Prudhoe Bay. The spill was caused by a hole in the oil transit line as a result of corrosion at a caribou crossing known to be locations for corrosion due to sediment build up. TREX-233863.007-.010.

618.    On August 6, 2006, a second leak of approximately 1,000 gallons occurred in the Eastern Operating Area as the line was being inspected pursuant to a Department of Transportation order. TREX-233863.007-.010.

619.    Both spills occurred in environmentally sensitive tundra ecosystem. TREX-233863.007-.010.

620.    BPXA acted negligently by failing to adequately inspect and clean the oil transit lines. Corrosion from sediment was a known problem, BPXA was aware of sediment build up in the pipelines, knew it had inadequate inspection data, and failed to take necessary actions to prevent leaks on the oil transit lines in light of these conditions. BPXA also negligently failed to ensure the integrity of its leak detection system. TREX-233863.010-.013.

621.    Like those at Grangemouth, these violations at Prudhoe Bay involved: the failure to properly identify and manage risk, as well as the failure to follow policies and procedures.

**v.     The BP Group's History is Replete with Deficient Safety Management Practices**

622.    As noted by Judge Vance, the "the record shows that, although not the BP entity charged in this case, the BP family of companies has a history of deficient safety management." *US v. BPXP*, Criminal Action No. 12-292, Rec. Doc. 65 at 5-6.

623.    The BP Group prior violations are particularly relevant to the violations that took place at the Defendants' well. BPXP and its affiliates argued throughout this litigation that they bear no responsibility for the actions taken by Haliburton and Transocean, the Group's main contractors for the Defendants' well. Rec. Doc. 10466 at 15-20, 31-45.

624.    This contention squarely contradicts representations made by the BP Group in a prior criminal plea in which it represented it would take appropriate responsibility for the actions

172

of its contractors. Specifically, more than ten years prior to the Defendants' disaster, BPXA admitted in a guilty plea it had "exercised inadequate oversight and supervision of the [HSE] functions" of its contractors. As this Court found in its Phase 1 ruling, BPXP and its affiliates clearly failed to exercise adequate oversight over the health and safety functions of its contractors and then sought to disavow its obligations to do so, flying in the face of the BP Group's commitment in the Endicott criminal plea and the lessons it supposedly learned from Texas City. Clearly, the BP Group did not comply the its agreement in the Endicott Island plea while drilling the Defendants' well, as multiple instances of failing to properly identify, manage, and avoid environmental and related operational risks were established in Phase I. *See, e.g.,* Rec. Doc. 13381-1 at 51 ¶¶ 201-204.

625.    The prior violations also all reflect the failure to properly identify and manage risk. At the Defendants' well this too was repeated. BPXP made numerous decisions in "isolation" and without mitigating the "associated risks," including those that should have increased the caution surrounding the negative pressure test. Indeed, numerous acts of negligence amounted to an extreme deviation from due care and a conscious disregard of known risks including: drilling the final 100 feet of the well with little or no margin, running the production casing with the float collar in unconverted mode and without a shoe filter, failing to verify whether the float collar converted by reverse circulating the well, not conducting a CBL, using LCM as a spacer for the displacement and negative pressure test, misinterpreting the negative pressure test, allowing simultaneous operations to occur during displacement, and failing to provide a displacement schedule to the Transocean drill crew. *See* Rec. Doc. 13381-1 at 18 ¶ 60,

19 ¶ 65, 34 ¶¶ 131-133, 47-50 ¶¶ 192-195, 56-57 ¶¶ 223-226, 58 ¶ 230, 64 ¶¶ 248-249, 70-71 ¶¶ 275-277, 76 ¶ 298, 125-126 ¶¶ 509-510, 129-130 ¶¶ 519-520.

626.     That the prior violations involve BPXP affiliates demonstrates the commercial and operational unity of all the affiliates within BP p.l.c. The violations also evidence the central control and direction by BP p.l.c. or the BP Group over many key aspects of all BP corporations, including BPXP, on important operational practices. As explained *infra* § VII.A., BPXP's operations, including those that led to the Defendants' disaster, are driven by the BP Group, through functions and business units, not by legal entities such as BPXP. Indeed, BPXP has no employees. To consider only BPXP when looking at its history of violations is to create a legal fiction for the purpose of assessing a penalty which is in direct conflict with the evidence of how the BP Group operates; indeed all of the safety policies and procedures addressed in this litigation are BP Group policies, not BPXP, making the prior safety problems of BPXP affiliates relevant.

### vi.     BPXP's Contentions at Trial Also Show it Has Not Learned its Lesson

627.     BPXP's Plea Agreement precludes any BP entity from arguing "payments made pursuant to Paragraph 4(c)(viii) . . . to reduce in any way, any civil claims by any party." Paragraph 4(c)(viii) includes all the special terms of probation." The special terms of probation, include payments made to National Fish and Wildlife Foundation or the National Academy of Sciences, and a requirement that BPXP continue to fund GOMRI. PP Tr. at 1370:19-1370:21; TREX-052673.035, .007.

174

628.    Yet, BPXP repeatedly presented these payments for the Court's consideration in deciding on the penalty. D-34605; D-34606; TREX-246896; PP Tr. at 1589:20-1593:05, 1599:10-1600:03, 1606:05-1606:12; PP Tr. at 1359:13-1360:23.

**B.      Anadarko, Too, Has a History of Past Violations**

629.    Anadarko has also committed violations of relevant statutory and regulatory provisions as reflected in Table 5. *See* Rec. Doc. 13808. In the interests of judicial economy, the United States has limited its proof to those violations to which Anadarko has stipulated but does not stipulate that this list comprises the full universe of violations as to Anadarko.

175

| Table 5: Anadarko's Prior Violations | |
|---|---|
| **Penalty** | **Type of Violation** |
| $4,500.00 | Alleged permit violations occurring on a facility offshore in the Gulf of Mexico in 2004 and 2005. Anadarko also paid $17,500 for a supplemental environmental project |
| $500.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately two gallons of oil occurring on June 20, 2005 |
| $5,334.58 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately fifteen barrels of synthetic based mud occurring on June 23, 2005 |
| $250.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately one gallon of crude oil occurring on May 10, 2005 |
| $500.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately two gallons of crude oil occurring on August 24, 2006 |
| $250.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately 0.5 gallon of crude oil occurring on May 14, 2009 |
| $250.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately 0.4 gallon of oil occurring in August of 2009 |
| $250.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of less than one gallon of crude oil occurring on December 26, 2009 |
| $1,000.00 | Violation(s) of CWA Section 311 in the Gulf of Mexico related to a discharge of approximately three barrels of synthetic based mud occurring on April 21, 2010 |
| $1,050,000.00 | Discharges of oil in violation of CWA Section 311(b) from certain onshore oil production facilities in Wyoming and Montana and violations of regulations implementing CWA Section 311(j) |
| Source: Rec. Doc. 13808 | |

## VI.   THE NATURE, EXTENT, AND DEGREE OF SUCCESS OF ANY EFFORTS OF THE VIOLATOR TO MINIMIZE OR MITIGATE THE EFFECTS OF THE DISCHARGE

### A.   The BP Group's Efforts to Minimize the Discharge Were Inadequate

630.   This Court has reviewed the Defendants' efforts to cap the leaking well in its

Phase 2 decision. As the Court found in that decision, the well did not stop flowing until July 15,

176

2010 at 2:24 p.m. CDT, eighty-seven days after the explosion that started the disaster. Rec. Doc. 14021 at 26 ¶ 184.

631.    Before the well was shut in, the BP Group did manage to contain and capture some oil through the RITT, Top Hat, and Capping Stack. *See, e.g.,* Rec. Doc. 14021 at 19 ¶ 116, 22 ¶¶ 142-144, 25 ¶ 176. However, as this court found, 3.19 million barrels of Defendants' oil were discharged into the waters of the Gulf of Mexico. Rec. Doc. 14021 at 43-44 ¶ 273.

**B.    The BP Group Was Inaccurate and then Lied about the Flow Rate, Creating Mistrust by the Public that Complicated the Response**

632.    Very early in the response, the BP Group reported to the Coast Guard that the spill was approximately 1,000 barrels per day ("bpd"). TREX-009105.052. The Coast Guard published the BP Group's estimate in a statement made to the public on April 24, 2010. Landry Dep. P2 at 103:24-106:10.

633.    Shortly after the April 24, 2010 announcement, NOAA began to express concern that the flow rate was more than 1,000 bpd. The FOSC, at that time ADM Landry, requested an update from the BP Group who reported that the estimate should be updated to 5,000 bpd. The Coast Guard announced the updated estimate on April 28, 2010. Landry Dep. P2 at 181:15-181:24, 182:02-183:15.

634.    This Court found that "BP repeatedly told government officials that its best estimate for flow rate was 5,000 barrels of oil per day, while the BP Group's internal documents showed there was little basis for this estimate and actual flow rates were significantly higher. Indeed, BP pled guilty to obstruction of Congress, 18 U.S.C. § 1505, for making such misrepresentations in response to a Congressional Committee inquiry." Rec. Doc. 14021 at 32 ¶ 228.

635.     While the Court found that the inaccurate and then false flow rate information did not delay or adversely affect source control, there is no question that the misleading information about flow rate had an impact on the overall response. Captain James Hanzalik, who worked within the Unified Command, recognized that the public trust was broken by the series of woefully inadequate flow rate estimates: "It made USCG look like they did not know what they were doing." TREX-009114.002.

636.     The distrust from the flow rate debacle infected other areas of the response. Political leadership for the states did not trust the numbers the government was using to track response equipment such as skimmers and boom. Laferriere Dep. at 215:08-216:03. Similarly, FOSC Captain Hein recognized that there a need to adjust response actions to address the mistrust of BP. Hein Dep. at 130:07-130:13, 130:15-131:04, 132:14-133:14, 133:16-135:01.

637.     Upon losing the public's trust, as the BP Group did through its failure to cap the well and its misleading flow rate estimates, the public turns to alternative sources of information and may even begin taking its own response actions – both of which can be dangerous. PP Tr. at 84:17-85:02. Once the trust was lost, the response became more complicated because the Unified Command had to take extra steps to show that it was actually doing what it said it was doing and to earn back the trust that the BP Group had squandered. PP Tr. at 85:13-85:22.

## C.     As a Responsible Party BPXP Was Required to Perform the Response Actions

638.     "The Oil Pollution Act, 33 U.S.C. § 2701 et seq.; Federal Water Pollution Act, 33 U.S.C § 1251 et seq.; and the National Contingency Plan, 40 C.F.R. § 300 et seq., established the legal framework for the coordination of the efforts to control the source of the oil. These statutes and regulations authorize the Federal On-Scene Coordinator (FOSC) to direct and monitor all

Federal, State and private actions. Efforts to coordinate the response were also governed by Homeland Security Presidential Directive 5 (HSPD-5). HSPD-5 designates the Secretary of the Homeland Security as the Principal Federal Officer for domestic incident management." Rec. Doc. 14021 at 11 ¶ 48; *see also* TREX-009105.025; Laferriere Dep. at 55:10-55:22.

639.    As FOSC Captain Hein testified: "They participated. They were supposed to." Hein Dep. at 28:24-29:05; *accord* PP Tr. at 100:19-100:22; Laferriere Dep. at 309:23-310:01 ("I'm suggesting that BP is responsible for the cleanup of the oil spill, absolutely, absolutely. Let's not forget that that is their duty.").

640.    A response under the National Contingency Plan does give the federal government "primacy" in order to "provide a single point of control over the [responsible party] and promote unity of effort across all the impacted jurisdictions." TREX-009100.006. The response, however, involves the required and active participation of the responsible party – not as an assistant but as an integral player. As the Houma Incident Commander indicated: "an oil spill response is a multi-million dollar[] corporation set up overnight with partners who don't necessarily want to be in business with each other." PP Tr. at 101:03-101:10.

641.    If a responsible party does not participate in the response, the Coast Guard has the authority and the financing, through the Oil Spill Liability Trust Fund, to undertake the response and then recover its costs. 33 U.S.C. §§ 2702(a), 2712(a). The responsible party can be penalized up to three times the removal costs incurred by the Coast Guard. 33 U.S.C. §§ 1321(b)(7)(B)(ii); *see also* 33 U.S.C. §§ 1321(b)(5), (7) (providing for penalties for failure to comply with a federal removal order). The Coast Guard has encountered situations in which it has had to perform the

179

response action and, though it has required additional Coast Guard resources, the response actions have proceeded successfully. Laferriere Dep. at 32:07-34:07.

642.    BPXP's failure to understand its obligations under the NCP is demonstrated by its continued effort to get credit for "assisting the Unified Command." As Captain Laferriere (ret'd) stated: "How can you assist something when you are part of it. It is like saying I'm assisting myself." Laferriere Dep. at 259:01-259:05, 264:14-264:24, 265:01-265:06; *see also* PP Tr. at 125:04-125:06.

643.    Similarly, BPXP's payments for damages under the various claims processes are legally required. Robertson Dep. at 128:16-130:21; 131:15-132:23.

644.    As noted in the United States' pre-trial brief, BPXP did pay for some items that were not required by law. "The evidence for these numbers is set forth in the report of BP's witness, Frank Paskewich. . . . Setting aside payments for NRD-related matters, which are legally required, Captain Paskewich (ret'd) sets out about $846,200,000 in expenses that BPXP paid for the GOMRI prior to the criminal plea agreement, tourism promotion, seafood promotion and testing, rig-worker support, and a donation for environmental restoration projects that are not NRD. The United States concedes that those expenses were incurred and were beyond the expenses "required by the Unified Command." Rec. Doc. 13901 at 11-12.

**D.    Even Were BPXP Entitled to Credit for the Response Action, It Has Exaggerated Its Success**

645.    BPXP spent a significant portion of the trial focused on the massive nature of its response to the oil spill. The United States does not dispute that *overall* the BP Group's response efforts satisfied its legal obligation. In the words of the United States' first witness: "I think BP did a pretty good job, I give it a B plus or an A." PP Tr. at 101:11-101:13. It is important to

180

remember, however, that the spill response was massive because the spill was massive.

Hein Dep. at 132:04-132:13.

646.     Further, it is undisputed that *overall*, as members of the Unified Command, BPXP

and the Coast Guard "did work collaboratively," "worked well together," and were effective in

making progress to respond to the spill, including successfully resolving any "burps" and

"mitigat[ing] them fairly quickly." Hein Dep. at 38:15-39:11, 39:14-39:17, 39:21-40:02, 40:05-

40:10, 40:14-40:18, 56:05-56:12, 56:14-56:16, 68:23-69:05, 256:01-256:25; McCleary Dep. at

152:08-152:17, 222:13-222:16, 222:20-222:23, 238:08-238:15.

647.     BPXP's efforts to claim its work as the "best" response, however, are

exaggerated. As the Incident Commander for the Houma Incident Command Post, Captain Roger

Laferriere testified:

> It is my duty to ensure that they do it adequately, which they did. It doesn't mean
> they did it excellently. It doesn't mean they did it superiorly. It doesn't mean they
> were awesome. It means they were adequate, adequate. That is it.

Laferriere Dep. at 309:23-310:07.

### i.     Judging the Success of a Response Requires Consideration of Many Factors

648.     Since the mid-1990s, Coast Guard officers have been trained in the doctrine of

best response – a concept drawn from a paper written by Coast Guard experts in oil spill

response. PP Tr. at 81:05-81:16.

649.     The guiding principle of the best response doctrine is that it is not enough to just

clean up the oil, there are "other factors that have to be taken into account in order for a spill

response to be considered successful." PP Tr. at 81:05-81:16. Accordingly, evaluating the

success of an oil spill response requires consideration of the safety and health of the responders

181

and community, environmental impacts, economic impacts, public information, stakeholder

support, and response organization. PP Tr. at 81:17-81:22; Laferriere Dep. at 56:25-58:11;

TREX-007802.007. BPXP's witness Captain Paskewich (ret'd) a slightly modified version of

this set of factors, but there was significant overlap between the parties' list of considerations.

*See* TREX-241529.007.

650.    BPXP made the misleading contention throughout the trial that the most

significant objective of the response, other than safety, was to keep the oil off the shoreline – as

though the remainder of the environment were irrelevant to the response and to evaluating the

effectiveness of the response. Of course, the focus of the Unified Command included the

shoreline, but it was expressly broader than that, it was to "[m]aximize protection of

environmentally and economically sensitive areas and contain and recover spilled material."

Laferriere Dep. at 91:01-91:13; *see also* PP Tr. at 1297:18-1297:21 (distinguishing shoreline

protection as a "key" objective rather than "primary").

### ii.    The BP Group Made Some Mistakes During the Response

651.    During the response, there were times when the Coast Guard considered

federalizing it because of the failure to close the well. As Admiral Allen (ret'd) stated in one of

his emails, "I would say maybe we are not satisfied with BP's responsiveness. The approach and

strategy are fairly well documented in response plans, it is the execution that is the problem."

TREX-009101.001; *see also* TREX-009495.095.

652.    In addition, ADM Landry had to repeatedly ask the BP Group about establishing

Forward Operating Bases in Louisiana, including a public statement "expressing [her]

dissatisfaction or disappointment." Landry Dep. at 391:12-391:22. These Forward Operating

Bases were critical to reducing travel and response time and allowed for better tactics, improved the span of command and control for the FOSCR, and provided more interaction at the local level. TREX-013514.004; TREX-009105.038.

653.    The Coast Guard also had to, on occasion, push BPXP for better information flow and instrumentation than BPXP was providing. J. Watson Dep. at 205:18-207:02, 212:05-213:06, 220:15-221:06, 414:11-414:19. One such incident occurred during the cruises instituted to test the concept of subsea dispersants. The initial cruise to collect data in early May was hindered by the failure of BPXP's contract scientists to procure the correct equipment, and thus the cruise was unable to collect useful data. Conmy Dep. at 201:01-204:07. The BP Group's failure deprived decision-makers of relevant information, forcing them to make decisions regarding subsea dispersants without an understanding of whether the dispersants were effective, or what would happen to the oil. Conmy Dep. at 303:03-303:06, 303:08-304:16, 304:18-305:18, 306:07-306:24, 307:01-307:11.

654.    Similarly, once the Joint Analysis Group was created to analyze oceanographic data, the BP Group's contractors were not forthcoming with data in a timely fashion. The BP Group also failed to develop a data management plan, leaving NOAA responsible for managing the data that was collected. Conmy Dep. at 105:13-106:13, 110:24-110:25, 110:02-111:08.

655.    Even more importantly, the BP Group failed to recognize the risk of failing to cap the well and therefore "failed to marshal the appropriate defense for the onslaught of the oil that came onshore initially." Laferriere Dep. at 252:04-252:14. As "a result, the oil came to shore without sufficient resources to respond to the removal of the oil. And it became a national outcry. National media event." Laferriere Dep. at 252:21-253:06.

656.    The BP Group was also slow to increase the skimming capacity of the Houma Incident Command. Laferriere Dep. at 340:07-340:09, 340:12-342:24, 343:01-344:05.

657.    At times, the Coast Guard also had to "push" the BP Group to increase the containment capacity to meet the amount of oil coming from the well. J. Watson Dep. at 164:06-165:23, 177:07-177:24.

658.    The Houma Incident Commander also believed that problems with response worker safety had less to do with the adequacy of the plans than with implementation of them in the field, noting that responders "simply needed to do better in future spills to ensure that no heat stress mishaps occur because they are preventable, 100 percent preventable." Laferriere Dep. at 135:04-135:17. He also ordered safety officers to do medical screening of response workers before they were put in the field, though that order was not carried out during his tenure. Laferriere Dep. at 136:12-137:06. The Commander's concern was corroborated by worker reports to NIOSH that they were not receiving proper safety training and that frequent rotation of supervisors resulted in people being unfamiliar with interpretation and understanding of rules, procedures and protocol. TREX-012257.021.

659.    Among other measures that Captain Laferriere (ret'd) ordered but that did not occur was the requirement for safety officers to do medical screening of response workers before they were put in the field. Laferriere Dep. at 131:23-132:18, 136:01-137:06. This was also a recommendation made by NIOSH. TREX-12257.024. Captain Laferriere (ret'd) had also requested a non-alcohol policy to help prevent heat stress illnesses that was not implemented, a policy for which workers themselves indicated support. Laferriere Dep. at 141:04-141:13; TREX-12257.022.

184

660.    Similarly, after the loss of a response worker during the off-duty hours, Captain Laferriere (ret'd) noted that "there is no such thing as off duty" during a response and that the Unified Command "should institute after hours activities as part of the safety program," something workers themselves also requested. Laferriere Dep. at 139:17-140:09; TREX-013027.005; TREX-012257.022.

661.    In addition, despite the BP Group's "incredible capabilities to address the media with their advertising and marketing campaigns," the Group's efforts to conduct stakeholder and media outreach during the spill were ineffective. Laferriere Dep. at 213:10-215:06; TREX-013514.006. For instance, it took the BP Group almost a month to improve public outreach. Laferriere Dep. at 213:24-215:06; TREX-241529.076-.077.

> ### iii.    BPXP's Assertion that it Removed Thirty-Seven Percent of the Oil is Unsupported by the Evidence

662.    Captain Paskewich (ret'd) concludes that the response to the Defendants' oil spill "removed" thirty-seven percent of the oil the Defendants spilled. PP Tr. at 1271:14-1271:21. He then compares apples to oranges by comparing the amount of oil dispersed, burned, and skimmed in the Defendants' spill to the amount of oil skimmed during other spills. He contends that the response was more effective than the responses to other oil spills, including three tanker spills and two well blowouts. *See* TREX-241529.008. The evidence, however, shows that this analysis suffers from at least three fatal flaws.

663.    Before evaluating the specifics of Captain Paskewich's (ret'd) claims regarding success, it is important to note that he and Captain Hanzalik (ret'd), upon whom he relied as a source of information, are employed by Clean Gulf Associates as President and Vice President, respectively. PP Tr. at 1295:20-1296:06.

a.      Clean Gulf Associates provides oil spill response services to the oil exploration and production industry and is funded by members' dues, including BP and Anadarko. PP Tr. at 1296:10-1297:03.

b.      Together BP and Anadarko provide between eighteen and twenty-five percent of the funding for Clean Gulf Associates. PP Tr. at 1296:10-1297:03.

c.      BP and Anadarko each has a seat on the board of directors of Clean Gulf Associates. PP Tr. at 1297:04-1297:06.

d.      The board of directors selects the President of Clean Gulf Associates, has the authority to fire him, and sets his compensation. PP Tr. at 1297:07-1297:17.

### a)      BPXP Compares Responses that Relied Predominantly on Skimming to a Response that Used Unprecedented *In Situ* Burns and Dispersants

664.    While the concepts and techniques used in the response to Defendants' spill were not unique in most respects, the particular combination in which dispersants, *in situ* burns, and skimming were used was unique. BPXP, however, seeks to convince the Court that this response is comparable to responses that used a very different toolbox under very different circumstances.

665.    For instance, the *Exxon Valdez* spill was an instantaneous spill from a tanker – not an ongoing discharge from a subsea well. In addition, only one *in situ* burn was attempted in the *Exxon Valdez* spill. *See* TREX-013514.007. Further, dispersants were applied only for the first few days. *See* TREX-013514.007. By contrast, the response to Defendants' spill required 411 *in situ* burns and over a million gallons of dispersants. *See supra* ¶¶ 20-21.

> **b)     BP Treats Burned and Dispersed Oil as "Removed" from the Environment**

666.    Captain Paskewich's (ret'd) opinion regarding the effectiveness of the response is premised on a misrepresentation of simple principles. To understand this, one must understand the three key strategies used to keep oil from reaching the shoreline: dispersants, skimming, and *in situ* burns.

667.    As discussed above, dispersants are used to break up the oil into small droplets. Dispersants do not remove oil from the environment. PP Tr. at 354:21-355:16; TREX-013514.006.



Figure 43: Smoke Plume from an In Situ Burn (TREX-009124.004)

668.    Similarly, in situ burns do not remove the oil from the environment. Rather, as one article noted, "[a]pproximately 4% by mass of oil burned on the surface was emitted as soot particles." TREX-240164.001; *see also* PP Tr. at 1281:07-1281:12, 1306:02-1306:15; TREX-011834.005 ("In-situ burning alters the composition of the spilled oil by eliminating anywhere from 90% to 99% of the original volume of oil contained in a fire resistant boom. A portion of the original oil is released into the atmosphere as soot and gaseous emissions.").

669.    By contrast, skimmers actually do remove the oil from the water. Hein Dep. at 47:17-48:08. In other words, skimming or "[m]echanical recovery is the preferred method of on water spill response because it removes the oil from the environment." TREX-012055.005.

670.     Captain Paskewich (ret'd), in arguing that he was correct to include dispersants and *in situ* burns in his "removal" analysis revealed a fundamental error in his analysis: "removal activities are response" actions he argued. PP Tr. at 1305:02-1305:12. He is clearly referring to the legal definition of response actions under the Oil Pollution Act. 33 U.S.C. § 2701(30). That dispersant application or *in situ* burning qualify legally as a removal action does not establish that the oil is actually removed – that is, gone from the environment – when these response techniques are used.

671.     When one compares the effectiveness of the response to the Defendants' violations to previous response actions using just the percentage of oil that was actually physically *removed* from the environment, Captain Paskewich's (ret'd) estimate of effectiveness falls to below the recovery rates in the other spills.

672.     Specifically, using the Court's total volume estimate of 3.19 million gallons discharged into the environment (Rec. Doc. 14021 at 43-44 ¶ 273), Captain Van Haverbeke demonstrated that the total volume removed – *i.e.,* skimmed – comes to only five percent. TREX-233890.001; TREX-247638.001.

673.     Thus, the response to the Defendants' violations removed less oil that the average spill response as shown in Figure 44. It also removed less oil than was removed during the *Exxon Valdez* response *See* TREX-233890.001; TREX-247638.001.



Figure 44: Comparison of "Effectiveness" of Responses (D-34006A.1)

### c)   Without a Daily Flow Rate, BPXP's Calculations are Unsupported

674.   Captain Paskewich's (ret'd) estimate is also incorrect because it relies on calculations that inherently require knowledge of the daily flow rate. Specifically, just before the Penalty Phase Trial, this Court issued its Findings of Fact and Conclusions of Law with respect to the Phase 2 Trial. In that opinion, the Court rejected both parties' estimates of the total volume – each of which was premised on a daily flow rate – and selected a value within the United States' uncertainty range. Rec. Doc. 14021 at 39-44 ¶¶ 256-273. The Court did not, however, determine the daily flow rate. Rec. Doc. 14021 at 39-44 ¶¶ 256-273.

675.   Captain Paskewich (ret'd) calculated his estimate of the effectiveness of the *Deepwater Horizon* response by starting with the Court's total volume. He then used the volumes identified by the United States in its interrogatory responses to calculate the percentages of oil burned, skimmed and dispersed. TREX-247638.002 n. 3.

676.    The United States' interrogatory responses relied upon values drawn from the Oil Budget Calculator. TREX-012198.003; TREX-009182.083. As Captain Van Haverbeke (ret'd) testified, while the values for amount skimmed and amount burned can be determined from actual measurements in the field, the values for the amount of oil dispersed and the amount of oil deemed unrecoverable in the Oil Budget Calculator were calculated using a daily flow rate. PP Tr. at 614:11-614:21. Because there is no flow rate associated with the now established total discharge, it is difficult, if not impossible, to adjust the Oil Budget Calculator figures for the amount of oil dispersed and the amount of oil deemed unrecoverable. PP Tr. at 614:22-615:05. Thus, Captain Paskewich's (ret'd) calculation of both the thirty-seven percent and the sixty-seven percent are based on numbers that are no longer valid.

### d)    The Comparison to Oil Available for Recovery Is Irrelevant

677.    Captain Paskewich (ret'd) also offered an alternative measure of effectiveness and claimed that the Court should consider the fact that the *Deepwater Horizon* response, using his flawed calculations, recovered sixty-seven percent of the "oil available for recovery." PP Tr. at 1277:17-1278:04. He defines "oil available for recovery" as excluding the percentage of oil that naturally disperses, naturally dissolves into the Gulf, or is otherwise not recoverable. PP Tr. at 1277:17-1278:04.

678.    The oil that dissolves in the Gulf is still there in the Gulf, as evidenced by this exchange between BPXP's expert and the Court in Phase 2:

THE COURT: Let me ask a very simple, basic question.

What do you mean by dissolved? Does that mean it's totally gone? Because I can dissolve something in water and it's still in the water.

THE WITNESS: Right.

190

THE COURT: For example, salt. Doesn't mean the water's not salty. So I'm trying to get an understanding of what you mean by dissolve. Does it mean the chemical has totally gone away, doesn't exist anymore in the water, or it's just so diluted that it doesn't –

THE WITNESS: No. The easiest is take this thing here. Okay? Originally, if we filled it up from the tap, it would just be H2O. Okay?

We pour out half of it and it fills with air, nitrogen, oxygen, and CO2. Screw on the cork. We shake it up. . . . So what's happened? Some of the nitrogen, CO2, and oxygen have now dissolved into the water.

If we sent that water to do . . . an analysis, a chromatographic analysis of that water, it would not only find H2O – hopefully it won't find anything else - but H2O, CO2, nitrogen, and oxygen, they're all dissolved in different amounts in the water. Doesn't mean they're gone, they're just in the water phase instead of being in the air phase.

P2 Tr. at 2350:25-2351:23.

679.     So too, the oil that is dispersed is still in the water (*see, e.g., supra* ¶ 367), and even oil consumed by bacteria leaves some hydrocarbons in the water (*see supra* ¶ 376). Measuring effectiveness by excluding oil that was not recovered turns the concept of effectiveness on its head – it is as though a police force measured its success not by comparing the numbers of criminals it caught against all criminals but only against those criminals that it *could* catch. The crimes still occurred even if there were good reasons why the police could not catch the criminals who committed them.

### iv.     The Reduction of Dispersant Use Was Sound Policy

#### a)     The Dispersant Directives Were Generated by the Unprecedented Volume of the Spill

680.     Dispersants are deployed pursuant to statutory and regulatory guidelines. First, EPA is responsible for authorizing particular dispersants, which it includes on a federal product

schedule. Allen Dep. P2 at 127:08-128:09. The two dispersant products deployed during the

Response had been included on that schedule by EPA. Allen Dep. P2 at 479:13-479:22.

681.    Second, particular Regional Response Teams and States may pre-authorize the

use of dispersants approved under conditions agreed to by the pre-designated FOSC and local

governments. Allen Dep. P2 at 127:08-128:03, 128:12-128:23. At the time of the Deepwater

Horizon Response, Louisiana was among the States that had preauthorized use of dispersants.

Allen Dep. P2 at 128:12-128:23.

682.    The pre-authorization for the use of dispersants in the *Deepwater Horizon*

response was found in a document called RRT-6 FOSC Dispersant Pre-Approval Guidelines and

Checklist. TREX-011835. This pre-approval document reflects the need to adapt techniques to

the unique circumstances of each oil spill:

> No single response method is 100% effective thereby establishing need to
> consider the use of all available methods from the start of the spill response.
> Initially, the assumption needs to be made that all three methods (mechanical *in-
> situ* burn and dispersants) may be used and then adjustments are made to that
> assumption as information concerning the spill is received by the [FOSC].

TREX-011835.005; *accord* TREX-011834.011 ("Every spill situation is different, and

throughout a spill, the conditions affecting the selection of a response mode are constantly

changing."); TREX-009114.003 (noting that "novel" applications of dispersants were not

included in the pre-approval).

683.    Moreover, the pre-authorization covers only the surface application of

dispersants, and does not contemplate combining surface and subsea application. *See, e.g.,*

TREX-011835.006 ("Pre-approval is not restricted to aerial application only. Other application

techniques (*e.g.,* boat) may be considered"), .012 (including the checklist consideration of the

appropriate "platform" for application and offering two choices: aerial and boat);

TREX-007802.005. For novel uses of dispersants not contemplated in the pre-authorization, EPA

concurrence is legally required. *See* 40 C.F.R. § 300.910(b).

684.    In typical oil spill responses, dispersants are rarely applied, let alone applied on

consecutive days:

> When I was stationed in Galveston in the late '90s, any time you had an offshore oil spill we would pull out the Regional Response Team pre-approval checklist, which was actually a flow chart that you put in some factors like the weather condition, wave heights, type of oil, what not, into the top of the flow chart and then you'd work your way through. And when you get to the bottom, it would say either not recommended to use dispersants or recommended to spray dispersants.
>
> *For the most part, we would end up with a no answer*, but on a handful of occasions we ended up with a yes and then we did use dispersants.

PP Tr. at 88:17-89:03 (emphasis added).

685.    By contrast for the Defendants' spill where there was a fresh spill every day, "we

would start at the top of the Region VI pre-approval checklist and we'd get to the bottom and we

would get to a yes, recommended using dispersants on many, many days in a row." PP Tr. at

89:04-89:20.

686.    As the failure to cap the well continued and the amount of dispersants being

applied increased, EPA became concerned about the continued application of dispersants. Allen

Dep. P2 at 132:07-132:22, 132:24-133:03; PP Tr. at 89:21-90:05. This concern increased when

the decision was made to start subsea dispersant application. TREX-011841.001.

687.    Admiral Allen testified that, although dispersants were effective and pre-

authorized for use during the response, as the response went on "two things evolved that

questioned the original basis for the preapprovals and gave rise to some questions about the – the

application of dispersants in this case. One was the overall aggregate amount of dispersants that

were being used. And second was the – heretofore the novel application of dispersants at the wellhead." Allen Dep. P2 at 130:03-131:14. These two issues were "never contemplated in the original framework for preapproval protocols" and therefore required consideration by the Coast Guard and EPA. Allen Dep. P2 at 131:11-131:14.

688.     The public also became increasingly concerned about the use of dispersants: "Though many argued that without the dispersants the ecological effects of the disaster would have been much worse, their use remained controversial throughout the study period. The dispersants broke up the oil and helped sink it, exacerbating fear and mistrust about the oil and the dispersants." TREX-011922.012.

689.     The increasing concerns resulted in a directive to BP on May 20, 2010 to determine whether a less toxic dispersant was "available in sufficient quantities" and "as effective at dispersing the oil plume." TREX-011842.001.

690.     When it was determined that no less toxic alternative existed, on May 26, 2010 Admiral Landry issued what has become known as "Addendum 3", which modified the existing directives regarding the application of dispersant and mandated that "BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible. BP shall establish an overall goal of reducing dispersant application by 75% from the maximum daily amount used . . . ." TREX-010576.001. The addendum allowed, however, for the FOSC to make exemptions to the limits contained in the directive. TREX-010576.001; Barron Dep. at 191:18-192:03, 192:05-192:14, 192:17-192:20, 192:24-193:02, 193:04-193:08, 193:10-193:14.

691.    The volumetric limits placed on the use of subsea dispersants were based on the flow rate estimates that were available at the time the limits were set. Conmy Dep. at 271:18-272:02, 272:04-273:07, 273:14-274:06.

692.    Addendum 3 and the decision to reduce the use of dispersants reflected the fact that there really is "no good choice" in whether or not to use dispersants because using dispersants means killing more organisms in the pelagic and deep benthic zones of the ocean to avoid the oil killing organisms on the shoreline. In addition, there are huge uncertainties with how exposure will actually occur." Barron Dep. at 275:09-276:23, 46:02-47:15, 47:17-47:21; *see also* TREX-011834.005; PP Tr. at 355:05-355:16; TREX-013183.013-.014; TREX-013183.020-.021; J. Watson Dep. at 495:02-496:12, 318:18-319:21 (stating that the Coast Guard was "constantly trying to improve the procedures for dispersants" to address appropriate targeting, effectiveness and toxicity); Laferriere Dep. at 160:12-161:04 ("all of the [skimming, dispersant, and burning] techniques involve transfer of risk").

693.    The issuance of Addendum 3 did not result in an immediate change in dispersant usage, but as time wore on the Unified Command required more information before it would approve the application of dispersants. PP Tr. at 90:23-91:06. This change in procedure caused frustration among the personnel at Houma because they were focused on their specific tactical mission of protecting the Louisiana shoreline. PP Tr. at 91:07-91:18, 134:15-134:16.

694.    Even after the issuance of Addendum 3, dispersants were applied frequently. In the fifty-six days between May 26, 2010 and the capping of the well, dispersants were applied aerially thirty-six times. PP Tr. at 92:03-92:10.

**b)**   **BPXP's Procedural Challenges to the Directive to Decrease Dispersant Use are Unfounded**

695.    BPXP's witness, Captain Paskewich (ret'd), argued that EPA's involvement in the dispersant question was "inconsistent with the NCP framework." TREX-241529.065. His assertion, however, is unsupported by the evidence.

699.    To the extent BPXP is complaining that EPA somehow "interfered" with the response action, BPXP is failing to take into account EPA's role in the response. *See supra* ¶ 315. As the United States' expert, Captain Van Haverbeke (ret'd), pointed out, the discussion of dispersant reductions began when the FOSC sought advice from the National Response Team, which EPA chairs. TREX-013514.008-.009; Hanzalik Dep. at 131:17-132:18, 132:21-132:23. Particularly in this spill, the first spill to be declared a Spill of National Significance, it was appropriate for the FOSC to seek advice from the National Incident Commander and the National Response Team, as the FOSC did for other difficult issues. TREX-013514.009-.010.

700.    BPXP also ignores the role of debate within a good response. A "healthy" response requires a discussion of important issues within the response. Laferriere Dep. at 62:18-64:12; *see also* J. Watson Dep. at 473:03-473:20, 481:03-481:20, 481:22-482:01, 482:11-484:07 (acknowledging the importance of a "healthy dialogue" regarding the balance between effective application and overuse); TREX-007802.007 (Admiral Landry stating: "There are certain stressful debates that are appropriate, such as the dispersant debates during NRT meetings . . .").

701.    Moreover, outside the heat of battle, most Coast Guard employees, including Admirals Landry and Austin, believe that the decision to limit dispersants was correct and that they were comfortable with the procedure for approval of dispersants. TREX-007802.005; PP Tr. at 91:19-92:02; *see also* Barron Dep. at 278:19-279:23.

### c)   BPXP's Claims that the Dispersant Directive Interfered with the Effectiveness of the Response are Unsupported

702.    BPXP's witness Captain Paskewich (ret'd), also attempted to demonstrate that the dispersant limitation interfered with the effectiveness of the response. PP Tr. at 1311:11-1311:17; TREX-009105.057-.058; TREX-011850; TREX-012534. In support of this erroneous contention, BP offered Figure 45 to demonstrate the correlation between shoreline impacts and the failure to apply dispersants.



Figure 45: Purported Correlation between Shoreline Impact and the Absence of Dispersant Usage (TREX-011850)

703.    BPXP admitted on cross-examination, however, that Figure 45 is misleading in several respects. First, he did no quality review of the underlying data to determine whether the graphic was accurate – he simply relied upon it as it was given to him by an individual who was neither deposed nor testified at trial. PP Tr. at 1312:06-1312:16.

704.    Second, the top part of Figure 45 uses different colored bars to correspond to the different degrees of shoreline oiling, as noted in the key. The gray bars represent tar balls, and

yet the SCAT data demonstrate that tar balls hit the shoreline before May 23, 2010. These tar

bars were not included in Figure 45. PP Tr. at 1312:24-1313:21. By leaving these tar balls out of

Figure 45, the graphic shows a larger than actual difference in shoreline oiling between the

periods before and after the issuance of Addendum 3. PP Tr. at 1313:22-1314:06. Yet Captain

Paskewich (ret'd) has no knowledge as to why the tar balls were excluded from Figure 45 and

therefore, whether the chart he relies upon for his opinions is accurate. PP Tr. at 1313:07-

1313:21.

705.    Third, Figure 45 only reports on oiling for the areas that the SCAT teams were

surveying on that particular day. As the response wore on, and after Addendum 3 was issued,

there was an "escalation in the mileage" surveyed each day by the SCAT teams. PP Tr. at

1315:07-1315:18. Accordingly, more shoreline oiling would have been detected after Addendum

3 was issued than before simply by dint of the increased inspections.

706.    Fourth, Figure 45 does not cover the entire period during which oil was

discharged. Addendum 3 was issued on May 26, 2010 and oil flowed until July 15, 2010, yet

Figure 45 only covers the period May 11, 2010 to June 14, 2010. PP Tr. at 1315:19-1315:25.

707.    Fifth, as shown in
Figure 46, the bottom portion of the
Figure 45 is supposed to track
aerial dispersants. The chart,
however, is incomplete in that it
does not include all of the
applications of surface dispersants



Figure 46: Dispersant Data Missing from BP's Witness's Analysis

used in the response. PP Tr. at 1316:01-1319:09; TREX-009182.087.US.01; TREX-241529.070.1.US/TREX-013132.70.1.US. That this chart was re-produced in the FOSC report does not free it from all of these errors. TREX-009105.057-.058.

708.    Sixth, even were the chart accurate in depicting a correlation between the failure to apply dispersants on a particular day and increased shoreline oiling, Captain Paskewich has not established that any particular decision not to apply dispersants was caused by Addendum 3 or that the failure to apply dispersants was the reason the shoreline was oiled. *Cf.* PP Tr. at 717:02-717:06 ("Correlation is not causation"). This point is aptly demonstrated by the fact that the chart shows that dispersants were not applied on days that preceded the issuance of Addendum 3. TREX-013514.008. In other words, the decision not to apply dispersants on any particular day could be caused by weather, the presence of other response activities causing a safety concern, the testing of subsea dispersant application, and, perhaps, occasionally as a result of delays in getting approval of dispersant use in a highly dynamic and complex response. TREX-011840.002; PP Tr. at 92:11-92:20; TREX-011838.003 ¶ 6.

709.    Seventh, as discussed above, dispersants increase the bioavailability of oil in the water column, thereby increasing the toxicity potential of oil to water-borne organisms. *See supra* ¶¶ 367-369. Even were BPXP correct that the immediate effects of not applying dispersants were apparent from this data, "we are still collecting data on the outcomes" of the unprecedented use of dispersants during the response. Laferriere Dep. at 220:11-221:22. BPXP has not established that the decision to reduce dispersants actually rendered the response less protective of the environment.

710.    Eighth, as the response proceeded into June and July, "there was more time for mechanical and skimming and burning equipment to get there in time, so the dispersants became less viable . . . ." Laferriere Dep. at 168:06-169:04. In other words, the decrease in dispersant usage would have occurred over time as less fresh oil was available.

711.    Ninth, had BPXP not been grossly negligent and willful in causing the oil spill and had it not been negligent in the capping of the well (see Rec. Doc. 14021 at 36 ¶ 246), far less oil would have reached the shoreline and fewer dispersant applications would have been required. J. Watson Dep. at 151:06-151:25.

>    **v.    Allegations of "Political" Interference by Local Officials Do Not Demonstrate Any Interference with the Effectiveness of the Response**

712.    It is undisputed that, throughout the response, the Unified Command faced a challenge keeping the State and local officials informed, participating, and satisfied with the response efforts. *See, e.g.,* Laferriere Dep. at 111:23-112:06 (recognizing that there was a "lot of work" to get to a unity of effort with the state of Louisiana). As the following paragraphs demonstrate, these challenges arose because of distrust arising out of the failed efforts to cap the well and the BP Group's misrepresentations regarding the flow rate (*see supra* §§ VI.A.-B.), and the fact that officials in this region are more familiar with implementation of the Stafford Act authorities in response to hurricanes than they are with the oil spill response structure.

713.    The unfamiliarity of state and local government officials with the National Contingency Plan contributed to their attempting steps out of synch with that plan. As Captain Laferriere explained:

>    They had a better understanding and acceptance of the 'bottom-up' response constructs defined within the Stafford Act and the National Response Framework (NRF) where the state and local governments direct the emergency response and

200

> the federal government plays a supporting role. This "bottom-up" construct was further reinforced in dramatic political and regulatory changes after the attacks of 911 which appropriately pushed substantial resources, grants, and emergency preparedness functions down to the local level.

TREX-009100.006; Laferriere Dep. at 255:13-257:13; TREX-011922.069-.070.

714.    Nonetheless, BPXP submitted deposition testimony and exhibits regarding the concerns that local officials expressed about access to boom. *See, e.g.,* TREX-009114.004 ("There was too much Parish empowerment. Which brought in too many political problems"); TREX-011853 (email chain discussing Plaquemine Parish President preventing removal of certain boom); McCleary Dep. at 214:25-216:04; 121:23-122:17, 129:02-130:05, 130:07-131:06, 131:08-131:12, 126:07-126:09, 126:11-126:19.

715.    The United States does not dispute that there were disputes regarding the distribution of boom and that the "redistribution of boom did reduce some Area Contingency Plan planned coverage areas" raising concern with local officials. TREX-009627.004. Similarly, the United States does not dispute that these concerns were sometimes expressed in hostile and ineffective ways – such as threats by local sheriffs to arrest response workers tasked with moving boom to where it was needed. Laferriere Dep. at 258:01-258:17.

716.    While it is therefore undisputed that these difficulties existed, BPXP has failed to show that such difficulties impeded the effectiveness of the measures taken to reduce or mitigate the effect of the oil on the environment or humans. Like the other FOSCs, Captain Hein acknowledged that certain actions of state officials caused frustration, but emphasized that such actions "didn't really stop us." Hein Dep. at 223:16-224:11; *see also* TREX-007802.007 (Admiral Landry stating "we did not let the 'noise' impact what we did.").

717.     Further, in every response it is the role of the FOSC to listen to stakeholders and ensure that their needs are met. It is important for the Unified Command to try to accommodate requests from stakeholders, because ultimately, the Defendants' violations were causing serious harm to the stakeholders' communities. *See supra* § I; Hewett Dep. at 107:11-108:04, 108:06-109:01, 109:03-109:05.

718.     Moreover, maintaining the public's trust in the response efforts is vital to the success of a response. *See supra* ¶¶ 632-637. For these and other reasons, it became important to the United States, if not BPXP, to convey to the public that the response was well planned and executed. TREX-009495.128.

### vi.     The Barrier Island Project and the Mississippi River Diversions Did Not Interfere with *BPXP*'s Efforts to Mitigate or Minimize the Effect of Its Violations

719.     On May 27, 2010, the National Incident Commander for the Defendants' spill, Admiral Thad Allen, "approved the implementation of a section of Louisiana's barrier island project proposal that could help stop oil from coming ashore and where work could be completed the fastest-as an integrated part of the federal response to the Defendants' spill." TREX-009627.005; Hewett Dep. at 49:12-49:15, 49:16-50:15.

720.     The berm project did not have any negative impact on the operations based out of Houma during the time when Capt. Hewett was incident commander there. Hewett Dep. at 111:03-111:14.

721.     The Unified Command approved this project because it would "allow assessment of the effectiveness and environmental impacts of this strategy in one of the areas most at risk of long-term impact by BP's leaking oil." TREX-009627.005-.006.

722.    "Some of the small sand berm projects USACE created did stop the oil from reaching those areas . . ." TREX-009114.004.

723.    Notably, BPXP submitted no evidence that the Barrier Island project interfered with its efforts to response to the spill caused by its violations. Similarly, BPXP has failed to demonstrate that the Mississippi River diversions interfered with or altered any effort by the BP Group to minimize or mitigate the effects of the disaster. For this reasons, the Barrier Island Project and the Mississippi River diversions are not relevant to the determination of either Defendants' penalty.

### vii.    The BP Group was Protecting its Own Private Economic Interests When Conducting the Response

#### a)    BPXP's Ability to Continue to do Business was on the Line

724.    The blowout at Defendants' well put at risk the BP Group's license to operate. Cross Dep. at 56:14-58:07, 117:03-0117:08, 117:16-118:04, 118:06-118:09, 118:11-118:14, 118:16-118:18, 119:12-119:19, 119:21, 139:01-10, 140:06-140:12, 140:14; TREX-012038.001 ("BP's US Businesses rely on the [BP America Response Team] to preserve their license to operate and for effective crisis management."); TREX-012304.003; TREX-012308; TREX-012334.003.

725.    The BP Group also understood that an ineffective response to events such as the Defendants' disaster, "could impact BP's reputation and expose the group to significant liability." TREX-012308; TREX-012324.003; Cross Dep. at 56:14-58:07, 139:07-10, 140:06-14; TREX-012334.007. Accordingly, the BP Group identified one of the main goals of a response is "protect and enhance the brand image through our responsiveness to an incident" – the brand

being BP not BPXP. Cross Dep. at 119:12-21, 135:05-17, 137:15-22; TREX-012330; TREX-012331; TREX-012332; TREX-012333.

726.    Indeed, BP – not BPXP – ran commercials regarding the response, tracked public sentiment, and performed surveys. Cross Dep. at 125:07, 125:09-125:09, 125:16-125:24, 126:01-126:13, 128:13-128:16, 128:22-128:23, 128:25-129:05, 130:10-130:13, 131:03-133:05. These surveys on the spill, attitudes towards drilling, and other issues included not just the Gulf Coast, but the whole United States, including a focus on "DC elite" or registered voters. Cross Dep. at 130:10-130:13, 132:08-133:05, 135:05-135:17, 137:15-137:22; TREX-012330; TREX-012332; TREX-012333.

727.    BP messaging included the talking point that "this is not our accident, but it's our responsibility to deal with." TREX-012325.002; Cross Dep. at 120:01, 120:05-120:14, 121:15-121:19, 122:05-122:13, 123:01, 123:03.

### b)    Early Restoration Earns BPXP Credit Toward Future NRD Claims

728.    Under the Framework for Early Restoration Addressing Injuries Resulting from the Deepwater Horizon Oil Spill, BPXP committed one billion dollars from the twenty billion dollar trust to pay for early restoration projects in the Gulf of Mexico. Rec. Doc. 2239 at 5.

729.    BPXP will receive financial credit for these early restoration projects in the yet unfiled natural resource damages case. PP Tr. at 1365:16-1370:15; TREX-011814.004-.006; TREX-011814.005.1.US; TREX-011814.006.1.US.

730.    Early restoration projects are intended to begin to make the environment and the public whole by (1) restoring, rehabilitating, replacing, or acquiring the equivalent of natural resources or services known to have been injured as a result of the Defendants' disaster or the

response, (2) compensating for interim losses resulting from the incident, address one or more specific injuries to natural resources or services associated with the disaster; (3) seeking to restore natural resources, habitats or natural resource services of the same type, quality, and of comparable ecological or human use value to compensate for identified resource and service losses resulting from the incident. Rec. Doc. 2239; Rec. Doc. 8194 at 2.

### E.   Anadarko's Mitigation Efforts Do Not Warrant a Reduction in the Penalty

731.   Anadarko seeks credit for its limited response efforts and its settlement with BPXP under this factor. Rec. Doc. 13903 at 14.

732.   Anadarko, too, is a responsible party under the Oil Pollution Act and therefore had a legal obligation to participate in the response and pay for removal costs and damages. Rec. Doc. 5809 at 8; 33 U.S.C. § 2702.

733.   Anadarko did not pay BPXP for Anadarko's billed share of spill costs throughout the response, citing a dispute under the parties' joint operating agreement for the well. PP Tr. at 2183:09-20. Anadarko also did not pay the Coast Guard for any of its response costs. PP Tr. at 2186:02-18; TREX-013208.0002. During the response, Anadarko's Chief Executive Officer was called to Congress to testify about the company's failure to pay. PP Tr. at 2184:07-10; TREX-013208.

734.   On October 16, 2011, over a year after the well was killed, Anadarko agreed to pay four billion dollars in cash to BPXP in a settlement to resolve the companies' respective claims against each other arising out of the Defendants' disaster. TREX-050473.0003 § 3.1; PP Tr. at 2184:11-14; Douglas Dep. at 31:22-25; Gwin Dep. at 167:13-22. Anadarko asserts that because it negotiated a "condition" specifying that BPXP use this settlement money to pay the

205

claims of persons whose injuries and damages arose out of the Defendants' violations, including claims under the Oil Pollution Act, Anadarko should receive a reduced penalty. PP Tr. at 2168:05-2168:23; PP Tr. at 2184:23-2185:05; TREX-050473.003 § 3.4.

735.    The settlement payment was treated by Anadarko as a tax-deductible business expense. Douglas Dep. at 36:15-37:05, 37:12-37:19. As part of the settlement, BPXP agreed to release its claims against Anadarko for approximately six billion dollars in outstanding invoices for spill costs and to forego future reimbursement under the Oil Pollution Act. PP Tr. at 2183:13-20; 2184:15-18; TREX-050473.0004 § 4.1. Anadarko agreed to discontinue its claim that BPXP was grossly negligent or acted with willful misconduct in connection with the blowout. TREX-050473.0005. Although the settlement specifies the payment is to be used by BPXP to pay claims, cash is fungible and Anadarko's payment in essence made four billion dollars available that BPXP could use for something else. PP Tr. at 2185:15-2186:01.

736.    Anadarko participated very little in the response itself. No one from Anadarko participated in the Unified Command. PP Tr. at 2181:11-2181:13; Lynch Dep. P2 at 705:09-705:13. Anadarko did not participate at all in booming, skimming, dispersant application, in-situ burning or other response-related efforts. PP Tr. at 2181:19-22.

737.    Mr. Hollek, Vice President of Deepwater Americas for Anadarko, testified that Anadarko officers made a written offer of assistance to BP and to DOI's Secretary during the response. PP Tr. at 2160:17-2162:03. Anadarko's offer to the Secretary, however, used the letter to reiterate its position that it lacked fault for the blowout. TREX-280002.001.

738.    In response to a distress call in the aftermath of the blowout, Anadarko sent two boats to assist with firefighting efforts, but Mr. Hollek conceded that anyone available would

similarly assist. PP Tr. at 2162:08-21. The firefighting efforts were unsuccessful as the *Deepwater Horizon* ultimately sank. Rec. Doc. 14021 at 10 ¶ 46, 14 ¶ 73.

739.    Anadarko also sold BP equipment in response to a request BP put out to industry participants. PP Tr. at 2163:01-2163:23. Anadarko understands that BP ultimately did not use the equipment for any source control effort. PP Tr. at 2163:12-2163:14. Anadarko bought back the equipment at a reduced price (because it had been modified by the BP Group) and intended to use it for future projects. PP Tr. at 2163:15-2163:20, 2186:02-2186:09.

740.    Anadarko assigned four Anadarko employees who worked between one and three weeks on source control efforts, including on the unsuccessful attempts to close the blowout preventer and stem the flow by the "junk shot." PP Tr. at 2164:02-2166:21; Rec. Doc. 14021 at 20 ¶ 129.

741.    Only one Anadarko representative – a contractor familiar with the well who had been assigned by Anadarko to monitor the well during drilling – worked for the entirety of the source control efforts. PP Tr. at 2164:12-2164:24; Quitzau Dep. P1 at 45:17-46:05, 46:14-46:18.

742.    The sum total of Anadarko's financial contribution in terms of its seconded individuals was close to $278,000. PP Tr. at 2181:23-2182:01.

743.    The paltry nature of Anadarko's mitigation efforts is aptly demonstrated by the following comparison:

a.    Anadarko received $163 million in insurance payments associated with the spill, much more than its $278,000 direct costs. PP Tr. at 2170:12-2170:16.

b.    Anadarko contributed five people to a response that involved, at its peak, 48,000 response workers. TREX-009105.023; *see supra* ¶ 69.

c.      Anadarko contributed five people with expertise to the source control effort while

companies completely unaffiliated with the well – such as Chevron, Shell, ExxonMobile,

and Conoco – brought significant resources to bear in the response, including by

providing subsea engineers, supply chain personnel and HSE experts. PP Tr. at 2182:02-

2182:06; PP Tr. at 1552:11-1552:19; *see also* TREX-009105.042. Mr. Hollek conceded

that Anadarko's contributions were part of the whole industry's contributions. PP Tr. at

2182:02-2182:06.

744.    Anadarko also made two donations (treated as charitable contributions for tax

purposes) to mitigate damages from the Incident. Douglas Dep. at 74:05-14, 75:07-75:21.

Anadarko made a donation of $1.1 million – or $100,000 for each of the 11 victims of the

Incident – and a contribution to Rockefeller Advisors establish a fund for Gulf Coast

communities to make $20 million available for support organizations serving distressed

communities "directly affected" by the Defendants' disaster. PP Tr. at 2170:18-2170:25,

2171:04-2171:13.

## VII.   THE ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR

### A.      BPXP and BP Have the Ability to Pay the Maximum Clean Water Act Penalty

745.    Separately or together, BP p.l.c. and BPXP have the ability to pay and financial

flexibility to fund or finance the maximum penalty under the Clean Water Act. PP Tr. at

1016:18-1016:19, 1016:22-1016:24; TREX-013123R.064-.065 ¶¶ 189 b, c, d; TREX-013123E;

Smith Dep. at 284:22-285:18, 289:03-289:23.

746.    There will be no long-term negative economic impact on BPXP or BP p.l.c. from

the payment of the maximum penalty under the Clean Water Act. PP Tr. at 1016:20-1016:22;

TREX-013123R.064 ¶¶ 189 c, d; TREX-013123E. "BP has recognized a provision of $3.5 billion for the estimated civil penalties for strict liability under the Clean Water Act." BP p.l.c. has recognized that "if BP is found to have been grossly negligent, the penalty is likely to be significantly higher than the amount currently provided." TREX-012303A.044.

747.    This section first sets forth the evidence and facts demonstrating that BPXP is operationally and financially controlled by the BP Group and integrated into it, that it has never received outside financing despite the recent costs and liabilities associated with Defendants' blow-out, and that it received financing from the Group as needed during the past years. Next, this section sets forth the facts showing that payment of a civil penalty will have no long-term negative impacts on BP p.l.c. Finally, evidence of BPXP's substantial assets and forward looking projections are set forth to show that a civil penalty will have no long-term effects on BPXP.

### i.    BPXP is Operationally and Financially Inextricable from the BP Group

748.    BPXP has substantial assets by itself, but to fully understand its financial status and to evaluate the economic impact of a penalty on it, it is necessary also to evaluate the financial wherewithal of the BP Group and BPXP's parent entities. BPXP is operationally and financially dependent on and an integrated and important part of the BP Group, a global oil and gas business. PP Tr. at 1014:14-1014:16. It is the BP p.l.c. Global Exploration and Production segment that makes business and tactical decisions in the Gulf of Mexico, not BPXP or its Board. PP Tr. at 1620:03-1621:16, 1621:18-1624:02.

749.    The BP Group conducts and manages its global businesses through an organizational structure that operates without regard to legal subsidiaries. PP Tr. at 915:25-916:02; TREX-013210.018, .034-.063, .083-.087; TREX-013235; TREX-013211;

TREX-013214.014-.016, .032-.033, .038-.040; TREX-013215.008-.010, .012, .016-.017, .019-.020, .023; PP Tr. at 1621:18-1624:02; TREX-006033.016-.017; TREX-012303A.006-.007, .029-.040.

> a)     **The BP Group Operates Through Segments and Functions that Make Decisions and Provide Services across the Group**

750.    The BP Group, and not only BPXP, has conducted and managed operations in the Gulf of Mexico, including at the Defendants' well and the response to the Defendants' disaster. PP Tr. at 915:25-916:06, 923:17-923:20; PP Tr. at 2014:01-14; TREX-013210; TREX-013235; TREX-013211.

751.    The BP Group manages its operations through its operating segments, not through legal entities such as BPXP. In order to manage its global operations, BP p.l.c. has divided its global enterprise into three segments: upstream, downstream, and alternative energy. The BP Group defines an operating segment as an operating component (a) that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the Group); (b) whose operating results are regularly reviewed by the chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance; and (c) for which discrete financial information is available. TREX-230483.002; PP Tr. at 918:04-918:09; TREX-006033; TREX-013210.019 (citing the deposition of Lamar McKay).

752.    The BP Group's "[u]pstream segment manages exploration and production activities through global functions with specialist areas of expertise." TREX-012303A.006-.007.

753.    The segments are organized into different operating or business units, Strategic Performance Units ("SPU") or Regional Business Units ("RBU"), typically by region.

TREX-013210.014-.015, .019, .026. The Gulf of Mexico SPU, now RBU, is the business unit established to manage assets in the Gulf of Mexico. Robertson Dep. at 28:10-28:14; PP Tr. at 1618:17-1618:23.

754.    For example, Mr. Morrison, in his role as Regional President for the Gulf of Mexico, was responsible for the safe and compliant operation of all activities in the Deepwater Gulf of Mexico. PP Tr. at 1532:12-1532:19.   This role was played by BP p.l.c. – not BPXP – and Mr. Morrison was supervised and reported through the BP p.l.c. global chain. PP Tr. at 1618:20-1619:16, 1620:02-1621:16.

755.    "Functions" within the BP Group provide support services to the operating business units. Robertson Dep. at 37:20-38:01. Functions include human resources, Government and Public Affairs ("GPA"), Finance, Tax, Treasury, Safety and Operations ("S&O"), and Legal. Robertson Dep. at 57:19-58:05, 58:10-58:12, 58:14-59:14, 68:19-68:24, 69:02-69:07, 70:23-70:11, 181:06-181:12; TREX-012643; TREX-012644; Cross Dep. at 54:22-55:08, 60:16-61:11, 61:20-62:04.

756.    For example, Treasury and Tax are Functions that decide which legal entity will be used to implement Group investments. There is a U.S. Treasury team which provides support to the U.S. entities. Bamfield Dep. at 75:12-75:20; Bucknall Dep. at 37:14-37:18, 40:01-40:09; Smith Dep. at 56:22-57:13, 57:16-58:14; TREX-012435.001-.002.

757.    Similarly, GPA was part of the BP America business unit and serviced different business units which did not have their own community affairs staff. Cross Dep. at 64:03-64:05. GPA would negotiate contracts for sponsorships and other events for business units, including the Gulf of Mexico. Cross Dep. at 20:03-20:19, 21:12-21:15. Those contracts were signed by BP

America, but then expensed to the different business units. Cross Dep. at 25:19-26:09, 26:16-27:11.

758.    As shown in Figure 47, the delegations of authority and direction in the BP Group's organizational structure for managing operations function without regard to the numerous subsidiary corporations that BP p.l.c. owns throughout the world, including BPXP. This fact is demonstrated in organizational charts, BP p.l.c. annual reports, the BP Group's Corporate Structure and Finance Process Guidance, and the deposition testimony of Andrew Inglis and Lamar McKay. At the time of the disaster, Mr. Inglis was the Chief Executive of the global upstream segment for BP p.l.c. and Mr. McKay was the President and Chairman of BP America. PP Tr. at 919:10-919:18; PP Tr. at 2014:21-2015:10; TREX-006033; TREX-012303A; TREX-002557; D-32904.2; D-32904; TREX-002515; TREX-002517; TREX-012435; TREX-013210.019-.020 (citing the depositions of Lamar McKay).



Figure 47: Lines of Delegation and Accountability within the BP Group (D-32904.2)

759.    Delegations of authority pass from the top of the BP Group's global upstream segment to the Gulf of Mexico Strategic Performance Unit, which managed operations in the Gulf of Mexico and at the Defendants' well. PP Tr. at 925:06-925:09; PP Tr. at 2014:21-2015:10; TREX-013210.051, .055, .058; TREX-013235.005, .011-.013, .015, .017; Robertson Dep. at 28:10-14; PP Tr. at 1618:17-1619:16.

760.    Through these delegations of authority, the BP Group makes decisions based on what is good for the BP Group as a whole. Bucknall Dep. at 37:01-37:08; PP Tr. at 1032:24-1032:25. For instance, when making an investment decision, the question that is examined is whether "this is a good investment of Group resources," regardless of which legal entities' books will be charged. TREX-012435.1.1.US.

761.    As Mr. McKay testified at his deposition, "BP Exploration and Production Incorporated, that subsidiary does not manage the assets. It owns the assets." PP Tr. at 928:02-928:16; TREX-011963; TREX-012820; TREX-012692; TREX-012693; TREX-012694; TREX-013210.020 (citing the depositions of Lamar McKay and Andy Inglis).

762.    No one in Drillings and Completion for the Gulf of Mexico SPU was or is an employee or officer of BPXP, including Patrick O'Bryan, who was the Vice President of Drilling and Completions at the time of the Defendants' disaster, Kevin Lacy, who was the V.P. of Drilling and Completions before Mr. O'Bryan, or Henry Thierens who preceded Mr. Lacy in that position. The BP Group's delegations of authority do not mention delegations from BPXP to anyone in Drilling and Completions, and there is no documentation that anyone in Drilling and Completions was or is accountable to BPXP. PP Tr. at 925:14-926:15, 927:18-927:25; TREX-002515; D-32909.2.

763.    The BP Group has developed centralized common processes, management, and financial systems that apply to the entire BP Group, including the Gulf of Mexico SPU, which are described in Common Process and Operations Management System Manuals and Handbooks. None of these Manuals or Handbooks mention subsidiaries, such as BPXP. PP Tr. at 922:23-923:11; TREX-002681; TREX-000268; TREX-000866; TREX-006205; TREX-006257; TREX-012435; Smith Dep. at 29:03-29:19; Bucknall Dep. at 15:23-15:25, 29:17-34:24, 36:01-38:03, 38:19-38:20, 39:20-39:23, 40:01-40:09, 229:07-229:14, 255:01-255:16; TREX-013210.085-.086; Robertson Dep. at 59:21-63:02, 69:02-69:07, 87:03-88:23, 95:10-96:01, 108:19-109:22, 149:12-153:09, 154:14-154:24, 175:22-176:20.

764.    The Group-wide nature of BP p.l.c.'s planning process illustrates the centralized nature of Group activities. Early in the year, regions or areas of business develop plans and estimates for the coming year and for a longer period as well. The regions send these plans to the segment team who will evaluate the relative merits of investment in one area or another globally. The segment review is called an "overview" and may be driven by functional expertise – *e.g.,* the segment review team refines the regional projections for technical or substantive reasons – or a reallocation of resources for investment from one activity to another globally. Finally, the segment "overview" is combined and reconciled with the other segments for the BP Group. The revised plan is sent back to the segments and regions. At the BP Group level the planning process develops a common understanding of what the BP Group wants to do, which means that the subsidiary companies in each location have a context in which to work. Bucknall Dep. at 99:23-102:04, 102:06-102:20.

214

**b)**      **BPXP Finances Are Managed by the BP Group**

765.      The BP Group manages the finances of the group centrally, through the Finance and Treasury Functions, which are responsible for accounting, performance management, business development, commercial operations and planning, maintaining the BP financial system, and monitoring the BP Group aggregate balance sheet. Robertson Dep. at 62:10-63:02, 63:22-64:06, 66:11-66:19; Bucknall Dep. at 28:08-28:14, 30:11-30:21; PP Tr. at 922:19-923:07, 935:15-936:03; TREX-013215.019-020.

766.      The BP Group's view is that cash should be handled according to BP Group standards and it is in the interests of every legal entity to make use of the fact that it is part of a larger organization. BPXP does not have an external bank account. If BPXP wanted to obtain its own external bank account it would need to go through the centralized planning process described *supra* § VII.A.i.a.. BP's Group Treasurer does not believe such an account is appropriate. Bucknall Dep. at 268:15-268:18, 268:23-269:10, 269:12-269:16, 269:18-270:17; Bamfield Dep. at 35:07-35:09.

767.      BP p.l.c.'s policy is to self-finance as many of its activities as it can. Bucknall Dep. at 21:07-21:09.

768.      The BP Group's liquidity is managed centrally. Bucknall Dep. at 40:11-41:06. Centralization of management and accounting provides efficiencies in terms of controls, compliance, personnel, and cash management. Bucknall Dep. at 31:11-33:01.

769.      Within the BP Group, cash is regarded as a BP Group asset. Bucknall Dep. at 40:11-41:06, 48:06-48:22.

770.     Treasury aggregates the cash surpluses of the subsidiaries and then arranges funding to other subsidiaries with liquidity needs. Bucknall Dep. at 34:06-35:16.

771.     BP p.l.c. operates BP International as an in-house bank to provide funding through a variety of legal entities down to subsidiaries. Bamfield Dep. at 220:14-220:18. The North America Funding Company ("NAFCO") is the in-house bank for the BP Group's American companies, and any surplus in NAFCO is deposited in BP International. Bucknall Dep. at 34:06-35:08; Bamfield Dep. at 35:07-35:08; Robertson Dep. at 96:17-99:21, 101:19-102:11, 107:23-108:09, 108:15-109:22, 115:04-115:16.

772.     Each legal entity, including BPXP, has an Internal Financing Account ("IFA") with BP International or NAFCO where the balance of their cash position is tracked. Bucknall Dep. at 49:17-49:25, 245:14-245:23; Smith Dep. at 266:10-267:06, 267:08-268:19.

773.     Under an IFA agreement, if the borrower were to exceed the IFA limit, the lender has the right to terminate the IFA at its option. Until the lender chooses to either increase the limits or replace with other types of financing, the borrower would be in breach of the lending agreement. Mr. Bamfield, Deputy Group Treasurer in BP Treasury, however, could not provide any examples where any lender in the BP Group terminated an IFA because it was exceeded by the borrower. Bamfield Dep. at 120:17-20, 121:12-121:15, 121:22-122:01, 125:25-126:02, 126:04-126:07, 126:09-126:15.

774.     BP Company North America acts as the controlled disbursement (paying agent) entity to make payments to third parties on BPXP's behalf. There may be some instances where BP America Production Company may also act to settle payments on behalf of BPXP, without

any contracts in place, or interest paid for this arrangement. Smith Dep. at 89:09-90:05; Robertson Dep. at 95:10-96:16, 152:07-13.

775.    The BP Group's Treasury function is also the aggregating place for credit risk management for the BP Group. BP International deposits the BP Group's cash with external banks as part of the investment process so that one entity is managing the BP Group's financial exposure. Bucknall Dep. at 51:19-52:04, 52:09-53:12; Bamfield Dep. at 135:02-135:13, 135:15-135:21. Treasury normally would not recommend pledges outside of the BP Group. Bamfield Dep. at 221:16-21, 222:05-222:07, 222:14-222:15.

776.    The BP Group maintains financial information in a "SAP system." This system is maintained by the Finance Function according to BP Group standards. Robertson Dep. at 61:20-63:02, 73:20-74:15, 87:03-6. Employees in the BP Group's Finance Function make decisions regarding the legal entities. Robertson Dep. at 87:03-88:05, 88:07-88:24, 154:09-155:03, 155:15-155:24, 158:12-160:23.

777.    For example, for this litigation, BPXP used the SAP system to produce reports for BPXP. Robertson Dep. at 76:17-76:25, 77:16-78:25, 79:09-80:14, 80:20-81:07, 81:09-81:12, 84:13-86:16, 87:03-87:23, 88:18-24; TREX-012646.

778.    The interconnectedness of the companies is also demonstrated by the movement of monies between BP Group entities.  Mr. Robertson moved costs from BP America Production Company's books to BPXP's books in the second quarter of 2014. He held no position in BPXP and transferred the costs without the permission of any executive, officer, or board of director from either BPXP or BP America Production Company. He made the transfer during discovery in this penalty phase and even backdated prior costs already expensed to BP America Production

217

Company. Mr. Robertson's time was originally billed to BP America Production, but during the litigation he moved the charge to BPXP's books. Robertson Dep. at 18:02-4, 19:04-8, 154:15-155:03, 155:15-155:23, 158:12-160:22. In contrast, monies previously charged to BPXP were moved to BP p.l.c. for the SEC settlement after consultation with BP America and BP Group accountants in London to reflect "proper ownership of the agreement." TREX-012678.003; Robertson Dep. at 230:02-230:14, 230:21-231:03.

**c)**    **Investment Decisions Are Made by the BP Group, Not Legal Entities, Through Structured Finance Notes**

779.    Authority to commit investments (whether capital expenditure, divestment or contractual commitments) rests with the segment or function which has delegated authority in the BP Group. PP Tr. at 920:12-921:12; TREX-012435.1.1.US; PP Tr. at 1621:18-1624:02; Bucknall Dep. at 255:12-255:16. In other words, the BP Group Segment or Function, not the legal entity, decides if it is a good investment.

780.    Financing decisions and changes to corporate structure cannot be made without the BP Group Treasury and Tax functions' support. TREX-012435.003. These functions make the decision as to what the legal entity structure will be and how to finance the investment. TREX-012435.001-.002. If the BP p.l.c. Chief Financial Officer did not support a proposal, it would not go forward to the legal entity. Bucknall Dep. at 255:12-255:16.

781.    This decision-making procedure is conducted through corporate Structured Finance Notes, which are used for a number of transactions, including: change of ownership, buying, selling or transferring assets, change in legal ownership of assets, funding companies through equity, debt or hybrid instruments, and setting and paying dividends. TREX-012435.003-.004; Bucknall Dep. at 102:13-103:13, 104:17-105:02, 105:11-105:13,

218

105:16-106:12, 226:09-226:19, 227:03-208:09, 228:11-228:12; TREX-012434; Smith Dep. at

232:20-233:03, 233:05, 233:07-234:12.

> d) **BPXP Financial Statements Reflect Decisions Made by the BP Group**

782.    BPXP did not prepare separate financial statements prior to the spill. PP Tr. at

1025:09-1025:11, 1025:22-1025:23; Robertson Dep. at 41:01-41:05, 203:24-204:06, 204:08-

204:17; Smith Dep. at 126:06-126:13, 126:16-126:22.

783.    Preparation of the BPXP financial reports shows the extent of the centralized

financial system and of BPXP's integration into the BP Group finances. After the spill, Michael

Robertson, the Controller for the Gulf Coast Restoration Organization ("GCRO") Finance team,

not a BPXP accountant, was asked to prepare financial statements for BPXP. Mr. Robertson held

no financial position within BPXP or the Gulf of Mexico RBU. Robertson Dep. at 18:02-18:04,

19:09-19:17, 158:12-160:20; PP Tr. at 1609:04-1609:14; *see also infra* § VII.A.h.

784.    BPXP financial reports reflect that decisions are made by the BP Group. Because

BP is managed by segment, financial information is tracked on the segment level and is distinct

from legal entities. TREX-230483.001; Robertson Dep. at 44:23-45:05, 203:24-204:06, 204:08-

205:06. BPXP's financial reports thus rely on "approximations" drawn from information on the

Gulf of Mexico RBU. *See, e.g.,* TREX-012676.007; TREX-012677.006, .010;

TREX-012679.006-.007, .009; TREX-012680.005-.006, .009; TREX-012681.007, .009;

TREX-012682.007-.009; TREX-246899.006; Robertson Dep. at 28:10-28:23, 228:01-228:13.

785.    In addition, the BPXP reports reflect that BP p.l.c. made the decision to appeal

this Court's Phase I decision and refer the reader to the BP p.l.c. financial reports to explain the

provisions for penalty liabilities. TREX-246898.004, .002, .006 ("the federal district court in

219

New Orleans ruled that under the U.S. Clean Water Act, the discharge of oil was the result of gross negligence and willful misconduct of BPXP and that BPXP is therefore subject to enhanced civil penalties. *BP* intends to appeal this ruling. . . .") (emphasis added).

786.    BPXP's financial reports contain no detail regarding the provision for the $3.5 billion.  Rather, the BPXP reports refer the reader to the BP p,l.c. annual report – referred to by BPXP as "our annual report." Robertson Dep. at 213:07-213:23, 221:08-221:17; TREX-006033.203.

787.    Further, BPXP's financial reports do not identify all spill-related costs – some of those are identified only in BP p.l.c. reports. TREX-012682.006-.008; TREX-246898.007.

788.    The first three BPXP financial reports, prepared for the third and fourth quarters of 2011 and the first quarter of 2012, are merely two pages containing a simple balance sheet and short explanations. TREX-012673; TREX-012674; TREX-012675.

789.    In the second quarter of 2012, the BPXP financial report added information and was now six pages, not because it was requested by anyone at BPXP, but because Mr. Robertson "continued to evolve the report." TREX-012767; Robertson Dep. at 216:07-14, 223:17-22, 218:24-219:07.

790.    BPXP's financial reports do not reflect what assets it owns, what assets other BP Group entities own, or how costs are charged among these assets. Robertson Dep. at 27:08-22; TREX-012646; TREX-012673; TREX-012674; TREX-012675; TREX-012676; TREX-012677; TREX-012678; TREX-012679; TREX-012680; TREX-012681; TREX-012682. BP America Production Company for example provides employees to BPXP but also owns some assets in the

Gulf of Mexico. The financial reports do not explain how these costs are charged and split between the entities. Robertson Dep. at 24:12-22, 105:22-107:09, 179:03-179:22.

**e)**      **BPXP Board Functions are Very Limited**

791.    In contrast to the BP p.l.c. board, the BPXP board has played a very limited role both before and after the Defendants' disaster. The BPXP board of directors does not (1) guide business plans, (2) set performance or objectives, or (3) oversee capital expenditures, acquisitions, or divestments. The BPXP board provided no oversight of the BP Group's operations in the Gulf of Mexico before the Defendants' disaster and only minimal oversight after the disaster, as evidenced by the BPXP board of directors' resolutions and minutes provided for the period from 2005 to 2014. Prior to the blowout, the activities of the BPXP board were limited to declaring dividends and appointing officers by consent in lieu of meeting. PP Tr. at 928:18-930:14, 935:13-935:22; PP Tr. at 2014:16-2014:20; Bray Dep. at 174:18-176:02, 177:23-178:08, 179:25-180:17, 182:01-182:12, 187:06-188:09, 198:16-209:16, 260:09-266:03, 319:15-320:05; TREX-012738; TREX-012739; TREX-012740; TREX-012741; TREX-012742; TREX-012743; TREX-012744; TREX-012745; TREX-012746; TREX-012747; TREX-012748; TREX-012749; TREX-012750; TREX-012751; TREX-012752; TREX-012825-012895; TREX-012905; TREX-013214.032; TREX-013215.009, .012, .023; D-32911; TREX-013210.034-.049; Bray Dep. at 260:09-266:03, 198:16-209:16.

792.    BPXP Board members historically have not had the requisite expertise to manage business activities or operations related to exploration or production. From February 11, 2005 to January 14, 2011, the BPXP board of directors was comprised of six attorneys and paralegals

221

who were members of the BP Group's centralized legal function. Bray Dep. at 169:19-174:16, 176:20-177:22, 184:01-185:22; TREX-011960; TREX-012825; TREX-012738; TREX-012748.

793.    Steven Bray, the head of the BP Group secretariat, confirmed the BPXP Board members' lack of involvement with the actual operations in the Gulf. Despite having been a board member or officer of both BPXP and BP Company North America from 2009 to the present, Steven Bray did not have much knowledge of the BP Group organization, the BP p.l.c. board of directors committees (other than the Gulf of Mexico committee), the BP Group Operations Risk Committee, or the Resource Commitment Meeting, which are responsible for approving investments and lease acquisitions. Mr. Bray confirmed his understanding that the BP p.l.c. board sets the tone from the top and that Robert Dudley, the present Chief Executive Officer for the BP Group, is responsible for the day-to-day management of the BP Group. Bray Dep. at 40:16-83:07, 156:23-157:07; TREX-011959; TREX-0012304A. When Mr. Bray was shown records from twenty-six BP p.l.c. subsidiaries where he was listed as a director or an officer, he either did not recall the nature of the business, recognize the name of the entity, or know what his role required of him for the entity. Bray Dep. at 157:08-168:25.

794.    From December 18, 2006, through March 24 2010, the BPXP board of directors declared dividends in the form of consent actions in lieu of meetings totaling $4.4 billion to its preferred stockholder, BP Products North America. Bray Dep. at 176:03-189:05; TREX-012738; TREX-012739; TREX-012740; TREX-012741; TREX-012742; TREX-012743; TREX-012744; TREX-012745; TREX-012746; TREX-012747; TREX-012748; TREX-012749; TREX-012750; TREX-012751.

795.    On December 22, 2009, the BPXP board of directors declared a dividend in the form of an action by written consent in lieu of meeting of $12 billion to its common stockholder, BP America Production Company. Bray Dep. at 185:24-186:11; TREX-012752.

796.    During the first year of the Defendants' disaster, the BPXP board held no meetings and issued no resolutions other than a dividend resolution on March 24, 2010 and officer election and removal resolutions in the form of unanimous written consents in lieu of meetings. Bray Dep. at 197:25-198:15.

797.    The BPXP Board's role expanded after the Defendants' disaster began, but primarily to deal with the consequences of the disaster and not to manage BPXP's assets. From 2011 to the present, the primary activity of the BPXP board of directors has been the review and discussion of litigation, regulatory and administrative claims, settlement, and compliance activity related to the Defendants' disaster and response. Bray Dep. at 210:01-258:06, 258:10-260:08. During this period, the BPXP board of directors has continued to not create or guide business strategy, major plans of action, or annual budgets for the Gulf of Mexico SPU. Bray Dep. at 260:09-263:16; TREX-012835; TREX-012836; TREX-012837; TREX-012838; TREX-012839; TREX-012840; TREX-012841; TREX-012842; TREX-012843; TREX-012844; TREX-012845; TREX-012846; TREX-012847; TREX-012848; TREX-012849; TREX-012850; TREX-012851; TREX-012852; TREX-012853; TREX-012854; TREX-012855; TREX-012856; TREX-012857; TREX-012858; TREX-012859; TREX-012860; TREX-012861; TREX-012862; TREX-012863; TREX-012864; TREX-012865; TREX-012866; TREX-012867; TREX-012868; TREX-012869; TREX-012870; TREX-012871; TREX-012872; TREX-012873; TREX-012874; TREX-012875; TREX-012876; TREX-012877; TREX-012878; TREX-012879; TREX-012880; TREX-012881;

TREX-012882; TREX-012883; TREX-012884; TREX-012885; TREX-012886; TREX-012887; TREX-012888; TREX-012889; TREX-012890; TREX-012891; TREX-012892; TREX-012893; TREX-012894.

### f)   BPXP Does Not Have Employees

798.    BPXP does not have its own employees. Instead, pursuant to a General Services Agreement between BPXP and BP America Production Company, BPXP receives a wide variety of services from BP America Production Company including employees as well as technical, engineering, commercial, marketing, environmental, legal, tax, banking, treasury, investment, financial, accounting, administrative, and other services. PP Tr. at 931:19-933:01, 935:13-935:25; PP Tr. at 1624:16-1625:05; PP Tr. at 2015:22-2016:2; Smith Dep. at 76:21-77:05; TREX-011964. The services agreement reflects that both companies have the same address, and the 2001 agreement and 2005 amended amendment are signed by the same person for both companies. Smith Dep. at 269:19-270:02, 270:12-18, 271:11-272:06, 272:09-16, 272:18-273:09, 273:13-19.

799.    While BPXP has a contract with BP America Production Company, BPXP can draw staff from other BP entities around the Globe without any written contract. PP Tr. at 1624:16-1625:05. Employee Costs are "automatically charged" to legal entities, no invoices are sent (even where contracts call for them), nor are contracts in place for all of these personnel costs. Financial records for BPXP do not separately reflect these personnel costs – the legal entities and costs are not segregated. Robertson Dep. at 19:04-19:08, 23:23-24:03, 24:05-24:08, 24:10-24:11, 25:08-25:25.

800.     Iris Cross, the manager of the national program for community affairs, was

employed by BP Corporation North America. Cross Dep. at 19:20-19:25, 22:05-22:19. Her

employment relationship with the BP Group remained unchanged no matter who she was

servicing – whether it be the Texas City Refinery after its explosion, the Gulf of Mexico RBU

for sponsorships, or working on the Defendants' disaster through the GCRO. Cross Dep. at

42:12-43:10; *accord* PP Tr. at 1617:22-1618:16 (Mr. Morrison worked all over the world but his

employer was always the same BP entity).

801.     While the costs of most employees of other BP Group entities on the response to

the Defendants' disaster have been charged to BPXP, the central players in management of the

response were not charged to BPXP, including Messrs. Dudley (Chief Executive Officer of the

GCRO), Suttles (Chief Operating Officer of the Exploration and Production segment for BP

p.l.c.), Rainey (Vice President of Exploration for the Gulf of Mexico SPU) or Lacy (Vice

President for Drillings and Completions of the Gulf of Mexico SPU). PP Tr. at 975:15-975:22;

PP Tr. at 1572:05-1573:01, 1624:16-1625:05; PP Tr. at 2015:21-2016:02; TREX-011981.048-

.049; TREX-013210.039-.040, .050-.066; Suttles Dep. at 817:06-817:10.

> **g)     The BP Group Does Not Distinguish Between Subsidiaries and
> the Group**

802.     As the following paragraphs demonstrate, BPXP asks the Court to rely on legal

distinctions among entities, yet ignores them in its own evidence.  BPXP argues that costs or

actions can be attributed to BPXP if they were expensed to BPXP even if they were paid for or

performed by another BP entity.

803.     Testimony of BPXP witnesses in the Penalty Phase trial, the Phase I trial, and

depositions, reveals that BP Group employees do not differentiate among the legal entities, but

instead view themselves as employees of the BP Group or of a segment. During the Penalty

Phase Trial, BPXP witnesses and counsel treated BPXP as synonymous with BP p.l.c. or the BP

Group. Witnesses on direct examination by BPXP repeatedly referred to "we," "the Company,"

or "my company" to refer to any entity within the BP Group, or they misidentified BPXP at the

urging of counsel. *See* PP Tr. at 1531:23-1532:06, 1536:04-1537:25, 1548:22-1550:07, 1572:05-

1572:22; PP Tr. at 1382:19-1382:21, 1385:13-1385:25, 1387:09-1388:22; PP Tr. at 1328:14-

1329:14, 1330:17-1331:14, 1373:06-1373:10; Robertson Dep. at 27:08-27:22, 59:21-61:05,

61:20-62:01, 73:20-74:10, 77:20-78:25, 213:17-214:10, 221:08-221:17. For example, BPXP has

no onshore production, but Mr. Morrison described his roles within "the company" as including

onshore operations. PP Tr. at 1536:04-23, 1573:16-1573:19, 1617:22-1618:06.

804.    Similarly, in prior phases, BP also ignored any corporate distinctions in

presenting evidence. For example, actions by John Guide, the well site leader, and Tony

Hayward, the CEO of BP p.l.c., are touted as actions on behalf of "BP." The BP Group's

blurring of corporate lines held true throughout BPXP's questioning of Dr. Bea concerning the

BP Group's Six Point Plan and actions by BP p.l.c. board committees. *See* P1 Tr. at 368:02-

391:04, 415:01-421:25; P1 Tr. at 440:16-443:22, 476:11-478:11.

805.    In fact, in both Phase 1 and Phase 2, employees repeatedly testified they worked

for "BP." *See* P1 Tr. at 1958:16-1959:10; P1 Tr. at 8574:14-8574:17; P2 Tr. at 579:06-579:25;

P2 Tr. at 909:15-910:03; P2 Tr. at 734:11-734:20.

806.    In its post-trial briefings from Phase I, BPXP was similarly opaque as to which

BP entity is involved. For example, in its findings of fact, BPXP and BP America Production

Company are separately defined and then they are defined collectively as "BP." Rec. Doc. 10467

at 30 ¶¶ 1, 2. BPXP deliberately used that definition because later it extended the term "BP" to include BP p.l.c. and other BP affiliates so that it could take credit for any safety investigations, reforms and improvements performed within the entire company. Claiming that "BP promptly investigated and accurately reported on the causes of the accident," BPXP points to Mark Bly, "BP's Group Head of Safety and Operations" as heading the investigation. Rec. Doc. 10467 at 488 ¶¶ 2333-2334. Mr. Bly, of course, was a member of the executive team of BP p.l.c. P1 Tr. at 883:09-883:17. Much of BPXP's findings of fact can only be read to include BP p.l.c. or other affiliates.

807.    In Phase I, BP similarly touted its safety culture, claiming that "BP's senior leadership understood that management must set the tone from the top on safety issues," citing testimony by BP p.l.c. employees Messrs. Bly, Hayward, and Inglis. Rec. Doc. 10467 at 507 ¶ 2429, 511 ¶¶ 2447-2449, 512-514 ¶¶ 2455-2463. References to BPXP in BP's Phase I Finding of Fact are extremely limited, referencing only its ownership of the Macondo lease and contract with M-I for Gulf of Mexico SPU offshore well services. Rec. Doc. 10467 at 41 ¶ 49, 88 ¶ 244.

808.    The BP Group does not think of its individual legal subsidiaries as separate entities the way it does its vendors and other partners in the business.  BPXP tracked the costs associated with Transocean and Halliburton as operations costs.  By contrast, BPXP treated the costs of employees of other BP Group entities as "employment compensation." D-34614; D-34622, PP Tr. at 1583:07-1584:05.

809.    Even outside of the courtroom, the distinction between BP Group entities are opaque to employees of the various BP Group entities. For instance, at trial Mr. Morrison admitted that at the time of his 2014 deposition he was not aware that he held the position of

Vice President of BPXP from January 7, 2010 to October 21, 2013. He also testified that he is the Regional President of BP's Gulf of Mexico RBU, Chairman of the Board of BPXP, "and apparently President [of BPXP] goes with that title." PP Tr. at 1619:17-1620:21, 1621:18-1624:02; TREX-011959. (Ms. Folse acknowledged at the time of her deposition that she was not aware she was the vice-president of BPXP. PP Tr. at 1371:10-1372:23).

810.    In addition, workers and managers in the Gulf of Mexico SPU did not consider themselves BPXP employees. Although BP America Production Company employed most of the workers in the wells and engineering sections of Drillings and Completions, at their depositions these workers testified that they were employed by BP America. None of these workers testified that they knew the role that BPXP played in the Gulf. PP Tr. at 931:19-933:01, 935:13-25, 975:15-22; PP Tr. at 2015:21-2016:02; TREX-002515; TREX-002939; TREX-011959; TREX-011981.048-.049; TREX-013210.039-.040, .050-.065; TREX-013235.011-.015, .017; Suttles Dep. at 817:06-817:10; Smith Dep. at 76:23-76:24.

811.    At trial, BPXP asserted that the United States was charging that the interdependence described above was improper. To the contrary, the United States' expert, Dr. Quivik, explained the BP Group's organizational structure for managing operations in the Gulf of Mexico at the Defendants' well and in response to the Defendants' disaster. Dr. Quivik offered no opinion as to whether these relationships were proper or improper, appropriate or inappropriate, or normal or abnormal. PP Tr. at 934:15-935:05; TREX-013211.006-.008.

812.    Other BP Group entities routinely enter into contracts committing BPXP to payments without any formal authorization or contract between BPXP and the contracting entity. BP America, for example submitted the Oil Spill Response Plan for the Defendants' well and

entered into oil spill response contracts utilized at the Defendants' disaster, despite the fact that it

owns no assets in the Gulf of Mexico directly. There is no contract for this arrangement between

BPXP and BP America, Inc. Robertson Dep. at 28:01-9, 182:25-186:01, 186:24-189:04, 190:22-

191:07, 149:12-153:09; TREX-012665.005-.006; TREX-012666; TREX-000769.418-.423;

TREX-012667; TREX-012668; TREX-012669.

>    **h)**     **The BP Group Managed and Financed BPXP's Response to the Disaster**

813.    Further evidence of the integrated nature of BPXP with the BP Group can be

found in the manner in which the BP Group responded to the Defendants' disaster. In its 2010

Annual Report, BP p.l.c. reported that in June 2010 it "established the Gulf Coast Restoration

Organization (GCRO) and subsequently equipped it with dedicated resources and capabilities to

manage all aspects of our response to the accident. This organization reports directly to the group

chief executive and is overseen by a specific new board committee." TREX-006033.016; TREX-

012638; TREX-012640; TREX-012641; Robertson Dep. at 28:01-28:25, 47:17-47:22; Bray Dep.

at 78:18-81:21, 320:06-321:08.

814.    During the Defendants' disaster, the BP p.l.c. board of directors met at least

weekly to respond both to the events in the Gulf of Mexico and in the financial markets. The BP

p.l.c. board also formed the Gulf of Mexico committee, whose primary responsibility has been

oversight of the Gulf Coast Restoration Organization ("GCRO"). PP Tr. at 922:05-922:17;

TREX-006033.92.1.US.

815.    That the response to the Defendants' disaster was initiated, organized, and

directed by the BP Group is also evidenced in BP p.l.c.'s annual reports, announcements made

by Anthony Hayward and Bob Dudley in the summer of 2010, the Gulf of Mexico Committee

charter, and deposition testimony. PP Tr. at 933:02-933:16; TREX-006033; TREX-012303A; TREX-012441; TREX-012640; D-32913; Suttles Dep. at 22:07-23:03, 41:07-43:08, 210:15-210:18, 224:10-224:17, 495:17-498:08, 547:10-548:19, 553:14-556:01, 585:09-585:14, 803:01-803:11, 817:04-818:22; TREX-013210.090.

816.    Much of the funding for the response to the spill came from BP p.l.c. PP Tr. at 1014:17-1014:21. BPXP's witness agrees that spill-related payments were made by other BP entities on behalf of BPXP. Den Uyl Dep. at 68:13-22, 69:07-15, 93:06-93:13, 77:18-77:22, 77:25-78:06.  Significant spill costs were incurred under contracts entered into by other BP Group entities, not BPXP. TREX-012666; TREX-012667; TREX-012668; TREX-012669; TREX-012670.

817.    For example, in the summer of 2010, BP p.l.c. officials met with the White House and established a twenty billion dollar trust that was funded over time with an initial payment of five billion dollars and quarterly payments of $1.25 billion. Verano Holdings was created as a subsidiary of BPXP to hold a security interest using BPXP leases as collateral for the remaining amounts to be paid into the trust fund until it was fully funded. Bucknall Dep. at 81:13-83:01.

818.    BPXP received the twenty billion dollars needed to fund the Oil Spill Trust through a number of sources including monies borrowed from NAFCO and BP International. BPXP witnesses could not identify how much money BPXP borrowed from NAFCO or identify which debts were solely spill-related costs and stated instead that "cash is fungible" within the BP Group. Smith Dep. at 44:07-44:19, 44:24-45:02, 45:16-22, 45:24-46:22, 47:03-47:08, 47:19-50:17, 50:19-52:02, 52:04-52:06, 156:24-157:07, 157:22-158:12, 223:18-223:21, 224:02-224:03,

224:16-226:02, 226:24-227:03, 227:05-229:19, 229:22-230:01; Den Uyl Dep. at 73:19-73:20, 73:22-74:03, 76:20-77:16.

819.    This money was provided to BPXP without the typical analyses performed when a corporation makes an investment or loan.  Even BPXP's witness on economic impact of the penalty could identify no analysis by the BP Group's management or BP p.l.c.'s board of directors to assess the expected return on capital investments or projected dividends from the spill-related expenses paid by the BP Group or BP p.l.c. Further, there was no analysis of the ability of BPXP to repay the contributions BP p.l.c. or the BP Group made to fund the spill related expenses. Den Uyl Dep. at 79:02-8, 79:10-14.

820.    Since the spill, BP p.l.c. and BPXP have made numerous statements indicating it would pay all legitimate claims related to the Defendants' disaster without assigning sole responsibility to its subsidiary BPXP. *See* TREX-012304A.007; TREX-012306A.078; TREX-012307A.025; TREX-012303A.011; TREX-012319.09; TREX-012343.05; TREX-012322.002; TREX-012432.013; TREX-012553.030.

821.    The BP Group chose to reflect the expenses of the GCRO and all spill costs on BPXP's books even though other BP Group entities are involved in litigation over the Defendants' disaster, including BP America Production Company, which is both a signatory to the civil class action settlement and has been found liable for gross negligence or willful misconduct. Robertson Dep. at 154:15-155:03, 230:21-230:03; TREX-012314; TREX-012638; TREX-012639; TREX-012640; Cross Dep. at 73:21-74:12, 78:25-79:13, 81:24-82:09, 88:01-88:20; TREX-012313; TREX-012315; TREX-012316; TREX-012317.

822.    Spill costs charged to BPXP include all legal costs related to this litigation, including SEC-related actions in which BPXP is not the defendant, and ignoring the fact that other BP Group entities are defendants in criminal and civil actions related to the Defendants' blowout. Robertson Dep. at 154:15-155:03, 158:12-160:23, 161:19-162:11, 162:13-163:05, 163:08-163:20.

823.    That the response was conducted by the BP Group and not just BPXP is also established by the fact that the management of the response was drawn from various legal entities. Just two examples suffice to establish this point:

a.    At the time of the Defendants' disaster, Mr. Suttles, the Chief Operating Office of Exploration and Production for the BP Group worldwide, drew his paycheck from BP Corporation of North America, and was appointed to be the BP Group's Senior Representative to the Unified Command by the Chief Executive Officer of the BP Group and the Chief Executive Officer of Exploration and Production for the BP Group. Suttles Dep. at 22:07-23:03, 41:07-43:08, 547:10-548:19, 585:09-585:14, 210:15-18, 224:10-17, 495:17-498:08, 553:14-556:01. Mr. Suttles testified that he was not familiar with the legal entity, BP Exploration and Production. Suttles Dep. at 803:01-803:11, 817:04-818:22.

b.    During the response to the Defendants' disaster, Ms. Cross (*see supra* ¶ 798) assisted with community affairs for the response to the disaster under the supervision of the Gulf of Mexico RBU and then the GCRO.  In all that time, she continued to be employed by BP Corporation North America. Cross Dep. at 37:12-37:22, 77:06-77:20, 81:24-82:09, 42:12-43:10, 44:14-44:18, 48:18-48:22, 50:09-50:18. Ms. Cross' superior

232

reported directly to BP America and her budget for community investment was from BP
America. Cross Dep. at 75:05-75:23, 78:25-79:13, 80:08-80:23, 177:17-177:22, 236:16-
237:09; TREX-012314; TREX-012315.

824.    The BP Group set a goal to dispose of up to thirty billion dollars in assets by the
end of 2011 in order to fund the response and other effects of the Defendants' disaster. Bucknall
Dep. at 85:07-86:22, 87:12-87:22, 88:11-88:16, 90:17-90:24, 91:16-92:21. That goal was later
increased to thirty-eight billion dollars and was largely completed by December 31, 2012. Smith
Dep. at 179:04-180:01, 180:07-180:08; TREX-012402; TREX-012405; TREX-012406;
TREX-012409; TREX-012410.

825.    The press releases announcing the sales make clear that the BP Group's asset
disposal program was a global effort to meet its financial obligations arising from the
Defendants' disaster. *See, e.g.,* TREX-012405.

826.    The BP Group's asset disposal efforts were not limited to the exploration and
production side of the global business, but also included the sale of a wholly-owned subsidiary,
ARCO Aluminum, a supplier of rolled aluminum sheet. The sale of ARCO to a consortium of
Japanese companies amounted to $680 million in cash. TREX-012409.

827.    To decide which assets to sell, the BP Group looked to expected divestment
proceeds and also looked to dispose of assets that others would find more valuable or could
develop more quickly. These decisions, like other BP Group decisions, were made on the basis
of what was in the best interest of the Group as a whole and then implemented through the
structured finance note process described above. Bucknall Dep. at 119:15-122:01.

828.    BP p.l.c. disclosed to its investors that the result of this divestment program is that BP p.l.c. is smaller, simpler, and much more focused company and that BP p.l.c.'s financial framework is sufficiently resilient to deal with the outcomes of these proceedings without compromising the future of BP p.l.c.. Smith Dep. at 291:14-17, 291:21-292:07, 292:15-293:01, 293:07-12, 293:16-20, 293:25-294:08, 294:12-14, 294:16-23; TREX-012769.002; TREX-012695.004.

### i)    The BP Group Regularly Provided Financing to BPXP

829.    The methods that BP p.l.c. and the BP Group used to finance the costs of responding to the Defendants' disaster reveal BPXP's ability to obtain financing from the BP Group. Very little financial information prior to the spill was provided in discovery. However, from 2009 to mid-2014, BPXP was funded by other BP entities, including:

a.    An internal five billion dollar line of credit known as an IFA with NAFCO. Bucknall Dep. at 245:05-245:13, 250:16-251:04; TREX-012436;

b.    Intercompany borrowings, including eleven billion dollars in loans from NAFCO. PP Tr. at 1028:13-23, 1029:01-1029:04; TREX-011968; TREX-013123R; TREX-013123E;

c.    An internal $3.1 billion loan. PP Tr. at 1026:08-1027:04, 1028:16-1028:18;

d.    Internal equity of preferred and common stock. PP Tr. at 1026:08-1027:05, 1028:13-1028:21; and

e.    An internal fourteen billion dollar equity injection. PP Tr. at 1026:08-1027:05, 1028:13-1028:21.

830.    Since 2009, BPXP never requested a loan or IFA that was denied by the BP Group. PP Tr. at 1030:16-1030:19, 1021:13-1021:15, 1028:13-23, 1029:01-1029:04; Smith Dep. at 73:07-73:12, 73:16-73:23.

831.    BPXP never obtained outside debt or outside equity during 2009 through mid-2014. PP Tr. at 1029:02-1030:22, 1021:13-1021:15.

832.    The BP Group treats monies owed to NAFCO as "working capital balances," not necessarily loans. Robertson Dep. at 95:15-96:01, 107:23-109:22, 209:14-210:15, 211:20-211:25.

833.    During 2010-2012, BPXP also obtained internal funding from another related BP entity, BP Company North America. BPXP payables to BP Company North America were $9.5 billion at the end of 2010, $9.4 billion at the end of 2011, and $9.2 billion at the end of 2012. PP Tr. at 1029:19-1030:11; TREX-011968; TREX-013123R.

834.    BP Company North America, BPXP's parent company, does not prepare financial reports. BP Company North America loans money to BPXP through a controlled disbursements process on behalf of various BP Group American companies including BPXP. Smith Dep. at 166:06-166:19, 168:12-168:18, 168:20-168:25, 169:02-169:05.

835.    To assist in repaying the eleven billion dollar advance to BPXP from NAFCO and the nine billion dollars owed to BP Company North America, BP America Production Company injected $13.9 billion of capital into BPXP.  This infusion was necessary because BPXP's liabilities exceeded its assets by approximately twelve billion dollars. PP Tr. at 1028:02-1028:09; Smith Dep. at 254:12-254:15, 254:17-255:24, 256:01-256:02, 256:04-256:14, 260:03; TREX-012437; TREX-012438. This transaction is notable in several ways:

a.      The capital contribution came from BP America Production Company.

b.      The capital contribution was not a loan and BPXP did not issue any additional shares.

c.      The structured finance note creating the transaction also allowed BP America Production Company to increase its IFA with NAFCO from $5 billion to $15 billion.

d.      No BP America Production Company Board approval was required.

e.      No valuation of BPXP was prepared.

f.      No internal funding agreements governed the intercompany transactions.

Bucknall Dep. at 255:17-258:20, 263:09-264:05, 265:01-265:08, 271:14-272:12; TREX-012437; Smith Dep. at 116:02-6, 116:08-13, 116:15-117:03, 117:18-25, 118:02-9, 118:11-21, 251:25-252:01, 252:03-22, 253:01-24, 254:24-255:24, 256:01-2, 256:04-5, 256:08-17, 256:20; PP Tr. at 1030:23-1031:12, 1029:05-1029:14, 1030:12-1030:15.

836.    At the beginning of 2013, there was approximate nine billion dollars payable to BP Company North America by BPXP.  This debt arose from BP Company North America paying BPXP invoices and then recording an intercompany receivable from BPXP for these payments. Smith Dep. at 111:23-113:04, 113:19-114:09, 115:02-19.

837.    On December 11, 2013, the structured finance note for NAFCO to extend a long-term loan to BPXP of $3.1 billion was supported because BPXP had unpaid balances with BP Company North America and the loan provided funds to pay that debt promptly. Bucknall Dep. at 273:09-276:14, 279:04-279:24; TREX-012439; TREX-012443.

838.    BPXP has not been required to provide collateral for the amount owed under its IFA. In addition, the December 2013 structured finance note for the BPXP loan of $3.1 billion

from NAFCO, indicates that there are no material risks. Smith Dep. at 240:12-240:24, 241:01, 241:20-23, 241:25-242:09, 245:04-10.

839.    Following these internal BP Group transactions to provide funding to BPXP, the BP Group removed BP America Production Company from the chain of ownership of BPXP. On or about January 1, 2014, there was a corporate reorganization pursuant to which BPXP, which had been a subsidiary of BP America Production Company, became a subsidiary of BP Company North America as part of a streamlining and simplification of BP's corporate structure. BP America Production Company effectively distributed its holdings in BPXP to its parent BP Company North America. The carrying value (book value) of BPXP was approximately $17 billion on the date of distribution. Smith Dep. at 63:24-64:22, 65:01-5, 67:07-9, 67:11-15, 73:24-74:11; Bamfield Dep. at 47:13-48:01, 50:06-10, 50:12-14, 50:19-25; TREX-011962.

840.    When the common stock of BPXP was distributed to BP Company North America, BP Corporation North America did not provide any consideration for the BPXP stock. Smith Dep. at 111:05-10, 111:12-19, 111:21-22.

841.    BP Company North America is largely a holding company for a variety of BP operations in the United States and serves as a controlled disbursement entity for a number of BP companies in terms of payments. Smith Dep. at 71:23-72:11.

> **j)     Other BP Group Entities Made Commitments and Took Actions on Behalf of the BP Group's Interests in the Gulf Before and After the Incident**

842.    Although BPXP was the lease holder and registered operator of the Defendants' well, multiple BP Group entities were involved in the drilling and operation of the well. BP Corporation North America was registered as the Areawide Guarantor for BPXP. BP America

Production Company entered the drilling contract with Transocean for the Deepwater Horizon to drill the well. BP America, not BPXP, submitted the Oil Spill Response Plan relied upon in the well permit. TREX-012757; TREX-012758; TREX-012662; Rec. Doc. 12465 at 8.

843.    BP Corporation North America is the primary guarantor and BP p.l.c. is the secondary guarantor for all payments due under the Plea Agreement from BPXP. Rec. Doc. 13725 at 2 ¶ 2.

844.    BP Corporation North America is the primary guarantor and BP p.l.c. is the secondary guarantor for BPXP's obligation to indemnify Anadarko for future natural resource damages. Gwin Dep. at 165:06-165:17.

> **k)    BPXP Increased Spending Since the Spill Instead of Creating Any Reserve for Penalties.**

845.    Since the Defendants' blowout, BPXP has increased its expenditures as shown in Table 6.

| Table 6: BPXP Increases in Expenditures since Defendants' Disaster (in billions of dollars) | | |
|---|---|---|
| Category | 2009 | 2013 |
| Capital Expenditures | 2.705 | 3.587 |
| Vendor Spending | 3.448 | 4.278 |
| Operational Expenditures | 1.165 | 1.989 |
| Employment Compensation | .426 | .482 |
| Sources: 1577:04-17; D-34612; D-34613; D-34614; D-34622; PP Tr. at 1604:01-1604:19 | | |

846.    BPXP currently has ten rigs drilling in the Gulf of Mexico, an increase from seven in 2011. PP Tr. at 1572:02-1572:04; TREX-012412.002. BPXP also leased new acreage in the Gulf since the incident. TREX-012677.003.

847.    BPXP embarked on these increased expenditures despite the BP Group having "provisioned" $3.5 billion for a civil penalty, which it now contends BPXP cannot pay. BPXP

President, Mr. Morrison could not explain how BPXP had accounted for this penalty other than that it was on the books. PP Tr. at 1597:19-1599:04; TREX-012303A.044.

848.    BPXP has chosen as a financial strategy to reinvest one hundred percent – rather than plan for a penalty, even though its original "provision" rested expressly on an assumption that there would be no finding of gross negligence or willful misconduct (an assumption proven to be false). Bamfield Dep. at 70:21-24, 71:01-11, 71:13-14, 71:19-72:01, 78:14-17, 78:19-23, 79:03-5, 79:07.

849.    BPXP admits it sold assets for strategic reasons and not to pay for spill costs. PP Tr. at 1571:07-1571:22.

850.    BPXP owns more than 600 leases, all acquired with the goal of extracting hydrocarbons. PP Tr. at 1571:23-1572:01.

851.    BPXP has "many sources of cash." A loan is only one source of cash for BPXP. Robertson Dep. at 215:07-216:03, 241:23-242:11. Even when capital expenditures exceeded cash from operations, it was of no consequence as BPXP had "various sources of cash." Robertson Dep. at 242:15-243:06.

> ii.    **Imposition of the Statutory Maximum Would Not Have a Long-Term Negative Impact on the Operations of BP p.l.c. or the BP Group**
>
>> a)    **BP p.l.c. and the BP Group Are Enormous, Have Been Very Stable, and Expanded 2009-2013**

852.    At trial, the United States' expert Mr. Ratner aptly demonstrated that BP p.l.c. and the BP Group would not suffer long-term negative impact from the payment of even the statutory maximum penalty, as demonstrated below.

853.    Mr. Ratner's testimony regarding the financial condition of BP p.l.c and the BP Group is uncontested. BPXP's witness Mr. Den Uyl ignored the complete interdependency of BP p.l.c., the BP Group, and BPXP that was demonstrated above. *See supra* § VII.A.i. Therefore, he offered no opinion regarding the financial condition of BP p.lc. or the BP Group. Den Uyl Dep. at 57:01-5, 57:07-20, 58:01-58:05, 64:13-65:02.

854.    Mr. Ratner's testimony, based on BP p.l.c.'s public reporting, shows that the BP Group is massive and that BP p.l.c. has grown since the Defendants' disaster as follows.

855.    Based on 2013 revenues, BP p.l.c. was the fifth largest company in the world with revenues of $396 billion in 2013. PP Tr. at 1014:22-1014:24.

856.    BP p.l.c. had $315 billion of assets at the end of the second quarter 2014 and $27 billion in cash. PP Tr. at 1014:24-1015:01.

### i)    BP p.l.c.'s Balance Sheet is Stronger Today than it Was Prior to the Defendants' Disaster

857.    As shown in Table 7, BP p.l.c.'s balance sheet is better today than it was prior to the spill. PP Tr. at 1015:02-3, 1034:15-17, 1035:19-1035:23.

| Table 7: BP p.l.c.'s Improved Condition Since the Defendants' Disaster | | |
|---|---|---|
| Category | Before the Spill | June 2014 |
| Cash Balances | $8.3 billion | $27 billion |
| Total Assets | $236 billion | $315 billion |
| Total Book Equity | $102 billion | $133 billion |
| Working Capital | $8 billion | $28 billion |
| PP Tr. at 1033:18-1033:21, 1034:04-1034:08, 1034:11-1034:13, PP Tr. at 1034:20-1034:21; TREX-013123R.027-.028 Table 8; TREX-232340; TREX-233104. | | |

858.    BP p.l.c. had $30 billion cash on hand at the end of the third quarter 2014. PP Tr. at 1033:25-1034:2; TREX-013123R.027-.028 Table 8; TREX-232340; TREX-233104.

859.    BP p.l.c.'s net debt has remained essentially flat: $26 billion in 2009 and $24.4 billion in June 2014. PP Tr. at 1034:21-1035:02; TREX-013123R, Table 8; TREX-232340; TREX-233104.

860.    As of June 2014, BP p.l.c. had a market equity of approximately $160 billion and a book equity (difference between the asset and the liabilities) of $132 billion. As of January 23, 2015, BP p.l.c.'s market equity was about $119 billion and was trading at less than its book value. PP Tr. at 1036:06-17; TREX-013123R, Table 8; TREX-232340; TREX-233104.

861.    BP p.l.c.'s revenues have grown from $246 billion in 2009 to $396 billion in 2013. PP Tr. at 1037:17-18; TREX-013123R; TREX-013123E; TREX-232340; TREX-233104.

862.    Except for 2010 (the year of the Defendants' disaster), BP p.l.c. has been extremely profitable; the company made $26 billion in 2009, $30 billion in 2011, $19 billion in 2012, and $30 billion in 2013. PP Tr. at 1037:25-1038:05; TREX-013123R; TREX-013123E; TREX-232340; TREX-233104.

863.    BP p.l.c.'s cash from operations was $27 billion in 2009, $13 billion in 2010, $22 billion in 2011, $20 billion in 2012, and $21 billion in 2013. BP p.l.c. disclosed that it will have $30 billion of cash from operations in 2014. PP Tr. at 1039:19-24; Bucknall Dep. at 74:04-75:01; TREX-013123R; TREX-013123E; TREX-232340; TREX-233104; TREX-012303A.129.

864.    BP p.l.c.'s capital expenditures or investing activities include: acquiring assets, investing in rigs, investing in wells, and similar expenditures to build the company. BP p.l.c.'s capital expenditures were $21 billion in 2009, $18 billion in 2010, $18 billion in 2011, $23 billion in 2012, $24 billion in 2013, and $11 billion for 6 months ending June 2014. PP Tr. at

1039:19-24; Bucknall Dep. at 74:04-75:01; TREX-012303A.129; TREX-013123R;

TREX-232340; TREX-233104.

865.    Some of BP p.l.c.'s capital expenditures are discretionary. PP Tr. at 1040:09-11.

866.    In line with the foregoing figures showing growth through 2014, BP p.l.c. has

highlighted for investors evidence of its financial health. In a May 2014 presentation to debt

investors, BP's Deputy Group Treasurer identified the following key facts and figures for 2014:

     a.    A fifty percent increase in operating cash flows;

     b.    Back to business in the Gulf of Mexico with ten rigs operational (highest ever);

     c.    Major projects on-tract – unpinning cash flow growth;

     d.    Balance sheet is stronger now than it was in 2010;

     e.    Almost tripled prospect inventory versus eight years ago;

     f.    Continued strong access to the international capital markets, including $43 billion

     in new bonds since the blowout.

Bamfield Dep. at 96:05-21, 96:23-97:16, 97:18-98:04, 98:06-17, 98:19-99:21, 99:23-100:14,

100:16-101:04, 101:06-9, 101:15-102:01, 103:10-103:18.

867.    In recent years, BP p.l.c. has built up a cash buffer from its operating cash flows.

This buffer will accommodate any foreseeable requirements.  In the first quarter of 2014, BP

p.l.c. had twenty-seven billion dollars in cash available for debt repayment, normal operating

expenses, and protection against oil price volatility. Bamfield Dep. at 140:10-141:05, 141:11-

141:25, 142:02-142:13, 142:15-142:20, 143:01-143:12, 143:14-144:07; TREX-012568;

TREX-012569.

868.     BP holds cash for a variety of different reasons: cash tied up in the business, cash needed for the volatility in future cash generation as oil prices fluctuate, cash to repay debt, cash for investments, and cash for various other contingent liabilities of the group that may arise. Bamfield Dep. at 218:03-218:13.

869.     One fact illustrates the volume of money handled on a routine basis by the BP Group: BP International, the legal entity that operates as the in-house bank for the BP Group, had assets of around forty billion dollars as of July 2014. The gross value of all the various transactions the BP Treasury function handles each year is around one trillion dollars every year. Bucknall Dep. at 23:12-16, 54:15-57:10; Bamfield Dep. at 40:22-40:24, 42:04-42:07, 42:10-42:13.

### ii)     BP p.l.c.'s Standard Measure of Oil and Gas Includes Only a Portion of BP p.l.c.'s Reserves

870.     The Standard Measure of Oil and Gas ("SMOG") projections are a regulatory requirement in the oil and gas industry, and all participants must perform the same prescribed calculation. Bucknall Dep. at 195:24-197:21. The SMOG calculation takes today's price and cost and carries it out over time, assuming the company only develops the proved reserves. In effect the SMOG calculation generates a liquidation value of the proved assets. Bucknall Dep. at 200:01-200:08.

871.     The SMOG figures are relevant because BP p.l.c.'s financial statements do not show the projected cash flows from the proved reserves.  The financial statements reflect only the investment in the assets to recover those proved reserves. PP Tr. at 1046:22-1047:01; Bucknall Dep. at 205:09-207:06.  Therefore, the SMOG value is a useful tool to gain an understanding of the order of magnitude of BP's *proven* reserves. Den Uyl Dep. at 259:02-10.

872.    According to BP's SMOG, the value of its proved reserves at year-end 2013 was $126 billion discounted to present value ($260 billion undiscounted). PP Tr. at 1043:16-1044:05; Bucknall Dep. at 214:08-25; TREX-012303A.294.

873.    One limitation of the SMOG value, however, is that it does not include any reserves that are not defined as "proved." Proved reserves are narrowly defined. Bucknall Dep. at 195:24-197:21.

874.    BP looks at proved reserves, probable reserves, and possible reserves. Bucknall Dep. at 196:13-25. In reality BP will develop both proved and probable wells. Bucknall Dep. at 200:18-21.

875.    BP's unproved reserves are three times the proved reserves. PP Tr. at 1044:11-1045:07, 1045:11-1046:20; TREX-013123R.011-.012; Bucknall Dep. at 198:08-199:24; TREX-012432.049.



Figure 48: BP Proven v. Unproven Reserves (TREX-013123R.012)

876.    BP p.l.c.'s proved reserves at year end 2013, including those located in Russia, totaled 17.996 billion barrels of oil equivalent. TREX-012303A.251.

877.    By the end of 2016, BP plans to start thirty-two new projects, which have the potential to contribute about one million barrels a day of oil equivalent. Bamfield Dep. at 95:12-24, 96:01-4; TREX-012552.028.

### iii)   The BP Group's American Companies Are Substantial in Their Own Right

878.   The wholly-owned BP p.l.c. subsidiaries in the United States also are massive. For example, the 2013 financial records of BP Corporation North America, the parent of BP Company North America, revealed that BP Corporation North America had total assets of approximately $177 billion and total revenues of approximately $147 billion. BP Corporation North America's 2013 financial records also revealed that it had projected future cash flows of approximately ninety-seven billion dollars. Smith Dep. at 169:09-169:12, 169:14-169:23, 170:09-170:14, 170:19-171:01, 171:03-171:14, 172:01-172:02, 172:04-172:08, 172:14-172:19, 172:23-172:06, 173:13-173:17, 174:25-175:01, 175:03-175:14, 175:16-175:23, 175:25-176:05, 176:07-176:14, 176:17, 176:20-176:24, 177:06-177:16, 177:19-179:07, 179:10; TREX-012782.

879.   Similarly, on March 31, 2014, BP America, the highest BP Group entity in the United States and the tax-paying entity in the United States, reported total revenues for the first quarter of thirty-seven billion dollars and total assets of $151 billion. BP America's proved reserves in the United States, Canada, Europe, Central and South America and other areas are approximately 3.1 billion barrels.  As of December 31, 2013, the total future cash flows for BP America were projected to be approximately $334 billion.  Smith Dep. at 185:11-186:12, 186:17-186:23, 194:01-194:17, 194:24-195:02, 196:04, 196:12-196:15, 196:17-196:21.

880.   BP entities transfer funds up the corporate chain through dividends.  Some examples are:

a.   In 2009, BP Corporation North America paid dividends of $24.9 billion to its common shareholder BP America. Smith Dep. at 182:08-182:12, 182:14-182:20, 182:22-182:23, 183:02-183:10, 184:02-184:06.

245

b.      In 2013, BP Corporation North America paid $3.1 billion in dividends to its

preferred shareholders and seven billion dollars in dividends to common stock

shareholders.  All of the shareholders were BP Group entities. Smith Dep. at 169:09-

169:12, 169:14-169:21, 170:09-170:14, 170:19-171:01, 171:03-171:14, 172:01-172:02,

172:04-172:08, 192:23-173:06, 173:13-173:17, 174:24-175:01, 175:03-175:14, 175:16-

175:23, 176:07-176:14, 176:17, 176:20-176:24, 177:06-177:16, 177:19-179:07, 179:10;

TREX-012782.

881.    Funds also flow down the corporate chain in the form of capital contributions of

equity.  For instance, in 2010 BP America made a capital contribution to its subsidiary BP

Corporation North America of $10 billion as a result of the effects of the Defendants' disaster.

Mr. Smith testified that BP uses BP Corporation North America as its guarantor entity, so the

$10 billion injection helped bolster the equity position of BP Corporation North America. When

asked if the $10 billion went to BPXP, Mr. Smith testified that since cash is fungible, it is hard to

ascertain the direction either downward or upward but it moves as it is supported, directed and

needed. Smith Dep. at 169:09-12, 169:14-23, 170:09-14, 170:19-171:01, 171:03-14, 172;1-2,

172:04-8, 172:14-19, 172:23-172:06, 173:13-17, 174:25-175;1, 175:03-14, 175:16-23, 175:25-

176:05, 176:07-14, 176:17, 176:20-24, 177:06-16, 177:19-179:07, 179:10, 182:08-182:12,

182:14-182:20, 182:22-182:23, 183:02-183:10, 184:02-184:06.

882.    As shown in Table 7 BP America's federal tax returns show substantial revenues

and relatively modest income tax payments by BP entities in the United States.

| Table 8: BP America's Income and Tax Payments 2009-2012 | | | | |
|------|----------------|----------------|----------------|------------|
| Year | Total Income | Taxable Income | Total Tax | Percentage |
| 2009 | $36,551,344,610 | $4,425,142,208 | $381,024,964 | 8.60% |
| 2010 | $45,206,041,368 | $6,513,518,862 | $7,450,860 | 0.11% |

| 2011 | $47,361,652,214 | $4,786,901,335 | $3,253,907 | 0.07% |
| 2012 | $50,061,278,550 | $11,035,309,540 | $70,842,985 | 0.64% |
| Source: TREX-012765; TREX-012766; TREX-012767; TREX-012768 | | | | |

883.   BP Holdings North America, Limited, and BP p.l.c. – both United Kingdom entities – own the voting stock of BP America. Smith Dep. at 214:19-215:04, 215:06-215:07, 215:14-215:17, 216:05-13, 216:15-217:12, 217:17-217:24, 218:03-218:19, 218:23, 218:25, 219:02-219:08, 219:10-219:11, 219:13-219:24, 220:09-221:11, 221:22-222:24.

### iv)   BP p.l.c. Has Implemented a Stock Buyback Program and Has Issued Substantial Dividends Since 2009

884.   A source of funding for a civil penalty that would not impact the BP Group's existing operations is funds that otherwise would be used to pay dividends or to buy back BP Group shares.

885.   Notwithstanding the cost of the spill and the possibility of a Clean Water Act penalty, in 2013-2014, BP p.l.c. bought back $7.5 billion of stock from shareholders. PP Tr. at 1040:24-1041:02; Bucknall Dep. at 75:20-76:14; TREX-012303A; TREX-013123R; TREX-232340; TREX-233104.

886.   In addition, since the spill, BP p.l.c. has grown its cash balance by nineteen billion dollars and paid nineteen billion dollars in dividends. PP Tr. at 1040:23-1041:13, 1042:01-1042:12; TREX-012303A; TREX-013123R; TREX-232340; TREX-233104; Bucknall Dep. at 75:20-76:14; TREX-012303A.

887.   Under the laws of the United Kingdom, when BP p.l.c. pays dividends to its shareholders, it must have sufficient distributable income to be able to pay the dividends out of surplus cash.  BP p.l.c.'s distributable income. Bamfield Dep. at 157:13-157:16, 157:23-158:01, 158:17-159:04, 159:06-159:09.

888.    Dividends are driven by the sustainable free cash flow and the operating capability of the BP Group and its ability to generate cash. Bucknall Dep. at 131:05-132:20.

889.    Share buyback programs are focused on making sure that the shares of the company are not diluted given the readjusted portfolio of assets, so that the shares match the assets that remain in the BP Group. Bucknall Dep. at 129:04-130:05. Share buybacks are more flexible for BP in terms of the timing and amount of the buybacks. Bucknall Dep. at 131:05-132:20.

890.    BP projects cash flows in excess of thirty billion dollars for year from 2014 through 2016.  PP Tr. at 1042:25-1043:07; TREX-012303A; TREX-013123R; TREX-012305A; TREX-012306A; TREX-012307A.

891.    BP also projects capital expenditures at the same level as in the prior years. PP Tr. at 1042:25-1043:07; TREX-012303A; TREX-013123R; TREX-012305A; TREX-012306A; TREX-012307A.

### v)    BP p.l.c. has Extensive Credit Lines and Can Issue Debt

892.    As another source of funding of a civil penalty, BP p.l.c. can either go directly to the credit market to raise funds through issuing debt, or it can avail itself of its unused credit facilities.

893.    As of December 2013, the BP Group had substantial amounts of undrawn credit lines totaling $7.375 billion. BP would look elsewhere first for liquidity, but these are a backstop if funding is needed on short notice. Bucknall Dep. at 137:15-139:06; TREX-012303A.173.

894.    BP has never drawn on its $7.4 billion standby credit facilities because they are for dire circumstances.  Rating agencies typically expect companies to have these credit lines if

they companies are issuing various types of debt in the market.  Bamfield Dep. at 212:14-214:22, 215:02-212:05; TREX-012978.005.

895.    In fact, BP p.l.c. can go directly to the market to raise funds.  As evidence of BP p.l.c.'s financial strength, since the end of 2010, BP has been able to issue approximately forty-three billion in debt, and that debt is unsecured. Bamfield Dep. at 103:10-103:18, 225:20-22.

896.    As of 2013, BP p.l.c. had SEC debt registration of $30 billion and had issued $6.9 billion. It had European debt registration of $30 billion and had issued $13.854 billion. Market conditions would determine the amount and price of future debt issuance. Bucknall Dep. at 100:16-100:20, 143:24-147:07.

### vi)    Third Party Credit Agencies Have Favorable Views of BP p.l.c.

897.    Based at least in part on presentations by BP, credit rating agencies have found that BP can pay significant penalties. Bamfield Dep. at 185:01-186:19,  189:12-23, 190:21-191:08, 191:10-23, 192:12-15; TREX-012952.

a.    In an unsolicited credit report, a well-known credit agency Fitch, estimated that so long as total payments related to the Defendants' disaster remain below seventy billion dollars, including amounts already paid out and the balance paid over a period of several years, BP p.l.c. will likely remain in the A rating category. *See* TREX-012769.001; Smith Dep. at 291:14-291:17, 291:21-292:07, 292:15-293:01, 293:07-293:12.

b.    In a solicited credit report, Moody's Investors Service Credit Opinion for BP p.l.c., dated April 30, 2014, Moody's indicated that BP p.l.c.'s ratings continue to be underpinned by: (1) an extremely large and diversified reserve base and considerable production despite the recent divestment of upstream assets that are mainly mature low-

249

growth, (2) an efficient cost base characterized by comparatively low discovery, development and lifting costs, and (3) a sound historical reserve replacement track record. If BP p.l.c. continues to "maintain prudent financial policies," Moody's concluded that BP has an ability to pay very large fines and legal claims. TREX-012695.003; Smith Dep. at 293:16-20, 293:25-294:08, 294:12-14, 294:16-294:23.

898.    A solicited rating is one that BP pays for and for which BP gives the rating agency access to BP's senior management to confirm publicly available information. Conversely, an unsolicited rating is not paid for and BP does not provide access to senior management for such ratings. Bamfield Dep. at 175:21-176:22, 176:24-177:11.

899.    BP gets a chance to review credit rating opinions for factual accuracy before they are published. Bamfield Dep. at 168:13-168:18, 168:24-169:03. BP's Deputy Group Treasurer is not aware of any errors in Moody's published opinions. Bamfield Dep. at 173:08-178:15, 173:17-173:21.

900.    Debt investors and other counterparties will pay considerable attention to these credit agency ratings in determining whether to invest in or contract with BP. Bamfield Dep. at 173:22-174:11.

### iii.    Imposition of the Statutory Maximum Would Not Have a Long-Term Negative Impact on the Operations of BPXP

901.    As detailed below, BPXP alone has substantial assets, as indicated by the following information concerning its holdings in the Gulf of Mexico, BP p.l.c.'s SMOG for proved reserves, and the limited forward-looking projections that BPXP produced in discovery.

      a)      **The Gulf of Mexico is one of BP's Four Key Areas in the Coming Years**

           i)      **BPXP Holds Eighty-Nine Percent of the BP Group's Activities in the Gulf of Mexico**

902.    BPXP owns in whole or in part hundreds of leases and significant oil reserves in the Gulf of Mexico and approximately eighty-nine percent of the BP Group's Gulf of Mexico activities are operated by BPXP. PP Tr. at 1015:04-1015:10; TREX-24055.006; TREX-233137.006; Bucknall Dep. at 217:21-218:03.

903.    According to BPXP's consolidated financial report for the fourth quarter of 2013, BP entities other than BPXP own approximately eleven percent of the leases owned by the BP Group in the Gulf of Mexico. BPXP's 30(b)(6) witness on the economic impact of a penalty and Vice President of Structured Finance for the Western Hemisphere, Brian Smith was unable to identify the specific entities. Smith Dep. at 108:21-109:11, 109:14.

904.    BP's Gulf of Mexico Region accounts for approximately twenty-two percent of BP's global oil production. PP Tr. at 1015:05-1015:09, 1047:20-23; Bucknall Dep. at 216:25-218:22, 276:17-277:19; TREX-240455.006; TREX-233137.006; TREX-012439.

905.    The Gulf of Mexico region is one of only four key geographic areas in the BP Group's upstream business. PP Tr. at 1015:11-12; TREX-013123R.008.

           ii)      **BPXP's Lower Tertiary Leases and Other Unproved Reserves Hold Future Potential**

906.    In 2014, BP projected that production in the Gulf of Mexico would increase from 211,000 barrels of oil equivalent daily in 2014 to 322,000 barrels of oil equivalent daily in 2018. Bucknall Dep. at 183:24-184:21; TREX-012430.

907.    BP's four principal producing hubs in the Gulf of Mexico are Thunder Horse, Atlantis, Mad Dog, and Na Kika. Those assets are early in their lifecycle with on average only twenty percent of their resource base produced to date. Bucknall Dep. at 184:22-187:09; TREX-012432.

908.    Other exploration successes – Kaskida, Tiber and Moccasin – are all scheduled to start producing oil in 2015 or later. Gila, a discovery in the Lower Tertiary, was not scheduled to produce oil before 2018. Bucknall Dep. at 186:25-194:16; TREX-012303A.028.

### iii)    The 2013 Gulf of Mexico SMOG Identifies Only Proven Reserves

909.    There is no specific SMOG for BPXP. There is, however, a SMOG analysis prepared for the Gulf of Mexico Region, to which BPXP refers in its internal, post-disaster financial statements. PP Tr. at 1047:07-1047:19, 1048:10-1048:19; TREX-244133.

910.    The methodology used in the SMOG for the Gulf of Mexico region is similar to that used by BP p.l.c. *See supra* § VII.A.ii.a.i.

911.    In its Gulf of Mexico SMOG, BP forecasts a gross revenue of $104 billion for the reserves that are proved, which results in a pretax cash flow of $68 billion and a post-tax cash flow of $45 billion undiscounted; this forecast is only for the GOM. PP Tr. at 1049:13-1049:25, 1051:06-1051:21; TREX-244133.

912.    If a penalty were required to be paid over time, future cash flow should not be discounted because BPXP would be paying the penalty with real dollars. PP Tr. at 1050:01-3.

913.    Using eighty-nine percent of BP p.l.c.'s 2013 SMOG value for the Gulf of Mexico, BPXP's fourth quarter 2013 Consolidated Financial Reports projects post-2015 discounted cash flow would contribute another eighteen billion dollars to BPXP. Bucknall Dep.

at 217:02-218:12; Smith Dep. at 97:25-98:08, 98:12-99:06, 99:10-19, 99:21-100:04, 100:07-10, 100:12-14.

914.     The 2013 GOM SMOG does not include BP's Lower Tertiary discoveries. These are hydrocarbons that BP recognizes are there and exist in the company portfolio. Bucknall Dep. at 295:02-296:23.

### b)     BPXP Has Substantial Assets

915.     BPXP has substantial assets. As of March 2014, BPXP reported eighteen billion dollars of fixed assets and approximately twenty-five billion dollars of total assets, not including future cash flows. PP Tr. at 1054:06-1054:07, 1055:01-1055:04; TREX-013123R.036 Table 14.

916.     As of March 31, 2014, BPXP's balance sheets reported $3.5 billion of book equity, but that figure already takes into account an accrual of $3.5 billion associated with the Clean Water Act penalty. In other words, $3.5 billion of any penalty is imposed in this case is already accounted for on BPXP's balance sheet and, together with the $3.5 billion of book equity disclosed in March 2014, reflected in the company's seven billion dollar book equity value. PP Tr. at 1054:15-1054:23; TREX-013123R.036 Table 14.

917.     In February 2013, Goldman Sachs presented its valuation of some of BPXP's assets, including Thunder Horse.  Goldman Sachs valued Thunder Horse alone at $17.9 billion net present value. Thunder Horse was just one of the fourteen assets comprising the Wood Mackenzie analysis discussed below. Bamfield Dep. at 154:22-155:11, 155:15-155:17, 155:19, 155:21-156:16, 156:19-156:21; TREX-012573.

c)      **BPXP Paid Over Sixteen Billion Dollars in Dividends to Other BP Entities in 2007-2010**

918.    From 2007 to 2010, BPXP paid sixteen billion dollars in dividends to its shareholders, which are BP Group entities. PP Tr. at 1056:07-1056:23; TREX-012792; TREX-012738; TREX-012739; TREX-012740; TREX-012741; TREX-012742; TREX-012743; TREX-012744; TREX-012745; TREX-012746; TREX-012747; TREX-012748; TREX-012749; TREX-012750; TREX-012751; TREX-012752.

919.    Prior to April 20, 2010, BPXP paid $4.4 billion in dividends to its preferred shareholder, BP Products North America and $12 billion in dividends to common shareholder, BP America Production Company. Mr. Smith testified that BP p.l.c. periodically reviews surplus and retained earnings with various subsidiaries to ensure that the top company of the group, BP p.l.c., has sufficient distributable reserves to provide for distribution of dividends to external shareholders. BP periodically looks for opportunities to effect distribution from different parts of the company. At the time, this was viewed as an appropriate action. Smith Dep. at 261:19-264:03, 264:05-265:03, 265:05-18.

d)      **The BP Group Projects Substantial Future Operating Cash Flows for the Gulf of Mexico Region**

920.    Although BP p.l.c. is a public company, BPXP is private company and does not have its own financial projections. PP Tr. at 1022:19-1022:24, 1025:05-1025:08.

921.    BPXP has produced very little non-public financial information concerning the BP Group's forward-looking projections for the Gulf of Mexico. First, in response to the Court's order to produce "any forward looking projections for the consolidated operations of BP p.l.c. in the Gulf of Mexico which are part of or are referenced in the minutes of the meetings of Board of Director minutes for BP p.l.c. for 2013 and 2014," (Rec. Doc. 12945), BPXP produced a single

set of minutes BP minutes, the substantive unredacted portion of which stated: "The peak in unfructified capital occurred <sic>next year but a key issue would be the restoration of production in the Gulf of Mexico in terms of base production, which is expected to rise to over 200,000 barrels a day in 2014." TREX-012429.003; Bucknall Dep. at 165:03-165:25.

922.    Second, BPXP produced a spreadsheet, entitled "Group Plan Template 4Q feed," which summarizes the regional recommendations from the BP Gulf of Mexico team submitted as part of the BP Group's global planning process. Bucknall Dep. at 169:17-170:11, 171:04-171:09; PP Tr. at 1025:02-1025:13; TREX-012430; TREX-012431.  The planning process is performed by the segments, as described in Section VII.A.i.a..

923.    The Group Plan Template was produced to the United States by BPXP in a hard copy version only. BPXP redacted five of the ten year projections. BPXP provided no backup or detail regarding the source of the revenue, the relevant assets, or the capital expenditures used in the Template. No detail of the projected expenses were provided to the United States or even BPXP's own witness on the economic impact of the penalty. PP Tr. at 1060:12-1060:18, 1016:01-1016:03.

924.    During his deposition, BP's Group Treasurer and Rule 30(b)(6) designee, Mr. Bucknall, testified that during the overview process the Group had changed the 2018 cash flow projection on the Group Plan Template from $6.7 billion to $5.5 billion, based on his discussions internal to the BP Group. He handwrote in the change but was unable to explain the reasons for the change or provide the underlying details of the plan. He also did not review an un-redacted version of the document, nor was one produced to the United States. PP Tr. at 1061:10-18, 1062:01-08; Bucknall Dep. at 167:09-184:16; TREX-012430.0003.



Figure 49: Handwritten Change to Cash Flow Projection in Gulf of Mexico Group Plan Template (TREX-012430.3.1.US)

925.     Without making the 2018 adjustment from $6.7 billion to $5.5 billion, the BP Group projects substantial operating cash flows (after tax but before capital expenditures) in excess of twenty-five billion dollars for the entire Gulf of Mexico region for 2014-1018. During that period, BP will have about $15 billion of capital expenditures and net cash flow of about $10.6 billion. PP Tr. at 1058:01-16; TREX-013123R.039 Table 17.

926.     Without making the 2018 adjustment from $6.7 billion to $5.5 billion, and using the eighty-nine percent figure for BPXP's portion of the Gulf of Mexico region, the projected five-year cash flow after capital expenditures allocable to BPXP is about $9.4 billion. Using the unexplained adjusted $5.5 billion, projected five-year cash flow after capital expenditures allocable to BPXP is about $8.3 billion. PP Tr. at 1062:09-1063:19; Bucknall Dep. at 181:15-182:16.

927.     If one extends the projections to the years which BPXP redacted from the Group Plan Template, the projected cash flow allocable to BPXP for the ten-year period beginning in 2014 is about $21.7 billion, assuming $3 billion in cash flows after capital expenditures for each

of the five years redacted in the Group Plan Template and using the $5.5 reduction. PP Tr. at 1062:20-1063:19.

928.     BPXP has provided neither the date of the Group Plan Template nor the oil and gas prices used in that Template. PP Tr. at 1063:20-1064:04.

> **e)     BPXP and BP Have Many Options to Pay a Penalty, but Have Made no Specific Plans**

929.     BPXP has many options for funding the penalty assessed in this case; it could use cash, borrow funds, raise equity, or sell stock. PP Tr. at 1064:05-23. None of the defendant's financial witnesses—the BP Group Treasurer, the BP Deputy Group Treasurer, or the Vice President of Structured Finance for the Western Hemisphere for BP—knew of any plans by BPXP or the BP Group for funding a civil penalty in this case other than the $3.5 billion "provision" set forth in BP's annual report. Bamfield Dep. at 40:04-40:07, 40:09-40:18, 40:21; Bucknall Dep. at 160:01-160:07, 160:17-160:20; Smith Dep. at 161:13-161:24. Even BPXP's retained financial witness, Mr. Den Uyl could not identify any plan for paying the civil penalty. Den Uyl Dep. at 256:09-256:20.

930.     BPXP also could raise debt from a non-BP entity, but it probably will not. BPXP has never raised debt externally, which would be more costly. This more costly course of action is unlikely to be approved since the BP Group Treasury would not recommend pledging assets to third parties. PP Tr. at 1064:24-1065:13; Bamfield Dep. at 219:13-222:19.

931.     Mr. Smith, Vice President of Structured Finance for the Western Hemisphere, testified that if the Court imposed a significant penalty on BPXP, and it did not have the cash, the BPXP board would need to request an additional lending capacity or an injection from its parent. Historically, the BP Group has provided funds in several ways, including offering through

257

BPXP's IFA, through an equity injection, or through a loan as the BP Group did in the first quarter of 2014. Smith Dep. at 156:01-3, 156:06-16, 156:18-23.

932.    Mr. Smith testified that he did not know what would happen to BPXP if the Court imposed a maximum penalty in this case. He also was unaware of any discussions about selling BPXP, or any financial planning for the possibility of a large civil penalty. Smith Dep. at 160:07-9, 160:15-161:03, 161:05, 161:13-21, 161:23-24.

933.    The Deputy Treasurer of the BP Group, Mr. Bamfield, had no information on the economic impact of a penalty on BPXP and does not know the amount that BPXP could pay. Bamfield Dep. at 29:01-30:16, 36:15-17.

934.    Mr. Bamfield is not aware of any planning by the BP Group for bankruptcy by BPXP. Bamfield Dep. at 70:21-24, 71:01-11, 71:13-14, 71:19-72:01, 78:14-17, 78:19-23, 79:03-5, 79:07.

935.    The BP Group's Treasurer was unable to say how BP would fund an $18 billion civil penalty, but stated that if BPXP were unable to fund it, there would be a discussion of the parent companies including BP p.l.c. as to how and whether to fund the penalty. Bucknall Dep. at 160:03-162:10.

        **f)**      **BPXP's Evaluation of Its Ability to Pay is Fatally Flawed**

        **i)**      **BPXP's "Valuation" is not Reliable**

936.    BPXP offered the opinion of Mr. Den Uyl to show that imposition of the statutory maximum penalty (then estimated at $18 billion) would have a significant impact on BPXP. He offered a "valuation" of BPXP's business of $16.1 billion dollars, though later (as discussed

below), he substantially reduced that value. *See generally* TREX-013153.023-.028;

TREX-247596.007; PP Tr. at 1207:03-1207:06.

937.    He acknowledged that there are three basic approaches to business valuations:

income approach, the market approach, and the cost approach. He further admitted that, in this

case, he used only the income approach and relied on an analysis performed by Wood

Mackenzie. Den Uyl Dep. at 33:24-35:20.

938.    The Wood Mackenzie research report was not a business valuation of BPXP.

Rather, it was a valuation of the BP Group's Gulf of Mexico assets. The Wood Mackenzie report

was not prepared and presented in accordance with any valuation standards. Den Uyl Dep. at

235:12-18, 236:02-9, 236:22-237:04.

939.    As the United States' expert Mr. Ratner demonstrated, BPXP did not provide Mr.

Den Uyl or anyone else with the information necessary to perform proper business valuation.

Specifically, neither BPXP's witness nor BPXP offered even the basic information necessary to a

perform a valuation, including: BPXP's business plan, access to management, a detailed capital

expenditure plan, or information on unproved reserves and contingent reserves. PP Tr. at

1050:11-1051:05.

940.    Mr. Den Uyl's work is replete with errors and flaws, including  (1) as stated

above, Mr. Den Uyl did not have sufficient information to perform a business valuation; (2) he is

not qualified to perform the valuation; (3) he did not perform adequate or sufficient due diligence

on the primary source of his analysis, (4) he did not include all of the BPXP assets in his

analysis; (5) he made a $7.8 billion adjustment that was not based on the correct data and is not

reconciled with detailed information on the adjusted costs; and (6) he relied inappropriately on

the Wood Mackenzie "low case" to adjust for oil prices. PP Tr. at 1015:24-1015:25; 1070:23-1072:18.

### (a)   BPXP's Witness is Not Qualified and Did Not Follow Standards for Business Valuations

941.   Mr. Den Uyl is unqualified to perform a business valuation of BPXP:

a.   He is an economist; he is not a certified public accountant and has no business valuation credentials. Den Uyl Dep. at 9:12-9:23, 10:13-10:17.

b.   Other than being a licensing professional for intellectual property licensing and valuations, he has no other professional certifications. Den Uyl Dep. at 10:13-10:17.

c.   He admitted that he did not follow any professional standards in performing his valuation. Den Uyl Dep. at 12:10-12:13, 32:04-32:08, 237:17-238:14.

d.   He has not attempted to complete courses and pass the required exams needed to be  designated a business valuation professional. Den Uyl Dep. at 31:19-32:03.

e.   He does not know whether he is an expert in projecting future cash flows and operational costs for offshore and gas industry assets. Den Uyl Dep. at 51:04-51:11.

f.   He has never been accepted by a court of law as an expert in projecting future cash flows or operational costs for offshore oil and gas industry assets. Den Uyl Dep. at 51:12-51:16.

942.   Mr. Den Uyl's opinions have been excluded in a number of prior cases. In one case, a United States District Court found that his testimony was not the product of reliable principles and methods, and he did not apply the principles and methods reliably to the facts of the case. Den Uyl Dep. at 13:18-14:23, 15:11-15:20, 15:22-15:25, 16:03-16:09, 16:18-17:03, 17:11-19:06, 19:13-19:25, 20:10-20:22, 20:25, 21:04-21:06, 21:08-22:09, 22:13-22:18, 22:20-

260

22:24, 23:03-24:03, 24:05-24:25, 25:21-26:03, 26:21-29:12, 29:14-29:25, 30:02-30:05, 30:07-30:18.

**(b)     BPXP's Witness Did Not Perform Due Diligence in Preparing his "Valuation" of BPXP**

943.     For each of the key documents upon which Mr. Den Uyl relied, he failed to conduct any inquiry into the basis of the document and had no access to the redacted portions of these documents. In addition, Mr. Den Uyl made only minimal inquiry of BP or BP Group employees to verify or correct his assumptions.

944.     The Wood Mackenzie document upon which Mr. Den Uyl relies is a valuation of selected reserves without detail about what is included in the analysis. PP Tr. at 1075:07-1076:07.

945.     Mr. Den Uyl's analysis rests on only fifty-two percent of the Wood Mackenzie report. The Index tab of the Master Spreadsheet indicates that twenty-seven different tabs or categories of data should be included in the file, thirteen tabs or categories of data are missing. TREX-230560; TREX-240835. This document was the primary source of his valuation work.

946.     Mr. Den Uyl did not know whether BP reviewed any drafts of the Wood Mackenzie research report or whether BP provided any comments. In fact, he did not even know if BP received a draft from Wood Mackenzie before the report was finalized. Den Uyl Dep. at 225:23-225:25, 226:08-226:11.

947.     Mr. Den Uyl also failed to do any due diligence regarding the completeness of the analysis. He simply assumed that the Wood Mackenzie report analyzed all the oil fields owned by BP in the Gulf of Mexico. Den Uyl Dep. at 223:04-223:07, 224:12-226:11, 226:13-228:02.

261

948.     Mr. Den Uyl testified that did not know the source of the information used by Wood Makenzie, including how much was obtained directly from BP. He never even asked BP that question. Den Uyl Dep. at 231:24-232:05, 232:08-232:15.

949.     Mr. Den Uyl relied on the BP Group Plan Template to develop future cash flows for BPXP. Den Uyl Dep. at 132:04-132:17.

950.     Mr. Den Uyl, however, lacked basic information about the BP Group Plan Template:

a.       He did not ask for or see a complete or electronic version of the document.

b.       He did not know why BP redacted the years 2019-2023.

c.       He did not see any of the underlying field development planning documents that are aggregated in the Group Plan Template.

d.       He did not know when the Group Plan Template was prepared or how often it is prepared and updated.

e.       He did not see a prior version of the Group Plan Template or ask for one.

Den Uyl Dep. at 146:22-147:12, 147:14-147:20, 147:22-148:01, 148:03-148:08, 148:10-149:12, 150:15-18, 150:23-25, 151:07-17.

951.     Mr. Den Uyl also relied on the BP Secret Draft, Version 4, March Investor Day Upstream Proof Points. This secret draft was the basis for Mr. Den Uyl's decision to reduce estimated cash flow for 2018 in the Group Plan Template. Den Uyl Dep. at 121:06-126:18.

952.     Again, Mr. Den Uyl was missing basic information:

a.       He only saw one page (29) of the eighty-three pages of the BP Secret Draft, Version 4.

b.      He did not know if the BP Secret Draft, Version 4 was ever disclosed to the public.

c.      He had not seen any other documents that show adjustments and operating cash (post tax) for any of the years 2014 through 1018.

d.      He had not seen an adjusted Group Plan Template showing the adjustments made that result in a $5.5 billion operating cash flow post tax for 2018.

e.      He was not aware of any records reflecting adjustments by BP to the projected cash flows for the years 2015 through 2018.

f.      He did not have a breakdown of the changes and projections by year or field or lease.

g.      He had not seen any underlying documents associated with reduced production levels.

Den Uyl Dep. at 120:21-122:13,124:08-125:13, 125:16-24, 126:05-14, 126:25-127:04, 128:03-11, 128:13-14, 131:08-12, 139:21-140:01, 140:03-6, 141:01-4, 141:09-142:02, 143:06-12, 143:14-144:04, 145:08-19, 155:22-156:05, 159:03-6, 159:08-11, 159:15.

953.    Mr. Den Uyl testified that neither the Group Plan Template, nor the BP Secret Draft, Version 4 provides a downward adjustment of cash flows for the years 2015, 2016, or 2017. Mr. Den Uyl did not know if BPXP or BP prepared any adjustments for the cash flows projected for 2015, 2016, or 2017 and even if they did, he used his own figures. Den Uyl Dep. at 160:06-10, 161:07-13, 161:25-162:15, 162:19-21.

954.    Mr. Den Uyl did not talk to anyone at Wood Mackenzie. Den Uyl Dep. at 48:02-48:18; PP Tr. at 1076:10-1076:17.

955.     In connection with his work on this case, Mr. Den Uyl met with BP Group employees for a few hours face-to-face in July 2014, and by telephone.  These employees provided no documents, and Mr. Den Uyl took no notes during the meetings. Den Uyl Dep. at 41:16-44:17.

956.     Mr. Den Uyl did not ask BPXP or the BP Group whether the company agreed with his work. Den Uyl Dep. at 254:11-17.

### (c)      BPXP's Witness Did Not Include All of BPXP's Assets in his Valuation

957.     The Wood Mackenzie analysis included only fourteen projects and only 1,450 square kilometers (10.2%) out of 14,000 square kilometers that the BP Gulf of Mexico region leases in the Gulf of Mexico. PP Tr. at 1076:25-1077:20, 1078:12-1079:18; TREX-013123R.019 Table 4.

958.     The fourteen projects included in the Wood Mackenzie report represent only sixty-four lease blocks. Mr. Den Uyl, however, acknowledged that the BP Group holds 611 blocks in the Gulf of Mexico. Den Uyl Dep. at 228:13-230:19, 230:21, 230:23-231:18.

959.     Mr. Den Uyl's opinions on the value of BPXP are based solely on the assets included in the Wood Mackenzie report. PP Tr. at 1016:04-1016:09. Mr. Den Uyl does not know how many active leases BP has in the Gulf of Mexico nor does he have any information or knowledge about of how much BP has invested in those leases. Den Uyl Dep. at 267:14-23. Accordingly, his valuation excludes substantial assets of BPXP.

960.     Two specific BPXP oil reserves either not valued or included in the Wood Mackenzie analysis or in Mr. Den Uyl's analysis include Gila, a major BPXP discovery, and Guadeloupe. PP Tr. at 1079:19-1080:05; TREX-233896.

961.    Although Wood Mackenzie assigned no value to Gila, BPXP announced on January 28, 2015, during the Penalty Phase trial, that BPXP had sold some of its Gila ownership to Chevron; the value of the Gila sale was not disclosed. PP Tr. at 1079:19-1080:05; TREX-233896.

### (d)    BPXP's Witness Made an Unsupported $7.8 Billion Adjustment to Projected Operating Costs

962.    Mr. Den Uyl did not accept Wood Mackenzie's estimate of projected operating costs. Rather, he decided that the Wood Mackenzie estimate of projected future costs was "significantly below BPXP's actual production and other operating expenses" and therefore he adjusted those projected costs by $7.8 billion. This adjustment, of course, reduced Mr. Den Uyl's "valuation" of BPXP. TREX-013153.025-.026.

963.    As Mr. Ratner testified, however, Mr. Den Uyl's adjustment of projected operating costs cannot be reconciled with the data produced by BP, particularly in the BP Group Plan Template. D-32347; PP Tr. 1080:09-1082:17.

964.    In fact, Mr. Den Uyl admitted that he did not reconcile the details comprising the Group Plan Template with the Wood Mackenzie information. Den Uyl Dep. at 149:03-149:08.

965.    There are differences among the forecasted operating costs set forth in the BP's Group Plan Template, the Wood Mackenzie analysis, and Mr. Den Uyl's projected future operating costs, as reflected in Table 9.

265

| Table 9: Differences between BP Group Plan Template and Wood Mackenzie Estimates of Operating Costs | | | |
|---|---|---|---|
| Year | Forecasted Operating Costs (billions of dollars) | | |
| | Group Plan Template | Wood Mackenzie | Den Uyl |
| 2014 | 2.225 | 2.280 | .508 |
| 2015 | 2.041 | 2.335 | .561 |
| 2016 | 2.113 | 2.471 | .603 |
| 2017 | 2.140 | 3.644 | .599 |
| 2018 | 2.396 | 4.070 | .590 |
| Sources: PP Tr. at 1207:15-1208:07, 1213:04-1213:06, 1210:13-1211:04; TREX-012431.1.2.US; TREX-230560; D-32351; D-32351.1.1.US; PP Tr. at 1211:05-1213:03; D-32352; D-32352.1.1.US | | | |

966.    Mr. Ratner specifically confirmed that Wood Mackenzie's operating costs reconcile with the Wood Mackenzie calculations. For example in 2014, $26 costs per barrel times 241,000 barrels of oil equivalent per day, times 365 days per year equals $2.280 billion. PP Tr. at 1208:08-1210:12; D-32349; TREX-230560; D-32349.1.1.US; D-32350; D-32350.1.1.US.

967.    By contrast, the numbers that Mr. Den Uyl uses for projected future operating costs were obtained from an untitled table in the Wood Mackenzie spreadsheet and are much lower than either the costs identified in the BP Group Plan Template or the Wood Mackenzie analysis. Neither Mr. Den Uyl nor BPXP have explained what this untitled table represents. PP Tr. at 1211:05-1213:03; D-32352; D-32352.1.1.US; TREX-230560; PP Tr. at 1080:09-1082:17; TREX-233888.007.

968.    Mr. Den Uyl did not reconcile the expense items that Wood Mackenzie had compared to the information from BPXP, because Wood Mackenzie did not provide a breakout of the operating expenses. Den Uyl Dep. at 242:12-243-12, 243:14-17, 245:07-11, 245:14-246:13, 246:16-248:23, 248:25-249:01.

969.    Moreover, BP management did not develop or review the formula Mr. Den Uyl used to calculate his $7.8 billion adjustment. Den Uyl Dep. at 163:08-21, 165:01-12, 167:17-18, 167:21-24.

970.    Mr. Den Uyl's $7.8 billion adjustment to the Wood Mackenzie analysis assumes that the adjustment applies until the year 2057. This assumption is based on speculation, since Mr. Den Uyl points to no source and ignores the fact that BP has indicated that it intends to reduce future costs through employee reductions. PP Tr. at 1074:07-1074:14, 1082:18-1084:06.

971.    On cross-examination of the United States' expert, Mr. Ian Ratner, BPXP attempted to support Mr. Den Uyl's operating cost adjustment by comparing the capital expenditure tab and the operating expenditure tab in the Wood Mackenzie analysis and suggesting Mr. Ratner had confused operating and capital expenditures. As demonstrated on redirect and in Table 10, however, in the Wood Mackenzie spreadsheets, the capital expenditure and operating expenditure figures actually differ and Mr. Ratner used the correct figures in reaching his conclusion that Mr. Den Uyl had improperly applied the $7.8 billion adjustment to the operating expenses. PP Tr. at 1199:08-1203:02; TREX-230560.

| Table 10: Wood Mackenzie Figures for Capital and Operating Expenditures (in billions of dollars) | | |
|---|---|---|
| Year | Capital Expenditures | Operating Expenditures |
| 2014 | 2.280 | 2.280 |
| 2015 | 2.381 | 2.335 |
| 2016 | 2.571 | 2.471 |
| 2017 | 3.867 | 3.644 |
| 2018 | 4.405 | 4.070 |
| PP Tr. at 1199:08-1203:02; TREX-230560. | | |

972.    In addition to the operating expenditure adjustments, Mr. Den Uyl also adjusted the projections for future cash flow from 2015 through 2017. Based on an adjustment provided in

BP's "secret draft," discussed above, in which the BP Group reduced the 2018 projected cash flow, Den Uyl assumed that cash flow for the years 2015 through 2017 would be lower too. At the same time, however, he held capital expenditures static for those years even though such expenditures are, in part, discretionary. Den Uyl Dep. at 168:23-169:24, 170:09-25.

973.     During Mr. Den Uyl's discussions with BP employees, Mr. Stott indicated that production and cash flows were adjusted for 2018; no other years other than 2018 were discussed. Den Uyl Dep. at 47:09-47:18.

### ii)     BP p.l.c. and BPXP Are Well Positioned to Deal with Current Oil Prices

974.     At trial, BPXP argued that the oil prices at the time of trial indicated that BPXP had a reduced ability to pay. In support of that argument, they offered a revised opinion by Bruce Den Uyl. The opinion and contention are unsupported by the evidence.



Figure 50: BP's Shareholder Presentation on the Volatility of Oil Prices (TREX-233865.008)

975.    Price volatility is inherent in the oil and gas industry and the oil prices at the time

of trial reflected that volatility. TREX-233856.008; PP Tr. at 1015:15-1015:18. As the BP Group

Deputy Treasurer testified, one of the many reasons the BP Group holds a significant amount of

cash is to account for the volatility in cash flows because of the oil price environments. Bamfield

Dep. at 182:06-8, 182:10-19.

976.    In a December 2014 presentation to investors, BP p.l.c. emphasized that, while

the low oil prices at that time introduced some near term uncertainty, BP p.l.c. saw low oil prices

as potentially healthy because they can drive greater efficiency in the value chain.

TREX-233856.009.

977.    In fact, BP p.l.c. assured its investors that it "has a good track record of managing

through these cycles and we believe we have enough flexibility to withstanding a period of low

oil prices." TREX-233856.010.

978.    Noting that BP p.l.c. is an integrated company, the company stated that lower

prices should benefit its downstream business and provide some natural offsets.

TREX-233856.010-.011.

979.    BP p.l.c. told its investors that it entered December 2014 with (1) a very strong

balance sheet, (2) a gearing ratio – the ratio of net debt to debt plus equity – at historically low

levels, (3) cash balances that were strong, and (4) a number of high-return new wells.

TREX-233856.010-.011; *accord* PP Tr. at 1035:13-1035:18; TREX-013123R.028 Table 8;

TREX-232340; TREX-233104. BP assured its investors that these factors ensured that,

notwithstanding the low oil prices, BP had the time and flexibility to make the right decisions

and that the company was going to continue to grow and invest over the long term. TREX-233856.010-.011. PP Tr. at 1067:07-1068:23; TREX-233856.

980.    Despite these assurances to BP's shareholders, at trial BPXP offered the opinion that the change in oil prices reduced the value of BPXP from $16.1 billion to $5.1 billion. TREX-247596.007; PP Tr. at 1207:03-1207:06.

981.    Mr. Den Uyl's December 30, 2014 revised valuation opinion assumes that after 2018, oil prices remain at sixty-six dollars growing only at two percent for inflation with no recovery forever. PP Tr. at 1085:18-1086:16.

982.    Mr. Ian Ratner, the United States' financial expert, demonstrated that this assumption regarding continued low prices is "not realistic" in such a volatile price market. PP Tr. at 1015:19-1015:22.

983.    Mr. Den Uyl's unrealistic assumption that oil prices will remain low until 2057 significantly undervalues BPXP because it significantly undervalues the largely immature assets in the Gulf of Mexico that are expected to begin producing cash after 2020 and 2025. PP Tr. at 1086:17-1087:06.

984.    Mr. Den Uyl's revised "valuation" of BPXP is also fatally flawed because he mistakenly applies the Wood Mackenzie low-case sensitivity scenario as a surrogate for the low oil prices. This low case scenario consists of a thirty-three percent adjustment across all assets and yet Mr. Den Uyl applies it to the Gulf of Mexico specifically. In other words, as Mr. Ratner pointed out, Mr. Den Uyl incorrectly assumes that the global BP Group cash flows have the same timing as the BP Group's Gulf of Mexico cash flows. PP Tr. at 1084:14-1085:13.

985.     Further, oil prices are only one factor that affects future cash flows. As Mr. Ratner testified, many variables affect future cash flow including volume of production, price, operating expenses, and capital expenditures. PP Tr. 1006:16-1007:02.

### iii)     BPXP Improperly Limits its Ability to Pay to its Current Internal Credit Line

986.     Mr. Den Uyl opines that BPXP can only pay a civil penalty that is within its existing internal line of credit. As Mr. Ratner pointed out, such an opinion is incorrectly static in that it assumes BPXP will take no action to satisfy a judgment greater, other than using its current line of credit. PP Tr. at 1069:09-1070:22; TREX-013127.

987.     Mr. Den Uyl provided no opinion on whether BPXP on its own can raise any debt or equity beyond its existing internal credit facilities.  He also provided no opinion on whether BP p.l.c. or the BP Group will assist BPXP to satisfy a judgment in this case. Den Uyl Dep. at 55:11-14, 55:16-17, 56:08-13.

988.     Mr. Den Uyl's bounding BPXP's ability to pay to its line of credit does not match past practice.  He himself admitted that BPXP borrowed more than ten billion dollars from the BP Group – nearly double its existing credit line. This additional borrowing, undertaken to address spill related costs, required no new agreements, no new structured finance note, and no new analysis. Den Uyl Dep. at 80:20-83:08, 83:13-83:15, 83:17-84:22, 84:23-85:20, 85:09-85:11, 86:13-86:16, 86:18-87:12, 92:10-92:16, 92:20-92:25.

989.     Mr. Den Uyl did not ask BP or NAFCO if they would advance funds to BPXP to satisfy a Clean Water Act penalty. Den Uyl Dep. at 87:22-88:07, 89:05-12.

990.     Mr. Den Uyl does not know what amounts BPXP could afford to pay towards a penalty if BPXP's credit facility was increased by $2 billion or even $10 billion. Den Uyl Dep. at 111:21-25, 112:02, 112:05-19, 112:21-25.

991.     Because he did no analysis of the financial status of BP p.l.c., Mr. Den Uyl did not know whether BP p.l.c. has the financial resources and ability to provide additional debt and equity funding to BPXP, nor does he have any analysis or documentation that BP will not provide any debt or equity funding to BPXP as a result of the outcome of this case. Den Uyl Dep. at 95:02-6, 95:08:19, 103:12-23, 103:25-104:15, 104:17.

992.     Mr. Den Uyl's reliance solely on existing credit lines also did not take into account cash flows for 2016 and later. He acknowledged, however, that BPXP cash flows for 2016 and thereafter would be relevant to a lender or an investor to assess BPXP's ability to repay a loan. Den Uyl Dep. at 184:20-185:09, 185:11-186:04, 186:08-12, 186:14-186:24, 187:16-21, 187:23-188:06, 188:15-20, 188:25-189:04, 189:06-10, 189:13-14.

993.     Mr. Den Uyl testified that he did not know whether BPXP could obtain credit in the open market, but was unaware of anything preventing BPXP from doing so. BPXP has not explored that option to date simply because there is so much capacity with the BP Group that BPXP has not had to go to the open market. Den Uyl Dep. at 218:03-33, 218:16-23.

994.     Mr. Den Uyl testified that he had not done any analysis or come to any conclusion about the amount of debt that BPXP could raise to pay for a Clean Water Act penalty in this matter. Den Uyl Dep. at 219:09-220:17, 260:02-7; 264:09-22, 264:24-25.

   **g)**  **No Evidence Suggests that Considering BP p.l.c.'s Finances in Determining BPXP's Penalty Will Discourage Well-Capitalized Companies from Investing**

995. BPXP's witness Professor Daines claimed that penalizing BPXP based on parental ability to pay will tend to discourage well-capitalized companies from investing in activities with a risk of financial loss. However, Professor Daines admitted that he had not done any empirical study regarding whether penalizing BPXP based on parental ability to pay would discourage such companies from investing in activities with a risk of financial loss. PP Tr. at 2019:02-2019:22.

996. Professor Daines testified that he had no reason to doubt BP's statement that approximately twenty-two percent of its oil production globally comes from the Gulf of Mexico. PP Tr. at 2019:23-2020:01.

997. Moreover, he admitted that he was not aware of any evidence that the expectation of a civil penalty under the Clean Water Act has discouraged BP from investing the Gulf of Mexico. PP Tr. at 2022:11-2022:18.

  **B.**  **Anadarko Can Pay a Substantial Penalty**

998. Anadarko offered no expert witness to analyze or comment on the economic impact of a civil penalty on Anadarko. PP Tr. at 990:11-990:13.

999. Moreover, Anadarko admitted that as of August 2014, it could pay the maximum civil penalty using available cash, new or existing credit facilities, loan arrangements, equity or debt offerings, and/or through the sale of assets. D-32314; PP Tr. at 990:25-991:01; PP Tr. at 1012:11-1013:07, 1013:11-1014:01; TREX- 233887R.028 ¶¶ 87-89, .033 ¶ 100c.

1000. Anadarko's financial and operational position is sufficiently strong so that, irrespective of the combination of financing options selected by the company to fund the penalty

obligation, no long term negative financial consequence would result from the payment of the maximum penalty. TREX-233887R.028 ¶ 89.

1001.   In Anadarko's Form 10-Q for the period ending June 30, 2014, Anadarko stated "Management believes that the Company's liquidity position, asset portfolio, and continued strong operating and financial performance provide the necessary financial flexibility to fund the Company's current and long-term operations." TREX-233887R.029 ¶ 90; TREX-232325.040; Gwin Dep. at 232:22-233:22.

1002.   In that same document, Anadarko maintained that its potential exposure to penalties resulting from the Clean Water Act will not materially impact the Company's consolidated financial position, results of operations, or cash flows. TREX-233887R.019 ¶ 56; TREX-232325.019.

**i.      Anadarko is a Global Public Oil and Gas Exploration and Production Company**



Figure 51: Anadarko's Portfolio (TREX-012391.005)

1003.   Anadarko is considered one of the world's largest independent exploration and production companies with nearly 2.8 billion barrels of oil equivalent of proved reserves as of December 31, 2013. TREX-233887R.007 ¶ 22; TREX-233887E.

274

1004.   Anadarko explores, develops, and produces oil that it then sells to third parties and does not have a downstream segment. It employs 6,000 people worldwide. PP Tr. at 2141:25-2142:10.

1005.   Anadarko holds a working interest and ownership in a number of offshore leases in the Gulf of Mexico and acts as both operator and non-operator. PP Tr. at 2143:01-2143:12; TREX-012801.009; D38031A.

1006.   As of February 2015, Anadarko had six deepwater rigs in operation. PP Tr. at 2143:13-2143:19.

1007.   Lucius is Anadarko's largest producing facility in the Gulf of Mexico. It recently came on line and is capable of producing 80,000 barrels of oil per day. PP Tr. at 2143:20-2143:23.

1008.   Anadarko currently is working on construction of its Heidelberg project, which is a twin to Lucius. PP Tr. at 2149:19-2149:24.

1009.   Anadarko is an experienced operator in deepwater exploration and production in the Gulf of Mexico. Anadarko considers itself a leader in deepwater drilling, has had a number of other discoveries in the Gulf of Mexico, and has drilled a number of successful deepwater wells in the Gulf of Mexico. Lucius and Heidelberg are mega-projects. TREX-012386.009-.010; TREX-012391.059.064; D-38031A.

1010.   Anadarko's portfolio holds interests in nearly 60 million acres in the US and abroad. In addition to its deepwater holdings in the Gulf of Mexico, it holds domestic assets in gas and liquids-rich plays in the Rockies and various shales. Internationally, it holds megaprojects in offshore Ghana and Algeria, among other holdings. TREX-233874.001.

ii.     **Anadarko is a Financially Strong Company with Positive Revenue Growth and Cash Flows**

1011.   Anadarko's balance sheet together with its current and projected operations collectively portray a financially strong company with positive revenue growth and positive cash flows. TREX-233887R.003 ¶ 3.a.

1012.   As of June 30, 2014, Anadarko had $58.4 billion in total assets. PP Tr. at 990:04-990:05; TREX-233887R.011 ¶ 30; D-32303.

1013.   Anadarko's total assets have grown relatively steadily, from $50 billion in 2009 to $58 billion as of June 30, 2014. The relationship between each individual asset and the total assets is very stable. PP Tr. at 994:16-994:24; TREX-233887R.011 ¶ 30; D-32303.

1014.   Anadarko had $5.365 billion cash on hand as of June 30, 2014. PP Tr. at 990:08; TREX-233887R.011 ¶ 30; D-32303.

1015.   Anadarko's cash balances have grown from $3.5 billion to in 2009 to $5.3 billion as of June 30, 2014. PP Tr. at 994:12-15; TREX-233887R.011 ¶ 30; D-32303.

1016.   Anadarko needs about one billion dollars for working capital. PP Tr. at 996:19-997:03; TREX-012393R.011 ¶ 31.c; Gwin Dep. at 194:14-195:09, 195:11-195:12.

1017.   In addition, Anadarko has a five billion dollar credit facility that is untapped. PP Tr. at 997:11-997:22.

1018.   Anadarko's market value as of June 2014 was fifty-five billion dollars. Even with a recent decline in oil prices in late 2014 and early 2015, Anadarko still has forty billion dollars of market equity, reflecting a substantial company. PP Tr. at 996:08-996:18; TREX-233887R.021 ¶ 71; TREX-233887E.002-.003.

276

1019.   Anadarko has grown its revenues from $9 billion in 2009 to $14.4 billion for 2013. For the six months ending June 30, 2014, Anadarko revenues were $10.283 billion. PP Tr. at 999:02-992:14; TREX-233887R.008 ¶ 24; D-32305.

1020.   Anadarko's operating income has grown from $377 million in 2009 to $4.2 billion as of June 30, 2014. PP Tr. at 999:18-999:21; TREX-0233887R.008 ¶ 24; D-32305.

1021.   Anadarko's operating cash flows are substantial, growing from $3.8 billion in 2009 to $8.3 billion in 2013. PP Tr. at 999:24-999:25, 1000:06-1000:07; TREX-233887R.008 ¶ 24; D-32305.

1022.   Anadarko generates cash from operations to fund capital expenditures, debt service obligations and dividend payments. Further, Anadarko management "…continuously monitors its liquidity needs, coordinates its capital expenditure program with its expected cash flows and projected debt-repayment schedule, and evaluates available funding alternatives in light of current and expected conditions." TREX-012386.072; TREX-233887R.029-.030 ¶ 93.c.

1023.   Anadarko has substantial cash from operating activities ranging from $3.9 billion in 2009 to $8.8 billion in 2013. PP Tr. at 1000:21-1000:24, 1001:08-1001:20; TREX-233887R.012-.013 ¶ 33; D-32306.

1024.   With the cash from operating activities, Anadarko paid out increasing dividends every year from 2009 to 2013 totaling $1.2 billion. Dividends are paid with the excess cash and once dividends are paid that cash is no longer available to Anadarko's operations or available for Anadarko to pay a penalty. PP Tr. at 990:09-990:10, 1000:21-1000:24, 1001:08-1001:20; TREX-233887R.012-.013 ¶ 33; D-32306.

1025.   For Anadarko, EBITDAX is a widely accepted financial indicator of the company's ability to incur and service debt, fund capital expenditures and make distributions to stockholders. EBITDAX shows the discretionary cash flows that Anadarko can use for debt payments, dividends, and capital expenditures. PP Tr. at 1003:13-1004:05; TREX-0233887R.010-.012, .035; TREX-012386.68; D-32307.

1026.   Anadarko's EBITDAX has grown (in absolute dollar amounts) every year between 2009 and 2013. Anadarko reports that its EBITDAX cash flows have grown from six billion dollars in 2009 to nine billion in 2013. Anadarko's reported cash flow, based on EBITDAX, was $7.1 billion for the six months ending June 2014. PP Tr. at 1003:13-1004:05; TREX-0233887R.010-.012, .035; TREX-012386.68; D-32307. Furthermore, Anadarko's EBITDAX has consistently exceeded sixty percent of revenues. TREX-233887R.010 ¶¶ 26-29, .035; D-32308.

1027.   Anadarko uses EBITDAX as a measure of Anadarko's cash flows. Anadarko's "management believes that presentation of adjusted EBITDAX provides information useful in assessing the company's financial condition and results of operations, and adjusted EBITDAX is widely accepted as an indicator of the company's ability to incur and service debt, fund capital expenditures, and make distributions to stockholders." EBITDAX is important and Anadarko's EBITDAX is "phenomenal." PP Tr. at 1001:25-1002:01, 1002:06-1002:07, 1002:13-1002:19, 1003:01-1003:12; TREX-233887R.010 ¶ 26; TREX-012386.68; D-32307.

1028.   In a rating agency update in May 2014, Anadarko reported discretionary cash flow from operations of $8 billion in 2013 and $8.8 billion was the forecast for 2014 (2015-2016 projections redacted). In that May 2014 rating agency update, Anadarko disclosed that it spent

278

$9.5 billion in 2013 and was going to spend $8.5 billion in 2014 in capital expenditures (2015-

2016 projections redacted). Anadarko's levels of discretionary cash flow from operations shows

that Anadarko has a lot of flexibility. PP Tr. at 1004:10-1005:04, 1005:11-16;

TREX-233887R.017-.018 ¶ 49; TREX-012386.068-.069; D-32309R; TREX-012393.

1029.   As of December 2013, Anadarko calculated estimated future net cash flows from

proved reserves of approximately $29.1 billion in its SMOG analysis. TREX-233887R.016 ¶ 44.

1030.   The SMOG analysis does not include the value of unproved reserves which can

be significantly greater than proved reserves. TREX-233887R.015 ¶ 41.

1031.   Anadarko spent $7.5 billion in payments to suppliers in the Gulf of Mexico alone

from 2010 to May 21, 2014. It spent $1.284 billion in the first quarter of 2014 and $3.5 billion in

2014 in payments to suppliers. PP Tr. at 2152:21-2153:02; D-38035A.

1032.   Importantly, Anadarko's total equity, the difference between the book assets and

the book liabilities, has remained relatively flat at $19 billion between 2009 and June 2014.

PP Tr. at 994:25-995:23; TREX-233887R.008 ¶ 24, .011 ¶ 30; D-32303.

1033.   Anadarko has been able to pay or accrue nine billion dollars associated with two

transactions, each bigger than the maximum penalty in this case, which shows that Anadarko has

a lot of cash and liquidity. PP Tr. at 1009:23-1011:10; TREX-233887R.003 ¶ 100b; D-32312.

1034.   As of its Form 10-Q through March 31, 2014, Anadarko management believed

that, with the exception of the now-resolved *Tronox* litigation, resolution of its pending

contingent liabilities would not have a material adverse effect on the Company's financial

position. Douglas Dep. at 46:10-46:22, 47:09-47:25, 48:02-48:09, 48:13, 48:22, 49:03-49:16;

279

TREX-012387.016. At that time the *Tronox* liability was considered contingent even though the settlement amount was known. Douglas Dep. at 48:02-48:09, 48:13-48:22.

1035. [See Appendix A for highly confidential information regarding Anadarko's future projections]

1036. Anadarko "monetizes" (*i.e.,* sells) its existing interests or completely divests certain projects, as a standard part of its business. Gwin Dep. at 15:14-16:03. Over a recent five year period, Anadarko had a $10 billion asset monetization, which means that it reduced its need for cash by that amount by selling interests in its assets. Gwin Dep. at 72:24-73:13.

1037. In 2014, when Anadarko assumed that its payment of the $5.15 billion Tronox settlement would be made in the fall of 2014, Anadarko represented that it could pay the settlement from a mix of cash and possibly some bridge financing. PP Tr. at 1011:16-1012:10; TREX-233887R.020-.21 ¶¶ 67-69; TREX-012393.006; D-32313. This statement demonstrates the various options Anadarko can consider to make payments.

### iii.   Anadarko is Well-positioned to Deal with Current Oil Prices

1038. [See Appendix A for highly confidential information regarding Anadarko's future projections]

1039. Even considering current oil prices, Anadarko's future projections for 2015 and 2016 are useful. They provide an order of magnitude analysis and information to understand the various drivers including: volume of production, price, operating expenses, and capital expenditures. Oil price swings are part of the oil and gas industry and Anadarko is a sophisticated company. PP Tr. at 1005:17-1006:10, 1006:19-1007:02.

1040.   According to Anadarko's recent 2014 third quarter results, Anadarko built up a cash balance on hand from $5.3 billion to $8 billion to fund the *Tronox* settlement. This build up demonstrates that Anadarko can and has increased its liquidity when necessary. Because Anadarko's operations generate cash, its liquidity position is at the discretion of management. Gwin Dep. at 191:01-193:04; PP Tr. at 1007:22-1008:06.

1041.   Anadarko's had fifteen billion dollars of revenues in the first nine months of 2014. PP Tr. at 1007:22-1008:06, 1008:16-1009:03; TREX-233874.006.



Figure 52: Anadarko's Capital Allocation for Sustained Growth and Value (TREX-012391.017)

1042.   In presentations to investors, Anadarko touts its "unmatched optionality" – *i.e.*, the flexibility that its broad and diverse assets base provides to respond to the highest rates of return. Gwin Dep. at 46:01-47:09; TREX-012390.001-.002; TREX-012391.005. Such assets include global deepwater assets and extensive on-shore assets in the United States in both conventional and unconventional plays. *See, e.g.,* TREX-012391.017.

1043.   A recent Morningstar analyst report showed that Anadarko was highly rated and that the current price of Anadarko stock was undervalued. PP Tr. at 1007:03-1007:04, 1007:22-1008:06, 1008:16-1009:03, 1009:12-1009:18; TREX-233874.001.

1044.   The Morningstar analyst report remarked upon Anadarko's diverse asset base and stated: "Given its vast opportunity set, Anadarko has considerable flexibility to modify development activity in response to changing market conditions. Ongoing non-core asset sales (which generated over $2 billion in the third quarter alone) should provide a cushion to help the company weather an environment of lower commodity prices." TREX-233874.001.

> **iv.   Anadarko Claims That it Needs Capital to Reinvest, but this Penalty Factor Requires Consideration of the Impact on Existing Operations, Not on Plans for Future Growth.**

1045.   From 2009 to 2013, Anadarko exceeded its targets for growth in its five year plan. Gwin Dep. at 48:10-49:21; TREX-012390; TREX-012391. It did so "despite the headwinds" its four billion-dollar payout in the settlement with BPXP and its preparation for the $5.1 billion payment in *Tronox*. Gwin Dep. at 48:10-49:21; TREX-012390; TREX-012391.

1046.   Anadarko's Chief Financial Officer Robert Gwin testified that in the oil and gas industry assets are continually depleted, and therefore reinvestment of cash is critical for an exploration and production company seeking to maintain its size. Gwin Dep. at 252:10-252:25. Anadarko, however, is not merely maintaining its existing size but has ambitious goals for growth. In 2014, its goals were six to nine percent. *See* TREX-012393.005; TREX-012388.001. In fact, Anadarko managed to grow substantially despite the *Tronox* and BP settlements. Gwin Dep. at 49:01-49:21. The *Tronox* payment will be made in a single year and will not impact cash flows projected for other future years. Gwin Dep. at 269:02-269:21.

1047.   In addition, Mr. Gwin confirmed that Anadarko can maintain its same growth without any exploration successes for at least three years. Its existing assets base, including its

development projects, will be the company's source of growth until 2020. Gwin Dep. at 216:01-217:20.

## VIII.   ANY OTHER MATTERS AS JUSTICE MAY REQUIRE

### A.      BP Did Not Revolutionize Spill Response

#### i.      Oil Spill Research and Development is a Continuous Government and Private Sector Effort

1048.   BPXP's witness, Captain Paskewich (ret'd), contended that BPXP developed a number of response technologies that aided the response and "will aid the spill response industry in the years to come." TREX-241529.079. He identified the following technologies and strategies: subsea application of dispersants; "groundbreaking" use of *in situ* burning; the Alternative Response Technology ("ART") program; oil mapping and imagery capabilities; the Snorkel SCAT program; the Sand Shark; the *Big Gulp* and *Little Gulp*; boom cleaners; and sharing the technology with others in the industry and governments around the world. TREX-241529.079-.081.

1049.   In evaluating these claims, it is important to understand a little of the history of oil spill research. After every major oil spill, such as the Torrey Canyon spill (1967), the Santa Barbara spill (1969), the Ixtoc spill (1979), and the *Exxon Valdez* spill (1989), interest among both government and private sector entities has increased in oil spill research and development. TREX-013513.006.

1050.   The Oil Pollution Act of 1990 greatly accelerated that research by establishing the Interagency Coordinating Committee on Oil Pollution Research. This Committee coordinates a comprehensive program of oil pollution research, technology development and demonstration. Participants in this program include federal agencies, industry, universities, research institutes,

state governments, and other nations. The committee is chaired by the U.S. Coast Guard.

TREX-013513.006; PP Tr. at 617:14-618:20; *see also* PP Tr. at 1626:15-1626:22.



Figure 53: Oil Spill Response Projects Initiated by DOI since 2001 (TREX-013153.009).

1051.   The Coast Guard has overseen the development of numerous response technology

and procedure innovations under the auspices of the Interagency Coordinating Committee on Oil

Pollution Research, including the first International Oil Spill Research and Development forum

in 1992. TREX-013513.007-.008.

1052.   In addition, a variety of individual federal agencies undertake their own

independent oil spill response research and development programs. DOI has funded over one

hundred projects related to oil spill response since 2001. TREX-013513.008-.009. DOI also

maintains the National Oil Spill Response Test Facility in Coastal New Jersey where both the

public and private sector can test full-scale oil spill response equipment in a 203 meter saltwater

wave and tow test tank. TREX-013513.009.

1053.  Similarly, the U.S. Coast Guard has been engaged in oil spill response research and development since 1969. EPA and NOAA, too, have research programs. TREX-013513.010; PP Tr. at 617:19-618:04.

1054.  Further, many states, private organizations (including API, SINTEF) and oil companies (such as ExxonMobil) have robust programs of research and development of oil spill response technology and procedures. PP Tr. at 618:06-618:20.

### ii. Changes in Technique Were Not Innovations but Instead Up-scaling of Classic Methods, Driven by the Size of the Defendants' Spill

1055.  Most of the "innovations" to which BPXP pointed the Court were simply modifications or upscaling of projects developed during this long history of private and public oil spill response research and development. Of course there has never been a spill of this size or significance it called for existing tools to be applied differently. PP Tr. at 1627:25-1628:10; TREX-230448.014-.019. Giving credit for these applications would reward BPXP and its co-defendant for the magnitude of their violations – thereby turning the purpose of a penalty on its head.

1056.  For instance, *in situ* burns had been the subject of almost a decade of research when the Coast Guard published its In-Situ Burning Operations Manual in 2001. PP Tr. at 620:13-621:13; TREX-230990.002. The novelty with respect to *in situ* burns in the response to the Defendants' disaster was not the idea of the burns or the design of the burns. Instead, the novelty was the sheer scale on which the burns occurred – a scale driven by the size of the Defendants' spill. TREX-013514.010-.011.

1057.  BPXP should not get credit for the scale of *in situ* burns, because that increased scale arises solely from the fact that the spill went on for eighty-seven days. Specifically, *in situ*

burns are most effective within twenty-four to thirty-six hours after the oil is discharged. In the *Exxon Valdez*, only one burn was attempted because the spill was an instantaneous spill and burns became ineffective after a few days. By contrast, in the Defendants' spill, fresh oil continued to enter the environment over a prolonged period, so that *in situ* burns remained a viable option for much longer. Notably, the last *in situ* burn occurred on July 19, 2010, just four days after the flow from the Defendants' well finally stopped. TREX-013514.007; Laferriere Dep. at 116:08-116:16, 116:18-116:21.

1058. Similarly, the common operating picture used by the Unified Command during the response, ERMA, was presented to Congress in a report by the Interagency Coordinating Committee on Oil Pollution Research in 2009. PP Tr. at 619:05-620:16; TREX-242543.021.

1059. In all, the technology improvements that BPXP has identified were "a matter of degree and not a matter of inventing whole new approaches." TREX-013515.004.

### iii. Any Innovation in the Response was not BP's Alone

1060. The BP Group was one member of a team drawn from across industry and government that worked collaboratively under the direction of the Unified Command. For example, *in situ* burning operations were managed collaboratively and, according to Richard Morrison, BP Deputy Area Commander during the response, "it's hard to say was it exactly BP or exactly Coast Guard." TREX-013513.016.

1061. The response to the Defendants' spill, including both cleanup and source control efforts, drew upon resources from across industry and government, including the Department of Energy, the Department of the Interior, the U.S. Geological Survey, the USCG, BP, Shell, Exxon-Mobile, ConocoPhillips, Chevron, Louisiana State University, the Massachusetts Institute

of Technology, and a wide variety of other federal and state agencies, outside experts and contractors. This is consistent with established National Incident Management System doctrine. Any particular response technique or technology employed during the course of the response, whether conventional or innovative, and the development of any new response technique or technology during the response, resulted from collaboration among the multitude of participants in the response and cannot be attributed solely to the efforts of the BP Group. TREX-013513.017.

1062.   The use of subsea dispersants had been considered before the spill. In fact, it was the BP Group's competitor ExxonMobil that suggested the use of subsea dispersants and even provided internal research to support the concept. TREX-013514.005.

1063.   The *Big Gulp* Skimmer was developed and inserted into the response by the owner on his own initiative, not the BP Group's, as were the boom washing machines. TREX-013514.010.

1064.   BPXP also touted its efforts to share the lessons learned as having improved oil spill response. Again, the sharing of information is contemplated by the structure of the National Contingency Plan and not something that BPXP has done alone. Since the spill the Coast Guard also has provided the community of oil spill responders with information and insights learned from its experience in responding to Defendants' violations. J. Watson Dep. at 67:08-69:14.

1065.   More importantly, BPXP's efforts to share its lessons learned are not voluntary – they are required by BPXP's criminal plea. PP Tr. at 1553:19-1564:10; TREX-052673.032; TREX-231104.

### iv. Every Spill is Unique and Requires Changes in Well-Established Techniques – Giving Credit for that is Giving Credit for Having Caused the Spill

1066.   Every oil spill is unique, which means that every spill response is unique. As the needs of a particular response become clear, it is expected that responders will adapt to them. The process of adapting the available resources to address the needs of a particular response is common and expected. This process is so integral to oil pollution response that it is expressly recognized in both the Coast Guard's Incident Management Handbook and the BP Group's own incident management handbook. TREX-013513.018.

1067.   Similarly, those working on the response to the Defendants' disaster, including the Coast Guard, the BP Group, and many others, looked to a number of techniques and technologies that had been used in the past but which had to be adapted to the specific requirements of the incident. These include, among others, the use of dispersants, in-situ burning, containment domes, junk shots, and capping stacks. As would be expected in any oil spill response, these existing concepts were evaluated in light of the unique circumstances of the spill and adapted accordingly. TREX-013513.019.

1068.   No two oil spills, or oil spill responses, are the same. For this reason, it is difficult to generalize about the contribution that any particular method used in the context of a specific response makes to the ability of future responders to work effectively. Responders to the Defendants' disaster acted appropriately in seeking response techniques tailored to the unique circumstances they confronted. Responders to future oil spills will be called upon to undertake the same type of incident-specific analysis. TREX-013513.019.

1069.   In every major spill response, there are going to be suggestions from stakeholders to try new or unproven spill response techniques. TREX-013515.006; Hewett Dep. at 93:02-93:05, 93:07-93:18. The Unified Command's development of the Alternative Response Technologies program was simply a spill-specific adaptation of an existing government process which was designed to meet the general need to sort through such suggestions.

1070.   The Alternative Response Technologies program was "as much a result of innovations in communications technology (the widespread availability of websites and email) and information management (improvements in database design and work sharing programs) as [it was] creditable to the Unified Command or to BP in particular." TREX-013515.006.

1071.   An example of how Captain Paskewich (ret'd) overstates the benefits of the Alternative Response Technologies program is his claim that, "BP and other ART team members supported the development of the Wave Glider." TREX-013515.008. Prior to 2010, to foster monitoring in the ocean, a private developer with the support of the Office of Naval Research created the Wave Glider. By 2010, the Naval Oceanographic Office had already purchased one commercially to support its missions. The Wave Glider in and of itself is a mobile platform that may be adapted for a variety of missions and sensors. Moreover, as with many of the technologies



Figure 54: Deepwater Horizon ART Program (TREX-013515.007)

289

and techniques cited by Captain Paskewich, its usefulness for future spill responses is speculative at best. TREX-013515.008.

1072.  "Of the 43,000 suggestions submitted for spill response, only 100 (less than one quarter of one percent) were judged worthy of testing. Of those, only 40 were implemented during the response. Captain Paskewich acknowledges as much in his Round 2 Report." TREX-013515.007.

1073.  To the extent that BPXP is correct that the response resulted in wholly new or innovative response technology, then that points not to a success during the response so much as to a failure of the BP Group to be prepared before the spill occurred in the first place. TREX-013515.012.

1074.  BPXP's claim of innovation and improvement of future oil spill response is exaggerated and is simply a restatement of the fact that BP had to respond to an oil spill. There was nothing unique, voluntary, or revolutionary in the fact that oil spill response technologies were adapted to the needs of the spill.

### B.  Both Defendants' Claims regarding their Importance to the Gulf Economy Are Exaggerated and Do Not Support Mitigation of the Penalty

1075.  Both Anadarko and BPXP argued that their penalties should be reduced because of the importance of their spending to the Gulf economy. *See, e.g.,* TREX-280010R.017-.019; TREX-013067.048-.049, .061-.062. The evidence shows, however, that these Defendants are modestly important and entirely replaceable in the Gulf economy.

1076.  Anadarko  asserts that its contributions to the Gulf in the form of employees and contractors entitle it to a lesser penalty.  The vast majority of the numbers put forward by Anadarko were for contractors, not employees, who may be phased out when the contract ends

and could then work for other companies.  D-38049 (separately listing employee and contractor hours for years 2010-2013 and part of 2014); PP Tr. at 2149:2-2149:18.

1077.   Before turning to the evidence particular to the two defendants, it is important to recognize that the entire oil and gas industry represents only a portion of the economic activity in the Gulf states; contributing six percent of Alabama's GDP, three percent of Florida's GDP, nine percent of Mississippi's GDP, thirty-six percent of Louisiana's GDP, and twenty-three percent of Texas's GDP. PP Tr. at 726:15-727:17; D-33521.



Figure 55: Comparison of Combined Oil and Gas Royalties to those of BPXP and Anadarko (TREX-013317. 021)

### i.      BPXP Is Modestly Important to the Gulf Economy

1078.   BPXP is modestly important in the Gulf of Mexico oil and gas industry. TREX-013317.005. BPXP's market share demonstrates that it is generally about ten to fifteen percent of the Gulf oil and gas industry; it contributes ten percent of subsea boreholes, eight percent of permanent production platforms, eight percent of active leases, twenty percent of

employment spending including vendors, eleven percent of hydrocarbon production, and sixteen percent of royalties. PP Tr. at 724:11-725:14; TREX-013317.009-.012; D-33501.

1079.   While BPXP's spending on labor and vendors is roughly twenty percent of the Gulf oil and gas industry, the vast majority of this spending is on vendors who would be hired by any other oil company that chose to develop the resources BPXP is currently developing. BPXP's employment spending supports nine vendors to every one employee. PP Tr. at 785:20-786:21; TREX-013318.024-.025.

1080.   In attempting to determine whether the royalties paid by BPXP over five years are significant, Dr. Scott compares this five year expenditure against a single year of Louisiana property tax revenue. PP Tr. at 2089:19-2090:22; D-34024. BPXP pays some of these royalties on behalf of other BP entities, and Dr. Scott does not know what portion of the royalty payments he reports is on behalf of BPXP. PP Tr. at 2099:01-2100:05; TREX-013067.054.

1081.   Dr. Scott attempts to determine whether BPXP's cumulative five-year capital expenditures across all of its Gulf of Mexico projects is significant by comparing this cumulative spending to single projects in the Gulf of Mexico region, such as the Cheniere liquid natural gas terminal. Dr. Scott does not compare BPXP's cumulative capital expenditures to any other oil company's cumulative capital expenditures. PP Tr. at 2100:07-2101:19; TREX-013067.045-.047.

1082.   Dr. Scott opines that BPXP's operational expenditures contribute significantly to the Gulf of Mexico economy. But more than thirty percent of these operational expenditures represent insurance premiums that BPXP pays to another BP entity. D-33596. Of the remaining

operational expenditures, Dr. Scott agrees that a portion was spent overseas or outside of the Gulf of Mexico region. PP Tr. at 2102:01-2104:16.

1083.   BPXP capital spending does not necessarily reflect money going to the Gulf of Mexico, as equipment and manufacturing is done in other places in the country and world. PP Tr. at 1625:06-1625:15.

1084.   BPXP also pointed to its spending in the region as part of the response for consideration in setting its penalty. Importantly, BPXP did not voluntarily run its response operation from Louisiana. Rather, BPXP had proposed establishing the Unified Command in Houston, Texas, and it was Coast Guard Admiral Landry, the first Federal On-Scene Coordinator, who directed that the response be run out of Louisiana. TREX-007802.001; TREX-009114.001.

### ii.   Anadarko, Too, Is Modestly Important to the Gulf Economy

1085.   Anadarko is modestly important in the Gulf of Mexico oil and gas industry. Anadarko's market share demonstrates that it generally makes up less than ten percent of the Gulf oil and gas industry; it contributes thirteen percent of subsea boreholes, fourteen percent of permanent production platforms, six percent of active leases, seven percent of hydrocarbon production, and three percent of royalties. PP Tr. at 725:15-726:14; D-33502.

1086.   To demonstrate Anadarko's importance to not only the regional but also national economy, Dr. Sunding cites to royalty revenue from offshore exploration and production. TREX-280010R.019 n.42. These payments enable these firms to extract resources from the Gulf of Mexico. *See* PP Tr. at 2189:08-10. According to Mr. Hollek, production royalties that Anadarko pays range from approximately 12.5% to 18.75%; the remainder goes to Anadarko and

293

its partners. PP Tr. at 2189:11-2189:17. Other than Dr. Sunding's statement concerning royalties, Anadarko offered no expert testimony on the company's contributions to the Gulf and national economy.

### iii. Defendants' Role in the Gulf Economy Can and Would Be Filled by Others

1087.  Market concentration analysis of leasing and production demonstrates that there is fluid (*i.e.,* relatively easy) entry and exit in the Gulf of Mexico oil and gas industry. PP Tr. at 723:12-724:05. In particular, there is fluid entry and exit in the deepwater segment of the Gulf of Mexico oil and gas industry as measured by market concentration of deepwater production platforms and deepwater subsea boreholes. PP Tr. at 804:07-18. This ease of entry and exit is significant because other firms could easily develop the same resources that BPXP and Anadarko currently develop, yielding the same economic benefits, such as expenditures on capital and labor. PP Tr. at 727:18-729:12.

1088.  BPXP's witness Dr. Scott agrees that if another firm took over some of BPXP's assets in the Gulf of Mexico, that firm would deliver substantially the same benefits to the Gulf economy from developing those resources. For instance, Chevron took over a portion of BPXP's assets in Gila and Tiber, both deepwater fields. Chevron will have similar expenditures associated with Gila and Tiber as BPXP would have had. PP Tr. at 2097:15-2098:23; *see also* PP Tr. at 1575:10-22, 1576:05-1577:03, 1581:09-21, 1583:25-1583:06, 1583:21-1584:14; D-34614; D-34622.

1089.  Further, Gulf of Mexico lease sales are the result of a bidding process, which can be quite competitive among companies, indicating that were BPXP and Anadarko to leave the Gulf, other companies would step into their place. PP Tr. at 2189:21-2190:01.

1090.   Similarly unhelpful to BPXP and Anadarko are their citations to the royalties they pay. Anyone producing oil in the Gulf would have to pay these royalties. PP Tr. at 2189:18-2189:20.

**C.     Anadarko's Claim that a Penalty Will Drive Non-Operators Out of the Gulf is Not Supported by the Evidence**

1091.   Dr. Sunding analyzes (1) entry and exit patterns and (2) changing title shares of non-operators for a subset of deepwater leases and concludes that the trends in each are "consistent" with his hypothesis that the prospect of civil penalty liability is driving non-operators out of the market. PP Tr. at 2288:02-2292:03. Dr. Sunding's empirical analyses of non-operator investment trends in the Gulf of Mexico are flawed because he uses the wrong metrics and overlooks other important variables. TREX-231646R.004.

1092.   In both of his analyses Dr. Sunding focused only on leasehold ownership, which has little impact on the economic contributions of deepwater activities. A key barometer of economic activity is the number of active rigs. A published study of deepwater rigs versus shallow offshore rigs shows that as of January 2014 deepwater activity had clearly accelerated and was greater than before Defendants' well blew out. TREX-231646R.005-.006.

1093.   In response to Dr. Sunding, Mr. Walkup analyzed non-operator behavior using publicly available information from 2013 regarding the development and production stages of deepwater projects, when the most revenue and capital are generated. He found that (1) the operator's share decreased, and therefore non-operator percent share in deepwater projects increased, in projects commenced after the United States filed its complaint; (2) the numbers of non-operators for the post-filing projects had gone up; and (3) analyzed by stage, there are more

non-operators in the newer, post-April 20, 2010 projects at earlier stages, again reflecting increased non-operator participation. TREX-231646R.007; TREX-013207.028-.029.

1094.   Dr. Sunding's analyses are further limited in that they only review deepwater leases in the 1000 meter or greater depth category, or approximately 3300 feet or greater in depth. PP Tr. at 2304:19-2305:04. Dr. Sunding did not analyze any leases in the 1800-3300 feet category, even though such leases would also be considered deepwater. PP Tr. at 1570:10-1571:04.

### i.      Dr. Sunding's Entry-Exit Analysis is Fatally Flawed

1095.   In addition, Dr. Sunding's exit and entry analysis is based on a relatively small sample size: just one observation per year between 1983 and 2013, or thirty-one observations in total. TREX-280010R.015 Table 1; PP Tr. at 718:19-718:24; PP Tr. at 2303:15-2304:09; TREX-013318.043.

1096.   Dr. Sunding's analysis covers a period in which the oil industry went through profound changes. He recognized this in stating that he limited his lease concentration analysis to the period 2000 forwards "[d]ue to the rapidly changing nature of the industry and available technology." TREX-280010R.016; *see also* TREX-013318.043-.044.

1097.   Dr. Sunding's methodology for his entry and exit analysis, however, assumes gradual technological changes rather than the actual industry "stair-step" pattern of abrupt advances in technology. PP Tr. at 718:07-718:09, 718:25-719:17; TREX-013318.043-.044; D-33535.

1098.   Although he concedes that it is common in the industry for companies to act as non-operators with respect to some projects and operators with respect to others, Dr. Sunding's

296

entry and exit analysis is further limited in that it only looks at firms who are exclusively non-operators in the leases in the dataset. PP Tr. at 2305:05-2306:10. The dataset of non-operators excludes Anadarko, BP and all major oil companies. PP Tr. at 2305:09-2306:06; D-33171 (list of fifty-four non-operators in the dataset).

1099.   For purposes of Dr. Sunding's entry and exit analysis, a firm is either "in or it's out." PP Tr. at 2306:11-2306:15. His analysis cannot distinguish a company exiting the Gulf that held sixty leases from a company that only held one. PP Tr. at 2306:11-2306:19. Therefore, Dr. Sunding cannot make any quantitative conclusions or rough estimates of the contributions that his set of non-operators makes to the Gulf of Mexico capital market.

1100.   Further, Dr. Sunding cannot show that the exit trend he identified was caused by the government's suit. PP Tr. at 2306:21-2307:08. He agrees, however, that as a general matter there are other things going on in the world that can drive market entry or exit from the Gulf. PP Tr. at 2307:09-2307:12, 2294:15-2294:16 ("The fact is there are a lot of factors that can drive investment in the Gulf."). He acknowledges that firms' motives for investment are "complex." TREX-280096.011.

1101.   Dr. Sunding also overlooks important industry variables and fails to rule out alternative explanations for the increase in net exit of non-operators that he finds following 2010. Larger events and trends than the filing of a complaint in 2010 occurred within the timeframe analyzed by Dr. Sunding including: (1) the possibility that non-operators departed because they now believe the risk of a blowout to be higher, given the disaster at the Defendants' well; (2) evolution toward projects in the Lower Tertiary play in the Gulf of Mexico, which is more expensive and challenging and has changed the mix of deepwater participants; (3) the six-month

moratorium on deepwater activity following the Defendants' blowout; (4) the emergence of profitable onshore opportunities in North America, such as opportunities in shale development, and the resulting portfolio reallocation of many industry players; (5) increasing costs for deepwater activity since 2010, which impacted smaller companies more; (6) the impact of the new deepwater regulations arising out of the Defendants' blowout, again changing the mix of industry participants, and a decision on the part of some industry players in reaction to the massive scope of the spill to wait for improved containment systems; and (7) expected future oil prices and expectations of oil price changes. TREX-231646R.005; PP Tr. at 716:17-718:06, 718:07-718:09, 719:18-720:07; TREX-013318.039-.044; D-33535; PP Tr. at 2307:13-2307:18.

1102.   Dr. Sunding identifies several companies as having exited the deepwater lease market he examined since December 2010. For those exiting companies, however, he failed to investigate why they may have exited beyond doing "some checking." PP Tr. at 2308:04-2308:22. He did not look at the capital investment strategies of these companies, for example, even though literature he cites concludes that estimating capital distortions may require firm-specific data. PP Tr. at 2308:09-2308:22.

1103.   Dr. Sunding touts MOEX as a "case study" of a non-operator that left the market "very likely as a result of the government's effort to impose penalties on it." TREX-280096.011-.012. MOEX agreed to payments totaling $90 million in civil penalties to the government, but MOEX also paid a much larger amount – over $1 billion – to resolve claims with BPXP over costs related to the Defendants' blowout. As a result of its settlement with BPXP, MOEX gave up its interest in the Macondo prospect and at the time held no other leases in the deepwater Gulf

of Mexico. Dr. Sunding admits he cannot determine why MOEX left the market. PP Tr. at 2309:07-2309:22.

1104.   Dr. Sunding also identified Black Elk as a company exiting the market he examined after December 2010. Dr. Sunding, however, cannot rule out the possibility that Black Elk left the market in part due to a serious incident it had in 2012 involving an offshore platform that resulted in the deaths of three individuals. PP Tr. at 2309:23-2310:09.

1105.   Another company Dr. Sunding identifies as exiting the market is St. Mary's Energy. St. Mary's is affiliated with SM Energy. Dr. Sunding is aware that SM Energy has publicly stated a strategy of focusing on onshore oil and gas plays with repetitive drilling and completion opportunities. Dr. Sunding did not consider that the onshore strategy could be an alternative reason for St. Mary's exiting the Gulf. PP Tr. at 2310:10-2310:21.

### ii.   Dr. Sunding's Lease Concentration Analysis is Also Flawed

1106.   Contrary to Dr. Sunding's claims, the market concentration of new leases adjusted for lease ownership demonstrates that capital was not fleeing the Gulf in the period following Anadarko being named as a Defendant. If capital were fleeing the Gulf, one would expect to see increases in market concentration of leases adjusted for lease ownership, but as demonstrated in Figure 56, that market concentration remained stable from 2009-2013. *See supra* ¶¶ 1087-1090.



Figure 56: Gulf of Mexico Oil Industry is Unconcentrated (D-33533)

1107.   When attempting to determine whether capital is leaving the Gulf, it is more appropriate to analyze the concentration of lease ownership over the market as a whole, as Dr. Mason did, than to analyze the concentration of ownership within individual leases, as Dr. Sunding did. PP Tr. at 720:15-722:16; TREX-013318.044-.046.

1108.   Dr. Sunding suggested at trial that oil and gas companies cannot enter and exit easily in the deepwater market. He did not opine on such matters in his report and lacks the experience necessary to form such an opinion. PP Tr. at 2294:24-2295:15; *see infra* ¶ 1244.

1109.   In any event, Dr. Sunding's statement conflicts with statements made by Anadarko's only fact witness at trial Mr. Hollek, Anadarko's vice president for Deepwater Americas. Mr. Hollek discussed the competitive nature of lease sales in the Gulf of Mexico region. PP Tr. at 2189:21-2190:01, 2158:19-2160:12 (discussing Anadarko's participation in lease sale bidding process). BPXP's recent sale of assets to Chevron further undermine Dr. Sunding's position. PP Tr. at 2098:09-2098:23; *see supra* § VIII.B.iii.

300

1110.   Anadarko bids on leases in the Gulf of Mexico, but the amount it spends varies from year to year depending on numerous factors. Variables affecting how much Anadarko spends on leases include: what is being made available at the lease auction; how much money Anadarko decides to bid compared to the asking price; how competitive the sale is; how much money Anadarko has to spend overall at the lease sale; and similar factors. The amount spent can reflect that Anadarko underbid and lost the sale, that it did not think there was a good prospect and so it did not want to invest much on the offered leases, or that it preferred holding low percentages of working interests. Without knowing all those facts, one cannot make conclusions as to Anadarko's level of investment from the DOI public data from the sales of leases in the Gulf of Mexico. PP Tr. at 2159:18-2160:12.

1111.   At trial, Anadarko executive Mr. Hollek testified that Anadarko has not made any decision to change its level of investment in the Gulf. PP Tr. at 2160:13-2160:16.

1112.   Anadarko's Chief Financial Officer, Mr. Gwin, claimed that fining non-operators will change their investment decision-making because as "passive investors" they do not control the actions of the operators. Gwin Dep. at 245:02-245:24. He was unable, however, to identify any examples of non-operators declining to join Anadarko projects due to CWA penalties. Gwin Dep. at 270:05-270:23. Gwin testified that "it wouldn't surprise" him if Anadarko had entered into agreements as a non-operator since being held strictly liable under the CWA. Gwin Dep. at 247:09-247:15. Finally, he could not identify any commercially viable non-operating projects that Anadarko had declined to join solely because of the prospect of CWA penalties. Gwin Dep. at 250:05-250:14.

1113.   Similarly, Ms. Douglas, Anadarko's Chief Accounting Officer, testified that she was aware that as per the Anadarko SEC disclosure, a CWA penalty was "probable," but she was not aware of any discussions where Anadarko management said it had to extricate itself from existing non-operating interests. Although she does not attend the full Board of Director meetings, she also was not aware of any Board of Director discussions where Anadarko decided not to proceed with an investment due to concerns about a Clean Water Act penalty, nor could she identify any projects that Anadarko had not joined because it would be a non-operator. Douglas Dep. at 109:02-110:18.

### D.   Anadarko's Claims Regarding the Role of Non-Operators Are Unsupported and Do Not Warrant Reduction in the Civil Penalty

1114.   Anadarko contends that imposing a Clean Water Act penalty on it will result in harmful participation by non-operators in the operation of deepwater drilling activities to the detriment of offshore safety. TREX-280097.012; TREX-280010R.005.

1115.   Anadarko premises this argument on its publicly expressed belief that non-operators are merely passive investors. Rec. Doc. 13747-5 at 3; TREX-013208.005.

1116.   Mr. Gardner Walkup, expert witness for the United States in response to Anadarko's contentions, established that Anadarko's contentions fail. As the following paragraphs demonstrate, imposing a material Clean Water Act penalty on Anadarko will promote continued active participation by non-operators in a manner consistent with the current industry norm for non-operators. Conversely, failure to impose a material penalty on Anadarko will establish the incentive for non-operators to act as "passive investors" to the detriment of offshore safety. PP Tr. at 819:13-820:06.

1117.   Notably, despite Anadarko's attempt to paint non-operators as simple "investors," industry does not use the term investors to refer to non-operators. One common term is "partner" which connotes the close and collaborative relationship between the operator and non-operators. TREX-013200.012. Anadarko's own witness Darrell Hollek used the term "partner" in his testimony at trial and Anadarko's executive Alan O'Donnell used it in deposition. *See, e.g.,* PP Tr. at 2157:21-2157:23, 2163:04-2163:08; O'Donnell Dep. at 47:02-47:18. Other terms used to describe the relationship include co-owner, lessee, or Participating Parties. *See, e.g.,* Beirne Dep. at 18:19-19:11, 31:16-32:02; TREX-280000.023-.024 § 2.52; TREX-085006.022 § 2.53.

1118.   By contrast, within the industry, the term "investors" typically describes shareholders or equity analysts. TREX-013200.010. Even Anadarko's witness Mr. Arnold did not use the term "investor." Rather he used the term "non-operating working interest owner" in his expert reports and the term "non-operator" in his trial testimony. *See* TREX-280011.004 n. 1; PP Tr. at 2216:02-2216:07. Anadarko's other witness (Dr. Sunding) used a term – "non-operating investor" – that does not even appear in a search of the industry technical paper database, www.onepetro.org. TREX-231646R.007.

1119.   Notably, Anadarko was a twenty-five percent owner and therefore stood to share in any profits from the activities performed under the Defendants' Joint Operating Agreement ("JOA"). TREX-280000.001, .023, .113; Rec. Doc. 5809 at 4-5, 10-11, 19-20; TREX-001943.

1120.   In addition, the Defendants' well was slated to be tied back to the Pompano production facility. Bodek Dep. at 264:23-265:25. Thus, the well was important to Anadarko because production could be sent to Pompano, where the volumes being processed were low and additional oil was needed to keep that facility running. Huch Dep. at 69:21-70:20, 70:22-71:05,

105:06-107:02, 107:05-107:06, 107:12-107:15, 107:22-108:15; TREX-001943.005. Anadarko

also would save processing fees by sending product to Pompano since it owned twenty-five

percent of that facility. Huch Dep. at 237:13-238:22, 238:24-239:06.

### i.   Using Stage-Gate Decision-Making Non-Operators Actively Participate in Design Decisions

1121.   Non-operators actively decide both the degree of their participation and how they

focus their participation. PP Tr. at 823:01-823:12. Decisions in oil and gas exploration and

production are made in the face of uncertainty, both technical and non-technical, and the industry

has developed the stage-gate process, illustrated in Figure 57,  to make decisions in light of this

uncertainty. PP Tr. at 823:19-826:25.



Figure 57: Stage-Gate Decision-Making (TREX-232848.10.1.US)

1122.   Mr. Walkup, the United States' expert, has extensive experience as a business

consultant in the exploration and production industry and in particular with stage-gate decision-

making. Mr. Walkup was Chevron's global expert in well testing from 1984 to 1989, during

which time he was involved in hundreds of well completions, both as an operator and a non-

operator. He also worked on well testing in a joint venture with Indonesia from 1989 to 1994,

where he was involved with operations at objective depth on hundreds of wells. D-33150; TREX-013200.005-.009; PP Tr. at 845:09-848-21.

1123.   Industry participants understand that overall decision quality is focused on the design phase, which is where value is most increased. PP Tr. at 832:07-832:12. Non-operators accordingly target and influence design decisions and through that targeting have an impact on value. Value refers not simply to profits but also to HSE and other aspects of a successful project. PP Tr. at 827:08-829:04, 829:25-831:07; TREX-232848; TREX-232848.10.1.

1124.   Due to the expense and risk associated with deepwater activities, non-operators target their active participation on design decisions, which are made in advance of the operations that implement the decisions. Initial well design decisions may involve dozens of people, hundreds of man-hours, and months of elapsed time. Operating decisions are made on the rig and merely implement the design decisions. TREX-013200.012-.013.

ii.   **Mr. Walkup Correctly Defines the Distinction between Design and Operational Decisions**

1125.   Mr. Walkup established that non-operators become involved in design decisions, but generally do not engage in the day-to-day on-the-rig decision making. Activities that involve design decisions include: criteria for calling total depth, temporary abandonment (such as negative pressure test design including fluid levels for drawdown, duration, pressure gauge type and locations), the casing design (including number of centralizers, long-string versus short string); the casing program (*e.g.,* float collar converted or unconverted while running casing, run casing with or without shoe filter, reverse circulating to test collar conversion); the cementing design (*e.g.,* foam versus conventional cement based on laboratory testing and simulation studies), and cementing program (*e.g.,* spacer fluids, cement volume, pumping rate at different

305

stages, cement evaluation program including when to run a cement bond log).

TREX-013200.012; PP Tr. at 901:05-901:15; D-33161.

1126.   Design can be an on-going process. For example, parties may prepare some of the well testing program, the temporary abandonment design, or other completion design prior to spudding the well, but finish up such designs after reaching Total Depth and performing the logging for the well. PP Tr. at 870:02-871:02.

1127.   By contrast, operational activities are the implementing decisions and activities that occur day-to-day on the rig. PP Tr. at 887:01-887:20. Operational activities with little or no direct non-operator involvement include assessing why operating pressures are low; verifying whether a float collar converted; interpreting a negative pressure test; monitoring a well for a kick; deciding whether to divert flow to a mud gas separator; deciding whether to activate emergency disconnects; repairing and maintaining a blow-out preventer (although the schedule for maintenance of the BOP may be part of the design in depending on the design and condition of the well, such as an high pressure-high temperature well). PP Tr. at 885:17-888:06.

1128.   In one area of disagreement with Mr. Walkup, Anadarko's witness, Mr. Arnold, argues that "design" decisions constitute a very narrow range of activities and most decisions are operational. Mr. Walkup, by contrast, argues for just the opposite. He demonstrates that operational decisions are a narrow category of day-to-day, on-the-rig decisions to implement design choices.  Most deepwater activities are subject to design in which non-operators can and do participate.

### iii.   Non-Operators' Active Participation Encompasses Many Forms and Activities

1129.   Integrated Project Teams ("IPTs") are a recognized way for non-operators to actively participate. The entire team is embedded together. PP Tr. at 880:11-880:14. IPTs are comprised of personnel from the operator and from the non-operators. Non-operators have the representation on the IPT equal in equivalent percentage to their equity share. The operator strongly influences the safety culture of the IPT because it selects the Project Manager to whom the IPT reports, but non-operators also will influence the safety culture of the IPT. TREX-231646R.013-.014; TREX-280000.200.

1130.   Industry articles illustrate the functioning of IPTs on certain projects. For example, an IPT can play a role in HSE leadership and culture. TREX-232804.

1131.   Similarly, Anadarko, as a non-operator, in the Jubilee project in Ghana, assigned a significant number of experienced key project personnel to the IPT early in the development phase, so that its technical capabilities were fully utilized on the project. TREX-232812.001. Anadarko had significant previous deepwater project experience, and its experience was



Figure 58: Spectrum of Relationships for Operators and Non-Operators (D-33165)

307

leveraged to provide many key project leadership positions. TREX-232812.002. Early teambuilding exercises focused on building a coherent team culture. TREX-232812.003.

1132.   Non-operators can actively participate even without an IPT, including at exploration wells. Such participation can include independent assessments of such things as technical issues, HSE, or financial issues; formal and informal technical discussions; partner meetings; stage-gate decision meetings; peer to peer communications and authorizations for expenditure ("AFE") approvals. PP Tr. at 880:15-880:19, 902:09-902:24; D-33165.

1133.   Further, non-operators can play an important role in promoting HSE safety culture through site visits, field visits or visits to contractors, which can reinforce the operator's message that HSE is important and show a commitment to it. In some instances, the operator and non-operators even form joint safety teams to promote a culture of safety. TREX-231646R.012-.013; TREX-280000.050-.051; TREX-232798.002-.003.

1134.   Non-operators also actively participate in assuring that the operator has a robust safety system. Under the model form operating agreement, non-operators have the right to request a briefing of the operator's safety and management system and to review the audits of that system. TREX-231646R.014; TREX-232798.002-.003; TREX-280000.237-.238. Industry authors also point to assessments that non-operators perform of the operators in other countries. TREX-232857.005-.006.

1135.   The role of non-operators in reviewing operators' HSE capabilities has increased since the Defendants' disaster. For example, on deepwater projects where Chevron holds a non-operating interest, it now audits its operators and has a program to collaboratively and proactively manage risks. TREX-231646R.016; TREX-232867.

1136.   Non-operators who acquire interests at different stages of the process perform due diligence which includes looking at the design plans and the performance of operations to identify differences between the two. Thus there is active participation before acquiring the interest. PP Tr. at 900:03-900:22. In addition, some aspects of design, such as temporary abandonment, are not completed until the parties reach total depth and perform logging of the well, so that the non-operator would be able to actively participate in review and preparation of such plans. PP Tr. at 870:02-871:02.

### iv.   Various Drivers Counsel Active Participation

1137.   A number of drivers lead non-operators to actively participate in deepwater projects. The drivers for non-operators to actively participate also mean that they must monitor progress and activities at the well. TREX-013200.018.

1138.   First, non-operators actively participate in order to acquire strategic learning. In order to acquire technical knowledge, the non-operator must have a high degree of participation, beyond merely monitoring. PP Tr. at 832:13-836:22; D-33155; TREX-013200.014-.020. The drivers for non-operators to actively participate



Figure 59: Drivers for Non-Operator's Focused Active Participation (D-33155)

also mean that they must monitor progress and activities at the well. TREX-013200.018.

1139.   Second, non-operators actively participate because of financial exposure due to the extremely high costs of deepwater exploration and development. While the financial rewards may be large, each individual deepwater project or well is very expensive relative to onshore

wells, requiring more active involvement in well operations and completions. PP Tr. at 832:13-836:22; D-33155; TREX-013200.014-.020.

1140.   Third, non-operators actively participate to stay informed so that they can communicate and manage relations with their investors and shareholders. Senior managers may announce the success or status of exploration efforts and it is important to avoid surprises, which may negatively impact share prices. PP Tr. at 832:13-836:22; D-33155; TREX-013200.014-020.

1141.   Fourth, non-operators actively participate to reduce technical risks to the deepwater wells and in particular to avoid damage in the zone of interest at objective depth. High hydrocarbon production rates are essential to a commercially viable deepwater well and, given the relatively few number of wells in deepwater, non-operators actively participate in each well. PP Tr. at 832:13-836:22; D-33155; TREX-013200.014-020.

1142.   Fifth, non-operators actively participate to manage reputational risk. Being associated with a negative event in one geographic area will impact a company's ability to access deepwater resources in another area, and competition is fierce. Therefore, non-operators actively participate in order to avoid losing resource access and the competitive advantage it provides. PP Tr. at 832:13-836:22; D-33155; TREX-013200.014-020.

1143.   Only by tracking progress and activities at the well can the non-operator ensure that the well's high production rates are not put into jeopardy, that it acquires any strategic or technical learning that it seeks, and that it can appropriately communicate with shareholder, investors and so forth about the well. The need for non-operators to monitor is reflected in the industry model form agreements' requirements that the operator share detailed technical data with the non-operators, both on the daily basis and in real-time. *See infra* § VIII.D.xi.

v.      **Examples of Active Participation Abound**

1144.   Contrary to Anadarko's arguments, industry literature supports that fact that non-operators actively participate in HSE and in other aspects of exploration and production and positively influence safety. PP Tr. at 837:11-844:13.

1145.   Three examples of this active participation have already been discussed: Chevron's use of an IPT to focus on HSE (*see supra* ¶ 1130), Chevron's program to evaluate HSE after the Defendants' disaster (*see supra* ¶ 1135), and Anadarko's work on the Jubilee project (*see supra* ¶ 1131). More examples exist of the industry's recognition of the active participation of non-operators.

1146.   For instance, in 2002 Shell, one of the pioneers of deepwater exploration and production in the Gulf of Mexico, shared its strategies and lessons learned from its role as a non-operator in a number of projects, and described the role of non-operators as being focused, active and improving HSE. PP Tr. at 837:11-839:07; TREX-232806.001.

1147.   In addition, in 2006 the Offshore Technology Conference published an article by a broad range of companies, including Chevron and Petrobras, about the various roles of non-operators, including in deepwater and exploration activities. TREX-232808.001; PP Tr. at 839:08-840:06.

1148.   Similarly, an article by Mr. Lawrie and others provides some detail of the various ways in which non-operators can participate, including auditing, visiting contractors, etc. TREX-232857.008 (which concludes that "what is clear is that NOP companies can play a significant role in the development of HSE excellence in any project, regardless of the size of their investment").

1149.   Anadarko's expert Mr. Arnold disparages this industry literature. *See, e.g.,* TREX-280098.004; PP Tr. at 2224:04-2224:05.

1150.   These articles, however, are written by industry sources, often were presented at industry conferences, and were published by well-established industry groups such as the Society of Petroleum Engineers or the Offshore Technology Conference. PP Tr. at 844:19-845:01. The industry is fast moving and relies on these kinds of articles, which span different organizations, sometimes with joint authors.  PP Tr. at 844:19-845:01.

### vi.   The Oil and Gas Industry Developed the Model JOA to Save Transaction Costs

1151.   The oil and gas industry puts together a Model Deepwater Operating Agreement for the Gulf of Mexico. The purpose of the Model Form Deepwater JOA is to promote efficiency. PP Tr. at 867:08-867:14. Drafting the legal documents from scratch would be time-consuming and expensive, so industry has cooperatively developed model form contracts under the auspices of the American Association of Professional Landmen. TREX-013200.20; *see also* Wardlaw Dep. at 134:17-136:12, 178:22-181:23 (BP employee who was on the drafting committee describing the years it took to update the current model).

1152.   The Models are updated periodically to reflect industry practices. The current version was finalized in 2007. Three noteworthy additions were made in this version: (1) ensuring that industry practice regarding the use of IPTs and stage-gate decision-making were reflected in the updated contract, (2) adding an Exhibit dedicated to HSE, and (3) including a requirement to provide realtime information to non-operators. TREX-013200.0022; TREX-085006.0035-.0037 § 5.7; Wardlaw Dep. at 270:09-270:15, 277:12-277:18 ("[W]e put the

312

realtime information provision [Section 5.7] in here in order to make sure that the non-operators had access to all the – all of the realtime information the same as what the operator has.").

1153.   The Defendants' JOA was based on the current model form and is very similar to it. Wardlaw Dep. at 244:11-245:16; PP Tr. at 854:09-855:14.

### vii.   The Model JOA Gives Non-Operators Leverage at Critical Junctures

1154.   The JOA is a sophisticated, detailed document with nuanced provisions giving non-operating parties participating in an activity enhanced leverage and bargaining power at specific junctures.

1155.   Anadarko emphasizes the control given to the operator under Article 5.1, which states that "the Operator has the exclusive right and duty to conduct . . . all activities or operations under this Agreement." Anadarko ignores, however, the limiting provision: "except as provided in Article 8.2 (Voting and Election Procedures) and Article 8.5 (Approved by Unanimous Agreement)." TREX-280000.034; TREX-085006.033.

1156.   These exceptions refer to the JOA also definition of voting and election rights for the non-operator. Article 8 provides that there are four general classes of activities and operation under the JOA: (a) those requiring approval by vote, (b) those requiring approval by election, (c) those requiring approval by unanimous agreement, and (d) those within the discretion of the operator. TREX-280000.051; TREX-085006.051. Generally, each participating party has a vote or election equal to its working interest share. TREX-280000.051; TREX-085006.051.

1157.   When more than two parties are entitled to vote, at least two parties (at Defendants' well), with a combined voting interest of a negotiated percentage (at Defendants' well it was fifty percent or more), must vote in favor to give approval. TREX-280000.052;

TREX-085006.052-.053. In other words, where a proposal is subject to a vote and there are more than two parties voting, at least one non-operator must support the proposal even if the operator holds a majority share.

1158.   Where an election is required, approval may be given by only one party entitled to elect, holding a negotiated percent – at Defendants' well, only ten percent – or more of the working interests. TREX-280000.052; TREX-085006.053. Thus, for proposals subject to approval by election, minority interest holders are given substantial input or leverage. TREX-280000.052; TREX-085006.053.

> ### viii.   The JOA Gives Non-Operators Leverage Regarding Drilling to Objective Depth and Subsequent Operations

1159.   Any participating party may propose drilling an exploration or appraisal well by providing an AFE and a well plan. The proposal requires approval by election – *i.e.*, a minority vote may suffice. TREX-280000.061 Art. 10.1.

1160.   The JOA requires the operator to drill to objective depth unless certain conditions apply, including (1) the participating non-operators refuse to sign supplemental AFEs for cost overruns or a change in scope; (2) the operator encountered certain technical difficulties that in its "sole opinion" rendered further drilling impractical; or (3) the participating non-operators unanimously approved the decision to cease drilling. TREX-280000.063; TREX-085006.064. Accordingly, if an operator wants to cease drilling before reaching objective depth and wishes to avoid demonstrating it experienced sufficient technical difficulties, it must obtain the unanimous approval of all of the participating non-operators.

1161.   Once the objective depth has been reached and all data provided to the participating parties, the operator will usually propose "exploratory operations at objective

314

depth," which may include additional testing, deepening the well, temporary abandonment and other measures. At that time, the operator is required to present the other participating parties (non-operators) a plan for the proposed activity, such as for temporary abandonment. The proposal is subject to election. TREX-280000.064; TREX-085006.065-.066.

1162.   The JOA enumerates a hierarchy of operations at objective depth. Non-operators may propose other alternative operations and if they are a higher priority, the proposal supersedes the operator's, even if the non-operator holds a minority interest, provided that sufficient parties come forward to perform and finance the alternate proposal. TREX-013200.013-.014; TREX-280000.065-.067; TREX-085006.067-.069. At a minimum, this structure gives the non-operating party leverage to push for higher priority operations at that juncture.

1163.   The timing for the operator's proposal and for the non-operators' proposal is short due to the daily costs of maintaining the rig on-site. At the Defendants' well, BPXP had twenty-four hours to submit its proposal and Anadarko and MOEX had twenty-four hours to make any separate proposals. TREX-280000.065. In order to meet these short deadlines, the parties must stay informed and communicate well in advance of the deadlines.

1164.   Similar provisions for proposing and approving wells and operations at objective depth appear in provisions governing wells drilled in the later stages on the leasehold, Appraisal (Article 11) and Development Operations (Article 13). TREX-280000.069-.079, .098-.110; TREX-085006.071-.082, .104-.117.

### ix.   The JOA Provides Leverage to Non-Operators by the Requiring Authorizations for Expenditure

1165.   Participating non-operators must authorize the operator's proposal to drill an exploratory well or to perform certain other specified activities by executing an AFE. TREX-280000.039-.040; TREX-085006.039.

1166.   Supplemental AFEs are required in the event of cost overruns or changes in scope of work. TREX-280000.039-.041; TREX-085006.039-.040. If a non-operator refuses to execute an initial or supplemental AFE for an exploratory well, however, it will lose its interest in that project and its expenditures will not be reimbursed. TREX-280000.116; TREX-085006.125.

1167.   Again, the requirement that participating non-operators give their approval provides them with some leverage or negotiating power at that time. The timing for approvals of AFEs is negotiated by the parties and can be short if the rig is on-site charging daily rates. *See, e.g.,* TREX-280000.054-.055. The short timeframe for approval when the rig is on-site is another driver for close monitoring by the non-operator in the period leading up to the AFE approval.

1168.   Even Anadarko's witness, Mr. Arnold, acknowledges that the requirement for AFE approval may result in some "informal conversations" and limited influence by the non-operators. TREX-280011.007. For example, a non-operator at a well operated by Anadarko obtained an extension of the AFE approval period to have its questions answered, and had many questions answered, including a request to see detailed plans for a workover, prior to approving an AFE. TREX-230016.

### x.   The JOA Gives Non-Operators a Role in HSE

1169.   Article 5.10 of the JOA provides that the operator must conduct operations and activities under the JOA in conformance with industry standards and local HSE statutory

requirements and in accordance with Exhibit K. Significantly, the JOA provides that it must

undertake those efforts "with the support and cooperation of the Non-Operators."

TREX-280000.039 (emphasis added); TREX-085006.038.

1170.   Both the Model JOA and the Defendants' JOA require the operator to have an

HSE Management Plan consistent with American Petroleum Institute Recommended Practice 75,

an industry standard. Upon written request, the operator must have a meeting and give a

sufficient overview of its program to demonstrate to the non-operator(s) that it has a plan in

compliance with the standard. The non-operators also can make the operator's HSE performance

an agenda item where past performance and future initiative are discussed. TREX-280000.237-

.238; TREX-232798.002-.003.

1171.   Upon written request, the operator also must provide to the non-operators copies

of any HSE audits conducted of the drilling operations on the subject well. TREX-280000.237-

.238; TREX-232798.002-.003.

1172.   The operator must maintain specific statistical information pertaining to HSE for

activities and operations conducted under the JOA and that information must be provided to non-

operators on a monthly basis. TREX-280000.237-.238; TREX-232798.002-.003.

1173.   Non-operators have a right of access to activities and operations in order to

conduct HSE inspection, and to the operator's HSE files. TREX-280000.237-.238;

TREX-232798.002-.003.

### xi.   Non-Operators Receive Extensive Information Concerning Operations and Have a Right to Access to all Facilities

1174.   Article 5.7 of the JOA requires the operator to provide participating non-operators

with extensive information related to well operations, including:

317

a.      Drilling and workover reports provided within eight hours of the preceding

twenty-four hour period, containing the current depth, the corresponding lithological

information, data on drilling fluid characteristics, information about drilling difficulties or

delays (if any), mud checks, mud logs, and hydrocarbon information, casing and

cementation tallies, and estimated cumulative costs, Article 5.7(b);

b.      Subject to certain cost-sharing and other provisions, real time data, Article 5.7(b);

c.      Copies of each application for a permit to drill and all amendments to that

application, Article 5.7(a);

d.      Reports on core data and analyses, Article 5.7(c);

e.      Copies of well test results, bottomhole pressure surveys, hydrocarbon analyses,

and similar information, Article 5.7(e);

f.      Copies of reports made to regulatory agencies, Article 5.7(f); and

g.      Copies of drilling prognoses, Article 5.7(i).

TREX-280000.036-.038; TREX-085006.035-.037.

1175.   In addition, the JOA requires the operator, upon written request, to use reasonable

efforts to give a requesting non-operator any additional information acquired by the operator.

TREX-280000.037-.038; TREX-085006.037.

1176.   The operator must provide copies of reports made to governmental authorities and

any orders, notices or directives received from government agencies. TREX-280000.036;

TREX-085006.035.

1177.   Data acquired or derived from operations conducted under the JOA is the property of all participating parties in that activity or operation, even if it is proprietary or confidential. TREX-280000.017, .050; TREX-085006.015, .050; PP Tr. at 2245:25-2246:16.

1178.   There were no formal or informal guidelines precluding BP Group employees from sharing technical work, such as detailed drilling and completion procedures, with non-operators. Beirne Dep. at 419:14-420:12.

1179.   Participating non-operators have access to all drilling rigs, production systems, and facilities to observe and inspect operations and wells in which they participate, as well as related data and files. TREX-280000.050-.051; TREX-085006.051.

1180.   Mr. Arnold does not dispute that all of this information is available to non-operators. Instead, he focuses solely on real-time data and the inability of the non-operator to detect kicks and losses (and well blowouts) in real time. TREX-280011.007-.008. While non-operators do obtain real-time data from the operator, Mr. Walkup does not suggest they use such data to monitor for kicks and losses on a real-time basis. Nonetheless, all the information that is available to non-operators – including real-time data – permits and encourages focused active participation.

### xii.   Anadarko's Witnesses Agree that Non-Operators Can Positively Influence HSE

1181.   Mr. Arnold agrees with Mr. Walkup on many points:

a.   He agrees that there are many different drivers that drive the degree of participation by a non-operator, including strategic learning, financial exposure, investor relations, technical risk, reputational risk, all of which "drive a particular non-operator to be more or less involved in any specific activity." PP Tr. at 2223:01-2223:19; D-38015.

b.      He also agrees that non-operators normally ask for and receive information on the status of the well's progress for business reasons such as disclosing information under SEC rules, evaluating AFEs, determining whether additional funds are needed for cash flow and budget planning purposes, and keeping managers informed. TREX-280011.007.

c.      Further, he agrees that non-operators' participation in deepwater projects extends beyond mere investment. He agrees that, as an industry norm, non-operators will review a well plan and sometimes discuss it with the operator. PP Tr. at 2248:04-2248:15. It is more common that non-operators will attend a pre-spud meeting than that they will not. PP Tr. at 2248:16-2248:21. Non-operators will monitor operations to see if operations are following the well plan so as to advise the financial community on major issues, and accordingly will have some knowledge of what is happening in the well. PP Tr. at 2248:22-2249:05. They should engage with the operator if they have any concerns. PP Tr. at 2249:06-2250:01.

d.      In addition, he acknowledges that the non-operator has some involvement at the time AFEs have to be authorized. "During exploration, a [non-operator] might have informal conversations with the Operator's staff, such as when the Operator is preparing an AFE to drill a well or change the scope of an approved AFE (*e.g.,* sidetrack a well because of drilling problems, temporarily abandon (or plug and abandon) a well) before reaching the agreed objectives." TREX-280011.007.

e.      He further agrees that non-operators sometimes have ability to influence design decisions. TREX-280097.003. As explained below, however, his view of the scope of design is too narrow. *See infra* § VIII.D.xv.

f.      Mr. Walkup agrees with Mr. Arnold that a non-operator's ability to contribute to certain onsite operational decisions is limited when such decisions are time-sensitive. PP Tr. at 885:01-885:06. Moreover, there are certain safety issues that require that decisions on the rig be highly centralized. PP Tr. at 885:07-885:16; PP Tr. at 2229:14-2229:24.

Further, contrary to his Anadarko's contentions, Mr. Arnold does not even contend that any leaseholder should take a passive role on a deepwater project. PP Tr. at 2222:16-2222:21. In his experience, the level of involvement varies on each project depending on the activity and other factors. PP Tr. at 2222:22-2222:25; D-38016.

1182.   Further, Mr. Arnold and Dr. Sunding, both Anadarko witnesses, do not dispute Mr. Walkup's contention that non-operators can positively influence safety. TREX-280096.008; PP Tr. at 2235:17-2235:19; TREX-280098.003.

1183.   Proof that industry can and does bring in non-operators to share expertise and will give a greater role to a non-operator in order to increase the information transfer is found in the announcement in January 2015 that BP brought Chevron into three deepwater leases in the Gulf of Mexico because of Chevron's experience in the development phase of similar leases. PP Tr. at 2224:20-2225:04.

### xiii.    Mr. Arnold's Attempt to Limit Effect of Non-Operators on HSE to the Development Phase is Unsupported and Irrelevant

1184.   Having conceded that non-operators can and do positively influence HSE, Mr. Arnold attempts to limit his opinion by contending that this influence generally occurs during the development rather than the exploratory phase. PP Tr. at 2235:17-2235:19; TREX-280098.003

1185.   Mr. Arnold himself, however, concedes that there is some non-operator involvement even in the exploratory phase. PP Tr. at 2223:21-2223:23; D-38016.

321

1186.   Mr. Arnold's distinction between exploration and development is not significant because certain activities occur in deepwater wells regardless of whether they are exploratory wells, appraisal wells, or development wells, including temporary abandonment procedures, using a cement bond log, or using a spacer between mud and cement for running a negative pressure test. PP Tr. at 901:05-902:08; D-33161; PP Tr. at 2247:02-2248:03; TREX-233288R.006.

1187.   Industry literature belies Mr. Arnold's claim that non-operators are not actively involved in exploration. In fact, the literature shows that active participation occurs during exploration activities. PP Tr. at 839:08-846:06; TREX-232808.004 ("At Chevron, we have utilized many types of commercial and equity arrangements for our *exploration* activities," reciting many benefits beyond sharing of financial risks to joining as a non-operator) (emphasis added); TREX-232857.008-.013 (describes active participation of non-operators in pre-spud planning process involving *exploration* departments of all the partners to make certain initial decisions, continuing thereafter) (emphasis added); TREX-233288R.004-.005.

1188.   Seeking to take advantage of an evidentiary limitation Anadarko itself sought, Anadarko emphasized the exploratory nature of the Defendants' well and prevented the United States from rebutting this contention. Rec. Doc. 13810 at 4 (general statements concerning industry do not open the door to evidence regarding defendant); PP Tr. at 879:24-880:02 (statement by counsel that "Macondo" was an exploration well); TREX-280011.007 n. 18 ("The blow-out here occurred before the end of exploratory operations, so typical Operating Agreement provisions giving [non-operators] more influence over later stages did not kick in."); TREX-280097.003 (non-operators "do not normally actively participate in exploratory wells

322

("like the Macondo well)"), .003 ("The Macondo blowout happened during exploratory

operations"), .004 ("Walkup . . . ignores…the distinction between the exploration stage (*i.e.,* the

phase during which the Macondo well blew out) and the development stage of deepwater

activities."); TREX-280098.003 ("since the Macondo well never reached the production stage"

the greater participation through IPTs has limited application to this case.), .005 ("Macondo

never went past the exploration stage" so IPTs are not relevant).

1189.   Even setting aside Anadarko's evidentiary gamesmanship, Mr. Arnold is incorrect

that the activities leading up to the blowout at Defendants' well can be classified as purely

"exploration." At the time of the blowout, the well was no longer an exploration well. O'Donnell

Dep. at 139:21-142:11, 219:15-220:19 (O'Donnell signed the final AFE on April 15, 2010,

because the well was going to be a development [well] and costs would come from the

development group); Huch Dep. at 233:26-237:12 (after April 15, 2010, when activities are

temporary abandonment and running of the production line, the activity was funded by

development; any wells being tied back to existing production facility are under the jurisdiction

of the development operations group).

### xiv.   Mr. Arnold's Attempt to Limit Non-Operator Decisions to Strategic Issues is Unsupported

1190.   Mr. Arnold cites Mr. Walkup's article, TREX-280090, and opines that non-

operator participation is only "strategic" and not "tactical." TREX-280098.006; PP Tr. at

2228:15-2231:02; D-38017. Mr. Arnold then misapplies that concept to limit the active

participation of non-operators from activities related to drilling of a well. PP Tr. at 2229:08-

2230:18; D-38019.

1191.   To understand why Mr. Arnold is incorrect, one must first note that the stage-gate decision-making can apply to a single well. PP Tr. at 2245:19-2245:24; PP Tr. at 868:14-868:25.

1192.   In any event, a specific decision may change from being considered tactical to being considered strategic during the stage gate process as decision-making moves through the stages and the decisions become more focused and detailed. For example, when a party is in the "selection phase," further detail on design may be a tactical decision. After the definition phase, however, the development plan is sufficiently detailed that it can be built. PP Tr. at 831:10-832:06. Thus, the stage gate decision-making continually focuses in on the more specific decisions, so that as an issue comes into the focus of the decision-making process, it becomes the strategic decision, leaving even more detailed decisions as the "tactical" decisions. Thus, what may be a "tactical" decision when an exploration and production company is considering which country to enter, or when it is evaluating the feasibility of further development, transforms into a "strategic" decision when stage-gate decision making is applied later on directly to drilling a specific well or wells, leaving even more detailed decisions to be "tactical" decisions. *See* TREX-280090.

1193.   Mr. Walkup's article and his distinction between strategic and tactical decisions is entirely consistent with his testimony. Mr. Walkup makes a distinction between decisions that involve non-operator input – *i.e.,* those that involve some design component, whether pre-drilling or for operations at objective depth ("strategic") – from those that solely involve emergencies or mere execution of designs, *i.e.,* operational activities as Mr. Walkup narrowly construes them ("tactical"). That distinction is entirely consistent with the strategic versus tactical distinction he

324

draws in his article when stage-gate decision making is applied to a single well. *See* TREX-280090.

1194.   Mr. Arnold and Anadarko seek to imply that IPTs only address high level "strategic" issues and that well-level details are "tactical" issues handled solely by the operator. That is not necessarily the case, however, as Anadarko's involvement in the Jubilee Project demonstrates. That example makes it clear that the IPT, including the non-operator representatives, handled design issues. TREX-232812.003-.004.

### xv.   Mr. Arnold Construes the Design Phase Too Narrowly

1195.   In contrast to Mr. Walkup, Mr. Arnold construes the scope of design activities very narrowly and the scope of operational activities broadly. *See, e.g.*, TREX-280097.011. Mr. Arnold and Anadarko also point to provisions in the Model JOA for well plan as support for their position that non-operators do not review much material related to well design beyond the AFE and that the operator may automatically revise well plans. *See, e.g.*, TREX-280097.011-.012 n. 33-34; PP Tr. at 871:24-874:03. Mr. Walkup's experience is to the contrary.

1196.   At trial, Mr. Arnold misconstrued Mr. Walkup's position and testified that Mr. Walkup contends that interpretation of a negative pressure test, monitoring pumping of cement, and approving tests of BOPs are activities in which non-operators should participate. PP Tr. at 2231:21-2232:10. As stated above, *see supra* ¶ 1193, activities that are merely execution of design decisions are not part of active non-operator participation and Mr. Walkup had already testified to that effect at the time of Mr. Arnold's testimony.

1197.   In formulating his opinions concerning well design, Mr. Walkup draws on his extensive experience with well design issues and documentation, and on his work with non-

operators, in connection with well testing and operations at objective depth, including temporary abandonment procedures. PP Tr. at 816:03-817:15, 845:09-848:21; D-33150; D-33156.

1198.   The JOA defines Well Plan as a "detailed" written description accompanying a proposal to, among other activities, drill a well (Exploratory, Appraisal, or Development) or subsequent operation at Objective Depth (which would include temporary abandonment), and enumerates specific items it must contain "at a minimum." Such items include "the proposed drilling plan, if applicable, and the proposed completion plan, including the casing program and directional details, if applicable." TREX-280000.026-.027; TREX-085006.025.

1200.   The Model and Defendants' JOAs provide that prior to drilling, any revision to the approved well proposal, Well Plan, or AFE must be approved unanimously by Participating Parties. TREX-280000.061; TREX-085006.061-.062.

1201.   Under the JOA, operators can revise the well plan once it commences drilling, but its ability is subject to certain caveats. Operators can change the well plan during drilling of an exploratory well "as is necessary for it to employ prudent oil field practices or to conduct safe operations" without "the approval of the Participating Parties as long as the operator's revisions carry out the scope and intent of the approved well plan and AFE, except as provided in Article 6.2.2 (Supplemental AFEs)." TREX-280000.062; TREX-085006.061-.062; PP Tr. at 872:04-872:13; 873:13-873:24. This provision reflects industry practice. PP Tr. at 873:25-874:03.

### E.   Anadarko's Argument that there Is no Deterrence Value in a Penalty for Anadarko Is Not Supported by the Evidence

1202.   Anadarko's witness, Dr. Sunding, argued that there is no deterrence rationale for imposing a penalty on Anadarko because it has already paid its Oil Pollution Act damages

through its settlement with BP. TREX-280010R.005-.006; PP Tr. at 2286:16-2286:19. As demonstrated in the following paragraph, his opinion is not supported by the evidence.

1203.   Dr. Sunding's analysis is limited to the deterrent effect of Clean Water Act penalties (and perhaps only to specific deterrence); he conceded at trial that he did not address in any way the punitive aspect of such penalties. PP Tr. at 2266:10-2266:15. Dr. Sunding's opinion therefore does not address whether Anadarko should pay a penalty as retribution or punishment for the harm that came from the failed venture in which it stood to profit.

1204.   This Court has held that "the primary objectives" of the Clean Water Act penalty provisions are to "*punish* and deter future pollution." Rec. Doc. 5446 at 20 (emphasis added). In other words, Dr. Sunding's entire opinion on this topic ignores one of the two primary purposes of penalties and is premised on reading the seriousness factor out of the Court's analysis of the statutory penalty factors. For this reason alone, his argument fails.

### i.      Dr. Sunding Fails to Recognize that the Statute and Public Policy Requires Damages and Penalties to be Treated Differently

1205.   Dr. Sunding's fundamental assumption is that the Oil Pollution Act "by itself" already achieves optimal deterrence by providing that violators compensate for their harms. TREX-280096.003; *see also* PP Tr. at 2263:22-2264:05 (discussing statutory scheme).

1206.   Dr. Sunding cannot reconcile his opinion with the structure of the Oil Pollution Act. At the same time Congress passed the Oil Pollution Act in 1990, it also amended the Clean Water Act to increase civil penalties for oil spills, and expressly linked the size of the spill in barrels to the penalty amount. PP Tr. at 2302:25-2303:07.

1207.   More recently, Congress has affirmed that penalties and damages for oil spills serve different purposes:

> The ability to obtain both NRD and penalties is not, and has never been, considered double recovery against a Responsible Party, but rather separate remedies provided by law that serve different purposes. Clean Water Act penalties are punitive in nature and serve a deterrent purpose, while NRD claims are intended to compensate the public for natural resource injuries resulting from an oil spill.

S. Rep. No. 112-100 at 15 (2011).

1208.   Though he ignored this statutory structure, Dr. Sunding admits that – from a legal and regulatory standpoint – penalties are treated differently than damages for public policy reasons. PP Tr. at 2311:06-2311:11. For example, this Court has held that parties could agree to an indemnity clause for damages but cannot agree to such a clause to correspondingly re-allocate penalties. *See* Rec. Doc. 5446 at 23. Similarly, compensatory damages such as those under the Oil Pollution Act are generally treated by companies as tax-deductible business expenses, whereas penalties are generally not deductible. PP Tr. at 2310:25-2311:14; TREX-280034.063.

1209.   Anadarko itself treated civil penalties and damages differently. The company paid and deducted its four billion dollar settlement with BP as a business expense, while carving civil, criminal, and administrative fines and penalties out of the settlement. *See* Douglas Dep. at 36:03-36:09; TREX-050473.009-.010 ¶ 5.3.a.iii.

1210.   Despite the different purposes and tax treatment of penalties and damages, Dr. Sunding focuses only on the pre-tax settlement amount as a measure of what Anadarko paid to resolve its Oil Pollution Act liability. *See* TREX-280010R.008.

### ii.      Dr. Sunding Lacks a Firm Basis for Asserting that $4 Billion Represents Sufficient Deterrence

1211.   Even were Dr. Sunding correct that damages served the same purpose as penalties, his deterrence argument fails because the full damages caused by the Defendants' violations have not been determined and therefore, Anadarko's share of the damages has not yet

been determined. PP Tr. at 714:16-715:01; TREX-013318.034-.035; D-33515; PP Tr. at 2312:20-2312:25.

1212.   Despite acknowledging that the amount of damages is still unknown, without any knowledge of the settlement negotiations or Anadarko's own valuation of the damages, Dr. Sunding speculates that because BP and Anadarko are both sophisticated companies, the four billion dollar amount is a "reasonable assessment of Anadarko's exposure to [Oil Pollution Act] damages under the relevant facts of the case." TREX-280096.004; PP Tr. at 2313:04-2313:11.

1213.   Dr. Sunding also did not investigate whether any other business reason prompted settlement in the agreed upon amount. Leading up to the settlement, Anadarko alleged that the spill was the result of BP's gross negligence. PP Tr. at 2167:20-2168:04; PP Tr. at 2313:15-17. As a result of the settlement, Anadarko agreed to stop asserting publicly and in litigation that BP was grossly negligent or had engaged in willful misconduct, and specifically agreed not to file an expert report in the multidistrict litigation against BP on these grounds. PP Tr. at 2314:01-2314:05; TREX-050473.005. Anadarko and BP agreed to the settlement the day before expert reports were due in the liability phase of the litigation. PP Tr. at 2314:17-2314:20; TREX-050473.001; Rec. Doc. 3126.

1214.   [See Appendix A for Highly Confidential information regarding the settlement negotiations].

### iii.    Dr. Sunding Misapplies The Formula for Optimal Deterrence

1215.   Dr. Sunding relies upon a theoretical formula from economic literature to define what he calls "optimal deterrence":

$$optimal\ deterrance = \frac{total\ amount\ of\ harm}{probability\ of\ detection}$$

TREX-280010R.007-.008.

1216.   Using this formula, Dr. Sunding argues that paying for external harms by itself may achieve optimal deterrence where the probability of detection is very high. He acknowledges that the converse is true. Where probability of detection is low, Dr. Sunding agrees it may be necessary for a violator to pay more than the damage caused by the spill in order to encourage the appropriate incentives. PP Tr. at 2274:23-2275:11; D-38072.

1217.   Dr. Sunding's focus, however, is on the probability of detecting a *violation*, not on detecting risky behavior that could lead to an oil spill. PP Tr. at 2315:06-2315:09.

1218.   He did no analysis of whether the types of risk-producing activities at issue in the Defendants' blowout could have been detected. PP Tr. at 2315:20-2316:01. Even under the optimal deterrence formula set out by Dr. Sunding, higher penalties could be required if the goal is deterring risky behaviors and the probability of detecting such behavior is low. *See* TREX-280010R.007.

1219.   Dr. Sunding further argues that optimal deterrence will be achieved whether BP or Anadarko compensates injured individuals as long as one of the leaseholders is providing compensation. PP Tr. at 2284:25-2285:09. Dr. Mason demonstrated, however, that when there are multiple parties exposing society to harm, the interaction between these two parties should be

330

considered in determining whether a payment by one of those parties optimally deters future risky actions by a similarly situated party. PP Tr. at 716:04-716:11; TREX-013318.036.

### iv.   Dr. Sunding Ignores the Difference between Punitive Damages and Clean Water Act Penalties

1230.   Dr. Sunding relies heavily on articles by economist Steven Shavell in forming his opinions on optimal deterrence. TREX-280010R.007. His reliance is misplaced. For instance, at trial Dr. Sunding relied on an article that suggested factors a court should consider in assessing punitive damages. The authors argued that courts had "struggled for years" to determine how to assess punitive damages due to a lack of guideposts. What Dr. Sunding overlooks is the fundamental unreliability of the article. The authors were sponsored by Exxon Corporation. At the time of the article, 1998, Exxon was appealing a punitive damage judgment in the *Exxon Valdez* oil spill litigation and the authors were serving as consultants to Exxon in connection with the litigation. TREX-280034.002; D-38065.

1231.   Further, were the article reliable and the authors correct regarding the factors to be considered for punitive damages, the analysis of punitive damages factors is irrelevant: Congress has been very clear as to the factors to be considered in setting a Clean Water Act Penalty. 33 U.S.C. § 1321(b)(8).

1232.   Accordingly, the article upon which Dr. Sunding relies is inapposite to the question before the Court. For example, the authors conclude, among other things, that to achieve a deterrent effect a corporate defendant's wealth generally should not be considered in assessing punitive damages. TREX-280034.007. Congress, however, expressly requires the Court to consider the financial status of the defendant in assessing Clean Water Act penalties. 33 U.S.C. § 1321(b)(8).

331

### v.   Dr. Sunding Minimizes the Risk of Under-Deterrence

1233.   Dr. Sunding agrees that penalties can serve as a powerful deterrent. PP Tr. at 2267:16-2267:17.

1234.   He also agrees that if penalties are "below the optimal level, enterprises engaged in risky activities are encouraged to take less-than-optimal precautions, and accidents will over under-deterred." TREX-280010R.007.

1235.   If a penalty is set too low, companies may engage too much in risk-producing activities. *See* TREX-280034.065 (in analyzing problems associated with deterrence where violator is judgment-proof, noting "If injurers can avoid having to pay for some of the harm they cause because their assets are limited, they will have a reduced incentive both to take precautions and moderate their participation in risky activities.").

1236.   Dr. Sunding acknowledges that from an economic standpoint, deterrence is not just aimed at the particular defendant, but also to deter others that might do the same thing. PP Tr. at 2317:21-2317:25. His analysis, however, does not address whether his approach might result in underdeterrence.

### vi.   Dr. Sunding's Absolute Deterrence Argument Ignores the Clean Water Act Penalty Factors

1237.   In addition to optimal deterrence, Dr. Sunding argues that the theory of "absolute" deterrence also supports his argument. "Absolute deterrence" is when "all types of a certain violation are deterred no matter the cost of deterrence." PP Tr. at 2278:01-2778:04.

1238.   Dr. Sunding argues that the goal of absolute deterrence also is not served by assigning a penalty to Anadarko in this case. According to Dr. Sunding, in order to achieve

absolute deterrence, penalties should be set to eliminate the prospect of gain on the part of the violator. TREX-280010R.009; PP Tr. at 2279:15-2279:20.

1239.   Dr. Sunding then asserts that "[i]n cases where the external damages exceed the violator's economic benefit, absolute deterrence is achieved *solely* by making the violator pay for those damages, so no additional penalty is warranted." TREX-280010R.009 (emphasis added).

1240.   Under Dr. Sunding's theory, then, where a serious blowout causes significant damage that outweighs the economic benefit of the violation, there would be no justification for a penalty. PP Tr. at 2319:11-2319:15. Dr. Sunding, therefore, would have the Court use economic benefit as the *sole* penalty factor – ignoring the other seven factors specified by Congress.

1241.   Dr. Sunding leaves open the possibility that if a company is culpable, there may be a reason to assess a penalty even where there is no economic benefit and damages have been paid. PP Tr. at 2319:11-2319:18. But literature he cites in support of his opinions on absolute deterrence – principally a 1985 article by Richard Posner – is concerned with cases involving intentional crimes of murder, rape and theft. TREX-280010R.009 n.16. Application of the theories of those authors therefore would show that no penalty is appropriate even where the violator is highly culpable. Thus, Dr. Sunding fails to support his distinction that a different result may be warranted where a violator is not culpable.

1242.   Dr. Sunding relies on a report from the EPA's Science Advisory Board as support for his opinions on optimal and absolute deterrence. PP Tr. at 2253:01-2253:13; D-38074. The Board was charged with evaluating a narrow category of economic benefit – illegal competitive advantage – but went beyond the scope of work requested by EPA and its report was not

333

approved or endorsed by EPA. PP Tr. at 2312:06-2312:15; TREX-280052.004; PP Tr. at 2311:15-2312:15.

### vii.    Dr. Sunding's Opinions on Efficient Deterrence are Unfounded

1243.   Dr. Sunding's opinion that extending penalties to non-operators is inefficient and can have adverse effects on safety is broadly drawn from the economics literature on moral hazard. TREX-280010R.010-.011; PP Tr. at 2283:08-2283:20.

1244.   Notably, Dr. Sunding is opining regarding the effect of a penalty on a relationship that he knows little about:

a.     He has no work experience in the oil and gas industry. PP Tr. at 2301:25-2302:09.

b.     He has no personal experience of how operators and non-operators relate on a daily basis. PP Tr. at 2301:25-2302:09.

c.     Prior to his work on this case, he had never reviewed a contract between an oil and gas operator and non-operator. PP Tr. at 2302:18-2302:20.

d.     He has done no work for an operator in the oil and gas industry to assist it in evaluating any sort of investment decision. PP Tr. at 2302:21-2302:24.

e.     No aspect of Dr. Sunding's work prior to this case specifically focused on Gulf of Mexico deepwater operators. PP Tr. at 2302:14-2302:17.

f.     He performed no analysis to determine whether non-operators like Anadarko would have had access to any information about risky behaviors engaged in by the operator and therefore whether his moral hazard theory applies. PP Tr. at 2316:15-2316:21, 2316:22-2317:01.

334

1245.   Despite this lack of foundation, Dr. Sunding assumes the non-operator has a significant lack of information and exaggerates the asymmetry of information between the operator and non-operator. He fails to take into account the extensive information that the non-operator does have, through the requirements of the joint operating agreement, through the non-operator's participation on project teams, and through communications with the operator, as well as other means. Non-operators have access to information – and use it – due to the "drivers" for active participation discussed above. TREX-231646R.008; PP Tr. at 2316:10-2316:21; *see also supra* §§ VIII.D.iv., xi. Under rights afforded under the joint operating agreement and by virtue of the often collaborative relationship between partners, non-operators also are able to influence deepwater activities. *See supra* § VIII.D.

1246.   Dr. Sunding assumes that the relationship between an operator and a non-operator is that of principal to agent and relies on economic literature related to that type of relationship. PP Tr. at 2280:10-2280:22; TREX-013318.038. Dr. Sunding also inappropriately relies on literature discussing the relationship between an operator and conventional lenders that use fixed terms – like a bank. TREX-280010R.011; TREX-280033. These comparisons are inappropriate, given the non-operator's ability to observe key actions of the operator. Rather, the better analogy from an economist's perspective would be a joint venture, where each party brings particular talents and assets to the relationship, and where each party has a role to play in the operation. TREX-013318.038; TREX-0231646R.008-.009.

1247.   Dr. Sunding further relies on literature that is simply irrelevant. As support for his argument that it is more efficient to penalize the operator, Dr. Sunding also relies on an article that discusses designing a different kind of insurance scheme to handle large oil spills in the

event that the liable party cannot pay the full damages. *See* TREX-280042; PP Tr. at 2281:25-2282:12; TREX-280042.049. This article does not address Clean Water Act penalties. TREX-280042.039 (in the only reference to penalties, suggesting that DOI regulatory fines create "only modest financial incentives" for deterrence).

### F.   Anadarko's Miscellaneous "Other Factors" Seek Credit for Things that Are Legally Required or Done for Its Own Business Reasons

1248.   Anadarko further contends its membership in three oil response organizations − Marine Well Containment Company, Clean Gulf Associates, and Marine Spill Response Corporation − entitle it to a lesser penalty. Anadarko's arrangements with these organizations enable the company to operate in the Gulf by assisting it to meet regulatory spill response and containment obligations. PP Tr. at 2190:02-2190:09; *see also* PP Tr. at 2192:06-2192:09, 2174:20-2175:01; 30 CFR §§ 254.24, .41-.45.

1249.   If Anadarko did not belong to these three or similar cooperative organizations, it would have to purchase its own response and containment equipment for a significantly higher amount than it currently pays in membership dues. PP Tr. at 2190:19-2191:04, 2175:12-2176:11.

1250.   Anadarko contends that it should be assessed a lower penalty because of other special projects related to its regulatory obligations. For example, Mr. Hollek discussed the abandonment of a production spar that was turned into an artificial reef. PP Tr. at 2179:06-2179:24. Anadarko, however, is subject, like any other operator, to abandoning and decommissioning regulations in the Gulf of Mexico. PP Tr. at 2192:10-2192:17.

1251.   Mr. Hollek also highlighted Anadarko's participation in an oil spill response drill scheduled for 2017. PP Tr. at 2179:25-2180:19. Even if Anadarko is not required to take part in

the drill, it does have regulatory obligations to demonstrate it can respond to oil spills, and Mr. Hollek described the drill as a "test" of operators such as Anadarko. PP Tr. at 2180:12-2180:15.

1252.   Anadarko also argues that its contributions to joint industry studies entitle it to a lesser penalty. Mr. Hollek explained that these studies are part of Anadarko's "regular course of business." PP Tr. at 2173:14-2174:11. For example, Anadarko contributes to universities to assist it with better interpretations of its seismic data and rock properties. PP Tr. at 2173:23-2174:11. These studies further Anadarko's mission as an oil and gas company and, therefore, merit no special consideration in the penalty analysis.

1253.   Anadarko further pointed to the lack of enforcement by the Department of the Interior against non-operators in the past. What Anadarko's argument omits, however, is that the JOA provides for non-operators to share in the costs of correcting correct HSE issues or to attaining compliance. TREX 280000.170 (Ex. C, Accounting Procedures, Subpart 13 "Ecological, Environmental, and Safety").

Respectfully submitted,

BENJAMIN C. MIZER                                JOHN C. CRUDEN
Acting Deputy Assistant Attorney General         Assistant Attorney General
Civil Division                                   Environment & Natural Resources Division
PETER FROST                                      SARAH HIMMELHOCH
Director, Torts Branch, Civil Division           MICHAEL MCNULTY
Admiralty and Aviation                           PATRICK CASEY
SHARON SHUTLER                                   RICHARD GLADSTEIN
MALINDA LAWRENCE                                 Senior Counsel
LAURA MAYBERRY                                   NANCY FLICKINGER
Trial Attorneys                                  Senior Attorney
R. MICHAEL UNDERHILL, T.A                        ABIGAIL ANDRE
Attorney in Charge, West Coast Office            A. NATHANIEL CHAKERES
                                                 RACHEL HANKEY
                                                 JUDY HARVEY
                                                 RACHEL KING
                                                 ERICA PENCAK

337

BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Sarah D. Himmelhoch
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
E-mail: steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis-Nexis File & Serve in accordance with Pretrial Order #12, and the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27 day of March, 2015.

                        /s/ Sarah D. Himmelhoch

HIGHLY CONFIDENTIAL PURSUANT TO PTO 13

**APPENDIX A: FINDINGS OF FACT CONTAINING HIGHLY CONFIDENTIAL INFORMATION (FILED UNDER SEAL)**



## APPENDIX B: GLOSSARY OF TERMS AND ABBREVIATIONS

| Term | Definition or Explanation |
|------|---------------------------|
| 20-F | Annual Report and Form 20-F |
| ACGIH | American Conference of Governmental Industrial Hygienists |
| ADS | American Depository Shares |
| AFE | Approval for Expenditure |
| AMOP | Arctic and Marine Oil Spill Program |
| APC | Anadarko Petroleum Corporation |
| ART | Alternative Response Technology |
| ARTES | Alternative Response Tool Evaluation System |
| ASA | Applied Science Associates |
| AVIRIS | Airborne Visible Infrared Imaging Spectrometer |
| BAA | Broad Agency Announcement |
| BEL | Business Economic Loss |
| BMPs | Best Management Practices |
| BOE | Barrels of Oil Equivalent |
| BOEM | Bureau of Ocean Energy Management |
| BOEMRE | Bureau of Ocean Energy Management, Regulation and Enforcement |
| BOP | Blowout Preventer |
| BPA | BP America, Inc. |
| BPAPC | BP America Production Company |
| BPCNA | BP Company North America, Inc. |
| BPI | BP International Limited |
| BPPNA | BP Products North America Inc. |
| BPXA | BP Exploration Alaska |
| BPXP | BP Exploration and Production, Inc. |
| BSEE | Bureau of Safety and Environmental Enforcement |
| BTEX | Benzene, Toluene, Ethyl benzene, and Xylene |
| CAGR | Compound Annual Growth Rate |
| CAPEX | Capital Expenditure |
| CDC | Centers for Disease Control and Prevention |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| CEWAF | Chemically Enhanced Water Accommodated Fraction of oil |
| CGA | Clean Gulf Associates |
| CPUE | Catch Per Unit Effort |
| CSA | Coastal Study Area |
| CSB | US Chemical Safety and Hazard Investigation Board |
| CTPV | Coal Tar Pitch Volatiles |
| CWA | The Federal Water Pollution Control Act, known popularly as the Clean Water Act |
| CWVA | Coastal Wetlands Vegetation Assessment |
| CYP1A | Cytochrome P450, family 1, subfamily A |
| CYP3A | Cytochrome P450, family 3, subfamily A |
| DRILLING AND COMPLETIONS | Drilling and Completions |
| dba d/b/a | Does Business As or Doing Business As |

| Term | Definition or Explanation |
|------|---------------------------|
| DCF | Discounted Cash Flow |
| DD&A | Depreciation, Depletion, and Amortization |
| DHOST | *Deepwater Horizon* Oil Spill Trust |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DOI | United States Department of the Interior |
| DOR | Dispersant to Oil Ratio |
| DOSS | Dioctylsulfosuccinate |
| DPnB | Dipropylene Glycol n-butyl Ether |
| DWH | Deepwater Horizon |
| DWRRA | Deepwater Royalty Relief Act |
| E&P | Exploration and Production |
| EBIT | Earnings Before Interest and Tax |
| EBITDA | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| EBITDAX | Earnings Before Interest, Taxes, Depreciation, Amortization, and Exploration Costs |
| EC50 | Effective Concentration where fifty percent of Maximal Effect is Observed |
| ECR | Engine Control Room |
| EDIP | Eurobond Debt Issuance Program |
| EPA | United States Environmental Protection Agency |
| ERMA | Environmental Response Management Application |
| FAS | Financial Advisory Services |
| FASB | Federal Accounting Standards Board |
| FDA | United States Food and Drug Administration |
| FFO | Funds from Operations |
| FMV | Fair Market Value |
| FOB | Forward Operating Base |
| FOI | Financial and Operating Information |
| FOSC | Federal On-Scene Coordinator |
| FOSC Report | Federal On-Scene Coordinator Report |
| FOSC-R | Federal On-Scene Coordinator Representative |
| FRTG | Flow Rate Technical Group |
| FWS | United States Fish and Wildlife Service |
| GAAP | Generally Accepted Accounting Principles |
| GCCF | Gulf Coast Claims Facility |
| GC-IMT | Gulf Coast Incident Management Team |
| GCMS | Gas Chromatography Mass Spectrometer |
| GCRO | Gulf Coast Restoration Organization |
| GEM | Global Economic Model |
| GOM | Gulf of Mexico |
| GOMEX | Gulf of Mexico Exercise |
| GOMRI | Gulf of Mexico Research Initiative |
| GPA | Government and Public Affairs Function of the BP Group |
| GRHOP | Gulf Region Health Outreach Program |
| HEWAF | High Energy Water Accommodated Fraction |
| HEWAF | High-Energy Water Accommodated Fraction of oil |
| HHE | Health Hazard Evaluation |

342

| Term | Definition or Explanation |
|---|---|
| HHI | Herfindahl-Hirschman Index |
| HHS | United States Department of Health and Human Services |
| HSE | Health, Safety and the Environment |
| HSPD | Homeland Security Presidential Directive |
| IAP | Incident Action Plan |
| IATAP | Interagency Alternative Technology Assessment Program |
| ICCOPR | Interagency Coordinating Committee on Oil Pollution Research |
| ICP | Incident Command Post |
| ICS | Incident Command System |
| ICS | Incident Command System |
| IFA | Internal Financing Account |
| IFRS | International Financial Reporting Standards |
| INC | Incident of Non-compliance |
| IOM | Institute of Medicine |
| IPT | Integrated Project Team |
| ISB | In Situ Burning |
| ISOM | Isomerization Unit |
| ISPR | BP *Deepwater Horizon* Incident-Specific Preparedness Review |
| ISPR | Incident Specific Preparedness Review |
| ITOPF | International Tanker Owners Pollution Federation Limited |
| JAG | Joint Analysis Group |
| JIC | Joint Information Center |
| JIP | Joint Industry Project |
| JOA | Joint Operating Agreement |
| Kow | octanol/water coefficient |
| L/C | Letter of Credit |
| LAASR | Louisiana Augering and Sequential Recovery |
| LC20 | Lethal Dose at which 20% of Test Animals Die |
| LC50 | Lethal Dose at which fifty percent of Test Animals Die |
| LDEQ | Louisiana Department of Environmental Quality |
| LDWF | Louisiana Department of Wildlife and Fisheries |
| LEWAF | Low Energy Water Accommodated Fraction |
| LIBOR | London Interbank Offered Rate |
| LISST | Laser In Situ Scattering and Transmissometry |
| MC252 | Mississippi Canyon, Block 252 |
| MMS | Minerals Management Service |
| MNS | Mackay-Nadeau-Steelman Laboratory Test |
| Model OA | AAPL Model Form of Offshore Deepwater Operating Agreement |
| MOEX | MOEX Offshore 2007 LLC |
| MSDS | Material Safety Data Sheet |
| MSRC | Marine Spill Response Corporation |
| MWCC | Marine Well Containment Company |
| NAFCO | North America Funding Company |
| NCP | National Oil and Hazardous Substance Pollution Contingency Plan |
| NGL | Natural Gas Liquids |
| NGO | Non-Governmental Organization |

| Term | Definition or Explanation |
|------|---------------------------|
| NIC | National Incident Command |
| NIC | National Incident Commander |
| NIEHS | National Institute of Environmental Health Sciences |
| NIIMS | National Interagency Incident Management System |
| NIMS | National Incident Management System |
| NIOSH | National Institute for Occupational Safety and Health |
| NIST | National Institute of Standards and Technology |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NOAA | National Oceanic and Atmospheric Administration |
| NOAA/ERD | NOAA's Emergency Response Division |
| NOP | Non-operating Party |
| NO-WIO | Non-operating Working Interest Owner |
| NOx | Nitrogen Oxides |
| NPV | Net Present Value |
| NRC | National Research Council |
| NRC | National Response Center |
| NRD | Natural Resource Damages |
| NRDA | Natural Resource Damage Assessment |
| NRT | National Response Team |
| NWS | National Weather Service |
| OCS | Outer Continental Shelf |
| OEL | Occupational Exposure Limit/Level |
| OPA | Oil Pollution Act of 1990 |
| OPEX | Operating Expense |
| ORR | Oil Recovery Rate |
| OSAT | Operational Science Advisory Team |
| OSC | On-Scene Coordinator |
| OSHA | Occupational Safety and Health Administration |
| OSRD | Oil Spill Response Division |
| OSRO | Oil Spill Response Organization |
| PAH | Polycyclic Aromatic Hydrocarbons |
| PBZ | Personal Breathing Zone |
| PEL | Permissible Exposure Limit |
| PINC | Potential Incident of Non-Compliance |
| PM | Particulate Matter |
| PM2.5 | Particulate Matter less than 2.5 Micrometers in Diameter |
| PP&E | Property, Plant and Equipment |
| PPE | Personal Protective Equipment |
| PRSS | Post Response Shoreline Survey |
| PTSD | Post-Traumatic Stress Disorder |
| QAP | Quality Assurance Plan |
| RAT | Rapid Assessment Team |
| RCOP | Replacement Cost Operating Profit |
| RDC | Research and Development Center |
| RE | Recovery Efficiency |

| Term | Definition or Explanation |
|---|---|
| REL | Recommended Exposure Limit |
| RevPAR | Revenue per available room |
| ROV | Remotely Operated Vehicle |
| RP | Responsible Party, under the Oil Pollution Act of 1990 |
| RRT | Regional Response Team |
| S&P | Standard and Poor's |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SAR | Synthetic Aperture Radar |
| SCAT | Shoreline Cleanup Assessment Technique |
| SCCP | Shoreline Clean-up Completion Plan |
| SEAMAP | Southeast Area Monitoring and Assessment Program |
| SEC | Securities and Exchange Commission |
| SEDAR | Southeast Data, Assessment, and Review |
| SEMS | Safety and Environmental Management Systems |
| SFN | Corporate Structure and Financing Note |
| SIC Code | Standard Industrial Classification Code |
| SMART | Special Monitoring of Applied Response Technologies |
| SMOG | Standard Measure of Oil and Gas |
| SOA | Secondary Organic Aerosols |
| SONS | Spill of National Significance |
| SOSC | State On-Scene coordinator |
| SPE | Society of Petroleum Engineers |
| SPU | Strategic Performance Unit |
| SSC | Scientific Support Coordinator |
| TE | Throughput Efficiency |
| TLV | Threshold Limit Value |
| TPAH | Total Polycyclic Aromatic Hydrocarbons |
| TU | Toxic Units |
| TWG | Technical Working Group |
| UAC | Unified Area Command |
| UC | Unified Command |
| UK HSE | United Kingdom Health and Safety Executive |
| UME | Unusual Mortality Event |
| USCG | United States Coast Guard |
| USG PA | United States Gallon per Acre |
| USGS | United States Geological Survey |
| VOCs | Volatile Organic Compounds |
| VOO | Vessels of Opportunity |
| VPP | Variable Pay Program |
| WAF | Water-Accommodated Fraction of oil |
| WHOI | Woods Hole Oceanographic Institute |
| WTI | West Texas Intermediate benchmark oil price |

**APPENDIX C: BIOGRAPHICAL INFORMATION AND QUALIFICATIONS OF THE LIVE AND DEPOSITION WITNESSES**

**1.      Admiral Thad Allen, Fact Witness, By Deposition, Called by the United States**



Admiral Thad Allen (ret'd) was the National Incident Commander for the response to the Defendants' violations beginning on May 1, 2010. Allen Dep. at 178:07-178:23. Prior to serving as the National Incident Commander, Admiral Allen had been Commandant of the Coast Guard. Allen Dep. at 178:07-178:23. The Admiral was designated as a Rule

Figure 60: Thad Allen

30(b)(6) witness for the United States on several topics, including:

Topic 29: Your knowledge of and involvement with the selection, testing, monitoring, approval, and use of subsea or surface dispersants at or in the area immediately above the MC252 Well as those matters affected or relate to Source Control Efforts and any effort to quantify the flow of hydrocarbons from the MC 252 Well.

Topic 97: The EPA's role and participation in the process of considering or determining the amount or type of dispersants to be applied in connection with the release of hydrocarbons from the MC252 Well, and the methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the EPA in connection with that role.

TREX-008803.005, .011.

**2.      Kenneth E. Arnold, Expert Witness, Called by APC**



Mr. Kenneth Arnold is a registered professional engineer who has worked in the oil and gas industry for more than fifty years. His past employers include Shell Oil Company and Paragon Engineering Services. He has served as an advisor on various panels examining offshore safety regulations. He has also taught facilities engineering and is a member of the

Figure 61: Kenneth Arnold

National Academy of Engineering. TREX-280011.003. Mr. Arnold was retained by APC "to provide . . . opinions on what impact imposing responsibility or duties on Non-Operating

346

Working Interest Owners . . . would have on the safety of offshore oil and gas operations."

TREX-280011.004.

### 3. Dr. Diane Austin, Expert Witness, Called by the United States



Diane Austin is an applied anthropologist, research professor, and director of the University of Arizona's School of Anthropology where she teaches applied anthropology, quantitative and qualitative research methods, and data management and analysis at both the graduate and undergraduate

Figure 62: Diane Austin

level. PP Tr. at 149:01-149:15; D-33300; TREX-013112.054-.075. She holds

a Bachelor's of Science in Environmental Science and Biology, a Master's of Science in

Environmental Engineering and an interdisciplinary Ph.D. that incorporates sociocultural

anthropology, environmental policy, environmental psychology, and environmental sociology.

PP Tr. at 148:17-148:25. She has twenty years of experience in applied anthropology including

eighteen years spent conducting multi-year anthropological studies related to the Gulf of

Mexico's oil and gas industry. PP Tr. at 153:22-155:18; D-33300; TREX-013112.054-.075. Dr.

Austin was asked to evaluate the sociocultural effects of the Deepwater Horizon disaster on Gulf

Coast communities. PP Tr. at 184:04-184:06.

### 4. Rear Admiral Meredith Lee Austin, Live Witness, Called by the United States



Rear Admiral Meredith Lee Austin served as Deputy Incident Commander and Incident Commander at the Houma Incident Command Post. PP Tr. at 75:16-75:25. The Houma ICP was responsible for addressing the oil once it hit the surface in the deep water and for the

Figure 63: Meredith Austin

shoreline of Louisiana, including the aerial dispersant applications. PP Tr.

at 104:20-104:25, 105:03-105:05. As Deputy Incident Commander her responsibilities included

planning and allocation of resources, as well as decisions that had to be made while the Incident

Commander was in the field. PP Tr. at 76:01-76:13. She has been with the Coast Guard for

twenty-nine years, primarily focused on marine safety. PP Tr. at 72:22-73:24. Prior to her

involvement in the response to the Defendants' disaster, Admiral Austin had participated in more

than one hundred oil spill response actions, including the response to the oil spills resulting from

Hurricane Katrina. PP Tr. at 74:11-74:22, 94:15-94:20. She served as the Commander of the

Pacific and National Strike Forces that are special teams set up to help FOSCs as surge forces

and oil and hazardous material response. PP Tr. at 73:06-73:14. She holds a bachelor's degree in

Marine Science as well as graduate degrees in public health, industrial hygiene, and national

security and certifications as an Incident Commander, Emergency Manager, and Industrial

Hygienist. PP Tr. at 73:15-73:24.

**5.      Nicholas Bamfield, Fact Witness, By Deposition, Called by the United States**



                    Mr. Bamfield is a chartered accountant, the Deputy Group

Treasurer in BP Treasury, and joined BP in 1988. He is employed by BP

p.l.c. Bamfield Dep. at 20:08-21:13, 29:10-29:12, 72:16-72:18. Mr.

Bamfield provides assistance to Mr. Bucknall with respect to the

management of aspects of the BP Group finances, intercompany capital

flows and access to external capital including in connection with certain

Figure 64: Nicholas Bamfield

liabilities associated with the Deepwater Horizon incident. Bamfield Dep. at 31:20-32:08. He

was identified by BP in its Rule 26(a) disclosure as a witness who "may have information

concerning the economic impact of a Clean Water Act penalty on BPXP." Bamfield Dep. at

28:21-29:05. Mr. Bamfield's knowledge of the direct financial impacts on BPXP is limited, as

that is not within his job responsibilities; he may have information and knowledge on any

348

impacts on the broader BP Group. Bamfield Dep. at 18:18-18:21, 21:6-21:13, 29:23-30:03, 30:05-30:07, 72:13-72:18.

### 6.    Mace Barron, Fact Witness, By Deposition, Called by the United States



Figure 65: Mace Barron

Dr. Mace Barron is a staff scientist with EPA and served as the United States' 30(b)(6) representative regarding "non-NRDA toxicology" with respect to Topic 3:

> Topic No.3: Your knowledge of and role in dispersant operations during the Response, including the selection, approval, use, limitations on use, safety, effectiveness, and effects of dispersants and dispersant constituents, including Corexit 9500 and/or Corexit 9527, and BPXP's role and involvement in those dispersant operations.

Barron Dep. at 12:05-12:21, 18:03-18:13; TREX-012112.006-.007. Dr. Barron is a toxicologist and provided advice to EPA during the Deepwater Horizon oil spill regarding potential toxicological effects relating to the use of dispersants and dispersed oil, including assisting with toxicity monitoring and the testing dispersants and dispersed oil. Barron Dep. at 24:17-25:25, 28:02-28:24, 32:03-32:10, 272:04-275:08.

### 7.    Michael Beirne, Fact Witness, By Deposition, Called by BP



Figure 66: Michael Beirne

An offshore land negotiator for BP, Michael Beirne served as a liaison between BP and its partner, APC. Beirne also assisted in negotiating the parties' agreements for the Macondo Well. Beirne Dep. at 15:18-15:25, 196:15-196:19.

### 8.   Robert Bodek, Fact Witness, By Deposition, Called by BP



Robert Bodek was a BP Operational Geologist who coordinated with Anadarko on the drilling of the Macondo Well. Bodek Dep. at 358:15-358:19, 364:05-365:07, 372:07-373:18, 375:08-375:25.

Figure 67: Robert Bodek

### 9.   Donald Boesch, Expert Witness, Called by the United States



Dr. Donald Boesch, a Gulf Coast native, is an ecosystems specialist with a bachelor's degree in biology from Tulane University and a Ph.D. in marine science from the College of William and Mary. PP Tr. at 338:08-338:13, 339:13-339:20; TREX-013183.004, .047; D-32150. In addition, he held a Fulbright postdoctoral fellowship at the University of Queensland in

Figure 68: Donald Boesch

Australia. PP Tr. at 338:08-338:13. He currently serves as the President and a Professor at the University of Maryland's Center for Environmental Science where he supervises the work of 8700 faculty members who are engaged in studies such as physical oceanography, chemistry, microbiology, fishery science, and environmental economics. PP Tr. at 338:13-338:20. He served as a consultant to the Federal-State Trustee Council performing the Natural Resources Damage Assessment following the Exxon Valdez Spill. PP Tr. at 338:21-338:23. He has served on thirteen panel studies for the National Academy of Science on a variety of topics, including serving a three-year term as the chair of the Ocean Studies Board. PP Tr. at 338:24-339:04. He was also appointed by the President of the United States as one of the seven members of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling and is serving on the Advisory Board for the National Academy of Science Gulf Research Program. PP Tr. at 339:05-339:12. He has published over seventy papers relating to ecosystems analysis.

350

PP Tr. at 339:21-339:24. Dr. Boesch was asked to assess which components of the ecosystems of the Gulf of Mexico suffered harm. PP Tr. at 337:21-337:23.

**10.     Dr. George Bonanno, Expert Witness, By Deposition, Called by the United States**



Figure 69: George Bonanno

George Bonanno, Ph.D. "is Professor of Clinical Psychology in the Department of Counseling and Clinical Psychology at Columbia University in New York City." TREX-013370.001. He authored several papers on the psychological effects of disasters and other potentially traumatic events on exposed individuals, including *Resilience and Variability Following Oil Spill Disasters* (TREX-013370), *Weighing the Costs of Disaster: Consequences, Risks and Resilience in Individuals, Families, and Communities* (TREX-013365), and *Trauma and Bereavement: Examining the Impact of Sudden and Violent Deaths* (TREX-013367).

**11.     Steven Bray, Fact Witness, By Deposition, Called by the United States**



Figure 70: Steven Bray

From 2009 to 2011, Mr. Bray served as vice president, senior attorney (U.S. securities and governance) and corporate secretary for BP America Inc. Bray Dep. at 27:13-27:24. He was employed by BP Corporation North America, Inc. Bray Dep. at 27:25-28:03; TREX-012815.001. During this period he managed the corporate governance activities of over 600 U.S. and international BP subsidiaries. Bray Dep. at 31:08-32:04. In early 2012, Mr. Bray moved to London and became head of the BP Group secretariat, special counsel and secretary to the BP p.l.c. board of director's Gulf of Mexico committee. His employing entity continues to be BP Corporation North America. Bray Dep. at 33:07-35:05.

**12.    Douglas Brown, By Deposition, Called by the United States**



Figure 71: Douglas Brown

Douglas Brown was chief mechanic and acting second engineer of the Deepwater Horizon, and was on board at the time of the explosion and fire on April 20, 2010. Brown Dep. at 24:13-24:17; 49:24-50:02. As of the date of his deposition, May 3, 2011, he had been unable to work since the explosion, due to his injuries. Brown Dep. at 127:04-127:22.

**13.    David Bucknall, By Deposition, Called by the United States**



Figure 72: David Bucknall

Mr. Bucknall is the BP Group Treasurer. He obtained a Master's degree at Oxford University. He worked for the Coopers and Lybrand accounting firm for a number of years, and then developed and sold his own company. In 2006 Mr. Bucknall joined BP as head of risk management for its integrated supply and trading function. In 2010, he became the executive assistant to Mr. Byron Grote, then CFO of the BP Group. In January, 2012, at the same time as Mr. Brian Gilvary became CFO, Mr. Bucknall became the Group Treasurer which was his position at the time of his deposition. Functions within Group Treasury include global cash management, corporate finance and risk, debt capital markets, pension, structured finance, and insurance as required for compliance. Bucknall Dep. at 14:17-26:10, 27:02-29:06. He is an employee of BP plc. Bucknall Dep. at 36:17-36:21. Mr. Bucknall testified as BP's Rule 30(b)(6) witness on the following topics:

5. The financial performance, historical trends and future projections for BP, including without limitation facts, analyses, policies and practices regarding the following:

a. The data, metrics and other information bearing on the financial performance and status of BP as publicly reported in its Annual 20-F filings with the United States, SEC and/or the United Kingdom.

b. Any of BP's contingent liabilities that, alone or combined, could have a significant impact on BP's financial performance or status, and for each such liability, the nature of the liability, the probability of its occurrence and the potential magnitude and timing of its financial impact.

c. Any unused or available credit lines or debt capacity available to BP, including likely terms.

d. The basis for BP's forward-looking projections for 2014 and into the future.

e. The contribution of exploration, production and related operations both as a global segment and in the Gulf of Mexico to BP's profitability.

f. Plans, proposals, or suggestions under development or consideration by BP, whether preliminary or otherwise, to sell further assets.

TREX-011966.006-.007; Bucknall Dep. at 15:23-15:25.

**14.    Lieutenant Commander Drew Casey, Fact Witness, By Deposition, Called by the United States**



Figure 73: Drew Casey

LCDR Casey was the Recorder for the ISPR. His primary responsibilities were leading the support staff and making sure the team had all the resources they needed to conduct their work. Casey Dep. at 28:08-30:11. Besides his work on the ISPR, he was not involved in the Deepwater Horizon response in any way. Casey Dep. at 18:08-18:12, 28:08-30:11, 53:11-54:12.

**15.    Dr. Richard Clapp,   Expert Witness, Called by the United States**



Figure 74: Richard Clapp

Dr. Richard Clapp is an epidemiologist specializing in the study of cancer and other diseases caused by toxic chemicals and other environmental agents. PP Tr. at 240:22-241:06; TREX-013346.003-.005, .018-.027; D-33600. He holds a bachelor's degree in biology from Dartmouth, a master's in public health from Harvard, and a doctorate in epidemiology from Boston University. PP Tr. at 241:13-241:17; TREX-013346.003-.005, .018-

353

.027; D-33600. Serving now as a Professor Emeritus at Boston University's School of Public Health, he has taught epidemiology and environmental health for more than fifteen years. He has also taught at other Massachusetts universities, including Harvard School of Public Health, Massachusetts Institute of Technology, Tufts University, and the University of Massachusetts; currently serving as an Adjunct Professor at the University of Massachusetts in Lowell. His lectures at these other universities addressed scientific and epidemiologic data regarding the carcinogenicity of chemical substances, including airborne toxic substances. PP Tr. at 242:19-243:06; TREX-013346.003-.005, .018-.027; D-33600. Dr. Clapp has also spent fifteen years managing and directing local and state public health programs. As Director of the Massachusetts Cancer Registry from 1980-1989, he was responsible for establishing a statewide cancer incidence reporting system in order to track the patterns of cancer in communities and among working populations. As part of this work, he examined data on malignancies in Massachusetts communities and conducted surveillance studies of workers and military veterans. He also worked as a consultant providing technical assistance to numerous citizens groups and governmental agencies regarding the health effects of toxic exposures. PP Tr. at 243:07-244:07; TREX-013346.003-.005, .018-.027; D-33600. Dr. Clapp has more than seventy peer-reviewed publications in the areas of epidemiology and public health. He is also a member of several professional societies, including the Society for Epidemiologic Research, the International Society for Environmental Epidemiology, and the American Public Health Association, and has served as a peer reviewer for several scientific journals, including the New England Journal of Medicine. PP Tr. at 244:08-247:02; TREX-013346.003-.005, .018-.027; D-33600. Dr. Clapp was asked evaluate the evidence of health impacts of the *Deepwater Horizon* explosion, spill, and cleanup. PP Tr. at 240:18-240:21; TREX-013346.003-.005.

16.     **Dr. Robyn Conmy, Fact Witness, By Deposition, Called by the United States**



Figure 75: Robyn Conmy

Dr. Robyn Conmy is a chemical oceanographer by training who works as a research ecologist for EPA's Office of Research and Development, overseeing oil spill research at the National Risk Management Research Laboratory. Conmy Dep. at 7:24-9:04, 9:20-10:25. She holds a bachelor, master and doctoral degree in marine science. Conmy Dep. at 7:24-8:16. Dr. Conmy was involved in the Deepwater Horizon response as a participant on the first oceanographic cruise designed to collect data relating to whether subsea dispersants were working, and whether they were creating a subsurface plume in the deep ocean. Conmy Dep. at 24:04-25:09, 243:19-244:17. Dr. Conmy was also involved in the interpretation of oceanographic data as part of the Joint Analysis Group, or JAG, a group of scientists from government agencies and BP that was brought together to interpret the nature and extent of the subsea plume of oil. Conmy Dep. at 26:08-26:23, 101:08-101:24. Dr. Conmy was designated by the United States as a Rule 30(b)(6) witness on the following topics:

> Your knowledge of data as of December 31,2013 regarding the nature and extent of any environmental impacts from the *Deepwater Horizon* Spill, including any environmental resources as to which You contend there has been no or limited recovery (as revised by *5/30114* Court Order, Rec. Doc. 12953) . . . Subsurface dispersant monitoring, JAG Reports
>
> * * *
>
> [A]ny decisions or actions (or inactions) by the Unified Command, BPXP, or other agency or entity that limited, impeded, delayed, or reduced the effectiveness of efforts to respond to, or otherwise mitigate, minimize, or prevent any environmental, economic, or other effects of, the *Deepwater Horizon* Spill . . . Subsurface dispersant monitoring, JAG Reports . . . .
>
> * * *
>
> [A]ny contention that BPXP or any other entity did not effectively respond to, or otherwise mitigate, minimize, or prevent any actual or potential environmental,

355

economic, or other effects of the Spill, and the bases for any such contention . . .
Subsurface dispersant monitoring, JAG Reports . . . .

\* \* \*

Your knowledge of and role in dispersant operations during the Response,
including the selection, approval, use, limitations on use, safety, effectiveness,
and effects of dispersants and dispersant constituents, including Corexit 9500
and/or Corexit 9527, and BPXP's role and involvement in those dispersant
operations. . . . Subsurface dispersant monitoring, JAG Reports . . . .

TREX-012112.006-.007; Conmy Dep. at 16:23-17:19.

**17.    Dr. Robert Cox, Expert Witness, Called by BP**



Figure 76: Robert Cox

Dr. Cox is an emergency room physician with board certifications in emergency medicine and toxicology. He also holds a Ph.D. in chemistry. PP Tr. at 1430:23-1431:17; D-35103; TREX-240110.005-.006. Dr. Cox worked for the State of Mississippi during the Deepwater Horizon response. PP Tr. at 1434:05-1434:18. Dr. Cox serves as a Professor at the University of Mississippi's Medical School, and works for Mississippi Poison Control. PP Tr. at 1431:24-1432:17; D-35103; TREX-240110.005-.006. He was hired by BP to testify in this litigation about the potential human health risks to response workers. TREX-240110.007.

**18.    Iris Cross, Fact Witness, By Deposition, Called by the United States**



Figure 77: Iris Cross

On April 20, 2010, Ms. Cross was employed by BP Corporate North America as a manager of National Programs and Houston Community Affairs. Cross Dep. at 19:20-19:25. In that capacity, she led BP's community outreach efforts across the Gulf States from the time of the incident until August 2010. Cross Dep. at 71:22-72:03, 72:19-73:03. Thereafter and through June 2013, Ms. Cross managed BP's community outreach efforts in

Louisiana. Cross Dep. at 71:22-72:10, 222:14-222:17. Ms. Cross has worked for BP for thirty-one years in the areas of government and public affairs. Cross Dep. at 48:18-48:22, 50:09-50:12.

**19.     Robert Daines, Expert Witness, Called by BP**



Figure 78: Robert Daines

Mr. Daines holds a B.S. degree in economics and a B.A. in American Studies, as well as a law degree from Yale Law School. PP Tr. at 1992:20-1992:24. He is currently a professor of law and business at Stanford University where he teaches corporate governance, corporations, complex transactions, and international business organizations. He is also co-director of Stanford's Rock Center on Corporate Governance. PP Tr. at 1993:24-1994:14. He was hired by BP to testify regarding the normalcy and legality of BP's corporate structure and the effect of considering a parent company's assets when evaluating the impact of a penalty on a violator. PP Tr. at 1991:22-1992:11; TREX-013214.004.

**20.     Bruce Den Uyl, Expert Witness, By Deposition and Report, Called by BP**



Figure 79: Bruce Den Uyl

Mr. Den Uyl is a financial consultant with the professional services firm of AlixPartners LLP. He has spent thirty years providing valuation and financial consulting to various industries. TREX-013153.002. He holds a bachelor's and master's degree in economics. TREX-013153.031. Mr. Den Uyl was retained by BP to "provide expert analysis related to the financial impact of a future Clean Water Act penalty on the violator, BPXP . . . ." TREX-013153.002.

### 21.    Margaret (Cathy) Douglas, Fact Witness, By Deposition, Called by the United States



Figure 80: Cathy Douglas

Ms. Douglas is Anadarko's Chief Accounting Officer. Douglas Dep. at 11:16-11:17. Anadarko designated her to testify for the corporation as to the following topics:

APC will produce Cathy Douglas as its designated witness to testify regarding: (1) the 10-Ks and 10-Qs for the period from 2010 to present that APC produces (Area of Inquiry 2(a)); (2) the charts of contingent liabilities that counsel for the United States and APC have agreed will be produced by APC as a compromise to the United States' Request for Production No. 7 to APC (Area of Inquiry 2(b)); and (3) general information regarding the contribution of APC's global and Gulf of Mexico operations to APC's profitability . . .

\* \* \*

Any expenditure(s) made by any APC entity since 2010 in connection with the Incident, Response or any other mitigation activities that APC contends should diminish its obligation to pay a civil penalty; and the facts concerning each expenditure, including without limitation for each:. . . b. Whether and to what extent the expenditure was expensed or capitalized and, for the latter, the useful life or lives assumed for tax-related purposes. c. Any other tax credits or incentives (*e.g.,* local, State or Federal) APC gained for the expenditure.

\* \* \*

[I]nformation regarding the Tronox settlement in its 10-Q . . .

TREX-012385.005, .007, .009, .010; Douglas Dep. at 15:22-19:01.

### 22.    James Dupree, Fact Witness, By Deposition, Called by BP



Figure 81: James Dupree

At the time of the DWH incident, James Dupree was the BP Gulf of Mexico Strategic Performance Unit Leader with responsibilities for strategy in the Gulf of Mexico and implementing the overall structure of the Operating Management System. Dupree Dep. at 57:06-57:11, 383:06-384:22, 554:14-555:05. During the spill response, Mr. Dupree led the source control effort in Houston. Dupree Dep. at 89:02-89:18. After the spill response, Mr. Dupree

became the Regional President for the Gulf of Mexico with responsibilities for strategy in the Gulf of Mexico. Dupree Dep. at 70:17-71:11, 288:25-289:22, 383:06-384:22.

**23.    Laura Folse, Fact Witness, Called by BP**



Figure 82: Laura Folse

Laura Folse has a master's degree in management and a bachelor's and master's in geology. PP Tr. at 1329:18-1329:24; D-34527. She has worked for BP on and off since 1982. Between 2002 and 2007 she served as Technology Vice President. PP Tr. at 1330:17-1331:22. After a three-year retirement, she returned as a consultant to assist in response actions and in 2011 became an employee of the GCRO. PP Tr. at 1332:08-1333:03. She is currently the executive vice president in charge of response and environmental restoration in the GCRO. PP Tr. at 1328:17-1328:19; D-34527.

**24.    Robert Gwin, Fact Witness, By Deposition, Called by the United States**



Figure 83: Robert Gwin

Mr. Gwin is a Chartered Financial Analyst. He joined Anadarko in 2006 and held a number of titles, including company Treasurer, until becoming Chief Financial Operator in 2009, a position he continues to hold today. Gwin Dep. at 10:20-10:25, 12:19-13:07, 13:10-13:13, 13:15-13:24, 14:01-14:16. He has been part of the APC Executive Committee since 2008. Gwin Dep. at 14:02-14:08. Mr. Gwin was designated to testify for Anadarko on a number of Rule 30(b)(6) topics related to forward looking or strategic, "big picture" financial issues:

359

APC also will produce Robert Gwin as its designated witness to provide general information regarding: (1) APC's unused or presently available cash, new or existing credit facilities or loan arrangements, equity or debt offerings, including general information regarding their terms (Area of Inquiry 2(c)); (2) the projections in the documents that APC will produce to the United States in response to the United States' Request for Production No. 2 and No. 5, including the highly sensitive Ratings Agency Presentations for the years 2009-2014 (Area 2(d)); and (3) plans, if any, by APC to sell assets to third parties in the future that are in excess of $100 million (Area 2( t)).

\* \* \*

APC will produce Robert Gwin as its designated witness to testify as to non-privileged general responsive information, if any, regarding APC's transfers of assets to third parties since April 20, 2010 that are in excess of $100 million, as reflected in the transfer documents that APC has agreed to produce . . .

\* \* \*

The impact of the expenditure on Anadarko's financial condition and operational capability at the time and into the future.

\* \* \*

The economic impact, if any, of the recent settlement filed on April 3, 2014 (Dkt. No. 635) in In re: Tronox, Adv. Proc. No. 09-01198-alg (Bankr. S.D.N.Y.) on APC's on-going business operations and its position regarding whether that settlement in any way impacts APC's ability to finance a civil penalty in this litigation.

\* \* \*

APC will produce Cathy Douglas to testify as its designated representative with respect to information regarding the Tronox settlement in its 10-Q, and will also produce Robert Gwin as its designated representative to testify as to other non-privileged information responsive to this Area of Inquiry, if any.

\* \* \*

APC will also produce Robert Gwin to testify as its designated representative regarding non-privileged responsive information regarding APC's $4 billion settlement with BP with regard to the Incident.

\* \* \*

APC will produce Robert Gwin as its designated representative to testify
regarding the potential impact of a penalty award on APC's future decisions
regarding investment as a non-operating party.

TREX-012385.007, .008, .010, .011, .014; Gwin Dep. at 14:14-14:16, 18:14-18:19, 21:21-22:21,

23:02-24:09.

## 25.    James Hanzalik, Fact Witness, By Deposition, Called by BP



Figure 84: James Hanzalik

Captain Hanzalik was employed by the Coast Guard during the

response and held several positions in the response, including the Unified

Command's Deputy for Pollution Response and Deputy Incident

Commander at Houma. Hanzalik Dep. at 14:25-15:04, 16:19-17:03. Captain

Hanzalik is no longer employed by the Coast Guard and is currently

employed by Clean Gulf Associates, a company that provides spill response resources for

exploration and production companies. Hanzalik Dep. at 8:25-9:03, 9:10-9:12, 257:22-258:13.

## 26.    Captain Julia Hein, Fact Witness, By Deposition, Called by the United States



Figure 85: Julia Hein

Captain Hein is the Deputy Director of Incident Management and

Preparedness Policy for the U.S. Coast Guard. Hein Dep. at 7:17-7:23. She

became involved in the response to the Defendants' disaster on or about May

29, 2010. Hein Dep. at 15:05-15:20. She became the chief of the planning

section, helping to coordinate the preparation of the Incident Action Plans and

other logistical efforts and later served as the lead in the environmental unit. Hein Dep. at 19:13-

20:02, 20:06-20:14; 22:02-23:02. From May to November 2011, Captain Hein served as the

Federal On-Scene Coordinator. Hein Dep. at 23:14-23:24.

**27.      Dr. Richard Heron, Fact Witness, By Deposition, Called by the United States**



Figure 86: Richard Heron

Dr. Richard Heron is BP's Vice President of Health and Chief Medical Officer, a position he has held since 2006. Heron Dep. at 15:12-15:22. Dr. Heron is also a physician with an accredited specialty in occupational medicine, a scientific field that focuses on worker health and well-being. Heron Dep. at 9:04-10:13, 14:17-15:05.

**28.      Captain Larry Hewett, Fact Witness, By Deposition, Called by the United States**



Figure 87: Larry Hewett

Captain Larry Hewett of the United States Coast Guard was the incident commander for the Houma Incident Command Post from mid-August to mid-September 2010. Hewett Dep. at 23:11-24:11. He has specialized in oil spill response work during his career in the Coast Guard. Hewett Dep. at 13:24-14:12. He was also the United States 30(b)(6) witness on the following topic:

> Topic No.2: Your knowledge of the nature, extent, and degree of effectiveness of the efforts to respond to, or otherwise mitigate, minimize, or prevent any environmental, economic, or other effects of, the *Deepwater Horizon* Spill, including but not limited to: . . . any response or cleanup activities that were not conducted at the direction and under the oversight of the Unified Command . . .

TREX-012112.006; Hewett Dep. at 35:01-36:08.

## 29.    Damian Higgins, Fact Witness, By Deposition, Called by BP



Figure 88: Damian Higgins

Damian Higgins is the Regional Coordinator of Environmental Quality Programs for the Pacific Southwest Region of the FWS. Higgins Dep. at 6:21-6:25. Mr. Higgins was designated as the United States' Rule 30(b)(6) witness on the following topic:

Topic No.1: Your knowledge of data as of December 31, 2013 regarding the nature and extent of any environmental impacts from the Deepwater Horizon Spill, including any environmental resources as to which You contend there has been no or limited recovery (as revised by 5/30114 Court Order, Rec. Doc. 12953). . . . Damian Higgins (Regional NRD Coordinator, FWS): FWS NRD data

TREX-012112.006; Higgins Dep. at 9:25-10:14. Pursuant to Rec. Doc. 12953, the topic was limited to knowledge of "data," such that no opinions or interpretations of the data were permissible.

## 30.    Darrell Hollek, Fact Witness, Called by Anadarko



Figure 89: Darrell Hollek

Darrell Hollek Anadarko's the Senior Vice President of Deepwater Americas for Anadarko Petroleum Company and therefore is in charge of the operations and management of all assets in the Gulf of Mexico, Brazil, and Alaska. PP Tr. at 2140:20-2141:02. He has worked in the oil and gas industry since 1980 and joined APC when it acquired Kerr-McGee. PP Tr. at 2141:03-2141:23; D-38030.

### 31.    Dr. John Howard, Fact Witness, By Deposition, Called by the United States



John Howard is the Director of NIOSH. Howard Dep. at 15:14-15:18. He was not the direct supervisor of NIOSH's work during the response. Howard Dep. at 24:08-24:12. He visited the Gulf Coast states on two occasions during the response: once to visit the Houma operational center and once to attend an Institute of Medicine conference on the

Figure 90: John Howard

Deepwater Horizon Incident. Howard Dep. at 24:24-25:17.

### 32.    Nick Huch, Fact Witness, By Deposition, Called by the United States in Rebuttal



Huch was a certified professional landman for Anadarko who was the point of contact on the Defendants' well. Huch Dep. at 15:03-15:07, 16:08-16:17. He had primary responsibility for negotiating, drafting, reviewing, and getting approvals to acquire offshore properties in the Eastern Gulf of Mexico, including the Macondo prospect. Huch Dep. at 21:15-22:04, 25:04-26:23.

Figure 91: Nick Huch

### 33.    Mark Huston, Fact Witness, By Deposition, Called by BP



Mark Huston was the Branch Chief for Environmental Response and Restoration with the Fish and Wildlife Service during the Response, and was personally involved in the Response until October 2010 as the Deputy Director of the Wildlife Branch. Huston Dep. at 21:01-21:11, 71:08-72:14.

Figure 92: Mark Huston

Mr. Huston was designated as the United States' Rule 30(b)(6) designee on the following topic:

> Topic No.1: Your knowledge of data as of December 31, 2013 regarding the nature and extent of any environmental impacts from the Deepwater Horizon Spill, including any environmental resources as to which You contend there has been no or limited recovery (as revised by 5/30114 Court Order, Rec. Doc. 12953). . . . Mark Huston (Deputy Director of the Office of Restoration and

Damage Assessment, DOl): Response data on birds, reptiles, land turtles (i.e., diamondback terrapins), and land mammals (i.e., nutria) . . . .

TREX-012112.006; Huston Dep. at 55:23-56:25. Pursuant to Rec. Doc. 12953, the topic was limited to knowledge of "data," such that no opinions or interpretations of the data were permissible.

## 34. Lieutenant Frank Kulesa, Fact Witness, By Deposition, Called by BP



Figure 93: Frank Kulesa

Lieutenant Francis Kulesa is currently assigned to the Coast Guard Office of Marine Environmental Response. Kulesa Dep. at 24:15-24:23. He is responsible for program management of the National Strike Force, development of the Marine Environmental Response Manual and has served as liaison to the Gulf Coast Incident Management Team, among other roles. Kulesa Dep. at 24:24-25:08. Lieutenant Kulesa deployed to the Deepwater Horizon response on or about June 7, 2010 and remained until August 1, 2010. Kulesa Dep. at 31:11-31:15, 34:17-34:21. He initially served at the Deputy Operations Section Chief for Shoreline East at the Houma Incident Command Post. On June 27, 2010, he transitioned into the Operations Sections Chief at Forward Operating Base Plaquemines. Kulesa Dep. at 34:22-35:02. Prior to his involvement with the Deepwater Horizon Response, Lieutenant Kulesa was involved in a number of other oil spill responses. Kulesa Dep. at 81:21-82:10.

**35.     Captain Roger Laferriere, Fact Witness, By Deposition, Called by the United States**



Figure 94: Roger Laferriere

Captain Roger Laferriere (ret'd) was in the US Coast Guard for 25 years, and became one of its most experienced and knowledgeable oil spill responders. Laferriere Dep. at 13:13-19:05, 35:13-36:04. Among other relevant experience, he served as the operations officer for the Atlantic Strike Team, the "government's pollution SWAT team." Laferriere Dep. at 24:02-24:14. He holds a Bachelor of Arts degree as well as master degrees in strategic studies and industrial hygiene. Laferriere Dep. at 14:14-14:09. He is qualified as an incident commander and operations branch manager within the ICS. Laferriere Dep. at 17:12-17:22. He was the Incident Commander at Houma during the Deepwater Horizon response from late May to late July 2010. Laferriere Dep. at 50:02-50:14. At the time of his deposition he was the National Incident Management Assist Team Leader for the IMAT-West team for the Federal Emergency Management Agency or FEMA is responsible for directing responses to large natural, man-made or other types of disasters. Laferriere Dep. at 19:02-19:25.

**36.     Rear Admiral Mary Landry, Fact Witness, By Deposition, Called by the United States**



Figure 95: Mary Landry

Rear Admiral Mary Landry (ret'd) served as the FOSC for the response to Defendants' violations from April 23, 2010 to June 1, 2010. Landry Dep. at 57:02-57:05, 57:20-57:24. She currently serves as the Director of Incident Management and Preparedness Policy for the Coast Guard. Landry Dep. at 397:03-397:10. In Phase 2, Rear Admiral Landry was the United States' Rule 30(b)(6) designee on the following topics:

4.     The training of United States personnel, including but not limited to personnel of the United States Coast Guard prior to April 20, 2010, to respond to,

or participate in a response to, an offshore oil well blow-out relating to Source Control Efforts.

\* \* \*

34.      Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the flow rate estimate of 1,000 bpd announced by Admiral Landry on April 24, 2010 [as to the announcement only]

35.      Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the flow rate estimate of 5,000" barrels of oil per day announced by Admiral Landry on April 28, 2010." [as to the announcement only]

Landry Dep. Phase 2 at 17:03-18:21.

**37.      Dr. Jane Lubchenco, Fact Witness, By Deposition, Called by BP**



Dr. Jane Lubchenco was the Administrator of NOAA from March of 2009 through February of 2013. Lubchenco Dep. at 11:24-12:18, 25:06-26:10. She oversaw NOAA's participation in the federal response to the Defendants' oil spill among her other duties as the head of the Agency. Lubchenco Dep. at 12:19-13:19, 26:15-27:07.

Figure 96: Jane Lubchenco

**38.      Dr. Harry Luton, Fact Witness, By Deposition, Called by the United States**



Dr. Harry Luton is a Senior Social Scientist at the Bureau of Ocean Energy Management BOEM in the Department of the Interior. Luton Dep. at 5:10-5:16. He holds a Ph.D. in American Studies and has worked as a social scientist for BOEM or its predecessor since 1983. Luton Dep. at 11:08-13:01. He was designated as a Rule 30(b)(6) witness for the United

Figure 97: Harry Luton

States on the following topic:

Topic No.9: Your knowledge of, role, involvement, and efforts in determining the nature and extent of any economic impacts of the *Deepwater Horizon* Spill and subsequent economic recovery, including BPXP's efforts to mitigate or minimize such impacts, and any associated data, analyses, or determination of such impacts.

. . . Harry Luton (Lead Social Scientist, BOEM): *Offshore Oil and the Deepwater Horizon: Social Effects on Gulf Coast Communities* Report; *Assessing the Impacts of the Deepwater Horizon Oil Spill on Tourism in the Gulf of Mexico Region* (June 17) . . . .

TREX-012112.008; Luton Dep. at 8:05-8:20, 8:21-9:07.

### 39.   Richard Lynch, Fact Witness, By Deposition, Called by Defendants



Figure 98: Richard Lynch

At the time of the Defendants' disaster, Richard Lynch was the Vice President of Drilling and Completions for the Central Developments Organization. During the spill response, Lynch managed the near-term containment efforts, which included work on source control and containment. At the time of his May 2011 deposition, Lynch was the Vice President for the Global Wells Organization for BP with responsibilities for the delivery of wells. Lynch Dep. at 11:02-11:08, 11:16-12:14, 12:01-12:06, 13:21-15:03, 77:05-78:23, 95:12-95:15, 114:17-116:18, 293:16-295:15.

### 40.   Charles Mason, Expert Witness, Called by the United States



Figure 99: Charles Mason

Dr. Mason is a Professor of Economics at the University of Wyoming and holds the H.A. True Chair in Petroleum and Natural Gas Economics. He teaches oil and gas economics, industrial organization and econometrics. He holds a Bachelor's Degrees in Mathematics and Economics with honors as well as a Ph.D. in Economics from the University of California, Berkeley. He has published more than sixty peer reviewed papers and served as an editor of prominent economics journals. TREX-013317.049-.059; D-33503; PP Tr. at 690:23-691:20, 692:07-692:23. Dr. Mason was asked to analyze the

368

severity of economic harm resulting from the oil spill and assess the role of BPXP and APC in the economy of the Gulf of Mexico region. PP Tr. at 690:12-690:19.

**41.    Captain Stephen McCleary, Fact Witness, By Deposition, Called by BP**



Figure 100: Stephen McCleary

Captain McCleary is the executive assistant to the Coast Guard's Judge Advocate General. During the Response, Captain McCleary served as legal advisor to the Unified Area Command. In the fall of 2010, he was asked to assist in coordinating the writing of the FOSC Report. The United States designated Captain McCleary to testify pursuant to Rule 30(b)(6) about the "United States' knowledge of facts in and the preparation and publication of" the FOSC Report. McCleary Dep. at 10:18-10:21, 24:05-25:11, 30:17-31:19, 32:02-32:15, 30:17-31:19, 50:14-51:07, 66:12-66:15; TREX-012112.008.

**42.    Sara McNulty, Fact Witness, By Deposition, Called by BP**



Figure 101: Sara McNulty

Ms. McNulty is currently an environmental ecologist in NOAA's Office of Protected Resources. Ms. McNulty's career has focused on sea turtles. McNulty Dep. at 8:20-8:23, 10:20-11:09, 11:15-12:10, 12:14-12:25. During the response, Ms. McNulty worked primarily on sea turtle response activities within the wildlife branch of the Unified Command in the marine mammal and sea turtle group. McNulty Dep. at 15:08-15:22, 16:19-17:14. She was as a Rule 30(b)(6) witness for the United States on the following topics:

Topic No.1: Your knowledge of data as of December 31, 2013 regarding the nature and extent of any environmental impacts from the Deepwater Horizon Spill, including any environmental resources as to which You contend there has been no or limited recovery (as revised by 5/30114 Court Order, Rec. Doc.

12953) . . . Sarah McNulty (Ecologist, NMFS): NOAA response data, sea turtles
(on land and at sea) . . .

* * *

Topic No. 4: Your knowledge of data regarding the collection, observation, and
rehabilitation of Wildlife for the period April 20, 2010 to December 31,2012,
including BPXP's role and involvement in such collection, observation, and
rehabilitation (as revised by 5/30114 Court Order, Rec. Doc. 12953). . . . Sarah
McNulty (Ecologist, NMFS): NOAA response data, sea turtles (on land and at
sea)

TREX-012112.006, .007; McNulty Dep. at 19:17-20:03, 20:17-22:03. Pursuant to Rec. Doc.

12953, the topic was limited to knowledge of "data," such that no opinions or interpretations of

the data were permissible

## 43.   Paul James Meinhart, Fact Witness, By Deposition, Called by the United States



Paul Meinhart was a motorman on the Deepwater Horizon, and was on

board at the time of the explosion and fire on April 20, 2010. Meinhart

Dep. P1 at 26:01-26:09.

Figure 102: Paul Meinhart

## 44.   Dr. Amy Merten, Fact Witness, By Deposition, Called by BP



Dr. Amy Merten is the Chief of the Spatial Data Branch in the Office

of Response Administration for NOAA. Merten Dep. at 9:19-10:01. Dr.

Merten is the lead for the data management technical working groups, charged

with tracking data and delivering data collected for the *Deepwater Horizon*

Figure 103: Amy Merten

NRDA. Merten Dep. at 16:10-16:24. Dr. Merten was designated as the Rule

30(b)(6) witness for the United States on the following topics:

Topic No.1: Your knowledge of data as of December 31, 2013 regarding the
nature and extent of any environmental impacts from the Deepwater Horizon

Spill, including any environmental resources as to which You contend there has been no or limited recovery (as revised by 5/30114 Court Order, Rec. Doc. 12953). Amy Merten (Chief, Spatial Data Branch, National Ocean Services, NOAA): NOAA NRD data . . .

TREX-012112.006; Merten Dep. at 13:02-14:01, 15:04-15:09. Pursuant to Rec. Doc. 12953, the

topic was limited to knowledge of "data," such that no opinions or interpretations of the data

were permissible.

**45.    Dr. Jacqueline Michel, Fact Witness, By Deposition, Called by the United States**



Figure 104: Jacqui Michel

Dr. Jacqueline Michel works for Research Planning Incorporated and was contracted to work as one of several SCAT coordinators for the state of Louisiana during the response. Michel Dep. at 12:08-12:14, 17:22-18:23. As part of her job, she oversaw SCAT teams collecting shoreline data in Louisiana. Michel Dep. at 18:13-19:22. She also helped write protocols for

the SCAT data collection and has thirty-eight years of experience working on oil spill response.

Michel Dep. at 18:13-19:22, 15:17-15:19. She has authored several publications about the SCAT

program used in response to Defendants' oil spill. Michel Dep. at 57:03-57:21, 59:20-60:12,

74:23-75:12; TREX-013004; TREX-013005; TREX-013006.

**46.    Mark Miller, Fact Witness, By Deposition, Called by BP**



Figure 105: Mark Miller

Mark Miller is the development group supervisor within NOAA's Emergency Response Division. Miller Dep. at 30:23-31:06. During the Deepwater Horizon response, he supervised scientists in NOAA's Seattle offices, and also served as a representative to the Interagency Solutions

Group. Miller Dep. at 35:08-36:02. He was involved in the development of the Oil Budget

371

Calculator. Miller Dep. at 55:15-56:03. Mr. Miller was designated as the United States' Rule

30(b)(6) witness on the following topic:

> Topic No.7: Your knowledge of the amount of oil and any analysis of the amount of Oil-Related Materials that You contend was contained, collected, dispersed, burned, removed, or cleaned up in connection with Response Activities and/or any natural processes, including but not limited to the amounts attributable to each process (for example, through the use of skimming, boom, dispersants, *in situ* burning, shoreline cleanup, and natural processes), and the preparation and publication of the "Oil Budget Calculator, Deepwater Horizon, Technical Documentation," and its appendices, dated November 2010. Mark Miller (Development Group Supervisor, NOAA)

TREX-012112.003; Miller Dep. at 56:23-57:06.

## 47.   Richard Morrison, Fact Witness, Called by BP



Figure 106: Richard Morrison

Richard Morrison is the regional president of BP Gulf of Mexico and the chairman and president of BPXP. PP Tr. at 1531:16-1531:19. At the time of the Defendants' disaster, Mr. Morrison was serving as the vice-president of operations for the Gulf of Mexico, BP Gulf of Mexico. PP Tr. at 1533:03-1533:07. During the response, he served as the deputy area commander for BP in the Unified Area Command from April 2010 until September 2010. PP Tr. at 1533-11-1533:21.

## 48.   Alan O'Donnell, Fact Witness, By Deposition, Called by the United States and BP



Figure 107: Alan O'Donnell

Alan O'Donnell is Anadarko Petroleum Corporation's Asset Manager for the Eastern GOM. He oversaw the team that evaluated the geologic and economic merits of the Macondo Prospect. O'Donnell Dep. at 35:19-36:05, 36:10-19. From January to April 20, 2010, Mr. O'Donnell supervised Anadarko's tracking of the Well's geological progress and efforts to hit pay. O'Donnell Dep. at 49:08-12, 50:12-50:13.

372

**49.     Captain Frank Paskewich, Expert Witness, Called by the BP**



Figure 108: Frank Paskewich

Captain Frank Paskewich (ret'd) serves as the president of Clean Gulf Associates. PP Tr. at 1222:12-1222:17. He spent the majority of his Coast Guard career in the field of marine safety and marine environmental protection. PP Tr. at 1223:03-1223:08. Captain Paskewich holds a bachelor of science in naval architecture and marine engineering and a master's degree in naval architecture, marine engineering, and mechanical engineering. He is a licensed professional engineer. PP Tr. at 1223:14-1223:21. He was hired as an expert by BP to "evaluate the nature, extent and degree of effectiveness of BP's efforts to minimize and mitigate the effects of the spill." PP Tr. at 1222:23-1223:02.

**50.     Robert Quitzau, Fact Witness, By Deposition, Called by the United States**



Figure 109: Robert Quitzau

Mr. Quitzau is a drilling engineer with more than 30 years of experience, who had designed and drilled a number of deepwater and offshore wells. Quitzau Dep. P1 at 18:15-18:18, 24:23-25:01, 46:14-46:18, 48:16-49:08. He was Anadarko's contact with BP and monitored the Macondo Well. Quitzau Dep. P1 at 30:04-30:07, 45:17-45:25. Mr. Quitzau worked at BP during the summer of 2010 on various teams involved in the efforts to kill the Macondo Well. *See, e.g.,* Quitzau Dep. P2 at 18:23-20:04, 242:10-243:03.

**51.      Dr. Fredric Quivik, Expert Witness, Called by the United States**



Figure 110: Fredric Quivik

Fredric Quivik is a professor of history in the Department of Social Sciences and the Graduate Program in Industrial Archaeology at Michigan Technological University. He also is a consulting historian of technology and principal in the firm of Quivik Consulting Historian, Inc. PP Tr. at 905:24-906:04; D-32900; TREX-013209.001. Dr. Quivik received his Ph.D. in History and Sociology of Science from the University of Pennsylvania in 1998. PP Tr. at 906:05-906:09; D-32900. He has been qualified and testified as an expert in a number of environmental cases, including those regarding parent-subsidiary relationships, such as *U.S. v. Asarco* (Bunker Hill Superfund case in Idaho), *U.S. v. Newmont Mining Corp., et al* (Midnite mine case in Washington state), *U.S. v. Sterling Centrecorp* (Lava Cap Superfund case in California), and *U.S. v. Marmon Holdings* (Golconda Superfund case in Idaho). PP Tr. at 907:23-908:08; D-32900. He was retained by the United States to "research and analyze the organization of the BP operations in the Gulf of Mexico at the Macondo well and in response to the Macondo disaster for purposes of analyzing the extent to which BPXP and other BP entities did and did not manage facets of those operations." PP Tr. at 905:08-905:14.

**52.      David Rainey, Fact Witness, By Deposition, Called by the United States**



Figure 111: Dave Rainey

At the time of the Defendants' blowout, Dave Rainey was the BP Vice President of Exploration for the Gulf of Mexico. Rainey Dep. at 17:10-17:13. After April 20, 2010, he became part of the response as the BP Deputy Incident Commander for the Unified Area Command until the end of June 2010. Rainey Dep. at 23:09-23:14, 129:10-130:09, 376:22-377:04. In the first week of July, Mr. Rainey became the Vice President of Science, Technology,

Environment, and Regulatory Affairs for the newly-established GCRO. Rainey Dep. at 23:14-24:10.

### 53.    Ian Ratner, Expert Witness, Called by the United States



Figure 112: Ian Ratner

Ian Ratner is a CPA, a Chartered Accountant, and a certified fraud examiner. He is also a principal and co-founder of GlassRatner Advisory & Capital Group, LLC. TREX-013153R.008 ¶¶ 5-6. Mr. Ratner also holds the designation of Accredited Senior Appraiser and is a professional business valuator. TREX-013153R.009 ¶ 6. He has more than twenty years of experience as a financial advisor and forensic accountant in the area of complex financial and economic damages, investigation of business disputes, corporate internal investigations, financial fraud investigations, funds tracing, business valuations, and bankruptcy and corporate restructuring. TREX-013153R.009 ¶ 8. Mr. Ratner holds an undergraduate degree in business and a graduate degree in accounting. TREX-013153R.009 ¶ 6. Mr. Ratner was asked to "examine the economic impact of a Clean Water Act penalty on the violators. And also to consider their ability to pay the penalty." PP Tr. at 987:07-987:10.

### 54.    Dr. Stanley Rice, Expert Witness, Called by the United States



Figure 113: Stanley Rice

Dr. Rice is a toxicologist who focuses on the effects of oil on physiology. PP Tr. at 472:14-472:17. He holds a B.S. and M.S. in Biological Science and a Ph.D. in Physiology. He was employed as a NOAA Toxicologist at the Auke Bay Laboratory from 1971 to 2012, when he retired. TREX-013330.005, .056-.064; D-32600; PP Tr. at 473:01-473:14. He was hired by NOAA specifically to initiate a study of the effects of oil on flora and fauna. Over the years he studied the effects of the Ixtoc spill as well as the Exxon

Valdez spill, as well as the relatively smaller Selendang Ayu spill and the Kuroshima spill, two different spills in the Aleutians. PP Tr. at 473:15-474:05. During his career he published over 130 peer-reviewed papers, including a large amount of work on the long-term effects of oil spills on fish embryos. PP Tr. at 474:06-474:13; D-32600. He has received NOAA's Bronze Award and has also received a NOAA Distinguished Career Award. PP Tr. at 474:14-474:20.

**55.    Mike Robertson, Fact Witness, By Deposition, Called by the United States**



Figure 114: Mike Robertson

Mike Robertson is the Director of Finance and Performance Management for the GCRO and responsible for accounting, reporting, and control of that organization. Robertson Dep. at 16:19-16:21, 16:24-17:06. Mr. Robertson was BP's Rule 30(b)(6) designee, testified as a corporate representative the following topics:

7. Any expenditure(s) that any BP entity has made in connection with the Incident or Response or any other mitigation activities that BPXP contends should diminish its obligation to pay a civil penalty, and the facts concerning each such expenditure including:

a. Identification of the expenditure, including which BP entity or entities incurred costs at any stage related to the expenditure;

b. Which BP entity financed the expenditure, initially and ultimately, including inter-BP company transfers or sales of assets;

c. The accounting and tax treatment of the expenditures for all involved BP entities including before and after tax costs;

d. Any BP entity providing guarantees for the expenditure;

* * *

f. Any debt owed by BPXP as a result of such expenditure and to whom or what entity such debt is owed.

TREX-011804.009; Robertson Dep. at 13:10-13:12.

**56.     Dr. Marshall Rose, Fact Witness, By Deposition, Called by APC**



Figure 115: Marshall Rose

Dr. Marshall Rose is the Chief of the Economics Division at BOEM. Rose Dep. at 10:17-10:25. The Economics Division is part of the DOI office that manages leasing on the Outer Continental Shelf. Rose Dep. at 14:14-14:18. Dr. Rose received his Ph.D. in economics from Tulane University in 1969. Rose Dep. at 11:01-11:10. Dr. Rose was the United States' 30(b)(6) witness for the following topics:

> Topic No. 9: Your knowledge of, role, involvement, and efforts in determining the nature and extent of any economic impacts of the Deepwater Horizon Spill and subsequent economic recovery, including BPXP's efforts to mitigate or minimize such impacts, and any associated data, analyses, or determination of such impacts. . . . Marshall Rose (Chief Economist, BOEM): DOl analysis of moratorium . . .

* * *

> Topic No. 11: Any policies, guidance, fair market value procedures, resource evaluations, modeling, or analyses conducted regarding leasing of oil and gas by the United States on the outer Continental Shelf, the Gulf of Mexico, or the Macondo Prospect (Mississippi Canyon Block 252 in particular), including without limitation lease sales, bids on leases, surety bonds, bonuses, royalties and royalty relief, rental payments, or other monetary payments owed to the United States; revenue sharing with the States; and energy security, economic, or other benefits to the United States, any State, or local region.

TREX-012112.008; Rose Dep. at 18:08-19:14. Dr. Rose supervised the DOI's evaluation of the potential economic impact of the moratorium. Rose Dep. at 28:21-28:23; TREX-012150.

### 57.     Michael Saucier, Fact Witness, By Deposition, Called by APC



Figure 116: Michael Saucier

Michael Saucier has worked for the BOEMRE, and its predecessor agency, the MMS since 1984. Saucier Dep. Vol. 1 at 11:01-11:25. Mr. Saucier was the Deputy to Lars Herbst, the MMS Gulf of Mexico Regional Director, and was the MMS representative to the Unified Area Command in response to the *Deepwater Horizon* disaster. Saucier Dep. Vol. 1 at 145:18-146:12. Mr. Saucier was aware of and kept up with the relief well operations. Saucier Dep. Vol. 1 at 148:04-148:10.

### 58.     Dr. Loren Scott, Expert Witness, Called by BP



Figure 117: Loren Scott

Loren Scott is an economist. PP Tr. at 2024:07-2024:10. He holds undergraduate and graduate degrees in economics. PP Tr. at 2025:12-2025:17. Between 1969 and 2004, Dr. Scott served in various professorial positions at Louisiana State University, eventually retiring from the Freeport-McMoRan Endowed Chair of Economics. PP Tr. at 2025:12-2026:11. Since retiring he has been doing economic consulting work and public speaking. PP Tr. at 2026:12-2026:24. Dr. Scott was hired by BP to "look at the level of BPXP's mitigation spending and what the impact of that might be" and "the economic impact o[n] the region of just the presence of this firm." PP Tr. 2024:07-2024:10.

**59.    Dr. Damian Shea, Expert Witness, Called by the United States**



Figure 118: Damian Shea

Dr. Shea an applied toxicologist. PP Tr. at 1629:19-1629:25. He holds a bachelor's degree in chemistry and a Ph.D. in environmental chemistry and has completed two postdoctoral positions. PP Tr. at 1630:21-1631:10. He currently serves as a Professor of Environmental Toxicology. PP Tr. at 1630:11-1630:14. He was hired by BP to "look at the chemicals that potentially would be of concern in both oil and the dispersants, and to evaluate the potential harm related to those chemicals." PP Tr. at 1630:05-1630:08.

**60.    Brian Smith, Fact Witness, By Deposition, Called by the United States**



Figure 119: Brian Smith

Mr. Smith has an MBA and has worked for BP (including predecessor entities) since 1993. Smith Dep. at 86:16-88:23. He is the Vice President of Structured Finance for the Western Hemisphere for BP (part of BP Group Function Treasury). Smith Dep. at 19:20-20:14. He is employed by BP Corporation NA, is a board member of four BP entities, and a vice president and chief financial officer of two hundred BP entities. Smith Dep. at 20:02-21:05. He was a vice president and chief financial officer of BPXP between 2009 and 2012. Smith Dep. at 29:03-29:19. Mr. Smith was designated as BP's Rule 30(b)(6) designee on the following topics:

6. The factual basis for any contention that a civil penalty of up to $18 billion would have a significant adverse impact on the business operations of BPXP, taking into account without limitation its historical financial relationships with other BP entities both pre- and post-Incident, and its financial and corporate relationship with each of BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America and BP p.l.c. from 2005 to the present, including without limitation:

a. Sources and uses of funds and transfers between or among BPXP, BP America Production Company, BP Company North America Inc., BP

379

Corporation North America Inc., BP America Inc., BP Holdings North America and/or BP p.l.c. or loans between or among those BP entities.

b. Sources and uses of funds and transfers between BPXP and any other BP entity, whether referenced above or not, and loans between BPXP and any other BP entities, whether referenced above or not.

c. Payment of dividends from each of BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America and BP p.l.c. to another BP corporate entity, including the amount of and history of dividends paid by BPXP to any other BP corporate entity.

d. Practices regarding one or more of BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America or BP p.l.c. financing the investments, operations, or other expenditures of other BP entities, and instances where that occurred.

e. Inter-company transactions, including those pursuant to service agreements (involving employees, technical, engineering, commercial, marketing, environmental, legal, tax, banking, investment, financial, accounting, administrative, or other services) or secondment agreements and any other transactions;

 h. Basis for the allocation of overhead or services provided by one BP entity to other BP entities;

g. Transfer and inter-company pricing policies and practices for the pricing of goods or services provided by one BP entity to another;

h. Guarantees of debt or other obligations by one BP entity for another; and,

i. Sales or other transfers of goods, services or assets from BPXP or from BP to unaffiliated third parties, *i.e.,* any non-BP entity.

7. Any expenditure(s) that any BP entity has made in connection with the Incident or Response or any other mitigation activities that BPXP contends should diminish its obligation to pay a civil penalty, and the facts concerning each such expenditure including:

a. Identification of the expenditure, including which BP entity or entities incurred costs at any stage related to the expenditure;

b. Which BP entity financed the expenditure, initially and ultimately, including inter-BP company transfers or sales of assets;

c. The accounting and tax treatment of the expenditures for all involved BP entities including before and after tax costs;

d. Any BP entity providing guarantees for the expenditure;

e. Impact of the expenditure on BP's financial condition and operational capability at the time and into the future;

f. Any debt owed by BPXP as a result of such expenditure and to whom or what entity such debt is owed.

TREX-011804.007-.009; Smith Dep. at 137:04-137:17, 284:22-284:12.

**61.    David Sunding, Expert Witness, Called by APC**



David Sunding is a professor at the University of California at Berkeley where he holds the Thomas J. Graff chair in natural resource economics in the Department of Agricultural and Resource Economics. PP Tr. at 2250:21-2251:07. He teaches undergraduate and graduate economics courses. PP Tr. at 2251:08-2251:13. He has served on various government panels and has testified as an expert witness in several cases. PP Tr. at 2252:15-2255:19.

Figure 120: David Sunding

**62.    Douglas Suttles, Fact Witness, By Deposition, Called by the United States**



From January 2009 through March 2011, Mr. Suttles was the Chief Operating Officer of Exploration and Production for the BP Group worldwide. Suttles Dep. at 22:07-23:03, 41:07-43:08, 585:09-585:14. On April 21, 2010, Mr. Suttles was appointed the leader of BP's spill response and BP's senior representative to the Unified Area Command, although

Figure 121: Douglas Suttles

Mr. Suttles was not an oil spill response expert. Suttles Dep. at 210:15-210:18, 224:10-224:17, 495:17-497:04, 553:14-556:01. Mr. Suttles retired from BP in March 2011, at the age of fifty. Suttles Dep. at 23:13-23:22.

381

### 63.    Dr. Elliott Taylor, Expert Witness, Called by BP



Figure 122: Elliott Taylor

Elliott Taylor works for Polaris Applied Sciences and has spent his career "engaged in spill response, preparedness planning, contingency planning, training, and supporting response" to oil spills. PP Tr. at 1747:18-1747:20, 1748:04-1748:09. He holds undergraduate and graduate degrees in oceanography. PP Tr. at 1748:22-1749:03. During the response to the spill, he worked with "BP and other responders" to set up a shoreline response program and the SCAT program. PP Tr. at 1753:20-1753:23. He was retained by BP to testify regarding the comprehensiveness of the SCAT program in "assessing and defining the oiling conditions along the shorelines" and to "look at the recovery of those shorelines . . . ." PP Tr. at 1756:02-1756:09.

### 64.    Dr. John Wesley Tunnell, Expert Witness, Called by BP



Figure 123: John Tunnell

John Tunnell is a marine biologist and ecologist who has specialized in the Gulf of Mexico. PP Tr. at 1850:12-1850:15. Dr. Tunnell holds undergraduate and graduate degrees in biology with emphases on marine science. After graduation he began working his way up the professorial scale at Texas A&M and currently holds the endowed chair of biodiversity and marine conservation at the Harte Research Institute. PP Tr. at 1851:07-1852:09. He has published both papers and books on the topics of the ecology and biology of the Gulf of Mexico. PP Tr. at 1853:12-1854:12. He was retained by BP to "evaluate the impacts of the oil spill on the populations of fish, shellfish and birds of the northern Gulf of Mexico." PP Tr. at 1850:18-1850:22.

### 65. Michael Utsler, Fact Witness, Called by BP


Figure 124: Mike Utsler

Mr. Utsler was a long-time employee of BP, working for the company for thirty-six years before retiring in December 2013 and moving to Australia to work for Woodside Energy. PP Tr. at 1385:13-1385:15, 1384:13-1384:19. At the time of the incident, Mike Utsler was employed by BP Alaska. PP Tr. at 1381:24-1382:10. Mr. Utsler served as BP's Incident Commander in Houma between April 25 through August 3, 2010 and then as BP's Unified Area Commander between August 3, 2010 and December 2012. PP Tr. at 1381:17-1381:23, 1382:22-1382:25; D-35002. He also served as chief operating officer for the GCRO from May 2011 to December 2013. D-35002.

### 66. Captain Mark Van Haverbeke, Expert Witness, Called by the United States


Figure 125: Mark Van Haverbeke

Captain Van Haverbeke (ret'd) is an expert in oil spill response and spill response research and development. PP Tr. at 601:15-601:18. Captain Van Haverbeke spent over fifty days in the Gulf of Mexico region during the *Deepwater Horizon* disaster supporting the FOSC in the implementation of the ARTES, including evaluating technologies, meeting with vendors, and explaining the process to citizens and vendors. TREX-013513.004. The Captain holds undergraduate and graduate degrees in naval architecture, marine engineering, and mechanical engineering, all of which he earned while serving in the U.S. Coast Guard. PP Tr. at 602:20-603:04. Although he has retired from active duty, Captain Van Haverbeke continues to work for the Coast Guard, starting as a civilian employee at the Coast Guard Research and Development Center in January 2006. PP Tr. at 603:05-603:11. While at the Center he has been responsible for developing a strategic plan for

spill response research for the Coast Guard and studied various ways of identifying submerged oil. PP Tr. at 603:19-604:23. During his thirty years on active duty with the Coast Guard, the Captain worked with the Regional Response Teams, served as an FOSC or deputy FOSC, and held other positions in which he was responsible for spill prevention and response. PP Tr. at 605:14-609:06. He was asked by the United States to evaluate BP's claims regarding the effectiveness of the response and innovations that BP claimed to have made during the response to the *Deepwater Horizon* disaster. PP Tr. at 601:10-601:14.

**67.    Gardner Walkup, Expert Witness, Called by the United States**



Figure 126: Gardner Walkup

Mr. Walkup is a management consultant in the energy sector, with a particular concentration on oil and gas. PP Tr. at 813:22-814:01. For about fifteen years, Mr. Walkup has been a partner in consulting firms to assist exploration and production clients make "tough decisions" regarding investment in various projects. PP Tr. at 814:20-815:11. In addition, he has published and participated in industry organizations such as the SPE in developing and discussing stage-gate decision processes and valuation. Mr. Walkup currently sits on the Management Committee and Economics Subcomittee of the SPE. PP Tr. at 815:12-815:18. He was retained by the United States to provide an opinion on the role of non-operating parties generally in exploration and production and with a focus on deepwater activities. PP Tr. at 813:02-814:04.

**68.    Kirk Wardlaw, Fact Witness, By Deposition, Called by BP**



Figure 127: Kirk Wardlaw

Kirk Wardlaw served as BP's Chief Land Manager for the GOM. Wardlaw Dep. at 17:18-17:23. He led negotiations with MOEX on the Macondo agreements, and also advised on BP's negotiations with Anadarko. Wardlaw Dep. at 27:08-27:15. Mr. Wardlaw was BP's 30(b)(6) designee on the parties' negotiations over the scope of information to be provided to Anadarko, as well as BP's understanding of Anadarko's rights to receive and respond to information about well design and operations at the Macondo Well. TREX-001860; Wardlaw Dep. at 30:16-30:17, 31:02-32:01.

**69.    Admiral James Watson, Fact Witness, By Deposition, Called by the United States**



Figure 128: James Watson

Admiral James Watson (ret'd) was the Director of Operations and the Deputy Command of the Coast Guard's Atlantic Area on April 20, 2010, when the Defendants' well blew up and began spilling oil into the Gulf of Mexico. J. Watson Dep. at 20:01-20:15, 22:04-22:09. At the time of the explosion, Admiral Watson had been with the Coast Guard since 1978. J. Watson Dep. at 16:18-16:21. In 2011, he became the director of the Bureau of Safety and Environmental Enforcement at the Department of the Interior. J. Watson Dep. at 10:20-11:09, 24:11-24:16. The Admiral served as the Federal On-Scene Coordinator between June 1, 2010 and July 12, 2010. J. Watson Dep. at 52:08-52:17, 52:20-52:21.

**70.**   **Nick Watson, Fact Witness, By Deposition, Called by the United States**



Nick Watson is a Transocean employee who was working as a roustabout on the Deepwater Horizon at the time of the explosion and fire on April 20, 2010. N. Watson Dep. at 8:08-8:13, 9:13-9:18, 74:18-74:19, 77:24-85:05.

Figure 129: Nick Watson

**71.**   **Dr. Curtis Whitson, Expert Witness, Phase 2 Quantification Segment, Called by BP**



Curtis Whitson is a professor of petroleum engineering at the Norwegian University of Science and Technology, Department of Petroleum Engineering and Applied Geophysics. He holds a bachelor's of science and a Ph.D. in petroleum engineering. TREX-011496.012. He was hired by BP to provide a pressure, volume, and temperature model to describe the physical and thermodynamic properties of Macondo reservoir fluids. TREX-011496.009.

Figure 130: Curtis Whitson

**72.**   **Dr. Aaron Zick, Expert Witness, Phase 2 Quantification Segment, Called by the United States**



Dr. Zick is an expert in fluid phase behavior. P2 Tr. at 1754:16-21. He holds a Ph.D. in Chemical Engineering. P2 Tr. at 1753:05-1753:07. As founder of his own company, Zick Technologies, Dr. Zick provides petroleum engineering consulting and software services, particularly related to the thermodynamic modeling of hydrocarbon fluids, that is, the prediction of the properties and phase behavior of hydrocarbon fluids. P2 Tr. at 1753:08-1753:19. Dr. Zick's clients include PERA A/S, the company owned by BP/Anadarko's trial expert Dr. Whitson. P2 Tr. at 2361:10-2361:12. Dr. Zick has spent the past 30 years doing equation-of-state

Figure 131: Aaron Zick

modeling of petroleum reservoir fluids. P2 Tr. at 1754:07-15. Dr. Zick wrote the software for

PhazeComp, the equation-of-state program used by both Dr. Zick and Dr. Whitson. P2 Tr. at

2360:21-2361:05; TREX-011490R.059. Dr. Whitson testified that PhazeComp is "absolutely"

his software of choice for building equation of state fluid characterizations. P2 Tr. at 2361:06-

2361:09.