## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | **MDL NO. 2179** |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | **SECTION: J** |
| | : | |
| **This Document Relates to:** | : | **JUDGE BARBIER** |
| | : | |
| *Civ. No.* **10-4536** | : | **MAG. JUDGE SHUSHAN** |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## <u>CLEAN WATER ACT – PENALTY PHASE</u>
## <u>PROPOSED CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

I.   PROCEDURAL POSTURE ................................................................................ 1

II.  MAXIMUM PENALTY ................................................................................... 4

III. LEGAL STANDARDS AND PURPOSES OF CWA ........................................ 5

   A.  Section 311 Penalties Should be High Enough to Punish and Deter the Defendants and Send a Message to the Oil and Gas Industry as a Whole. ...................................... 6

   B.  The CWA's Strict Liability Standard Ensures That Violators, Not the Public, Bear the Cost of "Polluting Enterprises." .................................................................. 8

   C.  Neither the CWA nor OPA Contemplate Offsets of Penalties for Costs or Damages Paid by the Violator. .................................................................................... 10

IV.  TOP DOWN APPROACH TO PENALTY CALCULATION IS MOST APPROPRIATE IN THIS CASE ................................................................... 12

V.  ANALYSIS OF SECTION 311(b)(8)'S PENALTY FACTORS ...................... 14

   A.  The Macondo Oil Spill Was an Extremely Serious Violation of the CWA. .............. 16

      i.  Examples of facts constituting actual harm in previous CWA cases ...................................18

      ii.  Potential harm alone is sufficient to establish the seriousness of a violation .........................20

      iii.  Examples of facts establishing potential harm in previous cases .........................................23

      iv.  Courts have rejected arguments limiting the seriousness factor .........................................24

   B.  Defendants' Economic Benefit Does Not Serve as a Starting Point for Penalty Calculation. ............................................................................................ 26

   C.  Consideration of the Culpability of Anadarko and BPXP ................................... 29

      i.  Culpability is not required to assess a significant CWA penalty .........................................29

      ii.  Cases where courts severely reduced the penalty due to the violator's lack of fault are inapposite here because those cases involved violations that were caused by unknown third parties with no connection to the violator's enterprise. ............................................................................32

      iii.  BPXP's gross negligence and willful misconduct in connection with the Macondo blowout denote a high degree of culpability and require a penalty near the maximum allowed under the law. ...............33

      iv.  Prior violations are relevant to culpability .................................................................34

   D.  Defendants Are Not Entitled to a Significant Reduction Under the Penalty Factor for Other Penalties Paid for the Incident ............................................................ 35

      i.  Anadarko has paid no penalties to date; BPXP is not entitled to a dollar-for-dollar discount for its criminal penalties. ..........................................................................................35

      ii.  Prior settlements do not provide guidance for BPXP's penalty amount, and Anadarko's civil penalty should exceed Transocean's settlement figure. .........................................................38

   E.  Neither Defendant Is Entitled to Any Deduction Given Their History of Violations.41

      i.  Violations of other statutes may be considered .................................................................42

      ii.  Violations by related entities may be considered .............................................................45

      iii.  Violations occurring years in the past may be considered ...................................................46

**F.    The Defendants' Penalties Should Not Be Reduced By Costs of Legally Required Damages and Response Efforts—Only a Modest Reduction Is Warranted Under the Mitigation Factor .......................................................................................................... 46**

    i.   BPXP's efforts during the response do not warrant a significant penalty reduction. ............................50

    ii.  Anadarko's limited efforts during the response and its settlement with BPXP after the fact do not warrant any reduction in penalty. ...........................................................................................54

**G.    Consideration of the Economic Impact of the Penalty on the Violator Does Not Warrant Any Reduction from the Maximum Penalty. .................................................. 55**

    i.   The Court may consider BP Group assets in assessing a penalty against BPXP ...................................56

    ii.  Anadarko's concerns about the opportunity costs of a large civil penalty do not meet the CWA standard for a reduction in penalty ...............................................................................................59

**H.    No "Other Matters" Warrant Reduction of the Defendants' Penalty. ...................... 60**

    i.    The justice factor is used sparingly ...................................................................................................61

    ii.   Justice does not require consideration of Defendants' alleged contributions to the economy ..............63

    iii.  There are no cases analogous to this one that justice requires be considered in setting an appropriate penalty ...........................................................................................................................................64

    iv.   Justice does not require the Court to mitigate Anadarko's penalties based on its non-operator status ..67

    v.   Anadarko's justice factor contentions merely reassert its culpability themes and do not require any additional penalty deduction. ......................................................................................................69

    vi.  Consideration of limited "other matters" under the justice factor may justify keeping penalties near the maximum ....................................................................................................................................72

    vii. Credit for a violator's good faith is viewed in context of violator's bad acts........................................73

**VI.  CONCLUSION ........................................................................................................... 74**

These proposed Conclusions of Law relate only to *United States of America v. BP Exploration & Production, Inc., et al.*, No. 2:10-cv-04536 (E.D. La.). The case is consolidated for pre-trial purposes with the multi-district litigation ("MDL 2179"). PTO # 1 ¶ 3. The consolidated cases all arise from the April 20, 2010 explosion, fire, and sinking of the DEEPWATER HORIZON mobile offshore drilling unit, which resulted in the release of 3.19 million barrels of oil into the Gulf of Mexico before it was finally capped approximately three months later. This case was tried in several phases. Rec. Doc. 4033, *as amended by* Rec. Docs. 4083, 6592. The trial of "Phase One" of *U.S. v. BPXP et al.* was joined in part under Fed. R. Civ. P. 42(a), with the Phase One trial of Transocean's limitation action (Civ. No. 10-2771) for the purpose of trying certain common factual issues related to the causes of the initial blowout.

The Penalty Phase was tried before the Court, sitting without a jury, from January 20, through February 2, 2015. At the conclusion of the Penalty Phase trial, the Court established deadlines for the filing of post-trial memoranda, and thereafter the Court took the matter under submission. Having considered the testimony and exhibits at trial, the credibility of the witnesses, the memoranda of counsel, and applicable law, the Court, in accordance with Federal Rule of Civil Procedure 52(a), issues these Conclusions of Law.[1]

## I.      PROCEDURAL POSTURE

1.      In the matter of *United States v. BP Exploration & Production, Inc. ("BPXP") et al.*, there are two Claims for Relief in the Complaint: (1) the first claim for relief seeks civil penalties under Section 311(b) of the Clean Water Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1321(b); (2) the second claim for relief seeks a declaratory judgment of liability under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and the Declaratory Judgment

---

[1] To the extent these conclusions of law are more properly classified as findings of fact, they should be so considered.

Act, 28 U.S.C. § 2201. The United States of America filed suit against, *inter alia*, BPXP and Anadarko Petroleum Corporation (Anadarko or APC).[2]

2.      On February 22, 2012, the Court issued an "Order and Reasons [As to the United States', Transocean's, and Anadarko's Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA]" ("SJ Order"), Rec. Doc. 5809; *In re Deepwater Horizon*, 844 F. Supp. 2d 746 (E.D. La. 2012). The SJ Order established that BPXP and Anadarko were each strictly liable for a civil penalty under CWA 311(b) as owners of the Macondo well. The SJ Order was affirmed on appeal. *In re Deepwater Horizon*, 753 F.3d 570 (5th Cir. 2014), *affirmed after petition for rehearing*, 772 F.3d 350 (5th Cir. 2014), *rehearing en banc denied*, 775 F.3d 741 (5th Cir. 2015).

3.      In the SJ Order, the Court ruled that BPXP and Anadarko were liable for removal costs and Natural Resource Damages as responsible parties under OPA. Rec. Doc. 5809. The Court further ruled that Transocean—as an owner of the *Deepwater Horizon* mobile offshore drilling unit—was not liable under OPA for subsea discharges, and that Transocean could only be held liable under CWA Section 311(b) for civil penalties if it could be shown to be an operator or person in charge of the well. Rec. Doc. 5809.

4.      Anadarko was severed from the Phase One trial shortly after it was found liable under CWA 311(b). Rec. Doc. 4642 at 3. Anadarko and the United States entered into a stipulation pursuant to which the United States dropped certain claims as to other Anadarko entities and claims that Anadarko was an operator or person in charge, and Anadarko stipulated that it owned a 25% share retroactively to October, 2009. Rec. Doc. 5930.

---

[2] The other Defendants (MOEX and Transocean Defendants) have settled their liabilities under the First Claim for Relief. The Court also entered Consent Decrees regarding the liability of the Transocean Defendants and MOEX for civil penalties under the Clean Water Act. Rec. Docs. 6698, 8608.

5.      On cross-motions for summary judgment between Transocean and BP, the Court ruled that contractual indemnification is unenforceable with respect to CWA penalties. Rec. Doc. 5446 at 19-23.

6.      The Phase One trial in *United States v. BPXP et al.* related to BPXP's penalty exposure under the CWA for gross negligence or willful misconduct.[3] On September 9, 2014, the Court issued its amended Phase One Findings of Fact and Conclusions of Law ("Phase One Findings"). Rec. Doc. 13381-1, *amending* Rec. Doc. 13355, 21 F. Supp. 3d 657 (E.D. La. Sept. 4, 2014). In that ruling, the Court found that BPXP acted with gross negligence and willful misconduct in causing the spill. Rec. Doc. 13381-1 at 129, 134 ¶¶ 515, 518, 535. Therefore, BPXP is subject to escalated civil penalties under CWA Section 311(b)(7)(D). The Court also found BPXP liable as "operator" and "person in charge" of the Macondo well and the *Deepwater Horizon* vessel. Rec. Doc. 13381-1 at 134-135 ¶¶ 537-539.

7.      In the Phase One Findings, the Court found that Transocean was an "operator" of the Macondo well under OPA, but that it was indemnified for OPA costs and damages by BP. Rec. Doc. 13381-1 at 150-151, 153 ¶¶ 606-09, 618.

8.      In its Phase One Findings, the Court found that OPA's limits of liability do not apply because BPXP violated several regulations. Rec. Doc. 13381-1 at 147-149 ¶¶ 595-602.

9.      Because the CWA case was tried in phases, the Court anticipated that some of the facts and evidence presented in Phases One and Two would also be relevant to the Penalty Phase. PP. Tr. 8:05-8:15.

10.     In Phase Two, the Court jointly tried the issue of Source Control for MDL 2179's Limitation action with remedy elements of the civil penalty claim for *U.S. v. BPXP and*

---

[3] Other matters to be tried later are set out in PTO # 41. There are two other issues related to Transocean, discussed below.

*Anadarko.* The Court also tried the issue of the quantity of barrels discharged into the ocean. On January 15, 2015, the Court issued its Findings of Fact and Conclusions of Law from the Phase Two Trial ("Phase Two Findings"). Rec. Doc. 14021. In the Phase Two Findings, the Court found that the total discharge of oil into the Gulf of Mexico (and thus the amount used to calculate the maximum CWA penalty) was 3.19 million barrels of oil. Rec. Doc. 14021 at 44 ¶ 277.[4]

11.     The Penalty Phase trial concerned the eight factors set out in Section 311(b)(8) for the Court to consider in determining the appropriate penalty amounts.

12.     The United States has not yet filed its claim for Natural Resource Damages under OPA. The Natural Resource Damage Assessment is ongoing. Findings in this CWA action regarding environmental and/or economic harm are not in any way intended, and should not be considered, preclusive or binding in any future claim for Natural Resource Damages filed by any party related to the Deepwater Horizon disaster.[5]

## II.     MAXIMUM PENALTY

13.     The Court has set the Defendants' maximum per barrel penalty. Rec. Doc. 14206. Per 33 U.S.C. § 1321(b)(7)(D), the maximum CWA civil penalty that may be imposed against BPXP is $4,300 per barrel of oil discharged; and the maximum penalty for Anadarko is $1,100 per barrel under 33 U.S.C. § 1321(b)(7)(A); 40 C.F.R. § 19.4.

---

[4] This volume determination resulted from a finding that approximately 4 million barrels of oil left the reservoir, and the parties' stipulation, Rec. Doc. 8620, that 810,000 barrels of oil were collected at the wellhead prior to being discharged into the environment.

[5] The States of Mississippi and Louisiana moved the Court for an Order to this effect (as well as other relief regarding the evidence to be presented at the Penalty Phase trial). Their motions were denied because neither State was a party to the CWA Penalty case. Rec. Doc. 13865. Notably, both the United States and BPXP supported an order clarifying that the CWA findings are not preclusive on a future Natural Resource Damages claim. Rec. Doc. 13728; Rec. Doc. 13734. The Court hereby clarifies that its findings are not intended to be preclusive in a future Natural Resource Damages proceeding to avoid all possibility of confusion or dispute on that point.

14.     In its Phase Two Ruling, the Court found that 3.19 million barrels of oil were discharged from the Macondo Well into the Gulf of Mexico. Phase Two Findings, Rec. Doc. 14021. Therefore, the maximum civil penalty for BPXP is $13.717 billion and the maximum civil penalty for Anadarko is $3.509 billion.

15.     As to BPXP, imposition of a near maximum penalty is appropriate in this case. In *United States v. Egan Marine Corp.*—the only CWA Section 311 case litigated to final judgment since the 1990 OPA amendments—the court imposed a penalty that was 89.3% of the maximum for a tanker spill of 4,817 gallons of oil. *Id.*, No. 08 C 3160, 2011 WL 8144393 (N.D. Ill. Oct. 13, 2011). The 10.7% discount was applied because the court did not find the defendant culpable under the penalty factors. *Id.* No discount was given for the defendant's mitigation efforts, even though the court found it had "complied with its legal obligations to aid in the cleanup." *Id.*

## III.    LEGAL STANDARDS AND PURPOSES OF CWA

16.     The overarching purpose of the CWA is to eliminate the discharge of all pollutants to waters of the United States, and thereby protect the nation's waters and people. *United States v. Aluminum Co. of America*, 824 F. Supp. 640, 645 (E.D. Tex. 1993); 33 U.S.C. § 1251(a). The purpose of penalties under Section 311 of the Act are threefold: to punish violators; deter violators and potential violators; and shift the costs of pollution to the relevant "polluting enterprise" (all owners and operators). *See Tull v. United States*, 481 U.S. 412, 422 (1987) (the purpose is punish and deter); *see also* 136 Cong. Rec. S11536-48 (daily ed. Aug. 2, 1990) (same); *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir. 1981) (the purpose includes cost-shifting); *United States v. Marathon Pipe Line Co.*, 589 F.2d 1305, 1309 (7th Cir. 1978) (same).

17.     The Court's assessment of a civil penalty under the CWA is highly discretionary and reviewed under an abuse of discretion standard. *Tull*, 481 U.S. at 427; *United States v. Citgo*

*Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013); *United States v. Marine Shale Processors*, 81 F.3d 1329, 1338 (5th Cir. 1996); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 576 (5th Cir. 1996).

### A. Section 311 Penalties Should be High Enough to Punish and Deter the Defendants and Send a Message to the Oil and Gas Industry as a Whole.

18.     After the *Exxon Valdez* spill, Congress wanted to "raise the cost of carelessness and to emphasize prevention." S. Hrg. 101-265 at 15 (statement of Rep. Schneider).[6] It concluded that "[o]ne of the best ways to induce the oil industry to operate more safely… is to make sure that they pay heavily when there is a spill." *Id.* OPA 1990 not only increased liability for response costs, but also increased the deterrent and punitive impact of CWA Section 311 by setting the scope of penalty authority according to the number of barrels discharged—a volume based system not found in other environmental statutes—and by lowering the standard for imposition of the highest penalties from "willfulness" to "gross negligence *or* willful misconduct." *See* Pub. L. No. 101-380, § 4301, 104 Stat. 484, 536-37 (1990) (emphasis added); *compare* 33 U.S.C. § 1321(6)(B) (1990) *with* 33 U.S.C. § 1321(b)(7)(A), (D) (1991).

19.     Because Clean Water Act penalties are retributive, they are not expressly tied to damages actually suffered as a result of violations. *Tull*, 481 U.S. at 422-23; *Coastal States*, 643 F.2d at 1128; *Weber v. Trinity Meadows Raceway, Inc.*, No. 4:92-CV-267-Y, 1996 WL 477049, at *15 (N.D. Tex. June 20, 1996). Indeed, the Supreme Court in *Tull* explained that:

> [CWA Section 309] does not direct that the "civil penalty" imposed be calculated solely on the basis of equitable determinations, such as the profits gained from violations of the statute, but simply imposes a maximum penalty of $10,000 per day of violation. The legislative history of the Act reveals that Congress wanted

---

[6] *Oil Spills in the Coastal Waters of Rhode Island, the Delaware River and the Houston Ship Channel: Hearing Before the Senate Subcomm. on Envtl. Prot. of the Comm. on Env't and Pub. Works*, S. Hrg. 101-265, 101st Cong., 1st Sess. 4 (1989) (hereinafter "S. Hrg. 101-265").

>the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. … [Section 309]'s authorization of punishment to further retribution and deterrence clearly evidences that this subsection reflects more than a concern to provide equitable relief.

*Tull,* 481 U.S. at 422-23. Penalties must therefore exceed the cost of restitution to achieve the Act's goals. Furthermore, in a given case, the amount of money necessary to achieve restitution or disgorgement will have some fixed amount, whereas the amount necessary to achieve retribution and deterrence will necessarily vary depending upon the target defendant. They must be large enough to meaningfully punish the defendant, and they must be seen to meaningfully punish the defendant.

20.     Section 311 penalties are meant to deter not only specific violators, but the industry as a whole. *Idaho Conservation League v. Magar*, No. 3:12-cv-0037, 2015 WL 632367, at *4 (D. Idaho Feb. 13, 2015) ("Like other civil penalties, the purpose of a penalty under the CWA is to provide restitution, punish the violator, and deter similar conduct by the violator and others.") (citing *Tull* at 422). In order to achieve general and specific deterrence, penalties must be high enough to *send a message to the entire industry*. *Id.*; *see also* Oil Pollution Liability and Compensation Act, 135 Cong. Rec. S9678 (Aug. 3, 1989), S. 686, SEC. 3. FINDINGS. ("(13) there is a need to establish a clear and sufficient structure of penalties to effectively *deter those who would discharge oil* to the waters of the United States or to punish those who cause such discharges") (emphasis added).

21.     In order to properly punish and deter violators, penalties cannot "simply be absorbed as a cost of doing business" or construed as an "acceptable environmental trade-off" for continued operations. Courts have recognized that any penalty that fits these descriptions is much too low. *Idaho Conservation League*, 2015 WL 632367, at *7; *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 868-869 (S.D. Miss. 1998); *see also PIRG v. Powell Duffryn*

*Terminals, Inc.*, 720 F. Supp. 1158, 1166 (D.N.J. 1989), *aff'd in part, rev'd in part*, 913 F.2d 64 (3d Cir. 1990).

22.     Where a violator fails to prove that a penalty will have a "ruinous effect," the economic impact factor does not reduce the penalty. *Gulf Park Water Co.*, 14 F. Supp. 2d at 868; *Powell Duffryn,* 720 F. Supp. at 1166 (defendant failed to show that assessing a severe penalty would jeopardize its continued operation); *Chesapeake Bay Found. v. Gwaltney*, 611 F. Supp. 1542, 1562 (E.D. Va. 1985), *aff'd*, 791 F.2d 304 (4th Cir. 1986), *vacated on other grounds*, 484 U.S. 49 (1987) (the court was "unpersuaded that any penalty warranted by Gwaltney's violations would jeopardize Gwaltney's continued operations"). Given the Defendants' large size and extensive resources, very high penalties for BPXP and Anadarko are warranted—for BPXP, near the statutory maximum—otherwise the penalties will amount to a write off for the cost of drilling in the Gulf.

**B.   The CWA's Strict Liability Standard Ensures That Violators, Not the Public, Bear the Cost of "Polluting Enterprises."**

23.     In addition to punishment and deterrence, Section 311 CWA penalties serve to shift the cost of oil spills from the public to *all* those who stood to profit from the violation-causing enterprise, even in the absence of fault:

> [D]eterrence is not the sole purpose of the civil penalty, or for that matter of strict liability in general. Strict liability, though performing a residual deterrent function, is based on the economic premise that certain enterprises ought to bear the social costs of their activities. In the FWPCA in general, Congress has made a legislative determination that polluters rather than the public should bear the costs of water pollution.

*Marathon Pipe Line Co.*, 589 F.2d at 1309 (internal citations omitted); *see also United States v. Tex-Tow, Inc.*, 589 F. 2d 1310, 1313 (7th Cir. 1978) ("the civil penalty furthers the overall statutory scheme by shifting the cost of pollution onto the polluting enterprise."). Therefore, a civil penalty is *mandatory* for *all involved* in the "polluting enterprise" behind each violation.

*See* 33 U.S.C. § 1321(b)(7)(A) and (D) (stating violators "shall be subject to a civil penalty"); *see also, United States v. BP Exploration & Prod. Inc. (In re Deepwater Horizon)*, 753 F.3d at 575 ("Civil liability under the Clean Water Act, therefore, is strict."); *Egan Marine*, 2011 WL 8144393, at *6 (penalties under Section 311 are mandatory); *Coastal States*, 643 F.2d at 1128 (penalties under Section 311 are mandatory).[7]

24.     The Fifth Circuit has stated that the provision for civil penalties in CWA Section 311(b)(6) (the administrative analogue to the judicial penalties at 311(b)(7) was designed to place "a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same." *Coastal States*, 643 F.2d at 1128, (cited with approval in the SJ Order, 844 F. Supp. 2d 746, 759 (E.D. La. 2012)); *see also Tex-Tow,* 589 F.2d at 1315 ("[i]t is reasonable to require those who 'cause' damage, not by their conduct but *by the activity they are engaged in*, to pay for the costs of abating that damage.") (emphasis added).

25.     Accordingly, substantial CWA penalties can be imposed on owners and operators even in the absence of fault. *See Coastal States*, 643 F.2d at 1128 (citing *Marathon Pipeline* for the proposition that "polluters rather than the public should bear the costs of water pollution" regardless of owner/operator fault. 585 F.2d at 1309); *Tex-Tow,* 589 F.2d at 1313-1314 (where owner was without fault, the court refused to read third party defense or proximate cause requirement into civil penalty provision).[8]

---

[7] Section 309(d) of the CWA also requires that violators of that provision "shall be subject to a civil penalty." Courts have interpreted this language to mandate a penalty. *See, e.g.*, *Atl. States Legal Found. Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990); *Gulf Park Water Co., Inc.*, 14 F. Supp. 2d at 858.

[8] The appropriateness of penalties for non-operating owners is discussed in more detail under the "degree of culpability" factor, *infra*.

26.     Congress' intent to use CWA Section 311 penalties to shift the costs of violation entirely to owners, operators, and persons in charge is also evidenced by the Act's lack of defenses against the imposition of penalties. Section 311 has narrowly defined defenses against liability for clean-up costs, (*e.g.*, an "act of God"), but the Act provides no defense to the assessment of the civil penalty. *Coastal States*, 643 F.2d at 1128 (discussing Section 311 penalties); *United States v. W. of Eng. Ship Owner's Mut. Prot. & Indem.*, 872 F.2d 1192, 1200 (5th Cir.1989) (discussing response-cost liability).

### C. Neither the CWA nor OPA Contemplate Offsets of Penalties for Costs or Damages Paid by the Violator.

27.     Penalties go beyond compensation: they "are intended to punish, and label defendants wrongdoers." *Gabelli v. S.E.C.,* 133 S. Ct. 1216, 1223 (2013) (citing *Tull*, 481 U.S. at 422). Congress recognized this, and intended CWA Section 311(b) penalties to be separate from and payable *in addition* to any response costs violators are required to pay: "I am particularly pleased that the legislation assures that those who are responsible for damaging our fragile environment will be subject to substantial civil and criminal penalties *in addition to responsibility for cleanup costs*." Senator Lieberman's comments on OPA passage, 136 Cong. Rec. S11544 (daily ed. Aug. 2, 1990) (emphasis added). This is consistent with the purposes of the Act: response costs are required to make the government whole, and are consistent with the concept that polluters pay for the pollution from their enterprises—whereas penalties are meant to punish and deter the violator. Allowing violators to offset their penalty payments by amounts paid for legally required response undermines these dual purposes and blurs the line between two distinct statutory obligations.

28.     The obligations to respond, pay response costs, and pay a civil penalty are three separate duties created by three different statutory provisions. Section 311(c)(5)(A) creates an

independent statutory obligation for violators to "respond immediately to a discharge," and 33 U.S.C. § 2702 requires them to pay for the cleanup. 33 U.S.C. § 1321(c)(5)(A); 33 U.S.C. § 2702. CWA Section 311(b)(7)(B) states that a party who fails to comply with a removal order "shall be subject to a civil penalty in an amount up to $ 25,000 per day of violation or an amount up to 3 times the costs incurred by the Oil Spill Liability Trust Fund as a result of such failure." 33 U.S.C. § 1321(b)(7)(B). These penalties are assessed in addition to the response costs and damages due under Title 1 of OPA, 33 U.S.C. § 2702.

29.     OPA requires responsible parties to pay for response costs. 33 U.S.C. § 2702(a). OPA also authorizes recovery of a variety of damages, including Natural Resource Damages. 33 U.S.C. § 2702(b)(2). OPA's reservation clause reinforces the clear intent of the statute to preclude offsets**:**

> *Nothing in this Act*, the Act of March 3, 1851 (46 U.S.C. 183 *et seq.*), or section 9509 of title 26, *shall in any way affect, or be construed to affect, the authority of the United States* or any State or political subdivision thereof—(1) to impose additional liability or additional requirements; or (2) to impose, or *to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge, of oil.*

33 U.S.C. § 2718(c) (emphasis added). It is clear from the strength of the statutory language that OPA costs and damages are meant to be assessed in addition to—not as an offset of— the CWA's penalty provisions.

30.     Notably, at the same time Congress enacted OPA, which created a comprehensive compensation scheme for oil spills, it amended CWA Section 311 to *increase* civil penalties. *See* Pub. L. No. 101-380, § 4301, 104 Stat. 484, 536-37 (1990); *compare* 33 U.S.C. § 1321(6)(B) (1990) *with* 33 U.S.C. § 1321(b)(7) (1991); *see also* H.R. Rep. No. 101-653, at 49 (1990) (OPA Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N 779, 833 ("Civil penalties should serve primarily as

an *additional* incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills.") (emphasis added).

31.     Congress has recently affirmed that penalties and damages for oil spills serve different purposes:

> The ability to obtain both NRD and penalties is not, and has never been, considered double recovery against a Responsible Party, but rather separate remedies provided by law that serve different purposes. Clean Water Act penalties are punitive in nature and serve a deterrent purpose, while NRD claims are intended to compensate the public for natural resource injuries resulting from an oil spill.

*Resources and Ecosystems Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast States Act of 2011 ("RESTORE Act"),*[9] Report to Accompany S. 1400, S. Rep. No. 112-100, 2011 WL 6155734, at *15 (Dec. 8, 2011).

## IV.     TOP DOWN APPROACH TO PENALTY CALCULATION IS MOST APPROPRIATE IN THIS CASE

32.     As explained in the United States' Memorandum on the Burden of Proof for Penalty Factors, Rec. Doc. 12479, the Fifth Circuit in *Citgo* described two different methods for determining a Clean Water Act penalty: the "top-down" and "bottom-up" methods.[10] *Citgo*, 723 F.3d at 552.

33.     The top-down method involves "calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist" based on the Court's consideration of the facts and the statutory penalty factors. *Marine Shale Processors*, 81 F.3d at 1337; *see also Citgo*, 723 F.3d at 552 (quoting *United States v. Allegheny Ludlum*, 366 F.3d 164,

---

[9] Pub. L. No. 112-141, Subtitle F, § 1602(b), 126 Stat. 405, 588 (2012); 33 U.S.C.A. § 1321 note.

[10] At the Penalty Phase Pretrial Conference, the Court dismissed as moot the United States' Memorandum on the Burden of Proof for Penalty Factors (Rec. Doc. 13994) indicating orally that it would decide the issue later. Thus, the United States here re-raises its arguments on the method of calculation for the Court's convenience.

178 n.6 (3d Cir. 2004), describing the "top-down" and "bottom-up" methods); *United States v. B&W Inv. Properties*, 38 F.3d 362, 368 (7th Cir. 1994) ("In considering fines under the [Clean Air] Act, courts generally presume that the maximum penalty should be imposed.").

34.     The Fifth Circuit has declined to exclusively adopt either the top-down or bottom-up approach. *Citgo*, 723 F.3d at 552. A number of district courts within the Fifth Circuit have applied the top-down approach in Clean Water Act cases. *See*, *e.g.*, *Cedar Point Oil*, 73 F.3d at 573-76 (upholding a district court's use of the "top-down" method to determine civil penalty under CWA section 309); *Gulf Park Water*, 14 F. Supp. 2d at 858 (reviewing Fifth Circuit practice and applying the top-down approach); *Weber*, 1996 WL 477049, at *15 (applying top-down approach); *United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *3 (S.D. Tex. Feb. 26, 2009) ("The Fifth Circuit endorsed the 'top-down' methodology for calculating the appropriate penalty.").

35.     The top-down method is the most logical approach in this case. In *Citgo*, the United States alleged significant economic benefit (tens of millions of dollars) resulting from years of ignored maintenance at the facility in question. *Citgo*, 723 F.3d at 552-53. Economic benefit was a central component of the penalty that the United States sought.[11] Here, in contrast to *Citgo*, the United States has alleged that BPXP's actions, while motivated by profit, did not result in a large economic benefit as compared to the scale of harm caused by the incident.

36.     In *Egan Marine*, neither party contended that the actions causing the oil spill resulted in an economic benefit. 2011 WL 8144393, at * 6-7. Thus, because there was no

---

[11] Under the bottom-up approach, the court begins with the economic benefit as the starting point for the penalty, and then goes through the remaining factors to determine whether (and how much) to increase the penalty. *Citgo*, 723 F.3d at 552.

economic benefit from which to begin the bottom-up analysis, the district court concluded that the bottom-up approach would be "inapposite," and applied the top-down approach instead. *Id.*

37.     The instant case is analogous to *Egan Marine*, in that economic benefit is not the primary driver compelling a large penalty. 2011 WL 8144393, at *7. The approach in *Egan Marine*—which has also been taken by numerous other courts inside and outside the Fifth Circuit—is most appropriate: begin the analysis at the top of the penalty range, only reducing the penalty for those factors that warrant a reduction.

## V.     ANALYSIS OF SECTION 311(b)(8)'S PENALTY FACTORS

38.     Section 311(b)(8) of the CWA lists eight penalty factors that the Court "shall consider" to assess a penalty. 33 U.S.C. § 1321(b)(8). The penalty factors are (1) "the seriousness of the violation or violations," (2) "the economic benefit to the violator, if any, resulting from the violation," (3) "the degree of culpability involved," (4) "any other penalty for the same incident," (5) "any history of prior violations," (6) "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge," (7) "the economic impact of the penalty on the violator," and (8) "any other matters as justice may require."

39.     The Court is *required* to consider all of the CWA penalty factors. *See Tull,* 481 U.S. at 422 n.8 (CWA Section 309 was amended to "require" trial courts to consider penalty factors); *Tyson Foods,* 897 F.2d at 1141 (interpreting CWA Section 309, stating that court must consider all factors).

40.     While the Court is required to consider all of the CWA penalty factors, a "district court's analysis of those factors is highly discretionary," and courts are not required to enhance or reduce the penalty for every factor. *Citgo*, 723 F.3d at 551 (court has discretion); *Egan*

*Marine*, 2011 WL 8144393 (lack of economic benefit and violator's completion of legally required response actions and other efforts to mitigate did not reduce the penalty); *see also Cedar Point Oil*, 73 F.3d at 576 (quoting *Tull*, 481 U.S. at 427).

41.     Courts have recognized that there is no mathematical formula for penalty assessment under the CWA, even for factors that lend themselves to quantitative estimates, like ability to pay and economic benefit. *Gulf Park Water*, 14 F. Supp. 2d at 868-869; *United States v. Smith*, No. 12-00498, 2014 WL 3687223, at *10 (S.D. Ala. July 24, 2014). In *Gulf Park Water*, the court explained that "while the experts offered calculations on the ability to pay as well as the economic benefit, to these findings there must be applied a degree of reason and common sense without the benefit of precise mathematical equations." 14 F. Supp. 2d at 868-869. The Fifth Circuit has cautioned courts that "calculation of discretionary penalties is not an exact science." *Marine Shale Processors*, 81 F.3d at 1338.

42.     Because only one court has tried to final judgment[12] a judicial penalty under Section 311(b) of the CWA since the 1990 amendments, (*Egan Marine*, 2011 WL 8144393), the Court's exercise of discretion may also be informed by legislative history and other courts' discussion of how to apply the penalty factors under CWA Section 309.[13] As the agencies primarily responsible for the CWA's enforcement and analysis, administrative decisions from the Environmental Protection Agency (EPA) and United States Coast Guard (USCG) are also relevant for "proper judicial interpretation of the statute." *See, e.g. Marathon Pipe Line*, 589 F.2d

---

[12] The *Citgo* case also provides recent guidance from the Fifth Circuit, but is pending on remand to the district court. September 29, 2011 Judgment, *United States v. Citgo Petroleum Corp.*, No. 08-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011) (hereinafter "*Citgo Judgment*"), vacated and remanded by the Court of Appeals, *Citgo*, 723 F.3d 547.

[13] CWA Section 309(d) includes Section 311(b)(8) penalty factors 1, 2, 5, 7, and 8 listed above.

at 1308 (considering EPA's interpretation of the CWA in administrative proceedings); *Tex-Tow*, 589 F.2d at 1313-15 (interpreting USCG's application of the factors in litigation context).

43.     However, the *size* of penalties assessed under administrative actions and other statutes are not directly analogous to penalties under Section 311(b) because of the unique statutory per-barrel penalty scheme reserved for judicial civil penalties, which evinces Congress' appreciation of the "deleterious effect" of oil spilled into our nation's waters. *United States v. Standard Oil Co.*, 384 U.S. 224, 226 (1966) ("its presence in our rivers and harbors is both a menace to navigation and a pollutant."). After the Exxon Valdez disaster, Congress determined that a unique volume based penalty should apply (by setting the maximum in each case based on the volume discharged), so as to adequately deter and punish the perpetrators of catastrophic oil spills. Further, Section 311's penalty factors were designed to be tailored to the specific facts of each case. While the *approach* courts have taken to penalty assessment in other cases may be instructive, the *amounts awarded* are not because of the unusually massive size of this violation. Related settlement amounts are not analogous to the judicial penalties the Court will assess, except to the extent that, as courts have recognized, judicially imposed penalties should be significantly higher than an early settlement may have been. *See e.g.*, *Tull*, 481 U.S. at 425 ("[P]enalties assessed by judges should be sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle").

### A. The Macondo Oil Spill Was an Extremely Serious Violation of the CWA.

44.     The first penalty factor is "the seriousness of the violation or violations…." 33 U.S.C. § 1321(b)(8).

45.     Although they attempt to downplay and understate its impact, BPXP and Anadarko both admit the spill was serious. As BPXP puts it, "BPXP does not deny that there were environmental impacts caused by this serious event." December 19, 2014 BPXP's and

Anadarko's Pretrial Memorandum for the Penalty Phase, Rec. Doc. 13903 at 9. Anadarko has admitted the spill was "extremely serious when it occurred." Rec. Doc. 13903 at 13.[14]

46.     While there is no prescribed set of facts a court must analyze under the seriousness factor, a spill's impact on the environment, human health, and the economy is typically considered. *See, e.g.*, *Citgo*, 723 F.3d 547 (considering impacts on environment and local economy, as well as the size and length of the spill); *Gulf Park*, 14 F. Supp. 2d at 859 (considering potential human health impacts and the violation's duration under Section 309). Therefore, the seriousness factor asks not only *whether* a spill was serious, but also *how* serious it was. Courts have historically considered a violation's actual and potential impact to answer this question. *See, e.g.*, *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 344 (E.D. Va. 1997) ("The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect"), *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999); *Smith*, 2014 WL 3687223, at *12 (considering the toxicity of the discharged substance and violations of reporting requirements, among other things). The two categories have no judicially prescribed definition, but can be described as: (1) facts and figures showing demonstrated impact (actual harm); and (2) facts and figures illustrating the scope of potential risk created by a violation (potential harm).

---

[14] Anadarko argues that the seriousness factor has limited relevance to Anadarko merely because it is not culpable. BPXP and Anadarko's Pretrial Memorandum for the Penalty Phase Trial, Rec. Doc. 13903 at 11. The seriousness of the incident is relevant to an assessment of a penalty against a strictly liable violator regardless of that violator's degree of fault or responsibility for the spill itself. 33 U.S.C. § 1321(b)(8) (the court "shall consider" each of the penalty factors); *Egan Marine*, 2011 WL 8144393, at *7 (imposing near-maximum penalty given the seriousness of the violation, despite violator not being culpable); *see also Coastal States*, 643 F.2d at 1128 (citing *Marathon Pipeline,* 585 F.2d at 1309, for the proposition that "polluters rather than the public should bear the costs of water pollution" regardless of owner/operator fault.).

### i. Examples of facts constituting actual harm in previous CWA cases

47.     Proof of actual harm is relatively straightforward, and includes: the length and size of the spill; demonstrated oiling of people, animals, or habitats; demonstrated injury, illness, or death of people, animals, or habitats; whether the substance discharged was toxic; and other impacts to the quality of life of affected communities. *See, e.g.*, *In re Tug Ocean Prince, Inc.*, 584 F.2d 1151, 1161 (2nd Cir. 1978) (discussing impacts of oil spills); *see also Citgo Judgment*, 2011 WL 10723934, at 4.

48.     Congress has declared that there should be "no discharges of oil or hazardous substances into or upon the navigable waters of the United States [or] adjoining shorelines. . . or in connection with activities under the Outer Continental Shelf Land Act or the Deepwater Port Act of 1974." 33 U.S.C. § 1321(b)(1). As the Second Circuit explained in *In re Tug Ocean Prince*:

> Dumping and accidental spilling of oil constitutes a major pollution threat to the water resources of the nation. It can destroy or limit marine life, ruin wild life habitats, kill birds, limit or destroy the recreational value of ocean beaches, lake shores and river stretches, contaminate water supplies and create fire hazards. Congress has repeatedly indicated its high regard for our water quality and, conversely, its disdain for pollution.

584 F.2d at 1161.

49.     In light of Congress' creation of a volume-based approach to calculating the maximum penalty, the duration and volume of a discharge is highly relevant to the seriousness factor. *Citgo Judgment*, 2011 WL 10723934, at 1-2; *Egan Marine*, 2011 WL 8144393, at *7; *Gulf Park Water*, 14 F. Supp. 2d at 859. For example, the *Citgo* court considered the 54,000 barrel two-day long spill indicative that the defendant's violation was "extremely serious." *Citgo Judgment*, 2011 WL 10723934, at 1-4 (describing the Citgo spill as "massive," "significant," "excessive," and "major."). The court in *Egan Marine* also considered the size of the discharge,

and found the spill of 4,817 gallons of oil serious. 2011 WL 8144393, at *7. While voluminous evidence of actual harm exists for the Court to consider, the size and length of the Macondo oil spill alone (3.19 million barrels over 87 days) is sufficient to find the violation was extremely serious. Phase Two Findings, Rec. Doc. 14021.

50.     Demonstrated impacts on the environment provide clear evidence of seriousness. Facts constituting a "very serious" violation under the penalty factors were summarized by the *Citgo* court:

> The evidence shows that marsh habitat, vegetation, fish, crabs, shrimp, and aquatic life were affected by the oil spill. Additionally, several birds were oiled and killed by the substances spilled into the environment. Areas of shoreline and waterfront, both industrial and residential, were oiled.

*Citgo Judgment*, 2011 WL 10723934, at 3. On appeal, the Fifth Circuit agreed that the spill was "massive, excessive, and a tragedy." *Citgo*, 723 F.3d at 553 (internal quotations omitted).

51.     In *Citgo*, actual harm to the economy was also inferred based on the closure of a waterway polluted by the spill: "Navigational waterways were shut down for several days, and restricted for a significant period following their reopening. *The spill disrupted both commercial and industrial businesses, as well as recreational water use for a period of time.*" *Citgo Judgment*, 2011 WL 10723934, at 3 (emphasis added). Fisheries closures or restrictions were imposed in federal and state waters off shore from Louisiana, Mississippi, Alabama, and Florida from April, 2010 to April, 2011 following the Macondo oil spill. Rec. Doc. 7114-22.

52.     Courts have also considered the amount of pollutants in water samples as evidence of actual harm. For example, the court in *Smithfield Foods* described the defendants' discharges in relation to the actual harm they caused:

- [T]here is sufficient evidence that defendants' ammonia and TKN violations contributed to the high nitrogen concentrations in the Pagan River, which exceed

19

the nitrogen goal for SAV restoration established by the Chesapeake Bay Program. 972 F.Supp. at 346.

- Although defendants are not the only source of fecal coliform in the Pagan River, their Permit exceedances significantly contributed to the microbiological contamination of the Pagan River, and further delayed direct harvesting of shellfish and safe direct contact recreation in the river. *Id.* at 347.

53.     The length and cost of cleanup efforts required are also evidence of actual harm and indicators of seriousness. *Egan Marine*, 2011 WL 8144393, at *2, *6-7 (finding that the violation was "undoubtedly serious, as evidenced by the extent of the cleanup efforts [139 days] and the compensation that both parties have paid out as a result [$5.5 million in cleanup costs].""). The response in this case is ongoing (1,801 days, as of the date of this filing (Mar. 27, 2015)), and has cost approximately $14 billion dollars. United States' Proposed Findings of Fact for the Penalty Phase ("US Phase Three Findings of Fact") at ¶¶ 2, 24; Rec. Doc. 13903 at 3. This alone is proof of an extremely serious violation.

54.     In summary, in comparison with previous cases, the actual harm alone established here – eleven men killed, a number of others severely injured, thousands of dead birds, 1100 miles of oiled shoreline – weighs heavily in favor of a maximum civil penalty.

### ii. Potential harm alone is sufficient to establish the seriousness of a violation

55.     While evidence of actual harm alone can prove a violation is extremely serious, so can evidence of potential impacts. The purpose of the CWA supports consideration of potential harm: Congress intended to punish violators for risking harm to the country's waters and people through *any* discharge of oil. 33 U.S.C. § 1321(b)(1) ("it is the policy of the United States that there should be *no discharges* of oil or hazardous substances into or upon the navigable waters of the United States [or] adjoining shorelines. . . or in connection with activities under the Outer Continental Shelf Land Act or the Deepwater Port Act of 1974.") (emphasis added); *see also* S. Rep. No. 101-94, at 2-3 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 724. Failure to consider

any potential for widespread harm created by a violator's discharge undermines that purpose. The Act also prohibits discharges of oil in "quantities as *may* be harmful," 33 U.S.C. § 1321(b)(3), which supports assessing potential harm. Section 311(b)(4) of the CWA directs the President to determine by regulation those quantities of oil that *may* be harmful, and the resulting regulations provide that such quantities are demonstrated by, *inter alia*, the presence of a "film" or "sheen" of oil on the water. 40 C.F.R. § 110.3(b).

56.    Because nothing in the CWA penalty assessment provisions require quantification of injuries or damages caused by a violation to establish seriousness, courts have routinely relied on evidence of potential harm in setting penalties. *United States v. Dico*, Inc., 4 F. Supp. 3d 1047, 1064 n.38 (S.D. Iowa 2014) ("in the context of assessing civil penalties under the Clean Air Act ('CAA') and the Clean Water Act ('CWA'), several courts have concluded that statutory violations that could potentially result in environmental harm were serious even absent proof of such harm."); *Smithfield Foods,* 972 F. Supp. at 344 ("The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect."), *aff'd in relevant part*, 191 F.3d 516; *Gulf Park Water*, 14 F. Supp. 2d at 859-61 ("[t]he United States is not required to establish that environmental harm resulted from the defendants' discharges or that the public health has been impacted due to the discharges, in order for this Court to find the discharges 'serious.'"); *Sierra Club v. Mas Tec N. Am.*, No. 03-1697-HO, 06-6071-HO, 2009 WL 426205, at *4 (D. Or. Feb. 19, 2009); *Sierra Club v. El Paso Gold Mines, Inc.*, No. 01 PC 2163, 2003 WL 25265873, at *8 (D. Colo. Feb. 10, 2003). Proof of potential harm, rather than actual harm, is particularly appropriate in cases where science establishing the presence or absence of environmental harm is incomplete. *United States*

*v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 430-33 (W.D. Pa. 2002) (citations omitted), *rev'd on other grounds*, 366 F.3d 164.

  57. Evidence of potential harm alone can justify a significant penalty. *See, e.g.*, *Marine Shale Processors,* 81 F.3d at 1336 (CWA Section 309 violations were "serious" even though there was little, if any, evidence of actual harm); *Smithfield Foods,* 972 F. Supp. at 344; *Gulf Park Water*, 14 F. Supp. 2d at 862 ("Although no evidence was presented of actual harm, the evidence was more than ample to establish that the violations…were serious. There is undisputed evidence of the potential harm to the public health and the environment posed by the discharge of pollutants by the defendants."). This makes sense given the retributive purpose underlying Section 311 penalties: if a violator's discharge creates a massive potential for harm, penalties should not be reduced simply because actual harm resulting from the spill was not as bad as it could have been. March 21, 2014 Transcript at 84 (The Court: "You can have an extremely serious violation that results in little or no damage, but it could have potential to do catastrophic damage, but it could be good fortune that it doesn't do extensive damage. It doesn't mean it's not an extremely serious violation."). The Fifth Circuit has explained that "almost winning a highly risky gamble with the environment does not much affect the egregiousness of having been gambling in the first place." *Citgo*, 723 F.3d at 555-56 (discussing the culpability factor). When, as here, the discharge puts an entire ecosystem and way of life at risk—and severe actual harm has already been established—the seriousness factor dictates that a severe penalty be imposed.

  58. BPXP argues that its penalty should be reduced because "it is also now clear-four years later-that the impacts were far less than feared..." December 19, 2014 BPXP's and Anadarko's Pretrial Memorandum for the Penalty Phase, Rec. Doc. 13903 at 9. As already

addressed in ¶ 57, *supra*, the fact that the spill was not as bad as it could have been does not change the fact that its actual consequences were staggeringly serious. It certainly does not merit any reduction of the penalty based on the seriousness factor.

### iii.  *Examples of facts establishing potential harm in previous cases*

59.     Courts have inferred potential harm to human health based on the threat of direct exposure to discharges but also based on closures arising from seafood safety concerns. For example, in *Gulf Park Water*, a CWA Section 309 case, the court found that the violations were serious based on potential harm to human health from possible exposure (finding discharges posed a "threat to human health," "risk to human health," and "exacerbated the risks to human health," 14 F. Supp. 2d. at 861-62) and inferred potential for human health harm based on the fact that oyster beds were closed as a result of the discharges (finding the oyster bed closures were a "direct, proximate" cause of the discharges and evidence of "serious public health impact," *id.* at 861). *See also Smithfield,* 972 F. Supp. at 347-348 (finding violations serious because of potential human health harm caused by the defendant's frequent and severe permit exceedances). The court in *Atlanta Gold* inferred potential harm to fish and people in a creek polluted by toxic discharges from a mine. 879 F. Supp. 2d at 1159-60, 1168 (finding violations were serious where toxic levels of contaminants were detected in receiving creek, even though there was "no evidence that the *untreated* waters of [the creek] serve as a source of drinking water…and therefore no evidence that AGC's discharges are *currently* causing or contributing to a serious public health problem.") (emphasis in original).

60.     Courts have also inferred potential harm to the environment based on: a discharge's threat to water quality generally (*see, e.g.*, *El Paso Gold Mines, Inc.*, 2003 WL 25265873, at *9); the presence of sensitive animals in discharge areas, (*see, e.g.*, *Gulf Park Water*, 14 F.Supp. at 861); and the toxicity of the discharged substance (*see, e.g.*, *Smithfield*, 972

F.Supp. at 347-48). For example, in *Allegheny*, the court noted that the government had not shown actual harm, but concluded the discharges were serious because:

> The record shows that the metals discharged by ALC can be toxic in small concentrations of only parts per billion, although ALC released toxic discharges of chromium on eight occasions in concentrations of parts per million. Dr. Diamond stated that ALC's closely spaced outfalls, the multiple and recurring violations within a relatively short time frame, and the synergistic effect of metals and pH violations, all combined to pose multiple stresses, the cumulative effect of which were more difficult for aquatic life to withstand.

187 F. Supp. 2d at 432. Therefore, potential harm can be inferred—and seriousness found—even in cases where actual harm from the spill cannot be specifically quantified, but components that could cause actual harm are present.

### iv. Courts have rejected arguments limiting the seriousness factor

61.     Courts have rejected arguments from polluters that violations are not serious because the receiving waters were already being polluted by other sources. *See, e.g.*, *Gulf Park*, 14 F. Supp. 2d at 859-62 (collecting Section 309 cases and holding "the existence of other sources of pollution does not mitigate the potential harm caused by this discharge"); *Idaho Conservation League*, 2015 WL 632367, at *4 ("It would therefore be antithetical to the CWA's purpose to credit the argument that a few sporadic discharges into an already-impaired stream warrant a nominal penalty.") (internal citations omitted).

62.     In *Allegheny*, the court criticized the defendant's environmental expert for averaging data in order to minimize harm:

> Dr. Barnthouse's analysis downplays the high concentration violations by averaging them with low concentration discharges over many years. The court finds persuasive Dr. Diamond's response that this analysis overlooks the likely toxicological effect of ALC's violations; it is analogous to arguing that consuming five gallons of alcohol in a single day is not harmful because on average the daily consumption over seven years is within acceptable limits.

187 F. Supp. 2d at 433. Efforts by BPXP to downplay the impacts of the Macondo oil spill through aggregation of environmental data are similarly problematic.

63.     BPXP argues that its penalty should be reduced because "it is also now clear-four [now nearly five] years later-that the …Gulf has largely recovered." December 19, 2014 BPXP's and Anadarko's Pretrial Memorandum for the Penalty Phase, Rec. Doc. 13903 at 9. Setting aside the point that BPXP significantly overstated evidence of recovery, this argument is at odds with the law. Partial recovery five years later scarcely diminishes the seriousness of this violation. Nothing in the Act supports the idea that eventual recovery mitigates harm caused by a spill in the first instance. Indeed, adoption of BPXP's position—that its penalty should be mitigated because time has passed and parts of the Gulf have begun to show signs of recovery—would mean that all violators need do to decrease their penalties is wait to see if the ecosystem they polluted is resilient. Also, quantification of precise damages and recovery is the subject of the yet unfiled NRD claim, a topic that is the subject of ongoing investigation by the State and Federal natural resource trustees (and apparently BPXP as well). BPXP will have the opportunity to prove in that case the asserted recovery of the Gulf. Such facts are not sufficient to reduce the Section 311 penalty under any factor.

64.     Though all penalty factors must be considered, courts have found that seriousness alone "weighs in favor of a substantial penalty." *Egan Marine*, 2011 WL 8144393, at *7.

65.     In sum, CWA caselaw has established that seriousness is a fundamental factor in penalty analysis. By setting the maximum penalty in each case based on the number of barrels discharged, the CWA itself clearly contemplates that the spill size is relevant to seriousness and the ultimate size of the penalty. Prior cases have also shown the types of harm that have been deemed "serious" enough to warrant high penalties. These cases make it abundantly clear that

the Macondo spill—which was orders of magnitude more extensive than prior oil spill, and the largest man-made environmental disaster in U.S. history—deserves a penalty orders of magnitude larger than prior penalties as well.

### B. Defendants' Economic Benefit Does Not Serve as a Starting Point for Penalty Calculation.

66.     One of the penalty factors is the "the economic benefit to the violator, if any, resulting from the violation…." 33 U.S.C. § 1321(b)(8).

67.     The words "if any" highlight that a penalty is appropriate even if there was no economic benefit. 33 U.S.C. § 1321(b)(8).

68.     The Fifth Circuit has explained that courts are required to make a "reasonable approximation" of economic benefit in determining a Clean Water Act penalty. *Citgo*, 723 F.3d at 552 (quoting *Cedar Point Oil*, 73 F.3d 546).

69.     "It is in the nature of [economic benefit] that its qualification will be imprecise." *Gulf Park Water*, 14 F. Supp. 2d at 864 (citing *Student Public Interest Research Group v. Hercules*, 19 Envtl. L. Rep. 20903, 20904 (D.N.J. April 6, 1989)). The "Court must endeavor to 'reach a rational estimate of [the violator's] economic benefit, *resolving uncertainties* in *favor of the higher estimate*.'" *Id.* (quoting *Gwaltney*, 611 F. Supp. at 1558). "Precise economic benefit to a polluter may be difficult to prove….a reasonable approximation of economic benefit is sufficient to meet plaintiff's burden for this factor." *Powell Duffryn Terminals*, 913 F.2d at 80 (citing S. Rep. No. 50, 99th Cong., 1st Sess. 25 (1985)).

70.     Two theories on calculating economic benefit are: 1) the cost of capital that was not spent but should have been to ensure compliance, and 2) the actual return on capital that

should have been used to ensure compliance but was not.[15] *Citgo*, 723 F.3d at 552. Here, the foregone costs of Defendants' cost-cutting measures represent capital that was not spent but should have been to ensure compliance. *See* US Phase Three Findings of Fact at ¶¶ 569-576. That amount, in the low millions of dollars, while significant in real dollar terms, is not a significant driver of the penalty given the sheer enormity of the spill. Similarly, the actual return on capital or costs avoided that should have been used to ensure compliance would also be dwarfed by the size and seriousness of the spill.

71.     In *Citgo*, the Fifth Circuit vacated the district court judgment and remanded for additional findings after the district court failed to make a reasonable approximation of economic benefit despite being presented with substantial evidence of significant and longstanding economic benefit. The Fifth Circuit explained that "proper consideration of economic benefit is integral to arriving at an appropriate damage award." 723 F.3d at 553. In that case, the district court heard expert testimony regarding Citgo's avoided and delayed costs over a number of years. *Id.* at 552. Instead of determining the economic benefit of those deferred costs, however, the district court found that "'the amount of [economic] gain to CITGO was less than the $83 million argued by the government, but more than the $719.00 asserted by CITGO.'" *Id.* (citing the district court's findings). Therefore, because there was effectively no finding on economic benefit, the Court of Appeals was unable to determine whether the civil penalty imposed was greater than the economic benefit incurred. *Id.* at 552-53.

72.     *Citgo* does not compel a more precise finding regarding economic benefit than is being urged by the United States in this case. In contrast to *Citgo*, there is not nearly so sharp a dispute between the parties as to the degree of economic benefit. Here, BPXP and Anadarko

---

[15] This is not an exhaustive list of the ways by which economic benefit may be proven, but simply a list of common examples.

have argued that there was no economic benefit. While the United States argued (and the Court has found) otherwise, the ascertainable value of that economic benefit is, according to all parties, a modest value compared to the scale of harm and destruction caused by the disaster. Under the circumstances of this case, a conservative estimate of hundreds of thousands to the low millions of dollars of economic benefit is a "reasonable estimate." US Phase Three Findings of Fact at ¶ 577. Anadarko's economic benefit was 25% of this total, because Anadarko was 25% owner. Likewise, BPXP's economic benefit was 65% of the total, because it was the 65% owner. A more precise quantification of the economic benefit would do little to aid the Court in determining the appropriate penalty for BPXP and Anadarko.

73.     The purpose of the economic benefit factor is to ensure that defendants do not wrongfully profit from their misconduct. *United States v. Mun. Authority of Union Tp.*, 150 F.3d 259, 263-64 (3d Cir. 1998) ("*Dean Dairy*"). Penalties should be higher than the economic benefit in order to adequately deter defendants who would seek such wrongful profits. *Id.* However, as the Supreme Court has specifically noted, civil penalties are not limited to achieving restitution of wrongful gains, and thus penalties are imposed even when there was no economic benefit. *Tull*, 481 U.S. at 423 ("[T]he district court acknowledged that petitioner received no profits from [the violations], but still imposed a $35,000 fine."). Indeed, when the violation is serious, significant civil penalties are appropriate regardless of economic benefit. *See, e.g.*, *Egan Marine*, 2011 WL 8144393, at *6-7 (penalty of 89% of maximum imposed despite no economic benefit); *Catskill Mtns. Chapter of Trout Unlimited v. City of New York*, 451 F.3d 77, 88-89 (2d Cir. 2006) (affirming district court's decision to not use lack of proof of economic benefit as a basis to lower $5.75 million penalty, but remanding due to error in calculation of maximum penalty amount).

74.     However, the relatively small amount of money, if spent, that could have helped avert this disaster highlights the egregiousness of the violation, and supports the imposition of a large penalty. Cutting corners to save such comparatively minor costs emphasizes how recklessly indifferent BPXP was with respect to the potential consequences of its actions.

75.     In the products liability tort law context, the knowing failure of a defendant to implement feasible, inexpensive protective measures is an aggravating factor that merits the imposition of punitive damages. *See, e.g.*, *Grimshaw v. Ford Motor Co.*, 174 Cal. Rptr. 348, 384 (Cal. Ct. App. 1981) (affirming imposition of punitive damages where defendant declined to correct defect "at minimal cost;" evidence showed "callous indifference to public safety" and "conscious disregard" of risk of injury). That reasoning is fully applicable here. Because BPXP recklessly took such extraordinary risks to save such comparatively small amounts of money, a large civil penalty is warranted to punish such conduct.

### C.  Consideration of the Culpability of Anadarko and BPXP.

#### i. *Culpability is not required to assess a significant CWA penalty*

76.     The Court ruled that Anadarko is not culpable. Rec. Doc. 12592.[16] However, the Act allows for the imposition of penalties up to $1,100/barrel of oil discharged even in the absence of negligence or fault, (*see* 33 U.S.C. § 1321(b)(7)(A) and 40 C.F.R. § 19.4), and the Fifth Circuit has recognized that CWA liability arises irrespective of knowledge, intent, or fault. *United States v. BP Exploration & Prod. Inc. (In re Deepwater Horizon)*, 753 F.3d at 575 (citing *Kelly v. United States EPA*, 203 F.3d 519, 522 (7th Cir. 2000)).

77.     Anadarko argues it should receive no penalty (or a low penalty) because it is not culpable in tort. This position is not supported by the law. CWA Section 311(b)(7) imposes strict

---

[16] The United States' arguments against this ruling are contained at Rec. Doc. 12462, and it does not reargue those points here.

liability for violations of Section 311(b)(3). *In re Deepwater Horizon*, 841 F. Supp. 2d at 1003 (recognizing liability is "strict"); *Coastal States*, 643 F.2d at 1127; *United States v. Gulf Park Water Co., Inc.*, 972 F. Supp. 1056, 1059 (S.D. Miss. 1997) (holding "compliance with the CWA is a matter of strict liability").[17]

78.     Numerous courts have held that once strict liability is established, assessment of a civil penalty is mandatory, even when there is no fault. *See, e.g.*, *Egan Marine*, 2011 WL 8144393, at *5 (discussing the mandatory nature of CWA liability); *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 226 (D.D.C. 2007) (same); *Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642, 652 (E.D. La. 2002) (same). If anything, the amendments and related legislative history clarified Congress' intent that all those involved in polluting enterprises will be penalized for violations of CWA Section 311.

79.     Courts have refused to significantly discount penalties based on the violator's degree of fault. In *Marathon Pipeline*, the court rejected the defendant's attempt for a nominal penalty in the absence of fault, reasoning:

> In effect, Marathon would have us read into the statute a strict standard of liability for a nominal penalty and a negligence standard of liability for a substantial penalty. We do not believe the plain language of the statute supports different standards for a substantial as opposed to a nominal penalty.

589 F.2d at 1308. Even though a third party caused the spill, the court held that the Act's strict liability standard "is an absolute liability provision which contemplates a substantial penalty even in the absence of fault." *Id.* at 1306; *see also Coastal States*, 643 F.2d at 1128 (citing *Marathon Pipeline* for the proposition that "polluters rather than the public should bear the costs of water pollution" regardless of owner/operator fault. 589 F.2d at

---

[17] These propositions also negate Anadarko's contentions under the "other matters as justice may require" factor that its non-operator status should mitigate its penalty. BPXP and Anadarko's Pretrial Memorandum for the Penalty Phase Trial at 13-14, Rec. Doc. 13903 at 15-16.

1309); *see also United States v. General Motors Corp.*, 403 F. Supp. 1151, 1157 (D. Conn. 1975) (commenting that although a third party defense "may appear to be a just and wise public policy, it is not contained in the statute, which is based on a concept of 'strict liability,' providing that a penalty 'shall be assessed' whenever oil is discharged in harmful quantities as established by regulation.")

80.     Courts have found strict liability sufficient to justify a substantial penalty under the Act, regardless of culpability. *See Marathon Pipe Line*, 589 F.2d 1305; *Tex-Tow,* 589 F.2d at 1313-1314. In *Egan Marine*, the court discounted the maximum penalty only 10.3% because the defendant was not culpable. 2011 WL 8144393. Indeed, the Fifth Circuit has held that "shifting of the burden from the public to the offending users albeit good faith, non-negligent users to be a valid exercise of congressional powers. The imposition of a civil monetary penalty, on a strict liability basis, is reasonably related to the purposes of the statutory scheme and is not unconstitutional." *Coastal States*, 643 F.2d at 1128.

81.     In *Tex-Tow*, the Seventh Circuit affirmed a district court's imposition of a penalty on a faultless owner:

> [A]n owner or operator of a discharging facility is liable to a civil penalty under the Federal Water Pollution Control Act, even where it exercised all due care and a third party's act or omission was the immediate cause of the spill.

589 F.2d at 1316. The court rejected the defendant's argument that it should pay no penalty because a third party caused the spill. *Id.* at 1312. Though *Marathon Pipeline* and *Tex-Tow* analyzed earlier versions of the CWA, the strict liability standard was not changed in the 1990 amendments.

82.     Other strict liability environmental statutes support this interpretation of the culpability factor under the CWA. Courts have emphasized that "it must be remembered that

liability and punishment serve similar purposes. To find a party liable despite its lack of culpability, but then to reduce, significantly, the applicable penalty based on this lack of culpability, would certainly undermine the goals of the [environmental protection] statute." *Steeltech, Ltd. v. United States EPA*, 273 F.3d 652, 656 (6th Cir. 2001) (Analysis of strict liability under the Emergency Planning and Community Right to Know Act (EPCRA)).

> ### ii. Cases where courts severely reduced the penalty due to the violator's lack of fault are inapposite here because those cases involved violations that were caused by unknown third parties with no connection to the violator's enterprise

83.     Third party actions provide no absolute defense to the imposition of significant penalties under the CWA. *General Motors,* 403 F. Supp. 1151. However, courts have decreased a non-culpable defendant's penalty in cases where violations were committed by third parties unknown to the violator and completely outside the violator's control. *Id.* While it is true that, in *General Motors*, the court decreased the violator's penalties to one dollar because of its lack of culpability, the facts are significantly different from the case at hand: in spite of defendant's active security at the discharge site, a vandal scaled two tall, locked barbed wire fences and opened valves on the facility's storage tanks. *Id.* at 1153. This third party vandal—over whom the defendant presumably had no influence, with whom it had no communication, and who was not part of the defendant's enterprise—caused the discharge. In the instant case, the polluter was BPXP, Anadarko's partner in the Macondo Well enterprise. Here, Anadarko stood to profit from the well and was directly engaged in the "polluting enterprise" that resulted in the spill. *Tex-Tow*, 589 F.2d at 1313 *(*"the civil penalty furthers the overall statutory scheme of shifting the cost of pollution onto the polluting enterprise.").

84.     *Coastal States,* 643 F.2d at 1128, also illustrates why Anadarko should not get a significantly reduced penalty. In that case, a pipeline owner was held strictly liable under

§ 1321(b)(6) when an unknown third party vessel struck a pipe and caused a 5,200 gallon discharge. *Id.* at 1126. On appeal, the Fifth Circuit amended the defendant's penalty from $5,000 (the statutory maximum) to $1,000 based on the fact that an unknown third party had been solely responsible for the discharge and because the struck pipeline "had been installed by the Defendant in accordance with all applicable governmental regulations and standard industry practice." *Id.* at 1126-1128.

85.     Here, the party that caused the Macondo oil spill was Anadarko's partner in the enterprise, and the record shows that non-operators like Anadarko "actively participate" in exploration and production activities. Even Anadarko's expert agrees that non-operators have some ability to influence certain activities conducted under the contract. US Phase Three Findings of Fact at ¶¶ 1181-1182. Moreover, the Court's penalty assessment includes consideration of all eight penalty factors, and does not hang on the culpability factor, as Anadarko implies. Therefore, although some reduction in penalty for Anadarko's lack of culpability is appropriate, a drastic reduction is not.

### iii. *BPXP's gross negligence and willful misconduct in connection with the Macondo blowout denote a high degree of culpability and require a penalty near the maximum allowed under the law*

86.     BPXP's culpability for the incident strongly weighs in favor of a penalty at or near the statutory maximum. Culpability encompasses a range of behavior that is blameworthy or merits condemnation. Gross negligence and willful misconduct are the most severe form of culpable behavior identified under Section 311 for civil liability. *United States v. Exxon Mobil Pipeline Co.*, 28 F. Supp. 3d 843, 851 (D. Ark. 2014). In addition to evidence presented in the Penalty Phase, facts found during the first two phases of trial are considered in setting the penalty. PP. Tr. 8:05-8:15.

87.     The facts related to BPXP's culpability were amply laid out in the Court's Phase One Findings, and will not be repeated here, except to highlight that the Court found BPXP's behavior to be "inexplicable" (at 70 ¶ 275); that its accident investigation report was "patently false" (at 71 ¶ 278); that certain negligent acts were profit-driven (at 129 ¶ 519); that BPXP's conduct evinced "an extreme deviation from the standard of care and a conscious disregard of known risks" (at 130 ¶ 520); and that its conduct constituted "reckless, willful, and wanton conduct." (at 130 ¶¶ 561-562). Rec. Doc. 13381-1.

88.     Further, while the response was ongoing, the Court found that BP lied to Federal responders about the flow rate. Phase Two Findings at 32 ¶ 228, Rec. Doc. 14021.

89.     Such deplorable conduct has not been the norm in most CWA cases, and warrants a penalty at or near the top of the statutory range. This is particularly true considering the seriousness of this violation: BPXP's gross negligence and willful misconduct resulted in: the largest human-caused oil spill in U.S. history; large economic, social, and environmental repercussions across five states and the Gulf of Mexico; the deaths of 11 people; and injury to others.

### iv.  Prior violations are relevant to culpability

90.     The evidence of prior violations and incidents is highly relevant to "the degree of culpability involved." While the penalty factor "degree of culpability" encompasses gross negligence, willful misconduct, and even criminal behavior, it is a more general term that also encompasses any blameworthy behavior. The Fifth Circuit has indicated that culpability includes strict liability and increases through higher degrees of culpability. *See Citgo*, 723 F.3d at 553; Oxford English Dictionary 118 (2d ed. 1989) ("deserving blame or censure, blameworthy"); American Heritage Dictionary of the English Language 442 (4th ed. 2000) ("deserving of blame or censure as being wrong, evil, improper, or injurious"); Merriam-Webster Dictionary Online,

http://www.merriam-webster.com/dictionary (last visited March 27, 2015) ("meriting condemnation or blame especially as wrong or harmful"). At a minimum, the prior violations and incidents demonstrate a repeated pattern of safety deficiencies by BP leading to serious criminal violations of environmental law. *See* US Phase Three Findings of Fact at ¶¶ 588-628. BP's failure to correct these serious deficiencies, resulting in its admitted criminal negligence at Macondo, comprises blameworthy behavior that warrants penalization. As outlined in US Phase Three Findings of Fact § VII.A.i., the BP Group drove safety policies across all subsidiaries, and the known deficiencies in its safety policies—as shown by other serious incidents—are relevant to how BPXP should be punished for the same deficiencies at Macondo.

### D. Defendants Are Not Entitled to a Significant Reduction Under the Penalty Factor for Other Penalties Paid for the Incident.

91.      One of the penalty factors is "any other penalty for the same incident…." 33 U.S.C. § 1321(b)(8).

92.      The parties have stipulated as to the other penalties that have been imposed on various parties related to this incident. Rec. Doc. 13725.

#### i. Anadarko has paid no penalties to date; BPXP is not entitled to a dollar-for-dollar discount for its criminal penalties

93.      Anadarko has not paid a civil penalty of any kind in connection with the Macondo Incident and therefore no deduction under this penalty factor is warranted.

94.      BPXP has signed a plea agreement and agreed to pay criminal fines of $1.256 billion for charges related to the incident. Rec. Doc. 13725.

95.      The Court may consider those criminal fines in setting BPXP's civil penalty. BPXP is not entitled to a dollar-for-dollar credit (or anything close to it) for the amount of the criminal fine. Such a credit would in essence negate the criminal fine. *United States v. Citgo Petroleum Corp.*, 697 F. Supp. 2d 670, 673 (W.D. La. 2010).

96.     The Clean Water Act clearly permits the imposition of parallel civil and criminal penalties in the same case. *See* 33 U.S.C. §§ 1319(g)(6), 1321(b)(11) (statutory bars on dual penalty recoveries only mention civil penalties). This demonstrates that Congress believed that civil and criminal sanctions were distinct and complementary. If BPXP were to receive a full dollar-for-dollar reduction in its civil penalty for the criminal fine, then it would effectively not have to pay any criminal fine.

97.     Judge Vance considered BP's outstanding civil liability and civil penalties as justification for the adequacy of the criminal settlement amount:

> The Court takes note of BP's significant expenses, mandatory and voluntary, stemming from the Deepwater oil spill because these other consequences, while distinct from the plea agreement, provide context for the $4 billion BP will pay under the plea agreement. They demonstrate that paying $4 billion dollars on top of all of the other financial consequences is a consequential penalty.

*U.S. v. BP Exploration & Production Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Jan. 30, 2013), Rec. Doc. 65, Reasons for Accepting Plea Agreement, at 17-18. Indeed, in obtaining approval of the criminal settlement, BPXP already received credit for various costs it incurred in relation to the spill, including response costs and state tourism grants. The court noted that the "$4 billion penalties should be considered in light of BP's other related payments, obligations, and liabilities." *Id.* at 15. BPXP is not entitled to receive credit for these payments a second time.

98.     Judge Vance also indicated that BPXP's criminal plea should not serve as a credit against civil liability:

> The Court also takes note that BP is prohibited under the agreement from seeking any tax benefit or *receiving any reduction in civil liability* based on the payments made pursuant to this agreement or referencing the payments in any public relations, marketing, or advertising. These restrictions ensure that BP will feel the full brunt of the $4 billion in penalties it is required to pay.

*Id.* at 12-13 (emphasis added). Therefore, though the criminal plea was considered "objectively reasonable compared to previous criminal fines"—it was "three times larger than the value of the next largest criminal resolution ever paid"— it was also deemed sufficient in light of BPXP's substantial civil liability that has yet to be assessed. *Id.* at 11.

99.     The United States also approved BPXP's criminal plea amount *in light of* BP's other spill related expenditures. In its memorandum approving the settlement, the United States emphasized the following:

- "This severe financial sanction *is on top of* the $24.2 billion BP has already spent on clean-up efforts, various litigation and other claim settlements, and numerous other spill-related costs and efforts through the third quarter of 2012. The $4 billion in monetary sanctions required by the Plea Agreement is also in addition to BP's financial exposure in the separate pending civil multi-district litigation, MDL-2179." *U.S. v. BPXP*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Jan. 16, 2013), Rec. Doc. 49, Joint Memorandum in Support of Proposed Guilty Plea by BP Exploration & Production Inc., at 2 (emphasis added).

- "The $4 billion total criminal recovery under the Plea Agreement, including $1.256 billion in criminal fines and $2.744 billion in other payments, is reasonable, adequate, and just, and eclipses all prior criminal resolutions. The adequacy of these monetary penalties should be assessed in light of the additional $24.2 billion in accident- and spill-related expenditures BP has made through the third quarter of 2012, and by the billions of dollars of additional liability BP faces in pending civil litigation." *Id.* at 9.

- "Civil litigation by the United States also continues, with an initial trial phase set to begin in February. BP faces the prospect of billions of dollars in additional liability in the civil actions, with potential civil penalties under the Clean Water Act and liabilities related to the ongoing Natural Resource Damage Assessment. If past cases are any indication, BP's civil liability is likely to be significantly greater than the criminal monetary penalties agreed upon in the Plea Agreement." *Id.* at 32.

These statements make clear that the United States' approval of BPXP's criminal plea was dependent on the assessment of independent civil penalties.

100.     As part of its criminal plea, BPXP agreed to make other payments besides its CWA criminal fine, but it also agreed not to request that this Court consider those payments in

setting its CWA civil penalty. Rec. Doc. 13725. Thus, the Court may only consider the $1.256

billion CWA criminal fine paid by BPXP, not the $4 billion total. Any credit for the fine cannot

exceed a small fraction of $1.256 billion without canceling out the effect of the fine. *Citgo*, 697

F. Supp. 2d at 673. Therefore, anything close to a dollar-for-dollar discount would circumvent

the purpose of the criminal fine and work against the structure of the CWA.

### *ii. Prior settlements do not provide guidance for BPXP's penalty amount, and Anadarko's civil penalty should exceed Transocean's settlement figure*

101.    As the only party found to have acted with gross negligence and willful

misconduct, and the majority owner and operator of the well, it is rational that BPXP receive an

enhanced penalty far larger than that imposed on any other party. Any argument that the Court

should use the Transocean or MOEX settlements as a benchmark for assessing BPXP's penalty

is inappropriate and inconsistent with the facts found in Phase One. BPXP's culpability for the

blowout was far greater than Transocean's, and thus its penalty should be far higher as well.

102.    Anadarko, as a partial owner of the Macondo well and a sophisticated deepwater

operator in the Gulf of Mexico, should pay in excess of Transocean's CWA civil penalty of $1

billion, which was paid in settlement. "Public policy strongly encourages the settlement of

cases." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 n.2 (5th Cir. 1988). To this end, the

Supreme Court has explicitly recognized that, in CWA cases, Congress intended that "penalties

assessed by judges should be sufficiently higher than penalties to which the Agency would have

agreed in settlement to encourage violators to settle." *Tull*, 481 U.S. at 426 (quoting 123 Cong.

Rec. 39190-91(1977)).

103.    This Court previously held that Transocean was not liable as an owner[18] under the

CWA, but that Anadarko was liable as an owner, SJ Order, 844 F. Supp. 2d at 756-61, stating:

> Anadarko and BP were the ones directly engaged in the enterprise which caused the spill. They were the mineral lessees, they owned the well, and they stood to profit directly from the oil it produced. Thus, Congress intended that the cost of pollution would be borne by these parties. By contrast, Transocean was involved in the ''enterprise'' by virtue of its contract with BP. Transocean was paid charter hire by BP; it did not stand to profit directly from the oil.

*Id.* at 759. Transocean acted with negligence while APC did not, but this $1 billion paid by the

"paid charter hire" still stands as a guidepost for the appropriate penalty for Anadarko, who co-

owned the well and stood to profit from the oil produced had the well been completed

successfully.

104.    The standard for court approval of a Consent Decree is that it be fair, adequate,

reasonable, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977), and consistent with the

objectives of the statute under which the action was brought, *United States v. City of Miami*, 664

F.2d 435, 441 (5th Cir. 1981) (Rubin, concurring). The Court determined that both the early

Transocean and MOEX settlements met this standard when it approved those respective consent

decrees. Rec. Docs. 6698, 8608.

105.    With respect to the Transocean settlement, there were several public comments

arguing that the amount of the civil penalty was too low. Rec. Doc. 8502. In response to the

comments, the United States noted that in the Summary Judgment Order on CWA liability, the

Court highlighted that the statutory scheme of the CWA reflected that those entities that stood to

reap the greatest profits of oil exploration—that is, the owners of the well—were the ones upon

whom the risks and liabilities of the activity fell, and that they were the ones who should bear the

---

[18] The Court subsequently found that Transocean was liable under the CWA as an "operator." Phase One Findings, Rec. Doc. 13381-1.

largest CWA penalties. Memorandum in Support of Motion to Enter Transocean Consent Decree at 12-13, Rec. Doc. 8502 at 15-16 (citing Rec. Doc. 5809 at 20-22). The Summary Judgment Order was affirmed on appeal and its reasoning still applies: in comparison to Transocean, Anadarko should suffer a greater civil penalty, because Anadarko was the entity that stood to reap the greater profit from the enterprise.

106.    With respect to MOEX, the United States submitted to the Court an Unopposed Motion to Enter Consent Decree on May 3, 2012. Rec. Doc. 6436. That consent decree provided for MOEX to pay a total of $90 million (in penalties and supplemental environmental projects) to resolve its liability under the CWA.

107.    One of the reasons the United States presented to the Court to support the adequacy and reasonableness of MOEX's penalty was that "MOEX's willingness to come forward in early settlement negotiations also warrants a discount." United States Memorandum in Support of Motion to Enter at 15, Rec. Doc. 6436 at 24.

108.    Anadarko submitted to the Court a Memorandum in Response to the Motion to Approve the MOEX Consent Decree. Rec. Doc. 6700. In its Memorandum, Anadarko objected to certain arguments made by the United States as irrelevant or incorrect. Notably, however, Anadarko never argued that an early settlement discount was improper, or that the amount of MOEX's penalty was too high. Rec. Doc. 6700. Even if it had argued against MOEX getting an early settlement discount, such an argument would have been contrary to the Congressional intent, recognized in *Tull*, that "penalties assessed by judges should be sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle." *Tull*, 481 U.S. at 426 (quoting 123 Cong. Rec. 39190-91 (1977)). Therefore, in order to

effectuate Congress' intent that settling parties receive discounts, Anadarko's penalty will necessarily be set significantly higher than the amount MOEX agreed to pay.

109.    Anadarko now argues that MOEX settled prior to the Court's ruling on culpability. By the time MOEX entered into its settlement, however, the Court had already dismissed all general maritime negligence claims against it, so MOEX in fact *was* already aware that it was not negligent. Rec. Doc. 3830 at 28-29.

### E.    Neither Defendant Is Entitled to Any Deduction Given Their History of Violations.

110.    One of the penalty factors is "any history of prior violations…." 33 U.S.C. § 1321(b)(8).

111.    Evidence of prior violations and incidents also may be considered under two other factors in Section 311(b)(8): (1) culpability; and (2) any other matters that justice may require. *See Citgo*, 723 F.3d at 554 (holding that a district court's analysis of the factors is highly discretionary); *see also Louisiana Envtl. Action Network v. LWC Mgmt. Co., Inc.*, No. 07-0595, 2008 WL 687190, at *2 (W.D. La. March 10, 2008) (requiring defendants to identify "every action in which any of the defendants [were] alleged to have violated any federal, state, or local water pollution control law" for consideration under either the prior violations or "other matters as justice may require" penalty factors under CWA Section 309).

112.    The Court has ruled that the United States may present limited evidence on four prior incidents by BP entities: Texas City, Prudhoe Bay, Endicott Island, and Grangemouth, and that the Court will "accord that material such weight as it deems appropriate." Rec. Doc. 13867; *See* US Phase Three Findings of Fact at ¶¶ 588-621.

113.    Anadarko has repeatedly violated the Clean Water Act in the Gulf of Mexico and elsewhere. Anadarko and the United States have stipulated to ten CWA violations, including

nine in the Gulf of Mexico, all of which occurred during the 2004-2010 timeframe. Rec. Doc. 13808. The Gulf of Mexico violations relate to permit violations and illegal discharges from offshore facilities. Anadarko paid penalties ranging from $250 to $5,334.58, and in one case, also performed a supplemental environmental project valued at $17,500 in exchange for mitigation of the penalty to be paid. In August 2009, the court entered a consent decree under which Anadarko agreed to pay a penalty of $1,050,000.00 related to discharges of oil in violation of CWA Section 311(b) from certain onshore oil production facilities in Wyoming and Montana and violations of regulations implementing CWA Section 311(j).[19]

114.    CWA Section 311(b)(8) broadly provides that "in determining the amount of a civil penalty under paragraphs (6) and (7), [the court shall consider] *any history of prior violations* . . ." 33 U.S.C. § 1321(b)(8) (emphasis added). There is no language limiting this inquiry to violations under a specific statute, or limiting the inquiry to the same timeframe or facility.

### i. *Violations of other statutes may be considered*

115.    Prior violations that are characteristically different from the violation at issue may be considered under this factor in a CWA Section 311(b) context. For example, in *Citgo*, the court considered the defendant's prior CWA Section 309 and RCRA violations under its Section 311(b)(8) analysis and found that Citgo"[did] not appear to have recognized the importance of compliance, pollution control, environmental responsibility, and the overall duty imposed on businesses to operate safely[.]" *Citgo Judgment*, 2011 WL 10723934, at 3. The Fifth Circuit agreed with certain conclusions of the district court, and commented that Citgo "reflected a lack

---

[19] The United States did not stipulate that these violations comprise the full universe of violations as to Anadarko, as such a stipulation would require a thorough investigation of numerous federal, state, and local files. Rec. Doc. 13808.

of environmental responsibility and a general disregard of its duty to operate its business safely." *Citgo*, 723 F.3d at 553; *see also Smith*, 2014 WL 3687223, at *13 (recognizing relevance of "any past state or federal environmental law or regulation violations" to analysis of prior violations factor under CWA 309).

116.    The plain language of Section 311 does not limit consideration of relevant "prior history" to other Section 311 violations committed by BPXP or Anadarko. *Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 718, n.9 (5th Cir. 2009), (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980), for the proposition that "the starting point for interpreting a statute is the language of the statute itself"). In interpreting CWA Section 309(c), the Fifth Circuit recognized that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Pruett*, 681 F.3d 232, 242, n.5 (5th Cir. 2012); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

117.    As applied to CWA Section 311, this rule of statutory interpretation supports consideration of violations of other statutes by BP entities: Section 311(b)(7) provides that civil penalties may be imposed against "[a]ny person who is the owner, operator, or person in charge of any . . . facility from which oil or a hazardous substance is discharged *in violation of paragraph (3)* . . ." 33 U.S.C. § 1321(b)(7) (emphasis added); the prior violation penalty factor, 33 U.S.C. § 1321(b)(8), includes no language limiting consideration to prior violations of paragraph (3).

118.    BPXP has cited caselaw under CWA Section 309 to suggest that only "similar violations" can be considered under this penalty factor. *See* Rec. Doc. 12347-1. However, none

43

of the cases cited by BPXP concerned the issue of whether a history of prior violations other than those under the CWA should be considered by a court under Section 309(d) of the CWA. Furthermore, Section 311(b)(8) of the CWA is broader with respect to this factor than Section 309(d) of the CWA. Significantly, Section 311(b)(8) refers to "any history of prior violations," in contrast to Section 309(d), which more narrowly refers to "any history of such violations." Nowhere in Section 311(b)(8) did Congress limit the language "any history of prior violations" to prior violations that occurred at the same facility, under the same statute, or within a specified period of time before the violations leading to liability. The broad scope of this penalty factor under Section 311(b)(8) is consistent with the sweeping prohibition on the discharge of oil and hazardous substances under CWA Section 311(b)(3).

119.   Furthermore, Courts have given the factor "any history of such violations" in CWA Section 309 a broad construction, rather than the narrow one BPXP has suggested. *See, e.g., Allegheny*, 187 F. Supp. 2d at 433, *aff'd in part, vacated in part,* 366 F.3d 164 (finding no reason to exclude *any* previous violation, "even ones that are settled," in a CWA Section 309 penalty action); *United States v. Mun. Auth. of Union Tp.*, 929 F. Supp. 800, 808 (M.D. Pa. 1996) (finding the court may weigh all of defendant's violations in the record, "not just those regarding which liability has been determined."); *In the Matter of Ketchikan Pulp Co*., No. CWA-1089-12-22-309(g), 1995 WL 814171 (EPA Nov. 22, 1995) (prior history of violations under the Clean Air Act and Toxic Substances Control Act not involving the Ketchikan pulp plant considered in evaluating claim involving the pulp plant under CWA Section 309).

### ii. *Violations by related entities may be considered*

120.    The plain language of Section 311(b)(8) does not prevent the consideration of "any history of prior violations" by defendants, nor does it prevent considerations of other statutory provisions–its entire text is "any history of prior violations." Furthermore, a review of the case law interpreting the statutory factors reveals that the inquiry is not limited solely to the named defendant. For example, the case law on how courts evaluate the "economic impact of the penalty on the violator" allows for the examination of the finances of related entities when appropriate. *See Dean Dairy*, 150 F.3d at 263. This is true in the Fifth Circuit, where in the *Citgo* case the court considered the finances of Citgo's parent corporation for ability to pay purposes.[20] In *Dean Dairy*, the relevant analysis was simply that the court had a rational basis for looking to the parent companies. Clearly, where BP PLC controlled the finances and business operations (including safety practices) of its subsidiaries, there is a rational basis for looking beyond BPXP when reviewing the history of prior violations factor. Moreover, when it believes it is in its interest to do so, BPXP relies on its affiliates under other penalty factors, including "the nature, extent, and degree of success of any efforts of the violator," as well as under the "other matters as justice requires". *See* US Phase Three Findings of Fact at ¶¶ 622-626.

121.    Finally, as discussed in the US Phase Three Findings of Fact at ¶¶ 592-593, the Endicott Island plea deal explicitly imposed duties upon the entire BP Group, and not just the BP subsidiary (BPXA, in that case) that committed the violations. Among other obligations, the plea deal required that all BP subsidiaries operating in the United States, including BPXP, comply with all laws and regulations. Thus, the Endicott plea deal is certainly relevant to the

---

[20] *See Citgo Judgment,* 2011 WL 10723934, at 4 ("The Court recognizes that Citgo is a multi-billion dollar, international company."); Rec. Doc. 12460-56 (Transcript of Citgo trial at 1145-1146, 1158-1160, 1210-1214, 1223-1235, 1273, 1292). Citgo's international parent company is Petroleos de Venezuela, S.A. ("PDVSA").

consideration of the gravity of BPXP's subsequent failure to comply with laws and regulations in this case.

### iii.  Violations occurring years in the past may be considered

122.    Courts have considered violations more than a decade old under this factor. *See, e.g.*, *Powell Duffryn Terminals*, 720 F. Supp. at 1163 (considering defendant's history of violations over 11 years in CWA Section 309 penalty action), *aff'd in relevant part*, 913 F.2d 64; *Smith*, 2014 WL 3687223, at *13 (stating that a "defendant's repeated violations or an ongoing history of a particular violation that spans a significant duration can justify upholding a higher penalty."); *Gulf Park*, 14 F. Supp. 2d at 864 (considering violations over 12 years in CWA Section 309 penalty action).

### F.   The Defendants' Penalties Should Not Be Reduced By Costs of Legally Required Damages and Response Efforts—Only a Modest Reduction Is Warranted Under the Mitigation Factor.

123.    One of the penalty factors is the "nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge…." 33 U.S.C. § 1321(b)(8).

124.    As responsible parties, BPXP and Anadarko were obligated to respond to the spill, and would have faced substantial additional legal liability had they not done so. Responsible parties are obligated to follow orders from the Federal On-Scene Coordinator in responding to oil spills. 33 U.S.C. § 1321(b)(7)(B); 33 U.S.C. § 1321(c); Exec. Order No. 11735, 38 Fed. Reg. 21243 (Aug. 3, 1973), *as amended by* Exec. Order No. 12418, 48 Fed. Reg. 20891 (May 5, 1983); Exec. Order No. 12777 Sec. 3, 56 Fed. Reg. 54757 (Oct. 18, 1991); 40 C.F.R. § 300.135(a). If a responsible party fails, without sufficient cause, to carry out removal actions or follow an order from the Federal On-Scene Coordinator, the responsible party may be liable for civil penalties of up to $37,500 per day of violation or an amount up to *three times* the amount

expended by the Oil Spill Liability Trust Fund as a consequence of the failure to follow the order. 33 U.S.C. § 1321(b)(7)(B); 40 C.F.R. § 19.4.

125.    BPXP has argued that its response efforts should merit a large reduction in its civil penalty, and that if it does not receive such a reduction, future violators will see no benefit to carrying out a robust response. BPXP's Pretrial Statement at 6, Rec. Doc. 13903 at 8. Anadarko similarly argues that its limited efforts related to source control should entitle it to a penalty reduction. *Id.* at 12, Rec. Doc. 13903 at 14. Their arguments are fallacious. As discussed above, the Clean Water Act provides ample incentives (in the form of substantial additional penalties) to ensure that responsible parties carry out directives issued by the Federal On-Scene Coordinator and comply with their legal obligations to clean up spills. If a responsible party were to walk away from a spill and force the Federal and State Governments to carry out the entire response, the RP would face penalties of up to *three times* the government's response costs. 33 U.S.C. § 1321(b)(7)(B)(ii). Additionally, OPA provides that any responsible party who fails to cooperate or assist with the response, or who fails to comply with a removal order, is not entitled to the benefit of the OPA liability caps. 33 U.S.C. § 2704(c)(2)(B) & (C). While the Court has ruled that the OPA liability cap does not apply in this case due to BPXP's violation of several regulations,[21] these provisions show that the CWA and OPA provide ample deterrence against responsible parties shirking their duties to cooperate and respond to oil spills.

126.    Responsible parties are liable, under OPA, for all oil spill removal costs. 33 U.S.C. § 2702(a)-(b). They are also obligated to follow their Oil Spill Response Plans, and follow the orders of the Federal On-Scene Coordinator. 33 U.S.C. § 1321(c)(3). The Clean Water Act makes clear that this obligation is not simply to write a check, but is instead an obligation to

---

[21] Phase One Findings at 147-149 ¶¶ 595-602, Rec. Doc. 13381-1.

affirmatively act in responding to an oil spill: "Nothing in this subsection affects…[t]he obligation of an owner or operator to respond immediately to a discharge, or the threat of discharge, of oil…" 33 U.S.C. § 1321(c)(5).

127.    Thus, to the extent BPXP seeks a penalty reduction for carrying out the response, it is largely seeking a credit for performing acts it was legally obligated to perform. Nothing obligates the Court to reward BPXP for complying with the law. While the CWA requires the Court to consider the efforts of BPXP to minimize or mitigate the effects of discharge, it does not call for a large reduction in the penalty based on this factor. Multiple courts have rejected arguments from defendants that penalties must be reduced based on high response costs incurred. *See, e.g.*, *Egan Marine*, 2011 WL 8144393, at *6-7 (imposing penalty at 89% of maximum despite defendant paying $2 million in response costs and "compl[ying] with its legal obligations to aid in the cleanup."); *Pepperell Associates v. EPA*, 246 F.3d 15, 29-30 (1st Cir. 2001) (affirming as reasonable administrative determination that penalty should not be reduced for cooperation during spill or for paying response costs that were required under the law). In fact, the high response costs in this spill were commensurate with the staggering scope of actual and potential harm posed by the spill. Reducing the penalty simply because response costs were high would perversely reward BPXP for causing a spill with potentially ruinous environmental effects.

128.    Another factor to consider in determining the effect of BPXP's response costs (and Anadarko's settlement) on its civil penalty is that its response costs and other OPA expenses are tax deductible. PP. Tr. 1595:16-1595:24. Thus, their impact on BPXP's bottom line is not as great as the total amount expended.

129.     In a similar vein, Anadarko's argument that it should receive a reduction because it paid BP $4 billion to settle claims for OPA contribution and damages should be rejected. Anadarko should not receive a penalty reduction just because it paid BPXP for conducting the response and paying claims on its behalf.

130.     BPXP and Anadarko have argued that the high cost of the response and damages will serve as a significant deterrent to future entities that would otherwise be likely to cause oil spills, thus lessening the need for a large penalty to achieve deterrence. BPXP and Anadarko Pretrial Statement at 1, 14, Rec. Doc. 13903 at 3, 16. This argument ignores the clearly stated purposes of CWA penalties, which are to be assessed above and beyond response costs and damages.[22] Courts have uniformly concluded that the CWA penalty scheme reflects a Congressional decision to reject a model of deterrence based solely on an economic weighing of cleanup and compensation costs. *See, e.g.*, *United States v. Atl. Richfield Corp.*, 429 F. Supp. 830, 837 (E.D. Pa. 1977) ("The Congressional purpose here was to impose a standard of conduct higher than that related just to economic efficiency."). *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111, 114 (2d Cir. 1995) (stating that under CWA Section 311(b)(6), the administrative penalty complement to 311(b)(7), the penalty "is not predicated upon the cost of removal, but upon the happening of the discharge. The determinative factor . . . is the discharge of oil, not its cleanup.").

131.     Further, the Clean Water Act penalties do not exist solely to deter. They also serve a punitive purpose. *Tull*, 481 U.S. at 422 ("The legislative history of the [CWA] reveals

---

[22] At the same time Congress enacted OPA, which created a comprehensive compensation scheme for oil spills, it amended CWA Section 311 to *increase* civil penalties. *See* Pub. L. No. 101-380, § 4301, 104 Stat. 484, 536-37 (1990); *compare* 33 U.S.C. § 1321(6)(B) (1990) *with* 33 U.S.C. § 1321(b)(7) (1991). *See also* H.R. Rep. No. 101-653, at 52 (1990) (OPA Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N 779, 833 ("Civil penalties should serve primarily as an *additional* incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills.") (emphasis added).

that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties."). Thus, even if the defendants were correct that response costs and damages in this case serve as deterrents to risky behavior, substantial penalties are still warranted due to the devastating nature of the spill.

### i. BPXP's efforts during the response do not warrant a significant penalty reduction

132.    BPXP is also not entitled to a significant penalty reduction (or any at all) for its efforts during the response because its misconduct did not stop after the rig exploded. While, overall, BPXP met its obligation to respond to the spill, the Court has found that BP repeatedly misled high-level federal officials about the flow rate from the well. Phase Two Findings at 32 ¶ 228, Rec. Doc. 14021. This shows an unequivocal effort by BPXP to downplay the scale of the disaster. The fact that BP's misstatements did not significantly impair the response is due in part, as the Court found, to federal officials not trusting them at face value. *See, e.g.*, Phase Two Findings at 33 ¶ 234, Rec. Doc. 14021 ("For example, Dr. Marcia McNutt, director of the Government's Flow Rate Technical Group testified that no one in the Government had any confidence in BP's 5,000 barrels per day estimate."). A response during which BP executives knowingly and repeatedly provided false statements to federal responders during a spill of national significance does not merit a CWA civil penalty reduction. BP's misleading statements to federal responders is distinct from the conduct for which BP has already been punished, which were statements to a Congressional subcommittee and statements related to the value of BP securities. Thus, declining to lower BPXP's penalty based on the mitigation factor due the lack of candor to federal responders would not punish BPXP twice for the same conduct.

133.    In drafting OPA, Congress understood that there were limitations on the amount of oil that could be recovered from the environment once it is spilled: "Unfortunately, the sad

fact is that once a spill occurs, the experts tell us we are lucky if 10 to 20 percent of the spilled oil is recovered." OPA Conference Report (Statement of Sen. Lieberman), 136 Cong. Rec. S11544-45 (daily ed. Aug. 2, 1990). Some response tools do not fully remove oil from the environment, but instead shift effects to less sensitive parts of the environment (*i.e.*, the water column and atmosphere as opposed to coastal marshes). Van Haverbeke Round 2 Expert Report, TREX-013514.006-.007. While such efforts are worth pursuing given the value of the resources at risk, this does not change the fact that, once oil is in the environment, the battle is largely already lost. One of the components of the "mitigation" factor is the "degree of success" of any efforts to minimize or mitigate the effects of the spill. 33 U.S.C. § 1321(b)(8). As explained by Capt. Van Haverbeke, the amount of oil actually removed from the environment as a result of this response was modest and in line with historical effectiveness rates. PP. Tr. 639:22-640:06; D-33768. These required response efforts do not warrant a significant reduction in the penalty amount.

134.     Some response tactics did actually prevent the discharge of oil into the environment—namely, the collection of oil from the wellhead and riser. BPXP has, in turn, already fully realized the benefit of those efforts, because the maximum penalty was reduced by nearly *3.5 billion* due to the 810,000 barrels of oil being subtracted from the total discharge. Thus, no further reduction in BPXP's penalty is required as a result of its collection efforts.

135.     BPXP also funded various efforts that were not required by the CWA and OPA. The Court may consider some portions of those efforts in assessing BPXP's penalty. Those efforts have been detailed in the United States' Pre-Trial Statement Regarding the Appropriate Civil Penalty for BPXP at 8, Rec. Doc. 13901 at 11. However, even those efforts suggest a reduction of far less than $1 billion, because BPXP received the benefit of some of those efforts

as part of its criminal plea. It agreed to continue funding those efforts as part of its criminal plea agreement, and in turn agreed not to seek a penalty reduction in this proceeding based on those efforts. Rec. Doc. 14212. While it can still seek credit for its efforts performed prior to the plea agreement, those amounts are comparatively small. *See* United States' Objections to D-34605 and D-34606; Rec. Doc. 14212.

136.     BPXP's response expert, Captain Frank Paskewich, outlined in his expert report various decisions made by federal and state officials that he contends made the response more "challenging." Paskewich Round 1 Report, TREX-013132.060-.075. These include limitations on dispersant use and special requests for response actions that BPXP believes were ineffective. BPXP never identified which penalty factor those acts should fall under, and while BP counsel, in his opening statement, disclaimed any argument criticizing the U.S. Coast Guard, he did not mention whether other federal or local entities were still subject to criticism. PP. Tr. 40:12-40:20.

137.     To the extent BPXP is still pursuing this argument, alleged misdeeds by government officials[23] are, by the terms of the Clean Water Act, of little or no relevance. The statute clearly focuses on the efforts of the *violator*: "nature, extent, and degree of any efforts of the *violator* to minimize or mitigate the effects of the discharge . . . ." 33 U.S.C. § 1321(b)(8) (emphasis added). Overall, BPXP has commended the Coast Guard for its leadership of the

---

[23] The United States does not concede that any of the actions or decisions criticized by BPXP were misdeeds at all. Rear Admiral Austin and Captain Van Haverbeke both explained at length at trial how the decisions criticized by BPXP were fully appropriate and justified under the circumstances.

Furthermore, the decisions of responders should be evaluated in the context in which those decisions needed to be made – in the midst of a massive, challenging, rapidly changing disaster of BPXP's making. In a different context, courts have often recognized that "one who is put to a sudden choice of action to avoid hazard created by the patent fault of the other has considerable latitude." *Afran Transp. Co. v. S/S Transcolorado*, 458 F.2d 164, 166-67 (5th Cir. 1972) (choices of a ship's captain in extremis "are to be judged not by an armchaired admiral… who has hours, days, weeks, months or years to reflect, but in the light of choices suddenly forced on by the neglect of the one now seeking total absolution.").

response. PP. Tr. 40:12-40:20. Peripheral disagreements regarding actions taken by federal, state or local government officials are clearly minimally relevant to whether BPXP merits a penalty reduction under this factor.

138.     In addition, reducing BPXP's penalty, on the facts of this case, based on alleged bad acts by governmental officials would effectively enable BPXP to improperly recoup response costs that it is barred from recovering under the CWA and OPA. The CWA and OPA set strict limits on the ability of a responsible party to recover the costs of removal from the federal government or the Oil Spill Liability Trust Fund. As stated, OPA mandates that responsible parties pay all costs of removal, subject to the liability caps (if applicable) found at 33 U.S.C. § 2704. Those liability caps are inapplicable here because various regulatory violations by BPXP caused the discharge. Phase One Findings at 147-149 ¶¶ 595-602, Rec. Doc. 13381-1.

139.     OPA bars responsible parties from making claims to the Oil Spill Liability Trust Fund unless they have defenses to liability under 33 U.S.C. § 2703, or they can assert a limitation of liability under 33 U.S.C. § 2704 (neither exception being applicable to BPXP).[24] OPA also bars the Oil Spill Liability Trust Fund from paying claims to any claimant to the extent that the incident was caused by the claimant's gross negligence or willful misconduct, providing an additional barrier to BPXP recovering from the Fund. 33 U.S.C. § 2712(b). Thus, BPXP is barred from recouping response costs from the federal government, even if the federal government or some other party *were* negligent.

---

[24] 33 U.S.C. § 2703 provides a complete defense to OPA liability under a narrow set of circumstances, and is inapplicable here. The Court has already ruled that the limitations on liability at 33 U.S.C. § 2704 are unavailable in this case because of BPXP's regulatory violations under 33 U.S.C. § 2704(c)(1)(B). Phase One Findings at 147-149 ¶¶ 595-602, Rec. Doc. 13381-1. BPXP's gross negligence and willful misconduct also render the liability caps inapplicable. 33 U.S.C. § 2704(c)(1)(A).

140.     Reducing BPXP's civil penalty because of some alleged bad act by federal or local officials would in effect provide BPXP with the same relief that it is barred from seeking under OPA. Instead of recoupment from the federal government, BPXP would be receiving a discount off its penalty, and the end result would be the same. BPXP is not entitled to use this CWA penalty action as an end-run around the strict statutory scheme of the CWA and OPA that ensures that the responsible party who causes an oil spill is the one who pays for its cleanup.

### ii. Anadarko's limited efforts during the response and its settlement with BPXP after the fact do not warrant any reduction in penalty

141.     As explained above, Anadarko's efforts to assist during the response were part of its legal obligations and, in any event, were almost negligible compared to the scope of the seriousness of the spill. Specifically, Anadarko's efforts were limited to: providing two boats for ultimately unsuccessful firefighting efforts; seconding four employees and a contractor for source control efforts; and selling BP equipment for a response strategy that was never implemented. US Phase Three Findings of Fact at ¶¶ 731-741. Anadarko did not participate in the Unified Command, or in any booming, skimming, dispersant application, in-situ burning, or other response-related efforts. US Phase Three Findings of Fact at ¶ 736. Other oil companies that were not owners of the well—and therefore did not have APC's legal obligations—provided comparable or arguably more significant resources in support of the industry's response. US Phase Three Findings of Fact at ¶¶ 326, 743. Anadarko is not entitled to any credit for these limited efforts that, in the end, were part of, and did not exceed, its legal duties.

142.     Anadarko also seeks credit for it $4 billion tax-deductible cash payment to BPXP to resolve their mutual claims against one another arising from the Macondo Incident because of the "condition" in the payment that specified BPXP use the money to pay the claims of persons injured by the spill. US Phase Three Findings of Fact at ¶¶ 734-735. These claims include those

brought under OPA, which APC—as a responsible party—has a legal obligation to pay. US Phase Three Findings of Fact at ¶ 735; Rec. Doc. 5809 at 8; 33 U.S.C. § 2702. In addition, although the money's intended use is to pay claims, cash is fungible and Anadarko's payment in essence made $4 billion available that BPXP could use for something else. In any event, Anadarko received other consideration for that payment, including indemnification by BPXP.[25]

### G. Consideration of the Economic Impact of the Penalty on the Violator Does Not Warrant Any Reduction from the Maximum Penalty.

143.    One penalty factor is "the economic impact of the penalty on the violator…." 33 U.S.C. § 1321(b)(8).

144.    The Supreme Court has held that a court may "seek to deter future violations by basing the penalty on its economic impact" on the violator. *Tull,* 481 U.S. at 423. A "civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business." *Powell Duffryn Terminals,* 720 F. Supp. at 1166, *rev'd in part on other grounds*, 913 F.2d 64. Thus, large defendants like BPXP and Anadarko require substantial penalties in order for the punitive and deterrent purposes of the CWA to be served. *Id.* at 1166; *see also United States v. Chevron USA, Inc.*, 639 F. Supp. 770, 779 (W.D. Tex. 1985) (Economic impact factor under Clean Air Act weighed in favor of a large penalty because "Chevron is a major corporation; one of the largest in the United States. Only a substantial penalty would have any economic impact or serve as any deterrent.").

145.    Where a violator cannot prove that a penalty will have a "ruinous effect," the economic-impact factor should not reduce the penalty. *Gulf Park Water*, 14 F. Supp. 2d at 868;

---

[25] Anadarko also made two contributions that were not required by the CWA or OPA: a donation to Transocean's fund for the victims' families and a donation to the Rockefeller Advisors to assist those directly affected by the spill. US Phase Three Findings of Fact at ¶ 744. Those efforts may be considered in determining Anadarko's penalty, but not on a dollar-for-dollar basis, given the tax-deductible nature of the contributions. *Id.*

*Powell Duffryn*, 720 F. Supp. at 1166 (defendant failed to show that assessing a severe penalty would jeopardize its continued operation); *Gwaltney*, 611 F. Supp. at 1562 (the court was "unpersuaded that any penalty warranted by Gwaltney's violations would jeopardize Gwaltney's continued operations").

### i. The Court may consider BP Group assets in assessing a penalty against BPXP

146.    Numerous courts[26] have considered the assets of a defendant's parent company as a matter of discretion in applying the penalty factors under the CWA. *See e.g. Dean Dairy*, 150 F.3d at 268-269 (parent's assets were considered in assessing a penalty against a subsidiary under the CWA where the parent was closely involved with the polluting activities and siphoned profits from the subsidiary); *Citgo Judgment*, 2011 WL 10723934, *vacated on other grounds*, 723 F.3d 547.[27]

147.    Before the Penalty Phase trial, BPXP filed a motion *in limine* to preclude the United States from introducing evidence to show the liability of BP Group entities other than BPXP. Rec. Doc. 13822. The United States did not oppose, and the Court granted that motion. Rec. Doc. 13994.

148.    In contrast, the Court denied BPXP's motion seeking to prohibit evidence related to the activities and finances of the BP Group for purposes of deciding whether to consider the assets of the BP Group in imposing a penalty against BPXP. Rec. Doc. 13994.

---

[26] *See United States v. Mountain State Carbon, LLC*, No. 12-19, 2014 WL 3548662, at *35 (N.D.W.Va. July 17, 2014) ("[c]ases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of the parent's assets is one factor, among many, that is appropriate in a Clean Water Act case.") (*quoting Idaho Conservation League*, 879 F. Supp. 2d at 1170); *Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.*, No. 89-3193, 1995 WL 461252, at *19 (D.N.J. March 9, 1995). The same is true for administrative penalties imposed by EPA. *In re Carroll Oil Company*, No. 8-99-05, 2002 WL 1773052 (EPA July 31, 2002); *In re: New Waterbury, Ltd*, No. 93-2, 1994 WL 615377 (EPA Oct. 20, 1994).

[27] In analyzing the economic impact of the penalty on the violator, the court stated that it "recognizes that Citgo is a multi-billion dollar, international company." *Citgo Judgment,* 2011 WL 10723934, at 4.

149.     As the Court indicated at the Penalty Phase Pretrial Conference, although BPXP is the sole defendant and sole entity than can be held liable, the evidence of financial wherewithal, or financial arrangements between BPXP and other BP Group entities may be relevant to the level of the penalty set by the Court. January 7, 2015 Penalty Phase Pretrial Conference Tr. at 31:14-33:03.

150.     In *Dean Dairy*, following trial, a district court issued a civil penalty of $4,031,000 for violations of the CWA, stating that it could look to the finances of the defendant's parent as part of its analysis. On appeal, the Third Circuit affirmed, holding, *inter alia*, that the assets of the defendant's parent corporation could be examined in determining the economic impact of the penalty on the violator. 150 F.3d at 268-269. The defendant contended that the district court erred in considering the finances of its parent because the parent corporation had not been sued, did not violate the CWA, and there was insufficient information to pierce the corporate veil.

151.     The *Dean Dairy* appellate court rejected the defendant's contention, stating that it was not the parent, but the violator who was penalized. The Court reasoned that:

> [i]f the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial resources are highly relevant. Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on a violator, and we see nothing improper in the same action here.

*Dean Dairy*, 150 F.3d at 268-269 (internal citations omitted).

152.     The Third Circuit explained that "[t]he consideration of a parent's financial condition in assessing a penalty on a subsidiary is a far cry from piercing the corporate veil and holding the parent liable for the actions of its subsidiary; here the penalty was assessed against the subsidiary alone. . . . The court simply undertook a fact-specific assessment that examined the role of the parent in the operations of the subsidiary, particularly with regard to the issue of

pollution of the nearby waters and actions that could have resolved it." *Dean Dairy*, 150 F.3d at 268-269.

153.    In *Idaho Conservation League*, another civil penalty action under the CWA, the court stated that the "[c]ases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of a parent's assets is one factor, among many, that is appropriate in a Clean Water Act case." 879 F. Supp. 2d at 1170. There, like here, the subsidiary and its parent filed joint annual reports that referred to "the Company" without making any distinction between the two entities. As here, the subsidiary also frequently raised money from its parent through "cash calls" that were recorded as intercompany loans. The court concluded that "[w]here AGC is a wholly owned subsidiary of Atlanta Gold, Inc., and where the parent company has provided AGC with a steady source of financing, consideration of AGI's assets is appropriate." *Id.*[28]

154.    As outlined in the Findings of Fact, BPXP alone has ample assets to pay a maximum penalty without ruinous consequences. US Phase Three Findings of Fact at ¶¶ 747-748, 761.  Even if BPXP alone could not cover the penalty without recourse to additional financing, no reduction in the maximum penalty is warranted under the economic impact factor, consistent with the *Dean Dairy* line of cases. Given the close involvement of the BP Group in managing BPXP's business operations in the Gulf of Mexico, including at the Macondo well and the response to the disaster, the substantial value of BPXP's oil and gas reserves, the dividends

---

[28] This case is distinguishable from *Dico,* 4 F. Supp. 3d 1047, relied on by BPXP. The defendant in *Dico* "generate[d] no revenue, ha[d] only a few assets and liabilities, and 'the only real activity that [was] run through it [was] relating to the remediation and cleanup of the EPA site here in Des Moines.'" *Id.* at 1055. In contrast, BPXP asserts that it holds the most federal deepwater lease acreage of any company in the Gulf of Mexico. Despite *Dico's* insolvency, the court awarded a civil penalty of $1,620,000, finding such a penalty "warranted by *Dico's* reprehensible conduct and also sufficient to carry out the main purpose of CERCLA civil penalties – deterrence." *Id*. at 1067. The court also imposed an additional $1,477,788 in punitive damages. *Id.* at 1068.

paid by BPXP to the BP Group before the blowout, and the financing and capital injections

provided by the BP Group to BPXP after the disaster, the financial resources of the BP Group are

highly relevant to evaluating the economic impact of the penalty on BPXP. *Dean Dairy*, 150

F.3d at 268. Under this factor, it is appropriate for a court to consider the revenues, assets, and

earning capacity of the BP Group. Because the BP Group has benefitted substantially from the

revenue and profits of BPXP, and it is likely that BPXP can access equity, capital, or borrowing

from the BP Group, BPXP can afford to pay the maximum penalty and there is no reason to

reduce the penalty for this factor.[29]

### ii. Anadarko's concerns about the opportunity costs of a large civil penalty do not meet the CWA standard for a reduction in penalty

155.     In light of Anadarko's massive size and global portfolio of oil and gas assets, a

high penalty amount is needed to achieve the deterrent effect the Act requires. *See Powell*

*Duffryn*, 720 F. Supp. at 1166; *Chevron USA, Inc.*, 639 F. Supp. at 779. At a minimum,

Anadarko is required show that the impact would be ruinous to its "existing business," or

jeopardize its "continued operations." *Gulf Park Water*, 14 F. Supp. 2d at 868; *Powell Duffryn*,

720 F. Supp. at 1166 (defendant failed to show that assessing a severe penalty would jeopardize

its continued operation); *Gwaltney*, 611 F. Supp. at 1562 (the court was "unpersuaded that any

penalty warranted by Gwaltney's violations would jeopardize Gwaltney's continued

---

[29]     Although BPXP failed to meet its burden to show an inability to pay, and reliable evidence presented by the United States established BPXP's and BP p.l.c.'s massive financial wherewithal, including $30 billion in cash on hand (US Phase Three Findings of Fact at ¶ 824), the Court may, in its discretion, impose the Clean Water Act penalty to be paid in installments.

There have been several instances of courts imposing Clean Water Act penalties over a period of time. *See, e.g., United States v. Cundiff,* No. 4:01CV-006, 2011 WL 855325, at *1 (W.D. Ky. Mar. 8, 2011) (Court required defendant to pay $25,000 in four installments); *United States v. Van Leuzen*, 816 F. Supp. 1171, 1181 (S.D. Tex. 1993) (penalty to be paid in monthly installments); *Conservation Law Found. v. City of Fall River et al.*, No. 87-3067-Z, 1992 WL 52520, at *9 (D. Mass. Mar. 11, 1992) (penalty to be paid in installments).

operations."). Under this standard, any negative impact on Anadarko's plans for growth, or the fact that it has other uses to which it might prefer to put its dollars, carry no weight.

156.    Even where a defendant is not culpable, this penalty factor applies and warrants a higher penalty if the defendant has substantial assets. To ignore this penalty factor simply because the defendant is not culpable would contradict the clear language of CWA Section 311(b), which provides that the Court shall consider all eight penalty factors and that liable parties shall be subject to a civil penalty.

### H. No "Other Matters" Warrant Reduction of the Defendants' Penalty.

157.    The last factor is "any other matters as justice may require" ("justice factor"). 33 U.S.C. § 1321(b)(8).

158.    BPXP and Anadarko have requested that the Court consider a number of matters under this factor, including: the defendants' alleged economic benefit to the entire Gulf (Rec. Doc. 13903 at 11, 16); BPXP's allegedly innovative spill response technology (Rec. Doc. 13903 at 12); penalty amounts assessed in unrelated cases (Rec. Doc. 13811 at 24); and Anadarko's non-operator status (Rec. Doc. 13903 at 15-16). Even if these assertions were valid, justice does not require the Court consider them under the traditional interpretation of this factor.

159.    "Because of the open-ended nature of the justice factor and the myriad factual scenarios that may arise under it," whether to apply this factor is entirely within the discretion of the court. *In Re: Spang & Co.*, 6 E.A.D. 226 (EPA Oct. 20, 1995); *Citgo*, 723 F.3d at 551. However, courts and administrative bodies have identified guiding principles that suggest that this factor be read narrowly and used sparingly. *See, e.g.*, *Catalina Yachts, Inc. v. U.S. EPA*, 112 F. Supp. 2d 965, 970 (C.D. Cal. 2000). Courts have also been reversed because of the improper consideration of unenumerated matters under this category. *Powell Duffryn*, 913 F.2d at 80-81 (reversing for improper consideration of government non-enforcement of relevant provisions);

*cf. Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1096 (10th Cir. 2007) (In Clean Air Act citizen suit, reversing due to district court's improper consideration of, *inter alia*, defendant's lack of intent to violate CAA). Therefore, while facts Defendants presented at trial may have been sufficient to clear a low relevance standard, that does not mean they merit lower penalties under the justice factor.

### i. The justice factor is used sparingly

160.    Interpretation of this factor hangs on the word *justice*—it is narrowly construed to mitigate penalties in rare circumstances only:

> This language provides that the 'justice' factor should only be applied when not giving someone credit would be a *manifest injustice*, and that application of this factor should be *far from routine* because the application of the other adjustments normally produces a penalty that is fair and just.

*Catalina Yachts*, 112 F. Supp. 2d at 970 (emphasis added); *see also In Re Pepperell Associates*, 9 E.A.D. 83 (EPA May 10, 2000); *In Re: Spang & Co*., 6 E.A.D. 226 (explaining that the justice factor operates "as a safety mechanism when necessary to prevent an injustice" and should rarely be used). Courts have therefore reserved the justice factor for matters not already considered under the other statutory factors, (*Citgo*, 723 F.3d at 554; *Smithfield*, 972 F. Supp. at 353), and only when "the assessed penalty is otherwise manifestly unjust." *Catalina Yachts*, 112 F. Supp. 2d at 969. In the case of the largest man-made environmental disaster in the history of the United States, very few, if any, new matters should be considered for penalty mitigation under this factor.

161.    An appropriately narrow application of this factor also protects the Court from making findings on complicated matters unrelated to the penalty factors or the purpose of CWA. The justice factor should not bog down the Court "in a time-consuming analysis of collateral matters that are, in reality, commonplace, *and thus do not rise to the level where justice requires*

*their consideration.*" *In Re: Spang & Co.*, 6 E.A.D. 226 (emphasis added). This approach tailors the factor to matters justice truly demands be considered, but also increases judicial efficiency and reflects courts' belief that application of the other seven statutory factors reliably produces just penalties. *Id.*; *Catalina Yachts*, 112 F. Supp. 2d at 969. BPXP's request that the Court consider technological advancements allegedly resulting from the spill as a mitigating factor is the kind of collateral, detailed question of fact that courts have declined to consider under the justice factor. Rec. Doc. 13903 at 12.

162.    Facts included under other penalty factors, (*e.g.*, seriousness and prior violations), may also be weighed against facts presented to mitigate penalties under the justice factor. For example, in *Allegheny*, the court would not decrease the defendant's penalty based on its alleged economic contribution to the community because of its long history of prior violations. *Allegheny*, 187 F. Supp. 2d at 446; *see also Smithfield*, 972 F. Supp. at 353. Even though the *Allegheny* court had discretion to consider the defendant's economic contributions to the community under the justice factor, it declined to lower the penalty based on evidence presented under other statutory factors. Any evidence of good faith actions taken by BPXP cannot mitigate the bad faith BPXP has already demonstrated both before and after the incident. *See, e.g.*, Phase One Findings at 71, 129-130, 140 ¶¶ 278, 519-20, 561-62, Rec. Doc. 13381-1; Phase Two Findings at 32 ¶ 228, Rec. Doc. 14021; Rec. Doc. 13725; TREX-052673 (Guilty Plea and Allocution).

### ii. Justice does not require consideration of Defendants' alleged contributions to the economy

163.     No court has ever considered broad claims of an entire company's regional economic contribution as part of a CWA penalty analysis. For example, even in *Citgo*, the court only considered the employment impact of the specific facility where the violation occurred. *Citgo Judgment*, 2011 WL 10723934, at 4. In contrast, BPXP and Anadarko want the Court to mitigate their penalties based on their entire Gulf of Mexico operations. PP. Tr. at 2142:09-2160:16; PP. Tr. at 2084:03-2096:08.[30] If *Citgo* is used as an analogy, any penalty decrease based on BPXP's and Anadarko's "contribution to the local economy" is be limited to what little, if any, resulted from drilling the Macondo well. The defendants have not presented evidence that the Macondo well itself provided any significant benefit to the Gulf economy.

164.     Justice also does not require that the Court mitigate BPXP and Anadarko's penalties just because they are large corporations that employ people and make expenditures proportional to the profits they seek to gain from their business. Indeed, reducing a penalty because a violator is large turns on its head the retribution and deterrence purposes of the CWA penalty. *See Tull*, 481 U.S. at 422-23 (identifying these purposes). Large violators are better able to absorb penalties. They experience less deterrent and punitive effect from the same penalty amount imposed on a smaller violator. *See Powell Duffryn*, 720 F. Supp. at 1158 (a "civil penalty must be high enough to insure that polluters cannot simply absorb a penalty as a cost of doing business.")

---

[30] As outlined in US Phase Three Findings of Fact ¶¶ 1076, 1079-1086, BPXP and Anadarko overstate their contributions to the Gulf economy, in part because the United States expert, Dr. Mason, showed that oil industry is highly competitive and that any reduced presence in the Gulf by either defendant would likely be offset by competitors increasing their presence.

165.     Furthermore, reducing the penalty because the defendant is a large corporation circumvents the structure of the Act's penalty factors. The CWA's "economic impact on the violator" factor was intended to allow the Court to set penalties at a level that will have appropriate punitive and deterrent effect given the violator's size. *Tull*, 481 U.S. at 423 (a court may "seek to deter future violations by basing the penalty on its economic impact" on the violator).

166.     When Congress revised the CWA to increase penalties for oil spills, it was aware of the economic contributions of oil and gas companies, but did not require courts to consider these contributions in setting an appropriate penalty. S. Rep. No. 101-94, at 28 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 748 (additional comments of Senator Chaffee, *et al.*) (noting the "massive profits that may be made from an offshore facility").

### iii.  There are no cases analogous to this one that justice requires be considered in setting an appropriate penalty

167.     BP submitted an unopposed motion arguing that the amount of other penalties is relevant as an "other matter." Rec. Doc. 13811-24. The motion was granted, but the United States reserved the right to argue whether the cases cited are irrelevant or distinguishable.

168.     The Court has already questioned the relevance of these cases. March 21, 2014 Penalty Phase Pretrial Conference Transcript at 26:18-27:02. Only one of the cases BP cited, *Egan Marine*, 2011 WL 8144393, addresses an oil spill penalty under CWA Section 311, and so only that single case was decided under the same spill-volume-based penalty system and penalty factors in 33 U.S.C. §1321(b)(8). *Egan Marine* issued a penalty slightly more than 89% of the statutory maximum. 2011 WL 8144393, at *6-7. Even so, *Egan Marine* is not an "analogous" case in terms of the appropriate overall penalty. CWA penalty assessment was designed to be an individualized process based entirely a case's unique facts—that is why Congress established the

penalty factors and application of the factors is left to the discretion of the Court. *Tull*, 481 U.S. at 427; *Citgo*, 723 F.3d at 551. At best, other cases provide guidance for how to interpret the statutory factors. They do not provide a benchmark for penalties, especially when there are few if any analogous facts.

169.    In contrast to CWA Section 309 penalty cases or cases under other regulatory statutes, CWA Section 311(b) contains the unique provision where penalties can be assessed on a per-barrel basis. Section 309 and other provisions assess penalties per day of violation only. *Compare* 33 U.S.C. § 1321(b)(8) *with* 33 U.S.C. § 1319(d) *and* 42 U.S.C. § 7413(b). This unique provision was added to the Clean Water Act specifically to address the possibility of massive oil spills. *See* S. Hrg. 101-265 at 13 (statement of Rep. Schneider).

170.    BPXP cited 18 cases and five settlements in support of its motion. Rec. Doc. 13811-24. Fourteen of the cases and one of the settlements cited were CWA Section 309 cases; three of the cases and one of the settlements cited were Clean Air Act violations. BPXP's comparison of its spill to other, non-oil-spill cases is not appropriate for consideration under the justice factor. Every defendant and every case is different; and the appropriate penalty amount necessarily depends on the aggravating and mitigating facts of each individual case. *See, e.g.*, *United States v. B&W Inv. Properties*, 38 F.3d 362, 368 (7th Cir. 1994) ("Comparison [of civil penalty amounts] with other cases, many of which resulted in plea agreements or did not involve asbestos, do not illuminate the treatment that should be accorded these defendants."). The task at hand for the Court is to determine the appropriate penalty *in this case* based on the egregious proven facts and the penalty factors in CWA Section 311(b)(8).

171.    A vast majority of the cases cited by BPXP in its motion (twelve of the fourteen Section 309 cases cited) are patently irrelevant because they were not considered extremely

serious under Section 309 of the CWA or because the facts suggest the environmental impact was very small (or the courts did not discuss seriousness). *See, e.g.*, *United States v. Avatar Holdings, Inc.* ("Florida Cities"), No. 93-281, 1996 WL 479533 (M.D. Fla. Aug. 20, 1996) (violations were "not serious" or only "somewhat serious"); *Sierra Club v. MasTec N.A.*, Nos. 03-1697 & 06-6071, 2009 WL 426205 (D. Or. Feb. 19, 2009) (violations had "minimal impact" and maximum sought by Plaintiff was awarded); *Sierra Club v. City of Colo. Springs*, No. 05-cv-01994, 2009 WL 2588696 (D. Colo. Aug. 20, 2009) (violation not serious enough to warrant maximum and because the defendant was a municipality the court was concerned the penalty would pass onto taxpayers); *United States v. Scruggs*, No. G-06-776, 2009 WL 500608 (S.D. Tex. Feb. 26, 2009) (violation did not threaten harm to human health or wildlife). The Macondo oil spill was extremely serious; it is hard to conceive of one more serious. As demonstrated by the relatively limited impacts found in the cases listed above, justice does not require that the penalty amounts from these cases be considered because their facts are in no way analogous to this case. Further, the levels of culpability displayed by the defendants in these cases are in no way comparable to the culpability of BPXP.

172.    Neither of the two remaining Section 309 cases cited by BPXP present facts analogous to this case. In *Gulf Park Water Co.* the penalty was greatly reduced based on the defendant's inability to pay. 14 F. Supp. 2d 854. *Idaho Conservation League* concerned violations arising from daily discharges of arsenic and iron into federal waters. The court performed a bottom-up analysis starting with economic benefit so that it could treat the violations for the effluent limitations of arsenic and iron separately because the "[p]laintiffs acknowledge[d] that 'iron compounds are generally not toxic to the environment . . . .'" 879 F. Supp. 2d at 1166 (calling the 'bottom-up' approach "more practical" given the facts).

173.     BP also cited five settlements, including two from this case.[31] As discussed in

¶ 42, *supra*, judicially assessed penalties should be significantly higher than penalties obtained in

settlements. Settlements in other cases are certainly not relevant to a judicial determination in

this case, as they involved particular facts, circumstances, and reasons why other parties wished

to avoid prolonged, costly litigation and resolve past claims.

### iv.  Justice does not require the Court to mitigate Anadarko's penalties based on its non-operator status[32]

#### a.  Mr. Arnold's opinions concerning federal regulatory activities are not relevant

174.     Mr. Kenneth Arnold, one of Anadarko's experts, made several points in his expert

reports regarding the regulatory activities of federal agencies (including MMS/BSEE, the Coast

Guard and EPA). TREX-013045.008-.011; TREX-013046.013. Justice does not require the

Court to consider this testimony. These regulatory activities largely covered regulations and

statutes other than CWA Section 311(b), and the Court ruled that arguments about how federal

agencies are enforcing regulations not at issue in this case are irrelevant to the question of

Anadarko's penalty amount: "I'm here to apply the Clean Water Act, not some regulations, and I

don't see the relevance of this. You know, the issue here is not whether the government has

previously enforced certain regulations or taken certain regulatory actions against non-operators,

that's not the issue in this case." PP. Tr. 2233:20-2235:07. To the extent Anadarko continues to

---

[31] *In re: Deepwater Horizon Oil Spill, Partial Consent Decree Between the Plaintiff United States of America and Defendants Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc.*, No. 2:10-md-2179, Rec. Doc. 8157-1 (E.D. La. Jan. 3, 2013) (CWA 311); *United States v. Hyundai Motor Co.*, No. 1:14-cv-01837, Rec. Doc. 2-1 (D.D.C. Nov. 3, 2014) (CAA); *In re:* Deepwater Horizon *Oil Spill, Consent Decree Between the United States and MOEX Offshore 2007 LLC*, No. 2:10-md-2179, Rec. Doc. 6698 (E.D. La. June 18, 2012) (CWA 311); *United States v. Colonial Pipeline Co.*, No. 1:00-cv-3142, Rec. Doc. 192 (N.D. Ga. June 16, 2013) (CWA 309 & 311); *United States v. Alpha Natural Resources, Inc.*, No. 2:14-cv-11609, Rec. Doc. 11 (S.D.W.V. Nov. 26, 2014) (CWA 309).

[32] *See supra*, at ¶¶ 76-82, discussion of Anadarko in culpability factor section.

make arguments based on the government's past or present regulatory activity, those arguments are irrelevant.

175.    Justice does not require the Court to evaluate whether and to what extent the federal government has commenced enforcement actions against owners who are in the narrow universe of companies that Anadarko delineates, whether under Section 311(b) or otherwise. In another context, courts have noted that "[a]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise…[T]he agency is far better equipped than the courts to deal with many of the variables involved in the proper ordering of its priorities." *Public Citizen, Inc. v. E.P.A.*, 343 F.3d 449, 464 (5th Cir. 2003) (citing *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (suit challenging as inadequate EPA's enforcement of the Clean Air Act).

### b. *Mr. Arnold's distinction between exploration and development violates Anadarko's own boundary between excluded culpability evidence and permissible justice factor evidence and accordingly is not entitled to be given any weight*

176.    In Anadarko's December 9, 2014 Combined (1) Reply in Support of its Motion to Enforce Court's Order Excluding Culpability Evidence; and (2) Opposition to the United States' Motion to Admit Evidence of Anadarko's Culpability, Rec. Doc. 13810, Anadarko stated that it would not put forth evidence of "Anadarko's knowledge or conduct related to the spill" but rather that "by discussing non-culpable non-operators in the industry *generally*"[emphasis in original], it would keep the door closed on Anadarko's specific actions in connection with Macondo. *Id.* at 4. Anadarko articulated where it believed the line between inadmissible and admissible evidence lies: "The government can, and must, rebut Anadarko's evidence about the industry only with general evidence about the industry." *Id.*

177.     Since the Court's ruling on the cross-motion regarding culpability, the United States has followed the line Anadarko drew: general, industry-wide evidence, not specific to Anadarko or Macondo, is admissible, but evidence specific to Anadarko or Macondo is not admissible for culpability purposes.[33] Anadarko, however, seeks to minimize as not relevant evidence of extensive industry-wide participation by non-operators during the feasibility and development phases of leasehold operations, by contending that "Macondo was an exploration well." *See* US Phase Three Findings of Fact at ¶¶ 1188-1189.

178.     Anadarko thereby violates its own boundary and crosses over into evidence that it would preclude the United States from introducing. The Macondo-specific distinction that Anadarko makes between exploration and development activities, must be given little weight, as well as any other Anadarko- or Macondo-specific facts and evidence presented by Anadarko.

### v. Anadarko's justice factor contentions merely reassert its culpability themes and do not require any additional penalty deduction.

179.     Some deduction from the statutory maximum is appropriate given the fact that Anadarko was found not to be negligent in connection with the Macondo Incident. However, Anadarko's justice factor contentions concerning non-operators advance the same themes and arguments that Anadarko would have pressed had the culpability evidence not been excluded. Specifically, Mr. Arnold opines that (1) the operator is or should be in charge of safety on the offshore facility, under MMS' pre- and post-Macondo regulations (*i.e.*, the operator is to blame); (2) non-operators lack legal control and do not have the same "real-time" information that the operator has and therefore should not be accountable for activities on the rig; and (3) despite

---

[33] The United States did, however, submit Macondo-specific deposition testimony to rebut Anadarko's contention that Macondo was an exploration well. *See, e.g.*, US Phase Three Findings of Fact at ¶ 1189. The United States is also summarizing certain provisions from the Macondo JOA, along with the industry model form JOA, which is similar in most respects. The Macondo JOA is from Anadarko's trial exhibit list, and Anadarko did not object to its introduction into evidence during trial.

being partial owners of offshore facilities, non-operators should not be penalized under CWA Section 311(b). These are precisely the same arguments Anadarko has advanced to exclude evidence regarding its culpability. *Compare, e.g.*, TREX-233271 *and* US Phase Three Findings of Fact at ¶¶ 579, 1190-1194 *with* Anadarko's Memorandum in Support of Motion *in Limine* To Exclude All Evidence Regarding Anadarko's Culpability, Rec. Doc. 12343-1, pg. 1-2 (citing B1 Order, Rec. Doc. 3830, at 28 that "BP was solely responsible for the drilling operations[,]… and [any] access to information that Anadarko… may have had did not give rise to a duty to intercede in an independent contractor's operations…."). Dr. Sunding opines that extending penalties to non-operators is inefficient because they lack sufficient information and control over activities at the well, drawing on economics literature regarding the principal-agent relationship, analogizing Anadarko to the principal and BP its agent. US Phase Three Findings of Fact at ¶ 1246.

180.    Justice does not require that the Court consider such evidence twice. The penalty factor of culpability amply accommodates Anadarko's role with respect to Macondo. Mr. Arnold and Dr. Sunding's opinions concerning non-operators in general under the justice factor is merely duplicative of Anadarko's position on culpability and does not merit further consideration in the Court's highly discretionary weighing of the penalty factors.

### a.  Dr. Sunding's arguments are inconsistent with the CWA and ignore fundamental differences between damages and penalties

181.    Dr. Sunding further argues that no penalty should be imposed on Anadarko because (1) it is a non-operator; (2) it paid a share of OPA damages (or its damages will be fully internalized by other parties) and (3) it received no economic benefit. US Phase Three Findings of Fact at ¶¶ 1202-1232. This opinion is at odds with the statutory scheme for oil spills, with provides for both compensatory damages *and* penalties on a strict-liability basis after

consideration of all eight penalty factors, which include but are not limited to economic benefit and culpability. *See* discussion supra (section on strict liability and statutory scheme/background). In an amendment to the CWA, Congress has recently affirmed that penalties and damages for oil spills serve different purposes, and that penalties are over and above cost internalization for harms caused by the incident. *See* RESTORE Act, Report to Accompany S. 1400, S. Rep. No. 112-100, 2011 WL 6155734, at *15 (Dec. 8, 2011) ("The ability to obtain both NRD and penalties is not, and has never been, considered double recovery against a Responsible Party, but rather separate remedies provided by law that serve different purposes. Clean Water Act penalties are punitive in nature and serve a deterrent purpose, while NRD claims are intended to compensate the public for natural resource injuries resulting from an oil spill.").

182.    Oil spill damages and penalties are treated differently for public policy reasons. For example, as this Court has held, parties can agree to an indemnity clause for OPA damages but cannot agree to such a clause to reallocate penalties. Order and Reasons as to Transocean and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity, Rec. Doc. 5446. Similarly, compensatory damages such as those under OPA are generally treated by companies as tax-deductible business expenses, but penalties are not deductible.

183.    Dr. Sunding also asserts, from an economic efficiency standpoint, that it is better to penalize operators than non-operators. US Phase Three Findings of Fact at ¶¶ 1243-1247. This is inconsistent with the CWA.  Liability under CWA Section 311 is not limited to operators, but specifically extends to owners of facilities from which oil is discharged. 33 U.S.C. § 1321(b)(7)(A); *see also,* ¶¶ 76-82, *supra*, regarding strict liability. Penalizing Anadarko based

on its status as an owner is in line with Congress' intent that the entities that stood to profit from the activity are the ones penalized when an incident occurs.

### vi. Consideration of limited "other matters" under the justice factor may justify keeping penalties near the maximum

184.     The justice factor should also be applied in accordance with the CWA's statutory purpose to increase penalties. *See, e.g.*, *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 487 (6th Cir. 2010) ("Rejecting a civil penalty as too high because of the greater seriousness of the violation, or because the penalty money could be used for remediation, is in tension with, rather than in accordance with, the statutory purpose behind civil penalties."). For example, courts have considered the importance of specific deterrence of a violator and the general deterrence of a regulated community as a reason to increase penalties under the justice factor. *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, No. S97-0858, 1999 WL 1797329, at *20-22 (E.D. Cal. Nov. 8, 1999) *aff'd in part, vacated in part, rev'd in part*, 261 F.3d 810 (9th Cir. 2001) ("The EPA argues that this Court ought to consider the need to deter "the regulated community" from violating the CWA through the imposition of a severe civil penalty. Otherwise, the EPA argues, the government's regulatory program could be subverted. …This factor is relevant and does weigh in favor of the imposition of a more severe civil penalty.")

185.     Increased penalties to achieve specific deterrence are especially important in cases where defendants have acted in bad faith. *Smith*, 2014 WL 3687223, at *15. Therefore, evidence of "bad-faith conduct of the violator, a violator's attitude toward achieving compliance, and the violator's ability to comply with the Act" can be considered under the justice factor if not previously considered under another factor. *Smithfield Foods*, 972 F. Supp. at 353. Because evidence demonstrating bad faith is relevant to other statutory factors (*e.g.*, culpability,

seriousness, prior violations), there is often no need to turn to the justice factor for inclusion of these facts. There is substantial evidence of BP's bad faith preceding, during, and immediately following incident (willful misconduct and gross negligent caused the spill; lied to government after). If the Court decides that the prior violations factor applies only to BPXP or only includes prior CWA Section 311 violations in its assessment of prior misconduct, the prior violations of the rest of the BP Group are relevant under the justice factor.

### vii. Credit for a violator's good faith is viewed in context of violator's bad acts

186.    A violator's good faith may also be relevant under the justice factor, but only when viewed in the proper context. *Allegheny*, 187 F. Supp. 2d at 445; *Smith*, 2014 WL 3687223, at *15. For example, in *Allegheny*, the court declined to mitigate the defendant's penalty based on "its lack of ongoing violations, its substantial expenditures for environmental projects, and its record of keeping promises to regulators" because:

> It [was] difficult to escape the conclusion, however, that this form of good faith sprung not from internal willingness to comply with its statutory obligations, but rather from the more intense government enforcement that need not have been pursued at all had ALC exhibited these tendencies earlier.

187 F.Supp.2d at 445. Therefore, BPXP's requests for credit for allegedly new spill response innovations, benefits to the Gulf community, or any other claim of reform or good behavior (*e.g.*, payment of legally required mitigation costs) is viewed in tandem with at least two facts: (1) BP is a criminal recidivist with a history of serious prior violations that resulted in deaths; and (2) BP caused the worst spill in U.S. history and killed 11 men through its gross negligence and willful misconduct.

## VI.    CONCLUSION

Based on analysis of the factors, a penalty at or near the maximum allowed under the

Clean Water Act is warranted for BPXP. The factors also weigh in favor of a substantial penalty

for Anadarko, with far fewer discounts than that Defendant has suggested.

Respectfully submitted,

BENJAMIN C. MIZER                                     JOHN C. CRUDEN
Acting Deputy Assistant Attorney General       Assistant Attorney General
Civil Division                                                  Environment & Natural Resources Division
PETER FROST                                               SARAH HIMMELHOCH
Director, Torts Branch, Civil Division              MICHAEL MCNULTY
Admiralty and Aviation                                   PATRICK CASEY
SHARON SHUTLER                                       RICHARD GLADSTEIN
MALINDA LAWRENCE                                  Senior Counsel
LAURA MAYBERRY                                      NANCY FLICKINGER
Trial Attorneys                                               Senior Attorney
R. MICHAEL UNDERHILL, T.A                     ABIGAIL ANDRE
Attorney in Charge, West Coast Office           A. NATHANIEL CHAKERES
                                                                       RACHEL HANKEY
                                                                       JUDY HARVEY
                                                                       RACHEL KING
                                                                       ERICA PENCAK
                                                                       BRANDON ROBERS
                                                                       GORDON YOUNG
                                                                       Trial Attorneys

                                                                       /s/ Sarah D. Himmelhoch
                                                                       STEVEN O'ROURKE
                                                                       Senior Attorney
                                                                       Environmental Enforcement Section
                                                                       U.S. Department of Justice
                                                                       P.O. Box 7611
                                                                       Washington, D.C. 20044
                                                                       Telephone: 202-514-2779
                                                                       E-mail: steve.o'rourke@usdoj.gov
                                                                       KENNETH A. POLITE, JR.
                                                                       United States Attorney
                                                                       Eastern District of Louisiana
                                                                       SHARON D. SMITH
                                                                       Assistant United States Attorney
                                                                       Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: March 27, 2015.                                      /s/ Sarah D. Himmelhoch
                                                           U.S. Department of Justice