**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig** | : | **MDL NO. 2179** |
| **"Deepwater Horizon" in the Gulf** | : | |
| **of Mexico, on April 20, 2010** | : | **SECTION: J** |
| | : | |
| **This Document Relates to:** | : | **JUDGE BARBIER** |
| | : | |
| *Civ. No.* **10-4536** | : | **MAG. JUDGE SHUSHAN** |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


**<u>CLEAN WATER ACT – PENALTY PHASE</u>**


**UNITED STATES OF AMERICA'S POST-TRIAL BRIEF**

*Table of Contents*

I.      Introduction ............................................................................................................1

II.     Legal Standards and Purposes of CWA and Penalty Factors ...............................5

III.    Analysis of the Factors that Had Live Witnesses
        during the Penalty Phase Trial ...............................................................................6

        A.      Impacts of the Spill (Seriousness) ...........................................................6

                1.      "Seriousness" Means Both Actual and Potential Harm .............................7

                2.      Evidence from the Trial: the Impacts were Extremely Serious .................9

        B.      BPXP Response to the Spill: Seriousness or Efforts to Mitigate? ........................19

                1.      "Efforts to Minimize or Mitigate" Otherwise Required
                        by Law do Not Mandate a Reduction in the Penalty ...............................20

                2.      BPXP's Efforts ................................................................................22

        C.      Anadarko's Response and Mitigation .......................................................24

        D.      BPXP Financial Issues (Economic Impact on the Violator) ................................25

                1.      Law Regarding Economic Impact Factor, Including the
                        Relevance of Related Corporate entities, and Payments Over Time .........25

                2.      The Statutory Maximum Penalty Would Not Have a Long-
                        Term Negative Impact on the Operations of BPXP ................................26

                3.      The Relationship between BPXP and the other Group Entities -
                        operationally and financially – Makes Relevant the finances
                        of all of those other Entities .............................................................28

                4.      Economic Impact on BP: "This company [BP] is – actually, has
                        a better balance sheet today than it had before the spill." ........................31

                5.      Any Concerns Can Be Resolved With Payments Over Time ...................31

        E.      Anadarko Financial Issues (Economic Impact on the Violator) ...........................31

        F.      Defendants' purported "Other matters." ...................................................32

                1.      Law regarding "Other matters." ........................................................32

i

2.      BPXP's & Anadarko's Purported Financial Contributions
to the Community:  Too Big to Fail; Too Small to Pay ............................ 33

3.      BPXP's Claims regarding Response Technology ..................................... 36

4.      Anadarko's purported "Other matters." .................................................... 37

      a.      Congress decided to impose a penalty on top of damages
and costs and did not require fault or economic gain. .................. 37

      b.      Even under Dr. Sunding's theory, there is no basis to
conclude that the $4 billion settlement approximates
OPA damages or will provide sufficient deterrence ..................... 41

      c.      The punitive purpose of CWA penalties
justifies penalties against Anadarko ................................................ 42

      d.      The non-operator "debate." ........................................................... 42

IV.    Analysis of the Factors that Had no Live Witnesses during the Penalty Phase Trial. ....... 46

    A.      Economic Benefit Factor, and the "Top Down or Bottom Up" Question. ........... 47

    B.      Culpability ........................................................................................................ 49

      1.      BP ............................................................................................................. 49

      2.      Anadarko ................................................................................................. 50

    C.      Other Penalties Paid for the Same Incident ........................................................ 50

      1.      BP's Criminal Plea .................................................................................. 51

      2.      The CWA Civil Penalty Settlements Can Be Considered
in Setting Anadarko's Penalty ................................................................ 51

    D.      Prior Violations of Anadarko ............................................................................. 54

    E.      Prior Violations of BP ........................................................................................ 54

V.    Conclusion ..................................................................................................................... 58

I.      **Introduction.**

Prior to the Penalty Phase trial, the United States asked the Court to impose on BPXP a civil penalty that approaches the statutory maximum penalty of $13.7[1] billion because of:

- the sheer enormity, duration, and volume of this spill;

- the deaths and injuries it caused;

- its toll on people, their businesses, society, and the environment;

- BPXP's failure to manage risks, focusing on cutting costs at Macondo; and

- BP's similar past history and criminal pleas for violating environmental and safety laws by failing to manage risks at other facilities.

The Court should reduce the penalty only if BPXP presents valid reasons to do so, under the statutory factors.

Because of its comparatively reduced role, Anadarko deserves a penalty less than the maximum available ($3.5 billion) but significantly above $1 billion, due to the seriousness of the violation, Anadarko's status as a 25% owner of the polluting enterprise, and the penalty paid by its contractor Transocean.

The trial confirmed that those unprecedented penalty amounts are appropriate for this unprecedented disaster. The parties and witnesses agreed on many of the Penalty Phase facts but disagree on how those facts relate to the statutory factors the Court must consider to determine the penalty amount.  For example, the United States proved that 1,100 miles of shoreline received at least some visible oil, with 220 miles being heavily oiled, and posits that such oiling

---

[1] Under 33 U.S.C. § 1321(b)(7)(D), $4,300 per barrel (result of Phase One Findings and "ORDER as to the Maximum CWA Per-Barrel Civil Penalty" (Rec. Doc. 14206)) times 3.19 million barrels (result of Phase Two Findings) yields $13,717,000,000 ($13.717 Billion) as the maximum. For Anadarko, Under 33 U.S.C. § 1321(b)(7)(A), $1,100 per barrel (strict liability result of Summary Judgment Order and "ORDER as to the Maximum CWA Per-Barrel Civil Penalty" (Rec. Doc. 14206)) times 3.19 million barrels (result of Phase Two Findings) yields $3,509,000,000 ($3.509 Billion) as the maximum.

is extremely serious.  BPXP compares the 1,100 miles oiled to the parts of the Gulf that were *not* oiled and suggests that "it could have been worse." Similarly, the United States did not dispute evidence showing a large and costly response to the spill. The *import* of that response is that it shows how massive this spill was, and how great the potential harm was. The evidence also was clear that before and during the response, BPXP readily availed itself of the operational and financial support of other BP Group Entities. Although BPXP's experts agree as to the facts of the interconnected relationships between the Group entities, they opined that conducting business in such a manner is appropriate.  The United States' experts also agree as to these facts, but opined that BPXP's relationships with the other entities relates to the "economic impact of the penalty on the violator," and also makes relevant the four prior criminal violations of health, safety and environmental laws by related BP entities at other facilities

Anadarko and the United States largely agreed on the facts as well. Anadarko stipulated that this violation was very serious. *See* Opening Statement (Ms. Kirby).[2] Anadarko's expert, Mr. Arnold, repeatedly stated that he agreed with many of Mr. Walkup's opinions regarding the role of co-owners of deepwater wells. U.S. Proposed Findings of Fact ("FOF") ¶¶ 1181-1183, 1185. There is no dispute that co-owners may and do become actively involved in well design and other decisions. The parties disagree, however, over whether penalizing a non-operating co-owner will promote safe operations or impair them, or whether it will affect deepwater participation.  But, the question of what penalty to assess the co-owner is not governed by expert opinion regarding matters of policy; rather it is to be determined by applying the statutory factors set forth by Congress in the statute.

---

[2] "I would like to say that we do not dispute that the spill was extremely serious when it occurred. And we do not take lightly the impact that it has had on the families of those killed in the tragedy, on the environment, or on the folks who live and work in the Gulf." PP Tr. at 71:01-71:05.

When weighing the factors for this specific disaster, the seriousness of the violation is paramount.[3]  Given the unprecedented seriousness of the violation, the defendants should justify why they should not pay the maximum penalty available. In doing so, they face an insurmountable hurdle because BPXP's own witnesses admitted there were serious harms and Anadarko presented no evidence contesting the harms:

- Dr. Cox (for BPXP) admitted that some workers suffered "significant" injuries during the response. FOF ¶ 73.

- Regarding economic issues, Dr. Scott (for BPXP) admitted that "there were clearly some losses and I cannot get away from that. I'm not going to ignore that. There were some losses, and some of them very serious losses."  PP Tr. at 2083:15-2083:17.

- Dr. Tunnell (for BPXP) admitted that "we all have still images in our mind of 2010 and oil in the water and oil going into the beaches and marshes. And we still see some residual impacts of those things around the wellhead, and particularly the heavily-oiled marshes in Louisiana." PP Tr. at 1858:03-1858:07.

- Tony Hayward stated that the event was an "environmental catastrophe." FOF ¶ 6.

Faced with these admissions, BPXP argued that such matters are of little consequence because they were (according to BPXP) only temporary, or could have been worse,[4] and so do not weigh in favor of a high penalty. BPXP's attitude, demeaning the import of the evidence of significant harms, underscores the need for it to be told, by this Court, in the form of a significant civil penalty, that this was an extremely serious violation.

In arguing for no or a low penalty, both defendants focus on payments that were made to

---

[3] That is not always the case.  For CWA cases involving matters with limited actual pollution, or no specifically demonstrated environmental harm, the "economic benefit" of non-compliance is often the principal concern, because the courts must level the playing field. Entities who obey the law should not be left in a worse economic position than violators of the law. Here, whether BPXP and Anadarko saved a few million dollars (or even many millions of dollars) on avoided costs of well control is of minor significance compared to the seriousness of lives lost, livelihoods lost, and other impacts of the violation.

[4] As established at trial, many of the harms were not "temporary," and for many human health and environmental harms, the jury is still out.

"mitigate" the discharge; but almost all such payments were already required to be paid under existing legal obligations. For example, Anadarko touts its $4 billion payment to BP, but that payment: (1) resolved contract arbitration with BP, wherein BP had sought far more than $4 billion; and (2) is a pittance compared to the total amount of removal costs and damages that resulted from this violation. BPXP emphasizes its payments for removal costs, private party claims, and its down payment on NRD.[5] Again, those payments are all required by the CWA, OPA, or BPXP's criminal plea, or otherwise benefit BP's business interests, so should carry no weight in reducing the penalty amount.

At trial BPXP sought to show that its sole source of funding for a penalty was a pre-existing, partially tapped line of credit from the BP Group in-house bank (NAFCO). Mr. Den Uyl contended that the entire value of BPXP was about $5.1 billion. FOF ¶¶ 936, 980. But, he ignored the full value of BPXP's assets and the fact that BPXP was able to rapidly mobilize massive resources and billions of dollars from within the BP Group to address and fund the legally-required response actions and claims payments. BPXP also repeatedly asked for credit for $40 billion in expenses, glossing over the fact that $3.51 billion of that was provisioned for the civil penalty in this case.

Finally, both defendants seek to reduce the penalty because they have many resources, spend large sums on capital and operational expenditures, and "employ"[6] many people in the Gulf. Those facts are yet another reason to keep the penalty high: for corporations this large, if

---

[5] BPXP in fact goes so far as to insist that the Court consider payments made pursuant to its criminal plea agreement, such as payments for GOMRI, and payments to the National Academy of Sciences. Under the terms of that agreement, such payments cannot be credited to the civil penalty. FOF ¶¶ 581, 627-628; COL ¶¶ 98, 100; Rec. Doc. 14202. Only the case fine (up to $1.25 billion) and any expenditures prior to the plea are at all relevant to the civil penalty.

[6] We use "air quotes" because it is undisputed that BPXP has no employees.

the penalty is not high enough, it will readily be written off as just another cost of doing business. This is especially so for corporations with projects that pose the risk of future spills into the environment.

After the Penalty Phase Trial, the position of the United States remains the same: the Court should impose a civil penalty on BPXP that approaches the maximum available amount of $13.7 billion, and should impose on Anadarko an amount that far exceeds $1 billion (but is less than the maximum of $3.5 billion).

## II.      Legal Standards and Purposes of CWA and Penalty Factors.[7]

After the Exxon Valdez oil spill, Congress recognized that it needed to "raise the cost of carelessness and to emphasize prevention" and concluded that "[o]ne of the best ways to induce the oil industry to operate more safely… is to make sure that they pay heavily when there is a spill." U.S. Proposed Conclusions of Law ("COL") ¶ 18. OPA 1990 increased the deterrent and punitive impact of CWA Section 311 through adoption of per-barrel penalties—a volume based system not found in other environmental statutes. COL ¶ 131. These amendments made clear that Congress "wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." See COL ¶¶ 19, 131.[8] Therefore, CWA penalties are not tied to damages actually suffered as a result of violations. COL ¶ 19.

A civil penalty must be high enough to insure that polluters cannot simply absorb the

---

[7] This section is a short overview. Throughout this brief, other legal standards are discussed as relevant to individual statutory factors.

[8] Because of the limited number of cases that have been tried to final judgment under CWA Section 311(b) since the 1990 amendments, the Court can also be informed by legislative history and other courts' discussion of how to apply the penalty factors under CWA Section 309. However, the dollar amounts of such penalties assessed (or settled) under administrative actions and other statutes are not directly analogous to penalties under Section 311(b) because of the unique statutory per-barrel penalty scheme reserved for judicial civil penalties. COL ¶¶ 42, 43.

penalty as a cost of doing business. COL ¶ 21. CWA Penalties "should also be sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle." COL ¶¶ 43, 102.

Finally, the question of whether to use a "top down" or "bottom up" approach is discussed in Part IV.A, below, associated with the discussion of the Economic Benefit factor.

## III.   Analysis of the Factors that Had Live Witnesses during the Penalty Phase Trial.

The trial focused on only four of the statutory factors. This section discusses those four, and Part IV discusses the factors without any witnesses at trial.[9]

### A.   Impacts of the Spill (Seriousness).

The difference between the witnesses for the United States and those for BPXP[10] can be summarized in two quotes:[11]

| US Expert: | "Basically everywhere the oil went, it created harm." |
|---|---|
| BPXP Expert: | "Technically, Gulf Coast actually ranges from the southern tip of Florida all the way around to the Yucatan Peninsula." |

This theme recurred throughout the various topics on impacts of the spill, such as human health, economic impairments, and environmental harm. In each topic, the experts for the United States examined where the oil actually went (or where effects were actually observed), and found potential harm and actual harm from the oil, when it was actually there. BPXP's experts looked at all the places where the oil never went, and at times when the oil was not there, and

---

[9] For a detailed discussion of the factors in order of the CWA, please see the proposed Conclusion of Law and proposed Findings of Fact.

[10] Anadarko admitted the spill was "extremely serious when it occurred." FOF ¶ 11. *See also* PP Tr. at 71:01-71:05.

[11] The first is Dr. Boesch, PP Tr. at 341:23-341:24, the second is Dr. Taylor. PP Tr. at 1810:3-1810:5.

aggregated all the data together, arguing that the penalty can only be high if the *entire* Gulf were severely and irretrievably harmed.[12] But BPXP's witnesses did all concede that there was serious harm in at least some areas, at some time periods, to humans or other species. Effectively, BPXP was saying, "pan the camera out, look over there, it's not so bad over there."

But the Court should instead pan the camera in, and look to where the oil actually went (*e.g.*, Barataria Bay). In *United States v. Allegheny Ludlum Corp.*, the court criticized the defendant's environmental expert for doing what BPXP's experts did at trial (averaging data in order to minimize harm):

> Dr. Barnthouse's analysis downplays the high concentration violations by averaging them with low concentration discharges over many years. The court finds persuasive Dr. Diamond's response that this analysis overlooks the likely toxicological effect of ALC's violations; it is analogous to arguing that consuming five gallons of alcohol in a single day is not harmful because on average the daily consumption over seven years is within acceptable limits.

187 F. Supp. 2d 426, 433 (W.D. Pa. 2002); COL ¶ 62. Efforts by BPXP to downplay the impacts of the Macondo oil spill through aggregation of environmental data should likewise be rejected.

### 1.    "Seriousness" Means Both Actual and Potential Harm.

Courts historically have considered a violation's actual and potential impacts on the environment, human health, and the economy to assess seriousness. COL ¶ 46. Nothing in the CWA requires quantification of actual damages to establish seriousness, and courts have routinely relied on evidence of potential harm alone.[13] COL ¶ 56. Evidence of potential harm alone can justify a significant penalty, COL ¶ 57, which follows, given the retributive purpose of

---

[12] Under this type of analysis, Hurricane Katrina was no big deal because everything was OK in Florida.

[13] As the Court itself stated, "the government's position -- and this will all be briefed post trial -- is that one of the considerations the Court has to take into account is the potential for future harm, long-lasting or permanent harm. BP apparently believes that that can only be the subject of an NRD action as I appreciate your argument, essentially. And if they can't prove it now, then it shouldn't be allowed in. I'll let you all make those arguments post trial." PP Tr. at 337:04-337:11.

Section 311 penalties: if a violator's discharge creates a massive potential for harm, penalties should not be reduced simply because actual harm resulting from the spill was not as bad as it could have been.  As the Court stated:

> You can have an extremely serious violation that results in little or no damage, but it could have potential to do catastrophic damage, but it could be good fortune that it doesn't do extensive damage. It doesn't mean it's not an extremely serious violation.

March 21, 2014 Transcript at 84; COL ¶ 57. The Fifth Circuit agrees:

> . . . almost winning a highly risky gamble with the environment does not much affect the egregiousness of having been gambling in the first place.

COL ¶ 57. Courts have also imposed penalties where there was actual harm. COL ¶¶ 47-54.

Therefore when, as here, a violation puts an entire ecosystem and way of life at risk—*and* severe actual harm has already been established—the seriousness factor dictates imposition of the most severe penalty.

Trial testimony demonstrated both actual and potential adverse impacts of the spill. "Potential" and "actual" harms fall into various categories. First, at the time of the spill, there was actual immediate harm to those on the rig, and also potentially massive harm to the rest of the Gulf. Some of the potential harm never manifested, such as response workers who were put at risk of accident or exposure to harmful constituents of oil, but who were not actually harmed. These workers have no claim in tort, but they were placed in harm's way, and that alone is "serious." Second, a great deal of that potential became reality. People were injured, habitats were destroyed. Some of this was easy to see and count (*e.g*., dead oiled pelicans); but, some of this actual harm was and is hard to see, and hard to measure (*e.g.,* extent of harm to turtles resulting from loss of sargassum habitat). Third, the future is now burdened by potential harm. Given that spill-related pollutants are in the environment and that exposures already suffered

cannot be undone, people, animals and habitats remain at risk of serious, long-term harms (*e.g.*, chronic effects to humans and marine organisms due to exposures).

### 2.   Evidence from the Trial: the Impacts were Extremely Serious.

The sheer magnitude of the spill demonstrates the seriousness of the Defendants' violations. This Court has already found that the Defendants' well discharged approximately four million barrels of oil, 3.19 million of which reached the environment. FOF ¶ 17. Congress' creation of a volume-based penalty scheme suggests that the length and volume of a discharge is relevant to the seriousness factor. COL. ¶ 49. For example, the *Citgo* court considered the 54,000 barrel, 24-day long spill to be "extremely serious." COL ¶ 49. Courts have also considered the length and cost of cleanup efforts required as evidence of actual harm and indicators of seriousness. The *Egan Marine* court found that the violation was "undoubtedly serious, as evidenced by the extent of the cleanup efforts [139 days] and the compensation that both parties have paid out as a result [$5.5 million in cleanup costs]."). COL ¶ 53. The response in this case is still ongoing (1,801 days, as of the date of this filing (Mar. 27, 2015)), and has cost approximately $14 billion dollars. This alone is proof of a serious violation. COL ¶ 53.

***Human Health Impacts***. Eleven men lost their lives as a result of the Defendants' violation. FOF ¶ 25. At least seventeen men and women were seriously injured in the explosion and its immediate aftermath. FOF ¶ 26. The remaining ninety-eight people on the rig faced risk of serious injury and lived through a horrific scene of death, destruction, and fear. FOF ¶¶ 27-62. BPXP's "look over there" tactics begin with respect to the spill's effects on human beings. Looking away from the people most impacted -- those who lost their lives or lived through the explosion -- BPXP's expert on human health (Dr. Cox) expressly excluded "any assessment of . . . rig worker deaths and injuries." FOF ¶ 64.

9

Following the explosion, a massive response action ensued. BP has acknowledged the "daunting set of challenges" facing the Unified Command in trying to protect the safety of "approximately 48,000 workers, the population of a medium-sized town, spread over an area that involved five states." FOF ¶ 68. These workers were put at risk of dehydration, heat effects, accidental injury, contact with oil, and inhalation of oil constituents. FOF ¶¶ 67, 69. Regardless of whether they were actually harmed, they were placed in harm's way, and that is serious.

For many response workers, those risks were realized: they were actually harmed. Thousands of injuries and illnesses were documented among cleanup workers and volunteers during the response. FOF ¶¶ 74-76, 98. BPXP's own expert at trial (Dr. Cox) admitted that "there were some injuries that I do feel were significant." FOF ¶ 73. But, Dr. Cox tried to downplay the injuries of nearly 1,000 response workers, each of whom required medical care (beyond first aid or restricted duty or days away from work), by comparing the number of workers injured to the total number of workers involved in the response. FOF ¶¶ 13, 76. Of course, the *rate* of injury does not diminish the *impact* of the injuries for those who suffered them; nor does the rate alter the fact that the tens of thousands of response workers who were not injured were put at risk of injury as a direct result of the spill. Dr. Cox also discounts some of the actual health effects; in his opinion, they are merely irritants, not significant or long-term. FOF ¶ 113. Those suffering such effects may have a different view.

Beyond those easily quantified actual injuries and illnesses, response workers were exposed to constituents of crude oil that are known to be toxic to humans. FOF ¶ 84. In the short term, some workers showed symptoms consistent with such exposures, even according to BPXP's expert Dr. Cox. FOF ¶¶ 83, 85, 93-98, 100-105, 113. The Medical Benefits settlement allows for recovery of damages for just such harms. FOF ¶¶ 106-107. But chronic adverse health

effects to response workers from exposure to oil or constituents may take years (or even decades) to manifest. Studies testing for long-term effects remain under way. FOF ¶¶ 114, 158-161. Dr. Richard Clapp's testimony showed that it is premature after only five years to draw conclusions about the long-term impact of the spill on human health, and that there is at least a risk of long-term harm. FOF ¶ 161.

Dr. Cox has admitted that many constituents of oil can have significant or long-term human health effects if exposure levels are high enough. FOF ¶¶ 132-134. But he has concluded -- before the period of time has elapsed in which such long-term effects might manifest -- that there will be no long-term health effects; he asserts exposure levels were not high enough to raise this concern. FOF ¶ 115; D35114. But Dr. Cox's conclusion is based on a paltry number of samples for some of the most harmful substances. FOF ¶¶ 132-134. For instance, Dr. Cox's analysis of response worker inhalation exposure to coal tar pitch volatiles (classified as potential occupational carcinogens), is based on just 61 sample results, but the response involved tens of thousands of people at work across the Gulf. FOF ¶ 134.

Finally, Dr. Cox, like many other BPXP experts, relies too heavily on general benchmarks, ignoring evidence that there is no safe exposure level for substances like coal tar pitch volatiles, benzene, and dioxins, and that sensitive individuals may experience adverse health effects at exposure levels below a given "threshold" level. FOF ¶¶ 116-119. Dr. Cox admitted on cross examination that risk exists at levels below the benchmarks he used, albeit "very low risk," FOF ¶ 115, but rather than waiting to see if any long-term effects develop, or even staying informed about on-going studies that may shed light on long-term effects, Dr. Cox concludes that no harm will occur. FOF ¶¶ 113, 163.

The disaster also caused risk of and actual psychological harm to individuals. Obviously,

the survivors of the explosion on the rig, and the families of the deceased and the survivors suffered actual or potential serious psychological and emotional harm. FOF ¶¶ 48, 59, 63, 172-176. But the risk of psychological harm extends beyond those so directly impacted by the disaster. FOF ¶¶ 172, 177-179, 182-184. Research by BPXP's expert Dr. Bonanno (ultimately abandoned at trial), shows that between 5-15% of a population exposed to a disaster suffer psychological problems "including PTSD, grief, depression, anxiety, stress-related health costs, substance abuse, and suicidal ideation" that he classifies as chronic, "persist[ing] for years after the event . . . ." FOF ¶ 166. Dr. Bonanno concludes that another 15-25% of the population suffer "elevated symptoms of distress" for months to a few years. FOF ¶ 167. And even those most resilient can suffer "at least some distress" during or immediately after a disaster. FOF ¶ 165. Dr. Bonanno agreed that the Deepwater Horizon oil spill was a disaster. FOF ¶ 164.

*Economic Impacts on Individuals and Businesses*. The testimony of Dr. Charles Mason showed that adding up claims paid for economic damages is a reliable source of information for determining the *severity* of economic harm, and in this case, with only those claims paid to date already totaling approximately $10 billion, it is clear that the economic harm is indeed severe. FOF ¶¶ 263, 274, 279. BPXP suggests that the amount of claims paid is inflated. Defendant is wrong: claimants were required to provide documentation such as tax records, photographic evidence, and pay stubs, and these records were evaluated by trained assessors. FOF ¶ 281. In each of the three claims processes, BPXP helped establish the claims protocols and reviewed the claims paid. FOF ¶ 282. And BPXP has used its appeal rights under the Court Supervised Settlement Program, challenging more than 20% of the proposed payments. FOF ¶ 282.

Moreover, the sum of claims paid does not even capture the full extent of the economic harm caused by the spill. It caused ripple effects that "reach[ed] out into the fabric of the entire

Gulf Coast region and economy." FOF ¶ 278. But losses suffered in many industries, such as the oil and gas industry, the real estate development industry, the banking, financial, and insurance industry, and the gaming industry were excluded from the Court Supervised Settlement Program. FOF ¶ 275. Further, not everyone who was eligible to make a claim was able to do so, and not all claims potentially eligible for payment are included in the current total amount of claims paid -- as of July 2014, 31% of all claims filed in the Court Supervised Settlement Program had not been reviewed. FOF ¶ 229, 276.

For BPXP's case, its expert witness Dr. Scott admits to plenty of economic harm, but he tries to wave it away through aggregation and averaging, across both place and time.

First, Dr. Scott conceded that the oil spill economically harmed the two industries he analyzed: the fishing and tourism industries. FOF ¶¶ 285-287. In May 2010, RevPAR (revenue per available room, an economic performance metric for the hotel industry) was down nearly 9% in Alabama's coastal tourism destinations, as compared to May 2009, and as the spill dragged on, RevPAR in June - August 2010 plummeted by one third, as compared to June - August 2009. Similarly, RevPAR was down by 13% in the Florida panhandle during the summer of the spill, as compared to the same months a year earlier. FOF ¶ 288. And according to Dr. Scott, the total *documented* loss of commercial fishing revenue in 2010, as compared to 2007-2009 average annual revenue, was $111.8 million. FOF ¶ 292. Although Dr. Scott did not analyze the economic impact of the spill on the oil and gas industry for this case, he did state in a 2011 paper that: "One of the sectors that was hardest hit by the after-effects of the oil spill was the oil and gas extraction sector." FOF ¶ 301.

However, Dr. Scott tried to argue that *in the aggregate* there were no net employment effects from the spill in 2010, in part because the spill created response jobs. But his opinion is

13

contradicted by the very paper he relies upon, which shows that Florida coastal communities had 50,000 fewer jobs in 2010 as compared to 2009. FOF ¶¶ 305-306. This net loss of jobs occurred because tourists stayed away from the Florida Gulf Coast during and after the spill, fearing that oil would make its way there. FOF ¶ 306. But unlike their counterparts in Louisiana (and to an extent Mississippi and Alabama), Florida residents out of work because of the spill could not take on a response job in order to make ends meet: in Florida there were very limited response activities, and therefore very few response-related jobs. FOF ¶ 306. Similarly, in making arguments about the finfish industry *as a whole*, Dr. Scott aggregated hundreds of species of finfish together; because of this aggregation, he was unable to determine if fishermen who specialized in catching only one species of finfish were impacted. FOF ¶ 304.

Finally, Dr. Scott claimed that the economic effects of the spill were temporary. This is untrue. For instance, although hotel revenues in the Florida panhandle and Mississippi Gulf Coast increased from 2011 to 2013, tourism revenues have been increasing nationwide as part of the recovery from the national recession. FOF ¶¶ 295-298. The 2011-2013 hotel revenues in the Florida panhandle and Mississippi Gulf Coast did not grow as quickly as hotel revenues in the Florida Atlantic Coast and inland Mississippi -- areas that were spared the brunt of the spill's damage -- during that same time period, evidence that shows ongoing harm to Florida and Mississippi coastal regions is statistically significant. FOF ¶ 298. But even assuming, *arguendo*, that the economic effects of the spill were temporary, such temporary harms are still serious. Economic recovery after a loss does not erase the harm suffered in the interim: the cost of missed opportunities, inability to pay employees' salaries, inability to pay rent or buy food -- *even if* these harms were temporary, they were real.

***Impacts on Local Communities and Society***. In addition to harming individuals, the spill

14

harmed the social fabric of the Gulf Coast. Anthropologist Dr. Diane Austin examined the sociocultural effects of the spill, and explained that economic harms suffered by individuals and businesses resulted in disruption to entire communities, as Gulf Coast communities are heavily dependent on the very industries impacted by the spill: tourism, fishing, oil and gas, and shipbuilding. FOF ¶¶ 218-222. Gulf Cost residents depend on those industries for more than their livelihoods, however; personal and cultural identity is tied to the Gulf, and to those industries. FOF ¶¶ 235-236. Damage to the Gulf and its industries (both actual and reputational damage) has harmed the identities of Gulf Coast residents and communities. FOF ¶¶ 232-238.

Even efforts to mitigate the economic harms of the spill, such as the Vessels of Opportunity ("VOO") program, tourism grants, and the claims process, caused tension and division within and among communities; as some were able to take advantage of the mitigation efforts, others were not. FOF ¶¶ 227-230. For instance, those with better access to resources were able to get help navigating the complicated claims process. FOF ¶ 229. Even BPXP's Dr. Scott had to admit, upon questioning by the Court, that the claims process created "winners and losers." FOF ¶ 261. Unsurprisingly, those who were already in a disadvantaged position were less likely to be able to avail themselves of the mitigation efforts, exacerbating pre-existing social and economic inequality and deepening ethnic and racial divides. FOF ¶¶ 228, 231.

***Impacts on the Environment.***  BPXP's spilled oil found its way into virtually every part of the environment and caused harm everywhere it went. FOF ¶¶ 352, 363. For some natural resources, studies to date show actual harm to natural functions and populations in an ecosystem. For other resources, harm likely occurred but cannot yet be unambiguously demonstrated and is therefore treated as "potential" harm for purposes of this penalty proceeding. FOF ¶¶ 355-365.

Oil is highly toxic and can persist for many years, as shown by Dr. Stanley Rice.

Decades of research have demonstrated that early life stages are particularly susceptible to impacts from exposure to extremely small amounts of oil constituents. FOF ¶¶ 443-444. Recent studies showed that low parts per *billion* concentrations of MC252 oil caused heart problems in developing yellowfin tuna, bluefin tuna, amberjack, and mahi mahi. FOF ¶¶ 444-449.

In the deep sea, Dr. Donald Boesch showed that marine snow coated the seabed with oily residue, killing rare, centuries-old deepwater corals, and that the damage to the more affected coral colonies will be lasting. FOF ¶¶ 380-389. Other deep sea organisms were harmed over at least fifty-seven square miles, with potential food web effects. FOF ¶¶ 393-397.

At and near the water's surface, oil harmed a wide variety of animals, including many food web organisms, *sargassum* communities, dolphins, turtles, birds, and fish. FOF ¶¶ 398-401. Harm to threatened or endangered sea turtles was documented through a substantial increase in adult strandings (the cause of which was disputed), relocating over 14,000 turtle hatchlings outside the Gulf to avoid the oil (not disputed), and killing large areas of *sargassum* that hatchlings and juvenile turtles need for habitat (not disputed). FOF ¶¶ 399, 405-406. Dolphin strandings also rose greatly following the spill. FOF ¶ 408. A study comparing the health of dolphins in heavily oiled (Barataria Bay) and unoiled (Sarasota Bay) habitats found "severe disease" in Barataria Bay dolphins and "strong evidence" linking the spill to that disease. FOF ¶¶ 409-412, 420b, 420d. Thousands of oiled, dead birds were recovered, representing only a fraction of the total killed. FOF ¶¶ 421, 424. Numerous studies indicated harm to both pelagic fish such as tuna and mahi mahi and bottom-dwelling fish such as red snapper and tilefish. FOF ¶¶ 447-457.

According to BPXP witnesses (Taylor, Folse), over 1,100 miles of shoreline were documented as visibly oiled by the Shoreline Cleanup Assessment Technique (SCAT) process,

harming marshes, mangroves, and beaches. FOF ¶¶ 510, 515-516. Due to limitations in the SCAT technique, which is designed for responding to spills rather than assessing harm, the full extent of oiling along and in marsh areas was not evaluated. FOF ¶¶ 521-529. BPXP's Dr. Tunnell acknowledged that saltwater marshes are particularly important habitats and also are the most vulnerable to oil spills (as are mangroves), and that the residual effects of heavy oiling are important. FOF ¶¶ 535-537. The oiling caused permanent marsh loss, either by killing it outright or by weakening the soil, which can increase susceptibility to erosion. FOF ¶¶ 538-540. Lost marsh will not naturally recover. FOF ¶ 541. For oiled marsh that has not eroded, concentrations of PAHs in the soils are declining so slowly that they may not reach pre-spill conditions for decades. FOF ¶¶ 553-554. Animals living in and near the marshes also were harmed, including shrimp, fiddler crabs, and others in the marsh community. FOF ¶¶ 555-558, 561. Beaches were harmed by the oil and the intensive clean-up activities. FOF ¶¶ 530-533.

BPXP's counsel acknowledged the seriousness of the spill before and during trial.  Status Conf. Tr. at 68:03-68:07 (Mar. 21, 2014); PP Tr. 51:01-51:05. But BPXP's witnesses downplayed the environmental harm, chiefly by making inapposite comparisons.

Dr. Tunnell, BPXP's overall environmental expert, concluded there were no "significant" impacts to populations of various species, finding no "collapse," "crash," or "total drop" in those populations.  FOF ¶ 459. But Dr. Tunnell admitted that none of his work on fish, shellfish, or bird population data included any computations of how large the spill's impact would have to be on any population before registering as "significant." FOF ¶¶ 426, 460. This is particularly important because of the variability of the populations and error rates in the population data, which Dr. Tunnell did not compute either. FOF ¶¶ 427, 463-464. Nor did Dr. Tunnell consult any literature regarding the use of these population data. FOF ¶¶ 428-431. Dr. Donald Boesch

explained that -- other than showing the absence of a "crash" in populations -- Dr. Tunnell's analysis lacks the statistical power to make any meaningful conclusions about the spill's effects on populations.  FOF ¶¶ 469-470.

Dr. Tunnell also minimized the spill's effects by taking issue with certain studies. Most prominently, Dr. Tunnell disputed a study examining the spill's effects on dolphin health in Barataria Bay. But he made important concessions that undermine his criticisms of the dolphin health study, including: (1) a lack of familiarity with the necropsy methodology, or the field health assessment methodology; (2) lack of familiarity with a deposition his critique relied upon; (3) a lack of expertise to challenge determinations about dolphin health; and (4) the relative similarity in contaminant levels (other than MC252 oil) between Barataria Bay and Sarasota Bay. FOF ¶¶ 414-416, 420.

BPXP's toxicologist, Dr. Shea, also minimized the potential for harm from the spill in two main ways: by using inappropriately high toxicity thresholds and by using aggregation to hide or minimize those samples that exceeded potentially toxic levels. Dr. Shea's use of EPA's 2003 general toxicity benchmarks systematically understated risk as follows:

- He admitted that without species-specific data, he cannot be certain that his methodology would be protective of Gulf species. FOF ¶ 484. EPA's guidance calls for the benchmarks to be adjusted for site-specific conditions and to be updated as more data become available, but Dr. Shea did not do so here despite the availability of such data. Amazingly, Dr. Shea claims that *no* research published since 2003 is sufficiently reliable for this purpose. FOF ¶¶ 489-491.

- The benchmarks used by Dr. Shea are higher than toxicity thresholds found in peer-reviewed studies on Gulf species. FOF ¶ 486.

- Dr. Shea admitted the susceptibility of early life stages to oil toxicity but could not say if any of the benchmark tests used embryonic life stages. FOF ¶ 479. Where, as here, mechanisms such as photoxicity are important, particularly with embryos, EPA recognizes that the benchmarks may not be protective. FOF ¶¶ 480-81.

- He disregarded EPA's guidance by failing to use available data to calculate benchmarks for all the PAHs measured in the water samples. FOF ¶¶ 499-500.

Dr. Shea's second major error is to average all water samples taken across inappropriately large areas of space, time, and depth, rather than focus on samples in the top few meters, which is where the greatest concentration of early life stage fish also would be found.[14] FOF ¶¶ 503-505. Contrary to Dr. Shea's approach, Dr. Rice used the same water column data to show that samples taken when and where the oil was present were toxic to life likely to be there at those times, based on benchmarks derived from recent peer-reviewed literature. FOF ¶ 450.

Putting aside BPXP's inapposite data groupings and comparisons, a great number and variety of plants and animals were harmed by the spill over a very wide geographic area.  One might then ask, "What was the actual extent of harm to each resource?"  Although BPXP is essentially arguing the contrary, such exact determination is unnecessary in a penalty proceeding, and more appropriate for the Natural Resource Damage Assessment (NRDA).

**B.    BPXP's Response to the Spill: Seriousness or Efforts to Mitigate?**

The majority of BPXP's case at trial related to its efforts to "mitigate" the effects of the spill, wherein BPXP highlighted its response actions, claims payments, "early NRD" payments, and the like. This is another area where the parties have limited factual disagreements; rather, the importance of those facts, in the legal framework under the CWA and OPA, is where the parties differ. In short, almost everything that BPXP emphasized was either: (1) required by law (economic damages, response costs) or by its guilty plea (GOMRI, Houston Center); (2) paid in a manner that avoids future litigation for recovery of those amounts (*i.e.*, mitigates ultimate

---

[14] Dr. Tunnell's reports also discuss toxicity thresholds and seafood safety data.  But at trial Dr. Tunnell admitted that he could not testify to appropriate toxicity thresholds and that the level of PAH exposure to fish cannot be extrapolated from the PAH levels found in fish tissue. FOF ¶ 468.

damages to be paid and reduces litigation costs, such as BPXP's payments for "early restoration" whereby BPXP gets credit against the future NRD claims); or (3) beneficial to BPXP's own economic interests in other ways (*e.g.*, tax deductible).[15]

### 1. "Efforts to Minimize or Mitigate" Otherwise Required by Law do Not Mandate a Reduction in the Penalty.

The 1990 OPA legislation set up a tripartite scheme of costs, damages, and penalties. As responsible parties, BPXP and Anadarko were obligated to respond to the spill, and would have faced substantial additional legal liability had they not done so. COL ¶¶ 124-127. Moreover, they are responsible for paying damages to injured parties, so paying to "mitigate" the impacts on those parties merely mitigates the damages that the Defendants would ultimately have to pay. COL ¶¶ 138-140. Under this legal framework, a court must "consider" the efforts to minimize or mitigate the discharge, but is not required to "reduce" the civil penalty for these payments absent compelling reasons to do so.[16]

Under the OPA scheme, payment of response costs and penalties are covered by different parts of the CWA. Section 311(c)(5)(A) creates a statutory obligation for violators to "respond

---

[15] For example, BPXP seeks to reduce its civil penalty based on payments and actions which have already been considered as a basis for accepting its criminal plea. At BPXP's request, the Court in the criminal matter considered: (1) the monies spent on the response, placed in trust, paid in civil settlements and claims, paid to the Gulf of Mexico Research Initiative (GOMRI), and used to establish a rig worker fund; (2) the sharing of lessons from the incident; and (3) the financial impact on BP plc (not limited to BPXP) as well as BP spending in the United States. Joint Memorandum in Support of Proposed Guilty Plea by BPXP, Case: 2:12-cr-00292-SSV-DEK, Doc. 49 Filed: 1/16/13, at 37-57; *see* Reasons for Accepting Plea Agreement, Case: 2:12-cr-00292-SSV-DEK, Doc. 65 Filed: 1/30/13, at 15-20. All of these items have already been considered in setting and accepting the criminal terms of BPXP's plea agreement and considering them again in the civil penalty assessment would be duplicative.

[16] There may be cases where economic benefit is the most significant factor and a court is using a "bottom up" approach. In such cases, failure of efforts to minimize or mitigate might well be a reason to increase the penalty. Similarly, the United States has already conceded that the Court should reduce the civil penalty by some amount to recognize only those expenditures to mitigate harms which were made by BPXP but were *not* required by law (*e.g.*, tourism promotion, seafood testing, and any amounts paid for GOMRI before it became required by the plea).

immediately to a discharge," and pay for the cleanup.[17] 33 U.S.C. § 1321(c)(5)(A). Section 311(b) creates an entirely independent obligation for the payment of penalties, one which Congress intended to be separate from and payable *in addition* to any CWA response costs: "I am particularly pleased that the legislation assures that those who are responsible for damaging our fragile environment will be subject to substantial civil and criminal penalties *in addition to responsibility for cleanup costs*." Senator Lieberman's comments on OPA passage, 136 Cong. Rec. S11544 (daily ed. Aug. 2, 1990). This is consistent with the purposes of the Act: response costs are required to make the government whole—whereas penalties are meant to punish and deter. Allowing violators to offset their penalty payments by amounts paid in costs and damages undermines these dual purposes and blurs the line between two distinct portions of the Act.[18]

Consistent with this intent, OPA, which includes provisions for the assessment of damages from the discharge of oil (*e.g.,* Natural Resource Damages), directly condemns offsets. Specifically, OPA's reservation clause states that**:**

> *Nothing in this Act*, the Act of March 3, 1851 (46 U.S.C. 183 et seq.),[1] or section 9509 of Title 26, *shall in any way affect, or be construed to affect, the authority of the United States* or any State or political subdivision thereof— **(1)** to impose additional liability or additional requirements; or **(2)** to impose, or *to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge, of oil.*

33 U.S.C. § 2718(c) (emphases added). It is clear from the strength of the statutory language that Congress intended OPA damages to be assessed in addition to—not as an offset against— any

---

[17] Responsible parties are obligated to follow orders from the Federal On-Scene Coordinator in responding to oil spills, and the failure to do so exposes a responsible party to liability for civil penalties under Section 311(b)(7)(B) of up to $37,500 per day of violation or an amount up to *three times* the amount expended by the Oil Spill Liability Trust Fund. COL ¶ 124.

[18] Similarly, the CWA also clearly states that response costs shall have no impact on OPA damages. Section 311(c)(5) ("Nothing in this subsection affects: (A) the obligation of an owner or operator to respond immediately to a discharge, or the threat of a discharge, of oil; or (B) the *liability of a responsible party under the Oil Pollution Act of 1990.*") (emphasis added).

other relevant statute's penalty or damages schemes.

More recently, Congress has reaffirmed that penalties and damages for oil spills serve different purposes. *Resources and Ecosystems Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast States Act of 2011 ("RESTORE Act"),* Report to Accompany S. 1400, Report 112-100, 2011 WL 6155734, at *15 (Dec. 8, 2011) ("The ability to obtain both NRD and penalties is not, and has never been, considered double recovery against a Responsible Party, but rather separate remedies provided by law that serve different purposes. Clean Water Act penalties are punitive in nature and serve a deterrent purpose, while NRD claims are intended to compensate the public for natural resource injuries resulting from an oil spill.").

### 2.     BPXP's Efforts.

Defendants' efforts to "minimize" were covered in Phase Two. The specific issue there was whether BPXP engaged in "extreme, extra-negligent conduct." Findings of Fact and Conclusions of Law Phase Two Trial (Rec. Doc. 14021) at 36, ¶ 246. The Court did, nevertheless, find that, "there is evidence that arguably could lead a factfinder to conclude that BP was negligent in its source control preparation. However, simple negligence is not at issue here. . . ." *Id.* ¶ 247. For purposes of the "efforts to minimize the discharge" factor, the Court is not required to find negligence, let alone extreme, extra-negligent conduct. That the Court deemed the source control efforts questionable, however, is relevant to this factor. Similarly, BPXP's "patently false" statements about the flow rate, Phase One Findings, Rec. Doc. 13381-1 at ¶ 278, impeded the "efforts to minimize" the discharge by placing extra work on the governmental response agencies. FOF ¶¶ 635-637.

As for the other response or removal actions, BPXP complied with orders of the FOSC,

and overall they did "a pretty good job." FOF ¶¶ 645-646.[19] However, BPXP also made mistakes during the response, especially regarding the initial start of response and preparing shorelines for the arrival of oil. FOF ¶¶ 651-661. By other indicators, BP's response was merely adequate,[20] but still sufficient to avoid incurring additional penalty exposure by failing to comply with the directions of the FOSC. FOF ¶¶ 647, 651.

While BP's response efforts were often commendable, their effectiveness was not. For example, BPXP held out its efforts to "remove" oil from the environment as superlative (37% removal), but BPXP inflated the collection effectiveness by asserting that dispersing oil into the water, or burning and emitting it into the air is the same as removing it by skimming. FOF ¶¶ 662, 664. Capt. VanHaverbeke showed a 5% removal rate by skimming, far lower than for the average spill. FOF ¶ 672. This is not surprising given Captain Laferriere's testimony that BP resisted repeated calls for more skimmers.  FOF ¶ 655. In other words, BPXP wants credit for dispersing oil further into, rather than removing it from, the environment. But those dispersions into air and water transferred the risk from the sensitive shoreline to the water column; it was a decision to endanger aquatic plants and animals rather than terrestrial plants and animals. FOF ¶ 692. Although the Unified Command accepted that tradeoff as the least bad choice available, the Court should not lose sight of the fact that it was, in fact, a tradeoff necessitated by Defendants' oil spill, as was the entire response.

---

[19] BPXP is also asking the court to decrease its penalty because of the acts of entities other than BP. BP's competitors supplied response workers and ideas. The federal government supplied response workers and equipment, as did States, local governments, and private organizations. These efforts burdened and distracted the governments from their ordinary duties to the public, as shown by the testimony of Adm. Meredith Austin. Now BP seeks to take credit for the efforts, ideas, and equipment of those entities.

[20] Laferriere Dep. at 309:23-310:07 (BPXP's response actions were performed "adequately. . . . It doesn't mean they did it excellently [or] superiorly. It doesn't mean they were awesome. It means they were adequate, adequate. That is it.").

Finally, on the topic of BPXP's various payments to "mitigate" the impacts of the spill, BPXP had Dr. Scott testify about various claims payments, but he admitted that "in an economic situation like this . . . you could have winners and losers." Dr. Scott, PP Tr. at 2083. Mr. Morrison testified that he was "proud" of the company's efforts to mitigate economic damages. At times BPXP seemed almost to be saying "you're welcome" to the people of the Gulf of Mexico. But, as discussed above, OPA requires such payment of damages. And of course BP had its own motivations to make these payments, such as mitigating damages.

### C.    Anadarko's Response and Mitigation.

To reduce Anadarko's penalty based on its close-to-non-existent response efforts would be wrong. Like BPXP, Anadarko is a responsible party under OPA, liable for removal costs and damages related to the discharge from the Macondo Well. Rec. Doc. 5809 at 8; 33 U.S.C. § 2702. Anadarko paid nothing to the Coast Guard for response costs. FOF ¶ 733. It did not participate in the Unified Command, or in any booming, skimming, dispersant application, in-situ burning or other response-related efforts.  FOF ¶ 736. Yet Anadarko seeks credit for the two boats it sent immediately after the blowout for firefighting efforts; equipment it sold to BP for a response strategy that was never implemented; and for the four employees and one contractor it supplied—out of the tens of thousands of people involved and significant resources provided in the response. FOF ¶¶ 738-743. Anadarko's response efforts are at most on par with other industry contributors who, in contrast to Anadarko, had no nexus to the Macondo well. FOF ¶¶ 326, 743(c).  Anadarko should not be entitled to any credit for these paltry, mostly unsuccessful efforts that, in the end, were part of, and did not exceed, its legal duties.

Anadarko also seeks credit for its $4 billion tax-deductible cash payment to BPXP to resolve their mutual claims against each other arising from the Macondo Incident because of the

"condition" in the payment that BPXP use the money to pay the claims of persons injured by the spill. FOF ¶¶ 734-735. These claims include those brought under OPA, which Anadarko – as a responsible party – is legally obliged to pay. FOF ¶ 732; COL ¶ 142; Rec. Doc. 5809 at 8; 33 U.S.C. 2702. Additionally, although the money's intended use is to pay claims, cash is fungible and Anadarko's payment in essence made $4 billion available that BPXP could use for something else.

   **D.    BPXP Financial Issues (Economic Impact on the Violator).**

   The penalty should not be reduced based on this factor because BPXP has not met its burden of showing that it does not have the ability to pay or financial flexibility to fund or finance the maximum penalty under the CWA.[21]

   **1.    Law Regarding Economic Impact Factor, Including the Relevance of Related Corporate entities, and Payments Over Time.**

   The Supreme Court has held that a court may "seek to deter future violations by basing the penalty on its economic impact" on the violator. *Tull v. United States,* 481 U.S. 412, 423 (1987). A "civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business." *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1166 (D.N.J. 1989), *rev'd in part on other grounds*, 913 F.2d 64 (3d Cir. 1990); COL ¶¶ 21, 73. Where a violator cannot prove that a penalty will have a "ruinous effect," the economic impact factor should not reduce the penalty. COL ¶¶ 22, 145. Related to this analysis is whether the assets and liabilities of other BP Group entities are relevant to the Court's assessment of the economic impact of a penalty on BPXP. The United States' arguments are summarized and set

---

[21]Before the Court's Phase One ruling, BP had recognized a provision of $3.5 billion for estimated civil penalties for strict liability under the CWA. BP, however, also recognized that "if BP is found to have been grossly negligent, the penalty is likely to be significantly higher than the amount currently provided." FOF ¶ 746.

out in the Proposed Conclusions of Law. COL ¶¶ 142, 146-150. In short, cases have concluded that the finances of affiliated companies are relevant when the defendant is (1) operationally and (2) financially interdependent on the other entities. COL ¶¶ 142, 146-150.

### 2.     The Statutory Maximum Penalty Would Not Have a Long-Term Negative Impact on the Operations of BPXP.

As explained by the United States' expert at trial, Ian Ratner, BPXP can pay the maximum penalty that can be imposed without such payment having a ruinous effect on or jeopardizing BPXP's continued operations. BPXP could fund or finance a penalty in a combination of ways, including: (i) internal or external borrowings; (ii) future operating cash flows; or (iii) the divestiture of assets or sale of partial interests in assets. FOF ¶¶ 745, 842, 901-935; TREX-013123R, 013125, 013127, 233888. BPXP has not met its burden to show otherwise.

BPXP owns hundreds of leases and significant oil reserves in the Gulf of Mexico. FOF ¶¶ 850, 902-917. As of March 2014, BPXP had at least $25 billion in total assets and $18 billion in fixed assets, not including future cash flows. FOF ¶ 915. BPXP reported $3.5 billion in book equity. FOF ¶ 916. Taking into account an additional $3.5 billion already provisioned for the CWA civil penalty, BPXP has $7 billion in book equity. FOF ¶ 916. The Standard Measure of Oil and Gas ("SMOG") analysis of proven reserves for the Gulf of Mexico Region indicates that post-2015, discounted cash flows would contribute another $18 billion to BPXP. FOF ¶¶ 909-914. BPXP criticizes Mr. Ratner for failing to perform a valuation of BPXP; this argument is unavailing as BPXP refused to produce in discovery the information necessary to do so, such as BPXP's business plan, access to management, a detailed capital expenditure plan, or information on unproved reserves and contingent reserves. FOF ¶¶ 921-928, 939.

BPXP's expert, Mr. Den Uyl, offered numerous flawed and unreliable opinions to reach his conclusion that BPXP only has the ability to pay a CWA penalty of $2.3 billion. FOF ¶¶ 936-

994. Mr. Den Uyl unrealistically assumes that BPXP's ability to pay should be based only on its current internal (BP) line of credit, despite the fact that BP has consistently allowed BPXP to exceed that internal line of credit or borrow with no line of credit at all.[22] FOF ¶¶ 771-774, 829-841, 986-994. Furthermore, Mr. Den Uyl did not perform a business valuation of BPXP. FOF ¶¶ 937-973. Instead, without performing due diligence, he relied on an analysis performed by a third-party (Wood Mackenzie), which evaluated only a small fraction of BPXP's assets and leases, rather than using BPXP's own evaluations or financials. FOF ¶¶ 943-973. Mr. Den Uyl failed to consider the assets of the BP Group in his evaluation of BPXP's ability to pay, completely ignoring BPXP's historic practice of issuing dividends to its common and preferred BP stockholders, and the BP Group's practice of making loans and capital contributions to BPXP. FOF ¶¶ 829-841, 918-919, 986-994. Finally, he assumes that the current low oil prices will continue for the next 40 years, which is not realistic. FOF ¶¶ 940, 974-985.[23]

Furthermore, BPXP's evidence at trial of its alleged contributions to the Gulf of Mexico suggest tremendous financial strength and contradict its claim that it lacks ability to pay the maximum penalty. Since the Macondo Incident BPXP has actually increased its capital expenditures (billions annually), the number of drilling rigs it is operating, its vendor spending, and its operational expenditures (billions annually). FOF ¶¶ 845-851.

Even if BPXP cannot afford to pay the maximum penalty without financial assistance

---

[22] His opinions on BPXP's cash flows and costs were based on a Group Plan Template spreadsheet that provides limited information, was not produced in electronic form, and was redacted. FOF ¶¶ 922-924, 949-950.

[23] In a December 2014 investor update, BP disclosed that "price volatility is inherent in our industry." BP stated that although "the current environment introduces some near term uncertainty, [o]ver time we see this as potentially healthy for the industry overall. It can drive greater efficiency right across the value chain and is one of the mechanisms that underpin long-range returns in our sector. . . . Lower prices should benefit our Downstream business and provide some natural offsets." FOF ¶¶ 975-979.

from the BP Group, no reduction in the maximum penalty is warranted under the economic impact factor. BPXP is inextricably linked to the BP Group, making consideration of the parent's assets in paying a penalty particularly relevant. Indeed, as explained below BP plc not only controls the operations of BPXP -- including at Macondo -- it controls BPXP's financing, and therefore will decide whether and how a penalty is funded by BPXP. See FOF ¶¶ 748-844.

> **3.** **The Relationship between BPXP and the other Group Entities – operationally and financially – Makes Relevant the finances of all of those other Entities.**

It is uncontested that BP plc and the BP Group played a controlling role in the operations of BPXP. See FOF ¶¶ 748-844. The United States' expert Dr. Fredric Quivik and BPXP's expert Professor Robert Daines agreed that: (1) the BP Group, and not only BPXP, conducted and managed operations in the Gulf of Mexico; (2) BPXP has no employees; (3) more than 2,000 BP Group employees conducted BPXP's operations in the Gulf; (4) BPXP's Board of Directors has not guided business plans, set performance objectives, or overseen capital expenditures, acquisitions or divestments in the Gulf of Mexico; (5) the BP Group has managed the finances of the Group centrally, and (6) BPXP does not have an external bank account. FOF ¶¶ 748-844, D-32914A; TREXs-013210, 13211, 13214, 13215, 13235.

The BP Group manages its *operations* through business segments and functions, not through legal entities such as BPXP. FOF ¶¶ 750-764. Delegations of authority pass from the top of BP's global upstream segment to the Gulf of Mexico Regional Business Unit (RBU), formerly known as the GOM Strategic Performance Unit ("SPU"), which managed operations in the Gulf of Mexico and at the Macondo well. FOF ¶¶ 758-761. No one in the Drillings and Completion ("D&C") organization of the Gulf of Mexico SPU was or is an employee or officer of BPXP, including Patrick O'Bryan, who was the Vice President of D&C at the time of the disaster. FOF

¶ 762. The Group makes decisions based on what is good for the Group as a whole; when making an investment decision, the question that is examined is whether "this is a good investment of Group resources" regardless of which legal entities' books will be charged. FOF ¶¶ 760, 764, 779-781.

The BP Group manages the *finances* of the group centrally, through the Finance and Treasury Functions, which are responsible for accounting, performance management, business development, commercial operations and planning, maintaining the BP financial system, and monitoring the BP Group aggregate balance sheet. FOF ¶¶ 765-790. Investment decisions are made by the BP Group through structured finance notes. FOF ¶¶ 760, 764, 779-781. Between 2007 and 2010, BPXP paid $16.4 billion in dividends to other BP Group entities: $12 billion to BP America Production Company, Inc. (its common stockholder), and $4.4 billion to BP Products North America, Inc. (its preferred stockholder). FOF ¶¶ 794-795, 918-919.[24]

The manner in which the BP Group responded to the Macondo disaster provides further evidence of their corporate relationships, because BPXP's response to the Macondo disaster was initiated, organized, and directed by the BP Group. FOF ¶¶ 813-844. In June 2010, the BP plc Board of Directors established the Gulf Coast Restoration Organization ("GCRO") to manage all aspects of BP's response to the disaster. GCRO reports directly to the BP Group chief executive and is overseen by a specific BP plc board committee. FOF ¶¶ 814-815. As Ian Ratner testified, much of the funding for the response to the spill came from BP plc. FOF ¶ 816. For instance,

---

[24] BP itself does not distinguish between its subsidiaries and the BP Group. BPXP asks the Court to rely on legal distinctions among entities, yet ignores them in its own evidence. FOF ¶¶ 799, 802-812. Testimony of BP witnesses in the Penalty Phase trial, the Phase I trial, and depositions, and instead treat BPXP as synonymous with the BP Group. FOF ¶ 803. In prior phases, BP also ignored any corporate distinctions in presenting evidence. FOF ¶¶ 804-807. Even outside of the courtroom, the distinction between BP entities is opaque to Group employees. For instance, officers were unaware they held positions at BPXP. FOF ¶ 809.

BPXP financed the $20 billion to the Oil Spill Liability Trust Fund for payment of claims through a number of sources including monies borrowed from the North American Funding Company ("NAFCO"), BP's in-house bank for its subsidiaries in the United States. FOF ¶¶ 817-819.[25]

The BP Group provided financing to BPXP before and after the Macondo disaster. From 2009 to mid-2014, other BP entities funded BPXP by: (a) an internal $5 billion line of credit known as an IFA with NAFCO; (b) intercompany borrowings, including $11 billion in loans from NAFCO; (c) an internal $3.1 billion loan; (d) internal equity of preferred and common stock; and (e) an internal $14 billion equity injection. FOF ¶¶ 771-774, 818-819, 829-841. There were no instances from 2009 to 2014 in which BPXP was unable to obtain the financing it needed from the BP Group. FOF ¶¶ 771-774, 818-819, 829-841.[26]

BP's Gulf of Mexico Region accounts for approximately 22% of BP's global oil production. The GOM region is one of only four key areas in BP's upstream business. In 2014, BP projected that production in the GOM would increase from 211,000 barrels in 2014 to 322,000 barrels in 2018. FOF ¶¶ 902-908. Simply put, the BP Group hinges on BPXP just as BPXP depends operationally and financially on the Group.[27]

---

[25] In order to fund the aftermath of the spill, BP set a goal to dispose of up to $30 billion in assets by the end of 2011. That goal was later increased to $38 billion and was largely completed by December 31, 2012. FOF ¶¶ 824-828.

[26] Although BPXP was the leaseholder and registered well operator, other BP entities made commitments and took actions on behalf of BP's interests in the Gulf before and after the incident. FOF ¶¶ 842-844.

[27] As this Court recognized at trial, the United States has not alleged that BP's "corporate structure is somehow improper, illegal, unusual for this type of business." PP Tr. at 2000:6-15. Instead, as the Court stated, "the government's argument is that because of the way they operate, what implication should you draw from that?" PP Tr. at 2000:23-2001:3. BPXP did not affirmatively establish that the relationship between BPXP and the BP Group is similar to that between other subsidiaries and their parents. Nonetheless, even if it is assumed that the  relationship between BPXP and the BP Group is typical in the oil and gas industry, such a fact would make it more critical that a substantial penalty be imposed so that massive companies like Anadarko and BPXP will be deterred from future violations.

4.     **Economic Impact on BP: "This company [BP] is – actually, has a better balance sheet today than it had before the spill."**

BP plc is the fifth largest public company in the world (by revenue) and could pay the maximum penalty out of existing cash on hand, as its cash balances totaled $27 billion as of June 30, 2014. FOF ¶¶ 852-859. BP plc projects its total cash flows to be in excess of $30 billion annually for 2014 to 2016. FOF ¶ 890. BP plc had total revenues of $396 billion in 2013, $315 billion in total assets as of second quarter 2014, and paid $32 billion in dividends to shareholders between 2009 and 2014. FOF ¶¶ 855-856; TREX-013123R.31. BP's SMOG includes only a portion of BP's reserves. BP's unproved reserves are three times the proved reserves. BP's proved reserves include 11 billion barrels of oil, which is about $126 billion net present value or $260 billion undiscounted cash flow. That does not include 33 billion barrels of unproved reserves. FOF ¶¶ 870-877. Thus, BP's financial wherewithal dwarfs the maximum penalty, and it is clearly in a position to make cash available for a penalty to BPXP. FOF ¶¶ 852-900.

5.     **Any Concerns Can Be Resolved With Payments Over Time**

BPXP has not met its burden of demonstrating that the maximum penalty would require payments over time. The Court in its discretion, however, may impose the penalty to be paid in installments. Several courts have done so. COL ¶ 154, fn. 29. This Court itself has entered a final judgment requiring Transocean to pay its civil penalty in installments (albeit by the consent).

E.     **Anadarko Financial Issues (Economic Impact on the Violator).**

This factor as to Anadarko does not require much heavy lifting by the Court. Anadarko admitted that as of August, 2014, it could pay the maximum civil penalty (which at that time was believed to be as high as $4.6 billion) using available cash, new or existing credit facilities, loan arrangements, equity or debt offerings, and/or through the sale of assets. FOF ¶¶ 998-1002. The United States has asked for a penalty significantly greater than $1 billion but substantially less

31

than $3.5 billion. Mr. Ratner's testimony amply established that Anadarko can pay any such amounts. FOF ¶¶ 1011- 1030. Not only do the financial statements of the company support this conclusion, *id.,* but Anadarko also has a history of easily handling unforeseen multi-billion dollar liabilities for environmental matters.[28] Whatever amount the Court deems fit, Anadarko can pay it. Indeed, any amount not in the billions may go largely unnoticed by a company of Anadarko's size and wealth.

### F.    Defendants' purported "Other matters."

#### 1.    Law regarding "Other matters."

"Because of the open-ended nature of the justice factor and the myriad factual scenarios that may arise under it," whether to apply this factor is entirely within the discretion of the court. *In Re: Spang & Co.*, 6 E.A.D. 226, 251 (E.P.A. Oct. 20, 1995); *United States v. Citgo Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013); COL ¶ 159. Interpretation of this factor hangs on the word justice—it should be narrowly construed to mitigate penalties in rare circumstances only:

> This language provides that the 'justice' factor should only be applied when not giving someone credit would be a *manifest injustice*, and that application of this factor should be *far from routine* because the application of the other adjustments normally produces a penalty that is fair and just.

*Catalina Yachts v. U.S. E.P.A.*, 112 F. Supp. 2d 965, 970 (C.D. Cal. 2000) (emphasis added); *see also In Re Pepperell Assocs.*, 9 E.A.D. 83 (E.P.A. May 10, 2000); *In Re: Spang & Co.*, 6 E.A.D. at 250 (explaining that the justice factor operates "as a safety mechanism when necessary to prevent an injustice" and should rarely be used). Courts have therefore reserved the justice factor for matters not already considered under the other statutory factors, (*Citgo*, 723 F.3d at 554; *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 353 (E.D. Pa. 1977)), and only when

---

[28]  Anadarko paid $4 billion to BP for liabilities relating to this case and paid over $5 billion to resolve its liabilities in the "Tronox" bankruptcy case. FOF ¶¶ 734, 1033 and 1037.

"the assessed penalty is otherwise manifestly unjust." *Catalina Yachts*, 112 F. Supp. 2d at 969; COL ¶ 160.

The justice factor should not bog down the court "in a time-consuming analysis of collateral matters that are, in reality, commonplace, *and thus do not rise to the level where justice requires their consideration*." *In Re: Spang & Co.*, 6 E.A.D. at 250 (emphasis added); COL ¶ 161. This approach tailors the factor to matters justice truly demands be considered, but also increases judicial efficiency and reflects courts' belief that application of the other seven statutory factors reliably produce just penalties. *Id.*; *Catalina Yachts*, 112 F. Supp. 2d at 969.

Finally, the Court can of course use the "justice" factor to *increase* penalties as it deems fit. COL ¶¶ 184-185. In this case – the largest environmental disaster in the history of the United States and caused by a grossly negligent defendant – very few if any new matters should be considered for penalty mitigation under the "justice" factor. COL ¶¶ 157-173.

## 2.     BPXP's & Anadarko's Purported Financial Contributions to the Community:  Too Big to Fail; Too Small to Pay.

Both Defendants tried to prove that they benefit the Gulf community by creating jobs and spending vast sums of money. Ironically, both companies (especially BPXP) also complained of the economic harms they will suffer in order to pay a penalty in this case.

When Congress revised the CWA it was aware of the economic contributions of oil and gas companies but did not require courts to consider these contributions in setting an appropriate penalty. S. Rep. No. 101-94, at 28 (1989), reprinted in 1990 U.S.C.C.A.N. 722, 748 (additional comments of Senator Chaffee, et al.) (noting the "massive profits that may be made from an offshore facility"); COL ¶¶ 163-166. Thus, defendants' arguments do not fall under any mandatory penalty factor, so can only be considered under the "justice" factor.

The Fifth Circuit in *Citgo* recognized that the courts have discretion to consider economic

benefit to the community. *Citgo,* 723 F.3d at 553-554. However, the defendants here have expanded beyond those economic contributions. There, the court considered only the employment impact of the *specific facility* where the violation occurred. *Citgo Judgment*, No. 08-893, 2011 WL 10723934, at 4 (W.D. La. Sept. 29, 2011). Here, the defendants presented evidence regarding their *entire* Gulf of Mexico operations and beyond. COL ¶ 163; FOF ¶¶ 1005-1009, 1075-1090.

BPXP and Anadarko ask the court to reduce their penalties because they are large corporations that employ people and make expenditures (proportional to the profits they seek to gain). Reducing a penalty because the violator is large turns on its head the retribution and deterrence purpose of the CWA penalty. Because the same monetary penalty punishes a large corporation less than a small corporation, a large corporation can absorb the impact of the penalty more easily. For this reason, the CWA includes the mandatory penalty factor "economic impact of the penalty on the violator," discussed above, intended to allow the court to set the penalty at a level that will have appropriate punitive and deterrent effect given the violator's size. Reducing a penalty because the violator is a large corporation that spends a lot of money would counteract the "economic impact of the penalty" factor and undermine the deterrent and retributive purposes of the penalty. For example, the *Allegheny* court declined to consider a defendant's economic benefit to the community, due in part to the size of the defendant's business:

> With regard to other matters that justice may require, ALC has argued that it is responsible for five steel mills and six wastewater treatment plants, a level of complexity that distinguishes it from violators in other reported cases. This is an objective argument with some appeal, but it is rebutted by defendant's long history of violations, *and by the notion that large businesses usually have or find correspondingly large amounts of resources to address their legal obligations.*

*Allegheny* 187 F. Supp. 2d at 446 (emphasis added); COL ¶¶ 162-166. The same reasoning

34

applies here.

Turning to the evidence, both BPXP and Anadarko are "modestly" important players in the Gulf economy. FOF ¶¶ 1075-1090 (Testimony of Dr. Mason). BPXP's[29] market share is about 10-15% of the Gulf oil and gas industry; Anadarko contributes less than 10%. FOF ¶¶ 1078, 1085. BPXP claims that its operational expenditures contribute significantly to the Gulf economy, but more than 30% of those expenditures represent insurance premiums BPXP pays to another BP entity. FOF ¶ 1082. As to both Defendants, the lion's share of all expenditures – on people or otherwise -- goes not to employees but instead to service contractors and vendors, who may be phased out when the contract ends and could work for other companies. FOF ¶¶ 1076, 1079. Further, capital spending by Defendants does not necessarily reflect money going to the Gulf to the extent that equipment is manufactured in other places in the country and world. FOF ¶¶ 1082-1083.  Defendants also tout their royalty payments, but to make this point, BPXP's expert Dr. Scott compares five years of BPXP royalties against a single year of Louisiana property tax revenues.  FOF ¶ 1080.

Moreover, Defendants' role in the Gulf economy can and would be filled by others. The market concentration analysis of leasing and production performed by U.S. expert Dr. Mason demonstrates that there is fluid entry and exit in the Gulf of Mexico oil and gas industry. FOF ¶¶ 1087-1090. BPXP's witness Dr. Scott agreed that if another firm took over some of BPXP's assets, that firm would deliver substantially the same benefits to the Gulf economy, consistent with Chevron's recent acquisition of a portion of BPXP's assets in deepwater fields Gila and Tiber. FOF ¶ 1088.

---

[29] BPXP presented evidence about itself, not about other BP entities. Of course, BPXP represents about 90% of BP activities in the Gulf, so there would be little difference if other BP entities were included. FOF ¶ 902.

Anadarko's claim that a penalty will drive non-operators—and capital—out of the Gulf is unfounded. To begin with, Anadarko's expert Dr. Sunding's studies focused on individual leases. A more reliable economic indicator would have been to analyze the concentration of lease ownership over the market as a whole, as Dr. Mason did, or to focus on the drilling, development and production stages of deepwater projects, where the most revenue and capital are generated, as Mr. Walkup did. Neither Dr. Mason nor Mr. Walkup found capital flight. FOF ¶¶ 1091-1094; 1106-1107.

Even if Dr. Sunding is correct that small players have left the Gulf at a higher rate after the spill, he concedes that the firms' reasons for entry and exit are "complex" and that investment is driven by "a lot of factors." FOF ¶ 1100. Nonetheless, he failed to investigate other possible business motives of the companies he studied, and overlooked important industry variables that occurred after the *Deepwater Horizon* Incident such as: an increased perception of risks associated with a blowout; evolution towards more expensive, technically-challenging projects in the Lower Tertiary in the Gulf of Mexico; and the emergence of profitable onshore opportunities in North American shale development. FOF ¶¶ 1101-1105.

### 3.    BPXP's Claims regarding Response Technology.

BPXP seeks to reduce its penalty by showing – and occasionally exaggerating – its efforts to improve on oil spill response technology. First, some of BPXP's efforts were required by its plea agreement. Second, many organizations regularly contribute improvements to oil spill response:

> Oil spill research and development is an ongoing process. New or innovative technologies and techniques developed . . . during the Deepwater Horizon were developed as a part of the Unified Command and the management team as a whole . . . and response relied primarily on existing technologies.

Van Haverbeke, PP Tr. at 617:3-8. Finally, no two oil spills, or oil spill responses, are the same.

Responders to the Deepwater Horizon spill acted appropriately in seeking response techniques tailored to the unique circumstances they confronted. Responders to future oil spills will be called upon to undertake the same type of incident specific analysis. FOF ¶¶ 1048-1074. In every major spill response, stakeholders will suggest new or unproven techniques. FOF ¶ 1069. BPXP's claim of innovation and improvement of future oil spill response is exaggerated and is simply a restatement of the fact that it had to respond to its own oil spill. There was nothing unique, voluntary, or revolutionary in the fact that oil spill response technologies were adapted to the demands of this particular spill. Giving credit for that would be tantamount to giving credit for having caused the spill.

### 4. Anadarko's purported "Other matters."

Most of the "action" at trial for Anadarko was in this amorphous factor. Of Anadarko's three witnesses, much of the testimony of Mr. Hollek (other than his testimony about the BP-Anadarko-Settlement and the 5 people sent for response), and all of the testimony of Mr. Arnold and Dr. Sunding fall only under this factor. But as set out above, the testimony is only important if "justice" so requires.

#### a. Congress decided to impose a penalty on top of damages and costs and did not require fault or economic gain.

Anadarko's expert Dr. Sunding claims that there is no deterrence value in a penalty for Anadarko, a non-operating 25% owner, because it has already resolved its OPA damages through its settlement with BP and received no economic benefit from the failed Macondo venture. But Dr. Sunding's economic theories are incompatible with the statutory scheme pursuant to which penalties for oil spills must be assessed *in addition to* compensation under OPA. When it passed OPA, Congress did not eliminate penalties for companies without fault, or make economic benefit a prerequisite for a penalty. Rather, each of those concepts are merely

one of eight different factors to be weighed by courts in assessing a just penalty under the CWA. 33 U.S.C. § 1321(b)(8); COL ¶ 27-31.

This Court has held—based on precedent and legislative history—that damages and penalties must be treated differently. Rec. Doc. 5446 (parties can agree to an indemnity clause for OPA damages but not for penalties). *See also* FOF ¶ 1208.

Through Dr. Sunding, Anadarko argues that it should receive no penalty because it is not culpable. But this position is contrary to law. First, Congress made clear that the underlying goal of Section 311(b) is to entirely prevent discharges of any kind: "it is the policy of the United States that there should be *no discharges* of oil or hazardous substances into or upon the navigable waters of the United States [or] adjoining shorelines." 33 U.S.C. § 1321(b)(1) (emphasis added); *see also* S. Rep. No. 101-94, at 2-3 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 724. COL ¶¶ 16, 48. That policy applies in the case of blameless discharges. The Fifth Circuit has stated that the provision for civil penalties in CWA Section 311(b)(6) (the administrative analogue to the judicial penalties at Section 311(b)(7)) was "designed to place a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same." *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir. 1981); COL ¶¶ 23-26.

Second, as a strict liability statute, a civil penalty is mandatory for *every* defendant that violates CWA Section 311(b)(3). *See* 33 U.S.C. § 1321(b)(7)(A) and (D) (stating violators "shall be subject to a civil penalty"); COL ¶¶ 23 and 78; *Coastal States Crude Gathering Co.*, 643 F.2d at 1128; *United States v. Egan Marine Corp.*, No. 08 C 3160, 2011 WL 8144915, at *5 (N.D. Ill. Oct. 13, 2011). Therefore, the Fifth Circuit has found that CWA liability arises irrespective of

38

fault, knowledge or intent, *United States v. B.P. Exploration & Prod. Inc.* (In re Deepwater

Horizon), 753 F.3d 570, 575 (5th Cir. 2014) (citing *Kelly v. United States EPA*, 203 F.3d 519,

522 (7th Cir. 2000)), and has held that the intent of Congress was to impose substantial CWA

penalties on owners and operators *even in the absence of fault*.  COL ¶¶ 23-26. Thus culpability

is a factor, not a requirement, for assessing substantial penalties.

Courts have refused to significantly discount penalties based on the violator's degree of

fault. In *United States v. Marathon Pipe Line Co.*, the Court rejected the defendant's attempt for

a nominal penalty in the absence of fault, reasoning:

> In effect, Marathon would have us read into the statute a strict standard of liability
> for a nominal penalty and a negligence standard of liability for a substantial
> penalty. We do not believe the plain language of the statute supports different
> standards for a substantial as opposed to a nominal penalty.

589 F.2d 1305, 1308 (7th Cir. 1978). Even though a third party caused the spill, the Court held

that the Act's strict liability standard "is an absolute liability provision which contemplates a

substantial penalty even in the absence of fault." *Id.* at 1306; *see also Coastal States Crude*

*Gathering Co.*, 643 F.2d at 1128 (citing *Marathon Pipe Line* for the proposition that "polluters

rather than the public should bear the costs of water pollution" regardless of owner/operator

fault); COL ¶¶ 76-82.[30] In *Egan Marine*, the court discounted the maximum penalty only 10.3%

because the defendant was not culpable *and* had contributed to the mitigation efforts. 2011 WL

8144393, at *7.[31]

---

[30] Although *Marathon Pipe Line* and *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir. 1978),
analyze earlier versions of the CWA, the strict liability standard was not changed in the 1990
amendments. If anything, the amendments and related legislative history clarified Congress' intent that all
those involved in polluting enterprises must be penalized for violations of CWA Section 311.

[31] Other strict liability environmental statutes support this interpretation of the culpability factor under the
CWA. Courts have emphasized that "it must be remembered that liability and punishment serve similar
purposes. To find a party liable despite its lack of culpability, but then to reduce, significantly, the
applicable penalty based on this lack of culpability, would certainly undermine the goals of the

Dr. Sunding further argues that economic benefit must be the "starting point" for a civil penalty under Section 311. For the reasons discussed *infra*, Section IV.A, such an approach is not warranted in this case, and even if applied, would result in a substantial penalty given the seriousness of this violation. Under Dr. Sunding's theory, where a serious blowout causes significant damage that outweighs the economic benefit of the violation, there would be no justification for a penalty against a non-operating owner so long as the damages were compensated. FOF ¶¶ 1239-1240. This framework ignores the other seven factors specified by Congress. While Dr. Sunding suggests that a different result might be warranted if a violator were culpable, the literature he cites—which is focused on intentional crimes of rape and murder—does not support his distinction. FOF ¶ 1241.

Additionally, Dr. Sunding asserts that economic efficiency warrants penalizing operators rather than non-operators. FOF ¶ 1243. But liability under CWA Section 311 is not limited to operators; rather, it specifically extends to owners of facilities from which oil is discharged. 33 U.S.C. 1321(b)(7)(A). Penalizing Anadarko based on its status as an owner is entirely consistent with Congress' intent that the entities that stand to profit from the activity are the ones penalized when an incident occurs. COL ¶¶ 23-26, 103, 105.

Dr. Sunding's arguments also demonstrate his lack of understanding of the operator/non-operator relationship in the offshore oil and gas industry. FOF ¶ 1244. As a matter of industry practice, non-operators in deepwater projects routinely do more than just contribute capital. Theories regarding moral hazard simply do not apply to the same extent here as they would to a mere investor relationship. Non-operators are *partners* who have significant information about

---

[environmental protection] statute." *Steeltech, Ltd. v. United States EPA*, 273 F.3d 652, 656 (6th Cir. 2001) (Analysis of strict liability under the Emergency Planning and Community Right to Know Act (EPCRA)).

the deepwater activities and have opportunities to assert influence, particularly in the designing of the wells. Even as a non-operator, sophisticated and experienced companies like Anadarko can contribute valuable insights to Health, Safety and Environment ("HSE") matters without creating the "too many cooks in the kitchen" problem. *See, infra,* Section III.F.4.d.

              **b.**      **Even under Dr. Sunding's theory, there is no basis to conclude that the $4 billion settlement approximates OPA damages or will provide sufficient deterrence.**

Relying on its $4 billion settlement with BP, Anadarko seeks a zero or low-dollar penalty. Anadarko explains that this sum is exactly the right amount of damages – for a 25% owner – to achieve deterrence. As shown above, *infra,* Sections III.B.1 and III.F.4.a, damages and penalties are distinct concepts under the statutory scheme.  But even accepting Dr. Sunding's erroneous assumption that OPA damages could entirely offset CWA penalties, Anadarko offers no analysis of what the settlement was intended to represent, and no analysis of why it was the right number. Indeed, the timing and terms of the settlement indicate that much more was at play than just an approximation of costs. As a result of the settlement, Anadarko agreed to stop asserting publicly and in litigation that BPXP was grossly negligent at the Macondo Well or had engaged in willful misconduct, and specifically agreed not to file an expert report in the multidistrict litigation. In fact, it concluded its agreement with BPXP the day before such reports were due. FOF ¶¶ 1211-1214.

Anadarko professes that the settlement represents the absolutely correct dollar amount to provide for deterrence, even though the outstanding bills from BP to Anadarko that were resolved by the $4 billion settlement were for approximately $6 billion. FOF ¶¶ 734-735. Anadarko's "perfect deterrence" amount did not even cover the bills to its co-owner, let alone the damages incurred by third parties.

To the extent that Anadarko is treating its payment as cumulative or "part of" the entire set of BP payments, that still provides no measureable representation of the "full" damages. Dr. Sunding's hypotheticals were simplistic, involving perfectly-known damages of $100. But what of the myriad types of damages that will never be compensated? For example, Dr. Austin discussed a loss of pride, identity, and self-reliance when people were put out of work. FOF ¶¶ 236-238. There is no component of the BP-Anadarko settlement or the BP-run settlements that expressly cover such items, and accordingly those payments cannot account for the "absolute" damages from the spill. FOF ¶¶ 264-275; 734. Dr. Sunding also incorrectly suggests that deterrence will be achieved as long as at least one of the leaseholders provides compensation, regardless of whether BP or Anadarko provide that compensation. Where there are multiple parties exposing society to harm, however, the interaction between the parties should be considered in determining whether a payment by one of those parties in fact deters future risky actions. FOF ¶ 1219.

### c. The punitive purpose of CWA penalties justifies penalties against Anadarko.

Dr. Sunding's analysis is limited to the deterrent effect of CWA penalties; he conceded at trial he did not address in any way the punitive aspect of such penalties. FOF ¶ 1203. Anadarko may nonetheless argue that the punitive purpose of the CWA would not be served by assessing a penalty against it because it bore no fault for the incident and was determined to be not culpable. However, Anadarko should pay a penalty as retribution for the social harm that came from the polluting enterprise in which it stood to profit.

### d. The non-operator "debate."

Anadarko's expert, Mr. Kenneth Arnold, contends that imposition of a penalty on non-operators engaged in off-shore exploration and production in the Gulf of Mexico will have a

detrimental effect on safety. FOF ¶ 1114. Mr. Arnold agrees with Mr. Walkup on a number of factual issues but, again, draws different conclusions from those facts. Anadarko fails to show, however, as a matter of fact or of law, that co-owners who are non-operators are unique and warrant a reduction in penalty solely on that basis.

The facts show that non-operators have the right to and do engage with operators. Mr. Arnold agrees with Mr. Walkup that deepwater non-operators participate at least in some degree due to several motives or drivers – not just the financial incentive to monitor an investment, but also to acquire new technological or geological learning from the operator, to make sure technical risks at the bottom of the wellbore are addressed properly, and to maintain accurate communications with investors. *See, e.g.* FOF ¶ 1181. Mr. Arnold agrees that as a result, non-operators do more than merely write a check: he agrees that they will review a well plan (although his definition of what constitutes a well plan differs from Mr. Walkup's); they will commonly attend a pre-spud meeting; and they will have some knowledge of what is happening in the well and will monitor operations to compare them to the well plan. *Id.*. He does not contend that a non-operating leaseholder should take a passive role and agrees that there is some level of non-operator participation in the well. *Id.* Mr. Arnold indicated that a non-operator has an opportunity for input and discussion as Authorizations for Expenditure (AFEs) are being prepared and agrees they may be able to influence design decisions. *Id.* He testified that non-operators can positively influence safety, FOF ¶ 1182, although he would limit that to the function of integrated project teams, comprised of representatives of non-operators and operators, formed after the exploration phase. FOF ¶ 1184.

United States' expert Mr. Walkup likewise agrees with Mr. Arnold that there are some decisions where non-operators for safety reasons do not play a role: a narrow category of time-

sensitive safety related decisions on the rig. FOF ¶ 1181.d. Mr. Walkup also agrees that day-to-day operational decisions on the rig are the responsibility of the operator, but, based on his extensive experience with well plans, he points out that such activities are merely implementation of design decisions which the non-operator previously had an ability to influence.[32] FOF ¶¶ 1125-1128; 1195-1197.

The evidence shows that non-operators actively participate in the design of high-cost and risky deepwater wells. *See,* FOF Section VIII.D.i-xi. They can be embedded with the project staff through integrated project teams (IPTs), and outside of IPTs can participate formally and informally in partner meetings, peer to peer communications, technical discussions, and even in site visits. FOF ¶¶ 1129-1136. The collaborative nature of the relationship is demonstrated by the use of the term "partner" which Anadarko witness Darrell Hollek used at trial. FOF ¶ 1117. Industry literature supports the active participation of non-operators in HSE matters and otherwise. FOF ¶¶ 1144-1150.

Industry norms are further reflected in the standard contracts that the oil and gas industry in the United States has developed, called a joint operating agreement ("JOA"), for offshore deepwater projects. FOF ¶¶ 1151-1153. Under the JOA, non-operators receive extensive information from the operator– including daily reports during drilling on the progress of the well with specific detailed technological information. FOF ¶¶ 1174-1179. They have the contractual right to request more. FOF ¶ 1175. They have certain contractual rights with respect to HSE matters. FOF ¶¶ 1169-1173. And, while they designate one party to serve as the operator and that party retains a great deal of control over day-to-day operations on the rig, there are many

---

[32] This non-operator input into design can occur during a pre-spud design review or later, after Objective Depth is reached, when design of temporary abandonment or other well completion activities is refined and finalized. FOF ¶ 1126. If non-operators join a project mid-way, as an industry norm they will also perform due diligence of well design and its implementation. FOF ¶ 1136.

junctures in the decision-making process where the JOA provides non-operators with leverage and input. FOF ¶¶ 1154-1168.

The Fifth and Seventh Circuits already make plain that owners without fault still must be penalized. In *Coastal States Crude Gathering Co.,* 643 F.2d at 1128, the Fifth Circuit awarded 20% of the maximum penalty against an owner of a pipeline even while agreeing the defendant had no fault. There, it was undisputed that an unknown third party had caused the discharge: a vessel struck the pipeline outside the permitted navigational channel hard enough to penetrate three feet of soil beneath the bottom of the bay, two inches of concrete casing and the pipe encased within it. *Id.* at 1126-1127. Defendant built and maintained the pipeline in compliance with all rules, regulations and industry practices, immediately corrected the leak and cleaned up its consequences. *Id.* at 1128. Defendant nonetheless received a penalty of 20% of the statutory maximum.[33]

Similarly, the Seventh Circuit's opinion in *Marathon Pipe Line Co.*, 589 F.2d at 1309-1310, upheld imposition of a civil penalty of 40% of the statutory maximum[34] against the owner of a pipeline from which a discharge had occurred. There a third party not in privity with defendant had caused the discharge: a bulldozer had damaged the pipe while digging a ditch for the owner of land through which the pipeline passed. The landowner knew of the damage but never reported it to Marathon, even though the pipeline's easement was properly recorded on the deed and the pipeline was marked in accordance with all federal regulations. *Id.* at 1306-1307.

---

[33] The statutory maximum under the administrative penalty provision at the time was $5,000. *Id.* at 1127 (citing version of 311(b)(6)). Therefore these pre-OPA cases provide some guidance as to how to approach application of the penalty factors for no-fault owners under Section 311(b), but do not provide support for absolute dollar figures.

[34] The statutory maximum under the administrative penalty provision at the time also was $5,000. *Marathon Pipe Line Co.*, 589 F.2d at 1307.

The district court upheld the assessment of an administrative penalty of $2,000, for a payment of 40% of the maximum penalty of $5,000. *Id.* at 1309-1310.

In contrast, the person directly causing the blow-out of the Macondo Well was not an unknown third party: Anadarko was in privity with BPXP. Anadarko was a non-operating partner under the industry standard JOA. FOF ¶¶ 1119-1153. Non-operators are more directly and actively involved in the deepwater exploration and production activities, including drilling or temporarily abandoning deepwater wells, than the pipeline owners in *Coastal States Crude* and *Marathon Pipe Line Co.* A non-operator, even if it is without fault, nonetheless is a partial owner of a deepwater well and concededly is in a position to have some influence or leverage over the course of events.

In fact, a significant penalty – one that exceeds what Transocean paid in settlement – is necessary here. Mr. Arnold makes the counter-intuitive argument that a smaller penalty is required to promote *less* involvement by non-operators, who are often highly sophisticated, oil and gas partners in deepwater projects. But Mr. Walkup demonstrates – and Mr. Arnold to some extent agrees – that the industry has and will continue to utilize *targeted* active non-operator participation in these technologically risky endeavors. Indeed, Mr. Walkup, an expert in industry decision-making, is adamant that non-operating co-owners of a well must receive *some* significant penalty for a catastrophic outcome, to incentivize continued active participation and vigilance on the part of sophisticated non-operating participating parties. FOF ¶ 1116.

## IV.   Analysis of the Factors that Had no Live Witnesses during the Penalty Phase Trial.

The facts offered by the parties as to the remaining four factors are so undisputed that no party brought any live witnesses to the penalty trial regarding these factors. Most of the facts are

either already established by prior rulings of this Court or stipulations. Again, what matters now is how the facts inform the factors.

A.      **Economic Benefit Factor, and the "Top Down or Bottom Up" Question.**

***Economic Benefit Factor***. The legal concept of economic benefit is often applied by presenting evidence of the avoided cost of compliance (*e.g.,* delaying capital expenditures and maintenance costs on pollution-control equipment), or money saved by cost-cutting, including some measure of the time-value of the savings. COL ¶ 70. The Phase One Findings of Fact are replete with findings that certain actions increased the likelihood of a blowout (or increased its severity) and those actions had the effect of saving BP and Anadarko money. *See* Rec. Doc. 13381-1 at ¶¶ 60, 65, 195, 210-211, 221-230 298, 299, and 519. By way of example, the Court determined that BP should have run a cement bond log, which would have taken time and cost money. Id.; FOF ¶ 572. Every day the rig remained on-site at the Macondo well cost BPXP and its partners about $1 million, FOF ¶ 570, so skipping the multi-hour bond log work likely saved the owners of the Macondo well a significant amount of money. Defendants' cost savings from rushing the job and cutting corners saved it millions of dollars, which could be a substantial component of the penalty in other smaller cases.

However, using such an "avoided costs" approach to economic benefit in this case shows that any benefit gained by the Defendants from those actions was drastically smaller than the maximum penalty available: millions of dollars in economic benefit compared to the billions of dollars as the maximum statutory penalty available in this case. The economic benefit is thus not a controlling factor on the facts of this case, so the Court should look more closely at the other factors (*e.g.*, the seriousness of this violation, BP's culpability, or the ability of the Defendants to

readily pay the maximum penalties) in setting the penalty amounts here. COL ¶¶ 66-75.[35] Indeed, the Court should recognize that the entire disaster could have been prevented for a (proportionately) miniscule amount of money.

**_Relevance of Economic Benefit to "Top Down" approach_**. In this case, the economic benefit factor also relates to the question of whether to use a "top down" or "bottom up" approach.[36] The role of economic benefit in this case makes the "bottom-up" approach inappropriate; the "top down" approach better fits the facts of this case:

> The "top-down" approach starts with the maximum applicable penalty, and deducts based on the mitigating factors. The "bottom-up" approach starts at the economic benefit of a violator, and adjusts up or down based on the other … factors. Courts appear to have discretion in determining which method to adopt. In this case, no one appears to contend that [the defendant] stood to gain significantly from this explosion or even from any of the lax safety practice alleged by the Government. Accordingly, the "bottom-up" approach seems inapposite.

_Egan Marine_, 2011 WL 8144393, at *6; COL ¶ 35-37. Given BPXP's misconduct, the enormity of this spill and its impacts, and the comparatively miniscule economic benefit realized by both Defendants, the top-down approach is the correct one here. That course conforms to _Citgo_, 723 F.3d at 551, which instructs that every statutory factor must be considered whatever method the Court uses to set the penalty (bottom-up, top-down, other).  Even if the Court chooses to start at zero dollars, the first factor – the seriousness of the violations – would jump the penalty amount

---

[35] Defendants might cite to _Citgo_ to insist that the Court must have a precise estimate of economic benefit. It is true that in _Citgo_, the Fifth Circuit remanded for a factual finding as to economic benefit. But in that case, the parties had each presented conflicting economic benefit witnesses, and the United States argued that economic benefit was a substantial factor for the court to consider on the facts of that case. This case is different, where economic benefit is not a substantial factor, and where neither side called a witness on the topic.

[36] The issue of using a "top down" or "bottom up" approach was previously briefed. Rec. Docs. 12479, 12567; _see also_ Rec. Docs. 12533, 12532. For an example of a top-down penalty determination, _see, e.g._, _Sierra Club v. Cedar Point Oil Co._, 73 F.3d 546, 573 (5th Cir. 1996). The specific relevance of "economic benefit" to this factor was also previously briefed. _See_ Rec. Doc. 13901. These cases are set out in more detail in the proposed Conclusions of Law.

back up to the maximum. Defendants may not have intended these results, but what BPXP and Anadarko let loose here amounts to what one would expect from an Act of God or War: Death and injury, widespread destruction of property and livelihood, injury to flora and fauna across thousands of square miles, creation of risk of more harm in the future, and mobilization of tens of thousands of people to respond to the disaster.

As for the bottom-up method, under the specific circumstances of this case the "bottom" for BPXP should *not* be an approximation of economic benefit, but instead should be $3.509 billion (3.19 million barrels at $1,100 per barrel). Now that gross negligence and willful misconduct have been found, the $1,100 per barrel amount should become a minimum amount, otherwise, the Phase One findings would be obviated. To be clear, no court has addressed that specific legal issue, but regardless of whether that is true as a *legal* matter, it is an appropriate place to start under the *factual* analysis of this case. Accordingly, if the Court prefers a "bottom up" approach, for BPXP for this spill, the "bottom" should be $3.509 billion.

## B. Culpability.

### 1.    BP.

The Phase One Record is replete with evidence of BPXP's culpability, and the Court's findings of gross negligence and willful misconduct show that there is every reason to make the penalty high.[37] The Phase Two Findings that BPXP's source control efforts are "arguably . . . negligent" further show BPXP's ongoing culpability, as does BP's post-spill lack of candor. Rec. Doc. 14021 at ¶¶ 228, 246. A final indicator of BPXP's culpability is its willingness to play games with its plea agreement for this very case, as evinced by its continued efforts to move in

---

[37] Part IV.E, below, discusses BP's four prior major environmental violations (under the factor "prior violations"). Of course, those same violations, as they show a repeating pattern of failing to control for risks of major accidents, and of cost cutting, also show culpability.

evidence about the costs required under its criminal plea. FOF ¶¶ 627-628. BP's public statements that it has "learned its lesson" and "changed its ways" have been heard before and cannot be squared with its conduct during the post-spill period.

### 2.     Anadarko.

Some reduction in penalty is warranted for Anadarko under the culpability penalty factor, in recognition of the fact that Anadarko was not an operator and was not negligent, although a substantial penalty is still appropriate based on the other penalty factors.

Pursuant to Rec. Docs. 5836, 12592, and 13355, the Court determined that Anadarko is not culpable within the meaning of CWA Section 311(b), because it previously had dismissed private party maritime negligence claims against Anadarko based on the pleadings. The Court precluded any evidence of Anadarko's culpability – i.e., any Anadarko- or Macondo-specific evidence–under this penalty factor.[38] COL ¶ 176. As the Court accurately observed at trial, however, evidence of culpability is not a prerequisite to a civil penalty, as the CWA is a strict liability statute—a penalty is required for all Section 311(b) violators. *See, e.g.*, *Egan Marine*, 2011 WL 8144393, at *5-6 (penalty is mandatory and court "is to consider" eight penalty factors under Section 311(b)(8)).

### C.     Other Penalties Paid for the Same Incident.

Because the parties have stipulated as to the other penalties that have been imposed on various parties related to this incident, [Doc. 13725], and because BPXP's criminal plea (TREX-

---

[38] The United States does not waive its legal arguments, which are set out in the earlier briefings, but does not reassert them here. *See, e.g.,* Rec. Docs. 12462, 13810. Summaries of the culpability evidence precluded by the Court's prior rulings as well as the United States' legal arguments are found in (1) the United States' Opposition to Anadarko's Phase Three Motion In Limine on culpability, Rec. Doc. 12462; (2) the June 2, 2014 Proffer, Rec. Doc. 12965; and (3) the full and unredacted expert reports of United States' expert Gardner Walkup, Exhibits 10 (unredacted Round Two report) and 17 (unredacted Round Three report) to the December 2, 2014 United States' Cross-Motion on Culpability, Rec. Doc. 13747.

052673) and Transocean's Consent Decree are also in the record, there was no evidence presented on this Factor. Of these payments, only a few are even arguably relevant.

### 1.  BP's Criminal Plea.

BPXP has signed a plea agreement and agreed to pay criminal fines of $1.256 billion for charges related to the incident. TREX-052673; [Doc. 13725]. BP might argue that the entirety of its $1.256 billion criminal fine should be deducted from the civil penalty, but that result is neither compelled nor appropriate. COL ¶¶ 94-100. First, the Court should not offset the civil penalty by the exact amount of the criminal fine, which would, in essence negate the criminal fine. *United States v. Citgo Petroleum Corp.,* 697 F. Supp. 2d 670, 673 (W.D. La. 2010). The CWA provides for imposition of parallel civil and criminal penalties in the same case. *See* 33 U.S.C. §§ 1319(g)(6), 1321(b)(11) (statutory bars on dual penalty recoveries only mention civil penalties). Civil and criminal sanctions are distinct and complement each other. Second, of the $1.256 billion fine, $500,000 was to resolve an obstruction-of-justice charge for BPXP's cover-up of the flow rate, which is a distinct violation from the actual discharge of oil and thus should not be considered as a prior penalty for the "same incident." TREX-052673; COL ¶¶ 94-100.

The other payments required by the Plea, including payments for environmental restoration (not NRD), for research (NAS), for maintaining safe operations, for GOMRI, and other payments required under a remedial order are not appropriate for consideration. The plea agreement expressly prohibits BPXP from asking this Court to deduct those amounts from its CWA civil penalty. TREX-052673 (Plea Agreement) at 7; COL ¶¶ 98, 100; FOF ¶¶ 627-628.

### 2.  The CWA Civil Penalty Settlements Can Be Considered in Setting Anadarko's Penalty.

With respect to Anadarko, the two prior CWA civil penalty settlements in this case can be considered, and Anadarko's should exceed those settlement amounts. "Public policy strongly

encourages the settlement of cases." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 n.2 (5th

Cir. 1988). The Supreme Court has explicitly recognized that Congress intended that "penalties

assessed by judges should be sufficiently higher than penalties to which the Agency would have

agreed in settlement to encourage violators to settle." *Tull*, 481 U.S. at 426 (quoting 123 Cong

Rec. 39190-91 (1977)).[39]

Transocean paid a $1 billion civil penalty.[40] This Court held that Transocean was not

liable as owner under the CWA, but that Anadarko is liable. 844 F. Supp. 2d 746, 756-61 (E.D.

La. 2013) [Doc. 5809]. In so holding, the Court stated:

> Anadarko and BP were the ones directly engaged in the enterprise which caused
> the spill. They were the mineral lessees, they owned the well, and they stood to profit
> directly from the oil it produced. Thus, Congress intended that the cost of pollution would
> be borne by these parties. By contrast, Transocean was involved in the ''enterprise'' by
> virtue of its contract with BP. Transocean was paid charter hire by BP; it did not stand to
> profit directly from the oil.

> Furthermore, this interpretation is also consistent with OPA, which was similarly
> designed to impose the greatest liability upon those who would benefit the most from oil
> production and transportation (discussed above).

*Id*. at 759. In response to public comments that the Transocean penalty was too low [Doc. 8502],

the United States pointed to the Court's foregoing rationale. U.S. Memorandum in Support of

Motion to Enter Transocean Consent Decree at 12-13 [Doc. 8502 at 15-16] (citing Doc. 5809 at

20-22). The principle that Anadarko should suffer a greater civil penalty than Transocean

---

[39] The standard for court approval of a consent decree is that it be fair, adequate, and reasonable, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977), and consistent with the objectives of the statute under which the action was brought, *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, concurring). The Court determined that both the Transocean and MOEX settlements met this standard when it approved those respective consent decrees. [Docs. 6698, 8608, 8609].

[40] Given BPXP's gross negligence and willful misconduct, the Transocean settlement is an inappropriate benchmark for BPXP's penalty, as BPXP's culpability for the blowout was far greater than Transocean's, and thus its penalty should be far greater as well.

because Anadarko was the entity that stood to profit from the enterprise still applies because the Court entered the consent decree and its Summary Judgment order as to Anadarko's liability was affirmed on appeal. *In re: Deepwater Horizon*, 753 F.3d 570 (5th Cir. 2014), *reh'g denied*, 772 F.3d 350, *petition for cert. filed*, 2015 WL 1322265 (U.S. March 24, 2015) (No. 14-1167). Of course, Transocean acted with negligence while Anadarko did not, but this $1 billion civil penalty for the "paid charter hire" still stands as a guidepost for penalizing a party "engaged in the enterprise."

As to MOEX, the United States submitted to the Court an Unopposed Motion to Enter Consent Decree on May 3, 2012. [Doc. 6436]. That consent decree provided for MOEX, the smallest player at Macondo, to pay a total of $90 million to resolve its liability under the CWA. Anadarko's penalty should be significantly higher because MOEX owned only a 10% interest in Macondo, while Anadarko owned 25%. Furthermore, and unlike MOEX, Anadarko is a sophisticated player in the Gulf of Mexico as both an operator and a non-operator. FOF ¶¶ 1005-1009.[41]

Finally, MOEX settled its penalty claim early,[42] while Anadarko never did. One of the reasons supporting the reasonableness of MOEX's penalty was its early settlement: "MOEX's willingness to come forward in early settlement negotiations also warrants a discount." United States Memorandum in Support of Motion to Enter at 15 [Doc. 6436 at 24]. Anadarko submitted comments on the settlement but never objected that an early settlement discount was improper,

---

[41] Anadarko apparently recognizes its role as greater than MOEX's, as Anadarko paid BP $4 billion to resolve all claims related to Macondo, while MOEX paid BP only about $1 billion. FOF ¶ 585.

[42] MOEX settled with the United States *after* the Court dismissed maritime negligence claims against it, FOF ¶ 584, undermining Anadarko's position that MOEX might not have settled had it known of the Court's later rulings on culpability.

nor that the amount of MOEX's penalty was too high. [Doc. 6700]. In any event, Congressional intent and the *Tull* decision support some discount for parties that settle, *see supra*, p. 52 and COL ¶ 108.

### D.   Prior Violations of Anadarko.

The United States and Anadarko stipulated that Anadarko is responsible for ten violations of the CWA, nine of which are violations of Section 311(b), in the United States. Nine violations were off-shore violations in the Gulf of Mexico since 2004. FOF ¶ 629.[43] Every violation of law counts, and it is hardly a meaningful defense for Anadarko to argue that they "only" had 10 violations of the same law in the same area in the same time period. No deduction from the statutory maximum is warranted given the number of violations.

### E.   Prior Violations of BP.

The BP Group's history of violations and culpable behavior counsels against any reduction in civil penalty here; BPXP's inextricable role in the BP Group warrants a greater penalty here than might otherwise be warranted. The CWA requires a penalty to be "tailored" to the specific defendant and situation for the purpose of deterrence. *See Tull*, 481 U.S. at 422; *United States v. Atlantic Richfield Co.*, 429 F. Supp. 830, 837-838 (E.D. Pa. 1977). It is BP plc and the BP Group that control safety and operations in the Gulf of Mexico, including all assets owned by BPXP, so the BP Group's history of safety deficiencies and criminal violations of environmental law should inform the assessment of a penalty here. FOF ¶¶ 748-764. Deterrence cannot be achieved without proper consideration of the BP Group's history of prior violations and failure to change its practices.

---

[43] While the United States agrees that each of the stipulated facts is accurate, it did not undertake a full investigation of all of Anadarko's prior violations under Section 311(b) or otherwise, which would have required a search of both federal and state files, and therefore does not stipulate that the list comprises the full history of Anadarko's violations.

As Judge Vance stated when approving BPXP's criminal plea, "The BP Family of companies has a history of deficient safety management." FOF ¶ 622. This repeat pattern is reflected in the following serious criminal environmental violations:

**Endicott (1999)**: In 1999, BP Exploration Alaska Inc. ("BPXA") pled guilty to knowingly failing to immediately report a hazardous release, after its contractor disposed of waste oil and hazardous substances down the wells at Endicott Island. FOF ¶¶ 589-591. In its plea, BPXA acknowledged that it exercised inadequate oversight over the HSE functions of its contractors, had inadequate audits, and inadequate resources for oversight. *See* FOF ¶ 592. BP -- not solely BPXA -- agreed to nationwide corrective measures across its exploration, production and drilling operations, explicitly including the Gulf of Mexico. FOF ¶¶ 593-596. BP promised to ensure that: all environmental risks would be identified, managed, and avoided at all operations (including contractors); all federal, state and local environmental laws, regulations, and permits would be adhered to; and appropriate policies, programs, and procedures would be in place, with organizational responsibilities clearly defined, understood, and implemented through verification. *See* FOF ¶¶ 597-598.

**Grangemouth (2000).** BP Oil Grangemouth Refinery Limited and BP Chemical Ltd. pled guilty to violating UK laws related to Health and Safety at Work after three incidents occurred at its facility. FOF ¶¶ 599-600. The violations included failings to investigate, adequately consider the safety implications of actions on the system, or provide information to employees. *See* FOF ¶ 601. Thus, these incidents included failure to adequately identify and manage risk, as well as the failure to follow policies and procedures. *See* FOF ¶ 602.

**Texas City (2005).** Five years later, and only months after its probationary period ended under its 1999 Endicott plea, BP Group's Texas City refinery exploded, leaving 15 dead and

more than 170 injured. FOF ¶ 603. BP Products North America Inc. ("BPPNA") pled guilty in 2007 to a felony for knowing violations of the Clean Air Act. FOF ¶ 604. BPPNA's plea rested on several knowing violations of safety regulations and risk management practices included failing to notify employees and contractors of risks; violating written procedures; failing to perform proper risk analysis; proceeding with operations despite known deficiencies; and failing to perform management of change. FOF ¶¶ 605-614. The explosion would not have occurred had BPNA complied with the regulatory requirements and the commitments following Endicott. FOF ¶¶ 612-613.

**Prudhoe Bay (2006).** Just one year later, BP's Prudhoe Bay pipeline in Alaska leaked 200,000 gallons of oil onto the Alaska tundra leading to a 2007 guilty plea by BPXA for violations of CWA Section 309(c)(1) and 311(b)(3) for the negligent discharge of oil. FOF ¶ 615. This is the same statute to which BPXP pled guilty for the Macondo spill. BPXA failed to adequately inspect and clean the oil transit lines, and to spend sufficient resources on them to address issues of corrosion. FOF ¶¶ 616-620; TREX-233863 at 8-13. As at Grangemouth and Texas City, these violations at Prudhoe Bay involved failure to properly identify and manage risk (or just ignoring it), failure to expend sufficient resources to address risks, and failure to follow policies and procedures that help control risks.

**Macondo (2010).** Each of these prior violations relates to BPXP's failures at the Macondo Well. BPXP argued that it bears no responsibility for the actions taken by its key contractors: Halliburton and Transocean. FOF ¶ 623. This contention squarely contradicts BP affiliates' representations in the Endicott Island criminal plea. FOF ¶¶ 592, 624. There, BP agreed it would implement procedures ensuring that all company operations, including those of contractors in the Gulf of Mexico, would not present risks to the environment. FOF ¶¶ 593, 624.

At the Macondo Well, however, BPXP not only failed in this respect, it disavowed any responsibility to do so. FOF ¶ 623. Each of these prior criminal convictions involves BP Group's failing to identify and manage risk (or just ignoring it), to follow practices and procedures, to communicate risk to contractors and to provide adequate resources. At Macondo, BPXP repeated the criminal shortcomings of its sister companies at Endicott, Grangemouth, Texas City and Prudhoe Bay. BPXP ignored risk, tolerated non-compliance, violated internal policies and practices, and repeatedly traded lower cost for more risk and less safety.[44]

In response, BPXP will argue that these prior violations are legally irrelevant because they are not CWA Section 311(b) violations and are not violations by BPXP itself, and therefore cannot be "prior violations" within the meaning of CWA Section 311(b)(8). These arguments are unavailing, as discussed at length in prior briefing during the Penalty Phase [Docs. 12460 and 12521] and as summarized in the proposed Conclusions of Law. COL ¶ 110-122. **First**, evidence of prior conduct or incidents is relevant to at least three of the eight statutory penalty factors in Section 311(b)(8): (1) any history of prior violations; (2) culpability; and (3) any other matters that justice may require. COL ¶ 111. **Second**, the plain language of Section 311 indicates that "*any* history of prior violations" is relevant, and that factor is not limited solely to violations of Section 311(b). 33 U.S.C. § 1321(b)(8); COL ¶¶ 114-122. Indeed, in *Citgo*, neither the district court nor the Fifth Circuit limited consideration of prior violations to violations of CWA Section 311(b). COL ¶ 115. **Third**, the plain language of Section 311(b)(8) does not prohibit consideration of prior incidents by entities other than the named defendant, and BPXP itself

---

[44] *See* FOF ¶ 625; Phase One Findings of Facts and Conclusions of Law ("Phase One Findings"), Rec. Doc. 13381-1 (revised findings), ¶¶ 56-60, 64-65, 68-69, 71, 106-107, 130-133, 144, 179, 182-183, 189-196, 201-204, 221-230, 249, 270-280, 282, 290, 296-299, 362-369, 505-514, 519-521, 551, ns. 28, 70, 71.

fiddled with corporate distinctions when it suited its interest, failing to distinguish between legal entities throughout trial. FOF ¶¶ 724-726; 802-812.

BPXP argues that it has paid enough, understands the seriousness of what occurred, has learned its lesson, and that there is little need for deterrence. The BP Group's almost-identical prior assurances – made as part of resolving criminal acts on two continents – suggest BPXP's current promises warrant no discount on penalty. Meanwhile, BPXP suggests that the Court should consider its presence and role in the local community, but asks the Court to simultaneously ignore BP's history of harming communities. Safety and risk management practices were driven by BPXP's parent companies – the same parent companies driving practices at Endicott, Grangemouth, Texas City, and Prudhoe Bay. FOF ¶¶ 626, 763. BP's prior violations and the penalties levied for them did not deter the behavior that led to the Macondo disaster, even as BP insisted that the company had learned its lesson. Even now, BPXP is playing games with the terms of its criminal plea at Macondo, asking the Court to consider payments made under its criminal plea despite being precluded from doing so. FOF ¶¶ 627-628. That these significant violations did not deter the criminal and grossly negligent behavior that led to the explosion and oil spill at the Macondo well is clearly relevant to the penalty here. The CWA civil penalty for the Macondo oil spill should be set to end this pattern.

**V.     Conclusion.**

For the foregoing reasons, the United States requests that the Court enter two civil penalties as follows:

BP:          Not quite $13.7 billion, but certainly over $12 billion.

Anadarko:    Significantly more than $1 billion, but substantially less than $3.5 billion.

Respectfully submitted,

BENJAMIN C. MIZER
Acting Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
SARAH HIMMELHOCH
MICHAEL MCNULTY
PATRICK CASEY
RICHARD GLADSTEIN
Senior Counsel
NANCY FLICKINGER
Senior Attorney
ABIGAIL ANDRE
A. NATHANIEL CHAKERES
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
E-mail: steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

59

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: March 27, 2015.                                        /s/ Steven O'Rourke
                                                                    U.S. Department of Justice