# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| Nos. 10-2179; 10-4536 | * | |
| | * | MAGISTRATE NO. 1 |
| | * | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \*

## ANADARKO PETROLEUM CORPORATION'S PENALTY PHASE TRIAL
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORGAN, LEWIS & BOCKIUS LLP

James J. Dragna
jim.dragna@morganlewis.com
Morgan, Lewis and Bockius LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@morganlewis.com
Thomas R. Lotterman
thomas.lotterman@morganlewis.com
David B. Salmons
david.salmons@morganlewis.com
Randall M. Levine
randall.levine@morganlewis.com
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street
Suite 1300
New Orleans, LA 70112
Telephone (504) 592-0691
Facsimile:  (504) 592-0696

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ................................................................... 1

I.  GENERAL BACKGROUND .................................................................... 1

    A.  Anadarko Petroleum Corporation ................................................ 1

    B.  The Macondo Well ........................................................................ 2

    C.  The Incident ................................................................................... 4

II.  THE SECTION 311 PENALTY FACTORS ............................................ 4

    A.  Seriousness of the Violation ......................................................... 4

    B.  Anadarko's Lack of Culpability .................................................... 4

    C.  The Nature, Extent, and Degree of Success of Any Efforts by Anadarko to Minimize or Mitigate the Effects of the Discharge ................................................. 5

    D.  Economic Benefit to Anadarko, If Any, from the Violation ................................. 9

        1.  Potential avoided costs due to BP's failure to run a cement bond log ............................................................................. 10

        2.  Potential avoided costs due to BP's decision not to perform a full bottoms-up circulation ................................ 11

        3.  Potential avoided costs due to BP and Transocean's failed interpretation of the negative pressure test ............................. 12

        4.  Potential avoided costs due to BP's decision to use Lost Circulation material ("LCM") as a spacer ............................. 13

    E.  Anadarko's History of Prior Violations ................................................... 14

    F.  Other Penalties for the Same Incident ................................................... 15

    G.  Economic Impact of a Penalty on Anadarko ......................................... 16

        1.  Impact of a penalty on Anadarko's business operations generally .......... 17

        2.  Impact of a penalty on Anadarko since oil prices fell 50% ..................... 19

    H.  Other Matters as Justice May Require ................................................... 22

        1.  Imposing a penalty on Anadarko could have negative effects on offshore safety .......................................................... 22

        2.  Mr. Walkup's opinions and criticisms of Mr. Arnold are unpersuasive .................................................................. 25

        3.  Dr. Mason's opinions about offshore ventures are unpersuasive ........... 29

        4.  Penalizing Anadarko will serve no rational economic purpose .............. 29

            (a)  Optimal deterrence ................................................. 31

            (b)  Absolute deterrence ................................................ 32

i

# TABLE OF CONTENTS
(continued)

**Page**

        (c)     Efficient deterrence ................................................................ 33

        (d)    The potential consequences of overdeterrence ........................... 34

    5.     Dr. Mason's and Mr. Walkup's criticisms of Dr. Sunding are not well founded........................................................................... 36

    6.     Anadarko significantly and positively contributes to the economies of the Gulf States ................................................................... 41

**PROPOSED CONCLUSIONS OF LAW** ........................................................... 45

I.      PROCEDURAL HISTORY........................................................................ 45

II.     GENERAL PRINCIPLES GOVERNING ASSESSMENT OF PENALTIES UNDER SECTION 311 ........................................................................... 45

    A.    The Meaning and Legislative Purposes of Section 311 ....................... 45

    B.    The Court's Discretion........................................................................ 48

    C.    No Particular Methodology is Mandated ........................................... 49

    D.    Tailoring Penalties to Each Defendant ............................................... 50

    E.    The Government's Burden of Proof .................................................... 50

    F.    Evaluating Expert Testimony .............................................................. 51

III.    ASSESSING A PENALTY AGAINST ANADARKO........................................ 52

    A.    No Punishment.................................................................................... 52

    B.    Deterrence as a Goal .......................................................................... 53

    C.    The Eight Section 311(b)(8) Factors.................................................. 55

        1.     Economic Benefit ...................................................................... 56

        2.     Degree of Culpability................................................................ 56

        3.     Seriousness of the Violation ..................................................... 58

        4.     Anadarko's Mitigation Efforts.................................................. 59

        5.     Anadarko's History of Prior Violations.................................... 60

        6.     Other Penalties for the Same Incident ...................................... 61

        7.     The Potential Economic Impact of Penalizing Anadarko........................ 61

        8.     Other Matters as Justice May Require ...................................... 62

IV.    OTHER PARTIES' NEGOTIATED PENALTIES........................................... 64

    A.    Transocean's Negotiated Penalty ...................................................... 64

    B.    MOEX's Negotiated Penalty .............................................................. 66

## TABLE OF CONTENTS
(continued)

                                                                                    **Page**

V.      OTHER ISSUES ............................................................................................................. 70

## CITATION REFERENCE TABLE

| **Short Form Citation** | **Exhibit or Transcript Reference** |
|---|---|
| TREX-XXXX | Admitted Trial Exhibit |
| D-XXXXX | Admitted Trial Demonstrative |
| Dep. (date) X:X | Bundled and admitted deposition testimony |
| Phase One Trial, Bea X:X | Phase One Trial testimony of PSC expert Dr. Bea, Feb. 26, 2013 (AM and PM transcr.) |
| O'Rourke X:X | Penalty Phase Trial, U.S. Opening Statement of Mr. O'Rourke, Jan. 20, 2015 (AM transcr.) |
| Mason X:X | Penalty Phase Trial testimony of U.S. expert Dr. Mason, Jan. 22, 2015 (AM transcr.) |
| Walkup X:X | Penalty Phase Trial testimony of U.S. expert Mr. Walkup, Jan. 22, 2015 (PM transcr.) |
| Ratner X:X | Penalty Phase Trial testimony of U.S. expert Mr. Ratner, Jan. 23, 2015 (AM and PM transcr.) |
| Paskewich X:X | Penalty Phase Trial testimony of BP witness Capt. Paskewich, Jan. 26, 2015 (AM transcr.) |
| Hollek X:X | Penalty Phase Trial testimony of APC witness Mr. Hollek, Feb. 2, 2015 (AM transcr.) |
| Arnold X:X | Penalty Phase Trial testimony of APC expert Mr. Arnold, Feb. 2, 2015 (AM transcr.) |
| Sunding X:X | Penalty Phase Trial testimony of APC expert Dr. Sunding, Feb. 2, 2015 (PM transcr.) |

Defendant Anadarko Petroleum Corporation respectfully submits the following proposed findings of fact for the Court's use and consideration in assessing a fair and appropriate penalty under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 1321(b)(7).

## PROPOSED FINDINGS OF FACT

## I.      GENERAL BACKGROUND

1.      In the oil and gas industry, there are integrated oil and gas companies and independent oil and gas companies.  Ratner 1088:5–13.  An integrated oil and gas company is engaged not only in exploration for and production of oil (known as the upstream business), but also in refinement and distribution of the oil and marketing to consumers (known as the downstream business).  Ratner 1088:8–11, 18–20, 21–23.  BP plc, Chevron, and Exxon Mobil are examples of integrated oil and gas companies.  Ratner 1088:12–17.

### A.      Anadarko Petroleum Corporation

2.      Anadarko Petroleum Corporation ("Anadarko") is an independent oil and gas company based in the United States in the business of exploring for, developing, and producing oil and gas.  Hollek 2142:2–6.  Anadarko does not have a downstream business and does not sell oil and gas directly to consumers.  Hollek 2142:2–8; Ratner 1089:17–1090:2.

3.      At trial, Anadarko presented fact testimony by Darrell Hollek, Anadarko's Senior Vice President of Deepwater Americas.  Mr. Hollek manages all operating assets in the Gulf of Mexico, Alaska, and Brazil.  Hollek 2140:20–2141:2; D-38030.  He has decades of experience in the oil and gas industry, the majority of which involve offshore operations in the Gulf of Mexico. Hollek 2141:4–2141:23; D-38030.

4.      Anadarko has approximately 6,000 employees worldwide, 520 of whom directly support its Gulf of Mexico operations.   Hollek 2142:9–10, 2144:20–23, 2145:5–15; D-38032. Other Anadarko employee groups provide additional support, such as IT and accounting.  Hollek

1

2145:16–21.  Approximately 390 daily contractors are retained to assist with Anadarko's Gulf operations.  Hollek 2144:24–2145:9; D-38032.

**B.**     **The Macondo Well.**

5.      BP Exploration and Production, Inc. (for simplicity, BP Exploration and Production, Inc. is referred to hereinafter as "BP") was the primary leaseholder in the lease of Mississippi Canyon Block 252, OCS-G32306 ("the Macondo Lease" or "the Macondo Leasehold").  Findings of Fact and Conclusions of Law—Phase One Trial ("Phase One Findings") ¶ 16 (Rec. Doc. 13355).

6.      BP had a 65% operating interest in the Macondo Well.  TREX-280000 at 1.

7.      MOEX Offshore 2007 LLC ("MOEX") was a non-operating investor in the Macondo Lease, and had a 10% interest in the Macondo Well.  TREX-280000 at 1.

8.      BP contracted with Transocean Holdings LLC ("Transocean") to drill the Macondo Well, using Transocean's mobile offshore drilling unit *Deepwater Horizon*.  Phase One Findings ¶¶ 17, 44 (Rec. Doc. 13355).

9.      Drilling operations on the Macondo Leasehold began on October 6, 2009, when the Marianas rig spudded the Macondo Well.  Phase One Findings ¶ 46 (Rec. Doc. 13355).

10.     Two months later, on December 17, 2009, Anadarko executed the operating agreement with BP for the Macondo Well ("the Operating Agreement").  TREX-280000 at 1–2. Anadarko had a 25% interest in the Macondo Well.  *Id*; Stipulated Order Regarding Anadarko Entities (Rec. Doc. 5930).

11.     Pursuant to the Operating Agreement and MMS regulations, Anadarko and MOEX formally designated BP as the "Operator" of the Macondo Lease.  TREX-280000 at 28.

12.     Under the Operating Agreement, Anadarko and MOEX were designated as Non-Operating Parties ("NOPs").  TREX-280000 at 22 (defining "Non-Operating Party" as "A Party other than the Operator").

13.     The Operating Agreement granted BP, as Operator, "the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement."  The Agreement also stated that "[t]he obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and . . . nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose."  TREX-280000 at 34, 142.

14.     The Operating Agreement provided that BP, as Operator, was not "subject to the control or direction of [Anadarko or MOEX]" and functioned as an independent contractor.  TREX-280000 at 34.

15.     Article 5.1 of the Operating Agreement granted BP the sole right to select employees, contractors, and consultants; to set their hours and compensation; and to employ drilling rigs and accompanying machinery and personnel.  TREX-280000 at 34.

16.     "As operator and primary leaseholder, BP's responsibilities included assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining and overseeing the project's contractors, and working on various aspects of the well and drilling operations."  Phase One Findings ¶ 43 (Rec. Doc. 13355).

17.     The Court found that "BP was solely responsible for the drilling operations."  Order and Reasons as to Motions to Dismiss the B1 Master Complaint ("B1 Order") at 28 (Rec. Doc. 3830).

18.     Under the Operating Agreement, Anadarko was obligated to contribute a proportional share of the costs associated with drilling the Macondo Well.  TREX-280000 at 39.

19.     The total cost incurred by all working interest owners in drilling the Macondo Well to target depth was $154 million.  Phase One Trial, Bea 329:19–24; D-2730.

### C.     The Incident.

20.     On April 20, 2010, a blowout, explosions, and fire occurred aboard the *Deepwater Horizon* as it was in the process of temporarily abandoning the Macondo Well, resulting in a release of oil and gas to the Gulf of Mexico from openings in Transocean's BOP and riser pipe ("the Incident").  Phase One Findings ¶¶ 2–6 (Rec. Doc. 13355).

21.     The discharge was halted on July 15, 2010.  Phase One Findings ¶ 7 (Rec. Doc. 13355).

22.     Anadarko lost its total investment, and its 25% ownership interest, in the $154 million project.  TREX-280000 at 1; Phase One Trial, Bea 329:19-24; D-2730.

## II.     THE SECTION 311 PENALTY FACTORS

### A.     Seriousness of the Violation

23.     Anadarko admits that the discharge was extremely serious when it occurred.[1]

### B.     Anadarko's Lack of Culpability

24.     Anadarko was not negligent, owed no duty to intervene in BP's operations, and bears no fault for the incident.  Because "BP was solely responsible for the drilling operations[,] . . .  [a]ny access to information that Anadarko . . . may have had did not give rise to a duty to intercede in [its] independent contractor's operations . . . ."  B1 Order at 28 (Rec. Doc. 3830); *see also* Rec. Doc. 4159 at 6 (dismissing B3 Plaintiffs' claims against Anadarko); Rec. Doc. 4578 at

---

[1]     Insofar as the Court renders findings on the question of the "seriousness of the violation" beyond the date of its occurrence (*i.e.*, its continuing impact, or not, on the environment), Anadarko adopts by reference BP's Proposed Findings of Fact with respect to the "seriousness of the violation."

25–26 (dismissing Louisiana's and Alabama's non-OPA claims against Anadarko); Rec. Doc. 4845 at 6, 11–12 (dismissing Local Government Entities' non-OPA claims against Anadarko).

25.     The Court finds that Anadarko has no culpability for the Clean Water Act violation that occurred in connection with the Incident.

26.     The Court found that BP engaged in grossly negligent conduct resulting in comparative fault of 67% for the blowout, explosion, and oil spill.  Phase One Findings ¶ 544 (Rec. Doc. 13355).

27.     The Court found that Halliburton Energy Services, Inc. ("Halliburton") engaged in negligent conduct resulting in comparative fault of 3% for the blowout, explosion, and oil spill.  Phase One Findings ¶ 544 (Rec. Doc. 13355).

28.     The Court found that Transocean engaged in negligent conduct resulting in comparative fault of 30% for the blowout, explosion, and oil spill.  Phase One Findings ¶ 544 (Rec. Doc. 13355).

29.     In light of the ruling that Transocean was not grossly negligent, the Court found that BP's agreements in the drilling contract (i) to contractually indemnify Transocean for claims and (ii) to release Transocean from claims were valid and enforceable against BP.  Phase One Findings ¶ 585 (Rec. Doc. 13355).

**C.     The Nature, Extent, and Degree of Success of Any Efforts by Anadarko to Minimize or Mitigate the Effects of the Discharge**

30.     Anadarko repeatedly offered its full assistance to the response efforts "in any way that is needed."  FOF ¶¶ 31–38, *infra*.

31.     The day after the blowout, Chuck Meloy, Anadarko's Senior Vice President of Worldwide Operations, reached out to his counterpart at BP, Andy Inglis, and asked, "please let

me know if Anadarko can be of any assistance *in any way*." (Emphasis added).  Hollek 2160:17–2161:2; TREX-280001 at 1; D-38040.

32.      Anadarko's CEO, Jim Hackett, communicated Anadarko's willingness to assist directly to Ken Salazar, Secretary of the Department of the Interior, stating that, "I want you to know that I am prepared to assist your office *in any way that is needed*."  TREX-280002 at 1 (emphasis added); Hollek 2161:3–16; D-38040.

33.      Under the Incident Command System, Anadarko did not have authority to force its involvement in response efforts.  Hollek 2167:1–4.  It participated to the extent it was allowed to do so, and as directed, by the Coast Guard and BP.  Hollek 2167:1–7; Lynch Dep. (5/20/11) 704:17–22, 705:9–13.

34.      There was no assistance requested that Anadarko did not provide.  Hollek 2167:8–10; Saucier Dep. (7/28/11) 391:8–13.

35.      Immediately upon learning of the incident, Anadarko sent vessels to assist in fire suppression efforts.  Hollek 2162:9–21; D-38041.

36.      Anadarko provided equipment requested by BP to assist in source control efforts.  Hollek 2162:22–2164:1; D-38041; Lynch Dep. (5/20/11) 702:19–704:14.  Because the equipment was owned by projects in which other companies held interests, Anadarko was obliged to, and did, charge BP for the equipment in the amount of $3.5 million, but Anadarko bought the unused equipment back from BP for $1.7 million even though it was modified and even though Anadarko had to transport it back to its facilities.  Hollek 2163:4–23.

37.      Anadarko also seconded five individuals to BP to assist in source control efforts.  Hollek 2164:2–2166:16; D-38041.  They lent "valuable" expertise and were "key members" of various efforts such as the top kill, junk shot manifold, closure of the BOP, and relief wells.

6

Hollek 2164:2–2166:21; Lynch Dep. (5/20/11) 699:14–700:14, 700:20–702:18; Quitzau Dep. (11/1/12) 18:23–20:4, 62:14–63:9, 64:1–8, 12–20, 65:7–13, 70:5–16; Quitzau Dep. (11/2/12) 521:3–18, 20. Their participation ranged in length from weeks to months.  Hollek 2164:13–21, 2166:17–21.

38.     Anadarko was willing to provide additional assistance beyond what was requested of it.  Hollek 2166:22–25.  Throughout the relief efforts, Anadarko continued to volunteer its assistance and asked to be included.  Quitzau Dep. (11/1/12) 241:2–16, 339:24–340:3.

39.     Under the Macondo Operating Agreement, BP was responsible in the first instance for paying all costs associated with any operations related to the Macondo Leasehold, including the cost of any response operations or mitigation efforts in the event of an oil spill. TREX-280000 at 39.

40.     Upon paying for all costs associated with any operations on the Macondo Leasehold, BP was authorized under the Operating Agreement to submit invoices to the non-operators Anadarko and MOEX for reimbursement equal to the non-operators' proportional interest shares, provided the costs were properly recoverable from the non-operators. Specifically, the Operating Agreement provided that "the Operator shall pay all Costs of all activities and operations under this Agreement, and each Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the Costs of these activities and operations."  TREX-280000 at 39.

41.     Coast Guard invoices for response costs were sent jointly to BP, Anadarko, MOEX, Transocean, and Lloyds.  *See, e.g.,* TREX-247637 at 4, 17, 27, 38.  Under the Operating Agreement, BP was responsible for initially paying the Coast Guard invoices.  TREX-280000 at 39.  BP paid the Coast Guard invoices.  Paskewich 1288:24–1290:4; TREX-247637 at 2.

42.     A dispute arose between Anadarko and BP regarding whether Anadarko had a contractual obligation under the Operating Agreement to reimburse BP for costs associated with the Incident, including response costs.  Hollek 2167:20–2168:4; *see also* Order and Reasons as to BP's Motion to Stay Proceedings Between BP and Anadarko (Rec. Doc. 3329).

43.     Anadarko contended that, pursuant to the Operating Agreement, Anadarko had no obligation to reimburse BP for any costs incurred as a result of the *Deepwater Horizon* oil spill because those costs were the result of BP's gross negligence.   Specifically, the Operating Agreement stated that "when liability results from the gross negligence or willful misconduct of a Party, that Party shall be *solely* responsible for liability resulting from its gross negligence or willful misconduct."  TREX-280000 at 143 (emphasis supplied).

44.     In October 2011, Anadarko and BP entered into a settlement agreement.  TREX-050473.  Under the settlement agreement, the parties released each other from claims under the Operating Agreement.  Anadarko paid $4 billion to BP on the express condition that "BPXP will use the Cash Payment to pay the claims of Persons whose injuries and damages arise out of or relate to the Deepwater Horizon Incident."  *Id.* at 3; D-38043; D-38042.  BP agreed to indemnify Anadarko for future compensatory damages claims asserted by third parties under OPA or other law, but did not indemnify Anadarko for any future assessment of penalties or punitive damages against Anadarko.  Hollek 2167:16–216823; TREX-050473 at 3.

45.     There is no evidence that BP used the $4 billion paid by Anadarko for any purpose other than "to pay the claims of Persons whose injuries and damages arise out of or relate to the Deepwater Horizon Incident" as the settlement agreement required.

46.     Five months earlier, in May 2011, MOEX paid $1.065 billion to BP conditioned on the same use, and received from BP a similar release and indemnification.  TREX-050444 at

3, 7-15.  MOEX had a 10% non-operating interest in the Macondo Well.  TREX-280000 at 1.
The settlement between BP and MOEX was reached <u>before</u> this Court ruled that the non-
operators of the Macondo Lease had no "degree of culpability" for the spill for purposes of the
Clean Water Act Penalty Phase.

47.     In addition to paying BP $4 billion to be used "to pay the claims of Persons whose
injuries and damages arise out of or relate to the Deepwater Horizon Incident," Anadarko
donated $1.1 million to the *Deepwater Horizon* memorial fund, which was established to assist
the families of those who died in the incident.  Hollek 2170:18–25; D-38042.  Anadarko's
donation was unconditional; no release of claims against Anadarko was required.  Hollek
2171:1–3.

48.     Anadarko provided a grant of $21,855,000 to establish the Fund for Gulf
Communities.  Hollek 2171:4–13; TREX-280005 at 1; D-38042; D-38045.  This fund distributed
$20,000,000.00 "to regional grant-making partners to support and strengthen community-based
organizations serving distressed communities in Florida, Alabama, Mississippi and Louisiana
directly affected by the *Deepwater Horizon* oil spill."  Hollek 2171:14–24; TREX-280005 at 1;
D-38045; D-38046.  More than 125 organizations received funding, allowing them to benefit
over 800,000 individuals.   Hollek 2171:25–2173:7; TREX-012916 at 2; TREX-012918; D-
38046; D-38052.

**D.     Economic Benefit to Anadarko, If Any, from the Violation**

49.     The Government has not adduced any evidence in the Penalty Phase or any other
phase that Anadarko obtained <u>any</u> economic benefit from the violation.

50.     The Government has conceded that any economic benefit obtained by BP from its
violation was "background noise," and has not shown that any economic benefit supposedly

realized by BP was passed along to Anadarko.  Tr. of Status Conference Re: Penalty Phase on March 21, 2014 at 26:22–27:3 (Statement by Steve O'Rourke).

51.    The Court finds that Anadarko received no economic benefit from the violation, in light of the Government's failure to meet its burden of proof to show any economic benefit by Anadarko.  Evidence regarding BP's economic benefit from the violation is not automatically extrapolated to Anadarko.  Anadarko was generally charged by BP in advance of planned operations for its proportional share of costs associated with those operations.  *See generally* TREX-1921 (Phase One Trial, Beirne, Group 8 Bundle 124).  There is no evidence that Anadarko ever received a refund from BP for Anadarko's payment with respect to operations, such as the cement bond log, that BP decided to forego after charging Anadarko for them.

52.    Alternatively, assuming that BP obtained an economic benefit, and assuming Anadarko would have realized a 25% proportional share of BP's economic benefit, the most Anadarko could have realized in possible cost savings likely would not exceed $4 million.  FOF ¶¶ 53-79, *infra*.

**1.    Potential avoided costs due to BP's failure to run a cement bond log.**

53.    The Court found that, after a cement job is pumped, a cement evaluation technique such as a cement bond log ("CBL") can be used to evaluate whether zonal isolation was achieved.  Phase One Findings ¶ 180 (Rec. Doc. 13355).

54.    The Court found that BP was responsible for deciding whether to run a CBL.  Phase One Findings ¶ 182 (Rec. Doc. 13355).

55.    The Court found that "[w]hen the Macondo cement job was performed, a Schlumberger team (another contractor hired by BP) was standing by on the HORIZON and

could have performed a CBL if BP requested them to do so."  Phase One Findings ¶ 184 (Rec. Doc. 13355).

56.     The Court found that BP decided not to run the CBL and sent the Schlumberger personnel back to shore.  Phase One Findings ¶ 185 (Rec. Doc. 13355).

57.     The Court found that "BP's decision was primarily driven by a desire to save time and money, rather than ensuring that the well was secure."  Phase One Findings ¶ 195 (Rec. Doc. 13355).

58.     The Court found that "running the CBL would have taken approximately 10-12 hours and would have cost around $128,000 to run plus about $400,000 for Schlumberger's time. Schlumberger estimated the cost of the CBL to be less than $200,000."  Phase One Findings ¶ 195 n.74 (Rec. Doc. 13355).

59.     The Court found that, under the BP/Transocean Drilling Contract, "[f]or each additional day the HORIZON remained at the Macondo Well, BP lost approximately another $1 million."  Phase One Findings ¶ 72 (Rec. Doc. 13355).

60.     Assuming that 10-12 hours of rig time would have cost at least $1 million, BP's maximum total avoided cost from not running the CBL would have been approximately $1,528,000.

61.     Assuming that Anadarko would have, but had not yet, contributed 25% of the cost of running the CBL, Anadarko's maximum avoided cost from BP's decision not to run the CBL would have been $382,000.

### 2.     Potential avoided costs due to BP's decision not to perform a full bottoms-up circulation.

62.     The Court found that a "[b]ottoms-up" refers to circulating mud in the well such that mud at the bottom is pumped back to the rig.  This has several purposes: to remove debris in

the well; to break the gel strength of mud so it can be displaced; and to pump mud from the bottom of the well to the surface so it can be evaluated.  Phase One Findings ¶ 192 n.71 (Rec. Doc. 13355).

63.     The Court found that "BP decided to not perform a full bottoms-up prior to the cement job because it was concerned about fracturing the formation."  Phase One Findings ¶ 192 n.71 (Rec. Doc. 13355).

64.     The Court found that "BP's decision not to perform a full bottoms-up circulation of mud prior to pumping the production casing cement job" increased the risk that the operation would fail.  Phase One Findings ¶ 192 (Rec. Doc. 13355).

65.     The Government has not adduced <u>any</u> evidence of the potential costs avoided by BP's decision not to conduct a full bottoms-up circulation.

66.     Assuming that a full bottoms-up circulation would have resulted in one additional day of rig time, the maximum avoided cost of BP's decision not to conduct a full bottoms-up circulation would have been $1 million.

67.     Assuming that Anadarko would have, but had not yet, paid 25% of the costs avoided by BP's decision not to conduct a full bottoms-up circulation, the maximum potential avoided cost to Anadarko of not conducting a full bottoms-up circulation would have been $250,000.

### 3.     Potential avoided costs due to BP and Transocean's failed interpretation of the negative pressure test.

68.     The negative pressure test was conducted over three hours on April 20, 2010. Phase One Findings ¶ 241 (Rec. Doc. 13355).

69.     The Court found that "if the negative pressure test had been correctly interpreted, the blowout, explosion, fire, and oil spill would have been averted."  Phase One Findings ¶ 252 (Rec. Doc. 13355).

70.     If BP had properly interpreted the negative pressure test, BP likely would have stopped operations, assessed the problem, and conducted another pressure test.  *See* Phase One Findings ¶ 196 (Rec. Doc. 13355).  A proper response to a failed negative pressure test would have resulted in additional rig time for operations to remediate the cement job.  Phase One Findings ¶ 192 n.70 (Rec. Doc. 13355) (finding that a "squeeze job" is a form of remedial cement work used when cement fails to achieve zonal isolation).

71.     Assuming that an appropriate response would have taken two additional days of rig time, the maximum potential avoided cost to BP would have been $2 million.

72.     Assuming that Anadarko would have, but had not yet, paid 25% of the costs avoided by not performing a second negative pressure test and not remediating the cement job, the maximum potential avoided cost to Anadarko of the misinterpretation of the negative pressure test would have been $500,000.

### 4.     Potential avoided costs due to BP's decision to use Lost Circulation material ("LCM") as a spacer.

73.     The Court found that "BP decided to use the LCM as a spacer to avoid the cost of transporting and disposing of the LCM, as well as the cost of creating an entirely new spacer from scratch."  Phase One Findings ¶ 298 (Rec. Doc. 13355).

74.     The Court found that "LCM had been stockpiled on the HORIZON in response to the lost return events that occurred while drilling the well.  Unused LCM typically must be transported to shore for disposal as a hazardous waste.  However, BP believed, rightly or

wrongly, that if the LCM had been used in the well, they simply could be dumped overboard without violating any environmental laws."  Phase One Findings ¶ 298 (Rec. Doc. 13355).

75.     The Court found "that BP's decision to use LCM as a spacer was not driven by any operational motive, but rather to save time and money."  Phase One Findings ¶ 298 (Rec. Doc. 13355).

76.     The Court found that the "decision to use the LCM as a spacer was unreasonable and led to the misinterpretation of the negative pressure test."  Phase One Findings ¶ 299 (Rec. Doc. 13355).

77.     The Government has not adduced <u>any</u> evidence of the costs avoided by BP's decision to use LCM as a spacer.

78.     Assuming that properly disposing of the LCM onshore and creating a new spacer could not have exceeded 10 additional days of rig time, the maximum potential avoided cost to BP would have been $10 million.

79.     Assuming that Anadarko would have, but had not yet, paid 25% of the costs that were avoided by BP's decision to not properly transport the LCM to shore for proper disposal and create a new spacer, the maximum potential avoided cost to Anadarko would have been $2.5 million.

### E.     Anadarko's History of Prior Violations.

80.     Anadarko has a significant offshore presence as an operator in the Gulf of Mexico.  As of July 2014, Anadarko operated 7 permanent platforms in the deepwater Gulf, tying it with Shell as the largest operator of platforms in that sector.  TREX-013318 at 48. Anadarko also operated 39 wells in the deepwater Gulf, ranking it as the second largest operator of wells there.  TREX-013318 at 49.

81.     Anadarko's record of operations in the Gulf of Mexico is remarkable.  Between 2004 to 2010, in addition to minor alleged permit violations, Anadarko had eight CWA discharge violations in the Gulf, the majority of which were discharges of two gallons or fewer and resulted in fines of $500 or less (for a total that was less than $13,000).  Anadarko's largest unauthorized discharge in the Gulf of Mexico during this period was only 15 barrels.  Stipulated Facts Concerning Anadarko's History of Prior Violations ("Stipulated Facts") (Rec. Doc. 13808).

82.     Anadarko's history of CWA violations for *onshore* production facilities *in other geographic areas* is not relevant to this proceeding.  For example, the Government points to a 2009 consent decree between the United States and Anadarko for alleged discharges from certain onshore oil production facilities in Wyoming and Montana.  Stipulated Facts (Rec. Doc. 13808).  Not only were these discharges alleged to be in a location other than the Gulf of Mexico, but Anadarko did not admit that the discharges actually occurred.  Consent Decree, *United States v. Anadarko Petroleum Corp.*, *et. al.*, No. 2:09-100, Doc. 9 (D. Wyo. filed Aug. 24, 2009).

**F.     Other Penalties for the Same Incident.**

83.     Anadarko has not been assessed or paid any other penalty for the *Deepwater Horizon* discharge.

84.     BP entered into a plea agreement with the United States in which it agreed to pay $4 billion in criminal fines and penalties under the Clean Water Act as part of the criminal investigation into matters related to the *Deepwater Horizon* incident.  Stipulations and Order Related to the "Any Other Penalty for the Same Incident" Factor ("Other Penalties Stipulation") at 1–2 (Rec. Doc. 13725).

85.     Certain Transocean defendants entered into a consent decree with the United States whereby they agreed to pay $1 billion in civil penalties under the Clean Water Act.  Other Penalties Stipulation at 3 (Rec. Doc. 13725).

86.     The Transocean defendants entered into a plea agreement with the United States by which they agreed to pay $400 million in criminal fines and penalties under the Clean Water Act as part of the criminal investigation into matters related to the *Deepwater Horizon* incident. Other Penalties Stipulation at 3–4 (Rec. Doc. 13725).

87.     MOEX and its parent company entered into a consent decree with the United States whereby they agreed to pay $45 million in civil penalties under the Clean Water Act, $25 million to five Gulf States, and to implement supplemental environmental projects at a cost of at least $20 million.  Other Penalties Stipulation at 3 (Rec. Doc. 13725).

### G.     Economic Impact of a Penalty on Anadarko.

88.     Anadarko admitted that, as of its August 2014 supplemental response to the United States' discovery requests, it had the ability to pay a CWA penalty of up to $4.6 billion using a combination of cash, asset sales, debt and/or equity financing.  TREX-230812 at 1–2.

89.     Anadarko did not admit that it would continue to have the ability to pay a $4.6 billion penalty <u>after</u> August 2014, or that payment of a penalty would be without negative economic impact.  TREX-230812 at 2.

90.     Anadarko did not submit an expert disclosure and report on economic impact of a penalty.

91.     At trial, the Government presented expert testimony of Ian Ratner, an accountant. Mr. Ratner was very complimentary of Anadarko, which he characterized as enormously successful because it is well-managed.  Ratner 1102:10–19.

92.     Mr. Ratner is not an expert in the oil and gas business or in the exploration and production business in particular. Ratner 1087:24–1088:4.

### 1.     Impact of a penalty on Anadarko's business operations generally.

93.     A penalty would have a negative economic impact on Anadarko's business operations by depriving the company of monies for ongoing operations, and could prevent or limit capital investments necessary for Anadarko's continued financial health.  TREX-230812 at 2.

94.     Mr. Ratner admitted that any penalty paid by Anadarko would have a negative economic impact on Anadarko's business operations, since any money used to pay a penalty is unavailable for operations and capital investment.  Ratner 1092:11–1093:2.

95.     Mr. Ratner agreed that the primary assets of an exploration and production ("E&P") company, like Anadarko, are its oil and gas reserves.  Ratner 1090:3–5.  Those assets begin to shrink once they are placed in production.  Ratner 1090:6–8.  As a result, making capital expenditures to continually replace those depleting assets is very important to an E&P company's survival and ability to grow.  Ratner 1090:9–19.

96.     Once produced, oil and gas reserves are replaced by drilling successes.  Ratner 1090:20–22.  Drilling successes bring in revenue for the upstream business of an E&P company and those revenues are what potentially lead to profits.  Ratner 1090:23–1091:4.

97.     Mr. Ratner admitted that Anadarko historically has used a "very significant" amount of its discretionary cash flow for capital investment to replenish its depleting assets. Ratner 1102:10–14.  Ratner testified that Anadarko's capital expenditures were $7.3 billion in 2012, $8.5 billion in 2013, and were planned to be $9.5 billion for 2014.  Ratner 1004:15–25; TREX-233887R at 29.  Nevertheless, Mr. Ratner declined to opine on the minimum amount of

capital investment that Anadarko needed to replace its depleting assets.  Ratner 1102:21–24.  As Mr. Ratner is not an expert in the oil and gas industry, he is not qualified to do so in any event.

98.     Mr. Ratner admitted that his opinions do not take into account Anadarko's obligation in January 2015 to pay $5.15 billion under a settlement agreement in the Tronox case. Ratner 1096:6–25.  That payment was due when approval by the U.S. District Court for the Southern District of New York became final, and has now been made.

99.     Mr. Ratner asserted that Anadarko had $8.3 billion in cash on hand as of the third quarter 2014.  TREX-233888 at 2; Ratner 1007:24–1008:4.  However, he admitted that the $5.15 billion Tronox settlement payment had not been paid as of that date.  Ratner 1096:6–25.  After paying the Tronox settlement, Anadarko's cash on hand is not sufficient to support the level of capital investment Anadarko made in 2012 ($7.3 billion) or 2013 ($8.5 billion), let alone the level of capital investment Anadarko had planned for 2014 ($9.5 billion).  Ratner 1004:15–25; TREX-233887R at 29.

100.     Mr. Ratner admitted that he did not analyze what Anadarko's shareholder value or operations would have been (or would be) if a combined $9.1 billion (for the Tronox settlement and the $4 billion settlement payment to BP) had not been taken out of the company.  Ratner 1104:22–1105:24.

101.     Mr. Ratner agreed that it was possible for a company to have the ability to pay a penalty, but payment could jeopardize its operations because, for instance, it borrowed to pay the penalty and its debt service was too high, or because, by virtue of the penalty payment, it had no money for capital expenditures the next year.  Ratner 1097:17–1098:4.  Mr. Ratner also agreed that if a penalty payment made the company unable to pay dividends as it historically had done, that could jeopardize its ability to raise capital via stock offerings.  Ratner 1098:5–8.

102.    Mr. Ratner testified that he believed Anadarko could pay the maximum CWA penalty without negative long-term consequences.  Ratner 990:23–991:1.  He defined "short term" as one to three years, "mid-term" as five to seven years, and "long term" as ten or so years.  Ratner 1091:9–15.

103.    Mr. Ratner did not provide any mid-term or long-term projections for Anadarko to support his opinions.  Ratner 1091:16–22.  Even though he did provide short-term projections, he testified that it was too aggressive to say a penalty would not have negative consequences for Anadarko in the short term because, for example, monies paid in penalty cannot be used to pay down debt or pay for capital investment.  Ratner 1091:23–1093:2.

104.    Given this admission, the absence of mid-term or long-term projections to support his opinion, the absence of an analysis regarding the minimum capital investment Anadarko needs to make to replace depleting assets and maintain financial health, and in view of Mr. Ratner's lack of expertise in the oil and gas industry, little weight can be given to Mr. Ratner's opinion that a penalty will not have a negative economic impact on Anadarko in the long-term.

**2.    Impact of a penalty on Anadarko since oil prices fell 50%.**

105.    The price of oil declined by 50% after experts were required to be identified in this case and after expert reports were required to be disclosed.  Order Regarding Penalty Phase Schedule (Rec. Doc. 12688); Order Regarding Amended Penalty Phase Schedule (Rec. Doc. 13428); TREX-247625; Ratner 1093:3–6, 1098:11–15.  On August 15, 2014 when opening expert reports were due, the price of oil was $97.3.  On September 12, 2014 when responsive expert reports were due, the price was $92.18.  On September 26, 2015 when rebuttal expert reports were due, the price was $95.55.  By January 12, 2015, the price had dropped to $46.06.  TREX-247625.

106.    Because of the sharp oil price decline, the Court permitted those parties who had presented expert opinions on economic impact to provide supplemental opinions. Order Regarding Supplemental Reports of R. Bruce Den Uyl and Ian Ratner in the Penalty Phase (Rec. Doc. 13919).   Since Anadarko had not submitted an expert opinion, it did not submit a supplemental expert opinion to address the impact of a penalty given the drop in oil prices.

107.    Mr. Ratner did not analyze the economic impact of a penalty on Anadarko in light of the sharp oil price decline that occurred in the last six months.   Ratner 1093:16–1094:7, 1098:11–15.   In his January 2015 supplemental expert report, Mr. Ratner relied on a third-party analyst report (Morningstar) to the effect that, in December of 2014, Anadarko was well-positioned to weather the decline in oil prices.   Ratner 1106:12–15; TREX-233888 at 2. However, he admitted at trial that the report did not opine that Anadarko could pay a material penalty <u>and</u> weather the decline in oil prices.   Ratner 1106:12–15, 1107:6–10.   The Morningstar report is hearsay and the opinions of its authors were not subjected to cross examination. Therefore, no weight can be given to the opinions stated in the Morningstar report in any event.

108.    Mr. Ratner did not model the various options Anadarko might have for paying a CWA penalty with a prevailing $45 price for oil; nor did he consider whether those options are still available to Anadarko given the oil price decline.   Ratner 1098:11–18.   Mr. Ratner admitted that the decline in oil prices will make some payment options more difficult.   Ratner 1098:14–18.

109.    Mr. Ratner agreed that Anadarko's expenses will not decline at the same rate as oil prices.   Ratner 1093:7–15.   He agreed, in fact, that some expenses like those under long-term contracts for rigs will not decrease at all.   Ratner 1095:8–22.

110.     Mr. Ratner testified that declining oil prices can lead to reductions in revenues, profits, capital expenditures, production operations, and work force.  Ratner 1094:8–1095:7.

111.     Unlike an integrated oil and gas company, as an independent, Anadarko is not able to offset revenue and profit reductions from its upstream business with increased revenues and profits from a downstream business.  Ratner 1088:5–1090:2; Hollek 2142:2–8.

112.     Mr. Ratner's report includes a chart depicting Anadarko's historical stock price against the Standard & Poor's 500 index through July 21, 2014, when Anadarko's stock was trading at about $108.87 a share.  Ratner 1102:25–1103:8; TREX-233887R at 24.  He testified that he included that chart because it was a good indicator of perceived equity in the company and its flexibility to obtain debt financing.  Ratner 1103:14–1104:2.  In other words, if perceived equity goes down, then flexibility to obtain debt financing goes down.  Ratner 1103:14–1104:2.

113.     Anadarko's stock has fallen from $108 a share in July 2014 to $80 a share by the time of trial; therefore, both its perceived equity and flexibility to obtain debt financing have gone down.  Ratner 1103:9–13.

114.     Mr. Ratner did not perform any analysis to determine if there was a tipping point at which Anadarko's stock price indicated an inability to raise equity or debt financing.  Ratner 1104:3–9.  He testified that he felt no need to conduct that analysis for debt financing because at the time Anadarko had an unused $5 billion line of credit.  Ratner 1104:3–21.  Mr. Ratner acknowledged at trial, however, that Anadarko had not yet made the Tronox $5.15 settlement payment.  Ratner 1096:6–25.  Mr. Ratner could not reasonably assume that the unused $5 billion line of credit was not needed for purposes other than payment of a penalty.

### H.    Other Matters as Justice May Require

#### 1.    Imposing a penalty on Anadarko could have negative effects on offshore safety.

115.    Anadarko presented expert testimony of offshore safety expert Kenneth Arnold. Mr. Arnold opined that: non-operating investors like Anadarko are not responsible for offshore safety; that the Government has not held them responsible in the past; and that imposing penalties on them could have negative unintended effects on offshore safety.

116.    Mr. Arnold has been involved in the offshore oil and gas industry for more than 50 years, with a particular emphasis on safety.  He is an expert in offshore safety and safety regulations.  Arnold 2194:19–2198:19, 2209:7–2210:14; TREX-280011 at 3; TREX-280138; D-38008.

117.    Mr. Arnold is a registered Professional Engineer, who has written or edited three textbooks, has been chosen three times to be a Distinguished Lecturer by the Society of Petroleum Engineers, and is a member of two National Academies.  He has received numerous awards recognizing his contributions to safety in the oil and gas industry.  Arnold 2197:15–18, 2198:25–2203:5; TREX-280011 at 3; TREX-280138; D-38011.

118.    Mr. Arnold has advised federal agencies and personnel, including the Director of MMS, on safety issues.  Arnold 2203:6–2206:14.  He spent his career trying to improve safety on offshore facilities, Arnold 2198:7–18, D-38011, and assisted in developing the safety regulations in use today.  Arnold 2205:18–2206:14, 2207:9–25, 2209:3–6; D-38011.

119.    Only an operator can create and maintain the necessary safety culture, and most decisions with high safety risks are operating decisions that non-operators do not control and have little ability to influence.  TREX-280011 at 4–8; TREX-280098 at 3–5; Arnold 2216:8–2218:22; D-38013A.

120.    Federal regulations recognize that the operator alone is able to ensure safe operations.   For offshore operations, there must be a single ultimate work authority with responsibility.  Arnold 2218:17–2219:7; TREX-280011 at 6; D-38010.

121.    The Minerals Management Service ("MMS") regulations in force at the time of the Incident provided that a non-operator must designate an operator, who must be approved by the government.   30 C.F.R. § 550.143.   Only if the designated operator fails to fulfill its obligations may the government pursue non-operators to fulfill the obligations.   30 C.F.R. § 550.146(b).

122.    The National Academy of Engineering has stated that the operator "is the only entity involved in offshore drilling that is positioned to manage the overall system safety of well drilling and rig operations."  Arnold 2232:17–2233:5; TREX-280054 at 122; D-38020.

123.    Non-operators can and do participate in offshore projects.   No single level of participation by non-operators is appropriate for all offshore projects.   Rather, non-operators' level of participation varies from project to project and depends on a variety of factors, such as the relative experience of the operator and non-operator, the phase of the operation, and the specific activity.   Arnold 2222:22–25, 2224:6–2227:12; D-38016; Arnold 2223:21–2224:5, 2231:5–16; TREX-280098 at 7.

124.    Non-operators are able to participate more in later stages of development; for example, Integrated Project Teams (the primary form of non-operator participation) are typically formed during the development phase of a lease.  TREX-13204 at 18, 70; TREX-280098 at 5; D-38016.

125.    Besides the threat of penalties, there are several incentives for non-operators to participate in certain operations, including significant investment in a well and a financial desire

to see it succeed, developing and maintaining investor relations, and opportunities to gain strategic learning.  Arnold 2223:1–19; D-38015.

126.    The balance of responsibilities between operators and non-operators is the result of decades of improvement in safety regulations and has not been changed since the Macondo Incident.  Arnold 2206:21–2208:25; 2233:7–19, 2235:20–2236:11; D-38010.

127.    Imposing Clean Water Act penalties on non-operators could increase their levels of participation above and beyond what would otherwise be appropriate for a given project, delaying and impeding critical, time-sensitive decisions.  That, in turn, would interfere with operators' safety culture and could have the unintended effect of decreasing offshore safety. Arnold 2210:16–2212:8, 2231:17–2232:10, 2235:10–2236:4; TREX-280011 at 4, 11; TREX-280097 at 3, 12–13; TREX-280098 at 3; TREX-280138; TREX-280139; D-38021; D-38019.

128.    As discussed below, *see* FOF ¶ 171, *infra*, economic theory also explains how imposing penalties on non-operators can actually reduce safety of deepwater operations.   Non-operators subjected to the risk of penalties are likely to demand a higher rate of return on their investment; operators, as a result, would receive lower returns.  TREX-280010-R at 11, TREX-280033 at 2.  Operators then would have the incentive to cut corners on safety in order to maximize their returns. TREX-280010-R at 11; TREX-280033 at 2.

129.    Since the Incident, federal agencies have considered the allocation of responsibility for offshore safety between operators and non-operators.  BSEE has revised its regulations governing offshore safety, and none of the new regulations imposes new responsibilities on non-operators or mandates a higher level of participation.  Arnold 2233:7–19; TREX-280097 at 3–4; D-38021.

130.    Non-operators can and do participate in and contribute to safety in some circumstances; however, contributions must be made in a fashion that does not disrupt the operator's ultimate work authority.  Arnold 2235:17–19; TREX-280098 at 6.

### 2.    Mr. Walkup's opinions and criticisms of Mr. Arnold are unpersuasive.

131.    Gardner Walkup is a management consultant with Berkley Research Group, TREX-13200 at 9, and was offered by the U.S. as an expert on the role of nonoperators in exploration "deepwater activities." Walkup 817:16–21.  He is not an expert in safety or a registered Professional Engineer.  He has not published or lectured on safety, and has not been recognized by any National Academy or organization for any work or achievements in promoting safety.  Walkup 857:3–23, 858:13–859:8.

132.    The Court finds that Mr. Arnold is vastly more qualified to opine on safety considerations that Mr. Walkup.

133.    Mr. Walkup's opinion that a "material Clean Water Act penalty will incentivize non-operators to pursue more active participation" and improve safety in offshore operations is premised on his belief that imposing a small, nominal, or zero-dollar penalty on a non-operator like Anadarko will "make passive behavior more likely."  Walkup 820:2–6, 855:15–856:16.  Mr. Walkup ignores the reality—which he admits—that non-operators are already incentivized to participate at appropriate levels on a case-by-case basis, given their investment in a well, their desire to see it succeed financially, their need to develop and maintain investor relations, and their willingness to gain strategic learning.  Walkup 832:14–836:22, 856:8–11; Arnold 2223:1–19; D-38015.

134.    Mr. Walkup claims that "focused active participation" by non-operators is an industry "best practice" in his opinion.  TREX-13200.  But Mr. Arnold shows that the

appropriate level of non-operator participation varies from project to project and depends on a variety of factors.  Arnold 2224:6–2228:2.  Mr. Arnold's testimony is more persuasive and credible.  There is no industry norm or standard practice for the appropriate level of participation by non-operators which applies to all situations.  Arnold 2223:21–2224:5, 2231:5–16; TREX-280098 at 7.

135.    While there may be various reasons why some non-operators choose or desire to actively participate in exploratory deepwater projects, the existence of those reasons is not evidence that active participation in all exploratory design activities is either customary or best practice for a non-operator.  FOF ¶ 123, *supra*.  The issue is not whether there are *reasons* for a practice to be followed, but whether the practice *is actually* followed by the industry.

136.    Non-operators can come into a lease at various times within the life cycle of a well, including after drilling has already begun and plans have received government approval. Walkup 869:1–12; TREX-280097 at 13.

137.    Mr. Walkup exaggerates a non-operator's right to "actively participate."  Rights given to non-operators under the standard Model Operating Agreement are generally subject to the operator's control.  For example, non-operators can visit the rig, but (i) must submit a request to the operator at least 48 hours in advance, and (ii) cannot "unreasonably" interfere with operations, both determinations made by the operator.  TREX-13204 at 50; TREX-280098 at 5–6.

138.    Mr. Walkup testified that he believes the Model Operating Agreement (TREX-13204) contains provisions reflecting some industry current practices and some best practices that involve non-operator active participation.  But, in Mr. Walkup's words, the Model Operating Agreement "is a dialogue between many companies and . . . they don't always agree."  Walkup

26

865:3–12.  As a result, the model Operating Agreement reflects compromises among those companies.  Walkup 867:8–18.

139.    The primary purpose of the Model Operating Agreement is not to impose uniform obligations on the industry but, as Mr. Walkup admitted, to provide a form that makes "bringing the enterprise together more efficient."   Walkup 866:20–867:14.   And, as Mr. Walkup pointed out, when people bring the Model Operating Agreement into their particular project or circumstance, there probably are additional changes to its provisions that take place as a result of more compromises between the contracting parties.  Walkup 866:20–867:18.   Thus, Mr. Walkup acknowledges that while the Model OA may be used as a starting point, or template, during negotiations, the final Operating Agreement that results from each set of negotiations is not dictated by the Model, but by the parties and the unique circumstances of the project.

140.    According to Mr. Walkup, his personal experience with non-operator active participation occurred before 1997, when non-operators provided input regarding the design of pressure transient analysis well-testing operations that he was running while he was employed by Chevron.  Walkup 845:9–846:9.  This personal experience regarding participation in the design of one type of testing provides insufficient basis for the Court to conclude that non-operators commonly do or should actively participate in all design aspects of exploratory deepwater drilling.

141.    Mr. Walkup's experience with non-operators since leaving Chevron in 1997 has consisted of four instances in which, as a management consultant, he assisted operators who were contemplating business dealings with non-operators based on the potential usefulness of the non-operator's experience or assets to the project at hand.  Walkup 847:2–848:21.  The only work that Mr. Walkup has ever performed directly for a non-operator has been as a consultant in

connection with a transaction.  Walkup 863:6–9.  Mr. Walkup's post-Chevron experience is insufficient for the Court to conclude that non-operators commonly do or should actively participate in all design aspects of exploratory deepwater drilling.

142.    Mr. Walkup admits that non-operators should not participate in tactical decisions for offshore operations.  TREX-280090 at 8.  He admits that non-operator participation in tactical decisions impedes safety by confusing lines of authority and slowing response times.  Walkup 885:1–16; TREX-13200 at 13; Arnold 2228:11–2229:7; TREX-280090 at 8; D-38017; D-38018.

143.    Mr. Walkup also admits that non-operators have limited ability to contribute to operational decisions, particularly given the time-sensitive nature of those decisions, and that safety concerns dictate that rig decisions be centralized.  Walkup 885:1–16; TREX-13200 at 13; D-38017.  For example, Mr. Walkup admits that non-operators do not participate in the following deepwater operations:  assessing why circulating pressure is low; verifying whether a float collar converted; interpreting a negative pressure test; monitoring the well for a kick; deciding whether to divert flow to a mud gas separator; deciding whether to activate emergency disconnects; and repairing or maintaining a BOP.  Walkup 885:19–888:6.

144.    Mr. Walkup's reliance on articles purporting to show "active participation" by non-operators is unpersuasive.  None of the articles are peer-reviewed, Walkup 888:7–16, and most are not relevant to the Macondo well.  For example, many of the articles relate to later stages of development (post-exploration) where non-operator participation is more common.  TREX-280097 at 4–6.

### 3.      Dr. Mason's opinions about offshore ventures are unpersuasive.

145.    Dr. Charles Mason is an economist with no expertise in the Exploration and Production business and no personal experience with non-operating working interest holders in the Gulf of Mexico.   Mason 799:8–11, 801:6–10.   Based solely on his interpretation of the Operating Agreement and on Mr. Walkup's statements, Dr. Mason opined that the relationship between Anadarko and BP was in the nature of a joint venture.   Mason 799:16–800:5; TREX-13318 at 36–39.

146.    Contrary to Dr. Mason's opinion, BP was an Independent Contractor under the Operating Agreement with MOEX and Anadarko.   FOF ¶ 14, *supra*.   The Court already has found that BP was an independent Contractor.   B1 Order at 28 (Rec. Doc. 3830).

147.    Dr. Mason's opinion about the relationship between Anadarko and BP is not reliable and outside the scope of his expertise.   Dr. Mason lacks relevant expertise that could inform his opinion.   Mason 799:8–11.   Dr. Mason never read an Operating Agreement before this case, and has no independent knowledge of what operating agreements between an operator and non-operator mean.   Mason 800:10–24; 801:6–15.

### 4.      Penalizing Anadarko will serve no rational economic purpose.

148.    Anadarko presented expert testimony of Dr. David Sunding.   Dr. Sunding opined that imposing penalties on Anadarko is not necessary to deter future violations of the Clean Water Act and that, since the Government filed this litigation against Anadarko and MOEX on December 15, 2010, non-operating investors have exited the deepwater drilling market at a rate greater than they have entered, resulting in a net exit of firms.   Sunding 2260:19–2321:3.

149.    Dr. Sunding is the Thomas J. Graff Professor of Natural Resource Economics, and Chair of the Department of Agricultural and Resource Economics at the University of

California, Berkeley.  TREX-280140 at 1; D-38060.  He has taught courses in environmental and resources economics at Berkeley for more than 20 years.  TREX-280140 at 1–2; Sunding 2251:9–23.

150.    Dr. Sunding has significant experience related to the economics of the Clean Water Act.  He has served on an EPA Science Advisory Board panel tasked with providing economic expertise on how penalties should be calculated under the Clean Water Act.  TREX-280140 at 6; Sunding 2253:4–10.  He has testified before Congress on multiple occasions regarding topics such as the economic effects of enforcement of different Clean Water Act provisions.  Sunding 2254:15–17.  He has also advised federal and state agencies on a variety of environmental matters.  Sunding 2255:22–2256:9.

151.    Dr. Sunding has testified as an expert in other Clean Water Act civil penalty cases and in legal proceedings related to water quality, water resource allocation, and valuation of natural resources.  Sunding 2254:4–8, 2254:22–2255:6.  He has been hired by the United States as an expert witness four times.  Sunding 2255:17–21.

152.    Dr. Sunding has authored more than 100 publications in resource and environmental economics. TREX-280140 at 7–26.  Dr. Sunding's research related to Section 404 of the Clean Water Act was cited by both the plurality and dissent in the U.S. Supreme Court case of *Rapanos v. United States*, 547 U.S. 715 (2006).  Sunding 2257:7–8.

153.    The Court finds that Dr. Sunding is highly qualified to opine on environmental and resource economics, Clean Water Act policies and penalties, and applied econometric analysis.

154.    Considering three economic theories of deterrence (optimal deterrence, absolute deterrence, and efficient deterrence), Dr. Sunding concluded that imposing a penalty against

Anadarko is not necessary to achieve deterrence, one of the two goals of Section 311.  TREX-280010-R at 7–11, 19.  In his opinion, imposing a penalty against Anadarko would be over-deterrent.  TREX-280010-R at 8, 19.

155.    Dr. Sunding did not render an opinion on whether, or to what extent, imposing a material penalty against Anadarko would fulfill Section 311's goal of punishment, as opposed to its goal of deterrence.  Sunding 2266:10–15.

156.    Dr. Sunding did not render an opinion on whether, or to what extent, a penalty should be imposed on BP in this case.  *See* TREX-280010-R at 5 n.2; Sunding 2261:11–14.

        **(a)**      **Optimal deterrence.**

157.    Optimal deterrence is the widely recognized concept in economics that a person who internalizes the external costs of his or her conduct (such as the harm that conduct causes) will be deterred from engaging in conduct when the expected costs of that conduct exceed its expected benefits.  TREX-280010-R at 7; *see also* TREX-280034 at 14; TREX-280024.

158.    In the context of oil spills, optimal deterrence is achieved by the Oil Pollution Act ("OPA"), which makes responsible parties liable for all harms caused by oil spills.  TREX-280010-R at 6–8.  Because of OPA's broad damages liability, civil penalties imposed under the Clean Water Act could result in overdeterrence.  TREX-280010-R at 7–8.

159.    Because money is fungible, a payment will have the same deterrent effect regardless of whether it is imposed as damages or a penalty.  Sunding 2270:16–22.

160.    Overdeterrence can have the counter-productive effect of discouraging socially valuable activities.  *See* TREX-280034 at 14; *see generally* TREX-280024.

161.    Civil penalties imposed under the Clean Water Act sometimes do not result in overdeterrence.  For example, a penalty over and above OPA damages could promote deterrence

where (i) the type of oil spill at issue has a low probability of detection, or (ii) OPA's cap on damages prevents responsible parties from fully compensating victims for the harm caused by a spill.  Sunding 2274:21–2279:22; 2320:21–25; TREX-280010-R at 8.

162.   In this case, because of the high probability of detecting large spills and because OPA damages have not been capped, a Clean Water Act civil penalty against Anadarko—a responsible party under OPA—is not necessary to achieve optimal deterrence.  TREX-280010-R at 8, 19.

### (b)   Absolute deterrence.

163.   Absolute deterrence is a level of deterrence intended to discourage all violations, even economically optimal ones.  TREX-280010-R at 8.

164.   Absolute deterrence is achieved when the total of all payments for a violation equals or exceeds any benefit violators might have obtained from the violation.  TREX-280010-R at 8–9; *see also* TREX-280052.

165.   As a matter of economic theory, no penalty is needed to achieve absolute deterrence when damages payments for a violation, by themselves, equal or exceed any benefit obtained from the violation.  Conversely, a penalty can achieve absolute deterrence when damages payments are less than any benefit obtained from the violation; in that event, a penalty achieves absolute deterrence when it equals the amount by which the benefit from the violation exceeds the damages payments.  TREX-280010-R at 8–9.

166.   A Clean Water Act civil penalty is not needed to achieve absolute deterrence against Anadarko in this case.  There is no evidence that Anadarko obtained any economic benefit from the violation, and the Government has conceded that any economic benefit from the violation was, at most, "background noise."  *See* FOF ¶ 50, *supra*.  Any gains Anadarko may

32

have obtained from the violation are dwarfed by the damages Anadarko already has paid for the violation—$4 billion, in addition to losing its investment in the well.  TREX-280010-R at 9.

       **(c)**     **Efficient deterrence.**

167.    The economic principle of efficient deterrence applies in all cases, regardless of the level of deterrence sought.  Efficient deterrence takes account of transaction costs and asymmetries in control and information, among other things, in order to identify the way to achieve any level of deterrence at the lowest social cost.  TREX-280010-R at 9.

168.    Efficient deterrence is an important consideration where multiple parties are implicated in a single violation.  Penalties have the maximum efficient deterrent effect when imposed on the party that directly exercises control over operational and cost-allocation decisions.  TREX-280010-R at 9–11.

169.    When damages or penalties are not imposed efficiently, the costs of achieving a given level of safety are unnecessarily high, and unintended consequences can result, such as decreased investment in safety by the entity with control.  TREX-280010-R at 9–11.

170.    In the context of an oil spill from a deepwater drilling operation, efficient deterrence is achieved by focusing a penalty on the operator.  The operator is the entity that is in control of the drilling operations and has the best ability to influence safety outcomes.  TREX-280010-R at 10–11; TREX-280042 at 27–28.  Imposing penalties on a non-operator is inefficient because non-operators have no control over operations, limited ability to influence decisions, and imperfect information.  TREX-280010-R at 9–11; TREX-280096 at 5–7; TREX-280042 at 27–28.

(d)     **The potential consequences of overdeterrence.**

171.    Economic theory explains how imposing penalties on non-operators can actually reduce safety of deepwater operations.  Non-operators subjected to the risk of penalties are likely to demand a higher rate of return on their investment; operators, as a result, would receive lower returns.  TREX-280010-R at 11, TREX-280033 at 2.  Operators then would have the incentive to cut corners on safety in order to maximize their returns. TREX-280010-R at 11; TREX-280033 at 2.

172.    Imposing a penalty on Anadarko could cause non-operators to reduce the amount of capital they are willing to invest in deepwater drilling operations, or to choose not to invest in deepwater drilling at all.  TREX-280010-R at 12.

173.    In the event that the Court uses its discretion to impose a penalty on Anadarko, the effect of that penalty on the deepwater drilling industry would depend on its size; *i.e.*, a large penalty would have a much greater negative impact on the industry than a very small one. Sunding 2266:19–2267:1; 2281:15–22; 2320:11–14.

174.    Deepwater drilling in the Gulf of Mexico is a cost-intensive endeavor that requires significant capital investment.  TREX-280010-R at 12, 18.  Access to capital from non-operators is essential for operators to be able engage in safe and effective deepwater drilling operations, so any reductions in non-operator investment would negatively impact the deepwater drilling industry.  *Id.*

175.    Deepwater oil and gas operations are an important economic driver in the Gulf region, so reductions in capital would also impact the economies of Gulf States.  TREX-280010-R at 17–19.

176.    All of Dr. Sunding's econometric analyses are consistent with the economic theory that the threat of a Clean Water Act penalty on non-operators will deter investment in the Gulf of Mexico and has reduced non-operators' investment in deepwater drilling.   TREX-280010-R at 13–19.   The effects Dr. Sunding observed in his econometric analyses likely would be magnified if a Clean Water Act penalty were ultimately imposed on Anadarko.   Sunding 2293:19–25.

177.    Dr. Sunding analyzed entry and exit patterns of non-operating investors before and after the Government filed a Clean Water Act penalty claim against Anadarko and MOEX on December 15, 2010.   Before, there was a ***net entry*** of about 0.9 non-operating investors per year into leases in the deepwater Gulf of Mexico.   TREX-280010-R at 14.   Dr. Sunding's analyses show that, even when factors such as oil prices, changes in the industry over time, and natural variation are taken into account, there has been a ***net exit*** of about 1.7 firms per year since the claim was filed against Anadarko and MOEX.   D-38081; TREX-280096 at 9–12.

178.    Dr. Sunding also analyzed whether non-operators' shares of individual leases has changed since the Government filed a Clean Water Act penalty claim against Anadarko and MOEX on December 15, 2010.   He analyzed 5,632 deepwater Gulf of Mexico leases, from 1983 to 2014.   He observed that those leases have become 8% more concentrated since December 15, 2010, a result that is consistent with fewer entities owning lease shares, due to the exit of non-operators.   TREX-280010-R at 16–17.

179.    The results of Dr. Sunding's econometric analyses are highly statistically significant.   TREX-280010-R at 15, 17; TREX-280096 at 10–11.

**5.    Dr. Mason's and Mr. Walkup's criticisms of Dr. Sunding are not well founded.**

180.    Dr. Mason objects to Dr. Sunding's application of optimal deterrence theory because Anadarko's $4 billion payment to BP, supposedly, does not represent Anadarko's fair share of the total OPA damages arising from the Incident.  TREX-013318 at 34–36; D-38076.  Dr. Mason's objection misses the point.   Optimal deterrence is achieved when <u>all</u> parties responsible under OPA (*i.e.* the lessees of the Macondo Prospect) are subject to OPA liability.  The precise amount of Anadarko's OPA payment is irrelevant to optimal deterrence because all that matters is that all responsible parties face the prospect of liability for the full extent of harms.  TREX-280096 at 4–5; Sunding 2285:2–18.

181.    There is no evidence that BP used Anadarko's $4 billion payment for anything other than paying claims under OPA, FOF ¶ 45, *supra*, and it is ultimately immaterial for purposes of deterrence how BP used the $4 billion, as together the parties were required to compensate for external harms under OPA.  See TREX-280096 at 4.

182.    Dr. Mason objects that Dr. Sunding failed to account for victims' risk preferences.  TREX-013318 at 35; D-38076.   In other words, Dr. Mason argues that Anadarko must be subjected to a higher level of deterrence because Gulf residents are adverse to the risk of an oil spill.   But as Dr. Sunding explained, such risk preferences are irrelevant when damages and penalties are assessed *ex post*, *i.e.* after a violation, and full payment of those damages achieves optimal deterrence.  Risk preferences would be relevant only if costs were imposed *ex ante*, *i.e.* before a violation.  Moreover, estimating the risk preferences of everyone who could potentially be affected by an oil spill is, as a practical matter, impossible.  TREX-280096 at 4–5; Sunding 2285:23–2286:5.

183.    Dr. Mason's objection that Dr. Sunding applied economic theory only to situations involving one defendant, *see* D-38076, is demonstrably false.  Large portions of Dr. Sunding's reports and his trial testimony—particularly, the portions addressing efficient deterrence—apply economic theory to situations involving multiple defendants.  TREX-280010-R at 7–11; TREX-280096 at 5–9; D-38075; Sunding 2280:12–2284:9.

184.    Dr. Mason did not conduct his own econometric analysis of entry and exit of non-operators in the deepwater Gulf; nor does he question the accuracy of Dr. Sunding's analysis.  Mason 803:2–4; *see* TREX-013318 at 39-44.  In fact, Dr. Mason admitted that the data indicate a *net exit* of non-operators from the Gulf of Mexico since 2010.  Mason 803:5–7

185.    Dr. Mason's objection that Dr. Sunding's econometric analyses did not prove causation, TREX-013318 at 43, lacks merit.  Dr. Sunding admitted that causation is impossible to prove in this context.  *See* TREX-280010-R at 13–17, Sunding 2306:23–2307:2.  Dr. Sunding performed his econometric analyses to determine whether the real-world effects were consistent or inconsistent with economic theory, and he concluded they were consistent.

186.    In his Round 1 report, Dr. Sunding identified particular "pure" non-operating investors exiting the deepwater market after December 15, 2010.  TREX-280010-R at 15–16.  It is not possible to *know* what caused each of them to exit.  MOEX's exit is an example.  TREX-280096 at 11.  MOEX was a first-time non-operator in the Gulf of Mexico and was named as a codefendant in the Government's CWA penalty complaint along with Anadarko.  MOEX abandoned its lease shares in the Gulf of Mexico and has not returned.  TREX-280096 at 11–12.

187.    In his Round 2 report, Dr. Mason suggested, but did not analyze, other potential causes of the effects Dr. Sunding observed.  TREX-013318 at 39–43.  In his Round 3 report, Dr. Sunding took several of those variables into account, and his results remained robust.  For

example, when Dr. Sunding addressed Dr. Mason's concern regarding non-linear technological change by including a non-linear time trend, net exit after December 15, 2010 actually worsened to 2.4 non-operators per year.  D-38081; TREX-280096 at 10.

188.    In his Round 2 report, Dr. Mason objected that Dr. Sunding did not account for changes in oil prices.  TREX-013318 at 42, 44.  Dr. Sunding did not initially include oil prices in his regression analyses because they might be affected by drilling activities in the Gulf, which could potentially bias the regression results.  TREX-280096 at 10–11.  Nevertheless, in his Round 3 report, Dr. Sunding accounted for oil prices by including WTI spot prices in one of his regressions; he observed a net exit of 1.7 non-operators per year, which is very close to the net exit of 1.8 from his Round 1 report.  D-38081; TREX-280096 at 11; TREX-280010-R at 15.

189.    At trial, Dr. Mason asserted that Dr. Sunding failed to account for "futures" (not future) prices, apparently referring to the specific derivative instrument traded on the New York Mercantile Exchange.  Mason 719:18–720:5.  But Dr. Sunding's inclusion of WTI spot prices in his Round 3 report did account for "anticipated *future* prices," which is what Dr. Mason discussed in his Round 2 report.  TREX-013318 at 44 (emphasis added).

190.    Dr. Mason suggested, but neither tested nor examined, a variety of reasons that individual companies may have left the deepwater market, including focusing on wells in shallow water and pursuing on-shore tight plays. TREX-013318 at 39–43.  Those are not alternatives to Dr. Sunding's hypothesis because one investor's decision to leave the deepwater market depends, in part, on the relative attractiveness of other investment opportunities.  *See* TREX 280096 at 12.

191.    The Government has introduced evidence that it contends shows that some investors had other reasons for exiting the deepwater market besides the threat of penalties,

including safety incidents or decisions to pursue onshore oil and gas plays. Sunding 2309:23–2310:20. This may be true as well, but that evidence does not show that exiting entities were unconcerned with potential liability for Clean Water Act penalties. Sunding 2310:18–21.

192.     Dr. Mason objects that Dr. Sunding's analysis of non-operators entry and exit has too small a sample size. TREX-013318 at 43. That objection lacks merit. Dr. Sunding examined every "pure" non-operating investor in deepwater leases over the entire 31-year span of the data—54 companies. D-33171. Dr. Sunding chose to analyze only entities that are always non-operators (and not entities, like Anadarko, that operate some leases and invest in others) because the impacts on "pure" non-operating investors likely are not obscured by their holdings as operators. They are, in other words, the "canary in the coal mine" who should experience changes to the industry before companies that both invest and operate. In addition, Dr. Mason's objection to Dr. Sunding's entry and exit analysis ignores that Dr. Sunding's concentration analysis, which was not limited to "pure" non-operating investors, corroborates his entry-and-exit findings. TREX-280010-R at 16–17.

193.     Dr. Mason's HHI calculations fail to rebut Dr. Sunding's concentration analysis. TREX-013318 at 45-46. Three of the four tables (Tables 5, 6, 7) cited by Dr. Mason do not even include non-operators. TREX-013318 at 30, 48–49. And two of the tables (Tables 6, 7) consider concentration only on a single date, July 1, 2014 (whereas Dr. Sunding considered concentration over time), and include only sites where platforms have been constructed or boreholes drilled. TREX-13318 at 45–46; 48–49. The fourth table (Table 3) is based only on newly acquired leases and ignores a host of data on investors who owned existing leases and left the market. TREX-013318 at 28.

194.    Dr. Mason's comparison of the HHI for Gulf of Mexico leases to the Department of Justice antitrust thresholds is irrelevant.  TREX-013318 at 46; D-33533.  Dr. Sunding does not contend that non-operators' decreased capital investment will present antitrust issues.  TREX-280096 at 13.

195.    The court finds that Dr. Sunding's econometric analysis of entry and exit by non-operators is more persuasive than Dr. Mason's critiques, for which Dr. Mason provides no supporting analysis.  Likewise, the court finds that Dr. Sunding's econometric analysis of lease share concentration is more persuasive and relevant than Dr. Mason's various concentration tables.

196.    Mr. Walkup critiques Dr. Sunding by examining the average shares of operators in certain offshore oil fields, based on a Credit Suisse report listing Credit Suisse's estimates for selected fields in the Gulf.   TREX-231646-R at 6–7.   His criticism lacks merit.  If non-operators leave the market and lease concentration increases, it does not necessarily follow that operators' shares will increase because other non-operators can acquire the departing investors' shares. That outcome is consistent with Dr. Sunding's theory and observations, since the remaining non-operators are expected to demand compensation for the increased risk they face, and that compensation could come in the form of greater shares on individual leases.  *See* TREX-280010-R at 11.

197.    Mr. Walkup also did nothing to verify the accuracy of the Credit Suisse report and did not know when the data was collected.  The report analyzes only certain "key" fields or projects, whereas Sunding analyzed all deepwater Gulf of Mexico leases.  The Credit Suisse report also relies on "estimates," whereas Sunding's data was taken directly from official BSEE

records.  Walkup 890:12–891:17, 893:15–894:5; TREX-13207 at 28–29; TREX-280010-R at 10–11.

198.    Mr. Walkup admitted that his analysis is "a static picture of ownership."  It does not analyze changes in lease ownership over the lifetime of a lease and does not provide any insight into non-operators who may have left the market or who changed their ownership shares after the incident.  Walkup 895:18–897:3.

199.    The court finds that Dr. Sunding's econometric analysis of lease share concentration is more persuasive and relevant than Mr. Walkup's analysis of the average shares of operators in certain fields.

### 6.    Anadarko significantly and positively contributes to the economies of the Gulf States.

200.    As a general matter, the Gulf of Mexico oil and gas industry provides significant benefits to the nation, including providing revenue to the federal government and states, and increasing national security through less reliance on foreign imports of oil.  Rose Dep. (6/26/14) 190:4–6, 8–10, 12–15, 17–23, 25, 193:11–16, 18–22, 24, 194:6–8, 10–15, 17–21, 23–25, 195:1–6, 8-11, 13 (APC Penalty Phase Deposition Bundle) (Chief of the Economics Division at BOEM).

201.    The oil and gas industry accounts for more than a third of Louisiana's Gross Domestic Product.  Mason 726:19–727:2; D-33521.

202.    Anadarko's operations include multiple facilities in the Gulf region, including in Texas and Louisiana.  Anadarko also has many offshore facilities and holds leases across the outer continental shelf.  Hollek 2142:12–2143:12; D-38031A.

203.    Considering the participants in both shallow and deepwater drilling, Anadarko has over a hundred peers in the Gulf of Mexico oil and gas industry.  TREX-13327.  In 2009, 2010,

and 2011, Anadarko was the largest producer of natural gas as an operator in the Gulf of Mexico. In 2009, Anadarko entities were the sixth and tenth largest producers of crude oil as operators in the Gulf of Mexico.  In 2010 and 2011, Anadarko was the fifth largest producer of crude oil. Mason 789:15–790:8; TREX-13327.

204.    As of July 1, 2014, Anadarko had the second highest number of subsea boreholes in the deepwater Gulf of Mexico (a 13.09% share), and was tied for the highest number of deepwater permanent platforms (a 14.29% share).  Mason 796:8–798:10; TREX-13318 at 48–49.

205.    Anadarko's operations provide employment and economic benefits to the region. For example, the construction of the Lucius production facility required ten and a half million man-hours to complete, much of which occurred in Ingleside, Texas.  Hollek 2143:13–2144:11. These activities also provide benefits to related industries, such as steel manufacturing.  Hollek 2144:12-19.

206.    Anadarko tracks the number of hours worked by its employees and contractors for Gulf of Mexico operations.  In 2010, Anadarko's Gulf operations resulted in approximately 4.48 million man-hours worked.  In 2014, there were approximately 14.9 million man-hours worked. This is the equivalent of approximately 2,156 and 7,225 full-time jobs in 2010 and 2014, respectively.   Hollek 2145:22–2148:7, 2148:20–2149:1; D-38049; TREX-012934 at 2; D-38033A; D-38034A.

207.    Anadarko contributes significantly to the economy through use of vendors and suppliers.  In 2010, in its capacity as an operator, Anadarko spent a gross amount of $1.13 billion on 965 suppliers.  In 2014, in its operator capacity, Anadarko spent approximately $3.5 billion (gross) on roughly 1,150 suppliers.  From 2010-2014, in its operator capacity, Anadarko paid

suppliers over $10 billion.  Hollek 2150:12–2153:11; TREX-012913 at 7; D-38050, D-38035A, D-38036A.

208.    According to estimates from the U.S. Bureau of Economic Analysis, each dollar spent on drilling oil and gas wells in the Gulf of Mexico results in $2.33 of direct, indirect, and induced economic output in the Gulf States.   TREX-280010-R at 18.   Thus, Anadarko's expenditures on Gulf drilling operations have significant impacts on the Gulf economy.

209.    Anadarko's operations provide significant income to the United States.  In 2010, Anadarko paid approximately $140 million to the United States in the form of production royalties, minimum royalties, and delay rentals. In 2014, this number increased to approximately $167 million.  Over $900 million in payments were made from 2010-2014.  Hollek 2155:13– 2157:2; TREX-012914 at 2; TREX-280007; D-38051; D-38037A; D-38038A.

210.    Anadarko paid $1.8 million in royalties associated with oil recovered from the Macondo well, but it did not accept any revenues from such oil.  Hollek 2154:15–2155:12; TREX-012914 at 2; D-38051.

211.    Anadarko also provides revenue to the United States by participating in lease sales.  The amount spent in any year depends on a multitude of factors, including success of bids, the attractiveness of leases, and the actions of competitors.  Hollek 2158:19–2159:11.  In 2010, Anadarko paid the United States $127.6 million in lease sale payments.  In 2014, Anadarko paid $9.5 million.  From 2010-2014, Anadarko paid $213 million.  Hollek 2157:3–2159:17, 2159:25– 2160:12; TREX-012937; D-38048.

212.    Anadarko spends $2-3 million a year funding joint industry studies and university research to improve industry operations in the Gulf.  Hollek 2173:14–2174:11.

213.    Anadarko participates in three oil spill response organizations:   Marine Well Containment Company; Clean Gulf Associates; and Marine Spill Response Corporation.   Hollek 2175:2–11.   Anadarko has invested approximately $200 million in capital in MWCC and continues to pay approximately $10 million per year in operating costs to MWCC and $800,000 in yearly costs to CGA.   Hollek 2175:12–2176:11, 2190:16–18.   Senior Anadarko personnel also serve in leadership positions at these organizations.   Hollek 2176:12–2177:9.

214.    Dr. Mason portrayed Anadarko as only moderately important in the industry and asserted that others can easily step in to take over the kinds of exploration and development operations Anadarko performs.   Mason 723:15–724:5, 725:18–726:14.   However, Dr. Mason is not an expert in the oil and gas industry.   Mason 799:16–19.   Dr. Mason's assertion also is at odds with the opinion of Mr. Walkup, whom the Government proffered for his purported offshore industry expertise, and who opined that deepwater drilling such as Anadarko performs requires large financial investments, and highly technical and particularized experience and skill. TREX-13200 at 12–13.

215.    Dr. Mason's analysis of Anadarko's role in the industry is based only on activities that Anadarko performs as an operator.   It does not consider, for example, hydrocarbon production from leases where Anadarko is a non-operator.   Mason 793:23–794:24.

216.    Dr. Mason's analysis of market share does not meaningfully assess the economic importance of Anadarko to the Gulf of Mexico economy, because it does not relate or compare Anadarko's market share to the rest of the relevant market.   TREX-13318 at 48–49.   Market share percentages alone do not reflect economic impact or lack of economic impact.   Many companies in large industries have relatively small market shares but are nonetheless very economically important in their industry—both Wal-Mart and Bank of America have market

shares in their teens, but no one would say they are unimportant to the economy.  The same is true for Anadarko.

## PROPOSED CONCLUSIONS OF LAW

Defendant Anadarko Petroleum Corporation respectfully submits the following proposed conclusions of law for the Court's use and consideration in assessing a fair and appropriate penalty under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 1321(b)(7).   Anadarko appealed this Court's summary judgment ruling to the United States Court of Appeals for the Fifth Circuit, which affirmed.   Anadarko has filed a petition for *certiorari* to the Supreme Court. Anadarko offers these proposed conclusions of law without prejudice to its pending appeal.

## I.   PROCEDURAL HISTORY

1.   The Government has sued Anadarko for civil penalties under Section 311(b)(7), 33 U.S.C. § 1321(b)(7), of the Clean Water Act ("CWA").

2.   The Court has previously held on summary judgment that Anadarko is subject to civil penalties under Section 311(b)(7) as a minority owner of the Macondo Well.   Rec. Doc. 5809 at 23–24.

3.   The Government has stipulated that it will not pursue any theory of liability under Section 311 that Anadarko acted as an "operator" or "person in charge" of either a vessel or a facility.   Stipulated Order Regarding Anadarko Entities (Rec. Doc. 5930).

4.   The Government has stipulated that it will not pursue CWA liability against Anadarko E&P Company LP.   Stipulated Order Regarding Anadarko Entities (Rec. Doc. 5930).

## II.   GENERAL PRINCIPLES GOVERNING ASSESSMENT OF PENALTIES UNDER SECTION 311.

### A.   The Meaning and Legislative Purposes of Section 311.

5.   Prior to 1990, Section 311(b)(6) of the Clean Water Act provided that "[a]ny owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection *shall be*

*assessed a civil penalty* by the Secretary of the department in which the Coast Guard is operating of *not more than $5,000 for each offense*." Pub. L. No. 95-217, 91 Stat. 1566 (1977) (emphases added); *see also U.S. v. Texas Pipe Line Co*., 528 F. Supp. 728, 731 n. 3 (D. Okla. 1978) (quoting the then-extant version of Section 311(b)).

6.      Congress substantially amended Section 311 in 1990 in conjunction with the passage of the Oil Pollution Act, 33 U.S.C. §§ 2701, *et. seq.* ("OPA").

7.      As part of the 1990 amendments, Congress created an entirely new penalty provision in Section 311(b)(7).  Section 311(b)(7) provides that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), *shall be subject to* a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged."   33 U.S.C. § 1321(b)(7)(A) (emphasis added).

8.      Congress's 1990 amendment and creation of Section 311(b)(7) fundamentally changed the structure and legislative purposes of Section 311(b) penalties in several important ways.

9.      Congress changed the language of the penalty provision from "shall be assessed a civil penalty" to "shall be subject to" a civil penalty.  This change in the language indicates a Congressional intent to give courts discretion to determine whether to assess any penalty against a defendant who is "subject to" a civil penalty.

10.      "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.,* 514 U.S. 386, 397 (1995).  The

Court therefore gives effect to the amendment, and holds that Section 311(b), as amended, does not mandate the assessment of penalties against every liable defendant in every case.

11.    As part of the 1990 amendment, Congress also repealed Section 311(b)(6)'s penalty amount limitation of "not more than $5,000 for each offense," and substituted a new penalty provision with theoretically unlimited civil penalties.

12.    The legislative history shows that the purpose of Section 311(b)(7) penalties is to "punish the violator and deter and prevent future violations."  136 Cong. Rec. S11,536-01 (1990) (Conf. Rep.); *see also Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir. 2000) ("Civil penalties under the Clean Water Act are intended to punish culpable individuals and deter future violations, not just to extract compensation or restore the status quo."); *U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 554 (5th Cir. 2013) (noting the Government's argument that "the purpose[s] of civil penalties" under Section 1321(b)(7) are "punishment and deterrence.").

13.    As part of the 1990 amendment, Congress repealed the "revolving fund" into which civil penalties were deposited.  *See* 33 U.S.C. § 1321(k), *repealed by* Pub. L. 101-380, Title I, § 2002(b)(2), 104 Stat. 507 (1990).  Penalties deposited into the "revolving fund" had been used to pay for administration of Section 311 and served a primarily remedial purpose. *E.g., U.S. v. Marathon Pipe Line Co.,* 589 F.2d 1305, 1309 (7th Cir. 1978) (holding civil penalty serves remedial purpose because under Section 1321(k) "the proceeds of civil penalty collections are to be deposited in a revolving fund").

14.    In place of the "revolving fund," Congress passed OPA; a "comprehensive federal scheme for the recovery of oil spill cleanup costs and the compensation of those injured by such spills."  *Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001).

15.     "[T]he civil penalty for violation of the Clean Water Act by discharging oil into a navigable water is not compensation for actual pecuniary loss."  *In re Jones*, 311 B.R. 647, 656 (Bkrtcy. M.D.Ga. 2004).  Thus, as the Court has already held, Section 311(b)(7) penalties are not remedial or regulatory in nature, and do not compensate either the Government or private parties for harms caused by an oil spill, but serve instead to punish and deter.  Rec. Doc. 5446, at 23.

### B.     The Court's Discretion

16.     The Court has broad discretion to tailor an appropriate civil penalty.  "Congress intended that trial judges perform the highly discretionary calculations necessary to award civil penalties after liability is found" under the penalty provisions of the CWA.  *Tull v. United States*, 481 U.S. 412, 425 (1987).  The Supreme Court has held that Congress has "delegate[ed]" to the courts the "highly discretionary calculations that take into account multiple factors [] necessary in order to set civil penalties under the Clean Water Act."  *Id.* at 426.  Accordingly, district courts have the discretion to "determine the amount of penalty, *if any*."  *Id.* at 427 (emphasis added).

17.     Section 311 preserves the Court's "broad discretion to set a penalty commensurate with the defendant's culpability" including "a civil penalty of only a nominal amount."  *Leslie Salt Co. v. U.S.*, 55 F.3d 1388, 1397 (9th Cir. 1995).

18.     Congress's imposition of a form of "strict liability" in Section 311(b)(7) does not relieve this Court of the obligation to rationally calibrate civil penalties to achieve Congress's goals.  *See U.S. v. Georgetown Univ.*, 331 F. Supp. 69, 71 (D.D.C. 1971) ("[C]ases like the one here involving strict liability . . . do necessitate some element of control by those indicted . . . When one is not in control of facilities which lead to a violation . . . the ultimate result or damage to persons or property should be examined in the light of the Congressional policy to impose

49

strict liability upon only those corporations or individuals who have it peculiarly within their power through the exercise of due diligence to protect the public.").

19.     The Court need not decide, for purposes of this case, whether its discretion starts at $0.00 or the nominal amount of $1.00.  It is enough that all courts to have considered the issue are in accord, and hold that this Court may, in its discretion, assess a nominal penalty.

### C.     No Particular Methodology is Mandated

20.     In *U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.* ("*CITGO*") the Fifth Circuit made clear that it does not require courts to use a "top-down," "bottom-up," or any other particular penalty calculation method.  723 F.3d 547, 552 (5th Cir. 2013).  However, "[w]hether the economic benefit is a floor, adjusted by a court's analysis of the other factors, or helps determine how much to lower the ceiling established in other ways, it should not be ignored."  *Id.* at 553.

21.     The Fifth Circuit held that "economic benefit serves as the starting point for calculating the civil penalty and is adjusted based on the remaining statutory factors. . . ." *Id.* at 552.

22.     The Court rejects the Government's proposal to use a "top-down" penalty assessment method, beginning with the maximum penalty and reducing the penalty according to the penalty factors.  Rec. Doc. 13901 at 2.  The Government's proposed method of penalty calculation is not mandated by the Fifth Circuit, and is inconsistent with the Fifth Circuit's guidance in the *CITGO* case when applied to Anadarko.

23.     As required by *CITGO*, the Court will use "economic benefit" as the "starting point" for calculating Anadarko's civil penalty, and will adjust the penalty beyond the "economic benefit" amount only if warranted by the other factors.

### D. Tailoring Penalties to Each Defendant

24.     Civil penalties must be "tailored to each individual violator," because "[a]n amount appropriate for one defendant might be ineffective (or grossly excessive) for another." Rec. Doc. 5446 at 21.

### E. The Government's Burden of Proof

25.     All civil penalties must be "rationally related to the offense." *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 177 (5th Cir. 2000).

26.     The "ordinary default rule [is] that plaintiffs bear the risk of failing to prove their claims" and courts "have usually assumed without comment that plaintiffs bear the burden of persuasion regarding the essential aspects of their claims." *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005).

27.     Courts have specifically noted that plaintiffs bear the burden of proving economic benefit when pursuing a CWA penalty. *See Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 80 (3d Cir. 1990) (finding that a plaintiff in a CWA case has a burden to provide "a reasonable approximation of economic benefit"); *United States v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 437 (W.D. Pa. 2002) *aff'd in part, vacated in part*, 366 F.3d 164 (3d Cir. 2004) (same).

28.     The Government bears the burden of proving that the penalty it seeks against Anadarko is fair, reasonable, and rationally related to Congress's purposes for Section 311(b)(7) civil penalties. *See Balice v. U.S. Dept. of Agriculture*, 203 F.3d 684, 691 n.4 (9th Cir. 2000) (in administrative context, "[w]here a statute requires an agency to consider specific mitigating factors before assessing a civil penalty . . . the agency [has] the burden of producing evidence showing that a proposed penalty is reasonable in light of those factors"); *see also Merritt v. U.S.*,

51

960 F.2d 15, 18 (2d Cir. 1992) (government has burden of proof for purposes of civil penalty assessment under the Shipping Act because, had Congress intended a different result, "it could have written" the factors "into the statute as an affirmative defense and shifted the burden of going forward with evidence onto the defendant").

29.     Placing the burden of proof on the Government also accords with the principle that "[p]enalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and free from doubt." *World Ins. Co. of Omaha, Neb. v. Pipes*, 255 F.2d 464, 472 (5th Cir. 1958) (citation and internal quotation marks omitted); *Baca v. C.I.R.,* 326 F.2d 189 (5th Cir. 1964) ("The law does not lightly impose penalties and courts look with disfavor on forfeitures."). "It is well-settled that in the application of penalties 'all questions in doubt must be resolved in favor of those from whom the penalty is sought.'" *Hatfried, Inc. v. Comm'r of Internal Revenue*, 162 F.2d 628, 633 (3d Cir. 1947) (citation omitted).

### F.     Evaluating Expert Testimony

30.     The Court, as the finder of fact, must "thoroughly consider[] the testimony of both sides' expert witnesses [and give] appropriate weight to their testimony in selecting which conclusions to credit and upon which not to rely." *Whole Woman's Health v. Lakey*, Cause No. 1:14–CV–284–LY, 2014 WL 4346480 at *4 n.1 (W.D. Tex. Aug. 29, 2014); *Garcia v. Kerry*, 557 Fed. Appx. 304, 309 (5th Cir. 2014) ("It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. In a bench trial, the district court is not obligated to accept or credit expert witness testimony.").

31.     "While [the Court] may not arbitrarily fail to consider" expert testimony, the Court possesses discretion to evaluate the competence of expert witness testimony, and is "the

final arbiter as between experts whose opinions may differ. . . ." *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977).

## III.   ASSESSING A PENALTY AGAINST ANADARKO

32.   For the reasons set out below, the Court declines to assess a penalty against Anadarko in any more than a nominal amount.

### A.   No Punishment

33.   The Court has found that Anadarko was not negligent in connection with the Incident and bears no fault for the Incident.

34.   No penalty will serve the Congressional purpose of "punishment" or "retribution" because Anadarko has engaged in no conduct meriting punishment.

35.   The Government's power to penalize non-culpable defendants like Anadarko is constrained by the Due Process Clause and by general notions of fairness and equity.  *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003) (Due Process prohibits "grossly excessive or arbitrary punishments"); *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919) (statutory civil penalty transcends Due Process if "wholly disproportioned to the offense and obviously unreasonable").

36.   Penalties may be assessed against defendants found to be without fault only in narrow circumstances: where the penalty serves a regulatory or remedial function, and where the penalty is relatively small.  *See U.S. v. Macia*, 740 F.3d 96, 105 (2d Cir. 2014) ("The Due Process Clause admits only a narrow category of strict liability [penalties], generally limited to regulatory measures where penalties are relatively small."); *cf. U.S. v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir. 1978) (where liable party is without fault, "absolute liability in the case of the civil penalty is not unduly harsh or unreasonable" such as would violate due process "in view of the limited nature of the liability [maximum of $5,000] and the flexibility afforded by the

statutory directive that . . . in setting the amount of the penalty, [the Court] take into account the charged party's . . . degree of culpability").

37.     The penalty the Government asks this Court to impose against Anadarko does not fall within those narrow circumstances.

38.     The Court finds that the Due Process Clause and general principles of fairness constrain the Court's discretion to assess a penalty against Anadarko, and that the Government has failed to provide any rational, non-punitive, justification for penalizing Anadarko in any more than a nominal amount.

**B.     Deterrence as a Goal**

39.     The Court finds that the Government failed to meet its burden to prove that penalizing Anadarko will serve Congress's purpose of deterring oil spills.

40.     The Court has considered evidence on the economics of deterrence and is persuaded that there is no accepted economic theory that would support penalizing Anadarko.

41.     The Court has held that OPA's liability cap does not apply in this case.  Phase One Findings ¶¶ 595-602 (Rec. Doc. 13355).

42.     Considering the theory of "optimal deterrence," the Court finds that Anadarko's liability for damages under OPA achieves "optimal deterrence" in this case, and that no penalty is needed or warranted to increase the level of deterrence.

43.     The Court finds that, to the extent Anadarko (or other non-operating parties like Anadarko) should be deterred in some measure, deterrence is more than achieved by Anadarko's $4 billion settlement payment to BP.

44.     As a non-culpable Responsible Party under OPA, Anadarko is entitled to seek contribution for its OPA liability from those whom the Court has found culpable—namely, BP,

Transocean and HESI.  33 U.S.C. § 2709.  Congress determined that OPA liability should be shifted from all Responsible Parties to only those who are ultimately found to be at fault for an oil spill.  The Court therefore holds that Anadarko cannot be penalized for availing itself of OPA's indemnity provisions when BP agreed to indemnify Anadarko for OPA liability beyond the $4 billion that Anadarko paid in connection with the settlement.  Moreover, that indemnification agreement does not vitiate Anadarko's OPA liability to third parties.

45.     Considering the theory of "absolute deterrence," the Court finds that no penalty is needed to remove an economic benefit that might have been realized from the violation.

46.     OPA liability in this case already far exceeds the minimal economic benefit Anadarko may have realized, if any, from BP's violation of the CWA.

47.     Considering the theory of "efficient deterrence," the Court finds that penalizing Anadarko in order to deter wrongful conduct causing oil spills would be impermissibly inefficient.

48.     Penalties should be used to deter those responsible for, or with control over, wrongful conduct.

49.     Anadarko's only conduct in this case is investing in oil and gas exploration on the OCS.  If Anadarko is penalized, then it follows that investment is the only conduct that will be deterred.

50.     Penalizing Anadarko cannot be justified by the Government's expert Mr. Walkup's opinion that it is needed in order to avoid deterring (or said another way, in order to incentivize) non-operators to "actively participate" in deepwater operations.

51.     As an initial matter, the Court is not persuaded that non-operator "active participation" as Mr. Walkup conceives it is an industry best practice.  Even if it were a "best

practice," an industry best practice is not the same as a required practice or a duty, the failure of which may justify a penalty. Indeed, this Court already has ruled that Anadarko had no duty to intercede in BP's operations and was not negligent in connection with the Macondo Incident.

52.     Mr. Walkup's opinion that Anadarko should be materially penalized to avoid deterring active participation by future non-operators is the equivalent of saying that this Court should penalize Anadarko for engaging in *lawful conduct*. To do so would be a "due process violation of the most basic sort," and must be rejected. *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

53.     The Court rejects any contention that Anadarko should be penalized in order to send a message to non-operators that a standard of conduct for non-operators ("active participation," as Mr. Walkup calls it) must be observed in the future.

54.     It is not this Court's province to legislate standards of conduct for investors in an offshore drilling venture. Section 311(b) was not intended for that purpose, and it is ill-suited to the job.

55.     The Court finds that using Section 311(b) penalties for the purpose of creating new standards or duties of care for non-operating investors would be an abuse of the Court's discretion. Neither Congress nor the regulatory agencies responsible for adopting rules pertaining to deepwater operations have deemed it appropriate to impose new standards of conduct, or an obligation to engage in "active participation," on non-operators. The Court will not use its discretion with respect to a CWA penalty against Anadarko to do so.

**C.     The Eight Section 311(b)(8) Factors**

56.     The Government has not met its burden of proving that a penalty is justified under the eight factors set out in Section 311(b).

56

57.     For purposes of applying the Section 311(b)(8) penalty factors, the relevant "violation" is the discharge of oil to the Gulf of Mexico beginning on April 20, 2010.

### 1.     Economic Benefit

58.     The Court finds that Anadarko obtained no economic benefit from the violation for purposes of this analysis, and thus the "starting point" for the penalty calculation is $0.00. *CITGO*, 723 F.3d at 551.

59.     The Government conceded that, for BP, any potential savings were "background noise," and the Government has not shown that those savings were passed on to Anadarko.  Tr. of Status Conference Re: Penalty Phase on March 21, 2014 at 26:22–27:3 (Statement by Steve O'Rourke).

60.     The Court rejects the Government's contention that the Court should disregard the "economic benefit" factor because any economic benefit to Anadarko from the violation was *de minimus* or non-existent.  *See* Rec. Doc. 13896 at 2.

61.     The Fifth Circuit held in *CITGO* that it is reversible error for a court to treat "economic benefit" as a "non-factor."  723 F.3d at 552.

62.     The fact that Anadarko obtained little or no economic benefit is highly relevant to assessing a fair and appropriate civil penalty, because "the fact that the defendant did not benefit financially from the violation suggests that a severe penalty is not appropriate in the instant case."  *U.S. v. Scruggs,* Civ. A. No. G-06-776, 2009 WL 500608, at *5 (S.D. Tex. Feb. 26, 2009).

### 2.     Degree of Culpability

63.     The ordinary meaning of "degree of culpability" refers to a measurement of a person's level of negligence or fault for causing a prohibited discharge.  *See, United States v.*

*General Motors Corp.*, 403 F. Supp. 1151, 1164–65 (D. Conn. 1975) (assessing a $1 nominal penalty under Section 311(b)(6) because "the defendant was not *negligent* or *at fault* in any way for this discharge of oil.  In other words, its *culpability* was zero . . . .") (emphases added).

64.     Strict liability statutes like Section 311(b)(7) subject liable defendants to civil penalties without regard to culpability, because a person can be strictly liable without having breached a duty of care or being otherwise personally blameworthy.  *United States v. Adderly*, 529 F.2d 1178, 1181 (5th Cir. 1976) (strict liability is not predicated on any "degree of culpability, either knowledge, intent, recklessness or willfulness").

65.     In Section 311(b) cases, once strict liability is established courts use the "degree of culpability" factor in the ordinary way to measure a violator's degree of "fault" or "negligence" with respect to the discharge.  *See United States v. Marathon Pipe Line Co.*, 589 F.2d 1305, 1308 (7th Cir. 1978) (equating "degree of culpability" with "degree of fault"); *United States v. Gen. Motors Corp.*, 403 F. Supp. 1151, 1164–65 (D. Conn. 1975) (using "fault," "negligence," and "culpability" interchangeably).

66.     Though not binding, the Court also notes that the Environmental Protection Agency defines the "degree of culpability" penalty factor in terms of relative "fault," "blameworthiness," and "negligence" in administrative penalty assessments under the CWA. *See Phoenix Constr. Servs., Inc.*, 11 E.A.D. 379, 2004 WL 1059751, at *28 (EAB 2004) ("The culpability statutory factor generally measures the level of the violator's fault or 'blameworthiness' and . . . the violator's willfulness and/or negligence."); *see id.* at *28 n.87 ("'the lack of any culpability may . . . indicate that no penalty action is appropriate'") (quoting EPA General Enforcement Policy # GM-22, *A Framework for Statute-Specific Approaches to Penalty Assessments: Implementing EPA's Policy on Civil Penalties* 18 (1984)); *see also Smith*

*Farm Enters., LLC*, CWA Appeal No. 08-02, 2011 WL 946993, at *52 (EAB Mar. 16, 2011) ("Notwithstanding the fact that most environmental statutes are strict liability statutes, the EPA recognizes that the violator's level of culpability, or degree of willfulness or negligence is not irrelevant.").

67.     Congress included the "degree of culpability" penalty factor because of the unfairness that could result from imposing penalty liability on faultless owners, and to permit courts to fairly calibrate CWA penalties according to culpability. *See Leslie Salt Co. v. U.S.*, 55 F.3d 1388, 1397 (9th Cir. 1995).

68.     On multiple occasions, this Court has held that Anadarko was not negligent or at fault because "BP was solely responsible for the drilling operations[,] . . .[and] [a]ny access to information that Anadarko . . . may have had did not give rise to a duty to intercede in an independent contractor's operations . . . ."  B1 Order at 28 (Rec. Doc. 3830); *see also* Rec. Doc. 4159 at 6 (dismissing B3 Plaintiffs' claims against Anadarko); Rec. Doc. 4578 at 25–26 (dismissing Louisiana's and Alabama's claims against Anadarko); Rec. Doc. 4845 at 6, 11–12 (dismissing Local Government Entities claims against Anadarko).

69.     Nothing has dissuaded the Court from its conclusion that Anadarko was not negligent, breached no duty of care, and bears none of the fault for the Incident.

70.     The Court finds that Anadarko is not culpable in any measure or degree. Accordingly, this factor does not warrant imposition of any penalty on Anadarko.

### 3.      Seriousness of the Violation

71.     Anadarko has not disputed that the violation in this case is extremely serious.

72.     The "seriousness of the violation" factor is intended to vindicate Section 311(b)(7)'s legislative purpose of "retribution" against those whose wrongful conduct caused an oil spill.  *Tull*, 481 U.S. at 423.

73.     For the reasons explained, the Court has found that Anadarko cannot rationally be *punished* for the Incident, so seeking retribution against Anadarko is not warranted.

74.     Insofar as the "seriousness" factor also serves deterrence, then it only rationally applies in relation to operating conduct that could prevent future spills.   Anadarko's only relevant conduct in this case was owning a 25% interest in the Macondo Well.  Section 311(b)(7) penalties are not intended to deter ownership of wells.

75.     Accordingly, the "seriousness of the violation" factor does not warrant penalizing Anadarko.

76.     The Court rejects the Government's contention that the "seriousness of the violation," standing alone, mandates a large penalty against Anadarko.  Rec. Doc. 13896 at 2. To accept the Government's contention would disregard Anadarko's lack of culpability and, instead, unfairly impute to Anadarko the wrongful conduct of the three parties who were culpable for the discharge and whom Anadarko could not control.

### 4.    Anadarko's Mitigation Efforts

77.     Congress intended for the courts to consider a defendant's efforts to mitigate the effects of an unlawful discharge when assessing a penalty.  33 U.S.C. § 1321(b)(8).

78.     There is no evidence that Anadarko failed to comply with its statutory mitigation obligations.

79.     This factor does not warrant penalizing Anadarko.

80.     The Court rejects the Government's contention that a defendant's mitigation efforts should be discounted in the penalty analysis because mitigation is required by law. Congress specifically included mitigation in the Section 311(b)(8) penalty factors, therefore a defendant's mitigation efforts cannot be ignored, no matter the defendant's motivation.  *See* 136 Cong. Rec. H6933-02 (1990) (Conf. Rep.) (remarks of Rep. Stangeland) ("Particular weight should be given to the degree of culpability, the economic impact of the penalty on the violator, *efforts taken to mitigate the spill*, and other matters as justice and fairness require.")  (emphasis added).

81.     The Court finds that Anadarko, as a non-operating investor in the Macondo Well, was permitted to play only a limited role in the Government-led Incident Command System responsible for mitigation and response activities.   Anadarko offered its full support and assistance, provided the support and assistance asked of it, and there is no evidence that either the Government or BP ever requested additional assistance that Anadarko did not provide. Under these circumstances, Anadarko fully satisfied its mitigation obligations.

82.     The Court further finds that Anadarko did not shirk its mitigation obligations by allowing BP to reimburse the Coast Guard for its expenses in connection with mitigation and response efforts.   Anadarko and BP had entered into an Operating Agreement that allocated to BP the initial responsibility for paying all costs associated with operations on the Macondo Leasehold.  The evidence shows that BP acted consistently with its contractual obligations, and in fact paid the Coast Guard's invoices.  There was no evidence that any Coast Guard invoices were left unpaid.  Anadarko did not have an obligation to pay Coast Guard bills that already were paid, and Anadarko cannot be faulted for complying with its contract with BP.

### 5.     Anadarko's History of Prior Violations

83.     The Court has considered Anadarko's history of prior violations in connection with Anadarko's own operations in the Gulf of Mexico.

84.     Evidence of another prior violation by Anadarko associated with an onshore facility in the Midwest is irrelevant, and the Court has not considered it in this analysis.

85.     Considered in relation to the full extent of Anadarko's operations in the Gulf of Mexico, Anadarko's prior violations are *de minimis* and evidence no pattern of disregard for the Clean Water Act, or the environment generally.  On the contrary, Anadarko's sparse history of violations is commendable.

86.     The Court finds that Anadarko's prior history of violations does not weigh in favor of penalizing Anadarko in any amount.

### 6.     Other Penalties for the Same Incident

87.     This Court already has punished, or will punish, those parties who are subject to penalties under Section 311(b), and who were at fault for the discharge.  As a result, Section 311(b)'s purposes of punishment and deterrence will be not advanced by penalizing Anadarko.

### 7.     The Potential Economic Impact of Penalizing Anadarko

88.     Courts are instructed to consider the potential economic impact of the penalty on a defendant, so that penalties will not be disproportionate to a defendant's size or financial wherewithal.

89.     Anadarko admits that, if required, it could pay the maximum penalty.  However, the Court finds that any penalty would impact Anadarko's business, and that the potential extent of that harm is impossible to predict in light of the present volatility in oil prices.

90.     Moreover, the Court finds that a defendant's theoretical *ability* to pay a penalty says nothing about whether that defendant *should* pay a penalty.  To penalize a defendant merely

because it is a financially sound corporation would "be discriminatory and would violate the rule of law . . . by making punishment depend on status rather than conduct." *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) ("[A] person is punished for what he does, not for who he is, even if the who is a huge corporation") (Posner, J.).

### 8.      Other Matters as Justice May Require

91.      The "other matters as justice may require" factor is generally used to introduce evidence to mitigate a potential penalty.  *See, e.g.*, *U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 553-54 (5th Cir. 2013) (affirming under justice factor district court's consideration of the defendant's role as a major employer and positive economic impact on the region to decrease penalty).

92.      The Court finds that penalizing Anadarko would likely produce undesirable side effects that would far outweigh any minimal utility to be gained from penalizing Anadarko.  This bolsters the Court's conclusion that penalizing Anadarko in any more than a nominal amount would be inappropriate.

93.      The Court finds that penalizing Anadarko would have negative impacts for the safety of offshore operations.  In particular, the Court is persuaded that offshore safety requires all decisions to be made within a culture of safety cultivated by the designated operator of an offshore facility or vessel, and that a penalty would interfere with that.

94.      The Government has never before penalized a non-operating party like Anadarko.

95.      The responsible federal agency regulators have not promulgated regulations requiring non-operators to oversee or interfere in offshore drilling operations, nor have they imposed any other operational obligations on non-operators.

96.     The Court finds it plausible that, by penalizing a non-operating investor for the first time in this case, non-operating investors in future operations will respond by interfering with an operator's authority and activity.   The Court presumes that, if the agency experts responsible for regulating the safety of offshore drilling believed that was a desirable result, then they would have already acted to achieve it by regulation.

97.     Furthermore, the Court is persuaded by the testimony of Anadarko's safety expert, Mr. Arnold, that incentivizing non-operators to attempt to exercise increased control over the operator's drilling operations may foster confusion and reduce safety overall.

98.     Section 311(b)(7) penalties should be used to deter unsafe practices.   House Conference Report, Oil Pollution Act of 1990, H.R. Conf. Rep. 101-653 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 833 ("Typically, oil spills involve a large element of human error.  Civil penalties should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills.").

99.     It would be counter to the Congressional intent to impose penalties that would confound Congress's goal for penalties.

100.     The Court is also persuaded that penalizing a non-culpable, non-operating investor like Anadarko could adversely impact investment in deepwater exploration and production.

101.     The offshore industry is critical to the Gulf States' recovering economies.   The Court finds that it would be counterproductive and contrary to Congressional intent to impose Section 311(b)(7) penalties on Anadarko, because penalizing a faultless investor will deter only investment—not oil spills.

102.    The Court also finds that no penalty amount greater than a nominal penalty would be appropriate because the legal basis for Anadarko's liability under Section 311(b)—*i.e.*, this Court's holding that oil discharged "from" the Macondo Well—was a matter of first impression and the subject of good faith disagreement.

103.    The same is not true for the other "operator" defendants, Transocean and BP, because they are liable under Section 311(b) whether the discharge was "from" the Macondo Well or "from" the *Deepwater Horizon*.  *See* Phase One Findings ¶ 609 (Rec. Doc. 13355) (holding Transocean is an "operator" of the Macondo Well); ¶ 611 n. 299 (holding BP would be liable under Section 311 as an "operator" of the *Deepwater Horizon*).

104.    Thus, while the Court adheres to its prior holding that Anadarko is "subject to" civil penalties under Section 311(b)(7) as an "owner" of the facility from which oil discharged, it is not appropriate to penalize a defendant in cases where the correct application of a penalty statute is subject to some uncertainty.  *See Cramer v. Wise*, 501 F.2d 959, 962 (5th Cir. 1974) ("[D]oubts regarding the proper extent of sanctions must be resolved in favor of the individual, not the Government.").

## IV.    OTHER PARTIES' NEGOTIATED PENALTIES

### A.    Transocean's Negotiated Penalty

105.    The Government has argued that Anadarko should be penalized in an amount greater than $1 billion, because the Government negotiated a $1 billion civil penalty as part of a partial consent decree with Transocean.  Rec. Doc. 13896 at 1.

106.    The Government also argued at trial that Anadarko's penalty should be "north of [a] billion dollars, significantly north of a billion dollars, because compared to Transocean, the day laborer, the owner should pay a higher penalty."  O'Rourke 29:14-17 (opening statement).

107.    The Government acknowledges that "Transocean acted with negligence while [Anadarko] did not," but contends that Anadarko nonetheless should be penalized even more than Transocean because Transocean was a "paid charter hire," whereas Anadarko "co-owned the well and stood to profit from the oil produced had the well been completed successfully." Rec. Doc. 13896 at 1.

108.    The Court rejects this argument.

109.    As an initial matter, the Government's characterization of Transocean as a mere "paid charter hire" or "day laborer" is inconsistent with the Government's earlier claims and arguments concerning Transocean's control over operations, degree of culpability, and share of fault for the discharge.  *See* Rec. Doc. 4840 at 12 (stating the Government's intent to prove that Transocean acted with "willful misconduct"); Rec. Doc. 10460-1 at 97 ("Transocean managed, directed and conducted operations specifically related to controlling the well, controlling the release of/and prevention of the release of hydrocarbons into the environment and thus was an operator of the Macondo Well."); Rec. Doc. 10461 at 39 ("[T]he evidence also shows that Transocean violated at least two applicable regulations that were the proximate causes of the incident."); Rec. Doc. 8502-1 at 11-12 ("[T]he acts and omissions of the Transocean Defendants played a role in causing the blowout, explosion, and oil spill; the culpability of the Transocean Defendants cannot be disputed. . . . Accordingly, the Transocean Defendants should pay a very large civil penalty, which is what they will do under the proposed Decree.").

110.    It also is inconsistent with this Court's finding that Transocean bears 30% of the fault for the Incident.  Phase One Findings ¶ 544 (Rec. Doc. 13355).

111.    Transocean also is not similarly situated to Anadarko because Anadarko has paid $4 billion in OPA damages to compensate the victims of the spill, and contributed to the

mitigation efforts in other significant ways, whereas Transocean has paid nothing to mitigate the impacts of the spill it caused, notwithstanding that it too is an OPA responsible party.

112.    In this regard, it is noteworthy that the Government's Motion for Entry of Partial Consent Decree with the Transocean Defendants, Rec. Doc. 8502-1, does not include *any* statement that Transocean took even minimal actions to mitigate the effects of the spill it caused, nor any statement that Transocean's penalty should be reduced under the Section 311(b)(8) "mitigation" penalty factor.

113.    The Government fails to provide any rational explanation for its assertion that Transocean's penalty is an appropriate "guidepost," Rec Doc. 13896 at 1, for any party other than Transocean—let alone for Anadarko.

### B.    MOEX's Negotiated Penalty

114.    If any party's prior negotiated settlement with the Government could be regarded as "guidepost" for Anadarko's penalty, it would be MOEX's negotiated $45 million CWA penalty. Rec. Doc. 6436-1.

115.    Like Anadarko, MOEX was a non-operating investor in the Macondo Well, and like Anadarko, MOEX was found non-negligent in connection with the Incident. Certain aspects of the MOEX consent decree are significant, because the Government asks this Court to treat Anadarko differently from MOEX but provides no reasons for such disparate treatment.

116.    For one, the Government has argued that Anadarko's $4 billion settlement payment to BP "was primarily a resolution of cross-claims arising from the Incident between business partners" and should not be considered under the Section 311(b)(8) mitigation factor. ***That is not the position the Government took with respect to MOEX.***

117.     When the Government moved this Court for entry of the MOEX consent decree, the Government argued that "MOEX paid BP about $1 billion *to cover compensatory damages and costs (including natural resource damages)* and in exchange BP indemnified MOEX for all such compensatory damages and costs."  Rec. Doc. 6436-1 at 6 (emphasis added).  Anadarko's $4 billion payment to BP was for the exact same purpose.  *Compare* TREX-050473 at 3, § 3.4 (Anadarko/BP settlement providing that "BPXP will use the Cash Payment to pay the claims of Persons whose injuries and damages arise out of or related to the *Deepwater Horizon* Incident") *with* TREX-050444 at 3, § 3.4 (BP/MOEX settlement providing that "BPXP will use the Cash Payment to pay the claims of Persons whose injuries and damages arise out of or related to the *Deepwater Horizon* Incident").

118.     There is no meaningful distinction between MOEX's settlement with BP and Anadarko's settlement with BP, and no rational basis to treat the settlements differently.

119.     Along the same lines, the Government now argues that Anadarko's "lack of active participation" in drilling operations justifies imposing a $1 billion penalty on Anadarko, because "[a]cting passive can't be a free pass."  O'Rourke 28:7-22 (opening statement).  ***That is not the position the Government took with respect to MOEX.***

120.     In response to a comment on the proposed consent decree that "MOEX's *lack of active participation* in the drilling operations should not mitigate its liability," the Government argued that "MOEX's '*lack of active participation*' in the drilling operation is certainly relevant (e.g., MOEX's degree of culpability) and should be evaluated under the Section 311(b)(8) factors as part of the penalty assessment."  Rec. Doc. 6436-1 at 23 (emphases added).

121.     In particular, the Government argued that the fact that "MOEX contends that it did not have knowledge of or play a direct role in other events at the well that contributed to the

blow-out and explosion at Macondo, *and that it was merely an investor*" weighed *against* penalizing MOEX.  *Id.* at 14 (emphases added).

122.    In other words, two of the critical facts that the Government previously argued weighed *against* penalizing MOEX—a settlement payment for OPA damages and lack of active participation—the Government now argues weigh *in favor* of penalizing Anadarko.  This is untenable, arbitrary, and capricious.

123.    As the Fifth Circuit has explained, "a party cannot advance one argument and then, for convenience or gamesmanship after that argument has served its purpose, advance a different and inconsistent argument." *Hotard v. State Farm Fire and Casualty Company*, 286 F.3d 814, 818 (5th Cir. 2002).

124.    Since the Government has advanced these points with respect to the MOEX consent decree, and this Court accepted them, the Government is estopped from arguing now that Anadarko's "lack of active participation" justifies penalizing Anadarko, and is estopped from arguing that Anadarko's $4 billion settlement payment to BP did not cover compensatory damages and costs resulting from the spill.  *See Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988) (holding that a court's approval of a settlement "is sufficient 'judicial acceptance' to estop" the Government "from later advancing an inconsistent position," because the court "is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable").

125.    No facts justify penalizing Anadarko in any amount greater than MOEX's $45 million CWA penalty.

126.    The fact that MOEX owned a 10% interest in the Macondo Well, whereas Anadarko owned a 25% interest, does not justify penalizing Anadarko more than MOEX.

Nothing in Section 311(b) suggests that the relative amount of a defendant's ownership interest in a discharging vessel or facility has any bearing on the amount of a penalty to be assessed.

127.    Indeed, the Government has contended that the size of MOEX's interest in the Well "does not dictate any particular reduction" and argued, instead, that "the Company's minority status should certainly be considered in deciding how to tailor a penalty for this particular defendant."  Rec. Doc. 6436-1 at 15.  The same should be true for Anadarko:  the size of its interest in the Well is irrelevant to determining its penalty, though its status as minority owner is relevant as a mitigating factor.

128.    Nor does it make any difference that Anadarko sometimes is an "operator" on other projects, whereas MOEX only ever acted as a "non-operator."  It is irrational to penalize Anadarko in this case because its other operations have *successfully* not violated the CWA.  With respect to this discharge, Anadarko's conduct was the same as MOEX's, so no greater penalty is warranted.

129.    The Court accepted the Government's arguments with respect to the MOEX consent decree, and found that a $45 million CWA penalty was "fair, reasonable" and in furtherance of "the objectives of the CWA."  Rec. Doc. 6698 at 5.  Accordingly, penalizing Anadarko in excess of $45 million would not be "fair, reasonable" and in furtherance of "the objectives of the CWA."

130.    While MOEX's $45 million CWA penalty amount is a better benchmark than Transocean's penalty, it is still far too high a penalty for Anadarko.

131.    The Court cannot ignore the context of MOEX's negotiated penalty.  MOEX settled in the face of litigation risks, before this Court ruled that non-operators had no degree of culpability, and before expert evidence was presented at the Penalty Phase trial showing that no

penalty will serve the purposes of Section 311(b).  *See* Rec. Doc. 6436-1 at 14 (conceding that "[e]vidence of MOEX's culpability is mixed").  The Government's case against Anadarko has gotten only weaker since MOEX settled.  Rec. Doc. 6436-1 at 1.

132.   Considering that penalties must be tailored to the individual defendant, the Court finds that no party's negotiated settlement relieves the Court of its obligation to calibrate a penalty for Anadarko that will serve Section 311(b)'s legislative purposes.

133.   Since the Court has found that no penalty under these circumstances will serve Congress's purposes of punishment and deterrence, the Court declines to assess any more than a nominal penalty.

## V.   OTHER ISSUES

134.   Section 311(b)(7) includes two methods of calculating maximum penalties: per-barrel, and per-day.  In the absence of gross negligence, the maximum per-barrel penalty is $1,100 per barrel.  In the absence of gross negligence, the maximum per-day penalty is $37,500 per day.  78 Fed. Reg. 66643, 66647–48 (Nov. 6, 2013).

135.   The Court has discretion to choose whether to use the per-barrel or per-day calculation in setting a penalty.  *See U.S. v. Egan Marine Corp.*, No. 08 C 3160, 2011 WL 8144393 at *6 (N.D. Ill. Oct. 13, 2011) (declining to use the per-day penalty calculation advocated by the Government that yielded a more than $3 million maximum penalty, in favor of the per-barrel penalty calculation that resulted in $112,000 maximum penalty).

136.   The Court has determined that 3.19 million barrels of oil were discharged.  Rec. Doc. 14021 at ¶ 277.

137.   Anadarko's maximum possible Section 311(b)(7) penalty calculated on a per-barrel discharged basis is $ 3.509 billion.

138.    The Court has found that oil discharged in violation of the CWA for 86 consecutive days.  Rec. Doc. 14021 ¶ 214.

139.    Anadarko's maximum possible Section 311(b)(7) penalty as calculated on a per-day basis is $3,225,000.

Respectfully submitted,

DATED: March 27, 2015                    **MORGAN, LEWIS & BOCKIUS LLP**

_/s/ James J. Dragna_____
James J. Dragna
jim.dragna@morganlewis.com
Morgan, Lewis and Bockius LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@morganlewis.com
Thomas R. Lotterman
thomas.lotterman@morganlewis.com
David B. Salmons
david.salmons@morganlewis.com
Randall M. Levine
randall.levine@morganlewis.com
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

**KUCHLER POLK SCHELL
WEINER & RICHESON, LLC**

Deborah D. Kuchler, T.A. (La. Bar No. 17013)

72

dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone (504) 592-0691
Facsimile (504) 592-0696

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of March, 2015.

 _____ */s/ James J. Dragna* _____
 James J. Dragna