# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| Nos. 10-2179; 10-4536 | * | |
| | * | MAGISTRATE NO. 1 |
| | * | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \*

## ANADARKO PETROLEUM CORPORATION'S
## PENALTY PHASE POST-TRIAL BRIEF

MORGAN, LEWIS & BOCKIUS LLP

James J. Dragna
jim.dragna@morganlewis.com
Morgan, Lewis and Bockius LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@morganlewis.com
Thomas R. Lotterman
thomas.lotterman@morganlewis.com
David B. Salmons
david.salmons@morganlewis.com
Randall M. Levine
randall.levine@morganlewis.com
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street
Suite 1300
New Orleans, LA 70112
Telephone (504) 592-0691
Facsimile:  (504) 592-0696

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.  THE TEXT, STRUCTURE, PURPOSE, AND HISTORY OF SECTION 311
    CLARIFY THE COURT'S TASK AND GUIDE ITS DISCRETION .......................... 3

    A.  The Court Can Impose A Nominal or Zero-Dollar Penalty On Anadarko ............ 3

    B.  Any Penalty Must Be Tailored To Achieve The Purposes Of Section
        311(b)(7) To Punish And Deter Oil Spills ........................................................ 5

        1.  There is no rational reason to punish Anadarko ....................................... 6

        2.  Penalizing Anadarko would not deter oil spills ........................................ 9

II. THE PENALTY FACTORS WEIGH AGAINST ANY PENALTY ............................ 11

    A.  Any Penalty Analysis Should Begin With Economic Benefit ........................... 11

    B.  Anadarko's Lack of Culpability ...................................................................... 13

    C.  Seriousness of the Violation ........................................................................... 13

    D.  The Nature, Extent and Degree of Success of any Efforts by Anadarko to
        Minimize or Mitigate the Effects of the Discharge ......................................... 14

    E.  Anadarko's Sparse History of Prior Violations ............................................... 15

    F.  Other Matters As Justice May Require ............................................................ 16

    G.  Any Other Penalty For The Same Incident ..................................................... 18

    H.  Economic Impact of the Penalty on Anadarko ................................................ 18

III. ANY PENALTY IN THIS CASE MUST BE LIMITED BY ANADARKO'S
     UNUSUAL CIRCUMSTANCES ......................................................................... 18

CONCLUSION .......................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Am. Ins. Co. v. U.S.*,
   62 Fed. Cl. 151 (2004) ...................................................................................................4

*Anadarko Petroleum Corporation v. United States*
   (S. Ct. #14-1167) ...........................................................................................................1

*Atl. States Legal Foundation v. Universal Tool Stamping, Inc.*,
   786 F. Supp. 743 (N.D. Ind. 1992) ..............................................................................16

*Bordenkircher v. Hayes*,
   434 U.S. 357 (1978) .......................................................................................................6

*U.S. v. Egan Marine Corp.*,
   No. 08 C 3160, 2011 WL 8144393 (N.D. Ill. Oct. 13, 2011) ........................................3

*Commodity Futures Trading Com'n v. Levy*,
   541 F.3d 1102 (11th Cir. 2008) .....................................................................................5

*Cramer v. Wise*,
   501 F.2d 959 (5th Cir. 1974) .......................................................................................18

*In re: Deepwater Horizon*,
   775 F.3d 741 (5th Cir. 2015) .............................................................................14, 15, 18

*Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*,
   528 F.2d 645 (5th Cir. 1976) .......................................................................................17

*Forest Group, Inc. v. Bon Tool Co.*,
   590 F.3d 1295 (5th Cir. 2009) .......................................................................................4

*Hawaii's Thousand Friends v. City and County of Honolulu*,
   821 F. Supp. 1368 (D. Haw. 1993) ..............................................................................16

*Holdridge v. U.S.*,
   282 F.2d 302 (8th Cir. 1960) .........................................................................................6

*Leslie Salt Co. v. U.S.*,
   55 F.3d 1388 (9th Cir. 1995) .........................................................................................3

*Mathias v. Accor Economy Lodging, Inc.*,
   347 F.3d 672 (7th Cir. 2003) .............................................................................18, 19, 20

## TABLE OF AUTHORITIES
(continued)

**Page**

*Montauk Oil Transp. Corp. v. Tug El Zorro Grande*,
    54 F.3d 111 (2d Cir. 1995)...........................................................................................8

*Morissette v. U.S.*,
    342 U.S. 246 (1952).....................................................................................................6

*Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*,
    913 F.2d 64 (3d Cir. 1990).........................................................................................13

*R&W Technical Servs. Ltd. v. CFTC*,
    205 F.3d 165 (5th Cir. 2000) .......................................................................................5

*Ratner v. Sioux Natural Gas Corp.*,
    719 F.2d 801 (5th Cir. 1983) ..................................................................................5, 11

*Resurrection Bay Conservation Alliance v. City of Seward, Alaska*,
    No. 3:06–CV–0224–RRB, 2008 WL 508499 (D. Ala. 2008) ...........................5, 11

*Rollins Environmental Services (NJ) Inc. v. EPA*,
    937 F.2d 649 (D.C. Cir. 1991)...................................................................................17

*S.E.C. v. Rosenthal*,
    650 F.3d 156 (2d Cir. 2011)........................................................................................3

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*,
    73 F.3d 546 (5th Cir. 1996) ...............................................................12, 13, 16, 20

*Sierra Club v. City of Colorado Springs*,
    No. 05–CV–01994–WDM–BNB 2009 WL 2588696 (D. Colo. Aug. 20, 2009) ....................3

*Sierra Club v. El Paso Gold Mines, Inc.*,
    No. 01-2163, 2003 WL 25265873 (D. Colo. Feb. 10, 2003).................................16

*Southern Pacific Transp. Co. v. U.S.*,
    13 Cl. Ct. 402 (Cl. Ct. 1987).......................................................................................6

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
    251 U.S. 63 (1919)......................................................................................................6

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)....................................................................................................6

*Tanguis v. M/V WESTCHESTER*,
    153 F. Supp. 2d 859 (E.D. La. 2001).........................................................................8

**TABLE OF AUTHORITIES**
(continued)

Page

*True v. U.S.*,
   894 F.2d 1197 (10th Cir. 1990) ...............................................................9

*Tull v. United States*,
   481 U.S. 412 (1987)................................................................. *passim*

*U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.*,
   723 F.3d 547, 551 (5th Cir. 2013) ..........................................................12

*U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC.*,
   257 F. Supp. 2d 407 (D. Me. 2003) ...........................................................5

*U.S. v. Allegheny Ludlum Corp.*,
   366 F.3d 164 (3d Cir. 2004)...................................................................16

*U.S. v. Atlantic Richfield Co.*,
   429 F. Supp. 830 (E.D. Pa. 1977) .........................................................6, 7

*U.S. v. Bay-Houston Towing Co., Inc.*,
   197 F. Supp. 2d 788 (E.D. Mich. 2002).......................................................5

*U.S. v. Coastal States Crude Gathering Co.*,
   643 F.2d 1125 (5th Cir. 1981) ..............................................................7, 8

*U.S. v. Eureka Pipeline Co.*,
   401 F. Supp. 934 (D.W.Va. 1975) ...........................................................7

*U.S. v. General Motors Corp.*,
   403 F. Supp. 1151 (D. Conn. 1975)...........................................................5

*U.S. v. Gulf Park Water Co., Inc.*,
   14 F. Supp. 2d 854 (S.D. Miss. 1998)........................................................14

*U.S. v. Lambert*,
   589 F. Supp. 366 (S.D. Fla. 1984) .......................................................5, 11

*U.S. v. Macia*,
   740 F.3d 96 (2d Cir. 2014)....................................................................7

*U.S. v. Marathon Pipe Line Co.*,
   589 F.2d 1305 (7th Cir. 1978) .............................................................4, 7

*U.S. v. Mun. Authority of Union Tp.*,
   929 F. Supp. 800 (M.D. Pa. 1996), *aff'd* 150 F.3d 259 (3d Cir. 1998) .................16

## TABLE OF AUTHORITIES
### (continued)

Page

*U.S. v. Scruggs*,
   Civ. A. No. G-06-776, 2009 WL 500608 (S.D. Tex. Feb. 26, 2009) ......................................12

*U.S. v. Tex-Tow, Inc.*,
   589 F.2d 1310 (7th Cir. 1978) ....................................................................................4, 7

*U.S. v. Texas Pipe Line Co.*,
   528 F. Supp. 728 (D. Okla. 1978)..................................................................................4

*U.S. v. Texas Pipe Line Co.*,
   611 F.2d 345 (10th Cir. 1979) ......................................................................................7

*U.S. v. W. B. Enters., Inc.*,
   378 F. Supp. 420 (S.D.N.Y. 1974)................................................................................7

**Statutes**

33 U.S.C. § 1321(b)(7)(A)......................................................................................................20

33 U.S.C. § 1321(b)(7)(B)......................................................................................................15

33 U.S.C. § 1321(k) .............................................................................................................7, 8

33 U.S.C. § 2713(a) ...............................................................................................................10

33 U.S.C. § 1321(b)(7) ................................................................................................1, 2, 3, 5

Oil Pollution Act, 33 U.S.C. § 2701, *et. seq.* ................................................................ *passim*

Pub. L. 101-380, Title I, § 2002(b)(2), 104 Stat. 507 (1990) ...............................................8

Pub. L. No. 95-217, 91 Stat. 1566 (1977)............................................................................4

Securities Exchange Act, 15 U.S.C. § 78a, *et. seq.* ...........................................................3

**Other Authorities**

136 Cong. Rec. H6933-02 (1990)........................................................................................15

136 Cong. Rec. S11,536-01 (1990) ........................................................................................8

H.R. Conf. Rep. 101-653 (1990) (Conf. Rep.),
   *reprinted in* 1990 U.S.C.C.A.N. 779 ......................................................................11

S. Rep. No. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722................................9

## PRELIMINARY STATEMENT

The Government's penalty claim against Anadarko under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 1321(b)(7), is unprecedented.  Anadarko is a non-operating party, who had no control over the operation that caused the spill; was not negligent and bears no fault for the spill; earned no benefit from the spill; and paid billions to compensate the spill's victims. Anadarko remains in this case only because it was a part owner of the Macondo Well.[1]  That status alone does not mean it is appropriate to penalize Anadarko, nor does it bear on the amount of the penalty the Court should assess.

The Government has never before sought Section 311(b)(7) penalties from a party like Anadarko for good reason.  Congress's goals for Section 311(b) penalties are to punish those who caused an oil spill and to deter future spills.  Penalties must be rationally related to achieving Congress's goals, and neither is served by penalizing Anadarko.  A court cannot rationally *punish* an innocent party, nor can it rationally *deter* conduct that violated no law or standard of care, and did not cause the spill.  The basic unfairness of the Government's claim is self-evident.  As a non-operating investor, Anadarko assumed some risk that it might lose its investment, and that it might have to pay OPA damages in the event of a spill.  Both have occurred.  But Anadarko could not have assumed that it would be *punished for someone else's conduct*.  If punishment and deterrence are sought, there are others to be targeted.

Section 311(b)(8)'s factors are meant to guide courts in tailoring penalties to achieve Congress's purposes.  Every factor, save one, is neutral or weighs against penalizing Anadarko. Anadarko earned no economic benefit from the violation; contributed to the mitigation efforts; paid billions in damages; and has an admirable record of compliance for its own operations in the

---

[1]     Anadarko has petitioned the Supreme Court to review the CWA liability ruling.  *See* Petition for Certiorari, *Anadarko Petroleum Corporation v. United States* (S. Ct. #14-1167).

Gulf, where it has a significant presence.  Contrary to the Government's view, the seriousness of a spill in and of itself does not lessen the Court's duty to ensure that penalties are rationally calibrated to punish and deter oil spills.   Rather, it highlights the anomaly of penalizing Anadarko.  Even where, as here, a spill is extremely serious, there is still no reason to *punish* an innocent party or to *deter* conduct by someone who did not cause the spill.

The unprecedented nature of the Government's claim also means that penalizing Anadarko will change industry expectations, and could have negative consequences for safety on offshore facilities, and for investment in the Gulf of Mexico.  That is not what Congress intended for Section 311, and is yet another reason to decline to penalize Anadarko.  With these principles in mind, it also is important to clarify at the outset what Anadarko is *not* arguing:

- **Anadarko is *not* arguing that fault or negligence is required for a defendant *to be subject* to penalties under Section 311(b)(7).**  This Court and the Fifth Circuit have held that Anadarko is *subject* to penalties as an owner of the Macondo Well.  Congress left it for the Court to decide, on a defendant-by-defendant basis, whether and to what extent a penalty should be imposed.

- **Anadarko is *not* arguing that Section 311 penalties can *never* be imposed in the absence of fault.**  A defendant's "degree of culpability" is only one of the eight penalty factors, and there may be times when it is not conclusive.  This is not one of those times.  While courts have assessed penalties against faultless defendants under the pre-OPA version of Section 311(b), the penalties were small (less than $5,000), and served remedial purposes superseded by OPA in 1990.  The pre-OPA cases do not require, or support, penalizing Anadarko.

- **Anadarko is *not* arguing that Section 311 penalties can *never* be imposed on OPA responsible parties.**  Anadarko paid $4 billion to BP to satisfy its OPA liability, and such liability is a significant deterrent.  Penalizing Anadarko on top of its damages liability would serve no purpose.  The same is not true for all responsible parties.  Penalties can also serve to punish culpable conduct, or to negate economic benefit.  Neither condition applies to Anadarko.

As shown below, the law and the evidence point in the same direction.  Anadarko has done nothing wrong for the Court to punish or deter.  Penalizing Anadarko in any substantial amount would be contrary to Congress's intent, unwarranted, and profoundly unfair.

## ARGUMENT

I. **THE TEXT, STRUCTURE, PURPOSE, AND HISTORY OF SECTION 311 CLARIFY THE COURT'S TASK AND GUIDE ITS DISCRETION**

### A. The Court Can Impose A Nominal or Zero-Dollar Penalty On Anadarko

The Government argues that Section 311(b)(7) "mandates" imposing substantial civil penalties on every liable defendant, in every case. Rec. Doc. 13896 at 2, n. 3. That argument distorts the text and structure of Section 311(b). In Section 311(b)(7), Congress identified the entities it wanted "subject to" civil penalties after a discharge. In Section 311(b)(8), Congress left it to the courts to sort out whether any or all of them should pay a penalty and, if so, how much. Like other CWA penalty provisions, Section 311(b) preserves a court's "broad discretion to set a penalty commensurate with the defendant's culpability" including "a civil penalty of only a nominal amount." *Leslie Salt Co. v. U.S.*, 55 F.3d 1388, 1397 (9th Cir. 1995).

Two textual features refute the Government's reading of Section 311(b)(7): the phrases "shall be *subject to* a civil penalty;" and "in an amount *up to*." The first phrase means what it says. It authorizes courts to consider penalizing a defendant but does not mandate more than a nominal penalty in every case. That is how courts interpret the phrase in other penalty statutes. *See Sierra Club v. City of Colorado Springs,* No. 05–CV–01994–WDM–BNB 2009 WL 2588696, at *12 (D. Colo. Aug. 20, 2009) (considering "shall be subject to" language of Section 309 and stating "[m]y plain reading of the statute is that a civil penalty is authorized but not mandated"); *S.E.C. v. Rosenthal,* 650 F.3d 156 (2d Cir. 2011) (holding that a person who is "subject to" a penalty under the Securities Exchange Act can be assessed a $0.00 penalty); *C.f., U.S. v. Egan Marine Corp*., No. 08 C 3160, 2011 WL 8144393 at *5–6 (N.D. Ill. Oct. 13, 2011), (adopting the reasoning of *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995)).

Had Congress wanted mandatory penalties over $0.00 or a nominal amount, as the Government believes, it would have written that a defendant "shall be assessed a civil penalty." Indeed, that is exactly what Section 311 *used to say* before Congress overhauled the section as part of the passage of OPA in 1990. *See* Pub. L. No. 95-217, 91 Stat. 1566 (1977); *see also U.S. v. Texas Pipe Line Co.*, 528 F. Supp. 728, 731 n. 3 (D. Okla. 1978) (quoting the then-extant version of Section 311(b)). Relying on the old language, some courts held that a penalty was "absolute" under the old Section 311(b). *U.S. v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir. 1978); *U.S. v. Marathon Pipe Line Co.*, 589 F.2d 1305 (7th Cir. 1978). Since Congress changed that critical language in 1990 (and fundamentally changed the purpose of Section 311(b) penalties, as explained below), those cases do not support the Government's position.

The second phrase means that the only thing a defendant in a Section 311(b) case "shall be subject to" is a penalty "in an amount up to" either $25,000 per day or $1,000 per barrel. Congress set a ceiling but not a floor and empowered courts to select an appropriate penalty below the maximum. Confronting similar penalty statutes with no mandatory minimum, courts read the phrase "in an amount up to" as implying no minimum threshold. *See Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1304 (5th Cir. 2009) (holding that civil penalty in an amount "not more than $500" per violation provides courts discretion to determine that a "fraction of a penny per [violation] is a proper penalty"); *see also Am. Ins. Co. v. U.S.*, 62 Fed. Cl. 151, 157 n.7 (2004) ("[T]he statement of a maximum does not imply the existence of a minimum.").

Both textual features were also present in CWA Section 309 when the Supreme Court addressed that penalty provision in *Tull v. United States*, 481 U.S. 412, 414 (1987). The Court understood that a penalty authorized in such words is not mandatory and absolute. Instead, by those words trial courts receive broad discretion to "determine the amount of penalty, *if any.*" *Id.*

4

at 427. (emphasis added).  Accordingly, on consideration of the facts and circumstances of this particular case, this Court can and should decide that penalizing Anadarko would be inappropriate, just as many other courts have found in similar CWA penalty cases.[2]

**B.    Any Penalty Must Be Tailored To Achieve The Purposes Of Section 311(b)(7) To Punish And Deter Oil Spills**

Every "sanction must be rationally related to the offense."  *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 177 (5th Cir. 2000) (holding that a $2.375 million penalty was "capricious and indefensible" when no harm resulted from defendant's conduct); *see Commodity Futures Trading Com'n v. Levy*, 541 F.3d 1102 (11th Cir. 2008) (the "rationally related standard adequately accounts for the broad discretion district courts typically exercise in calculating a civil monetary penalty.").  Here, the objectives of Section 311(b)(7) are to punish conduct that caused an oil spill and to prevent future oil spills by deterring similar conduct.  *See* Rec. Doc. 5446 at 20; *see also Tull*, 481 U.S. at 422 (holding that the purposes of Section 309 penalties are punishment and deterrence and analogous to punitive damages).  Any penalty this Court assesses should be tailored to fulfill those purposes, and no more.  *See Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 805 (5th Cir. 1983) (holding that penalty "should not exceed the level necessary properly to punish and deter").

---

[2]    *E.g., U.S. v. Lambert,* 589 F. Supp. 366, 375 (S.D. Fla. 1984) (concluding that it would "be inappropriate to impose a civil penalty" on co-owner of property where evidence did not support finding that co-owner "actively directed or caused the illegal" discharge); *U.S. v. General Motors Corp.*, 403 F. Supp. 1151, 1165 (D. Conn. 1975) (holding that it would be abuse of discretion "to impose more than a nominal penalty" where the defendant's "culpability was zero."); *U.S. v. Bay-Houston Towing Co., Inc.*, 197 F. Supp. 2d 788, 826 (E.D. Mich. 2002) ("[C]onsideration of the statutory factors as a whole supports a finding that no penalty is warranted in this case."); *Resurrection Bay Conservation Alliance v. City of Seward, Alaska*, No. 3:06–CV–0224–RRB, 2008 WL 508499 (D. Ala. 2008) ("After considering these factors in the context of this case, the Court concludes that civil penalties are not appropriate.");  *U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC*., 257 F. Supp. 2d 407 (D.Me. 2003) ("The Court has carefully considered each of these factors in reaching the decision that, on all of the facts of these cases, any award of statutory damages should be *nominal in amount relative to Defendants' maximum exposure* to a damage award under the statute.) (emphasis added).

### 1.     There is no rational reason to punish Anadarko.

Anadarko was not negligent in connection with the spill and bears no fault for the events that led to it.  FOF ¶¶ 24–28.  Those facts not only relate to Section 311(b)(8)'s "degree of culpability" factor.  They also demonstrate that imposing a penalty in order to *punish* Anadarko would be impermissibly arbitrary.

Faultless, non-negligent conduct like Anadarko's "is reasonable conduct," *U.S. v. Atlantic Richfield Co*., 429 F. Supp. 830, 836 (E.D. Pa. 1977), and the Government has no legitimate interest in penalizing it.  For "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes,* 434 U.S. 357, 363 (1978).  Section 311(b)'s imposition of a form of strict liability does not change that rule, for "the law abhors an injustice . . . even under a rule of strict liability." *Southern Pacific Transp. Co. v. U.S*., 13 Cl. Ct. 402, 409 (Cl. Ct. 1987).

The Government's power to penalize non-culpable defendants like Anadarko is thus constrained by the Due Process Clause and by general notions of fairness and equity.  *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003) (Due Process prohibits "grossly excessive or arbitrary punishments"); *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919) (statutory civil penalty transcends Due Process if "wholly disproportioned to the offense and obviously unreasonable").  Accordingly, penalties may be assessed against faultless defendants only in tightly circumscribed situations—where the penalty "seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, [and] where conviction does not gravely besmirch. . . ." *Holdridge v. U.S.*, 282 F.2d 302, 310 (8th Cir. 1960) (Blackmun, J.); *accord Morissette v. U.S.*, 342 U.S. 246, 258–60 (1952) (holding that penalty assessed without regard to fault is constitutional only if "relatively small, and conviction

does no grave damage to an offender's reputation"); *U.S. v. Macia*, 740 F.3d 96, 105 (2d Cir. 2014) ("The Due Process Clause admits only a narrow category of strict liability [penalties], generally limited to regulatory measures where penalties are relatively small.").

Those bedrock principles applicable to all penal statutes are fully consistent with Section 311(b).  When courts have assessed Section 311(b) penalties against faultless defendants like Anadarko, they did so only under the old pre-OPA version of the law.  Two unique aspects of that version made the assessment of penalties against non-negligent defendants rational.  First, the maximum civil penalty was small and capped at $5,000.  *See, e.g.*, *U.S. v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir. 1978) ($350 penalty assessed against faultless defendant); *U.S. v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir. 1981) ($1,000 penalty assessed against faultless defendant).

Second, that penalty served primarily a remedial, regulatory purpose because the small penalties were collected for a revolving fund that the Government used to clean up oil spills and to fund Section 311's administration.  *See Tex-Tow*, 589 F.2d at 1312–15; *see also U.S. v. W. B. Enters., Inc.*, 378 F. Supp. 420, 422–23 (S.D.N.Y. 1974); *U.S. v. Eureka Pipeline Co.*, 401 F. Supp. 934, 940 (D.W.Va. 1975); *Atlantic Richfield Co.*, 429 F. Supp. at 840 (rejecting Due Process challenge to penalty imposed on faultless defendant because "there is a rational nexus between the behavior being penalized and the purpose of the revolving fund.").[3]  Even so, courts that upheld such small remedial penalties under the old Section 311(b)(6) pointed out "the basic unfairness" of penalizing faultless defendants.  *U.S. v. Marathon Pipe Line Co.*, 589 F.2d 1305, 1310 (7th Cir. 1978) (Wood, J., concurring); *id.* (Bauer, J., concurring) ("To punish a business

---

[3]      *Accord U.S. v. Marathon Pipe Line Co.,* 589 F.2d 1305 (7th Cir. 1978) (holding civil penalty serves remedial purpose because under Section 1321(k) "the proceeds of civil penalty collections are to be deposited in a revolving fund"); *U.S. v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir. 1979) (noting that "assessments are deposited in a revolving fund to pay the costs of administering the Act").

engaged in enterprises essential to our national well-being for an unfortunate accident when the business is faultless, seems to be a self-defeating exercise of power.").

The current Section 311(b) lacks both of those restrictive features that kept penalties from becoming arbitrary.  First, civil penalties now are theoretically *limitless*.  The more than $1 billion penalty the Government wants from Anadarko is *one million times greater* than the largest penalty the Fifth Circuit ever approved against a faultless defendant under the old statute ($1,000), *Coastal States,* 643 F.2d at 1128, and *hundreds of thousands of times greater* than the largest Section 311(b) penalty any court has ever affirmed against a non-negligent defendant ($3,500).  *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111, 115 (2d Cir. 1995).

Second, as the Government has successfully argued, Section 311(b) penalties are no longer "remedial" or "regulatory."   Rec. Doc. 4840 at 6 ("Transocean's contention that CWA civil penalties are remedial rather than punitive is misplaced.").  Under the old Section 311(b), no other federal law required private companies to bear the full costs of cleaning up oil spills in the navigable waters, so Section 311's revolving fund defrayed clean-up costs otherwise borne by taxpayers.  That argument does not work anymore.  Section 311's "revolving fund" was repealed in 1990.  *See* 33 U.S.C. § 1321(k), *repealed by* Pub. L. 101-380, Title I, § 2002(b)(2), 104 Stat. 507 (1990).   In its place, Congress passed the Oil Pollution Act ("OPA")—"a comprehensive federal scheme for the recovery of oil spill cleanup costs and the compensation of those injured by such spills." *Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001).  The principle that a "polluter pays" for damages is now embodied in OPA, not Section 311.  The only remaining purposes for Section 311(b) civil penalties are punishment and deterrence.  *See* 136 Cong. Rec. S11,536-01 (1990) (Conf. Rep.) (statement of Sen. Lieberman explaining that enhanced penalties under 1990 amendment should "punish the violator and deter

and prevent future violations").   Consequently, since the 1990 amendment every court—including this Court—has recognized that Section 311(b) penalties are punitive and has rejected arguments that they are remedial.  Rec. Doc. 5446, at 23 (rejecting argument "that CWA civil penalties are primarily remedial in nature"); *see also True v. U.S.,* 894 F.2d 1197, 1206 (10th Cir. 1990) ("The penalty in section 311(b)(6) consequently must serve as an additional sanction to deter and punish, not to compensate or remedy.").

Since penalizing faultless defendants under Section 311(b) can no longer be justified by the relatively small penalties and remedial purposes that prevailed before OPA was enacted in 1990, the Government's case against Anadarko is out of step with the prior precedents.  While Anadarko's non-culpability may not dispose of the penalty question entirely under the Section 311(b)(8) factors, it should meaningfully limit the range of Anadarko's penalty exposure.

### 2.    Penalizing Anadarko would not deter oil spills.

Besides punishment, the other purpose for Section 311(b) penalties is to deter future oil spills.  The evidence confirms what common sense suggests—since Anadarko is not responsible for causing the oil spill, penalizing Anadarko will not effectively deter future oil spills.  Dr. David Sunding considered the three main economic theories of deterrence (optimal, absolute, and efficient deterrence) and concluded that none counsels in favor of penalizing Anadarko. FOF ¶¶ 148–70.  In fact, they all counsel against.

Optimal Deterrence.  Whenever a person must pay for the consequences of his actions, he internalizes the costs of those actions, weighs them against the benefits, and is incentivized to take precautions.   FOF ¶¶ 157–62.   Congress anticipated that, in most cases, OPA would accomplish optimal deterrence of oil spills by itself, for Congress knew that "the financial burden of a spill can deter negligence."   S. Rep. No. 101-94 (1990), *reprinted in* 1990

U.S.C.C.A.N. 722.  Consequently, where OPA exposes a "responsible party" to liability, civil penalties rarely are needed to achieve optimal deterrence.  FOF ¶¶ 161–62.

That is exactly Anadarko's situation here:  Anadarko is a "responsible party" under OPA and paid a massive $4 billion in OPA damages.  FOF ¶¶ 44, 162.  The deterrent effect of that payment is not reduced by the fact that Anadarko made the payment to BP (and required that it be used to pay for damages caused by the spill), rather than directly to the victims.  FOF ¶ 181.  OPA does not permit a party like Anadarko to pay OPA claimants directly.  *See* 33 U.S.C. § 2713(a).  As this Court has explained, where there are multiple OPA responsible parties for a single spill, OPA "claims must be presented to the party that has been formally designated [by the Coast Guard] as the Responsible Party and established a claims procedure . . . i.e., BP."  Rec. Doc. 4845 at 13.  Under that system, "[c]laimants present their claims to the [designated] Responsible Party, who pays the claims and is then allowed to seek contribution from other allegedly liable parties."  Rec. Doc. 3830 at 21 (citing 33 U.S.C. §§ 2709–13).  Just as Congress intended, BP set up a claims procedure, paid claimants, and sought contribution from Anadarko, leading to Anadarko's $4 billion payment.  FOF ¶¶ 39–45.  In economic terms, Anadarko and the other OPA responsible parties, taken together, internalized the costs of the spill.  Optimal deterrence, therefore, has been achieved without a civil penalty.

Absolute Deterrence.  Optimal deterrence does not remove every incentive for spills because some spills cause little or no compensable harm but their benefits exceed their costs.  To deter *all* spills, a penalty can be imposed to negate *any* benefit a defendant may have realized.  FOF ¶ 164.  As discussed below, the Government has no evidence that Anadarko obtained *any* economic benefit from the spill, and even if it had, it surely would pale when compared to

Anadarko's OPA liability.  FOF ¶ 166.  In this case, then, Anadarko's OPA liability achieves *both* optimal deterrence *and* absolute deterrence.

<u>Efficient Deterrence</u>.  For any level of deterrence (optimal, absolute, or something else entirely), there are efficient and inefficient ways to achieve it.  Achieving the maximum level of deterrence for the minimum cost is sound policy and, in fact, required as a matter of law.  *See Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 805 (5th Cir. 1983) (a penalty "should not exceed the level necessary properly to punish and deter").  Penalties have the maximum deterrent effect when imposed on parties that directly control operational and cost-allocation decisions; penalties are inefficient when placed on others.  FOF ¶ 170; *see U.S. v. Lambert*, 589 F. Supp. 366, 374 (S.D. Fla. 1984) (holding that it would "be inappropriate" to penalize co-owner of property where co-owner did not "actively direct[] or cause[]" discharge).

Since Anadarko engaged in no conduct that caused or contributed to the oil spill, Rec. Doc. 3830 at 28, and since Anadarko had no control over operations, FOF ¶¶ 11–17, any penalty imposed on Anadarko to deter future violations would be misdirected and highly inefficient. Stated differently, imposing a deterrent penalty on an investor would deter only investment. FOF ¶¶ 174–76.  That is not what Congress intended for Section 311(b) penalties,[4] and the Government has no legitimate interest in that result.  *See Resurrection Bay Conserv. Alliance v. City of Seward, Alaska*, No. 3:06–CV–0224–RRB, 2008 WL 508499, at \*6 (D. Alaska 2008) (the CWA is "not intended to prohibit responsible use of the resource or to make such use cost prohibitive").

---

[4]     *C.f.* H.R. Conf. Rep. 101-653 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 833 ("Civil penalties should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills.").

## II.    THE PENALTY FACTORS WEIGH AGAINST ANY PENALTY

### A.    Any Penalty Analysis Should Begin With Economic Benefit

In *U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.* ("*CITGO*") the Fifth Circuit held that "economic benefit serves as the starting point for calculating the civil penalty and is adjusted based on the remaining statutory factors. . . ." 723 F.3d 547, 551 (5th Cir. 2013). "[T]he economic benefit factor creates a nearly indispensable reference point," so "a district court generally must make a 'reasonable approximation' of economic benefit when calculating a penalty." *Id; see Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc*., 73 F.3d 546, 574 (5th Cir. 1996) (affirming penalty equal to economic benefit, despite violator's negligence). The Fifth Circuit made clear in *CITGO* that it does not require courts to use a "top-down," "bottom-up," or any other particular penalty calculation method.  723 F.3d at 552.  However, "[w]hether the economic benefit is a floor, adjusted by a court's analysis of the other factors, or helps determine how much to lower the ceiling established in other ways, it should not be ignored." *Id.* at 553.  And in all events, it is reversible error to treat "economic benefit as a non-factor," even where the amount is small or difficult to ascertain.  *Id.*

The Government does not heed *CITGO*.  Instead, it proposes using the statutory maximum penalty as the "starting point for calculating the civil penalty," and scorns "economic benefit."  Rec. Doc. 13901 at 2; Rec. Doc. 13896 at 1; 723 F.3d at 551.  Resisting *CITGO*, the Government argues that "economic benefit is not a controlling factor" here because Anadarko's economic benefit is too small (or nonexistent).  Rec. Doc. 13896 at 2.  That is no reason to deviate from *CITGO*.  The controlling factor does not cease to be controlling simply because it refutes the Government's position.  On the contrary, "the fact that the defendant did not benefit financially from the violation suggests that a severe penalty is not appropriate. . . ."  *U.S. v. Scruggs,* Civ. A. No. G-06-776, 2009 WL 500608, at *4 (S.D. Tex. Feb. 26, 2009).

The Government has not met its burden to prove that Anadarko obtained any economic benefit. *See Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 80 (3d Cir. 1990) (holding that the plaintiff in a CWA case bears the burden to prove economic benefit).   It put on no evidence at trial about any possible benefit.   The Government conceded that, for BP, any potential savings was "background noise," but the Government has not even tried to show that those savings were passed on *to Anadarko*.   Tr. of Status Conference Re: Penalty Phase on March 21, 2014 at 26-27.   Out of fidelity to *CITGO*, and solely for purposes of this proceeding, Anadarko has tried to quantify BP's savings by scouring the Phase I record and roughly estimating the costs that BP did not incur by failing to take steps necessary to prevent the prohibited discharge.   *See Sierra Club, Lone Star Chapter*, 73 F.3d at 574.   Because cost savings was not a focus of the Phase I trial, this approach is necessarily inexact.   Nevertheless, assuming as the Government does that Anadarko would have received a 25% share of BP's savings, any economic benefit Anadarko obtained would not have exceeded $4 million.   FOF ¶¶ 52–79; Rec. Doc. 13896 at 2.

### B.      Anadarko's Lack of Culpability

As the Government has argued, the "degree of culpability" factor "serve[s] to protect . . . relatively blameless violators from a penalty that is disproportionate to their . . . culpability." Rec. Doc. 4840 at 7.   Anadarko has no culpability for the violation because it was not negligent, had no control, and was not responsible for operations on the rig.   FOF ¶¶ 12–17.   That has broad implications for the other factors.   For purposes of the degree of culpability factor, it is enough to note that courts regularly assess zero or nominal penalties against defendants with no culpability for a violation, even if other factors might weigh in favor of a penalty.   *See* note 2, *supra* (collecting cases).

### C.      Seriousness of the Violation

The *Deepwater Horizon* oil spill was extremely "serious" by any measure, but that alone does not justify penalizing Anadarko.  *See U.S. v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 859 (S.D. Miss. 1998) (listing measures of seriousness).[5]  The Supreme Court holds that the "seriousness of the violation factor" under Section 309, "which is similar in relevant aspects to Section 311," Rec. Doc. 5446 at 20, fulfills Congress's purpose of *punishment*.  *Tull*, 481 U.S. at 422–23 (holding that "a court can require *retribution for wrongful conduct* based on the seriousness of the violations") (emphasis added).  Anadarko cannot rationally be punished, no matter how serious the spill.  Insofar as the "seriousness" factor also serves deterrence, then it only rationally applies in relation to operating conduct that could prevent future spills—not to investment.  Nor would penalizing Anadarko do anything to remediate the seriousness of the spill's harm.  OPA accomplishes that, and Anadarko has paid $4 billion toward the effort.  FOF ¶¶ 44, 158, 162.

### D.      The Nature, Extent and Degree of Success of any Efforts by Anadarko to Minimize or Mitigate the Effects of the Discharge

Anadarko's role as a non-operating investor meant that BP, as designated operator, was responsible for mitigation.  *See* Rec. Doc. 14021, at ¶ 213.  Within the Incident Command System required by federal law, Anadarko's ability to actively contribute to the mitigation efforts was limited to following the directions of the Government and BP.[6]  FOF ¶¶ 33, 86–87; Rec. Doc. 14021, at ¶¶ 48–67.  Within that framework, Anadarko complied fully with all laws and regulations governing mitigation and response to an oil spill by immediately reacting to news of the blowout and sending response vessels, FOF ¶ 35; contacting BP and the Department of

---

[5]      Anadarko adopts BP's Proposed Findings of Fact as to the "seriousness" factor.

[6]      Anadarko adopts BP's proposed Findings of Fact as to the "mitigation" factor.

Interior to offer full assistance, FOF ¶¶ 31–32; providing assistance when asked, FOF ¶¶ 34–38; and paying $4 billion to compensate the spill's victims, FOF ¶ 44.  Anadarko has also voluntarily contributed in other important ways: contributing over $20 million for use by organizations assisting those affected by the spill, and contributing $1.1 million to the *Deepwater Horizon* Memorial Fund to help the families of those who perished in the Incident.  FOF ¶¶ 47–48.

Neither of the Government's two points on mitigation undermines the conclusion that Anadarko did exactly what it was supposed to do.  *First*, the Government downplays Anadarko's mitigation efforts because they were legally required.  If only voluntary mitigation counted, the mitigation factor would be meaningless, since nearly every defendant in a Section 311 case has a duty to mitigate.  33 U.S.C. § 1321(b)(7)(B).  Besides, Congress intended penalties to, in part, deter responsible parties from shirking their mitigation obligations.[7]  That purpose would be confounded if the Court discounted Anadarko's mitigation efforts as the Government urges.

*Second*, the Government has tried to portray Anadarko as having shirked its mitigation duties because BP, not Anadarko, paid the Coast Guard's invoices.  That depiction is imprecise. As response and mitigation efforts continued, the Coast Guard submitted invoices to <u>*all*</u> OPA responsible parties (BP, Anadarko, Transocean, and MOEX) and to an insurer (Lloyd's).  FOF ¶ 41.  By contract, BP agreed to pay the invoices in the first instance, and that is exactly what BP did.  *Id.*  The Government cannot now complain about how private parties arranged to pay the Coast Guard's bills.  *Id.*

---

[7]     *See* 136 Cong. Rec. H6933-02 (1990) (Conf. Rep.) (remarks of Rep. Stangeland) ("Particular weight should be given to the degree of culpability, the economic impact of the penalty on the violator, *efforts taken to mitigate the spill*, and other matters as justice and fairness require.") (emphasis added).

### E.        Anadarko's Sparse History of Prior Violations

Anadarko has a remarkable compliance record for its operations in the Gulf of Mexico that shows no pattern of disregard for the CWA, especially considering the extent of Anadarko's activity in the region, and compared with other defendants in reported CWA penalty cases.[8] FOF ¶¶ 80–82.  From 2004 to 2010, in connection with its Gulf of Mexico operations Anadarko paid a mere $12,834 in civil penalties for minor alleged permit violations and eight small accidental releases.   FOF ¶ 81.   The penalties were typically $500 or less and involved discharges of roughly 2 gallons or fewer.[9]   Anadarko's compliance history certainly does not warrant any penalty, especially considering that the Supreme Court listed the "prior violations" factor as fulfilling the purpose of *punishment*.  *See Tull*, 481 U.S. at 423 ("A court can require *retribution for wrongful conduct* based on . . . the number of prior violations. . . .").

### F.        Other Matters As Justice May Require

The oil and gas industry is watching this case.   As many witnesses testified, the Government's effort to impose a "massive" penalty[10] on a non-operating investor like Anadarko is unprecedented.    Sunding 2287:13–16; Arnold 2233:7–22.    Penalizing Anadarko would influence future actions of other market participants in undesirable ways.

---

[8]        *See, e.g.,* U.S. *v. Allegheny Ludlum Corp*., 366 F.3d 164, 178–79, 179 n. 6 (3d Cir. 2004) (1,122 days of violations); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co*., 73 F.3d 546, 573–74 (5th Cir. 1996) (809 days of unpermitted discharge); *Sierra Club v. El Paso Gold Mines, Inc*., No. 01-2163, 2003 WL 25265873 at *6 (D. Colo. Feb. 10, 2003) (2,284 days of violations); *U.S. v. Mun. Authority of Union Tp*., 929 F. Supp. 800, 807 (M.D. Pa. 1996) (2,360 violations), *aff'd* 150 F.3d 259 (3d Cir. 1998); *Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1397 (D. Haw. 1993) (9,870 violations); *Atl. States Legal Foundation v. Universal Tool Stamping, Inc*., 786 F. Supp. 743, 746–47 (N.D. Ind. 1992) (1,977 permit violations from May 1984 to November 1988).

[9]        Anadarko contested a larger discharge penalty referenced in the stipulation, but that penalty is not relevant here.  It was associated with an onshore facility, not an offshore operation in the Gulf of Mexico, and Anadarko did not admit liability.  FOF ¶ 82; Rec. Doc. 13808.

[10]        Penalty Phase Trial Tr., Jan. 1, 2015, AM Sess. at 28:18–21 (U.S. opening statement).

Potential Impact to Safety of Offshore Operations.   Kenneth Arnold, an authority on offshore safety, explained how the Government's bid to make non-operators "active participants" (a term coined by the Government's expert, Gardner Walkup) at every stage of every offshore project will make offshore operations *less* safe.   FOF ¶¶ 119–30.   Offshore safety requires decisions to be made within a culture of safety and by the ultimate work authority.   *Id.* Penalizing a non-operating investor could compel those investors to interfere with an operator's authority, creating confusion, diffusing that critical authority, and reducing safety overall.   FOF ¶ 127.   Dr. David Sunding reached a complementary conclusion. FOF ¶ 128.   In order to maintain profits, and because of moral hazard, penalizing non-operators would incentivize operators to reduce their investment in safety precautions, despite their superior position and control over potentially harmful operations.   *Id.*

Potential Impact to Investment in Deepwater Exploration.   Penalizing Anadarko could adversely impact investment in deepwater exploration and production, to the detriment of the Gulf States' economies.   FOF ¶¶ 172–79.   Dr. Sunding's empirical analysis showed that non-operating investors have already left deepwater operations following the filing of the Government's claim against Anadarko.   These negative impacts would only become more pronounced in the wake of an actual penalty on Anadarko.

Other Fairness Considerations.   Courts may reduce a penalty, or award none at all, on the ground that a party's liability for the penalty was legally unclear.   "[U]ncertainty in meaning [of a penalty statute] is a mitigating factor that [has] to be taken into account in assessing the civil penalty."   *Rollins Environmental Services (NJ) Inc. v. EPA*, 937 F.2d 649, 654 (D.C. Cir. 1991); *see Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976).   Here, reasonable minds have disagreed over the legal basis for subjecting

Anadarko to penalties.  *In re: Deepwater Horizon*, 775 F.3d 741, 742 (5th Cir. 2015) (Clement, J., dissenting, joined by Jolly, Jones, Owen, Elrod and Southwick, JJ.) (stating that the panel opinion affirming Anadarko's CWA liability is "inconsistent with the text of the CWA" and emphasizing that "ambiguities in civil penalty statutes should be resolved in favor of the defendant").  The same principles of lenity and fairness that apply to the interpretation of penalty statutes should also be taken into account in this phase to preclude penalizing Anadarko.  *See Cramer v. Wise*, 501 F.2d 959, 962 (5th Cir. 1974) ("[D]oubts regarding the proper extent of sanctions must be resolved in favor of the individual, not the Government.").

### G.      Any Other Penalty For The Same Incident

This Court already has punished, or will punish, those liable parties at fault for the discharge.  FOF ¶¶ 83–87.  As a result, Section 311(b)'s purposes of punishment and deterrence will not be advanced by penalizing Anadarko.

### H.      Economic Impact of the Penalty on Anadarko

Any penalty would have an impact on Anadarko, its employees, and its shareholders.  A penalty would divert money that Anadarko could use for operations or reinvestment in exploration and development.  *See* FOF ¶ 94.  The current volatility of oil prices makes it even harder to gauge the true economic impact of a penalty, and the Court should take that uncertainty into account.  *See* FOF ¶¶ 105–14.

Despite those impacts, Anadarko admits it could pay the maximum penalty (if required).  FOF ¶ 88.  Of course, that does not justify penalizing Anadarko.  The "economic impact" factor does not allow courts to impose penalties based solely on a defendant's balance sheet.  *See Mathias v. Accor Economy Lodging, Inc*., 347 F.3d 672, 676 (7th Cir. 2003) ("a person is punished for what he does, not for who he is, even if the who is a huge corporation") (Posner, J.).

To do that would "be discriminatory and would violate the rule of law . . . by making punishment depend on status rather than conduct." *Id.* at 677.

## III. ANY PENALTY IN THIS CASE MUST BE LIMITED BY ANADARKO'S UNUSUAL CIRCUMSTANCES

The Government's rationale for imposing a penalty on Anadarko in excess of $1 billion is based on the penalty it negotiated with Transocean. Rec. Doc. 13896. That simple comparison flouts the principle, which this Court and the Government have both recognized, that penalties must be "tailored to each individual violator." Rec. Doc. 4840 at 7. "An amount appropriate for one defendant might be ineffective (or grossly excessive) for another." Rec. Doc. 5446 at 21.

Anadarko is nothing like Transocean, and a penalty based on Transocean's would be grossly excessive. Transocean paid nothing to mitigate the spill, Rec. Doc. 4477-1, yet bears 30% of the fault for it, Rec. Doc. 13355 at ¶ 544. According to the Government, Transocean was *grossly negligent.* Rec. Doc. 8502-1 at 15. By contrast, even though Anadarko bears no fault for the spill, it has paid $4 billion in damages, and lost its investment and 25% ownership interest in the $154 million project. FOF ¶¶ 22, 44. All the Government can muster to justify a Transocean-sized penalty against Anadarko is the fact that Anadarko "co-owned the well and stood to profit from the oil had the well been completed successfully." Rec. Doc. 13896 at 2. This is ordinary economic activity, not blameworthy conduct to be punished or deterred.

Even if the Court used other parties' settlements to calculate Anadarko's penalty, Transocean is a poor reference point. MOEX settled its CWA liability to the Government for $45 million. MOEX also agreed to pay $25 million in other penalties to five Gulf States (plus $20 million in supplemental environmental projects). Rec. Doc. 6436-1. Unlike Transocean, MOEX is at least a non-negligent, non-operating co-owner like Anadarko. But even MOEX's settlement is too high in hindsight. MOEX settled in the face of litigation risks, before this Court

ruled that non-operators had no degree of culpability, and before expert evidence was presented at the Penalty Phase trial.  *See* Rec. Doc. 6436-1 at 18 (conceding that "[e]vidence of MOEX's culpability is mixed").  In other words, the Government's case against Anadarko has gotten only weaker since MOEX settled.  In all events, given that this Court found that a $45 million CWA penalty for a non-negligent, non-operating co-owner of the Macondo Well was "fair, reasonable, and furthers the objectives of the CWA," Rec. Doc. 6698 at 5, it should follow that penalizing Anadarko by any greater amount would *not* be "fair, reasonable," or in furtherance "of the goals of the CWA."  *Id.*

Cases under other penalty provisions of the CWA show that the Government's proposed penalty for Anadarko—more than 33% of the statutory maximum—is astronomically high.  For just one example, in *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 576 (5th Cir. 1996), the Fifth Circuit affirmed a penalty in the amount of the economic benefit, despite finding that the violation was serious, and that the defendant had not demonstrated good faith in attempting to comply with the CWA.  There, the district court imposed, and the Fifth Circuit affirmed, a penalty of *less than one percent (1%) of the statutory maximum.  Id.*

Finally, the statutory maximum need not be defined by the volume of oil discharged. Section 311 also authorizes penalties calculated per day of violation. 33 U.S.C. § 1321(b)(7)(A). Congress did not mandate using one measurement over the other, meaning the Court may calculate penalties using the per day maximum penalty instead.  Using the per day penalty calculation, Anadarko's maximum penalty would be $3,225,000.  COL ¶ 116.

## CONCLUSION

For all the foregoing reasons, and those set forth in Anadarko's Proposed Findings of Fact and Conclusions of Law, the Court should decline to penalize Anadarko in any more than a nominal amount.

Respectfully submitted,

DATED: March 27, 2015

**MORGAN, LEWIS & BOCKIUS LLP**

/s/ *James J. Dragna*
James J. Dragna
jim.dragna@morganlewis.com
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@morganlewis.com
Thomas R. Lotterman
thomas.lotterman@morganlewis.com
David B. Salmons
david.salmons@morganlewis.com
Bryan M. Killian
bryan.killian@morganlewis.com
Randall M. Levine
randall.levine@morganlewis.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

**KUCHLER POLK SCHELL
WEINER & RICHESON, LLC**

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone (504) 592-0691
Facsimile (504) 592-0696

**<ins>CERTIFICATE OF SERVICE</ins>**

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of March, 2015.

/s/ <i>James J. Dragna</i>
_____
James J. Dragna
