**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | * * * | **MDL NO. 2179** <br> **SECTION J** |
| **This Document Relates To: 10-4536** | * * * * * | **Honorable CARL J. BARBIER** <br> **Magistrate Judge SHUSHAN** |

---

# PENALTY PHASE POST-TRIAL BRIEF OF BP EXPLORATION & PRODUCTION INC.

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia "Carrie" Karis, P.C.
Matthew T. Regan, P.C.
Scott W. Fowkes, P.C.
Mark J. Nomellini
A. Katrine Jakola
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

R. Keith Jarrett (Bar #16984)
Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Robert C. "Mike" Brock
Kimberly O. Branscome
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Joel M. Gross
ARNOLD & PORTER LLP
555 12th St., N.W.
Washington, DC 20004
Telephone: (202) 942-5000

*Attorneys for BP Exploration & Production Inc.*

**TABLE OF CONTENTS**

**INTRODUCTION....................................................................................................... 1**

**ARGUMENT............................................................................................................ 3**

**I. BPXP MOUNTED AN UNPRECEDENTED RESPONSE THAT EFFECTIVELY MITIGATED THE EFFECTS OF THE *DEEPWATER HORIZON* SPILL.......................................................................................... 3**

A. BPXP Rapidly Mobilized the Resources Needed to Support the Response........... 4

B. BPXP, Working Within Unified Command, Used Every Available Response Technique to Minimize the Effects of the Spill..................................... 6

C. Response Efforts Successfully Prevented Millions of Barrels of Oil from Reaching the Gulf Shoreline.................................................................... 8

D. The *Deepwater Horizon* Response Produced an Exceptional Safety Record.......................................................................................... 9

E. BPXP Actively Engaged with the Community.................................................... 10

F. BPXP Mitigated and Minimized Economic Effects of the Spill. ......................... 10

**II. THE SPILL'S EFFECTS WERE SIGNIFICANTLY LESS SERIOUS THAN INITIALLY FEARED.......................................................................................... 12**

A. Actual and Potential Harm to Aquatic Life in the Gulf Was Limited. ................. 13

B. Actual and Potential Harm to Birds, Wildlife and Coral Was Also Limited........ 16

C. The Impact to Gulf Beaches and Shoreline Habitats was Limited and Effectively Addressed.......................................................................... 18

D. There Is No Evidence of Significant Adverse Human Health Effects and Future Adverse Health Effects Are Highly Unlikely........................................... 19

E. Economic Effects Were Not Uniform Across the Gulf Coast and, Where Present, Were Followed by Swift Recovery....................................................... 20

**III. BPXP GAINED "MINIMAL," IF ANY, ECONOMIC BENEFIT FROM THE VIOLATION......................................................................................... 21**

**IV. BPXP'S PAYMENT OF $1.25 BILLION IN OTHER PENALTIES WARRANTS A REDUCTION OF THIS PENALTY................................................ 22**

**V. THE SIGNIFICANT NEGATIVE IMPACT OF A CWA PENALTY ON BPXP COUNSELS A PENALTY AT THE LOW END OF THE STATUTORY RANGE. .......... 23**

A. BPXP—And Not Any of Its Affiliated Companies—Is the Violator. .......... 23

B. BPXP's Current Financial Condition Reflects the Significant Negative Economic Impact of the Incident and Renders It Unable to Pay a Penalty Above the Low End of the Statutory Range. .......... 26

C. Additional Affiliate Support for BPXP Is Not Required and Cannot Be Assumed—Particularly In View of the Diminished Equity Value of BPXP. .......... 28

D. The 2013 Standardized Measure of Oil and Gas (SMOG) Analysis Does Not Reliably Measure BPXP's Value. .......... 32

E. The United States' Analysis Is Underpinned by Unrealistic Assumptions About Oil Prices. .......... 33

F. A CWA Penalty Would Have a Significant Negative Impact on BPXP and Would Threaten Its Solvency .......... 34

**VI. THE INVOLVEMENT OF OTHER PARTIES IN THE VIOLATION AND BPXP'S EXTRAORDINARY RESPONSE EFFORTS MERIT A REDUCED PENALTY. .......... 35**

**VII. THE TRIAL RECORD REFLECTS NO RELEVANT PRIOR VIOLATIONS. .......... 36**

**VIII. BPXP'S ROLE IN THE GULF REGION AND ITS TECHNOLOGICAL ADVANCEMENTS SUPPORT A LOW PENALTY. .......... 38**

A. BPXP Occupies an Important Role in the U.S. and Gulf Coast Economies. .......... 38

B. BPXP Funded Research Initiatives and Early Restoration Projects. .......... 39

C. BPXP Has Contributed to and Shared Technological Achievements and Industry-Leading Safety Advancements. .......... 39

**CONCLUSION .......... 40**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
956 F. Supp. 588 (D.S.C. 1997) ........ 21

*In re Britton Constr. Co.*,
8 E.A.D. 261 (EAB 1999) ........ 36

*In re Donald Cutler*,
2002 WL 32002754 (EPA 2002) ........ 36

*In re DWH*,
2012 WL 5960192 (E.D. La. Nov. 28, 2012) ........ 1

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001) ........ 2

*In re Indus. Chems. Corp.*,
2000 WL 1770494 (EPA 2000) ........ 36

*In re Serv. Oil, Inc.*,
2007 WL 3138354, (EPA 2007) ........ 36

*Sierra Club v. MasTec N. Am.*,
2009 WL 426205 (D. Or. Feb. 19, 2009) ........ 21

*United States v. Bedford*,
2009 WL 1491224 (E.D. Va. May 22, 2009) ........ 37

*United States v. Bestfoods*,
524 U.S. 51 (1998) ........ 24

*United States v. CITGO Petroleum Corp.*,
2011 WL 10723934 (W.D. La. 2011) ........ 3, 4, 5

*United States v. CITGO Petroleum Corp.*,
723 F.3d 547 (5th Cir. 2013) ........ 1, 3, 22

*United States v. Cundiff*,
No. 4:01-cv-00006-JHM (W.D. Ky. Dec. 8, 2009) ........ 28

*United States v. Dico, Inc.*,
4 F. Supp. 3d 1047 (S.D. Iowa 2014) ........ 25

*United States v. Egan Marine Corp.*,
2011 WL 8144393 (N.D. Ill. Oct. 13, 2011) ........ 4

*United States v. Gulf Park Water Co.*,
14 F. Supp. 2d 854 (S.D. Miss. 1998) ........................................ 37

*United States v. Mun. Auth. of Union Twp*,
929 F. Supp. 800 (M.D. Pa. 1996), *aff'd* 150 F.3d 259 (3d Cir. 1998) .................. 22, 25, 26, 35

*United States v. Scruggs*,
2009 WL 500608 (S.D. Tex. Feb. 26, 2009) ........................................ 37

**Statutes**

33 U.S.C. § 1319(d) ........................................ 37

33 U.S.C. § 1321(b)(3) ........................................ 22

33 U.S.C. § 1321(b)(8) ........................................ 4, 9, 23

## INTRODUCTION

The trial record confirms that a civil penalty against BP Exploration & Production Inc. (BPXP) at the low end of the statutory range is warranted and would achieve a fundamental objective of the CWA:  to incentivize the most effective response possible should environmental harm occur without encouraging behavior that might lead to such harm.  *See United States v. CITGO Petroleum Corp.*, 723 F.3d 547, 554 (5th Cir. 2013); *In re DWH*, 2012 WL 5960192, at *13 (E.D. La. Nov. 28, 2012).

BPXP acknowledges that the spill was a serious event, and it responded in a serious fashion.  BPXP's active participation in the response and its immediate and sustained deployment of massive resources are precisely the behaviors that a reduced penalty is meant to, and will, incentivize.  From the beginning, BPXP took extraordinary measures to respond to the *Deepwater Horizon* spill and mitigate its effects, including spending upwards of $100 million per day in 2010.  There is no dispute about the quality of BPXP's effort, and there can be little doubt that BPXP's response quickened the pace and enhanced the quality of recovery in the Gulf.

BPXP also proved at trial that the spill's economic and environmental impacts were less than initially anticipated and that the Gulf region has largely recovered.  Many factors contributed to this recovery, including herculean efforts by thousands of response workers, BPXP's initiatives in local communities, and the natural resilience of the Gulf of Mexico.  The United States speculated at trial about "potential" but unrealized environmental, human health, and economic catastrophes that could occur at some indeterminate time.  But the facts—many of which come from the government's own scientists and data—tell a different story.

As the Ninth Circuit recognized in the *Exxon Valdez* litigation, "Because the costs and settlements in this case are so large, a lesser amount is necessary to deter future acts."  *In re*

*Exxon Valdez*, 270 F.3d 1215, 1244 (9th Cir. 2001).  The same is true here.  The $27.5 billion spent as of the third quarter of 2014 ($33.7 billion not including insurance and settlement recoveries), the additional $8.2 billion in provisions and payables booked, and the future contingent liabilities (such as NRD and OPA claims) associated with this spill represent staggering standalone figures and an overwhelming collective punishment and deterrent to BPXP and others.  Adding billions to this total would provide no meaningful incremental deterrent.  Instead, imposing a large CWA penalty on BPXP would have the undesirable effect of incentivizing future operators to preserve funds to be used for future penalty payments rather than use available resources immediately to mobilize the most effective spill response possible, as BPXP did here.

BPXP's massive spending in response to the incident substantially weakened the financial condition of BPXP, a condition further exacerbated by the greater than 50% drop in oil prices since mid-2014.  The liabilities BPXP has incurred to date have exhausted its ability to pay a large CWA civil penalty—a fact that the plain language of the statute requires this Court to consider.  As the United States has recognized, a lower penalty is warranted where a larger penalty would have a "significant impact" on the violator.  Rec. Doc. 12479 at 8–9.  BPXP's equity value as of December 30, 2014 was approximately $5 billion, a value that is sensitive to the decline in oil prices that has occurred since that date.  Even assuming $100/bbl oil in 2015, rather than the $49/bbl prevailing price, a penalty assessed in 2015 in excess of $2.3 billion would exhaust all of BPXP's available resources.  The United States' attempt to bypass this limitation by suggesting that other BP entities will fund or finance any shortfall is both an admission of BPXP's limited financial capacity and an invitation for legal error, as it violates black-letter law that a parent corporation is not liable for the debts of a subsidiary.  In any event,

the United States' "solution" to BPXP's limited resources does not take into account that an investor—whether a related entity or not—would look at the financial strength of BPXP after a penalty was imposed but before it was paid and determine that, especially in the current oil price environment, further investment may not be warranted if the penalty is in the range proposed by the United States.

A limited CWA penalty taking BPXP's financial condition into account, by contrast, would allow BPXP to continue to occupy its important role in the Gulf economy and in the offshore exploration and production community generally. *See United States v. CITGO Petroleum Corp.*, 2011 WL 10723934 (W.D. La. 2011) ("it is only fair to view the role of [the violator] in the community and the state as a whole"), *rev'd and remanded on other grounds*, 723 F.3d 547 (5th Cir. 2013). BPXP's remarkable enhancements to its own drilling operations and those of others in the industry reflect BPXP's understanding of the significance of the incident.

As confirmed by the trial evidence and explained below, imposing a civil penalty on BPXP anywhere near the range suggested by the United States is unnecessary as a deterrent and will serve as a disincentive to BPXP and others. A lower penalty would conform to the eight CWA penalty factors under 33 U.S.C. § 1321(b)(8) and reinforce that, should a serious spill occur in the future, the proactive and cooperative approach taken by BPXP here is the desired behavior.

## ARGUMENT

### I. BPXP MOUNTED AN UNPRECEDENTED RESPONSE THAT EFFECTIVELY MITIGATED THE EFFECTS OF THE *DEEPWATER HORIZON* SPILL.

BPXP, working within Unified Command, mounted an extraordinarily effective response that minimized and mitigated the effects of the *Deepwater Horizon* spill—a fact that militates toward a penalty at the low end of the statutory range. *See generally* FFCL ¶¶ 14–342.

The CWA directs the Court to consider "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge." 33 U.S.C. §1321(b)(8). To that end, "[i]n determining the amount of a civil penalty, particular weight should be given to the rapidity and effectiveness of the response actions by the responsible party." Conf. Rep. on H.R. 1465, H.R. Rep. 101-653, at 153–54 (Aug. 1, 1990). In *CITGO*, the trial court considered the resources that CITGO brought to bear to respond to the spill and the company's "full force effort to minimize the damage from the spill." 2011 WL 10723934. The Court held that a reduced CWA penalty was warranted in part because CITGO's "well executed clean-up effort" mitigated damage and resulted in strong environmental recovery. *Id*. All mitigation efforts are relevant under the CWA. *See id.; United States v. Egan Marine Corp.*, 2011 WL 8144393, at *7 (N.D. Ill. Oct. 13, 2011) (when determining CWA penalty, the fact that a defendant "complied with its legal obligations to aid in the cleanup…cuts in favor of" the responsible party). Neither the statute nor the case law draws a distinction between efforts that are legally required and those that are not.[1]

**A. BPXP Rapidly Mobilized the Resources Needed to Support the Response.**

There is no dispute that BPXP quickly mobilized resources in what became the largest environmental response operation in U.S. history. Immediately following the explosion, BPXP activated its government-approved Oil Spill Response Plan. Tr. 1239 (Paskewich). By 5 p.m. on April 21—less than 24 hours after the explosion and before confirmation that oil was discharging from the well—105 responders working on behalf of BPXP had mobilized to the Gulf. TREX 241529.0017. By noon the following day, that number more than doubled. *Id*. The

[1] Tellingly, the United States cites no authority in support of its novel position that a court should not consider "legally required" mitigation efforts in assessing a CWA penalty.

response efforts involved, over time, more than 100,000 responders, 9,700 vessels, 127 aircraft, and 13.5 million feet of boom.  TREX 241529.0008; D34003.  By comparison, the response in *CITGO* involved 1,500 personnel and 60 miles of boom.  *CITGO*, 2011 WL 10723934.  The *Deepwater Horizon* response was the "largest unified response this country has ever seen." TREX 13514.0011; *see* FFCL ¶¶ 75–83.

BPXP played a critical role in providing resources necessary for the response.  Although "the federal government, the states, and many other organizations participated in the response," "BP provided most of the response personnel."  Tr. 657 (VanHaverbeke).  Approximately 85% of responders were working on behalf of BPXP, and they collectively devoted more than 70 million hours of time.  Tr. 1250–51 (Paskewich).  BPXP called upon resources from across the globe—even going so far as to commission the *Antonov*, the world's largest cargo plane, to transport boom from around the world.  Tr. 1416–18 (Utsler); TREX 9105.0131 (noting BPXP's "large-scale and significant contributions to logistics"); Laferriere Dep. 264 (BPXP "brought the right people in Houma to the fight.  The best people in the world.").

BPXP came "willingly," "with their resources," "committed to obtaining the best response possible," and it placed no limits on what was needed.  Tr. 112–13 (M. Austin); 1391 (Utsler).  BPXP took a "move heaven and earth" approach to the response and made sure that "everybody knew that the company had no limit" on securing resources.   Tr. 1547–49 (Morrison).  In August 2010, Admiral Paul Zukunft, the Commandant of the Coast Guard, stated that BPXP "was committed" and "living up to its responsibility."  TREX 150022.0010.  The Incident Specific Preparedness Review (ISPR) concluded that "BP was very proactive and placed no limits on what was needed to make the response successful."  TREX 9124.0111. Captain Frank Paskewich—who has over 33 years of experience in marine safety, environmental

protection, and oil spill response, and served as FOSC during the Hurricane Katrina response—testified that "BP conducted an extraordinarily effective response.…[T]hey rapidly mobilized the resources and people as needed to meet the demands of this situation."  Tr. 1238–39; 655–56 (VanHaverbeke) (admitting that response would not have been successful without BPXP).

BPXP does not claim sole credit for the response.  Just as the United States' witnesses acknowledged BPXP's critical role, BPXP's witnesses recognized the efforts of the Coast Guard and others.  For example, Mike Utsler testified, "I came away incredibly impressed by the U.S. Coast Guard, the Men and Women in Blue."  Tr. 1394 (Utsler); 1544–47 (Morrison); 1250 (Paskewich).  As every Coast Guard witness testified, BPXP and the Coast Guard worked collaboratively to ensure the best possible response.  FFCL ¶ 223.

### B.    BPXP, Working Within Unified Command, Used Every Available Response Technique to Minimize the Effects of the Spill.

BPXP and others used a broad range of measures, in a "layered" approach, to minimize the effects of the spill on Gulf shorelines.  Tr. 1257–58 (Paskewich); 1399–1403 (Utsler).

**Offshore.**  The Unified Command implemented offshore response measures as a first line of defense, including: (1) high-volume skimming; (2) controlled *in situ* burning; and (3) the application of dispersants.  Tr. 1399–1400 (Utsler).  The offshore skimming resources that BPXP deployed represented "the best available mechanical offshore skimming response technology in the United States."   TREX 9124.0119.   BPXP began mobilizing skimming resources immediately following the explosion.  Tr. 1258–59 (Paskewich).  More than 800 skimmers of all types were responding at the peak of operations.  Tr. 1258–59 (Paskewich); TREX 241529.0027.  The scale and success of *in situ* burning operations—considered by the Coast Guard to be "a safe and effective way to remove large volumes of oil from the ocean surface"—was unprecedented.  TREX 9105.0065; 9124.0055.  All told, 411 *in situ* burns were conducted, making it "the largest

*in situ* burning operation in U.S. history." TREX 9105.0067. As FOSC Captain James Hanzalik testified, it "was a huge operation," and BPXP "procured all the equipment, all the personnel, all the boats to go offshore and burn." Hanzalik Dep. 43–44. Dispersant operations during the response similarly were "incredibly complex" and "very well-orchestrated." Tr. 1264–65, 1267–68 (Paskewich); 1413 (Utsler). BPXP's contributions were essential to the success of the operation. *See* Hanzalik Dep. 47–49; Tr. 666 (VanHaverbeke); 1411–13 (Utsler).

**Nearshore.** Nearshore operations focused on (1) the use of small, agile skimming vessels, including Vessels of Opportunity (VOO), and (2) deployment of boom. TREX 241529.0037. Under the oversight of Unified Command, BPXP voluntarily created the VOO program to make available a core fleet of local professional mariners to assist with oil recovery, boom deployment, and other operations. TREX 241529.0039. The VOO program ultimately mobilized more than 9,000 local vessels, a fleet larger than the D-Day landing forces during World War II. TREX 9105.0138. Closer to shore, responders used boom as a barrier to encroaching oil. BPXP identified, acquired, and relocated all available stocks of boom worldwide and directed manufacturers to begin immediately producing more. TREX 9105.0133. At the peak of the response, responders deployed more than 13.5 million feet of boom to protect the shorelines. TREX 241529.0008, 21.

**Shoreline.** BPXP, working within Unified Command, deployed a massive Shoreline Response Program within days of the accident and weeks before oil came ashore. Tr. 1761 (Taylor). BPXP worked with others to survey, assess, and make recommendations based on the well-established Shoreline Cleanup and Assessment Technique (SCAT). TREX 13246. The SCAT teams surveyed 4,380 miles of shoreline. Tr. 1767–68 (Taylor); D34306. Shoreline Treatment Recommendations were tailored to achieve a net environmental benefit for affected

shorelines and ensure that further damage was not caused by cleanup techniques. Tr. 1783 (Taylor). BPXP led the massive effort to remove oil from the shoreline and marshes—including the development of new techniques like the Sand Shark. Tr. 461 (Boesch); TREX 241529.0047, 80–81. The goal of such efforts was to accelerate the removal and natural weathering of stranded oil. Michel Dep. 159–60; TREX 13246.0019. The Shoreline Response Program was "exemplary," "a very hard-fought effort," and "something to be proud of." Tr. 1804 (Taylor).

### C. Response Efforts Successfully Prevented Millions of Barrels of Oil from Reaching the Gulf Shoreline.

The layers of response techniques were unquestionably effective at reducing the impact of the spill. According to government estimates, the Unified Command skimmed approximately 160,000 barrels of oil, burned at least 260,000 barrels, and chemically dispersed an additional 770,000 barrels. TREX 12198.0005. In addition, BPXP successfully collected 810,000 barrels of oil before it reached Gulf waters. TREX 145373. In most open ocean spill responses, approximately 10–15% of oil is removed. Tr. 1276–77 (Paskewich). Here, BPXP and others skimmed, burned, and chemically dispersed approximately 37%—roughly ***three times greater*** than the typical removal rate. Tr. 1271 (Paskewich).[2] These results are exceptional and dwarf the percentages in other large spill responses such as the *Erika* (3%), the *Exxon Valdez* (8%), the *Ixtoc* (9%), the *Montara* (17%), and the *Sea Empress* (26%). D34006A.1.

The United States does not dispute that the response achieved its goal of limiting shoreline effects. In fact, government reports characterize the response as "ultimately successful" and note that response operations "significantly reduced the amount of oil that might

[2] The 37% total is based on the Court's ruling in Phase 2 and official government estimates and does not account for oil removed through natural processes such as evaporation, dispersion, and dissolution, or through shoreline cleanup—processes that all reduce the effect on the environment. Tr. 1277–78 (Paskewich).

otherwise have impacted near-shore habitats and environmentally sensitive areas." TREX 9105.0014; 9124.0056. United States witnesses made similar statements. FFCL ¶ 16. For example, Rear Admiral Austin wrote in the summer of 2010 that "we've managed to keep over 90% of the oil from hitting the shore, which is amazing." TREX 12484.

Rather than adopting the views of the United States' fact witnesses and the official government reports, and contrary to established spill response doctrine, the United States' expert Captain VanHaverbeke limits his assessment of the effectiveness of the response to oil mechanically removed through skimming.[3] That is improper. Tr. 1279 (Paskewich) ("[Y]ou have to use all the tools in the toolbox. You have to use mechanical recovery, dispersants, and burning.…That's what's required by doctrine, governmental doctrine."); *see also* 33 U.S.C. §1321(a)(8) ("(8) 'remove' or 'removal' refers to containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary"); TREX 9105.0079 ("The shoreline protection tactics, techniques, and procedures…across the response area ensured a layered defense beyond sub-sea dispersant, skimming at the source, in situ burning, aerial dispersant use, and VOOs skimming. All those measures helped minimize the environmental impacts of oiling along the Gulf Coast.").

### D. The *Deepwater Horizon* Response Produced an Exceptional Safety Record.

The Coast Guard concluded that "[t]he efforts and commitment to ensure the safety of those who worked on the spill, and that of the public, is one of the single most notable accomplishments of the *Deepwater Horizon* response." TREX 9105.0110. BPXP and its

[3] Even if Captain VanHaverbeke were correct that the appropriate measure of success is oil "removed" from the environment, his analysis fails to account for the large quantities of oil that were effectively removed from the environment using *in situ* burning and shoreline cleanup techniques. Tr. 652–53, 655 (VanHaverbeke); TREX 247534.0002; *see* FFCL ¶¶ 151, 153–54, 549–54.

Unified Command partners "made safety a priority," developing and implementing a comprehensive safety program to protect responders and the public. TREX 9105.0079, 110; Tr. 1390 (Utsler); Howard Dep. 51–67.

Despite the sheer size and complexity of the operations, the "response produced an exceptional safety record" with a "remarkably low injury rate for responders across the operation." TREX 9105.0009, 110. As the Directors of OSHA and NIOSH concluded: "Overall, the efforts to ensure the safety and health of these cleanup workers were very effective." TREX 12221.0005; Howard Dep. 117. BPXP and its Unified Command partners also took measures to protect the public in the Gulf region, including air monitoring, seafood testing, and funding public health initiatives. TREX 9105.0099–102; 240110.0073–74.

**E. BPXP Actively Engaged with the Community.**

BPXP and others in the Unified Command engaged with local communities to ensure that accurate information was available to the communities and to address community concerns. TREX 241529.0075. As early as April 21, 2010, BPXP began developing a community outreach plan and within two weeks established community outreach centers in Louisiana, Alabama, Florida, and Mississippi. Cross Dep. 40, 206–07. These centers were designed to ensure that BPXP was "helping to answer some of the questions that [were] being raised" and to listen to community concerns. Tr. 1423–24 (Utsler). The outreach centers were staffed by thousands of BP employees, spouses, and retirees. Cross Dep. 233–34. BPXP's outreach program was a success, receiving positive feedback from community leaders, state and local officials, businesses, and private citizens. Cross Dep. 212–19; TREX 12365; 12366; 12367; 12368.

**F. BPXP Mitigated and Minimized Economic Effects of the Spill.**

Since the spill, BPXP has spent approximately $25.7 billion on initiatives that have

mitigated the spill's economic effects: (a) $14.1 billion on spill response and cleanup (including nearly $600 million on the VOO program); (b) $11.2 billion in claims payments; (c) $230 million in tourism grants; (d) $82 million in seafood testing and marketing; and (e) $100 million for the Baton Rouge Area Foundation Rig Workers Compensation Fund.  Tr. 2037–39 (Scott); TREX 13067; 241529.0078.[4]

**VOO Program and Seafood Compensation Fund.**  BPXP mitigated the economic impact of the spill on commercial fisherman through the VOO program and the Seafood Compensation Fund.  Tr. 2070–71 (Scott); 734 (Mason); Hein Dep. 252, 259.  The money that BPXP has paid, or has committed to pay, "way more than compensated" for the decline in commercial fishing revenues that followed the spill.  Tr. 2072, 2082–83 (Scott).  BPXP's VOO spending in 2010 alone was more than five times the estimated loss of annual revenue, and the $2.3 billion designated for Seafood Compensation Program payments represents roughly 20.5 times the 2010 decline in Gulf commercial fishing revenue.  Tr. 2070–71 (Scott); TREX 13067.0018–20 (commercial fishing recovered in 2011 and 2012).

**Claims Payments.**  BPXP quickly established a claims process to compensate persons and businesses, established claims centers, and provided the public with information about how to file claims.  Cross Dep. 208–09, 220.  By the end of 2010, BPXP had paid more than $3.7 billion to claimants.  TREX 13067.0011.  As of June 30, 2014, BPXP had paid approximately $11.2 billion to persons and businesses for economic loss claims.  Tr. 2065 (Scott).  United States witnesses agree that BPXP's claims payments helped minimize the economic impacts of the spill.  Tr. 227–28 (D. Austin); Luton Dep. 96, 102–03.

---

[4]     The United States concedes that BPXP should receive credit for, among other things, tourism promotion ($70M), seafood promotion and testing ($153.2M), and rig-worker support ($100M).  Rec. Doc. 13901 at 8.

**State and Local Tourism Grants.**   In May 2010, BPXP voluntarily committed to provide tourism grants to the governments of Florida, Alabama, Mississippi, and Louisiana. TREX 13067.0006–07; Tr. 2042 (Scott); 730–31 (Mason).   BPXP has provided a total of $230 million in tourism grants to these four states since the spill.  TREX 13067.0006–07, 21; Tr. 731 (Mason).  The United States, its experts, and local officials all agree that BPXP's efforts contributed to the recovery of tourism.   Luton Dep. 107–08, 161–62; Tr. 230, 234–36 (D. Austin); 733 (Mason).

Importantly, of the $25.7 billion that BPXP spent on these mitigation efforts, approximately $16.3 billion was spent in 2010.  Tr. 2040–41 (Scott).  BPXP's payments for clean-up efforts, the initial claims process, and emergency claim payments mitigated economic harm by providing money to Gulf coast communities quickly.  Tr. 2041 (Scott); 210–11, 236 (D. Austin); 738–39 (Mason); Luton Dep. 77.

## II.   THE SPILL'S EFFECTS WERE SIGNIFICANTLY LESS SERIOUS THAN INITIALLY FEARED.

The *Deepwater Horizon* oil spill was a serious event that adversely affected parts of the Gulf environment, particularly in the summer of 2010.  Nonetheless, the United States' own data—including hundreds of thousands of samples collected over many years in one of the largest environmental investigations ever undertaken—has demonstrated that the effects were significantly less serious than asserted by the United States or initially predicted.  Many Gulf beaches are cleaner today than before the spill, seafood landings data are consistent with pre-spill levels, marshes are nearly fully recovered, and tourism has increased to record-breaking levels in portions of the northern Gulf.  These results are not surprising given the natural resilience of the Gulf of Mexico, including the large population of oil-consuming bacteria; the massive efforts to prevent oil from reaching sensitive habitats; the rapid, extensive cleanup and restoration of Gulf

shorelines and beaches; and BPXP's economic contributions to the region. *See generally* FFCL ¶¶ 343–671.

**A. Actual and Potential Harm to Aquatic Life in the Gulf Was Limited.**

Potential effects from the *Deepwater Horizon* oil spill were limited in part because biodegradation—combined with extensive mitigation efforts, natural dilution, evaporation and other processes—resulted in levels of oil exposure that were not harmful to aquatic life in the vast majority of the Gulf of Mexico. The *Deepwater Horizon* oil spill occurred roughly 40 miles from shore, in Gulf waters that have been home to natural oil seeps for millions of years. These natural seeps are part of a hydrocarbon ecosystem that includes large populations of oil-consuming bacteria. Tr. 371 (Boesch). These natural bacteria rapidly and safely degraded oil that was released from the wellhead. Tr. 1687 (Shea); D34879. Dr. Jane Lubchenco, the former administrator of NOAA, testified that the "bacteria that are normally decomposing [natural seep] oil began to do so with the MC252 oil. And they consumed it rapidly." Lubchenco Dep. 90. Moreover, the subsea dispersants applied as part of the response broke the oil into smaller particles, which made them more available to the bacteria. *Id.*

The Unified Command's Operational Science Advisory Team (OSAT) reported in December 2010 that less than one percent of the water samples collected after August 3, 2010 exceeded the EPA's benchmark for polycyclic aromatic hydrocarbons (PAHs)—a class of chemicals considered to be the best indicator of potential toxicity of spilled oil to aquatic life. TREX 12237.0006–07; Tr. 534–35 (Rice). Similarly, of the sediment samples collected after August 3, 2010, OSAT reported that approximately one percent exceeded the EPA benchmark for PAHs. *Id.* Chemical fingerprinting analysis of these sediment exceedances showed that only those within three kilometers of the wellhead were consistent with Macondo oil. *Id.*

Dr. Damian Shea, a renowned environmental chemist, eco-toxicologist, and expert in environmental risk assessment, compared nearly 18,000 water samples and over 8,000 sediment samples collected following the spill to the EPA's benchmark for toxicity and also found that the vast majority of the collected samples were safe for aquatic life. D34883; Tr. 1644, 1710–11 (Shea); TREX 13444.0012–15. Of the almost 18,000 water samples collected and analyzed for PAHs, 98.05% were safe for aquatic life. Tr. 1657–60 (Shea); TREX 13444.0020–26. Similar results were seen in the sediment sampling. Tr. 1668 (Shea); TREX 13444.0035–39 (98.08% of samples safe for aquatic life). Even when considering only samples collected from the geographic area the United States' expert indicated as a potential concern, 97.94% of the water samples were safe for aquatic life. Tr. 1661–64 (Shea); TREX 13444.0021.

The United States' environmental experts, in contrast, disregarded the available high-quality data and the EPA's own toxicity benchmarks in forming their initial opinions, choosing instead to propose a novel toxicity threshold based on a single toxicity test reported in a single scientific paper ("the Incardona paper"). Tr. 423–24 (Boesch); 514–15, 526, 534–35 (Rice). The United States' experts did not have a sound basis to ignore the EPA's toxicity benchmarks. Not only are EPA's benchmarks based on rigorous science and designed to measure for multiple types of toxicity, species, and life stages, but the United States' attempt to back away from these benchmarks is inconsistent with the EPA, Coast Guard, and NOAA's reliance on the benchmarks in this spill and the EPA's longstanding use of these benchmarks across the country. Tr. 1656–57 (Shea).

Further, the study on which the United States' experts primarily rely is deeply problematic. For example, two of the three species Incardona tested do not reside in Gulf waters, which Dr. Rice concedes is relevant because different species can respond differently to the same

dose of a given chemical.  Tr. 545–46.  The Incardona paper reports no information about the severity of the effect (edema) observed, rendering it impossible to know whether the edema was severe or trivial.  Tr. 1697–1700 (Shea); 548, 552–53 (Rice).  Moreover, the Incardona paper uses a non-standard blender method for preparing the oil and water mixture to which the test organisms were exposed.  Tr. 559–60, 63 (Rice); 1701 (Shea).  The blender method is designed to increase the toxicity of the mixture and does not match conditions in the Gulf of Mexico.  Tr. 1701–02, 1745 (Shea); TREX 13445.0012–15; Tr. 560–62 (Rice) (admitting he does not know how much energy was generated using the blender method or whether that energy level is comparable to the surface of the Gulf of Mexico).

Consistent with the finding that oil concentrations were below toxicity thresholds in most of the Gulf in 2010, the *Deepwater Horizon* oil spill did not cause significant adverse impact to fish or shellfish populations in the Gulf.  Tr. 1861 (Tunnell); TREX 13163; 13165.  Dr. Wes Tunnell, a lifelong Gulf resident and renowned biologist, examined five independent lines of evidence in reaching his conclusions: (1) long-term and (2) short-term population trends evidenced by fisheries-independent government data, (3) commercial and recreational fishery catch data, (4) water and tissue data evidencing exposure to harmful contaminants, and (5) government and academic findings.  Tr. 1877, 1896 (Tunnell); TREX 13163.0015.  Based on this comprehensive analysis, Dr. Tunnell demonstrated that post-spill population levels for fish and shellfish in the northern Gulf of Mexico are within pre-spill ranges and trends.  Tr. 1888 (Tunnell); TREX 13163; 13165.  Indeed, the United States' own expert Dr. Donald Boesch conceded that he was not able to demonstrate actual harm to fish populations, and he does not know whether any sublethal effects affected the survival of early life-stage fish.  Tr. 377, 438, 441 (Boesch).

Dr. Tunnell's opinions are consistent with the published literature. For example, a 2014 study found an "absence of measurable negative impacts among populations" of estuarine fish resulting from the spill. TREX 231543.0001. Another 2014 study concluded that the spill had no impact on shrimp population abundances. Tr. 450–51 (Boesch); TREX 13289; *see also* Tr. 449–50 (Boesch) (admitting even the study that he cites for injury to shrimp had no direct evidence of changes in shrimp abundance or mortality from their experiments). A 2010 report issued by the Louisiana Department of Wildlife and Fisheries found "no direct oiling of sampled [oyster] reefs," and Dr. Boesch is aware of no reports, scientific or otherwise, of Macondo oil killing oysters. TREX 230585.0008; 13183.0036.

**B. Actual and Potential Harm to Birds, Wildlife and Coral Was Also Limited.**

Although individual birds were harmed or killed by oil during the summer of 2010, the spill did not adversely affect bird populations. Tr. 1911 (Tunnell). For all 23 bird species Dr. Tunnell analyzed, the bird population data show that the spill caused no significant impact. Tr. 1911 (Tunnell); TREX 13163.0060–66. Dr. Tunnell's findings are consistent with government findings. Tr. 1907 (Tunnell). For example, Jack Bohannan, Refuge Manager for the Breton Sound National Wildlife Refuge, stated that "2011…will go down as the most productive year since Katrina, which was 2005, for nesting…." Tr. 1907 (Tunnell); TREX 12628. Moreover, during the summer of 2010, government scientists observed over 440,000 birds, only 0.67% of which were oiled. Tr. 1908 (Tunnell); TREX 12625; 13163.0065; Higgins Dep. 169–74. As with fish and shellfish, the United States' experts simply ignored the publicly available data about bird populations. Tr. 427 (Boesch). Instead, they relied on a flawed beached-bird model that even the United States' experts agree cannot be used to quantify the birds harmed as a result of the spill. Tr. 462–63 (Boesch); *see* FFCL ¶¶ 493–99.

There is also no evidence of population-level impacts to sea turtles or dolphins. Tr. 1915–16 (Tunnell); TREX 13164.0012.  Of the 613 sea turtle carcasses collected following the spill, only 18 were visibly oiled.  Tr. 458 (Boesch); 1916 (Tunnell).  According to NOAA Administrator Jane Lubchenco, "to our surprise, most of the dead stranded sea turtles had no observable oil on their bodies and were in good health prior to their death."  TREX 12080.0001. A number of causes of sea turtle deaths are under investigation, including accidental drowning in fishing nets and harmful algal blooms.  Tr. 458 (Boesch); TREX 13183.0019.  Similarly, only 10 of the 157 dolphin carcasses found following the spill were visibly oiled, and none of the 130 dolphin necropsy records indicate that oil was the cause of death.  Tr. 452 (Boesch); 1914 (Tunnell); TREX 13164.0009–10.  As with sea turtles, alternative causes for the dolphin deaths are under investigation.  An unusual mortality event (UME) relating to marine mammals in the Gulf of Mexico was declared to have started before the spill, and the cause of the UME has yet to be determined.  Tr. 453 (Boesch).  Dr. Boesch did not review the sea turtle or dolphin necropsy data.  Tr. 392, 427–28 (Boesch).

Finally, there is no evidence of widespread adverse impacts to deep sea coral populations. Tr. 1917 (Tunnell).  A 2012 study found that healthy coral communities were observed at all sites greater than 20 kilometers from the wellhead.  TREX 13195.1.1.BP; Tr. 447 (Boesch); 580 (Rice).  Dr. Boesch claims injury only to three coral sites, all of which were near the wellhead. Tr. 445–46 (Boesch); 1917 (Tunnell).  The authors of the study on which Dr. Boesch relies characterized the potential impact at one of these sites as "largely minor," and a follow-up article found that colonies with low levels of oil exposure were likely to recover completely by March 2012.  TREX 231547.0003.

### C. The Impact to Gulf Beaches and Shoreline Habitats was Limited and Effectively Addressed.

Despite extensive efforts to prevent oil from reaching the shoreline, oil did reach some Gulf beaches and shoreline habitats. The combination of Unified Command's Shoreline Response Program and natural recovery processes, however, was very effective in reducing the effects of that oil. Of the 4,378 miles of shoreline surveyed as part of the SCAT process, only 25.1% of the segments was observed as having any oiling. Tr. 1776–77 (Taylor); TREX 12199.0004. Moreover, the majority of oil that reached the shoreline was "light" or "trace" and rarely penetrated more than a few feet into the shoreline. TREX 13246.0043–45. By December 2010, only 26.2 miles of sand beaches had heavy or moderate oiling. TREX 13246.0044. By May 2012, over 90% of the shoreline surveyed was categorized as "No Oil Observed," only 0.1% was categorized as "Heavy," and most shoreline that still had some oiling fell into the "Trace" category. Tr. 1793 (Taylor). By the summer of 2014, the Gulf shoreline was "very comparable" to "pre-spill conditions in the Gulf"—"[f]or all intents and purposes, the shorelines are back at pre-spill use and pre-spill conditions." Tr. 1795 (Taylor).

Because of mitigation efforts and natural processes, most marshes were not affected by the spill, and those that were have recovered. A maximum of 86 miles of marsh shoreline was characterized as having some "heavy" oiling. Tr. 1798 (Taylor). By October 2010, that figure was down to 24.1 miles, and by May 2012, only 1.2 miles of marsh shoreline were heavily oiled. Tr. 1798 (Taylor). Marshes that were moderately, lightly, or very lightly oiled had comparable vegetation characteristics as non-oiled areas within one or two years. Tr. 1800 (Taylor); TREX 13246.0048, 52. Dr. Boesch agrees that marsh grass vegetation largely recovered within 18 months under low to moderate oiling. TREX 13183.0033. According to BPXP's expert Dr. Elliott Taylor, "the available data indicate that lightly, moderately, and the majority of

heavily oiled study sites do not differ from unoiled sites with regard to erosion." TREX 13247.0011; 231455.0005, 07.

**D. There Is No Evidence of Significant Adverse Human Health Effects and Future Adverse Health Effects Are Highly Unlikely.**

The data demonstrate that the spill did not produce significant adverse human-health effects to response workers or the public. Robert Cox, a board-certified medical doctor and toxicologist at the University of Mississippi Medical Center, analyzed publicly available human exposure and environmental sampling and monitoring data (in addition to performing a toxicological risk assessment). Tr. 1449; D35270. He found no evidence of significant adverse health effects to response workers or the public resulting from potential inhalational, dermal or oral exposure to oil or dispersants following the spill. TREX 240110.0007–08. No other expert performed this level of analysis.

Dr. Cox's findings are confirmed by federal and state agencies. Both the CDC and the EPA "found no direct exposures to [oil or dispersants] at levels high enough to be expected to cause harm" to the public. TREX 12235.0002. Air monitoring conducted by EPA and OSHA did not reveal airborne concentrations of chemicals at levels of concern to either workers or the public. TREX 240159; 12236. The OSAT-1 report noted that none of the 6,090 nearshore water samples exceeded the EPA benchmark for human health, and the OSAT-2 report concluded that the calculated potential cancer and non-cancer health risks from exposures to weathered MC-252 oil were below the EPA's acceptable risk levels. TREX 12237.0022; 12238.0003. A report issued by NOAA, FDA, and the Louisiana State Health Officer concluded that Gulf seafood was safe. Tr. 1478–80 (Cox). Health surveillance conducted by the CDC and the Louisiana and Mississippi Health Departments confirms these federal and state agencies' conclusions, revealing no trends of public health concern related to the spill. Tr. 1448 (Cox).

The United States now attempts to distance itself from the conclusions of its own agencies and entities through its expert Richard Clapp. Unlike Dr. Cox, Dr. Clapp is not a medical doctor, is not licensed to evaluate patients for medical conditions, is not board-certified in any medical specialty, and is not a toxicologist. Tr. 276 (Clapp). Dr. Clapp ignores the massive, publicly available sampling and monitoring dataset in favor of a review of "documents provided to [him] by attorneys of the U.S. Department of Justice and…of a summary of a June 2010 workshop at the Institute of Medicine." Tr. 289 (Clapp); TREX 13346.0006. In addition, Dr. Clapp fails to recognize salient differences between this spill and those discussed in the summary on which he relies. For example, Dr. Clapp does not account for the fact that the summary covers surface spills, not underwater spills; nor does he consider that these spills involved different types of oil. Tr. 294–95 (Clapp); TREX 240111.0006. Thus, Dr. Clapp's opinions are flawed. Ultimately, Dr. Clapp himself admits that he has ***no information or data*** that ***any*** health effects for ***any*** population were actually "caused by exposure to any toxins or chemicals associated with the *Deepwater Horizon* incident." Tr. 301, 324.

**E. Economic Effects Were Not Uniform Across the Gulf Coast and, Where Present, Were Followed by Swift Recovery.**

BPXP's spill-related spending in 2010–14 played an "important role" in preventing and avoiding potentially harmful economic effects of the spill or limiting such harm to a short period. TREX 13067.0004–05, 16–17. Luton Dep. 80; Tr. 2083–84 (Scott). In some places, the response spending and influx of response workers resulted in net positive effects for tourism-related businesses, such as hotels. Tr. 2035, 66–67 (Scott). In other places, there were negative economic effects on tourism and commercial fishing, but those effects were short-lived. Tr. 2035–37 (Scott); TREX 13067.0004–05, 23, 29–38. Independent analysis concluded that, although some areas experienced net positive employment and wage increases and others

experienced net declines, there was no net loss of employment in 2010 in the aggregate. Tr. 737, 739 (Mason).

## III. BPXP GAINED "MINIMAL," IF ANY, ECONOMIC BENEFIT FROM THE VIOLATION.

Even the United States does not suggest that BPXP realized a net economic benefit from the CWA violation at issue. *See generally* FFCL ¶¶ 873–80. Any possible operational cost savings identified in the Court's prior findings are inconsequential when compared to the cost of the violation to BPXP. *Sierra Club v. MasTec N. Am.*, 2009 WL 426205, at *5 (D. Or. Feb. 19, 2009) (court imposed more limited penalty where defendant's overall losses on project were significant); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 956 F. Supp. 588, 610–11 (D.S.C. 1997) (considering defendant's overall spending resulting from violation in context of economic benefit analysis and penalty imposed).

As a result of the incident, BPXP has incurred $35.7 billion in liabilities (after insurance and settlement recoveries, but not counting the CWA provision or BPXP's external legal costs)—$27.5 billion of those incurred liabilities have been paid. Tr. 1596 (Morrison). In contrast, the record evidence for the three decisions found by this Court to be causal and "profit driven"—(1) use of LCM as a spacer; (2) decision to drill the final 100 feet of the Macondo well; and (3) not conducting a cement bond log—shows that any cost savings (to the extent any savings occurred and can be calculated based on the evidence) were relatively minimal. Indeed, the United States described any economic benefit to BPXP as "background noise," unworthy of "wast[ing] [the Court's] time with new evidence." Mar. 21, 2014 Hr'g Tr. 26–27. In response, the Court ordered that "there will be no further discovery on this factor" in the Penalty Phase. Rec. Doc. 12592 at 2. As Judge Shushan observed, "We all agree that there was no economic benefit to either BP or Anadarko." Apr. 17, 2014 Hr'g Tr. 4.

The absence of an appreciable economic benefit to BPXP stemming from the CWA violation should steer the penalty toward the low end of the statutory range. During the trial, the United States reminded the Court that when compared to other penalty factors, "the economic benefit is not a driving factor in the Court's analysis of this penalty." Tr. 34 (Opening). The United States properly conceded the lack of evidence supporting a larger fine based on economic benefit, but that does not mean this statutory factor should play no role in the Court's analysis. *CITGO*, 723 F.3d at 553 ("Proper consideration of economic benefit is integral to arriving at an appropriate damage award."). The policy justification for the punitive nature of a CWA penalty is in part to ensure that companies are not incentivized to violate the CWA where it might result in economic benefits larger than an anticipated penalty. Where, as here, that cost savings does not exist, the need for a large penalty is greatly reduced. *Cf. United States v. Mun. Auth. of Union Twp. ("Dean Dairy")*, 929 F. Supp. 800 (M.D. Pa. 1996), *aff'd* 150 F.3d 259, 263 (3d Cir. 1998) (assessing penalty twice the amount of economic benefit accrued "to provide a proper deterrent and punishment").

## IV. BPXP'S PAYMENT OF $1.25 BILLION IN OTHER PENALTIES WARRANTS A REDUCTION OF THIS PENALTY.

The $1.25 billion in other penalties that BPXP paid for this same incident, which may be properly considered by the Court, warrant a reduced penalty. *See generally* FFCL ¶¶ 1103–05. The United States and BPXP entered into a Plea Agreement in connection with the *Deepwater Horizon* incident. Pursuant to that Plea Agreement and the subsequent judgment, and as part of $4 billion in total criminal recoveries, BPXP agreed to pay a criminal fine of $1.15 billion for the same violation at issue in this case—a discharge in violation of Section 1321(b)(3). The Court should accord full credit for this $1.15 billion fine; the statute expressly includes this factor to avoid an increase in total penalty by virtue of the Government electing to prosecute the same

CWA violation criminally and civilly. In addition, under its plea agreement, BPXP agreed to pay a penalty of $100 million for violations of the Migratory Bird Treaty Act in this same incident, and credit should again apply under this factor.[5] The United States concedes that these other penalty payments entitle BPXP to a credit, depending on how the Court exercises its discretion in setting the penalty. *See* Rec. Doc. 13901; Tr. 37 (Opening).

## V. THE SIGNIFICANT NEGATIVE IMPACT OF A CWA PENALTY ON BPXP COUNSELS A PENALTY AT THE LOW END OF THE STATUTORY RANGE.

Any CWA penalty must take into account "the economic impact of the penalty on the violator." 33 U.S.C. §1321(b)(8). The United States has acknowledged this factor may reduce a penalty where the violator demonstrates that such a penalty would have a "significant impact" on it. *See* Rec. Doc. 12479 at 8–9. Given BPXP's current financial condition, including its equity value and available funds, the economic impact of a penalty above the low end of the statutory range would threaten BPXP's solvency and its significant capital and other expenditures in the Gulf region. *See generally* FFCL ¶¶ 672–872.

### A. BPXP—And Not Any of Its Affiliated Companies—Is the Violator.

The law does not permit the United States to shift the penalty judgment to an entity other than BPXP. The CWA directs the court to examine the "economic impact of the penalty ***on the violator***"—not on other corporate affiliates.

Absent a ruling piercing the corporate veil—which the United States has confirmed repeatedly it is not seeking, *e.g.*, Tr. 1998 (Gladstein)—a corporate parent is not required to invest additional capital to meet its subsidiary's liabilities. This is a foundational principle of

[5] In addition to those criminal fines, BPXP agreed to make payments of $350 million to the National Academy of Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico and $2.394 billion to the National Fish and Wildlife Foundation. Rec. Doc. 13725. Pursuant to the terms of the Plea Agreement, BPXP does not seek any credit, offset or reduction of the civil CWA penalty in this proceeding for these payments.

corporate law and governance.  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (holding, in a CERCLA case, "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation…is not liable for the acts of its subsidiaries.").  This bedrock principle encourages economic investment because risks are known at the outset—an investor who invests $100 risks only $100—versus a scenario where past investment of any amount puts the investor's other assets at risk in the future.  FFCL ¶ 872.

Factually, the United States confirmed that, because BPXP is a wholly owned subsidiary, its financial relationship, financing flows, and corporate governance relationship with the BP Group are normal, common, appropriate and expected.  It is undisputed that intercompany financial flows and parental control exist with every wholly owned subsidiary and parent; BPXP is no exception.  The United States' witnesses and counsel confirmed at trial that BPXP was not undercapitalized, that dividends and discretionary intercompany capital injections are normal and appropriate, and that a shareholder's past capital injections do not compel more capital in the future.  D34469; TREX 13214.0014–16, 22–23.  As to BPXP's legal relationship to the functional business segment (Upstream) and region (Gulf of Mexico (GOM)), the United States agreed that it is common in the oil and gas industry to have a small number of functional business segments used across a large number of majority-owned subsidiaries.  FFCL ¶ 856.  The United States' position that activities by BPXP—which are normal for a wholly owned subsidiary—nevertheless permit the Court to assume its parent's assets are available to fund a judgment on BPXP would expand the CWA economic impact factor to the parent's assets in every case involving a wholly owned subsidiary regardless of the statute's focus on "the violator."  Tr. 2012 (Daines).  *See* FFCL ¶¶ 846–70.

Courts tasked with setting civil monetary penalties under federal environmental laws and in deciding punitive damages also have rejected the government's attempt to expand the ability-to-pay question to parent corporations. For example, in *United States v. Dico, Inc*., the court "decline[d] to consider the assets of [the defendant's parent company] Titan International when evaluating [defendant] Dico's ability to pay" an environmental penalty. 4 F. Supp. 3d 1047, 1065 n.43 (S.D. Iowa 2014). As the court explained, "[T]he proposition of considering the assets of the parent company, which is not a party to the lawsuit, when assessing civil penalties against a subsidiary is somewhat at odds with the basic principle of corporate law that each incorporated business entity enjoys a separate legal existence." *Id.*

The government has incorrectly asserted that the *Dean Dairy* case permits the Court to look to the assets of affiliated BP companies regardless of the significant negative impact a penalty would have on BPXP. *See* 929 F. Supp. 800. First, unlike here, *Dean Dairy* did not involve a circumstance where the penalty was potentially multiples greater than the equity value of the defendant violator. In *Dean Dairy*, the violator's equity value exceeded $20 million versus an approximately $4 million penalty. *Id.* at 806 ("The magnitude of fine which the court believes to be warranted in this case can be easily absorbed by Dean Foods without threatening its solvency.") Second, in *Dean Dairy*, the court rested its holding partly on the fact that the parent company, unlike here, "was siphoning off profits from [the violator]" even after the actionable conduct began. *Id.* at 808. BPXP has not only paid no dividends since the *Deepwater Horizon* incident, but also capital has flowed ***into*** BPXP from its parent companies—the exact opposite of the flow of funds at issue in *Dean Dairy.* Tr. 948 (Quivik). Far from evidence of siphoning, BPXP's pre-incident dividends were "normal" and "appropriate," and post-incident dividends were non-existent. Tr. 948–50. Third, the facts underpinning the *Dean Dairy* court's

consideration of parent participation in the defendant/subsidiary's actionable conduct do not apply here. 929 F. Supp. at 808 (stating that parent "had complete control over whether and when Fairmont would achieve compliance with its IU permit"). The United States has not claimed that any entity other than BPXP engaged in any actionable conduct.

Finally, the very fact that other BP Group entities assisted BPXP financially (through $14 billion in equity injections and $4–5 billion in net outstanding debt, *see* FFCL ¶ 715) or otherwise in the response and in meeting other incident-related financial obligations does not in turn render those entities' assets relevant in assessing a penalty on BPXP. Such a finding here would only discourage corporate parents from voluntarily providing beneficial assistance to subsidiaries in similar future circumstances, an outcome that makes no sense under the CWA and its underlying goals. Tr. 2010–11 (Daines).

**B. BPXP's Current Financial Condition Reflects the Significant Negative Economic Impact of the Incident and Renders It Unable to Pay a Penalty Above the Low End of the Statutory Range.**

BPXP has spent $27.5 billion (net) relating to the incident as of the third quarter 2014, and has booked an additional $8.2 billion in provisions[6] and payables, for a total of $35.7 billion (net) in pre-tax liabilities.[7] *See generally* FFCL ¶¶ 682–96.

[6] Provisions are amounts recorded in a company's financial accounts as known liabilities for payments that must be made in the future. Tr. 1596–97 (Morrison). They are not assets earmarked to pay a future obligation, nor has BPXP set aside $3.51 billion to pay a future CWA penalty. Tr. 1598–99 (Morrison). Companies are required by accounting rules to record provisions regardless of whether they have the economic ability to pay them.

[7] These totals (i) deduct approximately $6.3 billion in incident-related insurance and settlement recoveries (the gross numbers are $33.7 billion spent and $42.0 billion in liabilities incurred); (ii) do not include the $3.5 billion provision for CWA penalties, and (iii) do not include BPXP's external legal costs for the incident. TREX 246896; FFCL ¶ 678–92. Unless otherwise noted, the amounts discussed in this section are current as of the close of the third quarter of 2014, BPXP's most recent financial data as of trial. BPXP's approximately $35.7 billion in net Macondo liabilities are pre-tax, and BPXP receives certain tax benefits for some but not all of its Macondo-related payments. *See* FFCL ¶¶ 695–96.

The $27.5 billion paid and $35.7 billion incurred include BPXP's plea agreement obligations to pay $350 million to the National Academy of Sciences ($20 million of which had been paid through 3Q 2014) and $2.394

In addition to the $42 billion (gross) in incurred liabilities for which BPXP has paid, provisioned or recognized a payable, BPXP has significant contingent liabilities. These contingent liabilities, which differ from provisions in that they are known but not presently estimable, include (1) natural resource damages, (2) future business economic loss claims under the Economic and Property Damages Settlement, (3) state and local government claims under OPA, (4) unsettled litigation among the nearly 3,000 spill-related lawsuits that remain pending, and (5) possible indemnity obligations that may arise under BPXP's various settlement agreements for claims related to the *Deepwater Horizon* spill. FFCL ¶ 697–98.

BPXP's spending since the incident has exhausted its own resources. Indeed, since 2010, BPXP has needed to rely on capital infusions from its parent companies to remain solvent. *See generally* FFCL ¶¶ 705–15. Looking forward, the United States' expert Mr. Ratner agreed that if the 2014–18 GOM cash flow projections were adjusted to reflect (1) BPXP's ownership of GOM assets, (2) the Segment overview, and (3) BPXP's known future installment payments owed to the United States under the criminal plea through 2017 and to North America Funding Company (NAFCO) for its term loan due January 2016, then BPXP's actual net cash flow would be ***negative*** $577 million in 2014, ***negative*** $184 million in 2015, and ***negative*** $1.817 billion in 2016. Tr. 1174–77; FFCL ¶ 737. Importantly, the cash flow analyses examined by Mr. Den Uyl and Mr. Ratner assumed oil prices of $100/bbl over the period, not the dramatically lower current $49/bbl (WTI) price. Incorporating that price drop would directly reduce BPXP's projected future revenues, while leaving its liabilities unchanged. In short, a CWA penalty

billion to the National Fish and Wildlife Foundation ($400 million of which had been paid through 3Q 2014). BPXP is not arguing that those two payments reduce the amount of CWA penalties. They are, however, known scheduled future cash outflows for BPXP, and thus (i) affect BPXP's available cash to fund a penalty in coming years; and (ii) would be a consideration for any prospective investor deciding whether to extend capital to BPXP to enable it to pay a CWA penalty, as those outflows reduce BPXP's value.

assessed in 2015 in excess of $2.3 billion would exhaust all of BPXP's available cash resources and result in a funding shortfall, even under an assumed $100/bbl oil price. TREX 13153.14.[8]

Asset sales are not a viable solution for BPXP to generate significant additional funds. The United States conceded that BPXP could not divest more than $1–3 billion in additional assets without a significant negative impact on the company. Tr. 1127 (Ratner). Divestment of assets by BPXP would also reduce its ability to fund or finance a penalty by other means because it would reduce the asset value of the company and (to the extent the divested assets are expected to produce oil and gas in coming years) its anticipated cash flows from operations. *See* FFCL ¶ 809.

### C. Additional Affiliate Support for BPXP Is Not Required and Cannot Be Assumed—Particularly In View of the Diminished Equity Value of BPXP.

The United States incorrectly suggests that BPXP's past borrowing from affiliates allows one to assume future funding to pay a CWA penalty or obviate its negative impact. This argument is wholly speculative and ignores key facts in the record—including the undisputed fact that BPXP cannot compel additional equity investment from its parent or affiliate companies regardless of past behavior. Tr. 1158 (Ratner); 1607–08 (Morrison).

First, when BPXP's affiliates previously made voluntary investments into BPXP, circumstances were materially different. More than $14 billion of BPXP's spending in 2010 and 2011 was response-related and incurred at a blistering pace at a critical time. BPXP's affiliates

[8] A few cases suggest that courts have discretion to order that penalties be paid in installments. *See, e.g.*, Second Am. Restoration Order, *United States v. Cundiff*, No. 4:01-cv-00006-JHM, Rec. Doc. 207 (W.D. Ky. Dec. 8, 2009); *see* FFCL ¶ 1085 n.24. Structuring the penalty to be paid in installments, however, would neither eliminate the limitations on BPXP's ability to pay a penalty outside the low end of the statutory range nor the impact on its solvency. BPXP is expected to have little or no net free cash flow in the next few years with which to satisfy a penalty. In addition, even if structured to be paid in installments, if the net present value of the CWA penalty, plus BPXP's contingent liabilities, is greater than the equity value of BPXP, any potential investors to whom BPXP might look for capital would see the investment as having a negative overall value and yielding a negative overall return.

made investments in 2012 and extended additional credit in 2014 so that BPXP could pay down and refinance some of the response-related costs it had incurred.  Importantly, the oil price has declined dramatically since BPXP's affiliates made these earlier investments.  For example, oil was $106.59/bbl when BPAPC made its $14 billion equity injection into BPXP in early 2012; it is more than 50% lower now at $49/bbl (WTI).  TREX 247625.  At the time of NAFCO's $3.1 billion term loan to BPXP in early 2014, oil was $91.45/bbl (WTI).  TREX 247625.

Second, BPXP's $5 billion line of credit with its in-house bank, NAFCO, is governed by an Internal Funding Account contract.  Tr. 1117 (Ratner); TREX 13153.0013.  Since the incident, BPXP's credit limit with NAFCO has been exceeded at times to permit BPXP to pay its response-related liabilities, up to a total of approximately $11 billion in borrowings at year-end 2011.  TREX 13123R.0047 (tbl 19).  NAFCO, however, has the contractual right to refuse to allow BPXP to exceed its $5 billion limit in the future, and it also has the right to cancel the line of credit altogether.  FFCL ¶ 708.  BPXP also executed a $3.1 billion term loan in January 2014, which was used to repay other outstanding debt.  FFCL ¶ 713.

Third, BPXP's ability to secure funding or financing today depends, fundamentally, on BPXP's projected value.  ***The only BPXP valuation in the record is the equity valuation prepared by Mr. Den Uyl in August 2014 and adjusted for oil price inputs on December 30, 2014.***  As that valuation shows, as a result of BPXP's significant liabilities related to the spill, the billions of dollars in asset sales, and the recent steep decline in the value of its oil reserves, BPXP's equity value is approximately $5 billion as of December 2014, not accounting for BPXP's civil CWA liabilities or any of its contingent liabilities, or further drops in oil price since

that date.  TREX 247596.0007.[9]  Should the CWA penalty amount, plus BPXP's contingent liabilities (including NRD and OPA), exceed the current equity value of BPXP, potential investors to whom BPXP may look for capital to help fund those liabilities would see the investment as having a negative overall value and yielding a negative overall return. TREX 13160.0005–08; 13161.0008–09.

The United States did not prepare or present a valuation of BPXP, notwithstanding its valuation expert's admission that BPXP's valuation would be fundamental to the question of future funding or financing necessary to pay a CWA penalty.  Tr. 1181–82 (Ratner).  Instead, Mr. Ratner speculated that the valuation presented by BPXP's expert was understated by some indeterminate amount.  Mr. Ratner's challenges fall well short of the mark.

Notably, Mr. Ratner did not criticize Wood Mackenzie's independent valuations of 14 core assets owned by BPXP—the industry-standard benchmark data that formed the basis for the $5 billion equity valuation—but instead claimed the Wood Mackenzie analysis failed to include other BPXP assets, specifically sub-commercial assets and unexplored leases.[10]  TREX 13161.0018; *see generally* FFCL ¶¶ 761–68.  Mr. Ratner is demonstrably wrong.  For example, the Gila field that Mr. Ratner suggested was not included in the Wood Mackenzie analysis, Tr. 1079–80, is included by Wood Mackenzie as a "Sub-Commercial Discovery," which, as the name suggests, was not ascribed a positive value because of the uncertainty it will develop into a "commercial" asset.  Tr. 1188 (Ratner); TREX 240835 ("Exploration_Analysis" tab).  Moreover, the Wood Mackenzie report contains an analysis that confirms it did not overlook other assets

---

[9]   Using Wood Mackenzie's price sensitivity analysis and Mr. Den Uyl's December 30, 2014 assessment of BPXP's equity value, every incremental $1 change in oil prices would change BPXP's equity value by approximately $550 million, holding other input assumptions constant.  *See* FFCL ¶ 794.

[10]   Mr. Ratner also did not dispute Wood Mackenzie's oil price sensitivity analysis.  Tr. 1189–90.

with alleged additional positive value. Wood Mackenzie compared its valuation findings to BP p.l.c.'s publicly-traded market value that reflects all publicly known information about all parts of the company (including sub-commercial assets and unexplored leases). TREX 240835. Wood Mackenzie determined that its assessment of the BP Group's Upstream assets was ***20% greater*** than the value for those same assets assigned by the public equity markets. *Id.* If Mr. Ratner's speculation were correct about Wood Mackenzie being under-inclusive, one would have expected the exact opposite outcome in this analysis.

Mr. Den Uyl's operating expense adjustment represents the other primary area disputed by Mr. Ratner. Again, his criticisms are misguided and impeached by the record. Wood Mackenzie did not analyze the value of the legal entity BPXP, but rather analyzed stand-alone fields in the Gulf of Mexico region. TREX 13153.0024. As part of that analysis, Wood Mackenzie estimated operating expenses for those fields. Importantly, Wood Mackenzie had neither the non-public BPXP financial records that document BPXP's total operating expenses nor any non-public BPXP financial records that documented BPXP's field-level operating expenses. FFCL ¶ 776(b). By contrast, Mr. Den Uyl did analyze financial records for BPXP that include the costs BPXP incurs in addition to those specific to individual fields. TREX 13161.0018–19. Those internal records show that Wood Mackenzie's operating expenses for 2012 to 2014 were significantly below BPXP's actual production and other operating expenses. TREX 13153.0025. Mr. Den Uyl thus appropriately supplemented Wood Mackenzie's assessment of field-level operating expenses by adding the incremental amount of ***actual operating expenses*** reported in BPXP's non-public quarterly financial records.[11] Den

[11] BPXP began preparing financial reports on a quarterly basis in 2011. Robertson Dep. 203–04. Prior to then, BPXP's financial data were recorded in trial balances that contain the same information, but not in the form of an organized report. These trial balances were routinely run to support the development of financial reports. *Id.*

Uyl Dep. 273–74. Neither the United States nor Mr. Ratner disputes that Mr. Den Uyl's operating expense adjustment is based on the actual BPXP quarterly operating expenses for running its business, nor do they dispute that operating expenses are part of arriving at a valuation.[12] Mr. Den Uyl's $7.8 billion operating expense adjustment represents the present value of the additional amount of BPXP's ***actual*** operating expenses that are not captured in Wood Mackenzie's asset valuation model. FFCL ¶ 789–91. This adjustment, in turn and along with the other adjustments outlined in Mr. Den Uyl's valuation, allows the Court to understand the true equity value of BPXP as an operating business prior to any CWA penalty or other contingent liabilities, and the elements that drive that value.[13] The United States has no competing valuation in the record, and its criticisms of BPXP's valuation are lacking.

### D. The 2013 Standardized Measure of Oil and Gas (SMOG) Analysis Does Not Reliably Measure BPXP's Value.

Mr. Ratner improperly relied at trial on SMOG data from 2013 in discussing the value of BPXP. On cross examination, Mr. Ratner agreed that the SEC has expressly cautioned against the use of SMOG data to estimate fair value. *See* Tr. 1139. SMOG disclosures are required for financial reporting purposes to provide comparable information about volumes, not value. TREX 240928.0005–06, 24. In addition, the 2013 SMOG data is based upon an assumed and outdated oil price of $104/bbl. TREX 244133. Because oil prices have dropped to $49/bbl, the

[12] In his January 6, 2015 report, Mr. Ratner incorrectly claims that Wood Mackenzie's assessment of BPXP's operating expenses in 2014 are $2.28 billion. This number is in fact Wood Mackenzie's assessment of BPXP's ***capital*** expenditures, as shown in the "Cost_WM" tab of the Wood Mackenzie report titled "Wood Mackenzie Capital Expenditure Forecast." TREX 240835. As shown in the "Opex WM" tab, the 2014 costs are actually $508 million (the number cited in Mr. Ratner's September 12 Report), meaning that Mr. Ratner overstated 2014 operating expenses by over $1.7 billion in his January 6, 2015 report.

[13] Mr. Den Uyl actually estimated a ***decrease*** in operating expenses of approximately $250 million from 2014 to 2018 based on the Upstream Segment's GOM projections for operating expense, adjusted to apply reductions implied by the 2018 Segment overview. TREX 013153.0100; 247596.0002.

SMOG values used by Mr. Ratner are materially overstated today. Tr. 1140–41 (Ratner). Moreover, the SMOG data is neither adjusted to reflect BPXP's ownership share of the Gulf of Mexico assets, nor does it account for BPXP's Macondo-related liabilities, debt, or other obligations. TREX 244133; *see generally* FFCL ¶¶ 800–06.

**E. The United States' Analysis Is Underpinned by Unrealistic Assumptions About Oil Prices.**

Mr. Ratner and Mr. Den Uyl agree that oil price is a core input into an oil company's value. Tr. 1162 (Ratner). Oil prices have declined dramatically since the highs of recent years: for example, from well over $100/bbl in July 2014 to $49/bbl today (WTI). TREX 247596.0002; 247625. The average WTI price has remained in the $43–54 range in the first quarter of 2015. As the graph below shows, these recent oil prices are not anomalous. Rather, the current oil price is close to the long-term historical average oil price since 1968, which is approximately $50/bbl, after adjusting for inflation; without adjusting for inflation, the average is much lower.

TREX 247624; 247601B; 240835.

The anomaly rather is found in the oil prices testified to by Mr. Ratner. Mr. Ratner

speculated at trial that the price of oil could rise sharply back to historically above-average levels, mentioning an unspecified source claiming a climb to $200/bbl. Tr. 1066 (Ratner). Implicit in Mr. Ratner's speculation about high prices is the simple fact that, at lower oil prices, BPXP's ability to pay a CWA penalty is significantly diminished. And in fact, as of the date of this brief, the price of oil remains at $49/bbl and there has been no sign that oil prices will return to the above-historical-average levels that underpin Mr. Ratner's speculation. In support of his reliance on above-historical-average oil prices, Mr. Ratner cites a BP presentation stating that "[it has] historically, taken up to two years for prices to undergo a recovery following periods of steep price declines." Tr. 1067. Mr. Ratner omits the next sentence of the document, which critically states, "In all the instances shown—with the exception of the period between 1985 and 1986—the recovery was triggered by ***one or more OPEC production cuts***." TREX 233856.0009 (emphasis added). The United States offered no evidence that OPEC has cut production or has any plans to do so. Moreover, although the excerpt of the presentation cited by Mr. Ratner discusses a "recovery," it says nothing about the extent of the recovery. A recovery from the current price ($49/bbl) to levels that are still close to the long-term averages is far different from a recovery from the current price to the historically anomalous levels cited by Mr. Ratner ($100/bbl or $200/bbl).

**F. A CWA Penalty Would Have a Significant Negative Impact on BPXP and Would Threaten Its Solvency.**

Given BPXP's current financial position and the oil price environment, a CWA penalty above the low end of the statutory range would threaten BPXP's solvency and have a significant negative impact on BPXP. Because deepwater drilling is a capital-intensive business, cuts to capital expenditures would quickly cause reductions in future production and operating revenue. Tr. 1614 (Morrison). Similarly, any resulting reduction in activity levels would lead to a

reduction in BPXP's significant employment and vendor spending in the Gulf region. TREX 13067.0044 (BPXP's capital and operational expenditures from 2009–13 included $2.1 billion on employee compensation and more than $16.4 billion on compensation to vendors).

If the CWA penalty combined with NRD and OPA contingent liabilities were equal to or greater than $5 billion, these liabilities would eliminate all of the BPXP's equity value and threaten its solvency. There is no precedent for assessing a CWA penalty that would eliminate the majority, much less the entirety, of the equity value of the violator. Indeed *Dean Dairy*—repeatedly cited by the United States—approved a penalty only after concluding that it could "be easily absorbed by [the violator] Dean Foods ***without threatening its solvency***." 929 F. Supp. at 806 (emphasis added). Accordingly, a penalty above the low end of the statutory range would be inappropriate for BPXP.[14]

## VI. THE INVOLVEMENT OF OTHER PARTIES IN THE VIOLATION AND BPXP'S EXTRAORDINARY RESPONSE EFFORTS MERIT A REDUCED PENALTY.

As to the culpability factor, the causal role of other parties in the *Deepwater Horizon* incident suggests that the penalty assessed against BPXP should be set at the low end of the statutory range, even given the Court's finding of gross negligence by BP entities. *See generally* FFCL ¶¶ 881–90. In the Court's Phase 1 Ruling, which is now on appeal, the Court held that BPXP acted with gross negligence during events leading to the Macondo incident, but that other parties acted with negligence and share responsibility for causing the blowout and spill. The Court allocated 67% of the maritime law responsibility to BPXP and its affiliate BPAPC, 30% to Transocean, and 3% to Halliburton. Rec. Doc. 13355 ¶ 544. Notwithstanding the responsibility

[14] Courts routinely have awarded or approved CWA fines at a small fraction of the statutory maximum. FFCL ¶¶ 1139–41. A fine at the level requested by the United States would be many times greater than the total of all civil penalties paid in all environmental cases ever brought by the United States. *See* Rec. Docs. 13811, 13938.

of others for the spill, BPXP has borne nearly all of the response costs. With respect to culpability in Phase 2, the Court concluded that "the weight of the evidence" did not show that BPXP's flow-rate representations impeded source control efforts; punitive damages arising from BPXP's source control activities "were not warranted"; BPXP "was not grossly negligent, reckless, willful or wanton in its source control planning"; and BPXP's conduct was not "a superseding cause of the oil spill." Rec. Doc. 14021 ¶¶ 232–33, 48–49.

CWA precedent confirms that, in assessing the culpability factor, the fact finder may consider "the good faith and diligence of the violator in redressing the violations and fixing the problems." *See In re Serv. Oil, Inc.*, 2007 WL 3138354, at *52 (EPA 2007); s*ee also In re Indus. Chems. Corp.*, 2000 WL 1770494, at *3–4, *7 (EPA 2000) (reducing penalty on appeal because violator showed an "overall picture…of good faith"); *In re Donald Cutler*, 2002 WL 32002754, at *44 (EPA 2002) (remediation efforts held to alleviate or mitigate the culpability); *In re Britton Constr. Co*., 8 E.A.D. 261, at *16-17 (EAB 1999) (penalty reduced based in part on completion of mitigation plan). In its Phase 2 Ruling, the Court described BPXP's source control effort as a "massive and complex undertaking," emphasizing the $1.6 billion that BPXP spent on source control. The Court further noted that source control was a collaborative effort among BPXP and others, and that "BP's source control plan complied with then-existing federal regulations and industry practice." Rec. Doc. 14021 ¶¶ 213, 244. BPXP's extraordinary response efforts merit consideration under the culpability factor and further support a reduction in the penalty.

## VII. THE TRIAL RECORD REFLECTS NO RELEVANT PRIOR VIOLATIONS.

There is no evidence of any relevant history of prior violations that would support a CWA penalty. *See generally* FFCL ¶¶ 898–913. The trial record is limited to the guilty pleas for four prior incidents: (i) an incident in the mid-1990s at Endicott Island, Alaska, where BP

Exploration (Alaska) Inc. did not immediately report a hazardous waste discharge by one of its contractors; (ii) a steam line rupture and hydrocarbon fire in 2000 at a petrochemical complex in Grangemouth, Scotland, operated by BP Chemicals Ltd. and BP Oil Grangemouth Refinery Ltd.; (iii) an explosion and fire in 2005 at a BP Products North America Inc. refinery in Texas City, Texas; and (iv) two leaks in 2006 from oil transit lines operated by BP Exploration (Alaska) Inc. in Prudhoe Bay, Alaska. TREX 22394; 233863; 233864; 233876.

Although there is limited case law under CWA Section 311(b)(8) on the scope of the "history of prior violations" factor, cases interpreting the analogous "history of such violations" factor under Section 309 of the CWA demonstrate that, to be relevant, prior violations or incidents must be similar to the violation being penalized. *See* CWA Section 309(d), 33 U.S.C. § 1319(d); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 864 (S.D. Miss. 1998) (considering whether defendants have committed similar violations in the past); *United States v. Scruggs*, 2009 WL 500608, at *5 (S.D. Tex. Feb. 26, 2009) (same); *United States v. Bedford*, 2009 WL 1491224, at *17 (E.D. Va. May 22, 2009) (same).

In its Order allowing the guilty pleas to be introduced during the trial, the Court noted that it would "accord that material such weight as it deems appropriate." Rec. Doc. 13867 at 6. As the Court found in ruling on BPXP's initial motion before the Phase 1 trial, the Grangemouth, Prudhoe Bay, and Texas City incidents are too dissimilar to the *Deepwater Horizon* incident to be relevant. *See* Rec. Doc. 5634 at 3–5 (parties "failed to demonstrate any substantial similarity between the prior incidents and the Macondo casualty"). The Court examined the differences between these same prior incidents and the *Deepwater Horizon* incident and found that Grangemouth, Texas City, and Prudhoe Bay were "remote in time" and "all land-based," and that "the circumstances of oil refinery disasters and a MODU exploratory drilling disaster are

vastly different." *Id.* at 5. Now that the guilty pleas have been admitted and can be reviewed by the Court, they confirm the lack of similarity and relevance of these same prior incidents.

Even if these four prior incidents were somehow similar to the *Deepwater Horizon* incident, their consideration still would be inappropriate because only Section 311 violations committed by the violator (BPXP) are relevant to the assessment of the "history of prior violations" factor. *See* FFCL ¶¶ 1175; Rec. Doc. 13475. None of the four prior incidents in question involved BPXP (the defendant and violator here) or deepwater drilling, and only one of the four prior incidents (the pipeline leak in Prudhoe Bay) involved a CWA violation.

## VIII. BPXP'S ROLE IN THE GULF REGION AND ITS TECHNOLOGICAL ADVANCEMENTS SUPPORT A LOW PENALTY.

BPXP's positive contributions to the economies of the Gulf states over a sustained period, plus its development and sharing of technological advancements in the industry, counsel in favor of this Court invoking the "other matters" factor in setting a CWA civil penalty at the low end of the statutory range. *See generally* FFCL ¶¶ 914–90. As the *CITGO* court recognized in evaluating CWA penalties, "It is only fair to view the role of [the violator] in the community and the state as a whole." 2011 WL 10723934.

### A. BPXP Occupies an Important Role in the U.S. and Gulf Coast Economies.

BPXP is a positive contributor to the regional economy. According to the United States, in Louisiana alone, BPXP's spending accounts for four percent of the local economy. Tr. 727, 780–81 (Mason). In total, BPXP spends approximately $5 billion on capital and operational expenditures each year—more than virtually any company operating in the region. Tr. 1575–81, 1584 (Morrison); 2085–87 (Scott). That spending supports the regional economy in myriad ways: capital spending on infrastructure, salaries and wages for 2,300 highly compensated employees, and payments to vendors, which in turn support 40,000 more jobs. Tr. 211–12, 217–

18 (D. Austin); 1572 (Morrison); 786 (Mason).

BPXP is also important to the Gulf of Mexico oil and gas industry. It has operated in the Gulf for more than 50 years and is known for its deepwater exploration. Tr. 1569–70 (Morrison). BPXP is the operator of over 500 leases and operates 10 deepwater drilling rigs. Tr. 1571–72 (Morrison). From 2009–13, BPXP paid the United States more than $5.4 billion in royalty, rental, and bonus payments. TREX 13067.0054. For the past 4–5 years, BPXP has been either the number one or number two deepwater oil producer in the Gulf, and between 2009–13, BPXP's share of Gulf oil production was 150% that of its next highest peer. Tr. 768–69 (Mason); 2095–96 (Scott); TREX 13067.0056–58.

**B. BPXP Funded Research Initiatives and Early Restoration Projects.**

BPXP has also made monetary commitments to the Gulf coast that have supported economic and environmental recovery and helped restore the public's confidence.[15] For example, BPXP committed $500 million to the Gulf of Mexico Research Initiative (GoMRI), which funds research that did not exist before the spill.[16] Tr. 1358 (Folse). BPXP also voluntarily committed $1 billion to fund early restoration projects. As of January 2015, BPXP and the Trustees had designated $698 million for 54 projects in the Gulf states. Tr. 1356 (Folse).

**C. BPXP Has Contributed to and Shared Technological Achievements and Industry-Leading Safety Advancements.**

Finally, BPXP has also contributed to advancements in spill response technology and shared these advancements globally. The United States acknowledged that BPXP and the Coast Guard worked together to explore and develop new technologies during the response, Tr. 660–62

[15] These monetary commitments are on top of the $14.2 billion that BPXP spent on spill response efforts, including the VOO program, tourism and seafood marketing grants, and the block grants to fund response costs.

[16] BPXP incorporates by reference its motion with respect to credit sought for GoMRI. Rec. Doc. 14201.

(VanHaverbeke), including advancements in *in situ* burning, booming, dispersant application, skimming, shoreline cleanup, and communications infrastructure. FFCL ¶¶ 972–74. After the spill, BPXP created the Global Deepwater Response Group—staffing it with senior engineers and managers, including BPXP Chairman and President Richard Morrison—to capture the learnings and share them with industry, regulators, and governments. BPXP also took steps to further improve the safety of drilling operations, including opening the Houston Monitoring Center and revising Engineering Technical Practices. At over 150 presentations in 30 countries, BPXP has shared information about advancements in spill response technology and drilling safety, among other topics. Tr. 1534, 1559–60 (Morrison); TREX 231104. Today, BPXP's Global Deepwater Response Group remains committed to sharing the lessons learned and continues to collaborate with organizations, regulators, and industry groups to ensure that those learnings are embedded in industry practice and preparedness. Tr. 1559–60, (Morrison) (BPXP received "[a] lot of recognition [from regulators] for what the teams had done to advance those capabilities"), 1564–65.

BPXP's actions show that it understands the seriousness of the Macondo spill and is fully deterred from risking another such event. In this circumstance, there is no need for enhanced additional fines.

**CONCLUSION**

For the reasons set forth above, the Court should set the penalty at the low end of the statutory range of the Clean Water Act.

March 27, 2015

Respectfully submitted,

*/s/ R. Keith Jarrett*
R. Keith Jarrett

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of March 2015.

*/s/ R. Keith Jarrett*
R. Keith Jarrett